Westlaw.

187 P.3d 424 Page 1
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

Supreme Court of California
Kirk CRAWFORD et al., Plaintiffs and Appellants,
v.
WEATHER SHIELD MFG., INC., Defendant and Appellant.

No. S141541.
July 21, 2008.

**Background:** Group of homeowners in housing development brought construction defect action against developer and window subcontractor, and developer cross-complained against subcontractor for attorney fees incurred in defending suit and indemnification. After jury trial and bench trial, the Superior Court, Orange County, Nos. 815154, 815156, 815182, and 816278,Raymond J. Ikola, J., entered judgment for no liability on part of subcontractor to homeowners, no liability on part of subcontractor to developer for developer's causes of action for breach of contract and express indemnity, but providing, by way of declaratory relief, determination that developer was entitled to be defended by subcontractor. Subsequently, the court granted new trial on strict product liability against subcontractor in light of new precedent allowing such cause of action. Subcontractor appealed and homeowners filed protective cross-appeals. The Court of Appeal affirmed new trial order and judgment, and dismissed cross-appeals as moot. Subcontractor appealed. The Supreme Court granted review, superseding the opinion of the Court of Appeal.

**Holdings:** The Supreme Court, Baxter, J., held that:
(1) subcontractor's duty to defend applied to suit alleging a covered claim, disapproving *Regan Roofing Co. v. Superior Court,* 24 Cal.App.4th 425, 29 Cal.Rptr.2d 413, and
(2) subcontractor's duty to defend arose when action was brought.

Affirmed.

Opinion, 38 Cal.Rptr.3d 787, superseded.

West Headnotes

**[1] Insurance 217 🔑2268**

217 Insurance
217XVII Coverage—Liability Insurance
217XVII(A) In General
217k2267 Insurer's Duty to Indemnify in General
217k2268 k. In general. Most Cited Cases

**Insurance 217 🔑2913**

217 Insurance
217XXIII Duty to Defend
217k2912 Determination of Duty
217k2913 k. In general; standard. Most Cited Cases

A liability insurer's duty to indemnify runs only to claims that are actually covered by the policy, while the duty to defend extends to claims that are merely potentially covered.

**[2] Insurance 217 🔑2919**

217 Insurance
217XXIII Duty to Defend
217k2916 Commencement of Duty; Conditions Precedent
217k2919 k. Tender or other notice. Most Cited Cases

**Insurance 217 🔑2921**

217 Insurance
217XXIII Duty to Defend
217k2920 Scope of Duty
217k2921 k. In general. Most Cited Cases

**Insurance 217 🔑2930**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 2
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

217 Insurance
217XXIII Duty to Defend
217k2930 k. Termination of duty; withdrawal. Most Cited Cases

A liability insurer's duty to defend is a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded, or until it has been shown that there is no potential for coverage.

**[3] Indemnity 208 31(7)**

208 Indemnity
208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(7) k. Duty to defend. Most Cited Cases

Parties to a contract, including a construction contract, may assign one party, pursuant to the contract's language, responsibility for the other's legal defense when a third party claim is made against the latter. West's Ann.Cal.Civ.Code § 2772.

**[4] Indemnity 208 27**

208 Indemnity
208II Contractual Indemnity
208k26 Requisites and Validity of Contracts
208k27 k. In general. Most Cited Cases

**Indemnity 208 31(7)**

208 Indemnity
208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(7) k. Duty to defend. Most Cited Cases

Parties to a contract have great freedom to allocate responsibilities for each other's legal defense of third party claims as they see fit, subject to public policy and established rules of contract interpretation. West's Ann.Cal.Civ.Code § 2778.

**[5] Indemnity 208 27**

208 Indemnity
208II Contractual Indemnity
208k26 Requisites and Validity of Contracts
208k27 k. In general. Most Cited Cases

**Indemnity 208 31(7)**

208 Indemnity
208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(7) k. Duty to defend. Most Cited Cases

When parties to a contract knowingly bargain for indemnity for the legal defense of third party claims, that protection should be afforded. West's Ann.Cal.Civ.Code § 2778.

**[6] Indemnity 208 30(1)**

208 Indemnity
208II Contractual Indemnity
208k26 Requisites and Validity of Contracts
208k30 Indemnitee's Own Negligence or Fault
208k30(1) k. In general. Most Cited Cases

Parties to a contract may agree that the promisor's indemnity and/or defense obligations to the other party will apply only if the promisor is negligent, or, conversely, even if the promisor is not negligent. West's Ann.Cal.Civ.Code § 2778.

**[7] Indemnity 208 31(7)**

208 Indemnity
208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(7) k. Duty to defend. Most Cited Cases

In general, an agreement establishing one party's responsibility for the other's legal defense when a third party claim is made against the latter is construed under the same rules as govern the interpretation of other contracts. West's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 3
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

Ann.Cal.Civ.Code § 2778.

**[8] Insurance 217 ⚷1832(1)**

217 Insurance
217XIII Contracts and Policies
217XIII(G) Rules of Construction
217k1830 Favoring Insureds or Beneficiaries; Disfavoring Insurers
217k1832 Ambiguity, Uncertainty or Conflict
217k1832(1) k. In general. Most Cited Cases

Ambiguities in a policy of insurance are construed against the insurer, who generally drafted the policy, and who has received premiums to provide the agreed protection.

**[9] Indemnity 208 ⚷31(7)**

208 Indemnity
208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(7) k. Duty to defend. Most Cited Cases

**Indemnity 208 ⚷33(5)**

208 Indemnity
208II Contractual Indemnity
208k33 Particular Cases and Issues
208k33(5) k. Contractors, subcontractors, and owners. Most Cited Cases

Under contract in which subcontractor agreed "to defend any suit or action" against developer "founded upon" any claim "growing out of the execution of the work," subcontractor was required to provide a defense to homeowners' construction defect action against developer, insofar as that suit was founded upon claims alleging damage or loss arising from subcontractor's negligent role in the project, even though it was later determined in the same litigation that subcontractor was not negligent; clause creating duty to defend covered any claim that alleged facts that would give rise to a duty of indemnity under separate indemnity clause. West's Ann.Cal.Civ.Code § 2778.

*See Annot., Liability of subcontractor upon bond or other agreement indemnifying general contractor against liability for damage to person or property (1976) 68 A.L.R.3d 7; Cal. Jur. 3d, Contribution and Indemnification, § 36 et seq.; Cal. Transactions Forms, Transactions, § 20:14 (Thomson/West 2003).*

**[10] Indemnity 208 ⚷31(7)**

208 Indemnity
208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(7) k. Duty to defend. Most Cited Cases

**Indemnity 208 ⚷43**

208 Indemnity
208II Contractual Indemnity
208k43 k. Accrual of duty to defend. Most Cited Cases

A contractual promise to "defend" another against specified claims is a promise to render, or fund, the service of providing a defense on the promisee's behalf, a duty that necessarily arises as soon as such claims are made against the promisee, and may continue until they have been resolved. West's Ann.Cal.Civ.Code § 2778(4).

**[11] Indemnity 208 ⚷43**

208 Indemnity
208II Contractual Indemnity
208k43 k. Accrual of duty to defend. Most Cited Cases

A contractual duty to defend another against specified claims necessarily arises as soon as such claims are made against the promisee, and may continue until they have been resolved. West's Ann.Cal.Civ.Code § 2778(4).

**[12] Indemnity 208 ⚷31(7)**

208 Indemnity

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 4
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(7) k. Duty to defend. Most Cited Cases

A contractual duty to defend another is different from a duty expressed simply as an obligation to pay another, after the fact, for defense costs the other has incurred in defending itself. West's Ann.Cal.Civ.Code § 2778(3, 4).

**[13] Indemnity 208 ⚷85**

208 Indemnity
208IV Conclusiveness of Former Adjudication
208k85 k. In general. Most Cited Cases

If a contractual indemnitor declines the indemnitee's tender of defense of a third party claim against the latter, the third party's later judgment against the indemnitee may be conclusive evidence, against the indemnitor, of the indemnitee's liability to the third party, and the amount thereof, while the indemnitee's good faith settlement of the third party claim may be presumptive evidence against the indemnitor on that issue. West's Ann.Cal.Civ.Code § 2778(5).

**[14] Indemnity 208 ⚷42**

208 Indemnity
208II Contractual Indemnity
208k42 k. Accrual of liability. Most Cited Cases

Where an indemnitor has breached its obligation to accept and assume the indemnitee's active defense against claims encompassed by the indemnity provision, an indemnitee who was thereby forced, against its wishes, to defend itself is entitled to reimbursement of the costs of doing so. West's Ann.Cal.Civ.Code § 2778(4).

**[15] Indemnity 208 ⚷31(7)**

208 Indemnity
208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(7) k. Duty to defend. Most Cited Cases

Statute specifying an indemnitor's duty "to defend" the indemnitee upon the latter's request places in every indemnity contract, unless the agreement provides otherwise, a duty to assume the indemnitee's defense, if tendered, against all claims embraced by the indemnity. West's Ann.Cal.Civ.Code § 2778(4).

**[16] Indemnity 208 ⚷43**

208 Indemnity
208II Contractual Indemnity
208k43 k. Accrual of duty to defend. Most Cited Cases

The default statutory duty to defend an indemnitee against all claims embraced by the indemnity arises immediately upon a proper tender of defense by the indemnitee, and thus before the litigation to be defended has determined whether indemnity is actually owed, regardless of the eventual outcome of that litigation. West's Ann.Cal.Civ.Code § 2778 (4).

**[17] Indemnity 208 ⚷31(7)**

208 Indemnity
208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(7) k. Duty to defend. Most Cited Cases

Claims embraced by an indemnity, as to which the indemnitor's default statutory duty to defend is owed, include those which, at the time of tender, allege facts that would give rise to a duty of indemnity, rather than only those claims as to which indemnity is actually owed. West's Ann.Cal.Civ.Code § 2778(4).

**[18] Indemnity 208 ⚷43**

208 Indemnity
208II Contractual Indemnity

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 5
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

208k43 k. Accrual of duty to defend. Most Cited Cases

Under contract in which subcontractor agreed "to defend any suit or action" against developer "founded upon" any claim "growing out of the execution of the work," subcontractor's obligation to provide a defense to homeowners' construction defect action against developer arose as soon as that action was brought, regardless of the later determination in the same litigation that subcontractor was not negligent; duty expressed by subcontractor's promise to defend did not require a final determination of the issues. West's Ann.Cal.Civ.Code § 2778.

**[19] Indemnity 208 ⚷33(5)**

208 Indemnity
208II Contractual Indemnity
208k33 Particular Cases and Issues
208k33(5) k. Contractors, subcontractors, and owners. Most Cited Cases

Clause in subcontractor agreement requiring subcontractor to indemnify contractor "against" defined claims clearly indicated that the indemnity obligation would apply only if contractor ultimately incurred such a legal consequence as a result of covered claims being resolved against it. West's Ann.Cal.Civ.Code § 2778.

**[20] Indemnity 208 ⚷90**

208 Indemnity
208V Actions
208k90 k. In general. Most Cited Cases

When a party sues one or more other persons, seeking to establish a contractual right to a defense against litigation not yet concluded, these issues may, if the parties agree, be deferred until the underlying litigation is complete. West's Ann.Cal.Civ.Code § 2778.

**[21] Judgment 228 ⚷181(19)**

228 Judgment
228V On Motion or Summary Proceeding
228k181 Grounds for Summary Judgment
228k181(15) Particular Cases
228k181(19) k. Contract cases in general. Most Cited Cases

If any party moves for summary judgment or adjudication with respect to a contractual duty to defend against litigation still in progress, the court may resolve legal issues then ripe for adjudication, such as whether any of the contracts at issue include a duty to defend, and, if so, whether the underlying suit or proceeding as to which a defense is sought falls within the scope of any of the parties' contractual duty to defend. West's Ann.Cal.Civ.Code § 2778.

**[22] Indemnity 208 ⚷90**

208 Indemnity
208V Actions
208k90 k. In general. Most Cited Cases

If a court finds that an ongoing contractual duty to defend is owed by one or more parties, but the affected parties, acting in good faith, then cannot agree on how such a defense should be provided or financed, the court may, in its discretion, permit the underlying litigation to proceed with counsel chosen and paid by the party to whom the duty is owed, subject to a later determination of how damages for breach of the duty to defend should be apportioned among the breaching parties. West's Ann.Cal.Civ.Code § 2778.

**[23] Indemnity 208 ⚷31(1)**

208 Indemnity
208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(1) k. In general. Most Cited Cases

Statute listing rules for interpretation of indemnity agreements is not confined in its application to insurance agreements. West's Ann.Cal.Civ.Code § 2778.

*****724** Sedgwick, Detert, Moran & Arnold, Christina J. Imre, Stephanie Rae Williams, Orly Degani and Maureen M. Home, Los Angeles, for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 6
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

Defendant and Appellant.

Summers & Shives and Robert V. Closson, San Diego, for California Framing Contractor's Association as Amicus Curiae on behalf of Defendant and Appellant.

Crawford & Bangs, E. Scott Holbrook, Jr., Covina, and Joshua J. Wes, Los Angeles, for American Subcontractors Association as Amicus Curiae on behalf of Defendant and Appellant.

Horvitz & Levy, Lisa Perrochet and John A. Taylor, Jr., Encino, for California Professional Association of Specialty Contractors, Pacific Rim Drywall Association and Southern California Contractors Association as Amici Curiae on behalf of Defendant and Appellant.

McAtee Harmeyer and Jeff G. Harmeyer, San Diego, for Jeld–Wen, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

Stephan, Oringher, Richman, Theodora & Miller, Theodora Oringher Miller & Richman, Harry W.R. Chamberlain, Los Angeles, and Robert M. Dato for American Architectural Manufacturers Association as Amicus Curiae on behalf of Defendant and Appellant.

Anderson & Kriger, Clayton Anderson, La Mesa, Philip Y. Kim, Santa Ana; and Richard H. Benes, San Diego, for Plaintiff and Appellant Kirk Crawford.

Kabateck & Garris, Kabateck Brown Kellner, Brian S. Kabateck, Alfredo Torrijos and Richard L. Kellner, Los Angeles, for Plaintiff and Appellant Parviz Alai.

Cooper, White & Cooper, Kathleen F. Carpenter, Walnut Creek, and Carol J. Stair, San Francisco, for California Building Industry Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Green & Hall, Brian C. Plante and Samuel M. Danskin, Santa Ana, for Capital Pacific Holdings, Inc., as Amicus Curiae on behalf of Plaintiffs and Appellants.

Newmeyer & Dillion, Thomas F. Newmeyer, Jay B. Freedman and Michael B. McClellan, Newport Beach, for Standard Pacific Corp., KB Home, The Irvine Company, Alexander Communities, Inc., Taylor Woodrow Homes, Inc., and William Lyon Homes, Inc., as Amici Curiae on behalf of Plaintiffs and Appellants.

BAXTER, J.

****427** [1][2] ***547** Standard comprehensive liability insurance policies provide that the insurer must both indemnify and defend the insured against claims within the scope of the policy coverage. The insurer's duty to defend is broader than its duty to indemnify. The latter duty runs only to claims that are actually covered by the policy, while the duty to defend extends to claims that are merely potentially covered. (E.g., *Buss v. Superior Court* (1997) 16 Cal.4th 35, 45–46, 65 Cal.Rptr.2d 366, 939 P.2d 766 *(Buss); Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295, 24 Cal.Rptr.2d 467, 861 P.2d 1153.) “The [insurer's] defense duty is a continuing one, arising on tender of defense and lasting until the underlying lawsuit*****725** is concluded [citation], or until it has been shown that there is *no* potential for coverage....” (*Montrose, supra,* at p. 295, 24 Cal.Rptr.2d 467, 861 P.2d 1153.)

Here, however, we address issues concerning the contractual duty to defend in a *noninsurance* context. We consider whether, by their particular terms, the provisions of a pre–2006 residential construction subcontract obliged the subcontractor to defend its indemnitee—the developer-builder of the project—in lawsuits brought against both parties, insofar as the plaintiffs' complaints *alleged* construction defects arising from the subcontractor's negligence, even though (1) a jury ultimately found that the subcontractor was not negligent, and (2) the parties have accepted an interpretation of the subcontract that gave the builder no right of *indemnity*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 7
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

unless the subcontractor was negligent. We conclude that the answer is yes. We will therefore affirm the judgment of the Court of Appeal.

**FACTS AND PROCEDURAL BACKGROUND**

The basic facts are not in dispute. J.M. Peters Co. (JMP) was the developer, builder, and general contractor of a large Huntington Beach residential project. Weather Shield Manufacturing Co., Inc. (Weather Shield), contracted with JMP to manufacture and supply wood-framed windows for the project. In the contract, Weather Shield promised (1) “to indemnify and save [JMP] harmless against all claims for damages ... loss, ... and/or theft ... growing ***548** out of the execution of [Weather Shield's] work,” *and* (2) “at [its] own expense to *defend any suit or action* brought against [JMP] *founded upon* the claim of such damage[,] ... loss or theft.” (Italics added.)

In September and October 1999, 220 owners of 122 finished homes in the project sued JMP, Weather Shield, and other participants in the project's construction. The defendants included Darrow the Framing Corporation (Darrow), the project's principal subcontractor, whose responsibilities included framing the structures and installing the windows. The complaints alleged numerous construction defects, including electrical, plumbing, roofing, chimney, framing, and other structural problems. As relevant here, they also asserted that, because of improper design, manufacture, and installation, windows****428** in the homes, including those supplied by Weather Shield, leaked and fogged, causing extensive damage. Theories of negligence, strict liability, breach of warranty, and breach of contract were set forth.FN1

FN1. The cases were consolidated for pretrial and trial purposes.

In April 2000, JMP cross-complained against Weather Shield, Darrow, and all the other project subcontractors sued by the homeowners. The cross-complaints asserted, among other things, that under the pertinent subcontract provisions—all of which had been drafted by JMP and were identical on the point—the subcontractors owed JMP duties of indemnity and defense against the homeowners' complaints. The cross-complaints sought declaratory relief with respect to JMP's alleged indemnity and defense rights.FN2

FN2. JMP's cross-complaints alleged that the cross-defendant subcontractors had a “present” duty to provide, and JMP had a “present” right to receive, a contractual defense. Each cross-complaint also recited that “[b]y way of this Cross–Complaint, [JMP] hereby tenders the defense of this action to the Cross–Defendants, and each of them, pursuant to the applicable subcontracts. [JMP] is informed and believed and based thereon alleges that the Cross–Defendants, and each of them have and/or will reject, ignore, or fail to properly accept the tender of defense.” The record is silent as to whether JMP had previously tendered defense of the homeowners' actions to the cross-defendant subcontractors, or any of them. Weather Shield does not urge on appeal that it was absolved of any duty to defend by reason of JMP's failure to timely tender the defense of the homeowners' actions.

*****726** JMP, and all the subcontractors except Weather Shield and Darrow, settled before trial. The “sliding scale” settlement agreement provided the homeowners a minimum payment of $2.55 million, and guaranteed an additional sum of $1.45 million against any recovery from the nonsettling subcontractors. The settling defendants also agreed to assist the homeowners in prosecuting their claims against the nonsettling parties. JMP and the settling subcontractors mutually released all claims, demands, and liabilities among themselves. All complaints and cross-complaints were dismissed except as to Weather Shield and Darrow.

***549** In July 2002, during final pretrial proceedings, Weather Shield moved to dismiss the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 8
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

homeowners' strict liability causes of action. The motion cited then extant case law holding that a subcontractor hired by a developer—even a subcontractor that supplied a component product rather than a service—could not be strictly liable for defects in mass-produced homes, unless the subcontractor also owned or controlled the housing development. (See, e.g., *Casey v. Overhead Door Corp.* (1999) 74 Cal.App.4th 112, 119–120, 87 Cal.Rptr.2d 603 *(Casey); La Jolla Village Homeowners' Assn. v. Superior Court* (1989) 212 Cal.App.3d 1131, 1146, 261 Cal.Rptr. 146 (*La Jolla Village* ).) The court granted the motion, subject to a reevaluation of prejudice in the event of an intervening change in the law.

The window leak and framing issues went to trial against Weather Shield and Darrow on the remaining theories of negligence and breach of warranty. In October 2002, the jury returned general verdicts against Darrow and in favor of Weather Shield. The jury awarded the homeowners approximately $1 million in damages against Darrow. Following the jury verdict, Darrow settled all the complaints against it.

Thereafter, in March 2003, JMP's cross-complaint against Weather Shield was separately tried to the court. JMP sought both (1) express indemnity for amounts paid to the homeowners in settlement, and (2) under the duty-to-defend provisions of Weather Shield's subcontract, attorney fees and expenses incurred by JMP in defending itself against the homeowners' suit.

The trial court ruled that the subcontract's terms obliged Weather Shield to indemnify JMP for amounts paid to the homeowners only if Weather Shield was found negligent. Thus, the court determined, the jury's verdict that Weather Shield was not negligent absolved Weather Shield of indemnity liability in this case. On the other hand, the court concluded, the subcontract did give Weather Shield responsibility for JMP's legal defense against the homeowners' claims, insofar as those claims concerned the windows supplied by Weather Shield, regardless of whether ****429** Weather Shield was ultimately found negligent.

JMP presented evidence that it had incurred $375,069 in attorney fees to defend the homeowners' claims, and that 70 percent of the homeowner settlement amount was attributable to the window problems. JMP therefore urged that, under their subcontracts, Weather Shield and Darrow were together liable for 70 percent of JMP's defense fees, or $262,548. The *****727** court apportioned this amount equally between Darrow and Weather Shield, and therefore awarded JMP $131,274 in damages against Weather Shield. The court also found Weather Shield contractually liable to JMP, as the prevailing party on JMP's cross-complaint, for $46,734 in attorney fees incurred by JMP to prosecute the cross-action.

***550** Meanwhile, in December 2002, this court held in *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 127 Cal.Rptr.2d 614, 58 P.3d 450 (*Jimenez* ) that, contrary to the teaching of such cases as *Casey, supra,* 74 Cal.App.4th 112, 87 Cal.Rptr.2d 603, and *La Jolla Village, supra,* 212 Cal.App.3d 1131, 261 Cal.Rptr. 146, the manufacturer or supplier of a component part installed in a mass-produced home may be held strictly liable when a defect in the component causes damage to other parts of the structure. (*Jimenez, supra,* at p. 484, 127 Cal.Rptr.2d 614, 58 P.3d 450.)

Following entry of judgment in this case in March 2003, the homeowners moved for a judgment notwithstanding the verdict (judgment NOV) ( Code Civ. Proc., §§ 629, 659) and a new trial (*id.,* §§ 657, 659) against Weather Shield. Among other things, the homeowners asserted that, under *Jimenez,* they were entitled to try their previously dismissed strict liability causes of action. In May 2003, the court denied the motion for a judgment NOV, but granted a new trial against Weather Shield on the issue of strict liability.

Weather Shield appealed (1) the new trial order, and (2) the declaratory relief judgment insofar

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 9
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

as it required Weather Shield to reimburse JMP's expense of defending the homeowners' action and prosecuting JMP's cross-complaint. Two of the groups of homeowner plaintiffs filed protective cross-appeals from the judgment against them, and in Weather Shield's favor, on the construction-defect claims. JMP did not appeal the order absolving Weather Shield from contractual indemnity liability for amounts paid by JMP to the homeowners.FN3

FN3. We were informed by the parties that, following the trial court judgment, JMP assigned all its rights thereunder to the homeowners. The homeowners then defended JMP's defense-cost award in the Court of Appeal. In this court as well, the homeowners have briefed the defense-cost issue as assignees of JMP's rights under the defense-cost award.

In a divided decision, the Court of Appeal affirmed the orders and judgments challenged by Weather Shield, and dismissed the cross-appeals as moot. On the issue of Weather Shield's liability for JMP's defense, regardless of its own negligence, the majority reasoned, in essence, that Weather Shield's promise “to defend” JMP against suits founded upon claims arising out of the execution of Weather Shield's work necessarily contemplated an immediate duty to provide a service, which duty arose at the time such a suit was brought and a defense was therefore needed. Thus, the majority concluded, the duty could not depend upon the outcome of issues to be litigated in the very action Weather Shield was obliged to defend.

The concurring and dissenting opinion argued that the contract language did not compel the majority's interpretation of the duty to defend. Moreover, the concurring and dissenting opinion urged, policy concerns weigh against allowing a builder or developer with superior bargaining power to impose contractual defense obligations on a nonnegligent subcontractor.

***551** Weather Shield sought review, raising both the new-trial and defense-cost issues. We granted review, limited to the following issue: Did a contract under which a subcontractor agreed “to defend any suit or action” against a developer “founded *****728** upon” any claim “growing out of the execution of the work” require the subcontractor to provide a defense to a suit against the developer even if the subcontractor****430** was not negligent? FN4 We turn to that issue.

FN4. Subsequent to our grant of review, an issue arose whether, despite our limitation of issues, the pendency of review precluded further proceedings in the trial court under the new trial order, the propriety of which order we did not intend to address. Concluding that there was no reason to delay the homeowners' strict-liability trial while we considered the defense-cost issue, we therefore dismissed review with respect only to the order granting a new trial on that issue, as affirmed by the Court of Appeal. We directed the Court of Appeal to issue a partial remittitur in accordance with the partial dismissal order.

## DISCUSSION

[3] Parties to a contract, including a construction contract, may define therein their duties toward one another in the event of a third party claim against one or both arising out of their relationship. Terms of this kind may require one party to *indemnify* the other, under specified circumstances, for moneys paid or expenses incurred by the latter as a result of such claims. (See Civ.Code, § 2772 [“Indemnity is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person.”].) FN5 They may also assign one party, pursuant to the contract's language, responsibility for the other's *legal defense* when a third party claim is made against the latter. (See *Mel Clayton Ford v. Ford Motor Co.* (2002) 104 Cal.App.4th 46, 49, 55, 127 Cal.Rptr.2d 759 (*Mel Clayton Ford* ).)

FN5. All further unlabeled statutory refer-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 10
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

ences are to the Civil Code.

[4][5][6] As befits the contractual nature of such arrangements, but subject to public policy and established rules of contract interpretation, the parties have great freedom to allocate such responsibilities as they see fit. (*E.L. White, Inc. v. City of Huntington Beach* (1978) 21 Cal.3d 497, 507, 146 Cal.Rptr. 614, 579 P.2d 505 *(E.L.White, Inc.)*; *Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1276–1277, 87 Cal.Rptr.2d 497 (*Heppler* ).) “When the parties knowingly bargain for the protection at issue, the protection should be afforded.” (*Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 633, 119 Cal.Rptr. 449, 532 P.2d 97 ( *Rossmoor* ); see *Heppler, supra,* at p. 1277, 87 Cal.Rptr.2d 497.) Hence, they may agree that the promisor's indemnity and/or defense obligations will apply only if the promisor was negligent, or, conversely, even if the promisor was not negligent. (*Heppler, supra,* at p. 1277, 87 Cal.Rptr.2d 497; *Continental Heller Corp. v. Amtech Mechanical Services, Inc.* (1997) 53 Cal.App.4th 500, 505, 61 Cal.Rptr.2d 668 *(Continental Heller)*; ***552***Peter Culley & Associates v. Superior Court* (1992) 10 Cal.App.4th 1484, 1492, 13 Cal.Rptr.2d 624 (*Peter Culley & Associates* ).)

[7] In general, such an agreement is construed under the same rules as govern the interpretation of other contracts. Effect is to be given to the parties' mutual intent (§ 1636), as ascertained from the contract's language if it is clear and explicit (§ 1638). Unless the parties have indicated a special meaning, the contract's words are to be understood in their ordinary and popular sense. (§ 1644; *Continental Heller, supra,* 53 Cal.App.4th 500, 504, 61 Cal.Rptr.2d 668; accord, *Centex Golden Construction Co. v. Dale Tile Co.* (2000) 78 Cal.App.4th 992, 996–997, 93 Cal.Rptr.2d 259 (*Centex Golden* ).)

[8] Though indemnity agreements resemble liability insurance policies, rules for *****729** interpreting the two classes of contracts do differ significantly. Ambiguities in a policy of insurance are construed against the insurer, who generally drafted the policy, and who has received premiums to provide the agreed protection. (See, e.g., *Buss, supra,* 16 Cal.4th 35, 47–48, 65 Cal.Rptr.2d 366, 939 P.2d 766; *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 37–38, 36 Cal.Rptr.2d 100, 884 P.2d 1048.) In noninsurance contexts, however, it is the *indemnitee* who may often have the superior bargaining power, and who may use this power unfairly to shift to another a disproportionate share of the financial consequences of its own legal fault. (E.g., *Goldman v. Ecco–Phoenix Elec. Corp.* (1964) 62 Cal.2d 40, 49, 41 Cal.Rptr. 73, 396 P.2d 377 (*Goldman* ); see *Regan Roofing Co. v. Superior Court* (1994) 24 Cal.App.4th 425, 436, 29 Cal.Rptr.2d 413 (*Regan Roofing* ).)

****431** This public policy concern influences to some degree the manner in which noninsurance indemnity agreements are construed. For example, it has been said that if one seeks, in a noninsurance agreement, to be indemnified for his or her own active negligence, or regardless of the indemnitor's fault—protections beyond those afforded by the doctrines of implied or equitable indemnity—language on the point must be particularly clear and explicit, and will be construed strictly against the indemnitee. (E.g., *E.L. White, Inc., supra,* 21 Cal.3d 497, 507, 146 Cal.Rptr. 614, 579 P.2d 505; *Rossmoor, supra,* 13 Cal.3d 622, 628, 119 Cal.Rptr. 449, 532 P.2d 97; *Goldman, supra,* 62 Cal.2d 40, 44, 41 Cal.Rptr. 73, 396 P.2d 377; *Centex Golden, supra,* 78 Cal.App.4th 992, 998, 93 Cal.Rptr.2d 259; *Heppler, supra,* 73 Cal.App.4th 1265, 1278, 87 Cal.Rptr.2d 497.)

For similar public policy reasons, statutory law imposes some absolute limits on the enforceability of noninsurance indemnity agreements in the construction industry. At the time Weather Shield contracted with JMP, a party to a construction contract could not validly agree to indemnify the promisee for the latter's *sole* negligence or willful misconduct. (§ 2782, subd. (a); see also § 1668.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 11
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

***553** Finally, section 2778, unchanged since 1872, sets forth general rules for the interpretation of indemnity contracts, "unless a contrary intention appears." If not forbidden by other, more specific, statutes, the obligations set forth in section 2778 thus are deemed included in every indemnity agreement unless the parties indicate otherwise. Several subdivisions of this statute touch specifically on the indemnitor's obligations with respect to the indemnitee's defense against third party claims.

In this regard, the statute first provides that a promise of *indemnity* against claims, demands, or liability "embraces the *costs of defense* against such claims, demands, or liability" insofar as such costs are incurred reasonably and in good faith. (§ 2778, subd. 3, italics added.) Second, the section specifies that the indemnitor "is bound, on request of the [indemnitee], *to defend* actions or proceedings brought against the [indemnitee] in respect to the matters embraced by the indemnity," though the indemnitee may choose to conduct the defense. (*Id.,* subd. 4, italics added.) Third, the statute declares that if the indemnitor declines the indemnitee's tender of defense, "a recovery against the [indemnitee] suffered by him in good faith, is conclusive in his favor against the [indemnitor]." (*Id.,* subd. 5.) On the other hand, section 2778 provides, if the indemnitor got no reasonable notice of the action or was not allowed to control the indemnitee's defense, recovery by the third party against the indemnitee is only presumptive *****730** evidence against the indemnitor. (*Id.,* subd. 6.)

[9] With these principles in mind, we examine the pertinent terms of Weather Shield's subcontract with JMP. We agree with the Court of Appeal majority that, even if strictly construed in Weather Shield's favor, these provisions expressly, and unambiguously, obligated Weather Shield to defend, from the outset, any suit against JMP insofar as that suit was "founded upon" claims *alleging* damage or loss arising from Weather Shield's negligent role in the Huntington Beach residential project. Weather Shield thus had a contractual obligation to defend such a suit even if it was later determined, as a result of this very litigation, that Weather Shield was not negligent.

We focus on the particular language of the subcontract. Its relevant terms imposed two distinct obligations on Weather Shield. First, Weather Shield agreed "to indemnify and save [JMP] harmless against all claims for damages to persons or to property and claims for loss, damage and/or theft ... growing out of the execution of [Weather Shield's] work." Second, Weather Shield made a separate and specific promise "at [its] own expense *to defend any suit or action* brought against [JMP] *founded upon* the claim of such damage ... loss, ... or theft." (Italics added.)

[10][11] A contractual promise to "defend" another against specified claims clearly connotes an obligation of active responsibility, from the outset, for the ***554** promisee's defense against such claims. The duty promised is to render, or fund, the *service* of providing a defense on the promisee's behalf****432** —a duty that necessarily arises as soon as such claims are made against the promisee, and may continue until they have been resolved. This is the common understanding of the word "defend" as it is used in legal parlance. (See, e.g., Black's Law Dict. (8th ed. 2004) p. 450, col. 2 ["2. To represent (someone) as an attorney ..."]; Merriam Webster's Collegiate Dict. (11th ed. 2004) p. 326, col. 1 ["3: to act as attorney for ..."]; Random House Webster's College Dict. (2d rev. ed. 2001) p. 348, col. 2 ["4. to serve as attorney for (a defendant) ..."]; American Heritage Dict. (4th ed. 2000) p. 475, col. 2 ["4. *Law* a. To represent (a defendant) in a civil or criminal action ..."].)

[12][13] A duty to defend another, stated in that way, is thus different from a duty expressed simply as an obligation to pay another, after the fact, for defense costs the other has incurred in defending itself. Section 2778, the statute governing the construction of all indemnity agreements, makes the distinction clear. On the one hand, as noted above, the section specifies that a basic con-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 12
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

tractual *indemnity* against particular claims, demands, or liabilities "embraces the costs of defense" against such claims, demands, or liabilities. (*Id.*, subd. 3.) On the other hand, the statute separately specifies the indemnitor's duty actually "to defend," upon the indemnitee's request, proceedings against the latter "in respect to the matters embraced by the indemnity," though "the person indemnified has the right to conduct such defenses if he chooses to do so." (*Id.*, subd. 4.) Finally, section 2778 sets forth how the indemnitor's obligations will be affected if the indemnitor fails to accept an indemnitee's tender of defense or, alternatively, if the indemnitor is denied an opportunity to assume and control the defense. (*Id.*, subds. 5, 6.) FN6

> FN6. Pursuant to subdivision 5 of section 2778, if a contractual indemnitor declines the indemnitee's tender of defense of a third party claim against the latter, the third party's later judgment against the indemnitee may be conclusive evidence, against the indemnitor, of the indemnitee's liability to the third party, and the amount thereof, while the indemnitee's good faith settlement of the third party claim may be presumptive evidence against the indemnitor on that issue. (See, e.g., *Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 791, 244 Cal.Rptr. 655, 750 P.2d 297; *Peter Culley & Associates, supra*, 10 Cal.App.4th 1484, 1495–1497, 13 Cal.Rptr.2d 624.) In other words, a contractual indemnitor's failure to assume the indemnitee's defense and, with it, control of the underlying litigation may restrict the indemnitor's later ability to separately litigate issues pertaining to its own *indemnity* liability. In this case, as indicated above, no issue is presented of the effect of JMP's settlement with the homeowners on Weather Shield's indemnity liability. We confront the separate question whether the express terms of Weather Shield's subcontract required Weather Shield, at its own expense, to assume JMP's defense, and, having failed to do so, to reimburse JMP after the fact for the latter's actual defense costs, *regardless* of Weather Shield's liability to indemnify JMP for amounts paid to the homeowners in settlement.

*****731** [14] ***555** By virtue of these statutory provisions, the case law has long confirmed that, unless the parties' agreement expressly provides otherwise, a contractual indemnitor has the obligation, upon proper tender by the indemnitee, to accept and assume the indemnitee's active defense against claims encompassed by the indemnity provision. Where the indemnitor has breached this obligation, an indemnitee who was thereby forced, against its wishes, to defend itself is entitled to reimbursement of the costs of doing so.

Thus, in *Safeway Stores, Inc. v. Massachusetts Bonding & Ins. Co.* (1962) 202 Cal.App.2d 99, 20 Cal.Rptr. 820 (*Safeway Stores* ), one King undertook, by written agreement, to act as general contractor in the construction of a new Safeway store. The agreement included King's obligation to indemnify Safeway against any claims, demands, or suits for damage, loss, or injury " 'result [ing] from or occur[ring] in connection with the performance of [the] contract.' " (*Id.*, at p. 105, 20 Cal.Rptr. 820.) Construction workers employed by King sued Safeway for injuries they sustained when recently installed roof trusses collapsed. The workers alleged that Safeway had negligently permitted the installation of trusses it knew to be defective. King offered Safeway a defense, which Safeway initially accepted. However, it thereafter became apparent that the attorney furnished by King was serving King's conflicting interests; in discussions between the parties, King indicated he would deny indemnity liability if Safeway was found ****433** negligent. Safeway thereupon retained its own attorney to defend the workers' action, and later sought reimbursement of its defense costs from King.

The Court of Appeal agreed with Safeway. The court noted that "under the contract of indemnity,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 13
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

no contrary intent appearing, *King was bound to defend the actions.* (Civ.Code, § 2778, subd. 4.)” (*Safeway Stores, supra,* 202 Cal.App.2d 99, 114, 20 Cal.Rptr. 820, italics added.) However, the court reasoned, in light of the obvious conflict between Safeway's litigation interests and King's position on the indemnity issue, Safeway had reasonably inferred that, despite King's technical proffer, King did not intend to honor his contractual obligation to provide Safeway with a complete defense. Under these circumstances, the court concluded, Safeway did not act as a volunteer in assuming its own defense, and was entitled to reimbursement for King's breach of the duty to defend.

Similarly, in *Buchalter v. Levin* (1967) 252 Cal.App.2d 367, 60 Cal.Rptr. 369, the court acknowledged that subdivision 4 of section 2778 “establishes an indemnitor's obligation to *defend* the indemnitee *upon* ******732*** *request, even though the indemnity agreement does not expressly so provide.* ...” (*Buchalter, supra,* at p. 374, 60 Cal.Rptr. 369, italics added.) However, the court concluded, the subdivision's provision that the indemnitee may “conduct his own defense ‘if he chooses to do so’ ” (*ibid.*) does not mean the indemnitee ordinarily may ***556** refuse the indemnitor's good faith proffer of a complete defense, then still collect reimbursement from the indemnitor for the defense costs the indemnitee has voluntarily incurred. (*Id.*, at pp. 374–375, 60 Cal.Rptr. 369; cf. *Goodman v. Severin* (1969) 274 Cal.App.2d 885, 897, 79 Cal.Rptr. 555.)

In *Gribaldo, Jacobs, Jones & Associates v. Agrippina Versicherunges A.G.* (1970) 3 Cal.3d 434, 91 Cal.Rptr. 6, 476 P.2d 406 (*Gribaldo* ), a majority of this court carefully distinguished between the “costs of defense” described in subdivision 3 of section 2778, on the one hand, and the duty “to defend” the indemnitee, as set forth in subdivision 4 of the statute, on the other. There, an errors and omissions indemnity policy provided for a deductible of $2,500, said nothing about a duty to defend, gave the underwriters the *right* to assume the insureds' defense, specified that the insureds need not contest any legal claim unless counsel mutually chosen by the parties advised otherwise, and prohibited either party from settling a claim against the insureds without the other's consent. The policy further stated that if the insureds refused a settlement offer against the underwriters' recommendation, and elected to contest the claim further, the underwriters' liability would not exceed the amount for which the claim could have been settled, plus costs and expenses incurred by the insureds with the underwriters' consent.

After the insureds settled a third party claim, they sought declaratory relief against the underwriters on the issue of liability for defense costs. The insureds contended that under subdivision 4 of section 2778, the policy included, and the underwriters had breached, an “actual duty to defend” (*Gribaldo, supra,* 3 Cal.3d 434, 441, 91 Cal.Rptr. 6, 476 P.2d 406) any claim, of a type covered by the policy, in which the *initial demand* exceeded the $2,500 deductible. Hence, the insureds insisted, the underwriters were now obliged to pay the insureds' costs of defending such claims in full, regardless of the amounts for which the claims were actually resolved.

The trial court disagreed. It reasoned that, under the particular terms of the policy, the underwriters were not obliged to defend the insureds. Hence, the court concluded, any liability of the underwriters for the insureds' defense costs arose solely under subdivision 3 of section 2778, as part of any indemnity the underwriters otherwise owed the insureds. That obligation, the court held, applied only to costs incurred by the insureds to defend claims “embraced within the provisions of the policy, that is, those claims in excess of $2,500 actually paid by [the insureds].” (*Gribaldo, supra,* 3 Cal.3d 434, 441, 91 Cal.Rptr. 6, 476 P.2d 406.)

***557** This court affirmed. The majority agreed “that under the provisions of subdivision 4 of section 2778 the indemnitor is required to defend matters embraced by the indemnity if ... requested to do

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 14
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

so by the indemnitee." ****434**(*Gribaldo, supra,* 3 Cal.3d 434, 448, 91 Cal.Rptr. 6, 476 P.2d 406.) However, the majority noted, the policy at issue indicated a contrary intent, as section 2778 permits. By its plain terms, the policy *allowed* the underwriters, at *their option,* to assume the insureds' defense, and it "require [d] [the insureds] to defend claims where so advised by counsel." (*Ibid.*) Moreover, the majority noted, *****733** even assuming the policy did not, at the outset, exclude a duty to defend, the insureds had, contrary to the policy, incurred defense costs without first obtaining the underwriters' consent, and had failed, as required by subdivision 4 of section 2778, to *request* a defense. (*Gribaldo, supra,* at pp. 448–449, 91 Cal.Rptr. 6, 476 P.2d 406.)

Accordingly, the majority reasoned, the underwriters had breached no duty under subdivision 4 of section 2778 to defend any and all claims in which the demand exceeded the $2,500 deductible. Instead, the majority concluded, the trial court had acted correctly in calculating the underwriters' defense-cost liability under subdivision 3 of the statute. Under the latter provision, the majority held, the underwriters' defense-cost liability was limited to the insureds' expense of defending claims as to which the underwriters otherwise owed indemnity—i.e., those claims actually paid by the insureds in amounts exceeding the $2,500 deductible. (*Gribaldo, supra,* 3 Cal.3d 434, 447–450, 91 Cal.Rptr. 6, 476 P.2d 406.)

Recently, *City of Watsonville v. Corrigan* (2007) 149 Cal.App.4th 1542, 58 Cal.Rptr.3d 458 observed once again that subdivision 4 of section 2778 "describes the indemnitor's duty *to defend* ... actions or proceedings brought against the indemnitee if the latter requests the defense." (*City of Watsonville, supra,* at p. 1549, 58 Cal.Rptr.3d 458, original italics.) However, the Court of Appeal held that by failing to request a defense, or to notify the indemnitor of the third party action, and by unilaterally deciding to conduct its own defense, the indemnitee does not necessarily forfeit its contractual right to reimbursement of its defense *costs* under the *indemnity* provisions of subdivision 3 of the statute.

[15] Thus, as these decisions indicate, subdivision 4 of section 2778, by specifying an indemnitor's duty "to defend" the indemnitee upon the latter's request, places in every indemnity contract, unless the agreement provides otherwise, a duty to assume the indemnitee's defense, if tendered, against all claims "embraced by the indemnity." The indemnitor's failure to assume the duty to defend the indemnitee upon request (§ 2778, subd. 4) may give rise to damages in the form of reimbursement of defense costs the indemnitee was ***558** thereby forced to incur. But this duty is nonetheless distinct and separate from the contractual obligation to pay an indemnitee's defense costs, after the fact, as part of any indemnity owed under the agreement. (*Id.*, subd. 3.)

[16][17] Implicit in this understanding of the duty to defend an indemnitee against all claims "embraced by the indemnity," as specified in subdivision 4 of section 2778, is that the duty arises immediately upon a proper tender of defense by the indemnitee, and thus before the litigation to be defended has determined whether indemnity is actually owed. This duty, as described in the statute, therefore cannot depend on the outcome of that litigation. It follows that, under subdivision 4 of section 2778, claims "embraced by the indemnity," as to which the duty to defend is owed, include those which, at the time of tender, *allege* facts that would give rise to a duty of indemnity.[FN7] Unless the indemnity*****734** agreement states otherwise, the statutorily described duty "to defend" the indemnitee upon tender of the defense thus extends to all such claims.

FN7. We do not suggest that the indemnitor's duty to defend would *continue* even if, during the progress of the third party proceeding against the indemnitee, all claims potentially subject to the contractual indemnity obligation were eliminated, or if

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 15
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

the promisor otherwise conclusively established that the claims were not among those "embraced by the indemnity" ( § 2778, subd. 4). Such issues are not before us, and we express no views thereon.

[18] Here, the subcontract at issue not only failed to limit or exclude Weather Shield's duty "to defend" JMP, as otherwise provided by subdivision 4 of section 2778, it confirmed this duty. In language similar to that of the statute, the subcontract explicitly obligated Weather Shield both to *indemnify* ****435** JMP against certain claims, and "at [its] own expense *to defend* " JMP against "any suit or action ... founded upon" such claims. (Italics added.) The duty "to defend" expressly set forth in Weather Shield's subcontract thus clearly contemplated a duty that arose when such a claim was made,FN8 and was not dependent on whether the very litigation to be defended later established Weather Shield's obligation to pay indemnity.

FN8. Unlike subdivision 4 of Civil Code section 2778, Weather Shield's subcontract did not expressly condition the duty "to defend" upon the indemnitee's *request* for a defense. In any event, as noted above (fn.1, *ante* ), Weather Shield does not contend it was absolved of a duty to defend on account of any failure by JMP to make such a request.

Moreover, the subcontract at issue included a further express indication that the express duty "to defend" actions against JMP was not strictly limited to those claims on which, in the end, Weather Shield actually owed indemnity. The indemnity and defense clauses of the subcontract contained linguistic differences that conform to the logical distinctions between the two duties. On the one hand, the subcontract obligated Weather Shield to "indemnify ... [JMP] ... against" all claims for injury, damage, loss, or theft arising from performance of the subcontract, while, on the other, it required Weather ***559** Shield "to defend *any suit or action* ... against [JMP] *founded upon* the claim" of such injury, damage, loss, or theft. (Italics added.)

[19] One can only indemnify against "claims for damages" that have been resolved against the indemnitee, i.e., those as to which the indemnitee has actually sustained liability or paid damages. Indemnification, after all, is the act of saving another from the legal *consequence* of an act. ( § 2772.) Hence, a clause requiring Weather Shield to indemnify JMP "against" defined claims clearly indicated that the indemnity obligation would apply only if JMP ultimately incurred such a legal consequence as a result of covered claims.

By contrast, as noted above, the subcontract required Weather Shield "to defend" JMP against " *any suit or action* ... *founded upon* the claim of such damage...." (Italics added.) Under this language, the duty to defend arose, as it logically must, as soon as a "suit or action" was brought against JMP that was "founded upon" a covered claim, i.e., that asserted a claim within the coverage of both clauses. Necessarily, a duty expressed in this manner did not require a final determination of the issues, including the issue of Weather Shield's negligence, before Weather Shield was required to mount and finance a defense on JMP's behalf.

The Court of Appeal majority so concluded. Dissenting on this point, Justice O'Leary conceded at the outset that "the word 'defend,' as defined in the abstract, would ordinarily mean providing legal services for a pending claim." Nonetheless, she stressed, noninsurance indemnity contracts, unlike liability insurance policies, *****735** are construed to limit the obligations imposed, and the duties undertaken must be stated with particular clarity and specificity. Examined in that light, she asserted, Weather Shield's subcontract did not make absolutely clear that Weather Shield's duty to defend, unlike its duty to indemnify, arose regardless of its negligence.

To conclude that, absent greater specificity, the indemnity and defense obligations stated in the subcontract both required a finding of Weather Shield's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 16
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

negligence, Justice O'Leary reasoned as follows: The indemnity and defense obligations in Weather Shield's subcontract were "described in a single sentence" with two clauses. The first clause, stating the indemnity obligation, covered " 'claims for damages ... growing out of the execution of [Weather Shield's] work....' Everyone (the litigants, trial court, and majority) seems to agree [that] matters embraced by this indemnity clause [were] narrowly limited to damages *caused* by [Weather Shield's] own ***560** *negligent* work on the project." (Original italics.) The second clause, defining the defense duty, confined that responsibility to suits or actions founded upon " 'the claim of such damage....' The qualifying phrase, 'claim of such damage' clearly refer[red] to the earlier language limiting the scope of claims embraced by the indemnity, i.e., 'all claims for damages ... growing out of the execution of the work[.]' ****436** Therefore, both obligations appear to be dependent on the same coverage terms."

But Justice O'Leary's analysis overlooks the clear differences in the two clauses that we have described above. In particular, Weather Shield's express contractual duty to defend suits "founded upon" the kinds of claims specified in the agreement necessarily extended to suits that *alleged* such claims, not just suits in which they were proven. Assuming, as we must, that Weather Shield's subcontract obligated it to indemnify JMP against claims arising from Weather Shield's negligent performance of the subcontract, it follows that Weather Shield's contractual duty to defend JMP encompassed suits or actions that alleged such negligence on Weather Shield's part. Weather Shield could not avoid this duty on the ground that the very litigation to be defended might later result in a finding Weather Shield was, in fact, not negligent.

Parties to an indemnity contract can easily disclaim any responsibility of the indemnitor for the indemnitee's defense, or the costs thereof. Short of that, they can specify that the indemnitor's sole defense obligation will be to reimburse the indemnitee for costs incurred by the latter in defending a particular claim. However, the instant subcontract did neither. On the contrary, it specified that Weather Shield would be required, "at [its] own expense," to "defend" JMP against suits "founded upon" claims arising from Weather Shield's performance of its subcontract. This language indicated a more immediate obligation, one that would necessarily arise before the litigation to be defended could determine whether Weather Shield owed indemnity to JMP.

In arguing otherwise, Weather Shield relies heavily on *Heppler, supra,* 73 Cal.App.4th 1265, 87 Cal.Rptr.2d 497. There, in connection with another of JMP's large residential construction projects, Mueller–Lewis Concrete (Mueller) signed a JMP-drafted subcontract containing indemnity and defense clauses identical to those at issue here. Homeowners sued JMP, Mueller, and others for construction defects. Mueller declined JMP's tender of defense. In a global settlement, JMP assigned its contractual rights against Mueller to plaintiff homeowners. As JMP's *****736** assignees, they sought to recover against Mueller under both the indemnity and defense provisions. The defect, indemnity, and defense issues went to trial against Mueller. The trial court ruled that plaintiffs must prove negligence and causation against Mueller in order to trigger Mueller's contractual indemnity obligations. The jury returned a general verdict for Mueller.

***561** On appeal, plaintiffs challenged the lower court's ruling that Mueller's negligence was a prerequisite to its contractual duty of indemnity. The Court of Appeal affirmed the judgment in Mueller's favor. For a number of reasons, the court concluded that the language of the subcontract triggered Mueller's indemnity obligation only if Mueller itself was found negligent. (*Heppler, supra,* 73 Cal.App.4th 1265, 1275–1281, 87 Cal.Rptr.2d 497.) FN9

FN9. This aspect of the ruling in *Heppler, supra,* 73 Cal.App.4th 1265, 87 Cal.Rptr.2d 497, may be what has dis-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 17
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

suaded the homeowners in this case, acting in JMP's stead, from challenging on appeal the trial court's ruling that the identical indemnity clause in Weather Shield's subcontract required Weather Shield's negligence as a condition of its indemnity liability.

However, the plaintiffs in *Heppler* did not contend that, even if the indemnity clause in Mueller's subcontract was triggered only by Mueller's actual negligence, the duty-to-defend clause applied more broadly. Accordingly, the *Heppler* court never separately addressed the defense clause of the subcontract, or considered how the particular language of that clause might distinguish it from the indemnity clause. In affirming the general verdict for Mueller, the court simply assumed that the indemnity and defense provisions of the subcontract were congruent.[FN10]

FN10. This assumption is confirmed by *Baldwin Builders v. Coast Plastering Corp.* (2005) 125 Cal.App.4th 1339, 24 Cal.Rptr.3d 9, where the same Court of Appeal panel broadly stated the holding of *Heppler* as being that "an indemnitor/subcontractor generally will not be liable *or have a duty to defend its general contractor* pursuant to the terms of an indemnity agreement unless it was negligent in performing its work under the subcontract." (*Baldwin Builders, supra,* at p. 1347, 24 Cal.Rptr.3d 9, italics added.) But this passage in *Baldwin Builders* is dictum; the case had nothing to do with an indemnitor's duty, regardless of fault, to defend its indemnitee. The sole question was whether, having proved in the underlying construction defect litigation that it was not negligent, and thus owed no indemnity under the terms of its subcontract, the subcontractor/indemnitor could recover, under the contractual attorney-fee reciprocity statute (§ 1717, subd. (a)), its attorney fees incurred in so establishing. The Court of Appeal concluded that the answer was yes, reasoning that these were fees expended by the subcontractor/indemnitor to enforce the indemnity agreement itself, i.e., to prove that it owed no contractual indemnity.

****437** Here, by contrast, we directly confront the relationship, and the distinctions, between the two clauses. Upon examination, as explained above, their language differs in a way suggesting that, even if the indemnity obligation is triggered only by an ultimate finding of the indemnitor's fault, the defense obligation applies before, and thus regardless of, any finding to be made in the course of the litigation for which a defense is owed. Hence, whatever *Heppler's* merits on the issues actually considered in that case, we do not find the decision helpful or persuasive on the narrow question before us.

Similarly, *Goldman, supra,* 62 Cal.2d 40, 41 Cal.Rptr. 73, 396 P.2d 377, cited by Weather Shield, is of little use in construing the particular defense clause at issue in this case. Our opinion *noted* a duty-to-defend clause, phrased in language different from that we address here, that might bind the subcontractor in that case. (See *****737 *562***id.,* at pp. 42–43, fn. 2, 41 Cal.Rptr. 73, 396 P.2d 377). We also indicated that the indemnitee had demanded both indemnity and a defense from the subcontractor. (*Id.,* at p. 42, 41 Cal.Rptr. 73, 396 P.2d 377.) However, our decision addressed only the subcontractor's duties under the separate indemnity clause at issue in the case. Our holding was simply that if one seeks contractual indemnity protection for his or her own active negligence, the language providing such protection must be particularly clear and explicit. (*Id.,* at p. 44, 41 Cal.Rptr. 73, 396 P.2d 377.) Here, upon close examination of Weather Shield's subcontract, we find it did clearly and explicitly create a defense duty not dependent on the ultimate resolution of issues, such as Weather Shield's fault, that would only be determined after the duty arose.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 18
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

Nor, under close examination, is *Mel Clayton Ford, supra,* 104 Cal.App.4th 46, 127 Cal.Rptr.2d 759, helpful to Weather Shield's cause. Weather Shield suggests *Mel Clayton Ford* stands for the proposition that a duty-to-defend clause in a noninsurance agreement does not extend to mere allegations that would trigger an indemnity obligation only if proven. We do not so interpret the decision. In our view, Weather Shield takes out of context the passage on which it relies.

In *Mel Clayton Ford,* an agreement between a vehicle manufacturer and its retail dealer specified that the manufacturer would defend and indemnify the dealer against any third party suits, complaints, or claims " ' *concerning* ... injury or ... damage arising out of an occurrence caused *solely* by' " a manufacturing or design defect in a vehicle supplied to the dealer by the manufacturer. (*Mel Clayton Ford, supra,* 104 Cal.App.4th 46, 49, 127 Cal.Rptr.2d 759, italics added.) Thus, the manufacturer excluded from its defense obligation any suit or claim that alleged dealer negligence, or any theory other than manufacturing or design defect, as a sole or contributing cause of the injury or damage.

In 1989, the plaintiff purchased from the dealer a truck supplied by the manufacturer. Thereafter, the dealer performed maintenance on the vehicle. In 1997, while the plaintiff was driving the truck, it burst into flames, seriously injuring him. He sued both the manufacturer and the dealer, alleging not only a defectively designed and manufactured product, but also claims based on failure to warn, breach of warranty, and " 'theories of [the dealer's] direct or active negligence in the maintenance of the vehicle.' " (*Mel Clayton Ford, supra,* 104 Cal.App.4th 46, 50, 127 Cal.Rptr.2d 759.)

The Court of Appeal held that the manufacturer had no duty to undertake the dealer's defense under such circumstances. This was because "[t]he indemnity provision required [the manufacturer] to defend the Dealer only where the occurrence was caused *solely* by a production defect, and not ***563** whenever product liability was *one of the allegations****438*** of the underlying complaint." (*Mel Clayton Ford, supra,* 104 Cal.App.4th 46, 55, 127 Cal.Rptr.2d 759, second italics added.)

Thus, in *Mel Clayton Ford,* it was not an allegations-versus-proof distinction that negated the duty to defend. Rather, given the word "solely" in the indemnity/defense clause there at issue, the crucial fact was that the suit for which a defense was sought included allegations *other than* those to which the manufacturer had limited its defense duty—design or production defects attributable to the manufacturer itself.[FN11]

FN11. To the extent there is any ambiguity in *Mel Clayton Ford's* holding on this point, it cannot be resolved by further examination of the Court of Appeal's opinion in that case. Except for the summary passage quoted above, the Court of Appeal's discussion of this interpretive issue appeared in the unpublished portion of its partially published opinion.

*****738** Here, Weather Shield's contractual duty was not similarly limited. Weather Shield promised to defend JMP against any suit "founded upon" a "claim of ... damage" "growing out of the execution of [Weather Shield's] work." The contract did not specify, or even hint, that no defense duty would exist unless the suit was *solely* concerned with Weather Shield's performance under its own subcontract and included no other claims or allegations. Nor does Weather Shield so claim. Hence, nothing decided in *Mel Clayton Ford* establishes that until Weather Shield's faulty performance of its work was proven, it had no duty to defend JMP.

Finally, we are not persuaded by *Regan Roofing, supra,* 24 Cal.App.4th 425, 29 Cal.Rptr.2d 413, insofar as that decision suggests that a contractual duty to defend specified classes of claims, expressed in such terms, necessarily depends on the promisor's ultimate liability for indemnity on those claims.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 19
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

In *Regan Roofing,* after a housing developer, Pacific Scene, was sued for construction defects, it cross-complained against numerous project subcontractors to establish its contractual indemnity and defense rights. Each of these agreements required the subcontractor to indemnify Pacific Scene against all mechanic's liens related to the subcontractor's work, as well as " 'any other liability, cost or expense of any nature or kind arising out of or in any way connected with Subcontractor's performance, ... save and except only such liability, cost or expense caused by [Pacific Scene's] sole negligence or sole willful misconduct.' " (*Regan Roofing, supra,* 24 Cal.App.4th at p. 430, 29 Cal.Rptr.2d 413, italics added.) " 'Pursuant to the ... foregoing,' " the subcontracts declared, " 'Subcontractor shall indemnify and hold harmless [Pacific Scene] from any costs and expenses for attorney's fees ... resulting to [Pacific Scene] from such claims or liens.' " (*Ibid.,* italics omitted.) Finally, each agreement separately provided that " '[i]n the event any suit on any claim is ***564** brought against [Pacific Scene], subject to the provision, Subcontractor shall defend said suit at Subcontractor's own cost and expense....' " (*Ibid.,* italics omitted.)

Pacific Scene sought pretrial summary adjudication of a number of issues, including rulings on the subcontractors' duties to indemnify and defend. The trial court determined that the indemnity provision of the subcontracts included coverage for Pacific Scene's own negligence. However, the court found that the question whether the subcontractors actually owed indemnity was premature, because, among other things, Pacific Scene had not yet incurred liability or paid claims subject to indemnity. On the other hand, the court concluded, under the language of the agreements and section 2778, each subcontractor did have an immediate duty to defend claims " 'brought against [Pacific Scene] in respect to matters embraced by the indemnity clause.' " (*Regan Roofing, supra,* 24 Cal.App.4th 425, 432, 29 Cal.Rptr.2d 413.)

The Court of Appeal reversed on the latter point. The appellate court indicated that "summary adjudication of the duty to defend and its relationship to the duty to indemnify (i.e., the scope of 'the matters embraced by the indemnity') is premature. No determination has yet been made as to whether the subcontractors were negligent in the performance of their work, giving rise to a duty to indemnify *and a related duty to defend.* Pacific Scene has not *****739** clearly established that under this indemnity clause, the duty to defend****439** against claims of liability is entirely free-standing of the duty to indemnify for liability arising out of a subcontractor's negligence. [Citation.]" (*Regan Roofing, supra,* 24 Cal.App.4th 425, 436, 29 Cal.Rptr.2d 413, italics added.)

In reaching this conclusion, however, the Court of Appeal erred. The court seems to have assumed that, under subdivision 4 of section 2778, and unless the agreement at issue clearly provides otherwise, an indemnitor's duty to defend the indemnitee upon request in matters "embraced by the indemnity" is not, in the court's words, "free-standing," but extends only to claims as to which indemnity is actually owed. (*Regan Roofing, supra,* 24 Cal.App.4th 425, 436, 29 Cal.Rptr.2d 413.) And the court found no such explicit contrary intent in the subcontracts there under consideration.

However, as we have explained, the duty to defend upon the indemnitee's request, as set forth in subdivision 4 of section 2778, *is* distinct from, and broader than, the duty expressed in subdivision 3 of the statute to reimburse an indemnitee's defense costs as part of any indemnity otherwise owed. Moreover, the subcontracts at issue in *Regan Roofing,* like the one before us here, did explicitly indicate a separate and distinct duty to defend the indemnitee, at the indemnitor's own cost and expense, against *suits raising claims* covered by the indemnity. That duty—like Weather Shield's in this ***565** case—necessarily arose when such a claim was made against the indemnitee, and thus did not depend on whether the conditions of indemnity were, or were not, later established.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 20
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

[20][21][22] *Regan Roofing* was therefore mistaken insofar as it concluded that, under the agreements there at issue, the subcontractors' defense duties arose only if the subcontractors became liable for indemnity. We will disapprove the *Regan Roofing* decision to that extent.[FN12]

FN12. We realize that *Regan Roofing's* finding of prematurity was also substantially influenced by the practical difficulties of sorting out multiple, and potentially conflicting, duties to assume the active defense of litigation then in progress. (See *Regan Roofing, supra,* 24 Cal.App.4th 425, 437, 29 Cal.Rptr.2d 413.) Weather Shield and its amici curiae raise similar concerns. But the case before us does not present such problems. JMP cross-complained against Weather Shield and other subcontractors on indemnity and duty-to-defend issues, but the trial on these issues was postponed until after most of the subcontractors had settled with JMP, and after the underlying construction defect litigation against the remaining parties, including Weather Shield, was concluded. Thus, while the trial court correctly held that Weather Shield's contractual duty to defend *arose* when a suit *alleging* covered claims was brought against JMP, and that the duty thus did not depend on whether the conditions for indemnity were later established, the court was able to assess *after the fact* Weather Shield's proportionate liability for breach of its duty to defend.

The instant parties apparently saw no impropriety in this procedure, and neither do we. At least with respect to pre–2006 residential construction subcontracts, and subject to any future contrary or inconsistent legislation, the following procedures seem appropriate: When a party sues one or more other persons, seeking to establish a contractual right to a defense against litigation not yet concluded, these issues may, if the parties agree, be deferred until the underlying litigation is complete. If any party moves for summary judgment or adjudication (Code Civ. Proc., § 437c) with respect to the duty to defend against litigation still in progress, the court may proceed as it deems expedient. For example, the court may resolve legal issues then ripe for adjudication, such as whether any of the contracts at issue include a duty to defend, and, if so, whether the underlying suit or proceeding as to which a defense is sought falls within the scope of any of the parties' contractual duty to defend. If the court finds that an ongoing duty to defend is owed by one or more parties, but the affected parties, acting in good faith, then cannot agree on how such a defense should be provided or financed, the court may, in its discretion, permit the underlying litigation to proceed with counsel chosen and paid by the party to whom the duty is owed, subject to a later determination of how damages for breach of the duty to defend should be apportioned among the breaching parties.

*****740** Weather Shield and its amici curiae raise numerous, and substantial, policy concerns about an indemnity agreement that requires a subcontractor to defend a residential developer or builder in a construction defect suit before, and regardless of whether, the subcontractor itself is found to be at fault. Arguments asserted include the following: Large builders and developers use their superior bargaining power, and self-drafted contract terms, unfairly to shift the financial consequences of their own legal liability to faultless subcontractors, who are not compensated****440** for the risk and agree only because ***566** they need the work.[FN13] Such shifting discourages builders and developers

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 21
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

themselves from taking proper care in construction oversight. Small subcontractors, moreover, lack the resources to fund a developer's defense "up front" while often simultaneously defending themselves in the same lawsuit, where the developer typically pursues the hostile and conflicting strategy of pinning blame on them. The developer can demand a defense from a single subcontractor among many, and the latter may later be unable to obtain contribution from other subcontractors. Further, subcontractors, unlike liability insurers, lack defense attorney "panels" available at favorable fee rates. Because of privilege and conflict-of-interest issues, they may also lack access to the developer's attorney billing records. As a result, a subcontractor may be forced to pay exorbitant and unreasonable legal costs for the developer's defense. Finally, the vagaries of construction defect litigation in California have caused many insurers to leave the market. Thus, and contrary to the Court of Appeal's assumption, "backup" insurance to cover subcontractors' contractual defense burdens is not readily available at reasonable cost.

FN13. By noting this argument, we do not dismiss the possibility that in many instances, subcontractors may *prefer* to assume, and control, the defense of suits against builders, developers, or other contractors, especially when the claims raised may expose the subcontractors themselves to direct or indirect liability.

As Weather Shield and its amici curiae point out, statutes effective January 1, 2006, and January 1, 2008, respectively, were adopted to address just such concerns. These new laws, which apply to residential construction contracts entered *after* their effective dates, void any term in such a contract that obliges a subcontractor to indemnify certain other project participants, "including the cost to defend," against construction defect claims "to the extent" the claims "arise out of, pertain to, or relate to" the negligence of those other entities. (§ 2782, subds.(c), (d), as added by Stats. 2005, ch. 394, § 1; see § 2782, subd. (e), as added by Stats. 2007, ch. 32, § 1.) FN14 However, Weather Shield and its *****741** amici curiae assert that, unless we hold otherwise, California's 10–year ***567** statute of limitations for construction defects (Code Civ. Proc., § 337.15) still exposes numerous subcontractors who signed earlier agreements to unfair and burdensome defense demands by developers.

FN14. As noted above, section 2782, subdivision (a) has long provided that a party to a construction contract cannot agree to indemnify another project participant for the latter's *sole* negligence or willful misconduct. Subdivision (c) of section 2782, as adopted in 2005 and slightly amended in 2007, additionally provides in pertinent part: "For all construction contracts, and amendments thereto, entered into after January 1, 2006, for residential construction ..., all provisions, clauses, covenants, and agreements contained in, collateral to, or affecting any construction contract, and amendments thereto, that purport to indemnify, including the cost to defend, the builder ... by a subcontractor against liability for claims of construction defects are unenforceable to the extent the claims arise out of, pertain to, or relate to the negligence of the builder or the builder's other agents, other servants, or other independent contractors who are directly responsible to the builder, or for defects in design furnished by those persons.... This section shall not be waived or modified by contractual agreement, act, or omission of the parties. Contractual provisions, clauses, covenants, or agreements not expressly prohibited herein are reserved to the agreement of the parties."

Subdivision (d) of section 2782, also adopted in 2005 and effective January 1, 2006, provides in pertinent part: "Subdivision (c) does not prohibit a sub-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 22
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

> contractor and builder from mutually agreeing to the timing or immediacy of the defense and provisions for reimbursement of defense fees and costs, so long as that agreement, upon final resolution of the claims, does not waive or modify the provisions of subdivision (c)."
>
> Subdivision (e) of section 2782, as added in 2007 and effective for residential construction contracts entered after January 1, 2008, uses parallel language to expand the categories of project participants as to whom a subcontractor cannot be made contractually responsible for construction defect indemnity, including defense costs, "to the extent" such claims "arise out of, pertain to, or relate to" the negligence of those entities or their agents, their servants, or the independent contractors directly responsible to them. Under subdivision (e), the categories of project participants who may not obtain such contractual indemnity from a subcontractor now include not only the builder, but also "the general contractor or contractor that is not affiliated with the builder."

****441** In effect, Weather Shield and its amici curiae ask us to conclude as a matter of law that, in a pre–2006 residential construction contract, a term which expressly obliges a subcontractor "to defend" a builder, developer, or general contractor against claims "founded upon" the subcontractor's negligent work, but says nothing further about the scope of the duty, means only that the subcontractor must *reimburse* the promisee, after the fact, for the promisee's legal expenses as part of any *indemnity* ultimately owed by the subcontractor to the promisee. They suggest that to produce a contrary result, the subcontract should say, in so many words, that the duty to defend arises immediately when a claim is asserted against the promisee, is not limited to later reimbursement of the promisee's legal expenses, and applies regardless, and independent, of any duty of indemnity for which the subcontractor may later become liable.

[23] We are sensitive to the policy issues raised by Weather Shield and its amici curiae. Nonetheless, for reasons stated at length above, we decline the holding they propose. Even applying the rule of strict construction they espouse, the instant contract already sets forth, in unambiguous terms, an immediate and independent duty to defend. As we have indicated, an express promise "to defend" another against claims "founded upon" the promisor's acts or omissions *inherently* incorporates the characteristics they insist must be set forth in additional explicit terms. And if the parties intended only to give the indemnitee a right to after the fact reimbursement of its legal expenses as a component of any indemnity otherwise owed by the indemnitor, they would need no language to say so. That right is already included in every indemnity contract, unless otherwise specifically provided, under subdivision 3 of section 2778.[FN15]

> FN15. Amicus curiae Jeld–Wen, Inc., suggests "[t]here is good reason to believe" that section 2778's reference to "contract[s] of indemnity" was never intended to apply to anything but insurance contracts. Jeld–Wen notes that section 2778, adopted in 1872, traces its lineage to a similar 1865 New York statute which also used that term. This nomenclature, Jeld–Wen asserts, was commonly employed in the mid–19th century to refer to insurance contracts. Jeld–Wen further notes that early cases interpreting the 1865 New York law all concerned bonds or insurance policies. We reject the contention for several reasons. First, section 2778, governing "contract[s] of indemnity," appears in a portion of the Civil Code (title 12 of part 4 of division 3, commencing with section 2772) simply entitled

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

187 P.3d 424 Page 23
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114
**(Cite as: 44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721)**

"Indemnity." Section 2772 defines "indemnity" as "a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person." That definition is not confined to insurance agreements. Second, this same title includes a number of statutes that expressly apply to the indemnity provisions of *noninsurance* contracts. (See, e.g., §§ 2782–2784 [construction contracts], 2784.5 [hauling, trucking, or cartage contracts].) Third, California cases too numerous to mention have assumed, virtually since the inception of section 2778, that it applies to indemnity agreements outside the insurance context. (See, e.g., *Davis v. Air Technical Industries, Inc.* (1978) 22 Cal.3d 1, 6, fn. 6, 148 Cal.Rptr. 419, 582 P.2d 1010; *Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 41, fn. 9, 69 Cal.Rptr. 561, 442 P.2d 641; *Eva v. Andersen* (1913) 166 Cal. 420, 424–425, 137 P. 16; *Showers v. Wadsworth* (1889) 81 Cal. 270, 273–274, 22 P. 663; *Peter Culley & Associates, supra,* 10 Cal.App.4th 1484, 1494–1496, 13 Cal.Rptr.2d 624; *Buchalter v. Levin, supra,* 252 Cal.App.2d 367, 371–375, 60 Cal.Rptr. 369.) The Legislature has never indicated otherwise. No reason appears to disturb this settled construction.

*****742 *568** Finally, Weather Shield does not suggest that, as applied to it, the subcontract was either procedurally or substantively unconscionable. Nor does Weather Shield otherwise imply that it is a relatively small and powerless subcontractor overwhelmed by JMP's superior bargaining power. Furthermore, Weather Shield does not claim it naively signed the instant subcontract without understanding the terms. Indeed, in its opening brief, Weather Shield describes itself as "the out-of-state manufacturer of the ... wood windows" installed in the Huntington Beach residential development—a development that included at least 122 homes. This description suggests a multistate scale of operations, and a consequent sophistication, that would undermine any such assertions.[FN16]

FN16. Questioned on this subject at oral argument, Weather Shield's counsel did not deny that Weather Shield is a sizeable multistate purveyor of manufactured windows.

****442** We therefore conclude that the duty "to defend" JMP against claims " founded upon" damage or loss caused by Weather Shield's negligent performance of its work, as set forth in Weather Shield's subcontract, imposed such duties on Weather Shield as soon as a suit was filed against JMP that asserted such claims, and regardless of whether it was ultimately determined that Weather Shield was actually negligent. Accordingly, we affirm the judgment of the Court of Appeal.

***569 CONCLUSION**

The judgment of the Court of Appeal is affirmed. The decision in *Regan Roofing Co. v. Superior Court, supra,* 24 Cal.App.4th 425, 29 Cal.Rptr.2d 413, is disapproved to the extent it conflicts with the conclusions set forth in this opinion.

WE CONCUR: GEORGE, C.J., KENNARD, WERDEGAR, CHIN, MORENO, and CORRIGAN, JJ.

Cal.,2008.
Crawford v. Weather Shield Mfg. Inc.
44 Cal.4th 541, 187 P.3d 424, 79 Cal.Rptr.3d 721, 08 Cal. Daily Op. Serv. 9261, 2008 Daily Journal D.A.R. 11,114

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

H

Court of Appeal of Louisiana,
Fourth Circuit.
John MORELLA and His Wife, Jewel Morella
v.
BOARD OF COMMISSIONERS OF The PORT OF NEW ORLEANS.

No. 2004-CA-0312.
Oct. 27, 2004.

**Background:** After collecting workers' compensation benefits from his employer, injured employee sued board of port authority (dock board). Dock board brought third-party claim against employer, who leased terminal from port authority, seeking defense and indemnification under terms of lease. Both parties moved for summary judgment. The District Court, Orleans Parish, No. 2002-10061, Ethel Simms Julien, J., entered judgment that dock board was entitled to defense but not to indemnification. Parties cross-appealed.

**Holding:** The Court of Appeal, Leon A. Cannizzaro, Jr., J., held that lessee was not required to indemnify or defend dock board until determination that board was not negligent.

Affirmed in part, reversed in part,and remanded.

West Headnotes

**[1] Indemnity 208 ⚷42**

208 Indemnity
208II Contractual Indemnity
208k42 k. Accrual of Liability. Most Cited Cases

**Indemnity 208 ⚷43**

208 Indemnity
208II Contractual Indemnity
208k43 k. Accrual of Duty to Defend. Most Cited Cases

**Workers' Compensation 413 ⚷2142.25**

413 Workers' Compensation
413XX Effect of Act on Other Statutory or Common-Law Rights of Action and Defenses
413XX(B) Action by Third Person Against Employer
413XX(B)1 In General
413k2142.10 Indemnity or Contribution
413k2142.25 k. Indemnity, Contractual. Most Cited Cases

Lessee of port terminal was not required to indemnify or defend lessor port authority against lessee's employee's personal injury action against lessor until determination was made that lessor was not negligent, under indemnification provisions of lease, even though port authority claimed obligation to defend was broader than obligation to indemnify; nothing in indemnity provision unequivocally stated that port authority would be indemnified for its own negligence.

**[2] Indemnity 208 ⚷31(6)**

208 Indemnity
208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(6) k. Indemnitee's Own Negligence or Fault, in General. Most Cited Cases

Contractual indemnity agreement will not be construed to require the indemnitor to indemnify the indemnitee for the indemnitee's own negligence.

**[3] Indemnity 208 ⚷30(1)**

208 Indemnity
208II Contractual Indemnity
208k26 Requisites and Validity of Contracts
208k30 Indemnitee's Own Negligence or Fault

208k30(1) k. In General. Most Cited Cases

**Indemnity 208 31(6)**

208 Indemnity
208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(6) k. Indemnitee's Own Negligence or Fault, in General. Most Cited Cases

Absent an unequivocal agreement to the contrary, contractual indemnity agreements do not cover situations in which the indemnitee is found to be at fault.

***321** Ike Spears, Lakeisha N. Jefferson, Devoyce D. Stubbs, Spears & Spears, New Orleans, LA, for Defendant/Appellee, Board of Commissioners for the Port of New Orleans.

C. Gordon Starling, Jr., Kevin E. Gronberg, Wagner & Bagot, New Orleans, LA, for Defendant/Appellant, P & O Ports Louisiana, Inc.

(Court composed of Judge MICHAEL E. KIRBY, Judge EDWIN A. LOMBARD, Judge LEON A. CANNIZZARO, JR.)

***322 **1** LEON A. CANNIZZARO, JR., Judge.

This case involves an appeal from a summary judgment in favor of the defendant, Board of Commissioners for the Port of New Orleans (hereinafter referred to as the “Dock Board”), against the third party defendant, P & O Ports Louisiana, Inc.[FN1] P & O Ports is appealing the trial court's ruling in favor of the Dock Board.

FN1. The third party demand was made against New Orleans Marine Contractors, Inc. and its successor, P & O Ports.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

John Morella and his wife, Jewel Morella, originally sued the Dock Board for damages relating to an accident suffered by Mr. Morella during the course and scope of his employment with P & O Ports. Mr. Morella was operating a top loader[FN2] at the France Road Terminal, a wharf facility in New Orleans where ships transporting cargo are loaded and unloaded. When he was operating the top loader, it unexpectedly hit a pot hole in a paved area at the terminal, causing Mr. Morella to be injured.

FN2. A top loader is a piece of heavy machinery that is used to move cargo at the wharf.

****2** Mr. Morella collected worker's compensation benefits from P & O Ports pursuant to the Louisiana Workers' Compensation Law, La. R.S. 23:1021 *et. seq.* The Louisiana Workers' Compensation Law was the exclusive remedy available to Mr. Morella against P & O Ports in connection with the injuries he suffered from the accident involving the top loader. La. R.S. 23:1032 provides employers with immunity from tort lawsuits brought by employees for unintentional, job related injuries.

The terminal property was leased by the Dock Board to P & O Ports under a written lease. Because the Dock Board owned the property where Mr. Morella was injured, he sued the Dock Board claiming damages for the injuries that he had suffered as a result of the top loader hitting a pot hole on the Dock Board's property. The lease between the Dock Board and P & O Ports contained several provisions that related to the allocation of responsibility between the lessor and the lessee for injuries occurring on the leased premises.

After the Morellas sued the Dock Board, the Dock Board filed a third party demand against P & O Ports. In the third party demand the Dock Board alleged that pursuant to the lease, the terminal where Mr. Mollera's injuries occurred was under the “garde”[FN3] of P & O Ports. Thus, the Dock Board claimed that P & O Ports was solely responsible for injuries occurring at the terminal. The Dock

Board also alleged that pursuant to the lease, P & O Ports owed the Dock Board a defense in ****3** the suit filed by the Morellas and indemnification for any claims for which the Dock Board was held liable.

FN3. In *Loescher v. Parr,* 324 So.2d 441 (La.1976), the Louisiana Supreme Court discussed the meaning of the term "garde" and stated that "the English translation of 'sous sa garde' as 'in our custody' does not fully express the concept of the 'garde' of a thing-the legal responsibility for its care of keeping-, so that one may lose the custody of a thing without losing its 'garde'." 324 So.2d at 447 n. 6. *See also* *Ross v. La Conste de Monterville,* 502 So.2d 1026, 1029-32 (La.1987); *Mix v. Krewe of Petronius,* 95-1793 (La.5/22/96), 675 So.2d 792, 796 n. 3.

After P & O Ports answered the third party demand, it filed a motion for summary judgment against the Dock Board. P & O Ports argued that any obligation to defend or indemnify the Dock Board would arise only after there had been a judgment against the Dock Board and only if the ***323** Dock Board were not found to be negligent in connection with Mr. Morella's accident. It was P & O Ports' position that no indemnity or defense costs would be owed to the Dock Board if Mr. Morella's accident were determined to be caused by the Dock Board's negligence. Therefore, P & O Ports urged the trial court to find that the Dock Board's claims for a defense by P & O Ports and for indemnity were premature.

On P & O Ports' motion for summary judgment, the trial court held that P & O Ports owed the Dock Board a defense prior to a determination regarding the Dock Board's negligence or lack thereof in connection with Mr. Morella's accident. Although the judgment rendered by the trial court stated that the motion for summary judgment filed by P & O Ports was denied, it is apparent that by holding that P & O Ports was only required to provide the Dock Board a defense, rather than a defense and indemnification, the trial court in effect granted P & O Ports' motion for summary judgment with respect to the indemnification issue.

The Dock Board also filed a motion for summary judgment. The Dock Board argued that the trial court should find that the Dock Board was entitled to a defense furnished by P & O Ports and to indemnification for any losses the Dock Board might suffer in connection with the Morellas' claims. Although the trial court's judgment does not expressly refer to the motion for summary judgment filed by the Dock Board, by holding that P & O Ports owed a defense to the Dock ****4** Board, the trial court effectively granted the Dock Board's motion for summary judgment in connection with the defense owed by P & O Ports while effectively denying the Dock Board's motion for summary judgment on the issue of whether indemnification was owed by P & O Ports prior to the court's determination of whether or not the Dock Board was negligent in connection with Mr. Morella's accident.

P & O Ports is now appealing the trial court's holding that it owes a defense to the Dock Board on the grounds that it is premature to require P & O Ports to provide a defense. The Dock Board had originally sought a ruling that, even though there has been no determination regarding negligence with respect to Mr. Morella's accident, not only a defense but also indemnification are owed to the Dock Board. The Dock Board, however, has apparently abandoned its claim that indemnification is owed prior to a determination that it was not negligent. At oral argument the attorney representing the Dock Board argued that a defense, but not indemnification, is owed by P & O Ports until there has been a determination that the Dock Board was free from fault in connection with the accident.

**STANDARD OF REVIEW**

In *Independent Fire Insurance Co. v. Sunbeam Corp.,* 99-2181, 99-2257 (La.2/29/00), 755 So.2d 226, the Louisiana Supreme Court discussed the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

standard of review of a summary judgment as follows:

> Our review of a grant or denial of a motion for summary judgment is de novo. *Schroeder v. Board of Sup'rs of Louisiana State University,* 591 So.2d 342 (La.1991). A motion for summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law." La. C.C.P. art. 966(B). This article was amended in 1996 ****5** to provide that "summary judgment procedure is designed to secure the just, speedy, and inexpensive ***324** determination of every action...." La. C.C.P. art. 966(A)(2). In 1997, the article was further amended to specifically alter the burden of proof in summary judgment proceedings as follows:
>
>> The burden of proof remains with the movant. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
>
> La. C.C.P. art. 966(C)(2).

99-2181, 99-2257, p. 7, 755 So.2d at 230-31. *See also Shelton v. Standard/700 Associates,* 2001-0587 (La.10/16/01), 798 So.2d 60. Therefore, we must conduct a *de novo* review in the instant case.

**DISCUSSION**

**Lease Provisions**

The trial court determined that P & O Ports' duty to furnish a defense to the Dock Board was established in the lease between the Dock Board and P & O Ports. The lease contained broad indemnity provisions in favor of the Dock Board reading in relevant part as follows:

> Lessee shall protect, defend, indemnify, and forever hold harmless Board against all losses, costs, claims, charges, expenses, penalties, damages, fines, suits, demands, attorney's fees, interest, and actions of any kind and nature whatsoever arising out of, in connection with, or by reasons of any of Lessee's operations ... on the Leased Premises, including such as may be imposed for the violation of any Laws ... including all liability under employer's liability or worker's compensation acts....

Another section of the lease tracked the language quoted above except that the indemnification obligation under that section arose in relevant part out of "any accident or other occurrence, whether directly or indirectly caused, occasioned or ****6** contributed to in whole or in part through any act, omission, fault or negligence ... of Lessee, its officers, directors, employees, representatives, agents or invitees...."

The lease also carved out an exception to the indemnity obligations in the lease. The lease provided that "[t]he above [the indemnity provisions] notwithstanding, Lessee shall not be obligated to indemnify this Board for its negligence or fault or that of its officers, directors, employees, representatives, agents or invitees."

The lease further provided for the hiring of attorneys and the payment of attorneys' fees in connection with P & O Ports' indemnity obligations under the lease. The lease stated that when P & O Ports is fulfilling its obligations under the indemnity provisions of the lease, it must "engage attorneys to defend Board." Additionally, P & O Ports must select only attorneys to which the Dock Board has given its prior, written consent. Finally, the lease provided that if the Board has to retain an attorney to enforce the indemnity provisions of the lease, then P & O Ports shall be liable for the reasonable attorney's fees and costs associated with enforcing those provisions.

**Assignments of Error**

P & O Ports has raised three assignments of er-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ror in this case. Both issues of fact and issues of law are involved in the assignments of error. P & O Ports asserts that the trial court erred in the following ways:

(1) by holding that P & O Ports was required to undertake the Dock Board's defense prior to a finding that the Dock Board was not negligent in connection with Mr. Morella's claims;

***325** 7 (2) by failing to consider whether the Dock Board waived certain insurance requirements in the lease and whether the Dock Board's failure to correct the condition of the paved portions of the terminal area obviated the obligation to defend; and

(3) by failing to hold that P & O Ports does not owe indemnity to the Dock Board whether or not the Dock Board is negligent, because P & O Ports does not owe indemnity to the Dock Board if it is negligent, and there will be no judgment against the Dock Board to be indemnified, if the Dock Board is not negligent.

**Legal Analysis**

Under all of the assignments of error, the legal issue to be decided is whether P & O Ports owes a defense to the Dock Board prior to a determination that the Dock Board is free from negligence in connection with the claims made against the Dock Board by the Morellas. The trial court judge found that P & O Ports was obligated to defend the Dock Board against the Morellas' claims even without a determination that the Dock Board was negligent, because the judge held that the obligation to defend under the lease was broader than the obligation to indemnify. The determination of whether the Dock Board was free from negligence in connection with Mr. Morella's accident and the determination of whether any other party was at fault present material issues of fact that are yet to be resolved. Therefore, the trial court judge was correct in not finding that P & O Ports owed indemnity to the Dock Board prior to the resolution of those issues of fact. We must, however, examine her holding that P & O Ports must defend the Dock Board from the Morellas' claims prior to a determination regarding the Dock Board's negligence.

****8** In *Meloy v. Conoco, Inc.,* 504 So.2d 833 (La.1987), the Louisiana Supreme Court stated as follows regarding the distinction between an indemnity agreement and an insurance policy:

An indemnity agreement is a specialized form of contract which is distinguishable from a liability insurance policy. A cause of action under a liability insurance policy accrues when the liability attaches. However, an insurer's duty to defend arises whenever the pleadings against the insured disclose a possibility of liability under the policy. On the other hand, an indemnity agreement does not render the indemnitor liable until the indemnitee actually makes payment or sustains loss. Therefore, *a cause of action for indemnification for cost of defense does not arise until the lawsuit is concluded and defense costs are paid.*

504 So.2d at 839 (emphasis added) (citations and footnotes omitted).

This Court has also held that a cause of action for indemnification for the cost of defense does not arise until the lawsuit is concluded, and the costs of the defense are paid. In *Webb v. Shell Offshore Inc.,* 557 So.2d 276 (La.App. 4th Cir.1990), this Court, citing the *Meloy* case, stated that “a cause of action for indemnification for cost of defense does not arise until the lawsuit is concluded and defense costs are paid.” 557 So.2d at 278. This Court further stated that “Shell must assert its action for defense costs after the termination of the instant suit and may only recover if it is free of negligence or fault.” *Id.*

In *Thibodaux v. Southern Natural Gas Co.,* 97-1483 (La.App. 4 Cir. 1/23/98), 705 So.2d 1287, this Court considered whether or not a contracting company, John E. Graham & Sons, was contractually obligated to defend Columbia Gulf Transmission Company. The indemnity language contained

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***326** in an agreement between the two parties read as follows:

> Contractor [Graham] shall indemnify and hold harmless Company [Columbia] from and against any and all loss, ****9** damage and liability and from any and all claims for damages on account of or by reason of bodily injury, including death, which may be sustained or claimed to be sustained by any person ... *provided such are actually caused by or arise out of negligent acts or omissions of Contractor or its agents or employees in connection with the performance of this contract* ... provided, however, that the foregoing indemnification shall not cover loss, damage or liability arising from the sole negligence of the Company.... Contractor shall at its own cost and expense defend any such claim, suit, action or proceeding, whether groundless or not ... and Contractor shall pay any and all judgments which may be recovered in any such action ... and defray any and all expenses, including costs and attorney's fees, .... (emphasis ours)

1997-1483, pp. 2-3, 705 So.2d at 1288.

In the *Thibodeaux* case, the indemnitee, in whose favor the indemnity provision had been executed, argued that the provision obligated the indemnitor to provide a defense for the indemnitee. The indemnitee further argued that the indemnitors obligation to defend the indemnitee was separate and apart from any question of the indemnitors potential liability under the indemnity provision. This Court determined that, under the indemnity provision quoted above, the indemnitors duty to defend was triggered only in those instances where the indemnitors negligence was a contributing cause of the claim against the indemnitee. This Court noted that were the provision to be interpreted otherwise, then the indemnitor would be required to defend any suit brought against the indemnitee.

In the *Thibodeaux* case this Court noted that the language requiring indemnification of the indemnitee also required that the indemnitee must not be negligent for indemnification to be owed. Therefore, the duty to defend was triggered only where the indemnitee was not negligent. The provision in the contract regarding the duty to provide a defense for the indemnitee provided that ****10** "in any *such* claim, suit, action or proceeding," the indemnitor would be obligated to defend the indemnitee. *Id.* (emphasis added). This Court noted that the qualifying word "such" referred to claims where the indemnitee was not negligent; otherwise, any suit brought against the indemnitee, whether or not it involved the indemnitor in any way, would have to be defended by the indemnitor. This Court found that would be a result "we cannot envision as being intended." *Id.* Similarly, in the instant case we cannot envision that the parties to the lease intended PO Ports to be required to defend a claim brought against the Dock Board prior to a finding that the Dock Board was not negligent in connection with the claim.

In *Coleman v. Transit Management of Southeast Louisiana, Inc.*, 98-1511 (La.App. 4 Cir. 11/10/98), 723 So.2d 495, this Court again considered the duty to defend under an indemnification agreement. In that case the trial court granted an indemnitee's motion for summary judgment and ordered the indemnitor to provide a defense to the indemnitee. The trial court judge interpreted the indemnity provision to require that the indemnitor bear all costs of the defense. The trial court judge then held that if the indemnitee should be proven to be solely at fault with respect to the claim against it, then the indemnitor would be entitled to reimbursement of the ***327** amounts it had paid on behalf of the indemnitee. This Court held that there was a distinction between an insurer's obligation to defend its insured and an indemnitor's obligation to an indemnitee for the costs of a defense. This Court cited the *Meloy* case and the *Webb* case and discussed the proposition that a cause of action against an indemnitor for defense costs arises after the termination of the lawsuit against the indemnitee and is contingent upon the indemnitee being free from fault in connection with the claims against it in the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

underlying lawsuit. This Court then reversed the trial court's decision.

[1] ****11** In *Roundtree v. The New Orleans Aviation Board,* 2002-1757 (La.App. 4 Cir. 4/9/03), 844 So.2d 1091, this Court again considered whether the duty to defend under an indemnity agreement arose prior to a judgment against the indemnitee. The provisions of the relevant indemnity agreement read in pertinent part as follows:

> 6. Indemnification. The Contractor agrees to indemnify, defend by counsel acceptable to the Board and hold harmless the City of New Orleans, the New Orleans Aviation Board ... from any and all claims ... losses, damages or expense incurred by the Board resulting from the Contractor's performance of its obligations....

2002-1757, p. 6, 844 So.2d 1094-95. The trial court had ordered the indemnitor to defend the indemnitee. This Court reversed the trial court on this issue, however, because there was nothing in the indemnity agreement to indicate that the parties intended for the indemnitee to be indemnified in the event of its own negligence. Therefore, since the issue of negligence had not yet been tried, it was error for the trial court to require the indemnitor to defend the indemnitee.

In the instant case the Dock Board argued in oral argument that although the obligation of P & O Ports to indemnify is dependent on a finding that the Dock Board was not negligent in connection with the Morellas' claims, the obligation to defend the Dock Board is not contingent on a finding of negligence. The Dock Board based its argument on the language in the lease stating that "[t]he above [the indemnity provisions] notwithstanding, Lessee shall not be obligated to indemnify this Board for its negligence or fault or that of its officers, directors, employees, representatives, agents or invitees." Because the word "defend" is not included with the word "indemnify" in this provision, the Dock Board contended that only ****12** the obligation to "indemnify", not the duty to defend, is contingent on the freedom from negligence on the part of the Dock Board. We disagree.

[2] It is well settled in Louisiana jurisprudence that a contractual indemnity agreement will not be construed to require the indemnitor to indemnify the indemnitee for the indemnitee's own negligence. In *Polozola v. Garlock,* 343 So.2d 1000 (La.1977), the Louisiana Supreme Court stated as follows:

> A contract of indemnity whereby the indemnitee is indemnified against the consequences of his own negligence is strictly construed, and such a contract will not be construed to indemnify an indemnitee against losses resulting to him through his own negligent act, unless such an intention was expressed in unequivocal terms.

343 So.2d at 1003. *See also Perkins v. Rubicon, Inc.,* 563 So.2d 258, 259 (La.1990), where the Supreme Court stated that "a contract will not be construed to indemnify an indemnitee against losses resulting to him through his own negligence ***328** unless such an intention is expressed in unequivocal terms."

This Court has also ruled that an indemnitor is not obligated to indemnify an indemnitee against the indemnitee's own fault absent a clear, unequivocal statement to that effect in the indemnity agreement. *See, e.g., Carr v. New Orleans,* 626 So.2d 374 (La.App. 4th Cir.1993); *Federal National Mortgage Association v. Sethi,* 557 So.2d 354 (La.App. 4th Cir.1990); *Rosales v. Dixie Mill Supply Company,* 376 So.2d 179 (La.App. 4th Cir.1979).

In the instant case there is nothing in the indemnity provision that unequivocally states that the Dock Board will be indemnified for its own negligence. In fact, the agreement expressly states that notwithstanding what is in the indemnification provisions in the lease, P & O Ports "shall not be obligated to indemnify this Board for its negligence or fault." This language unequivocally ****13** states that P & O Ports' duty to indemnify is conditioned upon

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

a lack of fault on the part of the Dock Board.

[3] Under Louisiana law absent an unequivocal agreement to the contrary, contractual indemnity agreements do not cover situations in which the indemnitee is found to be at fault. The language in the lease in this case simply states what the law in Louisiana already provides. The omission of the word "defend" from the lease provision quoted in the preceding paragraph cannot in any way be construed as unequivocally providing that P & O Ports is obligated to defend the Dock Board from its own negligence. The only way the Dock Board could be entitled to have P & O Ports defend it prior to a determination that the Dock Board was free from fault in connection with the Morellas' claims would be by having an express, unequivocal provision affirmatively stating that P & O Ports agreed to defend the Dock Board without regard to fault on the part of the Dock Board. There is no such provision in the lease. Therefore, the obligation of P & O Ports to indemnify and defend the Dock Board does not arise until there has been a determination that the claims made against the Dock Board by the Morellas were not the fault of the Dock Board, and the issue of the Dock Board's fault has not yet been determined by the trial court.

We find that the trial court erred in holding that P & O Ports has a duty to defend the Dock Board at this point in the instant case. The issue of whether the lease requires P & O Ports to indemnify the Dock Board for attorneys' fees and other obligations that the Dock Board incurs in connection with the instant case cannot be decided until there is a decision regarding the Dock Board's fault in connection with the Morellas' claims. The obligation of P & O Ports to indemnify and defend the Dock Board is contingent upon the Dock Board's lack of ****14** negligence. Because the Dock Board's negligence or lack thereof has not yet been determined, any obligations that P & O Ports has under the indemnity provisions of the lease to indemnify and defend the Dock Board have not yet arisen. Therefore, the Dock Board's claims against P & O Ports are premature.

**CONCLUSION**

The judgment of the trial court that P & O Ports owes the Dock Board a duty to defend the Dock Board at this time is hereby reversed. Insofar as the trial court ruling finds that indemnification is not owed at this time to the Dock Board by P & O Ports, that part of the ruling is affirmed. This case is hereby remanded to the trial court for further proceedings in accordance with this opinion.

***329 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**

La.App. 4 Cir.,2004.
Morella v. Board of Com'rs of Port of New Orleans
888 So.2d 321, 2004-0312 (La.App. 4 Cir. 10/27/04)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

Court of Appeals of Arizona,
Division 1, Department E.
MT BUILDERS, L.L.C., Third Party Plaintiff/Appellee,
v.
FISHER ROOFING INC., Third Party Defendant/Appellant.

No. 1 CA-CV 07-0590.
Nov. 13, 2008.

**Background:** Condominium association brought construction defect action against general contractor and subcontractors. General contractor filed cross-claim seeking indemnity from subcontractors, including roofing subcontractor. After general contractor settled association's claims, the Superior Court in Maricopa County, No. CV 2001-001794, Paul A. Katz, J., granted general contractor summary judgment on its claim against roofing subcontractor. Roofing subcontractor appealed.

**Holdings:** The Court of Appeals, Norris, J., held that:
(1) general contractor had a valid indemnity claim arising out of settlement with condominium association, as indemnification provision in contract with subcontractor was a an agreement to indemnify for loss;
(2) indemnity provision required general contractor to prove subcontractor's fault;
(3) subcontractor did not lose the right to dispute its fault when it rejected general contractor's tender of defense;
(4) general contractor's settlement did not preclude subcontractor from disputing the existence and extent of its indemnity liability; and
(5) general issues of material fact precluded summary judgment on general contractor's indemnity claim.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Indemnity 208 31(1)**

208 Indemnity
208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(1) k. In general. Most Cited Cases

When there is an express indemnity agreement between parties, the extent of the duty to indemnify must be determined from that agreement.

**[2] Contracts 95 143(1)**

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k143 Application to Contracts in General
95k143(1) k. In general. Most Cited Cases

When parties bind themselves by a lawful contract the terms of which are clear and unambiguous, a court must give effect to the contract as written.

**[3] Indemnity 208 31(1)**

208 Indemnity
208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(1) k. In general. Most Cited Cases

**Indemnity 208 31(2)**

208 Indemnity
208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(2) k. Intention of the parties. Most Cited Cases

If the meaning of an indemnity provision re-

mains uncertain after consideration of the parties' intentions, as reflected by their language in view of surrounding circumstances, a secondary rule of construction requires the provision to be construed against the drafter.

**[4] Indemnity 208 ⚷42**

208 Indemnity
208II Contractual Indemnity
208k42 k. Accrual of liability. Most Cited Cases

A contractual right of indemnity may accrue upon the happening of one or both of two events; "indemnification against liability" applies once liability for a cause of action is established under which the indemnitee is not required to make actual payment, while, in contrast, "indemnification against loss or damages" applies when the indemnitee has actually paid the obligation for which he was found liable.

**[5] Indemnity 208 ⚷31(4)**

208 Indemnity
208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(4) k. Subject-matter in general. Most Cited Cases

An agreement may provide for both types of indemnification, indemnification against liability and indemnification against loss or damages.

**[6] Indemnity 208 ⚷33(5)**

208 Indemnity
208II Contractual Indemnity
208k33 Particular Cases and Issues
208k33(5) k. Contractors, subcontractors, and owners. Most Cited Cases

General contractor had a valid indemnity claim against roofing subcontractor arising out of general contractor's settlement of construction defect action brought by condominium association, as the indemnification provision in contract between general contractor and roofing subcontractor was an agreement to indemnify for loss, given that the provision obligated subcontractor to indemnify and hold general contractor harmless from and against all claims, damages, losses, and expenses under certain specified conditions and did not limit or restrict losses to losses incurred through entry of judgment, and the association's claim against general contractor relating to roofing subcontractor rested on alleged defects and negligent workmanship growing out of subcontractor's work under the subcontract.

**[7] Indemnity 208 ⚷31(4)**

208 Indemnity
208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(4) k. Subject-matter in general. Most Cited Cases

**Indemnity 208 ⚷42**

208 Indemnity
208II Contractual Indemnity
208k42 k. Accrual of liability. Most Cited Cases

Indemnification against a loss encompasses a loss incurred through a settlement as long as the loss is covered by the indemnity agreement.

**[8] Indemnity 208 ⚷57**

208 Indemnity
208III Indemnification by Operation of Law
208k56 Right of One Compelled to Pay Against Person Primarily Liable
208k57 k. In general. Most Cited Cases

In general, in an action for common law indemnity, the indemnity plaintiff must show: (1) it has discharged a legal obligation owed to a third party; (2) the indemnity defendant was also liable to the third party; and (3) as between itself and the defendant, the obligation should have been discharged by the defendant.

**[9] Indemnity 208 ⚷57**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

208 Indemnity
208III Indemnification by Operation of Law
208k56 Right of One Compelled to Pay Against Person Primarily Liable
208k57 k. In general. Most Cited Cases

**Indemnity 208 ⚷81**

208 Indemnity
208III Indemnification by Operation of Law
208k81 k. Accrual of liability. Most Cited Cases

Absent consent or fault of the defendant, the plaintiff in a common law indemnity action must show it has extinguished its own and the defendant's liability to prove it has discharged an obligation to a third party.

**[10] Indemnity 208 ⚷32**

208 Indemnity
208II Contractual Indemnity
208k32 k. Concurrent fault; active or passive negligence. Most Cited Cases

**Indemnity 208 ⚷42**

208 Indemnity
208II Contractual Indemnity
208k42 k. Accrual of liability. Most Cited Cases

Parties to an indemnity agreement can agree to dispense with the common law indemnity requirement that the indemnitee must show it has extinguished its own and the indemnitor's liability.

**[11] Indemnity 208 ⚷31(7)**

208 Indemnity
208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(7) k. Duty to defend. Most Cited Cases

A defense obligation, for purposes of an indemnity agreement or insurance contract, is of necessity a current obligation; the idea is to mount it, render it, and fund it now, before the insured's or indemnitee's default is taken, or trial preparation is compromised.

**[12] Indemnity 208 ⚷33(5)**

208 Indemnity
208II Contractual Indemnity
208k33 Particular Cases and Issues
208k33(5) k. Contractors, subcontractors, and owners. Most Cited Cases

**Indemnity 208 ⚷42**

208 Indemnity
208II Contractual Indemnity
208k42 k. Accrual of liability. Most Cited Cases

Indemnity provision in contract between general contractor and roofing subcontractor required general contractor to prove the extent of subcontractor's negligence, in order for general contractor to recover indemnity damages and the expenses general contractor incurred in defending against claims based on subcontractor's work, after general contractor settled construction defect action brought by condominium association; indemnity provision created a narrow form of indemnification as it limited subcontractor's indemnity obligation to the extent caused in whole or in part by any negligent act or omission of the subcontractor.

**[13] Indemnity 208 ⚷43**

208 Indemnity
208II Contractual Indemnity
208k43 k. Accrual of duty to defend. Most Cited Cases

Under indemnity provision in contract with general contractor, roofing subcontractor did not lose the right to dispute its fault when it rejected general contractor's tender of defense and failed to defend general contractor against claims based on subcontractor's work by condominium association in construction defect action; indemnity provision only required subcontractor to indemnify and hold

general contractor harmless against claims "to the extent" caused in whole in or part by subcontractor's negligence, and such language envisioned a determination of subcontractor's fault before subcontractor would be required to indemnify and prevented an interpretation of the provision as creating a duty to defend.

**[14] Appeal and Error 30 ⚷1079**

30 Appeal and Error
30XVI Review
30XVI(K) Error Waived in Appellate Court
30k1079 k. Insufficient discussion of objections. Most Cited Cases

Roofing subcontractor, on appeal in action by general contractor to enforce indemnity agreement after general contractor settled construction defect action brought by condominium association, waived arguments that even if it owed general contractor a duty to defend its performance of that duty was excused because it had an inherent conflict of interest with general contract and general contractor had never properly tendered its defense, where subcontractor, without any analysis, raised the arguments in a one sentence footnote.

**[15] Contracts 95 ⚷143.5**

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k143.5 k. Construction as a whole. Most Cited Cases

A cardinal rule of contract construction requires courts to look at the agreement as a whole, reading each part in light of all other parts.

**[16] Contracts 95 ⚷143.5**

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k143.5 k. Construction as a whole. Most Cited Cases

When construing contracts, courts are prohibited from construing one provision in a contract so as to render another provision meaningless.

**[17] Indemnity 208 ⚷59**

208 Indemnity
208III Indemnification by Operation of Law
208k56 Right of One Compelled to Pay Against Person Primarily Liable
208k59 k. Relative culpability. Most Cited Cases

Under common law indemnity, the party seeking indemnification must be proven free from negligence.

**[18] Indemnity 208 ⚷30(1)**

208 Indemnity
208II Contractual Indemnity
208k26 Requisites and Validity of Contracts
208k30 Indemnitee's Own Negligence or Fault
208k30(1) k. In general. Most Cited Cases

Unless expressed in clear and unequivocal terms, a contractual indemnity provision will not be construed to protect an indemnitee against its own negligence.

**[19] Indemnity 208 ⚷85**

208 Indemnity
208IV Conclusiveness of Former Adjudication
208k85 k. In general. Most Cited Cases

General contractor's settlement of construction defect action brought against it by condominium association did not preclude subcontractor, whose contract with general contractor contained an indemnity provision, from disputing the existence and extent of its indemnity liability to general contractor.

**[20] Indemnity 208 ⚷41**

208 Indemnity
208II Contractual Indemnity
208k41 k. Notice of settlement. Most Cited

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cases

**Indemnity 208 ⚷42**

208 Indemnity
208II Contractual Indemnity
208k42 k. Accrual of liability. Most Cited Cases

When an indemnitee settles a lawsuit covered by an indemnity agreement, it may obtain indemnity from its indemnitor if it gave the indemnitor notice of the action and an opportunity to defend and demonstrates the decision to settle was, under the circumstances, reasonable and prudent, without having to show it was actually liable to the third person, as long as the indemnitee can show its potential liability.

**[21] Indemnity 208 ⚷42**

208 Indemnity
208II Contractual Indemnity
208k42 k. Accrual of liability. Most Cited Cases

An indemnitee is only entitled to indemnity after it settles a claim by a third party if the third party's action was covered by the indemnity agreement.

**[22] Indemnity 208 ⚷104**

208 Indemnity
208V Actions
208k104 k. Questions for jury. Most Cited Cases

Whether an indemnitee's decision to settle is reasonable and prudent under the circumstances will normally present a question of fact, in an action by an indemnitee against an indemnitor to enforce an indemnity agreement.

**[23] Indemnity 208 ⚷42**

208 Indemnity
208II Contractual Indemnity
208k42 k. Accrual of liability. Most Cited Cases

The test as to whether a settlement by the indemnitee was reasonable and prudent, in an action by an indemnitee against an indemnitor to enforce an indemnity agreement, is what a reasonably prudent person in the indemnitee's position would have settled for on the merits of the claimant's case, which involves evaluating the facts bearing on the liability and damage aspects of claimant's case, as well as the risks of going to trial.

**[24] Indemnity 208 ⚷42**

208 Indemnity
208II Contractual Indemnity
208k42 k. Accrual of liability. Most Cited Cases

Determining whether a settlement was reasonable and prudent, when an indemnitee brings an action against an indemnitor to enforce an indemnitee agreement, requires the finder of fact to evaluate the facts pertaining to liability, the claimed damages, and the risks of going to trial and to compare these facts with the nature and size of the settlement.

**[25] Indemnity 208 ⚷42**

208 Indemnity
208II Contractual Indemnity
208k42 k. Accrual of liability. Most Cited Cases

The reasonableness of an indemnitee's settlement, for purposes of determining whether the indemnitee is entitled to indemnification from the indemnitor, consists of two components which are interrelated; a fact finder must look at the amount paid in settlement of the claim in light of the risk of exposure, or the probable amount of a judgment if the original plaintiff were to prevail at trial, balanced against the possibility that the original defendant would have prevailed.

**[26] Indemnity 208 ⚷42**

208 Indemnity
208II Contractual Indemnity

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

197 P.3d 758 Page 6
219 Ariz. 297, 197 P.3d 758, 543 Ariz. Adv. Rep. 21
**(Cite as: 219 Ariz. 297, 197 P.3d 758)**

208k42 k. Accrual of liability. Most Cited Cases

The fact that the claim against the indemnitee may have been successfully defended by a showing of contributory negligence, lack of negligence or otherwise, is but a part of the reasonableness analysis in an action by an indemnitee against an indemnitor, and, therefore, subject to proof.

**[27] Indemnity 208 ⚷100**

208 Indemnity
208V Actions
208k98 Evidence
208k100 k. Presumptions and burden of proof. Most Cited Cases

The burden is on the indemnitee to show its settlement was reasonable and prudent, in an action against an indemnitor.

**[28] Indemnity 208 ⚷101**

208 Indemnity
208V Actions
208k98 Evidence
208k101 k. Admissibility. Most Cited Cases

Evidence relevant to the showing of whether an indemnitee's settlement was reasonable and prudent, in an action against the indemnitor, will depend on the circumstances.

**[29] Judgment 228 ⚷181(19)**

228 Judgment
228V On Motion or Summary Proceeding
228k181 Grounds for Summary Judgment
228k181(15) Particular Cases
228k181(19) k. Contract cases in general. Most Cited Cases

Genuine issues of material fact regarding the extent and nature of alleged defects and negligence in roofing subcontractor's work, what portion of general contractor's settlement with condominium association in construction defect action was attributable to subcontractor's fault, and whether general contractor's settlement with association was reasonable and prudent, precluded summary judgment in general contractor's action against subcontractor for indemnity pursuant to indemnification provision in parties' contract.

**[30] Indemnity 208 ⚷36**

208 Indemnity
208II Contractual Indemnity
208k34 Scope and Extent of Liability
208k36 k. Costs and expenses. Most Cited Cases

Indemnity provision in contract between general contractor and roofing subcontract allowed general contractor to recover expert witness fees, if general contractor was entitled to indemnity following settlement with condominium association in construction defect action, where provision authorized indemnity for all claims, damages, losses, and expenses, including but not limited to attorney's fees and court costs.

****761** Lee Hernandez Kelsey Brooks Garofalo & Blake, PC By LeeP. Blake, Litchfield Park, and Wood Smith Henning & Berman, LLP By Brenda Radmacher, Phoenix, Co-Counsel for Third Party Plaintiff/Appellee.

Schneider & Onofry, PC By CharlesD. Onofry, Elda E. Orduno, Luane Rosen, Phoenix, and Struckmeyer & Wilson By DonaldR. Wilson, Phoenix, Co-Counsel for Third Party Defendant/Appellant.

***300 OPINION**

NORRIS, Judge.

¶ 1 This appeal arises out of a construction defect lawsuit filed by a condominium association against a general contractor, Appellee MT Builders, L.L.C., and others. In response to the association's claims against it, MT Builders sought indemnity from its subcontractors, including Appellant Fisher Roofing Inc., under what is known as a “narrow form” indemnity provision that restricted indemnity

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

"to the extent" of the subcontractor's***301 **762** negligence. After MT Builders settled the association's claims against it, MT Builders eventually obtained summary judgment on its indemnity claim against Fisher.

¶ 2 On appeal, Fisher challenges the superior court's construction and application of the indemnity provision and argues the court should not have granted summary judgment against it because the facts regarding its own negligence and the reasonableness of MT Builders' settlement with the association were in dispute. In part, we agree. Further, we agree with Fisher that it was not barred from contesting these matters because it failed to accept MT Builders' tender of defense. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

**FACTS AND PROCEDURAL HISTORY**

¶ 3 In January 2001, MV Condominium Association, Inc. ("Association") filed a construction defect lawsuit against various entities involved in the development, sale and construction of a condominium project, including the project's general contractor, MT Builders, and its roofing subcontractor, Fisher. The Association claimed MT Builders, Fisher and other defendant subcontractors had breached implied warranties of workmanlike performance, fitness and habitability. MT Builders, Fisher and the other defendant subcontractors denied the Association's claims.

¶ 4 Subsequently, seeking indemnity and asserting breach of a duty to defend, MT Builders filed a cross-complaint against Fisher and the other defendant subcontractors and a third-party complaint against other subcontractors not initially sued by the Association. MT Builders rested its claims against all of the subcontractors on an indemnity provision contained in the standard subcontract agreement it had used with all of the subcontractors. This provision provided as follows:

> 20. To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, Architect and the Builder and all their agents and employees from and against all claims, damages, losses and expenses, including but not limited to attorney's fees and court costs, arising out of or resulting from the performance or non performance [sic] of the Subcontractor's Work under this Subcontract, provided that any such claims, damage, loss or expense is attributable to bodily injury, sickness, disease, or death, or to injury to or destruction of tangible property including the loss of use resulting therefrom, to the extent caused in whole or in part by any negligent act or omission of the Subcontractor or anyone directly or indirectly employed by him or anyone for whose acts he may be liable, regardless of whether it is caused in part by a party indemnified thereunto. Such obligations shall not be construed to negate, or abridge, or otherwise reduce any other right or obligations of indemnity which would otherwise exist as to any party or person described in this paragraph.

¶ 5 In late 2002, MT Builders, along with several others, entered into a settlement agreement with the Association ("the settlement"). In exchange for $1,750,000 ("settlement sum") from MT Builders, the Association released its claims against MT Builders. The Association also assigned to MT Builders its direct claims against several of the defendant subcontractors, including Fisher. Fisher was not a party to MT Builders' settlement agreement with the Association.

¶ 6 After protracted and extensive briefing, *see infra* ¶¶ 39-48, the superior court subsequently entered summary judgment for MT Builders on its indemnity claim against Fisher. The judgment awarded MT Builders $240,523 in indemnity damages and $113,685.50 in attorneys' fees and defense costs it had incurred in defending itself against the Association's claims and in seeking indemnity from Fisher.

¶ 7 Fisher timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

("A.R.S.") sections 12-120.21(A)(1) and -2101(B) (2003).

**DISCUSSION**

*I. Validity of the Indemnity Claim*

¶ 8 As an initial matter, Fisher argues, as it did in the superior court, that MT Builders ***302 **763** did not have a valid indemnity claim because MT Builders' settlement with the Association failed to discharge any claims the Association had against Fisher. Fisher further argues the Association's assignment of its direct claims against Fisher to MT Builders means these claims were never extinguished and, thus, MT Builders never suffered any loss on those claims.

¶ 9 Fisher's argument is not well taken; it rests on a fundamental misunderstanding of its obligations under the indemnity provision at issue in this case and what those obligations mean.

[1][2][3] ¶ 10 Whether MT Builders had a valid indemnity claim requires us to interpret the indemnity provision and thus presents a question of law we review de novo. *Thomas v. Liberty Mut. Ins. Co.,* 173 Ariz. 322, 324, 842 P.2d 1335, 1337 (App.1992). When, as here, there is an express indemnity agreement between parties, the extent of the duty to indemnify must be determined from that agreement. *INA Ins. Co. of N. Am. v. Valley Forge Ins. Co.,* 150 Ariz. 248, 252, 722 P.2d 975, 979 (App.1986). And, when, as here, parties bind themselves "by a lawful contract the terms of which are clear and unambiguous, a court must give effect to the contract as written." *Grubb & Ellis Mgmt. Servs., Inc. v. 407417 B.C., LLC,* 213 Ariz. 83, 86, ¶ 12, 138 P.3d 1210, 1213 (App.2006). But, as with all contracts, if the meaning of an indemnity provision remains uncertain after consideration of the parties' intentions, as reflected by their language in view of surrounding circumstances, a secondary rule of construction requires the provision to be construed against the drafter. *First Am. Title Ins. Co. v. Action Acquisitions, LLC,* 218 Ariz. 394, 397, ¶ 8, 187 P.3d 1107, 1110 (2008); *Taylor v. State Farm Mut. Auto. Ins. Co.,* 175 Ariz. 148, 158 n. 9, 854 P.2d 1134, 1144 n. 9 (1993); *Allison Steel Mfg. Co. v. Superior Court,* 22 Ariz.App. 76, 80, 523 P.2d 803, 807 (1974) (court "inclined" to construe indemnity provision against general contractor because it occupied better bargaining position and drafted the agreement).

[4][5] ¶ 11 "A contractual right of indemnity may accrue upon the happening of one or both of two events. Indemnification against liability applies once liability for a cause of action is established; the indemnitee is not required to make actual payment." *INA,* 150 Ariz. at 253, 722 P.2d at 980. In contrast, indemnification against loss or damages applies "when the indemnitee has actually paid the obligation for which he was found liable." *Id.* An agreement may provide for both types of indemnification.

[6][7] ¶ 12 The indemnification provision at issue here obligated Fisher to "indemnify and hold harmless" MT Builders "from and against all claims, damages, losses and expenses" under certain specified conditions. This wording constitutes an agreement to indemnify for loss. *Cf. Skousen v. W.C. Olsen Inv. Co.,* 149 Ariz. 251, 253, 717 P.2d 930, 932 (App.1986) (contracts requiring party to save or hold other party harmless "have been interpreted to protect against only actual loss or damage"). The indemnification provision did not limit or restrict losses to losses incurred through entry of a judgment. Indemnification against a loss encompasses a loss incurred through a settlement as long as the loss is covered by the indemnity agreement. *S. Ry. Co. v. Georgia Kraft Co.,* 823 F.2d 478, 480-81 (11th Cir.1987); *Kaydon Acquisition Corp. v. Custom Mfg., Inc.,* 301 F.Supp.2d 945, 959 (N.D.Iowa 2004) (citing cases); *Peerless Landfill Co. v. Haleyville Solid Waste Disposal Auth.,* 941 So.2d 312, 317 (Ala.Civ.App.2006); Maurice T. Brunner, Annotation, *Liability of Subcontractor Upon Bond or Other Agreement Indemnifying General Contractor Against Liability for Damage to Person or Property* § 9, 68 A.L.R.3d 7, 61-63 (1976).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[8][9][10] ¶ 13 The record reflects the Association's claims against MT Builders relating to Fisher rested on alleged defects and negligent workmanship growing out of Fisher's work under the subcontract ("Fisher-based claims").FN1 MT Builders paid the Association ***303 **764** the settlement sum to settle the Fisher-based claims because it was potentially liable for Fisher's allegedly defective work. In so doing, it incurred a loss. This loss did not become a "non-loss" because the Association assigned its direct claims against Fisher to MT Builders. Nothing in the indemnity provision conditioned MT Builder's indemnification rights on obtaining a discharge for Fisher of Fisher's potential liability to the Association.FN2 AS A MATTER OF LAW, mt builders had A VALid indemnity claim against Fisher, and the Association's assignment of its direct claims against Fisher to MT Builders did not change that.

FN1. Under its subcontract with MT Builders, Fisher was to "furnish all material and labor to install all tile and built-up roofing for 16 ea. apartment bldgs., clubhouse and 5 ea. detached garage bldgs. per plans"; "dormer vents and painting of such included"; "inspect roofs prior to roofing for proper nailing and blocking-report any problems to the job superintendent"; and "comply with OSHA full protection requirements."

FN2. In general, in an action for common law indemnity, the indemnity plaintiff must show, first, it has discharged a legal obligation owed to a third party; second, the indemnity defendant was also liable to the third party; and third, as between itself and the defendant, the obligation should have been discharged by the defendant. Absent consent or fault of the defendant, the plaintiff must show it has extinguished its own *and* the defendant's liability to prove it has discharged the obligation to the third party in satisfaction of the first element. *Am. & Foreign Ins. Co. v. Allstate Ins. Co.,* 139 Ariz. 223, 225, 677 P.2d 1331, 1333 (App.1983) (citing Restatement (First) of Restitution § 76 (1937)); *Moore Excavating, Inc. v. Consol. Supply Co.,* 186 Or.App. 324, 63 P.3d 592, 595 (2003). However, as this case illustrates, parties to an indemnity agreement can agree to dispense with the common law indemnity requirement that the indemnitee must show it has extinguished its own and the indemnitor's liability. *Cf. Schweber Elec. v. Nat'l Semiconductor Corp.,* 174 Ariz. 406, 410, 850 P.2d 119, 123 (App.1992) ("When the parties expressly agree upon indemnity provisions in their contract, the extent of the duty is defined by the contract itself rather than common law principles.").

*II. Fault, the Duty to Defend, Preclusion and Reasonableness*

*A. Fault*

¶ 14 Fisher next argues MT Builders was not entitled to recover indemnity damages and the expenses it incurred in defending against the Fisher-based claims except to the extent those damages and expenses were caused by its (that is, Fisher's) negligent work. In other words, it argues its indemnity obligation was limited to only those losses and expenses caused by its own fault (causation plus negligence equals fault). *Cf. Hutcherson v. City of Phoenix,* 192 Ariz. 51, 53-54, ¶¶ 15-17, 961 P.2d 449, 451-52 (1998) (citing A.R.S. § 12-2506(F)(2) which defines "fault" as "an actionable breach of legal duty, act or omission proximately causing or contributing to injury or damages sustained by a person seeking recovery, including negligence").

[11] ¶ 15 In response, MT Builders argues it did not need to prove fault to obtain indemnification. Alternatively, it asserts Fisher lost or forfeited the right to dispute fault, and thus indemnity liability, because it failed to accept MT Builders' tender

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

of defense. This argument presupposes the indemnity provision imposed on Fisher a duty to defend MT Builders against the Association's Fisher-based claims.[FN3]

FN3. A duty to defend is a "specific obligation to assume, upon tender, the defense obligations and costs of another." Steven G.M. Stein & Shorge K. Sato, *Advanced Analysis of Contract Risk-Shifting Provisions: Is Indemnity Still Relevant?,* 27 Construction Lawyer 5, 9 (Fall 2007). Or, as described in *Crawford v. Weather Shield Mfg.,* 38 Cal.Rptr.3d 787, 806 (Cal.Ct.App.2006), *aff'd,* 44 Cal.4th 541, 79 Cal.Rptr.3d 721, 187 P.3d 424 (2008): "A defense obligation is of necessity a current obligation. The idea is to mount it, render it, and fund it *now,* before the insured's-or indemnitee's-default is taken, or trial preparation is compromised."

[12] ¶ 16 To resolve these arguments, which present issues of law subject to de novo review, *see Thomas,* 173 Ariz. at 324, 842 P.2d at 1337, we begin again with the specific language of the indemnification provision. That provision obligated Fisher to:

> [I]ndemnify and hold harmless ... [MT Builders] ... from and against all claims, damages, losses and expenses, including but not limited to attorney's fees and court costs, arising out of or resulting from the performance or non performance [sic] of the Subcontractor's Work under this Subcontract ... to the extent caused in whole or in part by any negligent act or omission of the Subcontractor or anyone directly or indirectly employed by him or anyone for ***304 **765** whose acts he may be liable, regardless of whether it is caused in part by a party indemnified thereunto.

Based on the plain language of this indemnity provision, we agree with Fisher that, to obtain indemnity, MT Builders was required to prove the extent of Fisher's fault.

¶ 17 The provision limited Fisher's indemnity obligation "to the extent caused in whole or in part by any negligent act or omission of the Subcontractor."[FN4] The word "negligent" modifies the words "act" and "omission" and imposes a fault standard. *Cf.* Justin Sweet, *Sweet on Construction Industry Contracts: Major AIA Documents* § 20.7, at 553 (2d ed.1992) (discussing indemnity provision in AIA Document A201-1987, *General Conditions of the Contract for Construction,* ¶ 3.18.1). This language creates what is known as a "narrow form" of indemnification-the indemnitor's obligation only covers the indemnitee's losses to the extent caused by the indemnitor or a person the indemnitor supervises or is responsible for (collectively, "supervisees"). *See generally* Justin Sweet & Jonathan J. Sweet, *Sweet on Construction Industry Contracts: Major AIA Documents* § 19.02, at 622 (4th ed. 1999 & Supp.2007).

FN4. The provision also limited Fisher's indemnity obligation to losses and expenses caused by and linked to its work ("arising out of or resulting from the performance or non performance [sic] of the Subcontractor's Work under this Subcontract"). As one commentator has recognized, "Nearly every indemnity provision contains language limiting the indemnitor's obligation to loss occasioned in some way or another to the activities or work of the indemnitor. Frequently, this limitation will begin with the phrase 'arising out of.' " 3 Philip L. Bruner & Patrick O'Connor, Jr., *Bruner and O'Connor on Construction Law* § 10:58 (2002 & Supp.2008) (footnote omitted).

¶ 18 Although the parties have not cited, nor have we found, any reported Arizona case construing the indemnity language at issue here,[FN5] other courts have construed this or virtually identical language as creating a comparative fault or negligence arrangement whereby the indemnitor's liability is limited "to the extent" it and its supervisees were at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

fault.[FN6] *East-Harding, Inc. v. Horace A. Piazza & Assocs.,* 80 Ark.App. 143, 91 S.W.3d 547, 551 (2002); *Hagerman Constr. Corp. v. Long Elec. Co.,* 741 N.E.2d 390, 392-95 (Ind.Ct.App.2000); *MSI Constr. Managers, Inc. v. Corvo Iron Works, Inc.,* 208 Mich.App. 340, 527 N.W.2d 79, 81 (1995); *Braegelmann v. Horizon Dev. Co.,* 371 N.W.2d 644, 646-47 (Minn.Ct.App.1985); *Nusbaum v. Kansas City,* 100 S.W.3d 101, 105-07 (Mo.2003); *Dillard v. Shaughnessy, Fickel & Scott Architects, Inc.,* 884 S.W.2d 722, 724-25 (Mo.Ct.App.1994) (applying Kansas law); *Mautz v. J.P. Patti Co.,* 298 N.J.Super. 13, 688 A.2d 1088, 1092-93 (App.Div.1997); *Greer v. City of Philadelphia,* 568 Pa. 244, 795 A.2d 376, 379-82 (2002); *Brown v. Boyer-Washington Blvd. Assocs.,* 856 P.2d 352, 354-55 (Utah 1993).

FN5. Although worded differently, the indemnity provision in *INA* only obligated the indemnitor to indemnify the indemnitee against damages caused by an error or omission in the indemnitor's work. *INA,* 150 Ariz. at 251, 722 P.2d at 978; *see also infra* ¶ 23.

FN6. In *Washington Elementary Sch. Dist. No. 6 v. Baglino Corp.,* 169 Ariz. 58, 60, 817 P.2d 3, 5 (1991), the indemnitor agreed to indemnify against loss caused "in whole or in part by any negligent act or omission of the [indemnitor] ... regardless of whether or not it is caused in part by a party indemnified hereunder." Our supreme court held this language was sufficiently broad to require "coverage for any type of damage caused by the negligent behavior of the indemnitor, even though also caused in part by the active negligence of the party indemnified." *Id.* at 62, 817 P.2d at 7. Thus, although the indemnity provision required indemnitor fault, it did not limit the indemnitor's liability only to the extent of its fault.

*B. The Duty to Defend*

[13][14] ¶ 19 The issue then becomes: did Fisher lose the right to dispute its fault when it rejected MT Builders' tender of defense and failed to defend MT Builders against the Association's Fisher-based claims? [FN7] MT ***305 **766** Builders answers this question "yes," reasoning Fisher's obligation to hold it harmless necessarily required Fisher to actually defend MT Builders against the Association's claims. To decide whether, as MT Builders argues, Fisher owed it a duty to defend, which it then breached, we again turn to the wording of the indemnity provision.

FN7. In the superior court, Fisher unsuccessfully argued that even if it owed MT Builders a duty to defend, its performance of that duty was excused because it had an "inherent" conflict of interest with MT Builders and MT Builders had never properly tendered its defense. On appeal, without any analysis, Fisher raises these arguments in a one sentence footnote. We decline to address these arguments and deem them waived. *See Schabel v. Deer Valley Unified Sch. Dist. No. 97,* 186 Ariz. 161, 167, 920 P.2d 41, 47 (App.1996) ("Issues not clearly raised and argued in a party's appellate brief are waived.").

[15][16] ¶ 20 On its face, the indemnity provision did not require Fisher to defend MT Builders; the word "defend" is notably absent. Instead, the parties agreed Fisher's obligation to indemnify and hold MT Builders harmless from and against all claims [FN8] would be limited "to the extent caused in whole or in part by" Fisher's negligence. In our view, the "to the extent" phrase prevents any interpretation of the indemnity provision as creating a duty to defend.[FN9] A claim is defended necessarily before it is decided; but the language used here envisioned a determination of Fisher's fault before Fisher would be required to indemnify and hold MT Builders harmless against all claims. We cannot square the language of this indemnity provision with a duty to defend existing in advance of a de-

197 P.3d 758 Page 12
219 Ariz. 297, 197 P.3d 758, 543 Ariz. Adv. Rep. 21
**(Cite as: 219 Ariz. 297, 197 P.3d 758)**

termination of fault.

FN8. We note, without expressing agreement, that some courts have held the duty to "indemnify and hold harmless" against claims does not impose on the indemnitor an immediate duty, upon request, to provide and pay for the ongoing defense of claims against the indemnitee, regardless of the indemnitor's ultimate liability for those claims, when the indemnity provision fails to impose on the indemnitor an explicit obligation to defend. These courts have interpreted this language as only requiring the indemnitor to reimburse the indemnitee for defense costs. *See, e.g., Rogers & Babler v. State,* 713 P.2d 795, 800 (Alaska 1986) (citing cases); *Miley v. Johnson & Johnson Orthopaedics, Inc.,* 41 Mass.App.Ct. 30, 668 N.E.2d 369, 372 (1996); *Linkowski v. Gen. Tire & Rubber Co.,* 53 Ohio App.2d 56, 371 N.E.2d 553, 557 (1977).

FN9. MT Builders focuses on the language in the indemnity provision requiring Fisher to indemnify and hold it harmless "against all claims" in arguing Fisher owed an immediate duty to defend MT Builders against the Fisher-based claims. However, a cardinal rule of contract construction requires us to look at the agreement as a whole, reading each part in light of all other parts. *C & T Land & Dev. Co. v. Bushnell,* 106 Ariz. 21, 22, 470 P.2d 102, 103 (1970); *Chandler Med. Bldg. Partners v. Chandler Dental Group,* 175 Ariz. 273, 277, 855 P.2d 787, 791 (App.1993) ("A contract must be construed so that every part is given effect, and each section of an agreement must be read in relation to each other to bring harmony, if possible, between all parts of the writing."). A corollary rule prohibits us from construing "one provision in a contract so as to render another provision meaningless." *Chandler Med.,* 175 Ariz. at 277, 855 P.2d at 791. Thus, we read the "against all claims" language relied upon by MT Builders in light of the "to the extent" language to conclude Fisher did not owe MT Builders a duty to defend in advance of a determination of Fisher's fault.

¶ 21 Of significance is MT Builders' failure to explain what the language "to the extent caused in whole or in part by any negligent act or omission of the Subcontractor" means. Instead, relying principally on this court's decision in *INA,* it argues we have recognized that the words "hold harmless ... against all claims" require an indemnitor to defend its indemnitee and, as in the insurance context, such a duty exists without proof of fault because the duty to defend is broader than the duty to indemnify. MT Builders' reliance on *INA* is misplaced, and we are not persuaded, under the facts of this case, that an indemnitor and a liability insurer should be treated the same.[FN10]

FN10. MT Builders also cites *Hauskins v. McGillicuddy,* 175 Ariz. 42, 852 P.2d 1226 (App.1992), *review denied with clarification,* 177 Ariz. 279, 867 P.2d 849 (1994), in support of its argument Fisher owed it a duty to defend. In addressing the scope of the indemnitor's duty to indemnify, we noted that under the indemnity provision at issue in that case the indemnitor had a duty to defend the indemnitee. *Id.* at 50, 852 P.2d at 1234. The indemnity provision there did not explicitly require the indemnitor to defend the indemnitee; instead, it required the indemnitor to indemnify and hold harmless the indemnitee "from all suits, actions or claims of any character brought because of any injuries or damage received or sustained by any person." *Id.* The provision at issue in that case did not, as it does here, include the "to the extent" restriction.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

197 P.3d 758 Page 13
219 Ariz. 297, 197 P.3d 758, 543 Ariz. Adv. Rep. 21
**(Cite as: 219 Ariz. 297, 197 P.3d 758)**

¶ 22 In *INA,* a homeowner sued her insurance carrier and its agent and asserted the carrier and the agent had wrongfully refused to pay her fire loss claim. 150 Ariz. at 250, 722 P.2d at 977. The agent tendered his defense to the insurance carrier pursuant to an indemnification clause in his agency agreement with the carrier. *Id.* at 251, 722 P.2d at 978. That clause required the carrier to indemnify and hold harmless the agent ***306 **767** against liability "you may become obligated to pay for damages sustained and caused by our error or omission ... provided you have not caused or contributed to such liability by your own acts, errors or omissions." *Id.* The carrier took the position the allegations of the homeowner's complaint controlled the agent's right to indemnity and refused the tender because the homeowner's complaint contained allegations of wrongdoing by the agent. *Id.* Ultimately, the agent's professional errors and omissions insurer ("E and O insurer") defended the agent. *Id.* After the homeowner's case was dismissed by stipulation, the E and O insurer demanded the carrier pay the attorneys' fees and costs it had incurred in defending the agent. *Id.* The carrier refused, and the E and O insurer sued the carrier for indemnification. *Id.*

[17][18] ¶ 23 We rejected the carrier's argument the allegations in the homeowner's complaint controlled the agent's contractual right to indemnity. *Id.* at 253, 722 P.2d at 980. After noting its argument was premised in part on analogizing its position to an insurer's duty to defend its insured, we stated:

> The duty to defend, however, is not the same as the duty to indemnify. The duty to defend arises at the earliest stages of litigation and generally exists regardless of whether the insured is ultimately found liable. The duty to indemnify depends on whether the indemnitee engaged in actual, active wrongdoing.[FN11] The accrual of the obligation to provide a defense does not control the accrual of the obligation to indemnify.
>
> FN11. Our statement that "[t]he duty to indemnify depends on whether the indemnitee engaged in actual, active wrongdoing" must be considered in the context in which it was made. Under common law indemnity, the party seeking indemnification must "be proven free from negligence." *Herstam v. Deloitte & Touche, LLP,* 186 Ariz. 110, 118, 919 P.2d 1381, 1389 (App.1996) (quoting *INA,* 150 Ariz. at 255, 722 P.2d at 982). Similarly, unless "expressed in clear and unequivocal terms," a contractual indemnity provision will not be construed to protect an indemnitee against its own negligence. *Washington Elementary,* 169 Ariz. at 61, 817 P.2d at 6. The contractual indemnity provision at issue in *INA* did not protect the agent against his own negligence. *See supra* ¶ 23.

*Id.* at 255, 722 P.2d at 982 (citation omitted).

¶ 24 We then rejected the carrier's argument that the agency agreement only provided indemnification for damages, not attorneys' fees: "A party is not 'held harmless' unless the indemnitor bears the indemnitee's costs of defending the third party's claim." *Id.*

¶ 25 In discussing the carrier's indemnity obligations to the agent, we did not, as MT Builders suggests, establish a rule that a contractual promise to "hold harmless" by itself creates an immediate, upfront duty to defend. Instead, we recognized an indemnitor's promise to hold harmless would allow an indemnitee to recover its defense costs *if* a claim was made against it that entitled it to indemnification.[FN12] We held, absent a duty to indemnify, the carrier was under no obligation to pay the E and O insurer's defense costs. *Id.* We stated:

FN12. We note the indemnity provision in *INA* did not impose a separate and distinct defense obligation. Thus, the only issue before us was whether a duty to hold harm-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

197 P.3d 758 Page 14
219 Ariz. 297, 197 P.3d 758, 543 Ariz. Adv. Rep. 21
**(Cite as: 219 Ariz. 297, 197 P.3d 758)**

> less and indemnify against liability was sufficiently broad enough to allow the indemnitee to obtain reimbursement for its defense costs.

The accrual of the right to indemnity is important here ... to illuminate a basic principle of indemnity. The right exists when there is a legal obligation on the indemnitee to pay or a sum is paid by him for which the indemnitor should make reimbursement. Such an obligation or sum cannot be imposed solely by a third party's unproven allegations against the indemnity parties, but requires factual determinations.

*Id.* at 253, 722 P.2d at 980.[FN13] Although we noted the duty to defend "arises at the earliest stages of litigation," *id.* at 255, 722 P.2d at 982, we made that statement in the context***307 **768** of addressing and rejecting the carrier's argument that its duty to indemnify was comparable to a liability insurer's duty to defend.[FN14] We did not suggest an indemnitor and a liability insurer should be treated the same, and we did not discuss whether an indemnitor must immediately defend its indemnitee when the indemnity provision does not require the indemnitor to do so and limits its indemnification to the extent of the indemnitor's fault.

> FN13. Accordingly, we concluded the E and O carrier and the agent were only entitled to recover defense costs attributable to claims against the agent that entitled him to indemnity, and had to bear those costs related to claims against the agent for only his own wrongdoing. 150 Ariz. at 255, 722 P.2d at 982.

> FN14. In discussing the cases cited by the carrier, we stated "[i]t is true that the obligation to indemnify may be satisfied either by defending the indemnitee or by paying the indemnitee's costs of defense *if the claim is covered by the indemnity agreement.*" 150 Ariz. at 254, 722 P.2d at 981 (emphasis added).

¶ 26 Further, even if we were to assume an insurance policy is analogous to an indemnity agreement, we have recognized the language of the insurance policy controls the scope and extent of the insurer's duty to defend. *Lennar Corp. v. Auto-Owners Ins. Co.,* 214 Ariz. 255, 260, ¶ 11, 151 P.3d 538, 543 (App.2007); *Cal. Cas. Ins. Co. v. State Farm Mut. Auto. Ins. Co.,* 185 Ariz. 165, 168, 913 P.2d 505, 508 (App.1996). Application of that principle here underscores the importance and significance of the "to the extent" limitation in this indemnity provision.

¶ 27 MT Builders argues conditioning a subcontractor's duty to defend on a determination of the extent of its fault would be "absurd" because the general contractor might have to wait "months or years" before receiving a defense. MT Builders makes a good point; as a practical matter, an indemnity provision obligating a subcontractor to defend the general contractor but imposing such a limitation might end up being of little value-by the time the extent of the subcontractor's fault has been determined, the general contractor might no longer need a defense. But this case does not present such a situation; we are not dealing with an indemnity provision that requires the indemnitor to defend its indemnitee. Parties are free to contract, *Smith v. Saxon,* 186 Ariz. 70, 73, 918 P.2d 1088, 1091 (App.1996), and they can agree the indemnitor will only be under a duty to reimburse the indemnitee's defense costs, and only then to the extent of the indemnitor's fault. That is the case here.

*C. Preclusion*

[19] ¶ 28 Relying on *Cunningham v. Goettl Air Conditioning, Inc.,* 194 Ariz. 236, 980 P.2d 489 (1999), and *Damron v. Sledge,* 105 Ariz. 151, 460 P.2d 997 (1969), MT Builders argues its settlement with the Association barred Fisher from disputing the existence and extent of its indemnity liability to MT Builders. We disagree.

¶ 29 In *Cunningham,* our supreme court discussed when a stipulated judgment in favor of a third person and against an indemnitee could bind

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the indemnitor. Applying Restatement (Second) of Judgments § 57 (1982), the court held that when an indemnity obligation exists, an indemnitor will be barred from disputing the existence and extent of its indemnitee's liability to a third person if the indemnitor had reasonable notice of the third person's action, refused to assume or participate in the indemnitee's defense and the indemnitee defended the action with due diligence and reasonable prudence. 194 Ariz. at 240, ¶ 19, 980 P.2d at 493. The indemnitor will also be barred from relitigating issues determined in the action against the indemnitee. *Id.*

¶ 30 In *Damron*, the court discussed whether a default judgment could bind an insurer that refused to defend its insured in a tort action. The insured settled the case, assigned to the plaintiff any rights he had against the insurer for bad faith in refusing to defend, withdrew his answer and “let the case go by default” in exchange for a covenant not to execute. 105 Ariz. at 152-53, 154, 460 P.2d at 998-99, 1000. The court stated that, absent fraud or collusion, the default judgment could be enforced against the insurer because an insurer refusing to defend “must accept the risk that an unduly large verdict may result from lack of cross-examination and rebuttal.” *Id.* at 155, 460 P.2d at 1001.

¶ 31 Neither case supports MT Builders' argument that its settlement with the Association determines the existence and extent of Fisher's indemnity liability. The issue in ***308 **769** each case was whether a judgment in favor of a third person and against the indemnitee/insured could bind the indemnitor/insurer from contesting the existence and scope of the indemnitee/insured's liability to the third person. Neither case held the judgment barred the indemnitor/insurer from contesting its own liability to its indemnitee/insured. *See infra* ¶ 35. Indeed, the supreme court in *Cunningham* explicitly recognized the agreement between the indemnitor and indemnitee, not the stipulated judgment, determined the extent of the indemnitor's liability to its indemnitee. 194 Ariz. at 242, ¶ 27, 980 P.2d at 495.

¶ 32 Therefore, although Fisher failed to accept MT Builders' tender of defense, Fisher's refusal to do so did not bar it from contesting its own fault and whether it was under an obligation to indemnify and hold MT Builders harmless from the loss it sustained when it settled the Association's Fisher-based claims.

*D. Reasonableness*

[20] ¶ 33 Although *Cunningham* and *Damron* do not, as MT Builders argues, hold an indemnitee's settlement with a third party will control the existence and extent of the indemnitor's indemnity liability, they are in accord with the approach taken by many courts regarding the right of an indemnitee to recover against an indemnitor when, as here, before liability is determined, the indemnitee settles an action against it by a third party. Under this approach, subject to an important qualification we discuss below, *see infra* ¶ 35, when an indemnitee settles a lawsuit covered by an indemnity agreement, it may obtain indemnity from its indemnitor if it gave the indemnitor notice of the action and an opportunity to defend and demonstrates the decision to settle was, under the circumstances, reasonable and prudent. *S. Ry. Co.,* 823 F.2d at 480; *Atl. Richfield Co. v. Interstate Oil Transp. Co.,* 784 F.2d 106, 110-13 (2nd Cir.1986); *Consol. Rail Corp. v. Ford Motor Co.,* 751 F.Supp. 674, 676 (E.D.Mich.1990); *Stone Bldg. Co. v. Star Elec. Contractors,* 796 So.2d 1076, 1090 (Ala.2000); *Grand Trunk W. R.R., Inc. v. Auto Warehousing Co.,* 262 Mich.App. 345, 686 N.W.2d 756, 763-64 (2004); *CIGNA Corp. v. Lincoln Nat'l Corp.,* 6 A.D.3d 298, 775 N.Y.S.2d 303, 304 (2004); *Valloric v. Dravo Corp.,* 178 W.Va. 14, 357 S.E.2d 207, 211-14 (1987); 41 Am.Jur.2d *Indemnity* § 46 (1995). If the indemnitee satisfies these conditions, it may obtain indemnity without having to show it was actually liable to the third person; it need only show its potential liability. We believe this approach is sound, workable and consistent with Arizona law. *See United Servs. Auto. Assoc. v. Morris,* 154 Ariz. 113, 120, 741 P.2d 246, 253 (1987) (insurer will be bound by stipulated judgment reached pursuant to settlement

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

made by insured if insured gave insurer notice and opportunity to defend, but only to the extent settlement was reasonable and prudent under the circumstances; such an approach "accords with general principles of indemnification law"). Accordingly, we adopt it here.

[21] ¶ 34 This approach is subject to an important qualification: the indemnitee is only entitled to indemnity if the third party's action was covered by the indemnity agreement. *Cunningham,* 194 Ariz. at 242, ¶ 27, 980 P.2d at 495 (language of indemnity agreement determines extent of indemnitor's liability to its indemnitee). The indemnitor is still entitled to challenge whether the indemnity provision was applicable to the action. *S. Ry. Co.,* 823 F.2d at 480-81 ("[I]f the indemnitee reasonably settled with the injured party, but the injury is not covered by the indemnity agreement, then the indemnitor is not liable to the indemnitee. Thus, the question of the coverage of the indemnity contract between [the parties] remains to be decided." (footnote omitted)); *Consol. Rail Corp.,* 751 F.Supp. at 676 (when enforceable indemnity contract exists and indemnitor has refused seasonable tender of defense along with notice that a settlement will be reached, indemnitee must "further show: (1) that the fact situation of the original claim was covered by the contract of indemnity, and (2) that the settlement was reasonable"); *Valloric,* 357 S.E.2d at 214 ("indemnitee must in his indemnity suit show that the original claim is covered by the indemnity agreement").

[22][23][24][25][26] ¶ 35 Whether an indemnitee's decision to settle is reasonable and prudent ***309 **770** under the circumstances will normally present a question of fact. In *Morris,* our supreme court explained what this standard meant in the insurance context; we find its explanation appropriate in the indemnity context: "The test as to whether the settlement was reasonable and prudent is what a reasonably prudent person in the insureds' position would have settled for on the *merits* of the claimant's case. This involves evaluating the facts bearing on the liability and damage aspects of claimant's case, as well as the risks of going to trial." 154 Ariz. at 121, 741 P.2d at 254 (citation omitted). Whether a settlement meets this standard requires the finder of fact to evaluate the facts pertaining to liability, the claimed damages, and the risks of going to trial and to compare these facts with the nature and size of the settlement. As recognized in *Trim v. Clark Equipment Co.,* 87 Mich.App. 270, 274 N.W.2d 33, 36-37 (1978), a case cited with approval in *Morris,* the reasonableness of

> the settlement consists of two components which are interrelated. The fact finder must look at the amount paid in settlement of the claim in light of the risk of exposure. The risk of exposure is the probable amount of a judgment if the original plaintiff were to prevail at trial, balanced against the possibility that the original defendant would have prevailed. If the amount of the settlement is reasonable in light of the fact finder's analysis of these factors, the indemnitee will have cleared this hurdle. The fact that the claim may have been successfully defended by a showing of contributory negligence, lack of negligence or otherwise, is but a part of the reasonableness analysis and, therefore, subject to proof.

(Citations omitted.)

[27][28] ¶ 36 The burden is on the indemnitee to show its settlement was reasonable and prudent. *Id.* at 36; *Valloric,* 357 S.E.2d at 214; *cf. Morris,* 154 Ariz. at 120, 741 P.2d at 253; *Himes v. Safeway Ins. Co.,* 205 Ariz. 31, 36-37, ¶ 12, 66 P.3d 74, 79-80 (App.2003). Evidence relevant to this showing will depend on the circumstances. In *Himes,* we discussed what evidence would be relevant to determining whether a stipulated judgment entered pursuant to a settlement between an insured and a third party was reasonable after the insurer allegedly breached its duty of equal consideration. Relying on *Morris,* we stated the "key test" was "whether the evidence would assist the reasonably prudent person, acting as though the person were

dealing with sufficient funds from his or her own pocket, in determining what a reasonable settlement amount would have been.” 205 Ariz. at 42-43, ¶ 37, 66 P.3d at 85-86. We identified a number of non-exclusive factors:

> [T]he releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation [on the merits]; ... any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released.

*Id.* at 42, ¶ 33, 66 P.3d at 85 (quoting *Chaussee v. Md. Cas. Co.*, 60 Wash.App. 504, 803 P.2d 1339, 1343 (1991)). Although *Himes* is an insurance case, its discussion of the type of evidence relevant to determining when a settlement is reasonable is equally applicable to a determination of the same issue in an indemnity case.

¶ 37 With these principles in mind, we turn to Fisher's argument that fact issues regarding the extent of its fault and the reasonableness of MT Builders' settlement with the Association precluded summary judgment.

*III. Fact Issues*

*A. Background*

¶ 38 After MT Builders had settled or otherwise resolved its indemnity claims against all but Fisher and two other subcontractors, it moved for summary judgment against Fisher and the two remaining subcontractors (“2003 motion”) and asserted an argument we have rejected in this opinion-that the subcontractors were barred from disputing their liability under the indemnity provision and were bound by the settlement because they had failed to accept MT Builders' tender ***310 **771** of defense. MT Builders also argued that because the settlement sum was less than what its and the Association's experts had determined would be needed to repair all of the construction defects, $1,756,297 and $7,408,264, respectively, its settlement with the Association was non-collusive, non-fraudulent, fair and reasonable. MT Builders' and the Association's experts had also estimated it would take at least $86,000 and $856,000, respectively, to repair the roofs. Fisher and the two other remaining subcontractors opposed MT Builders' motion.

¶ 39 The superior court granted MT Builders' motion “in its entirety” (“2004 indemnity ruling”). The court ruled, contrary to what we are now holding in this opinion, that “[t]he subcontractors' duties to defend and indemnity [sic] [were] not dependent upon an ultimate finding of negligence.” Although the court did not specifically find MT Builder's settlement of the Association's claims was reasonable, it found the subcontractors were “bound by MT Builders' settlement and [were] not excused by any of their several arguments seeking excusal.” Thereafter, in the normal course, the case was assigned to a different division of the superior court and thus to a different superior court judge.

¶ 40 Pursuant to the 2004 indemnity ruling, MT Builders asked the court to enter a judgment on its indemnity claim against the three subcontractors in the amount of the settlement sum. It also sought reimbursement for the attorneys' fees, litigation-related expenses (including expert witness fees) and court costs it had incurred in defending against the Association's claims as well as an award of the fees and costs it had incurred in pursuing its indemnity claim. In a series of orders, the court essentially reconsidered much of the 2004 indemnity ruling and held that, to obtain what the parties began to call “indemnity damages” and to recover the expenses it had incurred in defending against the Association's claims, MT Builders would have to prove the extent of Fisher's fault, that is, causation and negligence.

¶ 41 After further briefing by the parties, the court found MT Builders had incurred $525,082 in expenses (attorneys' fees, expert witness fees, other litigation-related expenditures and court costs) in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

defending against the Association's claims and in pursuing its indemnity claim. Apparently adopting a suggestion submitted by one of the other subcontractors, the court determined that because MT Builders had originally sought indemnity from 19 different subcontractors, each of the three remaining subcontractors would be required to indemnify MT Builders for 1/19th of that portion of the $525,082 pertaining to MT Builders' pre-settlement expenses ($439,817) and, because only the three subcontractors remained in the case after the settlement, 1/3rd of its post-settlement expenses ($85,265). After Fisher and the two other subcontractors objected to a form of judgment lodged by MT Builders, the court realized it had not resolved the allocation and amount of indemnity damages that should be assessed against the subcontractors.

¶ 42 Subsequently, the court ruled genuine issues of material fact existed regarding each subcontractor's “liability to indemnify MT Builders for damages directly resulting from the specific defective performance of” each particular subcontractor. The court set the matter for trial. The issue identified by the court, however, was never tried. MT Builders settled with the two other subcontractors, and the court resolved the issue as to Fisher based on competing motions for summary judgment filed by Fisher and MT Builders.

¶ 43 In its motion, Fisher argued MT Builders had failed to disclose any evidence and thus could not prove at trial, first, how much it had actually paid to settle the Fisher-based claims; second, whether it had reasonably defended the Fisher-based claims; and third, whether the sum it had paid to settle the Fisher-based claims was reasonable. In response, MT Builders argued the court had decided the “reasonableness” issue in its 2004 indemnity ruling, *see supra* ¶ 40, but even if the issue had not been decided, the settlement was reasonable, again noting the settlement sum was less than what the experts had estimated would need to be spent to repair all of the construction defects, *see supra* ¶ 39. It further argued these cost estimates provided ample evidence of the defects attributable to Fisher's work and ***311 **772** what portion of the settlement sum should be allocated to its settlement of the Fisher-based claims. It also identified witnesses who could testify regarding the reasonableness of the settlement and asserted it had reasonably defended the Fisher-based claims by hiring experts who had investigated the claims and by actively participating in written discovery.

¶ 44 In its motion, MT Builders argued the amount of money the Association had actually spent in 2004 on roof reconstruction and repairs, $240,523, constituted the best evidence of what portion of the settlement sum should be attributable to Fisher's work and its settlement of the Fisher-based claims. Asserting untimely disclosure, it also asked the court to prohibit Fisher from disputing this evidence by relying on a report and affidavit from a roofing defect expert, Gene Lawrence. In his report and affidavit, Lawrence described the defects as the type “usually corrected by a punch list process,” and stated the total reasonable repair cost would be “in the vicinity of $32,000.” He further stated that if the Association's roofing claims had been included in MT Builders' settlement with the Association, “only a small amount of this settlement amount should have been allocated to resolve the roof issues.”

¶ 45 Disputing the late disclosure accusation, Fisher requested permission to use Lawrence's opinions at trial. It further argued the amount ultimately paid by the Association for roof repairs was irrelevant because MT Builders was required to prove what amount it had actually paid to settle the Fisher-based claims and whether that amount was reasonable.

¶ 46 The court granted MT Builders' motion and denied Fisher's motion. FN15 It ruled: “Mt [sic] Builders has presented competent admissible evidence of the full amount of damages it suffered as a result of Fisher Roofing's negligence. Fisher Roofing has failed to present any competent admissible evidence to establish that the repairs or the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

amount paid for them were unreasonable."

FN15. Although the court did not explicitly rule on the nondisclosure charge, it referred to the Lawrence report in denying Fisher's request for clarification.

¶ 47 Subsequently, the court rejected Fisher's request that it clarify its ruling because triable issues of fact remained regarding Fisher's alleged negligence:

> Fisher Roofing's own expert provided a report detailing the roofing defects and necessary repairs. MT Builders ... provided the Court with a detailed summary of the actual roofing repairs made and the costs thereof.... Nowhere in its opposition to MT Builders' motion or at the oral argument of the same did Fisher ever suggest or support a suggestion that there remained any material issues of fact as regards its liability; Fisher chose only to contest the reasonableness and necessity of the roofing repairs without competent admissible evidence to support their defense.[FN16]

FN16. In refusing to clarify its ruling, the court stated Fisher had failed, in both its written and oral responses to MT Builders' motion, to suggest fact issues existed regarding its liability. We disagree with the court's assessment of the record. Throughout the course of this litigation, Fisher had argued MT Builders was not entitled to indemnity without proving fault. It reminded the court of its position by quoting from prior rulings of the court in its briefing on its "reasonableness" motion which the court considered at the same time it considered MT Builders' motion (indeed, the parties' briefing on the two motions overlapped). Further, Fisher pointed out the shifting positions taken by MT Builders about the amount of its indemnity damages, and thus the extent of its fault, and also argued MT Builders' evidence regarding what the Association had paid to make roof repairs was not probative evidence of its fault. On the record presented to the superior court, we cannot conclude Fisher abandoned its right to contest indemnity liability.

*B. Fact Issues*

¶ 48 We disagree with the superior court-genuine issues of fact remained to be tried before MT Builders was entitled to indemnity from Fisher. FN17 The court should not, therefore, have granted MT Builders summary judgment. We begin with what we ***312 **773** have called in this opinion "fault"-that is, causation and negligence.

FN17. "In reviewing a motion for summary judgment, we determine de novo whether any genuine issues of material fact exist." *Brookover v. Roberts Enters., Inc.,* 215 Ariz. 52, 55, ¶ 8, 156 P.3d 1157, 1160 (App.2007).

[29] ¶ 49 As discussed above, MT Builders was entitled to indemnity "to the extent" its losses and expenses were caused in whole or in part by Fisher's negligence. Although MT Builders presented the court with evidence that some of Fisher's work had been defective and negligently performed, the court was presented with conflicting evidence regarding the extent and nature of the alleged defects and negligence. As Fisher points out, in its summary judgment motions MT Builders relied on information concerning Fisher's work developed by the Association's experts that not only conflicted with MT Builders' experts, but also conflicted with Fisher's expert who considered the defects to be of the "punch list" variety and *de minimus* in nature. The repair cost estimates developed by these competing experts reflected this conflict, ranging from the Association's high of $856,223, to MT Builders' $86,000, to Fisher's low of "in the vicinity" of $32,000. The evidence showing what the Association actually spent on roof repairs in 2004, $240,523, only added to the confusion regarding the extent of Fisher's alleged fault and, thus, the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

losses incurred by MT Builders that could be attributed to Fisher's fault and allocated to its settlement of the Fisher-based claims.

¶ 50 To obtain indemnity, MT Builders was required to prove the extent of Fisher's fault and what portion of the settlement sum was attributable to that fault. The evidence it presented on these issues was in conflict, and it was not, therefore, entitled to summary judgment.

¶ 51 Further, as discussed above, MT Builders was not entitled to indemnity unless it demonstrated the amount it had paid to settle the Fisher-based claims was reasonable and prudent under the circumstances. Whether a settlement meets this standard requires the finder of fact to evaluate the facts pertaining to liability, the claimed damages, and the risks of going to trial and to compare these facts with the nature and the size of the settlement. *See supra* ¶ 36. Here, the nature and size of MT Builders' settlement of the Fisher-based claims was a moving target and the court was never in a position to make this comparison.

¶ 52 Although the repair estimates and the amount the Association spent to repair the roofs constituted probative evidence regarding the damages caused by Fisher's fault, *see Heppler v. J.M. Peters Co.*, 73 Cal.App.4th 1265, 87 Cal.Rptr.2d 497, 514 (1999), that evidence is just one factor in the matrix of facts that need to be considered by the finder of fact in deciding whether a settlement is reasonable and prudent. *See supra* ¶ 37. MT Builders did not present the court with evidence regarding many of the other considerations that come into play in deciding this issue-such as the merits or demerits of the Association's liability theories, possible defenses to the Association's Fisher-based claims, possible "faults" of the Association or of the other subcontractors who might have contributed to the roof problems, and the risks and costs of going to trial. Although the record before the superior court reflected MT Builders' counsel had investigated, litigated and defended the Fisher-based claims, the court was provided with no meaningful information regarding the strengths and weaknesses of those claims. Even if the overall settlement reached by MT Builders with the Association was reasonable and prudent under the circumstances, to obtain indemnity from Fisher, MT Builders was required to show that its settlement of the Fisher-based claims met this test. On this issue, based on the evidence presented to the superior court, MT Builders was not entitled to summary judgment. We therefore remand this case to the superior court for further proceedings consistent with this opinion.

*IV. Fees, Expenses and Costs*

¶ 53 On appeal, Fisher has challenged various aspects of the superior court's rulings regarding MT Builders' right to recover the fees, expenses and costs it incurred in defending against the Association's Fisher-based claims. Because certain of these issues are likely to arise on remand, we address them now.

****774 *313** ¶ 54 Fisher first argues it disputed the amount of attorneys' fees, expenses and costs MT Builders actually incurred ($439,817) in defending against the Association's claims. *See supra* ¶ 42. We disagree. The record reflects MT Builders provided the court with detailed information regarding the fees, expenses and costs it had incurred. Although Fisher objected to MT Builder's entitlement to these fees, expenses and costs, asserting the court could not award them without first determining what portion was related to Fisher's fault, Fisher never contested any of the amounts comprising the $439,817. On remand, MT Builders does not need to re-prove this amount.

¶ 55 Under the indemnity provision, however, MT Builders' recovery of its fees, expenses and costs is limited to those expenditures "arising out of or resulting from" Fisher's work under the subcontract "to the extent caused in whole or in part" by Fisher's negligence. The court will need to allocate or apportion the fees, expenses and costs accordingly. The parties have not addressed how the court should do this. Other courts, when applying identical or virtually identical indemnity provisions, have

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

awarded defense costs based on the same percentage of fault attributed to the indemnitor for the plaintiff's injuries. *See, e.g.*, *Nusbaum*, 100 S.W.3d at 108-09; *Dillard*, 884 S.W.2d at 725 (applying Kansas law). On remand the superior court is free to adopt this approach or any other approach consistent with the requirements of the indemnity provision.

[30] ¶ 56 Fisher next argues the indemnity provision did not allow MT Builders to recover expert witness fees because such fees are not considered recoverable court costs under A.R.S. § 12-332 (2003). Fisher misreads the indemnity provision, and MT Builders is entitled to recover expert witness fees. The indemnity provision did not limit indemnity to court costs; it authorized indemnity for "all claims, damages, losses and expenses, including but not limited to attorney's fees and court costs."

¶ 57 Fisher finally argues MT Builders is not entitled to recover fees and costs for pursuing its indemnity claim under either the subcontract or A.R.S. § 12-341.01 (2003). The subcontract requires a "prevailing party" FN18 and the statute requires a "successful party." Because we have reversed the summary judgment originally awarded in MT Builders' favor, it no longer is the prevailing or successful party and is not, at this time, entitled to an award of fees and costs under either the subcontract or the statute.

FN18. MT Builders' subcontract with Fisher provided: "In the event either party of this Agreement shall institute an action to enforce any provisions hereof, the prevailing party shall be entitled to recover from the losing party such additional sum as the court may adjudge as reasonable costs, including attorneys' fees, in connection with such suit."

*V. Attorneys' Fees and Costs on Appeal*

¶ 58 Both parties have requested an award of attorneys' fees on appeal. Because neither party has yet to prevail, we deny their requests with leave to the superior court to consider awarding the prevailing party the attorneys' fees it incurred on appeal. However, Fisher is entitled to an award of costs on appeal pursuant to A.R.S. § 12-341 (2003) upon its compliance with Arizona Rule of Civil Appellate Procedure 21.

**CONCLUSION**

¶ 59 For the foregoing reasons, we affirm in part and reverse in part the superior court's judgment and remand for further proceedings consistent with this opinion.

CONCURRING: DONN KESSLER and JOHN C. GEMMILL, Judges.

Ariz.App. Div. 1,2008.
MT Builders, L.L.C. v. Fisher Roofing, Inc.
219 Ariz. 297, 197 P.3d 758, 543 Ariz. Adv. Rep. 21

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.