647 F.3d 524
**(Cite as: 647 F.3d 524)**

H

United States Court of Appeals,
Fifth Circuit.
The ESTATE OF Mable Dean BRADLEY, by and
through Gloria SAMPLE, Administratrix of the Es-
tate of Mable Dean Bradley, as Assignee of claims
held by Grancare, Incorporated, Mariner Health
Care, Incorporated, Boyd P. Gentry, George Mor-
gan, M. Scott Athans, Robin C. Skelton and Eleta
Jo Grimmett, Plaintiff–Appellant,
v.
ROYAL SURPLUS LINES INSURANCE COM-
PANY, INCORPORATED; Lumbermen's Mutual
Casualty Company, Defendants–Appellees.

No. 10–60650.
July 19, 2011.

**Background:** Estate of nursing home resident who
died due to acute dehydration and an untreated ur-
inary tract infection shortly after she was trans-
ferred to hospital brought state-court wrongful
death action against nursing home's corporate par-
ent and, following jury verdict in estate's favor,
entered into settlement agreement with corporate
parent and its first-layer excess liability insurer. Es-
tate then sued corporate parent's second- and third-
layer excess liability insurers in federal district
court, seeking recovery for their alleged bad faith
failure to defend or indemnify corporate parent in
the underlying state lawsuit and settlement. The
parties filed cross-motions for summary judgment.
The United States District Court for the Northern
District of Mississippi, W. Allen Pepper, Jr., J.,
2010 WL 2723191, denied estate's motion and
granted summary judgment for both insurers. Estate
appealed.

**Holdings:** The Court of Appeals, Emilio M. Garza,
Circuit Judge, held that:
(1) under Mississippi law, second-layer excess liab-
ility insurer did not have a duty to defend its in-
sured in the underlying state lawsuit, and

(2) because the actual facts giving rise to liability in
the underlying state lawsuit occurred outside of
second- and third-layer excess liability insurers'
policies, neither excess insurer had a duty to indem-
nify corporate parent for the judgment or settlement
in the underlying state suit.

Affirmed.

West Headnotes

**[1] Federal Courts 170B ⟐776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial de novo. Most Cited
Cases

Court of Appeals reviews a district court's
grant of summary judgment de novo, applying the
same standards as the district court.

**[2] Federal Courts 170B ⟐766**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk763 Extent of Review Depend-
ent on Nature of Decision Appealed from
                    170Bk766 k. Summary judgment.
Most Cited Cases

**Federal Courts 170B ⟐802**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions
                170Bk802 k. Summary judgment.
Most Cited Cases
In reviewing a district court's grant of summary
judgment, the Court of Appeals views all facts in
the light most favorable to the nonmoving party,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

647 F.3d 524
**(Cite as: 647 F.3d 524)**

and affirms only if the evidence shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.Rules Civ.Proc.Rule 56(a), 28 U.S.C.A.

**[3] Federal Courts 170B ⟳373**

170B Federal Courts
   170BVI State Laws as Rules of Decision
     170BVI(A) In General
      170Bk373 k. Substance or procedure; determinativeness. Most Cited Cases

Where federal jurisdiction is based on diversity of citizenship, the Court of Appeals applies the substantive law of the forum state.

**[4] Federal Courts 170B ⟳382.1**

170B Federal Courts
   170BVI State Laws as Rules of Decision
     170BVI(B) Decisions of State Courts as Authority
      170Bk382 Court Rendering Decision
       170Bk382.1 k. In general. Most Cited Cases

To determine the substantive law of a particular state, the Court of Appeals looks to the final decisions of that state's highest court.

**[5] Federal Courts 170B ⟳390**

170B Federal Courts
   170BVI State Laws as Rules of Decision
     170BVI(B) Decisions of State Courts as Authority
      170Bk388 Federal Decision Prior to State Decision
       170Bk390 k. Anticipating or predicting state decision. Most Cited Cases

**Federal Courts 170B ⟳781**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)2 Questions of Local Law
       170Bk781 k. Local law questions in

general. Most Cited Cases

Where a state's highest court has not addressed the issues presented in a case before the district court based on diversity of citizenship, the district court must make an " *Erie* guess" as to how that court would have resolved the issues if presented with them, and the Court of Appeals does the same, de novo, on appeal.

**[6] Insurance 217 ⟳2268**

217 Insurance
   217XVII Coverage—Liability Insurance
     217XVII(A) In General
      217k2267 Insurer's Duty to Indemnify in General
       217k2268 k. In general. Most Cited Cases

**Insurance 217 ⟳2911**

217 Insurance
   217XXIII Duty to Defend
     217k2911 k. In general; nature and source of duty. Most Cited Cases

**Insurance 217 ⟳2913**

217 Insurance
   217XXIII Duty to Defend
     217k2912 Determination of Duty
      217k2913 k. In general; standard. Most Cited Cases

Under Mississippi law, an insurer's duties to defend and indemnify its insured are distinct and separate duties requiring the use of different standards.

**[7] Insurance 217 ⟳2914**

217 Insurance
   217XXIII Duty to Defend
     217k2912 Determination of Duty
      217k2914 k. Pleadings. Most Cited Cases

Under Mississippi law, when an insured is sued, an insurer's duty to defend is determined solely by comparing the facts alleged in the com-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

647 F.3d 524
**(Cite as: 647 F.3d 524)**

plaint with the terms of the policy.

**[8]** Insurance 217 ⬤═2913

217 Insurance
   217XXIII Duty to Defend
      217k2912 Determination of Duty
         217k2913 k. In general; standard. Most Cited Cases

**Insurance 217 ⬤═2914**

217 Insurance
   217XXIII Duty to Defend
      217k2912 Determination of Duty
         217k2914 k. Pleadings. Most Cited Cases

Under Mississippi law, an insurer has an absolute duty to defend a complaint which contains allegations covered by the language of the policy, but has no duty to defend those claims which fall outside the coverage of the policy.

**[9]** Federal Courts 170B ⬤═786

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)2 Questions of Local Law
            170Bk786 k. Particular questions. Most Cited Cases

Determination of whether insurer had duty, under state law, to defend its insured in underlying state suit, which rested on the factual allegations in the complaint and the language of its policy, would be addressed by the Court of Appeals as a matter of law.

**[10]** Insurance 217 ⬤═2917

217 Insurance
   217XXIII Duty to Defend
      217k2916 Commencement of Duty; Conditions Precedent
         217k2917 k. In general. Most Cited Cases

**Insurance 217 ⬤═2923**

217 Insurance
   217XXIII Duty to Defend
      217k2920 Scope of Duty
         217k2923 k. Effect of other insurance. Most Cited Cases

Under Mississippi law, second-layer excess liability insurer of nursing home's corporate parent did not have duty to defend its insured in underlying state-court lawsuit brought against insured by estate of deceased nursing home resident; although first-layer excess insurer had a broad duty to defend under its own policy and was obligated to pay all premiums on appeal bonds, second-layer excess policy only "followed form" to first-layer excess policy with respect to "professional liability," and first-layer excess policy's medical professional liability coverage endorsement contained no reference to a defense obligation, pursuant to terms of second-layer excess policy, insurer's duty to defend arose only after the actual payment of judgments or settlements had exhausted any underlying insurance, and that condition precedent was never satisfied, as mere entry of judgment exceeding limits of underlying insurance was insufficient to trigger excess insurer's defense duty.

**[11]** Insurance 217 ⬤═2271

217 Insurance
   217XVII Coverage—Liability Insurance
      217XVII(A) In General
         217k2267 Insurer's Duty to Indemnify in General
            217k2271 k. Accrual; conditions precedent. Most Cited Cases

Under Mississippi law, unlike an insurer's duty to defend, which can be determined at the beginning of a lawsuit, an insurer's duty to indemnify generally cannot be ascertained until the completion of litigation, when liability is established, if at all.

**[12]** Insurance 217 ⬤═2268

217 Insurance
   217XVII Coverage—Liability Insurance

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

647 F.3d 524
**(Cite as: 647 F.3d 524)**

217XVII(A) In General

217k2267 Insurer's Duty to Indemnify in General

217k2268 k. In general. Most Cited Cases

Under Mississippi law, unlike an insurer's duty to defend, which turns on the pleadings and the policy, the duty to indemnify turns on the actual facts giving rise to liability in the underlying suit, and whether any damages caused by the insured and later proven at trial are covered by the policy.

**[13]** Insurance 217 ⟨⟩2396

217 Insurance

217XVII Coverage—Liability Insurance

217XVII(B) Coverage for Particular Liabilities

217k2394 Excess and Umbrella Liability Coverage

217k2396 k. Scope of coverage. Most Cited Cases

Under Mississippi law, second- and third-layer excess liability insurers of nursing home's corporate parent did not have a duty to indemnify it for judgment or settlement in underlying state wrongful death action brought by estate of deceased nursing home resident; second- and third-layer excess policies "followed form" to first-layer excess policy with respect to professional liability, first-layer excess policy unambiguously limited indemnity to those damages resulting from medical incidents "which occur[red] during the policy period," and the events which gave rise to liability here, including resident's dehydration, broken femur, and severe urinary tract infection, occurred outside of the second- and third-layer excess insurers' policy periods.

**[14]** Insurance 217 ⟨⟩2268

217 Insurance

217XVII Coverage—Liability Insurance

217XVII(A) In General

217k2267 Insurer's Duty to Indemnify in General

217k2268 k. In general. Most Cited Cases

In action brought in federal court by estate of deceased nursing home resident against second- and third-layer excess liability insurers of nursing home's corporate parent, in which estate sought recovery for excess insurers' alleged bad faith failure to defend or indemnify corporate parent in underlying state lawsuit and settlement, state-court trial record was properly before the district court and, in determining facts underlying estate's indemnity claim, the district court was free to look to the record from the underlying suit.

**\*527** James Robert Freeman, Kathleen Clark Knight, Isaac Ramon Ruiz–Carus (argued), Wilkes & McHugh, P.A., Tampa, FL, for Plaintiff–Appellant.

John Stuart Robinson, Jr., Richard Tracy Conrad, III, Wells, Marble & Hurst, P.L.L.C., Ridgeland, MS, Kathy Johnson Maus (argued), Butler Pappas, Tallahassee, FL, Ronald Steven Rawls, Louis Schulman, Butler, Pappas, Weihmuller, Katz, Craig, L.L.P., Tampa, FL, for Defendant–Appellee Royal Surplus Lines Insurance Co.

Michael Cleary Bruck, Sr. Lit. Atty. (argued), Alyssa Mara Reiter, Williams, Montgomery & John, Chicago, IL, William Trey Jones, III, Christopher Anthony Shapley, Brunini, Grantham, Grower & Hewes, P.L.L.C., Jackson, MS, for Defendant–Appellee, Lumbermen's Mutual Casual Company.

Appeal from the United States District Court for the Northern District of Mississippi.

Before REAVLEY, GARZA and SOUTHWICK, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

In this insurance coverage dispute, the Estate of Mable Dean Bradley ("the Estate") appeals the district court's grant of summary judgment to the De-

647 F.3d 524
**(Cite as: 647 F.3d 524)**

fendants–Appellees Royal Surplus Lines Insurance Co. ("Royal") and Lumbermens Mutual Casualty Co. ("Lumbermens").[FN1] The district court found that, as a matter of law, Royal and Lumbermens were not required to defend or indemnify a policyholder/defendant in a separate lawsuit brought by the Estate in a Mississippi state court. For the reasons that follow, we AFFIRM.

> FN1. The Estate erroneously identified Lumbermens as "Lumbermen's" in the complaint and in the proceedings below. The district court accepted this nomenclature, but we will refer to Lumbermens by its proper corporate name.

### I

Mable Dean Bradley was a resident at the Indianola Health and Rehabilitation Center from February 7, 2000, to May 17, 2002, when she was transferred to the South Sunflower County Hospital in Sunflower County, Mississippi. Bradley died within 24 hours of her admission to the hospital. The immediate causes of death included acute dehydration and an untreated urinary tract infection.

Bradley's estate brought suit in Mississippi state court against the Indianola Health and Rehabilitation Center's corporate parent, Mariner Health Care, Inc., and several other defendants ("the Mariner defendants"). The Estate sought recovery based on claims of negligence, mistreatment, malice and/or gross negligence, fraud, breach of fiduciary duty, statutory survival, and wrongful death arising out of Bradley's residency at the Indianola nursing home. The Estate's complaint further alleged that the wrongs Bradley suffered "were of a continuing nature, and occurred throughout Mable Dean Bradley's stay at the Defendant's facility."

After a ten-day jury trial in the Circuit Court of Sunflower County, the jury awarded $1.5 million in compensatory damages and $10.5 million in punitive damages to Bradley's estate, and the trial court entered final judgment accordingly. No appeal was taken from the trial court's order. The Mariner de-

fendants wanted to pursue an appeal, and Mariner's first layer excess insurer, Lexington Insurance Company ("Lexington"), agreed to post a portion of the appellate bond. Mariner's second and third layer excess insurers—**\*528** Royal and Lumbermens, respectively—would not, however. Royal maintained that the applicable portion of its excess policy had not been triggered at that point, and thus, it owed no duty to participate in bonding the jury's award on appeal. Lumbermens insisted that its excess policy was limited to indemnification, and therefore, it owed no duty to participate in defending the Mariner action or in posting an appellate bond.

The Mariner defendants and Lexington then entered into a settlement agreement with the Estate that extinguished "any and all claims relating to" Bradley's care and treatment at the Indianola nursing home, "including claims for damages, costs, or attorney's fees ... in exchange for $10.5 million." Together, Lexington and Mariner paid a total of $2.3 million to the Estate as part of the settlement; Royal and Lumbermens paid nothing. Mariner assigned its interest in any claims against Royal and Lumbermens to the Bradley estate.

In February 2008, the Estate filed suit against Royal and Lumbermens in federal district court, based on the parties' diversity of citizenship, seeking recovery for Royal's and Lumbermens' alleged bad faith failure to defend or indemnify Mariner in the underlying state lawsuit and settlement. The Estate moved for summary judgment, asking the district court to find that the Royal policy in effect from March 1999 to March 2000, and the Lumbermens policy in effect from March 1998 to March 2001, provided excess coverage to Lexington's first layer excess policy in effect from July 1999 to July 2000.[FN2] The Estate also asked the court to find that the policies described above required the excess insurers collectively to defend and indemnify Mariner for the final judgment in the underlying state suit. Royal and Lumbermens filed cross-motions for summary judgment, asking the court to find to the contrary.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

647 F.3d 524
**(Cite as: 647 F.3d 524)**

FN2. Royal issued two second layer excess policies that were in effect at different times during Bradley's February 2000 to May 2002 stay at the Indianola nursing home. There were three Lexington policies in effect at different times during this same 27–month span. The Estate's decision to seek summary judgment under the specific policies described above is discussed in Section III.A.2, *infra*.

In December 2010, the district court denied the Estate's motion and granted summary judgment for both insurers, finding as a matter of law that Royal's and Lumbermens' respective policies did not require them to defend or indemnify Mariner in the state lawsuit. Because Royal and Lumbermens were not obligated to provide coverage in the underlying suit, the Estate's bad faith action could not lie, and the district court dismissed the Estate's claim with prejudice. This appeal followed.

II

[1][2] We review a district court's grant of summary judgment *de novo*, applying the same standards as the district court. *See Floyd v. Amite Cnty. Sch. Dist.,* 581 F.3d 244, 247 (5th Cir.2009). We view all facts in the light most favorable to the nonmoving party, and affirm only if the evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Floyd,* 581 F.3d at 247–48.

[3][4][5] Where federal jurisdiction is based on diversity of citizenship, as it is here, we apply the substantive law of the forum state. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). To determine Mississippi law, we **\*529** look to the final decisions of Mississippi's highest court. *See Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.,* 352 F.3d 254, 260 (5th Cir.2003). Because the Mississippi Supreme Court has not addressed the issues presented here, the district court had to make an "*Erie* guess" as to how that court would have resolved the issues if presen-

ted with them. *Id.; see also Holt v. State Farm Fire & Cas. Co.,* 627 F.3d 188, 191–92 (5th Cir.2010); *Batts v. Tow–Motor Forklift Co.,* 66 F.3d 743, 749–50 (5th Cir.1995). We do the same, *de novo,* on appeal.

III

The Estate argues that the district court erred in finding that Royal and Lumbermens were not required to insure Mariner in the underlying state action. Specifically, the Estate contends that Royal's excess policy unambiguously required Royal to defend and indemnify Mariner for the state court judgment and resulting settlement, and that the Lumbermens policy required it to indemnify Mariner for the same.FN3

FN3. The Estate's motion for summary judgment argued that Lumbermens owed a duty to indemnify *and* defend the Mariner defendants, and the district court's opinion addressed both arguments accordingly. On appeal, the Estate's opening brief only presses the first argument; the second is waived. *See Valle v. City of Houston,* 613 F.3d 536, 544 n. 5 (5th Cir.2010).

A

[6][7][8][9] Under Mississippi law, an insurer's duties to defend and indemnify its insured are distinct and separate duties requiring the use of different standards. *See Titan Indem. Co. v. Pope,* 876 So.2d 1096, 1101–02 (Miss.Ct.App.2004); *see generally* 14 Lee R. Russ & Thomas F. Segala, COUCH ON INSURANCE § 200:3 (3d ed.2007); 3 Jeffrey E. Thomas et al., NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION §§ 16.06[3][a], 17.01[1][b][ii] (2010). When an insured is sued, an insurer's duty to defend is determined solely by comparing the facts alleged in the complaint with the terms of the policy. *See United States Fid. & Guar. Co. v. Omnibank,* 812 So.2d 196, 200 (Miss.2002); *Delta Pride Catfish, Inc. v. Home Ins. Co.,* 697 So.2d 400, 403 (Miss.1997). An insurer "has an absolute duty to defend a complaint which contains allegations covered by the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

647 F.3d 524
**(Cite as: 647 F.3d 524)**

language of the policy, but ... no duty to defend those claims which fall outside the coverage of the policy." *Farmland Mut. Ins. Co. v. Scruggs,* 886 So.2d 714, 719 (Miss.2004). Because whether Royal had a duty to defend Mariner in the underlying state suit rests on the factual allegations in the complaint and the language of its policy, we address this issue as a matter of law. *See Noxubee Cnty. Sch. Dist. v. United Nat'l Ins. Co.,* 883 So.2d 1159, 1165 (Miss.2004) ("The interpretation of an insurance policy is a question of law, not one of fact.").

1

[10] Here, the district court looked to the terms of the Royal excess policy and observed that Royal's duty to defend arose only after the actual payment of judgments or settlements had exhausted any underlying insurance, and because that condition precedent was never satisfied, Royal's defense obligation never matured. We agree.

The Royal second layer excess policy at issue—the Big Shield Commercial Catastrophe Liability Policy—was a general liability policy that provided $10 million in coverage excess of Lexington's $2 million first layer excess policy, which itself followed Mariner's $1 million self-insured retention.**530** With respect to Royal's duty to defend, the Big Shield policy provided:

1. INSURING AGREEMENT

1....

2. We will have the right and duty to defend any "suit" seeking those damages [that the insured becomes legally obligated to pay] when:

   (a) The applicable limits of insurance of the "underlying insurance" and other insurance have been used up in the payment of judgments or settlements....

The parties agree that Lexington's $2 million first layer excess policy and Mariner's $1 million self-insured retention make up the "underlying insurance" referred to in this section of the Royal

policy.

Royal's Big Shield policy also included an endorsement that modified the policy's default terms and limited coverage for professional liability:

*PROFESSIONAL LIABILITY LIMITATION*
This endorsement modifies insurance provided under the following:

Commercial Catastrophe Liability Insurance ("Big Shield" Policy)

With respect to "Professional liability" arising out of any Insured's activities as a(n) Nursing Facilit[y] this policy is limited to the coverage provided in the "Underlying Insurance".

If coverage is not provided by "Underlying Insurance", coverage is excluded from this policy....

Lexington's first layer excess policy is the "underlying insurance" contemplated here.

The gravamen of the Estate's claim is that Royal's policy "followed form" to the Lexington policy in all respects, and because Lexington had a broad duty to defend under its own policy and was obligated to pay all premiums on appeal bonds, that Royal likewise was obligated to defend and participate in bonding the jury's award on appeal.FN4 This is mistaken.

FN4. *See Insituform Techs., Inc. v. Am. Home Assur. Co.,* 566 F.3d 274, 278 (1st Cir.2009) ("The phrase 'follow form' refers to the practice, common in excess policies, of having the second-layer coverage follow substantively the primary layer provided by the main insurer."); *see also id.* at 278 n. 3 ("[B]ut is a mistake to assume precision in such terminology; and even where a policy is described as 'follow form,' it does not necessarily provide coverage that is substantively *identical* to the underlying one.") (emphasis in original) (citing Barry R. Ostrager & Thomas R.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

647 F.3d 524
**(Cite as: 647 F.3d 524)**

Newman, 2 HANDBOOK ON INSUR-ANCE COVERAGE DISPUTES § 13.01 (11th ed.2002)).

As the district court correctly observed, nothing in the Royal policy suggests that it follows form as to *all* terms and conditions in the Lexington policy. Rather, the Professional Liability Limitation endorsement is the only term that contains a follow form provision, and it specifies that the Royal policy will follow form to the Lexington policy " *[w]ith respect to 'professional liability' "* arising out of Mariner's operations at the Indianola nursing home. A review of the Lexington policy's corresponding Medical Professional Liability Coverage endorsement reveals no reference to a defense obligation. Thus, in the absence of a duty to defend under the Lexington policy's relevant endorsement, Royal's defense obligation, if any, must be determined by reference to the default terms of the Big Shield policy. And, as that policy provided, Royal's duty to defend only arose after "[t]he applicable limits of the 'underlying insurance' and other insurance have been used up *in the payment of* judgments or settlements...." (emphasis added). Contrary to the Estate's claim, the mere entry of a judgment that exceeded the limits of the underlying insurance was insufficient ***531** to trigger Royal's defense duty. Instead, Royal's policy required *actual payment* that exhausted Mariner's self-insured retention and Lexington's policy limits. That condition never occurred prior to Mariner's settlement with the Bradley estate. As such, Royal did not have a duty to post an appellate bond or otherwise defend its insured in the underlying state lawsuit.

2

[11][12] Unlike the duty to defend, which can be determined at the beginning of a lawsuit, an insurer's duty to indemnify generally cannot be ascertained until the completion of litigation, when liability is established, if at all. *See Barden Miss. Gaming LLC v. Great N. Ins. Co.,* 576 F.3d 235, 239–40 (5th Cir.2009); *see also VRV Dev. L.P. v. Mid–Continent Cas. Co.,* 630 F.3d 451, 459 (5th Cir.2011)* ("[A]n insurer's duty to indemnify typically can be resolved only after the conclusion of the underlying action.") (applying Texas law). This is because, unlike the duty to defend, which turns on the pleadings and the policy, the duty to indemnify turns on the actual facts giving rise to liability in the underlying suit, and whether any damages caused by the insured and later proven at trial are covered by the policy. *See Columbia Cas. Co. v. Ga. & Fla. RailNet Inc.,* 542 F.3d 106, 111 (5th Cir.2008) (applying Texas law); *see generally* 14 COUCH ON INSURANCE § 200:3; 3 NEW AP-PLEMAN ON INSURANCE LAW LIBRARY EDITION § 17.01[1][b][ii]. Thus, in determining whether Royal or Lumbermens had any duty to indemnify Mariner, we look to the actual facts put forward at trial that established Mariner's liability in the state lawsuit.[FN5]

> [FN5]. We note that the Mississippi case law addressing liability insurers' separate duties to defend and indemnify is limited, and that the duty to defend is discussed almost exclusively in those Mississippi cases identifying the two duties. The lone exception appears to be *Titan Indemnity Co. v. Pope,* 876 So.2d 1096 (Miss.Ct.App.2004). In making an *Erie* guess as to Royal's and Lumbermens' indemnification obligations here, we rely on Circuit precedent and leading secondary sources accordingly. We have found nothing in our research that suggests that the Mississippi Supreme Court would deviate from the accepted definition of indemnity if that court were called upon to decide the question before us.

[13] At the outset, we note that there were two Royal policies in effect, and three Lexington policies in effect, at different times during Bradley's February 2000 to May 2002 stay at the Indianola nursing home.[FN6] The Estate sought summary judgment based on the Royal policy in effect from March 1999 to March 2000, and the Lumbermens

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

647 F.3d 524
**(Cite as: 647 F.3d 524)**

policy in effect from March 1998 to March 2001. Obviously, a significant portion of Bradley's 27–month residency fell outside the coverage periods for these specific policies. The Estate argued below, as it does here, that Bradley's injuries "were of a continuing nature" and that under the terms of the Lexington policy's professional liability endorsement, the entire 27–month span of Bradley's stay was to be considered a single "medical incident." The Estate elected, its argument goes, to submit its claim under that combination of policies that offered the greatest coverage limits at any single point during Bradley's residency.[FN7]

> FN6. There is only one Lumbermens policy at issue in this case.

> FN7. The Texas Supreme Court authorized this type of election in cases where a single, indivisible injury triggers more than one policy, covering different policy periods. *See Am. Physicians Ins. Exch. v. Garcia,* 876 S.W.2d 842, 855 (Tex.1994). The Mississippi Supreme Court has not passed on the issue decided in *Garcia* and we do not reach it either.

**\*532** Unsurprisingly, Royal and Lumbermens take issue with the claim that Bradley's injuries should be characterized as one continuous "medical incident." Both excess insurers note that the injuries that immediately preceded Bradley's death—acute dehydration, a broken femur, and an untreated urinary tract infection —occurred in April and May 2002, well outside either of Royal's or Lumbermens' policy periods. And, the insurers argue, the jury's compensatory and punitive damages awards were based on these three injuries specifically; not a finding of continuing negligence.

The Lexington medical professional liability endorsement is indeed the correct benchmark for assessing Royal's duty to indemnify Mariner. This is because, as all parties agree, Royal's excess policy follows form to the Lexington policy with respect to professional liability. The Lexington

policy provides:

## I. COVERAGE—MEDICAL PROFESSIONAL LIABILITY

1. The Company [Lexington] will pay on behalf of the **Insured** [Mariner] that portion of **ultimate net loss** in excess of the Self–Insured Retention which the **Insured** shall become legally obligated to pay as **Damages** which occur during the policy period, resulting from a **medical incident** arising out of the following professional services provided by the **Insured** to any person at any pharmacy or facility owned, managed or operated by the Named Insured in Item # 1 of the Declarations:

> a) medical, surgical, dental or nursing treatment to a **patient**, including the furnishing of food or beverage in connection therewith;

> b) furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances if the **personal injury** occurs after the **Insured** has relinquished possession thereof to others;

> ...

> Any such rendering of or failure to render the above described professional services, together with all related acts or omissions in the furnishing of such services to any one **patient** resulting in a **claim** shall be considered as arising out of one **medical incident**.

(emphasis in original). The Estate relies on this provision, coupled with its assertion that it put on evidence at trial demonstrating Mariner's negligence throughout Bradley's 27–month stay, for the proposition that the jury's verdict included the specific Royal and Lumbermens policy periods in issue. The record suggests otherwise.

[14] The state trial record shows that the claims submitted to the jury related exclusively to the in-

647 F.3d 524
**(Cite as: 647 F.3d 524)**

juries that Bradley suffered in the weeks before her death (i.e., dehydration, a broken femur, and a severe urinary tract infection).[FN8] The trial court restricted expert testimony to the April–May 2002 time frame, and the Estate's medical expert on causation, as well as Bradley's attending nurse practitioner, limited their testimony to this time frame accordingly. While the Estate did present some evidence of Mariner's general negligence**533** that occurred throughout the term of Bradley's stay, in the form of insufficient staffing and charting irregularities, this evidence could not have supported the jury's liability findings or damages awards. This is because the trial court charged the jury with finding that for medical liability to attach, there had to be a causal relationship between Mariner's wrongful conduct and Bradley's injuries. And the only evidence providing a nexus between Mariner's wrongful conduct and actual harm to Bradley related to conduct that occurred in April and May 2002.

> FN8. The Estate argues that it was error for the district court to refer to the state trial record, and it contends that we are likewise precluded from doing so on appeal. There is no support for this assertion. *See N. Am. Specialty Ins. Co. v. Royal Surplus Lines Ins. Co.,* 541 F.3d 552, 558 n. 12 (5th Cir.2008) (applying Texas law). The state trial record was properly before the district court and, in determining the facts underlying the Estate's indemnity claim, the court was free to look to the record from the underlying suit. *See* FED. R. CIV. P. 56(c).

Lexington's first layer excess policy unambiguously limits indemnity to those damages resulting from medical incidents "which occur during the policy period." And because the Royal and Lumbermens policies follow form to the Lexington policy with respect to medical professional liability, Royal and Lumbermens only had a duty to indemnify Mariner for those damages that occurred within their respective policy periods. Here, those policy periods ran from March 1999 to March

2000, and March 1998 to March 2001, for Royal and Lumbermens, respectively. Because the actual facts giving rise to liability in the underlying suit occurred outside of Royal's and Lumbermens' policies, neither excess insurer had a duty to indemnify Mariner for the judgment or settlement in the underlying state suit. There being no duty to indemnify, there could no breach in denying coverage. *See A & S Trucking Co. v. First General Ins. Co.,* 578 So.2d 1212, 1218 (Miss.1991). The Estate's bad faith action fails as a matter of law.

IV

The district court's summary judgment is AFFIRMED.

C.A.5 (Miss.),2011.
Estate of Bradley ex rel. Sample v. Royal Surplus Lines Ins. Co., Inc.
647 F.3d 524

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

750 F.2d 428
**(Cite as: 750 F.2d 428)**

▷

United States Court of Appeals,
Fifth Circuit.
Leroy SULLEN, Plaintiff,
v.
MISSOURI PACIFIC RAILROAD COMPANY,
Defendant.
Leroy SULLEN, Plaintiff-Appellant,
v.
CHEVRON CHEMICAL COMPANY, Defendant-
Appellee-Appellant,
v.
BROADMOOR CORPORATION, et al., Third
Party Defendants-Appellees.

No. 83-3372.
Jan. 14, 1985.

Contractor's employee brought personal injury suit against chemical company which was party to contract. The United States District Court for the Eastern District of Louisiana, Peter Beer, J., dismissed the suit on a finding that the chemical company was the employee's statutory employer under Louisiana Worker's Compensation Law at the time of the injury-producing accident, and dismissed chemical company's indemnification claim against the contractor. Appeals were taken. The Court of Appeals, Politz, Circuit Judge, held that: (1) the employee was statutory employee of the chemical company at time of the accident, and thus, the personal injury suit was barred under Louisiana Worker's Compensation Law, and (2) under terms of the contract, contractor had no duty to defend and was not obligated to reimburse chemical company for costs incurred in its defense of the personal injury suit, which was based solely on chemical company's alleged negligence.

Affirmed.

West Headnotes

**[1] Workers' Compensation 413 ⟿2164**

413 Workers' Compensation
  413XX Effect of Act on Other Statutory or
Common-Law Rights of Action and Defenses
    413XX(C) Action Against Third Persons in
General for Employee's Injury or Death
      413XX(C)1 Right of Action of Employee
or Representative Generally
        413k2160 What Persons Liable as
Third Persons
          413k2164 k. Principal Employer or
Employer of Injured Person. Most Cited Cases
  Under Louisiana Worker's Compensation Law, contractor's employee was statutory employee of chemical company for which the contractor was to provide laborers to clean tank cars prior to their being loaded with products at chemical company's plant, and thus, employee's personal injury suit against the chemical company was barred, where the cleaning of tank cars was an integral part of the chemical company's operations and where, before the company contracted for the tank car cleaning, the chemical company's employees regularly did this cleaning. LSA-R.S. 23:1032, 23:1061.

**[2] Indemnity 208 ⟿31(7)**

208 Indemnity
  208II Contractual Indemnity
    208k31 Construction and Operation of Contracts
      208k31(7) k. Duty to Defend. Most Cited Cases
  (Formerly 208k9(1))
  Under Louisiana law, whether a party is obliged to tender a defense to another party depends entirely upon the allegations in the precipitating pleadings.

**[3] Insurance 217 ⟿2914**

217 Insurance
  217XXIII Duty to Defend
    217k2912 Determination of Duty
      217k2914 k. Pleadings. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

750 F.2d 428

**(Cite as: 750 F.2d 428)**

(Formerly 217k514.10(1))

In determining whether an indemnitor or an insurer is obligated to defend indemnitee or insured under terms of indemnity or insurance contract, Louisiana courts look exclusively to pleadings in light of contract provisions; ultimate outcome of the case has no effect upon duty to defend.

**[4] Indemnity 208 ⚖⇒31(7)**

208 Indemnity
 208II Contractual Indemnity
  208k31 Construction and Operation of Contracts
   208k31(7) k. Duty to Defend. Most Cited Cases
 (Formerly 208k9(1))

Under Louisiana law, unless contract of indemnity specifically provides for costs of defense as a separate item of indemnification, indemnitor has no obligation to defend if the petition alleges facts which, if proven, would establish liability of the indemnitee but preclude coverage under indemnity agreement.

**[5] Indemnity 208 ⚖⇒33(5)**

208 Indemnity
 208II Contractual Indemnity
  208k33 Particular Cases and Issues
   208k33(5) k. Contractors, Subcontractors, and Owners. Most Cited Cases
 (Formerly 208k9(2), 208k9(1))

**Indemnity 208 ⚖⇒37**

208 Indemnity
 208II Contractual Indemnity
  208k34 Scope and Extent of Liability
   208k37 k. Attorney Fees. Most Cited Cases
 (Formerly 208k9(2))

Where contractor agreed to defend and indemnify chemical company for any loss, expense, claim or demand for injury to contractor's employees and for injury to third persons or employees of the chemical company arising out of performance of the contract, contractor had no duty to defend and was not obliged to reimburse the chemical company for costs incurred in its defense of personal injury suit brought by contractor's employee who was also statutory employee of the chemical company under Louisiana Worker's Compensation Law. LSA-R.S. 23:1032, 23:1061.

**\*429** Heisler & Wysocki, Bonnie L. Zakotnik, New Orleans, La., for Sullen.

McLoughlin, Barranger, Provosty & Melancon, Lloyd C. Melancon, New Orleans, La., for Chevron.

Bienvenu, Foster, Ryan & O'Bannon, H.L. Foster, III, New Orleans, La., for Broadmoor, et al.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before GEE, POLITZ and RANDALL, Circuit Judges.

POLITZ, Circuit Judge:

This diversity case occasions an examination and application of the statutory-employer provision of the Louisiana Worker's Compensation Law, La.R.S. 23:1061, as well as application of the Louisiana law governing indemnity between certain contracting parties. Leroy Sullen appeals the grant of summary judgment dismissing his personal injury claim on a finding that Chevron Chemical Company was his statutory employer at the time of the injury-producing accident.[FN1] Chevron appeals the dismissal**\*430** of its indemnification claim against Broadmoor Corporation, Sullen's employer. Finding neither error of fact or law in the district court's opinion, we affirm.

 FN1. Sullen also appealed from the judgment dismissing his complaint against Missouri Pacific Railroad Company. That appeal was dismissed previously by order

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

750 F.2d 428
**(Cite as: 750 F.2d 428)**

of this court and is not now before us.

*Facts*

Sullen was an employee of Broadmoor. Broadmoor contracted with Chevron to provide the laborers to clean tank cars prior to their being loaded with products at Chevron's Oak Point plant. The tank cars were cleaned daily. The Broadmoor crew was under the supervision and immediate direction of a Broadmoor foreman who had hiring and firing authority. The Broadmoor foreman, in turn, took his orders from a Chevron employee.

During the period of the Broadmoor/Chevron contract, Chevron employees occasionally performed car cleaning tasks when Broadmoor employees were not available, but Broadmoor and Chevron employees did not work together. Before Chevron's contract with Broadmoor, Chevron employees regularly and routinely cleaned tank cars. By the time this case was being readied for trial, because of an economic downturn Chevron had resumed tank car cleaning with in-house personnel. The contractual arrangement with Broadmoor was discontinued.

Under the contract, Broadmoor agreed to indemnify and hold Chevron harmless from any claim made by any Broadmoor employee. Broadmoor did not specifically agree to indemnify Chevron for claims based on Chevron's own negligence.

The district court found that the cleaning of tank cars before loading products for shipment was an integral part of Chevron's trade or business which had been performed customarily by Chevron employees. Accordingly, Sullen was found to be a statutory employee under La.R.S. 23:1061.[FN2] As a result of that designation, under La.R.S. 23:1032,[FN3] Sullen's exclusive remedy was under the Worker's Compensation Law and his tort action against Chevron was statutorily barred. As a consequence of the grant of Chevron's motion for summary judgment dismissing Sullen's claim, the district court considered moot Broadmoor's motion for summary judgment seeking dismissal of Chevron's

claim for contractual indemnity. The court noted that if the motion had not been moot, it would have been granted. Chevron maintains that despite the mootness, it is entitled to attorney fees and costs incurred in the successful defense against Sullen's *ex delicto* claim because the contract required Broadmoor to defend any suit brought by a Broadmoor employee.

FN2. The statutory-employer section, La.R.S. 23:1061, provides:

Where any person (in this section referred to as principal) undertakes to execute any work, which is a *part of his trade, business, or occupation* or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him.... [Emphasis added.]

FN3. La.R.S. 23:1032 provides in pertinent part:

The rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, or relations, against his employer, or any principal or any officer, director, stockholder, partner or employee of such employer or principal, for said injury, or compensable sickness or disease. For purposes of this

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

750 F.2d 428
**(Cite as: 750 F.2d 428)**

Section, the word "principal" shall be defined as any person who undertakes to execute any work which is a part of his trade, business or occupation in which he was engaged at the time of the injury, or which he had contracted to perform and contracts with any person for the execution thereof.

*Analysis*

A. *Statutory Employer*

After a period of some difficulty, including "conflicting interpretation," **\*431***Penton v. Crown Zellerbach Corp.,* 699 F.2d 737, 740 (5th Cir.1983), beginning with *Blanchard v. Engine & Gas Compressors Services, Inc.,* 613 F.2d 65 (5th Cir.1980), we have sought to minimize conflicts and accord a uniform application to R.S. 23:1061. In *Blanchard* we observed:

[W]e should first consider whether the particular principal involved in the case customarily does the type of work performed by the contractor and whether the contractor's work is an integral part of the work customarily performed by the principal. If either of these situations exist, then there is a statutory employment relationship, and the inquiry ends there. If, however, the principal does not normally engage in this type of activity, or if it is not normally a part of his practices, then it is necessary to determine if others engaged in businesses similar to that of the principal customarily do this type of work or if it is an integral part of their businesses. If either of these inquiries yields an affirmative answer, then the general custom of the trade will control to make the relationship between the principal in question and his contractors' employees that of statutory employer and employee.

613 F.2d 65, 71 (5th Cir.1982). In a *Blanchard* progeny, *Chavers v. Exxon Corp.,* 716 F.2d 315, 317 (5th Cir.1983), we quoted from and explained *Blanchard's* holding:

By way of further explanation we stated that the court "should first consider whether the particular principal involved in the case customarily does

the type of work performed by the contractor." If that answer is in the affirmative, the principal is a statutory employer with resulting workmen's compensation obligations and a concomitant liability shield. If the answer is negative, the court must continue the inquiry "to determine if others engaged in businesses similar to that of the principal customarily do this type of work or if it is an integral part of their businesses." If this query results in an affirmative response the principal is a statutory employer. In sum, the core inquiry is whether the employees of the principal or employees of other employers engaged in similar operations customarily perform the work at issue. In either instance, the principal will be deemed a statutory employer.

The Louisiana Supreme Court addressed the matter recently in *Lewis v. Exxon Corp.,* 441 So.2d 192 (La.1983), phrasing the test as follows:

Two elements of the § 1032 definition must be met in order for a principal to be considered a statutory employer. First, the "work" must be a part of the principal's "trade, business or occupation." Second, the principal must have been engaged in that trade, business or occupation at the time of the injury. Absent either of these two conditions, the injury will not come within the scope of the workers' compensation program.

Courts must look to the facts of each individual case to determine whether a particular activity is within the scope of a principal's trade, business or occupation. Generally, in order for a work or project to be within a principal's trade, business or occupation, it must be routine or customary, or some other type of activity which is necessary for the principal's day-to-day operations. Put another way, the works contemplated by the statute are those activities which are an actual part of the nature and purpose of the principal's enterprise. Extraordinary or nonrecurring constructions or repairs usually are outside the scope of the trade or business of manufacturing or production concerns.... General maintenance and repair work, which by their nature allow the smooth and continued opera-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

750 F.2d 428
**(Cite as: 750 F.2d 428)**

tions of the principal, are within the scope of the statute.... The specific task to which an individual employee is put should not be determinative of his coverage under the act. Instead, the entire scope of the work contract must be considered.

441 So.2d 197-98 (citations omitted). After *Lewis* we again considered the issue in **\*432**Hodges v. Exxon Corp., 727 F.2d 450 (5th Cir.1984), and concluded that although the language of *Lewis* differed from that in *Blanchard,* the analysis of the legal issue was the same under both articulations.

[1] Applying Louisiana law as announced by the Louisiana Supreme Court and as perceived by panels of this court in a growing line of cases, it is abundantly clear that summary judgment was appropriate in the present instance. *Blanchard* set out a disjunctive test under which a principal is a statutory employer if either the principal or others engaged in the same business customarily perform the work performed by the contractor *or* the work performed by the contractor is an integral part of work customarily performed by the principal or others engaged in the same business. While the affidavits and depositions in this case may be considered arguably insufficient to support a summary judgment on the ground that Chevron or others engaged in the business of blending oil additives customarily clean railroad tank cars, the record fully supports the trial judge's finding that the cleaning of tank cars is an integral part of Chevron's operations. The tank cars came into the plant daily and had to be cleaned before being loaded with Chevron products. Before Chevron contracted with Broadmoor, Chevron employees regularly did this cleaning along with other cleaning and general maintenance. During a period of business prosperity Chevron promoted all of its laborers to operators and contracted with Broadmoor for a pool of laborers to perform general maintenance and cleaning duties. When the economic conditions required belt tightening, Chevron returned to the use of its own employees for maintenance and cleaning. And as the *Lewis* court noted, maintenance work is an integral part of a principal's

trade, business or occupation and is within the reach of § 1061. *See also* Barrios v. Engine & Gas Compressor Services, Inc., 669 F.2d 350 (5th Cir.1982).

B. *Indemnification*

The contract between Chevron and Broadmoor provides:

3.2 CONTRACTOR [Broadmoor] agrees to defend and hold COMPANY [Chevron], its assigns, directors, employees, insurers, officers, stockholders and successors indemnified and harmless from and against any loss, expense, claim or demand for:

3.2.1 Injury to or death of CONTRACTOR'S employees or for damage to or loss of CONTRACTOR'S property in any way arising out of or connected with the performance by CONTRACTOR of services hereunder; and

3.2.2 Injury to, or death of, third persons or the employees of COMPANY, or for damage to or loss of property of COMPANY or of third persons, in any way arising out of or connected with the performance by CONTRACTOR of services hereunder. CONTRACTOR shall be liable for Property Damage to a maximum extent of $100,000.00.

Chevron has previously urged that contracts with identical or essentially similar wording entitled it to indemnity for costs and legal fees even when the claim was based solely on allegations of Chevron's negligence. Our response has been ambivalent. In Stephens v. Chevron Oil Co., 517 F.2d 1123 (5th Cir.1975), although recognizing that "the terms of this indemnity agreement do not entitle Chevron to be indemnified against its own negligence," id. at 1125, we nonetheless allowed recovery of fees and costs because the jury found Chevron free of negligence. In a companion suit decided that same day, Smith v. Chevron Oil Co., 517 F.2d 1154 (5th Cir.1975), Chevron was found negligent. Chevron's claim for reimbursement of costs and fees was expressly rejected because we found "no contract language to indicate an intent for [the in-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

750 F.2d 428
**(Cite as: 750 F.2d 428)**

demnitor] to provide a legal defense for Chevron against its negligent acts." *Id.* at 1158. In the recent case of *Wiley v. Offshore Painting Contractors,* 711 F.2d 602 (5th Cir.1983), we rejected Chevron's claim for indemnity, citing *Smith* and *Stephens* "where we held unequivocally**\*433** that this indemnity provision 'does not provide for indemnification for [Chevron's] own negligence in the clear and specific language required by Louisiana law.' " *Id.* at 610.

In a recent case, *Hyde v. Chevron U.S.A., Inc.,* 697 F.2d 614 (5th Cir.1983), we suggested that Louisiana law does not require a specific reference to negligent acts in order for an indemnity agreement to cover claims based on negligence if the language of the agreement reflects a clear intent to include those acts. However, *Wiley* holds that the wording in Chevron's contract, which we now review, does not show a clear intent of the parties to indemnify Chevron when the action is based on Chevron's sole negligence.

Nevertheless, Chevron argues that it is entitled to reimbursement for the cost of successfully defending an action based solely on its alleged negligence, *citing Stephens* and *Hobbs v. Teledyne Movible Offshore, Inc.,* 632 F.2d 1238 (5th Cir.1980). We are not persuaded. In allowing fees and costs the *Stephens* court overlooked controlling Louisiana precedent and the *Hobbs* court uncritically followed *Stephens,* overlooking intervening Louisiana decisions. The issue was not squarely presented to the court in *Stephens* or *Hobbs.* We do not labor under that limitation and we take cognizance of post-*Stephens* decisions of the Louisiana courts which reach a contrary result.

[2][3] Louisiana law is definite and certain. Whether a party is obliged to tender a defense to another party depends entirely upon the allegations in the precipitating pleadings. *American Home Assurance Co. v. Czarniecki,* 255 La. 251, 230 So.2d 253 (1969); *Young Oil Co. of Louisiana, Inc. v. Durbin,* 412 So.2d 620 (La.App.1982); *Sullivan v. Hooker Chemical Co.,* 370 So.2d 672

(La.App.1979); *Pearson v. Hartford Accident & Indemnity Co.,* 345 So.2d 123 (La.App.1977). In determining whether an indemnitor or an insurer is obligated to defend an indemnitee or insured under the terms of an indemnity or insurance contract, the Louisiana courts look exclusively to the pleadings in light of the contract provisions; the ultimate outcome of the case has no effect upon the duty to defend. *Young Oil Co. of Louisiana, Inc. v. Durbin; West Brothers of DeRidder, La., Inc. v. Morgan Roofing Co., Inc.,* 376 So.2d 345 (La.App.1979); *Sullivan v. Hooker Chemical Co.* In seeking cost and fee reimbursement Chevron is arguing its entitlement to a defense.

In *Sullivan v. Hooker Chemical* the plaintiff, an employee of Atlas Erection Co., was injured while working on Hooker Chemical's premises. The petition was based solely on allegations of Hooker's negligence and the negligence of a third party. Hooker conceded that its indemnity agreement with Atlas did not require Atlas to indemnify losses caused by its own negligence but argued that Atlas should have provided a defense. The trial court found that neither Hooker nor the third party was negligent and denied recovery of costs and fees. In analyzing Atlas' obligation to defend Hooker, Judge Lemmon (now Justice Lemmon of the Louisiana Supreme Court) stated and held:

Plaintiff's petition alleged Hooker was liable on the basis of its independent negligence and of its negligence or responsibility in relation to Giambelluca's contractual operations. There was no allegation of liability asserted against Hooker in relation to Atlas' contractual operations. Thus, unless the pleadings were expanded, Hooker could only have been found liable on the basis of its own negligence or that of Giambelluca.

The contract terms provided for indemnity for Hooker's liability for Atlas' negligence, but not for Hooker's own negligence or for Hooker's liability for negligence of a third party. Under these circumstances neither indemnity nor defense was owed by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

750 F.2d 428
**(Cite as: 750 F.2d 428)**

Atlas.

370 So.2d at 677.

[4] From the foregoing we conclude that unless the contract of indemnity specifically provides for costs of defense as a separate item of indemnification, the indemnitor**434** has no obligation to defend if the petition alleges facts which, if proven, would establish liability of the indemnitee but preclude coverage under the indemnity agreement.

[5] In analyzing Broadmoor's obligation to defend Chevron we are *Erie* -obliged to follow and apply Louisiana law. Doing so we focus exclusively on the pleadings considered against the backdrop of the indemnity agreement. Sullen's complaint was based solely on allegations of Chevron's negligence. As we have previously held, the language of this indemnity agreement does not obligate Broadmoor to indemnify Chevron for Chevron's own negligence (*Stephens, Smith* and *Wiley* ), and there is no language indicating the intent of Broadmoor to provide Chevron with the costs of defense against its own negligent acts (*Smith* ). Since the pleadings alleged only Chevron's negligence, Broadmoor had no duty to defend and is not obliged to reimburse Chevron the costs it incurred in its defense.

The judgment of the district court is AFFIRMED.

C.A.La.,1985.
Sullen v. Missouri Pacific R. Co.
750 F.2d 428

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

250 P.3d 682
**(Cite as: 250 P.3d 682)**

H

Colorado Court of Appeals,
Div. VII.
LAFARGE NORTH AMERICA, INC., d/b/a La-
farge West, Inc., Plaintiff–Appellee,
v.
K.E.C.I. COLORADO, INC., a Colorado corpora-
tion, Defendant–Appellant.

No. 09CA0460.
March 4, 2010.

**Background:** General contractor on a highway
construction project brought action against subcon-
tractor, and two of subcontractor's insurers, assert-
ing that subcontractor breached contractual obliga-
tions to defend, indemnify, and insure in relation to
an underlying negligence suit that motorcycle pas-
senger brought after a collision with construction
equipment killed her spouse, who was the driver of
the motorcycle. After first phase was litigated on is-
sues pertaining to interpretation of the indemnity
and insurance provisions of the subcontract, the
parties filed cross-motions for summary judgment.
The District Court, Adams County, No. 05CV904,
John T. Bryan, J., entered summary judgment rul-
ing that subcontractor breached contractual obliga-
tions to defend, indemnify, and insure. Subcontract-
or's motion to reconsider was denied and the Dis-
trict Court certified the judgment as final. Subcon-
tractor appealed.

**Holdings:** The Court of Appeals, J. Jones, J., held
that:
(1) mere allegation that subcontractor was partially
at fault on underlying negligence claim did not
render it liable for indemnification;
(2) allegation of fault on part of subcontractor was
sufficient to trigger subcontractor's duty to defend
general contractor;
(3) subcontractor's liability insurance, on which
general contractor was a named insured, provided
coverage for general contractor's negligence; but

(4) subcontractor was not required to provide
primary, as opposed to excess, insurance.

Affirmed in part, reversed in part, and re-
manded.

West Headnotes

**[1] Indemnity 208 ⟨⟩33(5)**

208 Indemnity
 208II Contractual Indemnity
  208k33 Particular Cases and Issues
   208k33(5) k. Contractors, subcontractors,
and owners. Most Cited Cases

 Indemnity provision in a subcontractor agree-
ment between general contractor and subcontractor,
which indicated that subcontractor would
"indemnify against and save it harmless" from
claims arising "in whole or in part" from any act or
omission of subcontractor, required subcontractor
to indemnify general contractor for general con-
tractor's own negligence where general contractor's
liability arose out of any incident which was at least
partially the result of subcontractor's acts or omis-
sions.

**[2] Indemnity 208 ⟨⟩31(1)**

208 Indemnity
 208II Contractual Indemnity
  208k31 Construction and Operation of Con-
tracts
   208k31(1) k. In general. Most Cited Cases

**Indemnity 208 ⟨⟩31(2)**

208 Indemnity
 208II Contractual Indemnity
  208k31 Construction and Operation of Con-
tracts
   208k31(2) k. Intention of the parties.
Most Cited Cases

 Courts construe an indemnity agreement in ac-
cordance with the same principles that govern the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

250 P.3d 682
**(Cite as: 250 P.3d 682)**

interpretation of contracts generally; they strive to effectuate the contracting parties' intent, as determined primarily from the contract language.

**[3] Indemnity 208 ⚿30(1)**

208 Indemnity
   208II Contractual Indemnity
      208k26 Requisites and Validity of Contracts
         208k30 Indemnitee's Own Negligence or Fault
            208k30(1) k. In general. Most Cited Cases

An indemnity provision that a party contends renders the indemnitor liable for the indemnitee's conduct must contain clear and unequivocal language to that effect.

**[4] Indemnity 208 ⚿30(1)**

208 Indemnity
   208II Contractual Indemnity
      208k26 Requisites and Validity of Contracts
         208k30 Indemnitee's Own Negligence or Fault
            208k30(1) k. In general. Most Cited Cases

The failure to refer specifically to an indemnitee's negligent conduct in an indemnity agreement does not render an otherwise unambiguous indemnity provision insufficient to indemnify the indemnitee from its own negligence.

**[5] Indemnity 208 ⚿31(6)**

208 Indemnity
   208II Contractual Indemnity
      208k31 Construction and Operation of Contracts
         208k31(6) k. Indemnitee's own negligence or fault, in general. Most Cited Cases

The general rule is that indemnity agreements which purport to indemnify for the negligent conduct of an indemnitee must be strictly construed.

**[6] Indemnity 208 ⚿31(6)**

208 Indemnity
   208II Contractual Indemnity
      208k31 Construction and Operation of Contracts
         208k31(6) k. Indemnitee's own negligence or fault, in general. Most Cited Cases

A contractual provision should not be construed to permit an indemnitee to recover for his own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties.

**[7] Indemnity 208 ⚿33(5)**

208 Indemnity
   208II Contractual Indemnity
      208k33 Particular Cases and Issues
         208k33(5) k. Contractors, subcontractors, and owners. Most Cited Cases

Under indemnity clause in subcontractor agreement which triggered subcontractor's duty to indemnify general contractor for claims for which subcontractor was at least partially at fault, mere allegation that subcontractor was partially at fault on underlying personal injury claim was not sufficient to render subcontractor liable.

**[8] Indemnity 208 ⚿31(7)**

208 Indemnity
   208II Contractual Indemnity
      208k31 Construction and Operation of Contracts
         208k31(7) k. Duty to defend. Most Cited Cases

**Indemnity 208 ⚿42**

208 Indemnity
   208II Contractual Indemnity
      208k42 k. Accrual of liability. Most Cited Cases

Because the duties to defend and to indemnify are separate and distinct, the former duty is triggered more easily than the latter, and a party may have a duty to defend but not a duty to indem-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

250 P.3d 682
**(Cite as: 250 P.3d 682)**

nify; a party's breach of the duty to defend does not preclude it from contesting its alleged duty to indemnify.

**[9] Indemnity 208 ⟪⟫43**

208 Indemnity
    208II Contractual Indemnity
        208k43 k. Accrual of duty to defend. Most Cited Cases

Under subcontractor agreement, which imposed upon subcontractor a duty to defend general contractor when the obligation to indemnify general contractor was potentially triggered, the subcontractor's duty to defend arose when the injured party in an underlying personal injury suit alleged that both general contractor and subcontractor were negligent, regardless of whether subcontractor was in fact partially at fault as required to trigger the obligation to indemnify.

**[10] Insurance 217 ⟪⟫1702**

217 Insurance
    217XII Procurement of Insurance by Persons Other Than Agents
      217k1702 k. Contracts. Most Cited Cases

**Insurance 217 ⟪⟫2361**

217 Insurance
    217XVII Coverage—Liability Insurance
      217XVII(B) Coverage for Particular Liabilities
        217k2359 Manufacturers' or Contractors' Liabilities
          217k2361 k. Scope of coverage. Most Cited Cases

Under subcontractor's contractual obligation to provide general contractor with liability insurance naming general contractor as an insured party, the liability insurance provided coverage for the general contractor's negligence, not solely for subcontractor's negligence, so long as it was for a claim connected to subcontractor's work, as set forth in the subcontract.

**[11] Insurance 217 ⟪⟫1010**

217 Insurance
    217I In General; Nature of Insurance
      217k1007 Types of Insurance
        217k1010 k. Liability. Most Cited Cases

"Liability insurance" compensates an insured for damages the insured must pay to others because of its own actions.

**[12] Insurance 217 ⟪⟫1702**

217 Insurance
    217XII Procurement of Insurance by Persons Other Than Agents
      217k1702 k. Contracts. Most Cited Cases

Subcontractor was not required to provide primary, as opposed to excess, insurance under subcontractor's contractual obligation to provide general contractor with "liability insurance" naming general contractor as an insured party, absent evidence of any intent, in the contract or otherwise, that the liability insurance be primary insurance.

**[13] Insurance 217 ⟪⟫2110**

217 Insurance
    217XV Coverage—in General
      217k2107 Other Insurance
        217k2110 k. Primary and excess insurance, in general. Most Cited Cases

In contrast to "primary insurance," which covers an injury at the first level before any other insurance is exhausted, "excess insurance" is activated only after the magnitude of the loss exceeds the limits of the applicable primary insurance.

**[14] Insurance 217 ⟪⟫1010**

217 Insurance
    217I In General; Nature of Insurance
      217k1007 Types of Insurance
        217k1010 k. Liability. Most Cited Cases

The fact that a policy is excess, as opposed to primary, does not affect whether it constitutes liability insurance, including comprehensive general liability; rather, whether insurance is "liability insur-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

250 P.3d 682
**(Cite as: 250 P.3d 682)**

ance" depends on the nature and extent of the con-
duct, injuries, claims, and damages covered.

**[15] Insurance 217 ⟲⟲2285(2)**

217 Insurance
   217XVII Coverage—Liability Insurance
     217XVII(A) In General
      217k2279 Amounts Payable
       217k2285 Other Insurance
        217k2285(2) k. Primary and excess
insurance. Most Cited Cases

**Insurance 217 ⟲⟲2285(4)**

217 Insurance
   217XVII Coverage—Liability Insurance
     217XVII(A) In General
      217k2279 Amounts Payable
       217k2285 Other Insurance
        217k2285(3) Proration and Alloca-
tion
        217k2285(4) k. In general. Most
Cited Cases

**Insurance 217 ⟲⟲2285(8)**

217 Insurance
   217XVII Coverage—Liability Insurance
     217XVII(A) In General
      217k2279 Amounts Payable
       217k2285 Other Insurance
        217k2285(8) k. Escape clauses.
Most Cited Cases

A "liability insurance" policy can be primary
or excess, may cover liability on a pro rata basis, or
may contain an escape clause providing that it will
not cover any loss that is also covered by another
policy.

**\*683** Wells, Anderson & Race, LLC, Larry S. Mc-
Clung, L. Michael Brooks, Jr., Denver, Colorado,
for Plaintiff–Appellee.

Senter, Goldfarb, & Rice, L.L.C., Jennifer M.
Palmer, Denver, Colorado, for Defend-
ant–Appellant.

Opinion by Judge J. JONES.

Defendant, K.E.C.I. Colorado, Inc., appeals the
district court's summary judgment ruling that it
breached contractual obligations to defend, indem-
nify, and insure plaintiff, Lafarge North America,
Inc. We conclude that (1) K.E.C.I. breached the
duty to defend but that it is premature to assess
**\*684** damages for that breach; (2) Lafarge is not en-
titled to summary judgment on its indemnification
claim; and (3) the district court incorrectly con-
strued K.E.C.I.'s duty to insure Lafarge. Therefore,
we affirm the judgment in part, reverse it in part,
and remand the case for further proceedings.

I. Background

Lafarge was the general contractor for a high-
way construction project administered by the Col-
orado Department of Transportation (CDOT).
K.E.C.I. provided traffic control services pursuant
to a subcontract with Lafarge.

Late one night, a motorcyclist drove onto a
highway entrance ramp and collided with a piece of
road construction equipment that a Lafarge employ-
ee had parked in the only traffic lane of the ramp.
The motorcyclist died in the accident; his wife, who
was a passenger on the motorcycle, was seriously
injured.

The injured wife sued Lafarge, the Lafarge em-
ployee who had parked the equipment on the ramp,
and K.E.C.I. for negligence. Lafarge demanded that
K.E.C.I. provide it a defense and indemnify it for
any liability it might have, invoking certain provi-
sions of the subcontract and K.E.C.I.'s insurance
policy, on which Lafarge was an additional named
insured. K.E.C.I. and the insurer refused Lafarge's
demands, essentially for the reasons that (1)
K.E.C.I. was not even partially at fault and its du-
ties to defend and indemnify Lafarge apply only if
K.E.C.I. was at least partially at fault; and (2) be-
cause the insurance policy was only an "excess"
coverage policy, (a) there is no duty to defend un-
der the policy, and (b) there is no coverage under
the policy to pay Lafarge because Lafarge had not
incurred any liability in excess of that covered by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

250 P.3d 682
**(Cite as: 250 P.3d 682)**

its own insurance policy. Lafarge settled the claims against it by paying $700,000 to the injured wife in return for a release.

Lafarge brought this case against K.E.C.I. and two of K.E.C.I.'s insurers. Its amended complaint asserted claims for breach of contract, fraud, and violation of the Colorado Consumer Protection Act. In essence, Lafarge alleged that (1) K.E.C.I. is contractually obligated to indemnify Lafarge for liability arising from Lafarge's own negligence so long as the liability arose in part from K.E.C.I.'s acts or omissions, which it did here; (2) the complaint in the personal injury case triggered K.E.C.I.'s contractual duty to defend Lafarge because it alleged that K.E.C.I. was at least partially at fault for the accident; and (3) the subcontract obligates K.E.C.I. to provide Lafarge with "primary," not merely "excess" insurance coverage.

The parties agreed to litigate the case in two phases, with the first phase limited to resolving the issues pertaining to interpretation of the indemnity and insurance provisions of the subcontract. After the parties completed discovery on those issues, they filed cross-motions for summary judgment. The district court granted Lafarge's motion and denied K.E.C.I.'s. As relevant here, the court ruled as follows:

• the subcontract unambiguously requires K.E.C.I. to indemnify Lafarge for Lafarge's negligence if K.E.C.I. was at least partially at fault;

• K.E.C.I. had breached the indemnity obligation;

• the subcontract unambiguously requires K.E.C.I. to defend Lafarge if a claim which could trigger K.E.C.I.'s obligation to indemnify Lafarge was asserted against Lafarge;

• K.E.C.I. had breached the duty to defend because the complaint in the personal injury case alleged that both Lafarge and K.E.C.I. were at fault;

• the subcontract unambiguously requires

K.E.C.I. to provide Lafarge with primary insurance coverage;

• K.E.C.I. had breached the duty to provide primary insurance; and

• K.E.C.I. is liable to Lafarge for Lafarge's cost of defense and the amount Lafarge paid to settle the personal injury case.

K.E.C.I. moved for reconsideration. It asserted that the court had misinterpreted the subcontract and had erred by finding it liable for indemnity when there had been no factual determination that it was even partially at fault for the accident. In denying K.E.C.I.'s **\*685** motion, the court again rejected K.E.C.I.'s arguments concerning interpretation of the subcontract and found (for the first time) that K.E.C.I. had waived its right to contest its liability for indemnification by breaching its duty to defend.

The district court certified its summary judgment as final. K.E.C.I. appeals.

### II. Discussion

K.E.C.I. raises the following contentions on appeal:

(1) The district court erred in granting summary judgment in Lafarge's favor on the duty to indemnify because

(a) the indemnification clause unambiguously provides that K.E.C.I. is liable only for its own negligence,

(b) the clause is at least ambiguous on that score, and

(c) it may challenge its alleged duty to indemnify Lafarge even if it breached its duty to defend.

(2) The court erred in finding that it had breached the duty to indemnify because the issue of breach was not before the court and no fact finder has found that it was at least partially at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

250 P.3d 682
**(Cite as: 250 P.3d 682)**

fault.

(3) The court erred in finding that K.E.C.I. has a duty to defend because, again, it is liable only for its own negligence; therefore, it only has a duty to defend Lafarge where Lafarge is alleged to be vicariously liable for K.E.C.I.'s acts, and no such liability was alleged in the personal injury case.

(4) The court erred in construing the insurance clause to require K.E.C.I. to provide Lafarge with primary insurance coverage because

(a) the clause does not contain any language imposing such a requirement, or

(b) the clause is ambiguous, and that ambiguity should he resolved against Lafarge under the relevant extrinsic evidence.

(5) The court erred in determining that K.E.C.I. had breached the contractual duty to insure because the issue of breach was not before the court.

We address these contentions in turn.

### A. Standard of Review

We review a district court's entry of summary judgment de novo. *A.C. Excavating v. Yacht Club II Homeowners Ass'n, Inc.,* 114 P.3d 862, 865 (Colo.2005). The construction of a contract (including the question whether the contract is ambiguous) is a question of law, which we also review de novo. *East Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.,* 109 P.3d 969, 974 (Colo.2005); *Boulder Plaza Residential, LLC v. Summit Flooring, LLC,* 198 P.3d 1217, 1220 (Colo.App.2008).

### B. Construction of the Subcontract
#### 1. Duty to Indemnify
##### a. Construction of the Indemnity Clause

[1] The indemnity clause at issue here, section 10(b) of the subcontract, provides as follows:

[K.E.C.I.] further specifically obligates [itself] to [Lafarge] in the following respects, to wit: ...

(b) To indemnify [Lafarge] against and save [it] harmless from any and all claims, suit, or liability for injuries to property, injuries to persons including death, and from any other claims, suits, or liability on account of [sic], arising in whole or in part of [sic] any act or omission of [K.E.C.I.], or any of [its] officers, agents, employees or servants....

[2] We construe an indemnity agreement in accordance with the same principles that govern the interpretation of contracts generally. *Boulder Plaza,* 198 P.3d at 1221; *Mid Century Ins. Co. v. Gates Rubber Co.,* 43 P.3d 737, 739 (Colo.App.2002). Therefore, we must strive to effectuate the contracting parties' intent, as determined primarily from the contract language. *East Ridge,* 109 P.3d at 974; *Boulder Plaza,* 198 P.3d at 1221. To do this, we look to the language of the provision at issue, giving the words and phrases used therein their plain and ordinary meanings, and to any other related provisions **\*686** as to interpret the contract in a way that harmonizes and gives effect to all its provisions. *East Ridge,* 109 P.3d at 974; *Boulder Plaza,* 198 P.3d at 1221; *Mid Century,* 43 P.3d at 739.

If, after applying these principles, we conclude that the provision is unambiguous, we must apply it as written. *B & B Livery, Inc. v. Riehl,* 960 P.2d 134, 136 (Colo.1998); *Mapes v. City Council,* 151 P.3d 574, 577 (Colo.App.2006). A contract provision is ambiguous " 'if it is fairly susceptible to more than one interpretation.' " *Dorman v. Petrol Aspen, Inc.,* 914 P.2d 909, 912 (Colo.1996) (quoting *Fibreglas Fabricators, Inc. v. Kylberg,* 799 P.2d 371, 374 (Colo.1990)); *accord East Ridge,* 109 P.3d at 974. However, the mere fact the parties express different opinions as to the meaning of the provision does not itself establish that there is an ambiguity. *Cherokee Metropolitan Dist. v. Simpson,* 148 P.3d 142, 146 (Colo.2006); *East Ridge,* 109 P.3d at 974.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

250 P.3d 682
**(Cite as: 250 P.3d 682)**

[3][4][5][6] In construing the indemnity clause here, we are also mindful of the following principles:

• An indemnity provision that a party contends renders the indemnitor liable for the indemnitee's conduct must contain " 'clear and unequivocal language to that effect.' " *Public Service Co. v. United Cable Television of Jeffco, Inc.,* 829 P.2d 1280, 1283 (Colo.1992) (quoting *Williams v. White Mountain Constr. Co.,* 749 P.2d 423, 426 (Colo.1988)); *accord Boulder Plaza,* 198 P.3d at 1221. However, the failure to refer specifically to the indemnitee's negligent conduct in the agreement does not render "an otherwise unambiguous indemnity provision insufficient to indemnify the indemnitee from its own negligence." *Public Service Co.,* 829 P.2d at 1284.

• The general rule is that "indemnity agreements which purport to indemnify for the negligent conduct of an indemnitee must be strictly construed...." *Id.* And though there has been "a growing trend to relax the rule of strict construction in construing indemnity contracts in commercial settings," *id.* at 1285, it remains the rule that " 'a contractual provision should not be construed to permit an indemnitee to recover for his own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties.' " *Id.* at 1283–84 (quoting *United States v. Seckinger,* 397 U.S. 203, 211 [90 S.Ct. 880, 25 L.Ed.2d 224] (1970)); *accord Boulder Plaza,* 198 P.3d at 1221.

We conclude that the indemnity clause unambiguously requires K.E.C.I. to indemnify Lafarge for Lafarge's own negligence where Lafarge's liability arises out of any incident which is at least partially the result of K.E.C.I.'s acts or omissions.

The provision at issue here is indistinguishable in principle from the one at issue in *Public Service Co.* That provision stated that the indemnitor would "save and hold harmless" the indemnitee "from and against all claims, liabilities, causes of action, or other legal proceedings" for damage or injuries to property or persons "in any way arising out of, connected with or resulting from the exercise by [the indemnitor] of the rights granted" by the contract. *Public Service Co.,* 829 P.2d at 1282. The court held that this clause unambiguously required the indemnitor to indemnify the indemnitee for the indemnitee's own negligence. In so holding, the court found it significant that the clause referred to "liabilities" and broadly covered such liabilities "in any way arising out of, connected with or resulting from" the indemnitor's exercise of its contractual rights. *Id.* at 1283.

The indemnity clause here similarly covers Lafarge's "liability" and encompasses such liability "arising in whole or in part" from K.E.C.I.'s acts and omissions. Though the language of the clause here is somewhat different from that in the clause at issue in *Public Service Co.,* those differences are not qualitatively such as to convince us that the two clauses are functionally distinguishable.

The cases on which K.E.C.I. relies are distinguishable, either because of differences in contractual language or governing law. For example, in *Boulder Plaza,* a division of this court held that an indemnity clause did not require the indemnitor to indemnify the **\*687** indemnitee for its own negligence, principally because the clause did not purport to cover the indemnitee's "liabilities" and did not broadly cover any liability arising "in any way" from the indemnitor's acts. *Boulder Plaza,* 198 P.3d at 1222.

In *Englert v. The Home Depot,* 389 N.J.Super. 44, 911 A.2d 72 (N.J.Super.Ct.App.Div.2006), the clause did not expressly cover the indemnitee's liability, the obligation applied only "to the extent" the injury was caused by the indemnitor's acts, and New Jersey law (unlike Colorado law) required that the indemnitee's negligence or fault be referred to in the agreement. The clause at issue in *Ostuni v. Town of Inlet,* 64 A.D.3d 854, 881 N.Y.S.2d 678 (2009), was worded similarly to the one at issue in *Englert.* And New York law voided any indemnity

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

250 P.3d 682
**(Cite as: 250 P.3d 682)**

agreement purporting to hold an indemnitor responsible for the indemnitee's acts.

Nor are we persuaded that any alleged disparity in bargaining power matters here. The clause is not ambiguous. The contract was bargained for: it was not one of adhesion. K.E.C.I. cites no authority for the proposition that a mere disparity in bargaining power between two commercial entities renders an unambiguous indemnity clause either ambiguous or unenforceable.

In sum, we reject K.E.C.I.'s contentions that the indemnity clause unambiguously requires K.E.C.I. to indemnify Lafarge only for K.E.C.I.'s negligence or, alternatively, is ambiguous in that regard. It unambiguously requires K.E.C.I. to indemnify Lafarge for Lafarge's negligence.[FN1]

> FN1. Having concluded that the indemnity clause is unambiguous, we also conclude that the district court did not err in refusing to consider K.E.C.I.'s extrinsic evidence of its meaning. *See Public Service Co. v. Meadow Island Ditch Co. No. 2,* 132 P.3d 333, 339 (Colo.2006) (while extrinsic evidence of local usage and circumstances surrounding the making of the contract may be considered in determining whether an ambiguity exists, the court may not consider the parties' extrinsic expressions of intent for that purpose).

b. K.E.C.I.'s Liability Under the Indemnity Clause

[7] We agree with K.E.C.I., however, that the district court erred in determining at the summary judgment stage that K.E.C.I. is liable to Lafarge under the indemnity clause.

The district court correctly ruled that K.E.C.I. is liable under the clause only if it was partially at fault. In further determining that K.E.C.I. had breached the obligation, however, the court apparently thought it enough that the plaintiff in the personal injury case had alleged that K.E.C.I. was at fault. This was error because K.E.C.I.'s liability for

indemnity is expressly conditioned on its fault in fact. Nothing in the clause indicates that a mere allegation of fault triggers liability. Indeed, the clear language of the clause is to the contrary. *See Cyprus Amax Minerals Co. v. Lexington Ins. Co.,* 74 P.3d 294, 300 (Colo.2003) ("the duty to indemnify is only triggered where the [provision] actually covers the alleged harm"); *Constitution Assocs. v. New Hampshire Ins. Co.,* 930 P.2d 556, 563 (Colo.1996) (same); *Hecla Mining Co. v. New Hampshire Ins. Co.,* 811 P.2d 1083, 1089–90 (Colo.1991) (same; also noting that whether the duty to indemnify is triggered is "a question of fact to be decided by the trier of fact").

[8] The district court's alternative conclusion that K.E.C.I. waived its right to contest its obligation to indemnify Lafarge by breaching its duty to defend is also contrary to Colorado law. Because the duties to defend and to indemnify are "separate and distinct," *Cyprus Amax,* 74 P.3d at 299; *Hecla Mining,* 811 P.2d at 1086 n. 5, the former duty is triggered more easily than the latter, *Constitution Assocs.,* 930 P.2d at 563, and a party may have a duty to defend but not a duty to indemnify, *id.,* a party's breach of the duty to defend does not preclude it from contesting its alleged duty to indemnify. *Bainbridge, Inc. v. Travelers Cas. Co.,* 159 P.3d 748, 756 (Colo.App.2006); *McGowan v. State Farm Fire & Cas. Co.,* 100 P.3d 521, 527 (Colo.App.2004); *accord Signature Development Cos. v. Royal Ins. Co.,* 230 F.3d 1215, 1221–22 (10th Cir.2000) (applying Colorado law); **\*688** *Flannery v. Allstate Ins. Co.,* 49 F.Supp.2d 1223, 1227–29 (D.Colo.1999) (applying Colorado law).

We are not persuaded that *Burlington Northern R.R. Co. v. Stone Container Corp.,* 934 P.2d 902 (Colo.App.1997), on which Lafarge relies, requires a different result. In that case, which involved an insured's claim against the insurer, the act triggering the indemnitor's indemnity obligation was undisputed and there had been a trial at which the fact finder had concluded that the triggering act had occurred. *Id.* at 904–05. In holding that an indemnitee

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

250 P.3d 682
**(Cite as: 250 P.3d 682)**

is not required to prove "absolute legal liability" to be entitled to indemnification for a settlement with the injured party, the division was clearly speaking of the indemnitee's liability to the injured party. *Id.* at 906–07; *see also id.* at 907 ("the *indemnitee* need only prove that *it* was potentially liable to the claimant") (emphasis added). Nothing in that decision indicates that the indemnitee need not prove that the act of the indemnitor triggering the indemnitor's liability occurred if, as here, such an act is indeed required. Here, that act—K.E.C.I.'s negligence—has not been established.

In sum, we conclude that the district court correctly construed the extent of K.E.C.I.'s duty under the indemnity clause but that it erred in finding on summary judgment that K.E.C.I. had breached its duty.[FN2]

> **FN2.** In light of this conclusion, we need not address K.E.C.I.'s argument that the district court erroneously held it liable for punitive damages paid by Lafarge. All issues concerning breach of the duty to indemnify and damages remain to be resolved in the district court.

### 2. Duty to Defend

[9] K.E.C.I. challenges the district court's conclusion that it breached its duty to defend on the same basis it challenges the court's conclusion that the indemnity clause requires it to indemnify Lafarge for Lafarge's own negligence—that the clause limits the indemnity obligation to K.E.C.I.'s own negligence.[FN3] We have rejected that proposed construction of the clause, however, and therefore (and for the reason noted below) K.E.C.I.'s challenge to the court's finding that it breached its duty to defend also fails.

> **FN3.** The parties agree that the indemnity clause imposes some duty to defend.

Unlike the duty to indemnify at issue here, K.E.C.I.'s duty to defend was triggered so long as the injured party alleged facts even potentially trig-

gering the obligation to indemnify. *See Cyprus Amax,* 74 P.3d at 299; *Hecla Mining,* 811 P.2d at 1089. The injured party's complaint did so, specifically alleging that both Lafarge and K.E.C.I. were negligent and that the injuries were the result of "their individual and collective negligent conduct." *See Cyprus Amax,* 74 P.3d at 299 (question whether the duty to defend is triggered is answered by looking no further than the four corners of the underlying complaint); *Hecla Mining,* 811 P.2d at 1089–90 (same); *see also American Economy Ins. Co. v. Schoolcraft,* 551 F.Supp.2d 1235, 1239 (D.Colo.2007) (same; the issue is one of law) (applying Colorado law). Therefore, the district court properly determined on summary judgment that K.E.C.I. had breached its duty to defend.

It is unclear what damages the district court assessed for the breach of this duty because the court did not indicate what damages it was assessing for each breach. But to the extent it awarded damages including the settlement amount, the award must be reversed because such an award depends on whether K.E.C.I. breached its duty to indemnify. That issue has yet to be determined.

### 3. Duty to Provide Insurance

Section 9 of the subcontract sets forth K.E.C.I.'s obligation to provide insurance. It states, in relevant part:

(a) ... [K.E.C.I.] shall also provide and maintain ... in full force and effect during the term of this Subcontract insurance ... in a company satisfactory to [Lafarge], protecting [K.E.C.I.], [CDOT], and [Lafarge] against liability from damages because of injuries, including death, suffered by persons other than employees of [K.E.C.I.] ... arising from and growing **\*689** out of [K.E.C.I.'s] operations in connection with the performance of this Subcontract.

(b) Required insurance shall be in the amounts and coverage's [sic] specified by the contract with [CDOT]. In no event shall the required insurance be less than the following: Such insurance cover-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

250 P.3d 682
**(Cite as: 250 P.3d 682)**

ing personal injuries or death shall be in the sum of not less than $250,000 for one person and not less than $500,000 for a single accident.... Written proof satisfactory to [Lafarge] of compliance with this section shall be furnished to [Lafarge] before any work is performed under this Subcontract....

The contract between Lafarge and CDOT (with which section 9 of the subcontract requires K.E.C.I. to comply) obligates Lafarge to provide "[c]omprehensive general liability" insurance and to "name [CDOT] as an additional named insured" on that policy. Neither that contract nor CDOT's specifications, however, state that the liability insurance Lafarge was obligated to provide must be "primary"—that is, insurance that is not contingent on the exhaustion of another policy of insurance. *See Allstate Ins. Co. v. Avis Rent–A–Car System, Inc.,* 947 P.2d 341, 346 (Colo.1997) ("When one insurance policy is 'primary' and the other policy is 'excess,' the primary insurer pays for damages up to the limits of its policy; when that policy is exhausted, the excess insurer covers any remaining damages up to the limits of its policy."); *DiCocco v. National General Ins. Co.,* 140 P.3d 314, 316 (Colo.App.2006) ("Primary insurance ... provides coverage of a given loss at the 'first level' of loss, after satisfaction of any deductible."); *Black's Law Dictionary* 815 (8th ed. 2004). (There is some indication in the record that CDOT changed its specifications in 2005 to expressly require primary insurance. But actual evidence of that change is not in the record and, in any event, any such change occurred after the parties entered into the subcontract.)

Before beginning work on the project, K.E.C.I. tendered a certificate of insurance to Lafarge indicating that Lafarge was an additional named insured on K.E.C.I.'s comprehensive general liability insurance policy. Specifically, the certificate stated that Lafarge was an "additional insured as respects general liability coverage, per Add'l Insd Endr CG8330 97199) (attached)." The attached document stated,

as relevant here: "Any coverage provided hereunder shall be excess over any other valid and collectible insurance available to the additional insured whether primary, excess, contingent or on any other basis unless a contract specifically requires that this insurance be primary or you request that it apply on a primary basis."

A Lafarge representative conceded in his deposition that Lafarge received the certificate before K.E.C.I. began the work, a Lafarge employee reviewed the certificate, and Lafarge voiced no objection to the certificate or the nature of the coverage until after the accident.

K.E.C.I. contends the district court erred in concluding that it breached the obligation to provide insurance because: (1) it was contractually required to provide coverage only for its own negligence and not for any negligence of Lafarge; and (2) there was no contractual obligation that it provide primary, as opposed to excess, insurance. We disagree with K.E.C.I.'s first contention but agree with its second.

K.E.C.I.'s contentions, and Lafarge's responsive arguments, present questions of contract interpretation and application of the law which, as noted above, we review de novo.

a. Coverage for Lafarge's Negligence

[10][11] It is undisputed that K.E.C.I. was obligated to provide Lafarge with "liability" insurance naming Lafarge as an insured party. Liability insurance compensates "an insured ... for damages the insured must pay to others because of [its] own actions." *Village Homes of Colo., Inc. v. Travelers Cas. & Surety Co.,* 148 P.3d 293, 298 (Colo.App.2006), aff'd, 155 P.3d 369 (Colo.2007); *accord Browder v. United States Fidelity & Guaranty Co.,* 893 P.2d 132, 134 n. 3 (Colo.1995) (citing Rowland H. Long, *Law of Liability Insurance* § 1.01 (1994)), *overruled in part by Hoang v. Assurance Co.,* 149 P.3d 798, 804 (Colo.2007); *see also* 15 *Holmes' Appleman on Insurance 2d* § 111.1, at 10 (2000); 20 *Holmes' Appleman on In-*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

250 P.3d 682
**(Cite as: 250 P.3d 682)**

surance 2d *690 § 129.1, at 4; *Black's Law Dictionary* 817. Therefore, the plain meaning of the term "liability insurance" refutes K.E.C.I.'s contention that the insurance needed only to cover K.E.C.I.'s negligence.

The subcontract also clearly expresses an intent that the insurance cover Lafarge's own negligence (subject to an important limitation noted below) because it essentially required K.E.C.I. to provide the insurance coverage Lafarge was required to provide CDOT for Lafarge's actions (again, subject to an important limitation noted below). Contrary to K.E.C.I.'s assertion, there is nothing illogical or unreasonable about such a requirement. Such a requirement is not an uncommon feature of construction contracts. *See, e.g., Pav–Lak Industries, Inc. v. Arch Ins. Co.,* 56 A.D.3d 287, 866 N.Y.S.2d 671 (2008); *Clapper v. County of Albany,* 188 A.D.2d 774, 591 N.Y.S.2d 258 (1992).

Nonetheless, the obligation for coverage is limited to injuries "arising from and growing out of [K.E.C.I.'s] operations in connection with the performance of the Subcontract." Therefore, the obligation to provide insurance covering Lafarge's liability, including for Lafarge's own acts, exists only for situations where the injury has the connection to K.E.C.I.'s work mandated by the express language of section 9 of the subcontract.

We express no opinion on whether K.E.C.I. breached its duty to provide insurance in this regard because the policy is not part of the record. Further, any determination of damages for any such breach is premature at this stage because no determination has been made either that the required connection to K.E.C.I.'s performance of the subcontract exists or that the policy fails to cover an injury for which K.E.C.I. was required to provide coverage and for which Lafarge has been held liable.

### b. Primary or Excess

[12] Though neither the contract nor the subcontract expressly requires primary insurance coverage, Lafarge argued in the district court, as it does on appeal, that liability insurance and general liability insurance are synonymous with primary insurance. We conclude that Lafarge is incorrect, and that the district court accordingly erred in apparently accepting Lafarge's argument.

[13] In contrast to primary insurance—which, as noted above, covers an injury at the first level before any other insurance is exhausted—excess insurance "is activated only after the magnitude of the loss exceeds the limits of the applicable 'primary' insurance." *DiCocco,* 140 P.3d at 316; accord *Allstate Ins. Co.,* 947 P.2d at 346; *see also Black's Law Dictionary* 816.

[14][15] The fact that a policy is excess, as opposed to primary, does not affect whether it constitutes liability (including comprehensive general liability) insurance. Whether insurance is liability insurance depends on the nature and extent of the conduct, injuries, claims, and damages covered. A liability policy can be primary or excess, may cover liability on a "pro rata" basis, or may contain an "escape" clause providing that it will not cover any loss that is also covered by another policy. *See Allstate Ins. Co. v. Frank B. Hall & Co.,* 770 P.2d 1342, 1345 (Colo.App.1989). Again, even a cursory review of insurance case law reveals numerous cases involving excess comprehensive general liability insurance policies. *See, e.g., Hartford Accident & Indemnity Co. v. Pacific Mut. Life Ins. Co.,* 861 F.2d 250, 252 (10th Cir.1988); *Colony Ins. Co. v. Georgia–Pacific, LLC,* 27 So.3d 1210, 1213 (Ala.2009); *River Village I, LLC v. Central Ins. Cos.,* 396 Ill.App.3d 480, 335 Ill.Dec. 707, 919 N.E.2d 426 (2009); *Englert,* 911 A.2d at 81–82. Indeed, in *Englert,* the court squarely held that a subcontractor satisfied its contractual obligation to name the contractor as an additional insured on a comprehensive general liability policy by naming it as an additional insured on an excess policy; the subcontract did not require primary coverage. 911 A.2d at 74–75, 81–82.

We observe that because liability coverage (including comprehensive general liability cover-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

250 P.3d 682
**(Cite as: 250 P.3d 682)**

age) may be excess, many parties desiring primary coverage have taken to explicitly requiring primary coverage (as CDOT may do now). *See, e.g.,* **\*691** *Meyer v. Lee Collins Air Conditioning Co.,* No. 1 CA–CV 07–0188, 2008 WL 2154798, at \*1 (Ariz.Ct.App. May 20, 2008)* (unpublished memorandum decision); *Georgia–Pacific LLC v. Swift Transp. Corp.,* No. W2008–00344–COA–R3–CV, 2008 WL 4380885, at \*2 (Tenn.Ct.App. Sept.29, 2008)* (unpublished decision); *Bituminous Cas. Corp. v. McCarthy Bldg. Cos.,* No. 04–08–00152–CV, 2009 WL 962536, at \*2 (Tex.App. Apr.8, 2009)* (unpublished memorandum opinion). It is undisputed that Lafarge did not do so here.

We therefore conclude that the subcontract does not unambiguously require K.E.C.I. to provide primary insurance. Lafarge offered no extrinsic evidence of the parties' intent to require primary insurance. The only extrinsic evidence of the point was Lafarge's acceptance, without objection, of K.E.C.I.'s certificate clearly showing excess coverage. Given that evidence, we must therefore resolve the ambiguity against Lafarge as the party that drafted the subcontract. *Allstate Ins. Co.,* 947 P.2d at 346; *Moland v. Indus. Claim Appeals Office,* 111 P.3d 507, 510–11 (Colo.App.2004); *see also East Ridge,* 109 P.3d at 974–75 (where a contract is ambiguous, the parties' conduct before the controversy arose is a reliable test of their interpretation of the agreement).

It follows that K.E.C.I. could not have breached the subcontract by failing to provide primary insurance.

### III. Conclusion

The judgment is affirmed in part and reversed in part, and the case is remanded to the district court for further proceedings consistent with this opinion.

Judge ROMÁN and Judge MILLER concur.

Colo.App.,2010.

Lafarge North America, Inc. v. K.E.C.I. Colorado, Inc.
250 P.3d 682

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

101 F.Supp.2d 454
**(Cite as: 101 F.Supp.2d 454)**



United States District Court,
E.D. Louisiana.

Gary FOSTER,
v.
SUBSEA INTERNATIONAL, INC.,

No. Civ.A. 96-4056.
July 27, 1998.

Employee injured aboard pipe-laying barge brought Jones Act suit against employer and vessel owner. Vessel owner sought indemnity from employer under terms of master service agreement, and from employer's liability insurer. On cross-motions for summary judgment, the District Court, Charles Schwartz Jr., J., held that: (1) issue of fact existed as to whether employee was seaman under Jones Act; (2) allegations of employee's complaint were within indemnity provision of master service contract between employer and vessel owner; (3) Longshore and Harbor Workers' Compensation Act (LHWCA) exclusiveness provision did not relieve employer of obligation to name vessel owner as additional insured; and (4) issue of fact existed as to whether liability policy covered vessel owner.

Ordered accordingly.

West Headnotes

**[1] Seamen 348 ⇌29(1)**

348 Seamen
    348k29 Personal Injuries
        348k29(1) k. In General. Most Cited Cases

**Shipping 354 ⇌84(1)**

354 Shipping
    354V Rights and Liabilities of Vessels and Owners in General
        354k78 Torts

            354k84 Injuries to Stevedores and Other Independent Contractors and Their Employees
                354k84(1) k. In General; Liability. Most Cited Cases

LHWCA and Jones Act are mutually exclusive, since masters and crewmembers are excluded from coverage under LHWCA. Longshore and Harbor Workers' Compensation Act, § 1 et seq., 33 U.S.C.A. § 901 et seq.; Jones Act, 46 App.U.S.C.A. § 688.

**[2] Seamen 348 ⇌2**

348 Seamen
    348k2 k. Who Are Seamen. Most Cited Cases

Requirements for seaman status under Jones Act are: (1) employee's duties must contribute to function of vessel or to accomplishment of its mission, and (2) seaman must have connection to vessel in navigation, or to an identifiable group of such vessels, that is substantial in terms of both its duration and its nature. Jones Act, 46 App.U.S.C.A. § 688.

**[3] Federal Civil Procedure 170A ⇌2512**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2512 k. Shipping and Seamen, Cases Involving. Most Cited Cases

Genuine issue of material fact existed as to whether employee working as welder's helper on pipe-laying barge was "seaman" under Jones Act, where employee had been on barge for only two and one-half weeks but was performing function essential to mission of vessel, precluding summary judgment on vessel owner's indemnity claim against employer and employer's liability insurer for vessel owner's Jones Act liability to employee for injuries suffered on barge. Jones Act, 46 App.U.S.C.A. § 688.

© 2011 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

101 F.Supp.2d 454
**(Cite as: 101 F.Supp.2d 454)**

**[4] Indemnity 208 ☞31(7)**

208 Indemnity
   208II Contractual Indemnity
      208k31 Construction and Operation of Contracts
         208k31(7) k. Duty to Defend. Most Cited Cases
   (Formerly 208k15(6))

**Insurance 217 ☞2914**

217 Insurance
   217XXIII Duty to Defend
      217k2912 Determination of Duty
         217k2914 k. Pleadings. Most Cited Cases
   Under Louisiana law, determination of whether indemnitor or insurer is obligated to defend indemnitee or insured under terms of indemnity or insurance contract depends on pleadings in light of contract provisions.

**[5] Indemnity 208 ☞69**

208 Indemnity
   208III Indemnification by Operation of Law
      208k63 Particular Cases and Issues
         208k69 k. Maritime Cases. Most Cited Cases
   (Formerly 208k13.2(7))
   Allegations in employee's Jones Act complaint against vessel owner and employer that employee was seaman and was injured while performing welding work on vessel were within indemnity provision of master service contract under which employer agreed to hold vessel owner harmless against such claims, and thus employer had duty to defend as to vessel owner, regardless of whether employee might eventually be determined to be longshoreman rather than seaman and thus not within Jones Act. Longshore and Harbor Workers' Compensation Act, § 1 et seq., 33 U.S.C.A. § 901 et seq.; Jones Act, 46 App.U.S.C.A. § 688.

**[6] Insurance 217 ☞1701**

217 Insurance

**217XII** Procurement of Insurance by Persons Other Than Agents
   217k1701 k. In General. Most Cited Cases
   Alleged status of employee injured aboard pipe-laying vessel as "longshoreman" rather than "seaman" did not relieve employer of duty to indemnify vessel owner as to injury pursuant to employer's master service contract obligation to name vessel owner as additional insured on its liability insurance, since LHWCA exclusiveness provision did not void obligation. Longshore and Harbor Workers' Compensation Act, § 5(b), 33 U.S.C.A. § 905(b).

**[7] Workers' Compensation 413 ☞2142.30**

413 Workers' Compensation
   413XX Effect of Act on Other Statutory or Common-Law Rights of Action and Defenses
      413XX(B) Action by Third Person Against Employer
         413XX(B)1 In General
            413k2142.10 Indemnity or Contribution
            413k2142.30 k. Longshoremen or Seamen, Injuries To. Most Cited Cases
   LHWCA exclusiveness provision does not void an agreement by an employer to name a vessel owner as an additional assured on its liability insurance policies. Longshore and Harbor Workers' Compensation Act, § 5(b), 33 U.S.C.A. § 905(b).

**[8] Federal Civil Procedure 170A ☞2501**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2501 k. Insurance Cases. Most Cited Cases
   Ambiguity in employer's liability insurance policy, consisting of conflict between alternate employer endorsement and definition of "insured" which did not include "alternate employer," created genuine issue of material fact as to policy's coverage of vessel owner in connection with on-board in-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

101 F.Supp.2d 454
**(Cite as: 101 F.Supp.2d 454)**

jury to employee, precluding summary judgment on vessel owner's indemnity claim against insurer in connection with employee's Jones Act suit against employer and vessel owner. Jones Act, 46 App.U.S.C.A. § 688.

**\*455** Leonard Cardenas, III, Baton Rouge, LA, David Lawrence Bateman, David L. Bateman, PLC, Baton Rouge, LA, for Gary Foster.

James E. Wright, III, William Joseph Joyce, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, William Sean O'Neil, O'Neil Eichin, New Orleans, LA, Ronald Adams Johnson, Johnson, Johnson, Barrios & Yacoubian, New Orleans, LA, Rufus C. Harris, III, Alfred Jackson Rufty, III, Harris & Rufty, LLC, New Orleans, LA, Cindy Teresa Matherne, Sher Garner Cahill Richter Klein McAlister & Hilbert, LLC, New Orleans, LA, for SubSea Intern., Inc., Curtis Callais Welding, Inc., C&G Welding, Inc. and St. Martin & Mahoney.

George James Richaud, Young, Richaud & Myers, New Orleans, LA, for American Empire Surplus lines Ins. Co.

*ORDER AND REASONS*

CHARLES SCHWARTZ, Jr., District Judge.

Before the Court is Sub Sea International Inc.'s ("Sub Sea") motion for summary judgment seeking contractual defense and indemnity from C & G Welding, Inc. ("C & G"), and insurance coverage from American Empire Surplus Lines Insurance Company ("American Empire"). Both American Empire and C & G filed timely opposition with respect to this motion. In turn, American Empire filed a cross motion for summary judgment claiming that the American Empire insurance policy at issue excludes Sub Sea from coverage because Sub Sea was the owner and operator of the vessel on which plaintiff Gary Foster was injured. Additionally, counsel for C & G filed a cross motion for summary judgment claiming that it does not owe Sub Sea contractual defense and indemnity under the

terms of the master agreement because plaintiff Gary Foster is a "longshoreman." These matters were noticed for hearing on July 8, 1998, but as oral argument was not requested, these matters were submitted for decision on the briefs and documents of record. For the reasons set forth herein below, American Empire's motion for summary judgment is denied, Sub Sea's motion for summary judgment is granted in part and denied in part, and C & G's motion for summary judgment is denied.

*BACKGROUND*

Plaintiff Gary Foster was part of a crew of approximately 8 pipe welders and 15 welder's helpers provided by C & G to work alongside and under the direction of Sub Sea welders aboard the LB 278, a pipelaying barge. C & G provided the welding crew pursuant to a contractual arrangement between Sub Sea and C & G. **\*456** The terms of this contractual arrangement were set forth in the Master Service Contract,FN1 which, *inter alia,* requires C & G to defend, indemnify, and provide certain insurance coverage to Sub Sea, protecting Sub Sea from claims by C & G's employees.

FN1. Rec.Doc. No. 65, Ex. "D".

While working aboard Sub Sea's pipe laying barge LB-278,FN2 plaintiff Gary Foster allegedly slipped on a welding lead and extension cord (collectively the "welding cables") laying on the deck of the barge and fell, sustaining injuries. Foster initially filed suit against Sub Sea under the Jones Act. Thereafter, plaintiff filed two amending complaints for damages, alleging that he was employed by C & G, and that C & G was responsible for his injuries.

FN2. At the time of the alleged accident, plaintiff Gary Foster was working for Sub Sea as part of the contractual arrangement between C & G and Sub Sea.

Four motions are currently pending before the Court. Sub Sea seeks summary judgment holding that the indemnity provisions contained in the Mas-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

101 F.Supp.2d 454
**(Cite as: 101 F.Supp.2d 454)**

ter Service Contract are enforceable. C & G opposes this motion and simultaneously seeks summary judgment holding that it does not owe a duty to defend or indemnify Sub Sea because plaintiff Gary Foster was a longshoreman within the meaning of the Longshoremen and Harbor Workers Compensation Act ("LHWCA"). Sub Sea also seeks summary judgment holding that it is covered under the terms of American Empire's insurance policy FN3 (American Empire Policy No. 6EX00771) as an alternate employer. Conversely, American Empire seeks summary judgment holding that Sub Sea is not covered under the terms of the subject insurance policy. Each of these motions will be addressed in turn.

FN3. Rec.Doc. No. 65, Ex. "E".

### ANALYSIS

Summary Judgment is appropriate when "all of the pleadings, depositions, answers to interrogatories, admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party need not support its motion with affidavits or other evidence, but to defeat a motion for summary judgment the non-movant must present evidence sufficient to establish the existence of each element of his claim as to which he will have the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The inferences drawn from the underlying facts, however, must be viewed in a light most favorable to the non-moving party. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Finally, the Court notes that the substantive law determines materiality of facts, and only "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

**I. C & G's Motion for Summary Judgment Seeking Dismissal of Sub Sea's Cross Claim for Indemnity and Defense**

Sub Sea submits that the Master Service Contract between Sub Sea and C & G is a maritime contract and that the indemnity provisions contained therein are enforceable. Notwithstanding plaintiff's complaint, C & G contends that Gary Foster is not a seaman, but a longshoreman who was injured on navigable waters. C & G submits that because Foster is a longshoreman, the contractual obligations between Sub Sea and C & G are governed by section 905(b) of the LHWCA. C & G claims that section 905(b) voids any indemnity obligation of the longshoreman's employer**457** [C & G] to the vessel owner [Sub Sea].

[1] In order to unravel the Gordian knot, the Court must first determine whether summary judgment is appropriate with respect to plaintiff Gary Foster's status as a "seaman" within the meaning of the Jones Act.FN4 Gary Foster claims that he worked on Sub Sea's barge 278 for approximately two and a half weeks before his accident. See, Rec.Doc. No. 70, Ex. "C" (Memorandum in Opposition to Sub Sea's Motion for Summary Judgment). Foster admitted that he had never worked on a Sub Sea barge prior to this particular job. Id. Foster also admitted that the vessels on which he had previously worked were neither owned by C & G nor C & G's affiliated company, Curtis Callais Welding. Additionally, Foster testified that the various barges on which he worked did not have anything to do with one another. Id.

FN4. It is well established that the LHWCA and the Jones Act are mutually exclusive, as masters and crewmembers are excluded from coverage under the LHWCA. See, Chandris v. Latsis, 515 U.S. at 355-358, 115 S.Ct. at 2183.

[2] There are two essential requirements for seaman status under the Jones Act.

"First ... an employee's duties must contribute to the function of the vessel or to the accomplish-

101 F.Supp.2d 454
**(Cite as: 101 F.Supp.2d 454)**

ment of its mission.... Second, and most import-
ant for our purposes here, a seaman must have a
connection to a vessel in navigation (or to an
identifiable group of such vessels) that is sub-
stantial in terms of both its duration and its
nature."

*Chandris, Inc. v. Latsis,* 515 U.S. 347, 368, 115
S.Ct. 2172, 2179, 132 L.Ed.2d 314 (1995). The Su-
preme Court has specifically rejected a "voyage
test" of seaman status, concluding that an employee
who was injured while performing his duties on a
vessel on the high seas was not necessarily a Jones
Act seaman. *Id.,* 515 U.S. at 358-364, 115 S.Ct. at
2184-2188.

C & G contends that plaintiff Foster cannot es-
tablish seaman status because he lacks a connection
to a vessel in navigation that is substantial in terms
of both its duration and its nature. The issue before
the Court, distilled to its essence, is whether Foster
may qualify for Jones Act status when his duration-
al connection to Sub Sea Barge 278 was for a time
period between ten days and two and a half weeks.

The Supreme Court stated in *Chandris* that the
ultimate inquiry in resolving seaman status is
"whether the worker in question is a member of the
vessel's crew or simply a land-based employee who
happens to be working on the vessel at a given
time." *Id.* at 2191. While the law requires that a
"seaman" have a connection to a vessel that is sub-
stantial in terms of both duration and nature, the in-
quiry is one encompassing the totality of the cir-
cumstances. *Id.* at 2190. The analysis of seaman
status, and ultimately of whether an employee's
connections are substantial in duration and nature,
may include a multiplicity of factors. See, *Bertrand
v. International Mooring & Marine, Inc.,* 700 F.2d
240 (5th Cir.1983). The number of days which
plaintiff intended to work aboard Sub Sea's Barge
278 is only such factor.

[3] In the instant matter, it is clear that Foster
was performing the "normal crew service" of Sub
Sea's barge 278. He worked alongside Sub Sea

welders, performing the functions of a welder's
helper on a pipe laying barge. This job was essen-
tial to the mission of the vessel. Furthermore, while
working on the barge in the Galveston Island Area,
Block 301, plaintiff was certainly exposed to the
perils of the sea, the protection from which was the
purpose of the Jones Act. As it is the temporal ele-
ment and the nature of the activities performed that
determine seaman status, the Court cannot conclude
as a matter of law that Foster's relationship with
Sub Sea Barge 278 was too short to satisfy the
durational requirement imposed by *Chandris.* See,
**\*458***Foulk v. Donjon Marine Co., Inc.,* 144 F.3d
252 (3rd Cir.1998) (Holding that an intended 10
day term of employment aboard a vessel was suffi-
cient to create a genuine issue of material fact with
respect to whether plaintiff (a diver) was a Jones
Act seaman). Accordingly, C & G's Motion for
Summary Judgment seeking dismissal of Sub Sea's
cross claims against it are denied.

## II. Sub Sea's Motion for Summary Judgment Regarding Contractual Defense and Indemnity Allegedly Owed by C & G

Sub Sea submits that the Master Service Con-
tract (Rec.Doc. No. 65, Ex. "D") (the "agreement")
between Sub Sea and C & G is a maritime contract
and that the indemnity provisions contained therein
are enforceable. C & G does not contest that the
agreement is a maritime contract, but asserts that it
does not have a duty to indemnify Sub Sea because
the plaintiff is a longshoreman, and such indemnity
agreements are voided by section 905(b) of the
Longshoremen's and Harbor Worker's Compensa-
tion Act.

[4] The Court first addresses the duty of the in-
demnitor to defend. "In determining whether an in-
demnitee or an insurer is obligated to defend an in-
demnitee or insured under the terms of an indem-
nity or insurance contract, the Louisiana courts look
exclusively to the pleadings in light of the contract
provisions; the ultimate outcome of the case has no
effect upon the duty to defend." *Sullen v. Missouri
Pacific R. Co.,* 750 F.2d 428, 433 (5th Cir.1985).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

101 F.Supp.2d 454
**(Cite as: 101 F.Supp.2d 454)**

[5] The indemnitee provision contained in the Master Service Agreement between Sub Sea and C & G provides:

4. INDEMNITY

....

(b) CONTRACTOR [C & G] shall be responsible, and COMPANY [Sub Sea] shall never be liable for property damage suffered by any person, firm or corporation, for personal injury to or death of any person, including, but not limited to, CONTRACTOR, any of CONTRACTOR's employees or the employees of CONTRACTOR's subcontractors, and CONTRACTOR agrees to indemnify and hold harmless COMPANY, against any and all claims, demands or suits ... which may be brought against COMPANY by any party, including, but not limited to, any employee of CONTRACTOR ... in any way arising out of or incident to the work to be performed under this contract....

Rec.Doc. No. 65, Ex. "D", p. 2, ¶ 4. In the instant matter, plaintiff has asserted a claim under the Jones Act against Sub Sea. This type of claim was expressly contemplated by the Master Service Contract as the alleged injury arose out of the work performed under the instant contract. The allegations contained in plaintiff's complaint claim that plaintiff is a Jones Act "seaman." Therefore, in so far as "the duty to defend" is concerned, it is of no moment that plaintiff may ultimately be classified as a longshoreman since the ultimate outcome of the case has no effect upon the indemnitor's duty to defend. Accordingly, C & G is obligated to defend Sub Sea under the express terms of the indemnification provisions contained in the Master Service Contract.

[6] As to the duty to indemnify, Sub Sea aptly points out the following provision contained in the Master Service Contract:

3. *INSURANCE*

CONTRACTOR [C & G] agrees to procure, maintain, and amend, at is sole expense, policies of insurance in the amounts outlined on that certain document attached hereto as Exhibit "A", which may from time to time be changed in accordance with COMPANY's [Sub Sea's] request as its needs and requirements change, which coverage shall fully address the liabilities assumed hereunder.

... Said policies shall further contain endorsements naming COMPANY as an **\*459** additional insured under said policies and waive the underwriters' rights of subrogation in favor of COMPANY, its affiliates, subsidiaries and joint venturers.

Rec.Doc. No. 65, Ex. "D", p. 2, ¶ 3.

[7] C & G correctly observes that if plaintiff Gary Foster is a longshoreman within the meaning of the LHWCA, the indemnitee provisions contained in the Master Service Contract are voided by section 905(b) of the LHWCA.[FN5] Although section 905(b) of the LHWCA voids indemnitee agreements between the employers of longshoremen and a vessel owner, the Fifth Circuit has held that section 905(b) does not void an agreement by an employer to name a vessel owner as an additional assured on its liability insurance policies. *Voisin v. Odeco Drilling Co.,* 744 F.2d 1174 (5th Cir.1984).

FN5. Section 905(b) provides in pertinent part:

In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person ... may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void....

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

101 F.Supp.2d 454
**(Cite as: 101 F.Supp.2d 454)**

33 U.S.C. § 905(b).

The insurance contract obtained by C & G through American Empire, ostensibly for the benefit of Sub Sea, contains the following exclusion:

B. Exclusions

This insurance does not apply to:

...

4. Any obligation assumed by or imposed upon the Insured or us under any Longshoreman and Harbor Workers Compensation Act, workers compensation, occupational disease, unemployment compensation, or disability benefits law, or any similar law;

Rec.Doc. No. 65 Ex. "E" pp. 1-2. Thus, if plaintiff is a longshoreman, C & G has breached its obligation under Section three (3) of the Master Service Contract to name Sub Sea as an additional insured. Consequently, C & G owes Sub Sea a defense and indemnity even if plaintiff is determined to be a longshoremen within the meaning of the LHWCA. See, *Harper v. Intracoastal Truck Lines,* 451 So.2d 1289, 1291 (1984).FN6

FN6. In *Harper,* Roustabout, a contractor, was required by its contract with Intracoastal, a corporation, to name Intracoastal as an additional insured with respect to all claims arising out of any work performed by contract labor and personnel furnished by Roustabout. Roustabout failed to name Intracoastal as an additional insured. The First Circuit held that Roustabout's failure to name Intracoastal as an additional insured was a breach of contract entitling Intracoastal to an award of expenses, including attorney's fees, of defending the suit brought by employee. 451 So.2d 1289, 1290-1291.

**III. Sub Sea and American Empire's Cross Motions for Summary Judgment on Coverage Un-**

der American Empire's Policy of Insurance.

[8] Sub Sea and American Empire have filed cross motions for summary judgment with respect to the issue of insurance coverage. Summary judgment with respect to this issue is premature at this stage as the policy at issue contains ambiguous language. Specifically, the policy is ambiguous with respect to whether an "Alternate Employer" FN7 is an "insured" **\*460** within the meaning of the policy. Section IV of the policy defines "Insured" as follows:

FN7. See, Rec.Doc. No. 65, Ex. "E" "Alternate Employer Endorsement".

*ALTERNATE EMPLOYER ENDORSEMENT*

This endorsement applies only with respect to bodily injury to your employees while in the course of special or temporary employment by the alternate employer in the territory named in Item 4 of the Declarations. Insurance afforded by this policy will apply as though the alternate employer is the insured.

...

The Insuring Agreements, Exclusions and Conditions of this Policy shall apply to the alternate employer, exception Condition 1, Cancellations shall not apply to the alternate employer.

1. Insured. The unqualified word "insured", wherever used in this policy, includes:

a) The Named Insured shown in Item 1 of the Declarations;

b) If the Named Insured in Item 1 of the Declarations is designated as a partnership or joint venture, any partner or member thereof but only with respect to the conduct of your business;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

101 F.Supp.2d 454
**(Cite as: 101 F.Supp.2d 454)**

c) Your executive officers and directors, but only with respect to their duties as your officers and directors;

d) Your stockholders, but only with respect to their liability as stockholders.

No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

Rec.Doc. No. 65, Ex. "E". Clearly, the definition of "insured" does not include "Alternate Employer's." Yet, the policy contains an Alternate Employer Endorsement which provides:
The Insuring Agreements, Exclusions, and Conditions of this Policy shall apply to the alternate employer, except Condition 1., Cancellation, shall not apply to the alternate employer.

Rec.Doc. No. 65, Ex. "E" "Alternate Employer Endorsement." The Court finds that the policy language is ambiguous, and thus the issue of insurance coverage warrants a full hearing.

Although summary judgment is not appropriate at this time, the Court cannot help but offer the following observation. American Empire submits that its policy permits recovery under the Jones Act against an employer who is not the owner or operator of the particular vessel on which the plaintiff is injured. See, American Empire's Opposition to Sub Sea's Motion for Summary Judgment, p. 5. [Rec.Doc. No. 69]. The Endorsement (Exclusion) which American Empire claims excludes Sub Sea's claim reads as follows:

It is agreed and understood that Exclusion No. 1 is deleted and replaced with the following: [The following is excluded from coverage]

1. Any liability of the insured to the captain or crew of any watercraft or vessel which is owned chartered loaned to rented to or **operated by or for any insured.**

Rec.Doc. No. 65, Ex. "E", Amendatory Endorsement (Watercraft Exclusion) (emphasis added). The Fifth Circuit has interpreted this clause to deny coverage to **all** insured when an injury occurs on a vessel owned or operated by **any** insured. See, *Farrell Lines, Inc. v. Insurance Co. of North America, 789 F.2d 300 (5th Cir.1986);* See also, *Insurance Company of North America v. West of England Shipowners Mutual Ins. Ass'n., 890 F.Supp. 1296, 1301 n. 5 (E.D.La.1995).* Accordingly, if Alternate Employer's are "insured" within the meaning of the subject policy, as American Empire submits, neither C & G nor Sub Sea are entitled to coverage under the unambiguous terms of the insurance policy.

The Court further notes that summary judgment is not appropriate at this time for an additional reason. The American Empire insurance policy at issue clearly excludes coverage for longshoremen. Rec.Doc. No. 65 Ex. "E" pp. 1-2. As the issue of seaman versus longshoreman status has been referred to the merits, summary judgment with respect to the insurance coverage issue is premature. See, Discussion in Section I, *supra.*

Accordingly, and for all of the above and foregoing reasons,

IT IS ORDERED that Sub Sea's Motion for Summary Judgment seeking contractual defense and indemnity from C & G Welding is GRANTED.

**\*461** IT IS FURTHER ORDERED that Sub Sea's Motion for Summary Judgment seeking insurance coverage from American Empire is DENIED.

IT IS FURTHER ORDERED that American Empire's Motion for Summary Judgment seeking a ruling that Sub Sea is not covered by the terms of the subject insurance policy is DENIED.

IT IS FURTHER ORDERED that C & G's Motion for Summary Judgment seeking an order voiding C & G's contractual defense and indemnification obligations is DENIED.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

101 F.Supp.2d 454
**(Cite as: 101 F.Supp.2d 454)**

E.D.La.,1998.
Foster v. SubSea Intern., Inc.
101 F.Supp.2d 454

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

623 F.Supp. 1452
**(Cite as: 623 F.Supp. 1452)**

United States District Court,
E.D. Louisiana.

Tyrone JACKSON and Eva Saunders Jackson
v.
TENNECO OIL COMPANY, et al.

Civ. A. No. 84–4677.
Dec. 5, 1985.

In action by worker injured on platform on outer continental shelf, platform owner asserted claims for contractual and tort indemnity against worker's employer and sought coverage under insurance policies issued to employer by insurer. On summary judgment motion of employer and insurer, the District Court, Mentz, J., held that: (1) platform owner was barred by Longshoremen's and Harbor Workers' Compensation Act and Louisiana law from asserting tort indemnity claim against employer, and (2) platform owner could not assert claims against insurer as third-party beneficiary under policy issued to employer. On reconsideration, the Court further held that indemnity provision of master service or work agreement between platform owner and contractor was void and unenforceable under Louisiana Oil Field Indemnity Act of 1981.

Order in accordance with opinion.

West Headnotes

**[1] Admiralty 16 ⚖️1.20(2)**

16 Admiralty
    16I Jurisdiction
        16k1.10 What Law Governs
            16k1.20 Effect of State Laws
                16k1.20(2) k. Contracts in General; Insurance. Most Cited Cases
    Louisiana law governed platform owner's right to seek contractual indemnity for injuries sustained by nonemployee on fixed platform on outer contin-

ental shelf.

**[2] Workers' Compensation 413 ⚖️2142.30**

413 Workers' Compensation
    413XX Effect of Act on Other Statutory or Common-Law Rights of Action and Defenses
        413XX(B) Action by Third Person Against Employer
            413XX(B)1 In General
                413k2142.10 Indemnity or Contribution
                413k2142.30 k. Longshoremen or Seamen, Injuries To. Most Cited Cases
    (Formerly 413k2142)
    Exclusive liability provision of Longshoremen's and Harbor Workers' Compensation Act, § 5(a), 33 U.S.C.A. § 905(a), barred platform owner's tort indemnity claim asserted against employer of worker allegedly injured while performing acidation and gravel packing work on platform on outer continental shelf; employer's liability was limited under 33 U.S.C.A. § 905(a) to the provision of compensation benefits due worker.

**[3] Insurance 217 ⚖️2360**

217 Insurance
    217XVII Coverage—Liability Insurance
        217XVII(B) Coverage for Particular Liabilities
            217k2359 Manufacturers' or Contractors' Liabilities
                217k2360 k. In General. Most Cited Cases
    (Formerly 217k435.24(1))
    Platform owner could not claim status as third-party beneficiary under contractor's policy by virtue of the master work or service agreement with contractor, since platform owner was a party to the agreement, and the agreement did not require that platform owner be named as an additional insured on the policy under which platform owner asserted its third-party claim.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

623 F.Supp. 1452
**(Cite as: 623 F.Supp. 1452)**

**[4] Insurance 217 ⟶2361**

217 Insurance
   217XVII Coverage—Liability Insurance
      217XVII(B) Coverage for Particular Liabilities
         217k2359 Manufacturers' or Contractors' Liabilities
         217k2361 k. Scope of Coverage. Most Cited Cases
   (Formerly 217k435.24(1))

Even if platform owner was entitled to be named as an additional insured under contractor's policies or claim protection of those policies for its own negligence, such claim was invalid and unenforceable under LSA-R.S. 9:2780, subd. G, proscribing indemnity provisions in oil drilling agreements.

**[5] Indemnity 208 ⟶30(5)**

208 Indemnity
   208II Contractual Indemnity
      208k26 Requisites and Validity of Contracts
         208k30 Indemnitee's Own Negligence or Fault
         208k30(5) k. Contractors, Subcontractors, and Owners. Most Cited Cases
   (Formerly 208k3)

Indemnity provision of master service or work agreement, requiring contractor to defend or indemnify platform owner for platform owner's liability as the owner or custodian of a defective thing or for its sole or concurrent fault, was void and unenforceable under Louisiana Oil Field Indemnity Act of 1981, LSA-R.S. 9:2780.

**\*1453** Michael H. Bagot, Jr., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for third-party defendant.

Guy E. Wall, Gordon, Arata, McCollam, Stuart & Duplantis, New Orleans, La., for defendant.

ORDER AND REASONS

MENTZ, District Judge.

This matter is before the Court upon motion of defendant, Halliburton Services, Inc. (Halliburton) and third party defendant, Highlands Insurance Company (Highlands) for summary judgment as to Tenneco Oil Company's (Tenneco) claims for contractual indemnity, tort indemnity, and coverage under insurance policies issued to Halliburton by Highlands. Halliburton contends that Tenneco's claim for contractual indemnity is barred by the Louisiana Oilfield Indemnity Act, La.Rev.Stat.Ann. 9:2780 (West Supp.1985) ("Indemnity Act:). Halliburton further claims that Tenneco's claim for tort indemnity is barred by § 905(a) of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq. Highlands avers that Tenneco's third party claim against it for coverage under insurance policies issued to Halliburton is without merit, because the policies issued by Highlands do not cover Tenneco or, in the alternative, are void under the Indemnity Act. For the reasons set forth below, the motion for summary judgment is GRANTED dismissing Tenneco's **\*1454** claim against Halliburton for tort indemnity, and Tenneco's third party claim for insurance coverage against Highlands. As to Tenneco's claim against Halliburton, the motion for summary judgment is GRANTED insofar as Tenneco seeks indemnity for its own negligence. Halliburton, should Tenneco be exonerated at trial, will be required to reimburse Tenneco its costs of defense.

Plaintiff herein was allegedly injured on or about November 25, 1983 while performing acidation and gravel packing work on a Tenneco platform on the outer continental shelf. At the time of his alleged injury, plaintiff was employed by Halliburton and the parties have stipulated that Halliburton was working for Tenneco pursuant to an August 4, 1980 Master Service or Work Agreement. Paragraph VII of the Agreement contains indemnity provisions which read as follows:

VII. INDEMNITY

A. Company agrees to defend, indemnify and hold Contractor, its subsidiary and affiliate com-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

623 F.Supp. 1452
**(Cite as: 623 F.Supp. 1452)**

panies, their agents, employees, directors, officers, servants, and insurers, harmless from and against any and all losses, claims, demands, liabilities or causes of action of every kind and character, in favor of any person or party, for injury to or illness or death of any employee of Company or its joint interest owners, which injury, illness or death arises out of or is incident to the work performed under this Contract, and regardless of the cause of such injury, illness or death, even though caused in whole or in part by a pre-existing defect, indemnitees' negligence or strict liability, or other legal fault of indemnitees. Company shall fully defend any such claim, demand or suit as its sole expense, even if the same is groundless. This indemnity shall be limited to the extent necessary for compliance with applicable State and Federal laws.

B. Contractor agrees to defend, indemnify and hold Company, its joint interest owners, its subsidiary and affiliate companies, their agents, employees, directors, officers, servants, and insurers, harmless from and against any and all losses, claims, demands, liabilities or causes of action of every kind and character in favor of any person or party, for injury to or illness or death of any employee of Contractor or any employee of subcontractors of Contractor, which injury, illness or death arises out of or is incident to the work performed under this Contract, and regardless of the cause of such injury, illness or death, even though caused in whole or in party by a pre-existing defect, indemnitees' negligence or strict liability, or other legal fault of indemnitees. Contractor shall fully defend any such claim, demand or suit at its sole expense, even if the same is groundless.

These reciprocal provisions require Halliburton and Tenneco to be responsible for personal injuries sustained by their own employees, regardless of fault. Other contractual provisions require Halliburton to provide certain insurance coverages and name Tenneco as an additional assured on its mar-ine insurance policies.

The 1980 Agreement does not specify a "terminable performance of a specific job or activity". See R.S. 9:2780(I). It is, in fact, an open-ended Master Service Agreement which governs work performed by Halliburton for Tenneco. This Court finds that the execution of the Agreement prior or to effective date of the Indemnity Act does not preclude the Act's application to the Agreement. See § 9:2780(I); *Rigby v. Tenneco Oil Co.,* 607 F.Supp. 1247, 1248 (E.D.La.1985); *Home Ins. Co. v. Garber Industries, Inc.,* 588 F.Supp. 1218, 1222 (W.D.La.1984); *Tobin v. Gulf Oil Corp.,* 535 F.Supp. 116, 117 (E.D.La.1982).

TENNECO'S CONTRACTUAL CLAIMS

Tenneco correctly notes that the application of the Indemnity Act voids only the obligation to indemnify Tenneco for Tenneco's**1455** negligence or strict liability and does not bar Tenneco's contractual claim against Halliburton for Halliburton's fault or negligence. *See Rigby v. Tenneco Oil Co.,* 607 F.Supp. 1247, 1248 (E.D.La.1985); *Home Ins. Co. v. Garber Indus., Inc.,* 588 F.Supp. 1218, 1222–23 (W.D.La.1984). However, Tenneco also argues that the Indemnity Act is inconsistent with the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(a)(2)(A) and § 905(a) of the LHWCA, 33 U.S.C. § 901, *et seq.* This argument was addressed by Judge Schwartz in *Rigby supra,* 607 F.Supp. at 1247–50 and by this Court in *Wilson v. J. Ray Mc-Dermott & Company, Inc.,* 616 F.Supp. 1301 (E.D.La.1985). For the reasons set forth in these opinions, the Court finds that R.S. 9:2780 is not inconsistent with federal law.

[1] Consequently, Louisiana law governs a platform owner's right to seek contractual indemnity for injuries sustained by non-employees on fixed platforms on the outer continental shelf. *See Rodrigue v. Aetna Cas. & Serv. Co.,* 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969).

TENNECO'S TORT INDEMNITY CLAIMS
Tenneco contends that tort indemnity is not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

623 F.Supp. 1452
**(Cite as: 623 F.Supp. 1452)**

barred by § 905(a) of the LHWCA. This section provides that:

> The liability of an employer prescribed in Sec. 4 *shall be exclusive and in place of all other liability* of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and *anyone otherwise entitled to recover damages* from such employer at law or in admiralty on account of such injury or death.... (emphasis added)

Notwithstanding jurisprudence to the contrary, Tenneco argues that tort indemnity is not barred in light of *Lockheed Aircraft Corporation v. United States,* 460 U.S. 190, 103 S.Ct. 1033, 74 L.Ed.2d 911 (1983).

In *Lockheed* the administrator of the estate of a civilian employee of the United States Navy brought a wrongful death action against the aircraft manufacturer. The manufacturer, in turn, sought indemnity from the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), § 2671 *et seq.* The Court examined the exclusive liability provision of the Federal Employees' Compensation Act, 5 U.S.C. 8116(c) as well as the earlier case of *Weyerhaeuser Steamship Company v. United States,* 372 U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963). Without ruling on the substantive basis of Lockheed's claim, the court held that the exclusive liability provision of the § 8116(c) did not bar a tort indemnity claim.

Neither *Lockheed* nor *Weyerhaeuser* interpreted the substantive provisions of the LHWCA. A thorough review of the legislative histories shows that Congress has had ample opportunity to and has, in fact, addressed the substantive rights of third parties without even suggesting any intention of making the employer liable in tort to third parties.

Although it cited the existence of "nearly identical language" in the exclusive remedy provisions of the FECA and the LHWCA, the Supreme Court did not rule on the question of whether a

third party tortfeasor is entitled to seek tort indemnity from a longshoremen's employer, as Tenneco does here. In fact, the Supreme Court has declined the invitation to hold employers of injured longshoremen liable in either tort indemnity or contribution to third party tortfeasors. *See Halcyon Line v. Haenn Ship Ceiling Corp.,* 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952); *Atlantic Coast Line R. Co. v. Erie Lackawana Railroad Company,* 406 U.S. 340, 92 S.Ct. 1550, 32 L.Ed.2d 110 (1972).

The Supreme Court's refusal to hold employers liable for tort indemnity to third parties in addition to requiring them to pay compensation benefits to the injured employee is consistent with the compromise *1456 between employers and employees that the LHWCA represents.

The LHWCA provides that a covered employee is entitled to receive compensation benefits from his employer regardless of fault and, in turn, relinquishes his right to a tort recovery from his employer. *See Peters v. No. River Ins. Co. of Morristown, N.J.,* 764 F.2d 306, 310 (5th Cir.1985); *Louviere v. Shell Oil Co.,* 509 F.2d 278, 283 (5th Cir.1975), *cert. denied,* 423 U.S. 1078, 96 S.Ct. 867, 47 L.Ed.2d 90 (1976); 33 U.S.C. 905(a). In a third party tort situation such as the instant litigation, the Fifth Circuit, in *Peters, supra,* stated:

> We have recognized that the compensation scheme of the Act furthers at least two other objectives, both of which are particularly relevant to the issue in this case; (1) "placing the burden ultimately on the company whose default caused the injury," *Louviere,* 509 F.2d at 283 (quoting *Italia Societa v. Oregon Stevedoring Co.,* 376 U.S. 315, 324, 84 S.Ct. 748, 754, 11 L.Ed.2d 732 (1964) ), and (2) "protect[ing] employers who are subject to absolute liability by the Act," id. (quoting *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 412, 74 S.Ct. 202, 206, 98 L.Ed. 143 (1953). The Act, as interpreted by the Supreme Court, furthers these objectives by (1) preserving a compensated worker's remedies against third parties; (2) allowing the employer in certain circumstances to as-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

623 F.Supp. 1452
**(Cite as: 623 F.Supp. 1452)**

sert the worker's rights against third parties when the worker has failed to do so; (3) denying third parties a right of contribution or indemnity from the employer even when the employer is at fault; (4) allowing the employer to recoup from third-party recoveries the benefits paid to the worker even if the employer is at fault; and (5) preserving the employer's right to assert its own independent cause of action against third parties for recovery of the compensation benefits paid to the worker.

764 F.2d at 310

To allow Tenneco to assert a tort indemnity claim against Halliburton would not only frustrate the purposes of the LHWCA as set out in *Peters, supra,* but would contravene the controlling jurisprudence in this Circuit.

The controlling jurisprudence in the Fifth Circuit is *Ocean Drilling and Exploration Co. v. Berry Brothers Oilfield Service,* 377 F.2d 511 (5th Cir.1967), *cert. denied,* 389 U.S. 849, 88 S.Ct. 102, 19 L.Ed. 118 (1967), in which Odeco claimed a right to tort indemnification from Berry Brothers, the employer of a longshoreman injured on a fixed Odeco platform on the outer continental shelf. The Fifth Circuit noted that the plaintiff was receiving benefits from Berry Brothers pursuant to § 905(a) of the LHWCA. The Court examined § 905(a) of the LHWCA and *Ryan Stevedoring Co. v. Pan Atlantic Steamship Corporation,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956) and stated that the obvious purpose of this section,

is to make the statutory liability of an employer to contribute to its employees compensation the exclusive liability *of such employer to its employees, or to anyone* claiming under or through such employee, *on account of his injury or death arising out of that employment.* In return, the employee, and those claiming under or through him, are given a substantial *quid pro quo* in the form of an assured compensation, regardless of fault, as a substitute for their excluded claims. 377 F.2d

at 514, *citing,* 350 U.S. at 129 [76 S.Ct. at 235] (emphasis in original).

Odeco's tort indemnity claim was dismissed on the basis that "the Act's [LHWCA] exclusive liability provision effectively abrogates any independent tort liability of the employer to its employees, thereby eliminating any basis which may have existed for indemnification on a tort theory. *Id.* See also, *Olsen v. Shell Oil Company,* 595 F.2d 1099, 1103 (5th Cir.1979).

The *Halcyon* and *Atlantic Coastline* opinions were dismissed as irrelevant in a footnote by the Supreme Court in *Lockheed.* **\*1457** In *Lockheed,* the Supreme Court did not overrule these decisions nor did it address the *Berry Brothers* decision and its progeny. In the footnote, the *Lockheed* majority dismissed the LHWCA cases noted in the dissenting opinion and suggested that *Halcyon* left open the question of whether a right to contribution would be subject to the LHWCA's exclusive liability provisions. 460 U.S. at 197, n. 8, 103 S.Ct. at 1037, n. 8, 74 L.Ed.2d at 914, n. 8, *citing* 342 U.S. at 286, n. 12, 72 S.Ct. at 277, n. 12, 96 L.Ed. 318.

The *Halcyon* court did not address this issue. Rather, it referred to circuit court rulings which held that § 905(a) precluded any action for tort indemnity or contribution against a longshoreman's employer. *See American Mutual and Liability Insurance Co. v. Matthews,* 182 F.2d 322, 1950 A.M.C. 1272 (2nd Cir. 1950); *Slattery v. Marra Brothers,* 186 F.2d 134, 1951 A.M.C. 183 (2nd Cir.1951). The *Matthews* court noted that "to impose a noncontractual duty of contribution on the employer is *pro tanto* to deprive him of the immunity which the statute grants him in exchange for his absolute, though limited, liability to secure compensation to his employees". 182 F.2d at 324, 1950 A.M.C. at 1275.

[2] It is clear, therefore, that *Lockheed* does not overrule the *Berry Brothers* decision and subsequent cases which have limited an employer's liability under § 905(a) of the LHWCA to the provi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

623 F.Supp. 1452
**(Cite as: 623 F.Supp. 1452)**

sion of compensation benefits to the injured employee or his survivors. *Lockheed* did not decide the question of tort indemnity under the LHWCA, which is a different act, with a different purpose from that of the FECA. A recent decision involving a tort indemnity claim under § 905(a) found *Lockheed* distinguishable on this ground. *See Causey v. K & B Equipment Company, Inc.,* 467 So.2d 1266 (La.App. 4th Cir.1985).

Even if this Court found *Lockheed* to be either binding or persuasive authority, the decision does not open the floodgates for tort indemnity or contribution claims. In the instant case, the applicable substantive law is that of Louisiana, since jurisdiction arises under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.* and diversity of citizenship.

In Louisiana, a party obligated to pay compensation is not solidarily liable with another party answerable in damages under La.Civ.Code Art. 2315. The Workmen's Compensation Act provides a substantive exception to the rule of Article 2315. An employer whose fault causes damage to an employee is not required to repair the damage. The employee has no cause of action under Article 2315 against the employer for damages for injury sustained in the course and scope of his employment due to the employer's fault. *Cripe v. Haynes,* 350 So.2d 956, 960 (La.App.2d Cir.1977); LSA–R.S. 23:1032; *Dandridge v. Fidelity & Casualty Co.,* 192 So. 887 (La.App.2d Cir.1939); *Shumake v. Home Indemnity Co.,* 68 So.2d 789 (La.App.2d Cir.1953).

Under Louisiana law, joint tortfeasors who are each answerable for damage caused by their acts or omissions are answerable in solido. La.Civ.Code Ann. Art. 2324; *Moss v. Guarisco,* 409 So.2d 323 (La.App. 1st Cir.1981), *writ denied,* 412 So.2d 540 (La.1982). For the employer and third party tortfeasor to be solidary obligors, the payment of compensation benefits by the employer must have the effect of extinguishing the plaintiff's right to assert these amounts as elements of damage owed by the

third party tortfeasor. See La.Civ.Code Ann. 1794 (West Supp.1985) (formerly Civil Code Art. 2091). Since payment of compensation benefits under either the Louisiana Workmen's Compensation Act, La.Rev.Stat.Ann.R.S. 23:1021 *et seq.,* or the LHWCA, 33 U.S.C. § 901 *et seq.,* does not extinguish an employee's right to pursue third parties for all damages sustained as a result of the third party's negligence, the compensation employer is not solidarily liable with a negligent third party,**\*1458** regardless of the extent to which the employer may have been concurrently negligent. *See Cripe v. Haynes, supra,* 350 So.2d at 960; *Sanderson v. Binnings Construction Company,* 172 So.2d 721 (La.App.4th Cir.1965); *Hebert v. Blankenship,* 187 So.2d 798 (La.App.3d Cir.1966); *Phillips v. Houston Fire and Casualty Insurance Company,* 219 F.Supp. 420 (W.D.La.1963); *Brenham v. Southern Pacific Company,* 328 F.Supp. 119 (W.D.La.1971), *aff'd,* 469 F.2d 1095 (5th Cir.1972), *cert. denied, Southern Pacific Transportation Company v. Sutton's Steel & Supply, Inc.,* 409 U.S. 1061, 93 S.Ct. 560, 34 L.Ed.2d 513 (1972).

The exclusive liability language of the Louisiana Workmen's Compensation Act, which is narrower than that found in the LHWCA, has been held to bar actions against the employer for indemnity or contribution. *See, Moak v. Link Belt Company,* 229 So.2d 395 (La.App. 4th Cir.1969), *dismissed in part, reversed in part on other grounds,* 257 La. 281, 242 So.2d 515 (1970); *Badeaux v. Patterson Truckline, Inc.,* 247 So.2d 875 (La.App.3d Cir.1971), *writ denied,* 259 La. 77, 249 So.2d 209 (1971); *Bagwell v. South Louisiana Electric Co-Op Association,* 228 So.2d 555 (La.App.3d Cir.1969).

The substantive law of Louisiana, which is the applicable law in this case, is that the party who is compelled to pay damages to an injured claimant may not demand contribution or indemnity from the claimant's compensation employer, even where the third party is only technically at fault. Both the LHWCA and the Louisiana Workmen's Compensation

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

623 F.Supp. 1452
**(Cite as: 623 F.Supp. 1452)**

Act relieve the employer of any liability it may have to its employees under La.Civ.Code Ann.Art. 2315. The employer's duty to pay compensation benefits to his injured employee arises out of the contract of employment, not out of a theory that the employer is a tortfeasor. Consequently, the compensation employer cannot be a joint tortfeasor with the third party as to its employees; third parties thus have no basis under any theory of tort law to demand indemnity. *See Bagwell, supra,* and *Sanderson, supra.*

As in the Louisiana compensation scheme, the LHWCA imposes an obligation upon employers to pay compensation benefits to employees injured in the course and scope of their employment, which obligation "shall be exclusive and in place of all other liability...." 33 U.S.C. § 905(a). Under 33 U.S.C. 933(a), the employee may prosecute an action against a third party without losing his right to receive compensation. The result achieved is identical to that reached under Louisiana substantive law. *See* La.Rev.Stat.Ann.R.S. 23:1101 (West Supp.1985).

The Supreme Court has long recognized that workers' compensation schemes exist, in part, to provide "for employers a liability which is fixed and determinate." *Bradford Electric Light Co. v. Clabber,* 286 U.S. 145, 159, 52 S.Ct. 571, 576, 76 L.Ed. 1026 (1932). Such a result is not achieved by imposing tort liability on employers through the back door. To allow such a result would upset the *quid pro quo* which the compensation schemes created limiting an employee's liability to the payment of compensation benefits to injured employees and place employers in the position of being potentially liable for *both* full compensation benefit and for all damages available in tort. The practical effect of such a situation would be to make the employer twice liable for the same event, magnify its potential liability beyond that of an ordinary tortfeasor, penalize it for making voluntary compensation payments, and such a result would frustrate the avowed purposes of the Act. *See, Peters v. No. River Ins.*

*Co. of Morristown, N.J., supra,* 764 F.2d at 310. Further, to allow third party tortfeasors to assert third party tort indemnity claims against employers would vest them with rights not held by or flowing through the claimant, but arising out of the claimant's injuries. This is not the result intended by Congress.

**\*1459** Finally, it should be noted that the result sought by Tenneco would result in the anomalous situation in which platform workers walk into and out of situations where the employer would be liable for tort indemnity. For example, a platform worker injured on a fixed platform on the outer continental shelf would expose his employer to a claim for indemnification or contribution by the platform owner. If the worker was injured on a fixed platform in territorial waters, no claim for indemnification or contribution could be asserted against his employer. *Cf. Herb's Welding, Inc. v. Gray,* 470 U.S. 414, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985), *on remand,* 766 F.2d 898 (5th Cir. 1985). This Court's review of the legislative history behind the LHWCA and the existing jurisprudence demands that Tenneco's claim for tort indemnity be rejected.

TENNECO'S THIRD PARTY BENEFICIARY CLAIM

Tenneco claims to be a third party beneficiary under the Highlands' policy by virtue of its 1980 Master Work or Service Contract with Halliburton. The 1980 Agreement only required Halliburton to name Tenneco as an additional assured on its marine insurance policies. Halliburton was not otherwise required to name Tenneco in its other policies and did not do so.

A contract is a *stipulation pour autrui* if it clearly reveals that the intent of the contracting parties was to provide a benefit to a third party. *Wallace v. Texaco, Inc.,* 681 F.2d 1088, 1090 (5th Cir.1982). However, for one to be the beneficiary of a *stipulation pour autrui,* he must not be a party to the contract which stipulates on his behalf. *Carl Heck Engineers v. Haselden & Assoc., Inc.,* 316

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

623 F.Supp. 1452
**(Cite as: 623 F.Supp. 1452)**

So.2d 890 (La.App. 1st Cir.1975), *writ refused,* 320 So.2d 912 (La.1975).

[3][4] Tenneco's third party beneficiary claims must be rejected. First, Tenneco as a party to the contract, may not claim the status of a third party beneficiary. Second, the contract does not require that Tenneco be named as an additional assured on the policy before this Court. Accordingly, Tenneco has no valid claim to protection on indemnity under the Highlands policies. Furthermore, even if it could be said that Tenneco was entitled to be named under these policies or claim the protection of these policies for its own negligence, such a claim would be invalid and unenforceable under La.Rev.Stat.Ann.R.S. 9:2780(G). In fact, this Court notes that identical claims by Tenneco for protection under insurances policies issued to a subcontractor were presented to Judge Schwartz in *Rigby, supra,* 607 F.Supp. at 1250.

In sum, this Court finds that Tenneco's third party beneficiary claim is without merit.

CONCLUSION

For the foregoing reasons, Tenneco's claim for tort indemnity against Halliburton is DISMISSED. Tenneco's claim against Highlands for insurance coverage is DISMISSED. Tenneco's claim for contractual indemnity against Halliburton is DISMISSED insofar as Tenneco seeks indemnity for its own negligence or fault. Tenneco's claim for attorney's fees and costs of defense is still before this Court. If, and only if Tenneco completely exonerates itself at trial, may Tenneco assert this claim against Halliburton. If, at trial, Tenneco is found to be one percent at fault, its claim for attorneys fees and costs of defense will be DISMISSED.

ON RECONSIDERATION

The Court, after a careful study of the recent Fifth Circuit opinions in *Sullen v. Missouri Pacific Railroad Company,* 750 F.2d 428 (5th Cir.1985) and *Laird v. Shell Oil Co.,* 770 F.2d 508 (5th Cir.1985), has reconsidered *sua sponte* that portion of its original opinion which dealt with Tenneco's

contractual claims for attorney's fees and **\*1460** costs of defense. Plaintiff's complaint alleges various acts of negligence against Halliburton, Bootstrap and Tenneco. However, plaintiff's claims against Halliburton, his employer, were dismissed by summary judgment. Thus, the record now contains only plaintiff's allegations against Tenneco and Bootstrap.

Paragraph VII.B. of the 1980 Master Service or Work Agreement (duplicated at beginning of opinion) requires that Halliburton defend and indemnify Tenneco for any claims made by any of its employees, or its subcontractor's employees, even where Tenneco is either strictly liable, concurrently negligent or solely at fault. In *Sullen* the Fifth Circuit in pertinent part held that

> Louisiana law is definite and certain. Whether a party is obliged to tender a defense to another party depends entirely upon the allegations in the precipitating pleadings. [citations omitted] ... In determining whether an indemnitor or an insurer is obligated to defend an indemnitee or insured under the terms of an indemnity or insurance contract, the Louisiana courts look exclusively to the pleadings in light of the contract provisions; the ultimate outcome of the case has no effect upon the duty to defend. [citations omitted] ...
>
> ... we conclude that unless the contract of indemnity specifically provides for costs of defense as a separate item of indemnification, the indemnitor has no obligation to defend if the petition alleges facts which, if proven, would establish liability of the indemnitee but preclude coverage under the indemnity agreement.

750 F.2d at 433–34. This case essentially provides a two-step test. The Court must first review the indemnity agreement in question and determine whether the contract for indemnity specifically provides a separate item for costs of defense. If the indemnity contract does not contain a separate item for cost of defense, then the trier of fact must review the petition and determine if it al-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

623 F.Supp. 1452
**(Cite as: 623 F.Supp. 1452)**

leges facts which, if proven, would establish liability on part on the indemnitee but precludes coverage under the indemnity agreement.

*Sullen* teaches that where an indemnity agreement contains a specific provision requiring the indemnitor to provide and pay for the defense of the indemnitee, the indemnitor has an obligation to defend the indemnitee. 750 F.2d at 433–34. In this case, the Agreement does not contain a specific costs of defense provision. Thus, under *Sullen,* if an agreement between the indemnitor and the indemnitee does not contain a specific provision obligating the indemnitor to pay for the defense of the indemnitee, the indemnitor has no obligation to defend the indemnitee where the pleadings allege facts which, if proven at trial, would establish the indemnitee's liability but eliminate coverage under the indemnity agreement. 750 F.2d at 433–34. Focusing exclusively on the pleadings and the broad language contained in Paragraph VII.B. of the Agreement, this court concludes that plaintiff's complaint, which alleges fault against Tenneco, Halliburton and Bootstrap does not, on its face, preclude coverage under the Agreement.

The required analysis does not stop with this Court's consideration of *Sullen.* If coverage is not precluded by the indemnity agreement, then the Court must look at the applicability of the Louisiana Oilfield Indemnity Act of 1981, Louisiana Revised Statutes Annotated § 9:2780. (West Supp.1985). After reviewing the Act, this Court concludes that the duty to defend as expressed in the Agreement is void and unenforceable as a matter of law because it violates the clear language contained in the Indemnity Act. The statute reads in pertinent part as follows:

§ 2780. Certain indemnification agreements invalid

A. The legislature finds that an inequity is foisted on certain contractors and their employees by the defense or indemnity**1461** provisions, either or both, contained in some agreements pertaining

to wells for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, to the extent those provisions apply to death or bodily injury to persons. *It is the intent of the legislature by this Section to declare null and void and against public policy of the state of Louisiana any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee, or an agent or employee of the indemnitee, or an independent contractor who is directly responsible to the indemnitee.*

B. *Any provision contained in, collateral to, or affecting an agreement pertaining to a well for oil,* gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, *is void and unenforceable to the extent that it purports to or does provide for defense or indemnity, or either, to the indemnitee against loss or liability for damages arising out of or resulting from death or bodily injury to persons, which is caused by or results from the sole or concurrent negligence or fault (strict liability) of the indemnitee, or an agent, employee, or an independent contractor who is directly responsible to the indemnitee.* (emphasis added).

Agreements between parties to contracts affecting the energy industry are *absolutely void* when they provide for indemnity against the indemnitee's sole or concurrent fault. *Durant v. Chevron U.S.A., Inc.,* 594 F.Supp. 527, 529 (E.D.La.1984), *aff'd on rehearing,* 613 F.Supp. 1189 (E.D.La.1985). The Louisiana legislature in order to protect certain contractors and their employees from an inequity being "foisted" upon them declared null and void any provision in any agreement pertaining to the energy industry when such provision requires either defense or indemnification for negligence or strict liability on the part of the indemnitee. 594 F.Supp. at 529.

[5] The Agreement between Halliburton and Tenneco requires Halliburton to defend and/or in-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

623 F.Supp. 1452
**(Cite as: 623 F.Supp. 1452)**

demnify Tenneco even when Tenneco is strictly liable or solely or concurrently at fault. Thus, the indemnity provision violates Louisiana's clear public policy expressed in La.Rev.Stat.Ann. § 9:2780(A) and (B). This Court holds that the indemnity provision requiring Halliburton to defend and/or indemnify Tenneco for Tenneco's liability as the owner or custodian of a defective thing (i.e. strict liability) or for its sole or concurrent fault is void and unenforceable as a matter of Louisiana statutory law. This does not preclude Tenneco from claiming contractual indemnity from Halliburton for Halliburton's fault. *See Home Insurance Co. v. Garber Industries, Inc.,* 588 F.Supp. 1218, 1222–23 (W.D.La.1984); *Rigby v. Tenneco Oil Co.,* 607 F.Supp. 1247, 1248 (E.D.La.1985); *Wilson v. J. Ray McDermott, Inc.,* 616 F.Supp. 1301, 1305 (E.D.La.1985). Furthermore, Halliburton has not established any legal basis to annul its obligation to indemnify Tenneco for Halliburton's fault.

In sum, Tenneco cannot enforce the Agreement and require Halliburton to defend and indemnify Tenneco against its own negligence or fault. However, if and only if Tenneco completely exonerates itself at trial, may Tenneco assert its claim for costs of defense and attorney's fees against Halliburton.

Accordingly,

The Court's earlier ruling on Highlands' and Halliburton's motion for summary judgment is PROPER and CORRECT.

D.C.La.,1985.
Jackson v. Tenneco Oil Co.
623 F.Supp. 1452

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.