106 S.W.3d 118, 162 Oil & Gas Rep. 1243
**(Cite as: 106 S.W.3d 118)**

▷

Court of Appeals of Texas,
Houston (1st Dist.).
TESORO PETROLEUM CORPORATION and Te-
soro E & P Company, L.P., Appellants,
v.
NABORS DRILLING USA, INC., Appellee.
Nabors Drilling USA, Inc. (Zurich American Insur-
ance Company, Subrogee), Appellant,
v.
Tesoro Petroleum Corporation and Tesoro E & P
Company, L.P., Appellees.

No. 01–00–00050–CV.
Dec. 12, 2002.
Rehearing Overruled June 13, 2003.

Oil well drilling contractor's property insurer brought subrogation action against operator to recover for loss of rig in blowout. Operator filed counterclaim and claim against the contractor for breach of contract. Contractor then asserted indemnity claim against operator for costs of defense and settlement of working interest owner's suit. The 234th District Court, Harris County, Scott A. Brister, J., entered summary judgment in favor of contractor and against insurer. Appeals were taken. The Court of Appeals, Davie L. Wilson, J. (Assigned), held that: (1) operator failed to establish gross negligence of drilling contractor and, therefore, failed to establish defense to obligation to indemnify contractor; (2) contractor's alleged breach of the contract would not excuse the operator from indemnifying the contractor; (3) indemnification and release provisions were enforceable under the safe harbor requirements of the Oilfield Anti–Indemnity Act (OAIA), even though the contractor released the operator from liability for damage to drilling rig; (4) contractor's waiver of insurer's subrogation rights was enforceable; (5) the waiver did not apply to insurer's claim against operator for gross negligence; and (6) factual issues on gross negligence precluded summary judgment.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Judgment 228 ☞185(2)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185 Evidence in General
                228k185(2) k. Presumptions and Burden of Proof. Most Cited Cases
A plaintiff moving for summary judgment is not under any obligation to negate affirmative defenses.

**[2] Judgment 228 ☞185(2)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185 Evidence in General
                228k185(2) k. Presumptions and Burden of Proof. Most Cited Cases
An affirmative defense will prevent a summary judgment only if each element of the affirmative defense is supported by summary judgment evidence.

**[3] Judgment 228 ☞185(2)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185 Evidence in General
                228k185(2) k. Presumptions and Burden of Proof. Most Cited Cases
A party raising an affirmative defense in opposition to a motion for summary judgment must either (1) present a disputed fact issue on the opposing party's failure to satisfy his own burden of proof or (2) establish at least the existence of a fact issue on each element of his affirmative defense by summary judgment proof.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.W.3d 118, 162 Oil & Gas Rep. 1243
**(Cite as: 106 S.W.3d 118)**

**[4] Indemnity 208 ⬤⟞104**

208 Indemnity
   208V Actions
      208k104 k. Questions for Jury. Most Cited Cases

A contractual right to indemnity should be determined in the same fashion as other contractual rights—as a matter of law.

**[5] Indemnity 208 ⬤⟞33(5)**

208 Indemnity
   208II Contractual Indemnity
     208k33 Particular Cases and Issues
      208k33(5) k. Contractors, Subcontractors, and Owners. Most Cited Cases

Operator's claim that an oil well drilling contractor committed gross negligence in connection with blowout and that the operator was not required to indemnify the contractor for liability to working interest owner was to be determined by facts, not allegations in owner's pleadings in its suit against the contractor.

**[6] Indemnity 208 ⬤⟞31(1)**

208 Indemnity
   208II Contractual Indemnity
     208k31 Construction and Operation of Contracts
      208k31(1) k. In General. Most Cited Cases

Facts, not allegations, determine an indemnitor's duty to indemnify.

**[7] Indemnity 208 ⬤⟞94**

208 Indemnity
   208V Actions
     208k94 k. Defenses. Most Cited Cases
A claim that a contractual exclusion precludes indemnity is an affirmative defense.

**[8] Judgment 228 ⬤⟞185.3(8)**

228 Judgment

228V On Motion or Summary Proceeding
   228k182 Motion or Other Application
     228k185.3 Evidence and Affidavits in Particular Cases
      228k185.3(8) k. Contracts. Most Cited Cases

In support of affirmative defense to oil well drilling contractor's indemnity claim, the operator opposing summary judgment bore the burden to raise a fact issue on each and every element of contractor's alleged gross negligence or willful misconduct so as to bring the indemnity claim within the exclusions in the indemnity agreement.

**[9] Indemnity 208 ⬤⟞102**

208 Indemnity
   208V Actions
     208k98 Evidence
      208k102 k. Weight and Sufficiency. Most Cited Cases

Operator of oil well failed to establish gross negligence of drilling contractor in connection with leaking blowout preventers and, therefore, failed to establish defense to obligation to indemnify contractor for its liability to working interest owner; the operator's expert did not give an opinion that improperly maintained blowout preventers caused the blowout and the resulting damages, and, thus, evidence of causation was insufficient.

**[10] Negligence 272 ⬤⟞1501**

272 Negligence
   272XVIII Actions
     272XVIII(A) In General
      272k1501 k. Nature and Form of Remedy. Most Cited Cases

Negligence and gross negligence are not separable causes of action, but are inextricably intertwined.

**[11] Negligence 272 ⬤⟞273**

272 Negligence
   272V Heightened Degrees of Negligence

106 S.W.3d 118, 162 Oil & Gas Rep. 1243
**(Cite as: 106 S.W.3d 118)**

272k273 k. Gross Negligence. Most Cited Cases

"Gross negligence" presumes a negligent act or omission and includes two further elements: (1) viewed objectively from the standpoint of the actor, the act or omission, i.e., harm-causing negligence, must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.

**[12] Damages 115 ⟲15**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
            115III(A)1 In General
                115k15 k. Nature and Theory of Compensation. Most Cited Cases

The absence of a viable negligence claim removes any justification for imposing actual damages.

**[13] Contracts 95 ⟲189.5**

95 Contracts
    95II Construction and Operation
        95II(C) Subject-Matter
            95k189.5 k. Exculpatory Contracts. Most Cited Cases

(Formerly 95k189)

In the context of a release for acts of negligence, negligence and gross negligence are not separable.

**[14] Indemnity 208 ⟲111**

208 Indemnity
    208VI Rights and Remedies of Indemnitor
        208k111 k. Discharge. Most Cited Cases

Oil and gas property operator's agreement to indemnify oil well drilling contractor was an inde-

pendent covenant, and, thus, contractor's alleged breach of the contract would not excuse the operator from indemnifying the contractor.

**[15] Indemnity 208 ⟲31(1)**

208 Indemnity
    208II Contractual Indemnity
        208k31 Construction and Operation of Contracts
            208k31(1) k. In General. Most Cited Cases

An indemnity agreement is an original obligation between the contracting parties and independent of other agreements.

**[16] Contracts 95 ⟲303(1)**

95 Contracts
    95V Performance or Breach
        95k303 Excuses for Nonperformance or Defects
            95k303(1) k. In General. Most Cited Cases

A prerequisite to the remedy of excuse of performance is that covenants in a contract must be mutually dependent promises.

**[17] Appeal and Error 30 ⟲1079**

30 Appeal and Error
    30XVI Review
        30XVI(K) Error Waived in Appellate Court
            30k1079 k. Insufficient Discussion of Objections. Most Cited Cases

Appellant waived its complaints by merely uttering brief conclusory statements, unsupported by legal citations, and thus presenting attenuated, unsupported argument. Rules App.Proc., Rule 38.1(g).

**[18] Appeal and Error 30 ⟲179(1)**

30 Appeal and Error
    30V Presentation and Reservation in Lower Court of Grounds of Review
        30V(A) Issues and Questions in Lower Court
            30k179 Sufficiency of Presentation of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.W.3d 118, 162 Oil & Gas Rep. 1243
**(Cite as: 106 S.W.3d 118)**

Questions

30k179(1) k. In General. Most Cited Cases

Insurer waived reliance on argument that was asserted for the first time in its motion for reconsideration, four months after the first summary judgment was granted and one month after amended order was signed granting partial summary judgment; the argument concerned applicability of waiver of its subrogation rights.

**[19]** Indemnity 208 ⟠30(5)

208 Indemnity
   208II Contractual Indemnity
      208k26 Requisites and Validity of Contracts
         208k30 Indemnitee's Own Negligence or Fault
            208k30(5) k. Contractors, Subcontractors, and Owners. Most Cited Cases

Indemnification and release provisions of oil well drilling contract stated a "mutual indemnity obligation" enforceable under the safe harbor requirements of the Oilfield Anti–Indemnity Act (OAIA), even though the contractor released the operator from liability for damage to drilling rig; although mutuality extended to every provision of the indemnity agreement except the release, an agreement to indemnify the operator for claims against it for loss of the rig would be superfluous, and the failure to include a meaningless indemnification provision did not destroy mutuality. V.T.C.A., Civil Practice & Remedies Code §§ 127.001(3), 127.005.

**[20]** Insurance 217 ⟠3522

217 Insurance
   217XXX Recovery of Payments by Insurer
      217k3511 Subrogation Against Third Parties; Right to Proceeds of Action or Settlement
         217k3522 k. Waiver or Loss of Subrogation Rights. Most Cited Cases

Oil well drilling contractor's waiver of its property insurer's subrogation rights against operator for loss of rig was enforceable, since the indemnifica-

tion and release provisions of the drilling contract stated a "mutual indemnity obligation" enforceable under the safe harbor requirements of the Oilfield Anti–Indemnity Act (OAIA). V.T.C.A., Civil Practice & Remedies Code §§ 127.001(3), 127.005.

**[21]** Indemnity 208 ⟠31(4)

208 Indemnity
   208II Contractual Indemnity
      208k31 Construction and Operation of Contracts
         208k31(4) k. Subject-Matter in General. Most Cited Cases

A "release" surrenders legal rights or obligations between the parties to an agreement; an "indemnity agreement," however, is a promise to safeguard or hold the indemnitee harmless against either existing and/or future loss liability.

**[22]** Indemnity 208 ⟠30(1)

208 Indemnity
   208II Contractual Indemnity
      208k26 Requisites and Validity of Contracts
         208k30 Indemnitee's Own Negligence or Fault
            208k30(1) k. In General. Most Cited Cases

The fair notice requirements of express negligence and conspicuousness apply to indemnity agreements because these particular agreements are used to exculpate a party from the consequences of its own negligence.

**[23]** Indemnity 208 ⟠30(1)

208 Indemnity
   208II Contractual Indemnity
      208k26 Requisites and Validity of Contracts
         208k30 Indemnitee's Own Negligence or Fault
            208k30(1) k. In General. Most Cited Cases

The "express negligence doctrine" mandates that a party seeking indemnity from the con-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.W.3d 118, 162 Oil & Gas Rep. 1243
**(Cite as: 106 S.W.3d 118)**

sequences of its own negligence must express that intent in specific terms in the indemnity agreement.

**[24] Indemnity 208 ☞30(1)**

208 Indemnity
    208II Contractual Indemnity
        208k26 Requisites and Validity of Contracts
            208k30 Indemnitee's Own Negligence or Fault
                208k30(1) k. In General. Most Cited Cases

"Conspicuousness," as part of the fair notice test of an indemnity agreement, mandates that there must be something on the face of an indemnity agreement to attract the attention of a reasonable person.

**[25] Indemnity 208 ☞30(5)**

208 Indemnity
    208II Contractual Indemnity
        208k26 Requisites and Validity of Contracts
            208k30 Indemnitee's Own Negligence or Fault
                208k30(5) k. Contractors, Subcontractors, and Owners. Most Cited Cases

Indemnity agreement in standard form contract by International Association of Drilling Contractors satisfied the express negligence doctrine requiring party to express intent in specific terms if it seeks indemnity from consequences of its own negligence; the contract stated that the indemnity obligations were without regard to the cause including a party's negligence.

**[26] Indemnity 208 ☞30(5)**

208 Indemnity
    208II Contractual Indemnity
        208k26 Requisites and Validity of Contracts
            208k30 Indemnitee's Own Negligence or Fault
                208k30(5) k. Contractors, Subcontractors, and Owners. Most Cited Cases

Provisions of oil well drilling contract provid-

ing for indemnification and release were conspicuous and satisfied the fair notice test; the agreement labeled them in capital letters "RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK" and "INSURANCE."

**[27] Insurance 217 ☞3522**

217 Insurance
    217XXX Recovery of Payments by Insurer
        217k3511 Subrogation Against Third Parties; Right to Proceeds of Action or Settlement
            217k3522 k. Waiver or Loss of Subrogation Rights. Most Cited Cases

Oil well drilling contractor's waiver of property insurer's subrogation rights against operator did not apply to insurer's claim against operator for gross negligence in connection with blowout; the indemnity agreement limited the parties' waiver of subrogation to the liabilities each assumed under the drilling contract, the contractor did not assume liability for losses to its rig caused by the operator's gross negligence, and if the contractor were to bring suit against the operator to recover for the loss of the rig, it would be seeking a double recovery.

**[28] Subrogation 366 ☞1**

366 Subrogation
    366k1 k. Nature and Theory of Right. Most Cited Cases

"Subrogation" is the right of one who has paid an obligation that another should have paid to be indemnified by the other.

**[29] Insurance 217 ☞3523(1)**

217 Insurance
    217XXX Recovery of Payments by Insurer
        217k3511 Subrogation Against Third Parties; Right to Proceeds of Action or Settlement
            217k3523 Subrogation as Derivative Right
                217k3523(1) k. In General; Rights or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.W.3d 118, 162 Oil & Gas Rep. 1243
**(Cite as: 106 S.W.3d 118)**

"Shoes" of Insured. Most Cited Cases

An insurer's right to subrogation derives from the rights of the insured and is limited to those rights.

**[30] Insurance 217 ☞3523(4)**

217 Insurance
 217XXX Recovery of Payments by Insurer
  217k3511 Subrogation Against Third Parties; Right to Proceeds of Action or Settlement
   217k3523 Subrogation as Derivative Right
    217k3523(2) Defenses Against Insured Affecting Insurer
    217k3523(4) k. Release or Settlement with Insured. Most Cited Cases

A release between the insured and an offending party prior to a loss destroys the insurance company's rights by way of subrogation.

**[31] Insurance 217 ☞3522**

217 Insurance
 217XXX Recovery of Payments by Insurer
  217k3511 Subrogation Against Third Parties; Right to Proceeds of Action or Settlement
   217k3522 k. Waiver or Loss of Subrogation Rights. Most Cited Cases

Parties to indemnity agreement must look to their own contract to determine what subrogation rights they may insist that the other party require its insurers to waive.

**[32] Subrogation 366 ☞35**

366 Subrogation
 366k35 k. Waiver or Loss of Right to Subrogation. Most Cited Cases

Where a party to an indemnity contract relating to an oil and gas well is not contractually obligated to enforce a waiver of subrogation, the other party cannot insist that it assert a waiver of subrogation.

**[33] Judgment 228 ☞181(23)**

228 Judgment

 228V On Motion or Summary Proceeding
  228k181 Grounds for Summary Judgment
   228k181(15) Particular Cases
    228k181(23) k. Insurance Cases. Most Cited Cases

Genuine issue of material fact as to whether oil well blowout was caused by operator's gross negligence precluded summary judgment on subrogation claim by drilling contractor's property insurer against the operator.

**\*121** Roy L. Barnes,William Pannill, Houston, TX, for Appellants.

Kenneth J. Lambert, Fletcher & Springer, L.L.P., Dallas, TX, R. Glen Rigby, Vinson & Elkins, L.L.P., Houston, TX, for Appellees.

Panel consists of Justices JENNINGS and WILSON FN*.

 FN* Justice Davie L. Wilson retired on March 30, 2002. Justice Wilson continues to sit by assignment on this case that was submitted on September 10, 2001.

## OPINION

DAVIE L. WILSON, Justice (Assigned).

Tesoro Petroleum Corporation and Tesoro E & P Company, L.P. (collectively "Tesoro") appeal a summary judgment requiring it to indemnify Nabors Drilling USA, Inc. (Nabors) for settlement monies Nabors paid a third party as a result of an oil well blowout. In five points of error, Tesoro contends the trial court erred in granting summary judgment on Nabors's indemnity claim because (1) Nabors's damages arose from a claim by LMP Petroleum Corporation (LMP) for gross negligence and willful misconduct, which were **\*122** specifically excluded from the indemnity agreement; (2) the summary judgment evidence raised a disputed fact issue as to whether Nabors had been grossly negligent in causing the blowout; (3) negligence and gross negligence are separate causes of action,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.W.3d 118, 162 Oil & Gas Rep. 1243
**(Cite as: 106 S.W.3d 118)**

either of which can lead to a judgment for compensatory damages; (4) a disputed issue of fact exists as to whether Nabors breached the contract, excusing Tesoro of its duty to indemnify Nabors; and (5) "Tesoro Petroleum Corporation" was not a party to the contract.

In a separate appeal, Nabors's insurance carrier, Zurich American Insurance Company (Zurich), appeals a summary judgment holding that it breached the drilling contract by filing suit in subrogation to Nabors's rights against Tesoro to recover insurance proceeds Zurich paid Nabors for the loss of its rig.

We affirm the summary judgment granted on behalf of Nabors and reverse and remand the summary judgment granted on behalf of Tesoro.

### I. Factual and Procedural Background

Tesoro entered into a Joint Operating Agreement with LMP to explore and develop oil and gas property located in Webb County, Texas. As the "operator," Tesoro agreed to manage and control all operations related to the oil and gas development of the property. Pursuant to the Agreement, Tesoro was authorized to enter into an independent contract with a drilling contractor to drill the oil and gas wells.

A. *The Drilling Contract*

Tesoro entered into a Daywork Drilling Contract with Nabors. FN1 As the "drilling contractor," Nabors agreed to drill Longoria No. 2, an oil well located in Webb County, to maintain the drilling equipment and the well-control equipment, to prevent and control fires and blowouts, and to protect the well hole. Nabors also agreed to assume liability for losses to or destruction of its surface equipment and to release Tesoro from liability for that damage. Tesoro assumed sole responsibility for damage to or loss of the hole, released Nabors from liability for such damage or loss, and indemnified Nabors against "any and all claims, liability and expense relating to such damage or loss." Each party also assumed liability and agreed to indemnify the other "from and against all claims, demands, and

causes of action" arising from the contract in favor of the party's own employees, subcontractors, or invitees "on account of bodily injury, death or damage to property." Tesoro and Nabors assumed the foregoing indemnities and liabilities without regard to the cause, except and excluding gross negligence or willful misconduct by either party. FN2 Each party agreed to maintain insurance for the liabilities it assumed under the drilling contract, in the same kind and amount as the other party, and to cause its insurer to waive subrogation to its rights against the other party for the liabilities contractually assumed.

> FN1. The drilling contract was a standard form contract written by the International Association of Drilling Contractors (IADC) and is used frequently in the business.

> FN2. Tesoro typed in the exclusionary clause, and initialed the change. Nabors did not object.

Before drilling, Nabors obtained a certificate of insurance listing Zurich as its insurer for damage to Nabors's drilling rig. Zurich's certificate waived subrogation to Nabors's rights against Tesoro "only as required by signed written contract and **\*123** only insofar as liability is assumed by [Nabors] under signed written contract subject always to the policy's terms, conditions and exclusions."

One month after Nabors began drilling the Longoria No. 2 Well, the well began flowing, but several of its blowout preventers (BOPs) began to leak. Longoria No. 2 eventually blew out and caught fire, destroying the drilling rig and rendering Longoria No. 2 unworkable. Tesoro spent $425,400 to get the well under control and an additional $404,900 to reimburse suppliers whose equipment was lost. FN3

> FN3. Tesoro then drilled the Longoria No. 2A well, but the well was a dry hole. Tesoro estimated it spent approximately $3 million cleaning up Longoria No. 2 and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.W.3d 118, 162 Oil & Gas Rep. 1243
**(Cite as: 106 S.W.3d 118)**

drilling Longoria No. 2A.

### B. *Webb County Lawsuit*

After the blowout, LMP, as a working interest owner in Longoria No. 2, brought an action in Webb County against Nabors, alleging, among other things, gross negligence and willful misconduct. Nabors sought indemnity from Tesoro. Tesoro intervened and sought a declaratory judgment as to whether it owed a duty to indemnify Nabors. LMP then sued Tesoro.

In early 1999, the Webb County suit settled, with Nabors paying LMP $113,333 and Tesoro paying LMP $95,000. There was no admission of liability by any party. Nabors's demand for indemnity from Tesoro, Tesoro's request for a declaratory judgment regarding its duty to indemnify Nabors, and Tesoro's claims against Nabors were not resolved and remained pending in Webb County.

### C. *Harris County Lawsuit*

In March 1998, while the Webb County suit was pending, Zurich, as Nabors's carrier, sued Tesoro in the 234th District Court of Harris County in Nabors's name and in subrogation to Nabors's rights against Tesoro. Zurich sought recovery of the insurance proceeds it paid to Nabors for the damage to Nabors's equipment from the blowout. The same day Zurich filed its suit, Tesoro's carrier sued various parties, but not Nabors, in the 190th District Court of Harris County, in connection with the blowout. The two Harris County suits were consolidated in the 234th District Court and form the basis of this appeal.

After consolidation, Tesoro filed a counterclaim against Zurich, asserting, among other things, that Zurich breached the drilling contract by filing suit in subrogation against Tesoro. Tesoro also filed a claim against Nabors, asserting that Nabors breached the drilling contract by providing faulty BOPs. Nabors then asserted its indemnity claim against Tesoro for recovery of the costs of its defense and settlement in the Webb County lawsuit, claiming that Tesoro had assumed liability for the

damage to the well and that Tesoro's negligence or gross negligence had caused the blowout.

Tesoro moved for summary judgment against Zurich and Nabors. The trial court granted the motion "in its entirety." However, in response to Nabors's motion for partial reconsideration, the court changed its order, granting Tesoro's motion in part and denying it in part. In its final summary judgment, the court denied Tesoro's motion for summary judgment against Nabors for breach of contract relating to the BOPs. However, it granted Tesoro's motion against Zurich, holding that Zurich breached the waiver of subrogation clause in the indemnity provision of the drilling contract by filing suit against Tesoro, and it awarded Tesoro damages **\*124** against Zurich for the breach. Tesoro and Zurich stipulated that Tesoro's damages were $120,000 in addition to appellate attorneys' fees.

Nabors likewise filed a motion for summary judgment on its indemnity claim against Tesoro. The trial court granted Nabors's motion and denied all of Tesoro's claims against Nabors. After a bench trial on damages, the trial court awarded Nabors $513,333, comprising $113,333 for the settlement payment to LMP in the Webb County suit and $400,000 in legal fees and other defense costs incurred by Nabors in that Webb County suit. The trial court also awarded Nabors $200,000 in legal fees in the Harris County suit for prosecuting its breach of contract and indemnity claim. The trial court additionally awarded Nabors $75,000 for appellate fees at the various stages of appeals. Tesoro and Zurich/Nabors non-suited their claims against the other defendants.

Tesoro and Zurich have both appealed the summary judgments entered against them.

### II. Standard of Review

A party moving for a traditional summary judgment has the burden of proving that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Nixon v. Mr. Property Mgmt. Co.,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Inc.,* 690 S.W.2d 546, 548 (Tex.1985); *Hernandez v. Koch Mach. Co.,* 16 S.W.3d 48, 51–52 (Tex.App.-Houston [1st Dist.] 2000, pet. denied). When deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *Nixon,* 690 S.W.2d at 548–49. Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *Id.*

A no-evidence summary judgment is improper if the nonmovant presents more than a scintilla of probative evidence to raise a material fact question in response to the motion. *A.H. Belo Corp. v. Corcoran,* 52 S.W.3d 375, 378 (Tex.App.-Houston [1st Dist.] 2001, pet. denied). More than a scintilla of evidence exists when the evidence presented arises to a level where reasonable and fair-minded people could differ in their conclusions. *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995).

[1][2][3] A plaintiff, when moving for summary judgment, is not under any obligation to negate affirmative defenses. An affirmative defense will prevent the granting of summary judgment only if each element of the affirmative defense is supported by summary judgment evidence. *Kirby Explor. Co. v. Mitchell Energy Corp.,* 701 S.W.2d 922, 926 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.). A party raising an affirmative defense in opposition to a motion for summary judgment must either (1) present a disputed fact issue on the opposing party's failure to satisfy his own burden of proof or (2) establish at least the existence of a fact issue on each element of his affirmative defense by summary judgment proof. "Moore" Burger, Inc. v. Phillips Petrol. Co., 492 S.W.2d 934, 936–37 (Tex.1972).

## III. Tesoro's Appeal

Tesoro appeals the summary judgment entered against it and in favor of Nabors. That judgment held that Nabors was entitled to indemnity under the drilling contract as a matter of law, awarded Nabors damages for Tesoro's breach of the indem-

nification agreement, and denied Tesoro's claims for damages against Nabors for providing faulty blowout preventers.

*125 A. *Indemnity Claim and Gross Negligence*

Tesoro contends that the trial court erred in requiring it to indemnify Nabors for the payment Nabors made to LMP to settle the Webb County suit because LMP's claims against Nabors were for Nabors's gross negligence and willful misconduct, claims for which Tesoro did not agree to indemnify Nabors.

Under the drilling contract, Nabors agreed to furnish "equipment [and] labor and perform services ... under the direction, supervision and control" of Tesoro. Tesoro assumed liability for any "damage to or loss of the hole," released Nabors from "any liability for damage to or loss of the hole," and agreed to defend and indemnify Nabors from all claims "relating to such damage to or loss of the hole." The contract further stated:

> [I]t is the intent of parties hereto that all indemnity obligations ... assumed by such parties ... be without limit and without regard to the cause or causes thereof including ... the negligence of any party or parties, whether such negligence be sole, joint, or concurrent, active or passive.

Tesoro added the next line which read, "but excluding the gross negligence or willful misconduct of a party hereto." Nabors did not object and began operating under the contract.

Tesoro contends that it is not required to indemnify Nabors for Nabors's defense against the claims made by LMP in the Webb County suit and Nabors's settlement of those claims. To support its position, Tesoro refers us to *Fisk Electric Co. v. Constructors & Assocs., Inc.,* 888 S.W.2d 813, 815–16 (Tex.1994). In *Fisk,* the supreme court held:

> Without an express reference in the indemnification provision to claims based upon negligence,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.W.3d 118, 162 Oil & Gas Rep. 1243
**(Cite as: 106 S.W.3d 118)**

there is no indemnity for defense costs incurred in connection with a negligence claim irrespective of whether the claim is ultimately proved.

*Id.* In the context of this case, *Fisk* does not apply. The question in the *Fisk* case was whether an indemnitor had a duty to provide a defense against negligence to the indemnitee when it was unclear whether the indemnity agreement covered negligence. The question posed in Tesoro's appeal is not whether the indemnity provisions of the drilling contract expressly cover negligence and exclude gross negligence. Both parties agree that they do. The question is whether Nabors *committed* gross negligence.

[4] A contractual right to indemnity should be determined in the same fashion as other contractual rights—as a matter of law. *Fisk,* 888 S.W.2d at 815. Construing the indemnity agreement under the normal rules of contract construction, it is clear the intent of the parties was for Tesoro to indemnify Nabors for any acts except those stemming from gross negligence and willful misconduct. *See Balandran v. Safeco Ins. Co.,* 972 S.W.2d 738, 741 (Tex.1998); *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 284 (Tex.1998).

[5][6] Tesoro contends, however, that it need show only that LMP's pleadings in the Webb County suit asserted that Nabors's gross negligence and willful misconduct caused LMP's losses to take away Tesoro's obligation to indemnify Nabors against those claims. Facts, however, not allegations, determine an indemnitor's duty to indemnify. The duty to defend may be triggered by the pleadings, but the duty to indemnify is based on the jury's findings. *See Farmers Tex. County Mut. Ins. Co. v. Griffin,* 955 S.W.2d 81, 82 (Tex.1997). Here, Nabors settled the Webb **\*126** County lawsuit with LMP, and there was no admission of liability.[FN4]

FN4. The settlement expressly excluded any recovery for punitive damages. Tesoro participated in the settlement and stipulated to its reasonableness.

[7] We must now determine if Nabors's claim is precluded by the gross negligence and willful misconduct exclusion. A claim that a contractual exclusion precludes indemnity is an affirmative defense. *Delta Eng'g Corp. v. Warren Petroleum, Inc.,* 668 S.W.2d 770, 773 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.). In *Delta,* the court stated, "If the indemnitor should later deny coverage under the contract, whether due to a contractual exclusion, or for some other reason, it is such party's burden to affirmatively state the justification for his refusal to indemnify." *Id.* Tesoro plead, by way of affirmative defense, that indemnification was improper based on Nabors's gross negligence or willful misconduct, *i.e.,* a contract exclusion.

[8] In support of its affirmative defense, Tesoro bore the burden to raise a fact issue on each and every element of Nabors's alleged gross negligence or willful misconduct so as to bring Nabors's indemnity claim within the exclusions in the indemnity agreement. *See Kirby Explor. Co.,* 701 S.W.2d at 926.

[9] The extent to which Tesoro directly addressed the gross negligence evidence in its response to Nabors's motion for partial summary judgment can be quoted in two lines: "Likewise, there is summary judgment evidence which specifically shows that Nabors was grossly negligent, which would preclude it from any indemnity. See Affidavit of Mike Smith, attached to Tesoro's Motion for Summary Judgment."

A review of the six-page affidavit of Mike Smith, Tesoro's retained expert, reveals that, despite assertions regarding improper conduct by Nabors on the job, Smith did not give an expert opinion that improperly maintained BOPs *caused* the Longoria No. 2 blowout and the resulting damages. Therefore, Tesoro failed to demonstrate a genuine issue of material fact relating to the specific element of causation necessary to maintain its affirmative defense of gross negligence.

We overrule Tesoro's issues one and two and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.W.3d 118, 162 Oil & Gas Rep. 1243
**(Cite as: 106 S.W.3d 118)**

affirm the award of damages on these issues.

**B. *Compensatory Damages***

In issue three, Tesoro asserts that Texas allows a jury to award compensatory damages for gross negligence and willful misconduct; thus, the fact that the LMP settlement did not include punitive damages is of no consequence.

Tesoro asks this Court to hold that "gross negligence is a separable cause of action from ordinary negligence that independently supports the recovery of compensatory damages."

[10][11][12][13] Negligence and gross negligence are not separable causes of action, but are inextricably intertwined. Negligence is a liability finding, involving duty, breach, and causation. Gross negligence presumes a negligent act or omission and includes two further elements:

(1) viewed objectively from the standpoint of the actor, the act or omission [i.e., harm-causing negligence] must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.

**\*127** *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 23 (Tex.1994). We agree with the San Antonio Court of Appeals, which has held "the absence of a viable negligence claim removes any justification for imposing actual damages." *Newman v. Tropical Visions, Inc.,* 891 S.W.2d 713, 722 (Tex.App.-San Antonio 1994, writ denied). That court further held that, in the context of a release for acts of negligence, negligence and gross negligence are not separable. *Id.* We agree.

We overrule Tesoro's issue three.

**C. *Breach of Contract Fact Issue***

[14] In issue four, Tesoro argues that the trial court erred in granting summary judgment to Nabors because a disputed issue of fact exists as to whether Nabors breached the contract, excusing Tesoro of its duty to indemnify Nabors.

Tesoro contends Nabors breached the paragraph in the drilling contract that provided: "[Nabors] shall maintain well control equipment in good condition at all times and shall use all reasonable means to prevent and control fires and blowouts and to protect the hole." It alleges this breach occurred when the BOPs failed because

Nabors chose to buy and install inferior and improper products into BOPs that did not have proven capacities or technical support that would maintain the well control equipment in good condition at all times.

Tesoro claims these actions breached the contract, and they also claim Nabors was grossly negligent for buying and installing the "inferior and improper" products.

As Nabors stated, Nabors's conduct in supplying well control equipment was either: (1) prudent; (2) negligent; (3) grossly negligent; or (4) intentional misconduct. Tesoro failed to raise a fact issue that Nabors's conduct was grossly negligent, and no party has alleged intentional misconduct. Thus, Nabors's conduct was either prudent or it was negligent. If the conduct was prudent, the conduct was not actionable. If the conduct was negligent, Tesoro is required to indemnify Nabors under its contract with Nabors. Either way, Tesoro's argument fails.

Tesoro further contends that indemnity is a dependant covenant; therefore, a breach of a part of the indemnity agreement excuses Tesoro from indemnifying Nabors at all. We disagree.

[15][16] An indemnity agreement "is an original obligation between the contracting parties and independent of other agreements." *Joseph Thomas, Inc. v. Graham,* 842 S.W.2d 343, 346 (Tex.App.-Tyler 1992, no writ). A prerequisite to the remedy of excuse of performance is that coven-

© 2011 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

106 S.W.3d 118, 162 Oil & Gas Rep. 1243
**(Cite as: 106 S.W.3d 118)**

ants in a contract must be mutually dependent promises. *Hanks v. GAB Bus. Serv.,* 644 S.W.2d 707, 708 (Tex.1982). Because an indemnity agreement is an independent covenant, Tesoro is not excused from performing under the contract based on unsupported allegations that Nabors breached the contract.

We overrule Tesoro's issue four.

**D.** *Party to Contract*

In issue five, Tesoro argues the trial court erred in granting summary judgment against "Tesoro Petroleum Corporation" because it is not a party to the contract.

The final judgment signed by the trial court includes "Tesoro Petroleum Corporation." Tesoro argues this was improper because Tesoro E & P, the limited partnership, is the only Tesoro entity that signed the drilling contract. Tesoro Petroleum concedes it did not raise this point in the trial court. As such, the issue is not properly before our Court. To preserve *128 an issue for appellate review, an issue must be raised with the trial court. TEX.R.APP. P. 33.1.

We overrule Tesoro's issue five.

**E.** *Tesoro's Conditional Points*

[17] Tesoro raises two conditional issues dependent on our decision on Zurich's appeal, but provides inadequate briefing on the two conditional points. The brief "must contain a succinct, clear, and accurate statement of the argument made in the body of the brief." TEX.R.APP. P. 38.1(g). Rule 38 requires Tesoro to provide us with such discussion of the facts and the authorities relied upon as may be requisite to maintain the point at issue. *See Franklin v. Enserch, Inc.,* 961 S.W.2d 704, 711 (Tex.App.-Amarillo 1998, no pet.). This is not done by merely uttering brief conclusory statements, unsupported by legal citations. *Id.* By presenting such attenuated, unsupported argument, Tesoro waives its complaints. *See id.*

We overrule Tesoro's conditional issues.

**IV. Zurich's Appeal**[FN5]

FN5. Zurich filed suit on behalf of Nabors, and all pleadings were in Nabors's name. For simplification, however, we will refer to all claims brought by Zurich, as the subrogee, as "Zurich's" claims.

Zurich appeals the trial court's summary judgment against it, and in favor of Tesoro, holding that Zurich breached the drilling contract by filing suit in subrogation to its insured's, Nabors's, claims against Tesoro and awarding Tesoro damages and attorneys' fees against Zurich. Zurich raises six issues for our review.

[18] In issue one, Zurich argues that the trial court improperly granted summary judgment on claims that had been dismissed. In issue two, Zurich contends that the indemnity agreement in the drilling contract is void and that the waiver of subrogation provision, which is limited to liabilities assumed under the indemnity agreement, is unenforceable. In issue three, Zurich argues that the waiver of subrogation provision does not apply to claims for gross negligence or willful misconduct. In issue four, Zurich argues that the waiver of subrogation provision does not apply to waive subrogation under the Zurich policy because Zurich's policy is not a liability policy and does not provide any liability coverage.[FN6] In issue five, Zurich contends the indemnity agreement, which provides for the parties' waiver of their insurers' subrogation rights, is void under the Texas Oilfield Anti Indemnity Act (TOAIA). It bases its contention on the premise that "the insurance procurement provision (including the waiver of subrogation provision therein), which directly supports the indemnity and release agreements of the contract, is void under the TOAIA." In issue six, Zurich argues that Tesoro's no-evidence motion for summary judgment was not granted or was improperly granted.

FN6. Zurich waived reliance on this argu-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.W.3d 118, 162 Oil & Gas Rep. 1243
**(Cite as: 106 S.W.3d 118)**

ment because it was asserted for the first time in its motion for reconsideration—four months after the first summary judgment was granted and one month after the amended order was signed granting partial summary judgment. *See Kelley–Coppedge, Inc. v. Highlands Ins., 980 S.W.2d 462, 467 (Tex.1998).*

### A. *Enforceability of the Waiver of Subrogation*

We first address issues two and five.

### 1. Applicability of the TOAIA

[19][20] In issues two and five, Zurich contends that the indemnity agreement in the drilling contract between Tesoro and Nabors is void and, therefore, the waiver **\*129** of subrogation rights, which is specifically limited to those liabilities assumed by the contracting parties, is unenforceable.

In issue five, Zurich contends that the assumption of liability provision to which Nabors agreed is void under the Texas Oilfield Anti–Indemnity Act (TOAIA). *See TEX. CIV. PRAC. & REM.CODE ANN. §§ 127.001 – 127.007* (Vernon 1997). The TOAIA provides that an indemnification provision in a contract pertaining to an oil or gas well that purports to indemnify a person against loss or liability for damages that result from the negligence of the indemnitee and arise from personal injury, death, or property injury is against public policy and void unless the conditions of section 127.005 of the Act are met. *See TEX. CIV. PRAC. & REM.CODE § 127.003.*

Section 127.005 of the TOAIA, the safe harbor provision, states the Act does *not* apply to agreements that state in writing that the indemnity obligation will be supported by liability insurance coverage to be furnished by the indemnitors, provided that, in the case of a mutual indemnity obligation, "the indemnity obligation is limited to the extent of the coverage and dollar limits of insurance ... each party as indemnitor has agreed to obtain for the benefit of the other party as indemnitee" or, in the case of a unilateral indemnity obligation, the

amount of insurance coverage is limited to $500,000. *See TEX. CIV. PRAC. & REM.CODE § 127.005.*[FN7] The TOAIA defines a "mutual indemnity obligation" as

> FN7. Section 127.005 of the TOAIA provides, in relevant part:
>
> (a) This chapter does not apply to an agreement that provides for indemnity if the parties agree in writing that the indemnity obligation will be supported by liability insurance coverage to be furnished by the indemnitor subject to the limitations specified in Subsection (b) or (c).
>
> (b) With respect to a mutual indemnity obligation, the indemnity obligation is limited to the extent of the coverage and dollar limits of insurance or qualified self-insurance each party as indemnitor has agreed to provide in equal amounts to the other party as indemnitee.

an indemnity obligation in an agreement pertaining to a well for oil ... in which the parties agree to indemnify each other ... against loss, liability, or damages arising in connection with bodily injury, death, and damage to property of the respective employees, contractors or their employees, and invitees of each party arising out of or resulting from the performance of the agreement. TEX. CIV. PRAC. & REM.CODE § 127.001(3). Zurich argues that the indemnity agreement between Nabors and Tesoro does not qualify as a mutual indemnity obligation and that the amount of insurance is not limited to $500,000, so the agreement satisfies neither condition of an enforceable indemnity agreement pertaining to an oil or gas well.

As noted above, the indemnity agreement signed by Nabors and Tesoro is part of a standard form drilling contract drafted by the IADC that is frequently used in the well-drilling business. Para-

106 S.W.3d 118, 162 Oil & Gas Rep. 1243
**(Cite as: 106 S.W.3d 118)**

graph 13 of the drilling contract, the insurance and waiver of subrogation provision, states that both Nabors and Tesoro will maintain, at their own expense, insurance coverage "of the same kind and in the same amount" as is required of the other, insuring the liabilities that are assumed in paragraph 14 of the drilling contract. Both parties also agree to cause their insurers to waive subrogation against the other for the liabilities that are assumed by the insured. Paragraph 13, therefore, tracks the insurance requirements of section 127.005 of the TOAIA.

**\*130** Paragraph 14 of the drilling contract provides for indemnities and releases between the parties. In section 14.1, Nabors agrees to assume liability for damage to its rig and to release Tesoro from such liability. In section 14.5, Tesoro releases Nabors from liability "for damage to or loss of the hole" and agrees to "protect, defend, and indemnify [Nabors] from and against any and all claims, liability, and expense relating to such damage to or loss of the hole." Finally, in sections 14.8 and 14.9 of the contract, Nabors and Tesoro agrees to release each other from liability and to indemnify each other "from and against all claims" arising in connection with the subject matter of the drilling contract in favor of the indemnitor's own employees, contractors or invitees "on account of bodily injury, death, or damage to property."

[21] Zurich, focusing solely on Nabors's release of Tesoro from liability for damages to Nabors's rig as found in section 14.1, contends that this provision is a *release,* not an indemnity, destroying the mutuality of the indemnification agreement.[FN8] The indemnity agreement, it argues, therefore fails to satisfy the requirements of the TOAIA safe harbor provisions and is void, and the waiver of subrogation, which is limited to the liabilities assumed in the indemnification provisions, is unenforceable. In support of its argument, Zurich points out that the supreme court has held that the type of assumption of liability in paragraph 14.1 is a type of "release." *Dresser Indus. Inc. v. Page Pet-*

*roleum, Inc.,* 853 S.W.2d 505, 508 (Tex.1993).

> FN8. A "release" surrenders legal rights or obligations between the parties to an agreement. An "indemnity agreement," however, is a promise to safeguard or hold the indemnitee harmless against either existing and/or future loss liability. *Dresser Indus. Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 508 (Tex.1993).

Zurich, however, overlooks the provisions of the agreement in which Tesoro and Nabors both agree to indemnify each other against claims by their own employees, contractors and invitees for personal injury, death, and property injury resulting from their own negligence; both agree to exclude claims for gross negligence and willful misconduct from the indemnification and release provisions; and both agree to maintain insurance in the same amount insuring against the liabilities assumed under the contract and to provide for waiver of their insurers' right of subrogation for the those liabilities. Mutuality thus extends to every provision of the indemnity agreement except paragraph 14.1.

Zurich also overlooks the simple reason for the disparity between the release from liability agreed to by Nabors in section 14.1 and the indemnification and release agreed to by Tesoro in the parallel section, section 14.5. This reason is that, once liability to employees, contractors, and invitees for loss of life, injury, or property loss is covered by other indemnity provisions in the contract, no one but Nabors, the drilling contractor, could suffer from loss of the rig (the subject matter of paragraph 14.1), whereas others besides Tesoro or Nabors could easily suffer from the loss of the well, to wit, a working interest owner such as LMP (the subject matter of paragraph 14.5), and could seek to recover its losses from the drilling contractor. Any indemnity Nabors could give to Tesoro for claims against it for loss of the rig would be superfluous; whereas Tesoro's indemnification against claims made against Nabors is not superfluous. We decline to hold that mutuality is destroyed by the failure to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.W.3d 118, 162 Oil & Gas Rep. 1243
**(Cite as: 106 S.W.3d 118)**

include meaningless indemnification provisions in a mutual indemnification obligation. The mutuality of the indemnity agreement is not destroyed **\*131** by Nabors's giving Tesoro a release in paragraph 14.1 without also agreeing to a meaningless indemnity for Tesoro against claims no one but Nabors could have.

Moreover, it seems clear that the supreme court would hold that the inclusion of a release where only a release makes sense is not enough to destroy the mutuality required for an enforceable indemnification agreement relating to an oil and gas well. The supreme court has only once addressed the issue of whether "release" language is subject to the TOAIA, and that was in a footnote in *Dresser.* The footnote stated, "Although we do note that today's holding would suggest that chapter 127 would apply to releases as well as to indemnity agreements, we do not need to reach the merits of such an argument." *Dresser,* 853 S.W.2d at 510 n. 5. We believe this footnote was judicial dictum meant to guide us. *See Palestine Contractors, Inc. v. Perkins,* 386 S.W.2d 764, 773 (Tex.1964) (holding that judicial dictum should be followed unless found to be erroneous); *see also, R.R. Comm'n v. Aluminum Co. of Am.,* 380 S.W.2d 599, 601 (Tex.1964) (declaring that dictum in earlier case was deliberately made to put others on notice of the court's intent). As such, we hold the TOAIA applies to releases such as those found in the contract at issue. Our decision does not conflict with the supreme court's decision in *Getty Oil Co. v. Ins. Co. of N. Am.,* 845 S.W.2d 794 (Tex.1992), which held that "the language of [section 127] applies exclusively to indemnity agreements." *Getty,* 845 S.W.2d at 804. The *Getty* court was determining the applicability of "insurance shifting" schemes that are not present in our case. *See id.* And, in any event, the agreement, taken as a whole, is an indemnification agreement.

Applying the usual standards of contract interpretation, therefore, we hold that the indemnification and release provisions of the drilling contract, taken together, constitute a "mutual indemnity obligation" as defined in the TOAIA and that the agreement complies with the safe harbor requirements of the TOAIA for enforceable indemnity agreements pertaining to an oil or gas well. *See* TEX. CIV. PRAC. & REM.CODE §§ 127.001(3); 127.005. We further hold that Nabors's waiver of its insurers' subrogation rights as to claims for which liability is assumed by Nabors under the contract is enforceable.

**2. The TOAIA's "fair notice" requirements**

As part of issue two, Zurich further contends that, "to be enforceable, paragraph 14.1 must both be conspicuous and meet the express negligence test." Zurich makes this statement to reinforce its argument that Nabors's release of subrogation rights in the drilling contract was void and unenforceable.

[22][23][24] The "fair notice" requirements of express negligence and conspicuousness apply to indemnity agreements because "these particular agreements are used to exculpate a party from the consequences of its own negligence." *Dresser,* 853 S.W.2d at 508. The "express negligence doctrine" mandates that a party seeking indemnity from the consequences of its own negligence must express that intent in specific terms in the indemnity agreement. *Id.* "Conspicuousness," as part of the fair notice test of an indemnity agreement, mandates that there must be something on the face of an indemnity agreement to attract the attention of a reasonable person. *Dresser,* 853 S.W.2d at 508. The supreme court has held that the fair notice requirements of express negligence and conspicuousness apply to both releases and indemnities. *Id.* at 509.

**a. The express negligence doctrine**

**\*132** [25] The indemnity agreement in the drilling contract satisfies the express negligence test. Under the contract, Nabors assumes liability for damage to or loss of its drilling rig and Tesoro assumes liability for "damage to or loss of the hole." Each releases the other from liability for damages or loss with respect to the contractually assumed liabilities and agrees to defend and indemnify the other from all such losses. Tesoro also

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.W.3d 118, 162 Oil & Gas Rep. 1243
**(Cite as: 106 S.W.3d 118)**

agrees to release Nabors from liability for claims relating to such damage to or loss of the hole and to indemnify it against such claims. Paragraph 14.3 states the intention of the parties that

> all indemnity obligations and/or liabilities assumed by such parties under terms of this contract, including without limitation, paragraphs 14.1 through 14.12 hereof, be without limit and without regard to the cause or causes thereof, including ... the *negligence* of any party or parties, whether such negligence be sole, joint or concurrent, active or passive, but excluding the gross negligence or willful misconduct of a party hereto.

(Emphasis added.)

The Texas Supreme Court has explicitly held that the precise language in an oil and gas drilling contract that appears in the standard form contract used by Nabors and Tesoro and that indemnifies parties against bodily injury, death, and property claims of its employees or contractors "without limit and without regard to the cause or causes thereof or the negligence of any party or parties," indemnifies a party "clearly and unequivocally against its own negligence," satisfying the express negligence doctrine. *Maxus Exploration v. Moran Bros., 817 S.W.2d 50, 56 (Tex.1991)*. Construing the indemnity agreement under the normal rules of contract construction and in light of authority, therefore, we find that the express intent of the parties was for Tesoro to indemnify Nabors for any acts, including acts of negligence, except those stemming from gross negligence and willful misconduct. The indemnity agreement meets the express negligence requirement.

**b. Conspicuousness**

[26] Paragraph 14 of the drilling contract, providing for indemnification and release, is labeled "RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK." (Capitals in original.) Similarly, paragraph 13 is labeled in capital

letters, "INSURANCE." We find that both provisions would attract the attention of a reasonable person. Moreover, Zurich cannot claim to have been unaware of the provisions of the drilling contract regarding indemnification, release, and insurance, because it relied upon the language of these provisions in delineating its reservation of rights in its certificate of insurance. We hold that paragraphs 14 and 13 are both conspicuous and meet the fair notice test.

Having determined that the indemnification and release provisions in the drilling contract meet the fair notice test and that the agreement satisfies the "safe harbor" provisions of section 127.005 of the TOAIA, we hold that the indemnification agreement between Tesoro and Nabors is valid and that the parties' agreement to provide for the waiver of subrogation by their insurers for liabilities assumed under the contract is enforceable.

We overrule Zurich's issues two and five.

**Zurich's Right to Subrogation to Nabors's Gross Negligence Claims**

[27] In issue three, Zurich argues that the waiver of subrogation provision in the indemnity agreement does not apply to **\*133** Nabors's claims for gross negligence or willful misconduct against Tesoro. Zurich contends such claims are specifically excluded from the assumption of liability provision of the contract and the indemnification provision, with its waiver of subrogation, even if valid, does not extend to liabilities Tesoro chose to exclude from that provision. Therefore, Zurich was entitled to bring claims for gross negligence or willful misconduct against Tesoro in subrogation to Nabors's rights.

[28][29][30] "Subrogation" is the right of one who has paid an obligation that another should have paid to be indemnified by the other. *Texas Ass'n of Sch. Bds., Inc. v. Ward, 18 S.W.3d 256, 258 (Tex.App.-Waco 2001, pet. denied)*. The object of such subrogation is to prevent the insured from receiving a double recovery. *Argonaut Ins. Co. v. All-*

106 S.W.3d 118, 162 Oil & Gas Rep. 1243
**(Cite as: 106 S.W.3d 118)**

*state Ins. Co.,* 869 S.W.2d 537, 541 (Tex.App.-Corpus Christi 1993, writ denied). An insurer's right to subrogation derives from the rights of the insured and is limited to those rights. *Interstate Fire Ins. Co. v. First Tape, Inc.,* 817 S.W.2d 142, 145 (Tex.App.-Houston [1st Dist.] 1991, writ denied). A release between the insured and an offending party prior to a loss destroys the insurance company's rights by way of subrogation. *Id.*

Here, Zurich seeks to recover from Tesoro reimbursement for the insurance proceeds Zurich paid Nabors for the damage to Nabors's equipment after the blowout. As part of its indemnification agreement with Tesoro, Nabors contractually waived Zurich's right of subrogation to the rights of Nabors against Tesoro for losses caused by Tesoro's negligence. Zurich, however, in its point of error three, contends that Tesoro was primarily liable for Nabors's losses because they resulted from Tesoro's gross negligence in maintaining the Longoria No. 2 well.

[31][32] A contractual right to indemnity should be determined in the same fashion as other contractual rights—as a matter of law. *Fisk,* 888 S.W.2d at 815. A liability insurer for an oil well driller or operator does not waive its right to subrogation to its insured's claims against the other party for matters beyond the scope of the indemnity agreement between those parties. *See Ken Petroleum Corp. v. Questor Drilling Corp.,* 24 S.W.3d 344, 355 (Tex.2000) (a waiver of subrogation by an oil well operator or drilling contractor for liabilities assumed under the contract does not waive the insurer's right to subrogation to enforce the indemnity agreement). The parties to the indemnity agreement must look to their own contract to determine what subrogation rights they may insist that the other party require its insurers to waive. *Id.* at 356–57. Where a party to an indemnity contract relating to an oil and gas well is not contractually obligated to enforce a waiver of subrogation, the other party cannot insist that it assert a waiver of subrogation. *See id.* at 356.

In this case, the indemnity agreement between Nabors and Tesoro plainly limits the parties' waiver of subrogation to the liabilities each assumed under the drilling contract. Nabors did not assume liability for losses to its rig caused by Tesoro's gross negligence. Tesoro remained liable for such losses. Nabors, however, recovered its losses from its insurance carrier, Zurich. Therefore, if Nabors were to bring suit against Tesoro to recover for the loss of its rig, it would be seeking a double recovery for the same loss from both Zurich and Tesoro. We hold, therefore, that Zurich, in subrogation to Nabors's rights against Tesoro for gross negligence, is not barred from seeking recovery from Tesoro of the insurance proceeds Zurich paid Nabors.

**\*134** We overrule Zurich's issue three to the extent it contends that Zurich has a right of subrogation to those claims against Tesoro as to which Nabors assumed liability under the indemnity agreement in the drilling contract and waived its insurers' subrogation rights. We sustain issue three to the extent it contends that Zurich is not barred from bringing suit against Tesoro in subrogation to Nabors's claims for losses to Nabors's due to Tesoro's gross negligence or willful misconduct, which are beyond the scope of the indemnity agreement.

**C. *The No–Evidence Summary Judgment***

In issue six, Zurich argues that the no-evidence summary judgment was improperly granted.

On August 9, 1999, the trial court signed an amended order on Tesoro's motion for partial summary judgment. On appeal, Zurich argues that this order is ambiguous because it does not specifically state that the court is granting a no-evidence summary judgment. Tesoro filed its motion for partial summary judgment "pursuant to Rules 166a(c) and 166a(i)," thus encompassing both traditional and no-evidence summary judgments. We, therefore, consider the trial court's summary judgment with respect to both subsections of rule 166a.

To establish its right to summary judgment, Te-

106 S.W.3d 118, 162 Oil & Gas Rep. 1243
**(Cite as: 106 S.W.3d 118)**

soro had to establish as a matter of law (1) that the indemnity agreement between itself and Nabors, including each party's waiver of its insurer's subrogation rights for liabilities assumed by that party, was valid and enforceable, (2) that the subrogation rights Zurich was attempting to enforce against Tesoro had been waived, and (3) that Zurich's filing suit in subrogation to Nabors's rights against Tesoro constituted a breach of the drilling contract. We have held that the indemnity agreement is enforceable and Nabors waived Zurich's right to subrogation as to losses for which Nabors assumed liability. However, Nabors did not assume liability for losses to itself caused by Tesoro's gross negligence or willful misconduct, and it did not waive Zurich's right to subrogation to recover insurance proceeds it had paid Nabors for such losses. Therefore, to defeat Tesoro's right to summary judgment, Zurich had to raise a fact issue as to whether its damage claims lay outside the scope of the indemnity agreement. *See* TEX.R. CIV. P. 166a(c), (i). Specifically, Zurich had to produce more than a scintilla of probative evidence that the blowout was caused by Tesoro's gross negligence, evidence on the basis of which "reasonable and fair-minded people could differ." *See Burroughs Wellcome Co.,* 907 S.W.2d at 499.

[33] To raise a fact issue with respect to Tesoro's gross negligence, Zurich presented the affidavit of Warren Guidry, its expert. Having established his credentials as a petroleum engineer with knowledge of the relevant facts, Guidry testified by affidavit that Tesoro, as the operator of the Longoria No. 2 well, should have stopped the drilling of the Longoria No. 2 well at the depth of 8973 feet and inserted a liner in the hole prior to resuming drilling. Guidry testified that this act would have prevented the blowout. He further testified that Tesoro provided inadequate well-site supervision by drilling further without setting a liner, by allowing the well to flow repeatedly without shutting it in, and "by allowing an uncontrollable amount of influx and unloading the well." Guidry testified that these acts were done with Tesoro's full knowledge

of the dangers associated with them and with conscious indifference to the rights, safety, or welfare of others. He concluded that Tesoro was grossly negligent and that its negligence and gross negligence proximately caused the loss of Nabors's rig.

**\*135** We find a trier of fact must be guided solely by expert opinion testimony with respect to the matters to which Guidry's affidavit testifies and the affidavit is clear, positive, and direct, otherwise credible and free from contradictions and inconsistencies and could have been readily controverted. *See* TEX.R. CIV. P. 166a(c). We further find that reasonable and fair-minded people could differ in their conclusions as to whether the acts and omissions testified to by Guidry were the result of Tesoro's conscious indifference to the right or welfare of affected persons, as required to establish gross negligence. *See Luna v. North Star Dodge Sales, Inc.,* 667 S.W.2d at 118. We therefore hold that Zurich raised a material fact issue as to whether the blowout of the Longoria No. 2 well was caused by Tesoro's gross negligence.

We sustain Zurich's issue six and reverse the summary judgment entered against Zurich in favor of Tesoro. Because the foregoing issues are dispositive of Zurich's appeal, we need not address its remaining issues.

### V. Conclusion

We affirm the trial court's summary judgment requiring Tesoro to indemnify Nabors. We reverse the summary judgment decreeing that Zurich breached the waiver-of-subrogation agreement by filing suit in subrogation to Nabors's rights against Tesoro. We remand Zurich's cause of action to the trial court.

Former Chief Justice MICHAEL H. SCHNEIDER, who sat on the original panel for this appeal, was appointed Justice of the Texas Supreme Court on September 6, 2002 and did not participate in this Opinion.

Tex.App.–Houston [1 Dist.],2002.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.W.3d 118, 162 Oil & Gas Rep. 1243
**(Cite as: 106 S.W.3d 118)**

Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.
106 S.W.3d 118, 162 Oil & Gas Rep. 1243

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

842 S.W.2d 343
**(Cite as: 842 S.W.2d 343)**



Court of Appeals of Texas,
Tyler.

JOSEPH THOMAS, INC., and Marvin Mackey,
Assignee of Joseph Thomas, Inc., Appellants,
v.
Terry GRAHAM, Sr., Appellee.

No. 12–90–00091–CV.
Oct. 30, 1992.

Subcontractor who had not been paid for the work that it performed on construction project brought suit against party which had agreed to protect property owner from general contractor's non-performance of construction agreement. The 114th Judicial District Court, Smith County, directed verdict in favor of defendant, and subcontractor appealed. The Court of Appeals, Ramey, C.J., held that defendant was "guarantor" and not "indemnitor," for purpose of deciding when statute of limitations on subcontractor's claim began to run.

Affirmed.

West Headnotes

**[1] Appeal and Error 30 ⬤⟲927(7)**

30 Appeal and Error
　30XVI Review
　　30XVI(G) Presumptions
　　　30k927 Dismissal, Nonsuit, Demurrer to Evidence, or Direction of Verdict
　　　　30k927(7) k. Effect of Evidence and Inferences Therefrom on Direction of Verdict. Most Cited Cases

In reviewing grant of directed verdict, appellate court must view evidence in light most favorable to nonmovant and disregard all evidence and inferences to the contrary.

**[2] Appeal and Error 30 ⬤⟲854(5)**

30 Appeal and Error
　30XVI Review
　　30XVI(A) Scope, Standards, and Extent, in General
　　　30k851 Theory and Grounds of Decision of Lower Court
　　　　30k854 Reasons for Decision
　　　　　30k854(5) k. Direction of Verdict, Dismissal, or Nonsuit. Most Cited Cases

Party appealing grant of directed verdict for which no specific grounds were recited must demonstrate that none of the grounds asserted by movant entitle movant to directed verdict.

**[3] Trial 388 ⬤⟲139.1(17)**

388 Trial
　388VI Taking Case or Question from Jury
　　388VI(A) Questions of Law or of Fact in General
　　　388k139.1 Evidence
　　　　388k139.1(5) Submission to or Withdrawal from Jury
　　　　　388k139.1(17) k. Insufficiency to Support Other Verdict; Conclusive Evidence. Most Cited Cases

Directed verdict is proper when evidence conclusively proves fact that establishes movant's right to judgment as matter of law.

**[4] Limitation of Actions 241 ⬤⟲56(2)**

241 Limitation of Actions
　241II Computation of Period of Limitation
　　241II(A) Accrual of Right of Action or Defense
　　　241k56 Reimbursement or Indemnity from Person Ultimately Liable
　　　　241k56(2) k. Indemnity. Most Cited Cases

Statute of limitations on action on contract of indemnity does not begin to run until final judgment is rendered in favor of plaintiff against indemnity.

842 S.W.2d 343
**(Cite as: 842 S.W.2d 343)**

**[5] Limitation of Actions 241 ☞46(10)**

241 Limitation of Actions
   241II Computation of Period of Limitation
      241II(A) Accrual of Right of Action or Defense
         241k46 Contracts in General
            241k46(10) k. Guaranty. Most Cited Cases

   Statute of limitations on action on absolute guaranty begins to run upon primary obligor's default.

**[6] Guaranty 195 ☞42(1)**

195 Guaranty
   195II Construction and Operation
      195k42 Conditions
         195k42(1) k. In General. Most Cited Cases

   "Absolute guaranty" is written guaranty that is unqualified and expresses no condition for payment of debt.

**[7] Guaranty 195 ☞42(1)**

195 Guaranty
   195II Construction and Operation
      195k42 Conditions
         195k42(1) k. In General. Most Cited Cases

**Guaranty 195 ☞72**

195 Guaranty
   195III Discharge of Guarantor
      195k72 k. Waiver or Estoppel of Guarantor. Most Cited Cases

   Absolute guarantor is primarily liable and waives any requirement that creditor take action against principal obligor as condition to his liability on guaranty.

**[8] Guaranty 195 ☞27**

195 Guaranty
   195II Construction and Operation

      195k27 k. General Rules of Construction. Most Cited Cases

   Traditionally, guarantor is favorite of law, and creditors' claims against him are strictly construed.

**[9] Guaranty 195 ☞4**

195 Guaranty
   195I Requisites and Validity
      195k4 k. Guaranty Distinguished from Other Contracts. Most Cited Cases

   In deciding whether contract establishes guaranty or indemnity relationship, it is nature of relationship, and not language in agreement, that controls.

**[10] Indemnity 208 ☞25**

208 Indemnity
   208II Contractual Indemnity
      208k25 k. In General. Most Cited Cases
   (Formerly 208k1)

   Contract of indemnity is original obligation between contracting parties independent of other agreements.

**[11] Guaranty 195 ☞1**

195 Guaranty
   195I Requisites and Validity
      195k1 k. Nature of Obligation. Most Cited Cases

   Unlike contract of indemnity, guaranty contract is collateral and secondary to principal contract that is guaranteed.

**[12] Guaranty 195 ☞4**

195 Guaranty
   195I Requisites and Validity
      195k4 k. Guaranty Distinguished from Other Contracts. Most Cited Cases

   Party's agreement to protect property owner from general contractor's nonperformance of general construction contract was contract of guaranty and not indemnity, for purpose of deciding when statute of limitations began to run on unpaid sub-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

842 S.W.2d 343
**(Cite as: 842 S.W.2d 343)**

contractor's action against guarantor.

**\*344** H.L. McGee, Tyler, for appellants.

Willis Jarrel, Sr., Tyler, for appellee.

Before RAMEY, C.J., and COLLEY and BILL BASS, JJ.

RAMEY, Chief Justice.

Marvin Mackey, dba Mackey–Harris Excavating and Paving Company ("Mackey"), appeals from a judgment following the trial court's instructed verdict in favor of the Defendant, Terry Graham, Sr. ("Graham"), after Mackey had rested his case. Mackey's suit arose out of a written agreement between Graham and Ferrier Construction Company ("Ferrier"), the general contractor on a project in Tyler known as Park East Business Center ("Park East"), which was owned by Joseph Thomas, Inc. ("Thomas"), the sole stockholder of which was one Joe Mangione ("Mangione"), and Joyce Ferrier, individually. Mackey was an asphalt paving subcontractor whose work on the project was duly accepted by the general contractor and owner, but for which he has not been paid. We will affirm.

The instrument made the basis of this suit is as follows:

July 9, 1979

Mr. Terry Graham

2101 East Fifth Street

Tyler, Texas 75701

Dear Mr. Graham:

This will confirm our agreement with you that in consideration of you guaranteeing our contract with Joseph Thomas, Inc., we will pay you a fee of SIX THOUSAND ($6,000.00) DOLLARS, the same being a guarantors fee and for you agreeing to protect the Citizens First National Bank of Tyler, Texas and Joseph Thomas, Inc., we guarantee that it will not cost you any money. If you are forced to pay any labor or material bills, we will reimburse you all the money you have been out together with any and all expenses plus 10% interest on money spent including attorney's fees.

Yours very truly,

FERRIER CONSTRUCTION

CO., INC.

BY:s/ Mrs. Joyce Ferrier

President

s/ Mrs. Joyce Ferrier

Individually

ACCEPTED BY:

s/ Terry Graham

Terry Graham, Sr.

The parties to the underlying general construction contract for the Park East improvements were Thomas, the owner, and Ferrier, the general contractor. Ferrier then agreed with the various subcontractors, including Mackey, to construct the project. After completion of the paving, Mackey filed suit for payment for his work against Ferrier and Mangione on November 17, 1980. In early 1981, Ferrier Construction Company filed for bankruptcy protection; the cause of action against that entity was abated. It is not disputed that in December 1981 or January 1982 Mackey had knowledge of the above-quoted letter agreement between Ferrier and Graham.

The corporate owner, Thomas, was joined as a defendant in the first suit in July 1984. Some two years later, on August 6, 1986, by agreement between Mackey, Mangione and Thomas, Mackey recovered judgment against Thomas in the first suit for $48,636.94, attorneys fees, interest and court

© 2011 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

842 S.W.2d 343
**(Cite as: 842 S.W.2d 343)**

costs, which judgment has not been satisfied.

Thomas then filed this suit against Graham on April 16, 1987, alleging that Graham was liable to it as indemnitor under the above agreement. On December 16, 1987, Thomas, joined by its president, Mangione, then assigned this cause of action against Graham to Mackey. Since that date, the suit has been prosecuted solely by Mackey, and Thomas has not participated further.

At the trial of this second suit and after Mackey had rested his case, the court granted Graham's oral motion for a directed verdict, and on January 16, 1990, entered its judgment thereon. No specific **\*345** grounds for the trial court's ruling were recited in the judgment. Among the grounds for instructed verdict orally argued by Graham after Mackey rested his case, in addition to Mackey's claim being barred by the limitations statute, were that Thomas' assignment of the claim to Mackey was ineffectual as being conditional only, and that Thomas had paid no monies to Mackey and had not urged his various legal defenses to Mackey's suit.

[1][2][3] In reviewing a trial court's action in granting a directed verdict, the appellate court must view the evidence in the light most favorable to the non-movant, the party against whom the verdict was instructed, and disregard all evidence and inferences to the contrary. *Qantel Business Sys. v. Custom Controls,* 761 S.W.2d 302, 303–304 (Tex.1988). As acknowledged in Mackey's brief, since the trial court's judgment recited no specific grounds for her ruling in granting the motion for instructed verdict, Mackey must demonstrate that none of the grounds asserted by Graham in its oral motion entitle Graham to the directed verdict. *See Rudolph v. ABC Pest Control, Inc.,* 763 S.W.2d 930, 932 (Tex.App.—San Antonio 1989, writ denied). In this case, a directed verdict is proper when the evidence conclusively proves a fact that establishes Graham's right to judgment as a matter of law. *McCarley v. Hopkins,* 687 S.W.2d 510, 512 (Tex.App.—Houston [1st Dist.] 1985, no writ).

Mackey has assigned three points of error. By his first point, Mackey asserts that the Texas limitations statute had not run on his cause of action against Graham. The four-year statute of limitations applies. TEX.CIV.PRAC. & REM.CODE ANN. § 16.004(a)(3) (Vernon 1992). Mackey's paving work having been performed in 1979, and this suit against Graham having been filed in 1987, the central inquiry is *when did Mackey's cause of action accrue:* at the time that Mackey's paving was completed and accepted but not paid by Thomas, or did it accrue in 1986 only after Mackey's judgment was rendered against Thomas.

[4] It is significant whether the agreement sued on was a contract of indemnity or guaranty. If Mackey's cause of action herein is upon a contract of *indemnity,* the statute of limitations has not run on this suit against Graham. It did not accrue until a contested or agreed final judgment was rendered in favor of Mackey against the indemnitee, Thomas, on August 6, 1986. *Conroe Truck & Tractor, Inc. v. Childs Truck Equipment, Inc.,* 723 S.W.2d 207 (Tex.App.—Beaumont 1986, no writ); *Amoco Chemicals Corp. v. Malone Service Co.,* 712 S.W.2d 611 (Tex.App.—Houston [1st Dist.] 1986, no writ); *City of San Antonio v. Talerico,* 98 Tex. 151, 81 S.W. 518 (1904).^FN1

> FN1. For an analysis of Texas indemnity law on this issue, *see Koonce v. Quaker Safety Products & Manufacturing Company,* 798 F.2d 700 (5th Cir.1986). *Also see* Wilson, CONTRIBUTION AND INDEMNITY: *When Does the Cause of Action "ACCRUE?",* 51 TEXAS BAR JOURNAL 120–24 (1988).

[5][6] If, however, Graham's obligation to Mackey arose out of an absolute contract of *guaranty,* Mackey's cause of action herein was barred; the cause of action against Graham under the guaranty agreement accrued in 1979 when Thomas did not pay Mackey for the paving work. *Shepherd v. Eric Schuster Corporation,* 424 S.W.2d 693 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

842 S.W.2d 343
**(Cite as: 842 S.W.2d 343)**

ref'd n.r.e.); *McGhee v. Wynnewood State Bank,* 297 S.W.2d 876 (Tex.Civ.App.—Dallas 1956, writ ref'd n.r.e.); *Austin v. Guaranty State Bank,* 300 S.W. 129 (Tex.Civ.App.—Waco 1927, no writ); *Ganado Land Co. v. Smith,* 290 S.W. 920 (Tex.Civ.App.—Galveston 1927, writ ref'd). A written guaranty that is unqualified and expresses no condition for the payment of the debt is an "absolute guaranty".[FN2] *Universal Metals & Machinery, Inc. v. Bohart,* 539 S.W.2d 874 (Tex.1976). Graham's obligation under the terms of the letter agreement requires no pre-conditional activity for its enforcement against Graham.

> FN2. Sometimes referred to as a "guaranty of payment"; it is to be distinguished from a "guaranty of collection" or "conditional guaranty".

**\*346** [7][8] A judgment against the principal obligor, Thomas, in this case, is not a condition precedent to the accrual of an absolute guaranty. An absolute guarantor is primarily liable and waives any requirement that the creditor take action against the principal obligor as a condition to his liability on the guaranty. *Hopkins v. First Nat'l Bank at Brownsville,* 551 S.W.2d 343, 345 (Tex.1977); *Ford v. Darwin,* 767 S.W.2d 851, 855 (Tex.App.—Dallas 1989, writ denied).[FN3] Traditionally, a guarantor is a favorite of the law and creditors' claims against them are strictly construed. *McKnight v. Virginia Mirror Company,* 463 S.W.2d 428, 430 (Tex.1971).

> FN3. Even those cases, since overruled, that required joinder of the principal obligor in a creditor's suit against a guarantor under TEX.R.CIV.P. 31 and TEX.CIV.PRAC. & REM.CODE ANN. § 17.001 (Vernon 1992), recognized that a judgment against that obligor was not a prerequisite to recovery against the guarantor. *See Cook v. Citizens National Bank of Beaumont,* 538 S.W.2d 460, 464 (Tex.Civ.App.—Beaumont 1976, no writ); *Ferguson v. McCarroll,* 588 S.W.2d 895

(Tex.1979).

Furthermore, Mackey's attorney admittedly had knowledge of Graham's obligation to Thomas and any other unpaid sub-contractors as early as 1981 or January 1982, more than four years before the filing of this suit against Graham.

The agreement sued on embodies two divisible, distinct obligations, one by each contracting party: (1) Graham promised, for a fee, to guarantee Ferrier's general construction contract with the owner, Thomas, and "to protect" Thomas;[FN4] and (2) the other party, Ferrier, promised that the payments made by Graham under (1) would not cost Graham any money, but that if it did, Ferrier would reimburse Graham, including his expenses and interest. Thus, the first agreement required Graham to satisfy Thomas' unpaid obligations on the Park East project, whereas the other obligation required Ferrier to repay Graham for his expenditures on that project.

> FN4. As well as the interim financing institution, Citizens First National Bank of Tyler, Texas.

The latter obligation (2) was considered in a prior appeal to this court, *Joyce Ferrier v. Terry Graham,* No. 12–84–0198–CV, in which we held, in an unpublished opinion, that that second portion of the agreement requiring reimbursement of Graham by Ferrier for payments to another sub-contractor was an indemnity contract. This was a standard direct indemnity agreement between the two contracting parties, Ferrier and Mackey.

[9] The first obligation, that of Graham to Thomas' creditors, is at issue here, however. Although the petition herein alleges that Mackey was asserting his claim under an indemnity agreement, the rights and duties of the parties is determined by the nature of the obligation. Likewise, it is noted that there are two distinct references in the first section of the agreement to a "guaranty" relationship. It is the nature of that relationship, not the language

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

842 S.W.2d 343
**(Cite as: 842 S.W.2d 343)**

in the agreement, that controls. *Wood v. Canfield Paper Co.,* 117 Tex. 399, 5 S.W.2d 748, 750 (1928).

[10][11][12] There are significant differences in the construction of a contract of guaranty and an indemnity contract. The latter is an original obligation between the contracting parties and independent of other agreements; on the other hand, a guaranty contract is collateral and secondary to the principal contract that is guaranteed in the secondary contract. *Olson v. Smith,* 72 S.W.2d 650, 652 (Tex.Civ.App.—El Paso, writ dism'd); *38 C.J.S. Guaranty* § 2, 4, 5 (1943). Here, Graham promised to protect the owner, Thomas, whose obligation to Mackey arose out of a separate and primary contract. Thomas was not a party to the agreement sued on. The instant case presents a classic collateral agreement of guaranty by Graham of the underlying general construction contract obligation of the owner, Thomas, to those who performed services on its behalf.

Mackey's cause of action against Graham, under his agreement to guarantee Thomas' obligations to his sub-contractors, accrued in 1979 when Thomas defaulted on its obligation to pay Mackey who had performed valuable services on behalf of the owner. The four-year statute of limitations**347** on the guaranty contract, therefore, had barred the suit against Graham which was not filed until April 1987. Mackey's first point is overruled. We hold that Graham is entitled to his judgment on the court's directed verdict as a matter of law. We need not address Mackey's remaining points of error challenging other possible grounds for the instructed verdict.

The trial court's judgment is affirmed.

Tex.App.–Tyler,1992.
Joseph Thomas, Inc. v. Graham
842 S.W.2d 343

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

644 S.W.2d 707
**(Cite as: 644 S.W.2d 707)**

▷

Supreme Court of Texas.
Don K. HANKS, d/b/a Hanks Claims Service, Petitioner,
v.
GAB BUSINESS SERVICES, INC., Respondent.

No. C–1095.
Dec. 31, 1982.
Rehearing Denied Feb. 16, 1983.

Suit was brought for breach of contract for the sale of an insurance adjusting business. The District Court, Lubbock County, Robert C. Wright, J., rendered judgment for buyer, and appeal was taken. The Court of Civil Appeals, 626 S.W.2d 564, affirmed, and further review was sought. The Supreme Court, Sondock, J., held that seller's breach of covenant not to compete did not excuse buyer's obligation to pay the final installment due for the business purchased where seller's breach could be adequately compensated by damages and where buyer, which retained the assets of the business and chose to treat the contract as continuing, waived any right to partially rescind the contract.

Reversed and rendered.

West Headnotes

**[1] Contracts 95 ⬤⬤303(1)**

95 Contracts
    95V Performance or Breach
        95k303 Excuses for Nonperformance or Defects
            95k303(1) k. In General. Most Cited Cases

A prerequisite to remedy of excuse of performance is that the covenants in a contract must be mutually dependent promises.

**[2] Contracts 95 ⬤⬤303(1)**

95 Contracts
    95V Performance or Breach
        95k303 Excuses for Nonperformance or Defects
            95k303(1) k. In General. Most Cited Cases

A breach of a covenant which is part of a legally enforceable contract gives rise to a cause of action for damages rather than affecting enforceability of provisions of the agreement.

**[3] Contracts 95 ⬤⬤303(1)**

95 Contracts
    95V Performance or Breach
        95k303 Excuses for Nonperformance or Defects
            95k303(1) k. In General. Most Cited Cases

Seller's breach of covenant not to compete did not excuse buyer's obligation to pay the final installment due for the business purchased where seller's breach could be adequately compensated by damages and where buyer, which retained the assets of the business and chose to treat the contract as continuing, waived any right to partially rescind the contract.

**[4] Contracts 95 ⬤⬤303(1)**

95 Contracts
    95V Performance or Breach
        95k303 Excuses for Nonperformance or Defects
            95k303(1) k. In General. Most Cited Cases

A party who elects to treat a contract as continuing deprives himself of any excuse for ceasing performance on his own part.

*707 Carr, Evans, Fouts & Hunt, Donald M. Hunt, Lubbock, for petitioner.

Jones, Trout, Flygare, Moody & Brown, Jack A. Flygare and Jeffrey B. Jones, Lubbock, for re-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

644 S.W.2d 707
**(Cite as: 644 S.W.2d 707)**

spondent.

SONDOCK, Justice.

This suit arose from an alleged breach of a contract between Petitioner, Don K. Hanks, d/b/a Hanks Claims Service ("Hanks") and GAB Business Services, Inc. ("GAB") for the sale of an insurance adjusting business. The trial court rendered judgment for GAB. The court of appeals affirmed. 626 S.W.2d 564. We reverse the judgments of the courts below and render judgment for Hanks.

In May of 1977, Hanks contracted with GAB for the sale of his insurance adjustment business. The contract specifically included accounts receivable, ninety-five items of office furniture, goodwill, and a five-year covenant not to compete. The contract price of $95,000 provided for payments of $28,000 at closing, $33,500 due one year from the date of closing, and the balance due two years from closing. In connection with the sales contract, Hanks signed an employment contract with GAB, which also contained a covenant not to compete.

Approximately one year later, after GAB had paid the $33,500 installment, a dispute between the parties arose and Hanks resigned his position with GAB. Hanks commenced competing with GAB in violation of the non-competition agreement. Hanks continued to compete until March of 1979, when he voluntarily ceased competition.

**\*708** During the time that Hanks was competing, GAB filed suit seeking injunctive relief and attorney's fees for Hanks' violation of the covenant not to compete. In July of 1979, after GAB failed to tender the last installment, which was then overdue, Hanks filed an amended answer and counterclaim for the final payment, exemplary damages, and attorney's fees. Later, GAB filed an amended petition seeking damages in addition to injunctive relief and asking to be excused from the final installment.

In response to the special issues submitted at trial, the jury found that GAB had been damaged in the amount of $1,200 for the eight month period in which Hanks actively competed in violation of the non-competition agreement and $5,850 future damages for the remainder of the five-year covenant period. GAB moved for judgment, requesting the permanent injunction and excuse from paying the final installment, in addition to the award of damages and $6,000 stipulated attorney's fees. At that time, the trial court required GAB to make an election between the jury award and the excuse remedy, whereupon GAB elected to be excused from making the final $33,500 payment. The trial court then entered judgment, excusing GAB from making the final installment, and awarding attorneys' fees on the contract.

The question presented by this case is: Did Hanks' breach of the covenant not to compete excuse GAB's obligation to pay the final installment due for the business purchased? The court of appeals applied the rule of *Morgan v. Singley,* 560 S.W.2d 746 (Tex.Civ.App.—Texarkana 1977, no writ) and held that GAB was excused from making the final payment. We do not agree.

[1][2][3] A prerequisite to the remedy of excuse of performance is that covenants in a contract must be mutually dependent promises. *Morgan v. Singley, supra.* In the instant case, this rule does not apply because the covenant not to compete should properly be classified as an independent promise. "The rule is that 'when a covenant goes only to part of the consideration on both sides and a breach may be compensated for in damages, it is to be regarded as an independent covenant, unless this is contrary to the expressed intent of the parties.' " *World Broadcasting System, Inc. v. Eagle Broadcasting Co.,* 162 S.W.2d 463, 465 (Tex.Civ.App.—San Antonio 1942, writ dism'd) *citing* 17 C.J.S., Contracts, § 344, at 800. The covenant not to compete in the Hanks/GAB contract only goes to part of the contract. The contract covers numerous items and the parties had bargained for a value of $5,000 to be assigned to the covenant not to compete, although the value assigned was admittedly for tax

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

644 S.W.2d 707
**(Cite as: 644 S.W.2d 707)**

reasons. Further, there is no express language in the contract that indicates the parties intended the covenants to be mutually dependent. As explained in *Landscape Design & Construction, Inc. v. Harold Thomas Excavating, Inc.,* 604 S.W.2d 374, 376 (Tex.Civ.App.—Dallas, 1980, writ ref'd n.r.e.), "A breach of a covenant which is part of a legally enforceable contract gives rise to a cause of action for damages rather than affecting the enforceability of the provisions of the agreement." *See Reinert v. Lawson,* 113 S.W.2d 293, 295 (Tex.Civ.App.—Waco 1938, no writ). In this case, Hanks' breach may be adequately compensated by damages.

[4] Any right GAB had to partially rescind the contract when Hanks breached the covenant not to compete has been waived. A party who elects to treat a contract as continuing deprives himself of any excuse for ceasing performance on his own part. *See Board of Regents, University of Texas v. S & G Construction Co.,* 529 S.W.2d 90 (Tex.Civ.App.—Austin 1975, writ ref'd n.r.e.); *Houston Belt & Terminal Ry. Co. v. J. Weingarten, Inc.,* 421 S.W.2d 431 (Tex.Civ.App.—Houston [1st Dist.] 1967, writ ref'd n.r.e.). At all times during the dispute and subsequent litigation, GAB chose to treat the contract as continuing. GAB retained all the assets of the business and continued its operation. Moreover, GAB did not pursue its excuse remedy until it had already instituted action to enforce the contract, well over a year after Hanks' breach of the covenant not to compete.

**\*709** In holding that GAB had not elected its remedy prior to judgment, the court of appeals relied on this Court's decision in *Bocanegra v. Aetna Life Ins. Co.,* 605 S.W.2d 848 (Tex.1980). The court reasoned that neither GAB's filing of the lawsuit nor its retention of the business operated as a "conclusive choice" that would create a "manifest injustice" within the meaning of the *Bocanegra* test. Similarly, the court held that GAB's actions did not waive its excuse remedy, reasoning that GAB's actions were only consistent with the closing

of the contract and did not constitute "intentional inconsistent conduct." We disagree. At the time of Hanks' breach, GAB could have elected to partially rescind the contract. Because GAB retained the assets of the business and chose to treat the contract as continuing, it could not elect the excuse remedy prior to judgment.

Finally, Hanks argues that there is no evidence to support the jury's finding of $5,850 future damages for the remaining period of the five year covenant. The court of appeals did not reach this question because it held that GAB was excused from performance. We disagree with the trial court's judgment on this point. The bulk of GAB's evidence on future damages was excluded by the trial court. The remaining testimony consisted of speculation as to future losses. GAB only introduced records of claims and gross amounts rather than completed work or overhead figures necessary to compute future profits.

The judgments of the courts below are reversed and judgment is here rendered that Hanks recover the final installment with an offset for the $1,200 damages found by the jury in favor of GAB plus prejudgment interest from June 1, 1979, to date of judgment. In light of the fact that both parties prevailed on their respective actions under the contract, we render judgment that neither party recover attorneys' fees.

ROBERTSON, J., not sitting.

Tex.,1982.
Hanks v. GAB Business Services, Inc.
644 S.W.2d 707

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**C**

Restatement of the Law — Contracts
Restatement (Second) of Contracts
Current through April 2011

Copyright © 1981-2011 by the American Law Institute

Chapter 8. Unenforceability On Grounds Of Public Policy
Topic 4. Interference With Other Protected Interests

§ 195. Term Exempting From Liability For Harm Caused Intentionally, Recklessly Or Negligently

Link to Case Citations

**(1) A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.**

**(2) A term exempting a party from tort liability for harm caused negligently is unenforceable on grounds of public policy if**

**(a) the term exempts an employer from liability to an employee for injury in the course of his employment;**

**(b) the term exempts one charged with a duty of public service from liability to one to whom that duty is owed for compensation for breach of that duty, or**

**(c) the other party is similarly a member of a class protected against the class to which the first party belongs.**

**(3) A term exempting a seller of a product from his special tort liability for physical harm to a user or consumer is unenforceable on grounds of public policy unless the term is fairly bargained for and is consistent with the policy underlying that liability.**

**Comment:**

*a. Rationale.* The law of torts imposes standards of conduct for the protection of others against unreasonable risk of harm. One cannot exempt himself from such liability for harm that is caused either intentionally or recklessly. See Restatement, Second, Torts § 500. (As to the possibility that one party's consent may give the other a defense under the law of torts, see Restatement, Second, Torts §§ 892-92D.) However, a party to a contract can ordinarily exempt himself from liability for harm caused by his failure to observe the standard of reasonable care imposed by the law of negligence. See Restatement, Second, Torts § 282. This rule is subject to an exception if the other party is a member of a protected class. Two examples of this exception are widely recognized. First, an employer is not permitted to exempt himself from liability to his employee for negligently caused injury (paragraph (a)). Second, one who is charged with a duty of public service, such as a common carrier or a public utility, and who undertakes to perform it for compensation, is not permitted to exempt himself from liability to the one to be served for negligent breach of that duty (paragraph (b)). The rigor of this rule may, however, be mitigated by a fairly bargained for agreement to limit liability to a reasonable agreed value in return for a lower rate. In most jurisdictions legislation has altered the rule in specific situations, usually by restricting the power to limit liability. The two examples given under Subsection (2) are not intended as an exhaustive list of situ-

ations in which such terms are unenforceable. If, for example, a statute imposes a standard of conduct, a court may decide on the basis of an analysis of the statute, that a term exempting a party from liability for failure to conform to that standard is unenforceable. See § 179(a).

**Illustrations:**

1. A, a common carrier, issues a pass to B, one of its employees. A term of the pass exempts A from liability to B for any injury caused by A's negligence. The term is unenforceable on grounds of public policy. Enforcement of a similar term in a pass given gratuitously to one who is not an employee would not be precluded on those grounds.2. A term in an agreement between A, a railroad, and B, an adjacent land owner, exempts A from liability to B for fires negligently caused by sparks from its engines. Because the term does not exempt A from liability for breach of its duty of public service, its enforcement is not precluded on grounds of public policy. The term would be unenforceable on those grounds if it exempted A from liability for harm caused either willfully, intentionally or recklessly.

*b. Relation to other rules.* Language inserted by a party in an agreement for the purpose of exempting him from liability for negligent conduct is scrutinized with particular care and a court may require specific and conspicuous reference to negligence under the general principle that language is interpreted against the draftsman. See § 206. Furthermore, a party's attempt to exempt himself from liability for negligent conduct may fail as unconscionable. See § 208. The rule stated in this Section does not apply to an agreement by a third person to indemnify a party against liability in tort. The effect of a term purporting to exempt a party from the consequences of a misrepresentation is governed by the rule stated in § 196.

*c. Strict product liability.* One who sells a product in a defective condition unreasonably dangerous to the user or consumer or to his property is subjected to liability for resulting physical harm under the rule stated in Restatement, Second, Torts § 402A. In general, a term exempting the seller from this liability is unenforceable on grounds of public policy. See Comment *m* to Restatement, Second, Torts § 402A. Subsection (3) states an exception for the rare situation in which the term is consistent with the policy underlying the liability. This might be the case, for example, for a term in a fairly negotiated contract between two merchants for the sale of an experimental product. Such a term would not, however, affect the rights of one who was not a party to the contract.

**REPORTER'S NOTE**

This Section is based on former §§ 574, 575. See 6A Corbin, Contracts § 1472 (1962 & Supp.1980); 15 Williston, Contracts §§ 1750-51 (3d ed.1972).

*Comment a.* Illustration 1 is based on Illustration 1 to former § 575. Illustration 2 is based on Illustration 2 to former § 575; cf. Rutter v. Arlington Park Jockey Club, 510 F.2d 1065 (7th Cir.1975); Lamoille Grain Co. v. St. Johnsbury and Lamoille County R.R., 135 Vt. 5, 369 A.2d 1389 (1976); compare Alabama Great So. R.R. v. Sumter Plywood Corp., 359 So.2d 1140 (Ala.1978). See also Meyerow, Exculpatory Provisions in Leases of Commercial Property—A Realistic Appraisal, 13 New England L.Rev. 739 (1978). As to exemption from liability for failure to observe a statutory duty imposed for the protection of human life, see Warren City Lines v. United Ref. Co., 220 Pa.Super.Ct. 308, 287 A.2d 149 (1971). For examples of legislative modification of the common law rules, see Carriage of Goods by Sea Act, 46 U.S.C. § 1304 (1976); Interstate Commerce Act, 49 U.S.C. §§ 20(11), 1502 Note (1976); Lopez v. A/S D/S Svendborg, 581 F.2d 319 (2d Cir.1978); Comment, 47 Fordham L.Rev. 323 (1978).

The rule forbidding terms exempting parties from harm caused intentionally is illustrated by Zuckerman-Ver-

Restatement (Second) of Contracts § 195 (1981)

non Corp. v. Rosen, 361 So.2d 804 (Fla.Dist.Ct.App.1978). The contrary general rule permitting such clauses as to negligence is stated in LaFrenz v. Lake County Fair Bd., 172 Ind.App. 389, 360 N.E.2d 605 (1977); and Jones v. Dressel, 582 P.2d 1057 (Colo.App.1978). However, some states forbid exculpatory clauses against a party's own negligence, see, e.g., Alabama Great So. R.R. v. Sumter Plywood Corp., supra; and Agricultural Serv. Ass'n v. Ferry-Morse Seed Co., 551 F.2d 1057 (6th Cir.1977) (applying Cal.Civ. Code § 1668 (West 1973)). Other courts, applying the general rule as to negligence, state that such exculpatory clauses will be strictly construed against the party relying on them, see, e.g., Belger Cartage Service v. Holland Constr. Co., 224 Kan. 320, 582 P.2d 1111 (1978); J.A. Jones Constr. Co. v. City of Dover, 372 A.2d 540 (Del.Super.Ct.1977), app. dism'd, 377 A.2d 1 (Del.1977). Compare Tunkl v. Regents of Univ. of California, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441 (1963). Some courts will not interpret an exculpatory clause to include a party's own negligence unless the word "negligence" is used verbatim. See, e.g., J.A. Jones Constr. Co. v. City of Dover, supra; Della Corte v. Incorporated Village of Williston, 60 A.D.2d 639, 400 N.Y.S.2d 357 (1977). Compare Marr Enterprises v. Lewis Refrig. Co., 556 F.2d 951 (9th Cir.1977); Zimmer v. Mitchell and Ness, 253 Pa.Super.Ct. 474, 385 A.2d 437 (1978). Courts are more likely to uphold clauses exculpating negligence when a voluntary dangerous activity such as sports is involved than when a less voluntary activity such as a medical procedure is involved. Compare Zimmer v. Mitchell and Ness, supra (skiing); and LaFrenz v. Lake County Fair Bd., supra (automobile racing), with Olson v. Molzen, 558 S.W.2d 429 (Tenn.1977) (abortion); and Leidy v. Deseret Enterprises, 252 Pa.Super.Ct. 162, 381 A.2d 164 (1977) (post-operative physical therapy).

For two lower court opinions refusing to relieve public utilities from liability for negligence despite tariffs approved by a regulatory commission, see Denmark v. New York Tel. Co., 97 Misc.2d 205, 411 N.Y.S.2d 506 (1978); Lee v. Consolidated Edison Co., 95 Misc.2d 120, 407 N.Y.S.2d 777 (1978).

Comment b. On the specificity of language required, see, in addition to the cases cited on this point in the Reporter's Note to Comment a, Lincoln Pulp & Paper Co. v. Dravo Corp., 436 F.Supp. 262 (D.Maine 1977); id., 445 F.Supp. 507 (D. Maine 1977); Orkin Exterminating Co. v. Montagano, 359 So.2d 512 (Fla.Dist.Ct.App.1978). The three opinions cited in this paragraph also rely on the rule of interpretation against the clause's draftsman. With respect to unconscionability, compare Louisville Bear Safety Serv. v. South Central Bell Tel. Co., 571 S.W.2d 438 (Ky.1978); and Berjian v. Ohio Bell Tel. Co., 54 Ohio St.2d 147, 375 N.E.2d 410 (1978), with Allen v. Michigan Bell Tel. Co., 18 Mich.App. 632, 171 N.W.2d 689 (1969). See also Post-tape Assoc. v. Eastman Kodak Co., 450 F.Supp. 407 (E.D.Pa.1978); id., 537 F.2d 751 (3d Cir.1976); LaFrenz v. Lake County Fair Bd., 172 Ind.App. 389, 360 N.E.2d 605 (1977); Note, Fairness, Flexibility and the Waiver of Remedial Rights by Contract, 87 Yale L.J. 1057 (1978).

Comment c. The exception in Subsection (2) is supported by Keystone Aeronautics Corp. v. R.J. Enstrom Corp., 499 F.2d 146 (3d Cir.1974); see also Wheeler v. Standard Tool and Mfg. Co., 497 F.2d 897 (2d Cir.1974). But cf. Sterner Aero v. Page Airmotive, 499 F.2d 709 (10th Cir.1974).

Case Citations

Case Citations Through December 1977, Including Cross References

— June 1984 Case Citations January 1978 — June 1984

— June 1989 Case Citations July 1984 — June 1989

— June 1991 Case Citations July 1989 — June 1991

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

— June 1996 Case Citations July 1991 — June 1996

— June 2001 Case Citations July 1996 — June 2001

— June 2006 Case Citations July 2001 — June 2006

— June 2010 Case Citations July 2006 — June 2010

Case Citations Through December 1977, Including Cross References:

Cross References to

1. Digest System Key Numbers

Contracts ⚷ 114

2. A.L.R. Annotation

Validity and construction of "No Damage" Clause with respect to delay in building or construction contract. 74 A.L.R.3d 187.

Validity and construction of contract exempting agricultural fair or similar bailee from liability for articles delivered for exhibition. 69 A.L.R.3d 1025.

Validity and construction of contract exempting hospital or doctor from liability for negligence to patient. 6 A.L.R.3d 704.

Conditions printed on confirmation slips as binding on customers of stock or commodity broker. 71 A.L.R.2d 1089.

Validity, construction, and effect of limited liability or stipulated damages clause in fire or burglar alarm service contract. 42 A.L.R.2d 591.

— June 1984: Case Citations January 1978 — June 1984:

No earlier citations

**C.A.4,** 1983. Cit. in disc. A woman brought an action for herself and her husband against the company which had installed an allegedly defective fire alarm in their house. The jury returned a general verdict for the homeowners, and the company appealed. This court held that the district court had erred in finding a liability-limiting provision in the protective service contract unlawful. It ruled that the provision should be given effect to limit negligence damages absent a finding that the parties had not contracted as equals, but that it would be ineffective to limit liability for violation of a consumer protection statute since it did not expressly provide such limitation. The court then vacated and remanded, stating that a general verdict did not reveal the basis of the jury's decision. Gill v. Rollins Protective Services Co., 722 F.2d 55, 58.

**D.Mass.** 1982. Subsecs. (1) quot. in part in disc. The plaintiffs, husband and wife, brought this diversity ac-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion to recover damages for personal injuries received by the husband when he drove his racing automobile off an allegedly defectively designed race track. The defendants were the race track, the landowner of record, another possible landowner, and the racing association, among others. The husband had executed a written release in blank prior to entering the race track. The defendants moved for summary judgment on the basis of the release, and the plaintiffs moved to amend their complaint to allege gross negligence by all defendants. This court granted summary judgment for some of the defendants on the issue of ordinary negligence. Under pertinent state law the release executed by the husband was sufficient to prevent any suit for ordinary negligence. However, quoting the Restatement among other authorities, this court ruled that such a release was inadequate as a shield against an action for gross negligence. Accordingly, this court permitted the plaintiffs to amend their complaint to allege gross negligence. The fact that the release did not specify who specifically was released from liability did not alone vitiate its effect because language in the release narrowed its applicability to a small, easily determinable group. This court also found that under state law the wife's action for loss of consortium was not disposed of by the husband's written release. That action was separate and maintainable by the wife. Finally, this court ruled that the motion by an individual defendant, now deceased, for summary judgment must be denied. An issue as to land ownership at the time of the accident was unresolved and summary judgment was inappropriate at the time of this decision. Gillespie v. Papale, 541 F.Supp. 1042, 1046.

**Cal.** 1983. Subsec. (2)(b) and com. cit. in ftn. The plaintiff brought his yacht to the defendant's marine repair facility to have the bottom cleaned and painted and certain repair work done. He signed a work order containing an exculpatory clause providing that the defendant would be absolved of all losses except those resulting from willful misconduct. The defendant hauled the boat out of the water and did the agreed work. As the vessel was being relaunched, it fell from a marine railway and was badly damaged. The plaintiff brought an action claiming negligence and gross negligence on the part of the defendant, and the action was consolidated with an action brought by the plaintiff's insurer as subrogee. The trial court found that the exculpatory clause validly exempted the defendant from responsibility for negligent damage to the vessel while it was in his custody for repairs. This court reversed. While noting that under admiralty law, an exculpatory clause freeing a ship repairer from liability for its negligence was not invalid as being contrary to public policy, the court nevertheless held that in this case the purported exculpatory clause did not clearly and unequivocally exclude the defendant's liability for negligence. Therefore, the plaintiff was permitted to maintain his action. Fahey v. Gledhill, 33 Cal.3d 884, 191 Cal.Rptr. 639, 644, 663 P.2d 197.

**Conn.** 1982. Com. (b) cit. in disc. The plaintiff bailor sued the defendant bailee for the loss of her property while it was in the defendant's warehouse. The lower court entered judgment for the plaintiff, finding that the defendant failed to rebut the presumption of negligence which arose when it did not return the bailed property, and that certain provisions limiting the defendant's liability did not become part of the bailment contract. The defendant appealed. This court held that the defendant did not rebut the presumption of negligence when it could not prove the actual circumstances of the fire that destroyed the plaintiff's goods. Further, the trial court did not err in finding that the plaintiff was unaware of the limitation of liability clauses in the receipts given her, even though one of them bore her signature. The court noted that the law did not favor contract provisions which relieve a person of his own negligence. This was particularly so in professional bailment situations where the parties often had unequal bargaining power. The assent of both parties was necessary to the provisions limiting the defendant's liability; the defendant could not prove that the plaintiff had actual knowledge of the exculpatory provisions or that her conduct warranted a reasonable belief that she had assented to them. The trial court credited the plaintiff's testimony that she was unaware of the provisions, and its conclusion that

they were not part of the contract was not clearly erroneous. This court also held that the evidence supported the trial court's award of damages. There was no error. Griffin v. Nationwide Moving & Storage Co., 187 Conn. 405, 446 A.2d 799, 803.

**Hawaii App.** 1983. Com. (a) cit. but dist. A marine surveyor failed to discover and inform the buyer of a boat of the deteriorated condition of the bottom of the boat, and the buyer sued for damages when the condition was later discovered and repaired. The lower court entered summary judgment in favor of the buyer, and the surveyor appealed. This court affirmed, holding that a marine surveyor would be held to a standard of good marine surveying practice, that there was substantial evidence to support the lower court's findings that the surveyor breached his duty and that he was negligent, and that an exculpatory clause in the marine survey report, although permissible, was not enforceable, because the buyer did not clearly and unequivocally accept the exculpatory provision. Krohnert v. Yacht Systems Hawaii, Inc., 4 Hawaii App. 190, 664 P.2d 738, 744.

**N.Y.** 1983. Cit. in disc. A contractor brought suit against a city to recover delay damages from the city. The facts indicate that the contract contained an exculpatory clause which provided that the contractor agreed to make no claim for damages for delay in the performance of the contract occasioned by any act or omission to act of the city or its representatives. The trial court entered judgment on the verdict in favor of the contractor, and the city appealed. The appellate court affirmed. This court found that the provision was entered into by the parties at arms' length. Thus, the court reversed, concluding that the exculpatory provision was enforceable. Kalisch-Jarcho, Inc. v. City of New York, 58 N.Y.2d 377, 461 N.Y.S.2d 746, 750, 448 N.E.2d 413.

**Wis.** 1982. Cit. and quot. in sup., cit. in diss. op., com. (a) cit. in sup., com. (a) cit. in ftn. in diss. op., com. (b) cit. in sup. The plaintiff, a riding student, brought this action to recover damages from the defendant, a horseback riding school, for personal injuries received during a riding lesson. Prior to the lesson, the plaintiff executed an exculpatory contract releasing the defendant from any liability for injury incurred during the lesson. A provision of the form contract recited the defendant's lack of liability insurance coverage. While there was no such insurance when the form contract was printed, liability coverage had been obtained and was in effect when the plaintiff signed the release. During discovery, the plaintiff learned of the insurance policy and attacked the validity of the exculpatory contract based on the insurance misstatement. The trial court, recognizing and enforcing the exculpatory contract, granted summary judgment to the defendant; the appellate court affirmed that decision when the plaintiff appealed. The plaintiff again appealed and this court reversed the decision and remanded the case. This court ruled that the exculpatory contract did not bar the plaintiff's recovery because the contract itself was unenforceable on public policy grounds. Citing the Restatement, this court first determined there was no fraudulent misrepresentation by the defendant. Quoting the Restatement extensively, this court then reviewed the usual public policy reasons for not enforcing exculpatory contracts and found none applicable. This court then stated that it would be contrary to public policy to enforce an exculpatory contract involving a mistake or deception in the bargaining process which is relevant to a reasonable person's decision to execute the release. Here, the disclaimer of any liability coverage was seen as such a mistake and the exculpatory contract was unenforceable. A spirited dissent opposed the expansion of public policy to include a mere misstatement as grounds for nonenforcement, especially here where the plaintiff expressly denied having relied on the misstatement. Merten v. Nathan, 108 Wis.2d 205, 321 N.W.2d 173, 177-178, 178, 180, 181.

**Wis.** 1983. Cit. in disc. A race car driver and his wife sued an agricultural society and others to recover for injuries that the husband sustained in an automobile racing accident. The trial court granted summary judgment in favor of the society on the basis of an exculpatory contract signed by the husband before the accident

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

occurred. The court of appeals reversed and remanded. The state supreme court affirmed the decision of the court of appeals. The exculpatory contract was not invalid as contravening public policy, but genuine issues of material fact existed as to whether the risk of negligent rescue operations was within the contemplation of the parties at the time the exculpatory contract was executed, and whether the contract was meant to encompass actions by defendants that may have occurred outside the area to which admission to the general public was prohibited. Arnold v. Shawano County Agr. Soc. 111 Wis.2d 203, 330 N.W.2d 773, 777.

   **Wis.**1984. Quot. in sup., coms. (a) and (b) cit. in case quot. in sup. A drapery business brought an action against a telephone company to recover damages for loss of business resulting from the telephone company's omission of the business's corporate trade name from a quarter-page advertisement in the commercial telephone directory. The trial court entered judgment on a jury verdict in favor of the drapery business, and the telephone company appealed. Upon denial of certification by this court, the intermediate court reversed the judgment of the trial court. On review, this court reversed the intermediate court, holding that a form contract, used by the telephone company for directory advertising and specifically limiting the telephone company's liability for errors or omissions to a refund of applicable charges, was an exculpatory contract, unconscionable and unenforceable as against public policy. Discount Fabric House v. Wisconsin Telephone Co., 117 Wis.2d 587, 345 N.W.2d 417, 421. The following cases have cited or referred to § 337 of the Tentative Drafts. This is now s 195 of the Official Draft.

   **N.Y.**1980. Cit. in disc. The plaintiff, an international metals trader, delivered three separate lots of the industrial metal indrium to the defendant commercial warehouse for safekeeping. The three lots of indrium were worth $100,000. When the metal was delivered to the defendant, it gave the plaintiff warehouse receipts for each lot. The terms and conditions of the bailment were printed on the back of the receipts. One of the conditions was that the warehouse's total liability would not exceed $50,000 unless the bailor made a written request within twenty days to increase this liability. For two years, the defendant billed the plaintiff for storage of the three lots. Finally, the plaintiff requested return of one of the three lots of the metal. The defendant informed it that it was unable to locate any of the metal. The plaintiff then brought this action against the defendant warehouse for conversion, seeking to recover the full value of the indrium. The defendant rejoined that the metal had been stolen through no fault of the warehouse and that the terms printed on each warehouse receipt limited the plaintiff's potential recovery to a maximum of $50 per lot of indrium. The lower court granted summary judgment to the plaintiff for the full value of the indrium. The appellate court affirmed. Absent an agreement to the contrary, a warehouse is not an insurer of goods and may not be held liable for any injury or loss of stored property not due to some fault on its part, but as a bailee, a warehouse is required both to exercise reasonable care so as to prevent loss or damage to the property and to refrain from converting materials left in its care. It has long been the law in this state that a warehouse, like a common carrier, may limit its liability for loss or damage to stored goods even if the injury or loss is the result of the warehouse's negligence so long as it provides the bailor with an opportunity to increase that potential liability by payment of a higher storage fee. If the warehouse house converts the goods, however, strong policy considerations bar enforcement of any such limitations upon its liability. A prior limitation on liability cannot be applied to diminish one's liability for injuries resulting from an affirmative and intentional act of misconduct such as conversion. When a warehouse converts bailed property, it ceases to function as a warehouse and loses its entitlement to the protections afforded by the agreement of storage. In this case, the plaintiff has proffered uncontroverted proof of delivery of the indrium to the defendant, a proper demand for its return, and the defendant's failure to honor this demand. The defendant has failed to make a sufficient explanation of the loss of the plaintiff's property to defeat a motion for summary judgment. Its unsupported claim that the metal was stolen does not suffice to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

raise any issue of fact on this point. The record therefore suffices to sustain the plaintiff's action in conversion and renders the contractual limitation upon the defendant's liability inapplicable. The dissent disagreed with this conclusion. It argued that the plaintiff was not entitled to summary judgment because the plaintiff had failed to prove that the defendant intentionally worked to deprive the plaintiff of its property. Without proof of intentional misconduct, the plaintiff cannot sustain an action in conversion. I.C.C. Metals, Inc. v. Municipal Warehouse Co., 50 N.Y.2d 657, 431 N.Y.S.2d 372, 376, 409 N.E.2d 849, 852.

**Va.**1978. Quot. in part in sup. In an action where recovery was sought against a power company and a contractor, which performed work on the company's facilities for damage resulting to a private home as a result of a fire allegedly caused by the power company's and the contractor's negligence in repairing electrical lines to a home, the company filed a cross-claim against the contractor to recover under an indemnity clause in their contract. After the company and the contractor settled plaintiff homeowner's claim, the trial court awarded judgment against the contractor. The appellate court reversed the judgment of the trial court, dismissed the power company's cross-claim and entered final judgment for the contractor. Held, inter alia, public policy forbids common carriers and other public service companies, including a power company, from directly or indirectly contracting against liability for breach of public duties through a contract of exemption or one of indemnification, and the power company was engaged in the performance of a public duty when it restored electrical service to the home; therefore, to the extent that the indemnity clause permitted evasion of liability to members of the public, the clause must be declared invalid. Richardson-Wayland Electric Corp. v. Virginia Electric & Power Co., 219 Va. 198, 247 S.E.2d 465, 467.

— June 1989:Case Citations July 1984 — June 1989:

**C.A.1,** 1985. Cit. in disc. Independent toy inventors sued a toy manufacturer, alleging misappropriation of ideas and technology, fraud, and breach of contract. The inventors had signed a disclosure agreement with the manufacturer and had given him a trade secret, the blueprint of an electronic game. The jury awarded damages to the inventors but the court overturned the verdict and entered judgment notwithstanding the verdict in favor of the manufacturer, holding that the disclosure agreement was legally dispositive of the misappropriations allegations. Reversing, this court held that the disclosure agreement was ambiguous and thus presented a question for the jury; the court reinstated the verdict. The court reasoned that, unless contractual language is clear, a party cannot exempt itself from liability for its own gross negligence or misrepresentations. The court also held that the formation of a confidential relationship imposes upon the disclosee the duty to maintain in the utmost secrecy the information received. Burten v. Milton Bradley Co., 763 F.2d 461, 465.

**C.A.6,** 1988. Cit. in sup. (Erron. cit. as Torts 2d.) Members of a religious commune were convicted by the trial court of willfully holding a minor to "involuntary servitude" after they beat the child to death for not doing his work. Affirming, this court held that the defendants were not immune from prosecution merely because they had the parents' consent to beat and otherwise punish the children of the commune. The court reasoned that a person could not consent by contract to suffer criminal wrongs or to allow a third person to harm their child. U.S. v. King, 840 F.2d 1276, 1283.

**S.D.Ill.**1986. Cit. in disc. A worker who was injured in a fall sued the owner of the premises for negligence in violating a state work safety statute. The owner sued the worker's employer, asserting that the employer was liable under the indemnity clause in their construction contract. This court dismissed the third-party claim against the employer, holding that both the state statute and common law prohibited indemnification for the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

property owner's own negligence. Stifle v. Marathon Petroleum Co., 644 F.Supp. 260, 262.

**D.Me.**1987. Subsec. (1) cit. in ftn. An employee of a cleaning company who was injured while cleaning a property owner's premises was then laid off by his employer. The property owner sued the cleaning company for indemnification after he was sued by the employee for negligence and tortious interference with his employment relationship. This court granted in part and denied in part the third-party defendant's motion for summary judgment, stating that because the cleaning contract did not entitle the property owner to indemnity for its intentional torts, it was not necessary for the court to decide whether the rule against clauses exempting a party from liability for that party's own intentional torts applied. Gatley v. United Parcel Service, Inc., 662 F.Supp. 200, 203.

**D.Me.**1987. Cit. in disc., com. (b) cit. in disc. A utility district sued a corporate customer for the costs of expanding its treatment facility and for the waste treatment costs it incurred after the customer stopped discharging waste to the facility. The customer sought contractual indemnification from the utility district for the costs of its activities on the customer's property. This court awarded the plaintiff the costs of expansion, but denied its claim for waste treatment costs. The court found for the customer on the indemnification agreement, holding that it was enforceable except to the extent that the customer sought indemnification for harm that it negligently, recklessly, willfully, or intentionally caused. The court further held that the customer was not entitled to indemnification for the costs of ground water monitoring because it had at least negligently caused the threat of ground water contamination at the landfill. Paris Utility Dist. v. A.C. Lawrence Leather Co., 665 F.Supp. 944, 959.

**W.D.Va.**1988. Subsec. (3) quot. in disc. A coal company that purchased a shaft used in a mine coal hoisting mechanism that failed sued the manufacturer of the shaft for consequential and punitive damages, alleging negligent or intentional failure to warn of a defect. The court granted the defendant's motion for summary judgment, holding that a limitations clause in the sales contract that excluded consequential and special damages was not void as to public policy for an intentional failure to warn. The court reasoned that the term was fairly bargained for between two parties with equal bargaining power and the contract concerned private business affairs, not a matter of interest to the public. Island Creek Coal Co. v. Lake Shore, Inc., 692 F.Supp. 629, 633, 634, judgment reversed 884 F.2d 1388 (4th Cir.1989).

**D.V.I.**1986. Subsec. (2)(a) quot. in sup. The plaintiff was hired by the defendant university as a support diver for a research project. After numerous dives, he allegedly suffered permanent injuries and he sued the defendant for maintenance of cure. The court held that the releases signed by the plaintiff were either void or inapplicable and denied the cross-motions for summary judgment. The court reasoned that, when a release is drawn by a defendant and the plaintiff passively accepts it, its terms will be strictly construed against the defendant. Further, the court reasoned that the terms exempting the university from liability to an employee for injury during his employment violated public policy and that courts were in general agreement that those terms would not be given effect. Etu v. Fairleigh Dickinson University West Indies, 635 F.Supp. 290, 295.

**E.D.Wis.**1986. Subsec. (1) quot. in case cit. in sup. A bank purchased several promissory notes and security agreements from another bank that were later defaulted on by the client. The purchasing bank sued the selling bank alleging that it had purchased the notes in reliance on the defendant's intentional and/or reckless misrepresentations. This court granted in part and denied in part the defendant's motion for summary judgment, holding, inter alia, that the disclaimer clause in the contract of sale did not excuse intentional or reckless action by the defendant because public policy would not permit its intentional and reckless wrongdoing to go unpun-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ished; for this reason, disclaimers of liability are ineffective against claims of fraudulent misrepresentation. Republicbank Dallas v. First Wis. Nat. Bank, 636 F.Supp. 1470, 1473.

**Alaska,** 1988. Cit. in sup. Purchasers under a state farm development program who failed to meet loan deadlines agreed to a stipulation that granted an extension but also waived "any and all defenses" against the seller's foreclosure action. When the extension deadline was not met, the seller withheld approved loans and moved for judgment on the stipulation. The trial court granted summary judgment for the seller. Reversing and remanding, this court held that "any and all defenses" was an ambiguous clause and was unenforceable against defenses arising after the stipulation because it did not distinguish between past and future defenses, and that there was sufficient evidence of frustration to preclude summary judgment. The court noted that the defendants had not expressly waived future defenses, and because such a waiver is disfavored, the court would not infer it. Wassink v. Hawkins, 763 P.2d 971, 975.

**Ariz.App.** 1987. Quot. in disc., com. (b) cit. in disc. A woman who was severely injured while watching an automobile race in an unprotected area sued the race track operator for negligence. The jury entered a general verdict for the defendant. Affirming, this court held that a release of liability form signed by the plaintiff was not invalid on public policy grounds where there was no employment relationship between the parties, the plaintiff was not a member of a protected class, and the defendant was not engaged in an activity affected with a public interest; moreover, the release was not unconscionable due to unequal bargaining power. Valley Nat. Bk. v. Stock Car Auto Racing, 153 Ariz. 374, 736 P.2d 1186, 1189.

**Cal.App.** 1986. Com. (a) cit. in disc. A bicyclist who was injured while participating in a race organized by a cycling federation sued the federation for negligence in the preparation and maintenance of the race course. The trial court granted the defendant's motion for summary judgment. This court affirmed the decision, stating that the trial court correctly found that the release form signed by the plaintiff was enforceable, since the situation complained of did not present a transaction affecting the public interest as defined by state law. Okura v. U.S. Cycling Federation, 186 Cal.App.3d 1462, 231 Cal.Rptr. 429, 431.

**Ill.App.** 1989. Cit. in sup. The administrator of the estate of a parachuting student brought a wrongful death action against the school after the student died during a jump. The trial court granted summary judgment for the school on the ground that the exculpatory clauses in a contract signed by the decedent released the school from liability. Affirming in part and reversing in part, this court held that the decedent was sufficiently knowledgeable of the danger of the activity to have expressly assumed the risk by signing the contract. The court, however, voided the clause exculpating the school from responsibility for the results of willful or wanton misconduct, reasoning that it was against public policy. Falkner v. Hinckley Parachute Center, 178 Ill.App.3d 597, 127 Ill.Dec. 859, 864, 533 N.E.2d 941, 946.

**Kan.** 1987. Cit. in sup. A homeowner sued an alarm service for damages that resulted from the failure of a fire alarm to warn of a fire. The trial court entered judgment on a jury verdict for the plaintiff on the ground that the defendant had violated the consumer protection act. Affirming, this court held that contractual limitations on liability for violations of the consumer protection act were valid only if they were fairly and knowingly entered into, and that such limitations were not favored and were therefore strictly construed. Corral v. Rollins Protective Services, 240 Kan. 678, 732 P.2d 1260, 1271.

**Mo.App.** 1984. Cit. but dist. A hospital employee claiming wrongful discharge brought an action for reinstatement. She was dismissed after she agreed to take a polygraph test but refused to sign a consent form stat-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing that she was acting voluntarily and waived all liability against the polygrapher and the hospital arising from the test. The hospital had required its employees to take the test as part of an investigation into the harassment of hospital supervisors. The trial court dismissed the action on appeal, this court affirmed, rejecting the employee's argument that the hospital's conduct constituted an exception to the "employment at will" doctrine in that it violated public policy. Ising v. Barnes Hospital, 674 S.W.2d 623, 625.

**N.Y.Sup.Ct.**1984. Cit. in case quot. in disc. The plaintiff sought to recover for extra work caused by the defendant's alleged gross negligence in supervising security and coordinating the progress of work in a municipal construction project. The defendant moved for summary judgment, based on an exculpatory clause in the contract. This court denied summary judgment, holding that an exculpatory clause that limits liability for grossly negligent acts is contrary to public policy. The court noted that there were sufficient issues of fact that, if proved, would demonstrate the defendant's gross negligence. Novak & Co. v. New York City Housing Auth., 125 Misc.2d 647, 480 N.Y.S.2d 403, 408.

**Pa.Super.**1984. Subsec. (2)(b) quot. in sup. in conc. op. The plaintiffs sued the local water company for negligently failing to supply sufficient amounts of water to fight a fire that damaged their businesses. The trial court found for the plaintiffs. This court reversed because the trial court erred when it admitted hearsay evidence. A concurring opinion stated that the defendant's tariff violated public policy because of a clause absolving the utility from all liability in the event of a loss of water pressure. The opinion also concluded that, since the plaintiffs' case was not based on the theory of res ipsa loquitur, the trial court properly refused to give a res ipsa loquitur instruction. DeFrancesco v. Western Pennsylvania Water, 329 Pa.Super. 508, 478 A.2d 1295, 1306.

**Tenn.**1985. Cit. in disc. A motorcyclist sued the operator of a motorcycle dragway for damages for personal injuries resulting from the allegedly negligent operation of the dragway. After the trial court entered summary judgment in favor of the operator, the intermediate appellate court affirmed. Reversing, this court held that a genuine issue of material fact existed as to whether the track operators' actions amounted to gross negligence so as to negate the effect of a release and waiver signed by the motorcyclist. Adams v. Roark, 686 S.W.2d 73, 75.

**Tenn.**1988. Cit. in sup. After their home was burglarized, homeowners sued the security alarm company that had installed several security features in their home, claiming, inter alia, intentional fraud and intentional and negligent misrepresentation. The trial court entered judgment on a jury verdict for the plaintiffs. The intermediate appellate court held, inter alia, that the defendant made negligent misrepresentations that rendered the contractual limitations against liability inapplicable and reversed and remanded for a new trial limited to the question of damages only. Reversing and remanding, this court held that, since there was insufficient evidence as to the plaintiffs' claims of intentional fraud and misrepresentation, the parties were bound by the contractual limitations against liability. The court stated that in the absence of fraud or overreaching, limitations against liability have generally been upheld. Houghland v. Security Alarms & Services, 755 S.W.2d 769, 773.

**Tex.App.**1986. Quot. in sup. The plaintiff sued a race track, alleging negligence and gross negligence for injuries he sustained while in the pit area of the race track. Before he was permitted to enter the pit area the plaintiff had to sign a release exempting the race track from liability. The lower court granted summary judgment for the race track based on this release. This court affirmed in part and reversed and remanded in part, holding, inter alia, that while the release exempted the race track for its negligence, the release did not exempt the race track for its gross negligence, as such a release would be against public policy. This court remanded

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

this issue of gross negligence for trial. Smith v. Golden Triangle Raceway, 708 S.W.2d 574, 576.

**Wash.**1988. Cit. in ftn. Students and their parents sought to enjoin the school district from requiring them to sign standardized release forms as a condition to participation in interscholastic athletics. The trial court granted the plaintiffs' motion for summary judgment on the grounds that the release forms were unconscionable adhesion contracts and the attempt to limit liability was void as against public policy; the court permanently enjoined the school district from requiring the students to sign the forms. Affirming in part and reversing in part, this court held that the exculpatory releases from any future school district negligence were invalid because they violated public policy. The court reasoned that public policy concerns outweighed traditional regard for freedom to contract because sports are part of scholastic activity, extensively regulated, and open to all students, but they are also competitively monopolistic due to a lack of alternative organized competition, and subject to the carelessness of coaches or others; therefore the release forms violated public policy because they offered no alternative ways for students to participate. Wagenblast v. Odessa Sch. No. 105-157-166J, 110 Wash.2d 845, 758 P.2d 968, 970.

**Wis.App.**1988. Quot. in case cit. in disc. A motorcycle racer sued the sponsors of a race for injuries sustained when he fell from his motorcycle during a practice run. He alleged that sponsoring a race on a dangerous track constituted gross negligence and willful and reckless disregard of his rights, defeating the releases that the sponsors had him sign. The releases provided that in entering the race, he was relying on his own inspection, skill, judgment, and ability, and not on any safety precautions taken by the sponsors. The trial court granted the sponsors summary judgment. This court affirmed, holding that the releases were not the types of exculpatory contracts that courts have voided on public policy grounds since the claim arose out of an occurrence within the contemplation of the parties at the time of execution. Trainor v. Aztalan Cycle Club, Inc., 147 Wis.2d 107, 432 N.W.2d 626, 629, 630, review denied 147 Wis.2d 889, 436 N.W.2d 30 (1988).

— June 1991:Case Citations July 1989 — June 1991:

**C.A.5,** 1990. Com. (b) cit. in disc. A ship owner sued several parties when a loading arm fell from a grain elevator tower and damaged its ship. The district court held that the voyage charterers, the owner-operator of the grain elevator, and the designer of the structure were liable. Affirming in part, reversing in part, and remanding, this court held the designer and owner-operator liable for negligence and apportioned damages between them, though the damages were to be recalculated and prejudgement interest awarded on remand. However, the charterers were held not liable on the basis of a "safe berth" clause in the absence of negligence. The court also determined that an inconspicuous exculpatory clause predicated on the elevator owner-operator's dock tariff did not relieve the operator of liability. It stated that a berth application signed by the shipowner's agent did not incorporate by reference the indemnity provision because it did not identify by either date or number the specific dock tariff that purported to exculpate the operator from its own negligence. Orduna S.A. v. Zen-Noh Grain Corp., 913 F.2d 1149, 1153.

**D.N.J.**1989. Cit. in disc. The co-owners of a nuclear power plant sued its operating owner for breach of contract, inter alia, arising from the shutdown of the Pennsylvania power plant. This court denied the operator's motion to dismiss the tort claims; however, it granted the motion to dismiss the fraud claim for lack of particularity, with leave to amend. The court determined, in part, that the claim that the operator did not sufficiently perform its contractual duties was essentially a contract claim, where the co-owners alleged that they did not receive the benefit of their bargain. However, it subsequently determined that Pennsylvania law could

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

subject the defendant to tort liability for improperly performing its contractual duties. The court refused to excuse the defendant's wilful violations of safety regulations and intentionally tortious behavior on the basis of an exculpatory clause in the contract between the parties. It noted that exculpatory clauses are construed strictly, and are void if they conflict with public policy. Public Service Ent. Group v. Philadelphia Elec., 722 F.Supp. 184, 211.

**N.Y.Sup.Ct.**1989. Cit. but dist. (Erron. cit. as Restatement of Contracts.) A dental patient who took advantage of a dental school clinic's lower-priced services signed a standard form waiver releasing the clinic from liability arising out of treatment by its students. The patient sued the clinic and its students for dental malpractice, claiming that the release form was not intended to relieve the defendants from responsibility for their negligent acts, and that to give the release such effect would be against public policy. This court denied the defendants' motion for summary judgment and awarded the plaintiff partial summary judgment dismissing the defendants' affirmative defense based on the release form. It held that the release could not survive close scrutiny because its terms did not state clearly that behavior involving negligence or fault was exempted from suit. The court noted that while exculpatory contracts are void where they bar suits against willful or gross negligence, they may generally be enforced where the claim sought to be foreclosed is grounded in ordinary negligence, but only after being subjected to intense judicial scrutiny. DeVito v. N.Y.U. College of Dentistry, 145 Misc.2d 144, 544 N.Y.S.2d 109, 110.

**Wis.App.**1990. Quot. in case quot. in sup., com. (a) cit. in sup. The wife of a water skier who was killed at a water-ski show sued the driver of the following boat, as well as other participants in the show and their insurers, for reckless conduct resulting in her husband's death, inter alia. The defendants moved for summary judgment on the ground that the decedent signed a release that barred the plaintiff's claims. The trial court denied the defendants' motion. Affirming in part, reversing in part, and remanding, this court held as a matter of law that the release did not bar the plaintiff's reckless conduct claim and that the issue of whether the driver of the following boat acted recklessly was for the jury to decide. Dobratz v. Thomson, 155 Wis.2d 307, 455 N.W.2d 639, 645, 646.

— June 1996:Case Citations July 1991 — June 1996:

**C.A.3,** 1995. Subsec. (2)(b) quot. in sup., cit. in case cit. in sup., cit. in headnote, and cit. generally in ftn. An architectural firm and a real estate developer entered into a contract that contained a limitation of liability clause. District court granted developer partial summary judgment, holding that the disputed clause was part of the contract but that it violated public policy and was therefore unenforceable. This court reversed and dismissed for lack of jurisdiction, holding, inter alia, that the disputed clause was not contrary to the Pennsylvania statute's specific public policy prohibiting architects from entering into hold-harmless clauses. The court stated that statute applied to contracts between architects and owners, not architects and developers. Further, the statute did not charge firm with any generalized duty to the public that could elevate its private contracts to matters of public concern. Valhal Corp. v. Sullivan Associates, Inc., 44 F.3d 195, 197, 201, 206, rehearing denied 48 F.3d 760 (3d Cir.1995).

**N.D.Ill.**1994. Quot. in case quot. in sup., cit. in disc. Funny-car driver whose vehicle collided with a van parked on a racetrack and was damaged in the ensuing fire sued the racetrack owner for damages, alleging that defendant failed to equip the racetrack facility with an adequate fire extinguishing system. The court granted in part and denied in part defendant's motion for summary judgment, holding that the release plaintiff ex-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ecuted prior to driving his car on the track, discharging defendant from all potential negligence liability, was
enforceable as a matter of law and barred plaintiff's negligence claim but did not prevent plaintiff from main-
taining his claims for breach of contract, misrepresentation, and fraud. Cadek v. Great Lakes Dragaway, Inc.,
843 F.Supp. 420, 422, 423.

**D.Kan.**1995. Cit. in headnote, subsec. (1) cit. in sup. Race car driver who was severely burned when his car
caught fire during practice lap sued race track owner, among others, alleging defendants' negligence, gross
negligence, and reckless and wanton conduct. Both parties moved for summary judgment; defendants conten-
ded that the release plaintiff signed absolved them from liability while plaintiff insisted the release was void
as against public policy. Granting in part and denying in part the motions, the court held that the release was
void to the extent it purported to relieve defendants of liability beyond ordinary negligence, but that the re-
mainder of the document was enforceable. The court explained that the invalidity of certain terms did not
render the entire release unenforceable. Wolfgang v. Mid-American Motorsports, Inc., 898 F.Supp. 783, 784,
788.

**M.D.Tenn.Bkrtcy.Ct.**1995. Adopted in case cit. in sup. Creditor filed nondischargeability petition against
partnership based on one partner's alleged misrepresentations. This court dismissed silent partner on the
ground that one partner's fraud could not be imputed to the other for purposes of 11 U.S.C. § 523(a)(2)(A) and
held the other partner liable. The intermediate appellate court reversed as to silent partner, and, on remand,
creditor moved for summary judgment as to the damages it claimed from him, offering an accounting in the
amount of $5 million. The court granted creditor's motion, but held that silent partner was entitled to present
defenses to the imputation of his partner's wrongdoing. It rejected silent partner's argument that liability was
necessarily limited to his $1.1 million personal guaranty, explaining that he could not limit his tort liability for
harm caused by his intentional or reckless misconduct. In re Sikes, 184 B.R. 742, 747.

**D.Vt.**1994. Subsec. (2)(b) cit. in headnote and cit. in case cit. in disc. Skier who sustained injuries when she
fell while skiing and her ski bindings did not release sued ski resort for the negligence of its employees in
fastening and adjusting her rented ski boots. Granting defendant's motion for summary judgment, the court
held, inter alia, that plaintiff was bound by the terms of a release she signed, since the release clearly and un-
ambiguously demonstrated an intent to absolve defendant of liability for plaintiff's injuries and a ski resort
was not the type of public service that would justify application of public policy to relieve plaintiff of the
terms of the release. Szczotka v. Snowridge, Inc., 869 F.Supp. 247, 248, 250.

**Cal.App.**1993. Subsec. (3) cit. but dist. After a man's wife died in a two-car automobile accident, the man
settled with the driver of the other car and signed a release form releasing "all other persons, firms, and cor-
porations." Subsequently, the man retained a new attorney and filed a wrongful death and products liability
claim against the manufacturer of the wife's car. Trial court denied summary judgment to manufacturer, hold-
ing that the general release form did not release the manufacturer because the form did not specifically identi-
fy the manufacturer. This court granted manufacturer's petition for writ of mandamus directing the trial court
to set aside its order, holding that the general release operated to release the manufacturer even though manu-
facturer was not specifically named. The court noted that the release at issue was not against public policy be-
cause it did not involve a contract term that exempted a seller of a product from liability for harm to a user or
consumer. GMC v. Superior Court (Ticich), 12 Cal.App.4th 435, 15 Cal.Rptr.2d 622, 628.

**Ill.**1994. Com. (b) cit. in sup. Employee sued employer for retaliatory discharge after he was fired as a res-
ult of his filing for workers' compensation. Employer thereafter sought a declaratory judgment that its three

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

insurers were required to defend and indemnify it against the retaliatory discharge action. The trial court granted insurers summary judgment, finding no insurance coverage and, therefore, no duty to defend. Intermediate appellate court reversed in part, holding that one insurer's policy potentially covered the tort of retaliatory discharge. Affirming, this court held that insurer breached its duty to defend because the retaliatory discharge action potentially fell within the policy's coverage. The court determined that interpreting the policy as providing coverage against retaliatory discharge claims did not violate any established public policy of Illinois, since it was permissible to provide insurance coverage against liability for injuries resulting from intentional acts. Dixon Distributing v. Hanover Ins., 161 Ill.2d 433, 204 Ill.Dec. 171, 177, 641 N.E.2d 395, 401.

**Md.**1994. Subsec. (1) cit. in sup., com. (a) quot. in sup. An investor who had suffered substantial losses sued her stockbroker and his investment firm, who invoked an exculpatory clause in the parties' investment contract in defense. This court affirmed the trial court's grant of defendants' motion for summary judgment, holding that the exculpatory clause, which exonerated the broker and firm from "any liability" for losses sustained in trading in securities except those losses that resulted from gross negligence or willful misconduct on the part of the broker or the firm, was valid and enforceable. There was no evidence of fraud, willful misconduct, or gross negligence in this case, as investor conceded that stockbroker never lied to her or made any misrepresentations to her. Wolf v. Ford, 335 Md. 525, 531, 644 A.2d 522, 525.

**Mo.App.**1991. Com. (a) cit. but dist. Alleging trespass on leased farmland that destroyed a significant portion of his wheat crop, a tenant sued his landlord for actual and punitive damages. The trial court entered judgment on a jury verdict for the tenant. Reversing and remanding, this court held, inter alia, that the lease limited the tenant's right to sue the landlord to an action for contractual damages only. The court stated that because the tenant knew what damage the landlord had caused and had decided on the cost of destroyed crops as an appropriate liability for the landlord, this contractual limitation in the lease exempting the landlord from tort liability should not be voided as against public policy. Davis v. Jefferson Sav. & Loan Ass'n, 820 S.W.2d 549, 554.

**N.M.App.**1992. Subsec. (1) cit. in sup. Polygraph examinee who was fired as a result of the test results sued the polygraph examiner's employer, among others, for compensatory and punitive damages on the ground that the test was conducted improperly and that defendant knew this and refused to contact plaintiff's employer to retract the results. Affirming in part the trial court's judgment for plaintiff, this court held that the release plaintiff signed was invalid because it released defendant from liability for willful or reckless misconduct. The court also stated that, because defendant's ratification of the examiner's negligence by refusing to retract the test results was in wanton disregard of plaintiff's interest, defendant could not rely on the release even if the examiner's error was only simple negligence. Conant v. Rodriguez, 113 N.M. 513, 828 P.2d 425, 428.

**N.Y.**1992. Subsec. (1) cit. in sup. Skyscraper owner and tenants sued fire alarm company and others for over $7 million in damages after a dispatcher, mistakenly believing the building's system to be out of service, failed to report fire signals to the fire department. The trial court dismissed all claims based on exculpatory clauses in the alarm company's contract with the building owner; the appellate division reversed. Modifying and affirming the appellate division's judgment, this court held that, while the exculpatory clauses were enforceable against claims of ordinary negligence, they could not restrict the alarm company's liability for grossly negligent or reckless conduct, and whether the company's conduct rose to the level of simple mistake or reckless indifference was a jury question. Sommer v. Federal Signal Corp., 79 N.Y.2d 540, 583 N.Y.S.2d 957, 962, 593 N.E.2d 1365, 1371.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**N.Y.**1994. Subsec. (1) quot. in sup. Software buyer sued seller after seller discontinued performance under contract containing "willful acts" exception to provision limiting defendant's liability for consequential damages. This court affirmed the appellate division's reduction of the trial court's entry of judgment on jury verdict for plaintiff, noting that, although the appellate division wrongly held that tort law principles always applied in interpreting term "willful acts," contract law led to same result. It said that plaintiff's proof that defendant's repudiation was motivated exclusively by economic self-interest in divesting itself of highly unprofitable business to promote sale of its software division to competitor was insufficient to establish that it willfully intended harm, and that consequential damages resulting from such nonperformance were risk plaintiff assumed. Metropolitan Life Ins. v. Noble Lowndes Intern., 84 N.Y.2d 430, 439, 618 N.Y.S.2d 882, 887, 643 N.E.2d 504, 509.

**Ohio App.**1989. Cit. in disc. After the plaintiff's decedent drowned during a canoeing trip sponsored by the defendant ski club, the plaintiff brought a wrongful death action charging negligence and failure to warn. The trial court granted the defendant summary judgment on the ground that the decedent had assumed the risk of the accident. Affirming, this court held that the plaintiff's claim was barred by the decedent's signing of a valid and enforceable indemnity contract that absolved the ski club of liability. Finkler v. Toledo Ski Club, 63 Ohio App.3d 11, 577 N.E.2d 1114, 1116, 1117.

**Or.App.**1993. Cit. in diss. op., subsec. (3) cit. and quot. in diss. op., com. (c) cit. and quot. in diss. op. A house painter sued the company that rented him scaffolding after the scaffolding tipped over and he was injured. This court, reversing summary judgment for the rental company and remanding, held that disclaimers on the front and back of the rental contract were inconspicuous as a matter of law, so that they did not preclude the painter from recovering. The disclaimers were in small type and the impact of a boldface caption, "Warranty Disclaimer," was minimized by adjacent captions printed in bold red capital letters. The dissent argued that the disclaimers were conspicuous and should have been given effect. It also asserted that, despite the strong public policy concerns underlying strict liability, such as protecting consumers, the unambiguous limitation of liability clause effectively disclaimed defendant's strict liability in tort. Anderson v. Ashland Rental, Inc., 122 Or.App. 508, 514, 515, 516, 858 P.2d 470, 473, 474.

**Or.App.**1993. Subsec. (2)(a) cit. in disc. County employee injured when struck by a dragster while working at a county facility where drag races were being held sued driver and association that sponsored the event. Affirming the trial court's granting of summary judgment for defendants, this court held that county's requirement that employee sign a release and waiver in order to continue his employment did not place employee at such an unfair disadvantage as to violate public policy. The court noted that employee's job at the drag strip was not his primary means of livelihood and that he apparently chose to work there because he was an avid racing hobbyist. Finch v. Andrews, 124 Or.App. 558, 560, 863 P.2d 496, 497.

**Pa.**1993. Coms. (a) and (b) cit. in ftn. to diss. op. Commercial lessees who leased the first floor of lessor's multi-story building sued lessor for water damages sustained to its stored inventory, after a toilet located in a second-floor apartment developed a leak. Lessees alleged several claims including breach of implied warranty for commercial premises and negligence. Trial court granted summary judgment to lessor, determining that an exculpatory clause in the lease prevented any action against lessor on account of water damage caused by any broken plumbing fixture. Appellate court reversed, holding that exculpatory clause was not specific enough to immunize lessor from liability for negligence. Reversing and reinstating trial court's order, this court held that exculpatory clause was valid and enforceable because lessees' waiver of lessor's responsibility for losses resulting from negligence was plainly expressed. Dissent argued that clause's language reliev-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing lessor of "any and all liability" were words of general import and were not broad enough to cover liability for negligence. Topp Copy Products, Inc. v. Singletary, 533 Pa. 468, 626 A.2d 98, 102.

**Pa.Super.**1991. Coms. (a) and (b) cit. in disc. A commercial tenant sued its landlord for property damage caused by water leaking from broken plumbing on the floor above, basing its claim on breach of implied warranty of habitability and negligence. The trial court granted the defendant summary judgment, finding that an exculpatory clause in the lease stated that the plaintiff released the defendant from "any and all liability" for water damage. Reversing and remanding for further proceedings, this court held that an exculpatory clause immunizing a landlord from liability for his own negligence must not be enforced absent unequivocal language showing the parties' intent; because the clause at issue used only words of general import, it could not be construed to immunize the defendant from liability due to the defendant's own negligence. The court never addressed the plaintiff's argument for recognizing an implied warranty of habitability in commercial leases. Topp Copy Products Inc. v. Singletary, 404 Pa.Super. 459, 591 A.2d 298, 301, reversed 533 Pa. 468, 626 A.2d 98 (1993). See above case.

**S.D.**1994. Cit. in spec. conc. op., subsec. (2)(b) quot. in spec. conc. op. Injured softball player brought an action for negligence against softball association and city that leased field to association for the purpose of operating a city softball league. Reversing the trial court's grant of summary judgment for defendants and remanding, this court held, inter alia, that a genuine issue of material fact existed as to whether plaintiff was aware she was signing a release and releasing defendants from liability for injuries she sustained as a result of her participation in the softball activity. The specially concurring opinion argued that an anticipatory exculpatory agreement releasing a city of all liability for negligence in the maintenance of public athletic fields should be unenforceable on public policy grounds. Johnson v. Rapid City Softball Ass'n, 514 N.W.2d 693, 702, 703.

**Tex.App.**1992. Quot. but dist. City police department fired officer from her job but agreed to limit future employer's access to information concerning her performance. At new job interview, officer signed a release allowing potential employer to access any past records. City provided all records of her performance, and officer sued city for defamation. The trial court awarded plaintiff damages, but this court reversed and rendered judgment that plaintiff take nothing, holding that release constituted consent to publication of potentially defamatory matters. It noted that city provided employment related information only, as described in the release. The court distinguished a case holding that a racetrack spectator could not waive right to sue for damages caused by gross negligence. Smith v. Holley, 827 S.W.2d 433, 438.

**Tex.App.**1994. Cit. in case quot. in sup., cit. in case quot. in conc. and diss. op. After a woman died while taking a scuba certification course, her family sued the diving instruction company and its president for wrongful death. Prior to taking the first class, the woman had signed an affirmation and liability release. Trial court granted defendants summary judgment. Affirming in part, reversing in part, and remanding, this court held, inter alia, that defendants satisfied their burden of proving that the preinjury release absolved them from liability resulting from their negligence, and that in this case negligence and gross negligence were not separable. Concurring and dissenting opinion argued that the release signed by the woman did not waive gross negligence. Newman v. Tropical Visions, Inc., 891 S.W.2d 713, 720-721, 723.

**Wash.**1996. Cit. and quot. in conc. op., subsec. (1) cit. in ftn. to conc. op. Participant in high-altitude breathing research expedition to Nepal sued expedition leader for, inter alia, negligence, alleging that she sustained permanent brain damage as a result of defendant's failure to have her descend once she began showing symptoms of altitude sickness. The trial court granted defendant's motion for summary judgment, concluding

that plaintiff's signed preinjury release form precluded a negligence claim. The intermediate appellate court affirmed, finding that the project was essentially a trek and the breathing experiment was merely incidental. Reversing and remanding, this court held that preinjury releases in the context of medical experimentation were unenforceable as against public policy, and that material factual issues existed as to whether this project was primarily recreational or for purposes of medical research. Concurrence believed that a preinjury release form was enforceable if the bargaining process was fair and the substance of the agreement, as judged by the standards set forth in s 195 of the Restatement (Second) of Contracts, consistent with public policy. Vodopest v. MacGregor, 128 Wash.2d 840, 913 P.2d 779, 792, 793.

**W.Va.**1991. Subsec. (1) and Rptr's Note cit. in ftn., subsecs. (2)(b) and (2)(c) and com. (a) cit. in disc. A woman who was injured while participating in a commercial whitewater rafting expedition sued the licensed whitewater outfitter operating the raft, alleging negligence and recklessness. The trial court awarded the defendant summary judgment, holding that the plaintiff's action was barred by an exculpatory release she signed before the accident, relieving the defendant of all tort liability. Reversing and remanding, this court held that an issue of fact existed as to whether the defendant's raft guide had failed to conform to a statutorily mandated standard of care. The court stated that the exculpatory clause should not be construed to exempt the defendant from liability for reckless behavior. Murphy v. North American River Runners, 186 W.Va. 310, 412 S.E.2d 504, 509, 510.

**W.Va.**1994. Subsecs. (2)(b)-(2)(c) cit. in case quot. in sup. University student injured while playing rugby sued university, among others, for his injuries. Reversing and remanding the trial court's granting of defendants' motion for summary judgment, this court held that, when university provided recreational activities to its students, it fulfilled its educational mission and performed public service; therefore, release signed by plaintiff violated public interest when university had decisive bargaining strength over plaintiff, since plaintiff had no choice but to sign it if he wished to play university rugby. Kyriazis v. University of West Virginia, 192 W.Va. 60, 450 S.E.2d 649, 654.

**Wis.**1991. Quot. in disc., cit. in case cit. in disc. The widow of a participant killed during a water ski show sued the ski club and other club members for negligence and the wrongful death of her husband. In motions for summary judgment, the defendants asserted that the participant signed an exculpatory contract that released them from liability, and the plaintiff asserted that the exculpatory contract was invalid on public policy grounds. The trial court denied both motions. The intermediate appellate court reversed in part, holding that the exculpatory contract was enforceable and not contrary to public policy. Reversing the appellate court decision and remanding, this court held that, although the contract was not void on public policy grounds, it was unenforceable because of vagueness and ambiguity regarding the event to which the contract pertained. In its public policy analysis, the court noted that none of the pertinent situations listed in this Restatement section were present in this case. Dobratz v. Thomson, 161 Wis.2d 502, 468 N.W.2d 654, 658-659, 660.

**Wis.**1994. Cit. in diss. op., com. (b) cit. in diss. op. Truck driver's wife sued his employer after she was injured in an accident while riding in the truck as a passenger. Intermediate appellate court affirmed trial court's entry of summary judgment for employer. This court reversed and remanded, holding that an exculpatory contract between wife and employer waiving employer's liability toward passengers in the company truck was void as being against public policy. A dissent argued that the release served acceptably identified purposes, was not overbroad, and was not void simply because it was standardized and offered to wife on a take-it-or-leave-it basis. Dissent stated that there was no authority that a standardized form was inherently or even presumptively invalid, and that there were no cases cited suggesting that the mere fact that the parties to a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

contract possess unequal bargaining strength means that no exculpatory clauses or releases are permissible. Richards v. Richards, 181 Wis.2d 1007, 513 N.W.2d 118, 129, 130.

**Wis.App.**1993. Quot. in part in sup., subsec. (2)(c) cit. in sup. and quot. in ftn. in sup., subsec. (3) cit. in sup. A volunteer flagging and communications crew worker at a racetrack sued the driver, driver's pit crew, track owner, racing clubs, and the manufacturer and distributor of the race car that went out of control and struck and injured her, asserting various claims despite having signed a standard form exculpatory contract before she was injured. Affirming the trial court's dismissal, this court held, inter alia, that, as the worker did not receive wages or monetary gain, she was not a common-law employee entitled to void the release as being against the public policy of not exempting employers from liability for injuries to employees in the course of their employment. Further, said the court, she was not an employee or frequenter entitled to protection under the safe place statute. Kellar v. Lloyd, 180 Wis.2d 162, 509 N.W.2d 87, 93, 94.

**Wis.App.**1995. Cit. in disc., cit. in ftn., cit. generally in ftn., subsec. (2)(c) cit. in disc. and in ftn., com. (a) quot. in sup. Parents of young skier who was killed when she collided with the concrete base of a ski lift tower brought wrongful death action against ski resort. Resort moved for summary judgment, citing an exculpatory clause relieving it from liability for damages associated with certain inherent risks in skiing and contained in the season pass signed by decedent's father. The trial court granted the motion and this court affirmed, holding that the exculpatory clause did not violate public policy by directly contravening Wisconsin's safe-place statute because, even if the statute applied, resort clearly bargained for an exclusion. The court explained that in exchange for a discount on their skiing, plaintiffs gave up the right to bring claims arising out of accidents such as the one that occurred here; consideration for the deal was sufficient, and there was no overreaching by resort. Yauger v. Skiing Enterprises, Inc., 196 Wis.2d 485, 538 N.W.2d 834, 837, 838.

— June 2001:Case Citations July 1996 — June 2001:

**D.Conn.**1997. Cit. in headnote, com. (b) cit. in disc., cit. in case cit. in disc. Furrier lost 66 furs when thieves entered an adjacent abandoned building and broke through the common wall separating the two premises; furrier's subrogee brought breach of contract and negligent misrepresentation action against alarm company that installed furrier's security system. Subrogee also sued furrier's landlord for negligence, alleging that landlord did not properly secure the adjoining vacant building. Company and landlord moved for summary judgment. Granting company's motion and denying that of landlord, the court held that, while an exculpatory clause in company's alarm system contract was enforceable, a similar provision in furrier's lease with landlord was invalid to the extent it could be read as an attempt by landlord to exempt itself from liability for gross negligence, recklessness, or intentional conduct. The court disagreed with a magistrate judge's determination that material factual issues existed as to whether company negligently misrepresented that infrared detectors would activate if furs were removed from their bins, and, if so, whether the exculpatory clause was voided as a result. Western Alliance v. Wells Fargo Alarm Services, 965 F.Supp. 271, 271, 279.

**S.D.Ohio,** 1997. Cit. in headnote, cit. in disc. A patentee brought, in part, an action for breach of contract against an automobile manufacturer, alleging that defendant's wrongful use of plaintiff's intellectual property in the design and development of an integrated child safety seat built into defendant's vehicles breached the terms of the parties' disclosure agreement. Granting defendant's motion for summary judgment, the court held, inter alia, that the agreement limited plaintiff's claims against defendant to those resulting from patent, copyright, or trademark infringement. The court noted that, while the agreement contained exculpatory language

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

that was not necessarily favored in the law, it protected any valid patent, copyright, or trademark held by plaintiff. Hassell v. Chrysler Corp., 982 F.Supp. 515, 516, 528.

**W.D.Wis.**1998. Cit. in headnote, com. (1) cit. in case cit. in disc. Participant in tractor pull brought personal injury action against organization that sanctioned an event at which he was hurt. Entering summary judgment for defendant, the court held, in part, that an exculpatory contract signed by plaintiff was valid and enforceable, and that, even if the court were to accept and follow the rule that exculpatory contracts did not absolve reckless conduct, plaintiff had failed to set forth any evidence tending to show that defendant acted in a manner so unreasonably dangerous that it knew or should have known that harm was highly probable. Rose v. National Tractor Pullers Ass'n, Inc., 33 F.Supp.2d 757, 758, 766.

**Conn.App.**1998. Com. (b) cit. in case quot. in sup. After plaintiffs discovered that the house they had purchased was infested with termites, they sued home inspection company for negligent performance of a prepurchase property inspection contract. The trial court entered judgment for plaintiffs and awarded them damages. Affirming, this court held, inter alia, that a contractual clause limiting defendant's damages to the amount of the inspection fee was not an enforceable disclaimer of liability for negligence. The court said that the law did not favor contract provisions relieving a person from his own negligence. Mattegat v. Klopfenstein, 50 Conn.App. 97, 103, 717 A.2d 276, 280.

**Hawaii,** 2001. Com. (a) cit. generally in ftn. Limited partners, as investors in limited partnerships that were purportedly formed to purchase and develop a parcel of land, sued general partners for breach of contract, fraud, and deceptive trade practices. Trial court granted general partners summary judgment and assessed sanctions against limited partners' attorney. This court vacated and remanded, holding, inter alia, that to the extent that plaintiffs' limited-partnership agreements were tainted by fraud, general partners could not rely on the exculpatory clause contained therein. Insofar as exculpatory clause purported to relieve general partners from vicarious liability, it conflicted with the Uniform Partnership Act, and the statute took precedence over the contract terms. Fujimoto v. Au, 95 Hawai'i 116, 19 P.3d 699, 738.

**Md.**1996. Subsec. (1) cit. in case cit. in disc. Sellers allowed their realtor to place a lock-box containing a key to their house on their home in order to facilitate its showing; they sought damages from realtor after a thief called realtor's office, obtained the combination to the lock-box, entered sellers' home, and removed $40,000 worth of jewelry. The trial court entered judgment on a jury verdict for sellers, but the intermediate appellate court reversed, having determined that an exculpatory clause in the parties' lock-box authorization was valid and enforceable. Reversing and remanding, this court held that, while exculpatory clauses were generally enforceable, the evidence here did not indicate that sellers intended to release realtor from liability for damages stemming from his own negligence. Adloo v. H.T. Brown, 344 Md. 254, 686 A.2d 298, 301.

**Mass.App.**1997. Quot. in ftn., coms. (a) and (b) cit. in disc. A participant in a motorcycle dirt bike race sued the race track owner, alleging negligence in failing to provide suitable flag holders to protect the participants from accidents and gross negligence in providing incompetent minor children to act as flagmen. Trial court granted defendant summary judgment, holding that plaintiff would not be able to prove that defendant was grossly negligent. This court affirmed in part, reversed in part, and remanded, holding, inter alia, that a released signed by plaintiff as a condition of participating in the race did not exempt defendant from liability for grossly negligent conduct. Zavras v. Capeway Rovers Motorcycle Club, 44 Mass.App.Ct. 17, 687 N.E.2d 1263, 1265.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**N.D.** 1999. Cit. in disc. Member of university hockey team sustained kidney and liver damage as a result of the severe dehydration he suffered while participating in a preseason conditioning road race; he sued university and race sponsor for, inter alia, negligence and concert of action. The trial court dismissed the complaint. Affirming, this court held, in part, that the release plaintiff signed, which purported to exonerate sponsor from liability for injuries incurred by runners, was not against public policy for lack of equal bargaining power, and that plaintiff's "concert of action" claim failed because there was no evidence that defendants worked together to organize and supervise hockey team's participation in the race, or of a common design or plan. Reed v. University of North Dakota, 1999 ND 25, 589 N.W.2d 880, 887.

**Or.App.** 1997. Subsec. (1) quot. in ftn. A holder of a season pass at a ski resort brought a negligence action against the limited partnership that owned the resort and its general partner to recover damages for injuries she allegedly sustained while attempting to board a chair lift. Affirming the trial court's grant of summary judgment for defendants, this court held, inter alia, that enforcement against plaintiff of the release provisions of the season pass application in the circumstances of this case would not offend Oregon's public policy, despite plaintiff's contention that the provisions impermissibly attempted to relieve defendants of liability for more than ordinary negligence. The court said that a party seeking to avoid contractual responsibility must show that enforcement of the contractual provision, as applied to him or her, would offend public policy, regardless of whether enforcement of the same provision against other parties in other circumstances would violate public policy. Harmon v. Mt. Hood Meadows, Ltd., 146 Or.App. 215, 222, 932 P.2d 92, 96.

**Tex.App.** 1999. Cit. in disc. After being rejected as unqualified for project to improve municipal high school, lowest bidder brought tort action against architectural firm that served as school district's agent. Specifically, plaintiff alleged tortious interference with business relations, negligence, business disparagement, and defamation. The trial court entered summary judgment for defendant. Affirming, this court held that, when it submitted its bid form, plaintiff simultaneously executed a waiver releasing both district and defendant from liability for existing and future claims; that the waiver was valid and did not offend public policy; and that plaintiff's participation in the bidding process effectively served as consent. Sedona Contracting v. Ford, Powell & Carson, 995 S.W.2d 192, 196, 199.

**Utah,** 1996. Cit. in headnotes, subsec. (3) quot. in part in disc., com. (b) cit. in disc. Owner of wastewater treatment facility withheld payment from its contractor when a fiberglass storage tank became overfilled and burst. Contractor then sued the subcontractor responsible for retaining the company that supplied the tank, subcontractor filed a third-party complaint against tank supplier, and supplier filed a third-party complaint against owner. Owner counterclaimed against all three plaintiffs, alleging, inter alia, breach of contract and negligence. The trial court determined that the case was controlled entirely by the contract, ordered owner to make the required payment, and entered judgment accordingly. The intermediate appellate court affirmed. Affirming, this court held, in part, that, to the extent owner's tort claims alleged strict liability and breach of a duty, independent of the construction contract, to provide services, they were not precluded by the existence of the contract, but that owner failed to prove that a breach on the part of contractor, subcontractor, or supplier was the proximate cause of the harm. Interwest Constr. v. Palmer, 923 P.2d 1350, 1351, 1356.

**Wyo.** 1999. Cit. in headnote, quot. in sup., subsec. (1) cit. in sup. and adopted, com. (a) quot. in disc. Employer sued former employee for breach of fiduciary duty and intentional interference with known economic advantage after defendant resigned from plaintiff's employ and started a competing business. The trial court entered summary judgment for defendant, concluding that the employment contract provided plaintiff's exclusive remedy. Reversing and remanding, this court held, in part, that the exclusive-remedy provision of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

employment agreement, which purported to exempt defendant from liability for intentional torts, was unenforceable as a matter of public policy. Fremont Homes, Inc. v. Elmer, 974 P.2d 952, 953, 956-957.

— June 2006:Case Citations July 2001 — June 2006:

**C.A.2,** 2003. Cit. in ftn. (Erron. cit. as Restatement Second of Torts.) Criminal defendant appealed his conviction for conspiring to hold hostage aliens who were smuggled into the United States and holding hostage a female alien. This court affirmed the conviction, holding, inter alia, that the district court's jury instruction was proper as it did not prohibit the jury from considering the smuggling agreements and/or from finding that the aliens consented to be detained through those agreements. The court noted that because alien-smuggling agreements were illegal and unenforceable, where a defendant caused an alien to remain in one location against her will when she would have preferred to be elsewhere, that defendant could not insulate himself from criminal liability by relying on an illegal, unenforceable agreement to furnish the alien's consent. U.S. v. Tian, 339 F.3d 143, 156.

**D.D.C.**2005. Subsec. (1) cit. and quot. in sup. Game-show contestant sued entertainment company for, in part, reckless and intentional conduct causing injuries allegedly due to actions of show's host during taping. Denying in part defendant's motion for summary judgment, this court held, inter alia, that such claims could not be waived by the release form signed by plaintiff pursuant to applicable District of Columbia law. Although District of Columbia law recognized a prospective liability waiver for claims of negligent conduct, for claims arising from reckless or intentional conduct the case law was silent, so the Restatement approach was adopted; under the Restatement, such waivers were not recognized to exempt a party from recklessly or intentionally caused harms. Wright v. Sony Pictures Entertainment, Inc., 394 F.Supp.2d 27, 33.

**D.Kan.**2005. Cit. in sup., subsec. (1) cit. in ftn. Sales agent sued communications company after company terminated it as agent, asserting claims for, in part, breach of contract and tortious interference with prospective business advantage. Granting company's motion to dismiss for lack of subject-matter jurisdiction, this court held, inter alia, that limitation-of-liability provision was valid and enforceable against agent's breach-of-contract claim, and, therefore, that claim did not meet required amount for exercise of diversity jurisdiction. The court noted that, while the limitation-of-liability provision generally was unenforceable as to intentional torts, like agent's tortious-interference claim, that claim failed to establish subject-matter jurisdiction because agent did not provide the court with a damages estimate on the claim. LDCircuit, LLC v. Sprint Communications Co., L.P., 364 F.Supp.2d 1246, 1258, 1263.

**D.Md.**2004. Subsec. (1) cit. in disc. Chapter 7 debtor brought adversary complaint against bankruptcy-petition preparers for various claims, including negligence. Denying petition preparers' motion to dismiss, this court held, inter alia, that exculpatory clauses in prepetition contract between debtor and petition preparers were too broadly worded, were unenforceable as against public interest, and failed to exculpate the petition preparers from their own negligence. In re Lucas, 312 B.R. 559, 565.

**S.D.N.Y.**2003. Com. (a) cit. in sup. (Erron. cit. as Restatement Third of Contracts). Subrogee insurers brought subrogation action against insured's landlord, alleging that insured suffered property damage due to landlord's inadequate maintenance of the leased premises. This court granted defendant's motion to dismiss, but it gave insurers leave to amend their complaint to add a claim of gross negligence. The court stated that claims of gross negligence could not be precluded under an exculpatory clause nor diminished under a liability-limiting clause. It noted that the risk of harm to the public increased when contracting parties exempted

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

themselves from liability for their intentional or reckless conduct. American Motorist Ins. Co. v. Morris Goldman Real Estate Corp., 277 F.Supp.2d 304, 307.

**S.D.W.Va.**2004. Subsecs. (2)(b)-(2)(c) cit. in case quot. in disc. Mother of 14–year-old girl who died while participating in church-sponsored rafting trip brought action against rafting company and its employee who piloted girl's raft, alleging that their conduct was proximate cause of her death. Rafting company subsequently filed a third-party complaint against church and pastor who let youth group, based on pastor's signature, purportedly on behalf of mother, on indemnification and release. This court granted summary judgment to church and pastor, finding, inter alia, that parent of a minor child could not indemnify third party for liability for conduct that violated a safety statute. Johnson v. New River Scenic Whitewater Tours, Inc., 313 F.Supp.2d 621, 631.

**Cal.App.**2003. Cit. generally in dist. Child and parents sued child-care provider following incident involving sexual touching between plaintiff child and another child in day-care program. Trial court found that release signed by parents barred negligence and contract claims against provider and entered judgment on jury verdict for provider on fraud claims. Reversing and remanding, this court held that an agreement exculpating child-care provider's from its own negligence was void as against public policy. Gavin v. YMCA of Metropolitan Los Angeles, 106 Cal.App.4th 662, 669, 131 Cal.Rptr.2d 168, 173.

**Conn.**2003. Com. (b) quot. in disc. Ski-resort patron who was injured while snowtubing sued resort owner for negligence. Reversing the trial court's grant of summary judgment for defendant and remanding, this court held that a release signed by plaintiff did not bar her claim because it did not expressly provide that, by signing it, plaintiff released defendant from liability for damages resulting from its negligence. Hyson v. White Water Mountain Resorts of Connecticut, Inc., 265 Conn. 636, 642, 829 A.2d 827, 831.

**Conn.**2005. Quot. in ftn. to diss. op. Patron of ski resort who was injured while snow tubing at resort sued operators of the facility for negligence. The trial court granted summary judgment for defendants on grounds that plaintiff had signed an agreement that released defendants from liability for their allegedly negligent conduct. Reversing, this court held, inter alia, that the release was unenforceable on public policy grounds. The dissent argued that the release was enforceable because snow tubing was a voluntary recreational activity and participants in such a recreational activity had the ability to weigh their desire to participate against their willingness to sign a contract containing an exculpatory clause. Hanks v. Powder Ridge Restaurant Corp., 276 Conn. 314, 347, 885 A.2d 734, 753.

**Del.Ch.**2006. Quot. in disc., cit. in sup., cit. in ftn., Rptr's Notes cit. in ftn. Private equity firm that bought a publishing company's stock sued private equity firm that sold the shares from its portfolio, seeking to rescind the contract based on the falsity of representations in the stock-purchase agreement. Granting in part and denying in part defendant's motion to dismiss, this court held that although the plain terms of the agreement's exclusive-remedy provision would limit plaintiff's remedy for its fraudulent-misrepresentation claim to a capped indemnity claim for damages, and would bar its claim for rescission, public policy invalidated the provision, so as to allow plaintiff to press its rescission claim, insofar as plaintiff proved that defendant intentionally misrepresented a fact within the agreement or knew that the publishing company had misrepresented such a fact. Abry Partners V, L.P. v. F & W Acquisition LLC, 891 A.2d 1032, 1059, 1060, 1063.

**Ky.**2005. Com. (a) cit. in disc. Widow of independent log hauler who was killed while unloading logs sued lumber-yard owner that had contracted for hauler's services, alleging failure to comply with safety regulations.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The trial court granted summary judgment for owner; the court of appeals affirmed. Reversing and remanding, this court held, inter alia, that, although not invalid per se, the exculpatory contract here did not exempt owner from liability for hauler's death. Because exculpatory contracts were disfavored and strictly construed against party relying on them, here, where the contract did not clearly set out what liability was covered, there was no reason to believe that hauler's death was specifically within its contemplation, as required for exemption from liability. Hargis v. Baize, 168 S.W.3d 36, 47.

**Me.**2005. Subsec. (1) cit. in disc. After church was destroyed by fire during renovations, church's insurers brought subrogation action against contractor whose employee caused the fire, seeking to recover damages. Trial court granted summary judgment for contractor, finding that waiver of subrogation in church's agreement with contractor barred insurers' claims. Affirming, this court held, inter alia, that even in the face of claims of gross negligence or willful and wanton misconduct, waiver of subrogation was not void as against public policy because there was no risk that an injured party would be left uncompensated. Reliance National Indemnity v. Knowles Industrial Services, Corp., 868 A.2d 220, 226.

**Mass.**2002. Subsec. (1) quot. in ftn. Student cheerleader injured during practice at public school sued city, alleging negligence and negligent hiring and retention of cheerleading coach. The trial court granted city leave to amend answer to add release as affirmative defense, then granted city summary judgment. On its own motion to transfer case from appellate court, this court held, inter alia, that enforcing release signed by parent on behalf of student was consistent with public policy of encouraging youth athletic programs. Sharon v. City of Newton, 437 Mass. 99, 110, 769 N.E.2d 738, 748.

**Minn.**2005. Subsec. (2)(b) quot. in sup. Houseboat renters sued rental company for negligence, alleging that they suffered brain damage from carbon-monoxide exposure while vacationing in the houseboat. The trial court granted defendant summary judgment against the renter who signed rental agreement and ordered renter to indemnify defendant for remaining plaintiffs' claims pursuant to rental agreement's provisions. The court of appeals affirmed. This court reversed and remanded, holding that exculpatory and indemnification clauses in rental agreement were unenforceable on public-policy grounds. Defendant, as an innkeeper providing a public service, could not circumvent duty to protect guests by requiring them to sign rental agreement containing an exculpatory clause that purported to release defendant from liability for negligence. Yang v. Voyagaire Houseboats, Inc., 701 N.W.2d 783, 789.

**N.M.**2003. Cit. in disc., subsec. (2) cit. in disc. Guest of a recreational resort facility who was injured while participating in a guided horseback trail ride sued resort owner for negligence. Trial court granted defendant summary judgment holding that a liability release signed by plaintiff was enforceable; court of appeals court reversed, holding that release was invalid as a matter of law. This court reversed and remanded, holding that, although a broad rule invalidating all liability releases in recreational context was not warranted, the release in this case was contrary to public policy expressed in state Equine Liability Act. The court noted that the rule on liability releases followed by New Mexico courts thus far had tracked rule followed in majority of other courts, as well as the Restatement. Berlangieri v. Running Elk Corp., 134 N.M. 341, 76 P.3d 1098, 1104, 1107 .

**N.M.App.**2002. Subsecs. (2) and (3) and com. (a) quot. in diss. op. Guest who was injured while horseback riding sued lodge for negligence. Reversing the trial court's grant of summary judgment for defendant and remanding, this court held, inter alia, that the release signed by plaintiff was unenforceable as against public policy. The dissent argued that the majority's holding that all releases in the commercial recreation industry

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

were per se against public policy and unenforceable was overbroad, and that the enforceability of a release should be measured on a case-by-case basis considering the circumstances of the case as a whole. Berlangieri v. Running Elk Corp., 132 N.M. 332, 48 P.3d 70, 81.

**Utah,** 2002. Cit. generally in ftn., subsec. (3) quot. in case quot. in disc., com. (c) cit. in disc. After estate of deceased worker brought a wrongful-death action on a theory of products liability against manufacturer of asphalt silo components, manufacturer filed a third-party complaint against decedent's employer for indemnification. The trial court granted manufacturer summary judgment on the indemnification claim, and apportioned the judgment. Reversing in part, this court rejected manufacturer's argument that the claim sounded in negligence and was covered by the equipment invoice's indemnification language. Bishop v. GenTec Inc., 48 P.3d 218, 224.

**Wis.**2005. Cit. in disc., quot. in ftn., subsec. (1) cit. in disc. Minor child filed suit against fitness center for wrongful death after his mother drowned while using center's pool. Trial court granted center's motion for summary judgment. Reversing and remanding, this court held, inter alia, that exculpatory language in guest registration and waiver form was overly broad and inclusive so as to render such language unenforceable, as it would include interpretation that was clearly contrary to public policy. Atkins v. Swimwest Family Fitness Center, 277 Wis.2d 303, 691 N.W.2d 334, 338, 340.

**Wis.App.**2004. Cit. in cases cit. and quot. in ftn., subsec. (1) quot. in sup., com. (a) cit. in sup. Automobile-dealership owners, who had entered into asset-purchase agreement and leases with dealer development corporation controlled by automobile manufacturer, brought action against corporation, manufacturer, and three directors, after corporation ceased doing business, transferred franchise rights to manufacturer for no value, and informed owners that it was insolvent and intended to default on all future obligations under leases. Holding that exculpatory language in the lease agreements precluded owners' action, the trial court dismissed claims. Reversing and remanding, this court held, inter alia, that the exculpatory clauses were unenforceable on grounds of public policy where the alleged harm was caused intentionally or recklessly. Finch v. Southside Lincoln–Mercury, Inc., 274 Wis.2d 719, 685 N.W.2d 154, 160, 163, 164.

— June 2010:Case Citations July 2006 — June 2010:

**C.A.6,** 2006. Subsec. (2) cit. in case cit. in disc. In this case, where the court determined that the former employees of a now-defunct company were entitled to the stock proceeds from an insurance firm's demutualization, the court cited to a number of Kentucky Supreme Court cases that applied various sections of the Restatement Second of Contracts, including § 195, to demonstrate that the Restatement was generally valid authority in Kentucky. Bank of New York v. Janowick, 470 F.3d 264, 271, certiorari denied 552 U.S. 825, 128 S.Ct. 195, 169 L.Ed.2d 36 (2007).

**D.Mass.Bkrtcy.Ct.**2007. Cit. in disc. Administrator of estate of stabbing victim brought an adversary proceeding against debtor, seeking a determination that a default judgment entered in plaintiff's wrongful-death action against debtor was excepted from discharge as a debt for willful and malicious injury by debtor. Granting summary judgment for debtor, this court held that plaintiff was bound by the parties' prepetition agreement containing plaintiff's knowing and voluntary waiver and release of the right to prosecute this nondischargeability complaint based on an intentional tort. The court noted that, although a term in a contract exempting a party from tort liability for harm caused intentionally or recklessly was unenforceable as against public policy, the prepetition agreement, contrary to plaintiff's argument, was not the product of a mistake of law, since it

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Restatement (Second) of Contracts § 195 (1981)

was made during litigation, was in the nature of an agreement for judgment, and was enforced by the trial court. In re Cunningham, 365 B.R. 352, 365.

**D.N.J.**2006. Com. (a) cit. generally in defense motion. Engineering and construction company sued consultant after it became clear that consultant's expert had lied about his academic credentials, allegedly resulting in an award against company by an arbitration panel before which expert testified. The trial court entered a jury verdict in favor of company on its breach-of-contract and negligence claims. Denying consultant's motion to mold the verdict, this court held, inter alia, that the exculpatory clause in the parties' contract was unenforceable under Maryland law where consultant's failure to provide company with a licensed engineer as an expert was a fundamental, pure breach of contract; no Maryland law was cited for the proposition that an exculpatory clause could operate to preclude liability for a contractual breach that went to the very essence of the contract between the parties. Wartsila NSD North America, Inc. v. Hill Intern., Inc., 436 F.Supp.2d 690, 695.

**S.D.N.Y.**2008. Subsec. (1) cit. in case quot. in sup. Italian air carrier brought a diversity action against publishing company for, among other claims, negligence and gross negligence, alleging that defendant posted air fares without noting that they were only available in a "low season," and, by the time the mistake was corrected, tickets had been sold to the public at an alleged loss to plaintiff of over $3.7 million. Granting defendant's motion for summary judgment, this court held, inter alia, that, because plaintiff's claims for negligence and gross negligence sounded in contract, not tort, the limitation-of-liability provision in the contract between these sophisticated commercial entities precluded, under Virginia law, recovery of lost revenue and profits; even if New York law applied, the outcome would be the same, since no reasonable jury could conclude that defendant engaged in conduct akin to intentional wrongdoing or reckless indifference such that enforcement of the limitation-of-liability provision would be avoided. Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Pub. Co., 580 F.Supp.2d 285, 294.

**S.D.N.Y.**2010. Cit. in case quot. in sup. and cit. in ftn. Cayman Islands special purpose entities (SPEs) created by bank solely on paper as vehicles for an investment in the Brazilian operations of failed Italian dairy conglomerate sued bank for, among other things, breach of certain management agreements, alleging that bank abandoned its due diligence obligations in managing the SPEs and failed to adequately advise the SPE boards that the Brazil stock was overvalued. This court dismissed the action, holding that the contract claim was without merit, in part because the agreements expressly limited bank's liability to "gross negligence or willful breach of duty," and, while bank's failure to disclose material information to the SPEs was a breach of fiduciary duty, it did not "smack of intentional wrongdoing" as required by New York law to pierce such an agreed-upon limitation of liability in a commercial contract. In re Parmalat Securities Litigation, 684 F.Supp.2d 453, 483.

**W.D.Va.**2009. Subsec. (1) quot. in sup. and cit. in case cit. in sup. Seller of telecommunications products sued manufacturer for business conspiracy, inter alia, after defendant began working with one of plaintiff's competitors and unexpectedly terminated its contract with plaintiff. Denying in part defendant's motion to dismiss, this court concluded that, even if the contractual limitation of liability provision in the parties' contract was intended to bar future claims for anything other than the payment of commissions due, the provision could not, as a matter of public policy, exempt defendant from liability for intentional, conspiratorial misconduct. All Business Solutions, Inc. v. NationsLine, Inc., 629 F.Supp.2d 553, 560.

**Ariz.App.**2007. Cit. in sup. Aircraft owner sued maintenance and repair company for, in part, breach of a maintenance contract and fraud. The trial court granted defendant's motion for summary judgment in part, rul-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing that plaintiff was barred from recovering lost profits under a limitation-of-damages clause contained in the contract. Reversing and remanding, this court, inter alia, adopted the rule that, while a party could contract to limit liability in damages for nonperformance of promises, such a provision was not effective where, as alleged here, that party acted fraudulently or in bad faith. The court noted that the purpose of the rule was consistent with Restatement Second of Contracts § 195, which prohibited contracts exempting parties from intentional or reckless tort liability. Airfreight Exp. Ltd v. Evergreen Air Center, Inc., 215 Ariz. 103, 158 P.3d 232, 240.

**Colo.App.**2009. Cit. in sup., cit. in case cit. in sup., adopted in case cit. in sup., subsec. (1) cit. in sup. and quot. and adopted in case quot. in sup. After investment fund sued investor, seeking a declaration regarding the proper characterization of investor's financial contribution to fund, investor filed a third-party complaint against fund's manager, alleging conversion, civil theft, and securities fraud. Following a bench trial, the trial court found that manager was personally liable to investor for conversion and civil theft. Affirming, this court held, inter alia, that an exculpatory provision in the agreement between investor and fund was unenforceable to the extent that it purported to exempt manager from personal tort liability, because manager's actions were not merely negligent and of no benefit to fund, but intentional, unauthorized, and self-serving, and the provision was of no practical benefit to investor. Rhino Fund, LLLP v. Hutchins, 215 P.3d 1186, 1191–1193.

**Conn.**2006. Cit. in sup., subsec. (2)(a) quot. in ftn. Professional racing driver employed by racing school sued employer and others for negligence after being injured while performing job-related duties. The trial court granted summary judgment for defendants. Reversing and remanding, this court held, inter alia, that driver's negligence claims were not precluded by an exculpatory agreement signed by driver prospectively releasing employer and others from liability for negligent acts causing injury to driver, because the agreement violated the public policy of the state and was, therefore, invalid. The court noted the explanation given for this result in Restatement Second of Torts § 496B comment f, which pointed to the disparity in bargaining power between an employer and an employee and the economic necessity that might force an employee to accept an employer's terms. Brown v. Soh, 280 Conn. 494, 506, 909 A.2d 43, 50.

**Del.Ch.**2010. Quot. in case quot. in ftn. Stockholders sued corporation and its officers and directors, alleging that defendants fraudulently induced them to invest in corporation. Granting defendants' motion to dismiss, this court held, inter alia, that the question of how far a contract could go to exculpate fraud under English law, which governed the parties' agreements, and the English public policies implicated by this question was best accomplished by an English court. The court noted that it had previously acknowledged the Restatement's rule that a term exempting a party from tort liability for harm caused intentionally or recklessly was unenforceable on grounds of public policy, but also noted that it had eschewed the broad recklessness standard in the Restatement as Delaware common law. Ashall Homes Ltd. v. ROK Entertainment Group Inc., 992 A.2d 1239, 1254.

**D.C.App.**2007. Subsec. (1) quot. in case quot. in sup. Member of fitness center sued center and one of its instructors, claiming that he was injured while participating in a kick-boxing demonstration. The trial court granted summary judgment for defendants. Affirming, this court held, inter alia, that the waiver and release plaintiff had signed upon accepting membership was valid and enforceable and was a complete defense for defendants; even where waiver provisions were so broad that they could be construed to exempt a party from liability for gross negligence or wanton conduct, as argued by plaintiff in this case, the better interpretation of the law was to hold only those provisions unenforceable on grounds of public policy, not the entire release. Moore v. Waller, 930 A.2d 176, 182.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Hawaii,** 2007. Subsec. (1) and com. (a) quot. in disc., com. (a) cit. in case quot. in sup. Buyer of hotel sued hotel's general managers and chief engineer, alleging that defendants, as representatives of seller, failed to disclose certain problems with the condition of the hotel before plaintiff signed the purchase agreement. The trial court granted summary judgment for defendants. Affirming, this court concluded that plaintiff's claims for breach of fiduciary duty were precluded by the agreement's nonrecourse provision. The court held that a nonrecourse provision, such as the instant one, that explicitly protected a party from tort liability was permissible as long as the agreement was not unconscionable and it was knowingly and willingly made, and was valid to the extent that it did not waive liability in situations of intentional or reckless conduct. Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. Partnership, 115 Hawai'i 201, 166 P.3d 961, 981, 983, 984.

**N.J.** 2006. Cit. in disc. Minor and his parents sued skateboard-park operator for negligence, after minor allegedly broke his leg when another skateboarder, about whom parents had complained, forced him off a skateboard ramp. The trial court dismissed the complaint without prejudice, and ordered arbitration. The appellate division reversed in part. Affirming, this court held, inter alia, that parent's execution of a pre-injury release of minor's future tort claims arising out of the use of a commercial-recreational facility was unenforceable; negligent activity on the part of commercial enterprises that attracted children had to be discouraged. Hojnowski v. Vans Skate Park, 187 N.J. 323, 901 A.2d 381, 386.

**N.J.Super.App.Div.** 2009. Cit. in case quot. in sup. Member of fitness club sued club and others, after she was injured when the handlebars of a stationary bicycle that she was riding in a group spinning class abruptly became detached. The trial court granted summary judgment for defendants, finding that defendants were absolved from liability under an exculpatory clause in plaintiff's membership agreement with club. Affirming, this court held, as a matter of contract interpretation and as a matter of public policy, that the clause only insulated defendants from ordinary negligence respecting the use of exercise equipment at its facility and did not shield defendants from extreme conduct such as reckless, willful or wanton, or palpably unreasonable acts or omissions diminishing the safe condition of its equipment; there was, however, no genuine issue of material fact that such extreme acts or omissions caused plaintiff's accident. Stelluti v. Casapenn, 408 N.J.Super. 435, 457, 975 A.2d 494, 507.

(1981)

REST 2d CONTR § 195

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.