Case 2:10-md-02179-CJB-DPC   Document 4477-51   Filed 11/03/11   Page 1 of 73

Westlaw

WILLSTN-CN § 19:20                                                                     Page 1
8 Williston on Contracts § 19:20 (4th ed.)

Williston on Contracts
Database updated May 2011

Richard A. Lord

Chapter
19. Miscellaneous Illegal Agreements
IV. Agreements to Indemnify

References Correlation Table

## § 19:20. Indemnity against intentional wrongs

**West's Key Number Digest**

West's Key Number Digest, Contracts ⚷114
West's Key Number Digest, Insurance ⚷2594(2)

It seems quite clear that the doctrine that agreements to indemnify against negligence are valid[1] should not be extended to intentional misconduct or willful wrongdoing involving personal volition, such as, for example, child molestation or other intentional and inherently harmful activity.[2] However, it has been said that "[i]ndemnification agreements are unenforceable as violative of public policy only to the extent that they purport to indemnify a party for damages flowing from the intentional causation of injury" so that indemnification may be permitted when grossly negligent conduct was alleged and found.[3] Decisions with respect to these issues raise difficult policy concerns: On the one hand, the courts are, with good cause, reluctant to encourage wrongdoing by permitting the wrongdoer to be indemnified for misconduct. On the other hand, a refusal to permit indemnity will often, if not usually, result in an injury being unredressed by compensation. Balancing these competing interests is difficult and often results in subtle distinctions.

Thus, it has been held[4] that intentional and negligent infliction of emotional distress is an "occurrence" within the meaning of a homeowner's insurance policy so as to trigger the insurer's duty to defend and indemnify, the court stating in part:

The insurance policy defines an occurrence as an 'accident.' In essence, the insurance company limits its coverage to accidental occurrences to preclude coverage for insureds whose conduct is intentionally-wrongful.

The jurisprudence interpreting insurance provisions that implicate the question of the extent of coverage for intentional acts demonstrates a careful balance between competing doctrines. On the one hand, we have long held that public policy denies insurance indemnification for the civil consequences of wrong-doing … . On the other hand, we recognize the desire to compensate victims with insurance proceeds to the extent that that compensation will not condone and encourage intentionally-wrongful conduct … .

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

We must thus interpret the terms 'occurrence' and 'accident' in a manner that is both consistent with the reasonable meaning of the insurance contract and responsive to the above policy concerns.

The key interpretive question is what should be deemed 'accidental': the act or the injuries resulting from the act?

In evaluating whether intentional statements can be considered accidental occurrences, other jurisdictions have split. Some hold that tortious statements do not constitute an occurrence because the act of speaking is intentional … .[5]

Other jurisdictions, focusing on the accidental nature of the injury, have held that intentional statements leading to unintentional injuries can be deemed an occurrence … .[6]

We adhere to the prevalent New Jersey rule and hold that the accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury. If not, then the resulting injury is 'accidental,' even if the act that caused the injury was intentional. That interpretation prevents those who intentionally cause harm from unjustly benefitting from insurance coverage while providing injured victims with the greatest chance of compensation consistent with the need to deter wrong-doing. It also accords with an insured's objectively-reasonable expectation of coverage for unintentionally-caused harm.

Even if the operative question is the intent to injure rather than to act, the question of what constitutes an 'intent to injure' remains. The key issue is whether the court must find a subjective intent to injure, or whether it can presume an intent to injure from the objective circumstances. In that regard, our inquiry parallels that taken in interpreting policy exclusions for intentional acts. Those exclusions preclude coverage for injuries expected or intended by the insured. Case law interpreting those policy exclusions, in addition to that interpreting the definition of 'occurrence,' is thus relevant.

The general trend appears to require an inquiry into the actor's subjective intent to cause injury.[7] Even when the actions in question seem foolhardy and reckless, the courts have mandated an inquiry into the actor's subjective intent to cause injury … .

When the actions are particularly reprehensible, the intent to injure can be presumed from the act without an inquiry into the actor's subjective intent to injure. That objective approach focuses on the likelihood that an injury will result from an actor's behavior rather than on the wrongdoer's subjective state of mind.[8]

Absent exceptional circumstances that objectively establish the insured's intent to injure, we will look to the insured's subjective intent to determine intent to injure. [The insured's] actions were a far cry from the type of egregious behavior that justifie[s] an objective approach … and thus do not justify a departure from the general rule requiring an inquiry into the insured's subjective intent to injure.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-md-02179-CJB-DPC   Document 4477-51   Filed 11/03/11   Page 3 of 73

Although [the insured's] statements were unquestionably intentional, there is little evidence that she intended or expected to injure the schoolteacher. Our impression is that she was motivated by concern for her child rather than by a desire to injure the teacher. Regardless of our impressions, the complaint itself included an allegation of negligent infliction of emotional distress. An allegation of negligence presumes the absence of an intent to injure. [The insurer] thus had the duty to defend until the negligence claim had been dismissed.

Moreover, the duty to defend also may have been triggered by the claim for intentional infliction of emotional distress, known as 'outrage' in New Jersey. Although 'outrage' is considered an intentional tort, it is recognized not only where conduct is intentional but also where it is 'reckless.' … A 'reckless' act under tort law does not meet the subjective intent-to-injure requirement under insurance law. Therefore, under both the 'negligent infliction of emotional distress' and the 'outrage' allegations, [the insurer] had a duty to defend unless and until a subjective intent to injure had been demonstrated.

In addition, as discussed previously,[9] several courts have recently had occasion to consider whether public policy permits or requires insurers to extend coverage to encompass awards of punitive damages, the better cases, if not the majority of them, holding such coverage permissible.

---

[FN1] See § 19:19.

**U.S.**

Chicago Housing Authority v. Federal Sec., Inc., 161 F.3d 485 (7th Cir. 1998) (security contractor's promise "to completely indemnify and hold harmless [housing authority] against any liability or expense arising out of any losses, claims, damages or injury resulting from any intentional acts or any negligent acts or omissions of [contractor] or its agents in the performance of this contract" obligated contractor to indemnify authority for authority's deliberate indifference to ongoing illegal activity by guards employed by contractor; to require contractor to indemnify authority for illegal activity of contractor's own guards or for contractor's allegedly sloppy security would not compromise general rule against contracts to indemnify someone for consequences of its intentional or negligent acts)

**Minn.**

Lake Cable Partners v. Interstate Power Co., 563 N.W.2d 81 (Minn. Ct. App. 1997) (for public policy reasons, indemnification agreement may not include indemnification for intentional conduct that could support award of punitive damages).

[FN2] Restatement Second, Torts §§ 20, 32

Restatement Second, Contracts § 196, comment a, declaring unenforceable as against public policy unreasonable exemptions from liability for fraudulent and nonfraudulent misrepresentations.

See also:

Cal Ins Code § 533 ("Willful act of insured-An insurer is not liable for a loss caused by the willful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others.").

8 Williston on Contracts § 19:20 (4th ed.)

**U.S.**

Cf. State Farm Fire and Cas. Co. v. Fullerton, 118 F.3d 374 (5th Cir. 1997) (holding, under Texas law, that insured's guilty plea to murder charge precludes either insured or heirs of his victims from asserting that he lacked intent to bring about harm and that conduct was therefore an accidental occurrence within meaning of insurance policy; the decision collects virtually all of the extant case law on the issue, concluding that there is an almost equal split between those jurisdictions that permit the question of intent to survive a guilty plea since the issue has not been actually litigated, and those jurisdictions that give preclusive effect to such a plea, and speculates, under Erie, that Texas would adopt the latter position)

Northwestern Nat. Cas. Co. v. McNulty, 307 F.2d 432 (5th Cir. 1962) (public policy prohibits insurance against liability for punitive damages; Florida verdict sought to be collected under Virginia policy)

Cf. Chicago Housing Authority v. Federal Sec., Inc., 161 F.3d 485 (7th Cir. 1998) (allowing indemnification when it places the burden on the primary wrongdoer)

Allstate Ins. Co. v. Gilbert, 852 F.2d 449 (9th Cir. 1988) (applying California law; insurer had no duty to defend or indemnify insured in action brought against child molester and wife, alleging intentional act of molester and negligence of wife in failing to supervise child or take steps to prevent molestation; molester's conduct was intentional within meaning of California statute and was therefore excluded from coverage, and action against wife, though based on her negligence, was the result of intentional act of "an insured," her husband, within meaning of policy exclusion)

Hanover Fire Ins. Co. of New York v. Merchants' Transp. Co., 15 F.2d 946 (C.C.A. 9th Cir. 1926)

Allstate Ins. Co. v. Tankovich, 776 F. Supp. 1394 (N.D. Cal. 1991) (purposeful racial harassment and racially motivated hate crimes were inherently harmful under California law and thus excluded from insurance coverage by statute excluding willful conduct)

State Farm Fire & Cas. Co. v. Ezrin, 764 F. Supp. 153 (N.D. Cal. 1991) (alleged nonconsensual sexual assault is intentionally wrongful conduct excluded from insurance coverage, surveying case law from several other jurisdictions)

ANR Production Co. v. Westburne Drilling, Inc., 581 F. Supp. 542 (D. Colo. 1984) (upholding exculpatory provision against simple negligence under Colorado law in light of parties' sophisticated commercial nature and equality of bargaining power, setting forth factors to consider; but denying summary judgment with respect to allegations of willful and wanton negligence, liability for which cannot be contracted away)

Allstate Ins. Co. v. Bailey, 723 F. Supp. 665 (M.D. Fla. 1989) (molestation of a four-year-old by a 15-year-old; though action framed by plaintiff in terms of negligence, conduct fell within intentional acts exclusion, and homeowner's insurer had neither duty to defend nor to indemnify)

Allstate Ins. Co. v. McCranie, 716 F. Supp. 1440 (S.D. Fla. 1989), aff'd, 904 F.2d 713 (11th Cir. 1990) (exclusions of intentional conduct by an insured excluded coverage for child molestation by one insured, and also excluded coverage as to another insured, the molester's sister, who was allegedly negligent; child molestation was intentional, regardless of molester's mental health, and could not be deemed accidental, and since exclusion was of intentional acts of "an insured," conduct of one insured barred

Case 2:10-md-02179-CJB-DPC   Document 4477-51   Filed 11/03/11   Page 5 of 73

coverage in favor of coinsured)

Cf. Paris Utility Dist. v. A.C. Lawrence Leather Co., Inc., 665 F. Supp. 944 (D. Me. 1987), judgment aff'd, 861 F.2d 1 (1st Cir. 1988) (citing text and, though deciding the case on narrower grounds, noting that "the proposition that an agreement to indemnify a party for the party's own intentional, willful, grossly negligent, or otherwise tortious act contrary to a distinct public policy is unenforceable … has much to recommend it.")

O'Neill v. Yield House Inc., 964 F. Supp. 806 (S.D. N.Y. 1997) (New York law precludes indemnification for punitive damages, but New Hampshire law permits indemnification for punitive damages; policies under precluding a punitive damage award may not apply when the tortfeasor is insolvent)

Whitt v. DeLeu, 707 F. Supp. 1011, 52 Ed. Law Rep. 576 (W.D. Wis. 1989) (alleged sexual misconduct with children excluded from coverage by intentional acts exclusion since injury is so likely to be caused that intent may be inferred)

**Ala.**

Cf. Tapscott v. Allstate Ins. Co., 526 So. 2d 570 (Ala. 1988) (complaint determines whether insurer has duty to defend and indemnify; thus, when complaint alleged only intentional torts, insurer had no obligation to defend or indemnify)

**Cal.**

J. C. Penney Casualty Ins. Co. v. M. K., 52 Cal. 3d 1009, 278 Cal. Rptr. 64, 804 P.2d 689 (1991) (the leading case in California involving child molestation, the molester pled guilty to criminal charges, after which he was sued civilly by the child and her mother, who attempted to avoid the statutory exclusion for intentional misconduct by dismissing their intentional tort claims and basing their action on negligence and negligent infliction of emotional distress; the court synthesized prior California decisions and spoke at length about the policies underlying the statutory exclusion, saying: "We conclude there is no coverage as a matter of law. No rational person can reasonably believe that sexual fondlings, penetration, and oral copulation of a five-year-old child are nothing more than acts of tender mercy. Except in the present case, every court to decide this issue under California law has held that a homeowner's insurance policy does not provide liability coverage for child molestation. The courts of many other states also have considered the issue and, almost without exception, have held there is no coverage.

"Cal. Ins. Code § 533 provides that an insurer is not liable for a 'wilful [sic] act of the insured.'

"Negligence is often, perhaps generally, the result of a 'willful act,' as the term is commonly understood. For example, 'An ordinary consequence of driving an automobile without the exercise of ordinary care or an intentional violation of a statute (speed in excess of the maximum speed limit), is injury to the person or property of the driver or a third person. Certainly no one would contend that an injury occasioned by negligent or even reckless driving was not accidental within the meaning of a policy of accident insurance … .' … A contrary rule would allow an insurer to deny coverage for a negligent act. That result is specifically prohibited by § 533 … .

"In short, § 533 does not preclude coverage for acts that are negligent or reckless. We find nothing in the statute, however, to support defendants' view that a child molester can disclaim an intent to harm his victim. There is no such thing as negligent or even reckless sexual molestation. The very essence of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

child molestation is the gratification of sexual desire. The act is the harm. There cannot be one without the other. Thus, the intent to molest is, by itself, the same as the intent to harm.

"The reasoning of prior decisions under § 533 also makes clear that the statute precludes coverage for child molestation. The public policy underlying § 533 is to discourage willful torts … .

"Because the wrongful act of child molestation is itself the harm, § 533 does not require a showing of the insured's subjective intent to harm. Likewise, [case law] does not require a showing by the insurer of its insured's 'preconceived design to inflict harm' when the insured seeks coverage for an intentional and wrongful act if the harm is inherent in the act itself. § 533 precludes coverage in this case because child molestation is *always* intentional, it is *always* wrongful, and it is *always* harmful. Except in the present case, every Court of Appeal to consider the question has also concluded that § 533 precludes coverage for molestation.

"Some acts are so inherently harmful that the intent to commit the act and the intent to harm are one and the same. The act is the harm. Child molestation is not the kind of act that results in emotional and psychological harm only occasionally. The contrary view would be absurd … .

"Except in the present case, every [California] court … has agreed that under California law child sexual molestation is not covered by a homeowner's liability policy … .

"Properly understood, defendants' argument is based not on the insured's intent, but on his motive. The gist of the argument is that his molestations were something akin to a misguided show of affection. In other words, his intent was to have sex with a child, but his motive was wholesome. Motive is irrelevant for purposes of § 533. Motive is relevant only to the different question of whether the conduct was wrongful, thereby giving rise to liability. For example, an insured may intentionally shoot another person in the head at point-blank range. Obviously, the insured (if sane) intends to injure. Whether the conduct is wrongful, however, will depend on the insured's motive. For example, his motive may be self-defense. If a court finds that the insured acted justifiably, it necessarily follows that the insured did not act wrongfully. In that case, there is no liability, and the application of § 533 is not at issue. If, however, the motive for the shooting is determined to be robbery, the shooting would be wrongful and excluded from coverage by § 533. There is no motive that can justify child sexual molestation. The insured's professed motive is therefore entirely beside the point for purposes of § 533.

"Although we are not bound by decisions of other states' courts, particularly in a case of statutory construction, they do reflect that our decision is in the mainstream on this issue … . To allow coverage for child molestation would be contrary to the almost unanimous rule in other states. … We are not aware of any decision by a state's high court that allows coverage for child molestation … .

"Defendants and their *amici curiae* argue at length that psychiatric testimony would show that child molesters are really sheep in wolves' clothing-that their abuse of children is an attempt at affection. We are reluctant to venture into uncertain territory still being explored by psychiatrists. We note, however, that testimony, psychiatric or otherwise, that no harm was intended flies '"in the face of all reason, common sense, and experience."' … Such testimony is also irrelevant in light of the rule that a child molester's subjective intent is irrelevant to the question of insurance coverage … . Moreover, if psychiatry can satisfactorily corroborate defendants' view and demonstrate the need for a change in the law, the proper forum is in the Legislature, where broad-based, perhaps conflicting empirical evidence can be

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

8 Williston on Contracts § 19:20 (4th ed.)

presented and considered.

"We hold that as a matter of law § 533 excludes liability insurance coverage for an insured's sexual molestation of a child. An insured therefore cannot show or attempt to show that he subjectively intended no harm.

"Some of the *amici curiae* briefs in this case have suggested that a decision denying coverage will encourage insurers to deny coverage for many other types of wrongdoing. Not so. We cannot emphasize too strongly to the bench and bar the narrowness of the question before us. The only wrongdoing we address is the sexual molestation of a child. Whether other types of wrongdoing are also excluded from coverage as a matter of law by § 533 is not before us.").

**Cal.**
Cf. State Farm Fire & Casualty Co. v. Eddy, 218 Cal. App. 3d 958, 267 Cal. Rptr. 379 (6th Dist. 1990) (alleged wrongful transmission of herpes; when insured denied knowing that he had genital herpes, had been tested for it, and was told that he did not have the disease, the fact that he intentionally engaged in sexual relations did not bar coverage under homeowners policy, discussing similar cases from other jurisdictions as well)

Blankenheim v. E. F. Hutton & Co., 217 Cal. App. 3d 1463, 266 Cal. Rptr. 593 (6th Dist. 1990) (hold harmless agreement, which by its terms was broad enough to encompass misrepresentations, violated California public policy as embodied in statute)

**Fla.**
Landis v. Allstate Ins. Co., 546 So. 2d 1051 (Fla. 1989) (child molestation was intentional act, regardless of actor's state of mind, and fell within intentional acts exclusion of insurance policy)

**Haw.**
Hawaiian Ins. & Guar. Co., Ltd. v. Blanco, 72 Haw. 9, 804 P.2d 876 (1990) (overruled on other grounds by, Dairy Road Partners v. Island Ins. Co., Ltd., 92 Haw. 398, 992 P.2d 93 (2000)) (when insured intentionally discharged rifle in direction of his neighbor, allegedly intending to frighten him, he should have reasonably expected that physical injury might result, and his insurance, which insured against accidents and occurrences, but excluded intentional harms, provided no coverage; moreover, claim of victim's wife against insured for emotional distress was likewise excluded since a reasonable person in insured's position would have expected that wife might suffer emotional harm by seeing husband wounded)

**Ill.**
Cf. Dixon Distributing Co. v. Hanover Ins. Co., 161 Ill. 2d 433, 204 Ill. Dec. 171, 641 N.E.2d 395 (1994) (citing Williston, distinguishing between an agreement exempting one from liability from intentional tort and an agreement by a third party indemnifying against consequences of tort; and declining to hold that providing insurance coverage for intentional acts, here alleged retaliatory discharge, violates Illinois public policy)

Prudential Property & Cas. Ins. Co. v. Kerwin, 215 Ill. App. 3d 1086, 159 Ill. Dec. 425, 576 N.E.2d 94 (1st Dist. 1991) (insured, while voluntarily intoxicated, shot victim in the presence of victim's wife and pleaded guilty to criminal charges; victim and wife brought civil action for intentional or negligent dis-

© 2011 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

Case 2:10-md-02179-CJB-DPC   Document 4477-51   Filed 11/03/11   Page 8 of 73

charge of weapon and negligent infliction of emotional distress; the court held that the insured's homeowners policy excluded coverage, since the act of shooting the gun was intentional, and said, as to the possibility that the intoxication might preclude a finding of intent: "In criminal cases, it is an affirmative defense if a defendant's voluntary intoxication is so extreme as to suspend the power of reason and to render him incapable of forming a specific intent which is an element of the offense … . The [victims] wish to make a quantum transition from voluntary intoxication being an affirmative defense to a specific intent crime, to voluntary intoxication relieving citizens from the consequences of their acts in civil cases. We reject the … attempted transition of an affirmative defense of criminal law to civil law.

"Plainly, in civil cases it would be against public policy to relieve citizens of the consequences of their acts based upon their voluntary intoxication. It follows that an insured cannot be heard to argue that he did not intend to do an otherwise intentional act on the basis that he was voluntarily intoxicated and thereby claim coverage under an insurance policy that excludes coverage for intentional acts. The law cannot be perverted to reach a result which would be inimical to public policy.").

**Me.**
Perreault v. Maine Bonding & Cas. Co., 568 A.2d 1100 (Me. 1990) (holding as a matter of law that injury produced by criminal sexual abuse of a child is expected or intended by insured within meaning of exclusion contained in homeowners policy, quoting from case law to the effect that "[d]enial of coverage is also 'in accord with the general rule that insurance to indemnify an insured against his or her own violation of criminal statutes is against public policy and, therefore, void.'")

**Mich.**
Greenman v. Michigan Mut. Ins. Co., 173 Mich. App. 88, 433 N.W.2d 346 (1988) (injury from sexual harassment is expected or intended by insured, thus precluding any duty to defend)

**Mont**
Safeco Ins. Co. of America v. Liss, 2000 MT 380, 303 Mont. 519, 16 P.3d 399 (2000) (public policy forbids indemnifying willful wrongdoing)

**N.J.**
Kuzmiak v. Brookchester, Inc., 33 N.J. Super. 575, 111 A.2d 425 (App. Div. 1955) (citing text; a clause which excused every conceivable wrongdoing, contained in a lease, was invalid)

**N.Y.**
Cf. Messersmith v. American Fidelity Co., 232 N.Y. 161, 133 N.E. 432, 19 A.L.R. 876 (1921) (refusing to include "willful misconduct")

Cf. State Farm Fire and Cas. Co. v. Irene S., 138 A.D.2d 589, 526 N.Y.S.2d 171 (2d Dep't 1988) (exclusion for intended or expected consequences did not necessarily preclude coverage for transmission of herpes since actor could intend acts yet not consequences of actions)

**N.C.**
Patti v. Continental Cas. Co., 126 N.C. App. 643, 486 S.E.2d 233 (1997), writ denied, 347 N.C. 401, 494 S.E.2d 417 (1997) (reviewing and synthesizing prior North Carolina case law, holding that a claim based on wrongful termination alleged intentional conduct from which could be inferred intent to injure

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

so that coverage under professional liability policy was excluded)

**Utah**

Anglo-California Trust Co. v. Hall, 61 Utah 223, 211 P. 991 (1922) (the court said: "The law will not give effect to a stipulation intended to grant immunity to fraud and iniquity.")

**Vt.**

Nationwide Mut. Fire Ins. Co. v. Lajoie, 163 Vt. 619, 661 A.2d 85 (1995) (the court, having previously ruled that sexual abuse of a minor inferentially gave rise to harm, refused to back away from the inferred intent rule when sexual abuse of a minor was alleged despite additional allegations that there was also nonsexual abuse; the court said: "[Defendant] forced intervenor to have sex with him, he showered with her, and subjected her to incessant criticism and verbal cruelty. It is inconceivable that sexual abuse of a minor by a family member will not be accompanied by other abuse and will not destroy familial relationships. If we require coverage for these subsidiary circumstances, we will require coverage in every sexual abuse case, undoing the inferred-intent rule. Moreover, we see no reason to distinguish between sexual abuse and related physical and mental abuse for purposes of the inferred-intent standard. Finally, in a creative attempt to achieve coverage, intervenor has drafted claims that go beyond the boundaries of established torts … . We agree with the trial court that labeling [defendant's] conduct as negligent 'is simply a disingenuous attempt to create a factual dispute.'")


## A.L.R. Library

Automobile insurance coverage for drive-by shootings and other incidents involving the intentional discharge of firearms from moving motor vehicles, 41 A.L.R.5th 91.

Death or injury from taking illegal drugs or narcotics as accidental or result of accidental means within insurance coverage, 32 A.L.R.5th 629.

Homeowner's liability insurance coverage of emotional distress allegedly inflicted on third party by insured, 8 A.L.R.5th 254.

Liability insurance coverage for violations of antipollution laws, 87 A.L.R.4th 444.

Criminal conviction as rendering conduct for which insured convicted within provision of liability insurance policy expressly excluding coverage for damage or injury intended or expected by insured, 35 A.L.R.4th 1063.

Acts in self-defense as within provision of liability insurance policy expressly excluding coverage for damage or injury intended or expected by insured, 34 A.L.R.4th 761.

Liability insurance: intoxication or other mental incapacity avoiding application of clause in liability policy specifically exempting coverage of injury or damage caused intentionally by or at direction of insured, 33 A.L.R.4th 983.

Construction and application of provision of liability insurance policy expressly excluding injuries intended or expected by insured, 31 A.L.R.4th 957.

Liability insurance coverage as extending to liability for punitive or exemplary damages, 16 A.L.R.4th 11.

Coverage under uninsured motorist clause of injury inflicted intentionally, 72 A.L.R.3d 1161.

Accident insurance: death or injury intentionally inflicted by another as due to accident or accidental means, 49 A.L.R.3d 673.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

8 Williston on Contracts § 19:20 (4th ed.)

**Law Reviews and Other Periodicals**

Houk, Insurance Law—Homeowner's Liability Insurance Policies: When Will the Pennsyvania Courts Infer Intent to Injure, 40 Vill L. Rev. 927 (1995)

Note, Validity of Insurance against Liability for Injuries Resulting from "Wilful and Wanton Misconduct," 22 Corn. L.Q. 590

[FN3]

**N.Y.**

Austro v. Niagara Mohawk Power Corp., 66 N.Y.2d 674, 496 N.Y.S.2d 410, 487 N.E.2d 267 (1985) (where the court also noted that the appellate court had failed to distinguish between exculpatory clauses, which attempt to deprive a party of damages resulting from another's wrongful act, and indemnity agreements, which permit the injured party recovery, but shift responsibility from one entity to another, indicating that in the former situation, attempts to include willful or grossly negligent conduct are not permitted, while in the latter case, at least grossly negligent conduct may be indemnified)

See also:

**U.S.**

Chicago Housing Authority v. Federal Sec., Inc., 161 F.3d 485 (7th Cir. 1998) (security contractor's promise "to completely indemnify and hold harmless [housing authority] against any liability or expense arising out of any losses, claims, damages or injury resulting from any intentional acts or any negligent acts or omissions of [contractor] or its agents in the performance of this contract" obligated contractor to indemnify authority for authority's deliberate indifference to ongoing illegal activity by guards employed by contractor; to require contractor to indemnify authority for illegal activity of contractor's own guards or for contractor's allegedly sloppy security would not compromise general rule against contracts to indemnify someone for consequences of its intentional or negligent acts).

[FN4]

**N.J.**

Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 607 A.2d 1255, 75 Ed. Law Rep. 347, 8 A.L.R.5th 937 (1992) (collecting both consistent and contrary authority; the companion case expands further on several questions, most notably the intent element necessary to trigger a duty to defend)

See also:

**U.S.**

Bailey v. State Farm Ins. Co., 810 F. Supp. 267 (N.D. Cal. 1992) (intentional act of insureds in installing railroad ties in road and removing concrete edging fell within intentional acts exclusion even if insureds did not intend to cause harm to other property owners but merely intended to improve their own property)

**La.**

Cf. Holcomb v. Kincaid, 406 So. 2d 646 (La. Ct. App. 2d Cir. 1981) ("occurrence" as defined in policy included conduct by former husband when plaintiff alleged that husband committed fraud by marrying her while he was still married to another and then, following dissolution of their marriage, that husband and his new wife harassed her; defense that husband's acts were intentional was unavailing)

**N.C.**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cf. Eubanks v. State Farm Fire and Cas. Co., 126 N.C. App. 483, 485 S.E.2d 870 (1997) (holding that solicitation to commit murder was extreme and outrageous act nearly certain to result in emotional harm to intended victims and their spouse or parent so that intent to injure could be inferred; thus, exclusion for bodily injury either expected or intended by insured was triggered, and insurer was not obligated to defend or provide coverage)

**Vt.**

American Protection Ins. Co. v. McMahan, 151 Vt. 520, 562 A.2d 462, 85 A.L.R.4th 945 (1989) (bodily injury includes exposure to toxic product, and therefore, insurer's obligation to defend attaches to any harm caused by that exposure including emotional distress damages)

## A.L.R. Library

Homeowner's liability insurance coverage of emotional distress allegedly inflicted on third party by insured, 8 A.L.R.5th 254.

## Law Reviews and Other Periodicals

Houk, Insurance Law—Homeowner's Liability Insurance Policies: When Will the Pennsyvania Courts Infer Intent to Injure, 40 Vill L. Rev. 927 (1995)

[FN5]
**U.S.**
Allstate Ins. Co. v. Tankovich, 776 F. Supp. 1394 (N.D. Cal. 1991) (purposeful racial harassment was not accidental within meaning of insurance policy regardless of whether racist intended to cause harm)

Cf. Allstate Ins. Co. v. Hansten, 765 F. Supp. 614 (N.D. Cal. 1991) (various allegations of breach of contract and intentional tortious conduct stated causes of action for "intentional violations" of "legal obligations" and hence were not covered as resulting from accidental loss as a matter of law)

**Cal.**
Cf. Merced Mutual Ins. Co. v. Mendez, 213 Cal. App. 3d 41, 261 Cal. Rptr. 273 (5th Dist. 1989) (act of oral copulation and attempted oral copulation was not occurrence or accident within meaning of homeowner's insurance policy when insured intended to perform act, though he might not have intended to cause harm allegedly caused thereby)

**Haw.**
Hawaiian Ins. & Guar. Co., Ltd. v. Blanco, 72 Haw. 9, 804 P.2d 876 (1990) (overruled on other grounds by, Dairy Road Partners v. Island Ins. Co., Ltd., 92 Haw. 398, 992 P.2d 93 (2000)) (insured should have reasonably expected that physical injury to victim and emotional injury to victim's wife would follow discharge of weapon in victim's direction even assuming that insured's intent was only to frighten victim)

**Ill.**
Cf. Prudential Property & Cas. Ins. Co. v. Kerwin, 215 Ill. App. 3d 1086, 159 Ill. Dec. 425, 576 N.E.2d 94 (1st Dist. 1991) (shooting by insured while voluntarily intoxicated was nevertheless intentional act, precluding coverage under insured's homeowners policy).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-md-02179-CJB-DPC   Document 4477-51   Filed 11/03/11   Page 12 of 73
WILLSTN-CN § 19:20                                                                 Page 12
8 Williston on Contracts § 19:20 (4th ed.)

[FN6]
**Cal.**

Cf. State Farm Fire & Casualty Co. v. Eddy, 218 Cal. App. 3d 958, 267 Cal. Rptr. 379 (6th Dist. 1990) (alleged wrongful transmission of herpes; though insured intentionally engaged in intercourse through which disease was allegedly spread to partner, he did not thereby intend to transmit disease, given facts alleged by insured that he did not know he had disease and that he had been tested and informed that he was not infected)

**Me.**

Burns v. Middlesex Ins. Co., 558 A.2d 701 (Me. 1989) (suit for bodily injury resulting from slander, invasion of privacy, and intentional infliction of emotional distress; the court said, in reversing a summary judgment in favor of the insurer that it had no duty to defend: "Here, the insurance policy excludes from coverage 'bodily injury … which is expected or intended by the insured.' In [an earlier decision] we found this exclusion ambiguous and interpreted it to refer 'only to bodily injury that the insured in fact *subjectively wanted* ("intended") to be a result of his conduct or in fact *subjectively foresaw as practically certain* ("expected") to be a result of his conduct' … . The underlying complaint that has provoked this controversy claims damages resulting from slander, invasion of privacy and intentional infliction of emotional distress. Even though they may be characterized as intentional torts, neither slander nor invasion of privacy requires that the tortfeasor, … 'subjectively wanted' or 'subjectively foresaw' bodily injury as the 'practically certain' result of her conduct. Comparing the underlying complaint to the insurance policy, therefore, we find that there is a duty to defend because the plaintiff in the underlying litigation against the insured may recover damages in that lawsuit that would be covered by the insurance policy.")

**Pa.**

United Services Auto. Ass'n v. Elitzky, 358 Pa. Super. 362, 517 A.2d 982 (1986) (defamation action brought by judge against former litigant based on statements made by her allegedly impugning judge; the court, in a thorough discussion of the matter, considered an intentional acts exclusion in the former litigant's policy, ruling: "In summary, we hold that an intended harm exclusionary clause in an insurance contract is ambiguous as a matter of law and must be construed against the insurer. We hold that such a clause excludes only injury and damage of the same general type which the insured intended to cause. An insured intends an injury if he desired to cause the consequences of his act or if he acted knowing that such consequences were substantially certain to result.

"In light of the preceding discussion, it is apparent that [the judge's] complaint does state a cause of action which may be covered by the … insurance policy. [The] libel claim is excluded under the policy's intended harm provision only if the [defendants] made their comments about the judge with the specific intent to cause him a harm generally similar to the emotional distress or injury to reputation which the Judge allegedly suffered. If the [defendants] are found to have made false statements about the judge even though they knew their claims were untrue, such an intent to harm might be presumed. But [the judge] can recover on his libel claim even if the [defendants] thought their claims were true if that belief was in reckless disregard of the truth … . If the [defendants] believed their statements were true then it is very possible that they did not make them for the purpose of injuring [the judge]. It is possible that [they] recklessly disregarded the truth and libeled [the judge] yet did so with pure hearts. For instance, they may have acted intending only to help reform the court system. Even so, if they recklessly ignored the possibility that their beliefs about [the judge] were misguided, liability may be imposed. Theoretically, [the judge] may succeed in his cause of action even if the [defendants] intended him no

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-md-02179-CJB-DPC   Document 4477-51   Filed 11/03/11   Page 13 of 73

harm. In that situation, the 'intended injury' exclusion would be inapplicable. In this regard, it is essential to distinguish intent from recklessness. In [a prior decision], we stated that a person acts intentionally when he desires to cause the consequences of his act or believes those consequences are substantially certain to result from it.

"Similarly, [the judge] may recover for intentional infliction of emotional distress even if the [defendants] did not have the specific intent to cause him such distress as long as they acted recklessly … . Though [the judge] has only alleged recklessness under the count in his complaint for libel, we note that he may amend his complaint at a later time. Therefore, [the] complaint clearly comprehends injuries which may not be excluded from coverage by the intended injury clause.

"However, our inquiry does not end here as the policy in question also excludes injury 'expected' by the insured. During the 1960's, insurance companies re-wrote the standard liability policy, adding an exclusion for injuries expected by the insured. The companies wished to exclude coverage for certain foreseeable results. They were aware that the courts had been generally unsympathetic to such an exclusion when construing the term 'intended' in the old policies. The companies added 'expected' to the new standard policy hoping to broaden the class of excluded injuries … .

"Ever since this change, courts have puzzled over the proper interpretation of the term. The main areas of disagreement have been: (1) is there any difference between 'intended' injury and 'intended and expected' injury; (2) whether 'expected' [sic] connotes an element of conscious awareness by the insured; and (3) what degree of forseeability [sic] is required to exclude an injury from coverage as 'expected' … .

"… We hold that for purposes of an exclusionary clause in an insurance contract, expected injury means that the insured acted even though he was substantially certain that an injury generally similar to the harm which occurred would result. This interpretation affords insured persons the maximum legal protection they could reasonably expect under a contract excluding expected injuries.

"However, this definition is also encompassed within the definition of intentional … . Therefore, we find ourselves in agreement with those jurisdictions which have ruled that intentional or expected are synonomous [sic] for purposes of insurance exclusionary clauses. In doing so, we have balanced the need to protect laymen from unforeseeable and hypertechnical legal constructions against the insurance industry's right to control which risks it wishes to provide contractual protection for. If the industry feels that our decision is in error and in serious conflict with its interests, its task is a simple one. It can protect itself by re-writing its policies to clearly exclude those risks against which it does not want to insure.").

[FN7]
**U.S.**
Allstate Ins. Co. v. Biggerstaff, 703 F. Supp. 23 (D.S.C. 1989) (emotional harm is bodily injury, the court also stating "that the damages resulting from the actions, and not merely the actions themselves, must be intentional, is clearly the law in South Carolina today.")

**Me.**
Burns v. Middlesex Ins. Co., 558 A.2d 701 (Me. 1989) (that test is whether insured "subjectively wanted" or "subjectively saw as practically certain" bodily injury to occur from her conduct)

**N.Y.**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

8 Williston on Contracts § 19:20 (4th ed.)

State Farm Fire and Cas. Co. v. Irene S., 138 A.D.2d 589, 526 N.Y.S.2d 171 (2d Dep't 1988) (exclusion for intended or expected consequences did not necessarily preclude coverage for transmission of herpes since actor could intend acts yet not consequences of actions).

[FN8]
**U.S.**
Aetna Cas. & Sur. Co. v. Sheft, 989 F.2d 1105 (9th Cir. 1993) (both the court of appeals and district court opinions containing exceptional discussions of California law concerning willful acts excluded from insurance coverage by statute; affirming district court's grant of summary judgment, holding that insurer had no duty to defend or indemnify estate of a movie star with respect to claims of former homosexual lover that the decedent engaged in high-risk sex knowing that he had the AIDS virus and intentionally concealed and misrepresented that fact; the court said: "Faithfully applying the law of California, as we must, the issue becomes not whether [decedent] had a preconceived design to inflict harm upon [his lover], but whether [decedent]'s act in affirmatively misrepresenting that he did not have AIDS with the intent to induce [the lover] to engage in high risk sex would be deemed inherently harmful by the California Supreme Court. California law is unsettled on this issue.

"Based on its analysis in [the leading California decision], which involved another emotionally-charged sexual act, we believe that the California Supreme Court would be impressed by the seriousness and deadliness of AIDS and, therefore, inclined to declare that [decedent]'s conduct was inherently harmful. It is undisputed that [decedent] knew that he was infected with the AIDS virus, and that he intentionally misrepresented and concealed his condition with the intent to induce [his lover] to engage in high risk sex over a period of nearly eight months. [Decedent] put [the lover's] health in jeopardy during an eight month period by willfully exposing [him] to the deadly AIDS virus. Finally, as a result of [decedent]'s misrepresentation, [the lover] suffered severe emotional distress. We therefore believe the California Supreme Court would reject the first three of the Estate's arguments and hold that [decedent]'s knowing exposure of [the lover] to a deadly disease was inherently harmful.

"Contrary to the Estate's assertion, courts applying California law have precluded coverage under [the California statute] even in the absence of a felony conviction … . In addition, the Estate's suggestion that [the lover] consented to the act producing his injuries is irrelevant. While [he] consented to have sex, he did not consent to be intentionally exposed to AIDS … .

"[W]e hold that [decedent]'s intentional misrepresentation that he did not have AIDS in order to induce [his lover] to engage in high risk sex would be held by the California Supreme Court to be inherently harmful conduct. Accordingly, [the statute] precludes coverage as a matter of law.").

**U.S.**
Allstate Ins. Co. v. Gilbert, 852 F.2d 449 (9th Cir. 1988) (husband and wife were insured by a homeowner's policy that excluded from coverage injuries caused by intentional acts of insured; husband molested a child, and child and her parents filed suit against husband, alleging intentional misconduct, and wife, alleging negligence in supervision; held, insurer did not have duty to defend or indemnify husband since his conduct was intentional within the meaning of a California statute and the policy exclusion, and while allegations as to wife were in negligence, since the action arose from intentional acts of "an insured," the husband, no duty existed as to wife either; the court said as to the husband that "intent to cause harm in molesting a child is supplied as a matter of law," and as to the wife "that by excluding insurance coverage for injury or damage intentionally caused by 'an insured person,' Allstate unambiguously excluded coverage for damages caused by the intentional wrongful act of any insured

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

WILLSTN-CN § 19:20
8 Williston on Contracts § 19:20 (4th ed.)

Case 2:10-md-02179-CJB-DPC   Document 4477-51   Filed 11/03/11   Page 15 of 73

Page 15

under the policies … . The … complaint seeks to recover damages for injuries intentionally caused by [husband], 'an insured person' under the policies. Coverage for these injuries is thus precluded whether compensation is sought from [husband or wife]")

State Farm Fire & Cas. Co. v. Ezrin, 764 F. Supp. 153 (N.D. Cal. 1991) (applying California law, noting cases from other jurisdictions as well; when act engaged in is wrongful, intent of insured to injure may be inferred, and alleged nonconsensual sexual assault was by its nature wrongful act)

Allstate Ins. Co. v. Bailey, 723 F. Supp. 665 (M.D. Fla. 1989) (molestation of a four-year-old by a 15-year-old; molestation, by its nature, is an act which leads to injury or harm, and intent to injure will be inferred, regardless of age of perpetrator; since no specific intent is required, age of molester is not relevant)

Allstate Ins. Co. v. Browning, 598 F. Supp. 421 (D. Or. 1983) (insurance policy which excluded coverage for intentional conduct excluded coverage for cross burning since such conduct was so certain to cause the harm alleged that intention would be inferred)

**Cal.**

Cf. J. C. Penney Casualty Ins. Co. v. M. K., 52 Cal. 3d 1009, 278 Cal. Rptr. 64, 804 P.2d 689 (1991) (child molester's motive in molesting child—alleged by the victim and her mother, as well as by psychiatrists on their behalf to have been the misguided attempt at affection—was irrelevant to the question whether homeowner's policy covered molestation, nor could insured show or attempt to show that he intended no harm)

**Fla.**

Landis v. Allstate Ins. Co., 546 So. 2d 1051 (Fla. 1989) (child molestation was intentional act, regardless of actor's state of mind, and fell within intentional acts exclusion of insurance policy)

**Haw.**

Hawaiian Ins. & Guar. Co., Ltd. v. Blanco, 72 Haw. 9, 804 P.2d 876 (1990) (overruled on other grounds by, Dairy Road Partners v. Island Ins. Co., Ltd., 92 Haw. 398, 992 P.2d 93 (2000)) (insured should have reasonably expected that physical injury to victim and emotional injury to victim's wife would follow discharge of weapon in victim's direction even assuming that insured's intent was only to frighten victim)

**Ill.**

Prudential Property & Cas. Ins. Co. v. Kerwin, 215 Ill. App. 3d 1086, 159 Ill. Dec. 425, 576 N.E.2d 94 (1st Dist. 1991) (the court said: "The facts that led to the shooting are not in dispute. [The insured] insulted [the victim's wife]. [The victim] responded by shouting an obscenity at [the insured]. [The insured] drew a gun, and then pointed it at [the victim] and shot him while he was only 10 feet away. [The victim] was not armed, and there was no physical threat to [the insured]. There is nothing to suggest that the gun was accidentally discharged. Plainly, the undisputed facts leave no doubt that [the insured] intended to injure [the victim].")

**Me.**

Perreault v. Maine Bonding & Cas. Co., 568 A.2d 1100 (Me. 1990) (the court, though recognizing that its previous decisions generally required an insurer to defend tort claims brought against their insureds

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

WILLSTN-CN § 19:20
8 Williston on Contracts § 19:20 (4th ed.)

Case 2:10-md-02179-CJB-DPC   Document 4477-51   Filed 11/03/11   Page 16 of 73
Page 16

only when the insured subjectively intended the injury or subjectively knew that injury was practically certain, said as to sexual assault of a child: "The crime for which [the insured] was convicted, however, cannot support a finding of injury other than the expected or intended injury excluded by the homeowner's policy … . By definition, [the insured] was not convicted of any inadvertent or negligent touching of the victim's genitals. He makes no such claim, nor could he in view of his criminal conviction. He, however, asserts that he did not 'expect' or 'intend' any injury to the young child as a result of the criminal sexual contact. We cannot, however, accept that any factfinder could rationally give any credit to [the insured's] assertion. On any objective basis, anyone intentionally committing the offense of unlawful sexual contact against a child is bound to expect that psychological and emotional harm will result. Harm from the sexual abuse of a child is so highly likely to occur that the intent to commit the act inherently carries with it the intent to cause the resulting injury. We rule as a matter of law that any injury produced by a criminal act of sexual abuse against a child is 'injury … expected or intended by the insured' within the meaning of the homeowner's exclusion.'

"Our decision today is consistent with the holding of the overwhelming majority of courts that 'because injury always ensues, the offender is deemed to intend any injury resulting from the act as a matter of law.' … Furthermore, homeowner's coverage for criminal sexual abuse of children is undoubtedly outside the contemplation of the parties to the insurance contract; indeed, '"[t]he average person purchasing homeowner's insurance would cringe at the very suggestion that [the person] was paying for such coverage. And certainly [the person] would not want to share that type of risk with other homeowner's policyholders."' … Denial of coverage is also 'in accord with the general rule that insurance to indemnify an insured against his or her own violation of criminal statutes is against public policy and, therefore, void.'").

**Minn.**

R.W. v. T.F., 528 N.W.2d 869 (Minn. 1995) (containing an exceptional review of Minnesota law, holding that transmission of herpes was intentional within meaning of exclusion, the court said in part: "The law in Minnesota is well-settled that an intentional act exclusion applies only where the insured acts with the specific intent to cause bodily harm … . Specifically, the requisite intent demands that the insured intended the harm itself, not merely that the insured generally intended to act … . Thus, the appropriate question in this case is not whether [defendant] intended to have sexual intercourse with [plaintiff], but rather whether he intended to transmit herpes

"We have said that the necessary intent may be established either by proving an insured's actual intent to injure or by inferring such intent as a matter of law … . The record indicates, and the jury found, that [defendant] did not have an actual desire or intent to give [plaintiff] herpes. Therefore, we must consider whether this is a proper case for inferring the requisite intent as a matter of law.

"We have considered this question in a number of other contexts and have established a general rule that the inference of intent arises when the nature and circumstances of the insured's act were such that harm was substantially certain to result … .

"Although [defendant's] negligence claim is unlike earlier Minnesota cases in that it does not stem from criminal acts or an intentional tort, we find the underlying legal reasoning and policy considerations applicable to the issue before us. The determination to infer intent as a matter of law results from a case by case factual inquiry, not a bright line rule of law. More specifically, the facts of particular import-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ance are those tending to show the likelihood of the harm—the greater the likelihood of the harm occurring, the more reasonable it is to infer intent.

"In this matter, the jury found that [defendant] knew or should have known that he had herpes and that he could transmit the disease through unprotected sexual intercourse. Under these circumstances, [his] decision to engage in unprotected sexual intercourse constituted a serious threat of injury to [plaintiff] that was substantially likely to occur, and did in fact occur. We conclude that [defendant's] transmission of herpes to [plaintiff], while not necessarily malicious, was intentional as a matter of law. [Plaintiff's] claim against [the insurer] must fail because the intentional act exclusion precludes coverage.

"We also note that it is contrary to the purpose of insurance coverage and public policy to indemnify [defendant's] conduct in this case. The jury found that [defendant] knew he had herpes and knew that he could transmit it to [plaintiff]. Nevertheless, [defendant] proceeded to have sexual intercourse without protection and without informing [plaintiff] of his condition. We refuse to promote the abdication of personal responsibility by providing insurance coverage when an insured engages in unprotected sexual intercourse despite having knowledge that he is infected with herpes, a highly contagious and serious sexually transmitted disease.").

**N.C.**
Patti v. Continental Cas. Co., 126 N.C. App. 643, 486 S.E.2d 233 (1997), writ denied, 347 N.C. 401, 494 S.E.2d 417 (1997) (reviewing and synthesizing prior North Carolina case law, holding that a claim based on wrongful termination alleged intentional conduct from which could be inferred intent to injure so that coverage under a professional liability policy was excluded)

Eubanks v. State Farm Fire and Cas. Co., 126 N.C. App. 483, 485 S.E.2d 870 (1997) (the court, having previously determined that sexual harassment was so likely to cause harm that intent to cause harm may be inferred, considered whether that rule ought only to apply to sexual offenses or rather should extend to solicitation to commit murder; the court said: "Notwithstanding, plaintiffs attempt to distinguish our holdings … as limited to 'cases involving sexual offenses.' However, we cannot fairly characterize efforts by an individual to obtain the death of another by the hiring of a paid assassin as less deplorable or outrageous, and thus less likely to result in injury or emotional distress, than the conduct considered in those opinions … .

"We therefore hold solicitation to commit murder is an extreme and outrageous act so nearly certain to result in emotional injury to the intended victim and spouse or parent thereof that intent to commit such injury may be inferred from the act … . Accordingly, [insured's] conduct in arranging to pay [an agent posing as a hit man] to murder [plaintiffs] was an extreme and outrageous act so nearly certain to result in emotional injury to plaintiffs that [insured's] intent to inflict that injury may be inferred from her conduct.

"… As the conduct of [insured] may be inferred to have intended the emotional distress which forms an essential element of plaintiffs' claims against her, defendant was not obligated to defend [insured] against those claims under the policy which expressly excluded liability for injury 'expected or intended by the insured.'").

**Wash.**
Western Nat. Assur. Co. v. Hecker, 43 Wash. App. 816, 719 P.2d 954 (Div. 2 1986) (insured was found

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

8 Williston on Contracts § 19:20 (4th ed.)

to have deliberately forced a third party to engage in anal intercourse, though he asserted that he had not intended to penetrate her anally and that he intended no harm; his insurer brought a declaratory judgment action, and the court first ruled that the act of anal intercourse and its accompanying injury was not an occurrence or an accident within the meaning of the policy because it was deliberate, and then said that even if it were initially covered, it would be excluded as intentionally caused harm, stating: "(1) The minority view follows the classic tort doctrine of looking to the natural and probable consequences of the insured's act; (2) The majority view is that the insured must have intended the act and to cause some kind of bodily injury; (3) A third view is that the insured must have had the specific intent to cause the type of injury suffered … . The majority view, which we now adopt, can be summarized as follows: (1) the insured must intend both the act and the injury; (2) intent may be actual or may be inferred by the nature of the act and the accompanying reasonable foreseeability of harm; (3) once intent to cause injury is found, it is immaterial that the actual injury caused is of a different character or magnitude than that intended … . Under this majority view, whether an act is intentional is a separate consideration that must be distinguished from whether the actor intended to cause injury. This approach avoids the logically untenable result that unless the insured intended the specific injury suffered, coverage is not excluded under the intentional injury exclusion.

"In the case before us, [insured] denies, first, that he acted intentionally and, second, that he intended any injury. The trial court did not make a specific finding that [insured] intended to injure [victim]. We need not, however, make that factual determination. We conclude that an act of forcible anal intercourse is an act of such a character that an intent to cause injury can be inferred as a matter of law. The character of the act is such that physical as well as mental trauma can be foreseen as accompanying it.").

[FN9] § 12:3.

**U.S.**

O'Neill v. Yield House Inc., 964 F. Supp. 806 (S.D. N.Y. 1997) (New York law precludes indemnification for punitive damages, but New Hampshire law permits indemnification for punitive damages; policies under precluding a punitive damage award may not apply when the tortfeasor is insolvent)

**Cal.**

PPG Industries, Inc. v. Transamerica Ins. Co., 20 Cal. 4th 310, 84 Cal. Rptr. 2d 455, 975 P.2d 652 (1999) (public policy prohibits indemnification for punitive damages)

**Minn.**

Lake Cable Partners v. Interstate Power Co., 563 N.W.2d 81 (Minn. Ct. App. 1997) (for public policy reasons, indemnification agreement may not include indemnification for intentional conduct that could support award of punitive damages).

Westlaw. © 2011 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

WILLSTN-CN § 19:20

END OF DOCUMENT

C

West's Louisiana Statutes Annotated Currentness
  Louisiana Civil Code
    Book III. Of the Different Modes of Acquiring the Ownership of Things (Refs & Annos)
      Title IV. Conventional Obligations or Contracts (Refs & Annos)
        Chapter 8. Effects of Conventional Obligations (Refs & Annos)
          Section 4. Damages
            → **Art. 2004. Clause that excludes or limits liability**

Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party.

Any clause is null that, in advance, excludes or limits the liability of one party for causing physical injury to the other party.

CREDIT(S)

Acts 1984, No. 331, § 1, eff. Jan. 1, 1985.

REVISION COMMENTS--1984

2008 Main Volume

    (a) This Article is new. It does not change the law, however. It expresses a consequence of the principle of contractual freedom stated in C.C. Art. 1901 (1870). In Freeman v. Department of Highways, 253 La. 105, 217 So.2d 166 (1968), the Supreme Court held that, as a matter of principle, clauses excluding or limiting liability for intentional fault (*fraud* or *dol*) are invalid because a party would be free to per-form or not to perform at will. Hence, his obligation would be subject to a purely potestative condition that would make it null. That reasoning aside, such clauses are against public policy because the over-riding principle of good faith would be destroyed if it were possible to contract away liability for fraud. Foreign civil codes contain abundant indication of the universality of this conclusion. See also Hayes v. Hayes, 8 La.Ann. 468 (1852).

    (b) This Article does not apply where federal legislation prevails. See 46 U.S.C. § 1304(5) and 49 U.S.C. §§ 20(11), 319, 1013; Comment, "Limitations of Liability: Passenger Injuries and Baggage Losses on Land, Sea, and Air," 34 Tul.L.Rev. 354 (1960).

    (c) Under this Article, a clause relieving a party from liability for damage caused by delay is valid. See Freeman v. Department of Highways, 253 La. 105, 217 So.2d 166 (1968).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(d) Under this Article, a clause relieving a party from liability for damage to property caused through slight fault is valid, unless prohibited by special statutes. See R.S. 10:7-309. See also Litvinoff, "Stipulations as to Liability and as to Damages," 52 Tul.L.Rev. 258 (1978).

(e) This Article does not govern "indemnity" clauses, "hold harmless" agreements, or other agreements where parties allocate between themselves, the risk of potential liability towards third persons. See Polozola v. Garlock, Inc., 343 So.2d 1000 (La.1977); Green v. Taca International Airlines, 304 So.2d 357 (La.1974); Reeves v. Louisiana and Arkansas Railway Company, 282 So.2d 503 (La.1973).

(f) This Article does not supersede R.S. 9:3221. See Terrenova v. Feldner, 28 So.2d 287 (La.App.Orl.Cir.1946); Tassin v. Slidell Mini-Storage, Inc., 396 So.2d 1261 (La.1981).

## HISTORICAL AND STATUTORY NOTES

2008 Main Volume

Source:

C.C. Arts. 11, 19, 1901, 1930, 2504, and 3556(13) (1870); Italian Civil Code Art. 1229; Quebec Draft Civil Code (1977) Arts. 300-303; Argentine Civil Code Art. 507; Swiss Code of Obligations Art. 100; Greek Civil Code Art. 332.

Titles III and IV of Book III of the Civil Code of 1870, which formerly contained C.C. arts. 1756 to 2291, all relative to Obligations, were amended and reenacted by Acts 1984, No. 331, § 1, to contain C.C. arts. 1756 to 2057, effective January 1, 1985.

Former art. 2004 of the 1870 Civil Code was redesignated as R.S. 9:2785 by Acts 1984, No. 331, § 4, effective January 1, 1985.

Section 4 of Acts 1984, No. 331 provides:

"The Louisiana State Law Institute is hereby instructed to transfer and redesignate Civil Code Arts. 2004 through 2006 as R.S. 9:2785 through 2787, as Chapter 4 of Code Title IV of Code Book III, entitled 'Death of a Party'. This redesignation is neither an amendment to nor reenactment of these Articles."

For history and text of former C.C. arts. 1756 to 2291 of the 1870 Civil Code prior to the 1984 Obligations Revision, and for similar provisions in earlier Codes, see Vol. 16, LSA-C.C. (Compiled Edition).

For disposition of the subject matter of the former articles, see the Disposition Table at the beginning of this Title.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

CROSS REFERENCES

    Assumption of responsibility by lessee, see R.S. 9:3221.

    Fault defined, see C.C. art. 3506.

    Freedom to contract for object, see C.C. arts. 1971, 1972.

    Laws for the preservation of the public interest, see C.C. art. 7.

    Liability of seller for personal act, see C.C. art. 2503.

LAW REVIEW AND JOURNAL COMMENTARIES

Contract, delict, morals, and law. Saul Litvinoff, 45 Loy.L.Rev. 1 (1999).

Contractual risk-shifting in offshore energy operations. Daniel B. Shilliday, Walter R. Mayer, John J. Michael, and Andrew P. Slania, 81 Tul.L.Rev. 1579 (2007).

Enforceability of "no damage for delay" clauses in construction contracts. 28 Loy.L.Rev. 129 (1982).

The lessor's privilege. 3 Tul.Civ.L.F. 1 (1975).

*Ramirez v. Fairgrounds Corporation:* The harm in holding harmless. 52 La.L.Rev. 1061. (1992).

Stipulations as to liability and as to damages. Saul Litvinoff, 52 Tul.L.Rev. 258 (1978).

LIBRARY REFERENCES

2008 Main Volume

    Contracts ⌾➞ 114.

    Westlaw Topic No. 95.

    C.J.S. Contracts § 271.

RESEARCH REFERENCES

2010 Electronic Update

ALR Library

2006 ALR 6th 14, Validity, Construction, and Application of Contractual Waiver of Subrogation Provision.

74 ALR 3rd 187, Validity and Construction of "No Damage" Clause With Respect to Delay in Building or Construction Contract.

175 ALR 8, Validity of Contractual Provision by One Other Than Carrier or Employer for Exemption from Liability, or Indemnification, for Consequences of Own Negligence.

67 ALR 208, Right to and Measure of Compensation for Animals or Trees Destroyed to Prevent Spread of Disease or Infection.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Treatises and Practice Aids

5 LA Civil Law Treatise § 4.23, Transferred Articles.

5 LA Civil Law Treatise § 16.45, Assumption of Risk and Quasi-Delict.

6 LA Civil Law Treatise § 5.1, Failure to Perform and Fault.

6 LA Civil Law Treatise § 13.1, Principle.

6 LA Civil Law Treatise § 5.28, in Search of a Conceptual Foundation.

6 LA Civil Law Treatise § 11.14, Damage to Person.

6 LA Civil Law Treatise § 11.15, Damage to Property.

6 LA Civil Law Treatise § 13.22, Intentional Fault, Gross Fault, Bad Faith, or Fraud.

6 LA Civil Law Treatise § 16.28, The Unification of Different Regimes of Liability.

12 LA Civil Law Treatise § 5:15, Illegitimates as Beneficiaries.

12 LA Civil Law Treatise § 18:29, Lessor Liability--Foreword.

18 LA Civil Law Treatise § 12.14, La.R.S. 9:3221--Shifting of Lessor's Responsibility to Lessee (Where Applicable).

Louisiana Divorce § 9A:19, La. Civ. C. Art. 2329. Exclusion or Modification of Matrimonial Regime.

Louisiana Real Estate Transactions § 18:4, Requirements for Valid Lease.

Louisiana Real Estate Transactions § 18:18, Title of Lessor.

Louisiana Real Estate Transactions § 18:23, Implied Rights and Obligations--Implied Obligations of Lessor--Lessor's Warranty Against Defects in Leased Premises.

Louisiana Real Estate Transactions § 18:24, Implied Rights and Obligations--Implied Obligations of Lessor-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

-Lessee's Assumption of Liability for Condition of Premises.

Louisiana Real Estate Transactions § 18:26, Implied Rights and Obligations--Implied Obligations of Lessor-
-Lessee's Assumption of Liability for Condition of Premises--Effect of Lessor's Intentional or Gross Fault.

Louisiana Real Estate Transactions § 9:107, Remedies for Breach of Purchase Agreement--Damages, Attorney's
Fees and Costs--Effect of Bad Faith.

NOTES OF DECISIONS

Advertisements 9
Construction and application 2
Construction of clauses 3
Construction with federal law 2.5
Delays 4
Drilling contract 5
Future rights 15
Gross negligence 8
Implied warranties 6
Insurance 10
Leases 11
Negligence 7
Peremption 16
Public policy 1
Theaters 12
Transportation 13
Warehousemen and warehouse receipts 14

1. Public policy

It is contrary to public policy and in contravention of state law to allow contracting party to prospectively ab-
solve itself from liability for injuries incurred through its intentional or grossly negligent acts. Broom v. Leebron
& Robinson Rent-A-Car, Inc., App. 2 Cir.1993, 626 So.2d 1212. Contracts ⊂⟩ 114

It is against public policy for a person to stipulate for a partial immunity for the commission of a future immoral
act. Hayes v. Hayes, 1852, 8 La.Ann. 468.

2. Construction and application

Article addressing clauses that exclude or limit liability does not nullify indemnity agreements limiting liability
of one party for causing injury to third party; article addresses only clauses excluding or limiting liability of one
party for injury to other party to contract. Bertrand v. Lala, App. 5 Cir.1992, 600 So.2d 788. Indemnity ⊂⟩
30(1)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Comments in this article that any clause is null that, in advance, excludes or limits liability of one party for causing physical injury to the other party were not part of the law and had no legislative effect on the article. Ramirez v. Fair Grounds Corp., Sup.1991, 575 So.2d 811. Statutes ⚷ 211

### 2.5. Construction with federal law

Federal statute prohibiting any state law or regulation related to a price, route, or service of any motor carrier did not preempt state statute prohibiting pre-accident waivers of liability, for purposes of determining validity of pre-accident waiver of liability that lessee of tractor-trailer required passenger to sign before passenger was injured in accident while riding in the tractor-trailer; state statute preserved a tort remedy for its citizens, and passenger's tort claim was not directly related to price, route, or service of interstate carrier. Ryes v. Home State County Mut., App. 3 Cir.2008, 983 So.2d 980, 2007-1266 (La.App. 3 Cir. 5/14/08), writ denied 988 So.2d 245, 2008-1213 (La. 8/12/08). Contracts ⚷ 114; States ⚷ 18.15

### 3. Construction of clauses

That indemnity agreements are to be strictly construed does not mean that such clauses are to be disregarded, but agreement must be given effect intended by parties. McNeal v. Wyeth-Scott, Inc., App.1982, 415 So.2d 568; Day v. Ocean Drilling & Exploration Co., D.C.1973, 353 F.Supp. 1350.

Under Louisiana law, contracts limiting liability are generally valid and enforceable; however, any waiver of liability for intentional misconduct or gross negligence is void. Houston Exploration Co. v. Halliburton Energy Services, Inc., C.A.5 (La.)2001, 269 F.3d 528, on remand 2002 WL 1963313. Contracts ⚷ 114

Schedule contained in contract clause dealing with amounts to be paid to engineering firm upon termination of the contract by power company provided that cancellation charges should equal the costs actually incurred by the engineering firm but that, if the costs were higher than the percentage of the contract listed in the schedule, the percentage would place a ceiling on recovery; listing of percentages in the schedule did not entitle the engineering firm to that amount. Southwestern Engineering Co. v. Cajun Elec. Power Co-op., Inc., C.A.5 (La.)1990, 915 F.2d 972. Contracts ⚷ 229(1)

No inherent conflict existed between no-damages-for-delay provision of mechanical services contract and schedule provided in contract for plant relocation project at issue, and therefore schedule did not take precedence over damages provision to permit contractor to recover additional compensation from project owner and its agent based on project delays and work disruptions. Pellerin Const., Inc. v. Witco Corp., E.D.La.2001, 169 F.Supp.2d 568. Contracts ⚷ 299(2)

Provision in renovation contract requiring contractor to maintain insurance to protect property owner from third-party claims arising out of contractor's operations was not nullified under Civil Code article that would invalidate provisions excluding or limiting liability of one party to another. Myers v. Burger King Corp., App. 4 Cir.1993, 618 So.2d 1123, writ denied 629 So.2d 348. Contracts ⚷ 114

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Indemnity provisions of oil well drilling contract were null to extent that they, in advance, excluded or limited liability of contractor for intentional or gross fault that caused damage to operator. Sevarg Co., Inc. v. Energy Drilling Co., App. 3 Cir.1991, 591 So.2d 1278, writ denied 595 So.2d 662. Indemnity 🔑 30(5)

Clauses in stall space agreement between race horse trainer and fairgrounds in which trainer, in advance, re-leased fairgrounds from any and all liability for damages suffered by trainer were null under this article nullify-ing clauses that, in advance, exclude or limit liability of one party for causing physical injury to the other party. Ramirez v. Fair Grounds Corp., Sup.1991, 575 So.2d 811. Contracts 🔑 114

Limitation of liability on part of company which agreed to design, fabricate, and install system for grain unload-ing to making of necessary repairs and furnishing of necessary parts applied to all obligations under the contract and not merely to the hardware and machinery. FMC Corp. v. Continental Grain Co., App. 4 Cir.1977, 355 So.2d 953, application withdrawn 356 So.2d 1001. Sales 🔑 280

When there is anything doubtful in indemnity agreements, court must endeavor to ascertain what was common intention of parties, rather than adhere to literal sense of terms. Polozola v. Garlock, Inc., Sup.1977, 343 So.2d 1000. Indemnity 🔑 31(2)

Contract of indemnity whereby indemnitee is indemnified against consequences of his own negligence is strictly construed and such contract will not be construed to indemnify indemnitee against losses resulting to him through his own negligent act, unless such intention was expressed in unequivocal terms. Polozola v. Garlock, Inc., Sup.1977, 343 So.2d 1000. Indemnity 🔑 31(6)

Contract of indemnity will not be construed to indemnify indemnitee against losses resulting to him through his own negligent acts where such intention is not expressed in unequivocal terms. Green v. TACA Intern. Airlines, Sup.1974, 304 So.2d 357. Indemnity 🔑 31(6)

   4. Delays

Under Louisiana law, no-damages-for-delay clause in construction contract was enforceable, given absence of evidence of bad faith, gross fault, or intentional fault by project owner and its agent, notwithstanding contract-or's claims that owner and agent provided incomplete engineering drawings, rescheduled and resequenced work, caused crowded work conditions, and were responsible for late equipment and material deliveries and changes in scope of work. Pellerin Const., Inc. v. Witco Corp., E.D.La.2001, 169 F.Supp.2d 568. Contracts 🔑 299(2)

State was entitled to 15 days' worth of liquidated damages for delay in completion of state construction project, where State claimed it was entitled to 212 days' worth of liquidated damages for delay in completing contract, but trial court determined that contractor was entitled to delay damages for 197 days as State and/or its architects were responsible for 197 days of delayed performance; that finding necessarily included rejection of contractor's claim that State was responsible for any delay in excess of 197 days. Fibrebond Corp. v. Aetna Cas. & Sur. Co., App. 1 Cir.1991, 583 So.2d 848. Damages 🔑 78(4)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Delay damages awarded to general contractor on state construction project were not shown to include items which contract prohibited including in calculating cost of work, and reduction of delay damages award was accordingly not required; construction analyst testified that average daily rate for general conditions was $223.83 and that average daily general and administrative expense costs was $230.50, for combined daily rate of $453.33, and damages of $222.83 per day were awarded. Fibrebond Corp. v. Aetna Cas. & Sur. Co., App. 1 Cir.1991, 583 So.2d 848. States ☞ 108

It is not against public policy for contracting parties to agree that, in case one of them fails to perform certain act timely and thus delays other in performance of his obligations, the former will not be held responsible for any damage caused by the delay. Freeman v. Department of Highways, Sup.1968, 253 La. 105, 217 So.2d 166. Contracts ☞ 108(2)

#### 5. Drilling contract

Indemnity provision of drilling contract holding operator responsible for damage to or loss of hole without limit and without regard to cause or negligence of any party violates statutory prohibition against excluding or limiting liability of one party for intentional or gross fault that causes damage to other party or excluding or limiting liability of one party for causing physical injury to other party; thus, the clause is null. Massey v. Decca Drilling Co., Inc., App. 2 Cir.1994, 647 So.2d 1196, 25,973 (La.App. 2 Cir. 12/7/94), rehearing denied , writ denied 653 So.2d 563, 1995-0069 (La. 4/21/95), writ denied 653 So.2d 564, 1995-0411 (La. 4/21/95), writ denied 653 So.2d 564, 1995-0417 (La. 4/21/95). Indemnity ☞ 30(5)

#### 6. Implied warranties

Under Louisiana law, as predicted by Fifth Circuit, state statute that rendered null any contract clause that excludes or limits liability of one party for intentional or gross law that causes damage to other party allows limitations on warranties, but renders null limitations on warranties when obligor is guilty of gross fault. Occidental Chemical Corp. v. Elliott Turbomachinery Co., Inc., C.A.5 (La.)1996, 84 F.3d 172. Contracts ☞ 114; Contracts ☞ 205.30

Allegations that subcontractor committed gross negligence in performing subcontract to rerate turbines and compressors was sufficient to allege that subcontractor committed gross fault, such that warranty provision in contract, that limited duration of subcontractor's liability to one year, impermissibly limited duration of warranty that involved gross fault, and so was void. Occidental Chemical Corp. v. Elliott Turbomachinery Co., Inc., C.A.5 (La.)1996, 84 F.3d 172. Contracts ☞ 114

Enforcement of default judgment, entered in action for damages concerning agreement to supply and service computer software, would be unconscionable and inequitable and, therefore, default judgment would be annulled, where letter from counsel for plaintiff indicated that he would request counsel for defendants to file responsive pleadings if parties were unable to reach amicable settlement, but such notice was not given before default judgment was sought. LeBlanc v. Electronic Clinic, Inc., App. 3 Cir.1987, 509 So.2d 629. Judgment ☞ 143(17)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Even though lessees assumed responsibility for water damage caused by vice or defect in premises by freely entering into warehouse agreements which clearly and unambiguously transferred such liability, owners lessors were not relieved of implied warranty in lessees' favor, where owners lessors knew or should have known that storage units were defective in that they did not secure against entering of water into units resulting from rain normally occurring in that area. Tassin v. Slidell Mini-Storage, Inc., Sup.1981, 396 So.2d 1261. Landlord And Tenant ⚷ 166(2)

#### 7. Negligence

Portion of contract between engineering firm and city respecting sewer improvement job, limiting firm's responsibility for general contractor's work methods, was not rendered invalid by statute prohibiting contract clause that, in advance, excludes or limits liability of one party for causing physical injury to the other party, absent privity of contract between firm and either general contractor or its employee, who was injured in excavation ditch on job, for purposes of employee's action against firm. Yocum v. City of Minden, App. 2 Cir.1995, 649 So.2d 129, 26,424 (La.App. 2 Cir. 1/25/95). Municipal Corporations ⚷ 350

Negligence of security firm employee, in permitting unauthorized individual on car dealership lot and in failing to close lot gate adequately, which resulted in theft of car, did not constitute breach of contract for security services such that contract limitation of liability clause was inapplicable; clause provided that security firm was not liable for losses "irrespective of origin * * * whether directly or indirectly caused by performance or nonperformance of obligations * * * or by negligent acts or omissions * * *," regardless of additional provision that security firm would "do its best.". Banner Chevrolet v. Wells Fargo Guard Services, App. 4 Cir.1987, 508 So.2d 966. Contracts ⚷ 189.5

An agreement to relieve one from liability for his malperformance of a contract is in substance comparable to an agreement to indemnify one against one's own negligence, and such an indemnity must be expressed in unequivocal terms. Melancon v. Juno, App. 4 Cir.1976, 337 So.2d 652. Contracts ⚷ 189.5

#### 8. Gross negligence

Failure of contractor, which was hired to perform drill stem testing on gas well, to verify that IPO valve installed had been properly pinned and to disassemble the test string and recheck the work did not constitute gross negligence under Louisiana law; thus, indemnity agreement which required owner to release and indemnify contractor for damages incurred when gas well blew out was valid and enforceable. Houston Exploration Co. v. Halliburton Energy Services, Inc., C.A.5 (La.)2001, 269 F.3d 528, on remand 2002 WL 1963313. Indemnity ⚷ 30(5); Mines And Minerals ⚷ 121

Purchaser's failure to explicitly plead intentional acts or gross negligence did not prohibit trial court from considering whether home inspection contract's advance $1000 liability limit was unenforceable under law, as fact pled gave company adequate notice of the potential causes of action. (Per opinion of Brown, C.J., with one judge joining and one judge concurring.) Cameron v. Bruce, App. 2 Cir.2008, 981 So.2d 204, 42,873, 42,983 (La.App. 2 Cir. 4/23/08), writ denied 992 So.2d 940, 2008-1127 (La. 9/19/08). Damages ⚷ 150

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cumulative acts of negligence by security company in installing security system in store that subsequently suffered undetected burglary constituted gross negligence, and thus, contractual provisions purporting to limit company's liability did not apply, where company failed to warn store that phone lines should be encased or buried and to take adequate steps necessary to guard warning siren from interference. Sportsman Store of Lake Charles, Inc. v. Sonitrol Sec. Systems of Calcasieu, Inc., App. 3 Cir.1998, 725 So.2d 74, 1998-851 (La.App. 3 Cir. 12/23/98), writ granted 739 So.2d 799, 1999-0201 (La. 3/26/99), reversed 748 So.2d 417, 1999-0201 (La. 10/19/99), rehearing denied. Telecommunications ⌐⌐ 1406

Trial court did not manifestly err in determining that exterminator was grossly negligent in failing to prohibit termite infestation in apartment complex, and thus exterminator's conduct was outside exculpatory clauses of pest control contract provision limiting exterminator's liability; exterminator failed to drill walkways as it was obligated to do under contract, termite damage was extensive, and exterminator had annual contract to inspect property. Tudor Chateau Creole Apartments Partnership v. D.A. Exterminating Co., Inc., App. 1 Cir.1997, 691 So.2d 1259, 1996-0951 (La.App. 1 Cir. 2/14/97). Negligence ⌐⌐ 306

   9. Advertisements

Limitation clause contained in contract for advertisement listing in telephone directory was binding on parties and while it may have seemed unfair, it was certainly unambiguous. Louisiana Shoes, Inc. v. South Cent. Bell Telephone Co., App. 5 Cir.1984, 445 So.2d 1304. Telecommunications ⌐⌐ 914(2)

Contractual clause, which limited telephone utility's liability, in regard to error in or admission from advertisement in yellow pages, to the amount of the charges for advertising, was not contrary to the law or public morals so as to be unenforceable. Roll-Up Shutters, Inc. v. South Central Bell Tel. Co., App. 4 Cir.1981, 394 So.2d 796, writ denied 399 So.2d 599. Telecommunications ⌐⌐ 914(2)

   10. Insurance

An indemnity agreement between drilling contractor and subcontractor requiring subcontractor to indemnify contractor against all risks of harm to subcontractor's employees while on platform on Outer Continental Shelf, when read as a whole, reflected parties' intention to require subcontractor to protect contractor against all risks of harm to subcontractor's employee who was injured while on the platform, not merely by assuming such risk itself, but by carrying insurance to cover it. Day v. Ocean Drilling & Exploration Co., E.D.La.1973, 353 F.Supp. 1350. Indemnity ⌐⌐ 33(5)

Automobile liability policy was not ambiguous as to preclusion of stacking of medical payments coverages under "limit of liability" and "other insurance" provisions so as to require application of rule providing for ambiguity in insurance contract to be resolved in favor of insured, notwithstanding provision for terms of policy to apply separately to each automobile when two or more automobiles were insured thereunder; provision concerning "two or more automobiles" in effect created as many policies as there were vehicles insured under policy, with result that "other insurance" provision came into effect. Jones v. Allstate Ins. Co., App. 3 Cir.1983, 429 So.2d 241. Insurance ⌐⌐ 2840

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

An insurer may limit its liability and, in the absence of ambiguity or conflict with statute or public policy, such limitation must be given effect. Hill v. Liberty Mut. Ins. Co., App. 4 Cir.1978, 357 So.2d 61, writ denied 359 So.2d 196. Insurance ☞ 2098

11. Leases

Statute prohibiting contract provisions that waived, in advance, a parties' claim for damages stemming from gross negligence or intentional bad acts did not apply to waiver of subrogation in commercial lease and, thus, did not preclude application of the waiver to tenant's property insurer's subrogation claims against landlord; the statute did not apply to agreements that allocated the risk of injury to third parties, and insurer was not a party to the lease agreement. Lifecare Hospitals of New Orleans, L.L.C. v. Lifemark Hospitals of Louisiana, Inc., App. 5 Cir.2008, 984 So.2d 894, 07-914 (La.App. 5 Cir. 4/15/08). Landlord And Tenant ☞ 29(1)

Provision of lease that lessor will not be liable to lessee for any damage to person or property caused by any act, omission or neglect of lessee or any other tenant of demised premises was null and void insofar as provision, in advance, excluded liability for physical injury. Verret v. Tonti Management Corp., App. 5 Cir.1995, 662 So.2d 480, 95-158 (La.App. 5 Cir. 6/28/95), rehearing denied , writ denied 667 So.2d 1054, 1995-3030 (La. 2/16/96). Landlord And Tenant ☞ 164(1); Landlord And Tenant ☞ 166(.5)

Article nullifying clauses that exclude or limit liability did not invalidate lease provisions exempting landlord from liability for damages resulting from condition of leased premises and did not negate effect of statute relieving landlord of liability for injury caused by unknown defect. Guillory v. Foster, App. 3 Cir.1994, 634 So.2d 1372, 1993-996 (La.App. 3 Cir. 3/2/94). Contracts ☞ 138(4)

Clause in lease which released landlord from any liability for any damage to person caused by act, omission, or neglect of lessee or any other tenant was null and unenforceable under statute nullifying clauses that, in advance, exclude or limit liability of one party for causing physical injury to other party. Boteler v. Lake Management, Inc., App. 5 Cir.1993, 628 So.2d 86. Release ☞ 20

Genuine issue of material fact existed as to whether automobile rental agency's refusal, under nonliability provision of rental agreement, to replace tires and wheels that had been stolen from rental vehicle constituted intentional or gross fault so as to make agency liable to renter for breach of contract. Broom v. Leebron & Robinson Rent-A-Car, Inc., App. 2 Cir.1993, 626 So.2d 1212. Judgment ☞ 181(19)

A provision in lease relieving landlord from responsibility to third persons for injuries from defects in leased premises, was effective to relieve landlord from such responsibility, even though Acts 1932, No. 174 permitting enforcement of such provision was not enacted until after expiration of lease, since the act was applicable to contracts executed prior to passage of the act. Terrenova v. Feldner, 1946, 28 So.2d 287. Landlord And Tenant ☞ 165(1)

Stipulation in lease relieving lessor of responsibility for damages by defect of leased property was lawful. Pecararo v. Grover, 1927, 5 La.App. 676.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-md-02179-CJB-DPC   Document 4477-51   Filed 11/03/11   Page 30 of 73

**12.** Theaters

Where proprietor of theater did not show that theater ticket purchaser was aware of limitations printed in very small type on ticket stating that management reserved right to refuse admission on ticket by refunding purchase price, the limitation did not foreclose the purchaser's right to recover damages for breach of contract including damages for humiliation and embarrassment where he was ejected from theater on sole ground that he was a cripple. Vogel v. Saenger Theatres, Sup.1945, 207 La. 835, 22 So.2d 189. Damages ☞ 57.49; Public Amusement And Entertainment ☞ 67

**13.** Transportation

In the absence of any express and unequivocal stipulation that defendant mover would not be liable for his own malperformance in moving plaintiff's house trailer, defendant could not be relieved from responsibility for damages on claim that plaintiff had agreed that he would not be responsible for any damages. Melancon v. Juno, App. 4 Cir.1976, 337 So.2d 652. Carriers ☞ 151.1

**14.** Warehousemen and warehouse receipts

Storage company which allowed third party, unauthorized by lessee, to enter lessee's storage unit and remove her possessions was liable to lessee, despite nonliability-for-theft provision of lease. Walker v. Self Service Storage and Miniwarehouses, Inc., App. 4 Cir.1986, 492 So.2d 210, annulled 519 So.2d 771. Warehousemen ☞ 24(7)

Defendant's furnishing of warehouse receipt containing customary exclusionary and limitation of liability clauses to plaintiff more than ten days after carpet had been accepted by defendant for storage did not make such clauses part of the contract of deposit and was not effective to limit defendant's liability to plaintiff for moth damage to stored rug. Olson v. Security Van Lines, Inc., App. 4 Cir.1974, 297 So.2d 674. Warehousemen ☞ 14

**15.** Future rights

Compromise or contractual clause is not null when it excludes or limits liability in advance except when party to contract relinquishes future rights of action arising from his physical injury or from intentional or gross fault of another party. Daigle v. Clemco Industries, Sup.1993, 613 So.2d 619. Compromise And Settlement ☞ 7.1

Compromise or settlement contract executed, prior to tort victim's death, by enumerated statutory beneficiaries with respect to their potential wrongful death claims did not violate law prohibiting tort victim from relinquishing by contract in advance his right to recover for damage caused by fault of another as contract did not fall into two specified types of contracts prohibited; beneficiaries did not sustain physical injury and defendants were not alleged to have been intentionally or grossly at fault. Daigle v. Clemco Industries, Sup.1993, 613 So.2d 619. Contracts ☞ 114

**16.** Peremption

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The one-year peremption period for filing action to annul judgment on grounds of fraud or ill practices began to run when husband knew or should have known that wife was living with and being supported by another man in Arizona, rather than date husband and wife's matrimonial agreement was approved and made the trial court's judgment, on husband's rule to terminate his obligation to pay spousal support. Greenland v. Greenland, App. 1 Cir.2009, 29 So.3d 647, 2008-2568 (La.App. 1 Cir. 12/9/09), writ denied 28 So.3d 1011, 2010-0004 (La. 3/5/10). Divorce ⚷ 610

The one-year limitation to file an action to annul is a period of peremption, and the burden of proof to show that a nullity action was brought within one year of the discovery of the fraud or ill practice is on the proponent of the nullity action. Greenland v. Greenland, App. 1 Cir.2009, 29 So.3d 647, 2008-2568 (La.App. 1 Cir. 12/9/09), writ denied 28 So.3d 1011, 2010-0004 (La. 3/5/10). Judgment ⚷ 456(1)

LSA-C.C. Art. 2004, LA C.C. Art. 2004

Current through the 2011 First Extraordinary Session.

(c) 2011 Thomson Reuters.No Claim to Orig. US Gov. Works.

END OF DOCUMENT

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

▷

United States Court of Appeals,
Fifth Circuit.
TODD SHIPYARDS CORPORATION, Plaintiff-
Appellee Cross Appellant,
v.
TURBINE SERVICE, INC., et al., and the Travel-
ers Insurance Company, Defendants-Appellees
Cross Appellants,
Sentry Insurance Company, et al., Defendants-Ap-
pellants Cross Appellees,
Auto Transportation, S.A., Intervenor-Appellee
Cross Appellant.
TURBINE SERVICE, INC. and the Travelers In-
surance Co., Plaintiffs-Appellants,
v.
The Vessel, S/S KATRIN, Defendant-Appellee,
Auto Transportation, S.A., Intervenor-Appellee
Cross Appellant.

No. 79-1685.
April 29, 1982.

Shipyard which had agreed to perform repairs
on vessel's turbine brought action against subcon-
tractor and subsubcontractor demanding return of
damaged parts. Subcontractors asserted a lien for
money due from shipyard. Vessel owner inter-
vened. The United States District Court for the Dis-
trict of Louisiana, Fred J. Cassibry, J., entered judg-
ment for owner, held that shipyard was entitled to
indemnity from subcontractors, and held that no ex-
clusion of insurance policies covering subcontract-
ors relieved their insurers from liability for dam-
ages caused by subcontractors, 467 F.Supp. 1257.
All parties, except insolvent subcontractor, ap-
pealed. The Court of Appeals, Dyer, Circuit Judge,
held that: (1) shipyard and subcontractors were li-
able to owner in damages for improper repair of
turbine rotor; (2) subcontractors were required to
indemnify shipyard, but first subcontractor was not
entitled to indemnity from subsubcontractor; (3)
District Court erred in finding shipyard guilty of

gross negligence; (4) District Court improperly cal-
culated loss of use time of the vessel since it failed
to apply percentage of operation time for period in-
volved; (5) owners were entitled to attorney fees
and prejudgment interest; (6) subcontractors' in-
surers were not excluded from liability for damage
to the entire ship or damages attributable to ship's
"down time"; and (7) defendants were not liable for
damage suffered by the ship in a second casualty.

Affirmed in part, modified in part, reversed in
part, and remanded.

West Headnotes

**[1] Admiralty 16 ⟨⟩118.7(5)**

16 Admiralty
  16XII Appeal
    16k118 Review
      16k118.7 Findings of Court
        16k118.7(5) k. Clearly Erroneous
Findings. Most Cited Cases
    Findings of fact made in an admiralty case are
binding unless clearly erroneous, and questions
concerning amount of damages, existence of negli-
gence and proximate causation are treated as factual
issues that are thus subject to clearly erroneous
standard.

**[2] Shipping 354 ⟨⟩76**

354 Shipping
  354V Rights and Liabilities of Vessels and
Owners in General
    354k76 k. Supplies, Repairs, and Advances.
Most Cited Cases
    In action in which shipowner sought to recover
damages to its ship's turbines allegedly caused by
negligence of shipyard, shipyard's subcontractor,
and subsubcontractor, trial court did not err in fail-
ing to exonerate subcontractor due to the parties' al-
leged mutual mistake of fact as to prepair condi-
tion of the turbine; existence of a defect extraneous
to contract between subcontractor and owner was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

wholly irrelevant.

**[3] Shipping 354 ☜76**

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
      354k76 k. Supplies, Repairs, and Advances. Most Cited Cases

   In action in which shipowner sought to recover damages to its ship's turbines allegedly caused by negligence of shipyard, shipyard's subcontractor, and subsubcontractor, district court's finding that owners were not contributorily negligent due to their failure to look for or discover design changes that caused the damage was not clearly erroneous; record supported finding that owner's representatives were led to believe that the repair had been made in a workmanlike manner.

**[4] Shipping 354 ☜76**

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
      354k76 k. Supplies, Repairs, and Advances. Most Cited Cases

   In action in which shipowner sought to recover damages to its ship's turbines allegedly caused by negligence of shipyard, shipyard's subcontractor, and subsubcontractor, finding that welding subcontractor, which knew of likelihood that welds would not hold up under pressure in turbine engine, was responsible for weld failure was not clear error.

**[5] Labor and Employment 231H ☜3125**

231H Labor and Employment
   231HXVIII Rights and Liabilities as to Third Parties
      231HXVIII(C) Work of Independent Contractor
         231Hk3125 k. In General. Most Cited Cases
   (Formerly 255k316(1) Master and Servant)

   A contractor who has employed a competent

subcontractor is not liable for his faults.

**[6] Shipping 354 ☜76**

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
      354k76 k. Supplies, Repairs, and Advances. Most Cited Cases

   In action in which shipowner sought to recover damages to its ship's turbines allegedly caused by negligence of shipyard, shipyard's subcontractor, and subsubcontractor, trial court's determination of shipyard's standard of care was proper and its findings that shipyard was negligent and that such negligence was proximate cause of owner's damages was not clearly erroneous.

**[7] Contracts 95 ☜114**

95 Contracts
   95I Requisites and Validity
      95I(F) Legality of Object and of Consideration
         95k114 k. Exemption from Liability. Most Cited Cases

   "Red letter" clause between shipowner and shipyard limiting shipyard's liability for negligence or breach of contract was valid in light of the parties' approximately equal bargaining power.

**[8] Shipping 354 ☜76**

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
      354k76 k. Supplies, Repairs, and Advances. Most Cited Cases

   In action in which shipowner sought to recover damages to its ship's turbines allegedly caused by negligence of shipyard, shipyard's subcontractor, and subsubcontractor, district court's conclusion that shipyard was guilty of gross negligence was erroneous in that record indicated that shipyard was not guilty of inflicting an intentional tort or that owner's damages were caused by a wanton disreg-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

ard of shipyard's responsibility under the repair contract or duty owed by it to owner.

**[9] Contracts 95 ☞189.5**

95 Contracts
    95II Construction and Operation
      95II(C) Subject-Matter
        95k189.5 k. Exculpatory Contracts. Most Cited Cases
    (Formerly 95k189)

In action in which shipowner sought to recover damages to its ship's turbines allegedly caused by negligence of shipyard, shipyard's subcontractor, and subsubcontractor, district court did not err in failing to find that "sole negligence" exemption in liability limitation clause was applicable to release shipyard of liability for the work even though the work was subcontracted by shipyard and resulted in a finding of joint and several liability.

**[10] Admiralty 16 ☞14**

16 Admiralty
    16I Jurisdiction
      16k9 Contracts
        16k14 k. Repairs and Supplies. Most Cited Cases

**Admiralty 16 ☞19**

16 Admiralty
    16I Jurisdiction
      16k17 Torts
        16k19 k. Injuries to Vessels or Other Property. Most Cited Cases

A shipowner has a maritime cause of action whether he sues in contract for its breach by a person with whom there was a contract for repairs of the vessel, or in tort for negligent performance of the maritime contract.

**[11] Collision 82 ☞126**

82 Collision
    82XII Suits for Damages
      82XII(E) Damages

        82k126 k. Nature and Grounds in General, and What Law Governs. Most Cited Cases

Tort, rather than contract, measure of damages is applied in classic cases where two parties unknown to each other come into contact and one comes away damaged, such as collision cases and other maritime torts.

**[12] Shipping 354 ☞76**

354 Shipping
    354V Rights and Liabilities of Vessels and Owners in General
      354k76 k. Supplies, Repairs, and Advances. Most Cited Cases

Shipyard's breach of its contract to repair vessel's turbine engine permitted adoption of contract rather than tort measure of damages, and thus shipowners were entitled to have the turbine in condition contracted for, and to recover as well for loss of use of the vessel, out-of-pocket expenses, and, in view of breach of warranties of workmanlike performance, costs and attorney fees.

**[13] Shipping 354 ☞76**

354 Shipping
    354V Rights and Liabilities of Vessels and Owners in General
      354k76 k. Supplies, Repairs, and Advances. Most Cited Cases

Mere fact that shipowner, after ship's turbine was negligently repaired by shipyard and subcontractors, had additional work done on the turbine between its removal from the ship and reinstallation did not mean that shipyard and subcontractors should have been relieved of shipping and reinstallation costs.

**[14] Shipping 354 ☞76**

354 Shipping
    354V Rights and Liabilities of Vessels and Owners in General
      354k76 k. Supplies, Repairs, and Advances. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

In action in which shipowner sought to recover damages to its ship's turbines allegedly caused by negligence of shipyard, shipyard's subcontractor, and subsubcontractor, district court did not err in awarding owner expenses of approximately $100,000 for reinstallation of turbine which had been removed to facilitate correction of defendants' negligent repair even though shipyard had offered to reinstall the turbine for $29,000 where manner in which shipowner had handled the initial repairs did not inspire confidence and, at that precise time, the parties were already engaged in litigation.

**[15] Shipping 354 ☞76**

354 Shipping
    354V Rights and Liabilities of Vessels and Owners in General
        354k76 k. Supplies, Repairs, and Advances.
Most Cited Cases
For purposes of determining damages to be awarded to shipowner for loss of use of ship due to shipyard's negligent repair of turbine, proper test was amount of time it would have reasonably taken to put the ship in condition for which owner had bargained.

**[16] Shipping 354 ☞76**

354 Shipping
    354V Rights and Liabilities of Vessels and Owners in General
        354k76 k. Supplies, Repairs, and Advances.
Most Cited Cases
In action in which shipowner sought to recover damages to its ship's turbines allegedly caused by negligence of shipyard, shipyard's subcontractor, and subcontractor's welding subcontractor, district court, in determining damages for loss of use time, erred in not applying percentage of time that the vessel was operational prior to defendants' attempted repair.

**[17] Shipping 354 ☞76**

354 Shipping

    354V Rights and Liabilities of Vessels and Owners in General
        354k76 k. Supplies, Repairs, and Advances.
Most Cited Cases
In action in which shipowner sought to recover damages to its ship's turbines allegedly caused by negligence of shipyard, shipyard's subcontractor, and subsubcontractor, district court's finding of a net profit loss per day of $3,000 was not clearly erroneous.

**[18] Shipping 354 ☞76**

354 Shipping
    354V Rights and Liabilities of Vessels and Owners in General
        354k76 k. Supplies, Repairs, and Advances.
Most Cited Cases
Shipowner's recoverable damages for negligence of shipyard and its subcontractors in repairing a turbine were not limited to value of the vessel in her damaged condition because a contractual rather than tort measure of damages was applicable.

**[19] Damages 115 ☞71**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(D) Expenses of Litigation
            115k70 Attorney Fees, Costs, and Expenses of Litigation
                115k71 k. Elements of Damages in General. Most Cited Cases
Foreseeable damages recoverable for breach of warranty of workmanlike performance include reasonable attorney fees and litigation expenses.

**[20] Interest 219 ☞39(2.6)**

219 Interest
    219III Time and Computation
        219k39 Time from Which Interest Runs in General
            219k39(2.5) Prejudgment Interest in General

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

219k39(2.6) k. In General. Most Cited Cases

(Formerly 219k39(2.5), 219k39(2))

Award of prejudgment interest is the rule rather than the exception.

**[21] Interest 219 ⟳39(2.25)**

219 Interest
   219III Time and Computation
      219k39 Time from Which Interest Runs in General
         219k39(2.5) Prejudgment Interest in General
         219k39(2.25) k. Admiralty and Maritime Matters. Most Cited Cases

(Formerly 219k39(2))

No peculiar circumstances would permit exercise of discretion not to award prejudgment interest to shipowner which obtained judgment in negligence action against shipyard and subcontractors.

**[22] Indemnity 208 ⟳69**

208 Indemnity
   208III Indemnification by Operation of Law
      208k63 Particular Cases and Issues
         208k69 k. Maritime Cases. Most Cited Cases

(Formerly 208k13.2(7))

Shipyard's negligence vis-a-vis shipowner regarding repair of ship's turbine did not bar its right to indemnity from subcontractor due to subcontractor's breach of implied warranty of diligent and workmanlike performance.

**[23] Indemnity 208 ⟳111**

208 Indemnity
   208VI Rights and Remedies of Indemnitor
      208k111 k. Discharge. Most Cited Cases
(Formerly 208k12)

Subcontractor, which agreed with shipyard to repair ship's turbine, was not entitled to indemnity for negligence from welder subsubcontractor to assist in the repair where there was adequate consid-

eration from welder for release obtained from subcontractor at welder's insistance.

**[24] Indemnity 208 ⟳69**

208 Indemnity
   208III Indemnification by Operation of Law
      208k63 Particular Cases and Issues
         208k69 k. Maritime Cases. Most Cited Cases

(Formerly 208k13.2(7))

Fact that there was no contract between welding subsubcontractor and shipyard did not preclude warranty of workmanlike performance owed to shipyard, and thus shipyard was entitled to indemnity from welding subsubcontractor for negligence arising from repair of ship's turbine.

**[25] Indemnity 208 ⟳67**

208 Indemnity
   208III Indemnification by Operation of Law
      208k63 Particular Cases and Issues
         208k67 k. Contractors, Subcontractors, or Owners. Most Cited Cases

(Formerly 208k13.2(6))

Privity of a contract is not essential for indemnity for breach of implied warranties of workmanlike performance since such warranties may extend to parties who are not in direct contractual relationship.

**[26] Indemnity 208 ⟳76**

208 Indemnity
   208III Indemnification by Operation of Law
      208k73 Scope and Extent of Liability
         208k76 k. Attorney Fees. Most Cited Cases

(Formerly 208k13.3)

In action in which shipowner sought to recover damages to its ship's turbines allegedly caused by negligence of shipyard, shipyard's subcontractor, and subsubcontractor, district court properly declined to award attorney fees to shipyard as part of indemnity award to it by subcontractors where the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

indemnity award was, for the most part, based upon evidence not produced by shipyard but, rather, by owner's attorneys' perseverance and where shipyard not only defended against liability, but teamed up with subcontractors to attack almost every item of damage sought to be proven by owner.

**[27]** Insurance 217 ⟶2278(29)

217 Insurance
    217XVII Coverage--Liability Insurance
      217XVII(A) In General
        217k2273 Risks and Losses
          217k2278 Common Exclusions
            217k2278(25) Property of Insured
            217k2278(29) k. Personal Property in Care, Custody or Control. Most Cited Cases
    (Formerly 217k435.24(7))

  Insurance policies issued to subcontractors excluding coverage for "property damage to * * * property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control" did not apply under Louisiana law where the occurrence causing damage occurred after insured subcontractors relinquished custody or control of the components upon which they performed their services.

**[28]** Insurance 217 ⟶2278(21)

217 Insurance
    217XVII Coverage--Liability Insurance
      217XVII(A) In General
        217k2273 Risks and Losses
          217k2278 Common Exclusions
            217k2278(20) Products and Completed Operations Hazards
            217k2278(21) k. In General.
Most Cited Cases
      (Formerly 217k2278(23), 217k2278(22), 217k435.24(4), 217k435.24(2.1), 217k435.24(7), 217k435.24(2), 217k435.2)

  Exclusion provision of policies covering turbine and welding subcontractors excluding coverage for loss of use of tangible property resulting from failure of subcontractors' products or work to meet level of performance warranted by subcontractors did not relieve insurers of liability for owner's loss of the use of ship which sustained physical injury to its turbine as result of failure of insured subcontractors' work product to meet level of performance impliedly warranted by subcontractors; alternatively, if the ship herself could not fairly have been considered the "property" injured during the casualty, the case would have fallen within the policies' exception to the exclusion regarding loss of use of "other tangible property" resulting from sudden and accidental physical injury of subcontractors' products or work performed.

**[29]** Insurance 217 ⟶2278(24)

217 Insurance
    217XVII Coverage--Liability Insurance
      217XVII(A) In General
        217k2273 Risks and Losses
          217k2278 Common Exclusions
            217k2278(20) Products and Completed Operations Hazards
            217k2278(24) k. Product Recalls; Sistership. Most Cited Cases
    (Formerly 217k435.24(7))

  Damages claimed by shipowner due to failure of turbine after its purported repair by turbine and welding subcontractors did not fall within "sister ship" exclusion since the damages were caused by very product whose failure to perform properly aroused apprehension about quality of "sister" products and since no "sister" products were involved.

**[30]** Insurance 217 ⟶2278(21)

217 Insurance
    217XVII Coverage--Liability Insurance
      217XVII(A) In General
        217k2273 Risks and Losses
          217k2278 Common Exclusions
            217k2278(20) Products and Completed Operations Hazards
            217k2278(21) k. In General.
Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

(Formerly 217k2278(22), 217k435.24(4))

Exclusion under insurance policies issued to turbine and welding subcontractors excluding coverage for "property damage to the named insured's products arising out of such products or any part of such products" was inapplicable to exclude coverage for damages sustained by shipowner due to subcontractors' improper repair of turbine since subcontractors did not manufacture, sell or distribute the turbine and thus the turbine was not the "named insured's product" and since the engine repairs constituted a service rather than a product.

**[31] Insurance 217 ☞2278(21)**

217 Insurance
   217XVII Coverage--Liability Insurance
     217XVII(A) In General
      217k2273 Risks and Losses
       217k2278 Common Exclusions
        217k2278(20) Products and Completed Operations Hazards
          217k2278(21) k. In General.
Most Cited Cases
(Formerly 217k2278(22), 217k435.24(4))

Under Louisiana law, an insurance exclusion relating to an insured's "products" does not exclude liability for losses arising from insured's services.

**[32] Insurance 217 ☞2278(21)**

217 Insurance
   217XVII Coverage--Liability Insurance
     217XVII(A) In General
      217k2273 Risks and Losses
       217k2278 Common Exclusions
        217k2278(20) Products and Completed Operations Hazards
          217k2278(21) k. In General.
Most Cited Cases
(Formerly 217k2278(22), 217k435.24(4))

Mere fact that a repairer supplies or replaces needed parts in course of making repairs does not render an exclusion relating to an insured's "products" applicable.

**[33] Insurance 217 ☞2278(21)**

217 Insurance
   217XVII Coverage--Liability Insurance
     217XVII(A) In General
      217k2273 Risks and Losses
       217k2278 Common Exclusions
        217k2278(20) Products and Completed Operations Hazards
          217k2278(21) k. In General.
Most Cited Cases
(Formerly 217k2278(22), 217k435.24(2.1), 217k435.24(2))

Under Louisiana law, exclusion contained in turbine and welding subcontractors' policies excluding coverage for "property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of the materials, parts or equipment furnished in connection therewith" was applicable regarding shipowner's damages arising from turbine negligently repaired by subcontractors; the exclusion carved out of policy damage to particular work performed by subcontractors but not overall damage thatincorporation of the defective work product caused to the entire entity, eliminated coverage for cost of repairing or replacing any component of subcontractors' work product that required such repair or replacement as result of their negligence whether or not such components were themselves defective, but did not exclude economic losses caused by subcontractors' faulty workmanship.

**[34] Shipping 354 ☞76**

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
     354k76 k. Supplies, Repairs, and Advances.
Most Cited Cases

In action in which shipowner sought to recover damages to its ship's turbines allegedly caused by negligence of shipyard, shipyard's turbine subcontractor, and subsubcontractor, district court's finding that no defendant caused excessive tip clearances in one turbine which resulted in damages

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

suffered in a second casualty was not clearly erroneous.

**\*405** Hulse, Nelson & Wanek, John I. Hulse, IV, New Orleans, La., for Sentry Ins. Co.

Phelps, Dunbar, Marks, Claverie & Sims, James B. Kemp, Jr., New Orleans, La., Richard A. Hagen, New York City, for Todd Shipyards.

Fred E. Salley, New Orleans, La., for Turbine Service and Travelers Ins.

Donald F. Mooney, New York City, Francois Allain, New Orleans, La., for Auto Transp., S.A.

Deutsch, Kerrigan & Stiles, Allen F. Campbell, New Orleans, La., for Gonzales.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before DYER [FN*], SAM D. JOHNSON and WILLIAMS, Circuit Judges.

> FN* Circuit Judge of the Eleventh Circuit, sitting by designation.

DYER, Circuit Judge:

In this appeal we review the judgment of the district court holding Todd Shipyards Corporation liable to Auto Transportation, S.A., for damage to its vessel S/S KATRIN and for detention in the amount of $963,523.20, and granting Todd Shipyards Corporation indemnity from Turbine Service, Inc. and Gonzales Manufacturing and Industrial Machine Works, Inc. and their respective underwriters, The Travelers Insurance Company and Sentry Insurance Company. The judgment exonerated the defendants from any liability resulting from the failure of the ships turbines which occurred off the coast of Cork, Ireland. No party is satisfied and all parties, except the insolvent Turbine Service, Inc. appeal. Except for Todd who concedes that the findings of fact are not clearly er-

roneous, the parties challenge many of the district courts 181 findings of fact and virtually all of the courts conclusions of law.[FN1]

> FN1. The trial of this blockbuster maritime action began on November 14, 1977 and ended May 23, 1978. There were 67 days of trial, 28 witnesses, over 7,000 pages of depositions and more than 600 exhibits offered. The record on appeal is contained in 83 volumes.

We affirm the judgment in favor of the defendants with respect to the Cork casualty. We affirm the judgment in favor of Auto Transportation and against all defendants with respect to liability. We modify the judgment with respect to damages. We reverse the judgment holding inapplicable one of the exclusions in the policies of Travelers and Sentry.

[1] At the outset it bears noting once again that findings of fact made in an admiralty case are binding unless clearly erroneous. Fisher v. Agios Nicolaos V, 628 F.2d 308 (5th Cir. 1980). And questions concerning the amount of damages, the existence of negligence and proximate causation are treated as factual issues and are thus subject to the clearly erroneous standard. General Intermodal Logistics Corp. v. Mainstream Shipyards and Supply, Inc., 666 F.2d 129, 131 (5th Cir. 1982); Pluyer v. Mitsui O.S.K. Lines, Ltd., 664 F.2d 1243, 1247 n.4 (5th Cir. 1982); Florida East Coast Railway Company v. Revilo Corp., 637 F.2d 1060, 1067 (5th Cir. 1981); Noritake Co., Inc. v. M/V Hellenic Champion, 627 F.2d 724, 728 (5th Cir. 1980).

**\*406** The KATRIN was purchased by Auto Transportation, S.A. (Owners) early in 1973. In 1975 a contract was entered into between Todd Shipyards Corporation (Todd) and Owners for the performance of bulkhead and boiler repairs, and to open the turbines for examination. The contract contained Todd's "red letter" terms and conditions. The boiler and bulkhead repairs were accomplished without incident and have no bearing on this litiga-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

tion.

The low pressure (LP) turbine was opened up by employees of Turbine Service, a subcontractor with whom Todd had dealt on prior occasions. It was found badly damaged and an agreement was subsequently made by Todd and Owners to effect permanent repairs to the LP turbine. These repairs consisted, in part, of removing four rows of the LP turbine for a complete renewal. Necessary blading was to be manufactured. The remaining turbine blading was to be faired, dressed and renewed. Other blading in the LP rotor and stator (stationary part of the turbine) were to be removed, faired and reinstalled in good order. Because Todd's labor force was occupied and its shops were crowded, Todd engaged Turbine Service to perform the necessary work.

There were insufficient spare blades aboard the vessel to supply the necessary replacements and Todd was unable to locate such blades. Turbine Service obtained replacement blades that were not compatible with the turbine and had to be modified for insertion in the turbine by milling off the blade roots and welding the old roots to the new blades. The welding work was performed by Gonzales without the knowledge of Todd or the Owners under a subcontract from Turbine Service in violation of the terms of the Todd purchase order.

Turbine Service directed Gonzales not to apply weld material to either the airfoil or the blade roots, as this would entail a considerable amount of machining to return the blades to their original design. A penetration weld was rejected by Turbine Service because of the time and cost involved, so a fillet weld was made on two sides of the rectangular shaped section where the airfoil base joined the old root, and a fusion patch (or edge weld) was made on the other two sides where the leading and trailing edges of the blade met the top of the root. Spacer rings were manufactured by Gonzales and installed in the turbine casing by Turbine Service and Gonzales to reduce the clearance between the modified rotor blades and the casing because the re-

placement blades were shorter than the originals.

Turbine Service did not know the components of the metal of the old roots and the new airfoil. Gonzales assumed that the metals were dissimilar and although the manufacturer's manual recommended a 309 rod, Gonzales used a 308 rod because there were no 309 rods in stock. It was later discovered that the blades and roots were 410 which requires pre-heating, post-heating and stress relieving, but Gonzales had no facilities to do such testing.

Turbine Service informed Gonzales that it would have tests run on the blades and obtain approval from Todd and Owners. Turbine Service never had the blades tested, and when it submitted a work list to Owners, it referred to "new blades manufactured" and failed to disclose the modifications of the blades by welding to either Todd or Owners.

Gonzales machined and welded the fabricated blades in four rows of the rotor, manufactured spacer rings according to measurements given to it by Turbine Service, and installed those rings. It balanced both the HP and LP rotors on its balancing equipment. On completion of this work, Gonzales obtained a release from liability from Turbine Service.

After reinstallation, the turbine was closed up in the vessel by Turbine Service, but with some difficulty because of a pre-existing distortion of the casing. The KATRIN satisfactorily passed a dock trial but on the river trial noises were heard inside the turbine. Upon return to Todd's shipyard, the LP turbine was opened and it was discovered that there was a failure of the welds in two rotor blades, and the broken blades caused all the ensuing damage.

**\*407** Owners elected to ship the LP turbine to its original manufacturer, Siemens, A.G. in Germany (Siemens) for rebuilding. Eight months later the LP turbine was returned to New Orleans and reinstalled by Ardell Engineering. On examination of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

the HP turbine, which had remained in place in New Orleans, it was disclosed that the gap between the tips of the rotor blades and the outer casing of the turbine (referred to as "clearances"), were excessive. Despite this discovery, Owners decided to let the vessel sail from New Orleans in March of 1976.

The KATRIN traded commercially for the next four months, experiencing excessive temperature in the condensor top. In July, 1976, passing the Irish coast at Cork, the turbines suddenly seized and stopped. The vessel began drifting towards the coast and the danger was such that the master ordered the chief engineer to try to operate the turbines, no matter what their condition, in order to save the ship and crew. The chief engineer started the turbines and operated them long enough to bring the vessel away from the coast and subsequently into the Cork harbor. The damage to the HP and LP turbines due to this casualty was so extensive that the vessel was sold for scrap.

This litigation was initiated by Todd in June 1975. It brought suit against Turbine Service and Gonzales, demanding return of the KATRIN's damaged turbine parts which had been removed after the river trial casualty and taken to the shops of Turbine Service and Gonzales. Both Gonzales and Turbine Service responded by asserting a lien for monies due from Todd on prior invoices for work done on the turbines. Owners then intervened. Turbine Service's insurer, Travelers and Gonzales' insurer, Sentry, were brought into the case.

Despite the manner in which the action was initiated, it is actually a suit by Owners to recover for damage to the KATRIN. The parties claims, counterclaims and cross claims at trial were as follows:

(1) Owners sought to recover from all other parties approximately $3.5 million dollars for the cost of repairing the KATRIN's LP turbine in Germany, loss in the vessel's value by reason of the Cork casualty, loss of use of the vessel during the various repair periods, and related expenses.

(2) Todd sought to recover from Owners its unpaid repair invoices, and sought indemnity from Turbine Service/Travelers and Gonzales/Sentry in the event that Todd was found liable to Owners.

(3) Turbine Service/Travelers sought indemnity from Gonzales/Sentry for negligent workmanship by Gonzales and sought to recover from Todd and Owners unpaid repair invoices.

(4) Gonzales/Sentry sought to recover unpaid repair invoices from all other parties, and sought indemnity from Turbine Service in the event that Gonzales/Sentry were found liable to Owners or Todd.

The district court made findings of fact and conclusions of law, Todd Shipyards Corp. v. Turbine Service, Inc., 467 F.Supp. 1257 (E.D.La.1978) in which it found, among other things, that the failure of one or more of the LP rotor blades caused the river casualty; that all of the repairers had been negligent and had breached implied warranties of workmanlike repair, and were consequently liable for damages arising from the river casualty; that no repairer was responsible for the excessive tip clearances that caused the Cork casualty; that Todd was entitled to indemnity from Turbine Service and Gonzales; and that no exclusion of the insurance policies of Travelers and Sentry relieved them from liability for the damages caused by their insureds. The court ordered Todd to pay Owners $967,633.20, plus costs, attorneys' fees and post judgment interest (subject to Todd's right of indemnity, except for attorneys' fees, against Turbine Service/Travelers and Gonzales/Sentry).

The crucial issues before the district court in this case were: what caused the river trial damage, and who is responsible for this casualty. There was substantial evidence to support the district courts' finding that it was negligent to weld new airfoils **\*408** on old roots of the LP rotor and that the failure of the welds in the rotor blades caused the casualty. The clearly erroneous rule disposes of this issue on appeal.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

The villian, to whom the finger of responsibility is pointed, is Sheridan, supervisor of the LP turbine repairs for Turbine Service. The district court found that he was negligent in three independent respects. First, in conceiving and directing the plan to weld new airfoils to old blade roots of the turbine-a method universally condemned by the experts who testified at trial. Second, in failing to consult with a welding engineer to determine a proper welding procedure; and third, in failing to conduct any testing on the fabricated blades (beyond beating them with a hammer) to determine whether or not they would stand up in service. It appears that Sheridan misled both Todd and Gonzales during the course of the repairs by telling them that he had located replacement blades when he had not, and telling Gonzales that the welding procedure had received Owners' approval when it had not. The district court found Sheridan's testimony on numerous occasions unworthy of belief-a finding fully supported by the record.

[2] Travelers, arguing for Turbine Service, claims clear error in the district courts' failure to exonerate Turbine Service from performance of its contract and from liability due to the parties mutual mistake of fact as to the pre-repair condition of the turbine. The district court found that in February 1975, no party to the lawsuit was aware of the distortion in the casings of the LP turbine-a finding that cannot be said to be clearly erroneous.

Travelers, in effect, concedes that Turbine Service was negligent in its repair of the LP turbine. However, Travelers points out that contracts may be rescinded if entered into by the parties under a mutual mistake of facts regarding the condition or quality of the object of the contract. Travelers argues that its contract for repair of the LP turbine was entered into under a mutual misapprehension of the turbine's actual condition; that unknown to all parties, the casings of the LP turbine were so distorted at the time the repair work was undertaken that a complete overhaul of the LP turbine was necessary. According to Travelers, this condition

made it impossible for Turbine Service to perform its repairs in a workmanlike manner, because the work would not have repaired what was actually wrong with the turbine. Travelers argues that even if Turbine Service had performed its obligations to perfection, its work would have been worthless to Owners, as it would have been necessary to rip it out to accomplish the reboring and remachining of the casings. We are not moved by this argument.

The object of Turbine Service's contract with Todd was the reblading, not the correction of the distortion of the casing (not known about at the time) of the LP turbine. It was entirely possible to reblade the turbine in a workmanlike manner. Whether the reblading would have rendered the KATRIN operative in the light of the distorted casing is a different question, but is wholly irrelevant to the contract between Turbine Service and Todd. If Travelers reasoning were sufficient to invalidate the contract and exonerate Turbine Service from liability, it would also suffice to remove Todd's obligation to pay Turbine Service had the latter performed its repairs in a workmanlike manner-a patently absurd result.

Travelers next insists that the district court committed clear error in failing to find that Owners were contributorily negligent with respect to the river trial casualty. The court found that Owners' representative did not know prior to the river trial casualty that new airfoils had been welded to the old turbine blade roots. It further found as a matter of law that Owners were not under a duty to inspect the repaired blades in the LP turbine to insure themselves that the blades were not welded or otherwise defective.

Travelers claim that Owners' representatives were negligent in failing to look for or discover the "idiosyncratic design changes" that caused the river casualty; in not respecting*409 the recommendation of their own expert that all rotor blades be replaced; and in failing to order the cessation of all work when the casing distortion was discovered during the turbine's reinstallation. We disagree.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

[3] While there may be some evidentiary conflict concerning what the Owners' representatives knew about the faulty repair, when Sheridan's testimony is given no weight as unworthy of belief, it cannot be said that the district courts' finding that the Owners were not contributorily negligent is clearly erroneous. The record supports the finding that at the time of the river trial the Owners' representatives were led to believe by all of the defendants that the repair had been made in a workmanlike manner, and no one even suggested, at the time, that the distortion of the casing, which made it difficult to close, would affect the clearances. The district courts' finding that the distorted casing did not contribute to or cause the damage to the LP turbine is not clearly erroneous.

[4] Gonzales argues that although it had to perform its welding and machinery work in a non-negligent and workmanlike manner, the district court placed an unfair burden on it by requiring it to be an expert in the field in which it worked since Turbine Service initiated the welding and fabrication procedure, directed the methods of fabrication, would not permit any variation, and undertook to perform all testing. Gonzales simply did what it was told to do. Thus it was clear error to hold Gonzales responsible for the weld failure.

We agree with the district courts' observation that "(a) repairer must have more responsibility than merely following orders.... This is particularly true when the customer ordering the work is not a welding expert." Gonzales knew that its product was going into a turbine that would turn up to 6,500 r.p.m.'s; knew that there was a likelihood that the welds would not hold up under the type of pressure to which they would be subjected; used fillet welds and fusion patches instead of a full penetration weld; did not even know or attempt to determine what the metals were before the welding; found out only after the fact that it did not use the correct welding rod and that the welding of the metals involved could only be properly conducted with pre-heat, post-heat and stress-relieving treatment; and

finally was so doubtful about welding new airfoils to old roots on a steam turbine rotor and so doubtful about the type of weld used that it sought and obtained a release from liability from Turbine Service. As the district court aptly put it "(t)he original negligence of Gonzales in defectively welding the blades was like a time bomb aimed at the KATRIN."

Todd, while happy that the district court upheld the validity of its red letter clause limiting its liability to $300,000.00,[FN2] is unhappy because the district court at the same time took away the limitation by holding that Todd was guilty of gross negligence. By the same token the "sole causation" language in the red letter clause was automatically invalidated.[FN3] Todd claims clear error in these rulings.

> FN2. The red letter clause in Todd's repair contract provided in pertinent part: "We contract for vessel repair and drydocking and other services only upon the basis of insured limited liabilities as set forth below. In no event shall our liability for any claim arising under this contract exceed in the aggregate the sum of $300,000," ....

> FN3. In this respect the red letter clause provided: "We are not liable for defective workmanship or material or for damage to any vessel or for any loss sustained by its Owners, charterers or underwriters, or parties in interest, directly or indirectly, in contract, tort or otherwise, unless the same is caused solely by the negligence of one of our employees, which negligence shall not be presumed but must be affirmatively established. Our liability, if any, is strictly limited to the cost of repair, correction or replacement therefor and in no event shall we be liable for any consequential damage whatsoever, including, but without limitation, delay, detention, demurrage, towage and pilotage."

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

At the time of the repairs Todd had the capability to reblade the turbine, but not the capacity to manufacture the blades. Todd's labor force was fully occupied, its shops were crowded, and it lacked extra **\*410** personnel needed to repair the turbine. It never contemplated performing the turbine repair with its yard personnel.

Todd asked Turbine Service to investigate possible methods of repairing the LP turbine. Todd had contracted with Turbine Service on previous jobs for, among other things, opening and closing of a main turbine, reblading turbine generators, major rotor work, and smaller turbine work. However, Todd conducted no independent investigation of the qualifications of Turbine Service to perform a major steam turbine reblading job.

Informal discussions between Todd and Turbine Service resulted in an understanding that Turbine Service was to accomplish the repair work on the LP turbine and that it would locate replacement blades to make the permanent repairs. Todd issued purchase orders to Turbine Service for repairing the HP turbine rotor and the LP turbine. The orders stated that the work could not be subcontracted. Turbine Service nevertheless subcontracted part of its work to Gonzales, without Todd's knowledge or permission. The work done by Gonzales under the supervision and control of Turbine Service was improper, and was the cause of the river trial casualty. When the LP turbine was returned to Todd none of its personnel knew that new airfoils had been welded to old roots on the LP rotor.

The district court found as a matter of law that:

The standard of conduct which applies to a shipyard conducting a major repair job as the main propulsion unit of a large vessel requires at least two things that Todd did not do. A shipyard must: (1) find out at least the broad outlines of the steps planned by a subcontractor and (2) inspect the finished repairs closely enough to be able to determine whether or not sub-standard repairs have been made or idiosyncratic design

changes have been employed.

467 F.Supp. at 1286-87.

Todd insists that it was not negligent. It simply contracted with Turbine Service to furnish and install new replacement blades in the rotor. It was under no duty, it is argued, to inspect or supervise the ordinary operational details of the subcontracted work, or to examine the assembled rotor upon its return for concealed defects.

Todd asserts that the damages suffered by Owners arose from the negligence of the independent contractor, Turbine Service, who deceived Todd by assuring it that it had located replacement blades when in fact it had not and had surreptitiously resorted to welding new airfoils on old roots. Todd argues that its sole possible fault was its failure to discover the concealed negligence of Turbine Service.

[5] It is true that "... a contractor, who has employed a competent subcontractor, is not liable for his faults," Person v. Cauldwell-Wingate Co., 176 F.2d 237, 239-40, (2nd Cir. 1949), cert. denied, 338 U.S. 886, 70 S.Ct. 189, 94 L.Ed. 544 (1949), but the evidence here bears out forcefully the incompetency of Turbine Service to do the repair work on the LP rotor.

[6] Without iterating the underlying facts it suffices to say that the standard of care enunciated by the district court was proper in this case and its findings that Todd was negligent and that such negligence was the proximate cause of the Owners damages is not clearly erroneous.

The district court upheld the validity of Todd's red letter clause which limited is liability for negligence or breach of contract to $300,000.00, but it also held that it was ineffective because Todd was guilty of gross negligence.

[7] We have no difficulty in affirming the district courts' finding that, under the circumstances of this case, the red letter clause is valid.   Alcoa

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

Steamship Co., Inc. v. Charles Ferran & Co., Inc., et al., 383 F.2d 46 (5th Cir. 1967), cert. denied, 393 U.S. 836, 89 S.Ct. 111, 21 L.Ed.2d 107. The court found, and we agree, that the parties to the repair contract enjoyed approximately equal bargaining power and that the red letter clause applied to all orders or work placed with Todd.

**\*411** A more difficult question to be resolved is the finding by the district court that Todd is guilty of gross negligence which vitiates the red letter clause. The court held, as a matter of public policy, that the clause is invalid because Todd undertook "to conduct substantial repair work to a component of a vessel that is vital to the vessel's safety, and ... (its) conduct was greatly below the standard established by law to protect others against unreasonable harm." Restatement Of Contracts s 574 (1932). The premise for this finding was that Todd effectively ignored a vessel repair it had contracted to perform.

Owners submit that they were unaware that Todd was unable to make the repairs, and that it would turn the work over to an incompetent subcontractor who had never been investigated by Todd. They urge that Todd not only abdicated its responsibility in subcontracting the work, but equally as bad, did not supervise the repair, or sufficiently inspect the work done by Turbine Service to determine whether it had been performed in a proper manner before it was reinstalled in the turbine. All of this, they argue, adds up to gross negligence.

Todd responds that it had previously subcontracted considerable work to Turbine Service which had been performed in a competent manner. Todd did not, and could not know, that Turbine Service lied about its ability to locate replacement blades, and concealed the fact that it had resorted to welding new airfoils on old roots. It submits that the evidence totally failed to establish that a reasonable inspection could have disclosed that the blades were welded.

[8] Gross negligence, which will invalidate an exemption from liability has been defined as "... harm wilfully inflicted or caused by gross or wanton negligence." 6A Corbin On Contracts s 1472 (1964 ed.) The type of negligence, "ordinary" or "gross", depends on the particular circumstances of each case. A careful review of the record leads us to the firm conclusion that Todd was not guilty of inflicting an intentional tort, or that the Owners' damages were caused by a wanton disregard of Todd's responsibility under the contract or the duty owed by it to the Owners. Thus the district courts' conclusion that Todd was guilty of gross negligence is erroneous.

Finally Todd contends that the district court erred in failing to find that the "sole negligence" exemption in the red letter clause [FN4] was applicable since the casualty was found to have been caused by the joint and several fault of Gonzales, Turbine Service, and Todd. While Todd did not disclaim all liability, it argues that it did restrict its liability to the sole negligence of its own employees which it could prevent.

FN4. See note 3, supra.

[9] We are not called upon to consider the efficacy of this clause in instances when the work is performed by Todd and its employees. But under the circumstances of this case, to suggest that the clause is applicable because the work was subcontracted by Todd and resulted in a finding of joint and several liability, thus releasing Todd of liability under the "sole causation" of its red letter clause is so repugnant to common sense and public policy that it cannot stand. Such an interpretation would lead to the preposterous result that a contractor could relieve itself of all liability by subcontracting the work to a wholly incompetent subcontractor. [FN5]

FN5. " 'If the law supposes that,' said Mr. Bumble... 'the law is a ass, a idiot.' C. Dickens, Oliver Twist, ch. 51 (1838)" Debra P. v. Turlington, 654 F.2d 1079 at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

1088 n.3 (5th Cir. 1981.) (Hill, J., dissenting).

Todd apparently had little confidence that the sole negligence clause would act as a liability buffer when it subcontracted work since it covered itself by providing for a full indemnity from its subcontractor Turbine Service, an unneeded protection if the exemption was applicable. Understandably, Todd has not favored us with any authority to support its position.

Having determined the liability issues as to the defendants, we now turn to the question of damages. All of the defendants **\*412** unite in attacking the district court's basis for assessing damages; its determination of the amount of damages to be awarded Owners for repairs and expenses; the amount of damages to be awarded for loss of use of the KATRIN; and in failing to limit Owners' recovery to the value of the KATRIN in her damaged, February 1975, condition.

The principal argument of the "united" defendants is that it was error for the district court to apply a contractual rather than a tort measure of damages. The district court determined that the injured party should be returned to the position it would have occupied had the contract not been violated. Accordingly, the court awarded Owners the sum of the cost of repairs to return the LP turbine to the state it would have been in had the contract been performed, the necessary expenses during the down time of the vessel, the loss of profits during the down time, (the down time being the amount of time it would have taken Todd to complete the repairs necessary to restore the LP turbine), and the costs and attorneys' fees.

The defendants urge that under the proper tort measure of damages Owners should have been placed as nearly as possible in the condition they occupied before the wrong complained of occurred. Thus the district court should have determined the condition of the LP turbine immediately before the KATRIN's arrival at Todd, since that is the condi-

tion to which Owner would be entitled to be restored. Defendants point out that when the KATRIN arrived at Todd, the condition of the LP turbine was so poor that it required complete reblading, and that after the river trial casualty the condition of the turbine was the same-complete reblading was required. Thus, defendants conclude, the river trial casualty did not cause any actual damage to the Owner. We disagree.

[10][11][12] The district court correctly found that a shipowner has a maritime cause of action whether he sues in contract for its breach by a person with whom there was a contract for repairs of the vessel, or in tort for the negligent performance of the maritime contract. Alcoa Steamship Company, Inc. v. Charles Ferran & Co., Inc., supra. The court also correctly found that tort measure of damages is applied in classic cases when two parties unknown to each other come into contact and one comes away damaged, such as collision cases and other maritime torts. Understandably, none of the cases defendants rely on to support their argument involve a breach of contract. But Todd breached its contract to repair the LP turbine and this fact permits the adoption of a different measure of damages. It is too well settled to require citation of authorities that damages awarded for breach of contract should return the party to the position he would have occupied had the contract not been violated. Owners are entitled to have the LP turbine in the condition contracted for, and to recover as well for loss of use of the vessel, out-of-pocket expenses, and (since defendants breached warranties of workmanlike performance) costs and attorneys' fees.

The defendants take the position that some expenses are attributable to their defective repairs and these should be for their account, but they were charged with numerous items of expense not attributable to the defective repairs, and other items of expense should have been at least prorated. They point out, for example, that the total expenses directly related to sending the KATRIN's LP turbine

© 2011 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

to Siemens for repair was $412,272.00, of which amount the district court found $221,394.00 was attributable to the repairs. This included $61,000.00 to manufacture the blades and $160,394.00 for that part of the Siemens repair work allocated as damages caused by defendants' negligence. The defendants contend that this is clear error because all of the work which was done by Siemens after the river trial was required by the distortion of the LP casing. Moreover, they argue the only identifiable damage to the turbine parts caused by their defective repairs was the damage to the rotor necessitating the manufacturing of a new set of blades at a cost of $29,069.77.

**\*413** The trouble with this argument is that the district court found, and correctly so, that the extent of the river trial damages and defective repairs was properly determined by the Joint Survey, in which all repairers participated on Todd's list of damages. And while the court found that the casing distortion was pre-existing, it opted to accept the Owners' expert's opinion that this was not a proximate cause of the damage to the LP turbine. We cannot say that this was clearly erroneous.

Defendants then argue that the $61,000.00 award for replacement blades as quoted by Siemens was overly generous because of the number of blades involved and the evidence they submitted that Leesona Corporation made a bid, rejected by the Owners, at an average cost of $47 per blade or a total of $37,000.00.

The only evidence that the Owners rejected such a bid is the testimony of Sheridan of Turbine Service, who the district court found unworthy of belief, a finding that is fully supported by the record. As the district court pointed out Leesona did not clearly specify what blade sizes were used to make their quotation. The courts' findings with respect to these damaged items can hardly be said to be clearly erroneous.

In addition, the district court found that the amount of Owner's out-of-pocket expenses attribut-

able to defendants' negligence was $276,052.00. This amount was the sum of numerous miscellaneous and often minute expenses. It included the full cost of shipping the turbine to Germany and of reinstalling it in the KATRIN, notwithstanding the fact that Siemens undertook significant repairs not necessitated by defendants' negligence. The total award for repairs and expenses was $497,446.00. The defendants ask us to reduce numerous items of damage as found by the district court by percentages varying from 10 to 100% and to find that Siemens' expenses, the KATRIN's agency accounts, surveyors accounts, master accounts, repatriation and crew expenses, and bunker and lube oil should amount to no more than $120,994.00 even under a completed contract theory. They argue that it was clear error for the district court to charge them with all of the shipping and reinstallation costs associated with the LP turbine since the costs were partially attributable to repairs not necessitated by defendants' negligence. Further, the defendants assert that the award of reinstallation expenses of approximately $100,000.00 was error when Owners had received a firm quotation from Todd of only $29,000.00 for reinstallation. They argue that the necessary repairs could have been accomplished in the United States rather than in Germany, and that the turbine's reinstallation could have been accomplished by New Orleans rather than New York laborers. We are unpersuaded.

[13][14] It would serve no useful purpose to discuss each of the defendants specific allegations of error in the courts findings as to damages. [FN6] There was, of course, conflicting evidence concerning the work required to be done, the work that was actually accomplished and the reasonable cost of the work. The district courts' function was to weigh the evidence, make credibility choices and find the facts. We are convinced that no mistake was made. "In an admiralty action, the trial courts' findings of damages are matters of fact and should be affirmed if not clearly erroneous." Florida East Coast Railway Company v. Revilo Corp., supra at 1067. The record fully supports the courts' finding that de-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

fendants' negligence necessitated the LP turbine repairs, and since the most competent repairer available was the German manufacturer, it was reasonable to ship the turbine to Germany. The mere fact that Owners had additional work done on the turbine between its removal from the KATRIN and the reinstallation does not mean the defendants should be relieved of the shipping and reinstallation costs. Moreover, we look with a jaundice eye on Todd's offer to reinstall the LP turbine for $29,000.00. It was conditioned on paying or **\*414** providing Todd with a $300,000.00 security deposit. The manner in which Todd had handled the turbine repairs hardly inspired confidence, and at that precise time the parties were already engaged in litigation. The other New Orleans repairers refused to bid on the reinstallation because they wished to stay clear of the disputes between Todd and Owners.

> FN6. We consider de minimus defendants disputes of items such as a $10.00 telephone service charge on the ground that there is no evidence this charge resulted from the river casualty.

Next the defendants take issue with the amount of damages awarded Owners for the loss of use of the KATRIN. The district court first determined the amount of down time caused by defendants' negligence. The court decided it would have taken 215 days after the river casualty to put the KATRIN in the condition Owners had bargained for-the sum of (a) the number of days (58) between May 25, 1975, when defendants should have completed their repairs, and July 21, 1975, when Owners acquired sufficient information to permit them to determine what new repairs were needed; (b) the number of days (122) needed to manufacture the replacement blades; and (c) the number of days (35) needed to reinstall the blades and put the vessel back into service.

The district court next determined what the loss of use cost Owners per day. To do this the court examined the record of the KATRIN on past voyages. The court found that the vessel's average net profit

was $1,400.00 per day during 1973, 1974, $2,000.00 per day during 1974 alone, and $4,000.00 per day during the last half of 1974. The court concluded that a reasonable net profit figure was $3,000.00 per day. Multiplying $3,000.00 by 215 days, the court awarded $645,000.00 as recoverable damages for loss of use.

[15] Defendants contend that the district courts' award of damages for loss of use was based on two clearly erroneous factual findings: that the amount of down time attributable to defendants negligence was 215 days, and that the loss of use cost the Owners $3,000.00 per day. The defendants submit that the KATRIN would have been out of commission for at least this number of days without defendants' negligence, since the vessel's turbines required complete reblading before as well as after the negligence occurred. Defendants suggest that the number of days of down time attributable to defendants' negligence was the number of days needed to make all necessary repairs to the KATRIN, minus the number of days needed to make the repairs caused by defendants' negligence. They argue that this difference is between 30 and 60 days. We are not persuaded by this argument. The proper test, as applied by the district court, is the amount of time it would reasonably take, after the river casualty, to put the KATRIN in the condition for which Owners had bargained.

Defendants next argue that in the 720 days preceding the vessel's arrival in New Orleans, she was operational only 381 days of the time, or 52 per cent, thus the district court should have found that the KATRIN would have been productive during only 122 days of the 215 days of down time. The record, however, clearly discloses that the vessel was operational 77.2% of the time. [FN7]

> FN7. The premise for defendants argument that the vessel was operational only 381 out of 720 days is Travelers' Exhibit 2. But this Exhibit is inaccurate because it does not show the time the vessel was employed in 1973. By reference to the KATRIN's en-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

gine and deck logs and Plaintiffs' Exhibit 2, the KATRIN was incapacitated at anchor, under tow or in a yard for 141 days. During the same period of time the KATRIN lost 23 days between charters which, when added to the 141 days for break down and repairs, gives 164 days nonoperating time out of 720 or a 77.2% operating average.

[16] The district court in calculating the loss of use time of 215 days, did not then apply the percentage of productive time of 77.2% which results in a loss of use time of 166 days rather than 215 days. This was clear error.

[17] Defendants take strong issue with the courts finding of a loss of net profit to the Owners of $3,000.00 per day. They contend that the finding failed to reflect the rapid decline of the market in 1975, the KATRIN's deteriorating condition, and her need for extensive repairs which drastically **\*415** lowered her earning average. But the district court did consider the contention of the defendants that the "golden era" in the shipping industry came to an end in 1975. It found, nevertheless, that the market picked up again in 1976. The court was also abundantly aware of the condition of the KATRIN. On the record before us, we cannot say that the district court's finding of a net profit loss per day of $3,000.00 is clearly erroneous.

The loss of use damage then is to be calculated at $3,000.00 per day for 166 days or $498,000.00. The district court will be directed to modify its judgment accordingly.

[18] The defendants next insist that since the cost of repairing the damages caused by the defendants exceeded the market value of the vessel in her condition prior to the casualty, the vessel was a constructive total loss and recoverable damages are limited to the value of the vessel in her damaged condition. They argue in the alternative that the total repairs, including the complete rebuilding of the LP turbine in 1975, exceeded the Owners' estimate of the value of the KATRIN in sound condition, or that at a minimum, the vessel's sound value in February, 1975, was $805,000.00, and since the required repairs were at least $673,957, this should have resulted in a damage award to Owners of no more than $167,043.00.

Both Owners and defendants are somewhat cavalier about the facts, particularly with regard to the KATRIN's February 1975 market value. Further discussion of the defendants' constructive total loss argument, would serve no useful purpose however, because it ignores the fact that the district court properly applied a contractual rather than a tort measure of damages.

[19] Finally, the defendants attack the district court's award of attorneys' fees to the Owners. Pointing to the "American Rule" they observe that the prevailing party is ordinarily not entitled to collect attorneys' fees from the losing party. They argue that the district court erred in ignoring the American Rule since the only exception to the rule is when bad faith or oppressive litigation tactics are shown, and they are absent here. Alyeska Pipeline Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). But the defendants overlook the rule that "(i)n this circuit foreseeable damages recoverable for breach of warranty of workmanlike performance include reasonable attorneys' fees and litigation expenses. Strachan Shipping Co. v. Koninklyke Nederlandsche, 5th Cir. 1963, 324 F.2d 746. " McCawley v. Ozeanosun Compania, Maritime, S.A., 505 F.2d 26, 32 (5th Cir. 1974); Accord, Thibodeaux v. Texas Eastern Transmission Corp., 548 F.2d 581, 587 (5th Cir. 1977).

To complete our consideration of the damage issues we take up the Owners contention that the district court erred in failing to award them prejudgment interest because there are no peculiar circumstances justifying denial of such interest. While the court awarded post-judgment interest it made no mention of pre-judgment interest in either its judgment or its findings of fact and conclusions of law.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

[20] The award of pre-judgment interest is the rule rather than the exception. Complaint of M/V Vulcan, 553 F.2d 489 (5th Cir. 1977). As we said Noritake Co. v. M/V Hellenic Champion, supra, at pp. 728-730:

As a general rule, pre-judgment interest should be awarded in admiralty cases-not as a penalty but as compensation for the use of funds to which the claimant is rightfully entitled. Discretion to deny pre-judgment interest is created only when there are 'peculiar circumstances' that would make it inequitable for the losing party to be forced to pay pre-judgment interest.

If the trial court does not make any mention of pre-judgment interest in its judgment or its findings of fact and conclusions of law, then it is more difficult to infer that the trial court has found peculiar circumstances and decided to exercise the discretion that those circumstances **\*416** create. * * * (W)hen no peculiar circumstances are disclosed on the face of record, and the case is of a type in which peculiar circumstances are less likely to exist, we have reversed the judgment of the district court insofar as it fails to award pre-judgment interest.

[21] No peculiar circumstances are apparent from the record which would permit the exercise of discretion not to award pre-judgment interest. On remand, the district court will be directed to calculate and award pre-judgment interest. See International Paint Co., Inc. v. M/V Mission Viking, 637 F.2d 382, 386 (5th Cir. 1981).

We next consider the questions of indemnity which are under attack by all parties. Turbine Service insists that the district court erred in granting Todd indemnity against Turbine Service. It draws our attention to the fact that the court based its award on the breach of an implied warranty of diligence and workmanlike performance and did not address itself to the express indemnity language in Todd's Purchase Order,[FN8] as it was required to do. Continental Casualty Co. v. Canadian Univer-

sal Ins. Co., 605 F.2d 1340 (5th Cir. 1979) cert. den., 445 U.S. 929, 100 S.Ct. 1317, 63 L.Ed.2d 762; Evans v. Triple R. Welding & Oil Field Maintenance Corp., 472 F.2d 713 (5th Cir. 1973). Turbine Service argues that since the indemnity provision contains no reference to indemnity for Todd's own negligence, Todd is precluded from receiving indemnity from Turbine Service because clauses purporting to indemnify one against his own negligence are to be strictly construed and must clearly state that intention. M.O.N.T. Boat Rental v. Union Oil, Etc., 613 F.2d 576 (5th Cir. 1980); Cole v. Chevron Chemical Co-Oronite Division, 477 F.2d 361 (5th Cir. 1973).

FN8. Todd's Purchase Order provides in part: "INDEMNIFICATION AND INSURANCE-Seller shall be liable for the loss of or damage to Buyer's or Buyer-furnished or Government-furnished property while such property is in Seller's possession. Seller agrees to carry fire and extended insurance coverage on all such property and to indemnify and save Buyer harmless from any and all judgments, orders, awards, costs, and expenses, including attorneys' fees and also claims on account of damage to property or bodily injury (including death) which may be sustained by Seller, Seller's employees, Buyer, Buyer's employees or third persons, arising out of or in connection with work performed for Buyer on premises occupied or under control of Buyer or Seller."

The Purchase Order also provided that all goods and labor were to be warranted by Turbine Service to be merchantable and fitting in all respects for the purpose for which intended; that Turbine Service would guarantee to Todd all the material, equipment and labor in the same manner and to the same extent that Todd was required to guarantee such material, equipment and labor to its customers and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

additionally forbid any subcontracting of the work by Turbine Service.

The short answer to this argument is that the "Indemnification and insurance" clause in the Purchase Order does not speak to the indemnification of Todd by Turbine Service arising out of the un-workmanlike performance of Turbine Service under the contract, but is obviously intended only to require insurance to indemnify Todd for damage caused to its property or employees during a bailment of Todd's property. This is perfectly clear by a mere reading of the clause. But if there should be any doubt about it, it is put to rest by reference to the remaining language of the Purchase Order which provided that all goods and labor were to be warranted by Turbine Service to be merchantable and fitting in all respects for the purpose for which intended; and that Turbine Service's guarantee of all material, equipment, and labor would be co-extensive with Todd's guarantee to its customers.

[22] The district court properly relied upon breach of the implied warranty of diligent and workmanlike performance of Turbine Service to award Todd indemnification from Turbine Service. See Parfait v. Jahncke Service, Inc., 484 F.2d 296, 302 (5th Cir. 1973); Garner v. Cities Service Tankers Corp., 456 F.2d 476, 481 (5th Cir. 1972); Waterman Steamship Corporation v. David, 353 F.2d 660, 665 (5th Cir. 1965), cert. den., 384 U.S. 972, 86 S.Ct. 1863, 16 L.Ed.2d 683 (1966). Todd's negligence vis-a-vis the Owner does not bar its right to indemnity from Turbine Service. *417 Southern Stevedoring & Contract Co. v. Hellanic Lines, Ltd., 388 F.2d 267 (5th Cir. 1968). We find inapposite the line of cases exemplified by Nelson v. Jacksonville Shipyards, 440 F.2d 668 (5th Cir. 1971) relied upon by Turbine Service, suggesting that recovery should be denied to an actively independent contractor seeking indemnity from another independent contractor.

Turbine Service asserts that the district court erred in failing to find that Turbine Service was entitled to indemnity from Gonzales. Sheridan of Tur-

bine Service executed and delivered a release to Gonzales after the faulty welding had been accomplished and the return of the turbine parts to Turbine Service. [FN9] The district court held that the release barred Turbine Service from relying upon implied contractual indemnity. Moreover, recovery could not be predicated upon the principles of active and passive negligence, nor on any other non-contractual indemnity theory. We agree.

> FN9. The release stated "Gonzales Manufacturing and Industrial Machine Works, Inc. makes no warranty as to the suitability of such repairs and accepts no liability for any possible failure in service or consequential damage arising from such failure.

[23] Sheridan was the main participant for Turbine Service throughout the entire repair work. Gonzales followed his directions in welding the new airfoils to the old roots of the LP rotor, although Gonzales was doubtful that the welds would hold up satisfactorily. Sheridan was held out as having full authority to contract with Gonzales and to do whatever was necessary to accomplish the work Gonzales was asked to do. Under the circumstances, Gonzales had the right to rely on Sheridan's authority to execute the release.

There was adequate consideration for the release because Gonzales told Sheridan at the outset of the work that it did not know whether the work to be done by it was proper, but since it was being done under Sheridan's instruction, Gonzales wanted a release when it had completed the work. Sheridan agreed. Turbine Service is not entitled to indemnity from Gonzales.

[24][25] Gonzales challenges the district courts' finding that Todd was entitled to indemnity from it. Gonzales' arguments for the most part, parallel those of Turbine Service. We will not extend this opinion by tracking through them again. Additionally, Gonzales contends that since there was no contract between Todd and Gonzales,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

there can be no warranty of workmanlike performance owed to Todd, and thus no indemnity in favor of Todd. We disagree. Privity of contract is not essential. Implied warranties of workmanlike performance may extend to parties who are not in direct contractual relationship. Whisenant v. Brewster-Bartle Offshore Company, 446 F.2d 394, 401 (5th Cir. 1971). We uphold the finding of the district court that Todd is entitled to indemnity from Gonzales.

[26] Todd complains that the district court should have awarded but failed to award it attorneys' fees as a part of the indemnity award to it by Turbine Service and Gonzales. The district court properly declined to do so. Todd's reliance upon Olsen v. Shell Oil Co., 595 F.2d 1099 (5th Cir. 1979) is misplaced. In that case the parties provided by contract that each should hold the other harmless in any suit by the employee of the other which arose out of the work to be performed under the contract. The court held that the contract to hold harmless necessarily included payment of attorneys' fees. Here, Todd's indemnity award was, for the most part, based upon evidence not produced by Todd but by Owners' attorneys' perseverance. Moreover Todd not only defended against liability, but teamed up with Turbine Service and Gonzales to attack almost every item of damage sought to be proven by Owners. We agree with the district court that the breach of the implied warranty of workmanlike performance on the part of Turbine Service and Gonzales resulting in indemnity to Todd does not in the circumstances of this case require the award of attorneys' fees to Todd.

We turn our attention to the insurance coverage of the Travelers and Sentry policies.**\*418** Both Turbine Service and Gonzales had in effect comprehensive general liability insurance policies issued by the respective insurance companies.[FN10]

FN10. The provisions of the Travelers and Sentry policies at issue in this case are identical in all material respects. Both policies contain contractual liability en-

dorsements as well as comprehensive general liability provisions. In light of our findings regarding the applicability of the general liability provisions, we need not consider the applicability of the contractual liability endorsements.

These policies provide:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence ....

The policies define "occurrence" as "an accident ... which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The policies define "property damage" as
(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period ....

Travelers and Sentry argue that the district court erred in failing to find that various exclusions contained in their policies relieve them from liability in this case. We discuss each of these exclusions in turn.[FN11]

FN11. Although the exclusions in the Travelers and Sentry policies are substantively identical, they are identified by different letters. Thus, Travelers' exclusion (1) is identical to Sentry's exclusion (n), Travelers' exclusion (m) is identical to Sentry's exclusion (o), and so on. We shall refer to the exclusions as they are denominated in the Sentry policy.

[27] First, the insurance policies exclude coverage for "property damage to ... property in the care,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

custody or control of the insured or as to which the insured is for any purpose exercising physical control." The insurers argue that this provision relieves them from liability for certain repairs and expenses. This argument is unavailing, since under Louisiana law [FN12] the exclusion does not apply where, as here, the occurrence causing damage occurs after the insured relinquishes custody or control of the property. Eymard v. C & W Well Servicing, Inc., 258 So.2d 406, 408 (La.App.), writ refused, 261 La. 465, 259 So.2d 915 (1972).

> FN12. Under Louisiana conflict of law rules the interpretation of insurance contracts is governed by the laws of the state where the contract was entered into. Deane v. McGee, 261 La. 686, 260 So.2d 669, 673 (La.1972); Wickham v. Prudential Insurance Company of America, 366 So.2d 951, 954 (La.App.1978). Although the record on this point is not completely clear, it appears the insurance contracts here at issue were entered into in Louisiana. Indeed, the parties have argued before this court on the basis that Louisiana law applies. We therefore apply Louisiana law in construing the Travelers and Sentry policies.

[28] The policies next exclude coverage for

> loss of use of tangible property which has not been physically injured or destroyed resulting from ... the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured ....

Travelers and Sentry argue that this provision relieves them of liability for loss of use of the KATRIN. This argument too is unavailing, for the simple reason that the KATRIN did sustain physical injury to its LP turbine as a result of the failure of the insured's work product to meet the level of performance impliedly warranted by the insureds.

Alternatively, if the KATRIN herself could not fairly be considered the property injured during the river trial casualty, this case would fall within the policy's exception to the exclusion:

> (T)his exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named ***419** insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured ....

The work performed by Turbine Service and Gonzales sustained sudden and accidental injury during the river trial casualty, and the KATRIN under this alternative view is "other tangible property" whose use was lost as a result of this injury. We conclude, then, that this exclusion does not relieve the insurers of liability.

[29] Exclusion (p) of the insurance policies excludes coverage for

> damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

Travelers and Sentry argue that the damages claimed by the KATRIN's Owners fall within this exclusion. This argument ignores, however, the exclusion's origin and purpose.

Exclusion (p) is known as the "sistership" exclusion, a term derived from an occurrence in the aircraft industry in which one plane crashed and its "sisterships" were thereafter grounded and recalled by the manufacturer in order to correct the common defect that had caused the crash. Arcos Corp. v. American Mutual Liability Ins. Co., 350 F.Supp. 380, 384 n.2 (E.D.Pa.1972), affirmed, 485 F.2d 678 (3rd Cir. 1973). The provision is intended to ex-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

clude from coverage the cost of preventative or curative action by withdrawal of a product in situations in which a danger is to be apprehended. Wyoming Sawmills, Inc. v. Transportation Insurance Co., 282 Or. 401, 578 P.2d 1253, 1257 (1978); Yakima Cement Products Co. v. Great American Insurance Co., 22 Wash.App. 536, 590 P.2d 371, 374-75 (1979). It is not, however, intended to exclude from coverage damages caused by the very product whose failure to perform properly aroused apprehension about the quality of "sister" products. 2 R. Long, The Law of Liability Insurance s 11.11 (1981). Still less is it intended to exclude from coverage damages arising from the malfunctioning of a product where no "sister" products are involved. See Elco Industries, Inc. v. Liberty Mutual Insurance Co., 90 Ill.App.3d 1106, 46 Ill.Dec. 319, 322, 414 N.E.2d 41, 45 (1980); Yakima Cement Products Co. v. Great American Insurance Co., 590 P.2d at 374-76; Ohio Casualty Insurance Co. v. Terrace Enterprises, Inc., 260 N.W.2d 450, 455 (Minn.1977); Gulf Insurance Co. v. Parker Products, Inc., 498 S.W.2d 676, 678-79 (Tex.1973); Bigelow-Liptak Corp. v. Continental Insurance Co., 417 F.Supp. 1276, 1281-82 (E.D.Mich.1976); Arcos Corp. v. American Mutual Liability Insurance Co., 350 F.Supp. at 385. It is clear, then, that exclusion (p) is not intended to exclude from coverage damages arising from the malfunctioning of the LP turbine.[FN13]

> FN13. As an independent ground for this conclusion, we note that most courts hold exclusion (p) inapplicable where the product is withdrawn by the insured rather than a third party. See Elco Industries, Inc. v. Liberty Mutual Insurance Co., 46 Ill.Dec. at 322, 414 N.E.2d at 45 (citing cases). In this case neither Turbine Service nor Gonzales withdrew the KATRIN or its LP turbine from service.

Exclusion (n) of the policies excludes coverage for "property damage to the named insured's products arising out of such products or any part of

such products." The policies define "named insured's products" as "goods or products manufactured, sold, handled or distributed by the named insured." The insurers argue that Turbine Service and Gonzales "handled" the LP turbine, in the sense of physically handling it, and that the turbine is therefore their product.

An identical interpretation of "handled" was urged in Smedley Co. v. Employers Mutual Liability Insurance Co., 143 Conn. 510, 123 A.2d 755 (1956). The court in that case stated:

> It is true that the verb "handle" means to "touch; to feel with the hand; to hold, take up, move, or otherwise affect, with **\*420** the hand." * * * Webster also defines "handle" as "to buy and sell; to deal, or trade in." That the intention of the insurer was to restrict the word "handled" to this meaning is apparent from the words "manufactured, sold * * * or distributed," with which it is linked.

> 123 A.2d at 758. Accord, Paxton-Mitchell Co. v. Royal Indemnity Co., 279 Or. 607, 569 P.2d 581, 587 (1977); G. Couch, Cyclopedia of Insurance Law, s 44A:56 (2nd Ed. 1981).

[30] Like the court in Smedley, we find that the verb "handled" as used in exclusion (n) means "to deal or trade in" rather than "to touch". Under this definition neither Turbine Service nor Gonzales handled the KATRIN's LP turbine. Since the insureds clearly did not manufacture, sell or distribute the LP turbine, the turbine is not the "named insured's product," and exclusion (n) is inapplicable.

[31][32] This conclusion may also be reached more directly by noting that engine repairs constitute a service rather than a product, and that under Louisiana law an exclusion relating to an insured's "products" does not exclude liability for losses arising from the insured's services. Swillie v. General Motors Corp., 133 So.2d 813, 823 (La.App.1961); see generally Couch, supra, s 44A:60. Travelers and Sentry argue that the turbine

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

may fairly be considered the repairers' product because the repairers replaced many of its parts. However, the mere fact that a repairer supplies or replaces needed parts in the course of making repairs does not render an exclusion relating to an insured's "products" applicable. See Lieberman v. New Amsterdam Casualty Co., 284 A.D. 1051, 135 N.Y.S.2d 850 (1954), appeal denied, 285 A.D. 830, 137 N.Y.S.2d 840 (1955).

[33] Exclusion (o) of the insurance policies excludes coverage for

property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of the materials, parts or equipment furnished in connection therewith ....

Turbine Service and Gonzales contend that this exclusion is inapplicable, relying on cases from numerous jurisdictions. We are bound, however, to apply the law of Louisiana, under which "injury to work" exclusions have consistently and unequivocally been held to eliminate coverage for the cost of repairing or replacing the insured's own defective work product. Vitenas v. Centanni, 381 So.2d 531, 535 (La.App.1980); Breaux v. St. Paul Fire & Marine Insurance Co., 345 So.2d 204, 208 (La.App.1977); Franks v. Guillotte, 248 So.2d 626, 628 (La.App.1971); Vobill Homes, Inc. v. Hartford Accident & Indemnity Co., 179 So.2d 496, 497-98 (La.App.1965), writ refused, 248 La.App. 698, 181 So.2d 398 (1966).[FN14]

> FN14. For a discussion of the policy considerations underlying "injury to work" exclusions, and presumably underlying their interpretation by the Louisiana courts, see Henderson, "Insurance Protection for Products Liability and Completed Operations-What Every Lawyer Should Know," 50 Neb.L.Rev. 415, 441-42 (1971).

Undaunted by these precedents, Turbine Service and Gonzales argue that the Louisiana courts

would make an exception to their usual interpretation of exclusion (o) if confronted by the unusual facts of this case. Citing, St. Paul Fire & Marine Insurance Co. v. Sears, Roebuck & Co., 603 F.2d 780, 784 (9th Cir. 1979) and Pittsburgh Plate Glass Co. v. Fidelity & Casualty Co., 281 F.2d 538, 541 (3rd Cir. 1960), they claim that work product exclusions are inapplicable when the insured's work product becomes so integrated into other tangible property that repair or replacement of that work product would entail injury to or replacement of a part of the existing property not originating from the insured. We dispose of this argument by noting that the present case does not fall within the proffered exception, since the repair or replacement of the work product of Turbine Service and Gonzales (e.g., the negligently welded blades) would not necessitate replacement of, or cause injury to, other parts of the LP turbine not originating from the insureds.

Our determination that exclusion (o) applies in this case compels us to resolve several subsidiary questions.

**\*421** The first such question is: What precisely is the insured's work product? Citing, Engine Service, Inc. v. Reliance Insurance Company, 487 P.2d 474 (Wyo.1971), Franks v. Guillotte, 248 So.2d 626 (La.App.1971), and Suwyn v. Auto-Owners Insurance Co., 15 Mich.App. 279, 166 N.W.2d 549 (1968), Travelers and Sentry contend that the insured's work product is the entire LP turbine, and that exclusion (o) consequently excludes coverage for the entire cost of repairing the turbine. Turbine Service and Gonzales insist that their work product is merely the specific components they attempted to repair, and that exclusion (o) at most eliminates coverage for the cost of repairing or replacing those components.[FN15]

> FN15. Gonzales cites several non-Louisiana cases for the proposition that exclusion (o) excludes coverage only for the cost of purchasing replacement parts, and not for the costs incurred in removing or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

replacing defective parts from an entity into which they have been incorporated. We reject this proposition as contrary to the Louisiana courts' categorical determination that the "injury to work" exclusion excludes the cost of repairing or replacing an insured's defective work.

The most analogous and instructive case addressing this issue is Travelers Insurance Co. v. Volentine, 578 S.W.2d 501 (Tex.Civ.App.1979). In Volentine, a repairer's negligent performance of a valve job on a customer's automobile engine resulted in the destruction of the entire engine. The repairer's insurance company contended that the "injury to work" exclusion eliminated coverage for the damages sought by the customer. After noting that this exclusion eliminates coverage only for damages to the work product itself, the court stated:

The decisive question then becomes: What was Volentine's work product? The entire engine, or merely the valve repair?

(J)udged by the allegations of the petition, it appears that Volentine's work or work product was the repair of the valves only, and that other parts of the automobile engine would constitute "other property".... To the extent those other parts were damaged or destroyed and Volentine is liable therefor, the policy affords coverage.

Id. at 504.

We find the court's analysis in Volentine persuasive. In our judgment, exclusion (o) carves out of the policy damage to the particular work performed by the insured, but not the overall damage that the incorporation of the defective work product causes to the entire entity. See Western Casualty & Surety Co. v. Polar Panel Co., 457 F.2d 957, 960 (8th Cir. 1972). The cases relied upon by the insurers, Franks, Engine Service and Suwyn, are distinguishable on the ground that the repairers in those cases overhauled the entire engine, rather than merely repaired and replaced a limited number

of engine components. Although the insurers claim that their insureds effectively overhauled the entire LP turbine, this contention is plainly contrary to the facts. Indeed, the insurers elsewhere argue vociferously that while the LP turbine needed a complete overhaul, the repairs undertaken by the insureds were relatively minor.

The second subsidiary question is: Does exclusion (o) exclude coverage for damage to the insured's entire work product or merely to the defective components of that work product? Citing, Pittsburgh Bridge & Iron Works v. Liberty Mutual Insurance Co., 444 F.2d 1286 (3rd Cir. 1971) and S. L. Rowland Construction Co. v. St. Paul Fire & Marine Insurance Co., 72 Wash.2d 682, 434 P.2d 725 (1967), Turbine Service and Gonzales argue that the exclusion applies only to the defective components. The trouble with this argument is that the cases supporting it construed a different provision than the one here at issue. The provision at issue in Pittsburgh Bridge and Rowland Construction, was exclusion (h)(4), a predecessor of the present exclusion (n) and (o). Exclusion (h)(4) excluded coverage for damage to "products ... manufactured, sold, handled or distributed ... by the insured, or work completed by or for the insured, out of which the accident arises." The court in Pittsburgh Bridge and Rowland Construction correctly found that the clause "out of which the accident arises" *422 was ambiguous, and resolved the ambiguity in favor of the insured by holding that exclusion (h)(4) applied only to the specific defective component that caused the accident.

In 1966 the insurance industry revised this exclusion to make clear that it applied to the insured's entire work product. See F.C. & S. Bulletins, Public Liability, Prb 3 & 4 (Dec.1972), quoted in 2 Long, supra, s 11.13 at 11-70. The revised "injury to work" exclusion appears in the policies insuring Turbine Service and Gonzales and expressly excludes "property damage to work performed ... arising out of the work or any part thereof, or out of materials, parts or equipment furnished in connec-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

tion therewith." (emphasis added). The courts have consistently held that this language unambiguously excludes coverage for the cost of repairing or replacing non-defective as well as defective components of the insured's work product. See, e.g., Indiana Insurance Co. v. DeZutti, 408 N.E.2d 1275, 1279-80 (Ind.1980); Timberline Equipment Co. v. St. Paul Fire & Marine Insurance Co., 281 Or. 639, 576 P.2d 1244, 1246-47 (1977); Adams Tree Service, Inc. v. Hawaiian Insurance & Guaranty Co., 117 Ariz. 385, 573 P.2d 76, 78-80 (Ariz.App.1977) (citing cases). The Louisiana courts join in this interpretation. See Franks v. Guillotte, 248 So.2d 626 (La.App.1971) (repairer overhauling automobile engine negligently replaced filterhead, causing damage to entire engine; "injury to work" exception held to exclude all coverage).

We conclude then, that exclusion (o) eliminates coverage for the cost of repairing or replacing any components of the insured's work product that required such repair or replacement as a result of the insured's negligence, whether or not such components were themselves defective.

The final subsidiary question is: Does exclusion (o) exclude coverage, not only for the immediate cost of repairing or replacing the insured's work product, but also for other economic losses caused by the insured's faulty workmanship?

Travelers and Sentry urge with particular alacrity that exclusion (o) excludes damages for loss of use of the KATRIN-by far the largest element of damages in this case. Two cases appear at first glance to support their position. In Employers Casualty Co. v. Brown-McKee, Inc., 430 S.W.2d 21 (Tex.Civ.App.1968 writ ref'd. n. r. e.), an agricultural company sued a builder for loss of storage revenue allegedly caused by the builder's improper construction of a grain elevator. The court determined that the agricultural company was in effect seeking damages for loss of use of the elevator, that such loss of use was merely an element of damage to the elevator, and that the work product exclusion eliminated coverage for such damages. Id. at 27.

Similarly, in Adams Tree Service, Inc. v. Hawaiian Insurance & Guaranty Co., 117 Ariz. 385, 573 P.2d 76, 78-80 (Ariz.App.1977), a contractor converted a tractor truck into a dump truck. When the dump truck subsequently collapsed, its owner was awarded damages against the contractor for, among other things, loss of use of the truck. In a later suit to determine whether this liability was covered by the contractor's liability policy, the court held that the dump truck constituted the contractor's product, that loss of use of the truck was merely an element of property damage to the truck, and that the "injury to product" exclusion eliminated coverage for such damages.

Upon examination, Brown-McKee and Adams Tree Service are clearly distinguishable from the present case. What was lost to use in those cases was the insured's own product-a grain elevator in Brown-McKee and a dump truck in Adams Tree Service.[FN16] On the other hand, what was lost to use in the present case-the KATRIN-was property other than the insured's own product. **\*423** A case more nearly on point is Oliver B. Cannon & Son, Inc. v. Fidelity & Casualty Co., 484 F.Supp. 1375 (1980). In that case a contractor negligently prepared and painted the interior linings of chemical process tanks, resulting in deterioration of the linings and loss of use of the tanks. The court determined that while the "injury to work" exclusion eliminated coverage for the cost of repairing the linings, it did not eliminate coverage for loss of use of the tanks.

> FN16. We note in passing that it is not clear whether the Louisiana courts would hold loss of use even of the insured's own defective work product to be excluded under exclusion (o). See Borden, Inc. v. Howard Trucking Co., 372 So.2d 242, 244 (La.App.), writ refused, 373 So.2d 544 (1979); but see Goodwin Well Service, Inc. v. Goss Construction Co., 380 So.2d 1246, 1247-48 (La.App.1980).

The answer to the question posed above may be

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

discerned in the law of Louisiana. As we have seen, the Louisiana courts hold that the "injury to work" exclusion excludes the cost of repairing or replacing the insured's work product. Those courts also hold that the exclusion does not exclude damages to property other than the insured's work product. Hendrix Electric Co. v. Casualty Reciprocal Exchange, 297 So.2d 470, 472-73 (La.App.1974); Hospital Service District No. 1 v. Delta Gas, Inc., 171 So.2d 293, 299 (La.App.) writ refused, 247 La. 673, 173 So.2d 540 (1965); Vobill Homes, Inc. v. Hartford Accident & Indemnity Co., 179 So.2d at 497.

Although the Louisiana courts have not addressed the precise question before us, the two principles set forth above appear sufficiently clear to light the way to an answer. At the risk of oversimplification, it appears that all economic losses suffered by the KATRIN's Owners may be attributed either to the "down time" of the KATRIN or to the repair or replacement of the work product of Todd, Turbine Service and Gonzales. Since the KATRIN is indisputably property other than the insured's work product, any damages attributable to its "down time" are not excluded by exclusion (o). On the other hand, some of the "out-of-pocket" expenses awarded to the KATRIN's Owners are clearly part of the cost of repairing the faulty workmanship of Turbine Service and Gonzales, and consequently are excluded from coverage by exclusion (o).

We conclude, then, that Travelers and Sentry are liable for those damages attributable to the KATRIN's "down time", such as damages for loss of use of the vessel, general expenses from the master's accounts, and pilotage, wharfage, tug, repatriation and recrewing expenses. However, Travelers and Sentry are not liable for any costs incurred in repairing and replacing the work product of their insureds, including the cost of inspecting, crating, shipping, and reinstalling the LP turbine. We remand to the district court for determination of the exact amount of Travelers' and Sentrys' liability.

[FN17]

FN17. The district court found the "injury to products" and "injury to work" exclusions applicable in this case. See 467 F.Supp. at 1312. However, because the court did not exclude coverage for all costs incurred in repairing and replacing the insured's work product, redetermination of the amount of those costs is necessary.

[34] Finally, we address the Owners' contention that the district court erred in failing to hold the defendants liable for damages suffered by the KATRIN in the Cork casualty. The district court found that the damages were caused by excessive blade tip clearances between the feather tips of the HP rotor blades and the HP casings, and it further found that no repairer filed or ground the feather tips of the HP rotor blades or otherwise caused excessive tip clearances. It is undisputed that in February of 1976, the Owners learned of the excessive tip clearances and learned that they would decrease the HP turbine's efficiency, increase consumption of fuel oil, and increase the HP turbine's exhaust temperatures. Owners nevertheless ordered the KATRIN to take on cargo and leave New Orleans the following month.

The Owners accept the district court's findings that the Cork casualty was caused by excessive tip clearances but argue that the court erred in not finding that the defendants' negligence caused the excessive clearances. Specifically they contend that the evidence established that the tip clearances were satisfactory in February 1975 (since those who examined the HP turbine at that time made no mention of excessive tip clearances); that Turbine Service personnel*424 ground the sides of the HP rotor blades; that the feather tips were ground by man and not by any casualty; and that the clearances were excessive in February 1976 when the KATRIN left Todd Shipyards. The Owners conclude that the excessive tip clearances were caused by defendants' filing or grinding of the feather tips during the "repairs".

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

The Owners further take the position that their operation of the KATRIN with knowledge of the excessive tip clearances was reasonable under the circumstances because the turbine's manufacturer had indicated that the excessive blade clearances would not cause a major casualty under normal operating conditions, and what happened off the coast of Cork was an abnormal fortuitous circumstance which required the vessel to reduce speed which accentuated the excess clearances; that substantial and lengthy repairs would have been required to rectify the condition in New Orleans; that Owners felt obliged to mitigate damages by making the KATRIN productive again; and Owners were anxious to end the KATRIN's long and inhospitable stay in New Orleans.

We are unpersuaded. The district court found, and we agree, that only two facts are clear concerning the HP rotor blade clearances; that they were (1) normal in 1975 and (2) excessive in February of 1976. There was no evidence that connected Todd, Turbine Service or Gonzales with the excessive clearances. As the district court stated, "(w)hat happened in the meantime is anyone's guess." It was undisputed that it would take almost 130 man hours to file off the tips, but no one saw or knew of any filing and no invoice showed any labor cost for such work. We are convinced that the court's finding that no repairer caused the excessive tip clearances is not clearly erroneous.

To summarize our disposition of the issues on appeal, we affirm the judgment of the district court holding the defendants Todd, Turbine Service and Gonzales liable to Owners in damages for the improper repair of the LP turbine rotor. We affirm the judgment of the district court requiring indemnification of Todd by Turbine Service and Gonzales, and the denial of indemnification of Turbine Service by Gonzales.[FN18] We conclude that the district court erred in finding Todd guilty of gross negligence. We disagree with the district court's calculation of the loss of use time of the KATRIN since it failed to apply the percentage of operation time

for the period involved. Such application results in a reduction of the loss of use damage from $645,000.00 to $498,000.00 and the district court is directed to modify its judgment accordingly. We affirm the courts' judgment awarding attorneys' fees to Owners. We direct the district court to include in its judgment an award for pre-judgment interest. We reverse the judgment of the district court holding that exclusion (o) of the Travelers **425 and Sentry policies are not applicable, and direct the district court on remand to determine the amount of the insurers' liability. We affirm the judgment of the district court exonerating the defendants from liability for damage suffered by the KATRIN in the Cork casualty.

FN18. Turbine Service asks us to recitify an error in the district court's calculation of damages. It points out that the sum of $221,393.76 was awarded to Owner for restoration of the LP turbine. This figure is included in the Todd damages of $1,142,446.21. This was reduced by the "savings made possible" figure of $174,813.00, leaving a balance due from Todd to Owners of $967,633.00. In reconciling the accounts between Todd and Turbine Service, the same figure of $221,393.76 was used. Todd was given a credit of $174,813.00 which represented Todd's contract price including profit. The district court then attempted to award Turbine Service its unpaid invoices of $125,818.75 but did so by crediting the figure against $221,393.76 instead of crediting it against Turbine Service's 50% share of Todd's indemnity claim of $967,633.00. But the $967,633.00 total due from Todd to Owners already included the $221,393.76 charge for restoration. Hence this latter charge was incorporated twice in the court's damage summaries despite its apparent intention of dealing with them separately. Unless there is a deduction of Turbine Service's unpaid invoices for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

674 F.2d 401, 1982 A.M.C. 1976
**(Cite as: 674 F.2d 401)**

$125,818.75 and Travelers' uninsured por-
tion (yet to be determined by the district
court on remand), from one half of the in-
demnity expenses, Todd will come out
ahead and Travelers will not receive credit
for its invoices.

Since the district court must recalculate
the damages on remand, as well as de-
termine Travelers uninsured amount un-
der its policy, we leave it to the district
court to make a final determination of
damages with respect to all parties.

AFFIRMED IN PART, MODIFIED IN PART,
REVERSED IN PART, AND REMANDED for fur-
ther proceedings not inconsistent with this opinion.

C.A.La., 1982.
Todd Shipyards Corp. v. Turbine Service, Inc.
674 F.2d 401, 1982 A.M.C. 1976

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

708 S.W.2d 574
**(Cite as: 708 S.W.2d 574)**

▷

Court of Appeals of Texas,
Beaumont.

Jerry W. SMITH, Appellant,

v.

GOLDEN TRIANGLE RACEWAY, Appellee.

No. 09–85–200 CV.
April 10, 1986.
Rehearing Denied May 7, 1986.

Party injured while in pit area of race track filed suit against track alleging both negligence and gross negligence. The 60th District Court, Jefferson County, Gary Sanderson, J., granted race track's motion for summary judgment based upon release, and appeal was taken. The Court of Appeals, Burgess, J., held that: (1) release clearly communicated its effect to plaintiff; (2) allegations of misrepresentations as to what plaintiff was signing when he signed release were insufficient to defeat motion for summary judgment; (3) release was not invalid on ground of great disparity of bargaining positions of parties; and (4) release attempting to exempt one from liability or damages occasioned by gross negligence is against public policy.

Affirmed in part and reversed and remanded in part.

West Headnotes

**[1] Public Amusement and Entertainment 315T**
🗝130

315T Public Amusement and Entertainment
  315TIII Personal Injuries
    315TIII(B) Defenses, Mitigating Circumstances and Statutory Limitations of Liability
      315Tk129 Pre-Injury Releases
        315Tk130 k. In general. Most Cited Cases
    (Formerly 376k6(6) Theaters and Shows)

Release, which stated that in consideration of being permitted to enter restricted area of race track, signer, released, waived, discharged and covenanted not to sue promoter, track operator, and track owner, agreed to indemnify and hold harmless releases, and agreed to assume full responsibility for risk of bodily injury, death or property damage, clearly communicated its effect to signer.

**[2] Judgment 228** 🗝181(33)

228 Judgment
  228V On Motion or Summary Proceeding
    228k181 Grounds for Summary Judgment
      228k181(15) Particular Cases
        228k181(33) k. Tort cases in general.
Most Cited Cases

Allegations of misrepresentations as to what signer was signing when he signed release upon entering restricted area of racetrack were insufficient to defeat motion for summary judgment in negligence action brought by signer, where allegations of misrepresentations were not directed against any one person in particular, and especially not against anyone connected with racetrack.

**[3] Public Amusement and Entertainment 315T**
🗝130

315T Public Amusement and Entertainment
  315TIII Personal Injuries
    315TIII(B) Defenses, Mitigating Circumstances and Statutory Limitations of Liability
      315Tk129 Pre-Injury Releases
        315Tk130 k. In general. Most Cited Cases
    (Formerly 376k6(6) Theaters and Shows)

Release signed as condition for entry into restricted areas of race track was not invalid on public policy grounds due to disparity of bargaining positions of parties; signer was under no compulsion to go into restricted or pit area of track.

**[4] Release 331** 🗝20

708 S.W.2d 574
**(Cite as: 708 S.W.2d 574)**

331 Release

  331I Requisites and Validity

    331k20 k. Legality of consideration. Most Cited Cases

Release attempting to exempt one from liability or damages occasioned by gross negligence is against public policy.

**\*574** Michael McGown, Weller, Wheelus & Green, Beaumont, for appellant.

Thomas Walston, Mehaffy, Weber, Keith & Gonsoulin, Beaumont, for appellee.

OPINION

BURGESS, Justice.

Jerry Smith was injured while in the "pit area" of Golden Triangle Raceway. He filed suit alleging both negligence and gross negligence. Golden Triangle Raceway filed a motion for summary judgment based upon a release signed by Mr. Smith. The motion was granted.

Mr. Smith's affidavit filed in response to the motion for summary judgment, in relevant portion, stated:

"4. I viewed the race from the infield area located in the center of the racetrack. To gain access into the infield area I signed a form and was provided a piece of paper with the words "pit pass" which was stapled to my shirt.

"5. I was told that a list of people entering in the pit area was necessary and I thus signed my name and my brothers name to the list provided by Golden Triangle Raceway. To the best of my recollection there was no writing on the list **\*575** nor was I told that each person had to sign individually.

"6. At no time was I told by anyone, be they an employee of Golden Triangle Raceway or anyone else, that the purpose of placing my signature on the list was to waive any and all rights I might have against Golden Triangle Raceway if I were

injured at the racetrack.

"7. The only representations made to me in regard to placing my signature on the list was that my signature was necessary to show who had entered into the pit area with no further explanation."

[1] Mr. Smith's first point of error alleges there is a fact issue raised as to whether or not the release clearly notified him of its effect. Mr. Smith cites several cases from other jurisdictions which hold that releases of this type must be clear and must inform the signer of the effect of the instrument. The release in question provides in pertinent part:

"IN CONSIDERATION of being permitted to enter for any purpose any RESTRICTED AREA (hereinafter defined as including but not limited to the ... pit areas, infield, burn out area, approach area, shutdown area ... and other areas of appurtenant to any area where any activity related to the event shall take place), or being permitted to ... observe, work for, or for any purpose participate in any way in the event, EACH OF THE UNDERSIGNED, for himself, ...:

"1. HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE the promoter, ... track operator, track owner, ... owners and lessees of premises used to conduct the event and each of them, their officers and employees, all for the purposes herein referred to as "releasees", from all liability to the undersigned ... for any and all loss or damage, and any claims or demands therefor on account of injury to the person or property or resulting in death of the undersigned, whether caused by the negligence of the releasees or otherwise while the undersigned is on or upon the restricted area and/or ... observing, ... or for any purpose participating in the event;

"2. HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS the releasees and each of them from any loss, liability,

708 S.W.2d 574
**(Cite as: 708 S.W.2d 574)**

damage, or cost that they may incur due to the presence of the undersigned in or upon the restricted area or in any way ... observing, ... or for any purpose participating in the event and whether caused by the negligence of the releasees or otherwise.

"3. HEREBY ASSUMES FULL RESPONSIBILITY FOR AND RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE due to the negligence of releasees or otherwise while in or upon the restricted area and/or while ... observing, ... or for any purpose participating in the event.

"EACH OF THE UNDERSIGNED expressly acknowledges and agrees that the activities of the event are very dangerous and involve the risk of serious injury and/or death and/or property damage. EACH OF THE UNDERSIGNED further expressly agrees that the foregoing release, waiver and indemnity agreement is intended to be as broad and inclusive as is permitted by the law of the Province or State in which the event is conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.

"THE UNDERSIGNED HAS READ AND VOLUNTARILY SIGNS THE RELEASE AND WAIVER OF LIABILITY AND INDEMNITY AGREEMENT, and further agrees that no oral representations, statements or inducements apart from the foregoing written agreement have been made.

"I HAVE READ THIS DOCUMENT. I UNDERSTAND IT IS A RELEASE OF ALL CLAIMS.

"I UNDERSTAND I ASSUME ALL RISK INHERENT IN RACING.

"I VOLUNTARILY SIGNED MY NAME EVIDENCING MY ACCEPTANCE OF THE ABOVE PROVISIONS."

**\*576** A release of this type has been held not to be against the public policy of this state. *Corpus Christi Speedway v. Morton,* 279 S.W.2d 903 (Tex.Civ.App.—San Antonio 1955, no writ). While the release here is not totally in "every day language" nor is it totally "legalese". We hold, as a matter of law, the release clearly communicated its effect to the signer. Point of error number one is overruled.

Point of error number two alleges a fact issue exists concerning whether or not Mr. Smith was given an opportunity to read the release and whether or not the import of the release was misrepresented to him.

[2] The only evidence before the court was Mr. Smith's deposition and his affidavit. Neither of these raise any fact issue against Golden Triangle Raceway. True, there are allegations of misrepresentation, but they are not directed against any one person in particular and especially not anyone connected with Golden Triangle Raceway. An affidavit opposing a motion for summary judgment must contain specific factual allegations which are direct and unequivocal. *Brownlee v. Brownlee,* 665 S.W.2d 111 (Tex.1984). This point of error is overruled.

[3] The next point of error alleges the trial court erred because there was a fact issue as to the validity of the release based upon the great disparity of the bargaining position of the parties. Mr. Smith cites no Texas case on this point. This simply was not a "bargaining" situation. Mr. Smith was under no compulsion to go into the pit area. There are no public policy considerations under which this could be construed as a "bargaining" situation. As previously noted, these types of releases are not against public policy, *Corpus Christi Raceway, supra.* This point of error is overruled.

The final point of error alleges the trial court erred in granting summary judgment because the release cannot relieve Golden Triangle Raceway from liability or damages occasioned by their own

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

708 S.W.2d 574
**(Cite as: 708 S.W.2d 574)**

gross negligence. We find no cases from our jurisdiction on this point. However, several other jurisdictions have adopted such a rule. *Lee v. Beauchene,* 337 N.W.2d 827 (S.D.1983), *Seymour v. New Bremen Speedway, Inc.,* 31 Ohio App.2d 141, 287 N.E.2d 111 (1971), *Winterstein v. Wilcom,* 16 Md.App. 130, 293 A.2d 821 (1981), *Barker v. Colorado Region-Sports Car Club of America, Inc.,* 532 P.2d 372 (Colo.App.1974), *Thomas v. Atlantic Coast Line R.R. Co.,* 201 F.2d 167 (5th Cir.1953), *Wade v. Watson,* 527 F.Supp. 1049 (N.D.Ga.1981), *aff'd,* 731 F.2d 890 (11th Cir.1984).

Several recognized treatises adopt such a rule. The RESTATEMENT OF CONTRACTS SEC. 574 (1932) states:

"A bargain for exemption from liability for the consequences of negligence not falling greatly below the standard established by law for the protection of others against unreasonable risk of harm, is legal except in cases stated in sec. 575."

The comment goes on to state:
"... By gross negligence is meant conduct falling greatly below that standard."

The RESTATEMENT (SECOND) OF CONTRACTS SEC. 195 (1979) states:
"A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy...."

See also, 6A CORBIN, *CONTRACTS* SEC. 1472 (1962) and W. PROSSER, *TORTS,* SEC. 68 (4th Ed.1971).

[4] The rule adopted by the other jurisdictions and supported by the treatises should be the rule in Texas. We hold a term in a release attempting to exempt one from liability or damages occasioned by gross negligence is against public policy. We sustain point of error number three.

The case is remanded for a trial only on the issue of gross negligence and the actual and punitive damages attributable to such gross negligence, if any.

AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.

Tex.App. Beaumont 1986.
Smith v. Golden Triangle Raceway
708 S.W.2d 574

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

626 So.2d 1212
**(Cite as: 626 So.2d 1212)**

C

Court of Appeal of Louisiana,
Second Circuit.

Henry BROOM, et al., Plaintiffs-Appellants,
v.
LEEBRON & ROBINSON RENT A CAR, INC. d/
b/a Budget Rent-A-Car, Defendant-Appellee.

No. 25,215-CA.
Oct. 27, 1993.

Automobile renters brought breach of contract action against automobile rental agency seeking to recover damages for agency's failure to replace rental vehicle after theft of tires and wheels. The First Judicial District Court, Parish of Caddo, Frank H. Thaxton, III, J., entered summary judgment in favor of rental agency, and renters appealed. The Court of Appeal, Williams, J., held that: (1) renters were not responsible for theft of rental vehicle's tires and wheels; (2) genuine issue of material fact existed as to whether rental agency's refusal to replace tires and wheels constituted breach of contract; and (3) genuine issue of material fact existed as to whether renters were entitled to recover damages for mental anguish or inconvenience for rental agency's alleged breach of rental contract.

Reversed and remanded.

Victory, J., concurred in result.

West Headnotes

**[1] Judgment 228 ⟿178**

228 Judgment
 228V On Motion or Summary Proceeding
  228k178 k. Nature of Summary Judgment.
Most Cited Cases
Motion for summary judgment is procedural device to avoid full scale trial where there is no genuine factual dispute. LSA-C.C.P. art. 966.

**[2] Judgment 228 ⟿185(2)**

228 Judgment
 228V On Motion or Summary Proceeding
  228k182 Motion or Other Application
   228k185 Evidence in General
    228k185(2) k. Presumptions and Burden of Proof. Most Cited Cases
Mover for summary judgment has burden of affirmatively showing absence of genuine issue of material fact and any doubt as to existence of such issue must be resolved against granting motion. LSA-C.C.P. art. 966.

**[3] Judgment 228 ⟿185(2)**

228 Judgment
 228V On Motion or Summary Proceeding
  228k182 Motion or Other Application
   228k185 Evidence in General
    228k185(2) k. Presumptions and Burden of Proof. Most Cited Cases
To satisfy burden of showing no genuine issue of material fact, mover for summary judgment must meet strict standard by showing that it is quite clear as to what truth is, and that excludes any real doubt as to existence of material fact. LSA-C.C.P. art. 966.

**[4] Judgment 228 ⟿185(2)**

228 Judgment
 228V On Motion or Summary Proceeding
  228k182 Motion or Other Application
   228k185 Evidence in General
    228k185(2) k. Presumptions and Burden of Proof. Most Cited Cases
Papers supporting motion for summary judgment are to be closely scrutinized while opposing papers are to be indulgently treated, in determining whether mover for summary judgment has satisfied his burden of showing no genuine issue of material fact. LSA-C.C.P. art. 966.

**[5] Judgment 228 ⟿185(2)**

626 So.2d 1212
**(Cite as: 626 So.2d 1212)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
           228k185 Evidence in General
                228k185(2) k. Presumptions and Burden of Proof. Most Cited Cases

When court is presented with choice of reasonable inferences to be drawn from subsidiary facts contained in affidavits and attached exhibits, reasonable inferences must be viewed in light most favorable to party opposing motion for summary judgment. LSA-C.C.P. art. 966.

**[6] Judgment 228 ⟲181(1)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
           228k181(1) k. In General. Most Cited Cases

Summary judgment will not be granted even if trial court has grave doubts as to party's ability to establish disputed facts as it is not function of trial court on motion for summary judgment to determine or even inquire into merits of issues raised. LSA-C.C.P. art. 966.

**[7] Judgment 228 ⟲185(5)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
           228k185 Evidence in General
                228k185(5) k. Weight and Sufficiency. Most Cited Cases

Weighing of conflicting evidence has no place in summary judgment procedure. LSA-C.C.P. art. 966.

**[8] Judgment 228 ⟲178**

228 Judgment
    228V On Motion or Summary Proceeding
        228k178 k. Nature of Summary Judgment. Most Cited Cases

Summary judgment is not substitute for trial on

merits. LSA-C.C.P. arts. 966, 967.

**[9] Appeal and Error 30 ⟲893(1)**

30 Appeal and Error
    30XVI Review
        30XVI(F) Trial De Novo
           30k892 Trial De Novo
               30k893 Cases Triable in Appellate Court
                  30k893(1) k. In General. Most Cited Cases

Appellate courts review summary judgment de novo under same criteria that govern district court's consideration of whether summary judgment is appropriate. LSA-C.C.P. arts. 966, 967.

**[10] Automobiles 48A ⟲390**

48A Automobiles
    48AVIII Garage Keepers, Repairmen, Auto Liverymen, and Filling Stations
        48Ak386 Renting Out of Vehicle by Auto Liverymen
           48Ak390 k. Injuries to Vehicle. Most Cited Cases

Renters of automobile were not responsible for theft of rental vehicle's tires and wheels, even though rental contract provided that customer was responsible for damage to wheel and rims, where no provision of contract made customer responsible for theft of wheels and rims, and where renters purchased loss damage waiver which provided that they were not responsible for loss or damage due to theft.

**[11] Contracts 95 ⟲143(2)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
           95k143 Application to Contracts in General
               95k143(2) k. Existence of Ambiguity. Most Cited Cases

When words of contract are clear and explicit

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

626 So.2d 1212
**(Cite as: 626 So.2d 1212)**

and lead to no absurd consequences, no further interpretation may be made in search of parties' intent. LSA-C.C. art. 2045.

**[12] Contracts 95 ⛁152**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
        95k151 Language of Instrument
            95k152 k. In General. Most Cited Cases

In determining meaning of words to contract, they are to be given their generally prevailing meaning. LSA-C.C. art. 2047.

**[13] Judgment 228 ⛁181(19)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
        228k181(15) Particular Cases
        228k181(19) k. Contract Cases in General. Most Cited Cases

Genuine issue of material fact existed as to whether automobile rental agency's refusal, under nonliability provision of rental agreement, to replace tires and wheels that had been stolen from rental vehicle constituted intentional or gross fault so as to make agency liable to renter for breach of contract. LSA-C.C. art. 2004.

**[14] Contracts 95 ⛁114**

95 Contracts
    95I Requisites and Validity
        95I(F) Legality of Object and of Consideration
            95k114 k. Exemption from Liability. Most Cited Cases

It is contrary to public policy and in contravention of state law to allow contracting party to prospectively absolve itself from liability for injuries incurred through its intentional or grossly negligent acts. LSA-C.C. art. 2004.

**[15] Damages 115 ⛁30**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
        115III(A)1 In General
        115k30 k. Elements of Compensation in General. Most Cited Cases

If plaintiffs intended, and nature of contract supports this contention, to gratify significant nonpecuniary interest by way of contract and, if obligor knew or should have known that failure to perform would cause nonpecuniary loss to obligee, requirements for recovery of nonpecuniary damages are satisfied. LSA-C.C. arts. 1994, 1997, 1998.

**[16] Judgment 228 ⛁181(19)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
        228k181(15) Particular Cases
        228k181(19) k. Contract Cases in General. Most Cited Cases

Genuine issue of material fact existed, precluding summary judgment, as to whether renters of automobile had significant nonpecuniary interest in execution of rental contract so as to entitle them to recover damages for mental anguish or inconvenience for automobile rental agency's alleged breach of rental contract. LSA-C.C. arts. 1994, 1997, 1998.

***1214** Davis & Singleton by S.P. Davis, Shreveport, for appellants.

Wiener, Weiss, Madison & Howell by John M. Madison, Jr., Mark L. Hornsby, Shreveport, for appellee.

Before VICTORY, BROWN and WILLIAMS, JJ.

WILLIAMS, Judge.

In this action to recover damages for breach of contract, the plaintiffs, Henry Broom and Loran Black, appeal a summary judgment rendered in fa-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

626 So.2d 1212
**(Cite as: 626 So.2d 1212)**

vor of the defendant, Budget Rent-A-Car. We reverse and remand.

In their petition, plaintiffs allege that on June 7, 1991, Henry R. Broom, Sr. went to Leebron & Robinson Rent-A-Car, Inc. d/b/a Budget Rent-A-Car (Budget) in Shreveport to rent a car. Mr. Broom's credit card did not have sufficient credit available, so Budget refused to rent the car to him. Mr. Broom returned to Budget later that same day with his brother-in-law, Loran Black, Sr. At that time, Mr. Black presented his credit card and entered into a written agreement with Budget to rent a Lincoln Town Car for a period of one week, at the rate of $199.00, with a return date of June 14, 1991. Mr. Broom was listed in the contract as an additional driver. Mr. Black also purchased a Loss Damage Waiver from Budget for an additional fee. Mr. Broom and his wife had planned to travel to New Jersey in the rental car. Mr. Broom alleges that they also intended to travel to Houston, Texas.

On or about June 9, 1991, while Mr. Broom was in Houston, Texas, he notified Budget that the tires and wheels had been stolen from the car. Plaintiffs requested that Budget replace the wheels and tires or provide them with a replacement vehicle so that they could complete their trip. Budget demanded that plaintiff's replace the wheels and tires. Budget also refused to give the Broom's another car.

Mr. Broom eventually rented another vehicle in Houston, Texas, and returned to Shreveport. Because of the delay, he and his wife had to purchase airline tickets to travel to New Jersey.

A representative of Budget later traveled to Houston to recover the rental car. The tires and wheels were replaced at a cost of approximately $1,800.

On June 4, 1992, both Mr. Broom and Mr. Black filed this suit against Budget seeking the following damages as a result of Budget's alleged willful, wanton, and intentional **1215** breach of contract: 1) loss of use of the rental vehicle; 2) loss of business trip; 3) mental anguish, distress and inconvenience; 4) economic loss; 5) attorney fees; and 6) exemplary damages. Budget reconvened requesting the rental car fee and the replacement cost of the tires and wheels. On August 10, 1992, Budget filed a motion for summary judgment. On August 31, 1992, the motion was argued and taken under advisement. Subsequently, the trial court granted the defendant's motion for summary judgment and dismissed plaintiffs' claims. Plaintiffs appealed.

LSA-C.C.P. Art. 966 provides that a motion for summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law.

[1][2] The motion for summary judgment is a procedural device to avoid a full scale trial where there is no genuine factual dispute. The mover for summary judgment has the burden of affirmatively showing the absence of a genuine issue of material fact and any doubt as to the existence of such an issue must be resolved against granting the motion. *Ouachita National Bank v. Gulf States Land & Development, Inc.,* 579 So.2d 1115 (La.App. 2d Cir.1991), *writ denied,* 587 So.2d 695 (La.1991).

[3][4][5] To satisfy his burden, the mover must meet a strict standard by showing that it is quite clear as to what the truth is, and that excludes any real doubt as to the existence of material fact. The papers supporting the mover's position are to be closely scrutinized while the opposing papers are to be indulgently treated, in determining whether mover has satisfied his burden. When the court is presented with a choice of reasonable inferences to be drawn from subsidiary facts contained in affidavits and attached exhibits, reasonable inferences must be viewed in the light most favorable to the party opposing the motion. *Ouachita National Bank, supra.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

626 So.2d 1212
**(Cite as: 626 So.2d 1212)**

[6][7] Summary judgment will not be granted even if the trial court has grave doubts as to a party's ability to establish the disputed facts. It is not the function of the trial court on a motion for summary judgment to determine or even inquire into the merits of the issues raised. The weighing of conflicting evidence therefore has no place in summary judgment procedure. *Ouachita National Bank, supra.*

[8] If the supporting documents presented by the moving party are insufficient to resolve all material facts at issue, summary judgment must be denied. If sufficient, the burden shifts to the opposing party to present supporting evidence showing that material facts are still at issue. LSA-C.C.P. Art. 967. A summary judgment is not a substitute for a trial on the merits. *Sanders v. City of Blanchard,* 438 So.2d 714 (La.App. 2d Cir.1983).

[9] Appellate courts review summary judgment de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. *Schroeder v. Board of Supervisors of Louisiana State University,* 591 So.2d 342 (La.1991).

[10] In the instant case, Budget asserts that since the plaintiffs' suit arose out of the alleged theft of the tires and wheels from the vehicle, summary judgment was properly granted. Budget argues that under the rental contract, it is not liable to the plaintiffs as a result of the theft of the tires and wheels. Budget offers the following language from the rental contract in support of its position:

CUSTOMER IS RESPONSIBLE FOR DAMAGE TO GLASS, WHEELS AND RIMS, AND LIGHTS.

No written reasons for judgment appear in the record of this case. In its "Judgment", the trial court concluded that "any genuine issues of material fact set forth in plaintiffs' petition are not recoverable under the contract between the parties and applicable Louisiana law." We are unsure of the trial court's exact meaning but it appears that it found that the items of damage claimed by the plaintiffs are not recoverable under the contract or Louisiana law.

**\*1216** Although the cited provision of the agreement holds the customer responsible for damage to the wheels and rims, we find no provision in the contract which makes the customer responsible for the theft of the wheels and rims. To the contrary, paragraph 8 of the contract provides that a renter who declines the optional Loss Damage Waiver is responsible for the full value of any loss or damage due to *theft* and other enumerated occurrences. The clear implication of this provision is to relieve responsibility for theft damages to those renters who purchase a Loss Damage Waiver.

[11][12] When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. Art. 2045. Also, in determining the meaning of the words to a contract, they are to be given their generally prevailing meaning. LSA-C.C. Art. 2047; *Schroeder v. Board of Supervisors, supra.*

In this case, the plaintiffs purchased a Loss Damage Waiver. Under the terms of the contract, they were not responsible for the theft of the wheels and tires. Thus, Budget's argument it could not have breached the contract for failing to replace the tires and wheels because plaintiffs were responsible for theft under the contract is without merit.

[13] In its motion for summary judgment Budget additionally cited paragraph 16(B) of the rental agreement in support of its position that it was entitled to judgment as a matter of law. Paragraph 16(B) of the rental agreement provides that Budget "shall have no liability for any indirect, special or consequential damages arising in connection with the furnishing, performance or use of the vehicle or for any claim based on the failure to honor a vehicle reservation requested by Renter."

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

626 So.2d 1212
**(Cite as: 626 So.2d 1212)**

Apparently, Budget and the trial court believed this "non-liability" provision of the rental contract defeats the plaintiff's entire cause of action. We again disagree.

LSA-C.C. Art. 2004 provides:

Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party.

Any clause is null that, in advance, excludes or limits the liability of one party for causing physical injury to the other party.

[14] Here, the plaintiffs' petition alleges an intentional refusal by Budget to honor the terms of the rental agreement. It is contrary to public policy and in contravention of Louisiana law to allow a contracting party to prospectively absolve itself from liability for injuries incurred through its intentional or grossly negligent acts. LSA-C.C. Art. 2004. *See also, Ramirez v. Fairgrounds Corp.,* 575 So.2d 811 (La.1991); *Walker v. Self Service Storage and Miniwarehouses, Inc.,* 492 So.2d 210 (La.App. 4th Cir.1986). There appear to be genuine issues of material fact as to whether Budget's conduct in this case amounted to "intentional or gross fault." That is, was the denial of replacement of the tires and wheels a reasonable interpretation of the contract? Was Budget's refusal intentional or grossly negligent?

In the absence of "intentional or gross fault," there would still remain issues of material fact given that the terms contained in Paragraph 16(B), "indirect," "special," and "consequential" are vague and are not defined by the contract. Whether the items of damage claimed by the plaintiffs would be prohibited by this provision is best decided by the trier of fact following trial.

Finally, Budget argues that summary judgment was appropriate because none of the damages sought by plaintiff are recoverable under Louisiana law. It contends plaintiff cannot recover damages

for mental anguish or inconvenience based on a breach of contract.

LSA-C.C. Art. 1994 provides:

An obligor is liable for the damages caused by his failure to perform a conventional obligation.

LSA-C.C. Article 1997 provides:

An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform.

**\*1217** LSA-C.C. Article 1998 then sets forth the requirements for the recovery of nonpecuniary damages:

Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss. Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee.

[15] If plaintiffs intended, and the nature of the contract supports this contention, to gratify a significant nonpecuniary interest by way of the contract, and, if the obligor knew or should have known that failure to perform would cause nonpecuniary loss to the obligee, then the requirements for recovery of nonpecuniary damages are satisfied. *See generally, Young v. Ford Motor Company, Inc.,* 595 So.2d 1123 (La.1992); *Mayerhofer v. Three R's Inc.,* 597 So.2d 151 (La.App. 3d Cir.1992); *Whitener v. Clark,* 356 So.2d 1094 (La.App. 2d Cir.1978) *writ denied,* 358 So.2d 638 (La.1978).

[16] In the instant case, plaintiffs seek damages for both pecuniary and nonpecuniary loss. They argue that they are entitled to damages for mental anguish and inconvenience because they had a signi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

626 So.2d 1212
**(Cite as: 626 So.2d 1212)**

ficant nonpecuniary interest in executing the rental contract. This assertion is best proved or disproved after the facts are established at a trial on the merits.

The evidence adduced in support of the motion for summary judgment does not establish beyond genuine dispute that Budget complied with the terms of the rental contract. Consequently, the movers failed to demonstrate that they were entitled to a judgment as a matter of law, and the motion for summary judgment was erroneously granted.

Having found that summary judgment was improperly granted, we do not reach the other issues raised on appeal.

Accordingly, the summary judgment is reversed, and the case is remanded to the district court for further proceedings consistent with this opinion. Costs of this appeal are assessed to the appellee, Budget Rent-A-Car.

REVERSED AND REMANDED.

VICTORY, J., concurs in result.

La.App. 2 Cir.,1993.
Broom v. Leebron & Robinson Rent-A-Car, Inc.
626 So.2d 1212

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

66 N.Y.2d 674                                                                                    Page 1

66 N.Y.2d 674
**(Cite as: 66 N.Y.2d 674, 487 N.E.2d 267)**

▷

Austro v Niagara Mohawk Power Corp.
66 N.Y.2d 674, 496 N.Y.S.2d 410
N.Y. 1985.

66 N.Y.2d 674, 487 N.E.2d 267, 496 N.Y.S.2d 410

Edward Austro et al., Plaintiffs,

v.

Niagara Mohawk Power Corporation, Defendant
and Third-Party Plaintiff-Appellant. Weber Con-
struction Company, Inc., et al., Third-Party Defend-
ants-Respondents, et al., Third-Party Defendants.
(And a Fourth-Party Action.)
Court of Appeals of New York

Argued September 10, 1985;
decided October 10, 1985

CITE TITLE AS: Austro v Niagara Mohawk Power
Corp.

## SUMMARY

Appeal, by permission of the Court of Appeals,
from an order of the Appellate Division of the Su-
preme Court in the Third Judicial Department,
entered July 23, 1984, which unanimously affirmed
a judgment of the Supreme Court, entered in
Saratoga County upon a verdict on the issue of liab-
ility rendered at a Trial Term (J. Raymond Amyot,
J.), and upon a stipulation fixing damages, ad-
judging that plaintiffs recover of defendant Niagara
Mohawk Power Corporation and the third-party de-
fendants Weber Construction Company, Inc. and
Kenneth Begin the sum of $899,500; that defendant
Niagara Mohawk was 90% liable and third-party
defendants Weber and Begin were 10% liable for
plaintiff's injuries, and that 75% of Niagara Mo-
hawk's negligence was gross negligence.

Plaintiff Edward Austro, an employee of Weber,
sustained serious injuries when he received an elec-
trical shock while handling a bucket attached to a
crane which came in contact with a power line

owned by Niagara Mohawk. At the time of the acci-
dent, Weber was performing a contract for the re-
pair of a concrete wall owned by Niagara Mohawk.
The contract provided that Weber would indemnify
Niagara Mohawk for any liability caused by
Niagara Mohawk's negligence, whether that negli-
gence was wholly or partly the cause of bodily in-
jury arising out of the work performed under the
contract. After plaintiffs brought an action against
Niagara Mohawk for negligence, Niagara Mohawk
commenced a third-party action against Weber and
Begin seeking contractual and common-law indem-
nification. On appeal, Niagara Mohawk contended
that the verdict was against the weight of the evid-
ence, that a finding of gross negligence was con-
trary to law, and that the trial court erred in finding
that the indemnification agreement, as it applied to
gross negligence, was void as a matter of public
policy.

The Appellate Division concluded that there was
sufficient evidence in the record to support the
jury's determination that both parties were respons-
ible for the happening of the accident and its de-
termination of apportionment, and that the trial
court properly calculated Weber's liability under the
indemnity provision.

*Austro v Niagara Mohawk Power Corp.,* 103 AD2d
903, reversed.

## HEADNOTES

Indemnity--Indemnification against Own Negli-
gence
(1) In a third-party action for indemnification
brought by a public utility against a contractor,
based upon an agreement by the contractor to in-
demnify the utility for any liability caused by the
utility's negligence resulting in bodily injury arising
out of work performed by the contractor under a
construction contract, an order of the Appellate Di-
vision, which affirmed so much of a judgment dis-
missing the utility's third-party complaint insofar as

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

66 N.Y.2d 674
**(Cite as: 66 N.Y.2d 674, 487 N.E.2d 267)**

it sought indemnification from the contractor for the utility's gross negligence, **\*676** should be reversed, and judgment granted to the utility on its third-party complaint. Indemnification agreements are unenforceable as violative of public policy only to the extent that they purport to indemnify a party for damages flowing from the intentional causation of injury. Because there is no allegation of intentional harm in this case, the utility should have been granted judgment against the contractor for the full amount of its liability to the injured plaintiff.

APPEARANCES OF COUNSEL

*Howard S. Rosenhoch* and *Lawrence H. Wagner* for appellant.
*Edward F. Layden* for respondents.

OPINION OF THE COURT

The order of the Appellate Division, insofar as appealed from, should be reversed, with costs, and judgment granted to Niagara Mohawk Power Co. (NiMo) on its third-party complaint against third-party defendants Weber Construction Co., Inc., and Kenneth Begin.

The Appellate Division affirmed the dismissal, following trial, of NiMo's third-party complaint insofar as it demanded indemnification from Weber for liability arising out of NiMo's gross negligence. The demand was based on an agreement by Weber to indemnify NiMo for any liability caused by the latter's negligence resulting, in whole or in part, in bodily injury arising out of work performed by Weber under a construction contract. The Appellate Division relied on this court's pronouncements, in *Gross v Sweet* (49 NY2d 102) and *Kalisch-Jarcho, Inc. v City of New York* (58 NY2d 377), that exculpatory agreements will not be read to exempt a willful or grossly negligent party from liability to an injured person. The Appellate Division, however, failed to distinguish between the exculpatory clauses involved in those cases, which typically deprive a contracting party of the right to recover for damages suffered as the result of the ex-

onerated party's tortious act, and indemnity contracts that simply shift the source of compensation without restricting the injured party's ability to recover. Indemnification agreements are unenforceable as violative of public policy only to the extent that they purport to indemnify a party for damages flowing from the intentional causation of injury (*Public Serv. Mut. Ins. Co. v Goldfarb,* 53 NY2d 392, 400). Because there is no allegation of intentional harm in this case, NiMo should have been granted **\*677** judgment against Weber and Begin for the full amount of its liability to plaintiff Austro. In view of our holding, we need not decide whether the evidence was legally sufficient to support the jury's finding of gross negligence against NiMo.

Chief Judge Wachtler and Judges Meyer, Simons, Kaye, Alexander and Titone concur; Judge Jasen taking no part.
Order reversed, with costs, and judgment granted to Niagara Mohawk Power Corporation in accordance with the memorandum herein.

Copr. (c) 2011, Secretary of State, State of New York

N.Y. 1985.
Austro v Niagara Mohawk Power Corp.
66 N.Y.2d 674, 487 N.E.2d 267578496 N.Y.S.2d 410602, 487 N.E.2d 267578496 N.Y.S.2d 410602

END OF DOCUMENT