For Opinion See 335 F.3d 376

United States Court of Appeals,

Fifth Circuit.

Seth A BECKER, Plaintiff - Intervenor Defendant - Appellee,

v.

TIDEWATER INC; Tidewater Incorporated; Twenty Grand Offshore Incorporated; Tidewater Marine, L.L.C., Defendants - Third Party Plaintiffs - Intervenor Defendants - Appellees - Appellants,

R & B Falcon Drilling USA Inc; Pental Insurance Company, Ltd; Certain Underwriters at Lloyds Insurance Co; Defendants - Appellants,

Baker Hughes Inc; Baker Hughes Oilfield Operations Inc; Baker Oil Tools Inc, a division of Baker Hughes Oilfield Operations Inc; Baker Oil Tools, a division of Baker Hughes Oilfield Operations Inc; Defendants - Third Party Defendants - Intervenor Plaintiff - Third Party Plaintiff - Appellant,

Hydra Rig, a division of Tuboscope Vetco International LP; Hydradyne Hydraulics Inc; Coflexip Stena Offshore Inc.; Defendants - Third Party Defendants - Third Party Plaintiff - Appellees.

No. 01-31420.

April 22, 2002.

Original Brief of Baker Hughes Inc, Baker Hughes Oilfield Operations Inc., and Baker Oil Tools Inc.

Robert E. Kerrigan, Jr., Joseph L. McReynolds, Allen F. Campbell, Joseph E. Lee, III, Deutsch, Kerrigan & Stiles, L.L.P., 755 Magazine Street, New Orleans, Louisiana (504)581-5141

STATEMENT REGARDING ORAL ARGUMENT

Aside from the $43 million jury award rendered below, this case presents an important and possibly *res nova* issue of Jones Act interpretation: When is a shore-based worker "reassigned" to classic seaman's work and what evidence is sufficient to allow a factfinder to determine whether the assignment to vessel work is substantial enough in terms of duration, performance, regularity and continuity to qualify for Jones Act recovery? The United State Supreme Court left this question open in *Chandris v. Latsis*; the question is now firmly before the Court in this appeal.

The sheer enormity of the jury verdict in this matter, which included a $29 million general damages award, also calls for appellate relief. It is argued that the jury was so overwhelmed by passion, prejudice or some other improper motive in arriving at its verdict, that the entire case should be re-tried. But additional errors of law contributed to the excessive award by allowing for duplication in the general damages award. At least one such error raises a second question that may be *res nova* in this Circuit: Does a separate jury award for "disfigurement and scarring" duplicate the damages awarded for pain and suffering and mental anguish?

Finally, this case presents an important issue of maritime contract interpretation: Should an indemnity provision in a maritime contract that is silent as to indemnity for gross negligence be construed to encompass gross negligence as a matter of law? For all these reasons, undersigned counsel suggest that oral argument is warranted for a full presentation and review of these issues.

Robert E. Kerrigan, Jr. (#7350)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Joseph L. McReynolds (#1947)

Allen F. Campbell (#3815)

Joseph E. Lee, III (#26968)

Deutsch, Kerrigan & Stiles, L.L.P.

775 Magazine Street

New Orleans, Louisiana (504)581-5141

## *vii TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ... ii

STATEMENT REGARDING ORAL ARGUMENT ... v

TABLE OF CONTENTS ... vii

TABLE OF AUTHORITIES ... ix

JURISDICTIONAL STATEMENT ... 1

STATEMENT OF THE ISSUES ... 1

Assignments of Error ... 1

Questions Presented for Review ... 2

STATEMENT OF THE CASE ... 4

A. Course of the Proceedings and Disposition in the District Court ... 4

B. Statement of the Facts ... 10

SUMMARY OF THE ARGUMENT ... 15

ARGUMENT ... 17

A. Seaman Status ... 17

1. Evolution of "Seaman" Status ... 18

2. No substantial connection to a vessel ... 24

3. Exclusion of Parr's testimony ... 26

B. The Jury's Damage Award is Excessive ... 29

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1. General damages ... 29

**viii** 2. The disfigurement award ... 37

3. Life Care award ... 40

4. Future medical expenses ... 41

5. Future lost wages ... 42

C. Tidewater's Gross Negligence ... 43

D. The Case Against the Manufacturers ... 47

CONCLUSION AND RELIEF SOUGHT ... 48

REVISED CERTIFICATE OF COMPLIANCE ... 51

**ix** TABLE OF AUTHORITIES

*CASES*

*Armand v. State, Dep't of Health and Human Resources*, 97 2958 (La. App. 1 Cir. 2/23/99), 729 So.2d 1085 ... 32

*Alderete v. Missouri Pac. Ry. Co.*, No Docket Number. (Webb Cty., TX 1995) ... 35

*Askanase v. Fatjo*, 130 F.3d 657 (5th Cir. 1997) ... 46

*Bannister v. Ullman*, 287 F. 3d 394, 2002 WL 491919, (April 2, 2002) ... 18

*Barrett v. Chevron, U.S.A., Inc.*, 781 F.2d 1067 ... 18-20, 22-24, 26, 28, 29

*Brown v. Southern Baptist Hosp.*, 96-1990, 96-1991 (La. App. 4 Cir. 3/11/98), 715 So.2d 423 ... 38

*Brunet v. United Gas Pipeline Co.*, 15 F.3d 500 (5th Cir. 1994) ... 44

*Caldarera v Eastern Airlines, Inc.*, 705 F. 2d 778, 784 (5th Cir. 1983) ... 29, 30

*Carumbo v. Cape Cod S.S. Co.*, 123 F.2d 991 (1st Cir. 1941) ... 19

*Chandris v. Latsis*, 515 U.S. 347, 132 L. Ed. 2d 314 (1995) ... v, 17, 19-22, 24, 26, 28

*Chung v. New York City Transit Authority*, 624 N.Y.S.2d 224, 213 A.D.2d 619 (N.Y.A.D. 2 Dept. 1995) ... 34, 35

*Coastal Iron Works, Inc. v. Petty Ray Geophysical*, 783 F.2d 577 (5th Cir. 1986) ... 46

*Cullivan v. State Farm Mut. Auto. Ins. Co.*, 428 So.2d 1231 (La. App. 3 Cir. 1983) ... 32

*Davis v. Odeco, Inc.*, 18 F.3d 1237 (5th Cir. 1994) ... 44

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*x *Day v. South Line Equip. Co.*, 551 So.2d 774 (La. App. 1 Cir. 1989), *writ denied*, 553 So.2d 474 (La. 1989) ... 38

*Dernette v. Falcon Drilling Co., Inc.*, 280 F.3d 492 (5th Cir. 2002) ... 25

*Dixon v. International Harvester Co.*, 754 F. 2d 573 (5th Cir. 1985) ... 29-31, 36

*Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336 (5th Cir. 1990) ... 29-31

*Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176 (5th Cir. 1995) ... 31

*Erie R. Co. v. Collins*, 253 U.S. 77, 40 S.Ct. 450 (1920) ... 38

*Foley v. Clark Equipment Co.*, 523 A.2d 379 (Pa. Supep 1987) ... 34

*Gallarzo v. Hyster Co.*, Case No. 715474 (Orange Cry., CA 1997) ... 35

*Gims v. Danos & Curole Marine Contractors, Inc.*, 1999 WL 983826 (E.D.La.) ... 23

*Gough v. National Pipeline Co. of America*, 996 F.2d 763 (5th Cir. 1993) ... 30

*Guilbeau v. W.W. Henry Co.*, 85 F.3d 1149 (5th Cir. 1996) ... 18

*Haley v. Pan Am. World Airways, Inc.*, 746 F.2d 311 (5th Cir. 1984) ... 30

*Harbor Tug and Barge Co. v. Papai*, 520 U.S. 548, 117 S.Ct. 1535, 137 L.Ed.2d 800 (1997) ... 21

*Harris v. Southern Pac. Transp. Co.*, Case No. SCC 24504 (Los Angeles Cty., CA 1993) ... 35

*Howell v. Posadas*, Case No., 93 L 9302 (Cook Cty., IL 2000) ... 35

*In the Matter of Torch, Inc.*, 1996 WL 185765 (E.D.La. 1996) ... 46

*In the Matter of TT Boat Corp.*, 1999 WL 1442054, (E.D.La. 1999) ... 46

*xi *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347 (5th Cir. 1988) ... 39

*Lebron v. United States*, 279 F. 3d 371 (5th Cir. 2002) ... 30, 35, 40, 41

*Lucas v. New York Transit Authority*, 57 N.Y.S.2d 919, 163 A.D.2d 21 (N.Y.A.D. 1 Dept. 1990) ... 34

*Manuel v. P.A.W. Drilling & Well Serv., Inc.*, 135 F.3d 344 (5th Cir. 1998) ... 23, 28

*McDaniel v. Anheuser-Busch, Inc.*, 987 F. 2d 298 (5th Cir. 1993) ... 37

*McDermott Intern., Inc. v. Wilander*, 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991) ... 17, 18, 21

*Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir. 1959) ... 19

*Owen v. Kerr-McGee Corp.*, 698 F.2d 236 (5th Cir. 1983) ... 46

*Palamo v. City of Austin, Texas*, 178 F.3d 968, 981 (5th Cir. 1996) ... 36

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Raymond v. Mobil Oil Corp.*, 983 F. 2d 1528 (10th Cir. 1993) ... 18

*Roberts v. Cardinal Services, Inc.*, 266 F. 3d 368 (5th Cir. 2001) ... 18

*Rodriguez v. State*, 634 N.Y.S.2d 93, 221 A.D.2d 277 (N.Y.A.D. 1 Dept. 1995) ... 34

*Salinas v. O'Neill*, 286 F. 3d 827, 2002 WL 453025 (5th Cir. 4/9/02) ... 31

*Shea v. New York City Transit Authority*, 735 N.Y.S.2d 609 (App. Div. 2001) ... 34, 35

*Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421 (5th Cir. 1988) ... 30

*Simpson v. State, Dep't of Transp. and Dev.*, 95 0115, 92 0116, 92 0117 (La. App. 1 Cir. 12/7/93), 636 So.2d 608 ... 32

*Smith v. Juneau*, 95-0724 (La. App. 4 Cir. 4/9/97), 692 So.2d 1365 ... 38

**xii** *Snearl v. Mercer*, 99-1738, 99-1739 (La. App. 1 Cir. 2/16/01), 780 So.2d 563 ... 33, 36

*Sosa v. M/V Lago Izabal*, 736 F.2d 1028 (5th Cir. 1984) ... 39-41

*St. Rornain v. Industrial Fabrication and Repair Service, Inc.*, 203 F.3d 376 (5th Cir. 2000) ... 44

*Todd Shipyards Corp. v. Turbine Service, Inc.*, 674 F.2d 401 (5th, Cir. 1982) ... 46

*Unnamed Civil Action*, No Docket Number Given (Chataqua Cty., NY 2000) ... 35

*Wallace v. Oceaneering Int'l*, 727 F. 2d 427 (5th Cir. 1984) ... 17

*Wells v. Dallas Independent School District*, 793 F. 2d 679 (5th Cir. 1986) ... 37

*Wheat v. United States*, 860 F. 2d 1256 (5th Cir. 1988) ... 30

*Willet v. Western Oceanic, Inc.*, 117 F.R.D. 379, 382 (E.D. La. 1987) ... 36

*Williams v. Chevron U.S.A., Inc.*, 875 F.2d 801 (5th Cir. 1989) ... 31

*Zeno v. Great Atlantic and Pacific Tea Co.*, 803 F.2d 178 (5th Cir. 1986) ... 31

*Zerangue v. Delta Towers, Ltd.*, 820 F.2d 130 (5th Cir. 1987) ... 31

**xiii** *STATUTES*

28 U.S.C. §1291 ... 1

28 U.S.C. §1333 ... 1

46 U.S.C. §688(a) ... v, 1, 4, 20, 22, 28, 48

Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §903(a) ... 1

Rule 406 of the Federal Rules of Evidence ... 27

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*MISCELLANEOUS AUTHORITIES*

1 MCCORMICK ON EVIDENCE § 185 ... 18, 27

22 AmJur 2d Damages § 256 ... 39

25 C.J.S. Damages § 66 ... 39

6A CORBIN ON CONTRACTS § 1472 (1964 ed.) ... 46

Dobbs, 2 THE LAW OF TORTS § 377 (West 2000) ... 38

Gerald W. Boston, 2 STEIN ON PERSONAL INJURY DAMAGES § 8:5 ... 39

Jerome H. Nates, *et al.*, I DAMAGES IN TORT ACTIONS § 8.30 ... 39

MCCORMICK ON DAMAGES § 88 (West 1935) ... 38

## *1 JURISDICTIONAL STATEMENT

Suit in the district court asserted claims under the Jones Act, 46 U.S.C. §688(a)("Jones Act"), and, alternatively, under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §903(a)("LHWCA"), remedies that arise under admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333. R,. 1:1,4.[FN1] Jurisdiction in this Court arises under 28 U.S.C. § 1291, from which final judgments of district courts may be appealed of right.

> FN1. References to the record are to the volume and page number, as in "R, 2:245." References to the volume and pages of the transcript are designated as "T, 25:37." References to the record excerpts are designated by their tab number in the Appendix, as in "RE 3."

Following a jury trial, final judgment was entered on August 27, 2001. RE 5. It was amended on October 30, 2001 (RE 4), following the district court's denial of post-trial motions for relief on October 11,2001. RE 3. The judgments disposed of all claims and defenses of the parties.

A timely notice of appeal was filed on November 8, 2001. RE 2.

## STATEMENT OF THE ISSUES

### Assignments of Error

The judgment of the district court encompasses (1) errors of substantive law bearing on the issue of plaintiff's "seaman" status and the employer's contractual indemnity obligations to the vessel owner; (2) excessive awards of general and special damages that indicate an emotional rather than a rational disposition of the *2 case on the part of the jury; and (3) reversible errors in certain critical evidentiary rulings during the trial that contributed to the jury's erroneous findings and excessive damage awards.

### Questions Presented for Review

1. Was the evidence insufficient as a matter of law to support the conclusion that the plaintiff, in his third summer internship with the same employer and with no previous sea-based work, had a substantial connection to a vessel to qualify for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

"seaman" status under the Jones Act, when his injury occurred on the first day of a three-day gravel-packing job on an offshore jack-up drilling rig?

2. Was the evidence insufficient as a matter of law to support the conclusion that plaintiff's appointment to the gravel-packing job was a permanent, rather than a temporary, assignment to vessel work that constituted a regular and continuous, rather than a temporary and sporadic, commitment of his labor within the meaning of *Chandris v. Latsis* and *Barrett v. Chevron, U.S.A., Inc.*?

3. Did the district court err as a matter of law in denying the employer's motions for summary judgment and for judgment as a matter of taw at the close of plaintiff's case on the issue of plaintiff's "seaman" status and allowing the case to go to the jury?

4. Did the district court commit reversible error in refusing to admit evidence of plaintiff's temporary assignment to the gravel-packing job for the jury's **3** consideration of all relevant circumstances bearing on the plaintiff's employment-connection to a vessel and, in effect, improperly shift the burden to the employer to disprove plaintiff's "seaman" status?

5. Are the $43 million in general and special damages awarded by the jury for the bilateral amputation of plaintiff's legs below the knees so excessive as to indicate a jury corrupted by bias, passion or prejudice, or other improper motive, and so large as to warrant a new trial, rather than a mere reduction under this Court's "maximum recovery rule"?

6. Did the district court commit reversible error in granting summary judgment for the vessel owner and its insurers in light of evidence that the actions of the vessel captain which caused the accident were "grossly negligent" and "demonstrated a reckless disregard for the safety of [the] men."?

7. Did the district court commit reversible error in refusing to charge the jury on the issue of the vessel owner's gross negligence, in refusing to allow the employer to present evidence of the vessel's gross negligence to the jury, and in refusing to allow the jury to decide the issue of the vessel's gross negligence as a question of fact?

8. Does the contract between the employer and the vessel owner exclude, by its silence, any indemnity obligations for injuries caused by the vessel owner's gross negligence as a matter of law?

**4** 9. Did the district court commit reversible error in refusing to allow the employer's expert to testify about design defects?

10. Did the district court abuse its discretion in refusing to grant the employer's post-trial motions for remittitur or a new trial?

STATEMENT DE THE CASE.

This is an appeal from a $43 million jury award of general and special damages to a petroleum engineering student seeking Jones Act recovery against his employer, and others, for the bilateral amputation of his legs below the knees that occurred in an accident on a jacked-up drilling rig in the Gulf of Mexico during his third summer internship.

While the amount of the award is alone a sufficient ground for relief on appeal, that the proceedings leading to the jury's award should end in such a judgment is at least partly explained by certain critical rulings made by the district court that themselves, singly and together, are grounds for reversal.

A. Course of the Proceedings and Disposition in the District Court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff, Seth Becker (hereinafter referred to by his first name, "Seth," to avoid confusion with the name of his employ-er), sued his employer, Baker Hughes, Inc. ("Baker"), under the Jones Act claiming to be a "seaman."[FN2] He included a negligence *5 claim under general maritime law and an unseaworthiness claim against Tidewater Inc., the owner of the vessel M/V REPUBLIC TIDE on which he was working at the time of the injury. He pleaded alternative recovery against Tidewater under § 905(b) of the LHWCA. He also asserted negligence claims under general maritime law against. Cliffs. Drilling Co. and R&B Falcon USA, (collectively "Falcon"), the respective owner and operator of the rig where the injury occurred in the Gulf of Mexico.

> FN2. Seth later amended his complaint to add Baker Hughes Oilfield Operations, Inc., and Baker Oil Tools, Inc., A Division of Baker Hughes Oitfield Operations, Inc. R, 2:231. Both are referred to as Baker.

Tidewater, and two affiliates,[FN3] asserted a third-party demand against Baker for contractual indemnity and defense under its Blanket Time Charter agreement.[FN4] Well before discovery had been completed, the district court granted Tidewater a summary judgment on its indemnity claim against Baker.[FN5] Baker had opposed Tidewater's motion on the ground that the agreement did not contemplate indemnity for the fault alleged.[FN6]

> FN3. Tidewater Marine, L.L.C. and Twenty Grand Offshore (collectively "Tidewater"), added as defendants by Seth's supplemental and amending complaint. R, 1:12, 77.

> FN4. R, 4:520.

> FN5. R, 8:1049 (Docket No. 221).

> FN6. R, 6:742. Baker also argued that the indemnity agreement was not enforceable under §905(b) of the LHW-CA.

Seth later amended his complaint to add as defendants Tidewater's underwriters, Pental Insurance Co. Ltd. and Certain Underwriters at Lloyd's *6 ("Underwriters").[FN7] The Underwriters cross-claimed and then moved for summary judg-ment against Baker, asserting the same indemnity rights as Tidewater under the Blanket Time Charter.[FN8] At the time the Underwriters filed their motion, evidence had emerged in discovery implicating Tidewater's gross negligence in caus-ing the accident at the rig. Baker opposed the Underwriters' motion on the ground that Tidewater's gross negligence was a disputed issue of material fact, citing legal authority that gross negligence was beyond the scope of the indemnity pro-vision.[FN9]

> FN7. R, 9:1214.

> FN8. R, 10:1412(Docket No. 310).

> FN9. R, 11:1577 (Docket No. 347).

Baker's own motion for summary judgment, on the issue of Seth's status as a "seaman," was set for hearing on the same day as the Underwriters' motion for summary judgment on indemnity.[FN10] The district court granted the Underwriters' motion, holding as a matter of law that the language of the Blanket Time Charter, though silent as to gross negligence, was nevertheless broad enough to encompass indemnity for gross negligence. RE 11:11-12. The court denied Baker's motion, ruling that factual issues existed as to Seth's status. RE 11:27.

> FN10. R, 10:1430; R, 13:1884.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Faced with indemnifying Tidewater's gross negligence, Baker filed third-party demands for product liability against Hydra Rig and Hydradyne Hydraulics for **7** defects in the coflex hose and reel assembly installed in the M/V REPUBLIC TIDE.[FN11] Plaintiff then amended his complaint to assert similar product liability claims against Hydra Rig and Hydradyne Hydraulics (succeeded by Drexel Holdings, Inc.), and against Coflex Stena Offshore, Inc.,[FN12] the manufacturer of the coflex hose.

FN11. R, 8:1076.

FN12. R, 9:1225.

In the parties' joint submission of Requested Jury Charges,[FN13] Baker specifically requested an instruction on the issue of gross negligence. R, 13:1956. Shortly before trial, Baker filed a motion asking the district court to reconsider the summary judgments granted to Tidewater and the Underwriters and re-urged its request for a jury charge on gross negligence. R, 13:1996. The motions were denied. RE 12.

FN13. RE 15.

Baker also interposed a written objection to the line on the Proposed Verdict Form (R, 13:1964-68) allowing the jury to allot a separate amount of damages for "disfigurement and scarring." The objection states, "Baker objects to this line claiming included in above." R, 13:1968. Over Baker's objection, "disfigurement and scarring" was included in the final Verdict Form as a distinct category of damages. The jury ultimately awarded Seth $7,000,000.00 for this category alone. RE 6:2090.

Trial commenced on July 9, 2001. Seth's counsel called Jamie Parr, Baker's **8** operations coordinator, as a witness for his case in chief. T, 26:449. On cross-examination, Baker's counsel sought to elicit testimony from Parr about Baker's employment procedures in assigning workers to the M/V REPUBLIC TIDE for offshore gravel-packing jobs. Because Parr, as the operations coordinator, was responsible for assigning men and equipment to the M/V REPUBLIC TIDE, Baker's counsel asked Parr whether, under Baker's scheduling procedures for that position, Seth would have remained on board the vessel after the job was finished. T, 26:470. Sustaining an objection by Seth's counsel, the district court refused to allow Parr to answer that question on the grounds his testimony was inadmissible speculation. T, 26:475-76.

Seth's counsel also called, as pan of his case in chief, Captain Ronald Campana, an expert in vessel operations and boat handling. Captain Campana had issued a report during pre-trial discovery in which he opined that Tidewater's captain had been "grossly negligent in the performance of his duties." Baker Proffer No. 1. The district court refused to allow Campana's report into evidence and refused to allow Baker's counsel to question Captain Campana about the gross negligence of Tidewater. T, 33:885-92. Campana's testimony also appears in the record as a proffer.

**9** Despite the express prohibition in the scheduling order,[FN14] plaintiff's expert, Stephen Killingsworth, was allowed to change his opinion from his pre-trial report. Instead of implicating the manufacturers, he testified that Baker was a sophisticated user and the *de facto* manufacturer of the reel assembly with ultimate responsibility for all product defects. [FN15] With this change in Killings worth's testimony, plaintiff did not oppose the manufacturer's motion for directed verdict. T, 38:1304. Baker was allowed to proceed with its third-party claims against the manufacturers, but the district court refused to allow Baker's expert in hydraulics, Walter Seyffert, to testify that there was a design defect in the hose and reel assembly, because that opinion was not specifically phrased as such in his report. T, 40:1538-42.

FN14. Scheduling order, R, 2:255-268, pp. 259-60. See the district court's comments at trial, at T, 40:1546-48.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN15. T, 33:928, 936-38, 955-54, 961-65.

At the close of plaintiff's case, Baker moved for judgment as a matter of law on the issue of Seth's seaman status. R, 14:2075; T, 38:1311-12. The motion was denied. RE 14:1312-16.

At the close of all the evidence, the court bifurcated the issues. The jury was asked to decide first whether Seth was "seaman." Seth's counsel made an impassioned plea to the jury to take up the torch on Seth's "own agony and his own misery" and "[p]lease fight for him on the issue. Seth Becker is a seaman." **10** T, 14:1704. Baker was left to defend the compensation scheme that Congress had enacted for land-based workers under the LHWCA and to argue that Seth's remedies under that scheme, and not under the Jones Act, were adequate and appropriate. T, 14:1705-07.

The jury found that Seth was a seaman and awarded him $29 million in general damages, including $7 million alone for disfigurement and scarring. The jury also awarded Seth-$11 million in future medical and life care expenses, $3 million in future lost wages, and $487,920.45 in past medical expenses. The jury assigned 65% of the fault to Baker, 30% of the fault to Tidewater, and 5% to Falcon, and assigned none of the fault to the manufacturers.

Judgment was entered on the jury verdict on August 27, 2001. RE 5. Baker timely moved for a new trial, or remittitur, arguing that the district court erred in ordering Baker to indemnify Tidewater and Tidewater's Underwriters, and that the award of damages was excessive and an abuse of discretion. The motions were denied on October 11, 2001. RE 3. The judgment was amended on October 30, 2001, to include judicial interest.

It is from these judgments that Baker has appealed. RE 4.

## B. Statement of the Facts

At the time of the accident in 1999, Seth was a 19 year-old engineering student at Montana Tech working toward a dual degree in petroleum and mechanical **11** engineering. To learn about the petroleum industry and help defray the costs of his education, Seth had for the past two summers worked as a summer intern for Baker with an eye toward securing a possible permanent engineering position with Baker after graduation.

Seth had completed his first summer engineering internship in 1997 (T, 38:1288), working out of Baker's shop in Bossier City, Louisiana, where he spent time observing and assisting Baker personnel on a handful of land-based rig jobs. None of his work that first summer involved vessels. T, 38:1289-90. Seth's second summer internship in 1998 took him to Baker's shop in Victoria, Texas, where, as in the previous summer, Seth did some field work, but participated only in land-based rig jobs; he did no vessel work whatsoever. T, 38-1290.

Seth returned to Baker's shop in Broussard, Louisiana for a third summer engineering internship in 1999. T, 38:1291. Seth testified that his work that summer was planned to concentrate on three areas: "[T]hey were going to start me out in pumping, and then they were going to try to get me into the screen manufacturing for sand control. And then in the end they were going to try and maybe let me see some fishing tools and hang around the regional engineers." T, 38:1272. Seth's testimony was corroborated by a work memorandum that outlined the activities planned for Seth that summer. [FN16] According to Seth, none of his planned activities involved vessel-**12** based work. T, 38:1292-93.

FN16. The memorandum was introduced without objection as Baker Ex. 2.

When Seth arrived in Broussard on May 24, Seth spent the first two weeks working in the shop, cleaning, steaming and checking equipment that came in from the field. T, 38:1291, 1294. Two of his superiors told him "that they would try to get [him] on a boat." After a few days, an opportunity arose for Seth to observe a gravel-packing operation on a Vastar

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

offshore fixed platform. David Gilley, the safety coordinator in the Broussard shop, gave Seth some offshore safety and training courses before he left for the job. T, 38:1294. The safety courses consisted of some videos, personal instructions about safety from some of the Baker workers, a written safety test, and water survival training. T, 38:1294.

Seth was a passenger in the boat ride to the Vastar platform. When he arrived, he observed and assisted in the work (T, 38:1294): "We all got on a work boat. We arrived on location. We loaded the equipment on the deck of the rig. We proceeded to set that equipment up, did the job, and rigged down and left via crewboat." T, 38:1295.

On the trip back from the Vastar platform, a chance need arose "to replace two men that had been working too long on the M/V REPUBLIC TIDE." T, 38:1271. Seth was given the job, as another opportunity to observe and learn about Baker's gravel-packing operations. T, 38:1271. In Seth's words, his "job basically was to help anyone; aid in any way possible to learn . . . [and]" to "just get in there and bang *13 iron and learn as much as you can." T, 38:1271. Ken Credeur, Baker's supervisor on the M/V REPUBLIC TIDE, testified he had never worked with a summer intern before and was not sure "exactly what Seth was supposed to do." T, 26:381.

The M/V REPUBLIC TIDE is a "technology vessel" owned and operated by Tidewater under a Blanket Time Charter with Baker. Under the charter, Tidewater is responsible for vessel operations and maintenance, while Baker is responsible for the specialized equipment used in servicing oil wells. The M/V REPUBLIC TIDE was equipped with a reel assembly that allowed a coflex hose, a dense but flexible steel hose used in gravel pack operations, to be spooled from the vessel up on the rig and down to the well. T, 26:451-52. The reel assembly was manufactured by Hydra Rig and Hydra-dyne Hydraulics with a quick disconnect safety feature to disconnect from the reel in the event of an emergency.

As the M/V REPUBLIC TIDE made its way to Falcon's jack-up drilling rig, No. 153, there was testimony that Captain Daniel E. Givens, the second captain in command, spoke to someone on the rig and received permission to drop anchor. T, 24:97. However, due to a leaking anchor windlass, Givens decided *not* to drop anchor when he arrived. T, 24:98-99. The current around the rig kept increasing during the first day, and the Tidewater captains held the vessel steady and in place with only the vessel's bow thruster and a couple of lines tied from the rig to the vessel. T, 24:108-09.

*14 In the meantime, the Baker hands had spooled the coflex hose from the reel assembly on the stem of the M/V REPUBLIC TIDE and secured the coflex hose to the rig for the gravel pack operation. Four of the six Baker workers, including Seth, had left the M/V REPUBLIC TIDE and were on the rig to assist in the operation. Several hours into the job, however, the bow thruster on the M/V REPUBLIC TIDE lost power. T, 24:254.

The quick disconnect feature did not disconnect the coflex hose from the reel or allow the reel to spool because there was air in the system. T, 40:1538-39. The M/V REPUBLIC TIDE radioed the rig that its bow thruster had failed and asked the rig to disconnect the coflex hose. When the Baker hands on the drill floor learned that the bow thruster had failed, they hurried to the hammer union where the coflex hose was connected to the rig. T, 24:190. But within moments of the bow thruster failure, the port line from the rig to the stem of the vessel snapped. T, 24:260. At that point, Captain Steve Lachney, the captain in command, decided to power up the vessel and break the remaining stem line to get the ship away from the rig, but he did not warn anyone on the rig that he was about to break away. T, 24:265.

The moving vessel began to pull the hose across the deck. Unaware of the captain's decision to move the vessel, Seth and the other Baker workers continued trying to disconnect the hose from the rig. When the hose began to move, Seth, who was standing in the "bite" of the coflex line, was pinned by the hose to the backstop *15 on the deck. The heavy coflex hose cut into his legs; both later had to be amputated below the knees.

Since the accident, Seth has undergone multiple surgeries, along with extensive therapy and rehabilitation. He experi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-md-02179-CJB-DPC   Document 4477-58   Filed 11/03/11   Page 12 of 66

enced an infection in his left leg that lasted several months, but that has since cleared up. Fortunately, he successfully completed his course work at Montana Tech and obtained a dual degree in petroleum and mechanical engineering.

## SUMMARY OF THE ARGUMENT

1. The evidence is not sufficient as a matter of law for any rational jury to conclude that Seth had a substantial temporal connection to the M/V REPUBLIC TIDE, or had been permanently assigned or re-assigned to the vessel, to qualify for Jones Act recovery. Seth was a land-based worker and his remedies are under the LHWCA, not the Jones Act. The district court erred in denying Baker's motions for summary judgment and for judgment as a matter of law on the issue of Seth's status as a "seaman."

2. Even if there were sufficient evidence to raise a jury issue, the district court committed reversible error in excluding from the jury's consideration, as part of the "total circumstances" bearing on Seth's employment, testimony from Baker's Director of Operations that Seth would not have returned to work on the vessel following completion of the three-day job. The testimony was not speculative, hut **16** was in fact probative and relevant to the issue of Seth's employment-connection to sea-based work. A rational jury could reasonably have inferred flora this testimony that Seth's vessel assignment was temporary and Sporadic, not permanent, and did not routinely expose him to the perils of the sea within the meaning of the Jones Act.

3. The jury's award of $29 million in general damages exceeds the nearest award for similar injuries in this jurisdiction by nearly 500 percent and is subject to remittitur under this Court's "maximum recovery rule." The award also contains a separate recovery for disfigurement that duplicates the recovery for mental pain and anguish. The special damage award for future medical costs and life care is likewise excessive and includes amounts that duplicate amounts awarded for general damages. Finally, the award for future lost wages is based on speculative assumptions about job opportunities that are unlikely to materialize. Because the damages are so large, however, a new trial is the more appropriate remedy than a mere reduction.

4. Baker is not obligated under its contract to indemnify Tidewater for the gross negligence of its captain. The district court's grant of summary judgments on this issue and its refusal to permit Baker to introduce evidence or to charge the jury on the issue of gross negligence was therefore reversible error and deprived Baker of substantial rights as a litigant.

5. Finally, the district court's refusal to let Baker's expert testify on design defects in the reel and hose assembly was reversible error. The ruling deprived Baker **17** of critical evidence on its third-party demands that resulted in an unfair and prejudicial assessment of the case by the jury and again deprived Baker of substantial rights as a litigant.

## ARGUMENT

### A. Seaman Status

According to the Supreme Court, the issue of Jones Act "seaman" status is "better characterized as a mixed question of law and fact."[FN17] If reasonable persons, applying the proper legal standard, could differ as to whether an employee is a "member of the crew," it is a question for the jury, but the jury must be permitted to consider all relevant circumstances bearing on the duration and nature of the employment-connection to a vessel.[FN18] Where the facts and the law will reasonably support only one conclusion, however, summary judgment or judgment as a matter of law (directed verdict) is mandated.[FN19] This Court's review of mixed questions **18** pertaining to "seaman status" is plenary,[FN20] or *de novo* .[FN21] Questions pertaining to sufficiency of the evidence are reviewed *de novo*,[FN22] as are grants or denials of summary judgments.[FN23]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN17. *McDermott Intern., Inc. v Wilander*, 498 U.S. 337, 356, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991): "When the underlying facts are established, and the rule of law is undisputed, the issue is whether the facts meet the statutory standard. . .It is for the court to define the statutory standard. . . If reasonable persons, applying the proper legal standard, could differ as to whether the employee was a [seaman], it is a question for the jury."

FN18. *Chandris v. Latsis*, 515 U.S. 347, 369, 115 S. Ct. 2172, 2190, 132 L. Ed. 2d 314 (1995): "In our view, 'the total circumstances of an individual's employment must be weighed to determine whether he had a sufficient relation to the navigation of vessels and the perils attendant thereon.'" (quoting *Wallace v. Oceaneering Int'l*, 727 F. 2d 427, 432 (5th Cir. 1984)).

FN19. *Wilander*, 498 U.S. at 356, 111 S. Ct. at 818.

FN20. *Roberts v. Cardinal Services, Inc.*, 266 F. 3d 368, 373 (5th Cir. 2001).

FN21. *See Bannister v. Ullman*, 287 F. 3d 394, 2002 WL 491919, (April 2, 2002)(legal conclusions are subject to plenary review and axe not subject to the same deference as findings of fact.)

FN22. *Guilbeau v. W.W. Henry Co.*, 85 F.3d 1149 (5th Cir. 1996).

FN23. *Raymond v. Mobil Oil Corp.*, 983 F. 2d 1528, 1534 (10th Cir. 1993).

### 1. Evolution of "Seaman" Status

The Supreme Court has recognized that remedies under the Jones Act and the LHWCA are mutually exclusive.[FN24] Seamen, regularly exposed to the perils of the sea, are covered under the Jones Act; maritime land-based employees are compensated for injuries under the LHWCA.

FN24. *Wilander*, 498 U.S. at 347, 111 S.Ct. at 813.

However, as Judge Gee aptly observed,[FN25] tendentious litigation over the factual issue of seaman status, and its greater rewards, has made the two schemes antagonistic: "So long as Jones Act benefits are more attractive than those of the other marine compensation schemes, astute counsel will seek to qualify their clients as 'seamen.' A bright line rule is called for, one that nudges coverage back toward the blue-water sailors for whom the Jones Act was meant."

FN25. *Barrett v. Chevron, U.S.A., Inc.* 781 F. 2d 1067, 1076 (*eh banc*) (*Gee*, J., concurring).

**\*19** Despite the best efforts of the courts, no bright line test has emerged. It is important therefore that juries not be asked or allowed to pass judgment on the fairness of the respective compensation schemes under the pretext of resolving a disputed issue of fact and that litigants not be put in the untenable position of having to defend one scheme over the other.

To that end, this Court's definition, formulated in *Offshore Co. v. Robison*,[FN26] allowed the issue of seaman status to be decided by a jury only when "there is evidence that the injured workman was *assigned permanently to a vessel . . . or performed a substantial part of his work on the vessel.*" Unlike the definitions formulated by the First[FN27] and Second[FN28] Circuits, *Robison's* definition was phrased in the disjunctive, and arguably provided broader application for Jones Act recovery. Later decisions held that for "substantial work" to be equivalent to a "permanent assignment" the evidence must show that the employee performed a significant part of his work aboard a vessel with some degree of regularity and continuity.[FN29]

FN26. 266 F. 2d 769, 779 (5th Cir. 1959)(emphasis added).

FN27. *Carumbo v. Cape Cod S. S. Co.*, 123 F.2d 991 (1st Cir. 1941)held that (a) the ship must be in navigation; (b) the worker must have a more or tess permanent connection to the ship; and (c) he must be aboard primarily to aid in navigation.

FN28. The Second Circuit adopted *Carumbo's* test with the modification that the vessel connection be substantial in terms of its duration and nature. *Chandris*, 20 F. 3d at 57.

FN29. *Barrett*, 281 F.2d at 1073-74.

This Court's *en banc* decision in *Barrett* attempted to quantify the duration of **\*20** the assignment necessary to allow submission of the issue to a jury by adding what the Supreme Court has described as "a strictly temporal gloss to the Jones Act inquiry":[FN30]

FN30. *Chandris v. Latsis*, 515 U.S. 347, 366, 115 S. Ct. 2172, 2188, 132 L. Ed. 2d 314 (1995).

[I]f the employee's *regularly* assigned duties require him to divide his time between vessel and land (or platform) his status as a crew member is determined 'in the context of his entire employment' with his current employer. This is not an inflexible requirement, however, and does not preclude assessment of the extent of the employee's work aboard a vessel over a shorter time period if the employee's *permanent job assignment* during his term of employment has changed. If the plaintiff receives a new work assignment before his accident in which either his essential duties or his work location is *permanently changed*, he is entitled to have the assessment of the substantiality of his vessel-related work made on the basis of his activities in his new job.[FN31]

FN31. *Barrett*, 781 F. 2d at 1075 (emphasis added; citations omitted).

Under the *Barret* formulation, substantiality is not established if the assignment results in a commitment to the vessel's mission or welfare that is only temporary and sporadic, rather than regular and continuous. The assessment of substantiality may be made on a longer or shorter period of employment, depending on the facts, but since *Barrett*, this Court "has consistently declined to find seaman status where the employee spends less than 30 percent of his time aboard ship." [FN32]

FN32. *Chandris*, 115 S. Ct., at 2188, and cases cited; see also this Court's recent discussion in *Roberts*, 266 F. 3d, at 374-375: "[A]s a general rule, [a worker] must show [substantial duration] by demonstrating that 30 percent or more of his time is spent in service of that vessel."

In 1995, after reviewing and synthesizing the definitions formulated primarily **\*21** in the First, Second, and Fifth Circuits,[FN33] the Supreme Court formulated and pronounced a conjunctive definition of "seaman" in *Chandris v. Latsis* [FN34] that requires a connection to a vessel that is substantial in both time and function:

FN33. The Supreme Court weighed in on the legal controversy surrounding "seaman" status in *McDermott International, Inc. v. Wilander*, 498 U.S. 337, 356, 111 S. Ct. 807, 818, 112 L. Ed.2d 866 (1991). The court held that "[t]he key to seaman status is employment-related connection to a vessel in navigation," and that the employee's duties "must contribut[e] to the function of the vessel or to the accomplishment of its mission." *Wilander* however did not address the "requisite connection to a vessel in any detail," prompting the court to address that question four years later in *Chandris*. In *Harbor Tug and Barge Co. v. Papai*, 520 U.S. 548, 117 S. Ct. 1535, 137 L. Ed.2d 800 (1997), a case of little practical relevance here, the court issued its third major decision

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

that defines "an identifiable group of vessels" as a group of vessels "under common ownership or control" of the same employer. *Id.* at 557, 117 S. Ct. at 1541.

FN34. 515 U.S. 347, 366, 115 S. Ct. 2172, 2188, 132 L. Ed. 2d 314 (1995).

First, as we emphasized in *Wilander*, "an employee's duties must 'contribut [e] to the function of the vessel or to the accomplishment of its mission.'

* * *

Second, . . . a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its *duration and nature*.[FN35]

FN35. *Chandris*, 115 S. Ct., at 2189 (emphasis added).

The purpose of both prongs, the court explained, is to effectuate the remedies within the respective Congressional compensation schemes: "The fundamental purpose of this substantial connection requirement is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers whose employment **\*22** *does not regularly expose them to the perils of the sea.*" [FN36]

FN36. *Id.*, 115 S. Ct., at 2190 (emphasis added).

In formulating its definition, *Chandris* specifically rejected a "voyage" test for seaman stares, under which "anyone working on board a vessel for the duration of a 'voyage' in furtherance of the vessel's mission [would have] the necessary employment-related connection to qualify as a seaman." Under the LHWCA, Congress had "established that a worker is no longer considered to be a seaman simply because he is doing a seaman's work at the time of injury."[FN37] Where a worker's duties are divided between land-based and sea-based work, the Court specifically alluded to the *Barrett* formulation as a workable and appropriate guideline: "Generally, the Fifth Circuit seems to have identified an appropriate role of thumb for the ordinary case: A worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act."[FN38]

FN37. *Chandris*, 515 U.S., at 358, 117 S.Ct., at 2184-85.

FN38. *Chandris*, 515 U.S. at 371, 115 S.Ct. at 2190: "We agree with the Court of Appeal that seaman status is not *merely* a temporal concept, but we also believe that it necessarily includes a temporal element."

In situations involving re-assignments, the Supreme Court said essentially what this Court had said in *Barrett*:
When a maritime worker's basic assignment changes, his seaman status may change as well. For example, we can imagine situations in which **\*23** someone who had worked for years in an employer's shoreside headquarters is then reassigned to a ship in a classic seaman's job that involves a regular and continuous, rather than intermittent, commitment of the worker's labor to the function of a vessel. Such a person should not be denied seaman status if injured shortly after the reassignment . . . If a maritime employee receives a new work assignment in which his essential duties are changed, he is entitled to have the assessment of the substantiality of his vessel-related work made on the basis of his activities in his new position.[FN39]

FN39. *Id.* at 372, 117 S.Ct. at 2191-2192 (internal citations omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Viewed in context, this comment is properly understood to address situations involving more or less permanent re-assignments that meet the test for substantiality in terms of both duration and nature.[FN40] Otherwise, any duty assignment that involves work on board a vessel, however temporary or sporadic, would make a worker injured on the first day of his assignment eligible for Jones Act recovery. A temporary job assignment, ineligible for seaman status under *Barrett*, would otherwise be indistinguishable from a permanent, or regular and continuous, re-assignment,[FN41] **24** resulting in a *de facto* "voyage test" that *Chandris* specifically rejected.[FN42]

> FN40. *See, e.g., Manuel v. P.A.W. Drilling & Well Serv., Inc.,* 135 F.3d 344 (5th Cir. 1998)(worker's injury after working on board the vessel for two months following a re-assignment substantial enough in terms of duration to qualify for Jones Act "seaman" status).

> FN41. *See, e.g., West v. David M. Lamulle Constr. Co., Inc.,* 1998 WL 151428 (E.D.La.). A land-based construction worker had been assigned to work on a barge flotilla that moved from one coastal construction job to another. The employer had a practice of routinely moving workers from one job assignment to another. The worker was injured on the first day. The only evidence that the worker's new assignment to the barge operation was permanent (substantial in duration) rather than temporary was the worker's self-serving testimony that "it was understood." The district court held that the worker's connection to a vessel was not substantial in either nature or duration and granted summary judgment for the employer. *See also Gims v. Danos & Curole Marine Contractors, Inc.,* 1999 WL 983826 (E.D.La.). Plaintiff spent ten months out of a year working on non-vessel fixed platforms interspersed with about two months of work on jack-up drilling vessels where he was injured. Plaintiff argued he was a seaman because "he might have been permanently reassigned to work on [the vessel] *after* his injury occurred." The district court disagreed and granted summary judgment to the employer, noting that plaintiff routinely split his time between vessel and platform work and that he had admitted in deposition that, according to normal company procedure, he likely would have worked only the customary 28-day shift on the jack-up vessel.

> FN42. "We believe it important to avoid "'engrafting upon the statutory classification of a 'seaman' a judicial gloss so protean, elusive, or arbitrary as to permit a worker to walk into and out of coverage in the course of his regular duties.""" *Chandris,* 115 S. Ct., at 2186 (quoting *Barrett v. Chevron U.S.A., Inc.,* 781 F. 2d at 1075).

2. No substantial connection to a vessel

The district court denied Baker's motions for summary judgment and for judgment as a matter of law at the close of plaintiff's case.[FN43] In denying the latter motion, the lower court commented that it thought the evidence was so overwhelmingly in Seth's favor that the verdict should be directed for the plaintiff.[FN44]

> FN43. RE 14.

> FN44. RE 14. The court read the above-quoted language from *Chandris* into the record, advising the attorneys to look closely at the case. RE 14.

To the contrary, and with all due respect to this district court, the evidence was in no way sufficient to support any reasonable conclusion other than Seth was a land-based student worker, who by chance opportunity was temporarily assigned to the M/V REPUBLIC TIDE for a one-time gravel packing job, to observe, learn and work as part of his summer training and exposure to all of the field activities of Baker's oilfield services.

The only evidence of Seth's employment-connection to sea-based work **25** consisted of(l) his participation in an off-

shore training and safety course, (2) a one-day visit to a Vastar platform, (3) testimony that on his trip to the Falcon rig for the gravel-pack job he was as much a member of the crew of the M/V REPUBLIC TIDE as anyone else, and (4) his work aboard the vessel during the job..

Evidence that Seth was given training in offshore work and safety is not sufficient to establish seaman status. Even temporary workers have to be trained if they are expected to assist in the function or mission of the vessel. Training and exposure to Baker's oilfield activities was the very purpose of Seth's internship, and it is hoped that all student workers are instructed in appropriate safety practices, onshore and off.

Seth's work on the Vastar platform does not establish seaman status. Fixed platforms are not vessels, and workers injured on fixed platforms are covered under the LHWCA.[FN45]

> FN45. See, e., *Demette v. Falcon Drilling Co., Inc.*, 280 F.3d 492 (5th Cir. 2002).

Testimony that Seth was as much a part of the crew as any other is not sufficient to establish seaman status. The same could be said of any worker assigned to the same crew position, whether the assignment were temporary or regular and continuous. A worker is not a seaman simply because he is doing the ship's work at **26** the time of injury.[FN46]

> FN46. *Chandris*, 515 U.S., at 358, 117 S.Ct., at 2184-85: "[W]e do not believe that any maritime worker on a ship at sea as part of his employment is automatically a member of the crew within the meaning of the statutory scheme." *Id.*, 117 S.Ct. at 2187..

The mere fact that Seth was ordered to work a crew position aboard the M/V REPUBLIC TIDE is not sufficient as a matter of law to establish a substantial connection to that vessel. There is no evidence that Seth's planned activities were permanently changed or that his essential duties as an intern had changed. His assignment to the gravel-pack job was in fact neither planned nor permanent. It arose by happenstance, to relieve two weary workers who needed rest. In light of the work Seth performed over his previous summer internships with Baker, and the work planned for him that summer, Seth's work aboard the M/V REPUBLIC TIDE comes nowhere near the kind of regular or continuous commitment of his labor to the service of that vessel, that regularly exposed him to the perils of the sea, within the meaning of *Barrett* and *Chandris*. His work was at best temporary and sporadic. His injury may have been the result of a truly *Palsgraffian* series of unfortunate mistakes that happened to coincide with his first day on the job, but Seth was not a blue-water seaman under the Jones Act.

### 3. Exclusion of Parr's testimony

If the substantiality or permanence of Seth's assignment were indeed a triable issue, and Baker does not concede that it was, the district court's exclusion of the **27** testimony of Baker's Operations Coordinator, Jamie Parr, was reversible error.

Parr explained that workers were assigned to the crew position filled by Seth on a rotation system, and the practice was for them to leave the boat when the job was finished and return to the district office. T, 26:472, 476. It was possible that Seth might have been re-assigned to another vessel later, but only if his name happened to be placed at the top of the rotation schedule. T, 26:475. Because Parr could not say with certainty that Seth would not have returned to the vessel in the future, the district court excluded his testimony as speculation. T, 26:474-75.

Testimony about future events is not inadmissible unless it rises to the level of "dubious projections into the future or questionable surmises."[FN47] As the operations coordinator, responsible for assigning workers on the M/V REPUBLIC

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

TIDE, Parr had the requisite knowledge and foundation to testify about Baker's scheduling practices. His testimony was relevant and probative evidence under Rule 406 of the Federal Rules of Evidence, bearing on the total circumstances surrounding Seth's employment-connection to a vessel. Parr's testimony supports the reasonable inference that Seth's assignment was only temporary, and not substantial in duration, *28 regular or continuous, and should have been submitted for the jury's consideration.[FN48]

> FN47. According to McCormick, "Speculativeness usually arises with regard to dubious projections into the future or questionable surmises about what might have happened had the facts been different." 1 MCCORMICK ON EVIDENCE § 185.

> FN48. "The jury should be permitted, when determining whether a maritime employee has the requisite employment-related connection to a vessel in navigation, to consider all relevant circumstances bearing on the [elements of the status inquiry]." Chandris, 515 U.S. at 369, 115 S. Ct. at 2190.

It was plaintiff's burden to prove that the assignment to the M/V REPUBLIC TIDE was substantial in duration, permanent, regular or continuous. It was not Baker's burden to prove that it was not.[FN49] The court's ruling improperly had the effect of shifting the burden to Baker to disprove that Seth had not been permanently assigned to the vessel. The fact that future vessel assignments may occur does not make an otherwise temporary or sporadic current assignment permanent or substantial. Such a rule completely undercuts the rationale of Barren. Workers who spend 30 percent or less of their time doing a ship's work, regardless of the number of future job assignments to a vessel, do not qualify for seaman status. The district court's ruling shifted the burden of proof onto Baker and then made it an impossible one to carry.

> FN49. Manuel, 135 F. 3d at 347 (citing Chandris, at 368-72, 115 S.Ct. at 2189-91).

If the Supreme Court rejected the "voyage test" in order to edge Jones Act recovery back to those blue-water workers regularly exposed to the perils of the sea, affirming the judgment on the evidence in this case will have precisely the opposite effect. Any job assignment, however temporary or sporadic, would be sufficient to *29 establish a substantial vessel connection unless the employer can state with absolute certainty that no future assignments will ever be made again. An affirmance on the basis of the evidence in this case will send the wrong signal to astute counsel to continue precisely the kind of litigation that Judge Gee decried in Barrett.

The case, in short, should not have gone to the jury, whose damage award alone, as argued next, shows it was unable to give a dispassionate or reasonable review of the evidence or the facts. It certainly should not have been submitted without the testimony of Mr. Parr.

### B. The Jury's Damage Award is Excessive

The jury awarded $29 million in general damages and nearly $14.5 million in special damages. Both amounts are excessive.

### 1. General damages

The standards of review applicable to excessive damages are well-known. A jury is given broad discretion in awarding damages, and a jury's award is reversible as excessive, under the clear error standard,[FN50] only "on the strongest of showings."[FN51] The award must be so large as to "shock the judicial conscience," or so exaggerated as to indicate "bias, passion, prejudice, corruption, or other improper motive," or as *30 "clearly exceed[ing] that amount that any reasonable man [or woman] could feel the claimant entitled to."[FN52]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN50. *Douglass v. Delta Air Lines, Inc.*, 897 F. 2d 1336, 1339 (5th Cir. 1990); *Caldarera v Eastern Airlines, Inc.*, 705 F. 2d 778, 784 (5th Cir. 1983).

FN51. *Dixon v. International Harvester Co.*, 754 F. 2d 573, 590 (5th Cir. 1985).

FN52. *Id.*

Nonetheless, a jury's discretion in awarding damages, though broad, is not "boundless."[FN53] As the late Judge Rubin remarked, "The sky is simply not the limit for jury verdicts, even those that have been once reviewed."[FN54] Each case ultimately is reviewed on its own facts, but when an award is challenged as excessive, this Court has found it useful to "examine damage awards in analogous cases" as an objective frame of reference to determine whether the award is "disproportionate to the injury sustained."[FN55] Further, under this Circuit's "maximum recovery rule," such disproportion may be shown when "'the award exceeds 133% of the highest previous recovery in the [relevant jurisdiction]'" for a factually similar case.[FN56]

FN53. *Wheat v. United States*, 860 F. 2d 1256, 1259 (5th Cir. 1988).

FN54. *Caldarera*, 705 F. 2d at 7114.

FN55. *Wheat*, 860 F. 2d at 1259; *e.g.*, *Gough v. National Pipeline Co. of America*, 996 F.2d 763 (5th Cir. 1993) (citing an Illinois appellate decision involving similar injuries as the "best guidepost," this court ordered a remittitur of the jury's award from $1.5 million to $600,000 as the maximum allowable recovery for severe emotional distress and posttraumatic stress disorder injuries, or a new trial); *Simeon v. T. Smith & Son. Inc.*, 852 F.2d 1421 (5th Cir. 1988)(again, this court further reduced the district court's remittitur of the jury's award of $1.25 million from $750,000 to $600,000 as the maximum recovery the jury reasonably could have allowed, based on offshore cases with roughly similar injuries); *Dixon v. International Harvester Co.*, 754 F.2d 573 (5th Cir. 1985)(comparing two analogous cases involving bum victims, this court reduced the jury's award from $2.8 million to $500,000.00, or a new trial).

FN56. *Lebron v. United States*, 279 F. 3d 371 (5th Cir. 2002)(quoting *Douglass*, 897 F. 2d at 1344, n. 14 (citing *Haley v. Pan Am. World Airways, Inc.*, 746 F.2d 311 (5th Cir. 1984)). A panel of this Court recently suggested that in jury trials a multiplier of 50 percent rather than 33 percent should be applied to the maximum allowable recovery so as to avoid substituting the reviewing court's judgment for that of the jury. *Salinas v. O'Neill*, 286 F. 3d 827, 2002 WL 453025, fn. 6 (5th Cir. 4/9/02). Because the award here exceeds the highest previous award by 500 percent, reduction is warranted regardless of the multiplier used.

*31 Even without reference to analogous awards for similar injuries,[FN57] in those cases where "a jury's award exceeds the bounds of reasonable recovery,"[FN58] this Court has not hesitated to reduce the award to "'the maximum amount the jury could properly have awarded,'"[FN59] or direct the district court to do so.[FN60]

FN57. *Cf.*, *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176 (5th Cir. 1995)(jury's award reduced from $5 million to $3 million, or new trial ordered, without reference to analogous cases); *Zerangue v. Delta Towers, Ltd.*, 820 F.2d 130, 134 (5th Cir. 1987)(damages reduced from $300,000.00 to $200,000 because the award was based on an "emotional reaction to the nature of [plaintiff's] experience rather than a reasoned view of what the evidence justifies to be the dollar damages which the defendant should be required to pay.")

FN58. *Dixon*, 754 F. 2d at 590 (5th Cir. 1985).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN59. *Zeno v. Great Atlantic and Pacific Tea Co.*, 803 F.2d 178, 181 (5th Cir. 1986); *see also Eiland*, 58 F.3d at 183. As this court has noted, "[t]he 'maximum recovery rule' does not necessarily limit an award to the highest amount previously awarded in the state . . . [T]he maximum recovery rule does not become operative unless the award exceeds 133% of the highest previous recovery in the state." *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1344 n. 14 (5th Cir. 1990)

FN60. An appellate court's power to grant a remittitur is the same as the district court's. *Dixon, op. cit; Williams v. Chevron U.S.A., Inc.*, 875 F.2d 801 (5th Cir. 1989).

This is one of those cases. Even without considering any analogous case, the jury's award of $29 million for past and future physical and mental pain and suffering (and disfigurement) is shockingly large. But when Seth's award is compared to the awards affirmed or reduced in analogous Cases from this jurisdiction and elsewhere, the disproportion between the award and the injuries shows that the jury's award was not based on a rational view of the evidence, but an emotional one. The award is not *32 merely excessive; it is punitive, exceeding the highest previous award for similar injuries in this jurisdiction by nearly 500%.

For example, in four Louisiana cases awarding damages for double amputation of the legs, none involved an award higher than $6 million. In *Armand v. State, Dep't of Health and Human Resources*,[FN61] a healthy six-year-old child was forced to undergo an emergency amputation of both legs and two of his fingers due to medical malpractice. The court awarded $4,000,000.00 in general damages.[FN62] In *Cullivan v. State Farm Mut. Auto. Ins. Co.*,[FN63] a 639-year-old man suffered multiple leg and rib fractures and lung injuries and ultimately lost both legs to gangrene following an automobile accident. The trial court awarded plaintiff general damages of $500,000.00, consisting of $150,000.00 for past pain and suffering and $350,000.00 for the loss of his legs. The court of appeal upheld the award, noting that it was not "a clear abuse of the trial court's discretion."

FN61. 97 2958 (La. App. 1 Cir. 2/23/99), 729 So.2d 1085, *writ denied* 99-0842 (La. 5/14/99), 741 So.2d 661.

FN62. The $4,000,000.00 award was reduced on appeal to $500,000.00 pursuant to the statutory cap under the Louisiana Medical Malpractice Act.

FN63. 428 So.2d 1231 (La. App. 3 Cir. 1983), *writ denied* 433 So.2d 180 (La. 1983).

In *Simpson v. State, Dep't of Transp. and Dev.*,[FN64] a fifteen-year-old boy suffered a traumatic amputations of both legs, along with a severe closed head injury *33 and concussion, resulting in decreased learning potential, dexterity and strength, following an automobile accident. Noting that the plaintiff was "a mere shell of the person he once was," the trial court awarded $6,000,000.00 in general damages. The appellate court affirmed.

FN64. 95 0 t 15, 92 0116, 92 0117 (La. App. 1 Cir. 12/7/93), 636 So.2d 608, *writs denied* 94-0042, 94-0047, 94-1005 (La. 5/6/94), 637 So.2d 472.

*Snearl v. Mercer*,[FN65] decided in February, 2001, is especially analogous. A 22-year-old construction worker suffered bums over 51% of his body when he was trapped in a burning truck. He watched as the fire worked its way up his legs to his abdomen, leaving "skeletonized extremities below the knee."[FN66] He eventually lost both legs as well as his penis. He was forced to undergo numerous painful skin grafts, and the construction of a new penis out of skin and muscle taken from his forearm. The appellate court affirmed the jury's award of $5 million in general damages, noting that the award was "on the high side," but not an abuse of discretion in light of plaintiff's injuries.[FN67]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2002 WL 32180622 (C.A.5)                                                                                      Page 21

FN65. 99-1738, 99-1739 (La. App. 1 Cir. 2/16/01), 780 So.2d 563.

FN66. *Id.*, at 589.

FN67. *Id.*, at 590.

The Louisiana cases are not anomalies. No case reported from other jurisdictions comes near to the amount of general damages awarded in this case. In all but one of the cases, the jury awards were reduced either on post-trial motions or on appeal. Significantly, in none of them did the reducing court look to prior awards.

**\*34** For example, in *Rodriguez v. State*,[FN68] a mental patient had both of his legs severed when he jumped in front of a subway. The trial court awarded $3.5 million in general damages, which included $1.5 million past pain and suffering, $500,000.00 future pain and suffering and $1.5 million for permanent loss of his legs. The appellate court ordered a new trial if plaintiff did not accept a reduction to $1.25. million for past pain and suffering, $500,000.00 for future pain and suffering and $1.25 for permanent loss of his legs.

FN68. 634 N.Y.S.2d 93, 221 A.D.2d 277 (N.Y.A.D. 1 Dept. 1995).

*Chung v. New York City Transit Authority*[FN69]is another case in which the plaintiff's legs were severed by a subway train. The jury awarded a staggering $62,226,600.00 million, which the trial court remitted to $5 million. The appellate court reduced the award even further, to $2.7 million, and ordered a second trial on the issue of past pain and suffering. At the second trial, the jury awarded $2.7 million for past pain and suffering. The trial court remitted that number to $1.5 million, and the appellate court further lowered the award to $600,000.00.

FN69. 624 N.Y.S.2d 224, 213 A.D.2d 619 (N.Y.A.D. 2 Dept. 1995).

Even in *Shea v. New York City Transit Authority*,[FN70] cited by plaintiff in **\*35** opposition to Baker's motion for re-mittitur, the trial court ordered a remittitur of the jury's award from $25,765,000.00 to $14,830,710.00 as the maximum recovery. available to the plaintiff who also lost both legs in a subway accident. The judgment was reversed on appeal on other grounds but, again, the appellate court commented that even with. the remission the damage award was excessive: "We note that the award of damages, even as reduced by the court, deviated materially from what would be reasonable compensation."

FN70. In *Lucas v. New York Transit Authority*, 735 N.Y.S.2d 609 (App. Div. 2001), another mentally unstable plaintiff jumped in front of a subway train, which severed both of his legs below the knee. The appellate court held that the jury's award of $3 million for pain and suffering did not "shock the conscience." In *Foley v. Clark Equipment Co.*, 523 A.2d 379 (Pa. Super 1987), plaintiff was struck by a forklift, leading to the subsequent amputation of both legs. The jury awarded $15 million. The appellate court remanded for a new trial on other grounds, but noted that it would otherwise have found the $15 million verdict excessive: "Were the plaintiff to invest the $15 million, he could generate an annual income of $900,000.00, far exceeding his earning capacity."

*Shea* illustrates the wisdom of *Lebron's* ruling that only reported cases are relevant in analyzing an award under the "maximum recovery" rule. None of the reported verdicts from other jurisdictions approaches the award in this case, except the jury award in *Chung*, which was reduced on appeal. However, were this court to review analogous awards in unreported cases, it would find that only one award in one case approaches the amount in this case, and even that award is nearly $12 million lower than the jury's award to Seth.[FN71]

FN71. *Unnamed Civil Action*, No Docket Number Given (Chataqua Cty., NY 2000)(a 52-year-old plaintiff had

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

both legs amputated due to complications from medical malpractice; jury award of $17.2 million, consisting of $11 million past pain and suffering and $6.2 million future pain and suffering); *Howell v. Posadas*, Case No. 93 L 9302 (Cook Cty., IL 2000) (45-year-old plaintiff's loss of blood flow resulted in the surgical amputation of both legs above the knee; jury awarded $10,620,000.00 general damages); *Gailarzo v. Hyster Co.*, Case No. 715474 (Orange Cry., CA 1997) (49-year-old plaintiff awarded $3 million for loss of legs crushed by a forklift); *Alderete v. Missouri Pac. Ry.* Co., No Docket Number (Webb Cty., TX 1995)(thirteen-year-old plaintiff awarded $3,625,000.00 for loss of both legs after falling under a moving boxcar); *Harris v. Southern Pac. Transp.* Co., Case No. SCC 24504 (Los Angeles Cry., CA 1993)(train severed both of 34-year-old welder's legs below the knee; jury awarded $3.7 million, but the parties settled on appeal for $1.8 million); *Palarno v. City of Austin, Texas*, 178 F.3d 968, 981 (5th Cir. 1996); *Willet v. Western Oceanic, Inc.*, 117 F.R.D. 379, 382 (E.D. La. 1987).

**\*36** The only argument advanced below to justify the jury's award was that Seth's injuries were unique. The district court indeed denied the motions for remittitur on that basis. Seth's injuries were unquestionably extreme, but they were not any more extreme than the pain endured by others with similar extreme injuries in other cases where this court reduced the damages.[FN72] While one may argue, rather grotesquely, that legs severed by a train are worthy of less compensation than legs severed by a corex cable, there has been no attempt to distinguish the suffering endured by the young man in *Snearl* from that endured by Seth, because frankly no rational distinction can be made.

> FN72. *cf, Dixon*, 754 F. 2d at 589, where this Court noted that the extreme pain and suffering endured by the plaintiff "was initially as intense as the human body and mind can bear" and continued for several months. Plaintiff had been pierced in the abdomen by a sapling in a tractor accident and lost both testicles and all of the skin on his penis and abdomen from the navel to the groin. As noted *supra*, this Court reduced the award from $2.8 million to $500,000.

Seth's suffering, predictably and understandably, was bound to engender the natural sympathies of any jury. But even taking those sympathies into account, it is patently obvious that the award is extraordinarily high. The sheer magnitude of the award raises both eyebrows, indicating a jury overwhelmed by passion, prejudice, bias or perhaps even anger against the defendants for having put Seth, a true innocent, into harm's way without paying more attention to his safety. But emotion is not a **\*37** proper motive on which to base an award. The award in this case is so disproportionate that reduction is not an adequate remedy and a new trial should be ordered.[FN73]

> FN73. *Wells v. Dallas Independent School District*, 793 F. 2d 679, 683-684 (5th Cir. 1986)("[A]t some point on the scale an excessive award becomes so large that it can no longer be considered merely excessive. At that point, when an award is 'so exaggerated as to indicate bias, passion, prejudice, or corruption, or other improper motive,'" remittitur becomes inadequate and an unqualified new trial should be granted.

### 2. The disfigurement award

The verdict form submitted to the jury contained a separate line-item for "Disfigurement and Scarring." Baker made a timely and proper objection to this line-item as already included in the line-items for past and future physical and mental pain and suffering.[FN74] The objection was overruled. Thus, in addition to $22 million awarded for past and future mental and physical pain and suffering and disability, the jury awarded an additional $7 million for "disfigurement and scarring." The inclusion of a separate line-item for disfigurement and scarring invited the jury to make an erroneous and impermissible double award for the same damages.

> FN74. Baker's written objection was made on the verdict form itself: "Baker objects to this line claiming included in above." RE 15:1968. This was sufficient to preserve the issue on appeal. *See McDaniel v. Anheuser-*

*Busch, Inc.*, 987 F. 2d 298, 307 (5th Cir. 1993).

Since at least the early part of the twentieth century, courts have allowed recovery for tortious disfigurement and scarring, but generally only as a subset or **\*38** form of mental anguish or suffering.[FN75] Research has found no decision from this Court or the Louisiana Supreme Court that squarely addresses the precise issue of double recovery.

> FN75. *See, e.g., Erie R. Co. v. Collins*, 253 U.S. 77, 85-86, 40 S.Ct. 450, 453 (1920) (allowing recovery for the "shame or humiliation" and "mental pain" stemming from "personal mutilation or disfiguration"); *see also*, Mc-CORMICK ON DAMAGES § 88 (West 1935) (recognizing "disfigurement" as part of the damages recoverable for pain and suffering and mental anguish).

However, the Louisiana Fourth Circuit Court of Appeal has twice overturned a disfigurement and scarring award as an impermissible double recovery of mental and physical pain and suffering: "[D]isfigurement and scarring has as an integral part of their substance the mental pain and anguish that accompany such disfigurement and scarring."[FN76] In a case involving a leg amputation, the First Circuit Court of Appeal likewise held that damages for disfigurement and scarring were at least partly encompassed by other awards to the plaintiff.[FN77] Doctrinal jurisprudence confirms the rationale of these cases that disfigurement and scarring damages stem from the mental pain and anguish a plaintiff suffers as a result of the tort.[FN78]

> FN76. *Smith v. Juneau*, 95-0724 (La. App. 4 Cir. 4/9/97), 692 So.2d 1365, 1385; *accord, Brown v. Southern Baptist Hosp.*, 96-1990, 96-1991 (La. App. 4 Cir. 3/11/98), 715 So.2d 423,434, *writs denied*, 98-1186, 98-1348 (La. 5/29/98), 720 So.2d 672.

> FN77. *Day v. South Line Equip. Co.*, 551 So.2d 774, 787-88 (La. App. 1 Cir. 1989), *writ denied*, 553 So.2d 474 (La. 1989) (plaintiff received $500,000.00 for physical and mental pain and suffering, $400,000.00 for lost future earnings and earning capacity, and $1 million for disfigurement and scarring; court of appeal reduced disfigurement and scarring award to $625,000.00).

> FN78. *See, e.g.*, Dobbs, 2 THE LAW OF TORTS § 377 (West 2000) ("Any form of unpleasant emotional reactions to the injury or its consequences, so long as it is proximately related to the tort, is a basis for the pain and suffering recovery. Disfigurement, for example, may cause mental pain or embarrassment . . ."); 22 AmJur 2d Damages § 256 ("Damages may be awarded for the embarrassment or humiliation that results from scarring or disfigurement"); 25 C.J.S. Damages § 66 ("[M]ental pain in contemplation of a permanent mutilation or disfigurement of the person may be considered as an element of damage"); Gerald W. Boston, 2 STEIN ON PERSONAL INJURY DAMAGES § 8:5 ("The mental anguish, the sense of loss and burden, and the inconvenience [suffered by] a person who is substantially crippled in body or limb . . . are all included in the concept of pain and suffering"); *Id.* § 8:2 ("the term pain and suffering covers disfigurement and deformity"); Jerome H. Nates, *et al.*, I DAMAGES IN TORT ACTIONS § 8.30 (characterizing "disfigurement" as simply a basis for recovery of "loss of enjoyment of life" damages).

**\*39** In opposition to the post-trial motions, plaintiff cited several cases as support for the proposition that disfigurement and scarring can be awarded as a separate item of damages,[FN79] but those cases are distinguishable. For example, in *Johnson v. Offshore Express, Inc.*,[FN80] the issue of double recovery was never raised, and the award contained no separate recovery for mental pain and anguish, as there was in this case.

> FN79. Opp. at pp. 4-5; R,15:2443-44.

FN80. 845 F.2d 1347 (5th Cir. 1988).

Research has found no Jones Act case squarely on point,[FN81] but there is precedent in this Court that a seaman is not entitled to recover the same damages twice simply by separating them out into differently named categories. In *Sosa v. M/V Lago Izabal*,[FN82] a badly burned and partially paralyzed seaman was awarded $6,000.00 per year for "rehabilitative items" designed to make him more comfortable and independent as part of future medical expenses. This Court reversed and **40** remanded to the trial court for reconsideration, noting that "[t]o the extent that these rehabilitative items are not medical expenses but merely serve to alleviate physical suffering or mental anguish, they duplicate the $10 million pain and suffering award."[FN83]

FN81. The Jones Act case cited by plaintiff, *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347 (5th Cir. 1988), is distinguishable.

FN82. 736 F.2d 1028 (5th Cir. 1984).

FN83. *Sosa*, 736 F. 2d at 1034.

In this case, adding a separate line-item in the verdict form for disfigurement and scarring invited the jury to make a separate award for that item and resulted in an impermissible double recovery for the same physical and mental pain or disability already included in separate line-items. The award should therefore be reversed.

### 3. Life Care award

As noted in *Sosa*, above, duplicate awards for mental anguish, masquerading as future medical costs, are not recoverable. This Court reached the same conclusion in *Lebron v. United States*,[FN84] where it questioned "whether part of the medical expense award may duplicate part of the awards for intangible harms."

FN84. 279 F.3d 321,329 (5th Cir. 2002). The award there "included equestrian and aquatic therapy, which the court . . . suggest[ed] . . . was [partly] compensating for the emotional harms caused by the defendant's negligence." The court remanded the case "for a determination of which items were compensable medical expenses and which duplicated the intangible awards."

Here, the jury awarded $11 million for future medical and life care expenses, based largely on the testimony of plaintiff's life care expert, Anthony Choppa, and plaintiffs economist, Dr. Douglas Womack, who projected future medical expenses **41** to range between $6.9 million and $10.6 million. The Life Care Plan prepared by Dr. Choppa[FN85] however contains a number of projected future medical expenses that serve only to ameliorate plaintiff's future mental suffering and are therefore not recoverable under *Sosa* and *Lebron*. For example, the Plan includes the following items:

FN85. See Choppa Life Care Plan, Exhibit P1-32, pp. 7, 15-16; Tr. at 1039, 1051-54.

| | |
|---|---|
| Sports prostheses (18,000.00 per leg at least every five years for 30 years) | $1,620,227.00 |
| Maintenance on sports prostheses ($250.00 per leg per year for 30 years) | $ 12,975.00 |
| 3-wheel motorcycle kit | $ 15,000.00 |
| Health club membership ($34.00 per month for 30 years) | $ 14,804.00 |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-md-02179-CJB-DPC   Document 4477-58   Filed 11/03/11   Page 25 of 66

| | |
|---|---|
| Mono ski ($8,000.00 every five years for 26 years) | $ 42,365.00 |
| Maintenance on mono ski ($500.00 per year for 26 years) | $ 15,886.00 |
| Ski school | $ 5,000.00 |
| Power chair | $ 98,636.00 |
| Chore Service/Maid | $ 228,867.00 |
| Gen. maintenance worker | $ 57,727.00 |
| Wheelchair acc. home | $ 23,500.00 |
| Job site modification | $ 4,500.00 |
| Van | $ 37,625.00 |
| Van maintenance | $ 3,527.00 |
| Hand controls | $ 23,604.00 |
| **TOTAL** | **$2,204,243.00** |

Under *Sosa*, at least $2.2 million of the Life Care Plan duplicates the general damages award.

4. Future medical expenses

**\*42** The projected future medical expenses also include costs for above-the-knee prosthetics based on the testimony from Dr. Smith that Seth will probably need above-the-knee amputations at some point in the future, although Dr. Smith could not say when exactly over the course of Seth's life that "probability" would occur. According to Dr. Meier, a board certified specialist in _physical medicine and rehabilitation with over 25 years experience in treating amputees, Seth should never have to lose eider of his legs above the knees.

Whether or not the jury was within its discretion to credit Dr. Smith over Dr. Meier about the need for future amputations, the projected costs of future above-the-knee prosthetics are wildly inflated and speculative. Those costs were calculated on the assumption of 10% annual increases beginning in three years and continuing for the next fifty years, with a maximum future cost projected to reach one million dollars per leg for prosthetics that today cost no more than $45,000 each. These amounts should be deducted from the jury's award.

5. Future lost wages

The jury's award of $3 million in lost wages was based on the testimony of Dr. Womack, who projected future lost earnings of roughly $3.1 million. It was undisputed that plaintiff will be able to find employment at a salary of $24,000.00 per year. Dr. Womack opined however that but for the accident Seth would have earned the highest salary for a petroleum engineer in the United States, or $58,000.00 a year, **\*43** for the first five years of employment.[FN86] In the fifth year of Seth's employment, Dr. Womack assumed that Seth's salary would increase to $150,000. That figure was based on the assumptions made by other experts that Seth would be entitled to certain completion bonuses, after working in the field for several years, or would accept employment in the Middle East.[FN87] Dr. Womack nearly, tripled his projection of Seth's future earning capacity based on speculation about job opportunities that Seth might be offered and might accept five years after graduation,[FN88] with no certainty that such job opportunities were likely even to occur.

FN86. T, 36:1142.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN87. T, 36:1150.

FN88. T, 38:1210-12.

Upon request during cross-examination, Baker's expert showed the jury that calculations of the present value of a starting annual salary of $56,000.00, projected over Seth's expected work life, totaled only $1,174,000.00.[FN89] Baker suggests this amount as the most that a reasonable jury could award for lost future wages, and the jury's award should be reduced accordingly. Any greater award would be based on impermissible speculation.

FN89. T, 38:1405.

## C. Tidewater's Gross Negligence

A district court's decision to exclude evidence is reviewed for abuse of **44** discretion.[FN90] An erroneous evidentiary ruling is reversible when it deprives a party of a substantial right.[FN91]

FN90. *St. Romain v. Industrial Fabrication and Repair Service, Inc.*, 203 F.3d 376, 381 (5th Cir. 2000); *Davis v. Odeco, Inc.*, 18 F.3d 1237, 1247 (5th Cir. 1994).

FN91. *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 505 (5th Cir. 1994).

The Blanket Time Charter between Baker and Tidewater contains a reciprocal indemnity agreement obligating Baker and Tidewater to indemnify each other for the other's negligence. Baker is required to indemnify Tidewater for "any liability for injury to, illness or death of [any Baker employees], . . . however said injury, illness or death arises or occurs, whether through the negligence in whole or in part of [Tidewater], unseaworthiness of any vessel or otherwise."[FN92]

FN92. Baker Ex. 4, Blanket Time Charter, ¶ XIV. But for the recent decision in *Demette v. Falcon Drilling Company, Inc.*, 280 F.3d 492 (5th Cir. 2002), the indemnity agreement is arguably not enforceable under § 905(b) of the LHWCA as a matter of law. To the extent *Demette* is not applicable to the facts of this case, Baker re-urges its immunity under that provision as an additional defense to the indemnity claims.

The contract is silent as to Baker's obligation to indemnify for Tidewater's gross negligence. Evidence of Tidewater's gross negligence emerged during discovery, after the district court had granted Tidewater's summary judgment but before Tidewater's Underwriters had filed their motion for summary judgment. Ronald Campana, plaintiff's maritime expert, issued an expert report that stated that "Captain Givens was grossly negligent in the performance of his duties in not informing the O.I.M. that his vessel was not anchored." Baker Proffer No. 1, **45** Campana Expert Report, p. 6.

Baker asserted Tidewater's gross negligence as a disputed issue of material fact in opposition to the Underwriters' motion, and moved for reconsideration of Tidewater's summary judgment before trial. The district court declined to consider the evidence, declined to reconsider its prior summary judgment and granted the Underwriters' motion. The effect of the summary judgments was to rule the testimony inadmissible or irrelevant to the issue of Baker's indemnity obligations.

At trial, the district court refused to charge the jury on gross negligence or let the jury even consider the issue. Accordingly, Baker placed Campana's testimony into the record as a proffer. RE 17:885-892. Campana testified that the Tidewater's captain "never achieved the standards" of good seamanship, but "fell well below the standards." RE 17:889. Campana explained that he used the phrase "gross negligence as an adverb defining the term negligence," (RE 17:889) and that, "without any legal context whatsoever," was of the opinion "that Captain Given was grossly negligent in the performance of his duties in not informing the OIM that his vessel was not anchored." RE 17:890. He also agreed that "the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

conduct of the Tidewater captain demonstrated a reckless disregard for the safety of men." R.E 17:890.

In response to a specific question from the judge,[FN93] Compana replied:

FN93. "Does that mean a lot of negligence or does it mean total disregard for human life?"

**\*46** I mean it was - in degrees of negligence, it was the highest type of negligence in the performance of his duties in not telling the rig he wasn't anchored. You have a little negligence and you have a lot of negligence, I appreciate that, but from our terms as a seaman, the very minimum he could have done was tell the rig he wasn't anchored. *The fact that he didn't do so was the highest form of disregard for the standards of the trade.*[FN94]

FN94. T, 33:894 (emphasis added).

The District Court for the Eastern District of Louisiana has twice held that, when an indemnity provision in a maritime contract is silent as to the indemnitee's gross negligence, "[s]uch silence dictates its exclusion."[FN95] This Court defined gross negligence in the maritime context in *Todd Shipyards Corp. v. Turbine Service, Inc.*:

FN95. *In the Matter of Torch, Inc.*, 1996 WL 185765 (E.D.La. 1996) (denying indemnitee's motion for summary judgment); *In the Matter of TT Boat Corp.*, 1999 WL 1442054, p. 6 (E.D.La. 1999): "The Court will not read 'gross negligence' into an indemnity provision in which it is not specifically covered." See cases cited therein supporting the district court's rationale.

Gross negligence, which will invalidate an exemption from liability, has been defined as ". . . harm willfully inflicted or caused by gross or wanton negligence." 6A CORBIN ON CONTRACTS § 1472 (1964 ed.) The type of negligence, "ordinary" or "gross", depends on the particular circumstances of each case.[FN96]

FN96. 674 F.2d 401, 411 (5th Cir. 1982); *accord, Coastal Iron Works, Inc. v. Petty Ray Geophysical*, 783 F.2d 577, 582 (5th Cir. 1986).

An expert's opinion as to a legal conclusion is not admissible,[FN97] but Campana's testimony that the inactions of Tidewater's captain showed "the highest form of disregard for the standards of the trade" were certainly probative of the degree of **\*47** Tidewater's negligence and should have been admitted for the jury's consideration. A reasonable juror could properly infer from that testimony that Tidewater was guilty of gross negligence. Its exclusion therefore deprived Baker of a substantial defense to Tidewater's indemnity claim and, as with the exclusion of Parr's testimony, was reversible error. The summary judgments granted to Tidewater and its insurers should therefore be reversed and the case remanded for a new trial on the issue of Tidewater's gross negligence.

FN97. *Owen v. Kerr-McGee Corp.*, 698 F.2d 236,240 (5th Cir. 1983)); *accord., Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997).

D. The Case Against the Manufacturers

The district court's evidentiary rulings allowing Killingsworth to change his testimony at trial, in a classic sandbag maneuver, to implicate Baker as the "ultimate manufacturer" liable for the defective corex hose and reel assembly, was prejudicial and unfair.[FN98] It was completely inconsistent with the pre-trial scheduling order. The court's later ruling refusing to allow Baker's expert to testify on the issue of design defect, under the pretext that his report did not contain that precise phrase, was also patently unfair and prejudicial to Baker's case against the manufacturers. The combination of these rulings was reversible error and deprived Baker of substantial rights as a litigant.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN98. Killingsworth's testimony on Baker's "ultimate responsibility" was an inadmissible legal conclusion under Rule 704 of the Rules of Evidence. See *Owen v. Kerr-McGee Corp.*, 698 F.2d at 240.

**\*48** CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, Baker requests the following relief:

1. The judgment be reversed and rendered in Baker's favor on the issue of Seth's seaman status. The evidence was insufficient as a matter of law to support a finding that Seth had a substantial connection to a vessel in navigation or that his assignment to vessel work was permanent or constituted a regular or continuous commitment of his labor to qualify for Jones Act recovery. Seth's remedies were under the LHWCA.

2. Alternatively, the judgment be reversed and the case remanded for a new trial on the issue of seaman status, with an order that the testimony from Jamie Parr about Baker's scheduling and employee rotation system be admitted for consideration of Seth's employment-connection to the M/V REPUBLIC TIDE.

3. The summary judgments in favor of Tidewater and Tidewater's Underwriters be reversed and the case remanded for a new trial on the issue of Tidewater's gross negligence.

4. The judgment on Baker's third-party demand should be reversed and the case remanded for a new trial on the issue of product defect.

5. Finally, the judgment be reversed and the case remanded for a new trial on the issue of Seth's damages, or, alternatively, the damages be reduced in accordance with the maximum recovery rule.

Seth A BECKER, Plaintiff - Intervenor Defendant - Appellee, v. TIDEWATER INC; Tidewater Incorporated; Twenty Grand Offshore Incorporated; Tidewater Marine, L.L.C., Defendants - Third Party Plaintiffs - Intervenor Defendants - Appellees - Appellants, R & B Falcon Drilling USA Inc; Pental Insurance Company, Ltd; Certain Underwriters at Lloyds Insurance Co; Defendants - Appellants, Baker Hughes Inc; Baker Hughes Oilfield Operations Inc; Baker Oil Tools Inc, a 2002 WL 32180622 (C.A.5 ) (Appellate Brief )

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2002 WL 32180621 (C.A.5)                                                    Page 1

For Opinion See 335 F.3d 376

United States Court of Appeals,

Fifth Circuit.

Seth A. BECKER, Plaintiff - Intervenor Defendant - Appellee,

v.

TIDEWATER INC., et al., Defendants,

Tidewater Incorporated; Twenty Grand Offshore Incorporated; Tidewater Marine LLC, Defendants - Third Party Plaintiffs - Intervenor Defendants - Appellees - Appellants,

R & B Falcon Drilling USA, Inc.; Pental Insurance Company, Ltd; Certain Underwriters at Lloyds Insurance Co., Defendants - Appellants,

Hydra Rig, a division of Tuboscope Vetco International LP, Defendant - Third Party Defendant - Third Party Plaintiff - Appellee,

Hydradyne Hydraulics, Inc., Defendant - Third Party Defendant - Appellee,

v.

Coflexip Stena Offshore Inc., Defendant - Third Party Defendant - Appellee,

v.

Baker Hughes Inc.; Baker Hughes Oilfield Operations, Inc., Defendants - Intervenor Defendants - Appellants, andBaker Oil Tools, Inc., a division of Baker Hughes Oilfield Operations, Inc., Defendant - Third Party Defendant - Intervenor Plaintiff - Third Party Plaintiff - Appellant,

Baker Oil Tools, a division of Baker Hughes Oilfield Operations, Inc., Third Party Defendant - Appellant.

Nos. 01-31420, 01-31421 and 01-31422.

June 26, 2002.

On Appeal from the United States District Court for the Western District of Louisiana Civ. A. 99-1198

Appellee Brief of Tidewater Inc., Tidewater Marine, L.L.C., Twenty Grand Offshore, Inc. and Their Underwriters

Cliffe E. Laborde III, James D. Hollier, Laborde & Neuner, P.O. Drawer 52828, Lafayette, LA 70505-2828, (337) 237-7000

**STATEMENT REGARDING ORAL ARGUMENT**

While there are several issues in this appeal on which the Court may be aided by oral argument, the three issues addressed by Tidewater are resolvable on the briefs. Should the Court desire oral argument, however, Tidewater will be pleased to participate.

**\*iv TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ... i

STATEMENT REGARDING ORAL ARGUMENT ... iii

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

TABLE OF CONTENTS ... iv

TABLE OF AUTHORITIES ... vi

STATEMENT OF THE ISSUES ... 1

STATEMENT OF THE CASE ... 2

STATEMENT OF FACTS ... 5

SLFMMARY OF THE ARGUMENT ... 9

ARGUMENT ... 12

I. Seaman Status ... 12

A. Jury Finding that Plaintiff was a Seaman has Sound Evidentiary Basis ... 12

B. Baker Liable as Time Charterer Regardless Of Plaintiff's Status ... 15

II. Baker Owes Tidewater Defense and Indemnity ... 17

A. District Court Did Not Exclude Evidence ... 20

B. Insufficient Evidence to Warrant Jury Charge ... 26

III. Record Evidence Supports Jury Finding of Falcon Fault ... 30

CONCLUSION ... 37

*v CERTIFICATE OF SERVICE ... 39

CERTIFICATE OF COMPLIANCE ... 41

## *vi TABLE OF AUTHORITIES

*Askanase v. Fatjo*, 130 F.3d 657 (5th Cir. 1997) ... 24

*Bannister v. Ullman*, 287 F.3d 394 (5th Cir. 2002) ... 13

*Campbell v. Seacoast Products, Inc.*, 581 F.2d 98 (5th Cir. 1978) ... 13

*Coastal Iron Works, Inc. v. Petty Ray Geophysical, Div. of Geosource, Inc.*, 783 F.2d 577 (5th Cir. 1986) ... 28

*Cooper Industries, Inc. v. Tarmac Roofing Systems, Inc.*, 276 F.3d 704 (5th Cir. 2002) ... 26

*Cooper v. Offshore Exp., Inc.*, 717 F.Supp. 1180 (W. D. La. 1989), *affirmed*, 915 F.2d 1569 (5th Cir. 1990) ... 15, 16

*Davis v. Odeco, Inc.*, 18 F.3d 1237 (5th Cir. 1994) ... 24

*Demette v. Falcon Drilling Company, Inc.*, 253 F.3d 840 (5th Cir. 2001) ... 19

*Demette v. Falcon Drilling Company, Inc.*, 280 F.3d 492 (5th Cir. 2002) ... 20

*Federal Barge Lines, Inc. v. SCNO Barge Lines, Inc.*, 711 F.2d 110 (8th Cir. 1983) ... 16

*Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) ... 17

*Kerr-McGee Corp, v. Ma Ju Marine Services, Inc.*, 830 F.2d 1332 (5th Cir. 1987) ... 16

*McDermott Intern., Inc. v. Wilander*, 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991) ... 12

*Moore v. Phillips Petroleum*, 912 F.2d 789 (5th Cir. 1990) ... 15

*Owen v. Kerr-McGee Corp.*, 698 F.2d 236 (5th Cir. 1983) ... 24

*Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567 (5th Cir. 2001) ... 26

***vii** Scindia Steam Nav. Co., Ltd. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1(1981) ... 17

*Serbin v. Bora Corp., Ltd.*, 96 F.3d 66 (3rd Cir. 1996) ... 17

*Snyder v. Whittaker Corporation*, 839 F.2d 1085 (5th Cir. 1988) ... 34

*St. Romain v. Industrial Fabrication and Repair Service, Inc.*, 203 F.3d 376 (5th Cir. 2000) ... 23, 24

*Wagner v. McDermott, Inc.*, 79 F.3d 20 (5th Cir. 1996), *cert. denied*, 519 U.S. 945, 117 S.Ct. 333, 136 L.Ed.2d 246 (1996) ... 20

***STATUTES***

F.R.C.P. 54(b) ... 3, 19

33 U.S.C. § 905(b) ... 2, 16, 17, 18, 20

33 U.S.C. § 905(c) ... 19, 20

F.R.E. 802 ... 25

## *1 STATEMENT OF THE ISSUES

1. The jury found that plaintiff was a Jones Act seaman, on evidence that plaintiff had been assigned by Baker to work as one of the essential members of the crew of an offshore supply vessel. Should the jury's verdict be disturbed?

2. Tidewater claimed that Baker owed defense and indemnity to Tidewater under the Time Charter between the parties. Baker contested the indemnity clause by arguing that Tidewater was guilty of gross negligence and that the district court excluded expert testimony supporting Baker's defense. Did the district court err in enforcing the indemnity clause where (1) the expert testified that his descriptive use of the term gross negligence was not intended to convey a legal standard, and (2) Baker failed to present evidence from the expert after being invited to do so by the district court?

© 2011 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

3. Falcon's Offshore Installation Manager ("OIM"), who was primarily responsible for the safety of personnel on the Falcon drilling rig, admitted to several critical mistakes by Falcon employees before plaintiff's accident. Did those admissions give the jury a reasonable evidentiary basis for concluding that Falcon was partially at fault in causing plaintiff's accident?

## *2 STATEMENT OF THE CASE

Seth Becker lost both of his legs just below the knees in an accident that occurred while he was working on a well stimulation job in the Gulf of Mexico. Suit was filed on his behalf against the following parties:

(1) Baker Hughes, Inc., and plaintiff's employer, Baker Oil Tools, Inc., a Division of Baker Hughes Oilfield Operations, Inc. ("Baker") for negligence under the Jones Act and general maritime law, and alternatively, under 33 U.S.C. §905(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA").

(2) Twenty Grand Offshore, Inc., and Tidewater Marine, L.L.C., ("Tidewater"), as owner and operator of the M/V Republic Tide, an offshore supply vessel under time charter to Baker, for unseaworth iness and general maritime law negligence; alternatively, under 33 U.S.C. §905(b) of the LHWCA. Plaintiff subsequently joined Tidewater's underwriters as defendants.

(3) R & B Falcon Drilling, USA, Inc. ("Falcon"), the owner and operator of the jack-up drilling unit on which plaintiff was injured, for general maritime law negligence.

(4) Energy Resource Technology, Inc. ("ERT"), the well operator, for platform-based negligence.

(5) Coflexip Stena Offshore, Inc. ("Coflexip"), Hydradyne Hydraulics, Inc. ("Hydradyne") and Hydra Rig, a division of Tuboscope Vetco International, L.P. ("Hydra Rig"), the manufacturers of the coflex hose and reel assembly installed by Baker on the M/V Republic Tide, for a defective product.

Tidewater filed a cross claim against Baker for contractual defense and indemnity under the terms of the Time Charter in effect between Tidewater and *3 Baker at the time of the accident. (R, 4: 520-522).[FN1] The district court granted summary judgment on this cross claim prior to trial. Tidewater moved to certify the district court's ruling as a final judgment under F.R.C.P. 54(b), but the district court refused to do so. (R, 8: 1049; R, 9: 1312).

> FN1. References to the record are to the volume and page number, as in "(R, 1: 77)". References to the transcript are also designated by volume and page number, such as "(T, II: 168)". Record excerpts are designated such as "(RE 1)".

When plaintiff amended his complaint to add Tidewater's underwriters as defendants, those underwriters filed a similar cross claim against Baker for contractual defense and indemnity, and followed that pleading with a motion for summary judgment.[FN2] The district court granted underwriters' motion. (R, 9: 1214-1217; R, 9: 1292-1296; R, 10: 1412-1428; R, 13: 1884).

> FN2. Plaintiff's amended complaint named Certain Underwriters at Lloyds Insurance Company as a defendant. Tidewater answered on behalf of Certain Underwriters at Lloyds, Subscribing to Risk No. LEO 106200, and the Judgment and Amended Judgment contain the corrected reference. (R, 9:1292-1296; R, 14:2224-2231; R, 16:2509-2517).

Notwithstanding the district court's rulings, Baker persisted in its refusal to honor its contractual obligation to defend and indemnify Tidewater and its underwriters, and continued to fight application of the indemnity clause of the Time Charter. Consequently, Tidewater defended itself at the trial, during which Baker stood alone in seeking to have Tidewater found guilty of gross negligence so that Baker could try to use that finding to evade its indemnity obligation.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*4** With complete agreement of the parties, the district court bifurcated the question of plaintiff's status from the other issues in the case. (T, XIII-A: 1669-1670). After the jury found plaintiff to be a seaman, the jury was charged on the remaining issues and deliberated on liability, apportionment, and damages. The jury found that 65% of the responsibility lay with Baker, 30% with Tidewater, and 5% with Falcon. Coflexip, Hydra Rig and Hydradyne were exonerated.[FN3] Plaintiffs damage award exceeded $43 million. (R, 14: 2088-2091).

> FN3. ERT's oral motion for judgment as a matter of law was granted at trial, and it was dismissed from the case. (R, 14: 2074).

Judgment was entered in favor of plaintiff on the jury verdict. Judgment was also entered in favor of Tidewater and its underwriters on the contractual indemnity claim against Baker on that portion of the damage award that had been rendered against Tidewater.[FN4] (R, 14: 2224-2231). The district court denied post-trial motions by the defendants on various issues. (R, 16:2507).

> FN4. The judgment was subsequently amended on October 30, 2001 to include judicial interest. (R, 16: 2509-2517).

The defendants' appeal the damage award as excessive. Baker appeals the jury determination that plaintiff was a seaman and renews its challenge to the contractual indemnity obligation it owes to Tidewater. Falcon challenges the evidentiary basis for the jury's imposition of liability on Falcon.

## \*5 STATEMENT OF FACTS

The M/V Republic Tide, a 226-foot special purpose supply vessel owned and operated by Tidewater, was working for Baker under a Time Charter and was assisting with Baker's well stimulation operations being conducted for ERT at the time in question. (T, I: 75-77; T, II: 135-136). Under the Time Charter, Baker was responsible for maintaining and operating equipment that Baker had installed on the vessel so that Baker could perform specialized services on oil and gas wells, while Tidewater was in charge of the operation, navigation, and maintenance of the vessel. (T, II: 168, 187; T, III: 450, 462).

The Baker equipment on the vessel included pumps, tanks, and a reel assembly around which was wound a stainless steel coflex hose. The coflex hose could be spooled out from the reel so that Baker materials stored in tanks on the vessel could be pumped directly from the vessel to the wellhead. (T, II: 176-177; T, III: 367-368, 411). There was a "quick release" mechanism on the reel assembly that was supposed to immediately disconnect the cofiex hose from the reel in the event of an emergency, which in turn would allow the vessel to move away from the rig. (T, II: 128-129). Baker's well stimulation work was performed by its crew of six Baker employees, each of whom was assigned by Baker to live **\*6** and work aboard the M/V Republic Tide. (T, III: 452-453). The Tidewater crew complement consisted of eight persons who were likewise assigned to the vessel.

Plaintiff boarded the vessel with the other Baker employees the day before his accident on a crew change. (RE 2-Tidewater Trial Exhibit 3C). Once the fresh Baker crew was aboard the vessel, the M/V Republic Tide departed Port Fouchon for a Falcon jack-up drilling rig in East Cameron Block 38 in the Gulf of Mexico. (RE 2-Tidewater Trial Exhibit 3C). On arrival at the location, the vessel attempted to set her anchor. During that effort, a seal ruptured on the anchor windlass, causing a major leak of hydraulic fluid, and the attempt was aborted. (T, II: 98-99). The captain decided to hold the bow of the vessel in position with the bow thruster, a common practice on such jobs, while the vessel's stem was moored to the rig with two, 4-inch polypropylene lines, secured at both port and starboard. (T, II: 101-102, 167).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The captain was stationed at the vessel's stern controls. Four of the Baker crewmen, including the plaintiff, were lifted up to the Falcon rig by a personnel basket so they could set up the Baker equipment on the rig. The other two Baker crewmen remained aboard the vessel and prepared for the pumping operation. (T, VIII: 1421-22). The coflex hose was spooled off of the reel assembly and lifted up to the drilling rig with the Falcon crane. The coflex hose was snaked along the **7** catwalk on the main deck and up the V-door to the drill floor, where it was connected to the well manifold so that Baker could conduct pumping operations directly from the vessel into the well. (T, II: 176-177).

At approximately 9:30 a.m., without any prior warning, the bow thruster on the M/V Republic Tide throttled down to idle speed. (T, II: 254, 258, 295).[FN5] The vessel captain immediately contacted the Falcon crane operator by radio to report the problem, and instructed the Tidewater engineer on the vessel to check on the thruster. (T, II: 255, 258-259). The captain attempted to hold the vessel's position and heading using the two main engines, but he was having difficulty overcoming the seas that were pushing the vessel over to starboard. The pressure of the current against the vessel caused the port stern line to part. (T, II: 259-260).

> FN5. While Falcon claimed that the M/V Republic Tide reported bow thruster problems before it even arrived on location, the Baker and Tidewater personnel denied this allegation. (T, II: 161-162, 219-220, 294-295; T, III: 340, 390; T, VIII: 1473-1474).

The captain then instructed the Baker hands on the vessel to activate the quick release on Baker's reel assembly to disconnect the cofIex hose from the vessel. However, the quick release did not work, and the cofIex hose grew increasingly tight as the seas continued to push the vessel over to starboard. (T, II: 270-271). The captain radioed the Falcon crane operator a second time, and told him that the cofIex hose needed to be disconnected from the rig, since the captain **8** was not certain how long he would be able to hold the vessel in position. (T, II: 265; T, IV: 663-664).

Donald Frederick, Falcon's toolpusher, was standing on the drill floor with the Baker crew members when the bow thruster throttled down. (T, IV: 630). Frederick was immediately informed over the intercom by the Falcon crane operator of the vessel's situation and that the cofIex hose needed to be disconnected on the rig. (T, IV: 663-664). Frederick knew at that moment that he had an emergency on his hands. (T, IV: 646, 657).

All four of the Baker crewmen aboard the rig immediately left the drill floor, walked down the stairway to the main deck and proceeded along the catwalk to a hammer union where the cofIex hose was connected. (T, II: 189-190; T, IV: 631-633). Although Frederick knew that the rig under his command was faced with an emergency, he watched as the Baker crewmen marched directly into harm's way, and Frederick made no effort to warn the Baker crewmen of the danger that any second the cofIex hose might be pulled tight by the vessel. (T, IV: 646, 657, 684-685). While the Baker crewmen were trying to disconnect the cofIex hose from the hammer union, the hose was pulled tight, pinning the plaintiff against a backstop on the rig, causing severe injuries to him.

### *9 SUMMARY OF THE ARGUMENT

Tidewater addresses three issues in this brief: (1) seaman status; (2) the district court's judgment that Baker owes Tidewater defense and indemnity under the Time Charter; and (3) Falcon's fault. On these three issues, the jury findings and the district court's judgment should be affirmed.

### I. *Seaman Status*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Baker was conducting well stimulation activities from the M/V Republic Tide, a supply vessel which had been rigged and outfitted to Baker's specifications for that purpose. Plaintiff was assigned to the vessel as one of six essential members of the Baker crew that was required to perform well stimulation work. Plaintiff boarded the vessel on a regular crew change with his other Baker co-workers. Plaintiff understood that he was assigned to this vessel for the duration of the job and until he received a new assignment.

The record evidence is legally sufficient to justify the jury's verdict that plaintiff was a seaman under the Jones Act. Baker argues that the jury verdict should be set aside so that plaintiffs remedy against Baker is limited to compensation benefits under the LHWCA. However, even if plaintiff is a longshoreman, Baker is liable to the same extent in its capacity as time charterer of **10** the vessel, because Baker retained operational control over the Baker equipment and employees aboard the vessel.

## II. *Indemnity*

The Time Charter between Tidewater and Baker contains an indemnity provision which requires Baker to defend and indemnify Tidewater for claims by Baker employees caused in whole or in part either by Tidewater's negligence or the unseaworthiness of its vessel. The district court ruled on four different occasions that Baker was contractually obligated to Tidewater for defense and indemnity. Baker argues - without support from any other party - that Tidewater's negligence amounted to gross negligence, which Baker claims is not covered by the indemnity provision of the Time Charter. Baker contends that the district court excluded testimony from an expert that would have supported a finding of gross negligence against Tidewater. However, the expert clearly explained that he did not intend to characterize Tidewater's conduct as reckless, willful or intentional, and did not use the term "gross negligence" in his report in any legal manner whatsoever. The record confirms that rather than improperly excluding evidence, the district court actually invited Baker to question the expert in front of the jury. Baker declined, and chose instead to present the expert's **11** report as a proffer. As a result, there was no evidence put before the jury which justified a jury charge or an interrogatory on gross negligence.

## III. *Falcon Liability*

The jury found Falcon five percent at fault for plaintiff's injuries. Donald Frederick, Falcon's OIM, was responsible for the safety of all personnel aboard the rig, and recognized that he had an emergency on his hands three to five minutes before plaintiff's accident. During that critical interval, Frederick watched as plaintiff and his co-workers proceeded into an area of imminent danger on the rig, and Frederick made no attempt to warn or convey the existence of an emergency to them. Frederick also admitted a critical mistake in failing to utilize the superior vantage point of the Falcon crane operator, who from his position in the crane was able to track the movement of the vessel and the consequent tightening of the coflex hose. Frederick's testimony provided a sufficient basis for the jury's conclusion that Falcon was partially at fault in causing the accident.

## **12 ARGUMENT

Tidewater addresses three issues on this appeal: (1) Record evidence supporting the jury's verdict that plaintiff was a seaman; (2) The district court's ruling that Baker owes Tidewater and its underwriters contractual defense and indemnity; and, (3) Record evidence supporting the jury's finding of liability against Falcon.

## I. *SEAMAN STATUS*

### A. Jury Finding that Plaintiff was a Seaman has Sound Evidentiary Basis

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Under the Jones Act, if reasonable persons applying the proper legal standard could disagree as to whether a plaintiff is a member of the crew of a vessel, then plaintiffs status is a question for the jury. *McDermott Intern., Inc. v. Wilander*, 498 U.S. 337, 356, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991). Given that essential facts were in dispute regarding plaintiff's status, the district court was correct in submitting the question to the jury, the position Baker supported during trial. (T, VIII: 1654, 1658). The jury was properly charged, there were no objections to the instructions, and the jury found plaintiff to be a Jones Act seaman. (T, XIII-A: 1669; T, IX: 1730). Because that finding is supported by record evidence, it cannot be disturbed on appeal.

**\*13** Aggrieved by the jury's determination that plaintiff was a seaman, Baker appeals that finding and contends that the standard of review is *de novo*. (Baker brief p. 18, citing *Bannister v. Ullman*, 287 F.3d 394 (5th Cir. 2002)). Baker is wrong. The applicable standard of review for sufficiency of the evidence in a Jones Act claim is whether there is a reasonable evidentiary basis for the jury's verdict. *Campbell v. Seacoast Products, Inc.*, 581 F.2d 98, 99 (5th Cir. 1978). That standard is satisfied here.

Baker was the time charterer of the MN Republic Tide, a special purpose supply vessel that had been completely rigged out with Baker equipment installed aboard the vessel to Baker specifications. (T, I: 76; T, III: 450-452, 457). After the vessel was modified with the Baker equipment, offshore well servicing operations were performed by Baker using its equipment and crewmen aboard the vessel. The six Baker employees who lived and worked aboard the M/V Republic Tide operated and maintained the Baker equipment. (T, III: 462). Baker admits that five out of its six crewmen were seamen, but Baker - and Baker alone - contends that plaintiff does not qualify for seaman status because he had only been working for Baker the last three summers. (R, 13: 2064, pp. 16-17).

Evidence was introduced which established that plaintiff was assigned to the MN Republic Tide on June 7, 1999, and he reported to the vessel with his **\*14** fellow crewmen on a scheduled crew change. (T, II: 238, RE 2). Although plaintiff was new to the vessel, he was an essential member of the Baker crew assigned to work aboard the vessel. (T, III: 479-480; T, VIII: 1434, 1439). Plaintiff ate, slept, and worked aboard the vessel, and was willing to do anything and everything that his supervisors and co-workers instructed him to do. The Tidewater captains considered plaintiff to be a member of the vessel's crew. (T, II: 168,252).

When plaintiff was reassigned to the M/V Republic Tide, Baker informed him that he would remain aboard the vessel for the duration of the well stimulation job, and probably for other jobs on the vessel. Plaintiff testified that he was expecting his assignment on the M/V Republic Tide to last until he became thoroughly familiar with offshore pumping operations. (T, VII: 1272).

Because conflicting evidence was introduced regarding the duration of plaintiff's work aboard the vessel, the district court submitted the status question to the jury. (T, VIII: 1658). The jury found plaintiff to be a seaman, and properly so. That finding, supported as it is by record evidence, cannot be disturbed on appeal.

Baker's challenge to the jury finding that plaintiff was a seaman is a curious one. Baker contends that even though plaintiff was one of the six essential persons required to complete its crew complement during a well stimulation job, **\*15** plaintiff had a status different than his Baker co-workers aboard the vessel, the eight Tidewater crew members, and even the Baker employee whose place plaintiff took aboard the vessel. Baker centers its argument on the fact that plaintiff had only worked for Baker for the last three summers, while plaintiff was pursuing a college degree. (Baker brief, p. 2, 24). Baker tried to single out plaintiff for disparate treatment under the circumstances, and the jury disagreed, finding plaintiff to be a seaman. That finding is supported by the law

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

and the evidence, and cannot be disturbed.

### B. Baker Liable as Time Charterer Regardless of Plaintiff's Status

Baker argues that it is insulated from liability under the LHWCA because plaintiff was a longshoreman, not a seaman. (Baker brief, p. 15). Even should plaintiff be singled out on appeal as a longshoreman, Baker is no less liable to plaintiff in its capacity as time charterer of the vessel. Because Baker was both the time charterer of the vessel *and* the employer of the plaintiff, Baker owed the plaintiff a duty in both capacities. The two duties are separately owed and do not affect one another. *Moore v. Phillips Petroleum*, 912 F.2d 789, 791 (5th Cir. 1990).

A time charterer who has no control over the vessel generally has no liability for negligence of the crew or unseaworthiness of the vessel. **16** *Cooper v. Offshore Exp., Inc.*, 717 F.Supp. 1180, 1186 (W. D. La. 1989), *affirmed*, 915 F.2d 1569 (5th Cir. 1990). But that is not the case here, for the parties to the charter clearly intended otherwise. Under §905(b) of the LHWCA, a time charterer is liable if the cause of the harm is within the charterer's sphere of control and responsibility or has been transferred to the charterer by the clear language of the charter agreement. *Kerr-McGee Corp. v. Ma Ju Marine Services, Inc.*, 830 F.2d 1332, 1343 (5th Cir. 1987).

The Time Charter in this case was not a "fully found" charter. *Federal Barge Lines, Inc. v. SCNO Barge Lines, Inc.*, 711 F.2d 110, 112 (8th Cir. 1983); *Cooper*, 717 F. Supp. at 1186. Instead, the charter was a non-traditional arrangement, because Baker, as time charterer, retained operational control over the Baker equipment installed aboard the vessel. Baker also assigned Baker employees to live and work aboard the vessel and operate Baker equipment for well stimulation activities conducted by Baker from the Tidewater vessel. (T, III: 462). Inasmuch as Baker was contractually responsible for operating and maintaining its equipment, Baker is liable for the negligent breach of those responsibilities under §905(b). *Kerr - McGee Corp.*, 830 F.2d at 1343. The jury finding that Baker was negligent permits this Court to affirm Baker's responsibility either as plaintiff's Jones Act employer, or as time charterer under **17** §905(b). The standard of negligence - ordinary care under the circumstances - is the same.[FN6] *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338-339 (5th Cir. 1997); *Scindia Steam Nav. Co., Ltd. v. De Los Santos*, 451 U.S. 156, 167, 101 S.Ct. 1614, 1622, 68 L.Ed.2d 1 (1981), and *Serbin v. Bora Corp., Ltd.*, 96 F.3d 66, 71 (3rd Cir. 1996). Therefore, even if plaintiff does not qualify for seaman status, Baker is no less liable to plaintiff in its capacity as time charterer of the vessel.

> FN6. While the standard of causation is more liberal under the Jones Act, the degree of causation is not an issue on this appeal.

### II. *BAKER OWES TIDEWATER DEFENSE AND INDEMNITY*

Whether plaintiff's status is as a seaman or a longshoreman, the Time Charter obligates Baker to defend and indemnify Tidewater for plaintiff's claims, because plaintiff claimed - and the jury found - that his damages were caused in part by Tidewater's negligence and by the unseaworthiness of the MN Republic Tide, precisely what the Time Charter specified.[FN7] Baker's refusal to honor this **18** obligation prompted Tidewater to file a cross claim, on which the district court granted summary judgment. (R, 4: 520-522; R, 5: 677-712; R, 6: 810-835).

> FN7. The relevant text provides "None of the OWNER INDEMNITEES shall have any liability, for injury to, illness or death of the personnel or employees of CHARTERER [Baker Oil Tools], of CHARTERER's invitees, of CHARTERER's sublessee(s) of the vessel, or of CHARTERER's contractors or subcontractors (other than any of the OWNER INDEMNITEES), however said injury, illness, or death arises or occurs, whether through the negligence in whole or in part of any of the OWNER INDEMNIT-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

EES, unseaworthiness of any vessel or otherwise; and CHARTERER shall protect, defend, indemnify and hold harmless the OWNER INDEMNITEES from and against all claims, suits, losses, liabilities, expenses, demands, costs (including reasonable attorneys' fees) and/or damages as a result of such illness, injury or death." (R, 5:695-710).

Baker sought to avoid indemnity by arguing that (1) plaintiff was a longshoreman and 33 U.S.C. § 905(b) voided contractual defense and indemnity clauses; and (2) the unseaworthiness of the M/V Republic Tide voided the indemnity obligation. The district court rejected both arguments after Tidewater established that the indemnity clause was valid regardless of plaintiff's status, and that the Time Charter by its terms required Baker to indemnify Tidewater for unsea worthiness claims. (R, 5: 677-712; R, 6: 810-835; R, 8: 1049).

When plaintiff joined Tidewater's underwriters as defendants in the case, they called upon Baker for indemnity under the Time Charter, and later moved for summary judgment. (R, 10:1412-1428). Baker opposed, this time contending that Tidewater's gross negligence voided Baker's contractual obligation, even though plaintiff had never alleged that Tidewater was guilty of gross negligence. (R, 11:1577-1587). Baker premised its argument on a line from the sixth page of the report of plaintiff's marine expert, Ronald Campana, who concluded that the vessel captain was grossly negligent in failing to advise rig personnel that he had not dropped anchor when the vessel arrived at the rig. The district court recognized that Baker had not been called upon to indemnify Tidewater (or its **19** underwriters) for gross negligence because plaintiff never alleged that Tidewater was guilty of gross negligence. (R, 13: 2064, pp. 9-12). The motion was granted. (R, 13: 1884). On the eve of trial, Baker filed a Motion for Reconsideration of this ruling, and that motion was denied. (T, A: 133-135; R, 13: 1996-2004). [FN8]

> FN8. After trial, Baker again challenged the district court's ruling that Baker owed contractual defense and indemnity to Tidewater. This time, Baker focused on its status argument, citing as authority the dissent in the panel opinion in *Demette v. Falcon Drilling Company, Inc.*, 253 F.3d 840 (5th Cir. 2001). Baker argued that plaintiff was not a seaman and was not the right type of longshoreman, and that therefore, 33 U.S.C. § 905(c) was not applicable to plaintiff. The district court rejected Baker's argument. (R, 13: 1996-2004; R, 13: 2065).

Because the district court declined Tidewater's request to certify the judgments as final under F.R.C.P. 54 (b), the judgments remained subject to reconsideration anytime before entry of final judgment. (R, 9:1312). Baker's refusal to accept the district court's rulings required Tidewater to defend the case at trial and on this appeal.

In its brief, Baker finally concedes that the Time Charter is a maritime contract containing reciprocal indemnity obligations, and for the first time, Baker does not challenge its obligation to defend and indemnify Tidewater for ordinary negligence. Instead, Baker contends on appeal that the district court excluded evidence of gross negligence and that the improperly excluded evidence would have justified a jury instruction as well as a jury interrogatory on gross **20** negligence.[FN9] (Baker brief, p. 44-47). Baker's complaints are not well-founded because the district court did not improperly exclude evidence, and the expert's testimony did not warrant a jury charge on gross negligence.

> FN9. In a footnote, Baker also suggests to this Court that §905(b) invalidates its indemnity obligation in the event plaintiff is a longshoreman. Once again, Baker is wrong because §905(c) specifically allows indemnity if: (1) the longshoreman is covered by the OCSLA; (2) the indemnity provisions are reciprocal; and (3) the contract is between the longshoreman's employer and the vessel. 33 U.S.C. §905(c);

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Wagner v. McDermott, Inc.*, 79 F.3d 20, 22 (5th Cir. 1996), *cert. denied*, 519 U.S. 945, 117 S. Ct. 333 (1996). All three requirements are met here. Tidewater established as much in the district court. (R, 5: 677-712; R, 6: 810-835; R, 10: 1412-1425; R, 13: 1905-1912). Given this Court's recent decision in *De- mette v. Falcon Drilling Company, Inc.*, 280 F.3d 492 (5th Cir. 2002), Tidewater's position on this issue is even stronger.

### A. District Court Did Not Exclude Evidence

The history surrounding Campana's opinion regarding gross negligence is necessary to understand the ruling re- garding his testimony. At the beginning of trial, the district court set forth the ground rules on this issue:
The Court: This is what we're going to do: At the conclusion of this trial after all the evidence is heard I will make that decision. If there is some testimony of gross negligence and I feel it should go to the jury, I will allow it. If not, I won't.

(T, A: 135; RE 3).

The district court later considered Tidewater's motion *in limine* which sought to prohibit Campana from testify- ing before the jury to the legal conclusion **\*21** that Tidewater was guilty of gross negligence. The district court deferred ruling on the motion until Campana was called to the stand. (T, A: 144-145).

At trial, Campana was questioned in the presence of the jury by plaintiff, Falcon and Tidewater, and he freely expressed his views on Tidewater's conduct. At one point, Campana offered a legal conclusion that invaded the province of the jury, and at Tidewater's request, the district court admonished the jury to disregard that testi- mony. (T, V: 877-878).

When its turn arrived, Baker elected not to question Campana in the presence of the jury:
Mr. Galloway: Your Honor, I have some questions for Captain Campana, but as we discussed, I think yester- day....
The Court: No problem.
Mr. Galloway: I would like to do them **after everybody else has asked their questions and out of the pres- ence of the jury.**
The Court: **And those are the only questions you have?**
Mr. Galloway: **Correct.**
The Court: **You don't have any others before the jury?**
**\*22** Mr. Galloway: **Correct.**

(T, V: 879; RE 3). (emphasis added).

When the other parties completed their questioning, the jury was excused, and Baker examined Campana. (T, V: 885-892). Campana was questioned extensively about his opinions in the case, and Baker ultimately focused on Campana's lone statement at page 6 of his report on gross negligence. (T, V: 892). Baker then advised the dis- trict court that it was done:
Mr. Galloway: **I have nothing further, your Honor, other than I would like to proffer, as Baker Proffer Number 1, Captain Campana's report where he refers to gross negligence.**

(T, V: 893; RE 3). **(emphasis added).**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The district court proceeded to conduct its own examination of the expert outside the jury's presence, during which Campana clarified that he used the word "gross" as an adverb, and not in any legal sense whatsoever. (T, V: 894-895). Having listened to Baker's entire examination of Campana, the district court told Baker that it would allow the jury to hear all of the questions Baker posed to Campana during Baker's examination, save the one question that called for Campana to give a legal conclusion on gross negligence.

*23 The Court: **I want you to know that there are many questions that you had, Mr. Galloway, that I would have allowed you to ask in front of the jury. I just would not have allow[ed] you to ask the final question, "Was that gross negligence?" Do you understand?**

Mr. Galloway: I understand that.

(T, V: 895; RE 3). **(emphasis added).**

The district court articulated its concern to the expert:

The Court: What I don't want to do is invade the province of the jury to make a determination on negligence or gross negligence or whatever. That's why I didn't allow you to testify that in your opinion the captain was negligent. The jury determines if the captain is negligent or not negligent.

(T, V: 894-895; RE 3).

The only testimony by Campana that the district court specifically disallowed was his legal conclusion that Tidewater was guilty of gross negligence. This ruling was correct, and it is telling that Baker did not object to this ruling at trial.

A district court's decision to exclude evidence is reviewed for abuse of discretion. (Baker Brief, p. 43-44, fn. 90). **\*24**_St. Romain v. Industrial Fabrication and Repair Service, Inc._, 203 F.3d 376 (5th Cir. 2000); _Davis v. Odeco, Inc._, 18 F.3d 1237 (5th Cir. 1994). That standard applies to the district court's refusal to allow Campana to testify to the legal conclusion that Tidewater was guilty of gross negligence. But since Baker concedes in brief that an expert's opinion on a legal conclusion is not admissible, the district court cannot be guilty of an abuse of discretion when the challenged evidentiary ruling is correct. (Baker Brief p. 46, fn. 97, citing _Owen v. Kerr-McGee Corp._, 698 F.2d 236, 240 (5th Cir. 1983) and _Askanase v. Fatjo_, 130 F.3d 657, 673 (5th Cir. 1997) ).

Baker's next contention is that the district court excluded Baker's examination of Campana before the jury. Baker is factually incorrect, because Baker never tried to examine Campana before the jury, nor was Baker's examination of Campana offered by Baker as a proffer. When the jury was returned to the courtroom, the parties were given the opportunity to further question Campana:

The Court: Are there any other questions of Captain Campana from the plaintiff?.

Mr. Roy: No, sir.

The Court: **From any of the defendants?**

Mr. Galloway: **No, your Honor.**

*25 (T, V: 896; RE 3) **(emphasis added)**. The only evidence specifically offered by Baker as a proffer was Campana's report, which is inadmissible hearsay. F.R.E. 802. (T, V: 893). In sum, Baker was given liberty to question Campana about the underlying factual basis for every one of the opinions expressed in his report, but Baker chose not to do so.

Baker's failure to examine Campana in front of the jury is fatal to its argument on this appeal, for there is no rul-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing of record for this Court to review, because the district court made it plain that Baker's examination of Campana could have been put before the jury. (T, V: 895). It is disingenuous for Baker to now blame the district court for improperly excluding evidence that Baker never even tried to present to the jury.

Baker lodged no objection to an evidentiary ruling of the district court, failed to examine Campana in the presence of the jury after being invited to do so by the district court, failed to specifically offer its examination of Campana as a proffer, and simply proffered an inadmissible expert report. Charging the district court with abuse of discretion under these circumstances is baseless, for no discretion was exercised. While there is a serious question as to whether Baker has preserved the "exclusion issue" for review on appeal, Baker's failure to object to any action by the district court on this point makes the standard of review at **26** best plain error. *Rodriguez v. Riddell Sports. Inc.*, 242 F.3d 567, 579 (5th Cir. 2001). (T, V: 879, 894-896). Baker's appeal falls woefully short of that standard.

## B. Insufficient Evidence to Warrant Jury Charge

Baker next argues that the district court should have charged the jury and submitted a jury interrogatory on gross negligence based upon the Campana testimony that Baker failed to present to the jury. Baker's failure to put its examination of Campana before the jury is fatal to its requested jury instruction and interrogatory, because that is the only testimony on which Baker relied in asking the district court for a gross negligence charge against Tidewater. (T, V: 892). A trial court's refusal to charge the jury on either a claim or an issue is reversible error only if there existed a legally sufficient evidentiary basis which justified submitting the issue to the jury. *Cooper Industries, Inc., v. Tarmac Roofing Systems, Inc.*, 276 F.3d 704, 709 (5th Cir. 2002). No such basis existed here.

The evidence of Tidewater's negligence was presented during trial principally through the testimony of Campana, the Tidewater captains and the Tidewater engineer, Clarence Polk. (T, II:90-174, T, II:245-331, T, VIII: 1458-1487). At the close of the evidence, the district court was of the view that the **27** evidence presented did not warrant a jury interrogatory on Tidewater's gross negligence:
The Court: This Court certainly feels, after hearing all the testimony, that--the days of the testimony--**there is no gross negligence on the part of Tidewater. It's not even a close call.**

(T, VIII: 1641; RE 3). **(emphasis added)**.

At the charge conference, the district court once again considered Baker's request for a jury instruction and jury interrogatory on gross negligence:
The Court: Page 35 is the gross negligence charge. This is Baker's charge requesting that the court allow the jury to be charged on and in a line be on the jury verdict form for gross negligence of Tidewater.
This Court has already ruled that, based on the facts and the evidence of this case, especially through the testimony of Mr. Polk, I believe, who was the engineer who said that the -- and I found him very credible. I find him extremely credible. He said that the anchor worked up until the time that they were out there. He thought it worked. He went to put it --in fact, dropped the anchor and that's when he found out there was some problems with the anchor which made the vessel unseaworthy.
**28** But because of that and because of his testimony, it does not make Tidewater grossly negligent. He also testified as the engineer that the bow thrusters worked and were working properly except for the time of this accident, and he had no warning that -- of either of these -- either the anchor or the bow thruster going out in advance of them malfunctioning.

(T, XIII-A: 1681-1682; RE 3).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The district court later reiterated this view to the parties during jury deliberations, outside the presence of the jury:

The Court: I think this case was too clear, and there is no gross negligence. I thought that from the beginning and it's gotten stronger as we've gone along including the people that Baker put on the stand like Mr. Polk.

(T, IX: 1854; RE 3).

Even Campana's testimony on "gross negligence" does not support Baker's requested jury charge. Gross negligence in a maritime context means harm willfully inflicted or caused by gross or wanton negligence. *Coastal Iron Works, Inc. v. Petty Ray Geophysical, Div. of Geosource, Inc.*, 783 F.2d 577, 582 (5th Cir. 1986). Campana was clear in his testimony outside the jury's presence that Tidewater's negligence did not rise to the level of willfulness or reckless **\*29** disregard. When questioned by Baker, Campana clarified that he used the phrase "gross negligence" in his report only "as an adverb" "without any legal context whatsoever." (T, V: 889-890). When pressed, Campana stated that the actions of the Tidewater captain did not exhibit "reckless disregard." (T, V: 891). During the district court's follow-up examination outside the jury's presence, Campana further clarified what he had in mind when he used the term on page 6 of his report:

Mr. Campana: To be gross negligence on behalf of a vessel's master legally would have to be **wanton and reckless and intentional. And I don't use that term in that manner in any way, shape or form.**

(T, V: 895; RE 3). **(emphasis added)**. In sum, even the Campana testimony that Baker neglected to present to the jury fails to support Baker's plea for a gross negligence charge.

Baker contends on appeal that Tidewater was guilty of gross negligence because rig personnel were not informed that the anchor had not been set. Baker never made that argument to the jury, and for a simple reason. The fact that the vessel was not anchored was known by Baker supervisors, and none of them saw fit to advise rig personnel that the anchor had not been set. (T, II: 230-231; T, III: 405). It would have been incongruous for Baker to argue to the jury that **\*30** Tidewater - but not Baker - was guilty of gross negligence because Tidewater did not relay information of which both Tidewater and Baker were equally aware. No jury would buy that argument. This Court shouldn't either.

### III. *RECORD EVIDENCE SUPPORTS JURY FINDING OF FALCON FAULT*

The jury verdict apportioning part of the liability to Falcon was justified, although Falcon claims it should fall for lack of evidence. (Falcon brief, p. 17). Falcon is wrong.

The testimony of Donald Frederick, Falcon's OIM, is sufficient in and of itself to provide the evidentiary basis for Falcon's liability. (T, IV: 611). As the OIM, Frederick holds a license issued by the United States Coast Guard, which charges him with responsibility for the safety of personnel aboard the drilling rig. (T, IV: 702, 704-705). Frederick was stationed on the drill floor of the rig when the M/V Republic Tide's bow thruster lost throttle. He was immediately informed by his crane operator that (1) the Republic Tide's bow thruster was down; (2) the boat captain was uncertain how much longer he could hold the vessel in position; and (3) the captain was requesting that the coflex hose be disconnected from the rig. (T, IV: 628, 630-631, 663-664). At that point, Frederick recognized that an emergency situation existed on the Falcon rig, and admitted that he was aware that **\*31** personnel on the main deck of the drilling rig were at serious risk because of the potential for violent movement of the corex hose. (T, IV: 646, 657).

Instead of taking action, Frederick simply watched as plaintiff and the other three Baker crewmen left the drill

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

floor to go down to the main deck to disconnect the corex hose. (T, IV: 631-33, 660). Although Frederick recognized that the Baker hands were proceeding into an area of imminent danger, Frederick made no attempt to warn the Baker crewmen or to convey the existence of an emergency to them. (T, IV: 684-685). Instead, Frederick remained on the drill floor for some time before descending the stairway to the main deck and ducking out of harm's way. (T, IV: 634-636, 642).

Frederick admitted his responsibility to closely monitor an emergency situation once he became aware of its existence. (T, IV: 669).[FN10] His testimony that he "never thought" of warning the Baker crewmen of the impending danger makes plain that he failed in this responsibility. (T, IV: 647). The jury verdict reflects that failure.

> FN10. Steve Adams, Frederick's shore-based supervisor, acknowledged that he would have issued a warning to the Baker crewmen if he had been provided with the information known to Frederick in the minutes before the accident. (T, IV: 705-706). Mickey Hoffpauir, the company man employed by ERT, also testified that he would not have allowed the Baker crew to work in that area under the circumstances unless someone on the rig was monitoring the movement of the vessel. (T, IV: 844-845).

**\*32** This Court should note - as the jury most certainly did - that plaintiff was not injured when the bow thruster of the M/V Republic Tide went down, or when the quick release mechanism on the coflex reel failed to disconnect the hose. Rather, plaintiff's accident did not occur until three to five minutes later, after Frederick became aware of the emergency and allowed the Baker crewmen to proceed to the main deck and position themselves in the only place on the rig where they were at risk for injury if the coflex hose were to move. (T, IV: 649). During that critical interval, Frederick failed to warn the Baker crew to stay clear of the coflex hose. He also failed to take ready advantage of the superior vantage point enjoyed by the Falcon crane operator in the cab of the Falcon crane who was in the best position to track movement of the vessel and the danger that the hose presented on the rig. Frederick's trial testimony illustrates this point:

Q: Did you think to ask him, John, how much slack is in that hose? Keep us posted on where that boat is because I got men right on my deck working on that hose? Did you think to call him and ask that?

A: No.

Q: Should you have, sir?

A: Could have.

Q: I know you could have. Should you have, as the OIM on that vessel, given the circumstances that existed at the time?

**\*33** A: Yes.

Q: But you didn't do that, did you?

A: No, sir.

(T, IV: 663; RE 4).

* * *

Q: And clearly the failure to use the crane operator as your eyes and ears at that particular moment under the emergency circumstances that existed was a critical mistake, wasn't it, sir?

A: Yes.

(T, IV: 670; RE 4).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Frederick also conceded that he and Falcon's crane operator were in the best position to determine whether plaintiff and the Baker crewmen were in danger prior to the accident:

Q: After this emergency arose, who was in the best position to determine whether men working on this hammer union at that location by the backstop were in -- were at risk for movement of that hose? You on the rig floor, the crane operator up in the crane, or the captain in the doghouse of this boat?

* * *

A: Two people had the best seeing. I could have seen it if I would have looked out there, and the crane operator could have probably seen it.

(T, IV: 685-686; RE 4).

**\*34** A simple warning to the Baker crewmen by the Falcon OIM or the Falcon crane operator would have averted this accident, notwithstanding the equipment problems on the M/V Republic Tide or negligence on the part of Baker. Falcon's argument that the jury's conclusion is based purely on speculation displays disregard for record evidence. The jury was within its authority in reasonably inferring from the evidence that Falcon's failure to warn the Baker crewmen of the danger was a causal factor in this accident. *Snyder v. Whittaker Corporation*, 839 F.2d 1085, 1090 (5th Cir. 1988); ("This court will not disturb a jury verdict based on substantial evidence and reasonable inferences."). When the bow thruster throttled down and the quick release did not work, the Falcon OIM and the Falcon crane operator were in the best position to protect the Baker crewmen by looking for movement of the vessel, watching the coflex hose, warning rig workers of the danger and clearing the area if necessary. Falcon had a duty to protect the Baker crewmen from danger, and failed to do so. Plaintiff's injury resulted.

These facts and circumstances justified the jury's finding of breach of duty and causation on the part of Falcon. Frederick's credibility was an integral element of the jury verdict, for his trial testimony was one of only three pieces of evidence specially requested by the jury during deliberations. (T, IX: 1856).

Frederick's first attempt to justify his failure to warn the Baker crewmen of the danger was that he assumed that the MN Republic Tide's anchor was set when **\*35** the bow thruster went down. (T, IV: 645). Under cross, Frederick admitted that he did not know whether or not the vessel was anchored when the bow thruster failed, and even acknowledged that had he known the anchor was not set, he would not have acted any differently in responding to the emergency. (T, IV: 650-652).

Frederick also testified on direct that he did not fully appreciate the danger, because the only information provided to him by Falcon's crane operator was that the M/V Republic Tide had lost her thruster. (T, IV: 629-630, 645). On cross, Frederick admitted that his crane operator advised him not only that the bow thruster was down, but that the captain did not know how much longer he could hold the vessel in position, and that the coflex hose needed to be disconnected from the rig. (T, IV: 663-664).

Frederick then testified that he expected the vessel crew to activate the quick release on the coflex reel, which would free the hose from the vessel and avert the danger. (T, IV: 676, 682-683). However, Frederick was confronted with his deposition testimony that prior to the accident, he did not even know that the coflex reel on the boat was equipped with a quick release mechanism. (T, IV: 682-683).

The Court need only review Frederick's cross examination at trial to see that Frederick rarely admitted the truth

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

until he was confronted and impeached with **36** prior testimony. (T, IV: 650-671, 682-686). His performance did not advance Falcon's defense.

In no wise was the assessment of fault against Falcon based upon mere speculation or hypothetical conjecture of what the Falcon crane operator should have done under the circumstances, as Falcon argues. The jury needed to look no farther than Frederick, the OIM who had primary responsibility for the safety of workers aboard the drilling rig, to find Falcon partially liable. Falcon's liability must be affirmed, because it has a legally sufficient evidentiary basis.

## *37 CONCLUSION

The jury finding that plaintiff was a seaman has a sound evidentiary basis. There was evidence on both sides of the issue, and reasonable minds could differ on the conclusion. The district court properly submitted the question to the jury, and there is no basis to disturb that finding on appeal.

The district court's disallowance of expert testimony on a legal conclusion was proper, and certainly no abuse of discretion. Baker's additional contention that the district court excluded testimony is factually incorrect, and the issue was not properly preserved for review. At best, that issue is subject to the plain error standard of review, a standard which Baker carmot meet.

Falcon's challenge to the sufficiency of the evidence falls short because there is a reasonable evidentiary basis for the jury's finding.

On these three issues, the judgment should be affirmed.

Seth A. BECKER, Plaintiff - Intervenor Defendant - Appellee, v. TIDEWATER INC., et al., Defendants, Tidewater Incorporated; Twenty Grand Offshore Incorporated; Tidewater Marine LLC, Defendants - Third Party Plaintiffs - Intervenor Defendants - Appellees - Appellants, R & B Falcon Drilling USA, Inc.; Pental Insurance Company, Ltd; Certain Underwriters at Lloyds Insurance Co., Defendants - Appellants, Hydra Rig, a division of Tuboscope Vetco International LP,
2002 WL 32180621 (C.A.5 ) (Appellate Brief )

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

335 F.3d 376, 2003 A.M.C. 1653
**(Cite as: 335 F.3d 376)**

▷

United States Court of Appeals,
Fifth Circuit.
Seth A. BECKER, Plaintiff–Intervenor Defend-
ant–Appellee,
v.
TIDEWATER, INC., et al., Defendants,
Tidewater Incorporated, Twenty Grand Offshore Incor-
porated, Tidewater Marine, L.L.C., Defendants–Third
Party Plaintiffs–Intervenor Defend-
ants–Appellees–Appellants,
R&B Falcon Drilling USA, Inc., Pental Insurance Com-
pany, Ltd., Certain Underwriters at Lloyd's Insurance
Co., Defendants–Appellants,
Hydra Rig, a division of Tuboscope Vetco International,
L.P., Defendant–Third Party Defendant–Third Party
Plaintiff–Appellee,
Hydradyne Hydraulics, Inc., Defendant–Third Party De-
fendant–Appellee,
v.
Coflexip Stena Offshore, Inc., Defendant–Third Party
Defendant–Appellee,
v.
Baker Hughes, Inc., Baker Hughes Oilfield Operations,
Inc., Defendants–Intervenor Defendants–Appellants,
and
Baker Oil Tools, Inc., a division of Baker Hughes Oil-
field Operations, Inc., Defendant–Third Party Defend-
ant–Intervenor Plaintiff–Third Party
Plaintiff–Appellant,
Baker Oil Tools, a division of Baker Hughes Oilfield
Operations, Inc., Third Party Defendant–Appellant.

No. 01–31420.
June 19, 2003.
Rehearing and Rehearing En Banc Denied July 21,
2002.[FN*]

FN* Judge Dennis is recused in this matter on
the basis of his interest in Transocean Sedco
Forex, Inc., parent corporation of R&B Falcon
Drilling, and therefore did not participate in the
consideration of the petition for rehearing en

banc.

As Revised July 24, 2003.

Injured employee sued employer oilfield company
under Jones Act, and, in the alternative, under Long-
shore and Harbor Workers' Compensation Act
(LHWCA). Employer filed third-party demands against
manufacturers of coflex hose and reel assembly in-
stalled on vessel. Following jury trial, the United States
District Court for the Western District of Louisiana,
Richard T. Haik, Sr., Chief Judge, entered judgment for
employee, and determined that manufacturers were not
liable. Employer appealed. The Court of Appeals,
Benavides, Circuit Judge, held that employee did not
become seaman when he was assigned to technological
vessel, so as to be protected by Jones Act.

So ordered.

West Headnotes

**[1] Workers' Compensation 413 ⟿2085**

413 Workers' Compensation
    413XX Effect of Act on Other Statutory or Com-
mon-Law Rights of Action and Defenses
        413XX(A) Between Employer and Employee
            413XX(A)1 Exclusiveness of Remedies Af-
forded by Acts
                413k2085 k. Federal Acts. Most Cited
Cases
    The Jones Act and the LHWCA are mutually ex-
clusive compensation regimes. Longshore and Harbor
Workers' Compensation Act, § 1 et seq., 33 U.S.C.A. §
901 et seq.; Jones Act, 46 App.U.S.C.A. § 688.

**[2] Workers' Compensation 413 ⟿2085**

413 Workers' Compensation
    413XX Effect of Act on Other Statutory or Com-
mon-Law Rights of Action and Defenses
        413XX(A) Between Employer and Employee
            413XX(A)1 Exclusiveness of Remedies Af-
forded by Acts

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

335 F.3d 376, 2003 A.M.C. 1653
**(Cite as: 335 F.3d 376)**

413k2085 k. Federal Acts. Most Cited Cases

If a plaintiff satisfies the criteria for being a seaman, he is covered by the Jones Act and not the LHWCA; if he does not, he is protected only by the LHWCA. Longshore and Harbor Workers' Compensation Act, § 1 et seq., 33 U.S.C.A. § 901 et seq.; Jones Act, 46 App.U.S.C.A. § 688.

**[3] Seamen 348 ⟨⟩29(5.16)**

348 Seamen
    348k29 Personal Injuries
        348k29(5.16) k. Questions for Jury. Most Cited Cases

Although a determination of whether an injured worker is a seaman under the Jones Act is a mixed question of law and fact and it is usually inappropriate to take the question from the jury, judgment as a matter of law is mandated where the facts and the law will reasonably support only one conclusion. Jones Act, 46 App.U.S.C.A. § 688.

**[4] Federal Courts 170B ⟨⟩617**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
            170BVIII(D)1 Issues and Questions in Lower Court
                170Bk617 k. Sufficiency of Presentation of Questions. Most Cited Cases

Employer did not waive argument that injured employee was not seaman as matter of law for purposes of Jones Act, when employer admitted, in response to employee's post-trial motion for judgment, that seaman status was issue of fact for jury to determine, where any such statements were uttered after district court informed counsel that either it would hold that employee was seaman as matter of law or issue would go to jury, and where, with respect to this issue, employer filed motion for summary judgment, moved for judgment as matter of law at close of employee's case and at close of all evidence, and moved for judgment notwithstanding verdict. Jones Act, 46 App.U.S.C.A. § 688; Fed.Rules

Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[5] Federal Courts 170B ⟨⟩617**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
            170BVIII(D)1 Issues and Questions in Lower Court
                170Bk617 k. Sufficiency of Presentation of Questions. Most Cited Cases

The Court of Appeals is not required to treat any purported concession as binding.

**[6] Seamen 348 ⟨⟩29(1)**

348 Seamen
    348k29 Personal Injuries
        348k29(1) k. In General. Most Cited Cases

The Jones Act provides a cause of action permitting unlimited damages against the negligence of a plaintiff's employer. Jones Act, 46 App.U.S.C.A. § 688(a).

**[7] Seamen 348 ⟨⟩29(5.4)**

348 Seamen
    348k29 Personal Injuries
        348k29(5.4) k. Persons Against Whom Suit May Be Brought. Most Cited Cases

A Jones Act seaman may sue the owner of any vessel on which he is working for a breach of the warranty of seaworthiness, regardless of whether the vessel is owned by his employer. Jones Act, 46 App.U.S.C.A. § 688.

**[8] Seamen 348 ⟨⟩29(5.4)**

348 Seamen
    348k29 Personal Injuries
        348k29(5.4) k. Persons Against Whom Suit May Be Brought. Most Cited Cases

A Jones Act seaman may sue third parties for general maritime law negligence. Jones Act, 46 App.U.S.C.A. § 688.

**[9] Shipping 354 ⟨⟩84(1)**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

335 F.3d 376, 2003 A.M.C. 1653
**(Cite as: 335 F.3d 376)**

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
     354k78 Torts
      354k84 Injuries to Stevedores and Other Independent Contractors and Their Employees
       354k84(1) k. In General; Liability. Most Cited Cases

**Workers' Compensation 413 ⬤═2085**

413 Workers' Compensation
   413XX Effect of Act on Other Statutory or Common-Law Rights of Action and Defenses
     413XX(A) Between Employer and Employee
      413XX(A)1 Exclusiveness of Remedies Afforded by Acts
       413k2085 k. Federal Acts. Most Cited Cases

The LHWCA provides a cause of action for injuries sustained by a broad range of land-based maritime workers, excluding seamen covered by the Jones Act. Longshore and Harbor Workers' Compensation Act, § 1 et seq., 33 U.S.C.A. § 901 et seq.; Jones Act, 46 App.U.S.C.A. § 688.

**[10] Workers' Compensation 413 ⬤═260**

413 Workers' Compensation
   413V Employees Within Acts
     413V(B) Particular Classes of Persons in General
      413k260 k. Seamen, Fishermen, Stevedores, and Other Maritime Employees. Most Cited Cases

The LHWCA provides a no-fault workers' compensation scheme against a worker's employer for the death or disability of anyone engaged in maritime employment to receive medical costs, prejudgment interest, and two-thirds of the worker's salary for as long as the disability persists. Longshore and Harbor Workers' Compensation Act, §§ 5, 7(a), 8(a), 33 U.S.C.A. §§ 905, 907(a), 908(a).

**[11] Shipping 354 ⬤═84(1)**

354 Shipping
   354V Rights and Liabilities of Vessels and Owners

in General
     354k78 Torts
      354k84 Injuries to Stevedores and Other Independent Contractors and Their Employees
       354k84(1) k. In General; Liability. Most Cited Cases

The LHWCA permits a restrictive theory of negligence against a vessel as a third party to recover damages for injuries caused by vessel negligence. Longshore and Harbor Workers' Compensation Act, § 5(b), 33 U.S.C.A. § 905(b).

**[12] Shipping 354 ⬤═84(1)**

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
     354k78 Torts
      354k84 Injuries to Stevedores and Other Independent Contractors and Their Employees
       354k84(1) k. In General; Liability. Most Cited Cases

An LHWCA plaintiff may sue nonvessel third parties under general maritime law tort principles. Longshore and Harbor Workers' Compensation Act, § 1 et seq., 33 U.S.C.A. § 901 et seq.

**[13] Shipping 354 ⬤═84(1)**

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
     354k78 Torts
      354k84 Injuries to Stevedores and Other Independent Contractors and Their Employees
       354k84(1) k. In General; Liability. Most Cited Cases

Recovery pursuant to general maritime law is available only from defendants outside the scope of the LHWCA's statutory scheme. Longshore and Harbor Workers' Compensation Act, § 5(b), 33 U.S.C.A. § 905(b).

**[14] Shipping 354 ⬤═84(3.2)**

354 Shipping
   354V Rights and Liabilities of Vessels and Owners

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

335 F.3d 376, 2003 A.M.C. 1653
**(Cite as: 335 F.3d 376)**

in General
    354k78 Torts
      354k84 Injuries to Stevedores and Other Independent Contractors and Their Employees
        354k84(3) Dangerous or Defective Condition of Vessel, Appliances, or Places for Work
        354k84(3.2) k. Vessels and Places for Work. Most Cited Cases

An LHWCA worker, unlike a Jones Act seaman, does not have a cause of action for unseaworthiness. Longshore and Harbor Workers' Compensation Act, § 5(b), 33 U.S.C.A. § 905(b); Jones Act, 46 App.U.S.C.A. § 688.

**[15] Seamen 348 ☞2**

348 Seamen
    348k2 k. Who Are Seamen. Most Cited Cases

For an individual worker to be a seaman, and therefore entitled to the protections of the Jones Act, the worker's duties must contribute to the function of the vessel or to the accomplishment of its mission, and the employee must have a connection to a vessel in navigation, or to an identifiable group of such vessels, that is substantial in terms of both duration and nature. Jones Act, 46 App.U.S.C.A. § 688.

**[16] Seamen 348 ☞2**

348 Seamen
    348k2 k. Who Are Seamen. Most Cited Cases

For an employee's duties to contribute to the function of a vessel or to the accomplishment of its mission, as required for the employee to be a seaman protected by the Jones Act, the employee need only show that he does the ship's work; this threshold requirement is very broad, encompassing all who work at sea in the service of a ship. Jones Act, 46 App.U.S.C.A. § 688.

**[17] Seamen 348 ☞2**

348 Seamen
    348k2 k. Who Are Seamen. Most Cited Cases

Oilfield company employee's duties contributed to function of technology vessel or to accomplishment of its mission, as required for employee to be "seaman"

protected by Jones Act, where employee filled one of vessel's crew positions and engaged in vessel's work while on board. Jones Act, 46 App.U.S.C.A. § 688.

**[18] Seamen 348 ☞2**

348 Seamen
    348k2 k. Who Are Seamen. Most Cited Cases

The requirement that a worker must have a substantial connection to a vessel in order to be a seaman covered by the Jones Act is intended to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation. Jones Act, 46 App.U.S.C.A. § 688.

**[19] Seamen 348 ☞2**

348 Seamen
    348k2 k. Who Are Seamen. Most Cited Cases

The total circumstances of an individual's employment must be weighed to determine whether he had a sufficient relation to the navigation of vessels, and the perils attendant thereon, to be a seaman covered by the Jones Act. Jones Act, 46 App.U.S.C.A. § 688.

**[20] Seamen 348 ☞2**

348 Seamen
    348k2 k. Who Are Seamen. Most Cited Cases

The duration of a worker's connection to a vessel and the nature of the worker's activities, taken together, determine whether a maritime employee is a seaman protected by the Jones Act, since the ultimate inquiry is whether the worker in question is a member of the vessel's crew or simply a land-based employee who happens to be working on the vessel at a given time. Jones Act, 46 App.U.S.C.A. § 688.

**[21] Seamen 348 ☞2**

348 Seamen
    348k2 k. Who Are Seamen. Most Cited Cases

The requirement that a worker must have a substantial connection to a vessel in order to be a seaman covered by the Jones Act constitutes a status-based standard, that is, it is not the employee's particular job

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

335 F.3d 376, 2003 A.M.C. 1653
**(Cite as: 335 F.3d 376)**

that is determinative of seaman status, but the employee's connection to a vessel. Jones Act, 46 App.U.S.C.A. § 688.

**[22] Seamen 348 ⚷2**

348 Seamen
   348k2 k. Who Are Seamen. Most Cited Cases
While seaman status under the Jones Act is not simply a temporal concept, the amount of time a worker spends aboard a vessel in navigation is helpful in determining if that worker has attained seaman status. Jones Act, 46 App.U.S.C.A. § 688.

**[23] Seamen 348 ⚷2**

348 Seamen
   348k2 k. Who Are Seamen. Most Cited Cases
As a general rule, a worker must show substantial duration, as required for the worker to be protected as a seaman under the Jones Act, by demonstrating that 30% or more of his time is spent in service of that vessel. Jones Act, 46 App.U.S.C.A. § 688.

**[24] Seamen 348 ⚷2**

348 Seamen
   348k2 k. Who Are Seamen. Most Cited Cases
An employee who has worked for years in an employer's shoreside headquarters and who is then reassigned to a ship in a classic seaman's job qualifies for seaman status under the Jones Act even if he is injured shortly after reassignment. Jones Act, 46 App.U.S.C.A. § 688.

**[25] Seamen 348 ⚷2**

348 Seamen
   348k2 k. Who Are Seamen. Most Cited Cases
A worker who has been reassigned to a land-based job cannot claim seaman status under the Jones Act based on prior service at sea. Jones Act, 46 App.U.S.C.A. § 688.

**[26] Seamen 348 ⚷2**

348 Seamen

348k2 k. Who Are Seamen. Most Cited Cases
A worker who, over the course of his employment, has worked in the service of a vessel in navigation well under 30% of his time may still qualify for seaman status if he has been reassigned to a new position that meets this temporal requirement. Jones Act, 46 App.U.S.C.A. § 688.

**[27] Seamen 348 ⚷2**

348 Seamen
   348k2 k. Who Are Seamen. Most Cited Cases
For an employee to qualify for the protections of the Jones Act as a seaman based upon a reassignment to a new position that meets the requirement that the employee spends 30% of his time in service of a vessel, the employee must undergo a substantial change in status, not simply serve on a boat sporadically; merely serving an assignment on a vessel in navigation does not alter a worker's status. Jones Act, 46 App.U.S.C.A. § 688.

**[28] Seamen 348 ⚷2**

348 Seamen
   348k2 k. Who Are Seamen. Most Cited Cases
Intern employed by oilfield company did not become "seaman" when he was assigned to technological vessel, so as to be protected by Jones Act despite not having spent 30% of his time in service of vessel, where intern's superiors wanted him to gain exposure to various work areas over summer, many of which had nothing to do with navigation, intern was hired to "fill in" for another individual on vessel and told to "learn as much as you can," and intern's assignment to vessel did not alter company's overall plan for intern, consisting almost exclusively of land-based work. Jones Act, 46 App.U.S.C.A. § 688.

**[29] Seamen 348 ⚷29(5.12)**

348 Seamen
   348k29 Personal Injuries
     348k29(5.12) k. Presumptions and Burden of Proof. Most Cited Cases
The Jones Act plaintiff bears the burden of proof for establishing seaman status. Jones Act, 46

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

335 F.3d 376, 2003 A.M.C. 1653
**(Cite as: 335 F.3d 376)**

App.U.S.C.A. § 688.

**[30] Seamen 348 ⟨⟩2**

348 Seamen
   348k2 k. Who Are Seamen. Most Cited Cases
   Fact that employee of oilfield company was given training in offshore work and safety was insufficient to establish that he was "seaman" protected by Jones Act. Jones Act, 46 App.U.S.C.A. § 688.

**[31] Seamen 348 ⟨⟩2**

348 Seamen
   348k2 k. Who Are Seamen. Most Cited Cases
   Fact that employee worked on oil platform did not establish that he was "seaman" covered by Jones Act. Jones Act, 46 App.U.S.C.A. § 688.

**[32] Shipping 354 ⟨⟩1**

354 Shipping
   354I Regulation in General
     354k1 k. What Constitutes a Vessel. Most Cited Cases

**Shipping 354 ⟨⟩84(1)**

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
     354k78 Torts
       354k84 Injuries to Stevedores and Other Independent Contractors and Their Employees
         354k84(1) k. In General; Liability. Most Cited Cases
   Fixed platforms are not "vessels" for purposes of the Jones Act, and workers injured on them are covered under the LHWCA, not the Jones Act. Longshore and Harbor Workers' Compensation Act, § 1 et seq., 33 U.S.C.A. § 901 et seq.; Jones Act, 46 App.U.S.C.A. § 688.

**[33] Seamen 348 ⟨⟩2**

348 Seamen
   348k2 k. Who Are Seamen. Most Cited Cases

Testimony that oilfield company employee was as much a part of vessel's crew as any other person was insufficient to establish that employee was "seaman" protected by Jones Act. Jones Act, 46 App.U.S.C.A. § 688.

**[34] Seamen 348 ⟨⟩2**

348 Seamen
   348k2 k. Who Are Seamen. Most Cited Cases
   Seaman status does not attach to a worker, such that he is protected by the Jones Act, simply because he is necessary to the vessel's mission at the time of injury. Jones Act, 46 App.U.S.C.A. § 688.

**[35] Seamen 348 ⟨⟩2**

348 Seamen
   348k2 k. Who Are Seamen. Most Cited Cases
   Seaman status under the Jones Act is not coextensive with seaman's risks. Jones Act, 46 App.U.S.C.A. § 688.

**[36] Shipping 354 ⟨⟩84(1)**

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
     354k78 Torts
       354k84 Injuries to Stevedores and Other Independent Contractors and Their Employees
         354k84(1) k. In General; Liability. Most Cited Cases
   The standard of vessel negligence under the LHWCA section permitting recovery for such negligence is different from that of negligence under the general maritime law. Longshore and Harbor Workers' Compensation Act, § 5(b), 33 U.S.C.A. § 905(b).

**[37] Shipping 354 ⟨⟩80**

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
     354k78 Torts
       354k80 k. Dangerous or Defective Condition of Vessel or Appliances. Most Cited Cases
   The LHWCA does not permit recovery based upon

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

335 F.3d 376, 2003 A.M.C. 1653
**(Cite as: 335 F.3d 376)**

the doctrine of unseaworthiness. Longshore and Harbor Workers' Compensation Act, § 5(b), 33 U.S.C.A. § 905(b).

**[38] Federal Courts 170B ☞915**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)7 Waiver of Error in Appellate Court
            170Bk915 k. In General. Most Cited Cases
    Employer waived products liability claim against manufacturers of coflex hose and reel assembly installed on vessel, arising from injury of employee, where employer attempted to argue in brief that district court committed reversible error by refusing to allow expert testimony regarding design defects, but employer devoted only one paragraph to such issue, presented little argument, did not cite single case, and did not set forth applicable standard of review.

**\*381** James Parkerson Roy (argued), Jamie D. Parker, Domengeaux, Wright, Roy & Edwards, Lafayette, LA, for Becker.

Cliffe E. Laborde, III (argued), James D'Arensbourg Hollier, Laborde & Neuner, Lafayette, LA, for Tidewater Inc., Twenty Grand Offshore, Inc., Tidewater Marine LLC, Pental Ins. Co., Ltd. and Certain Underwriters at Lloyd's Ins. Co.

Robert Emmett Kerrigan, Jr. (argued), Allen F. Campbell, Joseph Lee McReynolds (argued), Joseph Edward Lee, III, Deutsch, Kerrigan & Stiles, New Orleans, LA, for Baker Hughes Inc., Baker Oil Tools, Inc., Baker Hughes Oilfield Operations, Inc. and Baker Oil Tools.

Douglas C. Longman, Jr. (argued), George Clifford Plauche', Perret Doise, Lafayette, LA, for Hydra Rig.

Paul Joseph Politz, Lynn Louise White, Taylor, Wellons, Politz & Duhe, New Orleans, LA, for Hydradyne Hydraulics, Inc.

Randall K. Theunissen, Arthur I. Robison, Allen & Gooch, Lafayette, LA, for Coflexip Stena Offshore Inc.

Appeals from the United States District Court for the Western District of Louisiana.

Before BENAVIDES, STEWART and CLEMENT, Circuit Judges.

BENAVIDES, Circuit Judge:

    Before the Court are a number of issues stemming from the horrific ordeal of Seth A. Becker, a young man catastrophically injured while at sea on a gravel-packing assignment at an offshore oil rig. In a lawsuit involving multiple defendants and causes of action, the jury sitting in the district court found for plaintiff, awarding him damages in excess of $43 million. A number of issues, the most significant of which being whether plaintiff is a seaman under the Jones Act, 46 U.S.C. app. § 688 (2000), are before this Court on appeal. Because we determine that plaintiff is not a Jones Act seaman, it is unnecessary to address all but one of the remaining issues. Accordingly, the matter must be, and is, remanded to the district court for proceedings not inconsistent with this opinion.

**\*382** I.

    This case concerns injuries sustained while at sea by plaintiff-appellee Seth A. Becker, a 22 year-old who had just finished the fourth year of a five-year program at Montana Tech University, where he was studying mechanical and petroleum engineering. For the summer of 1999, plaintiff accepted a full-time position working for defendant Baker Hughes, Inc. (Baker), as he had done the previous two summers.[FN1]

    FN1. Baker's business encompasses providing a broad range of oilfield services and products to members of the petroleum industry.

    Plaintiff's internship began as the previous two had—plaintiff was assigned to land-based work. Specifically, Baker had planned that plaintiff engage and gain knowledge in a variety of areas over the course of the summer, including oil pumping, screen manufacturing for sand control, repairing fishing tools, and, apparently, foremost, learning directly from Baker's team of regional engineers. Of these activities, only the oil

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

335 F.3d 376, 2003 A.M.C. 1653
**(Cite as: 335 F.3d 376)**

pumping assignments implicated vessels and boating. Still, despite Baker's largely land-based plan for plaintiff, a superior at Baker expressed hopefully that Baker would "try to get [plaintiff] out on a boat" at some point during the summer. Plaintiff spent the first two weeks of the internship working on land in Baker's shop, performing relatively basic tasks such as cleaning and checking equipment that had returned from the field. At a later point, plaintiff was offered the opportunity to observe a gravel-packing operation on a Vastar offshore fixed platform. Before this trip, plaintiff received some brief offshore safety and training information, which included videos, personal instructions, a written safety test, and water survival training. On the trip to the platform, plaintiff was a passenger, although he engaged in work for Baker upon arriving at the platform. As plaintiff returned from this trip, Baker determined that its technology vessel, the M/V REPUBLIC TIDE ("REPUBLIC TIDE") needed two workers to replace two members of the requisite six-person crew who had served at sea for an extended period of time and were in need of time off. Baker assigned plaintiff to the REPUBLIC TIDE, instructing him to "learn as much as you can." Despite plaintiff's intern status, the record reflects that he filled one of the required six positions on the REPUBLIC TIDE, engaged in real work while on-board, and was treated no differently than the other workers on the vessel.

The REPUBLIC TIDE was owned by defendant Tidewater, Inc., but had been time-chartered by Baker to service oil wells during gravel pack operations. Baker had used Tidewater's vessel as its offshore technology pumping vessel since November or December 1998 and had specially modified it, installing tanks, generators, pumps, and a high pressure winch system, which included a hydraulic power unit, reel, hydraulic piping, 300 feet of 6–1/2–inch steel coflex hose, and various other kinds of sophisticated equipment. This equipment, which was owned, operated, and maintained by Baker, permitted Baker to use the REPUBLIC TIDE for high pressure pumping operations competitive with those of other vessels in the Gulf of Mexico.

For this particular mission on the REPUBLIC

TIDE, Baker scheduled a twelve-hour trip to the R&B Falcon/Cliffs Rig 153 ("Cliffs Rig 153"), located in the Gulf of Mexico and owned by defendant Cliffs Drilling Co. and operated by defendant R&B Falcon Drilling USA, Inc. (collectively**\*383** "Falcon"). En route to Cliffs Rig 153, the master of the REPUBLIC TIDE and Tidewater employee, Captain Daniel Givens, provided plaintiff a minimal orientation, which took no more than fifteen minutes and consisted only of the general safety instructions—for instance, the location of life preservers and where to abandon ship.

Things began to go terribly wrong on the first day of the mission. When the REPUBLIC TIDE arrived at Cliffs Rig 153, the vessel was unable to drop anchor successfully and therefore its location had to be maintained using bow-thrusters, a fact of which plaintiff and the other crew members were not notified. To begin preparing for the gravel pack operation aboard the rig, the Baker employees, including plaintiff, unwrapped the REPUBLIC TIDE's coflex hose and ran it from the RE-PUBLIC TIDE to Cliffs Rig 153. Although the winch system to which the hose was connected had a component manufacturer-installed emergency disconnect function, the manner in which the hose had been unwrapped would prevent this mechanism from triggering. There was no other way to disconnect the hose quickly and the record reflects that senior employees of Baker, Tidewater, and Falcon all recognized this potential danger.

To perform work on the rig, the Baker crew was lifted in a basket up to the rig floor. Shortly thereafter, the REPUBLIC TIDE lost its bow-thrust and it became uncertain how long the vessel could hold its position. As a result, the coflex hose needed to be disconnected from the rig, and plaintiff and two other Baker employees were ordered to leave the rig floor and go to the main deck to perform this task. As plaintiff attempted to knock the coflex hose's connections loose, the REPUB-LIC TIDE began to move.

Second-in-command on the REPUBLIC TIDE, Captain Steven Lachney, was at the helm as the vessel drifted. With the stern moored to the rig by two six-inch ropes, Captain Lachney saw the six-inch rope tied to the port stern snap. Without warning anyone, Captain Lach-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

335 F.3d 376, 2003 A.M.C. 1653
**(Cite as: 335 F.3d 376)**

ney powered the port engine in reverse and the starboard engine in forward, causing the six-inch rope tied to the starboard stern also to snap. This, in turn, caused the REPUBLIC TIDE to surge away from the rig, jerking the coflex hose tight and pinning plaintiff against the catwalk backstop. The REPUBLIC TIDE continued to swing in the strong current and the thick coflex hose, which had pinned plaintiff, began sawing through his legs to the point that they were almost entirely severed from his body. After sustaining this injury and losing nine pints of blood, plaintiff, who had remained conscious throughout the ordeal, was evacuated.

Plaintiff spent six weeks in the hospital, where he almost died. The parties stipulated that plaintiff's total medical bills—including those incurred during his hospital stay—amounted to $487,920.48. During the time at the hospital, plaintiff's legs were amputated below the knee, leaving a great deal of scar tissue. Furthermore, plaintiff endured bone infections and will require additional surgeries on his legs, potentially culminating with above-the-knee amputations, which will exacerbate plaintiff's condition considerably. As a result of this accident, plaintiff suffers from post-traumatic stress disorder, chronic pain disorder, depression, low self-esteem, phantom pain, stump pain, neuropsychological, psychological, and emotional problems, short-term memory loss, concentration problems, sleep disturbances, and permanent brain damage due to his heavy loss of blood after the accident. Most, if not all, of these debilitations will persist and require ongoing treatment, counseling,**384** and medication for the remainder of plaintiff's life, which doctors have projected will last into his seventies.

Plaintiff subsequently sued Baker pursuant to the Jones Act, 46 U.S.C. app. § 688 and, in the alternative, the Longshore and Harbor Workers' Compensation Act (LHWCA). 33 U.S.C. §§ 901–950 (2001). Plaintiff also filed suit against Tidewater, alleging a negligence claim under general maritime law and, in the alternative, under the LHWCA. Plaintiff also claimed that the REPUBLIC TIDE was an unseaworthy vessel. Plaintiff further asserted negligence claims under general maritime law against Falcon. Tidewater and two of its affili-

ates then asserted a third-party demand against Baker for contractual indemnity and defense under a pre-existing blanket charter agreement. Baker opposed Tidewater's motion on the ground that the agreement did not contemplate indemnity for Tidewater's gross negligence. Prior to the completion of discovery, the district court granted Tidewater's motion for summary judgment on its indemnity claim against Baker.

Plaintiff later amended his complaint to add as defendants Tidewater's underwriters, Pental Insurance Co. Ltd. and certain underwriters at Lloyd's ("Underwriters"). The Underwriters cross-claimed and filed a motion for summary judgment against Baker, asserting the same indemnity rights as Tidewater under the blanket time charter, which motion was granted.FN2 Baker also filed a motion for summary judgment on the issue of plaintiff's seaman status, which motion was denied. Notwithstanding the district court's rulings to the contrary, Baker persisted in its refusal to defend and indemnify Tidewater and the Underwriters, and continued to fight application of the agreement's indemnity clause. Thus, Tidewater defended itself at trial, during which Baker attempted to prove Tidewater's gross negligence so as to avoid indemnification.

> FN2. At the time the Underwriters filed their motion, evidence had emerged in discovery that allegedly implicated Tidewater's gross negligence. Baker opposed the Underwriters' motion on the ground that Tidewater's gross negligence was still a disputed issue of material fact.

Faced with indemnifying Tidewater's liability, Baker filed third-party demands for products liability against Hydra Rig and Hydradyne Hydraulics for defects in the manufacture of the coflex hose and reel assembly installed on the REPUBLIC TIDE. Plaintiff then amended his complaint to assert similar product liability claims against these companies, and against Coflexip Stena Offshore, Inc., the manufacturer of the coflex hose (collectively, "component manufacturers").

In the parties' joint submission of requested jury charges, Baker requested an instruction on the issue of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

335 F.3d 376, 2003 A.M.C. 1653
**(Cite as: 335 F.3d 376)**

gross negligence, which was rejected. Baker also filed a motion asking the district court to reconsider the summary judgments granted to Tidewater and the Underwriters and urged its request for a jury charge on gross negligence. Again, this motion was denied. Baker also interposed a written objection to the line of the proposed verdict form allowing the jury to allot a separate amount of damages for "disfigurement and scarring," which objection was ultimately denied.

Over the course of trial, a number of other disputes arose, including that concerning the testimony of Jamie Parr, Baker's operations coordinator, as a witness for plaintiff's case-in-chief. The district court excluded testimony given by Parr as to what plaintiff's duties would be after the trip to the Cliffs Rig 153, because Parr admitted that he had no firsthand knowledge**385** about Baker's future plans for plaintiff and also because Parr could not testify with certainty about the scope of plaintiff's future duties. Also controversial was the testimony of Captain Ronald Campana, an expert in vessel operations and boat-handling. The court refused to allow a portion of Campana's report that Tidewater's senior employee, Ronald Frederick, had been "grossly negligent in the performance of his duties," because he determined that such a statement invaded the jury's ability to decide an ultimate issue.

All parties stipulated that plaintiff was an innocent victim and free from all fault. At the close of plaintiff's case, Baker moved for judgment as a matter of law on the issue of plaintiff's seaman status, which motion was denied. At the close of all evidence, the court bifurcated the issues. The jury was asked first to decide whether plaintiff was a seaman under the Jones Act. It determined that plaintiff indeed was a seaman. Once this threshold determination was made, the remaining jury instructions regarding liability and damages reflected that plaintiff was a seaman and did not contemplate the alternate theories of recovery that plaintiff pled, such as those under the LHWCA. The jury then found that Baker was negligent under the Jones Act, the REPUBLIC TIDE was unseaworthy and a substantial cause of plaintiff's injuries and that Tidewater and Falcon were negligent under general maritime law. The jury assigned 65 percent of the fault to Baker, 30 percent to Tidewater, and 5 percent of Falcon, although the parties were held to be jointly and severally liable. The jury found further that Coflexip, Hydradyne, and Hydrarig did not manufacture a defective product and thus bore plaintiff no liability. The court also concluded that these companies were not liable to Baker.

The jury then awarded plaintiff $29 million in general damages, including $7 million for disfigurement and scarring.[FN3] The jury also awarded plaintiff $11 million in future medical and life care expenses, $3 million in future lost wages, and $56,000 in past lost wages. Judgment was entered in favor of plaintiff on the jury verdict and in favor of Tidewater and the Underwriters on the contractual indemnity claim. Baker timely moved for a new trial, or remittitur, arguing that the district court erred in ordering Baker to indemnify Tidewater and the Underwriters, and that the award of damages was excessive and constituted an abuse of discretion. These motions were denied. The judgment was later amended to include judicial interest.

[FN3.] The breakdown for general damages was as follows:

|  |  |
|---|---|
| —past physical pain and suffering, including physical disability and impairment, past loss of enjoyment of life and inconvenience on the normal pursuits and pleasures of life | $5,000,000 |
| —future physical pain and suffering, including physical disability and impairment, future loss of enjoyment of life and the effects of the injuries and inconvenience on the normal pursuits and pleasures of life | $6,000,000 |
| —past mental anguish and suffering, as well as feelings of economic insecurity | $5,000,000 |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

335 F.3d 376, 2003 A.M.C. 1653
**(Cite as: 335 F.3d 376)**

caused by disability

—future mental anguish and suffering, as well as feelings of economic insecurity caused by disability $6,000,000

—disfigurement and scarring $7,000,000.

Presented for appeal are the following five issues:

(a) whether the district court erred in assigning plaintiff seaman status under the Jones Act;

(b) whether the district court erred in determining that there was sufficient **386** evidence for finding Falcon 5 percent liable;

(c) whether the district court erred by not remitting the jury's damages award;

(d) whether the district court erred by finding no fault in the component manufacturers' conduct; and

(e) whether the district court erred by determining that Baker must indemnify Tidewater.

## II.
### A.

[1][2] The threshold issue brought forth on this appeal is whether plaintiff is a seaman under the terms of the Jones Act, codified at 46 U.S.C. app. § 688. Specifically, at issue is whether the district court erred by allowing the jury to decide whether plaintiff is a seaman, and thus entitled to protection under the Jones Act, or whether he is a longshoreman and therefore under the auspices of the Longshore and Harbor Workers' Compensation Act (LHWCA), codified at 33 U.S.C. §§ 901–950. It is well-settled that the Jones Act and the LHWCA are "mutually exclusive compensation regimes." *Harbor Tug and Barge Co. v. Papai,* 520 U.S. 548, 553, 117 S.Ct. 1535, 137 L.Ed.2d 800 (1997). *See also Chandris, Inc. v. Latsis,* 515 U.S. 347, 355–56, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). That is, if plaintiff satisfies the criteria for being a seaman, he is covered by the Jones Act and not the LHWCA; if he does not, he is protected only by the LHWCA. *See id.* at 355–58, 115 S.Ct. 2172.

[3][4][5] Although determination of whether an in-

jured worker is a seaman under the Jones Act is a mixed question of law and fact and it is usually inappropriate to take the question from the jury, judgment as a matter of law is mandated where the facts and the law will reasonably support only one conclusion. *See Papai,* 520 U.S. at 554, 117 S.Ct. 1535. Here, plaintiff maintains that the issue of his seaman status was properly given to the jury. On the other hand, Baker asserts that plaintiff, as a matter of law, is not a seaman under the Jones Act and that plaintiff should be permitted to proceed only under the LHWCA.[FN4]

> FN4. Plaintiff contends that Baker has waived the argument that he is not a seaman as a matter of law by admitting, in response to plaintiff's post-trial motion for judgment, that seaman status was an issue of fact for the jury to determine. Any such statements, however, were uttered after the district court informed counsel that either it would hold that plaintiff is a seaman as a matter of law or the issue would go to the jury. After this choice was presented, Baker naturally argued, for the sake of that argument, that the issue of seaman status was a jury issue. Given this, and the fact that, with respect to this issue, Baker (i) filed a motion for summary judgment, (ii) moved for judgment as a matter of law at the close of plaintiff's case and at the close of all the evidence, and (iii) moved for judgment notwithstanding the verdict, Baker has preserved this argument. In any event, this Court is not required to treat any purported concession as binding, and we would choose not to do so here. *See Pool Co. v. Cooper,* 274 F.3d 173, 185 (5th Cir.2001).

[6][7][8] A brief summary of the two statutes' provisions and remedial schemes explains the litigation posture of the parties, particularly the cross-claims of the defendants, in this case. The Jones Act provides a cause of action permitting unlimited damages against

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

335 F.3d 376, 2003 A.M.C. 1653
(Cite as: 335 F.3d 376)

the negligence of a plaintiff's employer. *Ferguson v. Moore–McCormack Lines,* 352 U.S. 521, 522–23, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957). Specifically, the act provides that "[a]ny seaman who shall suffer personal injury in the course of his employment may ... maintain an action for damages at law ..., and in such action all statutes of the United **\*387** States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply...." 46 U.S.C. app. § 688(a). A Jones Act seaman may also sue the owner of any vessel on which he is working for a breach of the warranty of seaworthiness, regardless of whether the vessel is owned by his employer. *Parks v. Dowell Div. of Dow Chem. Corp.,* 712 F.2d 154, 156–58 (5th Cir.1983). Finally, a Jones Act seaman may also sue third parties for general maritime law negligence. *Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 498, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971).

[9][10][11][12][13][14] In contrast, the LHWCA provides a cause of action for injuries sustained by a broad range of land-based maritime workers, excluding seamen covered by the Jones Act. *See Chandris,* 515 U.S. at 356, 115 S.Ct. 2172. First, the LHWCA provides a no-fault workers' compensation scheme against a worker's employer for the death or disability of anyone engaged in maritime employment to receive medical costs, 33 U.S.C. § 907(a), prejudgment interest, *id.* § 905, and two-thirds of the worker's salary for as long as the disability persists. *Id.* § 908(a). Second, the LHWCA permits a restrictive theory of negligence against a vessel as a third party to recover damages for injuries caused by vessel negligence. 33 U.S.C. § 905(b). *See also Scindia Steam Nav. Co., Ltd. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981); Joseph D. Cheavens, *Terminal Workers' Injury and Death Claims,* 64 Tulane L. Rev. 361, 364 (1989).FN5 An LHWCA plaintiff may also sue nonvessel third parties under general maritime law tort principles. *Melerine v. Avondale Shipyards,* 659 F.2d 706, 708 (5th Cir.1981); *see also Harrison v. Flota Mercante Grancolombiana, S.A.,* 577 F.2d 968, 977 (5th Cir.1978).FN6 An LHWCA worker, unlike a Jones Act seaman, does not have a cause of action for unseaworthiness. *See* 33 U.S.C. § 905(b). *See also Cooper Stevedoring Co. v.*

*Fritz Kopke, Inc.,* 417 U.S. 106, 113 n. 6, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974) (Under the LHWCA, "an employee injured on a vessel can bring an action against the vessel for negligence, but the vessel's liability will not be based upon the warranty of seaworthiness or breach thereof."). Thus, whether plaintiff is a seaman determines which statutory scheme applies and, ultimately, the degree and extent to which each defendant may be liable.

FN5. The LHWCA also provides for recovery against a worker's employer for vessel negligence if that employer is also deemed to be such. *See* 33 U.S.C. § 905(b); *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983).

FN6. Recovery pursuant to general maritime law is available only from defendants outside the scope of the LHWCA's statutory scheme. *See* 33 U.S.C. § 905(b); *see also* 1 Thomas J. Schoenbaum, Admiralty and Maritime Law 156 & n.13 (2d ed.1994) (noting that those covered by the LHWCA can only use general maritime law for claims against those outside the realm of the statute).

[15] To determine if an individual worker is a seaman, and therefore entitled to the protections of the Jones Act, the Supreme Court has established a two-prong test. First, "an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission." *Chandris,* 515 U.S. at 368, 115 S.Ct. 2172. Second, "a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both duration and nature." *Id.*

[16][17] The Supreme Court in *Chandris* admitted that satisfying the first prong of the test is relatively easy: the **\*388** claimant need only show that he "do[es] the ship's work." *Id. See also In re Endeavor Marine, Inc.,* 234 F.3d 287, 290 (5th Cir.2000). This threshold requirement is "very broad," encompassing "all who work at sea in the service of a ship." *Chandris,* 515 U.S. at 368, 115 S.Ct. 2172 (internal citations and quotation

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

335 F.3d 376, 2003 A.M.C. 1653
**(Cite as: 335 F.3d 376)**

marks omitted). Here, it is clear that plaintiff satisfies this threshold requirement: he filled one of the REPUBLIC TIDE's crew positions and engaged in the vessel's work while on board. Plaintiff, therefore, clears this initial Jones Act hurdle.

[18][19][20][21] Turning to the second prong—whether plaintiff has a connection to a vessel in navigation that is substantial both in duration and nature—it is undisputed that the REPUBLIC TIDE is a vessel in navigation. The only remaining question, then, is whether plaintiff's connection to the REPUBLIC TIDE is substantial in duration and nature, therefore warranting coverage under the Jones Act. *See id.* Put differently, whether the jury erred in determining that plaintiff was a seaman turns on whether it had sufficient evidence before it to conclude that plaintiff was substantially connected to the REPUBLIC TIDE. The requirement of a substantial connection to a vessel is intended "to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation." *Id.* As the Supreme Court has noted,

> the total circumstances of an individual's employment must be weighed to determine whether he had a sufficient relation to the navigation of the vessels and the perils attendant thereon. The duration of the worker's connection to a vessel and the nature of the worker's activities taken together, determine whether a maritime employee is a seaman because the ultimate inquiry is whether the worker in question is a member of the vessel's crew or simply a land-based employee who happens to be working on the vessel at a given time.

*Id.* at 370, 115 S.Ct. 2172 (internal citations and quotation marks omitted). Importantly, this second prong constitutes a "status-based" standard—*i.e.*, "it is not the employee's particular job that is determinative [of seaman status], but the employee's connection to a vessel." *Id.* at 364, 115 S.Ct. 2172. As a result, the Court speculated that under this standard even a ship repairman, who may know nothing about boating or sailing, could qualify as a seaman. *Id.* at 363–64, 115

S.Ct. 2172. The Court expounded on this status-centric language in *Papai,* 520 U.S. at 555, 117 S.Ct. 1535, noting that it matters whether "the employee's duties take him to sea" and that the Jones Act's coverage is confined to "those workers who face *regular* exposure to the perils of the sea." *Id.* at 560, 117 S.Ct. 1535 (emphasis added). By invoking a status-based standard, the Court rejected, both explicitly and by necessary implication, a so-called "voyage test" in which "anyone working on board a vessel for the duration of a 'voyage' in furtherance of the vessel's mission has the necessary employment-related connection to qualify as a seaman." *Chandris,* 515 U.S. at 358, 115 S.Ct. 2172.

[22][23][24][25][26] While seaman status is not simply a temporal concept, the amount of time a worker spends aboard a vessel in navigation is helpful in determining if that worker has attained seaman status. *See id.* at 371, 115 S.Ct. 2172. This circuit has quantified the duration of time necessary to allow submission of the issue of seaman status to a jury by using a 30 percent rule of thumb. "[A]s a general rule, [a worker] must show [substantial duration] by demonstrating that 30 percent or more of his **\*389** time is spent in service of that vessel." *Roberts v. Cardinal Servs. Inc.,* 266 F.3d 368, 375 (5th Cir.2001). The Supreme Court endorsed this thirty-percent rule:

> Generally, the Fifth Circuit seems to have identified an appropriate rule of thumb for the ordinary case: A worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act. This figure of course serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases.... And where undisputed facts reveal that a maritime worker has a clearly inadequate temporal connection to vessels in navigation, the court may take the question from the jury by granting summary judgment or a directed verdict.

*Chandris,* 515 U.S. at 371, 115 S.Ct. 2172.[FN7] Importantly, the Supreme Court has articulated an exception to temporal guidelines, such as our thirty-percent benchmark. *Id.* at 372, 115 S.Ct. 2172. First, an employ-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

335 F.3d 376, 2003 A.M.C. 1653
**(Cite as: 335 F.3d 376)**

ee who has worked for years in an employer's shoreside headquarters and who is then reassigned to a ship in a classic seaman's job qualifies for seaman status even if he is injured shortly after reassignment. *Id.* Second, a worker who has been reassigned to a land-based job cannot claim seaman status based on prior service at sea. *Id.* The Court summed up these two exceptions by noting that "[i]f a maritime employee receives a new work assignment in which his essential duties are changed, he is entitled to have the assessment of the substantiality of his vessel-related work made on the basis of his activities in his new position." *Id.* Thus, a worker who, over the course of his employment, has worked in the service of a vessel in navigation well under thirty percent of his time may still qualify for seaman status if he has been reassigned to a new position that meets this temporal requirement. *See id.* It is this exception that plaintiff now tries to utilize, claiming that his assignment to the REPUBLIC TIDE constituted the requisite fundamental change in his status.

> FN7. After *Chandris,* this circuit reaffirmed the 30–percent rule. In *Nunez v. B&B Dredging, Inc.,* 288 F.3d 271, 277 (5th Cir.2002), it was held that because the plaintiff spent only approximately 10 percent of his work time aboard a vessel in navigation, he did not qualify for seaman status as a matter of law.

[27] This exception, however, creates a potential problem: any worker who works intermittently on vessels in navigation and who sustains an injury in the course of doing so will claim seaman status if he is injured while at sea. For instance, a worker whose duties sometimes take him to sea could claim that the start of each voyage establishes a reassignment to a sea-based position and that his return to shore again shifts his status back to a land-based worker. It appears that the Supreme Court attempted to preempt such arguments by specifically rejecting a "voyage test" of seaman status under which a worker could "walk into and out of coverage in the course of his regular duties." *Id.* at 363, 115 S.Ct. 2172 (citing *Barrett v. Chevron, U.S.A., Inc.,* 781 F.2d 1067, 1075 (5th Cir.1986)). Rather, the Court's opinion in *Chandris* contemplates that a change in cov-

erage under the Jones Act occurs only when the status of the worker changes, not simply because a worker happens to serve on a vessel before returning to work on land. *See Chandris,* 515 U.S. at 363, 115 S.Ct. 2172. Thus, for plaintiff to qualify for the Jones Act's protections, he must have undergone a substantial change in status, not simply serve on a boat sporadically. To give teeth to the *Chandris* opinion's rejection of a voyage **\*390** test, it must be held that merely serving an assignment on a vessel in navigation does not alter a worker's status. If that were not the case, *Chandris* in fact *would* have established a voyage test. This conclusion is consistent with the language of *Chandris,* which instructs that "we do not believe that any maritime worker on a ship at sea as part of his employment is automatically a member of the crew within the meaning of the statutory scheme." *Id.* at 358, 115 S.Ct. 2172.

[28][29] Plaintiff attempts to fit himself into the first *Chandris* exception to the Fifth Circuit's general 30 percent temporal requirement. As plaintiff bears the burden of proof for establishing seaman status, he accordingly must show that he fits within the framework of *Chandris.* FN8 He argues that although in the past he did not work on sea vessels at all (let alone for 30 percent of his time), he was assigned to the REPUBLIC TIDE and, at that point, underwent a change in status and became a seaman. If we are to be persuaded by this theory, we would need to conclude that (i) when plaintiff was assigned to the REPUBLIC TIDE, he was removed from his former position of land-based intern and assigned to a new, sea-based position, (ii) this reassignment permanently changed his status, and (iii) by serving in this new position, plaintiff would spend at least 30% of his time aboard a vessel.

> FN8. *See Barrett v. Chevron, U.S.A., Inc.,* 752 F.2d 129, 132 (5th Cir.1985) ("An injured person claiming the benefits of the Jones Act, 46 App.U.S.C. § 688 (1976), has the burden of establishing seaman status.") (citing *Bernard v. Binnings Const. Co., Inc.,* 741 F.2d 824 (5th Cir.1984); *Billings v. Chevron U.S.A. Inc.,* 618 F.2d 1108, 1109 (5th Cir.1980)).

On this record, the evidence is insufficient for a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

335 F.3d 376, 2003 A.M.C. 1653
**(Cite as: 335 F.3d 376)**

finder of fact to conclude that plaintiff has proven his status at Baker fundamentally changed when he was assigned to the REPUBLIC TIDE. As such, no reasonable jury could conclude that, under Supreme Court and Fifth Circuit precedent, plaintiff is a Jones Act seaman. Indeed, the record indicates that the superiors at Baker had planned that plaintiff would gain exposure to a number of areas over the course of the summer, including oil pumping, screen manufacturing for sand control, fishing tools, and, apparently foremost, learning directly from regional engineers. The latter three of these duties, by plaintiff's own admission, have nothing to do with being on a vessel in navigation. Furthermore, the testimony indicates that plaintiff's assignment to the REPUBLIC TIDE was not a fundamental change in status, but rather an opportunity presented to him during the course of the internship. Indeed, plaintiff testified that his superiors at Baker "would try to get me out on a boat." And, when the REPUBLIC TIDE needed two men to replace two other workers who had been working for too many hours, plaintiff was assigned to fill in, being told to "learn as much as you can." Thus, the record paints a picture that plaintiff's placement onboard the REPUBLIC TIDE was one of many activities to take place during the course of the summer. And, while it is impossible to know with complete certainty how events would have unfolded had plaintiff not suffered this terrible accident, there is absolutely no evidence that plaintiff's assignment served to alter Baker's overall plan for him, which comprised land-based work almost exclusively. Thus, plaintiff cannot carry his burden that he was reassigned from his job as a summer engineering intern to a regular and continuous sea-based employment position aboard the REPUBLIC TIDE.

[30] This conclusion withstands plaintiff's arguments to the contrary. In support**391** of plaintiff's assertion that he is a seaman, plaintiff notes (1) his participation in an offshore training and safety course, (2) a one-day visit to a Vastar platform, (3) testimony that on his trip to the Falcon rig for the gravel-pack job he was as much a member of the crew of the REPUBLIC TIDE as anyone else, and (4) his work aboard the vessel during the job. None of these arguments furthers plaintiff's assertion that his status had changed and that he became

a Jones Act seaman. First, evidence that plaintiff was given training in offshore work and safety is not sufficient to establish seaman status. Even temporary workers have to be trained if they are expected to assist in the function or mission of the vessel. The idea that receiving training would create seaman status is inconsistent with the demands of *Chandris,* which holds that merely serving aboard a boat is not sufficient, in itself, to warrant seaman status. *See Chandris,* 515 U.S. at 361, 115 S.Ct. 2172. And, one could contemplate situations in which individuals who are clearly not seamen—such as observers or guests—aboard a vessel would receive some safety training. Plaintiff's receiving safety training is therefore insufficient to establish seaman status.

[31][32][33][34] Second, plaintiff's work on the Vastar platform does not establish seaman status. Fixed platforms are not vessels, and workers injured on them are covered under the LHWCA, not the Jones Act. *See, e.g., Demette v. Falcon Drilling Co.,* 280 F.3d 492 (5th Cir.2002). Third, testimony that plaintiff was as much a part of the crew as any other person is insufficient to establish seaman status. Seaman status does not attach to a worker simply because he is necessary to the vessel's mission at the time of injury. *See Chandris,* 515 U.S. at 358, 115 S.Ct. 2172. *Chandris* holds that temporary workers are not seamen, although such workers may be treated as regular crew members by their peers. *See id.*

Finally, the mere fact that plaintiff was ordered to work a crew position aboard the REPUBLIC TIDE is not sufficient as a matter of law to establish a substantial connection to that vessel, absent evidence that his essential duties as an intern had changed. *See Chandris,* 515 U.S. at 358, 115 S.Ct. 2172 (rejecting a "voyage test" under which anyone working on board a vessel for the duration of the voyage in furtherance of the vessel's mission would have necessary employment-related connection to qualify as seaman). Indeed, there is no evidence that plaintiff's planned activities were permanently changed or that his essential duties as an intern had been altered by his assignment to the REPUBLIC TIDE. Plaintiff's mission aboard the REPUBLIC TIDE was in fact neither planned nor permanent, despite the fact that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

335 F.3d 376, 2003 A.M.C. 1653
**(Cite as: 335 F.3d 376)**

he served as a necessary member of the crew and engaged in Baker's work. Rather, plaintiff's position on the REPUBLIC TIDE arose by happenstance, to relieve two weary workers who needed rest. In light of the work plaintiff performed over his previous summer internships with Baker, and the work planned for him that summer, plaintiff's work aboard the REPUBLIC TIDE does not constitute the kind of regular or continuous commitment of his labor to the service of that vessel that regularly exposed him to the perils of the sea within the meaning of *Chandris.*

Although it could be argued that plaintiff's merely being assigned to the REPUBLIC TIDE is evidence enough from which a reasonable jury could conclude that his status had changed, this argument fails for two reasons. First, it is clear from the record that Baker's plan for plaintiff may have included his being placed on a boat. Thus, plaintiff's assignment to the REPUBLIC TIDE would not necessitate that the structure of plaintiff's **\*392** largely land-based internship had been fundamentally altered. Second, if plaintiff's assignment to the REPUBLIC TIDE constitutes sufficient evidence to conclude that plaintiff's status had changed, then the burden of proof would effectively be placed on defendants to prove that plaintiff would be transferred away from the vessel and that the assignment was only temporary, rather than requiring plaintiff to show that his status had changed. Such an outcome would be inconsistent with *Barrett,* which assigns the burden of proof to the plaintiff. *See Barrett,* 752 F.2d at 132.

Finally, this case is clearly distinguishable from our holding in *Manuel v. P.A.W. Drilling & Well Service, Inc.,* 135 F.3d 344, 352 (5th Cir.1998). In *Manuel,* the plaintiff was injured while working full-time on defendant's vessel, as he had done for the duration of his employment with the defendant. There, the defendant claimed that because it was *possible* that the plaintiff might have been transferred to a land-based position at some point in the future, he could not be a Jones Act seaman. We rejected the defendant's argument, establishing that merely being "subject to reassignment [to a non-seaman role or status] ... at some later time is of no moment" and does not in itself defeat a worker's prayer

for seaman status. *Id.* Put differently, an employer's claim that an employee "could have been assigned to other work locations" does not preclude that employee's seaman status. *Id.* The facts here are distinguishable from those in *Manuel.* Here, plaintiff had engaged, and was scheduled to engage, in primarily land-based activities during the course of his employment at Baker. In short, plaintiff was a land-based worker who happened to be assigned to a mission on a vessel; he was not a sea-based worker, like the plaintiff in *Manuel,* whose only connection to land-based employment was the mere possibility of being transferred to such a position at an indeterminate future date.[FN9]

> FN9. Also at issue in this appeal is whether the district court properly excluded as speculative some of the testimony of Jamie Parr, Baker's operations coordinator, specifically Parr's claim that plaintiff's appointment to the REPUBLIC TIDE was temporary. In the testimony that was excluded, Parr explained that workers were assigned to the crew position filled by plaintiff on a rotation system, and the practice was for them to leave the boat when the job was finished and return to the district office. It was possible that plaintiff might have been reassigned to another vessel later, but only if his name happened to be placed at the top of the rotation schedule. Because Parr could not say with certainty that plaintiff would not have returned to the vessel in the future and because Parr could not testify with certainty about the scope of plaintiff's future duties, the district court excluded this testimony as speculation.

> Plaintiff and Tidewater agree with the district court that this testimony was speculative because Parr could not testify with absolute certainty whether plaintiff would be sent back on a vessel or not. On the other hand, Baker notes that testimony about future events is not inadmissable unless it rises to the level of "dubious projections into the future or questionable surmises about what might have happened had the facts been dif-

© 2011 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

ferent." 1 McCormick on Evidence § 185. As the operations coordinator, responsible for assigning workers on the REPUBLIC TIDE, Parr would appear to have the requisite knowledge and foundation to testify about Baker's scheduling practices. His testimony was relevant and probative evidence under Rule 406, Fed.R.Evid., bearing on the total circumstances surrounding plaintiff's employment-connection to a vessel. Parr's excluded testimony supports the reasonable inference that plaintiff's assignment to the RE-PUBLIC TIDE, and to Baker's fleet generally, was only temporary, and not substantial in duration, regular, or continuous. Accordingly, it would appear that the district court should not have excluded such testimony.

We need not find error here, however, because Parr's excluded testimony tends to prove that plaintiff is not a seaman. And, as we have concluded that plaintiff is indeed not a seaman, such excluded testimony becomes superfluous.

[35] Thus, circuit precedent and the Supreme Court's holdings in *Chandris* and *393 *Papai* require the determination that plaintiff is not a seaman as a matter of law under the Jones Act. A reasoned review of the evidence compels only the conclusion that plaintiff was a land-based worker who had been assigned to a mission on a vessel at sea. And, merely serving on such a voyage does not warrant Jones Act protection. Reaching this conclusion does not mean that plaintiff was not a valued employee who engaged in difficult and, unfortunately, dangerous work. While it is all too apparent that plaintiff was exposed to the risks of working at sea, our precedent nevertheless instructs that "[s]eaman status is not coextensive with seaman's risks." *Chandris,* 515 U.S. at 361, 115 S.Ct. 2172 (citing *Easley v. Southern Shipbuilding Corp.,* 965 F.2d 1, 4–5 (5th Cir.1992)). Accordingly, the district court erred in allowing the issue of plaintiff's seaman status under the Jones Act go to the jury. Rather, because plaintiff is not a seaman under the Jones Act, the jury's finding to the contrary was

improper.

### B.

[36][37] The next question, then, is how to proceed after having determined that the district judge improperly permitted the jury to determine the issue of seaman status. As this matter should have proceeded as an LH-WCA claim, rather than as a Jones Act claim, the district court must reevaluate plaintiff's claims in light of the rights and remedies available to LHWCA plaintiffs with respect to both liability and damages, keeping in mind the appropriate theories of recovery and the applicable standards of negligence. FN10 It is, therefore, necessary to vacate the findings of liability against Baker, Tidewater, and Falcon, as the jury's instructions on liability and damages did not contemplate plaintiff's status as an LHWCA worker rather than a Jones Act seaman. Accordingly, this matter must be remanded for proceedings not inconsistent with this opinion.

FN10. For instance, the LHWCA provides recovery pursuant to a no-fault compensation scheme against a plaintiff's employer. *See* 33 U.S.C. § 901 *et seq.* Furthermore, as Section 905(b) of the LHWCA permits recovery for vessel negligence, the district court will have to determine which defendant—or defendants—may be liable under this theory of negligence, rather than under other negligence doctrines such as that of general maritime law. Note that the standard of vessel negligence pursuant to Section 905(b) is different from that of negligence under the general maritime law. *See Pimental v. LTD Canadian Pacific Bulk,* 965 F.2d 13, 15 (5th Cir.1992); *Melerine v. Avondale Shipyards, Inc.,* 659 F.2d 706, 708 (5th Cir.1981). Moreover, the LHWCA does not permit recovery based upon the doctrine of unseaworthiness. *See* 33 U.S.C. § 905(b). *See also Cooper Stevedoring Co. v. Fritz Kopke, Inc.,* 417 U.S. 106, 113 n. 6, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974).

### C.

[38] As the issue of liability and damages with respect to Baker, Tidewater, and Falcon should be vacated

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

335 F.3d 376, 2003 A.M.C. 1653
**(Cite as: 335 F.3d 376)**

and remanded to the district court, only one of the remaining four issues on appeal need be addressed, FN11 namely, whether the component manufacturers are liable to Baker. As an *394 initial matter, it appears that Baker has waived any such claim against these parties. In its brief, Baker attempts to argue that the district court committed reversible error by refusing to allow expert testimony regarding design defects. Baker's brief, however, devotes only one paragraph to the issue and presents little, if any, in the way of argument. Baker asserts only that the district court's refusal to allow its expert to testify regarding alleged design defects in the reel and hose assembly was "reversible error," depriving Baker of "substantial rights as a litigant." Baker does not cite a single case in support of its position nor does it set forth the applicable standard of review. Baker's brief further provides no discussion explaining why the district court's determination constitutes reversible error. Furthermore, Baker does not clarify its claim that it was "deprived of substantial rights as a litigant," leaving the component manufacturers—and this Court—to speculate about the nature of the issues to be addressed. It appears clear that this argument has not been adequately raised and, as such, is deemed waived. See *Hidden Oaks Ltd. v. City of Austin,* 138 F.3d 1036, 1045 (5th Cir.1998); *Melton v. Teachers Insurance and Annuity Ass'n of America,* 114 F.3d 557, 561 (5th Cir.1997).

FN11. The other three issues on appeal need not be addressed for the following reasons. First, the issue whether the jury had sufficient evidence to conclude that Falcon was negligent under general maritime law and therefore 5 percent accountable for plaintiff's injuries is now moot because the determination that plaintiff is a seaman was erroneous. Accordingly, Falcon, the owner of Cliffs Rig 153, may have to be pursued under the terms of Section 905(b) of the LHWCA for vessel negligence, not under general maritime law. Second, now that it is established that the LHWCA governs, the question whether Baker must indemnify Tidewater must be considered anew, consistent with the statutory scheme articulated in 33

U.S.C. § 905(b)-(c), given that we have vacated the defendants' liability and it has yet to be determined which defendant, or defendants, may be liable to this plaintiff under the terms of the LHWCA. Also yet to be determined is whether the evidence will show proof of gross negligence by any of the defendants. Finally, the question of whether damages should be remitted is rendered moot as the liability of Baker, Tidewater, and Falcon has been vacated.

III.

Thus, we reverse the district court's decision allowing the jury to determine whether plaintiff is a Jones Act seaman and hold that plaintiff is not a seaman as a matter of law. Accordingly, we vacate the findings of liability and damages with respect to Baker, Tidewater, and Falcon and remand this case to the district court so that the matter may proceed as an LHWCA case in a manner not inconsistent with this opinion. FN12 We affirm the determination that the component manufacturers are not liable to Baker. These holdings render moot all other remaining issues on appeal.

FN12. Accordingly, the motion filed by Falcon seeking permission to file a supplemental brief that pertains to damages issues is dismissed as moot.

C.A.5 (La.),2003.
Becker v. Tidewater, Inc.
335 F.3d 376, 2003 A.M.C. 1653

END OF DOCUMENT

405 F.3d 257, 2005 A.M.C. 1113, 61 Fed.R.Serv.3d 432
**(Cite as: 405 F.3d 257)**

United States Court of Appeals,
Fifth Circuit.
Seth A. BECKER, Plaintiff-Appellee,
v.
TIDEWATER, INC., et al., Defendants.
Tidewater, Inc.; Cliffs Drilling Co.; R&B Falcon
Drilling USA, Inc.; Twenty Grand Offshore, Inc.;
Tidewater Marine LLC; Pental Insurance Company,
Ltd.; Certain Underwriters at Lloyds Insurance Co.;
Subscribing to Risk No. LE010620O, Defendants-
Appellees,
v.
Baker Hughes, Inc.; Baker Oil Tools, Inc., a divi-
sion of Baker Hughes Oilfield Operations, Inc., De-
fendants-Appellants.

No. 04-30243.
March 30, 2005.

**Background:** Injured employee sued employer un-
der Jones Act, and, in the alternative, under Long-
shore and Harbor Workers' Compensation Act
(LHWCA) and for negligence. Following reversal
of jury verdict in favor of employee on Jones Act
claims, and remand, 335 F.3d 376, the United
States District Court for the Western District of
Louisiana, Richard T. Haik, Sr., Chief Judge, gran-
ted employee leave to amend complaint and reas-
sert declaration asking for bench trial. Employer
appealed.

**Holding:** The Court of Appeals, Edith Brown
Clement, Circuit Judge, held that employer had no
right to jury trial on employee's LHWCA and negli-
gence claims.

Affirmed.

West Headnotes

**[1] Federal Courts 170B ⇒817**

170B Federal Courts

170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)4 Discretion of Lower Court
170Bk817 k. Parties; Pleading. Most
Cited Cases

District court's order, granting employee leave
to amend his complaint and reassert declaration
identifying his claim as admiralty or maritime claim
and requesting bench trial, would be reviewed for
abuse of discretion. Fed.Rules Civ.Proc.Rules 9(h),
39, 28 U.S.C.A.

**[2] Jury 230 ⇒14(1.4)**

230 Jury
230II Right to Trial by Jury
230k14 Particular Actions and Proceedings
230k14(1.4) k. Employment and Labor
Relations Cases. Most Cited Cases

Offshore oil well operator had no right to jury
trial on employee's LHWCA and negligence claims,
after Court of Appeals had reversed jury verdict in
favor of employee on his Jones Act claim and re-
manded for further consideration of his LHWCA
and negligence claims, inasmuch as post-remand
LHWCA and negligence claims did not alter histor-
ical exclusion of jury trials for admiralty suits, and
employee never asserted any basis of jurisdiction
that would provide employer with Seventh Amend-
ment right to jury trial. U.S.C.A. Const.Amend. 7;
Fed.Rules Civ.Proc.Rule 38(e), 28 U.S.C.A.

**[3] Jury 230 ⇒14(1.4)**

230 Jury
230II Right to Trial by Jury
230k14 Particular Actions and Proceedings
230k14(1.4) k. Employment and Labor
Relations Cases. Most Cited Cases

District court did not abuse its discretion in re-
fusing to provide offshore oil well operator with
jury trial on employee's LHWCA and negligence
claims, after Court of Appeals had reversed jury
verdict in favor of employee on his Jones Act claim

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

405 F.3d 257, 2005 A.M.C. 1113, 61 Fed.R.Serv.3d 432

**(Cite as: 405 F.3d 257)**

and remanded for further consideration of his LH-WCA and negligence claims, given that Court of Appeals had not required jury trial in remand order, and none of employee's available claims post-remand provided such right. U.S.C.A. Const.Amend. 7; Fed.Rules Civ.Proc.Rule 38(e), 28 U.S.C.A.

**[4] Federal Courts 170B ⬤⬤612.1**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
         170BVIII(D)1 Issues and Questions in Lower Court
            170Bk612 Nature or Subject-Matter of Issues or Questions
               170Bk612.1 k. In General. Most Cited Cases

Court of Appeals had no power to review employer's argument that district judge displayed prejudice in favor of employee, and that LHWCA case thus should be transferred to another district judge in event of bench trial, where employee failed to raise such argument below. Longshore and Harbor Workers' Compensation Act, § 1 et seq., 33 U.S.C.A. § 901 et seq.; 28 U.S.C.A. § 144.

**\*258** James Parkerson Roy (argued), Domengeaux, Wright, Roy & Edwards, Lafayette, LA, for Becker.

**\*259** Cliffe E. Laborde, III (argued), James D'Arensbourg Hollier, Laborde & Neuner, Lafayette, LA, for Tidewater, Inc., Twenty Grand Offshore, Inc., Tidewater Marine LLC, Pental Ins. Co. and Certain Underwriters at Lloyds.

Delos Edward Flint, Jr., Fowler, Rodriguez & Chalos, New Orleans, LA, for Cliffs Drilling Co. and R&B Falcon Drilling USA, Inc.

Edwin G. Preis, Jr., Jennifer Elmer Michel (argued), Tammy B. Scelfo, Preis, Kraft & Roy, Lafayette, LA, for Baker Hughes, Inc. and Baker Oil Tools, Inc.

Appeal from the United States District Court for the Western District of Louisiana.

Before JONES, WIENER, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

[1] As a result of his horrific injuries suffered aboard the rig *M/V REPUBLIC TIDE,* plaintiff-appellee Seth Becker filed suit against defendant-appellee Tidewater, Inc., the owner of the rig, defendant-appellant Baker Hughes, Inc. ("Baker Hughes"), Becker's employer, and defendant-appellee R&B Falcon Drilling USA, the rig's operator. *See Becker v. Tidewater, Inc.,* 335 F.3d 376, 381-86 (5th Cir.2003) ("*Becker I*") (recounting the factual and procedural history). Becker asserted claims under the Jones Act, under which Becker asked for a jury trial. Becker also brought, in the alternative, claims under the Longshore Harbor Workers' Compensation Act ("LHWCA"), as well as negligence claims under general maritime law. The jury found that Becker was a seaman and subsequently reached a verdict in his favor for $43 million in damages for violation of the Jones Act. On appeal, a panel of this Circuit ruled that Becker was not a seaman and thus could have no remedy under the Jones Act, reversing and remanding for further proceedings regarding only the LHWCA and negligence claims. *Id.* at 393. On remand, the district court granted Becker leave to amend his complaint and "reassert" a Rule 9(h) declaration, under which he asked for a bench trial for his remaining claims. Baker Hughes objects, and has filed this interlocutory appeal. We review the district court's order for abuse of discretion. *See* Fed.R.Civ.P. 39; *Hernandez v. Hill Country Tel. Co-op., Inc.,* 849 F.2d 139, 144-45 (5th Cir.1988).

[2] Baker Hughes has no right to a jury trial. Becker's post-*Becker I* LHWCA and negligence claims do not alter the historical exclusion of jury trials for admiralty suits. Importantly, Becker never asserted diversity jurisdiction, or any other basis of jurisdiction which would provide Baker Hughes a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

405 F.3d 257, 2005 A.M.C. 1113, 61 Fed.R.Serv.3d 432
**(Cite as: 405 F.3d 257)**

right to a jury trial under the Seventh Amendment. *See Rachal v. Ingram Corp.,* 795 F.2d 1210, 1216 (5th Cir.1986). Despite Baker Hughes's rhetoric that because factual diversity exists the right to a jury trial vests in Baker Hughes, it is well settled that the plaintiff is master of his complaint, and Becker has the exclusive power to invoke diversity jurisdiction. *See, e.g., Allen v. R&H Oil & Gas Co.,* 63 F.3d 1326, 1335 (5th Cir.1995). By failing to do so, the possible factual existence of diversity between parties does not give rise to the legal existence of diversity jurisdiction. Thus, Baker Hughes has no constitutionally or statutorily based right to a jury trial, and Baker Hughes cannot use the Federal Rules to create such a right where one does not already exist. FED.R.CIV.P. 38(e) ("These rules shall not be construed to create a right to trial by jury of the issues in an admiralty or maritime claim.").

**\*260** [3] In *Becker I,* this Court provided for the scope of the proceedings on remand:

[T]he district court must reevaluate plaintiff's claims in light of the rights and remedies available to LHWCA plaintiffs with respect to both liability and damages.

335 F.3d at 393. Simply put, this Court did not require a jury trial for *Becker II,* and the district court did not abuse its discretion in refusing to provide one where none of Becker's available claims post-*Becker I* provided such a right.

[4] Finally, Baker Hughes conclusorily alleges, for the first time on appeal, that the district judge displayed prejudice in favor of Becker, urging that if a bench trial is to be held, the case should be transferred to another district judge. Apparently at the request of the parties, the district judge appears to have mediated the settlement conference,FN1 in the course of which he would have gained significant knowledge of the parties' settlement positions. When the settlement negotiations failed, the judge was faced with the possibility of also becoming the trier of fact. Indeed, it was emin-

ently reasonable to expect such an occurrence-had the jury found Becker to be a longshoreman rather than a seaman, the judge would have been the fact finder in a non-jury trial. This role would have been inappropriate given his discrete knowledge of the parties' evaluation of their respective financial positions on settlement. After that possibility materialized, he should have been recused, either by offering to do so *sua sponte* or by granting a recusal motion filed by a party. *See, e.g., Woodson v. Surgitek, Inc.,* 57 F.3d 1406, 1413 n. 10 (5th Cir.1995) (noting that the district court judge recused himself in similar circumstances); *Tucker by Tucker v. Calloway County Bd. of Educ.,* 136 F.3d 495, 503 (6th Cir.1998) (same). However, we have no power to review Baker Hughes's argument because it failed to raise the issue below, let alone meet the stringent procedural requirements set forth in 28 U.S.C. § 144. *See also Horton v. Bank One, N.A.,* 387 F.3d 426, 435 (5th Cir.2004) ("Arguments not raised in the district court cannot be asserted for the first time on appeal.") (quoting *In re Liljeberg Enters., Inc.,* 304 F.3d 410, 427 n. 29 (5th Cir.2002)).

FN1. *See* Hearing Transcripts, No. 99-CV-1198 (October 11, 2001).

The decision of the district court is AFFIRMED.

C.A.5 (La.),2005.
Becker v. Tidewater, Inc.
405 F.3d 257, 2005 A.M.C. 1113, 61 Fed.R.Serv.3d 432

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.