For Opinion See 586 F.3d 358 , 581 F.3d 256

United States Court of Appeals, Fifth Circuit.
Seth A. BECKER, Plaintiff- Appellant,
v.
TIDEWATER, INC.; et al, Defendants.
Tidewater, Inc.; Tidewater Marine, LLC; Twenty Grand Offshore, Inc.; Pental Insurance Company, Ltd.; Certain Underwriters at Lloyd's Subscribing to Risk No. LE010620O, Defendants - Appellees,
v.
Baker Hughes, Inc.; Baker Oil Tools, Inc, A Division of Baker Hughes Oilfield Operations, Inc., Defendants - Appellants.
No. 08-30183.
June 18, 2008.

On Appeal from the United States District Court for the Western District of Louisiana, The Honorable Richard T. Haik, Sr., Judge Civil Action No. 99-1198

Original Brief of Appellant, Baker Hughes, Inc. and Baker Oil Tools, Inc., A Division of Baker Hughes Oilfield Operations, Inc.

Preis & Roy, (A Professional Law Corporation), Edwin G. Preis, Jr. (10703), Jennifer E. Michel (18114), 102 Versailles Blvd., Suite 400, Post Office Drawer 94-C, Lafayette, Louisiana 70509, Telephone: (337) 237-6062, Counsel for Defendants/Appellants, Baker, Hughes, Inc. and Baker Oil Tools, Inc., A Division of Baker Hughes, Oilfield Operations, Inc.

STATEMENT REGARDING ORAL ARGUMENT

Baker Hughes, Inc. and Baker Oil Tools, Inc., a Division of Baker Hughes Oilfield Operations, Inc. (collectively, "Baker") suggest oral argument is desired and warranted because of the significance and complexity of the legal and factual issues involved in this case. This appeal calls for the resolution of issues pertaining to maritime contract interpretation, the validity and/or scope of indemnity provisions included in a vessel time charter agreement, the interplay of indemnity and insurance obligations included in a vessel time charter agreement; gross negligence, and the distinction of employer fault versus time charter/vessel fault under the "dual capacity doctrine" recognized by this Court in *Kerr-McGee Corp. v. Ma-Ju Marine Services, Inc.*[FN1] Moreover, this Court's decision in *Marquette Transp. Co., Inc. v. Louisiana Machinery Co., Inc.,*[FN2] which bears significantly upon several of the issues listed above, specifically including the enforceability of an indemnity provision included in a time charter agreement breached by the purported indemnitee, was not rendered until after the original trial and appeal of this case. Baker respectfully submits this matter should be heard at oral argument in order to provide counsel an opportunity to address any questions, comments or concerns which may be held by this Court regarding the issues presented, and to provide the Court an opportunity to fully explore the effects of its decisions in this litigation upon these and future litigants.

FN1. 830 F.2d 1332 (5th Cir. 1987).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2008 WL 7295642 (C.A.5)

FN2. 367 F.3d 398 (5th Cir. 2004).

## *TABLE OF CONTENTS*

CERTIFICATE OF INTERESTED PERSONS ... iii

STATEMENT REGARDING ORAL ARGUMENT ... v

TABLE OF CONTENTS ... vi

TABLE OF AUTHORITIES ... viii

JURISDICTIONAL STATEMENT ... 1

ISSUES PRESENTED FOR REVIEW ... 1

STATEMENT OF THE CASE ... 4

STATEMENT OF FACTS ... 10

SUMMARY OF THE ARGUMENT ... 17

ARGUMENT ... 25

A. Standards of Review ... 25

B. Insurance Procured by Tidewater Under Blanket Time Charter Agreement Must Be First Exhausted ... 27

C. Indemnity Provision of Blanket Time Charter Agreement Is Unenforceable ... 42

1. LHWCA §905(b) ... 42

2. Tidewater's Breach of Blanket Time Charter Agreement ... 45

3. Tidewater's Gross Negligence ... 56

D. In the Alternative, Indemnity Obligation Under Blanket Time Charter Agreement Is Limited to Plaintiff's General Damages ... 63

E. All Baker Fault Is Employer Fault ... 69

F. District Court's Refusal to Allow Additional Discovery and Evidence Was an Abuse of Discretion ... 78

CONCLUSION AND RELIEF SOUGHT ... 89

CERTIFICATE OF COMPLIANCE ... 92

## *TABLE OF AUTHORITIES*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Statutes:**

28 U.S.C. §1291 ... 1

28 U.S.C. §1333 ... 1

33 U.S.C. §§901 ... 2, 64

33 U.S.C. §905(a) ... 23, 69, 74, 78

33 U.S.C. §905(b) ... passim

33 U.S.C. §905(c) ... 2, 7, 19, 24, 42, 79

43 U.S.C. §1331 ... 2

43 U.S.C. §1333 ... 2, 19, 43, 44

46 U.S.C. app. §688 ... 5

**Rules:**

Federal Rule of Civil Procedure 9(h) ... 7

**Case Cites:**

*A.M.C. Liftboats, Inc. v. Apache Corp.*, 2008 WL 217177 (E.D.La. 2008) ... 32

*American Cas, Co. of Redding Pennsylvania v. Idaho First Nat'l Bank*, 328 F.2d 138 (5th Cir. 1954) ... 54

*Badeaux v. Torch, Inc.*, 1989 WL 140227 (E.D.La. 1989) ... 23, 69

*Baza v. Chevron Oil Service Co.*, 1996 WL 711506 (E.D.La. 1996) ... 23, 69

*Beckcer v. Tidewater, Inc.*, 335 F.3d 376 (5th Cir. 2003) (referred to herein as "*Becker I*") ... passim

*Becker v. Tidewater, Inc.*, 405 F.3d 257 (5th Cir. 2005) (referred to herein as "*Becker II*") ... 1, 7, 10

*Bienvenu v. Texaco, Inc.*, 164 F.3d 901 (5th Cir. 1999) ... 64

*Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955) ... 22

*Blair v. Sealift, Inc.*, 91 F.3d 755 (5th Cir. 1996) ... 84

*Botley v. Mar-Dril. Inc.*, No. 93-1640 (W.D.La. 199(5) ... 18, 36

*Brown v. Sea Mar Mgmt., LLC*, 2006 WL 3328194 (W.D.La. 2006) ... 23, 69

*Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370 (5th Cir. 2000) ... 26

*Cargill Fertilizer, Inc. v. PEARL JAHN O/B*, 190 F.Supp.2d 894 (E.D.La. 2002) ... 64

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Carter Jones Lumber Co. v. LTV Steel Co.,* 237 F.3d 745 (6th Cir. 2001), *cert. denied, Dixie Distributing Co v. Carter-Jones Lumber Co.,* 533 U.S. 903, 121 S.Ct. 2244, 150 L.Ed.2d 232 (2001) ... 87

*Cates v. Beauregard Electric Co-Op., Inc.,* 316 So.2d 907 (La.App. 3d Cir. 1975), *aff'd,* 328 So.2d 367 (La. 1976) ... 60

*Chembulk Trading LLC v. Chemex. Ltd.,* 393 F.3d 550 (5th Cir. 2004) ... 41

*Cleere Drilling Co. v. Dominian Explor. & Prod., Inc.,* 351 F.3d 642, n.13 (5th Cir. 2003) ... 68

*Computalog U.S.A. v. Mallard Bay Drilling. Inc.,* 21 F.Supp.2d 620 (E.D.La. 1998) ... 32, 39, 52

*Consolidated Grain & Barge Co. v. Capital Marine Supply. Inc.,* 2001 WL 823737 (E.D.La. 2001) ... 32

*Corbitt v. Diamond M. Drilling Co.,* 654 F.2d 329 (5th Cir. 1981) ... 64, 65

*Cousins v. State Farm Mut. Auto. Ins. Co.,* 294 So.2d 272 (La.App. 1st Cir. 1974), *writ denied,* 296 So.2d 837 (La. 1974) ... 30

*Daggs v. Martin,* 2002-1799 (La.App. 1st Cir. 6/27/03), 851 So.2d 1190, *writ denied,* 2003-2636 (La. 12/12/03), 860 So.2d 1158 ... 76, 77, 78

Dahlen v. Gulf Crews, Inc., 281 F.3d 487 (5th Cir. 2002) ... 71

*Daughdrill v. Ocean Drilling & Exploration Co.,* 665 F.Supp. 477 (E.D.La. 1987) ... 58

*Daughdrill v. Ocean Drilling & Exploration Co.,* 702 F.Supp. 1267 (E.D.La. 1988) ... 23, 69

*Denton v. Fireman's Fund Indemnity Co.,* 352 F.2d 95 (10th Cir. 1965) ... 54

*Diamond Offshore Co. v. A&B Builders. Inc.,* 302 F.3d 531 (5th Cir. 2002) ... 26, 84

*Dow Chem. Co. v. M/V Roberta Tabor.* 815 F.2d 1037 (5th Cir. 1987) ... 23, 25, 69

*Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207 (5th Cir. 1986) ... 51, 84

*Ford v. NYLCare Healthplans of the Gulfcoast, Inc.,* 141 F.3d 243 (5th Cir. 1998) ... 65, 67

*Gautreaux v. Scurlock Marine. Inc.,* 84 F.3d 776 (5th Cir. 1996) ... 73

General Ins. Co. of America v. Fleeger, 389 F.2d 159 (5th Cir. 1968) ... 54

*Gravatt v. City of New York,* 226 F.3d 108 (2nd Cir. 2000) ... 75

*Gregory v. Tennessee Gas Pipeline Co.,* 948 F.2d 203, 205 (5th Cir. 1991) ... 36

*Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.,* 180 S.W.3d 635 (Tex.App.-Houston, October 11, 2005) ... 68

*Hendry Corp. v. Aircraft Rescue Vessels.* 113 F.Supp. 198 (E.D.La. 1953) ... 60

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Hess v. Upper Mississippi Towing Corp.,* 559 F.2d 1030 (5th Cir. 1977) ... 74

*Hiclcs v. Ocean Drilling & Exploration Co.,* 512 F.2d 817 (5th Cir. 1975), *cert denied,* *H.B. Buster Hughes. Inc. v. Ocean Drilling & Exploration Co.,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d. 639 (1976) ... 64

*Hiern v. St. Paul-Mercury Indemnity Co.,* 262 F.2d 526 (5th Cir. 1959) ... 54, 55

*Hodgen v. Forest Oil Corp.,* 87 F.3d 1512 (5th Cir. 1996) ... 43

*Hollier v. Union Texas Petroleum Corp.,* 972 F.2d 662 (5th Cir. 1992) ... 44

*Hudson v. Forest Oil Corp.,* 2003 WL 21276385 (E.D.La. 2003) ... 54

*Ingalls Ship Building v. Federal Ins. Co.,* 410 F.3d 214 (5th Cir. 2005) ... 64

*In re Diamond Services,* 281 F.3d 1279 (5th Cir. 2001) ... 33

*In re Diamond Services,* 2001 WL 531091 (E.D.La. 2001) ... 32, 33, 35

*In the matter of Torch, Inc.,* 1996 WL 185765 (E.D.La. 1996) ... 58

*In the matter of T.T. Boat Corp.,* 1999 WL 1442054 (E.D.La. 1999) ... 58

*La Esperanza De P.R., Inc. v. Perez Y Cia. De Puerto Rico. Inc.,* 124 F.3d l0 (1st Cir. 1997) ... 58

*Landry v. Oceanic Contractors. Inc.,* 731 F.2d 299 (5th Cir. 1986) ... 37, 38, 52

*Lirette v. Popich Bros. Water Transport. Inc.,* 699 F.2d 725 (5th Cir. 1983) ... 64

*Kerr-McGee Corp. v. Ma-Ju Marine Service. Inc.,* 830 F.2d 1332 (5th Cir. 1987) ... 70, 73, 78

*Klepac v. Champlin Petroleum,* 842 F.2d 746 (5th Cir. 1998) ... 32, 34, 38

*Marquette Transp. Co., Inc. v. Louisiana-Machinery Co., Inc.,* 367 F.3d 398 (5th Cir. 2004) ... 4, 19, 25, 50, 51, 52, 83, 84, 85

*Moore v. Phillips Petroleum Co.,* 912 F.2d 789 (5th Cir. 1990) ... 70

*Mott v. ODECO,* 577.F.2d 273 (5th Cir. 1978) ... 65

*Neissho-Iwai Co., Ltd. v. M/V Stolt Lion,* 617 F.2d 907 (2nd Cir. 1980) ... 70

*Qgea v. Loffland Brothers Co.,* 622 F.2d 186 (5th Cir. 1980) ... 2, 17, 18, 30, 31, 32, 33, 35, 64, 89

*Orduna S.A. v. Zen-Noh Grain Corp.,* 913 F.2d 1149 (5th Cir. 1990) ... 64

*Peavey Co. v. M/V ANPA,* 971 F.2d 1168, 1175 (5th Cir. 1992) ... 18, 36

*Price v. Rosiek Const. Co.,* 509 F.3d 704 (5th Cir. 2007) ... 27

*Randall v. Chevron U.S.A. Inc.,* 13 F.3d 888 (5th Cir. 1994) ... 64

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Royal Ins. Co. of Am. v. Southwest Marine*, 194 F.3d 1009 (9th Cir. 1999) ... 58

*Ruehs v. Alliance Offshore. L.L.C.*, 2007 WL 275915 (E.D.La. 2007) ... 32

*Saavedra v. Murphy Oil U.S.A. Inc.*, 930 F.2d 1104 (5th Cir. 1991) ... 32, 36

*Schudel v. General Electric Co.*, 35 Fed.Appx. 484 (9th Cir. 2002) ... 87

*Smith v. Tenaco Oil Co., Inc.*, 803 F.2d 1386 (5th Cir. 1986) ... 64

Snue Harbor. Ltd. v. Zurich Ins., 96.8 F.2d 538, 545 (5th Cir. 1992) ... 36

*State v. Vinzaut*, 7 So.2d 917 (La. 1942) ... 60

*State Indus., Inc. v. Mor-Flo Indus., Inc.*, 948 F.2d 1573 (Fed. Cir. 1991) ... 86

*Stewart v. Cran-Vela Rental Co., Inc.*, 510 F.2d 982 (5th Cir. 1975) ... 18

The Houston Exploration Co. v. Haliburton Energy Services. Inc., 269 F.3d 532 (5th Cir. 2001) ... 21, 26, 58, 60, 63, 68

*Theriot v. A.S.W. Well Service Inc.*, 1990 WL 158990 (E.D.La. 1990) ... 23, 69

*Theriot v. Bay Drilling Corp.*, 783 F.2d 527 (5th Cir. 1986) ... 64

*Todd's Shipyards Corp. v. Turbine Services. Inc.*, 674 F.2d 401 (5th Cir. 1982) ... 58

*Tullier v. Halliburton Geophysical Servs., Inc.*, 81 F.3d 552 (5th Cir. 1996) ... 32, 33

*Union Texas Petroleum Corp. v. PLT Engineering.* 895 F.2d 1043 (5th Cir. 1990), *cert. denied*, 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990) ... 19, 44

*U.S. v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948) ... 26

*Wagner v. McDermott. Inc.*, 899 F.Supp. 1551 (W.D.La. 1994), *aff'd*, 79 F.3d 20 (5th Cir. 1996) ... 19, 43

*Walter Oil & Gas Corp. v. Safeguard Disposal Systems. Inc.*, 961 F.Supp. 931 (E.D.La. 1996) ... 64

*Weathersby v. Conoco Oil Co.*, 752 F.2d 953 (5th Cir. 1984) ... 68, 69

*Weber v. Azalea Fleet. Inc.*, 2005 WL 711608 (E.D.La. 2005) ... 73

*White v. Cooper T. Smith Corp.*, 690 F.Supp. 534 (E.D.La. 1988) ... 69

Woods v. Dravo Basic Materials Co., Inc. v. U.S. Gypsum Co., 887 F.2d 618 (5th Cir. 1989) ... 32

*Zapata Marine Service v. O/Y Finnlines, Ltd.*, 571 F.2d 208 (5th Cir. 1978) ... 65

### *JURISDICTIONAL STATEMENT*

Following appeal and remand,[FN3] this action proceeded to trial before the district court under the court's ad-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

miralty and maritime jurisdiction set forth in 28 U.S.C. §1333. A bench trial/proceeding was conducted, and final judgment was entered by the district court on January 9, 2008. (R.Vol.18, pp.5485-5492, R.E. Tab D). This judgment disposed of all claims asserted by all parties aside from quantification of any recoverable attorneys' fees and costs. Timely Notices of Appeal were filed on January 31, 2008 (R.Vol.18, pp.5497-5498, R.E. Tab C) and February 1, 2008 (R.Vol.18, pp.5499-5500, R.E. Tab C). Jurisdiction in this Court arises under 28 U.S.C. §1291, under which final judgments of district courts may be appealed as of right.

FN3. See *Becker v. Tidewater Inc.,* 405 F.3d 257 (5th Cir. 2005), hereinafter referred to as "*Becker II.*"

## *ISSUES PRESENTED FOR REVIEW*

1. Plaintiff was injured during operations being performed under a Blanket Time Charter Agreement ("Charter") between Baker and Tidewater Marine, Inc. ("Tidewater").[FN4] The Agreement contains reciprocal indemnity obligations, along with an obligation for Tidewater to procure and maintain Protection and Indemnity ("P&I") insurance including Baker as an additional assured. Considering this Court's holding in *Ogea v. Loffland Brothers Co.,*[FN5] and the line of cases decided thereunder, did the district court err as a matter of law by ruling that defense and coverage under Tidewater's P&I insurance is not available to Baker?

FN4. "Tidewater" is also used herein to refer collectively to the Defendant/Appellees, Tidewater, Inc., Tidewater Marine, LLC, and Twenty Grand Offshore, Inc.

FN5. 622 F.2d 186 (5th Cir. 1980).

2. The operations being performed under the parties' Charter involved the use of Tidewater's vessel, the M/V REPUBLIC TIDE, which was chartered to Baker but kept under the navigational control of Tidewater at all pertinent times. Sections 905(b) and (c) of the Longshore and Harbor Workers' Compensation Act ("the LHWCA")[FN6] prohibit enforcement of indemnity agreements between an employer (Baker) and a vessel (Tidewater) in the vessel's favor unless, among other things, the injured employee (Plaintiff) is entitled to LHWCA benefits by virtue of Section 1333 of the Outer Continental Shelf Lands Act ("the OCSLA").[FN7] Did the district court err as a matter of law in upholding the Charter's indemnity provisions in favor of the vessel when Plaintiff's entitlement to LHWCA benefits did not derive from the OCSLA?

FN6. 33 U.S.C. §§ 901-905.

FN7. 43 U.S.C. § 1331, *et seq.*

3. Did the district court err as a matter of law by ruling that Tidewater's failure to provide and maintain its vessel in a safe and seaworthy condition, fit to maintain station for the job, did not constitute breach of the Charter, rendering its indemnity provisions unenforceable?

4. Did the district court commit reversible error by holding that Tidewater's willful, reckless disregard for the safety of others did not constitute gross negligence?

5. Did the district court err as a matter of law by failing to void the Charter's indemnity provisions in light of Tidewater's grossly negligent conduct which was not included in the scope of the indemnity provided?

6. Did the district court err as a matter of law by ruling that the Charter's indemnity provisions encompassed liability for Plaintiff's special damages when its language expressly states that "[n]otwithstanding anything to the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

contrary" and "regardless of the negligence on the part of any party," neither Baker nor Tidewater shall be liable to the other "for any punitive, indirect, incidental, special or consequential damages of any kind or nature?"

7. Did the district court err as a matter of law by ruling that the Charter's indemnity provisions encompass liability for costs and attorneys' fees incurred by Tidewater in pursuing its third-party indemnity claim against Baker, despite the well-established rule in this Circuit that such costs and fees are not recoverable?[FN8]

    FN8. See, e.g., *Weathersby v. Conoco Oil Co.*, 752 F.2d 953 (5th Cir. 1984).

8. Where Baker's fault in contributing to this accident related solely to its provision, maintenance and use of tools and equipment supplied to complete well stimulation services for its customers, the condition of Plaintiff's work environment, and its training and supervision of Plaintiff, did the district court err as a matter of law by assessing of fault against Baker in its capacity as time charterer for this conduct when Baker was immune from all such conduct in its capacity as Plaintiffs LHWCA employer?

9. Did the district court commit reversible error in refusing to allow the parties to conduct additional discovery and/or to submit additional evidence, including experts, on the issue of Tidewater's gross negligence and breach of the Charter in light of this Court's mandate in *Becker v. Tidewater. Inc.*, 335 F.3d 376 (5th Cir. 2003) (hereinafter referred to as *"Becker I"*) and decision in *Marquette Transp. Co., Inc. v. Louisiana Machinery Co., Inc.,* FN[FN9] which was not rendered until after the original trial and appeal of this case and bears significantly on the effects of Tidewater's breach?

    FN9. 367 F.3d 398 (5th Cir. 2004).

## *STATEMENT OF THE CASE*

This lawsuit was initiated by Plaintiff, Seth Becker, against Baker, Tidewater, Cliffs Drilling Co. and R&B Falcon USA, following an accident which occurred in the Gulf of Mexico aboard the jack up Cliffs Rig 153. Plaintiff initially filed suit against Baker, his employer, and Tidewater, as owner of the REPUBLIC TIDE, for recovery under the Jones Act.[FN10] Alternatively, he sought damages from Baker and Tidewater under the general maritime law and Section 905(b) of the LHWCA. (R.Vol.1, p.l25). His claims against Cliffs Drilling and R&B Falcon (collectively "Falcon"), the respective owner and operator of the Cliffs Rig 153, were brought under the general maritime law. He later amended his complaint to add Tidewater's underwriters, Pental Insurance Co., Ltd. and Certain Underwriters at Lloyd's Subscribing to Risk No. LEO 106200 ("Underwriters"),[FN11] as party defendants. (R.Vol.6, p. 1557).

    FN10. 46 U.S.C. app. §688.

    FN11. "Underwriters" is also meant to include and refer to any and all additional insurance companies from which Tidewater may have procured insurance coverage pursuant to the terms of the parties' Charter, including without limitation, CNA.

After responding to Plaintiffs suit, Tidewater filed a third-party demand against Baker for defense and indemnity under the Charter. (R.Vol. 3, p.764). The district court granted Tidewater summary judgment on these claims before the close of discovery. (R.Vol. 5, p.1375). Later, Underwriters filed their own cross-claims and moved for summary judgment against Baker on the same grounds. (R.Vol.6, p.1780). By the time their motion was filed, evidence had emerged implicating Tidewater's gross negligence in causing Plaintiff's accident. Baker opposed

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the motion on grounds that Tidewater's gross negligence was not encompassed in the Charter's indemnity provisions. (R.Vol.7, p.1964). The district court rejected Baker's arguments, holding as a matter of law that the Charter's indemnity language, though silent as to gross negligence, was nevertheless broad enough to encompass indemnity for gross negligence. (R.Vol. 8, p. 2288; June 14, 2001 hearing transcript, pp. 2-12; R.E. Tab F). Importantly, this ruling foreclosed additional discovery on the issue of Tidewater's gross negligence.

The case proceeded to trial by jury on July 9, 2001. The jury concluded Plaintiff was a seaman and determined liability and damages against Baker, under the Jones Act, against Tidewater under the general maritime law and for unseaworthiness, and against Falcon under the general maritime law. (July 9, 2001 Trial Transcript ("TT"), pp. 1863-1868.) The district court entered judgment on the jury's verdict on August 27, 2001. (R.Vol. 9, p.2678).

This Court reversed the jury's findings and vacated the liability and damages aspects of the judgment with respect to Baker, Tidewater and Falcon in *Becker I*. The case was then remanded to the district court for further proceedings as an LHWCA case, to proceed in a manner not inconsistent with the Court's opinion.[FN12] As a result, the potential liability of Baker, as Plaintiffs employer, was limited to LHWCA benefits, with its only tort exposure being for any §905(b) vessel negligence, in its capacity as time charterer rather than employer.[FN13] In addition, the indemnity dispute between Baker and Tidewater was to be considered anew under the application of LHWCA Sections 905(b) and (c), as was the issue of Tidewater's gross negligence in causing Plaintiff's injuries.[FN14]

> FN12. *Becker I, 335 F.3d at 394*.

> FN13. *Id*. at 393-394, n. 10-11.

> FN14. *Id*.

On remand, Baker filed a motion to have the matter set as a jury trial *de novo* and requested a new scheduling order. (R.Vol.12, p.3321). Conversely, Plaintiff sought leave to amend his complaint to declare that he was pursuing his claims under the district court's admiralty and maritime jurisdiction pursuant to Rule 9(h) of the Federal Rules of Civil Procedure and thereby would have no jury. (R.Vol.12, p.3306). The district court granted Plaintiff's motion, denied Baker's motion and ordered the matter to go forward as a limited bench proceeding. (R.Vol.12, p.3567). Baker appealed, but the district court's ruling was affirmed in *Becker II*.

The case was again remanded and set for a bench trial to take place on December 12, 2005. (R.Vol. 13, p. 3693). Leading up to trial, Baker requested leave of court to conduct additional limited discovery and to submit additional evidence, including expert testimony, regarding the issues to be addressed by the district court pursuant to the *Becker I* decision, particularly with respect to Tidewater's gross negligence. (R.Vol. 13, p.3725). With only six days left to trial, the district court granted Baker leave to take supplemental depositions of those witnesses it had deposed before the original trial, denied leave for additional depositions, denied leave to retain an expert on the issue of gross negligence, and denied the remainder of Baker's requests. (R.Vol. 17, p. 4811, R.E.Tab E.1).

Baker also filed several pre-trial Motions for Summary Judgment pertaining to the validity of the Charter's indemnity provision (R.Vol. 14, p.4075), Tidewater's breach of the Charter (R.Vol. 14, p.3950), the exclusion of special damages from the scope of the Charter's indemnity language (R.Vol.13, p.3894), the exclusion of Tidewater's costs and attorneys' fees incurred in pursuing its indemnity claims (R.Vol.13, p.3894), and coverage owed to Baker as an additional assured under Tidewater's insurance policies. (R.Vol.14, p.4122). All of Baker's motions were denied. (R.Vol. 17, pp. 4813, 4814, 4817, and 4819, R.E. Tab E). In response to the latter two mo-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

tions, the district court affirmatively ruled that Plaintiff's special damages and Tidewater's costs and attorneys' fees incurred for pursuing its indemnity claims are included within the scope of the Charter's indemnity language (R.Vol. 17, p.4814, R.E. Tab E.1), and further that Baker was not entitled to additional assured coverage under Tidewater's insurance polices procured under the Charter. (R.Vol.17, p.4819, R.E. Tab E.1).

Shortly before trial, Baker and Falcon reached an agreement with Plaintiff to settle all claims between them. Tidewater refused to participate in negotiations and was thereby excluded from the settlement. Under the agreement, Plaintiff, Baker and Falcon agreed Plaintiff would remain in the case to pursue his claims against Tidewater, and that any recovery obtained from Tidewater would be shared among the parties to the settlement. The existence of the agreement was disclosed to Tidewater by letter on December 2, 2005. (R.Vol.17, p.4895).

The matter proceeded to trial on December 12, 2005. Very limited evidence was admitted, Baker proffered the report of its expert, Captain David Scruton, regarding Tidewater's gross negligence (Baker Proffer B-1, submitted at December 2005 trial, pp.42-43), and the district court took all matters under advisement. The parties were later allowed to submit post-trial proposed findings of fact and conclusions of law (R.Vol.17, pp. 4905, 4952, 5046, 5091 and R.Vol. 18, p.5147). The district court rendered its ruling on all claims on November 14, 2007. (R.Vol.18, p.5431).

The court held Tidewater 45% at fault and Baker, as time charterer, 55% at fault in causing Plaintiff's injuries. (R.Vol.18, p.5445-5453). It further adopted its rulings on Baker's various pre-trial motions and held (1) Tidewater was not guilty of gross negligence; (2) Tidewater did not breach the Charter in such a way that would have vitiated its indemnity provision; (3) the Charter's indemnity provision was fully enforceable against Baker; and (4) the vast majority of Baker's fault in contributing to the accident arose from its capacity as time charterer rather than employer. (R.Vol.18, pp.5452-5453). Falcon was found free of liability.

Final judgment on the district court's ruling was entered on January 9, 2008. It is from this judgment, and the district court's rulings on Baker's various pre-trial motions that Baker appeals.

### STATEMENT OF FACTS

The factual history of this case has been well documented by this Court in *Becker I* and II. Therefore, Baker sets forth only those factual matters which remain pertinent to the issues at hand.

Plaintiff was injured in the course and scope of his employment with Baker Hughes, Inc. on June 18, 1999. Baker is an oilfield service company engaged in the business of providing various well-simulation services to oil companies in, among other areas, the Gulf of Mexico. Plaintiff was injured while assisting in a gravel-packing job aboard the jack up Cliffs Rig 153, which was owned by Falcon and located in the Gulf of Mexico at the time of his accident.

Completion of the gravel-packing job required use of the M/V REPUBLIC TIDE, a Tidewater-owned vessel time chartered to Baker and outfitted with specialized equipment to perform well-stimulation services for offshore oil wells. The REPUBLIC TIDE was chartered from Tidewater to Baker under a Blanket Time Charter Agreement ("Charter") confected on January 23, 1998, which remained in effect at all pertinent times. (R.Vol.14, p.3931, R.E. Tab G). The Charter required Tidewater to deliver and maintain a seaworthy vessel and to remain responsible for manning, supplying, maintaining, operating, navigating, and managing the vessel while it was being used by Baker. (Charter Art. III, VI, VII). Baker assumed responsibility for various fees and assessments, and was given the right to "install additional equipment in connection with its operations," but with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the proviso that all such equipment was to remain Baker's property. (Charter Art. VIII, X).

Tidewater's duty to provide and maintain its vessel is outlined in Article III of the Charter and required that the REPUBLIC TIDE be, "***properly equipped and in every respect seaworthy and in good running order and in every way fit and ready for CHARTER'S use and for the employment intended."*** (Emphasis added). Additionally, Tidewater was required to "***maintain in full force and effect on the vessel any required United States Coast Guard documents and inspection Certificates,*** together with any other documents required of the vessel." (Emphasis added). The Charter also includes reciprocal indemnity provisions between Baker and Tidewater, and an obligation for Tidewater to obtain Protection and Indemnity insurance covering Baker as an additional insured and waiving subrogation against it. (Charter Art. XI, XIV).[FN15] No corresponding insurance obligations were imposed on Baker.

> FN15. The defense, indemnity and insurance provisions included in the parties' Charter will be quoted and more fully discussed in the "ARGUMENT" section of this brief.

Pursuant to its rights under the Charter, Baker kept a coflex hose unit onboard the REPUBLIC TIDE, and supplied a rotating crew of six employees to operate the unit and service Baker's clients. While working as a summer intern for Baker, Plaintiff was selected to join the REPUBLIC TIDE's crew to observe and assist in the gravel-pack job aboard the Rig 153. (TT, pp.1271, 1290-1291). In the words of this Court, "[t]hings began to go terribly wrong" from the inception of Plaintiffs involvement in this mission.[FN16]

> FN16. *Becker I*, 335 F.3d at 383.

During the voyage to the rig, Tidewater Captain Daniel Givens, first in command of the REPUBLIC TIDE, called and reported to rig personnel that the REPUBLIC TIDE was running late because of problems with its bow thruster, and that he needed permission to drop anchor. (TT, pp.553-555, 771-775). He was told to anchor near the bow of the rig to avoid underwater pipelines located near its stern. When he arrived, however, he decided not to drop anchor due to a leak in the vessel's anchor windlass. (TT, pp. 98-99). Rather than drop anchor and repair the leak during the gravel pack job, an operation known to take 12 to 18 hours, Captain Givens unilaterally determined he would not drop anchor, but would instead maintain the vessel's position through the use of mooring lines and its faulty bow thruster. (TT, pp. 92-108). Amazingly, Captain Givens notified no one aboard the rig that the vessel remained unanchored (TT, p.102).[FN17] (It must be noted that Falcon would not have allowed operations to continue had it known the vessel was unanchored. (TT, pp.776)).

> FN17. See also *Becker I*, 335 F.3d at 383.

The leaking windlass bears significantly on Tidewater's duty to have provided and maintained a seaworthy vessel. The record reveals Tidewater participated in the U.S. Coast Guard's Streamlined Inspection Program ("SIP"), which required it to conduct a full quarterly inspection of the anchor windlass in March of 1999. Yet Tidewater failed to conduct such an inspection in March 1999 in the quarter during which Plaintiff's accident occurred. (TT, pp. 246-251). About one month before the accident, however, Clarence Polk, the REPUBLIC TIDE's chief engineer, checked the anchor system's hydraulic fluid level and added an additional 10 to 15 gallons of fluid to the system (TT, p.1475), an inordinate amount.

Along with the anchor windlass malfunction, Tidewater's vessel also came equipped with a faulty bow thruster. Captain Givens had notified rig personnel of problems with the REPUBLIC TIDE's bow thruster before he even arrived on location. (Baker Trial Exhibit 13, pp. 14-15, 46, admitted at December 2005 trial, pp.39-40). Yet,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

upon learning of the leak in the anchor windlass, he decided to rely upon the bow thruster to maintain the vessel's position. The danger of his decision was exacerbated by a increasing ocean current moving across the RE-PUBLIC TIDE's port bow. (TT, p.108). Captain Givens was fully aware of the current and the danger it presented. His awareness is exhibited by his decision not to use the vessel's "quick-release cleats" when mooring it to the rig. (TT, p.163). As discussed below, these decisions led directly to the tragedy which has befallen Seth Becker.

Captain Givens was relieved by second caption Steve Lachney. at approximately 6:00 a.m. on the morning of Plaintiffs accident. (TT. p.245). By that time, the Baker crew had unwrapped the hose from Baker's coflex hose unit installed on the REPUBLIC TIDE and ran it from the vessel to the Cliff's Rig 153 (TT, p. 254). Captain Lachney was also aware the vessel was unanchored when he came on duty, but he too failed to relay that information to the rig. Instead, he continued to attempt to hold the vessel's position with the bow thruster, while hoping its previous problems would not resurface. (TT, p. 280). Unfortunately, his hopes were dashed when the bow thruster failed during operations, in the face of the ever-increasing current. (TT, pp. 258-259).

With the bow thruster down and the anchor not in use, the REPUBLIC TIDE had no means of holding itself in position and began to drift starboard with the current. Recognizing the danger of the situation, Captain Lachney radioed the Rig 153 and informed a Falcon crane operator, John Corkern, that his bow thruster had failed. (TT, pp. 258-259). At this time, the vessel was attached to the rig only by two stern mooring lines (one port, one star-board) and the coflex hose. Moments after informing the rig of the bow thruster failure. the. vessel's port stern mooring line snapped, allowing the vessel to drift further starboard with the current. (TT, p. 260). Captain Lach-ney instructed two Baker crew members to disconnect the coflex hose from its reel assembly located on the back of the vessel. (TT, p. 271, 333, 1422). The reel assembly malfunctioned, however, and the crew was unable to release the hose. Captain Lachney called the rig a second time to inform rig personnel that Baker's crew on board would need to disconnect the coflex hose at its connection on the rig. This instruction was Captain Lach-ney's last communication with anyone aboard the Rig 153 prior to Plaintiffs accident. (TT, p.265).

Captain Lachney's order to disconnect the hose was relayed to the Baker crew. In response, Plaintiff and two of his co-workers proceeded to the main deck to disconnect the hose. While the Baker workers were attempting to break the hose connection, Captain Lachney decided to purposely break the vessel's starboard stern mooring line by powering up his engines and pulling away from the rig. (TT, p. 265). Captain Lachney admitted he was fully aware that he would also be pulling on the coflex hose on which he had sent the Baker hands to work. (TT, p. 311). Yet despite his awareness of the potential mortal danger posed, he made no attempt to alert anyone aboard the rig of what he was planning to do. (TT, p. 266).

Captain Lachney powered up his engines and snapped the starboard mooring line. As expected, this caused the vessel to jerk tight on the coflex hose, whipping it across the deck and into Plaintiff, who was pinned between the hose and a backstop aboard the rig. Plaintiff sustained horrendous injuries and the loss of both his legs as a result of Captain Lachney's actions.[FN18]

       FN18. *Becker I*, 335 F.3d at 383.

## SUMMARY OF THE ARGUMENT

The issues presented in this appeal primarily concern the scope, application and enforceability of the reciprocal indemnity provisions set forth in the Charter and their interaction with Tidewater's separate obligation to procure and maintain Protection and Indemnity insurance covering Baker as an additional insured.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2008 WL 7295642 (C.A.5)

In *Ogea v. Loffland Brothers Co.*,[FN19] and the long line of cases decided thereunder, this Court has treated obligations to obtain insurance by one in favor of the other party as separate and distinct from the indemnity provisions included in the pertinent contract, has determined insurance obligations prime indemnity and has required exhaustion of the insurance coverage obtained before indemnity obligations can be enforced. Here, as in *Ogea*, the Charter includes reciprocal indemnity obligations, while only the indemnitee (Tidewater) was obligated to procure insurance coverage naming the indemnitor (Baker) as an additional assured under the Tidewater's insurance policies. These policies were to include waivers of subrogation in favor of Baker. Consequently, this case fits squarely within the legal rule espoused by *Ogea*, which prevents the indemnity obligation from being effective until Tidewater's insurance coverage is exhausted.

> FN19. 622 F.2d 186 (5th Cir. 1980).

Addtionally, as Tidewater and Underwriters rejected Baker's claims for additional assured coverage, Baker defended itself throughout this litigation. Underwriters owed Baker a defense and should be held responsible to reimburse Baker for its entire defense costs. Morever, even should this Court now find a lack of full coverage for Baker under any of Tidewater's policies, reimbursement of defense costs is still due to Baker through the date such determination was/is made.[FN20]

> FN20. See *Peavey Co. v. M/V ANPA*, 971 F.2d 1168, 1175 (5th Cir. 1992) ("If the policy calls for a defense of the claim, an insurer has the obligation to provide a defense to its insured, even if ultimately the insurers may have no liability under the policy."). See also *Botley v. Mar-DriL Inc.,* No. 93-1640 at *11 (W.D.La. 1996) (Exhibit 4 to Baker's Memorandum in Support of Motion for Summary Judgment for Additional Assured Coverage and Defense or Alternatively, Breach of Contract Damages (R. Vol.14, p.4122), admitted at December 2005 trial, pp.13-15, R.E. Tab J) (although no coverage under the policy was found to exist, duty to defend still applied up until the issuance of the court's ruling on coverage).

Should this Court find that Baker is not afforded full additional assured protection under these policies for the claims Plaintiff and Tidewater brought against it, Tidewater would be in breach of its obligations under the Charter, thereby rendering it directly liable to Baker for its damages, including attorneys' fees, under the *Ogea* line of decisions.[FN21]

> FN21. *Ogea*, 622 F.2d at 189, citing *Stewart v. Cran-Vela Rental Co., Inc.*, 510 F.2d 982 (5th Cir. 1975).

Should the indemnity provision itself become relevant, Tidewater's claims for indemnity against Baker fail because the indemnity agreement is unenforceable for several reasons. First, LHWCA Sections 905(b) and (c) interact to bar enforcement of the indemnity provision against Baker, as Plaintiff's employer, unless Plaintiff was entitled to LHWCA benefits by virtue of Section 1333 of the OCSLA. In *Wagner v. McDermott, Inc.*,[FN22] and *Union Texas Petroleum Corp. v. PLT Engineering*,[FN23] application of the OCSLA was determined based upon whether the location where the substantial work to be performed under the contract at issue qualified as an OCSLA situs. The record in this case reflects the substantial work to be completed under the Charter was to take place on the REPUBLIC TIDE, a vessel, not a situs covered under the OCSLA. Therefore, since the OCSLA is not implicated, Plaintiff's entitlement to LHWCA benefits does not derive from it, and the Charter's indemnity provisions are prohibited as to Baker under LHWCA Section 905(b).

> FN22. 899 F.Supp.1551, 1556 (W.D.La.1994), *aff'd*, 79 F.3d 20 (5th Cir.1996).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN23. 895 F.2d l043 (5th Cir. 1990), *cert. denied*, 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990).

Second, the indemnity provisions are rendered unenforceable due to Tidewater's preceding breach of the Charter. This Court recognized in *Marquette Transportation Co., Inc. v. Louisiana Machinery Co., Inc.,*[FN24] that breach of a contractual warranty may invalidate an indemnity agreement in the same contract. Here, the Charter required Tidewater to use due diligence to provide Baker with a vessel that was properly equipped, in good running order and in every way fit for her intended employment. It also required Tidewater to maintain all required U.S. Coast Guard documents and inspection certificates demonstrating Tidewater's compliance with all Coast Guard regulations and inspections. Ignoring its obligation, Tidewater failed to conduct a proper inspection of the anchor and anchor windlass pursuant to its participation in the Coast Guard's Streamlined Inspection Program, thereby increasing both the likelihood that an injury would occur, and the severity of the injury which did occur through the use of its vessel The failure of Tidewater to inspect the anchor deck machinery pursuant to SIP guidelines was a breach of its obligation to use due diligence to provide a vessel properly equipped, in good running order and in every way fit for her intended employment. This failure greatly increased the probability that the anchor would not function properly when needed, materially increasing the scope of the risk of injury to workers, and the potential liability of Baker under the Charter's indemnity provision. As Tidewater's provision of a vessel incapable of maintaining a stationary position posed a real risk of severe injury, the scope of the indemnity obligation undertaken by Baker was thereby materially and radically changed by Tidewater, such that it was rendered void and unenforceable.

FN24. 367 F.3d 398, 408 (5th Cir. 2004).

The third reason indemnity under the Charter is vitiated is by virtue of Tidewater's gross negligence in causing Plaintiff's injuries. Tidewater's role in this accident includes: (1) misleading rig personnel into believing the RE-PUBLIC TIDE was anchored during gravel pack operations; (2) relying on a faulty bow thruster to maintain the vessel's position in the face of an ever-increasing ocean current; and (3) ordering Baker crew members to disconnect the coflex hose from the rig, then intentionally powering up the vessel to break the starboard mooring line, with full awareness doing so would violently drag the coflex hose across the deck in the vicinity of those Baker crew members without giving any warning whatsoever. "Gross negligence" has been defined as an "entire absence of care," the "want of even slight care and diligence," and the "utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others."[FN25] Here, Tidewater's actions and/or omissions easily fit within these definitions, and as gross negligence was not expressly included in the Charter's indemnity language, public policy dictates Tidewater cannot be indemnified for its gross negligence in causing Plaintiffs injuries.[FN26]

FN25. *The Houston Exploration Co. v. Haliburton Energy Services. Inc.,* 269 F.3d 528, 532 (5th Cir. 2001) (internal footnotes and citations omitted).

FN26. *Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 90, 75 S.Ct. 629, 99 L.Ed. 911 (1955); *Todd Shipyards Corp. v. Turbine Service. Inc.,* 674 F.2d 401, 410-411 (5th Cir. 1982).

If, in spite of the foregoing, the indemnity provision is upheld, it can only be enforced with respect to Plaintiff's general damages. Paragraph XIV of the Charter sets forth the parties' reciprocal indemnity obligations. It also includes a provision which clarifies that "[n]otwithstanding anything to the contrary contained herein," the parties agreed neither "shall be liable to the other for any punitive, indirect, incidental, special or consequential dam-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ages of any kind or nature," and that "each party hereby agrees to waive its right of recourse in this regard against the other party." This provision is clear and unequivocal, and based upon jurisprudential rules for interpreting maritime contracts, fully enforceable against Tidewater to prevent inclusion of special damages from any award to Tidewater.

Further, the lower court's ruling that Tidewater is entitled to reimbursement of attorneys fees and expenses incurred not only in defense, but also in pursuit of indemnity is manifestly erroneous. It is well-settled that in the absence of express language granting such recovery, an indemnity obligation extends only to cost of defense for the underlying claim.[FN27] Therefore, Tidewater is not entitled to recover expenses for pursuing indemnity regardless whether the Charter's indemnity provisions are upheld.

> FN27. *Weathersby v. Conoco Oil. Co.*, 752 F.2d 953 (5* Cir. 1984); *Dow Chem. Co. v. M/V Roberta Tabor,* 815 R2d 1037, 1046 (5th Cir. 1987); *Brown v. Sea Mar Mgmt., LLC,* 2006 WL 3328194, *4 (W.D.La. 2006); *Baza v. Chevron Oil Service Co.*, 1996 WL 711506, *5 (E.D.La. 1996); *Theriot v. A.S.W. Well Service. Inc.*, 1990 WL 158990, *3 (E.D.La. 1990); *Badeaux v. Torch. Inc.*, 1989 WL 140227, *2 (E.D.La. 1989); *Daughdrill v. Ocean Drilling & Exploration Co.*, 702 F.Supp. 1267, 1268 (E.D.La. 1988).

Aside from the issues pertaining to indemnity, the record reflects additional errors of law committed by the district court with regard to the characterization of Baker's fault in contributing to this accident as vessel negligence rather than employer fault. Contrary to the district court's ruling, any breach of Baker's duty to provide Plaintiff with proper training, supervision and a safe place to work, and its provision and maintenance of equipment to be used by its employees in their operations, falls within the purview of employer responsibility. Time charterer liability, by contrast, is limited to the breach of defined duties determined by tradition and agreement, which, as here, generally relate to the carrying of cargo, directing of when and where the vessel will travel and timing of a voyage. Any duty breached by Baker clearly did not fall within its time charterer role. As such, it is immune from liability to Plaintiff under Section 905(a) of the LHWCA. Tidewater, then, must be held liable for 100% of Plaintiff's damages. Such damages are recoverable from Underwriters.

As a final matter, it must be noted the district court abused its discretion by preventing the parties from conducting additional discovery and submitting additional evidence pertaining to the issues to be addressed on remand following the *Becker I* decision. Before this case was originally tried, the district court ruled Baker's indemnity obligation under the Charter encompassed any gross negligence on the part of Tidewater, thereby preventing Baker from submitting additional proof thereof. On appeal, after reversing the jury's finding of seaman status, this Court remanded the matter to proceed as a LHWCA case in a matter not inconsistent with its opinion.[FN28] In footnote eleven to the decision, the Court ordered reconsideration of Tidewater's indemnity claims under the statutory scheme articulated in LHWCA Sections 905(b) and (c), and a determination of whether any of the defendants were guilty of gross negligence.[FN29] In spite of this direction, the district court refused additional discovery and evidence on these issues beyond allowing Baker to redepose only certain previously-deposed witnesses. The court also refused to allow Baker to introduce the report of its vessel operations expert, Captain David Scruton, pertaining to Tidewater's gross negligence in causing Plaintiff's injuries. Considering this court's *Becker I* mandate, Baker submits the district court's refusal constitutes an abuse of discretion.

> FN28. *Becker I*, 335 F.3d at 394.

> FN29. *Id.* at 393-394, n. 11.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Baker avers there is more than enough evidence in the lower court's record to require a finding of gross negligence on the part of Tidewater, justifying the consequent abrogation of the indemnity agreement. If, however, this Court were to believe otherwise, Baker requests that its proffered expert report of David Scruton be considered. Further, Baker requests the opportunity to conduct real discovery on these issues, as it has never before been permitted, such that the full facts have not yet been presented for evaluation. The lower court's judgment inappropriately limited discovery and expert testimony in this regarding and should be reversed and remanded as an abuse of discretion.

ARGUMENT

### A. *Standards of Review*

This appeal involves the district court's interpretation of a maritime contract, which interpretations qualify as conclusions of law, and as such are to be reviewed *de novo*.[FN30]

> FN30. See, e.g., *Marquette Transp., Co., Inc. v. Louisiana Machinery Co.*, 367 F.3d 398, 402 (5th Cir. 2004); citing, *Dow Chem Co. v. M/V Roberta Tabor*. 815 F.2d 1037, 1042 (5th Cir. 1987).

This appeal also pertains to the district court's denial of summary judgment based upon determinations of the application of federal statutes such as the LHWCA and OCSLA. These determinations constitute conclusions of law and, along with denials of summary judgment, are also to be reviewed *de novo*.[FN31]

> FN31. *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 540 (5* Cir. 2002) (internal citations omitted).

Determinations of gross negligence qualify as findings of fact, subject to the clearly erroneous standard.[FN32] A finding of fact is "clearly erroneous" when, in the face of supporting evidence, the reviewing court is still left with "the definite and firm conviction that a mistake has been made."[FN33]

> FN32. *Houston Exploration Co. v. Halliburton Energy Serv., Inc.*, 269 F.3d 528, 531 (5th Cir. 2001) (internal citations omitted).
>
> FN33. Id., quoting, *U.S. v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct.525, 542, 92 L.Ed. 746 (1948).

Questions regarding the capacity under which Baker's fault arose concern issues regarding the legal duties owed to Plaintiff as time charter versus those owed to him as his employer. Whether a defendant owes a plaintiff a legal duty is a question of law.[FN34] As such, the district court's determinations regarding the characterization of Baker's fault constitutes conclusions of law to be reviewed *de novo*.

> FN34. *Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000).

And finally, questions pertaining to rulings on evidence and discovery are reviewed for abuse of discretion.[FN35]

> FN35. *Price v Rosiek Const. Co.*, 509 F.3d 704, 707 (5th Cir. 2007) (internal citations omitted).

### B. *Insurance Procured by Tidewater Under Blanket Time Charter Agreement Must First be Exhausted*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Charter was confected between Tidewater and Baker on or about January 23, 1998. Under the Agreement, Baker is designated as "CHARTERER" and Tidewater as "OWNER." Article XI addresses insurance and provides in pertinent part:

OWNER shall during the term hereof procure and maintain in effect the following insurance:

\* \* \*

(ii) Protection and Indemnity Insurance covering the liabilities of OWNER in the amount of $2,000,000 on the Ocean P&I Clause SP-23 Form or equivalent, including Collision/Towers liability and crew coverage, but excluding Cargo Liability Coverage and coverage for those risks, if any, assumed or insured by CHARTERER in this Charter. Such insurance may be subject to a deductible not to exceed $20,000 per occurrence. Such deductibles shall be for OWNER'S account.

The aforesaid policies shall include CHARTERER, in its capacity as time charterer of the vessel, as an additional assured, but only with respect to the risks assumed by OWNER in this Charter, and shall contain a waiver of subrogation in favor of CHARTERER, but only with respect to the risks assumed by OWNER in this Charter.

(R.Vol. 14, p. 3931, R.E. Tab G). There is no provision requiring Baker to obtain insurance under the Agreement.

The relevant indemnity provisions are found in Article XIV of the Charter. That Article reads in pertinent part:

None of the CHARTERER INDEMNITEES [Baker] shall have any liability for injury to, illness or death of the crew of the vessel, or of the employees of OWNER..., however said injury, illness or death arises or occurs, whether through the negligence in whole or in part of any of the CHARTERER INDEMNITEES, unseaworthiness of any vessel, or otherwise; and OWNER shall protect, defend, indemnify and hold harmless the CHARTERER INDEMNITEES from and against any and all claims, suits, losses, liabilities, expenses, demands, costs (including reasonable attorneys' fees) and/or damages as a result of such injury, illness or death.

None of the OWNER INDEMNITEES [Tidewater] shall have any liability for injury to, illness or death of the personnel or employees of CHARTERER [Baker]..., however said injury, illness or death arises or occurs, whether through the negligence in whole or in part of any of the OWNER INDEMNITEES, unseaworthiness of any vessel or otherwise; and CHARTER shall protect, defend, indemnify and hold harmless the OWNER INDEMNITEES from and against all claims, suits, losses, liabilities, expenses demands, costs (including reasonable attorneys' fees) and/or damages as a result of such illness, injury or death.

Notwithstanding anything to the contrary contained herein, it is expressly agreed by and between the parties hereto that, regardless of the negligence on the part of any party hereto or the unseaworthiness of any vessel, neither such party shall be liable to the other for any punitive, indirect, incidental, special or consequential damages of any kind or nature (including, but not limited to, loss of profits, loss of use, loss of hire, and loss of production); and each party hereby agrees to waive its rights of recourse in this regard against the other party.

(R.Vol. 14, p. 3931, R.E. Tab G). These provisions exhibit that the Charter has reciprocal indemnity obligations, but a one-sided insurance requirement in Baker's favor.

Pental Insurance Co. issued a policy (Policy No. M-3900), effective April 1, 1999, providing marine liability coverage to Tidewater as a named insured and to Baker as an additional assured. (Baker Trial Exhibit 11, admitted at December 2005 trial). The policy, in pertinent part, provides:

[T]he unqualified word "Assured" includes: (i) the "Named Assured"; (ii) if the "Named Assured" is a partnership, the unqualified word "Assured" also includes any partner therein, but only with respect to his liability as

such; and (iii) any person, organization, trustee or estate to whom or to which the "Named Assured" is obligated by virtue of a contract or agreement to include or name as an assured, co-assured or additional assured.

(Id. at Marine Liability Form, p.5). In addition, Endorsement No. 2 of the policy designates its $5,000,000 of coverage as "primary insurance as required by contract."

Certain Underwriters at Lloyds Subscribing to Risk No. LEO 106200 issued an excess policy, effective April 26, 1999, which also provides marine liability coverage to Tidewater as a named insured and to Baker as an additional assured (Baker Trial Exhibit 12, admitted at December 2005 trial), and adopts the same definition for insureds as is provided in the underlying Pental policy. (Id. at Endorsement No. 3). Both policies also contain waivers of subrogation as required under the Charter. (Baker Trial Exhibit 11, General Conditions, p.1; Baker Trial Exhibit 12, Supplemental Clauses, p. 5).

When considering the application of the above provisions, one must keep in mind the well-accepted principle that the insurer is a champion of the insured's interest, such that the insured's interests are paramount to those of the insurer.[FN36] Counsel for Tidewater and Underwriters conceded on December 18, 2003, in open court, that Baker is entitled to additional assured status under Tidewater's policies. (December 18, 2003 hearing transcript, p. 21): Thus, Baker is and has been entitled to coverage and defense from Tidewater's insurers for the claims brought against it in this lawsuit. Fifth Circuit precedent, beginning with *Ogea*, is controlling and supports this conclusion.

> FN36. *Cousins v. State Farm Mut. Auto. Ins. Co.*, 294 So.2d 272, 279 (La.App.lst Cir. 1974), *writ denied*, 296 So.2d 837 (La. 1974).

In *Ogea*, this Court was called to interpret indemnity provisions in a drilling contract. Ogea, the original plaintiff, was injured on an offshore platform owned by Phillips Petroleum Co. ("Phillips") and operated by Loffland Brothers ("Loffland"). Ogea was an employee of International Hammer, one of Phillips' contractors. Ogea filed suit against Loffland, and later, Schlumberger Well Surveying Corporation ("Schlumberger"). One year later, Loffland filed a third-party complaint against Phillips seeking indemnity. Phillips in turn counter-claimed against Loffland, asserting that Loffland was obligated to obtain liability insurance covering Phillips and that any failure to do so constituted a breach of the drilling contract. Loffland and Schlumberger settled with Ogea, but the claims between them persisted.[FN37]

> FN37. *Id.* at 187-188.

The drilling contract's indemnity clauses provided that Loffland would indemnify Phillips "from any and all claims... asserted by [Loffland's] personnel, agents or invitees, or by the personnel or agents of [Loffland's] subcontractors ...." Likewise, Phillips agreed to indemnify Loffland "for all claims ... asserted by [Phillips'] personnel, agents or invitees, or by the personnel or agents of [Phillips] subcontractors . . . ."[FN38] The contract also required Loffland to obtain comprehensive general liability insurance naming Phillips as a co-insured.[FN39] Phillips had no reciprocal obligation.

> FN38. *Id.* at 188.

> FN39. *Id.*

The district court concluded Phillips did not owe indemnity to Loffland. The court determined that either Loff-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

land acquired the proper insurance protecting Phillips or, if it did not, Loffland had breached the contract. In either circumstance, Phillips could not be held liable to Loffland.[FN40]

> FN40. *Id.*

On appeal, Loffland argued only the indemnity provisions of the contract were relevant when evaluating Phillips' liability. This Court dismissed Loffland's argument, instead recognizing that the contract must be viewed as a whole.[FN41] Reading the indemnity and insurance provisions together, the Court determined that the contract clearly limited Phillips' liability to only those damages exceeding the limits of insurance coverage afforded to it under Loffland's policy.[FN42] In other words, the drilling contract's insurance provision requiring additional assured coverage was deemed to prime the indemnity agreement.

> FN41. *Id.* at 189.

> FN42. *Id.* at 190.

The *Ogea* decision has been followed on numerous occasions in subsequent years.[FN43] In *Woods v. Dravo Basic Materials Co., Inc. v. U.S. Gypsum Co.*,[FN44] this Court interpreted a similar contract as again intending to exhaust all insurance coverage before having the indemnity provision apply. In *Tullier v. Halliburton*,[FN45] this Court again held that liability coverage maintained by the indemnitee primed the indemnity obligations included in the parties' time charter agreement. It identified the controlling and determinative factor in such cases "is the existence of 'additional assured' coverage whereby an indemnitee agreed to procure insurance coverage for the benefit of the indemnitor."[FN46] When this controlling factor is found to exist, *Ogea* requires the insurance procured by the indemnitee to be exhausted before the indemnity provisions can apply.[FN47]

> FN43. See *A.M.C. Liftboats, Inc. v. Apache Corp.*, 2008 WL 217177, *5-6 (E.D.La. 2008); *Ruehs v. Alliance Offshore. L.L.C.*, 2007 WL 275915, *1 (E.D.La. 2007); *Consolidated Grain & Baree Co., Inc. v. Capital Marine Supply, Inc.*, 2001 WL 823737, *3 (E.D. La. 2001); *In Re Diamond Servs.*, 2001 WL 531091, *3 (E.D.La. 2001); *Computaloe U.S.A., Inc. v. Mallard Bay Drilling. Inc.*, 21 F.Supp.2d 620, 624 (E.D.La. 1998); *Tullier v. Halliburton Geophysical Servs., Inc.*, 81 F.3d 552, 553-554 (5th Cir. 1996); *Saavedra v. Murphy Oil U.S.A., Inc.*, 930 F.2d 1104, 1104, 1110 (5th Cir. 1991); *Klepac v. Champlin Petroleum*, 842 F.2d 746, 747-748 (5* Cir. 1998).

> FN44. 887 F.2d 618, 621-622 (5th Cir. 1989).

> FN45. 81 F.3d at 553-554.

> FN46. *Id.* at 554.

> FN47. *Id.* at 554-555.

Also, in *In Re Diamond Services.*,[FN48] this Court affirmed, without opinion, the district court's underlying ruling, which extended the rule espoused in *Ogea* and *Tullier* to require exhausting available P&I insurance of the indemnitor regardless whether the policy actually provided the coverage sought. The district court in *Diamond* held the only logical way to reconcile reciprocal indemnity obligations with one-sided, mandatory insurance requirements, resulting in both companies being insured under the same policy, was to conclude the parties intended to exhaust the insurance coverage before triggering the indemnity obligations.[FN49]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN48. 281 F.3d 1279 (5th Cir. 2001).

FN49. *In Re Diamond Servs.*, 2001 WL 531091 at *3.

Even in *Klepac v. Champlin Petroleum Co.*,[FN50] where the contract's insurance obligation was specifically tied into the parties' indemnity agreement, the Court still held the pertinent insurance coverage primed any indemnity obligation. In *Klepac*, Western Oceanic, Inc. ("Western") entered into a drilling contract with Champlin Petroleum Co. ("Champlin"), requiring Champlin to indemnify Western under certain circumstances but Western to name Champlin as a co-insured on certain insurance policies it was required to obtain.[FN51] However, the contract stated the coverage affored to Champlin under Western's policies extended only to "risks, losses, and liabilities assumed [t]herein by [Western] or in respect of which [Western] has agreed to indemnify CHAMPLIN."[FN52]

FN50. 842 F.2d 746 (5th Cir. 1988).

FN51. *Id.* at 747.

FN52. *Id.*

The plaintiff, Klepac, sued both companies for injuries he sustained on Western's offshore drilling rig. Western filed a cross-claim against Champlin for indemnity.[FN53] Champlin argued its indemnity obligation applied only to amounts exceeding Western's insurance coverage procured under the contract.[FN54] The district court granted summary judgment in favor of Western. In doing so, it noted that Western was only required "to name Champlin as co-insured *on policies insuring Western's indemnitees to Champlin"* not on its comprehensive general liability policies procured under the contract.[FN55] On appeal, the district court's ruling was reversed. This Court instead held *Ogea* was determinative and compelled it to conclude that Champlin's duty to indemnify Western applied only to those amounts of damages exceeding Western's insurance coverage.[FN56]

FN53. *Id.* at 746.

FN54. *Id.* at 746-747.

FN55. *Id.* at 747. (emphasis in the original).

FN56. *Id.* at 748.

The foregoing clearly reveals Tidewater's insurance must be exhausted before the Charter's indemnity provisions can be applied. This Court has required such a result even where the contract did not require contractual liability coverage.[FN57] Therefore, where, as here, the additional assured requirement exists, additional assured status must be recognized and given full effect, entitling Baker to coverage for all claims in this litigation. Only after the insurance is exhausted can the indemnity obligations come into play.

FN57. *In Re Diamond Servs.*, 2001 WL 531091 at *2-3.

In addition, Baker is also entitled to reimbursement of its defense costs, regardless whether coverage is held to apply. As an additional assured under Tidewater's policies, Baker is owed a defense from Underwriters for all claims brought against it in this litigation.[FN58] Underwriters' duty to defend Baker is much broader than its duty to indemnify.[FN59] Its duty has been characterized as "expansive;" if the allegations set forth in the un-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

derlying complaint are even potentially covered under the policy, the duty to defend applies,[FN60] and does so regardless whether coverage is ultimately found to exist.[FN61] Here, the claims brought against Baker clearly have the potential to be covered under Tidewater's policies. And even if coverage is ultimately found not to exist, Baker is still entitled to reimbursement of defense costs through the date of formal judicial denial.[FN62]

> FN58. *Saavedra v. Murphy Oil U.S.A., Inc.*, 930 F.2d 1104, 1110 (5th Cir. 1991); *Peavey Co, v. M/V ANPA*, 971 F.2d 1168, 1177-1178 (5th Cir. 1992); *Botley v. Mar-Dril, Inc.*, No. 93-1640 at *11 (W.D.La. 1996) (Exhibit 4 to Baker's Memorandum in Support of Motion for Summary Judgment for Additional Assured Coverage and Defense or Alternatively, Breach of Contract Damages (R.Vol.14, p.4122), admitted at December 2005 trial, pp.13-15, R.E. Tab J).

> FN59. *Gregory v. Tennessee Gas Pipeline Co.*, 948 F.2d 203, 205 (5th Cir. 1991) (internal citations omitted).

> FN60. *Snue Harbor. Ltd. v. Zurich Ins.*, 968 F.2d 538, 545 (5th Cir. 1992).

> FN61. *Peavey*, 971 F.2d at 1175.

> FN62. See *Botley*, No. 93-1640 at *11 (although no coverage under the policy was found to exist, duty to defend still applied up until the issuance of the court's ruling on coverage).

In response to Baker's arguments, Tidewater has taken the position that it was not required to obtain insurance covering Baker's indemnity obligation, and that the insurance it did procure does not provide such coverage. In doing so, it relies exclusively on this Court's holding in *Landry v. Oceanic Contractors. Inc.*,[FN63] and the following language of the Charter:

> FN63. 731 F.2d 299 (5th Cir. 1986).

The aforesaid policy shall include CHARTERER, in its capacity as time charterer of the vessel, as an additional assured, but only with respect to the risks assumed by OWNER in this Charter . . . ."

Tidewater greatly misconstrues the *Landry* holding and application of the indemnity provisions, as is shown below.

In *Landry*. Oceanic, employer of an injured seaman, entered into an agreement with Tidex, the vessel owner, requiring Tidex to obtain P&I insurance naming Oceanic as an additional assured.[FN64] Coverage for Oceanic under the Pental policy procured by Tidex was limited to "liabilities that may be imposed against the Named Assured [Tidex] by law in the absence of contract."[FN65] This Court interpreted the quoted provision of the policy to mean additional assureds were covered under the policy, but only for liability predicated on some legal (not contractual) liability of Tidex, the named insured.[FN66]

> FN64. *Id*. at 301-303.

> FN65. *Id*. at 304.

> FN66. *Id*.

Contrary to Tidewater's position, *Landry,* as a pure coverage decision, did not involve any issues of indemnity,

or the interplay between insurance and indemnity, an dis therefore not applicable.[FN67] Nevertheless, even if *Landry* were controlling, it would still establish Baker's entitlement to coverage for Tidewater's legal (tort) liability; exactly what the lower court has denied Baker.

> FN67. Underwriters have not to this point raised any defenses to coverage under their respective policies.

As set forth above, *Klepac (supra)* instructs that all insurance coverage is to apply regardless whether the contract's language seems to restrict it to the parties' indemnity obligations. Further, *Diamond (supra)* instructs that coverage is to apply regardless whether the indemnitor is entitled to appropriate coverage as an additional assured. Baker submits that where indemnity and insurance are both at issue *Klepac* and *Diamond*, not *Landry*, are controlling and demand exhaustion of Tidewater's policy limits before any indemnity obligation can be enforced.

Moreover, Tidewater drafted the Charter obligating itself to procure insurance "covering the **liabilities** of OWNER [Tidewater]" but excluding "coverage for those **risks**, if any, assumed or insured by CHARTERER [Baker] in this Charter." (Emphasis added). (Charter Article XI). Tidewater further guaranteed the insurance it obtained would provide Baker coverage as an additional assured in its capacity as time charterer of the vessel for the " **risks**" Tidewater assumed under the contract.

Tidewater has urged that the above language was intended only to extend coverage to Baker for the indemnities contractually assumed by Tidewater and to exclude coverage for the indemnities undertaken by Baker. However, when Tidewater drafted Article XI, it used the words "liabilities" and "risks," not "indemnities." It must be presumed the use of different terms was for some purpose.[FN68]

> FN68. *Computalog U.S.A. Inc. v. Mallard Bay Drilling. Inc.*, 21 F.Supp.2d 620, 624 (E.D.La. 1998) (each provision of a contract must be given a meeting which renders it, along with all other provisions, effective rather than meaningless).

A review of the Charter reveals Baker and Tidewater both undertook risks separate and apart from Article XTV's reciprocal indemnity provision. For example, in Article V, Baker agreed to protect, defend, indemnify and hold harmless Tidewater from and against any violations of law or violations of the Coast Guard certificate of inspection for the vessel resulting from Baker's well stimulation operations, including loading or unloading of cargoes associated therewith. In Article VII, the operation, navigation and management of the vessel were designated to remain under the exclusive control of Tidewater, but with Baker having the right to designate the times of vessel movement. If Baker insisted upon certain action or inaction by Tidewater, and the Master did so under protest, Baker would have been solely responsible for all injuries or damages resulting therefrom.

These risk allegations are roughly parallel to the Charter's insurance requirements. The P&I policy to be obtained by Tidewater responds to damages arising from the navigation and operation of the vessel, whether caused by the Master or the time charterer. The exclusion of cargo liability coverage matches Baker's assumption of risks associated with cargo-related damages. These are the "risks" referred to in the Article XI insurance provision, not the indemnities set forth in Article XIV.

Plaintiffs injuries arose out of the risks expressly assumed by Tidewater under the Charter, operation, navigation and management of the vessel. It's Captain's order for the Baker crew to disconnect the coflex hose from the rig, which placed them directly in harm's way and subsequent intentional breaking of the starboard mooring line

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

without warning them to stand clear of the area, were undeniably part of the operation, navigation and management of the vessel, the "risks" Tidewater retained. Though Tidewater may now find it beneficial to argue that "risks" and "indemnities" are one and the same, the fact remains they are different terms with different definitions and usages in the Charter. As drafter of the agreement, Tidewater could have employed the same terms. They chose not to and cannot now be permitted to rewrite their contract.

Furthermore, the Charter's insurance provision states the requisite policies "shall include CHARTERER, *in its capacity as time charterer of the vessel*, **as an** additional assured, but only with respect to the risks assumed by OWNER in this Charter...." (Emphasis added). Tidewater focuses on the last phrase in formulating its argument, while ignoring the first.

Basic rules of contract interpretation require that effect be given to all provisions, such that the first part of the above-quoted provision cannot be ignored.[FN69] The provision's language unequivocally reveals Tidewater obligated itself to provide coverage to Baker in its capacity as time charterer. And since, in light of the *Becker I* decision, Baker's liability (aside from LHWCA benefits) is now limited to its actions taken as time charterer of Tidewater's vessel, the phrase is called squarely into play. The provision as a whole must be interpreted to require Tidewater's insurance to cover Baker's time charterer liability with respect to the risks assumed by Tidewater under the contract, i.e. operation, navigation and management of the vessel. Since Plaintiff's injuries arose directly from these vessel risks, Tidewater's insurance must be exhausted before the indemnity provisions are relevant.

> FN69. See *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004).

### C. *Indemnity Provision of Blanket Time Charter Agreement is Unenforceable*

Notwithstanding the application first of Tidewater's insurance the facts presented in this case, and application of the laws which they invoke, render the Charter's indemnity agreement unenforceable against Baker. Specifically, it is prohibited by LHWCA Section 905(b) and vitiated both by Tidewater's breach of its duties under the Charter and gross negligence.

### 1. LHWCA § 905(b)

This Court has already held that Plaintiff was entitled to the status of longshoreman at the time of his injury.[FN70] In light of that decision, the viability of the Charter's indemnity agreement was required to "be considered anew, consistent with the statutory scheme articulated in 33 U.S.C. § 905(b)-(c)...."[FN71]

> FN70. *Becker I*, 335 F.3d at 392-393.

> FN71. *Id.*at 394, n. 11.

Section 905(b) of the LHWCA provides that a covered employer shall not be liable to a vessel or vessel owner, directly or indirectly, for any damages recovered through its application, and further that "any agreements or warranties to the contrary shall be void." Subsection (c) of that Section includes an exception to this prohibition by declaring:
Nothing contained in subsection (b) of this section shall preclude the enforcement according to its terms of any reciprocal indemnity provision whereby the employer of a person entitled to receive benefits under this chapter by virtue of section 1333 of Title 43 [the OSCLA] and the vessel agree to defend and indemnify the other for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

cost of defense and loss or liability for damages arising out of or resulting from death or bodily injury to their employees.

These provisions combine to prohibit indemnity agreements between an LHWCA employer and a vessel owner, in the vessel owner's favor, unless, among other things, the injured employee is entitled to receive LHWCA benefits by virtue of Section 133 of the OSCLA. Here, however, the OSCLA is not applicable to the contract in question. Therefore, Section 905(b)'s prohibition of the Charter's indemnity agreement must be enforced.

In *Hodgen v. Forest Oil Corp.*, [FN72] this Court cited the Western District's opinion in *Wagner v. McDermott. Inc.*, [FN73] and praised it for its "heroic efforts to deal with the conflicting precedent". [FN74] in evaluating prior Fifth Circuit case law involving the determination of the OCSLA's application. The district court in *Wagner* identified that although some prior Fifth Circuit cases viewed the site of the accident as determinative of the OCSLA's application, [FN75] under its decision in *Union Texas Petroleum Corp. v. PLT Engineering*. [FN76] in cases involving a contractual dispute, the OCSLA's application was determined by the location where the substantial work was to be performed under the contract. [FN77] In *Union Texas Petroleum Corp. v. PLT Engineering*, this Court found the controversy arose on a situs covered by the OCSLA because "[t]he locations where the substantial work was done were covered situses[.]". [FN78]

FN72. 87 F.3d 1512, 1524 (5th Cir. 1996).

FN73. 899 F.Supp.1551, 1556 (W.D.La. l994), aff'd, 79 F.3d 20 (5th Cir. 1996).

FN74. *Id.*

FN75. See, e.g., *Hollier v. Union Texas Petroleum Corp.*, 972 F.2d 662, 665 (5* Cir. 1992).

FN76. 895 F.2d 1043 (5* Cir. 1990), *cert. denied*, 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990).

FN77. *Id.* at 1556.

FN78. *Id.* at 1047.

In this case, the location where the substantial work was to be performed in compliance with the Charter, i.e., the REPUBLIC TIDE, was not a covered OCSLA situs since it was neither attached to nor erected upon the seabed of the Outer Continental Shelf. Tidewater's claims against Baker involve a contractual dispute. Applying *PLT*'s analysis to the case at hand instructs that application of the OCSLA is not invoked under these facts. Thus, Plaintiff is not entitled to LHWCA benefits by virtue of Section 1333 of the OCSLA, rendering effective Section 905(b)'s prohibition of the Charter's indemnity agreement as it pertains to Baker. Tidewater's indemnity claims must fail.

## 2. Tidewater's Breach of Blanket Time Charter Agreement

As set forth above, Article III of the Charter obligated Tidewater to use due diligence to provide a vessel:
. . . with clear decks and being on her *delivery* **properly equipped and in every respect seaworthy and in good running order and in every way fit and ready for CHARTERER'S use and for the employment intended**...; and OWNER undertakes to so maintain the vessel **during the period of service under [the] Charter.**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

* * *

Throughout the term hereof, OWNER shall maintain in full force and effect on the vessel any required United States Coast Guard documents and Inspection Certificates, together with any other documents required of the vessel. (Emphasis added).

(R. Vol. 14 p. 3931, R.E. Tab G). In addition, Article XXIV states "...this Charter shall be subject to all applicable laws, orders, rules, regulations, and requirements of any State or Federal Government or any agency thereof." The record reveals Tidewater clearly breached its duties under these provisions. As discussed below, guidance by this Court indicates this breach operates to vitiate the indemnity agreement set forth in the Charter, thereby relieving Baker from any liability it may have otherwise owed to Tidewater.

It has been firmly established that Tidewater sent the REPUBLIC TIDE out to the Cliff's Rig 153 with two malfunctioning and defective pieces of critical equipment. Tidewater was aware the vessel's bow thruster was faulty, and would have known that its anchor was likely to fail had it followed its own equipment-inspection procedures mandated by the U.S. Coast Guard. The bow thruster and anchor were absolutely essential to Tidewater's principle duty under the Charter, i.e., to provide a vessel that would hold its position for the duration of the work to be performed at the rig.

Daniel Ray Sibley, a fluid engineer working aboard the Rig 153 at the time of the accident (Baker Trial Exhibit 13, p.12, admitted at December 2005 trial, p. 39-40), is the only disinterested, unbiased witness who testified about the REPUBLIC TIDE's bow thruster problems being experienced before the Rig 153 job. Sibley was able to confirm the testimony of other witnesses that the REPUBLIC TIDE reported bow thruster problems and requested permission to anchor on arrival at the rig. (Id. at pp. 14-15, 46). Personnel aboard the rig told Captain Givens to drop anchor toward the bow of the rig to avoid underwater pipelines located near its stern. (TT, pp. 773-774). The unreliable bow thruster failed and proved a major contributing cause of the accident.

The REPUBLIC TIDE arrived at the rig at approximately 3:00 a.m. on June 8, 1999. (TT, pp. 92-102). When she arrived, Tidewater personnel requested that mooring lines be lowered so the vessel could tie off to the rig from its port and starboard stern. (Id.). At approximately 3:30 a.m., the REPUBLIC TIDE'S attempt to anchor was hindered due to an anchor windless hydraulic motor failure, reported as a leaking hydraulic seal. This hydraulic motor failure effectively disabled the vessel's ability to retrieve its anchor because she no longer had the hydraulics to operate the windless. (Id.). Although the bow thruster was previously reported as having operational difficulties, when the anchor failed, Captain Givens chose not to deploy the anchor, but rather to rely on the bow thruster as the sole means of maintaining the vessel's position during operations (Id.).

Tidewater's breach of the Charter stems not only from this malfunctioning of its vessel, but also from its failure to use due diligence to provide a vessel properly equipped and in every way fit for her intended employment. In addition to beginning the gravel pack job with an unreliable bow thruster, Tidewater failed to properly inspect the ultimately-inoperable anchor and anchor windless pursuant to the U.S. Coast Guard Streamlined Inspection Program ("SIP"). The SIP is an alternative to traditional Coast Guard inspections, the primary goal of which is to maintain vessels in continued compliance with Coast Guard regulations.[FN79] The SIP permits participating companies, such as Tidewater, to avoid a stringent annual Coast Guard inspection through a regimented program of self-inspection.

FN79. Guidance on the Streamline Inspection Program can be found at *www.uscq,mil,* attached as exhibit "H" to Baker's Motion for Summary Judgment against Tidewater and Underwriters seeking dis-

missal of their claims for defense and indemnity due to their breach of the Charter (R.Vol. 14, p. 3950), admitted into evidence at December 2005 trial, pp. 13-15; R.E. Tab I).

In implementing the program under Coast Guard guidelines, Tidewater adopted a requirement that the anchor deck machinery, including the anchor windlass and wenches, be inspected in the first quarter (March) and third quarter (September) of every year. (July 2001 Trial Exhibit ("TE") P-22). Under Tidewater's anchor deck machinery inspection protocol, the company inspector must verify the pneumatic and hydraulic lines and connections of the anchor deck machinery are not leaking. (TE P-22).

The Tidewater inspection report for the quarter immediately proceeding the accident establishes the deck machinery, which includes the anchor windless and wenches, was not inspected. (TE P-17; TT, pp. 246-251). This failure is a direct breach of Tidewater's obligation to use due diligence to provide a vessel properly equipped and in every way fit for her intended purpose. It also constitutes a breach under Articles III and XXIV of the Charter, which required Tidewater to maintain in full force and effect all required inspection certificates and to comply with all applicable laws and regulations.

By enrolling in the SIP, Tidewater took it upon itself to properly inspect its vessels and ensure compliance with Coast Guard regulations, much like the obligation it undertook under the Charter. If a vessel owner is permitted to enroll in the SIP, a program that entrusts to the owner the obligation to ensure the safety of its vessels, knowing violations of SIP inspection obligations by that vessel owner should not be taken lightly. Tidewater's failure to inspect the anchor deck machinery for the quarter prior to the underlying accident constitutes a material breach of its inspection obligation and of the Charter, for which Tidewater must bear the consequences.

Moreover, Tidewater had actual evidence of a potential problem with the anchor windless hydraulics just one month before the accident. REPUBLIC TIDE engineer Clarence Polk testified that he added 10 to 15 gallons of hydraulic fluid in May 1999 while checking on the anchor windless (TT, p.1475). If anything, the considerable volume of fluid added is evidence, not of two-month late SIP inspection, as Tidewater has sought to characterize it, but rather establishes there was a problem with the windless hydraulics, one that a proper inspection of the equipment should have uncovered. Polk dismissed the addition of such a volume of fluid as not suggestive of any problem. (Id.). The fallacy in his reasoning is revealed by the leak that occurred when the REPUBLIC TIDE unsuccessfully attempted to deploy her anchor.

By seeking defense and indemnity from Baker, Tidewater is attempting to enforce a contract that it first breached. Its proposed interpretation of the Charter would completely read out of the contract Tidewater's bargained-for obligation to provide and maintain a seaworthy vessel for Baker's well stimulation operations. An obligation that - if complied with - should have kept the risk of injuries at a reasonable level. Allowing Tidewater to violate its contractual undertakings, thereby significantly increasing the likelihood and severity of injury, yet enforcing the indemnity provision, conflicts with basic principles of maritime law relating to indemnity contracts and cannot stand.

In *Marquette Transportation Co., Inc., v. Louisiana Machinery Co., Inc.,*[FN80] this Court recognized that breach of a contractual warranty may invalidate an indemnity agreement in the same contract.[FN81] In *Marquette*, the owners, operators, and insurers of a destroyed vessel brought an action against shipyard defendants who had previously performed the repair work on the vessel. The shipyard counter-claimed for attorneys' fees and costs it incurred in defending the suit based on the repair agreements' indemnification provision, whereby the vessel's owner agreed to defend, indemnify and hold harmless the shipyard.[FN82] This Court held the in-

demnity provision valid and enforceable as the indemnitee had not breached its warranties, but added that the indemnity clause did not absolve the shipyard of its warranty duties under the contract and that if the shipyard had been found in breach of those warranties, the Court's application of the indemnity clause would perhaps have been different.[FN83] Where, Tidewater did breach the warranties it owed under the Charter, the indemnities provided therein cannot be enforced in Tidewater's favor.

    FN80. 367 F.3d 398 (5th Cir. 2004).

    FN81. *Id.* at 408.

    FN82. *Id.* at 401.

    FN83. *Id.* at 408.

Tidewater has dismissed this Court's statements in *Marquette* as mere dicta, and instead relied upon *Fontenot v. Mesa Petroleum Co.*[FN84] in arguing that separate obligations relating to warranties do not void the indemnity agreement. In *Fontenot,* this Court upheld an indemnity provision contained in a contract for the provision of a drilling rig, despite allegations that the indemnitee breached its implied warranty of workmanlike performance under the contract.[FN85] Tidewater's reliance on *Fontenot*, however, is fundamentally flawed. Tidewater's obligation to provide and maintain a seaworthy vessel fit to maintain position for extended periods was not merely implied, as was the warranty breached in *Fontenot*, but rather was expressly set forth in the Charter. The parties, in negotiating, bargaining for, and apportioning the various liabilities and advantages in the Charter, thought Tidewater's duty to provide and maintain the REPUBLIC TIDE in a seaworthy condition important enough to formalize it in Article III. Tidewater's assertion that the Charter should be read as though Article III simply does not exist cannot withstand either the basic principles of maritime contract interpretation or this Court's reasoning in *Marquette*.[FN86]

    FN84. 791 F.2d 1207 (5th Cir. 1986).

    FN85. *Id.* at 1218-1219.

    FN86. Baker further notes that in *Landry v. Oceanic Contractors. Inc.,* 731 F.2d 299, 303-304 (5th Cir. 1984), a case heavily relied upon by Tidewater as set forth above, Tidewater's predecessor, Tidex, argued that its insurance obligation under a bareboat charter agreement was nullified by the charterer's breach of the charter - the exact same argument it now attempts to summarily dismiss - but was denied such relief due to its waiver of the argument.

Baker's position is further supported by the law applicable to maritime indemnity contracts. In *Computalog U.S.A. Inc. v. Mallard Bay Drilling. Inc.,*[FN87] the district court concisely reviewed the well-settled and axiomatic concepts that govern maritime contract interpretation in this Circuit:

    FN87. 21 F.Supp.2d 620 (E.D.La. 1998).

A maritime contract must be interpreted according to the general rules of contract, construction and interpretation. Each provision of a contract must be read in light of others so as to give each the meaning reflected by the contract as a whole. Finally, each provision of a contract must be given a meeting which renders it, along with all other provisions, effective rather than meaningless.[FN88]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN88. *Id.* at 624 (internal citations omitted).

Tidewater's proposed interpretation of the Charter would render meaningless its express assumption in Article III of the obligation to provide and maintain the REPUBLIC TIDE in a seaworthy condition. The only way to give effect to this provision is to conclude that Tidewater must live up to its basic obligations to maintain the vessel before it can take advantage of the indemnity language set forth in Article XIV. Otherwise, it would have absolutely no incentive to live up to its bargained-for obligation to provide and maintain a seaworthy vessel, but instead would remain comfortable in the knowledge that, regardless of the injury or damage caused by its breach of that duty, it could seek defense and indemnity from Baker. To make matters worse, Tidewater's failure to provide a seaworthy and properly functioning vessel greatly increased both the likelihood and severity of potential injury, thereby impermissibly enlarging the risk allocated to Baker under the indemnity agreement. Such an absurd result cannot have been contemplated, would be against public policy, and Baker must now be discharged from its purported liability under Article XIV.

Controlling precedent dictates that an act or omission by the indemnitee in breach of his duties under a contract of indemnity that increases the risk or liability of the indemnitor, or otherwise injures the rights or remedies of the indemnitor, discharges the indemnitor from his liability under the indemnity contract, at least to the extent of the injury caused.[FN89] This principle was discussed in *General Insurance Company of America v. Fleeger*.[FN90] In *Fleeger*, the insurance company and insurer of bonds covering certain contractors, sought indemnity for amounts paid on the bonds against the indemnitor, a construction company. Prior to the signing of each indemnity agreement, an agent for the insurance company represented to the construction company that each contractor had been checked out, reviewed and found to be competent. However, evidence presented at trial revealed the insurance company had noticed that the contractors were in default, but nevertheless, continued to issue bonds for them. The court acknowledged this action increased the risks to the construction company and prejudiced their rights under the indemnity agreement.[FN91]

> FN89. *Hierm v. St. Paul-Mercury Indemnity Co.*, 262 F.2d 526, 528 (5th Cir. 1959); *General Ins. Co. of America v. Fleecer*. 389 F.2d 159, 161, n.3 (5th Cir. 1968); *Denton v. Fireman's Fund Indemnity Co.*, 352 F.2d 95, 96, 99. (10th Cir. 1965); *American Cas. Co. of Redding, Pennsylvania v. Idaho First Nat'l Bank*, 328 F.2d 138, 142-143 (9th Cir. 1954); *Hudson v. Forest Oil Corp.*, 2003 WL 21276385, *4 (E.D.LA.2003).

> FN90. 389 F.2d 159 (5th Cir. 1968).

> FN91. *Id.* at 160-161.

This Court affirmed the trial court's findings that the insurance company had made false representations regarding the competency of the contractors, that the construction company relied upon these representations, and that the representations were a material inducement.[FN92] The construction company was released from three indemnity agreements.[FN93] Relying on precedent, this Court noted "it is equally well settled that an act on the part of an indemnitee which materially increases the risks or prejudices the right of the indemnitor will discharge the indemnitor to the extent that he has been damaged as a result of that act."[FN94]

> FN92. *Id.* at 161.

> FN93. There was a fourth indemnity agreement discussed as to that one, there was no evidence of material inducement.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN94. *Id.* at 161, n. 3; citing, *Hiern*, 262 F.2d 526.

Well stimulation operations require the chartered vessel to remain stationary along side the rig for an extended period of time. Tidewater knew the REPUBLIC TIDE would need to be maintained in a stationary position alongside the Cliffs Rig 153 for 12 to 18 hours. (TT, pp. 137-138, 251). Captain Givens notified the rig that he did not trust the vessel's bow thruster to perform properly. (TT, p. 773). By failing to follow its own protocols and conduct the necessary inspections of the anchor and anchor windless, knowing full well of the need for the anchor to work properly, Tidewater greatly increased the scope and severity of the risk, and enlarged the potential liability of Baker under the indemnity agreement, changing the terms of the contract without Baker's consent. As such, Tidewater's breach of contract should be recognized as discharging Baker from any liability under Article XIV of the Charter.

### 3. Tidewater's Gross Negligence

Based upon the definitions and parameters assigned to the meaning of "gross negligence" by courts, it is without question that Tidewater's actions in causing Paintiff's injuries, when taken as a whole, rise to the level of gross negligence. Consider the following:

• Tidewater Captain Daniel Givens misled the crew of the Cliffs Rig 153 into believing that the REPUBLIC TIDE would be anchored during the 12-18 hour gravel pack job;

• Although it had given him trouble earlier, Captain Givens chose to rely on the bow thruster to maintain position for the 12-18 hour gravel pack job;

• After the unanchored REPUBLIC TIDE's faulty bow thruster not surprisingly failed, Tidewater Captain Steven Lachney sent Plaintiff and his co-workers to disconnect the coflex hose on the rig.

• Captain Lachney knew that powering up the vessel to break the stern line would also violently pull on the coflex hose, causing it to move across the deck and endangering the men working in the area of the hose;

• Despite his actual knowledge of the danger presented by his intended course of action, Captain Lachney powered up the REPUBLIC TIDE and violently pulled the hose taut, without telling anyone what he was doing or warning of the danger he knew his actions would create, as a result of which Plaintiffs legs were severed.

These actions exhibit a course of conduct revealing a complete and utter disregard for safety of others and a conscious and reckless indifference to the consequences of their actions. If Captain Lachney's conduct in instructing Plaintiff to work on the very hose he then moved violently across the deck, with full knowledge of his proximity, is not grossly negligent conduct, it is difficult to envision what ever might suffice. Indeed, Tidewater was guilty gross negligence. The Charter's indemnity agreement did not extend to such conduct (see Charter Article XIV), and Tidewater is thus answerable for its own fault.

In *Becker I,* this Court expressly required determination of the defendants' potential gross negligence at the retrial of this matter.[FN95] This issue arose during the first appeal with regard to Baker's argument that because gross negligence was not expressly included within the scope of the Charter's indemnity provision, Baker could not be required to indemnify Tidewater for Tidewater's own gross negligence. This Court's directive to the district court to consider "proof of gross negligence" was an acknowledgment that Tidewater's gross negligence, if found, would vitiate Baker's indemnity obligations under the language of the Charter.[FN96]

FN95. *Becker I*, 335 F.3d at 393-394, n.11.

FN96. Its reasoning is supported by the well-settled rule that indemnity for gross negligence will not be enforced unless it is expressly set forth in the indemnity agreement at issue. *Todd's Shipyard Corp. v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Turbine Service. Inc.,* 674 F.2d 401, 411 (5th Cir. 1982); *Royal Ins. Co. of Am, v. Southwest Marine,* 194 F.3d 1009, 1015-1016 (9th Cir. 1999); *Daughdrill v Ocean Drilling & Exploration Co.,* 665 F.Supp.477, 481-482 (E.D.La. 1987); *La Esperanza De P.R., Inc. v. Perez Y Cia. De Puerto Rico. Inc.,* 124 F.3d 10, 19 (1st Cir. 1997); *In the matter of T.T. Boat Corp.,* 1999 WL 1442054 (E.D.La.1999); *In matter of Torch. Inc.,* 1996 WL 185765 (E.D.La. 1996).

Though often discussed, "gross negligence" has not been easily defined. Most recently, this Court in *The Houston Exploration Co. v. Halliburton Energy Services, Inc.,*[FN97] cited approvingly to a series of definitions setting forth the nature - and parameters of the concept:

    FN97. 269 F.3d 528 (5th Cir. 2001).

Other courts have defined gross negligence as the "entire absence of care," the "want of even slight care and diligence," and the "other disregard of the dictates of prudence, amounting to complete neglect of the rights of other." At least one Louisiana court stated that one is grossly negligent when he "has intentionally done and act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make highly probable that harm would follow." Mere advertence or honest mistake does not amount to gross negligence.[FN98]

    FN98. Id- at 532 (internal footnotes and citations omitted).

Under these definitions, gross negligence is not just a breach of the standard of care, but rather a lack of care all together. Just as important, the grossly negligent actor proceeds despite the understanding that potentially grievous injury is likely to result from his actions. Taken together, the definitions cited by this Court are strikingly similar to the terms used at trial by Captain Ronald Campana to describe Tidewater's actions in this case: the failure *to* do even "the very minimum [one] could have done," such that one's conduct amounts "the highest form of disregard for the standards of the trade." (TT, p. 894.)[FN99]

    FN99. Captain Campana's testimony was accepted as a proffer only during the original trial of this case, but later admitted into evidence as the December 12, 2005 retrial as Baker Exhibit 15. (December 2005 trial transcript, p.40).

The evidence of Tidewater's gross negligence is as clear and uncontradicted as it is shocking. Captain Campana, Plaintiff's vessel operations expert, was the first to use the phrase "grossly negligent" in this case, when he described the Tidewater captains' failure to inform the rig that the vessel would not be anchored, despite their earlier assurances that it would be. When asked what he meant when he described this omission as "grossly negligent," Captain Campana responded as follows:

I mean it was -- in degrees of negligence, it was the highest type of negligence in the performance of his duties in not telling the rig he wasn't anchored. You have little negligence and you have a lot of negligence, I appreciate that, but from our terms as a seaman, the very minimum he could have done was tell the rig he wasn't anchored. The fact that he didn't do it was the highest form of disregard for the standards of the trade.

(TT, p. 894). Captain Campana's characterization of Captain Given's failure to advise the rig he would not be anchored is no different from this Court's most recent clarification of what "gross negligence" means. Given's failure to notify the rig that his vessel was unanchored and potentially at the mercy of the current was a failure to do "the very minimum he could have done," is tantamount to an " 'entire absence of care' [or] the 'want of even slight care and diligence [.]' "[FN100]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN100. *Houston Exploration,* 269 F.3d at 532. quoting *Hendry Corp. v. Aircraft Rescue Vessels,* 113 F.Supp. 198, 201 (E.D.La 1953), and *State v. Vinzant,* 200 La. 301, 315, 7 So.2d 917, 922 (1942).

Earlier in his testimony, Captain Campana related: "I would not say [Givens] deviated from the standards [of good seamanship], I would say he never achieved the standards. He was well below the standards." (TT, p. 888-889). This analysis of Captain Given's failure to keep the rig informed goes to the very heart of what this Court has concluded "gross negligence" means. His failure to advise the rig that he was not anchored was not "mere adverence" or an "honest mistake," but instead was an act "intentionally done in reckless disregard of the risk known to him [.]".[FN101]

FN101. *Houston Exploration.* 269 F.3d at 532, quoting *Cates v. Beauregard Electric Co.-Op., Inc.,* 316 So.2d 907, 916 (La.App.3d Cir. 1975), aff'd, 328 So.2d 367 (La.1976).

Not to be outdone, Tidewater Captain Steven Lachney was also grossly negligent in directly causing Plaintiff's injuries. Captain Lachney knew when he powered up the REPUBLIC TIDE that he was exposing Plaintiff and the other Baker hands to tremendous danger, yet he proceeded in the face of that knowledge without warning anyone. His conduct fits almost precisely with the most exacting of the gross negligence definitions cited by this Court, describing the grossly negligent actor as one who

has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.[FN102] Nothing can better describe Captain Lachney's appreciation for the utter

FN102. *Id.* at 532.

disregard of the risk his actions presented than his own words offered under examination by Plaintiff's counsel:

Q. It was clear to you a hose just like this one right here, this coflex steel hose, that's what went over the rail up on the M/V REPUBLIC TIDE from your boat?

A. Correct, sir.

Q. You're in that dog house aware that big steel cable goes up in the air and over the rail on the Cliff's 153 and your bow thruster goes down right?

A. Correct. [TT, p. 254].

* * *

Q. Did you ever call Baker and say, I'm getting ready to power up my engines?

A. No, I did not call them and say, I'm ready to power up my engines. I did call him and tell him we could not do anything, to get rid of the hose at that time. And that they are going to have do something up there on the rig. That was my last and final call to the rig. [TT, p. 265].

* * *

Q. You pulled on that rope?

A. I did pull on that rope.

Q. You did it intentionally?

A. I did pull on that rope intentionally.

Q. And prior to pulling on that rope intentionally, you never called the rig or the Baker hands up on that rig and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

told any of them you were getting ready to pull on that rope intentionally; is that true, sir?
A. That is true. [TT, p. 266].

\* \* \*

Q. In fact, at some point your boat did pull on the coflex hose, right?
A. At some point it did.
Q. Three feet of movement, just three of feet of movement with your boat will cause the coflex hose to move a lot up on that rig deck, right?
A. Correct.
Q. And you knew that before you powered up and popped that, right?
A. Correct. [TT, p.311].

In summary, Captain Lachney told the Baker hands to go disconnect the hose, then moments later powered up his vessel without bothering to warn the men he had just sent into harm's way of the danger they were in. Again, this is not a case of "mere inadvertence" or "honest mistake," but instead was a situation in which the actor fully appreciated the likely harm his action could cause and proceeded nonetheless.

Whether taken individually or collectively, Tidewater's actions were grossly negligent under even the most stringent of definitions set forth in *Houston Exploration*. Therefore, Tidewater's claims against Baker must fail as its gross negligence goes beyond the bounds of the Charter's indemnity agreement.

### D. *In the Alternative, the Indemnity Obligation under Blanket Time Charter Agreement is Limited to Plaintiffs General Damages,*

Notwithstanding its arguments to the contrary, if the Charter's indemnity provision is upheld, and Tidewater and Underwriters are provided relief thereunder, Baker's obligation would be limited to the amount of the judgment reflecting Plaintiff's general damages only. This limitation is based upon the Charter's express terms, which specifically exclude any obligation on the part of Baker to defend, indemnify or hold harmless Tidewater or Underwriters from and against any claims for punitive, indirect, incidental, special or consequential damages of any kind or nature, or interest thereon.

Indemnity contracts are to be strictly construed,[FN103] requiring one to look to what is clearly and unequivocally expressed when interpreting same.[FN104] In doing so, indemnity agreements should be read as a whole and the words utilized should be given their plain meaning unless the provision is ambiguous.[FN105] A court should not look beyond the written language of the contract to determine the intent of the parties unless the disputed language is ambiguous.[FN106] Where ambiguity is found, the language is to be construed strictly against the party who drafted the agreement.[FN107]

FN103. *Randall v. Chevron U.S.A. Inc.,* 13 F.3d 888, 906 (5th Cir. 1994), overruled on other grounds by *Bienvenu v. Texaco. Inc.*, 164 F.3d 901 (5th Cir. 1999); *Cargill Fertilizer. Inc. v. PEARL JAHN O/B,* 190 F.Supp.2d 894, 900 (E.D.La. 2002); *Smith v. Tenaco Oil Co., Inc.,* 803 F.2d 1386, 1388 (5* Cir. 1986).

FN104. *Theriot v. Bay Drilling Corp.,* 783 F.2d 527, 540 (5th Cir. 1986); *Corbitt v. Diamond M. Drilling Co.,* 654 F.2d 329, 333 (5th Cir. 1981); *In the matter of TT Boat Corp.,* 1999 WL 1442054, *6 (E.D.La. 1999) (internal citations omitted); *Orduna S.A. v. Zen-Noh Grain Corp.,* 913 F.2d 1149, 1153

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(5th Cir. 1990) (internal citations omitted); *Cargill Fertilizer,* 190 F.Supp.2d at 899-900; *Walter Oil & Gas Corp. v. Safeguard Disposal Systems. Inc.,* 961 F.Supp. 931, 933-934 (E.D.La. 1996).

FN105. *Ingalls Ship Building v. Federal Ins. Co.,* 410 F.3d 214, 2005 WL 1168414, *3 (5th Cir. 2005); *Walter Oil.* 961 F.Supp. at 933-934 (internal citations omitted); *Lirette v. Popich Bros. Water Transport. Inc.,* 699 F.2d 725, 728 (5th Cir. 1983); *Ogea,* 622 F.2d at 189; *Corbitt,* 654 F.2d at 332.

FN106. *Cargill,* 190 F.Supp.2d at 900 (internal citations omitted); *Corbitt,* 654 F.2d at 332-333; *Hicks v. Ocean Drilling & Exploration Co.,* 512 F.2d 817, 825 (5th Cir. 1975); *cert. denied,* *H.B. Buster Hughes, Inc., v. Ocean Drilling & Exploration Co.,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639 (1976) .

FN107. *Ford v. NYLCare Healthplans of the Gulfcoast, Inc.,* 141 F.3d 243, 249-250 (5th Cir. 1998); *Mott v. ODECO,* 577 F.2d 273, 278 (5* Cir. 1978); *Zapata Marine Service v. O/Y Finnlines. Ltd,* 571 F.2d 208, 209 (5th Cir. 1978).

Furthermore, an indemnity provision must be construed so as to cover only losses, damages and liabilities that reasonably appear to have been contemplated by the parties, and it is inappropriate to impose liability for any losses or liabilities that are not expressly stated within the terms of the agreement or of such a character that it could reasonably be inferred they were intended to be included in the indemnity contract.[FN108]

FN108. *Corbitt,*654 F.2d at 333.

A review of the Charter demonstrates that when Tidewater drafted the Charter, it placed the respective indemnity obligations of the parties addressing property-related damages in Article XIII, and personal injury-related damages in Article XIV. After setting forth the personal injury-related indemnity obligations, Tidewater included a third paragraph of Article XIV, which reads in pertinent part:
***Notwithstanding anything to the contrary contained herein***, it is expressly agreed by and between the parties hereto that, regardless of the negligence on the part of any party hereto or the unseaworthiness of any vessel, ***neither such party shall be liable to the other for any punitive, indirect, incidental, special or consequential damages of any kind or nature*** (including, but not limited to, loss of profits, loss of use, loss of hire, and loss of production); and ***each party hereby agrees to waive its right of recourse in this regard against the other party.*** (Emphasis added).

The language emphasized above leaves no doubt that the parties excepted the excluded damages from any indemnity obligations in Article XIV and waived recourse against each other as to same.

This is bolstered by application of the above-referenced rules of construction for maritime indemnity agreements. When asking: (1) is the language clear and unequivocal, and (2) is the third paragraph of Article XIV unambiguous, when taking into account the plain meaning of the words and reading the Charter as a whole? Baker submits the answer to both questions is clearly, "yes."

Tidewater has argued, and the district court has agreed, that the Charter's provision waiving special damages simply means the parties agreed not to be liable to each other for such damages, but that damages of third parties are excepted from this exclusion. (R.Vol. 17, p. 4814; R.E. Tab E.3). This interpretation is illogical, however, considering the exclusionary language in the Charter's Article XIV addressing personal injury indemnity. If the parties had intended to except third party liability from this exclusion, Article XIV would be the most inappro-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

priate place to include this language.

In expressing its purpose for including Article XIV's third paragraph, it was incumbent upon Tidewater as drafter to do so in clear and unequivocal terms. It is Baker's position that, as written, the Charter's indemnity obligations clearly and unequivocally do not extend to the excluded damages, and that the parties clearly and unequivocally waived recourse against each other for such claims. While Baker believes the language could hardly have been more clear, any perceived ambiguity would have to be strongly and strictly construed against the drafter of the document, in this case Tidewater, and against those whose rights derive from the rights of the drafter, Underwriters. Indeed, if the Charter is ambiguous, Tidewater and Underwriters cannot now claim the benefit of the doubt, but rather it is Baker who must be protected from an unintended, unfair result.[FN109]

     FN109. See *Ford*, 141 F.3d at 241-250.

Tidewater has asserted an additional challenge to the exclusion by claiming the breadth of the Charter's indemnity provision, applying to "any liability" and "all claims, and/or damages" usurps application of the exclusion of damages covered provided in Article XIV's third paragraph. Its reasoning is obviously flawed, however, because it ignores the absolute introductory language, "[n]otwithstanding anything to the contrary," of the waiver provision. Use of this phrase clause indicates the parties contemplated the possibility that other parts of the contract may conflict with the pertinent provision, and so agreed the provision must be given effect regardless of any contradictory language included in the contract.[FN110] As a result, the provision modifies all obligations under the Charter Agreement, especially those set forth in the very same section of the contract in which it appears (Article XIV).

     FN110. *Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.,* 180 S.W.3d 635 (Tex.App.-Houston, October 11, 2005), citing, *Cleere Drilling Co. v. Dominian Explor. & Prod., Inc.,* 351 F.3d 642, 649, n. 13 (5th Cir. 2003).

Finally, with respect to Tidewater's claim for attorneys' fees, costs and expenses, not only in defending against Plaintiff's claims, but also in prosecuting its. third party complaint and cross claim, this too is an area where Tidewater greatly over estimates the scope of Article XIV's indemnity provision and is simply wrong.

In *Weathersby v. Conoco Oil Co.,*[FN111] this Court specifically rejected a claim by an indemnitee for recovery of attorneys' fees and costs incurred in establishing its right to indemnification, even though indemnification was owed. The Court rejected the argument that cases standing for the proposition that attorneys' fees and costs incurred in the defending against the main demand are recoverable by an indemnitee also support the recovery of attorneys' fees and costs incurred in establishing one's right to indemnification under an indemnity agreement, characterizing the rejected argument as a misapprehension of the law.[FN112] *Weathersby* has been followed uniformly by the courts of this Circuit.[FN113] It is clear then that no recovery of any costs of pursuing defense and indemnity can be recovered by Tidewater or Underwriters. The lower court's ruling to the contrary must be reversed as a clear error of law.

     FN111. 752 F.2d 953 (5th Cir. 1984).

     FN112. *Id*. (internal citations omitted).

     FN113. See, e.g., *Dow Chem. Co. v. M/V Roberta Tabor,* 815 F.2d 1037, 1046 (5th Cir. 1987); *Brown v. Sea Mar Mgmt., LLC,* 2006 WL 3328194, *4 (W.D.La. 2006); *Baza v. Chevron Oil Service Co.,* 1996

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

WL 711506, *5 (E.D.La. 1996); *Theriot v. A.S.W. Well Service, Inc.,* 1990 WL 158990, *3 (E.D.La. 1990); *Badeaux v. Torch, Inc.,* 1989 WL 140227, *2 (E.D.La. 1989); *Daughdrill v. Ocean Drilling & Exploration Co.,* 702 F.Supp. 1267, 1268 (E.D.La. 1988).

### E. *All Baker Fault is Employer Fault*

An LHWCA employer is immune from suit in tort by his employee.[FN114] While it is possible for an employer who is also the charterer of a vessel to be liable to his employee for "vessel negligence" under 33. U.S.C. § 905(b), "an employer is not liable for *any* negligence, but *'only* for negligence in its [charterer] capacity.' " [FN115]

> FN114. 33 U.S.C. § 905(a).

> FN115. *White v. Cooper/T. Smith Corp.,* 690 F.Supp. 534, 538 (E.D.La. 1988) (emphasis in original) (internal footnotes and citations omitted).

Where an employer is also the time charterer of a vessel, there must be a strict delineation between the employer's role as employer and its role as time charterer, and of the duties owed to the plaintiff-employee in each capacity. "When the defendant is both the time charterer and the employer [the LHWCA] only subjects the defendant to negligence liability in its capacity as a time charterer.... The two duties are separately owed and do not affect each other."[FN116] That is "the duties and responsibilities against which the claim of the defendant's negligence must be measured are necessarily limited to those which arise out of and are founded on the relationship which the time-charterer establishes between the defendant and the vessel."[FN117]

> FN116. *Moore v. Phillips Petroleum Co.,* 912 F.2d 789, 791 (5th Cir. 1990) (internal citations omitted).

> FN117. *Kerr-McGee Corp. v. Ma-Ju Marine Service, Inc.,* 830 F.2d 1332, 1339 (5th Cir. 1987).

When considering the duties Baker owed to Plaintiff as time charterer, it must be remembered that a time charter is a contract whereby "the charterer engages for a fixed period of time a vessel, which remains manned and navigated by the vessel owner, to carry cargo whereever the charterer instructs[.]"[FN118] The time charter's role is limited to directing the commercial activity of the vessel, determining the ship's routes, destinations, timing of the mission, and the designation of cargo.[FN119] "[A] time charterer cannot be liable under [LHWCA §905(b)] unless it is negligent, and it is a fundamental precept of tort law that there can be no negligence unless there is first a duty."[FN120]

> FN118. *Neissho-Iwai Co., Ltd. v. M/V Stolt Lion,* 617 F.2d 907, 911 (2nd Cir. 1980).

> FN119. *Kerr-McGee,* 830 F.2d at 1340-1341.

> FN120. *Id.* at 1340.

As this Court has described, a time charterer has responsibilities and can be held liable under Section 905(b), but the scope of that potential liability is decidedly limited:
Certainly the time-charterer has some responsibilities. It designates the cargo that the chartered vessel will carry, and if, for example, it carelessly chooses an unsafe combination of cargo to share the same hold, it could be liable for resulting damages. The time-charterer directs where and when the vessel will travel, so if it forces it out in hurricane weather or similarly treacherous conditions, it may be liable under [§905(b)]. But its duties are de-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

termined by tradition and agreement.[FN121]

      FN121. *Id.* at 1341 (internal citations omitted).

Nor does a time charterer have any duty to supervise the loading or unloading of cargo, or to warn of open and obvious dangers.[FN122]

      FN122. *Dahlen v. Gulf Crews, Inc.,* 281 F.3d 487, 496-497 (5th Cir. 2002).

A time charterer's duties to an LHWCA worker are far narrower in scope than those owed by the vessel owner or owner *pro hac vice.* That is, for Baker's fault to be upheld in this matter, the record must have demonstrated proof of *time charterer* vessel negligence rather than general vessel negligence, a much more limited inquiry.

The Charter itself sets forth Baker's duties as time charterer in this case. It reveals Baker's role in its relationship with Tidewater was in line with a time charterer's role as it has been described by this Court. Under the Charter, Baker had the right to charter Tidewater vessels for use in well stimulation operations. (Charter Article I, II). Tidewater agreed to deliver and maintain a seaworthy vessel (Charter Article III), and remained responsible for manning, supplying, maintaining, operating, navigating, and managing the vessel. (Charter Article VI, VII). Baker remained responsible for various fees and assessments. (Charter Article X). The purpose of the Charter is explicitly identified as "the lawful movement of materials and personnel incidental to CHARTERER'S operations...in the inshore and offshore waters of the Gulf of Mexico." (Charter Article V). Finally, Baker was given the right to "install additional equipment in connection with its operation," with the proviso that all such equipment was to remain Baker's property. (Charter Article VIII).

Contrast these duties with those of the LHWCA employer. Because the LHWCA is a no-fault compensation scheme, there is limited discussion in either the Act itself or the jurisprudence of the duties that an LHWCA employer owes to its longshoreman. What is clear, however, is that the duty to provide the longshoreman with a safe place to work is within the purview of employer responsibility. As this court observed in *Kerr-McGee,* such a duty is
... subsumed within [the longshoreman's] workers' compensation rights under the LHWCA .... [T]o impose on [the time charterer] such a non-deligable duty, even though "cast in terms of negligence" would have much the same result as making it liable in a capacity other than its capacity as time charter.[FN123]

      FN123. 830 F.2d at 1342.

Likewise there is no question that the duties to train[FN124] and to supervise[FN125] a maritime worker arise out of employer responsibility.

      FN124. *Gautreaux v. Scurlock Marine. Inc.,* 84 F.3d 776 (5th Cir. 1996), rev'd on other grounds.

      FN125. *Weber v. Azalea Fleet. Inc.,* 2005 WL 711608 (E.D.La.2005).

The district court found Baker negligent as time charterer for its role in the installation and maintenance of its equipment aboard the REPUBLIC TIDE. Specifically, the court found fault with Baker in its installation and maintenance of the coflex reel system and an iron sleeve through which the hose ran from the vessel to the rig, referred to as the "blue shoe." (R.Vol. 18, pp.5444-5447, R.E.Tab C). The court also imputed Baker with time

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

charterer fault for failing to properly train and instruct its employees on how the coflex reel system operated. Finally, the court found Baker guilty of time charterer fault as "direct[or] [of] the commercial activities of the vessel and as the party responsible for well stimulations under the Charter[.]" (Id. at p.5444). Contrary to the court's findings, Baker submits its alleged negligence in contributing to this accident relates entirely to its role as Plaintiff's employer.

Large portions of the record contain discussion of Baker's alleged role in the design and construction of the coflex hose reel assembly. In particular, Plaintiff's expert, Steve Killingsworth, essentially argued Baker was the de facto "manufacturer" of the reel assembly system. This allegation reveals Plaintiff's claims against Baker as "manufacturer" are tantamount to a strict products liability claim. While this type of claim may be entertained when considering a Jones Act employer's liability, such alleged fault cannot be ascribed to Baker in this case for - two reasons: first, Section 905(a) of the LHWCA provides a longshoreman's exclusive means of recovery against his employer in that capacity, thereby precluding a strict products liability claim; and second, this Court has already determined that the negligence action allowed to injured longshoremen under § 905(b) does not include a claim for strict liability, which would include strict products liability claims.[FN126]

  FN126. *Hess v. Upper Mississippi Towing Com.,* 559 F.2d 1030 (5th Cir. 1977).

Moreover, Baker cannot be held liable in tort to Plaintiff for any alleged failure to provide proper equipment for the performance of his duties or for the manner in which Baker performed its well stimulation activities. Though the coflex hose unit was "installed" on the back of the vessel, the unit remained Baker's property, and thus, amounted to no more than Baker's tools for performing its well-stimulation operations. It must be remembered that Baker was not a co-owner of the REPUBLIC TIDE. Rather, as time charterer, it was simply entitled to direct where the vessel was to travel to perform the services which Baker provides. The coflex hose unit was simply one of the tools Baker provided to its own employees to aid in the completion of its services.

An analysis of Baker's actions in light of the distinction this Court requires to be drawn between "employer" and "vessel" fault can lead only to the conclusion that Baker's provision and maintenance of equipment used in well stimulation operations must fall within the realm of employer fault. As the Second Circuit has put it, "the key issue is whether [the charterer's] employees who were at fault committed their negligent acts in their capacity as agents of the vessel...or employees[.]"[FN127] Any deficiencies or failures in the use or maintenance of the coflex hose reel assembly, the "blue shoe," or any other Baker equipment pertained to Baker's well-stimulation operations, and thus, its employer responsibility, rather than its role as time charterer. The same even more compellingly holds true for any deficiencies of Baker in properly training and instructing its employees in the use of well stimulation equipment.

  FN127. *Gravatt v. City of New York,* 226 F.3d 108, 125 (2nd Cir. 2000).

A case from the Louisiana First Circuit Court of Appeal is instructive on this issue. In *Daggs v. Martin,*[FN128] a longshoreman claimed damages for alleged injury sustained while building an oil platform from the deck of his employer's spud barge, suing his employer under Section 905(b). The employer acted in a dual capacity as both the barge owner and as the plaintiff's employer. The injury occurred when the plaintiff's supervisor, stepping from the barge to the deck of the platform, accidently struck the plaintiff with pipe jack. The court analyzed the employer's allegedly negligent conduct to determine whether the conduct was performed in the course of the operation of the owner's vessel as a vessel, or whether the conduct was performed in furtherance of the employer's harbor worker operations.[FN129]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

> FN128. 2002-1799 (La.App.lst Cir. 6/27/03), 851 So.2d 1190, *writ denied*, 2003-2636 (La.12/12/03), 860 So.2d 1158.

> FN129. *Id*. at 1192.

Affirming the district court, the Louisiana First Circuit concluded the employer
was negligent in its capacity as an employer, not in its capacity as a vessel owner. The task of the barge was to transport materials to the job site. The task of the construction crew was to construct the platform; this task included transporting the pipe jack from the barge to the platform. The performance of the construction work was separate and apart from the work of the vessel.[FN130]

> FN130. *Id*. at 1193.

*Daggs* is highly relevant to this case. All of Baker's alleged fault in the accident related directly to its well-stimulation activities, not to its role as a time charterer of the vessel. In particular, the equipment used in the performance of the well-stimulation activities had no relation to Baker's rights and duties as time charterer, i.e., carrying of cargo and control of when and where the vessel was to sail. Just as in *Daggs*. the vessel here provided a transportation function for the Baker workers and equipment, whose activities and responsibilities were focused on the well and had no relation to navigation or vessel operations. As the employer in *Daggs* actually owned the vessel, opening it to far more expansive liability than Baker might face here in the decidedly more limited role of time charterer, to hold Baker liable as a §905(b) "vessel" in this case would open liability to "vessel fault" to every time charterer who places any men or equipment on a chartered vessel.

This is not to say that there are no circumstances under which a time charter might be liable to his longshore employee who is aboard the chartered vessel. Consider, for example, a situation in which Plaintiff hypothetically had sustained injuries while at sea or at a job site because Baker had ordered the vessel to use undue haste in rushing from one job to another or demanded, over a captain's protest, that the vessel proceed to the next job in the face of unsafe weather. Either instance would implicate Baker's time charterer fault, i.e., fault in its capacity as the entity with the authority to direct when and where the REPUBLIC TIDE sailed. But the propriety of Baker's equipment and methods for performing its well-stimulation work are so plainly within the purview of Baker's employer responsibility that they clearly should not have been considered for purposes of assessing fault to Baker in this case.

For the reasons set forth above, and explained in *Kerr-McGee* and *Daggs*, Baker, as time charterer, cannot be held liable for its failure to provide Plaintiff with adequate training or a safe place to work. To hold otherwise would effectively eviscerate the tort immunity provided by §905(a).

With Baker's fault arising from its employer capacity only, which is protected from liability under LHWCA §905(a), Tidewater must be held liable for 100% of Plaintiff's damages.[FN131]

> FN131. *In re ADM/Growmark River System, Inc.,* 234 F.3d 881, 888 (5th Cir. 2000).

### F. *District Court's Refusal to Allow Additional Discovery and Evidence was an Abuse of Discretion*

Baker submits the record as it now stands provides more than enough evidence to void the Charter's indemnity provisions and support a finding of gross negligence on the part of Tidewater. Should this Court find otherwise, however, the district court's judgment must still be reversed due to its abuse of discretion in preventing Baker

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

from conducting additional discovery and submitting additional evidence, including the report and testimony of its vessel operations expert, Captain David Scruton, prior to the retrial of this case.

After appeal and remand from *Becker I.* Baker moved to conduct additional limited discovery and to retain an expert witness on the issue of gross negligence. (R.Vol. 13, p. 3725). Baker's Motion was filed in keeping with this Court's mandate that "the question whether Baker must indemnify Tidewater must be considered anew, consistent with the statutory scheme articulated in 33 U.S.C. §905(b)-(c)," and for a determination of "whether the evidence will show proof of gross negligence by any of the defendants."[FN132] In a ruling entered only six days before trial, the disctrict court rejected all requests, aside from allowing Baker to take certain supplemental depositions of those earlier deposed. (R.Vol. 17, p. 4811, R.E. Tab E.1). By doing so, the court abused its discretion.

> FN132. *Becker I*, 335 F.3 at 394.

Leading up to the original trial, the district court granted summary judgment in favor of Tidewater and Underwriters, ruling that the Charter's indemnity provisions were broad enough to encompass Tidewater's gross negligence in causing Plaintiffs injuries. (R.Vol. 8, p. 2288; June 14, 2001 hearing transcript, pp. 2-12; R.E. Tab F). The effect of this ruling was that it disposed of any opportunity Baker had to produce additional evidence supporting it's claim that. Tidewater was grossly negligent. Since, according to the district court, the Charter's indemnity provisions encompassed gross negligence, the issue of whether gross negligence existed was moot until that decision was vacated in *Becker I.* It also had the effect of eliminating any motive for Baker to introduce such evidence, because it would do nothing but increase its exposure by heaping further fault on Tidewater.

On appeal in *Becker I.* this Court specifically noted Tidewater's motion for summary judgment was granted before discovery was complete.[FN133] Then, in discussing the granting of Underwriters' motion, the Court correctly noted that evidence allegedly implicating Tidewater's gross negligence had emerged between the granting of Tidewater's motion and the filing of Underwriters' motion, and that Baker claimed whether Tidewater was guilty of gross negligence was still a disputed issue of fact.[FN134] The Court then mandated that the indemnity issue between Baker and Tidewater be reconsidered and specifically noted: "also yet to be determined is whether the evidence *will show* proof of gross negligence by any of the defendants."[FN135]

> FN133. *Becker I,* 335 F.3d at 384.

> FN134. *Id*. at 384, n.2.

> FN135. *Id*. at 393, n.11 (emphasis added).

By requiring a determination of the merits of this claim, this Court clearly rejected the district court's earlier ruling that the contract language was broad enough to include indemnification for gross negligence. Moreover, by referencing "evidence" rather than the record, and by speaking in future tense, in terms of "will show" rather than as though the evidence had already been obtained, the Court clearly anticipated additional evidence being taken to allow a full hearing on gross negligence with evidence, including testimony and experts, to assist in its determination.

The actions and omissions of Tidewater's captains involved in the Rig 153 job, and conduct of Tidewater concerning the inspection, maintenance and repair of its vessel which led to its condition at the time, the various failures of equipment on the day of the accident and contingency planning of the Tidewater captains in light of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

these circumstances were all relevant to the inquiry of Tidewater's degree of culpability. Baker sought to conduct further discovery on these issues but was allowed, only six days before trial, to merely update depositions previously taken, a worthless exercise. Additionally, Baker sought leave to retain an expert on the gross negligence issue, a vessel operations expert, Captain David Scruton, regarding Tidewater's conduct prior to and at the time of Plaintiff's accident. The lower court denied this and refused to consider this evidence. Captain Scruton's report (Baker Proffer B-l, submitted at December 2005 trial, pp.42-43) provides expert opinion identifying the following:

• That ten gallons of hydraulic fluid was added to the anchor windlass in May 199 indicated there was a potential problem with the windlass leaking hydraulic fluid. (Id., p.3).

• Captain Givens acted with complete disregard for the standards of good seamanship practices by proceeding with the gravel packing job without being anchored, and exhibited an utter disregard for the safety of others by allowing rig personnel to believe the vessel was anchored. (Id., p.4).

• Tidewater's utter and complete lack of foresight and/or contingency plans in the event vital equipment was lost was especially egregious when its captains had full knowledge and appreciation of the fact that maintaining the vessel's position was of paramount importance to the safety of the rig, the vessel, and all personnel. (Id.)

• Captain Lachney demonstrated a complete and reckless disregard for the safety of the men working on the rig after the vessel's bow thruster failed by powering up the vessel's engines, breaking the starboard stern line and pulling away from the rig, while being fully aware such movement would cause the coflex hose to move significantly and that personnel were working in close proximity to the coflex hose pursuant to his instruction. (Id., pp.5-6).

Based on this Court's *Becker I* mandate, Baker submits it should have been allowed to introduce Captain Scruton's testimony for consideration at the retrial of this case. This Court should at a minimum, consider Captain Scruton's expert report in evaluating whether Tidewater's conduct was grossly negligent.

Additional evidence of Tidewater's breach of the Charter should also have been admitted. As noted above, because the district court granted Tidewater summary judgment on its indemnity claims before discovery was completed for the original trial, Baker was prevented from providing additional evidence on the issue because it was rendered moot.

However, following the original trial and *Becker I.* this Court's opinion in *Marquette, supra*, was rendered and provided additional support for vitiating the Charter's indemnity agreement due to Tidewater's breach.

As set forth above, in *Marquette,* this Court stated that if the indemnitee had been found in breach of its warranties under the pertinent contract, the Court's application of the indemnity clause would have perhaps been different.[FN136] This statement called into question Tidewater's reliance on *Fontenot v. Mesa Petroleum*, *supra*, in support of its argument that the indemnity provision was valid. Baker notes prior rulings from this Court may be re-examined on remand if "controlling authority has since made a contrary decision of law applicable to such issues."[FN137] When an intervening opinion from this Court articulated a different rule than was followed prior to the original trial, the district court should have allowed the parties to supplement the record under the newly articulated standard.[FN138]

    FN136. 367 F.3d at 408.

    FN137. *Blair v. Sealift. Inc.,* 91 F.3d 755, 761 (5th Cir. 1996) (internal citations omitted).

    FN138. See *Diamond Offshore Co.,* 302 F.3d at 545-546 (Summary judgment record was insufficient

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

under intervening Fifth Circuit opinion to establish whether location of repair contractor's employee's alleged injury on an offshore drilling rig qualified as an OCSLA situs, such that the indemnity agreement between the contractor and the operator of the rig was valid with respect to employee's injury, notwithstanding coverage under the LHWCA. Therefore, remand was ordered with directions to allow operator to put forth additional summary judgment proof, since neither the district court nor the parties, in developing the summary judgment record, had the benefit of the subsequent opinion, which articulated a significantly different rule than was followed by the district court.).

Of particular importance to this issue is the indication that Tidewater may have ignored its obligation to inspect the REPUBLIC TIDE'S anchor windlass for a much longer period that just the quarter before Plaintiff's accident. Tidewater's participation in the Coast Guard's SIP required it to inspect the anchor windlass twice each year, in March and September. Tidewater's records reflect this inspection was never performed for the quarter immediately preceding the accident. Following remand from *Becker I.* Baker requested leave to conduct. additional discovery regarding Tidewater's inspection procedures because the record was unclear as to whether the semi-annual inspections for the preceding year (1998) were ever performed. Tidewater apparently ignored Plaintiff's request for documents during the litigation which would have provided this information during discovery leading up to the original trial. (Deposition transcript of Steven J. Lachney, p. 254, attached as Exhibit "A" to Baker's Motion for Leave to Conduct Limited Discovery and Retain Expert Witness (R.Vol. 13, p.3725) and admitted into evidence at December 2005 trial, pp. 13-15). Baker pleaded with the district court for leave to obtain this missing information, but its request was flatly rejected.

In light of this Court's opinion in *Marquette,* which came after *Becker I.* specifically indicating that a purported indemnitee is not absolved of its warranty duties under a contract just because indemnity provisions are included therein, Baker should have been allowed to conduct discovery and supplement the record with additional evidence of Tidewater's breach of its obligations under the Charter, including its failure to abide by SIP requirements during the quarters, and even years preceding Plaintiffs accident. By preventing Baker from doing so, the district court again abused its discretion.

Decisions to admit new evidence on remand from an appellate mandate vacating a judgment and ordering determination of issues has consistently been met with favor by federal appellate courts. In *State Indus., Inc. v. Mor-Flo Indus.,* Inc.,[FN139] the Federal Circuit vacated the initial judgment of the district court and mandated that it reconsider the issue of willful infringement and enhanced damages on remand.[FN140] The district court adhered to the mandate by reopening the record to hear new evidence on those issues.[FN141] Plaintiff argued that reopening the record was not permitted by the appellate decision. In a subsequent appeal, the Federal Circuit pointed out that, although it did not explicitly order a new evidentiary hearing, it certainly did not forbid one and, absent contrary instructions, such a decision was left to the sound discretion of the trial court.[FN142]

  FN139. 948 F.2d 1573 (Fed. Cir. 1991).

  FN140. *Id.* at 1577.

  FN141. *Id.*

  FN142. *Id.*

Similarly, the Sixth Circuit in *Carter Jones Lumber Co. v. LTV Steel Co.,*[FN143] held the district court properly allowed the plaintiff to introduce evidence on remand of an issue that had been ordered by the appellate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

court to be considered, after the district court had not done so at trial.[FN144] The same situation is presented here. The district court was instructed to reconsider Tidewater's indemnity claims and gross negligence, issues which were disposed of early on in the litigation. Thus, on remand, the parties should have been allowed to introduce evidence on these issues as their consideration "anew" was required by the appellate Court.

> FN143. 237 F.3d 745 (6th Cir. 2001), *cert denied*, *Dixie Distributing Co.v. Carter-Jones Lumber Co.*, 533 U.S. 903, 121 S.Ct. 2244, 150 L.Ed.2d 232 (2001)

> FN144. *Id*. at 751.

Finally, in *Schudel v. General Electric Co.,*[FN145] the plaintiffs argued the district court erred in dismissing their claims without a retrial, when the appellate court had remanded for a new trial. On remand, the district court granted defendant's unopposed motion to conduct an inquiry prior to retrial of the remaining claims to determine whether the plaintiffs could present evidence of causation that would survive the standards set out in the appellate court's first opinion.[FN146] The plaintiff was allowed to submit affidavits from his three experts used at trial and from two newly retained experts.[FN147] Although the Ninth Circuit had previously remanded for a new trial, it found the district court's actions proper as plaintiffs were "given...a fair change to remedy their inability to rely on the expert testimony they presented at the first trial by supplementing that testimony with new evidence."[FN148]

> FN145. 35 Fed.Appx.484 (9th Cir. 2002).

> FN146. *Id*. at 486.

> FN147. *Id*. at 487.

> FN148. *Id*. at 487-488.

These decisions reveal the preference of reviewing courts that district courts veer toward inclusion of too much, rather than too little, new evidence on remand. Baker submits that since the district court here did the exact opposite, it abused its discretion and impermissibly inhibited the parties from developing their case on the issues impacting in Tidewater's indemnity claims which were to be "considered anew" on remand. Should this Court believe there to be insufficient evidence upon which to find gross negligence or breach of contract, this matter should be remanded with instructions to allow discovery on these issues to proceed, and the issues to be considered again anew.

CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, Baker requests the following relief:

1. The judgment be reversed and rendered in Baker's favor, against Tidewater and Underwriters, requiring that Tidewater's insurance coverage from Pental Insurance Co., Ltd, Certain Underwriters at Lloyds Subscribing to Risk No. Le010620O, and other available coverage be applied to Plaintiff's damages award and fully exhausted. This result is supported by the language of the parties' Charter, general rules of maritime contract interpretation, and this Court's long line of cases, beginning with *Ogea.* which require exhaustion of insurance limits for accidents arising from contracts with terms similar to the parties' Charter. Baker should also be awarded reimbursement of all defense costs, which must be quantified on remand.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2. The judgment be reversed and rendered in Baker's favor, against Tidewater, on Tidewater's claims for indemnity. Not only does Section 905(b) of the LHWCA prohibit enforcement of the Charter's indemnity provisions against Baker, but the record also firmly establishes those provisions are vitiated due to Tidewater's breach of the Charter and gross negligence which caused Plaintiff's injuries.

3. Alternatively, the judgment be reversed and rendered in Baker's favor, limiting its indemnity obligation to Tidewater's liability for Plaintiffs general damages. Fifth Circuit precedent prohibits an indemnitee from recovering costs and attorneys' fees incurred in pursuing its claim for defense and indemnity. In addition, the Charter clearly and unequivocally excludes "punitive, indirect, incidental, special [and] consequential damages" from the parties reciprocal indemnity obligations "notwithstanding anything to the contrary contained [t]herein." The general rules of maritime contract interpretation warrant giving full effect to this limitation, and thereby, limiting Baker's indemnity obligation, if any, to Tidewater's liability for Plaintiff's general damages only.

4. The judgment be reversed and the defendants' fault be reallocated to reflect that Baker is 0% at fault in its capacity as time charterer of the REPUBLIC TIDE, and thus, Tidewater was 100% at fault in causing Plaintiff's injuries.

5. And finally, should this Court find the evidence of record insufficient to support Baker's arguments regarding the invalidity of the Charter's indemnity agreement due to Tidewater's breach of contract or gross negligence, that the judgment be vacated and the matter remanded to the district court for further proceedings to allow for additional discovery and the admission of additional evidence pertaining to these issues.

Seth A. BECKER, Plaintiff- Appellant, v. TIDEWATER, INC.; et al, Defendants. Tidewater, Inc.; Tidewater Marine, LLC; Twenty Grand Offshore, Inc.; Pental Insurance Company, Ltd.; Certain Underwriters at Lloyd's Subscribing to Risk No. LE010620O, Defendants - Appellees, v. Baker Hughes, Inc.; Baker Oil Tools, Inc, A Division of Baker Hughes Oilfield Operations, Inc., Defendants - Appellants.
2008 WL 7295642 (C.A.5 ) (Appellate Brief )

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

100 S.Ct. 2636                                                           Page 1
448 U.S. 242, 100 S.Ct. 2636, 14 ERC 1673, 65 L.Ed.2d 742, 10 Envtl. L. Rep. 20,477
**(Cite as: 448 U.S. 242, 100 S.Ct. 2636)**

Supreme Court of the United States
UNITED STATES, Petitioner,
v.
L. O. WARD dba L. O. Ward Oil and Gas Operations.

No. 79-394.
Argued Feb. 26, 1980.
Decided June 27, 1980.
Rehearing Denied Aug. 22, 1980.
See 448 U.S. 916, 101 S.Ct. 37.

Lessee of onshore drilling facility sued to enjoin collection of "civil penalty" imposed for discharge of oil from retention pit into navigable waters. Consolidated therewith was suit by the United States to collect the unpaid penalty. The United States District Court for the Western District of Oklahoma, Luther B. Eubanks, J., rendered judgment for the Government, and operator appealed, 423 F.Supp. 1352. The Court of Appeals for the Tenth Circuit, reversed and remanded, 598 F.2d 1187. Writ of certiorari issued. The Supreme Court, Mr. Justice Rehnquist, held that: (1) the monetary penalty imposed by Federal Water Pollution Control Act against any owner or operator of a vessel etc., from which oil or a hazardous substance is discharged in violation of the Act is civil and does not trigger the protections afforded by the Constitution to a criminal defendant and hence, reporting requirement, as used to support a "civil penalty" does not violate the reporter-violator's right against compulsory self-incrimination, and (2) proceeding in which the penalty was imposed was not "quasi-criminal" within the meaning of the *Boyd* rule for purpose of triggering the Fifth Amendment's protection.

Judgment of Court of Appeals reversed.

Mr. Justice Blackmun filed an opinion concurring in the judgment, in which Mr. Justice Marshall joined.

Mr. Justice Stevens filed a dissenting opinion.

West Headnotes

**[1] Penalties 295 &#x1F852;16**

295 Penalties
    295II Actions and Other Proceedings
        295k16 k. Nature and Form of Remedy. Most Cited Cases

Whether a particular statutorily defined penalty is civil or criminal is a matter of statutory construction.

**[2] Penalties 295 &#x1F852;16**

295 Penalties
    295II Actions and Other Proceedings
        295k16 k. Nature and Form of Remedy. Most Cited Cases

Inquiry whether a statutory penalty is civil or criminal proceeds on two levels: first, a court sets out to determine whether Congress, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or another and, second, where Congress has indicated an intention to establish a civil penalty, the court inquires further whether the statutory scheme was so punitive either in purpose or effect as to negate that intention.

**[3] Penalties 295 &#x1F852;16**

295 Penalties
    295II Actions and Other Proceedings
        295k16 k. Nature and Form of Remedy. Most Cited Cases

The seven *Kennedy* considerations for determining whether a penalty, although labeled civil, is, in fact, a criminal sanction are neither exhaustive nor dispositive.

**[4] Environmental Law 149E &#x1F852;223**

448 U.S. 242, 100 S.Ct. 2636, 14 ERC 1673, 65 L.Ed.2d 742, 10 Envtl. L. Rep. 20,477

**(Cite as: 448 U.S. 242, 100 S.Ct. 2636)**

149E Environmental Law
  149EV Water Pollution
    149Ek223 k. Penalties and Fines. Most Cited Cases
      (Formerly 199k25.7(24) Health and Environment)

Fact that Rivers and Harbors Appropriation Act of 1899 made criminal the escape of oil from an oil retention pit at a drilling facility, which oil eventually found its way into body of navigable water did not render the "civil penalty" under Federal Water Pollution Control Act criminal in nature. Federal Water Pollution Control Act Amendments of 1972 (Clean Water Act), § 311(b)(6), 33 U.S.C.A. § 1321(b)(6); Rivers and Harbors Appropriation Act of 1899, § 13, 33 U.S.C.A. § 407.

**[5] Criminal Law 110 ⟨⟩393(1)**

110 Criminal Law
  110XVII Evidence
    110XVII(I) Competency in General
      110k393 Compelling Self-Incrimination
        110k393(1) k. In General. Most Cited Cases

**Environmental Law 149E ⟨⟩207**

149E Environmental Law
  149EV Water Pollution
    149Ek204 Compliance and Enforcement
      149Ek207 k. Reporting, Notice, and Monitoring Requirements. Most Cited Cases
      (Formerly 199k25.7(24) Health and Environment)

**Environmental Law 149E ⟨⟩223**

149E Environmental Law
  149EV Water Pollution
    149Ek223 k. Penalties and Fines. Most Cited Cases
      (Formerly 199k25.7(24) Health and Environment)

The monetary penalty imposed by Federal Water Pollution Control Act against any owner or op-

erator of a vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of the Act is civil and does not trigger the protections afforded by the Constitution to a criminal defendant; hence, reporting requirement, as used to support a "civil penalty", does not violate the reporter-violator's right against compulsory self-incrimination. Federal Water Pollution Control Act Amendments of 1972 (Clean Water Act), § 311(b)(3, 5, 6), 33 U.S.C.A. § 1321(b)(3, 5, 6); U.S.C.A.Const. Amend. 5.

**[6] Criminal Law 110 ⟨⟩393(1)**

110 Criminal Law
  110XVII Evidence
    110XVII(I) Competency in General
      110k393 Compelling Self-Incrimination
        110k393(1) k. In General. Most Cited Cases

**Environmental Law 149E ⟨⟩207**

149E Environmental Law
  149EV Water Pollution
    149Ek204 Compliance and Enforcement
      149Ek207 k. Reporting, Notice, and Monitoring Requirements. Most Cited Cases
      (Formerly 199k25.7(24) Health and Environment)

**Environmental Law 149E ⟨⟩223**

149E Environmental Law
  149EV Water Pollution
    149Ek223 k. Penalties and Fines. Most Cited Cases
      (Formerly 199k25.7(24) Health and Environment)

Proceeding in which "civil penalty" authorized by Federal Water Pollution Control Act was imposed on lessee of onshore drilling facility from which oil had escaped into navigable water, was not "quasi-criminal" within meaning of *Boyd* rule so as to implicate Fifth Amendment protection against compulsory self-incrimination as regards use of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

448 U.S. 242, 100 S.Ct. 2636, 14 ERC 1673, 65 L.Ed.2d 742, 10 Envtl. L. Rep. 20,477

**(Cite as: 448 U.S. 242, 100 S.Ct. 2636)**

statutory reporting requirements, i. e., obligation to report a discharge or spill, in support of the penalty. Federal Water Pollution Control Act Amendments of 1972 (Clean Water Act), § 311(b)(3, 5, 6), 33 U.S.C.A. § 1321(b)(3, 5, 6); U.S.C.A.Const. Amend. 5.

**\*\*2637** *Syllabus* FN\*

FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

**\*242** Section 311(b)(3) of the Federal Water Pollution Control Act prohibits the discharge of oil into navigable waters. Section 311(b)(5) requires any person in charge of an onshore facility to report any such discharge to the appropriate Government agency, and a failure to report subjects the person to a fine or imprisonment. Section **\*\*2638** 311(b)(5) also provides for a form of "use immunity," by specifying that notification of the discharge or information obtained by the exploitation of such notification is not to be used against the reporting person in any criminal case, except for prosecution for perjury or for giving a false statement. Section 311(b)(6) provides for the imposition of a "civil penalty" against any owner or operator of an onshore facility from which oil was discharged in violation of the Act. When oil escaped from a drilling facility leased by respondent and spilled into a tributary of the Arkansas River system, respondent notified the Environmental Protection Agency of the discharge, and this was reported to the Coast Guard who assessed a $500 penalty against respondent under § 311(b)(6). After his administrative appeal was denied, respondent filed suit in Federal District Court, seeking injunctive relief against enforcement of §§ 311(b)(5) and (6) and collection of the penalty. The Government filed a separate suit to collect the penalty, and the suits were consolidated for trial. Prior to trial, the District Court rejected respondent's contention that the

reporting requirements of § 311(b)(5), as used to support a civil penalty under § 311(b)(6), violated his right against compulsory self-incrimination, and ultimately the jury found that respondent's facility did, in fact, spill oil into the creek in question. The Court of Appeals reversed, holding that § 311(b)(6) was sufficiently punitive to intrude upon the Fifth Amendment's protections against compulsory self-incrimination.

*Held* :

1. The penalty imposed by § 311(b)(6) is civil and hence does not trigger the protections afforded by the Constitution to a criminal defendant. Pp. 2640-2642.

(a) It is clear that Congress intended in § 311(b)(6) to impose a civil penalty upon persons in respondent's position, and to allow imposition**\*243** of the penalty without regard to the procedural protections and restrictions available in criminal prosecutions. This intent is indicated by the fact that the authorized sanction is labeled a "civil penalty," and by the juxtaposition of such label with the criminal penalties set forth in § 311(b)(5). P. 2641.

(b) The fact that § 13 of the Rivers and Harbors Appropriation Act of 1899 makes criminal the conduct penalized in this case does not render the penalty under § 311(b)(6) criminal in nature. The placement of criminal penalties in one statute and of civil penalties in another statute enacted 70 years later tends to dilute the force of the factor-the behavior to which the penalty applies is already a crime-considered, *inter alia* in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644, as indicating that a penalty is criminal in nature. Neither that factor nor any of the other factors set forth in *Mendoza-Martinez* are sufficient to render unconstitutional the congressional classification of the penalty established in § 311(b)(6). Pp. 2641-2642.

2. The proceeding in which the penalty was im-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

448 U.S. 242, 100 S.Ct. 2636, 14 ERC 1673, 65 L.Ed.2d 742, 10 Envtl. L. Rep. 20,477

**(Cite as: 448 U.S. 242, 100 S.Ct. 2636)**

posed was not "quasi-criminal" so as to implicate the Fifth Amendment's protection against self-incrimination. *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, distinguished. In light of overwhelming evidence that Congress intended to create a penalty civil in all respects and weak evidence of any countervailing punitive purpose or effect, it would be anomalous to hold that § 311(b)(6) created a criminal penalty for the purposes of the Self-Incrimination Clause but a civil penalty for all other purposes. Pp. 2642-2644.

10 Cir., 598 F.2d 1187, reversed.

Edwin S. Kneedler for petitioner.

Stephen Jones, Enid, Okl., for respondent.

*244 Mr. Justice REHNQUIST delivered the opinion of the Court.

The United States seeks review of a decision of the United States Court of Appeals for the Tenth Circuit that a proceeding for the assessment of a "civil penalty" under § 311(b)(6) of the Federal Water Pollution Control Act (FWPCA) is a "criminal case" **2639 within the meaning of the Fifth Amendment's guarantee against compulsory self-incrimination. We granted certiorari, 444 U.S. 939, 100 S.Ct. 291, 62 L.Ed.2d 305, and now reverse.

I

At the time this case arose,FN1 § 311(b)(3) of the FWPCA prohibited the discharge into navigable waters or onto adjoining shorelines of oil or hazardous substances in quantities determined by the President to be "harmful." FN2 Section 311(b)(5) of the Act imposed a duty upon "any person in charge of a vessel or of an onshore facility or an offshore facility" to report any discharge of oil or a hazardous substance into navigable waters to the "appropriate agency" of the United States Government. Should that person fail to supply such notification, he or she was liable to a fine of not more than $10,000 or imprisonment of not more than one year. Section 311(b)(5) also provided for a form of "use im-

munity," specifying that "[n]otification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement." 33 U.S.C. § 1321(b)(5).FN3

> FN1. Section 311 was amended by the Clean Water Act of 1977, Pub.L. 95-217, 91 Stat. 1566, and the Federal Water Pollution Control Act Amendments of 1978, Pub.L. 95-576, 92 Stat. 2468. Except as noted, those amendments have no bearing on the present case. See nn. 2 and 4, *infra.*

> FN2. Section 311(b)(3) was amended by the Federal Water Pollution Control Act Amendments of 1978, Pub.L. 95-576, 92 Stat. 2468, to prohibit the discharge of oil and hazardous substances "in such quantities as *may* be harmful" (emphasis added), as determined by the President.

> FN3. At the time in question, § 311(b)(5) read in full:

> "Any person in charge of a vessel or of an onshore facility or an offshore facility shall, as soon as he has knowledge of any discharge of oil or a hazardous substance from such vessel or facility in violation of paragraph (3) of this subsection, immediately notify the appropriate agency of the United States Government of such discharge. Any such person who fails to notify immediately such agency of such discharge shall, upon conviction, be fined not more than $10,000, or imprisoned for not more than one year, or both. Notification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement."

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

448 U.S. 242, 100 S.Ct. 2636, 14 ERC 1673, 65 L.Ed.2d 742, 10 Envtl. L. Rep. 20,477
**(Cite as: 448 U.S. 242, 100 S.Ct. 2636)**

**\*245** Section 311(b)(6) provided for the imposition of a "civil penalty" against "[a]ny owner or operator of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation" of the Act. In 1975, that subsection called for a penalty of up to $5,000 for each violation of the Act.[FN4] In assessing penalties, the Secretary of the appropriate agency was to take into account "the appropriateness of such penalty to the size of the business or of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the gravity of the violation . . . ." 33 U.S.C. § 1321(b)(6).[FN5]

FN4. Section 311(b)(6) was amended by the Federal Water Pollution Control Act Amendments of 1978, Pub.L. 95-576, 92 Stat. 2168, to authorize civil penalties of up to $50,000 per offense, or up to $250,000 per offense in cases where the discharge was the result of willful negligence or misconduct.

FN5. At the time of the discharge in this case, § 311(b)(6), as set forth in 33 U.S.C. § 1321(b)(6), read:

"Any owner or operator of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3) of this subsection shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than $5,000 for each offense. No penalty shall be assessed unless the owner or operator charged shall have been given notice and opportunity for a hearing of such charge. Each violation is a separate offense. Any such civil penalty may be compromised by such Secretary. In determining the amount of the penalty, or the amount agreed upon in compromise, the appropriateness of such penalty to the size of the business of the owner or operator charged, the ef-

fect on the owner or operator's ability to continue in business, and the gravity of the violation, shall be considered by such Secretary. The Secretary of the Treasury shall withhold at the request of such Secretary the clearance required by section 91 of Title 46 of any vessel the owner or operator of which is subject to the foregoing penalty. Clearance may be granted in such cases upon the filing of a bond or other surety satisfactory to such Secretary."

**\*246 \*\*2640** According to § 311(k) of the Act, funds collected from the assessment of penalties under § 311(b)(6) were to be paid into a "revolving fund" together with "other funds received ... under this section" and any money appropriated to the revolving fund by Congress. See 33 U.S.C. § 1321(k). Money contained in this fund was to be used to finance the removal, containment, or dispersal of oil and hazardous substances discharged into navigable waters and to defray the costs of administering the Act. 33 U.S.C. § 1321(*l* ). another section of the Act allowed the United States Government to collect the costs of removal, containment, or dispersal of a discharge from the person or corporation responsible for that discharge in cases where that person or corporation had been identified. 33 U.S.C. § 1321(f).

On or about March 23, 1975, oil escaped from an oil retention pit at a drilling facility located near Enid, Okla., and eventually found its way into Boggie Creek, a tributary of the Arkansas River system.[FN6] At the time of the discharge, the premises were being leased by respondent L. O. Ward, who was doing business as L. O. Ward Oil & Gas Operations. On April 2, 1975, respondent Ward notified the regional office of the Environmental Protection Agency (EPA) that a discharge of oil had taken place. Ward later submitted a more complete written report of the discharge, which was in turn forwarded to the Coast Guard, the agency responsible for assessing civil penalties under § 311(b)(6).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

448 U.S. 242, 100 S.Ct. 2636, 14 ERC 1673, 65 L.Ed.2d 742, 10 Envtl. L. Rep. 20,477

**(Cite as: 448 U.S. 242, 100 S.Ct. 2636)**

FN6. All parties concede that Boggie Creek is a "navigable water" within the meaning of 33 U.S.C. § 1362(7).

After notice and opportunity for hearing, the Coast Guard assessed a civil penalty against respondent in the amount *247 of $500. Respondent filed an administrative appeal from this ruling, contending, *inter alia*, that the reporting requirements of § 311(b)(5) of the Act violated his privilege against compulsory self-incrimination. The administrative appeal was denied.

On April 13, 1976, Ward filed suit in the United States District Court for the Western District of Oklahoma, seeking to enjoin the Secretary of Transportation, the Commandant of the Coast Guard, and the Administrator of EPA from enforcing §§ 311(b)(5) and (6) and from collecting the penalty of $500. On June 4, 1976, the United States filed a separate suit in the same court to collect the unpaid penalty. The District Court eventually ordered the two suits consolidated for trial.

Prior to trial, the District Court rejected Ward's contention that the reporting requirements of § 311(b)(5), as used to support a civil penalty under § 311(b)(6), violated his right against compulsory self-incrimination. The case was tried to a jury, which found that Ward's facility did, in fact, spill oil into Boggie Creek. The District Court, however, reduced Ward's penalty to $250 because of the amount of oil that had spilled and because of its belief that Ward had been diligent in his attempts to clean up the discharge after it had been discovered.

The United States Court of Appeals for the Tenth Circuit reversed. *Ward v. Coleman*, 598 F.2d 1187 (1979). Although admitting that Congress had labeled the penalty provided for in § 311(b)(6) as civil and that the use of funds collected under that section to finance the administration of the Act indicated a "remedial" purpose for the provision, the Court of Appeals tested the statutory scheme against the standards set forth in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-169, 83 S.Ct. 554,

567-568, 9 L.Ed.2d 644 (1963), FN7 and held that **2641 § 311(b)(6) was sufficiently *248 punitive to intrude upon the Fifth Amendment's protections against compulsory self-incrimination. It therefore reversed and remanded for further proceedings in the collection suit.

FN7. The standards set forth were "[w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment-retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned. . . ." 372 U.S., at 168-169, 83 S.Ct., at 567-568 (footnotes omitted).

II

The distinction between a civil penalty and a criminal penalty is of some constitutional import. The Self-Incrimination Clause of the Fifth Amendment, for example, is expressly limited to "any criminal case." Similarly, the protections provided by the Sixth Amendment are available only in "criminal prosecutions." Other constitutional protections, while not explicitly limited to one context or the other, have been so limited by decision of this Court. See, *e. g., Helvering v. Mitchell*, 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917 (1938) (Double Jeopardy Clause protects only against two criminal punishments); *United States v. Regan* 232 U.S. 37, 47-48, 34 S.Ct. 213, 216-217, 58 L.Ed. 494 (1914) (proof beyond a reasonable doubt required only in criminal cases).

[1][2] This Court has often stated that the question whether a particular statutorily defined penalty is civil or criminal is a matter of statutory construction. See *e. g., One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 237, 93 S.Ct. 489,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

448 U.S. 242, 100 S.Ct. 2636, 14 ERC 1673, 65 L.Ed.2d 742, 10 Envtl. L. Rep. 20,477

**(Cite as: 448 U.S. 242, 100 S.Ct. 2636)**

493, 34 L.Ed.2d 438 (1972); *Helvering v. Mitchell, supra,* 303 U.S., at 399, 58 S.Ct., at 633. Our inquiry in this regard has traditionally proceeded on two levels. First, we have set out to determine whether Congress, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other. See *One Lot Emerald Cut Stones v. United States, supra,* at 236-237, 93 S.Ct., at 492-493. Second, where Congress has indicated an intention to establish a civil penalty, we have inquired further whether the statutory*249 scheme was so punitive either in purpose or effect as to negate that intention. See *Flemming v. Nestor,* 363 U.S. 603, 617-621, 80 S.Ct., 1367, 1376-1378, 4 L.Ed.2d 1435 (1960). In regard to this latter inquiry, we have noted that "only the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground." *Id.,* at 617, 80 S.Ct., at 1376. See also *One Lot Emerald Cut Stones v. United States, supra,* 409 U.S., at 237, 93 S.Ct., at 493; *Rex Trailer Co. v. United States,* 350 U.S. 148, 154, 76 S.Ct. 219, 222, 100 L.Ed. 149 (1956).

As for our first inquiry in the present case, we believe it quite clear that Congress intended to impose a civil penalty upon persons in Ward's position. Initially, and importantly, Congress labeled the sanction authorized in § 311(b)(6) a "civil penalty," a label that takes on added significance given its juxtaposition with the criminal penalties set forth in the immediately preceding subparagraph, § 311(b)(5). Thus, we have no doubt that Congress intended to allow imposition of penalties under § 311(b)(6) without regard to the procedural protections and restrictions available in criminal prosecutions.

[3] We turn then to consider whether Congress, despite its manifest intention to establish a civil, remedial mechanism, nevertheless provided for sanctions so punitive as to "transfor[m] what was clearly intended as a civil remedy into a criminal penalty." *Rex Trailer Co. v. United States, supra,* 350 U.S. at 154, 76 S.Ct., at 222. In making this de-

termination, both the District Court and the Court of Appeals found it useful to refer to the seven considerations listed in *Kennedy v. Mendoza-Martinez, supra,* 372 U.S., at 168-169, 83 S.Ct., at 567-568. This list of considerations, while certainly neither exhaustive nor dispositive, has proved helpful in our own consideration **2642 of similar questions, see, *e. g., Bell v. Wolfish,* 441 U.S. 520, 537-538, 99 S.Ct. 1861, 1873-1874, 60 L.Ed.2d 447 (1979), and provides some guidance in the present case.

[4] Without setting forth here our assessment of each of the seven *Mendoza-Martinez* factors, we think only one, the fifth, aids respondent. That is a consideration of whether "the *250 behavior to which [the penalty] applies is already a crime." 372 U.S., at 168-169, 83 S.Ct., at 567. In this regard, respondent contends that § 13 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 407, makes criminal the precise conduct penalized in the present case. Moreover, respondent points out that at least one federal court has held that § 13 of the Rivers and Harbors Appropriation Act defines a "strict liability crime," for which the Government need prove no scienter. See *United States v. White Fuel Corp.,* 498 F.2d 619 (CA1 1974). According to respondent, this confirms the lower court's conclusion that this fifth factor "falls clearly in favor of a finding that [§ 311(b)(6)] is criminal in nature." 598 F.2d, at 1193.

While we agree that this consideration seems to point toward a finding that § 311(b)(6) is criminal in nature, that indication is not as strong as it seems at first blush. We have noted on a number of occasions that "Congress may impose both a criminal and a civil sanction in respect to the same act or omission." *Helvering v. Mitchell, supra,* 303 U.S., at 399, 58 S.Ct., at 633; *One Lot Emerald Cut Stones v. United States, supra,* 409 U.S., at 235, 93 S.Ct., at 492. Moreover, in *Helvering,* where we held a 50% penalty for tax fraud to be civil, we found it quite significant that "the Revenue Act of 1928 contains two separate and distinct provisions imposing sanctions," and that "these appear in dif-

448 U.S. 242, 100 S.Ct. 2636, 14 ERC 1673, 65 L.Ed.2d 742, 10 Envtl. L. Rep. 20,477
**(Cite as: 448 U.S. 242, 100 S.Ct. 2636)**

ferent parts of the statute . . . ." 303 U.S., at 404, 58 S.Ct., at 636. See also *One Lot Emerald Cut Stones v. United States, supra,* at 236-237, 93 S.Ct., at 492-493. To the extent that we found significant the separation of civil and criminal penalties within the same statute, we believe that the placement of criminal penalties in one statute and the placement of civil penalties in another statute enacted 70 years later tends to dilute the force of the fifth *Mendoza-Martinez* criterion in this case.

[5] In sum, we believe that the factors set forth in *Mendoza-Martinez*, while neither exhaustive nor conclusive on the issue, are in no way sufficient to render unconstitutional the congressional*251 classification of the penalty established in § 311(b)(6) as civil. Nor are we persuaded by any of respondent's other arguments that he has offered the "clearest proof" that the penalty here in question is punitive in either purpose or effect.

### III

Our conclusion that § 311(b)(6) does not trigger all the protections afforded by the Constitution to a criminal defendant does not completely dispose of this case. Respondent asserts that, even if the penalty imposed upon him was not sufficiently criminal in nature to trigger other guarantees, it was "quasi-criminal," and therefore sufficient to implicate the Fifth Amendment's protection against compulsory self-incrimination. He relies primarily in this regard upon *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), and later cases quoting its language.

In *Boyd*, appellants had been indicted under § 12 of an "Act to amend the customs revenue laws and to repeal moieties," for fraudulently attempting to deprive the United States of lawful customs duties payable on certain imported merchandise. According to the statute in question, a person found in violation of its provisions was to be "fined in any sum not exceeding $5,000 nor less than $50, or be imprisoned for any time not exceeding two years, or both; and, in addition to such fine, such merchandise shall be forfeited." 116 U.S., at 617, 6

S.Ct., at 525. Despite the pending indictment, appellants filed a claim for the goods held by the United States. In response, the prosecutor obtained an order of the District Court requiring appellants to produce the **2643 invoice covering the goods at issue. Appellants objected that such an order violated the Fourth and Fifth Amendments by subjecting them to an unreasonable search and seizure and by requiring them to act as witnesses against themselves.

This Court found the Fifth Amendment applicable, even though the action in question was one contesting the forfeiture *252 of certain goods. According to the Court: "We are . . . clearly of opinion that proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offences committed by him, though they may be civil in form, are in their nature criminal." *Id.*, at 633-634, 6 S.Ct., at 534. While at this point in its opinion, the Court seemed to limit its holding to proceedings involving the forfeiture of property, shortly after the quoted passage it broadened its reasoning in a manner that might seem to apply to the present case: "As, therefore, suits for *penalties and forfeitures*, incurred by the commission of offences against the law, are of this quasi-criminal nature, we think that they are within the reason of criminal proceedings for all the purposes of the fourth amendment of the constitution, and of that portion of the fifth amendment which declares that no person shall be compelled in any criminal case to be a witness against himself . . . ." *Id.*, at 634, 6 S.Ct., at 534 (emphasis added).

Seven years later, this Court relied primarily upon *Boyd* in holding that a proceeding resulting in a "forfeit and penalty" of $1,000 for violation of an Act prohibiting the employment of aliens was sufficiently criminal to trigger the protections of the Self-Incrimination Clause of the Fifth Amendment. *Lees v. United States*, 150 U.S. 476, 14 S.Ct. 163, 37 L.Ed. 1150 (1893). More recently, in *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965), and *United*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

448 U.S. 242, 100 S.Ct. 2636, 14 ERC 1673, 65 L.Ed.2d 742, 10 Envtl. L. Rep. 20,477

**(Cite as: 448 U.S. 242, 100 S.Ct. 2636)**

*States v. United States Coin & Currency*, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971), this Court applied *Boyd* to proceedings involving the forfeiture of property for alleged criminal activity. *Plymouth Sedan* dealt with the applicability of the so-called exclusionary rule to a proceeding brought by the State of Pennsylvania to secure the forfeiture of a car allegedly involved in the illegal transportation of liquor. *Coin & Currency* involved the applicability of the Fifth Amendment privilege against compulsory self-incrimination in a proceeding brought by the United States to secure forfeiture *253 of $8,674 found in the possession of a gambler at the time of his arrest.

Read broadly, *Boyd* might control the present case. This Court has declined, however, to give full scope to the reasoning and dicta in *Boyd*, noting on at least one occasion that "[s]everal of *Boyd* 's express or implicit declarations have not stood the test of time." *Fisher v. United States*, 425 U.S. 391, 407, 96 S.Ct. 1569, 1579, 48 L.Ed.2d 39 (1976). In *United States v. Regan*, 232 U.S. 37, 34 S.Ct. 213, 58 L.Ed. 494 (1914), for example, we declined to apply *Boyd* 's classification of penalties and forfeitures as criminal in a case where a defendant assessed with a $1,000 penalty for violation of the Alien Immigration Act claimed that he was entitled to have the Government prove its case beyond a reasonable doubt. *Boyd* and *Lees*, according to *Regan*, were limited in scope to the Fifth Amendment's guarantee against compulsory self-incrimination, which "is of broader scope than are the guarantees in Art. [III] and the [Sixth] Amendment governing trials and criminal prosecutions." 232 U.S., at 50, 34 S.Ct., at 218. See also *Helvering v. Mitchell*, 303 U.S., at 400, n. 3, 58 S.Ct., at 633 n. 3. Similarly, in *Hepner v. United States*, 213 U.S. 103, 29 S.Ct. 474, 53 L.Ed. 720 (1909), this Court upheld the entry of a directed verdict against the appellant under a statute similar to that examined in *Lees*. According to *Hepner*, "the *Lees* and *Boyd* cases do not modify or disturb but recognize the general rule that penalties may be recovered by civil actions, although such actions may be so far

criminal in their nature that the defendant cannot be compelled to testify against himself in such actions in respect to any matters involving, or that **2644 may involve, his being guilty of a criminal offense." *Id.*, at 112, 29 S.Ct., at 478.

The question before us, then, is whether the penalty imposed in this case, although clearly not "criminal" enough to trigger the protections of the Sixth Amendment, the Double Jeopardy Clause of the Fifth Amendment, or the other procedural guarantees normally associated with criminal prosecutions, is nevertheless "so far criminal in [its] nature" *254 as to trigger the Self-Incrimination Clause of the Fifth Amendment. Initially, we note that the penalty and proceeding considered in *Boyd* were quite different from those considered in this case. *Boyd* dealt with forfeiture of property, a penalty that had absolutely no correlation to any damages sustained by society or to the cost of enforcing the law. See also *Lees v. United States, supra* (fixed monetary penalty); *One 1958 Plymouth Sedan v. Pennsylvania, supra* (forfeiture); *United States v. United States Coin & Currency, supra* (forfeiture). Here the penalty is much more analogous to traditional civil damages. Moreover, the statute under scrutiny in *Boyd* listed forfeiture along with fine and imprisonment as one possible punishment for customs fraud, a fact of some significance to the *Boyd* Court. See 116 U.S., at 634, 6 S.Ct., at 534. Here, as previously stated, the civil remedy and the criminal remedy are contained in separate statutes enacted 70 years apart. The proceedings in *Boyd* also posed a danger that the appellants would prejudice themselves in respect to later criminal proceedings. See *Hepner v. United States, supra*, 213 U.S., at 112, 29 S.Ct., at 478. Here, respondent is protected by § 311(b)(5), which expressly provides that "[n]otification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except [for] prosecution for perjury or for giving a false statement." 33 U.S.C. § 1321(b)(5).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

448 U.S. 242, 100 S.Ct. 2636, 14 ERC 1673, 65 L.Ed.2d 742, 10 Envtl. L. Rep. 20,477

**(Cite as: 448 U.S. 242, 100 S.Ct. 2636)**

[6] More importantly, however, we believe that in the light of what we have found to be overwhelming evidence that Congress intended to create a penalty civil in all respects and quite weak evidence of any countervailing punitive purpose or effect it would be quite anomalous to hold that § 311(b)(6) created a criminal penalty for the purposes of the Self-Incrimination Clause but a civil penalty for all other purposes. We do not read *Boyd* as requiring a contrary conclusion.

*255 IV

We conclude that the penalty imposed by Congress was civil, and that the proceeding in which it was imposed was not "quasi-criminal" as that term is used in *Boyd v. United States, supra.* The judgment of the Court of Appeals is therefore

*Reversed.*

Mr. Justice BLACKMUN, with whom Mr. Justice MARSHALL joins, concurring in the judgment.

I agree with the Court that a proceeding for assessment of a monetary penalty under § 311(b)(6) of the Federal Water Pollution Control Act, 33 U.S.C. § 1321(b)(6), is not a "criminal case" within the meaning of the Fifth Amendment. I reach this conclusion, however, for a number of reasons in addition to those discussed in the Court's opinion.

The Court of Appeals engaged in a careful analysis of the standards set forth in *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168-169, 83 S.Ct. 554, 567-568, 9 L.Ed.2d 644 (1963), for distinguishing civil from criminal proceedings. These standards are cataloged in a footnote of the Court's opinion. *Ante,* at 2640, n. 7. The Court of Appeals concluded that some of the seven stated factors offered little guidance in this case, while others supported a "criminal" designation. In particular, it found that scienter played a part in determining the amount of penalty assessments; that the penalties promote traditional retributive aims of punishment; that behavior giving rise to the assessment is subject to criminal punishment under § 13 of the Rivers and Harbors Appropriation Act of 1899, **2645 33 U.S.C.

§ 407; and that the criteria employed by the Coast Guard to set the amount of assessments permit penalties that may be excessive in relation to alternative remedial or nonpunitive purposes. *Ward v. Coleman,* 598 F.2d 1187, 1192-1194 (CA10 1979). The Court is content to discuss only one of *256 these findings. See *ante,* at 2641. Because of the consideration given the others by the Court of Appeals, I think they deserve brief discussion, too.

My analysis of these other factors differs from that of the Court of Appeals in two principal respects. First, I do not agree with that court's apparent conclusion that none of the *Mendoza-Martinez* factors strongly supports a "civil" designation for a penalty proceeding under § 311(b)(6). I conclude that imposition of a monetary penalty under this statute does not result in the imposition of an "affirmative disability or restraint" within the meaning of *Mendoza-Martinez, supra,* 372 U.S., at 168, 83 S.Ct., at 567; that monetary assessments are traditionally a form of civil remedy; and that, as the Court of Appeals conceded, 598 F.2d, at 1193, § 311(b)(6) serves remedial purposes dissociated from punishment. Although any one of these considerations by itself might not weigh heavily in favor of a "civil" designation, I think that cumulatively they point significantly in that direction.

Second, I would assign less weight to the role of scienter, the promotion of penal objectives, and the potential excessiveness of fines than did the Court of Appeals. *Mendoza-Martinez* suggested that a sanction that "comes into play *only* on a finding of *scienter* " might be indicative of a criminal proceeding. 372 U.S., at 168, 83 S.Ct., at 567 (first emphasis added). Plainly, that is not the case here. Scienter is not mentioned on the face of the statute, and it is only one of many factors relevant to determination of an assessment under Coast Guard Commandant Instruction 5922.11B (Oct. 10, 1974). Furthermore, although the fines conceivably could be used to promote primarily deterrent or retributive ends, the fact that collected assessments are deposited in a revolving fund used to defray the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

448 U.S. 242, 100 S.Ct. 2636, 14 ERC 1673, 65 L.Ed.2d 742, 10 Envtl. L. Rep. 20,477

**(Cite as: 448 U.S. 242, 100 S.Ct. 2636)**

expense of cleanup operations is a strong indicator of the pervasively civil and compensatory thrust of the statutory scheme. See § 311(k), 33 U.S.C. § 1321(k). Finally, while some of the factors employed by the Coast Guard to set **\*257** the amount of assessments undoubtedly could be used to exact excessive penalties, others are expressly related to the cost of cleanup and other remedial considerations. In the absence of evidence that excessive penalties actually have been assessed, I would be inclined to regard their likelihood as remote.

For these reasons, I agree with the Court that only the fifth *Mendoza-Martinez* factor, "whether the behavior to which [the sanction] applies is already a crime," 372 U.S., at 168, 83 S.Ct., at 168, supports the respondent. Since I feel that this factor alone does not mandate characterization of the proceeding as "criminal" for purposes of the Fifth Amendment, particularly when other factors weigh in the opposite direction, I concur in the judgment.

Mr. Justice STEVENS, dissenting.

There are a host of situations in which the Government requires the citizen to provide it with information that may later be useful in proving that the citizen has some liability to the Government. In determining whether the combination of compulsion and liability is consistent with the Fifth Amendment, I would look to two factors: first, whether the liability actually imposed on the citizen is properly characterized as "criminal" and second, if so, whether the compulsion of information was designed to assist the Government in imposing such a penalty rather than furthering some other valid regulatory purpose.

Although this case is admittedly a close one, I am persuaded that the monetary penalty imposed on respondent pursuant to § 311(b)(6) of the Federal Water Pollution Control Act, 33 U.S.C. § 1321(b)(6), was a "criminal" sanction for purposes of the Fifth Amendment protection against compelled self-incrimination. As the Court of **\*\*2646** Appeals pointed out, penalties under § 311(b)(6) are not calculated to reimburse the Government for

the cost of cleaning up an **\*258** oil spill.[FN1] Rather, this part of the statute is clearly aimed at exacting retribution for causing the spill:

> FN1. An owner or operator is liable for cleanup costs or, in the event that the discharge is "nonremovable," for liquidated damages under 33 U.S.C. § 1321(b)(2)(B)(i) and § 1321(f). As the Court of Appeals noted, payment of these damages does not relieve the owner or operator of liability for civil penalties under § 311(b)(6). *Ward v. Coleman*, 598 F.2d 1187, 1191 (CA10 1978).

"The penalties are based on such factors as the gravity of the violation, the degree of culpability and the prior record of the party. The fact that a party acted in good faith, could not have avoided the discharge and, once it occurred, undertook clean-up measures immediately is to be given no consideration in relation to the 'imposition or amount of a civil penalty.' " *Ward v. Coleman*, 598 F.2d 1187, 1193 (CA10 1979).

I agree with the Court of Appeals that, under these circumstances, application of the factors set forth in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644, leads to the conclusion that the penalty is a criminal sanction rather than a purely regulatory measure.

That is not the end of the inquiry, however. A reporting requirement is not necessarily invalid simply because it may incriminate a few of the many people to whom it applies. Two examples from the tax field will illustrate my point. As this Court held in *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 and *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906, statutes that are plainly designed to obtain information from a limited class of persons engaged in criminal activity in order to facilitate their prosecution and conviction are invalid under the Fifth Amendment. On the other hand, when the general income tax laws require a full reporting of each taxpayer's income in order to fulfill the Gov-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

448 U.S. 242, 100 S.Ct. 2636, 14 ERC 1673, 65 L.Ed.2d 742, 10 Envtl. L. Rep. 20,477

**(Cite as: 448 U.S. 242, 100 S.Ct. 2636)**

ernment's regulatory objectives, the fact that a particular answer may incriminate a particular taxpayer is not a sufficient excuse for refusing to **\*259** supply the relevant information required from every taxpayer. See *United States v. Oliver*, 505 F.2d 301, 307-308 (CA7 1974).[FN2]

> FN2. As I suggested in *Oliver* :
>
> "The enactment of special legislation designed to procure incriminating disclosures from a select group of persons engaged in criminal conduct was tantamount to an accusation commencing criminal proceedings against them. The statutory demand to register as a gambler was comparable to the inquisitor's demand that a suspect in custody admit his guilt. The admission, once made, would almost inevitably become a part of the record of a criminal proceeding against a person who had already been accused when he confessed. Just as the *Miranda* decision may be read as having enlarged the adversary proceeding to commence when the accused is first taken into custody, *Marchetti* and comparable cases have, for Fifth Amendment purposes, treated special statutes designed to secure incriminating information from inherently suspect classes of persons as the commencement of criminal proceedings against those from whom incriminating information is demanded. Under this analysis, we must test the applicability of the Fifth Amendment to a self-reporting statute at the time that disclosure is compelled.
>
> "The statute which defendant Oliver is accused of violating is applicable to the public at large, and its demands for information are neutral in the sense that they apply evenly to the few who have illegal earnings and the many who do not. The self-reporting requirements of the Internal Revenue Code are justified by acceptable reasons of policy, entirely unrelated to any purpose to obtain incriminating evidence against an accused person othough the disclosure of defendant's illegal income was compelled by statute, and even though we assume that such disclosure might well have been incriminating, the *Marchetti* holding does not justify the conclusion that the Fifth Amendment excuses defendant's obligation to report his entire income." (Footnotes omitted.) 505 F.2d, at 307-308.

Thus, given that the statutory penalty in this case is a criminal sanction, the issue becomes what the primary purpose of requiring the citizen to report oil spills is. If it is to simplify the assessment and collection of penalties from those responsible, it should fall within the reasoning of *Marchetti* and *Grosso*. On the other hand, if the **\*\*2647** requirement is merely to assist the Government in its cleanup responsibilities and **\*260** in its efforts to monitor the conditions of the Nation's waterways, it should be permissible. Although the question is again a close one, the automatic nature of the statutory penalty, which *must* be assessed in each and every case, convinces me that the reporting requirement is a form of compelled self-incrimination.[FN3] I therefore respectfully dissent.

> FN3. As a result, I would hold that the Government could not use a report filed by an individual owner or operator in assessing a civil penalty under § 311(b)(6). However, I believe the Government could still use such a report in assessing damages under either § 311(b)(2)(B)(i) or § 311(f), see n. 1, *supra*, since penalties assessed under those subsections are regulatory rather than punitive in character.

U.S.Okl.,1980.
U.S. v. Ward

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

100 S.Ct. 2636
448 U.S. 242, 100 S.Ct. 2636, 14 ERC 1673, 65 L.Ed.2d 742, 10 Envtl. L. Rep. 20,477
**(Cite as: 448 U.S. 242, 100 S.Ct. 2636)**

448 U.S. 242, 100 S.Ct. 2636, 14 ERC 1673, 65 L.Ed.2d 742, 10 Envtl. L. Rep. 20,477

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.