22 U.S. Op. Off. Legal Counsel 141, 1998 WL 1180050 (O.L.C.)

Office of Legal Counsel
U.S. Department of Justice

**\*1 APPROPRIATE SOURCE FOR PAYMENT OF JUDGMENTS AND SETTLEMENTS IN
UNITED STATES V. WINSTAR CORP.
AND RELATED CASES**

July 22, 1998

The Federal Savings and Loan Insurance Corporation Resolution Fund is the appropriate source of payment for judgments against, and settlements by, the United States in United States v. Winstar Corp. and similar cases arising from the breach of certain agreements to which the Federal Savings and Loan Insurance Corporation was a party.

**MEMORANDUM FOR NEAL S. WOLIN
DEPUTY GENERAL COUNSEL
DEPARTMENT OF THE TREASURY**

On July 1, 1996, the Supreme Court decided United States v. Winstar Corp., 518 U.S. 839 (1996). The Court held that the United States was liable in three cases for breaching contracts into which it had entered with entities that took over failing thrifts during the savings and loan crisis of the 1980's. Because the United States Court of Federal Claims ("CFC") had not yet determined the appropriate measure or amount of damages, the Supreme Court remanded for further proceedings. Id. at 910. After the Winstar decision was handed down, a large number of cases premised on identical or similar theories of relief that had been stayed pending the Supreme Court's decision were activated. FN;B1[FN1]FN;F1 We understand that in virtually all of these cases, which are currently pending before the CFC or the United States Court of Appeals for the Federal Circuit, the government contests liability and/or disagrees with the plaintiffs regarding the appropriate measure or amount of damages.

You have asked for our views regarding the appropriate source for payment of judgments in the Winstar-related cases. FN;B2[FN2]FN;F2 Because the government is currently considering the possibility of settling two of the three cases that the Supreme Court considered in Winstar, as well as certain other Winstar-related cases, you have also asked for our opinion regarding the appropriate source of funds for the payment of such settlements. The appropriate source of funds for a settled case is identical to the appropriate source of funds should a judgment in that case be entered against the government. See Availability of Judgment Fund in Cases Not Involving a Money Judgment Claim, 13 Op. O.L.C. 98, 103 (1989) ("[I]n determining whether a proposed settlement is payable from the Judgment Fund, the Attorney General or his designee should examine the underlying cause of action, and decide whether the rendering of a final judgment against the United States under such a cause would have required a payment from the Judgment Fund."); 3 Office of the General Counsel, United States General Accounting Office, Principles of Federal Appropriations Law 14-9 (2d ed. 1994) ("GAO Principles") (stating that compromise settlements have no effect on the source of funds). FN;B3[FN3]FN;F3

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Our discussion of the appropriate source of funds necessarily is premised on courts finding the government li-able or on the government entering into settlements based on the risk that a court would find the government li-able. We do not, however, mean to suggest that we have reached any conclusions regarding the likelihood of such potential findings. We discuss cases in the context of a finding of government liability because it is only in those cases, and in settlements entered into due to the risk of such a finding, that the appropriate source of funds for the payment of judgments by the government is an issue.

**\*2** We understand from the Commercial Litigation Branch of the Civil Division of the Department of Justice that, to the extent that the government has settled or is engaged in settlement negotiations in any of the <u>Winstar</u>-related cases, these cases involve "Assistance Agreements" or "Supervisory Action Agreements" to which the Federal Savings and Loan Insurance Corporation ("FSLIC") was a party. We have therefore limited our analysis of the appropriate source of payment for settlements or potential judgments to the <u>Winstar</u>-related cases in which FSLIC was a party to the underlying Assistance Agreements and Supervisory Action Agreements. FN;B4 [FN4]FN;F4

Based upon the information currently available to us, we believe that the FSLIC Resolution Fund is the appro-priate source of funds to pay judgments and settlements in <u>Winstar</u>-related cases in which FSLIC was a party to an Assistance Agreement or Supervisory Action Agreement. FN;B5[FN5]FN;F5 Congress created the FSLIC Resolution Fund to assume, with a single statutory exception that is not relevant here, 12 U.S.C. § 1441a (1994), "all assets and liabilities of the FSLIC on the day before" FSLIC was abolished. 12 U.S.C. § 1821a(a)(2) (1994). Although the term "liabilities" is not defined in the statute, its ordinary meaning includes contingent liabilities, such as certain contractual obligations, and there is no reason to believe that Congress departed from this ordin-ary meaning when it created the FSLIC Resolution Fund. Based on the Supreme Court's theory of liability in <u>Winstar</u>, we believe that the judgments or settlements in the <u>Winstar</u>-related cases in which FSLIC was a party to the underlying Assistance Agreements and Supervisory Action Agreements would qualify as "liabilities" of FSLIC under § 1821a(a)(2). Accordingly, in these cases, the potential judgments, and the settlements entered in-to to avoid the risk of such judgments, are payable from the FSLIC Resolution Fund. Because payment is "otherwise provided for" within the meaning of the Judgment Fund statute, the Judgment Fund is not available to pay such judgments and settlements. <u>See</u> 31 U.S.C. § 1304 (1994).

## I. BACKGROUND

During the Great Depression, over 1,700 savings and loans, or "thrifts," failed because borrowers could not pay their mortgages. <u>See</u> H.R. Rep. No. 101-54, pt. 1, at 292 (1989), <u>reprinted in</u> 1989 U.S.C.C.A.N. 86, 88 ("House Report"). As a result, thrift depositors lost approximately $200 million. In response, Congress took three actions to stabilize the thrift industry. First, in 1932, Congress created the Federal Home Loan Bank Board ("Bank Board") to channel funds to thrifts to finance home mortgages and to prevent foreclosures. <u>See</u> Pub. L. No. 72-304, ch. 522, 47 Stat. 725 (1932) (codified as amended at 12 U.S.C.A. §§ 1421-1449 (West 1989 & Supp. 1998)). Second, Congress passed the Home Owners' Loan Act of 1933, which authorized the Bank Board to charter and to regulate federal thrifts. <u>See</u> Pub. L. No. 73-43, ch. 64, 48 Stat. 128, 132-34 (1933) (codified as amended at 12 U.S.C. §§ 1461-1468c (1994 & Supp. II 1996)). Finally, in 1934, Congress created the Federal Savings and Loan Insurance Corporation, "under the direction of" the Bank Board, to insure thrift deposit ac-counts and to regulate all federally insured thrifts to ensure that their capital is unimpaired and that their finan-cial policies and management are "safe." <u>See</u> Pub. L. No. 73-479, ch. 847, 48 Stat. 1246, 1256-61 (1934) (codified as amended at 12 U.S.C.A. §§ 1701- 1750g (West. 1989 & Supp. 1998)); 12 U.S.C. § 1726(c) (1988) (repealed 1989).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

22 U.S. Op. Off. Legal Counsel 141, 1998 WL 1180050 (O.L.C.)

Case 2:10-md-02179-CJB-DPC   Document 4477-60   Filed 11/03/11   Page 3 of 48

Page 3

**A. The Savings and Loan Crisis of the Early 1980's**

**\*3** The savings and loan crisis of the early 1980's originated from the rising interest rates of the late 1970's and early 1980's. Many thrifts were locked into long-term, low-yield, fixed-rate mortgages created when interest rates were low, and thus the high interest rates caused the thrifts to experience large operating losses as they raised savings account interest rates in an effort to attract funds from depositors. See Winstar, 518 U.S. at 845 (plurality opinion); House Report at 291, reprinted in 1989 U.S.C.C.A.N. at 87. By 1981, thrifts' mortgage portfolios were yielding ten percent, but the thrifts were paying an average of eleven percent for their funds, and between 1981 and 1983, 435 thrifts failed. See House Report at 296, reprinted in 1989 U.S.C.C.A.N. at 92. As the federal insurer of the thrift deposits, FSLIC was responsible for liquidating the failed thrifts, if necessary, and reimbursing depositors for the insured funds they had lost. FSLIC, however, lacked adequate assets to do so. In 1985, for example, FSLIC had $4.55 billion in its insurance fund, but the Bank Board estimated that it would cost $15.8 billion to liquidate all the thrifts deemed insolvent under generally accepted accounting principles ("GAAP"). See Winstar, 518 U.S. at 847 (plurality opinion).

In response to the crisis, Congress and the executive branch extensively deregulated the thrift industry to enable thrifts to compete with other financial services providers for funds and to broaden their investment powers. See id. at 845 (plurality opinion); House Report at 291, reprinted in 1989 U.S.C.C.A.N. at 87. In addition, the Bank Board lowered the capital requirement for thrifts from five percent to four percent of assets in 1980, and from four to three percent in 1982. See Winstar, 518 U.S. at 845-46 (plurality opinion). The capital requirement has been described as "'the most powerful source of discipline for financial institutions.'" Id. at 845 (quoting Breeden, Thumbs on the Scale: The Role that Accounting Practices Played in the Savings and Loan Crisis, 59 Fordham L. Rev. S71, S75 (1991)). To give more leeway to the struggling thrifts, the Bank Board also promulgated new "regulatory accounting principles" that often replaced GAAP in determining whether thrifts could meet the Bank Board's capital requirement. "The reductions in required capital reserves," the plurality explained in Winstar, "allowed thrifts to grow explosively without increasing their capital base, at the same time deregulation let them expand into new (and often riskier) fields of investment." Id. at 846.

Based upon the facts before it, the plurality observed that, "[r]ealizing that FSLIC lacked the funds to liquidate all of the failing thrifts, the Bank Board chose to avoid the insurance liability by encouraging healthy thrifts and outside investors to take over ailing institutions in a series of 'supervisory mergers.'" Id. at 847. The plurality explained:

> **\*4** Such transactions, in which the acquiring parties assumed the obligations of thrifts with liabilities that far outstripped their assets, were not intrinsically attractive to healthy institutions; nor did FSLIC have sufficient cash to promote such acquisitions through direct subsidies alone, although cash contributions from FSLIC were often part of a transaction. Instead, the principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations.

Id. at 848 (citations omitted).

According to the plurality in Winstar, the Bank Board and FSLIC FN;B6[FN6]FN;F6 granted acquiring entities three different types of beneficial accounting treatment, often referred to as "forbearances," in connection with supervisory mergers. Id. at 848- 56. First, the Bank Board and FSLIC "let the acquiring institutions count supervisory goodwill toward their reserve requirements." Id. at 850 (plurality opinion). Under the "purchase method" of accounting, "goodwill," i.e., the amount by which the purchase price of an acquired entity exceeds the fair value of all identifiable assets, could be counted as an intangible asset. Id. at 848-49 (plurality opinion). The plurality noted that, in the typical situation, the counting of goodwill as an intangible asset makes sense because

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

a rational purchaser in a free market would not purchase a business for more than the fair value of the business's assets unless there were some "going concern" value that made up the difference. <u>Id.</u> at 849. In the supervisory mergers, however, this situation was not the case. Instead, "[b]ecause FSLIC had insufficient funds to make up the difference between a failed thrift's liabilities and assets, the Bank Board had to offer a 'cash substitute' to in-duce a healthy thrift to assume a failed thrift's obligations." <u>Id.</u> at 849-50 (plurality opinion). According to the plurality, that "cash substitute" permitted the healthy thrift to count the amount by which the liabilities of a fail-ing thrift exceeded the fair value of its assets as an intangible asset, and was referred to as "supervisory good-will." <u>Id.</u> Counting supervisory goodwill as an intangible asset that could be used to meet capital requirements was attractive to the acquiring entities because it prevented the negative net worth of the failing thrifts from be-ing deducted from the acquiring entities' capital, thereby allowing them to avoid insolvency under federal re-quirements. <u>Id.</u> at 850 (plurality opinion).

Second, thrifts were permitted to take extended periods of time, up to forty years, to "depreciate" or amortize the value of supervisory goodwill, a questionable asset. The essence of supervisory goodwill was that it created a paper asset in a supervisory merger that was necessary because the liabilities of the institution being acquired exceeded the fair value of its assets. When the acquiring entity was permitted to extend the time to write down that paper asset, it understated for each reporting period the resulting amortization expense and reduction in its recorded assets and deferred a possible failure to meet capital requirements. <u>See id.</u> at 851 (plurality opinion).

**\*5** In addition, thrifts were permitted to accelerate the recognition of capital gains to be realized on depreciated assets, when those benefits in fact arose over longer periods. The "gains" arose from the accretion of discounts on loans in portfolio. A thrift cannot sell at face value a loan bearing interest at a below-market interest rate. In-stead, it accepts a discount from face value that would increase the effective rate on that asset to a market rate. As these loans approach maturity, the discount decreases to zero. The acquiring entity would record the accre-tion of discount on its income statement as a gain, in the same fashion as it would for a bond in portfolio that it holds to maturity. The faster the thrift recognized the gains, the more income it could report in the short term. <u>See id.</u>

The amount of discount in a troubled thrift would generally approximate the amount of goodwill created by the supervisory merger. Ideally, a thrift should have written down its goodwill at the same rate it recognized gains from accretions of discount. The combination of the questionable practices of accelerating the rate of gain recog-nition and deferring the amortization of supervisory goodwill provided a method for unhealthy institutions to at-tempt to survive by engaging in supervisory mergers. According to the plurality in <u>Winstar</u>, "[t]he difference between amortization and accretion schedules thus allowed acquiring thrifts to seem more profitable than they in fact were." <u>Id.</u> at 853.

Third, the Bank Board and FSLIC generally permitted double-counting of cash contributions by FSLIC to super-visory mergers. While the acquiring entity was permitted to treat FSLIC's cash contribution as a credit for its capital requirement, described as a "capital credit," it was not required to subtract the amount of the contribution from the amount of supervisory goodwill. <u>Id.</u> Thus, the amount was, in effect, counted twice, once as a tangible asset -- cash -- and once as an intangible asset -- supervisory goodwill. <u>Id.</u>

**B. The Legislative Response: FIRREA**

The regulatory measures taken in the 1980's by the Bank Board and FSLIC to prop up the failing thrift industry actually aggravated its decline by papering over inadequate reserves and encouraging thrifts to engage in risky loans and investments. See <u>Transohio Savings Bank v. Director, Office of Thrift Supervision</u>, 967 F.2d 598, 602

(D.C. Cir. 1992); House Report at 298-99, reprinted in 1989 U.S.C.C.A.N. at 94-95. By 1988, FSLIC was in-solvent by over $50 billion. See House Report at 304, reprinted in 1989 U.S.C.C.A.N. at 100. In response to this situation, and to restore the strength of the thrift industry and the deposit insurance fund, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act, Pub. L. No. 101-73, 103 Stat. 183 (1989) ("FIRREA"). See House Report at 291, reprinted in 1989 U.S.C.C.A.N. at 87. FIRREA was adopted, inter alia, to "promote, through regulatory reform, a safe and stable system of affordable housing finance," to "improve the supervision of savings associations by strengthening capital, accounting, and other supervisory standards," and to "curtail investments and other activities of savings associations that pose unacceptable risks to the Federal de-posit insurance funds." FIRREA, § 101(1)-(3), 103 Stat. at 187 (codified at 12 U.S.C. § 1811 note (1994)).

**\*6** FIRREA abolished both FSLIC and the Bank Board. FSLIC's thrift deposit insurance function was assumed by the Federal Deposit Insurance Corporation ("FDIC"), which became the manager of the new "Savings Asso-ciation Insurance Fund." See 12 U.S.C. § 1811(a) (1994); H.R. Conf. Rep. No. 101-222 at 393, 394 (1989), re-printed in 1989 U.S.C.C.A.N. 432, 433 ("House Conference Report") (FIRREA gives FDIC "the duty of insur-ing the deposits of savings associations as well as banks."). In addition, FIRREA created a separate fund under the management of the FDIC called the FSLIC Resolution Fund. See 12 U.S.C. § 1821a. The FSLIC Resolution Fund generally assumed all of the "assets and liabilities" of FSLIC as of the day before its abolition. Id. § 1821a(a)(2).

Each of the Bank Board's principal functions was transferred to a different agency upon its dissolution: (1) the supervision and regulation of the thrift industry was transferred to the Office of Thrift Supervision ("OTS") in the Department of the Treasury, see 12 U.S.C. § 1462a(e) (1994); 12 U.S.C. § 1813(q) (1994); House Confer-ence Report at 404,reprinted in 1989 U.S.C.C.A.N. at 443; House Report at 453, reprinted in 1989 U.S.C.C.A.N. at 249; (2) the management and regulation of thrift deposit insurance through FSLIC was transferred to the FD-IC, see 12 U.S.C. § 1811; (3) the oversight and supervision of the twelve regional Federal Home Loan Banks was transferred to the Federal Housing Finance Board, see 12 U.S.C. § 1422a (1994); 12 U.S.C. § 1422b (1994); and (4) the liquidation of the assets of failed thrifts was transferred to the Resolution Trust Corporation ("RTC") for those thrifts that became insolvent between 1989 and 1995, see 12 U.S.C. § 1441a. See also House Confer-ence Report, at 408- 09, reprinted in 1989 U.S.C.C.A.N. at 447-48; see generally American Fed'n of Gov't Em-ployees, Local 3295 v. Federal Labor Relations Auth., 46 F.3d 73, 74 & n.1 (D.C. Cir. 1995); Employment Status of the Members of the Board of Directors of the Federal Housing Finance Board, 14 Op. O.L.C. 146 (1990) (preliminary print).

FIRREA also required OTS to prescribe at least three capital requirements for thrifts -- a leverage limit requiring thrifts to maintain core capital of at least three percent of the thrift's total assets; a tangible capital requirement of at least one- and-a-half percent of the thrift's total assets; and a risk-based capital requirement aligned with the risk- based capital requirement for national banks. See 12 U.S.C. § 1464(t)(1)-(2), (9) (1994). In addition, FIRREA gradually phased out over a five-year period the ability of thrifts to include "qualifying supervisory goodwill" in calculating core capital. Id. § 1464(t)(3)(A). Under FIRREA, OTS promulgated regulations equat-ing capital credits with supervisory goodwill, thereby excluding such credits from satisfying the capital require-ments. 12 C.F.R. § 567.1(w) (1990). As a result of these new strict requirements, "many institutions immedi-ately fell out of compliance with regulatory capital requirements, making them subject to seizure by thrift regu-lators." Winstar, 518 U.S. at 858 (plurality opinion).

## C. United States v. Winstar

**\*7** The Supreme Court's Winstar decision addressed the consequences of the new capital requirements on three

different institutions -- Glendale Federal Bank, FSB, Winstar Corporation, and The Statesman Group, Inc. -- that were parties to supervisory mergers. All three claimed financial losses due to the change in the regulatory structure caused by FIRREA, and they filed suit against the United States in the Court of Federal Claims on both contractual and constitutional theories. That court granted the plaintiffs' motions for partial summary judgment on contract liability because it found that the government had breached contractual obligations to permit the plaintiffs to count supervisory goodwill and capital credits toward their capital requirements. Statesman Sav. Holding Corp. v. United States, 26 Ct. Cl. 904 (1992) (granting summary judgment on liability to Statesman and Glendale); Winstar Corp. v. United States, 25 Cl. Ct. 541 (1992) (finding contract breached and entering summary judgment on liability); Winstar Corp. v. United States, 21 Cl. Ct. 112 (1990) (finding an implied-in-fact contract but requesting further briefing on other contract issues). After the cases were consolidated, a divided panel of the Federal Circuit reversed, holding that the parties did not clearly assign the risk of a subsequent change in the regulatory capital requirements to the government. Winstar Corp. v. United States, 994 F.2d 797, 811-13 (Fed. Cir. 1993). After rebriefing and reargument, the Federal Circuit, sitting *en banc*, reversed the panel and affirmed the CFC's rulings on liability, concluding that FIRREA breached the government's prior contractual obligations and that the government therefore was liable in money damages for the breach. Winstar Corp. v. United States, 64 F.3d 1531 (Fed. Cir. 1995) (en banc).

Writing for a plurality of four, FN;B7[FN7]FN;F7 Justice Souter first described the merger between Glendale and the First Federal Savings and Loan Association of Broward County, a thrift whose liabilities exceeded the fair value of its assets by over $700 million. FSLIC entered into a "Supervisory Action Agreement" ("SAA") with Glendale. Winstar, 518 U.S. at 861 (plurality opinion). The SAA contained an integration clause that, according to the plurality, incorporated by reference the Bank Board's resolution approving the merger, which in turn referred, inter alia, to a document stipulating that any supervisory goodwill would be treated in accordance with Bank Board Memorandum R-31b. That memorandum permitted the use of the purchase method of accounting and the recognition of supervisory goodwill as an asset subject to amortization. One of the reasons that the plurality interpreted the integration clause in the SAA to include the Board's resolutions and memoranda was that it would have been "irrational" for Glendale to enter into an agreement that immediately made it insolvent unless it obtained a contractual commitment that the policies identified in the resolutions and memoranda would continue. Id. at 862-63. The plurality agreed with the Federal Circuit's judgment that "'the government had an express contractual obligation to permit Glendale to count the supervisory goodwill generated as a result of its merger with Broward as a capital asset for regulatory capital purposes.'" Id. at 864 (quoting Winstar Corp. v. United States, 64 F.3d at 1540). FN;B8[FN8]FN;F8

**\*8** The Winstar merger resulted from FSLIC actively soliciting bids for the acquisition of Windom Federal Savings and Loan Association, a failing thrift. Id. (plurality opinion). FSLIC and Winstar Corporation, a group of private investors formed for the purpose of acquiring Windom, entered into an "Assistance Agreement" ("AA") under which FSLIC agreed to contribute $5.6 million in cash to the acquisition. The AA contained an integration clause that, according to the plurality, also incorporated the Bank Board's approval resolution and a forbearance letter signed by the Bank Board permitting the amortization of supervisory goodwill over thirty-five years. Id. Again, the plurality noted that it was apparent that "'the intention of the parties [was] to be bound by the accounting treatment for goodwill arising in the merger.'" Id. at 866 (quoting Winstar Corp. v. United States, 64 F.3d at 1544).

When Statesman asked FSLIC for government assistance in purchasing a subsidiary of an insolvent thrift, FSLIC responded that it could only obtain such assistance if it purchased the parent thrift as well as three other unstable thrifts. Statesman and FSLIC entered into an AA under which FSLIC contributed $60 million to the ac-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

quisition, $26 million of which could be treated as a permanent capital credit for purposes of the regulatory capital requirement. Like the transactions with Glendale and Winstar, the plurality found that the AA contained an integration clause incorporating contemporaneous resolutions and letters issued by the Bank Board approving the use of supervisory goodwill to be amortized over a long period (this time twenty-five years). Id. at 867. Once again, the plurality accepted the Federal Circuit's finding that "'the government was contractually obligated to recognize the capital credits and the supervisory goodwill generated by the merger . . . .'" Id. (quoting Winstar Corp. v. United States, 64 F.3d at 1543).

Justice Souter, writing for the plurality, rejected the government's various common law defenses and held that the United States was liable for breach of contract. In characterizing the contracts at issue, the plurality emphasized that "[n]othing in the documentation or the circumstances of these transactions purported to bar the Government from changing the way in which it regulated the thrift industry." Id. Rather, Justice Souter explained:

> We read this promise as the law of contracts has always treated promises to provide something beyond the promisor's absolute control, that is, as a promise to insure the promisee against loss arising from the promised condition's nonoccurrence. Holmes's example is famous: "[i]n the case of a binding promise that it shall rain to-morrow, the immediate legal effect of what the promisor does is, that he takes the risk of the event, within certain defined limits, as between himself and the promisee."

Id. at 868-69 (plurality opinion) (quoting Holmes, The Common Law (1881) in 3 The Collected Works of Justice Holmes 268 (S. Novick ed. 1995)). In other words, "the Bank Board and FSLIC . . . assumed the risk [that the law would] change," id. at 908 (plurality opinion), see id. at 883 (plurality opinion), and agreed to pay plaintiffs for the losses, if any, caused by such a change, see id. at 887 (plurality opinion) ("[T]he Government agreed . . . to indemnify its contracting partners against financial losses arising from regulatory change."). See also id. at 890 (plurality opinion). The plurality found that, "[w]hen the law as to capital requirements changed . . . the Government was unable to perform its promise and, therefore, became liable for breach." Id. at 870.

**\*9** Justice Scalia, writing for himself and two other Justices, concurred in the judgment. He agreed with the plurality "that the contracts at issue in this case gave rise to an obligation on the part of the Government to afford respondents favorable accounting treatment, and that the contracts were broken by the Government's discontinuation of that favorable treatment, as required by FIRREA." Id. at 919 (Scalia, J., concurring). He also agreed that by promising to regulate the plaintiffs in a particular fashion into the future, "the Government had assumed the risk of a change in its laws." Id. at 924.

However, Justice Scalia disagreed with the approach used by the plurality to reject the government's "unmistakability" and "sovereign acts" defenses. According to Justice Scalia, by characterizing the contracts at issue as merely insurance against the contingency that the regulations might change, rather than as promises not to change the regulations, the plurality had incorrectly avoided making the determination whether the government was entitled to assert these defenses to contractual liability. Id. at 919. Justice Scalia argued that prior precedent had not made the availability of these defenses dependent upon the nature of the underlying contract, id., and he suggested that, in any event, the contracts did appear to constrain the sovereign authority of the government insofar as they required the government to pay damages for undertaking a sovereign act. Id. at 919-20. With respect to this latter point, he added that "[v]irtually every contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance: 'The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it, - - and nothing else.'" Id. at 919 (quoting Holmes, The Path of the Law (1897), in 3 The Collected Works of Justice Holmes 391, 394 (S. Novick ed. 1995)). Nevertheless, Justice Scalia concluded that the government's contractual undertaking was

sufficiently clear to overcome the "unmistakability" and "sovereign acts" defenses. Id. at 919-22, 923-24. He also concluded that, because the plaintiffs did not seek to enjoin the exercise of sovereign authority, but rather to receive damages for breach of contract, there was no force to the government's "reserved powers" defense, which he described as "[s]tand[ing] principally for the proposition that certain core governmental powers cannot be surrendered." Id. at 922-23. Finally, Justice Scalia rejected the government's defense that there was no "express delegation" of authority permitting the restraint of sovereign power. Id. at 923.

Although the plurality and Justice Scalia may have differed in their characterization of the relevance of the nature of the underlying contracts to the availability of certain governmental defenses, they agreed that the government had assumed the risk of regulatory change. They also were in general agreement on what constituted the breach of contract: the plurality adopted the Federal Circuit's conclusion that the breach occurred when, pursuant to the new requirements imposed by FIRREA, the federal regulatory agencies limited the use of supervisory goodwill and capital credits, id. at 870, and Justice Scalia found that the enactment and implementation of FIRREA gave rise to plaintiffs' claims of breach of contract. Id. at 920. Finally, both the plurality and Justice Scalia found that the Bank Board and FSLIC had sufficient authority to enter into the contracts: "the Bank Board and FSLIC had ample statutory authority to . . . promise to permit respondents to count supervisory goodwill and capital credits toward regulatory capital and to pay respondents' damages if that performance became impossible." Id. at 891 (plurality opinion); see also id. at 923 (Scalia, J., concurring) ("[W]hatever is required by the 'express delegation' doctrine is to my mind satisfied by the statutes which the principal opinion identifies as conferring upon the [Bank Board and FSLIC] authority to enter into agreements of the sort at issue here."). For such authority, the Court pointed both to FSLIC's statutory authority to enter into contracts under 12 U.S.C. § 1725(c) (1988) (repealed 1989), and to its authority in certain circumstances to guarantee an acquiring institution against certain losses in order to facilitate a merger or consolidation with a failed or failing thrift under 12 U.S.C. § 1729(f)(2) (1988) (repealed 1989). Id. at 890 (plurality opinion); id. at 923 (Scalia, J., concurring).

## II. ANALYSIS

**\*10** We understand that currently pending before the Court of Federal Claims and the Federal Circuit are more than one hundred cases premised on identical or similar theories of relief as the three cases at issue in Winstar. We further understand that some of these cases involve AA's or SAA's entered into by FSLIC, and that FSLIC was involved in some but not all of the remaining cases. We address here only those cases in which FSLIC was a party to an AA or SAA. See supra p. 2.

There are two potential sources for the payment of judgments (or settlements) against the government in the cases considered here: the Judgment Fund or the FSLIC Resolution Fund. The "Judgment Fund" is a permanent and indefinite appropriation established by Congress in 1956 to pay certain final judgments, awards, compromise settlements, and interest and costs. The Automatic Payment of Judgments Act, ch. 748, § 1302, 70 Stat. 678, 694-95 (1956) (codified as amended at 31 U.S.C. § 1304). The Judgment Fund may be used to pay certain judgments and settlements when payment is "not otherwise provided for." Id. The question for our purposes is whether Congress "otherwise provided for" the payment of judgments and settlements in the Winstar-related cases addressed in this memorandum when it created the FSLIC Resolution Fund in 1989 to assume, with a single statutory exception that is not applicable here, 12 U.S.C. § 1441a, "all assets and liabilities of the FSLIC on the day before" FSLIC was abolished, 12 U.S.C. § 1821a(a)(2).

## A. Availability of the Judgment Fund

Prior to the creation of the Judgment Fund, many agencies had to seek specific appropriations from Congress to

pay judgments and settlements because agency operating appropriations are not generally available to make such payments. As a result of this burdensome process, payments were often unduly delayed, causing excess charges for post- judgment interest. See Availability of the Judgment Fund for the Payment of Judgments or Settlements in Suits Brought Against the Commodity Credit Corporation Under the Federal Tort Claims Act, 13 Op. O.L.C. 362, 363 (1989) ("CCC Opinion"). The Judgment Fund addressed this problem by eliminating the need for Congress to pass specific appropriations bills for the payment of judgments and settlements that were not "otherwise provided for." 31 U.S.C. § 1304; see CCC Opinion, at 363; 3 GAO Principles at 14-24 to 14-26. This Office has explained that § 1304 was not "designed to shift liability to the United States Treasury from agencies that had specific and express statutory authority to pay judgments and settlements out of their own assets and revenues, but rather to eliminate the need for Congress to pass specific appropriations bills for the payment of judgments." CCC Opinion, at 366.

Section 1304 provides in pertinent part:

(a) Necessary amounts are appropriated to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law when --

*11 (1) payment is not otherwise provided for;

(2) payment is certified by the Secretary of the Treasury; and

(3) the judgment, award, or settlement is payable --

(A) under sections 2414, 2517, 2672, or 2677 of title 28; . . . . 31 U.S.C. § 1304(a) (1994 & Supp. II 1996). Thus a judgment or settlement may be paid out of the Judgment Fund only if three conditions are met: payment must not be "otherwise provided for;" the Secretary of the Treasury must certify payment; and the judgment must be payable pursuant to one of several specified statutory provisions.

Whether the Judgment Fund is available for payment of judgments and settlements in the Winstar-related cases addressed in this memorandum depends first upon whether such payment is "otherwise provided for" within the meaning of § 1304(a), i.e., whether there is another appropriation or fund that lawfully may be used for payment. FN;B9[FN9]FN;F9 See 62 Comp. Gen. 12, 14 (1982); see also 3 GAO Principles at 14-25 (to determine whether Judgment Fund is available to pay a type of judgment that did not exist prior to the Fund's establishment, usually examine whether Congress has established a mechanism that is available for payment). Whether a payment is "otherwise provided for" is a question of legal availability rather than actual funding status. See Memorandum for Donald B. Ayer, Deputy Attorney General, from J. Michael Luttig, Principal Deputy Assistant Attorney General, Office of Legal Counsel, Re: Department of Energy Request to use the Judgment Fund for Settlement of Fernald Litigation at 7 (Dec. 18, 1989) ("DoE Opinion") (citing 66 Comp. Gen. 157, 160 (1986)); accord 3 GAO Principles at 14-26. The Judgment Fund does not become available simply because an agency may have insufficient funds at a particular time to pay a judgment. See id.; DoE Opinion at 7. If the agency lacks sufficient funds to pay a judgment, but possesses statutory authority to make the payment, its recourse is to seek funds from Congress. See DoE Opinion at 8; 3 GAO Principles at 14-26. Thus, if another appropriation or fund is legally available to pay a judgment or settlement, payment is "otherwise provided for" and the Judgment Fund is not available.

## B. Availability of the FSLIC Resolution Fund

The FSLIC Resolution Fund ("FRF") is another possible source of payment for judgments against, or settlements by, the government, at least in the Winstar-related cases addressed in this memorandum. FIRREA simultaneously abolished FSLIC as of the date of enactment, August 9, 1989, and, except as provided in 12 U.S.C. § 1441a, transferred "all assets and liabilities of the [FSLIC] on the day before August 9, 1989" to the FRF, a separate fund to be managed by the FDIC. FN;B10[FN10]FN;F10 12 U.S.C. § 1821a(a)(2) (1994); see FIRREA §

401(a)(1) (codified at 12 U.S.C. § 1437 note (1994)). The FRF may not be commingled with any other FDIC funds or assets. Id. It was initially funded by FSLIC's transferred assets, income earned on those assets, certain liquidating dividends and payments on claims from receiverships, and borrowed funds. Id. § 1821a(b) (1994). From 1989 to 1992, the FRF was supplemented by certain assessments against members of the Savings Association Insurance Fund. Id. If these sources of funds "are insufficient to satisfy the liabilities of the FSLIC Resolution Fund, the Secretary of the Treasury shall pay to the Fund such amounts as may be necessary, as determined by the [FDIC] and the Secretary, for FSLIC Resolution Fund purposes." Id. § 1821a(c)(1) (1994). In addition, "[t]here are authorized to be appropriated to the Secretary of the Treasury, without fiscal year limitation, such sums as may be necessary to carry out [§ 1821a]." Id. § 1821a(c)(2) (1994). Because this language merely authorizes an appropriation, there would have to be an appropriation from which the Secretary of the Treasury could replenish the FRF. See 1 GAO Principles at 2-34 ("'The mere authorization of an appropriation does not authorize expenditures on the faith thereof . . . .'" (quoting 16 Comp. Gen. 1007, 1008 (1937)).

**\*12** The question that we must answer in determining whether the FRF is available to pay judgments or settlements in the Winstar-related cases in which FSLIC was a party to an AA or SAA is one of congressional intent. We must decide whether Congress intended for the phrase "all assets and liabilities of the [FSLIC] on the day before August 9, 1989," which FIRREA transferred to the FRF, 12 U.S.C. § 1821a(a)(2), to encompass the kind of liability that would give rise to settlements by, or judgments against, the United States in Winstar-related cases of this type. If Congress did so intend, then the FRF is available to pay the judgments or settlements that arise out of such cases. FN;B11[FN11]FN;F11 If not, then the FRF is not available to pay such judgments or settlements and, absent the existence of some other fund from which payment could be made, the Judgment Fund would be the appropriate source of payment.

We conclude that, in light of the relevant statutory text and legislative history, Congress intended the phrase "liabilities of the [FSLIC] on the day before August 9, 1989," 12 U.S.C. § 1821a(a)(2), to encompass the contingent liability that arose from the contractual obligations that, under the theory of liability set forth in Winstar, FSLIC had assumed prior to FIRREA's passage and that may, as a consequence of FIRREA's enactment and implementation, become definite liabilities resulting in judgments against, or settlements by, the United States. Our conclusion is based on three related determinations: (1) liability arising from AA's or SAA's to which FSLIC was a party constitute "liabilities of the [FSLIC]," id. (emphasis added), to the extent that the statutory term "liabilities" encompasses contingent liabilities; (2) the statutory phrase " liabilities of the [FSLIC]," id. (emphasis added), does encompass contingent liabilities arising from FSLIC contracts that may have created obligations leading to the payment of judgments or settlements by the United States in the class of Winstar-related litigation considered herein; and (3) the language "on the day before August 9, 1989," does not reflect Congress's intention to exclude contingent liabilities arising from such FSLIC agreements, even though it is the enactment of FIRREA, an event that took place after the "day before August 9, 1989," that might give rise to any such judgments or settlements. We therefore conclude that the FRF is the appropriate source of payment for such settlements or judgments. We note that our construction of § 1821a(a)(2) is consistent with the Tenth Circuit's decision in Security Federal, 25 F.3d 1493 (10th Cir. 1994). FN;B12[FN12]FN;F12

1.

It is our view that liabilities resulting from AA's or SAA's to which FSLIC was a party qualify as "liabilities of the [FSLIC]," 12 U.S.C. § 1821a(a)(2) (emphasis added), to the extent that the term "liabilities" encompasses contingent liabilities. As we have explained, the Supreme Court's decision in Winstar held the government liable insofar as the enactment and implementation of FIRREA resulted in the breach of AA's and SAA's that had been

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

entered into with various plaintiffs. The Court concluded that these contracts provided for the assumption of the risk of regulatory change and constituted promises to pay plaintiffs damages in case of breach. Under the theory of liability recognized in Winstar, a demonstration that the governmental party to the AA's or SAA's had the statutory authority to enter into them is critical to any claim that may be brought to enforce them. Winstar, 518 U.S. at 890-91 (plurality opinion); id. at 923 (Scalia, J., concurring). The Supreme Court recognized in Winstar that FSLIC had such authority to enter into agreements that provided for the assumption of the risk of regulatory change. See id. at 890 (plurality opinion); see also id. at 923 (Scalia, J., concurring). Accordingly, to the extent that the governmental liabilities arising out of these agreements in the Winstar-related cases constitute "liabilities" within the meaning of § 1821a(a)(2), it is fair to treat them as liabilities "of the [FSLIC,]" as any governmental obligation to pay, or settlement premised on such an obligation, would arise from contracts entered into by FSLIC.

**\*13** Moreover, we do not believe that, for purposes of determining the statutory source of payment, such liabilities could be attributed to the Bank Board. In contrast to FSLIC, which exercised its contracting power in forging the underlying agreements, it is our understanding that, in the cases considered in this memorandum, the Bank Board was "acting through" FSLIC's authority to contract, Winstar, 518 U.S. at 890 (plurality opinion), and was not exercising authority in connection with the agreements that are the subject of this memorandum other than in its capacity as the "operating head" of FSLIC. House Report at 424, reprinted in 1989 U.S.C.C.A.N. at 220; see 12 U.S.C. § 1725(a) (1988) (repealed 1989) (establishing FSLIC "under the direction of" the Bank Board). Accordingly, for purposes of construing the statutory provision that established the FRF, any liabilities resulting from the agreements would be "liabilities" of FSLIC, rather than of the Bank Board. FN;B13[FN13]FN;F13

We also believe that, in light of the quasi- corporate nature of FSLIC, Congress would have intended to treat these liabilities as "liabilities of the [FSLIC.]" This conclusion is supported by the fact that Congress does not ordinarily intend for the Judgment Fund to serve as the source of payment for liabilities that result from the breach of contractual obligations of governmental entities such as FSLIC. Instead, Congress ordinarily expects that such liabilities will be paid out of the separate funds of such governmental entities. Accordingly, it seems entirely logical to conclude that Congress intended for the FRF to serve as the source of payment for all those liabilities that Congress, had it not abolished FSLIC, would have expected FSLIC to have paid out of its own funds. The FRF, after all, is the fund that Congress established in order to succeed generally to all of the assets and liabilities of FSLIC.

Our determination that FSLIC is the type of governmental entity that Congress ordinarily would expect to use its own funds to pay for liabilities resulting from the breach of its contractual obligations stems from both its statutory designation as a "government corporation" and an examination of the functions that it performs. For example, the General Accounting Office ("GAO") has generally found that judgments against a government corporation, such as FSLIC, see 31 U.S.C. § 9101(3)(E) (1988) (repealed 1989) (listing FSLIC as a wholly-owned government corporation), should be paid from the corporation's own funds:

> The theory is that a government corporation is set up to operate in a business- like manner. It is usually given considerable latitude in determining its expenditures; it is free of many of the restrictions on appropriated funds that apply to noncorporate agencies; and its statutory charter typically contains a 'sue and be sued' clause. Of particular relevance . . . a corporation may generally retain funds it receives in the course of its operations and is not required to deposit them in the Treasury as miscellaneous receipts. Also, unlike a regular government agency, a government corporation may procure liability insurance. This being the case, it is logical that losses incurred by a government corporation, whether by judgment or otherwise, should be treated as liabilities of the corporation and charged to corporate funds.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*14** 3 GAO Principles at 14-36.

This Office has not expressly considered or adopted GAO's reasoning regarding the appropriate source for payment of judgments against a government corporation. Our approach has been to focus on case- specific determinations of congressional intent. In <u>Availability of the Judgment Fund for the Payment of Judgments or Settlements in Suits Brought Against the Commodity Credit Corporation Under the Federal Tort Claims Act</u>, 13 Op. O.L.C. 362 (1989), for example, we analyzed whether the Judgment Fund was available to pay settlements for suits brought against the Commodity Credit Corporation ("CCC") under the Federal Tort Claims Act ("FTCA"), by searching for indications that Congress intended for the CCC to discharge its own debts, including judgments against it, from its own funds. <u>Id.</u> at 367. As evidence of such intent, we noted that: (1) for the first fifteen years of its existence, the CCC operated largely in a private manner; (2) like similar government corporations, the CCC was exposed to legal liability through a sue-and-be-sued clause; and (3) the CCC was authorized to "'determine the character of and the necessity for its obligations and expenditures and the manner in which they shall be incurred, allowed, and paid'" and to "'make final and conclusive settlement and adjustment of any claims by or against the Corporation.'" <u>Id.</u> (quoting 15 U.S.C. § 714b(j), (k)). We found that "[s]ince the CCC thus has the authority to apply its own funds to the payment of 'any' of its judgment claims, it follows that the CCC's obligations arising from FTCA may be paid from corporate funds. Accordingly, payment of such FTCA judgments against the CCC is 'otherwise provided for' within the meaning of 31 U.S.C. § 1304(a)(1), and the Judgment Fund is not available for that purpose." <u>Id.</u>

The common thread running through our and the GAO's analysis is that, in determining whether Congress intended for an entity to pay judgments from its own funds, relevant considerations include whether: Congress has designated the entity as a government corporation; the government corporation operates in a private, or "business-like," manner, as evidenced by, for example, its latitude to determine its expenditures, its exemption from the normal restrictions on appropriated funds, or the type of program it runs; the government corporation is exposed to legal liability through a sue-and-be-sued clause; and the government corporation has a revolving fund through which it may retain funds received in the course of its income-generating operations and spend those funds on day-to-day expenses.

We believe that the relevant circumstances indicate that Congress intended for FSLIC to pay judgments against it from its own funds. Congress expressly designated FSLIC as a government corporation. <u>See</u> 31 U.S.C. § 9101(3)(E) (1988) (repealed 1989). In addition, while FSLIC in part performed an inherently governmental function in its role as a regulator of the thrifts, the deposit insurance function it performed was one that could have been performed by the private sector. FSLIC had considerable latitude to determine its necessary expenditures and could operate without considering the usual statutory provisions regarding the use of appropriated funds. <u>See</u> 12 U.S.C. § 1725(c)(5) (1988) (repealed 1989) (requiring FSLIC to "determine its necessary expenditures . . . and the manner in which the same shall be incurred, allowed, and paid, without regard to the provisions of any other law governing the expenditure of public funds."). FSLIC also operated like a private business in that its real property was subject to state or local taxes. <u>See</u> id. § 1725(e). And FSLIC could sue and be sued. <u>See</u> FDIC v. Meyer, 510 U.S. 471, 475 (1994) (citing 12 U.S.C. § 1725(c)(4) (1988)). Finally, FSLIC's insurance fund operated as a revolving fund -- paying for both its current operating expenses and defaults on depositors' accounts out of premiums levied on the institutions it insured, without having to deposit its funds in the Treasury as miscellaneous receipts. <u>See</u> 12 U.S.C. § 1727(b) & (c) (1988) (repealed 1989) (providing for payment of premiums to FSLIC by insured institutions); <u>id.</u> § 1725(d) (1988) (repealed 1989) ("Moneys of [FSLIC] not required for current operations shall be deposited in the Treasury of the United States, or upon the approval of the Secretary of the Treasury, in any Federal Reserve bank, or shall be invested in obligations of, or guaran-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

teed as to principal and interest by, the United States."); id. § 1728 (1988) (repealed 1989) (providing for payment of insurance by FSLIC). Thus, it appears that Congress would have expected the liabilities of FSLIC that resulted from breaches of contracts into which FSLIC had entered to have been paid from FSLIC's insurance fund, and that Congress would have expected the liabilities at issue here to have been paid from that fund if they had become definite prior to FSLIC's abolition.

2.

**\*15** There remains, then, the question whether the statutory term "liabilities" should be construed to encompass not only definite liabilities, such as a final judgment entered prior to FSLIC's abolition as the consequence of an AA or SAA entered into by FSLIC, but also such contingent liabilities as a contractual obligation that FSLIC had assumed in an AA or SAA but that had not been breached prior to the time FIRREA abolished FSLIC. FIRREA does not define the term "liabilities" in the phrase "liabilities of the [FSLIC]," 12 U.S.C. § 1821a(a)(2), but it is well-established that "the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980). In accord with this interpretive principle, the Supreme Court has explained that when a word or phrase in a statute has not been defined by Congress, it should ordinarily be construed in accordance with "its ordinary or natural meaning." FDIC v. Meyer, 510 U.S. 471, 476 (1994) (relying on Black's Law Dictionary for the ordinary meaning of a term).

In ordinary usage, the term "liability" is "a broad legal term [that] has been referred to as of the most comprehensive significance, including almost every character of . . . responsibility, absolute, contingent, or likely." Black's Law Dictionary 914(6th ed. 1990); see id. (liability "has been defined to mean: all character of debts and obligations . . . an obligation which may or may not ripen into a debt; any kind of debt or liability, either absolute or contingent, express or implied; condition of being actually or potentially subject to an obligation; condition of being responsible for a possible or actual loss, penalty, evil, expense, or burden; . . . every kind of legal obligation, responsibility or duty . . . present, current, future, fixed or contingent debts . . . .") (citations omitted); cf. Webster's Third New International Dictionary 1302 (1986) (defining "liability" as "the quality or state of being liable" and defining "liable" as "bound or obligated according to law or equity: responsible, answerable"); Montauk Oil Transp. Corp. v. Tug "El Zorro Grande", 54 F.3d 111, 114 (2d Cir. 1995) (quoting Black's Law Dictionary as support for reading the term "liabilities" in a statute broadly to encompass civil penalties already imposed). Thus, the ordinary meaning of the term "liabilit[y]" strongly supports the conclusion that Congress intended the phrase "liabilities of the [FSLIC]" in § 1821a(a)(2) to include any contingent liability arising from promises made by FSLIC to insure against the risk of regulatory change, even though that liability had not become definite by the time of FSLIC's abolition.

Of course, we do not mean to suggest that the term "liabilities" is invariably best construed, regardless of context, to include contingent liabilities arising from agreements that have provided for the assumption of the risk of events that have not yet occurred. Here, however, the overall statutory context counsels in favor of giving the term "liabilities" its ordinary, expansive meaning. When FIRREA abolished FSLIC, it designated where the functions and the assets and liabilities of FSLIC would be transferred. See supra, p. 7; see also House Report, at 438, reprinted in 1989 U.S.C.C.A.N. at 234 (explaining that the FRF "will assume all the assets and liabilities of the FSLIC except for those expressly transferred or assumed by the Resolution Trust Corporation"). Congress established the FRF to wind up all of FSLIC's affairs, see 12 U.S.C. § 1821a(f) (providing for dissolution of FRF "upon satisfaction of all debts and liabilities and sale of all assets"), and was careful not to extinguish existing obligations attributable to FSLIC's actions. See FIRREA, § 401(f) (codified at 12 U.S.C. § 1437 note (1994))

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

("savings provision" explaining that the abolition of FSLIC "shall not affect the validity of any right, duty, or obligation of" FSLIC and providing for the continuation of all suits commenced against FSLIC). But nowhere in FIRREA did Congress expressly provide that it intended for the FRF to assume only definite, but not contingent, liabilities with respect to FSLIC.

**\*16** It would be anomalous to conclude that Congress, in creating a detailed statutory framework intended to wind up the affairs of FSLIC, simply left unanswered the question where the contingent liabilities arising from FSLIC agreements that had not yet been breached should be transferred. This anomaly does not arise, however, if "liabilities" is construed consistent with its ordinary, broad meaning. For under such a construction, it is clear that Congress intended the FRF, which (with the sole exception of 12 U.S.C. § 1441a) Congress identified as the fund to which "all" of the FSLIC "liabilities" were to be transferred, to be the source of payment for the subset of liabilities that were contingent prior to FSLIC's abolition.

Moreover, we have found no affirmative evidence in our review of the relevant legislative materials that Congress intended to exclude contingent liabilities from the "liabilities" that it plainly intended to transfer to the FRF. All of these materials are consistent with construing "liabilities" in a manner that would include the contingent liability attributable to the FSLIC agreements, and none provides a clear, contrary indication of congressional intent. In light of the expansive, ordinary meaning of the term "liability," as well as the particular statutory context at issue here, the term "liabilities" in § 1821a(a)(2) should be construed to include the type of contingent liability that arose from AA's and SAA's that FSLIC entered into prior to its abolition. See John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank, 510 U.S. 86, 94-95 (1993) (in interpreting the meaning of a statutory provision, "we examine first the language of the governing statute, guided not by a single sentence or member of a sentence, but looking to the provisions of the whole law, and to its object and policy") (quotations and citations omitted).

Certainly the statutory provision that addresses payments from the FRF arising from "legal proceedings," 12 U.S.C. § 1821a(d), does not manifest an intention on the part of Congress to exclude liabilities that were only contingent at the time of FSLIC's abolition. Instead, that provision makes clear that Congress fully expected the FRF to be the source of payment for FSLIC liabilities that would arise from litigation commenced only after FSLIC had been abolished. Section 1821a(d) provides: "Any judgment resulting from a proceeding to which [FSLIC] was a party prior to its dissolution or which is initiated against the [FDIC] with respect to [FSLIC] or with respect to the FSLIC Resolution Fund shall be limited to the assets of the FSLIC Resolution Fund." 12 U.S.C. § 1821a(d). The plain language of this provision indicates that Congress contemplated that judgments resulting from cases initiated against the FDIC after the enactment of FIRREA with respect to FSLIC's pre-FIRREA activities would be paid from the FRF. That is to say, Congress must have intended for the liabilities of the [FSLIC]" transferred to the FRF to include at least some potential judgments resulting from actions by FSLIC prior to its abolition, brought against the FDIC as the successor to FSLIC's obligations. 12 U.S.C. § 1821a(a)(2). Yet, in addressing the availability of the FRF to pay such future judgments, Congress did not purport to limit the class of payable "liabilities." Instead, Congress employed the broad phrase "any judgment," which comports with the expansive, ordinary meaning of "liabilities" that we believe Congress intended to adopt in § 1821a(a)(2).

**\*17** Nor can it be argued that the particular class of future judgments and settlements at issue here -- judgments and settlements that may arise from contractual agreements assuming the risk of regulatory change that, by definition, had not been breached prior to FSLIC's abolition -- were so far beyond the contemplation of Congress at the time that it established the FRF that it would be implausible to construe the term "liabilities" in §

1821a(a)(2) to encompass them. As Justice Souter explained in Winstar, the effect that the enactment of FIR-
REA might have on the agreements was a subject of "intense concern" in the congressional debate over the le-
gislation. 518 U.S. at 902 (plurality opinion). FN;B14[FN14]FN;F14 For example, "[o]pponents of FIRREA's
new capital requirements complained that '[i]n its present form, [FIRREA] would abrogate written agreements
made by the U.S. government to thrifts that acquired failing institutions by changing the rules in the middle of
the game.'" Id. at 900- 01 (plurality opinion) (quoting 135 Cong. Rec. 12,145 (1989) (statement of Rep. Acker-
man)). More generally, Justice Souter noted that the effect that the legislation might have on existing FSLIC
contracts was "a focal point of the congressional debate," id. at 900 (plurality opinion), and that "Congress itself
expressed a willingness to bear the costs at issue here when it authorized FSLIC to 'guarantee [acquiring thrifts]
against loss' that might occur as a result of a supervisory merger." Id. at 883 (quoting 12 U.S.C. § 1729(f)(2)
(1988) (repealed 1989)). Given the attention in Congress to the question whether FIRREA would abrogate the
agreements to assume the risk of regulatory change, it would appear reasonable to construe "liabilities of the
[FSLIC]" to encompass any liability that might result from the breach of those agreements.

Finally, the relevant legislative history does not demonstrate that Congress intended for "liabilities of the
[FSLIC]" to exclude contingent liabilities. Inaccordance with the natural reading of the term "liabilities" in §
1821a(a)(2), the earlier versions of the provision reported out of both the Senate and House committees spe-
cified that the types of liabilities that the FRF would inherit included "debts, obligations, contracts and other li-
abilities of [FSLIC], matured or unmatured, accrued, absolute, contingent, or otherwise." S. Rep. No. 101-19, at
107- 08 (Apr. 13, 1989); House Report at 64 (May 16, 1989) (identical language); see also S. Rep. No. 101-19,
at 319 (explaining that "[t]he liabilities transferred include FSLIC's outstanding obligations under assistance
agreements with acquirers of failing thrift institutions"); House Report at 334, reprinted in 1989 U.S.C.C.A.N. at
130 (explaining that the FRF "is the successor to the existing reserves and assets, debts, obligations, contracts
and other liabilities of the FSLIC"). This explanatory language was deleted without any reference in the House
Conference Report, and thus it could be argued that the deletion reflects Congress's intent to have adopted a nar-
rower meaning of "liabilities" in the statute itself. We do not believe, however, that such a reading of the legis-
lative history would be sound. To the contrary, the appearance of this broad description of liabilities in the Sen-
ate and House reports is consistent with the conclusion that Congress intended the term "liabilities" to retain its
ordinary, and quite expansive, meaning, and that Congress simply deleted the explanatory language as unneces-
sary.

*18 In evaluating the effect of the deletion of the explanatory language, we have reviewed the case law that con-
cludes that Congress does not ordinarily "intend sub silentio to enact statutory language that it has earlier dis-
carded in favor of other language." INS v. Cardoza-Fonseca, 480 U.S. 421, 442-43 (1987); see also Gulf Oil
Corp. v. Copp Paving Co., 419 U.S. 186, 200 (1974) (Congress's deletion of provision "strongly militates
against a judgment that Congress intended a result that it expressly declined to enact"). There are certainly situa-
tions in which the deletion of language that has appeared in an earlier, unenacted version of the legislation may
be read to signal Congress's intention to have enacted a provision with a different meaning. There are also situ-
ations, however, where the deletion of the language that appeared in earlier versions of the bill merely reflects
Congress's intention to have avoided an unnecessary redundancy that would have resulted from the inclusion of
the additional language. See Gemsco, Inc. v. Walling, 324 U.S. 244, 263-65 (1945) (rejecting argument that de-
letion in conference of an illustrative parenthetical phrase from a bill meant that Congress intended to circum-
vent the authority conferred by the bill where parenthetical had been both inserted and deleted without com-
ment); see also ErieR.R. Co. v. Tompkins, 304 U.S. 64, 72-73 & n.5 (1938) (overturning the Court's previous in-
terpretation of § 34 of the Federal Judiciary Act in part because of the "research of a competent scholar, who ex-

amined the original document") (citing Charles Warren, New Light on the History of the Federal Judiciary Act of 1789, 37 Harv. L. Rev. 49, 51-52, 81-88, 108 (1923) (when the drafter of an amendment to § 34 replaced his original version's phrase "the Statute law of the several States in force for the time being and their unwritten or common law now in use, whether by adoption from the common law of England, the ancient statutes of the same or otherwise" with "laws of the several States," the latter was intended to be a concise summary that encompassed the former)).

Here, as we have explained, the ordinary meaning of the undefined term "liabilities" is perfectly consistent with the expansive descriptions of "liabilities" contained in the House and Senate reports. FN;B15[FN15]FN;F15 In addition, the other indications of congressional intent that we have identified above do not suggest that Congress intended to depart from the ordinary meaning of "liabilities" in establishing the FRF. Indeed, they all suggest that Congress intended to ensure a comprehensive transfer to the FRF of all of the assets and liabilities that had formerly been FSLIC's. Accordingly, we believe that Congress would have indicated in some way its intention for the deletion of the explanatory language to exclude the ordinary meaning of the term "liabilities," rather than merely to eliminate redundancies, if it had intended that result. Thus, the legislative history concerning the use of the term "liabilities" in § 1821a(a)(2) is consistent with the conclusion that Congress intended for that term to retain its ordinary meaning.

3.

*19 Although we believe that Congress intended the phrase "the liabilities of the [FSLIC]" to encompass contingent liabilities resulting from contracts in which FSLIC assumed the risk of regulatory change, we must still consider the effect of the remaining portion of the relevant statutory language -- i.e., the portion of the statute that limits the liabilities of FSLIC to include only those that existed "on the day before August 9, 1989." It could be argued that the inclusion of this limiting language reflected Congress's intention to exclude liabilities resulting from breaches of contract caused by FIRREA's enactment and implementation, which, of course, occurred after August 8, 1989. Under that view, the phrase "liabilities of the [FSLIC]" on the day before it was abolished would encompass, for example, outstanding promissory notes for the cash assistance that FSLIC had promised to contribute to supervisory mergers. The phrase would not encompass mere contingent liabilities that were attributable to agreements by FSLIC that would not be breached until after August 8, 1989. We do not believe, however, that this argument has force.

As we have already explained, there is nothing in the term "liabilities" itself that would counsel in favor of construing it to exclude contingent liabilities resulting from FSLIC contracts that had not been breached as of August 8, 1989. Indeed, the ordinary meaning of that term points in the opposite direction, and we have found no evidence that Congress intended the date restriction in § 1821a(a)(2), i.e., the phrase "on the day before August 9, 1989," to limit the types of "liabilities" of FSLIC transferred to the FRF. We do not believe, for example, that Congress intended this date restriction to preclude the FRF from serving as the source of payment for judgments or settlements resulting from breaches of FSLIC agreements that occurred either on the date of FIRREA's enactment, or later, when FIRREA was implemented, and thus after "the day before August 9, 1989." Instead, we believe that the inclusion of the date restriction merely resulted from the timing of FSLIC's abolition; technically, FSLIC was abolished just after midnight on August 8, and thus the transfer to the FRF of FSLIC's liabilities as of midnight on August 8 makes sense as a matter of timing. Earlier versions of the bill reported out of both the House and Senate committees had used the phrase "[o]n the date of the dissolution of [FSLIC] in accordance with section 401 of [FIRREA]," see S. Rep. No. 101-19, at 107 (Apr. 13, 1989); House Report at 64 (May 16, 1989), and there is no indication in the House Conference Report that the substitution of "the day before August

9, 1989" for "the date of the dissolution of [FSLIC]" was intended to work any substantive change.

### III. CONCLUSION

We conclude, therefore, that the transfer of "all assets and liabilities of the [FSLIC] on the day before August 9, 1989" to the FRF included not only the transfer of those liabilities that were definite on the day before FSLIC was abolished by reason of a judgment, or that arose from a breach of a contractual obligation that occurred on or before that date, but also those contingent liabilities that resulted from FSLIC's earlier assumption of the risk of adverse changes in the regulatory structure and that became definite only after FSLIC had been abolished. 12 U.S.C. § 1821a(a)(2). Because the FRF inherited these contingent liabilities from FSLIC, it also inherited the corresponding duty to pay damages once the regulatory structure changed. Thus, the FRF is legally available to pay judgments resulting from proceedings seeking to enforce this duty, and any settlements based on the risk of such judgments. Because payment is "otherwise provided for" within the meaning of the Judgment Fund statute, the Judgment Fund is not available to pay such judgments and settlements. See 31 U.S.C. § 1304. In sum, we believe that the FRF is the appropriate source of funds to pay judgments and settlements in Winstar-related cases in which FSLIC was a party to an Assistance Agreement or Supervisory Action Agreement.

**\*20** RANDOLPH D. MOSS
Acting Assistant Attorney General
Office of Legal Counsel

FN1 For ease of discussion, we refer to both these cases and the cases decided by the Supreme Court in Winstar collectively as "Winstar-related cases."

FN2 Although we provided the Federal Deposit Insurance Corporation the opportunity to provide its views on this matter, it declined to do so.

FN3 Although the opinions and legal interpretations of the General Accounting Office and the Comptroller General often provide helpful guidance on appropriations matters and related issues, they are not binding upon departments, agencies, or officers of the executive branch. See Bowsher v. Synar, 478 U.S. 714, 727-32 (1986).

FN4 It is our understanding that whether an agreement qualifies as an "Assistance Agreement" or a "Supervisory Action Agreement" depends only on the labeling of the agreement; the terms were used interchangeably, although the term "Assistance Agreement" was more common. Telephone conversation between Caroline Krass, Attorney- Adviser, Office of Legal Counsel and Aaron Kahn, Principal Litigation Counsel, Office of the General Counsel, Office of Thrift Supervision, Department of the Treasury (June 30, 1998).

FN5 In March 1996, prior to the Supreme Court's decision in Winstar, this Office opined that the FSLIC Resolution Fund was the proper source for payment of the judgment in RTC v. FSLIC, 25 F.3d 1493 (10th Cir. 1994) ("Security Federal"). See Letter for Ricki Helfer, Chairman, FDIC, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, Re: Reimbursement from the Federal Judgment Fund for Payment of Judgment in RTC v. FSLIC, (10th Cir. 1994) (Mar. 18, 1996) ("Helfer Letter"). Our opinion expressly stated, however, that it was limited to the facts of Security Federal. See id. at 2 ("We have not attempted to determine and make no suggestion here as to the proper source of payment for any judgment that might be entered in the other goodwill/capital forbearance cases.").

FN6 We refer to "the Bank Board and FSLIC" together for ease of discussion in this section of the memor-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

andum, although both entities may not have been involved in all cases.

FN7 Justice Souter was joined by only two other Justices in two subsections of his opinion that discussed the government's "sovereign acts" defense. 518 U.S. at 896-903.

FN8 The government's petition for a writ of certiorari did not directly contest the existence of contracts between the government and plaintiffs, and therefore the question was not technically before the Court. See 518 U.S. at 860-61 (plurality opinion); United States v. Winstar Corp., 64 F.3d 1531 (Fed. Cir. 1995) (en banc), petition for cert. filed, 64 U.S.L.W. 3486 (U.S. Dec. 1, 1995) (No. 95-865) (listing as "questions presented" whether unmistakability doctrine, reserved powers doctrine, or sovereign acts doctrine should bar enforcement of alleged contracts). The Federal Circuit and the Court of Federal Claims, however, both found that contracts existed in the three transactions at issue in Winstar, see Winstar Corp. v. United States, 64 F.3d at 1545, and the plurality seemed to accept the Federal Circuit's characterization of the contracts.

FN9 Because we conclude that payment for the judgments and settlements at issue fails to meet the "not otherwise provided for" requirement in § 1304(a), we express no opinion as to whether that provision's other two requirements are met.

FN10 Section 1441a established the RTC and provided for its termination by December 31, 1995. See 12 U.S.C. § 1441a(b) (1994); 12 U.S.C. § 1441a(m)(1) (1994). Upon termination, all assets and liabilities of RTC were to be transferred to the FRF. Id. § 1441a(m)(2). If the RTC's assets exceeded its liabilities, FIRREA obligated the FRF to transfer any net proceeds from the sale of the assets to the Resolution Funding Corporation. Id.

FN11 In addition to transferring the assets and liabilities of FSLIC to the FRF, it is clear that Congress also intended for judgments or settlements arising from the "liabilities of the [FSLIC]" to be paid out of the FRF. See 12 U.S.C. § 1821a(c) (providing for a "Treasury backup" if the funds in the FRF are insufficient to satisfy its liabilities); id. § 1821a(d) (limiting the payment of certain judgments to the assets of the FRF).

FN12 The Tenth Circuit held in that case that the FRF is the appropriate source for payment of a judgment resulting from the breach of contractual obligations incurred by FSLIC where the breach occurred after FSLIC's abolition. Id. In reaching that conclusion, the court of appeals relied on §§ 1821a(a) and 1821a(d) to hold that the restitution to which the plaintiff investors were entitled should be paid from the FRF rather than the RTC's assets: "Because FIRREA designates the FSLIC Resolution Fund as the successor to FSLIC rights and obligations and limits recovery to the Fund's assets, the Fund is the proper source of restitution to the Investors." Id. at 1506; cf. Helfer Letter (concluding that under § 1821a(d), the FRF rather than the Judgment Fund was the proper source for payment of the judgment in Security Federal because FDIC, FSLIC and FRF were all named defendants, the court ordered payment of the judgment from the FRF, and the case involved an AA negotiated and executed by FSLIC).

FN13 At least for purposes of § 1821a(a)(2), the fact that the "United States" appears as the defendant in the Winstar-related cases does not make any liabilities resulting from FSLIC agreements liabilities of the United States as a whole rather than of FSLIC. The styling of the captions in these cases simply reflects the requirement that all cases brought in the CFC must be brought against the "United States," see 28 U.S.C. § 1491(a) (1994), a requirement that obtains without regard to the source from which payments would be made for any liability that results from such litigation. Although 12 U.S.C. § 1821a(d) defines one class of judgments payable from the FRF as those "resulting from a proceeding to which [FSLIC] was a party prior to its dissolution or which is initiated against the [FDIC] with respect to [FSLIC] or with respect to the FSLIC Resolution Fund," we do not be-

lieve that this provision limits the liabilities transferred to the FRF to those resulting from actions in which FSLIC or the FDIC was named as a defendant. Instead, it is clear that, in light of the text, structure, and legislative history of § 1821a(d), Congress did not intend for this provision to limit the class of payable FSLIC liabilities, but rather to insure that the FDIC would only use FRF funds to pay those FSLIC liabilities that had been transferred to the FRF. See S. Rep. No. 101-19, at 319 (section 1821a(d) "insulates the FDIC and the other funds it manages from liabilities of FSLIC that are transferred to the [FRF]"); see also House Report at 335, reprinted in 1989 U.S.C.C.A.N. at 131 ("Any judgment resulting from . . . any action which is initiated against the FDIC based upon FSLIC actions is limited to the assets of the FSLIC Resolution Fund.").

FN14 This section of Justice Souter's plurality opinion and the other portions of the opinion cited in this paragraph were joined by only two other Justices.

FN15 In reaching its conclusion in Security Federal that the FRF was the appropriate source of payment, the Tenth Circuit relied on the earlier, more complete, listing of the types of liabilities transferred to the FRF. See 25 F.3d at 1505 ("the FSLIC Resolution Fund . . . 'is the successor to the existing reserves and assets, debts, obligations, contracts and other liabilities of the FSLIC'" (quoting House Report at 334)). The court did not address, however, whether the deletion of that additional, descriptive language from the final version of § 1821a(a)(2), which uses only the term "liabilities," reflected Congress's intention to have adopted a narrower meaning of "liabilities."

22 U.S. Op. Off. Legal Counsel 141, 1998 WL 1180050 (O.L.C.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 1

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

United States District Court, S. D. New York.
Complaint of TUG OCEAN PRINCE, INC. and Red
Star Towing & Transportation Company, as Owner and
Charterer of the TUG OCEAN PRINCE, for Exonera-
tion from or Limitation of Liability, Plaintiffs and
Third-Party Plaintiffs,
v.
UNITED STATES of America, Third-Party Defendant.
UNITED STATES of America, Plaintiff,
v.
PITTSTON MARINE TRANSPORT CORPORATION,
Red Star Towing & Transportation Company, Tug
Ocean Prince, Inc.,
and
TUG OCEAN PRINCE and BARGE NEW LONDON,
in rem, Defendants.

Nos. 74 Civ. 3358(GLG) and 75 Civ. 5801(GLG).
Sept. 6, 1977.

Oil barge being towed in Hudson River channel
collided with submerged rocks causing oil spillage.
Owner of tug sought exoneration or limitation of liabil-
ity. Barge owner sought indemnity from tug owner for
fines imposed on it under Federal Water Pollution Con-
trol Act, and Government sought costs of pollution
cleanup and imposition of civil penalty on barge owner.
The District Court, Goettel, J., held that: (1) the inabil-
ity of the tug's pilot to locate a warning buoy did not en-
title the tug owner to exoneration from liability (2) the
tug owner was entitled to limitation of liability (3) the
coast guard was not liable under the Suits in Admiralty
Act for negligence in maintaining aids to navigation in
the area of the grounding (4) the tug owner's liability for
cleanup costs was limited to $100 per gross ton of the
tug, and (5) the fine imposed on the barge owner would
be remanded so as to permit absence of culpability to
mitigate the amount of the fine.

Order in accordance with opinion.

West Headnotes

**[1] Shipping 354 ☞207**

354 Shipping
  354XI Limitation of Owner's Liability
    354k206 Losses and Injuries Subjects of Limita-
tion
      354k207 k. In general. Most Cited Cases
  Owner of tug was not entitled to exoneration from
liability resulting from grounding of barge being towed
by tug on theory that accident was caused by Govern-
ment's failure to maintain adequate aids to navigation,
where indicated that fact that warning buoy
was obscured by ice was merely "but for" factor which,
had it been visible, might have corrected navigational
errors which were proximate cause of accident, and that
inability to use aid to navigation was not proximate
cause of accident.

**[2] Shipping 354 ☞208**

354 Shipping
  354XI Limitation of Owner's Liability
    354k206 Losses and Injuries Subjects of Limita-
tion
      354k208 k. Privity or knowledge of owner.
Most Cited Cases
  In order for vessel owner to limit its liability for
damage caused by vessel, duty is upon owner to estab-
lish lack of privity or knowledge. 46 U.S.C.A. § 183.

**[3] Shipping 354 ☞208**

354 Shipping
  354XI Limitation of Owner's Liability
    354k206 Losses and Injuries Subjects of Limita-
tion
      354k208 k. Privity or knowledge of owner.
Most Cited Cases
  Although failure to perceive navigational hazard
might be indicative of generalized incompetence which
creates unseaworthy condition, inadequate response to
known danger presents error in navigational judgment
and, as such, falls outside vessel owner's privity and
knowledge, for purposes of limitation of liability. 46

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

U.S.C.A. § 183.

**[4] Shipping 354 ☞207**

354 Shipping
    354XI Limitation of Owner's Liability
        354k206 Losses and Injuries Subjects of Limitation
           354k207 k. In general. Most Cited Cases
      Where failure of tug to have lookout is statutory fault, owner seeking limitation of liability must prove that violation could not have contributed to casualty in any way. Inland Rules, art. 29, 33 U.S.C.A. § 221.

**[5] Shipping 354 ☞209(3)**

354 Shipping
    354XI Limitation of Owner's Liability
      354k209 Proceedings
        354k209(3) k. Pleading, evidence, and issues. Most Cited Cases
      Evidence, in tug owner's action for limitation of liability, indicated that, even assuming failure of tug pilot to maintain separate lookout was statutory fault, such failure did not contribute to collision. Inland Rules, art. 29, 33 U.S.C.A. § 221.

**[6] Shipping 354 ☞208**

354 Shipping
    354XI Limitation of Owner's Liability
      354k206 Losses and Injuries Subjects of Limitation
        354k208 k. Privity or knowledge of owner. Most Cited Cases
      Errors in management aboard vessel may not be imputed to owners so as to deny limitation of liability. Inland Rules, art. 29, 33 U.S.C.A. § 221.

**[7] Shipping 354 ☞209(3)**

354 Shipping
    354XI Limitation of Owner's Liability
      354k209 Proceedings
        354k209(3) k. Pleading, evidence, and issues. Most Cited Cases
      Evidence, in tug owner's action for limitation of li-

ability, indicated that collision was caused not by failure to make chain of command apparent prior to departure but rather by failure of otherwise competent officer, who was not familiar with river being navigated, to seek assistance from more experienced mate, event which was not unseaworthy condition for which owner could be held responsible. Inland Rules, art. 29, 33 U.S.C.A. § 221.

**[8] Shipping 354 ☞11**

354 Shipping
    354I Regulation in General
      354k11 k. Protection of life and property. Most Cited Cases
      Merely warning mariners of perilous condition, as rule, will not absolve coast guard of duty to correct dangerous condition, but adequate warnings may absolve them from particular liability.

**[9] Shipping 354 ☞11**

354 Shipping
    354I Regulation in General
      354k11 k. Protection of life and property. Most Cited Cases
      Where coast guard had warned river mariners of possibility of ice obstructing warning buoys in particular span of Hudson River channel, and where "notice to mariners" for week of accident made particular mention of problem of ice-covered buoys in same area, absent showing that coast guard had notice of ice covering particular buoy during day in question and could have repaired it, coast guard would not be liable in negligence under Suits in Admiralty Act as result of grounding of oil barge on submerged rocks. Suits in Admiralty Act, §§ 1–12, 46 U.S.C.A. §§ 741–752.

**[10] Negligence 272 ☞1635**

272 Negligence
    272XVIII Actions
      272XVIII(C) Evidence
        272XVIII(C)4 Admissibility
          272k1635 k. Similar facts and transactions; other accidents. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

(Formerly 272k134(2))

Evidence of prior similar accident has some tendency to establish dangerous or defective condition at place in question.

**[11] Negligence 272 ☞1635**

272 Negligence
  272XVIII Actions
    272XVIII(C) Evidence
      272XVIII(C)4 Admissibility
        272k1635 k. Similar facts and transactions; other accidents. Most Cited Cases
    (Formerly 272k125)

Because evidence of prior similar accident in negligence case draws its relevance from principle that similar causes can be expected to produce similar effects, admissibility of such evidence hinges upon demonstration that conditions had been substantially similar on all occasions.

**[12] Shipping 354 ☞11**

354 Shipping
  354I Regulation in General
    354k11 k. Protection of life and property. Most Cited Cases

Negligence, if any, on part of coast guard, in not establishing more effective aids to navigation in area of Hudson River channel where black can buoy warning of submerged rocks became obstructed by ice, was not proximate cause of grounding of oil barge on submerged rocks where pilot of tug that was towing barge had available, for navigational purposes, both radar and fixed light tower on shore, but where he nevertheless strayed away from channel looking for obscured buoy. Suits in Admiralty Act, §§ 1–12, 46 U.S.C.A. §§ 741–752.

**[13] Environmental Law 149E ☞214**

149E Environmental Law
  149EV Water Pollution
    149Ek214 k. Civil liability; cleanup costs. Most Cited Cases
    (Formerly 199k25.7(23) Health and Environment,

270k35 Navigable Waters)

Traditional admiralty concept of limiting third party vessel owner's liability with reference to his vessel rather than vessel which actually spilled oil is contained in Water Quality Improvement Act of 1970. Federal Water Pollution Control Act, § 311(f)(1) as amended 33 U.S.C.A. § 1321(f)(1).

**[14] Statutes 361 ☞190**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k187 Meaning of Language
        361k190 k. Existence of ambiguity. Most Cited Cases

Where statutory language is clear and unequivocal, there is no occasion for court to resort to interpretive aids.

**[15] Environmental Law 149E ☞214**

149E Environmental Law
  149EV Water Pollution
    149Ek214 k. Civil liability; cleanup costs. Most Cited Cases
    (Formerly 199k25.7(23) Health and Environment, 270k35 Navigable Waters)

Where owner of oil barge which ran aground on submerged rocks causing spillage in Hudson River channel, and owner of tug which was towing barge at time of accident, were not same entity, and where there was no vestige of contractual relationship running between owners of two vessels and Government, "flotilla rule," would not apply to require calculation of tug owner's liability for cleanup costs under Water Quality Improvement Act of 1970 based upon combined tonnage of tug and barge; tug owner's liability would be limited to $100 per gross ton of tug alone. Federal Water Pollution Control Act, § 311(f)(1), (g) as amended 33 U.S.C.A. § 1321(f)(1), (g).

**[16] Indemnity 208 ☞69**

208 Indemnity
  208III Indemnification by Operation of Law

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

208k63 Particular Cases and Issues
208k69 k. Maritime cases. Most Cited Cases
(Formerly 208k13.1(2.1), 208k13.1(2))

Even though penalty imposed on vessel owners under Federal Water Pollution Control Act amendments of 1972 as result of discharge of oil or hazardous substance is civil in nature, and even though provision holds owner or operator of vessel strictly liable for penalty regardless of culpability or third-party causation, statute does not contemplate right of indemnity for penalty imposed. Federal Water Pollution Control Act, § 311(b)(6) as amended 33 U.S.C.A. § 1321(b)(6).

**[17] Environmental Law 149E ⬦⬦223**

149E Environmental Law
149EV Water Pollution
149Ek223 k. Penalties and fines. Most Cited Cases
(Formerly 199k25.7(24), 199k25.15(6) Health and Environment, 270k35 Navigable Waters)

In view of fact that owner of oil barge which, while being towed in Hudson River channel, ran aground and spilled oil, had no right to indemnity from tug owner with respect to fine imposed on it under Federal Water Pollution Control Act amendments of 1972, case would be remanded to Coast Guard to permit absence of culpability to mitigate amount of fine imposed. Federal Water Pollution Control Act, § 311(b)(6) as amended 33 U.S.C.A. § 1321(b)(6).

**\*909** Healy & Baillie, New York City, for plaintiffs and third-party plaintiffs; John D. Kimball, New York City, of counsel.

McHugh, Heckman, Smith & Leonard, New York City, for defendant, Pittston Marine Transport Corp.; Maurice F. Beshlian, New York City, of counsel.

Gilbert S. Fleischer, New York City, in charge, for the third-party defendant and plaintiff, United States of America Admiralty & Shipping Section Dept. of Justice; Janis G. Schulmeisters, New York City, of counsel.

FINDINGS OF FACT

GOETTEL, District Judge.

1. At all material times Tug Ocean Prince, Inc. was, and still is, a New York corporation and the owner of the Tug OCEAN PRINCE. Red Star Towing & Transportation Company (hereinafter collectively referred to with Tug Ocean Prince, Inc. as "Plaintiffs"), was, and still is, a West Virginia corporation with an office and principal place of business in New York, and at all material times was the charterer of the Tug OCEAN PRINCE, and **\*910** manned, victualed, supplied and operated said Vessel.

2. The Tug OCEAN PRINCE is a United States documented, steel hulled, diesel driven, single screw, 1,800 horsepower tugboat built in 1958, having an overall length of 94.7 feet, an extreme breadth of 27.1 feet and a deep draft of about 13 to 14 feet. Her registered gross tonnage is 198 tons and her registered net tonnage is 134 tons.

She was at all material times equipped with direct pilothouse engine controls, a gyro compass, a magnetic compass, a Decca radar and a searchlight. Her chart for the area was a 1969 edition. Although a subsequent edition was available, there were no material differences between the charts in the location and characteristics of the relevant aids. Buoy "21" had been renumbered to Buoy "25".

3. Red Star had no written procedure for supplying its tugs with navigational information or material. The ordering of charts was left to the captain without the office having a system to check what charts and other navigational publications were needed. Red Star had no procedure for checking that this material was obtained by the Captains. On the voyage in question, the OCEAN PRINCE was carrying current editions of the Light List and Coast Pilot.

4. Red Star Towing & Transportation Company (hereinafter singly referred to as "Red Star") is engaged in the business of general towage in the coastal and inland waters of the United States, including New York Harbor and its tributaries.

5. Red Star Marine Services, Inc. is a company

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

which at all material times provided "management services" for Red Star, including "operations" such as booking of work, scheduling and dispatching of tugs to accomplish that work, hiring and firing of personnel, and overseeing the total operation of the Red Star fleet which includes the Tug OCEAN PRINCE.

6. Red Star and Red Star Marine Services, Inc. are related companies, and have the same president, Mr. Robert W. Sanders.

7. Walter Kristiansen at all material times was vice-president of operations of Red Star Marine Services, Inc.

8. The Red Star companies are also related to the Bushey shipyard at Brooklyn, New York and the various Bushey companies in the New York Harbor area.

9. Red Star has offices at 500 Fifth Avenue, New York, New York, where its tug dispatchers are located.

10. The dispatchers of another related company, at all materials times, were located in the same offices, and used the same radios and frequencies.

11. Captains, Relief Captains, Mates and other crew members serving on Red Star tugs are hired by Red Star Marine Services, Inc. but are paid by Red Star.

12. Red Star Marine Services, Inc. had internal requirements for the hiring of navigators, which included a requirement that Tug Captains and Mates it employed either have or obtain a Coast Guard license for the operation of Red Star tugs as a condition to their employment, which company policy preceded subsequent Coast Guard licensing requirements. In addition, when one of the navigators was unfamiliar with the area the tug was dispatched to, Red Star's policy was that the other navigator have extensive experience in and be familiar with the area, and that this man be available to assist the other navigator whenever necessary or if requested by the man on watch.

13. Pittston Marine Transport Corporation (hereinafter "Pittston") is a New York corporation and, at all material times, was engaged in the business of

transporting petroleum cargoes by barge in, among others places, New York Harbor and its tributaries. At all material times Pittston owned, operated, manned, victualed and supplied the tank barge NEW LONDON, of 1,665 gross and net tons and having overall dimensions of 295 feet in length and 43 feet in breadth. The Barge is equipped with a pushing well or notch at its stern into which the bow of a pushing tug fits, providing motive power and steering control.

14. The United States of America (hereinafter the "Government") is a sovereign **\*911** which, under the auspices of the Coast Guard, establishes, maintains and operates an aids to navigation system on the entire length of the Hudson River in the State of New York. It does so under statutory authority to serve, inter alia, the needs of the commerce of the United States. (14 U.S.C. § 81).

15. On February 2 and 3, 1974, the Tug OCEAN PRINCE carried a full crew of six men including two United States Coast Guard licensed (for uninspected towing vessels not more than 200 miles off-shore) navigators, John Kiernan and Walter Reimer, two deckhands, an engineer and a cook.

16. At all relevant times, Mate Reimer held a valid license issued by the United States Coast Guard which gave him authority to serve as operator of uninspected towing vessels upon the inland waters of the United States, including the Hudson River. Reimer had been a Tug Captain for five years, and was qualified generally to serve as a Tug Captain, although he had never before navigated the Hudson River. He had served as a deckhand on tankers on the Hudson River briefly some six years earlier. He worked for Red Star in the capacity of Captain, Relief Captain and Mate, principally on board the OCEAN PRINCE, for a period of one and one-half (1 1/2 ) years before the voyage in question.

17. Kiernan was also licensed by the Coast Guard and had extensive experience as a Tugboat Captain on the Hudson River which spanned a period of more than 30 years. He was employed by an associated company as a Tug Captain, but was temporarily assigned to Red Star to fill a vacancy on the Tug OCEAN PRINCE and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

went on board on February 1, 1974.

18. During the voyage in question, Kiernan and Reimer stood alternating six hour watches, with Kiernan standing the 6:00 to 12:00 watches in the morning and evening and Reimer standing the 12:00 to 6:00 watches. One deckhand was assigned to each watch. The Captain or Mate of the watch did the steering and navigating. The deckhand performed various chores, such as line handling, general maintenance on board the tug, and, if requested by the Captain or Mate, lookout duties, steering under the Captain's or Mate's supervision, and getting coffee, all of which were well known to Red Star's vice-president of operations.

19. Prior to the voyage in question, the Tug OCEAN PRINCE had operated in southern waters, in Georgia, Florida, Texas and Louisiana for over a year. During December of 1973 and January of 1974, it operated in and about New York but Reimer was on vacation at that time. He rejoined the Tug in New York on February 2, 1974 at the Bushey shipyard in Brooklyn. Kiernan was already on board. Kiernan had never met Reimer before February 2, 1974, but knew that he was regularly assigned to the OCEAN PRINCE. He was not advised and was unaware of Reimer's lack of familiarity with the Hudson River.

20. While the plaintiffs knew that Reimer lacked familiarity with the Hudson when he rejoined the OCEAN PRINCE on February 2, it was assumed that this lack of experience would be discussed between Reimer and Kiernan when they met on the vessel.

21. Red Star's Personnel Department was responsible for designating the Captain of the Vessel. Red Star intended Kiernan would be Captain. Kiernan indicated doubt in his own mind that he was Captain, but he took certain steps which were appropriately done by the Captain. It is the Captain's duty to know the experience and qualifications of the Mate.

22. On Friday, February 1, 1974, Pittston phoned in an order to Red Star, advising that it would need a tug to tow its Barge NEW LONDON to Kingston, New York sometime during the weekend. The order was entered on a job order card, which was given to the tug dispatcher's office. In response to Pittston's order, the dispatcher, Philip Keenan, decided to assign the Tug OCEAN PRINCE to do the job, and did so at 1800 hours on February 2nd. Keenan did not discuss with Kiernan or Reimer who was to be Captain and who the Mate.

**\*912** 23. Keenan was aware of the make-up of the pilothouse crew on the OCEAN PRINCE on February 2nd, and had been told by the day dispatcher, Robert Fitch, that Kiernan was Captain and Reimer was Mate. Keenan was aware of Reimer's lack of experience as a navigator on the Hudson. He decided, however, that the OCEAN PRINCE would be suitable for the voyage since Kiernan, who had extensive experience as a tug navigator on the Hudson River, was on board and would be available to assist Reimer if necessary. He also assumed Reimer's lack of experience on the Hudson River would be discussed between Kiernan and Reimer. The dispatcher's decision to assign the OCEAN PRINCE to the NEW LONDON job was in accordance with accepted practice in the tugboat industry of dispatching a tug to an area one of the navigators had not navigated before so long as the other navigator on board has experience in the area.

24. From the Bushey shipyard the OCEAN PRINCE, with Kiernan on watch, proceeded to Esso dock in Bayonne, New Jersey, and made up to the loaded Barge NEW LONDON. Reimer, who was off-watch, nevertheless assisted the deckhands in making up the tow, and then went below when the Tug and Barge left on the voyage to Kingston, New York.

25. The NEW LONDON was taken in tow forward of the OCEAN PRINCE in push-tow fashion with the bow of the Tug snugly secured in the Barge's stern notch with steel cables and several parts of synthetic lines. The overall length of both Vessels was about 385 feet, with steering and propulsion being supplied by the Tug. Both Vessels had a combined gross tonnage of 1,863. The Barge had a draft of about 12 feet. In its loaded condition, the Barge had only two feet freeboard and the view ahead from the Tug's pilothouse was unobstructed.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

26. John Kiernan was in charge of the navigation during the first leg of the voyage which commenced at 1915 hours. At 2330 hours, Mate Walter Reimer came to the pilothouse of the Tug and relieved Captain Kiernan of the watch. Kiernan remained with Reimer for about 15 minutes, and then retired without any discussion of navigation on the river. The Tug and her Tow were approaching Haverstraw, New York at the time. The Tug, with Reimer now in charge of navigation, continued the trip northbound past Peekskill, New York and through Bear Mountain Bridge. At about this time, Reimer sent his deckhand to the galley to get coffee, leaving Reimer alone in the wheelhouse.

Reimer did not ask Kiernan to stand the watch with him, although Kiernan would have if asked. This is customary practice aboard towboats. At all relevant times the tide was ebbing, there was ice in the river, and visibility was two miles with snow flurries. The Tug was making good a speed of about 6 knots over the bottom (the Vessels were proceeding against the current). At this time the Tug's radar was operating and in use. A navigation chart for the area was open and in use. Reimer was able to see both shorelines of the river to port and starboard and was also able to see over the full length of the Barge and a safe distance ahead. He was using his radar from time to time to confirm his visual sightings and to locate aids to navigation and other points of reference ahead. At all times the Tug's radar, steering system and engine controls were operating properly.

27. Reimer had not attended any navigation school and never had any formal training in the use of the radar, but was familiar with its operation.

28. The river north of the Bear Mountain Bridge is bounded on both sides by mountains. There was ice flowing on the river with heavy accumulations along parts of the shorelines.

Dead ahead of the Bear Mountain Bridge, west of the navigable channel, approximately one and three-quarter miles north of the Bridge is an obstruction consisting of a pinnacle rock or rocky area, the apex of which is 7 feet below the mean low water line and not

visible to vessels in navigation. It is located east of a wide shoal area along the west shore which also is not visible from **\*913** the surface. The rock obstruction and shoal area west of it projects almost 400 yards into the river from its westerly shore.

About 600 to 800 yards north of the rock is lighted beacon# 27 located on the easterly shore of Con Hook Island. The light is 46 feet above the water according to the Light List and is visible to a tug from the town of Manitou about 1.3 miles south.

The River is 800 yards wide off Mystery Point, and narrows to 450 yards off Con Hook Island. The channel east of the rock described above, which is located between Mystery Point and Con Hook Island, is about 500 yards wide. The river depth in this area varies between 35 feet and 127 feet.

29. The rock presents a dangerous hazard and obstruction to navigators in the Hudson River, apparent on the chart and well known to mariners familiar with the waters and to the Coast Guard.

30. The obstruction is marked by the "25" lighted buoy, which was established and is maintained and operated by the Coast Guard for the purpose of marking the rocky obstruction near the channel. The buoy also marks the westerly extreme of the navigable channel and a bend in the river. The "25" light buoy is replaced by the Coast Guard annually in December at the commencement of the ice season by an unlighted, second class black can buoy. The can buoy was in use on February 3, 1974. This change is noted in the Light List.

31. Reimer knew of the existence of the buoy on the chart and the obstruction it designated.

32. As the Tug and her Tow passed abeam Mystery Point, Reimer did not locate the "25" can buoy either visually or on the radar. Because the said buoy marks a dangerous obstruction as well as a bend in the channel, Reimer reduced engine speed, turned on the Tug's powerful spotlight to illuminate the area ahead, and continued to search for the buoy visually and by radar.

33. Shortly afterwards, at about 0130 on February

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

3, 1974, the Barge struck the rock on its port bow resulting in damage to the Barge's forepeak and # 1 and 2 port side cargo compartments. After impact, Reimer sighted the buoy to the starboard partially visible in the ice near the Vessel's wake. He assumed that the Barge and the Tug in making the turn to starboard after the incident had freed the buoy from the ice.

34. The buoy was obscured by ice and was not seen by Reimer as the Tug and Tow approached it. The ice flow and ice accumulation along the shorelines including north of Mystery Point on the easterly shore partially obscured the image of the shoreline both to the eye and on radar.

35. Immediately after the casualty Kiernan was summoned and return to the pilothouse. He saw the lighted tower of Con Hook Island ahead and the "25" black can buoy about 50-75 feet off the starboard beam of the Tug. The Vessels were still on a northerly heading at the time. After turning around, the lights on the Bear Mountain Bridge about 2 miles south of the Tug's position were also visible. Kiernan brought the Tug and Barge to the Day Line Pier south of the casualty site where they remained until the NEW LONDON was partially lightened into another barge later in the day.

36. The grounding of the Barge NEW LONDON resulted, in part, from Reimer's lack of knowledge of local landmarks and experience on the Hudson River.

37. Reimer did not examine the Light List or the Coast Pilot very carefully because he was unfamiliar with the warning therein not to rely solely on buoys and the warning that ice covers the buoys in this area during the winter.

38. Reimer failed to post a lookout when conditions were such that same was required.

39. A navigator who is about to enter strange waters should familiarize himself with the applicable charts, the Light List and the Coast Pilot.

40. The Light List contains a number of warnings to the navigator including the following:

**\*914** "It is imprudent for a navigator to rely on floating aids to navigation to always maintain their charted position and to constantly and unerringly display their advertised characteristics. The obstacles to perfect performance are of such magnitude that complete reliability is manifestly impossible to achieve. Buoys are liable to be carried away, shifted, capsized, or sunk as the result of storms, ice conditions, collisions, or other accidents.

"All buoys should, therefore, be regarded as warnings or guides and not as infallible navigation marks; especially those located in exposed positions. Whenever possible, a ship should be navigated by bearings or angles on fixed objects on shore and by soundings rather by reliance on buoys."

41. The Light List also states that the lighted buoy "25" (Aid, No. 1874) is "replaced by an unlighted can from Dec. 15 to April 1." It also shows that the fixed light No. 27 on Con Hook Island is on a black skeleton tower, the top of which is 46 feet above water.

42. With respect to the ice on the Hudson, the Coast Pilot states:

"The ice season usually starts in early January and ends in mid-March. Normally shipping is affected most seriously in the Hudson River between Tappan Zee and Albany. In addition to the problem of getting through the ice, aids to navigation are covered or dragged off station by moving ice. Buoys are removed from the Hudson River during the ice season then reset in late March when the ice clears. However, the river is well marked by lights along the shore." (p. 235).

43. The rock obstruction marked by the "25" can buoy is located in an area which is susceptible to ice accumulation on the ebb tide because an "eddy" is created south of Con Hook Island which results in ice build-up. On the ebb tide, ice accumulation north of Mystery Point on the east shore, directly across the channel from the rock, also occurs. These conditions are known to the Coast Guard and, on occasion, result in the obscuring of the buoy on the west and a distortion of the shoreline on the east.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

44. With respect to Con Hook Island, the Coast Pilot makes the following observation:

"A rock, with a depth of 7 feet over it and marked by a lighted buoy, is about 0.3 mile southward of Con Hook. When descending the river, particularly with a fair current, there is a tendency to set toward the rock; caution is advised."

45. At no time prior to the grounding did Mate Reimer see the flashing light on Con Hook Island, north of the can buoy "25".

46. The proximate and predominate causes of the grounding were errors in navigation. These errors in turn were the result of an error in management, whereby a navigator inexperienced with the waters was given no assistance from an experienced navigator then on board in traversing a portion of the river that was dangerous under the circumstances then existing.

47. With proper use of radar, Reimer could have gotten a radar range from the Bear Mountain Bridge with reasonable accuracy. With a radar range off Bear Mountain Bridge and a visual bearing on Con Hook Light it would have been possible to construct a danger bearing to keep the Vessel off the rock. However, since the Tug, as most tugs, was not equipped with a gyro repeater or a pelorus it was difficult to take accurate visual bearings.

48. The obscuring of the buoy by ice contributed to the grounding in that if the buoy had been visible it would have indicated to Reimer he was off course and to the west of the channel.

49. The casualty involving the NEW LONDON was the third grounding at the same location involving similar circumstances during the prior 20 years. One year before the grounding of the NEW LONDON, on February 26, 1973, the loaded gasoline Barge GEORGE T. TILTON, while being push-towed by the Tug BART TURECAMO, struck the rock marked by the "25" black can buoy, causing damage to the **915** Barge and pollution. Coast Guard records show the buoy was reported to be under the ice at the time of the grounding.

50. In January, 1969, the Coast Guard Cutter SASSA-FRASS went aground on the same rock due to a navigational error with the buoy in plain view.

51. In December, 1963, the Coast Guard Cutter SAUK went aground at the same location. In this case, it was reported to the Coast Guard that the can buoy in question was under the ice. In investigating the incident, the Coast Guard learned that several other casualties at the same rock preceded the SAUK grounding, although those incidents occurred in the 1920's and 1930's and the conditions existing therein were not developed.

52. Similarly, in January, 1976, the Barge ROBERT L. POLING, while in tow of the Tug JOAN MORAN went aground on the same rock. Coast Guard records show that the buoy was reported to be almost completely submerged under the ice at the time of the grounding.

53. During the following winter a major oil spill occurred at the same location, but the facts of that incident were not developed at trial.

54. The can buoy is the best practical floating aid for the site, available under present technology. A fixed tower on the rock, the base of which would be in 7 feet of water, would be damaged or destroyed by ice.

55. In light of the difficulty in keeping this floating aid to navigation visible during the winter season, there were available other navigational aids which could have been established on land which would better aid the mariner in staying in the channel.

56. The Coast Guard has not established any ranges or lights on the eastern shore in the immediate area approaching can buoy "25".

57. The Government publication of Waterborne Commerce of the United States shows the following with respect to the number of trips passing the Con Hook area:

Vessels and tug and barge flotillas travelling between Upper Bay, New York Harbor and Waterford, New York

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

| | Up Bound | Down Bound |
|---|---|---|
| 1971 | 70,586 | 73,081 |
| 1972 | 57,779 | 59,378 |
| 1973 | 61,741 | 62,468 |
| 1974 | 55,578 | 55,306 |
| | ------- | ------- |
| Total 4 years | 245,684 | 250,233 |

Of these, 118,435 were up bound tug and barge flotillas and 166,133 were down bound tug and barge flotillas with drafts of 18 feet or less.

58. As a result of the NEW LONDON striking the rock, oil leaked from the Barge into the river. Notice of violation was given to Pittston on August 27, 1974; written response was submitted by Pittston and a hearing was held on September 26th; thereafter a civil penalty of $5,000.00 was assessed and notice of Pittston's right to appeal the penalty was given to Pittston. Pittston appealed the assessed penalty. The Commandant of the Coast Guard denied the appeal.

OPINION

To summarize the major events giving rise to this litigation, on February 3, 1973, the barge New London, loaded with oil and in the tow of the Tug Ocean Prince, ran aground on a submerged rock formation in the Hudson River. The buoy, placed by the Coast Guard to mark the obstruction, was apparently obscured by ice. The impact caused the New London to leak oil, fouling the river. The Government undertook the cleanup operation. This sequence of events raises some difficult questions of maritime liability and novel issues of interpretation of the Water Quality Improvement Act of 1970.FN1

FN1. 33 U.S.C.A. § 1151 et seq., (Supp. 1977). It is conceded that all claims fall within the admiralty jurisdiction of this court, Fed.R.Civ.Proc. 9(h) and arise under 33 U.S.C.A. § 1321 (Supp.1977) 46 U.S.C. § 183 et seq. and 46 U.S.C. § 742 (1970).

Tug Ocean Prince, Inc., as owner, and Red Star Towing & Transportation Company, as charterer of the Tug Ocean Prince, *916 seek exoneration from liability on the ground that the accident was caused by the Government's failure to maintain adequate aids to navigation. (They are referred to hereafter simply as "Plaintiffs"). Alternatively, they seek to have their liability limited to the value of the tug, claiming that the grounding resulted from a cause outside their privity and knowledge. Claimant Pittston seeks to recover the value of all the oil lost from its barge either from the plaintiffs or from the Government. The Government seeks the substantial costs of the oil pollution cleanup from the other parties and a civil penalty from Pittston. Pittston, in turn, seeks indemnity from the plaintiffs for any liability it may have to the Government because of the oil spill.

The trial was bifurcated and issues concerning damages reserved for later consideration. The liability issues will be considered separately.

*Plaintiffs' Claim for Exoneration or Limitation of Liability*

The grounding of the barge New London was caused by a grave error in navigation by the Mate, Reimer. Unfamiliar with the locale, deceived by ice build-up along the shore, he allowed the tow to stray to the west of the channel while he concentrated on attempting to locate a buoy which had apparently become obscured by drifting ice floes. His concentration on locating the buoy was ill advised in light of the fact, clearly set forth in the Coast Pilot, that buoys in this area (the Hudson River between Tappan Zee and Albany) get covered and moved off station at that time of year by moving ice. Even without the warning in the Coast Pilot, a mariner familiar with the river would not have relied on the buoy at this time of year under the existing conditions.

[1] While the plaintiffs contend that the inability to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

locate the buoy was the proximate cause of the grounding, it is clear that the errors of navigation were the proximate cause. The obscured buoy was merely a "but for" factor which, had it been visible, might have corrected the navigational errors. It cannot be said, therefore, that inability to use the aid to navigation was the proximate cause of the incident. American Smelting & Refining Co. v. S. S. Irish Spruce, 548 F.2d 56 (2d Cir. 1977). Because the accident was not inevitable, but was instead due to negligence, plaintiffs are not entitled to exoneration from liability. The Grace Girdler, 74 U.S. 196, (7 Wall.) 441, 18 L.Ed. 790 (1868); The Jumna, 149 F. 171 (2d Cir. 1906). Whether the plaintiffs are entitled to indemnity from the Government under the Suits in Admiralty Act, 46 U.S.C. §§ 741-52, because of its failure to provide a more reliable aid to navigation, will be considered subsequently.

Having concluded that plaintiffs are not entitled to exoneration from liability, we turn to the related question of whether plaintiffs are nevertheless entitled to limit their liability pursuant to the Limitation of Liability Act, 46 U.S.C. § 183 et seq.

The operation of tug boats differs in several material respects from that of ocean going vessels. Because tugs are kept in operation so steadily and the watch standers work such long hours (twelve a day) it is necessary to have two complete sets of crews, changing every two weeks, as well as alternates for vacation periods. The crew ordinarily includes two watchstanders, a Captain and a Mate, who alternate six hour watches. While on watch they usually not only command and navigate the tug but also serve as helmsmen "steering" the vessel. Necessarily this limits the amount of instrument navigation and plotting of position possible. For this reason such tugs are not usually equipped with gyro repeaters or peloruses for taking positions. Navigation is done by sight of eye, piloting from known landmarks and aids to navigation. Consequently, intimate familiarity with the waters and hazards is far more important than in ocean navigation. An unfamiliar helmsman requires assistance from an experienced one. It is the responsibility of the Captain to see that the inexperienced navigator (who could be himself) gets such assistance.

This responsibility, along with certain administrative chores, is one of the **\*917** few distinguishing factors between the duties of a Captain and those of a Mate.

Plaintiffs appreciated this factor in assigning a crew to the Ocean Prince, but an unfortunate set of circumstances created unforeseen confusion relating to which of the watchstanders was to assume the position of Captain. Much of the uncertainty stemmed from the fact that Reimer, one of the watchstanders on the night in question, had been a regular pilothouse watch stander aboard the Ocean Prince. He had served as both Mate and Captain when the vessel was stationed in the South. After Reimer had left for an extended vacation, the vessel was brought to New York. Reimer had no experience in piloting the Hudson.

The day before Reimer returned to the Ocean Prince, the Mate then aboard took leave. Needing an experienced man, plaintiffs called upon an associated company to supply a suitable person. It sent John Kiernan, a tugboat captain with 30 years experience on the Hudson River. When Kiernan came aboard on February 1, 1974, the preceding Captain was still there, so Kiernan started as Mate. The next day Reimer rejoined the vessel and the Captain left. Kiernan knew that Reimer was a full-time employee of plaintiff, regularly assigned to the vessel, and qualified to act as its Captain. He did not know that Reimer had not been aboard the vessel during the couple of months it had been operating on the Hudson or that he had never navigated the Hudson on any vessel.

The vessel commenced the voyage in question shortly after Reimer came on board and, during the half day preceding the grounding, the two had only two brief discussions. Kiernan contends that, since he was only a replacement, and it was Reimer's regular vessel, he believed Reimer was the Captain. Kiernan, however, occupied the Captain's cabin, stood the watch traditionally taken by the Captain and performed certain administrative tasks which were the Captain's responsibility. (Kiernan maintains that he was forced to assume these tasks after the grounding due to Reimer's extremely upset emotional state.) While Kiernan vaguely claims he alerted Reimer when the watch changed to the general

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

navigational situation ahead, his testimony in this regard was not credible, particularly in light of his professed lack of knowledge of Reimer's unfamiliarity with the river.

It remains a mystery why Reimer did not seek assistance as navigation became progressively more difficult due to the treacherous river conditions. (The issue could not be explored because Reimer, who is no longer in plaintiffs' employ, was beyond the subpoena power of the court and did not testify at trial.) His evidence was offered through two lengthy depositions, but in neither of these did any of the counsel explore his motivation in proceeding alone at night up a strong ice-choked river, while aware that he was not picking up the next aid to navigation along the route. One possible answer lies in his having sent his deckhand down to the galley to make coffee prior to the grounding. (He returned, apparently just about the moment of the grounding.) Had the deckhand been available, he could have taken the wheel while a radar range was taken, or been sent forward as a lookout, or, as the best course, been sent to get Kiernan out of his bunk. Had Kiernan been brought to the wheel house, it is very likely he would have quickly detected that they were to the west of the channel and that the buoy was obscured by drifting ice. The question remains whether Reimer's error in judgment is attributable to plaintiff. If so, it is a factor within plaintiff's "privity or knowledge" and a ground for denying limitation of liability under the Limitation of Liability Act, 46 U.S.C. § 183 et seq.

*Limitation of Liability*

The claimant and the Government maintain that limitation should be denied because Reimer's inexperience rendered the vessel unseaworthy. They contend that plaintiff's failure to post a lookout violated Title 33 U.S.C. § 221. They also claim that plaintiffs had failed to provide proper charts aboard the tug. These contentions will be discussed in order.

**\*918** [2] The burden is clearly upon plaintiffs, in a proceeding under Title 46 U.S.C. § 183, to establish their own lack of privity or knowledge in order to limit their liability. Coryell v. Phipps, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943). In Spencer Kellogg & Sons,

Inc. v. Hicks, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932), the Supreme Court, while denying limitation in that case, nevertheless distinguished situations in which an "emergency must be met by the master alone. In these there is no opportunity of consultation or cooperation or of bringing the proposed action of the master to the owner's knowledge. The latter must rely upon the master's obeying rules and using reasonable judgment." Id. at 511-12, 52 S.Ct. at 453. Plaintiffs claim that the collision at issue here presented just such an emergency and contend that it is questionable whether there were any preventative measures which could have been taken to avoid the accident.

Claimants and the Government maintain that Reimer's general unfamiliarity with the Hudson, rather than a specific error of navigational judgment, was the direct cause of the accident. Following this line of argument, they contend that his inexperience created a condition of unseaworthiness which was within the privity and knowledge of plaintiffs. While this view finds support in a nineteenth century case, The Lady Pike, 88 U.S. 1, 21 Wall. 1, 22 L.Ed. 499 (1874), modern authority has rejected it. In The Temple Bar, 137 F.2d 293 (4th Cir. 1943) the court stated:

"(T)he decision (The Lady Pike) cannot be accepted as authority for the broad proposition that it is negligent to put a master in charge of a ship, whatever the voyage, unless he is familiar with all the local conditions he may be expected to encounter. If, as in the case at bar, a master, qualified in other respects, is placed in command, and if he is supplied with charts and publications sufficient to enable a competent man safely to navigate the ship, it is not necessary that he should have prior knowledge of local conditions; and lack of it will not cause the ship to be unseaworthy."

Id. at 297.

It is clear that the court did not base its finding of the Master's competence on his familiarity with the assigned route. The court required, instead, that the Master be qualified in other respects (not specified) and that owner stock the ship with relevant charts and navigational publications.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

[3] Plaintiffs maintain that they have fulfilled these conditions. Reimer is a licensed tug captain with several years' experience in tugboats. He had available charts and publications which clearly designated the location of the submerged rocks. Moreover, he was clearly aware of the hazard because he had been searching for the can buoy for a substantial period prior to the grounding. A failure to perceive the hazard might have been indicative of generalized incompetence which would have created an unseaworthy condition. An inadequate response to a known danger presents an error in navigational judgment and, as such, falls outside the owner's privity and knowledge. As stated by a definitive treatise in the field:

"The navigation of the vessel is under the absolute control of her master . . . and no case has been found where a shipowner, individual or corporate, has been denied limitation because of a liability arising out of an error of management or of navigation on a voyage committed by an employee whom the owner was warranted in believing to be competent with knowledge of his duties."

3 Benedict on Admiralty § 42 at 5-25 (6th ed. 1975).

Defendant also argues that plaintiffs failed to provide proper charts aboard the tug. Reimer denied this assertion in his depositions and claimed that he had referred to both a chart of the Hudson which designated the location of the rock and the Coastal Pilot and Light List. The Coastal Pilot and Light List state that during the winter, can buoys can become submerged in the ice and cannot be seen. It appears that Reimer was not aware of this condition. But this was due to his own negligence in **919 not referring to the manual, rather than the owner's negligence in not providing it. Since the materials were on board, it is clear that the owner's duty to was satisfied. The question is whether the equipment on board was "reasonably fit under the circumstances":

"Neither the absence of an additional watch officer nor the location of the rudder angle indicator involved negligence or rendered the vessel unseaworthy. Although the presence of an additional officer or the relo-

cation of the indicator might have reduced the possibility of collision, that is not the standard by which we are to determine whether Farrell (the owner) is entitled to limitation. Rather, we must ask whether the procedures and equipment utilized rendered the vessel reasonably fit under the circumstances. . . . the vessel as equipped was reasonably capable of performing the intended mission if properly operated. The accident resulted from lack of care and failure to exercise proper procedures by those on the bridge. For this Farrell is liable, but it is also entitled to limit." (emphasis added; footnote omitted.)

Farrell Lines, Inc. v. Jones, 530 F.2d 7 (5th Cir. 1976) at 12-13. See also United States v. Sandra & Dennis Fishing Corp., 372 F.2d 189 (1st Cir. 1967).

Defendants also contend that there existed a violation of Title 33 U.S.C. § 221 which provides in pertinent part:

"Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of . . . any neglect to keep a proper lookout . . . ."

Mate Reimer was alone in the wheelhouse at the time of the casualty since he had sent the deckhand, Hebert, below to make coffee.

The parties appear to have assumed, with some support from precedent (see Dwyer Oil Transport Co. v. The Edna M. Matton, 255 F.2d 380 (2d Cir. 1958); The Supply No. 4 (The Dalzellea), 109 F.2d 101 (2d Cir. 1940) ) that there is no compliance with the statute where a tug master simultaneously serves as a lookout. It seems somewhat unreasonable to require a small vessel running in uncongested waters to maintain both a pilot and a lookout at all times. In fact, one court in a case involving a tugboat stated that the rule requiring a separate lookout was limited to large vessels. In other instances, a court should weigh "the size of the vessel and the opportunity of the navigator to have a full view of the sea." Anthony v. International Paper Co., 289 F.2d 574, 580 (4th Cir. 1961). It is unclear whether the law of this Circuit requires a tug to have a lookout at all

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

times or only when conditions of navigation require it. Poling Russell, Inc. v. United States, 196 F.2d 939 (2d Cir. 1952).

[4] Assuming, arguendo, that the law of this Circuit requires the posting of a separate lookout on a tug at all times, a violation would then be established and the Pennsylvania rule, 86 U.S. 125, 19 Wall. 125, 22 L.Ed. 148 (1874) would come into play with the effect that the owner must prove that the violation could not have contributed to the casualty in any way. See Ira S. Bushey & Sons v. United States, 172 F.2d 447 (2d Cir. 1949). This is not, however, an unbearable burden. Dwyer Oil Transport Co. v. The Edna M. Matton, supra at 382; National Bulk Carrier v. United States, 183 F.2d 405 (2d Cir.), cert. denied, 340 U.S. 865, 71 S.Ct. 89, 95 L.Ed. 631 (1950).

[5] There was no proof whatever that a lookout forward could have observed the ice stranded buoy. The buoy, according to the evidence, was not visible until freed from the ice by the wake of the passing tug. Indeed, as indicated earlier, had the deckhand been in the wheelhouse, he would have been more useful taking the wheel and freeing Reimer to either take navigational fixes or call Kiernan, the experienced pilot. Therefore, the failure to post a lookout cannot be said to have contributed to the collision.

[6] Finally, we have the question concerning the plaintiffs' responsibility for the alleged confusion as to who was to be the Captain of the vessel. Kiernan testified **920** that had he known he was the Captain, he would have assured himself that Reimer was familiar with the river before allowing him to take the wheel under the conditions. Again, errors in management aboard the vessel may not be imputed to the owners so as to deny limitation. South Carolina Highway Dep't v. Jacksonville Shipyards, Inc.,1976 A.M.C. 456 (S.D.Ga.1975); see also New York Marine No. 10, (The C. F. Coughlin), 109 F.2d 564, 565 (2d Cir. 1940); Petition of Tracy, 194 F.2d 362, 363 (2d Cir. 1952).

[7] It is argued that the failure to make the chain of command apparent prior to departure was an error by the managing officers of the corporation and, con-

sequently, within the owner's privity and knowledge. Craig v. Continental Ins. Co., 141 U.S. 638, 12 S.Ct. 97, 35 L.Ed. 886 (1891). But without regard to whether he acted in the capacity of Captain or Mate, Reimer was well aware that he was unprepared to navigate under the difficult conditions which were rapidly developing. Kiernan was quite emphatic that he was willing to render assistance to Reimer whether he was Captain or Mate. Therefore, it was Reimer's failure to seek assistance, more than Kiernan's failure to offer it, that caused the accident. Reimer's failure in this regard is similar to the neglect of an otherwise competent officer to consult available charts and aids to navigation—an event which is not an unseaworthy condition for which the owner is responsible. California and Hawaiian Sugar Co. v. Columbia S. S. Co., 391 F.Supp. 894 (E.D.La.1972), aff'd, 510 F.2d 542 (5th Cir. 1975). Plaintiffs are, therefore, entitled to limit their liability.

*Governmental Responsibility for the Grounding*

We turn now to the plaintiff's contention that the Government's negligence in maintaining the aids to navigation in the area of the grounding was a factor in the grounding and, therefore, the Government should be found liable for negligence under the Suits in Admiralty Act, 46 U.S.C. §§ 741-52.

In Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the Supreme Court recognized that liability under the Federal Tort Claims Act extended to the Coast Guard's failure to adequately maintain a lighthouse. Contrasting nonfeasance and misfeasance, the Court held that, while the Coast Guard had no obligation to supply lighthouse services, once it exercised its discretion by electing to do so, it must use due care. Consequently, the Coast Guard was under a duty to maintain the equipment and to warn mariners in the event the lighthouse became inoperative.

Indian Towing was applied to the placement and maintenance of buoys by this court in Afran Transport Co. v. United States, 309 F.Supp. 650 (S.D.N.Y.1969), aff'd, 435 F.2d 213 (2d Cir. 1970), cert. denied, 404 U.S. 872, 92 S.Ct. 72, 30 L.Ed.2d 116 (1971). In that case, damages were sought following the grounding of an oil tanker on a reef caused by a marker buoy having

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

drifted out of position. Again, while the decision to erect a navigational aid lay within the Coast Guard's discretion, having acted, the Coast Guard was required to act with due care.

[8] Thus Indian Towing imposes a dual responsibility upon the Coast Guard, once it has decided to locate an aid to navigation in a waterway. First, the Coast Guard must use due care to see that the aid is properly maintained and operated. Secondly, should an aid become inoperative the Coast Guard has an additional duty to warn mariners of the absence of the expected aid. Merely warning mariners of a perilous condition, as a rule, will not absolve the Coast Guard of the duty to correct a dangerous condition, but adequate warnings may absolve them from a particular liability. Compare Greer v. United States, 505 F.2d 90 (5th Cir. 1974) with De Bardeleben Marine Corp. v. United States, 451 F.2d 140 (5th Cir. 1971).

[9] In the instant case, the Coast Guard was confronted with submerged rocks at the periphery of the Hudson River channel relatively close to another aid to navigation *921 (Con Hook Light). This area had a good safety record during most of the year while the lighted aid was in use. At the time of the Ocean Prince grounding, the buoy was in position, although obscured by ice. Applying Indian Towing to these facts, the Coast Guard had the duty to maintain the buoy or to warn of any interruption of service. The evidence demonstrates that the Coast Guard, in the Coast Pilot, warned mariners of the possibility of ice obstructing buoys in this particular span of waterway and, additionally, the "Notice to Mariners" for the week of the accident made particular mention of the problem of ice covered buoys in that area. Absent a showing that the Coast Guard had notice of ice covering this particular buoy during the day in question (and could have repaired it), the Court is not persuaded that the Coast Guard was negligent in its servicing of the buoy.

The Coast Guard had determined (and the evidence supported its conclusion) that during the winter months a can buoy was the most effective floating aid to navigation available. The large, lighted buoy not only was more vulnerable to flow ice, but was also subject to the added danger that the light would be broken, thereby extinguishing the expected aid. The plaintiff does not strenuously challenge this but argues, instead, that the problems of maintaining the buoy ice free and the dangers of the location, warranted the installation of different forms of aids to navigation, either constructed on man-made islands or shore-based range lights.

In considering the dangers of the location, some evidence was admitted concerning accidents at the site during the prior thirty years, as well as two groundings (one of which resulted in a severe ecological disaster) occurring in the following couple of years.

[10][11] Courts have generally recognized that evidence of a prior similar accident has some tendency to establish a dangerous or defective condition at the place in question. Hayes v. Lane Construction Corp., 260 F.2d 279 (2d Cir. 1958) (applying New York law); Balchunas v. Palmer, 151 F.2d 842 (2d Cir. 1945) (applying Conn. law). Such evidence draws its relevance from the principle that similar causes can be expected to produce similar effects, so that admissibility hinges upon a demonstration that the conditions had been substantially similar on all occasions. Hayes, supra; Balchunas, supra; Knight v. Baltimore & Ohio R.R. Co., 8 F.R.D. 261 (S.D.N.Y.1948).

Judge Weinstein, in his treatise on evidence, does not distinguish between prior and subsequent accidents, but states generally that

"(e)vidence of other accidents in the same place or involving the same machinery or instrumentality is generally admissible, not because it shows that defendant has a general tendency to be negligent, but because it tends to prove either (1) the existence of a dangerous or defective condition where this is in issue or (2) that defendant knew or should have known of the dangerous or defective condition.

"The requisite similarity of accidents depends on what the evidence is designed to prove:

'If the proof of other accidents is offered to estab-lish the dangerous condition, logic would require simil-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

arity of hazard. But if offered to prove notice of danger, the requisite is the warning quality of the other accident. Thus evidence of a previous accident at the place, unknown to the owner defendant, would be irrelevant to prove notice of the danger, but it may be relevant to prove the dangerous condition of the place. Likewise, evidence that is unnecessary to prove dangerous condition may be logically relevant to prove the notice of the hazard. Of course as the circumstances of other accidents are more similar to the one in question, the probative value of such evidence for either or both purposes is likely to be greater.' " 2 J. Weinstein & M. Berger, Weinstein's Evidence § 404(11) at 404-76 (1976), citing, Trautman, "Logical or Legal Relevancy—A Conflict in Theory," 5 Vand.L.Rev. 385, 402 (1952).

**\*922** While the subsequent disasters have emphasized the navigational hazard in this area, we must evaluate the reasonableness of the Coast Guard's decisions on the basis of facts available at the time of the grounding. Prior thereto, and over a period of thirty or so years, despite an extremely heavy volume of traffic, there had only been two groundings under similar circumstances. (One of them, to the mortification of the Coast Guard, involved the Cutter Sauk in 1963. Another cutter, in completely dissimilar circumstances, ran aground in 1969 causing the reef to be known locally as "Coast Guard Rock".)

Although, at the time of the accident the location was not considered to have a high priority among Hudson River sites needing additional aids to navigation, some consideration was given to the situation by the Coast Guard's officials. Evidence as to the cost and feasibility of aids to navigation other than a buoy at this location persuades the Court that the Coast Guard used due care in its decision to mark the reef in the winter of 1974 with a black can buoy. The Coast Guard weighed the need for some other aid to navigation against the costs of various fixed lights, constructions on the pinnacle or its demolition. It also considered the ecological problems in establishing shore based aids, the priority needs of other, more dangerous, locations and the funds available.

In the absence of showing that a can buoy was so

ineffective that its choice constituted negligence per se, the Coast Guard should not be divested of its executive discretion to choose such aids to navigation as will most effectively and efficiently function within its fixed budgetary limitations. In so concluding, it must be stressed that this evaluation is limited to the history of the hazard in 1974. The Coast Guard's liability for the subsequent groundings, and the wisdom of erecting different types of aids to navigation at this time, are issues not before this Court.

[12] There is a further reason for refusing to find the Coast Guard liable for this accident. Reimer had available for navigational purposes both radar, which could take bearings and ranges on prominent objects (such as Bear Mountain Bridge) and the Con Hook Light, on which a visual bearing could have been taken. Nevertheless, he strayed west of the channel looking for an obscured buoy. The premise that the presence of additional aids might have assisted in correcting his navigational error would be a

"fortuity (having) nothing to do with proximate cause. Liability must rest on causal relationship between the negligent aspect of the conduct and the harm resulting from the conduct."

American Smelting and Refining Co. v. S.S. Irish Spruce, 548 F.2d 56, 60 (2d Cir. 1977).

It cannot be said, therefore, that the negligence, if any, of the Government in not establishing more effective aids to navigation was the proximate cause

*of the grounding. The Amount of Plaintiff's Liability*
*Under the Water Quality Improvement Act*

The Water Quality Improvement Act of 1970, as amended by the Federal Water Pollution Control Amendments of 1972, was passed by Congress in the wake of two disastrous oil spills: the running aground of the tanker, Torrey Canyon, off the coast of England in 1967 and the Santa Barbara drilling disaster in 1969. The primary purpose of the new legislation was to permit the Government to collect cleanup costs directly from the polluter. To effect this goal, the Act provided, in Section 102(f)(1) of the Water Quality Improvement

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

Act of 1970, later codified at 33 U.S.C.A. § 1321(f)(1) (Supp.1977) that:

"Except where an owner or operator can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses, such owner or operator of any vessel from which oil or a hazardous substance is discharged . . . **\*923** shall . . . be liable to the United States Government for the actual costs incurred . . . in an amount not to exceed $100 per gross ton of such vessel or $14,000,000, whichever is lesser, except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs." (emphasis added).

In other words, the owner or operator of a vessel which discharges oil can limit its liability, provided the government cannot show willful negligence or misconduct.

The legislative history indicates that conflicting policies resulted in both the limitation amount and the willful negligence standard for breaking the limitation. The Senate bill, as introduced, would have imposed liability only if negligence were shown. The original limitation amount was the lesser of $450 per gross ton or $15 million. The $450 amount was based upon the estimated cleanup cost of one ton of oil. Later evidence indicated that while this figure reflected an accurate, cleanup estimate, it was improbable that any vessel would discharge its entire cargo. The $100 figure was thereafter substituted to approximate actual, anticipated costs. S.Rep.No. 91-351 at 4, 91st Cong., 1st Sess. (1969), 3 E.P.A. Legal Compilation (Water) at 1327.

[13] While the limitation amount appears to reflect actual cleanup costs, this goal is not realized where a third party causes the oil spillage. Section 102(g), 33 U.S.C.A. § 1321(g) (Supp.1977) controls third party liability and provides that subject to the same defenses

provided in Section 102(f)(1), a third party which causes an oil spill will be liable instead of the owner or operator of the spilling vessel. This section also contains a limitation of liability, and further distinguishes situations where the third party is the owner or operator of a vessel from other third party situations. Where the third party is an owner or operator of a vessel "the liability of such third party . . . shall not exceed $100 per gross ton of such vessel or $14,000,000, whichever is the lesser." (emphasis added). The section goes on to provide that where the third party causing the spillage is not an owner or operator of a vessel, its liability "shall not exceed the limitation which would have been applicable to the owner or operator of the vessel . . . from which the discharge actually occurred." (emphasis added). Clearly this represents a conscious legislative choice to inject traditional admiralty concepts into the limitation calculation by limiting a third party vessel owner's liability with reference to his vessel rather than the vessel which actually spilled the oil. Obviously, once the limitation is calculated with reference to a vessel other than that which spilled the oil, the correlation between vessel gross tonnage and actual cleanup costs is destroyed.

[14] The legislative history indicates that the drafters, in providing the third party defense, envisioned a situation where the third party vessel collides with an oil-carrying vessel. S.Rep.No. 91-351 at 5, 91st Cong., 1st Sess. (1969), 3 E.P.A. Legal Compilation (Water) at 1329. The available legislative materials provide no clue as to whether the drafters ever considered the situation presented where a substantially smaller vessel either collides with or, as presented here, negligently causes the oil spillage. It is inconceivable that Congress was unaware that much of the oil moving on inland waterways is carried by barges and that the tugs pushing them are often owned by third parties. Faced with the clear choice to limit a third party's liability with reference to the gross tonnage of a vessel not spilling the oil, the Court must construe the section in accordance with the clear import of its terms, even if the effect would seem contrary to the general legislative intent. Where statutory language is clear and unequivocal, there is no occasion for the Court to resort to interpretive aids.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

United States v. Oregon, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961); Arkansas Valley Industries, Inc. v. Freeman, 415 F.2d 713, 717 (8th Cir. 1969).

**\*924** In the face of unequivocal statutory language and the absence of conflicting legislative history, the Government nevertheless contends that the "flotilla rule" should apply. Application of this rule would result in the calculation of the limitation amount by reference to the combined gross tonnage of the tug and the barge. While no authority has been submitted concerning the application of the rule in the statutory context presented here, it has been applied in traditional admiralty petitions for exoneration or limitation of liability. The Supreme Court in Sacramento Nav. Co. v. Salz, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663 (1927) required surrender not only of a barge but also of the steamboat towing the barge in an action by the owners of the barge's cargo. In a later case, Standard Dredging Co. v. Kristiansen, 67 F.2d 548, 550 (2d Cir. 1933), the Second Circuit interpreted the flotilla rule to permit recognition of a tug and barge as a single vessel where they are "owned in common and engaged in a common enterprise." Thus, the rule which emerged, as the Government concedes, is that where there exists a contractual or other obligation running from the petitioner for limitation to the claimant and a flotilla of commonly owned vessels was used to fulfill the obligation, the flotilla is regarded as one vessel for calculating the limitation fund.

[15] The Tug Ocean Prince and the barge were not owned by the same entity nor is there any vestige of a contractual relationship running between the owners of either of these two vessels and the Government. Consequently, the flotilla rule, as traditionally stated, would be inapplicable to the facts of this case. The Government, conceding this much, would have this Court break new ground, and apply a mutation of the rule to flesh out the terms of the statute. As the discussion of the language and history of the statute indicates, the provision limiting the liability of third party vessel owners to the value of their vessel is unambiguous. The Court cannot substitute its notions of proper legislative goals for those adopted by Congress. Arkansas Valley Industries, Inc. v. Freeman, supra.

*The Amount of the Penalty To be Assessed Against Pittston*

The penalty provision added by the Federal Water Pollution Control Act Amendments of 1972, codified at 33 U.S.C. § 1321(b)(6) (Supp.1977) reads in pertinent part:

"Any owner or operator of any vessel . . . from which oil . . . is discharged . . . shall be assessed a civil penalty . . . of not more than $5000 for each offense. No penalty shall be assessed unless the owner or operator charged shall have been given notice and opportunity for a hearing on such charge. . . . "

A civil penalty in the amount of $5,000 was assessed against Pittston after a hearing before a Coast Guard hearing examiner. Pittston had refused to pay the penalty on the authority of the federal district court holding in United States v. LeBeouf Bros. Towing Co., 377 F.Supp. 558 (E.D.La.1974). The lower court had held that the penalty provided by 33 U.S.C.A. § 1321(b)(6) (Supp.1977) was criminal in nature and could not be imposed except in a criminal proceeding which afforded adequate protections for Fifth and Sixth amendment rights. This holding was thereafter reversed on appeal, 537 F.2d 149 (5th Cir. 1976) and a petition for certiorari has been denied, 430 U.S. 987, 97 S.Ct. 1688, 52 L.Ed.2d 383 (1977). With the exception of this single, lower court holding, courts appear to be unanimous in finding the penalty civil. United States v. General Motors Corp., 403 F.Supp. 1151 (D.Conn.1975); United States v. Eureka Pipeline Co., 401 F.Supp. 934 (N.D.W.Va.1975); United States v. Independent Bulk Transport, Inc., 394 F.Supp. 1319 (S.D.N.Y.1975); United States v. W. B. Enterprises, Inc., 378 F.Supp. 420 (S.D.N.Y.1974).

The penalty provision at issue holds the owner or operator of a vessel strictly liable for the penalty, following a hearing at which normal due process safeguards are extended. Section 1321(b)(6) provides that "(i)n determining the amount of the penalty **\*925** . . . the appropriateness of such penalty to the size of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

business of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the gravity of the violation, shall be considered . . . ."

The Coast Guard has stated its interpretation of these standards in "Coast Guard Policy for the Application of Civil Penalties Under Section 311(b)(6), FWPCA," which was printed as an appendix to the lower court decision in United States v. LeBeouf Bros. Towing Co., supra, at 569-70. While the statute does not explicitly include the degree of the actor's culpability as a factor in assessing the amount of the fine, the Coast Guard policy statement emphasizes that "(a) number of considerations may be made in determining the gravity of a violation, such as the degree of culpability associated with the violation, the prior record of the responsible party, and the amount of oil discharged. Substantial intentional discharges should result in severe penalties, as should cases of gross negligence, and so on. This is not to suggest that other considerations may not combine to determine the gravity of a violation." Id. at 569 (emphasis added).

In this context, it is valuable to note that while the 1972 amendments make no reference to culpability as a prerequisite for a substantial fine,[FN2] the predecessor of this penalty did. Section 11(b) of the Water Quality Improvement Act of 1970, Pub.L.No. 91-224, previously codified at 33 U.S.C. § 1161(b)(5), provided for a maximum fine of $10,000 for "knowing" discharges. The 1966 amendments to the Oil Pollution Act of 1924 created liability when a discharge resulted from a "grossly negligent or willful act." Note, Liability for Oil Pollution Cleanup and the Water Quality Improvement Act of 1970, 55 Cornell L.Rev. 973 (1970).

> FN2. The Senate bill provided for assessment of the penalty where the government could show that the owner or operator acted "wilfully or negligently." S.Rep. 92-414, 92nd Cong., 2d Sess., reprinted in (1972) U.S.Code & Ad.News 3732.

Thus, while the section does not expressly require culpable behavior, prior legislation and the Coast Guard

interpretive standards for implementing the penalty all make reference to some element of negligent or knowing conduct prior to the imposition of a substantial penalty. The Government contends that the maximum fine should be assessed against Pittston on the sole basis of the "gravity of the violation," without any consideration of the degree of Pittston's culpability. The Government further argues that, while third party causation does not provide a defense to imposition of the penalty, it does provide a basis for indemnity.

The only case disclosed by our research where the third party's responsibility is discussed is United States v. General Motors Corp., 403 F.Supp. 1151 (D.Conn.1975). In that case, vandals opened the valves of several of defendant's oil storage tanks causing oil to flow into a nearby river. In an extended analysis of the history and purpose of the penalty, Judge Clarie found that while third party causation did not constitute a defense, defendant's lack of culpability would require reduction of the penalty to the nominal sum of one dollar. [FN3]

> FN3. The parties had stipulated that the proceedings before Judge Clarie should proceed as a trial de novo, and therefore the judge indicated that it was appropriate "to consider whether the sanction imposed by the administrative agency conforms to the facts brought out at the trial." The court found that the Coast Guard's finding that defendants were negligent deviated from the facts.

Of course, the present case differs from General Motors in that the purportedly culpable party, The Tug Ocean Prince, is before the Court. There are three possible responses to this situation, in that the Court could: 1) obviate the need for indemnity by reducing the fine to a nominal sum; 2) following the Coast Guard's procedure and assess the entire fine against Pittston while recognizing a right to indemnity; 3) assess the fine against the allegedly culpable party, The Tug Ocean Prince. The first course would follow the only authority on point. **\*926** The second alternative requires more discussion.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

Section 1321 does provide generally for indemnity by stating that:

"The liabilities established by this section shall in no way affect any rights which (1) the owner or operator of a vessel . . . may have against any third party whose acts may in any way have caused or contributed to such discharge. . . . "

33 U.S.C.A. § 1321(h) (Supp.1977). The issue then becomes whether the penalty imposed by Section 1321(b)(6) is a "liability" so as to provide a basis for indemnity. The parties draw support for their indemnity theory by pointing to the penalty provided in 33 U.S.C.A. § 1321(b)(2)(B)(iii) (Supp.1977) which imposes a "penalty" in lieu of cleanup costs where it is impossible to remove a hazardous substance from the water. This penalty, unlike that of Section 1321(b)(6), is denominated a "liability" and is subject to the defense of third party causation.

[16] Clearly, no indemnity could have been sought had the penalty been construed as criminal, intended to punish the actor. The weight of current authority, discussed above, has concluded that this particular penalty is civil and, therefore, the claimed right to indemnity is at least tenable. However, the penalty imposed in lieu of clean-up costs correlates not to the penalty provision at issue here, but rather to the Government's action for the actual costs of clean-up. Both of these actions recognize the third party defense, and, thereby, implicitly provide a ground for indemnity. The absence of a third party defense in this penalty provision, the language of the statutes, and the purposes of the various remedies supplied to the Government, lead to the conclusion that no indemnity right was contemplated for the penalty imposed by Section 1321(b)(6), even though it is civil in nature.

Finally, the Government urges that the "flotilla rule" should apply not only to determine the correct limitation amount but also the possible imposition of the fine on the third party, Tug Ocean Prince. Both the penalty provision, Section 1321(b)(6), and the provision governing primary liability for cleanup costs, Section 1321(f), impose liability on the "owner or operator of a vessel." It is at least a tenable construction of the stat-

utory language, as applied to the facts of case, that "operator" should be construed to include to a tug operating a "dumb" barge. It is uncertain whether this construction of the statute was argued before the Coast Guard hearing examiner, but by imposing the fine solely upon Pittston, the examiner implicitly rejected this view. Similarly, the Government's stance in its action for cleanup costs in that Tug Ocean Prince is liable, if at all, under Section 1321(g) which concerns third party liability. Thus, the Government has adopted a contrary position and has not taken the required administrative steps to impose liability on plaintiff.

[17] For these reasons, and in light of the General Motors decision, it appears to be the better course not to recognize a right to indemnity and, instead, to permit the absence of culpability to mitigate the amount of the fine. The case should be remanded to the Coast Guard to set a fine consistent with the degree of culpability attributable to the barge owner.

ORDER

1. Plaintiffs are entitled to limit their liability to the value of the Tug Ocean Prince and the amount of her pending freight immediately after the grounding, for which amount Pittston is entitled to judgment with costs.

2. Pittston, not having been responsible for the oil spill, the Government's cause of action against it for cleanup costs is dismissed with costs.

3. The claims of plaintiffs and Pittston against the United States (in 74 Civ. 3358) and Pittston's counterclaim (in 75 Civ. 5801) are dismissed with costs.

4. Plaintiffs are liable to the United States for cleanup costs not to exceed $19,800.

**\*927** 5. The fine against Pittston is remanded to the Coast Guard for reconsideration consistent with this opinion. Pittston's claim for indemnity from plaintiffs is dismissed with costs.

6. If the parties cannot agree on the amount of cleanup costs or the amount of the limitation fund, they

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

436 F.Supp. 907, 1978 A.M.C. 1806
**(Cite as: 436 F.Supp. 907)**

should advise the Court and the matter will be set for in-
quest.

  SO ORDERED.

D.C.N.Y. 1977.
Tug Ocean Prince, Inc. v. U.S.
436 F.Supp. 907, 1978 A.M.C. 1806

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

589 F.2d 1310, 12 ERC 1593, 1980 A.M.C. 2936, 9 Envtl. L. Rep. 20,006
**(Cite as: 589 F.2d 1310)**

C

United States Court of Appeals,
Seventh Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
TEX-TOW, INC., Defendant-Appellant.

No. 78-1656.
Argued Oct. 30, 1978.
Decided Dec. 22, 1978.

Barge operator appealed from a summary judg-
ment entered by the United States District Court for
the Eastern District of Illinois, James L. Foreman,
Chief Judge, enforcing a $350 civil penalty as-
sessed by the United States Coast Guard against the
appellant under the Federal Water Pollution Control
Act for a discharge of oil into navigable waters.
The Court of Appeals, Castle, Senior Circuit Judge,
held that: (1) the third-party causation defense con-
tained in the provisions of the Federal Water Pollu-
tion Control Act dealing with cleanup liability and
liquidated damages liability is not to be read into
the civil penalty provision; (2) presence of defend-
ant's tank barge at pier was a legal cause of oil spill,
even though defendant was not at fault and the spill
was caused by a third party's act or omission, since
the fact of the actual pollution plus the statistically
foreseeable pollution attributable to a statutorily
defined type of enterprise satisfied, together, the re-
quirement of cause in fact and legal cause, and (3)
the "cause" of a spill is the polluting enterprise
rather than the conduct of the charged party or a
third party; accordingly, an owner or operator of a
discharging facility is liable to a civil penalty under
the Federal Water Pollution Control Act, even
where it exercised all due care and a third party's
act or omission was the immediate cause of the
spill.

Affirmed.

Bauer   and   Harlington   Wood,   Jr.,   Circuit

Judges, filed a concurring opinion.

West Headnotes

**[1] Environmental Law 149E ⟜223**

149E Environmental Law
  149EV Water Pollution
    149Ek223 k. Penalties and Fines. Most Cited
Cases
    (Formerly 199k25.7(23) Health and Environ-
ment, 270k35)

Third-party causation defense contained in the
provisions of the Federal Water Pollution Control
Act dealing with cleanup liability and liquidated
damages liability is not to be read into the civil
penalty provision. Federal Water Pollution Control
Act Amendments of 1972 (Clean Water Act), §
311(b)(1), (2)(B)(iii, iv), (3, 6), (f), 33 U.S.C.A. §
1321(b)(1), (2)(B)(iii, iv), (3, 6), (f).

**[2] Statutes 361 ⟜189**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k187 Meaning of Language
        361k189 k. Literal and Grammatical
Interpretation. Most Cited Cases

**Statutes 361 ⟜190**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k187 Meaning of Language
        361k190 k. Existence of Ambiguity.
Most Cited Cases

There are two circumstances in which the court
may look beyond the express language of a statute
in order to give force to congressional intent: where
the statutory language is ambiguous; and where a
literal interpretation would thwart the purpose of
the overall statutory scheme or lead to an absurd
result.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

589 F.2d 1310, 12 ERC 1593, 1980 A.M.C. 2936, 9 Envtl. L. Rep. 20,006
**(Cite as: 589 F.2d 1310)**

**[3] Environmental Law 149E ⟨⟩223**

149E Environmental Law
　149EV Water Pollution
　　149Ek223 k. Penalties and Fines. Most Cited
Cases
　　(Formerly 199k25.7(23) Health and Environment, 270k35)

　A literal interpretation of the Federal Water Pollution Control Act's penalty provision, according no third party or other defenses to the civil penalty, will further the overall statutory scheme of shifting the cost of pollution onto the polluting enterprise. Federal Water Pollution Control Act Amendments of 1972 (Clean Water Act), § 311(b)(6), 33 U.S.C.A. § 1321(b)(6).

**[4] Environmental Law 149E ⟨⟩223**

149E Environmental Law
　149EV Water Pollution
　　149Ek223 k. Penalties and Fines. Most Cited
Cases
　　(Formerly 199k25.7(23) Health and Environment, 270k35)

　Absolute liability in the case of the civil penalty imposed by Federal Water Pollution Control Act is not unduly harsh or unreasonable in view of the limited nature of the liability and the flexibility afforded by the statutory directive that the Coast Guard, in setting the amount of the penalty, take into account the charged party's ability to pay and the "gravity of the violation," which has been interpreted by the Coast Guard to include degree of culpability. Federal Water Pollution Control Act Amendments of 1972 (Clean Water Act), § 311(b)(6), 33 U.S.C.A. § 1321(b)(6).

**[5] Negligence 272 ⟨⟩405**

272 Negligence
　272XIII Proximate Cause
　　272k405 k. Strict Liability. Most Cited Cases
　(Formerly 379k15)

　Causation is required even under a strict liability statute.

**[6] Environmental Law 149E ⟨⟩223**

149E Environmental Law
　149EV Water Pollution
　　149Ek223 k. Penalties and Fines. Most Cited
Cases
　　(Formerly 199k25.7(23) Health and Environment, 270k35)

　Presence of defendant's tank barge at pier was a legal cause of oil spill, even though defendant was not at fault and the spill was caused by a third party's act or omission, since the fact of the actual pollution plus the statistically foreseeable pollution attributable to a statutorily defined type of enterprise satisfied, together, the requirement of cause in fact and legal cause. Federal Water Pollution Control Act Amendments of 1972 (Clean Water Act), § 311(b)(6), 33 U.S.C.A. § 1321(b)(6).

**[7] Negligence 272 ⟨⟩387**

272 Negligence
　272XIII Proximate Cause
　　272k374 Requisites, Definitions and Distinctions
　　　272k387 k. Foreseeability. Most Cited
Cases
　(Formerly 272k59)

　The statistical foreseeability of an accident is a proper basis on which to affix legal responsibility.

**[8] Environmental Law 149E ⟨⟩223**

149E Environmental Law
　149EV Water Pollution
　　149Ek223 k. Penalties and Fines. Most Cited
Cases
　　(Formerly 199k25.7(23) Health and Environment, 270k35)

　Under the absolute liability standard involved in the Federal Water Pollution Control Act, neither fault nor defect need be proved, so foreseeability is used not to establish these but rather to affix legal responsibility despite the absence of fault or defect and also to limit the scope of that liability. Federal Water Pollution Control Act Amendments of 1972

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

589 F.2d 1310, 12 ERC 1593, 1980 A.M.C. 2936, 9 Envtl. L. Rep. 20,006
**(Cite as: 589 F.2d 1310)**

(Clean Water Act), § 311(b)(6), 33 U.S.C.A. § 1321(b)(6).

**[9]** Environmental Law 149E ⟶166

149E Environmental Law
    149EV Water Pollution
        149Ek163 Constitutional Provisions, Statutes, and Ordinances
        149Ek166 k. Validity. Most Cited Cases
    (Formerly 199k25.7(23) Health and Environment, 270k35)

Federal Water Pollution Control Act's imposition of a civil penalty in a situation of third-party causation for an oil spill is not irrational and comports with substantive due process, since the purpose of the Act's civil penalty provision is not only to deter spills but also has certain nondeterrent, economic purposes rationally served by an absolute liability standard. Federal Water Pollution Control Act Amendments of 1972 (Clean Water Act), § 311(b)(3, 6), 33 U.S.C.A. § 1321(b)(3, 6); U.S.C.A.Const. Amends. 5, 14.

**[10]** Environmental Law 149E ⟶223

149E Environmental Law
    149EV Water Pollution
        149Ek223 k. Penalties and Fines. Most Cited Cases
    (Formerly 199k25.7(23) Health and Environment, 270k35)

"Cause" of a spill is the polluting enterprise rather than the conduct of the charged party or a third party; accordingly, an owner or operator of a discharging facility is liable for a civil penalty under the Federal Water Pollution Control Act, even where it exercised all due care and a third party's act or omission was the immediate cause of the spill. Federal Water Pollution Control Act Amendments of 1972 (Clean Water Act), § 311(b)(6), 33 U.S.C.A. § 1321(b)(6).

***1312** Larry D. King, Houston, Tex., for defendant-appellant.

Robert L. Simpkins, Asst. U. S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, and BAUER and WOOD, Circuit Judges.

CASTLE, Senior Circuit Judge.

Tex-Tow, Inc. appeals from the district court's enforcement by way of summary judgment of a $350 civil penalty assessed by the United States Coast Guard against Tex-Tow under section 1321(b)(6) of the Federal Water Pollution Control Act (FWPCA) [FN1] for a discharge of oil into navigable waters in violation of section 1321(b)(3) of the Act. In this case, as in United States v. Marathon Pipe Line Company, 589 F.2d 1305 (7th Cir. 1978), decided this same day, a company was held liable to a civil penalty based on its ownership or operation of a discharging facility even though it was not at fault and the spill was caused by a third party's act or omission. In Marathon, the company argued that no more than a nominal penalty could be imposed in the absence of fault. Here, Tex-Tow argues that no penalty, nominal or substantial, can be imposed on a party that did not "cause" the spill. We sustain the penalty against this new attack for much the same reasons as in Marathon, as Tex-Tow's causation argument is very similar to Marathon's fault argument and suffers from the same defect that it ignores the absolute nature of the civil penalty liability, as well as the penalty's remedial and economic rather than deterrent objectives.

FN1. 33 U.S.C. s 1321(b)(6) (1976). All references to the FWPCA in this opinion are to the 1972 and 1973 amended versions. The 1977 amendments, which changed the wording of section 1321(b)(6), do not apply to this case as the spill occurred in 1974.

Tex-Tow operated a tank barge which was being loaded with a cargo of gasoline at a dock on the Mississippi River owned and operated by Mobil Oil Company. As the barge was filled with gasoline, it

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

589 F.2d 1310, 12 ERC 1593, 1980 A.M.C. 2936, 9 Envtl. L. Rep. 20,006
**(Cite as: 589 F.2d 1310)**

sank deeper into the water, settling on an underwater steel piling that was part of the dock structure. The piling punctured the hull of the barge, resulting in a discharge of 1600 gallons of gasoline into the river. Concededly Tex-Tow was not at fault as there is no reasonable way it could have known of the piling and it received no warning from Mobil. We will also assume for purposes of this opinion that Tex-Tow would have a third-party causation defense (on the basis of an act or omission by Mobil), if such a defense were available in the case of the civil penalty.

*The Statutory Scheme*

The FWPCA was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. s 1251(a). Toward that end, Congress set the goal of eliminating the discharge of all pollutants into navigable waters by 1985. s 1251(a)(1). Section 1321, dealing with oil and hazardous substance liability, sets a "no discharge" policy of immediate effect and prohibits any discharge in harmful quantities. ss 1321(b)(1) and (3). The section holds owners or operators *1313 of discharging facilities [FN2] liable for clean-up costs, subject to the defenses of act of God, act of war, negligence of the United States Government, or act or omission of a third party. s 1321(f). If the discharged substance is nonremovable, the owner or operator is liable to a variable civil penalty dependent on the amount and toxicity of the substance spilled.[FN3] This "liquidated damages liability" [FN4] is again subject to the four enumerated defenses. s 1321(b)(2)(B)(iii). Finally, section 1321(b)(6), the immediate focus of our concern here, makes owners and operators liable to a civil penalty of up to $5,000, with no provision for any defenses but with the amount of the penalty to be determined by the Coast Guard, which is instructed to take into account ability to pay and "gravity of the violation." [FN5]

FN2. The term "discharging facilities" shall be used where the statute refers to "vessel, onshore facility, or offshore facil-

ity."

FN3. The EPA is charged with drawing up a schedule assigning appropriate per unit penalties to various nonremovable substances. s 1321(b)(2)(B)(iv).

FN4. This penalty, assessed only where clean-up is impossible due to the nonremovable nature of the hazardous substance, has elsewhere been called a "penalty in lieu of clean-up costs." See, e. g., United States v. General Motors Corp., 403 F.Supp. 1151, 1157 (D.Conn.1975).

FN5. Section 1321(b)(6) states:

Any owner or operator of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of (section 1321(b)(3)) shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than $5,000 for each offense. No penalty shall be assessed unless the owner or operator charged shall have been given notice and opportunity for a hearing on such charge. Each violation is a separate offense. Any such civil penalty may be compromised by such Secretary. In determining the amount of the penalty, or the amount agreed upon in compromise, the appropriateness of such penalty to the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the gravity of the violation, shall be considered by such Secretary.
. . .

*Statutory Interpretation*

[1][2][3][4] First, Tex-Tow argues that the third party causation defense contained in the provisions dealing with clean-up liability and liquidated damages liability should also be read into the civil penalty provision. We decline to do so, as did

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

589 F.2d 1310, 12 ERC 1593, 1980 A.M.C. 2936, 9 Envtl. L. Rep. 20,006
**(Cite as: 589 F.2d 1310)**

the court in United States v. General Motors Corp., 403 F.Supp. 1151, 1157 (D.Conn.1975). As stated in International Telephone and Telegraph Corporation v. General Telephone & Electronics Corporation, 518 F.2d 913, 917-918 (9th Cir. 1975):

There are two circumstances in which this court may look beyond the express language of a statute in order to give force to Congressional intent: where the statutory language is ambiguous; and where a literal interpretation would thwart the purpose of the over-all statutory scheme or lead to an absurd result. (Citations omitted.)

Neither of these circumstances is present here. The statutory language is not ambiguous, and a literal interpretation according no third party or other defenses to the civil penalty furthers the overall statutory scheme of shifting the cost of pollution onto the polluting enterprise. It is true that the statute affords narrow defenses to the two other liabilities, however absolute liability in the case of the civil penalty is not unduly harsh or unreasonable in view of the limited nature of the liability (maximum of $5,000) and the flexibility afforded by the statutory directive that the Coast Guard, in setting the amount of the penalty, take into account the charged party's ability to pay and the "gravity of the violation," which has been interpreted by the Coast Guard to include degree of culpability.[FN6]

FN6. "Coast Guard Policy for the Application of Civil Penalties under Section 311(b)(6), FWPCA," reprinted as an appendix to United States v. LeBeouf Bros. Towing Co., Inc., 377 F.Supp. 558, 569 (E.D.La.1974).

[5][6] Tex-Tow, however, asserts that a causation requirement must be implied in the civil penalty provision because no liability may exist in the absence of causation. We agree that causation is required even under a strict liability statute, however *1314 Tex-Tow has conceded that the presence of its barge at the pier was a cause in fact of the spill. The only question is whether legal, or proximate,

cause also exists. This is "essentially a question of whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred." Prosser, The Law of Torts 244, s 42 (4th ed. 1971). Tex-Tow argues that the mere presence of its barge at the dock is not sufficient to constitute legal cause. We believe, however, that more than "mere presence" was involved here. Tex-Tow was engaged in the type of enterprise which will inevitably cause pollution and on which Congress has determined to shift the cost of pollution when the additional element of an actual discharge is present. These two elements, actual pollution plus statistically foreseeable pollution attributable to a statutorily defined type of enterprise, [FN7] together satisfy the requirement of cause in fact and legal cause. Foreseeability both creates legal responsibility and limits it. An enterprise such as Tex-Tow engaged in the transport of oil can foresee that spills will result despite all precautions and that some of these will result from the acts or omissions of third parties. Although a third party may be responsible for the immediate act or omission which "caused" the spill, Tex-Tow was engaged in the activity or enterprise which "caused" the spill. Congress had the power to make certain oil-related activities or enterprises the "cause" of the spill rather than the conduct of a third party. [FN8] With respect to the civil penalty Congress has exercised this power.

FN7. Namely an "owner or operator of any vessel, onshore facility, or offshore facility" which pollutes navigable waters.

FN8. In fact, the essence of absolute liability is that Conduct is irrelevant. "Treating the problems of accident law in terms of activities rather than in terms of careless conduct is the first step toward a rational system of resource allocation." G. Calabresi, The Decision for Accidents: An Approach to Nonfault Allocation of Costs, 78 Harv.L.Rev. 713, 716 (1965).

[7][8] The statistical foreseeability of an acci-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

589 F.2d 1310, 12 ERC 1593, 1980 A.M.C. 2936, 9 Envtl. L. Rep. 20,006
**(Cite as: 589 F.2d 1310)**

dent is a proper basis on which to affix legal responsibility. In Mickle v. Blackmon, 252 S.C. 202, 166 S.E.2d 173 (1969) the statistical foreseeability of automobile accidents gave rise to a manufacturer's duty to design cars to minimize injury upon collision. In Davis v. Wyeth Laboratories, Inc., 399 F.2d 121 (9th Cir. 1968), the statistical foreseeability of some adverse reactions to a polio vaccine gave rise to a manufacturer's duty to warn consumers, as marketing the vaccine without the warning was held to constitute a "defect" under strict products liability law. Under the absolute liability standard here involved neither fault nor defect need be proved, so foreseeability is used not to establish these but rather to affix legal responsibility despite the absence of fault or defect and also to limit the scope of that liability.

We note that the question of ultimate liability remains unresolved, as Tex-Tow may still have an indemnity cause of action against Mobil under section 1321(h). However, the only court to consider the question has construed section 1321(h) as not extending the indemnity cause of action to recovery of the civil penalty. Tug Ocean Prince, Inc. v. United States, 436 F.Supp. 907, 926 (S.D.N.Y.1977).[FN9] Such an interpretation is consistent with the economic or risk-shifting view of the civil penalty here taken, as the party engaged in the potentially polluting enterprise is in the best position to estimate the risk of accidental pollution and plan accordingly, as by raising its prices or purchasing insurance.[FN10] Economically, it makes sense to place the cost of pollution on **\*1315** the enterprise (here water transport of gasoline) which statistically will cause pollution and in fact does cause pollution.[FN11] We do not, however, here decide the question of ultimate liability.

FN9. Section 1321(h) provides as follows:

(h) Rights against third parties who caused or contributed to discharge

The liabilities established by this section shall in no way affect any rights which (1)

the owner or operator of a vessel or of an onshore facility or an offshore facility may have against any third party whose acts may in any way have caused or contributed to such discharge . . . .

Tug Ocean Prince, supra, interpreted "liabilities" as not including the civil penalty.

FN10. In other words, Tex-Tow is the "cheapest cost avoider." G. Calabresi and J. Hirschoff, Toward a Test for Strict Liability in Torts, 81 Yale L.J. 1055, 1060 (1972).

FN11. This is the theory of cost "internalization," under which the social costs of an enterprise are attributed to that enterprise. The enterprise will presumably pass such costs on to consumers of its product in the form of higher prices. The consumer will then be charged the true cost of the product (cost to the manufacturer plus cost to society), and in making his personal decision as to whether the product is "worth it" also be casting a vote as to the social utility of the product. See, e. g., Calabresi, The Decision for Accidents, note 8 Supra, at 717-20.

*Substantive Due Process*

[9] What we have already said respecting Tex-Tow's statutory interpretation argument goes far toward refuting Tex-Tow's second argument that imposing a civil penalty in a situation of third party causation is irrational. First, we note that the Supreme Court has not struck down an economic regulation on the substantive due process grounds here urged since 1937.[FN12] Second, Tex-Tow's claim of irrationality is grounded in the assumption that the purpose of the civil penalty is to Deter spills. As we have already explained here and in Marathon, the civil penalty also has certain non-deterrent, economic purposes which are rationally served by an absolute liability standard.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

589 F.2d 1310, 12 ERC 1593, 1980 A.M.C. 2936, 9 Envtl. L. Rep. 20,006
**(Cite as: 589 F.2d 1310)**

FN12. G. Gunther, Constitutional Law Cases And Materials 591 (9th ed. 1975). "Economic regulation" is used in contrast to regulation of non-economic private interests. Id. at 565, 567. The civil penalty would clearly be an economic regulation as no personal or non-economic interest of Tex-Tow is involved.

There are several indicia in section 1321 itself of purposes other than deterrence: neither clean-up liability nor liquidated damages liability is premised on a finding of fault,[FN13] and, of course, civil penalty liability is absolute, although tempered by the statutory directive that "gravity of the violation" be considered in setting the amount of the penalty. There is also evidence of a Remedial purpose to clean up spills once they occur rather than solely a Deterrent purpose to prevent spills in the first instance. The section provides for government clean-up of disaster spills, s 1321(d), and of other spills which the discharger does not clean up itself, s 1321(c)(1). To fulfill this remedial function, the Council on Environmental Quality [FN14] is directed to develop a National Contingency Plan, pursuant to which the EPA and the Coast Guard [FN15] are authorized, Inter alia, to set up detection systems, purchase removal equipment, and train and maintain a strike force. s 1321(c) (2).

FN13. The defenses of act of God, act of war, negligence of the United States Government, and act or omission of a third party leave open the possibility that a faultless owner or operator will nevertheless be held liable because of the inapplicability of any of these four narrow defenses.

FN14. The President delegated his planning authority under s 1321(c)(2) to the Council on Environmental Quality. Executive Order No. 11735, Assignment of Presidential Functions, Sec. 4 (appended to 33 U.S.C. s 1321).

FN15. Id. at Sec. 5(b).

The civil penalty is directly implicated in all these remedial functions as proceeds from civil penalty collections are to be placed in the revolving fund which finances these government activities. s 1321(k). It is reasonable to require those who "cause" damage, not by their conduct but by the activity they are engaged in, to pay for the costs of abating that damage. Forfeitures have been used to finance a regulatory scheme, See, e. g. One Lot Emerald Cut Stones v. United States, 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972), and penalties or forfeitures have been sustained against due process attack even though the charged party was faultless and a third party was the immediate cause of the violation. Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (yacht forfeited even though third parties violated the drug laws), Edelberg v. Illinois Racing Bd., 540 F.2d 279 (7th Cir. 1976) (winnings forfeited although third parties drugged the horse). *1316 The present case is stronger than these forfeiture cases as the activity of the charged owner or operator (water transportation of oil) Is responsible for the pollution.

[10] We hold that the "cause" of a spill is the Polluting enterprise rather than the Conduct of the charged party or a third party. Accordingly, an owner or operator of a discharging facility is liable to a section 1321(b)(6) civil penalty even where it exercised all due care and a third party's act or omission was the immediate cause of the spill.

Affirmed.

BAUER and WOOD, Circuit Judges, concurring.
We concur, but with the same reservations we expressed in concurring in United States v. Marathon Pipe Line Company, 589 F.2d 1305, also decided this date.

C.A.Ill., 1978.
U.S. v. Tex-Tow, Inc.
589 F.2d 1310, 12 ERC 1593, 1980 A.M.C. 2936, 9

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

589 F.2d 1310, 12 ERC 1593, 1980 A.M.C. 2936, 9 Envtl. L. Rep. 20,006
**(Cite as: 589 F.2d 1310)**

Envtl. L. Rep. 20,006

END OF DOCUMENT