806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

United States Court of Appeals,
Ninth Circuit.
UNITED STATES of America, Plaintiff/Appellee,
v.
The CITY OF TWIN FALLS, IDAHO, Defendant.
The CITY OF TWIN FALLS, IDAHO, Third-Party
Plaintiff/Appellant,
v.
HAMILTON AND VOELLER, INC., an Idaho cor-
poration; Detweiler Bros., Inc., an Idaho corpora-
tion; Envirotech Corporation, d/b/a Envirotech Sys-
tems, Inc., a foreign corporation doing business in
Idaho, Third-Party Defendants/ Appellees.
UNITED STATES of America, Plaintiff/Appellee,
v.
The CITY OF TWIN FALLS, IDAHO, Defendant.
The CITY OF TWIN FALLS, IDAHO, Third-Party
Plaintiff/Appellant,
v.
HAMILTON AND VOELLER, INC., an Idaho cor-
poration, Third-Party Defendant,
and
Envirotech Corporation, d/b/a Envirotech Systems,
Inc., Third-Party Defendant/Appellant.

Nos. 84-3832, 84-3837.
Argued and Submitted Oct. 9, 1985.
Decided Dec. 15, 1986.

Federal Government sued city for violation of
federal water pollution statutes, and city filed third-
party action against contractor and others respons-
ible for design and construction of city's sewage
treatment plant. Following resolution of main claim
in favor of federal Government under terms of stip-
ulation and consent decree, the United States Dis-
trict Court for the District of Idaho, Ray McNich-
ols, J., entered judgment in favor of city in third-
party action and awarded city its attorney fees and
some costs. City appealed, and contractor cross-
appealed. The Court of Appeals, Boochever, Circuit
Judge, held that: (1) district court had ancillary and

pendent jurisdiction over city's claims against con-
tractor in third-party action; (2) retention of third-
party action by district court once principal federal
claim was settled was not abuse of discretion; (3)
contract between city and contractor for supply and
installation of secondary treatment equipment at
sewage treatment plant was a "sale of goods con-
tract," rather than a construction contract; (4) ex-
pert witness fees in addition to statutory $30 per
day witness fee could be awarded; and (5) refusal to
award each party costs for depositions of its expert
witnesses conducted by other party was error.

Affirmed in part, reversed and remanded in
part.

West Headnotes

**[1] Federal Courts 170B ⟨⟩23**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk20 Ancillary and Incidental Juris-
diction
                170Bk23 k. Coparties and New
Parties. Most Cited Cases
    District court had ancillary jurisdiction over
third-party claim of city against sewage treatment
plant contractor for indemnity for civil penalties
arising from discharge of various pollutants from
plant in violation of federal water pollution stand-
ards and pollution discharge permit; indemnity
claim arose out of installation, warranty, and failure
of plant to return clean water to river, which was
same transaction which was subject of claim of fed-
eral Government asserted against city in main ac-
tion. Fed.Rules Civ.Proc.Rule 14(a), 28 U.S.C.A.

**[2] Federal Courts 170B ⟨⟩15**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk14 Jurisdiction of Entire Contro-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

versy; Pendent Jurisdiction

170Bk15 k. Federal Question Cases in General, Claims Pendent To. Most Cited Cases

District court had pendent jurisdiction over city's third-party claims against sewage treatment plant contractor for breach of contract and warranty, where such third-party claims were state claims arising from same nucleus of operative facts as city's ancillary third-party indemnity claim asserted against contractor, in main action brought by federal Government against city for violations of federal water pollution statutes. Fed.Rules Civ.Proc.Rule 18(a), 28 U.S.C.A.

**[3] Federal Courts 170B** 18

170B Federal Courts
170BI Jurisdiction and Powers in General
170BI(A) In General
170Bk14 Jurisdiction of Entire Controversy; Pendent Jurisdiction
170Bk18 k. Validity or Substantiality of Federal Claims and Disposition Thereof. Most Cited Cases

**Federal Courts 170B** 23

170B Federal Courts
170BI Jurisdiction and Powers in General
170BI(A) In General
170Bk20 Ancillary and Incidental Jurisdiction
170Bk23 k. Coparties and New Parties. Most Cited Cases

Retention of jurisdiction over pendent and ancillary claims set forth in third-party action after principal federal claim was settled was not abuse of discretion, where district court expressed its concern about continuing jurisdiction over the "voluminous" third-party action and desirability of having matter tried locally, was aware of responsibility to reevaluate jurisdiction throughout pendency of litigation, requested additional briefing from the parties, and made reasoned determination to retain jurisdiction over the action. Fed.Rules Civ.Proc.Rules 14(a), 18(a), 28 U.S.C.A.

**[4] Municipal Corporations 268** 339(2)

268 Municipal Corporations
268IX Public Improvements
268IX(C) Contracts
268k339 Validity and Sufficiency in General
268k339(2) k. Conformity to Estimates, Specifications, and Request for Bid. Most Cited Cases

Prebid submittal and guarantee letter submitted by contractor did not modify or defeat formation of contract between contractor and city to supply and install secondary treatment equipment for sewage treatment plant, where neither submittal nor letter actually listed any changes or took any exception for original contract specifications, and contractor subsequently signed contract which included both original specifications and terms set forth in first addendum to plans and specifications issued by city's consulting engineer.

**[5] Sales 343** 53(1)

343 Sales
343I Requisites and Validity of Contract
343k53 Questions for Jury
343k53(1) k. In General. Most Cited Cases

When evidence so clearly indicates undisputed facts that no jury issue remains to be resolved, it is proper for district court to rule on issue as to whether particular transaction is a contract for sale of goods within scope of Uniform Commercial Code or a construction contract. I.C. § 28-2-102.

**[6] Sales 343** 3.1

343 Sales
343I Requisites and Validity of Contract
343k3 Sale Distinguished from Other Transactions
343k3.1 k. In General. Most Cited Cases
(Formerly 343k3)
Even though some contract documents referred to "construction" and "contractors," under Idaho

law, contract for supply and installation of secondary treatment equipment at sewage treatment plant was "sale of goods contract," rather than construction contract, and, thus, was within scope of Uniform Commercial Code; purpose of contract was to purchase and install equipment which would separate and dispose of sludge produced in secondary treatment of wastewater, and predominant factor, thrust, and purpose of contract was for sale of goods, with necessary, nondivisible, but incidental services component. I.C. §§ 28-2-102, 28-2-105(1).

**[7] Sales 343 ⚶404**

343 Sales
    343VIII Remedies of Buyer
        343VIII(C) Actions for Breach of Contract
            343k404 k. Nature and Form. Most Cited Cases
    Provision of contract for supply and installation of secondary treatment equipment at sewage treatment plant, stating that equipment manufacturer was to remove equipment and refund cost of equipment and its installation at option of city if performance of sludge treatment system in compliance with specifications was not attained within two years after completion and start-up of plant, did not limit city to exclusive contract remedy; instead, city was entitled to all remedies and damages available under Idaho Uniform Commercial Code. I.C. § 28-2-719(1)(b).

**[8] Damages 115 ⚶59**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(B) Aggravation, Mitigation, and Reduction of Loss
            115k59 k. Matter of Mitigation; Collateral Source Rule in General. Most Cited Cases
    Under Idaho law, collateral source rule did not apply so as to preclude offset of funds granted by the United States and state of Idaho from amount of damages sustained by city caused by contractor's breach of contract for supply and installation of

secondary treatment equipment at sewage treatment plant.

**[9] Federal Civil Procedure 170A ⚶851**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak851 k. Form and Sufficiency of Amendment. Most Cited Cases
    District court could not have denied motion to amend third-party complaint to add claim for punitive damages on basis of "futility of amendment" without abusing its discretion, where sufficient allegations concerning third-party defendant's harmful state of mind were made to state claim for punitive damages. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[10] Federal Civil Procedure 170A ⚶840**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak839 Complaint
                170Ak840 k. Time for Amendment. Most Cited Cases

**Federal Civil Procedure 170A ⚶843**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak839 Complaint
                170Ak843 k. Nature and Extent of Relief Sought. Most Cited Cases
    Refusal to permit third-party complaint to be amended to add claim for punitive damages after jury trial had begun was not abuse of discretion, where third-party defendant's trial preparation involved responding to third-party plaintiff's contract, warranty, and negligence claims only, third-party defendant would have been substantially prejudiced if required to defend against punitive damages claim at such a late point in the proceedings, and adequate continuance at that time would have been

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

unduly disruptive of the jury trial. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[11] Federal Civil Procedure 170A ☜2741**

170A Federal Civil Procedure
   170AXIX Fees and Costs
      170Ak2741 k. Witness Fees. Most Cited Cases

District courts have discretion to award expert witness fees in addition to statutory witness fee upon finding on record that expert testimony was crucial or indispensable in establishing prevailing party's case or defense; calling into doubt *Henkel v. Chicago, St. Paul, Minneapolis & Omaha Ry.*, 284 U.S. 444, 52 S.Ct. 223, 76 L.Ed. 386; declining to follow *J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 790 F.2d 1193 (5th Cir.); *Murphy v. International Union of Operating Engineers*, 774 F.2d 114 (6th Cir.); *Bosse v. Litton Unit Handling Systems*, 646 F.2d 689 (1st Cir.); *Cleverock Energy Corp. v. Trepel*, 609 F.2d 1358 (10th Cir.). 28 U.S.C.A. § 1821.

**[12] Federal Civil Procedure 170A ☜2741**

170A Federal Civil Procedure
   170AXIX Fees and Costs
      170Ak2741 k. Witness Fees. Most Cited Cases

Application for expert witness fees in addition to statutory witness fee should be given careful scrutiny, and district courts should exercise their discretion in awarding such fees sparingly. 28 U.S.C.A. § 1821.

**[13] Federal Civil Procedure 170A ☜2741**

170A Federal Civil Procedure
   170AXIX Fees and Costs
      170Ak2741 k. Witness Fees. Most Cited Cases

Prior application and approval of enhanced fee for expert's testimony is not required. 28 U.S.C.A. § 1821.

**[14] Federal Civil Procedure 170A ☜2741**

170A Federal Civil Procedure
   170AXIX Fees and Costs
      170Ak2741 k. Witness Fees. Most Cited Cases

Purpose of rule providing that district court shall require party seeking discovery to pay expert a reasonable fee for time spent in responding to discovery, is to avoid unfairness of requiring one party to provide expensive discovery for another party's benefit without reimbursement. Fed.Rules Civ.Proc.Rule 26(b)(4)(C), 28 U.S.C.A.

**[15] Federal Civil Procedure 170A ☜2741**

170A Federal Civil Procedure
   170AXIX Fees and Costs
      170Ak2741 k. Witness Fees. Most Cited Cases

Before it refuses to order deposing party to pay costs of deposition of other party's expert, district court must make finding of manifest injustice. Fed.Rules Civ.Proc.Rule 26(b)(4)(C), 28 U.S.C.A.

**[16] Federal Civil Procedure 170A ☜2741**

170A Federal Civil Procedure
   170AXIX Fees and Costs
      170Ak2741 k. Witness Fees. Most Cited Cases

Refusal to award each party its costs for depositions of its expert witnesses taken by the other party, thereby resulting in each party paying its own experts when the other party deposed those experts, was error, in absence of finding that manifest injustice would result if party taking the deposition were required to pay costs of that deposition. Fed.Rules Civ.Proc.Rule 26(b)(4)(C), 28 U.S.C.A.

**[17] Municipal Corporations 268 ☜1040**

268 Municipal Corporations
   268XVI Actions
      268k1040 k. Costs. Most Cited Cases

District court could award attorney fees, under Idaho statute permitting award of attorney fees in contract actions relating to purchase or sale of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

goods, to city which prevailed in its action against contractor involving contract relating to supply and installation of secondary treatment equipment in sewage treatment plant, which contract was a contract for the sale of goods. I.C. § 12-120(2).

**[18] Federal Courts 170B ⟜415**

170B Federal Courts
   170BVI State Laws as Rules of Decision
      170BVI(C) Application to Particular Matters
         170Bk415 k. Damages, Interest, Costs and Fees. Most Cited Cases
    Federal courts must follow state law as to attorney fees in diversity actions.

**[19] Municipal Corporations 268 ⟜1040**

268 Municipal Corporations
   268XVI Actions
      268k1040 k. Costs. Most Cited Cases
    City was entitled to its reasonable attorney fees on appeal under Idaho statute providing that prevailing party is to be allowed reasonable attorney fee in any civil action to recover on contract relating to purchase or sale of goods, where contract at issue for supply and installation of secondary treatment equipment at sewage treatment plant was for the sale of goods, and city substantially prevailed on its appeals. I.C. § 12-120(2).

**\*864** Randall D. Morrison, Finan, White & Morrison, San Francisco, Cal., for plaintiff/appellee.

**\*865** John C. Hohnhorst, John C. Hepworth, Hepworth, Nungester & Felton, Twin Falls, Idaho, for defendant.

Appeal from the United States District Court for the District of Idaho.

Before TANG, SCHROEDER,[FN*] and BOOCHEVER, Circuit Judges.

      FN* Honorable Ben C. Duniway participated in the original panel in this case. Upon

his death, Honorable Mary M. Schroeder was drawn as his replacement.

BOOCHEVER, Circuit Judge:
    The United States sued the City of Twin Falls, Idaho for violation of federal water pollution statutes. The City filed a third-party indemnity action against Envirotech Corporation and others responsible for the design and construction of the City's sewage treatment plant. The United States prevailed against the City, and the City obtained a jury verdict in its breach of contract and warranties action against Envirotech. The verdict was for $1,222,493.65, and the district court awarded the City attorney fees and some costs. The City moved unsuccessfully for a partial new trial on damages. Envirotech cross-appeals. The parties raise numerous issues involving jurisdiction, contract formation and modification, Uniform Commercial Code application and remedies, jury instructions, punitive damages, expert witness costs and fees, and attorney fees.

### FACTS
    The City of Twin Falls (the City) needed a new secondary waste treatment plant to meet United States Environmental Protection Agency (EPA) water pollution discharge standards. Between 1972 and 1974, a Twin Falls engineering firm, Hamilton and Voeller, Inc., designed the facility and prepared specifications for the equipment. The City solicited bids for the various phases of the project, including site preparation and general construction (Division I), and manufacture and installation of the secondary treatment equipment (Division III). For its Division III contract, the City required the bidder to guarantee it would meet certain specifications, including a specified rate of dewaterability of sludge[FN1] and a percentage of biological oxygen demand (BOD)[FN2] that would be attained without the use of chemicals. The successful bidder also was required to agree that it would repair or replace equipment failing to meet specifications within the first year. If after a two year period the equipment still did not meet specifications, the City had an op-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

tion to demand the removal of the equipment and refund of payments.

> FN1. Dewatering is the process of removing microscopic organisms known as sludge from waste water by the use of a vacuum filter.

> FN2. BOD is a measure of the total amount of oxygen demanded from water by pollutants and microorganisms.

Envirotech Corporation (Envirotech) won the bid for supplying and installing the secondary treatment equipment. The facility was constructed and the treatment system installed between 1974 and 1976. Problems with the secondary system began immediately, and the system never performed as intended.

In September 1976, the United States (for the EPA) commenced an action seeking injunctive relief and civil penalties against the City in the federal district court for the District of Idaho, alleging that the City's sewage treatment plant was discharging various pollutants in violation of federal water pollution standards and the pollution discharge permit issued the City by the EPA. The district court's jurisdiction was based upon 28 U.S.C. § 1331 (1982) (federal question) and 28 U.S.C. § 1345 (United States as plaintiff).

The City denied the allegations, and in March 1978, it joined several third-party defendants, including Envirotech (a California corporation which manufactured and sold the pollution control equipment which is the subject of this appeal). The answer and third-party complaint alleged that in **\*866** order to comply with the federal water pollution standards, the City contracted with the third-party defendants to design and build the treatment facility, and that as a result of breach of contract and negligence, the City was "potentially liable to the Plaintiff for daily alleged fines...." Because there were other third-party defendants defeating diversity, the City in an amended answer asserted jur-

isdiction as to the third-party defendants based upon the pendent and ancillary nature of this claim. The City alleged that it had been sued by the United States and that it was "entitled to indemnity for any and all loss occasioned by recovery by the United States," as well as for all costs and attorney fees. It also sought additional damages arising from the need to repair or replace the treatment plant caused by Envirotech's negligence and breach of express and implied contract warranties.

In October 1980, the litigation between the United States and the City was concluded in the United States' favor under the terms of a stipulation and consent decree. Among other things, the decree required the City to repair and reconstruct the plant to meet its EPA pollution discharge permit requirements. By the terms of the consent decree, the court retained jurisdiction over the proceedings until the decree terminated on December 31, 1982. The court observed that, for all practical purposes, the suit between the United States and the City was terminated, that the City's third-party actions presented voluminous and complex state law issues best resolved in the state courts, that the trial was likely to be protracted, and that there appeared to be no complete diversity of jurisdiction. Nevertheless, the court determined to retain jurisdiction because of the extensive discovery already conducted.

The jury returned a verdict against Envirotech for the sum of $1,222,493.65, and judgment was entered accordingly. Following trial, the City moved for a partial new trial on its measure of damages objection. The motion was denied. The City also sought costs including expert fees and costs which it paid its experts for depositions taken by Envirotech. The City obtained costs of $15,109.79 from Envirotech, but the expert fees and deposition costs were denied. The City was awarded statutory attorney fees from Envirotech in the amount of $275,000, and Envirotech appeals this award.

**ANALYSIS**
**I. JURISDICTION**
The court denied Envirotech's motion to dis-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

miss for lack of subject matter jurisdiction. Envirotech appeals the ruling that the district court had ancillary jurisdiction over the City's third-party claims. Envirotech argues that the City's third-party claims were pendent party claims, i.e., the City brought in new parties on state law claims which, because of the absence of complete diversity, had no independent basis of federal subject matter jurisdiction. Envirotech also contends that even if the court had ancillary jurisdiction, it abused its discretion in refusing to dismiss the third-party claims which predominantly involved state law issues.

The City responds that the district court possessed ancillary jurisdiction permitting the City to implead third-party defendants under Rule 14(a) of the Federal Rules of Civil Procedure for indemnification of the City's liability as to the original plaintiff, the United States. Further, once the district court properly exercised its ancillary jurisdiction as to the City's indemnity claims, it also had pendent jurisdiction over the City's remaining damage claims under Rule 18.

**Standard of Review**

This court reviews de novo a district court's decision on subject matter jurisdiction. *Jones v. Gordon,* 792 F.2d 821, 824 (9th Cir.1986); *Clayton v. Republic Airlines, Inc.,* 716 F.2d 729, 730 (9th Cir.1983).

**Discussion**
**A. Ancillary and Pendent Jurisdiction**

Fed.R.Civ.P. 14(a) permits a defendant, as a third-party plaintiff, to bring an action **\*867** against a person not a party "who is or may be liable to him for all or part of the plaintiff's claim against him." Rule 18(a) permits a party asserting a claim to relief as a third-party claimant to join as many claims as he has against the opposing party. Fed.R.Civ.P. 18(a).

[1] Both ancillary and pendent jurisdiction

expand the scope of federal courts by permitting parties to obtain a federal forum for claims which, by themselves, are not within the statutory jurisdiction of the federal courts.... Ancillary claims are claims which ... arise out of the same transactions that are the subject of the federal cause [ ] of action but which are asserted after the original complaint is filed, usually by one other than the original plaintiff.

*Blake v. Pallan,* 554 F.2d 947, 956-57 n. 11 (9th Cir.1977). The City's indemnity claim against Envirotech arises out of the installation, warranty, and failure of the treatment system to return clean water to the river. This is the same transaction which was the subject of the federal claim against the City. The third-party claim is therefore ancillary under this definition.

[2] The City's contract and warranty claims involve issues not presented by the United States' complaint. We must determine whether they are pendent under the provisions of Rule 18(a). In *Blake,* we defined pendent claims as "state claims which arise from the same 'nucleus of operative facts' as that of a federal claim and which are joined in the same complaint with the federally cognizable claim by the original plaintiffs against the original defendants." 554 F.2d at 956-57 n. 11. We have concluded that the City's indemnity claim is ancillary to "the federally cognizable claim." Viewing the City as the "original plaintiff" in its third-party action against Envirotech as the "original defendant," the City's contract and warranty claims are state claims arising from the same nucleus of operative facts as the indemnity claim, and thus are pendent to its ancillary claim.

This court was faced with a similar situation in *United States ex rel. Payne v. United Pacific Insurance Co.,* 472 F.2d 792 (9th Cir.), *cert. denied,* 411 U.S. 982, 93 S.Ct. 2273, 36 L.Ed.2d 958 (1973). In *Payne,* a subcontractor was not paid by his contractor for equipment and labor, and brought suit against the surety of the contractor on performance and payment bonds. The Miller Act, 40 U.S.C. § 270b (1982), provided the basis of his cause of action. The surety impleaded the contractor, seeking

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

indemnity for the surety's liability to Payne. The surety also joined other claims against the contractor on other performance bonds regarding projects, other than the one involving Payne. Prior to trial, the surety settled the subcontractor's claims. The district court ruled that the third-party claims were ancillary to the original federal question action.

This court agreed that ancillary jurisdiction existed as to the surety's third-party indemnity claim for its liability arising out of the transaction spawning the original action. We held that "third-party claims are ancillary if the claims arise out of the subject matter of the original action and involve the same persons and issues ... or if they arose out of the same 'transaction or occurrence,' " 472 F.2d at 794 (citations omitted), and that under these tests, the district court properly asserted jurisdiction over the surety's claim for indemnification as to Payne's claims.

As to the other claims asserted by the surety against the contractor, however, we found that there was no close nexus between those third-party claims and the original claim brought by Payne. "The fact that the third-party claim arose from the same general background does not suffice as a nexus." *Id.* at 795.

Under *Payne,* ancillary jurisdiction clearly exists as to the City's third-party indemnification claims. The City's additional claims for breach of contract and breach of express and implied warranties also arise from the same transaction, and unlike the situation in *Payne,* there is a close factual and logical nexus between the pendent **\*868** claims added under Rule 18(a) and the original claim. Therefore, pendent jurisdiction supports these claims. *See also Schwab v. Erie Lackawanna Railroad,* 438 F.2d 62 (3d Cir.1971); *Noland Co. v. Graver Tank & Manufacturing Co.,* 301 F.2d 43, 49-51 (4th Cir.1962). We hold that the district court properly ruled that ancillary and pendent jurisdiction existed.

**B. District Court's Exercise of Discretion**

Having concluded that there was ancillary and pendent jurisdiction, the next question is whether the district court abused its discretion in retaining the case after the principal federal claim was settled. Although this court reviews questions of jurisdiction de novo, *Clayton,* 716 F.2d at 730, once having determined that ancillary jurisdiction exists, this court has said that ancillary jurisdiction, like pendent jurisdiction, is a "doctrine of discretion." *Blake,* 554 F.2d at 958 (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)). Under the abuse of discretion standard, this court will not reverse unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors. *Potlatch Corp. v. United States,* 679 F.2d 153, 157 (9th Cir.1982). Justification for ancillary jurisdiction " 'lies in consideration of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims....' " *Blake,* 554 F.2d at 958 (quoting *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139). *See also Hill v. Rolleri,* 615 F.2d 886, 889 (9th Cir.1980) (where federal diversity jurisdiction over third-party claim existed when trial began, it survived settlement of main action upon which diversity jurisdiction depended). "Joinder of a state law claim against a pendent party has been allowed if that party has already been brought into the case as a third-party defendant by the party sued on a federal claim." 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3567.2 (1984) (footnote omitted); *see also Ortiz v. United States Government,* 595 F.2d 65, 69 (1st Cir.1979).

[3] The district court expressed its concern about continuing jurisdiction over the "voluminous" third-party action and the desirability of having the matter tried locally. The district court was aware that it had a responsibility to reevaluate its jurisdiction throughout the pendency of the litigation. *See Gibbs,* 383 U.S. at 727, 86 S.Ct. at 1139. It requested additional briefing from the parties and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

made a reasoned determination that it should retain jurisdiction over the action. Under these circumstances, we cannot say that the district court abused its discretion.

## II. CONTRACT FORMATION OR MODIFICATION

Envirotech next contends that the district court erred in ruling as a matter of law that Envirotech's Pre-bid Submittal and guarantee letter did not affect its contract with the City. When the City solicited bids for the sludge treatment system, it required certain specific guarantees:

(1) the system was required to treat the sludge so that it would be dewaterable at a minimum rate of 4 lbs/sq.ft./hr.;

(2) this rate was to be accomplished without the use of chemicals;

(3) the BOD (biological oxygen demand) contained in the recycle streams produced by the system was never to exceed an amount equal to fifteen percent of the BOD contained in the raw sewage influent to the plant; and

(4) if the system failed to meet these specifications within two years of system start-up, the seller was to remove the equipment and refund the price at the City's option.

In April 1974, the City's consulting engineer issued its first addendum to the plans and specifications. The addendum required each bidder to list all changes or exceptions taken with the specifications. Envirotech argues that it responded with a Pre-bid Submittal which differed from the **\*869** specifications required by the City. Envirotech's Pre-bid Submittal stated that because the treatment plant might be required to dewater one hundred percent heat treated waste activated sludge (more difficult to dewater and treat), the loading rate would be less than the City's required 4 lbs/sq.ft./hr.; that better loading rates could be achieved by using chemicals in the secondary treatment process; and that the

BOD load might be greater than the City required.

Envirotech also argues that it submitted a guarantee letter which did not contain all of the guarantees that the City required. Rather, Envirotech omitted the guarantees concerning dewatering and recycling rates and the provision that chemical treatment was not to be used. Envirotech argues that it only included the City's requirement concerning the supplier's right to repair and the City's option to require removal and refund.

During trial, Envirotech moved for a directed verdict based upon its theory that the Pre-bid Submittal and guarantee letter either defeated the formation of the contract or constituted a counteroffer which was accepted by the City and resulted in an agreement based upon the terms of the letters. The district court denied Envirotech's motion, ruling as a matter of law that the letters were not adequate to change the contract. The court instructed the jury that the Pre-bid Submittal and guarantee letter did not affect the contract. The jury, therefore, was not permitted to consider their effect on the formation or modification of the contract, and in its Special Verdict, specifically found that Envirotech contracted to meet the City's specifications. Envirotech argues that the district court erred in its ruling, and that it was for the jury to determine whether the documents defeated or modified the formation of the contract.

### Standard of Review

The interpretation of a contract is a mixed question of law and fact. *Interpetrol Bermuda Ltd. v. Kaiser Aluminum Int'l. Corp.,* 719 F.2d 992, 998 (9th Cir.1984). We review the interpretation of a contractual provision de novo. *Kemmis v. McGoldrick,* 767 F.2d 594, 597 (9th Cir.1985); *Interpetrol Bermuda Ltd.,* 719 F.2d at 998 (the principles of contract interpretation to be applied are questions of law subject to de novo review). The determination of whether contract language is ambiguous is a matter of law. *In re U.S. Financial Securities Litigation,* 729 F.2d 628, 632 (9th Cir.1984). "If a provision is ambiguous, however,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

its interpretation depends on the parties' intent at the time of execution." *Kemmis,* 767 F.2d at 597. The district court then should make factual findings as to the parties' actual intent. *Id.* The district court's factual findings concerning what the parties intended, said, and did are reviewed under the clearly erroneous standard. *Id.; Interpetrol Bermuda Ltd., 719 F.2d at 998; see also Laborers Health & Welfare Trust Fund v. Kaufman & Broad, 707 F.2d 412, 418 (9th Cir.1983)* (intent as issue for trier of fact).

Under Idaho law, "where it is contended that a contract has been modified, and the evidence relating to the modification is undisputed and unambiguous, the trial court must decide as a matter of law whether the contract was modified." *Johnson v. Allied Stores Corp., 106 Idaho 363, 368, 679 P.2d 640, 645 (1984)* (citations omitted).

From these cases we derive the general rule that the determination of the parties' intent to modify a contract is a question of fact for the jury. There is a threshold, however, where the trial judge must first examine the evidence to determine whether there is an actual ambiguity or uncertainty concerning the parties' intent. If the judge determines that there is no ambiguity, then the court is entitled to rule as a matter of law whether the contract was modified. *In re U.S. Financial Securities Litigation, 729 F.2d at 632.* We review the district court's legal determination de novo. *United States v. McConney, 728 F.2d 1195, 1202-04 (9th Cir.)* (en banc), *cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984);* **\*870***United States ex rel. Union Building Materials Corp. v. Haas & Haynie Corp., 577 F.2d 568, 572 (9th Cir.1978).*

**Discussion**

[4] We hold that the court did not err in ruling as a matter of law that the Pre-bid Submittal and guarantee letter did not modify or defeat the formation of the contract. Initially we observe that the first addendum, which instructed bidders to list all changes and exceptions taken with the specifications, also contained the following provision:

The thermal conditioning system offered **shall condition** raw primary or waste activated sludges or mixtures of the two **as specified,** so that the sludge can be dewatered on the vacuum filters **without the addition of chemicals** or any other filter aid. The thermally conditioned product ... **shall be dewaterable according to the performance requirements** of Section C [of the original specifications for] Basis of Design.

(Emphasis added). Thus, the very addendum which Envirotech argues invited changes to the specifications, clearly indicates that the City expected dewatering and conditioning of the sludge without the use of chemicals and in accordance with the contract specifications.

Second, we note that neither the Pre-bid Submittal nor the guarantee letter submitted by Envirotech actually lists any changes or takes any exception whatever with the original specifications. Nor did Envirotech specifically take exception with the provision of the addendum set out above. Rather, Envirotech speculates that the treatment plant "**may** have to dewater one hundred percent heat treated waste activated sludge," and that when "just waste activated sludge ... is being processed ... the return ... **can have** a total ... BOD up to thirty percent...." Further, Envirotech "**recommend**[s] that a chemical feeding system be added...." More is required to reach that threshold of ambiguity necessary to send to the jury the question of the parties' intent concerning contract formation or modification.

Finally, Envirotech has produced no evidence that when it signed the contract, it had not bound itself to the specifications and conditions contained therein. Thus, even assuming that the Pre-bid Submittal and guarantee letter served to take exception with the specifications, Envirotech subsequently signed the contract which included both the original specifications and the explicit provision earlier quoted from the first addendum. Reviewing the contract terms de novo, we find that the terms are unambiguous, that Envirotech signed the contract containing those terms, and that the Pre-bid Sub-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

mittal and the guarantee letter were not sufficient to modify the contract. We therefore affirm the district court's ruling.

### III. APPLICABILITY OF THE UCC

Envirotech next contends that the district court erred in ruling as a matter of law that Envirotech's contract with the City was a sale of goods contract within the scope of the Uniform Commercial Code (UCC), rather than a construction contract not within the UCC, and that the district court should have submitted this as a question of fact to the jury.

### Standard of Review

[5] In response to Envirotech's motion for directed verdict, the district court ruled that it was "satisfied it is a matter of law that this was a contract for the sale of goods. I'll have to apply the UCC." "Ordinarily, the question whether a particular transaction is a construction contract or a contract of sale is an issue of material fact, which must be resolved at trial," *Holden v. Placid Oil Co.,* 512 F.Supp. 644, 647 n. 2 (E.D.La.1981) (where district court ruled in a summary judgment proceeding that the transaction was a sale of goods), but when the evidence so clearly indicates undisputed facts that no jury issue remains to be resolved, it is proper for the court to rule on the issue. Thus, if the contract was unambiguous, it was not error for the district court to make its determination as a matter of law.

### *871 Discussion

Chapter 2 of the Idaho Uniform Commercial Code-Sales is applicable to "transactions in goods." Idaho Code § 28-2-102 (1980). " 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale...." *Id.* § 28-2-105(1). The Idaho Supreme Court has not enunciated a test for determining whether contracts involving both sales of goods and services are governed by the Idaho UCC.

In *Haas & Haynie Corp.,* this court was faced with the problem of mixed sales and services contracts.

There is some question as to whether Article 2 of the Uniform Commercial Code is applicable to the contract at issue here. Article 2 applies to the sale of goods and this contract involves both sale of goods and provision of services. The modern trend is to apply Article 2 to such mixed sales/ services contracts.

577 F.2d at 572 n. 2 (the court said it did not need to decide how Hawaii would resolve the issue because the result it reached was the same whether or not the UCC applied) (citing *Bonebrake v. Cox,* 499 F.2d 951, 958 (8th Cir.1974)).

In *Bonebrake,* the Eighth Circuit reversed a decision that the UCC did not apply where the contract provided for the rendition of services for the installation of bowling alley lanes and equipment. "[T]he fact that the contract 'involved substantial amounts of labor' does not remove it from inclusion under the Code...." *Id.* at 959. The court then enunciated the test which this circuit in *Haas* regarded as the "modern trend":

The test for inclusion or exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom).

*Id.* at 960 (footnotes omitted). *Accord Omaha Pollution Control Corp. v. Carver-Greenfield Corp.,* 413 F.Supp. 1069, 1085 (D.Neb.1976).

[6] The purpose of the City's contract with Envirotech was to purchase and install equipment which would separate and dispose of sludge produced in the secondary treatment of waste water. Some of the contract documents refer to "construction" and "contractors." On the other hand, other contract documents and documents prepared by Envirotech indicate the contract was for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

goods. *See, e.g.,* Contract Specifications Addendum 1 at Envirotech's Excerpt of Record page 3: Division III. "Included shall be the percentage of the total selling price for which the supplier is furnishing and installing the particular piece of equipment, to include and cover piping ..., high pressure pump(s) and sludge grinders, heat exchanger(s), reactor, boiler ..., vacuum filters and support equipment, etc., required for the complete installation." These all are movable goods as contemplated by Idaho Code § 28-2-105(1).

Applying the *Bonebrake* test, we find that the predominant factor, thrust, and purpose of the contract with Envirotech was for the sale of goods, with a necessary, non-divisible, but incidental services component. We agree with the district court and hold that as a matter of Idaho law, this contract was governed by the Idaho Uniform Commercial Code.

### IV. CONTRACT REMEDY

The district court ruled as a matter of law that the contract provided the City with a specific "exclusive remedy" which the City had "elected," limiting the City's recovery to the purchase price of the equipment, costs of its removal, minor damages suffered before its replacement, and prejudgment interest. The contract provision at issue provides:

E. GUARANTEES
(4) If performance of the sludge treatment system in compliance with the specification**\*872** and to the satisfaction of the Engineer is not attained within two years after completion and startup of the treatment plant, the equipment manufacturer shall remove his equipment and refund the cost of the equipment and its installation at the option of the Owner.
On March 21, 1978, the City Manager sent a letter to Envirotech's Senior Vice President, which stated:

This letter is your notification that the provisions of specifications paragraph ... E(4) ... of your contract.... must be implemented.... No action or

response on your part has been initiated to date therefore it is expected that you will remove your equipment from the plant site and refund the cost of the equipment and its installation, just exactly as you contracted to do.

Please be advised that your failure to perform your contractual obligation immediately as stated above may result in the City removing your equipment for you at your expense.

The City contends that the district court erred because the contract remedy was not exclusive as a matter of law and that the City is entitled to all remedies and damages available under the Idaho UCC. Envirotech responds that the court ruled correctly regarding the exclusive nature of the contract provision. Envirotech also argues that the provision is a liquidated damages provision and as such the City is not entitled also to recover compensatory damages; the City elected its remedy, which did not fail of its essential purpose; and the City is not entitled to replacement costs or "cover" for a different sewage treatment plant. Finally, Envirotech argues that the costs of the replacement plant were paid by the government and the court incorrectly ruled that the collateral source rule applied.

### Discussion
### A. Exclusive Remedy

Under the Idaho UCC, parties to a contract may provide for an exclusive, limited remedy in the event of breach. Idaho Code § 28-2-719(1) (1980). Before a remedy will be deemed exclusive, however, the parties must have clearly intended and provided for exclusivity. Subsection (b) of Idaho Code § 28-2-719(1) provides:

resort to a [contractual] remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

*Accord Jensen v. Seigel Mobile Homes Group,* 105 Idaho 189, 196, 668 P.2d 65, 72 (1983) (finding that repair was not intended as an exclusive remedy); *see also* Idaho Code § 28-2-719, Offi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

cial Comment No. 2 (presumption that remedies are cumulative rather than exclusive); *cf. Clark v. International Harvester Co.,* 99 Idaho 326, 337-39 & n. 9, 581 P.2d 784, 795-97 & n. 9 (1978) (court reviewed language of an express limited repair-or-replace warranty which provided that the rights were "in lieu of all warranties, express or implied, ... [and] all other obligations or liabilities, including liability for incidental or consequential damages," and held that the intent "clearly expressed by its terms" was to limit purchaser's remedy to repair-or-replace).

[7] The contract before this court contains no language of exclusivity. The record indicates no provisions or language limiting the City's remedies, and the parties have not contended that there are any other provisions. Applying the language and policy underlying Idaho Code § 28-2-719(1)(b) and the Idaho decisions in *Jensen* and *Clark,* we hold that the provision does not limit the City to an exclusive contract remedy. Thus, the district court erred in ruling as a matter of law that the clause created an exclusive remedy. Accordingly, we reverse that ruling and remand for partial new trial to give the City an opportunity to seek its other remedies under the Idaho UCC.

### B. Collateral Source Rule

The original treatment plant project was funded seventy-five percent by the United States (EPA) and fifteen percent by the State of Idaho. The United States and the State of Idaho also paid a substantial portion**873** of the cost of the replacement facilities after the original equipment failed to perform. The district court ruled that these federal and state replacement payments were from a "collateral source," and held that under the collateral source rule, Envirotech could not offset its contract liability and must respond in damages regardless of the source of funds used for repair.

That a party's liability is not reduced by payments or other benefits received by the injured party from collateral sources is a well-recognized principle in tort law, Restatement (Second) of Torts

§ 920A (1977), and Idaho follows this tort principle. *Lasselle v. Special Products Co.,* 106 Idaho 170, 174, 677 P.2d 483, 487 (1983). Further, courts generally have encountered little difficulty in applying the collateral source rule to payments made voluntarily and gratuitously, or even where the funds are given to plaintiff by a government agency, *e.g. Roundhouse v. Owens-Illinois, Inc.,* 604 F.2d 990, 994 (6th Cir.1979), or by way of a government grant, *Town of East Troy v. Soo Line Railroad Co.,* 476 F.Supp. 252, 253-54 (E.D.Wis.1979), *aff'd,* 653 F.2d 1123, 1132 (7th Cir.1980), *cert. denied,* 450 U.S. 922, 101 S.Ct. 1373, 67 L.Ed.2d 351 (1981). *See also Wheatland Irrigation District v. McGuire,* 562 P.2d 287, 302 (Wyo.1977) (citing cases). In *Alesko v. Union Pacific Railroad Co.,* 62 Idaho 235, 243, 109 P.2d 874, 878 (1941), the Idaho Supreme Court likewise held that the collateral source rule barred evidence of government relief benefits for flood damage caused by defendant.

Assuming that the funds granted by the United States and the State of Idaho to aid in the replacement of the treatment facility were a collateral source, the question is whether the collateral source rule applies in a contracts case. This issue presents a pure question of state law: whether Idaho courts would apply the collateral source rule to preclude offsetting remedial grants or benefits provided by the government from the amount of damages for breach of contract. We review the district court's determination of this issue de novo. *Meckert v. Transamerica Insurance Co.,* 742 F.2d 505, 506 (9th Cir.1984).

We have found no authority to support the application of the collateral source rule in the contracts field. Authority is to the contrary. *Daniel Construction Co. v. International Union of Operating Engineers, Local 513,* 570 F.Supp. 299, 303 (E.D.Mo.1983) ("The doctrine simply is not applicable to breach of contract cases"), *aff'd on other grounds,* 738 F.2d 296 (8th Cir.1984); *Grover v. Ratliff,* 120 Ariz. 368, 370, 586 P.2d 213, 215

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

(Ariz.App.1978) ("The collateral source rule is a concept of damages in tort cases and does not apply to an ordinary breach of contract case."); *see also United Protective Workers of America, Local No. 2 v. Ford Motor Co.,* 223 F.2d 49, 54 (7th Cir.1955) ("We have been unable to find a single case in which this rule has been carried over to contract damages."); D. Dobbs, *Handbook on the Law of Remedies* 587 (West 1973) ("the collateral source rule is not used at all in contracts claims").

The policy rationales underlying the collateral source rule also do not support its application to contract cases. *See Restatement (Second) of Contracts § 347* comment e (1979) (the principle "is less compelling in the case of a breach of contract than in the case of a tort").

[I]t is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers....

Perhaps there is an element of punishment of the wrongdoer involved.

Restatement (Second) of Torts § 920A comment b (1977). Thus, if there must be a double recovery, the law prefers that the injured victim receive it rather than the **\*874** tortfeasor. *Cf.* Fleming, *The Collateral Source Rule and Loss Allocation in Tort Law,* 54 Cal.L.Rev. 1478, 1545 (1966) ("Yet there is evident uneasiness about this result. That double recovery runs against the grain is attested ... by the evident judicial distaste for extending it to borderline situations, such as cases of contractual liability.").

In actions for breach of contract only such damages will be allowed as fairly compensate the injured party for his loss. *Anderson v. Gailey,* 100 Idaho 796, 800, 606 P.2d 90, 94 (1980) (citations omitted). The Idaho court explained:

"[A]s a general proposition ... the purpose or objective of the court is to place the injured party ... in the position no better and no worse than he would have occupied had the contract been performed." ...

We have long held in Idaho that the purpose of awarding damages for breach of contract is to fully recompense the non-breaching party for its losses sustained because of the breach, not to punish the breaching party.

*Id.* at 801, 606 P.2d at 95 (quoting *King v. Beatrice Foods Co.,* 89 Idaho 52, 58-59, 402 P.2d 966, 969 (1965)) (citations omitted).

[8] With these principles in mind, we believe that if the Idaho Supreme Court were presented with this issue, it would hold, as we do here, that the collateral source rule does not apply to preclude the offset of funds granted by the United States and the State of Idaho from the amount of damages sustained by the City caused by Envirotech's breach of contract.

**C.**

In view of our decision on contract remedy issues, we need not address the City's and Envirotech's other arguments concerning the City's measure of damages.

**V. AMENDMENT OF COMPLAINT FOR PUNITIVE DAMAGES**

The City next contends that the district court erred in failing to permit the City to amend its complaint to add a claim for punitive damages. The City urges that the availability of punitive damages is an issue of fact for resolution by the jury, and that the court invaded the jury's province in determining the merits of the propriety of punitive damages. Envirotech argues that the court properly exercised its discretion in denying the City leave to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

amend its complaint because to do so at such a late date during the course of the trial would have been prejudicial.

In March 1978, the City filed its third-party claim against Envirotech. Jury trial began on November 8, 1983. On December 30, 1983, the City moved to amend its complaint to add a claim for punitive damages. The court ruled that it was inclined to allow the City to amend its complaint to add the claim, but that it probably would not submit the issue to the jury. Envirotech objected to allowing the amendment, arguing that it would be prejudiced by the City presenting theories of fraud, malice, and oppression to the jury even if the court ultimately disallowed the claim. Further, Envirotech argued that its entire trial strategy, including discovery, exhibits, witnesses, and defenses, was prepared with a view to responding only to the City's contract, warranty, and negligence claims. The court ordered its statement that the motion was granted be rescinded, and ruled that the motion was under advisement.

On January 31, 1983, the City renewed its motion to amend based on the authority of *Cheney v. Palos Verdes Investment Corp.,* 104 Idaho 897, 904, 665 P.2d 661, 668 (1983), which holds that under Idaho law, allowance of punitive damages is a question of fact for the jury. The court denied the City's motion.

### Standard of Review

The denial of leave to amend the pleadings after a responsive pleading has been filed is reviewed for an abuse of discretion. *Klamath-Lake Pharmaceutical Association v. Klamath Medical Service Bureau,* 701 F.2d 1276, 1292 (9th Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983).

### *875 Discussion

Fed.R.Civ.P. 15(a) provides that after a response has been filed, a complaint may only be amended by leave of the court. This court has held that

[m]otions to amend ... are commonly granted. Although within the trial court's discretion, leave to amend "shall be freely given when justice so requires." ... We are required to review the exercise of the trial court's discretion to deny a motion to amend strictly. Thus, where the record does not clearly dictate the district court's denial, we have been unwilling to affirm absent written findings ... and have reversed findings that were merely conclusory....

*Klamath-Lake,* 701 F.2d at 1292-93 (citations omitted).

In *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), the Supreme Court identified four factors relevant to whether a motion for leave to amend the pleadings should be denied: undue delay, bad faith or dilatory motive, futility of amendment, and prejudice to the opposing party. In *United States v. Webb,* 655 F.2d 977, 980 (9th Cir.1981), this court held that delay alone, no matter how lengthy, is an insufficient ground for denial of leave to amend. "In the absence of some statement of reasons or findings of fact showing bad faith or prejudice, we cannot determine whether it was an abuse of discretion to deny [the] motion for leave to amend [the] pleadings." *Id.*

The record shows clearly that Envirotech argued it would be prejudiced by the late amendment adding a claim for punitive damages. Had the district court expressly based its denial of leave to amend on that ground, the court would have properly exercised its discretion. It appears, however, that the district court may have denied the motion to amend upon its independent analysis of the merits of the punitive damages claim. This is contrary to Idaho substantive law which provides that "punitive damage awards are in the first instance a jury decision, subject to the trial court's authority to modify or overturn that jury verdict as a matter of law." *Palos Verdes,* 104 Idaho at 904, 665 P.2d at 668.

In *Palos Verdes,* the Idaho Supreme Court af-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

firmed an award of punitive damages in an action for nonpayment and fraud arising out of an oral contract. In addition to holding that an award of punitive damages "should be left first to the determination of the trier of the fact," *id.,* 665 P.2d at 668, the Court also explained that

> [t]he justification for punitive damages must be that the defendant acted with an extremely harmful state of mind, whether that state be termed "malice, oppression, fraud or gross negligence" ... or simply "deliberate or willful"....

*Id.* 104 Idaho at 905, 665 P.2d at 669 (citations omitted). *See also Boise Dodge, Inc. v. Clark,* 92 Idaho 902, 907, 453 P.2d 551, 556 (1969) (under Idaho law, "punitive damages may be assessed in contract actions where there is fraud, malice, oppression or other sufficient reason for doing so"). Of course, the party seeking punitive damages must make sufficient allegations of fraud or other harmful state of mind to reach the threshold of raising the question of punitive damages for proper presentation to the jury. *See Palos Verdes,* 104 Idaho at 905, 665 P.2d at 669 ("sufficient evidence was placed before the jury to raise the question[ ] of defendants' malice").

[9] Based upon our review of the exhibits and testimony in the record, we believe that sufficient allegations concerning Envirotech's harmful state of mind were made to state a claim for punitive damages. For example, the City offered as Exhibit 18 a letter from Envirotech's salesman which characterized the City's consulting engineer as a "novice," and which stated that the salesman "should find no problems in getting him to accept any of my proposals." Further, in the third paragraph of this letter, the salesman asks, "If there are any unfair advantages I can take in helping set this project up, please notify me of them now so I can incorporate them in the specifications." Because there was sufficient**\*876** evidence to raise the question of punitive damages, the district court could not have denied the City's motion to amend its complaint to add a claim for punitive damages on the basis of

"futility of amendment," *Foman,* 371 U.S. at 182, 83 S.Ct. at 230, without abusing its discretion.

Normally we would remand to the district court to reconsider, in light of this opinion, its ruling denying the motion to amend. In this case, however, the highly respected trial judge died during the pendency of this appeal. This panel is therefore in a better position than a judge unfamiliar with this voluminous record to determine whether the amendment should be allowed.

[10] As we have previously indicated, jury trial began on November 8, 1983. It was not until December 30, 1983, that the City moved to amend its complaint by adding the claim for punitive damages. Envirotech's trial preparation involved responding to the City's contract warranty and negligence claims only. We believe that Envirotech would have been substantially prejudiced if required to defend against the punitive damage claim at such a late point in the proceedings. Moreover, an adequate continuance at that time would have been unduly disruptive of the jury trial. Accordingly, we conclude that the denial of the motion to amend was not an abuse of discretion.

## VI. EXPERT WITNESS FEES AND DEPOSITION FEES
### A. Expert Witness Fees

The City served a Memorandum of Costs upon the district court, requesting, in part, expert fees in the amount of $170,610.67. In denying the application for expert fees, the district court said, "I will allow only the $30 a day witness fee for all witnesses, expert or ordinary. I will not allow extra fees for expert witnesses." The City requests this court to join the recent trend in other circuits and hold that district courts have the discretion in appropriate cases to award expert witness fees in excess of the statutory amount authorized for witnesses generally. The City also asks us to remand for the district court to make a finding and exercise its discretion whether to award enhanced expert witness fees in this case.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

### Standard of Review

Whether enhanced expert witness fees may be allowed is a question of law reviewed de novo. *See United States v. McConney,* 728 F.2d 1195, 1202-04 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

### Discussion

By statute, witnesses in federal courts "shall be paid an attendance fee of $30 per day for each day's attendance." 28 U.S.C. § 1821(b) (1982). In *Henkel v. Chicago, St. Paul, Minneapolis & Omaha Ry.,* 284 U.S. 444, 52 S.Ct. 223, 76 L.Ed. 386 (1932), the Court rejected a claim for fees for expert witnesses who had testified at trial, holding that

when the Congress has prescribed the amount to be allowed as costs, its enactment controls....

Specific provision as to the amounts payable and taxable as witness fees was made by the Congress as early as the Act of February 28, 1799.... The statute now applicable is the Act of April 26, 1926 [the predecessor of 28 U.S.C. § 1821].... Under these provisions, additional amounts paid as compensation, or fees, to expert witnesses cannot be allowed or taxed as costs in cases in the federal courts.

284 U.S. at 446, 52 S.Ct. at 224 (citations omitted, brackets added). The Court also observed that

[t]he Congress has dealt with the subject comprehensively and has made no exception of the fees of expert witnesses. Its legislation must be deemed controlling and excludes the application in the federal courts of any different state practice.

*Id.* at 447, 52 S.Ct. at 225.

Fed.R.Civ.P. 54(d) provides that "[e]xcept when express provision therefor is made ... in a statute of the United States ..., costs shall be allowed as of course to the **\*877** prevailing party unless the court otherwise directs...." In combination

with Rule 54(d), which grants the district court **in the absence of other statutory authority** the discretionary authority to award costs to a prevailing party, *Henkel* would appear to resolve the question of enhanced expert fees in the negative. *Henkel,* however, was decided before enactment of the Federal Rules of Civil Procedure. In a later case, the Supreme Court recognized that Rule 54 authorizes district courts to exercise their discretion "sparingly" to award costs not specifically enumerated in 28 U.S.C. § 1821. *Farmer v. Arabian American Oil Co.,* 379 U.S. 227, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964). The Court stated:

We do not read that Rule [54(d) ] as giving district judges unrestrained discretion to tax costs to reimburse a winning litigant for every expense he has seen fit to incur in the conduct of his case. Items proposed by winning parties as costs should always be given careful scrutiny.... **Therefore, the discretion given district judges to tax costs should be sparingly exercised with reference to expenses not specifically allowed by statute.**

*Id.* at 235, 85 S.Ct. at 416 (emphasis added, brackets added).

The rule traditionally followed by federal courts is that expert fees cannot be recovered as costs beyond the statutory allowances provided in 28 U.S.C. § 1821. *E.g., J.T. Gibbons, Inc. v. Crawford Fitting Co.,* 790 F.2d 1193, 1194-95 (5th Cir.1986) (en banc); *Murphy v. International Union of Operating Engineers,* 774 F.2d 114, 132-34 (6th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986); *Bosse v. Litton Unit Handling Systems,* 646 F.2d 689, 695 (1st Cir.1981); *Cleverock Energy Corp. v. Trepel,* 609 F.2d 1358, 1363 (10th Cir.1979), *cert. denied,* 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261 (1980).

In reliance on *Farmer,* however, other federal courts have held that the prevailing party may recover expert witness fees when the expert's testimony was crucial to the resolution of the case. *See,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

*e.g., Paschall v. Kansas City Star Co.,* 695 F.2d 322, 338-39 (8th Cir.1982) (" 'While *Farmer* commands perhaps a tight-fisted exercise of discretion in order to insure moderation in the cost of litigation, it does not mandate parsimony to the extent of precluding recovery of legitimate and indispensible [sic] litigation expenditures.' " (quoting *Roberts v. S.S. Kyriakoula D. Lemos,* 651 F.2d 201, 206 (3d Cir.1981)), *rev'd on other grounds,* 727 F.2d 692 (8th Cir.) (en banc), *cert. denied,* 469 U.S. 872, 105 S.Ct. 222, 83 L.Ed.2d 152 (1984); *Roberts,* 651 F.2d at 206 ("when the expert's testimony 'played a crucial role in the resolution of the issues presented,' a district court, in its discretion, may award expert fees"); *see also International Woodworkers of America v. Champion International Corp.,* 790 F.2d 1174, 1181-93 (5th Cir.1986) (en banc) (Ruben, J., dissenting) (surveying cases from all circuits). Even those courts that adhere to the traditional teaching of *Henkel* and hold that expert witness costs must be limited under 28 U.S.C. § 1821 have recognized flexibility in limited "exceptional circumstances." *See, e.g., Quy v. Air America, Inc.,* 667 F.2d 1059, 1066 (D.C.Cir.1981); *Illinois v. Sangamo Construction Co.,* 657 F.2d 855, 864-65 (7th Cir.1981).

Against this background, we examine our own precedents concerning costs and expert witness fees. In *Thornberry v. Delta Air Lines, Inc.,* 676 F.2d 1240, 1245 (9th Cir.1982), *vacated on other grounds,* 461 U.S. 952, 103 S.Ct. 2421, 77 L.Ed.2d 1311 (1983), a Title VII case, we held without discussing *Henkel* or *Farmer* that the district court did not abuse its discretion in awarding costs, including expert witness fees. Although the opinion is not entirely clear that the court was faced with the precise issue of enhanced expert fees, the parties' briefs revealed that the issue of the trial court's discretion in awarding costs in addition to those allowed by Fed.R.Civ.P. 54(d) and 28 U.S.C. § 1920 was vigorously argued. *See also International Woodworkers,* 790 F.2d at 1191 (Rubin, J., dissenting) (reading *Thornberry* as establishing a permissive rule in allowing enhanced expert witness fees). In

any event, **\*878** our discussion concerning the scope of the district court's discretion is instructive and bears repeating:

> The exercise of that discretion may not be unlimited, however. We note [there is] ... language suggesting that these elements of cost may only go beyond the statutory "limits" (subsistence and transportation) in the presence of special circumstances. *See* F.R.Civ.P. Rule 54(d); 28 U.S.C. §§ 1821, 1920.... It is clear, however, that the required "special circumstances" are largely a matter of the reasonable needs of the party in the context of the litigation. Thus, in determining whether or not special circumstances exist, the judge must look to the practical litigation needs of the party.... In the instant case, the trial court found that the testimony of the expert computer witnesses was essential both to prove the plaintiff's prima facie case through the use of statistics and to rebut the defendant's ... defense. That finding is adequately supported by the record, and satisfies us that the trial court properly considered the relationship between the claimed ... expert witness fees and the reasonable needs of the litigation.

> 676 F.2d at 1245.

Likewise, in *Shakey's Inc. v. Covalt,* 704 F.2d 426 (9th Cir.1983), we suggested that under "exceptional circumstances" the district court might exercise its " 'inherent equitable discretionary authority' " to award additional expert fees upon a showing that the expert testimony was "essential to establish[ing] the defense." *Id.* at 437 (citation omitted). We also stated that "[e]xercise of this authority usually requires a prior application to the court to incur the costs in issue." *Id.* We held, however, that under the circumstances in *Shakey's,* the district court did not abuse its discretion in disallowing additional expert costs.

[11][12][13] Thus it is clear that we have previously expressed our approval of the district court's exercise of its discretionary authority to award en-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

hanced expert witness fees in the proper case. We take this opportunity to clarify our position, and hold that district courts have the discretion to award additional expert witness fees upon a finding on the record that the expert testimony was crucial or indispensable in establishing the prevailing party's case or defense. *Twentieth Century Fox Film Corp. v. Goldwyn,* 328 F.2d 190, 224 (9th Cir.), *cert. denied,* 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964), is not to the contrary. There we merely denied non-witness accounting fees in an antitrust case; no issue of expert witness fees was presented. As the cases teach, application for expert witness fees should be given "careful scrutiny," and district courts should exercise their discretion "sparingly." *Farmer,* 379 U.S. at 235, 85 S.Ct. at 411. Because the trial court will better be able to evaluate the importance of expert testimony at the conclusion of the trial, we further hold that prior application and approval of an enhanced fee for the expert's testimony is not required.

The district court made no finding regarding allowance of expert fees, so it is impossible to determine whether the court denied the fees in the exercise of its discretion considering the factors discussed *supra,* or on the basis that the City did not make prior application, or under the belief that enhanced expert fees were not allowable. We therefore vacate the district court's denial of additional expert fees and remand this issue for the court to make a finding and exercise its discretion consistent with this opinion.

**B. Fees of Experts Deposed by Others**

The City also contends that the district court abused its discretion in requiring each party to pay its own experts when other parties deposed those experts. The City asked the court for a protective order requiring Envirotech to pay the City's experts for preparing for and attending Envirotech's depositions. The court denied the motion and required each party in the interim to pay its own experts for depositions by other parties. The court indicated that the matter would be resolved at the conclusion of the case in connection with the **\*879** taxation of costs. The court ultimately denied the City's claim for expert fees, including those associated with the experts' depositions. Envirotech does not deny that the City's claim falls within the purview of Fed.R.Civ.P. 26(b)(4)(C), but rather argues that each party had several experts and it would make no sense to award the City's deposition fees on appeal without awarding the other parties their fees as well.

**Standard of Review**

The question of whether a type of cost is allowable under the rules is a question of law which we review de novo. *McConney,* 728 F.2d at 1202. The amount of costs awarded is reviewed for an abuse of discretion. *Moore v. Hughes Helicopters, Inc.,* 708 F.2d 475, 486 (9th Cir.1983).

**Discussion**

Fed.R.Civ.P. 26(b)(4) authorizes the deposition of experts, and subdivision 26(b)(4)(C) specifically provides:

> Unless manifest injustice would result, (i) the court **shall** require that the party seeking discovery pay **the expert** a reasonable fee for time spent in responding to discovery....

Fed.R.Civ.P. 26(b)(4)(C) (emphasis added). The purpose of the rule is to avoid the unfairness of requiring one party to provide expensive discovery for another party's benefit without reimbursement. 4 J. Moore, J. Lucas, & G. Grotheer, Jr., *Moore's Federal Practice,* ¶ 26.66[5] (2d ed. 1984). The language of the rule is mandatory ("shall"), unless manifest injustice would result. The Advisory Committee Notes explain that the court may decline to award expenses if it finds that manifest injustice would result. Fed.R.Civ.P. 26(b)(4)(C), Notes of Advisory Committee, 1970 Amendment.

[14][15][16] In this case, the district court made no findings and provided no explanation as to the reason it denied expert deposition costs. Before it refuses to order a deposing party to pay the other

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

party's expert, the district court must make a finding of manifest injustice. In the absence of such a finding, the district court erred in refusing to award the City's expert deposition costs. Neither the rule nor the Advisory Notes make a distinction between prevailing and other parties. Thus, it would seem that Envirotech should also benefit from any reconsideration by the district court, and be reimbursed for the reasonable fees incurred for any deposition of its own experts taken by the City, absent findings of manifest injustice. We reverse and remand so that the court may award the City and Envirotech their expert deposition costs, unless the court articulates findings of manifest injustice.

### VII. ATTORNEY FEES

[17] Envirotech argues that the district court erred in awarding the City attorney fees pursuant to Idaho Code § 12-120(2) (1979) (§ 12-120(3) as amended), because that section applies only to contract actions "relating to purchase or sale of goods." Our holding that the contract was for the sale of goods as defined by the Idaho UCC disposes of that contention. We affirm the award of attorney fees.

The City claims attorney fees on appeal pursuant to Idaho Code § 12-120(2), which provides:

In any civil action to recover on ... [a] contract relating to the purchase or sale of goods, ... the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs.

In *McKee Brothers Ltd. v. Mesa Equipment, Inc.,* 102 Idaho 202, 203, 628 P.2d 1036, 1037 (1981), the Idaho court awarded attorney fees on appeal under this statute.

[18] Federal courts must follow state law as to attorney fees in diversity actions. *See Interform Co. v. Mitchell,* 575 F.2d 1270, 1280 (9th Cir.1978) (applying Idaho law).

[19] Because we have concluded that the contract at issue is for the sale of goods, and as the City

has substantially prevailed on these appeals, we hold that the City is entitled to its reasonable attorney fees on appeal under Idaho Code § 12-120(2). Because in any event it is necessary**880** to remand, we request that the district court assess appropriate fees for the appeal.

### CONCLUSION

We conclude that ancillary and pendent jurisdiction supported the City's third-party claims in the district court, and affirm the district court's jurisdictional ruling. We also hold that the court did not abuse its discretion in retaining the case once the underlying federal action was settled. We affirm the district court's holdings that the contract was not modified by the Pre-bid Submittal and guarantee letter, that the Uniform Commercial Code is applicable to the contract, and that attorney fees should be awarded the City under Idaho Code § 12-120(2).

We hold, however, that the court's ruling that the contract provided the City with an exclusive remedy is erroneous. We remand for a partial new trial to permit the City to seek its other remedies under the Idaho UCC. We also vacate the district court's collateral source rule holding, and remand this issue for reconsideration during the partial new trial. We further hold that the court did not abuse its discretion in denying the City's motion to amend its complaint to add punitive damages.

We hold that the district courts in this circuit have the discretion in exceptional cases to award expert witness fees in addition to the statutory $30 per day witness fee authorized by 28 U.S.C. § 1821(b). We remand so the district court may exercise its discretion consistent with this opinion. We further hold that the court erred in refusing to award expert deposition costs. On remand, absent manifest injustice, the district court should award both the City and Envirotech their reasonable expert witness fees incurred as a result of the opposing party's discovery depositions. Finally, we award the City its costs and reasonable attorney fees on appeal as provided by Idaho statute, and request the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937, 2 UCC Rep.Serv.2d 1324
**(Cite as: 806 F.2d 862)**

district court to determine that award.

    AFFIRMED IN PART, REVERSED AND RE-MANDED IN PART.

C.A.9 (Idaho),1986.
U.S. v. City of Twin Falls, Idaho
806 F.2d 862, 25 ERC 1346, 6 Fed.R.Serv.3d 937,
2 UCC Rep.Serv.2d 1324

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

653 N.E.2d 1218                                                                    Page 1
100 Ohio App.3d 270, 653 N.E.2d 1218
**(Cite as: 100 Ohio App.3d 270, 653 N.E.2d 1218)**

C

Court of Appeals of Ohio,
Second District, Montgomery County.

BEERMAN REALTY COMPANY, Appellant,
v.
ALLOYD ASBESTOS ABATEMENT COM-
PANY, Appellee.

No. 14650.
Decided Jan. 11, 1995.

Following imposition of civil penalties against building owner under Clean Air Act (CAA), owner brought action against asbestos removal contractor for breach of contract and unjust enrichment, requesting indemnification for civil penalty and attorney fees incurred in defense of action in which civil penalties were assessed. The Court of Common Pleas, Montgomery County, sustained summary judgment motion against owner, and owner appealed. The Court of Appeals, Brogan, J., held that building owner is not entitled to seek indemnity on common-law grounds from contractor for civil penalty imposed upon owner under CAA.

Affirmed.

Frederick N. Young, J., filed concurring opinion.

Fain, J., filed dissenting opinion.

West Headnotes

**[1] Indemnity 208 ⟁74**

208 Indemnity
   208III Indemnification by Operation of Law
      208k73 Scope and Extent of Liability
         208k74 k. In General. Most Cited Cases
   (Formerly 208k13.1(2.1))
   Building owner may not seek, on common-law grounds, indemnity from contractor for civil penal-

ties assessed under Clean Air Act (CAA), as indemnification for civil penalties would violate public policy and contravene purpose of CAA; if building owner could escape liability by merely contracting with another party for removal of asbestos, then owner would have no incentive to act responsibly in disposing of his building by choosing dependable contractor and taking measures to adequately supervise work. Clean Air Act, §§ 112, 113, as amended, 42 U.S.C.A. §§ 7412, 7413.

**[2] Environmental Law 149E ⟁296**

149E Environmental Law
   149EVI Air Pollution
      149Ek296 k. Penalties and Fines. Most Cited Cases
   (Formerly 199k25.6(9) Health and Environment)
   In civil penalty action under Clean Air Act (CAA), it is not valid defense that defendant merely owned building and contracted with another party for removal of asbestos; both parties may be sued by Environmental Protection Agency (EPA) for civil penalties. Clean Air Act, §§ 112, 113, as amended, 42 U.S.C.A. §§ 7412, 7413.

**[3] Indemnity 208 ⟁75**

208 Indemnity
   208III Indemnification by Operation of Law
      208k73 Scope and Extent of Liability
         208k75 k. Costs and Expenses. Most Cited Cases
   (Formerly 208k13.3)
   Allowing indemnity for attorney fees incurred in defending against civil penalty action under Clean Air Act (CAA) would have violated public policy; it would have been inharmonious to disallow indemnification for civil penalty while allowing indemnification for fees incurred in connection with that penalty. Clean Air Act, §§ 112, 113, as amended, 42 U.S.C.A. §§ 7412, 7413.

**[4] Costs 102 ⟁194.25**

102 Costs
   102VIII Attorney Fees
     102k194.24 Particular Actions or Proceedings
       102k194.25 k. In General. Most Cited Cases

Building owner against whom civil penalties were assessed in action under Clean Air Act (CAA) failed to establish applicability of any exception to general rule that when multiple parties are defendants in litigation, each bears costs of his or her own defense. Clean Air Act, §§ 112, 113, as amended, 42 U.S.C.A. §§ 7412, 7413.

**[5] Indemnity 208 ⬅35**

208 Indemnity
   208II Contractual Indemnity
     208k34 Scope and Extent of Liability
       208k35 k. In General. Most Cited Cases
     (Formerly 208k9(1))

Building owner could have sought indemnification from asbestos removal contractor, had there been contractual indemnification provision, for civil penalties assessed against owner under Clean Air Act (CAA). Clean Air Act, §§ 112, 113, as amended, 42 U.S.C.A. §§ 7412, 7413.

**\*\*1218 Concurring Opinion**
John Henry Phillips, Cincinnati, for appellant.

Gary W. Auman and Matthew D. Stokely, Dayton, for appellee.

BROGAN, Judge.

Appellant Beerman Realty Co. ("Beerman") appeals from the decision of the Montgomery County Court of Common Pleas sustaining a summary judgment motion against \*\*1219 it. Beerman raises three assignments of error on appeal, asserting that the trial court's decision was contrary to law.

This case arises from two asbestos removal projects conducted in Dayton, Ohio. Beerman, a real estate management company, owns and operates several buildings in the Dayton area, including two buildings which Beerman planned to have demolished. Alloyd Asbestos Abatement Company ("Alloyd") is a corporation in the business of removing asbestos from buildings.

On September 28, 1987, Beerman entered into a contract with Cornett Trucking Company to demolish a building at 22-34 East Third Street in Dayton, Ohio. \*272 Cornett subcontracted with Alloyd to remove the asbestos from the building in accordance with Environmental Protection Agency ("EPA") standards prior to the demolition. The record does not contain a copy of the subcontract.

On November 16, 1988, Beerman contracted directly with Alloyd to remove asbestos from a building located at 14 South Main Street to prepare the building for demolition. That contract specified the location of the asbestos to be removed and required the removal to be done in accordance with applicable EPA regulations.

Subsequent to Alloyd's removal of asbestos from the building sites, inspectors from the Regional Air Pollution Control Agency inspected both buildings and found violations of environmental laws and regulations. The alleged violations included failing to ensure that friable asbestos materials which had been removed remained wet until disposal, and also failing to remove friable asbestos from the building prior to its demolition.

As a result of the violations, the federal EPA filed a civil action against Beerman and Alloyd in United States District Court for violation of the Clean Air Act, Sections 7412-7413, Title 42, U.S.Code, and violation of the federal regulations for the removal of asbestos, the National Emission Standards of Hazardous Air Pollutants ("NESHAP"), Section 61.147, Title 40, C.F.R.[FN1] As relief, the EPA sought enjoinment of future violations and the assessment of civil penalties against both Beerman and Alloyd individually.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

100 Ohio App.3d 270, 653 N.E.2d 1218
**(Cite as: 100 Ohio App.3d 270, 653 N.E.2d 1218)**

FN1. Pursuant to Section 112 of the Clean Air Act, Section 7412, Title 42, U.S.Code, the Administrator of the EPA is required to develop NESHAP. A violation of a NE-SHAP standard constitutes a violation of the Clean Air Act. Section 7412, Title 42, U.S.Code.

The EPA subsequently settled its claim against Beerman, which agreed to pay a $10,000 civil penalty to the government as part of the settlement. At the time of the trial court's decision in this case, the EPA had also settled its claim against Alloyd, contingent upon Alloyd's paying a civil penalty of an undisclosed amount pending entry of a consent decree. Neither Beerman nor Alloyd admitted any liability as part of their respective settlements with the EPA.

On September 27, 1993, Beerman filed a complaint in the Montgomery County Court of Common Pleas against Alloyd for breach of contract and unjust enrichment. In its first two causes of action, Beerman alleged that it had suffered damages as a result of Alloyd's breach of contract for the asbestos removal at both building sites. Beerman requested indemnification for the $10,000 civil penalty it had paid to the government, as well as the attorney fees of approximately $53,000 incurred by Beerman in defense of the EPA action. In its third cause of action, Beerman alleged that Alloyd had been unjustly enriched by being paid additional amounts over the contract price to finish removing asbestos *273 from the South Main Street building after the violations were discovered. Beerman sought to recover the additional $3,000 it paid Alloyd to remove the asbestos in compliance with the federal regulations.

On April 29, 1994, Beerman filed a motion for partial summary judgment on the issue of Alloyd's liability for the breach of contract and unjust enrichment claims. On the same date, Alloyd filed a motion for partial summary judgment on the issue of recoverability of attorney fees.

On May 27, 1994, the trial court sustained Alloyd's motion for summary judgment and overruled Beerman's motion for summary judgment. In so doing, the trial court made the following findings: (1) Beerman's attorney**1220 fees were not recoverable under Ohio's general rule that when "multiple parties are defendants in litigation, each bears the cost of his or her own defense"; (2) Beerman's claim for recovery of the $10,000 civil penalty was actually a claim for implied indemnity, which was unenforceable because such indemnity contravenes the public policy underlying the Clean Air Act to impose strict liability on both owners and operators of demolition sites; and (3) genuine issues of material fact existed as to whether Alloyd was liable to Beerman for its unjust enrichment claim because the parties' intentions regarding the contract needed to be resolved.

Beerman subsequently dismissed its claim for unjust enrichment without prejudice in order to immediately appeal the trial court's decision regarding the recoverability of the civil penalty and attorney fees. Beerman then filed a timely notice of appeal.

[1] Beerman raises three assignments of error on appeal, claiming that the trial court's decision was contrary to law. As its first assignment of error, Beerman raises the following:

"I. The trial court erred in holding that Beerman is not entitled to indemnification from Alloyd."

In support of this assignment of error, Beerman argues that the public policy underlying the Clean Air Act does not prohibit indemnification for civil penalties and, thus, Beerman should be entitled to proceed with its action for common-law indemnification against Alloyd. In opposition, Alloyd argues that the trial court correctly held that public policy prohibits indemnification for civil penalties under the Clean Air Act because the statute imposes strict liability on both owners and operators of demolition sites for violations of the Act.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

100 Ohio App.3d 270, 653 N.E.2d 1218
**(Cite as: 100 Ohio App.3d 270, 653 N.E.2d 1218)**

In this case, Beerman, the owner of the buildings, and Alloyd, the operator of the asbestos removal operation, were both sued for individual civil penalties by the EPA. Neither party disputes that each was independently liable for these penalties. It is well established that more than one party at a de-molition site may be fined **\*274** for environmental violations. The regulations clearly apply to both owners and operators of demolition operations and each violating party may be fined. See *United States v. Geppert Bros., Inc.* (E.D.Pa.1986), 638 F.Supp. 996.

[2] In *Geppert Bros.,* the United States brought a civil penalty action against both the building owner and the asbestos removal contractor. The trial court struck the building owner's affirmative defense that he had contracted with the removal company to remove the asbestos in accordance with the EPA standards and thus should not be held personally liable for any violations. The court held that both the building owner and the contractor were individually liable for the violations. Thus, in a civil penalty action, it is not a valid defense that the defendant merely owned the building and contracted with another party for the removal of the asbestos. Both parties may be sued by the EPA for civil penalties. In the present case, Beerman did not attempt to assert an affirmative defense in the original penalty action but, instead, has brought a subsequent action for indemnification. Unfortunately, *Geppert Bros.* does not address the issue of whether an indemnification action may be brought.

The issue for our resolution is whether a building owner may seek indemnification for civil penalties assessed against him under the federal Clean Air Act. The Clean Air Act and the asbestos NE-SHAP are silent on the issue of whether a party may seek indemnification for civil penalties assessed pursuant to the Act. The statutes neither grant a right of indemnification nor prohibit it. Neither party has cited case law directly addressing the question of whether indemnification for civil penalties under the Clean Air Act would violate the

public policy underlying the Act, and we likewise have found none. Further, we find that the cases cited by the parties in support of their respective positions are clearly distinguishable from the present case.

First, Beerman argues that *United States v. Gen. Dynamics Corp.* (N.D.Tex.1991), 755 F.Supp. 720, stands for the proposition that indemnification is allowed in an environmental civil penalty action. However, we find that case to be distinguishable. In *General Dynamics,* the indemnification was allowed for civil penalties assessed pursuant to violation**\*\*1221** of a *state* environmental law, not the federal regulations. Further, the trial court did not address the public policy underlying the statute or whether the purpose of the statute would be defeated by allowing indemnification.

Alloyd cites *Geppert Bros.* in support of its argument that indemnification should not be allowed. As discussed above, we find that the *Geppert Bros.* case is also distinguishable. The court in *Geppert Bros.* does not address the specific issue of indemnification.

**\*275** We have found only two cases which address the specific issue of indemnification in a civil penalty action under the Clean Air Act. However, both cases arise in the context of a cross-claim in the original federal penalty action. Further, the cases do not reach the issue of whether such indemnification violates public policy because the respective trial courts in those cases decided the issue on other grounds. See *United States v. R.E.A.G.* (D.Conn.1989), 730 F.Supp. 482; *United States v. Bank IV Kansas, N.A.* (Dec. 23, 1993), D.Kan. No. 93-2315-JWL, unreported, 1993 WL 545224. Thus, neither case is instructive as to the resolution of the present case.

As no controlling authority exists, we next turn to the underlying purposes of the Clean Air Act to determine whether they would be defeated by allowing a building owner who has been forced to pay civil penalties for violations of that statute to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

receive indemnification for those penalties. The main purpose of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." Section 7401(b)(1), Title 42, U.S.Code. To achieve this purpose, the legislators drafted the civil penalty provision to provide strict liability for violations of the Act:

"[T]he Act and the asbestos NESHAP provide strict liability for civil violations of their provisions. This reading is supported by the language of the Act, the legislative history of the Act and cases construing the Act and emission standards promulgated thereunder. Strict liability is essential to meet the purpose of the Act to protect and improve the quality of the nation's air." *United States v. Ben's Truck & Equip., Inc.* (E.D.Cal.1986), 25 Envt.Rept.Cas. (BNA) 1295, 1298, 1986 WL 15402.

Courts have consistently held that the civil penalty provision imposes strict liability on both owners and operators. *Id.; Geppert Bros., supra; United States v. Hugo Key & Son, Inc.* (D.R.I.1989), 731 F.Supp. 1135; *United States v. Tzavah Urban Renewal Corp.* (D.N.J.1988), 696 F.Supp. 1013.

The specific purpose of imposing strict liability on the building owner is to ensure that "owners of property act responsibly in disposing of their buildings. The regulations prevent the owner of a building from avoiding liability for hazardous substances present in a building by merely contracting with another party to demolish the building." *Geppert Bros., supra,* 638 F.Supp. at 1000. This specific purpose is obviously undermined by allowing a building owner to recover the civil penalty imposed, for if the building owner may escape liability by merely contracting with another party for the removal of the asbestos, then the owner has no incentive to act responsibly in disposing of his building by choosing a dependable contractor and taking measures to adequately supervise the work.

**\*276** At first glance, it may appear that the

building owner would still be encouraged to seek a reputable, dependable asbestos removal company even if indemnification were allowed. It may be argued that the owner would still be inconvenienced by having to bring a subsequent action in state court to recover the penalty, paying attorney fees and costs for the indemnification action, and foregoing the use of the money he has paid for the civil penalty until he recovers it, which potentially could take months or years.

However, in reality, most owners would likely not suffer these inconveniences because they would not wait to assert a later state court action for indemnification. Instead, they could simply assert a cross-claim against the contractor in the federal action. See *R.E.A.G., supra; Bank IV Kansas, supra.* Thus, the entire matter would be resolved in the same action, and the owner would have little incentive to ensure compliance**\*\*1222** with the provisions of the Act because, although he might be primarily liable to the government for the original payment of the civil penalty, he could recover any penalty assessed against him in the same action.

Further, the legislative history of the civil penalty provision of the Clean Air Act is also instructive. Although indemnification was not specifically addressed, the committee developing the provision specifically discussed the issue of whether to impose penalties only for "knowing" violations or to impose them for all violations. H.R.Rept. No. 94-1175, 94th Cong., 2d Sess., 52-55 (1976). In deciding to impose strict liability even for accidental violations, the committee noted:

"[W]here protection of the public health is the root purpose of a regulatory scheme (such as the Clean Air Act), persons who own or operate pollution sources in violation of such health regulations must be held strictly accountable. This rule of law was believed to be the only way to assure due care in the operation of any such source. Any other rule would make it in the owner or operator's interest not to have actual knowledge of the manner of operation of the source. Moreover, in the Committee's

100 Ohio App.3d 270, 653 N.E.2d 1218
**(Cite as: 100 Ohio App.3d 270, 653 N.E.2d 1218)**

view, the public health is injured just as much by a violation due to negligence or inaction as it is by a violation due to intent to circumvent the law. Thus, the Committee believes that the remedial and deterrent purposes of the civil penalty provision would be better served by not limiting its application to 'knowing' violations.

"Fourth, *the Committee intends to permit any argument about the violator's knowledge, intent, negligence, or culpability to be considered by the courts in deciding how much to fine any violator, rather than in determining whether any enforcement action can be brought in the first place.*" (Emphasis added.) H.R.Rept. No. 94-1175, 94th Cong., 2d Sess., at 53.

**\*277** Thus, it seems that the legislature intended to impose a harsh regulatory scheme to ensure compliance with the Act. As stated above, the legislature intended for the federal court to consider Beerman's good faith attempt to comply with the requirements in assessing the amount of the penalty. However, it seems clear that the legislature did not intend to allow an owner to escape all liability even where the owner has attempted to comply.

The legislature recognized that the imposition of the penalty on seemingly innocent parties may produce a harsh result, but reasoned that such a measure was necessary to comply with the purposes of the Act:

" '[T]he Act imposes not only a positive duty to seek out and remedy violations when they occur but also, and primarily, a duty to implement measures that will insure that violations will not occur. The requirements of foresight and vigilence [*sic* ] imposed on responsible corporate agents are beyond question demanding, and perhaps onerous, but they are no more stringent than the public has a right to expect of those who voluntarily assume positions of authority in business enterprises whose services and products affect the health and well-being of the public that supports them.' " H.R.Rept. No. 94-1175, 94th Cong., 2d Sess., at 53-54, quot-

ing *United States v. Park* (1975), 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489.

Further, the legislature specifically addressed measures which could be taken by parties such as building owners to avoid liability for accidental violations:

"In many instances, proper quality control, maintenance, inspection, monitoring, repair, personnel tests, or other measures can prevent or minimize the likelihood of such accidental violations. The omission or inadequate execution of such prophylactic measures would be a proper basis for enforcement under title I or title II of the Act (as appropriate) just as surely as an intentional violation." H.R.Rept. No. 94-1175, 94th Cong., 2d Sess., at 54.

In the present case, there is no indication that Beerman did anything to ensure compliance other than contract with a company to have the asbestos removed. Although other compliance measures, such as having another company monitor the asbestos removal work or inspect the result, may be expensive and seem unduly burdensome, it seems clear that the legislature intended for such drastic measures to be taken by building owners to ensure compliance.

**\*\*1223** Upon reviewing the legislative history of the civil penalty provisions of the Act and case law interpreting the purpose, we find that allowing indemnification for civil penalties would violate the public policy and contravene the purpose of the Clean Air Act. The legislature recognized that the provision was harsh, but **\*278** apparently found that the important purpose of the Act required such a strict result.

Our finding is strengthened by analogy to the Clean Water Act. Courts have previously recognized that parity exists between the penalty provisions of the Clean Air Act and the Clean Water Act. See *United States v. A.A. Mactal Constr. Co.* (Apr. 10, 1992), D.Kan. No. 89-2372-V, unreported, 1992 WL 245690. In several cases, federal courts

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

100 Ohio App.3d 270, 653 N.E.2d 1218
**(Cite as: 100 Ohio App.3d 270, 653 N.E.2d 1218)**

have held that indemnification for civil penalties under the Clean Water Act is not allowed. See Annotation (1981), 55 A.L.R.Fed. 141, 178, Section 18. One district court, holding that such indemnification was not allowed, reasoned that "[t]he absence of a third party defense in this penalty provision, the language of the statutes, and the purposes of the various remedies supplied to the Government, lead to the conclusion that no indemnity right was contemplated for the penalty imposed." *Tug Ocean Prince, Inc. v. United States* (S.D.N.Y.1977), 436 F.Supp. 907, 926; see, also, *United States v. Tex-Tow, Inc.* (C.A.7, 1978), 589 F.2d 1310; *Montauk Oil Transm. Corp. v. Tug "El Zorro Grande"* (June 15, 1993), S.D.N.Y. No. 5513, unreported, 1993 WL 213037. We find the reasoning in these cases to be persuasive. Under the Clean Air Act, there is no provision for a third-party defense to the civil penalties. Further, the legislative history of the Act and case law interpreting the Act indicate that the legislature intended to impose a harsh and strict penalty. Although we recognize that not allowing indemnification may seem to impose an unfair burden on a building owner who has attempted to comply with the provisions, we find that the underlying purpose of the statute dictates such a result.

It is well established that indemnification will not be allowed if such indemnification violates public policy. See *Worth v. Aetna Cas. & Sur. Co.* (1987), 32 Ohio St.3d 238, 513 N.E.2d 253; *Cincinnati Ins. Co. v. Diebold, Inc.* (1989), 64 Ohio App.3d 273, 581 N.E.2d 566.

Accordingly, we find that, because allowing a subsequent action for indemnification for the recovery of a civil penalty contravenes public policy, Beerman is not entitled to pursue its indemnification claim in this case. Appellant's first assignment of error is overruled.

[3] As its second assignment of error, Beerman raises the following:

"II. The trial court erred in holding that Beerman could not recover its attorneys' fees."

In support of this assignment of error, Beerman argues that, under implied indemnification, it should be allowed to recover the attorney fees it incurred in defending against the civil penalty action as a result of Alloyd's alleged breach of contract. Alloyd argues that no such indemnification should be allowed.

**\*279** In light of our resolution of the first assignment of error, we find that allowing indemnification for the attorney fees incurred in defending against the civil penalty action would also violate public policy. We find it inharmonious to disallow indemnification for the civil penalty while allowing indemnification for the fees incurred in connection with that penalty.

[4] Moreover, "[i]t is the general rule in this state that when multiple parties are defendants in litigation, each bears the costs of his or her own defense." *Krasny-Kaplan Corp. v. Flo-Tork, Inc.* (1993), 66 Ohio St.3d 75, 609 N.E.2d 152. Although significant exceptions to this rule exist, Beerman has not demonstrated that any of them apply to the present case.

Beerman's second assignment of error is overruled.

As its third assignment of error, Beerman raises the following:

"III. The trial court erred by not granting Beerman's motion for summary judgment as to liability against Alloyd for breach of contract."

**\*\*1224** In support of this assignment of error, Beerman argues that no genuine issues of material fact exist regarding whether Alloyd breached its contract to remove asbestos from the buildings.

We find it unnecessary to consider this assignment of error. In our disposition of Beerman's first and second assignments of error, we found that Beerman would not be entitled to recover the civil penalty or the attorney fees regardless of whether Alloyd had actually breached the contract. Addi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

100 Ohio App.3d 270, 653 N.E.2d 1218
**(Cite as: 100 Ohio App.3d 270, 653 N.E.2d 1218)**

tionally, Beerman has voluntarily dismissed its claim against Alloyd for unjust enrichment. Accordingly, Beerman's third assignment of error is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

YOUNG, J., concurs.

FAIN, J., dissents.

FREDERICK N. YOUNG, Judge, concurring.

[5] I write separately to note my concurrence with both (a) the well-reasoned opinion of Judge Brogan that for reasons of public policy a building owner is not entitled to seek *on common-law grounds* indemnity from a contractor for a civil penalty imposed on the owner for violations of the Clean Air Act and (b) the *280 dissenting opinion of Judge Fain that the operation of the marketplace should allow indemnification *on contract grounds* from a contractor that has agreed to indemnify the building owner. In the latter case, the owner has presumably paid a premium for that indemnity agreement and has every incentive to award the contract to a financially sound, and therefore more likely successful, contractor. By the same token, a contractor that offers indemnification to an owner has a greater incentive to perform the contract properly under the strictures of the Clean Air Act than if it were not held to account for both its own liability and the owner's liability.

The public policy behind the Clean Air Act would be even better served if contractual indemnification is allowed because of the added incentive for the owner to find a responsible contractor and the increased incentive for a contractor to do the job properly. Those incentives do not exist if the owner can obtain a common-law indemnity or the contractor is irresponsible financially or otherwise. Because I find no contractual indemnification provision in the record before us, affirmance is the proper decision.

FAIN, Judge, dissenting.

In my view, public policy does not clearly preclude an owner from obtaining indemnification from an asbestos removal company when the latter's breach of a contract with the owner proximately causes the imposition of a civil penalty against the owner. Because the marketplace is traditionally the preferred arena for finding the most economically efficient way in which to accomplish an objective, I would not restrict the parties' freedom to contract in the absence of a clear public policy basis for doing so.

*Tug Ocean Prince, Inc. v. United States* (S.D.N.Y.1977), 436 F.Supp. 907, involved the Clean Water Act, which I concede to be analogous to the Clean Air Act. In that case, the trial court elected to remand the cause to the United States Coast Guard for consideration of the mitigation of an owner's liability because of diminished culpability, rather than to impose indemnification against the operator who caused the spill. The trial court seems to have held that indemnification was not provided for by the Clean Water Act, rather than that indemnification as a matter of express or implied contract would violate public policy.

In *United States v. Tex-Tow, Inc.* (C.A.7, 1978), 589 F.2d 1310, 1314-1315, the court expressly disclaimed making any decision with respect to an owner's indemnification by a third party. The court merely held that an owner is strictly *281 liable for the civil penalty, even though the violation may have been caused by an independent actor.

The public's interest in safe, effective removal of asbestos from buildings containing it is best served by allowing companies specializing in asbestos removal to compete freely in the marketplace, to assure owners, as part of that competition, that they can safely and effectively accomplish the removal of **1225 asbestos, and to back up that assurance with an agreement to indemnify the owner for any liability which it may incur as a result of the job's not being properly done. Preventing indemnification restricts freedom of contract, and, in my view, interferes with the ability of the marketplace

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

100 Ohio App.3d 270, 653 N.E.2d 1218
**(Cite as: 100 Ohio App.3d 270, 653 N.E.2d 1218)**

to establish and to identify those companies that can safely and effectively remove asbestos from older buildings.

It is true that the availability of indemnification as a possible offset to an owner's liability for a civil penalty will have a tendency to reduce the owner's incentive once he has found an asbestos removal company in good financial standing. But, by the same token, the ability of the asbestos removal company to offer indemnification to the owner will enhance the incentive of the asbestos removal company to do a good job, and it is in the best position to ensure that the asbestos is removed safely and effectively. I find no clear public policy in favor of restricting the ability of a company like Alloyd to offer the owner of a building indemnification for any liability to which the owner may be exposed as a result of the job of asbestos removal being improperly performed.

I would reverse the summary judgment in favor of Alloyd, and remand this cause for a trial on both the issue of Alloyd's liability for indemnification of the civil penalty imposed against Beerman, and the issue of Alloyd's liability for the attorney fees incurred by Beerman in defense of the action against it for the civil penalty. In my view, a reasonable jury might find both components of liability to have been reasonably foreseeable as consequential damages as a result of Alloyd's alleged breach of contract.

Ohio App. 2 Dist.,1995.
Beerman Realty Co. v. Alloyd Asbestos Abatement Co.
100 Ohio App.3d 270, 653 N.E.2d 1218

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

955 F.Supp. 1153, 27 Envtl. L. Rep. 20,916
**(Cite as: 955 F.Supp. 1153)**

C

United States District Court,
D. Minnesota,
Fifth Division.

UNITED STATES of America, Plaintiff,
v.
J & D ENTERPRISES OF DULUTH, Defendant.

Civ. No. 5-95-298 (PAM/RLE).
Feb. 5, 1997.

United States brought Clean Air Act (CAA) action against contractor, seeking civil penalties for violations of asbestos removal regulations during demolition of warehouse owned by city. Contractor moved for leave to file third-party complaint against city. The District Court, Erickson, United States Magistrate Judge, held that public policy prohibited indemnification for CAA civil penalties.

Motion denied.

West Headnotes

**[1] Federal Civil Procedure 170A** ⟨⟩**287**

170A Federal Civil Procedure
  170AII Parties
    170AII(G) Bringing in New Parties; Third-Party Proceedings
      170Ak287 k. Liability of Third Party in General. Most Cited Cases
For proper impleader to occur, third-party plaintiff must implead person against whom it can assert claim of joint or secondary liability, that arises out of plaintiff's claim against third-party plaintiff. Fed.Rules Civ.Proc.Rule 14(a), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A** ⟨⟩**287**

170A Federal Civil Procedure
  170AII Parties

    170AII(G) Bringing in New Parties; Third-Party Proceedings
      170Ak287 k. Liability of Third Party in General. Most Cited Cases
Impleader is available only if there is underlying substantive right to pursue claim for relief against third-party defendant. Fed.Rules Civ.Proc.Rule 14(a), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A** ⟨⟩**281**

170A Federal Civil Procedure
  170AII Parties
    170AII(G) Bringing in New Parties; Third-Party Proceedings
      170Ak281 k. In General. Most Cited Cases
State law governs impleader determination, in federal question jurisdiction case, where third-party complaint is not itself based on federal law. Fed.Rules Civ.Proc.Rule 14(a), 28 U.S.C.A.

**[4] Contribution 96** ⟨⟩**1**

96 Contribution
  96k1 k. Nature and Grounds of Obligation. Most Cited Cases
Under Minnesota law, "contribution" allows one to recover proportionate share from other liable party.

**[5] Indemnity 208** ⟨⟩**20**

208 Indemnity
  208I In General
    208k20 k. Nature of Obligation. Most Cited Cases
    (Formerly 208k1)
Under Minnesota law, "indemnity" is right of one party held liable to another to shift entire burden of liability to third party also liable for same harm; unlike contribution, it does not require common liability, but arises out of contractual relationship, either express or implied by law, which required one party to reimburse the other entirely.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

955 F.Supp. 1153, 27 Envtl. L. Rep. 20,916
**(Cite as: 955 F.Supp. 1153)**

**[6] Indemnity 208 ☞59**

208 Indemnity
    208III Indemnification by Operation of Law
        208k56 Right of One Compelled to Pay
Against Person Primarily Liable
          208k59 k. Relative Culpability. Most
Cited Cases
    (Formerly 208k13.2(2), 208k13.2(1))

**Indemnity 208 ☞61**

208 Indemnity
    208III Indemnification by Operation of Law
        208k56 Right of One Compelled to Pay
Against Person Primarily Liable
          208k61 k. Secondary Liability. Most
Cited Cases
    (Formerly 208k13.2(2), 208k13.2(1))

    Under Minnesota law, absent an express contractual provision, indemnity is recognized where one seeking indemnity has only derivative or vicarious liability for damage caused by one sought to be charged, where one seeking indemnity has incurred liability by action at direction, in interest of, and in reliance upon one sought to be charged, and where one seeking indemnity has incurred liability because of breach of duty owed to him by one sought to be charged.

**[7] Indemnity 208 ☞20**

208 Indemnity
    208I In General
        208k20 k. Nature of Obligation. Most Cited
Cases
    (Formerly 208k1)

    Under Minnesota law, indemnification is governed by judicial concepts of equity, and as consequence, indemnity does not lend itself to hard-and-fast rules and its application depends upon particular facts of each case.

**[8] Indemnity 208 ☞20**

208 Indemnity
    208I In General

        208k20 k. Nature of Obligation. Most Cited
Cases
    (Formerly 208k1)

    Under Minnesota law, indemnity is not permitted where its application would contravene public policy.

**[9] Environmental Law 149E ☞284**

149E Environmental Law
    149EVI Air Pollution
        149Ek275 Particular Pollutants
          149Ek284 k. Asbestos. Most Cited Cases
    (Formerly 199k25.6(5.1) Health and Environment)

    Purpose of National Emission Standard for Hazardous Air Pollutant (NESHAP) regulation for asbestos is to ensure that buildings containing asbestos are demolished in such way as to minimize release of asbestos dust into air. Clean Air Act, § 113(b), as amended, 42 U.S.C.A. § 7413(b); 40 C.F.R. § 61.145.

**[10] Indemnity 208 ☞64**

208 Indemnity
    208III Indemnification by Operation of Law
        208k63 Particular Cases and Issues
          208k64 k. In General. Most Cited Cases
    (Formerly 208k15(2))

    Contractor's action for indemnification, so as to secure proportionate share of Clean Air Act (CAA) civil penalties against warehouse owner for asbestos violations during demolition of building, was not cognizable under Minnesota law. Clean Air Act, § 112, as amended, 42 U.S.C.A. § 7412; 40 C.F.R. § 61.145.

**[11] Damages 115 ☞87(1)**

115 Damages
    115V Exemplary Damages
        115k87 Nature and Theory of Damages Additional to Compensation
          115k87(1) k. In General. Most Cited
Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

955 F.Supp. 1153, 27 Envtl. L. Rep. 20,916
**(Cite as: 955 F.Supp. 1153)**

**Damages 115 ☞92**

115 Damages
    115V Exemplary Damages
        115k92 k. Persons for or Against Whom Exemplary Damages May Be Awarded. Most Cited Cases

    Under Minnesota law, public policy is not served by permitting transfer of responsibility for payment of punitive damages to another, as purpose of punitive damages is lost when such damages are paid by another on defendant's behalf.

**[12] Indemnity 208 ☞30(1)**

208 Indemnity
    208II Contractual Indemnity
        208k26 Requisites and Validity of Contracts
            208k30 Indemnitee's Own Negligence or Fault
                208k30(1) k. In General. Most Cited Cases
    (Formerly 208k8.1(1))

    Under Minnesota law, if party is to seek indemnification for its own negligence, there must be express provision in contract to indemnify indemnitee for liability occasioned by its own negligence; such obligation will not be found by implication.

**\*1154** Friedrich A.P. Siekert, Asst. U.S. Atty., Minneapolis, MN, for U.S.

Carrie C. Green, Minneapolis, MN, for J & D Enterprises of Duluth.

ORDER

ERICKSON, United States Magistrate Judge.
    I. *Introduction*
    This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A), upon the Motion of the Defendant J & D Enterprises of Duluth, Inc. ("J & D") for an Order granting it leave to serve a Summons and Third-Party Complaint upon the City of St. Paul, Minnesota ("St.Paul").

    A Hearing on the Motion was conducted on May 30, 1996,[FN1] at which time the Government appeared by Friedrich A.P. Siekert, Assistant United States Attorney, and J & D appeared by Carrie C. Green, Esq.

    FN1. Following the close of the Hearing, we afforded the parties the opportunity to submit supplemental submissions on issues that were raised during the course of oral argument.

    For reasons which follow, we deny the Motion.

II. *Factual Background*
    In this action, the Government seeks to impose civil penalties against J & D for alleged violations of Sections 112 and 114 of the Clean Air Act. See, *Title 42 U.S.C. §§ 7412 and 7414.* The alleged violations occurred in connection with the demolition of an abandoned warehouse, that was owned by St. Paul, and that was located at 923 Shepard Road in St. Paul.

    By way of additional background, on May 26, 1987, St. Paul condemned the warehouse **\*1155** in order to facilitate a proposed expansion of Shepard Road, and the City decided to have the warehouse demolished. After a potential bidder complained about the presence of asbestos, St. Paul inspected the site and obtained samples to determine the presence of asbestos-containing materials. Testing revealed that certain ceiling panels contained asbestos at a "hazardous level." Based upon this testing, St. Paul revised its bid specifications to require, among other things, the removal of the asbestos prior to the start of demolition. Among the five bids that were received by St. Paul, for the demolition of the warehouse, J & D's lump sum bid of $18,420, which included $2,200 for the removal of asbestos, was determined to be the lowest. In August of 1991, St. Paul contracted with J & D to raze the warehouse and, on September 18, 1991, J & D commenced the demolition process.

    According to the Government, in demolishing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

955 F.Supp. 1153, 27 Envtl. L. Rep. 20,916
(Cite as: 955 F.Supp. 1153)

the warehouse, J & D violated a number of the Federal regulations which govern the removal of asbestos. Specifically, the Complaint alleges that J & D failed to provide sufficient notice of the contemplated demolition,[FN2] that it submitted a deficient notice of the demolition after the razing had begun,[FN3] that it failed to remove all of the "Regulated Asbestos Containing Materials ('RACM')" before the demolition was undertaken,[FN4] that it failed to adequately wet the RACM when it was stripped from the warehouse,[FN5] and that it failed to ensure that the RACM remained wet until it was collected and contained.[FN6] In addition, the Government alleges that J & D violated Section 114 of the Act, *Title 42 U.S.C. § 7414,* when it submitted inaccurate answers in response to a formal Request for Information. For relief, the Government seeks civil penalties for each violation, in an amount of up to $25,000 for each day of violation, together with a permanent injunction that would require J & D to fully comply with any pertinent asbestos regulations.

FN2. Title 40 C.F.R. § 61.145(b) requires that "[e]ach owner or operator of a demolition or renovation activity * * * shall: (1)[p]rovide the Administrator with written notice of intention to demolish or renovate."

FN3. Title 40 C.F.R. § 61.145(b)(4) requires a notice of demolition to contain, among other details, the procedure that will be employed to detect the presence of "Regulated Asbestos Containing Materials ('RACM')", the scheduled starting and completion dates for the demolition, and the location of the waste disposal site where the RACM will be deposited.

FN4. Title 40 C.F.R. § 61.145(c)(1) requires each owner or operator of a demolition or renovation activity to "[r]emove all RACM from a facility being demolished or renovated before activity begins that would break up, dislodge, or similarly disturb the

material."

FN5. Title 40 C.F.R. § 61.145(c)(3) requires each owner or operator of a demolition or renovation activity to "adequately wet the RACM" when it is "stripped from a facility component while it remains in place in the facility."

FN6. Title 40 C.F.R. § 61.145(c)(6)(i) requires each owner or operator of a demolition or renovation activity to ensure that RACM, which has been removed or stripped, "remains wet until collected and contained or treated in preparation for disposal."

In the Motion before us, J & D seeks leave from the Court to serve and file a Third-Party Complaint against St. Paul. In the proposed Third-Party Complaint, J & D seeks indemnity for all of the civil penalties that may be assessed in this action, and that arise from the demolition of the warehouse. J & D bases its indemnity claim on each of the following theories: breach of contract, breach of an implied warranty, and negligent misrepresentation. Specifically, the proposed Third-Party Complaint alleges that the contract between St. Paul and J & D delegated the notification and asbestos removal responsibilities to St. Paul; that St. Paul, as the owner of the warehouse, breached its implied warranty of site access; and lastly, that St. Paul negligently misrepresented the scope of the work that was required under the demolition contract.

III. *Discussion*

A. *Standard of Review.* Rule 14(a), Federal Rules of Civil Procedure, provides the procedural mechanism by which a party may assert a Third-Party claim. Rule 14(a) states, in relevant part:

At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint**1156** to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

955 F.Supp. 1153, 27 Envtl. L. Rep. 20,916
**(Cite as: 955 F.Supp. 1153)**

for all or part of the plaintiff's claim against third-party plaintiff. The third-party plaintiff need not obtain leave to make the service if the third-party plaintiff files the third-party complaint not later than 10 days after serving the original answer. Otherwise, the third-party plaintiff must obtain leave on motion upon notice to all parties to the action.

The governing law makes clear that Rule 14(a) should be liberally construed in favor of impleading a third-party, see, *United of Omaha Life Ins. Co. v. Reed*, 649 F.Supp. 837 (D.Kan.1986), as its purpose is to avoid a circuity of actions and a multiplicity of suits, see, *Dixon v. Northwestern National Bank*, 275 F.Supp. 582 (D.Minn.1967), in order that all related claims may be disposed of in one action, *id.; Patten v. Knutzen*, 646 F.Supp. 427 (D.Colo.1986), and thereby simplify, and expedite, the litigation process. *Blais Construction Co., Inc. v. Hanover Square Associates-I*, 733 F.Supp. 149, 152 (N.D.N.Y.1990); *Waylander-Peterson Co. v. Great Northern Ry. Co.*, 201 F.2d 408 (8th Cir.1953).

[1][2] For a proper impleader to occur, the third-party plaintiff must implead a person against whom it can assert a claim of joint or secondary liability, that arises out of the plaintiff's claim against the third-party plaintiff. See, *Erickson v. Erickson*, 849 F.Supp. 453, 456 (S.D.W.Va.1994); *Greene Line Mfg. Corp. v. Fibreboard Corp.*, 130 F.R.D. 397, 399 (N.D.Ind.1990). Otherwise stated, the third-party plaintiff must show that, if it is found to be liable to the plaintiff, then the third-party defendant is, or may be, liable to it. *Resolution Trust Corp. v. Farmer*, 836 F.Supp. 1123, 1129 (E.D.Pa.1993). However, Rule 14 does not itself provide a substantive theory of recovery, for an impleader is available only if there is an underlying substantive right to pursue a claim for relief against the third-party defendant. See, *Kim v. Fujikawa*, 871 F.2d 1427, 1434 (9th Cir.1989); *Green v. United States Department of Labor*, 775 F.2d 964, 971 n. 7 (8th Cir.1985); *Ragusa v. City of Streator*,

95 F.R.D. 527, 528 (N.D.Ill.1982) (impleader improper where governing substantive law did not allow for indemnity or contribution).

B. *Legal Analysis.* Given these precepts, J & D's proposed Third-Party Complaint is proper only if St. Paul "is or may be liable" to J & D for all, or part, of any civil penalties that J & D may be assessed in this action. By its proposed Third-Party Complaint, J & D alleges a right to indemnity from St. Paul. Whether a substantive claim may properly be pursued against a third-party, including one for indemnification, is a substantive rather than a procedural question.

[3] While it is well-established that, in a diversity action, a Federal Court must apply State law in determining whether there is a substantive right to recovery, see, *Leppala v. Sawbill Canoe Outfitters, Inc.*, 361 F.Supp. 409, 410 (D.Minn.1973), "[t]he fact that a case is brought in federal court on the basis of federal question jurisdiction does not mean that state law on indemnification or contribution is irrelevant." 3 J. Moore, *Moore's Federal Practice* ¶ 14.03[3] at 14-25. Indeed, State law governs the impleader determination where, as here, the Third-Party Complaint is not itself based upon Federal law. See, e.g., *Kennedy v. Pennsylvania R.R.*, 282 F.2d 705, 709 (3rd Cir.1960) (in an action commenced under the Federal Employers' Liability Act, State law doctrine of comparative negligence governed the defendant's third-party complaint) Accordingly, whether St. Paul may be liable to J & D for the claims that have been alleged in the Government's Complaint, must be determined under Minnesota's law of indemnification.[FN7]

> FN7. We are mindful that, in certain limited situations, Federal law may allow a claim for contribution or indemnification, either by Congressional creation or through the power of the Federal Courts to fashion a Federal common law remedy. See, e.g., *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 638, 101 S.Ct. 2061, 2065-66, 68 L.Ed.2d 500

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

955 F.Supp. 1153, 27 Envtl. L. Rep. 20,916
**(Cite as: 955 F.Supp. 1153)**

(1981). Here, however, J & D makes clear that its proposed third-party claims are founded solely upon State law. Of course, the lack of a Federal cause of action does not necessarily preclude the existence of State law remedies. *Baker, Watts & Co. v. Miles & Stockbridge,* 876 F.2d 1101, 1106 (4th Cir.1989).

**\*1157** [4][5] Under Minnesota law, "[i]ndemnity and contribution are both remedies based on equitable principles to secure restitution to one who has paid more than his just share of a liability." *Hermeling v. Minnesota Fire & Cas. Co.,* 548 N.W.2d 270, 273 n. 1 (Minn.1996), quoting *White v. Johnson,* 272 Minn. 363, 367, 137 N.W.2d 674, 677 (1965), overruled on other grounds, *Tolbert v. Gerber Indus., Inc.,* 255 N.W.2d 362 (1977). In contrast to contribution, which allows one to recover a proportionate share from the other liable party, "[i]ndemnity is the right of one party held liable to another to shift the entire burden of liability to a third party also liable for the same harm." *Nerenhausen v. Chicago, M., St. P. & Pac. R. Co.,* 479 F.Supp. 750, 756 (D.Minn.1979), citing *Hendrickson v. Minnesota Power & Light Co.,* 258 Minn. 368, 371, 104 N.W.2d 843, 846-47 (1960), overruled on other grounds, *Tolbert v. Gerber Indus., Inc.,* supra. Moreover, unlike contribution, "[i]ndemnity does not require common liability, but arises out of a contractual relationship, either express or implied by law, which requires one party to reimburse the other entirely." *Hermeling v. Minnesota Fire & Cas. Co.,* supra at 273 n. 1.

[6] Minnesota Courts recognize the right to indemnity among joint tortfeasors in four situations, only three of which depend upon an express contractual provision. *Hendrickson v. Minnesota Power & Light Co.,* supra at 373, 104 N.W.2d 843, modified by *Tolbert v. Gerber Indus., Inc.,* supra at 367. Therefore, absent an express contractual provision, indemnity is recognized:

1) Where the one seeking indemnity has only a derivative or vicarious liability for damage

caused by the one sought to be charged;

2) Where the one seeking indemnity has incurred liability by action at the direction, in the interest of, and in reliance upon the one sought to be charged; and

3) Where the one seeking indemnity has incurred liability because of a breach of duty owed to him by the one sought to be charged.

*Tolbert v. Gerber Indus., Inc.,* supra at 367.

According to J & D, each of the three theories of liability, which have been alleged in the proposed Third-Party Complaint, falls within one of the foregoing categorizations.

[7][8] Nevertheless, indemnification is "governed by judicial concepts of equity." *Allum v. MedCenter Health Care, Inc.,* 371 N.W.2d 557, 560 (Minn.App.1985), quoting *Olson v. Village of Babbitt,* 291 Minn. 105, 111, 189 N.W.2d 701, 706 (1971). As a consequence, indemnity "does not lend itself to hard-and-fast rules, and its application depends upon the particular facts of each case." *Zontelli & Sons v. City of Nashwauk,* 373 N.W.2d 744, 744 (Minn.1985). Indemnity is not permitted, however, where its application would contravene public policy. *Id.,* citing *Northern Pacific Railway Co. v. Thornton Bros. Co.,* 206 Minn. 193, 196, 288 N.W. 226, 227 (1939); *Independent School Dist. No. 877 v. Loberg Plumbing & Heating Co.,* 266 Minn. 426, 434, 123 N.W.2d 793, 799 (1963) (contract provisions that violate public policy are void).

Accordingly, we are to determine whether, under Minnesota law, public policy prohibits indemnification for civil penalties under the Clean Air Act. In making this determination, we address the underlying purposes of the Clean Air Act, and then we turn to those Minnesota decisions which have addressed the same, or similar, policy concerns in the context of indemnification.

The purpose of the Clean Air Act is "to protect

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

955 F.Supp. 1153, 27 Envtl. L. Rep. 20,916
**(Cite as: 955 F.Supp. 1153)**

and enhance the quality of the Nation's air resources." *Title 42 U.S.C. § 7401(b)(1).* As a part of a strategy to protect the Nation's air quality, the Act requires the Administrator of the EPA to prescribe an emission standard for asbestos, which Congress has deemed to be a hazardous air pollutant. *Title 42 U.S.C. § 7412(d).* To enforce compliance with these emission standards, Section 113 of the Act gives the Administrator of the EPA authority to commence a civil action to recover civil penalties whenever she finds that an owner or operator violates, or fails to comply with, any National Emission Standard for Hazardous Air Pollutant ("NESHAP") regulation. *Title 42 U.S.C. § 7413(b).* Although the Clean Air *1158 Act is a civil and not a criminal statute, the penalties imposed pursuant to its authority "can be considered quasi-criminal." *U.S. v. Tzavah Urban Renewal Corp.,* 696 F.Supp. 1013, 1021 (D.N.J.1988).

[9] The purpose of the asbestos NESHAP regulation, which is implicated in this case, "is to ensure that buildings containing asbestos are demolished in such a way as to minimize the release of asbestos dust into the air." *United States v. Geppert Bros., Inc.,* 638 F.Supp. 996, 1000 (E.D.Pa.1986). To achieve this purpose, the asbestos NESHAP imposes obligations on both the owner and the operator of the demolition project. For example, in *United States v. Geppert Bros.,* the EPA brought a civil action for violations of the Clean Air Act, which were generated by a demolition project, against both the demolition contractor and the owner of the building. The owner raised, as an affirmative defense, that it could not be liable for the violations because it had contracted with the operator to do the actual work involved in razing the structure. In rejecting this defense, the Court concluded that the regulations were intended to apply to both the owner of the building being razed, and the operator of the demolition project.

Under the Act, the term "owner or operator" is defined as any person "who owns, leases, operates, controls, or supervises the facility being demol-

ished or renovated or any person who owns, leases, operates, controls or supervises the demolition or renovation, or both." *Title 40 C.F.R. § 61.141.*[FN8] As is clear, an organization that has control over an asbestos removal project qualifies as an "operator," as that term is used in the Statute. *Adair v. Troy State University of Montgomery,* 892 F.Supp. 1401, 1409 n. 9 (M.D.Ala.1995).

> FN8. For reasons that are not disclosed in the Record, the Government chose not to seek civil penalties against St. Paul, notwithstanding the City's status as the owner of the warehouse. Of course, there need not be a legal relationship between the plaintiff and the putative third-party defendant in order for the defendant to assert a proper impleader and, therefore, the fact that the Government chose not to seek civil penalties against St. Paul is largely irrelevant to our analysis. See, e.g., *Smithkline Beckman Corp. v. Pennex Products Co.,* 103 F.R.D. 539, 541 (E.D.Pa.1984) ("It is not relevant to the defendant's right to bring in a third-party defendant, that the plaintiff * * * declines to assert a claim against him."), quoting 3 J. Moore, *Moore's Federal Practice* ¶ 14.10 at 14-62.

In furthering the statutory purpose of improving the quality of the Nation's air, the Act, and the asbestos NESHAP, provide strict liability for civil violations. See, e.g., *United States v. B & W Inv. Properties,* 38 F.3d 362, 367 (7th Cir.1994) ("Having been deemed an owner or operator, [defendant] has no valid challenge against application of the Act, regardless of how minimal the company's responsibilities or knowledge might actually have been."), cert. denied, 514 U.S. 1126, 115 S.Ct. 1998, 131 L.Ed.2d 1000 (1995). In this respect, the legislative history, which accompanies the 1977 Amendments to the Clean Air Act, reflects Congress' rationale for establishing a strict liability scheme, as follows:

"[W]here protection of the public health is the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

955 F.Supp. 1153, 27 Envtl. L. Rep. 20,916
**(Cite as: 955 F.Supp. 1153)**

root purpose of a regulatory scheme (such as the Clean Air Act), persons who own or operate pollution sources in violation of such health regulations must be held strictly accountable. This rule of law was believed to be the only way to assure due care in the operation of any such source. Any other rule would make it in the owner or operator's interest not to have actual knowledge of the manner of operation of the source. Moreover, in the Committee's view, the public health is injured just as much by a violation due to negligence or inaction as it is by a violation due to intent to circumvent the law. Thus, the Committee believes that the remedial and deterrent purposes of the civil penalty would be better served by not limiting its application to 'knowing' violations."

*H.R.Rep. No. 94-1175, 94th Cong., 2d Sess. at 52 (1976).*

As demonstrated by the following Committee note, Congress recognized that the imposition of a civil penalty upon an 'unknowing' party might produce a harsh result, but reasoned that such a measure was necessary in order to advance the purposes of the Act:

**\*1159** " '[T]he Act imposes not only a positive duty to seek out and remedy violations when they occur but also, and primarily, a duty to implement measures that will assure that violations will not occur.' "

*Id.* at 53-54, quoting *United States v. Park,* 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975). Without question, Congress intended to impose a strict, regulatory scheme in order to ensure compliance with the strictures of the Clean Air Act.

[10] Given the importance that Congress has placed upon air quality-as reflected by the application of strict liability to offending owners and operators-we conclude that an operator's action for indemnification, so as to secure a proportionate share of a civil penalty against an owner, is not cognizable under Minnesota law. As we have noted, it is

settled Minnesota law that indemnification will not be allowed if its application would violate public policy.

In *Zerby v. Warren,* 297 Minn. 134, 143, 210 N.W.2d 58, 64 (Minn.1973), the Minnesota Supreme Court considered the validity of a contractual indemnity provision in the context of a strict liability, statutory claim. There, in a wrongful death action, the seller of glue sought contractual indemnity from the manufacturer of the product. At issue was a Minnesota Statute that made the sale of intoxicating glue, to a minor, a violation of State law. In the Court's view, the legislature had concluded that, in the interest of the public welfare, minors should not be sold glue which contained specific harmful ingredients. In denying the seller's claim for indemnity, the Court reasoned that "[a]ny agreement which relieves the defendants of the consequences of the violation of the public policy imposed by [the statutory provision] is against public policy." *Id.* at 144, 210 N.W.2d 58. While the Court recognized that a party may contract so as to seek indemnity against its own negligent acts, a contract may not relieve a person from the discharge of an absolute duty that has been imposed by law for the protection of others. *Id.* at 143-44, 210 N.W.2d 58. As with the defendant in *Zerby,* J & D seeks indemnification in an effort to relieve itself from the consequences of having, purportedly, violated a statutory duty that had been imposed for the protection of others. See also, *Blair v. Anik Liquors,* 210 N.J.Super. 636, 645, 510 A.2d 314, 319 (1986) (indemnification for fines resulting from statutory violations violates public policy).

More recently, in *Hutt Consultants v. Const. Maintenance Systems, Inc.,* 526 N.W.2d 62, 65 (Minn.App.1995), the Minnesota Court of Appeals rejected a general contractor's contractual claim, for indemnification against a subcontractor, in order to recoup the benefits that the general contractor was ordered to pay in a workers' compensation proceeding, where the general contractor had violated its statutory duty to acquire workers' compensation in-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

955 F.Supp. 1153, 27 Envtl. L. Rep. 20,916
**(Cite as: 955 F.Supp. 1153)**

surance. In so ruling, the Court explained that, to allow "a general contractor to shift its workers' compensation expenses by means of an indemnification provision would contravene the public policy embodied in the Workers' Compensation Act of requiring employers to bear the burden of their employees' work-related injuries." *Id.* at 65. As the Court viewed the matter, since the legislature, as a matter of public policy, "had already decided who sh[ould] bear the risk of loss," the parties were not free to place that risk on someone else. *Id.* The Court also expressed concern that allowing indemnification might create an incentive for employers to forego the purchase of workers' compensation insurance that is required by State law. *Id.* Likewise, to permit indemnification in this instance would similarly undermine the policies fostered by the Clean Air Act, for Congress concluded that both "owners" and "operators" should be held responsible for ensuring compliance with the asbestos NESHAP. Moreover, allowing J & D to indemnify itself for any strict liability penalties, that should ultimately be imposed, could effectively remove any incentive on J & D's part to comply with the governing air quality regulations.

[11] Our finding, that indemnification would contravene public policy, is strengthened by an analogy to the general rule, under Minnesota law, which bars the insurability of an award of punitive damages. "Because the punitive purpose of punitive *1160 damages is lost when such damages are paid by another on the defendant's behalf, public policy is not served by permitting transfer of the responsibility for payment of punitive damages to another." *Rosenbloom v. Flygare,* 501 N.W.2d 597, 602 (Minn.1993); see also, *Wojciak v. Northern Package Corp.,* 310 N.W.2d 675, 680 (Minn.1981). In recognition of the policy concerns relating to the insurability of punitive damages, the Minnesota Supreme Court, in *Perl v. St. Paul Fire and Marine Ins. Co.,* 345 N.W.2d 209, 215-16 (Minn.1984), denied an attorney's request to be reimbursed, at his insurer's expense, for the fees that he was required to forfeit as a result of his own misconduct. See

also, *St. Paul Fire and Marine Ins. Co. v. Briggs,* 464 N.W.2d 535, 539 (Minn.App.1990) (holding that insurance coverage for nonpayment of taxes is contrary to public policy since corporate officers are under a legal obligation to ensure that corporate taxes are paid), rev. denied (Minn., March 15, 1991). These same policy concerns militate against J & D's request to be indemnified for any penalties that it should be assessed for violating the prohibitions of the Clean Air Act.

[12] Also supportive of our conclusion, that Minnesota law provides J & D with no substantive basis for an indemnity claim against St. Paul, is the absence of any operative provision for contractual indemnity for J & D's own wrongdoing. In *Tolbert v. Gerber Indus., Inc.,* supra at 367, the Court rejected the previously recognized doctrine, which had permitted a claim for indemnity where the party seeking reimbursement had incurred liability because of its failure, even though negligent, to discover or prevent the misconduct of the one against whom reimbursement was being sought. After *Tolbert,* if a party is to seek indemnification for its own negligence, "there must be an express provision in the contract to indemnify the indemnitee for liability occasioned by its own negligence; such an obligation will not be found by implication." *Farmington Plumbing v. Fischer Sand and Aggregate, Inc.,* 281 N.W.2d 838, 842 (Minn.1979); see also, *Barr/Nelson, Inc. v. Tonto's, Inc.,* 336 N.W.2d 46, 53 (Minn.1983) ("There is no implied right of indemnity for one's own wrongful conduct."). According to the Court in *Farmington Plumbing,* the preclusion of an implied right of indemnity, for one's own wrongful conduct, "is consistent with the policy expressed in *Tolbert v. Gerber Indus., Inc.,* supra, that each tortfeasor accept responsibility for damages commensurate with its own relative culpability." *Id.* at 842.

Of course, in denying J & D's request to commence an indemnity claim against St. Paul, we assume, but without deciding, that the allegations of the proposed Third-Party Complaint are true. Nev-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

955 F.Supp. 1153, 27 Envtl. L. Rep. 20,916
**(Cite as: 955 F.Supp. 1153)**

ertheless, even if J & D had relied upon St. Paul's representations and contractual obligations to its own detriment, the Clean Air Act places the responsibility on both "owners" and "operators" to ensure compliance with the Act. While we recognize that J & D does not request indemnification "for its own negligence," we conclude that the reasoning of the Minnesota Supreme Court, in *Tolbert v. Gerber Indus., Inc.,* supra at 367, applies to penalties for which the law imposes an absolute duty. As we have noted, in *Tolbert,* the Court concluded that, absent an express contractual provision, indemnity should not be permitted to shift an "entire loss from one culpable wrongdoer to another." *Id.* at 367.

Moreover, the conclusion we reach is consistent with the only case that addresses whether considerations of public policy will allow an "owner" or "operator" to indemnify itself, under State law theories of recovery, against the imposition of a civil penalty under the Clean Air Act. In *Beerman Realty Co. v. Alloyd Asbestos Abatement Co.,* 100 Ohio App.3d 270, 653 N.E.2d 1218 (1995), the Ohio Court of Appeals held that an owner could not, on common law grounds, seek indemnity for the penalties that were assessed under the Act. Relying upon the legislative history of the civil penalty provisions, the Court concluded that allowing indemnification would violate public policy, and would contravene the purposes of the Clean Air Act. *Id.* 653 N.E.2d at 1223. According to the Court, if the building owner could escape liability by merely contracting with another party for the removal of the asbestos, then the owner would have no incentive to act responsibly, in the disposal of an asbestos-laden building, by *1161 choosing a dependable contractor, and by taking measures to adequately supervise the work. *Id.* at 1221. We find this reasoning to be persuasive. As we have related, to permit indemnification here would have the practical effect of removing any incentive, on J & D's part, to ensure compliance with the NESHAP regulations. Cf., *United States v. Tex-Tow, Inc.,* 589 F.2d 1310, 1314 (7th Cir.1978) (denying indemni-

fication of civil penalties assessed under the Clean Water Act on the ground that "the party engaged in the potentially polluting enterprise is in the best position to estimate the risk of accidental pollution and plan accordingly"); *Tug Ocean Prince, Inc. v. United States,* 436 F.Supp. 907, 926 (S.D.N.Y.1977) (absence of defense, and the purposes of penalty provision, lead to the conclusion that there is no right to indemnity under the Clean Water Act), rev'd in part, aff'd. in part, 584 F.2d 1151 (2d Cir.1978), cert. denied, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979).

In denying leave to amend, we do not overlook J & D's abundant concern that St. Paul is primarily and, perhaps, solely responsible for the alleged violations. Should this be the ultimate determination, however, J & D will not be prejudiced by this Order, for Section 113(e) of the Act, *Title 42 U.S.C. § 7413(e),* requires the Court, where appropriate, to consider a variety of specific criteria in assessing the amount of any civil penalty, based upon the defendant's unique circumstances. See, e.g., *United States v. Midwest Suspension and Brake,* 824 F.Supp. 713, 735 (E.D.Mich.1993), aff'd, 49 F.3d 1197 (6th Cir.1995); *United States v. Harford Sands, Inc.,* 575 F.Supp. 733, 735 (D.Md.1983) (while not relevant to a determination of liability, defendant's lack of knowledge may affect its culpability and, therefore, the amount of a civil penalty which would be appropriate).

"[I]n addition to such other factors as justice may require," the Act requires the Court to consider the defendant's "good faith efforts to comply." *Title 42 U.S.C. § 7413(e)(1).* In this respect, the Government correctly notes that "the court can mitigate the impact of strict liability in cases where the evidence shows that a specific defendant is less culpable due to the actions of another person." *Government's Supplemental Memorandum,* at 6. Accordingly, to the extent that J & D believes that the actions taken by St. Paul are germane to the amount of penalty that J & D should be assessed, it may urge these same arguments to the Court irrespective of wheth-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

955 F.Supp. 1153, 27 Envtl. L. Rep. 20,916
**(Cite as: 955 F.Supp. 1153)**

er St. Paul has been joined as a third-party defendant. Further, if J & D's assertions as to the relative culpability of St. Paul are established, then the Government's election, to forego a joinder of St. Paul, will work no disadvantage to J & D, for J & D will pay no more in penalties than the amount that the Court determines that J & D should justly bear, and no more. If, as J & D urges, the failure to join St. Paul will foreclose an opportunity to obtain full recompense for a violation of the Clean Air Act, then the Government can bear the brunt of any public opprobrium should it have failed to effectively, and fairly, enforced the legislative policies which undergird the Clean Air Act.[FN9]

> FN9. We recognize the existence of some authority which holds that the liability for a civil penalty, under the Clean Air Act, is joint and several. See, e.g., *United States v. B & W Inv. Properties, Inc.,* No. 91 C 5886, 1994 WL 53781 *5 (N.D.Ill., February 18, 1994) (affirming Magistrate Judge's recommendation that penalty under the Clean Air Act can be imposed jointly and severally), aff'd, 38 F.3d 362, 367 (7th Cir.1994). We need not reach that issue here, however, for the Government has opposed, for reasons unknown to this Court, the joinder of all of the alleged wrongdoers. Nevertheless, given our rejection of J & D's attempt to institute an indemnity claim against St. Paul, we would substantially doubt the propriety of holding J & D vicariously liable for the sole fault of St. Paul, under some notion of joint and several liability. Here again, however, we need not reach that issue for, applying its equitable powers to do what is just, the Court can assure that J & D will pay no more than its proper share of any total penalty, and the Government should not be heard to complain that St. Paul's wrongdoing, if any, has not been properly punished through a vicarious penalty against J & D. We are aware of no public policy that is

fostered by the targeting of one of several potential wrongdoers to bear a penalty that should be equitably allocated on the basis of primary fault. If, as J & D urges, St. Paul has, with impunity, avoided its responsibilities under the Clean Air Act as a result of what J & D regards as the Government's indulgently noncritical eye, then the Court can assure that J & D will endure no prejudice, and the Government will bear, as it properly should, any warranted criticism should it have abandoned the national goal of an effective and nonpartisan enforcement of the Clean Air Act.

**\*1162** Accordingly, we conclude that J & D has failed to show that there is an underlying substantive basis, under Minnesota law, upon which it may assert a third-party claim for indemnity against St. Paul.

NOW, THEREFORE, It is—

ORDERED:

That J & D's Motion for Leave to file a Third Party Complaint against St. Paul [Docket No. 10] is DENIED.

D.Minn.,1997.
U.S. v. J & D Enterprises of Duluth
955 F.Supp. 1153, 27 Envtl. L. Rep. 20,916

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.