# ADMIRALTY AND MARITIME LAW

## Fourth Edition

By

**Thomas J. Schoenbaum**

*Professor of International Studies,
International Christian University, Tokyo
Visiting Professor of Law, George Washington University
Dean and Virginia Rusk Professor of Law Emeritus,
University of Georgia*

## Volume 2

Chapters 11–End
Table of Cases
Index

**PRACTITIONER TREATISE SERIES**



THOMSON
WEST

Mat # 40165373

In 1983, new cargo insurance clauses were developed by the Institute of London Underwriters in place of the old Lloyd's S.G. (ship and goods) Policy. These clauses were introduced to meet criticism of the quaint and archaic language and risk allocation of the S.G. Policy which had remained relatively unchanged since its adoption in 1779. The revised clauses included Institute Cargo Clauses (A), (B), and (C), Institute War Clauses (Cargo),[4] Institute Strikes Clauses (Cargo), and the Malicious Damage Clause. Institute Cargo Clauses (A) covers "all risks" except for named exclusions. Institute Cargo Clauses (B) is more limited and covers certain named risks, while Institute Cargo Clauses (C) covers only major casualties. These new policy forms present several new questions of interpretation that must be resolved in future controversies.[5]

## § 19-12. Protection and Indemnity Insurance

Protection and Indemnity (P & I) insurance came into common use after the 1835 case of De Vaux v. Salvador[1] established that collision liability was not a "peril of the sea" and thus was not covered under the basic Lloyd's S.G. policy.[2] Lloyd's underwriters soon developed a stan-

---

siderably, with resulting variance in rates, depending on the degree of protection provided.

7) Shipping practices. Newcomers to foreign trade may not have experienced traffic personnel. Even experienced shippers vary greatly in their shipping practices.

8) The Consignee. The character and business methods of the consignee may greatly affect the extent of damage payments. He can substantially reduce claims by making repairs and by promptly taking delivery. On the other hand, irresponsible behavior of the consignee can materially increase losses.

9) Salvage. The proceeds of salvage operations reduce the net amount of loss. Salvage possibilities vary with the goods themselves, locality and economic conditions.

10) Underwriting experience. The underwriter's experience with the Assured is a valuable guide in determining whether the rate is adequate or excessive, but it is not the sole determinant. An adverse loss ratio indicates the need for careful reconsideration of risk factors; it does not necessarily indicate that the rate should be revised. Rates are made for the future. An underwriter considers which losses can reasonably be expected to recur.

Id. at 14–15.

Insurers bear the burden of proving the applicability of policy exclusions, while the insured has the burden of proving that the loss occurred within the policy periods. New Hampshire Ins. Co. v. Martech, USA, Inc., 993 F.2d 1195, 1993 AMC 2426 (5th Cir.1993).

4. Under English law, a war risk exclusion did not exclude coverage for a custom seizure of cargo for re-labeling. North Branch Resources, LLC v. M/V MSC Cali, 132 F.Supp.2d 293, 2001 AMC 1465 (S.D.N.Y.2001), judgment vacated in part on reconsideration 154 F.Supp.2d 793 (S.D.N.Y.2001).

5. The consequences of discarding the old language and of adopting the new clauses cannot be precisely predicted. The old jurisprudence will provide the point of departure for analysis. See Mankabady, The New Lloyd's Policy and Cargo Clauses, 13 J.Mar.L. & Com. 527 (1982); O'May, The New Marine Policy and Institute Clauses, [1985] 1 L.M.C.L.Q. 191; Diamond, The Law of Marine Insurance—Has It a Future? [1986] 1 L.M.C.L.Q. 25.

### § 19-12

1. 111 Eng.Rep. 845 (K.B.1836).

2. Protection and Indemnity clubs have been described as "the Cinderella[s] of marine insurance." This reference is in regard to the relatively recent development of protection and indemnity insurance as compared to hull insurance and cargo insurance. Wilding, The Protection and Indemnity Clubs, 1961 J. of the Institute of

dard Collision Liability or "Running Down Clause" to be added to existing hull insurance policies to cover three-quarters of this risk in return for an additional premium.³ Protection and Indemnity (P & I) "clubs"—mutual insurance societies—were founded to cover the remaining one-quarter, and they gradually broadened their coverage to include other third-party risks and risks not covered by hull policies.⁴

Protection and Indemnity insurance today covers virtually all the risks not covered by hull insurance. As the practical and statutory liabilities of shipowners increased, so did the coverage provided by Protection and Indemnity Clubs.⁵ Shipowners look to Protection and Indemnity Clubs for insurance against their liabilities including claims for damage or compensation in respect of the following categories of loss:

1) personal injury to or illness or loss of life of crew members;
2) personal injury to or loss of life of stevedores;

---

Transport 113 (discussing the historical background and formation of this insurance and its underwriters' association). See also Tilley, The Origin and Development of the Mutual Shipowners' Protection & Indemnity Association, 17 J.Mar.L. & Com. 261 (1986).

The P & I Clubs provide *indemnity*, not liability coverage. They are only obliged to indemnify their members or policy holders for judgments, settlements, or claims which have actually been paid. There is also no duty to defend. Firma C–Trade SA v. Newcastle Protection & Indemnity Assn., 2 All. E.R. 705, [1990] 2 Lloyd's Rep. 191; Ahmed v. American S.S. Mut. Protection & Indem. Assn., 640 F.2d 993, 1981 AMC 897 (9th Cir.1981), appeal after remand 701 F.2d 824, 1983 AMC 2712 (9th Cir.1983), affirmed 701 F.2d 824, 1983 AMC 2712 (1983). But see Orion Ins. Co. v. Firemen's Ins. Co., 46 Cal.App.3d 374, 120 Cal.Rptr. 222, 1975 AMC 1183 (1975).

Travelers Indemnity Co. v. Calvert Fire Insurance Co., 798 F.2d 826 (5th Cir.1986), on rehearing in part 836 F.2d 850 (5th Cir.1988) is noover the P & I carrier, the London Steamship Owners' Mutual Insurance Assotable for the court's discussion of the lack of personal jurisdiction ciation, Ltd., as well as the fact that the court undertook to reform a bond posted as security to insure the payment of damages arising from a collision in international waters.

3. Most hull underwriters refused to cover more than three-quarters liability for fear that full coverage would not discourage ships' masters from being negligent.

4. For comprehensive Annotations to the SP–23 policy form analyzing the U.S. jurisprudence, see The MLA Report (Marine Protection and Indemnity Policy and Annotation Project), Doc. No. 761, October 19, 2001. There is a helpful symposium on Protection and Indemnity insurance in 43 Tul.L.Rev. 457 et seq. (1969). Information on the practical aspects of this form of insurance can be found in Bernard, Protection and Indemnity Insurance (2nd ed. 1950) and Libby, Some Aspects of Protection and Indemnity Insurance, 1952 Ins.L.J. 684; Norman J. Ronneberg, Jr., An Introduction to the Protection & Indemnity Clubs and the Marine Insurance They Provide, 3 U.S.F.Mar.L.J. 1 (1991).

Both the American and English versions of the Collision Liability on "Running Down Clause" now cover fully any damages to another vessel arising out of a collision. See Bender Shipbuilding & Repair Co. v. Brasileiro, 874 F.2d 1551, 1991 AMC 220 (11th Cir.1989).

For a comprehensive review of P & I insurance coverage of oil pollution, see R.C. Springall, P & I Insurance and Oil Pollution, 6 J. of Energy and Natural Res.L. 25 (1988).

5. For instance, under the "compulsory by law" provision in a protection and indemnity policy, indemnity coverage varies according to the requirements of particular laws. See East Coast Tender Service, Inc. v. Robert T. Winzinger, Inc., 759 F.2d 280, 1986 AMC 114 (3d Cir.1985) (phrase "compulsory by law" insuring against liability for removal of wreck of a vessel is not restricted to situations in which an express order from a governmental body directs removal); see also Continental Oil Co. v. Bonanza Corp., 706 F.2d 1365, 1983 AMC 2059 (5th Cir.1983); Accord: Zurich Ins. Co. v. Pateman, 692 F.Supp. 371, 1988 AMC 2813 (D.N.J.1987).

3) personal injury to or illness or loss of life of passengers and others;

4) loss of personal effects;

5) diversion expenses;

6) life salvage;

7) collision liabilities (typically those risks excluded from the Running Down Clause of Hull Insurance);

8) loss or damage to property other than cargo;

9) pollution;

10) towage contract liabilities;

11) liabilities under contracts and indemnities;

12) wreck liabilities;

13) cargo liabilities;

14) cargo's proportion of general average or salvage not otherwise collectible;

15) certain expenses of salvors;

16) fines;

17) legal costs; and

18) omnibus coverage for new risks which arise suddenly or exceptional cases not within the express provisions currently in use.[6]

The "omnibus rule," noted above, gives wide discretion to authorize payment of claims that the P & I Club feels are within the scope of the association.[7] This rule is frequently used and constitutes one of the major advantages of this form of mutual insurance over that obtainable on the markets. Another advantage is that, in many cases, P & I Clubs insure their members' liabilities with very high limits on the amount of coverage.[8]

There are approximately twenty-five P & I Clubs in the world with the great majority located in the United Kingdom.[9] Mutual Clubs organized along the general lines of P & I Clubs also exist for several classes of special coverage, such as freight, demurrage, and defense (F.D. and D.). These F.D. and D. Clubs cover claims and liabilities arising from (a) freight—the amount of money paid for the carriage of goods; (b) demurrage—a penalty payable to the shipowner in carriage contracts

---

6. Coughlin, Protection & Indemnity Clubs, 1984 Lloyd's Mar. & Com.L.Q. 403, 405–11. See generally Marine P & I Policy Annotations, Annotations of the American Steamship Owners' Mutual Protection and Indemnity Association Form Policy (1982) and First Addenda to Marine P & I Policy Annotations (1985).

7. Coughlin at 411.

8. Protection and Indemnity Clubs may also provide guarantees or bonds for the shipowner in certain situations such as arrest proceedings. If the circumstances resulting in the arrest was a covered risk, then the club may place the bond at its own expense. If not, the club may still place the bond, but will require counter-security from the shipowner. See Wilding, supra at 118–19 (discussing the services provided by Protection and Indemnity Clubs).

9. British P & I Clubs insure approximately 65 percent of the world's shipping fleet. See Coughlin, supra at 404.

for delay in loading or unloading of cargo; and (c) defense—legal expenses that may not be covered in Protection and Indemnity insurance. Special insurance is available for insurance of war risks and insurance of losses caused to shipowners by strikes of their crews or stevedores. Clubs may also insure against the special risks inherent in container transportation, the loss and damage to the containers and associated equipment, such as cranes, as well as liabilities to third parties. Forwarding agents and terminal operators may obtain cover as well as shipowners and charterers.[10]

### Cover for Additional Assureds

In some trades, particularly in offshore drilling, it is customary to name other parties as additional assureds on a vessel's P & I policy, defining other parties in such an endorsement as "anyone for whom the vessel is working." In such cases coverage is extended to the additional assured only if there is a causal operational relationship between the vessel and the resulting injury to a third party.[11] The additional assured may not claim an indemnity under the policy for an injury to a third party that arises independently of the vessel's operations.[12]

### Other Liability Policies

An employer may have a general civil liability policy and a separate Workmen's Compensation and Employer's Liability (WC/EL) policy in

---

10. Id. at 404–05.

11. E.g., Clement v. Marathon Oil Co., 724 F.Supp. 431 (E.D.La.1989); Clark v. B & D Inspection Serv., 896 F.2d 105, 1990 AMC 2110 (5th Cir.1990).

A provision of a P & I policy covering the assureds as "owners" will be interpreted to cover a charterer as an additional assured.

Coverage for "loss of life ... of any person" included coverage for a possible punitive damages award. Randall v. Chevron U.S.A., Inc., 13 F.3d 888, 1994 AMC 1217 (5th Cir.1994), modified 22 F.3d 568, 1994 AMC 2492 (5th Cir.1994).

Insureds can be covered by more than one P & I policy; if so, rules of priority of the policies determine coverage. Institute for Shipboard Education v. Cigna Worldwide Ins. Co., 22 F.3d 414, 1994 AMC 1775 (2d Cir.1994).

There is a difference of opinion whether an agreement to procure additional assured coverage is a maritime contract. Compare Illinois Constructors Corp. v. Morency & Assoc., 794 F.Supp. 841, 1993 AMC 203 (N.D.Ill.1992); Angelina Casualty Company v. Exxon Corp., 876 F.2d 40, 1989 AMC 2677 (5th Cir.1989). State law applies to such a contract. United States Fidelity & Guaranty Co. v. Williams, 676 F.Supp. 123, 1988 AMC 2006 (E.D.La.1987); Stockstill v. Petty Ray Geophysical, 888 F.2d 1493, 1990 AMC 2957 (5th Cir.1989). Additional assured coverage can be added to a hull policy as well as P & I insurance. E.g., Employers Ins. of Wausau v. Trotter Towing Corp., 834 F.2d 1206 (5th Cir.1988), rehearing denied 841 F.2d 633 (5th Cir.1988).

12. See Gryar v. Odeco, Inc., 719 F.2d 112, 1986 AMC 1359 (5th Cir.1983) (per curiam); Lanasse v. Travelers Ins. Co., 450 F.2d 580, 1972 AMC 818 (5th Cir.1971). See also St. Paul Fire & Marine Ins. Co. v. Vest Transportation Co., Inc., 666 F.2d 932, 943 (5th Cir.1982); and Wiley v. Offshore Painting Contractors, Inc., 711 F.2d 602, 1984 AMC 1144 (5th Cir.1983), modified and rehearing denied 716 F.2d 256, 1984 AMC 1144 (5th Cir.1983).

Under what is frequently referred to as the *Lanasse* rule, the courts allow coverage to an additional assured only when it can show it was acting in a vessel owner or charterer capacity and a causal relationship between the insured vessel and the resulting injury. For a thorough analysis, see Robert T. Lemon II, The Lanasse Rule and the Additional Assured's Dilemma Under American Form P & I Policies, 21 J.Mar.L. & Com. 503 (1990).

addition to P & I insurance. In this case it is important to consider whether the various policies adequately cover the possible risks. Many comprehensive general liability policies contain watercraft and maritime risk exclusions.[13] P & I policies may exclude liability under any Compensation Act. Under a WC/EL policy a compensation insurer will cover scheduled or limited benefits provided by a compensation statute, but may exclude tort damages under 33 U.S.C. § 905(b). Moreover, a compensation insurer can recover its payments out of the proceeds of a section 905(b) settlement or judgment.[14]

## § 19–13. Insurable Interest

In order to recover on a policy of marine insurance, the assured must show (1) that he has suffered a financial loss; (2) that the loss was caused by a peril insured against; (3) that the subject matter of the loss was covered by the policy; and (4) that the assured had an "insurable interest," some legal or equitable relationship to the voyage or insured property. Therefore, an insurable interest is a necessary precondition for a valid contract of insurance. If the insured has no interest, he can suffer no loss; the contract is deemed to be a wagering contract and is void. The insurable interest must be held at the time of the loss.[1]

The term "insurable interest" has never been exhaustively defined, however. The English Marine Insurance Act 1906 specifies that:

> (1) Subject to the provisions of this Act, every person has an insurable interest who is interested in a marine adventure.

> (2) In particular a person is interested in a marine adventure where he stands in any legal or equitable relation to the adventure or to any insurable property at risk therein, in consequence of which he may benefit by the safety or due arrival of insurable property, or may be prejudiced by its loss, or by damage thereto, or by the detention thereof, or may incur liability in respect thereof.[2]

---

13. See Pepper v. Plaisance, 732 F.Supp. 48 (E.D.La.1989).

14. E.g., Taylor v. Bunge Corp., 845 F.2d 1323, 1988 AMC 2610 (5th Cir.1988).

Under Louisiana law, a standard workers' compensation and employer's liability policy is not "ocean marine insurance" and is therefore covered under La.R.S. 22:1375 which created the Louisiana Insurance Guaranty Association (LIGA), which covers insurance claims against insolvent insurance companies. Deshotels v. SHRM Catering Servs., 538 So.2d 988 (La.1989). Since LIGA excludes coverage for "ocean marine insurance" P & I claims are not required to be paid. Backhus v. Transit Casualty Co., 549 So.2d 283, 1990 AMC 417 (La.1989).

### § 19–13

1. Hooper v. Robinson, 98 U.S. (8 Otto) 528, 25 L.Ed. 219 (1878). See also Hart v. Delaware Ins. Co., 11 F.Cas. 683 (C.C.D.Pa. 1809) (No. 6,150); Chase v. Hammond Lumber Co., 79 F.2d 716 (9th Cir.1935) and Fuerst Day v. Orion Ins. Co., [1980] 1 Lloyd's Rep. 656. For a comprehensive study on the concept of "insurable interest" in relation to all forms of insurance, see Harnett & Thorton, Insurable Interest in Property: A Socio–Economic Reevaluation of a Legal Concept, 48 Colum.L.Rev. 1162 (1948).

For a recent case holding that the insured lacked an insurable interest, see El Fenix de Puerto Rico v. Serrano Gutierrez, 786 F.Supp. 1065, 1992 AMC 486 (D.P.R. 1991).

2. British Marine Insurance Act 1906, § 5(1) and (2). Gilmore & Black conclude that these provisions establish two concurrent tests to determine if an "insurable