**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the GULF | * | |
| OF MEXICO, on APRIL 20, 2010 | * | |
| | * | SECTION J |
| Relates to: *All Cases* | * | |
| | * | JUDGE BARBIER |
| (Including No. 10-2771) | * | |
| | * | MAG. JUDGE SHUSHAN |
| ************************************** | * | |

**PSC STATUS REPORT**
**AND MEMORANDUM IN SUPPORT OF MOTION TO**
**<u>ESTABLISH ACCOUNT AND RESERVE FOR LITIGATION EXPENSES</u>**

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

I.      INTRODUCTION ....................................................................................... 1

II.     THE RESPONSIBILITIES OF THE PSC UNDER PTO #8 ............................... 4

III.    REPORT ON THE PSC's WORK IN MDL NO. 2179 .................................. 7

        A.      Organization.......................................................................... 7

        B.      PSC Document Depository ...................................................... 9

        C.      Document Discovery ............................................................. 10

        D.      Weekly Discovery Conferences................................................ 11

        E.      Cooperation with Opposing Counsel ....................................... 11

        F.      Coordination Between and Among Plaintiffs' Counsel and
                Litigants

        G.      Depositions .......................................................................... 13

        H.      Pleading Bundles .................................................................. 13

        I.      Short Form Joinders and Other Case Management Initiatives ............... 14

        J.      Limitation Trial Structure ....................................................... 14

        K.      Experts ................................................................................ 15

        L.      Legal Analysis ...................................................................... 15

        M.      Protection of Putative Class Members...................................... 16

        N.      Science ................................................................................ 17

IV.     THE PSC AND OTHER COMMON BENEFIT ATTORNEYS ARE
        ADVANCING COSTS AND INVESTING TIME ON A CONTINGENT
        BASIS .................................................................................................. 19

V.      THE SOURCE AND APPLICATION OF THE COMMON BENEFIT
        DOCTRINE:  PRINCIPLES, PRACTICES, AND EQUITIES.......................... 21

VI.     THE FEDERAL DISTRICT COURTS HAVE THE AUTHORITY AND
        DISCRETION TO ENTER "HOLD BACK" ORDERS UNDER THE
        COMMON BENEFIT DOCTRINE ............................................................. 22

VII.    "UP FRONT" ASSESSMENTS AND "HOLD BACK" ORDERS.................... 28

VIII.   THE COMMON BENEFIT DOCTRINE INCENTIVIZES
        CONTINGENT EFFORTS AND EXPENDITURES TO CONSERVE
        THE RESOURCES OF LITIGANTS............................................................ 31

IX.     WHAT IS THE CUSTOMARY OR APPROPRIATE RANGE OF
        COMMON BENEFIT ASSESSMENTS?....................................................... 32

## **TABLE OF CONTENTS**
(continued)

**Page**

X.    THE PSC's REQUEST TO ESTABLISH A COURT-SUPERVISED ACCOUNT IN THESE MDL AND LIMITATION PROCEEDINGS .............. 35

XI.    CONCLUSION ................................................................................................. 37

## I.      INTRODUCTION

On August 10, 2010, the United States Judicial Panel on Multidistrict Litigation issued its Transfer Order in MDL No. 2179, centralizing the federal Deepwater Horizon-related proceedings in the Eastern District of Louisiana, and assigning them to the Honorable Carl J. Barbier for coordinated or consolidated proceedings pursuant to 28 U.S.C. § 1407.  That same day, August 10, 2010, this Court issued its Pre-Trial Order No. 1, setting an initial conference and making foundational provisions for the overall case management of these proceedings. Among these provisions was a procedure for the appointment, and description of the functions, of Plaintiffs' Liaison Counsel and a Plaintiffs' Steering Committee.  (*See* Document 2, filed 08/10/10, pp. 12-19, ¶¶ 16-17).

On August 27, 2010, in its Pre-Trial Order No. 6 [Doc 110], this Court appointed James Parkerson Roy and Stephen J. Herman as Plaintiffs' Co-Liaison Counsel, to additionally serve as *ex efficio* members of the Plaintiff Steering Committee, and as members of a Plaintiffs' Executive Committee.  On October 8, 2010, in its Pre-Trial Order No. 8, this Court appointed, as members of the Plaintiffs' Steering Committee ("PSC"), the undersigned counsel.  This Order also appointed Plaintiffs' Co-Liaison Counsel together with PSC members Brian Barr and Scott Summy, to comprise the Plaintiff Executive Committee.[1]

The undersigned Co-Liaison Counsel and members of the PSC hereby respectfully submit this comprehensive Status Report to report upon and describe the progress of the litigation throughout the past year, including the time and resources they have expended in fulfilling their court-designated responsibilities, and in prioritizing and advancing the claims and

---

[1] On October 5, 2011, in its Pre-Trial Order No. 46 [Doc 4226], and pursuant to the consideration of said counsels' applications, this Court re-appointed Plaintiffs' Co-Liaison Counsel and the originally-appointed members of the Executive Committee and the PSC, and added Joseph F. Rice and Conrad S.P. Williams to the PSC.

interests of plaintiffs in these MDL/Limitation proceedings.

The undersigned additionally move for an Order establishing a Court-supervised account for litigation expenses, and directing Defendants to deposit into this account an amount equal to a specified percentage of every settlement, judgment or other payment to a plaintiff or putative class member in connection with claims arising out of the Macondo / *Deepwater Horizon* disaster. This "hold back" mechanism, now routine in MDL litigation, will preserve a fund from which, at an appropriate time, if and as necessary, the Court may make common benefit fee and cost awards, (if any).[2]

The PSC does not, at this point, seek an actual common benefit fee or cost reimbursement award – only a reserve.

Indeed, the PSC's ultimate goal is to recoup the costs of prosecuting this litigation directly from the Defendants, and to seek such payment in the form of a statutory fee award, class counsel fee award, separately negotiated fee, or combination thereof - payable optimally over and above any settlement payments made by or on behalf of Defendants.

This mechanism now sought, routine in MDL litigation, would simply preserve a fund from which, at an appropriate time, if and as necessary, the Court could make common benefit fee and/or cost reimbursement awards.

---

[2] *See In re Vioxx Prod. Liab. Litig.* (MDL No. 1657), 760 F.Supp.2d at 654; *In re Zyprexa Prod. Liab. Litig.* (MDL No. 1596), 467 F.Supp.2d 256, 261-263 (E.D.N.Y. 2007); *In re Diet Drugs ("Phen-Fen") Prod. Liab. Litig.* (MDL No. 1203), 563 F.Supp.2d 442, 457-58, 491-96 (E.D.N.Y. 2008), *affirmed*, 582 F.3d 524 (3d Cir. 2009); *In re Yasmin & Yaz Mktg., Sales Practices and Prods. Liab. Litig.* (MDL No. 2100), 2010 U.S.Dist. LEXIS 22361, *9 (S.D.Ill. 2010) (8% assessment represents a hold back); *In re Medtronic, Inc. Implantable Defibrillators Prod. Liab. Litig.* (MDL No. 1726), 2008 U.S. Dist. LEXIS 122868 (D.Minn. 2008).

The PSC proposes, in this regard, that the Defendants be required to deposit a reserve in an amount equal to six percent (6%)[3] of the gross amount of any settlement, judgment or other payment by or on behalf of a Defendant arising out of the Macondo / *Deepwater Horizon* incident and spill into the court-supervised escrow account.[4]

As noted above, the PSC does *not* seek a common benefit cost and/or fee award of 6%, nor suggest that six percent (6%) will be an appropriate award for their work and/or cost contributions at the end of the day.

Indeed, the PSC recognizes that an appropriate award may be less (or more) than six percent (6%), and could conceivably vary, in light of the nature of the plaintiff, the type of recovery, timing issues, or other circumstances.

The PSC seeks a reserve of six percent (6%) because, (as shown in Section IX of this Memorandum), this percentage is consistent with what has been widely approved other MDLs.

The PSC members earlier agreed to a voluntary reserve from the attorney fee portion of their clients' settlements,[5] and will likewise place those funds into the court-supervised account.[6]

---

[3] In light of the ongoing and substantial coordination and contributions between and among the PSC and other Common Benefit Attorneys and the State of Alabama, as well as the State of Louisiana, the PSC seeks a reserve of only four percent (4%) of any settlement, judgment or other payment to the State of Alabama or to the State of Louisiana.  Moreover, the PSC does *not* seek any hold-back at this time over settlements, judgments or other payments to the United States.

[4] Some or all of the reserve may be paid directly by the Defendant, over and above the plaintiff's recovery, depending on the nature and terms of the settlement, judgment or other payment at issue.

[5] It is, of course, the PSC's preference that any common benefit award not paid directly by Defendants be imposed on the contingent attorney fee portion of any recovery, to the extent it is practicable and equitable to do so.

[6] The PSC's voluntary hold-back agreement relating to settlements or payments prior to the entry of an order by the Court would be superseded by this Court's Order with respect to any future settlements, judgments or other payments, should the present motion be granted.

A determination as to the propriety, source, appropriate amount and allocation of any common benefit fee and/or cost reimbursement award (if any), should be reserved - pursuant to a transparent process, including notice and hearing, such as that described in Judge Fallon's *Vioxx* common benefit fee award and allocation decisions[7] - for another day.

## II.      THE RESPONSIBILITIES OF THE PSC UNDER PTO 8

This Court's October 8, 2010 Pre-Trial Order No. 8 provided and directed as follows, with respect to the duties and responsibilities to be undertaken by the PSC:

"The PSC will have the following responsibilities:

Discovery

    (1)    Initiate, coordinate, and conduct all pretrial discovery on behalf of plaintiffs in all actions which are consolidated with the instant multi district litigation.

    (2)    Develop and propose to the Court schedules for the commencement, execution, and completion of all discovery on behalf of all plaintiffs.

    (3)    Cause to be issued in the name of all plaintiffs the necessary discovery requests, motions, and subpoenas pertaining to any witnesses and documents needed to properly prepare for the pretrial of relevant issues found in the pleadings of this litigation.  Similar requests, notices, and subpoenas may be caused to be issued by the PSC upon written request by an individual attorney in order to assist him/her in the preparation of the pretrial stages of his/her client's particular claims.

    (4)    Conduct all discovery in a coordinated and consolidated manner on behalf and for the benefit of all plaintiffs.

Hearings and Meetings

---

[7] *See In re Vioxx Prods. Liab. Litig.* (MDL No. 1657), 760 F.Supp.2d 640 E.D.La. 2010). *See also*, *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227, 234 (5th Cir. 2008).

(1)     Call meetings of counsel for plaintiffs for any appropriate purpose, including coordinating responses to questions of other parties or of the Court.  Initiate proposals, suggestions, schedules, or joint briefs, and any other appropriate matter(s) pertaining to pretrial proceedings.

(2)     Examine witnesses and introduce evidence at hearings on behalf of plaintiffs.

(3)     Act as spokesman for all plaintiffs at pretrial proceedings and in response to any inquiries by the Court, subject of course to the right of any plaintiff's counsel to present non-repetitive individual or different positions.

Trial

(1)     Coordinate trial team(s)'s selection, management and presentation of any common issue, "bellwether" and/or "test" case trial(s).

Miscellaneous

(1)     Submit and argue any verbal or written motions presented to the Court or Magistrate on behalf of the PSC as well as oppose when necessary any motions submitted by the defendant or other parties which involve matters within the sphere of the responsibilities of the PSC.

(2)     Negotiate and enter into stipulations with Defendants regarding this litigation.  All stipulations entered into by the PSC, except for strictly administrative details such as scheduling, must be submitted for Court approval and will not be binding until the Court has ratified the stipulation. Any attorney not in agreement with a non-administrative stipulation shall file with the Court a written objection thereto within five (5) days after he/she knows or should have reasonably become aware of the stipulation.  Failure to object within the term allowed shall be deemed a waiver and the stipulation will automatically be binding on that party.

(3)     Explore, develop, and pursue all settlement options pertaining to any claim or portion thereof of any case filed in this litigation.

(4)     Maintain adequate files of all pretrial matters, including establishing and maintaining a document or exhibit depository, in either real or virtual format, and having those

> documents available, under reasonable terms and conditions, for examination by all MDL Plaintiffs or their attorneys.
>
> (5)    Perform any task necessary and proper for the PSC to accomplish its responsibilities as defined by the Court's orders, including organizing subcommittees or workgroups comprised of plaintiffs' attorneys not on the PSC and assigning them tasks consistent with the duties of the PSC.
>
> (6)    Perform such other functions as may be expressly authorized by further orders of this Court."

PRE-TRIAL ORDER NO. 8, pp.3-4.

In its October 8, 2010 Pre-Trial Order No. 9, this Court issued specific and detailed provisions for common benefit time and expense submissions, including task and activity codes and forms. The undersigned, and other common benefit attorneys, have duly and regularly submitted their time and cost reports to CPA Phil Garrett of Garrett and Company, who has collected, corrected, and complied them. These are available to the Court at any time for its *in camera* review.

As the *Manual*, the courts (including the Fifth Circuit), and commentators recognize, contemporary multi-party litigation, including multi-district litigation, cannot function fairly and efficiently without court designation of leadership (typically lead or liaison counsel and counsel committees) to organize, coordinate, and conduct the work of common discovery, trial preparation, and, as in this MDL, the trial itself.[8] On the plaintiffs' side, courts are advised to designate, as this Court did in its Pre-Trial Order No. 8, a leadership group with the varied skills, experience, resources, and attributes necessary to the vigorous prosecution of all plaintiffs' common interests. This role transcends the traditional attorney-client role. As the *Manual* observes, "counsel designated by the court also assume a responsibility to the court and an

---

[8] *See, e.g, MCL 4th*, §§ 10.22-10.225.

obligation to act fairly, efficiently, and economically in the interests of all parties and parties' counsel."[9]

## III.     REPORT ON THE PSC's WORK IN MDL NO. 2179

### A.     Organization

Even prior to the formal appointment of the PSC Order Pre-Trial Order No. 8, the acting Co-Liaison Counsel put in place a series of working groups, later finalized by the PSC.  Co-Liaison and the PSC have been directing and coordinating their efforts ever since.

In order to perform and complete the extensive work necessary to prepare for the Limitation Trial and the other proceedings within the MDL and otherwise surrounding the Macondo / *Deepwater Horizon* incident and claims, the PSC has enlisted the assistance of a number of plaintiffs' counsel, from highly respected firms across the country, who represent plaintiffs in these proceedings and/or claimants in the GCCF process, and has organized these common benefit attorneys into Common Benefit Work Groups, which include, *inter alia*:


**Administrative Work Groups**
Depository
Privilege
Electronic Discovery
Summaries


**Legal Research & Writing Work Groups**
Maritime & Limitation Law & Briefing
Briefing (general)
Master Complaints (oversight)
B1 Master Complaint
RICO Work Group
B3 Master Complaint
Regulatory / Injunctive Work Group

---

[9] *MCL 4th*, § 10.22.

**Written Discovery**
BP/MOEX/Anadarko
Transocean
Halliburton
M1-Swaco
Schlumberger
Weatherford
Cameron
Third Party

**Science, Environmental and Damages Work Groups**
Economic Models / Property Damages
Science & Experts
Sampling & Testing
Environmental Impact
Ecological Impact
Medical Monitoring

**Jurisdiction**
BP PLC
Mitsui
Triton

**Deposition and Trial Prep Teams**
Phase One Liability Depo Team
Phase One Liability Expert Teams (by expert)
Phase One Liability Depo Cut Team
Phase Two Liability Depo Team
Document Review Team

**Punitive Damages**
Corporate Culture & History

**Insurance**

**GCCF**


These working groups are comprised of 45 formal Work Group Coordinators, (of whom 33 are from non-PSC firms), and 83 formal Work Group Members, (of whom 69 are from non-PSC firms). These firms devote their time, and incur significant out-of-pocket expense, to conduct the common benefit work essential to the prosecution of these MDL proceedings.

In all, 340 lawyers from ninety different firms have invested over 230,000 hours and contributed over $11.54 million in out-of-pocket held and shared expenses for the common benefit of claimants and litigants affected by the Macondo / *Deepwater Horizon* disaster.[10]

## B.     PSC Document Depository

The prodigious task of document review, analysis, and case management has been headquartered at the MDL 2179 PSC Depository, located near the federal courthouse at the URS Building, 600 Carondelet Street, New Orleans, Louisiana.  The PSC Depository encompasses the entire eighth floor, an area of approximately 15,500 square feet, encompassing conference and "war" rooms, offices, and over 70 dedicated computer workstations staffed on a fulltime basis. Very early on, the PSC unanimously decided to require document review and analysis, and other essential work, to be done **in person, by lawyers, at the Depository**, rather than remotely.  The PSC recognized that this on-site, in-person approach involved personal sacrifice and inconvenience on the part of the PSC members and their staff.  Experience has borne out the prediction that a collective real time, in-person approach would be more effective and more efficient; facilitate interaction; promote the exchange of ideas among the group; yield better insight and strategies; and enable document review to maintain the pace required by the Court's schedule.  The experience of centralizing common benefit work at the Depository has created an *esprit d'corp* and positive morale that has made the relocation sacrifice more than worthwhile. We believe this approach, namely the Depository itself, a true headquarters and review center of the common benefit effort, (in effect the PSC "law firm" office), may be unique in current MDL

---

[10] In addition, the PSC members and other Common Benefit Work Group Members and Coordinators have incurred approximately $1.5 million in unpaid expenses, which are still being processed.  At the same time, PSC members and other Common Benefit Attorneys have contributed and additional $1.8 million to a joint account for payment of further shared expenses, as incurred.

practice.  It has become a giant "war room" manned on a daily basis since opening in December 2010.

### C.   Document Discovery

Document discovery is frequently an area of delay and frustration in MDL proceedings. This litigation, by contrast, has enjoyed the intensive and expeditious production of millions of pages of documents, enabling the litigation to proceed toward the deposition phase, and to trial in February 2012, on a timely basis.  As of October 2011, the PSC had loaded approximately 15.7 million pages of documents into iConnect.  (At least 20 million pages of additional documents produced by the U.S. are yet to be loaded.)  More documents arrive on a daily basis. (In addition, the PSC and other Common Benefit Attorneys have collected, indexed and produced over 10,000 articles and other materials, as well as voluminous reliance documents in association with the Phase One Liability Expert Reports.)  The PSC has utilized over 70 document reviewers and analysts, including PSC members, members of their firms, and other Common Benefit Attorneys, to review and analyze all documents, with a particular emphasis on the review of relevant custodial files produced in preparation for depositions.[11]

---

[11] For example, as of October 2011, the following subtotals, in pages of documents, had been received from defendants and third parties:

| Party | Pages |
|---|---|
| Add Energy | 161,722 |
| Am. Bur. Shipping | 5,606 |
| Anadarko | 159,904 |
| Baker Risk | 57,849 |
| BP | 4,929,739 |
| Cameron | 387,276 |
| Dril-Quip | 52,950 |
| Halliburton | 765,375 |
| M-I Swaco | 83,086 |
| ModuSpec | 12,320 |
| MOEX | 229,969 |

D.      **Weekly Discovery Conferences**

Among the case management innovations implemented by the court which have proven to be of immense value to the efficient and cost-effective progress of these proceedings toward trial, and to which the PSC has dedicated intensive and ongoing effort, is that of regular weekly discovery conferences.  To date, Magistrate Judge Shushan has presided over weekly Friday Discovery Conferences, and has issued around 100 Orders (including 25 working group Conference Orders) for the conduct of document and deposition discovery in these proceedings. As a result of the efforts of the PSC, and of U.S. and States' Coordinating Counsel, working in an atmosphere of good faith and civility with opposing counsel, under the continuous and ongoing guidance of the Court, through the hands-on management of the Magistrate Judge, stipulations and accommodations have been reached; expedited procedures have been developed; and the spirit of professionalism and cooperation called for by the *Manual For Complex Litigation* has prevailed.[12]

E.      **Cooperation with Opposing Counsel**

The PSC recognizes that the "added demands and burdens of complex litigation place a premium on attorney professionalism" including the need to act as "advocates in a manner that will foster and sustain good working relationships among fellow counsel and the court," and to

| | |
|---|---|
| Trans | 6,406,718 |
| USA | 1,894,443 |
| Weatherford | 134,742 |
| Wild Well Control | 128,656 |
| Other Third Parties | 311,159 |
| **TOTAL** | **15,721,608** |

[12] *See, e.g.*, *Manual For Complex Litigation, Fourth* (Federal Judicial Center 2004) (hereinafter "*MCL 4th*" or "*Manual*") § 10.21 Responsibilities in Complex Litigation: "...complex litigation places greater demands on counsel in their dual roles as advocates and officers of the court.  The complexity of legal and factual issues makes judges especially dependent on the assistance of counsel" to make the litigation work.

communicate "constructively and civilly with one another and attempt to resolve disputes informally as often as possible."  *MCL 4th*, § 10.21, pp 22-23.  The PSC has striven to do so, in a litigation whose stakes are among the highest of any modern MDL, and the commitment, attitude and skill of the Magistrate Judge in supervising the discovery effort and other pretrial matters has made this challenge a pleasure.

### F.    Coordination Between and Among Plaintiffs' Counsel and Litigants

The PSC has endeavored to work closely with counsel for the United States and other plaintiffs, including, particularly, Coordinating Counsel for the States and his staff.  In addition to the formal Work Groups, outlined above, the PSC has endeavored to reach out to all attorneys handling claims in the GCCF and/or actions in the MDL/Limitation, through various ListServes, CLE programs, and PSC-sponsored meetings to provide updates regarding the body of accumulate information regarding the environmental and economic issues, the GCCF process, liability issues, trial plan, and the progress of the litigation itself.

Beyond the formal Work Groups, the PSC has organized meetings and calls to gather facts and to discuss issues and strategies between and among counsel prosecuting Vesseel of Opportunity ("VoO") contract and other claims, for example, oyster claims, and other types of claims being prosecuted by GCCF claimants, plaintiffs and putative classmembers.

The PSC provided assistance to thousands of *pro se* litigants who filed Short-Form Joinders in advance of the April 20, 2011 Limitation deadline, and have retained outside consultants to establish and maintain a database, so that important information can be provided if and as necessary.  The PSC, at the same time, endeavors to respond to inquiries regarding pleadings, discovery and other matters, from *pro se* litigants, plaintiffs' counsel, and defense counsel, and to assist the Clerk of Court.

Subject to the confidentiality provisions of Pre-Trial Order No. 13,  the PSC has made the

master set of deposition exhibits available to plaintiffs' counsel *via* FTP Site.  The PSC has also made its Depository available to Coordinating Counsel for States and his staff, counsel for the United States, and counsel for the State of Louisiana.

### G.     Depositions

As a result of an actively-managed, well-staffed, and intensively pursued document discovery phase, substantial and timely document production has occurred.  This in turn has assisted and enabled preparation for the multiple tracks of Phase One depositions that have been conducted, including multiple depositions in London.  The pace of depositions increased each month starting in early spring 2011.  On some days, as many as seven full day depositions were simultaneously taking place, on two continents.  To facilitate the efficient conduct of the London depositions, for approximately one month in June 2011, the PSC maintained a branch depository office at the London deposition building where the London office of Kirkland & Ellis International, LLP is located and the depositions were taken.  Depositions of witnesses on multiple tracks, many taking two days, have been conducted and coordinated at an intensive and unrelenting pace.  240 depositions were completed over the approximate six-month period of Phase I discovery.  Some deposition transcripts exceed 800 pages.  Over 5,000 deposition exhibits have been utilized.

The PSC has submitted over 100 sets of designations for the Phase One Trial, accompanied by high-lighted trial exhibits and the first group of two-page summaries.  Over 50 Phase One Liability Expert Depositions have been scheduled to occur in November-December 2011.

### H.     Pleading Bundles

As the *Manual* states among its general principles, the goal of active case management of complex litigation is to conserve the resources of the litigants and of the Court, and to promote

the fair and efficient resolution through "an effective plan for the orderly conduct of pretrial and trial proceedings."[13]  To do so, the Court enlists the active cooperation and best efforts of designated counsel, to assure that large scale litigation does not become protracted litigation, and that complex proceedings do not sink under their own weight.  To this end, this Court has adopted a series of innovative procedures, some of which have been proposed by Plaintiffs, others by Defendants, and some of which the Court has developed on its own.  The PSC has played a major role in proposing and implementing key elements of this case management plan.  These case management tools have included the Co-Liaisons' proposal for organizing the parties and claims into pleading bundles; the preparation and filing of the resulting pleading bundle complaints; and the briefing and argument of motions to dismiss directed to these Master Complaints

## I.    Short Form Joinders and Other Case Management Initiatives

Another innovative procedure is the design and utilization of short form joinders and other procedures to assist claimants, including *pro se* litigants, in appearing and preserving their claims in these proceedings.

Another innovative case management procedure in which the PSC has been an active participant is the Vessels of Opportunity ("VoO") charter dispute mediation program, in which the parties agreed to select a sample of cases for motions, briefing, discovery, and a mediation under a stipulated procedure in the close of 2011, in the hope that these proceedings will prove instructive and constructive in the resolution of some or all of the VoO contract claims.

## J.    Limitation Trial Structure

The Court has entertained proposals for a trial plan and structure for the limitation trial that will commence on February 27, 2012.  The PSC has worked actively and creatively, with

---

[13] *MCL 4th*, § 10.13 at p. 13.

opposing counsel, the Special Master, and the Court, in a fair and practical design for a phased limitation trial.  The Trial Plan recently announced by the Court incorporates the essential aspects of these proposals, for a single Limitation Trial, in three Phases, conducted as a bench trial.  Phase I (the "Incident Phase") will involve issues relevant to the loss of well control, the fire, explosion and sinking of the Deepwater Horizon, culminating in the release of oil from the Macondo well.  After a break of duration to be determined by the Court, the trial will resume for Phase II, addressing source control and the quantification of the oil discharged from the well. Phase III will address claims arising from the post-Incident clean-up efforts.

### K.      Experts

While the conduct of document and deposition discovery is a key task of the PSC, it is not the only task that the PSC is performing, on an ongoing basis, for the common benefit.  In preparation for the Limitation Trial, the PSC has interviewed, evaluated, and retained experts in multiple fields, as both consultants and testifying experts, and has formed working groups to advance the Plaintiffs' case in the multiple complicated scientific, technical, environmental, and maritime areas that are relevant to the trial in these proceedings.

The expert reports of key Phase One liability experts have been submitted, along with voluminous productions of Consideration Materials and the filing of Expert Reliance Exhibit Lists.  At the same time, teams of Common Benefit Attorneys are working on the initial stages of Phase Two liability expert reports, as well as the formulation of scientific, economic and environmental analyses, theories and strategies.

### L.      Legal Analysis

In addition to work with experts, the PSC has undertaken the ambitious work of legal analysis in the fields of the OPA, General Maritime Law, other federal and state law, punitive damages, and the intersection and overlap of private economic loss, governmental, and public

interest claims.  Plaintiffs have consulted with legal as well as scientific and technical experts, have conducted extensive legal as well as factual research, and have developed and implemented the "pleading bundles" system to organize and prosecute common and recurring claims of multiple categories of plaintiffs in this litigation.

      **M.**      **Protection of Putative Class Members**

The PSC has organized and preserved class action claims in these proceedings, and has acted at all times to protect the procedural interests of putative class members in fair treatment in these proceedings, including motions and reports directed to the activities of BP's GCCF, in order to protect putative class members/claimants from unfair, coercive, or inconsistent treatment with respect to the presentment of their claims to GCCF, and the preservation of their claims for prosecution in these proceedings.

The PSC and other Common Benefit Attorneys have also provided substantial efforts to ensure that claimants pursuing claims with Mr. Feinberg as part of BP's GCCF are aware of the nature of the relationship between Mr. Feinberg and BP.  As the Court is aware, for many months Mr. Feinberg claimed to be fully "independent" of BP despite the fact that his relationship with BP was much more closely related.  After substantial briefing by the PSC, and in coordination with several Attorneys General, the Court ordered Mr. Feinberg to stop referring to himself as "independent" and to further abide by the prevailing rules and standards imposed on lawyers with respect to communications with adverse and unrepresented parties.

The PSC continues to monitor the GCCF process, and filed a Supplemental Brief in Support of Supervision Over the BP Interim Claim Process, seeking Court appointment of a Special Master under Fed. R. Civ. P. 53 to ensure compliance with OPA, and to make findings and/or recommendations regarding the satisfaction of OPA's presentment requirements and the scope and/or efficacy of releases.  The PSC is also working with the U.S. Department of Justice

and the Gulf State Attorneys General in Attorney General Holder's audit of the GCCF.

The PSC and other Common Benefit Attorneys have provided further evidence and briefing to the Court to help ensure compliance with the Oil Pollution Act of 1990, and have otherwise worked with the GCCF, the Court, claimants, and others, in efforts to improve the fairness and efficiency of BP's GCCF process. These efforts, the PSC believes, provide a substantial common benefit to all claimants – even those who are not actively engaged in this MDL.

### N.     Science

The PSC has made considerable, vitally important scientific evidence contributions to the litigation and will continue to do so. The PSC has focused on the oil spill's environmental and ecological impacts and the damages flowing from those impacts. It has retained a robust data collection team of consultants ensuring that all relevant data is available and accessible for our experts, and it has a team of consultants ready to take samples in the event of current or future oiling events. Especially in light of BP's public statements that most if not all of the oil from the Deepwater Horizon was captured, has dissipated or has been degraded by weather and/or microorganisms, it is vital to the successful prosecution of the cases in the MDL to have world-renowned scientific experts who can credibly, forcefully and with robust scientific backing refute these insupportable statements by BP. It would be near impossible for all parties to the MDL to calculate both the extent and duration of the damages caused by this oil spill without the scientific evidence currently being developed by the PSC. Indeed, the team of scientific experts amassed by the PSC is putting the pieces together now to counter these false statements and demonstrate the actual volume of discharge, movement of the oil, and damage caused by that oil to the businesses in and around the Gulf; to businesses that rely on Gulf products; to people who rely on the Gulf for subsistence; to the natural resources (including shorelines, sea life, marshes

and beaches) shared by citizens of the U.S. and the States;  to local tax revenues; and to numerous other injured claimants-in-limitation, GCCF claimants, and parties to the MDL pleading bundle complaints.

At the outset, the PSC, recognizing the critical aspect of the scientific evidence in this case, formed a "Science Group" in November 2010 to oversee and coordinate the five science and environmental Work Groups.  The core members of the Group consist of attorneys from seven law firms, and have fulfilled numerous roles, including:

1.    Identifying potential expert witnesses on myriad science issues;

2.    Conducting a comprehensive literature and background review of each of the identified potential expert witnesses;

3.    Interviewing potential experts who passed the vetting process of (2) above;

4.    Retaining qualified experts in the dozens of fields relevant to proving the claims in the master bundle complaints;

5.    Compiling a notebook of qualified and retained experts in myriad fields of expertise relevant to the oil spill for review by any MDL attorney at the PSC depository;

6.    Evaluating and approving studies relevant to the task of proving environmental and ecological injury and damage to the plaintiffs in the MDL; and

7.    Developing and maintaining a library on all scientific studies and anecdotal articles that address the oil spill's environmental and ecological impacts.

Since the Group's formation, it has interviewed over 200 potential scientific experts — leaders in their fields of expertise — to ensure a top-rated group of experts with relevant experience for the MDL.  This initial task was particularly challenging, as the list of experts knowledgeable about deepwater oil spills is small.  It has required delving into issues such as (1) quantifying the oil that flowed from the riser; (2) quantifying the oil that reached and will continue to reach the surface; (3) determining the effect of the dispersant on oil coming out of the riser; (4) quantifying the oil that remains in the Gulf; (5) determining the likely quantity and

location of oil from the oil spill that will surface in the form of oil slicks, tar balls or tar mats in the future; (6) evaluating the oil spill's impacts on the populations and the health of Gulf sea life and the Gulf ecosystem as a whole; and (7) determining the length of time the environmental and ecological impacts will continue.  Indeed, the answers to these questions and more are critical to calculating the damages of any of the plaintiffs in the MDL; the scientific evidence the PSC and other Common Benefit Attorneys are developing is critical to the trial phases following phase one and for allocation purposes in the event of a resolution before final judgment.

To address the issues set forth above, the Group has hired dozens of experts and has undertaken numerous studies and projects for the benefit of all of the plaintiffs in the MDL.[14] This work is well underway and is on schedule to be produced in the form of expert reports and models as early as December 2011.  The PSC and other Common Benefit Attorneys have compiled and maintain notebooks containing relevant information regarding the experts interviewed and retained to date.  These are available for review by private attorneys and federal, state and local government attorneys with cases in the MDL and are critical to the successful prosecution of their cases.

## IV.   THE PSC AND OTHER COMMON BENEFIT ATTORNEYS ARE ADVANCING COSTS AND INVESTING TIME ON A CONTINGENT BASIS

At every step, the PSC and other Common Benefit Attorneys have been keenly aware of the importance of maintaining a schedule so as to meet the Court's firm trial date for the February 2012 Limitation trial.  Time is money, and the time-sensitive prosecution of this

---

[14] Because the actual studies and projects are protected as the PSC's attorney work product, and the time to disclose the experts and this expert evidence is many months away, this memorandum will not disclose the names of the experts retained nor the specific studies and projects the PSC has undertaken to establish the extent and duration of environmental and ecological damages.  If the Court would like further detail in these areas, the PSC respectfully requests that it be permitted to submit that information for *in camera* review.

litigation has, and will, conserve not only the time, but the resources, of all involved.  Complex

litigation is expensive, and has become more so in recent years, despite the best efforts of courts,

and certainly the best efforts of Plaintiffs' counsel, to conserve costs and to do more with less.  In

complex litigation, it is the function of the PSC not only to perform the major work for the

common benefit of plaintiffs, but to fund the infrastructure and advance the considerable costs

that are necessary and unavoidable.  Because the PSC does so out-of-pocket, its interests in cost-

efficiency and expedition are aligned with those of all plaintiffs.[15]  Because its members dedicate

and pool their resources, they can face their well-funded adversaries in this litigation on a level

of commitment commensurate with the duties and responsibilities placed upon them by the

Court.

The expenses referenced in this Status Report have been advanced by the PSC and other

Common Benefit Attorneys on a contingent basis.  The undersigned recognize that there is a risk

of non-recovery, and that any recovery will be delayed, to the end of these proceedings, and will

depend upon Court approval.  In order to produce, preserve, or enhance the benefit for Plaintiffs,

the PSC has committed to advance, out-of-pocket, the substantial costs of conducting discovery,

including building and maintaining the infrastructure of a document and discovery repository,

paying the costs related to depositions, experts, and testing.  Members of the PSC and other

Common Benefit Attorneys generally pay for their necessary travel and living expenses, out-of-

pocket.  To date, the members of the PSC and other Common Benefit Attorneys have contributed

---

[15] As Judge Easterbrook noted in *Kirsch v. Flynn*, 786 F.2d 320, 325-26 (7th Cir. 1986),
"The contingent fee [percent contract] uses private incentive rather than careful monitoring to
align the interests of lawyer and client.  The lawyer gains only to the extent his client gains . . . .
At the same time as it automatically aligns interests of lawyer and client, rewards exceptional
success, and penalizes failure, the contingent fee automatically handles compensation for the
uncertainty of litigation."  *See also* Conte, *Attorney Fee Awards* (Third Edition) § 1.7 Economics
of Contingent-Fee-Award Practice, pp. 29-32

over $11.54 million towards common benefit shared and held expenses.  Assessments will

continue, as necessary, to pay for the costs of proceeding to trial, and conducting the limitation

trial and follow-on proceedings.  These expenses are advanced with only one guarantee,

contingent on a successful outcome:  that, under the equitable common benefit doctrine, as

established and articulated by the United States Supreme Court as within the inherent authority

of District Court judges, PSC and Common Benefit Attorneys are assured that the Court will

review their work and expenses, and enter an order providing for just and reasonable

reimbursement and compensation from the overall benefit obtained.[16]

## V.     THE SOURCE AND APPLICATION OF THE COMMON BENEFIT DOCTRINE: PRINCIPLES, PRACTICES, AND EQUITIES

In order to provide for the reimbursement of expenses advanced and compensation for

work performed by designated counsel who carry out their court-directed duties and

responsibilities, "common benefit", "hold back" or "assessment" orders are issued by MDL

judges in the exercise of their equity jurisdiction and inherent case management authority.

Judge Barbara Rothstein (the recent Director of the Federal Judicial Center) described

how this system works in *In re Phenylpropanolamine ("PPA") Prods. Liab. Litig.* (MDL

No. 1407), 2009 U.S.Dist. LEXIS 126729, *1-2 (W.D.Wash. 2009), "Certain lawyers

representing plaintiffs in this litigation were authorized to undertake work for the benefit of all

MDL 1407 plaintiffs (such work is hereinafter referred to as 'common benefit work').  Counsel

undertaking this work did so with the understanding that at the conclusion of MDL 1407, they

would be reimbursed out of an account funded with a percentage of verdicts and settlements in

---

[16] It is, of course, the preference of the undersigned that such a common benefit award be ultimately paid by the Defendants, in the form of statutory attorneys fees or negotiated terms, and not subtracted from the recoveries of Plaintiffs.  In the alternative, the PSC would suggest that such common benefit fees (if any) be taken first out of the contingency attorney fees (if any), as opposed to the net recovery.

cases associated with MDL 1407." The *PPA* common benefit account had been created by a

hold back order, (modified to 8% for a particularly complex settlement with one defendant),

similar in operation to the proposed order to establish a common benefit account and reserve

sought here.  2009 U.S. Dist. LEXIS 126729, **3-4.

> The overarching principles of the common benefit doctrine are threefold:
>
> 1) the common benefit system spreads the necessary costs of litigation equitably among all who receive a benefit from the litigation, but only if and when the benefit is realized by a recovery;
>
> 2) the common benefit system incentivizes designated counsel to undertake the substantial risk of advancing such necessary costs and time at their own expense, on a contingent basis, for the benefit of all, on the prospect of recouping it later, if and when these efforts are successful; and
>
> 3) the system produces a net benefit to all participants by eliminating duplication of cost and effort, and most fully realizing the potential economies of scale inherent in mass tort/mass disaster litigation.

The common benefit system both reduces the overall and per-plaintiff expense of

litigation, and shifts the initial responsibility and risk for the expenditure of those costs from the

many who cannot afford to advance them, to the few who can.

## VI. THE FEDERAL DISTRICT COURTS HAVE THE AUTHORITY AND DISCRETION TO ENTER "HOLD BACK" ORDERS UNDER THE COMMON BENEFIT DOCTRINE

The courts appointed to serve as MDL transferee courts are vested with broad discretion

and authority to coordinate and supervise the complex multidistrict litigation that is centralized

under their stewardship.  To manage such complex litigation, the transferee court may appoint

liaison counsel and plaintiffs' steering committees to coordinate and conduct investigation,

discovery, and other pretrial preparation and trial work.  *See Manual for Complex Litigation*

*(Fourth)*, § 22.62.  The "necessary corollary to court appointment of [such] counsel . . . is the

power to assure that these attorneys receive reasonable compensation for their work."  As the

Fifth Circuit explained in *Florida Everglades*,

> "if lead counsel are to be an effective tool, the court must have means at its disposal to order appropriate compensation for them. The court's power is illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation."

*In re Air Crash Disaster at Florida Everglades* (MDL No. 139), 549 F.2d 1006, 1016 (5th Cir. 1977) ("*Florida Everglades*").[17]

The Fifth Circuit recently reaffirmed the principles and mechanisms it endorsed in *Florida* Everglades in this very litigation, stating:

> "We have long held that a district court has the inherent authority and discretion to consolidate and manage complex litigation, particularly when serving as the transferee court in a multidistrict proceeding. *See In re Air Disaster at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1012-16 (5th Cir. 1977) (holding that an MDL transferee court has managerial power that is "especially strong and flexible in matters of consolidation," and that the court's managerial power necessarily includes the authority to appoint lead or liaison counsel and to compensate them for their work). This discretion is firmly grounded in the Federal Rules of Civil Procedure, particularly Rules 16, 26, 37, 42, and 83, which contain numerous grants of authority that supplement a district court's inherent power to manage litigation. Indeed, Rule 16(c) expressly authorizes district courts to adopt "special procedures for managing potentially difficult or protracted actions that may

---

[17] "A transferee court in a federal multidistrict litigation has the power to determine the compensation for appointed lead counsel and to impose its fee calculation on all federal plaintiffs, even if their cases are 1) before other federal courts rather than the transferee court, or 2) not yet in a federal court, but ultimately are in such a court." *In re Zyprexa Prod. Liab. Litig.*, (MDL No. 1596) 467 F.Supp.2d 256, 265 (E.D.N.Y. 2006), *citing Walitalo v. Iacocca*, 968 F.2d 741, 747 (8th Cir. 1992), and *Florida Everglades*, 549 F.2d at 1019 (MDL transferee court that appointed leadership committee "was the only tribunal that could effectively handle the fee matter."). *See also Zyprexa*, 451 F.Supp.2d 458 (E.D.N.Y. 2006) (court exercised its case management/common benefit authority to allocate a share of attorney fee responsibility to federal and state governments collecting on Medicare/Medicaid liens from MDL settlements).

> involve complex issues, multiple parties, difficult legal questions,
> or unusual proof problems."  Fed. R. Civ. P. 16(c)(2)(L)."[18]

Common benefit or "hold back" orders thus reflect a basic equitable principle:  a party whose efforts benefit other parties should receive reasonable compensation for those benefits conferred, the burden should be shared among all beneficiaries, and the burden should be proportional to the benefit.

The Supreme Court has repeatedly held that a party who expended resources to secure a common benefit should be compensated by all those who have benefited.  The Court first articulated this common benefit doctrine 130 years ago, long before the advent of modern class action or multidistrict litigation, in the landmark decision of *Trustees v. Greenough*, 105 U.S. 527 (1881).  The doctrine articulated in *Trustees v. Greenough* ensures that litigants and counsel whose efforts and expenditures have recovered, preserved, or enhanced recoveries for the benefit of others are ratably reimbursed and compensated by the beneficiaries of their efforts. In traditional terms, this is an elementary matter of equitably apportioning the costs of a benefit conferred to avoid unjust enrichment.  A long line of Supreme Court authority reaffirms that it is unjust enrichment and contrary to public policy for claimants who benefit from others' work in a litigation, to do so without contributing to the cost of the efforts that produced the benefit, and therefore recognizes a right to payment from them.  *See Trustees*, *supra*; *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885); *Sprague v. Ticonic National Bank*, 307 U.S. 161, 166 (1939). The common benefit doctrine "reflects the traditional practice in courts of equity" and "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Boeing Co. v. Van Gemert*, 444 U.S. 472,

---

[18] *In re:  State of Louisiana, Petitioner*, No. 11-30178, Order Denying Petition for Writ of Mandamus to the United States District Court for the Eastern District of Louisiana, U.S.D.C. No. 2:10-MD-2179, issued April 11, 2011.

478 (1980).

While the common benefit doctrine is applied frequently, but not exclusively, in class

actions, and shares some principles and concepts with the class counsel fee procedures under

Fed. R. Civ. P. 23, it was developed by the Supreme Court **independent** of the class action

procedure, and applies to **all** substantive and procedural litigation contexts.  *See Sprague v.*

*Ticonic Nat'l Bank*, 307 U.S. 161, 166 (1939).  "That the party in a situation like the present

neither purported to sue for a class nor formally established by litigation a fund available to the

class, does not seem to be a differentiating factor so far as it affects the source of the recognized

power of equity to grant reimbursements of the kind for which the petitioner in this case

appealed to the Chancellor's discretion."  Rather, the power to withhold, collect and spread costs

through a common benefit mechanism is "part of the original authority of the Chancellor to do

equity in a particular situation."  307 U.S. at 166.  The doctrine rests broadly on the principle that

"to allow others to obtain full benefit from the plaintiff's efforts without contributing equally to

the litigation expenses would be to enrich others unjustly at the plaintiff's expense."[19]

While the venerable equitable common benefit doctrine reflects the inherent ability of

*every* federal district judge to do equity in a wide variety of procedural circumstances, it has

become a staple of effective case management in modern complex litigation, especially

contemporary multidistrict ("MDL") litigation.  The Fifth Circuit led the way in its early

appellate affirmation of a common benefit order in *Florida Everglades, supra,* which followed

the Supreme Court's *Trustees*, *Sprague* and *Pettus* common benefit decisions to hold that proper

management of multidistrict litigation requires the entry of what have since become known as

---

[19] *Pettus*, 113 U.S. at 116; s*ee also Mulligan Law Firm v. Zyprexa MDL Plaintiffs'*
*Steering Committee*, 594 F.3d 113, 119 (2d Cir. 2010) (petition for writ of mandamus from MDL
common benefit order denied).

"common benefit," "assessment" or "hold back" orders.  *Florida Everglades* gave practical implementation to court-appointed lead/liaison counsel and PSC structures by holding that because "lead counsel's services are in part for all parties with like interests and their lawyers," a multidistrict litigation transferee court is obligated to compensate counsel who developed and prosecuted a case from the recovery of others who reaped the benefit of that work and followed on its coat-tails. *Id.* at 1017 (emphasis added).

Thus, under the common benefit doctrine, multidistrict transferee courts are empowered to require that fees be equitably shared in complex civil litigation.  *See, e.g.*, *Florida Everglades*, 549 F.2d at 1016 ("We hold that the district court had the power to direct that the Committee and its counsel be compensated and that requiring the payment come from other [non-member] attorneys was permissible."); *Smiley v. Sincoff*, 958 F.2d 498, 501 (2d Cir. 1992) ("District courts have exercised this power to establish fee structures designed to compensate committee members for their work on behalf of all plaintiffs involved in consolidated litigation."); *Walitalo v. Iacocca*, 968 F.2d 741, 747 (8th Cir. 1992) ("It is well established that courts can impose liability for court-appointed counsel's fees on all plaintiffs benefiting from their services"); *In re San Juan Dupont Plaza Hotel Fire Litig.* (MDL No. 721), 111 F.3d 220, 223-25 (1st Cir. 1997); *In re MGM Grand Hotel Fire Litig.* (MDL No. 453), 660 F.Supp. 522 (D.Nev. 1982); *In re FTC Line of Business Report Litig.*, 626 F.2d 1022, 1027 (D.C. Cir. 1980).  Underlying these and other decisions, in a wide variety of class action, MDL, consolidated, and other complex litigation contexts, is "the equitable notion that those who have benefited from litigation should share its costs."  *Skelton v. General Motors Corp.*, 860 F.2d 250, 252 (7th Cir. 1988) (citation omitted).

The *Manual for Complex Litigation (4th ed. 2004)* (the "*Manual 4th*"), emphasizes that, together with an MDL court's power and obligation to appoint responsible counsel, comes the

power and obligation to ensure that counsel who have undertaken core work on the litigation,

particularly court-appointed counsel, receive compensation, including from later-filed (or

unfiled) cases and settlements that take advantage of and piggy-back on their work.  The *Manual*

*4th* recognizes and endorses the hold back mechanism as follows:

> "Class counsel generally have the benefit of the common fund
> doctrine to support payment for their efforts on behalf of the class
> or consolidated litigants.  MDL judges generally issue orders
> directing that defendants who settle MDL-related cases contribute
> a fixed percentage of the settlement to a general fund to pay
> national counsel."  *Id.* § 20.312; see also *id.* §§ 11.211, 14.211,
> 14.215, 22.927.

As *Greenough* noted, the fund from which common benefit fees and costs are to be paid

must be "subject to the control of the court." 105 U.S. at 536.  In *Boeing v. Van Gemert*, 444

U.S. 472, 478 (1980), the Supreme Court explained that this means the court must have

"[j]urisdiction over the fund involved in the litigation."  This criterion is satisfied by jurisdiction

over a party that controls the fund, usually the defendant.[20]  In the MDL context, transferee

courts create this fund through orders directing defendants to "hold back" a specified percentage

from settlements that release claims asserted in the MDL.  The account into which these hold

back funds are deposited becomes the source of common benefit fees and costs awards that are

made, at the close of the proceedings, pursuant to duly-noticed motion and a court approval

process.  The <u>unawarded</u> <u>funds</u> <u>are</u> <u>returned</u> <u>to</u> <u>the</u> <u>beneficiaries</u>.

Admiralty and maritime proceedings, such as the instant consolidated Limitation

proceedings, are familiar examples of *in rem* jurisdiction.  The comprehensive case management

jurisdiction of a district court over complex litigation, MDL proceedings, or class actions has

---

[20] Alan Hirsch and Diane Sheehey, *Awarding Attorneys' Fees and Managing Fee Litigation*, at p.59 (Federal Judicial Center 1994); Mary Frances Derfner & Arthur D. Wolf, *Court Awarded Attorney Fees § 2.03*, at 2-27 to 2-34.1 (discussing various ways in which a court may exercise control of the fund).

also been recognized as *in rem*[21] jurisdiction, with the common fund, settlement fund, or the litigation or the complex litigation itself as the foundational *res*.  In the proper exercise of this *in rem* jurisdiction, the district court may regulate and enjoin the conduct of those appearing before it, and others, in order to prevent interference with its administration of the litigation, to enjoin conflicting or competing state proceedings, and to protect, preserve, approve, and apportion judgments or settlements.[22]

## VII.  "UP FRONT" ASSESSMENTS AND "HOLD BACK" ORDERS

A well-accepted feature of the common benefit doctrine, as it has been adapted to contemporary mass tort MDL case management, is the mechanism that enables MDL courts to exercise their jurisdiction over the named parties (including defendants) and their counsel to compensate and reimburse costs incurred and labor expended by designated counsel for the common benefit.  This is accomplished by ordering the Defendants, who are properly before the

---

[21] According to *Black's Law Dictionary* (7th Ed.), *in rem* [Latin for "against a thing"] is jurisdiction "involving or determining the status of the thing, and therefore the rights of persons generally with respect to that thing."  Accordingly,

> "An action *in rem* is one in which the judgment of the court determines the title to property, and the rights of the parties, not merely as between themselves, but also as against all persons at any time dealing with them or with the property upon which the court had adjudicated."  R.H. Graveson, *Conflicts of Laws*, 98 (7th. ed. 1974).

[22] *In re Diet Drugs Prods. Liab. Litig.*, 369 F.3d 293, 306 (3d Cir. 2004); *In re Diet Drugs*, 282 F.3d 220, 235 n.12 (3d Cir. 2002); *Battle v. Liberty Nat'l Life Ins. Co.*, 877 F.2d 877, 882 (11th Cir. 1989); *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1332, 1334 35 (5th Cir. 1981).  *See also In Re Baldwin-United Corp.*, (MDL No. 581) 770 F.2d 328 (2d Circuit 1985), upholding the district court's authority, under the All-Writs Act, 28 U.S.C. § 1651, to enjoin states from bringing actions that would affect the rights of any plaintiff or class members, whose claims, in the form of putative class actions, were before the district court.  *Baldwin-United* analogized the MDL court's jurisdiction to "that of a court in an in rem action or in a school desegregation case, where it is intolerable to have conflicting orders from different courts." 770 F.2d at 337.  "An important feature of the All-Writs Act is its granted authority to enjoin and bind non-parties to an action when needed to preserve the court's ability to reach or enforce its decision in a case over which it has proper jurisdiction."  *Id*. at 341.

court, to "hold back" a percentage of the funds they (or an amount equivalent to such percentage) pay to claimants to settle MDL-related claims.  *See Diet Drugs*, 553 F.Supp.2d at 456-58; *Vioxx*, 760 F.Supp. at 654; *Zyprexa*, 467 F.Supp.3d at 261.  The fund accumulated by deposits of this "hold back" into a Court-supervised account is then available to compensate (after court scrutiny and approval) Common Benefit Attorneys whose work has protected or enhanced the value of such claims, such as through the development of the law and facts common to all claims, or through the development of structures, mechanisms, or systems that facilitate or expedite the settlements themselves.  This "hold back" frequently does not diminish the plaintiffs' recovery, or increase their attorneys' fees:  it may, depending upon the circumstances, be assessed potentially or entirely against the defendants, or against the plaintiff attorney fee portion of any recovery.  In some instances, it has been paid by the defendants in addition to awards to plaintiffs - *e.g.,* under statutory attorney fee provisions, or as a separately negotiated settlement term.  This is the PSC's goal and preference here.

The amount and value of the benefit conferred is not determined by either the beneficiary or the benefactor, since each might view benefit with a different eye.  The "hold back" itself thus does not guarantee that any specific amount of common benefit will be awarded or paid;  it does not relieve common benefit applicants of the burden of demonstrating that their time, effort, and expense in fact produced the benefit;  nor does it shift this burden from the applicants to anyone else.   Funds available through a hold back mechanism to pay qualified applicants are not immediately awarded.  The Court, as the most knowledgeable and neutral assessor of value, must decide – at a later appropriate time - how much to award, and to whom.  Any balance not awarded is redistributed to the beneficiaries.

This failsafe feature of the hold back mechanism ensures that no claimant ever pays,

directly or indirectly, more than the value of the services rendered.[23]

Typically, Liaison Counsel and the members of the Court-designated PSC contribute "up front" cash assessments to fund the common benefit work. Here, almost twelve million dollars has already been contributed, on a contingent basis, by Co-Liaison Counsel, PSC members, and other Common Benefit Attorneys, to create a working fund to pay for the work of the document depository, the conduct of depositions, fact investigation, the retention and preparation of experts, and other activities which, in turn, will produce a tangible and valuable benefit for all plaintiffs. Without a hold back order in place, the PSC will have expended many millions of dollars in upfront assessments to fund the necessary work for the common benefit of all plaintiffs which this Court has designated and directed them to undertake, without any system for equitable reimbursement. In addition to the ongoing advancement of "up front" cost assessments to pay for document analysis, depositions, investigations, expert witnesses and other major expenses of this litigation, the PSC devotes its time, again on a contingent basis (PSC and other Common Benefit Attorneys have submitted over 230,000 hours to date), is keeping and submitting its time records, while awaiting the "if" and "when" of an ultimate recovery to recoup this common benefit time.

---

[23] For example, in the *Diet Drugs* MDL, the initial common benefit assessment was 9%, a typical assessment of that era. After it became clear there were sufficient funds available to compensate the common benefit lawyers, the court reduced this amount to 6%. *In re Diet Drugs Prod. Liab. Litig.*, 582 F.3d 524, 554 (3d Cir. 2009). *See also Turner v. Murphy Oil USA, Inc.*, 422 F. Supp. 2d 676 (E.D. La. 2006) (approving 10% assessment for common benefit attorney's fees, and 2% assessment for common benefit costs, on individuals who opted out and retained counsel for purposes of filing lawsuits or settling claims); *In re MGM Grand Hotel Fire Litig.* (MDL No. 453), 660 F. Supp. 522 (D. Nev. 1987) (adjusting assessment percentage upward to 7%). Common benefit orders typically provide that, to the extent the Fund ultimately exceeds the amount needed to make payments as provided in the Proposed Order, the Court may order a refund, on a *pro rata* basis, to those who contributed to the Fund. Such a rebate was recently ordered in the *Vioxx* litigation, in which the common benefit award ultimately approved was 6.5% of the $4-plus billion settlement, rather than the 8% originally requested and withheld.

## VIII.  THE COMMON BENEFIT DOCTRINE INCENTIVIZES CONTINGENT EFFORTS AND EXPENDITURES TO CONSERVE THE RESOURCES OF LITIGANTS

As noted above, multidistrict transferee courts routinely enter orders that create a funded source for future court-approved compensation to liaison counsel and court-appointed committees.  Along with judicial appointment of designated counsel (such as liaison counsel and plaintiffs' steering committee members), and the issuance of an order to provide for some measure of reimbursement and compensation for their services – *if* and *when* the litigation generates monetary recoveries – is the obligation of such counsel to conserve their own efforts, and to spend their time carefully and productively.  MDL courts ensure that such time is not wasted, duplicated, or expended unproductively or unnecessarily by keeping close watch over the time spent and costs incurred by designated counsel.  As this Court has done in Pre-Trial Order No. 9, MDL courts typically require designated counsel to report, periodically, to an auditor, or to the court itself, and time and costs records are scrutinized carefully before any judicial approval of payment occurs.  Funds held back under a common benefit order are distributed to counsel only after court scrutiny and approval of the reasonableness of the time and costs for which awards are requested.  *See generally*, *MCL 4th*, §§ 10.223; 14.215; 14.22-14.232.[24]

---

[24] The MDL court's case management authority over complex litigation extends beyond the evaluation, determination, and award of any common benefit fees, to the regulation of the contingent fees of all plaintiffs' attorneys who appear before it.  While not always exercised, this authority is available to limit, or "cap" in appropriate circumstances, contingent fees that would otherwise consume too much of the plaintiffs' recoveries.  *See, e.g.*, *In re Vioxx Products Liability Litigation (MDL No. 1657)*, 650 F. Supp. 2d 549 (E.D. La. 2010) (MDL transferee court imposed a 32% contingent fee cap based on the court's inherent authority, and its implied authority from the settlement, to limit the fees, and promote the just and efficient conduct of the litigation under 28 U.S.C. § 1407(a), the MDL statute).  In *Vioxx* the common benefit fee ultimately awarded (6.5%) was deducted from the private contingent fees, rather than the plaintiffs' share of the settlement proceeds.

Numerous courts have enforced the common benefit doctrine in the context of non-class, mass tort or product liability multidistrict litigation, as the early decrees in *Florida Everglades*, *supra*; and *In re MGM Grand Hotel Fire Litigation* (MDL No. 453) 570 F. Supp. 913 (D. Nev. 1983); and the recent common benefit orders entered in the *Avandia*, *Trasylol*, *Bextra* and *Kugel Mesh* MDLs demonstrate.[25]

Indeed, the common benefit doctrine is of particular, practical, and immediate utility in the MDL context.  By designating a relatively small group of plaintiffs' attorneys with substantial resources that are directed by the Court to risk these resources in a common cause— the prosecution of the MDL on behalf of all plaintiffs—the Court assures at the outset that significant benefit accrues to all plaintiffs, their counsel, and to the system itself throughout the proceedings.  Such benefit creation includes the real net benefit of lower costs and less work for individual counsel, some of which would otherwise be required to conducting all discovery, replicate the time and costs of litigating all motions, preparing for trial, and retaining all experts on their own.  The only work entitled to compensation from a common benefit fund is work that has demonstrably provided a benefit to all plaintiffs, or to a defined group of plaintiffs as a whole—the common benefit work.  In contrast, work benefiting only a single plaintiff is, of course, compensated under the terms of that plaintiffs' fee contract with his or her individual counsel.

## IX.    WHAT IS THE CUSTOMARY OR APPROPRIATE RANGE OF COMMON BENEFIT ASSESSMENTS?

The chart below illustrates assessments in recent MDLs, updating charts prepared by

---

[25] *See also, In re Protegen Sling and Vesica System Prods. Liab. Litig.* (MDL No. 1387), 2002 WL 31834446 (D. Md. Apr. 12, 2002) ("*Protegen Sling*") (9% set-aside); *In re Linerboard Antitrust Litig.* (MDL No. 1261), 292 F. Supp. 2d 644 (E.D. Pa. 2003) ("*Linerboard*") (establishing common fund and requiring set-aside for class counsel in antitrust multidistrict litigation).

Prof. William B. Rubenstein of Harvard Law School, which appeared in "On What A 'Common Benefit Fee' Is, Is Not, And Should Be," *Class Action Attorney Fee Digest* (March 2009), can be found at www.billrubenstein.com.  As Professor Rubenstein reports, Court-approved hold back assessments in MDL litigation appear to range from 4%-18%, with a significant cluster in the 4%-8% range.  The six percent (6%) hold back is a frequently selected percentage.  This chart illustrates the hold back distribution:[26]



Professor Rubenstein's article also summarizes the way MDL common benefit fee assessments work:

> "Courts often set the fee early in the litigation, ordering the defendant to 'hold back' that amount from any settlement it reaches throughout the case.  A fund is thereby generated, and at the conclusion of the case, those attorneys who did common benefit work can petition the judge for disbursement of some or all

---

[26] Recent additional hold back orders in *Fosamax* (up to 9%); *Zimmer* (4%); *Gladolinium* (6%) (*see fn.* 24 below) demonstrate this range.

> of the fund. . . the common benefit fee is therefore a way of
> spreading the fees for a case between [individual Plaintiffs'
> Attorneys] doing individual client work locally and PSCs doing
> common benefit work at the national or aggregate level.  It is
> essentially an intra-attorney fee allocation mechanism."

Rubenstein, at p. 89.  The assessment thus avoids adding a surcharge on plaintiffs to their

individual attorney's fees, so that even in cases where the defendant does not ultimately bear the

cost of the hold back, the system assures that all lawyers and clients share equitably in the costs,

as well as the benefits, of work done in connection with an MDL.  It is common practice, in

contemporary MDLs, to impose any common benefit holdback against lawyers' fees, or other

sources, not claimants' proceeds.[27]

Three recent hold back orders from contemporary MDLs are attached as Exhibits A-C to

this submission to illustrate the mechanisms used to create "common benefit funds" in current

practice.[28]  Clearly, each litigation presents circumstances that may call for variations; this

litigation includes the prospect of statutory fee awards under *e.g.*, the Clean Water Act and OPA,

---

[27] *See, e.g., In re Vioxx Prods. Liab. Litig.* (MDL No. 1657), 2010 U.S. Dist. LEXIS 139917 (E.D. La.. Dec. 9, 2010) (awarding a 6.5% common benefit assessment against the attorneys' fees portions of recoveries from a comprehensive non-class personal injury settlement, in the court's exercise of its inherent and case management authority over the beneficiaries of the PSC's common benefit work).  At the appropriate time, the Court, consistent with MDL history and procedure, will exercise its authority over the MDL and its participants to compensate and reimburse approved work of court-appointed counsel in an appropriate amount.  *See, e.g., Manual for Complex Litigation*, Fourth (Federal Judicial Center 2004), §§10.223, 14.215; Hirsh & Sheehey, Awarding Attorneys' Fees and Managing Fee Litigation (Federal Judicial Center 2005).

[28] *See* EXHIBIT A, *In re: Fosamax Products Liability Litigation* (MDL No. 1789), *Case Management Order No. 17* (amended) (Establishing Plaintiffs Common Benefit Fund) (SDNY April 28, 2011) (up to 9% [mandatory] assessment); EXHIBIT B, *In re: Zimmer Durom Hip Cup Products Liability Litigation* (MDL No. 2158) Case Management Order No. 3:  Order Establishing Common Benefit Fund (DNJ January 21, 2011) (4%); EXHIBIT C, *In re: Gadolinium Based Contrast Agents Products Liability Litigation* (MDL No. 1909), Pretrial Order No. 2 (Establishing Gadolinium Based Contrast Agents Fee and Expense Fund to Compensate and Reimburse Attorneys for Services Performed and Expenses Incurred for MDL Administration at the Common Benefit) (ND Ohio, February 20, 2009) (6%).

making appropriate a hold back equivalent to, rather than deducted from, a specified percentage.

Because six percent (6%) is consistent with what has been widely approved other MDLs, the PSC now recommends this percentage be adopted by the Court as an across-the-board hold back with respect to settlements, judgments or other payments arising out of the Macondo / *Deepwater Horizon* incident and spill.[29]

## X.   THE PSC's REQUEST TO ESTABLISH A COURT-SUPERVISED ACCOUNT IN THESE MDL AND LIMITATION PROCEEDINGS

The *Manual* advises the court to make provision for the compensation of designated counsel; in cases that will be litigated, adjudicated and resolved exclusively as class actions, Rule 23 itself provides a framework and a jurisprudence for such compensation, which is contingent upon a successful outcome, and subject to court review.[30]  On the defense side, where payment by the hour (regardless of outcome and without deferral) is the norm, setting aside funds to compensate defense lead or liaison counsel on an ongoing basis is relatively straightforward.[31]

On the plaintiffs' side, however, most representation is contingent.  In this MDL, contingent fee representation is, of necessity, the norm, at least for individual claimants who are not well funded commercial interests, or governmental entities.  Indeed, the members of the

---

[29] In light of the ongoing and substantial coordination and contributions between and among the PSC and other Common Benefit Attorneys and the State of Alabama, as well as the State of Louisiana, the PSC seeks a reserve of only four percent (4%) of any settlement, judgment or other payment to the State of Alabama or to the State of Louisiana. Moreover, the PSC does *not* seek any hold-back at this time over settlements, judgments or other payments to the United States.

[30] This MDL, unlike some mass tort MDLs in which "hold back" orders are put in place, includes class actions for economic loss of the type courts have certified under Rule 23(b)(3). The ultimate resolution of all or part of these proceedings could take the form of a class action settlement.  In such case, attorneys fees would be awarded, from the defendants or a common fund; the hold back account could be applied to this award, or, if unused, could be returned.  In no event would duplicative costs or fees be paid.

[31] *See, e.g.*, *MCL 4th*, § 14.215, Compensation for Designated Counsel.

Plaintiffs' Steering Committee designated by this Court act for the common benefit of all plaintiffs, are representing many of their personal clients on a contingent fee basis.  Their clients typically advance neither fees nor costs; these are borne by the lawyers themselves.  Accordingly, the members of the Plaintiffs' Steering Committee and other Common Benefit Attorneys are not only prosecuting their respective clients' claims on a contingent basis, risking both their time, and advancing costs out of their pocket to do so; they are working on a doubly contingent basis, since their common benefit works is likewise contingent.  There is no public or private source of funding for their work on an ongoing basis, other than their own resources.  Thus, while their service benefits the Court, the public, all plaintiffs, and indeed the defendant as well, at least indirectly, none of the beneficiaries is compensating the members of the PSC and other Common Benefit Attorneys, or defraying their expenses, on an ongoing basis.

        To date, members of the PSC and other Common Benefit Attorneys have advanced millions of dollars to fund the work of the PSC, in addition to the travel costs and other costs they are paying, out-of-pocket, to serve on the PSC itself.  They have invested thousands of hours of time.  They recognize that these expenditures will not be reimbursed, in whole or in part, unless and until this litigation generates a benefit for the plaintiffs.  At that point, they will apply to the Court for compensation and reimbursement, proportional to this benefit, requesting an award equivalent to a small percentage of the recovery.  This may take the form of a statutory award of fees; a class action award governed by Rule 23(e), (h), and class action fee awards jurisprudence; a payment by the defendants, equal a percentage of but not deducted from, the recovery to plaintiffs; a request for award from a common benefit fund; or a "hold back" from individual recovery.  The form of this request cannot be known at the present time, because the format the structure of any global verdict, judgment, or other final resolution is not presently

known, given the complexities of these MDL and consolidated limitation proceedings (which include or are associated with multiple class actions, the pleading bundles Master Complaints, the Limitation action, numerous individual cases, over 108,000 short-form joinders, approximately 20,000 additional claimants-in-limitation, and the GCCF claims process).

Since the touchstone of the equitable "common benefit" doctrine is indeed equity, that is, a fair apportionment of costs among beneficiaries, the exact nature of such an application cannot yet be forecast.  However, because it is preferred practice for the court and parties to be aware of the potential magnitude of such a request, insofar as is practicable, the PSC notes at this time its own first step toward the equitable apportionment of common benefit expenses:  its members' voluntary agreement to deposit a portion of their attorneys' fees on their own clients' settlement proceeds for common benefit fees and/or expenses – pending (and to be superseded by) a formal order of the Court.  The PSC seeks to establish this Court-supervised fund in order to preserve this *res* intended to compensate and reimburse PSC members and other Common Benefit Attorneys for common benefit contributions to the litigation, as may be ultimately ordered or awarded by the Court.

While a common benefit award may be owed with respect to settlements or other payments previously made through the GCCF or otherwise, that is an issue left for another day.

Indeed, the PSC does *not,* at this time, seek an actual common benefit or cost reimbursement <u>award</u> – which may ultimately be paid directly by Defendants, may be less (or more) than six percent (6%), and could conceivably vary, in light of the nature of the plaintiff, the type of recovery, timing issues, or other circumstances.

## XI.    CONCLUSION

From August 2010 (and before) to the date of this submission, the PSC and other Common Benefit Attorneys have endeavored, on a daily basis, to discharge the responsibilities

placed upon them by this Court in Pre-Trial Order No. 8.  This Report describes, in summary fashion, the work of the PSC and other Common Benefit Attorneys to date, to the extent protective orders and the work-product doctrine permit.  This work continues on a daily basis, with gathering intensity and purpose, as the date of the February 2012 Limitation and Liability Trial draws near.  Based upon the foregoing, and submitting to the Court's evaluation and assessment of their work thus far for the common benefit of plaintiffs and putative class members in these MDL proceedings, the undersigned respectfully request that the Court establish a Court-supervised trust fund, through the mechanism of reserve and deposit, by Defendants, of amounts equivalent to six percent (6%) of each payment they make to plaintiffs, putative classmembers or other claimants arising out of the Macondo / *Deepwater Horizon* disaster.  This account would serve as a potential source from which potential common benefit fees and costs may be requested, evaluated and awarded at an appropriate time, in the event or to the extent such fees are not paid directly by Defendants.


This <u>7th</u> day of <u>November,</u> <u>2011</u>.


Respectfully submitted,


| | |
|---|---|
| <u>        /s/ Stephen J. Herman        </u> | <u>        /s/ James Parkerson Roy        </u> |
| **Stephen J. Herman**, La. Bar No. 23129 | **James Parkerson Roy**, La. Bar No. 11511 |
| **HERMAN HERMAN KATZ & COTLAR LLP** | **DOMENGEAUX WRIGHT ROY & EDWARDS LLC** |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, Louisiana 70113 | Lafayette, Louisiana 70501 |
| Telephone: (504) 581-4892 | Telephone: (337) 233-3033 |
| Fax No. (504) 569-6024 | Fax No. (337) 233-2796 |
| E-Mail: sherman@hhkc.com | E-Mail: jimr@wrightroy.com |
| *Plaintiffs' Liaison Counsel* | *Plaintiffs' Liaison Counsel* |

**PLAINTIFFS' STEERING COMMITTEE**

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT DRESCHER & IMPREVENTO
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Memorandum will be filed into the record *via* the Court's ECF electronic filing system and will be served on all counsel *via* Lexis-Nexis File & Serve, pursuant to PRE-TRIAL ORDER NO. 12, this 7th day of November, 2011.

/s/ Stephen J. Herman and James Parkerson Roy