**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" in the | § | |
| GULF OF MEXICO, | § | SECTION:  J |
| on APRIL 20, 2010 | § | |
| | § | JUDGE BARBIER |
| Applies to:   All Cases | § | |
| | § | MAG. JUDGE SHUSHAN |
| | § | |

_____

## HESI'S BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE THE NATIONAL COMMISSION REPORTS

Halliburton Energy Services, Inc. ("HESI") asks this Court to exclude from evidence the reports of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling ("National Commission Report") and its Chief Counsel's report ("Chief Counsel Report") (together, "the Reports") as discussed in the PSC's letter of October 17, 2011.  Rec. doc. 4340-2 ("PSC Ltr.").  *See* Trial Exhs. 06300, 00986.  As set forth below, the Reports are hearsay, and do not fall within any of the hearsay exceptions.  Moreover, the investigation that led to the Reports was preliminary, and was marred by a lack of procedural safeguards, discernible evidentiary standards, or due process.  Accordingly, the Reports are inadmissible hearsay.

### I.        The Reports are Hearsay and Not Subject to the "Public Record" Exception.

The PSC argues that the Reports are admissible under the public record exception to the hearsay rule.  *See* PSC Ltr. at 2-3 (citing FED. R. EVID. 803(8)(B)(C)).  The public record exception does not apply to the Reports because (1) they do not meet the definition of public

records or reports under Rule 803 and (2) the statute authorizing presidential advisory commissions does not authorize the type of fact finding that Rule 803(8) deems reliable.[1]

Rule 803(8)(B) and (C) provides:

> Records, reports, statements, or data compilations, in any form, *of public offices or agencies*, setting forth . . . (B) matters observed pursuant to a duty imposed by law *as to which matters there was a duty to report*, . . . or (C) in civil actions and proceedings . . . *factual findings* resulting from an investigation made *pursuant to authority granted by law*, unless the sources of information or other circumstances indicate lack of trustworthiness.

FED. R. EVID. 803(8) (emphasis added); *Moss v. Ole South Real Estate, Inc.*, 933 F.2d 1300, 1305 (5th Cir. 1991) (same). *See also United States v. Stone*, 604 F.2d 922, 925 (5th Cir. 1979) (803(8) exception "designed to allow admission of official records and reports prepared by an agency or government office for purposes independent of specific litigation"). The National Commission (the "Commission") is not a public office or agency, and it had no authority granted by law or duty imposed by law to report fact findings. The method and manner by which the Commission conducted its investigation do not meet the standards of reliability that must accompany evidence that is admitted in a federal trial and therefore the facts found by the Commission "lack . . . trustworthiness." Accordingly, the Reports are not excepted from the hearsay rule under Rule 803(8).

### A.     The Commission is not a "public office or agency."

The Commission was established by presidential Executive Order 13,543. Exec. Order 13,543, 75 Fed. Reg. 29,397 (May, 21, 2010). Its creation, as with other presidential advisory commissions, was authorized by the Federal Advisory Committee Act. *See* 5 U.S.C. App. ("FACA"); Exec. Order 13,543, 75 Fed. Reg. 29,397, at Sec. 5(b). When enacting FACA,

---

[1] The PSC's contention that the Reports are "clearly admissible" under the hearsay exception presumes that the National Commission is a public office or agency. Because the National Commission is not a "public office or agency," the authorities cited in the PSC's letter are inapplicable.

Congress found that such commissions are "a useful and beneficial means of furnishing expert advice, ideas, and diverse opinions to the Federal Government."  FACA § 2(a).  FACA specifically limits the role of such commissions:  "[T]he function of advisory committees should be *advisory only*."  FACA § 2(b)(6) (emphasis added).  Further, only the President or an "officer of the Federal Government" may determine what action should be taken or policy expressed given an advisory commission report and recommendations.  FACA § 9(b).

The Commission members are neither government employees nor public officials.[2] Instead, they are members of the public tapped by the President to advise the government.  *See also* FACA § 3(2) (defining advisory committee as not including officers or employees of the federal government).  For these reasons, the Commission is not a "public office or agency," and the Reports cannot be considered a "public record" excluded from the hearsay rule under Rule 803(8), which applies only to "records, reports, statements, or data compilations" of "public offices or agencies."

**B.      Rule 803(8)(B) applies to reports of "matters observed" by the public official, which is not the case with the Reports.**

The justification for Rule 803(8)'s exception to the hearsay rule is the assumption that a public official will perform his duty properly and the unlikelihood that he or she will remember details independently of a contemporaneously compiled record.  *See* FED. R. EVID. 803(8), Adv. Comm. Notes, 56 F.R.D. 183, 311 (reproduced in M. GRAHAM, FEDERAL PRACTICE AND PROCEDURE:  *Evidence* § 7049 (Interim Edition)); *Moss*, 933 F.2d at 1305.  Rule 803(8)(B) is intended to exempt from the hearsay rule regularly compiled data from direct observations by public officials, such as weather bureau records of rainfall.  *See* M. GRAHAM, FEDERAL PRACTICE AND PROCEDURE:  *Evidence* § 7049 (Interim Edition) (citing *e.g.*, *Minnehaha County v. Kelly*,

---

[2] *See* http://www.oilspillcommission.gov/page/commission-members.

150 F.2d 356 (8th Cir. 1945)).   Rule 803(8)(A) and (B) only apply when all persons who participate in the initial supplying of information possess personal knowledge of the matters related and all persons furnishing and recording the information must be under an official duty to do so.   M. GRAHAM, FEDERAL PRACTICE AND PROCEDURE:   *Evidence* § 7049 (Interim Edition). For example, a police report recording a bystander's observations would not be admissible because the bystander was not acting pursuant to an official duty.   *Id*.

The Commission interviewed witnesses, reviewed documents from the companies involved, reviewed materials gathered by other investigative bodies, consulted experts, and met with industry groups.   Chief Counsel Report at 2.   The Commission's sources were not public officials who directly observed matters with a duty imposed by law to report on such matters. *See* FED. R. EVID. 803(8)(B).   Consequently, Rule 803(8)(B) is inapplicable to the Reports and they are not excluded from the hearsay rule.

### C. The Commission had no "duty imposed by law" or "authority granted by law" to make fact findings within the meaning of Rule 803(8)(C).

The Commission's role was very specific.   The President directed it to "examine the relevant facts and circumstances concerning the root causes of the *Deepwater Horizon* oil disaster" and "develop options for guarding against, and mitigating the impact of, oil spills," including (1) "improvements to federal laws, regulations, and industry practices" and (2) "organizational or other reforms of Federal agencies or processes necessary to ensure such improvements are implemented and maintained."   *Id*., Sec. 3(a), (b).   The Commission could only make policy recommendations, not "factual findings resulting from an investigation made pursuant to authority granted by law."   *See* FED. R. EVID. 803(8)(C).   Consequently, even if the Commission was a "public office or agency," the Reports do not fall within the scope of Rule 803(8).   *See United States v. Durrani*, 659 F. Supp. 1183, 1186 (D. Conn. 1987), *aff'd*, 835 F.2d

410 (2ⁿᵈ Cir. 1987) (report of President's Special Review Board charged not as an investigative body or to determine matters of criminal culpability but to make recommendations did not fall within Rule 803(8)(C)).

In *Durrani*, a criminal defendant sought admission of the report of the "President's Special Review Board" (otherwise known as the "Tower Report") on the Iran/Contra affair. *See Durani*, 659 F. Supp. at 1184. The report at issue provided that "[t]his Board was not established. . . as an investigative body nor was it to determine matters of criminal culpability. Rather, the President's Special Review Board in *Durrani* was established to gather the facts, to place them in their proper historical context, and to make recommendations about what corrective steps might be taken." For these reasons, the court held that the Tower Report failed to meet Rule 803(8)(C)'s requirement that "the factual findings a party seeks to admit result from an investigation made pursuant to authority granted by law." *Durrani*, 659 F. Supp. at 1186.[3] The same is true for the Reports. Similar to the task of the Board in *Durrani* to "gather facts" and "make recommendations," the Commission's "Mission," pursuant to Executive Order 13,453, was to "examine. . . facts" and "develop options" for the improvement of federal laws and oversight. Exec. Order 13,543, 75 Fed. Reg. 29,397 (May, 21, 2010) at Sec. 3(a) & (b). The Commission took a backseat to every other governmental, non-governmental, and independent investigation. Rule 803(8)(C) does not apply to a report that is in essence a research project like the Reports are here. *See City of New York v. Pullman, Inc*., 662 F.2d 910, 914 (2d Cir. 1981) (report analyzing the attitudes and perceptions of police officers toward public corruption was

---

[3] The Second Circuit affirmed the district court's opinion in *Durrani*. *See* 835 F.2d 410, 425. According to the Second Circuit, such a determination is "well within the wide discretion afforded the trial judge in determining 'whether the hearsay document offered in evidence has sufficient independent indicia of reliability to justify its admission.'" *Id.* The Second Circuit did term the court's decision to exclude the evidence "thoughtful" but "perhaps ill-advised, given the extremely sparse evidence otherwise available to the [criminal] defendant." Of course, this is not a criminal case, and, as the Court is aware, the mountains of evidence produced by the various parties and non-parties can by no means be termed "sparse." *Id.* (quoting *City of New York v. Pullman, Inc.*, 662 F.2d 910, 914 (2ⁿᵈ Cir. 1981)).

found inadmissible because it was not the type of factual investigative report contemplated by Rule 803(8)(C)).

### D.    Rule 803(8)(C) does not apply because the reports are not "final."

To be admissible under Rule 803(8)(C), a factual finding must be final.  *See Smith v. Isuzu Motors, Ltd*., 137 F.3d 859, 862-63 (5th Cir. 1998).  The Reports are, by their own caveats, based on incomplete data.  National Commission Report at xi ("[t]here is still much we do not know"); Chief Counsel Report at 2 (findings based on "evidence and information available to date").  Because the Reports are based upon incomplete data and are by no means "final," they are not admissible under Rule 803(8).

### E.    The Reports lack trustworthiness.

A report is not admissible under Rule 803(8)(C) if "sources of information or other circumstances indicate lack of trustworthiness."  FED. R. EVID. 803(8)(C).  Factors to consider in a reliability analysis under Rule 803(8)(C) include: (1) the timeliness of the investigation; (2) the special skill or experience of the official; (3) whether a hearing was held and the level at which conducted; and (4) possible motivation problems suggested by *Palmer v. Hoffman*, 318 U.S. 109 (1943).  FED. R. CIV. P. 803(8)(C) advisory committee note.  An analysis of at least three of these factors reveals that the Reports are not admissible.

#### 1.    *The committee had no special skill or experience.*

The Reports fail to satisfy the "special skill and experience" element.  The Commission's mandate was to "examine facts" and to "develop options" for improvements to federal laws and oversight, not to make factual determinations based upon special skill or experience.  *See Gentile v. County of Suffolk*, 129 F.R.D. 435, 452 (E.D.N.Y. 1990).  The Commission had issued no prior reports and had no prior experience analyzing deepwater drilling issues.  Additionally, the

Commission was not comprised of individuals qualifiable as experts because none of the committee members have experience in the oil and gas industry. This absence of industry experience was recognized almost immediately after the makeup of the Commission was announced. *See* Klaus Gohrbandt, *Spill Commission not qualified to improve industry*, PENSACOLA NEWS J. (FLA.), (July 14, 2010), attached as Exhibit 1 (noting that the representation in the Commission completely ignores petroleum engineering expertise and that the members are not qualified to evaluate the root causes of the Macondo well disaster); *see also* John A. Sullivan, *Business Leaders Fear Politics Foremost in Reaction to Disaster*, NAT'L GAS WK. (Energy Intelligence Group, Inc.), July 19, 2010, attached as Exhibit 2 (quoting local business leader, "Not one of them has any experience in the energy industry and the only person with engineering experience is in optics").

2.      *The "hearings" were simply a presentation of preliminary facts.*

During the public hearings on November 8 and 9, 2010, which occurred less than four months after the first meeting of the Commission, the Chief Counsel's team presented preliminary findings to the Commission. Because the Commission did not have subpoena power, the level at which the hearing was conducted was extremely limited. The Commission itself recognized the limitations that come with the lack of subpoena power. At a November 8, 2010 hearing, Chief Counsel Fred Bartlit stated:

> [a]t any rate, we've talked to a lot of people about whether if they were sitting there--people in the industry generally. And, you know, because I don't have subpoena power, I have to look you in the eye and say I'm telling you what people told me. I can't subpoena people and put them under oath. I wish I could, respectfully to the Commissioners, *because I think it's damned important*. But that's the way it goes.

National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, Fifth Meeting, Day One, Transcript of Proceedings (Nov. 8, 2010) at 161:7-15, attached as Exhibit 3 (emphasis added).  Discovery between the parties was in the very beginning stages and the Commission lacked the necessary investigative power to outpace it.  *See Durrani*, 659 F. Supp., at 1187 (court questioned whether fact-gathering process was sufficiently reliable where Board had no authority to subpoena documents, compel testimony, swear witnesses, or grant immunity).

       *3.  Possible motivation problems.*

  The motivation factor "reflects a concern that the report be compiled for the purpose of impartially finding the facts, not in anticipation of litigation."  *Durrani*, 659 F. Supp. at 1187.  In *Durrani*, the analysis at issue took place following a notorious public situation and prosecution for various officials "lingered on the horizon."  659 F. Supp. at 1187.  While the *Durrani* court did not question the Board's ability to impartially consider the evidence before it, it did question the underlying sources of information.  *Id.*  When requesting subpoena power, Fred Bartlitt specifically noted the difficulty of obtaining impartial information:

> We sat down with everybody. We'd get a lot of arguments. This is where subpoena power, Senator, would be helpful, because *it's going to be hard to resolve those unless I can sit people down in a room in a very professional, gentlemanly way and cross-examine them and find out, you know, what's believable and not believable*. Not that anybody's intentions--so far I have no reason to believe anybody's intentions--said anything to me that they don't believe. But there are--*People are advocates, good ones, high-powered ones*.

Exhibit 3 at 175:14-176:3 (emphasis added).  Because the Reports were prepared when hundreds of lawsuits were on file and criminal prosecution for various players was expected, the Commission's underlying sources of information must also be questioned.

4.      *The Commission's investigative methods were unsound.*

In addition to the factors weighing against the admissibility of the Reports identified in the Advisory Committee Notes to Rule 803 (8), the Reports are inadmissible because the Commission conducted its investigation without appropriate procedural safeguards or discernible evidentiary standards.  The means and methods by which the Commission's staff gathered "evidence" would not be credited by any court of law.  For example, the Commission regularly conducted interviews without keeping any formal record.  It often interviewed multiple witnesses at the same time, or informed one witness of information provided by another witness, thus allowing for the recollections of one witness to become infected by those of other witnesses and undermining the reliability of all the testimony.  The Commission also operated without any articulated standards for resolving the myriad factual conflicts and credibility issues it faced.  It summarily rejected, in a whimsical and capricious manner, relevant proof on key issues that was specifically brought to its attention.  Simply put, there were no evidentiary standards or assurances of procedural fairness.  These failures render the Reports wholly unreliable and also offend traditional notions of due process and fair play.

An analysis of the foregoing factors, as well as the Commission's unsound investigation, reveals that the Reports do not pass Rule 803(8)(C)'s reliability analysis.  Accordingly, even if the Reports were those of a "public office or agency" and were made pursuant to a duty or authority granted by law, they are neither trustworthy nor admissible.

## II.      The Reports are expert reports that fail to comply with Rule 702.

The Reports, in essence, constitute premature expert reports subject to the restrictions of Federal Rules of Evidence 26 and 702, and to challenges under *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993).  *See Thakore v. Universal Machine Co. of Pottstown*, 670 F. Supp.2d 705, 720-24 (N.D. Ill. 2009) (rejecting "business record" exception to accident report

and noting that the report was the "functional equivalent" of an expert report under Rule 26, but without the informative detail necessary to support and evaluate such an expert report).  The Reports are functional equivalents of expert reports, and the PSC has not complied with Rule 702.  The PSC has not established that the authors of the Reports are qualified as experts with knowledge, skill, experience, training, or education.  Nor has the PSC established that: (1) the Reports are based upon sufficient facts or data; (2) the Reports are the products of reliable principles and methods; or (3) the authors have applied the principles and methods reliably to the facts of this case.  FED. R. EVID. 702.  Because the "expert" Reports do not comply with Rule 702, they are not admissible.

### III.    Conclusion

The National Commission Report and its Chief Counsel Report are not the types of public reports that Rule 803(8) contemplates and exempts from the hearsay rule.  Moreover, they are de facto expert reports, for which the PSC has not complied with Fed. R. Civ. P. 702.  Accordingly, this Court should find the Reports inadmissible and HESI's Motion to Exclude the Reports should be granted.

Dated:  November 7, 2011.

Respectfully Submitted,

**GODWIN RONQUILLO PC**

**By:**  /s/  *Donald E. Godwin*
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
dgodwin@GodwinRonquillo.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
bbowman@GodwinRonquillo.com
Jenny L. Martinez
State Bar No. 24013109
jmartinez@GodwinRonquillo.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
fhartley@GodwinRonquillo.com
Gavin E. Hill
State Bar No.  00796756
ghill@GodwinRonquillo.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332


and

R. Alan York
AYork@GodwinRonquillo.com
Jerry C. von Sternberg
JVonSternberg@GodwinRonquillo.com
Misty Hataway-Coné
MCone@GodwinRonquillo.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone:  713.595.8300
Facsimile:  713.425.7594

**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Halliburton Energy Services, Inc.'s *Brief in Support of its Motion to Exclude the National Commission Reports* was filed electronically with the Clerk of the Court using the CM/ECF system and that notice of this filing will be sent to all counsel through the CM/ECF system on this 7th day of November, 2011.

/s/ Donald E. Godwin
Donald E. Godwin



Copyright 2010 Pensacola News Journal
All Rights Reserved
Pensacola News Journal (Florida)

July 14, 2010 Wednesday

**SECTION:** ONLINE MAIN; Pg. A9

**LENGTH:** 508 words

**HEADLINE:** Spill Commission not qualified to improve industry

**BYLINE:** By, Klaus Gohrbandt

**BODY:**

VIEWPOINT

Klaus Gohrbandt

Klaus Gohrbandt is a resident of Gulf Breeze. He holds a doctorate degree in geology and is an independent, certified petroleum geologist.

What are we to expect from President Barack Obama's Deepwater Horizon Oil Spill Commission?

The president decreed on May 21, by executive order, a bipartisan "National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling," composed of seven members who have "experience in or represent the scientific, engineering and environmental communities (and) the oil and gas industry." Its report is due in six months after the commission's first meeting.

The commission's mission was defined as to "examine the root causes of the Deepwater Horizon oil disaster" and to "develop options for guarding against, and mitigating the impact of, oil spills associated with offshore drilling, taking into consideration the environmental, public health, and economic effects." This is to be achieved by "improvements to federal laws, regulations and industry practices applicable to offshore drilling" and "organizational or other reforms of federal agencies or processes."

The problem with the commission is that the background of its members does only partially, and to a variable degree, qualify them for the high task outlined in the mission.

The representation in the commission is overwhelmingly focused on environmental expertise, which is certainly the first priority. But it completely ignores petroleum engineering expertise to improve on petroleum industry practices and standards, which must be the second priority to avoid - or at least reduce - blowouts in the future.

The commission members, judging by their legal background, are well qualified to propose improvements to effective oversight, monitoring, response capabilities and reform implementations and their maintenance.

One member is certainly highly qualified to apply science in ecosystem management.

But the commission members are, judging by their lack of technical background, obviously not qualified to evaluate the root causes of the Macondo well (Deepwater Horizon rig) disaster and suggest practical and effective improvements to industry practice applicable to offshore drilling in the future.

Exhibit 1

Spill Commission not qualified to improve industry Pensacola News Journal (Florida) July 14, 2010 Wednesday

Klaus Gohrbandt is a resident of Gulf Breeze. He holds a doctorate degree in geology and is an independent, certified petroleum geologist.

The Deepwater Horizon Oil Spill Commission:

Bob Graham, co-chair, former governor and U.S. senator from Florida.

William K. Reilly, co-chair, former head of the U.S. Environmental Protection Agency.

Commissioners:

Frances G. Beinecke, president of the Natural Resources Defense Council.

Donald Boesch, president of the University of Maryland Center for Environmental Science.

Terry D. Garcia, executive vice president for mission programs, National Geographic Society, and a former assistant secretary of Commerce for oceans and atmosphere.

Dr. Cherry A. Murray, dean of the Harvard School of Engineering and Applied Sciences.

Frances Ulmer, chancellor of the University of Alaska Anchorage.

**LOAD-DATE:** July 15, 2010



6 of 26 DOCUMENTS

Copyright 2010 Energy Intelligence Group, Inc.
All Rights Reserved
Natural Gas Week

July 19, 2010

**SECTION:** FEATURE STORIES

**LENGTH:** 1073  words

**HEADLINE:** Business Leaders Fear Politics Foremost in Reaction to Disaster

**BODY:**

Many South Louisiana business and industry leaders are convinced that President Obama is using the Deepwater Horizon disaster as a political ploy to push his "green agenda" at the economic expense of the region.

One of those who believes the president is using the disaster to further his environmental goals is MidSouth Bank President C. R. "Rusty" Cloutier.

In his office overlooking downtown Lafayette, Cloutier told <em>Natural Gas Week</em> he can defend his conclusion using the president's own words and the composition of the panel he picked to develop new rules and regulations for the energy industry.

In his Oval Office address to the nation recently, Obama said, "Each day, we send nearly $1 billion of our wealth to foreign countries for their oil. And today, as we look to the Gulf, we see an entire way of life being threatened by a menacing cloud of black crude.

"We cannot consign our children to this future. The tragedy unfolding on our coast is the most painful and powerful reminder yet that the time to embrace a clean energy future is now. Now is the moment for this generation to embark on a national mission to unleash America's innovation and seize control of our own destiny."

The president said this switch to a greener future will come at a cost.

It's that cost that worries Cloutier.

"The cost the president was referring to is jobs being lost in South Louisiana and East Texas," Cloutier said. He added that in March, Obama did in fact, signal a move that his administration would support opening areas of the Atlantic Coast, the eastern Gulf of Mexico and the north coast of Alaska to exploration and production.

This angered many environmental groups, which accused Obama of going back on campaign promises. After an explosion and fire destroyed the <em>Deepwater </em>Horizon and killed 11 men Apr. 20, the president ordered a halt to deepwater drilling and a review of new shallow water drilling permits that slowed that process to a crawl.

For almost a month, no drilling permits for shallow water wells in the Gulf were permitted. However, Pritchard Capital Partners in a recent report to its clients said one permit has been issued and two others are now under consideration.

"The president has his published moratorium on deepwater drilling and a de facto moratorium on shallow water drilling," Cloutier said. The end result, he said, "is DC politics that will cost this region jobs and work and companies. This is a region that weathered the recession fairly well and now, one of the primary industries is going to be shut down? Where is the economic sense in that?"

Exhibit 2

Business Leaders Fear Politics Foremost in Reaction to Disaster Natural Gas Week July 19, 2010

The second evidence he uses is the panel the president has picked to study what happened at the BP well at Mississippi Canyon Block 252 and draft new safety regulations and rules for deepwater drilling.

"If you look at the panel, you can see the politics that is involved," Cloutier said. "Not one of them has any experience in the energy industry and the only person with engineering experience is in optics. And these are the ones that will develop rules for the offshore energy industry -- which is incredibly technical and engineering-based."

For the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, Obama named:

o Frances G. Beinecke, president of the Natural Resources Defense Council;

o Donald Boesch, president of the University of Maryland Center for Environmental Science, where he is also a professor of Marine Science and vice chancellor for Environmental Sustainability for the University System of Maryland;

o Terry D. Garcia; executive vice president for Mission Programs for the National Geographic Society;

o Cherry A. Murray; dean of the Harvard School of Engineering and Applied Sciences, John A. and Elizabeth S. Armstrong Professor of Engineering and Applied Sciences.

o Frances Ulmer, chancellor of the University of Alaska Anchorage, member of the Aspen Institute's Commission on Arctic Climate Change and a board member with the Alaska Nature Conservancy, the National Parks Conservation Association and the Union of Concerned Scientists.

Cloutier said none of the panelists has experience in the energy industry -- an industry known for pushing technological and engineering developments. The only engineer on the panel is Murray, who's a past president of the American Physical Society with expertise in condensed matter and materials physics.

Cloutier said he has been in contact with leaders of energy companies across the Gulf Coast and all agree that any regulations that make offshore drilling safer are welcome.

"Everyone agrees. If you can make something safer, then do it," Cloutier said. "But, do you shut down an entire industry for six months or longer? The offshore energy industry is not an industry that can be shut down and then restarted quickly or easily."

Seventh generation oyster harvester and owner of Motivat Seafoods in Houma, Mike Voisin is probably one of the last people anyone would expect to come to the defense of the energy industry.

"In South Louisiana, the seafood industry has worked hand-in-hand with the energy industry for decades -- since there was an offshore energy industry," Voisin told <em>NGW</em>. "Many fishermen and shrimpers have family who work in the energy industry. You take one away, you inevitably hurt the other."

He said he has been in contact with leaders in the seafood and energy industries and all have expressed "a lot of anxiety about what is going to happen. Is there politics involved? I think so if you look at the panel the president has appointed."

Time, he said, is against the energy industry and the fear he hears from others is that the panel will take a long time to reach its conclusions and submit a final report.

"The panel is going to meet until mid-July and I think a lot of people are worried that they will take six to eight months to reach a decision," Voisin said. "So, it could be well into next year before they reach a decision and submit their report. The whole time, a lot of people will be losing their jobs."

Cloutier was a little more blunt.

He expects the commission to come up with "a list of rules and regulations that will be so farfetched and so impossible to follow that they will in fact, shut down offshore drilling. I have had some drilling company presidents tell me they are looking at moving their business to Brazil -- because the government there is more stable."

John A. Sullivan, Lafayette, Louisiana

**LOAD-DATE:** August 16, 2010

NATIONAL OIL SPILL COMMISSION MEETING
CONDUCTED ON MONDAY, NOVEMBER 8, 2010

1  (Pages 1 to 4)

1

1   NATIONAL COMMISSION ON THE
2   BP DEEPWATER HORIZON OIL SPILL
3   AND OFFSHORE DRILLING
4   ----------------------------x
5   FIFTH MEETING, DAY ONE   :
6   Transcript of Proceedings  :
7   ----------------------------x
8
9            Monday, November 8, 2010
10           Grand Hyatt Washington
11             1000 H Street, NW
12             Washington, DC
13             (202) 582-1234
14             9:00 a.m.
15
16
17
18
19
20   Job No.: 5957
21   Pages: 1 - 398
22   Reported by: John L. Harmonson, RPR

3

1            C O N T E N T S
2   Call to Order                         4
3   Opening Remarks by Co-Chair Graham         7
4   Opening Remarks by Co-Chair Reilly         9
5   Presentation by Chief Counsel Bartlit      13
6   Presentation by Mr. Sankar            75
7   Presentation by Mr. Grimsley          116
8   Presentation by Chief Counsel Bartlit 155
9
10          PANEL DISCUSSION 1
11   Panel Discussion with BP, Transocean and    184
12   Halliburton:
13       Mark Bly, Executive Vice President of
14       Safety and Operational Risk, BP
15       Bill Ambrose, Director of Special Projects,
16       Transocean
17       John Gisclair, Insite Support Service
18       Coordinator, Halliburton/Sperry Sun
19       Drilling Service
20       Richard F. Vargo, Jr., Gulf of Mexico Region
21       Manager - Cementing, Halliburton
22

2

1       National oil spill commission meeting held
2   before:
3
4
5           SENATOR BOB GRAHAM, CO-CHAIR
6           WILLIAM K. REILLY, CO-CHAIR
7           FRANCES G. BEINECKE, MEMBER
8           DONALD BOESCH, MEMBER
9           TERRY D. GARCIA, MEMBER
10          CHERRY A. MURRAY, MEMBER
11          FRANCES ULMER, MEMBER
12          CHRIS SMITH, Designated Federal
13            Official
14
15
16
17
18       Pursuant to Notice, before John L. Harmonson,
19   Registered Professional Reporter in and for the
20   District of Columbia.
21
22

4

1          P R O C E E D I N G S
2       MR. SMITH:  Good morning, everybody, and
3   welcome to this the fifth meeting of the National
4   Commission on the BP Deepwater Horizon Oil Spill and
5   Offshore Drilling.  I am hereby calling this meeting
6   to order.
7       My name is Chris Smith and I am the
8   designated federal official for this Commission.  I
9   also serve as the Deputy Assistant Secretary for Oil
10  and Natural Gas for the U.S. Department of Energy.
11  I'll be helping to guide this group through two days
12  of busy hearings today and tomorrow.
13      Before we proceed, I would like to
14  familiarize everybody with the safety procedures for
15  this building.  In case of fire or emergency, you'll
16  see the main exits to my left, your right.  Simply
17  exit, turn left and go up the escalators and you will
18  see the exits to the street.  So that's in case of
19  emergency.
20      I'd also like everybody to turn your phones
21  and BlackBerries to silent or vibrate.
22      The President established this bipartisan

Exhibit 3

NATIONAL OIL SPILL COMMISSION MEETING
CONDUCTED ON MONDAY, NOVEMBER 8, 2010

41 (Pages 161 to 164)

Page 161

1  enough knowledge about all the other activities that
2  are going on on the rig to interpret it the right way,
3  and to act very rapidly. It depends on a -- on people
4  getting every -- basically one person getting
5  everything right at the right time when you have to
6  move fast.
7      At any rate, we've talked to a lot of
8  people here about whether if they were
9  sitting there -- people in the industry generally.
10 And, you know, because I don't have subpoena power, I
11 have to look you in the eye and say I'm telling you
12 what people told me. I can't subpoena people and put
13 them under oath. I wish I could, respectfully to the
14 Commissioners, because I think it's damn important.
15 But it's the way it goes.
16     People in the industry have said to us, "Of
17 course, we would have noticed that. That's a kick
18 detection. We would want to move fast." So I pressed
19 them like I'm pressing myself here. And people then
20 began to say, "Gee, I don't know," at least about this
21 first one.
22     Now, the second one is interesting because

Page 162

1  they turn off the pumps totally to perform a test.
2  The pumps are off, and now the drill pipe pressure is
3  going up quite a bit.
4      We've met with TO at length, and they've
5  given us a lot of data and useful explanations that
6  can explain why at the beginning and the end some of
7  this happened. But nobody can say that in the core of
8  this period the drill pipe pressure wasn't going up
9  when the pumps were off.
10     And most people we talked to throughout the
11 industry say that's a kick and it should have been
12 defected and somebody move fast. The explosion
13 occurred at 21:49. This is 21:10 to 21:12, a half
14 hour to act. The BOP can be closed in 46 or
15 47 seconds.
16     So the -- the -- We'll be talking about
17 this later, but when I looked at this, just an
18 ordinary person, I said, "Gee, with all the skills
19 that NASA and people have, isn't there a better way to
20 display this information so that it's clear, and we
21 have algorithms that point when things are heading in
22 the wrong direction?"

Page 163

1      Now, this is a little bit unfair because
2  I'm talking about the Sperry Sun data, and the data
3  the driller was looking at was the TO data. And maybe
4  the TO data was a lot clearer than this. Maybe it
5  wasn't as clear. Maybe there was -- there was digital
6  information that was easier to pick up. We would sure
7  like to know that, if the Commission please. But we
8  don't.
9      I would expect, I guess, that the TO
10 screen, just common sense, would be better than Sperry
11 Sun because it's their rig and their investment and
12 their money. But I don't know that, I'm just -- It's
13 shear total guesswork. But it's a critical thing that
14 would be good to know.
15     Now, one of the issues, we know there
16 was -- there was -- there was a kick then. We know
17 hydrocarbons were coming through the cement job that
18 had not been remediated. It could have been
19 remediated if people had decided to but wasn't. We
20 know there was a leak.
21     Remember I told you earlier that we would
22 discuss where the leak occurred. Did it come up this

Page 164

1  annulus here or did it come up the shoe?
2      Let's go to the next one.
3      Okay. This is a casing hanger seal. We've
4  talked to Dril-Quip. They made this. They're very
5  cooperative. These guys have some of the best
6  engineers I've ever met, and I've been in this
7  business a long time. And they say there is no damage
8  to the casing hanger seals at all, they are pristine.
9  If the leak came up the annulus, there would be some
10 damage to the casing hanger seals.
11     Remember I told you you would be blown away
12 by the power of this gas under pressure coming up
13 through the riser carrying sands and everything? This
14 is the way the inside of the casing looks when it's
15 made in the factory.
16     This stuff is so strong that on the inside
17 quarter-inch deep slots have been just totally blown
18 away by the force of your own gas coming up through
19 that casing. Amazing, the force of this stuff. But
20 the inside is totally eroded and the outside is
21 pristine.
22     BP agrees that the leak was up the shoe and

NATIONAL OIL SPILL COMMISSION MEETING
CONDUCTED ON MONDAY, NOVEMBER 8, 2010

44 (Pages 173 to 176)

173

1    50 minutes later BP calculates
2    through their -- they have some software called OLGA
3    which we have not unpacked yet.  You know what I mean
4    by that.  We haven't gone through it and figured out.
5    We assume that it's sensible.  And nobody has really
6    quarreled with some -- I've put up here BP's
7    conclusions that most people don't disagree with.
8        Now the well is underbalanced.  It took 50
9    minutes of taking out the heavy mud and putting in the
10   seawater to underbalance the well.  That means if
11   the -- if the cement job is failing, the hydrocarbons
12   will start entering the well.
13       Okay.  A little after that, nine minutes
14   after that, we get this subtle increase.  There's
15   anomalous drill pipe pressure.  The well is
16   underbalanced.  The symptoms are now starting to show
17   up again on this very Sperry Sun data.  I keep saying
18   this, but it's so easy to get confused.  We do not
19   know what Transocean's driller was looking at.
20       Now we get -- The pumps are off and then
21   now we see the drill pipe pressure going up more
22   steeply.  The BOP is open.  The cement is the only

174

1    barrier.  Hydrocarbons are coming in the well.  They
2    are going to get up in the drill pipe.  When they get
3    up in the drill pipe above the BOP, there is nothing
4    you can do to stop that.  When they're above the BOP,
5    you can't stop the influx of hydrocarbons.
6        21:38, the BP report calculates that
7    hydrocarbons are now in the riser.  The BOP is open.
8    They're above the BOP.  If you shut the BOP down,
9    you've still got a mile of riser full of hydrocarbons.
10   Imagine the volume.  They're going to come out on the
11   rig.  Even if the BOP is shut at that point, you're
12   probably going to have a big explosion.  Now, would
13   that have solved maybe some of the later problems?
14   Maybe.
15       21:40, mud actually is coming out on the
16   rig floor.  The mud is in the top in the riser.  The
17   hydrocarbons are coming up under enormous pressure,
18   they're pushing the mud out on the rig floor.
19       Now the annular preventer is activated.
20   That's that big tire that closes -- I showed you early
21   on.  It seems like it's a week ago.
22       (Laughter)

175

1        MR. BARTLIT:  It shows the -- It closes the
2    annulus.  So the crew, Transocean's crew, operated
3    then at 21:41.  BP says this is the first kick -- this
4    is the first action taken by the crew when they
5    physically see the mud coming up on the floor.  We
6    don't know if that's accurate.  I'm just telling you
7    what BP says.
8        There are disputes between BP and
9    Transocean as to who said what to who when.  There are
10   disputes between Halliburton, BP as to who said to who
11   one -- said what to who when.  There are disputes, if
12   the Commission please, about who has responsibility
13   for what.
14       We sat down with everybody.  We'd get a lot
15   of arguments.  This is where subpoena power, Senator,
16   would be helpful, because it's going to be hard to
17   resolve those unless I can sit people down in a room
18   in a very professional, gentlemanly way and
19   cross-examine them and find out, you know, what's
20   believable and what's not believable.
21       Not that anybody's intentions -- so far I
22   have no reason to believe anybody's intentions -- said

176

1    anything to me that they don't believe.  But there
2    are -- People are advocates, good ones, high-powered
3    ones.
4        Annular preventer activated.
5        There's a nearby ship, the Damon Bankston.
6    If you go out to these wells, there are all these
7    ships working around them.  And if you go out in the
8    North Sea, there will be 20 standoff ships.  It's like
9    a small community out there.
10       The drill crew does exactly the right
11   thing.  They think of the ship.  If there is an
12   explosion, they don't want them to get involved.  They
13   say, "Move back, something bad is going on."
14       Gas comes out on the drill floor.  You'll
15   see how fast this happens.  21:38, they're in the
16   riser.  Eight minutes later the gas is up.
17       First explosion; power lost.  Things happen
18   fast.  This really brings to life those last couple
19   hours and what was going on.  You see clearly that
20   it's when the negative pressure test is wrongly
21   concluded to have worked and they start removing the
22   mud until the pressure on the -- on the hydrocarbons