UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | : | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | : | |
| GULF OF MEXICO, on | : | SECTION:  J |
| APRIL 20, 2010 | : | JUDGE BARBIER |
| | : | MAG. JUDGE SHUSHAN |
| **THIS DOCUMENT RELATES TO ALL** | : | |
| **CASES AND 10-2771** | : | JURY TRIAL DEMANDED |
| | : | |

. .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .

**MEMORANDUM IN SUPPORT OF
CAMERON INTERNATIONAL CORPORATION'S
MOTION FOR SUMMARY JUDGMENT DENYING
ALL CLAIMS ASSERTED BY TRANSOCEAN AND
DECLARING OBLIGATIONS OF TRANSOCEAN
TO INDEMNIFY AND DEFEND CAMERON**

Cameron International Corporation ("Cameron") submits this brief in support of its motion for summary judgment (1) denying the claims asserted against it by the Transocean petitioners as a matter of law; and (2) declaring that the Transocean petitioners are obligated (a) to indemnify and defend Cameron from all other claims asserted against Cameron in the cases pending in these consolidated actions and (b) as part of that defense obligation, to reimburse Cameron's defense costs in connection with the litigation arising out of the Macondo oil well blowout and spill.

**I.    INTRODUCTION**

Cameron's motion is based on the risk allocation provisions of interrelated written contracts involving the *Deepwater Horizon* and its BOP equipment.  A "fundamental purpose of risk allocation" in the offshore drilling industry "is to create a clear line of demarcation so each

- 1 -

1075046v.1

party will be able to evaluate its risk exposure and obtain appropriate insurance (or elect to self-insure)."   C. Moomjian, *Contractual Insurance and Risk Allocation in the Offshore Drilling Industry [Part 1]*, CONTRACT DRILLER JAN./FEB. 1999 ["*Risk Allocation 1*"], p. 20 (attached as Appendix A); *see Jig the Third Corp. v. Puritan Marine Ins. Under. Corp.*, 519 F.3d 171, 176 (5th Cir. 1975) (enforcement of contractual indemnity provisions acknowledges the "consideration that businessmen can bargain over which party is to bear the risk of damage and set the price accordingly, thus achieving a more rational allocation of the risk").   The risk allocation provisions of the pertinent agreements should be enforced as written.

The Drilling Contract between BP and Transocean governing construction, operation, and use of the *Deepwater Horizon* is the first agreement with pertinent risk allocation provisions. The other agreements containing such provisions – namely the direct indemnity obligations of Transocean to Cameron – are the contracts between Transocean and Cameron governing (a) Cameron's sale of BOP equipment for the *Deepwater Horizon* as specified in the Drilling Contract, and (b) any subsequent work on the BOP equipment.

The Drilling Contract between BP and Transocean contains a very detailed and bargained for allocation of risks.  BP committed in writing to indemnify Transocean, and to hold Transocean harmless from, all loss of reservoir and underwater pollution claims – including breach of contract claims – arising from use of the *Deepwater Horizon* to drill wells.  In doing so, BP explicitly agreed to "bear the expense of loss" of the hole or reservoir and to "assume all responsibility" for underwater pollution claims, and in that context, to hold Transocean harmless from claims of third parties – explicitly including claims based on indemnity contracts.

The written Terms and Conditions for the sale of the *Deepwater Horizon*'s BOP equipment from Cameron to Transocean ("Terms and Conditions"), and the Master Service

1075046v.1

Agreement between these parties governing work on that equipment ("MSA") contain corresponding indemnity provisions. Transocean independently agreed to indemnify Cameron for, hold it harmless from, and defend it against the following claims arising from use of the Cameron equipment:

- personal injury and death claims asserted by Transocean employees and invitees on the drilling rig;
- claims for damage to the Transocean property like the *Deepwater Horizon*;
- and, as provided in any customer contract like the Drilling Contract, claims for loss of hole or reservoir **and pollution claims.**

The risk allocation terms of the Drilling Contract and, in particular, BP's commitments to "bear" the expenses related to loss of hole or reservoir and to "assume all responsibility" for pollution claims – and to hold Transocean harmless for those claims – explain and support Transocean's independent commitment in the Terms and Conditions and the MSA to "provide" that same protection to Cameron.  Nevertheless, Cameron is entitled to that indemnity from Transocean without regard to Transocean's ability to secure its own rights against BP.  Accordingly, none of the legal issues raised by Transocean concerning the indemnity obligations of BP to Transocean have any bearing on the resolution of Transocean's obligations to Cameron.

After the filing of the many lawsuits consolidated in this proceeding, Cameron demanded that Transocean fulfill its contractual indemnity obligations.  In turn, Transocean demanded that BP fulfill its contractual obligation to hold Transocean harmless from the Cameron indemnity claim. But rather than hold Cameron harmless, and in conscious breach of its written contractual obligations, Transocean sued Cameron.  And rather than hold Transocean harmless, and in conscious breach of its written contractual obligations, BP sued Cameron, prompting Cameron to crossclaim for indemnity from Transocean.

1075046v.1

## II.    THE WRITTEN INDEMNITY OBLIGATIONS

The interrelated contractual risk allocation obligations set forth below are based on the accompanying Statement of Material Undisputed Facts filed pursuant to Local Rule 65.1 (cited hereafter as "SOF"):

### A.    Transocean's Indemnity Obligations to Cameron

As set forth in the Introduction, there are two contractual sources of indemnity obligations that Transocean undertook directly in favor of Cameron.  The first source is the written "Terms and Conditions" for two BOP equipment purchase orders for specified equipment to be installed on the *Deepwater Horizon*.  SOF ¶ 6, Exhs. 2, 3, 4.  The second is the written MSA between Cameron and Transocean.  SOF ¶7, Exh.5.

#### 1.    The Purchase Orders' "Terms and Conditions"

The Terms and Conditions were agreed to by Cameron, as "Seller," and R&B Falcon, as "Purchaser."  SOF Exh. 4.  Transocean subsequently succeeded to the rights and obligations of R&B Falcon with respect to the BOP equipment.  SOF ¶ 10.  As is customary in the industry, the risk allocation provisions of the Terms and Conditions allocate responsibility between Transocean and Cameron according to the type of liability or expense.  With respect to personal injury and death and property damage claims and liability, the Terms and Conditions contain reciprocal indemnity agreements; each party is responsible for its own employees and property.  In addition, the Terms and Conditions contain an express provision under which Transocean provides indemnity protection for the loss of hole and reservoir and pollution costs.

##### a.    *Reciprocal Indemnities*

The first two subparagraphs of Paragraph 18 of the Terms and Conditions set out the reciprocal indemnities between Cameron and Transocean:

- 4 -

> The Seller [i.e., Cameron] shall be liable and shall defend, release, indemnify and hold harmless and waive all rights of recourse against Purchaser [i.e., R&B Falcon/Transocean] and its customers, their parent, subsidiary, and affiliated companies, and their subcontractors together with their agents, employees, invitees, directors, officers, shareholders and insurers of each ("Purchaser Group") from and against any and all claims, demands or causes of action of every kind and character, brought by any person or party, for injury to, illness or death of any member of the Seller Group or for damage to or loss of property owned or leased by the Seller Group which injury, illness, death, damage or loss arises out of or is incident to the Operations REGARDLESS OF WHETHER CAUSED IN WHOLE OR IN PART BY A PRE-EXISTING DEFECT, SELLER'S SOLE, JOINT AND/OR SEVERAL NEGLIGENCE, WILLFUL MISCONDUCT, STRICT LIABILTY, UNSEAWORTHINESS OF ANY VESSEL, OR OTHER LEGAL RESPONSIBILITY OF PURCHASER GROUP.
>
> The Purchaser [i.e., R&B Falcon/Transocean] shall be liable and shall defend, release, indemnify and hold harmless and waive all rights of recourse against Seller [i.e., Cameron], its parent, subsidiary, and affiliated companies, and their subcontractors together with their agents, employees, invitees, directors, officers, shareholders and insurers of each ("Seller Group") from and against any and all claims, demands or causes of action of every kind and character, brought by any person or party, for injury to, illness or death of any member of the Purchaser Group or for damage to or loss of property owned or leased by the Purchaser Group which injury, illness, death, damage or loss arises out of or is incident to the Operations REGARDLESS OF WHETHER CAUSED IN WHOLE OR IN PART BY A PRE-EXISTING DEFECT, SELLER'S SOLE, JOINT AND/OR SEVERAL NEGLIGENCE, WILLFUL MISCONDUCT, STRICT LIABILTY, UNSEAWORTHINESS OF ANY VESSEL, OR OTHER LEGAL RESPONSIBILITY OF SELLER.

The capitalized typeface is in the original. These reciprocal provisions reflect the industry's customary "knock-for-knock" risk allocation provisions with respect to personal injury, death, and property damage. *Risk Allocation* 1, pp. 20-21.

        As the quoted language confirms, each party indemnified the other not only with respect to the indemnitor's "employees," but also with respect to the indemnitor's "invitees." Transocean therefore owes defense and indemnity obligations for injuries to anyone (other than a Cameron employee) that was invited onto the *Deepwater Horizon* by Transocean. In addition,

1075046v.1

Transocean is obligated to "hold" Cameron "harmless" – and it "waive[d] all rights of recourse" against Cameron – for any damage to Transocean property.

> b.   _Pollution, Loss of Hydrocarbons and Reservoir Damage_

The final subparagraph of the Terms and Conditions, paragraph 18, provides as follows:

> In the event that Purchaser [i.e., Transocean] is entitled to indemnity **under any contract** with its customers or suppliers with respect to pollution, loss of hydrocarbons, damage to reservoirs, loss of hole or other damages associated with blowout or loss of well control, **Purchaser [Transocean] will provide Seller [Cameron] with the benefit of such indemnity to the fullest extent possible.**

(Emphasis added.)   The Drilling Contract with BP is, of course, a "contract" of Transocean Holdings "with" a "customer[ ]" of Transocean.  As we explain below, the Drilling Contract is also a contract under which Transocean "is entitled to indemnity with respect to pollution" or "other damages associated with blowout or loss of well control" within the meaning of this last subparagraph of Paragraph 18 of the Terms and Conditions.

### 2.   **The MSA for Subsequent Work**

Under the MSA, Cameron was the "Contractor," and the term "Transocean" included a broad set of Transocean corporate affiliates for whom work was to be performed. Paragraph 1 of the MSA explained the scope of the MSA:

> "[a]s between the parties hereto, this Agreement shall control and govern all Work . . ., including purchase orders ("Work Order"), which are in any way connected with Transocean including, but not limited to, the performance of all Work by Contractor, its affiliates, and/or its and their subcontractors for or with Transocean, any of the Transocean subsidiaries or other entities, and/or any third party (including any third party for whom or with which Transocean is rendering services or under contract and regardless of whether or not a Work Order has been

- 6 -

issued hereunder) where such Work is performed at the same drill site, well
location, vessel, fixed platform, or other location (including on the way to or from
such location) as Transocean is located, operating, and/or performing services
("Work Premises")."

The MSA did not obligate Cameron to perform any particular work in connection with the
*Deepwater Horizon* or any other drilling unit or rig.  Correspondingly, MSA ¶ 3 confirmed that
the MSA did not "obligate Transocean to order any Work from Contractor."  MSA ¶ 3.

The MSA risk allocation provisions are similar to those contained in the Terms
and Conditions.

### a.  *Reciprocal Indemnities*

Paragraph 15A of the MSA provides as follows:

Contractor [i.e., Cameron] shall defend, release, indemnify and hold harmless
Transocean, its parents, subsidiaries, affiliates, officers, directors, employees and
agents from and against all liens, claims, demands or causes of action, costs,
expenses or losses (including but not limited to attorneys' fees) attributable to, for
or on account of injury to , illness or death of employees, invitees, and/or agents
of Contractor, its affiliates and subcontractors (other than Transocean and
Transocean's agents, affiliates and subcontractors), or  loss or damage to property
of Contractor, its affiliates and subcontractors (other than Transocean and
Transocean's agents, affiliates and subcontractors) which arise from, are incident
to or result directly or indirectly from the performance of the Work, the presence
of employees or invitees of Contractor at any job or worksite, or transportation to
or from such locations, performance of this Agreement or breach hereof.

Transocean shall defend, release, indemnify and hold harmless Contractor [i.e.,
Cameron, its parents, subsidiaries, affiliates, officers, directors, employees and
agents from and against all liens, claims, demands or causes of action, costs,
expenses or losses (including but not limited to attorneys' fees) attributable to, for
or on account of injury to, illness or death of employees, invitees, and/or agents of
Transocean, its affiliates and subcontractors (other than Contractor and
Contractor's agents, affiliates and subcontractors), or  loss or damage to property
of Transocean, its affiliates and subcontractors (other than Contractor and
Contractor's agents, affiliates and subcontractors) which arise from, are incident
to or result directly or indirectly from the performance of the Work, the presence

- 7 -

of employees or invitees of Transocean at any job or worksite, or transportation to or from such locations, performance of this Agreement or breach hereof.

      b. *Pollution, Loss of Hydrocarbons and Reservoir Damage*

      As added by Amendment No. 1, Paragraph 15B of the MSA provides as follows:

Transocean agrees that if Transocean is entitled to indemnity under any contract with its customers or suppliers with respect to pollution, loss of hydrocarbons, damage to reservoirs, loss of hole or other damages associated with blowout or loss of well control, Transocean will provide Contractor with the benefit of such indemnity to the fullest extent possible.

As with the purchase order Terms and Conditions, the Drilling Contract is unquestionably a "contract" of Transocean Holdings "with" a "customer[ ]." And as explained below, under the Drilling Contract, Transocean "is entitled to indemnity with respect to pollution" or "other damages associated with blowout or loss of well control" within the meaning of this Paragraph 15B.

### 3.  Relevant Provisions of Transocean Agreements

      *a.* With respect to claims arising from use of the BOP equipment and other Cameron "work" related to the *Deepwater Horizon*, Transocean agreed (1) to hold Cameron harmless, and to indemnify Cameron fully, with respect to claims for "injury" and "death" of employees or "invitees," and (2) "to waive all rights of recourse" for "loss or damage to Transocean property."  These provisions apply even if the pertinent injury or loss is "CAUSED IN WHOLE OR IN PART BY A PRE-EXISTING DEFECT or Cameron's NEGLIGENCE."

      *b.* In addition, Transocean agreed to "provide" Cameron "with the benefit of" the "indemnity" of any customer contract.  At the time of these written agreements with Cameron, Transocean had already executed such a contract with its customer BP – namely, the Drilling Contract for construction, use, and operation of the *Deepwater Horizon*.  SOF ¶¶ 1-8.

- 8 -

### B.  BP's Indemnity Obligations to Transocean

Effective December 9, 1998, predecessors of Transocean and BP entered into a the Drilling Contract for the construction, use, and operation of the *Deepwater Horizon*.  *See* SOF ¶ 1, Exh. 1.  The current successor parties to the Drilling Contract are BP America Production Company as "Company" ("BPAPC") and Transocean Holdings, LLC as "Contractor."  SOF ¶¶ 9, 10.

As part of the events giving rise to this indemnity dispute, BP Exploration and Production Inc. ("BPXP") signed a lease with the U.S. Government allowing it to explore for and potentially produce hydrocarbons from reserves in the subsoil of the Outer Continental Shelf. SOF ¶ 11, Exh. 6.  BPXP sold minority interests in the lease, and entered into an Operating Agreement with its co-lessees. SOF ¶ 19.  Section 5.1 of the Operating Agreement provided that BPXP "shall contract for and employ any drilling rigs" reasonably necessary to operate drilling activities on the lease.  SOF Exh. 9.  Section 30.2.1 of the Drilling Contract gave BPAPC the right to assign the Drilling Contract to an affiliate like BPXP.  SOF Exh. 1.

According to BP, BPXP and BPAPC jointly hired Transocean to drill the Macondo well on the lease with the *Deepwater Horizon*.  SOF ¶¶ 15, 16.  In addition, BPXP obtained permission from the U.S. Government to use the *Deepwater Horizon* to drill the well on the lease.  SOF ¶ 17, Exh. 8.  For purposes of events arising from operation of the *Deepwater Horizon* in connection with the Macondo prospect, therefore, it is inescapable that BPXP and BPAPC are bound by the terms of the Drilling Contract.

#### 1.  Risk Allocation in the Drilling Contract

The Drilling Contract allocates risks between BP as COMPANY and Transocean as CONTRACTOR.  Many of its provisions parallel and thus foreshadow the indemnities in the

later Terms and Conditions and the MSA between Transocean and Cameron.   Indemnity
obligations are allocated by type of liability, claim or expense.   "The interests of both contracting
parties are furthered by establishing a firm risk allocation scheme which allocates responsibility
for specific risks and enables each party to measure the risk exposures it will absorb or insure."
*Risk Allocation* 1, p. 20.   Just as with the Transocean/Cameron agreements, neither party is
completely relieved of responsibility for its allegedly harmful acts.

  a.   *Reciprocal Indemnities*

Article 21 of the Drilling Contract contains reciprocal indemnities for personal
injury or death.   Article 22 contains reciprocal indemnities concerning the respective property of
BP and Transocean.   These are customary risk allocations in the offshore industry.   *Risk
Allocation* 1, pp. 20-21.

  b.   *Loss of Hole or Reservoir*

Article 23 addresses (in all caps and bold type in the original) indemnity for
"**LOSS OF HOLE OR RESERVOIR**."

Article 23.1 provides (in all caps and bold type in the original), that "**SHOULD
THE HOLE BE LOST OR DAMAGED, THE LOSS OR DAMAGE WILL BE BORNE
BY**" BP as "**COMPANY AND COMPANY SHALL PROTECT, RELEASE, DEFEND,
INDEMNIFY AND HOLD HARMLESS**" Transocean as "**CONTRACTOR FROM AND
AGAINST ALL CLAIMS FOR LOSS OF OR DAMAGE TO THE HOLE.**"   The second
sentence limits Transocean's liability in circumstances where Transocean's negligence causes
the loss.

Article 23.2  provides (in all caps and bold type in the original), that

**"IN THE EVENT ANY WELL BEING DRILLED HEREUNDER
SHALL BLOWOUT, CRATER OR CONTROL BE LOST FROM ANY**

- 10 -

**CAUSE, COMPANY [BP] SHALL BEAR THE ENTIRE COST AND EXPENSE OF KILLING THE WELL OR OF OTHERWISE BRINGING THE WELL UNDER CONTROL, AND SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS CONTRACTOR [TRANSOCEAN] FROM AND AGAINST ALL CLAIMS, SUITS, DEMANDS, AND CAUSES OF ACTION FOR COSTS ACTUALLY INCURRED IN CONTROLLING THE WELL.**

Article 23.3 of the Drilling Contract provides (in all caps and bold type in the original, that BP as

**"COMPANY [BP] SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS CONTRACTOR [TRANSOCEAN] FOR ANY AND ALL CLAIMS ON ACCOUNT OF (1) INJURY TO, DESTRUCTION OF, LOSS, OR IMPAIRMENT OF ANY PROPERTY RIGHT IN OR TO OIL, GAS, OR OTHER MINERAL SUBSTANCES OR WATER, IF AT THE TIME OF THE ACT OR OMISSION CAUSING THE INJURY, DESTRUCTION, LOSS, OR IMPAIRMANT, THE SUBSTANCE HAD NOT BEEN REDUCED TO PHYSICAL POSSESSION ABOVE THE SURFACE OF THE EARTH OR (II) ANY LOSS OR DAMAGE TO ANY FORMATION, STRATA, OR RESERVOIR BENEATH THE SURFACE OF THE EARTH.**

Consequently, for any well blowout associated with the *Deepwater Horizon*, BP committed (1) to bear the damage and expense of loss of hole or reservoir; (2) to bear the "entire cost" of capping a well blowout, and (3) to hold Transocean harmless from any loss or claim occasioned by the well blowout, including loss of hydrocarbons.  This obligation also represents a customary allocation of risks in the offshore drilling industry.  C. Moomjian, *Contractual Insurance and Risk Allocation in the Offshore Drilling Industry [Part 2]*, CONTRACT DRILLER MARCH/APRIL 1999 ["*Risk Allocation* 2"], p. 14 (attached as Appendix B).

    *c.  Pollution*

Article 24 addresses (in all caps and bold type in the original) indemnity for "**POLLUTION**."

- 11 -

Section 24.1 provides (in all caps and bold type in the original) that Transocean as "**CONTRACTOR SHALL ASSUME FULL RESPONSIBILITY FOR**" and indemnify BP as **COMPANY** for, and hold BP harmless from exposure for pollution "**ORIGINATING ON OR ABOVE THE SURFACE OF THE LAND OR WATER**." Section 24.1 further provided for a limited indemnity obligation for claims "**ARISING FROM POLLUTION IN ANY WAY CAUSED BY THE DRILLING UNIT WHILE IT IS OFF THE DRILLING LOCATION, WHILE UNDERWAY OR DURING DRIVE OFF OR DRIFT OF FROM THE DRILLING LOCATION.**"

Section 24.2 sets out the responsibility of BP America as "**COMPANY**." It provides in full (in all caps and bold face in the original) as follows:

> **COMPANY SHALL ASSUME FULL RESPONSIBILITY FOR AND SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY, AND HOLD CONTRACTOR HARMLESS FROM AND AGAINST ANY LOSS, DAMAGE, EXPENSE, CLAIM, FINE, PENALTY, DEMAND OR LIABLITY FOR POLLUTION OR CONTAMINATION, INCLUDING CONTROL AND REMOVAL THEREOF, ARISING OUT OF OR CONNECTED WITH OPERATIONS UNDER THIS CONTRACT HEREUNDER AND NOT ASSUMED BY CONTRACTOR IN ARTICLE 24.1 ABOVE, WITHOUT REGARD FOR NEGLIGENCE OF ANY PARTY OR PARTIES AND SPECIFICALLY WITHOUT REGARD FOR WHETHER THE POLLUTION OR CONTAMINATION IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OR FAULT OF CONTRACTOR.**

Read in conjunction with section 24.1, this pollution indemnity agreement applies to all underwater pollution from a drilled well. BP, therefore, committed to "assume full responsibility for" underwater "pollution" liability, damages, claims and costs "arising out of or connected with operations under the" Drilling Contract for the *Deepwater Horizon*. This too is a customary allocation of risks in the offshore drilling industry. *Risk Allocation* 2, p. 14.

- 12 -

1075046v.1

d.   *Meaning of All Provisions*

Section 25.1 then amplifies the coverage of the language used in all the indemnity

provisions as follows (and again in all caps and bold face in the original):

**EXCEPT TO THE EXTENT ANY SUCH OBLIGATION IS SPECIFICALLY LIMITED TO CERTAIN CAUSES ELSEWHERE IN THIS CONTRACT, THE PARTIES INTEND AND AGREE THAT THE PHRASE "SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS" MEANS THAT THE *INDEMNIFYING PARTY SHALL* PROTECT, RELEASE, DEFEND, INDEMNIFY, AND *HOLD HARMLESS THE INDEMNIFIED PARTY OR PARTIES FROM AND AGAINST ANY AND ALL CLAIMS,* DEMANDS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES (INCLUDING REASONABLE ATTORNEYS FEES), JUDGMENTS AND AWARDS *OF ANY KIND OR CHARACTER, WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF, INCLUDING PREEXISTING CONDITIONS,* WHETHER SUCH CONDITIONS BE PATENT OR LATENT, THE UNSEAWORTHINESS OF ANY VESSEL OR VESSELS (INCLUDING THE DRILLING UNIT), *BREACH OF CONTRACT, STRICT LIABILITY, TORT, OR THE NEGLIGENCE OF ANY PERSON OR PERSONS, INCLUDING THAT OF THE INDEMNIFIED PARTY,* WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, ACTIVE, PASSIVE OR GROSS OR ANY OTHER THEORY OF LEGAL LIABILITY AND *WITHOUT REGARD TO WHETHER THE CLAIM AGAINST THE INDEMNITEE IS THE RESULT OF AN INDEMNIFICATION AGREEMENT WITH A THIRD PARTY.***

(Italics and underlining added.)  By reason of section 25.1, BP expressly committed in sections

23 and 24.2 to hold Transocean harmless from any and all contractual indemnity claims of third

parties against Transocean arising from loss of the hole or reservoir or underwater pollution

claims connected with drilling operations conducted by the *Deepwater Horizon*.

e.   *The Drilling Contract and the BOP*

BP's commitments to "bear the entire cost and expense" of well control, to

"assume full responsibility" for underwater pollution costs, and to hold Transocean harmless

from contractual indemnity claims have particular significance for Cameron because of the

Drilling Contract's provisions governing BOP equipment.  Under section 15.2 of the Drilling

- 13 -

Contract, Transocean was obligated to "use the blowout prevention equipment specified in Exhibit B hereof on all strings of casing unless otherwise directed by" BP.  It is no surprise, therefore, that the specifications of BOP equipment in the Transocean purchase orders correspond to the specifications for the BOP equipment set out by BP in Exhibit B of the Drilling Contract.  SOF Exhs. 1 (Exh. B); 2, 3.

Moreover, under section 5.1 of the Drilling Contract, any modification to the BOP equipment before installation was governed by the procedures of Exhibit H.  Under the Project Execution Plan appended as Exhibit H, BP and Transocean were obligated to work together to resolve technical issues involving equipment, specifically including (in section 3.2.1.4 of section 3 of the plan, at page 10 of 17 of Exhibit H) the BOP equipment.

By the terms of the Drilling Contract, therefore, BP and/or Transocean had control over the design of the BOP equipment before and after it was sold by Cameron to Transocean. This is not surprising, because it was ***BPXP*** as OCS lessee that bore the responsibility under the regulations of the U.S. Minerals Management Service to provide the proper BOP equipment in drilling the well on the federal OCS lease at issue.  *See* 30 C.F.R. §§ 250.442 ("must install" a "subsea BOP system"); 250.515 (the BOP system "shall be designed, used, maintained, and tested in a manner necessary to assure well control in foreseeable conditions and circumstances").  Notably, a key element of the ***BPXP application*** for and MMS approval of the use of the *Deepwater Horizon* to drill the well was a schematic of the unit's BOP.  SOF Exh. 8.

Accordingly, BP's commitment to "assume full responsibility" for underwater pollution costs, and its commitment to hold Transocean harmless from contractual indemnity, make particular sense in connection with Transocean's commitment to "provide" Cameron with

- 14 -

the "benefit" of the indemnity provisions of the Drilling Contract.   BP assumed full responsibility for underwater pollution under the indemnity provisions in part because it had significant control over the design of the BOP equipment and direct regulatory obligations with respect to use of that equipment to drill deepwater OCS wells.

> f.   *Meaning of "Provide the Benefit"*

The Transocean indemnity agreements with Cameron were explicitly anticipated by section 25.1 of the Drilling Contract, and the Transocean obligations with respect to loss of reservoir and pollution under the agreements with Cameron incorporate the indemnity provisions of customer contracts like the Drilling Contract.  All these indemnity agreements must therefore be interpreted together.

Section 25.2 of the Drilling Contract is directly relevant to explain Transocean's commitment to "provide the benefit" of any customer indemnity to Cameron.  Section 25.2 bears the title "**BENEFIT OF INDEMNITIES,**" and it provides as follows (with bold and all caps in the original):

> **TO THE EXTENT A PARTY IS ENTITLED TO INDEMNIFICATION IN ARTICLES 21, 22, 23 AND 24, SUCH PARTY'S PARENT, SUBSIDIARIES, AFFILITATES, CO-OWNERS AND JOINT VENTURERS (IF ANY), AND THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, AND EMPLOYEES, THE DRILLING UNIT AND ITS LEGAL  AND BENEFICIAL OWNERS, IN REM OR IN PERSONAM *SHALL* ALSO *BE ENTITLED TO SUCH INDEMNIFICATION* AND DEFENSE THEREUNDER.  ANY SUCH PERSON SO ENTITLED TO INDEMNIFICATION AND DEFENSE UNDER THIS ARTICLE 25.2 ARE HEREINAFTER REFERRED TO AS AN "EXTENDED BENEFICIARY OF INDEMNIFICATIONS.**

(Italics and underlining added; there is no closing quotation mark in the original.)

By its motion, Cameron is not asserting a right as "extended beneficiary of indemnifications" by BP under the Drilling Contract.  It is asserting instead its rights against

- 15 -

Transocean under the Terms and Conditions and MSA.  This language in the Drilling Contract, however, necessarily establishes the meaning of the identical language used in the Terms and Conditions and MSA.  The title and highlighted language in article 25.2, therefore, make clear that Transocean's obligation in the Terms and Conditions and MSA to "provide" Cameron with the "benefit" of the Drilling Contract indemnity means that Cameron "shall be entitled" to receive directly from Transocean the "indemnification and defense" prescribed in sections 23 and 24 of the Drilling Contract, as defined in section 25.1.

### 3.   Lawsuits, Indemnity Demands, and Responses

The well drilled and completed by BP with the *Deepwater Horizon* blew out. SOF ¶ 22.  As confirmed by the many filings in this proceeding, Cameron has been sued by many claimants for the alleged failure of the BOP equipment to prevent their injuries and damages allegedly resulting from the well blowout.

Cameron demanded indemnity protection from Transocean under the terms of the purchase order Terms and Conditions and MSA.  SOF ¶ 23, Exh. 10.  With specific reference to the Cameron indemnity claims, Transocean in turn demanded indemnity protection from BP under the terms of the Drilling Contract.  SOF ¶ 25, Exh. 11.

Directly contravening its obligation to hold Cameron harmless from claims and to provide Cameron with the benefit of the Drilling Contract indemnity provisions, however, Transocean sued Cameron. SOF ¶ 29; Doc. 2068.  Similarly, directly contravening its contractual commitment to "assume full responsibility" for underwater pollution and bear the expense of well control and loss of hole or reservoir, BP sued Cameron.  SOF ¶ 29; Docs. 2064, 2065.  In response to BP's claims, Cameron cross-claimed against Transocean for indemnity and asserted the Drilling Contract against BP as an affirmative defense.  SOF ¶ 30; Docs. 2865, 2872.  In

- 16 -

other words, rather than hold Transocean harmless as it was obligated to do, BP instead sued Cameron and thereby precipitated contractual indemnity claims against Transocean.  Nor has Transocean fulfilled its commitment to "provide the benefit" of the Drilling Contract by holding Cameron harmless from, or defending Cameron against BP's claims for loss or reservoir or pollution.

## III.   ARGUMENT

As a matter of law, the risk allocation provisions of the Terms and Conditions governing the BOP purchase and the MSA should be enforced as written.  That is clearly the position Transocean takes in its own motion against BP.  *See* Docs. 4477 and 4477-2.

Transocean must be held to its agreements to waive all rights of recourse against Cameron – to hold Cameron harmless – for all claims for personal injury, death or property damage, and to provide Cameron the benefits of the "loss of hole or reservoir" and pollution indemnity in the Drilling Contract.  Cameron should be granted summary judgment denying Transocean's claims against Cameron, and should be granted a summary declaratory judgment that Transocean is required to indemnify Cameron for all claims in this proceeding, including the claims of BP, and to defray Cameron's past and future expense of defending those claims.

### A.  Maritime Law Governs the Drilling Contract and Cameron Agreements

The Drilling Contract pertains to the use of a vessel for maritime commerce – the movement of drilling apparatus from place to place in deep waters in the Gulf of Mexico.  It is therefore a maritime contract.  *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 26 (2004); *Proshipline Inc. v. Aspen Infrastructures, Inc.*, 609 F.3d 960, 967-68 (2d Cir. 2010).  "[I]f the contract sued upon is a maritime contract, maritime law applies."  *Grand Isle Shipyard, Inc. v. Seacor Marine ,*

- 17 -

*LLC*, 589 F.3d 778, 789 n.9 (5th Cir. 2009) (en banc).[1]   The parties to the Drilling Contract

agreed in section 35.3 that the law governing the Drilling Contract would be "the General

Maritime Law of the United States."

The purchase orders' Terms and Conditions pertain to the provision of equipment

to be moved by a vessel from well to well offshore.  It is settled that contracts "for the furnishing

of equipment for vessels . . . are considered maritime contracts."  *Har-Win, Inc. v. Consolidated*

*Grain & Barge Co.*, 794 F.2d 985, 986 (5th Cir. 1986) (citations omitted); *accord*, 1. THOMAS J.

SCHEONBAUM ET AL., ADMIRALTY AND MARITIME LAW § 3-10 (4th ED. 2003).  Indeed, Cameron

and Transocean agreed in paragraph 1 of the Terms and Conditions that the agreement would be

"governed by the General Maritime Law of the United States."

The MSA is likewise a maritime contract for work on or provision of vessel

equipment.   Under paragraph 18, the MSA is "GOVERNED BY . . . THE GENERAL

MARITIME LAWS OF THE UNITED STATES."

## B.  Maritime Law Requires Enforcement of Indemnity Agreements in Strict Accordance with Their Terms

"A maritime contract containing an indemnity agreement . . . should be read as a

whole and its words given their plain meaning unless the provision is ambiguous."  *Breaux v.*

*Halliburton Energy Services, Inc.*, 562 F.3d 358, 364 (5th Cir. 2009), quoting *Weathersby v.*

---

[1] In *Grand Isle*, the Fifth Circuit *en banc* majority held that, under the Outer Continental Shelf Lands Act, a court should not "apply tort analysis to determine where [a] contractual controversy arose" and overruled all of its prior holdings that had focused on "where the underlying accident occurred" to choose the law to apply to a contractual indemnity issue.  589 F.3d at 787-88.  This holding makes clear that, under OCSLA, choice of law for tort claims and choice of law for contractual indemnity claims are subject to different analyses.  The analysis requiring the application of Louisiana law to the underlying tort claims in this case, therefore, does not control the choice of law analysis for the contractual indemnity claims made the basis of this motion.  Under footnote 9 in *Grand Isle*, maritime law governs indemnity issues under the maritime contracts at issue without regard to the choice of law for the underlying tort claims.

1075046v.1

*Conoco Oil Co.*, 752 F.2d 953, 955 (5th Cir. 1984) (internal citation omitted).  "Disagreement as to the meaning of a contract does not make it ambiguous, nor does uncertainty or lack of clarity in the language chosen by the parties."  *Breaux*, 562 F.3d at 364, quoting *Weir v. Fed. Asset Disposition Ass'n*, 123 F.3d 281, 286 (5th Cir. 1997) (citation omitted).  "Where 'the written instrument is so worded that it can be given a certain definite legal meaning or interpretation, then it is not ambiguous'" and can be construed "'as a matter of law.'"  *Id.*

Under maritime law, "'[a] court should construe an indemnity clause to cover all losses which reasonably appear to have been within the parties' contemplation.'"  *Breaux*, 562 F.3d at 364, quoting *Foreman v. Exxon Corp.*, 770 F.2d 490, 496 (5th Cir. 1985) (internal quotations and citation omitted); *accord*, *Weathersby*, 752 F.2d at 955; *Corbett v. Diamond M Drilling Co.*, 654 F.2d 329, 333 (5th Cir. 1981).  Furthermore, a "basic principle of contract interpretation in admiralty law is to interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous."  *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004) (citations omitted).  Correspondingly, "construction of a maritime contract should not 'lead[ ] to . . . absurd consequences.'"  *In re Fitzgerald Marine & Repair, Inc.*, 619 F.3d 851, 861-62 (8th Cir. 2010), quoting *Chembulk Trading*, 393 F.3d at 555 n.6.

These principles calling for enforcement of risk allocation provisions in accordance with the unconditional language of the indemnity provisions are of vital importance to companies involved in offshore drilling.  *Risk Allocation* 1, p. 20.  If not enforced as written, indemnity provisions will not "enable" either party "to measure the risk exposures it will absorb or insure."  Transocean clearly agrees that contractual indemnity agreements should be enforced as written.  *See* Doc. 4477-2.

- 19 -

1075046v.1

There are admittedly qualifications to these general principles under maritime law.  For example, "an indemnitor is entitled to express notice that under his agreement, and through no fault of his own, he may be called upon to pay damages caused solely by the negligence of his indemnitee."  *Corbett*, 654 F.2d at 333.  Similarly, clear notice is required to shift liability for alleged product defect.  *Jig the Third Corp. v. Puritan Marine Ins. Under. Corp.*, 519 F.2d 171, 177 (5th Cir. 1975).

Each of the risk allocation agreements between Transocean provides express notice that with respect to certain categories of claims and costs, one of the parties may be called upon to pay damages caused solely by the indemnitee even if the claims are based in negligence or product defect.  In fact, the key provisions are highlighted through the use of all caps.

The Drilling Contract then provides ample support for the Transocean indemnity obligations related to pollution and loss of reservoir, explicitly providing in section 25.1 that BP will indemnify Transocean and hold it harmless from breach of contract claims based on indemnification.

### C.  Statutory Authority for Specific Indemnities

General maritime law, of course, only applies "[a]bsent a relevant statute."  *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986).  The Oil Pollution Act of 1990 specifically authorizes the pollution indemnities in the Drilling Contract and the Cameron/Transocean agreements.   "Nothing in this Act prohibits any agreement to . . . hold harmless, or indemnify a party to such agreement for any liability under this Act."  33 U.S.C. § 2710(a).  The pollution indemnity obligations of Transocean to Cameron, therefore, are valid to defeat Transocean's claims related to OPA recovery for oil pollution.  Transocean agrees.  Doc. 4477-2, pp. 25-27.

- 20 -

**D.  Under the Unambiguous Terms of the Terms and Conditions and MSA, Transocean's Claims Against Cameron Should Be Denied as a Matter of Law**

It is beyond reasonable dispute that Transocean violated the terms of its obligations to hold Cameron harmless when it cross-claimed against Cameron in this proceeding. All of the injury and death claims that are the subject of Transocean's contribution cross-claims against Cameron were asserted by "employees" or "invitees" of Transocean within the meaning of Transocean's indemnity obligations to Cameron. The Transocean cross-claims were asserted in direct violation of Transocean's waiver of rights of recourse against Cameron and its obligation to hold Cameron harmless for such claims.

Moreover, the direct Transocean cross-claim against Cameron for loss of part of the value of the *Deepwater Horizon* directly violates Transocean's obligation to waive its rights of recourse against Cameron and hold Cameron harmless for "loss or damage to property of Transocean."

The remaining oil spill claims that are the subject of Transocean's cross-claims against Cameron are unambiguously covered by the pollution indemnities provided to Cameron by Transocean. The Drilling Contract indemnity provisions are unquestionably an "indemnity under [a] contract" with a Transocean customer within the meaning of the "pollution cost" provision of the Transocean agreements to indemnify Cameron. Transocean was obligated to "provide" Cameron "with the benefit" of that Drilling Contract indemnity. The Drilling Contract had already been executed when Transocean agreed to protect Cameron "to the fullest extent possible," and was referenced in the Transocean agreements with Cameron. SOF ¶¶ 1-8. When interpreted in light of Drilling Contract § 25.2, "provid[ing] the benefit of" the Drilling Contract "indemnity" necessarily entitles the benefitted party to the same indemnification set out in the

- 21 -

1075046v.1

Drilling Contract.  Inasmuch as BP agreed by that indemnification to "bear the expense of" loss of reservoir and to "assume full responsibility" for pollution costs, the "benefit of the indemnity" is complete relief from all responsibility for loss of reservoir or pollution costs.  Under the unambiguous terms of the Transocean/Cameron agreements, Transocean must "provide" Cameron precisely that "benefit of" the Drilling Contract indemnity.  Transocean's contribution cross-claims were therefore asserted in direct violation of Transocean's express contractual obligations to Cameron.

As Transocean itself acknowledges, an indemnitor may not assert contribution claims against its indemnitee.  Doc. 4477-2, pp. 24-25.  This principle is established law, as confirmed by section 23(c) of the Restatement (Third) Torts: Apportionment of Liability: "A person who has a right of indemnity against another person . . . is not subject to liability for contribution to that person."  The Restatement's reporters cogently explain the reasoning supporting this rule:

> "It would frustrate the purpose of indemnity to permit a person who is liable for indemnity to recover contribution from the person to whom indemnity is owed.  Indemnity makes the indemnitee whole at the expense of the indemnitor.  An indemnitor's contribution against the indemnitee would cause the indemnitee not to be made whole."

RESTATEMENT (THIRD) TORTS: APPORTIONMENT OF LIABILITY § 23, comment c, at 286.  The Transocean contribution claim against Cameron is therefore precluded by its agreement to indemnify Cameron.  *Campbell v. Sonat Offshore Drilling, Inc.*, 27 F.3d 185 (5th Cir. 1994) (affirming summary judgment dismissing contribution crossclaim on the basis of indemnity agreement).

The legal issues posed by Transocean's motion for summary judgment against BP, as identified in this Court's order of November 3, 2011 (Doc. 4473), have no bearing on

Transocean's obligations to Cameron.  Most importantly, Transocean's alleged misconduct cannot relieve Transocean of its independent and direct indemnity obligation to "provide" Cameron with the "benefit" of the BP pollution and reservoir loss indemnity.  That would be an absurd interpretation of the Terms and Conditions and MSA that is forbidden by Fifth Circuit authority.  *See In re Fitzgerald Marine & Repair, Inc.*, 619 F.3d 851, 861-62 (8th Cir. 2010).

Furthermore, under article 25.1 of the Drilling Contract, BP has an explicit obligation to indemnify Transocean with respect to Cameron's contractual indemnity claim. Under established Fifth Circuit authority, that mutual obligation of BP and Transocean to indemnify one another for such contract claims is entirely valid and enforceable.  *See Breaux*, 562 F.3d at 364-66 (upholding summary judgment of indemnity for contractual obligation).  In addition, these obligations of Transocean and BP with respect to the potential liability ***of Cameron*** have nothing to do with the potential liability of BP or Transocean with respect to the conduct ***of Transocean***.  Finally, the obligation of BP to indemnify Transocean against and hold Transocean harmless from Cameron's contract claim of indemnity would be enforceable without regard to Transocean's conduct in any event.  *See* RESTATEMENT (SECOND) CONTRACTS §§ 183, 184 (the independent parts of an agreement that are not unenforceable as a matter of public policy are enforced); *accord*, G. GIESEL, CORBIN ON CONTRACTS §§ 89.4-89.7 (REV. ED. 2003).

As a matter of law, therefore, all of Transocean's claims against Cameron are foreclosed by Transocean's agreements to indemnify Cameron.

**E.  Under the Unambiguous Terms of the Transocean/Cameron Agreements, Cameron is Entitled to a Summary Judgment Declaring that Transocean Must Indemnify Cameron For and Defend Cameron Against the Claims in This Proceeding**

Contrary to its agreements, Transocean has neither assumed the defense of Cameron in this proceeding, nor unqualifiedly committed to defend and indemnify Cameron

- 23 -

with respect the claims in this proceeding.   Cameron is therefore entitled to a summary declaratory judgment enforcing Transocean's obligations to defend Cameron and indemnify it for every claim asserted against Cameron in this proceeding by parties other than Transocean.

The obligation to defend includes the obligation to reimburse defense fees and other costs incurred because of the indemnitor's failure to defend.  *Lirette v. Popich Bros. Water Transport, Inc.*, 699 F.2d 725, 728 (5th Cir. 1983) (citations omitted); *see Becker v. Tidewater, Inc.*, 586 F.3d 358, 375 (5th Cir. 2009).   Cameron is therefore further entitled to a summary declaratory judgment that Transocean is obligated by its contractual defense obligations to defray Cameron's defense costs in connection with lawsuits involving the Macondo oil well blowout and spill.

Respectfully submitted,

|  |  |
|---|---|
|  | */s/ Phillip A. Wittmann* |
| David J. Beck, T.A. | Phillip A. Wittmann, 13625 |
|   *dbeck@brsfirm.com* |   *pwittmann@stonepigman.com* |
| Joe W. Redden, Jr. | Carmelite M. Bertaut, 3054 |
|   *jredden@brsfirm.com* |   *cbertaut@stonepigman.com* |
| David W. Jones | Keith B. Hall, 24444 |
|   *djones@brsfirm.com* |   *khall@stonepigman.com* |
| Geoffrey Gannaway | Jared Davidson, 32419 |
|   *ggannaway@brsfirm.com* |   *jdavidson@stonepigman.com* |
| BECK, REDDEN & SECREST, L.L.P. | STONE PIGMAN WALTHER |
| One Houston Center | WITTMANN L.L.C. |
| 1221 McKinney St., Suite 4500 | 456 Carondelet Street |
| Houston, TX 77010 | New Orleans, Louisiana  70130 |
| Phone: (713) 951-3700 | Phone: (504) 581-3200 |
| Fax: (713) 951-3720 | Fax: (504) 581-3361 |

*Attorneys for Cameron International Corporation*

- 24 -

1075046v.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Memorandum in Support of Cameron International Corporation's Motion for Summary Judgment Denying All Claims Asserted by Transocean and Declaring Obligations of Transocean to Indemnity and Defend Cameronhas been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 8th day of November, 2011.

_____*/s/ Phillip A. Wittmann*_____

1075046v.1