# Contractual insurance and risk allocation in the offshore drilling industry

Cary A Moomjian Jr, Vice President and General Counsel
Santa Fe International Corp; Chairman,
IADC Contracts Committee

**EDITOR'S NOTE:** *This series of articles, authored by the Chairman of the IADC Contracts Committee, will review contractual risk allocation and insurance provisions in the offshore drilling industry. Offshore drilling contracts are used for Mobile Offshore Drilling Units (MODUs), such as jackups, semisubmersibles, drillships and drill barges, as well as platform rigs. Although many of the concepts discussed herein are equally applicable to platform rig and MODU drilling contracts, this series of articles will focus upon contracts for MODU operations.*

> 'Risks generally are allocated to the contracting parties *without regard to cause*. While it may initially seem inappropriate to protect a party guilty of negligence or misconduct, a fundamental purpose of risk allocation is to create a clear line of demarcation so each party will be able to evaluate its risk exposure and obtain appropriate insurance (or elect to self-insure)'
>
> —Cary A Moomjian, Santa Fe International;
> Chairman, IADC Contracts Committee

## INTRODUCTION

**THERE ARE SEVERAL** principal types of offshore drilling contracts, the most common being a daywork contract, in which the contractor furnishes its rig and crews and receives a stated rate for each day of the contract term. In a turnkey contract, the contractor receives a lump sum for drilling a specified well or wells. In a footage contract, the contractor receives a specified amount of compensation for each foot of hole drilled.

In the offshore arena, turnkey and footage contracts infrequently are employed and the majority of operations are performed on a daywork basis. As will be discussed, there are considerable differences between daywork and turnkey or footage contracts in respect of risk allocation and insurance.

Cary A Moomjian Jr

In contrast to traditional maritime chartering and shipping activities, the offshore drilling industry has evolved relatively recently. Offshore drilling contracts originated from their land-based counterparts and developed over the years with increased complexity. While standard form printed contracts are the mainstay for land-based drilling, most offshore contracts are based upon negotiated manuscript agreements. There is little standardization in offshore drilling contract terms as compared to land drilling and commercial vessel charters or contracts of affreightment, where standard form contracts predominate.

The model drilling contract forms developed by the **International Association of Drilling Contractors** frequently are used for land drilling, but seldom are employed for offshore operations. However, the IADC model contracts often serve as a source of reference for parties involved in drafting and negotiating offshore drilling contracts.

General Conditions of Contract and a Form of Agreement for Mobile Drilling Units recently were adopted for use in the UK Sector of the North Sea by the CRINE Network (Cost Reduction in the New Era). These new standards have been utilized by several major oil companies and leading offshore drilling contractors, and increasingly are becoming accepted in the UK. The CRINE Network is expanding its efforts to reduce costs and enhance efficiencies beyond the UK, and its standard contract forms may be adopted in other offshore oil and gas producing areas over the next few years.

In offshore drilling contracts, commercial, risk allocation and

Appendix B

> 'The "knock for knock" concept frequently is adopted to allocate risk for injury or death of the respective employees of the contractor and operator. In most jurisdictions, the employer legally is required to maintain insurance covering injury or death of its personnel and each party should be prepared to assume such risks in the context of a drilling contract. A more troublesome situation arises in respect of responsibility for claims of third party personnel'

insurance terms have tended to vary with the marketplace, albeit in a rather perverse fashion. In tight rig markets, where rig utilization and rates are high, contractors are able to negotiate favorable terms. Conversely, in soft rig markets with low rates and utilization, operators often are able to reshape contracts in their favor. The perversity results from the fact that contractors enjoy high rates, high utilization and favorable contract terms in good markets, while low rates, poor utilization and unfavorable contracts are the norm in soft markets.

## RISK ALLOCATION PROVISIONS

Before considering specific provisions, it is appropriate to consider the underlying philosophies for contractual risk allocation. In good or bad markets, an offshore drilling contract should contain clear and unqualified contractual risk allocations.

The interests of both contracting parties are furthered by establishing a firm risk allocation scheme which allocates responsibility for specific risks and enables each party to measure the risk exposures it will absorb or insure. This only can be accomplished by a straightforward and unconditional risk allocation structure.

Provisions which provide that one party will assume a specific risk of loss or liability unless the other party is negligent or otherwise culpable do not accomplish this objective. To the contrary, they create a situation where a determination of culpability is a prerequisite to identifying which party must absorb the risk. The undesirability of this situation becomes evident when it is recognized that such conditional risk allocation provisions often effectively require both parties to place insurance covering the same risks since a determination of negligence or culpability (and resulting contractual liability) only can be made after the loss occurs.

Accordingly, risks generally are allocated to the contracting parties *without regard to cause.* While it may initially seem inappropriate to protect a party guilty of negligence or misconduct, a fundamental purpose of risk allocation is to create a clear line of demarcation so each party will be able to evaluate its risk exposure and obtain appropriate insurance (or elect to self-insure).

Before considering specific liability and indemnity provisions, several fundamental principles should be considered. Contractual risk allocation provisions should obligate parties to defend, indemnify and release rather than merely assume liability. While a clause obligating one party to "assume liability" for a specified risk may appear adequate at first blush, the absence of a provision which obligates that party to defend, indemnify and release the other party may substantially dilute the intended contractual protection.

A "Scope of Indemnity" clause often is included in drilling contracts to specifically obligate an indemnifying party to protect, defend, and indemnify the other party against all liabilities and costs including "reasonable attorney fees" (query whether the attorney or the fees must be reasonable) associated with any claims subject to the indemnity. Another common feature of such clauses is an "inurement" provision which extends the contractual assumptions of liability and indemnities to each party's parent, affiliate and subsidiary companies and their respective officers, directors, shareholders and employees. In offshore contracts, the inurement provision also should extend to the drilling rig as an entity (in rem) since maritime law generally classifies MODUs as vessels which may be named as defendants in lawsuits.

## CUSTOMARY RISK ALLOCATION CONCEPTS

Customary practice in the offshore drilling industry provides that the contractor bears risks of personal injury or death of its personnel and generally assumes liability for rig and associated contractor equipment loss or damage. Conversely, the operator normally accepts liability for its own personnel and property and, in daywork contracts, generally assumes responsibility for well related risks (including pollution, wild well control, well damage or loss) and reservoir damage.

The principle that each party assumes liability for its own property and personnel, often referred to as "knock for knock", is in-

corporated into the IADC model contract forms as well as the CRINE Network General Conditions of Contract.

## LIABILITY FOR PERSONNEL

The "knock for knock" concept frequently is adopted to allocate risk for injury or death of the respective employees of the contractor and operator. In most jurisdictions, the employer legally is required to maintain insurance covering injury or death of its personnel and each party should be prepared to assume such risks in the context of a drilling contract. A more troublesome situation arises in respect of responsibility for claims of third party personnel, both in respect of the various subcontractor and service company personnel which may be dispatched to the rig site by either of the parties and as respects "true" third parties (i.e., the general public and others who have no contractual relationship with either party).

As respects the employees of subcontractor or service companies, such as cementing, logging and casing crews, the operator and contractor often indemnify each other for injury or death of employees of their respective subcontractors and other contractors. This is based on the understanding that the party that hires such services will negotiate the terms of engagement and should require the service company or subcontractor to contractually extend an indemnity for injury or death of its own personnel. If the contractor and operator extend a drilling contract indemnity for injury or death claims of their own respective employees and those of their subcontractors and other contractors, the personal injury/death risks remaining to be covered in a general third party liability clause are reduced substantially.

A similar result is achieved in circumstances where a separate "mutual hold harmless" agreement is entered into between the drilling contractor and the various service companies and subcontractors involved in the operations. These "round robin" agreements generally apply the knock for knock approach and require each signatory to assume liability and hold the other signatories harmless for their respective personnel and property.

## LIABILITY FOR EQUIPMENT AND PROPERTY

The "knock for knock" approach also generally applies to equipment and property of each party. Here again, the respective parties are expected to insure (or self-insure) their own assets against damage or loss and thus should be prepared to accept the associated risk in the context of a drilling contract.

Prudent contracting suggests that the parties also specifically address damage or loss of equipment and property provided by their respective subcontractors and other contractors. The operator and contractor will negotiate the relationship with their respective service providers and should be able to allocate the property risks to the asset owners. Extension of the mutual indemnities for property and equipment to include equipment and property provided by each party's respective subcontractors and other contractors, or utilization of a mutual hold harmless agreement, substantially reduces the property risks remaining to be addressed in a general third party liability clause.

Among traditional exceptions to the "knock for knock" principle is the compensation customarily afforded contractors for in-hole and subsea equipment damaged or lost while working on a daywork basis. The contractor's insurance may exclude or limit coverage for equipment in the hole and the operator often assumes responsibility for uninsured drill string damage or loss. In offshore contracts, such coverage is normally extended to subsea equipment including blowout preventers, riser and mooring systems. Such contractual provisions frequently (1) state that the operator's responsibility to compensate the contractor for in-hole and subsea equipment damaged or lost while in use is to be offset by any insurance proceeds recoverable by the contractor, (2) deny the contractor compensation for in-hole or subsea losses resulting from its negligence or ordinary wear and tear, and (3) provide a fair measure of compensation based upon an agreed depreciated value (expressed in a manner which fairly compensates the contractor for the loss so the contractor neither receives new equipment for old nor a meager depreciated value).

**EDITOR'S NOTE:** *The second part of this series of articles, to be published in the March/April edition of* DRILLING CONTRACTOR, *will discuss contractual provisions addressing well risks, reservoir loss/damage, general third party liability, consequential damages as well as customary provisions of turnkey and footage contracts.*

## ABOUT THE AUTHOR

*Cary Moomjian, VP General Counsel of* **Santa Fe International Corp**, *is Chairman of the IADC's Contracts Committee and was the 1996 IADC Contractor of the year. A frequent author and lecturer, Mr. Moomjian is widely regarded as one of the industry's foremost experts on drilling contracts. This series of articles is based on remarks made by the author at the 1998 Houston Marine Insurance Seminar.*