```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3
      IN RE:  OIL SPILL       MDL NO. 2179
 4    BY THE OIL RIG
      "DEEPWATER HORIZON"     SECTION:  J
 5    IN THE GULF OF
      MEXICO, ON APRIL        JUDGE BARBIER
 6    20, 2010                MAG. JUDGE SHUSHAN

 7

 8




14
              Deposition of KELLY S. GRAY, taken
15    in the Pan American Life Center, Bayou
      Room, 11th Floor, 601 Poydras Street, New
16    Orleans, Louisiana 70130, on Thursday,
      April 14, 2011.
17

18
      APPEARANCES:
19

20
              THORNHILL LAW FIRM, APLC
21            (By:  Tom W. Thornhill, Esquire
                    Emily Gebhardt, Esquire)
22            1308 Ninth Street
              Slidell, Louisiana  70458)
23               (Plaintiff's Steering Committee)

24

25

                    GAUDET KAISER, L.L.C.
                Board-Certified Court Reporters
```

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC   Document 4525-1   Filed 11/07/11   Page 2 of 14
183

1  rather than reading and I know it sounds
2  like I'm reading but can you answer that
3  question?  Did the locks begin when you
4  started tripping in the hole and acquiring
5  new footage?
6       A.   I don't recall exactly the time
7  frame.
8       Q.   Well, you answer in the next
9  e-mail about an hour later, just above,
10 that the lockups did not start once we
11 loaded the data, they began February 9th?
12      MR. HARTLEY:
13           Object to form.
14 EXAMINATION BY MR. THORNHILL:
15      Q.   Did I read that correctly?
16      A.   You read it correctly, yes, sir.
17      Q.   Okay.  Well, that correctly
18 answers his question; doesn't it?
19      MR. HARTLEY:
20           Object to form.
21      THE WITNESS:
22           Again, that would be -- no.  No,
23 sir.  That would not be what I stated.
24 EXAMINATION BY MR. THORNHILL:
25      Q.   What did you state?

1          A.   I did not state anything.  I see
2     Nick's name at the bottom of that
3     statement.
4          Q.   So he responded on Joe Keith's
5     e-mail with that response?
6          A.   Yes, sir.
7          Q.   That the lockups began
8     February 9th.  And when I say he, Nick.
9          A.   Yes.  I assume that's -- that he
10    wrote this.
11         Q.   Nick's last name, again, is?
12         A.   Malczewskyj.
13         Q.   He writes further, does he not,
14    we tripped in the hole to test the BOPs on
15    the 8th and then tripped out.  The first
16    lockup was four hours after we started
17    tripping in for the cleanout run.
18              That's what he wrote; correct?
19         A.   That is what he wrote.
20         Q.   Now, back to Greg Navarette's
21    e-mail just below the last sentence we
22    didn't read, says if it was the original
23    database we should have seen the lockups as
24    soon as we loaded.  If it is the original
25    database then we might need to delete it

1        A.    I was not asked that specific
2    question, sir.
3        Q.    I'm not understanding your
4    response.
5              Do you recall the February 17,
6    2010 incident where the computers from
7    Halliburton crashed and BP was required to
8    shut down the rig for an hour?
9        MR. HARTLEY:
10             Object to form.
11       THE WITNESS:
12             I recall having to swap
13   computers, yes, sir.
14   EXAMINATION BY MR. THORNHILL:
15       Q.    And the rig shut down for an
16   hour?
17       A.    I recall the rig waiting on us.
18       Q.    All right.
19       MR. THORNHILL:
20             We'll label Tab 36 as
21   Exhibit 1602.
22             (Whereupon, the document
23   referred to was marked as Exhibit No. 1602
24   for identification.)
25   EXAMINATION BY MR. THORNHILL:

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC   Document 4525-1   Filed 11/07/11   Page 5 of 14
204

1    Q.   You say, do you not, in the
2  first two sentences, as you are copied on
3  the e-mail by Greg, we're planning to just
4  bring in all runs on the new ADI.  I've
5  already performed repairs on the old data
6  sets.  Did I read that correctly?
7    A.   Yes, sir, that is correct.
8    Q.   What did you do to repair the
9  old data sets?
10   A.   There is a function in
11 databasing admin, administrator, that
12 allows you to repair runs when you're not
13 in the current run.  It's fixing the
14 misallocated files.
15   Q.   All right.  And you did that,
16 according to this e-mail; correct?
17   A.   I did a repair on the data sets,
18 yes, sir.
19   Q.   When you say you repaired the
20 data sets, do you have to correct
21 information that is wrong?
22   A.   No, sir, I do not.
23   Q.   Do you have to show in different
24 locations or different levels information
25 that's shown on different levels?

**GAUDET KAISER, L.L.C.**
Board-Certified Court Reporters

1    A.    I do not.  The repair does not
2    affect gathered information whatsoever.
3        Q.    What does the repair repair?
4        A.    It's hard to explain.  Like I
5    said, it's like when you do a defrag on
6    your personal computer, you have
7    allocations of space for certain data sets.
8    And when you do a repair on it, it will put
9    it back into its correct position.
10       Q.    Was it your opinion, from your
11   work in trying to repair the old data sets,
12   that the repairs were attempts to prevent
13   the computers from crashing?
14       A.    Anything that can speed your
15   computer system will help aid in its
16   processing, yes, sir.
17       Q.    Thank you.  Tab 40 is our next
18   Exhibit 1606.
19            (Whereupon, the document
20   referred to was marked as Exhibit No. 1606
21   for identification.)
22   EXAMINATION BY MR. THORNHILL:
23       Q.    And we may do one more before we
24   change tapes and take a lunch break.  Okay.
25   This is under Tab 41, it's BP HZN 2179 MDL

**GAUDET KAISER, L.L.C.**
Board-Certified Court Reporters

1    MR. HARTLEY:
2         Object to form.
3    THE WITNESS:
4         No, sir.  I don't know.
5    EXAMINATION BY MR. LEOPOLD:
6    Q.   Are you aware of any malfunction
7    or glitches or problems with the Sperry
8    computers and the INSITE system on
9    April 20th, 2010?
10   A.   I'm not aware of any, no, sir.
11   Q.   Are you aware of any reason why
12   the data such as the data we've been
13   looking at for the last two hours wouldn't
14   be reliable based on a problem with the
15   INSITE system that was taking place on
16   April 20th?
17   A.   No, sir, I'm not.
18   Q.   Were you aware of whether you
19   were having the rebooting problems that we
20   discussed earlier with the previous counsel
21   on April 19th and 20th?
22   A.   I did not have any problems.  I
23   don't know.
24   Q.   Did you hear of any other Sperry
25   mud loggers having rebooting problems with

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3    IN RE:  OIL SPILL       )     MDL NO. 2179
      by the OIL RIG,         )
 4    DEEPWATER HORIZON in    )     SECTION "J"
      the GULF OF MEXICO,     )
 5    April 20, 2010          )     JUDGE BARBIER
                              )
 6                            )     MAG. JUDGE
                              )     SHUSHAN
 7
```

                    * * * * * * * * * * * * *
                             VOLUME 1
                    * * * * * * * * * * * * *

               Deposition of **ROBERT BODEK**,
    taken at Pan-American Building, 601 Poydras
    Street, 11th Floor, New Orleans, Louisiana,
    70130, on the 11th of April, 2011.

**APPEARANCES:**

    Mr. Mikal C. Watts
    **WATTS, GUERRA, CRAFT, LLP**
    Four Dominion Drive, Building Three
    Suite 100
    San Antonio, Texas 78257
    Phone:  210-447-0500  Fax:  210-447-0501

              APPEARING FOR THE
              PLAINTIFFS' STEERING COMMITTEE

**GAUDET KAISER, L.L.C.**
Board-Certified Court Reporters

1   there.  I don't know necessarily what --
2   what a squeeze job costs.
3       Q.    But the bottom line is a squeeze
4   job or the need for it is a bummer because
5   it takes time and money and it slows down
6   the progress, right?
7               MR. FIELDS:
8                   Objection, form.
9       A.    Yes, it does.
10      Q.    All right.  And so that led you
11  to respond in Tab 15, Bates Page Number
12  270472.
13              On February the 13th, the
14  next day, you write to Brian Morel.  Thanks
15  for the shitty cement job, Trent.
16      A.    I did.  I wasn't -- this -- I
17  meant this as just kidding.  Brian is a --
18  Brian is a friend of mine.  Just
19  disappointed that we did get a poor
20  leak-off test.  I wasn't sure that it was a
21  cement job.  Like I said, you can get a
22  poor leak-off test -- there could be
23  several ways you can get a poor leak-off
24  test.  A poor cement job is one of the
25  ways.  And I used this expletive in this

```
 1    kidding statement when talking with a
 2    friend at an expense of another co-worker.
 3         Q.   Yeah.  And basically you got a
 4    poor leak-off test result, and you thought
 5    it was a result of a poor cement job.
 6              That's what you said,
 7    right?
 8         A.   I was kidding.  I did not know.
 9         Q.   Okay.
10         A.   Like I said, there's several
11    ways you can get an undesirable low
12    leak-off test.  I didn't know it was cement
13    job.  I was making -- I was kidding.
14         Q.   Let's talk about why you got
15    what you got.  Go to Tab 26.
16              Now, this is an e-mail that
17    originally is sent to you.  And you see the
18    subject says the event that started it all,
19    question mark?
20         MR. MONICO:
21              Bates number, please?
22         MR. WATTS:
23              I'm sorry.  284169.
24         Q.   It's an e-mail from Albertin to
25    you.  Subject line, the event that started
```

```
                                                                   1

 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
 3  IN RE:  OIL SPILL        )  MDL NO. 2179
    BY THE OIL RIG           )
 4  "DEEPWATER HORIZON" IN   )  SECTION "J"
    THE GULF OF MEXICO, ON   )
 5  APRIL 20, 2010           )  JUDGE BARBIER
                             )  MAG. JUDGE SHUSHAN
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
              Deposition of Dawn Peyton, taken
19  at Pan-American Building, 601 Poydras Street,
    11th Floor, New Orleans, Louisiana, 70130, on
20  the 8th day of September, 2011.
21
22
23
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
         1          MR. BEFFA:  Is this on a CD?
         2          MR. MATTHEWS:  No.  I've got copies.
         3          Q.    (BY MR. MATTHEWS)  It's Bates
         4  numbered ANA-MDL-000261741.
09:58    5          THE REPORTER:  2617?
         6          MR. MATTHEWS:  41.
         7          Q.    (BY MR. MATTHEWS)  And what
         8  exhibit?
         9          A.    4996.
09:58   10          Q.    And do you recall this document?
        11          A.    Yes.
        12          Q.    This is after the explosion,
        13  right?
        14          A.    It was.
09:58   15          Q.    What was the reaction to
        16  Anadarko with respect to the explosion?
        17          MS. WILMS:  Object to form.
        18          A.    I can't speak for Anadarko.
        19          Q.    (BY MR. MATTHEWS)  What was your
09:59   20  reaction?
        21          A.    You know, it -- it was a
        22  terrible event.
        23          Q.    Was that the reaction of most of
        24  the people in the development team?
09:59   25          MS. WILMS:  Object to form.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
              1         A.     My -- you know, that would be my
              2    opinion of their reaction.
              3         Q.     (BY MR. MATTHEWS)  All right.
              4    Did you prepare this document on -- by April
09:59         5    23rd?
              6         A.     This is an e-mail that I sent,
              7    yes.
              8         Q.     And it's to your boss, right?
              9         A.     It is.
09:59        10         Q.     All right.  And what does it
             11    relate to?
             12         A.     This relates to, you know, what
             13    I thought the well was flowing -- or could
             14    have been flowing after the blowout, but, you
10:00        15    know, this was made up with a ton of
             16    assumptions that, you know, I didn't have any
             17    access to any kind of real data.  This is
             18    just kind of my back of the envelope
             19    calculation.
10:00        20         Q.     Okay.  And it's based upon
             21    information that you knew or used common
             22    sense, but basically information that you
             23    knew or along the way had been provided by
             24    BP, right?
10:00        25         MS. WILMS:  Object to form.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1         MR. BEFFA:  Objection; form.
 2         A.     There is way too many
 3   assumptions in this for -- for me to have a
 4   good answer.  Like, this is just my
 5   two-minute calculation, and I definitely did
 6   not have enough information to make any kind
 7   of an accurate determination of flow rate.
 8         Q.     (BY MR. MATTHEWS)  All right.
 9   Well, like it or not, it's here.  And it
10   says, I'm calculating an ACF, what is that?
11         A.     That's an AOF, absolute open
12   flow.
13         Q.     Of 45,000 barrels of oil per
14   day, right?
15         A.     That's what this says.
16         Q.     Then it says, "with the riser
17   disconnected."  Do you know if the riser was
18   disconnected?
19         A.     I had no idea.
20         Q.     That was one assumption?
21         A.     Yes.
22         Q.     Do you know if, in fact, that
23   the riser wasn't disconnected?
24         A.     I don't know.
25         Q.     Okay.  What's the second page?
```

**PURSUANT TO CONFIDENTIALITY ORDER**