# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | **MDL No. 2179** |
| **"Deepwater Horizon" in the Gulf of** | * | |
| **Mexico, on April 20, 2010** | * | |
| | * | **SECTION: J(1)** |
| **This Document Applies to:** | * | |
| | * | |
| Actions by the States of Alabama and | * | **JUDGE BARBIER** |
| Louisiana, Part of Pleading Bundle "C" | * | |
| | * | |
| 10-4182, *Alabama v. BP P.L.C., et al.* | * | **MAG. JUDGE SHUSHAN** |
| 10-4183, *Alabama v. Transocean, Ltd., et* | * | |
| *al.* | * | |
| 10-3059, *Louisiana v. Triton Asset Leasing* | * | |
| *GmBH, et al.* | * | |
| 11-516, *Louisiana v. BP Exploration. &* | * | |
| *Prod., Inc., et al.* | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ORDER AND REASONS

### [As to the Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of Pleading Bundle "C"]

Before the Court are multiple Defendants' Motions to Dismiss[1] under Federal Rules 12(b)(1),

12(b)(6), and 12(c), respecting the First Amended Complaints of the States of Alabama and

---

[1] (Rec. Docs. 2630, 2631, 2637, 2638, 2639, 2642, 2644, 2645, 2646, 2647, 2649, 2651, 2653, 2655, 2656). Some Motions also sought to dismiss the Local Government Entity Master Complaint or all claims in Bundle C.  At present, however, the Court only considers the Motions against Alabama and Louisiana.  Arguments respecting Local Government Entities are preserved.

Louisiana, as well as the corresponding Oppositions,[2] Replies,[3] Supplemental Briefs,[4] and Post-Argument Briefs.[5]

## I. BACKGROUND AND PROCEDURAL HISTORY

This Multi-district Litigation ("MDL") consists of hundreds of consolidated cases, with thousands of claimants, pending before this Court.  These cases arise from the April 20, 2010 explosion, fire, and sinking of the DEEPWATER HORIZON mobile offshore drilling unit ("MODU"), and the subsequent discharge of millions of gallons of oil into the Gulf of Mexico before it was finally capped approximately three months later.  The consolidated cases include claims for the deaths of eleven individuals, numerous claims for personal injury, and various claims for environmental and economic damages.

By and through their respective Attorneys General, the States of Alabama and Louisiana (sometimes referred to collectively as "the States") initiated individual actions that were consolidated with this MDL (Case Nos. 10-4182, 10-4183, 10-3059, 11-516), and subsequently filed Amended Complaints.[6]  (Rec. Docs. 1872, 2031).  The States allege that the oil spill caused a variety of past, present, and future damages, including damage to natural resources and property, economic

---

[2]  (Rec. Docs. 3203, 3213).

[3]  (Rec. Docs. 3554, 3555, 3556, 3557, 3561, 3562, 3580, 3581, 3582, 3583, 3584).

[4]  (Rec. Docs. 3978, 3979, 3981, 3982, 3991, 3992, 4000, 4001, 4002, 4003, 4005).

[5]  (Rec. Docs. 4106, 4107, 4115).

[6]  Pretrial Order No. 11/Case Management Order No.1 consolidated and organized claims filed in this MDL into several "pleading bundles." (Rec. Doc. 569).  These actions form a portion of pleading bundle "C," "Public Damage Claims," which includes "claims brought by governmental entities for, inter alia, loss of resources, loss of tax revenues, property damages, response or restoration costs, and civil penalties."  (Rec. Doc. 1549).

losses (including lost revenues, such as taxes), costs associated with responding to the oil spill and performing removal actions, costs associated with providing increased or additional public services, and the long-term reputation damage or "stigma" associated with the oil spill.

Named as Defendants are BP Exploration & Production, Inc. and its related entities (collectively, "BP"), Transocean Ltd. and its related entities (collectively, "Transocean"), Halliburton Energy Services, Inc. and its related entities (collectively, "Halliburton;"), M-I, LLC ("M-I"), Cameron International Corp. ("Cameron"), Weatherford U.S., L.P. ("Weatherford"), Anadarko Petroleum Corporation Co. and Anadarko E&P Company LP (collectively, "Anadarko"), MOEX Offshore 2007 LLC and MOEX USA Corp. (collectively, "MOEX"), and Mitsui Oil Exploration Co., Ltd. ("MOECO").

Seeking compensatory and punitive damages, Alabama's Amended Complaint asserts claims under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701, *et seq.*, general maritime law (negligence and products liability), and Alabama law (negligence, products liability, public and private nuisance, trespass, and fraudulent concealment).  Alabama also seeks civil penalties against all Defendants for violations of the Alabama Water Pollution Control Act ("AWPCA"), Ala. Code §§ 22-22-1 to -14, the Alabama Air Pollution Control Act ("AAPCA"), Ala. Code §§ 22-28-1 to -23, the Alabama Hazardous Wastes Management Act ("AHWMA"), Ala. Code §§ 22-30-1 to -24, and the Alabama Solid Waste Disposal Act ("ASWDA"), Ala. Code §§ 22-27-1 to -18.[7]  Finally,

---

[7] Alabama claims there are forty-three separate and distinct coastal waters of the State, and the introduction of pollutants into each of those waters constitutes a separate violation under the AWPCA.  Each day pollution remains in those waters constitutes a new violation of the AWPCA.  Accordingly, Alabama seeks civil penalties of $25,000 per day, per contaminated body of water, under the AWPCA.  Alabama also claims compensatory and punitive damages under the AWPCA.  Under the AAPCA, Alabama seeks penalties of $25,000 per day.  Under the AHWMA, Alabama claims that the chemical dispersants used to remediate the oil spill violated that Act, and seeks penalties of $50,000 per day.  Under the ASWDA, Alabama seeks civil penalties of $200 per day.

Alabama requests a declaratory judgment that BP, Transocean, Anadarko, MOEX, and MOECO are held jointly and severally liable to it for OPA removal costs.

Louisiana asserts OPA and general maritime law claims that are similar to Alabama's. Under Louisiana law, the State asserts claims of negligence, products liability, trespass, nuisance,[8] *garde*,[9] unjust enrichment, ultra hazardous activity, fraudulent concealment and negligent misrepresentation, and for violations of the Louisiana Oil Spill Prevention and Response Act ("LOSPRA"), La. R.S. 30:2451 *et seq.* Louisiana also seeks civil penalties for violations of the Louisiana Environmental Quality Act/Water Control Law, La. R.S. 30:2025(E), 30:2076.[10] Finally, Louisiana requests a declaratory judgment that BP, Transocean, Anadarko, MOEX, and MOECO are jointly and severally liable to it under OPA for damages and removal costs, and that BP, Anadarko, MOEX, Transocean, Cameron, and Halliburton are similarly liable for damages and response costs under LOSPRA.

## II. **PARTIES' ARGUMENTS**

Most Defendants argue that the Clean Water Act ("CWA"), 33 U.S.C. § 1251, *et seq.*,[11] and the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.*, preempt all claims

---

[8] Louisiana pleads trespass and nuisance under both state law and general maritime law.

[9] "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications." La. Civ. Code art. 2317.

[10] Louisiana seeks civil penalties "of not more than $32,500 for each day of violation ($50,000 for each day of violation of a compliance order issued by the [La. Dept. of Environmental Quality]), and for an additional penalty of not more than $1,000,000 for each day of violation." (Rec. Doc. 2031 ¶ 188). In addition to penalties, Louisiana also seeks response action costs, attorney fees, and litigation costs under the Environmental Quality Act.

[11] The CWA is also known as the Federal Water Pollution Control Act ("FWPCA"). *See* 33 U.S.C. § 1251 historical and statutory note, short title.

4

under state law.  Defendants further assert that OPA displaces general maritime law claims,[12] thus the States' only cause of action is against "Responsible Parties" as defined by OPA.  Defendants conclude that because the States have not complied with OPA's "presentment" procedure, all OPA claims should be dismissed as well.

Defendant Cameron employs a different choice-of-law analysis.  Cameron argues that maritime law does not apply and OCSLA adopts the law of the adjacent state, Louisiana, to the extent it is not inconsistent with federal law.  Continuing, Cameron argues that to the extent Louisiana law would allow recovery against parties other than OPA Responsible Parties, it is inconsistent with federal law and preempted by OCSLA.

The States contend that general maritime law claims (including punitive damages under maritime law) are not preempted, because this case falls within the Court's admiralty jurisdiction and OPA expressly preserved maritime law.  The States urge that OCSLA's provision adopting adjacent-state law does not apply, and thus the laws of all states are available.  They contend that state law is applicable here, because OPA preserved state law and state law supplements (and thus is not preempted by) maritime law.  The States also urge that they are not subject to OPA's presentment requirement, but, in any respect, they have sufficiently alleged presentment.

### III.  LEGAL STANDARD

A motion to dismiss under Rule 12(c) is subject to the same standard as a motion under Rule12(b)(6).  *In Re: Great Lakes Dredge & Dock Co.*, 624 F.3d 201,  209-210 (5th Cir. 2010).  Thus,

---

[12]  Arguing in the alternative, Defendants allege that non-OPA claims for purely economic losses are barred under general maritime law.

> To avoid dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To be plausible, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In deciding whether the complaint states a valid claim for relief, we accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff. [*Doe v.*] *MySpace*, 528 F.3d [413,] 418 [5th Cir. 2008]. [The Court does] not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir.2007)); *see also Iqbal*, 129 S. Ct. at 1940 ("While legal conclusions can provide the complaint's framework, they must be supported by factual allegations.").

*Id.* at 210 (some citations omitted).

## IV. DISCUSSION

With some exceptions discussed below, the issues raised by the Motions to Dismiss are identical to those previously addressed in the Court's Order and Reasons respecting the Motions to Dismiss the "B1" Master Complaint ("B1 Order"). (Rec. Doc. 3830 , - - F. Supp. 2d - -, 2011WL 3805746 (E.D. La. August 26, 2011)). Thus, the Court finds its conclusions in the B1 Order resolve many of the arguments presented here.

## A. Choice of Law; Penalties under State Law

Many of the choice-of-law issues are resolved by the B1 Order. First, the conclusions that the DEEPWATER HORIZON was a vessel under maritime law and that this case falls within the Court's admiralty jurisdiction are equally applicable here. (Rec. Doc. 3830, at 4-8). The B1 Order also held that, while jurisdiction under OCSLA was present, OCSLA did not adopt the law of the adjacent state as surrogate federal law under 43 U.S.C. § 1333(a)(2)(A). (Rec. Doc. 3830 at 8-11[13]).

---

[13] The conclusion that the law of the adjacent state, Louisiana, could not be adopted under OCSLA was based on the second prong of the *PLT* test, which prohibits such adoption when maritime law applies to the issue. However, the Court also noted in the B1 Order that the language of 43 U.S.C. § 1333(a)(2)(A) refers to "artificial islands and fixed structures erected thereon," as distinguished from "temporarily attached" structures listed in Section 1333(a)(1), and thus

That holding also applies here.  Therefore, the Court rejects Cameron's argument that OCSLA adopts Louisiana law.

The B1 Order also held that claims of negligence and products liability under general maritime law were not preempted by OPA (including the availability of punitive damages), provided that the plaintiff alleged either physical injury to a proprietary interest or qualified for the commercial fisherman exception (*Id.* at 18-27).  Thus, because the States have alleged physical injury to proprietary interests (*see, e.g.,* Rec. Docs. 1872 ¶ 92, 2031 ¶ 109) and the other elements pertinent to negligence and products liability claims, the States have stated causes of action under general maritime law.  Consequently, punitive damages may also be available to the States where their claims arise under general maritime law.  (Rec. Doc. 3830 at 26-27).  OPA's presentment requirement is discussed separately, below.

The B1 Order also held that state-law claims were preempted by maritime law.  As the States point out below, however, civil penalties were not at issue in the B1 Order and are unique to the States.  In light of this, the Court revisits the issue of whether state law is preempted.

The B1 Order focused on several factors when it concluded that maritime law preempted state law.  The Court noted that the casualty at issue occurred from a MODU that was floating on the "high seas" (the waters seaward of state territorial waters[14]) and connected by its drill pipe to the to the Outer Continental Shelf ("OCS"), which OCSLA declares to be an area of "exclusive federal jurisdiction." (Rec. Doc. 3830 at 12 (citing 43 U.S.C. § 1333(a)(1)).  Because adequate and uniform

Section 1333(a)(2)(A) did not appear to apply to a semi-submersible drilling rig/MODU like the DEEPWATER HORIZON.

[14] "The 'high seas' simply encompass 'all parts of the sea that are not included in the territorial sea or in the internal waters of a State.'"  *Reynolds v. Ingalls Shipbuilding Div.*, 788 F.2d 264, 268 (5th Cir. 1986); *see also* 43 U.S.C. §§ 1312, 1332(2).

remedies for the B1 claims are provided through legislation (OPA) and general maritime law, there were no substantive gaps for state law to fill.  (*See id.* at 14 (discussing *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 99 (1996)).  Thus, the B1 Order stated that it would contravene one of maritime law's fundamental purposes—"harmony and appropriate uniform rules relating to maritime matters"—if the Defendants to the B1 Master Complaint were subjected to the various laws of each of the affected Gulf Coast States into which oil passively flowed.  (*Id.* at 12-13).[15]  The Court also held that OPA's savings provision, 33 U.S.C. § 2718, did not preserve these claims.  Finally, the B1 Order noted that this conclusion was "consistent with" the Supreme Court's conclusion in *International Paper Co. v. Ouellette*, 479 U.S. 481 (1987).  (Rec. Doc. 3830 at 16-17).

---

[15]  At oral argument and in an post-argument briefing, the States point to cases where state law was upheld outside state waters.  These cases are distinguishable for reasons that are discussed below.  However, as to a broader point implicated by these cases, the Court notes that the B1 Order did not conclude that state law could never apply outside state waters; rather, that state law could not apply in this circumstance: "Thus, to the extent state law **could** apply to conduct outside state waters, ***in this case*** it must 'yield to the needs of a uniform federal maritime law.'" (Rec. Doc. 3830, at 13 (citation omitted; emphasis added)).  The Court acknowledges that there are instances where state law applies outside state waters.  However, the Court adds that, on the high seas federal interests (and federal law) typically predominate over state interests, particularly when substantive rights and remedies are available under federal law.  This point was explained by the Fifth Circuit when it discussed the meaning of term "applicable" in OCSLA Section 1333(a)(2)(A) in a case  involving an allision between a vessel and a fixed platform on the OCS:

> [OCSLA's] deliberate choice of federal law, federally administered, requires that 'applicable' be read in terms of necessity—necessity to fill a significant void or gap.
> . . .
> The collision was a classic maritime case within the validly extended Admiralty jurisdiction in which both substantive rights and remedies were quite ample.  There is no void, there are no gaps.
> . . .
>     The United States has interests in its relations to other nations quite different from those among its own several states.  Thus, while it does not offend the constitutional imperative for the uniformity of admiralty for the Louisiana Direct Action Statute to apply to maritime cases occurring on inland waters of Louisiana, quite different considerations enter in mandatorily applying that to some—but a very select class—cases on the Outer Continental Shelf.  The class is select in the sense that it must somehow be physically-causally related to the structure ('artificial island') without which Louisiana law is as irrelevant as that of Pakistan.
> . . .
> Whether for off shore, unlike inland, maritime cases we would hold the Direct Action Statute inconsistent we need not here determine.  Taking into account the National and International interests behind that element we do hold that for this maritime case the Direct Action Statute is not applicable.

*Cont'l Oil Co. v. London S.S. Owners' Mut. Ins. Assoc.*, 417 F.2d 1030, 1036-40 (5th Cir. 1969).

The States contend that this holding should not apply to their claims for civil penalties. They argue that the remedies under OPA and general maritime law do not vindicate their right and duty as separate sovereigns to protect their environments, citizens, and economies from pollution by punishing those whose pollution enters state territorial waters. Furthermore, the States argue that their penalties are only triggered when oil entered their territories, thus they do not attempt to regulate or penalize extra-territorial conduct; instead the conduct they seek to punish is allowing oil to enter state waters. Similarly, they assert that state penalties would not conflict with the "uniformity" principle sought by maritime law, since they are merely adding penalties to conduct that is unlawful under federal law. The States also claim that if their penalties are not available there would be no incentive for a discharger to prevent spills from entering state waters.

The Court acknowledges that it is questionable whether its reasons for holding that maritime law preempted the B1 claims would apply to the State's civil penalties, but it does not reach this issue. Rather, the States' asserted penalties focuses the Court's attention on the CWA and *Ouellette*, which interpreted the that Act. This is because Section 311(b) of the CWA provides for, *inter alia*, federal civil penalties when there is a "harmful" discharge of oil into or upon the navigable waters of the United States, the contiguous zone, or in connection with activities under the Outer Continental Shelf Lands Act. 33 U.S.C. § 1321(b). By contrast, one of the primary concerns of OPA—the federal statute primarily at issue in the B1 Order—is providing compensatory relief for damages resulting from an oil spill. *See* 33 U.S.C. § 2702. Further, Section 311 of the CWA contains its own savings clause for state law, which is discussed below.

In *Ouellette* the Supreme Court held, "when a court considers a state-law claim concerning interstate water pollution that is subject to the CWA, the court must apply the law of the State in

which the point source is located."  479 U.S. 481, 487 (1987).  In that case, Vermont landowners

sued a New York paper mill under Vermont's common law of nuisance for pollution originating in

New York waters but flowing into and affecting Vermont waters.  *Id.* at 483-84.  After noting that

"the control of interstate pollution is primarily a matter of federal law," *id.* at 492, and discussing

the regulatory framework imposed by the CWA's nation-wide permit system (the National Pollutant

Discharge Elimination System or "NPDES"), *id.* at 487-491, the Court reasoned that Vermont law

was preempted because, "[a]pplication of an affected State's law to an out-of-state source would

. . . undermine the important goals of efficiency and predictability in the permit system."  *Id.* at 496.

Instead, plaintiffs in an "affected State" must sue under the laws of the "source State" or avail

themselves of the other remedies provided by the CWA.  *Id.* at 497-98 & n.18.

      Here, the Court takes judicial notice of the fact that, much like the New York paper mill in

*Ouellette*, an NPDES permit regulated BP's discharges on the OCS.[16]  Thus, this case involves

"state-law claim[s] concerning interstate water pollution that is subject to the CWA," bringing it

within *Ouellette*'s precedent.  Nevertheless, the States attempt to distinguish *Ouellette* on the

grounds that the discharge in that case was lawful in the source State, but not in the affected State;

whereas here the discharge was universally unlawful.  Thus, argue the States, *Ouellette*'s concern

regarding creating conflicts with the CWA's regulatory scheme is not present.

      The Court acknowledges that a discharge of oil that violates all potentially-applicable laws

---

[16] *See* Notice of Final NPDES General Permit, Final NPDES General Permit for New and Existing Sources and New Dischargers in the Offshore Subcategory of the Oil and Gas Extraction Category for the Western Portion of the Outer Continental Shelf of the Gulf of Mexico (GMG290000), 72 Fed. Reg. 31,575 (June 7, 2007); BP's Bundle B1 Memo. in Supp. of Mot. to Dismiss, at 12-13 & Exs. 14 (NPDES No. GMG290000) &15 (Notice of Intent dated Feb. 23, 2009) (Rec. Doc. 1440 at 26-27), *incorporated by reference and cited in* BP's Bundle C Memo. in Supp. of Mot. to Dismiss, at 2 n.4, 9 (Rec. Doc. 2644-1 at 18 n.4, 25) *and* BP's Bundle C Reply Br. at 6 (Rec. Doc. 3584 at 18).  Neither State contests the fact that an NPDES permit governed Defendants' operations in the Gulf of Mexico, and in fact, Alabama expressly discussed this permit in its brief.  *See* State of Ala.'s Bundle C Memo. in Opp. at 10 (Rec. Doc. 3203 at 18) ("the OCS General Permit at issue here explicitly banned the Defendants from spilling formation oil").

would not appear to implicate the CWA's regulatory scheme.  However, fatal to the States' argument is the fact that the Vermont plaintiffs in *Ouellette* specifically alleged that the discharges violated the New York paper mill's NPDES permit.  In other words, like the instant matter, the discharge in *Ouellette* was alleged to be universally unlawful:

> . . . If, ***as was also alleged in respondents' complaint, [the New York paper mill] is violating the terms of its permit***, respondents may bring a citizen suit to compel compliance.

*Id.* at 498 n.18 (emphasis added); *see also Ouellette v. Int'l Paper Co,* 602 F. Supp. 264, 266 (D. Vt. 1985) ("Count II alleges that defendant has violated its [NPDES] permit by discharging pollutants into Lake Champlain in excess of the amounts specified in the permit").  Notwithstanding this allegation,[17] the *Ouellette* Court concluded that the only available remedies were those provided under the source-State's law and the CWA.

Thus, even though the discharge was universally unlawful, *Ouellette*'s instruction is clear: only the law of the source State and federal law may apply.[18]  Because the source of this discharge occurred within an exclusive federal jurisdiction, the OCS, the only available law is federal law. All States occupy the position of "affected States;" therefore the States' civil penalties are preempted.[19]  The language of the CWA provides additional support for this conclusion.  As

---

[17] Because *Ouellette* was before the Court on a motion to dismiss under Rule 12(c), the Court was bound to accept the allegation as true.  Although the defendant also moved to dismiss under Rule 56 (summary judgment), it appears the Court applied the Rule 12 standard.

[18] The only federal remedy *Ouellette* referred to was the CWA; OPA did not exist when *Ouellette* was decided and claims under general maritime law were not before the Court.  However, remedies under both OPA and general maritime law are available for reasons explained in the B1 Order.  (Rec. Doc. 3830 at 18-27).

[19] After revisiting *Ouellette*, it appears that the Court may have been inaccurate when the B1 Order stated that its conclusion was "consistent" with *Ouellette*.  Rather, the issue of preemption of state law may have been compelled by *Ouellette*'s interpretation of the CWA, in addition to the reasons stated in the B1 Order.  In any respect, the Court's conclusion in the B1 Order remains unchanged.

mentioned, Section 311(b) of the CWA provides federal penalties for harmful discharges of oil, and

Section 311(*o*)(2) contains a savings clause.  The language of Section 311(*o*)(2) is consistent

*Ouellette*'s holding:

> Nothing in this section shall be construed as preempting any State or political
> subdivision thereof from imposing any requirement or liability with respect to the
> ***discharge of oil*** or hazardous substance ***into any waters within such State***, or with
> respect to any removal activities related to such discharge.

33 U.S.C. § 1321(*o*)(2) (emphasis added).  Prior to the *Ouellette* decision, it might have been

debatable whether "discharge of oil . . . into any waters within such State" meant only the source

of the discharge, or whether that term should be interpreted broadly to mean any State into which

oil flowed.  However, when Section 311(*o*)(2) is construed with *Ouellette*, the debate is resolved in

favor of the narrower interpretation.[20]

The States argue that OPA's savings clause for state penalties, 33 U.S.C. § 2718(c), which

does not include the CWA's qualifier, "into any waters within such State," preserves their penalties:

> Nothing in this Act, the Act of March 3, 1851 (46 U.S.C. 183 et seq.), or section
> 9509 of title 26, shall in any way affect, or be construed to affect, the authority of the
> United States or any State or political subdivision thereof—
>     (1) to impose additional liability or additional requirements; or
>     (2) to impose, or to determine the amount of, any fine or penalty (whether
>     criminal or civil in nature) for any violation of law;
> relating to the discharge, or substantial threat of a discharge, of oil.

Assuming that the absence of "into any waters within such State" supports the States' interpretation,

OPA's saving clause still cannot be considered in a vacuum.  OPA Section 2718  must construed

*in pari materia* with CWA Section 311(*o*)(2), because these statutes address common topics.  *See*

82 C.J.S. § 476 (2011).  If a conflict exists between OPA's savings clause and the CWA's, the CWA

---

[20] Section 311's definition of "discharge" does not lead to a different conclusion. *See* 33 U.S.C. 1321(a)
("'discharge' includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping .
. .").

controls in this instance because it is the more-specific statute; i.e., the CWA contains penalties for discharges.  *See* 82 C.J.S. § 482 (2011).  Furthermore, although OPA amended Section 311(*o*)(2) to add the phrase ", or with respect to any removal activities related to such discharge," it left in place "into any waters within such State."  *See* OPA § 4202, Pub. L. No. 101-380, 104 Stat. 484, 532 (codified as amended at 33 U.S.C. § 1321(*o*)(2)).  Because Congress is presumed to be aware of *Ouellette*'s interpretation of the CWA when it passed OPA, the fact that OPA did not remove "into any waters within such State" leads to the construction that Congress did not intend to change *Ouellette*'s interpretation of the CWA.  82 C.J.S. § 512 ( 2011).

As to the States' argument that without state penalties, there is no incentive for a defendant to prevent its oil spill from entering state waters, the Court does not agree.  The CWA and its corresponding regulations require owners or operators of vessels and facilities to submit a plan for responding to an oil spill.  33 U.S.C. § 1321(j)(5); 30 C.F.R. § 254.1, *et seq.*  In the event of a spill, parties must immediately carry out the provisions of its response plan,  as well as notify the National Response Center.  33 U.S.C. § 1321(c)(5); 30 C.F.R.. §§ 254.5, 254.46.  Failure to comply with the response plan or an order from the federal removal authority triggers specific CWA penalties.  33 U.S.C. § 1321(b)(7)(B), (C).[21]  These penalties are separate from those imposed by the CWA when there is a "harmful" discharge, which, given that they are based on either the days a discharge occurs or the volume of oil released, create another incentive to stop the source of a discharge (and thus

---

[21] Failure to comply with a removal order is penalized "in an amount up to $25,000 per day of violation or an amount up to 3 times the costs incurred by the Oil Spill Liability Trust Fund as a result of such failure." 33 U.S.C. § 1321(b)(7)(B).  Failure to comply with a response plan results in a penalty of $25,000 per day of violation.  33 U.S.C. § 1321(b)(7)(C).

limit the amount of oil that could potentially flow into state waters).  33 U.S.C. § 1321(b)(7)(A).[22]

Failure to report a discharge, provide assistance when requested by a responsible official, or comply

with a federal removal order will also revoke OPA's defenses and limit of liability.  33 U.S.C. §§

2703(c), 2704(c).  Also, one of the factors used to determine the amount of a CWA penalty is

whether efforts to minimize or mitigate the effects of the discharge were successful.  33 U.S.C. §

1321(b)(8).  Thus, while they may not specifically target state waters, federal laws provide

substantial incentives for a discharger to promptly and efficiently stop the spread of oil and

remediate its effects.   It is also worth noting that amounts paid pursuant to CWA penalties are

applied to the Oil Spill Liability Trust Fund, which, in turn, are used to pay for future oil spill

response actions, fund natural resource damage assessment and restoration, and pay uncompensated

removal costs and damages claims.  26 U.S.C. § 9509(b)(8), (c)(1)(C); 33 U.S.C. §§ 1321(s), 2712.

Thus, CWA penalties indirectly benefit all States.[23]

Furthermore, although the Court does not decide at this time issues concerning liability or

the extent of liability, it certainly appears that the States are eligible to recover all of their removal

costs[24] under OPA.  33 U.S.C. § 2704(b), (c)(4) (providing that certain Responsible Parties are liable

---

[22]  Penalties are either $25,000 per day or $1,000 per barrel.  33 U.S.C. § 1321(b)(7)(A). The penalty is increased in the event of gross negligence or willful misconduct to $3,000 per barrel.  33 U.S.C. § 1321(b)(7)(D).

[23]  Although the Court does not base its conclusion on legislation not yet enacted, it is also worth noting that proposed legislation would direct 80% of CWA penalties paid in connection with this oil spill to the Gulf Coast States. *See, e.g.*  Resources and Ecosystems Sustainability, Tourist Opportunities, and Revived Economies of the Gulf Coast States Act of 2011, S. 1400, 112th Cong. §§ 3-4 (2011); *see also* H.R. 3096, 112th Cong. (2011).

[24]  OPA defines "removal costs" as "the costs of removal that are incurred after a discharge of oil has occurred or, in any case in which there is a substantial threat of a discharge of oil, the costs to prevent, minimize, or mitigate oil pollution from such an incident."  33 U.S.C. § 2701(31).  "'[R]emove' or 'removal' means containment and removal of oil or a hazardous substance from water and shorelines or the taking of other actions as may be necessary to minimize or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches." 33 U.S.C § 2701(30).

for all removal costs). If OPA's liability cap on damages does not apply,[25] then the States may recover all OPA damages as well, which includes damage to natural resources and property, lost revenues and profits, and the cost of providing additional public services. *See* 33 U.S.C. § 2702(b)(2). Furthermore, the States may be entitled to receive punitive damages under general maritime law, given the Court's holding above. Consequently, preemption of state penalties in this instance denies only the States' ability to receive an additional penal amount.

The Court is also unpersuaded by two cases cited at oral argument, upon which the States rely for the proposition that state regulations may apply outside state waters. The first case, *Pacific Merchant Shipping Association v. Goldstene*, involved a California statute that prohibited ships intending to enter a California port from using certain pollution-generating fuels within 24 miles of the California coast. 639 F.3d 1154 (9th Cir. 2011), *cert. pending and add'l briefing requested*, No. 10-1555, 2011 WL 4530049 (U.S. Oct. 4, 2011). Notably, that statute did not apply to ships merely passing within the 24-mile zone without stopping at a California port. *Id.* at 1175 ("Likewise, we further observe that the Vessel Fuel Rules generally apply to 'foreign and US flag-commercial ships calling at California ports,' and, among other things, contain an exemption for vessels merely passing through the region.").

The exemption for vessels not calling port makes *Goldstene* distinguishable from this matter. In effect, California's law regulates only those ships intending to immediately enter California waters (by virtue of their decision to port), who would otherwise bring with them pollution incidental to their operations. Although the California regulation appears to push the limits of state regulation, it is ultimately tied to activity occurring within California's territorial waters, where

---

[25] BP stated that it waives its limit of liability under OPA. (Rec. Doc. 559). As mentioned above, there are also circumstances that will void OPA's limitation of liability. *See* 33 U.S.C. § 2704(c).

jurisprudence has consistently upheld States' interests in regulating pollution. *See, e.g.*, *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440 (1960). Here, however, the DEEPWATER HORIZON was operating off the coast of Louisiana without any apparent intent to enter state waters. Thus, the oil that entered state territories is not analogous to the pollution regulated by the California statute, given that the MODU did not intend to bring its pollution into state waters. Rather, the DEEPWATER HORIZON is analogous to those ships merely transiting California's 24-mile zone, which are exempt from regulation despite the fact that their pollution might passively enter California's territory.[26]

In the second case relied upon by the States, *Gillis v. Louisiana*, the Fifth Circuit upheld a Louisiana statute that regulated pilots outside Louisiana waters. 294 F.3d 755 (5th Cir. 2002). As explained by the *Gillis* court, however, since 1789 Congress has left the regulation of pilots to the States, and the Supreme Court has upheld such laws even when they involved areas outside state waters. *Id.* at 761-62. Also, and similar to the California statute, the pilotage regulation at issue in *Gillis* concerned ships that intended to enter (or were departing from) state waters which, again, is in contrast to the DEEPWATER HORIZON. Thus, *Gillis* is also distinguishable from this matter. *See also* note 15, *supra*.

As to the other cases cited by the States involving pollution originating within state waters, *e.g. Askew v. Am. Waterways Operators Inc.*, 411 U.S. 325 (1973), the Court remains unpersuaded for reasons stated above and in the B1 Order. Moreover, none of the cases cited by the States are

---

[26] In an earlier case, the Ninth Circuit struck down a similar version of the statute which regulated vessel emissions (as opposed to fuel) within 24 miles of the California coast, holding that the regulation was preempted by the Clean Air Act. *See Pac. Merch. Shipping Assoc. v. Goldstene*, 517 F.3d 1108 (9th Cir. 2008). That case appears more analogous to the instant matter, since the regulation involved an emission (which arguably is similar to a discharge) and did not discriminate between ships intending enter a California port and those merely passing within the 24-mile zone.

as on-point as *Ouellette*.

Finally, the Court notes that the States' arguments might also implicate Due Process concerns, given that, under the States' theory, as many as five Gulf Coast States would be able to impose their penalties. This would seem excessive given that the source of the discharge occurred in no State, and it is not alleged that the discharge was an intentional act. *See BMW v. Gore*, 517 U.S. 559, 574 & n.22 (1996) ("Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose. . . . [T]he basic protection against 'judgments without notice' afforded by the Due Process Clause, is implicated by civil penalties." (citations omitted)). By contrast, had the source of the discharge occurred within a State, the discharger would certainly be on notice that penalties under federal law and the source State's law would apply.

The Court is respectful of the States' desire to exercise their police powers and punish those who pollute their waters. However, for reasons stated above, the Court finds that the States' penalties asserted are preempted and must be dismissed. Furthermore, for reasons stated above and in the B1 Order, the Court also holds that the States' claims for compensatory and punitive damages asserted under state law are also preempted and must be dismissed. By this reasoning, Louisiana's request for a declaratory judgment under LOSPRA, must also dismissed.

**B. Presentment under OPA**

Defendants seek to dismiss all claims, arguing that the States have failed to sufficiently allege compliance with OPA's "presentment" requirement. Defendants advance this argument under Fed. R. Civ. P. 12(b)(1), lack of subject matter jurisdiction, by contending that presentment is a

jurisdictional prerequisite. Alternatively, Defendants assert that presentment is a mandatory condition precedent and move to dismiss under Fed. R. Civ. P. 12(b)(6).

As to whether presentment is a jurisdictional rule or a mandatory condition precedent, there is disagreement in decisions from this Court. *Compare Marathon Pipe Line Co. v. LaRoche Indus. Inc.*, 944 F. Supp. 476, 477 (E.D. La. 1996) (jurisdictional), *with Leboeuf v. Texaco*, 9 F. Supp. 2d 661, 665 (E.D. La. 1998) (mandatory condition precedent). The B1 Order previously concluded that OPA presentment is a mandatory condition precedent. (Rec. Doc. 3830 at 30-31) The Court does not sway from this holding and finds further support in the Supreme Court's recent discussion on this issue in another context. *See Henderson v. Shinseki*, - - U.S. - -, 131 S. Ct. 1197, 1202-07 (2011). Accordingly, the 12(b)(1) Motions are denied; Defendants' arguments are considered under Rule 12(b)(6).

Relying on *United States v. M/V Cosco Busan*, 557 F. Supp. 2d 1058 (N.D. Cal. 2008), the States argue that when a State seeks removal costs, Sections 2713(b)(1)(C) and 2717(f)(2) (both quoted below) exempt it from having to first present its claim to the Responsible Party. The States further contend that when a State combines a claim for removal costs with a damages claim, both are exempt from presentment. Defendants argue that *Cosco Busan* misinterpreted these statutes. After studying the matter, the Court respectfully disagrees with *Cosco Busan*'s interpretation.

OPA Section 2713 contains the presentment requirement and states, in pertinent part:

(a) Presentation
Except as provided in subsection (b) of this section, ***all claims for removal costs or damages shall be presented first to the responsible party*** or guarantor of the source designated under section 2714 (a) of this title.

(b) Presentation to Fund
   (1) In general
   Claims for removal costs or damages may be presented first to the Fund—

18

. . .
          (C) by the Governor of a State for removal costs incurred by that State; or
. . .

(c) Election
If a claim is presented in accordance with subsection (a) of this section and—
          (1) each person to whom the claim is presented denies all liability for the claim, or
          (2) the claim is not settled by any person by payment within 90 days after the date upon which
                    (A) the claim was presented, or
                    (B) advertising was begun pursuant to section 2714 (b) of this title, whichever is later,
the claimant may elect to commence an action in court against the responsible party or guarantor or to present the claim to the Fund.

33 U.S.C. § 2713 (emphasis added).  Section 2717(f)(2) establishes the statute of limitations for

removal costs:

> (2) Removal Costs
> An action for recovery of removal costs referred to in section 2702 (b)(1) of this title must be commenced within 3 years after completion of the removal action. In any such action described in this subsection, the court shall enter a declaratory judgment on liability for removal costs or damages that will be binding on any subsequent action or actions to recover further removal costs or damages. Except as otherwise provided in this paragraph, an action may be commenced under this subchapter for recovery of removal costs *at any time* after such costs have been incurred.

33 U.S.C. § 2717(f)(2) (emphasis added).

*Cosco Busan* interpreted the phrase "at any time" as exempting parties seeking removal costs

under Section 2702(b)(1) from OPA's presentment procedure.  *Id.* at 1060-61.  In response to the

defendants' argument that this interpretation would allow *any* claimant seeking removal costs to

avoid presentment, the court replied:

> Contrary to Defendants' assertion, § 2717(f)(2) does not apply to "*any* claimant." Instead, § 2717(f)(2) only applies to "recovery of removal costs referred to in section 2702(b)(1)." Section 2702(b)(1), in turn, only applies to removal costs incurred by the United States, a State, an Indian tribe, or a person acting pursuant to the National Contingency Plan [FN 3]. ***Thus, §§ 2702(b)(1) and 2717(f)(2) permit only the***

> ***United States, a State, or an Indian tribe to bring an action at any time to recover removal costs.***  All other claimants seeking damages or recovery costs must first present their claims to the responsible party, pursuant to § 2713.
>
> [FN 3.] The National Contingency Plan, codified at 33 U.S.C. § 1321(d), is a plan for removal of oil and hazardous substances prepared and published by the President. Neither party mentions the National Contingency Plan and the Court concludes that, at this time, it is not relevant to Defendants' Motion.

*Id.* at 1061 (citations omitted, second emphasis added).

However, Section 2702(b)(1) does not limit removal costs to just the United States, a State, or an Indian tribe:

> (b) Covered removal costs and damages
> (1) Removal costs
> The removal costs referred to in subsection (a) of this section are—
> (A) all removal costs incurred by the United States, a State, or an Indian tribe under subsection (c), (d), (e), or (l) of section 1321 of this title, under the Intervention on the High Seas Act (33 U.S.C. 1471 et seq.), or under State law; ***and***
> (B) any removal costs incurred by ***any person*** for acts taken by the person which are consistent with the National Contingency Plan.

33 U.S.C. § 2702(b) (emphasis added).   "Any person" includes private parties. 33 U.S.C. § 2701(27).  Thus, private parties may recover removal costs so long as their actions were "consistent with the National Contingency Plan" ("NCP").[27]  If *Cosco Busan*'s conclusion were correct that Section 2717(f)(2) trumps Section 2713's presentment requirement, then that conclusion would apply to private parties as well, which is exactly the concern expressed by the defendants in *Cosco Busan.*

Instead, this Court interprets "at any time" in Section 2717(f)(2) as clarifying the first

---

[27] The NCP is a set of federal regulations created by the CWA and provide, *inter alia*, "procedures for preparing for and responding to discharges of oil." 40 C.F.R. § 300.1.  The CWA requires that all removal actions "shall, to the greatest extent possible, be in accordance with the [NCP]." 33 U.S.C. § 1321(d)(4).  Consistent with this requirement, OPA Section 2702(b) states that the only private removal costs which are recoverable are those that were consistent with the NCP's standards.

sentence of that paragraph: "An action for recovery of removal costs referred to in section 2702(b)(1) of this title must be commenced within 3 years after completion of the removal action." In other words, to the extent one *might* interpret the first sentence of 2717(f)(2) as meaning that removal costs may only be sought after all removal actions are concluded, "at any time" makes clear that this is not the case:  A claimant may periodically present removal costs as they are incurred.[28] Interpreting "at any time" in this manner gives appropriate meaning to that phrase within the context of Section 2717(f)(2) and Section 2713(a)'s statement that "all claims for removal costs or damages shall be presented first to the responsible party."

Furthermore, it would seem odd that Congress would choose to insert an exception to the presentment procedure in a Section concerning the statute of limitations, rather than directly in Section 2713.  This point is highlighted by the fact that Congress *did* create a limited exception to the presentment requirement, and inserted it in Section 2713.  Section 2713(b) provides select circumstances when a party may present its claim directly to the Oil Spill Liability Trust Fund, rather than first presenting the claim to the Responsible Party.   State removal costs are one exception.  33 U.S.C. § 2713(b)(C).  However, Section 2713(b) does not state that parties who might avail themselves of this exception are also free to sue a Responsible Party without first presenting their claim.  Thus, the Court finds that the States must present their OPA claims to a Responsible Party before proceeding in Court.[29]

_____

[28]   This interpretation is also consistent with the second sentence of Section 2717(f)(2): "In any such action described in this subsection, the court shall enter a declaratory judgment on liability for removal costs or damages that will be binding on any subsequent action or actions to recover further removal costs or damages."  This sentence envisions that a claimant will bring a series of claims over the course of conducting removal actions, rather than one lump claim at the end.

[29]   *See also United States v. Murphy Exploration & Prod. Co.*, 939 F. Supp. 489, 492 (E.D. La. 1996) ("[The defendant] also argues that the government's claim is barred because the OPA requires that all claims be presented first to the responsible party. [Defendant argues that] [b]ecause the Coast Guard sought and obtained compensation from the

Turning to the issue of whether the States have sufficiently alleged presentment, the B1

Order discussed the practical problem of OPA presentment in the context of an MDL with 100,000

claimants:

> There are likely large numbers of B1 claimants who have completely bypassed the
> OPA claim presentation requirement, others who have attempted to present their
> claims but may not have complied with OPA, and others who have properly
> presented their claims but have been denied for various reasons. Claimants who
> have not complied with the presentment requirement are subject to dismissal without
> prejudice, allowing them to exhaust the presentment of their claims before returning
> to court. In the ordinary case, the Court would simply dismiss those claims without
> prejudice. However, as the Court has previously noted, this is no ordinary case. A
> judge handling an MDL often must employ special procedures and case management
> tools in order to have the MDL operate in an orderly and efficient manner. In this
> massive and complex MDL, the Court is faced with a significant practical problem.
> It would be impractical, time-consuming, and disruptive to the orderly conduct of
> this MDL and the current scheduling orders if the Court or the parties were required
> to sort through in excess of 100,000 individual B1 claims to determine which ones
> should be dismissed at the current time. Moreover, such a diversion at this time
> would be unproductive and would not advance towards the goal of allowing the
> parties and the Court to be ready for the limitation and liability trial scheduled to
> commence in February 2012. No matter how many of the individual B1 claims
> might be dismissed without prejudice, the trial scheduled for February would still go
> forward with essentially the same evidence.
>
> In summary on this issue, the Court finds that presentment is a mandatory
> condition-precedent with respect to Plaintiffs' OPA claims. The Court finds that
> Plaintiffs have sufficiently alleged presentment in their B1 Master Complaint, at least
> with respect to some of the Claimants. For the reasons stated above, the Court does
> not intend to engage in the process of sorting through thousands of individual claims
> at the present time to determine which claims have or have not been properly
> presented.

(Rec. Doc. 3830 at 30-31 (footnotes omitted)).

---

[Oil Spill Liability Trust Fund] before presenting a claim to the responsible party, the government has failed the statutory requirement imposed by 33 U.S.C. § 2713(a) . . . . Here, the stipulated facts indicate that the Coast Guard presented its claims to [Defendant] and that [Defendant] denied liability and refused payment for more than 90 days after receiving the request for payment. Therefore, [Defendant]'s situation is distinguishable from the facts in *Boca Ciega* and finds no independent support in the statutory language.").

With respect to the States, a different practical problem arises.  Although there are only two States, their claims involve a much wider array of damages than private plaintiffs, and the extent of some of these damages are not yet known and are inherently difficult to calculate.  For example, assessing damage to natural resources is complex enough that OPA created a specific set of federal regulations to guide assessments.  33 U.S.C. § 2706(e); 15 C.F.R. § 990.  Assessments made in accordance with these regulations creates a presumption of validity.  33 U.S.C. § 2706(e)(2).  Furthermore, the cost of assessment is itself a recoverable damage under OPA, and OPA's three-year statute of limitations does not even begin to run for natural resources damages until completion of the assessment.  33 U.S.C. §§ 2706(d)(C); 2717(f)(1)(B).

Both States allege in their Complaints that they have satisfied OPA's presentment requirement.  Alabama made a single allegation of compliance, while Louisiana set forth more detail.  (Rec. Docs. 1872 ¶ 217, 2031 ¶¶ 143-152).  Both States contend that they have presented multiple claims to BP, some of which were wholly or partially rejected.  The States admit that some of their claims in the Amended Complaints are premature, given that the extent of damage is not yet known.  However, the States assert that the need to preserve future claims in light of the Court's deadlines imposed to fulfill the MDL's goal of efficient resolution, as well as various statutory deadlines which may or may not apply, compelled the States to assert all claims, even those not yet entirely known.

As stated in the B1 Order, a judge handling an MDL often must employ special procedures and case management tools in order to have the MDL operate in an orderly and efficient manner.  The Court is conscious of the burdens the MDL has placed on counsel for all parties.  Although the States ultimately must present each claim to the Responsible Party in order to recover damages for

that claim, the Court will not require the States to repeatedly amend their Complaints to specifically state the circumstances of each presentment.  Doing so would be a distraction to parties already under significant strains, and likely disruptive to this proceeding given the role the States play. Furthermore, given that presentment is not itself a cause of action, but a fact to be alleged to a cause of action, as well as the Court's finding that presentment is not a jurisdictional requirement, the Court is not convinced that OPA requires the parties to allege such specifics in their Complaints. Accordingly, the Court finds the States have sufficiently alleged presentment under OPA.

**C.  Other Claims Asserted under General Maritime Law**

In addition to negligence and products liability, Louisiana also asserts trespass, public nuisance, and private nuisance under general maritime law.

As to the trespass claim, the Fifth Circuit has explained,

> While no rule of trespass exists in maritime law, federal courts may borrow from a variety of sources in establishing common law admiralty rules to govern maritime liability where deemed appropriate.  It has held that in the absence of federal cases or an established federal admiralty rule on trespass, it would be more appropriate to apply general common law rather than state law which would "impair the uniformity and simplicity which is a basic principle of the federal admiralty law ..."  Applying this rationale, we hold that general common law and in particular the Restatement (Second) of Torts should control to determine the law of maritime trespass, in order to promote uniformity in general maritime law.

*Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.*, 959 F.2d 49, (5th Cir. 1992). The Restatement (Second) of Torts distinguishes between intentional trespass (e.g., a person purposefully entering another's land) and unintentional trespass (e.g., a person walking on a sidewalk near a store, slips, and falls against the store's window, breaking it).  *See* Restatement (Second) of Torts § 165, 166 (1965).  Louisiana's Complaint does not sufficiently allege that any Defendant intended to place oil its property.  As to unintentional trespass, the Restatement provides

24

that, except in instances involving ultra-hazardous activity, a defendant is liable only when his conduct is negligent, and only for the harm caused to the land, the possessor, or a thing or third person in whose security the possessor has a legally protected interest. *Id.* Offshore drilling activities are not considered ultra-hazardous. (*See* Rec. Doc. 3830 at 28 (citing *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550 (5th Cir. 1987)). Thus, the trespass claim is effectively absorbed into general maritime law negligence, as both require negligent conduct and both require physical injury to a proprietary interest or personal injury. Damages under trespass also appear to be no greater than those recoverable under general maritime law negligence. In light of *Marastro*'s instruction that a court "***may*** borrow from a variety of sources in establishing common law admiralty rules to govern maritime liability ***where deemed appropriate***," the Court finds it is not appropriate for it to borrow from common law in this instance, since the trespass claim is effectively the same as one for negligence. Accordingly, the claim for trespass under maritime law is dismissed.

As to the nuisance claims, courts have declined to recognized this tort in maritime cases. *See Louisiana, ex rel. Guste v. M/V Testbank*, 752 F. Supp. 1019, 1030-33 (5th Cir. 1985) (en banc); *Sekco Energy, Inc. v. M/V Margaret Chouest*, 820 F. Supp. 1008, 1013-14 (E.D. La. 1993). This Court similarly declines, given the other remedies available under OPA and general maritime law.

**D.  Other Issues Resolved by the B1 Order: Moratorium Damages, Anadarko & MOEX**

The States allege economic losses resulting from the moratorium on deepwater drilling imposed after the oil spill. The B1 Order addressed this identical issue. Accordingly, the Court refrains from defining the precise contours of OPA causation—necessarily a factual analysis—at this time, and merely holds that the States have alleged sufficient facts to state a plausible claim for these damages. For similar reasons, the Court does not consider at this time Transocean's argument

regarding "stigma" damages.

The B1 Order also dismissed all general maritime law negligence claims against Anadarko and MOEX, but did not dismiss OPA claims against those parties. Identical claims are asserted here. Accordingly, the States' general maritime law claims against Anadarko and MOEX are dismissed. The OPA claims against those parties are preserved.

## V. <u>SUMMARY</u>

In summary, the Court finds as follows:

1.    The States have stated claims for negligence and products liability under general maritime law.

2.    Punitive damages are available to the States under general maritime law.

3.    The States' claims under state law, including civil penalties and Louisiana's request for declaratory judgment under LOSPRA, are preempted. The state-law claims are dismissed.

4.    Presentment under OPA is a mandatory condition precedent, not a jurisdictional requirement. The Motions to Dismiss under Rule 12(b)(1) are denied.

5.    The States are subject to OPA's presentment requirement. The States have sufficiently alleged presentment.

6.    Claims of nuisance and trespass asserted under general maritime law are dismissed.

7.    General maritime law negligence claims against Anadarko and MOEX are dismissed.


Accordingly,

**IT IS ORDERED** that Defendants' Motions to Dismiss the Complaints of the States of Alabama and Louisiana (Rec. Docs. 2630, 2631, 2637, 2638, 2639, 2642, 2644, 2645, 2646, 2647,

2649, 2651, 2653, 2655, 2656) are **GRANTED IN PART** and **DENIED IN PART**, as set forth above.

New Orleans, Louisiana, this 14th day of November, 2011.

_____
United States District Judge