# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | SECTION: J(1) |
| | * | |
| This Document Applies to: | * | JUDGE BARBIER |
| 11-274 c/w 11-275 | * | |
| | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## ORDER AND REASONS
### [As to the Insurance Actions]

Before the Court are the Motion for Judgment on the Pleadings in the Insurance Actions (Rec. Doc. 3211)[1] filed by BP Exploration & Production, Inc. and its related entities (collectively, "BP"); Oppositions filed by Ranger Insurance Limited ("Ranger") (Rec. Doc. 3847), various underwriters ("Underwriters" or "Excess Insurers") (Rec. Doc. 3705), and Transocean Ltd. and its related entities (collectively, "Transocean") (Rec. Doc. 3849); BP's Reply (Rec. Doc. 3934); Transocean's Motion to Convert BP's Motion for Judgment on the Pleadings to a Motion for Summary Judgment (Rec. Doc. 3706); and the Sur-Replies of Ranger (Rec. Doc. 4349), "Underwriters" (Rec. Doc. 4351), and Transocean (Rec. Doc. 4353).

In its Motion for Judgment on the Pleadings in the Insurance Actions (Rec. Doc. 3211), BP seeks a final judgment in its favor in respect to all claims presented in Case Nos. 11-274 and 11-275 (the "Insurance Actions"). Specifically, BP requests that the Court issue the following two judicial declarations in favor of BP and against the plaintiffs in the Insurance Actions:

---

[1] Unless stated otherwise, citations to Court documents are to Case No. 10-md-2179.

1.  That BP is an "additional insured" under the insurance policies at issue (the "Insurance Policies" or the "Policies"); and

2.  That the scope of BP's coverage rights as an "additional insured" is governed by the terms and conditions of the insurance policies themselves; it is not limited to the scope of Transocean's contractual indemnity of BP in the underlying drilling contract between Transocean and BP pursuant to which the Deepwater Horizon was operating in April 2010 (the "Drilling Contract")—a contract to which none of the insurers is a party.

BP further requests that the Court deny each of the four proposed judicial declarations set forth in Paragraph 22 of the insurers' complaints, and instead declare as follows with respect to each of those matters:

a.  That whether and to what extent "BP assumed … responsibility" in the Drilling Contract "for any and all liabilities arising out of or in any way related to the release of oil" from the Macondo Well is, as a matter of law, not relevant to the insurers' coverage obligations to BP under the Ranger and Excess Policies;[2]

b.  That BP's "additional insured" status under the Drilling Contract is not defined or otherwise limited to exclude "the pollution liabilities BP has incurred and will incur with respect to oil emanating from" the Macondo Well;[3]

c.  That Plaintiff Ranger and Plaintiffs Excess Insurers have coverage obligations to BP as an "additional insured" under Ranger's and the Excess Insurers' policies for "the pollution liabilities BP has incurred and will incur with respect to the oil emanating from" the Macondo Well that are not limited by the indemnities in the Drilling Contract;[4] and

d.  That BP is "entitled to coverage under the [Ranger and Excess Policies] for the pollution liabilities BP has incurred and will incur with respect to the oil emanating from" the Macondo Well, if and as the substantive terms and conditions of those

_____

[2] See Rec. Doc. 3211, at 2 (citing Civil Action No. 11-274, Rec. Doc. 1-1, at 7, ¶ 22.A; No. 11-275, Rec. Doc. 1-1, at 7, ¶ 22.A).

[3] See Rec. Doc. 3211, at 2 (citing Civil Action No. 11-274, Rec. Doc. 1-1, at 7, ¶ 22.B; No. 11-275, Rec. Doc. 1-1, at 7, ¶ 22.B).

[4] See Rec. Doc. 3211, at 2 (citing Civil Action No. 11-274, Rec. Doc. 1-1, at 7, ¶ 22.C; No. 11-275, Rec. Doc. 1-1, at 7, ¶ 22.C).

2

policies provide, without reference to the Drilling Contract.[5]

Simply stated, the issue is the extent of "additional insured" coverage, if any, to which BP is entitled by virtue of the insurance contracts procured by Transocean as the named insured. Ranger, the Excess Insurers, and Transocean argue for a limited scope of coverage for BP:  only to the extent that Transocean is obligated in the Drilling Contract to indemnify BP.  BP argues for broad coverage:  coverage is not limited by the Drilling Contract and is interpreted solely in reference to the terms of the Insurance Policies.

## BACKGROUND AND PROCEDURAL HISTORY

### A.  The Insurer Complaints

The Insurance Actions are two declaratory judgment actions.  One was filed by Ranger, a primary liability carrier, and the other was filed by various excess liability carriers led by London market syndicates ("Excess Insurers," and together with Ranger, "Insurers").  The Insurers issued liability insurance policies to Transocean Holdings LLC and its affiliates ("Transocean").  The Insurance Actions concern the scope of BP's "additional insured" coverage under the Insurance Policies issued to Transocean.  Specifically, the Insurers "'seek a judicial declaration of their rights and duties as to BP, if any, under the Policies in connection with BP's pollution-related liabilities for the oil emanating from BP's well' as a result of the fire, explosion, and sinking of Transocean's Deepwater Horizon on April 20, 2010 (the 'Deepwater Horizon Incident')."  Rec. Doc. 3211-1, at 5.  The parties agree that the complaints in both actions are identically worded in all material respects.

---

[5]  See Rec. Doc. 3211, at 2 (citing Civil Action No. 11-274, Rec. Doc. 1-1, at 7, ¶ 22.D; No. 11-275, Rec. Doc. 1-1, at 7, ¶ 22.D).

## B.  The Drilling Contract

The Drilling Contract defines BP's and Transocean's obligations; it identifies liabilities that each separately assumed.  The contract contains cross-indemnities between Transocean (referred to as "Contractor" in the Drilling Contract) and BP (referred to as "Company" in the Drilling Contract).  Each party committed itself to hold the other harmless for certain specified liabilities.  Thus, as to pollution-related liabilities: (1) Transocean in Article 24.1 assumes full responsibility for above-surface oil pollution discharges without regard to the negligence of any party; and (2) BP assumes full responsibility for specified oil pollution damage without regard to any party's negligence, *except* for liability assumed by Transocean under Article 24.1.  Rec. Doc. 3211-6, at 11-12.

The Drilling Contract also imposes an insurance requirement on Transocean:

> Without limiting the indemnity obligation or liabilities of CONTRACTOR [Transocean] or its insurer, at all times during the term of this CONTRACT, CONTRACTOR shall maintain insurance covering the operations to be performed under this CONTRACT as set forth in Exhibit C.

Rec. Doc. 3211-6, at 8.  Exhibit C (titled "Insurance Requirements") sets forth the types and minimum amounts of coverage that Transocean is required to purchase and maintain.  Included is the requirement that BP and its affiliates be named as additional insureds "in each of [Transocean's] policies, except Workers' Compensation for liabilities assumed by [Transocean] under the terms of this Contract."  Rec. Doc. 3211-6, at 17.  The Insurers are not parties to the Drilling Contract, which expressly states that only "Extended Beneficiaries of Indemnification" (as defined in the Drilling Contract) are third-party beneficiaries of the contract.  Rec. Doc. 3211-6, at 13.

## C.  The Insurance Policies

The Insurance Policies include the Ranger policy with its $50 million of general liability coverage and the Excess Policies providing an additional $700 million of general liability coverage.

The Ranger and Excess Policies have materially identical terms.  The key terms at issue are "Insured" and "Insured Contract."  "Insured" is defined as including the Named Insured, and other parties.  Pertinent to the instant motion, "Insured" includes:

> (c) *any person or entity to whom the "Insured" is obliged by any oral or written "Insured Contract"* (including contracts which are in agreement but have not been formally concluded in writing) entered into before any relevant "Occurrence", *to provide insurance such as is afforded by this Policy* . . . .

Rec. Doc. 3211-7, at 89 (emphasis added).  "Insured Contract" is defined as follows:

> The words "Insured Contract", whenever used in this Policy, shall mean any written or oral *contract or agreement entered into by the "Insured"* (including contracts which are in agreement but have not been formally concluded in writing) *and pertaining to business under which the "Insured" assumes the tort liability of another party* to pay for "Bodily Injury", "Property Damage", "Personal Injury" or "Advertising Injury" to a "Third Party" or organization. Tort Liability means a liability that would be imposed by law in the absence of any contract or agreement.

Rec. Doc. 3211-7, at 90 (emphasis added).

Other parts of the Policies address additional insureds.  A general condition in Endorsement 1 provides that additional insureds are automatically included where required by written contract. Rec. Doc. 3211-7, at 71.  Condition D.1 to Section I coverage provides a limitation:  Transocean has the privilege to name additional insureds only to the extent as is required under contract or agreement.  Rec. Doc. 3211-7, at 13.  The parties dispute whether and how these provisions apply.

## THE PARTIES' ARGUMENTS

### A.  Summary of Arguments

The parties agree that Texas law governs interpretation of the Policies, pursuant to the Policies' choice-of-law provision.  They do not dispute that the Drilling Contract and Insurance Policies are properly before the Court as documents attached to or referred to in the pleadings.

BP asserts that the Insurers do not contest that BP is an "additional insured" under the Insurance Policies.  It cites the complaints, which acknowledge that "the drilling contract requires additional insured protection in favor of certain BP entities."[6]  However, Transocean points out that it does dispute the scope of such "additional insured" coverage.

The parties clearly contest the scope of "additional insured" coverage under the Policies. BP argues that under Texas law and Fifth Circuit jurisprudence applying said law, these insurers' obligations to BP, who is an additional insured, are determined solely by reference to the terms and conditions of the Policies themselves, rather than indemnities in the underlying Drilling Contract to which the Insurance Policies relate.  The Insurers counter that this Court must look to the terms of the underlying indemnities in the Drilling Contract and that coverage is limited in scope to the liabilities that Transocean assumed under its terms.

## B.  BP's Arguments

BP states that this case is ripe for Rule 12(c) adjudication because the question of insurance policy interpretation is generally a question of law for the Court.  BP argues that governing Texas law requires that any reasonable doubt be construed in favor of the insured and its coverage claim. It cites Texas Supreme Court decisions to the effect that where an insurance contract is subject to more than one reasonable interpretation, it is ambiguous, and the interpretation most favoring coverage will be adopted.  Thus, the Court should adopt BP's interpretation, if reasonable, even if the Insurers' interpretation is more reasonable.

In arguing that BP is an "Insured" under the Policies, according to the Policies' plain language, BP must argue that Transocean is obligated to BP by an "Insured Contract" to provide the

---

[6]  Civil Action No. 11-274, Rec. Doc. 1-1, at 4, ¶ 11; No. 11-275, Rec. Doc. 1-1, at 4, ¶ 11.

insurance afforded under the Policies.  BP argues that the Drilling Contract is such an "Insured Contract":  in the Drilling Contract, Transocean has agreed to indemnify BP and to procure insurance for the benefit of BP.  Thus, at a minimum (and the Insurers do not dispute), BP is entitled to "additional insured" coverage for liabilities assumed by Transocean under the Drilling Contract. However, BP further argues that BP is entitled to "additional insured" coverage beyond the scope of Transocean's contractual indemnity of BP.  It argues that under the Texas Supreme Court case Evanston Insurance Co. v. ATOFINA Petrochemicals, Inc., 256 S.W.3d 660 (Tex. 2008), and the Fifth Circuit case Aubris Resources LP v. St. Paul Fire and Marine Insurance Co., 566 F.3d 483 (5th Cir. 2009), only the *terms of the policies* control coverage—*not* the scope of Transocean's indemnification of BP in the underlying Drilling Contract.  BP presents these cases as follows.

### 1. **ATOFINA**

The Texas Supreme Court in ATOFINA held that in determining the scope of an "additional insured" company's rights under a liability policy procured by its contractor, the court must look not "to the indemnity agreement in the service contract" but rather to "the terms of the umbrella insurance policy itself."  ATOFINA, 256 S.W.3d at 664.  In the case, ATOFINA entered into a service contract with a contractor for work to be done at a refinery.  Id. at 662.  The contractor agreed to indemnify ATOFINA for losses not attributable to ATOFINA's sole negligence, misconduct, or strict liability.  Id.  However, BP asserts, the court stated that to determine the scope of coverage, it would look not to the indemnity agreement, but to the insurance policy itself.  The court ultimately held that ATOFINA was entitled to insurance coverage for the liability at issue. Id. at 675.  In a footnote, it stated that the scope of coverage is not limited by a contractual indemnity clause, where the additional insured provision is *separate from and additional to* the indemnity

7

provision.  Id. at 664 n.5.  The court found that the additional insured provision at issue met this description.  Id. at 670.

### 2. Aubris

The United States Fifth Circuit Court of Appeals in Aubris considered "what effect a general indemnity provision in an oilfield services agreement has on the scope of additional insured coverage required by the same agreement."  Aubris, 566 F.3d at 485.  In the services agreement, the owner was to be an additional insured under the contractor's insurance policies, except for any obligations for which the owner specifically agreed to indemnify the contractor.  Id. at 485-86.  The insurer denied coverage, arguing that the owner had agreed to indemnify the contractor for the owner's own negligence.  Id.  The insurer argued for a reading of the services agreement's "additional insured" and general indemnity provisions together, "such that there is no coverage in causes of action arising from [the owner's] own negligence."  Id. at 486.  The court found ATOFINA on point and held that it should only look to the "additional insured" provision—not the indemnity provision—of the services agreement to determine the scope of coverage.  Id. at 488-89. The court also cited Texas legal canons of insurance interpretation and considered the purpose of the services agreement's "additional insurance" provision, which was to secure insurance coverage for the additional insured.  Id. at 486, 490.

BP argues that ATOFINA and Aubris apply to the instant case.  The insurance and indemnity provisions are separate.  The insurance provision of the Drilling Contract requires that BP and its affiliates be named as additional insureds in each of Transocean's policies (with the aforementioned workers' compensation exception).  In Aubris, where the services agreement provided for the owner to be an additional insured *except for* obligations for which the owner specifically agreed to

8

indemnify the contractor, there was no substantive limit on the "additional insurance" coverage.  BP argues that, *a fortiori*, in the present case, without any such excepting language in the insurance provision, BP is entitled to full coverage under the Ranger and Excess Policies.  Additionally, BP urges that the Policies, which are the contracts at issue, contain no language limiting the scope of BP's "additional insured" coverage to the scope of Transocean's indemnities of BP under the Drilling Contract.  Thus, BP argues that under the Policies, because it qualifies as an "Insured," it is entitled to all coverage that the Policies provide.  Additionally, in <u>ATOFINA</u>, the policy "followed form" to the underlying primary policy, which excluded "additional insured" coverage if ATOFINA was solely negligent.  Still, the <u>ATOFINA</u> court held that coverage was available because the claims at issue were settled without a finding of "sole negligence" of ATOFINA.  *A fortiori*, BP argues, the Policies at issue contain no such limiting language, and thus BP is entitled to the full scope of "additional insurance" coverage.

Further, if the Insurers wanted to narrow the scope of "additional insurance" coverage, they could have done so through language limiting such coverage "only to liabilities for which the Named Insured is expressly obligated to indemnify such other Insured under an Insured Contract."  Rec. Doc. 3211-1, at 30.  No such language was included in the Policies.  In sum, insurance and indemnity are two different things.  The former is governed by insurance policies and the latter by the terms of indemnities in service contracts.

BP's final argument is that whether BP is liable to Transocean under the Drilling Contract's indemnity provisions is irrelevant to the scope of BP's "additional insurance" coverage under the Insurance Policies.  BP states that the Fifth Circuit in <u>Aubris</u> quoted <u>ATOFINA</u>, which stated that where an "additional insured" provision is separate from and additional to an indemnity provision,

the scope of the insurance requirement is not limited by the indemnity provision. Further, the Insurers are not third-party beneficiaries of the Drilling Contract, so they have no right to a declaration of BP's obligations to Transocean under that contract. Thus, BP argues that whether it has responsibility for liabilities arising from the Deepwater Horizon Incident is irrelevant. Only the Insurance Policies themselves determine the scope of coverage.

## C. The Insurers' and Transocean's Oppositions

The Insurers argue that the pleadings do not establish that BP is entitled to unlimited coverage for its pollution liabilities.[7] The major argument raised is that BP's "additional insured" status cannot extend to any of the liabilities assumed by BP under the Drilling Contract. The Insurers start from the premise that the Court must look beyond the face of the Policies. The Court cannot ignore the underlying Drilling Contract. To do so would absurdly posit that Transocean would apportion liabilities between itself and BP in the Drilling Contract, and then contradictorily afford BP boundless "additional insured" protection for liabilities that BP specifically assumed in that same Drilling Contract. Further, BP is mentioned nowhere in the Policies; thus, the Court is required to look to the Drilling Contract to determine whether it is an "Insured Contract" within the meaning of the Policies (and thus BP is an "Insured"). The Insurers urge that common sense indicates that where the Drilling Contract is necessary to establish BP as an additional insured, it is also necessary to establish the scope of insurance coverage. The non-movants further argue that the Drilling Contract must be considered together with the Policies because the Drilling Contract expresses Transocean's and the Insurers' intent under the Policies.

---

[7] They further argue in a footnote that BP's motion exceeds the pleadings, and therefore the motion should be converted to one for summary judgment. Rec. Doc. 3705, at 6 n.14. Transocean also separately moves for conversion of the instant motion to one for summary judgment (Rec. Doc. 3706).

Transocean and the Insurers argue that the Drilling Contract is not an "Insured Contract" for BP's pollution liabilities related to the Macondo Well.  This conclusion is reached as follows:  In the Drilling Contract, BP assumed responsibility for pollution liabilities pertaining to subsurface oil releases.  The Drilling Contract only required Transocean to obtain insurance for BP for risks that BP *did not* assume.  Thus, Transocean was not required to obtain insurance for BP as to liabilities flowing from the Deepwater Horizon Incident, which was caused by a subsurface release.  The Policies only allowed Transocean to name additional insureds to the extent required under contract.[8] The Drilling Contract did not require Transocean to name BP as an additional insured as to well spill liabilities.  Thus, Transocean was not permitted by the terms of the Policies to name BP as an additional insured regarding such liabilities.  Therefore, the Drilling Contract is not an "Insured Contract" as to *those* pollution liabilities, and BP is not an additional insured as to such liabilities.

The Insurers also argue that BP is not entitled to construe the Policies against the Insurers because (1) BP was not a contracting party to the Policies; (2) the Policies are not adhesionary contracts; (3) BP has not established who drafted the Policies; and (4) BP has not shown that the policy wording is ambiguous.  As to (1), BP is an additional insured and, thus, a "stranger" to the Policies, and there is Texas case law that the principle of construction against the insurer should not apply where the party promoting such construction is a "stranger" to the contract.  As to (2), Texas courts recognize an exception to the general rule favoring coverage where the parties were of equal bargaining power.  In this case, the Insurers are entitled to discovery to establish that this "sophisticated insured" exception applies to negate the rule favoring coverage.  Namely, there are factual issues regarding the relative bargaining power of Transocean and the Insurers.  As to (3),

---

[8] See Rec. Doc. 3211-7, at 13.  This provision is in a part of the policy that BP does not address in its initial brief.  The Insurers use portions of their briefs to argue that it is appropriate to look at the policy as a whole.

there is no evidence before the Court as to who drafted the Policies, and Transocean's role, if any, in drafting. This presents a factual issue as to which party is entitled to a presumption. Finally, as to (4), even if the Policies contain an ambiguity, the interpretation of the Policies is a factual issue.

In addition to the need for proof of industry practice, the Insurers argue that further discovery is appropriate by virtue of court orders. The MDL Panel ordered the Insurance Actions consolidated with the instant MDL, despite BP's argument that insurance issues could be determined without reference to the parties' liabilities under the Drilling Contract. Additionally, the Insurers allege that this Court ordered that discovery regarding interpretation of the Drilling Contract is relevant. See Rec. Doc. 2593.

The non-movants argue that factual issues also exist respecting which policy provisions apply to the coverage that BP seeks. BP seeks a declaration of coverage under the entirety of the Policies, but states that it is not arguing regarding Section I coverage. The Policies arguably establish a priority scheme: Section II coverage only exists where Section I coverage is not applicable. At the least, how this priority scheme works is a factual issue. Importantly, the "Insured Contract" definition upon which BP relies is applicable only to Section II coverage. Without a determination as to whether Section I coverage applies, it cannot be determined whether and to what extent Section II coverage applies. Thus, the non-movants argue that BP's motion is premature and inappropriate. Further, BP has not demonstrated that Section II.B coverage applies to the instant facts. Section II.B only provides coverage for "onshore liabilities," but the pollution liabilities at issue are offshore in nature.

The Insurers distinguish the ATOFINA and Aubris cases, on a number of grounds. In ATOFINA, the court found coverage because the policy did not contain language limiting the scope

of coverage.  The policy did not incorporate, or even reference, the underlying services contract, whereas in the present case, the Policies incorporate the Drilling Contract.  Unlike the ATOFINA policy, the Policies in this case clearly define "Insured Contract" to include only "additional insured" coverage *required* under the Drilling Contract, which does not include liability assumed by BP under the Drilling Contract.  The Insurers also assert that the Aubris court did *not* confine its review solely to the insurance policy.  Further, the Aubris court interpreted the services agreement to require a separate indemnification agreement by the owner for specific tort lawsuits, to exclude the contractor's "additional insured" coverage obligation to the owner.  In contrast, the Drilling Contract has no "specific" requirement that Transocean and BP execute separate indemnity agreements on a claim-by-claim basis—unlike the services contract as construed by the court in Aubris.  To the extent BP has assumed certain tort liabilities, Transocean is not contractually obligated to procure "additional insured" coverage, so the Insurance Policies do not cover BP as to those liabilities.  Finally, the Insurers point to several Fifth Circuit cases allegedly holding that where an insurance policy provides "additional insured" coverage as required by a written contract of the named insured, such coverage is limited to the extent of the named insured's liabilities specified in the underlying contract.

Transocean raises policy arguments in its opposition.  First, if coverage is found in this case, companies like BP would continue to pay no premiums, but would be fully insured through their contractors.  This is contrary to what former BP CEO Tony Hayward stated:  that BP was self-insured because it believed that the cost of insuring against pollution risks was too high.  See Rec. Doc. 3849, at 8-10.  Thus, Transocean argues, BP's lawyers' Rule 12(c) motion takes a contrary position to that of BP's CEO.  Second, if BP is successful, it is breaching the Drilling Contract

13

through "invading Transocean's limits of insurance in a manner that was not intended by the parties and is explicitly prohibited by the plain language of the drilling contract."  Rec. Doc. 3849, at 41. Transocean also has moved for BP's motion to be converted to one for summary judgment, or alternatively denied as premature, due to alleged factual issues.  See Rec. Doc. 3706.

## D.  Reply and Sur-Replies

BP's reply argues many points regarding issues raised in the oppositions, only a few of which are mentioned here.  First, the cases relied upon by the non-movants either are non-Texas-law cases or were decided prior to ATOFINA and Aubris.  Second, the Rule 12(c) motion is properly presented to the Court because Magistrate Judge Shushan ruled in May 2011 that BP could proceed with such a motion, without the need for BP to alternatively request summary judgment.  See Rec. Doc. 2593, at 2-3.  Third, BP argues that its proposed legal rules of insurance interpretation govern, and that there is no exception for sophisticated bargainers.  Fourth, there is no "priority scheme" as between the Section I and II coverages.

Fifth, BP argues that the Insurers have misinterpreted the insurance provision in the Drilling Contract.  That provision requires Transocean to name BP as an additional insured in each of Transocean's policies, "except Workers' Compensation for liabilities assumed by [Transocean] under the terms of this Contract."  Rec. Doc. 3211-6, at 17.  The oppositions all argue that this provision only requires Transocean to obtain coverage for BP as to liabilities that Transocean assumed.  However, BP argues, such a reading ignores the first three words of that clause:  "except Workers' Compensation."  Thus, the provision requires insurance coverage for BP, except workers' compensation liabilities that Transocean assumed under the Drilling Contract.  BP argues that for the Insurers' proposed reading to prevail, an extra comma would be needed:  coverage would have

14

to be mandated, "except Workers' Compensation[**,**] for liabilities assumed by [Transocean] under the terms of this Contract."  With that hypothetical comma, the insurance obligation would only extend to liabilities Transocean assumed.  But as the contract *actually* reads, the insurance obligation extends generally to all liabilities under the Contract—even those BP assumed—except for workers' compensation liabilities that Transocean assumed.

Ranger and the Excess Insurers also filed sur-replies with the Court, which do not present any "new cases," but mainly purport to correct alleged misstatements made in BP's reply.  They argue that <u>ATOFINA</u> and <u>Aubris</u> merely use standard contractual interpretation rules, the contracts and policies at issue in <u>ATOFINA</u> and <u>Aubris</u> are distinguishable from those in this case, the instant motion is premature, BP is not entitled to a presumption in favor of coverage, BP's "missing comma" argument is incorrect, and BP's interpretations of the Drilling Contract's additional insurance provision are unreasonable.

## DISCUSSION

BP brings the instant motion pursuant to Rule 12(c), which provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  F. R. CIV. P. 12(c).  "A motion brought pursuant to Fed.R.Civ.P. 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts."  <u>Hebert Abstract Co., Inc. v. Touchstone Props., Ltd.</u>, 914 F.2d 74, 76 (5th Cir. 1990).  The standard for dismissal for a Rule 12(c) motion for judgment on the pleadings is the same as that for dismissal for failure to state a claim under Rule 12(b)(6).  <u>Johnson v. Johnson</u>, 385 F.3d 503, 529 (5th Cir. 2004).

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." F. R. CIV. P. 8(a)(2). The complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 346 (2005). The allegations "must be simple, concise, and direct." F. R. CIV. P. 8(d)(1).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, __U.S.__, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 547 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. Lormand v. U.S. Unwired, Inc., 565 F.3d 228, 232-33 (5th Cir. 2009); Baker v. Putnal, 75 F.3d 190, 196 (5th Cir. 1996). The court is not, however, bound to accept as true legal conclusions couched as factual allegations. Iqbal, 129 S. Ct. at 1949-50.

**A. Alleged Legal Precedent: ATOFINA and Aubris**

BP moves under Rule 12(c) because it argues that based on the applicable law governing the insurance contracts before the Court, BP is clearly entitled to the relief it seeks. Specifically, BP asserts that the Texas Supreme Court's decision in ATOFINA and the Fifth Circuit's decision in Aubris require this Court to determine BP's scope of coverage strictly by reference to the Insurance Policies, and thus there is coverage available for the oil pollution risks at issue. Thus, the Court's first order of business is to address what effect, if any, these cases have on the legal interpretation of the policies at issue.

### 1.  **ATOFINA Is Distinguishable**

BP asserts that the Texas Supreme Court held in <u>ATOFINA</u> that the scope of an "additional insured" company's rights under a liability policy procured by its contractor is limited to the terms of the insurance policy itself.  In <u>ATOFINA</u>, a refinery owner, ATOFINA Petrochemicals, Inc., contracted with Triple S Industrial Corporation for the performance of certain work at the refinery. <u>ATOFINA</u>, 256 S.W.3d at 662.  The service contract contained separate indemnity and insurance provisions.  <u>Id.</u>  The indemnity provision required Triple S to indemnify ATOFINA except for losses attributable to ATOFINA's concurrent or sole negligence, misconduct, or strict liability.  <u>Id.</u>  The insurance provision obligated Triple S to carry both primary and excess liability insurance insuring the indemnity agreement.  <u>Id.</u> at 662-63.  A Triple S employee fell through a corroded storage tank roof and died, leading to a wrongful death suit against Triple S and ATOFINA.  <u>Id.</u> at 663. ATOFINA demanded coverage under the excess (or umbrella) policy as an additional insured.  <u>Id.</u>

The coverage interpretational issues presented in <u>ATOFINA</u> were quite different from those in the present case.  Two coverage provisions were at issue.  The first provided coverage to ATOFINA as an additional insured, but only with respect to operations performed by Triple S or facilities owned or used by Triple S.  <u>Id.</u> at 664.  The issue under this coverage provision was whether ATOFINA's negligence prevented the injury from having a sufficient connection with operations that were performed by Triple S.  <u>Id.</u>  The court held that the injury respected operations performed by Triple S, and that any negligence of ATOFINA did not change this result.  <u>Id.</u> at 667. Thus, there was coverage under the first provision.

The court also addressed coverage under a second provision that made ATOFINA an insured under the umbrella policy to the extent of coverage under the primary policy.  <u>Id.</u>  The court found

that where the underlying policy excluded coverage for ATOFINA's sole negligence, coverage under *the umbrella* insurance policy provision was excluded for losses caused by ATOFINA's sole negligence.  Id.  Therefore, the ATOFINA coverage issues did not revolve around the underlying *service* contract, but rather the interpretation of the language of the umbrella *insurance* policy and consideration of the underlying primary insurance policy.  Quite the opposite, the present case involves insurance policies that—BP does not dispute—at the least require reference to the underlying Drilling Contract to determine additional insured *status*.[9]

In spite of the factual dissimilarity between this case and ATOFINA, BP makes much of certain select quotations, characterizing them as "holdings" that directly bind this Court.  Contrary to BP's assertion, when looking at the context in which the court made these statements, they lose the effect BP wishes them to have.  In the court's introductory discussion of the case, the court stated:

> In its service contract with Triple S, ATOFINA disclaimed any right of indemnity for losses "attributable to [its] concurrent or sole negligence." Under the terms of the service contract, ATOFINA is not entitled to be indemnified by Triple S if the Jones loss was occasioned in any way by ATOFINA's negligence. *But ATOFINA does not seek indemnity from Triple S*; it claims instead that it is entitled to indemnification from Evanston by virtue of its status as an additional insured on the umbrella policy Evanston issued to Triple S. ***Instead of looking, as the court of appeals did, to the indemnity agreement in the service contract to determine the scope of any coverage, we base our decision on the terms of the umbrella insurance policy itself.***

ATOFINA, 256 S.W.3d at 663-64 (emphasis added).  The court certainly did make a distinction

---

[9] ATOFINA involved a number of other issues, none of which are relevant to the present case.  For example, the court decided, assuming ATOFINA qualified as an insured under both policy provisions, whether they were independent bases of coverage; and whether ATOFINA was prevented "from obtaining insurance proceeds for losses resulting from its own negligence."  Id. at 668-70 (quoted portion at 670).  The court actually did provide some discussion referring to the underlying service contract.  It found that where the service contract required Triple S to name ATOFINA in the policies as an additional insured, and where the insurance and indemnity provisions of the service contract were separate, the service contract did obligate Triple S to name ATOFINA as an additional insured even for ATOFINA's negligence.  Id. at 670.  Thus, BP's argument that ATOFINA entirely forbids reference to the BP-Transocean Drilling Contract must fail.

between indemnity and insurance, as BP asserts.  If ATOFINA was seeking indemnity from Triple S, it would most probably lose; its own negligence precluded it from receiving indemnity from Triple S.  Thus, the Texas Supreme Court pointed out that ATOFINA was *not seeking indemnity from Triple S under the service contract.  It was seeking "indemnity" from **the insurer** under the umbrella insurance policy.*  Therefore, the court was required to look at the terms of the insurance policy itself.

Indeed, the parties in this case do not and cannot dispute that the Insurance Policies likewise determine the scope of coverage.  But what BP misses is what the ATOFINA court did not state at this portion of the opinion, but which became clear in the court's ensuing discussion.  When the ATOFINA court proceeded to follow its own mandate of looking to the terms of the policy, it was face-to-face with a policy that made *absolutely no reference to the service contract in determining the scope of available insurance coverage, which is **diametrically** opposed to the Policies at issue in the present case*.  The Policies issued to Transocean all refer to an "Insured Contract" under which Transocean assumes the tort liability of another entity.  The policies issued to Triple S in ATOFINA did not incorporate, or even reference, the underlying service contract.  To be clear, the two "insured" provisions at issue in ATOFINA read as follows:

> A person or organization for whom you have agreed to provide insurance as is afforded by this policy; but that person or organization is an insured only with respect to operations performed by you or on your behalf, or facilities owned or used by you.
> * * *
> Any other person or organization who is insured under a policy of "underlying insurance." The coverage afforded such insureds under this policy will be no broader than the "underlying insurance" except for this policy's Limit of Insurance.

Id. at 664, 667.  The first quoted "insured" provision contemplated an additional insured for whom Triple S had agreed to provide insurance, but did not require reference to an underlying agreement

to determine the scope of insurance coverage.  The second quoted "insured" provision did not even acknowledge the need for an insurance obligation between Triple S and ATOFINA, but rather only referenced the *underlying insurance policy*, due to the "following form" nature of the umbrella policy at issue in <u>ATOFINA</u>.

Thus, in context, the court's statement clarified that the mere fact that ATOFINA would "lose" if it sought indemnity from Triple S did not mean it could not get insurance benefits from the insurer.  It is true that indemnity and insurance are two different things, involving contracts with different parties.  But contrary to BP's assertion, this statement is not an assertion that where, as in this case, the insurance policy references the underlying indemnity agreement, the court must ignore the indemnity agreement and—with tunnel vision—look solely at the insurance policy.  The court certainly "base[d its] decision on the terms of the umbrella insurance policy itself," but that was because said terms did not refer to the service contract.  The quoted portion of <u>ATOFINA</u> cannot lead to the result BP desires, for such a result would *ignore* the intent of the parties when they expressly refer to an underlying contract to determine the scope of additional insurance coverage.

Further, footnoted language in <u>ATOFINA</u> cited by BP supports the conclusion that reference can be made to the underlying Drilling Contract.  The <u>ATOFINA</u> court stated that "where an additional insured provision is separate from and additional to an indemnity provision, the scope of the insurance requirement is not limited by the indemnity clause."  <u>Id.</u> at 664 n.5.  This quoted language actually shows the court's willingness to look at the underlying service contract—at both the indemnity provision and the provision that required Triple S to obtain "additional insured" coverage for ATOFINA's benefit.  The Court concludes that Texas law, as interpreted by <u>ATOFINA</u>, does not prevent reference to the underlying Drilling Contract to determine the scope

20

of additional insurance coverage in this case.

### 2. __Aubris__ Does Not Apply

BP asserts that __Aubris__ adopted the rule of __ATOFINA__ that where an insurance provision is separate from and additional to an indemnity provision, the indemnity provision does not limit the additional insured obligation of the contractor, and therefore does not limit the scope of additional insured coverage under the insurance policy.  BP argues that __Aubris__ is exactly on point and mandates that in this case the Court not look to the indemnity provisions of the Drilling Contract in determining the scope of coverage.

The __Aubris__ court indeed recognized that in many respects __ATOFINA__ was factually almost indistinguishable from __Aubris__.  __Aubris__, 566 F.3d at 488.  J&R Valley Oil Services ("J&R"), a contractor, agreed via a "services agreement" with oilfield owner United Oil and Minerals ("United") to service United's oilfield properties.  __Id.__ at 485.  The services agreement required J&R to name United as an additional insured in an insurance policy and contained an indemnity provision whereby United agreed to indemnify J&R for claims arising from United's negligence.  __Id.__  An explosion at one of the oilfield properties killed one J&R employee and injured another, leading to lawsuits against United and J&R, for which United sought additional insured coverage.  __Id.__[10]  The insurer denied coverage.

The insurance policy provided additional insured coverage where specifically required in a written agreement.  __Id.__  That written agreement was the "services contract," whose insurance provision mandated J&R to name United as an additional insured "except with respect 'to any obligations for which UNITED has specifically agreed to indemnify' J&R Valley."  __Id.__ at 485-86.

---

[10]  The specific issue was whether the insurer had a duty to defend United in the lawsuits arising from the explosion.  __Id.__

As previously stated, the services agreement's general indemnity provision stated that United would indemnify J&R for claims arising from United's own negligence.  Id.  Thus, a lynchpin issue was whether the court should read the indemnity and insurance provisions of the services agreement together.

The insurer argued that the indemnity and insurance provisions should be read in conjunction to deny coverage.  Via the general indemnity provision, United had agreed to indemnify J&R for this specific act of negligence.  In turn, the insurance provision did not require coverage as to this negligence:  such negligence fell within the exception clause in the insurance provision.  However, the Aubris court reached the opposite result.  Importantly, the Fifth Circuit did not only look to the insurance policy.  Rather, it considered "the relationship between and among the policy, the additional insured provision in the services agreement, and the indemnity provision in the services agreement."  Id. at 487.  Finding ATOFINA "instructive" and "in many respects . . . indistinguishable," id. at 488, the Fifth Circuit took from ATOFINA that:

> [I]n determining whether there is coverage, a court looks only to the additional insured provision itself; that indemnity is a separate, and later arising, question from coverage. . . . The separate indemnity provision is not applied to limit the scope of coverage. Indeed, on this point the Texas Supreme Court could not have been clearer:
>
>> We have noted that where an additional insured provision is separate from and additional to an indemnity provision, the scope of the insurance requirement is not limited by the indemnity clause.
>
> Here, United is not seeking indemnity from J&R Valley. It instead seeks to enforce St. Paul's duty to defend it on the basis that it is J&R Valley's additional insured. As in [ATOFINA], we have an additional insured provision that is separate from, and additional to, an indemnity provision. As [ATOFINA] makes clear, the scope of additional insured coverage here is not limited by the separate general indemnity provision . . . .

Id. at 488-89 (internal citations omitted).

The Fifth Circuit went on to hold that coverage was available because the services agreement's additional insured provision was separate from and additional to the indemnity provision. The language of that insurance provision, though, was striking. It provided that coverage would not apply "with respect to any obligations for which UNITED has *specifically agreed* to indemnify [J&R]." Id. at 487 (emphasis added). The court adopted United's reasonable interpretation of this language: a *general indemnity* provision was *not enough* to constitute a *specific agreement* of indemnity that would exclude J&R's additional insurance obligation. Rather, in order for United to "specifically agree" to indemnify J&R Valley, and thus exclude additional insurance coverage, a "separately considered and extra-contractual decision" was required. Id. at 490. Namely, to exclude coverage, United and J&R would have had to execute a *separate contract from the services agreement* whereby United specifically agreed to indemnify J&R in connection with the *specific litigation* related to the oilfield explosion. Id. On this point, Aubris is factually distinguishable from the present case. The Drilling Contract's insurance provision as expressed in Exhibit C requires additional insurance coverage for certain "liabilities assumed . . . *under the terms of this Contract*." Rec. Doc. 3211-6, at 17 (emphasis added). Thus, while in Aubris the services contract insurance provision referred to extra-contractual indemnities, the present Drilling Contract insurance provision refers internally to the Drilling Contract itself. By extension, while the Aubris contract required reference to extra-contractual indemnities, the Drilling Contract permits reference to intra-contractual indemnities.

The Court finds that the rule in Aubris is not a blanket rule that a court may never look at an indemnity provision to determine the scope of additional insured coverage, and that the application of the Aubris reasoning actually suggests that the Court in this case *should* look to the indemnity

23

provisions.  First, the Court is not persuaded by BP's "policies only" approach.  The Aubris court clearly looked to the underlying services contract.  Second, as just noted, Aubris held that the court should look to the insurance provision.  Thus, the Court in this case looks to Exhibit C of the Drilling Contract.  Third, Aubris did not hold that an indemnity provision never determines the scope of additional insured coverage, but held (based on a footnote in ATOFINA) that where the insurance provision is "separate from, and additional to, an indemnity provision," the "separate general indemnity provision" does not limit the scope of coverage.  Id. at 489.  Fourth, application of the Aubris rule does not mandate a non-indemnity analysis of the scope-of-coverage issue.  The Drilling Contract insurance provision imposes the additional insurance obligation for liabilities assumed by Transocean under the terms of the Drilling Contract.  This language is distinguishable from the Aubris language on two grounds.  First, the Aubris services agreement's insurance provision was general, with an exception for a specific indemnity agreement.  In contrast, the Drilling Contract insurance provision is narrow, only addressing "liabilities assumed by [Transocean] under the terms of [the Drilling Contract]."  Rec. Doc. 3211-6, at 17.  Second, and vitally important, the Aubris insurance provision was separate from and additional to the general indemnity agreement.[11]  For this reason alone, the Aubris indemnity provision was irrelevant to the scope-of-coverage question.

Thus factually distinguished, the only remaining effect Aubris could have on this case would be to prevent consideration of the Drilling Contract indemnity provisions, if the insurance provision is separate from and additional to them.  The Court holds that it is not.  Exhibit C states that BP is

---

[11]  The Court notes that the Aubris court seems to have made much of the fact that this was a "general" indemnity agreement, id. at 485, 489, in contrast to the present Drilling Contract with its specific allocations of risks between Transocean and BP.

24

to be named as an additional insured "for liabilities assumed by [Transocean] under the terms of this Contract." Rec. Doc. 3211-6, at 17.  Thus, the insurance provision, in stating the scope of additional insured coverage, incorporates, without limitation, the "terms of this Contract"—which is the Drilling Contract.  The terms of the Drilling Contract determine which liabilities Transocean has assumed, and accordingly, the liabilities for which BP must be named as an additional insured.  The terms of the Drilling Contract certainly include the indemnity provisions of the contract.  The "terms of this Contract" is broad language that in no way excludes the indemnity provisions from consideration.  Therefore, whatever the scope of Aubris's "indemnity-provisions-do-not-affect-additional-insured-coverage" rule, that rule does not apply here.[12]

## B.  Threshold Issues—Interpretative Canons and Applicable Contractual Provisions

The Court proceeds to the Policies themselves to determine the scope of available coverage, and therefore whether BP is entitled under Rule 12(c) to the judicial declarations it seeks.  The parties agree that due to the Insurance Policies' Texas choice-of-law provision, Texas law applies. Under Texas law, insurance policies are construed according to ordinary contract principles, and interpretation of insurance policies is a question of law.  New York Life Ins. Co. v. Travelers Ins. Co., 92 F.3d 336, 338 (5th Cir. 1996).  The primary goal of contractual interpretation is to give effect to the written expression of the parties' intent, which requires the Court to read all parts of the contract together and to strive "to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative."  Balandran v. Safeco Ins. Co. of Amer., 972 S.W.2d 738, 741

---

[12]  The Court notes BP's argument that Aubris holds that the "status"-of-coverage question is determined by the insurance provision of an underlying agreement, and that ATOFINA and Aubris both hold that the "scope" question is determined solely by reference to the insurance policies themselves.  See Rec. Doc. 3934, at 16.  Based on the Court's previous discussion, these two cases do not lead to the result BP seeks.  Additionally, the Court finds no bifurcation into "scope" and "status" questions that are separately addressed in the holdings and rationales of these two cases.

(Tex. 1998).

Under Texas law, additional rules of interpretation apply where an insurance policy contains an ambiguous term or clause.  See Gomez v. Hartford Co. of the Midwest, 803 S.W.2d 438, 441-42 (Tex. App.–El Paso 1991) ("Before resorting to rules of construction, the court must first determine whether an ambiguity does in fact exist. A contract is ambiguous if, after applying the rules of contract interpretation, a provision remains reasonably susceptible of two meanings.") (citations omitted).   The parties give much of their attention to debating (1) the extent of applicable presumptions of coverage and other interpretative canons, as well as (2) whether the Policies' Section II—under which BP seeks its judicial declarations—can even be invoked.  Thus, before turning to the language of the Policies, the Court addresses these issues.

### 1.  Interpretative Canons

As previously stated, where an ambiguity exists, the Court uses canons unique to the interpretation of insurance policies.  A policy is ambiguous only if it is susceptible of more than one reasonable interpretation, in which case the Court "must resolve the uncertainty by adopting the construction that most favors the insured."  Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co., Inc., 811 S.W.2d 552, 555 (Tex. 1991).   But this rule of "*contra proferentum*"—construction of an ambiguous policy term or provision in a way that most favors the insured—is stronger yet.  In fact, "[t]he court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." Id.

The Insurers and Transocean argue that the quoted statement of the *contra proferentum* rule

does not apply where the parties are of equal bargaining power—where the insured is a sophisticated entity that participates in drafting the insurance coverage.  See Vought Aircraft Indus., Inc. v. Falvey Cargo Underwriting, LTD., 729 F. Supp. 2d 814, 823 (N.D. Tex. 2010).  However, BP argues that there is no "sophisticated insured exception" under Texas law.  Thus, the parties dispute whether the above-quoted *contra proferentum* rule should apply in this case:  (1) whether a "sophisticated insured exception" exists under Texas law, and (2) if it does, whether there is sufficient evidence to trigger it.  If such an exception does exist under Texas law and if its application would affect the outcome, the Court would be required to determine whether the exception has been triggered.  The Court agrees with the Insurers and Transocean that there is insufficient evidence in the record regarding negotiation of the Insurance Policies to conclude whether or not the exception would even apply.

At this juncture, however, the Court need not address whether the exception exists under Texas law, or whether it would be triggered in this case.  Under the facts of this case, the exception would only be implicated if there was more than one reasonable interpretation advanced concerning a particular policy provision.  In other words, the analysis only comes to a halt if BP advances a reasonable interpretation, and thus could benefit from the *contra proferentum* rule.  Therefore, the Court proceeds to a discussion of the Policies on the assumption that, for the sake of argument *only*, the above-quoted *contra proferentum* rule could apply; and the Court will only address the purported sophisticated insured exception if BP advances a reasonable interpretation that conflicts with the Insurers' or Transocean's reasonable interpretation of a particular policy provision.

### 2.  Which Coverage Applies

Transocean and the Insurers argue that BP inappropriately brings its Rule 12(c) motion as

to Section II coverage.  They argue that the Policies establish a coverage priority scheme:  Section II coverage only exists when Section I coverage is not applicable.  They state that the "Insured Contract" definition upon which BP relies is applicable only to Section II coverage.  At the least, they argue, BP's motion is premature, and BP also has not demonstrated that Section II.B coverage applies to the instant facts.  They assert that Section II.B only provides coverage for "onshore liabilities," but the pollution liabilities at issue are offshore in nature.

At this juncture, the Court proceeds with its Rule 12(c) analysis on the assumption that there is no coverage priority scheme that forbids initial consideration of Section II.  Only if, after analyzing the provisions in Section II, the Court finds that coverage could be available will the Court address whether there is a priority scheme such that Section I must be considered.  And if such a priority scheme is then found, the Court will determine whether Section I coverage exists under the present facts.

## C.  Determination of Section II Coverage

BP has the initial burden of establishing coverage as an insured under the terms of the Insurance Policies.  See Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London, 327 S.W.3d 118, 124 (Tex. 2010).  Although, as previously noted, the parties have presented no binding jurisprudential requirement that this Court address separate "status" and "scope" coverage issues, the Court uses these categories as hermeneutic devices in determining whether BP carries its burden.

### 1.  "Status" of Coverage

The Court turns to the language of the Insurance Policies themselves, specifically Section II.  The parties do not dispute that the terms "Insured" and "Insured Contract" are determinative of additional insured coverage *vel non* under Section II.  The term "Insured" includes:

> (c) *any person or entity to whom the "Insured" is obliged by any oral or written "Insured Contract"* (including contracts which are in agreement but have not been formally concluded in writing) entered into before any relevant "Occurrence", *to provide insurance such as is afforded by this Policy . . . .*

Rec. Doc. 3211-7, at 89 (emphasis added). Therefore, whether and to what extent BP is an "Insured" depends on whether Transocean, as the named "Insured," has obligated itself to BP via an "Insured Contract" to provide insurance afforded by the Policies. "Insured Contract" is defined as:

> [A]ny written or oral *contract or agreement entered into by the "Insured"* (including contracts which are in agreement but have not been formally concluded in writing) *and pertaining to business under which the "Insured" assumes the tort liability of another party* to pay for "Bodily Injury", "Property Damage", "Personal Injury" or "Advertising Injury" to a "Third Party" or organization. Tort Liability means a liability that would be imposed by law in the absence of any contract or agreement.

Rec. Doc. 3211-7, at 90 (emphasis added). Thus, to determine whether there is an "Insured Contract," the Court must look to the Drilling Contract. The Court must determine whether it is a written agreement that Transocean, as the named "Insured," has entered into, pertaining to business under which Transocean has assumed the tort liability of another party—BP.

BP and Transocean have each assumed certain tort liabilities of the other under the Drilling Contract; thus, the contract is an "Insured Contract," at least for some purposes. Therefore, returning to the definition of "Insured," BP meets this definition if Transocean is obliged by the "Insured Contract" to provide the insurance afforded under the Policies. Thus, the Court must look to the insurance provision of the Drilling Contract to consider whether that provision obliges Transocean to obtain coverage for BP. The insurance provision of the Drilling Contract is Section 20.1, which provides that Transocean, as "CONTRACTOR," must maintain insurance covering contractual operations as set forth in Exhibit C. Rec. Doc. 3211-6, at 8. Exhibit C reads:

> *[BP]*, its subsidiaries and affiliated companies, co-owners, and joint venturers, if any, and their employees, officers and agents *shall be named as additional insureds in each of [Transocean's] policies, except Workers' Compensation for liabilities assumed by [Transocean] under the terms of this Contract.*

Rec. Doc. 3211-6, at 17 (emphasis added).  It immediately becomes clear that there are conceivable situations in which BP could qualify as an "Insured."  The insurance provision clearly states that BP "shall" be named as an additional insured in the relevant policies at least in some circumstances.  Therefore, Transocean is required under the "Insured Contract" to provide insurance coverage to BP, and BP has the "status" of an "Insured" for some purposes.  BP would have the Court stop here and grant its motion:  the Drilling Contract's insurance provision provides that BP is an "Insured" at least to some extent, so no further consideration of the Drilling Contract is permitted.  However, the Court has already rejected this view by rejecting BP's interpretations of <u>ATOFINA</u> and <u>Aubris</u>.  The question is whether the "scope" of BP's coverage requires further consideration.

### 2.  "Scope" of Coverage

#### a.  The Insurance Provision—Extent of Applicability

BP argues that under the Court's analysis thus far, BP qualifies as an "Insured," and thus that it is entitled to all coverage that the Policies provide.  A simple reading of the "Insured" provision may lead to this result.  That provision simply says that an entity is insured where named insured Transocean is obligated by an "Insured Contract" to provide insurance as is afforded under the Policies.  It does not say to what extent that "Insured" entity is entitled to coverage.  However, the "Insuring Agreements" provide that an "Insured" is covered for liability imposed by law or assumed by the "Insured" under an "Insured Contract."  Rec. Doc. 3211-7, at 19.  Thus, under one possible literal reading, BP as an "Insured" would be entitled to coverage for liability imposed by law—including any such liability regarding oil pollution from the Deepwater Horizon Incident.

30

However, there is a *potential* ambiguity created by another very plausible reading.  The Policies define "Insured" to require an "Insured Contract" that obligates Transocean to obtain insurance for that "Insured."  Thus, unless the Drilling Contract obligates Transocean to obtain insurance for BP under the Policies, BP cannot be an "Insured."  The Court has already acknowledged that the Drilling Contract's insurance provision clearly imposes at least some additional insurance requirement upon Transocean.  Because the purpose of the Policies' "Insured" definition is to allow Transocean in an "Insured Contract" to contractually set the parameters for its insurance obligation, arguably one should find BP to be an "Insured" only to the extent that there is an insurance obligation within the Drilling Contract.

The intent of the parties is the essence of contractual interpretation.  Balandran, 972 S.W.2d at 741.  A simple reading of the "Insured" definition may suggest limitless coverage.  However, considering the purpose of the Insurance Policies' definition of "Insured" to include an additional insured like BP only because Transocean has agreed to this within the Drilling Contract, the Policies also may be read to require consideration of the entire insurance provision in the Drilling Contract.  Indisputably, one must look to the insurance provision to determine whether *any* insurance obligation even exists.  It is highly plausible not only to read that insurance provision to determine that *in some instances* BP would have to be named, and therefore the "Insured" definition would be triggered, but also to read the entire insurance provision to determine the precise boundaries of the Drilling Contract's additional insurance obligation.

The mere fact that there is disagreement about the meaning of terms does not create an

ambiguity,[13] and there is only an ambiguity if more than one interpretation is reasonable.[14]   The Court finds that only the latter interpretation is reasonable.  One cannot definitely conclude that there is, in fact, an insurance obligation, making BP an "Insured," without looking at the Drilling Contract's insurance provision.  Therefore, it is unreasonable to adopt BP's interpretation, that there is unlimited-in-scope coverage just because *in the abstract* Transocean is obligated to name BP as an additional insured.  One must examine the Drilling Contract's insurance provision to determine whether BP is an "Insured," and thus it is unreasonable that BP's rights as an "Insured" could come about without the involvement of that entire provision.  See Balandran, 972 S.W.2d at 741 (stating that the court must read all parts of a contract together and give meaning to every sentence, clause, and word).  The Court holds that the scope of Transocean's insurance obligation in the Drilling Contract determines the scope of additional insurance coverage available to BP under Section II of the Policies.

Although the Court must interpret the exact language of the Policies at issue rather than merely point to policy language in other cases, the Court notes that its finding is supported by judicial decisions regarding similar policy language in other cases.  Specifically, the Court finds that because the Policies at issue state that BP is an "Insured" where Transocean is obliged by the Drilling Contract to provide insurance, the Court must read the entire insurance provision in the Drilling Contract to determine the scope of coverage.  The Fifth Circuit did the same thing in Aubris.

---

[13] Quinn, Michael Sean and L. Kimberly Steele, Insurance Coverage Opinions, 36 S. TEX. L. REV. 479, 499 (1995); County of Maverick v. Tex. Ass'n of Counties Workers' Comp. Self-Ins. Fund, 852 S.W.2d 700, 705 (Tex.App.–San Antonio 1993) ("Mere disagreement over the meaning of a provision in the contract does not, however, make it ambiguous."); cf. Quinn, *supra*, at 499 ("[M]ere complexity, and the accompanying need for skull-work, does not imply the presence of ambiguity.").

[14] See Fiess v. State Farm Lloyds, 202 S.W.3d 744, 746 (Tex. 2006) ("If a policy provision has only one reasonable interpretation, it is unambiguous and we must construe it as a matter of law.").

There, the insurance policy defined an additional insured as a person with whom the named insured had agreed in a written contract for insurance to add said person as an additional protected person under the policy, and only if that written contract specifically required such coverage.  Aubris, 566 F.3d at 487.  The court then turned to the underlying insurance provision in the services agreement to "ask whether it requires coverage in the underlying Garza litigation."  Id.  In other words, the court looked to the insurance provision to determine whether it required coverage for the specific risk encountered.[15]  This Court now does the same in looking to the Drilling Contract's insurance provision to determine whether it requires coverage as to the pollution risks for which BP seeks additional insured coverage.

Similar results have obtained in other cases.  In Certain Underwriters at Lloyd's London v. Oryx Energy Co., 142 F.3d 255, 258 (5th Cir. 1998), the policy provided, "It is understood and agreed that any ... corporation ... and/or entity for whom or with the Assured may be operating is hereby named as additional assured when required."  The Fifth Circuit turned to the underlying contract to determine the insurance obligation therein.  Id.  In Becker v. Tidewater, Inc., 586 F.3d 358, 370 (5th Cir. 2009), the policy defined as an "Assured" a person to whom the "Named Assured" was obligated by a contract to name said person as an assured or additional assured under the policy.  The Fifth Circuit stated that to determine such "additional assured" status, the court was required to look at the insurance and indemnity provisions of the underlying time-charter contract. Id.  The court then turned to the limiting language of the insurance provision to determine the scope

---

[15]  Admittedly, the Aubris insurance policy was more express than the present Policies in requiring consideration of whether the service contract "specifically requires" coverage.  566 F.3d at 487.  Still, Aubris demonstrates that in appropriate cases—like the present one—the Court may look to a service contract's insurance provision to determine whether it requires insurance coverage as to specific liabilities.

of coverage.  Id. at 371.[16]  Therefore, the Court finds that no case put forward by BP demonstrates that under Texas law, the "scope"-of-coverage inquiry is determined solely by reference to an insurance policy.  Rather, the cited cases show that where the policy refers to the insurance provision in an underlying service-type contract, reference to that insurance provision is appropriate to determine the scope of coverage.  The Court now turns to the Drilling Contract's insurance provision to determine the scope of available Section II coverage for BP.

### b. The Insurance Provision—Interpretation

For the sake of clarity, and due to its importance, the Court quotes again the relevant insurance obligation of Transocean within Exhibit C of the Drilling Contract:

> [(A)] [BP], its subsidiaries and affiliated companies, co-owners, and joint venturers, if any, and their employees, officers and agents shall be named as additional insureds in each of [Transocean's] policies, [(B)] except Workers' Compensation for liabilities assumed by [Transocean] under the terms of this Contract.

Rec. Doc. 3211-6, at 17.  The Court divides this provision into the noted Parts "(A)" and "(B)."  The meaning of Part A is undisputed.  It imposes an obligation on Transocean to name BP as an additional insured in each of the relevant policies.  If Part A constituted the entirety of the insurance provision, the additional insured obligation would be, without limitation, simply to name BP as an

---

[16]  In fact, in this one respect, the similarity of this case to Becker is striking.  The policy literally only required the named assured to be obligated by an insurance provision in an underlying agreement to name an entity as an additional assured.  The policy did not expressly state that insurance coverage was limited "to the extent of" the insurance provision in the time charter.  Id. at 370.  Still, the court found that the insurance policy limited additional assured status to when the named assured was obligated by the time charter insurance provision to designate the party seeking coverage as an additional assured.  Id. at 371.  Further, although the court used the word "status," the court addressed a coverage question as to particular risks—what BP calls the "scope"-of-coverage inquiry.  Id. at 370 (addressing the district court's holding "that because Baker was *only an 'additional assured'* under the policies *for risks assumed by Tidewater*, there was *no coverage for Seth's injuries* because *those risks* were assumed by Baker pursuant to the indemnity agreement.") (emphasis added).  The Court also notes BP's argument that Becker applied Louisiana and maritime law, not Texas law.  Rec. Doc. 3934, at 12-13.  However, in light of the Court's previous discussion rejecting BP's notion of a unique Texas rule under ATOFINA of "policies-only" coverage interpretation, there is no showing that the Becker court's contractual interpretative method may not be persuasive reasoning before this Court.

34

additional insured.  However, Part B modifies this additional insurance obligation.  BP reads Part B as a very narrow *exception to* the general insurance obligation, and argues that said exception does not apply in this case.  Transocean and the Insurers read Part B as a *limitation upon* what would otherwise be a very general insurance obligation, and argue that said limitation eliminates the additional insurance obligation as to the oil pollution risks at issue.

BP reads Part B as an exception clause:  the insurance obligation does not extend to "Workers' Compensation for liabilities assumed by [Transocean] under the terms of this Contract." The Insurers read Part B as if a comma is present after "except Workers' Compensation." Specifically, they read the provision as stating that the insurance obligation exists, "except Workers' Compensation," *only* for "liabilities assumed by [Transocean] under the terms of this Contract." Under such a reading, the general insurance obligation only extends to those liabilities Transocean assumes under the Drilling Contract, with some sort of "workers' compensation" exception.  Thus, the interpretative dispute revolves around the "so-called *missing comma issue*."[17]

In order for the Court to side with one interpretation, that interpretation has to at least be reasonable.  See Balandran, 972 S.W.2d at 741 (stating that the court adopts a construction urged by the insured as long as it is not unreasonable).  It is unclear how BP's proposed reading would make much sense.  It would apparently mean that there is no insurance obligation for workers' compensation liabilities assumed by Transocean under the Drilling Contract.  Or perhaps, as BP argues, it would mean that "'Workers' Compensation' is the only type of coverage carved out" of the insurance obligation, Rec. Doc. 3934, at 32, thus rendering the "liabilities assumed" portion of Part B superfluous.  See Rec. Doc. 4069, at 21-22 (BP arguing, "You could put a period" after

---

[17] See Rec. Doc. 4069, at 20, line 4 (transcript of oral argument on the instant motion).

"Workers' Compensation").  The Court will not accept BP's interpretation that would render the "liabilities assumed" language superfluous, because the Court is required under Texas law to strive "to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative." Balandran, 972 S.W.2d at 741.

Because the Court rejects BP's suggestion that the "liabilities assumed" portion of Part B is superfluous, it is left with BP's other suggested interpretation that Transocean is not required to name BP as an additional insured under its workers' compensation policies, at least for those liabilities assumed by Transocean under the contract.  This interpretation has the potential to create an ambiguity; therefore, the contract may be read in the light of the surrounding circumstances when the contract was made, to clarify whether an ambiguity exists.  Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995).  While a patent ambiguity is evident on the face of a contract, a latent ambiguity "arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter."  Id.

BP's interpretation of Part B cannot create an ambiguity if it is not reasonable.  As noted, BP argues that Part B is meant to except from the coverage obligation workers' compensation liabilities that are assumed by Transocean.  If such were the case, then for any liability not fitting within that exception, the obligation to obtain additional insured coverage for BP would exist. Workers' compensation liabilities *assumed by BP* would *not* fit within that exception clause.  And therefore, "Transocean would be required to name BP as additional insured on Transocean's worker's compensation policy for liabilities assumed by BP."  Rec. Doc. 4017-2, at 9 (emphasis removed).  The question, then, is whether an interpretation leading to this result is reasonable.

36

Transocean provides an instructive example in arguing that this interpretation does not make sense.  See id.  If a BP employee were to sustain bodily injury and bring a workers' compensation claim against BP, to the extent BP assumed workers' compensation liability, BP could make a claim as an additional insured under Transocean's workers' compensation policy.[18]  Such a result seems odd at best.  It would imply that (1) Part A adopted a general rule requiring unlimited additional insured coverage for BP, and (2) Part B created a small exception for liabilities related to injuries to Transocean's own employees; but (3) Part B retained the general rule of coverage for BP as to liabilities related to injuries to BP's own employees.  BP offers no explanation as to why the parties would have bargained for a narrow carve-out for Transocean's workers' compensation liabilities—for which BP would not even need additional insured protection due to the fact that Section 21.1 allocates such liabilities to Transocean, not BP.[19]  The Court finds that BP's interpretation is unreasonable.

The question, then, is whether the Insurers' proposed interpretation is reasonable.  BP argues that the Insurers' interpretation of Part B runs counter to the language's plain meaning.  For the insurance obligation to run only to liabilities assumed by Transocean, a comma after "except Workers' Compensation" would be needed.  However, under Texas law, "[w]hile punctuation may be resorted to in order to solve an ambiguity which it has not created, punctuation or the absence of punctuation will not of itself create ambiguity."  Anderson & Kerr Drilling Co. v. Bruhlmeyer, 136

---

[18]  In fact, it appears that BP did assume workers' compensation liability for injuries to its own employees.  See Rec. Doc. 3211-6, at 8, Article 21.2 to the Drilling Contract (providing that BP shall indemnify and hold harmless Transocean from and against all claims asserted by BP's employees for personal injury arising out of or related to the work performed under the Drilling Contract).

[19]  Transocean also argues that "the insurance industry does not recognize additional insured coverage in workers' compensation policies," Rec. Doc. 4017-2, at 9, but there is insufficient evidence in the record for the Court to base its decision on this assertion.

S.W.2d 800, 803 (Tex. 1940).  Further, a court may insert a comma "to ascertain from the words used the intention of the parties."  Id. at 804.  The mere absence of a comma does not create an ambiguity; and its absence, to provide the reading(s) suggested by BP, would lead to an unreasonable interpretation.

The Court reads Part B as containing an exception for workers' compensation, with an implicit comma to the extent necessary to set off "Workers' Compensation" as its own exception. The Court finds that this creates a reasonable interpretation and comports with the intent of the parties evidenced in the Drilling Contract's entirety.  It is reasonable because BP and Transocean have made specific, "blow-by-blow" allocations of liabilities between themselves and cannot lightly be presumed to have undone that by writing in an insurance provision that would require BP to be an additional insured as to the lion's share of liabilities assumed by BP.  See Rec. Doc. 3211-6, at 8-12 (allocating responsibilities for personal injury or death; loss of or damage to the drilling unit, general equipment, and hole-equipment; damage during the mobilization period; loss or damage to the hole or reservoir; underground damage; and pollution damage).

The only reasonable interpretation of Drilling Contract Exhibit C, Parts "A" and "B," is that the insurance obligation is for *Transocean to name BP as an additional insured in all policies except workers' compensation policies for those liabilities that Transocean assumed under the Drilling Contract*.  Even so, BP would have the Court find that this is only the "floor" of the coverage obligation, rather than the ceiling.  This cannot be correct.  The Court has already found that the Insurance Policies refer to the insurance provision of the Drilling Contract to determine the scope of coverage.  The Policies do not refer to the insurance provision merely to determine a *minimum* of coverage; the insurance provision determines *coverage*—the full universe thereof.  *Expressio*

38

*unius est exclusio alterius*; the inclusion of liabilities assumed by Transocean excludes from the additional insurance obligation those liabilities assumed by BP.[20]  The insurance provision imposes an additional insurance obligation as to liabilities assumed by Transocean under the Drilling Contract, nothing more and nothing less.

In light of the foregoing, the Court holds that under Section II of the Policies, BP is an additional insured only for liabilities assumed by Transocean under the terms of the Drilling Contract.  Thus, the Court must look to the terms of the Drilling Contract to determine the scope of coverage.  The Court finds that the only reasonable interpretation is that the phrase "the terms of this Contract" refers to the Drilling Contract's indemnity provisions—the only provisions that establish which liabilities Transocean has assumed.  Unlike in <u>Aubris</u> where the word "specifically" required reference to an extra-contractual indemnity, there is no such limiting language in the Drilling Contract.  The contract does *not* say that the insurance obligation is limited to the scope of liabilities assumed by Transocean *pursuant to* the terms of the contract, but rather "***under*** the terms of this Contract."  Rec. Doc. 3211-6, at 17.  The only reasonable interpretation is that the insurance provision refers to risks assumed within Drilling Contract indemnity provisions.[21]  As a result, the Court turns to the indemnity provisions to determine whether the Deepwater Horizon Incident oil pollution risks were allocated to Transocean under the Drilling Contract, such that BP is entitled to

---

[20] <u>See</u> <u>CKB & Assoc., Inc. v. Moore McCormack Petroleum, Inc.</u>, 734 S.W.2d 653, 655 (Tex. 1987) (finding that the *expressio unius* maxim applied in determining which causes of action were settled in a compromise agreement); <u>St. Paul Mercury Ins. Co. v. Lexington Ins. Co.</u>, 78 F.3d 202, 206 (5th Cir. 1996) (stating that the maxim means that "the enumeration of one or more of the elements of a class 'implies [the] exclusion of all not expressed, even though all would have been implied had none been expressed.'") (some internal quotations and footnote omitted).

[21] To the extent there is an ambiguity, it does not matter.  Namely, one could argue that "under" the terms of the contract might mean "in accordance with," thus allowing, for example, BP to point to some extra-Drilling Contract agreement whereby Transocean assumed oil spill risks.  However, BP points to no such side agreement and no provision in the Drilling Contract permitting such a side-agreement allocation of risks.

Section II additional insured coverage for those risks.

### c.  The "Terms of this Contract"—Indemnity Provisions

Article 24 of the Drilling Contract allocates responsibility for pollution risks between the

"Contractor" (Transocean) and the "Company" (BP):

> 24.1  Contractor Responsibility
> [Transocean] shall assume full responsibility for and shall protect, release, defend, indemnify, and hold [BP] and its joint owners harmless from and against any loss, damage, expense, claim, fine, penalty, demand, or liability *for pollution or contamination*, including control and removal thereof, *originating on or above the surface of the land or water,* from spills, leaks, or discharges of fuels . . . or any other liquid or solid whatsoever in possession and control of [Transocean] and without regard to negligence of any party or parties . . . .
> * * *
> 24.2  Company Responsibility
> [BP] shall assume full responsibility for and shall protect, release, defend, indemnify, and hold [Transocean] harmless from and against any loss, damage, expense, claim, fine, penalty, demand, or liability for pollution or contamination, including control and removal thereof, arising out of or connected with operations under this contract hereunder *and not assumed by [Transocean] in Article 24.1 above*, without regard for negligence of any party or parties . . . .

Rec. Doc. 3211-6, at 11-12.  The Insurers in the Insurance Actions only seek a declaration of no

additional insured coverage for BP as to "pollution claims against BP for oil emanating from BP's

well."[22]  Likewise, BP has brought its Rule 12(c) motion concerning BP's pollution liabilities

respecting oil emanating from the Macondo well.  Rec. Doc. 3211, at 2.  Thus, the only issue is

whether BP has additional insured coverage as to pollution liabilities pertaining to subsurface oil

releases from the Macondo well.

The Court finds that BP, under the Drilling Contract, assumed responsibility for Macondo

well oil release pollution liabilities.  BP's assumption of pollution responsibility is found in Article

---

[22]  Civil Action No. 11-274, Rec. Doc. 1-1, at 2, ¶ 5; No. 11-275, Rec. Doc. 1-1, at 2, ¶ 5.

24.2, in which BP assumes pollution liabilities not assumed by Transocean in Article 24.1.  Article 24.1 allocates to Transocean liabilities for pollution originating on or above the surface of the water. The Deepwater Horizon Incident entailed a subsurface release; thus, Transocean did not assume pollution liabilities arising from the Incident.  Further, because Transocean did not assume these liabilities under Article 24.1 of the Drilling Contract, BP assumed them under Article 24.2's catch-all provision:  responsibility for pollution arising out of or connected with operations under the contract and not assumed by Transocean in Article 24.1.  Because Transocean did not assume these liabilities, there is no additional insurance obligation in favor of BP for these liabilities.

The Court notes that reference to the foregoing indemnity provisions to determine the scope of insurance coverage upholds the reasonable expectations of the parties.  As already stated, BP would have the Court look to the Drilling Contract to find that it is an "Insured Contract," but stop there.  Stopping there would ignore the allocation of risks under the "Insured Contract," which is the Drilling Contract.  As Transocean convincingly argues, it is absurd that (1) in the Drilling Contract, BP would assume liability for subsurface oil releases; but then (2) in that same contract, oblige Transocean to name it as an additional insured providing coverage as to liability that BP assumed.  BP does not disagree that *some* reference *must* be made to the Drilling Contract to answer the question of additional insured coverage, because the *Policies do not mention BP*—only "Insured Contract[s]."

Insurers have to know what risks they are insuring to be able to appropriately calculate the premiums they must collect.  Thus, Ranger and the Excess Insurers would not reasonably have agreed to permit Transocean to name additional insureds as to *any* conceivable risk.  At the same time, insurance is a contract between the parties:  the Insurers and Transocean.  But where that

41

contract of insurance requires reference to the underlying Drilling Contract—its insurance provision, which in turn references underlying indemnities—it is within the intent of the Insurers and Transocean that those indemnities shape the extent of additional insured coverage.  At least, that is the parties' intent given the language of the *policies at issue*—which is the language that matters.[23]

## CONCLUSION

Because Transocean did not assume the oil pollution risks pertaining to the Deepwater Horizon Incident—BP did—Transocean was not required to name BP as an additional insured as to those risks.  Because there is no insurance obligation as to those risks, BP is not an "Insured" (or "additional insured") for those risks.  Therefore, BP is not entitled to the declarations of coverage it seeks under Section II of the Policies.  BP's motion for judgment on the pleadings must be denied.

For the foregoing reasons, **IT IS ORDERED** that BP's Motion for Judgment on the Pleadings in the Insurance Actions (Rec. Doc. 3211) be and is hereby **DENIED**.

**IT IS FURTHER ORDERED** that Transocean's Motion to Convert BP's Motion for Judgment on the Pleadings to a Motion for Summary Judgment (Rec. Doc. 3706) is **MOOT.**

New Orleans, Louisiana, this 15th day of November, 2011.

UNITED STATES DISTRICT JUDGE

---

[23] Regarding industry custom as bearing upon the parties' intent, the Excess Insurers argue:

> The restricted coverage contemplated by the Drilling Contract and incorporated in the Excess Policies is common practice in the energy industry when securing insurance coverage.  Discovery will confirm that it is uncommon or non-existent in the drilling industry for a well operator like BP to expect or require a drilling contractor, such as Transocean, to bear the well operator's liabilities through unrestricted access to the drilling contractor's insurance coverage.

Rec. Doc. 3705, at 25-26.  The Court need not opine on whether this description of the oil and gas industry is accurate but notes that if true, this would only support the result reached by the Court.