# EXHIBIT G

 **CSI Technologies**

# In the United States Court for the Eastern District of Louisiana

## Oil Spill by the Oil Rig MDL No. 2179 Deepwater Horizon in the Gulf of Mexico on April 20, 2010

**Prepared on behalf of BP on October 17, 2011**

**"Evaluation of the Cementing on the 9 7/8" x 7" Production Casing String on the Macondo Well"**

Expert Report by:

Fred Sabins
*CSI Technologies*
President
Office Direct: 281-784-7902
Cellular:  713-725-3078
Email: fsabins@csi-tech.net

**CONFIDENTIAL**

In the United States Court for the Eastern District of Louisiana

Oil Spill by the Oil Rig MDL No. 2179

Deepwater Horizon in the Gulf of Mexico on April 20, 2010

Evaluation of the Cementing on the 9 7/8" x 7" Production Casing String on the Macondo Well

Expert Report of Fred Sabins

On Behalf of BP

Contains information designated Confidential under the Protective Order

1

TABLE OF CONTENTS

# Contents

1   Introduction ........................................................................................................................ 5

2   Background and Credentials ............................................................................................... 6

   Education, Professional Affiliations, Certifications and Licenses.......................................... 6

   Private Sector Work Experience ......................................................................................... 7

   Public Sector Projects ........................................................................................................ 8

   Awards ............................................................................................................................... 8

   Articles and Publications .................................................................................................... 9

   Court Experience................................................................................................................ 9

3   Executive Summary........................................................................................................... 10

4   Discussion of Analysis, Results and Conclusions .............................................................. 13

   4.1   Halliburton's Foam Cement Slurry Utilized Improper Additives That Caused the Slurry to Be Unstable .................................................................................................................... 14

      4.1.1   Basic Requirements of Slurry Design..................................................................... 16

      4.1.2   Halliburton Slurry Design Defects.......................................................................... 17

      4.1.3   D-Air 3000............................................................................................................. 18

      4.1.4   SCR-100L Retarder................................................................................................ 21

      4.1.5   Effects of Halliburton Slurry Design Defects.......................................................... 23

   4.2   Halliburton Knew or Should Have Known of the Foam Slurry Instability and Should Have Communicated That Information to BP ..................................................................... 25

      4.2.1   Halliburton Testing Before the Job Indicated the Instability of the Foam Cement Slurry................ 25

      4.2.2   Halliburton Should Have Communicated to BP That There Were Serious Concerns about the Stability of the Foam Cement ................................................................................ 30

   4.3   Available Data and Halliburton Communications Indicate that Halliburton Recommended the Job Go Forward and Reported that the Job was Executed Successfully................................ 33

      4.3.1   Halliburton Recommends that BP Go Forward with the Cement Job ................................. 34

      4.3.2   Halliburton Executes the Cement Job and Reports that the Job Went Well...................... 36

      4.3.3   Even After the Explosion, Halliburton Reported to BP and Internally that the Cement Job Had Gone Well ........................................................................................................... 40

      4.3.4   Failure of the Cement to Isolate the Hydrocarbons Was a Result of the Design of the Slurry Not the Placement of it........................................................................................ 41

4.3.5     Analysis of the Available Data Indicates that the Spacer Cleaned the Hole and Cement Was Placed in the Annulus ........................................................................................................42

4.3.6     The Foam Cement Slurry Design Resulted in a Failure of the Cement Once Placed in the Well .......43

4.4     Additional Critical Considerations When Utilizing Foam Cement Applications ........................... 46

    4.4.1     Foam Cement Volume Variation with Pressure ........................................................46

    4.4.2     The Importance of Foam Cement Rheology ...........................................................47

    4.4.3     Free Fluid and Fluid Loss Testing ......................................................................48

    4.4.4     Application of Foam Cement in SOBM Environments is Common in the Industry ..........................49

    4.4.5     Halliburton's Use of SA 541 Anti-Settling Additive ....................................................49

    4.4.6     Halliburton's Use of Well Life 734 ....................................................................50

    4.4.7     Halliburton's Use of KCL ...............................................................................51

4.5     Post-Incident Analysis by Other Parties Confirm the Problems with the Slurry Designed by Halliburton. ...........................................................................................................52

    4.5.1     Chevron Testing Verifying Slurry Defects ...............................................................53

    4.5.2     OTC Testing Verifying Slurry Defects ...................................................................55

    4.5.3     Other Experts Also Conclude that the Foam Cement Was Not Stable ...................................57

4.6     Temperature Modeling by Halliburton ................................................................... 59

4.7     Opticem Results ........................................................................................ 62

    4.7.1     Opticem runs with Halliburton Internal Program Matching April 18 Runs ...........................63

    4.7.2     OptiCem Runs with Internal Halliburton Program and Files with Modified Inputs ...................65

    4.7.3     Gas Flow Potential Changes with Modified Inputs .......................................................68

4.8     Long String vs. Liner .................................................................................... 68

4.9     Bottoms Up Circulation for Hole Conditioning ............................................................ 70

4.10     Centralization ......................................................................................... 71

4.11     Volume of Cement .................................................................................... 74

4.12     Gas Flow Potential .................................................................................... 74

4.13     Lift Pressure .......................................................................................... 77

4.14     Conducting CBL ....................................................................................... 78

4.15     Losses During Placement ............................................................................. 81

4.16     Float Collar Conversion ............................................................................... 81

4.17     Wait on Cement (WOC) Time .......................................................................... 84

    4.17.1     Temperature and Pressure Effects on WOC Time ......................................................85

    4.17.2     Implication of WOC Time Analysis ...................................................................86

4.18    Swapping of Drilling Fluid in the Rat Hole and Cement in the Shoe Tract After Placement ...... 87

Employment History.............................................................................................................................99

Professional Affiliations and Accomplishments ................................................................................100

Publications and Patents....................................................................................................................101

Education...........................................................................................................................................101

# 1   Introduction

The objective of this work is to analyze the design and execution of cementing operations for the production interval of the Macondo well. This analysis includes all aspects of Halliburton's cement composition design, laboratory testing of the slurry, modeling of cement job and well parameters to ensure successful cement placement, placement of cement, and Halliburton's interactions with BP and other service providers to coordinate all aspects of the application.

Cementing the production interval of a deepwater well in the Gulf of Mexico is a complex operation that requires coordination and team work between the operator and its contractors. Casing is placed into a well across from the hydrocarbon-bearing zones that later will be produced. This casing is "cemented" into place by displacing a cement slurry down through the casing and up the annulus and then allowing it to set. This set cement is intended to protect the pipe, to prevent short-term fluid flow, and to provide long-term zone isolation in the annulus.

In order to accomplish this operation, the operator and service providers must work closely to ensure success. Numerous factors associated with deepwater drilling introduce significant variations into the drilling and completion of wells such as Macondo. These variations guarantee that each deepwater production casing cementing operation will be unique. The cementing service contractor must design the cement composition to satisfy the cement's intended functions for each particular well.

In analyzing production casing cementing operations performed on the Macondo well, it is imperative to differentiate between the short-term and long-term functions required of the cement seal. In the short-term, the cement in the annulus must provide a seal which acts as a well control barrier and prevents uncontrolled flow of formation fluids into and up the well bore. Long-term seal effectiveness of the cement, on the other hand, is a production aid to control permeable zones and optimize recovery of the hydrocarbons during the completion operations.

5

Review of the events concerning the cement design and operation for the Macondo production interval indicates that failure of the cement at the casing shoe to block uncontrolled hydrocarbon flow resulted from the instability of the foamed cement. The cement placed across the shoe of the casing was porous and possessed little mechanical integrity. This cement, although set at the time of the negative test, provided no barrier to prevent short-term flow into the casing.  As the cementing contractor, it is Halliburton's responsibility to design and deliver a stable foam cement.  Halliburton possesses all of the necessary expertise and capability to design and test a foam cement, and would have been expected to apply this expertise to the Macondo production interval cementing design and operation.

This evaluation of Halliburton cementing operations is based on the application of technical expertise and expert knowledge of oilwell cementing theory and practice to the information provided by BP, other parties in the litigation, the government, and various other investigative bodies. The findings and opinions expressed in this report are made with a reasonable degree of engineering certainty.

## 2    Background and Credentials

I am the founder and President of CSI Technologies Inc., a wholly owned subsidiary of the Superior Energy Services.  I have over thirty years of cementing experience in all phases of cement slurry design and operations. I have particular experience in foam cements, short-term failure of cement, long-term leakage of fluids through cemented annulus, and displacement mechanics to optimize cementing jobs.

**Education, Professional Affiliations, Certifications and Licenses**

- B. S. Chemical Engineering, New Mexico State University (1978).
- M. S. Petroleum Engineering, University of Oklahoma (1992).
- Licensed Professional Engineer, State of Texas.
- Member, Society Professional Engineers (SPE).
- Prepared University of Oklahoma Master's thesis on the catastrophic flow of gas during and after cementing.

- Served as Chairman of API Work Group "Physical Models and Methods for Testing Fluid Migration."
- Served as member of SPE Distinguished Lecturer Selection Committee.
- Served as Chairman of SPE Forum Series "Maintenance and Utilization of Old Wellbores."
- Member of API Subcommittee 10 and member of task group developing new API recommended practices for testing of foam cement in the laboratory, with specific focus on foam mixing apparatuses for laboratory generation of foams.
- Chairman and member of various other API cement task groups.
- Member of API task group on Cement Evaluation By Sonic and Ultrasonic Tools.

**Private Sector Work Experience**

- Served as Engineer, Group Leader, and Section Manager at Halliburton Research Facility in Duncan, Oklahoma.
- Involved in the development of foam cementing and initial lab testing of foam cement during its development at Halliburton Research Facility.
- Responsible for full scale displacement test using foam spacers and foam cement, in conjunction with ARCO.   Assisted in the development of foam rheology correlations still used by Halliburton in the modeling of pumping foam cement jobs.
- Headed Halliburton team that developed foam cement as a solution for fluid flow in Gulf of Mexico operations. The initial foam used in this application was called Deepwater Flow Stop.
- Developed the static gel strength (SGS) measurement and determined its effect on gas migration while at Halliburton.
- Developed Gas Flow Potential correlation while at Halliburton that is widely used currently as the standard for determining which cement slurries should be used to combat the severity of gas flow after cementing.
- Served as Manager of Halliburton Cementing Technology during development of CJOBCEM, the precursor to OptiCem. This program was the first cementing program to model foam cement.

- Served as manager of the Halliburton Full Scale Displacement Facility, which involved a major focus on placement mechanics of cements in a well bore.
- Served as Cementing Manager of Westport Technology Center.
- Co-developed patented foam cement correlations for Chandler Engineering that are used worldwide by the industry to correlate UCA measurements to compressive strengths for foam cements.
- Conducted a study for the DeepStar organization (a consortium of various operators in the GOM) to test various gas migration slurries, including foam cement from Schlumberger, Halliburton, and BJ Services for applications in the Gulf of Mexico.
- Founder and President of CSI Technologies, which has consulted on over 1,500 critical cement jobs, including more than fifty foam cement jobs, since its inception in 2000.

**Public Sector Projects**

- Obtained DOE grant of $1.5 million to research alternatives to foam cement, specifically looking at hollow microspheres for a variety of cementing applications.
- Managed a Joint Industry Project funded by the MMS and involving 15 operators that looked at the long-term sealing of various systems for deep water operations including foam cements (5-year project).
- Recently awarded million dollar BOEMRE project to develop new cementing procedures and methods for cementing in the Gulf of Mexico.

**Awards**

- Chosen to co-author API Technical Report 10TR2, "Shrinkage and Expansion in Oilwell Cements."
- Received API Appreciation Award from Subcommittee on Well Cements.
- Received SPE In Appreciation of Service Award for "Cementing for Harsh Environments" Forum Series.
- Received SPE Appreciation Award for "Outstanding Technical Editor" from Editorial Review Committee.

8

- Received 2005 OTC Innovation of the Year Award for development of a resin that seals gas flow in wells
- Recognized as a Leader in Cementing Practices Worldwide by the Journal of Petroleum Technology
- Awarded 27 patents related to oil and gas well cementing.

**Articles and Publications**

- Authored or co-authored more than sixty-five articles and technical papers on a variety of cementing and related topics
  - Wrote approximately ten papers on placement mechanics of cements in a well bore.
  - Wrote approximately ten papers on short-term gas flow after cementing

**Court Experience**

- Previously qualified as an expert witness on cementing related issues in federal court, and served as an expert in cementing related cases on behalf of both Service Companies and Operators.
- The following list includes all matters that I have been retained on as an expert for the last four years:
  - Peak Completions Technologies vs. Weatherford
  - Mayne & Mertz vs. BJ Services
  - Ron Boorman vs. Halliburton Energy Services
  - Schlumberger vs. Tarpon Operating & Development
  - Erskine Energy vs. BJ Services
  - Bullock, Scott, Neisig, Morgan, Leeton & Strauss, P.C. vs. O'Ryan Oil & Gas
  - EOG vs. Halliburton Energy Services
  - Byron Roach vs. Halliburton Energy Services
  - Tarpon Operating & Development vs. Schlumberger
  - O'Ryan Oil & Gas vs. Key Energy
  - Reliance vs. Hunt Energy

9

- Arnold Operating vs. Schlumberger
- Hartzog, Conger, Cason & Neville vs. BJ Services

## 3  Executive Summary

The following summary and conclusions regarding Halliburton's performance are based upon review of information available regarding the 9 7/8" x 7" production string on the Macondo well. It is my opinion that Halliburton did not deliver an acceptable level of engineering analysis for the cement slurry design, and the quality of service was well below industry standard. This service quality, especially concerning the foam stability of the cement composition, was unacceptable for the Macondo production string cementing and allowed the uncontrolled flow of hydrocarbons into the well.  The cement composition required careful design and testing to ensure suitable performance as a base for foam cement under the application conditions at the Macondo well. Slurry properties which affect the cement's ability to provide a short-term mechanical barrier to flow of hydrocarbons into the wellbore (e.g. foam stability and strength development) were not appropriately considered. Testing was not properly performed, and test results were not correctly interpreted. The instability of the slurry was not correctly identified or communicated to BP. Halliburton had sole responsibility for the design and testing of the foam cement to ensure a stable foam cement composition. While BP drilling engineers have a general understanding of cementing operations, they lack knowledge about the chemistry and interactions of Halliburton's proprietary additives.  Further, BP lacked the foam cement engineering expertise to evaluate lab test results and identify subtle performance concerns that were readily apparent to those skilled in the art of foam cement testing.   Halliburton, in contrast, possessed all of the required expertise necessary to identify the potential problems with slurry design and test results, without any assistance from BP.

After the execution of the cement job, Halliburton reported that the cement placement had occurred without incident and that full returns were achieved. Based on Halliburton's assessment that the cement job had gone well, it was decided that no further assessment of the cement placement was necessary after the cement job. Less

than 24 hours after the cement operation, however, when the well was placed in an underbalanced condition, the defective cement slurry failed to contain the hydrocarbons in the well, allowing hydrocarbons to flow into the well and up the casing. In summary, conclusions from this investigation are:

1. Halliburton used a combination of additives in the slurry that produced a foam cementing composition which was unstable. This instability caused gas segregation, which results in a non-homogeneous foam cement slurry in which some portions contain high amounts of gas and other portions contain little or no gas. This discrepancy in the gas bubble size and distribution made the portion of the cement slurry with the high volume of gas unable to act as a barrier to hydrocarbons. In the Macondo well, the portion of the cement column that would have experienced this high gas concentration is the last portion of the foam cement and the shoe cement.  Although the shoe cement was designed to be unfoamed, my professional opinion is that it likely became filled with nitrogen bubbles that broke out of the unstable foam cement and migrated up the column of cement as it was pumped.  This upward migration was driven by buoyancy of nitrogen bubbles coalescing and rising through the base slurry. The pockets of gas in these areas resulted in cement in the shoe and the lower portion of the annulus with high permeability and low compressive strength, and which did not provide a seal to hydrocarbon flow up the production casing.

2. BP contracted Halliburton to provide cementing expertise for the Macondo well team. Mr. Jesse Gagliano, a Halliburton cementing engineer, was assigned by Halliburton, pursuant to the contract between Halliburton and BP, to act as the cement expert on the Macondo well team. This arrangement is consistent with industry practice. Halliburton engineering and laboratory staff, as members of a highly-regarded, worldwide provider of cementing services for challenging applications, should have recognized potential  performance issues in its cement slurry and corrected them. They failed to do so.  Furthermore, Halliburton's communications with BP regarding the cement design suggested that the short-term barrier characteristics of the cement were adequate. While questions

11

regarding long-term inter-zonal communication (due to potential channeling) were discussed, no concern over foam stability or the resulting effectiveness of the barrier formed from the cement pumped on the well appears to have been raised by Halliburton.

3. Halliburton was responsible for designing the cement slurry to meet the desired objectives of cementing the production interval on the well. In designing the cement slurry, Halliburton used additives in violation of its own internal requirements. The use of these particular additives created a slurry that was unsafe and that failed to isolate the zones in the well. Halliburton did not notify BP that its use of this combination of additives was in violation of its own requirements or notify BP of the risks of using these additives in combination in the foam slurry.

4. Halliburton was responsible for testing the cement slurry. Although it had test results indicating that the foam cement was defective, it did not share those results with BP. When Halliburton did provide BP with limited test results on the slurry, it did so without indicating any problems with the stability of the slurry. Even though Halliburton knew, or should have known, that the foam cement was defective based on internal tests performed in its laboratory, Halliburton recommended that BP proceed with the cement job.

5. Halliburton was responsible for executing the cement job, monitoring the execution, and reporting on the success or failure of the cement job. BP was prepared to address issues that were identified with the cement job. No remedial measures were ultimately taken, however, because Halliburton and Transocean reported that no losses had occurred during the cement job and Halliburton reported that the cement job went well. Halliburton's communications with BP, and internally, immediately after the cement job and after the incident reflect that the cement had been pumped successfully with no losses—indicating that the target top of cement had been achieved.

6.  Before pumping the cement job, Halliburton appears to have raised concerns with BP about certain operational decisions including centralization and circulation that could result in channeling and losses to the formation. But on April 18, 2010, Halliburton proposed and recommended the cement slurry design and procedure that was used in the cementing operation on April 19, 2010, which incorporated BP's operational decisions without comment. Following the cement job, Halliburton internal and external communication indicated that the cement job was successfully pumped. Halliburton did not communicate to BP (or internally) any concerns about the placement of cement.

7.  The cement slurry, as designed by Halliburton, did not perform its intended function of isolating the hydrocarbons from entering the well. The cement did not act as a barrier in the well either in the annulus across from the zones or the cement in the shoe.

8.  The Halliburton April 18, 2010 OptiCem run provided to BP before cementing of the Macondo well indicated a Gas Flow Potential value of 10.29. This GFP value generated a note of "SEVERE" gas flow potential in the OptiCem Report. However, the April 18th OptiCem report used several incorrect inputs. When the inputs are corrected and the model run again, the GFP value is reduced from 10.29 to 1.42. This does not reflect a SEVERE gas flow potential, or even a MODERATE gas flow potential. Instead, a GFP value of 1.42 would be classified as MINOR gas flow potential by OptiCem.

## 4   Discussion of Analysis, Results and Conclusions

The review, analysis and conclusions from my work to date are set out as follows. The investigation is ongoing and the analysis presented here will be supplemented if warranted by additional findings.

### 4.1  Halliburton's Foam Cement Slurry Utilized Improper Additives That Caused the Slurry to Be Unstable

In the normal operations of the Macondo well team and wells teams generally, each of the team members brings a different expertise to the operation. Mr. Gagliano was the Halliburton representative on the team and the cementing technical expert assigned by Halliburton to BP as per the contract between the parties[1]. Mr. Gagliano was stationed in the BP facility and was "on call" 24 hours a day to provide technical expertise to the rest of the BP well team regarding the design of the cementing slurry for the well, the dynamic pre-job design of the cement slurry placement, and the final mixing and pumping of the slurry in the well[2]. Specifically Mr. Gagliano's role was to provide the expertise to design appropriate cement slurry for the specific conditions in the well and communicate how and why this cement slurry was appropriate for the well.[3] Halliburton

---

[1] Contract for Gulf of Mexico Strategic Performance Unit – Offshore Well Services between BP Exploration and Production Inc. and Halliburton Energy Services, Inc. (Halliburton Contract), Section 3, Appendix 5, A.2.2.1 ("CONTRACTOR shall provide to COMPANY an Onshore Engineer to work either in COMPANY's or CONTRACTOR's offices as required by COMPANY. This individual shall be a member of COMPANY's well planning team."); 2.2.1 (c) ("Take full accountability for the technical quality, safety and environmental performance of all sub-contracted services managed by CONTRACTOR"), (g) ("Apply risk based engineering processes to prepare the BOD, individual well programs and all associated engineering and documentation"), (i) ("Provide engineering support for all aspects of the service provided and fully competent in running all engineering software models offered to support the service, including the ability to run CONTRACTOR's cementing software from COMPANY's office"), (j) ("Provide solutions where conventional cement design and procedures are not suitable, such as blend and foam cement"), (k) ("Make recommendations on fit for purpose slurry designs to meet agreed specification"), (l) ("Participate in the review of the previous days drilling activities with COMPANY's onsite and offsite drilling management as required"), and (x) ("Produce or ensure the following documents are prepared, approved, and issued [Cement Program, Detailed Cement Report, End of Well Reports, and Basis of Design addressing Risks, Mitigations and Options].").

[2] *Id.*; Gagliano testimony before Committee on Energy and Commerce (Gagliano CEC) at 7 ("BP was the well owner and BP hired Halliburton to provide cement services for the Macondo well. When I did my work on the project I physically sat in BP's office in Houston... I was in-house technical support for cement operations and responsible for providing proposals, design reports using OptiCem software simulations and lab testing the cement slurry. Throughout the Macondo project I made recommendations to BP about the type of cement best suited for each casing, volumes and rates of spacers in cement and on the production string the use of centralizers and foam cement.") at 40 ("It is a 24/7 job. It is holidays, weekends. It doesn't matter. So we work all the time.").

[3] Kellingray Dep. at 526 ("Certainly in terms of slurry design, it's very clearly in the cementing company's area of expertise."); Fleece Dep. at 357 ("Who was the cement specialist and cement contractor that you relied on to design the cement slurries used on the Macondo well? THE WITNESS: On the Marianas we were using Halliburton."); Walz Dep. at 335 ("I was expecting that Halliburton was doing the proper testing and design work to support the product that they were providing us.").

markets itself as the leading cement service company in the world,[4] and it markets its engineers as experts in designing and implementing foam cement in wells[5] (Halliburton refers to this process as ZoneSeal Isolation process). Halliburton is also regarded by operators as one of the industry's leading cement service providers. BP contracted with Halliburton to provide reputable and professional service in the area of cementing.[6] And, specifically, BP contracted with Halliburton to design the cement slurry, the spacer and plan and execute the cement job.[7]

Consistent with industry practices, and in my experience, the BP engineers working on the Macondo well would have been focused primarily on getting a good cemented casing in place to create a barrier to the flow of hydrocarbons and allow safe abandonment, further operations, and ultimate production of the well. Although the BP engineers would be concerned about the cementing in a general sense, their

---

[4] Faul Dep. at 470 ("Halliburton advertises itself as the leading cementer in the oil and gas industry, correct? A. Yes, we do."); Serio Dep. at 299 ("Q. In fact, you guys hold yourselves out as the leaders in foam cement technology; isn't that true? A. Yes, sir."); Zone Seal Isolation Process from www.Halliburton.com; Ravi Dep. at 173 ("Halliburton is a leader, pioneer in cementing -- providing cementing technology and cementing services.").

[5] Zone Seal Isolation Process from www.Halliburton.com; Ravi Dep. at 173 ("Halliburton is a leader, pioneer in cementing -- providing cementing technology and cementing services.").

[6] Halliburton Contract at Section 2, 4.2 ("CONTRACTOR shall carry out all of its obligations under the CONTRACT and shall execute the WORK with all due care and diligence and with the skill to be expected of a reputable contractor experienced in the types of work to be carried out under the CONTRACT."), 4.3 (CONTRACTOR shall take full responsibility for the adequacy, stability, health, safety, and environmental protection of all its operations and methods ..."), 9.2 ("All personnel employed on the WORK shall, for the work they are required to perform, be competent, properly qualified, skilled and experienced in accordance with good industry practice."); Section 3, 1.1 ("All personnel employed on the WORK shall, for the work they are required to perform, be competent, properly qualified, skilled and experienced in accordance with good industry practice."); 29.1 ("CONTRACTOR warrants and guarantees that: (a) it shall exercise all reasonable skill, care and diligence in the performance of the WORK and shall carry out the WORK in accordance with the requirements of the CONTRACT and to internationally recognized good oilfield practices and standards."); and 31.3.

[7] Halliburton Contract at Section 3, Appendix 5 A at 1.1 ("1.1 CONTRACTOR shall as requested by COMPANY provide cementing materials, engineering, mixing and pumping services, hereinafter referred to as "Cementing Services" as defined herein, which shall include but not be limited to: 1.1.1 Primary cementing of all casing strings") and 1.2 ("Provide onshore engineering support to the operation, with a full and comprehensive technical back up to the operation. This shall include as a minimum: 1.2.1 Development and update the cement Basis of Design (BOD), 1.2.2 Slurry and spacer design, 1.2.3 Job planning and design, 1.2.4 Engineering simulations (pressures / temperatures / placement / mechanical failure), 1.2.5 Operational management / supervision, and 1.2.6 Job evaluation and reporting.").

operational decisions emphasized the good of the well, as a whole, above achieving the "optimal" cementing conditions. Operational issues would be the focus of the drilling engineers, and that appears the case for the Macondo well team.[8] The BP engineers relied on Halliburton (and, in particular, Mr. Gagliano) for the technical details of the cement slurry, testing, and cement placement operations[9]. This reliance is consistent with standard industry practices[10].

### 4.1.1   Basic Requirements of Slurry Design

The objectives for any cement design include casing support, control of short-term hydrocarbon flow, and long-term zonal isolation to prevent hydrocarbon leakage. Halliburton's US Land-Offshore Work Methods describes a basic approach to cement design[11]:

> Each well has specific characteristics that dictate the cement slurry properties. Careful and thorough review of these well characteristics is essential for designing of effective slurry. The overall goal of designing a cement slurry for a specific well application is to select a practical yet economical cement design that can be placed effectively in existing well conditions. The designed slurry should develop and retain properties necessary to isolate all target zones as well as support and protect the

---

[8] BP-HZN-2179MDL00250628 (April 16, 2010 Brian Morel email to Jesse Gagliano regarding Cement Procedure); BP-HZN-2179MDL00081605 (April 16, 2010 John Guide email regarding Additional Centralizers); BP-HZN-2179MDL00315248 (April 17, 2010 Brian Morel email to John Guide regarding Lab Tests).

[9] Cunningham Dep. at 757 ("Mr. Gagliano was a component of the well's team as a service provider providing the services, you know, of design of cement jobs, design of slurries, interacting with the well's team, to optimize the cement jobs that would be executed on the rigs."); Kellingray Dep. at 236 ("we had Cement Engineers from the suppliers who worked in an office, and the model we had was that they were integrating into our Teams, and we would rely at first pass on those."); Kellingray Dep. at 426 ("from the BP side, as I said, [the outside contractors] were a part -- they were part of an Engineering Team, and, therefore, they were within the Team to do those technical roles"); Walz Dep. at 618-619 (BP was "relying upon Halliburton, the cement contractor, and upon Jesse with regard to providing the cement services and the design" because "we were not cementing experts.").

[10] Kellingray Dep. at 210 ("That was the model that most operators worked under. Cementing had been moved out so that there were a lot of -- a lot of reliance and a lot of the work was with the cement companies...") and 673 ("The other operators had different models varying from -- similar to us, which would be probably Exxon and Conoco particularly had single cement Consultants like myself and rely very much on how the suppliers actually work with them.").

[11] HAL_0558016 (Halliburton US and Land–Offshore Work Method (October 2009)) at 254.

casing. Engineers should analyze all aspects of the job from physical slurry requirements to equipment needs on location in order to develop a total cement job design.

Further the reference states that "When dealing with varying wellbore environments it is important to design the best slurry possible that will stand up to downhole conditions while maintaining the designed slurry properties such as fluid loss, stability, thickening time, etc."

In order to meet these basic design requirements, the effects of each additive in the cement composition must be evaluated in light of the system as a whole. The evaluation should confirm that the effect of the additives on the cement composition's performance should not interfere with or counteract performance of other additives in the system in a manner that could ultimately render the cement unstable. Performance properties of the composition measured under application conditions should confirm that the design provides adequate sealing for prevention of both short-term hydrocarbon flow and long-term fluid leakage.

### 4.1.2  Halliburton Slurry Design Defects

The base cement slurry composition used for the Macondo well by Halliburton appears to have been blended previously for a non-foamed application. Because this cement blend was used for a non-foamed job and was not adjusted for a foam application, it was ultimately ineffective in preventing the short-term hydrocarbon flow in the Macondo Well.

Halliburton's specific cement design was as follows:

Class H cement + 0.07% bwoc EZ-FLO + 0.25% bwoc D-Air 3000 + 1.88 lb/sk KCl (Potassium Chloride) Salt + 20.0% bwoc SSA-1 (Silica Flour) + 15.0% bwoc SSA-2 (100 Mesh) + 0.2% bwoc SA-541 + 0.11 gal/sk ZoneSeal 2000 + 0.09 gps SCR-100L + 1.0 lb/bbl WellLife 734 + 4.93 gal/sk Fresh Water.

The cement system was a blended Lafarge Class H cement mixed at 16.74 ppg with a liquid retarder added to the mixing water and a liquid surfactant. EZ-FLO is a bulk flow enhancer incorporated into the cement system to improve flow of the dry bulk cement. D-Air 3000 is a defoamer used to prevent foaming while mixing the cement. KCl salt is an additive used to help shale stability. SSA-1 and SSA-2 are crystalline silica grinds included to prevent strength retrogression of the cement at temperatures above 235°F. ZoneSealant 2000 is a surfactant added to promote foaming and improve foam stability. SCR-100L is a liquid cement retarder. WellLife 734, a mechanical property enhancer/lost circulation material, was also added by hand to the cement mix tub.

Halliburton's slurry design was fundamentally flawed in that it used two additives—D-Air 3000 and SCR-100L—that had independent detrimental effects on the foam cement slurry, and which independently and collectively contributed to make the foam unstable. The issues with D-Air 3000 and SCR-100L are described below.

### 4.1.3   D-Air 3000

The dry blend used for the Macondo well contained D-Air 3000, a defoamer additive used to eliminate undesired air entrainment during slurry mixing on non-foam applications.

Halliburton's Global Laboratory Best Practices explicitly state that defoamers should not be used in foam cements, as they will destabilize the foam. This quote from the Halliburton document states,

> ***Important – For the base slurry tests outlined above, a defoamer is recommended to avoid excessive air entrainment that can result in slurry contamination and erratic test results. The defoamer is for the base slurry testing purposes only, and should NOT be included in the foam slurry tests outlined in this section or in actual job designs.***[12]

---

[12] Dep. Ex. 4347, HAL_0675798 (Halliburton Global Laboratory Best Practices) at HAL_0677647 (from Foam Slurry Testing section) (emphasis added).

Thomas Roth, Halliburton's Vice President of Cementing at the time of the incident, acknowledged that D-AIR 3000 should not be used in foam cement applications.[13] Further, every Halliburton witness working in its Broussard laboratory for cement testing for the Gulf of Mexico agreed that D-AIR 3000 should not be used with foamed slurries.[14] In fact, the lab technicians in the Broussard laboratory are trained to notify the engineer if D-AIR 3000 is used in a foam cement slurry.[15] Based on my experience, both the engineers and the technicians at Halliburton should have known that defoamer should not be included in a foam slurry design, especially in light of the clear warnings in the Halliburton manuals. In my experience, I would not have expected the BP's engineers to have understood the effect of including D-AIR 3000 in a foam slurry.

Numerous other Halliburton documents, including its Cementing Technology Manual and Foam Cementing Operations Manual,[16] warn against using defoamers in foam cement[17]. In fact, Halliburton Global Laboratory Best Practices provides a test method to determine the effectiveness of the D-AIR 3000 product. Various cement compositions that have a tendency to foam are mixed, the D-AIR 3000 is added to the slurry to test along with all the other constituents and the resulting density is measured. The manual

---

[13] Roth Dep. at 431 ("Q. You would agree with me, though, that Halliburton should not have used D-AIR 3000 in the cement slurry used in the Macondo well, correct? A. D-AIR 3000 is not in the recommended best practices for foam.").

[14] Quirk Dep. at 370 ("I would prefer to have a cement blended without D-AIR because of what I just stated."); Dubois Dep. at 294 ("Q. What I'm asking you though is, does it concern you as a lab man that a -- that the D-Air was present in this recipe even though Halliburton best practices recommended against having D-Air in a foam slurry recipe? A. Yes, it would"); Stelly Dep. at 71 ("I wouldn't have D-Air in – in that type of slurry"); Richard Dep. at 25 ("There's some additives that – like D-Air's a defoamer. I mean, there's some additives that just don't -- should – you shouldn't use with foam slurries; you could, but you shouldn't.").

[15] Richard Dep. at 188 ("Q. Now, earlier today you said that if you saw [D-AIR] in a foam slurry, you would call the Engineer, correct? A. Yes, sir. That's procedure.").

[16] Dep. Ex. 4348, HAL_1124190 (Halliburton Cementing Technology Manual) at 11-11 ("Interaction with Other Additives: Avoid using dispersants or defoamers additives."); HAL_0128425 (Halliburton Foam Cementing Operations Manual) at HAL_0128439 ("In general, defoamers and dispersants tend to destabilize foam cement.").

[17] Roth Dep. at 434 ("Q. Okay. So do you agree that Halliburton cementing technology manual warns not to use D-AIR in foam cements? A. Yes."); Richard Dep. at 184 ("Q. And are you aware that the Cementing Technology Manual says not to use D-AIR in foam slurries? A. Yes, sir.").

19

states: "Some cements do not entrain air. To measure defoamer efficiency in these cements, add 0.5 milliliters of ZoneSealant 2000 foamer or similar foamer before API/ISO mixing[18]". **The purpose of this test is to show the efficiency of D-Air 3000 in defoaming slurries, including slurries made with ZoneSeal 2000 foamer.** The results of the tests indicate that D-AIR 3000 is an excellent destabilizing additive for foam cements, particularly those with ZoneSealant 2000 (the foamer used in the Macondo well cement blend).

Further, several patents issued to Halliburton teach that defoamers like D-AIR 3000 can destabilize foamed fluids and release entrained air from cement slurries during mixing.[19]

---

[18] Dep. Ex. 4348, HAL_0676490 (Halliburton Global Laboratory Best Practices) at 3.1-55.

[19] U.S. Patent 6,156,808 (2000) Column 4 lines 9 through 43 describe use of the covered defoamer to prevent formation of foam in a well treating fluid or to defoam previously formed stable foamed well treating fluids. Specific use of the invention to defoam stable foamed cement is cited.  Specified composition of the defoaming composition is polypropylene glycol, particulate hydrophobic silica, and a liquid diluent. Column 5 line 60 begins description of a lab experiment to illustrate the patented defoamer's ability to defoam a stable foamed cement.  The cement slurry with an unfoamed density of 15.9 lb/gal was foamed to a density of 10.5 lb/gal and then treated with the defoamer.  The density of the cement after defoamer treatment was 15.8 lb/gal indicating the foam was unstable.

U.S. Patent 6,417,142 (2002) describes the use of defoamers in the oil and gas industry to "prevent the formation of a foam or the entrainment of a gas in a liquid or to destroy a previously formed foam" (column 1, line 14).  This patent further cites defoaming performance of a prior art material with the same listed composition as the one covered in 6,156,808 in Examples 1 and 2 beginning in column 4.  Performance both in prevention of foam formation during mixing and breaking foamed cement are illustrated.  This prior art material, with composition listed as propylene glycol, activated silica, and $C_{12}$-$C_{14}$ internal olefins, appears to be very effective at prevention of foam during cement mixing and also has destabilizing effect on previously foamed cement.

U.S. Patents 7,308,938 (2007), 7,517,836 (2009), and 7,863,225 (2011) compare performance of D-AIR 3000L to that of covered compositions in cement mixing and breaking stable foamed cement.  Composition of D-AIR 3000L is reported to be polypropylene glycol, particulate hydrophobic silica, and an aliphatic hydrocarbon which agrees with the description of the defoamer covered in 6,156,808.  The performance data, listed in Examples 1 and 2 beginning in column 8 of 7,308,938, is identical for all three patents as well as that from 6,417,142.  These data confirm that D-AIR 3000L is very effective at prevention of foam during cement mixing and also has a destabilizing effect on previously foamed cement.  Foaming additive listed in Example 2 of each patent is ZONESEAL[TM] 2000.

U.S. Patents 7,150,322, 7, 273,103, 7,670,423, and 7,824,489 The first paragraph of the DESCRIPTION OF EMPODIMENTS section of each of these three patents describes the function of defoaming compositions. Generally, defoamers lower interfacial tension of liquids enabling gas to escape. Thus, defoamer function in

In contrast, I have not seen a single Halliburton paper that states it is acceptable to use D-AIR 3000 with foamed slurries. And, in my experience working with other cement service providers, I have never seen defoamer additive used in a foam slurry design.

Pre-incident QC testing, pre-job cement testing by Halliburton, and post-incident testing by CSI and other investigative bodies confirm the destabilizing effect of D-AIR 3000 on foamed cement slurries. **Testing by CSI, Chevron, and Oilfield Testing all indicated that the foam slurry tested was unstable.[20]**

In summary, Mr. Gagliano used a cement blend that included D-AIR 3000—an ingredient designed specifically to defoam cement—in a slurry that was intended to be foamed. The use of this ingredient in a foam cement slurry is specifically prohibited by Halliburton and violates fundamental slurry design practices.

### 4.1.4   SCR-100L Retarder

SCR-100L is a synthetic copolymer of AMPS and hydroxycarboxylic acid. This material is a cement retarder with an application temperature range of up to 250°F. This additive has a secondary function of dispersing (thinning) cement slurries, and it is listed as a dispersing additive in the Halliburton Cementing Technology Manual[21].

Multiple Halliburton manuals clearly specify that dispersing additives should be avoided with foam cements.  The Foam Cement section of the Cementing Technology Manual instructs: "Interaction with Other Additives: Avoid using dispersants or defoamers

---

well treatment fluids (e.g. cement compositions) is stated as hindering foaming or air entrainment during mixing or in breaking foam or entrained air already present. These data, always presented in Table 3, indicate that D-AIR 3000L is very effective in breaking foam from stabilized aqueous foam.  It is reported that no residual foam remained after treatment. .

[20] Dep. Ex. 4572 (Oct. 26, 2010 Letter from Craig Gardner to Sam Sankar ("Chevron Report")) at 9 ("A series of nine tests were conducted under varying conditions as described below... None of the tests produced a stable foam."); Aug. 1, 2011 Oilfield Testing & Consulting (OTC) report at 34-43 (Sec. 11).  See below at Section 4.5.

[21] Dep. Ex. 4348, HAL_1124190 (Halliburton Cement Technology Manual) at 5-32 ("Effect on Slurry Properties: ... 4. Disperses"); see also Roth Dep. at 471 ("It states that SCR-100 is a dispersant. The design manual identifies to avoid the use of dispersing additives."); Richard Dep. at 40 ("You mentioned to us earlier that SCR-100L is a retarder, correct? A. Yes, sir. Q. And that has a potential as a dispersant to destabilize the foam, doesn't it, sir? A. Yes, sir.").

additives."[22] The Global Laboratory Best Practices advises that in designing the base slurry for a foam cement job, engineers should "[a]void dispersing additives that are known to be detrimental to foam stability."[23]

Articles published by Halliburton experts document the destabilizing effect that dispersing retarders have on foamed cement. An SPE paper by Chatterji[24] et al specifically states that copolymers of hydroxycarboxylic acids and AMPS (the chemical description of SCR-100L) destabilize foams and recommends foam cements should not be designed with retarders of this composition.[25] The Chatterji paper proposes, instead, use of non-dispersing retarders in foam cements.

Because SCR-100L is a dispersing additive, higher concentrations result in more dispersing effect on the slurry. Halliburton has indicated in testimony that the change from 0.08 to 0.09 gal/sk of SCR-100L should not have affected the rheology of the cement slurry[26]. **This is not the case**. Testing performed by Oilfield Testing and Consulting (OTC) demonstrated the effect of SCR-100L concentration on slurry rheology.[27] As shown in Table 1 (below), the data from OTC indicates that an increase in SCR-100L concentration from 0.08 to 0.09 gal/sk significantly reduced cement

---

[22] Dep. Ex. 4348; HAL_1124190 (Halliburton Cement Technology Manual) at 11-11; see also Roth Dep. at 470-471 ("Can you agree with me that Halliburton warns to avoid dispersing additives that are known to be detrimental to foam stability?... A.This document says that."); Richard Dep. at 184 ("And you -- are you aware that it [Cementing Technology Manual] says not to use dispersing retarders in foam slurries? A. Yes, sir.").

[23] Dep Ex. 4347 (Halliburton Global Laboratory Best Practices) at HAL_0677645.

[24] Chatterji et al., "Development of a Set Retarder for Foamed Cement Applications," SPE 80244, SPE (2003).

[25] Chatterji et al. at 2-3 ("Laboratory Evaluation"; "Table 4 illustrates that the slurry containing the non-dispersing foamed cement retarder was considerably more stable than the sample containing tartaric acid and acrylic acid/AMPS copolymer.").

[26] Ravi Dep. at 151-152 ("your opinion as the chief technical adviser of Halliburton is that you would not expect there to be very much difference between -- in test results between a slurry containing .08 gallons of retarder and a slurry containing .09 gallons retarder; is that correct? A. That's correct."); Quirk Dep. at 592 ("Q. [D]o you have an opinion as to whether that one gallon would have made any difference in the foam stability? THE WITNESS: In my opinion I would expect that it would not make that much difference.").

[27] August 1, 2011 OTC Letter Report at Section 5.

rheology. At each test temperature, the change in SCR-100L concentration from 0.08 to 0.09 gal/sk significantly lowered both the Pv (plastic viscosity) and Ty (yield stress).

**Table 1 - Effect of SCR-100 Concentration of Slurry Rheology**

| Run # | Temperature | SCR-100 Retarder | Pv | Ty |
|-------|-------------|------------------|------|------|
| Rh1 | 80°F | 0.08 gal/sk | 46.5 | 0.50 |
| Rh2 | 135°F | 0.08 gal/sk | 43.5 | 0.50 |
| Rh3 | 80°F | 0.09 gal/sk | 27.8 | 0.25 |
| Rh4 | 135°F | 0.09 gal/sk | 36.0 | 0.00 |

As described in its Foam Cementing Technology Manual, Halliburton offers other retarders which do not have dispersing effects and are more suitable for foam slurries.[28] Instead of selecting one of these options, Halliburton violated its own practices and used a retarder in the Macondo foam cement slurry which had the effect of dispersing the slurry and contributing to the instability of the foam[29].

### 4.1.5   Effects of Halliburton Slurry Design Defects

A stable foam cement consists of gas entrained in the slurry in small discrete bubbles that do not interconnect. As described in SPE 15519[30], "stable foam cement is produced by shearing a mixture of gas (usually nitrogen), surfactants, stabilizers and almost any

---

[28] Halliburton Foam Cementing Operations Manual at HAL_0128440 ("Additives Compatible with Foam Cement – Retarders – Diacel LWL, WG-17, MMCR").

[29] Roth Dep. at 471 ("Q. Okay. So you would agree with me that Mr. Gagliano, based on your own cementing manuals, should have avoided using SCR-100, correct? A. These documents state what they state. It states that SCR-100 is a dispersant. The design manual identifies to avoid the use of dispersing additives.").

[30] SPE 102185 Vidick, B. "The Search for Alterntives to Screen: Is Permeable Cement an Option?", 2006 SPE Annual Conference in San Antonio Tx. September 24-27.

oil field cement slurry. The shear, surfactants, and stabilizers are required to generate uniform discrete bubbles that will not coalesce and migrate. Without small discrete bubbles the foam will be unstable resulting in a foam cement with high permeability and low compressive strengths."

Stable foam cement is a lightweight but high strength material that will seal the annulus from hydrocarbon flow. To achieve its objectives, it must be generated in a homogeneous state at the surface injection point and remain in a stable homogeneous state as it is pumped down the well. It must also continue to remain in a stable homogeneous state until the cement sets to provide an impermeable barrier to well fluids[31].

In contrast, unstable foams are unable to act as a barrier to hydrocarbons due to their high permeability (ability of fluids to flow through it under pressure) and low strength. The distribution of nitrogen in unstable foam systems is not homogeneous. An unstable foam slurry consists of gas comingled in the slurry in the form of bubbles and gas pockets that are interconnected. If unstable enough, these pockets of free gas produce an extremely porous and permeable cement.[32] Permeability variations can range from 30,000 md in unstable foams to 0.1 md in stable foams.[33] In other words, the permeability of unstable foam cement can be 300,000 times greater than the permeability of stable foam cement. The discrepancy in the bubble distribution makes the portion of the cement slurry with high gas concentration unable to act as a barrier to hydrocarbons. In fact, the gas pockets tend to act as flow paths for the hydrocarbons instead.

---

[31] Well Cementing, 1990 ed. at 14-2, 14-3, 14-7.

[32] U.S. Patent No. 5,339,902 Well Cementing Using Permeable Cement, Harris et al. (This patent covers a method of cementing a casing in a wellbore using foamed cement slurry with high permeability. This foamed cement is sufficiently permeable to allow hydrocarbon flow into the wellbore while preventing the flow of unconsolidated formation particles. Nitrogen volumes claimed range from 30 vol% to 70 vol%, and permeability is reported to be 0.3 to 50 darcies. The patent states "A cement composition having a permeability of 0.3 darcies will typically be as conducive to flow as most producing subterranean formations." A laboratory example (p. 10) presents results of a 5 lb/gal cement with permeability of 27.2 darcies.).

[33] SPE 102185 Vidick, B. "The Search for Alterntives to Screen: Is Permeable Cement an Option?", 2006 SPE Annual Conference in San Antonio Tx. September 24-27, See figure 5 and 6 in this paper.

## 4.2   Halliburton Knew or Should Have Known of the Foam Slurry Instability and Should Have Communicated That Information to BP

Pursuant to the contract between the parties, Halliburton was responsible for conducting laboratory testing of the slurry it designed to ensure that the slurry would perform adequately in downhole conditions.[34]   Halliburton was also obligated under the terms of the contract to report its test results to BP.[35] BP did not have its own cement laboratory and relied on cementing contractors such as Halliburton to conduct testing.[36]

In my thirty-three years of experience, both as an employee of Halliburton and as a consultant, it has been the responsibility of the service company to inform the operator if there are problems with the design of the cement slurry.[37]

### 4.2.1   Halliburton Testing Before the Job Indicated the Instability of the Foam Cement Slurry.

The following chart illustrates the foam stability laboratory testing conducted by Halliburton. The comments are supplied to describe the slurry as mixed and tested. In the chart below, "TT" represents the reported Thickening Time in hours and minutes. Foam Stability is reported as a density in pounds per gallon.    Conditioning time

---

[34] Halliburton Contract at Section 3, Appendix 5 A at 1.6 ("Provide services for a complete range of cement and slurry testing requirements"), 5.2 ("Cement and Spacer Sampling and Testing"), 5.3 ("Laboratory Testing and Reporting").

[35] Halliburton Contract at Section 3, Appendix 5 A at 5.2.1 ("The final results supplied to COMPANY prior to each job shall be available to COMPANY more than 24 hours before pumping cement and tests shall be completed using actual rig samples and not load out samples unless previously agreed with COMPANY.").

[36] Kellingray Dep. at 424 ("BP didn't have a cement lab, and several other parties don't have access to cement labs, so their reliance on testing is actually with the suppliers."); Fleece Dep. at 358 ("Q. And who was the -- who was the person and the contractor that you relied upon to test the cement slurries that were to be used, that BP was going to use at Macondo? A. Halliburton did the testing."); Walz Dep. at 201 ("The expectation is that the cement provider would be running the proper tests that they felt necessary for their product.").

[37] Faul Dep. at 544-545 ("Q. Now -- and that we discussed that you can rely on Halliburton to pump a good foam cement job, correct? A. I think you could make that statement. Q. Well, let's be more specific. BP can rely on Halliburton to pump a good foam cement job? A. I would like to think so. Q. And absent any warning that there's something wrong with the stability of that foam, BP can rely -- rely on Halliburton to pump a good foam? A. I'm not sure where you're going with the warning. Q. Well, if BP can rely on Halliburton to pump a good foam job, how would they know when Halliburton is not pumping a good foam job? Halliburton would have to tell them, right? A. Yes.").

represents the amount time the slurry was conditioned before stirring in hours and minutes.

## Table 2 - Halliburton Lab Testing[38]

| Lab Weigh-up Sheet Date | SCR-100 gal/sk | TT | Foam Stability | Conditioning time | Halliburton notes on laboratory sheets | Comments from Sabins |
|---|---|---|---|---|---|---|
| 2/10/2010 | 0.1 | 3:04 | none | | | |
| 2/12/2010 | 0.14 | 3:42 | none | | | |
| 2/12/2010 | 0.2 | 5:00 | none | | | |
| 2/12/2010 | 0.2 | | 16.8/17.6 | none | On crush test: "Slurry is settling, will repeat" | This indicates an unstable foam; rheologies very low |
| 2/16/2010 | 0.2 | | 15.9/15.9 | 2 hours | On crush test: "Hard on bottom, soft on top", "hard on bottom, firm on top" | This indicates an unstable foam |
| 4/13/2010 | 0.08 | 5:30 | 15.7/15.1 | 1.5 hours | | This indicates an unstable foam |
| 4/15/2010 | 0.09 | 6:52 | | | | |
| 4/16/2010 | 0.09 | 7:37 | cancelled | Unknown | "Cancel foamed stability as per Jesse" | Should test stability of 0.09 gps slurry |
| 4/17/2010 | 0.08 | None | 15.0/15.0 | 3 hours | | This indicates an unstable foam |

All four of the foam stability tests conducted for this well in February and April of 2010 showed that the foam cement was unstable (one test appears to have been mixed with the wrong formulation). Halliburton does not dispute that the first three foam stability tests indicated that the foam was unstable.[39] Although the early tests were conducted on slurries that contained a higher retarder concentration than what ultimately was used on the final slurry recommended by Halliburton for the Macondo well production casing,

[38] See HAL_DOJ_0000052-53; HAL_DOJ_0000055-56; HAL_DOJ_0000058-59; HAL_DOJ_0000061-62; HAL_DOJ_0000067-68; HAL_DOJ_0000035-36; HAL_DOJ_0000045-46; HAL_DOJ_0000049-50; HAL_DOJ_0000042-43.

[39] Roth Dep. at 445-446 ("Q. Okay. And did you find that all of those other tests prior to the tests on Exhibit 750 of foam stability showed instability? A. The other tests that I reviewed did not provide favorable foam stability results. Q. Okay. Meaning that they were unstable, correct? A. The tests were -- the tests indicated no stability on the slurries.").

these early tests provided indication that even the base slurry design developed by Halliburton was flawed.

With respect to the foam stability test performed on the lab weigh-up sheet dated April 17, 2010, Halliburton has suggested that the results of this test indicate that the foam pumped in the Macondo well was stable[40].   Halliburton's statement raises several concerns.

First, as shown in Table 2 the stability test documented on the April 17, 2010 weigh-up sheet was not performed on the actual slurry used in the Macondo well, which contained 0.09 gallons per sack of the SCR-100L retarder. Rather, the April 17th test was performed on a slurry that contained 0.08 gallons per sack of the SCR-100L. Thus, even if the results on the weigh-up sheet dated April 17th demonstrated stability, which they did not, those results would not be an indication of stability of the actual slurry pumped in the hole.[41] The slurry pumped in the hole had a retarder concentration of 0.09 gallons per sack, and it **was never tested**.

Second, the results on the weigh-up sheet dated April 17th show that the specific gravity of test samples were 1.8 and 1.799, which equate to densities of 15.0 lb/gal. Halliburton contends that this result indicates that the slurry is stable. ***This conclusion is wrong!*** If the resulting foam cement sample is heavier than the design target density, as it was in this case, the slurry is losing part of its gas. **A slurry cannot therefore be considered stable if it is heavier than the design density**, particularly by 0.5 ppg. The results on the weigh-up sheet dated April 17th indicates that the slurry lost 25% of it its gas[42] and was therefore unstable. The instability of the slurry has subsequently been

---

[40] Vargo Dep. at 529 ("The lab test, the foam stability test for eight gallons per hundred sacks or .08 gallons per sack, that stability test was complete. It was stable.").

[41] See Section 4.1.4 for discussion of the rheology effects from changes in SCR-100L concentration.

[42] Quirk Dep. at 480-481 ("Q. That would indicate that about a quarter of the nitrogen has been lost from the sample, correct? A. Based on these -- on these calculations.").

confirmed by three laboratories—my laboratory, the Chevron laboratory and Oilfield Testing & Consulting.[43]

In addition to the problems outlined above, Halliburton had additional deficiencies in its testing of the foam cement slurry it recommended to BP:

    a. No stability testing was performed on the 0.09 gal/sk retarder slurry—only the 0.08 gal/sk was tested. This is unacceptable. Post-incident testing and industry literature conclusively establish that retarder concentration affects the slurry rheology and therefore slurry stability.  Industry practices dictate that it is very important to have the exact slurry tested prior to the job. Further, the format of the lab report submitted to BP was confusing and made it difficult to identify that the foam stability testing was not performed on the exact slurry that was pumped[44].

    b. Halliburton used the wrong procedure in conducting the April 17th foam stability test.[45] Halliburton lab worksheets indicate that the slurry was conditioned at 135°F prior to foaming and then placed immediately at 180°F.[46]  At this temperature, the SA-541 present in the slurry would have activated to increase slurry viscosity and make the slurry appear more stable.  Under downhole conditions, however, the slurry would experience a bottomhole temperature of 135°F and then slowly heat up to 180°F,

---

[43] Dep. Ex. 2477 ("CSI Report"); Chevron Report at 9 ("A series of nine tests were conducted under varying conditions as described below... None of the tests produced a stable foam."); August 1, 2011 OTC Letter Report at 34-43 (Section 11) and 38 (table indicating all of the slurries tested had bubble breakout).

[44] Roth Dep. at 403 ("Q. When you first read that report, you were misled to believe that the results were all relating to one slurry test, correct? A. Again, the same answer: When I read the report, I didn't realize that there was two different slurries that were being reported on that document.").

[45] It is unclear whether Halliburton conditioned this slurry at 180°F or 135°F for three hours before foaming: Ms. Stelly, the lab shift manager, testified that the slurry was conditioned at 180°F (Stelly Dep. at 211); and Mr. Richard, the technician that put on the test, testified that he did not remember conditioning the slurry, the length of time the slurry was conditioned or the conditioning temperature (Richard Dep. at 136). If Halliburton conditioned the slurry at 180°F, that would be a very serious error. My report describes the situation where a less serious error was committed.

[46] Richard Dep. at 138-139 ("Q. You seal the PVC pipe, and you drop it in the -- the water that's 180? A. Yes, sir.").

which would not be sufficient to activate the SA-541 until several hours had passed.[47]

c. Halliburton did not conduct the unset foam stability test, as recommended by the API[48]. This procedure is used to visually examine foam stability in the short-term.[49] Although Halliburton claims that it conducts the foam tests according to API, it did not perform one of the most critical foam tests.

d. The rheology test results indicate that the base slurry designed by Halliburton was too thin to generate a stable foam. The slurry in question had a yield point ("YP") of two at $135\,^\circ$F and a yield point of zero at $80\,^\circ$F.[50] This violated Halliburton's recommended practices, which state that when designing a cement slurry for foaming: "Avoid the tendency to design a low-rheology slurry"[51]. Zero is the lowest possible meaningful yield point a cement slurry can have. Halliburton's own calculations show that the slurry it recommended to BP for foaming had "low-rheology".

e. Halliburton ran lab tests at the wrong foam quality and at the wrong retarder concentration. The foam quality at downhole conditions, as indicated by Halliburton's own OptiCem models, was 18.5%.[52]

---

[47] Dep. Ex. 5568 (SA-541 Technology Bulletin) ("When cement slurries containing SA-541 are heated to temperatures greater than 150°F, the material yields to suspend downhole solids."); Richard Dep. at 241 ("Q. Okay. Now, if you flip on the other side of this, one of the additives is SA-541, right? A. Yes, sir. Q. And is that an antisettling additive? A. It stands for Suspending Agent No. 541. Q. And so if it's -- it's the type of additive that would help thicken up a slurry? A. Yes. Q. Or help suspend solids in the slurry? A. It's a suspending agent, but it's also temperature activated. Q. And do you know what temperature it's activated? A. 190, 190 degrees Farenheit.").

[48] API 10B-4 at 9.3.1 (Stability of unset foamed cement slurry).

[49] Stelly Dep. at 185-188.

[50] HAL_0050585-88 (April 12, 2010 Lab Results – Primary with handwritten calculations of Yield Point).

[51] Dep. Ex. 4347 (Halliburton Global Laboratory Best Practices) at HAL_0677645.

[52] April 18, 2010 OptiCem Report at 21-22 (under Quality %).

Halliburton's foam stability tests, however, were conducted on a slurry with a foam quality of 12.98%. In general, foam stability increases as foam quality decreases.

All of the testing performed on the 0.08 gal/sk retarder foam slurry indicated foam instability. The addition of 0.01 gal/sk of the SCR-100L retarder to the slurry would cause the slurry to be thinner, and thus add to any instability problems. During the weeks leading up to the final cement job, and at the time the slurry was pumped into the Macondo well on April 19th, Halliburton knew, or by industry standards should have known, that the cement slurry was unstable or at the very least, was very likely to be unstable, and needed to be redesigned before being used in the well.

### 4.2.2  Halliburton Should Have Communicated to BP That There Were Serious Concerns about the Stability of the Foam Cement

Halliburton was responsible for design and testing the cement slurry[53]. BP does not have a cementing laboratory and must rely on Halliburton to provide the information from lab test results[54]. Further, as foam cement is a specialty, non-conventional cement, it would be expected that Halliburton would need to advise BP on foam stability issues that the BP Macondo well team would otherwise not understand or fully appreciate to the extent that Halliburton should have.[55] Halliburton provided BP with test results on

---

[53] Halliburton Contract at Section 3, Appendix 5 A at 1.1, 1.2, 1.6, 5.2, 5.3; Little Dep. at 91-92 ("[T]he operator are not the experts in cement slurry design. That's why we – we contract with the cement provider. They come with the -- a -- the design to meet the criteria that -- that the -- that the Team decide they want to implement; i.e., the -- the -- where to get the cement to, what's the . . . what's the conditions in the well that the cement has to -- the program has to -- to meet."); Corser Dep. at 106-107 ("The cement job is first designed and proposed by Halliburton... Then Halliburton works with the BP engineers to refine and review the cement job, the placement, what's going to be pumped, the fluids, the type. Then there is supposedly an extensive testing program done by Halliburton to ensure that the cement will actually work when put in place.").

[54] Kellingray Dep. at 424; Fleece Dep. at 358; Walz Dep. at 205 ("I was relying on Halliburton to convey if there was any issues with the cement. My expectation was that it would have been flagged to me or one of my engineers.") and 206 ("My experience with all my service providers and cementing in the -- over my 30 years is that if there was a problem, a substantial problem with a slurry design, they -- I've never had -- they've always brought it up to my attention.").

[55] Kellingray Dep. at 134 ("Are you telling me that you would not have expected a Well Team in the Gulf of Mexico to have known or to have suspected, even, that the foam quality with that value may, in fact, be an unstable slurry? A. It goes back to an earlier comment, Halliburton were engaged and part of the Well Engineering

the slurry without indicating any concerns with the results. Although Halliburton had test results indicating that the foam cement was unstable, it did not share those results with BP and instead recommended that BP proceed with the cement job.

The following test results were provided to BP along with various emails that described the testing.  Quotes from the emails appear in parentheses.

a. Pilot test results on March 8, 2010 ("I've attached the lab test for your review")[56].

b. Pilot test results on April 1, 2010 ("I already have a pilot test run, see attached. Once I get samples from the rig sent in to the lab and get a temp reading from Sperry to run WellCat temp modeling I will start running lab tests for the Prod Casing")[57].

c. Test results for 0.08 gal/sk slurry on April 15, 2010 ("Attached is the updated OptiCem report & lab test")[58].

d. Test results for 0.08 gal/sk slurry on April 16, 2010, ("I have not received any foamed compressive strengths yet. The JPT is currently 4:08 (pumping all cement at 2 bpm) and we currently have 5:30 pump time which gives us a 1:22 cushion. I will forward the results of test with additional retarder once I get it.")[59].

e. Test results for 0.08 gal/sk and 0.09 gal/sk slurry on April 17, 2010 ("Attached are the lab tests, one with 8 gal of retarder and one with 9 gals. Below are the pump times. The 8 gals lab test also includes the UCA and

Team. They were looking at the Cementing Operation and would have been giving cement advice to the Team. But most of the Team would have relied on Halliburton in terms of Engineering and understanding.").

[56] BP-HZN-2179MDL00243096.

[57] BP-HZN-2179MDL01288582.

[58] BP-HZN-2179MDL00249820.

[59] BP-HZN-2179MDL00250613.

foamed crush CS. The 9 gals UCA has only been on for 30 min and has not shown any CS yet. 8 gals — 5:30 hrs, 9 gals — 7:37 hrs The JPT is about 4:08 hrs, I would be comfortable going with the 5:30 hrs time. Please review and let me know. Thanks!!!")[60]

f.  Compressive strength chart for 0.09 gal/sk slurry on April 18, 2010 ("Forgot to attach CS in previous e-mail.  Below is the chart for 9 GPHS of SCR-100L.")[61]

g.  Compressive strength chart for 0.09 gal/sk slurry on April 18, 2010 ("Below is the chart")[62]

h.  Test results for 0.09 gal/sk slurry on April 18, 2010 ("Attached it [sic] the revised information for the upcoming 9 7/8" x 7" Prod Casing job.  The compressive strength yet is not completed yet, it currently has 34 hours. The chart of the progress is below.  Let me know if you have any questions.  Thanks!!")[63]

A review of email sent by Mr. Gagliano during this time period did not reveal any communication suggesting foam instability concerns. Additional review of numerous deposition transcripts, as well as Mr. Gagliano's testimony before Congress, produced no evidence that Mr. Gagliano or any other Halliburton employee told anyone at BP about the foam stability issues. Mr. Richard Vargo, Halliburton's corporate witness on communications with BP concerning the February and April foam stability tests, testified, "I don't know of any communication from Halliburton to BP about concerns about a foam stability test on the days leading up to the job."[64]

---

[60] BP-HZN-2179MDL01299582.

[61] BP-HZN-2179MDL00250724.

[62] BP-HZN-2179MDL00250740.

[63] BP-HZN-2179MDL00041325.

[64] Vargo Dep. at 541 and 531-532 (Halliburton's designated witness on communications with respect to testing).

Mr. Gagliano attended the morning meetings with the BP well team on a daily basis and it does not appear that he indicated to anyone, either at BP or at Halliburton, that there were problems and concerns with his cement slurry design. He also does not appear to have indicated any problem with the slurry design in any of his numerous phone and email communications with the BP well team and with other Halliburton employees and other contractors. Within the industry, foam instability is a significant concern, and the operator and other Halliburton employees should have been made aware of the issues with the foam slurry.

## 4.3   Available  Data  and  Halliburton  Communications  Indicate  that Halliburton Recommended the Job Go Forward and Reported that the Job was Executed Successfully

Halliburton was responsible for executing the cement job, monitoring the execution and reporting on the success or failure of the cement job.[65] On April 18, 2010, Halliburton sent BP a recommended cement plan and design report. The BP wells team was prepared to address issues that had been identified in the planning of the cement job, including channeling and potential fracturing and losses. The job decision tree indicates that BP would perform a bond log if losses occurred during the cement job, and a crew from Schlumberger was flown to the rig to perform the bond log if needed.[66] After the cement job was pumped, Halliburton reported to BP that the cement job went well.[67] The Halliburton and Transocean crews reported that no losses occurred during the job, indicating that the cement was not lost to the formation.  When the cement is not lost to

---

[65] Halliburton Contract at Section 3, Appendix 5 A at 1.1 ("1.1 CONTRACTOR shall as requested by COMPANY provide cementing materials, engineering, mixing and pumping services, hereinafter referred to as "Cementing Services" as defined herein, which shall include but not be limited to: 1.1.1 Primary cementing of all casing strings") and 1.2 ("Provide onshore engineering support to the operation, with a full and comprehensive technical back up to the operation. This shall include as a minimum: 1.2.6 Job evaluation and reporting.").

[66] BP_HZN_2179MDL00252464.

[67] Nathaniel Chaisson reported to Jesse Gagliano that the cement job had completed successfully at 5:44 AM on April 20, 2010 (HAL_0011208) and then gave the same report on the 7:30 AM morning meeting on April 20, 2010.  Chaisson Dep. at 353-354 ("The only reason I'm present at this morning meeting was because I was asked by, I believe it was Bob Kaluza the company man, just to come in on the morning meeting and give an overview of what we pumped and how the job went.").

the formation, it is an indication in the industry that cement has been placed up into the annulus at least to the target top of cement.[68] If Halliburton personnel had any remaining concerns about the cement job, the testimony and communications indicate that those concerns were not communicated to BP or others.

### 4.3.1   Halliburton Recommends that BP Go Forward with the Cement Job

Throughout the entire drilling operation leading up to cementing of the Macondo production casing, BP engaged Halliburton's design engineer in discussions regarding well progress, design criteria, and well issues. The Halliburton design engineer, Mr. Gagliano, was aware of these communications and accepted the decisions reached by BP in his final job recommendation.

a.   On April 14, 2010, Mr. Gagliano distributed an OptiCem run modeled with long string casing[69].

b.   On April 16, 2010, Mr. Gagliano received information from Nathaniel Chaisson, Halliburton's cementer on the rig, about the decision to run only 6 centralizers[70].

c.   On April 17, 2010, Mr. Gagliano attended the morning meeting and did not raise any concerns about the use of 6 centralizers.[71]  On that same day,

---

[68] Tabler Dep. at 380-381 (the Transocean driller confirmed full returns to the Halliburton cementer) and 453 ("Q. And that's because if you have no losses, then the cement has nowhere to go except up the annulus. A. That's correct."); Chaisson Dep. at 357 ("Q. And that result is reflected in your post-job report, that you had full returns for this job? A. That is correct. Not only did I speak with Cathleenia Willis, I also made some calls to the rig floor. ... And I was also informed by the individuals on the rig floor that, yes, we do have full returns, we have no losses.").

[69] Anderson Dep. at 264 ("It was -- there was a successfully executed cement job."); Tabler Dep. at 378-381 and 382 ("Q. Was there anything during the cement job that raised a question in your mind whether the job was completed successfully?   A. No, sir."); TRN-INV-00000548 (TO interview notes of Burgess) at TRN-INV-00000550.

[70] Chaisson Dep. at 73-74 ("Q. And by 7:50 central on April 16th, Friday evening, you had called and informed Halliburton's account representative, Jesse Gagliano, of that decision not to run the additional 15 centralizers; right? A. That phone call was placed at 7:50 p.m., that's correct. Q. And in that phone call you informed Mr. Gagliano that BP had made the decision not to run the additional 15 centralizers; correct? A. That is correct.").

he sent version 5 of the cementing recommendation without expressing any concerns. Mr. Chaisson also met with the BP crew on that day to discuss the job pumping procedure, including planned circulation, and sent the plan to Mr. Gagliano[72] without expressing any concerns.

d. On April 18, 2010, Mr. Gagliano sent an OptiCem model with 7 centralizers and a job recommendation with the new procedure and circulation volume to BP.  He did not raise any concerns with either the centralizers or the circulation volume.[73]

e. In the same April 19, 2010 transmission, Mr. Gagliano sent an updated UCA chart with 34 hour results, indicating that the slurry would have adequate compressive strength to proceed with pressure testing at approximately 8 hours 40 minutes.

f. On April 19, 2010, BP conferred with its contractors concerning the upcoming cement job. No one from Halliburton expressed concern about the cement job that would be performed.[74]

Mr. Gagliano does appear to have expressed concerns to BP engineers relating to the placement of the cement and the potential for long-term hydrocarbon leakage from mud or gas channeling that might occur with seven centralizers and not circulating bottoms-up.  Instead, final engineering decisions from BP were accepted and incorporated into

---

[71] Chaisson Dep. at 78 ("Q. But you don't recall Mr. Gagliano raising it on April 17th at the morning meeting; correct? A. I cannot recall, no.").

[72] Dep. Ex. 711, HAL_0125561 (April 18, 2010 Nathaniel Chaisson email to Jesse Gagliano attaching 9.875" x 7" Casing Job Procedure).

[73] BP-HZN-2179MDL00041325

[74] Tabler Dep. at 425-426 ("Q. So at the morning meeting of April 19th, do you remember the topic of cementing coming up, this is what we're going to do in the next 24 hours, cement the production casing? A. Yes, sir. It was -- it was mentioned about picking up the casing, the -- the whole job sequence. Q. And at the April 19th meeting, did anyone from BP, Halliburton, or any of the other contractors express concern with the cement job that was going to be performed by Halliburton? A. No, sir, not to my recollection. I -- there wasn't any concern at all.").

the final Halliburton job recommendation. Further, in my review of documents and transcripts, I was unable to locate any communication from Mr. Gagliano to anyone within Halliburton where Mr. Gagliano raised a concern with any of the operational decisions made by BP. And, at no time, either in written correspondence or oral communications, did anyone with Halliburton express concern over performance issues relating to short-term prevention of flow of hydrocarbons.[75]

### 4.3.2   Halliburton Executes the Cement Job and Reports that the Job Went Well

In its advertising and marketing literature, and in the depositions of numerous Halliburton witnesses, Halliburton states that it is the leading cementing service company in the world.[76] BP and Halliburton signed a contract which required Halliburton to supply a cementing expert to work in the BP wells team to supply the needed technical ability[77]. Halliburton was responsible for executing the cement job and monitoring it for success and failure. As a cementing specialist, Halliburton has vast experience with foam jobs, whereas operators like BP have limited experience. I understand that BP has utilized foam cement in deep production strings on only five jobs since it began drilling in deepwater, and always under the direction of a cementing service provider. Halliburton, on the other hand, presented its experience with use of foam cement for production strings in deepwater wells to be in the range of 79 jobs[78].

On April 19, 2010, at approximately 7:30 p.m. CST Halliburton began the cementing operation aboard the Deepwater Horizon rig. The operation concluded at approximately

---

[75] Walz Dep. at 899 ("Q. And during that call on the 19th, did Mr. Gagliano raise any concerns whether or not running six centralizers or any concerns that running six centralizers would negatively impact the safe operations of the rig during the temporary abandonment or cementing procedures? A. No.").

[76] Faul Dep. at 470 ("Halliburton advertises itself as the leading cementer in the oil and gas industry, correct? A. Yes, we do."); Serio Dep. at 299 ("Q. In fact, you guys hold yourselves out as the leaders in foam cement technology; isn't that true? A. Yes, sir.").

[77] Halliburton Contract, Section 3, Appendix 5, A.2.2.1 ("CONTRACTOR shall provide to COMPANY an Onshore Engineer to work either in COMPANY's or CONTRACTOR's offices as required by COMPANY. This individual shall be a member of COMPANY's well planning team.").

[78] Gagliano CEC 91 ("It's not an unusual thing that, at least in my experience, that we use foam in production casing jobs.").  Dep. Ex. 621, Halliburton *BP Deepwater Investigation: Preliminary Insights* (September 26, 2010) at 5.

12:36 a.m. CST in the early morning of April 20, 2010. Halliburton employees reported to BP and to other Halliburton personnel that the job was a success and that it went well. All of the Halliburton cementers on the rig testified that the job was successfully pumped.[79] Halliburton and Transocean employees reported no losses during the cement job.[80] In a communication from Halliburton cementing engineer Mr. Chaisson to Mr. Gagliano at approximately 5:44 a.m. on April 20, 2010, Mr. Chaisson reported: "We have completed the job and it went well. Full returns were observed throughout, and I estimated about 100 psi of lift pressure before we bumped the plug."[81] Halliburton concluded that the top of cement was located at least 500 feet above the highest hydrocarbon-bearing zone and that MMS requirements were met[82]. No concerns about any aspect of the cement job were expressed[83]. In his post-job report prepared hours after the job but before the Macondo blowout, Mr. Chaisson included the following chart:

---

[79] Anderson Dep. at 264 ("It was -- there was a successfully executed cement job."); Tabler Dep. at 378-381 and 382 ("Q. Was there anything during the cement job that raised a question in your mind whether the job was completed successfully? A. No, sir."), and 422 ("Q. Okay. And when Nathan told -- spoke with Jesse, he was supposed to convey your opinion and Paul's opinion that the cement job went successfully? A. Yes, sir.").

[80] Tabler Dep. at 380-381 ("Q. And did you observe full returns during the cement job? A. I personally did not. That was through Transocean. Q. Okay. Did you understand that there were full returns during the cement job? A. Yes, sir. Q. And who told you that there were full returns? A. I was getting my information from Dewey, which is the driller.").

[81] HAL_0011208 (4/20/2010 Chaisson email to Gagliano attaching post-job report); Tabler Dep. at 422 ("Q. Okay. And when Nathan told -- spoke with Jesse, he was supposed to convey your opinion and Paul's opinion that the cement job went successfully? A. Yes, sir.").

[82] HAL_0011209 (Post-Job report sent 4/20) at 2 ("Estimated TOC: 17,300 ft." and "MMS Req. met: Yes").

[83] Tabler Dep. at 388 ("Q. So if you believe that the cement job was pumped unsuccessfully, you would alert the operator? A. Yes, sir. Q. And then from -- and why would you alert the operator? A. To let him know we -- we may have some -- an unsuccessful cement job. Q. So that he can take further actions if necessary? A. Yes, sir, that's correct. Q. 'Cause if he doesn't know that there's an unsuccessful cement job, he can't take any actions? A. That's correct.") and 386 ("So my question is, whether or not you told anybody, hey, there's something wrong with the job, let's run a cement bond log? A. No, sir. I didn't mention anything to anybody.").

### Table 3 - Halliburton Post-Job Report

| String: | 9.875" x 7" | Type: | Production Casing | Weight (ppf): | 62.80 #/ft x 32.00 #/ft |
|---|---|---|---|---|---|
| Callipered ID: | N/A | Casing MD: | 12488 ft x 18304 ft | Casing TVD: | 12488 ft x 18304 ft |
| Landing String OD/ID (in): | 6.625 / 5.426 32.67 #/ft | Landing String Length: | 5060 ft | Water Depth/Air Gap: | 4992' / 75' |
| Inner String OD/ID (in): | N/A | Innerstring Length: | N/A | BHST/BHCT: | 210 / 135 degrees |
| Hole Size: | 10.50" x 8.88" | Rat Hole: | 55 ft | Open Hole Actual Excess: | 0 % |
| Shoe Track Length: | 189 ft | Circulation Rate: | 4 bpm | Circulation Volume: | 150 bbls |
| Returns While Circulating? | Yes | Pipe Movement? | No | Displacement Rate: | 4 bpm |
| Returns While Cementing? | Yes | Mud Lost While Cementing: | No | Mud Weight /Type: | 14.0 ppg SBM Pad Mud |
| Annular Flow Before/After Cementing? | No | Dart Shear? | Yes | Estimated TOC: | 17,300 ft. |
| Casing Test: | 1000 psi | Cement Tagged At: | N/A | Hard Cement in Shoe? | N/A |
| MMS Req. met | Yes | Actual Shoe Test: | N/A | Squeeze Performed? | N/A |

As this chart indicates, Mr. Chaisson reported that the top of cement reached 17,300 feet (the target top of cement) and that MMS requirements were met. In the body of his April 20th Post Job report, Mr. Chaisson further reported that full returns were experienced and that lift pressure was observed. In the report, there is no reference or suggestion from Halliburton regarding any concerns about pre-job circulation, centralization, channeling, or pressure anomalies. No mention is made of the need for a cement bond log, nor is BP's decision not to run a bond log criticized or even mentioned.[84] Halliburton employees have agreed that there were no communications sent by Halliburton to BP after the conclusion of the cement job indicating any concerns regarding displacement of drilling fluid, channeling, or cement height or any other issue.[85] Even internally, there were no concerns expressed by Mr. Gagliano or the

---

[84] HAL_0011209 (Post-Job report sent 4/20).

[85] Roth Dep. at 407 ("Q. Okay. After the cement job concluded, do you know whether or not anyone from Halliburton told BP – anyone at BP or Transocean or anyone -- that they still had concerns about the cement

cementers on the rig after the cement job.[86] All of the Halliburton communications that did take place (to BP and internally) indicate that Halliburton believed the cement had been placed without losses, and that cement had been placed to the target top of cement.[87]

In sum, both Halliburton and Transocean personnel reported to BP that no losses had occurred during the cement operation, which is significant in the industry. First, the absence of losses during the cement job indicates that the cement and mud were not lost to the formation, meaning that there was no fracturing or lost circulation at the production interval, as predicted by the OptiCem model.[88] Second, the absence of losses indicates to the operator and others that the cement pumped down the hole was

---

job? A. It's my understanding that the postjob report that was submitted by the team indicated basically, in that report, that the work that was performed at the surface was as to the plan that was agreed by BP as part of the design work."); Chaisson Dep. at 537-538 ("Q. So when the job concluded at that time, you reported to BP that the operation had been successful; correct? A. I sent an e-mail to Jesse Gagliano stating that; correct. Q. And then you had, then you also wrote post-job report; correct? A. That is correct. Q. And you understood that that post-job report would be communicated to BP; correct? A. I understood that it would be communicated to Jesse Gagliano, who would then take the information from that post-job report, review it, make any necessary changes and format it in the way that BP, his customer, would want to see it."); Vargo Dep. at 521-522 ("Q. Are you aware of any communication from Halliburton to BP after the cement job was performed that indicated that Halliburton believed that there was still channeling? A. I'm not aware of any communication after the cement job.").

[86] For example, Roth Dep. at 501 ("Q. Would you agree with me that … Jesse Gagliano does not identify any concern about the cement job, correct? A. I was unaware of really any concerns about the cement job on April the 21st.") and 502 (Gagliano did not raise concerns about centralizers or CBL after the incident); Vargo Dep. at 439-441 (does not recall any concerns raised by Mr. Chaisson, Mr. Tabler, Mr. Haire and Mr. Anderson in the days following the incident).

[87] HAL_0011208 (4/20/2010 Chaisson email to Gagliano: "We have completed the job and it went well."); Tabler Dep. at 422 ("Q. Okay. And when Nathan told -- spoke with Jesse, he was supposed to convey your opinion and Paul's opinion that the cement job went successfully? A. Yes, sir."); Dep. Ex. 4517 (4/20/2010 Morel email to John Guide, Mark Hafle, Brett Cocales, Greg Walz:  "Just wanted to let everyone know that the cement job went well. Pressures stayed low, but we had full returns the entire job, saw 80 psi lift pressure and landed out right on the calculated volume.").

[88] April 18, 2010 OptiCem Report at 25.

circulated and placed into the annulus, at least as high as the target top of cement, particularly, when as here lift pressure was also seen.[89]

### 4.3.3   Even After the Explosion, Halliburton Reported to BP and Internally that the Cement Job Had Gone Well

Halliburton created two versions of the Post-job report for the Macondo well production casing cement job. The first version was circulated internally within Halliburton a day after the blow out on April 21st, and the second was delivered to BP several days after the explosion on April 23, 2010.[90] In both versions, Halliburton continued to report that there were no problems with the job, returns, lift pressure, compliance with MMS regulations and achievement of target top of cement.  Mr. Chaisson testified that he was instructed to include everything and anything significant about the cement job in his revised report.[91] The revised report, like the original, contained no comments, criticisms, or concerns about the number of centralizers used, the amount of conditioning, the potential for channeling, or the decision to not run a CBL after observation of full returns.  Consistent with the two post job reports, internal Halliburton email communications in the days after the incident also indicated that the job went well.[92] In an internal email dated July 25, 2010, Tommy Roth, Halliburton's Vice President of Cementing at the time of the incident, states that modeling with Halliburton's Displace 3D program showed that the planned spacer addressed any channeling concerns: "Spacer volume was sufficient to sweep entire annulus volume. As such, spacer was

---

[89] Tabler Dep. at 453 ("Q. And that's because if you have no losses, then the cement has nowhere to go except up the annulus? A. That's correct."); Faul Dep. at 496 ("Q. Do you agree with me that if you have no lost returns and have some lift pressure, the cement has to go up the annulus? It's got nowhere else to go, right? A. I would agree with that."); BP-HZN-2179MDL00057816 (MC252 #1ST00BP01 - Macondo Prospect 7" x 9 7/8" Interval - Production Casing Operations, April 15, 2010).

[90] HAL_0011208 (4/20/2010 Chaisson email to Gagliano attaching Post-Job Report Ver. 1); BP-HZN-2179MDL00441560 (4/23/2010 Gagliano email to Hafle attaching Post-Job Report Ver. 2).

[91] Chaisson Dep. at 116 ("I was asked to come in and make any additions to the post-job report concerning events prior to the job, anything leading up to the job, because of the magnitude of the incident.").

[92] Dep. Ex. 4340 (Gagliano 4/21/2010 email to Roth re job); HAL_0011208 (4/20/2010 Chaisson email to Gagliano attaching Post-Job Report Ver. 1).

sufficient to sweep channel. Subsequent testing with 3D confirms statement that spacer was sufficient."[93]

### 4.3.4   Failure of the Cement to Isolate the Hydrocarbons Was a Result of the Design of the Slurry Not its Placement in the Wellbore

Thorough and rigorous evaluation of events surrounding the design composition and placement of the cement lead to the opinion that the cause of the cement failure was the slurry design.

There are two types of hydrocarbon flow of concern after a cementing treatment. The first is short-term high-volume hydrocarbon flow. This phenomenon typically occurs within the first 24 hours after the cement is in place, when the cement is setting and well operations may be occurring. Flow can be dramatic and result in a blowout at the surface of the well.

The second type of flow, long-term hydrocarbon leakage, is dramatically different than the flow described above. This flow typically occurs days and months after the cement job, rather than hours. This flow is generally described as minor to moderate, and it manifests as flow between zones or a slow leakage of hydrocarbon flow to the surface. This flow is a result of incomplete displacement of the drilling mud in the annulus when placing the cement.[94]

Operational decisions, such as the pre-job circulation, centralization, and channeling relate to a cement job's ability to prevent long-term annular leakage. The ability of a slurry to prevent short-term cement failure, on the other hand, is determined solely by the slurry's design and the location of the slurry (whether it across from the hydrocarbon producing zones and is in the shoe track below the float collar).

---

[93] HAL_1071448 (Roth response to Badalementi question "Halliburton your computer simulator indicated channeling, which lead to mud and cement inter mixing. However you still recommended foam cement.").

[94] Halliburton presentation "Annular Gas Migration - Solutions to Annular Gas Flow" at 5 ("Flow observed 'days' after cement is placed. Flow volume is slight to moderate.").

### 4.3.5   Analysis of the Available Data Indicates that the Spacer Cleaned the Hole and Cement Was Placed in the Annulus

Available data from the job indicates that the top of cement was likely near designed parameters, indicating that gross channeling of drilling fluid did not occur as suggested by Halliburton's OptiCem models. In addition to the evidence of lift pressure and full returns, the intersection of the relief well with the Macondo well at 17,200 feet (only 100 feet above intended cement top) revealed that the annulus at this depth was free of cement.[95] This discovery strongly supports the conclusion that the annulus was thoroughly displaced, or at least that no significant channeling occurred. Given that no losses were reported, and no cement was found at 17,200', it can be concluded with reasonable scientific certainty that the hydrocarbon zones were covered with cement at the conclusion of the cement operation.

Much emphasis has been placed on centralization, conditioning, GFP and the potential for channeling.[96] These issues are important design parameters for cementing a well. Conducting an extensive study of the decisions relating to centralization, channeling, and conditioning leads to my opinion that these engineering design decisions had no significant impact on cement placement. Instead, based on surface pressures and evidence indicating that the flow path of hydrocarbons was through the inside of the

---

[95] Sprague 3/22 Dep. at 803-804 ("Q. Okay. Where -- where in the Macondo hole did you intercept with the DD3 relief well? A. It was somewhere around 17,200 feet, I recall.  Q. Was that above the top of cement on the long string of casing? A. Yes.  Q. And was it below the bottom of -- I believe it would be the 9-7/8 inch liner? A. Yes.  Q. So is that a -- a portion of open hole?  A. Yes."); September 17, 2010 Update on Gulf of Mexico MC252 Operations ("Operations conducted bottoms up circulation, which returned the contents of the well's annulus to the rig for evaluation. Testing of the drilling mud recovered from the well indicated that no hydrocarbons or cement were present at the intersect point.").

[96] Halliburton itself admits that channel is not a safety issue and is routinely addressed by remedial cementing. HAL_0048828 (Tim Probert Responses to Questions for Hearing Record) at 3 ("Cement channeling does not in itself create a safety concern.  When cement channeling occurs, it is typically remedied by pumping additional cement as a subsequent additional step in the well program."), 4 (same) and 5 (same); Gagliano CEC at 93 ("Q Did you think that BP was acting unsafely by choosing the 6 centralizer design?  A I wouldn't look at it as unsafe. The channeling indicates to me there was a high potential of remedial work that would be needed to be done after the fact."); Halliburton presentation "Annular Gas Migration - Solutions to Annular Gas Flow" at 5 ("Flow observed 'days' after cement is placed.  Flow volume is slight to moderate.").

production casing,[97] it is my opinion that the cement seal failure was a result of instability of the foam cement slurry, as discussed above and further in the next section.

### 4.3.6   The Foam Cement Slurry Design Resulted in a Failure of the Cement Once Placed in the Well

The cement slurry designed by Halliburton, once placed, did not isolate the hydrocarbon zones in the well. The cement did not act as a barrier in the well either in the annulus across from the zones or in the shoe.

After reviewing and analyzing the data and testing relating to the cement slurry, the data indicates to a reasonable degree of scientific certainty that the cement slurry did not isolate the hydrocarbons in the well as it was supposed to do. It did not provide short-term barrier for well control as anticipated.

As discussed previously, the base dry cement slurry composition included ingredients that caused the foam cement slurry to be unstable and, thus, ineffective in preventing the short-term high volume hydrocarbon flows in the Macondo Well. In order to generate a stable foam cement in the well, a cement containing foaming surfactant must be injected with nitrogen at a differential pressure sufficient to disperse small, discrete micro-bubbles throughout the cement slurry. This generation of the foam occurs at the surface requires that the volume of the nitrogen injected at the surface be sufficient to produce the appropriate volume of gas under downhole conditions. For the Macondo well, in order to achieve a 14.5 lb/gal slurry (18.5% volume nitrogen gas at 14,000 psi) at the bottom of the well, the slurry had to be injected with nitrogen at the surface to a gas volume of 60% volume nitrogen (at 1000 psi). This amounted to roughly 60 barrels (bbls) of nitrogen injected into approximately 40 bbls of cement slurry at the surface of the well.

If the mechanical energy of the injection system is insufficient and/or the chemistry associated with the slurry is not effective, the foam will not be "generated". Rather than

---

[97] BP Incident Investigation Report, Appendix W, add energy report (Report-Dynamic Simulations Deepwater Horizon Incident BP).

creating a stable foam slurry with evenly distributed in small microscopic bubbles that stay entrained and entrapped, injection of nitrogen at surface conditions results in essentially a co-mingled two phase system of cement slurry and gas bubbles which will migrate due to the buoyancy of the gas.

The Macondo slurry suffered from several key design flaws that did not enable foam to be generated at the surface conditions. The post-incident testing performed by Oilfield Testing & Consulting ("OTC") demonstrates that a 60% by volume foam could not be generated even with four times the API-recommended mixing energy (one minute of shearing in the blender versus 15 seconds).[98] In the lab, foam generation is simulated by partially filling a blender container with base slurry and shearing the slurry at an extremely high rate (12,000 rpms) until the container is full of foam cement.  The API dictates that the cement slurry should foam in less than 15 seconds. This amount of time in the blender approximately simulates the shearing energy in the field foam generator.[99] The slurry, under the high shear forces in the blender, should encapsulate the air in the blender and disperse it uniformly throughout the cement slurry.

The test result at OTC showed that the 60% by volume gas foam slurry could not be generated in the 15, or even 60 seconds. The slurry, instead, would entrain only 30% volume of air.[100] As this slurry was representative of the foamed cement on the Deepwater Horizon, 43 bbls (or 73%) of the gas injected at the surface may not be entrained into stable micro bubbles, but could be free to coalesce and move through the cement. Downhole, this could mean that over 10 bbls at the top of the cement column, which was placed in the shoe joint and around the shoe in the annulus, could have a very high amount of unstable gas. This would render the slurry incapable of containing the short-term high volume hydrocarbon flow that occurred on the well.

---

[98] API RP 10B-4 "Recommended Practice on Preparation and Testing of Foam Cement Slurries at Atmospheric Pressure."

[99] Id.

[100] August 2, 2011 OTC Report, Macondo Well Evaluation of 60% Foam Quality Foam Stability Testing at 8 (picture of foam generation).

The following is picture is a set sample of unstable foam cement.



**Figure 1: Sample of Unstable Foam Cement**



To properly isolate the zones in a well, a foam slurry must be first successfully generated at the surface and then remain stable until it is placed. Once in place, the slurry must also remain stable until the cement hardens and develops compressive strength to hold the bubbles throughout the matrix of the cement. If the cement foam is unstable at any of these times, the nitrogen will migrate through the slurry and coalesce and gather non-uniformly in the cement slurry. While flowing down the casing, this unstable cement will allow movement of the gas from the bulk of the foam cement slurry to redistribute the bubbles more toward the last part of the cement slurry pumped into the well. This movement of the bubbles is due to the buoyancy of the gas in the slurry (due to the difference of the densities of the gas which is about 0.1 lb/gal at 1000 psi verses the cement slurry which is 16.7 lb/gal). This instability allowed a high concentration of the nitrogen bubbles to gather in the last portions of the total slurry that was pumped into the well.

## 4.4   Additional   Critical   Considerations   When   Utilizing   Foam   Cement Applications.

In addition to the problems previously noted with Halliburton's slurry design, foam cement applications require consideration of a number of other critical factors described below.  My review of the documents and depositions does not indicate that Halliburton adequately considered and addressed these concerns.

### 4.4.1   Foam Cement Volume Variation with Pressure

Foamed cement is a three phase fluid containing nitrogen gas, cement and water. Gases like nitrogen are compressible, meaning that they experience large volume changes when exposed to temperature and pressure.  As a foam slurry is pumped downhole and exposed to increasing temperature and pressure, the "foam quality"—ratio of gas volume to total foam cement volume—changes due to this compressibility.

Foam qualities used in offshore cementing are typically in the range of 15-35%, as studies have shown that the permeability for foamed cement increases dramatically at foam gas volumes above 35%, creating potential stability issues.[101] In the Gulf of Mexico, foamed cement is most commonly used in shallow hole sections.  In these applications, a relatively small nitrogen ratio is required, the pressure difference between the surface conditions and the placement conditions is small, and the pump time is minimal.  Therefore, the slurry does not experience dramatic change from the time that it is generated at the surface to the time that placement is complete.   In deepwater wells, however, the pressure difference between the surface conditions and the bottomhole conditions is far greater, meaning that a much larger volume of nitrogen must be injected into the cement at the surface to achieve the desired density downhole, and the foamed cement will be at a high nitrogen volume for a longer period due to the longer pump time.  The deeper the well, the greater the difference will be.

---

[101] Rozières, J. and Ferrière, R., "Foamed-Cement Characterization under Downhole Conditions and its Impact on Job Design", *SPE Production Engineering, August 1991, at 297-304.* SPE 20453; Goodwin, K.J. et all, "Cement Sheath Stress Failures" (1991). Foam cements with nitrogen volumes outside this range having a higher propensity toward instability.

For the Macondo production casing, the planned downhole foamed density was 14.5 lb/gal, which equates to a foam quality of approximately 18.5%.[102] To achieve the 18.5 foam quality downhole, the slurry had to be injected with 60% nitrogen at surface conditions.  Creation and maintenance of a stable foam at 60% foam quality is difficult, and if gas bubbles coalesce in a foam cement, it is not possible to re-stabilize the foam or re-disperse the bubbles into the cement while pumping the cement downhole. Thus, analysis of the foam slurry at surface conditions is critical to the proper design of a stable foam.

As the cementing expert responsible for designing the foam cement system, Halliburton should have confirmed that its foam slurry design was stable at both surface mixing conditions and simulated downhole conditions.  My review of the relevant documents and testimony does not indicate that such an analysis was performed.[103]  Further, post-incident testing by Oilfield Testing & Consulting has indicated that a stable foam slurry could not be generated at 60% foam quality using Halliburton's slurry design.[104]

### 4.4.2   The Importance of Foam Cement Rheology

When designing a foam cement, the rheology of the base slurry is critical. Generally, the thicker the base slurry, the more easily a stable foam can be generated.[105]  Thus, Halliburton's Global Laboratory Best Practices specifically instructs employees that when designing a base slurry to be foamed, "[a]void the tendency to design a low-

---

[102] HAL_0117352 (April 18, 2010 9 7/8" x 7" Production Casing Design Report) at 22.  Note: The Halliburton lab test reports a 13% foam quality, but this foam quality was incorrectly calculated based on a 14.5 lb/gal foam slurry at *surface* conditions. The difference in the two values is caused by the change in the nitrogen compressibility factor and the higher nitrogen density at downhole conditions.

[103] DuBois Dep. at 297-99.

[104] August 2, 2011 Oilfield Testing & Consulting Macondo Well Evaluation of 60% Foam Quality Foam Stability Testing at 7.

[105] HAL_0128439 Halliburton's Foam Cementing Operations Manual states "admixes that increase viscosity or add thixotropy tend to stabilize foam cements."

rheology slurry," and avoid using "dispersing additives" which have the effect of thinning the slurry and lowering its rheology.[106]

In an annotated copy of the April 12th 2010 lab results provided by Halliburton, the yield points of the Macondo well slurry are calculated by hand on the lab sheet and reported as 0 $lb_f$/100 ft$^2$ at 80°F and 2 $lb_f$/100ft$^2$ at 135°F. These yield points are extremely low—a value of 0 is the lowest possible yield point—and indicate a very thin slurry which is unacceptable for foam cement design.

The Halliburton engineer and laboratory technicians should have recognized that it would not be possible to generate stable foam with such a thin base slurry. It does not appear, however, that anyone at Halliburton considered the effects of rheology in the design of the Macondo slurry. The result was a foamed slurry that violated Halliburton's own internal guidelines on foam design, exhibited problems with stability, and failed to isolate the hydrocarbon zones in the wellbore.

### 4.4.3   Free Fluid and Fluid Loss Testing

Contrary to API recommendations, industry best practices, and its own testing manuals, Halliburton did not conduct either a free fluid test or a fluid loss test on the slurry it designed for the Macondo well production casing.[107]

Halliburton's manual instructs: "Because this test is to be used for determining slurry stability it is important to look for signs of solids settling as well as observe the free fluid amount." Another comment in the Halliburton's design documents states, "Some retarding additives may affect the rheological properties of a slurry and cause problems with settling and/or free fluid."[108]

---

[106] Dep. Ex. 4347 (Halliburton Global Laboratory Best Practices) at Vol. 4, 3-47.

[107] Dep. Ex. 4347 (Halliburton Global Laboratory Best Practices) at Vol. 4, 3-48.

[108] Dep. Ex. 4347 (Halliburton Global Laboratory Best Practices) at Vol. 4, 3-49.

#### 4.4.4  Application of Foam Cement in SOBM Environments is Common in the Industry

The drilling mud utilized in the Macondo well was synthetic oil based mud.  Discussion has occurred among various parties in this litigation that the use of foam cement is inappropriate in wells drilled with SOBM.[109] Foam cement has been used in SOBM environments many times in the Gulf of Mexico. It is common knowledge in the industry the SOBM can destabilize foam cements, and SOBM is a foam cement design concern, but many wells have been drilled with SOBM and cemented with foam cement.[110] The key to a successful foam cement job in a SOBM environment is to correctly design the spacer systems and pumping operation so that the foam cement has minimal contact with the SOBM. The use of foam cements in SOBM environment was considered in this job by the wells team and it was determined that, with the proper placement design of the job, the problem of the foam contacting the SOBM would be alleviated.[111]

#### 4.4.5  Halliburton's Use of SA-541 Anti-Settling Additive

SA-541 is an anti-settling material which increases slurry viscosity when it is exposed to temperatures over 150°F.[112] This additive, as stated in the Halliburton literature, will not increase the viscosity of a cement slurry until the slurry reaches a temperature of at

---

[109] Glen Benge Expert Report at 13.

[110] It is my experience that most operators are drilling with SOBM in the Gulf of Mexico. Halliburton presented in a power point some 79 wells have used foam cement in the deep production string (Dep. Ex. 621, Halliburton *BP Deepwater Investigation: Preliminary Insights* (September 26, 2010) at 5). This is common practice.

[111] Cunningham Dep. 131-133 ("I had exchanged conversation with Brian Morel very early in March, when he attended a BJ audit with me, and we had had dinner, and he had mentioned that there was -- potentially foam cement was on the table for the Macondo production cement job. During that meeting, we just talked slightly about foam cement and I suggested to him that utilizing foam cement after you've changed from your water-based mud in the riserless section to the synthetic oil-based mud presented some additional challenges and that a cap slurry could potentially mitigate some of those challenges. So when he got back from that audit on -- I think on like March 8th or so, he sent a mail to me asking about, you know, what a cap slurry is, and I responded to him saying that once you switch to synthetic oil-based mud, there is an increased risk of the foam stability and that cap slurry could be used to mitigate that.); 4/18/2010 Gagliano email attaching Job Recommendation ver. 6 (BP-HZN-2179MDL01299741).

[112] HAL_0045047 Halliburton Technical Bulletin on SA-541. "This additive does not increase viscosity until the temperature is 150 F". Also see http://www.halliburton.com/public/cem/contents/Chem_Compliance/web/H02043.pdf

least 150°F. It therefore had no benefit for the Macondo slurry because the bottom hole circulating temperature (BHCT) of this well was 135°F.

Halliburton has suggested that the SA-541 activated and provided some viscosity in the Macondo slurry, but its own rheology test results contradict this assertion. The Halliburton test results show that the Plastic Viscosity was 84 cp at 80°F and 54 cp at 135°F, indicating that the SA-541 did not cause an appreciable difference in the slurry rheology between 80°F and 135°F.[113] The Chevron testing and OTC testing also confirm that rheology readings were very similar or lower at 135°F than 80°F.

Even though the SA-541 does not affect the rheology of the slurry downhole, it does effect the interpretation of the laboratory test results that are conducted above 135°F, primarily the foam stability test. Any tests that are conducted on the slurry at temperatures above 150°F will erroneously have a much higher viscosity than at the lower temperatures because of the impact of SA-541. This is significant in the stability tests on the foam cement. The laboratory sheets from Halliburton[114] indicate that the slurries used in the foam stability tests were conditioned for between 1.5 to 3 hours and then placed into a bath at 180°F. At this temperature, the SA-541 in the slurry would activate and increase the viscosity and stability of the foam slurry. A foam stability run at 135°F and then slowly heated to 180°F would likely indicate more instability.

### 4.4.6   Halliburton's Use of Well Life 734

Well Life 734 is an additive used to modify the mechanical properties of the set cement. Halliburton's literature states that it is used to increase tensile strength and prevent lost circulation.[115]

This product is added at the well site into the cement slurry. For the Macondo well, it was added at a concentration of 1lb/bbl of slurry. Most laboratory tests on slurries

---

[113] BP-HZN-2179MDL01299584 (Halliburton's April 18 lab report) at 2.

[114] HAL_DOJ_00000035-36.

[115] http://www.halliburton.com/public/cem/contents/Data_Sheets/web/H/H05868.pdf.

designed with lost circulation additives like WellLife 734 additives omit the fibers from the test sample because mixing in a lab mixer chops the fibers or the fibers interfere with instrument readings.   A Halliburton presentation prepared in the litigation has claimed that WellLife 734 additive improves rheology, improves slurry stability, and decreases fluid loss.[116] This presentation is contradicted by the testimony of Timothy Quirk, the manager of Halliburton's Broussard lab, who stated that he's not aware of any effect that WellLife 734 has on foam stability."[117] Similarly, Richard Vargo, Halliburton's Technical Manager for Gulf of Mexico, testified that WellLife 734 has no effect on slurry stability or thickening time.[118]

### 4.4.7   Halliburton's Use of KCL

KCl is added to oilwell cements to prevent swelling and instability of water-sensitive clays in the formations that the cement will cover.[119] A side effect of KCl is that it disperses the cement particles and thins the slurry.[120]

---

[116] Halliburton Presentation HAL_0579630, at 4 ("WellLife® 734 fibers added in the slurry in the mixing tub, not used in laboratory tests as this may interfere with the paddle used in lab testing and the fiber is inert, improves rheology, slurry stability, decreases fluid loss and helps prevent losses during placement.").

[117] Quirk Dep. at 384 ("Q. And are you aware of any effect that WellLife 734® gives to foam stability? A. No, I'm not.").

[118] Vargo Dep. ("Q. Right. And so do you use the WellLife® 734 in your testing, or do you not? A. The WellLife® 734 is a -- is a glass fiber that is an inert additive that can -- that can cause problems in -- in performing the test, but we don't see any difference in -- we don't believe there's any difference in thickening time because it's a -- an inert additive, sir.").

[119] HAL_1124623 (Halliburton "Cementing Technology Manual"); Nelson E. B. et al. "Well Cementing Second Addition", Chapter 3 p 71-80; Cunningham Dep. at 205 ("Q. Okay. A. -- I was asking him to -- for his comments and his feedback on that, if they were doing it for clay stabilization, which is the reason to add KCL or is there another reason that they've added it that I'm not aware of or was it doing -- or was it being done as a way to enhance revenue.").

[120] Beirute Dep. at 124-125 ("Q. with respect to the foam slurry containing the dispersing additives, and listing the (KCl, retarder, EZ Flo) and defoamer - all against industry practices..., again, is it your opinion that it was against industry practices for the foam slurry the -- to include the dispersing agents in the defoamer? A. I would say that we felt that the use of materials that potentially could be dis -- dispersants under the conditions of the -- the well was not advisable. Q. Well, is it your opinion that that would be against industry practice for the foam slurry to contain the dispersing agents and the defoamer? A. Yeah, would I say that that is correct. That's what we stated.").

The formations to be covered by the Macondo slurry did not require KCl for clay stabilization. The presence of this dispersant and its potential effects on foam stability should have prompted Halliburton to thoroughly investigate foam stability across the entire range of nitrogen volumes and to add thickening agents to increase slurry rheology if required.

## 4.5   Post-Incident Analysis by Other Parties Confirm the Problems with the Slurry Designed by Halliburton.

Several laboratory studies were performed to determine the stability of the foam cement in the well.

a.  Testing by CSI on a simulated slurry indicated that "The 18.5% quality foam was not stable when generated at atmospheric pressure at 110F or 140F."[121] CSI data showed that at all of the gas volume percentages tested, either the slurry would not foam in 15 seconds, or could not be generated at all and  was not stable after sitting static for 2 hours.[122]

b.  Chevron performed testing on stock additives and cement from Halliburton.  The test results indicated that, using the materials provided by Halliburton and available design information regarding the slurry used at the Macondo well, Chevron was "unable to generate a stable foam with any of the tests described in Section 9 of the report."[123]

c.  Testing by OTC exhibited "Bubble Break-out" on every sample tested.[124] A total of 15 different samples were tested, including Halliburton stock

---

[121] CSI report "Laboratory Analysis of Cementing Operations on the Deepwater Horizon" at 3.

[122] CSI developed a simulated slurry from additives that were similar in nature to the Halliburton additives and were the industry "best match" without having the exact materials Halliburton additives. BP asked Halliburton to supply the additives for the tests but they refused.

[123] Chevron Report, "National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling Cement Testing Results" (October 26, 2010) at 9.

[124] August 1, 2011 OTC Letter Report at 38.

additives and cement, and **actual rig samples** of the blend used on Macondo.

In summary, three independent laboratories confirmed that the slurry that Halliburton designed was unstable.

Numerous publications in the industry explain the inability to generate a stable foam and the results of instability.[125] All experts in the field agree that a set unstable foam slurry will in fact have an extremely high permeability (the measure of the flow of fluids through the matrix of the cement) and very low strength. The cement matrix in this highly-permeable, unstable cement results from open cell structure in which nitrogen bubbles to interconnect. The permeability of a portion of unstable foam in which high amounts of nitrogen have coalesced can be 30,000 md.[126] A cement that has stable structure with evenly distributed throughout the matrix could have a permeability of 0.01 md. The high matrix permeability of the unstable foam would not provide sufficient resistance to flow of hydrocarbons and would develop low compressive strength.

### 4.5.1   Chevron Testing Verifying Slurry Defects

At the request of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, Chevron's Briarpark laboratory performed a number of tests with representative materials from the well in question.[127] These materials were supplied by Halliburton. The tests results are summarized in Chevron's report. The cement slurry that Chevron tested was the Macondo slurry composition that was pumped into the well.

Chevron conducted the following tests:

    a.  Thickening time

---

[125] Aldrich, C.H. and Mitchell, B. J., "Strength, Permeabilities, and Porosity of Oil Well Foam Cement", Journal of Engineering for Industry, 1975.

[126] SPE 102185 Vidick et al. "The Search for Alternatives to Screen: Is Permeable Cement a Viable Option" SPE 2006 San Antonio Texas.

[127] Chevron Report, "National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling Cement Testing Results" (October 26, 2010).

b.  Mixability

c.  Fluid Loss and Free Fluid Testing

d.  UCA compressive strength

e.  Crush compressive strength

f.  FYSA viscosity Profile and Gel Strength

g.  Rheological profile measurement

h.  Foam mixing and stability

i.  Effect of Mud Contamination on Unfoamed Slurry Sonic Strength Development

j.  Stability of Foamed Cement with Mud or Spacer Contamination

k.  Static Gel Strength Development

Chevron tested a slurry with 0.09 gal/sk retarder (the retarder concentration used by Halliburton in the cement job). Chevron did not test a slurry with 0.08 gal/sk as Halliburton tested for rheology, foam stability and crush compressive strengths.   The Chevron report states that "Many of the test results were in reasonable agreement with those reported by Halliburton," apparently referencing tests related to the rheology characteristics, compressive strength and other characteristics of the foam slurry. This is evidence that the slurry that Chevron tested was representative of the slurry pumped in the Macondo well.[128] Chevron goes on to report: "However, we were unable to generate a stable foam with any of the tests described in Section 9 of the report," which described the foam stability tests run. The Chevron lab could not generate a stable foam cement system in any of the nine tests that were using various testing techniques

---

[128] Gardner Dep. at 249 (agreed that Halliburton samples that Chevron tested would perform reasonably the same as the rig samples: "They were in reasonable agreement, so you would think that they would perform reasonably the same.").

and methods. It is my opinion that Chevron's testing confirms the design defect in the slurry.

### 4.5.2   OTC Testing Verifying Slurry Defects

The Oilfield Testing & Consulting laboratory conducted testing on the Macondo cement slurry with stock cement and additives supplied by Halliburton as well as testing on the actual blend of cement that was received from the rig (from the Damon Bankston vessel), along with a sample of the SCR-100L supplied by Halliburton. OTC tested both a 0.08 gal/sk SCR-100L concentration slurry and a 0.09 gal/sk SCR-100L concentration slurry. The various tests that OTC performed were:

    a.  Water analysis

    b.  Mixing and Blending

    c.  Fluid Conditioning

    d.  Rheology

    e.  Free Fluid and BP Settling

    f.  Fluid Loss

    g.  Thickening Time

    h.  Compressive Strength

    i.  Compatibility Tests

    j.  Foam Stability Tests

OTC also performed separate testing on generation of a foam at 60% by volume and 110°F.

Rather than discuss all of the details of all the testing outlined in the OTC report, this section provides conclusions regarding the most important aspects of each.

OTC Report on Lab Testing:

1. All results from foam tests showed that the Halliburton-designed foam cement was unstable.

2. Foam stability testing of **the exact blend of cement from the rig** also showed that the foam cement was unstable.

3. Rheology test results indicate that a 0.01 gal/sk increase in SCR-100L concentration affected the rheology of the cement. Using 0.09 gal/sk of retarder created a thinner slurry than use of 0.08 gal/sk of.[129]

4. The cement slurry and mud where incompatible when mixed. This indicates that the two fluids would not easily mix.[130]

5. The free water performance of the base slurry was unacceptable for a production cement slurry.[131]

6. The compressive strength of the Macondo slurry was greatly affected by the pressure applied to the cement during curing. The test pressure used by OTC in this testing was 3000 psi. Using a temperature schedule that simulated the most likely heat-up time of the well, the 0.09 gal/sk retarder slurry achieved 500 psi in 17 hours and 42 minutes at 3000 psi. If the test had been conducted at an approximate bottom hole pressure of 14,500 psi, however, the slurry would have reached 500 psi in less time.[132]

Report on Foam Generation at 110°F:

The OTC testing indicated that the slurry, as designed, could not be foamed to 60% volume. Even when four times the amount of energy recommended by API was applied

---

[129] See Section 4.1.3 in this Report for the data.

[130] August 1, 2011 OTC Letter Report at 33.

[131] August 1, 2011 OTC Letter Report at 13 (Section 6. Free Fluid and BP Settling).

[132] Chevron Report at 6 (Protocol 2).

to the slurry, the slurry would only foam to approximately 30% by volume (see picture below). This means that 70% of the nitrogen likely was not entrained in a stable foam during foaming operations for the Macondo cement job. The blender jar of cement from this test, pictured below, should be full of foam cement, but, as shown, the top two blender blades are exposed. This indicates that a stable foam cement will not be generated at the injection point on the rig.[133]

### Figure 2 - Picture of Attempt to Blend 60% by Volume Foam



### 4.5.3   Other Experts Also Conclude that the Foam Cement Was Not Stable

The expert report authored by George Birch[134] concurs with the CSI assessment and the laboratory results Chevron and OTC—that the foam cement as designed was not stable. In his report, Mr. Birch noted that all stability tests reported by Halliburton indicated foam stability issues. After analysis on Halliburton's performance for the

---

[133] August 1, 2011 OTC Letter Report at 39 (showing densities of top, middle, and bottom of set foamed slurry).

[134] August 26, 2011 Review of Macondo #1 9-7/8" x 7" Production Casing Cementation (Birch Expert Report) at 7.

Macondo well, Mr. Birch specifically concluded that "Halliburton failed to act as a minimally competent cement contractor," that the foam cement designed by Halliburton was unstable, that Halliburton failed to conduct essential cement testing, and that Halliburton cement program incorporated a slurry design that was defective.[135]

Mr. Birch corroborated the cement design flaws discussed in sections 4.1.2 through 4.1.4 above. Birch describes D-AIR-3000, SCR-100 and KCl as additives that can disperse a cement slurry and destabilize foam bubbles. Birch further noted that the yield point of the slurry was too low in light of both displacement mechanics and foam stability. Birch states that yield point of over 5 $lb_f/100ft^2$ are recommended. Finally, he determined that the Halliburton foam stability test results indicate an unstable foam, since in every instance, the measured density was significantly higher than target density. Birch ultimately concluded that "the cement recipe should have been reexamined, reformulated, and redesigned" and that the slurry, as designed, was not suitable for the well conditions presented at the Macondo.[136]

Glen Benge also submitted an expert report, in which he states that the Macondo foam design used a leftover blend from a previous job, and that this blend had additives not suitable for foam cementing.[137] Benge further concluded that Halliburton did not perform all of the necessary testing to ensure a stable design (including free water settling, fluid loss, and rheology), and that D-Air 3000, and SA-541 were not appropriate additives to be used.[138]

---

[135] Birch Expert Report at 3 (Conclusions).

[136] Birch Expert Report at 5.2.

[137] August 26, 2011 Evaluation of the Cementing on the 9 7/8" x 7" Production String on the Macondo Well (Benge Report) at 12-13 ("Certain additives contained in the Kodiak #2 dry blend were either detrimental to or not necessary for foaming the cement slurry on the Macondo production string. These additives include D-Air 3000 and SA-541.").

[138] Benge Report at 28-32 ("A complete test series was not performed for the slurry containing 0.09 gal/sk SCR-100 retarder that was actually pumped on the Macondo well.").

Phil Rae also authored a report for Transocean.[139] In his report he states:

- "The cement design in terms of composition values, performance and arguably, density was inappropriate for this casing string in the particular well. Better designs with superior properties could easily been formulated and proposed for this critical cementing operation."

- "Laboratory data presented for the cement slurry were inaccurate or misleading and misrepresented the properties and characteristics of the cement. Failure to identify the significance of these inaccuracies and inconsistencies or to advise of their potential importance almost certainly contributed to the subsequent disaster."

- "Important additional laboratory tests that would have verified the performance characteristics of the cement and spacer system proposed and their suitability or otherwise for this application, were not carried out, or not reported."

## 4.6   Temperature Modeling by Halliburton

Halliburton utilized Landmark's WellCat (Well Casing and Tubing) software to perform temperature calculations for the Macondo well.[140] WellCat is an integrated suite of programs that predicts temperatures and pressures in the wellbore. WellCat provides temperature and pressure simulations for a wide range of drilling, cementing, production, injection, completion, and workover operations.

CSI received five WellCat files from Halliburton from the Macondo well project to review the WellCat runs used by Halliburton in 2010 to design the foam cement prior to the April 19, 2010 Macondo production casing cement job. The most current file could not

---

[139] TRN-INV-03404062 (Phil Rae, "Deepwater Horizon Macondo Blowout, A Review of Cement Designs and Procedures," August 20, 2010).

[140] Gagliano CEC at 14 ("I do the OptiCem modeling and do temperature modeling.").

be run as received and created a run error.[141] CSI was, however, able to see from the file that the Bottom Hole Static Temperature (BHST) input for the file was 240°F. This observation answers the question regarding exactly what value of BHST Halliburton input for WellCat. I note, however, that Mr. Gagliano indicated static temperature of the well was 210°F.[142]

CSI has the WellCat modeling and a report was generated on this modeling performed last year.[143] WellCat modeling performed by CSI predicts a circulating temperature during cementing of 140°F.[144] Halliburton used a 135°F bottom hole circulating temperature for cement testing.[145] Figure 3 is a CSI temperature plot for the first and last sack of cement during displacement and placement. Figure 4 is a graph that predicts both the placement and post-placement heat of the well from a CSI WellCat run conducted last year.

---

[141] HAL_0530943.wcd file.

[142] Gagliano CEC at 67 ("Also the static temperature of this bill was 210 for the cement job.").

[143] Details are shown in CSI Report "Analysis of Cementing Operations on the Deepwater Horizon and Possible Contributing Factors to Loss of Well Control" at 31.

[144] Details are shown in CSI Report "Analysis of Cementing Operations on the Deepwater Horizon and Possible Contributing Factors to Loss of Well Control" at 31.

[145] Halliburton recently produced WellCat files relating to its temperature simulations which I plan to review to further my understanding of Halliburton's use of WellCat on the Macondo well production interval.

### Figure 3: WellCat Cement Temperature vs. Time Based on Pre-Job Mud Circulation Temperature Profile



Prediction of the temperature profiles of the first and last sacks of cement during and after placement as calculated from CSI modeling with WellCat are plotted in Figure 4.

**Figure 4 - CSI WellCat Run for Well Heatup**



The temperature heat up chart shows that after placement, the well should heat up to 210˚F in about 16 hours. I reserve the right to conduct further investigation in this area as some of the files were only recently received and I have not has a chance to fully analyze them.

## 4.7  OptiCem Results

OptiCem is an integrated wellbore simulation program for all types of cement. It calculates a variety of outputs that are used to design a cement program. OptiCem can be used to design conventional cement, as well as foam cement programs. When OptiCem is used to simulation placement of a foam cement it is important to realize that the program simulates the job assuming that the foam slurry is stable.

CSI currently owns a version of OptiCem purchased from Landmark. The CSI version is slightly different than the internal OptiCem version that Halliburton uses. After the Macondo incident, CSI was retained by BP to investigate the modeling provided to BP by Halliburton prior to the cement job. In addition CSI was charged with determining the effect of various parameters on the output. In addition CSI was asked to conduct OptiCem simulations to simulate the cement job using the actual conditions of the well. CSI's analyses were set forth in a detailed report in 2010.[146]

From CSI's work in the summer of 2010, it was determined that some of the inputs used by Halliburton in its OptiCem modeling were incorrect.  Among other things, Halliburton used incorrect inputs for the reservoir's pore pressure, the centralizer properties and the centralizer spacing. These incorrect inputs resulted in incorrect outputs in those models, specifically with respect to predicted channeling and predicted gas flow potential (GFP). CSI, using the Landmark version of OptiCem, demonstrated that the use of proper inputs would change those outputs in a significant way. However, CSI did not previously have the ability to run the corrected inputs in Halliburton's internal version of OptiCem used for the Macondo well.

In this litigation, Halliburton made their internal version of OptiCem available as well as the input files associated with the Macondo cement job used by Halliburton in their prejob runs in April 2010. CSI conducted several runs with the Halliburton OptiCem program with the input files provided. The runs  related to two categories:  modeling to understand Halliburton's April 18, 2010 OptiCem report; and modeling to determine the effect of corrected inputs of well conditions on Halliburton's internal OptiCem program.

### 4.7.1   OptiCem runs with Halliburton Internal Program Matching April 18 Runs

CSI examined the April 18, 2010 Halliburton OptiCem ADI file.[147]  The inputs to the ADI file were generally in agreement with CSI's work last summer. CSI noticed that the file

---

[146] BP Incident Investigation Report, Appendix K, "Analysis of Cementing Operations on the Deepwater Horizon and Possible Contributing Factors to Loss of Well Control" (CEN0685).

[147] HAL_0530943.

from Halliburton was actually dated April 19, 2010 and that there were slight changes in the input values for the fluid rheologies for reasons unknown to CSI.

CSI performed simulations with this input file to confirm the operation of the program and that the output matched the April 18, 2010 runs provided by Halliburton to BP prior to the April 19, 2010 cement job.

The output from this OptiCem file was slightly different than the final April 18, 2010 output provided to BP due to slight changes in the input rheologies. Below is the output graph for ECD at the fracture zone. Even with the slight rheology differences the graph is very close to the April 18, 2010 report Halliburton supplied to BP.

### Figure 5 - OptiCem Match to April 18 Run Prior to Incident



#### 4.7.2 OptiCem Runs with Internal Halliburton Program and Files with Modified Inputs

Using the input files provided by Halliburton that corresponded to the April 18 input files, OptiCem was run with corrected inputs that reflected actual well information and relevant inputs that were incorrectly input by Halliburton in the April 18, 2010.  The corrections included changes in the following inputs:

- Centralizer Placement

- Centralizer Restoring Force

65

- Centralizer Size

- Pore Pressure of Hydrocarbon Zones

- Location of Hydrocarbon Zones

- Density of the base Oil

- Compressibility of the Mud

- Caliper Data

The following is description of each of the changes.

1. The tops of previous casing strings in the Halliburton file were found to differ slightly than those provided by BP.

2. An abridged hole caliper using only 23 data points was utilized in the Halliburton simulation. CSI used 160 data points.

3. Base oil density was identified as 6.7 ppg by CSI, but Halliburton modeled it at 6.5 ppg.

4. A 15.0 ppg fracture density was utilized at casing TD in the Halliburton model, but CSI used a 14.51 ppg fracture density at this depth.

5. Halliburton modeled pore pressure gradients ranging from 13.81 ppg to 14.01 ppg. CSI used the most recent accepted pore pressure and zone depth of the hydrocarbon zones.

6. Halliburton's centralization inputs assumed 7 centralizers from 18,035 ft to 18,305 ft with 45 ft spacing, CSI used 6 centralizers from 17,833 ft to 18,256 ft with varied spacing.[148]

---

[148] BP provided Halliburton with its centralizer spacing plan on April 15, 2010 but Mr. Gagliano did not include that in his modeling.  BP-HZN-2179MDL00249844-00249847 (April 15, 2010 Morel email to Jesse Gagliano with attachment showing centralizer placement: "We have 6 centralizers, we can run them in a row, spread out, or

7. Additionally, the centralizer specification used in the HES simulation differ from the data provided by Weatherford, with the Halliburton centralizer inputs showing an 8.622 in nominal OD and Weatherford provided data showing 10.75 in nominal OD.

The results from the Halliburton OptiCem run with these modifications varied from the April 18 run prior to the Macondo job and the match that CSI did for this report. The major variations were in two areas. First the length of the 100% displacement in the April 18 report was from 18,300 to 18,100' (This was referred to as Erodibility Profile).[149]

With the modifications using the corrected inputs, the OptiCem output revealed that 100% displacement was achieved across the length of the annulus from 18,300' to 17,900'. The graph for the displacement efficiency is shown below. This shows that the Halliburton OptiCem model predicts that the mud was completely displaced with cement from the bottom of the hole up to 17,900'. In other words, **OptiCem predicts that all three of the major hydrocarbon producing zones from 18,051 to 18233 would have been covered by cement with no channeling at all, when the correct well information is used in the model.** Any modeled channeling would have occurred above 17900'—more than a hundred feet above the main pay sands. This is consistent with the view expressed by Halliburton after the incident.[150]

---

any combinations of the two. It's a vertical hole so hopefully the pipe stays centralized due to gravity. As far as changes, It's too late to get any more product to the rig. our only options is to rearrange placement of these centralizers. Please see attached diagram for my recommendation.").

[149] CSI OptiCem run dated October 2011.

[150] HAL_1071448 ("Subsequent testing with 3D confirms statement that spacer was sufficient."); Dep. Ex. 708 at HAL_0011214 (April 20, 2010 9.875" x 7" Foamed Production Casing Post Job Report, noting "Cement job pumped as planned"; "Full returns seen throughout entire job"; "Estimated 100 psi of lift pressure"; "Floats held after job.").

## **Figure 6 - Erodibility (Displacement Efficiency) in the Modified Well File**

CONFIDENTIAL



### 4.7.3  Gas Flow Potential Changes with Modified Inputs

The Halliburton April 18, 2010 run provided to BP before cementing of the Macondo well indicated a Gas Flow Potential value of 10.29. This GFP value generated a note of "SEVERE" gas flow potential. However, the April 18th OptiCem report used incorrect inputs. When the inputs are corrected, the GFP value is reduced from 10.29 to 1.42. This does not reflect a SEVERE gas flow potential, or even a MODERATE gas flow potential. Instead, a GFP value of 1.42 would be classified as MINOR gas flow potential by OptiCem.

### 4.8   Long String vs. Liner

The BP Internal Investigation Report summarized BP's analysis of the decision to run a liner versus a long string.[151] The investigation team determined that the long string was chosen over the liner for four reasons:

1. Opticem modeling predicted that zonal isolation would more likely be achieved with a long string versus liner.

2. Annular pressure buildup could be major problem if using a liner instead of a long string.

3. Although both the liner and the long string each had two annulus barriers, the added necessity of installing a tieback with a liner introduced a higher risk of mechanical integrity failure.

4. The total lifetime cost of the liner is higher than that of the long string considering the mechanical integrity risks of the liner and the tieback associated with it.

CSI did a detailed analysis of the effect of running a liner instead of a long string on the Macondo well from a cementing engineering perspective. A detailed report was written and has been produced.[152] The most pertinent conclusions were as follows:

1. The circulating pressures would be higher in the case of a liner versus a long string. This would mean it would be more difficult to place the cement job without breaking down the formation with a liner. This is due to the liner hanger restriction, which increases the pressure to place the cement.

2. The Gas Flow Potential (GFP) decreased slightly when modeling the cement job with a liner, using the same centralization profile. GFP values dropped by less than 5% at all zones modeled. The slightly lower GFP in the liner scenario can be

---

[151] BP Incident Investigation Report at 33.

[152] Dep. Ex. 2968 (CSI, OptiCem Analysis Comparison Macondo Production Casing: Liner and Centralizer Modeling, Supplemental Report to "Analysis of Cementing Operations on the *Deepwater Horizon* and Possible Contributing Factors to Loss of Well Control" (July 7, 2010)).

attributed to different fluid positions at the end of the cementing providing slightly higher hydrostatic pressure.

### 4.9   Bottoms Up Circulation for Hole Conditioning

As a general rule it is recommended that at least one bottoms up is circulated prior to cementing. However, the ability to apply this best practice is limited by well conditions. Circulating bottoms up ensures that any debris or gas residing in the drilling fluid at the bottom of the hole will be swept to surface. For the Macondo production casing, BP decided to limit pre-job hole circulation to 346 barrels. The design criteria driving this decision were based upon the following factors[153]:

1. The large hole volume would necessitate long circulation time to circulate bottoms up and create high potential for wash outs.

2. Limiting circulation time would limit the chances of inducing losses to the weak formation.

3. The synthetic oil based mud in the well was well conditioned and fairly solids free due to the circulation several days prior, and no new hole had been drilled since the last circulation.

The practice to circulate another "full" bottoms up prior to cementing on April 19, was not prudent or recommended in this case. The BP wells team evaluated this issue and chose to circulate what they believed was necessary to condition the hole without

---

[153] Walz Dep. at 545:23-547:23 ("Q. And what did you say to Mr. Guide? A. ... We talked about it, and basically, we starting reviewing, went back, all right. We already made the conditioning trip where we circulated, you know, 4500 some odd barrels and the open hole volume was -- it was only -- the annular volume we talked about, like 55 barrels or so, and then we looked also -- so we looked at that. We looked at the results that we got from that. We then talked about the volume of fluid that would be displaced during the actual cement job in front of the cement, and that was another thousand, 1500 barrels with the spacer. And so when you look at how many times, you know, 10, 20 times the open hole volume, it seemed like we would have plenty of fluid, fresh mud, going across that open hole, that limited size of open hole to, and that we may actually create other issues if we did circulated another two or three thousand barrels on top of that... It was primarily centering around a wash out, or that we could actually reopen up the lost circulation zone, wash away our lost circulation material that we had bridging that was -- and start that issue up again.").

creating wash outs or losing circulation.[154]  This is consistent with what other operators have done in similar situations.[155]  The amount and rate of circulation was known to Halliburton before the job and incorporated into Halliburton's recommended job procedure.[156]

In summary, the amount of circulation before the primary cement job took place was adequate to condition the hydrocarbon bearing zones to receive cement.[157]  Given the dimensions of the well bore in the open hole area, the annular space in the bottom 1,100 feet of the well from 17170 to 18330 would have been conditioned multiple times over.[158]

### 4.10 Centralization

In the weeks leading up to the cementing operation, there appears to have been a number of discussions concerning the number of centralizers to use on the production casing for the Macondo well. At some point during the week before the incident, Halliburton sent BP an OptiCem model using 21 centralizers.  BP ordered 15 additional

---

[154] Walz Dep. at 545-549 ("Q. And then there would be the additional issues that would be created A. It was primarily centering around a wash out, or that we could actually reopen up the lost circulation zone, wash away our lost circulation material that we had bridging that was -- and start that issue up again.").

[155] Tabler Dep. at 415-416 ("Q. Okay. So what was your understanding why Mr. Vidrine did not want to run a full bottoms up? A. As I just stated, because of the low frac gradient and the pore pressure. Q. Uh-huh. And was that in – was that -- did that explanation make sense to you? A. Yes, sir, it did. Q. And is that a reason that you've seen on prior cement jobs for not running a bottoms-up circulation? A. Yes, sir. I've seen it a – a couple other times. Q. Other operators also? A. Yes, sir.").

[156] BP-HZN-2179MDL01299741 (Halliburton 4/18 Job Recommendation (ver. 6)) at 8 ("Job Procedure": "CIRCULATE 150 BBLS @ 4 BPM AS PER CO. MAN.").  Both Halliburton's onshore and offshore cement engineers were aware of this decision.  Gagliano CEC at 61 ("Once I received a procedure from the rig, I did have a conversation with Nathaniel Chaisson, who is the Halliburton engineer on location [about the circulation].").

[157] Tabler Dep. at 419 ("Q. Okay. And if it were several, like two or three annular volumes of the open hole, would that be sufficient to condition the mud in the open hole area? A. Yes, sir. Q. And would that also be sufficient to clear any debris in that open hole area where you're going to do your cementing? A. Yes, sir.").

[158] Walz Dep. at 545-549 ("the open hole volume was -- it was only -- the annular volume we talked about, like 55 barrels or so" and "the volume of fluid that would be displaced during the actual cement job in front of the cement, and that was another thousand, 1500 barrels with the spacer. And so when you look at how many times, you know, 10, 20 times the open hole volume, it seemed like we would have plenty of fluid, fresh mud, going across that open hole.").

centralizers to be flown to the rig, but it ultimately ran six centralizers because bowstring centralizers were sent to the rig. The six centralizers that were already on board were of the integral type and did not require stop collars to hold them in place. The additional 15 centralizers sent to the rig were the slip-on type that required stop collars to hold them in the proper location.

It is well-known in the industry that centralizers can increase the difficulty of running the casing into the hole with them and can cause the casing to get stuck.[159] BP had recently experienced an issue with stuck casing on another well[160] that was attributed to presence of centralizers. It is well known in the industry that it is critical that production casing be run to the casing point because failure to do so can lead to complications with completion and abandonment operations.

Weatherford experts agreed that it is a common practice among their clients to run less centralizers than what is recommended by computer programs or cementing service providers. In addition, the Weatherford experts agreed that the slip integral centralizers are more robust than the slip on bow string centralizers.[161] In the Macondo well, the

---

[159] Chaisson Dep. at 532 ("Q. [W]hat concerns have you heard in the past?  A. The majority of the concerns have been actually if you're getting to casing to bottom, centralizers hanging up on various constrictions in the wellbore geometry."); DRIL-QUIP Suggested Procedure for SS-15 Subsea Wellhead System at 17 ("Note: DRIL-QUIP does not recommend the use of centralizers on casing for subsea application. Previous experience has shown these units can be damaged, or torn off the casing when passing through ball joints and BOP stacks. As a result, they can become lodged in the Wellhead, causing damage and problems in setting the subsea Casing Hanger and Seal Assembly."); Hurta Dep. at 239 ("Would it also be fair to say that since Dril-Quip discourages the use of centralizers, if someone were to use centralizers, in Dril-Quip's opinion, the fewer, the better?  A. That's a fair statement, yes.").

[160] Lirette Dep. at 160:25-161:17; Clawson Dep. at 220:4-13 ("Q. Okay. What issue did you have on thunder Horse? And — and I'd — and when I say issue, what issue with the centralizers did you have on the Thunder Horse well?  A. One of the previous Thunder Horse well with the — the stop collar, the centralizer's stacked up, they slipped, you know, in a couple of locations on the pipe itself.").

[161] Clawson Dep. at 296-297 ("Q. But do you agree that those stop collars also can slide -- slide if sufficient force is applied to them, that they can be dislocated and moved from where they were originally intended to be placed?  A. It's possible.  Q. And would you further agree that when you have centralizer subs, those are welded in, those are not going to slide around?  A. Correct.  Q. So in terms of risk, it is always preferable to have -- to run centralizer subs if you don't want the centralizers to slide around?  A. Correct."); Lirette Dep. at 162-163 ("Q. Okay. And are they also more tolerant to being handled so that the -- the springs don't break off of inline centralizers?  A. In a tight hole situation, yes.").

open hole interval was nearly vertical and thus required less centralizers than an inclined hole.[162]

It is recognized that running fewer centralizers does not pose a safety risk and any potential channeling that causes long-term isolation issues can be addressed by remedial cementing.[163] Operators frequently run less than the number of centralizers suggested by the cementing contractor due to operational concerns.[164] Two factors are important when considering the effect of centralization on mud displacement and the potential for channeling on the well. The first factor considered critical to cement placement is eccentricity of the casing-well bore annulus. With "eccentric" annular flow, the casing leans toward one side of the annulus, creating a wider flow gap on one side than the other, which means that the pressures required to flow at a particular velocity are lower in the wide side than the narrow side. This phenomenon can result in bypassing mud in the narrow side of the annulus, leaving an uncemented channel on the narrow side. This drives the cement top higher as the cemented annular volume is lessened. The issue is driven by drilling fluid rheology and is generally lessened for oil-based drilling fluids which usually have lower static gel strength development than aqueous drilling fluids. It was shown in the previous section that the Opticem runs using the best well data predicted that 100% displacement of the drilling mud would be predicted from the shoe up to 17900'. After the incident, Tommy Roth, Vice President of

---

[162] Lirette Dep. at 163 ("Q. Do you know that the Macondo well was a near vertical well? A. Yes. Q. And is that a consideration that takes place in determining how many centralizers to run? A. Yes. Q. Generally in a vertical well, you would run less centralizers than in an inclined well? A. Yes.").

[163] HAL_0048828 (Tim Probert Responses to Questions for Hearing Record) at 3 ("Cement channeling does not in itself create a safety concern. When cement channeling occurs, it is typically remedied by pumping additional cement as a subsequent additional step in the well program."); Gagliano CEC at 93 ("Q Did you think that BP was acting unsafely by choosing the 6 centralizer design? A I wouldn't look at it as unsafe. The channeling indicates to me there was a high potential of remedial work that would be needed to be done after the fact."); Walz Dep. at 217-218 ("when we talk about zonal isolation and the like, a channel -- because you have a channel doesn't mean the well is going to kick.").

[164] Tabler Dep. at 446-447 (operators run a range of centralizers from no centralizers to many centralizers).

Cementing, indicated in correspondence that Halliburton had run Displace 3D modeling and it confirmed that the spacer was sufficient to sweep the hole.[165]

## 4.11 Volume of Cement

Cement volume and targeted cement height was the responsibility of BP engineers. The constraints facing them in this determination were:

- A lost circulation zone at the bottom of the hole severely limited cement density and cement column height.

- The MMS requires a minimum cement height of 500 feet above highest hydrocarbon bearing zone.

- It was desirable that the cement top be below the shoe of that last casing at 17,100 feet in order to limit the annular pressure build up in the well. .

The primary constraint in establishing designed top of cement was the lost circulation zone. It was imperative to maintain circulation up the annulus in order to ensure that cement coverage was sufficient. The third constraint superseded BP's guideline of bringing cement 500 feet above the highest hydrocarbon bearing zone. Once cement top was established, caliper log data was used to fine tune volume requirements

The volume of the cement that was run on this well was dictated by the BP engineers. The volume met the BOEMRE requirements and was as much as the engineers judged the well could take without breaking down. BP's concern was to prevent losses on the formation while providing the necessary coverage of the cement in the annulus. The decision on the volume of cement to use for the production casing was the result of sound engineering judgment in consideration of the hole conditions.

## 4.12 Gas Flow Potential

Gas Flow Potential factor is a dimensionless number indicating the estimated potential for encountering gas migration, as a tool to quantify a well's potential for gas flow. The

---

[165] HAL_1071448 ("Subsequent testing with 3D confirms statement that spacer was sufficient.").

existence of moderate or severe gas flow potentials is not unusual and is controlled by slurry design.[166]

Well geometry, formation pressure, and cement fluid characteristics are combined into the dimensionless variable to quantify a specific well's potential for seal failure due to gas flow immediately following cement placement. Two key parameters accounted for in GFP analysis are the cement's volume reduction and gel strength development.  These parameters control the hydrostatic pressure transmitted to the gas-containing formation during cement hydration. Depending on well geometry, top of cement, hydrostatic pressure, and formation pore pressure, GFP can range from less than one all the way to infinity. Lower GFP indicates lower potential for gas flow occurrence. This factor then helps cementing engineers to design a slurry appropriate to the well conditions. The GFP classifications provided in the OptiCem help section are included in Table 4.

---

[166] Tabler Dep. at 457 ("Q. And have you cemented other wells where there is a moderate gas flow potential or a severe gas flow potential before? A. Yes, sir. Q. And is it -- is it anything out of the ordinary for a well to have a moderate gas flow potential or a severe gas flow potential? A. No, sir. Q. And what does gas flow potential tell you? A. If we have a gas flow potential, we need to look at the design slurries to prevent any channeling.").

**Table 4: Gas Flow Potential Classifications and Treatments from OptiCem**

| GFP | Condition | Description |
|---|---|---|
| Less than 0 | Under Balanced | The treatment should be changed to target being over balanced. |
| 0 – 1 | Good | Annular flow should not be a factor. With flow potentials less than 1.0, no special anti-gas migration techniques are required, provided optimum mud displacement techniques are utilized. |
| 1 – 4 | Minor | • Additives for fluid loss control to limit volume reduction.<br>• Modify the job design by use of back pressure, shortened cement column, and other parameters. |
| 4 – 8 | Moderate | • Use GasStop to delay gel strength with rapid transition time.<br>• Use thixotropic cements for rapid gel strength that minimizes time for gas to percolate in the annulus. |
| 8 – 15 | Severe | • Use GAS-CHEK cement that generates gas down hole to make slurry compressible.<br>• Use Super CBL that generates gas down hole to make slurry compressible.<br>• Use foam cement for compressible cement slurry. |
| Over 15 | Critical | If a gas flow potential of greater than 15 is calculated, then changes should be made to the cementing program to lower it below 15.<br>• Multiple stage cementing<br>• Reduce height of cement<br>• Hold the back pressure, etc. |

A series of preventive measures for gas flow have been developed and categorized according to degree of potential severity. However, as the referenced literature points

76

out, fluid loss of the cement is fundamental to the estimation of gas flow. This cement parameter must be controlled in every potential gas flow situation. In low GFP wells, low fluid loss alone (less than 100 cc/30 min) can alleviate gas flow. In more severe situations, additional corrective steps may be necessary to alter gel strength development or even the compressibility of the cement. Foam cement is one recommended method of controlling high gas flow potential.[167]

The Halliburton April 18, 2010 run provided to BP before cementing of the Macondo well indicated a Gas Flow Potential value of 10.29. This GFP value generated a note of "SEVERE" gas flow potential. However, the April 18th OptiCem report used incorrect inputs. When the inputs are corrected, the GFP value is reduced from 10.29 to 1.42. This does not reflect a SEVERE gas flow potential, or even a MODERATE gas flow potential. Instead, a GFP value of 1.42 would be classified as MINOR gas flow potential by OptiCem.

### 4.13 Lift Pressure

In terms of oilfield cementing, lift pressure is a general term that relates to an increase in the pressure differential between the annulus and wellbore while placing cement in the annulus. The pressure increase is commonly caused by the higher relative density of the cement and higher friction pressure required to move the cement upward in the annulus.

Lift pressure can have multiple interpretations. The most common interpretations are the hydrostatic differential produced by cement entering the annulus, the dynamic pressure differential caused by lifting the cement in the annulus, or the hydrostatic or dynamic pressure increase produced by lifting all fluids other than mud into the annulus. For the purposes of this report, the lift pressure will represent the dynamic pressure increase caused by lifting cement into the annulus at a particular pump rate.

---

[167] Faul Dep. at 464 ("Q. And yesterday you -- you said that foam is a very good system for severe gas flow potential? A. Yes.").

CSI was retained by BP last year and did an analysis of the lift pressure observed on the actual Macondo cement job and compared it to various OptiCem predictions. This data was presented in the report prepared on the subject.[168] This information will not be repeated in this report. In summary however, the predicted lift pressure in the Halliburton April 18th OptiCem report, based on the ECD plot, was approximately 550-600 psi with channeling. The actual lift pressure seen at the end of the job is around 190 psi, based on 245 psi pump pressure just prior to bumping the bottom plug and 435 psi pump pressure just before bumping the top plug from the Halliburton job pump pressure data.

From the data previously presented, the lift pressure seen in the actual job is lower than the OptiCem predictions. Differences in results can be attributed to a number of variables. Although not previously considered, it also appears from review of relevant data and new information provided since the previous analysis, that another possible explanation of the lower pressure is simply that the OptiCem prediction of severe channeling did not occur.

Considering all of the unknown variables that affect lift pressure, it is not possible to determine a top of cement based on the lift pressure seen during the job. The observed lift pressure during the job is lower than all predictions. This suggests that the actual top of cement is potentially lower than predicted by the OptiCem models.

## 4.14 Conducting Cement Bond Log (CBL)

Two purposes of running a cement bond log on production casing are:

- To confirm that the top of cement meets planned targets if there are losses during the job.

- To determine if channeling or other placement issues produced a result requiring remediation. This is normally done before production or in the course of production.

---

[168] Analysis of Cementing Operations on the Deepwater Horizon and Possible Contributing Factors to Loss of Well Control (CEN0685).

With respect to whether it would run a CBL before temporary abandonment of the Macondo well, BP employed a decision tree that dictated the proper course of action.[169] According to the decision tree, if there were no losses during the cement job, then the CBL would be run during the completion phase.  If there were losses during the cement job, then a CBL would be run before abandonment to determine top of cement so that appropriate remedial actions could be taken if necessary. Since the losses would be tied to additional modeled pressure from channeling, BP's contingency plan would address both possibilities.[170]  Additionally, in the April 15th drilling program, BP indicates an additional consideration of lift pressure:  If no lift pressure was evident or if losses were observed, then the CBL would be run prior to abandonment.[171] Lift pressure and full returns are common indications in the industry for successful cement jobs.[172]

Following the Macondo cement job, Halliburton and Transocean reported that there were no losses, and Halliburton reported that the job went well.  Based upon the report of no losses and that the job went well, BP decided not to run the CBL on April 20 and to instead defer a CBL until the completion phase when it returned to the well.  This decision was announced to the contractors on the April 20, 2010 morning meeting and

---

[169] Dep. Ex. 4456 at BP-HZN-MBI00010575 (Decision tree).

[170] Walz Dep. at 168 ("the modeling was always suggesting that if the channeling did occur, it was going to result into a higher ECD, which was going to cause lost circulation, and we put in mitigations and contingency plans to deal with that.") and 188 ("the model was saying that if we had channeling, our ECD would go up, lost circulation would occur and resulting into -- in which case we had contingency plans that would kick in. We never saw lost circulation to my knowledge during the cement job.").

[171] BP-HZN-2179MDL00057816 (MC252 #1ST00BP01 - Macondo Prospect 7" x 9 7/8" Interval - Production Casing Operations, April 15, 2010).

[172] Tabler Dep. at 421 ("Q. [W]hat if BP were looking for full returns and lift pressure, are those also appropriate indicators of a successful cement job? A. Yes, sir, that's appropriate. Q. And have you, in your experience on other wells, seen operators – other operators use those type of indicators to determine a successful cement job? A. Yes, sir."); HAL_0558016 (US Land/Offshore Cementing Work Methods) at 286 ("If no apparent losses occurred during a cement job one should expect that the top of cement should be at least as high as that calculated from hole size and volume of cement pumped."); Kellingray Dep. at 192 ("I think the industry runs very few cement logs, whether it's BP or any other operator. It's not something that's standard, and there's no Regulatory authority I'm aware of actually stipulates that you would run Cement Bond Logs either after cementing or during -- or prior to temporary abandonment.").

there were no objections.[173] Specifically, the cementing contractor Halliburton did not indicate any need to conduct a cement bond log.[174] The reason that a cement bond log is often run later is because it provide better information after the cement has had more time to cure.[175] This is commonly done by operators.[176] Halliburton cementer, Nathan Chaisson, reported on the success of the cement job at this meeting and neither Mr. Chaisson, nor any other contractor, disagreed with this decision.  Under the conditions seen on the Macondo well, the decision not to run the CBL before abandonment is consistent with common industry practices.  Immediately following the cement operation and before the incident, Halliburton documents and communications indicated that Halliburton's assessment of the cement job was that it had gone well, no losses were observed, lift pressure was seen, the floats held, targeted top of cement had been achieved, and MMS requirements had been met.[177]

---

[173] Walz Dep. at 900-901 ("Q. On April 20th, was there also a morning call?  A. Yes.  Q. And to the best of your recollection, was Mr. Gagliano in attendance?  A. Yes.  Q. Did the subject of running a CBL come up on that call?  A. Yes.  Q. And did -- did Mr. Guide, to your recollection, pose a question to the group?  A. Yes.  Q. What question Mr. – did Mr. Guide pose to the group?  A. 'Does anyone see a need to run the CBL?'  Q. And did Mr. Jesse Gagliano have any response, to your recollection?  A. No, sir.").

[174] Anderson Dep. at 239-240 ("Q. Did you participate in any conversations with BP or Halliburton about running a cement bond log after the cement job was completed?  A. No, I did not.  Q. Okay.  Are you aware of anybody from Halliburton -- anyone else from Halliburton having discussions with BP about a cement bond log being run after the cement job was completed?  A. No, I did not.").

[175] Kellingray Dep. at 192-193 ("I don't believe that cost actually is the main driver. It's really around how confident you are in the cement you placed. ... do you have a reason for not believing you've achieved isolation. And the other part of the reason is actually -- what actually is the information you're going to attain, what you're going to do with it. And the final piece is that they are logs which are very subjective to interpretation, and ... can be confusing.").  Based on my experience, cement bond logs are subject to interpretation.").

[176] Roth Dep. at 506 (agreeing that on many wells "Halliburton has been involved with the cement operation where the -- the operator proceeded with temporary abandonment without a CBL and conducted the CBL at the completion phase.").

[177] Dep. Ex. 708, at HAL_0011214 (April 20, 2010 9.875" x 7" Foamed Production Casing Post Job Report, noting "Cement job pumped as planned"; "Full returns seen throughout entire job"; "Estimated 100 psi of lift pressure"; "Floats held after job.").

### 4.15 Losses During Placement

Following the cement job, Halliburton is responsible for reporting on the cement job to BP for BP to make a decision on whether to run a cement bond log.[178] Halliburton reported to BP and the other rig contractors that the cement job was pumped successfully with full returns.[179] There is no evidence that losses were apparent on the rig following the cement job on this well. Both Halliburton and Transocean confirmed that there were full returns during the placement of the cement.[180]

### 4.16 Float Collar Conversion

Prior to the cementing operation, it took nine attempts to establish circulation after the casing was run.   A float collar is used at the top of the shoe track during cementing operations to prevent cement from u-tubing back up the casing above the shoe track after the cement has been landed in place with a bottom and top wiper plug. The bottom plug lands first on the top of the float collar, the cement is pushed through the bottom

---

[178] Gagliano CEC at 88 ("We provided the information to BP and they based their decisions off the information we gave them to bond log or not.").

[179] Chaisson Dep. at 357:7-24 ("Q:  And did Ms. Willis indicate to you at the conclusion of the cement job that you did, in fact, have full returns? A:  Correct.  Throughout the cement job and at the end of the cement job.  Q:  And that result is reflected in your post-job report, that you had full returns for this job?  A:  That is correct.  Not only did I speak with Catheleenia Willis, I also made some calls to the rig floor.  I can't be certain what individual was on the other end on the rig floor because they are also monitoring returns up there, or they had that capability to.  And I was also informed by the individuals on the rig floor that, yes, we do have full returns, we have no losses.").

[180] Dep. Ex. 708, HAL_0011208 - HAL_0011221 (April 20, 2010 Chaisson email to Jesse Gagliano attaching post-job report, noting "Full returns were observed throughout . . . ."); Gisclair Dep. at 115 ("Q. Did you identify any losses or loss returns during that cement job? A. Not while the cement was put in place, no. Q. Did you identify any loss returns after the cement was put in place? A. No."); Tabler Dep. at 380-381 ("Q. And did you observe full returns during the cement job? A. I personally did not. That was through Transocean. Q. Okay. Did you understand that there were full returns during the cement job? A. Yes, sir. Q. And who told you that there were full returns? A. I was getting my information from Dewey, which is the driller."); Tabler Dep. at 204-205 ("Q. Okay. So did you get complete returns during the performance of the cement job? A. I was told that w e had complete returns from the driller."); Chaisson Dep. at 357 ("Q. And did Ms. Willis indicate to you at the conclusion of the cement job that you did, in fact, have full returns? A. Correct. Throughout the cement job and at the end of the cement job. Q. And that result is reflected in your post-job report, that you had full returns for this job? A. That is correct. Not only did I speak with Cathleenia Willis, I also made some calls to the rig floor. I can't be certain what individual was on the other end on the rig floor because they are also monitoring returns up there, or they had that capability to. And I was also informed by the individuals on the rig floor that, yes, we do have full returns, we have no losses.").

plug and through the valves on the float collar, followed by the top plug.   In a normal operation, the cement volume will fill the shoe track up through the float collar to the point below the bottom and top plugs.  The set cement then becomes the barrier to hydrocarbon flow up the shoe track.

Weatherford literature indicates that a flow rate of 5 to 8 bbls/min would generate a pressure differential of 500 to 700 psi across the float collar.[181] This pressure differential results in a force sufficient to shear the autofill float tube retention pins, which will cause the tube to exit the float collar and "convert" the float collar. It is important to understand that these are *differential* pressure and flow rate across the float collar, not to be confused by the drill pipe pressure or the flow rates measured at the top.

If the float collar itself was clogged, it would have converted when the drill pipe pressure reaches 500 to 700 psi.  However, if there was a blockage below the float collar in the last 200 feet of shoe track or at the reamer shoe, there would not be a differential pressure across the autofill tube in the float collar even as the rig increased the pressures used to create circulation.

The first eight attempts to establish circulation were unsuccessful in converting the float collar due to a blockage that prevented generation of any circulation (or flow) through or differential pressure across the float collar. Eventually on the ninth attempt, this blockage was cleared when the maximum drill pipe pressure reached approximately 3,142 psi.[182]  Circulation was established and the cement job was pumped as planned.

---

[181] Dep. Ex. 2582 (Flow-Activated Mid-Bore Auto-Fill Float Collar Model M45AP).

[182] Chaisson Dep. at 272 ("Q. Did the float collars convert before or after the cement job, or do you know if they ever converted? A. Based on my experiences of, based on my experiences and my knowledge of float collars I thought they did float. I'm sorry, I thought they did convert, as did everyone else on the rig floor."); Tabler Dep. at 433 ("Q. Okay. Who told you they converted? A. I don't remember which driller was on -- on tour at the time. Q. Okay. So a driller called you on the headset and said, we've converted, come -- come back out to the floor? A. Yes, sir.").

Halliburton's onshore personnel was informed of the multiple attempts to establish circulation and convert the float collar.[183]

This problem of establishing circulation while attempting to convert the float collar is experienced routinely in other wells prior to the cementing operation. The common way to clear a blockage in the shoe is repeated pressuring of the pipe. This is the industry standard way of handling this situation.[184] The Allamon hand on the rig recommended that BP pressure up to clear the blockage and BP contacted Weatherford for the correct amount of pressure that the float collar could hold.[185] In his deposition, Bryan Clawson with Weatherford testified that pressuring up is the typical way to clear debris that may impact conversion of the float collar.[186] He also indicated in his deposition that he does not see any evidence that the float collar did not convert.[187] Consistent with industry practices, conversion of the float collar was checked with a positive float check.[188]

Stress Engineering Services Inc. ("SES") performed at study for BP last year.[189] The study involved various performance tests on the Weatherford 7" Model M45AP float

---

[183] Gagliano CEC at 64 ("At the time I had received one, possibly two calls before the job. ... They had problems with pressuring up and converting the floats. They had tried several different times. And when they were finally able to circulate, they were seeing lower than expected pressures. So [Mr. Chaisson] had called me and let me know what had happened.").

[184] Tabler Dep. at 432 ("Q. Have you -- have you seen operators take any other action other than pressuring up to clear -- to convert the float collar? A. No, sir, not -- not that I can recall.").

[185] BP-HZN-BLY00061629, at P. 8 (Handwritten notes of Interview with Brian Morel by Jim McKay).

[186] Clawson Dep. at 317-318 ("Q. Okay. So you would agree that pressuring up and trying to clear the clog is sort of a typical way of dealing with a clog? A. Yes.").

[187] Clawson Dep. at 336. ("Q. Okay. And since -- since then up till today, do you have any indication that the float collar did not convert? A. No.").

[188] Tabler Dep. at 442 ("Q. Okay. But what was -- what was your conclusion that -- was your conclusion that you had a good float check? A. Yes, sir -- A. -- that's correct. Q. And did you confirm that with Mr. Lambert and also the wellsite leader? A. Yes, sir. Q. In your experience, is that a common way to check the floats that you've seen on other wells? A. Yes, sir, that's correct."); April 20, 2010 MC 252 Daily Drilling Report, BP-HZN-2179MDL00251266-70 (Daily Drilling Report for April 20th, 2010 for midnight to 30 minutes past midnight – "Bled back 5 bbls, floats holding.").

[189] Dep. Ex. 3308, BP-HZN-BLY00128487-00128742 (Stress Engineering Services, Inc., Engineering Report on Testing of Weatherford M45AP Float Collar (November 22, 2010)).

collar with dual valve seats and an auto-fill tube. The objective of the test program was to "evaluate the performance and design limits of various aspects of the float collar and to document its performance under conditions similar (according to information provided to SES) to those downhole in the Macondo well before, during and after the cementing operation."[190]

In it summary report, Stress found that "for all test scenarios executed in this program, conversion of the float collar occurred."[191] According to testing performed by SES, the sudden release of the blockage created a surge of flow (approximately 10 bbls/min) through the float collar ports and generated sufficient differential pressure to successfully convert the float collar. This experimental data was compelling and there is no other evidence that indicates that the float collar did not convert.

### 4.17 Wait on Cement (WOC) Time

WOC (Waiting on Cement) time is the time period following completion of cement placement in which well operations that would place cement under differential pressure are suspended to allow the cement to harden.

An operator relies heavily on the service company for accurate information about set time of the cement and its early strength development to make the WOC decision. In this case, Halliburton supplied BP with initial set and strength development data indicating that the WOC time interval between cement placement and the negative test was sufficient time for the cement to set.[192] Glen Benge, the expert for the United States, questions Halliburton's calculation of WOC time, citing the rate of temperature increase followed in the Halliburton testing as much too great.  I agree with Mr. Benge's

---

[190]   Dep. Ex. 3308, at BP-HZN-BLY00128492 (Stress Engineering Services, Inc., Engineering Report on Testing of Weatherford M45AP Float Collar (November 22, 2010)).

[191]   Dep. Ex. 3308, at BP-HZN-BLY00128494 (Stress Engineering Services, Inc., Engineering Report on Testing of Weatherford M45AP Float Collar (November 22, 2010)).

[192]   April 18, 2010 Lab Report (UCA chart stating "500 psi @ 8:40:30") (HAL_0117352); Gagliano CEC at 73 ("after the cement was in place, 8 hours 40 minutes and 30 seconds later, it should have reached approximately 500 psi in compressive strength.").

observation that the heat up rate for Halliburton's laboratory testing of cement strength development is too high. However, review of subsequent WellCat modeling and laboratory testing results at more realistic heat up rates leads me to disagree with Mr. Benge's conclusion that shoe cement was unset at the time of the negative test.

### 4.17.1 Temperature and Pressure Effects on WOC Time

The key to establishing required WOC time is determination of cement strength development in the laboratory. The more closely downhole temperature and pressure conditions are matched, the more accurate the determination.

Determination of WOC time for Macondo well operations is complicated by the extreme water depth and total well depth. These parameters create a complex system for predicting temperature in the well. Additionally, the depth results in unusually high bottomhole pressures. Temperature, the variable with most impact on cement set and strength development rates, is increasing with time as the wellbore heats up after circulation. This rate of temperature increase was modeled using WellCat as described above. WellCat temperature modeling predicted bottomhole temperature of 210°F at 16 hrs after cement placement. Therefore, a reasonable heat up rate is known for evaluation. Bottomhole pressures are also known from depths and fluid column densities.

Most discussion and speculation regarding the state of cement at the shoe of the Macondo production casing at the time of the negative test was based on laboratory testing at non-representative temperatures and pressures. The tests supplied by Halliburton[193], in which bottomhole pressure was accurately modeled but temperature increase rate was inaccurately high, indicated cement could be set in over 8 hours. Most accurate simulation of temperature was testing of the system reported by OTC.[194] The strength development test described in their report was performed with actual cement and additives. Temperature increase rate matched that predicted by WellCat.

---

[193] HAL_0117352 (April 18, 2010 9 7/8'' x 7'' Production Casing Design Report using 7 centralizers).

[194] Oilfield Testing & Consulting, JIT Macondo Well Testing (August 1, 2011) at 27, 30.

The test indicated the cement would develop 50 psi compressive strength (initial set) in 16 hrs 32 min., however this test was performed at pressure of 3000 psi.

Consideration of pressure effects on kinetics of (i) cement setting and (ii) strength development leads to the conclusion that the strength development measured by OTC would be faster at higher pressure. Several studies report significant shortening of cement set time result from increased curing pressure.[195] The study of this phenomenon dates back to the early 1940's with results prominently published. While results of magnitude and degree of effect vary, the majority of researchers report significant shortening of thickening time with curing pressure application approaching that encountered on the Macondo production string.

Based on this research, it is estimated that initial set of the cement reported in the OTC testing could have been shortened by as much as 25-50% by testing at actual bottom hole pressure. My best engineering estimate is that initial set occurred around 12 hrs after placement and that cement compressive strength reached 500 psi around 45 minutes later.

### 4.17.2 Implication of Wait on Cement (WOC) Time Analysis

The analysis presented here supports the assumption that the cement at the shoe of the Macondo well was set at the time the negative test was performed.

Temperature conditions chosen by Halliburton for laboratory testing were not accurate simulations of downhole conditions. This would not necessarily be readily apparent to an operator drilling engineer. Halliburton reported the compressive strength development of the slurry to BP, and it would be consistent with industry practices for the BP drilling engineers to assume that the test conditions were designed to yield results that correlate to their specific application. This analysis supports the opinion that BP engineers used information supplied by Halliburton in a correct and sound manner.

---

[195] ONeal and Benischek 1954 and Metcalf and Dresher 1978.  For example, in the Metcalf and Dresher research, a sample reached 612 psi in 8 hours under 3,000 psi, and reached 1638 psi in the same 8 hours when cured under 10,200 psi .   Similarly, the ONeal and Benishek study demonstrated that initial setting times were lower for cement at 8,000 psi compared to setting at 0 to 2,000 psi.

Further, the conclusion that the shoe cement was set at the time of the negative test is consistent with foam instability as the cause of the short-term hydrocarbon flow. Such instability would result in low-strength, high-permeability cement with poor mechanical structure and strength, which would not act as a well control barrier even when set.

## 4.18 Swapping of Drilling Fluid in the Rat Hole and Cement in the Shoe Tract After Placement

Hundreds of petroleum wells are cemented each day, and concern about potential intermixing or swapping between the cement and the rat hole mud is rarely seen. It is common industry practice is to place heavier cement over the lower density fluid in the rat hole. The successful outcome of almost all these operations indicates that concern over this potential is not warranted.

The mechanical and chemical aspects of the well geometry and fluids in question cast significant doubt on the possibility of fluid swapping in this particular instance. The flow velocity of cement through the ports on the reamer shoe, the rat hole length, the shape of the reamer shoe, and the incompatibility of cement and drilling fluid render it highly unlikely that the cement and drilling fluid would exchange places following cement placement.

The Chevron testing confirms this conclusion. The Macondo slurry design with 0.09 gps SCR-100 was tested by Chevron with up to 30% contamination with drilling mud and compressive strengths curves were determined. The compressive strengths of the contaminated cement slurry had about the same initial set and 500 psi compressive strength time as the non-contaminated cement system.[196] This indicates that any realistic contamination amount of the drilling fluid that is considered reasonable would not alter the initial set and compressive strength development. This fact is significant as to the mixing of the cement slurry in the shoe with the mud in the rat hole. Any degree of mixing would not have a detrimental effect on the set properties of the cement

---

[196] Chevron Report at 12.

## Appendix A

Sources Relied Upon

I have relied on all documents referenced throughout my report as well as the materials listed in Appendix A in reaching the conclusions described in my report.

| DESCRIPTION | BATES |
| --- | --- |
| Contract for Gulf of Mexico Strategic Performance Unit Offshore Well Services Between Bp Exploration And Production, Inc. and Halliburton Energy Services, Inc. | BP-HZN-2179MDL00335299 - BP-HZN-2179MDL00335845 |
| Recommended Practice for Testing Well Cements API 10B-2 | HAL_1068405 -HAL_1068597 |
| Recommended Practice on Preparation and Testing of Foamed Cement Slurries at Atmospheric Pressure API 10B-4 | n/a |
| Cementing Shallow Water Flow Zones in Deepwater Wells API Recommended Practice 65 | HAL_0129363 -HAL_0129416 |
| Isolating Potential Flow Zones During Well Construction API Recommended Practice 65--Part 2 | HAL_0129476 -HAL_0129579 |
| GP 10-60 - Zonal Isolations Requirements during Drilling Operations and Well Abandonment and Suspension: Group Practice - BP Group Engineering Technical Practices | BP-HZN-2179MDL00269659 - BP-HZN-2179MDL00269673 |
| E&P Segment Recommended Practice Drilling and Completions Manual SRP 4.1-0001 | BP-HZN-2179MDL00723692 - BP-HZN-2179MDL00723714 |
| E&P Segment Recommended Practice Drilling and Completions Manual SRP 4.1-0003 | BP-HZN-BLY00173992 - BP-HZN-BLY00174016 |
| E&P Segment Recommended Practice Drilling and Completions Manual SRP 4.1-0004 | BP-HZN-2179MDL00610141 - BP-HZN-2179MDL00410162 |
| E&P Segment Recommended Practice Drilling and Completions Manual SRP 4.1-0005 | BP-HZN-2179MDL00640467 - BP-HZN-2179MDL00640494 |
| Gulf of Mexico SPU - Recommended Practice for Cement Design and Operations in DW GoM | BP-HZN-2179MDL00360844 - BP-HZN-2179MDL00360879 |

| **DESCRIPTION** | **BATES** |
|---|---|
| Cementing in hostile environments: Guidelines for obtaining isolation in demanding wells | BP-HZN-BLY00111338 - BP-HZN-BLY00111434 |
| US Land-Offshore Cementing Work Methods | HAL_0558016 -HAL_0558330 |
| Halliburton Cementing Technology Manual | HAL_1124190 -HAL_1124724 |
| Halliburton Global Laboratory Best Practices | HAL_0675798 -HAL_0678468 |
| Foam Cementing Operations Manual | HAL_0128425 -HAL_0128518 |
| Technology Bulletin, SUBJECT: SA-541 Delayed Hydrating Suspending Aid | HAL 0045047 -HAL 0045050 |
| Technology Bulletin, SUBJECT: Zone Sealant 2000 Foamer/Stabilizer for Freshwater and Saturated-Salt Slurries | HAL 0045251 -HAL 0045253 |
| Email - From: Lacy, Kevin , To: Frazelle, Andrew, Subject: RE: Any Heads Up on the Marianas Situation | BP-HZN-2179MDL01819626 - BP-HZN-2179MDL01819627 |
| Email - From: Gagliano, Jesse, To: Hafle, Mark, Subject: OptiCem Run | BP-HZN-2179MDL00243096 - BP-HZN-2179MDL00243104 |
| Email - From: Gagliano, Jesse, To: Morel, Brian, RE: Out of Office | BP-HZN-2179MDL01288582 - BP-HZN-2179MDL01288587 |
| Email - From: Guide, John, To: Sanders, Robert, Subject: RE: Any of you guys ever fish casing centralizers from a well - namely the wellhead? | BP-HZN-2179MDL00302417 |
| Email – From: Morel, Brian, To: Gagliano, Jesse re cement procedure. | BP-HZN-2179MDL00250628 |
| Subject: Production Casing Proposal and OptiCem Report | HAL 0126062 |
| Email - From: Walz, Gregg, To: Guide, John, Subject: Additional Centralizers | BP-HZN-BLY00068635 |
| Email - From: Morel, Brian, To: Gagliano, Jesse, Subject: RE: OptiCem Report | HAL_0010648 -HAL_0010650 |
| Email - From: Morel, Brian, To: Gagliano, Jesse, Subject: RE: OptiCem Report | BP-HZN-2179MDL00249820 - BP-HZN-2179MDL00249843 |

| **DESCRIPTION** | **BATES** |
|---|---|
| Email - From: Cocales, Brett, To: Morel, Brian, Subject: RE: Macondo STK geodetic | BP-HZN-MBI00128383 - BP-HZN-MBI00128385 |
| Email - From: Gagliano, Jesse, To: Morel, Brian, Subject: Lab tests | BP-HZN-2179MDL01299582 - BP-HZN-2179MDL01299587 |
| Email - From: Morel, Brian To: Guide, John, Subject: FW: Lab tests | BP-HZN-2179MDL00315248 |
| Email - From: Guide, John, To: Sims, David, Subject: RE: Discussion - The way we work with engineering | BP-HZN-BLY00120105 - BP-HZN-BLY00120106 |
| Email - From: Gagliano, Jesse, To: Morel, Brian, Subject: RE: Lab tests | BP-HZN-2179MDL00250724 - BP-HZN-2179MDL00250726 |
| Email - From: Gagliano, Jesse, To: Morel, Brian, Subject: RE: Lab tests | BP-HZN-2179MDL00250740 - BP-HZN-2179MDL00250742 |
| Email - From: Gagliano, Jesse, To: Cupit, Anthony, Subject: Updated Info for Prod Casing job | BP-HZN-2179MDL00041325 - BP-HZN-2179MDL00041373 |
| Email - From: Cocales, Brett, To: Holik, Cynthia, Subject: FW: 9 7/8" X 7" Lab Test | BP-HZN-2179MDL00413111 - BP-HZN-2179MDL00413115 |
| Email - From: Cunningham, Erick, To: Winters, Warren, Subject: FW: 9 7/8" X 7" Prod Casing lab tests & DIMS Reports before and during job | BP-HZN-2179MDL00413116 |
| Email - From: Roth, Thomas, To: Balamenti, Anthony, Subject: Re: Fred Sabins | HAL_1071448 |
| Email - From: Probert, Tim, To: Roth, Thomas, Subject: Re: Post Static Kill | HAL_1056592 - HAL_1056593 |
| Cement Lab Weigh-Up Sheet | HAL_0502434 - HAL_0502435 |
| Cement Lab Weigh-Up Sheet | HAL_0502440 - HAL_0502441 |
| Cement Lab Weigh-Up Sheet | HAL_0506909 - HAL_0506910 |
| Cement Lab Weigh-Up Sheet | HAL_DOJ_0000035 - HAL_DOJ_0000036 |
| Cement Lab Weigh-Up Sheet | HAL_DOJ_0000045 - HAL_DOJ_0000046 |

| **DESCRIPTION** | **BATES** |
|---|---|
| Cement Lab Weigh-Up Sheet | HAL_DOJ_0000049<br>HAL_DOJ_0000050 |
| Cement Lab Weigh-Up Sheet | HAL_DOJ_0000042<br>HAL_DOJ_0000043 |
| 9 7/8" x 7" Production Casing Design Report | n/a |
| 9 7/8" x 7" Production Casing Design Report | HAL_0010572 -HAL_0010591 |
| 9 7/8" x 7" Production Casing Design Report | n/a |
| 9 7/8" x 7" Production Casing Proposal, version: 4 | HAL_0010736 -HAL_0010747 |
| 9 7/8" x 7" Production Casing Proposal, version: 5 | HAL_0010853 -HAL_0010864 |
| 9 7/8" x 7" Production Casing Proposal, version: 6 | n/a |
| 9.875" x 7" Foamed Production Casing Post Job Report | BP-HZN-CEC011406 -<br>BP-HZN-CEC011419 |
| OptiCem screenshots from Jesse Gagliano | HAL_1144065 -HAL_1144082 |
| Macondo Prospect MC 252 #1 Post job OptiCem PRDV.xlsx | HAL_1126189 |
| OptiCem v6.4.7 - Job Data Listing | HAL_0131423 |
| E Lee 9 7-8 CSGRUN 01.XLS | HAL_0578764 |
| PowerPoint Presentation - Cement Slurry Tests Completed | HAL_0608109 |
| Deposition Transcript of Anderson, Rex | n/a |
| Deposition Transcript of Corser, Kent | n/a |
| Deposition Transcript of Corser, Kent | n/a |
| Deposition Transcript of Winters, Warren | n/a |
| Deposition Transcript of Winters, Warren | n/a |
| Deposition Transcript of Gisclair, John | n/a |

| DESCRIPTION | BATES |
|---|---|
| Deposition Transcript of Gisclair, John | n/a |
| Deposition Transcript of Chaisson, Nathaniel J. | n/a |
| Deposition Transcript of Chaisson, Nathaniel J. | n/a |
| Deposition Transcript of Quirk, Timothy L. | n/a |
| Deposition Transcript of Quirk, Timothy L. | n/a |
| Deposition Transcript of Cunningham, Erick | n/a |
| Deposition Transcript of Cunningham, Erick | n/a |
| Deposition Transcript of Vargo, Richard Frank | n/a |
| Deposition Transcript of Vargo, Richard Frank | n/a |
| Deposition Transcript of Walz, Gregory Stephen | n/a |
| Deposition Transcript of Walz, Gregory Stephen | n/a |
| Deposition Transcript of Cocales, Brett | n/a |
| Deposition Transcript of Cocales, Brett | n/a |
| Deposition Transcript of Serio, Michael C. | n/a |
| Deposition Transcript of Serio, Michael C. | n/a |
| Deposition Transcript of Lambert, Lee | n/a |
| Deposition Transcript of Lambert, Lee | n/a |
| Deposition Transcript of Guide, John | n/a |
| Deposition Transcript of Guide, John (Corrected) | n/a |
| Deposition Transcript of McKay, David | n/a |
| Deposition Transcript of Hurta, Gary (DrilQuip 30(b)(6)) | n/a |
| Deposition Transcript of Bhalla, Kenneth (Stress 30(b)(6)) | n/a |
| Deposition Transcript of Young, Kenneth (Stress 30(b)(6)) | n/a |

| **DESCRIPTION** | **BATES** |
|---|---|
| Deposition Transcript of Katsounas, Andreas (Stress 30(b)(6)) | n/a |
| Deposition Transcript of Clawson, Bryan | n/a |
| Deposition Transcript of Clawson, Bryan | n/a |
| Deposition Transcript of Lirette, Brent (Weatherford 30(b)(6)) | n/a |
| Deposition Transcript of Tabler, Vincent | n/a |
| Deposition Transcript of Tabler, Vincent | n/a |
| Deposition Transcript of Kellingray, Daryl | n/a |
| Deposition Transcript of Kellingray, Daryl | n/a |
| Deposition Transcript of Faul, Ronald Ray | n/a |
| Deposition Transcript of Faul, Ronald Ray | n/a |
| Deposition Transcript of Dubois, Richard | n/a |
| Deposition Transcript of Fleece, Trent | n/a |
| Deposition Transcript of Hafle, Mark | n/a |
| Deposition Transcript of Roth, Thomas | n/a |
| Deposition Transcript of Roth, Thomas | n/a |
| Deposition Transcript of Ravi, Krishna | n/a |
| Deposition Transcript of Stelly, Phyllis | n/a |
| Deposition Transcript of Richard, Benjamin | n/a |
| 2010.06.11 Committee on Energy and Commerce Hearing Transcript of Jesse Gagliano | n/a |
| Roth, Thomas - Presentation to NAE | BP-HZN-2179MDL01045307 - BP-HZN2179MDL010453023 |
| NAE Transcript 3 of 4 - Halliburton Presentation and Q&A | BP-HZN-2179MDL02567444 - BP-HZN2179MDL02567557 |

| **DESCRIPTION** | **BATES** |
| --- | --- |
| Drilling & Completions MOC Initiate (date initiated 4/15/2010) | BP-HZN-MBI00143292 - BP-HZN-MBI00143294 |
| Halliburton Post Incident Test Results | HAL_0050582 -HAL_0050594 |
| Annular Gas Migration: Solutions to Annular Gas Flow | HAL_0131422 |
| Appendix W   Report-Dynamic Simulations Deepwater Horizon Incident BP.pdf | BP-HZN-BLY00000526 - BP-HZN-BLY00000585 |
| Macondo - Chief Counsel's Report- 2011 | PSC-MDL2179-002192 - PSC-MDL2179-002562 |
| MDL Dep. Ex. 0198: Engineering Report on Testing of Weatherford M45AP Float Collar: Report PN 1751225 | WFT-MDL-00003370 - WFT-MDL-00003561 |
| MDL Dep. Ex. 0197: HORIZON INCIDENT, FLOAT COLLAR STUDY - ANALYSIS: Report PN 1101198 | WFT-MDL-00003610 - WFT-MDL-00003729 |
| Halliburton Press Release re Presidential Commission Report | n/a |
| Report to the President by the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling | n/a |
| NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING CEMENT TESTING RESULTS | n/a |
| Chevron Curve Type: Foam Cement Strength | CVX80311 00000806 |
| Video file from GOV053 Production | DJIT001-000002.avi |
| Video file from GOV053 Production | DJIT001-000004.mov |
| Video file from GOV053 Production | DJIT001-000006.mp4 |
| Video file from GOV053 Production | DJIT001-000008.avi |
| Video file from GOV053 Production | DJIT001-000009.mov |
| Video file from GOV053 Production | DJIT001-000011.mp4 |

| **DESCRIPTION** | **BATES** |
|---|---|
| Video file from GOV053 Production | DJIT001-000013.mov |
| Video file from GOV053 Production | DJIT001-000015.mp4 |
| Video file from GOV053 Production | DJIT001-000017.mov |
| Video file from GOV053 Production | DJIT001-000019.mp4 |
| Video file from GOV053 Production | DJIT001-000021.mov |
| Video file from GOV053 Production | DJIT001-000023.mp4 |
| Video file from GOV053 Production | DJIT001-000026.mp4 |
| Video file from GOV053 Production | DJIT001-000029.wmv |
| Video file from GOV053 Production | DJIT001-000030.rm |
| Video file from GOV053 Production | DJIT001-000032.wmv |
| Video file from GOV053 Production | DJIT001-000033.mpg |
| Video file from GOV053 Production | DJIT001-000036.mpg |
| Video file from GOV053 Production | DJIT001-000039.mpg |
| Video file from GOV053 Production | DJIT001-000042.mpg |
| Video file from GOV053 Production | DJIT001-000045.mpg |
| Macondo - 9875 in X 7 in Prod Casing.wcd | HAL_0530943 |
| Macondo - 9.875 in X 7 in Prod Casing.wcd | HAL_0533889 |
| Macondo - 9.875 in X 7 in Prod Casing.wcd | HAL_0534307 |
| Macondo - 9.875 in X 7 in Prod Casing.wcd | HAL_1029721 |
| Macondo - 9.875 in X 7 in Prod Casing.wcd | HAL_1031459 |
| Macondo - 9.875 in X 7 in Prod Casing.wcd | HAL_1034979 |
| Halliburton Responses to Bingaman Questions | HAL_0048828 -HAL_0048837 |
| MC 252#1 - Macondo Production Casing and TA Forward Planning Decision Tree | BP-HZN-MBI00010575 |

96

| DESCRIPTION | BATES |
|---|---|
| Email - From: Morel, Brian, To: Guide, John, Subject: RE: Lab tests | BP-HZN-2179MDL00315248 |
| Email - From: Morel, Brian, To: Gagliano, Jesse, Subject: RE: Retarder Concentration | BP-HZN-2179MDL00250778 |
| Email - From: Morel, Brian, To: Gagliano, Jesse, Subject: RE: Cement Procedure | BP-HZN-2179MDL00250628 - BP-HZN-2179MDL00250630 |
| Email - From: Guide, John, To: Sims, David, Subject: RE: Additional Centralizers | BP-HZN-2179MDL00081605 - BP-HZN-2179MDL00081606 |
| MC252 #1ST00BP01 - Macondo Prospect 7'' x 9 7/8'' Interval - Production Casing Operations, April 15, 2010 | BP-HZN-2179MDL00057816 |
| April 12, 2010 Lab Results – Primary with handwritten calculations of Yield Point | HAL_0050585- HAL_0050588 |
| Email – From: Gagliano, Jesse, To: Morel, Brian attaching lab test results. | BP-HZN-2179MDL00250613 |
| Deepwater Horizon Macondo Blowout, A Review of Cement Designs and Procedures | TRN-INV-03404062 |
| August 26, 2011 Evaluation of the Cementing on the 9 7/8" x 7" Production String on the Macondo Well | Expert Report by Glen Benge |
| August 26, 2011 Review of Macondo #1 9-7/8" x 7" Production Casing Cementation | Expert Report by George Birch |

## Appendix B

Curriculum Vitae of Fred Sabins

Fred Sabins is currently the President of CSI Technologies LLC (CSI). CSI provides "State of the Art" cementing and fluids technology to the Oil industry through laboratory testing, technical consulting in the office or on the job site, research and development of new cementing technologies, and engineering products. Fred has worked for several companies in the industry in key positions.

**Summary of Qualifications**

- Over 33 years of Petroleum Industry Cementing Experience
- Chosen as 1 of 4 recognized Leaders in Cementing Practices Worldwide by Journal of Petroleum Technology
- Developed State-of-Art Fluid Migration Program for Maurer Engineering which is currently the State-of-Art tool for analysis of Gas Migration problems
- Cementing applications expert in upstream drilling operations
- Experienced lecturer for all levels of cementing from basic to critical
- Federal Court Expert witness for cementing and cementing operations
- Awarded multiple DOE research projects in Cementing and Stimulation
- Initiator and Lead Engineer assigned to several ongoing Joint-Industry R&D Projects researching cements for harsh environments
- Former Global Technology Manager for largest cementing company in the world (HES) responsible for innovations in cementing operations
- Multiple Professional Awards from API and SPE
- Successful developer of more than 15 engineered products for well completions

**Employment History**

*CSI Technologies LLC (1999 – present)*

Founder and President: Formed CSI to provide the oil and gas industry with independent, objective, high-quality cementing services and R&D. Expanded to include engineered product development. With acquisition by Superior Energy Services in 2004 CSI was further able to expand service offering to include stimulation services, water control, and well abandonment.

*Benchmark Research & Technology, Inc. (1998 - 1999)*

Vice President of Cementing Technology: Developed and provided service to all aspects of petroleum industry cementing requests. Responsibilities included establishing a full service cement testing laboratory, overseeing and managing a wide range of cementing services and product developments, and providing expert consultation on cementing issues for clients worldwide. Fred was also responsible for conducting cement training schools and seminars for worldwide audiences of petroleum engineers. Additionally he managed development of cement additives currently being marketed in U.S. and internationally.

*Westport Technology Center International (1993 - 1998)*

Cementing Technology Manager: Responsibilities included managing a full service cementing laboratory and providing expert consultation on cementing issues for clients worldwide. Fred was project manager for a number of joint industry research projects. He was responsible for conducting cement training schools and seminars for worldwide audiences of petroleum engineers. Duties also included identifying and pioneering advanced cementing applications and technologies.

*Halliburton Energy Services (1978 - 1993)*

Global Cementing Technology Manager: Responsible for implementation of technical innovations into Halliburton's world-wide cementing product line which grossed over $1 billion annually. Fred was the focal point for all new product/process introduction and

application worldwide. He served as expert technical advisor to Halliburton clients with difficult problems or an interest in applying new innovations. Previous assignments in Halliburton included Manager of Cementing Technology Section of the Duncan Technology Center. As manager of 50 engineers, chemists, and field personnel, his duties included providing consulting services to major oil companies as well as managing innovative research, interpreting test results and applying statistical simulations, managing a state of the art cement performance testing laboratory, providing specialized cement training schools, and directing project teams implementing research conclusions.

## Professional Affiliations and Accomplishments

### American Petroleum Institute (API)

- Chairman of Work Group "Physical Models and Methods for Testing Fluid Migration"
- Chosen to co-author "Shrinkage and Expansion in Oilwell Cements" API Technical Report 10TR2
- Chairman and member of other various cement task groups.
- Received Appreciation award from Subcommittee on Well Cements.

### Society of Petroleum Engineers (SPE)

- In Appreciation of Service from "Cementing for Harsh Environments" Forum Series
- Award of Appreciation for "Outstanding Technical Editor" from Editorial Review Committee
- Member of Distinguished Lecturer selection committee
- Chairman of Forum Series "Maintenance and Utilization of Old Wellbores"

**Publications and Patents**

- Fred has authored/co-authored 65 articles and technical papers on a variety of cementing and related topics (see attached)
- Fred has been awarded 27 patents in the oil and gas well cementing area (see attached)

**Education**

- B. S. Chemical Engineering, New Mexico State University (1978).
- M. S. Petroleum Engineering, University of Oklahoma (1992).

**Publications**

1. Watters L; Sonnier P; Sabins F, "Study Produces Supercement For Annular Seal And Long-Term Integrity For Deep, Hot Wells." Drilling Contractor, Vol 63, No 5, Pp. 116,118-119, Sept/Oct 2007

2. Watters L; Sabins F, "Cement Alternative Has Unique Properties." E&P, Vol 80, No 5, Pp. 111-112, May 2007.

3. Sabins F, "A Novel Technology For Lightening Slurry Weight." Drilling Fluid & Completion Fluid (Zuanjingye Yu Wanjingye), Vol 23, No 4, Pp. 47-49,90, July 30, 2006.

4. Proehl T; Sabins F, "DeepStar CTR 7501 Drilling And Completion Gaps For HPHT Deepwater Wells Drilling Assessment." Global Deepwater Technology Development DeepStar Project, Feb 13, 2006.

5. Proehl T; Sabins F, "DeepStar CTR 7501 Drilling And Completion Gaps For HPHT Deepwater Wells Cementing Assessment." Global Deepwater Technology Development DeepStar Project, Feb 13, 2006.

6. Proehl T; Sabins F, "DeepStar CTR 7501 Drilling And Completion Gaps For HPHT Deepwater Wells Completion Assessment." Global Deepwater Technology Development DeepStar Project, Feb 13, 2006.

7. Watters L; Edgley K; Sabins F, "Long-Term Cement Integrity of HPHT [High-Pressure, High-Temperature] Cement Systems" US Dept Energy Grant, Gas TIPS, Vol 11, No 3, Pp. 20-23, Summer 2005.

8. Sabins F, "Long-term Cement Integrity of HTHP Cement Systems: DOE-Deep Trek Project." IADC Drilling Engineering Association Workshop, Galveston, Tx, May 24-25, 2005.

9. Rusch D W; Sabins F; Aslakson J, "Microannulus Leaks Repaired With Pressure-Activated Sealant." SPE-91399, SPE Eastern Regional Meeting, Charleston, Wv, Sept 15-17, 2004.

10. Reid P; Santos H; Labenski F; Sabins F; Watters L, "Associative Polymers For Invasion Control In Water-And Oil-Based Muds And In Cementing Spacers: Laboratory And Field Case Histories." Aade-04-df-ho-33, Aade 2004 Drilling Fluids Conference, Houston, Tx, April 6-7, 2004.

11. Sabins F, "Ultra-light Hollow Glass Spheres Improve Cement Slurry Performance For Lightweight Cement Applications." 3M-98-0212-3744-5, April 2004.

12. Sabins F, "Ultra-Lightweight Cement Slurries Improve Cement Performance." Gas TIPS, Vol 8, No 4, Pp. 4-7, Fall 2002.

13. Cobb S; Maki V; Sabins F, "Method For Predicting Compressive Strength Of Foamed Cement Under Temperature And Pressure." Oil & Gas Journal, Vol 100, No 15, April 15, 2002.

14. Sabins F, "JIP Studies Cement Integrity." E & P, Vol 75, No 2, Pp. 47-49, February 2002.

15. Sabins F; Yates P; Weyland V; McDonald S, "Low-Cost And Environmentally Sound Plugging Of Abandoned Wells." 8th Annual International Petroleum Environmental Conference, Houston, Tx, Nov 6-9, 2001.

16. Sabins F, "JIPs [Joint Industry Projects] Lead To Advances In Cementing." American Oil Gas Reporter, Vol 43, No 13, Pp. 93-94,104, Dec. 2000.

17. Sabins F L; Edwards T M; Maharidge R L, "Critical Evaluation Of Blast Furnace Slag Mud Converted To Cement." IADC/SPE-35085. IADC/SPE Drilling Conference, New Orleans, March 12-15, 1996, Proceedings, Pp. 371-392, 1996.

18. Cowan M; Sabins F, "New Correlations Improve Temperature Predictions For Cementing And Squeezing." Oil & Gas Journal, Vol 93, No 34, Pp. 53-57, Aug 21, 1995.

19. Sabins F; de Rozieres J, "Shrinkage And Expansion In Oil Well Cements." API Work Group on Shrinkage, Api Meeting, Calgary, Canada, June 1995.

20. Sabins F; Wiggins M L, "Parametric Study Of Gas Entry Into Cemented Wellbores." SPE-28472, 69th Annual SPE Technical Conference, New Orleans, Sept 25-28, 1994, Production Operations And Engineering Proceedings, Vol 1, Pp. 75-90, 1994.

21. Sabins F L; Smith R C; Broussard M D; Talbot K J; Olaussen S R, "Factors Contributing To Cement Sheath Deposition In Casing Under Highly Deviated Well Conditions." SPE-19934, SPE Drilling Completion Vol 8, No 4, Pp. 265-270, Dec 1993.

22. Sabins F L; Sutton D L, "The Relationship Of Thickening Time, Gel Strength, And Compressive Strength Of Oilwell Cements." SPE-11205, <u>Cementing</u>, Pp. 57-66, 1992.

23. Sutton D L; Sabins F; Faul R, "Preventing Annular Gas Flow Pt.2: New Evaluation For Annular Gas-Flow Potential." <u>Cementing</u>, Pp. 172-175, 1992.

24. Sutton D L; Sabins F; Faul R, "Preventing Annular Gas Flow Pt.1: Annular Gas Flow Theory And Prevention Methods Described." <u>Cementing</u>, Pp. 168-171, 1992.

25. Griffith J E; Sabins F L; Harness P E, "Investigation Of Ultrasonic And Sonic Bond Tools For Detection Of Gas Channels In Cements." SPE-24573, 67th Annual SPE Technical Conference, Washington, Dc, Oct 4-7, 1992, Drilling Proceedings, Pp. 245-260, 1992.

26. Beirute R M; Wilson M A; Sabins F L, "Attenuation Of Casing Cemented With Conventional And Expanding Cements Across Heavy-Oil And Sandstone

Formations." SPE-18027, SPE Drilling Engineering Proceedings Vol 7, No 3, Pp. 200-206, Sept 1992.

27. Harness P E; Sabins F L; Griffith J E, "New Technique Provides Better Low-Density-Cement Evaluation." SPE-24050, SPE West Regional Meeting, Bakersfield, Ca, March 30-April 1, 1992, Proceedings Pp. 249-258.

28. Beirute R M; Sabins F L; Ravi K V, "Large-Scale Experiments Show Proper Hole Conditioning: A Critical Requirement For Successful Cementing Operations." SPE-22774, SPE Permian Basin Oil & Gas Recovery Conference, Midland, Tx, March 18-20, 1992, Proceedings Pp. 95-110.

29. Beirute R M; Ravi K V; Sabins F L, "Large-Scale Experiments Show Proper Hole Conditioning: A Critical Requirement For Successful Cementing Operations." 66th Annual SPE Tech Conference, Dallas, Tx, Oct 6-9, 1991, [Production Operations & Engineering] Pt 1, Pp. 35-150, 1991.

30. Wilson M A; Sabins F L; Beirute R M, "Factors Affecting Cementing Efficiency Across Heavy Oil And Other Unconsolidated Formations In Vertical And Inclined Holes." 5th Unitar Et Al Heavy Crude & Tar Sands International Conference, Caracas, Venezuela, Aug 4-9, 1991 Proceedings Vol 2, Pp. 407-420, 1991.

31. Sabins F L; Sutton D L, "Interrelationship Between Critical Cement Properties And Volume Changes During Cement Setting." SPE-20451, SPE Drilling Engineering Proceedings Vol 6, No 2, Pp. 88-94, June 1991.

32. Sutton D L; Sabins F L, "Supplement To SPE 20451, Interrelationship Between Critical Cement Properties And Volume Changes During Cement Setting." SPE-22952.

33. Gerke R R; Logan J L; Sabins F L; Simon J M, "A Study Of Bulk Cement Handling And Testing Procedures." SPE-14196, SPE Production Engineering Proceedings V 5, No 4, Pp. 425-432, Nov 1990.

34. Sabins F L; Sutton D L, "Interrelationship Between Critical Cement Properties and Volume Changes During Cement Setting." 65th Annual SPE Technical Conference, New Orleans, La, Sept 23-26, 1990, Proc [D-Drilling], Pp. 471-484, 1990.

35. Sabins F L, "Problems In Cementing Horizontal Wells." SPE-20005, Journal Of Petroleum Technology, Vol 42, No 4, Pp. 398-400, April 1990.

36. Broussard M D; Talbot K J; Smith R C; Olaussen S R; Sabins F L, "An Investigation Of Factors Contributing To The Deposition Of Cement Sheaths In Casing Under Highly Deviated Well Conditions." IADC/SPE Drilling Conf, Houston, Tx, Feb 27-Mar 2, 1990, Proc Pp. 203-210, 1990.

37. Crump J B; Sabins F L, "Guidelines For Selecting Cement That Will Be Perforated." 36th Annual Southwestern Petroleum Short Course Ass Et Al Mtg, Lubbock, Tx, April 19-20, 1989, Pp. 11-20.

38. Wilson M A; Sabins F L, "A Laboratory Investigation Of Cementing Horizontal Wells." SPE-17925, 6th SPE Middle East Oil Show, Manama, Bahrain, March 11-14, 1989, Pp. 23-33.

39. Savage R E; Sabins F; Berryman L, "Full-Scale Testing Key To Successful Field Performance." Oil & Gas Journal, Vol 86, No 40, Pp. 58, 60, 62-63, Oct 3, 1988.

40. Beirute R M; Wilson M A; Sabins F L, "Attenuation Of Casing Cemented With Conventional And Expanding Cements Across Heavy Oil And Sandstone Formations." SPE-18027, 63rd Annual SPE Technical Conference, Houston, Oct 2-5, 1988, Pp. 97-111.

41. Wilson M A; Sabins F L; Beirute R M, "Other Unconsolidated Formations In Vertical And Inclined Holes." 63rd Annual SPE Tech Conference, Houston, Tx, Oct 2-5, 1988, Pp. 85-96, 1988.

42. Sabins F L; Wilson M A, "[R] A Laboratory Investigation Of Cementing Horizontal Wells." SPE Drilling Eng, Vol 3, No 3, Pp. 275-280, Sept 1988.

43. Austin C; Zimmerman C; Sullaway B; Sabins F, "Fundamentals Of Horizontal Well Completions." Drilling, Vol 49, No 3, Pp. 28-31, May-June 1988.

44. Wilson M A; Sabins FL, "A Laboratory Investigation of Cementing Horizontal Wells." 62nd Annual SPE Technical Conference, Dallas, Tx, Sept 27-30, 1987, Proc [P – Production Operations and Engineering], Pp. 493-501, 1987.

45. Sabins F L; Sutton D L, "The Relationship Of Thickening Time, Gel Strength, And Compresssive Strengths Of Oilwell Cements." SPE-11205, SPE Production Engineering Proceedings Vol 1, No 2, Pp. 143-152, March 1986.

46. Logan J L; Simon J M; Sabins F L; Gerke R R, "A Study of Bulk Cement Handling And Testing Procedures." 60th Annual SPE of AIME Tech Conference, Las Vegas, Nv, Sept 22-25, 1985, Preprint No SPE-14196, 16 Pp., 1985.

47. Stehle D; Sabins F; Gibson J; Theis K; Venditto J J, "Conoco Stops Annular Gas Glow With Special Cement." <u>Petroleum Engineering International</u>, Vol 57, No 4, Pp. 21-24, April 1985.

48. Sutton D L; Sabins F; Faul R, "Preventing Annular Gas Flow Pt. 2: New Evaluation For Annular Gas-Flow Potential." <u>Oil & Gas Journal</u>, Vol 82, No 51, Pp. 109-112, Dec 17, 1984.

49. Sutton D L; Sabins F; Faul R, "Preventing Annular Gas Flow. Pt. 1: Annular Gas Flow Theory And Prevention Method Described." <u>Oil & Gas Journal</u>, Vol 82, No 50, Pp. 84-86, 91-92, Dec 10, 1984.

50. Rivas O H; Sabins F L; Sutton D L, "Relationship Between Thickening Time, Gel Resistance And Compressive Resistance Values (La Relacion Entre El Tiempo De Espesamiento, La Resistencia Del Gel Y La Resistencia A La Compresion De Los Cementos)." 4th Venezuela Min Energia Minas Et Al Latin America Drilling Congress, Caracas, Oct 1-5, 1984, Proc Vol 1, 27 Pp.

51. Sutton D L; Sabins F L; Cook C Jr, "Effect of Excessive Retardation On The Physical Properties Of Cement Slurries." <u>Journal of Petroleum Technology</u>, Vol 36, No 9, Pp. 1357-1365, Aug 1984.

52. Burkhalter J F; Sutton D L; Rao P P; Sabins F L, "A Laboratory Instrument To Continuously Monitor The Compressive Strength Of Cement Slurries." 31st Annual Southwestern Petroleum Short Course Ass Et Al Mtg, Lubbock, Tx, April 25-26, 1984, Proceedings Pp. 1-6, 1984.

53. Sabins F L; Tinsley J M; Sutton D L, "Transition Time Of Cement Slurries Between The Fluid And Set State." SPE-9285, 1st Norwegian Petroleum Soc Northern Europe Drilling Conference, Kristiansand, Norway Oct 24-26, 1983.

54. Watters L T; Sabins F L, "Field Evaluation Of Method To Control Gas Flow Following Cementing." SPE-9287, 1st Norwegian Petroleum Soc Northern Europe Drilling Conference, Kristiansand, Norway Oct 24-26, 1983.

55. Tinsley J M; Sabins F L; Sutton D L; Miller E C, "Study Of Factors Causing Annular Gas Flow Following Primary Cementing." SPE-8257, 1st Norwegian Petroleum Soc Northern Europe Drilling Conference, Kristiansand, Norway, Oct 24-26, 1983, Proceedings, 12 Pp.

56. Sutton D L; Sabins F L, "Here's How To Apply Laboratory Cement-Test Specifications to Actual Operations." <u>Oil & Gas Journal</u>, Vol 81, No 21, Pp. 64-68, May 23, 1983.

57. Sabins F L; Tinsley J M; Sutton D L, "Transition Time Of Cement Slurries Between The Fluid And Set States." <u>Society Of Petroleum Engineering Journal</u>, Vol 22, No 6, Pp. 875-882, Dec 1982.

58. Sutton D L; Sabins F L, "The Relationship of Thickening Time, Gel Strength, And Compressive Strengths of Oilwell Cements." 57th Annual SPE OD AIME Fall Tech Conference, New Orleans, La, Sept 26-29, 1982, Preprint No SPE-11205, 12 Pp., 1982.

59. Sabins F L; Browning P L, "Well Completion And Stimulation. Cement Compressibility Evaluated." <u>Drill Bit</u>, Vol 31, No 2, Pp. 67-69, Feb 1982.

60. Kettl F; Sabins F, "New Method Solves Gas Flow Through Cement." <u>Western Oil Reporter</u>, Vol 39, No 2, Pp. 141-143, Feb 1982.

61. Cook C Jr; Sutton D L; Sabins F L, "The Effect of Excessive Retardation on the Physical Properties of Cement Slurries." 56th Annual SPE of AIME Fall Tech Conference, San Antonio, Tx, Oct 5-7, 1981, Preprint No SPE-10221, 12 Pp., 1981.

62. Tinsley J M; Sutton D L; Sabins F L, "Transition Time Of Cement Slurries Between The Fluid And Set State." 55th Annual SPE Of AIME Fall Tech Conf, Dallas, Tx, Sept 21-24, 1980, Preprint No SPE-9285, 12 Pp., 1980.

63. Watters L T; Sabins F L, "Field Evaluation Of Method To Control Gas Flow Following Cementing." 55th Annual SPE Of AIME Fall Tech Conf, Dallas, Tx, Sept 21-24, 1980, Preprint No SPE-9287, 6 Pp., 1980.

64. Miller E C; Sutton D L; Tinsley J M; Sabins F L, "(R) Study Of Factors Causing Annular Gas Flow Following Primary Cementing." <u>J Petrol Technol</u>, Vol 32, No 8, Pp. 1427-1437, Aug 1980.

65. Miller E C; Tinsley J M; Sabins F L; Sutton D L, "Study Of Factors Causing Annular Gas Flow Following Primary Cementing." 54th Annual SPE Of AIME Tech Conf, Las Vegas, Sept 23-26, 1979, Preprint No SPE-8257, 12 Pp., 1979.

**Patents**

1. Watters L; Sabins F L; Burts B D Jr; Burts B D III, "Well Remediation Using Downhole Slurry." Us Patent 7363976 (April 29, 2008)

2. Sikora C J; Sabins F L; Beckman K J; George M E, "Fluid Loss Concentrate For Hydraulic Cement." World Patent CN101006155 (July 25, 2007)

3. Watters L T; Sabins F L, "Method Of Forming A Cementitious Plug In A Well." Us Patent 6732797 (May 11, 2004).

4. Sabins F L; Maki V E, "Apparatus And Method For Estimating The Compressive Strength Of Foam Cement." Us Patent No 6345535 (Feb 12, 2002).

5. Maki V E; Sabins F L, "Dynamic Fluid Loss Cell Apparatus and Method Thereof." Us Patent 6269684 (Aug 7, 2001).

6. Sabins F L, "Cementing Compositions, A Method Of Making Therefor, And A Method." Us Patent 6171386 (Jan 9, 2001)

7. Sabins F L; Maki V, "Acoustic Method For Determining The Static Gel Strength Of A Cement Slurry." Us Patent No 5992223 (Nov 30, 1999).

8. Allen T E; Arnold G D; Case L R; Clark M A; Folmnsbee G E; Gammill J L; Macadam J M; Richardson J M; Sabins F L, "Method Of Evaluating Oil Or Gas Well Fluid Process," Us Patent No 5355951 (Oct 18, 1994).

9.  Allen T E; Arnold G D; Case L R; Clark M A; Folmnsbee G E; Gammill J L; Macadam J M; Richardson J M; Sabins F L, "Method Of Evaluating Oil Or Gas Well Cementing Process," Uk Patent No 616109 (Sept 21, 1994).

10. Ravi K M; Sabins F L, "Drilling Fluid Removal In Primary Well Cementing," Us Patent No 5339899 (Aug 23, 1994).

11. Sabins F L; Sutton D L, "Method Of Preventing Gas Migration During Primary Well Cementing," Us Patent No 5327969 (July 12, 1994).

12. Childs J D; Sabins F L, "Method Of Cementing A Subterranean Zone," Canada Patent No 1253680 (May 9, 1989).

13. Childs J D; Sabins F L, "Set Retarded Cement Compositions And Well Cementing Methods," Canada Patent No 1249713 (Feb 2, 1989).

14. Childs J D; Sutton D L; Sabins F L; Love R; Weigand W A, "Set Retarder Cement Composition," Australia Patent No 579405 (Nov 24, 1988).

15. Childs J D; Sutton D L; Sabins F L, "Set Delayed Cement Compositions And Method Of Using The Same," Canada Patent No 1241029 (Aug 23, 1988).

16. Childs J D; Sabins F L; Taylor M J, "Thixotropic Cements For Use In Wells," Europe Patent No 145151 (April 6, 1988).

17. Childs J D; Sabins F L; Taylor M J, "Thixotropic Cement Slurry Compositions," Australia Patent No 565900 (Oct 1, 1987).

18. Childs J D; Sutton D L; Sabins F L, "Set Delayed Cement Compositions And Methods Of Using The Same," Us Patent No 4676832 (June 30, 1987).

19. Sabins F L; Sutton D L; Johnson J W, "Positive Stirring Consistometer Cup And Method Of Using The Same," Us Patent No 4653313 (March 31, 1987).

20. Childs J D; Sabins F L, "Thixotropic Cements For Combating Gas Migration Problems," Canada Patent No 1217326 (Feb 3, 1987).

21. Childs J D; Sabins F L; Taylor M J, "Thixotropic Cement For Combating Lost Circulation Problems," Canada Patent No 1217325 (Feb 3, 1987).

22. Childs J D; Sabins F L, "Set Retarded Cement Compositions And Well Cementing Methods," Us Patent No 4582139 (April 15, 1986).

23. Childs J D; Sutton D L; Sabins F L; Love R; Weigand W A, "Well Cementing Methods And Compositions," Europe Patent No 177308 (March 9, 1986).

24. Childs J D; Sabins F L; Taylor M J, "Thixotropic Cements For Use In Wells," Europe Patent No 145151 (June 19, 1985).

25. Sabins F; Childs J D, "Method Of Using Thixotropic Cements For Combating Gas Migration Problems," Us Patent 4524828 (May 25, 1985).

26. Childs J; Sabins F; Taylor M J, "Method Of Using Thixotropic Cements For Combating Lost Circulation," Us Patent No 4515216 (May 7, 1985).

27. Boyce D. Burts JR; Boyce Donald Burts III, Freddie L. Sabins; Larry Watters, "Primary Wll Cementing with Downhole Mixed Epoxy, US Patent No. 0289824 (Nov 27, 2008)

## Compensation

For this report, I was compensated at a rate of $300 per hour for technical preparation. I will be compensated at a rate of $350 per hour for deposition or courtroom appearance.