# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

300 North LaSalle
Chicago, IL  60654

J. Andrew Langan P.C.
To Call Writer Directly:
(312) 862-2064
Andrew.langan@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

November 14, 2011

**Via E-Mail (Sally_Shushan@laed.uscourts.gov)**        **Contains Information Designated
Confidential Under The Protective Order**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the
    Eastern District of Louisiana
500 Poydras Street, Room B-345
New Orleans, LA 70130

Re:    **In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of
Mexico, on April 20, 2010, MDL No. 2179.**

Dear Judge Shushan:

BP submits this letter pursuant to Federal Rules of Civil Procedure 16, 26, and 37 to
request an order striking Halliburton's untimely Rule 26 disclosure of Roland Chemali as an
expert witness and precluding him from testifying at trial as an expert.  In the alternative, BP
requests an order requiring Halliburton to make Mr. Chemali available for deposition in January
2012.

## INTRODUCTION

Three weeks after the deadline to submit expert reports, Halliburton untimely designated
another expert by identifying him as a rebuttal witness.  But, Roland Chemali is unquestionably
an untimely designated expert for two reasons.  First, Mr. Chemali is an affirmative expert
because his proffered areas of testimony relate solely to Halliburton's cross-claim that BP
negligently failed to identify the M57B sand as a hydrocarbon zone—an issue on which
Halliburton carries the burden of proof.  Second, Mr. Chemali is not a rebuttal expert because *no
party* other than Halliburton submitted *any* opening expert report addressing the M57B sand.
Thus, there is simply no expert for Mr. Chemali to rebut.  Mr. Chemali's proffered testimony
should be stricken for the additional reason that it is cumulative of the proffered opinions of
another Halliburton expert, Richard Strickland, and thus, Halliburton would suffer no prejudice
if it were precluded from offering a similar opinion from Mr. Chemali.  As such, the Rule 26
disclosure of Mr. Chemali as a "rebuttal" expert witness should be stricken.

Chicago        Hong Kong        London        Los Angeles        Munich        New York        Palo Alto        San Francisco        Shanghai

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
November 14, 2011
Page 2

## BACKGROUND

On October, 19, 2010, the Court issued Pretrial Order No. 11 establishing the sequence for expert discovery.  Rec. Doc. 569.  Pretrial Order No. 32 maintained this sequence, but modified certain dates.  Rec. Doc. 1506.  In the Court's July 1, 2011 Order Regarding Revised Schedule for Phase One Expert Discovery, the Court provided the PSC with additional time for the preparation of its expert reports.  Rec. Doc. 3126.  The Order stated in relevant part:

- October 17, 2011:  All February 2012 Trial Defendants, 14(c) Defendants, and/or Third-Party Defendants to serve expert reports.

- November 7, 2011:  Rebuttal Expert Reports for February 2012 Trial.

- November 14, 2011:  Begin depositions of Phase One Experts for February 27, 2012 trial.

- December 23, 2011:  End depositions of Phase One Experts for February 27, 2012 trial.

In the Original and First Amended Cross Claim of Defendant Halliburton Energy Services, Halliburton asserted Count III for Negligence/Gross Negligence/Willful Misconduct against the BP Defendants.  Rec. Doc. 2086 (filed in 2:10-MD-02179); Rec. Doc. 445 (filed in 2:10-CV-02771).  Among other things, Halliburton alleged that BP was "negligent, grossly negligent, and/or acted with willful misconduct" by "[f]ailing to exercise ordinary and reasonable care in connection with its drilling design and operations."  *Id.* ¶ 45(a).  In its September 1, 2011 motion for leave to file a second amended cross claim, Halliburton argued that its operative complaint already included a negligence claim for BP's alleged failure to identify the M57B interval.  Rec. Doc. 3893 at 4 ("The facts relative to BP's failure to identify the shallower hydrocarbon-bearing zones are encompassed within HESI's already existing negligence claims against the BP Entities, although the proposed amended cross-claim more specifically states these factual bases for BP's negligence and gross negligence.").  After briefing by the parties, the Court denied Halliburton's motion on October 10, 2011.  Rec. Doc. 3893.  On October 25, 2011, Halliburton filed a motion for reconsideration of the Court's order.  Rec. Doc. 4396.

Pursuant to the October 17, 2011 deadline for initial expert reports, Halliburton served nine expert reports on its affirmative issues.  Among the nine Halliburton reports, the expert report of Richard Strickland purported to analyze the nature of the sand intervals for the final section of the Macondo well, focusing on certain well data reflecting the petrophysical properties

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
November 14, 2011
Page 3

of zones above 17,900 feet.  *See* Ex. A (Expert Report of Richard Strickland (exhibits and appendices omitted)).  In his report, Dr. Strickland opines on what a "hydrocarbon bearing zone" is and whether BP mistakenly identified the shallowest hydrocarbon bearing zone at 17,803 feet (instead of the M57B interval at 17,467 feet).  *Id.* at 9, 43.  As BP did not carry the burden of proof on Halliburton's negligence claims, it did not submit an affirmative expert report in October on the M57B sand.  On November 7, 2011, BP submitted the Expert Report of Richard Lee, Larry Lockard, and Leif Colson to rebut the allegations in Dr. Strickland's report.

After the deadline to disclose affirmative experts, Roland Chemali, Halliburton's Chief Petrophysicist, was deposed at BP's request on November 3, 2011.  Mr. Chemali testified as a fact witness on certain technical topics, including his personal interpretation of the M57B sand.  *See* Ex. B (Roland Chemali Dep.) at 150-52, 195.  Because Halliburton had not disclosed that Mr. Chemali was an expert witness, BP did not examine him on any expert opinions.  After BP's examination, Halliburton solicited opinions from Mr. Chemali on its re-direct examination.  BP counsel immediately asked whether Halliburton intended to tender Mr. Chemali as an expert.  Halliburton counsel declined to disclose whether Halliburton would designate him.  Ex. B at 228:4-24.  BP, therefore, requested the opportunity to re-examine Mr. Chemali immediately on the expert opinions Halliburton had solicited, and reserved the right to depose him again should Halliburton later designate Mr. Chemali as an expert witness.  *Id.*  Halliburton acquiesced to the latter request and agreed that BP could reserve the right to re-depose Mr. Chemali if he was designated as an expert.  *Id.*

Four days after Mr. Chemali's deposition, Halliburton served a Rule 26 disclosure designating Mr. Chemali as a "rebuttal" expert regarding the nature of the sand intervals for the final section of the Macondo well, particularly zones above 17,900 feet including the M57B.  *See* Ex. C (Halliburton Rule 26 Disclosure) at 2-3.  Halliburton's disclosure does not—because it cannot—identify any expert whose opinions Mr. Chemali rebuts.  Because (a) expert reports for affirmative claims were due on October 17, 2011, (b) BP nor any other party submitted any affirmative expert relating to the M57B sand for Mr. Chemali to rebut, and (c) Mr. Chemali's proposed testimony would be cumulative of Dr. Strickland's testimony, BP files this motion to strike Halliburton's late designation of Mr. Chemali as an expert witness.

## ARGUMENT

The Federal Rules provide that when a party "fails to obey a scheduling or pretrial order," the court may prohibit the offending party from introducing the "designated matters in evidence." Fed. R. Civ. P. 16(f)(C), 37(b)(2)(A)(ii). The question of whether to exclude untimely expert testimony is left to the sound discretion of the district court. *Bradley v. United States*, 866 F.2d 120, 124-25, 127 (5th Cir. 1989) (finding district court abused its discretion in admitting

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
November 14, 2011
Page 4

untimely designated expert witness); *see also 1488, Inc. v. Philsec Inv. Corp.*, 939 F.2d 1281, 1288 (5th Cir. 1991) (finding no abuse of discretion in excluding untimely expert witness); *Geiserman v. MacDonald*, 893 F.2d 787, 790-91 (5th Cir. 1990) (same).

Four factors guide whether a court should permit the introduction of untimely expert evidence:  (1) the explanation, if any, for the party's failure to identify the witness; (2) the importance of the witness's testimony; (3) the prejudice to the opposing party of allowing the witness to testify; and (4) the possibility of curing such prejudice by granting a continuance. *Bradley*, 866 F.2d at 125.  Here, all four factors favor striking Halliburton's late designation of Mr. Chemali as an expert witness.

### A.     Halliburton Has No Explanation for Its Untimely Designation of a New and Cumulative Expert Witness.

Halliburton has not offered any explanation, much less any reasonable explanation, for its untimely designation of Mr. Chemali as an expert witness.  Instead, Halliburton attempts to disguise its late disclosure by designating Mr. Chemali as a purported rebuttal expert, even though no party submitted any affirmative report for Mr. Chemali to rebut.  In its untimely Rule 26 disclosure, Halliburton proffers Mr. Chemali as an expert on sand intervals above 17,900 feet in the Macondo well and the criteria a reasonably prudent operator would consider for determining a hydrocarbon zone.  *See* Ex. C at 2.  "Mr. Chemali is expected to testify concerning his belief that BP was reckless in failing to identify and account for the shallow M57B gas zone located at a depth of 17,467 feet." *Id.*  In addition, Mr. Chemali will opine on "the manner in which hydrocarbon bearing zones in a well such as Macondo are identified and treated by operators such as BP," and the belief "that the M57B zone located at 17,467 feet in the Macondo well is a hydrocarbon bearing zone that should have been considered by BP petrophysicists after examining the triple combo well logs obtained from Schlumberger prior to the cementing of the Macondo well." *See id.* at 2-3.

These subject areas of testimony clearly relate to Halliburton's claim for negligence, gross negligence, or willful misconduct against BP.  The date by which Halliburton was required to identify its affirmative experts passed three weeks before Halliburton served its Rule 26 disclosure of Mr. Chemali as a "rebuttal" expert witness.  *See* Rec. Doc. 3126.

Moreover, Halliburton should not be heard to argue that its untimely disclosed expert is offered in rebuttal because BP nor any other party proffered any affirmative experts relating to the M57B sand.  Halliburton admits as much in that its Rule 26 disclosure fails to identify the affirmative expert or opinion that Mr. Chemali will rebut.  As such, Mr. Chemali is "rebutting" a nonexistent expert witness.  He is plainly a late-designated expert witness disguised as a rebuttal

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
November 14, 2011
Page 5

witness.  Because Halliburton has not, and cannot, offer any reasonable justification for its untimely designation, its "rebuttal" expert disclosure of Mr. Chemali should be stricken.  *See Bradley*, 866 F.2d at 125.

### B.     Mr. Chemali's Expert Testimony Is Duplicative of Halliburton's Expert Richard Strickland.

The second *Bradley* factor regarding the importance of the late-disclosed expert's testimony supports striking Mr. Chemali as an expert witness.  *See Bradley*, 866 F.2d at 125.  Not only is Mr. Chemali untimely disclosed, but his proffered testimony is also cumulative of the report submitted by Halliburton expert Richard Strickland.  Halliburton will suffer no prejudice without Mr. Chemali's testimony because it has already designated another expert, Dr. Strickland, to address issues relating to interpretation of the M57B sand.  *See* Ex. A at 3-6 (Executive Summary).

Thus, the Court should strike Halliburton's untimely designation of Mr. Chemali as an expert witness.  *See Philsec*, 939 F.2d at 1288 (finding no abuse of discretion in excluding untimely expert witnesses when plaintiff already had a different and properly designated expert witness testifying on the same subject).

### C.     BP Will Be Prejudiced If Mr. Chemali Is Permitted to Testify as an Expert Witness.

Although expert testimony typically impacts a central issue in a lawsuit, courts routinely exclude a late-disclosed expert witness where there is no legitimate explanation for the delay in making the designation, and the opposing party is prejudiced by the untimely expert designation.  *See Geiserman*, 893 F.2d at 792 ("The importance of such proposed testimony cannot singularly override the enforcement of local rules and scheduling orders."); *see also Bradley*, 866 F.2d at 125-27; *Philsec*, 939 F.2d 1288-89.

The Court's July 1, 2011 Order Regarding Revised Schedule for Phase One Expert Discovery established dates governing expert discovery so that Phase 1 could proceed to trial in February 2012.  *See* Rec. Doc. 3126.  BP spent significant time and incurred substantial expense to abide by these deadlines, including serving expert reports by October 17, 2011, and expert rebuttal reports by November 7, 2011, the deadlines prescribed in the July 1, 2011 Order.  *Id.* Halliburton's late disclosure of Mr. Chemali, disguised as a rebuttal expert, prejudices BP because it was denied the opportunity to submit a rebuttal expert report responding to Mr. Chemali's opinions and was further denied the opportunity to question him about his opinions at his deposition.  In addition, the late disclosure of Mr. Chemali delays when BP will be able to

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
November 14, 2011
Page 6

discover his opinions and BP will incur time and expense preparing responses to those opinions. BP will thus be prejudiced as its resources are diverted to responding to Mr. Chemali's late expert opinions, while Halliburton and the other parties prepare for trial as the Court's July 1, 2011 Order envisioned.  Halliburton should not be permitted to unilaterally rewrite the Court's Order to BP's detriment by designating an additional expert after the deadline.

### D.    A Continuance is Not Available.

The Court recently stated that "a continuance of the [Phase 1] trial is unavailable."  Rec. Doc. 3893 at 2.  And, no continuance is possible where numerous parties and hundreds of Court personnel, witnesses, and attorneys would be affected by Halliburton's improper late designation of an expert witness.  *See Geiserman*, 893 F.2d at 792 (a continuance "would not deter further dilatory behavior, nor serve to enforce local rules or court imposed scheduling orders").

If the Court is not inclined to strike Mr. Chemali as an untimely disclosed expert witness, BP requests that the Court order Halliburton to make Mr. Chemali available for deposition in the first part of January 2012.  Halliburton has already agreed to do so if he were designated as an expert when it became clear on direct examination at Mr. Chemali's November 3, 2011 deposition that Halliburton intended to solicit expert opinions from him:  "MR. LANCASTER: If you are, then I want to cross-examine him now off the topics you read. If you're—if you're going to do it later, then I'll reserve the opportunity for when you tender him as an expert.  MR. BOWMAN: You—you can reserve."  Ex. B at 228:15-20.

## CONCLUSION

Under the guise of a rebuttal designation, Halliburton attempts to circumvent the expert-discovery deadlines prescribed in this case for all parties.  But Mr. Chemali is by no definition a rebuttal witness.  His testimony relates solely to the M57B sand issue in Halliburton's affirmative cross-claim, which is not the subject of any other party's affirmative expert reports. The deadline for affirmative expert reports passed three weeks before Halliburton disclosed Mr. Chemali as an expert.  Under well-settled Fifth Circuit law, the designation of Mr. Chemali as an expert witness should be stricken.  In the alternative, BP seeks an order requiring Halliburton to make him available for deposition in the first part of January 2012.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
November 14, 2011
Page 7

      Thank you for your consideration of this submission.


                         Respectfully submitted,

                         /s/ J. Andrew Langan

                         J. Andrew Langan

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: OIL SPILL by the OIL RIG<br>"DEEPWATER HORIZON" in the<br>GULF OF MEXICO,<br>on APRIL 20, 2010<br><br>        Applies to:<br><br>               ALL CASES and<br>               2:10-cv-02771 | MDL No. 2179<br><br>Section: J<br><br>The Honorable Judge Barbier<br>Mag. Judge Shushan |

**REPORT OF RICHARD F. STRICKLAND, P.E., PhD**

# Table of Contents

I.  Introduction and Charge ........................................................................................... 3

II.  Executive Summary ................................................................................................. 3

III.  Qualifications ........................................................................................................... 6

IV.  Background Information Concerning Hydrocarbon Bearing Zones ......................... 8

V.  Quality and Availability of Data Was Sufficient for the Determination of the Highest Hydrocarbon Bearing Zone Before Cementing ........................................................ 9

VI.  BP Analysis of Highest Hydrocarbon Bearing Zone ............................................. 10

BP Analysis before the Blowout Could Have Identified the M57B Zone as Hydrocarbon Bearing But Did Not ........................................................................... 11

LWD Data Could Have Been Used to Identify M57B as Gas ......................... 12

Wire Line Logs Could Have Been Used to Identify M57B as Gas ................. 13

BP Analysis after the Blowout Consistently Identified the M57B as Gas .............. 19

April 21st Group Discussion First Interpreted M57B as Gas .......................... 20

Calculations by Ms. Skripnikova, Technical Notes and Memorandum Corroborate Interpretation of Gas-Bearing Zone ............................................ 21

BP Analysis after Discussion with Bly Team Emphasizes Uncertainty, Still Interprets Gas in M57B .................................................................................... 25

VII.  Strickland Analysis of Highest Hydrocarbon Bearing Zone .................................. 29

BP had Sufficient Information as of April 13, 2010 to Identify the M57B Gas Zone 29

Analysis of the Depth of Investigation of Resisitivity Tool Confirms that Hydrocarbons Detected in M57B were not Solely Due to Infiltration of Oil Base Mud ...................................................................................................................... 33

The Effect of Oil Base Mud and Mud Filtrate Invasion ........................................... 34

Water Saturation Calculations Show the M57B as Hydrocarbon Bearing .............. 35

Available Information about Schlumberger ELAN Analysis Does not Establish Superior Reliability ................................................................................. 37

Another Zone above M56A May Contain Hydrocarbons ......................................... 38

VIII. Pore Pressure in M57B is around 12,871 psia ........................................................ 39

IX. An Analysis of the Macondo LWD Data Suggests that Additional Hydrocarbon Intervals May Exist at the Bottom of the Well ......................................................... 41

X.  Summary of My Analyses ....................................................................................... 42

XI. List of Exhibits ......................................................................................................... 45

XII. List of Appendices .................................................................................................. 46

## I.  Introduction and Charge

1. My name is Richard F. Strickland, and I have been retained by Halliburton Energy Services, Inc. to express an opinion as to the highest hydrocarbon bearing zone in the open hole interval of the BP operated Mississippi Canyon, Block 252 well #1 (the *"Macondo Well"*) prior to running and cementing the final string of casing.

## II.  Executive Summary

2. BP mistakenly identified the M56A zone at 17,803 ft (md)[1] as the uppermost hydrocarbon bearing zone in the Macondo well.   My analysis has confirmed that BP should have identified the uppermost hydrocarbon bearing zone as the M57B zone, located at 17,467 ft (md).  BP's analysis of the highest hydrocarbon zone was superficial, incomplete and thus incorrect.  BP knew or should have known that the M57B zone was the shallowest hydrocarbon zone in the well prior to cementing the final string of casing in the Macondo well.   I understand that BP did not provide information concerning the M57B zone to Halliburton and that BP's incorrect identification of the

_____

[1] The measured depths of this and other zones may vary slightly from log to log.

uppermost hydrocarbon bearing zone could have affected the cement job.  It is also possible that additional hydrocarbon bearing zones exist deep in the well and are located at and below the location of the reamer shoe at 18,304 ft (md).

3.  Halliburton began cementing the final string of casing in the Macondo well on April 19, 2010.  It is my understanding that Halliburton designed the cement job based on parameters obtained from the operator BP including the depth of the highest hydrocarbon bearing interval.  I further understand that adequate cement above the highest hydrocarbon interval is important for zonal isolation and for satisfying federal regulations.

4.  BP determined and that the highest hydrocarbon bearing zone was located at a depth of 17,803 ft (md), the so-called *"M56A"* zone as it was named post-incident.  I understand that BP then represented to Halliburton, based on the depth of this zone, that the top of cement (TOC) should be designed at 17,300 ft, approximately 500 ft above the zone at 17,803 ft (md). BP's Ms. Galina Skripnikova took 27 minutes to make the interpretation of the highest hydrocarbon bearing zone using a qualitative review of a hard copy print of log measurements.

5.  My calculations, including variations of methods and inputs, demonstrate that the highest hydrocarbon bearing zone was actually zone M57B located at a depth of 17,467 ft (md).  The actual highest zone is 336 ft higher than BP's interpretation.

6.  Ms. Skripnikova and possibly others at BP possessed adequate information to identify the M57B as the highest hydrocarbon bearing zone before the final cement job was pumped on April 19th.

   a.  Appropriate calculations could have been conducted April 3rd or later based on logging while drilling (LWD) data.

   b.  Appropriate calculations could have been conducted April 12th or later based on wireline logging data. In fact, the evidence suggests that calculations were made but not reviewed for the purpose of determining the highest hydrocarbon bearing zone.

c. Appropriate calculations, whether made by hand or using specialized software, would have shown that the M57B zone contained gas.

7. Because Ms. Skripnikova used a brief and qualitative approach instead of a quantitative one, her interpretation was superficial, incomplete and incorrect. Ms. Skripnikova spent twenty-seven minutes or less to arrive at her conclusion. She performed only a visual inspection of the field print of the Triple Combo log to make the determination. Ms. Skripnikova ignored other available data and failed to perform or to consult simple and available calculations which would have confirmed that the M57B zone contained gas.

8. BP did not identify the M57B zone as the highest hydrocarbon bearing interval in the open hole section of the well from as early as the taking of the LWD data around April 3rd through the review of the wire line data by Ms. Skripnikova on April 13th and up until the day after the blowout.

9. All BP documentation I have reviewed since the blowout suggests that BP held the view that the zone M57B zone contains gas. On April 21st, the day after the blowout, a team of BP petrophysicists first identified the M57B as the correct highest hydrocarbon zone. Subsequently, additional quantitative analysis by Ms. Skripnikova corroborates that interpretation. Technical documentation prepared by Ms. Skripnikova and a team of other technical personnel reiterates and affirms that the M57B contains gas. The last technical documentation, as well as Ms. Skripnikova herself, emphasize uncertainties but maintain the baseline conclusion that the zone contains gas.

10. Based on my review and analysis of information available prior to the pumping of the cement job, a reasonably prudent analyst would have determined the highest hydrocarbon bearing zone is at 17,467 ft (md), the M57B zone. BP, therefore, knew or should have known that the highest hydrocarbon bearing zone was the M57B, 336 feet above the M56A zone at 17,803 ft (md) as picked by Ms. Skripnikova, before the cement job was pumped.

11. Finally, it is my understanding that Halliburton relied on BP's incorrect analysis when designing and pumping the cement job.  Accordingly, Halliburton performed the cement job on the Macondo well without knowledge of the M57B gas zone at 17,467 ft (md). Since it was designed based on an incorrect conclusion, the top of cement would only be roughly 164 feet above the M57B, potentially failing to provide adequate zonal isolation and failing to meet federal regulatory requirements.

12. Since the pressure was not directly measured, I have calculated from data in a nearby zone that the gas in M57B exists at a pressure of 12,871.1 psia.

13. My analysis also indicates that potential additional hydrocarbon intervals exist adjacent to and below the reamer shoe, that is, beside and below the end of the final casing string.


## III.  Qualifications

14. I am the President of The Strickland Group, Inc. (TSG).  TSG provides petroleum consulting services in the area of reservoir and geological engineering to oil-and-gas producers, pipeline companies, and other parties in the oil and gas business.  I have performed studies on fields throughout the United States including the Gulf of Mexico, Eastern and Western Europe, the North Sea, the Middle-East, China, North Africa, CIS countries, India, Indonesia, Central America and South America.

15. I graduated from Texas A&M University with a BS degree in Petroleum Engineering in 1970.  I received my MSc and PhD in Petroleum Engineering from Texas A&M in 1974 and 1976, respectively.  After that time, I was an Associate Professor of Petroleum Engineering at Texas A&M University for six years, teaching courses in reservoir engineering and numerical simulation of oil and gas reservoirs.  I have also taught these same subjects in over seventy-five company run, or industry sponsored courses attended by reservoir engineers and geoscientists from practically every major oil company in the world.

16. I am a registered professional engineer in the State of Texas and a member of the National Society of Professional Engineers.  I am a

member of the Society of Petroleum Engineers and have held several positions at the national and local level.  I have served as an officer and director of the Accrediting Board of Engineering and Technology, which accredits graduate and undergraduate engineering programs in the United States, and have served on this board's Engineering Accreditation Commission, which is the only body that accredits such programs in the United States.

17.  Over the past 35 years I have performed and supervised hundreds of reservoir engineering and geological projects including field studies, economic evaluations, audits and field unitizations.  I have testified as a petroleum engineering expert before state regulatory commissions in Texas, Oklahoma, Arkansas, Alaska and Mississippi, in over thirty state and federal court proceedings in the United States and in similar proceedings in the United Kingdom and Sweden including international arbitrations.  I have also served as an arbitrator in an oil and gas matter.  My resume, a bibliography of my published papers and a list of cases where I have provided testimony during the last four years are attached as Appendix A.

18.  I am frequently employed by various governmental entities such as the United States Department of Justice and the Internal Revenue Service to determine the fair market value of oil and gas assets.  My clients include major oil companies such as BP, ExxonMobil, ChevronTexaco, ConocoPhillips as well as major independents.

19.  My specialty is in the area of reservoir engineering, describing the physical nature of formations and the fluids they contain, and predicting future performance of wells and entire fields.  Integral to that process is a reservoir description developed from petrophysical analysis.  Analysis of open hole well logs is an important part of a reservoir engineering tool kit, and I have evaluated well logs in most of the field studies I have performed. Earlier in my career I developed mathematical models for log evaluation but now use commercial software packages.

20.  Appendix B lists Bates-numbered materials received and available for my review in the preparation of my opinions.

## IV.  Background Information Concerning Hydrocarbon Bearing Zones

21.  A hydrocarbon bearing zone is a defined interval that contains oil and/or gas at a sufficient level such that oil and/or gas will flow out of the zone and into a well bore when the pressure in the well bore is reduced below the pressure in the zone.  In reservoir engineering and geological terms, the zone containing oil and gas is normally called a reservoir, and the rock is called a formation. For convenience and clear communication formations may be given names or labels such as M56A or M57B.

22.  For a formation to be hydrocarbon bearing it must have sufficient porosity and oil or gas saturation such that it will flow in the presence of a pressure differential. Underground formations are composed of various types of rocks and almost always contain some type of fluid. Most rocks have tiny pore spaces that contain the fluid. Quantification of the pore spaces is expressed as a fraction or percentage of the bulk volume of the rock and termed *"porosity"*.  Porosity values range from 0.0% (no pores in the rock) to a high value of approximately 37%.

23.  In reservoir engineering terms, a fluid is water, oil or gas or any combination of the three.  The volume of water, oil or gas in the pore spaces is expressed as a fraction or percentage of the pore volume, called either oil, water or gas saturation.  If all the pore spaces in a rock are full of water then it is said to be 100% water saturated.  It is very rare to find a subsurface formation that does not contain some water. Typically, if a formation contains some percentage of water saturation (*e.g.*, 52%), the remainder of the pore spaces will be filled with a hydrocarbon (*e.g.*, the remaining 48%).   Hydrocarbon bearing zones, by definition, must contain some level of oil and/or gas saturation.  However, if the hydrocarbon saturation is too low then the fluid will not flow.

24.  Permeability is the engineering term describing the resistance to flow of a single fluid in a porous formation.  Permeability is measured in terms of millidarcies, md, not to be confused with the abbreviation for measured depth (md).  In general terms the higher the porosity the higher the permeability.  If the rock contains more than one fluid, for example oil and water, then the concept of relative permeability, a

value between 0.0 and 1.0, comes into play.  Relative permeability is directly related to the saturation of the fluid.  If the rock is 100% water saturated then its relative permeability will be 1.0.  The minimum gas saturation required for flow in response to a pressure differential is low.  Gas saturations above 30% will almost certainly flow gas and most likely water.

25.  Operators typically characterize zones as having *"net pay"* and containing volumes of oil, gas or water based on criteria reflective of commerciality.  For a zone to have net pay, usual criteria are the porosity must be greater than a specified value, perhaps 12% or 14%, and the water saturation must be less than 40% or perhaps 50%.  For example, on the Macondo well BP defined *"net pay"* zones as zones having less than 50% water saturation.[2] Other criteria such as clay or shale content may be specified.

26.  A hydrocarbon bearing zone does not have to meet the same criteria as net pay.  As it relates to the issue of designing and executing a successful cement job, a hydrocarbon bearing zone is one that can flow oil or gas into the wellbore, contaminating the cement or producing channels.  As I understand the cementing process both contamination and channels jeopardize the integrity of the seal between the formation and the casing.

### V.  Quality and Availability of Data Was Sufficient for the Determination of the Highest Hydrocarbon Bearing Zone Before Cementing

27.  When cementing began on April 19, 2010 a considerable amount of high quality data had been obtained over the open hole interval of the Macondo well. The types of data fall under several categories including daily drilling reports, measurements and logging while drilling, open hole wire line logs, core samples and fluid samples.

28.  The process of data gathering begins before the well is drilled and continues after the well has been completed. One of the most

---

[2] *e.g.*, BP-HZN-2179MDL02396746-83

important times to gather subsurface data is during and immediately after drilling the well to total depth (TD).  On the Macondo well, during drilling, information is collected including drilling parameters as well as information about the rocks being penetrated.  This digital data is termed Measurement While Drilling (MWD), Logging While Drilling (LWD) and mud logs.  After drilling to TD and before setting the final string of casing and cementing, the drill string (which contains the MWD and LWD instruments) and bit are removed from the well.  The interval between the last string of casing down to TD is called the *"open hole"*. Numerous specialized instruments, termed logging tools, are lowered by means of a wire line to TD and then slowly retrieved up through the open hole interval.  The recorded measurements are called the open hole wire line logs, or more generally the wire line logs. The wire line is run in and out of the open hole several times as different instruments are employed.  Pressure in the formation along with physical samples of the rock and fluid in the formations can also be sampled by wire line.  The rock samples are called sidewall cores, and in the case of the Macondo well the device used is called a rotary sidewall coring tool. Fluid samples are obtained by forcing a small sealing probe against the face of the formation and withdrawing fluid which is stored in sample containers in the tool and, like the rotary sidewall cores, are retrieved at the surface.

29. From my review the data appears to be of sufficient quantity and quality such that it is appropriate for use in determining the highest hydrocarbon bearing interval.

30. At the time of cementing some of the data had yet to be analyzed. The core and fluid samples were at onshore labs for processing and analysis. The state of analysis of the petrophysical data by BP on that date is not clear.

## VI.  BP Analysis of Highest Hydrocarbon Bearing Zone

31. The analysis by BP of the highest hydrocarbon bearing zone, and specifically of the M57B zone, appears to have gone through several stages.  Initially, BP did not identify the M57B zone as hydrocarbon bearing.  Shortly after the incident, BP concluded that the zone does,

in fact, contain hydrocarbons.  Finally, after review by the incident investigation team, the writing of BP emphasizes the uncertainty of the zone, less rigorous analyses and the possibility that it contains brine instead of gas.

*32.* As discussed in further detail below, from my analysis of the Macondo well data I conclude that BP, through its petrophysicist Ms. Galina Skripnikova, was mistaken in identifying the M56A zone at 17,803 ft (md) as the uppermost hydrocarbon bearing zone in the well. Based on my review of the documents and testimony, BP knew or should have known that the M57B zone at 17,467 ft (md) was the uppermost hydrocarbon bearing zone in the open hole section of the Macondo we'll before the cement was pumped and before the blowout occurred.

**BP's Analysis before the Blowout Could Have Identified the M57B Zone as Hydrocarbon Bearing But Did Not**

33.  Ms. Skripnikova was the BP log analyst on the Deepwater Horizon at the time the open hole logs were run and determined the zone at 17,803 ft (md) was the shallowest hydrocarbon bearing zone, assuming that the M57B contains brine instead.

34.  In her original analysis of the highest hydrocarbon bearing zone, conducted while on the rig the morning of April 13th, Ms. Skripnikova relied solely upon a *"printout"* or *"field print"* of the Schlumberger logs.[3] She evidently could not see the data as precisely on the hard copy printout as she could subsequently when working with software and digital data.  She observed that the density and neutron logs seemed to *"touch"* in the M57B zone.  Because she did not observe *"cross-over",* she concluded that the interval, though a porous sand, was water-bearing.[4]  Cross-over is a log response common to permeable gas-bearing zones.  The tool which determines porosity based upon the density (*"density"* tool) of the measured rock reads artificially high while the tool which calculates porosity based upon the concentration of hydrogen atoms (*"neutron"* tool) reads artificially low. By convention,

---

[3] Skripnikova Depo. Tr. pg 566:24 to 567:23

[4] Skripnikova Depo. Tr. pg 443:2 to 7, 445:11 to 13, and 438:19 to 439:7

11

the area between the graphed curves is shaded when the values invert this way because *"cross-over"* is a tell-tale sign of the presence of gas.

35. The next time Ms. Skripnikova recalls considering the M57B zone was the day after the incident, April 21st.  After returning back from the rig, she proceeded with her log analysis but focused on the main pay zones; she did not reconsider her initial evaluation of the M57B.[5]

36. Instead of the brief and qualitative analysis actually performed, Ms. Skripnikova and/or other members of BP's staff could and should have conducted quantitative petrophysical analyses for the determination of the highest hydrocarbon-bearing zone.   Appropriate data, including that in digital form, was timely and available for this purpose.

*LWD Data Could Have Been Used to Identify M57B as Gas*

37. Ms. Skripnikova began her quantitative log analysis using LWD data before wire line logs were acquired.   She regularly produced and distributed analyses based on this data.  The analyses utilized digital data and were produced using log analysis software.  For example, Ms. Skripnikova produced and distributed analyses on April 2nd, April 3rd, April 4th, April 5th and April 10th after total depth was reached.[6]  In each of these cases, she distributed an annotated image of the digital log curves in a PowerPoint file. Exhibit 1 is an example of the interpretation made by Ms. Skripnikova based upon the LWD data and distributed to the BP team.[7]

38. Though the log curves did not include density or neutron measurements at this time, they did include gamma ray, resistivity and others.   On two of the distributions, she presented quantitative analyses of water saturation and net pay, and included the assumptions used in the calculations.[8]  I have not found any documentation to demonstrate that such calculations were made over

---

[5] Skripnikova Depo. Tr. pg 440:8 to 441:18

[6] BP-HZN-2179MDL00032399-400, BP-HZN-2179MDL00022623-4, BP-HZN-2179MBI00118092-3, BP-HZN-2179MDL00002589, BP-HZN-2179MDL0000529, BP-HZN-MBI00125815-7

[7] Exhibit 1 is BP-HZN-2179MBI00118092-3.

[8] BP-HZN-2179MBI00118092-3, BP-HZN-2179MDL00005293

the M57B interval, but, given the way most log analysis packages work, the calculation was very likely made just not presented in her PowerPoint slides.

39. The basic parameters Ms. Skripnikova used for quantitative log analysis of the main pay zones are shown in the following table:

| Constant | Description | Value |
|---|---|---|
| a | Tortuosity factor | 1.0 |
| m | Cementation exponent | 1.81 |
| n | Saturation exponent | 1.88 |
| Rw | Formation water resistivity | 0.03 |
| Phi | Porosity | 23% or 28% |

40. In her later analysis after the wire line logs were run she used the same values for *"a"*, *"m"*, and *"n"* and a value for formation water resistivity *"Rw"* of 0.021. Had Ms. Skripnikova made similar calculations with the LWD data using the same assumptions, she would have shown that the M57B zone was hydrocarbon bearing.

41. The LWD data was readily and timely available to Ms. Skripnikova in digital format as demonstrated by the analyses which she did conduct and present.  In fact, the necessary data was loaded into her software program apparently as early as April 3rd.[9]

*Wire Line Logs Could Have Been Used to Identify M57B as Gas*

42. In order to make an appropriate, quantitative analysis of the wire line log data, Ms. Skripnikova could have used the same field print which she actually used.  A more thorough analysis could have been easily conducted using specialized software. Available documentation provided by BP, including for example Exhibit 2, demonstrates that Ms. Skripnikova did have both the software and the data necessary to make a quantitative analysis of the highest hydrocarbon zone when the question was asked of her.  Instead, she relied upon a brief and qualitative review of the data.  It is not clear why even the simplest quantitative analysis was not made or, if they were already made, why they were not reviewed.

---

[9] BP-HZN-2179MDL00022623-4

13

43. On April 9th, Ms. Skripnikova travelled to the rig to witness the recording of the wire line logs.[10]   Wire line logs and other wire line tests were recorded from April 10th to April 15th.   The first log run was the Triple Combo which began late on April 10th and was completed in the early morning of the 11th. The next log run was the CMR completed by the afternoon of the 11th.   It should be noted that *"the wire line logging diary"* indicates that special note was taken of the M57B zone during the acquisition of the CMR log.  The diary records, *"12:05 [April 11th] Slow down to log thin sand @ 17,468' md"*.  The phrase *"Slow down"* refers to the speed the logging tool is being pulled by the formations.[11]

44. The OBMI log was the third run made the evening and night of April 11th. The next wire line tools run took samples of fluids and rock from the wellbore.  For the current purpose, all relevant wire line logging data was acquired by the start of April 12th. Ms. Skripnikova witnessed the logging runs including the Triple Combo, CMR and others until April 13th.[12]   It was, of course, the morning of April 13th that Ms. Skripnikova relied upon the field print of the Triple Combo log to determine the highest hydrocarbon zone.

45. An email exchange on April 12th while she was on the rig demonstrates that Ms. Skripnikova had loaded wire line log data into her log analysis software and had performed relevant analytical calculations one day before the inquiry about the highest hydrocarbon zone.  This same exchange strongly suggests that other personnel in Houston, including at least one petrophysicist, also had available to them the wire line log data and that the data was viewed by these other personnel in a conference room setting possibly similar to that conducted later when the M57B was identified as a hydrocarbon bearing zone.

46. The email exchange, attached as Exhibit 2, pertains to the fluid sampling program, that is, what depth intervals they wished to take

---

[10] Skripnikova Depo. Tr. pg 36: 11 to 22

[11] BP-HZN-2179MDL00889345-52

[12] BP-HZN-2179MDL00889352

fluid samples using wire line tools.[13] Both the Triple Combo and CMR logs had both been completed the day before.  The issues under discussion were unrelated to the M57B.  In order to simplify the exchange, the following excerpts demonstrate the basis of the discussion and not the details. The exchange progressed as follows:

Ms. Kelly McAughan writes, evidently from Houston,

*"From looking at logs we have decided. . ."*

And again,

*"Around here they are thinking because of the high porosity on CMR that. . ..  The density was too high saying. . .You guys probably have a different interpretation. What do you think of. . .?"*

Ms. Skripnikova replies,

*"We think it is CMR and Density reading. . .Bruce, did you see the logs? Can you please comment?"*

(*"Bruce"* refers to Bruce Wagner, another petrophysicist who subsequently participated in the group meeting which first identified the M57B as hydrocarbon bearing.[14])

Ms. McAughan answers,

*"I'm waiting on Bruce right now.  We have all been in the conference room."*

47.  The discussion above demonstrates that both Ms. Skripnikova and a group of BP personnel in Houston were viewing both Triple Combo and CMR data on April 12th.

48.  About five hours later, Ms. Skripnikova replies again, apparently to confirm the sampling program.  She attaches to her email a PowerPoint slide[15] which is a screen capture from log analysis

---

[13] Exhibit 2 is BP-HZN-2179MDL00884298-300.

[14] Skripnikova Depo. Tr. pg 573:9 to 18

[15] BP-HZN-2179MDL00884300

software. Though the lettering is somewhat difficult to read in the image, it is clear it includes data from the first logging run, that is, from the Triple Combo log, such as environmentally corrected gamma ray, caliper, and density.  The image also includes tracks based upon the interpretation of the raw data such as porosity and water saturation. The attachment to this email establishes that Ms. Skripnikova had received, loaded and analyzed Triple Combo data in digital format by April 12th.

49.  It may be noted that both normal practice and other emails corroborate that digital data was available to Ms. Skripnikova and others for quantitative analysis.  The workorder for the wireline logging services specified that the digital format should be created prior to generation of "*prints*" and that the digital format should be made available through a web portal.[16]  The Schlumberger field personnel listed on the same workorder testified that data on the Macondo well would have been available to BP personnel very quickly after beginning the upload to the web portal.[17]

50.  As for the loading and analysis of the digital data, Ms. Skripnikova emailed the last of her analyses based on LWD data cited above on the afternoon of April 10th while she was on the rig.[18]  This fact strongly suggests that Ms. Skripnikova had with her on the rig the necessary hardware and software to conduct quantitative log analysis, as would be appropriate and expected. Shortly after returning to shore on April 14th, Ms. Skripnikova distributed another analysis showing that she had imported wire line data into her log analysis software by that time.[19]  Also on April 14th, Mr. Bodek and a manager planned to review the CMR data.[20] By April 15th, digital form of the wire line data was available and distributed to partners in the well.[21]

---

[16] BP-HZN-MBI00117468-79 at 470.

[17] Emanuel Depo. Tr. pg 158:10 - 159:15, 94:3-22, and 31:1 - 32:9.

[18] BP-HZN-MBI00125815-7

[19] BP-HZN-2179MDL00884286-9

[20] *Ibid.*

[21] BP-HZN-MBI00127247

51. The day after the email exchange above is when Ms. Skripnikova identified the 17,803 ft (md) interval M56A as the highest hydrocarbon bearing zone. An email from geologist Mr. Bobby Bodek requests her interpretation of the highest hydrocarbon bearing interval for use in the cementing design, though seven other individuals were copied on the email.

> Mr. Bodek writes,
>
> *"The drilling team, in their cement procedure preparations, needs to know the depth of the shallowest hydrocarbon-bearing interval in the open hole. From your calculations, could you provide the depth of the shallowest hydrocarbon zone and 'reply all' to this email."*
>
> Twenty-one minutes later and based strictly on the hard copy field print, Ms. Skripnikova replies,
>
> *"I think the shallowest HC sand is at 17,803 md".*
>
> In reply, Mr. Bodek writes,
>
> *"I can buy that. Tha't the shallowest sand that we see legitimate DEN/NEU cross-over on the triple combo log".* [*sic*]
>
> Finally, Ms. Skripnikova returns,
>
> *"And high resistivity. don't see much on gas though. Bobby, can you look back at geological report? Anything in it? Maybe too thin though"* [*sic*]

From the documents I have reviewed, it appears that the email exchange ends here, twenty-seven minutes after the first question was asked. A copy of this exchange can be found at Exhibit 3.[22]

52. From this email exchange between Ms. Skripnikova and Mr. Bodek I observe the following:

---

[22] Exhibit 3 is BP-HZN-MBI00126430.

- The request from Mr. Bodek to Ms. Skripnikova includes a justification of the need for the information and without reference to any prior conversation or understanding.

- The request assumes that Ms. Skripnikova has made *"calculations."* This is unsurprising since Mr. Bodek received from Ms. Skripnikova several interpretations including the analysis the day before and including prior analyses based on LWD data.

- Ms. Skripnikova replies in a very short time.

- Mr. Bodek's reply suggests that he also had log data available to him and that he saw a lesser cross-over or near cross-over at a higher depth, presumably the M57B.

- The analysis by Mr. Bodek, like the qualitative work made by Ms. Skripnikova, centers on the presence or absence of density-neutron cross-over.

53. The analysis by Ms. Skripnikova was superficial and incomplete. Superficial in that she only spent twenty seven minutes to arrive at her conclusion and incomplete in that she only did a visual inspection of the field print of the Triple Combo log. It is not clear why even the simplest quantitative analysis was not made or, if they were already made, why they were not reviewed.

54. As demonstrated when the group of petrophysicists zoomed in to view the data on April 21st, the log data does show density-neutron cross-over at M57B.  Since Ms. Skripnikova did have digital data on April 12th she could have easily determined whether there was neutron-density cross-over in the M57B zone. Her log analysis software would allow a detailed visual examination of the M57B zone by zooming in to observe the tell-tale cross-over. Alternatively, she could have used the software to create a simple cross plot of the data, to make water saturation calculations or, more likely, just to view calculations which she had already made.

55. Even if the digital data was not available, Ms. Skripnikova could have made routine water saturation calculations showing the M57B was likely hydrocarbon bearing.  As discussed above she had basic parameters for analysis and with the Triple Combo log a better estimate of porosity read directly from the log.  For this purpose water saturation calculations are straight forward and do not require specialized software.  A hand held calculator is sufficient or a spreadsheet even better.  I have tested the procedure and found that the calculations can be done in about 30 minutes or perhaps longer depending on the sophistication of the calculations.

56. With an estimated porosity of 21% the water saturation is 54% and the hydrocarbon saturation 46%, M57B was certainly a hydrocarbon bearing zone.  Later calculations done by Ms. Skripnikova, discussed in more detail below, using digital data, refined parameters and specialized log analysis software determined the water saturation of the M57B was 52% and the hydrocarbon saturation 48%.

57. Not only did Ms. Skripnikova's analysis overlook the M57B, at least two others also reviewed the logs and evidently had the opportunity to recognize the M57B zone, namely Mr. Wagner and Mr. Bodek.

58. Lastly, the same digital data and software were available to BP and Ms. Skripnikova after she returned from the rig on April 14th and continuously through the pumping of the cement on April 19th.

59. BP's analysis of the highest hydrocarbon zone was superficial and incomplete.  BP should have identified the M57B zone as the highest hydrocarbon-bearing interval in the open hole section of the well. The deficiency persisted from as early as the taking of the LWD data around April 3rd, through the review of the wire line data on April 13th and up through the date of the blowout.

**BP Analysis after the Blowout Consistently Identified the M57B as Gas**

60. A caucus of petrophysicists first agreed on the day after the blowout that the M57B contains gas.  Subsequently, Ms. Skripnikova conducted a rigorous analysis of the M57B, along with other zones in the well.  Like my work described below, she concluded that the M57B

zones contains gas.  The contemporaneous documentation of these analyses often states the conclusions flatly, without statements of uncertainty.  The most comprehensive document predating the involvement of the Bly investigation team does expound on some uncertainties but still concludes that the M57B is *"Gas"* or *"likely gas"* without even an implied reference to the possibility that the interval is a water bearing zone.

*April 21st Group Discussion First Interpreted M57B as Gas*

61. After April 13th, the next time Ms. Skripnikova recalls considering the M57B zone was the day after the incident.  After returning back from the rig, she proceeded with her log analysis but focused it on the main pay zones; she did not reconsider her initial evaluation of the M57B.[23] However, on the day after the incident, a meeting was called with a larger number of BP petrophysicists.[24] It was then, using software and digital data, that she and the others more closely examined the zone and concluded that it did indeed show cross-over and was likely a gas-bearing zone.[25] Though more data was available, it appears that the same Triple Combo log, which was the basis for the rig interpretation, remained the basis for the revised interpretation.[26] The primary difference identified by Ms. Skripnikova in her deposition was that the data was magnified and viewed more clearly on the 21st using software and digital data than it was on April 13th using a printout.

62. Meeting on the day after the blowout, this group of four or five petrophysicists reached a consensus that the M57B zone likely contained gas due primarily to the density-neutron cross-over observed at one data point in the zone.[27] In her deposition Ms. Skripnikova emphasized the uncertainty involved and the *"possibility"* of its being gas.[28] The uncertainty, she argues, is the reason the zone

---

[23] Skripnikova Depo. Tr. pg 440:8 to 441:18

[24] Skripnikova Depo. Tr. pg 441:14 to 18 and 210: 9 to 212:16

[25] Skripnikova Depo. Tr. pg 444:14 to 448:17

[26] Skripnikova Depo. Tr. pg 441:19 to 444:21

[27] Skripnikova Depo. Tr. pg 211:18 to 212:16, 377:4 to 14, 434:21 to 435:13, 441:14 to 18, 444:9 to 20, 518:20 to 22, and 573:9 to 18

[28] Skripnikova Depo. Tr. pg 504: 6 to 9

was called gas.[29] In any event, this information identifying the M57B as a gas zone then went to other people investigating the cause of the blowout[30] and evidently to those planning relief wells.  The *"Macondo sand table"* created and distributed by the group identified the contents of the 17,467 ft to 17,468 ft (md) zone without caveat, *"GAS"*. One version of the document is attached as Exhibit 4.[31]

*Calculations by Ms. Skripnikova, Technical Notes and Memorandum Corroborate Interpretation of Gas-Bearing Zone*

63. Following this meeting on April 21st, Ms. Skripnikova undertook a more rigorous evaluation of all of the zones in the Macondo well, including the M57B.   That work was evidently completed by May 19th when documentation began in a series of *"Technical Notes".* By this date, Ms. Skripnikova had received all of the relevant information and all information she had requested.[32] Ms. Skripnikova recalled that the analysis "*was accurate to the best of my interpretation.  It was the best interpretation I could come at this point of time.*"[33] [*sic*] Ms. Skripnikova's best interpretation concluded, without ambiguity, that the 17,467 ft (md) zone contained gas.

64. From April 21st forward until the results were formally documented with text in the latest *"Technical Memorandum"* of July 26th, Ms Skripnikova remained the only one of the group of petrophysicists who actually made any petrophysical calculations.  She offered in deposition, "*Most of the technical work, all of the calculation was done by myself, was done by me, by myself exclusively. There was some corrections to my text.*"[34] [*sic*]

65. My review of documents shows that the analysis by Ms. Skripnikova was initially documented and distributed in slides and spreadsheets.[35]

---

[29] Skripnikova Depo. Tr. pg 517:17 to 518:6

[30] Skripnikova Depo. Tr. pg 435:7 to 13

[31] Exhibit 4 is BP-HZN-2179MDL00426906-8.

[32] Skripnikova Depo. Tr. pg 331:22 to 332:11

[33] Skripnikova Depo. Tr. pg 326:19 to 25

[34] Skripnikova Depo. Tr. pg 389:16 to 20

[35] See *e.g.* BP-HZN-2179MDL02522551, BP-HZN-2179MDL00449834-5, BP-HZN-2179MDL02655864-5, BP-HZN-2179MDL02912088

It seems that her analyses were best documented in Technical Notes and a Technical Memorandum, including drafts. These documents seem to contain the relevant work by Ms. Skripnikova and offer some discussion of the results.

66. Concerning the M57B, a Technical Note drafted between May 19th and May 22nd shows the analysis by Ms. Skripnikova and the *"consensus"* of the contributors that the zone contains gas.[36] Fifteen individuals, including geologists, reservoir engineers, managers and others, contributed to the May 19th draft of the Technical Note dealing with the pressures expected to be found in various sands for the purpose of evaluating kill options for the well. Ms. Skripnikova is listed among the contributors, and she was responsible for at least the majority of the data in the attached table *"Layer Properties Used for Calculations"* to the drafts.[37] Concerning the May 20th version of this document, Ms. Skripnikova states that the column labeled *"Fluid Content"* was *"done with a team of petrophysicists*."[38] She testified that she did not know who was responsible for the *"Expected to Flow"* column.[39]

67. This table of *"layer properties"* presented the results of her log analysis and the consensus of the *"team of petrophysicists"* for the M57B and other zones. While the fluid content for a deeper zone is listed as *"Uncertain",* the fluid content for the M57B is shown as *"Gas"*. Under the column *"Expected to Flow"*, the M57B zone reads, *"Yes".* Similarly, a separate table containing the final calculated pressures lists *"M57B Gas".* Most significantly, the text of the Note reiterates the conclusion reached by the group of 15 contributors, *"This range [of pressures] considers the impact of shallower high pressure gas zones, which are found at depths between 17,467 – 17,806 ft MD-RKB."* It continues, *"There was consensus that these gas zones were likely to be open. . ."* The May 19th version of this document can be found at Exhibit 5. This Note went through three more revisions dated May 20th to May 22nd.

---

[36] The May 19th version of the document references a May 17th version, but my research has not yet located this previous version.

[37] Skripnikova Depo. Tr. pg 324:6 to 326:18; Skripnikova deposition exhibits 3529, 3530, 3531, BP-Hzn-2179MDL02176694-6699, BP-HZN-2179MDL02181151-1157, BP-HZN-2179MDL02178046-8053

[38] Skripnikova Depo. Tr. pg 391:4 to 9

[39] Skripnikova Depo. Tr. pg 391: 10 to 23

22

However, the relevant language cited above is common through all of the drafts which I've reviewed.[40]

68.  A second draft Technical Note dated May 26th on a closely related issue refers back to the work in the first Technical Note.  It is attached as Exhibit 6.[41]  The eight preparers of this second Note perform their work on the assumption that the M57B is gas and may be *"adding to the total flow"* from the well.   The Note attaches an image of log analysis results prepared by Ms. Skripnikova titled *"Reservoir Description, Macondo Sand Identification, 5/18/2010."* This graphic labels five lower zones as either *"Brine"* or *"Oil".* Two zones are treated with some ambiguity. M56A is labeled *"Oil or Gas",* and M57C is labeled *"Uncertain".* Like the lowest zones, the M57B is labeled without ambiguity, *"Gas".*

69.  Before the review by the Bly investigation team, the most comprehensive document about the log analysis of M57B is the *"Technical Memorandum"* of May 25th titled *"Post-well Subsurface Description of the Macondo well (MC 252)".*[42]  This longer and more detailed document was prepared by seven authors including Ms. Skripnikova.   In deposition she testified that she wrote the petrophysical section.[43]   Some copies of the document are watermarked *"DRAFT"* while others are not.[44] The majority of the petrophysical section discusses analysis of the main pay intervals. Other parts contain analysis and references to the M57B.   The document, one copy of which is attached as Exhibit 7,[45] provides the most descriptive account of analysis for the M57B zone to this date:

- Figure 2 is a sand identification chart for sands below the 9 7/8" liner showing the M57B as *"Gas".* (pg 4)

---

[40] I have not located the *"C"* draft nor a final version of the memo.

[41] Exhibit 6 is BP-HZN-2179MDL00646535-47.

[42] BP-HZN-2179MDL02181151-7, BP-HZN-2179MDL02178046-53

[43] Skripnikova Depo. Tr. pg 363:1 to 6

[44] *e.g.* BP-HZN-2179MDL03289695-732 and BP-HZN-2179MDL02396746-83

[45] Exhibit 7 is BP-HZN-2179MDL02396746-83.

- The section *"Determination of net sand cut off"* beginning on page 24 discusses the issue of the effect of gas on the calculation of porosity from the density log and whether or not the density log for various zones should be corrected.  Ms. Skripnikova describes how the lower, main sands exhibited *"gas signature"* on logs but were determined by sampling to contain volatile oil instead of gas and, as such, the density log should not be corrected. Concerning other sands which were not sampled, she writes, *"Three further sands have been identified in the TD hole section, which have a gas signature on Neutron-Density logs: namely M57B, M56A and M56F.. . .Fluid typing of the sands is uncertain and parameters are difficult to assess accurately due to the thin nature of these sands, being below confident log resolution."* (pg 27) In the context of this section the discussion is whether the identified zones contain oil or gas.

- Figure 29 pertains to *"fluid typing"*. One label on the figure reads, *"M57B, Gas, above thermogenic front"*.

- In the section above Figure 29, Ms. Skripnikova discusses the sonic log and the interpreted *"thermogenic front"* to infer whether certain, zones that were not sampled are oil or gas. She extends this discussion to the M57B and writes, *"The M57B sand is approximately 2 feet thick and likely to be below log resolution for accurate fluid determination, but based on its position above the thermogenic front it is likely to be gas."* (pg 30)

- The summary table of properties in Figure 33 lists M57B as *"Gas"* while some other zones are treated less decisively as *"Uncertain"* or *"Oil or Gas"*.

70. Concerning the M57B, the text and the figures consistently point to the conclusion that the zone contains either *"Gas"* or *"likely gas"* and was treated as such in tables summarizing *"pay"* in the well.

**BP Analysis after Discussion with Bly Team Emphasizes Uncertainty, Still Interprets Gas in M57B**

71. The nature of the discussion of the M57B in the Technical Memorandum changed somewhat from the May 25th version to the latest version of July 26th.  Though some more data was presented and the associated uncertainty was emphasized, the baseline interpretation that the zone contains gas remains unchanged. These changes were made after Ms. Skripnikova met with the Bly team to explain her conclusions.

72. On June 5th, the Bly team received a copy of a spreadsheet by Ms. Skripnikova titled *"MC252-1 Sand Description v2.xls"*.  This table is substantially the same as the tables shown in a Technical Note and Technical Memorandum of late May, clearly showing the M57B as *"Gas"* and *"Yes"* under the column labeled *"Expected to flow"*. The document generated a request from Mr. Allen Pere of the Bly team to discuss the M57B sand and two other zones with the asset team members.  This meeting was planned for June 9th between Mr. Pere, Ms. Skripnikova and Ms. McAughan.  Ms. Skripnikova did, in fact, meet with Mr. Pere.[46] As requested in a prior email, he talked with her specifically about the M57B sand, among other things.  More to the point, *"[H]e asked me to show him the data and my explanations why – it's gas."*[47] Shortly afterwards, Ms. McAughan sent Mr. Pere the May 25th version of the Technical Memorandum. The email chain and relevant exhibits may be found at Exhibit 8 and Exhibit 9.[48]

73. Between the time the May 25th version was provided to Mr. Pere and the latest version dated July 26th, Ms Skripnikova recalls only one significant change in the document: the fluid type contained in M57B was changed from gas to water.[49] Ms Skripnikova described that the change was a "*team decision to be more accurate*" since they had done additional work to evaluate the uncertainty associated with the

---

[46] Skripnikova Depo. Tr. pg 395:7 to 16

[47] Skripnikova Depo. Tr. pg 396: 8 to 15

[48] Exhibit 8 is BP-HZN-BLY00115511-13.  Exhibit 9 is BP-HZN-2179MDL02393584-626.

[49] Skripnikova Depo. Tr. pg 334:22 to 335:10

sand and had included an interpretation by Schlumberger.[50]   Ms Skripnikova offered, "*But then after we received the analysis of – of all the sands within the last open hole section done by Schlumberger and ELAN it kind of confirms my understanding what I was thinking on – on the rig.*"[51]

74. As cited above, Ms. Skripnikova testified that, at the time she produced her analysis as reflected in the earlier May 25th version, she had received all data she required and requested. The analysis was "*accurate to the best of [her] interpretation,*" and Ms. Skripnikova was the only person among BP staff to perform petrophysical calculations. Moreover, the July 26th version of the document dates the Schlumberger ELAN log interpretation to May 3rd, more than three weeks before the original May 25th version of the Technical Memo.

75. As mentioned by Ms. Skripnikova in deposition, the final draft has extensive editorial changes to the text which she originally wrote, most unrelated to the M57B.[52] The document can be found as Exhibit 10.[53] Changes related to the fluids of the M57B zone include:

- The summary of zonal properties in Figure 35 (previously Figure 33) was changed so that M57B now shows "*Probable Gas*" instead of "*Gas*".  All other parameters, including water saturation of 52%, remain unchanged from the May 25th version. (pg 36)

- The "*fluid typing*" Figure 29 is changed so that M57B is labeled "*Probable Gas*" instead of "*Gas*". (pg 31)

- Two figures are added and discussed briefly.  Figure 30 shows the field print of the Triple Combo log from which Ms. Skripnikova's original, qualitative interpretation was made on April 13th. The brief text notes the absence of "*pronounced*"

---

[50] Skripnikova Depo. Tr. pg 335:11 to 21

[51] Skripnikova Depo. Tr. pg 435:14 to 18

[52] Skripnikova Depo. Tr. pg 336:8 to 19

[53] Exhibit 10 is BP-HZN-BLY00082874-914.

density-neutron cross-over and the lack of *"mud gas response"*. (pg 32)

- The new Figure 31 shows the standard analysis of the ELAN log interpretation from May 3rd. The text observes that this interpretation shows the M57B saturation to be *"moved water"*. (pg 33)

- The text about fluid typing shown in Figure 29 previously read *"The M57B sand is approximately 2 feet thick and likely to be below log resolution for accurate fluid determination, but based on its position above the thermogenic front it is likely to be gas."* The new text reads, *"The M57B sand is approximately 2 feet thick and is below log resolution for accurate fluid determination. However, if hydrocarbons were present, based on the density-neutron cross-over and its position above the thermogenic front it is likely to be gas rather than oil."* (pg 31)

- Additional text in this section also notes the lack of a *"show"*[54] over the M57B interval, *"There was no gas heavier than C1 [methane] observed on mud gas chromatograph in the M57B and M56A sands and neither cut or florescence on cuttings."* The M56A is the zone at 17,803 ft (md) which was originally treated as the highest hydrocarbon zone. (pg 31)

- The discussion on earlier pages of how fluids affect porosity calculations remains almost exactly the same.  Instead of the M57B being listed as having a *"gas signature on Neutron-Density logs,"* the zone is stated to have a *"probable gas signature."* (pg 27)

76. The three additional data points / analyses offered in this version of the Memo do not provide good evidence to support the changes made.  All of the newly included data was available for the original May 25th interpretation:

---

[54] A *"show"* is when hydrocarbons are physically present in the mud or cuttings recovered from the wellbore after drilling through a zone.

- First, the Triple Combo field print does nothing to substantiate proper interpretation of the M57B zone.  It is useful to understand the qualitative interpretation made by Ms. Skripnikova.

- Second, the observation about the lack of hydrocarbons physically observed in mud or cuttings is not probative. Specifically, the M56A zone at 17,803 ft (md) was accepted as the highest hydrocarbon bearing zone without the same physical evidence.

- Third, the text does not justify why the Schlumberger standard ELAN interpretation presented is equal or superior to the calculations performed by Ms. Skripnikova. The text merely offers the standard ELAN as an alternative without opining on its reliability.

- Finally, the Schlumberger ELAN log interpretation presented is incomplete.  The document presents the ELAN standard analysis as one alternative but omits the Laminated Sand Analysis (LSA) as another alternative. Unlike the standard analysis shown in the figure, the LSA analysis does indicate that the M57B contains hydrocarbons.[55]

77. In the entire petrophysical section of this July 26th memorandum the only evidence presented that the M57B may not be hydrocarbon bearing is a single sentence and accompanying figure referencing the Schlumberger ELAN analysis.  I do not find this convincing.

78. It appears that Ms. Skripnikova also continues not to be persuaded that the M57B is a water zone.  Although she acknowledges in her deposition high uncertainty related to the zone, she continues to believe that the M57B zone probably contains gas.[56] She states that she agrees with the July 26th version of the memo concerning most of the sands but not all of them.[57] Specifically, she concludes about the

---

[55] Deposition exhibit 3541

[56] Skripnikova Depo. Tr. pg 432:20 to 434:20

[57] Skripnikova Depo. Tr. pg 433:3 to 14

M57B, "*It's probable gas*," a conclusion which she reiterates twice more.[58]   It should be noted that Ms Skripnikova stated a different conclusion at the end of the deposition.[59]

## VII. Strickland Analysis of Highest Hydrocarbon Bearing Zone

### BP had Sufficient Information as of April 13, 2010 to Identify the M57B Gas Zone

79. As of April 13, 2010 the primary data sources were the open hole logs, MWD and LWD data and daily drilling reports.  Review of the MWD and LWD data along with the daily drilling reports showed potential hydrocarbon zones that should be reviewed at several intervals above the main pay zones.   The following table identifies potential hydrocarbon intervals on the left side and the indicators of possible hydrocarbons on the right.

| DEPTH[60] – MEASURED DEPTH | COMMENTS AND INDICATORS OF POTENTIAL HYDROCARBON ZONES |
|---|---|
| 17,408 (17,389) | Gamma ray, resistivity |
| 17,487 (17,467) | M57B Gamma ray, resistivity |
| 17,491 (17,474) | Gamma ray, resistivity |
| 17,677 (17,662) | Gamma ray, resistivity, C1, C2 |
| 17,720-17,780 (17,704-17,724) | Gamma ray, resistivity, C1, C2, HW, well not static and lost circulation |
| 17,821 (17,803) | M56A Gamma ray, resistivity |
| 17,928 (17,912) | Gamma ray, resistivity |
| 17,943 (17,927) | Gamma ray, resistivity, C1, C2 |
| 17,991 (17,976) | Gamma ray, resistivity, C1, C2 |
| 18,047 (18,031) | Gamma ray, resistivity, C1, C2 |
| 18,057 | Gamma ray, resistivity, C1, C2 |
| 18,076 | Gamma ray, resistivity, C1, C2 |

---

[58] Skripnikova Depo. Tr. pg 434:14 to 20 and 436:6 to 10

[59] Skripnikova Depo. Tr. pg 518:24 to 519:4

[60] File MC252_001_ST00BP01_5MD_PHASE_ATTEN.emf.  The second number in parentheses is from the final print of the Triple Combo Log, file BP_MC252_OCSG_32306_ST00BP01_R1D1_MD_TCOM_Final_5in.PDS

80. The depths in the above table (MWD, LWD logs) differ from the measured depths recorded with the Triple Combo Log (numbers in parentheses) by 15 to 56 feet.  The indicator notations are described as follows:

   a. Gamma ray – the gamma ray is significantly below shale values.  This is an indication of sand, containing fluid that may flow, as compared to shale, which does not.

   b. Resistivity – the resistivity measurement (curve P40H) is greater than surrounding shale values which may indicate hydrocarbons.

   c. C1 and C2 – Hydrocarbon components methane (C1) and ethane (C2) from the chromatograph analysis shown on the mud log.[61] The presence of these components in the mud suggests the presence of hydrocarbons in associated formations.

   d. HW – Hot Wire measurements taken as part of the mud logs suggest an increased gas volume in the mud returning to the surface from these zones.

81. The presence of methane and ethane from the mud log are indicators that hydrocarbons are present, although the precise depth is uncertain due to the lag time between drilling an interval and surface detection from entrained gas in the circulating mud system.  The same is true for an increase in gas volume detected by the hot wire system.

82. Quantitative determinations of fluid content can be made from gamma ray, resistivity, and an indicator of porosity such as neutron, density or sonic values.  The Triple Combo log records these values (except for sonic) along with other parameters. Although calculations are required for specific values, pattern recognition of the response from the four curves is used for a *"quick look"* indication of hydrocarbons. An industry accepted graphical format aids in pattern recognition. Exhibit 11 is a plot of the curves from the Triple Combo log for the M56A

---

[61] File MC252_001_ST00BP01_5MD_COMBO.emf

zone, identified by Ms. Skripnikova as the highest hydrocarbon bearing zone, at a depth of 17,803 ft (md).  The curves are plotted on three *"tracks"* representing three different horizontal axes with a common vertical depth axis. The first track contains the gamma ray and also the actual hole size as measured by a caliper.  The second track displays resistivity measurements, five measurements each with a different horizontal depth of investigation, plotted on a logarithmic axis.  The neutron and density curves, both of which indicate porosity, are plotted in the third track.

83. The *"pattern"* an analyst looks for is the gamma ray curve moving to the left (track one), the resistivity curves moving to the right (track two) and the neutron density curves coming together with the neutron moving left to right and the density moving right to left (track three). The value of each curve is important but the pattern is recognized in the context of the curves response compared to the adjacent formations. A crossover of the neutron and density curves is a traditional indicator of a porous zone containing gas; however, this is not an absolute proof but rather an indicator of gas.  If the pattern holds, *i.e.* all four indicators are exhibited at the same depth, this is a very positive signal that the zone contains hydrocarbons. Cross-over of the neutron and density curves is a fifth, and strong positive indicator, signaling the hydrocarbons in the zone may be gas as compared to oil.

84. Exhibit 12 is a plot of these same curves for the M57B zone at a depth of 17,467 ft (md) showing the same pattern as the M56A zone.

85. It appears that Ms. Skripnikova used pattern recognition as the only basis for determining the highest hydrocarbon bearing interval.  This conclusion is supported by the fact that she spent 27 minutes for her analysis.  Before concluding that the M56A zone was the highest hydrocarbon zone she should have considered other factors and at least done some quantitative analysis as discussed below.

86. A review of the final print of the Triple Combo log shows cross-over of the neutron and density curves in the M56A zone at 17,803 ft (md), Exhibit 13, and although not as distinct as the M56A zone, the M57B zone at 17,467 ft (md), Exhibit 14. The M57B zone cross-over is less

31

distinct on the field copy, Exhibit 15[62], as compared to the final print shown in Exhibit 14. However, it appears that Ms. Skripnikova had the Triple Combo digital data on April 13th loaded into log analysis software, and she could have easily resolved the issue.

87. If a zone has sufficient porosity, the resistivity log is also useful as a visual indicator of fluid content with increased resistivity potentially indicating hydrocarbons.  Reading from the final print (Exhibit 14), the porosity in the M56A is approximately 25% and in the M57B zone approximately 21%, both well above minimum values for flow.

88. For thin sands such as the M56A and the M57B, low resistivity of the adjacent shales or very thin shales, on the order of one inch or less, within the sand reduces the resistivity values recorded by the logging tools. The true resistivity of a sand containing hydrocarbons will be higher than the resistivity of a combination of sands and thin shales. For porous sands such as these, higher resistivity is a strong indicator of hydrocarbons.

89. The Structural Dipmeter Computation[63] is a Schlumberger processed interpretation of the angle at which formations intersect the well bore. The log header lists April 12, 2010 as the date processed. The dipmeter shows increasing dip in the 80 feet of beds above the M57B zone.  At 17,467 ft (md) the M57B zone dips at approximately 36 to 45 degrees.   Just below the zone the dip increases to a maximum of about 75 degrees before suddenly dropping below 10 degrees. Schlumberger interpreted the abrupt change in dip to be a small fault at approximately 17,476 ft (md).

90. In a vertical well, resistivity measurements are perpendicular to the well bore.   In a thin bed dipping at 36 to 45 degrees resistivity determined from an induction tool is a complex mixture of parameters. Resistivity is determined from the induction measurements. For the M57B zone it is likely that the true resistivity of the sand is higher than recorded by the tool due to the dip of the sand.  Higher resistivity will

---

[62] BP Technical Memorandum dated July 26, 2010, page 32, Figure 30 Triple Combo field print over M57B and M56A, Exhibit 3533

[63] File BP_Macondo_OCSG_32306_001_ST00BP01_MSD_Final.pds

result in lower water saturations for this zone making it more likely that the M57B zone is hydrocarbon bearing.

91. There is no evidence from my review that Ms. Skripnikova took these factors into consideration.  In my opinion, had she done so she would have concluded that the M57B zone was the highest hydrocarbon bearing interval.

92. There are other considerations that also have relevance to the calculation of water saturation in a zone.

**Analysis of the Depth of Investigation of Resistivity Tool Confirms that Hydrocarbons Detected in M57B were not Solely Due to Infiltration of Oil Base Mud**

93. The gamma ray, neutron and density curves record their readings as a function of the characteristics of the formation in the immediate vicinity of the well bore.  Resistivity tools used in the Macondo well are designed with a vertical and horizontal resolution. The digital files from the Triple Combo log present 15 different resistivity values in three groups of five.  The three groups are for three different vertical resolutions of one, two or four feet. In each group there are five different horizontal resolutions, 10, 20, 30, 60 and 90 inches.  The 10 inch horizontal curve measures the resistivity in the formation 10 inches away from the well bore, *i.e.* a depth of investigation of 10 inches, while the 90 inch log has a 90 inch depth of investigation.

94. Exhibit 16 is a comparison of the five logs in each of the three different vertical resolutions. For clarity on the exhibit all five curves are not shown for the one and four foot vertical resolution. Track one on the left of the exhibit shows the gamma ray curve in green, extending to the left at the depth of the M57B, and the caliper in red. The second track contains two resistivity curves with a one foot vertical resolution and a depth of investigation of 10 inches, black curve, and 90 inches, red curve. The third track has five resistivity curves all with a vertical resolution of two feet, while the fourth track has two resistivity curves with a four foot vertical resolution.  Resistivity curves are traditionally plotted on a logarithmic scale as shown in the exhibit.  Comparison of

the tracks demonstrates the suppression of the resistivity as the vertical resolution increases.

95. As is standard in the industry, the field print and the final print of the Triple Combo log displayed resistivity curves with a two foot vertical resolution. However in thin sands the one foot vertical resolution resistivity curves may be a better choice for water saturation calculations.

**The Effect of Oil Base Mud and Mud Filtrate Invasion**

96. The final open hole section of the Macondo well was drilled with a synthetic oil base mud consisting of a mixture of about 70% synthetic oil and 30% water. The drilling mud has numerous functions such as cuttings transport to the surface for inspection and removal, cooling and lubricating the bit and drill string and formation pressure control among others.

97. During the drilling process the hydrostatic pressure exerted by the column of mud is usually slightly greater than the pressure in the formation. As the drilling mud tries to flow into a formation due to the positive difference in pressure, solid particles in the mud form a layer on the rock face. In drilling terms this is called *"mud cake"*. The mud cake filters out the solid particles but allows some of the liquid, synthetic oil and water, to invade the formation. The invading fluid is called *"mud filtrate"*.

98. The resistivity tools make measurements at five different depths of investigation, 10, 20, 30, 60 and 90 inches. The shallow depth of investigation tools tend to measure the resistivity of the sand containing mud filtrate while the deeper looking tools are less influenced by mud filtrate and tend to measure the resistivity of the sand containing the undisturbed reservoir fluid. The synthetic oil in the mud filtrate is highly resistive.

99. Exhibit 17 is similar to Exhibit 16 except the resistivity curves are plotted on a linear instead of logarithmic scale. An additional curve, radius of invasion, is shown in the fifth track. The effect of synthetic oil based mud filtrate invasion is demonstrated by examining the five curves in the third track. Note the successively lower resistivity values

34

of the 10, 20 and 30 inch tools.  The 10 inch tool is most influenced by the mud filtrate while the 20 and 30 inch tools are less influenced.  The 60 and 90 inch tools read almost the same value indicating that the depth of mud filtrate invasion is somewhere between 30 and 60 inches.

100. The digital data from the Triple Combo Log contains a calculated diameter of invasion, curve AOD2. The fifth track on Exhibit 17 is the radius of invasion, one-half the diameter, for comparison to the resistivity curves.  The scale on the radius of invasion curve is from zero to 100 with each vertical line representing 10 inches.  At the depth of the M57B sand the radius of invasion is about 30 inches, confirming the response of the tools shown in track three and the appropriateness of using the 90 inch resistivity measurement for water saturation calculations.  Water saturation calculations require a resistivity of the formation, true resistivity (Rt), not influenced by mud filtrate invasion or other issues.  The use of the resistivity curve with the greatest depth of investigation, 90 inch curve, for the M57B zone calculates a water saturation of about 50%, corresponding to a hydrocarbon saturation of about 50%, and thus a hydrocarbon bearing zone.

**Water Saturation Calculations Show the M57B as Hydrocarbon Bearing**

101. In addition to the different vertical resolutions for the resistivity logs, the Triple Combo also has high resolution values for the gamma ray, density and neutron curves.  For thin sands these are useful for better quantifying values within a zone.

102. The simplest method to calculate water saturation uses Archie's equation. More complex equations for water saturation are the Simandoux or Modified Simandoux and the Indonesian formula.  Other methods to determine water saturation are Waxman and Smits, Dual Water and the Laminated Sand Analysis. The more complex equations require additional data and analysis before making water saturation calculations.

103. Using the high resolution curves I calculated water saturation for the M57B zone by several different methods for comparison.  For the log parameters of *"a"*, *"m"*, *"n"* and *"Rw"* I used two sets of parameters. The first set, identified by the letters "BP" in the following figures, are the same as used by Ms. Skripnikova in her post incident analysis. The second set, identified by the letters *"SLB"*, are values that Schlumberger, the company that ran the logs, used in their analysis. Following a similar procedure as BP, porosity was calculated from a corrected density curve with a fluid density representing a 70%/30% mixture of base oil and water.

104. Exhibit 18 shows water saturation calculated by four methods with the BP parameter set for the M57B zone.  The first track shows the gamma ray in green, the caliper in red and the differential caliper as a dotted grey line. The second track just to the right of the depth labels, is the water saturation, labeled Sw, from Archie's equation with a horizontal scale of 0.0 to 1.0 and ten divisions such that each light grey vertical line is 0.1 or 10%.  Reading from the blue curve opposite the M57B label the water saturation is about 40%.  The third track, same horizontal scale as track two, shows calculated water saturations by three methods.  The lowest Sw value, 29%, is the blue curve labeled SW_ModS_BP, comes from the Modified Simandoux equation. The black curve Sw value is about 32% and comes from the Indonesian formula, SW_Ind_BP.  The red curve from the Simandoux equation, SW_Sim_BP, calculates a Sw value of about 36%.

105. Exhibit 19 is the same presentation format as Exhibit 18 except the three water saturation curves in the third track use the Schlumberger parameter set identified by the label SLB in the curve names.  The second track is the same in both exhibits.  Using Schlumberger parameters yields higher water saturation values ranging from 36% to 53% compared to the 29% to 36% with the BP parameters.

106. The above calculations demonstrate that the M57B zone is hydrocarbon bearing.  In my opinion Ms. Skripnikova was incorrect in her April 13th conclusion concerning the highest hydrocarbon bearing zone.

**Available Information about Schlumberger ELAN Analysis Does Not Establish Superior Reliability**

107. The Technical Memorandum dated July 26, 2010, page 33 (Exhibit 10) contains the only description of the Schlumberger ELAN Log Analysis: *"The Schlumberger ELAN well logs analysis shows the M57B saturation is moved water (i.e. the elevated resistivity is due to synthetic mud invasion), see Figure 31."* Figure 31 displays in conventional log format five tracks of measured and calculated curves. The graphic design and presentation of Figure 31 is of poor quality, rendering the figure indecipherable. The M57B zone is displayed as part of a 100 foot interval printed in 1.5 vertical inches. At the time of this writing a more legible version has just been received from BP. However, an extensive document search did not produce additional information about the Schlumberger ELAN analysis. The combination of the one sentence and the figure are an insufficient basis for proper review or conclusions at this time. As presented, the one sentence and the figure do not establish that the ELAN analysis should be relied on to the exclusion of other methods.

108. The fifth track on the above mentioned Figure 31 of the Technical Memorandum appears to be taken from a Schlumberger processed log titled *"Laminated Sand Analysis"*[64] (LSA). The LSA does provide information relevant to the topic of hydrocarbon saturations in the M57B zone. The oft-mentioned Triple Combo log (general industry name) is the Schlumberger product called *"RT Scanner"* (RTS). When BP purchased the RT Scanner, Schlumberger also provided their Laminated Sand Analysis. The two acronyms are usually part of the name used for the file containing the digital measurements, *e.g.* R1D1_RTS-LSA. The results of the Laminated Sand Analysis are presented as a graphical image (.pds file) and as an ASCII file (.las file).

109. One of the objectives of the LSA calculations is to calculate water saturation for each component of the rock instead of a single water saturation for all the components combined. The calculation

---

[64] Graphic file BP_MC252_OCSG_32306_001_ST00BP1_R1D1_RTS-LSA-14-inch-wide.pds, digital file BP_MC252_OCSG_32306_001_ST00BP1_R1D1_RTS-LSA.las

procedure divides the formation into four components: sand, silt, laminated shale and dispersed shale.  Silt has a much smaller particle size than sand. The shale component is divided between laminated shale, existing as thin layers, and dispersed shale, existing as tiny particles spread throughout the sand.

110. The silt, laminated and dispersed shale volumes usually have very high water saturations. Even though the water saturation is high, water may not flow because of bonding and capillary forces.   If a hydrocarbon bearing sand contains silts and shales, the measured resistivity values will be lower than the same sand without these components.  Lower resistivity values result in higher calculated water saturations unless the effects of the other components are taken into account.

111. Archie's water saturation equation does not account for water contained in shales.  Other equations such as Simandoux, Modified Simandoux and Indonesian have additional terms to account for the water in shales. The next level of calculation sophistication is the Laminated Sand Analysis.  Each level of increasing complexity in the analysis requires additional calculations and physical constants which may not be available and are estimated from general principles or regional studies.

112. The digital file of Schlumberger LSA contains values for three water saturation calculations.  Exhibit 20 displays information in three tracks. The first two tracks are the same as previous Exhibit 18 and Exhibit 19. The third track displays the water saturation in the sand, (blue curve labeled SWT_SAN) and a curve described in the LSA file as *"Total Water Saturation Standard"* (red curve labeled SWT_STD).  Of note is the water saturation in the sand, about 31% meaning that the hydrocarbon saturation is 69%.

**Another Zone above M56A May Contain Hydrocarbons**

113. Only the M56A and the M57B show cross-over on the Triple Combo Log, however another zone may contain some level of hydrocarbon saturation.   Of particular interest is the zone at 17,704 to 17,724 ft (md), the M57C zone.  The resistivity is higher at 17,708 and 17,723 ft

with a much lower resistivity in between. The out of gauge hole makes the density curve less reliable.   However, in this interval the daily drilling report showed that the well was not static. On April 3, 2010 while drilling from 17,634 to 17,761 ft (md) the well lost 134 barrels of mud.[65]   Between 1:30 and 2:00 a.m. the driller flow checked the well, was not able to obtain a *"no flow"* condition and subsequently shut in the well. Over the next 6.5 hours the well flowed back at rates from 6 to 24 barrels per hour and built up pressure at the surface. While drilling this interval the mud log recorded a significant rise in the gas content of the mud and the gas chromatograph showed the gas contained both methane and ethane.  These are strong indications of a hydrocarbon bearing zone.

## VIII.  Pore Pressure in M57B is around 12,871 psia

114. For use in other calculations, I have been asked also to opine on the pressure of fluids in the M57B zone.  Though BP measured directly the pressure in a number of zones, it did not measure the pressure in the M57B zone.  Consequently, it is necessary to calculate a pressure in the M57B zone based on pressure measurements taken in other zones.  The nearest direct pressure measurements, and thus the most suitable for this purpose, come from the nearby M57C zone located a few hundred feet below the M57B.

115. In the M57C zone there were four tests with multiple pressure measurements in each test.  The final results[66] showed five pressure measurements that appear valid for this analysis.

116. The next issue is the True Vertical Depth (TVD) of the pressure measurements. The difference between measured depth (md) and TVD is due to the reality of drilling; a perfectly straight vertical hole is not possible.  To account for the deviation from vertical a survey is taken of the well bore and measured depths converted to true vertical depth.  For the Macondo well there are two primary sources for the survey: one taken as the well is drilled and another taken when the

---

[65] File Daily drilling report 2.pdf. See 4/3/2010 pg. 4.
[66] File GeoTap Data_HAL_0060925.pdf

open hole logs were recorded.  At the point where the Geotap pressures were recorded there is a 15 foot difference in the TVD values from the two sources. The survey taken when the open hole logs are recorded is normally considered superior to the measurements made during the drilling process, and this is the one I have used. However for completeness I have also calculated pressures using the TVD information obtained during the drilling process.

117. During the drilling process formation properties of gamma ray and resistivity were continuously recorded. At the depths of the Geotap, there is a distinct gamma ray and resistivity signature easily located on the open hole, Triple Combo log, which also recorded the same formation properties.  From this I concluded that a measured depth of 17,724 ft corresponds to a TVD of 17,696 ft.  Since logs are measured from the elevation of the derrick floor, 75 feet above mean sea level, to calculate the sub-sea depth subtract 75 feet from the TVD value to achieve a TVDss of 17,621 ft.

118. The M57B depth is 17,467 ft (md) on the Triple Combo log or 17,382 feet TVDss which is 238 feet above the Geotap level.  The following table summarizes the values based on TVD measurements from the wire line logs:

| TVDSS (FEET) | MEASURED PRESSURE OF M57C (PSIA) | CALCULATED PRESSURE OF M57B (PSIA) |
|---|---|---|
| 17,619.5 | 13,046.9 | 12,870.6 |
| 17,619.5 | 13,038.1 | 12,862.0 |
| 17,619.5 | 13,049.4 | 12,873.1 |
| 17,620.0 | 13,065.4 | 12,888.5 |
| 17,619.6 | 13,037.3 | 12,861.1 |
| Average | 13,047.4 | **12,871.1** |

119. The following table presents the same information except the TVD measurements are referenced to TVD values determined during the drilling process.

40

| TVDSS (FEET) | MEASURED PRESSURE OF M57C (PSIA) | CALCULATED PRESSURE OF M57B (PSIA) |
|---|---|---|
| 17,637.5 | 13,046.9 | 12,869.7 |
| 17,637.5 | 13,038.1 | 12,861.1 |
| 17,637.5 | 13,049.4 | 12,872.2 |
| 17,637.9 | 13,065.4 | 12,887.7 |
| 17,637.5 | 13,037.3 | 12,860.2 |
| Average | 13,047.4 | **12,870.2** |

120. From the above analysis the pressure in the M57B is 12,871.1 psia.

## IX. An Analysis of the Macondo LWD Data Suggests that Additional Hydrocarbon Intervals May Exist at the Bottom of the Well

121. Schlumberger was unable to lower its wire line tools past a depth of approximately 18,280 ft (md).   However, LWD data is available down to a depth of 18,340 ft (md).  The base of the main pay zone, M56D is at 18,206 ft (md). While drilling at 18,260 ft (md) circulation was lost.  Over the next two days over 1,500 barrels of mud was lost to the well.

122. The Triple Combo log did not record a gamma ray at this depth but the neutron and density curves were captured and show four feet of cross-over.  The M56F is classified as an oil zone by BP.

123. The gamma ray and resistivity LWD data shows a package of sands and shales from 18,224 to 18,322 ft (md) with the most pronounced sand at 18,250 ft (md), the M56F zone.  There is not enough data to calculate water saturations below the level of the M56F; missing is a measurement of porosity.  However, the LWD data can be used to illustrate the pattern of sands and shales. To demonstrate, I prepared two exhibits using just the LWD data of gamma ray and the deep reading resistivity.

124. Exhibit 21 shows this information for the M57B zone. In the first track on the left is the gamma ray curve with a color gradient from lower gamma ray reading (left extension) in yellow, indicating sand, to higher readings (moving to the right) in gray, indicating shale.  The second

track on the right displays resistivity on a logarithmic scale with higher values (right extension) shaded green indicative of possible hydrocarbons and lower values shaded blue indicative of water.  As discussed in a previous section there are porosity measurements over this zone so that water saturation can be calculated, approximately 50% water and 50% hydrocarbon.  There are zones above and below the M57B level that show a slight yellow color mixed with mostly grey and probably have high water saturations.

125. Exhibit 22 is the same presentation for the last 132 feet of the well below the main pay sands, M56D and M56E.  The last string of casing was landed in this interval with the reamer shoe at 18,304 ft (md).  The gamma ray and resistivity curves are shaded in the same fashion as Exhibit 21. The M56F, an oil zone, is the most prominent of the sands in this interval. Other sands are thin, two to four feet thick, and the resistivity response is suppressed compared to the M56F zone but indicative of possible hydrocarbons.

126. At a depth of 18,330 ft (md) to 18,340 ft (md) the mud log recorded methane and ethane and the cuttings showed a slight increase in sand count and a dull yellow fluorescence on 1-2 pieces with no cut. Unfortunately, the resistivity values were not recorded over this interval. The gamma ray response, methane and ethane on the mud log, a slight increase in sand count and fluorescence, taken together suggest that the lowest interval in the well may be hydrocarbon (oil) bearing.

## X.  Summary of My Analyses

127. Visual inspection of the Triple Combo log shows the M57B zone has positive hydrocarbon indicators of decreasing gamma ray, increasing resistivity, neutron and density curves merging, neutron density crossover and adequate porosity.  Additionally, steep bed dip most likely reduces measured resistivity. Taken together, this method shows it is highly likely that the zone is hydrocarbon bearing.

128. Before the cement job was pumped on April 19, 2010 there was sufficient data available such that a reasonably prudent analyst would have classified the M57B zone as hydrocarbon bearing.

129. After the incident quantitative analysis by BP, Schlumberger's LSA calculations and my independent analysis confirm that the M57B was the uppermost hydrocarbon bearing zone in the open hole section of the Macondo well prior to cementing the final string of casing.

130. Based on my work I have formed the following opinions:

- BP mistakenly identified the M56A zone at 17,803 ft (md) as the uppermost hydrocarbon bearing zone in the Macondo well;

- BP should have identified the uppermost hydrocarbon bearing zone as the M57B zone, located at 17,467 ft (md);

- BP's analysis of the highest hydrocarbon zone was superficial, incomplete and thus incorrect;

- BP knew or should have known that the M57B zone was the shallowest hydrocarbon zone in the well prior to the final pumping of cement in the Macondo well;

- I understand that BP did not provide information concerning the M57B zone to Halliburton, and that BP' incorrect identification of the uppermost hydrocarbon bearing zone could have affected the cement job;

- It is possible that additional hydrocarbon bearing zones exist deep in the well and are located at and below the location of the reamer shoe at 18,304 ft (md); and

- The pressure in the M57B is 12,871.1 psia.

131. I reserve the right to modify this report and to supplement my opinions if additional data becomes available and in response to reports served by other parties.

Richard F. Strickland, P.E., PhD
October 17, 2011
PE License No. 45925

The Strickland Group, Inc.
Texas Registered Engineering Firm F-4263

## Statement of Compensation

I am being compensated at the rate of $450 per hour for my services to HESI in preparing this report, and will be paid at the rate of $450 per hour for any deposition or trial testimony in this matter.

# Exhibit B

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3   IN RE:  OIL SPILL      )     MDL NO. 2179
     by the OIL RIG,        )
 4   DEEPWATER HORIZON in   )     SECTION "J"
     the GULF OF MEXICO,    )
 5   April 20, 2010         )     JUDGE BARBIER
                            )
 6                          )     MAG.  JUDGE
                            )     SHUSHAN
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22              Videotaped deposition of ROLAND
     CHEMALI, taken at Pan-American Building, 601
23   Poydras Street, 11th Floor, New Orleans,
     Louisiana, 70130, on the 3rd of November,
24   2011.
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    comparing the quality of the copy versus the

2    large spreadsheet that we have marked as

3    exhibit 5934, that the quality of copying on

4    the -- what you have in your hand is not as

5    clear as what we have on 5934?  Would you

6    agree?

7         A.    I would agree.  I agree.

8         Q.    All right.  Now, go ahead and,

9    holding your copy, look at the M57 B sand at

10   17,467.

11        A.    Correct.  I'm looking at it.

12        Q.    Okay.  And do you see in the

13   left-hand column, there is a legend that

14   tells you what the different colors signify?

15   Can you find that -- that legend?

16        A.    It's on top.

17        Q.    Yeah.  You have to run up the --

18        A.    Yeah, on the top.

19        Q.    -- well bar and --

20        A.    Yes, on the top.  Yeah, it's

21   not -- okay.  'Cause you said on the

22   left-hand column.  Yes, uh-huh.

23        Q.    All right.

24        A.    Uh-huh.

25        Q.    And so the page that you're

PURSUANT TO CONFIDENTIALITY ORDER

1    holding in your hand -- and does it have a

2    Bates number on it?

3            A.     A what number?

4            Q.     Does it have a little number so

5    we can -- why don't you just hold it up for

6    the camera -- the camera?   There we go.

7    Okay.  All right.  So the topmost box in that

8    left-hand column --

9            A.     Uh-huh.

10           Q.     -- what color is that?

11           A.     Green.

12           Q.     Green.  And what does green

13   signify?

14           A.     In many presentations, it's oil.

15           Q.     Right.

16           A.     Uh-huh.

17           Q.     All right.  Is there a box above

18   that?

19           A.     I don't see it here.

20           Q.     Okay.  Did you see it two days

21   ago?

22           A.     Above the green?

23           Q.     Yeah.

24           A.     I don't recall.

25           Q.     Okay.  Turn to the page prior.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1                    Is there a box --

2         A.    That's a good point.

3         Q.    -- where you can sort of connect

4    them and --

5         A.    No, sir.

6         Q.    Okay.  So look at -- so let's

7    look at what I handed you --

8         A.    Uh-huh.

9         Q.    -- which is exhibit 5934.

10                   Do you see that there's a box

11   above the green oil box?

12        A.    There are three boxes, yeah.

13        Q.    Right.  There are three boxes.

14        A.    Uh-huh.

15        Q.    And the first box above the

16   green oil box is a white box, and it's called

17   water, correct?

18        A.    Correct, yeah.

19        Q.    And then there's an orange box

20   called moved hydrocarbon, correct?

21        A.    Correct.

22        Q.    And there's a blue box called

23   moved water, correct?

24        A.    Uh-huh.

25        Q.    All right.  Is that right?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1   between density and neutron.

2           When density and neutron are

3   widely separated, that is an indication that

4   you are probably dealing with, probably -- I

5   always like to add the word probably -- with

6   shale that is likely to be impervious, except

7   if there are eliminations.

8           But when you see them come

9   together, that is generally indicative of

10  permeable formations that are likely to flow,

11  whether a fluid is in them.  And in that

12  sense, there were some obvious areas where

13  there was potential of flow.

14       Q.     Where?

15       A.     The one that comes to mind is

16  the M57 B at 17468, something like this.

17  That is one.  There's another one at 1736 --

18  370 as well where they come together.  So

19  there are multiple areas where they're like

20  that.

21          Let me put it this way:  If you

22  see them come together, that means it's

23  likely to be a permeable zone.  If you don't

24  see them come together, you can't really say

25  it's not a permeable zone.

**PURSUANT TO CONFIDENTIALITY ORDER**

 1     producing, yes, that's correct.

 2          MR. DILLS:  That's all I have.  Thank

 3     you very much.

 4          MR. LANCASTER:  So is it the intention

 5     of either the PSC or Halliburton to tender

 6     Mr. Chemali as an expert witness in this

 7     case?

 8          MR. BOWMAN:  I don't know.

 9          MR. LANCASTER:  Okay.  Because if you

10     are --

11          MR. BOWMAN:  I mean, I -- he obviously

12     is an expert.

13          MR. LANCASTER:  If you are --

14          MR. BOWMAN:  He obviously is an expert.

15          MR. LANCASTER:  If you are, then I want

16     to cross-examine him now off the topics you

17     read.  If you're -- if you're going to do it

18     later, then I'll reserve the opportunity for

19     when you tender him as an expert.

20          MR. BOWMAN:  You -- you can reserve.

21          MR. LANCASTER:  All right.

22          MR. BOWMAN:  I mean, he -- obviously he

23     is an expert, but whether he's going to be

24     designated is another question.

25          VIDEOGRAPHER:  Time is 2:09 p.m.  We

**PURSUANT TO CONFIDENTIALITY ORDER**

# Exhibit C



40768990

Nov 7 2011
11:18PM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG | § | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the GULF OF | § | SECTION:  J |
| MEXICO, on APRIL 20, 2010 | § | |
| | § | JUDGE BARBIER |
| This Document Relates To: | § | |
| ALL CASES  0-2771 | § | MAG. JUDGE SHUSHAN |

## DEFENDANT HALLIBURTON ENERGY SERVICES, INC.'S DISCLOSURE OF NON-RETAINED REBUTTAL EXPERT WITNESS NOT REQUIRED TO PROVIDE A WRITTEN REPORT

Defendant Halliburton Energy Services, Inc. ("Halliburton"), by and through its attorneys, Godwin Ronquillo P.C., and pursuant to Fed. R. Civ. P. 26(a)(2)(C), hereby respectfully identifies the following individual who may be called to provide rebuttal expert testimony during Phase One of the February, 2012, Limitation and Liability Trial, and who is not required to provide a written report:

Roland Chemali

Mr. Chemali is the Chief Petrophysicist for Sperry Drilling.  He graduated with a degree in Engineering from the Ecole Polytechnique of Paris, France in 1966.  He earned an additional engineering degree from the French Petroleum Institute IFP in 1967 before receiving a Masters of Science in Mathematics from the Louisiana State University in 1969.  Mr. Chemali has over 40 years of experience in the design and use of downhole measurement tools that analyze the characteristics of subterranean formations.  Specifically, while at Schlumberger Mr. Chemali played a role in the development of the triple combo tool, a tool that provides simultaneous measurements of resistivity, density, and porosity, and whose measurements are at issue in this case.  Mr. Chemali also has decades of experience interpreting well logs documenting the

measurements recorded by downhole tools such as the triple combo tool.  He was also a 2011 finalist considered for the World Oil Lifetime Achievement Award.

Mr. Chemali is expected to provide evidence, including opinion testimony, concerning the hydrocarbon bearing zones in the Macondo well.  Specifically, Mr. Chemali is expected to testify regarding the hydrocarbon bearing zones in the well above 17,900 feet, including the zone at 17,803 feet that was identified by BP as being the shallowest hydrocarbon bearing zone in the well, and the M57B zone at 17,467 feet that expert witnesses have identified as the shallowest zone.  Mr. Chemali is expected to testify that a reasonable petrophysicist would have identified at least fours zones above 17,900 feet as being potential hydrocarbon bearing zones, including three zones located above the 17,803 foot zone identified by BP petrophysicist Ms. Galina Skripnikova as being the shallowest zone in the Macondo well.  Furthermore, Mr. Chemali is expected to testify concerning his belief that BP was reckless in failing to identify and account for the shallow M57B gas zone located at a depth of 17,467 feet.

Mr. Chemali is also expected to provide opinion testimony concerning the manner in which hydrocarbon bearing zones in a well such as Macondo are identified and treated by operators such as BP.  For example, Mr. Chemali will testify that a reasonably prudent operator should consider hydrocarbon bearing zones from both economic and a safety perspectives.  Even though some hydrocarbon bearing zones may not be capable of producing commercially viable quantities of hydrocarbons, if the zone has properties (including a sufficiently elevated pore pressure and sufficient permeability) that would enable hydrocarbons in the zone to flow into the wellbore, the zone should be isolated as a part of the operator's cement program.  Specifically, Mr. Chemali will testify that any hydrocarbon bearing zone capable of producing hydrocarbon

flow (whether oil or gas) into the wellbore should not be ignored, and that ignoring such a zone, as BP ignored the M57B zone, would be highly unsafe.

Finally, Mr. Chemali is expected to testify that, after analyzing the well logs and the other available data and analyses related to the formations in the Macondo well, he believes that the M57B zone located at 17,467 feet in the Macondo well is a hydrocarbon bearing zone that should have been considered by BP petrophysicists after examining the triple combo well logs obtained from Schlumberger prior to the cementing of the Macondo well.  Mr. Chemali will testify that a reasonably prudent petrophysicist, after examining the Schlumberger wireline logs, would have noted the M57B zone and would have classified it as a risk to the well and to the cement program.

This identification has been made based on the information reviewed by and available to Halliburton as of the date of this disclosure.  Halliburton respectfully reserves the right to identify additional topics for Mr. Chemali's testimony based on the rebuttal reports to be served on November 7, 2011.  Halliburton respectfully reserves the right to identify additional opinions and expert witnesses in rebuttal in accordance with the Court's pretrial order.

Respectfully submitted

**GODWIN RONQUILLO PC**

**By:** /s/ Donald E. Godwin
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
dgodwin@GodwinRonquillo.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
bbowman@GodwinRonquillo.com
Jenny L. Martinez
State Bar No. 24013109
jmartinez@GodwinRonquillo.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
fhartley@GodwinRonquillo.com
Gavin E. Hill
State Bar No. 00796756
ghill@GodwinRonquillo.com
Renaissance Tower
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
Telephone: 214.939.4400
Facsimile: 214.760.7332

and

R. Alan York
State Bar No. 22167500
ayork@GodwinRonquillo.com
Jerry C. von Sternberg
State Bar No. 20618150
jvonsternberg@GodwinRonquillo.com
Misty Hataway-Coné
State Bar No. 24032277
mcone@GodwinRonquillo.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2011, a copy of the forgoing Defendant Halliburton Energy Services, Inc.'s Disclosure of Non-Retained Expert Witness Not Required to Provide a Written Report has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12.


/s/ Donald E. Godwin
Donald E. Godwin