UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | : : : : : : | MDL NO. 2179  SECTION: J  JUDGE BARBIER |
| **THIS DOCUMENT RELATES TO ALL CASES** | : : : | MAG. JUDGE SHUSHAN |

. .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .

### CAMERON'S RESPONSE TO BP, TRANSOCEAN, AND HALLIBURTON'S MOTIONS TO EXCLUDE EVIDENCE OF OTHER GOVERNMENTAL REPORTS

Pursuant to the Court's Order Regarding Schedule for BP Motions *in Limine* and Responses to PSC Issues (Dkt. No. 4572), Cameron respectfully files this response to the motions *in limine* filed by BP (Dkt. No. 4515), Transocean (Dkt. No. 4521), and Halliburton (Dkt. No. 4523) to exclude the introduction at trial of the Report of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling ("National Commission Report") and its Chief Counsel's report ("Chief Counsel Report") (together, "the Reports") investigating the Macondo disaster.

### The Legal Standard

Federal Rule of Evidence 803(8)(C) provides an exception to Rule 802's prohibition on hearsay for

> [r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

While legal conclusions are generally not considered "factual findings" for the purposes of Rule 803(8)(C), any other conclusions and opinions that are based on factual

1

findings are covered by the rule. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169-70 (1988). The author of the report must also have first-hand knowledge of the report's subject matter, although this requirement is met if the author controls the conduct of the investigation. *U.S. v Cent. Gulf Lines, Inc.*, 974 F.2d 621, 626 (5th Cir. 1992); *United States v. Davis*, 826 F. Supp. 617, 621, n.19 (D.R.I. 1993).

If all of these requirements are met, a party can still challenge the report for its "lack of trustworthiness." Fed. R. Evid. 803(8)(C). A court will presume the trustworthiness of a government report. *Melville v. Am. Home Assurance Co.*, 584 F.2d 1306, 1316 (3d Cir. 1978). An opponent may demonstrate untrustworthiness based on 1) the timeliness of the investigation; 2) the skill or experience level of the investigator; 3) whether a hearing was held; and 4) possible motivation problems, such as bias arising from anticipated litigation. *Beech Aircraft Corp.*, 488 U.S. at 167 n.11 (citing Fed. R. Evid. 803(8) advisory committee's notes); *see also* 30B MICHAEL H. GRAHAM, FEDERAL PRACTICE AND PROCEDURE § 7049, at 625-631 (2006).

BP, Transocean, and Halliburton raise two principal objections to the admissibility of the Reports: that the Reports were generated without proper legal authority and lack trustworthiness. Each is addressed below.

### The Reports were Made Pursuant to Authority Granted by Law

The National Commission (the "Commission") was created by the President pursuant to Executive Order No. 13,543. 75 Fed. Reg. 28,397 (May 21, 2010). The Commission was empowered to "examine the relevant facts and circumstances concerning the root causes of the Deepwater Horizon oil disaster" and "submit a final public report to the President with its findings." *Id.* The Commission was tasked with holding public hearings and conducting an investigation into the "root causes" of the Macondo disaster. *Id.* The Chief Counsel was a

member of the Commission's staff, and its Report is a "companion" to the National Commission Report.  Chief Counsel's Report, Forward.

The contention that the Reports were not made pursuant to legal authority is without merit.  Executive Order 13,543, issued by the President of the United States, undeniably affords the Commission and its Chief Counsel legal authority to make factual findings and generate the Reports. The Commission and Chief Counsel acted pursuant to and within the scope of an Executive Order of the President.

In a similar circumstance, Judge Hellerstein held that the authority of the 9/11 Commission was indistinguishable from any other public office or agency that issues reports: the 9/11 Commission Report "is a report of a public commission, pursuant to an Act of Congress, written following an investigation by staff and Commissioners appointed pursuant to that Act." *In re Sept. 11 Litig.*, 621 F. Supp. 2d 131, 155 (S.D.N.Y. 2009).  The 9/11 Commission was made up of ten "prominent United States citizens, with national recognition and significant depth of experience in such professions as governmental service, . . . intelligence gathering, commerce (including aviation matters), and foreign affairs."  *Id.* at 152.  And in *Gentile v. County of Suffolk*, 129 F.R.D. 435, 449 (E.D.N.Y. 1990), the court held that it was "incontrovertible that the Temporary Commission of Investigation of the State of New York had the authority pursuant to its enabling statute to investigate Suffolk County's law enforcement agencies." *See also United States v. Central Gulf Lines, Inc.*, 974 F.2d 621, 627–28 (5th Cir. 1992) (duty to prepare public record may be delegated by United States to agency or to foreign government without the record losing its character as a public record).

Here, the Commission was composed of seven Presidential appointees "drawn from among distinguished individuals, and may include those with experience in or representing

the scientific, engineering, and environmental communities, the oil and gas industry, or any other area determined by the President to be of value to the Commission in carrying out its duties." 75 Fed. Reg. 28,397. The fact that the Commission members were not full-time government employees is immaterial for purposes of Rule 803(8). They were appointed by the President and empowered to conduct their investigation and issue the Reports pursuant to federal law.

### The Reports are Trustworthy

BP, Transocean, and Halliburton contest that the Reports lack trustworthiness. An authorized report of a government agency is assumed to be trustworthy absent evidence to the contrary. *See, e.g.*, *Kehm v. Procter & Gamble Mfg. Co.*, 724 F.2d 613, 618 (8th Cir. 1983) (affirmative showing of untrustworthiness required); *United States v. AT & T Co.*, 498 F. Supp. 353, 360 (D.D.C. 1980). The burden is on the party opposing introduction to make "'an affirmative showing of untrustworthiness, beyond the obvious fact that the declarant is not in court to testify.'" *Bradford Trust Co. v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 805 F.2d 49, 54 (2d Cir. 1986) (citation omitted); *see also Keith v. Volpe*, 858 F.2d 467, 481 (9th Cir. 1988) (assumption is one of trustworthiness, with burden of establishing untrustworthiness on opponent of evidence). An opponent may demonstrate untrustworthiness based on 1) the timeliness of the investigation; 2) the skill or experience level of the investigator; 3) whether a hearing was held; and 4) possible motivation problems, such as bias arising from anticipated litigation. *Beech Aircraft Corp.*, 488 U.S. at 167 n.11.

(1)     Timeliness

Neither BP nor Halliburton contend that the Reports were untimely. Transocean contests that the National Commission Report was created too quickly, and thus lacks trustworthiness. The Commission was charged with issuing its report within six months of its

4

first meeting. 75 Fed. Reg. 28,397. The National Commission Report was issued on January 1, 2011, approximately 8 months after the oil spill. The Chief Counsel's Report was issued shortly thereafter, on February 17, 2011. By comparison, the Bly Report was issued on September 8, 2010, and Transocean's Investigation Report was issued in June 2011.

Contrary to Transocean's contention, the timeliness factor is designed to ensure that government reports are created sufficiently close to the events at issue to ensure that they are based on reliable information that has not gone stale. *See Chavez v. Carranza*, 559 F.3d 486, 496 (6th Cir. 2009) (noting that the timeliness factor focuses on how much time passed between the events being investigated and the beginning of the investigation). Transocean's argument misses the mark. The Reports were timely created.

With respect to Transocean's argument that the Reports did not consider certain issues because of the unavailability of information, Cameron submits that this does not render the Reports untrustworthy. Rather, the Reports are admissible for those issues on which a full record was available to the Commission and Chief Counsel during their investigation—which are the issues addressed in the Reports. The Reports do not purport to make final findings about why the BOP did not close because the BOP investigation had not been completed. Chief Counsel's Report at 203 ("Until that testing is complete, a full examination of blowout preventer failure is impossible."). But that does not render the Reports untrustworthy on all other issues.

(2)   *Skill and Expertise*

BP and others also contest that the Reports were created by individuals who lacked personal knowledge of the facts. The author of the Rule 803(8)(C) report is required to have first-hand knowledge of the matters in the report for the report to be admissible under Rule 803(8)(C). *See, e.g., U.S. v Central Gulf Lines, Inc.*, 974 F.2d 621, 626 (5th Cir. 1992) (firsthand

5

knowledge required for a document to be admissible under Rules 803(8)(B) and 803(8)(C)). But, the "firsthand" knowledge requirement is met if the author of the report controls the conduct of the investigation or has firsthand knowledge of statements by declarants who did have firsthand knowledge of the facts. *See, e.g.*, *Robbins v. Whelan*, 653 F.2d 47, 52 (1st Cir. 1981) (recognizing firsthand requirement but concluding that even though author did not personally produce data in the report nor verified its accuracy, firsthand knowledge was shown where the agency "initiated the inquiry and specified in detail the information sought, the methodology to be used in developing the information, and the statistical standards to which the manufacturers were to adhere"); *Fraley v. Rockwell Int'l Corp.*, 470 F. Supp. 1264, 1267 (S.D. Ohio 1979) (firsthand requirement met where "author had first-hand knowledge of the statements made by declarants who did have first-hand knowledge of the facts mentioned in the factual findings made in the public document").

Here, the Commission held public hearings, conducted interviews of eyewitnesses and experts, and reviewed documents provided by the parties involved. The Commission met six times between July 12 and December 3, 2010. National Commission Report, App'x E. The Chief Counsel relied on its own team of retained experts and other experts "from every corner of the drilling industry." Chief Counsel's Report, Acknowledgements. He also relied on documents provided by BP utilized by the Bly investigation team. *Id.* In addition, Transocean "graciously invited us to visit one of its deepwater drilling rigs to appreciate firsthand the scale and complexity of its operations [and] Halliburton provided samples of cement material for testing." *Id.* The Chief Counsel also relied on voluntary interviews with members of the rig crew, cementers, mudloggers, equipment suppliers, and shore-based engineers. *Id.* Rule 803(8) does not require that the Commission's members be industry experts themselves.

(3) *Due Process*

The Commission held ten days of public hearings between July 12 and December 3, 2010, with several opportunities for public comment throughout these meetings. *See* http://www.oilspillcommission.gov/meeting-3/meeting-details. The Commission also obtained evidence from congressional hearings and from the Coast Guard hearings and from the parties themselves.

BP objects to the Reports' reliance on testimony from the Coast Guard / MBI hearings. As set out in Cameron's submissions on the admissibility of the MBI report, the materials that fall within the scope of § 6308's prohibition is limited – only "findings of fact, opinions, recommendations, deliberations, [and] conclusions" are specifically mentioned as inadmissible. Notably, § 6308 does not preclude the use of purely factual information that would otherwise be admissible at trial, just because those facts were developed in an MBI proceeding. Accordingly, § 6308 does not preclude the Reports from relying on MBI hearing testimony.

(4) *Bias*

The Commission was made up of seven members comprising "an independent, nonpartisan entity, directed to provide a thorough analysis and impartial judgment." National Commission Report, Forward. The Reports were not generated with an eye toward litigation; rather, the Commission was "tasked with providing recommendations on how we can prevent – and mitigate the impact of – any future spills that result from offshore drilling." *Weekly Address: President Obama Establishes Bipartisan National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling*, May 22, 2010, *available at* http://www.oilspillcommission.gov/sites/default/files/documents/osc_presidential_announcement.pdf. The fact that litigation was pending during the Commission's investigation does not soil the

Reports. As the Chief Counsel made clear, each of the parties participated in the investigation, including making documents and cement samples available.

The arguments of BP, Transocean, and Halliburton largely go to the weight of the evidence, rather than to the Reports' admissibility. *See e.g.*, *United States v. School Dist. of Ferndale, Mich.*, 577 F.2d 1339, 1354–55 (6th Cir. 1978) (bald assertion that hearing examiner was not an expert does not necessarily affect trustworthiness of findings or admissibility, although it may affect weight to be given findings); Korematsu v. U.S. 584 F. Supp. 1406, 1416 n.5 (N.D. Cal. 1984) ("Admission of the report under 803(8) would allow it to be weighed along with other evidence, if any, and permit the court to make its own findings."). BP, Transocean, and Halliburton have not met their burden of showing that the Reports are untrustworthy.

### Wholesale Exclusion is Unwarranted

Finally, if the Court is concerned that specific portions of the Reports may contain double hearsay or may otherwise be inadmissible, the proper course would be to rule on the admissibility of those portions of the Reports as they are proffered. *See, e.g.*, *In re Sept. 11 Litig.*, 621 F. Supp. 2d 131, 158 (S.D.N.Y. 2009) (holding that "the 9/11 Report is not admissible as a whole. Specific findings may be admissible."). Excluding the Reports in their entirety is unwarranted.

### Conclusion

BP, Transocean, and Halliburton move to exclude the introduction into evidence of the National Commission and Chief Counsel's Reports. As set out above, the Reports were made pursuant to proper legal authority granted by the President and generated pursuant to a proper and timely investigation into the facts and causes of the Macondo disaster. Should

portions of the Reports indicate that they are based on double hearsay or cause the Court other concern regarding their admissibility, the Court should not "throw out the baby with the bathwater" as BP, Transocean, and Halliburton propose.  Rather, a careful examination of the admissibility of each proffered portion of the Reports is required.  The motions *in limine* should be denied.

1076308v.1

Respectfully submitted,

| | |
|---|---|
| David J. Beck, T.A.<br>    dbeck@brsfirm.com<br>Joe W. Redden, Jr.<br>    jredden@brsfirm.com<br>David W. Jones<br>    djones@brsfirm.com<br>Geoffrey Gannaway<br>    ggannaway@brsfirm.com<br><br>BECK, REDDEN & SECREST, L.L.P.<br>One Houston Center<br>1221 McKinney, Suite 4500<br>Houston, TX  77010-2010<br>713-951-3700<br>713-951-3720 (fax) | /s/ Phillip A. Wittmann<br>Phillip A. Wittmann, 13625<br>    pwittman@stonepigman.com<br>Carmelite M. Bertaut, 3054<br>    cbertaut@stonepigman.com<br>Keith B. Hall, 24444<br>    khall@stonepigman.com<br>Jared A. Davidson, 32419<br>    jdavidson@stonepigman.com<br><br>STONE PIGMAN WALTHER WITTMANN L.L.C.<br>546 Carondelet Street<br>New Orleans, Louisiana  70130<br>504-581-3200<br>504-581-3361 (fax)<br><br>**ATTORNEYS FOR CAMERON INTERNATIONAL CORPORATION** |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the above and foregoing Response to BP, Transocean, and Halliburton's Motions to Exclude Evidence of Other Governmental Reports has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of November, 2011.

/s/ Phillip A. Wittmann

1076308v.1