UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This Document Relates to: *All Cases*<br><br>(Including No. 10-2771) | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SHUSHAN |

**PLAINTIFFS' CONSOLDIATED OPPOSITION TO BP'S MOTIONS *IN LIMINE*
REGARDING PRIOR ALLEGED IMPROPER CONDUCT AND PRIOR
ADVERSE CRIMINAL, CIVIL, OR REGULATORY PROCEEDINGS**

Plaintiffs respectfully submit the following memorandum in opposition to BP's motion *in limine* to preclude evidence of prior improper conduct allegedly "unrelated" to the Macondo Well incident [Doc 4514] and BP's motion *in limine* to preclude evidence of prior adverse criminal, civil, or regulatory proceedings allegedly "unrelated" to the Macondo Well incident [Doc 4512]:

**MAY IT PLEASE THE COURT:**

The goal of Process Safety and Risk Management is to anticipate, prevent, control, and mitigate major incidents (*e.g.,* incidents that have the potential to cause multiple fatalities, catastrophic environmental damage, etc).[1] Although there are a number of components to an effective Process Safety and Risk Management system, it is widely accepted that sharing lessons learned from other process safety incidents is a critical part

---

[1] *See* Tony Hayward Depo, pp.145-146; Samuel DeFranco Depo, pp.19-22.

of understanding and designing systems that will prevent future harms.[2]

The critical link between "lessons learned" and Process Safety and Risk Management is nothing new to BP. Since the 1960s, BP has acknowledged that the "need to pass on the lessons of the past to the widest audience possible" is "an essential part of ensuring safe operations."[3] Indeed, BP's Group Practice on incident investigation acknowledges that a central purpose of incident investigations is to "facilitate[] the sharing of investigation findings to prevent or reduce the risk of future incidents." BP GROUP DEFINED PRACTICE 4.4-002 Incident Investigation, TREX-01742 at 4. Moreover, BP's employees and experts in this case have universally acknowledged that learning and implementing the lessons of prior incidents is an essential part of Process Safety and Risk Management:

- "[T]he communication of lessons learned helps prevent process safety incidents;" companies that do not learn from a process safety incident "will be doomed to repeat it." SAMUEL DEFRANCO DEPO, p.64.

- "Lessons learned are an important part of process safety." CHERYL GROUNDS DEPO, p.116.

- "It's important that BP investigates any incident . . . to get the lessons learned." JOHN BAXTER DEPO, p.336.

- "A strong safety culture is one that continuously reflects on its safety performance and learns from it…. An organization with a strong safety culture learns from safety outcomes and events. Individuals throughout the organization reflect on operations and continuously strive to achieve safe and reliable performance and better understand existing practices,

---

[2] *See, e.g.,* API RECOMMENDED PRACTICE 75 (3d 2004), p.23 ("the intent of [an] investigation should be to learn from the incident and help prevent similar incidents"); United Kingdom Health Safety Executive, *Developing Process Safety Indicators* (1st ed. 2006), p.21 ("Each occasion [*i.e.,* incident] provides an opportunity to consider whether improvements should be made. Lessons from these enquiries should be applied *across the whole organization*") (emphasis added).

[3] Atherton, John (BP), Gil, Frederic (BP), <u>Incidents that Define Process Safety</u> (2d 2008) at ix.

2

> thus improving them." EXPERT REPORT OF KATHLEEN SUTCLIFFE, pp.54-55.

Indeed, BP's own expert, Morris Burch, establishes that the lessons learned from Grangemouth, Texas City and Prudhoe Bay are directly relevant to the process safety systems that BP contends were in place – and in any event should have been in place – to identify and mitigate risks specific to deepwater drilling in the Gulf of Mexico in 2010:

> These incidents [*i.e.* Grangemouth, Texas City and Prudhoe Bay] drove BP to substantially increase the resources allocated to process safety management…..
>
> BP's leadership was engaged in supporting PSM throughout the organization….
>
> **BP had process safety policies and procedures in place to identify and mitigate risks associated with deepwater drilling in the Gulf of Mexico….**
>
> **Overall Conclusion**
>
> There is overwhelming evidence to support my opinion that BP has had, for many years, a comprehensive and *continually improving* process safety management system. BP investigated and *continued to learn from incidents,* enhancing its systems and procedures, and increasing its monitoring and oversight by leadership.

EXPERT REPORT OF MORRIS BURCH, Executive Summary, pp.iv-vi (some **emphasis** in original; some *emphasis* supplied). While BP experts Burch and Sutcliffe both include "disclaimer" footnotes acknowledging that the Court may find these prior incidents inadmissible,[4] such acknowledgment is nothing more than a tautology: inadmissible evidence is inadmissible.

The question for the Court is, of course, whether such evidence is admissible, and BP's own experts provide both the methodology and conclusions which directly link the

---

[4] *See* BURCH REPORT, p.iv fn.1; SUTCLIFFE REPORT, p.55 fn.226.

prior incidents to the process safety management system that did – or did not – exist at the Macondo leading up to April 20, 2010.

**PLAINTIFFS DO *NOT* SEEK TO INTRODUCE EVIDENCE OF PRIOR BAD ACTS IN ORDER TO PROVE CONFORMITY WITH BP'S "CHARACTER" IN CAUSING THE BLOWOUT IN QUESTION**

In its initial objections to the Plaintiffs' "List of 300" sample Trial Exhibits, BP only objected on the basis of Rules 402 and 403. While BP now objects on Rule 404(b) grounds, it is clear that Plaintiffs are *not* seeking to introduce evidence of prior incidents in order to show that BP did or did not do something on April 20, 2010 in conformity with its "character" – *e.g.,* to prove that BP is a "bad" company, in order to prove that BP acted "badly" leading up to the blowout on April 20, 2010. Rather, the acts and omissions of BP with respect to Macondo incident are otherwise established.

Evidence regarding BP's prior incidents, and the lessons learned (or not learned) therefrom, is "admissible for *another purpose,* such as proving motive, opportunity, intent, *preparation, plan, knowledge,* identity, *absence of mistake* or *lack of accident*." FED. RULE EVID. 404(b) (emphasis supplied).

As outlined above, the examination of BP's prior incidents, the investigation thereof, and the lessons learned therefrom, establishes both **(i)** a "standard of care", as it were, with respect to process safety and management system reliability policies and procedures that should have been in place prior to Macondo, and **(ii)** the fact that, and ways in which, process safety management systems established months in advance or thousands of miles away affect predictable human failures that occur on the rig in exigent situations. These issues are, of course, directly relevant to fault and allocation-of-fault issues, completely unrelated to the "character" of BP.

Moreover, however, and perhaps more significantly, the existence of these incidents, and the lessons (purportedly) learned therefrom, establish notice, **_knowledge_** and other planning (or lack thereof) on the part of BP, and render BP particularly egregious, reckless and indifferent with respect to Macondo. *See, e.g.,* Minshew v. Floyd H. Brown, No.95-2507, 1996 WL 601436 (E.D. La. Oct. 18, 1996) (Fallon, J.) ("the plaintiff may use circumstantial evidence such as past conduct or prior incidents in an attempt to prove ***state of mind***") (emphasis supplied); *citing,* Garvey v. Dickson College, et al, 763 F.Supp. 799, 801 (M.D.Pa. 1991).

BP's knowledge of these important process safety and system reliability principles, issues, and suggested applications are central to the questions of, not only basic fault, and fault allocation, but the critical issues of "gross negligence" or "willful misconduct" and other related determinations which turn largely on the defendant's state of mind.

## The Evidence of Prior Incidents in this Case is Particularly Relevant

The Rule 404(b) inquiry devolves into a simple Rule 402 relevance test with the Rule 403 safeguard where, as here, the evidence is proffered to establish facts in question, and not just introduced to prove bad "character". *See, e.g.,* United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978). For relevance, admissibility should be liberally permitted. *See* Henson v. Odyssea Vessels, Inc., 2008 U.S. Dist. LEXIS 12026 (E.D. La. Feb. 15, 2008) (Barbier, J.) (noting in the context of relevancy "that the Supreme Court favors a liberal standard of admissibility"). Rule 403 has no application in a bench trial. *See* Gulf States Utils. Co. v. Ecodyne Corp., 635 F.2d 517, 519 (5th Cir. 1981) (in the absence of a

5

jury, asking the presiding trial judge exclude relevant evidence as "unduly prejudicial" is a "useless procedure" as "Rule 403 has no logical application to bench trials").

BP is a prime example of why lessons learned are critical to effective process safety and risk management. During the ten years preceding the Macondo blowout, BP had three major incidents in its operations. These major incidents occurred at BP's Grangemouth, Scotland refinery, Texas City refinery, and Prudhoe Bay, Alaska pipeline. Collectively, these major incidents resulted in three criminal convictions, 180 injuries, 15 deaths, the release of hundreds of thousands of barrels of gas and oil into the environment, and millions of dollars in fines, restitution, injury settlements, and property damage.[5]

Although the Grangemouth, Texas City, and Prudhoe Bay incidents involved different types of operations, were separated by thousands of miles, and occurred years apart, each of the accident resulted from the same systemic flaws in BP's Process Safety and Risk Management system. Among other things, the various investigations concluded that: **(1)** BP emphasized profits over process safety; **(2)** BP focused on personal safety while ignoring process safety; **(3)** BP management did not adequately oversee the company's process safety risks; **(4)** BP's organizational structure and/or constant reshuffling of personnel increased process safety risks; **(5)** BP was blind to major process safety risk; **(6)** BP did not properly audit its operations; **(7)** BP did not create, follow, and

---

[5] *See* Major Incident Investigation Report: BP Grangemouth, Scotland (Aug. 18, 2003), p.4; U.S. Chemical Safety and Hazard Investigation Board Investigation Report: Refinery Explosion and Fire, Report No. 2005-04-I-TX (Mar. 2007), TREX-06012 at 17; Alaska Department of Environmental Conservation: Situation Report (Mar. 28, 2008), TREX-00869 at 1; Judgment from Criminal Case, United States District Court for the Southern District of Texas (4:07-CR-00434), TREX-06006 at 1-3; Judgment from Criminal Case, United States District Court for Alaska (3:07-CR-00125), TREX-06008 at 1-5.

update safety critical procedures; **(8)** BP did not maintain safety critical equipment; and **(9)** BP had failed to learn from prior process safety incidents within its organization.[6]

After BP blew up the Texas City refinery, BP acknowledged publicly that its approach to Process Safety and Risk Management was fundamentally flawed. *See, e.g.*, STATEMENT BY JOHN BROWN, BAKER PANEL CONFERENCE CALL (Jan. 16, 2007) ("[A]s Chief Executive, I have the responsibility to learn from what has occurred . . . I recognize the need for improvement . . . I need to take a lead in . . . championing process safety as the foundation of BP's operations"). In fact, BP's then Vice-President of Safety & Operations emphasized that if BP did not learn the lessons from the Texas City explosion, BP was going to have another Texas City every 10-15 years.[7]

Following the Texas City explosion, BP created a Six Point Plan which was eventually folded into a comprehensive Operating Management System ("OMS").[8] BP specifically developed the Six Point Plan and OMS as a response to the incidents that occurred at Grangemouth, Texas City, and Prudhoe Bay.[9]

BP executives themselves conceded the relevance of the "lessons learned" from the Texas City beyond its refining operations. In the wake of the Texas City explosion, BP required its executive management and other employees across the company to read a book titled *Failure to Learn,* which contains a stinging criticism of BP's Process Safety and Risk Management including its systemic inability to learn from prior incidents.[10]

---

[6] *See* EXPERT REPORT OF ROBERT BEA AND WILLIAM GALE, pp.29-48.

[7] *Safety: The Number One Priority,* The BP Magazine, Issue 3 (2006).

[8] ELLIS ARMSTRONG DEPO, pp.49-50; MARK BLY DEPO, p.240.

[9] ELLIS ARMSTRONG DEPO, pp.49-50.

[10] TONY HAYWARD DEPO, pp.204-205; DAVID RICH DEPO, pp.607-608; Hopkins, Andrew, *Failure to Learn* (Reprinted 2010) [TREX-06026].

Indeed, BP repeatedly underscored that "[e]very part of our business is fully implementing" the "lessons learned" from the Texas City explosion.[11] In fact, shortly after the Texas City explosion, Ellis Armstrong, an executive in BP's Exploration & Production segment, stressed that "Texas City had a big impact on us . . . As a result, we have fundamentally changed our approach to safety and operations and that change is ongoing."[12]

As noted, this evidence is directly relevant to: **(i)** a "standard of care", as it were, with respect to process safety and management reliability policies and procedures that should have been in place prior to Macondo; **(ii)** the fact that, and ways in which, process safety management systems established months in advance or thousands of miles away affect predictable human failures that occur on the rig in exigent circumstances; and **(iii)** BP's extensive, continuing, and repeated, knowledge, notice, study (and blind and willful ignorance) of same.

Ultimately, BP's refusal to learn the lessons from the Grangemouth, Texas City, and Prudhoe Bay incidents was borne out by the Macondo blowout. The Macondo blowout was the result of the same types of systemic organizational causes as the Grangemouth, Texas City, and Prudhoe Bay failures.[13]

### THESE PRIOR INCIDENTS (AND THEIR SURROUNDING INVESTIGATIONS AND RESPONSES) ARE RELEVANT TO BP PLC MANAGEMENT'S CONTROL OVER WORLDWIDE DRILLING OPERATIONS.

These prior incidents, (along with the investigations thereof and responses thereto), also go to the control exerted by BP plc from London, as well as the

---

[11] *Safety: The Number One Priority,* The BP Magazine, Issue 3 (2006).
[12] *Safety: The Number One Priority,* The BP Magazine, Issue 3 (2006).
[13] EXPERT REPORT OF ROBERT BEA AND WILLIAM GALE, pp.29, 49-80.

technological and/or other feasibility of implementing various procedures and/or other safeguards before the Macondo blowout. This evidence is direct proof of gross negligence at the highest levels of BP and gives rise to liability for punitive damages.

The BP plc Board of Directors was responsible for implementing the "Six Point Plan" in the Gulf of Mexico, but refused or otherwise failed to apply it to MODUs. This knowing disregard for a significant risk that lead to a catastrophic event is relevant to the issue of negligence, gross negligence, and punitive damages.

### EVEN ASSUMING *ARGUENDO* THAT THE INCIDENTS ARE NOT OTHERWISE INDEPENDENTLY ADMISSIBLE, (WHICH IS DENIED), THEY MAY BE RELIED UPON BY PROCESS SAFETY EXPERT WITNESSES DRS. BEA AND GALE.

It is well-settled that an expert can rely upon otherwise inadmissible evidence as long as it is of a type "reasonably relied upon by experts in the particular field." FED. R. EVID. 703. *See also, e.g.,* Monsanto Co. v. David, 516 F.3d 1009, 1015-1016 (5th Cir. 2008) (finding that an expert could rely upon a report prepared by someone else).

Drs. Bea and Gale are proferred experts in the field of System Reliability and Process Safety, of which an important component is relying upon past mistakes. Each one of the challenged Trial Exhibits is listed on the Bea and Gale Expert Reliance Exhibit List, and form an important basis to the methodology and analysis undertaken by them, as well as the conclusions they reach.

## CONCLUSION

For the above and foregoing reasons, BP's motion *in limine* to preclude evidence of prior improper conduct allegedly "unrelated" to the Macondo Well incident [Doc 4514] and BP's motion *in limine* to preclude evidence of prior adverse criminal, civil, or regulatory proceedings allegedly "unrelated" to the Macondo Well incident [Doc 4512] should be denied.

This 18th day of November, 2011.

Respectfully submitted,

| | |
|---|---|
| /s/ Stephen J. Herman | /s/ James Parkerson Roy |
| Stephen J. Herman, La. Bar No. 23129 | James Parkerson Roy, La. Bar No. 11511 |
| HERMAN HERMAN KATZ  & COTLAR LLP | DOMENGEAUX WRIGHT ROY  & EDWARDS LLC |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, Louisiana 70113 | Lafayette, Louisiana 70501 |
| Telephone: (504) 581-4892 | Telephone: (337) 233-3033 |
| Fax No. (504) 569-6024 | Fax No. (337) 233-2796 |
| E-Mail: sherman@hhkc.com | E-Mail: jimr@wrightroy.com |
| *Plaintiffs' Liaison Counsel MDL 2179* | *Plaintiffs' Liaison Counsel MDL 2179* |

### PLAINTIFFS' STEERING COMMITTEE

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS, MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office: (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT DRESCHER & IMPREVENTO

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY 10003
Office: (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P. C.

999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL 36660
Office: (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA 70726
Office: (225) 664-4193
Telefax: (225) 664-6925
E-Mail: calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse

218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW & ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130
Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Office: (214) 521-3605
Telefax: (214) 599-1172
E-Mail: ssummy@baronbudd.com

Mikal C. Watts
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail: mcwatts@wgclawfirm.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101

<div style="columns:2">

Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail: ervin@colson.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

</div>

**CERTIFICATE OF SERVICE**

    WE HEREBY CERTIFY that the above and foregoing Opposition will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 18th day of November, 2011.

                                       /s/ Stephen J Herman and James Parkerson Roy