UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | : : : : : : | MDL NO. 2179<br><br>SECTION:  J<br>JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |
| **THIS DOCUMENT RELATES TO** 10-2771 and 10-4536, *United States v. BP Exploration and Production Inc., et al.* | : : : | <br>JURY TRIAL DEMANDED<br> |

. . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .

### BRIEF OF CAMERON INTERNATIONAL CORPORATION IN SUPPORT OF TRANSOCEAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON BP'S INDEMNITY OBLIGATIONS

In accordance with the Court's Order of November 3, 2011 (Doc. 4473), Cameron International Corporation ("Cameron") submits this brief to address certain legal issues raised in Transocean's Motion for Partial Summary Judgment Against BP to Enforce BP's Contractual Obligations, Including BP's Obligation to Defend, Indemnify and Hold Transocean Harmless Against Pollution Claims (Doc. 4477: "Transocean's Motion").

**I.    SUMMARY OF ARGUMENT ON SPECIFIED LEGAL ISSUES**

This Court's Order (Doc. 4473) identifies two legal issues for briefing in connection with Transocean's Motion. First, was indemnity "owed under a contractual provision"?  Second, "could" Transocean conduct ("e.g., gross negligence") "void that" indemnity "provision"?

1.    The answer to the first issue is "yes," specific indemnity was owed.  Under the unambiguous terms of the Drilling Contract, BP owed indemnity, defense, and hold harmless obligations to Transocean for certain categories of loss, expense, or liability – just as Transocean

owed BP indemnity, defense, and hold harmless obligations for other, separate categories of costs.  BP committed to Transocean that it would "bear" the entirety of any expense or damage occasioned by well blowout, including loss of hole, loss of reservoir, and well control efforts.  BP further agreed to "assume full responsibility for" any liability or expense related to underwater pollution discharges.  BP and TO further mutually agreed that there would be no limits on their allocated obligations for the separate categories of risk.  BP and TO also agreed, when acting as indemnitor, to indemnify the other, as indemnitee, for any contractual indemnity obligations undertaken by the indemnitee with respect to the indemnitor's allocated category of risk.

In short, Transocean is fully responsible for injury and death claims by its own employees and by persons other than BP employees, for its own property, and for surface pollution, and for all third party indemnity obligations of BP with respect to these categories of liability and expense.  Correspondingly, as the Court has already concluded (Doc. 4588), BP is fully responsible for injury and death claims of its own employees, for its own property, and for subsurface oil pollution released from the Macondo well, and for all third party indemnity obligations of Transocean related to these categories of liability or expense.

2. The answer to the second issue is "no," the conduct of Transocean cannot *void* the risk allocation provisions of the Drilling Contract.  First, Cameron agrees with Transocean that the sophisticated risk allocation provisions of the Drilling Contract are fully enforceable as written under maritime law, even as it relates to indemnity for gross negligence.  Second, even if the indemnity for gross negligence is not enforced on the theory that it somehow violates public policy, the remaining indemnity agreements are valid and enforceable as a matter of longstanding contract law.

a. As a general matter, under the "public policy" analysis required by Supreme Court maritime law decisions, the mutual agreements to indemnify for gross negligence with respect to separate allocated categories of expense or liability in the Drilling Contract should be enforced as a matter of law. No Fifth Circuit case has **held** otherwise in a maritime case, and no Fifth Circuit decision has analyzed the public policy in favor of such indemnities for oil spill costs and damages established by the Oil Pollution Act of 1990.

A "fundamental purpose of risk allocation" in the offshore drilling industry "is to create a clear line of demarcation so each party will be able to evaluate its risk exposure and obtain appropriate insurance (or elect to self-insure)." C. Moomjian, *Contractual Insurance and Risk Allocation in the Offshore Drilling Industry [Part 1]*, CONTRACT DRILLER JAN./FEB. 1999 ["*Risk Allocation* 1"], p. 20 (attached in the Appendix hereto); *see Jig the Third Corp. v. Puritan Marine Ins. Under. Corp.*, 519 F.3d 171, 176 (5th Cir. 1975) (enforcement of contractual indemnity provisions acknowledges the "consideration that businessmen can bargain over which party is to bear the risk of damage and set the price accordingly, thus achieving a more rational allocation of the risk"). It is a general principle of maritime law that indemnity provisions in maritime agreements should be enforced as written. That principle is reinforced in this case by the policy established by Congress in OPA – namely that indemnity agreements for pollution risks, and particularly indemnity agreements that leave liability for oil pollution costs and damages with the "responsible party" designated under OPA for OCS oil spills – are enforceable. 33 U.S.C. § 2710. The risk allocation provisions of the Drilling Contract should therefore be fully enforced as written.

b. Even if BP's agreement to indemnify Transocean for Transocean's gross negligence were not enforced (in which event, Transocean's agreement to indemnify BP for BP's

gross negligence would likewise not be enforced), the balance of the risk allocation provisions in the Drilling Contract would remain fully enforceable. The entire indemnity obligation of BP cannot be voided. The principle that parts of agreements that do not offend public policy are to be enforced even if there are other unenforceable provisions in the agreement is established contract law in the United States and should be applied as maritime law in this case.

This principle is particularly applicable to the parties' separate obligations to indemnify each other for the contractual indemnity obligations with respect to the pertinent category of indemnified expense or loss. In short, without regard to Transocean's conduct, BP remains obligated to indemnify and hold Transocean harmless from the claims of Cameron and others based on Transocean's commitment to indemnify them for underwater pollution and loss of reservoir claims and expenses resulting from a well blowout.

## II.     The Drilling Contract Allocates Pollution and Other Liability and Expense to BP

The Court is already thoroughly conversant with the risk allocation terms of the Drilling Contract from its resolution of insurance issues under that agreement (Doc. 4588).

### *Reciprocal Indemnities*

Article 21 contains reciprocal indemnities for personal injury or death. Article 22 contains reciprocal indemnities concerning the respective property of BP and Transocean.

### *Loss of Hole or Reservoir*

Article 23 addresses (in all caps and bold type in the original) indemnity for "**LOSS OF HOLE OR RESERVOIR**." Article 23.1 provides (in all caps and bold type in the original) that if a hole is lost, "**THE LOSS OR DAMAGE WILL BE BORNE BY**" BP as Company, and BP agreed to **PROTECT, RELEASE, DEFEND, INDEMNIFY AND HOLD**

HARMLESS" Transocean as "**CONTRACTOR FROM AND AGAINST ALL CLAIMS FOR LOSS OF OR DAMAGE TO THE HOLE.**"

Article 23.2 provides (in all caps and bold type in the original), that in the event of a blowout, BP as Company "**SHALL BEAR THE ENTIRE COST**" of well control and "**PROTECT, RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS**" Transocean "**FROM AND AGAINST ALL CLAIMS, SUITS, DEMANDS, AND CAUSES OF ACTION**" for the cost of well control.

Article 23.3 of the Drilling Contract provides (in all caps and bold type in the original, that BP as Company shall **PROTECT, RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS** Transocean from claims for loss of hydrocarbons or reservoir.

*Pollution*

Article 24 of the Drilling Contract addresses (in all caps and bold type in the original) indemnity for "**POLLUTION**."  As this Court recently summarized, in article 24.2, BP assumed "pollution liabilities not assumed by Transocean in Article 24.1."  (Doc. 4588, p. 41).  Article 24.1 "allocates to Transocean liabilities for pollution originating on or above the surface of the water."  *Id.*  Article 24.1 did not allocate to Transocean "pollution liabilities pertaining to subsurface oil releases from the Macondo well."  *Id.* at 40.  Inasmuch as "the Deepwater Horizon Incident entailed a subsurface release" from the Macondo well, Transocean did not assume the pollution liabilities at issue in this case.  *Id.* at 41.  Instead, "BP assumed them under" the catch-all terms of Article 24.2.  *Id.*

In conclusion, BP assumed all liabilities for subsurface oil releases from the Macondo well, the pollution liability in this case.  In particular, BP "**SHALL ASSUME FULL RESPONSIBILITY FOR**" the subsurface oil releases from the Macondo well, and

"**INDEMNIFY**" and "**HOLD**" Transocean "**HARMLESS FROM**" any liability associated with that subsurface pollution.

<u>*Meaning of All Indemnities*</u>

Section 25.1 amplifies the coverage of the language used in all the indemnity provisions as follows (and again in all caps and bold face in the original):

> **EXCEPT TO THE EXTENT ANY SUCH OBLIGATION IS SPECIFICALLY LIMITED TO CERTAIN CAUSES ELSEWHERE IN THIS CONTRACT, THE PARTIES INTEND AND AGREE THAT THE PHRASE "SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS" MEANS THAT <u>THE INDEMNIFYING PARTY SHALL</u> PROTECT, RELEASE, DEFEND, INDEMNIFY, AND <u>HOLD HARMLESS THE INDEMNIFIED PARTY OR PARTIES FROM</u> AND AGAINST <u>ANY AND ALL CLAIMS</u>, DEMANDS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES (INCLUDING REASONABLE ATTORNEYS FEES), JUDGMENTS AND AWARDS OF ANY KIND OR CHARACTER, WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF, <u>INCLUDING</u> PREEXISTING CONDITIONS, WHETHER SUCH CONDITIONS BE PATENT OR LATENT, THE UNSEAWORTHINESS OF ANY VESSEL OR VESSELS (INCLUDING THE DRILLING UNIT), <u>BREACH OF CONTRACT</u>, STRICT LIABILITY, TORT, *OR THE NEGLIGENCE OF ANY PERSON OR PERSONS, INCLUDING THAT OF THE INDEMNIFIED PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, ACTIVE, PASSIVE OR GROSS* OR ANY OTHER THEORY OF LEGAL LIABILITY AND <u>WITHOUT REGARD TO WHETHER THE CLAIM AGAINST THE INDEMNITEE IS THE RESULT OF AN INDEMNIFICATION AGREEMENT WITH A THIRD PARTY</u>.**

(Italics and underlining added.)  By reason of section 25.1, therefore, BP expressly committed in sections 23 and 24.2 to hold Transocean harmless from any claims or liability arising from any supposed "gross" negligence of Transocean and all contractual indemnity claims of third parties against Transocean arising from loss of the hole or reservoir or the subsurface pollution claims in this case.

**III.     AN INDEMNITEE'S MISCONDUCT DOES NOT VOID INDEMNITY OBLIGATIONS**

As a matter of law, the risk allocation provisions of the Drilling Contract should be fully enforced as written, including the mutual indemnity for gross negligence. Even if the mutual indemnity for gross negligence in the Drilling Contract is not enforced, the balance of the indemnity obligations are valid and should be enforced. As a matter of law, Transocean's alleged misconduct cannot void the BP indemnity obligation in its entirety.

### A. Maritime Law Requires Enforcement of Indemnity Agreements in Strict Accordance with Their Terms

Cameron agrees that the Drilling Contract is a maritime contract governed by maritime law.[1] "A maritime contract containing an indemnity agreement . . . should be read as a whole and its words given their plain meaning unless the provision is ambiguous." *Breaux v. Halliburton Energy Services, Inc.*, 562 F.3d 358, 364 (5th Cir. 2009), quoting *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 955 (5th Cir. 1984) (internal citation omitted). "'A court should construe an indemnity clause to cover all losses which reasonably appear to have been within the parties' contemplation.'" *Breaux*, 562 F.3d at 364, quoting *Foreman v. Exxon Corp.*, 770 F.2d 490, 496 (5th Cir. 1985) (internal quotations and citation omitted); *accord*, *Weathersby*, 752 F.2d at 955; *Corbett v. Diamond M Drilling Co.*, 654 F.2d 329, 333 (5th Cir. 1981).

There are admitted qualifications to these general principles under maritime law. For example, "an indemnitor is entitled to express notice that under his agreement, and through

---

1   in Grand Isle Shipyard, Inc. v. Seacor Marine , LLC, 589 F.3d 778, 787-88 (5th Cir. 2009) (en banc), the Fifth Circuit en banc majority held that, under the Outer Continental Shelf Lands Act, a court should not "apply tort analysis to determine where [a] contractual controversy arose," and overruled all of its prior holdings that had focused on "where the underlying accident occurred" to choose the law to apply to a contractual indemnity issue. This holding makes clear that, under OCSLA, choice of law for tort claims and choice of law for contractual indemnity claims are subject to different analyses. Any analysis requiring the application of Louisiana law to the underlying tort claims in this case, therefore, does not control the choice of law analysis for contract issues. Accordingly, under Grand Isle, maritime law governs indemnity issues under the maritime contracts at issue without regard to the choice of law for the underlying tort claims. Id. at 789 n.9.

no fault of his own, he may be called upon to pay damages caused solely by the negligence of his indemnitee." *Corbett*, 654 F.2d at 333.  Furthermore, maritime law requires "express notice" when "a party seeks to shift his contractual liability to indemnify a third party." *Id.*  The bolded and capitalized language of Section 25.1 of the Drilling Contract referring to negligence, gross negligence, breach of contract, and indemnification agreements easily satisfies these notice requirements.  The Fifth Circuit has repeatedly enforced agreements to transfer contractual indemnity obligations with less explicit contractual language.  *See Breaux*, 562 F.3d at 364-66; *Campbell v. Sonat Offshore Drilling, Inc.*, 27 F.3d 185 (5th Cir. 1994); *Lirette v. Popich Bros. Water Transport, Inc.*, 699 F.2d 725 (5th Cir. 1983).

### B. Under the Terms of the Drilling Contract, Transocean's Gross Negligence Could Not Invalidate BP's Indemnity

By expressly agreeing to indemnify for gross negligence, the parties made clear that gross negligence in the operation of the *Deepwater Horizon* would not constitute a material breach of the mutual indemnity obligations that would warrant a refusal to enforce the indemnity obligations.  The Fifth Circuit's decisions in *Hiern v. St. Paul Mercury Indem. Co.*, 262 F.2d 526 (5th Cir. 1959), and *General Ins. Co. of America v. Fleeger*, 389 F.2d 159 (5th Cir. 1968) do not justify a different result.

In *Hiern*, a surety who had paid surety bonds covering embezzlement sued the principal on an indemnity contract and obtained a summary judgment for the amount of the indemnified loss.  The principal claimed that he had advised the surety about wrongful diversions covered by the bonds and that the surety had assured him that it was taking action to prevent further diversions, but did not do as it had represented.  The Fifth Circuit held that the principal had properly raised a fact issue under the "general rule of law that any act on the part of

an indemnitee which materially increases the risk, or prejudices the rights, of the indemnitor, will discharge the indemnitor under the contract of indemnity," citing a Louisiana state court decision. 262 F.2d at 529 (citation omitted). It therefore reversed the summary judgment and remanded the case for further proceedings. *Id.* 530.

In this case, however, the parties expressly agreed to indemnify one another for the other's gross negligence with respect to the allocated categories of loss and damage. Any gross negligence by Transocean, therefore, cannot have increased the risk or prejudiced the rights of BP under the terms of the Drilling Contract. The general principle referenced in *Hiern* simply does not apply in the context of the risk allocation provisions of the Drilling Contract.

In *Fleeger,* the Fifth Circuit upheld a jury verdict based on the "general rule of law" announced in *Hiern*. The jury had specifically found that the indemnitee, a surety for construction contract bonds, had continued to issue bonds after receiving notice of defaults by the contractors, had thereby increased the risk of the indemnitor principal, and had not acted in good faith. 389 F.2d at 161.

Like the principle announced in *Hiern*, this holding in *Fleeger* cannot be applied in this case under the terms of the Drilling Contract. Because the Drilling Contract expressly required indemnity for gross negligence, no gross negligence committed by Transocean could have ***increased*** the risks to BP under the contract.

Neither of these cases, therefore, support the proposition that BP can avoid its indemnity obligations under the Drilling Contract on the theory that Transocean committed gross negligence.

### C. As a Matter of Maritime Law, the Mutual Agreement to Indemnify for the Gross Negligence of the Indemnity Should Be Enforced

To be sure, the Fifth Circuit has suggested in dicta that an indemnity covering gross negligence is unenforceable. *Becker v. Tidewater, Inc.*, 586 F.3d 358, 367 (5th Cir. 2009). Because the Fifth Circuit has never reached or upheld a finding of gross negligence in an indemnity case, however, it has never actually **held** such a provision to be void and unenforceable. *See id.*; *Houston Exploration Co. v. Halliburton Energy Services, Inc.*, 269 F.3d 528, 531 (5th Cir. 2001); *Todd Shipyards Corp. v. Turbine Service, Inc.*, 674 F.2d 401, 410-11 (5th Cir. 1982). Moreover, the *Houston Exploration* case was decided under Louisiana law and therefore referenced a Louisiana statute governing indemnity agreements. 269 F.3d at 531 nn. 5 and 6. The dictum in *Becker* merely cites the decision in *Houston Exploration* without explaining why maritime law would or should blindly follow a Louisiana code provision. And *Todd Shipyards* involved a "red letter" clause providing for complete exculpation for negligence, not an indemnity agreement, and certainly not the allocated indemnity of the type contained in the Drilling Contract. No maritime decision has ever addressed the indemnity issue in the context of OPA.

The Ninth Circuit has held that a "red letter" clause relieving a party of any liability for gross negligence is unenforceable. *See Royal Ins. Co. of America v. Southwest Marine*, 194 F.3d 1009, 1015-16 (9th Cir. 1999). In doing so, however, the Ninth Circuit commented that it had previously "weighed the policy considerations," and held that except in towing contracts, "exculpatory clauses are enforceable even when they completely absolve parties from liability for negligence." *Id.* at 1014 (citation omitted). And according to the *Southwest Marine* panel, the goal of simplicity and predictability for maritime legal principles counsel in favor of a result that does not require the difficult task of drawing the line between

simple and gross negligence. *Id.* at 1015, citing *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 631-32 (1959). In addition, "the policy that originally led the Ninth Circuit to enforce exculpatory provisions in ship repair contracts – freedom of contract – weighs in favor of extending the unqualified exculpatory provisions in these contracts to gross negligence." *Id.* at 1015 (citation omitted). The *Southwest Marine* panel nevertheless followed what then appeared to be the weight of authority with respect to fully exculpatory "red letter" clauses in refusing to permit complete relief from liability for gross negligence. *Id.* at 1016 (citations omitted).

Like the Ninth Circuit, the Fifth Circuit has not hesitated to uphold red letter clauses providing complete exculpation for a party's simple negligence. *See Todd Shipyards*, 674 F.2d at 410. "This exception to the ancient principle that a party may not immunize himself from the consequences of his own negligence is predicated on the consideration that businessmen can bargain over which party is to bear the risk of damage and set the price accordingly." *Jig the Third Corp. v. Puritan Marine Ins. Under. Corp.*, 519 F.3d 171, 176 (5th Cir. 1975) (citations omitted). It has therefore become the "general rule" that exculpatory clauses between "parties of relatively equal bargaining power" are valid. *Id.* (citations omitted).

The key question in this instance, therefore, is whether public policy concerns trump freedom of contract with respect to the mutual gross negligence indemnities in the Drilling Contract. As noted, no Fifth Circuit holding answers that question.

The Supreme Court has established how a court should proceed to determine the correct maritime rule in these circumstances. In the absence of a relevant statute, a court may proceed to "fashion the rule that will best answer the question presented." *McDermott, Inc. v. AmCLYDE*, 511 U.S. 202, 207 (1994); *see East River SS Corp. v. Transamerica Delaval, Inc.*,

476 U.S. 858, 864 (1986). Cameron submits, therefore, that this Court should fashion the rule that will best answer whether BP and Transocean should be allowed to indemnify one another for gross negligence in accordance with the express terms of the Drilling Contract.

The identified premise for refusing to enforce indemnities for gross negligence is deterrence of "moral hazard." It is founded on "the policy against enforcement of contracts that encourage wrongdoing." G. GIESEL, CORBIN ON CONTRACTS §§ 85.17, at 443 (REV. ED. 2003) ("CORBIN"). However, in "this time of liability insurance that indemnifies for the act of the insured or employees of the insured, the question of the impact of [this] public policy has become much less transparent than in earlier times." *Id.*

The policy considerations weighing in favor of upholding indemnity for gross negligence are the same as those supporting enforcement of red letter clauses: freedom of contract to allow sophisticated businesses to allocate risks in the most efficient manner and the simplicity and practicality of a rule that does not distinguish between simple and gross negligence. As a general proposition, "[b]alancing these competing interests is difficult." 8 WILLISTON ON CONTRACTS § 19:20 (4th Ed.) (Doc. 4457-53, p. 1 of 73).

Cameron submits, however, that the terms of the Drilling Contract do not pose a difficult question. Unlike a red letter clause providing complete exculpation for gross negligence, the allocated indemnity for gross negligence in the Drilling Contract leaves each of the parties exposed to significant loss occasioned by their own gross negligence. Even if BP honors its full indemnity commitment, Transocean remains responsible for injuries and death suffered by its own employees and invitees, for surface pollution, and for damage and loss of its own property. These costs are the more significant costs incurred in most offshore drilling casualties. Indemnity of Transocean for its own gross negligence with respect to the property of

BP and oil spills merely reflects a rational allocation of risks to the party that can bear the financial risk of such an extraordinary event.  Furthermore, the limited indemnity of the Drilling Contract is no more of an encouragement to wrongdoing than would be an enforceable "red letter" clause exculpating Transocean for all liability for *all* costs and expenses based on simple negligence.  It is certainly impossible to imagine that BP intended to encourage wrongdoing by Transocean by agreeing to indemnify for Transocean's gross negligence.

By contrast, given the allocation of risks to both parties in the Drilling Contract, the policy considerations favoring enforceability of the gross negligence indemnity are overwhelming.  Vaster and R&B Falcon – BP and Transocean – are sophisticated businesses. They know better than any court how to allocate risks among themselves in the most efficient way.  Maritime law favors certainty in contractual obligations, not resort to complex litigation. Any alteration of that risk allocation deprives Transocean of important consideration under the Drilling Contract.  And public policy hardly supports giving BP the windfall it would receive if it were relieved of its contractual commitment to cover all liability and costs in the specified categories.

For these reasons, the mutual agreement to indemnify for gross negligence in the Drilling Contract – under which BP is to indemnify and hold Transocean harmless with respect to loss of reservoir, loss of well, well containment and subsurface pollution from the Macondo well – should be enforced as written.  Transocean's conduct cannot void the indemnity in any respect.

### D.  The Pollution Indemnity Is Fully Enforceable Under OPA

As noted above, the Court acting as an admiralty court is free to determine the best rule in these circumstances only in the absence of a controlling statute.  The Supreme Court

- 13 -

1076585v.1

has admonished that "an admiralty court must be vigilant not to overstep the well-considered boundaries imposed by federal legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 27 (1990). When Congress has spoken, "its judgment must control." *Atlantic Sounding Co. v. Townsend*, 129 S. Ct. 2561, 2572 (2009). And the "reasoning of *Miles* remains sound." *Id.* Accordingly, "an admiralty court should look primarily to . . . legislative enactments for policy guidance" in determining the proper rule of maritime law. *Id.*, quoting *Miles*, 489 U.S. at 27; *accord*, *Exxon Shipping Corp. v. Baker*, 128 S. Ct. 2605, 2631 n.21 (2008). Therefore, in order to determine whether the risk allocation provisions of the Drilling Contract are enforceable as a matter of public policy, a court must look first and foremost to the most pertinent legislation underlying the agreed allocation of risks.

With respect to the pollution indemnities in the Drilling Contract, that legislation is OPA. And the provisions and policies of OPA require enforcement of the Drilling Contract pollution risk allocation provisions as written.

Under OPA, Transocean is a "responsible party" because of its ownership and operation of the *Deepwater Horizon* as a vessel. 33 U.S.C. § 2701(32)(A). BP and its co-lessees are "responsible parties" because they are lessees under an OCS lease and therefore responsible for the Macondo well as an "offshore facility." *Id.* § 2701(32)(C). OPA makes the defined "responsible parties" liable for designated oil spill costs and expense "notwithstanding any other provision or rule of law." *Id.* § 2702(a).

Congress consciously made the OCS lessee/well operator liable "to bear the full and complete cost of cleanup" for the very reason that those engaged in OCS operations would be financially capable of dealing with high volume offshore oil spills. *See* S. REP. 101-94, 101ST CONG., 1ST SESS., 1990 U.S.C.C.A.N. 722, 748-49 (additional views of Senators Chafee,

Lieberman, Graham, and Durenberger). Consistent with this policy, the liability limits imposed by OPA for the *Deepwater Horizon* as a mobile offshore drilling unit are divided between an initial amount applicable to a "tank vessel," *id.* § 2704(b)(1), and all excess liability up to the limit, which is allocated to the MODU as an "offshore facility" *id.* § 2704(b)(2). And then, in its very next provision, OPA removes those liability limits for a responsible party "if the incident was proximately caused by . . . gross negligence or willful misconduct." *Id.* § 2704(c).

After establishing this comprehensive liability scheme, Congress specifically addressed indemnity agreements with respect to that liability. "Nothing in this Act prohibits any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this Act." 33 U.S.C. § 2710(a). In other words, it was the policy decision of Congress not to forbid indemnity for "any liability under this Act." And as noted, that "liability under" OPA for which indemnity agreements are permitted explicitly included, in § 2704(c), liability "based on gross negligence or willful misconduct."

OPA was passed in 1990. When the Drilling Contract agreed to in 1998, the parties clearly understood that the Contract's allocation of pollution risks mirrored OPA's liability scheme and that OPA fully validated the Contract's indemnity agreements. The provisions of the Drilling Contract shifting all OPA liability for surface pollution to the OPA "responsible party" that owns and operates the drilling unit, while shifting all OPA liability for subsurface pollution to the OPA "responsible party" that is an OCS lessee drilling an oil well as an "offshore facility," transparently fulfill the "policy guidance" in OPA. The public policy established in OPA, therefore, requires enforcement of such an agreement as written. Under OPA, the gross negligence indemnity is valid with respect to all claims for OPA recovery and oil spill damages.

### E. Even if the Gross Negligence Indemnity Is Unenforceable with Respect to Some or All Covered Claims or Expenses, the Remainder of the Indemnity Obligations Are Fully Enforceable

It has long been the law of the Supreme Court that the invalidity of one part of a contract on grounds of public policy generally leaves the remainder of the contract valid and enforceable. *McCullough v. Virginia*, 172 U.S. 102, 113-16 (1898). Relying on centuries of common law precedent, the Court reaffirmed "that the bad parts do not affect the good. The valid may be enforced." *Id.* at 115, quoting *Gelpcke v. City of Dubuque*, 68 U.S. (1 Wall.) 221, 222 (1864).

This is the point of sections 183 and 184 of the RESTATEMENT (SECOND) OF CONTRACTS ("RESTATEMENT"); *see* CORBIN §§ 89.4-89.7 (discussing sections 183 and 184). Even if one part of an agreement is held unenforceable, a court "may nevertheless enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange." RESTATEMENT § 184(1). In this case, the mutual "gross negligence" indemnity cannot be deemed an essential part of the total exchange of rights and responsibilities under the Drilling Contract. Under section 184(1), to "engage in serious misconduct" prohibiting resort to § 184(1) means to engage "in such serious misconduct that the entire agreement is unenforceable." RESTATEMENT § 184, Comment a. The operational terms of the Drilling Contract were in fact performed by both parties – the *Deepwater Horizon* was constructed and then operated to drill wells. When there is such mutual performance, there is "no injustice in permitting the party to abandon the improper promise and to enforce the other one." CORBIN § 89.7 at 640.

In addition, a "court may treat only part of a term as unenforceable under the rule stated in Subsection (1) if the party who seeks to enforce the term obtained it in good faith and in accordance with reasonable standards of fair dealing." RESTATEMENT § 184(2). Inasmuch as the risk allocation provisions of the Drilling Contract were largely reciprocal, and the provisions of section 25.1 were entirely mutual, there is no basis for BP to contend that those provisions were not obtained in good faith or in accordance with reasonable standards of fair dealing.

Illustration 2 of section 184 contains an example that, although involving exculpatory clauses, is right on point. "A and B make an agreement for A to repair B's building under which B promises not to hold A liable for a 'willful or negligent breach of duty.' The provision is fairly bargained for. Although part of B's promise is unenforceable on grounds of public policy (§ 195), it is enforceable with respect to negligence."

Under these principles, which should be unhesitatingly adopted as a matter of maritime law, any failure to enforce the indemnity for gross negligence against BP should leave the remainder of BP's indemnity obligations fully enforceable.

### F. BP's Agreement to Indemnify Transocean for Transocean's Contractual Indemnity Obligations Relating to Covered Claims and Expenses Is Fully Valid and Should Be Enforced Without Regard to Transocean Misconduct

With respect to the categories of its indemnity obligations – loss of hole, loss of reservoir, containment costs, and pollution liability and expense – BP unambiguously agreed to indemnify Transocean for Transocean's contractual indemnity obligations. (Doc. Drilling Contract art. 25.1 (all indemnities provide protection against claims for "**BREACH OF CONTRACT**, . . . **WITHOUT REGARD TO WHETHER THE CLAIM AGAINST** [Transocean] **IS THE RESULT OF AN INDEMNIFICATION AGREEMENT WITH A**

**THIRD PARTY**.")   Based on this explicit notice, this agreement is entirely valid and enforceable under maritime law.  *See Breaux*, 562 F.3d at 364-66 (upholding summary judgment of indemnity for contractual obligation).   And this provision of the Drilling Contract unambiguously covers Transocean's contractual indemnity obligations to Cameron (*see* Doc. 4524-1, pp. 6 and 8).

Based on the principles outlined in the foregoing section, this BP agreement to indemnify Transocean for its contractual indemnity commitments is fully enforceable without regard to Transocean's misconduct or the enforceability of the separate BP indemnity for gross negligence.  This makes perfect sense.  The issue under Transocean's contractual commitment to Cameron is indemnity for Cameron's potential liability, and thus for an allocated share of losses allegedly *attributable to Cameron*.  Neither this alleged Cameron liability nor the related indemnity by Transocean have anything to do with Transocean's liability, or the related indemnity by BP, for the losses allegedly *attributable to Transocean* based on gross negligence.

For this reason, BP's obligation to indemnify Transocean and hold it harmless from Cameron's claim for indemnity under Cameron's contracts with Transocean is fully valid and enforceable without regard to the misconduct of Transocean.  As Cameron's pending motion for summary judgment explains (Doc. 4524), Cameron in turn is entitled to contractual indemnity from Transocean.

1076585v.1

Respectfully submitted,

David J. Beck, T.A.
    dbeck@brsfirm.com
Joe W. Redden, Jr.
    jredden@brsfirm.com
David W. Jones
    djones@brsfirm.com
Geoffrey Gannaway
    ggannaway@brsfirm.com
BECK, REDDEN & SECREST, L.L.P.
One Houston Center
1221 McKinney, Suite 4500
Houston, TX  77010-2010
713-951-3700
713-951-3720 (fax)

and

*/s/ Phillip A. Wittmann*
Phillip A. Wittmann, 13625
    pwittmann@stonepigman.com
Carmelite M. Bertaut, 3054
    cbertaut@stonepigman.com
Keith B. Hall, 24444
    khall@stonepigman.com
Jared Davidson, 32419
    jdavidson@stonepigman.com
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
504-581-3200
504-581-3361 (fax)

**ATTORNEYS FOR CROSS-DEFENDANT COUNTER-PLAINTIFF CAMERON INTERNATIONAL CORPORATION**

1076585v.1

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Brief of Cameron International Corporation in Support of Transocean's Motion for Partial Summary Judgment on BP's Indemnity Obligations has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 22nd day of November, 2011.

                                                */s/ Phillip A. Wittmann*
                                                Phillip A. Wittmann