# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois  60654

Andrew Langan, P.C.
To Call Writer Directly:
(312) 862-2064
andrew.langan@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

November 22, 2011

Via E-Mail (Sally_Shushan@laed.uscourts.gov)

Contains Information Designated
Confidential Under The Protective Order

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the
  Eastern District of Louisiana
500 Poydras Street, Room B-345
New Orleans, LA 70130

      Re:    In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, MDL No. 2179.

Dear Judge Shushan:

      BP submits this short letter in support of its request to strike Halliburton's untimely designation of Roland Chemali as an expert witness.  BP simply seeks to enforce the Court's orders to prevent Halliburton from untimely converting Mr. Chemali's criticisms of Richard Strickland's analyses into a second petrophysics opinion.

      Halliburton's petrophysics expert, Dr. Strickland, submitted an initial report on October 17, 2011 supporting Halliburton's M57B claims.  Since that disclosure, BP elicited testimony from Mr. Chemali, Chief Petrophysicist for Sperry Drilling, that undermines the credibility of Dr. Strickland's opinions.  For example, Mr. Chemali testified that a reasonable petrophysicist would have identified certain hydrocarbon zones above the M57B sand (which Dr. Strickland did not do).  Ex. D (Chemali Dep.) at 171:21-172:3.  As such, Halliburton disclosed Mr. Chemali not to rebut BP's experts but to preserve its ability to present alternative petrophysics opinions at trial.  The Court's expert schedule was intended to prevent parties from shifting theories.

      There is nothing "ironic" about BP requesting the Court to strike an untimely-designated expert witness.  BP will be prejudiced by Halliburton's late designation as it has focused on developing evidence to rebut Dr. Strickland's timely-disclosed opinions and not Mr. Chemali's undisclosed opinions.  Among other things, BP was denied the opportunity to examine Mr. Chemali on his opinions at his deposition.  Further, Halliburton's counsel refused to allow BP to re-examine Mr. Chemali on the allegedly expert opinions that it elicited after BP's examination.

**KIRKLAND & ELLIS LLP**

The Honorable Sally Shushan
November 22, 2011
Page 2

In its opposition to BP's request, Halliburton attempts to argue that Mr. Chemali is a true rebuttal witness to BP's affirmative and rebuttal witnesses. This *post hoc* explanation fails for two reasons. First, Chuck Schoennagel and Fred Sabins are not affirmative witnesses on petrophysics or Halliburton's claims relating to the M57B sands—the subjects of Mr. Chemali's Rule 26 disclosure. And, a closer examination of Halliburton's arguments against Mr. Chemali's deposition testimony reveals that Mr. Chemali is not even qualified to opine on the topics identified by Halliburton in Mr. Schoennagel's and Mr. Sabins's reports. Second, the Court should not give credence to Halliburton's argument that Mr. Chemali will rebut two BP rebuttal witnesses whose reports were served contemporaneously with Mr. Chemali's expert disclosure.

Tellingly, Halliburton identified the affirmative opinions that its rebuttal experts were rebutting in its other rebuttal disclosures—but Mr. Chemali's disclosure lacks this information. Halliburton's *post hoc* explanations in its opposition should be rejected as Mr. Chemali is unquestionably an affirmative expert witness untimely designated. As such, Halliburton's designation of Mr. Chemali should be struck or Mr. Chemali should be required to sit for another deposition on his late-disclosed expert opinions that are inconsistent with Dr. Strickland's opinions.

I. **BP's Affirmative Expert Witnesses Do Not Opine on the Subjects of Mr. Chemali's Proffered Rebuttal Testimony and, Even If They Did, Mr. Chemali Does Not Have the Expertise to Rebut Those Opinions.**

Halliburton argues that Mr. Chemali was designated to rebut the opening reports of Mr. Schoenagel and Mr. Sabins. This assertion is false. As a preliminary matter, Mr. Schoenagel's and Mr. Sabins' initial reports do not expressly address the M57B sand—as Halliburton admits by its silence. Second, as described below, Mr. Chemali admits that he does not have the expertise to rebut these opinions relating to MMS regulations and cementing, and his opinions go far beyond the scope of any purported rebuttal.

Frank Schoennagel is the former Deputy Regional Director of the MMS Gulf of Mexico Region with responsibility for regulating all activities conducted by the offshore oil and gas industry in the GOM. He does not purport to be an expert in petrophysics and does not opine on the petrophysics of any sand interval in the Macondo Well. Despite that, Halliburton argues that Mr. Chemali rebuts Mr. Schoennagel's opinions:

**KIRKLAND & ELLIS LLP**

The Honorable Sally Shushan
November 22, 2011
Page 3

### A. *Chemali Rebuts Shoennagel's Conclusion.*

On October 17, 2010, BP submitted Schoennagel's expert report, in which he avows that a hydrocarbon bearing zone under the MMS regulations only includes producible intervals and does not include "all stringers identified in the wellbore" (such as the M57B). (Schoennagel Report 10/17/11 at p. 27, Ex. D). Chemali is expected to rebut this conclusion and testify that even so-called "stringers," or smaller hydrocarbon zones, such as those identified by BP above 17,900 feet should be included as hydrocarbon bearing zones. (Ex. C). Likewise, from both an economic and safety perspective, these smaller hydrocarbon zones should also be considered during the cement job design process. (*Id.*).

Among other things, Mr. Schoennagel provides his expert opinion on the cementing requirements in the MMS regulations that he was responsible for applying in the Gulf of Mexico. In particular, Halliburton focuses on his opinion on how a "hydrocarbon-bearing zone" should be construed based on historic usage and MMS practice. HESI Opp., Ex. D at 27. Mr. Chemali has no basis to rebut this opinion. Specifically, Mr. Chemali testified that he has never communicated with the MMS (or BOEMRE) on what constitutes a "hydrocarbon-bearing zone" and has never consulted with anyone at Halliburton on whether to cement such zones:

> **Q:** Have you ever had any communications with the MMS or BOEMRE concerning what constitutes a hydrocarbon-bearing zone?
> **A:** No, sir.
> **Q:** Have you ever had communications with any operator, whether it's Chevron or Exxon or BP, about what constitutes a hydrocarbon-bearing zone?
> **A:** No, sir. (Chemali Dep. at 49:17-21.)
>
> **Q:** In all your time at Halliburton, has any of their cementing specialists ever consulted with you on whether or not a particular zone within a well constituted a hydrocarbon-bearing zone?
> **A:** No. No, sir. (Chemali Dep. at 50:23-51:3.)

Likewise, Fred Sabins is the president of CSI Consulting Technologies, an independent cement testing laboratory, with over thirty years of cementing experience and has chaired several API work groups and task groups relating to cement. Mr. Sabins also is not an expert is petrophysics and does not have any opinions relating to the petrophysics of the Macondo Well. Despite that fact, Halliburton argues that Mr. Chemali rebuts Mr. Sabins' opinions:

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
November 22, 2011
Page 4


### B. *Chemali Rebuts Sabins' Opinions.*

Another BP expert, Sabins, also discusses in his report what he considers to be the major hydrocarbon bearing zones and why he believes that they were covered by the top of cement in the final cement job on the Macondo well. Specifically, Sabins concludes in his report that the final cement job covered the "three major hydrocarbon producing zones from 18,051' to 18,233' and thus it was the slurry design and not the location of the slurry that allowed the hydrocarbon flow to enter the well." (Sabins Report 10/17/11 at pp. 41-42, 67, Ex. E). Sabins further asserts "with reasonable scientific certainty" that, despite the top of cement being set at 17,300 feet (therefore not addressing the M57B zone), the "hydrocarbon zones were covered with cement at the conclusion of the cement operation." (*Id.* at pp. 42, 74). Contrary to Sabins' conclusion, Chemali is expected to opine that all potential hydrocarbon zones were not covered by cement. (Ex. C).

Among other things, Mr. Sabins reviewed the data in this case and provided his expert opinion that the failure of the cement was caused by Halliburton's unstable cement slurry design and not by placement of the cement. In particular, Halliburton focuses on Mr. Sabins' evaluation of the relief well data and the cement job data to conclude that the top of cement was likely placed near designed parameters and thus the hydrocarbon zones that were the target of the cement job (*i.e.*, the three hydrocarbon zones from 18,501 feet to 18,233 feet) were covered with cement. HESI Opp., Ex. E at 41-42, 67. But Mr. Chemali fares no better as cement expert, and has no basis to rebut this opinion. Mr. Chemali testified that he "do[es]n't understand what goes on into designing a cement job," has "[n]o idea whatsoever" about cementing procedures, and only learned post-incident about how much cement should be placed over the hydrocarbon zones:

> **Q:** In performing the analysis or the interpretation, do you ever report that to the Halliburton cementing side of Halliburton for purposes of them designing a cement job?
> **A:** I was never asked to do it, and I never volunteered to do it because **I don't understand what goes on into designing a cement job**.
> (Chemali Dep. at 179:14-22 (emphasis added)**.)**
>
> **Q:** Have you — do you have any experience with the cementing process?
> **A:** No.
> **Q:** Are you familiar at all with Halliburton's cementing procedures?

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
November 22, 2011
Page 5

>    **A:** No.
>    **Q:** What about BP's cementing procedures?
>    **A:** No idea whatsoever.
>    (Chemali Dep. at 185:16-24.)
>
>    **Q:** In your opinion, what is the importance of identifying potential hydrocarbon-bearing zones? Why is that important?
>    **A. I'll be honest with you. Before this happened, I did not know about the — the rule of having a certain distance between hydrocarbon zone and top of cement**. I learned it through my conversation with Jeff Moss or through the conversation since Macondo. I did not know that there was a rule about highest hydrocarbon zone and top of cement.
>    (Chemali Dep. at 224:12-25 (emphasis added).)

In his own "honest" words, Mr. Chemali is a man who has no experience interpreting what a "hydrocarbon-bearing zone" is under the MMS regulations and does not understand what goes into a cement job. Mr. Chemali is not an MMS expert or a cement expert—whether rebuttal or otherwise.

Further, as can be easily discerned from Mr. Chemali's disclosure, the scope of his proffered testimony is not limited to rebutting Mr. Schoennagel's MMS opinions or Mr. Sabins' cement opinions (if Mr. Chemali is able to rebut those opinions at all). Among other petrophysics opinions, Mr. Chemali is designated to "testify that *a reasonable petrophysicist* would have identified at least four zones above 17,900 feet as being potential hydrocarbon bearing zones." BP Motion, Ex. C at 2. Mr. Chemali is also designated to testify that "the M57B zone located at 17,467 feet in the Macondo well is a hydrocarbon bearing zone that *should have been considered by BP petrophysicists* after examining the triple combo well logs obtained from Schlumberger prior to the cementing of the Macondo well" and that "*a reasonably prudent petrophysicist*, after examining the Schlumberger wireline logs, would have noted the M57B zone." BP Motion, Ex. C at 3.

There is no getting around the reality that Mr. Chemali is an untimely designated affirmative expert witness on petrophysics whose testimony Halliburton has attempted to shoehorn into a rebuttal disclosure to avoid being struck. He was not a rebuttal expert when disclosed on November 7th, and he does not become a rebuttal expert by virtue of Halliburton's arguments. BP's request to strike Mr. Chemali—or in the alternative, to depose him as an expert—should be granted.

**KIRKLAND & ELLIS LLP**

The Honorable Sally Shushan
November 22, 2011
Page 6

II. **Halliburton Cannot Justify Its Late Designation by Retroactively Proffering Mr. Chemali as a "Rebuttal-Rebuttal" Expert to BP's Rebuttal Experts Who Were Simultaneously Designated.**

Halliburton's other *post hoc* explanation for Mr. Chemali's testimony—that he is offered in rebuttal to BP's rebuttal witnesses—also fails.  First, Halliburton could not have known BP's rebuttal witnesses before designating Mr. Chemali as a purported "rebuttal-rebuttal" witness: Halliburton served its Rule 26 disclosure of Mr. Chemali simultaneously with BP's service of its rebuttal witness designations.  Second, even assuming *arguendo* that Halliburton presciently designated Mr. Chemali as a rebuttal to BP's then-unknown rebuttal expert witnesses, Mr. Chemali still should not be allowed to testify because the Court's order governing expert discovery does not envision "rebuttal-rebuttal" expert witnesses.  Rec. Doc. 3216.

Halliburton's argument that Mr. Chemali is a "rebuttal-rebuttal" witness is as untenable as his designation as a rebuttal witness.  He should not be permitted to testify in either capacity at trial.[1]

II. **Halliburton's Argument About Mr. Chemali's and Dr. Strickland's Different Analyses Misses the Point.**

Halliburton spends two pages addressing "BP's argument that Chemali's testimony is cumulative of Strickland's testimony, and therefore his designation should be stricken[.]"  HESI Opp. at 3-5.  Halliburton's response misses the point.  The cumulative nature of Mr. Chemali's testimony indicates the second of the four factors the Fifth Circuit considers when determining whether to strike an untimely designated expert—the importance of the expert's testimony—supports striking Mr. Chemali.  *See Bradley v. United States*, 866 F.2d 120, 125 (5th Cir. 1989); BP Motion at 5.  In other words, Mr. Chemali's testimony is less important if it is cumulative of another Halliburton expert, Dr. Strickland.  And Halliburton concedes as much in its letter, acknowledging that "there is some overlap in the analysis provided by the two experts" before asserting that Mr. Chemali may offer additional opinions too.  HESI Opp. at 4.

---

[1]  And Mr. Chemali certainly should not be allowed to testify as an expert without sitting for deposition again as an expert witness.  Halliburton's opposition ignores BP's request to further depose Mr. Chemali as an expert—something that Halliburton's counsel agreed to at his fact deposition.  BP Motion, Ex. B at 228:15-20.  Instead, Halliburton merely asserts that "for all intents and purposes [BP] treated him as an expert witness during his deposition."  HESI Opp. at 1.  As Halliburton well knows, deposing an expert witness is a different animal than deposing a fact witness, all intents and purposes notwithstanding.  BP is already harmed if the Court allows Mr. Chemali as a rebuttal expert witness because it has lost the opportunity to develop evidence that contradicts Mr. Chemali's opinions during discovery.  That harm would be compounded if permission to depose Mr. Chemali were not granted.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
November 22, 2011
Page 7

      Halliburton's cases on the uniqueness of experts' testimony are therefore inapposite. BP does not argue that Mr. Chemali should not be allowed to testify solely because his testimony is cumulative of Dr. Strickland's. BP argues that because Mr. Chemali was untimely designated, the Court should consider the four *Bradley* factors, one of which is the importance of the expert's testimony. Here, the overlapping testimony demonstrates that Mr. Chemali's testimony is not that important to Halliburton because it can obtain the testimony from another witness. Thus, the second *Bradley* factor supports striking the late designation of Mr. Chemali.

      Further, as described above, allowing Mr. Chemali's cumulative yet different opinions would prejudice BP because it has prepared for Halliburton's M57B claims under the theories in Dr. Strickland's report and Halliburton should not be allowed to change its theories three weeks later after its expert is discredited by its own Chief Petrophysicist.

## CONCLUSION

      In its November 14, 2011 letter, BP laid out the factors the Fifth Circuit considers when determining whether to strike an untimely designated expert witness. Halliburton opposed none of BP's arguments regarding these four factors in its November 21, 2011 response. Instead, with the benefit of hindsight Halliburton constructed *post hoc* reasons that Mr. Chemali is actually a rebuttal or a "rebuttal-rebuttal" expert witness, notwithstanding the lack of affirmative expert witnesses to rebut. Halliburton's late designation of Mr. Chemali as an expert disguised as a rebuttal witness should be struck. In the alternative, BP requests an order requiring Halliburton to make Mr. Chemali available for deposition by January 13, 2012.

      Thank you for your consideration of this submission.

      Respectfully submitted,

      /s/ Andrew Langan     .

      Andrew Langan, P.C.