# EXHIBIT B

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

300 North LaSalle
Chicago, IL  60654

J. Andrew Langan P.C.
To Call Writer Directly:
(312) 862-2064
Andrew.langan@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

November 14, 2011

**Via E-Mail (Sally_Shushan@laed.uscourts.gov)**

**Contains Information Designated
Confidential Under The Protective Order**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the
  Eastern District of Louisiana
500 Poydras Street, Room B-345
New Orleans, LA 70130

Re:     **In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of
        Mexico, on April 20, 2010, MDL No. 2179.**

Dear Judge Shushan:

      BP submits this letter pursuant to Federal Rules of Civil Procedure 16, 26, and 37 to
request an order striking Halliburton's untimely Rule 26 disclosure of Roland Chemali as an
expert witness and precluding him from testifying at trial as an expert.  In the alternative, BP
requests an order requiring Halliburton to make Mr. Chemali available for deposition in January
2012.

## INTRODUCTION

      Three weeks after the deadline to submit expert reports, Halliburton untimely designated
another expert by identifying him as a rebuttal witness. But, Roland Chemali is unquestionably
an untimely designated expert for two reasons.  First, Mr. Chemali is an affirmative expert
because his proffered areas of testimony relate solely to Halliburton's cross-claim that BP
negligently failed to identify the M57B sand as a hydrocarbon zone—an issue on which
Halliburton carries the burden of proof.  Second, Mr. Chemali is not a rebuttal expert because *no
party* other than Halliburton submitted *any* opening expert report addressing the M57B sand.
Thus, there is simply no expert for Mr. Chemali to rebut.  Mr. Chemali's proffered testimony
should be stricken for the additional reason that it is cumulative of the proffered opinions of
another Halliburton expert, Richard Strickland, and thus, Halliburton would suffer no prejudice
if it were precluded from offering a similar opinion from Mr. Chemali.  As such, the Rule 26
disclosure of Mr. Chemali as a "rebuttal" expert witness should be stricken.

Chicago      Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
November 14, 2011
Page 2

## BACKGROUND

On October, 19, 2010, the Court issued Pretrial Order No. 11 establishing the sequence for expert discovery. Rec. Doc. 569. Pretrial Order No. 32 maintained this sequence, but modified certain dates. Rec. Doc. 1506. In the Court's July 1, 2011 Order Regarding Revised Schedule for Phase One Expert Discovery, the Court provided the PSC with additional time for the preparation of its expert reports. Rec. Doc. 3126. The Order stated in relevant part:

- October 17, 2011:  All February 2012 Trial Defendants, 14(c) Defendants, and/or Third-Party Defendants to serve expert reports.

- November 7, 2011:  Rebuttal Expert Reports for February 2012 Trial.

- November 14, 2011:  Begin depositions of Phase One Experts for February 27, 2012 trial.

- December 23, 2011:  End depositions of Phase One Experts for February 27, 2012 trial.

In the Original and First Amended Cross Claim of Defendant Halliburton Energy Services, Halliburton asserted Count III for Negligence/Gross Negligence/Willful Misconduct against the BP Defendants. Rec. Doc. 2086 (filed in 2:10-MD-02179); Rec. Doc. 445 (filed in 2:10-CV-02771). Among other things, Halliburton alleged that BP was "negligent, grossly negligent, and/or acted with willful misconduct" by "[f]ailing to exercise ordinary and reasonable care in connection with its drilling design and operations." *Id.* ¶ 45(a). In its September 1, 2011 motion for leave to file a second amended cross claim, Halliburton argued that its operative complaint already included a negligence claim for BP's alleged failure to identify the M57B interval. Rec. Doc. 3893 at 4 ("The facts relative to BP's failure to identify the shallower hydrocarbon-bearing zones are encompassed within HESI's already existing negligence claims against the BP Entities, although the proposed amended cross-claim more specifically states these factual bases for BP's negligence and gross negligence."). After briefing by the parties, the Court denied Halliburton's motion on October 10, 2011. Rec. Doc. 3893. On October 25, 2011, Halliburton filed a motion for reconsideration of the Court's order. Rec. Doc. 4396.

Pursuant to the October 17, 2011 deadline for initial expert reports, Halliburton served nine expert reports on its affirmative issues. Among the nine Halliburton reports, the expert report of Richard Strickland purported to analyze the nature of the sand intervals for the final section of the Macondo well, focusing on certain well data reflecting the petrophysical properties

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
November 14, 2011
Page 3

of zones above 17,900 feet. *See* Ex. A (Expert Report of Richard Strickland (exhibits and appendices omitted)). In his report, Dr. Strickland opines on what a "hydrocarbon bearing zone" is and whether BP mistakenly identified the shallowest hydrocarbon bearing zone at 17,803 feet (instead of the M57B interval at 17,467 feet). *Id.* at 9, 43. As BP did not carry the burden of proof on Halliburton's negligence claims, it did not submit an affirmative expert report in October on the M57B sand. On November 7, 2011, BP submitted the Expert Report of Richard Lee, Larry Lockard, and Leif Colson to rebut the allegations in Dr. Strickland's report.

After the deadline to disclose affirmative experts, Roland Chemali, Halliburton's Chief Petrophysicist, was deposed at BP's request on November 3, 2011. Mr. Chemali testified as a fact witness on certain technical topics, including his personal interpretation of the M57B sand. *See* Ex. B (Roland Chemali Dep.) at 150-52, 195. Because Halliburton had not disclosed that Mr. Chemali was an expert witness, BP did not examine him on any expert opinions. After BP's examination, Halliburton solicited opinions from Mr. Chemali on its re-direct examination. BP counsel immediately asked whether Halliburton intended to tender Mr. Chemali as an expert. Halliburton counsel declined to disclose whether Halliburton would designate him. Ex. B at 228:4-24. BP, therefore, requested the opportunity to re-examine Mr. Chemali immediately on the expert opinions Halliburton had solicited, and reserved the right to depose him again should Halliburton later designate Mr. Chemali as an expert witness. *Id.* Halliburton acquiesced to the latter request and agreed that BP could reserve the right to re-depose Mr. Chemali if he was designated as an expert. *Id.*

Four days after Mr. Chemali's deposition, Halliburton served a Rule 26 disclosure designating Mr. Chemali as a "rebuttal" expert regarding the nature of the sand intervals for the final section of the Macondo well, particularly zones above 17,900 feet including the M57B. *See* Ex. C (Halliburton Rule 26 Disclosure) at 2-3. Halliburton's disclosure does not—because it cannot—identify any expert whose opinions Mr. Chemali rebuts. Because (a) expert reports for affirmative claims were due on October 17, 2011, (b) BP nor any other party submitted any affirmative expert relating to the M57B sand for Mr. Chemali to rebut, and (c) Mr. Chemali's proposed testimony would be cumulative of Dr. Strickland's testimony, BP files this motion to strike Halliburton's late designation of Mr. Chemali as an expert witness.

## ARGUMENT

The Federal Rules provide that when a party "fails to obey a scheduling or pretrial order," the court may prohibit the offending party from introducing the "designated matters in evidence." Fed. R. Civ. P. 16(f)(C), 37(b)(2)(A)(ii). The question of whether to exclude untimely expert testimony is left to the sound discretion of the district court. *Bradley v. United States*, 866 F.2d 120, 124-25, 127 (5th Cir. 1989) (finding district court abused its discretion in admitting

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
November 14, 2011
Page 4

untimely designated expert witness); *see also 1488, Inc. v. Philsec Inv. Corp.*, 939 F.2d 1281, 1288 (5th Cir. 1991) (finding no abuse of discretion in excluding untimely expert witness); *Geiserman v. MacDonald*, 893 F.2d 787, 790-91 (5th Cir. 1990) (same).

Four factors guide whether a court should permit the introduction of untimely expert evidence: (1) the explanation, if any, for the party's failure to identify the witness; (2) the importance of the witness's testimony; (3) the prejudice to the opposing party of allowing the witness to testify; and (4) the possibility of curing such prejudice by granting a continuance. *Bradley*, 866 F.2d at 125. Here, all four factors favor striking Halliburton's late designation of Mr. Chemali as an expert witness.

A.     **Halliburton Has No Explanation for Its Untimely Designation of a New and Cumulative Expert Witness.**

Halliburton has not offered any explanation, much less any reasonable explanation, for its untimely designation of Mr. Chemali as an expert witness. Instead, Halliburton attempts to disguise its late disclosure by designating Mr. Chemali as a purported rebuttal expert, even though no party submitted any affirmative report for Mr. Chemali to rebut. In its untimely Rule 26 disclosure, Halliburton proffers Mr. Chemali as an expert on sand intervals above 17,900 feet in the Macondo well and the criteria a reasonably prudent operator would consider for determining a hydrocarbon zone. *See* Ex. C at 2. "Mr. Chemali is expected to testify concerning his belief that BP was reckless in failing to identify and account for the shallow M57B gas zone located at a depth of 17,467 feet." *Id.* In addition, Mr. Chemali will opine on "the manner in which hydrocarbon bearing zones in a well such as Macondo are identified and treated by operators such as BP," and the belief "that the M57B zone located at 17,467 feet in the Macondo well is a hydrocarbon bearing zone that should have been considered by BP petrophysicists after examining the triple combo well logs obtained from Schlumberger prior to the cementing of the Macondo well." *See id.* at 2-3.

These subject areas of testimony clearly relate to Halliburton's claim for negligence, gross negligence, or willful misconduct against BP. The date by which Halliburton was required to identify its affirmative experts passed three weeks before Halliburton served its Rule 26 disclosure of Mr. Chemali as a "rebuttal" expert witness. *See* Rec. Doc. 3126.

Moreover, Halliburton should not be heard to argue that its untimely disclosed expert is offered in rebuttal because BP nor any other party proffered any affirmative experts relating to the M57B sand. Halliburton admits as much in that its Rule 26 disclosure fails to identify the affirmative expert or opinion that Mr. Chemali will rebut. As such, Mr. Chemali is "rebutting" a nonexistent expert witness. He is plainly a late-designated expert witness disguised as a rebuttal

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
November 14, 2011
Page 5

witness.  Because Halliburton has not, and cannot, offer any reasonable justification for its untimely designation, its "rebuttal" expert disclosure of Mr. Chemali should be stricken.  *See Bradley*, 866 F.2d at 125.

> **B.**     **Mr. Chemali's Expert Testimony Is Duplicative of Halliburton's Expert Richard Strickland.**

The second *Bradley* factor regarding the importance of the late-disclosed expert's testimony supports striking Mr. Chemali as an expert witness.  *See Bradley*, 866 F.2d at 125. Not only is Mr. Chemali untimely disclosed, but his proffered testimony is also cumulative of the report submitted by Halliburton expert Richard Strickland.  Halliburton will suffer no prejudice without Mr. Chemali's testimony because it has already designated another expert, Dr. Strickland, to address issues relating to interpretation of the M57B sand.  *See* Ex. A at 3-6 (Executive Summary).

Thus, the Court should strike Halliburton's untimely designation of Mr. Chemali as an expert witness.  *See Philsec*, 939 F.2d at 1288 (finding no abuse of discretion in excluding untimely expert witnesses when plaintiff already had a different and properly designated expert witness testifying on the same subject).

> **C.**     **BP Will Be Prejudiced If Mr. Chemali Is Permitted to Testify as an Expert Witness.**

Although expert testimony typically impacts a central issue in a lawsuit, courts routinely exclude a late-disclosed expert witness where there is no legitimate explanation for the delay in making the designation, and the opposing party is prejudiced by the untimely expert designation. *See Geiserman*, 893 F.2d at 792 ("The importance of such proposed testimony cannot singularly override the enforcement of local rules and scheduling orders."); *see also Bradley*, 866 F.2d at 125-27; *Philsec*, 939 F.2d 1288-89.

The Court's July 1, 2011 Order Regarding Revised Schedule for Phase One Expert Discovery established dates governing expert discovery so that Phase 1 could proceed to trial in February 2012.  *See* Rec. Doc. 3126.  BP spent significant time and incurred substantial expense to abide by these deadlines, including serving expert reports by October 17, 2011, and expert rebuttal reports by November 7, 2011, the deadlines prescribed in the July 1, 2011 Order.  *Id.* Halliburton's late disclosure of Mr. Chemali, disguised as a rebuttal expert, prejudices BP because it was denied the opportunity to submit a rebuttal expert report responding to Mr. Chemali's opinions and was further denied the opportunity to question him about his opinions at his deposition.  In addition, the late disclosure of Mr. Chemali delays when BP will be able to

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
November 14, 2011
Page 6

discover his opinions and BP will incur time and expense preparing responses to those opinions. BP will thus be prejudiced as its resources are diverted to responding to Mr. Chemali's late expert opinions, while Halliburton and the other parties prepare for trial as the Court's July 1, 2011 Order envisioned. Halliburton should not be permitted to unilaterally rewrite the Court's Order to BP's detriment by designating an additional expert after the deadline.

### D.    A Continuance is Not Available.

The Court recently stated that "a continuance of the [Phase 1] trial is unavailable." Rec. Doc. 3893 at 2. And, no continuance is possible where numerous parties and hundreds of Court personnel, witnesses, and attorneys would be affected by Halliburton's improper late designation of an expert witness. *See Geiserman*, 893 F.2d at 792 (a continuance "would not deter further dilatory behavior, nor serve to enforce local rules or court imposed scheduling orders").

If the Court is not inclined to strike Mr. Chemali as an untimely disclosed expert witness, BP requests that the Court order Halliburton to make Mr. Chemali available for deposition in the first part of January 2012. Halliburton has already agreed to do so if he were designated as an expert when it became clear on direct examination at Mr. Chemali's November 3, 2011 deposition that Halliburton intended to solicit expert opinions from him: "MR. LANCASTER: If you are, then I want to cross-examine him now off the topics you read. If you're—if you're going to do it later, then I'll reserve the opportunity for when you tender him as an expert. MR. BOWMAN: You—you can reserve." Ex. B at 228:15-20.

## CONCLUSION

Under the guise of a rebuttal designation, Halliburton attempts to circumvent the expert-discovery deadlines prescribed in this case for all parties. But Mr. Chemali is by no definition a rebuttal witness. His testimony relates solely to the M57B sand issue in Halliburton's affirmative cross-claim, which is not the subject of any other party's affirmative expert reports. The deadline for affirmative expert reports passed three weeks before Halliburton disclosed Mr. Chemali as an expert. Under well-settled Fifth Circuit law, the designation of Mr. Chemali as an expert witness should be stricken. In the alternative, BP seeks an order requiring Halliburton to make him available for deposition in the first part of January 2012.

**KIRKLAND & ELLIS LLP**

The Honorable Sally Shushan
November 14, 2011
Page 7

Thank you for your consideration of this submission.

Respectfully submitted,

/s/ J. Andrew Langan

J. Andrew Langan

**EXHIBIT C**



Nov 7 2011
11:18PM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG | § | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the GULF OF | § | SECTION:  J |
| MEXICO, on APRIL 20, 2010 | § | |
| | § | JUDGE BARBIER |
| This Document Relates To: | § | |
| ALL CASES  0-2771 | § | MAG. JUDGE SHUSHAN |

**DEFENDANT HALLIBURTON ENERGY SERVICES, INC.'S DISCLOSURE**
**OF NON-RETAINED REBUTTAL EXPERT WITNESS NOT REQUIRED**
**TO PROVIDE A WRITTEN REPORT**

Defendant Halliburton Energy Services, Inc. ("Halliburton"), by and through its attorneys, Godwin Ronquillo P.C., and pursuant to Fed. R. Civ. P. 26(a)(2)(C), hereby respectfully identifies the following individual who may be called to provide rebuttal expert testimony during Phase One of the February, 2012, Limitation and Liability Trial, and who is not required to provide a written report:

Roland Chemali

Mr. Chemali is the Chief Petrophysicist for Sperry Drilling.  He graduated with a degree in Engineering from the Ecole Polytechnique of Paris, France in 1966.  He earned an additional engineering degree from the French Petroleum Institute IFP in 1967 before receiving a Masters of Science in Mathematics from the Louisiana State University in 1969.  Mr. Chemali has over 40 years of experience in the design and use of downhole measurement tools that analyze the characteristics of subterranean formations.  Specifically, while at Schlumberger Mr. Chemali played a role in the development of the triple combo tool, a tool that provides simultaneous measurements of resistivity, density, and porosity, and whose measurements are at issue in this case.  Mr. Chemali also has decades of experience interpreting well logs documenting the

measurements recorded by downhole tools such as the triple combo tool. He was also a 2011 finalist considered for the World Oil Lifetime Achievement Award.

Mr. Chemali is expected to provide evidence, including opinion testimony, concerning the hydrocarbon bearing zones in the Macondo well. Specifically, Mr. Chemali is expected to testify regarding the hydrocarbon bearing zones in the well above 17,900 feet, including the zone at 17,803 feet that was identified by BP as being the shallowest hydrocarbon bearing zone in the well, and the M57B zone at 17,467 feet that expert witnesses have identified as the shallowest zone. Mr. Chemali is expected to testify that a reasonable petrophysicist would have identified at least fours zones above 17,900 feet as being potential hydrocarbon bearing zones, including three zones located above the 17,803 foot zone identified by BP petrophysicist Ms. Galina Skripnikova as being the shallowest zone in the Macondo well. Furthermore, Mr. Chemali is expected to testify concerning his belief that BP was reckless in failing to identify and account for the shallow M57B gas zone located at a depth of 17,467 feet.

Mr. Chemali is also expected to provide opinion testimony concerning the manner in which hydrocarbon bearing zones in a well such as Macondo are identified and treated by operators such as BP. For example, Mr. Chemali will testify that a reasonably prudent operator should consider hydrocarbon bearing zones from both economic and a safety perspectives. Even though some hydrocarbon bearing zones may not be capable of producing commercially viable quantities of hydrocarbons, if the zone has properties (including a sufficiently elevated pore pressure and sufficient permeability) that would enable hydrocarbons in the zone to flow into the wellbore, the zone should be isolated as a part of the operator's cement program. Specifically, Mr. Chemali will testify that any hydrocarbon bearing zone capable of producing hydrocarbon

flow (whether oil or gas) into the wellbore should not be ignored, and that ignoring such a zone, as BP ignored the M57B zone, would be highly unsafe.

Finally, Mr. Chemali is expected to testify that, after analyzing the well logs and the other available data and analyses related to the formations in the Macondo well, he believes that the M57B zone located at 17,467 feet in the Macondo well is a hydrocarbon bearing zone that should have been considered by BP petrophysicists after examining the triple combo well logs obtained from Schlumberger prior to the cementing of the Macondo well. Mr. Chemali will testify that a reasonably prudent petrophysicist, after examining the Schlumberger wireline logs, would have noted the M57B zone and would have classified it as a risk to the well and to the cement program.

This identification has been made based on the information reviewed by and available to Halliburton as of the date of this disclosure. Halliburton respectfully reserves the right to identify additional topics for Mr. Chemali's testimony based on the rebuttal reports to be served on November 7, 2011. Halliburton respectfully reserves the right to identify additional opinions and expert witnesses in rebuttal in accordance with the Court's pretrial order.

Respectfully submitted

**GODWIN RONQUILLO PC**

By:  /s/  Donald E. Godwin
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
dgodwin@GodwinRonquillo.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
bbowman@GodwinRonquillo.com
Jenny L. Martinez
State Bar No. 24013109
jmartinez@GodwinRonquillo.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
fhartley@GodwinRonquillo.com
Gavin E. Hill
State Bar No. 00796756
ghill@GodwinRonquillo.com
Renaissance Tower
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
Telephone: 214.939.4400
Facsimile: 214.760.7332

and

R. Alan York
State Bar No. 22167500
ayork@GodwinRonquillo.com
Jerry C. von Sternberg
State Bar No. 20618150
jvonsternberg@GodwinRonquillo.com
Misty Hataway-Coné
State Bar No. 24032277
mcone@GodwinRonquillo.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES, INC.**

4

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2011, a copy of the forgoing Defendant Halliburton Energy Services, Inc.'s Disclosure of Non-Retained Expert Witness Not Required to Provide a Written Report has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12.

/s/ Donald E. Godwin
Donald E. Godwin

**EXHIBIT D**

United States District Court
Eastern District of Louisiana

*In re: Oil Spill by the Oil Rig Deepwater Horizon
in the Gulf of Mexico on April 20, 2010,*
MDL No. 2179

# EXPERT REPORT OF CHUCK SCHOENNAGEL L.L.C.

## MMS Regulatory Regime

## October 17, 2011

Submitted on Behalf of BP

**CONFIDENTIAL**

**NEPA Review:**

On February, 23 2009, MMS received an Initial Exploration Plan from BP for Mississippi Canyon Block 252, Lease OCS-G 32306.[125]   On March 10, 2009, MMS deemed the plan submitted.[126]   The proposed Plan included 15 Sections covering numerous aspects of the proposal, and MMS approved the Plan on April 6, 2009.[127]

At the time I was the Deputy Regional Director (DRD) in the GOMR, the review process used by MMS for Exploration Plans in deepwater in the Central and Western Planning Areas (CWPA) of the GOM was to do Categorical Exclusion Review of Exploration Plans (EP) to satisfy the National Environmental Policy Act (NEPA) review process.   To my knowledge, no EPs submitted to MMS GOMR in deepwater in the CWPA of the GOM while I was the DRD ever resulted in MMS conducting an EA on an EP.  This process was followed by MMS DOI and reviewed by the Council on Environmental Quality in the Executive Office of the President.

As an analog, since I was the DRD, the MMS GOMR used this process for reviewing Development Operations Coordination Documents (DOCDs) in the CWPA.  However, sometime the early 2000s, the MMS GOMR decided that we needed to have additional environmental analysis on deepwater so we started to do EAs on DOCDs in the CWPA.  MMS GOMR divided the CWPA into grids and would conduct an EA on a DOCD in a particular grid until that grid was covered by an EA.  Once a grid was covered by an EA and a Finding of No Significant Impact (FONSI) was issued on the EA, the MMS GOMR would not conduct future NEPA analysis on DOCDs in that grid unless MMS GOMR decided that another EA should be conducted in that grid for a DOCD.

Therefore, in my opinion, there was no reason to expect that MMS would have initiated an EA for the Initial EP submitted by BP.

---

[125] BP-HZN-SNR-0000271-391; BP-HZN-BLY00000015.
[126] *Id.*
[127] *Id.*

**Cementing:**

Effective January 1, 1975, through OCS Order No. 2, the USGS required that when production casing is set it must fill the annular space at least 500' above the uppermost producible hydrocarbon bearing zone. Effective January 1, 1980, through a revision to OCS Order No. 2, the USGS required that when production casing is set it must fill the annular space at least 150 meters (492') above the uppermost hydrocarbon bearing zone. Subsequent revisions to the OCS Orders or the 30 CFR 250 regulations have not changed significantly from this requirement, although the regulations moved away from the metric system.

By MMS regulation at 30 CFR 250.421, the operator is required to set production casing such that it should be cemented at least 500' above the uppermost hydrocarbon-bearing zone. After reviewing the regulations, I could not find a definition for a hydrocarbon bearing zone. However, at 30 CFR 250.115 and 250.116, MMS does identify the procedures the operator must follow to determine well producibility. At 30 CFR 250.297(b), MMS requires that information must be provided in a Conservation Information Document (CID) for each hydrocarbon-bearing reservoir that is penetrated by a well that would meet the producibility requirements of 30 CFR 250.115 or 250.116. Similarly, on MMS's website concerning reporting requirements for Form MMS-125, End of Operations Report under Hydrocarbon Bearing Intervals, it requires an operator to enter all intervals in the borehole that encountered hydrocarbons that meet or exceed the qualifying criteria of 30 CFR 250.115 or 116. Based on the lack of a definition for a hydrocarbon bearing zone, but clear guidance on what needs to be reported in both the CID and Form MMS-125, I believe that the regulatory requirement for cementing 500' above the uppermost hydrocarbon bearing zone means a zone that meets the requirements of 30 CFR 250.115 or 250.116.

The regulations referenced above do not require 500 feet of cement above every stringer identified in a wellbore.

**BOP Systems:**

In testing BOP systems, the USGS/MMS required that testing be conducted on a weekly basis and at other time frames as specified by the OCS Orders or regulations. In the FRN dated June 1, 1998, MMS revised 30 CFR 250.407 to require that BOP systems must be tested when installed, before 14 days have elapsed since the last BOP test, and before drilling out each string of casing or a liner.

In setting the pressures for testing the BOP system, the USGS in 1975 required that the ram-type preventers be tested to the rated working pressure of the stack. In the January 1, 1980 revision to OCS Order No. 2, the USGS required that the BOP system should be tested to the anticipated surface pressure for the ram-type preventers with a subsequent revision on September 15, 1980, including both a definition of anticipated surface pressure and methods for calculating it. In the FRN dated April 1, 1988, the USDOI through the MMS published its final rulemaking effective May 31, 1988, including that ram-type preventers should be tested to the rated working pressure or as otherwise approved by the District Supervisor. In the FRN dated February 20, 2003, the USDOI through the MMS published its final rulemaking effective March 24, 2003, for oil and gas Drilling Operations in the OCS. Included at 30 CFR 250.448, the MMS revised the pressure testing requirements to use the MASP for testing the BOP system. In determining MASP, MMS stated in 30 CFR 250.413(f) that MASP are "the pressures that you reasonably expect to be exerted upon a casing string and its related wellhead equipment."

In my opinion, both of the above changes to frequency and pressure in testing the BOP system were made by MMS in order to lessen the wear and tear on the BOP system ram-type elements. Also, when MMS stated in 30 CFR 250.413 that the design of a well must address certain criteria, those criteria included pore pressures, drilling fluid weights, and MASP. At 30 CFR 250.413(f) it stated that "For this section, maximum anticipated surface pressures are the pressures that you reasonably expect to be exerted upon a casing string and its related wellhead equipment. In calculating maximum anticipated surface pressures, you must consider: drilling, completion, and producing conditions; drilling fluid densities to be used below various casing strings; fracture gradients of the exposed formations; casing setting depths; total well depth; formation fluid types; safety margins; and other pertinent conditions." In my opinion, if an APD had been submitted to MMS in

**EXHIBIT E**

 **CSI Technologies**

# In the United States Court for the Eastern District of Louisiana

# Oil Spill by the Oil Rig MDL No. 2179 Deepwater Horizon in the Gulf of Mexico on April 20, 2010

**Prepared on behalf of BP on October 17, 2011**

**"Evaluation of the Cementing on the 9 7/8" x 7" Production Casing String on the Macondo Well"**

**Expert Report by:**

Fred Sabins

CSI Technologies

President
Office Direct: 281-784-7902
Cellular: 713-725-3078
Email: fsabins@csi-tech.net

**CONFIDENTIAL**

In the United States Court for the Eastern District of Louisiana


Oil Spill by the Oil Rig MDL No. 2179

Deepwater Horizon in the Gulf of Mexico on April 20, 2010



Evaluation of the Cementing on the 9 7/8" x 7" Production Casing String on the Macondo Well




Expert Report of Fred Sabins


On Behalf of BP


Contains information designated Confidential under the Protective Order

sufficient to sweep channel. Subsequent testing with 3D confirms statement that spacer was sufficient."[93]

### 4.3.4   Failure of the Cement to Isolate the Hydrocarbons Was a Result of the Design of the Slurry Not its Placement in the Wellbore

Thorough and rigorous evaluation of events surrounding the design composition and placement of the cement lead to the opinion that the cause of the cement failure was the slurry design.

There are two types of hydrocarbon flow of concern after a cementing treatment. The first is short-term high-volume hydrocarbon flow. This phenomenon typically occurs within the first 24 hours after the cement is in place, when the cement is setting and well operations may be occurring. Flow can be dramatic and result in a blowout at the surface of the well.

The second type of flow, long-term hydrocarbon leakage, is dramatically different than the flow described above. This flow typically occurs days and months after the cement job, rather than hours. This flow is generally described as minor to moderate, and it manifests as flow between zones or a slow leakage of hydrocarbon flow to the surface. This flow is a result of incomplete displacement of the drilling mud in the annulus when placing the cement.[94]

Operational decisions, such as the pre-job circulation, centralization, and channeling relate to a cement job's ability to prevent long-term annular leakage. The ability of a slurry to prevent short-term cement failure, on the other hand, is determined solely by the slurry's design and the location of the slurry (whether it across from the hydrocarbon producing zones and is in the shoe track below the float collar).

---

[93] HAL_1071448 (Roth response to Badalamenti question "Halliburton your computer simulator indicated channeling, which lead to mud and cement inter mixing. However you still recommended foam cement.").

[94] Halliburton presentation "Annular Gas Migration - Solutions to Annular Gas Flow" at 5 ("Flow observed 'days' after cement is placed.  Flow volume is slight to moderate.").

### 4.3.5    Analysis of the Available Data Indicates that the Spacer Cleaned the Hole and Cement Was Placed in the Annulus

Available data from the job indicates that the top of cement was likely near designed parameters, indicating that gross channeling of drilling fluid did not occur as suggested by Halliburton's OptiCem models. In addition to the evidence of lift pressure and full returns, the intersection of the relief well with the Macondo well at 17,200 feet (only 100 feet above intended cement top) revealed that the annulus at this depth was free of cement.[95] This discovery strongly supports the conclusion that the annulus was thoroughly displaced, or at least that no significant channeling occurred. Given that no losses were reported, and no cement was found at 17,200', it can be concluded with reasonable scientific certainty that the hydrocarbon zones were covered with cement at the conclusion of the cement operation.

Much emphasis has been placed on centralization, conditioning, GFP and the potential for channeling.[96] These issues are important design parameters for cementing a well. Conducting an extensive study of the decisions relating to centralization, channeling, and conditioning leads to my opinion that these engineering design decisions had no significant impact on cement placement. Instead, based on surface pressures and evidence indicating that the flow path of hydrocarbons was through the inside of the

---

[95] Sprague 3/22 Dep. at 803-804 ("Q. Okay. Where -- where in the Macondo hole did you intercept with the DD3 relief well?  A. It was somewhere around 17,200 feet, I recall.  Q. Was that above the top of cement on the long string of casing?  A. Yes.  Q. And was it below the bottom of -- I believe it would be the 9-7/8 inch liner? A. Yes.  Q. So is that a -- a portion of open hole?  A. Yes."); September 17, 2010 Update on Gulf of Mexico MC252 Operations ("Operations conducted bottoms up circulation, which returned the contents of the well's annulus to the rig for evaluation. Testing of the drilling mud recovered from the well indicated that no hydrocarbons or cement were present at the intersect point.").

[96] Halliburton itself admits that channel is not a safety issue and is routinely addressed by remedial cementing. HAL_0048828 (Tim Probert Responses to Questions for Hearing Record) at 3 ("Cement channeling does not in itself create a safety concern.  When cement channeling occurs, it is typically remedied by pumping additional cement as a subsequent additional step in the well program."), 4 (same) and 5 (same); Gagliano CEC at 93 ("Q Did you think that BP was acting unsafely by choosing the 6 centralizer design?  A I wouldn't look at it as unsafe. The channeling indicates to me there was a high potential of remedial work that would be needed to be done after the fact."); Halliburton presentation "Annular Gas Migration - Solutions to Annular Gas Flow" at 5 ("Flow observed 'days' after cement is placed.  Flow volume is slight to moderate.").

- Centralizer Size

- Pore Pressure of Hydrocarbon Zones

- Location of Hydrocarbon Zones

- Density of the base Oil

- Compressibility of the Mud

- Caliper Data

The following is description of each of the changes.

1. The tops of previous casing strings in the Halliburton file were found to differ slightly than those provided by BP.

2. An abridged hole caliper using only 23 data points was utilized in the Halliburton simulation. CSI used 160 data points.

3. Base oil density was identified as 6.7 ppg by CSI, but Halliburton modeled it at 6.5 ppg.

4. A 15.0 ppg fracture density was utilized at casing TD in the Halliburton model, but CSI used a 14.51 ppg fracture density at this depth.

5. Halliburton modeled pore pressure gradients ranging from 13.81 ppg to 14.01 ppg. CSI used the most recent accepted pore pressure and zone depth of the hydrocarbon zones.

6. Halliburton's centralization inputs assumed 7 centralizers from 18,035 ft to 18,305 ft with 45 ft spacing, CSI used 6 centralizers from 17,833 ft to 18,256 ft with varied spacing.[148]

---

[148] BP provided Halliburton with its centralizer spacing plan on April 15, 2010 but Mr. Gagliano did not include that in his modeling.  BP-HZN-2179MDL00249844-00249847 (April 15, 2010 Morel email to Jesse Gagliano with attachment showing centralizer placement: "We have 6 centralizers, we can run them in a row, spread out, or

7.  Additionally, the centralizer specification used in the HES simulation differ from the data provided by Weatherford, with the Halliburton centralizer inputs showing an 8.622 in nominal OD and Weatherford provided data showing 10.75 in nominal OD.

The results from the Halliburton OptiCem run with these modifications varied from the April 18 run prior to the Macondo job and the match that CSI did for this report. The major variations were in two areas. First the length of the 100% displacement in the April 18 report was from 18,300 to 18,100' (This was referred to as Erodibility Profile).[149]

With the modifications using the corrected inputs, the OptiCem output revealed that 100% displacement was achieved across the length of the annulus from 18,300' to 17,900'. The graph for the displacement efficiency is shown below. This shows that the Halliburton OptiCem model predicts that the mud was completely displaced with cement from the bottom of the hole up to 17,900'. In other words, **OptiCem predicts that all three of the major hydrocarbon producing zones from 18,051 to 18233 would have been covered by cement with no channeling at all, when the correct well information is used in the model.** Any modeled channeling would have occurred above 17900'—more than a hundred feet above the main pay sands. This is consistent with the view expressed by Halliburton after the incident.[150]

---

any combinations of the two. It's a vertical hole so hopefully the pipe stays centralized due to gravity. As far as changes, It's too late to get any more product to the rig. our only options is to rearrange placement of these centralizers. Please see attached diagram for my recommendation.").

[149] CSI OptiCem run dated October 2011.

[150] HAL_1071448 ("Subsequent testing with 3D confirms statement that spacer was sufficient."); Dep. Ex. 708 at HAL_0011214 (April 20, 2010 9.875" x 7" Foamed Production Casing Post Job Report, noting "Cement job pumped as planned"; "Full returns seen throughout entire job"; "Estimated 100 psi of lift pressure"; "Floats held after job.").

Cementing, indicated in correspondence that Halliburton had run Displace 3D modeling and it confirmed that the spacer was sufficient to sweep the hole.[165]

## 4.11 Volume of Cement

Cement volume and targeted cement height was the responsibility of BP engineers. The constraints facing them in this determination were:

- A lost circulation zone at the bottom of the hole severely limited cement density and cement column height.

- The MMS requires a minimum cement height of 500 feet above highest hydrocarbon bearing zone.

- It was desirable that the cement top be below the shoe of that last casing at 17,100 feet in order to limit the annular pressure build up in the well. .

The primary constraint in establishing designed top of cement was the lost circulation zone. It was imperative to maintain circulation up the annulus in order to ensure that cement coverage was sufficient. The third constraint superseded BP's guideline of bringing cement 500 feet above the highest hydrocarbon bearing zone. Once cement top was established, caliper log data was used to fine tune volume requirements

The volume of the cement that was run on this well was dictated by the BP engineers. The volume met the BOEMRE requirements and was as much as the engineers judged the well could take without breaking down. BP's concern was to prevent losses on the formation while providing the necessary coverage of the cement in the annulus. The decision on the volume of cement to use for the production casing was the result of sound engineering judgment in consideration of the hole conditions.

## 4.12 Gas Flow Potential

Gas Flow Potential factor is a dimensionless number indicating the estimated potential for encountering gas migration, as a tool to quantify a well's potential for gas flow. The

---

[165] HAL_1071448 ("Subsequent testing with 3D confirms statement that spacer was sufficient.").

**EXHIBIT F**

## ROLAND CHEMALI
Halliburton Energy Services
3000 N Sam Houston Parkway, Room J1P2
Tel: 1-281-871-4257; email: roland.chemali@halliburton.com

- Chief Petrophysicist at Halliburton Sperry Division
- Expertise in Log Analysis, Wireline and Logging While Drilling
- Internal Consulting for Halliburton Managers and Geoscientists
- Consulting for Operating Companies
- Training and Mentoring in Basic and Advanced Petrophysics
- Multiple Industry Awards.
- Distinguished SPE Lecturer 2010-2011
- 3 times Distinguished SPWLA Speaker
- VP Technology and President-Elect Society of Petrophysicists and Well Log Analysts SPWLA
- Over 50 Technical Publications, Many Co-authored with Oil Company Geoscientists: Chevron, Total, Saudi Aramco, Kuwait Oil Company, Devon, ENI, BP, Arco and others.
- Log Interpretation in Many Types of Reservoirs, Including Shaly Sand, Carbonates, Thin Bed Analysis, Unconventional Resources
- Optimal Well Placement, New Logging Technology
- Co-Organized and Spoke Multiple Industry Forums,  Including One on "Shale Gas" in Barcelona Spain

## HALLIBURTON ENERGY SERVICES

### 2007 to Present Chief Petrophysicist Sperry Drilling
Roland Chemali acts as consultant to Halliburton management and to operating companies to establish interpretation methods and define new applications for logs in terms of formation evaluation. While logs measure physical parameters including resistivity, density, sonic velocity, formation pressure, the log users within the energy companies seek to determine hydrocarbon content, permeability, rock strength and other petrophysical parameters. As Chief Petrophysicist Roland Chemali helps define and validate methods to bridge the information between the log measurements and the petrophysical parameters. One significant activity in 2008-09 was to define and validate real time well Geosteering decisions based on resistivity logs. That activity was sanctioned by Halliburton's 2009 Best Technology of the Year 2009 for which Mr. Chemali was co-recipient.

## BAKER HUGHES

### 2005-2007     Project Manager Azimuthal Deep Resistivity
Roland Chemali managed the development and launch of a new LWD sensor and service for advanced geosteering, named AziTrak™. This service is described in SPE publication: "Navigating and Imaging in Complex Geology with Azimuthal Propagation Resistivity While Drilling" SPE-

102637. AziTrak is now fully deployed bringing the benefits of advanced geosteering to the global oil exploration and production industry. In recognition for the success of the AziTrak project Roland and his project team received the Baker Hughes Technology Excellence Award in 2006.

**2002-2005 LWD Marketing Manager for Emerging Technologies**
Roland Chemali assumed the product management of LWD Formation Pressure Tester, Magnetic Resonance, Electrical Imaging, Ultra-Deep Resistivity and other advanced technologies. In that position Roland was responsible for defining the design requirements, key features and answer products and interpretation algorithms for these services. A series of technical papers covering all the new sensors helped oil company users take full advantage of the new technology. The publications were co-authored with geoscientists from Maersk, BP, ENI and Total. All of these products and services are now fully deployed and operational.

## WEATHERFORD (Formerly Computalog Ltd.)

**1998-2002 Vice President Technology Wireline**
In that position Roland Chemali supervised the development of new formation evaluation sensors for Computalog Ltd, a wireline company based in Calgary which has since been acquired by Weatherford International. During his four year tenure Roland's contribution was of managerial nature. The challenge he met was to produce quality logging tools economically adapted to the low cost land market in western Canada. The most notable logging equipment completed in that time span included a dipole sonic, a micro-electrical imaging sensor and a specialized cement bond tool for high temperature applications.

## HALLIBURTON ENERGY SERVICES

**Chief Petrophysicist and Marketing Manager of the Wireline Logging Division**
Roland Chemali supervised and contributed to the development of "Desktop Petrophysics", a log interpretation package used by Halliburton Wireline until 2008. The software package included multiple algorithms that allowed the geoscientist user to convert the log measurements into formation evaluation parameters. From resistivity, density, porosity and sonic wave analysis, the software package derived an estimate of hydrocarbon content, hydrocarbon typing, permeability, geological features and rock mechanical properties. The unique benefit of this package was its ability to handle complex lithology, laminated reservoirs, and extract valuable information from the entire suite of open hole and cased hole logs available at that time.

During his tenure as Chief Petrophysicist Roland Chemali confirmed the phenomenon of "Resistivity Dispersion" in sedimentary formations, which he had discovered in the lab several years earlier. He showed in particular that in many instances the departure between the resistivity measured at the frequency of wireline tool and that at the higher frequency of LWD can be related to the pore structure of the matrix of the reservoir. The results were published in a 1995 SPWLA paper. In recent years, a new very high frequency electromagnetic sensor was designed by Schlumberger and deployed to measure the magnitude of the dispersion and relate it to the pore structure.

**Research and Engineering Group Leader**

Roland Chemali managed the development of several innovative wireline logging sensors, and invented some key enabling technologies within those instruments. The most notable instrument was the High Resolution Induction for which Roland was project manager then product manager at launch time. The instrument had a life of 10 years from 1991 to 2001 with the last ones being still run in the field to this day. One has to keep in mind that induction logs are run in the vast majority of wells worldwide and are key to quantifying hydrocarbon reserves. The logs recorded by HRI's will be archived for years to come as base-line for future formation evaluation in those fields. The HRI also set the bar higher than the pre-existing ILd-6FF40 for future induction logging developments.

One parallel achievement was the understanding of resistivity anisotropy and how it affects log response. A publication on electrical anisotropy by Roland Chemali et Al is often cited when evaluating the potential of laminated reservoirs including turbidites.

Another major achievement by Roland Chemali during that period was the publication of the first significant paper modeling and predicting the response of Induction Logs and LWD logs in horizontal wells. That publication was invited for presentation in many parts of the world and was at the origin of modern geosteering.


## SCHLUMBERGER OIL FIELD SERVICES

**Research Project Engineer (Ridgefield)**

Roland Chemali designed a logging sensor called the Spherically Focused Log (SFL-E), a very successful Schlumberger product. It is estimated that the sensor was run in half the wells logged during an 18 year time span.

Experimental work in the core laboratory suggested the presence of resistivity and dielectric dispersion with frequency. The work met with some skepticism and remained unpublished. The phenomenon was finally observed in real logs in the mid 90's when comparing wireline and LWD resistivity (see above- 1995 publication) and has now become the focus of a new high frequency electromagnetic log to measure resistivity and dielectric dispersion.

## ACADEMIC

.

- Roland graduated in Engineering from the Ecole Polytechnique of Paris, France. This is the top engineering school in France with a small class of 300 and well known alumni including Conrad Schlumberger founder of the Schlumberger company, Thierry Desmarest CEO of Total, Carlos Ghosn CEO of Renault-Nissan, and Valery Giscard Destaing President of France.
- Roland earned an additional engineering degree at the French Petroleum Institute IFP in 1967.
- Finally Roland Chemali earned a M.S. in Mathematics from LSU in 1969.

It is noteworthy that of the 7 years of college, Roland Chemali had full academic scholarship for the last 6 years, including tuition, books, lodging and spending stipend.

## AWARDS AND SOCIETIES

❖ Special Meritorious Award for Engineering Innovation Petroleum Engineer International for the HRI project (1988).
❖ Distinguished Technical Achievement Award of Society of Petrophysicists SPWLA (1997)
❖ Twice Distinguished Speaker for SPWLA (2008-2005)
❖ Distinguished Member of Technical Staff 1991, Halliburton
❖ Best Inter Division Technology Award, 2006, Baker Hughes
❖ Best Technology of the Year 2009, Halliburton
❖ Elected VP Technology for SPWLA 2010-2011
❖ President-Elect SPWLA 2011-2012
❖ SPE Distinguished Lecturer 2010-2011
❖ Finalist World Oil Lifetime Achievement Award in 2011

### Selected Patents

1. "Method and Apparatus for Sonic Dip Measurement". Chemali et Al. 4,918,669. Prototype was built and successful but technology was too complex for the times.

2. "Logging apparatus for measurement of earth formation resistivity". Gianzero, S., Chemali, R. US Patent 5,191,290

3. "Method for improving the accuracy of dip determination using adjustable high pass filters". Chemali et Al., US Patent 5,239, 267.

4. "Method for variable radial depth induction log". Chemali et Al, US Patent 5,448,171.

5. "Logging while drilling tool with azimuthal sensitivity". Jerabek and Chemali. US Patent 5,892,460.

6. "Electrical imaging in conductive and non-conductive mud". Chemali et Al, US Patent. 6,957,708.

7. "Measurement-while-drilling assembly using real-time toolface oriented measurements". Estes and Chemali. US Patent 7,114,565.

8. "Method for signal enhancement in azimuthal propagation resistivity while drilling". Chemali et al. US Patent 7,375,530

9. "Method of Generating a Deep Resistivity Image in LWD Measurements". Wang, T., Chemali, R., US Patent 7,894,990.

10. "Apparatus and method for azimuthal MWD resistivity imaging at multiple depths of investigation". Signorelli et Al, US Patent 7,723,991.

## Selected Publications
### *Roland Chemali*

1. "The Shoulder Bed Effect on the Dual Laterolog and its Variation with the Resistivity of the Borehole Fluid". Chemali R., Gianzero S., Strickland R., Tijani S. Paper UU, SPWLA Annual Symposium, June 1983, Calgary.

2. "The Depth of Investigation of Compressional Sonic Wave Logging for the Standard and the Long Spacing Sonic Sonde". Chemali R., Gianzero S., Su S., 9th SAID Colloquium, October 1984, Paris.

3. "The Response of the Elrec Sonde to a Salt Dome or a Regional Dip". Chemali R., Gianzero S., Nekut A., S.E.G. Annual Meeting, December 1984, Atlanta.

4. "Focused Resistivity Logs". Moran J., Chemali R., a Chapter in "Developments In Geophysical Exploration Methods", Elsevier Applied Science Publishers. 1985, London.

5. "The Effect of Sonde Eccentering on Resistivity Tools: An Exact Theoretical Model" Gianzero, S., Chemali, R., Su, S-M, SPWLA Annual Symposium, June 1985, paper GG.

6. "A New Resistivity Tool for Measurement While Drilling". Gianzero S., Chemali R., Lin Y., Su S. Foster M.. SPWLA Annual Symposium, June 1985, Dallas.

7. "Determining the Invasion Near the Drill Bit with the Toroid Sonde". Gianzero S., Chemali R., Su S., SPWLA Annual Symposium, June 1986, Houston.

8. "The Effect of Shale Anisotropy on Focused Resistivity Devices". Chemali R., Gianzero S., Su S., SPWLA Annual Symposium, June-July 1987, London.

9. "A New Microresistivity Logging Device". Chemali R., Gianzero S., Su S., SPWLA Annual Symposium, June-July 1987, London. Paper I.

10. "The Dual Laterolog in Common Complex Situations". Chemali R., Gianzero S., Su S., SPWLA Annual Symposium June 1988, San Antonio, also invited paper at European Symposium, October 1988, Oslo.

11. "Induction, Resistivity and MWD Tools in Horizontal Wells". Gianzero S., Chemali R., Su S.. Paper N, SPWLA Annual Symposium, June 1989, Denver.

12. "Measuring Rxo and Dip in Oil Based Mud With the Six Arm Dipmeter". Chemali, R., Su, S-M, Goetz, J., SPWLA Annual Symposium, June 1989, Denver. Paper O.

13. "Induction, resistivity and MWD Tools in Horizontal Wells". Gianzero, S.C., Chemali, R., Su, S.. SPE 22347. International Meeting on Petroleum Engineering, 24-27 March 1992, Beijing, China

14. "Methods for Improved Dipmeter Determination in Water-Based Mud with the Six-Arm Dipmeter". Chemali R., Su S., Goetz J., Maute R., Osborn F., The Log Analyst, May-June 1991, pp.298-308.

15. "New Developments in the High Resolution Induction Log". Strickland R., Chemali R., Su S., Gianzero S., Klein J., Sakurai S, Walker M.. Paper D, SPWLA Annual Symposium 1990, 1991. Midland and Oklahoma City.

16. "A New Algorithm for Automatic Shoulder bed Correction for Dual Laterolog Tools". Tumer K., Torres D., Chemali R. Paper Q, SPWLA Annual Symposium June 1991, Midland.

17. "Azimuthal Toroid Array for Resistivity Logging System". Gianzero S., Sinclair P., Chemali R.. September 3, 1991. US Patent 5,045,795.

18. "Comparisons of Wireline and Logging While Drilling Highlights Resistivity Frequency Dispersion of Sedimentary Formations". Chemali R., Heysse D., Merchant A., Jackson C. SPWLA Annual Symposium, Paris, June 1995.

19. "Integrating Imaging Logs in Formation Evaluation". Fam, M., Haugland, M., Chemali, R., Seiler, D. Stewart, W.. SPWLA Annual Symposium, New Orleans, June 1996

20. "New Technology in Well Logging" Géologues Hydrocarbures, Volume 1, Number 114, October 1997, pp. 31-40. Also presented at SPE Caracas and Mexico Villahermosa.

21. "Applying Electrical Micro-Imaging Logs to Reservoir Evaluation". Fam, M.Y., Chemali, R., Seiler, D., Haugland, M., Stewart, W.F., SPE 30608, SPE Annual Technical Conference and Exhibition, 22-25 October 1995, Dallas, Texas

22. "Formation Pressure Testing During Drilling: Challenges and Benefits". Meister, M., Lee, J., Krueger, V., Georgi, D., Chemali, R. SPE 84088. SPE Annual Technical Conference and Exghibition, 5-8 Oct 2003, Denver, Colorado

23. "High Resolution Visualization Of Near Wellbore Geology Using While-Drilling Electrical Images". Ritter, R., Chemali, R., Lofts, J., Gorek, M., Fulda, C., Morris, S., Krueger, V. SPWLA Annual Symposium, Noorwijk, June, 2004

24. "Improved LWD Density Images and Their Handling for Thin Bed Definition and for Hole Shape Visualization". Meyer, N., Holehouse, S., Kirkwood, A., Zurcher, D., Chemali, R. SPWLA  Annual Symposium, New Orleans, June 2005, Paper Y.

25. "Successful Applications of Azimuthal Propagation Resistivity for Optimum Well Placement and Reservoir Characterization While Drilling". Chemali, R., Hart, E., Flynn, T., Meyer, H., Helgesen, T., Kirkwood, A., Merchant, G., Berle, A. SPE 109959. SPE Annual Technical Conference and Exhibition, 11-14 November 2007, Anaheim, California, U.S.A.

26. "Navigating and Imaging in Complex Geology With Azimuthal Propagation Resistivity While Drilling". SPE 102637-MS. Bell, C., Hampson, J., Eadsforth, P., Chemali, R., Helgesen, T., Meyer, H., Peveto, C., Poppitt, A., Randall, R., Signorelli, J., Wang, T. SPE Annual Technical Conference and Exhibition, 24-27 September 2006, San Antonio, Texas, USA

27. "Real-Time Formation Imaging, Dip, and Azimuth While Drilling From Compensated Deep Directional Resistivity". Wang, T., Chemali, R., Hart, P., Cairns, P. SPWLA Annual Symposium, Austin, June 2007, Paper NNN.

28. Permeability and Saturation Evaluation in Deepwater Turbidite Utilizing Logging-While-Drilling Low-Gradient Magnetic Resonance". Turco, K., Brenneke, J., Jebutu, S., Kirkwood, A., Thern, H., Chemali, R., Kruspe,T. SPE 109646-MS. SPE Annual Technical Conference and Exhibition, 11-14 November 2007, Anaheim, California, U.S.A

29. "A New Deep Azimuthal Resistivity LWD for Optimal Well Placement and Reservoir Exploitation; Successful Validation with Saudi Aramco" Palmer, R., Silva, A., Hajari, A., Bittar, M., Shokeir, R., Lotfy, A., Chemali, R. SPE Saudi Arabia Section Technical Symposium, 10-12 May 2008, Al-Khobar, Saudi Arabia"

30. The Depth-of-Electrical Image, a Key Parameter In Accurate Dip Computation and Geosteering". Bittar, M., Chemali, R., Morys, M., Wilson, J., Hveding, F. SPWLA Annual Symposium, Edinburgh, Scotland, June 2008, Paper TT.

31. "Integrating Images From Multiple Depths of Investigation and Quantitative Signal Inversion in Real Time For Accurate Well Placement". Chemali, R., Bittar, M., Hveding, F., Wu, M., Dautel, M. IPTC-12547-PP. Presented at the International Petroleum Technology Conference held in Kuala Lumpur, Malaysia, 3-5 December 2008.

32. "Geosteering for Maximum Contact in Thin-Layer Well Placement". Al-Mutari, B., Al-Ajmi, H., Ali, A., Saleh, K., Kishore, B., Reeves, D., Chemali, R., Al-Abri, H., Manrique, C., Hawkins, D., SPE-120551, 2009. Presented at the Middle East Oil & Gas Show and Conference held 15–18 March 2009 in Bahrain.

33. "Successful Geosteering in Ecuador Using the Bright Spot Phenomenon from Deep Resistivity Images". Diaz, M., Iza, A., Rodas, J., Carrion, C., Manrique, C., Chemali, R., Pineda, G., Sandoval, J., 2009. SPE-122794 presented at the Latin American and Caribbean Petroleum Engineering Conference, 31 May- 3 June, in Cartagena, Colombia.

34. "The Azimuthal Wave Resistivity Opens a Window on The Geology Away From The Wellbore Path" Chemali, R., Bittar, M., Calleja, B., Hawkins, D., Manrique, C.. SPE-121894. Presented at the 2009 SPE EUROPEC/EAGE Annual Conference and Exhibition held in Amsterdam, The Netherlands, 8–11 June 2009.

35. "Real Time Decisions with Improved Confidence Using Azimuthal Deep Resistivity and At-Bit Gamma Imaging While Drilling". Harris, M., Byrd, D., Archibald, M., Naupari, C., Bittar, M., Chemali, R.., SPE-123859 presented at the 2009 SPE Offshore Europe Oil & Gas Conference, 8-11 September, Aberdeen, UK.

36. "Deep Electrical Images, Geosignal, and Real Time Inversion Help Guide Steering Decisions". Seifert, D., Al-Dossary, S., Chemali, R., Bittar, M., Lotfy, A., Pitcher, J., Bayrakdar, M., SPE-123940 presented at the 2009 Annual Technical Conference and Exhibition, 4-7 October, New Orleans, Louisiana.

37. "Proactive Geosteering in Thin reservoir Bound by Anhydrite in Saudi Arabia". Al-Hajari, Soremi, A., Ma, S., Julaih, A., Thompson, T., Sagghya, G., Lotfy, A., Bayrakdar, M., Bittar, M., Chemali, R. Presented at the International Petroleum Technology Conference held in Doha, Qatar, 7–9 December 2009.

38. "Real Time Proactive Optimal Well Placement Using Geosignal and Deep Images". Bittar, M., Chemali, R., Pitcher, J., Cook, R., Knutson, C., OTC-20894, presented at the SPE-Offshore Technology Conference, 3-5 May 2010 in Houston, Texas.

39. "Application of High-Resolution LWD Borehole Images for reservoir Characterization in Tectonically and Geologically Complex Reservoirs". Spicer, R. Lund, D., Dautel, M., Chemali, R., Morys, M., Hendricks, W., Hinz, D.. Presented at the SPWLA 51st Annual Logging Symposium held Perth, Australia, June 19-23, 2010.

40. "Field Testing of an Advanced LWD Imager for Oil-Based Mud Applications". Morys, M., Chemali, R., Goodman, G., Smollinger, G., Schaecher, B., Maki, V.. Presented at the SPWLA 51st Annual Logging Symposium held Perth, Australia, June 19-23, 2010.

41. Real Time Reservoir Characterization and Geosteering Using Advanced High Resolution LWD Resistivity Imaging". Al-Musharfi, N., Bansal, r., Ahmed, M., Kanj, M., Morys, M., Conrad, C., Chemali, R., Lotfy, A., Bayrakdar, M., Parker, T., SPE-133431 presented at the 2010 Annual Technical Conference and Exhibition 19-22 September, Florence, Italy.

42. Reservoir Characterization, Fracture Mapping, and Well Placement Using a Suite of Logging-While-Drilling Images with Multiple Resolutions in a Marginal, Middle East Carbonate Reservoir. SPE RCSC, 9-11 October 2011, Abu Dhabi, UAE; co-authored with ADCO geoscientists

**Public Speaking Venues during the Last 24 Months**
**(not including speaking at Halliburton internal training):**

1. Perth Australia
2. Moscow, Russia
3. Ahmedabad, India,
4. Nanjing, China,
5. Noyabersk, Russia
6. Tomsk, Russia
7. Cracow, Poland
8. Stavanger, Norway
9. Florence, Italy,
10. Paris, Pau, France
11. Aberdeen, UK
12. Dubai, UAE
13. Ciudad Carmen, Villahermosa, Mexico
14. Anchorage, Alaska,
15. Barcelona, Spain
16. Houston (over 15 times)
17. Colorado Springs, Co,
18. Savannah, Georgia
19. Oklahoma City, Tulsa, Oklahoma,
20. Dallas, Texas
21. Ravenna, Italy
22. San Ramon, California

# EXHIBIT G

# RICHARD F. STRICKLAND

## THE STRICKLAND GROUP, INC.

4521 S Hulen, Suite 102
Fort Worth, TX  76109
(817) 338-0800
(817) 338-0830 (fax)
www.tsg.net

## BIOGRAPHICAL DATA

Birth date:  August 31, 1948                          Marital Status:  Married, two children
Citizenship:  United States

## EDUCATION

College

B.S., Petroleum Engineering, Texas A&M University (1970)
M.S., Petroleum Engineering, Texas A&M University (1974)
Ph.D., Petroleum Engineering, Texas A&M University (1976)

Honor Societies

Tau Beta Pi (Engineering Honor Society)
Pi Epsilon Tau (Petroleum Engineering Honor Society)

## EXPERIENCE

Industrial
The Strickland Group, Inc, President (June 2001 to Present)
Cawley, Gillespie & Associates, Inc., President (January 1991 – May 2001)
Cawley, Gillespie & Associates, Inc., Executive Vice President (January 1988 - December, 1990)
Cawley, Gillespie & Associates, Inc., Petroleum Consultant (July 1982 - December 1987)
Reservoir Simulation Technology, Inc., President (December 1980 - May 1982)
Simulation Technology, Partner (September 1974 - November 1980)
Numerical Simulation Section, Phillips Petroleum Company, Reservoir Engineer (May 1974 - Sep. 1974)
Atlantic Richfield, Reservoir and Production Engineer (1970 and 1972)
Pan American Petroleum, Engineering Assistant (May 1969 - September 1969)
Tidewater Oil and Gas, Engineering Assistant (May 1968 - September 1968)
Getty Oil, Engineering Assistant (May 1967 - September 1967)

Educational
Associate Professor, Texas A&M University (September 1980 - May 1982)
Assistant Professor, Texas A&M University (September 1976 - August 1980)
Instructor, Texas A&M University (September 1975 - May 1976)

*Richard F. Strickland*
Page 2

<u>Military</u>

US Army, South Vietnam, Infantry (September 1970 - February 1972)

## PROFESSIONAL AFFILIATIONS

Society of Petroleum Engineers (SPE)
Texas Society of Professional Engineers (TSPE)
National Society of Professional Engineers (NSPE)
NSPE - Professional Engineers in Private Practice (NSPE-PEPP)
American Consulting Engineers Council
Registered Professional Engineer in the State of Texas
Sigma Xi

## PROFESSIONAL COMMITTEE MEMBERSHIPS

Frost Bank Advisory Board (2000 to Present)
Petroleum Engineering Industry Board, Texas A&M University (1995 - 2000)
Society of Petroleum Engineers Editorial Review Committee (1978 - 1980)
Student Development Committee of American Association of Engineering Studies (1979 - 1980)
Society of Petroleum Engineers Education and Accreditation Committee (1981 - 1994)
Engineering Accreditation Commission of ABET (1984 - 1987)
Board of Directors of the Accreditation Board for Engineering and Technology (1988 -1994)
Chairman of the Fort Worth Section of the Society of Petroleum Engineers (1988)
Board of Directors of the Fort Worth Section of the Society of Petroleum Engineers (1989 - 1992)

<u>Texas A&M University Committee Memberships</u>

      Academic Council, Member
      College of Engineering Computing Committee, Member
      Petroleum Engineering Scholarship Committee, Chairman
      University Disciplinary Appeals Panel, Member
      L. F. Peterson Engineering Computing Center, Director
      College of Engineering Student Honors and Awards Committee, Chairman
      Brazos Valley Regional Science and Engineering Fair, Director

## HONORS AND AWARDS

Outstanding Faculty Award, College of Engineering, Texas A&M University (April, 1980)
Member, Graduate Faculty, Texas A&M University
Dresser Professor of Petroleum Engineering
Accreditation Board for Engineering and Technology - Fellow

## PUBLICATIONS AND PRESENTATIONS

Strickland, R.F.: "An Analysis of Artificial Barriers for Controlling Water Coning," M.S. Thesis,   Texas
      A&M University, May 1974.

*Richard F. Strickland*
Page 3

Strickland, R.F. and Morse, R.A.: "Artificial Barriers May Control Water Coning," Oil and Gas Journal, October 4 & 7, 1974.

Strickland, R.F.: "Gas Injection for Up-structure Oil Drainage," Ph.D. Dissertation, Texas A&M University, December 1976.

Strickland, R.F. and Jennings, J.W.: "Recent Developments in Texas A&M University's Lignite Gasification Project," 4th Annual Underground Coal Conversion Symposium. June 1978, Steamboat Springs, Colorado.

Strickland, R.F. and Jennings, J.W.: "Analysis of Geological Limitations to Underground Coal Gasification," In Situ, Vol. 3, Number 3, September 1979.

Strickland, R.F. and Morse, R.A.: "Gas Injection for Up-structure Oil Drainage," Journal of Petroleum Technology, October 1979, pp. 1323-1331.

Jennings, J.W., Strickland, R.F., and Von Gonten, W.D.: "Underground Lignite Gasification at Texas A&M," Presented at:

> Symposium on Energy and Mineral Recovery Research, April 12-14, 1977, Golden, Colorado;
> Third Annual Underground Coal Conversion Symposium, June 6-9, 1977, Fallen Leaf Lake, California;
> Second Annual In-Situ Energy Recovery Technology, July 11-12, 1977, Albuquerque, New Mexico.

Strickland, R.F. "Short Courses for Industrial Representatives,"

> Topics: Oil and Gas Technology
> Basic Reservoir Engineering
> Advanced Reservoir Engineering
> Numerical Simulation
> Thermodynamics and Phase Behavior
> Oil and Gas Property Evaluation
> Presented 1977 through 1990

Strickland, R.F. "Disputes about the Panhandle Field of Texas",
> Society of Petroleum Engineers, Dallas Section, November 1986, December 1989.
> Dallas Geological Society, February 1990.

Strickland, R.F. "Oil & Gas Property Evaluation - A Seminar for Fiduciaries',"
> May 1988, May 1990.

Ravnaas, R.D., Strickland, R.F., Lake, L.W., Yang, A.P., Malik, Prezbindowski, and Mairs. "Three Dimensional Conditional Simulation of Schneider (Buda) Field," paper SPE 23970 presented at the Permian Basin Oil and Gas Recovery Conference, Midland, TX, March 1992.

Strickland, R.F., "Attributes of the Petroleum Engineer of the Future", presented at the Society of Petroleum Engineers Fall Meeting, September 1993.

*Richard F. Strickland*
Page 4

Strickland, R.F., "Outsourcing, The View of a Consultant", presented at the Society of Petroleum Engineers Annual Meeting, September, 1994. SPE Houston Section, November, 1994. SPE Dallas Section, December 1994. SPE Ft. Worth Section, March 1995.

Strickland, R.F., Shingler, T., "Comparison of US and UK Transactions: Expected Market Value, paper SPE 28191 presented at the SPE Oil & Gas Economics, Finance & Management Conference in London, UK, June 1994.

Strickland, R.F., Purvis, Dwayne C., Alexander, R.A., Quinn, M.A., "Coupling Probabilistic Methods and Finite Difference Simulation: Three Case Histories" paper SPE 38777 presented at the SPE Annual Technical Conference and Exhibition, San Antonio, TX, October 1997.

Strickland, R.F., Purvis, Dwayne C., "Problems Reconciling Probabilistic and Deterministic Reserve Classifications and Evaluations" paper SPE 68591 presented at the SPE Hydrocarbon Economics and Evaluation Symposium, Dallas, TX, April 2001.

Nickle, Brad, Strickland, R.F., Purvis, Dwayne C., "Resolving the Nightmare of Performance Reporting and Portfolio Management – A Web Based Approach" paper SPE 95164-PP presented at the SPE Hydrocarbon Economics and Evaluation Symposium, Dallas, TX, April 2005.

Strickland, R.F., *"Finite Difference Simulation of the Barnett Shale"* presented at the Barnett Shale Symposium II, Dallas, TX, June 2005.

Strickland, R.F., Purvis, Dwayne C., Presentation at the Unconventional A&D – 2008 Round Table, "Barnett Shale – Was It Worth It", Denver, CO, March 2008.

Strickland, R., Purvis, D., and Blasingame, T., *Practical Aspects of Reserve Determinations for Shale Gas* paper SPE 144357 presented at the SPE North American Unconventional Gas Conference and Exhibition, The Woodlands, TX, June 2011.

## UNIVERSITY AND INDUSTRY SCHOOLS TAUGHT

University Courses

Engineering Analysis: Introduction to engineering analysis affording practice in analyzing and solving engineering problems including computational methods and devices.

Petroleum Development: Principles of oil field development including drilling equipment, drilling fluids, casing and cementing of wells and formation evaluation.

Reservoir Rock Properties: Systematic study of physical properties of petroleum reservoir rocks; lithology, porosity, fluid saturation, permeability, relative and effective permeability and capillary characteristics.

Petroleum Development Laboratory: Properties and the testing and treating of drilling fluids and cements; well surveying practices.

*Richard F. Strickland*
Page 5

Fluid Properties Laboratory:  Conventional and special core analysis.  Analysis of drill cuttings. Determination of lithology, porosity, fluid saturation, capillary pressure characteristics, electrical properties, permeability and relative permeability.

Reservoir Fluids:  Thermodynamic behavior of naturally occurring hydrocarbon mixtures.  Evaluation and correlation of physical properties of petroleum reservoir fluids including laboratory and empirical methods.

Petroleum Property Management:  Factors which influence industrial organizations, securities and value of oil and gas properties.  Preparation of valuation reports; taxation; introduction to mineral law.  Regulation of petroleum production.

Petroleum Measurement and Transportation:  Fluid static and dynamics.  Theory and methods of gas and liquid measurements and transportation including mixed streams.

Measurements Laboratory:  Flow and metering of gas and liquid in pipelines.  Oil and gas well testing, field automation and optimization of sucker rod pumping installations.

Petroleum Engineering Numerical Methods:  Use of numerical methods for petroleum problems. Application of numerical differentiation, integration, interpolation, and curve fitting.  Introduction to numerical simulation.

Reservoir Engineering:  Frontal advance processes.  Influence of rock and fluid properties on reservoir performance.  Well performance as related to various completion and stimulation techniques.

Materials Balance Methods:  Materials balance methods.  Identification of type of reservoir mechanism. Estimation of fluids in place and future production under primary recovery, gas injection and water influx.

Unsteady State Processes:  Transient phenomena in fluid flow systems.  Applications to finite and infinite reservoirs.  Pressure build up and draw down, skin factor, interference, reservoir limits, drill stem testing, pulse testing.

Petroleum Recovery Methods:  Secondary and tertiary oil recovery.  Gas drive, water flooding, steam, hot water, in-situ combustion and miscible displacement.  Use of carbon dioxide, surfactants, emulsions and viscous water for increasing oil recovery.

Special Topics in numerical methods and reservoir simulation.

Industry Schools
Basic Reservoir Engineering
Advanced Reservoir Engineering
Numerical Simulation
Oil and Gas Property Evaluation
Oil and Gas Technology
Thermodynamics and Phase Behavior

COMMUNITY

Church

Ordinations: Deacon, Elder, The Church in Cityview

***Richard F. Strickland***
Page 6

<u>Recreational</u>

Golf, Machinist

## CASES WHICH AS AN INDEPENDENT CONSULTANT DR. RICHARD F. STRICKLAND HAS GIVEN EXPERT TESTIMONY AND BEEN SUBJECT TO CROSS EXAMINATION 2005-2011

| No. | Date | Type (Trial or Deposition) | Court | Style | Cause |
|---|---|---|---|---|---|
| 1 | 2004 2005 | Deposition | State District Court Wise County, Texas | Littlefield Limited Partnership and Rodney Hughes v. Savannah Energy, Inc. and EnCana Oil and Gas USA, In. | Case No. 03-06-696 |
| 2 | 2004 2005 | Trial | State District Court Victoria County, Texas | David Ohrt, et al. v. Union Gas Corporation, et al. | Case No. 01-12-57, 427-A |
| 3 | 2005 | Trial | International Court of Arbitration of the International Chamber of Commerce | Occidental Peninsula II, Inc. v. Nexen Inc. | ICC Case No. 12788/JNK |
| 4 | 2005 | Report | American Arbitation Association Commercial Arbitration Rules | The Louisiana Land and Exploration Company v. Chevron USA, Inc. and Hilcorp Energy I, L.P. | Case No. 701980075404 |
| 5 | 2006 | Deposition | Texas Railroad Commission Travis County, Texas | Application to Amend the Field Rules for the Texas Hugoton field, | Oil & Gas Docket No. 10-0246056 |
| 6 | 2006 2007 2008 | Trial | United States Court of Federal Claims, | Amber Resources Co , et al v. United States | Nos. 02-30C, 04-1822C, 05-249C |
| 7 | 2007 | Trial | International Court of Arbitration of the International Chamber of Commerce | Yemen Exploration & Production v. Republic of Yemen | ICC Case No 14108/EC |
| 8 | 2008 | Deposition | United States Bankruptcy Court, Southern District of New York | Investment Properties of America, LLC, et al., Debtors | Case No  07-13621 (MG) |
| 9 | 2008 | Trial | Superior Court of State Alaska Third Judicial District Anchorage, Alaska | Remand Proceedings Pursuant to December 26, 2007 Order of Superior Court Regarding Point Thomson Unit Agreement | 3AN-06-13751 CI |
| 10 | 2008 | Deposition | United States Distrct Court Eastern District of Louisiana | Texaco Exploration and Production, Inc. and Marathon Oil Company vs. AmClyde Engineered Products, Inc., et al | No. 99-3623 |

| 11 | 2009 | Report | United States District Court Eastern District of Texas Sherman Division | Hillwood Enterprises, LP v. Intel Corporation v. Council Properties, LLC | Cause No. 4:08-cv-00112 |
|----|------|--------|------|------|------|
| 12 | 2009 | Trial | Probate Court 24th Judicial District Denver County, Colorado | In the Matter of the Estate of Sheldon K. Beren | Case No. 96PR401 |
| 13 | 2009 | Report | Permanent Court of Arbitration, The Hague, Netherlands | Sonatrach v. BP Exploration (El Djazair) Limited, BP Exploration Operating Company Limited | Case No. AA224 |
| 14 | 2009 | Trial | Oklahoma Corporation Commisstion | St. Mary Land and Exploration | CD 200902218-T |
| 15 | 2010 | Report | 67th Judicial District Tarrant County, Texas | Glade 121, LP v. Douglas Lee Harrington, et al., v. Rubloff Development Group, Inc and Mark A Robinson | |
| 16 | 2011 | Trial | United States Court of Federal Claims | Chevron U.S.A., Inc. v. United States | Case No. 1:04cv1365C |

**EXHIBIT H**

# Expert Report of
# Richard Lee, Ph.D.
# Larry Lockard,
# and J. Leif Colson

**IN RE: OIL SPILL by the OIL RIG
"DEEPWATER HORIZON"
in the GULF OF MEXICO
on APRIL 20, 2010
MDL No. 2179**

**Report Date: November 7, 2011**

**Prepared for BP**



**RJ LEE GROUP**
DELIVERING SCIENTIFIC RESOLUTION

**CONFIDENTIAL**

RJ Lee Group
Expert Report of Richard Lee, Ph.D, Larry Lockard, and J. Leif Colson

### 4.5.2   Analysis of additional data including the high resolution wireline logs, the Combinable Magnetic Resolution (CMR) log, and the Oil Base Micro Imager (OBMI) processed data support the conclusions made on the rig., namely that;

1. The high resolution data does not indicate a substantial neutron density porosity crossover such as is seen in M56E (Figure 4), confirming Ms. Skripnikova's original observations, It is clear from the following figure (Figure 5) taken from the American Association of Petroleum Geologists' Methods 16,[15] that neutron density porosity crossover can occur that has no correlation to the presence of gas in the formation. Note the crossover evident in the log that occurs for other reasons such as borehole roughness (rugosity) and break outs (see orange shading Figure 5).

2. The CMR log shows a dramatically reduced amount of large pore size porosity in the M57B as compared to the very large amount of large pore porosity observable in the main pay zones. These large interconnected pores are required for sufficient rock permeability needed for formations to produce significant quantities of fluid (Figures 7, 8),

3. M57B has an apparent thickness of less than 2 feet. Dr. Strickland states the apparent dip of the interval is between 36 and 75 degrees, thus the true vertical thickness is even less, between 1.6 feet and 0.5 feet (Figure 9), making M57B even less likely to be a zone of interest.

### 4.5.3   Any hydrocarbon or contaminating fluid that could come from M57B could not have contributed to a failure of the cement job:

Dr. Strickland's calculations regarding pressure and permeability are speculative and not based upon data and appear to have no foundation in actual data. Further, Dr. Strickland's pressure and permeability assumptions are refuted by the observed and recorded data that are available. Namely, if his assumptions about pressure and permeability were true, then the pressure and permeability of this zone would have evidenced itself in a number of other circumstances.

Even if M57B were hydrocarbon bearing, the cement job was not affected while cement was being pumped into annulus/casing because if such flow occurred it would have increased the volume of mud returning. Halliburton stated that they had full mud circulation during the cement job.

At no time during the drilling and wireline logging was the well in a situation where M57B contributed observable flow into the wellbore, even when the mud weight was reduced from 14.5 ppg to 14.3 ppg while drilling past the 17,800 ft depth, during which proper mud circulation continued. When drilling passed the 18,250 ft depth and the mud weights were

---

15 Ibid.

RJ Lee Group
Expert Report of Richard Lee, Ph.D, Larry Lockard, and J. Leif Colson

adjusted for a bit trip, even reduced to 14.0 ppg, there was no kick of gas into the well. There was no indication that the well was ever underbalanced or out of control.  And there was never any observed flow from M57B into the mud column even as the mud weights changed before, during and after the bit trip and resumption of drilling. Any effect from M57B would not have impacted the cement below because of the mud weights during displacement of the cement, and any gas would only move upward (which did not happen here).  Additionally, the theories proposed are not  based on any data, analysis or modeling and are speculation not supported with facts or data, but rather possibilities and hypothetical scenarios  As pointed out above, if Dr. Strickland's analysis were correct, there would have been changes in several indicators – none of which were observed.  We therefore conclude his analysis is incorrect.

### 4.6   Uncertainties in the calculation of water saturation (Sw) tend to decrease the possibility that M57B contains hydrocarbons

Water saturation is routinely calculated as part of the determination of the potential for a zone to contain hydrocarbons, either gas or oil. As water saturation increases, the likelihood of hydrocarbons decreases. The interpretation of the data (e.g. the wireline log data) is subject to uncertainties; the larger the uncertainty the lesser the likelihood that the zone is a hydrocarbon bearing zone.  Water saturation depends on a number of parameters: a is the tortuosity factor, m is the cementation exponent, n is the saturation exponent, $R_w$ is the connate water resistivity (dependant on water salinity and temperature), shaliness is related to the addition of clay in the sand and reduces the apparent resistivity of the formation.

Archie's equation[16] is used to estimate water saturation: $S_w = [(a/\theta^m)(R_w/R_t)]^{(1/n)}$,  where  $S_w$ = water saturation, $\theta$ = porosity, $R_w$ = formation water resistivity, $R_t$ = observed bulk resistivity, a = tortuosity factor which is generally 1, m = cementation factor which is generally 2,  and n = saturation exponent which is generally 2.

Table 3.  Investigation of Water Saturation Parameters

| A | B | C | D |
|---|---|---|---|
| Parameter | Used value of the parameter (based on BP values) | Expected value of the parameter (based on evaluated apparent rock quality) | Effect on Sw of changing from the values in column B to the values in column C |
| a (not expected to change) | 1.0 | 1.0 | No change |
| m (expected to be higher) | 1.88 | 2 | Would increase Sw |
| n (expected to be higher) | 1.18 | 2 | Would increase Sw |
| Rw (could be higher) | 0.022 ohmm (120kppm salinity) | Uncertain, but probably less saline | Would increase Sw |

---

16Ibid.

14

RJ Lee Group
Expert Report of Richard Lee, Ph.D, Larry Lockard, and J. Leif Colson

| Increased shale content (clay correction) | 0% | 40% | Would decrease Sw (would also decrease effective porosity) |
|---|---|---|---|
| Porosity (effective porosity expected to be lower) | 18% | 15% | Would increase Sw |

BP used the most conservative estimates (see column B), based on their estimated properties of the highest quality formation in the well, for these formation parameters to compute water saturation (Sw), estimate cementation exponent (m) and saturation exponent(n),. The estimated value of 52% water saturation in M57B was reported by BP in the Technical Memorandum dated 26 July 2010; therefore, a more accurate Sw would certainly be higher based on the expected changes in the formation parameters  The estimated cementation exponent m, is expected to be higher in M57B than in M56E because the rock quality is poorer, has a lower effective porosity and permeability, due to the lack of large pores and increased shale content, as shown by the gamma ray and the CMR (Figures 7, 8). A similar argument applies to the saturation exponent, but rock samples, fluid samples, and laboratory analysis would be needed to establish the precise values of m, n and Rw.

**4.7    Requirements for a hydrocarbon bearing zone**

Dr. Strickland defined  hydrocarbon bearing zone as: "a defined interval that contains oil and/or gas at a sufficient level such that oil and/or gas will flow out of the zone and into the well bore when the pressure in the well bore is reduced below the pressure in the zone". This definition appears to be of Dr. Strickland's  own invention. As acknowledged by Trocquet of MMS, and Halliburton's own petrophysicist, Dr. Roland Chemali, President Elect of the Society of Petrophysicists and Well Log Analysts (SPWLA), there is no   definition of a hydrocarbon bearing zone in the regulations or published standards.

In industry practice, the determination of the uppermost hydrocarbon-bearing zone is made with the type of data that Ms. Skripnikova used, applying petrophysical expertise and judgment.  It is instructive that BOEMRE considers the same technical characteristics we have addressed in assessing M57B in certain of the agency's regulatory provisions relating to potential hydrocarbon zones.  For example, in the regulations governing scientific exploration, BOEMRE requires reporting of "hydrocarbon occurrences," which exclude "background gas" and "minor accumulations of gas," such as the very low concentration of methane detected in M57B. See 30 CFR Sections 251,6(b)(1); 251.1 (definition of "hydrocarbon occurrence").  Moreover, the BOEMRE regulations for making "producibility" determinations focus on formation characteristics that, in the case of M57B, indicate that the zone would not be considered hydrocarbon bearing. See 30 CFR Section 250.116.  Dr. Strickland ignored these essential characteristics of M57B:

- From the logs M57B has an apparent thickness of less than 2 feet (Figure 1). Dr. Strickland states the apparent dip is between 36 and 75 degrees, thus the true vertical thickness is even less, between 1.6 feet and 0.5 feet (Figure 5)

15

# EXHIBIT I

 **CSI Technologies**

# In the United States Court for the Eastern District of Louisiana

# Oil Spill by the Oil Rig MDL No. 2179 Deepwater Horizon in the Gulf of Mexico on April 20, 2010

**Prepared on behalf of BP on November 7, 2011**

**"Evaluation of the Cementing on the 9 7/8" x 7" Production Casing String on the Macondo Well"**

**Expert Report by:**

Fred Sabins

⊕ **CSI Technologies**

President
Office Direct: 281-784-7902
Cellular:  713-725-3078
Email: fsabins@csi-tech.net

**CONFIDENTIAL**

In the United States Court for the Eastern District of Louisiana


Oil Spill by the Oil Rig MDL No. 2179

Deepwater Horizon in the Gulf of Mexico on April 20, 2010



Evaluation of the Cementing on the 9 7/8" x 7" Production Casing String on the Macondo Well




Rebuttal Expert Report of Fred Sabins


On Behalf of BP




Contains information designated Confidential under the Protective Order

not result in the short-term, high-volume flow characterizing the cement failure at the Macondo well.

Third, as previously discussed, OptiCem modeling of well conditions predicts that 100% displacement efficiency occurs at the bottom of the well, from 18,300' to 18,100' and that channeling occurs only above 17,900'. If this is the case, then the channeling and contamination could not have been causal to the cement failure. Further, Halliburton's modeling with Displace 3D, a more sophisticated displacement modeling program, showed good displacement throughout the cemented interval.[108]

Finally, Frigaard's report fails to consider the effects of foam stability on the density hierarchy. For example, Frigaard's opinion that the unfoamed tail slurry and foamed slurry likely mixed is based on the assumption that the foam slurry was a stable, single-phase fluid with a density lower than the tail slurry. As explained above, however, this is not case because the foamed slurry was never successfully generated at the surface. Thus, the free gas and gas breakout from the unstable foam slurry would eventually have permeated the tail slurry and resulted in a low-density tail slurry with a high concentration of gas. Without considering the properties of the foam slurry itself, Frigaard cannot accurately predict the interaction between the foam slurry and tail slurry downhole.

## 3.7   There is no evidence that Halliburton would have acted differently if it knew about the M57B zone before the job.

Halliburton's expert David Bolado argues that BP did not provide Halliburton with necessary inputs for it to run accurate OptiCem modeling. Specifically, he argues without evidence that BP did not disclose the existence of the M57B zone to Halliburton in order to save time and money by avoiding the need for a redesign of the casing and cement program. Mr. Bolado does not cite to any evidence to support his claims that BP believed the M57B zone to be a hydrocarbon zone before the cement job or that BP believed a redesign would have been necessary if the M57B zone proved to be

---

[108]   Dep. Ex. 5220 ("Spacer volume was sufficient to sweep entire annulus volume. As such, spacer was sufficient to sweep channel. Subsequent testing with 3D confirms statement that spacer was sufficient.").

hydrocarbon-bearing. Instead, the available documents and deposition testimony demonstrate that BP did not consider the M57B zone in the cement design for the Macondo well because it was not believed to be a hydrocarbon-bearing sand before the incident.[109]

Further, Mr. Bolado argues without evidence that if Halliburton knew about this zone before the cement job, it would have redesigned the cement program rather than pumping the job. He reaches this conclusion based on a purported OptiCem model, which calculates the GFP of the M57B zone to be 54.

I have seen no evidence that Mr. Gagliano would have calculated GFP for the M57B zone or concluded that the cement program needed to be redesigned based on this result. Typically, GFP is calculated at each sand interval and the highest GFP is considered by the cement contractor in designing the cement slurry. Here, the April 18, 2010 OptiCem file shows that there was another sand in Gagliano's file at 17,700' which had a GFP of 10.57—higher than the GFP of 10.29 that Gagliano incorrectly calculated.[110] Gagliano does not appear to have included this higher GFP calculation in his final OptiCem run to BP, reported the information to BP through other means, or utilized this information in providing his cementing recommendation to BP.

Given that Gagliano did not calculate or use GFP from the highest zone, it is unclear whether he would have even considered information on the M57B interval had BP provided it to him. Indeed, his pre-incident conduct suggests that Gagliano would not have utilized the information in the way that Bolado speculates.

---

[109]   MDL Dep. Ex. 3512 (BP-HZN-2179MDL00249267) (Bodek asks for the location of the shallowest hydrocarbon-bearing interval; Skripnikova responds "I think the shallowest HC sand is at 17,803 md"; Bodek responds "I can buy that. That the shallowest sand that we see legitimate DEN/NEU cross-over on the triple combo log"); Skripnikova Dep. at 438-439 ("Q. All right. And at that time, you were aware that there was a, did you say low-porosity sand at 17,467 feet? A. Yes, I saw at that sand."; "Q. Okay. So you knew there was a sand there; you didn't know, however, whether or not it was hydrocarbon bearing? A. My interpretation was it's wet sand. There was wet sand. Q. Okay. So you did not know if it was hydrocarbon bearing at that time? A. To the tech-- - to the -- at the data I had at the rig, looking at the printout, I considered and report -- did not report that sand at 14,467 as a hydrocarbon-bearing sand because I thought it was -- it -- it was a wet -- wet sand.").

[110]   HAL_0530943.

**EXHIBIT J**



LEXISNEXIS® FILE & SERVE
40768805
E-SERVICE
Nov 7 2011
10:04PM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | : : : : : : : | MDL NO. 2179<br><br>SECTION: J |
| THIS DOCUMENT RELATES TO: ALL CASES | : : : | JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |

## BP's DISCLOSURES OF NON-RETAINED REBUTTAL EXPERT WITNESS NOT REQUIRED TO PROVIDE WRITTEN REPORT

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(C), BP hereby respectfully identifies Graham Vinson as a BP employee who may be called to provide expert testimony during Phase One of the February 2012 Limitation and Liability Trial, but who is not required to provide a written report.

Mr. Vinson is currently the team lead for BP's Gulf of Mexico exploration TIGER Team, the group of subsurface specialists working on Gulf of Mexico exploration wells. Mr. Vinson has more than 30 years of experience in Gulf of Mexico drilling and prior to leading the TIGER team, spent 22 years as a petrophysicist, both with BP and Shell. Mr. Vinson has been involved in developing industry standards for subsurface drilling matters, including operational petrophysics, extended coring and pore pressure and fracture gradient prediction. As the manager for the TIGER team, Mr. Vinson has been involved with nearly 20 deepwater exploration wells in the Gulf of Mexico.

Mr. Vinson is expected to present evidence, including opinion testimony, related to the M57B zone in the production interval of the Macondo well.  Mr. Vinson is expected to testify that Dr. Strickland's opinions related to the M57B are incorrect and that BP properly identified the top hydrocarbon bearing zone.

Mr. Vinson is expected to testify that based on his expertise and analysis of the various data available on the M57B, including the mud log reports, triple combo log reports, OBMI, CMR, and other wireline and mud log data, that the M57B is not likely to be a hydrocarbon bearing zone.  Mr. Vinson is expected to explain his analysis of the data and why the data cannot be shown to conclusively determine that the M57B is a hydrocarbon bearing zone.

Additionally, Mr. Vinson is expected to testify based on his experience and expertise, that the BP team's analysis of the top hydrocarbon bearing zone was complete, accurate and appropriate.  Mr. Vinson will explain that the indicators available during wireline logging would not cause a reasonable operator to conclude that M57B was a hydrocarbon bearing zone and that the BP team appropriately identified the top hydrocarbon zone .

BP has made this identification based on the information reviewed and available as of the date of this disclosure.  BP reserves the right to identify additional persons and testimony based on new information as it is discovered.  Moreover, pursuant to the Court's directive on September 30, 2011, BP has not identified every fact witness who may provide opinion testimony at trial.

Dated: November 7, 2011

Respectfully submitted,

By: /s/ Don K. Haycraft

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099   Telephone:
(504) 581-7979
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000

Robert C. "Mike" Brock     (mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW     Washington,
DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP Exploration & Production Inc.,
BP America Production Company, and BP p.l.c.*