## EXHIBIT 1

- **Aug. 26, 2010 Minute Entry and Order** (Dkt. 99, p. 4):

  "IT IS FURTHER ORDERED that no destructive testing of metallurgical analysis on the *Deepwater Horizon's* BOP and related equipment and appurtenances will be conducted without further order of the Court[.]"

- **Transcript of Sept. 3, 2010 hearing on Motion for a Protective Order** (transcript excerpts attached hereto as Appendix B):  An announcement was made that a contract had been entered into with the DNV for forensic testing, and the Court stated it hoped the parties could agree on the testing protocol, but if there was disagreement, "that's something that obviously can be brought back to the attention of this Court before any testing or certainly any destructive testing has begun" (Appx. B at p. 104, l. 13).

- **Sept. 3, 2010 Minute Entry (Dkt. 167):** The Court addressed the preservation of the BOP and that a report would be required regularly.

- **Transcript of the Sept. 16, 2010 status conference** (transcript excerpts attached hereto as Appendix C):  The Court stated that it would require a periodic update on the progress of the BOP testing during the monthly status conferences (Appx. C at p. 58, l. 1).

- **Oct. 15 Minute Entry (Dkt. 565):**  Stated that counsel for the United States reported on the BOP testing facility and protocol and attached as Exhibit 1 is an update from the JIT.

- **Transcript of the Oct. 25, 2010 pre-trial conference** (transcript excerpts attached hereto as Appendix D):  The  JIT status report was introduced into evidence.  The status report states that a workshop on BOP forensic testing was held in Houston on September 14, 2010 and was open to "Parties-in-Interest (PIIs) and Parties in the Multi-District Litigation (MDL)" and that workshop "provided the opportunity for open and collaborative dialogue between the Parties and DNV about the comprehensive BOP testing procedures."   Mr. Underhill, the U.S. attorney, assured the Court that the JIT was attempting to make the examination by the DNV a "collaborative process" (Appx. D at p.50, l. 7).  The Court expressed its concern over the delay in beginning the examination (*Id.* at p. 53, l. 8).

- **Nov. 19, 2010 Status Conference (Dkt. 782):**  Counsel for the United States reported that testing of the BOP had begun and was scheduled to be completed by March, 2011.  The transcript of that hearing shows the court asked Mr. Underhill for an update on the BOP testing (p. 27, l. 13).

- **Dec. 17, 2010 Status Conference (Dkt. 905):** The report stated that counsel for the Department of Justice reported that forensic testing on the BOP was proceeding according to schedule.

- **Transcript of Jan. 28, 2011 Status Conference** (transcript excerpts attached hereto as Appendix E):  The transcript of the January 28, 2011 status conference shows clearly that a distinction was made between the inadmissibility of the JIT Report and the use of the DNV report by the parties.  The Court began by expressing its concern over the BOP testing falling behind schedule (Appx. E at p. 30, l. 1).  Mr. Underhill stated that although the testing had fallen somewhat behind schedule because of various factors, it was anticipated that the testing would be completed by the end of the first week of March (*Id.* at p. 31, l. 16).  He also stated that he was attempting to get the data out to the parties sooner than that, so that the parties can "find what's useful to them for the purposes of taking depositions in the MDL" (*Id.* at p. 33, l. 5).  Mr. Miller later expressed his concerns about any delay in the release of the final report of the DNV (*Id.* at p. 36, l. 14) and the impact on discovery deadlines (*Id.* at p. 36, l. 20).  Mr. Sterbcow, representing the PSC, also expressed his concerns about the timing of the release of the DNV report and stated:  "We haven't been able to retain certain experts because we're not sure where we're heading with this [.]"  (*Id.* at 38, l. 9).  He later stated the need to "hire all of our experts[.]"  (*Id.* at 39, l. 2).

  Mr. Underhill then made a distinction between the MBI final report and the DNV final report, as follows (*Id.* at p. 39, l. 6; emphasis added):

  I wanted to make a clarification in response to what Paul, Mr. Sterbcow said.  When I talked about the report being out at the end of March, perhaps it's not clear to all in the courtroom.  **There are going to be two reports.  One we anticipate, as I said, hopefully by the end of March.  That's the DNV's forensic testing report.  The board's report is going to be later than that, but I don't think that matters to this Court because the Board's report by statute is inadmissible.  We can't use it, none of us, as evidence in this Court.  I think I've got the statute right.  The DNV report, which will be the forensic tester's report, will be done before that, and that's what, I think, the parties are looking for.**

- **The Mar. 25, 2011 Status Conference (Dkt. 1761):**  The report states that Mr. Underhill reported that the BOP testing is complete and the "Government has issued a report, which is now available to the public."  The report also states that BP's motion for access to the BOP for further testing was discussed, with a mandate that all further testing be completed by June 15, 2011.

# APPENDIX A

1

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  OIL SPILL BY THE OIL RIG      *   MDL NO. 2179
             *DEEPWATER HORIZON* IN THE        *
6            GULF OF MEXICO ON                 *   Section J
             APRIL 20, 2010                    *
7                                              *   August 20, 2010
                                               *
8    This Document Relates to All Cases   *   9:00 a.m.
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

9

10

11               STATUS CONFERENCE BEFORE THE
                 HONORABLE CARL J. BARBIER
12               UNITED STATES DISTRICT JUDGE

13   <u>Appearances</u>:

14

15   For the Plaintiffs:         Domengeaux Wright Roy
                                    & Edwards, LLC
16                               BY:  JAMES P. ROY, ESQ.
                                 556 Jefferson Street, Suite 500
17                               Post Office Box 3668
                                 Lafayette, Louisiana 70502

18

19   For the Plaintiffs:         Herman, Herman, Katz & Cotlar, LLP
                                 BY:  STEPHEN J. HERMAN, ESQ.
20                               820 O'Keefe Avenue
                                 New Orleans, Louisiana 70113

21

22   For the Defendants:         Kuchler Polk Schell
                                    Weiner & Richeson, LLC
23                               BY:  DEBORAH D. KUCHLER, ESQ.
                                 1615 Poydras Street, Suite 1300
24                               New Orleans, Louisiana 70112

25

1   Appearances:

2

3   For the Defendants:            Liskow & Lewis, APLC
                                    BY:  DON K. HAYCRAFT, ESQ.
                                    701 Poydras Street, Suite 5000
4                                   New Orleans, Louisiana 70139

5

6   For the Defendants:            Godwin Ronquillo, PC
                                    BY:  DONALD E. GODWIN, ESQ.
                                    1201 Elm Street, Suite 1700
7                                   Dallas, Texas 75270

8

9   For the Defendants:            Frilot, LLC
                                    BY:  KERRY J. MILLER, ESQ.
10                                  1100 Poydras Street, Suite 3700
                                    New Orleans, Louisiana 70163

11

12  For the Defendants:            Stone Pigman Walther Wittmann, LLC
                                    BY:  PHILLIP A. WITTMANN, ESQ.
                                         CARMELITE M. BERTAUT, ESQ.
13                                  546 Carondelet Street
                                    New Orleans, Louisiana 70130

14

15  Also Participating:            David J. Beck, Esq.
                                    Joe W. Redden Jr., Esq.
16                                  J. Andrew Langan, Esq.
                                    R. Michael Underhill, Esq.
17                                  Lieutenant Commander Jeff Bray
                                    Silvia Murphy, Esq.
18

19  Official Court Reporter:       Toni Doyle Tusa, CCR, FCRR
                                    500 Poydras Street, Room HB-406
20                                  New Orleans, Louisiana 70130
                                    (504) 589-7778
21

22

23
    Proceedings recorded by mechanical stenography; transcript
24  produced by computer.

25

<u>**PROCEEDINGS**</u>

**(August 20, 2010)**

1

2

3    (WHEREUPON the following proceedings were held in

4  chambers with all parties participating by telephone.)

5    THE COURT:  Good morning everyone.

6    MR. WITTMANN:  Good morning, Your Honor.

7  Phil Wittmann.  We have a bunch of us on the line.  I think

8  Don Haycraft has a complete roll.

9    THE COURT:  Let's get the roll of who is on the line,

10  Mr. Haycraft.

11    MR. WITTMANN:  Don?

12    THE COURT:  Maybe everyone is here but Don.

13    UNIDENTIFIED SPEAKER:  Your Honor, he had indicated

14  he was borrowing a phone somewhere, so it may have dropped off.

15    MR. WITTMANN:  I'll tell you what I have so far,

16  Judge.  We have Mike Underhill representing the Department of

17  Justice.  Commander Jeff Bray is along, as well, with him.

18    THE COURT:  Wait, wait, wait.  Go slower, Phil.

19  Start over.  Mike Underhill --

20    MR. WITTMANN:  Mike Underhill.

21    THE COURT:  -- with Department of Justice?

22    MR. WITTMANN:  Yes, sir.

23    THE COURT:  Okay.

24    MR. WITTMANN:  Commander Jeff Bray.

25    THE COURT:  That's B-R-A-Y?

1      MR. WITTMANN:  Yes.

2      THE COURT:  Okay.

3      MR. WITTMANN:  Silvia Murphy also with DOJ.

4      THE COURT:  Okay.

5      MR. UNDERHILL:  Actually, Silvia is with Minerals

6  Management, or Department of Interior I should say.

7      MR. WITTMANN:  I'm sorry.  Then we did have Don on

8  for a while, but he is not there now.

9      MR. HAYCRAFT:  Hello?  Hello?  Y'all aren't hearing

10  me?

11      THE COURT:  There you are.  Now we hear you.

12      MR. WITTMANN:  Can you hear me, Don?

13      MR. HAYCRAFT:  Yes, I hear you fine.  All of the

14  sudden people started talking about me being gone.

15      THE COURT:  Well, you weren't responding when your

16  name was called.

17      MR. WITTMANN:  I'll continue the roll call, Don, and

18  correct me if I leave anybody out.

19      MR. HAYCRAFT:  Okay.

20      MR. WITTMANN:  We have David Beck, Joe Redden,

21  Phil Wittmann, and Carmelite Bertaut for Cameron.  We now have

22  Don on for BP.  For the plaintiffs we have Jim Roy and Steve

23  Herman.  For Halliburton we have Don Godwin.  For Anadarko we

24  have Deb Kuchler.  For Transocean we have Kerry Miller.  Is

25  there anyone else from BP on?  Andy, are you on?

1    instead of having a testing protocol drafted by the Department

2    of Interior and thrust upon us, that the testing protocol, the

3    transport, the handling of the BOP ought to be the subject of

4    this Court's jurisdiction and ought to be a product of input

5    from all interested parties, including the litigants before the

6    Court, and that's really the subject of our motion for

7    protective order.

8              We understand the BOP is going to come up,

9    decisions are going to be made as to how to transport it, where

10   to transport it.  I would say that this is the first I'm

11   hearing about Stennis Space Center in Bay St. Louis.  For the

12   last several days, what we heard was that the BOP was going to

13   Michoud, no questions asked.  Now we have heard it's going to

14   Stennis Space Center.

15             It's been Transocean's position, as well as a

16   number of other interested parties, that Michoud did not have

17   the capacity to hold the BOP.  Your Honor, it's 50 feet high.

18   It's 350 tons.  You have to bring it to the right place.  It

19   has to be transported right.  The evidence has to be preserved.

20   This is not a piece of pipe.  This is a large sophisticated

21   piece of equipment.  It's critical evidence in the case.

22             We would be happy to have our motion for

23   protective order set on a expedited basis so that the Court can

24   look at it and get involved, but that in essence is the

25   substance.  It is input from all interested parties into the

1  handling, transport, and to the testing and analysis that's

2  going to be done on the BOP.

3           THE COURT:  Well, I would have assumed that all the

4  interested parties would have had input.  Mr. Underhill,

5  there's been no input on any of the protocol by any of the

6  interested parties?

7           MR. UNDERHILL:  I'm looking at a note here,

8  Your Honor.  I've been handed a note by my DOI representative

9  saying that the marine board engaged the parties in interest in

10  the testing protocols and intends to do so.  Can I make a

11  suggestion --

12           THE COURT:  Sure.

13           MR. UNDERHILL:  -- that may simplify some of what we

14  are dealing with today?

15           THE COURT:  All right.

16           MR. UNDERHILL:  What I would respectfully suggest,

17  Your Honor, is that we split this discussion into two separate

18  issues.  Let's take the issue of Transocean's concern about the

19  testing protocol and, for that matter, the private plaintiffs'

20  concern.  We see that as being step two.  Step two.  That's not

21  what we are talking about now.

22                 Any testing that goes forward, my best ballpark,

23  what I'm being told, is probably not going to happen for

24  probably at least a month and probably even way outside that.

25  I shouldn't say "way outside," but at least for a month.  The

1    contract is trying to be let to the consultant that will do the

2    engineering teardown.  There aren't really many people that can

3    do it, frankly.  There are only a few out there that are

4    qualified to do it.  They don't even have a contract yet, so

5    that's down the road.

6             We fully expect and fully expected Your Honor --

7    assuming you got the MDL and you did.  We fully expected

8    Your Honor to be telling the parties, including the board and

9    the government, that you approve of any testing protocols that

10   are done.

11            I think in your pretrial order it says that the

12   parties are to confer and try to work things out.  If they do,

13   that's a great thing.  If they can't, then we will have a

14   conference like we are having right now.  So that's step two.

15   We are not talking about testing.  Nobody is going to test the

16   BOP.  Nobody is going to test the fish removed from the well,

17   the drill string.

18            All we are talking about now is step one, which

19   is to get it out of the water, put it under safe and secure

20   control, where it's free from the elements, where it's free

21   from any party's ability to try and meddle with the evidence,

22   everybody is safe, everybody is secure.

23            On that note, once I get a copy that I know is

24   the final draft, I will be very happy to provide that to the

25   Court and have it distributed to the parties in interest.

16

1  There's absolutely no problem.  The only reason I'm not doing

2  it now is I don't have a final draft with me.  I think that

3  will give Your Honor something to actually look at and judge

4  whether the evidence protocols that we are really talking about

5  this morning are sufficient in Your Honor's mind.

6            That would be my suggestion.  We split it up

7  into retrieval, step one.  Testing is down the road.  We'll

8  deal with that once we actually get somebody contracted in

9  place to do the testing and tell the parties what the proposed

10  protocols are.  Then if the parties want to try to shoot

11  bullets at it, we will do that.

12          THE COURT:  Let me ask this.  Don Haycraft or whoever

13  can address this.  What is the time line now that we are

14  looking at in terms of the attempt to retrieve the drill string

15  first and then the blowout preventer?

16          MR. HAYCRAFT:  Judge, Mike probably has details too,

17  but my understanding as early as tomorrow, when this ambient

18  testing place is completed, then Admiral Allen will give the

19  go-ahead to begin the fishing expedition and retrieve the drill

20  pipe.  That's why we wanted the status conference today because

21  it may well be this weekend that the fishing operations start.

22          THE COURT:  Well, why don't we talk about that first.

23  That would not involve retrieving or removing the blowout

24  preventer.

25          MR. HAYCRAFT:  Right.

1   even begun.

2          MS. KUCHLER:  That's true, and we share in those

3   concerns.

4          THE COURT:  That's what we are talking about right

5   now.  Again, I'm assuming that the government, the unified

6   command, or the Coast Guard, whoever is in charge here, is

7   going to be working with the contractor to do just what you

8   said, to get a testing protocol at some point.  Is that right,

9   Mr. Underhill?

10          MR. UNDERHILL:  That's correct, Your Honor.  It's

11   part of the plan.  They felt the most expeditious way to do it

12   was to have the expert contractor submit the protocols, put it

13   out for comment.  Listen, if the protocols can be strengthened,

14   then everybody is better off, but put that out there rather

15   than have ten plans that compete.  I think that the lady

16   from -- I think it was Anadarko --

17          THE COURT:  Right.

18          MR. UNDERHILL:  What she suggests was, in fact, the

19   plan.

20          THE COURT: `Right.  What has been drafted so far with

21   regard to the BOP?  Do you have a protocol for removing it,

22   preserving it, transporting it, storing it, and all that?  Do

23   you have a protocol for all of that yet?

24          MR. UNDERHILL:  We do, and that's what I said,

25   Your Honor.  I'm actually down the hall from you in the witness

1   room.   What I have, I think this is the final language, but it
2   has "Draft" written on it.   I'm hesitant to give it to
3   Your Honor until I know it's actually the final.
4        THE COURT:   Well, I don't necessarily want you to
5   give it to me, but I would like you to maybe share it with the
6   interested parties here who are on this phone call.   That's
7   what Mr. Miller is asking for so that they can have some input
8   and it's not just presented to them as a fait accompli.
9        MR. UNDERHILL:   Are we talking now about the evidence
10   protocol or the BOP testing phase?
11        THE COURT:   Well, we are talking about both, but my
12   thinking is that the final drafting of the testing will have to
13   wait until it is drafted or finalized by the contractor and
14   then put out, as you said, for comment.   We just want to make
15   sure it's not issued and then they say, "The testing is going
16   to occur tomorrow and here's the protocol," that there's some
17   reasonable opportunity for input from the interested parties.
18        MR. UNDERHILL:   No, we are totally on board with
19   that.   All I was trying to make clear, Your Honor, is we have
20   the evidence.   I'm talking about the retrieval and the storage
21   protocol --
22        THE COURT:   Right.   Right.   That's what I'm talking
23   about too.
24        MR. UNDERHILL:   -- and the chain of custody protocol,
25   and I think that's in the form that -- well, let's put it this

1  way.  Hopefully that's the final form because in order to --
2  this was the approach that was taken, in order to satisfy the
3  highest level of chain of custody, that we would do it in
4  accordance with even a criminal protocol because that would
5  satisfy any potential civil parties' concerns about chain of
6  custody.  In other words, that's the highest common
7  denominator.
8          THE COURT:  When can you give that to all the
9  interested parties who are on this call?
10         MR. UNDERHILL:  I can probably do it within the hour.
11         THE COURT:  Okay.
12         MR. UNDERHILL:  I've got nods from the heads over
13 there.  They said that's possible.
14         THE COURT:  Okay.  Why don't we agree that that's
15 what you will do.  As Mr. Roy or Mr. Herman pointed out, they
16 are not technically interested parties perhaps in the context
17 of the marine board of investigation, but they certainly are
18 interested parties in this litigation, so I want them to be
19 included on that.  Okay?
20         MR. UNDERHILL:  I understand.  Just to try to make it
21 even clearer that we are taking the chain of custody and
22 evidence preservation requirements very seriously, there's an
23 FBI evidence recovery team that is going to be a part of this.
24 If I'm not mistaken, it's probably already a part of it.  So
25 these are people that are experienced in chain of custody,

1    making sure that everything is done by the book --

2            THE COURT:  Okay.

3            MR. UNDERHILL:  -- so nobody has a problem later

4    about anything being done to the evidence that was improper

5    once it's removed from the seafloor and until it's put under

6    lock and key.

7            THE COURT:  Anybody else want to weigh in on any of

8    the things we just talked about?

9            MR. GODWIN:  Your Honor, Don Godwin for Halliburton.

10   We join Transocean's motions as well as Kerry's and Deb's

11   comments this morning.

12           THE COURT:  Okay.  Very well.  Well, it sounds like

13   this is what we have agreed to do.  Mr. Haycraft, you have

14   already circulated a proposed order?

15           MR. HAYCRAFT:  Right, and I want to get it to Mike.

16           THE COURT:  Okay.  Get it to Mr. Underhill.  I don't

17   know if there are any remaining issues relating to your

18   proposed order.  If there are, we can hear them now if anybody

19   wants to voice them.

20           MR. WITTMANN:  We have a couple, Your Honor.

21           THE COURT:  Okay.  Mr. Wittmann.

22           MR. WITTMANN:  In paragraph 2, Don, of your order you

23   say, "No metallurgical analysis or other potential destructive

24   testing on the recovered physical evidence will be conducted

25   without first providing plaintiffs . . . ."  I would say

33

1   drill string, the BOP, all that.  That's a separate document.

2   So is the question that people want to review --

3          THE COURT:  They want both.  They want both.  Is

4   there any problem with that?

5          MR. UNDERHILL:  I would only offer this up for

6   consideration, Your Honor.  I represent a litigant or a

7   potential litigant, too, so I look at it from a lawyer's

8   perspective.  But it causes me deep concern when we have

9   counsel -- good counsel, don't get me wrong, good, skilled

10  counsel -- starting to make engineering decisions that they're

11  not qualified to do when these files -- the engineering plans,

12  we are talking 30, 40, 50-page plans.  We are not talking

13  lawyerese.

14         THE COURT:  I don't think any lawyer is going to try

15  to do engineering.  I think they just want to be able to see it

16  and have input, if they think it's necessary, or know what's

17  going on or what's planned.  I think they are entitled to that.

18         MR. UNDERHILL:  Can I ask you to hold one second?  I

19  have a question for Lieutenant Commander Bray.

20              Jeff, do you know if once the engineering plans

21  are finalized, whether they're available through the unified

22  command as public documents?

23              We can try to find that out, Your Honor.  That

24  might be the simple way to do it.

25         THE COURT:  All right.  I think the interested

34

1  parties are entitled to have access to that one way or the

2  other, so see if we can facilitate that the easiest way.  Okay?

3          MR. UNDERHILL:  Sure.

4          THE COURT:  Anybody have anything else?

5          MR. ROY:  That's for both the pipe recovery and the

6  BOP procedures that are anticipated for removal; correct?

7          THE COURT:  Correct.  Correct.

8          MR. UNDERHILL:  Understood.

9          THE COURT:  Anything else from anyone?

10         MS. BERTAUT:  Judge, it's Carmelite Bertaut.  Can we

11  have the name of the court reporter?

12         THE COURT REPORTER:  Toni Tusa.

13         THE COURT:  Anybody have anything else?

14         MR. HAYCRAFT:  Nothing here, Judge.

15         THE COURT:  Everyone have a great weekend.

16         (WHEREUPON the Court was in recess.)

17                        * * *

18                  **CERTIFICATE**

19      I, Toni Doyle Tusa, CCR, FCRR, Official Court
   Reporter for the United States District Court, Eastern District
20 of Louisiana, do hereby certify that the foregoing is a true
   and correct transcript, to the best of my ability and
21 understanding, from the record of the proceedings in the
   above-entitled and numbered matter.

22

23

24                        s/ Toni Doyle Tusa
                          Toni Doyle Tusa, CCR, FCRR
25                        Official Court Reporter

# APPENDIX B

1                    UNITED STATES DISTRICT COURT
2                    EASTERN DISTRICT OF LOUISIANA

3    *****************************************************************

4    IN RE:  OIL SPILL BY THE
     OIL RIG *DEEPWATER HORIZON*
5    IN THE GULF OF MEXICO ON
     APRIL 20, 2010
6                              MDL NO. 2179 "J"
                               NEW ORLEANS, LOUISIANA
7                              FRIDAY, SEPTEMBER 3, 2010, 9:30 A.M.

8    THIS DOCUMENT RELATES TO
     ALL CASES
9
     *****************************************************************
10

11                   TRANSCRIPT OF MOTION PROCEEDINGS
             HEARD BEFORE THE HONORABLE CARL J. BARBIER
12                   UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15

16   FOR THE PLAINTIFFS:     LEWIS, KULLMAN, STERBCOW & ABRAMSON
                             BY:  PAUL M. STERBCOW, ESQUIRE
17                           PAN AMERICAN LIFE BUILDING
                             601 POYDRAS STREET, SUITE 2615
18                           NEW ORLEANS LA  70130

19                           WILLIAMS LAW GROUP
                             CONRAD S. P. WILLIAMS, ESQUIRE
20                           435 CORPORATE DRIVE, SUITE 101
                             HOUMA LA  70360
21

22                           MARTZELL & BICKFORD
                             BY:  SCOTT R. BICKFORD, ESQUIRE
23                           338 LAFAYETTE STREET
                             NEW ORLEANS LA  70130
24

25

Case 2:10-md-02179-CJB-DPC   Document 4748-1   Filed 11/28/11   Page 20 of 43
Case 2:10-md-02179-CJB-SS   Document 543   Filed 10/14/10   Page 104 of 125

104

| | | |
|---|---|---|
| 11:59AM | 1 | meeting. |
| 11:59AM | 2 | I was going to say something else.  Oh, well, just that in |
| 11:59AM | 3 | terms of the longer-term issues of preservation, forensic testing |
| 12:00PM | 4 | analysis and forensic examination, again, from what I've heard |
| 12:00PM | 5 | here, there will be opportunity for consultation and input from |
| 12:00PM | 6 | the interested parties.  And I know that the -- I do think |
| 12:00PM | 7 | that -- I hope that you all will be able to agree on the testing, |
| 12:00PM | 8 | forensic protocols and those things without court intervention; |
| 12:00PM | 9 | but, obviously, again, if there is some major disagreement or |
| 12:00PM | 10 | disagreements before that begins -- none of that should begin |
| 12:00PM | 11 | until protocols have been put in place and everyone has had a |
| 12:00PM | 12 | chance to weigh in -- and if there are some major disagreements, |
| 12:00PM | 13 | that's something that obviously can be brought back to the |
| 12:00PM | 14 | attention of this Court before any testing or certainly any |
| 12:01PM | 15 | destructive testing has begun.  Okay? |
| 12:01PM | 16 | MR. MILLER:  Thank you, Your Honor. |
| 12:01PM | 17 | THE COURT:  Does anyone have anything else? |
| 12:01PM | 18 | MR. GORDAN:  Your Honor, my name is Steve Gordan from |
| 12:01PM | 19 | Houston, Texas.  And I was late, and I just wanted to apologize. |
| 12:01PM | 20 | I represent a party in interest, Doug Brown of the Joint |
| 12:01PM | 21 | Investigation Taskforce. |
| 12:01PM | 22 | THE COURT:  Eileen, here is the sheet.  I think there |
| 12:01PM | 23 | are some other people who haven't signed in.  If anyone is here |
| 12:01PM | 24 | who has not signed in to show that you were here today, we'll put |
| 12:01PM | 25 | this in the record, you can sign in with Eileen as soon as we |

Case 2:10-md-02179-CJB-DPC   Document 4748-1   Filed 11/28/11   Page 21 of 43
Case 2:10-md-02179-CJB-SS   Document 543   Filed 10/14/10   Page 108 of 125

108

<pre>
 1                     REPORTER'S CERTIFICATE

 2

 3       I, Cathy Pepper, Certified Realtime Reporter, Registered

 4  Merit Reporter, Registered Professional Reporter, Certified Court

 5  Reporter of the State of Louisiana, Official Court Reporter for

 6  the United States District Court, Eastern District of Louisiana,

 7  do hereby certify that the foregoing is a true and correct

 8  transcript, to the best of my ability and understanding, from the

 9  record of the proceedings in the above-entitled and numbered

10  matter.

11

12

13                              s/Cathy Pepper
                                _____
14                              Cathy Pepper, CRR, RMR, CCR

15                              Official Court Reporter

16                              United States District Court

17

18

19

20

21

22

23

24

25
</pre>

Case 2:10-md-02179-CJB-DPC  Document 5448-1  Filed 01/28/11  Page 22 of 43
Case 2:10-md-02179-CJB-SS  Document 5443-1  Filed 01/14/11  Page 1 of 125

1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3   ********************************************************

 4   IN RE:  OIL SPILL BY THE
     OIL RIG DEEPWATER HORIZON
 5   IN THE GULF OF MEXICO ON
     APRIL 20, 2010
 6                             MDL NO. 2179 "J"
                               NEW ORLEANS, LOUISIANA
 7                             FRIDAY, SEPTEMBER 3, 2010, 9:30 A.M.

 8   THIS DOCUMENT RELATES TO
     ALL CASES
 9
     ********************************************************
10

11              TRANSCRIPT OF MOTION PROCEEDINGS
            HEARD BEFORE THE HONORABLE CARL J. BARBIER
12                UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15

16   FOR THE PLAINTIFFS:     LEWIS, KULLMAN, STERBCOW & ABRAMSON
                             BY:  PAUL M. STERBCOW, ESQUIRE
17                           PAN AMERICAN LIFE BUILDING
                             601 POYDRAS STREET, SUITE 2615
18                           NEW ORLEANS LA  70130

19                           WILLIAMS LAW GROUP
                             CONRAD S. P. WILLIAMS, ESQUIRE
20                           435 CORPORATE DRIVE, SUITE 101
                             HOUMA LA  70360
21

22                           MARTZELL & BICKFORD
                             BY:  SCOTT R. BICKFORD, ESQUIRE
23                           338 LAFAYETTE STREET
                             NEW ORLEANS LA  70130
24

25
```

10:49AM  1   significant data or significant forensic evidence during the

10:49AM  2   performing of that if that was not performed as part of the

10:49AM  3   forensic study.

10:49AM  4   Q.   Now, my questions of Mr. Farr probably weren't the most

10:49AM  5   articulate in terms of --

10:49AM  6           THE COURT:  Wait.  Before you go there, your last

10:49AM  7   answer, explain that for me.  What would be the risk of

10:49AM  8   compromising the forensic evidence?

10:49AM  9           THE WITNESS:  You know, we're looking at the failure of

10:49AM 10   the BOP and its components to react to the blowout.  And that is

10:49AM 11   probably -- in large part, will be contained within the ram

10:49AM 12   cavities and -- or could possibly be within the rams, it could be

10:50AM 13   associated with the packing material, the donuts, as we called

10:50AM 14   them.  That could be critical to our -- to our forensic evidence,

10:50AM 15   and that should only be -- and the ram -- the ram cavities, that

10:50AM 16   should only be opened up during the forensic investigation where

10:50AM 17   we are paying attention to the forensic evidence, as opposed to

10:50AM 18   only being concerned with preservation standpoint of the surfaces

10:50AM 19   from corrosion.

10:50AM 20           MR. UNDERHILL:  Thank you, Your Honor.

10:50AM 21                            EXAMINATION

10:50AM 22   BY MR. UNDERHILL:

10:50AM 23   Q.   I was going to say that my questions to Mr. Farr probably

10:50AM 24   weren't the most articulate because I'm not an engineer,

10:50AM 25   certainly not a BOP expert.

Case 2:10-md-02179-CJB-DPC Document 4748-1 Filed 11/28/11 Page 24 of 43
Case 2:10-md-02179-CJB-SS Document 5433 Filed 10/11/11 Page 90 of 125

59

10:50AM 1    To the best of your understanding, could you take us, just

10:50AM 2  very generically, the steps that you understood that he talked

10:50AM 3  about doing?  And I'm not talking about the fine detail.  Just

10:50AM 4  keep it on the broad scope.

10:50AM 5    First of all, did he talk about removing the annulars?

10:50AM 6  A.   Yes.  I mean, he's talking about removing the annulars, he's

10:51AM 7  talking about opening up the ram cavities where the -- you know,

10:51AM 8  the ram positioning, for instance, may be very important to us,

10:51AM 9  and just what the condition of those are.  And we want to be able

10:51AM 10  to look at that for the first time within our forensic

10:51AM 11  investigation.

10:51AM 12    So most of the activities that they want to perform within

10:51AM 13  this intermediate preservation step, I think they called it,

10:51AM 14  those are all things that have to be done under the context of a

10:51AM 15  forensic investigation and preserving the evidence that may be

10:51AM 16  contained within those areas.

10:51AM 17  Q.   Is it safe to assume that when the testing protocol -- I'm

10:51AM 18  talking about the forensic testing goes forward in October, that

10:51AM 19  these things will, in fact, be taken apart?

10:51AM 20  A.   Yes, that's correct.

10:51AM 21  Q.   And will it be done in some sort of methodical protocol, a

10:52AM 22  step-by-step-by-step-by-step process, so that you can approach it

10:52AM 23  in a scientific forensic manner?

10:52AM 24  A.   That's correct, documenting every step that we take during

10:52AM 25  that process.

10:52AM 1   Q.   And by documenting, could you give us a little detail on

10:52AM 2   that?

10:52AM 3   A.   Well, the documenting will both be video documenting, it'd

10:52AM 4   be photography; but, also, it's the -- it's the location of each

10:52AM 5   component within those areas.  It's looking at the amount of

10:52AM 6   torque that it takes to remove the bolts from these areas.

10:52AM 7       I mean, it's just documenting everything that is involved

10:52AM 8   with removing the casings and going into these -- into these

10:52AM 9   areas and the components within them.  Positioning, condition of

10:53AM 10  the components, it's all of that.

10:53AM 11  Q.   Almost on the home stretch here, sir.  Two general summary

10:53AM 12  questions, and we can, I think, finish.

10:53AM 13      Is it your opinion that the -- whatever we want to call

10:53AM 14  them, short-term procedures, that in that gap of time between

10:53AM 15  September 9th and October 1st, is it your opinion that those

10:53AM 16  procedures must be done in order to preserve the evidence for the

10:53AM 17  purposes of forensic testing?

10:53AM 18  A.   These -- these tests should be done as long as they don't

10:53AM 19  interfere with or compromise any other forensic information.

10:53AM 20      So the condition of the BOP stack as it is brought up to the

10:53AM 21  surface is very critical.  The positioning, if -- if there is a

10:53AM 22  pipe within the wellbore of the BOP, that's critical to note

10:53AM 23  that.  And we want to be very careful as to whether we -- that we

10:54AM 24  don't disturb that evidence even during those preservation

10:54AM 25  procedures.

10:54AM 1     And that -- the discussion is -- will go on with the team

10:54AM 2  that's onboard doing that, doing the preservation procedures.

10:54AM 3  And the procedures have, in fact, within them decision points

10:54AM 4  depending on what is found as they bring the -- when the BOP then

10:54AM 5  is retrieved.

10:54AM 6  Q.   Is it fair -- do you understand that there are at least two,

10:54AM 7  possibly three pieces of drill pipe inside the BOP?

10:54AM 8  A.   I understand that there could be multiple pieces, I don't

10:54AM 9  know how many.

10:54AM 10  Q.   And I don't mean to be facetious here, but would it be

10:54AM 11  correct to state that that's not the way it's designed to be; in

10:54AM 12  other words, you're supposed to have one pipe in there at a time,

10:54AM 13  not two or three, correct?

10:54AM 14  A.   Yeah, multiple pieces and the conditions of those pieces,

10:54AM 15  all of that is -- is something that is just critical to the -- to

10:54AM 16  the forensic evidence.

10:55AM 17  Q.   And is it your preference that as little as possible be done

10:55AM 18  to disturb that forensic evidence?

10:55AM 19  A.   That is my position, until the forensic investigation team

10:55AM 20  is involved during that testing process.

10:55AM 21  Q.   And do you understand that it might -- they might have to do

10:55AM 22  things for other operational reasons, but your ideal would be

10:55AM 23  that they not perform them?

10:55AM 24  A.   That's correct.

10:55AM 25     And, again, it's what the condition is when they bring --

Case 2:10-md-02179-CJB-DPC Document 4748-1 Filed 11/28/11 Page 27 of 43
Case 2:10-md-02179-CJB-SS Document 5438 Filed 10/11/40 Page 70 of 125

70

11:08AM 1    A.    The heat itself could increase the corrosion rate, but I
11:08AM 2    don't believe it will increase it beyond the 12-mil-per-year type
11:08AM 3    number.   And if it does increase it, we're still talking minimal
11:09AM 4    corrosion that will occur during a four-to-five-week period.
11:09AM 5    Q.    So a highly ambient environment will lead to faster
11:09AM 6    corrosion than a subsea aqueous environment, correct?
11:09AM 7    A.    That's correct.
11:09AM 8    Q.    Sir, what about -- would you agree with me that within the
11:09AM 9    inner working parts of the BOP, including the well bore sections
11:09AM 10   and the annulars, that there is the potential, given the ambient
11:09AM 11   environment, for acidic reactions to occur?
11:09AM 12   A.    No, I don't agree.
11:09AM 13   Q.    Why not?
11:09AM 14   A.    It just isn't.   The reactions probably are driven by the
11:09AM 15   presence of oxygen, not the presence of acid.   And the acid you
11:09AM 16   might be talking about could be generated due to carbon dioxide
11:10AM 17   being present in the air.
11:10AM 18   Q.    What about -- you've talked a lot about the seawater
11:10AM 19   environment.   The wellbore section of the BOP, even when it's in
11:10AM 20   the ambient environment at the Michoud yard, it's still going to
11:10AM 21   have on it, and this is a real nontechnical term, remnants or
11:10AM 22   residue of saltwater, correct?
11:10AM 23   A.    Correct.   It will be washed and cleaned, you know, as per
11:10AM 24   the preservation procedures.
11:10AM 25   Q.    What about remnants of petroleum hydrocarbons, will those be

# APPENDIX D

1                    UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF LOUISIANA

3

4

5

6    IN RE:  OIL SPILL BY THE        *   Docket 10-1156 "J"
     OIL RIG DEEPWATER HORIZON       *
7    IN THE GULF OF MEXICO ON        *   October 15, 2010
     APRIL 20, 2010                  *
8                                    *   9:30 a.m.
                                     *
9    This Document Relates to:       *
                                     *
10   All cases.                      *
                                     *
11   * * * * * * * * * * * * * * * * * *

12                      PROCEEDINGS BEFORE THE
13                    HONORABLE CARL J. BARBIER
                    UNITED STATES DISTRICT JUDGE
14

15   APPEARANCES:

16

17   For the Plaintiffs:        Domengeaux, Wright, Roy & Edwards
                                BY:  JAMES P. ROY, ESQ.
18                              556 Jefferson Street
                                Suite 500
19                              Post Office Box 3668
                                Lafayette, Louisiana 70502

20

21                              Herman, Herman, Katz & Cotlar
                                BY:  STEPHEN J. HERMAN, ESQ.
22                              820 O'Keefe Avenue
                                New Orleans, Louisiana 70113

23

24

25

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1    MR. UNDERHILL: Fair enough. The only point I wanted

2    to make is that -- to the Court and the parties, for that

3    matter, is that the JIT figured that they could pretend like

4    they're Patton driving up through Italy and roll over anybody

5    on the way. They didn't take that course. They respected the

6    parties' concerns as well as Your Honor's concerns to try to

7    make it a collaborative process. And if that slowed down the

8    process, so be it.

9          I personally think that that's good in the long

10   run. Because if they can work it out up front, we spend less

11   time in court. The DNV final plan is due either today or very

12   soon. They received 200 line comments from, I think, seven

13   different parties. They're taking those comments seriously and

14   trying to incorporate them into the plan.

15         Once that's approved, the testing itself will

16   start, hopefully, very soon, possibly as early as next week.

17   That's not a promise, but it's my hope.

18    THE COURT: What is the status -- my understanding

19   from the last time we were here that it was sent to Michoud,

20   there was no -- there was concern, I know, from Mr. Miller and

21   Transocean about this thing being out on the dock, not in an

22   enclosed facility, for some extended period of time and we

23   were -- I thought -- I didn't go back and read the transcript,

24   frankly. So I may be misstating this or not remembering it

25   correctly.

1    things usually don't go on schedule and that concerns me in
2    this context.
3                    That if the government -- whoever it might be.
4    I'm not criticizing any particular agency now -- but in
5    general, my experience has been that if they tell me something
6    is going to be done in six weeks, I can usually double it in
7    terms of when something is going to happen.
8                    I just want to send the message that this needs
9    to proceed and we need to get this done because so many other
10   things hinge on getting this analysis done and report done and
11   so forth.
12            **MR. UNDERHILL:**  Your Honor, message received.  It's
13   been relayed before, it will be relayed again.
14            **THE COURT:**  Okay.
15            **MR. UNDERHILL:**  I note one comment about government
16   bureaucracies:  We actually did better than AT&T did this
17   morning on the conference call, so... and I hope that we
18   continue to do that.
19            **THE COURT:**  I'll give you that one.
20                    Maybe it will be Verizon next time.  It looks
21   like they've taken over the iPhone and the iPad it looks like.
22                    Anybody else want to say anything about that,
23   about the BOP testing?
24                    Thank you, Mr. Underhill.
25                    Okay.  Cement testing.  I guess this is you,

UNITED STATES OF AMERICA
DEPARTMENT OF HOMELAND SECURITY
DEPARTMENT OF THE INTERIOR
JOINT INVESTIGATION CONDUCTED BY
UNITED STATES COAST GUARD
BUREAU OF OCEAN ENERGY MANAGEMENT, REGULATION AND ENFORCEMENT

# In the Matter of the Fire & Explosion on the Deepwater Horizon

TO: Parties-in-Interest

Below is a status update for the DEEPWATER HORIZON Macondo well Blowout Preventer system (BOP), which is currently located at the NASA Michoud Assembly Facility ("NASA/Michoud facility"), and is being prepared for continuation of the ongoing forensic testing process. As explained below, the phased forensic testing plan is proceeding expeditiously and in accordance with the JIT's goal of seeking technical input from the interested parties to the extent reasonably possible. In accordance with the foregoing collaborative process, the forensic testing design plan has included a technical workshop in Houston on September 14th; the receipt of technical input from interested parties on October 8th and 11th; and DNV will further confer with interested parties who submitted comments prior to the completion of the final BOP testing protocols. A brief outline of the ongoing BOP phased forensic testing process is set out below:

- September 11, 2010, the BOP and Lower Marine Riser Package (LMRP) arrived by barge at Coast Guard Base Support Unit (BSU) New Orleans, located on the NASA/Michoud facility.

- September 14, 2010, DNV Columbus Inc. (a subsidiary of Det Norske Veritas) the organization hired by the Board to conduct the BOP forensic testing, held a test plan design workshop in Houston, TX. The workshop, which was open to the Parties-in-Interest (PIIs) and Parties in the Multi-District Litigation (MDL), provided the opportunity for open and collaborative dialogue between the Parties and DNV about the comprehensive BOP testing procedures.

- September 23, 2010, Michoud Site preparations continued, testing platforms for the BOP and LMRP were completed and the equipment required identified. DNV continued to review maintenance records and other documents related to the BOP, to the extent provided by relevant PIIs, as well as video and photos of the intervention efforts associated with the BOP since the incident on April 20, 2010.

- September 28, 2010, the Board received the draft testing protocols from DNV, which incorporated input from the Parties who attended the BOP workshop.

- September 28, 2010, the Yellow and Blue Control Pods were lifted from the LMRP and moved to the West Dock in preparation of flushing the two control Pods.

10-15-10
Status Conf Ex 1
Filed 10-15-10 RB        MDL 2179

1  So far I've seen that and I appreciate that.

2          Anybody have anything else to say before we

3  adjourn?  All right.  Have a good day everyone.

4          **THE DEPUTY CLERK:**  All rise.

5          (WHEREUPON, the proceedings were concluded.)

6                          *****

7                       <u>CERTIFICATE</u>

8      I, Jodi Simcox, RMR, FCRR, Official Court Reporter

9  for the United States District Court, Eastern District of

10 Louisiana, do hereby certify that the foregoing is a true and

11 correct transcript, to the best of my ability and

12 understanding, from the record of the proceedings in the

13 above-entitled and numbered matter.

14

15

16                    <u>S/ Jodi Simcox, RMR, FCRR</u>

17                    Jodi Simcox, RMR, FCRR
                      Official Court Reporter

18

19

20

21

22

23

24

25

# APPENDIX E

```
 1                       UNITED STATES DISTRICT COURT
                         EASTERN DISTRICT OF LOUISIANA
 2

 3     **********************************************************

 4     IN RE:  OIL SPILL BY THE
       OIL RIG DEEPWATER HORIZON
 5     IN THE GULF OF MEXICO ON
       APRIL 20, 2010
 6                                    CIVIL ACTION NO. 10-MD-2179 "J"
                                      NEW ORLEANS, LOUISIANA
 7                                    FRIDAY, JANUARY 28, 2011, 9:30 A.M.

 8     THIS DOCUMENT RELATES TO
       ALL ACTIONS
 9
       **********************************************************
10
                         C O R R E C T E D   C O P Y
11            TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
              HEARD BEFORE THE HONORABLE CARL J. BARBIER
12                    UNITED STATES DISTRICT JUDGE

13
       APPEARANCES:
14

15     FOR THE PLAINTIFFS:

16                              DOMENGEAUX WRIGHT ROY & EDWARDS
                                BY:  JAMES P. ROY, ESQUIRE
17                              P. O. BOX 3668
                                556 JEFFERSON STREET
18                              LAFAYETTE, LA  70502

19                              HERMAN HERMAN KATZ & COTLAR
                                BY:  STEPHEN J. HERMAN, ESQUIRE
20                                   SOREN E. GISLESON, ESQUIRE
                                820 O'KEEFE AVENUE
21                              NEW ORLEANS, LA  70113

22                              BREIT DRESCHER IMPREVENTO & WALKER
23                              BY:  JEFFREY A. BREIT, ESQUIRE
                                1000 DOMINION TOWER,
24                              999 WATERSIDE DRIVE
                                NORFOLK, VA  23510
25
```

09:23AM

10:15AM 1          Okay.  I would like to move onto BOP testing status.  Where
10:15AM 2    is Mr. Underhill?  There he is.
10:15AM 3          I'll just state the reason this is on here again -- I think
10:15AM 4    it's on here routinely -- but I was kind of concerned recently
10:15AM 5    when I read -- again, I hate to keep referring to what I read in
10:15AM 6    the news media -- I read in the news media that the chemical
10:15AM 7    board was complaining or stating that things were falling way
10:15AM 8    behind out at Michoud, and it caused me concern that, again,
10:15AM 9    since we have all of these deadlines in place, that I didn't want
10:15AM 10   this to cause us problems with the discovery expert deadlines and
10:15AM 11   so forth.
10:15AM 12         So I would like to hear where we are, Mr. Underhill.
10:15AM 13              MR. UNDERHILL:  Mike Underhill, attorney for the
10:15AM 14   United States and also, to the extent needed, for the
10:15AM 15   Joint Investigation Team conducting Marine Board hearings.
10:15AM 16         Your Honor, could I preface in response to your comments,
10:16AM 17   we're all very sensitive to the issue of moving this ball
10:16AM 18   forward.  I'm going to give a pitch for the JIT.  They -- I don't
10:16AM 19   want to give a precise budget figure because I don't know if we
10:16AM 20   have it.  It's safe to say, however, that they've spent
10:16AM 21   substantial amounts of money -- and I'm talking substantial
10:16AM 22   amounts of money -- to move the Marine Board hearings forward for
10:16AM 23   the benefit of all the parties.
10:16AM 24         Yesterday is a good example.  We took a witness that
10:16AM 25   probably, if not for his testimony before the Marine Board that

10:16AM 1  did a lot of discovery for us, we easily could have taken

10:16AM 2  two days.  We finished in one.  So everybody's receiving the

10:16AM 3  benefits of the literally millions of dollars that they are

10:16AM 4  doing, and this is a pitch for my client.  A lot of those people

10:16AM 5  you've met, Lieutenant Commander Bray with the Coast Guard, these

10:16AM 6  are salaried people serving our country for, I can guarantee you,

10:16AM 7  not a whole lot of money and there is no overtime involved.  So

10:16AM 8  they are working hard.  They are sensitive to everybody's needs

10:17AM 9  and Your Honor's.  They are really doing their best.

10:17AM 10      So the segue to that is that to try to move this process

10:17AM 11  forward, the testing, so that we can all benefit the MDL from

10:17AM 12  their results.  I think the last time I appeared before

10:17AM 13  Your Honor at the last case management conference I gave a caveat

10:17AM 14  prediction that they would be done by the end of February with

10:17AM 15  the actual physical teardown of the BOP stack.

10:17AM 16      I was pretty close.  It looks like they are now projecting

10:17AM 17  the end of the first week of March, a week more than I said last

10:17AM 18  time.  They've explained to me that it was partly due to

10:17AM 19  construction problems of this facility -- you see there, which is

10:17AM 20  housing the BOP; I'll go to it in a moment -- and also due to the

10:17AM 21  weather delay.  So they are actually on track.

10:17AM 22      What I'm showing now on the overhead, and for people on the

10:17AM 23  phone, is the construction process of the building that they

10:17AM 24  constructed out at -- note the pronunciation, Your Honor --

10:17AM 25  Michoud -- thank you; it's an inside joke, folks -- that they

10:19AM 1  before Magistrate Judge Shushan if necessary to try to figure out
10:19AM 2  a way to get that data out to everybody.  We're talking hard
10:19AM 3  drives of data, I'm told.  So it's a lot of data.  We're trying
10:19AM 4  to get it out there so people can start sifting through that,
10:19AM 5  find what's useful to them for the purposes of taking depositions
10:19AM 6  in the MDL.
10:19AM 7           THE COURT:  As I understand it, this is data or
10:19AM 8  information that eventually will be publicly available when the
10:20AM 9  official report is rendered, but you want to try to facilitate
10:20AM 10 some or all or as much as possible being made available to the
10:20AM 11 parties in the case earlier rather than later?
10:20AM 12          MR. UNDERHILL:  Precisely so, Your Honor.  So we're
10:20AM 13 trying to get a jump start for the discovery needed in this case
10:20AM 14 so we don't hold up Your Honor's schedule.  At the end of that
10:20AM 15 process, all of this stuff will be, presumably, subject to any
10:20AM 16 confidentiality, proprietary information, for example, that may
10:20AM 17 be subject to limitations.  All else will be made public.  So
10:20AM 18 that's the intent, and I hope Your Honor accepts that in good
10:20AM 19 faith because I'm giving it to my client in good faith and I
10:20AM 20 trust them.
10:20AM 21          THE COURT:  Okay.  Again, I wasn't trying to say
10:20AM 22 anything negative about your clients or the folks who -- I'm sure
10:20AM 23 they are very dedicated employees out there who are doing this
10:20AM 24 work, and I appreciate that.  I just know how things are and how
10:20AM 25 things can tend to fall a week behind and two weeks behind, and

10:23AM 1  is a sign outside.  You should have seen it when you came in.

10:23AM 2  You should have your phone off, not on vibrate or anything else.

10:23AM 3  No texting, tweeting or any of those things while you're in here,

10:23AM 4  okay?

10:23AM 5          Thank you.  I appreciate it.

10:23AM 6          Mr. Miller.

10:23AM 7          MR. MILLER:  Yes, Your Honor, Kerry Miller on behalf of

10:23AM 8  Transocean.

10:23AM 9          Just to comment a little bit on the status of the BOP

10:24AM 10  testing and issues covered by Mr. Underhill.  First I want to

10:24AM 11  thank Mr. Underhill for his efforts in trying to move this issue

10:24AM 12  forward.

10:24AM 13          He mentioned a couple of issues, Your Honor, and I would

10:24AM 14  like to touch the upon those.  Number one is the so-called *final*

10:24AM 15  *report* that's going to come out from the BOP testing.  He's

10:24AM 16  saying -- suggesting maybe that date is late March, but he can't

10:24AM 17  make a promise or a representation.

10:24AM 18          Your Honor, that is of concern to us, given the time

10:24AM 19  constraints that we're under in connection with the February 2012

10:24AM 20  trial and the July 31 fact discovery deadline.  It may be

10:24AM 21  beneficial, Your Honor, if we could move that issue forward by

10:24AM 22  getting some kind of timeline in place that we could more closely

10:24AM 23  monitor, that the Court could monitor that is between where we

10:24AM 24  are right now and late January and where we're going to be at the

10:24AM 25  end of March to keep us on schedule, to keep us on pace.  So I

38

| | |
|---|---|
| 10:26AM 1 | THE COURT:  Sure. |
| 10:26AM 2 | MR. STERBCOW:  Good morning, Your Honor. |
| 10:26AM 3 | THE COURT:  Good morning. |
| 10:26AM 4 | MR. STERBCOW:  Paul Sterbcow for the PSC. |

10:26AM 5   With respect to the testing from our perspective, I just
10:26AM 6 want everyone to be aware that it directly affects our ability to
10:26AM 7 choose deponents, schedule depositions.  We don't know what
10:26AM 8 information is going to come out of either of these tests, the
10:26AM 9 protocols and the final testing.  We haven't been able to retain
10:26AM 10 certain experts because we're not sure where we're heading with
10:26AM 11 this, and it's affected the MBI's ability to finish their
10:26AM 12 hearings and release their final report.

10:26AM 13   My understanding is that they're at the point where they
10:26AM 14 have covered all the ground they are going to cover, other than
10:26AM 15 specifically the BOP and its performance, maintenance, et cetera.
10:26AM 16 Obviously that affects us too because to the extent we can get
10:27AM 17 testimony from the Marine Board, we don't have to duplicate our
10:27AM 18 efforts.  Like Mr. Underhill said, yesterday with that witness,
10:27AM 19 it cut his testimony time in half.

10:27AM 20   So given the fact that we're running up against a tight
10:27AM 21 schedule, it is really imperative that the government do anything
10:27AM 22 and everything they can to move both of these, not just the BOP,
10:27AM 23 because the cement is a very key component to this case as well,
10:27AM 24 and as soon as we can get those things done and get that
10:27AM 25 information, we'll be in a much better position to plan out,

10:27AM 1   really, the remaining deposition schedule, give them all the

10:27AM 2   names, hire all of our experts, and really make sure that we're

10:27AM 3   on schedule to meet your deadlines.

10:27AM 4          THE COURT:  All right.  Thank you.

10:27AM 5          MR. UNDERHILL:  Mike Underhill again, Your Honor.

10:27AM 6       I wanted to make a clarification in response to what Paul,

10:27AM 7   Mr. Sterbcow said.  When I talked about the report being out at

10:27AM 8   the end of March, perhaps it's not clear to all in the courtroom.

10:27AM 9   There are going to be two reports.  One we anticipate, as I said,

10:27AM 10  hopefully towards the end of March.  That's the DNV's forensic

10:28AM 11  testing report.  The board's report is going to be later than

10:28AM 12  that, but I don't think that that matters to this Court because

10:28AM 13  the Board's report by statute is inadmissible.  We can't use it,

10:28AM 14  none of us, as evidence in this Court.  I think I've got the

10:28AM 15  statute right.  The DNV report, which will be the forensic

10:28AM 16  tester's report, will be done before, and that's what, I think,

10:28AM 17  the parties are looking for.

10:28AM 18         So I didn't want the Court or my client to say that

10:28AM 19  Mr. Underhill, you just promised the Board's report at the end of

10:28AM 20  March.  That's not going to happen.  But what we're looking for

10:28AM 21  in the litigation hopefully will happen at the end of March.  So

10:28AM 22  just with that clarification.

10:28AM 23         THE COURT:  The testimony of the witnesses who have

10:28AM 24  testified in the board hearing is available?

10:28AM 25         MR. UNDERHILL:  Oh, definitely.  Definitely.  I think

10:28AM 1    that what Mr. Sterbcow, not to speak for him, I think what he was

10:28AM 2    saying is that, if I understand the process, once the DNV

10:28AM 3    forensic report is out, at that point, the Board, I suspect,

10:29AM 4    intends to call witnesses, including DNV, to testify about

10:29AM 5    findings and like that.

10:29AM 6            THE COURT:  Sure.

10:29AM 7            MR. UNDERHILL:  But that's just the way it's going to

10:29AM 8    be.  But the report itself from DNV, hopefully by the end of

10:29AM 9    March.

10:29AM 10           THE COURT:  I would think there are plenty of witnesses

10:29AM 11   that are going to occupy you guys for the next couple months that

10:29AM 12   don't depend on the BOP testing, fact witnesses as to what

10:29AM 13   happened, who did what and those sorts of things.

10:29AM 14           MR. UNDERHILL:  Thank you, Your Honor.

10:29AM 15           THE COURT:  Does anybody else need to speak on that?

10:29AM 16       Defendant BP's second motion for confirmation of

10:29AM 17   nonapplicability of preservation of evidence obligations as to

10:29AM 18   certain items.

10:29AM 19           MR. LANGAN:  Yes, Andy Langan for BP.

10:29AM 20       Your Honor, this is now an agreed motion.  Thank you to the

10:29AM 21   PSC and to Mr. Underhill for their cooperation, but this is the

10:29AM 22   second time we've come to Your Honor and asked for some

10:30AM 23   clarification and relief with respect to preservation as it

10:30AM 24   relates to physical equipment that was used or could have been

10:30AM 25   used, was available for use in response to the spill.  There is

REPORTER'S CERTIFICATE

1
2
3       I, Cathy Pepper, Certified Realtime Reporter, Registered
4  Merit Reporter, Registered Professional Reporter, Certified Court
5  Reporter of the State of Louisiana, Official Court Reporter for
6  the United States District Court, Eastern District of Louisiana,
7  do hereby certify that the foregoing is a true and correct
8  transcript, to the best of my ability and understanding, from the
9  record of the proceedings in the above-entitled and numbered
10 matter.
11
12
13                              s/Cathy Pepper
14                              Cathy Pepper, CRR, RMR, CCR
15                              Official Court Reporter
16                              United States District Court
17
18
19
20
21
22
23
24
25