

**U.S. Department of Justice**

**Civil Division, Torts Branch**
**Admiralty & Aviation**
P.O. Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
*Overnight Delivery Address:*
*7th Floor, Room 7-5395*
*450 Golden Gate Avenue*
*San Francisco, CA 94102-3463*

Telephone: (415) 436-6648
Facsimile: (415) 436-6632
Email: mike.underhill@usdoj.gov

<u>Via E-Mail and Hand Delivery</u>                November 18, 2011

The Honorable Carl J. Barbier           The Honorable Sally Shushan
United States District Judge            United States Magistrate Judge
500 Poydras Street, Room C-268          500 Poydras Street, Room B-345
New Orleans, Louisiana 70130            New Orleans, Louisiana 70130

Re:   Response of the United States to BP's Two Motions *in Limine* to Preclude the Introduction of Evidence Regarding **(1)** "Prior Adverse Criminal, Civil, or Regulatory Proceedings Concerning Conduct Unrelated to the Macondo Well Incident" [Rec. Doc. 4512-1]; and **(2)** "Instances of Prior Alleged Improper Conduct Unrelated to the Macondo Well Incident" [Rec. Doc. 4514-1]

Dear Judge Barbier and Magistrate Judge Shushan:

On November 7, 2011, BP submitted two motions *in limine* regarding evidence of its prior misconduct and penalties, arguing that its earlier conduct is "unrelated to the Macondo Well Incident" and should be excluded, at least from the Phase One trial. The United States submits this letter brief in response to provide the United States' views as to the relevance of such evidence both to the causes of the Macondo blowout (and resulting discharge), and to BP's civil penalties under the Clean Water Act.

**I.    Legal Background.**

**A.    Claims of the United States in Phase One (as against BP).**

Liability under Section 311(b)(3) of the Clean Water Act, 33 U.S.C. § 1321(b)(3), is strict and imposes an "absolute" liability standard on polluters. *United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1127 (5th Cir. 1981). A civil penalty is mandatory when it has been established that a defendant violated Section 311(b)(3) of the Clean Water Act. 33 U.S.C. § 1321(b)(7)(A) and (D) (violators "*shall be* subject to a civil penalty") (emphasis added); *Atlantic States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1142 (11th Cir. 1990) (holding that the same "shall be subject to a civil penalty" language in Section 309(d) of

the Clean Water act mandates a penalty). If strictly liable for violating Section 311(b) of the CWA, a defendant is subject to a penalty of up to $1,100 per barrel of oil discharged. 33 U.S.C. § 1321(b)(7)(A).

Where, however, the violation results from "gross negligence or willful misconduct," the Court is authorized to nearly quadruple the strict liability penalty up to an amount of $4,300 per barrel of oil discharged.[1] Gross negligence and willful misconduct are to be assessed cumulatively, based on a consideration of "all of the circumstances." *Water Quality Ins. Syndicate v. United States*, 632 F. Supp. 2d 108, 115 (D. Mass. 2009) (upholding a finding of gross negligence). *See also Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1164 (2d Cir. 1978) ("While any one of the faults of Red Star alone . . . may not constitute 'willful misconduct,' on the entire record the various inactions and gross disregard of the potential harm amount, in our opinion, to willful misconduct within the meaning of the [Clean Water Act]."); *Saba v. Compagnie Nationale Air France*, 78 F.3d 664, 667 (D.C. Cir. 1996) (A court may, when determining willful misconduct or reckless disregard, "consider a pattern of conduct even if no one action or omission by itself would meet that standard.").

Thus, all of the causes of the blowout -- "all the circumstances" that contributed to the blowout -- are relevant and evidence related to those circumstances is admissible to show whether BP will be subject to the lower strict liability ($1,100) or the higher "gross negligence or willful misconduct" ($4,300) multiplier.

### B. Rule 404(b) Standard.

BP's arguments are based on Federal Rule of Evidence 404(b), which provides for the exclusion of evidence of "other crimes, wrongs, or acts . . . to show action in conformity therewith." Put another way, the "extrinsic" evidence of the prior conduct must be "relevant to an issue other than the defendant's character." *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978). While Rule 404(b) prohibits the introduction of evidence for the exclusive purpose of demonstrating the defendant's character, the Rule also provides specific examples of permissible uses of such evidence, including for showing a defendant's "motive, opportunity, intent, preparation, plan [or] knowledge." Fed. R. Evid. 404(b).

An important caveat to Rule 404(b) is that evidence of prior acts that is "intrinsic," as opposed to "extrinsic," is not covered by the Rule. *United States v. Yi*, 460 F.3d 623, 632 (5th Cir. 2006). "Intrinsic" evidence involves prior acts that are "inextricably intertwined" with the current act, including those that were "necessary preliminaries" to the current act. *Id.* Such evidence is "admissible to complete the story . . . by proving the immediate context of the events in time and place, and to evaluate all of the circumstances under which the defendant acted." *United States v. Brown*, 388 F. App'x. 455 at *5 (5th Cir. 2010) (internal quotations omitted).

---

[1] The original civil penalty amounts were increased in 2004 to $1,100 (strict liability) and $4,300 (gross negligence or willful misconduct) per barrel discharged, respectively. Civil Monetary Penalty Inflation Adjustment Rule, 40 C.F.R. § 19.4.

## II. Discussion.

### A. Evidence of prior acts is not "extrinsic" but rather intertwined with the causes of the Macondo well blowout and subsequent oil spill.

A key component of any industrial program is its process safety practices. This amounts to a company's procedures for ensuring that risks are identified and accounted for, and that other priorities, such as profit, do not supplant safety concerns. Failures in process safety are, almost by definition, prerequisites for any serious industrial accident.

BP argues that the prior incidents at Grangemouth, Texas City, and Prudhoe Bay are "wholly dissimilar to, and temporally, operationally, and geographically removed from, the events involving the Macondo Well" and thus are irrelevant to understanding the causes of the Macondo incident. [Rec. Doc. 4514] at 6. BP emphasizes that none of the previous incidents involved deepwater drilling, loss of well control, or a similar kind of oil spill. *Id.* at 1-2. What BP does not discuss is evidence that would demonstrate that BP failed to learn from and correct known systemic and management-level causes of these previous incidents, and that this process safety failure contributed to the Macondo blowout. Evidence of this nature would not be extrinsic at all, but rather "inextricably intertwined" with Macondo and necessary to provide the full context for the event.

Process safety and risk management is the framework through which catastrophic risks are systematically identified, assessed, and managed by industry.[2] Process safety failures are diverse and can include failure to identify hazards, failure to properly analyze risk, lack of key competencies, failure to comply with standards, and lack of accountability among a company's management.[3] The tenets of process safety are designed to prevent these failures, and one of the most fundamental tenets is learning from experience or "lessons learned."[4] At the heart of

---

[2]   *See* Recommended Practice for Development of a Safety and Environmental Management Program for Offshore Operations and Facilities, API Recommended Practice 75, at 7 (API RP 75) (3d ed. May 2004) (The purpose of risk hazards analysis is to "identify, evaluate, and where unacceptable, reduce the likelihood and/or minimize the consequences of uncontrolled releases and other safety or environmental incidents."). In public materials, BP itself recognizes the field of process safety and its role in preventing failures such as spills or explosions. *See* Process Safety | BP, http://www.bp.com/sectiongenericarticle800.do?categoryId=9036227&contentId=7066990.

[3]   *See* Guidelines for Risk Based Process Safety, Center for Chemical Process Safety ("CCPS Guidelines") at vii-xxvii (2007).

[4]   The Center for Chemical Process Safety identifies four "pillars of process safety": (1) Commit to process safety; (2) Understand hazards and risks, (3) Manage risk, (4) Learn from experience. CCPS Guidelines at vii-xxviii, 549. *See also* API RP 75, at 23 (Process Safety and Risk Management programs should provide for the "investigation of all incidents with serious safety or environmental consequences."). "The intent of the investigation should be to learn from the incident and help prevent similar incidents." *Id.*

lessons learned is the identification of key root causes of incidents in order to avoid the same causal mistakes in the future.[5]

Importantly, process safety management causes can be of the same nature irrespective of the type of operation or facility.[6] Accordingly, the investigations of the Grangemouth, Texas City and Prudhoe Bay incidents and BP's responses to those incidents may reveal similar causes regarding company-wide management failures with regard to assessing and managing risk as Macondo. If the prior investigations indicated that BP management, for example, focused on the wrong performance indicators to assess risk or failed to ensure that maintenance on safety critical equipment was completed on time, and those same concerns were at issue in Macondo, such evidence goes to whether BP's flawed process safety management is a root cause of the Macondo blowout.[7]

To the extent that BP's failure to learn from past events and implement effective risk management tools resulted in process safety management failures at Macondo, evidence of the prior incidents adds the necessary context and enables the factfinder to "complete the story" of the events leading up to the blowout. As such, this evidence should be introduced in Phase One, which will encompass issues leading up to the Macondo blowout and subsequent oil spill, as opposed to later phases relating to the stopping of the release of hydrocarbons from the Incident and the amount of oil released into the Gulf of Mexico (Phase Two), as well as efforts taken to contain the discharge through *in situ* burning and use of dispersants (Phase Three). Pre-Trial Order 41 [Rec. Doc. 4083] at 2-3.

### B. Evidence of prior acts is relevant to BP's motivations with respect to drilling and operations at Macondo.

As discussed, Rule 404(b) permits the introduction of prior acts evidence in order to demonstrate BP's "motive" with respect to the Macondo Well incident. Accordingly, extrinsic evidence related to the prior incidents also should be allowed to show that BP was driven primarily by profits and cost concerns. *See Beechum*, 582 F.2d at 912 n.15 (recognizing that evidence of a defendant's financial circumstances could be admitted under Rule 404(b) to

---

[5] CCPS Guidelines at 552.

[6] *See* Deposition of Anthony Hayward, 88:4-88:20, June 6, 2011 (stating that process safety was a "common theme" in the investigations of Grangemouth, Texas City, and Prudhoe Bay). BP itself has acknowledged process safety failures and took some steps to address them across its entire business, including drilling, in the form of its Operating Management System (OMS), which was developed in part as a result of the lessons learned from the Texas City incident that occurred at a BP refinery. *See* Deposition of Kevin Lacy, 132-133, June 1, 2011. However, OMS was never applied to the Macondo Well. *See* Deposition of Kal Jassal, 108:24-109:3, 143:12-144:6, July 21, 2011.

[7] For example, Mark Hafle, the senior drilling engineer, created a "risk register" prior to the start of drilling at Macondo that apparently was not completed or updated. *See* Deposition of Kal Jassal, 111-112. Moreover, the Macondo risk register, which was required by a BP manual that pre-dated the Texas City incident, lists "cost" and "schedule" as potential risk impacts, and does not contain a consideration of the health, safety and environmental impacts of such risks. *See* Deposition of Cheryl Grounds, 108-12, May 4, 2011.

establish motive). For example, the BP-commissioned investigation of the Texas City incident states that BP plant managers were challenged to cut costs by twenty-five percent, and found that BP often emphasized short-term metrics such as profitability over long term concepts such as process safety performance. *See* The Report of the BP U.S. Refineries Independent Safety Review Panel ("Baker Panel Report") at 83, 90-91 (2007). Similarly, BP's own task force on the Grangemouth incidents found that health and safety were "unofficially sacrificed to cost reductions, and cost pressures inhibited staff from asking the right questions." *Id.* at 91 (quoting findings from BP's internal investigation of Grangemouth). Evidence of BP's profit motive with respect to these prior incidents provides support for the theory that this same motivation was present at Macondo, leading BP personnel to elevate profit concerns over safety with respect to operations and drilling of the Well.

### C. Evidence of prior bad conduct, penalties and fines are also relevant to the CWA penalty factors.

In addition to determining whether a defendant's actions or omissions constituted gross negligence and willful misconduct, a court "shall consider" the following factors in assessing the amount of civil penalties pursuant to the Clean Water Act: the seriousness of the violation or violations; the economic benefit to the violator, if any, resulting from the violation; *the degree of culpability involved*; any other penalty for the same incident; *any history of prior violations*; the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge; the economic impact of the penalty on the violator; and "any other matters as justice may require." CWA Section 311(b)(8), 33 U.S.C. § 1321(b)(8) (emphases added).

The Court has yet to schedule a separate trial Phase in which the Court will assess a specific dollar amount of the civil penalty under the Clean Water Act against BP, based on these factors. However, as this penalty Phase may incorporate findings made in earlier Phases, the United States should be permitted to introduce evidence of prior acts relating to process safety violations in Phase One, particularly given the Court's Order that "[a]ll parties shall present evidence relevant to a particular Phase during that Phase and should not expect they will be permitted to fill evidentiary gaps in one Phase by presentation of evidence in a subsequent Phase . . . ." Pre-Trial Order 41 [Rec. Doc. 4083] at 4. Having said that, let the record be clear that the United States intends to introduce additional evidence of BP's prior violations during that penalty assessment Phase. The three instances at issue in this motion are relevant in Phase One to process safety and motive, but do not represent the entire universe of all of BP's prior violations that would be relevant for the penalty Phase.

With respect to the CWA penalty factors, BP itself has acknowledged that evidence that goes to BP's culpability, including for events occurring post-explosion, is relevant to culpability and should not be excluded.[8] As discussed above, evidence of BP management's failures with

---

[8] *See* BP's Memorandum in Opposition to PSC's Motion *In Limine* of Claimants-in-Limitation to Exclude Evidence Regarding the Alleged Fault of Non-Parties And/Or Immune Parties (Including the United States) [Rec. Doc. 4392] at 3, 10-12 (opposing motion, *inter alia*, on basis that evidence bearing on government's "approvals of BP's activities at the well site and BP's adherence to

regard to assessing and managing risk is similarly probative as to its fault, and thus also to its degree of culpability. In particular, evidence that BP was aware of process safety failures with respect to formal risk assessments, but failed to correct them, would be relevant to the culpability factor.

BP argues that the incidents at Grangemouth, Texas City, and Prudhoe Bay are irrelevant because they are "too remote" from the Macondo events. In doing so, BP cites court decisions excluding, under Rule 404(b), evidence of prior acts committed several years before the current act. *See* [Rec. Doc. 4514-1] at 4. However, none of these cited cases involves the Clean Water Act, which expressly requires that a court take into account of "any history" of prior violations in making a penalty assessment. CWA Section 311(b)(8), 33 U.S.C. § 1321(b)(8). Accordingly, courts have previously considered a defendant's violations from across an extended time period in assessing a CWA civil penalty. *See, e.g., PIRG v. Powell Duffryn Terminals, Inc.*, 720 F. Supp. 1158, 1163 (D.N.J. 1989) (considering defendant's history of violations over 11 years in CWA Section 309 penalty action), *aff'd in relevant part*, 913 F.2d 64 (3d Cir. 1990); *United States v. Gulf Park Water Co.*, 14 F. Supp. 2d 854, 864 (S.D. Miss. 1998) (considering defendant's history over 12 years in CWA Section 309 penalty action). Moreover, by use of the expansive word "any" the statute does not limit the types of prior violations that shall be considered.

Prior act evidence that goes to BP's degree of culpability may be related to the causes of the Macondo incident and therefore fits squarely within the scope of Phase One, while evidence related to the other factors addressed here may fit within the not-yet scheduled separate Phase in which the Court will be called upon to assess a specific dollar amount of the civil penalty under the Clean Water Act. However, any Phase may incorporate findings made in earlier Phases, so the United States should be permitted to introduce evidence of prior acts relating to process safety violations in Phase One, particularly given the Court's statements in Pre-Trial Order 41 [Rec. Doc. 4083] at 4.

### III.  Conclusion.

In sum, evidence of BP's past incidents, particularly evidence that demonstrates that BP failed to take corrective action based on the investigations of these incidents, is probative as to causes of the Macondo Well incident. Moreover, to the extent that the prior acts demonstrate that BP was aware of certain inadequacies in its risk assessment and safety management processes but disregarded them, such evidence also informs whether BP should be subject to heightened penalties under the Clean Water Act's provisions for gross negligence and willful misconduct. Such evidence is also relevant to the Clean Water Act penalty factors, which, *inter alia*, require a consideration of prior violations, the violator's degree of culpability, and the economic impact of a penalty on the violator. Accordingly, the United States respectfully requests that the Court deny BP's motion to exclude such evidence.

---

government decision making *after* the spill" are probative of its "degree of culpability" under the CWA penalty factors) (emphasis added).

Respectfully submitted,

R. Michael Underhill
Attorney in Charge
Dept. of Justice, Torts Branch
West Coast and Pacific Rim Office

cc: (via e-mail)
Plaintiffs' Liaison Counsel
States Coordinating Counsel
Steve O'Rourke, DOJ, ENRD
Defendants' Liaison Counsel
Ben Alums
Mike O'Keefe