

|  |  |
|---|---|
|  | **U.S. Department of Justice** |
|  | **Civil Division, Torts Branch**<br>**Admiralty & Aviation**<br>P.O. Box 36028<br>450 Golden Gate Avenue<br>San Francisco, CA 94102-3463 |
| Telephone: (415) 436-6648<br>Facsimile: (415) 436-6632<br>Email: mike.underhill@usdoj.gov | *Overnight Delivery Address:*<br>*7th Floor, Room 7-5395*<br>*450 Golden Gate Avenue*<br>*San Francisco, CA 94102-3463* |

<u>Via E-Mail and Hand Delivery</u>                                    November 18, 2011

The Honorable Carl J. Barbier                          The Honorable Sally Shushan
United States District Judge                              United States Magistrate Judge
500 Poydras Street, Room C-268                      500 Poydras Street, Room B-345
New Orleans, Louisiana 70130                        New Orleans, Louisiana 70130

      Re:    Reply of United States to BP's Response to the PSC's October 17th Letter
              Regarding "Alleged Daubert/702 Issues within Defendants' Business Records;
              <u>Bly Interview Notes; and other Misc. Business Records"</u>

Dear Judge Barbier and Magistrate Judge Shushan:

        On October 17th, the PSC filed its letter brief addressing the admissibility of BP's "Internal Investigation Team Report," colloquially referred to as the "Bly Report." (PSC letter regarding "Alleged Daubert/702 Issues within Defendants' Business Records.")  On November 4th, BP filed its response.  The United States submits this reply in response to BP's letter brief.

        1.        **<u>Admissibility of the Bly Report</u>**

        Because BP conceded that the Bly Report is generally admissible in its November 4 Letter, the United States does not brief that issue here.  November 4, 2011 letter from Langan at 2 ("the September 8, 2010 *Deepwater Horizon* Accident Investigation Report (Trial Exhibit 00001) (referred to below as the Internal Investigation Team Report, or IIT Report) is generally admissible.").  We also note that wholly aside from the business records exception, the Bly Report (and Transocean Report) nevertheless would constitute party admissions by those respective parties and therefore would not be within the scope of the hearsay rule.

        BP adds the caveat that the admissibility of references in the Bly Report to the Joint Investigation Team ("JIT") Report and to testimony before the JIT is to be briefed separately.  The United States agrees with BP that admissibility *vel non* of the JIT Report and related testimony should be briefed separately.

        2.        **<u>Admissibility of Interview Notes by the Members of the Bly Investigation Team</u>**

        BP appears to agree with the PSC that the interview notes of the Bly Team members themselves (*i.e.*, the accounts of the interviews as written by the BP investigators) qualify as Rule 803(6) business records.  To the extent that BP (or any other defendant) has not so conceded, admissibility of the investigators' notes as business records has been established by the testimony of the investigators themselves. In short, Bly investigation interviews were conducted in accordance with BP's Group Defined Practices ("GDP") for Incident Investigation, which required incident interviews like those conducted by the Bly investigators. *See*, deposition testimony of Bly

investigators Kevin Fontenot (examination laying foundation of Bly interview notes as business records, Depo at pp. 115-130); Matt Lucas (Bly investigation witness interviews were conducted in as accurate a manner as possible and in accordance with BP's GDP for accident investigations, Depo at pp. 303-308); and Steve Robinson (Depo at pp. 212-213).

### 3. Admissibility of Statements Made to Bly Investigators

BP appears to argue that statements of the interviewees to the investigators may be "double hearsay" and, as such, outside the business records exception applicable to the investigators' notes (the alleged first hearsay level). This of course is *not* correct, at least insofar as BP employees being interviewed by BP investigators, since the BP interviewees themselves (as well as the interviewers) were BP employees acting in the regular course of business with respect to BP's accident investigation practices under the GDP. Since the sources and recorders of information, as well as every other participant in chain producing the record, are acting within the regular course of business, each falls within the scope of the business records exception. *Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 271 (5th Cir. 1991); *see also U.S. v. Gurr*, 471 F.3d 144, 152 (D.C. Cir. 2006).

Even if these interviewee statements were not business records within the scope of Fed.R.Evid. 803(6), statements made by interviewees during interviews conducted for the Bly investigation should be admitted. Succinctly, the interviewees' statements are admissible because: (1) as admissions of a party opponent, Fed.R.Evid. 801(d)(2)(D), they are not hearsay in the first instance; (2) they are not being offered for the truth of the matter asserted and are therefore not hearsay (Rule 801(c)); or (3) if hearsay, they fall within the state of mind exception to the hearsay rule. Fed. R. Evid. 803(3).

#### A. Admissions Under Fed.R.Evid. 801(d)(2)

BP, through its internal investigators, compiled the Bly Supporting Documents during the course of BP's investigation into the cause of the Deepwater Horizon disaster. The documents contain the statements of BP employees as to "facts surrounding the uncontrolled release of hydrocarbons and efforts to contain the release aboard the TransOcean drillship Deepwater Horizon . . . ." [TREX-00002, Appendix A to Bly Report (BP-HZN-BLY00000194). The interviewees' statements, therefore, are BP admissions. *See U.S. v. Saks*, 964 F.2d 1514, 1524 (5th Cir. 1992) (under Fed.R.Evid. 801(d)(2)(D), an employment relationship must exist during which the employee made a statement concerning a matter within the scope of employment). Courts afford admissions of a party-opponent generous treatment in determinations of admissibility. *Aliotta, supra*, 315 F.3d at 761 (*citing* Fed.R.Evid. 801 advisory committee note: "[n]o guarantee of trustworthiness is required in the case of an admission" and admissions enjoy "Fed.R.Evid. freedom . . . from the restrictive influences of the opinion rule and the rule requiring first-hand knowledge"; and *Russell v. United Parcel Serv.*, 666 F.2d 1188, 1190 (8th Cir. 1981) (holding that "firsthand knowledge is not required where admissions are involved")).

BP does not appear to dispute that statements of BP employees to Bly investigator interviewers (and transcribed by those interviewers) are party admissions and thus admissible against BP.[1] Let us take, for example, what BP's Houston-based Senior Drilling Engineer, Mark Hafle, admitted to BP investigators regarding a conversation between himself and BP employee and Well Site Leader ("WSL") Don Vidrine, one of the two BP WSLs who approved the disastrous negative pressure test shortly before the blowout and deaths on April 20th. Hafle's statement to the Bly

---

[1] To the extent BP argues that a non-BP employee's statement is an admission solely against the interviewees' employer, the issue effectively is moot since such statements are admissible against BP and other defendants pursuant to the discussion below regarding "state of mind" and statements not admitted for the truth of the matter asserted.

investigators regarding his own words, and Vidrine's statements to Hafle, are admissions by both Hafle and Vidrine – and as such, neither of the declarants' statements are hearsay since they fall within Fed.R.Evid. 801(d)(2)(D). Hafle confessed to the Bly investigators:

> Don Vidrine called Mark at 8:52 pm to talk about how to test the surface plug and whether they should apply a pressure test or a weight test. Mark noted that Don also talked to him about the negative tests. *Vidrine told Mark that the crew had zero pressure on the kill line, but that they still had pressure on the drill pipe. Mark said he told Don that you can't have pressure on the drill pipe and zero pressure on the kill line in a test that's properly lined up.* Mark said that he told Don he might consider whether he had trapped pressure in the line or perhaps he didn't have a valve properly lined up. *Don told Mark that he was fully satisfied that the rig crew had performed a successful negative test.*[2]

Hafle clearly understood the patently obvious and told Vidrine that the negative pressure test could not be considered a success given the two inconsistent pressures on the kill line and drill pipe. Yet Hafle did absolutely *nothing* to countermand Vidrine's disastrously conclusory statement that he was "fully satisfied that the rig crew had performed a successful negative test." According to the log of the call between Hafle and Vidrine, the conversation ended at 9:02 p.m., ten minutes after the well began to flow. BP's Bly Report states that the hydrocarbons did not pass the BOP and enter the riser until approximately 9:38 p.m. [TREX-00001, p. 98], which means that both BP and Transocean had over a full half hour *after* the conclusion of the call to close in the well through normal operation of the BOP and thereby prevent eleven deaths and the most significant oil spill in the nation's history. Instead, Vidrine and Hafle did nothing between the end of the call and the moment that oil and gas shot onto the rig and, at approximately 9:49 p.m., exploded and ended the lives of eleven men. For purposes of this letter brief, *both* Hafle's and Vidrine's statements constitute admissions and therefore (a) are not hearsay and (b) are admissible. Even if Vidrine's statements are not considered to be admissions, they are admissible because they need not be considered for the truth of the matter asserted. Indeed, some of Vidrine's statements were most certainly *not* true - but they are and can be offered to demonstrate that such reports were made to Hafle, who did nothing about them.

An additional example of party admissions under Fed.R.Evid. 801(d)(2)(D) are Bly interview statements by WSLs Kaluza and Vidrine. Transocean personnel had posited the theory of a "bladder effect" or "annular compression" to explain the apparent pressure differential in the negative pressure test. Both BP's Bly Report and Transocean's Report admitted that no such phenomenon could be discovered.[3] According to Kaluza's interview by Bly investigators, he told them:

> Jason [Transocean Assistant Toolpusher Jason Anderson] said 'Bob and Don, this happens all the time' they called it a 'bladder effect' said annular element will compress drill pipe pressure to equalize differential pressure. Jason said all company men do it differently, but this happens every time when the riser is heavy the annular puts pressure down on fluid below...
> \*  \*  \*  \*  \*  \*
> Bob - 'if you have seen this so many times before, it must be true.' Bob left rig floor,

---

[2] TREX-00296, BP-HZN-BLY00103037 (emphasis added).

[3] Bly Report, TREX-00001, p. 89; Transocean Report, TREX-0 4248, p 123; Boots and Coots Negative Pressure Test Report for BP, TREX-00190; Mark Bly Deposition, p. 374.

'I went to bed with no anxiety at all.'[4]

Kaluza's statement, "if you have seen this so many times before, it must be true…," goes to the competency of BP and the WSL to whom it handed over something so potentially powerful and lethal as a deepwater well like Macondo, and works to act as an admission by BP. Likewise, Jason Anderson's statements about the non-existent bladder effect, as related by Kaluza, are party admissions against Transocean.

### B. State of Mind Exceptions to Hearsay Rule

Even if some of the statements within the Bly Supporting Documents were not considered admissions of BP (or Transocean), they may be admitted under the state of mind exception to the hearsay rule. Under Fed.R.Evid. 803(3), statements that otherwise may constitute hearsay are admissible if they show the declarant's state of mind.

As an example, consider the foregoing Bly interview notes whereby WSL Vidrine states that the Transocean crew "had dismissed drill pipe pressure as anything serious somewhat joked about my concern over drill pipe – they found it humorous that I continued talking about." TREX-00003-A, *supra*, Notes of Vidrine Interview (BP-HZN-CEC20351-54 at 352). Vidrine's statements reveal his state of mind, specifically his "concern" over the results of the negative pressure test on the drill pipe, and they also reveal the state of mind of the Transocean employees ("joked" and "found it humorous"). *See, Morris Jewelers, Inc. v. General Elec. Credit Corp.*, 714 F.2d 32, 34 (5th Cir. 1983) (customers' letters and verbal statements to plaintiff indicating customers' angry state of mind admissible under state of mind exception).

Consider also Vidrine's statement to Hafle, which Hafle then related to the Bly investigators (BP would label Vidrine's statement as "third level hearsay"). The statement, "Don told Mark that he was fully satisfied that the rig crew had performed a successful negative test…," reveals Vidrine's state of mind, *i.e.*, that he believed (erroneously) that the negative pressure test was successful.[5] In addition, that particular statement by Vidrine would not be offered for its truth, as the negative pressure test very clearly had not been successful.

Similarly, BP's letter brief (p. 5, first bullet point) quotes a statement related to a BP Bly investigator by Transocean's Jimmy Harrel, "Are you [f-ing] happy, the rigs [sic] on fire now. I knew this would happen." [Citing TREX-00151.] BP argues that the statement is an admission against Transocean and thus admissible solely as against Transocean. BP neglects to acknowledge that the statement reveals Harrell's state of mind ("I knew this would happen") and is admissible under the hearsay exception of Fed.R.Evid. 803(3) – and thus admissible against Transocean *and* BP.

### C. Statements Not Offered for the Truth of the Matter Asserted Are Not Hearsay and Are Admissible

Additionally, some statements do not meet the definition of hearsay under Fed.R.Evid. 801 because they are not being offered for the truth of the matter asserted. "It is axiomatic that 'verbal conduct which is assertive but offered as a basis for inferring something other than the matter asserted' is excluded from the federal definition of hearsay." *United States v. Webster*, 750 F.2d 307, 330 (5th Cir. 1984) (quoting Fed.R.Evid. 801(a) advisory committee note (1975)).

---

[4] Bly Team interview notes of Kaluza, TREX-00005, BP-HZN-MBI100021276 - 77.

[5] Bly Team interview notes of Mark Hafle, *supra*, TREX-00296, BP-HZN-BLY00103037.

For example, Transocean and BP employees' statements concerning the existence of the "bladder effect" are not being admitted for the truth of the matter asserted – *i.e.*, that the bladder effect exists. Indeed, it does not exist, as both BP's and Transocean's reports admit.[6] The statements instead would be offered to show Transocean's and BP's disastrous reliance on a false and non-existent phenomenon, reliance that led directly to the tragedy. *See Royall v. National Ass'n of Letter Carriers*, 507 F.Supp.2d 93, 99 (D.D.C. 2007), *aff'd* 548 F.3d 137 (D.C. Cir. 2008) (Witnesses' testimony as to third-party statements concerning an employment discrimination plaintiff's performance was not hearsay where it was offered not for the truth of the matters asserted therein, but as an explanation of why the witnesses believed that terminating the plaintiff's employment was necessary and appropriate).

In addition, the previously quoted interview of Hafle concerning his 8:52 - 9:02 p.m. telephone conversation with WSL Vidrine [TREX-00296] does not need to be offered for the truth of the matters asserted, but merely to show that Hafle was on notice regarding the discrepancy between the tests on the kill line and the drill pipe. *See Benford v. Richards Medical Co.*, 792 F.2d 1537, 1540 (11th Cir. 1986) (upholding admission of testimony of employee of company employed by manufacturer of hip prostheses that he heard former president of company advising manufacturer's representative on telephone not to use stainless steel in hip prosthesis that was offered to show that manufacturer was on notice of potential problems with using cast stainless steel in prosthesis, rather than the truth of the matter asserted); *United States v. Anost*, 356 F.2d 413, 417-18 (7th Cir. 1966) (reversing district court and holding that defendants' evidence as to alleged transaction with third person, who allegedly engaged them to deliver goods, and as to content of telephone conversations between defendants relating to this transaction, was not excludable as hearsay where offered not to prove truth of matters asserted but to show facts made known to and relied upon by defendants); *Misner v. General Motors*, 165 F.R.D. 105, 107-08 (D. Utah 1996) (holding that videotape of crash tests performed by vehicle manufacturer and test report proffered for purpose of establishing that manufacturer had notice of phenomena of seat belt inertial unlatching would not constitute hearsay because material was not being offered for truth of matter asserted).

The same holds true for BP's mistaken analysis of Jason Anderson's statements to BP's WSLs: "Jason said 'all company men do it differently, but this happens every time, when the riser is heavy the annular puts pressure on the down on the fluid below.'" *See* BP's letter brief, p. 5, bullet two. BP argues that the statement is merely a party admission against Transocean and thus only admissible against that party. To the contrary, admission of the statement need not be admitted to prove the truth of the matter asserted – indeed, the "matter asserted" is a falsehood since it describes the non-existent "bladder effect" that Transocean proposed and that the BP's WSLs bought into, with results that we now recognize as disastrous. In short, the statements attributed to Transocean are not hearsay and therefore are admissible against Transocean and BP.

Pursuant to the authorities cited herein, the United States respectfully requests that this Court admit the Bly Report and interviews, subject to the later determination concerning references in the Bly Report (and other parties' reports) to the JIT Report and testimony before the JIT.

Respectfully submitted,

R/Michael Underhill
Attorney in Charge
Dept. Of Justice, Torts Branch
West Coast and Pacific Rim Office

---

[6] Bly Report, TREX-00001, p. 89; Transocean Report, TREX-0 4248, p. 123.

cc: (via e-mail)
    Plaintiffs' Liaison Counsel
    States Coordinating Counsel
    Defendants' Liaison Counsel
    Steve O'Rourke, DOJ, ENRD
    Ben Alums
    Mike O'Keefe