# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * MDL NO. 2179 <br> * <br> * SECTION: J <br> * JUDGE BARBIER <br> * MAGISTRATE JUDGE SHUSHAN |
| THIS DOCUMENT RELATES TO ALL ACTIONS | * <br> * <br> * <br> * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## BP'S MEMORANDUM IN SUPPORT OF
## <u>MOTION FOR SPOLIATION SANCTIONS</u>

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone:  202-662-5985
Facsimile:  202-662-6291

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone:  504-581-7979
Facsimile:  504-556-4108

Robert R. Gasaway
Jeffrey Bossert Clark
Aditya Bamzai
Kirkland & Ellis LLP
655 Fifteenth Street, NW
Washington, DC 20005
Telephone:  202-879-5000
Facsimile:  202-879-5200

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

*Attorneys for BP Exploration & Production Company*

December 5, 2011

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................4

    A.    Halliburton's Destruction of Foam Stability Testing Results. .................................5

    B.    Halliburton's Consumption of Limited Quantities of Physical Samples. ...............7

    C.    Halliburton's Statements Attributing the Failure of the Cement to Channeling. ............................................................................................................8

    D.    Halliburton's Proprietary "Displace 3D" Modeling of Possible Channeling. ............................................................................................................9

    E.    Halliburton's Failure to Produce Its Proprietary Modeling Results. .....................10

ARGUMENT .....................................................................................................................14

I.      THE COURT HAS AUTHORITY TO REMEDY HALLIBURTON'S MISCONDUCT. .............................................................................................................14

II.     THE COURT SHOULD SANCTION HALLIBURTON'S SPOLIATION OF POST-INCIDENT CEMENT SLURRY TESTING MATERIALS AND RESULTS. ........................................................................................................................17

    A.    Halliburton Wrongfully and Willfully Destroyed Post-Incident Cement Slurry Testing Results. ..........................................................................................18

        1.    Halliburton Conducted Tests that Destroyed Physical Evidence in Halliburton's Exclusive Control. .............................................................18

        2.    Halliburton Did Not Give Notice that Its Testing Would Occur, Nor Did It Preserve and Share the Results of the Testing. ........................18

        3.    The Destruction of the Cement Testing Results by Halliburton Employees Was Intentional and Willful. ...................................................19

    B.    An Adverse Finding of Fact Against Halliburton Is Warranted. ...........................21

III.    THE COURT SHOULD RECTIFY HALLIBURTON'S WRONGFUL FAILURE TO PRODUCE NON-PRIVILEGED, PROPRIETARY, POST-INCIDENT "DISPLACE 3D" MODELING RESULTS. ....................................................................22

    A.    Halliburton Wrongfully Failed to Produce the Results of Its Proprietary 3D Modeling or to Notify the Court of Its Apparent Disappearance. ..................23

i

B.    The Court Should Order the Forensic Recovery of the Proprietary
Modeling Results Halliburton Lost.........................................................................24

CONCLUSION.....................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashton v. Knight Transp., Inc.*,
  772 F. Supp. 2d 772 (N.D. Tex. 2011) ............................................................. 16, 24

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ............................................................................................ 16

*Compaq Computer Corp. v. Ergonome Inc.*,
  387 F.3d 403 (5th Cir. 2004) ............................................................................. 15

*Duque v. Werner Enters., Inc.*,
  2007 WL 998156 (S.D. Tex. Mar. 30, 2007) .................................................... 14, 17

*In re Enron Corp. Sec. Derivatives & ERISA Litig.*,
  762 F. Supp. 2d 942 (S.D. Tex. 2010) .............................................................. 14, 15

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*,
  456 U.S. 694 (2002) .......................................................................................... 15

*Pipes v. UPS, Inc.*,
  2009 WL 2214990 (W.D. La. July 22, 2009) ............................................ 14, 15, 16

*Powell v. Town of Sharpsburg*,
  591 F. Supp. 2d 814 (E.D.N.C. 2008) ............................................................... 20

*Pressey v. Patterson*,
  898 F.2d 1018 (5th Cir. 1990) ........................................................................... 16, 24

*Rimkus Consulting Grp., Inc. v. Cammarata*,
  688 F. Supp. 2d 598 (S.D. Tex. 2010) .............................................................. 16

*Vodusek v. Bayliner Marine Corp.*,
  71 F.3d 148 (4th Cir. 1995) ............................................................................... 24

*Whitt v. Stephens Cnty.*,
  529 F.3d 278 (5th Cir. 2008) ............................................................................. 20

**Rules**

FED. R. CIV. P. 37(b) ........................................................................................... 15, 16, 19

FED. R. CIV. P. 37(b)(2)(A) ................................................................................. 15, 16

## INTRODUCTION

Halliburton has consistently held fast to two core assertions regarding the cement that it pumped into the Macondo well on April 19, 2010.  These core assertions have formed the backbone of Halliburton's defense of its conduct leading up to the Macondo oil spill.

- *First*, Halliburton has insisted that the foam cement Halliburton pumped into the Macondo well on April 19, 2010 was "stable," despite testing results from multiple sources to the contrary and despite the bald fact that Halliburton's cement allowed hydrocarbons to flow up the well and into the riser on the night of April 20, 2010.

- *Second*, Halliburton has maintained that the real problem at Macondo was that the cement "channeled" inside the well because of BP's engineering decisions, including the decision to use fewer centralizers than Halliburton had recommended.

Recently, it has become clear that results from Halliburton's own non-privileged, post-incident testing contradict both of Halliburton's core positions.  As set forth in full detail below, deposition testimony by Halliburton witnesses and Halliburton internal documents show (1) that Halliburton's own post-incident, non-privileged cement testing indicates that the Macondo well cement slurry was not stable, and (2) that Halliburton's own post-incident, non-privileged, proprietary computer modeling indicates that there was no "channeling" of the cement in the Macondo well.

Halliburton has steadfastly refused to provide these critical testing and modeling results in discovery.  Halliburton's refusal has been unwavering, despite repeated BP discovery requests and a specific order from this Court.  BP has now learned the reason for Halliburton's intransigence — Halliburton destroyed the results of physical slurry testing, and it has, at best, lost the computer modeling outputs that showed no channeling.

More egregious still, Halliburton intentionally destroyed the evidence related to its non-privileged cement testing, in part because it wanted to eliminate any risk that this evidence would be used against it at trial.  Moreover, with respect to the post-incident computer modeling,

Halliburton has asserted, without any explanation, that the information is simply "gone."  As described in detail below, the key facts include the following:

### Cement Testing

- In late April or early May of 2010, Halliburton directed its employees to prepare and test a batch of the cement slurry — testing that appears likely to have used (and so destroyed) limited cement additives from the Macondo well project.  *See, e.g.*, Ex. 1 (Morgan Dep.) at 16:16-19, 17:3-20:5; Ex. 2 (Quirk Dep.) at 88:23-89:2.

- According to deposition testimony, Halliburton's post-Incident testing in Duncan, Oklahoma, showed that (1) the Macondo well slurry settled, meaning that solids in the cement mixture were separating from liquids; and (2) the base slurry could not be foamed.  Ex. 2 (Quirk Dep.) at 124:23-25; Ex. 3 (Faul Dep.) at 264:2-11; ███████ ████████████  Such sedimentation is an indication of instability.  Rickey Morgan in the Duncan lab also reported that the slurry looked "thin" to him, meaning that the slurry could be unstable once poured into the well.  Ex. 1 (Morgan Dep.) at 20:23-22:9.

- One of Halliburton's Duncan employees, Rickey Morgan, testified under oath that he destroyed test results in order to keep the information from being "misinterpreted" in ways adverse to Halliburton in litigation.  *See, e.g.*, *id.* at 101:7-23.

- After the Duncan experiments showed settling, Ron Faul asked another Halliburton lab to replicate the tests.  *See* Ex. 2 (Quirk Dep.) at 88:23-89:18. ███████████████████████ ████████████████  The new tests indicated foam instability.  *Id.* at 333:6-10; 480:13-481:2.

- Upon reviewing these latest testing results, Halliburton employees destroyed records of the testing as well as the physical cement samples used in the testing.  *See, e.g., id.* at 331:21-24; 393:11-21.

### Modeling

- Similarly, Halliburton conducted modeling of the Macondo well cement job using Halliburton's proprietary Displace 3D Simulator.  Ex. 5 (Roth Dep.) at 495:14-496:5.  Tommy Roth, Halliburton's Vice President in charge of its cement business at the time of the incident, stated in a July 25, 2010 e-mail that this post-incident modeling demonstrates that there was no channeling in the Macondo well: "[S]pacer was sufficient to sweep channel.  Subsequent testing with 3D confirms statement that spacer was sufficient." ██████████████████

- Notwithstanding the relevance of this post-incident modeling, and its responsiveness to BP discovery requests, Halliburton did not produce the results generated by its proprietary Displace 3D modeling software or additional documents associated with that modeling.  *See* Ex. 7 (11/22/2011 letter, B. Harding to J. Martinez).  Even Tommy Roth's

e-mail describing the results of the Displace 3D modeling was not produced until July 2011, near the end of fact discovery.

- On August 15, 2011, after discovering the critical Roth email and searching for and failing to find the documents associated with the modeling, BP promptly requested an immediate production of documents and communications pertaining to the Displace 3D modeling.  *See* Ex. 8 (08/15/2011 letter, B. Harding to J. Martinez); Ex. 9 (9/22/2011 e-mail, X. McKeever to J. Martinez).  BP ultimately moved to compel, and the Court ordered Halliburton to produce, all non-privileged, post-incident investigative materials by October 12, 2011.  *See* Ex. 10 (9/27/2011 Order).

- Halliburton responded by producing thousands of pages of documents in the days leading up to October 12, 2011.  Still, Halliburton failed to notify BP that it did not produce the modeling referenced in Tommy Roth's July 25, 2010 e-mail despite BP's repeated requests.  Nor did Halliburton inform BP that the modeling was "gone."

- After still more waiting, and still further requests, BP arranged a meet-and-confer session.  During this meet-and-confer session, Halliburton stated for the first time that these critical modeling results were now "gone." Ex. 11 (11/11/2011 letter, B. Harding to J. Martinez).  Halliburton has not explained to BP or the Court why or how such essential evidence could, and apparently did, simply vanish.  *See* Ex. 7 (11/22/2011 letter, B. Harding to J. Martinez).

- Nonetheless, Halliburton continues to contend that the Halliburton cement job failed, not because of Halliburton's own errors in designing the slurry, but rather because BP's decisions caused the Halliburton cement to "channel."  Most recently, Halliburton submitted expert reports espousing this very theory, despite apparently having conducted post-incident modeling using proprietary software that indicated the exact opposite.

Because Halliburton has deprived the Court and parties of uniquely relevant evidence, BP respectfully requests that the Court impose adverse findings of fact, award attorneys' fees, and direct Halliburton to implement additional remedial steps as described below.

Specifically, with respect to the evidence of cement testing destroyed by Halliburton's employees — thereby forever depriving the Court and parties of uniquely relevant evidence — BP respectfully requests that the Court impose adverse findings of fact and award attorneys' fees.  With respect to the inexplicably missing computer modeling results, BP respectfully requests that the Court direct and supervise forensic efforts to recover the missing data.  If those efforts prove unsuccessful, BP requests that the Court then grant expedited discovery into the

circumstances surrounding this data loss and expedited remedies to cure it. These remedies are amply warranted in law and by principles of fair play, and they are essential to ensure this Court's trial is not tainted by Halliburton's misconduct.

## BACKGROUND

There is no serious dispute that Halliburton's cement job failed to isolate hydrocarbons in the Macondo well. But what precisely led to this failure of Halliburton's cement job — Halliburton's poorly-designed and unstable cement slurry or other decisions and factors — remains hotly contested. As the Judicial Panel on Multidistrict Litigation made clear, such disputes over what "cause[d] the Deepwater Horizon [incident] and the role, if any, that each defendant played in it" are at the very center of this multidistrict litigation. Ex. 12 (J.P.M.L. 8/10/2010 Order at 3).

Given the central importance of causation questions, multiple courts have issued orders directing parties involved in the *Deepwater Horizon* incident to preserve potentially relevant evidence. Such orders and directives include (among others):

- An April 30, 2010 temporary restraining order issued just 10 days after the blowout, directing Halliburton to refrain from any "destruction of any documents pertaining to the April 20, 2010 explosion," Ex. 13 (4/30/2010 *Stone* TRO);

- A May 5, 2010 preservation order, requiring Halliburton "[t]o reasonably refrain and resist from any changing, alteration and/or destruction of any documents pertaining to the April 20, 2010 explosion or subsequent efforts expended in connection with such event … and to take immediate action to prevent the automatic and/or systematic programmed deletion or discarding of such documents," Ex. 14 (5/5/2010 Order at 1);

- A June 18, 2010 preservation order, mandating that Halliburton "preserve all documents and other physical evidence" in connection with the blowout on the *Deepwater Horizon*, Ex. 15 (6/18/2010 Order); and

- This Court's August 10, 2010 Pretrial Order No. 1, directing all parties to "take reasonable steps to preserve all documents, data and tangible things containing information potentially relevant to the subject matter of this litigation" and warning that "[f]ailure to comply [could] lead to dismissal of claims, striking of defenses, imposition of adverse inferences or other dire consequences," Ex. 16 (Pretrial Order No. 1 at ¶ 14)).

### A.      Halliburton's Destruction of Foam Stability Testing Results.

Notwithstanding its duty to preserve potentially relevant evidence in the weeks and months following the April 20, 2010 incident, Halliburton proceeded deliberately to destroy relevant evidence generated in the course of non-privileged, post-incident investigations.

In late April or early May 2010, Halliburton's Global Advisor in Gulf Cementing, Rickey Morgan, analyzed a cement slurry with the same composition as the foam slurry pumped at the Macondo well.  *See* Ex. 1 (Morgan Dep.) at 10:14-20; 19:12-20:5; 92:7-93:6.  He testified that the slurry "looked thin," which he explained implied lower-than-expected viscosity, a property that reflects how stable the slurry is when mixed and pumped into the well.  *Id.* at 20:23-21:8; 98:3-8.  Moreover, although Mr. Morgan testified that he did not observe any "settling," *id.* at 180:20-21 — which is another condition that can potentially indicate a cement slurry's instability — Timothy Quirk and Ron Faul reported that Mr. Morgan's tests had indicated such "settling," Ex. 3 (Faul Dep.) at 264:2-11; 269:24-270:11; Ex. 2 (Quirk Dep.) at 124:19-125:3; 127:5-19.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████

Mr. Morgan verbally reported these testing results to his supervisor, Ronald Faul.  Ex. 3 (Faul Dep.) at 270:3-6.  Mr. Morgan did not document his observations in writing.  *See* Ex. 1 (Morgan Dep.) at 22:10-23:6; 105:4-10.  There is no suggestion that the relevant Halliburton tests are privileged and Halliburton has not asserted any claims of privilege over them.

Significantly and remarkably, Mr. Morgan admitted under oath that he "threw out" the slurry samples he tested because he was "worried about" those materials "being misinterpreted in the litigation":

Q.  [D]id you take down any notes about the slurry?

A.  No, ma'am.

Q.  You didn't take any pictures?

A. No, ma'am.

Q. *And then you said you dumped out the sample?*

A. *Yes, ma'am*.

Q. And you mentioned that the reason that you didn't document the test and *you threw out the sample was because you were worried about it being misinterpreted in the litigation?*

A. *Yes, that's part of the reason yes, ma'am*.

*Id.* at 101:9-23 (emphasis added).

After hearing Mr. Morgan's verbal report of the slurry testing results, Mr. Faul contacted Tim Quirk (Halliburton's Area Lab Manager for its Broussard Laboratory) to request a variety of foam stability tests on a cement slurry with the same composition as used at the Macondo well. *See* Ex. 3 (Faul Dep.) at 263:12-265:6.  Mr. Faul explained that the cement sample tested by Mr. Morgan at Halliburton's Duncan Laboratory showed signs of "settling," an indicator of possible instability.  Mr. Faul further explained that he wanted Mr. Quirk to verify the stability of Halliburton's foam design.  *Id.*; Ex. 2 (Quirk Dep.) at 89:11-24.

Mr. Faul expressly ordered Mr. Quirk not to create a record of these tests or their results. *See id.* at 128:18-22; ███████ Instead, Mr. Faul instructed Mr. Quirk to conduct the tests ██ ███████ — meaning Mr. Quirk was not to record the tests in Halliburton's "Viking" system or otherwise document them as called for by Halliburton's normal cement testing procedures.  Ex. 3 (Faul Dep.) at 387:1-388:8; Ex. 2 (Quirk Dep.) at 128:18-22; ████████████

As requested, Mr. Quirk performed various foam stability tests, with and without mud contamination.  *See id.* at 122:12-123:7.  At his deposition, Mr. Quirk ███████████ ██████████████████ but was unable to recall other details — including, for example,

6

████████████████████████████████████████ the densities of the cured foam, or other essential testing results.  *Id.* at ████████████████████████████ 333:2-5.

To BP's knowledge, the results for the uncontaminated foam stability tests are not recorded in any standard or customary scientific manner anywhere.  This is apparently because, in accordance with Mr. Faul's express instructions, Mr. Quirk did not create a written report of the foam stability tests he conducted or otherwise document his findings in the Viking system.  *See id.* at 330:5-14).  Moreover, although Mr. Quirk actually did make notes of the contaminated foam stability test results, he ***"got rid of"*** those notes after reporting the testing results to Mr. Faul.  *See id.* at 393:11-21 (emphasis added).  Likewise, Mr. Quirk purposefully discarded the physical cement test samples after completing the tests, despite having not recorded the results and destroying the limited notes that he did take.  *See id.* at 331:21-24.

The combination of Halliburton's decision not to document this testing and the intentional destruction by its employees, both of the testing notes that were taken and the slurry sample that was used, have deprived BP, other parties, and the Court of unique, relevant evidence that cannot be replicated.  Moreover, deposition testimony firmly establishes such evidence would have supported BP's claims and undermined Halliburton's defenses had it been preserved.

> **B.      Halliburton's Consumption of Limited Quantities of Physical Samples.**

It appears that the testing by Mr. Quirk may well have been conducted by using (and thus destroying) limited cement additives from the Macondo well project.  Because Mr. Quirk's testing was not documented, however, there are no documents that definitively indicate, one way or another, what type of cementing material was employed.

Nonetheless, ██████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████ Ex. 19 (Richard Dep.) at 198:10-16 (confirming lot 6264 was used in both post-incident

testing and on the rig).

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████ Halliburton has recognized

that the lot 6264 material is subject to the Court's preservation order.  *See* Ex. 21, at 4-5 (HESI

request to modify preservation order).

**C.    Halliburton's Statements Attributing the Failure of the Cement to Channeling.**

Before the incident, Halliburton used OptiCem software to model how the cement would

be placed in the well. ████████████████████████ Halliburton has maintained

that its OptiCem modeling predicted channeling of the cement in the annulus above the main pay

zones of the well.  *See* ██████████████████ Ex. 24 (T. Roth, BP Deepwater Horizon

Investigation:  Preliminary Insights), at 9.

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████   Indeed, Halliburton has not

produced a single post-cement job communication indicating that Halliburton believed, after the

cement was pumped, that channeling had occurred.  Despite this, Halliburton has consistently

maintained, after the fact and for purposes of litigation, that channeling did in fact occur and,

moreover, that this channeling is the reason Halliburton's cement failed to isolate the

hydrocarbons that eventually flowed up the well and exploded.

    Critically, Halliburton has further contended that this alleged channeling is attributable to

BP's decisions, not Halliburton's.  ████████████████████████████████

████████████████████

█   ██████████████████████████████████████████
    ███████████████████████████████████████████
█   ████████████████████████████████████████████
    ████████████████████████████████████████████
    ████████████████████████████

    Now, however, BP has come to learn that these opinions from Halliburton's experts

appear to run contrary to results of non-privileged, post-incident modeling using proprietary

software that was conducted in July 2010 by Halliburton itself — results never produced in this

litigation; results that are now, inexplicably, "gone."  Ex. 11 (11/11/2011 letter, B. Harding to J.

Martinez).

    **D.    Halliburton's Proprietary "Displace 3D" Modeling of Possible Channeling.**

    Halliburton's Displace 3D Simulator is a proprietary computational fluid dynamics tool

designed to help engineers assess (among other things) the risk of channeling.  Ex. 26 (Displace

3D™ Simulator, http://www.halliburton.com/public/cem/contents/Data_Sheets/web/H/H06210.pdf). Because this model is proprietary, it is not available to BP or other litigants.

To avoid channeling, engineers pump specialized fluids called "spacers" into the wellbore to help clear a well of residual drilling mud and contaminants before pumping cement. *See, e.g.*, Ex. 27 (Nguyen Dep.) at ███████ 338:16-339:3.  According to Halliburton, its proprietary Displace 3D Simulator models in three dimensions how mud, spacer, and cement pumped into the wellbore move about over time, which in turn allows engineers to determine the degree of mud displacement success and to predict with accuracy the possibility of channeling. *See* Ex. 26 (Halliburton Data Sheet).  Halliburton's OptiCem program, which was used as the basis for Halliburton decisionmaking before the April 20, 2010, incident, does not include such sophisticated functionality.  *See* Ex. 3 (Faul Dep.) at 509:17-20; Ex. 28 (Sweatman Dep.) at 210:21-211:9 (reporting that he never saw 3D modeling of the Macondo well).

At some time after April 20, 2010, Halliburton employees conducted non-privileged analysis of its April 19 cementing operation using the proprietary Displace 3D Simulator.  *See* Ex. 6 (HAL_1071448).  As best as BP can determine, the results from those modeling runs indicate that there was no channeling at the Macondo well — confirming what Halliburton communicated internally and to BP after the cement was pumped on April 19, 2010.  *See id.*; *see also* Ex. 29 (Dugas Dep.) at 293:23-296:3.

### E.    Halliburton's Failure to Produce Its Proprietary Modeling Results.

Despite BP's discovery requests, the non-privileged results of Halliburton's proprietary Displace 3D modeling have not been produced in this litigation.  Instead, BP learned of them from an e-mail that Halliburton did not produce until July 2011.  In that e-mail, dated July 25, 2010, Tommy Roth dismissed the possibility of channeling at the Macondo well based on the results of post-incident modeling performed with Halliburton's proprietary Displace 3D

10

software.  *See* ▬▬▬▬▬▬▬▬  Specifically, in responding to internal concerns that Halliburton had recommended foam cement despite possible channeling, Mr. Roth stated: "Spacer volume was sufficient to sweep entire anulus [*sic*] volume.  As such, spacer was sufficient to sweep channel.  Subsequent testing with 3D confirms statement that spacer was sufficient." *Id.*

According to Mr. Roth's July 25, 2010, e-mail, Halliburton's proprietary 3D modeling showed that the volume of spacer fluid pumped into the Macondo well before cementing had been sufficient to clear out residual drilling mud from the annulus and thus eliminate the mud channeling that is now the linchpin of Halliburton's defense.  Roth's e-mail had stated that the "[s]pacer volume was sufficient to sweep entire anulus [*sic*] volume," *id.*, and Roger Dugas agreed in his deposition that this meant the possibility of channeling was not a significant issue.  *See* Ex. 29 (Dugas Dep.) at 295:12-296:3.

The proprietary, post-incident Displace 3D modeling referenced in Mr. Roth's July 25, 2010 e-mail is responsive to numerous BP requests for production propounded on March 25, 2011.  Specifically, this modeling should have been produced in response to BP's Requests Nos. 9, 20, 29, and 61.  *See* Ex. 30.  In particular, Request for Production No. 29 states: "Please produce all documents discussing, reflecting or relating to the displacement efficiency of the spacer fluid used in the Macondo well, including simulations."

Upon learning of their existence, BP made repeated requests that these modeling results be produced, together with all other post-incident investigative materials being improperly withheld by Halliburton.  *See* Ex. 8 (8/15/2011 letter, B. Harding to J. Martinez).  When Halliburton failed to produce these materials, BP moved to compel Halliburton to provide documents and witnesses related to its post-incident investigative activities not conducted at the

direction of counsel.  *See* Ex. 31 (BP's 8/29/2011 Motion to Compel).  On September 27, 2011, the Court ordered Halliburton to produce all remaining non-privileged, post-incident investigative materials "by **Wednesday, October 12, 2011**."  Ex. 10 (9/27/2011 Order at 2-3) (emphasis added).

In the days following the Court's Order and leading up the October 12, 2011 court-ordered deadline, Halliburton produced over ten thousand pages of documents.  In producing these documents, Halliburton never mentioned that the proprietary post-incident modeling referenced in Tommy Roth's July 25, 2010 e-mail was unavailable.  Accordingly, BP was forced to make several further attempts to secure Halliburton's compliance with the Court's order and obtain the missing proprietary modeling:

- October 13, 2011 letter from BP to Halliburton:  "We understand that the testing referenced in Mr. Roth's e-mail refers to Displace 3D modeling of the Macondo well, which modeling is responsive to several of BP's Requests …. Accordingly, please produce this modeling.  If, for any reason, you contend that this modeling is privileged, please advise and point us to the privilege log entry describing the basis of the privilege claim." Ex. 32 (10/13/2011 Letter at 2).

- October 20, 2011 e-mail from BP to Halliburton (sent three days after Halliburton's submission of expert reports claiming channeling occurred):  "I am sending this e-mail due to the urgency of this request which is a follow-up request to previous requests and the Court's recent orders …. We have searched all recent productions and still cannot locate the 3D modeling referenced by Mr. Roth in [his] email.  Please direct us to the [B]ates numbers where the modeling can be found, or produce the modeling as soon as possible." Ex. 33 (10/20/2011 email, B. Harding to J. Martinez).

Finally, on October 24, 2011, almost two weeks after this Court's production deadline had elapsed, Halliburton promised that it would search for the missing modeling results.  This is the entirety of Halliburton's response:

> Subject to HESI's objections to BP's document requests, HESI has produced responsive, non-privileged documents based on agreed-upon search terms and custodians.  In addition to the existing production, HESI will make a good faith reasonable search for additional responsive and non-privileged documents reflecting the 3D testing referenced in Mr. Roth's e-mail.

Ex. 34 (10/24/2011 letter, C. Raines to B. Harding) at 2.

On October 27, 2011, BP notified Halliburton that it would seek the Court's intervention unless Halliburton could provide a definitive date by which it would produce the missing results generated by its proprietary modeling software:

> As you know, Judge Shushan ordered Halliburton to complete its production of documents related to any non-privileged post-incident activities of Halliburton personnel by October 12, 2011. That deadline passed two weeks ago, yet we are still waiting for you to produce the [] Displace 3D modeling … which we have repeatedly requested for over a month. ***The prejudice to BP from this failure by Halliburton to comply with the Court's September 27, 2011 order is substantial. Moreover, that prejudice continues to grow with each passing day that Halliburton fails to produce the requested materials*** …. Accordingly, unless Halliburton produces these items by the end of the week (or gives us a definitive date by the end of the week for production shortly thereafter), we will have no choice but to seek the Court's intervention.

Ex. 35 (10/27/2011 letter, B. Harding to J. Martinez) at 2-3 (emphasis added).

After receiving no response, BP requested that the parties discuss the missing modeling results in a meet-and-confer session, which occurred on November 8, 2011. During that conference, Halliburton revealed for the first time that the results of its proprietary modeling were now "gone," meaning that they could no longer be located. *See* Ex. 11 (11/11/2011 letter, B. Harding to J. Martinez).

Because Halliburton failed to explain the circumstances surrounding the disappearance of the proprietary 3D modeling results during the November 8 conference, BP requested the following clarification on November 11, 2011:

> We do not have a written response explaining how or why the 3D modeling evidence is no longer available. I believe you stated the computer is gone but it was somewhat unclear what happened. ***Would you please describe why the evidence is no longer available so that we can accurately represent the issue to the Court***? We plan to file our motion on this issue next week and would appreciate a response by the end of the day on Monday.

13

*Id.* (emphasis added).  Halliburton later clarified that, while the testing results were "gone" from the computer, Halliburton still has the computer itself.  *See* Ex. 7 (11/22/2011 letter, B. Harding to J. Martinez).  Halliburton has not otherwise responded as of the date of this Memorandum, nor has it indicated that it plans a further response.

## ARGUMENT

As to the critical cement testing evidence, the record is unequivocal that Halliburton deliberately destroyed inculpatory testing results that go to the heart of multiple parties' claims and defenses.  Indeed, the evidence recounted above strongly indicates Halliburton destroyed at least some of this evidence ***precisely because*** Halliburton believed other parties could use the evidence against it.  As described below, this conduct merits the substantive sanction of adverse factual findings in the MDL case — in addition to attorneys' fees and additional discovery remedies.  In addition, and as described below, Halliburton's inexplicable failure to produce inculpatory computer modeling, which it now claims is simply "gone," merits court-ordered remedial forensic measures to recover the missing modeling results, and, failing that, expedited discovery accompanied by further relief as appropriate.

## I.   THE COURT HAS AUTHORITY TO REMEDY HALLIBURTON'S MISCONDUCT.

A party's duty to preserve evidence "arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."  *In re Enron Corp. Sec. Derivatives & ERISA Litig.*, 762 F. Supp. 2d 942, 963 (S.D. Tex. 2010).  A person "anticipat[ing] being a party … to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary."  *Pipes v. United Parcel Serv.*, 2009 WL 2214990, at *1  (W.D. La. July 22, 2009) (internal quotations omitted).  "[T]he duty to preserve

material exists throughout the litigation." *Duque v. Werner Enters., Inc.*, 2007 WL 998156, at *3 (S.D. Tex. Mar. 30, 2007).

Halliburton's duty to preserve evidence relevant to the explosion on board the *Deepwater Horizon* arose in the days and weeks following April 20, 2010.  Within a relatively short period of time following the explosion, Halliburton knew (or should have known) that evidence relevant to determining the cause of the incident — and in particular to assessing whether failures of Halliburton's cement had contributed to the *Deepwater Horizon* explosion — would be relevant to issues in pending litigation.  *See In re Enron*, 762 F. Supp. 2d at 963.  Against this backdrop, the Court's authority to remedy Halliburton's intentional destruction of evidence and violation of prior court orders independently derives from two separate sources.

*First*, where, as here, a party has destroyed evidence in violation of a specific court order, the court may impose sanctions under Rule 37(b).  *See* FED. R. CIV. P. 37(b)(2)(A).  Such civil sanctions may include (among others) barring the disobedient party from introducing evidence or directing that certain facts shall "be taken as established for purposes of the action."  Such sanctions may also include striking the disobedient party's pleadings, dismissing the action, and rendering a default judgment against the disobedient party.  FED. R. CIV. P. 37(b)(2)(A)(i)-(vi).

Rule 37(b) requires that sanctions be "'just'" and "'relate[d] to the particular claim'" that was the subject of the discovery violations.  *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 413 (5th Cir. 2004) (quoting *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (2002)).  In applying sanctions under Fed. R. Civ. P. 37(b), courts consider the following factors:  "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending

party is seriously at fault, will serve to deter such conduct by others in the future." *Pipes*, 2009 WL 2214990, at *2 (internal quotations omitted).

**Second**, discovery sanctions may be based on the Court's inherent power to control the judicial process and prevent its abuse. *See generally Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) (inherent power to sanction not displaced by federal statute or rules of procedure); *see also Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 611 (S.D. Tex. 2010). Sanctions available under a court's inherent powers encompass a broad choice of remedies and penalties, including all of the same sanctions a court may impose under Fed. R. Civ. P. 37(b). *See Ashton v. Knight Transp., Inc*., 772 F. Supp. 2d 772, 801 (N.D. Tex. 2011) (listing available civil sanctions and noting that federal courts have "broad discretion in crafting a remedy that is proportionate to both the culpable conduct of the spoliating party and resulting prejudice to the innocent party").

Sanctions available under a court's inherent powers are "confined … to instances of bad faith or willful abuse of the judicial process." *Pressey v. Patterson*, 898 F.2d 1018, 1021 (5th Cir. 1990). Undoubtedly "'bad faith' is to be judged by 'necessarily stringent' standards." *Pressey*, 898 F.2d at 1021. Hence, "courts do 'not automatically draw an inference of bad faith simply because documents are destroyed after the initiation of litigation." *Pipes*, 2009 WL 2214990, at *1. BP thus readily concedes that in the context of this MDL litigation, among the most complex in history, the aspirational goal of complete and total preservation of any and all documents that are created within a corporation is too much to ask from anyone. But, with respect to the cement testing, Halliburton's actions go beyond merely making a mistake — or even a series of mistakes. Rather, they amount to the intentional, bad-faith destruction of uniquely relevant evidence. In addition, Halliburton has failed to provide any explanation for its

supposed loss of the inculpatory computer modeling, a circumstance that, at a minimum, is highly suspicious.  Should further facts emerge that provide a basis to believe that Halliburton acted intentionally or in bad faith with respect to the loss of this evidence, additional sanctions may be warranted under the Court's inherent powers.

## II.   THE COURT SHOULD SANCTION HALLIBURTON'S SPOLIATION OF POST-INCIDENT CEMENT SLURRY TESTING MATERIALS AND RESULTS.

"Sanctions are appropriate when a party's destruction of evidence causes prejudice and the party knew or should have known the evidence was relevant to pending or potential [litigation]."  *Duque*, 2007 WL 998156, at *3.  Here, the record establishes that Halliburton undertook a single, integrated course of non-privileged conduct that led ultimately to its destroying key physical evidence and testing results.

Halliburton conducted tests that (1) destroyed scarce physical evidence, which (2) Halliburton alone had access to, notwithstanding (3) Halliburton's knowledge that litigation was pending, but (4) without notice to other parties that the testing would occur, and (5) with a conscious decision not to record the testing results and to destroy the only notes reflecting the conduct of the testing, out of (6) a professed and admitted — albeit discreditable — fear the testing results would later be "misinterpreted in th[is] litigation."  Halliburton's spoliation of unique physical and documentary evidence — done intentionally to prevent parties from obtaining and possibly "misinterpreting" this evidence in circumstances where all six of the above factors are present — rises to the level of bad faith.  Accordingly, Halliburton's conduct, coupled to the bad faith it evinces, merits the remedies requested in this Memorandum, whether under Fed. R. Civ. P. 37(b) or pursuant to the Court's inherent powers.

### A.    Halliburton Wrongfully and Willfully Destroyed Post-Incident Cement Slurry Testing Results.

The record establishes that Halliburton disregarded its obligations by deliberately and in bad faith destroying key evidence from post-incident cement slurry testing. This intentional destruction of relevant evidence has prejudiced BP and other parties to this litigation.

### 1.    Halliburton Conducted Tests that Destroyed Physical Evidence in Halliburton's Exclusive Control.

As explained above, in late April or early May 2010, Mr. Morgan analyzed a cement slurry with the same composition as the foam slurry pumped at the Macondo well. *See supra* p. 5. Mr. Morgan's testing appears to have used part of Halliburton's limited stock of the cement ingredients from the same lot as those used at the Macondo well. *See supra* p. 8. After those tests, Mr. Faul subsequently instructed Mr. Quirk to conduct additional testing. *See supra* p. 6. This additional testing was then performed by Mr. Quirk, and likely used up — and thus destroyed — limited cement additives from the Macondo well project. Indisputably, these same-lot cement additives were within the exclusive control of Halliburton and not available to other parties. *See supra* p. 8.

### 2.    Halliburton Did Not Give Notice that Its Testing Would Occur, Nor Did It Preserve and Share the Results of the Testing.

Halliburton failed to provide notice to any party that the non-privileged tests conducted by Messrs. Morgan and Quirk were going to occur and, as a result, no party knew of them in advance. No party could go to Court to seek to prevent Halliburton's use and destruction of the evidence or alter the protocols used for the testing. Nor could any other party monitor the results of that testing or request copies of the testing results. Halliburton alone had prior knowledge of, and access to, this destructive testing process.

18

Indeed, not only did other parties not know about these destructive tests, but even within Halliburton itself, it appears that the tests were conducted in such a way that their results were not preserved or made generally available.  Mr. Faul asked Mr. Quirk to conduct foam stability tests on the slurry used at the Macondo well ███████████ Ex. 3 (Faul Dep.) at 263:12-264:1; Ex. 2 (Quirk Dep.) at 128:2-22; ██████████████ Mr. Quirk conducted those tests and, significantly, destroyed both his notes and the test results.  *See id.* at ████████ 393:11-21.

### 3. The Destruction of the Cement Testing Results by Halliburton Employees Was Intentional and Willful.

There can be little doubt that Halliburton employees intentionally and willfully destroyed relevant evidence for improper reasons.  Mr. Quirk testified as follows:

"Q. Do you recall what happened to the physical pieces of cement that you tested?  Did you dispose of that?

*A. Yeah, just discarded it.*"

Ex. 2 (Quirk Dep.) at 331:21-24 (emphasis added).

"Q. Did you have hand notes before you talk[ed] to Mr. Faul?

A.  Yes.

Q. And what happened to those hand notes?

*A. I got rid of them.*"

*Id*. at 393:16-21 (emphasis added); ████████████████████████████

████████████████████████████████████

Likewise, Mr. Morgan testified:

"Q. And then you said you dumped out the sample?

A. Yes, ma'am."

Ex. 1 (Morgan Dep.) at 101:14-16 (emphasis added).

The facts surrounding this intentional destruction of evidence manifest "bad faith" within the meaning of applicable civil discovery precedent applying Fed. R. Civ. P. 37(b) and the Court's inherent powers.  Critically, BP does not assert that Halliburton's apparent decisions to avoid documenting the test results and dispose of the slurry upon conclusion of the testing, in and of themselves, warrant discovery sanctions.  Rather, BP contends that these decisions — combined with the intentional destruction of all other evidence of the test, including scarce cement ingredients and all notes reflecting the testing protocols and results — rises to the level of sanctionable spoliation of evidence under applicable civil discovery rules.

Here, unlike in many other spoliation cases where the alleged spoliator's motivation for destroying evidence is unclear, Rickey Morgan, Halliburton's Global Advisor in Gulf Cementing, has candidly admitted that he destroyed evidence willfully, with full knowledge of pending litigation, and for the express purpose of keeping unfavorable information out of the hands of Halliburton's litigation adversaries.

Mr. Morgan testified as follows:

"Q. And you mentioned that the reason that you didn't document the test and *you threw out the sample was because you were worried about it being misinterpreted in the litigation?*

A. *Yes, that's part of the reason yes, ma'am*."

Ex. 1 (Morgan Dep.) at 101:17-23 (emphasis added).

Purposefully destroying evidence because it is deemed to contain potentially unfavorable information that could benefit a litigation adversary is, by definition, "bad faith" conduct.  *See*, *e.g.*, *Whitt v. Stephens Cnty.*, 529 F.3d 278, 284 (5th Cir. 2008) (bad faith shown where party "intentionally destroy[ed] important evidence" and "did so because the contents of those documents were unfavorable to that party"); *Powell v. Town of Sharpsburg*, 591 F. Supp. 2d 814, 820 (E.D.N.C. 2008) (describing bad faith as "destruction for the purpose of depriving the

20

adversary of the evidence").  In this case, Mr. Morgan's candid admissions that he dumped test samples to prevent such information from being "misinterpreted" and "twisted" against Halliburton, in circumstances where no other record of the testing was made or kept, underscores the wrongfulness of these actions.  Parties in this MDL litigation do not have the right to destroy evidence because they fear it may be "misinterpreted."  Interpretation of evidence is the responsibility of a trier of fact, and litigating parties cannot decide for themselves what facts a trier of fact is and is not capable of accurately "interpreting."

**B.     An Adverse Finding of Fact Against Halliburton Is Warranted.**

There can be no question BP and other parties have been prejudiced by Halliburton's undisclosed, deliberate destruction of scarce physical evidence.  The slurry tested by Mr. Morgan had precisely the same composition as that used at Macondo and may have included some of the same ingredients.  *See* Ex. 1 (Morgan Dep.) at 19:12-20:5; 92:7-93:6.  Moreover, Mr. Morgan's testing showed that the slurry appeared thinner than expected and was settling — two indications of potential problems with the Halliburton slurry design.  *See id.* at 20:8-21:3; 180:12-24; 187:16-188:2; Ex. 2 (Quirk Dep.) at 124:23-25; Ex. 3 (Faul Dep.) at 264:2-11.  Mr. Morgan then destroyed the scarce materials used in the test because he was afraid that it could be used in litigation.  *See* Ex. 1 (Morgan Dep.) at 101:7-23.

Indeed, Mr. Morgan's verbal report concerning those testing results so concerned Mr. Faul that he asked Mr. Quirk to conduct foam stability tests on the slurry used at the Macondo well ██████████  Ex. 3 (Faul Dep.) at 263:12-264:1; Ex. 2 (Quirk Dep.) at 128:2-17; ██████ Mr. Quirk then conducted those tests and destroyed his notes and the test results.  ████████ ████████████  By deliberately destroying this documentary and scarce physical evidence in the manner described above, Halliburton forever deprived other litigating parties of the opportunity to analyze and review the results of Halliburton's own testing of the slurry.

Significantly, Halliburton is contending that post-incident testing performed by CSI Technologies, Inc. ("CSI") — one of the world's leading cement laboratories — using simulated slurry (because Halliburton would not provide BP with laboratory stock additives) is not reliable and that post-incident testing by Chevron and by Oilfield Testing & Consulting ("OTC") using Halliburton laboratory stock additives is likewise not reliable. Halliburton further contends that test results using the rig samples that it turned over to the government for testing are also unreliable, because of the passage of time. In this fashion, Halliburton conveniently contends that the *only* reliable testing is the pre-incident testing that Halliburton itself performed. Tellingly, Halliburton's experts did not conduct and do not rely on any post-incident testing.

But directly belying these multiple Halliburton contentions of convenience is the glaring fact that the non-privileged, post-incident, testing described above, performed by Halliburton itself, appears to have confirmed the CSI, Chevron, and OTC reports — and refuted Halliburton's own litigating positions. Given these unusual, extraordinary facts, the Court should order an appropriately framed finding of fact adverse to Halliburton. This factual finding should be available for use by all MDL parties. It should stipulate, in essence, that the testing performed by Messrs. Morgan and Quirk showed Halliburton's slurry design to be unstable.

## III. THE COURT SHOULD RECTIFY HALLIBURTON'S WRONGFUL FAILURE TO PRODUCE NON-PRIVILEGED, PROPRIETARY, POST-INCIDENT "DISPLACE 3D" MODELING RESULTS.

Undisputed facts establish that Halliburton has failed to produce highly valuable, non-privileged, proprietary, post-incident, Displace 3D modeling results that Halliburton claims — without explanation — are simply "gone." Because these results were produced using proprietary software, BP and other parties are simply unable to reproduce them using their own resources. Accordingly, the Court should direct a forensic examination (at Halliburton's expense) to recover the proprietary modeling results. In the event such an examination proves

unsuccessful — and the modeling results truly are "gone" for good — the Court should then grant BP expedited discovery into the circumstances of that data loss, and, if justified by evidence of bad faith or sufficiently wrongful conduct by Halliburton, make an adverse finding of fact against Halliburton as to what this proprietary modeling would have shown.

> **A.      Halliburton Wrongfully Failed to Produce the Results of Its Proprietary 3D Modeling or to Notify the Court of Its Apparent Disappearance.**

Halliburton was obliged to produce all non-privileged, post-incident modeling results, *first* in response to BP's March 2011 requests for production, *see* Ex. 30 (BP Requests); and, *second*, pursuant to the Court's September 27 Order "Regarding BP's Motion to Compel Halliburton Investigation Materials," *see* Ex. 10 (September 27, 2011 Order).

After repeated inquiries and follow-up requests seeking to enforce this Court's September 27 Order, Halliburton now claims that its modeling results are "gone," cannot be found, and will not be produced.  *See* Ex. 11 (11/11/2011 letter, B. Harding to J. Martinez); Ex. 7 (11/22/2011 letter, B. Harding to J. Martinez).

Asked to explain how critical evidence could disappear in clear disregard of this Court's Order, Halliburton at first ignored the question.  *See* Ex. 7 (11/11/2011 letter, B. Harding to J. Martinez) ("Would you please describe why the evidence is no longer available so that we can accurately represent the issue to the Court?").  After BP's follow-on inquiries, Halliburton's only response was to say that the results of its proprietary modeling has disappeared from the computer on which it was performed.  *See* Ex. 7 (11/22/2011 letter, B. Harding to J. Martinez).

Halliburton's explanation is, at a minimum, highly suspicious and warrants further inquiry, especially given the following:

- The indisputable relevance of these modeling results to Halliburton's core allegations of channeling, *see supra* at p. 9;

- Halliburton's protracted refusal to respond to BP's repeated requests for such modeling results, *see supra* at pp. 11-14;

- The significant prejudice Halliburton's supposed loss of this modeling has caused BP by potentially forever depriving it of the ability to examine and rely upon results of Halliburton's own proprietary 3D modeling to refute Halliburton's core allegations, *see supra* at p. 10;

- The unfair advantage Halliburton is poised to reap from the unexplained disappearance of this unfavorable evidence, *see supra* at p. 9, which BP alone cannot possibly reproduce, due to the proprietary nature of the computer model used to generate it; and

- The testimony establishing Halliburton's willingness to destroy and suppress **other** potentially unfavorable evidence, *see supra* at pp. 5-8.

### B.    The Court Should Order the Forensic Recovery of the Proprietary Modeling Results Halliburton Lost.

BP has been prejudiced by being prevented from buttressing key claims and defenses by showing them to be supported by Halliburton's own proprietary modeling.  *See Rimkus*, 688 F. Supp. 2d at 616-17 (prejudice may be shown where evidence "as a whole would allow a reasonable fact finder to conclude that the missing evidence would have helped the requesting party support its claims and defenses"); *Ashton*, 772 F. Supp. 2d at 801 ("Generally, the prejudice element is satisfied where a party's ability to present its case … is compromised.") (internal quotations omitted); *see also Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155-57 (4th Cir. 1995).

In choosing an appropriate remedy for Halliburton's failure to produce its proprietary modeling results, the Court enjoys "broad discretion" to fashion relief adapted to address Halliburton's misconduct, *see Pressey*, 898 F.2d at 1021, provided the sanction is "no harsher than necessary to respond to the need to punish or deter and to address the impact on discovery," *Ashton*, 772 F. Supp. 2d at 801.

Applying these principles, an appropriate sanction would be for the Court to compel Halliburton to fund an examination by a third-party specialist (one reasonably acceptable to the

Court, other parties, and BP) of the computer used to produce the proprietary 3D modeling results referenced in Tommy Roth's July 25, 2010 e-mail.  Such a sanction obviously will not fully cure the prejudice suffered by BP and other parties from having been denied timely access to Halliburton's proprietary 3D modeling results.  Still, such an examination might well recover the missing modeling results, or shed light on the circumstances of their apparent disappearance. If the model outputs are recoverable, that would tend to ameliorate the prejudice the MDL parties have suffered, by providing BP and other parties what is perhaps as close a substitute as possible to the evidence Halliburton wrongfully failed to produce.  *See Rimkus*, 688 F. Supp. 2d at 618 ("appropriateness of a sanction" can be measured by whether it 'restore[s] the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence."). Furthermore, assuming the forensic recovery efforts succeed, such a remedy would preclude Halliburton from unjustly benefitting from its failure to preserve evidence.

If the model outputs are not recoverable, BP respectfully submits that it should then be entitled to expedited discovery into the circumstances of the data loss.  Furthermore, BP reserves the right to come to the Court on an expedited basis seeking a finding of fact, under both Fed. R. Civ. P. 37(b) and this Court's inherent discovery powers, to the effect that the missing proprietary modeling showed no channeling occurred at the Macondo well — in the event the full record reveals Halliburton's bad-faith destruction or wrongful failure to preserve the results of its proprietary modeling.

## CONCLUSION

For these reasons, BP respectfully requests that the Court impose the remedies requested herein, plus reasonable attorneys' fees, to redress Halliburton's misconduct and rectify the resulting prejudice to BP.

Dated: December 5, 2011

Respectfully submitted,

/s/ Don K. Haycraft

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone:  202-662-5985
Facsimile: 202-662-6291

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone:  504-581-7979
Facsimile:  504-556-4108

Robert R. Gasaway
Jeffrey Bossert Clark
Aditya Bamzai
Kirkland & Ellis LLP
655 Fifteenth Street, NW
Washington, DC 20005
Telephone:  202-879-5000
Facsimile: 202-879-5200

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

**Attorneys for BP Exploration & Production Company**

26

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 5th day of December, 2011.

/s/ Don K. Haycraft
Don K. Haycraft