# Exhibit 3

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3    IN RE: OIL SPILL        )   MDL NO. 2179

     by the OIL RIG          )

4    "DEEPWATER HORIZON" in  )   SECTION "J"

     the GULF OF MEXICO, ON  )

5    APRIL 20, 2010          )   JUDGE BARBIER

                             )

6                            )   MAG. JUDGE

                             )   SHUSHAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20                   VOLUME 1 OF 2

21

22        Deposition of RONALD RAY FAUL, taken

23   at Pan American Life Center, 601 Poydras

24   Street, Ponchartrain Room, New Orleans,

25   Louisiana, on the 29th of June, 2011.

**PURSUANT TO CONFIDENTIALITY ORDER**

1     that software was not the same as that

2     which Halliburton uses in its labs; is

3     that correct?

4          A.   Yeah, I'm not --

5               MR. CHEN:   Objection, form.

6          A.   I'm not sure what features would

7     be different.

8          Q.   (BY MR. THORNHILL)   Have you

9     looked at the off-the-shelf version that

10    Halliburton sells and compared it to what

11    Halliburton uses in its labs?

12         A.   I have not.

13         Q.   All right.

14         A.   And we -- you know, that wouldn't

15    be in the lab as well; it would be the

16    engineering design software.

17         Q.   Okay.   All right.   I gotcha.

18               Now, tell me -- tell me a

19    little bit about what you had Mr. Quirk

20    do.  Did you call him on the phone or did

21    you send him an e-mail and say, I want you

22    to do some tests?

23         A.   Okay.   I called him on the phone

24    and asked him to get lab stock

25    materials --

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   Uh-huh.

2    A.   -- and repeat the test that was on

3    the final BP Macondo production liner,

4    production casing report, repeat the

5    stability test specifically.

6    Q.   Yeah.  Yeah.  Now -- now, you did

7    that, as I understand it, because somebody

8    in Duncan had told you that they had

9    attempted a duplication of the test, and

10   they found that the cement settled, right?

11   A.   Yes.

12   Q.   All right.  So when you called

13   Mr. Quirk, it was probably within a week

14   or two after the blowout had started,

15   right?

16   A.   It would have been in May

17   sometime.

18   Q.   In May?

19   A.   Yes.

20   Q.   The blowout's April 20, so in

21   early May you were calling and saying --

22   A.   Probably --

23   Q.   -- let's --

24   A.   Probably a little later in May.

25   Q.   Now --

1   A. After the 15th.

2   Q. Okay.  You had from Duncan a

3 report that the cement was settling,

4 and -- I got that right, correct, you --

5 that they -- they told you the cement

6 samples that they tested that they thought

7 were samples similar to the Macondo job,

8 they -- they were settling, right?

9   A. Yes.  He called me and said that

10 the sample he mixed up was showing some

11 signs of settling.

12   Q. Had you guys sent up to Duncan

13 some of the samples that you had on hand

14 at that time so that they could perform

15 the tests?

16   A. We had sent up lab stock.

17   Q. That'd be some of the same samples

18 you and I just went over in tab 60, right?

19   A. No.  Tab 60, I believe, was

20 samples from the Macondo well specific to

21 the Macondo well, and those were isolated.

22 So lab stock would have been samples in

23 the lab that -- that had -- we -- we

24 didn't touch the -- those were under lock

25 and key.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.   Okay.   Now, when you say lab

2   stock, though, for Duncan to test the

3   cement blends similar to what was used in

4   the Macondo production casing job, you

5   know, the 7-inch job --

6      A.   Yes.

7      Q.   -- they would have needed to have

8   blended into the cement essentially the

9   same materials that were blended into the

10   cement for the Macondo 7-inch production

11   job?

12      A.   We could have sent them samples of

13   Lafarge cement and samples of materials

14   from the lot numbers that we had in the

15   lab, but we didn't send them any of the

16   material from the -- from the rig --

17      Q.   Okay.

18      A.   -- Macondo.

19      Q.   Okay.   All right.   So you sent

20   them the cement -- the Lafarge cement.

21   Did --

22      A.   Yeah.

23      Q.   -- you take that out of the bin

24   down in Port Fourchon?

25      A.   I don't know where they got it.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    It would have been just cement that was in

2    the lab, representative of what was in

3    Port Fourchon.

4        Q.   Yeah.  So it's fair for me to say,

5    isn't it, that you wouldn't have sent them

6    somebody else's cement, you'd have sent

7    them the cement from -- from that which

8    you sent out to the rig, right, out of

9    that Port Fourchon bin, I guess, huh?

10       A.   Out of the Port -- yes, out of

11   Port Fourchon that was current at that

12   time.

13       Q.   Sure.  Sure.  So you get out of

14   the Port Fourchon bin some cement, the

15   Lafarge Class H cement, API rated, all

16   right, and that's the same stuff that was

17   used on the job, the -- the Macondo job,

18   and you get some of the -- the additives

19   that you had in the lab that were the same

20   additives that you used out on the job and

21   you sent it up to Duncan and they tested

22   it?

23       A.   Yes.

24       Q.   Is Duncan the headquarters?

25       A.   Duncan is our technology center.

1      Q.  You just sent it up to Duncan?

2      A.  Correct.

3      Q.  All right.  So they -- they get

4   cement out of the bin and they get the

5   additives out of the -- out of the lab in

6   Broussard and they test it.  And then did

7   they send you a written result?

8      A.  We did not do a foam stability

9   test.  These samples were sent up to do a

10  conductivity test --

11     Q.  Uh-huh.

12     A.  -- and which I did get a -- a

13  written result on.

14     Q.  Uh-huh.  Now, BP asked you to do

15  the conductivity test --

16     A.  That's --

17     Q.  -- correct?

18     A.  -- correct.

19     Q.  I got that right.

20          Now, tell me, did I get this

21  wrong?  Did -- did Duncan's lab write down

22  or print up the results?

23     A.  All I got was --

24          MR. HILL:  Object to form.

25     Q.  (BY MR. THORNHILL)  Did it?  This

1    is the conductivity test that you're

2    talking about having been done for BP.  I

3    can pull out the e-mails, if you want to,

4    where they're asking you to do it.

5         A.   Yeah.

6         Q.   Yeah.  And so they asked you to do

7    the test?

8         A.   Yes.

9         Q.   And you have the test run in -- in

10   Duncan?

11        A.   That's correct.  I had the

12   conductivity test run in Duncan.

13        Q.   You picked up the phone or

14   e-mailed or somehow or another told the

15   guys in Duncan what to do, right?

16        A.   Yes.

17        Q.   All right.  Who did you talk to up

18   there?

19        A.   I talked to a number of people.

20   From the beginning, I started talking with

21   Tom Daly, David Jones and traded e-mails

22   with several people.  On the results, I

23   was dealing with Ricky Morgan.

24        Q.   Okay.  And so did Ricky send to

25   you the results in an e-mail?

1    A.   Ricky would send me the results of

2    the conductivity test in an e-mail.

3    Q.   Yeah.   How about the test that

4    showed the settling; did Ricky send you

5    that?

6    A.   No, he called me.

7    Q.   What did he do with those results

8    that showed the settling?

9         MR. HILL:   Object to form.

10   A.   I don't know what he did with the

11   results.

12   Q.   (BY MR. THORNHILL)   What did Ricky

13   tell you he did with those results?

14   A.   He didn't tell me anything he'd

15   done with them.

16   Q.   Did you tell Ricky to do what you

17   told Mr. Quirk to do, i.e., destroy the

18   test results?

19        MR. HILL:   Object to form.

20   A.   I don't recall telling Mr. Quirk

21   to do that.

22   Q.   (BY MR. THORNHILL)   Have you read

23   Mr. Quirk's deposition?

24   A.   No, I have not.

25   Q.   Have you talked to Mr. Quirk?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.  I have talked to him, but not

2   about this topic.

3      Q.  Well, you obviously talked to him

4   to tell him what to do, didn't you?

5      A.  Yes, I did.

6      Q.  And he talked to you and you

7   talked to him when he had the results,

8   didn't he?

9      A.  He called me with the results.

10      Q.  And when he called you, are you

11   telling us that you told Mr. Quirk not to

12   destroy the results?

13      A.  I'm saying that I did not tell him

14   to destroy the results.

15      Q.  What did you tell him?

16      A.  I just told him to call me with

17   the results.

18      Q.  Well, where are the results from

19   the tests in -- in Duncan that were done

20   on the exact same cement that you've just

21   identified for us and -- and the same

22   additives?

23               MR. HILL:  Object to form.

24      Q.  (BY MR. THORNHILL)  Where are

25   those results?

**PURSUANT TO CONFIDENTIALITY ORDER**

1                    With -- with BP, you shared

2       this information from your hard drive,

3       correct?

4              A.   With BP, I shared that document on

5       conductivity test results.

6              Q.   Did you send that to BP by e-mail?

7              A.   Yes.

8              Q.   Who'd you send it to?

9              A.   Ken Allen.

10             Q.   Spell it again.

11             A.   Kenneth Allen.

12             Q.   A-L-L-E-N or A-L-A-N?

13             A.   A-L-L-E-N, I believe.

14             Q.   Where is Mr. Allen?  Where does he

15       work?

16             A.   He has a BP e-mail address.  He

17       was at Westlake, the BP office.

18             Q.   Did you meet him at the Westlake

19       office?

20             A.   I didn't meet him.  I just

21       corresponded with him by e-mail.

22             Q.   You had more than one e-mail with

23       him?

24             A.   Yes.

25             Q.   All righty.  And --

**PURSUANT TO CONFIDENTIALITY ORDER**

1    (Discussion off the record.)

2    Q.  So let me see if I got it right.

3    Mr. Allen got the information.  Did he

4    e-mail you back that he had received it?

5    A.  Yes.

6    Q.  Did the two of you discuss in

7    e-mails the results of the test?

8    A.  Nope.

9    Q.  Did the -- did the results of the

10   tests show that the -- that the cement had

11   any particular characteristics that we

12   could identify as being good or bad,

13   according to conductivity tests?

14   A.  The only results in that e-mail

15   were on the conductivity test itself.

16   Q.  What's a conductivity test

17   intended to show?  Explain --

18   A.  The --

19   Q.  -- that to the jury.

20   A.  The conductivity are the

21   resistance of the cement itself.  My

22   understanding is that the directional

23   drillers wanted this information to assist

24   in locating the relief well to the

25   original well.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  Okay.  Now, would you expect the

2    cement that has set up and hardened for a

3    long time to have less conductivity or

4    more conductivity than that which is wet

5    and first going in the hole?

6    A.  No, it -- we would have more.

7    Q.  More conductivity?

8    A.  Yes, as it -- as it gains

9    strength.

10    Q.  All right.  And what did the

11    conductivity tests show on the cement that

12    was tested in -- in Duncan?

13         MR. HILL:  Object to form.

14    A.  Just -- just numbers.

15    Q.  (BY MR. THORNHILL)  Okay.  Was

16    there any other information sent to you by

17    the Duncan lab to show the results of

18    tests?

19    A.  No.

20    Q.  So Ricky called you but didn't

21    send you anything in writing to show the

22    settling of the cement that was tested?

23    A.  That's correct.

24    Q.  Was the cement he was testing that

25    showed the settling the same cement that

1    requested the retarder concentration be

2    increased?

3        A.  No, I don't really -- I don't

4    really know that.

5        Q.  Do you know -- I think earlier you

6    spoke with Mr. Thornhill about some

7    additional testing that was done after the

8    blowout.

9        A.  Yes.

10       Q.  We know that you worked on some

11   foam stability testing and then some

12   contamination testing that you did with

13   the foam and you also -- and also the

14   conductivity and resistivity testing that

15   was done at the Duncan labs.  I'm not

16   going to go back into that because he

17   covered those areas pretty well.

18                I do want to know about the

19   clean foam stability without the

20   contamination.  I know you asked Mr. Quirk

21   to run that test.  Correct?

22       A.  I asked Mr. Quirk to perform a

23   foam stability test with lab stock

24   materials to repeat the test that was

25   given on the final BP report.

1    Q.  And I know you were asked earlier

2    today whether or not you told Mr. Quirk to

3    destroy his -- his notes or any results

4    that he had gotten.  You testified that

5    you didn't instruct him to do that at all.

6    A.  I don't remember instructing him

7    to destroy any -- any work that he had

8    done.  I did ask him not to put it in the

9    Viking system because it was not

10   associated with a customer need.  It was

11   internal Halliburton information.

12   Q.  Okay.  So you told him not to put

13   it into the Viking system --

14   A.  That's correct.

15   Q.  -- which is an -- that's an

16   electronic sort of process, isn't it?

17   A.  Yes.

18   Q.  Did you also instruct him not to

19   generate a report in connection with the

20   testing he was conducting?

21   A.  He gave me all the information

22   that I wanted when -- over the phone call.

23   I didn't tell him to -- to generate a

24   report.

25   Q.  Okay.  But that -- I appreciate

1  that.  But my question is, did you

2  specifically tell Mr. Quirk not to

3  generate a report in connection with the

4  foam stability test he was running for you

5  after the blowout?

6      A.  He would have had to put it in

7  Viking to do that, and I asked him not to

8  put it in Viking.

9      Q.  And I know today you've talked

10  about -- and just so I understand, you've

11  talked quite a bit about information

12  gathering, that you -- you were -- you

13  were conducting these tests after the fact

14  so you could gather facts and information,

15  and you used some of that information to

16  brief and educate some of the -- the other

17  people at Halliburton about what had

18  happened on Macondo; is that right?

19      A.  To give information to them so

20  that they could build -- we could build

21  presentations and they could go to

22  Washington and -- and present that

23  information.

24          We specifically did not do any

25  investigation.  We didn't look into how it

1    happened or why it happened, just what

2    happened, and that's it.

3        Q.  So you were -- you were handling

4    gathering factual information?  That was

5    what your job was?

6        A.  I was one of the people, yes.

7        Q.  Okay.  Well, I'm a little

8    confused, so I wanted to let you look at

9    an e-mail that I have behind tab 20.  And

10   maybe you can help clear this up for me.

11             You're not a -- you're not a

12   recipient of this e-mail, but this is an

13   e-mail dated June 12th, 2010 from Ronald

14   Sweatman.

15       A.  Yes.

16       Q.  Is he a Halliburton employee?

17       A.  Yes, he is.

18       Q.  And what's his position?

19       A.  Ron is on the GBTS, global

20   business and technical solutions, team.

21       Q.  Okay.  And he's sending an e-mail

22   to several folks, and he -- and this

23   e-mail's about kick and casing modeling

24   teams.  And it's my appreciation, after

25   reviewing this e-mail -- and particularly

PURSUANT TO CONFIDENTIALITY ORDER

1    if you turn the page, there's an agenda

2    that some kick simulation and modeling was

3    being performed by Halliburton with

4    respect to the Macondo well, and please

5    take a moment to look at it.

6        A.   Okay.   I'm not familiar with this

7    work.

8        Q.   You're not familiar with this?

9        A.   No.

10       Q.   So do you know if this was being

11   used as part of an investigation by

12   Halliburton as to what happened on

13   Macondo?

14       A.   I don't know what they were doing.

15       Q.   Fair enough.

16           MS. SULLIVAN:   I'm going to

17   mark Exhibit 20 as 3116.

18           (Exhibit Number 3116 marked.)

19           MR. HILL:   I'm sorry, 31 --

20           MS. SULLIVAN:   16.

21       Q.   (BY MS. SULLIVAN)   All right.   So

22   we know there wasn't a static gel strength

23   transition time test conducted before

24   Macondo?

25       A.   That is correct.

**PURSUANT TO CONFIDENTIALITY ORDER**

1             UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF LOUISIANA

3    IN RE: OIL SPILL          )   MDL NO. 2179

     by the OIL RIG            )

4    "DEEPWATER HORIZON" in   )   SECTION "J"

     the GULF OF MEXICO, ON   )

5    APRIL 20, 2010            )   JUDGE BARBIER

                               )

6                              )   MAG. JUDGE

                               )   SHUSHAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20               VOLUME 2 OF 2

21

22       Deposition of RONALD RAY FAUL, taken

23    at Pan American Life Center, 601 Poydras

24    Street, Ponchartrain Room, New Orleans,

25    Louisiana, on the 30th of June, 2011.

**PURSUANT TO CONFIDENTIALITY ORDER**

1     and figure out what went wrong?

2               MR. HILL:  Object to form.

3          A.  I'm -- I'm not in charge of this

4     event.

5          Q.  (BY MR. CHEN)  Right.  If you were

6     in charge of this event --

7          A.  I don't know what I'd do.

8          Q.  Don't know what you'd do.  But

9     possibly what you'd normally do, if there

10    were a charge that your cement failed?

11         A.  That -- that's not my decision to

12    make.

13         Q.  Now, you also said one of your

14    conclusions was that there was severe

15    channeling.

16               Now, channeling is an

17    effective displacement efficiency, right?

18         A.  That's correct.

19         Q.  Yesterday we talked about two

20    different displacement programs, the --

21    the new program you have, iCem, and also

22    Displace 3D?

23         A.  Correct.

24         Q.  Does Halliburton have any other

25    displacement programs?

PURSUANT TO CONFIDENTIALITY ORDER

509

1        A.  No.  Those are -- those are the

2    programs that we have.

3        Q.  Now, were either of those two

4    programs run to analyze the displacement

5    for the April cement job?

6        A.  I don't --

7            MR. HILL:  Object to form.

8        A.  I don't think so.

9        Q.  (BY MR. CHEN)  Okay.  Based on all

10   your review of materials and your talking

11   to people, those -- Halliburton did not

12   run a displacement program to analyze

13   displacement for the April cement job?

14           MR. HILL:  Object to form.

15       A.  Halliburton ran the OptiCem

16   program.

17       Q.  (BY MR. CHEN)  Okay.  Does OptiCem

18   have a displacement program within it?

19       A.  It does not have Displace 3D in

20   it, no.

21       Q.  But does it have a displacement

22   program in it to calculate displacement?

23       A.  There is a calculation that

24   OptiCem can do that deals with -- not

25   particularly displacement, but

**PURSUANT TO CONFIDENTIALITY ORDER**

1    displacement efficiency, I guess.

2        Q.  Okay.  So OptiCem can calculate

3    displacement efficiency?

4        A.  Based on -- it can estimate some

5    bypassed mud and make some estimates about

6    top of cement based on that.

7        Q.  And when you say bypassed mud, is

8    that the same thing as displacement of mud

9    and displacement efficiency?

10        A.  It --

11             MR. HILL:  Object to form.

12        A.  It's -- it's mud that would --

13    would not be displaced in the well bore on

14    the bore hole.

15        Q.  (BY MR. CHEN)  Okay.  I -- I

16    skipped over one thing earlier.  Did your

17    team reach any conclusions regarding the

18    float collar?

19             MR. HILL:  Object to form.

20        A.  No.

21        Q.  (BY MR. CHEN)  Did -- I mean, but

22    you examined some information about the

23    float collar, right?

24        A.  We read the information in the

25    report about the -- the number of times

**PURSUANT TO CONFIDENTIALITY ORDER**