# Exhibit 29

1

```
1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA
2

3    IN RE:  OIL SPILL       )  MDL NO. 2179
     BY THE OIL RIG          )
4    "DEEPWATER HORIZON" IN  )  SECTION "J"
     THE GULF OF MEXICO, ON  )
5    APRIL 20, 2010          )  JUDGE BARBIER
                             )  MAG. JUDGE SHUSHAN
6
```

                    ****************
                       VOLUME 1
                    ****************


        Deposition of Roger Wayne Dugas, taken at
the Pan-American Building, 601 Poydras Street,
11th Floor, New Orleans, Louisiana, 70130, on the
20th day of October, 2011.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1  What is that?  Is that a new Halliburton
 2  technology?
 3      A.  I'm assuming that Tommy is referring to
 4  our Displace 3D software.
 5      Q.  Right.  Is that a new -- that's a new
 6  technology that's a -- that you're selling now?
 7      A.  Not selling.  It's not new.  I mean, it's
 8  -- it's been in existence.  How long, I don't
 9  know, but I mean, we're not talking years here,
10  but it's not -- new to me, last week.
11      Q.  Okay.  That's fair enough.  You're --
12  okay.  So as of July 2010, was it a software that
13  Halliburton was now marketing to clients, do you
14  think, as of last Summer?
15      A.  Marketing is -- is -- I say "No," if you
16  say "marketing."
17      Q.  Okay.  Selling?
18      A.  No.  We're not selling it.  It was
19  software used just like OptiCem.
20      Q.  Okay.  So software that Halliburton used
21  to -- to -- to model a job?
22      A.  Right.
23      Q.  Okay. And did you -- did you use it on
24  all jobs, or just on some jobs?
25      A.  I don't know how often the Techni -- the
```

```
 1  Technical staff used it.
 2      Q.  Okay.  Is it software that you utilized
 3  when you were an Account Representative?  Was it
 4  available to you, as an Account Representative?
 5      A.  No.
 6      Q.  Okay.  And was it software that any
 7  Account Representative is capable of -- of
 8  running and using, or is it -- really, is it
 9  something that you're more -- that's kind of
10  a -- more sophisticated Technical people use?
11      A.  I'm trying to think about my last answer.
12  Displace 3D was available whenever I was an
13  Account Rep.  I did not use it very often.
14          As a matter of fact, I never used it.
15  If, in the event that I needed it, the Engineers
16  would run it for me.
17      Q.  Okay.  So it was not something that you
18  utilized.  Did it require special training or
19  special knowledge in order to run it?
20      A.  Yeah, at the time, the TAs ran it --
21      Q.  Okay.
22      A.  -- the Senior Engineers.
23      Q.  The Senior Engineers?  Okay.  When it
24  says:  "Spacer volume was sufficient to sweep
25  entire annulus volume."  What does that mean to
```

```
 1  you, as a former Account Representative?
 2              MR. BOWMAN:  Objection, form.
 3      A.   Can I read this entire thing before I
 4  make any assumptions, from the top?
 5      Q.   (By Ms. Harding) Sure.
 6      A.   Okay.  (Reviewing document.)  Okay.
 7      Q.   So, just to go back, there's a --
 8  Mr. Badamen -- Badalamenti is saying to
 9  Mr. Turton and Mr. Roth:  One of the things that
10  we need to address is the following question that
11  we could be asked, essentially, "Halliburton your
12  computer simulator indicated channeling, which
13  led to mud and cement intermixing.  However, you
14  still recommended foam cement."
15           And then Mr. Roth responds:  "Anthony
16  good point.  Spacer volume was sufficient to
17  sweep entire annulus volume.  As such, spacer was
18  sufficient to sweep channel.  Subsequent testing
19  with 3D confirms statement that spacer was
20  sufficient."
21           So what did -- from your former role as
22  an Account Representative, and somebody who
23  worked with displacement models and displacement,
24  and understands its significance, what did --
25  what does it mean when he says "Spacer volume was
```

1  sufficient to sweep entire annulus volume"?
2           MR. BOWMAN:  Objection, form.
3       A.  The spacer volume that was modeled in the
4  3D --
5       Q.  (By Ms. Harding) M-h'm.
6       A.  -- was of suf -- sufficient volume enough
7  in which to clean out any channeling opt --
8  possibilities, which undoubtedly someone down
9  here that Anthony was talking about is --
10      Q.  Had raised?
11      A.  -- is quoting, so to speak.
12      Q.  Right.  So somebody had raised the
13  possibility of channeling, and Mr. Roth is
14  responding:  That's a good point.  We have to
15  address that, because if there had been -- well,
16  we'll get away from that.  We'll come back to
17  that.
18          But he's saying that's not an issue
19  because we tested it and the "Spacer volume was
20  sufficient to sweep the entire annulus volume,"
21  right?
22          MR. BOWMAN:  Objection, form.
23      A.  That -- that -- that would be my
24  interpretation of the E-mail.
25      Q.  (By Ms. Harding) And that's -- when he

```
 1  says:  "As such, spacer was sufficient to sweep
 2  channel," that's just saying the same thing?
 3       A.   Yeah.  That would be my interpretation.
 4       Q.   Okay?  And have you seen any of this --
 5  of the 3D modeling referenced in this E-mail,
 6  4352, in connection with any work that you did
 7  after the incident?
 8       A.   No.
 9       Q.   Okay.  Have you done any work on the
10  investigation after the incident?
11       A.   No.
12       Q.   Okay.  Are you aware of whether
13  Halliburton conducted any -- conducted any
14  investigation of the cementing operation at
15  Macondo, other than any kind of lawyer-directed
16  investigation?
17       A.   I don't know.
18       Q.   You don't know.  Were you involved in any
19  decisions as to whether or not to perform such an
20  investigation?
21       A.   No.
22       Q.   Okay.  Are you aware of the HSE
23  requirements to do an investigation after there's
24  an incident?
25       A.   I don't know the requirements, no.
```

```
 1       Q.  It's not part of your responsibility?
 2       A.  No.
 3       Q.  Okay.  If you could turn back, all the
 4  way back to Tab No. 2, if you look at the
 5  organizational chart behind Tab No. 2, I'm going
 6  to mark this as --
 7              THE COURT REPORTER:  It's previously
 8  marked.
 9              MS. HARDING:  It is previously
10  marked?
11              THE COURT REPORTER:  M-h'm.  Look at
12  other page.  Is it?
13              MS. HARDING:  I don't see it
14  anywhere.  No.
15              THE COURT REPORTER:  Yes, I just saw
16  something.
17              MS. HARDING:  That's -- that's not
18  part of his notebook.  It was just mine.
19              THE COURT REPORTER:  I'm sorry.
20              MS. HARDING:  That's okay.
21              MR. MITCHELL:  5929.
22              MS. HARDING:  Twenty -- I'm sorry?
23  5929?  We're going to mark this as 5929.
24          (Exhibit No. 5929 marked.)
25       Q.  (By Ms. Harding) Do you recognize this
```

**PURSUANT TO CONFIDENTIALITY ORDER**