# EXHIBIT 26.A

In Support of

Plaintiff United States' Memorandum of Law in Support of the
United States' Second Motion for Partial Summary Judgment; and
Statement of Undisputed Material Facts in Support Thereof

# MACONDO PROSPECT
# OFFSHORE DEEPWATER
# OPERATING AGREEMENT

*370266*

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001601

|     |       |                                                                          |    |
| --- | ----- | ------------------------------------------------------------------------ | -- |
|     | 4.4.2 | Removal for Cause by Vote                                                | 18 |
|     | 4.4.3 | Timing of Vote to Remove Operator                                        | 18 |
| 4.5 |       | Selection of Successor Operator                                          | 19 |
| 4.6 |       | Effective Date of Resignation or Removal                                 | 19 |
| 4.7 |       | Delivery of Property                                                     | 19 |

**ARTICLE 5 – RIGHTS AND DUTIES OF OPERATOR ......................................... 20**

| 5.1  | Exclusive Right to Operate            | 20 |
| ---- | ------------------------------------- | -- |
| 5.2  | Workmanlike Conduct                   | 21 |
| 5.3  | Drilling Operations                   | 21 |
| 5.4  | Liens and Encumbrances                | 21 |
| 5.5  | Records                               | 22 |
| 5.6  | Reports to Government Agencies        | 22 |
| 5.7  | Information to Participating Parties  | 22 |
| 5.8  | Completed Well Information            | 24 |
| 5.9  | Information to Non-Participating Parties | 24 |
| 5.10 | Health, Safety, and Environment:      | 25 |

**ARTICLE 6 – EXPENDITURES AND ANNUAL OPERATING PLAN ....................... 25**

|     |         |                                                                                                             |    |
| --- | ------- | ----------------------------------------------------------------------------------------------------------- | -- |
| 6.1 |         | Basis of Charges to the Parties                                                                             | 25 |
| 6.2 |         | AFEs                                                                                                        | 25 |
|     | 6.2.1   | AFE Overrun Notice                                                                                          | 26 |
|     | 6.2.2   | Supplemental AFEs                                                                                           | 26 |
|     |         | 6.2.2.1 Permitted Over-expenditures on Well Operations                                                      | 27 |
|     |         | 6.2.2.2 Permitted Over-expenditures on the Feasibility AFE, a Post-Production Project Team AFE, or an Enhanced Recovery Project Team AFE | 28 |
|     |         | 6.2.2.4 Permitted Over-expenditures on an Execution AFE                                                     | 28 |
|     |         | 6.2.2.5 Permitted Over-expenditures on All Other AFEs                                                       | 28 |
|     | 6.2.3   | Further Operations During a Force Majeure                                                                   | 28 |
|     | 6.2.4   | Long Lead Well Operation AFEs                                                                               | 29 |
|     |         | 6.2.4.1 Approval of a Long Lead Well Operation AFE                                                          | 29 |
| 6.3 |         | Security Rights                                                                                             | 30 |
|     | 6.4.1   | Effect and Content of Annual Operating Plan                                                                 | 30 |
|     |         | 6.4.1.1 Capital Budget                                                                                      | 30 |
|     |         | 6.4.1.2 Expense Budget                                                                                      | 31 |
|     |         | 6.4.1.3 Operator Forecasts and Informational Items                                                          | 31 |
|     | 6.4.2   | Submission of Draft Annual Operating Plan                                                                   | 32 |
|     | 6.4.3   | Review of Draft Annual Operating Plan                                                                       | 32 |

**ARTICLE 7 – CONFIDENTIALITY OF DATA .......................................................... 33**

|     |       |                                                                   |    |
| --- | ----- | ----------------------------------------------------------------- | -- |
| 7.1 |       | Confidentiality Obligation                                        | 33 |
|     | 7.1.1 | Exceptions to Confidentiality                                     | 33 |
|     | 7.1.2 | Permitted Disclosures                                             | 33 |
|     |       | 7.1.2.1 Operator's Permitted Disclosures                          | 33 |
|     |       | 7.1.2.2 All Parties' Permitted Disclosures                        | 34 |
|     | 7.1.3 | Limited Releases to Offshore Scout Association                    | 35 |
|     | 7.1.4 | Continuing Confidentiality Obligation                             | 35 |
| 7.2 |       | Ownership of Confidential Data                                    | 36 |
|     | 7.2.1 | Trades of Confidential Data                                       | 36 |
|     | 7.2.2 | Ownership of Non-Consent Data                                     | 36 |

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001604

5.10 **Health, Safety, and Environment:**
With the goal of achieving safe and reliable activities and operations in compliance with all applicable laws and regulations, including avoiding significant and unintended impact on (i) the health or safety of people, (ii) property, or (iii) the environment, the Operator shall, with the support and cooperation of the Non-Operators, while it conducts activities or operations under this Agreement:

(a) design and manage activities or operations to standards intended to achieve sustained reliability and promote the effective management of HSE risks;

(b) apply structured HSE management systems and procedures consistent with those generally applied in the petroleum industry to effectively manage HSE risks and pursue sustained reliability of operations under this Agreement; and

(c) conform with locally applicable HSE related statutory requirements that may apply.

In fulfilling its duties and obligations hereunder, the Operator shall act in accordance with the provisions of Exhibit "K."

## ARTICLE 6 – EXPENDITURES AND ANNUAL OPERATING PLAN

6.1 **Basis of Charges to the Parties**
Except as otherwise provided in this Agreement, the Operator shall pay all Costs of all activities and operations under this Agreement, and each Participating Party shall reimburse the Operator in proportion to its Participating Interest Share for the Costs of these activities and operations. All charges, credits, and accounting for expenditures shall be made under Exhibit "C." Funds received by the Operator under this Agreement may be commingled with the Operator's own funds.

6.2 **AFEs**
The Operator shall not undertake an activity or operation whose Costs are Five Hundred Thousand dollars ($500,000.00) or more, unless an AFE has been

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001635

| | |
|---|---|
| 1 | included in a proposal for an activity or operation and the proposal has been approved by Vote, Election, or unanimous agreement, whichever is applicable, or the Operator is exercising one of its discretionary powers under this Agreement. An approved proposal grants the Operator authority to commit or expend funds on the approved proposal for the account of the Participating Parties. For an activity or operation whose Costs are in excess of Two Hundred Fifty Thousand dollars ($250,000.00), but less than Five Hundred Thousand dollars ($500,000.00), the Operator shall furnish the Participating Parties with an AFE for information purposes only. Notwithstanding the foregoing, in the event of an emergency, or if in the sole discretion of the Operator a perceived emergency exists that poses an imminent threat to life, safety, property, or the environment, the Operator may immediately make those expenditures for the Joint Account as, in its opinion as a reasonable and prudent operator, are necessary to deal with the emergency, but only to the extent necessary to stabilize the situation and alleviate the imminent threat. The Operator shall report to the Participating Parties, as promptly as possible, the nature of the emergency, the action taken, and the Costs incurred. |

6.2.1   **AFE Overrun Notice**

For informational purposes only, the Operator shall provide an AFE overrun notice to all the Participating Parties if it appears (based upon Operator's reasonable estimate) that the actual total Costs associated with an original AFE will exceed the estimated total expenditures in that original AFE by more than ten percent (10%), but will not require the submission of a supplemental AFE under Article 6.2.2 (*Supplemental AFEs*).

6.2.2   **Supplemental AFEs**

Except as provided in Article 6.2.3 (*Further Operations During a Force Majeure*), if it appears (based upon the Operator's reasonable estimate) that the actual Costs associated with an original AFE or its approved supplemental AFEs will exceed the relevant permitted over-expenditure set forth below, the Operator shall promptly submit a supplemental AFE to the Participating Parties. A supplemental AFE shall include the dollar amount of the permitted over-expenditure from the previously approved AFE as part of the dollar amount of that supplemental AFE. Subject to Article 8.6.1 *(Well Proposals,*

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001636

*Recompletions, and Workovers*), after receipt of the supplemental AFE each Participating Party has the right to make an Election as to its further participation in the approved activity or operation. If a proposed supplemental AFE is approved by Election, the Operator shall continue to conduct the approved activity or operation associated with the supplemental AFE at the sole Cost and risk of the Participating Parties in the supplemental AFE. Any Participating Party making an Election not to participate in an approved supplemental AFE becomes a Non-Participating Party in the activity or operation associated with the original AFE once the actual Costs expended on the activity or operation exceed the permitted over-expenditure amount of the last AFE in which the Non-Participating Party Elected to participate, without regard to whether all the activities or operations (including plugging and abandonment) in the original AFE have been conducted at the time of its Election not to participate. A Non-Participating Party in a supplemental AFE is subject to the same Hydrocarbon Recoupment premium, Underinvestment, or acreage forfeiture provision in Article 16 (*Non-Consent Operations*) that would apply to a Party Electing or Voting not to participate in the originally approved activity or operation, except a Hydrocarbon Recoupment premium or an Underinvestment shall apply only to the Costs of the approved activity or operation not borne by the Non-Participating Party. If a supplemental AFE is not approved by Election, the Operator shall conclude the activity or operation as soon as practical, and each Participating Party will be responsible for its Participating Interest Share of the Costs of the activity or operation, including Costs in excess of the permitted over-expenditure amount.

### 6.2.2.1 Permitted Over-expenditures on Well Operations

The permitted over-expenditure for an Exploratory Operation, an Appraisal Operation, or a Development Operation is an amount equal to ten percent (10%) of the estimated total Costs in the original AFE for that operation or its approved supplemental AFEs for wells.

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001637

#### 6.2.2.2 Permitted Over-expenditures on the Feasibility AFE, a Post-Production Project Team AFE, or an Enhanced Recovery Project Team AFE

The permitted over-expenditure for the Feasibility AFE, a Post-Production Project Team AFE, or an Enhanced Recovery Project Team AFE is an amount equal to fifteen percent (15%) of the estimated total Costs in the original AFE for that activity or its approved supplemental AFEs.

#### 6.2.2.3 Permitted Over-expenditures on a Selection AFE or Define AFE

The permitted over-expenditure for the Selection AFE or the Define AFE is an amount equal to fifteen percent (15%) of the estimated total Costs in the original AFE for that activity or its approved supplemental AFEs.

#### 6.2.2.4 Permitted Over-expenditures on an Execution AFE

The permitted over-expenditure for the Execution AFE is an amount equal to fifteen percent (15%) of the estimated total Costs in the original AFE for that activity or its approved supplemental AFEs. The "cumulative estimated total Costs in the original AFE for that activity" is the total dollar amount of the Execution AFE, its approved supplemental AFEs and all approved Long Lead Development System AFEs.

#### 6.2.2.5 Permitted Over-expenditures on All Other AFEs

The permitted over-expenditure for all other AFEs is an amount equal to fifteen percent (15%) of the estimated total Costs in the original AFE for that activity or operation or its approved supplemental AFEs.

### 6.2.3 Further Operations During a Force Majeure

No Party is permitted to make an Election not to participate in further activities or operations under Article 6.2.2 (Supplemental AFEs) during a Force Majeure or during an emergency that poses a threat to life, safety, property, or the environment, but may make an Election not to participate in further activities or operations that are to be conducted

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001638

after the termination of the Force Majeure or emergency. Notwithstanding any contrary provision of this Agreement, if Costs arising as a result of Force Majeure or emergency cause the amount of an original AFE and its approved supplemental AFEs to exceed their permitted over-expenditure in Article 6.2.2 *(Supplemental AFEs)*, no supplemental AFE will be required; however, once stabilization takes place and Force Majeure or emergency expenditures are no longer being incurred, the Operator shall submit to the Participating Parties a supplemental AFE for the activities or operations that are to be conducted after termination of the Force Majeure or emergency in order for them to make an Election under Article 6.2.2 *(Supplemental AFEs)* as to their participation in those activities or operations.

6.2.4 **Long Lead Well Operation AFEs**

In addition to the Operator's right under Article 12.6 *(Long Lead Development System AFEs)* to submit Long Lead Development System AFEs for long lead-time items prior to the submission of the Execution AFE, the Operator may submit an AFE to the Parties, which will allow the Operator to make advance commitments for or purchases of equipment or services, which are commercially reasonable and necessary to facilitate the early and orderly commencement of any kind of well or well operation (including any associated tie-back Facilities) ("Long Lead Items") (a "Long Lead Well Operation AFE").

6.2.4.1 **Approval of a Long Lead Well Operation AFE**

Each Long Lead Well Operation AFE requires the unanimous agreement of the Parties.

6.2.4.2 **Non-Participating Parties in the Operations Associated with the Long Lead Well Operation AFE**

If a Party, who participated in a Long Lead Well Operation AFE, does not participate in an approved well or well operation, for which Long Lead Items were procured under that AFE, the Operator shall reimburse that Party its Participating Interest Share of the Costs of those Long Lead Items within thirty (30) days of the approval of that well or well operation, provided, however, that Party's share of those

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001639

Costs shall be included in the calculation of any Hydrocarbon recoupment to which it is subject as a result of that well or well operation. The Operator shall invoice the Participating Parties in that well or well operation for their proportionate share of the reimbursement under this Article 6.2.4.2 in accordance with Exhibit "C."

### 6.2.4.3 Disposition of Items Associated with the Long Lead Well Operation AFE

Notwithstanding the provisions of Exhibit "C," the Participating Parties in an approved well or well operation for which Long Lead Items were procured shall approve by Vote the disposition of those Long Lead Items if they are not utilized for the approved well or well operation. If the disposition is approved, the disposition will be binding on all Participating Parties in that well or well operation. The disbursement of the proceeds realized from the disposition of those Long Lead Items shall take place in accordance with Exhibit "C."

## 6.3 Security Rights

Addressed in Exhibit "F" of this Agreement and is incorporated into this Agreement by this reference.

## 6.4 Annual Operating Plan

### 6.4.1 Effect and Content of Annual Operating Plan

The Annual Operating Plan is for informational and planning purposes and does not obligate any Party to any course of action or expenditures or constitute a Vote, Election, or unanimous agreement to participate in any specific activity or operation. To the extent known on the date of submission of the Annual Operating Plan, the Annual Operating Plan shall include the following items, without limitation:

#### 6.4.1.1 Capital Budget

(a) a list of proposed wells to be drilled including their anticipated order, drilling time, depths, surface and bottomhole locations, objective sands, type of well

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001640

(Development, Appraisal), purpose of well (production, injection), and estimated Costs;

(b) capital well operations listed by well, with their estimated Cost;

(c) capital projects that have estimated gross Costs greater than three million dollars ($3,000,000.00). The term "capital project" includes addition of new equipment and expansion or upgrades of existing equipment; and

(d) an estimated total amount (in aggregate) for capital projects.

6.4.1.2 **Expense Budget**

(a) expense well operations listed by well, with their estimated Cost;

(b) expense projects that have estimated gross Costs greater than three million dollars ($3,000,000.00). The term "expense project" includes repair, replacement, inspection, and maintenance of existing equipment;

(c) an estimated total amount (in aggregate) for expense projects; and

(d) estimated Operations and Maintenance (O&M) expenditures for the year may be shown in the aggregate. O&M expenses include the ongoing, everyday expenditures necessary to operate the field.

6.4.1.3 **Operator Forecasts and Informational Items**

(a) production forecasts;

(b) injection forecasts;

(c) fuel gas forecasts;

31

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001641

|   |   |   |
|---|---|---|
| 1 | (d) | scheduled or planned downtime exceeding three (3) days; |
| 3 | (e) | data collection programs; |
| 4 | (f) | Facility constraint and ullage forecast; |
| 5 | (g) | geochemical or geophysical survey(s) or special test(s) that might be contemplated; and |
| 7 | (h) | other areas deemed of significance by the Operator. |

6.4.2 **Submission of Draft Annual Operating Plan**
Beginning in the year in which a Development Plan is approved, and in each subsequent year, the Operator shall develop and submit to the Non-Operating Parties, by July 1st, a draft Annual Operating Plan for the next calendar year. The Annual Operating Plan process will be used (a) as a reporting mechanism by which the Operator will inform the Non-Operating Parties of results of the previous year's activities and operations, (b) to review ongoing activities and operations, and (c) for the remainder of the current year and the next succeeding calendar year, to forecast and plan activities and operations and to forecast anticipated Hydrocarbon production volumes, operating expenses, and capital expenditures.

6.4.3 **Review of Draft Annual Operating Plan**
The Non-Operating Parties may provide suggested changes, additions, or deletions to the Annual Operating Plan to the Operator and all other Parties in writing before September 1st of each year. The Operator will then make changes that it deems necessary (if any) and submit the final Annual Operating Plan to the Non-Operating Parties no later than November 1st of each year, at which time the Annual Operating Plan is deemed adopted by all Parties.

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001642

EXHIBIT "C"

Attached to and made a part of that certain Operating Agreement dated October 1, 2009 by and between BP Exploration & Production Inc., as Operator, and MOEX Offshore 2007 LLC, as Non-Operator

# ACCOUNTING PROCEDURE
# PROJECT TEAM
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

1. **DEFINITIONS**

All terms used in this Accounting Procedure, if not otherwise defined in the Agreement to which this Accounting Procedure is attached, shall have the following meaning:

"Affiliate" shall mean, with respect to any Party, any separate legal entity directly or indirectly controlling, controlled by, or under common control with such Party, unless otherwise defined in the Agreement to which this Accounting Procedure is attached. For the purposes of this agreement, Affiliates shall include those listed in Appendix A to this Exhibit C.

"Controllable Material" shall mean Material that at the time of acquisition or disposition by the Joint Account is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of the Operator's field employees and/or contract labor directly employed on the Joint Property in the conduct of Joint Operations.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties.

"Joint Operations" shall mean activities required to handle operating conditions and problems for the exploration, appraisal, development, production, protection, maintenance, abandonment, and restoration of the Joint Property.

"Joint Property" shall mean the real and personal property subject to the Agreement to which this Accounting Procedure is attached. For operations involving subsea or remote structures, the phrase "on the Joint Property" may include a platform, surface production facility, remote facility, or floating production storage facility, which is the surface location from which Joint Operations are conducted, even if such location is not owned by the Joint Account.

"Material" shall mean personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

"Non-Operators" shall mean the Parties to this Agreement other than the Operator.

"Offshore Facilities" shall mean platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

"Operator" shall mean the Party designated to conduct the Joint Operations.

"Parties" shall mean legal entities signatory to the Agreement or their successors or assigns to which this Accounting Procedure is attached.

"Personal Expenses" shall mean reimbursed costs for travel, temporary living, relocation, and other expenses of Operator's employees, as well as similar expenses incurred by a Non-Operator or any Party's Affiliate for personnel assigned to a Project Team.

"Project Team" shall mean employees of the Parties, Affiliates, or contractors assigned to perform work and/or studies as authorized under the terms of the Agreement.

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001761

"Shore Base Facilities" shall mean onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions benefiting the Joint Property.

"Technical Employees" shall mean personnel having special and specific engineering, geoscience, or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

2. **STATEMENTS AND BILLINGS**

   A. The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. In lieu of detailed descriptions, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

   B. Non-Operators shall bill the Operator, on a monthly basis, in accordance with the provisions contained herein, for the salaries, wages, payroll burden, and Personal Expenses, if any, of its employees assigned to the Project Team. In a like manner, the Non-Operator shall bill the Operator for such expenses of the Non-Operator's Affiliate employees and/or contractor employees retained by the Non-Operator who are assigned to the Project Team. The Operator shall reimburse the Non-Operators in accordance with Section I, Paragraph 3.B. For the purposes of Paragraphs 3, 4, and 5 of this Section I, the Non-Operator's costs shall be considered a Joint Account.

   C. The Operator or Non-Operators may make available to the Parties any statements and bills required under Section I.2 and/or Section I.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator or Non-Operator shall provide the Parties instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator or Non-Operator notifies the Parties that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission.

3. **ADVANCES AND PAYMENTS BY THE PARTIES**

   A. If gross expenditures for the Joint Account are expected to exceed $50,000 in the next succeeding month's operations, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for such month's operations. Unless otherwise provided in the Agreement, any billing for such advance shall be payable within 30 days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the excess to subsequent month's billings or advances, unless a refund is specifically requested.

   B. Except as provided below, each Party shall pay its proportionate share of all bills in full within thirty (30) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime

CONFIDENTIAL

APC-HEC1-000001762

ACCESS RESTRICTED

rate published by the Federal Reserve plus three percent (3%) per annum. Interest shall begin accruing on the first day of the month in which the payment was due.

[X] Electronic Fund Transfer (optional)

C. Payments by Parties for monthly cash advances and billings shall be made by Electronic Fund Transfer (EFT) or Automated Clearing House (ACH) transaction.

4. **ADJUSTMENTS**

   A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements (including payout status statements) rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after 24 months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto requesting review for adjustment.

   B. All adjustments initiated by the billing Parties except those described in (1) through (4) below are limited to the 24-month period following the end of the calendar year in which the original charge appeared or should have appeared on the billing Party's Joint Account statement or payout status statement. Adjustments made beyond the 24-month period are limited to the following:

      (1) a physical inventory of Controllable Material as provided for in Section V,
      (2) an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Party relating to another property,
      (3) a government/regulatory audit, and/or
      (4) working interest ownership adjustments

5. **EXPENDITURE AUDITS**

   A. A Non-Operator, upon notice in writing to the Operator and other Non-Operators including any non-participating Parties, shall have the right to audit the Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit. The lead audit company's audit report shall be issued within ninety (90) days after completion of the audit testing and analysis but no later than ninety (90) days after the end of the calendar year in which the audit was commenced; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Paragraph 4.A above. All claims shall be supported with sufficient documentation. Failure to issue the report within the prescribed time or to take specific written exception within the twenty-four (24) month period will preclude the Non-Operator from taking exception to any charge billed within the time period audited.

   A timely filed audit report or any timely submitted response thereto shall suspend the running of any applicable statute of limitations regarding claims made in the audit report. While any audit claim is being resolved, the applicable statute of limitations will be suspended; however, the failure to comply with the deadlines provided herein shall cause the statute to commence running again.

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001763

B.  The Operator shall allow or deny all exceptions in writing to an audit report within one hundred eighty (180) days after receipt of such report. Denied exceptions should be accompanied by a substantive response.

C.  The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt.

The Operator or any audit participant may call an audit resolution meeting for the purpose of resolving audit issues/exceptions that are outstanding at least fifteen (15) months after the date of the audit report. The meeting will require one month's written notice to the Operator and all audit participants, a mutually agreed upon time and location, and attendance by representatives of the Operator and audit participants with authority to resolve such outstanding audit issues.

The lead audit company will coordinate the response and positions of the audit participants throughout the audit resolution process. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. An audit resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting can be discussed at subsequent meetings until each such issue is resolved.

E.  This Accounting Procedure contemplates Non-Operators may incur Project Team expenditures that are subsequently billed to the Operator and charged to the Joint Account pursuant to Section I, Paragraph 2.B. Accordingly, such Non-Operators are required to maintain auditable records supporting such charges. Regarding such charges, the Operator and/or any other Non-Operators are hereby provided the same rights and obligations as set forth in Section I, Paragraphs 5.A. through 5.D., as pertain to the Non-Operators in audit of the Joint Account. Conversely in such situation, the Non-Operator being audited is hereby provided the same rights and obligations as set forth in Section I, Paragraphs 5.A. through 5.D. for the Operator.

6. **APPROVAL BY PARTIES**

Where an approval or other agreement of the Parties is expressly required under other sections of this Accounting Procedure, the Operator shall notify all Parties of the proposal.

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, an affirmative vote of two (2) or more Parties having a combined participating interest of at least fifty-one percent (51%) shall be controlling.

For the purpose of administering the voting procedures of this Paragraph 6, if two or more Parties to this Agreement are Affiliates of each other, such Affiliated Parties shall be treated as a vote by a single Party having the combined interest of the Affiliated Parties.

II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

1. **RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations

2. **LABOR**

CONFIDENTIAL

ACCESS RESTRICTED

APC-HEC1-000001764