# EXHIBIT 29

In Support of

Plaintiff United States' Memorandum of Law in Support of the
United States' Second Motion for Partial Summary Judgment; and
Statement of Undisputed Material Facts in Support Thereof

1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
2

3

   IN RE:  OIL SPILL     MDL NO. 2179
4  BY THE OIL RIG
   "DEEPWATER HORIZON"   SECTION:  J
5  IN THE GULF OF
   MEXICO ON APRIL 20,   JUDGE BARBIER
6  2010                  MAG. JUDGE SHUSHAN

7



13

14

          Deposition of **JIM W. BRYAN,** taken in
15  the Pan American Life Center, Bayou Room,
    11th Floor, 601 Poydras Street, New
16  Orleans, Louisiana 70130, on Friday, May 6,
    2011.

17

18

19  **APPEARANCES:**

20

21          KIRKLAND & ELLIS LLP
            (By:  Ryan Micallef, Esquire)
22          300 North LaSalle
            Chicago, Illinois  60654
23              (Attorneys for BP)

24

25

**GAUDET KAISER, L.L.C.**
Board-Certified Court Reporters

1          MR. FINEMAN:

2               Can I have Tab 12, please?

3     EXAMINATION BY MR. FINEMAN:

4          Q.     Okay.  I'm going to give you

5     what's been previously marked as

6     Exhibit 1915, ANA-MDL-000041237.

7          A.     Okay.

8               (Whereupon, the document

9     referred to was previously marked as

10    Exhibit No. 1915 for identification.)

11    EXAMINATION BY MR. FINEMAN:

12         Q.     This document is e-mails dated

13    October 20, 2009.  I believe you're on the

14    distribution list of the e-mail -- the

15    second of the e-mails; is that correct?

16         A.     The one at the top of the page?

17         Q.     Yes.

18         A.     Yes, sir.  That is correct.

19         Q.     And this is an e-mail from

20    Mr. Huch in which he's saying: I told BP

21    late yesterday that we'd be recommending

22    Option 1 to our management.  BP has agreed

23    and is going to do likewise.

24               You see that?

25         A.     Yes, I do.

1      Q.     And then Option 1 is described

2   below.  You see that?  It's in the earlier

3   e-mail.

4      A.     Yes, uh-huh.

5      Q.     To the best of your knowledge,

6   was that the ultimate -- the deal that was

7   ultimately struck as described in Option 1?

8      MR. MICALLEF:

9            Object to form.

10     MR. FINEMAN:

11            You can answer.

12     THE WITNESS:

13            Yes.  Yes, that was the --

14   ultimately, the -- the prospect Sawatch and

15   Tobacco Root were the prospects that --

16   that were -- or the leases that were traded

17   comprised those two prospects.

18   EXAMINATION BY MR. FINEMAN:

19     Q.     Okay.  And in that option, which

20   ultimately became the deal, it says:  We

21   pay one-third for one-quarter of the well

22   costs.

23            Do you see that?

24     A.     Yes.

25     Q.     What does that mean?

1   that you didn't play any role in drafting

2   or preparing the documents.  Did you review

3   the transaction documents before they were

4   executed?

5          A.      As I recall, I was not in the

6   office when they were executed.  And so, I

7   don't think I saw the exact final draft

8   execution, you know, documents.  I probably

9   saw some iterations of those prior to that.

10         MR. FINEMAN:

11             I'm going to give you documents

12   marked 1942, APC-SHS2A-000008493 through

13   8523.  It's Tab 21.

14             (Whereupon, the document

15   referred to was marked as Exhibit No. 1942

16   for identification.)

17   EXAMINATION BY MR. FINEMAN:

18         Q.      Do you recognize this document,

19   Mr. Bryan?

20         A.      I do.

21         Q.      What is this document?

22         A.      It is a Lease Exchange

23   Agreement.

24         Q.      And what does this Lease

25   Exchange Agreement show us or tell us?

1        A.     Well, among many things --

2        MR. NEGER:

3               Objection to form.

4   EXAMINATION BY MR. FINEMAN:

5        Q.     What is the purpose of this

6   document?

7        A.     It was -- the purpose of the

8   document was to effect an exchange of four

9   leases that our company owned with one

10  lease that BP owned.

11       Q.     Okay.  The document is between

12  BP Exploration Production Inc., Anadarko

13  Petroleum Corporation, and Anadarko E&P

14  Company; correct?

15       A.     Correct.

16       Q.     Okay.  Turn to the second page

17  of the document.

18               There's -- in items 1.4, 1.5,

19  1.6, those are the identities of the

20  properties at issue; correct?

21       A.     Yes.

22       Q.     Okay.  So the properties that

23  Anadarko E&P -- or the transferring or the

24  interests in those properties that are

25  being transferred are described in 1.5;

1           We are -- he has a similar

2     attorney-in-fact -- designation, as I do

3     from the company.  So, therefore, he is

4     the -- sort of my backup, if you will.

5     BY MR. FINEMAN:

6          Q.     What does "attorney-in-fact"

7     mean in the context in which you just used

8     it?

9          A.      It means that me and others that

10    are -- that are designated by the company

11    to be an agent and attorney-in-fact or

12    attorney-in-fact are authorized to execute

13    certain documents.

14         Q.      And, again -- okay.

15         MR. FINEMAN:

16              Tab 20 is the next document.

17    This is 1943, ANA-MDL-000030613, through

18    30650.

19              (Whereupon, the document

20    referred to was marked as Exhibit No. 1943

21    for identification.)

22    EXAMINATION BY MR. FINEMAN:

23         Q.      This document is entitled

24    Macondo Prospect Well Participation

25    Agreement, Deepwater Gulf of Mexico.

1    Correct?

2         A.      Yes.

3         Q.      Do you recall this document?

4         A.      I do.

5         Q.      Okay.   What is this document?

6         A.      This is the document that --

7    that sets forth the provisions of the

8    participation by Anadarko in the drilling

9    of the -- of the Mississippi Canyon 252

10   Macondo well.

11        Q.      Is this document the document

12   that essentially lays out the economic

13   terms of the relationship between Anadarko

14   and BP with respect to the well?

15        A.      Yes.

16        Q.      Okay.   Can you -- this document,

17   by the way is -- the same was true, I

18   think, of the Lease Exchange Agreement and

19   the same will be true of the Operating

20   Agreement.   The documents were signed on

21   December 17, 2009, effective October 1,

22   2009; is that correct?

23        A.      They're dated the 17th.   I

24   actually think that they were signed after

25   the 17th but dated the 17th.

1          A.      Because Kerr-McGee Oil and Gas

2     Corporation is a 25 percent owner in

3     Pompano, and certain provisions were being

4     made for Pompano.  And so that's the reason

5     they -- they were listed as well.

6          Q.      And this goes back to our

7     discussion earlier about the potential tie

8     back to Pompano; correct?

9          A.      Yes.

10          Q.      Okay.  So Kerr-McGee was made a

11     part of the Well Participation Agreement,

12     because you needed their -- that company's

13     consent for the tie back provisions that

14     appear in this document; is that correct?

15          A.      Yes.

16          Q.      But Kerr-McGee had no

17     participation interest in the Macondo

18     Prospect; correct?

19          A.      That is correct.

20          Q.      Okay.  In Recital B on the first

21     page?

22          A.      Okay.

23          Q.      It says that APC -- that's

24     Anadarko Petroleum; correct?

25          A.      Yes.

1      Q.     Okay.  Have you seen this

2   document before?

3      A.     I have.

4      Q.     Okay.  What is this?

5      A.     This is the -- the document that

6   Anadarko E&P and Anadarko Petroleum

7   Corporation signed to effectively join the

8   operator.  The operator was executed prior

9   to our participation.

10      Q.     Okay.  So if you turn to the

11   next page, the -- yes.  Right there.

12      A.     Okay.

13      Q.     This document is dated

14   October 1, 2009.  It was executed

15   December 17, 2009; correct?

16      A.     Correct.

17      Q.     And it is signed on behalf of

18   Anadarko E&P and Anadarko Petroleum by

19   Mr. Wallace; correct?

20      A.     That is correct.

21      Q.     Did you participate in -- well,

22   strike that.

23            This -- all this joinder does is

24   indicate your participation in the

25   operating agreement; is that correct?

1          MR. MICALLEF:

2                Object to form.

3     EXAMINATION BY MR. FINEMAN:

4          Q.     All what this document does is

5     indicate Anadarko E&P is Anadarko

6     Petroleum's joinder of the operating

7     agreement; is that correct?

8          A.     Right.  Yes, sir.

9          Q.     Okay.  And the document -- this

10    joinder also refers to a company called

11    MOEX Offshore 2007, LLC.  You see that?

12         A.     Yes.

13         Q.     Okay.  For purposes of the

14    deposition today, I'm going to refer to

15    that company as MOEX.  Is that okay?

16         A.     Yes.

17         Q.     Who was MOEX?

18         A.     MOEX, as I appreciate it, is a

19    subsidiary -- subsidiary of Mitsui, a

20    Japanese corporation.

21         Q.     And what was MOEX's role with

22    respect to the operating agreement?

23         A.     They were a non-operating party,

24    co-owner.

25         Q.     And they had 10 percent

1    interest?

2         A.    Yes.

3         Q.    Okay.  I'm going to come back to

4    them in a little bit.

5              So, I think a minute ago, you

6    mentioned that this -- if you turn to the

7    front face page of the actual offering

8    agreement, it's called the Macondo

9    Prospect, Offshore Deepwater Operating

10   Agreement; correct?

11        A.    Yes.

12        Q.    And this document, you said, was

13   already in existence at the time you

14   executed the joinder; is that correct?

15        A.    Yes.

16        Q.    And it was in existence because

17   it had already been entered into between --

18   by and between BP and MOEX; is that

19   correct?

20        A.    Yes.

21        Q.    Did Anadarko play any role in

22   negotiating the terms of the operating

23   agreement?

24        A.    No.

25        Q.    To the best of your knowledge,

1    did Anadarko express any concerns or offer

2    any changes to the operating agreement?

3         A.    Not that I'm aware.  It was --

4    as I appreciate it, it was executed,

5    obviously, before we were -- we ratified

6    it.

7         Q.    But to -- but to your knowledge,

8    did Anadarko ask for any changes to the

9    operating agreement before executing the

10   joinder?

11        A.    No.

12        Q.    Do you know whose responsibility

13   it was at Anadarko to be familiar with the

14   terms of the operating agreement?

15        A.    It would've been Nick Huch.

16   Primarily, Nick is the -- kind of the lead

17   negotiator for this.

18        Q.    Have you ever read this

19   document?

20        A.    In its entirety?

21        Q.    Yes.

22        A.    I don't believe so.

23        Q.    Have you ever read portions of

24   of it?

25        A.    Yes, I have.

1    would be?

2         A.    For the Gulf of Mexico, it would

3    be Dick Keelan.

4         Q.    Can you spell the last name for

5    me?

6         A.    Yes.  It's K-E-E-L-A-N, I

7    believe.

8         Q.    Were there any other transaction

9    documents, besides the ones we've looked

10   at -- you know what, before you answer that

11   question, let's look at some other

12   documents that I do want to show you.

13        MR. FINEMAN:

14             So I'm going to give you

15   document 1944.  It's Tab 5.  This

16   document -- the exhibit only includes a

17   couple of Bates-stamped numbered documents.

18   But I'm not -- I can't recall the source of

19   the other documents, the other pages.

20             So the two pages at the end of

21   this exhibit are ANA-MDL-000020295 and 296.

22   The other pages of the exhibit do not have

23   Bates-stamp numbers.

24             (Whereupon, the document

25   referred to was marked as Exhibit No. 1944

1    for identification.)

2    EXAMINATION BY MR. FINEMAN:

3         Q.    So I'm giving you 1944.

4         MR. NEGER:

5              And are you representing that

6    the two pages which do have Bates stamps on

7    them are a part of the document that is not

8    numbered?

9         MR. FINEMAN:

10             I'm going to ask the question.

11   For purposes of my examination, it's part

12   of one exhibit.  I'm not making

13   representations about what belongs with

14   what.  Just the way we've assembled it.

15   Hopefully, the witness can tell me.  We can

16   separate them, too, if we need to.  It

17   doesn't matter.

18        MR. NEGER:

19             Okay.

20   EXAMINATION BY MR. FINEMAN:

21        Q.    Could you take a look at this

22   exhibit.  This is a letter -- the front

23   page is a letter dated February 11, 2010,

24   to MMS from Wendy Rodriguez at Anadarko;

25   correct?

1          A.      That is correct.

2          Q.      And it shows it was approved on

3     February 23, 2010; correct?

4          A.      That is correct.

5          Q.      And then again -- on the next

6     page, it also shows the documents were

7     signed by -- on behalf of BP and Anadarko

8     Petroleum on December 17, 2009; correct?

9          A.      That's correct.

10         Q.      And then the designation of

11    operator documents, where it shows --

12    stamped received February 23, 2010;

13    correct?

14         A.      That is correct.

15         Q.      And again, those were dated on

16    behalf of Anadarko Petroleum and Anadarko

17    E&P on December 17, 2009?

18         A.      That is correct.

19         MR. FINEMAN:

20              This is Exhibit 1945.  Again,

21    the first page of this document does not

22    have a Bates stamp number.  The second and

23    third pages are 000023862 to 23863.

24              (Whereupon, the document

25    referred to was marked as Exhibit No. 1945

1   for identification.)

2        MR. NEGER:

3             Which tab is --

4        MR. HARTLEY:

5             Which tab is this?

6        MR. FINEMAN:

7             I'm sorry.  This is Tab 7.

8   EXAMINATION BY MR. FINEMAN:

9        Q.    The first -- the first page of

10  this document is a letter dated April 20,

11  2010, from Vera Wells at Anadarko E&P; is

12  that correct?

13       A.    That is correct.  This was

14  signed by Vera Wells.  The letterhead says

15  Anadarko E&P.

16       Q.    Fair enough.  And who is Vera

17  Wells?

18       A.    Vera Wells is also an analyst in

19  our group.

20       Q.    And she reports either directly

21  or indirectly to you?

22       A.    She does.

23       Q.    Okay.  And do you know what this

24  document -- this cover letter and the

25  following attached pages are?

1          A.      It is transmitting the -- to the

2     MMS an assignment from Anadarko E&P Company

3     to Anadarko Petroleum Company of 22 and a

4     half net percent working interest.

5          Q.      And this is that transfer that

6     was contemplated in the Well Participation

7     Agreement that we looked at earlier?

8          A.      Yes.

9          Q.      Okay.  This -- if you turn to

10    the second page, it shows that this -- this

11    is the actual assignment document; correct?

12         A.      That is correct.

13         Q.      Okay.  And it shows that it was

14    received by MMS -- stamped "received" on

15    April 21, 2010?

16         A.      Yes.

17         Q.      Is that correct?

18         A.      Uh-huh (affirmative).

19         Q.      And it shows at the bottom of

20    the page that it was approved on April 28,

21    2010?

22         A.      Correct.

23         Q.      Okay.  And the next page shows

24    that you signed the document on behalf of

25    both Anadarko E&P and Anadarko Petroleum?

1          A.      That is correct.

2          Q.      And it appears that you dated

3     the document April 15, 2010?

4          A.      That is correct.

5          Q.      Okay.  Do you know why it was in

6     mid April 2010 that the document -- that

7     you executed this document and not back in

8     December?

9          A.      Specifically, no.  I suspect

10    it's just probably a administrative delay.

11    It wasn't dated as timely maybe as it

12    should.  The assignment was -- you know,

13    for the second part, for the assignment

14    from ANP to APC, you really couldn't have

15    submitted that until the previous one

16    was -- was approved.

17         Q.      Okay.  And do you know why --

18    strike that.

19         MR. FINEMAN:

20              Why don't we take a 5-minute

21    break right here?

22         MR. NEGER:

23              Sure.

24         THE VIDEOGRAPHER:

25              Off the record.  This is Tape 2.

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC   Document 4820-37   Filed 12/06/11   Page 20 of 21
133

1    participation in the initial Macondo well;

2    correct?

3          A.    That is correct.

4          Q.    Okay.  Can I direct your

5    attention to the definition of IEW or

6    initial exploratory well?

7          A.    Okay.

8    MR. NEGER:

9                Where is that?

10    MS. FLICKINGER:

11                It's on page 2, on the Well

12    Participation Agreement.

13    MR. NEGER:

14                Okay.

15    EXAMINATION BY MS. FLICKINGER:

16          Q.    And the final -- it defines the

17    well currently being drilled by the

18    operator on the Macondo Prospect area and

19    any substitute wells.

20                And then the final sentence

21    says, the interest in the IEW assigned to

22    APC consists of all tangible personal

23    property in the well, including the tubular

24    and wellhead costs as set forth in the AFE.

25                You see that?

1        A.      Yes, I do.

2        Q.      Do you have an understanding of

3    what "tangible personal property" means?

4        A.      In the context of the well, I

5    can only imagine that was the -- you know,

6    the equipment that at that time had already

7    been installed in the well.  You know, we

8    were joining after the commencement of the

9    operation.  So I don't know specifically

10   what those things would be, but I think

11   they would be those sorts of things.

12       Q.      Is tangible personal property

13   something in your capacity as land manager

14   would use -- is that a concept that you use

15   in drafting the various agreements?

16       A.      You know, I don't see that much.

17   I see that it's here, obviously, but that's

18   not a term we use a lot.

19       Q.      Are you involved in the

20   invoicing and the payments that take place

21   once the joint operating agreements are

22   completed?

23       A.      No, ma'am.

24       Q.      You're not?

25       A.      No.