# EXHIBIT 31

In Support of

Plaintiff United States' Memorandum of Law in Support of the
United States' Second Motion for Partial Summary Judgment; and
Statement of Undisputed Material Facts in Support Thereof

```
 1               UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA
 2

 3
      IN RE:  OIL SPILL      MDL NO. 2179
 4    BY THE OIL RIG
      "DEEPWATER HORIZON"    SECTION:  J
 5    IN THE GULF OF
      MEXICO, ON APRIL       JUDGE BARBIER
 6    20, 2010               MAG. JUDGE SHUSHAN

 7
```

```
13

14
            Deposition of NICHOLAS G. HUCH,
15    taken in the Pan American Life Center,
      Bayou Room, 11th Floor, 601 Poydras Street,
16    New Orleans, Louisiana 70130, on Monday,
      May 16, 2011.
17

18
      APPEARANCES:
19

20
            LIEFF CABRASER HEIMANN & BERNSTEIN,
21          LLP
            (By:  Steven E. Fineman, Esquire and
22                Annika K. Martin, Esquire)
            250 Hudson Street, 8th Floor
23          New York, New York  10013
                (Attorneys for Plaintiff's
24               Steering Committee)

25
```

```
 1        Q.    Do you recall, do you know
 2   whether or not anybody from Anadarko
 3   Petroleum or Anadarko E&P ever signed this
 4   document?
 5        A.    They did not.
 6        MR. FINEMAN:
 7             Let's go off the record for one
 8   second.
 9        THE VIDEOGRAPHER:
10             Off the record.  It's 11:57.
11             (Off the record.)
12        THE VIDEOGRAPHER:
13             Returning to the record.  It's
14   11:58.
15   EXAMINATION BY MR. FINEMAN:
16        Q.    Mr. Huch, I'm going to give you
17   what's been previously marked as
18   Exhibit 1243.  It's Tab 28.
19             You can take the rubber band off
20   and if you need to look at the document,
21   read anything to answer questions, that's
22   fine.  Okay?
23             Do you recognize this document?
24        A.    Which document you're referring
25   to?
```

```
 1         Q.    Well, let's start with the
 2   document that's on the front up at the top
 3   which is called ratification and joinder of
 4   operating agreement Macondo Prospect.
 5         A.    Yes, I do.
 6         Q.    Can you tell me what this is?
 7         A.    It's exactly what it says it is,
 8   it's a ratification and joinder of the
 9   operating agreement, existing operating
10   agreement that was in place between BP and
11   MOEX.
12         Q.    And did you participate in the
13   drafting of this document?
14         MR. NEGER:
15               What you mean, the ratification
16   and joinder?
17         MR. FINEMAN:
18               Yes.  We just clarified that
19   we're only talking about that document
20   right now.
21         THE WITNESS:
22               BP drafted it and submitted it
23   to us for our review and approval.
24   EXAMINATION BY MR. FINEMAN:
25         Q.    And what is the purpose of this
```

```
 1    document?
 2        A.    This sets forth the revised
 3    interests under the operating agreement as
 4    a result of the lease exchange agreement
 5    and well participation agreement.
 6        Q.    And that is reflected here on
 7    this page, is that Anadarko E&P takes 22.5
 8    percent working interest and Anadarko
 9    Petroleum 2.5 percent interest?
10        A.    Yes.
11        Q.    If you'll look at the next page,
12    again, this document was executed on
13    December 17, 2009 by Mr. Wallace on behalf
14    of Anadarko E&P and Anadarko Petroleum;
15    correct?
16        A.    Yes.
17        Q.    Okay.  If you can put that down
18    and look at the next big piece of paper.
19    You can put that down, too.  All right.
20    The next document is Macondo Prospect
21    offshore deepwater operating agreement;
22    correct?
23        A.    Yes.
24        Q.    And there's exhibits as well,
25    I'll point them out to you when we get
```

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC   Document 4820-39   Filed 12/06/11   Page 6 of 11
176

1  there.
2              You testified a moment ago that
3  this document was already in existence when
4  you, when Anadarko signed the ratification
5  and joinder of operating agreement;
6  correct?
7       A.   Yes.
8       Q.   And do you recall, this was,
9  that's because the MOEX Offshore 2007 and
10 BP had already entered into this document;
11 is that correct?
12      A.   Yes.
13      Q.   Did you participate at all in
14 the content, in drafting the content of
15 this document?
16      A.   No.
17      Q.   Did you ever express to BP any
18 reservations or complaints about any
19 provision of this document?
20      A.   No.
21      Q.   Okay.  Was it the case that
22 Anadarko just accepted this document as the
23 operating agreement because it was already
24 in place?
25      A.   Yes.

```
 1    with the MMS, it says the parties recognize
 2    and agree that prior to MMS approval of the
 3    assignment of the BP property into AEP, APC
 4    will become the owner of all of the BP
 5    property upon delivery of the subsequent
 6    AEP assignment.  Did I read that right?
 7         A.    Yes.
 8         Q.    What did you understand to be
 9    the BP property that's referred to?
10         A.    BP property would have been the
11    Macondo block, the MC 252.
12         Q.    And if you would, look with me
13    at paragraph 1.4 on the other page.  And it
14    defines BP property.  I'll just go ahead
15    and read it.  It says, BP property means an
16    undivided 25 percent of 100 percent record
17    title interest in and to lease OCS-G 32306,
18    Mississippi Canyon Block 252, excluding the
19    tangible personal property, which includes
20    the tubulars and wellhead for the
21    Mississippi Canyon Block 252 No. 1.
22               Is that definition of property
23    something that you've seen before?
24         A.    For the most part.
25         Q.    The last clause about excluding
```

```
 1    the tangible personal property, is that a
 2    term that you typically see in lease
 3    exchange agreements?
 4         MR. NEGER:
 5              Objection to form.
 6         THE WITNESS:
 7              It's not typical.
 8    EXAMINATION BY MR. LEOPOLD:
 9         Q.   What do you understand that to
10    mean?
11         A.   We excluded the tangible
12    personal properties in the well going to
13    AEP and APC.
14         Q.   Okay.  And tangible personal
15    property, you understand to be what?
16         A.   Equipment associated with the
17    well.
18         Q.   Can you give me some examples?
19         A.   Downhole pipe, wellheads, casing
20    equipment that's downhole.
21         Q.   Okay.  Anything else?
22         A.   No.  That's just an example.
23    I'm not an engineer.
24         Q.   Okay.  Thanks.
25              And I notice in the definition
```

```
 1         Q.    Your understanding is that APC
 2   paid for all the costs associated with
 3   Macondo?
 4         A.    Yes.
 5         Q.    Even though on the AFEs that AEP
 6   was still signing -- the AFEs; is that
 7   correct?
 8         A.    Yes.
 9         Q.    Like the money that was being
10   paid on AEP's behalf was coming from APC?
11         A.    Yes.
12         Q.    If you would, turn with me to
13   page 2 of the agreement?  And let's look at
14   the definition of the initial exploratory
15   well.
16               And I want to go to the last
17   sentence of that definition and it says the
18   interest in the IEW, which is the initial
19   exploratory well, assigned to APC consists
20   of all tangible property in the well,
21   including the tubular and wellhead costs as
22   set forth in the AFE.
23               Did I read that correctly?
24         A.    Yes, you did.
25         Q.    What did you understand that to
```

1  mean?
2       A.   Because the well had already
3  commenced operations October 1st, they
4  already had pipe set in the ground, there
5  was already tangible equipment out there
6  and it was understood that APC would get
7  the entirety of 25 percent of that.
8       Q.   Okay.  And what did you
9  understand the relationship between this
10 provision and the one in the lease exchange
11 agreement?  How did those work together?
12      A.   Which provision in the lease
13 exchange agreement?
14      Q.   I'm sorry.  The one that we just
15 discussed regarding tangible personal
16 property.
17      A.   You're talking about excluding
18 it?
19      Q.   Right.
20      A.   Yeah, it was never the intent
21 for AEP to own any of the tangible
22 property, the BP property.  That's why it
23 was excluded in the lease exchange
24 agreement, but included here.
25      Q.   So the intent was that APC would

```
 1   end up with the tangible personal property?
 2        A.    Yes.
 3        Q.    Okay.  Thank you.  If you would,
 4   turn with me to page 6 of the well
 5   participation agreement.  At the bottom,
 6   paragraph 5, I want to read the last
 7   sentence of that paragraph into the record.
 8             It says if there's any conflict
 9   between the terms of this agreement and the
10   lease exchange agreement, the terms of this
11   agreement shall prevail.
12             Did I read that correctly?
13        A.    Yes.
14        Q.    Okay.  Let's stop there.  That
15   was -- so your understanding was that A --
16   because of the well participation
17   agreement, APC would receive the tangible
18   personal property; correct?
19        A.    Yes.
20        Q.    All right.  Let's now turn to
21   the operating agreement.  That's Tab 72 in
22   your binder.  And if you would, turn with
23   me to page 14.  This is previously marked
24   Exhibit 1243.
25             So, in paragraph 4.1 it talks
```