# UNDER SEAL

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig        MDL NO. 2179
       "Deepwater Horizon" in the Gulf
       of Mexico, on April 20, 2010        SECTION J

Applies to: *All Cases*        JUDGE BARBIER
       MAGISTRATE JUDGE SHUSHAN

## ORDER

### [Regarding Halliburton's Motion to Disqualify (Rec. doc. 4595)]

On November 15, 2011, Halliburton filed a motion to disqualify Michael Viator, Fred Sabins and CSI Technologies, Inc. ("CSI") and to strike expert opinions. Rec. doc. 4595. CSI and BP submitted oppositions. Rec. docs 4718 and 4723. Halliburton submitted a reply which included an affidavit from Richard Vargo. Rec. doc. 4779. BP moved to strike the affidavit of Richard Vargo. Rec. doc. 4783. BP submitted a sur-reply. Rec. doc. 4797.

The ultimate issue concerns the application of the doctrine of imputed disqualification to the unique facts in this situation. The Fifth Circuit has not ruled on imputed disqualification in the context of experts. In Stencil v. Fairchild Corporation, 174 F.Supp.2d 1080 (C.D. Cal. 2001), the court refused to employ the doctrine to disqualify the expert. In BP Amoco Chemical Company v. Flint Hills Resources, LLC, 500 F.Supp.2d 957 (N.D. Ill. 2007), the court stated that "[t]he majority of courts dealing with this issue have held that the standard of expert disqualification differs from that of attorney disqualification because experts are not advocates in the litigation but sources of information and opinions." Id. at 960 (quotation marks omitted). For the reasons described below, the circumstances in this case require the application of the doctrine of imputed disqualification to

Fred Sabins,[1] a retained expert for BP.  Halliburton's motion is granted.

**CHRONOLOGY**

| | |
|---|---|
| 07-05-2006 | Michael Viator began working as a chemical engineer for Halliburton and executed an intellectual property agreement with Halliburton (the confidentiality agreement). |
| 04-20-2010 | Macondo well blow out. |
| 08-00-2010 | BP retained CSI and Fred Sabins as consulting experts. |
| 03-12-2011 | Viator left the employ of Halliburton. |
| 03-30-2011 | Richard Vargo, an employee of Halliburton, was deposed. |
| 04-14-2011 | Viator was hired by Fred Sabins to work for CSI.[2] |
| 09-28-2011 | BP and Halliburton entered into a software escrow agreement granting authorized BP attorneys and cement experts access to Halliburton software and data. |
| 10-04-2011 | Halliburton learned that Viator worked at CSI when he was included on BP's list of persons authorized to have access to the data. |
| 10-17-2011 | Sabins submitted a report on behalf of BP concerning cement. |
| 11-02-2011 | Viator was deposed by Halliburton. |
| 11-07-2011 | Sabins submitted a second expert report on behalf of BP. |

---

[1] Mr. Sabins is president of CSI.  The order of disqualification extends to the company and all of its employees.

[2] Mr. Vargo was deposed before Mr. Viator was hired by CSI.  Therefore, BP's assertion that Halliburton is using the attorney-client privilege and work-product doctrine as a shield and a sword (Rec. doc. 4783) must fail.

## MICHAEL VIATOR

### 1)      Viator's Work at Halliburton and CSI

Viator testified at his deposition that he worked on the post-incident investigation on behalf of Halliburton.  He reported directly to Michael Serio and on occasion to Richard Vargo. Rec. doc. 4595 (Exhibit B at 21-22).  Vargo was in charge of the investigation and Stephanie Bragg was part of the investigation as well.  Id. at 26.

As early as August, 2010, Viator was involved in the post-incident investigation through his preparation of an August, 2010 report pertaining to a foam casing review.  Id. at 104-105.  He also reviewed a post-incident report prepared by Halliburton employee Nathan Chaisson, by reviewing Chaisson's work and making his own calculations in order to reaffirm that everything was reported correctly.  Id. at 12-13.  For the investigation team he worked on a project "looking up gas flow potential prior - - simulations to see the amount of gas flow potential that was encountered."  Id. at 34.

During the preparation for his deposition, he reviewed e-mails prepared during the post-incident investigation to which Stephanie Bragg, "a lawyer in Halliburton's behalf," was a recipient. Id. at 14-15.  He knew Bragg was working on behalf of Halliburton on the post-incident investigation.  Id. at 16.

At the time of his employment with Halliburton he signed an "Intellectual Property Agreement of Halliburton Services, Inc.," id. at 22-23, and he deemed his work at Halliburton to be confidential.  Id. at 25.  He considered his work, processes, calculations, paperwork and discussions with others regarding the post-incident investigation to be confidential.  Id. at 25.  He believed that all of the work he provided for Halliburton in connection with the Macondo well blowout was

3

"highly confidential." Id. at 27.

Viator knew that Vargo, who was in charge of the post-incident investigation, was working with counsel for Halliburton. Id. at 38. He attended "meetings" with some of the lawyers representing Halliburton. Id. at 38 and 40. He described one meeting: "We actually were giving them information that we simulated and investigated. It was more of an informative meeting to discuss what was found and explaining how to understand the material." Id. at 41-42. The team gave the attorneys snapshots of simulations and data in Excel spreadsheets, all of which he deemed confidential. Id. at 43. Some of the data involved OptiCem simulations.[3] Id. at 43.

Vargo told him that the information he learned as a member of the investigation team was confidential and he said so multiple times. Viator explained that was "highly stressed." Id. at 46.

Exhibit 7341 to Viator's deposition is a report Vargo prepared for purposes of his meeting with the Department of Justice and with Halliburton's experts in the civil litigation. Viator was involved in preparation of the report in part based upon information that he reviewed from Jesse Gagliano's[4] and Nathaniel Chaisson's files and data. Id. at 84-85. He also used the well cat files, and the Macondo 1 files as part of his duties as an investigative team member. Id. at 87-88.

Viator left the employ of Halliburton in March, 2011 and went to work for CSI in April,

_____

[3] OptiCem[TM] is software used by Halliburton for wellbore simulations and modeling for cementing jobs. Sabins' report of October 17, 2011 reviews Halliburton's OptiCem reports run in April, 2011 before the start of cementing for the Macondo well. The expert reports have not been filed in the record. Attached is the cover page and page 13 of Sabins' October 17, 2011 report where he discusses Halliburton's use of the OptiCem program.

[4] Jesse Gagliano is a Halliburton engineer. The PSC alleges that, prior to the incident, he spent about a day running models to determine if six centralizers would be enough to prevent channeling of gaseous hydrocarbons. The analysis, which was presented to BP, concluded that 21 centralizers were the recommended number to ensure a secure cement job; use of 10 would result in a moderate gas flow problem; and use of only 6 would result in a severe gas flow problem. Rec. doc. 879 at 77. At his deposition in this proceeding, Gagliano invoked his Fifth Amendment privilege and refused to testify. He did testify at the U.S. Coast Guard and Bureau of Energy Management joint investigation.

about a month later.  Id. at 27.  He applied to CSI for a fracturing job and received a call from the human resources department informing him that they were looking for a research engineer at CSI. Id. at 46.  He went to the interview and met with Jeff Waters and Fred Sabins.  Id. at 47.  He informed them that he was involved in "post-well analysis" and that he had been involved in the investigative team under the direction of Vargo.  Id. at 49-50.  While he mentioned he had been involved in "simulations," he did not tell them he had performed OptiCem simulations along with Nate Chaisson.  Id. at 51-52.  Waters and Sabins did not ask for any clarification.  Id. at 52.  Viator testified that Sabins told him he should not discuss anything to do with the Macondo well while he was at CSI.  Id. at 108-109.

Viator was then assigned to work on the BP file at CSI.  He performed a review of published scientific journals at the request of Sabins.  Id. at 55-56.  When he logged his time, he knew it was for the BP Macondo well.  Id. at 56.  He understood that Sabins was "using his professional license to write an expert review" involving BP and the Macondo well incident.  Id. at 58-59.

His literature review related to pressure effects on cement slurries, particularly Portland cement. Id. at 60-61. Halliburton had provided him with training to understand how cement slurries are affected by pressure and temperature, and he used that understanding in order to perform his review.  Id. at 62.  While at Halliburton, as a member of the investigative team, he reviewed lab results on compressive strengths.  Id. at 63.  When Sabins asked him to do the review, he did not ask Viator whether he would have to use anything that he learned while he was employed at Halliburton. Id. at 64-65.

5

2)      **Should Viator be disqualified?**

In <u>Koch Refining Company v. Jennifer L. Boudreaux, MV</u>, 85 F.3d 1178 (5th Cir. 1996), the Fifth Circuit stated that "[f]ederal courts have the inherent power to disqualify experts . . . , although cases that grant disqualification are rare." 85 F.3d at 1181.  At issue in <u>Koch</u> was the disqualification of a retained expert.  Viator is not a retained expert for either Halliburton or BP.  Rather, he was a staff engineer at both firms.  But by education, training and his experience at Halliburton, he is an expert. The first issue in <u>Koch</u> was whether the "bright line" rule applied.  The Fifth Circuit stated:

> [T]his is not a case in which the expert switched sides.  If that were the case, no one would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and had received confidential information from the adverse party pursuant to the earlier retention.  This is a clear case for disqualification.

<u>Id</u>. at 1181.

In the absence of the bright line rule, the Fifth Circuit provides a two part test.  The burden is on Halliburton to prove both elements of the test by a preponderance of the evidence.[5]  <u>Id</u>. at 1181. The first element is whether it was objectively reasonable for Halliburton to conclude that a confidential relationship existed with Viator.  <u>Id</u>.  Halliburton cites the confidentiality agreement and Viator's testimony that he knew he was in possession of confidential information.  BP argues this is insufficient.  As to the first element, Halliburton has carried its burden of proof.

The second element is whether any confidential or privileged information was disclosed by Halliburton to Viator.  <u>Id</u>. at 1181.

Such information would include discussion of the [retaining party's] strategies in the

---

[5]  In <u>BP Amoco Chemical Company v. Flint Hills Resources, LLC</u>, 500 F.Supp.2d 957 (2007), the court described the burden as heavy.  <u>Id</u>. at 960.  This is just another way of saying that disqualification orders for experts are rare.

litigation, the kinds of experts [the party] expected to retain, [the party's] views of the strengths and weaknesses of each side, the role of each of the [party's] witnesses to be hired, and anticipated defenses.  However, purely technical information is not confidential.

85 F.3d at 1182 (citations omitted).   In its initial memorandum Halliburton contends that it disclosed such information to Viator.  BP responds that Halliburton has not carried its burden on this issue and, at most, only technical information was disclosed to Viator.  Halliburton responds with Richard Vargo's affidavit[6] detailing the depth of involvement Viator had in Halliburton's post-incident investigation.  BP moved to strike the affidavit on the ground Halliburton invoked the attorney-client privilege and work-product doctrine to limit BP's questioning of Vargo at his deposition on March 30 and 31, 2011, but now uses such information contained in the affidavit in order to establish the second prong of the test.  Rec. doc. 4783.

BP's motion to strike Vargo's affidavit will be granted.  Halliburton's motion must rise or fall on the evidence presented with its motion and not with its reply.[7]  By his own admission, Viator's involvement in the investigation was not limited to purely technical information.  During the post-incident investigation, he reviewed at least one e-mail to which a Halliburton lawyer was

---

[6] Exhibit A to Rec. doc. 4779-1.

[7] BP also urges that the Vargo affidavit be stricken as the presentation of new information after BP's opposition.  It contends that such a supporting affidavit should have been presented with the original motion. Rec. doc. 4783 (memorandum at 8).  The motion to strike the affidavit will be granted for this reason.  In addition, if Halliburton is permitted to rely on the Vargo affidavit, BP will urge that it be granted a right to depose Vargo regarding the facts contained in his affidavit.  Under that scenario BP would argue that Halliburton be required to produce all records concerning Viator's activities at Halliburton from April 20, 2010 through when he left Halliburton.  It can be anticipated that Halliburton will demand all the documentation from CSI relating to Viator from the commencement of his employment to the present and possibly the depositions of Sabins and others at CSI.  This will lead to a mini-trial on the disqualification issue.  There is not enough time remaining in the pretrial schedule to permit Halliburton and BP to conduct such discovery.

a recipient.  Rec. doc. 4595 (Exhibit B at 14-15).[8]  He attended at least one meeting with some of Halliburton's lawyers and possibly more than one.  He related that Vargo stressed on multiple occasions that the information he learned as a member of the investigation team was confidential. Halliburton has carried its burden of proof on the second element of the Koch two part test.

The answers to both questions in the two part test set out in Koch are in the affirmative, and therefore Viator is disqualified.  However, since only Sabins and CSI are designated as testifying experts, the analysis turns to them.

### FRED SABINS and CSI

Halliburton contends that Sabins and CSI should be disqualified because they actually received Halliburton's confidential information from Viator.  The assertion is denied by Viator.[9] He testified that: (1) he did not provide any information regarding what he did at Halliburton to Sabins and CSI; (2) he did not use any of Halliburton's confidential information to perform the work he did at CSI; (3) Sabins told him that he should not discuss anything involving the Macondo well while he was at CSI; and (4) he followed Sabins' instructions.  Halliburton has not presented any evidence that contradicts Viator's testimony that he did not explicitly share Halliburton's confidential information with Sabins and CSI.  Rec. doc. 4595 (Exhibit B at 43, 108 and 113-14).[10]

The issue is whether imputed disqualification should be imposed on Sabins and CSI.  In Stencil v. Fairchild Corporation, 174 F.Supp.2d 1080 (C.D. Cal. 2001), the court refused to employ

---

[8]  Pursuant to PTO no. 14 (Rec. doc. 655), privilege log identification is not required for post-April 20, 2010 communications exchanged between the producing party and counsel.  The e-mails described by Viator were protected from disclosure.

[9] Sabins did not submit an affidavit.

[10] Nor should that be expected.  It is to be assumed that experts in this situation will deny breach of confidentiality agreements or transmission of confidential information.

such a rule to disqualify an expert.  It cited and followed <u>Koch</u> to conclude that there was an objectively reasonable expectation of confidentiality and at least some confidential information was disclosed by plaintiffs to a patent expert, Craig Summers, who worked at a firm's Newport Beach, California, office.  The defendant retained a patent expert, Thomas Smegal, employed by the same firm, but in the firm's San Francisco office.  The court stated:

> [T]he issue is not a conflicted attorney but a conflicted expert.  Thus, the concerns of loyalty that in large part drive imputed disqualification are absent.  In addition, even though the two experts in this case are both employed by KMOB, a proper screen satisfactorily addresses the policy goal of protecting the confidentiality of ... work product.  This screen need not be as restricting as would be appropriate for a conflicted attorney.  Likewise, since expert witnesses are hired as individuals and not through firms, the fact that the screen may serve to separate two experts who work in the same organization does not give the Court pause.
>
> An adequate screen is presented here.  Summers and Smegal have had no interactions with each other with respect to this matter apart from disclosing that they both were contacted by the parties in this case.  Summers also states that he has not disclosed to Smegal any of the potentially confidential information he received from Clemmer during Clemmer's attempt to retain Summers' services.  In addition, Summers works in Newport Beach, California, while Smegal works in KMOB's San Francisco office, over five hundred miles distant.  Further, Smegal has declared that he has no direct access to any documents Summers may have drafted in this matter, nor will he have such access in the future.  Thus, it appears to the Court that plaintiff has not and will not suffer any unfair prejudice it Smegal is permitted to act as Defendant's expert.

<u>Id</u>. at 1087.  There are obvious differences in the "screen" in <u>Stencil</u> and what transpired in the instant case.  As to the adequacy of the screen, Sabins is the president of CSI and Viator's boss.  CSI has only one office and Viator actually performed work on the BP file while in the employ of CSI.

In <u>BP Amoco Chemical Company v. Flint Hills Resources, LLC</u>, <u>supra</u>, the court said that "[t]he majority of courts dealing with this issue have held that the standard for expert disqualification differs from that of attorney disqualification. . . ."  500 F. Supp. at 960.  In that case there was a dispute concerning BP Amoco's sale of a refinery to Flint Hills.  Flint Hills objected to

BP Amoco's selection of Packer Engineering as its retained expert.  The Packer firm performed testing and analysis work at the refinery for both parties.  Three engineers at the Packer firm did the work at the refinery for Flint Hills.  The court found there was a sufficient screen stating that:

> [W]e deal first with whether the entire firm should be [disqualified]. BP Amoco notes that Packer employs 167 engineers, only three of whom have done any work for Flint Hills. Flint Hills contends that an analogy should be drawn from the Rules of Professional Conduct, which require the disqualification of a firm if some of its attorneys have a conflict of interest. Those rules do not apply to expert witnesses, however, for the reasons noted above. Thus, courts have refused to impute a conflict of interest on other members of an expert's firm, choosing instead to apply safeguards such as screens to prevent the transmission of confidential information.
>
> [O]nly three . . . of the 167 engineers, have performed work for Flint Hills. Furthermore, the declaration of Kenneth Packer, head of Packer, states that these three will not consult, testify or provide information regarding the reports they either authored or reviewed, as dictated by the agreement with Flint Hills. . . . [A] a sufficient screen has been put in place permitting, at the very least, the other engineers not involved with Flint Hills to be employed as litigation consultants and testifying experts for BP Amoco.

Id. at 960-61.  Again, there are major distinctions between the "screen" in the BP Amoco case and the "screen" in the instant case.

The question of whether the imputed disqualification rule should be applied to Fred Sabins and CSI is difficult, but there is a critical factor present in this case which requires the application of the rule which is not present in Stencil or BP Amoco.  Sabins created the dilemma in which the court finds itself.[11]  General policy objectives aim to ensure that parties have access to expert witnesses who possess specialized knowledge and to allow experts to pursue their professional calling.  Id.  But "[f]ederal courts have inherent power to disqualify expert witnesses where or when it is necessary to protect the integrity of the adversary process, and/or to promote public confidence

---

[11] This problem was not created by attorneys or clients establishing an inexpensive relationship with potentially harmful experts solely to keep them from acting on behalf of the opposing party.  See, e.g., Koch, 85 F.3d at 1183 (citations omitted).

in the legal system." <u>BP Amoco</u>, 500 F. Supp. 2d at 960 (citations omitted).

The sole cause of this motion to disqualify is Sabins' decision to hire Viator. Once he was hired, Sabins did not erect a sufficient screen to prevent Viator from having any contact whatsoever concerning CSI's work for BP. To the contrary, whatever screen Sabins may have erected, he ignored by having Viator perform work on the BP consultation. The <u>Stencil</u> and <u>BP Amoco</u> decisions found not only an effective screen, but found nothing factually to suggest improper conduct on the part of the experts involved. Sabins, while acting as a retained expert in extremely high profile litigation, hired a former Halliburton chemical engineer whom he knew had worked on Halliburton's investigation into the cementing on the Macondo well. Sabins acted to his, CSI's, and ultimately BP's detriment. As to BP, it is a harsh result, but one which is warranted by Mr. Sabins' actions and which is necessary to preserve the integrity of the judicial process.

IT IS ORDERED that: (1) Halliburton's motion to disqualify (Rec. doc. 4595) is GRANTED; (2) BP's motion to strike as to the Vargo affidavit (Rec. doc. 4783) is GRANTED; and (3) the deadline for an appeal of this order is **Tuesday, December 13, 2011.**

New Orleans, Louisiana, this 8th day of December, 2011.

**SALLY SHUSHAN**
**United States Magistrate Judge**