# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | § | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE GULF OF | § | |
| MEXICO, ON APRIL 20, 2010 | § | SECTION J |
| | § | |
| THIS DOCUMENT RELATES TO: | § | JUDGE BARBIER |
| ALL CASES, 2:10-CV-2771 AND | § | |
| 2:10-CV-04536 | § | MAGISTRATE JUDGE SHUSHAN |

## AMICUS CURIAE BRIEF OF THE INTERNATIONAL ASSOCIATION OF DRILLING CONTRACTORS IN RELATION TO TRANSOCEAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Rec. Doc. 4457-2)

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *iii*

I.  STATEMENT OF INTEREST OF AMICUS CURIAE. . . . . . . . . . . . . . . . . . . . 1

II.  ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   A.  ALLOCATION OF RISKS IN OFFSHORE DRILLING CONTRACTS . . . . . . . . . . . 1

   B.  MARITIME LAW SUPPORTS INDEMNITY AGREEMENTS IN THE
       OFFSHORE DRILLING INDUSTRY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   C.  THE GENERAL MARITIME LAW DOES NOT INVALIDATE FREELY
       NEGOTIATED RECIPROCAL INDEMNIFICATION AGREEMENTS
       THAT ENCOMPASS GROSS NEGLIGENCE . . . . . . . . . . . . . . . . . . . . . . . . 13

          1.  Decisions From The Fifth Circuit. . . . . . . . . . . . . . . . . . . . . 14

          2.  Opinions From District Courts Within The Fifth Circuit. . . . . . . 17

   D.  INDEMNITY FOR GROSS NEGLIGENCE SHOULD NOT BE HELD TO
       VIOLATE MARITIME PUBLIC POLICY. . . . . . . . . . . . . . . . . . . . . . . . . . 20

          1.  Public Policy Concerns In Admiralty Regarding Contractual
              Allocations Of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

          2.  None Of The Public Policy Concerns Regarding
              Exculpatory Clauses Or Unilateral Limitations Of
              Liability Are Applicable To Freely Negotiated
              Indemnity Agreements In The Offshore Drilling
              Industry That Provide For Reciprocal Obligations
              As A Means Of Allocating Risk . . . . . . . . . . . . . . . . . . . . . . 28

          3.  Public Policy Does Not Void Insurance Coverage
              That Provides Indemnity For An Insured's Gross
              Negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

          4.  The Laws Of Other Countries Allow Indemnity
              For Gross Negligence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

   E.  OPA SUPPORTS THE INDEMNITY CLAIMS . . . . . . . . . . . . . . . . . . . . . . . 36

   F.  IADC'S SUPPORT OF CONTRACTUAL ALLOCATIONS
       OF RISK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

IV.    CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**APPENDICES**

1.      A.W. Thompson, *Announcing the A.A.O.D.C. Standard Drilling Contract for Contractors and Companies,* Drilling Contractor, Apr. 1952, at 50

2.      C.A. Moomjian, Jr., *Equity in Drilling Contracts: Responding to Operator and Contractor Concerns*, Presented to SPE/IADC Drilling Conference (1993), at 615

3.      Cary A. Moomjian, Jr., *Contractual Insurance and Risk Allocation in the Offshore Drilling Industry*, Drilling Contractor, Mar.-Apr. 1999, at 15

4.      Statement on Comprehensive Oil Pollution and Compensation Legislation by Wayne K. Hillin on March 27, 1985

5.      Transcript of House Bill 915 Before the Committee on Civil Law and Procedure on May 26, 1981

6.      Remarks of W.B. Huthnance to the Committee on Civil Law and Procedure on February 10, 1981

## TABLE OF AUTHORITIES

<u>Cases</u>:                                                                                    Page

*Agip Petroleum Co., Inc. v. Gulf Island Fabrication, Inc.*,
    920 F. Supp. 1330 (S.D. Tex. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Austro v. Niagara Mohawk Power Corp.*,
    487 N.E.2d 267 (N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Atlantic Sounding Co. v. Townsend*,
    129 S. Ct. 2561 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Becker v. Tidewater, Inc.*,
    586 F.3d 358 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Bisso v. Inland Waterways Corp.*,
    349 U.S. 85 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24, 25, 26, 27

*BREMEN v. Zapata Off-shore Co.*,
    407 U.S. 1 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27, 36, 42

*Canada Steamship Lines v. R.*,
    (1952) AC 192 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Cole v. Chevron Chem. Co.*,
    334 F. Supp. 263 (E.D. La. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Compania Anonima Venezolana de Navegacion v. A.J. Perez Expert Co.*,
    303 F.2d 692 (5th Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Corbitt v. Diamond M. Drilling Co.*,
    654 F.2d 329 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Cormier v. Rowan Drilling Co.*,
    549 F.2d 963 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9

*Crowder v. Am. Eagle Airlines, Inc.*,
    118 Fed. App'x 833 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Dalton v. Childress Serv. Corp.*,
    432 S.E.2d 98 (W.Va. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Darty v. Transocean Offshore U.S.A., Inc.*,
    875 So. 2d 106 (La. App. 4 Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Day v. Ocean Drilling & Exploration Co.,*
    353 F. Supp. 1350 (E.D. La. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Dillingham Tug & Barge Corp. v. Collier Carbon & Chem. Corp.,*
    707 F.2d 1086 (9th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co.,*
    372 U.S. 697 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Dooley v. Korean Air Lines Co.,*
    524 U.S. 116 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*East River S.S. Corp. v. Transamerican Delaval, Inc.,*
    476 U.S. 858 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*E.E. Caledonia (formerly Occidental Petroleum (Caledonia) Ltd.*
        *v. Orbit Valve Co. Europe PLC,*
            (1994) 2 Lloyd's Rep. 239 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Energy XXI, GoM, Inc. v. New Tech Eng'g, L.P.,*
    No. H-10-110, 2011 U.S. Dist. LEXIS 41223
        (S.D. Tex. Apr. 15, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Estes Express Lines, Inc. v. Chopper Express, Inc.,*
    641 S.E.2d 476 (Va. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 29

*Fairfield Ins. Co. v. Stephens Martin Paving, L.P.,*
    246 S.W.3d 653 (Tex. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Fernales Shipping Co. v. Bonaire Petroleum Corp.,*
    733 F.2d 381(5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*First Jersey Nat'l Bank v. Dome Petroleum Ltd.,*
    723 F.2d 335 (3d Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 29

*Flour Western, Inc. v. G&H Offshore Towing Co.,*
    447 F.2d 35 (5th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Fontenot v. Mesa Petroleum Co.,*
    791 F.2d 1207 (5th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Getty Oil Co. v. Insurance Co. of N. Am.,*
    845 S.W.2d 794 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Glaspell v. Ohio Edison Co.,*
    505 N.E.2d 264 (Ohio 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Hamelin v. Simpson Paper (Vt.) Co.,*
    702 A.2d 86 (Vt. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Hogeland v. Sibley, Lindsay & Curr Co.,*
    366 N.E. 2d 263 (N.Y. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Homburg Houtimport BV v. Agrosin Private Ltd., The Starsin*
    (2003) 1 Lloyd's Rep. 571,
        [203] A11 ER (D) 192 (Mar) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re Horizon Vessels, Inc.,*
    No. H-03-3280, 2005 U.S. Dist. LEXIS 42110
        (S.D. Tex. Nov. 18, 2005), *opinion adopted as modified,*
            2005 U.S. Dist. LEXIS 42117 (S.D. Tex. Dec. 22, 2005) . . . . 18, 19

*Houston Exploration Co. v. Halliburton Energy Services, Inc.,*
    269 F.3d 528 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Kelly v. Dimeo, Inc.,*
    581 N.E.2d 1316 (Mass. App. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 29

*La Esperanza de P.R., Inc. v. Perez y Cia. de P.R., Inc.,*
    124 F.3d 10 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*LeBlanc v. Global Marine Drilling Co.,*
    193 F.3d 873 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Leitao v. Damon G. Douglas Co.,*
    693 A.2d 1209 (N.J. Super. Ct. App. Div. 1997) . . . . . . . . . . . . . . . . . . . . . . . 10

*Louviere v. Byers,*
    526 So.2d 1253 (La. App. (3d Dist)), *writ denied,*
        528 So.2d 153 (La. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Liverpool & Great Western Steam Co. v. Phenix Insurance Co.,*
    129 U.S. 397 (1889) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Miles v. Apex Marine Corp.,*
    498 U.S. 19 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Mobil Oil Corp. v. Higginbotham,*
    436 U.S. 618 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Photo Production Ltd. v. Securicor Transport Ltd.,*
    (1980) AC 827 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Railroad Co. v. Lockwood,*
   84 U.S. (17 Wall.) 357 (1873). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Riggle v. Allied Chem. Corp.,*
   378 S.E.2d 282 (W.Va. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

*Rodrigue v. Legros,*
   563 So. 2d 248 (La. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Royal Ins. Co. of Am. v. Southwest Marine,*
   194 F.3d 1009 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

*Sharp v. Daigre,*
   555 So.2d 1361 (La. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Taylor v. Lloyds Underwriters of London,*
   972 F.2d 666 (5th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Thyssen, Inc. v. Nobility MV,*
   421 F.3d 295 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Torch, Inc.,*
   C.A. No. 94-2300 C/W 95-1982 Sec. "K" (1),
      1996 U.S. Dist. LEXIS 5053
         (E.D. La. Apr. 16, 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Todd Shipyards Corp. v. Turbine Service, Inc.,*
   674 F.2d 401 (5th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 17, 18, 20, 30

*Trevino v. Lightning Laydown, Inc.,*
   782 S.W.2d 946 (Tex. App.--Austin, 1990, writ denied). . . . . . . . . . . . . . . . . 35

*In re TT Boat Corp.,*
   C.A. No. 98-0494 C/W 98-1109 Sec. "K" (5),
      1999 U.S. Dist. LEXIS 21025
         (E.D. La. Sept. 10, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Twenty Grand Offshore, Inc.,*
   492 F.2d 679 (5th Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 33

*In re Unterweser Reederei, GMBH,*
   446 F.2d 907 (5th Cir. 1970) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*In re Unterweser Reederei, GMBH,*

428 F.2d 888 (5th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25-26

*Voisin v. O.D.E.C.O. Drilling Co.*,
    744 F.2d 1174 (5th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**United States Legislative Materials**:

    Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq*. . . . . . . . . . . . . . . . . . . 32, 37

    Statement on Comprehensive Oil Pollution and Compensation
        Legislation by Wayne K. Hillin on March 27, 1985 . . . . . . . . . . . . . . . . 38

**State Legislative Materials**:

    LA. CIV. CODE ANN. art. 2004. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    Louisiana Oilfield Anti-Indemnity Act (LOIA),
        LA. REV. STAT. ANN. 9:2780A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 40

    Remarks of W.B. Huthnance, to the Committee on Civil Law
        and Procedure on February 10, 1981 . . . . . . . . . . . . . . . . . . . . . . . 39, 40, 41

    Transcript of House Bill 915 Before the Committee on
        Civil Law and  Procedure on May 26, 1981 . . . . . . . . . . . . . . . . . . . . . . 39

    Texas Oilfield Anti-Indemnity Act, TEX. CIV PRAC & REM.
        CODE § 127.005(a), (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**Orders from this Litigation**:

    Order and Reasons [As to Motions to Dismiss the B3 Master
        Complaint] (Rec. Doc. 4159). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    Order and Reasons [As to the Insurance Actions]
        (Rec. Doc. 4588) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 42

**Contracts**:

    BP/Transocean Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 28, 32, 33, 41

    IADC Offshore Daywork Drilling Contract – U.S . . . . . . . . . . . . 5, 12, 28, 32, 33

**Oil Company Financial Data**:

Exxon Mobil Corp., Annual Report (Form 10-K)
(Feb. 25, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Chevron Corp., Annual Report (Form 10-K)
(Feb. 24, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Drilling Company Financial Data**:

Transocean, Ltd., Annual Report (Form 10-K)
(Feb. 28, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Diamond Offshore Drilling, Inc., Annual Report
(Form 10-K) (Feb. 25, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Noble Corp., Annual Report (Form 10-K)
(Feb. 25, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Articles and Treatises**:

6A Corbin on Contracts § 1472 (1964 ed.) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

W. Eugene Davis, *Admiralty Law Symposium: A Sea Chest for Sea
Lawyers: The Role of Federal Courts in Admiralty: The
Challenges Facing The Admiralty Judges of the Lower
Federal Courts*, 75 Tul. L. Rev. 1355 (2001). . . . . . . . . . . 37

C.A. Moomjian, Jr., *Equity in Drilling Contracts: Responding to
Operator and Contractor Concerns*, Presented to
SPE/IADC Drilling Conference (1993), at 615 . . . . . . . . . . . . . . 3, 9

Cary A. Moomjian, Jr. *Contractual Insurance and Risk Allocation in
the Offshore Drilling Industry*, Drilling Contractor,
Mar.-Apr. 1999, at 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

RESTATEMENT (SECOND) OF TORTS § 500, cmt. (g) . . . . . . . . . . . . . . . . . . . . . . 35

1 Schoenbaum, Admiralty & Maritime Law § 10-3 . . . . . . . . . . . . . . . . . . . . . . 27

A.W. Thompson, *Announcing the A.A.O.D.C. Standard Drilling
Contract for Contractors and Companies, Drilling
Contractor*, April 1952, at 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Other Sources**:

*BP Income Statement Annual Data,* YAHOO FINANCE,
http://finance.yahoo.com/q/is?s=BP+Income+State
ment+annual (last visited Dec. 7, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . .11

Katie Howell and Mike Soraghan, *Deepwater Companies Pull Up
Stakes, and Some May Never Return,* N.Y. TIMES,
http://www.nytimes.com/gwire/2010/06/03/03greenwire-
deepwater-companies-pull-up-stakes-and-some-ma-10130.
html (June 3, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Independent Statistics & Analysis,* U.S. Energy Info. Admin.,
U.S. DEP'T OF ENERGY, http://www.eia.gov/countries/
index.cfm?topL=con (last visited December 7, 2011) . . . . . . . . . . . . . . . . 1

Joe Nocera, *Moratorium Won't Reduce Drilling Risks,* N.Y. TIMES,
http://www.nytimes.com/2010/06/26/business/26no
cera.html (June 25, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Press Release,* NAT'L OCEAN INDUS. ASS'N,
http://www.noia.org/website/article.asp?id=38561
(June 2, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Adam Sharp, *Updated Nat Gas Price and Consumption Data,*
ENERGY & CAPITAL, http://www.energyandcapital.com/
articles/us-natural-gas-consumption/1114 (Apr. 7, 2010) . . . . . . . . . . . . . 1

**AMICUS CURIAE BRIEF OF THE INTERNATIONAL ASSOCIATION
OF DRILLING CONTRACTORS IN RELATION TO TRANSOCEAN'S
MOTION FOR PARTIAL SUMMARY JUDGMENT (Rec. Doc. 4457-2)**

TO THE HONORABLE JUDGES OF SAID COURT:

The International Association of Drilling Contractors ("IADC"), amicus curiae herein, presents its brief in relation to Transocean's Motion for Partial Summary Judgment (Rec. Doc. 4457-2) as follows:

## I.   STATEMENT OF INTEREST OF AMICUS CURIAE

The interest of the IADC is set forth in the Motion of the International Association of Drilling Contractors for Leave to File Amicus Curiae Brief in Relation to Transocean's Motion for Partial Summary Judgment (Rec. Doc. 4457-2).

## II.   ARGUMENT

### A.   ALLOCATION OF RISKS IN OFFSHORE DRILLING CONTRACTS

The United States uses 18,771 barrels of oil[1] and 64 billion cubic feet of natural gas per day[2] as petroleum products have become essential to every aspect of American life. Our reliance on oil and gas far exceeds merely using hydrocarbon fuel to power our vehicles and businesses or the myriad products derived from oil that range from pharmaceuticals to fertilizers. Our economy, our military, and our daily lifestyles are dependent on a continued and unfettered supply of oil and gas. Consequently, every President for the past four decades has pledged to reduce America's dependence on foreign oil; however, they have not been able to stem the tide of a continuing decline in the percentage of oil and gas we consume that is produced within the United States.

---

[1] Independent Statistics & Analysis, U.S. Energy Info. Admin., U.S. DEP'T OF ENERGY, http://www.eia.gov/countries/index.cfm?topL=con (last visited December 7, 2011).

[2] Adam Sharp, Updated Nat Gas Price and Consumption Data, ENERGY & CAPITAL, http://www.energyandcapital.com/articles/us-natural-gas-consumption/1114 (Apr. 7, 2010).

Fortunately, successful exploration, development, and production in the Gulf of Mexico have brought our Continental Shelf to the forefront of the struggle to provide the resources to fuel American independence from foreign oil. More than 50,000 wells have been drilled in the Gulf of Mexico since 1947, and, in recent years, the drilling has moved into deeper waters. The number of wells drilled in deep waters (exceeding 1000 feet) now exceeds the number drilled in shallow waters. Thirty-three percent of the United States' oil[3] and eleven percent of its natural gas are generated from the Gulf of Mexico.[4]

Offshore drilling presents challenges that are not faced in land-based exploration, and these challenges are magnified as exploration and production move to deeper waters where oil companies pursue discoveries to slake America's thirst for oil. In addition to onshore risks, such as injuries, deaths, property damage, loss of reservoir, control of well, and redrilling, offshore drilling faces exposures for pollution damage to marine environments and for the containment and removal of oil from the oceans. Furthermore, efforts to control a blowout or "wild well" are complicated not just by the depths of the well, but by the depths of the water that are measured in miles, not feet. The response to the Macondo well incident alone has involved hundreds of vessels and tens of thousands of personnel.

For more than half a century, as drilling has moved offshore, drilling contractors and operators have entered into contractual agreements that allocate *inter se* the risks that can arise from these operations.[5] The negotiations and the allocations have evolved over the years to

---

[3]Joe Nocera, *Moratorium Won't Reduce Drilling* (June 2, 2010), *Risks,* N.Y. TIMES, http://www.ny times.com/2010/06/26/business/26nocera.html (June 25, 2010).

[4]*Press Release,* NAT'L OCEAN INDUS. ASS'N, http://www.noia.org/website/article.asp?id=38561 (June 2, 2010).

[5]Years of negotiations between oil companies and drilling contractors resulted in standardization of agreements on allocations of risks almost sixty years ago. *See* A.W. Thompson, *Announcing the*

reflect the operational realities and economic necessities involved in offshore drilling and exploration.[6] Both parties, drilling contractors and oil companies, recognize that no single contractor or group of contractors can withstand many of the financial risks and exposures from an accident such as the Macondo well incident, and that these risks are not insurable by contractors.[7] Consequently, oil companies, such as BP, voluntarily agree to accept responsibility for losses from a blowout that include control of the well (including relief wells), damage to the hole, pollution cleanup and removal, pollution liability, and reservoir loss or damage. In return, drilling contractors generally accept the risk of pollution that originates from the contractor's equipment above the surface of the water, for damage to or loss of their drilling rig, and for injuries and deaths of their employees, which are risks that can be insured by contractors.[8]

The provisions reflecting the balance of risks that are contractually allocated between the oil companies and drilling contractors, often referred to as "knock-for-knock" or "mutual hold harmless" provisions, do not merely reflect the economic necessity that contractors could not work offshore without the benefit of the customary indemnity agreements. The contracts also efficiently allocate responsibility to the parties who are in the best position to manage the risk. In the context of pollution, the drilling contractor is generally responsible for pollution emanating above the surface of the water from its equipment, while the oil company is responsible for

---

*A.A.O.D.C. Standard Drilling Contract for Contractors and Companies*, Drilling Contractor, Apr. 1952, at 50 (Appendix 1).

[6] *See* C.A. Moomjian, Jr., *Equity in Drilling Contracts: Responding to Operator and Contractor Concerns*, Presented to SPE/IADC Drilling Conference (1993), at 615 (Appendix 2). Mr. Moomjian explained how "the principal contract terms can be addressed in a fair and equitable manner to provide a sound contractual framework for a successful drilling program." *Id.*

[7] In its Order and Reasons [As to the Insurance Actions], this Court noted the statement that BP had self insured the pollution risks because the cost of insuring them was too high for BP. Order and Reasons at 13 (Rec. Doc. 4588).

[8] *See* Cary A. Moomjian, Jr., *Contractual Insurance and Risk Allocation in the Offshore Drilling Industry*, Drilling Contractor, Mar.-Apr. 1999, at 15 (Appendix 3).

pollution emanating below the surface from its well. In the majority of offshore accidents that involve property damage or personal injuries, the contractors bear the responsibility as they provide the rig and most of the manpower. In extraordinary circumstances, such as the Macondo well incident, a drilling contractor like Transocean will absorb the loss of its rig valued in the hundreds of millions of dollars as well as the claims of dozens of its employees.

Oil companies and drilling contractors learned decades ago that it was not sufficient to generally allocate responsibility to the party who could best manage the risk and absorb the financial consequences in the event of an accident. The allocations had to be expressed without regard to the cause or degree of fault because any other basis for allocating responsibility essentially allocated nothing, thereby vitiating the purpose of the agreement. If risk is not allocated without regard to degrees of fault, then the responsibility can only be determined after a full trial and appeal addressing the liability of the parties. This provides no certainty to the parties as to the risks they must insure or bear, and it results in the inefficiency of each party having to insure or retain exposure for all risks and to defend every claim. When all of the parties have to defend any claim, it ultimately multiplies both the costs and burdens upon the judicial system.[9] The Macondo well incident illustrates the importance of upholding risk allocations without regard to degrees of fault inasmuch as the disputed risk allocation has engendered not just the fees and expenses that have been and will be incurred by each party to litigate the issues of fault but has engaged the court to address the contractual arguments related to those issues. According sanctity to contractual provisions allocating risks without regard to cause or degree of

---

[9] *See* C.A. Moomjian, *Equity in Drilling Contracts, supra* note 6, at 619.

fault will allow contracting parties to be confident of their obligations and enable them to accept and insure or absorb those risks.[10]

Placing contractors at risk of exposures they cannot insure or absorb would effectively prevent operations from proceeding in American waters and drive exploration and production from the United States to other countries where risks can be anticipated and lawfully allocated. The effect of not honoring the parties' contractual indemnity agreements as a matter of public policy would actually constitute unwise public policy as it would make the United States more dependent upon foreign oil imports, which directly impacts this country's energy security. Furthermore, the effect on the United States' economy would also be demonstrable. Even if only four percent of production were affected by drillers moving abroad, the government would net $7.6 billion less in direct federal tax revenues,[11] the price of gasoline, fuel oil, and other petroleum products would skyrocket, and jobs would be lost to foreign operations.

Without exaggeration, the issues before this Court could fundamentally alter the basis for almost every offshore drilling contract in the country. For the reasons stated herein, the IADC respectfully requests that the Court issue a definitive ruling that contractual indemnity provisions governed by the general maritime law of the United States are enforceable without regard to cause or the degree of fault, notwithstanding gross negligence.

---

[10]The IADC promulgates model contracts for different operations. The IADC Offshore Daywork Drilling Contract—U.S. ("IADC Model Contract") contains indemnity obligations that are similar to the BP/Transocean Contract. A copy of the IADC Model Contract is attached to Transocean's Mot. For Partial Summ. J. as Rec. Doc. 4457-13, pp. 18-48. A copy of the BP/Transocean Contract is attached to Transocean's Motion for Partial Summary Judgment. *See* App. A-3 (Rec. Doc. 4457-3). The IADC Model Contract defines the indemnity obligations to include all claims and damages "without limit and without regard to the cause or causes thereof, including . . . the negligence of any degree or character (whether such negligence be sole, joint or concurrent, active, passive, or gross) of any person or persons, including such negligence of the party seeking the benefit of a release, indemnity, or assumption of liability . . . ." *See* Rec. Doc. 4457-13, pp. 30-31.

[11]Katie Howell and Mike Soraghan, *Deepwater Companies Pull Up Stakes, and Some May Never Return,* N.Y. TIMES, http://www.nytimes.com/gwire/2010/06/03/03greenwire-deepwater-companies-pull-up-stakes-and-some-ma-10130.html (June 3, 2010).

### B.   MARITIME LAW SUPPORTS INDEMNITY AGREEMENTS IN THE OFFSHORE DRILLING INDUSTRY

Exploratory wells in deep waters are drilled from sophisticated floating structures such as the Deepwater Horizon, which is deemed a vessel by the general maritime law and to which principles of admiralty law apply. As noted herein, the general maritime law of the United States recognizes that indemnity agreements provide certainty between the parties for the risks they face, thus allowing the participants to allocate the risks to the parties who can best avoid the loss and who can insure or absorb it. Voiding these agreements on public policy grounds would undermine both this fundamental principle and the carefully negotiated balance of undertakings.

The general maritime law affirms that parties have "the absolute right to prescribe their respective indemnity obligations." *Cormier v. Rowan Drilling Co.*, 549 F.2d 963, 970 (5th Cir. 1977). The Fifth Circuit has reiterated that the underlying purpose of indemnity agreements in this industry is to provide the efficient allocation of risks between contracting parties. In describing a reciprocal indemnity provision whereby each party to a contract agreed to indemnify the other for injury or death claims by their respective employees, the Fifth Circuit stated:

> This carefully drawn, commonly used contractual provision reflects a practical, efficient agreement by parties faced with sharing, apportioning or underwriting the economic risks of offshore drilling. It is a means by which unnecessary insurance costs are avoided, the ultimate bearer being the owner for whom others contract.
>
> The reciprocal indemnity provisions between Continental and Rowan avoids this doubling of costs to the owner, Contin-ental. Thus, the reciprocal indemnity provision requires each party to carry adequate self-insurance and results in a dove-tailed, highly integrated insurance program, the practical effect of which is to impose on each (and their insurers) the sole and ultimate loss arising out of injury to the respective employees of each. This inures to the benefit of all involved, since it cuts out needless

6

> insurance costs (which are undoubtedly passed along to the final
> consumer at some point). Also, to the extent that it clearly defines
> the respective indemnity obligations of both parties, it cuts down
> on unnecessary litigation costs.

*Id.* at 970. In *Fontenot v. Mesa Petroleum Co.*, the Fifth Circuit further explained that the

purpose of indemnity agreements in oilfield service contracts:

> . . . is to divide the responsibility for personal injury/death among
> the many employers and contractors according to the identity of
> the injured employee rather than according to which party's fault
> or negligence caused the injury. In effect, each party assumes the
> risk of the other's negligence and agrees to be responsible for
> injuries to its own employees no matter how, or by whom, caused.

791 F.2d 1207, 1216 (5th Cir. 1986).

This court has also acknowledged the importance of indemnity agreements in the

offshore oil industry. *Day v. Ocean Drilling & Exploration Co.*, 353 F. Supp. 1350 (E.D. La.

1973). In *Day*, the court examined the provisions of a contract between a drilling contractor and

a subcontractor that was performing work on an offshore platform.  Applying Louisiana law

through the OCSLA, the court found that the parties' intent was to require the subcontractor to

protect the drilling contractor against all risks of harm to the subcontractor's employees, and vice

versa. *Id.* at 1353. The parties accomplished this, not merely by indemnity, but also by insurance

to cover these risks and indemnity obligations. *Id.* The court stated that this allocation was a

business decision that the subcontractor could take into account in pricing its work, and that

"[s]uch agreements are designed, in the economic sense to shift the risks arising from a

hazardous enterprise." *Id.* (citing *Cole v. Chevron Chem. Co.*, 334 F. Supp. 263, 266-68 (E.D.

La. 1971)).

In addition to allocating risks, indemnity agreements in the offshore industry serve the

critical function of creating certainty in the event of a loss. Parties know their responsibilities and

can avoid the unnecessary litigation and expense associated with determining which party is at fault. This leads to greater efficiency and lower transaction costs in the event a loss. If a lawsuit ensues, the parties and the court need only compare the allegations in the complaint and the allocations of the contract to determine which party is responsible for the claim. The agreements also create the certainty by which contractors can manage their business, as contractors insist on indemnity for claims that they cannot insure or absorb.

The courts have recognized and supported the fundamental principles underlying indemnity agreements. Applying the Fifth Circuit's *Cormier* opinion to an IADC drilling contract, a Louisiana court identified "the two policy considerations underpinning the use of reciprocal indemnity agreements such as the one at issue in the instant case: (1) The elimination of the expense of redundant insurance coverage and (2) a reduction in unnecessary litigation and its concomitant expense." *Darty v. Transocean Offshore U.S.A., Inc.*, 875 So. 2d 106, 111-12 (La. App. (4th Cir.) 2004); *see also Rodrigue v. Legros*, 563 So. 2d 248, 255 (La. 1990) ("By allowing indemnity provisions to be fully enforceable, the federal maritime law gives parties the contractual freedom to allocate risks between themselves").

Moreover, the principles applicable to maritime indemnity agreements have been recognized by non-maritime courts throughout the United States. *See, e.g., First Jersey Nat'l Bank v. Dome Petroleum Ltd.*, 723 F.2d 335, 339 (3d Cir. 1983) (New Jersey law allows "parties to a commercial transaction [to] have great latitude in their preferred allocation of risks of loss") (citations omitted); *Estes Express Lines, Inc. v. Chopper Express, Inc.*, 641 S.E.2d 476, 479 (Va. 2007) ("the purpose of an indemnity provision is to pre-determine how potential losses incurred during the course of a contractual relationship will be distributed between the potentially liable parties"); *Leitao v. Damon G. Douglas Co.*, 693 A.2d 1209, 1211 (N.J. Super. Ct. App. Div.

8

1997) (discussing principles underpinning indemnity contracts in the construction industry and noting that the practical effect of indemnity agreement is to allocate between the parties the insurance necessary to protect the project and who will pay for the coverage for specific risks, and that this allocation of financial responsibility for the acts of the parties is part of the bargaining process); *Kelly v. Dimeo, Inc.*, 581 N.E.2d 1316, 1318–19 (Mass. App. 1991) (holding that a provision by which a subcontractor expressly agreed to underwrite the conduct of its employees regardless of the degree of fault was part of the bargaining in the industry); *Hamelin v. Simpson Paper (Vt.) Co.*, 702 A.2d 86, 88–90 (Vt. 1997) (holding that commercial parties with equal bargaining power may allocate the risk of liability among themselves regardless of negligence and public policy concerns of fairness); *Hogeland v. Sibley, Lindsay & Curr Co.*, 366 N.E. 2d 263, 267 (N.Y. 1977) (indemnity agreement's purpose was to allocate risk of liability to third parties through the employment of insurance); *Dalton v. Childress Serv. Corp.*, 432 S.E.2d 98, 101 (W.Va. 1993) ("Generally, indemnity clauses serve our goals of encouraging compromise and settlement by reducing settlement discussions to bilateral discussions, by *encouraging adequate levels of insurance*, and by allowing the parties to a contract to allocate among themselves the burden of defending claims.") (emphasis in original); *Riggle v. Allied Chem. Corp.*, 378 S.E.2d 282, 289 (W.Va. 1989) (holding that contractual allocations of risk between parties that are covered by insurance are not contrary to public policy).

The Macondo well incident demonstrates that the risks and potential liabilities inherent in the offshore drilling industry can be enormous. The related pollution claims are calculated not in the millions of dollars but in the billions of dollars. Drilling contractors are simply not capable of bearing this risk. While many of these companies are substantial in their own right, their earnings

are dwarfed by the magnitude of the pollution abatement costs and economic loss claims relating to this incident. Insurance is not available to drilling contractors for the billions of dollars of potential liability for pollution arising from a blowout. Instead, contractors necessarily rely on the contractual agreement of their customers who are capable of undertaking this risk, the major oil companies that explore in deepwater areas of the Gulf of Mexico.[12] As the expenses of all of the contractors and subcontractors associated with a drilling program are ultimately borne by the oil companies, it makes economic sense for the oil companies to accept the risks associated with their wells and reservoirs, rather than paying each contractor separately to undertake those risks. The oil companies can spread these risks by taking on additional investors, as BP did in this case.[13]

In its recent Order and Reasons (Rec. Doc. 4588), the Court recognized the effort made in the BP/Transocean Contract to allocate risk, stating that "BP and Transocean have made specific, 'blow-by-blow' allocations of liabilities between themselves" whereby "BP, under the Drilling Contract, assumed responsibility for Macondo well oil release pollution liabilities" and, correspondingly, "Transocean did not assume pollution liabilities arising from the incident." Order and Reasons at 38, 40–41 (Rec. Doc. 4588). The contractual allocations in the BP/Transocean Contract and in the IADC Model Contract reflect the benefits each party receives

---

[12]In 2010, Exxon Mobil Corporation and Chevron Corporation had pre-tax incomes of $52.9 billion and $32 billion, and after-tax incomes of $31.4 billion and $19.1 billion, respectively. *See* Exxon Mobil Corp., Annual Report (Form 10-K) (Feb. 25, 2011); Chevron Corp., Annual Report (Form 10-K) (Feb. 24, 2011). In 2009, BP had pre-tax income of $25.1 billion and after-tax income of $20.6 billion. BP Income Statement Annual Data, YAHOO FINANCE, http://finance.yahoo.com/q/is?s=BP+Income+State ment+annual (last visited Dec. 7, 2011). In contrast, the three largest offshore drilling contractors, Transocean, Diamond Offshore Drilling, Inc. and Noble Corporation, had after-tax incomes in 2010 of $988 million, $955.5 million and $773.4 million. *See* Transocean, Ltd., Annual Report (Form 10-K) (Feb. 28, 2011); Diamond Offshore Drilling, Inc., Annual Report (Form 10-K) (Feb. 25, 2011); Noble Corp., Annual Report (Form 10-K) (Feb. 25, 2011).

[13]BP spread its risks in this case through agreements with Anadarko and MOEX.

from the operations. Transocean agreed to accept responsibility for the pollution originating above the surface of the water from its rig, for the loss of the Deepwater Horizon and its equipment as well as for the injuries and deaths to the members of the Transocean crew. Offshore drilling contractors generally receive a daily rate for their operations in drilling the wells. The daily rate accounts for the drilling contractor's capital investment and operating costs of the rig and labor, including the insurance on the rig and crew. Thus, it makes sense that the parties agreed that the drilling contractor should be responsible for its personnel, its rig, and pollution originating above the surface from its rig. While the loss of an offshore drilling rig can cost hundreds of millions of dollars, that exposure can be insured, and the cost of insurance can be included in the daily contract rate. Similarly, the responsibility for injuries and deaths of the drilling contractor's employees working on the rig can be insured. However, as the risks undertaken by the drilling contractor are connected to its equipment and crew, so too is its compensation. Likewise, the risks undertaken by the oil companies are related to their investment in the drilling operation. Oil companies reap the profits from the production from their wells, which are only limited by the amount of oil and gas that can be produced. The contractual allocation of responsibility follows the economic interest of the parties in the operation, as the loss of oil and the pollution damage and liabilities resulting from oil emanating from the well are customarily allocated to the oil company. With the greater potential for reward comes the burden of the greater risks associated with the drilling of the well.

The reciprocal indemnity obligations of the parties also encourage, not discourage, safety. By placing ultimate financial responsibility on parties according to their interests in the venture, each party is given the financial incentive to operate safely with respect to its personnel and property. Contractors, which invest their rig and crew, have the incentive to operate the rig

safely. Correspondingly, the allocation of responsibility for the loss of the well and reservoir and the pollution arising therefrom to the oil companies gives them the financial incentive to operate the well safely.

### C.   THE GENERAL MARITIME LAW DOES NOT INVALIDATE FREELY NEGOTIATED RECIPROCAL INDEMNIFICATION AGREEMENTS THAT ENCOMPASS GROSS NEGLIGENCE

While the Fifth Circuit has discussed indemnity and exemptions from liability in the context of gross negligence claims, it has never had to rule whether a maritime contract that provides for indemnity for claims of gross negligence is enforceable under maritime public policy. The Ninth Circuit summarized the authority from the courts: "No court of appeals has held an exculpatory clause in a maritime contract inapplicable to gross negligence. The First and Fifth Circuits have indicated that exculpatory clauses do not cover gross negligence, but concluded that such conduct had not been established in the particular cases." *Royal Ins. Co. of Am. v. Southwest Marine*, 194 F.3d 1009, 1014 (9th Cir. 1999). A review of the decisions from the Fifth Circuit demonstrates that the court has not enunciated a public policy invalidating freely negotiated contracts that contain indemnity agreements encompassing gross negligence.

#### 1.   Decisions From The Fifth Circuit

The Fifth Circuit has addressed red-letter exemptions from liability and exculpatory provisions in cases involving allegations of gross negligence. In *Todd Shipyards Corp. v. Turbine Service, Inc.*, 674 F.2d 401 (5th Cir. 1982), the court analyzed *both* a red-letter exemption from all liability *and* indemnification for all liability in the context of claims for gross negligence. That case involved faulty repair work done on a vessel at Todd's shipyard. Todd subcontracted this work to Turbine Service, which in turn subcontracted some its work to Gonzales Manufacturing & Industrial Machine Works. The owner of the vessel brought suit, and

the district court found the repairers were negligent and in breach of warranty. Todd sought to alleviate its liability through a red-letter clause contained in its repair contract with the owner of the vessel. This clause was a unilateral exemption from liability in favor of Todd, and placed a cap on total liability for any claims at $300,000. The district court upheld the validity of the limitation of liability with respect to the negligence and breach of contract claims, but ruled that the limitation "was ineffective because Todd was guilty of gross negligence." *Id.* at 410.

The Fifth Circuit affirmed the district court's ruling that the clause was valid for the claims involving negligence and breach of contract and then analyzed the issue of whether Todd was grossly negligent. The Fifth Circuit did not reach the public policy concerns because it rejected the district court's finding of gross negligence. However, in dictum, the court stated that "[g]ross negligence, which will invalidate an exemption from liability has been defined as harm willfully inflicted or caused by gross or wanton negligence."[14] Consequently, the Fifth Circuit held that the exculpatory clause was enforceable to limit Todd's liability for its own negligence, but the court did not have to address the issue whether public policy in admiralty would invalidate extension of the contractual limitation to gross negligence as there was no gross negligence on the part of Todd.

Despite finding that Todd was guilty of gross negligence that rendered its contractual limitation of liability ineffective as to the vessel, however, the district court did not find that maritime public policy prevented Todd from being awarded full indemnity from its contractor, Turbine Service, and its subcontractor, Gonzales Manufacturing. *Id.* at 416, 417. Thus, the district court held that public policy would invalidate a unilateral exemption from liability in the context of turning over custody of a vessel to a shipyard to perform repairs, but the same court

---

[14]*Id.* at 411 (quoting 6A Corbin on Contracts § 1472 (1964 ed.)). The court cited no maritime authority or maritime public policy justification for that statement.

found no impediment to awarding full indemnity to the ship repairer from its contractor and subcontractor despite the court's finding that the ship repairer was guilty of gross negligence.

In *Houston Exploration Co. v. Halliburton Energy Services, Inc.*, 269 F.3d 528 (5th Cir. 2001), the Fifth Circuit again discussed the issue of gross negligence, this time in the context of an offshore work order. Houston Exploration contracted with Halliburton to provide services on an offshore well off the coast of Louisiana. The work order provided that Houston Exploration would "defend, indemnify and hold Halliburton . . . harmless from and against any and all liability, claims, costs, expenses, attorney's fees and damages . . . resulting from . . . loss of well control." *Id.* at 529-30. Despite this provision, Houston Exploration brought suit against Halliburton claiming damages as a result of a well blowout allegedly resulting from Halliburton's work on the well. Houston Exploration argued that the indemnity provision was "unenforceable because Halliburton's conduct amounted to gross negligence." *Id.* at 531. Citing the Louisiana statute which nullifies an agreement "that, in advance, excludes the liability of one party for intentional or gross fault that causes damage to the other party,"[15] the parties did not "dispute[ ] that a party's gross negligence defeats its right to enforce an indemnity contract of this kind" under Louisiana law. *Id.* Again, however, the Fifth Circuit did not have to face the ultimate question whether indemnity for gross negligence is valid under maritime law because the court found that Halliburton was not grossly negligent in that case.[16]

---

[15] LA. CIV. CODE ANN. art. 2004. The district court found that Louisiana law was applicable, and neither party challenged that finding on appeal. *Houston Exploration*, 269 F.3d at 531 n.5. In view of the resolution of the case, the Fifth Circuit found that "the same outcome obtains whether Louisiana or maritime law applies . . . ." *Id.* Consequently, the Fifth Circuit applied Louisiana law as the district court had.

[16] The Fifth Circuit reached a similar result in *Becker v. Tidewater, Inc.*, 586 F.3d 358 (5th Cir. 2009). There, an employee of Baker Hughes was injured on an offshore drilling rig and sued both Baker and Tidewater. The contract between Baker and Tidewater contained an indemnity provision that required Baker to indemnify Tidewater for injuries to Baker's employees. As in *Houston Exploration* the parties

None of the decisions from the Fifth Circuit contain any substantive discussion of maritime public policy nor a determination that maritime public policy invalidates an offshore indemnity agreement encompassing gross negligence, whether unilateral or reciprocal or whether freely negotiated or as a result of overweening bargaining position. The Ninth Circuit was correct when it stated that "[n]o court of appeals has held an exculpatory clause in a maritime contract inapplicable to gross negligence." *Royal Ins. Co.*, 194 F.3d at 1014.

### 2.    Opinions From District Courts Within The Fifth Circuit

The district courts in this circuit have reached differing conclusions on the question whether public policy should invalidate the indemnity provisions of freely negotiated contracts based on allegations of gross negligence. As noted above, the decision of this Court in the *Todd Shipyards* case reached opposite conclusions depending on whether the context was a unilateral exculpatory clause in a ship repair contract or indemnity from that ship repairer against its contractor and subcontractor. *Todd Shipyards* involved both a contractual limitation on liability as well as indemnity claims. Although the district court held that the contractual limitation of $300,000 in Todd's contract with the plaintiff vessel owner "was ineffective because Todd was guilty of gross negligence," *Todd Shipyards*, 674 F.2d at 410, the district court did not consider its finding of gross negligence to be a bar to awarding Todd indemnity from its contractor and subcontractor. *Id.* at 416, 417.

More recently, this Court has considered indemnity agreements for claims of gross negligence but held that the contractual language was not broad enough to provide indemnity for gross negligence. *See In re Torch, Inc.*, C.A. No. 94-2300 C/W 95-1982 Sec. "K" (1), 1996 U.S.

---

did not present the public policy issue to the court as it was "undisputed that Baker escapes indemnity if Tidewater's actions leading to [the plaintiff's] injuries were grossly negligent." Moreover, the Fifth Circuit was not called upon to address the public policy issue as the court affirmed the district court's ruling that Tidewater's conduct did not rise to the level of gross negligence.

Dist. LEXIS 5053 *28–*32 (E.D. La. Apr. 16, 1996); *In re TT Boat Corp.*, C.A. No. 98-0494 C/W

98-1109 Sec. "K" (5), 1999 U.S. Dist. LEXIS 21025 *5 (E.D. La. Sept. 10, 1999). The court in

*Torch* found that the indemnity provision was valid as to negligence under maritime law, but

held that the provision was "silent with respect to gross negligence and/or liability for wanton

and reckless behavior" and that "[s]uch silence dictates its exclusion." *Torch*, 1996 U.S. Dist.

LEXIS 5053 at *28-*29. The court in *TT Boat* followed the ruling from *Torch* to hold that a

provision exculpating liability for consequential damages caused by "negligence, strict liability,

products liability and/or unseaworthiness" could not be expanded to include damages caused by

gross negligence. *TT Boat*, 1999 U.S. Dist. LEXIS 21025 at *5-*7. In neither case did the court

have to engage in such analysis if it was not going to enforce the agreement in any event because

it violated public policy.

One court in the Southern District of Texas has upheld an indemnity agreement in a case

alleging reckless conduct on the part of the indemnitee. *In re Horizon Vessels, Inc.*, No. H-03-

3280, 2005 U.S. Dist. LEXIS 42110 (S.D. Tex. Nov. 18, 2005), *opinion adopted as modified*,

2005 U.S. Dist. LEXIS 42117 (S.D. Tex. Dec. 22, 2005). In that case, Horizon entered into a

contract with the predecessor to Thales Geosolutions to perform work on the construction of a

subsea gas pipeline. *Id.* at *5-6. The contract required Thales to indemnify Horizon for damage

"REGARDLESS OF WHETHER CAUSED OR CONTRIBUTED TO BY NEGLIGENCE OR

OTHER FAULT (INCLUDING SOLE, JOINT, CONCURRENT OR GROSS NEGLIGENCE)."

*Id.* at *15. During the course of its work under the contract, a Horizon vessel damaged an

underwater cable. Thales argued that the contract did not cover Horizon's reckless conduct,

which Thales urged caused the damage to the cable. The court adopted the magistrate judge's

opinion, which held: "The plain language of this provision unambiguously imposes upon Thales

16

an obligation to defend and indemnify Horizon even if Horizon engaged in reckless conduct with respect to the alleged incident." *Id.* at *35.

A different result was reached in *Energy XXI, GoM, Inc. v. New Tech Eng'g, L.P.*, No. H-10-110, 2011 U.S. Dist. LEXIS 41223 (S.D. Tex. Apr. 15, 2011). In that case, Energy XXI and New Tech entered into a Master Service Agreement whereby New Tech would supply personnel to work on a jack up rig for a well off the coast of Louisiana. The agreement contained provisions requiring Energy XXI to indemnify New Tech for any claims of property damage to the well. Energy XXI then brought suit against New Tech for negligence, gross negligence and breach of contract to recover damages resulting from stuck drill pipe in Energy XXI's well. Energy XXI argued that enforcing the indemnity provision for Energy XXI's claims that New Tech was grossly negligent would violate public policy.[17] Citing the dictum from *Todd Shipyards*, the court concluded "that the indemnity provision in this case, to the extent it encompasses claims for gross negligence, is unenforceable." *Id.* at *44. Certification to the Fifth Circuit has been requested (Rec. Doc. 53).

### D.   INDEMNITY FOR GROSS NEGLIGENCE SHOULD NOT BE HELD TO VIOLATE MARITIME PUBLIC POLICY

An analysis of the decisions of the Fifth Circuit and the district courts in the Fifth Circuit demonstrates that there is no binding precedent on the issue of whether public policy requires the

---

[17]Some courts have voided unilateral exculpatory clauses and red-letter clauses under maritime law in the context of gross negligence. *See, e.g., Agip Petroleum Co., Inc. v. Gulf Island Fabrication, Inc.*, 920 F. Supp. 1330, 1341 (S.D. Tex. 1996) (holding that an exculpatory clause limiting consequential damages could not limit liability for gross negligence); *Royal Ins. Co. of Am. v. Southwest Marine*, 194 F.3d 1009, 1014 (9th Cir. 1999) (holding a unilateral exculpatory clause could not be used by a party to "shield itself contractually from liability for gross negligence"); *La Esperanza de P.R., Inc. v. Perez y Cia. de P.R., Inc.*, 124 F.3d 10, 19 (1st Cir. 1997) (noting that a red letter exculpatory clause may not limit liability for gross negligence under maritime law). In each of these situations, courts were reluctant to allow a party in a superior negotiating position to fully relieve itself from all liability, regardless of fault, at the expense of the other party.

legal system to void the balance of freely negotiated indemnity agreements in the offshore drilling industry. The IADC will therefore address the public policy concerns affecting indemnity agreements in offshore drilling contracts. While some courts and commentators have enunciated public policy concerns with indemnification agreements involving both negligence and gross negligence of the indemnitee, these concerns are not offended by the freely negotiated allocations of responsibilities between the sophisticated parties in the offshore drilling industry.

1.      **Public Policy Concerns In Admiralty Regarding Contractual Allocations On Liability**

Judicial restraints in the maritime law on freedom of contract originated in response to the unilateral contracts imposed in situations such as common carriage. In the nineteenth century the Supreme Court addressed exemptions to liability of maritime common carriers in *Liverpool & Great Western Steam Co. v. Phenix Insurance Co.*, 129 U.S. 397 (1889). In *Liverpool*, the insurer of cargo brought suit against the owner of the carrying vessel for damage to the cargo when the vessel was stranded as a result of the negligence of the crew of the vessel. In response, the vessel owner asserted the exceptions to liability in the bills of lading that included damage "arising from the negligence, default, or error in judgment of the master, mariners, engineers or others of the crew, or otherwise howsoever." *Id.* at 438. Thus, the Court was presented with the issue of "the validity and effect of that clause in each bill of lading by which the [vessel owner] undertook to exempt itself from all responsibility for loss or damage by perils of the sea, arising from negligence of the master and crew of the ship." *Id.* Citing the law applicable to cattle

drovers on railroads,[18] the Court stated that "employment of a common carrier is a public one" and that "[t]he carrier and his customer do not stand upon a footing of equality. The individual customer has no real freedom of choice." *Id.* at 440-41. Consequently, the Court concluded "that an express stipulation by any common carrier for hire, in a contract of carriage, that he shall be exempt from liability for losses caused by the negligence of himself or his servants, is unreasonable and contrary to public policy, and consequently void." *Id.* at 441-42. The Court rejected consideration of state law, "codes, decisions of courts and opinions of commentators in France, Italy, Germany and Holland," and decisions of courts in Great Britain that upheld such exemptions from liability. *Id.* at 443, 447. The Court did note, however, that there are exceptions to the general rule such that a carrier can charge a lesser "rate of freight based on the condition that the company assumed liability only to the extent of an agreed valuation of the goods, even in case of loss or damage by its negligence" or enter into "an agreement by which the carrier receives the benefit of any insurance obtained by the shipper from a third person." *Id.* at 442.

The Supreme Court was sharply divided when it considered exemptions from liability in marine towing contracts nearly a century later in *Bisso v. Inland Waterways Corp.,* 349 U.S. 85 (1955). *Bisso* involved the question whether the tug could validly contract against its liability for its negligent towage arising out of the sinking of its towed barge. The four-member majority

---

[18]The Court stated: "The question appears to be substantially determined by the judgment of this court in *Railroad Co. v. Lockwood.*" Liverpool, 129 U.S. at 439 (citing *Railroad Co. v. Lockwood*, 84 U.S. (17 Wall.) 357 (1873)). *Lockwood* involved an injury to a cattle drover who engaged a stock train to transport his cattle from Buffalo to Albany. The drover paid no fee for his travel, but he received a drover's pass when he signed an agreement to transport the cattle that required him to attend to the cattle and to take all risk of injury to the cattle or to himself. Concluding that the contract involved common carriage, the Court held that the railroad could not exempt itself from responsibility for its negligence. *Lockwood*, 84 U.S. at 383-84.

explained the public policy against the "monopolistic compulsions"[19] of the tug's unilateral exculpatory clause:

> This rule is merely a particular application to the towage business of a general rule long used by courts and legislatures to prevent enforcement of release-from-negligence contracts in many relationships such as bailors and bailees, employers and employees, public service companies and their customers. The two main reasons for the creation and application of the rule have been (1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods or services from being overreached by others who have power to drive hard bargains.

*Id.* at 90-91 (footnotes omitted).

Three members of the Court dissented from the action of "imposing views of public policy upon contracting parties."[20] The dissenters stated: "Of course, the Court should not restrict the area of full bargaining between tow and tug unless an overriding public interest calls for such restriction." *Id.* at 98. The dissenters noted that Congress had "limited its interference in the field of transportation to relationships between common carriers and their own customers, . . ." which was "concededly not the relationship" in *Bisso*. *Id.* at 116. In response to the argument that permitting exoneration from liability would "stimulate irresponsibility" and that prohibiting

---

[19] *Bisso*, 349 U.S. at 91.

[20] *Id.* at 116. Justice Harlan, who did not participate in the *Bisso* decision, later stated that he "would prefer to see *Bisso* reconsidered, believing, with deference, that it was wrongly decided." Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co., 372 U.S. 697, 698 (1963) (Harlan, J., concurring). Justice Douglas wrote a separate concurrence in *Bisso* that was explained by Judge Wisdom in *In re* Unterweser Reederei, GMBH, 428 F.2d 888, 908 n.30 (5th Cir. 1970) (Wisdom, J., dissenting), *rev'd sub nom.* BREMEN v. Zapata Off-shore Co., 407 U.S. 1 (1972) (quoting *Bisso*, 349 U.S. at 97 (Douglas, J., concurring)):

> *Bisso* was only a four-Justice opinion. The fifth, Justice Douglas, concurred only because he professed ignorance of the "economics and organization of this business". He admitted that the Court's rule might be "outmoded" and in need of change, that the tugboat industry might be "less able to carry the risks of . . . losses than its customers, ["] and that it might be "fairer in the long run" to allow the tugboat operator to transfer liability. But in the absence of a record that threw light on those "large questions of policy", he was unwilling to change what he considered an already established rule in the federal courts.

exoneration would "provide an incentive to reasonable care," *id.* at 118, 119, the dissenters responded:

> In the commercial setting of the towage industry this argument has little force, unless we are prepared also to forbid the tug to insure against such losses or liabilities. If not, then the question ultimately is whether public policy requires that the tug, rather than the tow, shall bear the cost of insurance. Indeed, in all likelihood, the economic burden will fall upon the tow in either case. In the absence of anything in the record, or any facts of which this Court may take judicial notice, that the tug has exploited an unfair bargaining position, there is no reason why the parties should not be free to distribute this cost as they see fit.

*Id.* at 119.

While the *Bisso* dissenters believed that the parties' freedom of contract should not be overturned because the economic burden of losses would ultimately fall on the tow despite the Court's ruling, subsequent decisions have allowed the Court's public policy determination to be circumvented more directly. Even though a clause requiring the towed vessel to obtain insurance on the vessel, to name the tug as an additional insured on that insurance, and to waive subrogation against the tug operates to exculpate the tug and the tug's insurers from having to pay for damage to the tow, the Fifth Circuit has held that this provision "is not an exculpatory clause of the type invalidated in *Bisso*." *In re Twenty Grand Offshore, Inc.*, 492 F.2d 679, 685 (5th Cir. 1974).[21]

---

[21]*See also Flour Western, Inc. v. G&H Offshore Towing Co.*, 447 F.2d 35 (5th Cir. 1971) (requirement that cargo owner obtain insurance upheld against *Bisso* argument). In *Dillingham Tug & Barge Corp. v. Collier Carbon & Chem. Corp.*, 707 F.2d 1086, 1090 (9th Cir. 1983), the Ninth Circuit agreed:

> We believe that the reasoning of the Fifth Circuit is sound, and that it is not against public policy to enforce an insurance provision in a towage contract. Furthermore, it is economically efficient to allow the enforce-ment of such provisions. The parties to a towage contract with such a provision are effectively insuring themselves under one policy against any loss due to the fault of either one of them, instead of each obtaining separate policies for this purpose. A single policy can be obtained

The Supreme Court did not invalidate contractual provisions that had the effect of exculpating liability in *BREMEN v. Zapata Off-shore Co.*, 407 U.S. 1 (1972). Zapata, an American company based in Houston, contracted with Unterweser, a German company, to tow Zapata's drilling rig from Louisiana to the Adriatic Sea off the coast of Italy. The towing contract contained two exculpatory clauses and a forum selection clause for the London Court of Justice. The rig was damaged while in tow in the Gulf of Mexico. Despite the forum selection clause, Zapata brought suit against the tug and Unterweser in federal court in Tampa. The district court declined to enforce the forum selection clause, and a majority of the Fifth Circuit panel agreed, finding support from the "indications that Zapata's substantive rights will be materially affected if the dispute is litigated in an English court" on account of the exculpatory provisions in the towing contract:

> These provisions are apparently contrary to public policy and unenforceable in American courts. However, according to the affidavit of F.D. Bateson, Zapata's English maritime law expert, these clauses would be held prima facie valid and enforceable by an English court. The district court was entitled to consider that remanding Zapata to a foreign forum, with no practical contact with the controversy, could raise a bar to recovery by a United States citizen which its own convenient courts would not countenance.

*In re Unterweser Reederei, GMBH*, 428 F.2d 888, 895 (5th Cir. 1970).

In dissent, Judge Wisdom found two policy concerns from *Bisso* for exculpatory clauses in towing agreements, "that they may be produced by overweening bargaining power; and that they do not sufficiently discourage negligence." *Id.* at 907. Judge Wisdom did not believe, however, that the *Bisso* decision was driven as much by policy as by precedent: "I believe the policy is not so strong. *Bisso* depends less on the questions of public policy than on the long line

---

cheaper than two individual policies. In the event of a loss, the same insurance company pays for the loss despite who is at fault.

of authority which it believed established a federal rule barring enforcement of such contracts."

*Id.* at 908. Judge Wisdom wanted to evaluate how the parties had considered the "financial

responsibility for the risks" and "allocated responsibility," stating:

> It is equally possible that the contract price took this factor into
> account. I conclude that we should not invalidate the forum
> selection clause here unless we are firmly convinced that we would
> thereby significantly encourage negligent conduct within the
> boundaries of the United States. At the very least, before excluding
> the forum clause, we should remand to the district court for
> compilation of a record dealing with the economic relationships in
> this industry and the consequences of enforcing forum clauses in
> this international context.

*Id.* at 908-09. When the en banc Fifth Circuit adopted the majority opinion of the panel by an 8-6

majority, Judge Wisdom again dissented, stating: "The decision of the majority is a backward

step by a forward-looking court. It has no place in a shrinking world where international

commercial transactions are becoming increasingly commonplace." *In re Unterweser Reederei,*

*GMBH,* 446 F.2d 907, 911 (5th Cir. 1970) (en banc).

Quoting at length from Judge Wisdom, the Supreme Court overturned the decision of the

Fifth Circuit. Stating that "[a] contractual choice-of-forum clause should be held unenforceable if

enforcement would contravene a strong public policy of the forum in which suit is brought,"

*BREMEN,* 407 U.S. at 15, the Court answered: "It is clear, however, that whatever the proper

scope of the policy expressed in *Bisso,* it does not reach this case. *Bisso* rested on considerations

with respect to the towage business strictly in American waters, and those considerations are not

controlling in an international commercial agreement." *Id.* at 15-16.

In summary, just as the Supreme Court was careful "not to over-emphasize the strength

of the [*Bisso*] policy" in declining to apply its policy arguments in the international towing

context presented in *BREMEN, id.* at 16, so too should this Court decline to extend anti-

23

indemnity arguments to the situation of a freely negotiated offshore drilling contract with the fair and balanced customary reciprocal indemnity agreements that are vital to the survival of the industry. The Fifth Circuit recognizes that, outside of circumstances like common carriage, the parties "enjoy freedom of contract" by which they may allocate responsibilities between themselves. *Fernales Shipping Co. v. Bonaire Petroleum Corp.*, 733 F.2d 381, 383 (5th Cir. 1984); *see also Thyssen, Inc. v. Nobility MV*, 421 F.3d 295, 307 (5th Cir. 2005) ("The law of private carriage, now primarily charter parties, . . . is still governed by the principle of freedom of contract.") (quoting 1 Schoenbaum, Admiralty & Maritime Law § 10-3, at 589) (citations omitted). After enunciating the freedom of contract for maritime parties, Judge John R. Brown added that admiralty judges have similar freedom in dealing with maritime contracts: "The Chancellor . . . may stride the quarterdeck of maritime jurisprudence and, in the role of admiralty judge, dispense . . . that which equity and good conscience impels." *Fernales*, 733 F.2d at 386 (quoting *Compania Anonima Venezolana de Navegacion v. A.J. Perez Expert Co.*, 303 F.2d 692, 699 (5th Cir. 1962)). Consequently, in the context of indemnity, the Fifth Circuit has stated: "A contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties . . . ." *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir. 1981) (citations omitted). That freedom was echoed by the Supreme Court in *East River S.S. Corp. v. Transamerican Delaval, Inc.*, 476 U.S. 858, 873-74 (1986):

> Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power, we see no reason to intrude into the parties' allocation of the risk.

24

As in *East River*, there is no basis for intruding on the parties' freely negotiated allocations of risk in offshore drilling contracts.

> **2.     None Of The Public Policy Concerns Regarding Exculpatory Clauses Or Unilateral Limitations Of Liability Are Applicable To Freely Negotiated Indemnity Agreements In The Offshore Drilling Industry That Provide Reciprocal Obligations As A Means Of Allocating Risk**

The public policy concerns cited by admiralty courts and by common-law courts as a means of voiding contractual limitations of liability are not present in the context of freely negotiated indemnity agreements that provide reciprocal obligations such as those presented by the BP/Transocean Contract and the IADC Model Contract. Neither public policy concern indentified by Judge Wisdom is applicable in this context. The first policy is that the agreement must have been produced by overweening bargaining power, such as with the contracts of adhesion in common carriage or the unilateral shipyard repair contracts. Other jurisdictions that have tackled this issue have agreed that there is a critical difference between unilateral exemptions from liability in contracts of adhesion produced from superior bargaining power compared to indemnity provisions that fairly allocate risks between sophisticated parties based on substantive and economic reasons, and these courts have held that public policy does not preclude indemnity for gross negligence in the latter situation. *See, e.g., Austro v. Niagara Mohawk Power Corp.*, 487 N.E.2d 267 (N.Y. 1985); *First Jersey Nat'l Bank v. Dome Petroleum Ltd.*, 723 F.2d 335, 341 (3d Cir. 1983) ("noted the vital distinction between exculpation and indemnification and held that while public policy may preclude contractual exculpation for reckless, willful or grossly negligent conduct, it is not offended by indemnification against such conduct"); *Estes Express Lines, Inc. v. Chopper Express, Inc.*, 641 S.E.2d 476, 479–80 (Va. 2007) (noted that indemnity agreements "do not invoke the same public policy concerns as pre-

injury release agreements" because "unlike pre-injury release provisions, indemnity provisions do not bar or even diminish an injured party's ability to recover from a tortfeasor"); *Kelly v. Dimeo, Inc.*, 581 N.E.2d 1316, 1318 (Mass. App. 1991) ("where commercial entities have negotiated on a level playing field before entering their contractual arrangements, it is not necessary to explore the theoretical underpinnings of the indemnity doctrine"); *Glaspell v. Ohio Edison Co.*, 505 N.E.2d 264, 267 (Ohio 1987) (stating the differences between releases of liability and indemnity agreements and ruling that public policy is not offended by indemnity contracts that provide a "reasonable allocation of the risks of doing business among fellow businesses").

In *Austro*, Niagara filed a third-party complaint demanding indemnification from Weber Construction Co., arising out of Niagara's gross negligence in the underlying personal injury claim by Austro. *Austro*, 487 N.E.2d at 267. Austro was an employee of Weber, and Weber's contract with Niagara provided that Weber would indemnify Niagara for "any liability caused by [Niagara]'s negligence resulting, in whole or in part, in bodily injury arising out of work performed by Weber." *Id*. The intermediate appellate court applied the general rule that was stated in dictum in *Todd Shipyards* that "exculpatory agreements will not be read to exempt a willful or grossly negligent party from liability to an injured person." *Id*. The New York Court of Appeals reversed this ruling noting that the lower court:

> failed to distinguish between the exculpatory clauses involved in those cases, which typically deprive a contracting party of the right to recover for damages suffered as the result of the exonerated party's tortious act, and indemnity contracts that simply shift the source of compensation without restricting the injured party's ability to recover.

*Id.* The court then held that indemnity agreements "are unenforceable as violative of public policy only to the extent that they purport to indemnify a party for damages flowing from the intentional causation of injury." *Id.*

Applying the specific public policy concerns to offshore drilling contracts, it would be disingenuous for oil companies to argue that drilling contractors took advantage of them by use of the drilling contractors' "overweening bargaining power." Oil companies such as BP are large, sophisticated corporations that have the ability to negotiate the terms of their agreements on an equal footing with the offshore drilling contractors. To the contrary, many oilfield contractors would assert that "Big Oil" inherently has superior bargaining power. Thus, the context presented by the offshore oil and gas industry is dramatically different than common carriage or other situations that produce contracts of adhesion, and the courts have recognized that sophisticated parties' freedom to contract should be honored by the courts. *See, e.g., Abry Partners V L.P. v. F & W Acquisition LLC,* 891 A.2d 1032, 1061 (Del. Ch. 2006) (finding that a limitation of liability and exclusive remedy provision in a purchase agreement was enforceable and did not violate public policy to the extent that the seller did not make intentional misrepresentations or act with knowledge of the falsity thereof). Sophisticated businesses can "make their own judgments about the risk they should bear," and those contractual expectations should be respected. *Id.* "Freedom of contract prevails in an arm's length transaction between sophisticated parties such as these, and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain. If they are dissatisfied with the consequences of their agreement, the time to say so was at the bargaining table." *TFCG-Illinois, L.P. v. United Maint. Co., Inc.*, No. 2:09-CV-1122, 2011 U.S. Dist. LEXIS 126116 *37 (D. Utah Nov. 1, 2011). This is precisely the principle advocated by the IADC in this brief.

As discussed above, indemnity agreements in offshore drilling contracts allocate the risks equitably to each party based upon their substantive contributions and the relative benefits received under the contract so that the party in the best position to avoid the risk and insure or bear the burden is the party that assumes the risk. Decades of negotiations between drilling companies and oil companies have achieved this balanced risk allocation, which is reflected in both the IADC Model Contract and the BP/Transocean Contract. It simply cannot be contended that the oil companies have been put in a take-it-or-leave-it situation or that they have been victimized by the superior position of the drilling contractors.

Allocations of responsibility that include indemnity for gross negligence likewise do not pose a threat to the public policy concerns related to safety and for discouraging negligent conduct.[22] Allowing oil companies to assume responsibility for the environmental risks associated with the escape of oil from the oil company's well would not provide a disincentive to safety or proper drilling practices by drilling contractors when those contractors have simultaneously assumed responsibility in the hundreds of millions of dollars for their rig, their personnel, and the escape of oil above the surface from their rig. The customary balanced allocation of responsibility in offshore drilling contracts does not completely exculpate any party from all liability or responsibility. Nor does the allocation prohibit the ability of an injured third party from being able to recover. Rather, these contracts apportion the responsibility for losses between the drilling contractor and the oil company in an equitable manner based on the property, equipment and personnel involved by each party. Moreover, the reciprocal agreements encourage, not discourage, safe practices. If each party is responsible for significant losses

---

[22]Congress has considered different proposals with respect to indemnity in connection with statutory pollution liability and continues to permit indemnity agreements without regard to cause. *See infra* Subsection E addressing the effect of the Oil Pollution Act of 1990.

despite the negligence or gross negligence of the other party, then each party has a direct financial incentive in insuring that the other party acts responsibility. The concerns for public policy identified by the courts in invalidating other limitations on liability are simply not present in the context of the indemnity agreements in offshore drilling contracts.

### 3. Public Policy Does Not Void Insurance Coverage That Provides Indemnity For An Insured's Gross Negligence

The limited extent to which admiralty law restricts freedom of the parties to contractually allocate risks is eliminated altogether when the parties support the allocations by insurance provisions. Both the IADC Model Contract and the BP/Transocean Contract contain provisions requiring the drilling contractor to obtain insurance for its indemnity agreements and to name the operator as an additional insured to the extent of the indemnities allocated to the drilling contractor.[23] Even when there is a public policy invalidating the indemnity, however, the Fifth Circuit has upheld insurance obligations in contracts despite the public policy denying the parties the freedom to contract directly with respect to a particular loss. *See, e.g., LeBlanc v. Global Marine Drilling Co.*, 193 F.3d 873, 875 (5th Cir. 1999) (holding that additional insured provision in the contract was valid and enforceable despite the invalidity of the indemnity); *Voisin v. O.D.E.C.O. Drilling Co.*, 744 F.2d 1174, 1177–78 (5th Cir. 1984) (same); *see also In re Twenty Grand Offshore, Inc.*, 492 F.2d 679, 685 (5th Cir. 1974) (towing contract); *Flour Western, Inc. v. G&H Offshore Towing Co.*, 447 F.2d 35 (5th Cir. 1971) (towing contract). Similarly, Texas upholds additional insured provisions regardless of the validity of the indemnity agreement in the same contract. *See Getty Oil Co. v. Insurance Co. of N. Am.*, 845 S.W.2d 794, 803-06 (1992).

---

[23] This court addressed the insurance provisions of the BP/Transocean Contract in its Order and Reasons [As to the Insurance Actions] (Rec. Doc. 4588).

Like indemnity agreements, insurance policies are simply contracts by which insurance companies agree to indemnify the insured for the risks covered by the policy, regardless of the insured's fault. When presented with the issue whether there was a maritime rule prohibiting coverage for punitive damages in a marine insurance policy, the Fifth Circuit held that the cases had "not established a specific and controlling federal rule disallowing the recovery of punitive damages from an insurance company." *Taylor v. Lloyds Underwriters of London*, 972 F.2d 666, 669 (5th Cir. 1992).

In the absence of a maritime rule prohibiting an insurer from indemnifying its insured for punitive damages or gross negligence, the Fifth Circuit in *Taylor* held that the court should apply "the law of the state having the greatest interest in the resolution of the issues." *Id.* The public policy of many states that are critical to the offshore industry, such as Louisiana and Texas, does not prohibit coverage for punitive damages in the gross negligence context. *See, e.g., Sharp v. Daigre*, 555 So.2d 1361, 1364 (La. 1990) (superseded on other grounds by statute); *Louviere v. Byers*, 526 So.2d 1253, 1256-57 (La. App. (3d Dist)), *writ denied*, 528 So.2d 153 (La. 1988); *Fairfield Ins. Co. v. Stephens Martin Paving, L.P.*, 246 S.W.3d 653, 660 (Tex. 2008) (In light of legislation allowing claims of gross negligence to supplement workers' compensation claims, "Texas public policy does not prohibit insurance coverage for claims of gross negligence in this context."). As with marine insurance, there should be no maritime policy invalidating freely negotiated allocations with respect to gross negligence. Insurance and indemnity obligations, which are coupled together in most of the contracts in the offshore drilling industry, should be interpreted in a way that gives consistency to the entire contract and that upholds the expectations of the parties.

**4.      The Laws Of Other Countries Allow Indemnity For Gross Negligence**

30

Invoking public policy to invalidate indemnity agreements in drilling contracts will have international consequences that extend far beyond the inconsistent application of these contracts throughout the world. Indemnity for conduct that amounts to gross negligence can be enforced in other countries, such as England, which do not differentiate between degrees of negligence[24] and which will enforce contractual indemnity provisions relieving a party from its own negligence provided the clause uses sufficiently clear wording to state that the indemnity should cover the loss. *See, e.g., Canada Steamship Lines v. R.,* (1952) AC 192; *E.E. Caledonia (formerly Occidental Petroleum (Caledonia) Ltd. v. Orbit Valve Co. Europe PLC* (1994) 2 Lloyd's Rep. 239. Moreover, it is a fundamental principle of English law that commercial parties of equal bargaining power should be free to contract on any basis without interference by the courts, provided that they are not contracting to perform an illegal act. *Photo Production Ltd. v. Securicor Transport Ltd.* (1980) AC 827 ("normally when the parties were bargaining on equal terms they should be free to apportion the risks as they thought fit, making provision for their respective risks according to the terms they chose to agree"); *Homburg Houtimport BV v. Agrosin Private Ltd., The Starsin,* (2003) 1 Lloyd's Rep. 571, [203] A11 ER (D) 192 (Mar) ("Legal policy favours the furtherance of international trade. Commercial men must be given the utmost liberty of contracting. They must be left free to decide [how to] allocate commercial risks.").

If drilling contractors are faced with unlimited exposure in the United States for the risks customarily accepted by the oil companies in any case where gross negligence is alleged, it will

---

[24]Jurisdictions in the United States have also begun to adopt this principle. The Restatement no longer differentiates between degrees of negligence. RESTATEMENT (SECOND) OF TORTS § 500, cmt. (g); *see also Crowder v. Am. Eagle Airlines, Inc.,* 118 Fed. App'x 833, 840 n.29 (5th Cir. 2004) (applying Texas law) ("[w]hile there is a difference between negligence and gross negligence, it is only a difference of degree not kind"); *Trevino v. Lightning Laydown, Inc.,* 782 S.W.2d 946, 949 (Tex. App.—Austin, 1990, writ denied) (same).

not take long for contractors to move their rigs out of the United States and to foreign waters where they can freely contract with respect to exposures that threaten the existence of the company. Just as the Supreme Court reasoned in *BREMEN*, the Court should be careful not to over-emphasize the strength of public policy in light of its international implications, particularly when the effect of invalidating the agreement will be damaging both to the economy and to our national security. Viewed in this context, public policy should favor freedom of contract between sophisticated parties such as drilling contractors and oil companies.

### E.   OPA SUPPORTS THE INDEMNITY CLAIMS

This Court recently recognized the "uniformity principle" that regulates general maritime law in situations in which Congress has provided a remedy. Order and Reasons [As to Motions to Dismiss the B3 Master Complaint] at 20 (Rec. Doc. 4159). For the past 150 years, the Supreme Court has been guided by Congress' legislative enactments when enunciating maritime law and policy. This was summarized in *Dooley v. Korean Air Lines Co.*, 524 U.S. 116, 122 (1998) (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)): "[W]hile we could 'fill a gap left by Congress' silence,' we were not free to 'rewrite rules that Congress has affirmatively and specifically enacted.'" Consequently, the Supreme Court has instructed that "an admiralty court should look primarily to these legislative enactments for policy guidance." *Atlantic Sounding Co. v. Townsend*, 129 S. Ct. 2561, 2572 (2009) (quoting *Miles v. Apex Marine Corp.*, 498 U.S. 19, 27 (1990)).[25]

---

[25]Judge W. Eugene Davis, who has served both as a district and appellate judge, summarized this principle from the standpoint of admiralty judges:

> [A]dmiralty judges are no longer charged with declaring principles of maritime law based on the customs and usages of the sea or based on the policies of furthering commerce and protecting maritime workers. Instead, they must look way back over their shoulders so as not to step on the penumbras of legislation that might apply to some related area.

In enacting the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq.*, Congress provided limits of liabilities for responsible parties but created an exception to those limits "if the incident was caused by—(A) gross negligence or willful misconduct . . . ." *Id.* § 2704(c)(1). However, Congress expressly permitted responsible parties to contract for indemnity for such liability: "Nothing in this Act prohibits any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this Act." *Id.* § 2710(a). The breadth and clarity of the statutory provision addressing indemnity are striking—"any agreement" for "any liability," and that liability includes gross negligence. There is no gap nor room for supplementation, and this Court should not invoke public policy to overturn the specific enactment of Congress that permits indemnity for an incident caused by gross negligence or willful misconduct.

## F.    IADC'S SUPPORT OF CONTRACTUAL ALLOCATIONS OF RISK

The arguments presented by the IADC herein are not new or novel. They are based on decades of negotiations by which oil companies and drilling contractors have reached consensus on the allocation of risks to the parties who were in the best position to protect against those risks and absorb the financial consequences therefrom. The testimony presented to the Louisiana Legislature when it considered limitations on the freedom to contract exemplifies the importance of the issues presented to this Court.[26]

---

W. Eugene Davis, *Admiralty Law Symposium: A Sea Chest for Sea Lawyers: The Role of Federal Courts in Admiralty: The Challenges Facing the Admiralty Judges of the Lower Federal Courts*, 75 Tul. L. Rev. 1355, 1358 (2001).

[26]The IADC also presented testimony to Congress to preserve the sanctity of the right to apportion "pollution liability risks by agreement among the parties operating on the OCS." Statement on Comprehensive Oil Pollution Liability and Compensation Legislation by Wayne K. Hillin on March 27, 1985, at 3 (Appendix 4). His Statement was made in the context of Congress' consideration of the standard for gross negligence in proposed oil spill legislation that would create a potential liability for offshore drilling contractors that would otherwise be subject to their customary contractual indemnity from the oil companies. *See id.*

In 1980-81, the Louisiana Legislature considered proposals for the Louisiana Oilfield Anti-Indemnity Act ("LOIA"), which threatened to eliminate the parties' ability to allocate risk through indemnity agreements. The initial proposal for the statute was not limited to personal injury claims as it is today but would also have applied to "any loss whatsoever," and would have included pollution, clean up, and property damage. The IADC, drilling contractors, and oil companies recognized the danger this proposal presented to the industry and presented testimony to the Legislature to limit application of the statute. Jim Justiss, with Justiss Oil Company, testified as a representative of the IADC before the Committee on Civil Law and Procedure as follows:

> The realities of the situation are that no drilling contractor in the state of Louisiana can afford to take on the liability that might result from underground damage. No contractor that I know can take on the gigantic exposure that is his as a result of possible fines levied from some of the major oil spills that can occur as a result of his negligence of his own employees. We cannot absorb that fairly. What we are looking at are realities and the realities are this. We contractors have to have that indemnification from our customers in order to operate because the risk is too much to accept for the profit involved. We are not starting from the same ground zero as our customers. He has a potential here of discovering an oil reserve that might mean hundreds of millions of dollars to him. The only potential I have is the profit that I can make (inaudible). So, I would urge you regardless of the contents of this bill at this time or what happened to the bill on the floor. I'm not familiar with the legislative proceedings. But if we lose that indemnification from our operators the drilling contracting industry will desert Louisiana like rats leaving a sinking ship. We will go to to [sic] other states. We cannot accept this responsibility.

(Appendix 5, Transcript of House Bill 915 Before the Committee on Civil Law and Procedure on May 26, 1981, pp. 52-53). W.B Huthnance, the president of Huthnance Drilling Company, explained the effect of adopting a public policy that invalidated indemnity agreements:

> Thus, the indemnity we must supply to the operator, while being an administrative burden, in no way threatens the financial position

34

of Huthnance Drilling Company. What threatens us is the potentially devastating losses from a major blowout in connection with the pollution and loss of oil. An example is an incident such as the Bay of Campeche blowout. In the event of a large spill with pollution damage, loss of oil and great expenses to control the well, a contractor such as Huthnance Drilling Company could not begin to respond in damages, and insurance to cover these various items is not reasonably available to us. Under the 1978 amendments to the Outer Continental Shelf Lands Act there is potentially unlimited liability for cleanup costs, and in a major disaster the damages for pollution and cleanup could run into the hundreds of millions of dollars.

With the current freedom of contract, we come to the bargaining table demanding indemnity for those elements which we cannot reasonably insure and to which we cannot respond. The oil companies, on the other hand, have the wherewithal to respond to a claim in the hundreds of millions of dollars, and they have been willing to trade this indemnity for our indemnifying them on the property and injury claims. Huthnance Drilling Company could not sign a drilling contract without these covenants and we cannot work offshore without them. The indemnity covenants are a balance by which we are able to stay in business in exchange for absorbing the day-to-day administration of claims handling. It was the total freedom of contract which led to this balance, and a statute destroying our freedom of contract could seriously jeopardize offshore drilling. Currently there is give and take, and indemnity is a two-way street. I only ask that you allow us to maintain our ability to freely negotiate so that everyone may bargain for those covenants that they need.

(Appendix 6, Remarks of W.B. Huthnance to the Committee on Civil Law and Procedure on February 10, 1981, pp. 3-4).

The LOIA is premised on the same concerns espoused by courts in voiding unilateral exculpatory clauses. After hearing this testimony, the Louisiana Legislature limited the scope of the LOIA as enacted so that it provides: "The legislature finds that an inequity is foisted on certain contractors and their employees by the defense or indemnity provisions, either or both, contained in some arguments pertaining to wells for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, *to the extent those provisions apply to*

*death or bodily injury to persons.*"[27] LA. REV. STAT. Ann. 9:2780A (emphasis added). The legislature did not find that the public policy against indemnity agreements encompassing negligence should extend to the freely negotiated provisions involving pollution and property damage that are vital to the survival of the drilling contractors.

## III.   **CONCLUSION**

The remarks made by Mr. Justiss and Mr. Huthnance[28] thirty years ago are as true today as they were then, except that the losses can now involve billions of dollars rather than hundreds of millions of dollars. Oil companies and drilling contractors have reached a fair and balanced contractual allocation of risks that recognizes both the roles and responsibilities of the parties and their economic circumstances and necessities. Drilling contractors rely on the freedom of contract combined with the assumption of risks by the oil companies in order to work in the offshore environment. The indemnity obligations are a two-way street that is the result of fair bargaining. There is no unfair advantage, and it is the freedom of contract that resulted in the balance of reciprocal obligations. No public policy demands that this balance be invalidated; rather, maritime law supports the parties' freedom to allocate risks as the parties did in the BP/Transocean Contract.

To paraphrase Judge Wisdom, this forward-looking Court should not take the backward step of overturning a freely negotiated contract containing fair and equitable undertakings. Maritime public policy should "uphold[ ] the reasonable expectations of the parties." Order and Reasons at 41 (Rec. Doc. 4588). As in *BREMEN*, whatever the proper scope of public policy is that invalidates contractual agreements, it should not reach the allocations in offshore drilling

---

[27] Texas also confronted these same issues when it enacted the Texas Oilfield Anti-Indemnity Act. Texas addressed the economic concerns of the oil industry by excepting from this Act indemnity agreements that are supported by insurance or self insurance. TEX. CIV. PRAC. & REM. CODE § 127.005(a), (b).

[28] Both Mr. Justiss and Mr. Huthnance served as IADC Directors.

contracts. The IADC reiterates Mr. Huthnance's request that oil companies and drilling contractors be allowed "to maintain our ability to freely negotiate so that everyone can bargain for those covenants that they need." WHEREFORE, the IADC, on behalf of all of its offshore drilling contractor members, urges the Court to rule that neither the general maritime law of the United States nor maritime public policy invalidates oilfield indemnity provisions in the event of gross negligence.

Respectfully submitted,

BROWN SIMS, P.C.

By: /s/ Lisa M. Africk

Lisa M. Africk (#26724)
650 Poydras Street, Suite 2200
New Orleans, Louisiana 70130
Telephone: 504.569-1007
Telecopier 504.569-9255
lafrick@brownsims.com

*ATTORNEYS FOR THE INTERNATIONAL ASSOCIATION OF DRILLING CONTRACTORS*

OF COUNSEL:

Kenneth G. Engerrand
Texas Bar No. 06619500
kengerrand@brownsims.com
Robert M. Browning
Texas Bar No. 00796264
rbrowning@brownsims.com
1177 West Loop South Tenth Floor
Houston, Texas 77027-9007
Telephone: 713,629-1580
Telecopier: 713.629-5027

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send an electronic notice of to all CM/ECF participants.

/s/ Lisa M. Africk
Lisa M. Africk

38