# Appendix 2



# SPE/IADC 25740

## Equity in Drilling Contracts: Responding to Operator and Contractor Concerns

C.A. Moomjian Jr., Santa Fe Drilling Co.

SPE and IADC Member

Copyright 1993, SPE/IADC Drilling Conference.

This paper was prepared for presentation at the 1993 SPE/IADC Drilling Conference held in Amsterdam 23–25 February 1993.

This paper was selected for presentation by an SPE/IADC Program Committee following review of information contained in an abstract submitted by the author(s). Contents of the paper, as presented, have not been reviewed by the International Association of Drilling Contractors or the Society of Petroleum Engineers and are subject to correction by the author(s). The material, as presented, does not necessarily reflect any position of the SPE or IADC, their officers, or members. Papers presented at SPE/IADC meetings are subject to publication review by Editorial Committees of the SPE and IADC. Permission to copy is restricted to an abstract of not more than 300 words. Illustrations may not be copied. The abstract should contain conspicuous acknowledgment of where and by whom the paper is presented. Write Librarian, SPE, P.O. Box 833836, Richardson, TX 75083-3836, U.S.A. Telex, 163245 SPEUT.

## ABSTRACT

This paper discusses conceptual aspects of certain major drilling contract terms. The respective objectives of operators and contractors are assessed in reviewing key contract issues.

Subjects of this paper applicable to all daywork drilling contracts include contract extension options, commencement date provisions, termination provisions, rate structure, liability/indemnity allocations and insurance obligations. In respect of contracts for international operations, the analysis includes a review of provisions addressing currency fluctuations, political risks, local taxation and customs duties. In regard to long-term contracts, provisions addressing rate adjustment for cost variations and early termination compensation are evaluated.

This paper emphasizes the respective individual concerns and objectives of operators and contractors and attempts to seek a "common ground" upon which the principal contract terms can be addressed in a fair and equitable manner to provide a sound contractual framework for a successful drilling program.

## INTRODUCTION

Rather than delve into the intricacies of principal drilling contract terms, which have been reviewed by the author in a prior publication (Ref. 1), this paper discusses important contract issues from a conceptual perspective. The discussion focuses upon provisions traditionally encountered in daywork contracts, and does not examine the unique aspects of contracts based upon footage, turnkey or other incentive drilling concepts (the author reviewed incentive contracts in Ref. 2).

Drilling contract negotiations tend to focus upon each specific project, and the resulting contract terms often are a function of the bargaining positions of the parties and prevailing market conditions. The author suggests that the parties should consider their respective concerns and objectives in attempting to resolve controversial contract issues in a logical and balanced fashion.

Almost inevitably, certain contractual provisions are the subject of deliberations and negotiations between the parties. This paper analyzes such provisions for purposes of suggesting a means of addressing

---

References at end of paper

contractual issues in a fashion which fairly balances the respective interests of the contractor and operator.

## CONTRACT EXTENSION OPTIONS

Operators frequently require a right to extend the duration of a drilling contract for a specified period of time or a number of additional wells. Significant issues that arise in relation to contract extension options include the notice period for exercise of the option and the rates which will be payable during the option term.

From the operator's standpoint, extension options often are important inasmuch as the decision to drill additional wells may be dependent upon the results of the initial wells to be drilled under the contract. An operator also may desire options for potential additional wells that are tentative in nature or subject to future budgetary allocations.

From the contractor's perspective, options to extend the contract rarely are desirable. A contract extension option is a one-sided right which may be exercised or abandoned at the operator's election. Because the timing of future rig availability will be dependent upon whether an extension option is exercised, such options often impede the contractor's efforts to market a rig for subsequent work. In this regard, operators should endeavor to minimize requests for options to the extent reasonably required while allowing as much advance notice for option exercise as possible to facilitate the contractor's marketing efforts and enable other operators interested in contracting the rig to assess its availability realistically.

The option notice date should be designated by reference to a specific point in time to afford the contracting parties and operators interested in contracting the rig a precise date upon which rig availability can be determined. A term extension option exercisable a specified number of days prior to completion of a particular well does not achieve this objective since it is impossible to measure back from an indeterminate future event.

Another important issue relating to extension options involves rig rates during the extension period. Many contracts provide that the previously prevailing contract rates will continue to be applicable during the optional extension term or contain a specific schedule of rates which apply during said term. The inequity of such provisions is apparent because an operator will have no motivation to exercise an extension option if the market has softened, and thus will offer the contractor additional work only if it agrees to accept the lower prevailing market rates. Conversely, in a rising market, operators readily will exercise fixed-price extension options at rates below the market thus preventing the contractor from securing the higher rates available in the marketplace.

Viewed in the abstract, the appropriate rates to be paid for a rig during an optional contract extension are the market rates for comparable equipment prevailing at the time the option is exercised. A common means of implementing this concept is to stipulate that the rates applicable to the optional extension period shall be as mutually agreed by the parties. However, this tends to "soften" the option from an operator's standpoint since there is no firm right to extend the contract beyond the fixed term upon pre-established rates. This factor can be ameliorated either by specifying a minimum and maximum rate range for the optional extension period or by stating that, if the parties fail to agree upon applicable rates, a designated third party shall fix the rates for the option period within the parameters of the proposals of the operator and contractor (akin to "baseball arbitration"). Another alternative is to state that the rates for the optional period shall be determined by reference to a designated index or market rate publication.

It is recommended that the following be considered when addressing contract extension options:

- The operator should limit requests for extension options to contingent work which has a realistic prospect of materializing.

- The option should be subject to an exercise notice date that is fixed in time and which gives as much advance notice as is practical under the circumstances.

- The rates applicable to the extension option term should be the market rates that prevail at the time the option is exercised, and thus should be determined by mutual agreement between the parties or by reference to a specified index or publication.

**COMMENCEMENT DATE**

One of the more troublesome issues to be confronted while negotiating a drilling contract for future work concerns the commencement date. The problem becomes most acute when the rig is completing a contract for another operator, and often is exacerbated when the existing contract contains extension options.

From the operator's perspective, scheduling of the commencement date is important for many reasons. The operator must plan for execution of the drilling program and arrange logistics for provision of required supplies and services. In some circumstances, such as where a drilling deadline is imposed under the operator's concessionary agreement, timing of the commencement of operations may be crucial.

The contractor also is confronted with a number of considerations regarding timing of commencement for a future contract. If the rig is operating, the contractor must fulfill its existing contractual obligations and may not be able to predict when ongoing operations will be completed with any degree of accuracy--both due to the uncertainties associated with drilling activities and, potentially, because of outstanding contract extension options.

When setting a "target date" or "window" for commencement of operations under a future contract, the contractor should be protected against imposition of arbitrary delays (and resulting idle time) by the operator. Conversely, the operator should not be required to wait an unreasonable period of time for the contracted rig to become available.

These considerations may best be addressed in the contract by designating a period of time or "window" for commencement of operations and specifying "take or pay" and "drop dead" dates. If the rig is available and ready to commence operations by a specified date and the operator requests a delay, a designated dayrate would be payable from the "take or pay" date until operations actually commence. In a similar vein, the operator should be accorded a right to terminate the contract without penalty in the event operations have not commenced by a specified "drop dead" date.

Some contracts obligate the contractor to pay a daily penalty to the operator in the event operations do not commence by a stated date. Although this may seem to be a reasonable provision when considering the costly ramifications to the operator resulting from a delay, a penalty should be imposed only if the delay is caused by circumstances within the contractor's control. Justification for such penalty clauses dissipates rapidly when it is recognized that the contractor has every motivation to commence operations as soon as possible to begin earning revenue and avoid costly idle rig time.

It is recommended that the following be considered when addressing commencement date provisions:

- A reasonable "window" for commencement of operations should be designated. Factors to be addressed in determining the commencement window include the current contractual status of the rig and any applicable concessionary commitment deadlines.

- To protect the contractor against unanticipated idle time when the rig is ready to commence operations on schedule

but is delayed at the operator's request, consideration should be given to a stipulated "take or pay" date.

- To afford the operator flexibility in the event commencement is delayed due to unavailability of the rig, consideration should be given to designation of a "drop dead" date for commencement of operations after which the operator may elect to terminate the contract without penalty.

## TERMINATION PROVISIONS

Drilling contracts customarily include provisions addressing premature termination. The circumstances which may cause curtailment of a drilling program generally fall into three categories: (1) unsatisfactory performance or financial inadequacies of the contractor; (2) situations where it is impractical to proceed due to operational, political or force majeure events; and (3) circumstances where the operator desires to discontinue drilling due to internal considerations. Each of these categories should be addressed to assess the consequences of premature termination in respect of the demobilization obligation and, if applicable, early termination compensation (see discussion infra).

The first category involves termination at the operator's election due to the contractor's fault and normally occurs as a result of poor performance, insolvency or bankruptcy of the contractor. Although the operator justifiably desires a right to terminate the contract under such circumstances, the contractor should be given a reasonable opportunity to remedy the situation before the termination becomes effective. If the contractor is unable to effect a cure, termination of the contract should occur without entitlement to demobilization or early termination compensation.

The second category of events that justifies premature contract termination includes actual or constructive total loss of the rig, major rig damage that renders the rig unavailable for an extended period of time, and suspension of operations due to protracted force majeure. Neither party normally is responsible for the event that justifies such "no-fault" contract termination, which by the terms of the contract may occur automatically (generally in the case of a total rig loss) or at the option of one or both contracting parties. Except as respects actual physical total loss of the rig, the demobilization obligation should be applicable. If the contract includes early termination compensation provisions, their applicability for each potential event of "no fault" termination should be determined by the parties and specified in the contract.

The third category of common termination provisions gives the operator rights to conclude a contract for convenience upon specified notice, thus enabling the operator to terminate prematurely due to circumstances such as budgetary restraints, concessionary disputes or internal policy considerations. Since such provisions effectively constitute options to terminate upon notice, the contractual provisions addressing demobilization and, if applicable, early termination compensation should be effective whenever an operator prematurely terminates a drilling contract for convenience.

It is recommended that each of the provisions addressing early contract termination:

- specify the applicability of the demobilization obligation; and
- stipulate whether any terms addressing compensation for early termination are applicable.

## RATE STRUCTURE

Drilling contracts customarily contain several designated rate provisions specifying the compensation due to the contractor when the rig is operating, moving, on standby, under repairs or unable to operate due to force majeure. Such provisions should be drafted carefully to avoid disputes as to

which rate is applicable and should fairly address limited compensation at a reduced rate when operations are suspended for rig repairs or force majeure.

An aspect of rate provisions that often becomes contentious is the point in time at which dayrates commence and cease. The approach to this issue will vary depending upon how rig mobilization and demobilization are to be compensated. If performed on a lump-sum basis, it behooves the contracting parties to designate a specific operational event that signifies when mobilization has been completed and dayrates commence. Cessation of dayrates and commencement of demobilization should similarly be specified. When mobilization and demobilization are performed on a dayrate basis, the contract should designate operational events that determine commencement and cessation of the rates.

Another aspect of rate provisions that often is subject to negotiation involves compensation when operations are suspended due to rig repairs or force majeure. Operators wish to minimize or suspend their payment obligations for a non-performing rig, and contractors generally recognize the legitimacy of provisions reducing or limiting compensation while a rig is inoperative.

A reasonable period of time should be afforded the contractor for performance of rig repairs before rates cease. This period should be determined by considering the type of rig involved, the area of operation, and the availability of materials, equipment and personnel to effect necessary repairs.

Drilling contracts frequently provide that a reduced rate is payable for a limited period of time when operations are suspended due to force majeure. In considering force majeure rate provisions, the parties should balance the operator's desire to curtail payment for a non-productive rig with the contractor's desire to remain on the payroll when unable to continue operations due to circumstances beyond its control.

The most important considerations to be addressed in regard to rate provisions are:

- the necessity of precisely designating when dayrates commence and cease, and
- providing compensation for a reasonable period of time at a reduced rate should operations be suspended by reason of repairs to the drilling rig or force majeure.

RISK ALLOCATION AND INSURANCE PROVISIONS

The contract provisions addressing risk allocation and insurance obligations often are subject to extensive negotiation. Although the specifics of the liability/indemnity and insurance terms are beyond the scope of this paper (see discussion in Ref 1), several important conceptual considerations arise in relation to these contractual provisions.

The interests of both contracting parties should be furthered by establishing a firm risk-allocation scheme, both to create a clear demarkation in the allocation of responsibility for specific risks and to enable each party to measure the risks it must be prepared to absorb or insure. This can be accomplished only by a straightforward and unconditional scheme of risk allocation.

Provisions which provide that one party will absorb a specific risk of loss or liability unless the other party is negligent or otherwise culpable do not accomplish this objective. Quite the contrary, they create a situation where a determination of culpability may be a prerequisite to identifying which party must absorb the risk. The undesirability of this situation becomes evident when it is recognized that such conditional risk allocation provisions often require both parties to place insurance against the same risk. The only real beneficiaries of such conditional risk allocations are the underwriters, who receive extra insurance premiums because both the contractor and operator are compelled to insure the same risks, and the attorneys who earn substantial fees in the determination of legal liability for claims and losses.

It is suggested that the parties realistically appraise risk allocation based upon their respective involvement in the drilling program, their ability to respond to a loss, and the risks they customarily insure. This should create a risk-allocation scheme by which the contractor essentially assumes full responsibility for its rig and crews, while the operator absorbs the risks associated with the well in progress (including hole loss/damage, wild-well control, pollution and reservoir damage) and the property and personnel it dedicates to the drilling operation.

**PROVISIONS APPLICABLE TO INTERNATIONAL CONTRACTS**

When drilling work is to be undertaken in a foreign location, concern often is focused upon provisions addressing currency fluctuations, political risks, local taxation and customs duties.

Consideration of the respective concerns and objectives of the contracting parties should serve to create a rational and balanced approach to these unique aspects of international drilling contracts.

**Currency Fluctuations:**

When undertaking work in a foreign location, the contractor desires to be protected for costs to be incurred in local currency while the operator prefers to have cost predictability in respect of the drilling services.

Several means of addressing exchange rate fluctuations have been implemented in relation to contracts for international work. One approach is the "split rate" or "dual currency" concept whereby the rates of compensation are expressed in a set amount of external and local currency. When implementing this concept, the contractor projects local currency costs and agrees to accept a specific portion of its compensation in local currency. Under this approach, the contractor avoids converting external currency to the local medium of exchange with attendant exchange rate fluctuation exposure. The operator is afforded a degree of cost predictability, especially if it has revenue in the local currency.

Another commonplace approach is to designate a percentage of the external currency rates as the contractor's local cost component and then adjust compensation (up or down) if the exchange rate varies by a specified amount during the contract term. Although this effectively transfers the currency fluctuation risk to the operator, it also prevents a windfall to the contractor and constitutes a balanced approach since the operator's rig cost (measured in external currency) may decrease if the external currency strengthens in relation to the local currency.

**Political Risks:**

International drilling contracts expose the parties to risks associated with potential hostilities and political instability in the area of operation. Although the contractor ordinarily assumes general risk of loss of its equipment and obtains all-risk or hull and machinery insurance, such policies traditionally exclude coverage for war and political risks (expropriation, nationalization and deprivation).

While contractors are reluctant to accept an uninsured equipment loss exposure, operators seldom relish the concept of assuming this risk. One manner of resolving the situation is to require the contractor to obtain a special policy of insurance for war and political risks on a cost-reimbursement basis. Alternatively, either the operator or contractor may agree to absorb the risk exposure on a self-insured basis.

**Local Taxation and Customs Duties:**

In international work, issues often arise concerning responsibility for local

SPE/IADC 25740                         CARY A. MOOMJIAN, JR.                                    7

taxation imposed upon the contractor's income, revenues, property or personnel as well as customs duties assessed upon importation of the contractor's equipment. Both parties have a common objective of cost predictability, and difficult negotiations often ensue when there is no clear understanding of how local taxes or customs duties will be imposed. The situation is ameliorated whenever the operator obtains tax and duty exoneration for its contractors under a concessionary agreement, in which case the operator readily should be prepared to relieve the contractor from responsibility for local taxation and customs duties.

When the cost of local taxation or local customs duties is predictable, the contractor should be prepared to absorb these costs and factor them into the rates. When cost predictability is absent, the most logical approaches are to either allocate responsibility for payment of local taxation and/or customs duties to the operator, or establish a predetermined amount which is to be absorbed by the contractor before responsibility for payment of such imposts revert to the operator.

## PROVISIONS APPLICABLE TO LONG-TERM CONTRACTS

When a lengthy drilling program is to be undertaken under a long-term contract, concern often is focused upon provisions addressing rate adjustments for cost variations and early termination compensation. Consideration of the respective concerns and objectives of the contracting parties should serve to facilitate resolution of these unique aspects of long-term drilling contracts.

### Rate Adjustment Provisions:

When entering into a long-term contract, the contractor desires protection against cost increases caused by reason of inflation or new legislative or regulatory enactments. In contrast, operators prefer fixed-rate contracts with resulting cost predictability.

Although the objectives of the parties are divergent, it generally is recognized that rate adjustment provisions are prudent for long-term contracts. Without such protection, the contractor would necessarily include an inflation factor and contingencies for future governmental requirements in its rates.

The parties should endeavor to structure rate variation provisions so as to facilitate contract administration and avoid costly and disruptive verification audits. This can be achieved by indexing portions of the rates and/or adjusting rates to reflect actual variations of readily verifiable key cost components (e.g. labor, catering and insurance).

### Early Termination Compensation:

A long-term drilling contract should constitute a commitment for utilization of a rig for a lengthy period. The parties nevertheless should recognize that changing circumstances may necessitate early contract termination (see discussion supra). This often is addressed by contract provisions specifying compensation for early termination, which actually are tantamount to liquidated damages clauses.

From the contractor's perspective, a "long-term" contract becomes illusory if it is subject to early termination without compensation. The contractor's rates originally were developed and based upon the specified contract term and may include an amortization of positioning costs, rig modifications or equipment required for the contract. While operators often require the flexibility of prematurely terminating a contract for convenience, they generally recognize that some compensation should be paid to the contractor in the event of such early contract termination.

Provisions addressing early termination compensation often stipulate that a daily rate is payable following termination during the remainder of the contract term

unless the rig is operating for another party (thus avoiding a windfall to the contractor). Another approach simply specifies that a lump sum is due upon early termination, measured either by a designated amount which reduces proportionately to zero over the contract term or by multiplying a specific monetary amount by the number of days remaining in the contract term.

## CONCLUSION

Although drilling contract negotiations often focus upon controversial issues where significant divergence of opinion exists between the contracting parties, it is suggested that the parties approach these issues on an objective and rational basis by considering their respective concerns and objectives. When addressed in this fashion, the principal contract terms can be resolved in a fair and equitable manner resulting in a contract which facilitates a mutually successful drilling operation.

## REFERENCES

1. Moomjian, Cary A. Jr.: "Drilling Contracts: Pursuit of an Equitable and Balanced Relationship Between Operators and Contractors," 1989 SPE/IADC Drilling Conference.

2. Moomjian, Cary A. Jr.: "Incentive Drilling Contracts: A Logical Approach for Enhancement of Drilling Efficiency," 1991 SPE/IADC Drilling Conference. Reprinted in SPE Drilling Engineering, March 1992.