# Appendix 3

# Contractual insurance and risk allocation in the offshore drilling industry

**Cary A Moomjian Jr, Vice President and General Counsel, Santa Fe International Corp; Chairman, IADC Contracts Committee**

**EDITOR'S NOTE:** *This is the second of a 3-part series of articles on risk allocation and insurance provisions of offshore drilling contracts. The first segment, which appeared in the January/February 1999 edition of* DRILLING CONTRACTOR, *discussed contractual risk allocation in general, and reviewed customary provisions addressing liability for personnel, equipment and property.*



Cary A Moomjian Jr

**ALTHOUGH PERSONNEL,** equipment and property risk allocations are among the most important contractual provisions, other important risks customarily are addressed in offshore drilling contracts. This segment of the series of articles on contractual risk allocation and insurance provisions of offshore drilling contracts reviews the customary contractual risk allocations for well loss or damage, pollution, wild well control, reservoir loss or damage, liability to third parties and war/political risks in daywork contracts and discusses the principal differences which arise in turnkey and footage contracts.

## WELL RISKS

Risks related to the well being drilled pursuant to the contract generally are allocated to the operator in daywork offshore drilling contracts since such risks traditionally are insured (or retained on a self-insured basis) by operators through placement of "Owner's Extra Expense" insurance coverage or, in the case of offshore position, by participation in mutual associations such as "OIL." It would be unreasonable to impose well risks upon contractors in daywork contracts because such risks customarily are excluded from the insurance coverage routinely maintained by contractors and, in circumstances where

contractors are able to obtain supplemental insurance for well risks, would result in uneconomic duplicate insurance.

Specific well risks generally are allocated as follows:

### (I) WELL DAMAGE/LOSS

A fundamental well risk relates to damage or loss of the well being drilled pursuant to the contract. Traditionally, daywork contacts require the operator to assume risk of damage or loss of the well, with a proviso that the operator may direct the contractor to redrill a well damaged or lost due to the contractor's negligence at a specified reduced rate. The operator assumes the lion's share of the risk while the contractor agrees to accept a reduced payment to rectify the results of its negligence.

### (II) THE ENVIRONMENT

Pollution and environmental liability are major components of risk allocation. It generally is accepted that the contractor should bear responsibility for pollution/environmental liability related to "rope, soap and dope" discharged from the rig. Technically, this will require the contractor to extend an indemnity and assume full responsibility for spills of refuse, garbage, fuel, lubricants, paint, pipe dope, waterbased drilling fluids, ballast and bilge which may be spilled, dumped or discharged from the drilling unit.

The balance of the pollution and environmental risks generally are absorbed by the operator in daywork contracts and the operator's indemnity customarily covers responsibility for pollution liability (including cleanup and removal) to the full extent not expressl assumed by the contractor. In many cases, the contractor may be required to absorb a limited financial liability for pollution which results from its negligence (perhaps in an amount sufficient to offset all or part of the operator's insurance deductible).

### (III) WILD WELL CONTROL

The third well related risk customari covered by Owner's Extra Expense i surance relates to wild well control daywork contracts, the operator norm ly assumes liability and extends an demnity for the costs of controlling a w well, including relief well(s).

### RESERVOIR LOSS/DAMAGE

Reservoir loss or damage is a risk tra tionally assumed by operators. Althou the prospects of damaging a product reservoir or formation during a drilli operation are rather remote, the asso ated potential liabilities are akin to co sequential damages and normally are located to the operator which has a pr prietary interest in the reservoir.

### THIRD PARTY LIABILITY

One of the most difficult and controve sial clauses addresses third par claims. As discussed in the first insta ment of this series, the importance of third party liability clause will be re duced substantially if the parties eith expand the coverage of the indemniti for their own personnel and propert include the personnel and propert their respective subcontractors and o er contractors or utilize a mutual ho harmless agreement. Viewed in this co text, the third party liability or genera indemnity clause becomes a residu "catch-all" provision intended to addre liability for losses sustained by "tr third parties which have not otherwi been allocated in the contract.

The IADC model contract forms incl the parties' respective subcontract and other contractors within the gen "knock for knock" risk allocation pro sions for personnel and equipment. C versely, the CRINE General Conditio Contract and Form of Agreement li the coverage to the personnel and pr erty of the contracting parties, their a iates and the direct subcontractors o drilling contractor. In this regard, CRINE Guidance Notes include the lowing observations:

"The reciprocal indemnities betw Company and Contractor relate on the arties included in the Compan Contractor Groups as defined ..."

"...Third Parties are defined as any party who is not a member of the Company or Contractor Groups."

"The result of the above is that certain parties, who in many cases will be present at some parts of the Worksite, are Third Parties for the purposes of the Indemnity Clauses. These include in particular other contractors of the Company. On the Contractor side, direct Subcontractors are included in the Contractor Group but lower tiers of subcontractors are not included."

"The reasons for such exclusions are firstly the extreme difficulty, or impossibility of providing in contracts of this type an enforceable mutual hold harmless to include for all contractors of the Company and all tiers of subcontractors, taking into account the current principle of privity of contract under English Law. Secondly, the property of other Oil Companies must be addressed on a case by case basis once specific agreements with such Companies have been made, as discussed above."

"It is recognised that this is not necessarily a standard industry position, and the Parties may wish to extend the definition of the Company Group to include Company's other contractors, and Contractor Group to include other tiers of Contractor's Subcontractors, if this is their current practice. "

Continuing its discussion, the CRINE Guidance Notes comment upon potential use of a mutual hold harmless agreement:

"As to worksites where a number of contractors will be working in close proximity to each other, consideration should be given both by the company and by the various contractors involved, to the use of a stand alone mutual hold harmless agreement, signed by all the relevant parties. By the use of a suitable document the parties can define their obligations to each other in respect of a particular project, thereby simplifying insurance arrangements and minimizing costs."

Whether the **scope** of coverage is inclusive or exclusive of the parties' respective subcontractors and other contractors, third party liability clauses take several forms. They sometimes require the contractor to extend an indemnity for third party claims resulting either from "performance of the contract" or from

contractor's "acts or omissions" (standards that bear no relation to fault or culpability). Such clauses may limit the contractor's responsibility to a stated amount or the specified limit of the contractor's liability (Protection and Indemnity) insurance coverage, and occasionally provide that the operator shall indemnify the contractor for third party claims which exceed said limit. Other commonly employed third party liability provisions state that each party shall be responsible for the consequences of its

> 'The IADC model contract forms include the parties' respective subcontractors and other contractors within the general "knock for knock" risk allocation provisions for personnel and equipment. Conversely, the CRINE General Conditions of Contract and Form of Agreement limit the coverage to the personnel and property of the contracting parties, their affiliates and the direct subcontractors of the drilling contractor'
>
> —Cary A Moomjian Jr

own negligence, or that the respective liabilities of the contracting parties in respect of third party claims shall be determined by the designated applicable law. Occasionally, proforma contract forms simply ignore the issue by excluding a third party liability clause.

None of the foregoing produces a very satisfactory result. Under the first series of alternatives, the contractor and its underwriters may be held responsible for claims of third parties for which they may not otherwise have any legal liability, a rather onerous obligation which may be softened by limiting responsibility to a designated monetary amount. The alternative of holding each contracting party responsible for the consequences of its own negligence or providing that applicable law shall determine liability in respect of third party claims certainly appears fair in concept, but requires a determination of negligence or other legal liability and will be very difficult to administer when both parties are charged with a degree of comparative negligence or culpability.

Although not entirely satisfactory, an acceptable approach involves allocation of responsibility for third party claims on the basis that the contractor indemnifies the operator to the extent such claims result from the contractor's negligence up to a stated monetary limit or the specified

insurance limit, with the operator holding the contractor harmless for such losses which exceed the stated limit of liability or are not attributed to contractor's negligence. The difficulty with this approach is the necessity of determining the presence or absence of negligence as a prerequisite to risk allocation.

The foregoing discussion illustrates the complexities associated with third party liability clauses, which often are among the most contentious issues in offshore drilling contract negotiations. The difficulties surrounding a fair and objective allocation of third party exposures underscore the wisdom of expanding "knock for knock" indemnities for property and personnel to include the property and personnel of the parties' respective subcontractors and other contractors or utilizing mutual hold harmless agreements. In these contexts, the troublesome third party liability clause rarely will be invoked because it only covers potential liabilities to a small group of residual third parties.

## WAR AND POLITICAL RISKS

A potential deviation from the "knock for knock" principle relates to war and political **risk exposures to the contractor's** MODU in international contracts. This aspect of risk allocation which generally is examined on a case-by-case basis. Factors such as whether the offshore rig already was in a particular jurisdiction or was mobilized to the site for a specific contract may bear upon allocation of potential losses associated with confiscation, nationalization, expropriation or deprivation of the rig or damage or loss resulting from war risks.

Obviously, the political climate and likelihood of hostilities or insurrection in the area of operations will be significant factors in evaluating war and political risks. Such risks normally are excluded from standard Hull and Machinery insurance coverage and may be contractually allocated be eent eo erator and contractor either by liability/indemnity clauses or by requiring one of the contracting parties to obtain political and war risk insurance covering the contractor's rig and associated equipment.

## CONSEQUENTIAL DAMAGES

Consequential damages resulting from drilling operations may encompass

profits, production losses or delays, or business interruptions. Offshore drilling contracts customarily include a consequential damages clause stating that each party waives its rights to seek recourse from the other party for indirect or consequential damages arising from performance of the contract.

## TURNKEY AND FOOTAGE

In turnkey contracts, the contractor earns a lump sum payment for drilling a specified well and normally provides all of the well consumables and associated services. When working on a turnkey basis, the contractor generally directs and controls drilling operations and absorbs or insures the well risks. Under these circumstances, a contractor often assumes risks associated with well damage or loss, pollution and wild well control (frequently limited to the Owner's Extra Expense insurance coverage obtained by the contractor).

In footage contracts, the contractor earns a fixed amount of remuneration per foot of hole drilled to a specified depth and often provides drilling bits and mud materials while working on a footage ba-

sis. Footage contracts are somewhat of a hybrid between daywork and turnkey contracts, and rarely are utilized for offshore operations. Allocation of well risks for footage work usually are negotiated on an ad hoc basis in offshore drilling contracts and may be based either upon customary daywork or turnkey provisions.

Both footage and turnkey contracts frequently exclude protection for the contractor's in-hole tools and subsea equipment, and often specify that no additional compensation is due to the contractor for redrilling a lost or damaged well. Contractors normally obtain Owner's Extra Expense insurance on the well to cover the cost of redrilling a damaged or lost well, pollution and wild well control. In turnkey and footage contracts, the operator normally assumes liability for reservoir damage.

Footage and turnkey contracts afford the contractor the potential to increase profits if the drilling work is performed efficiently and without problems or delays and the contractor's remuneration normally includes an increment for the assumption of the additional risks and the

cost of supplemental insurance associated with footage or turnkey operations. Occasionally, contractors may obtain special "turnkey" or "AFE" coverage to protect against significant cost overruns in the event unforeseen difficulties are encountered in drilling a turnkey well.

**EDITOR'S NOTE:** *The third and final part of this series will appear in the next edition of* DRILLING CONTRACTOR. *This segment will review governing law, anti-indemnity sta-tutes and insurance provisions customarily included in offshore drilling contracts.*

## ABOUT THE AUTHOR

*Cary Moomjian, VP/General Counsel of Santa Fe International Corpora-tion, is Chairman of the IADC Contracts Committee and was the 1996 IADC Contractor of the year. A frequent author and lecturer, Mr Moomjian is widely regarded as one of the industry's foremost experts on drilling contracts. This series of articles is based on remarks made by the author at the 1998 Houston Marine Insurance Seminar.*



Integrated

Drilling

& Well

Services

Co., Ltd.

WWW.CROSCO.COM

For more information contact Crosco's headquarters: Ulica grada Vukovara 18, 10000 Zagreb, Croatia
Tel: ++385 1 3652 333; Fax: ++385 1 3096 448; E-mail: marketing.crosco@crosco.tel.hr

Circle 452 on Reader Service Card