# Appendix 4

STATEMENT

ON

COMPREHENSIVE OIL POLLUTION LIABILITY AND

COMPENSATION LEGISLATION

Wayne K. Hillin

Vice President, Legal

Reading & Bates Drilling Co.

Houston, Texas

On Behalf of the

National Ocean Industries Association (NOIA)

and the

International Association of Drilling Contractors (IADC)

At Hearings Before the

House Subcommittee on Coast Guard and Navigation

House of Representatives

Washington, D.C.
March 27, 1985

Mr. Chairman and Members of the Subcommittee: I am Wayne K. Hillin, Vice President, Legal, of Reading & Bates Drilling Co. of Houston, Texas. I have been asked to substitute for Mr. Paul L. Kelly, Vice President for Industry and Government Relations of Rowan Companies, Inc. of Houston, Texas, who could not appear before the Subcommittee today.

I am appearing on behalf of the National Ocean Industries Association (NOIA) and the International Association of Drilling Contractors (IADC). NOIA is a national trade association with over 450 member companies engaged in virtually every aspect of the search for and the recovery of offshore hydrocarbon resources. IADC is a trade association representing the oil and gas well drilling contractors. Its total membership numbers over 1500 member companies worldwide, about 95% of whom are U.S. based. We appreciate the opportunity to come before the Subcommittee to give you our comments on the proposed comprehensive oil spill liability legislation now before you.

Before doing so, we would like to note that Mr. Kelly previously appeared on behalf of NOIA and the IADC before this subcommittee on April 20, 1983 and before that on March 29, 1982 to discuss needed amendments to Title III of the Outer Continental Shelf Lands Act Amendments of 1978 which established the liability and compensation scheme for damages resulting from oil spills on the OCS. The principal concerns voiced on behalf of our associations in the past have in large measure been considered and addressed by the Subcommittee and are incorporated in the

present pending legislation, H.R. 1232, namely the maximum liability limits and the provisions which would allow the apportionment of pollution liability risks by agreement among the parties operating on the OCS to reflect more closely the prevailing industry practice that existed before the enactment of the OCS Lands Act Amendments of 1978. We hope the Subcommittee and the Congress will continue to recognize the importance of these provisions to the development of the offshore oil industry and in turn the national resources and national security of this country.

We support enactment of comprehensive oil spill legislation and feel that H.R. 1232, with amendments, would serve well as the appropriate vehicle. Two of our concerns with the bill are as follows:

(1) The definition of gross negligence is too expansive in that it contains what is normally considered ordinary negligence such as violations of federal standards and regulations. Under the bill, the responsible party would be held strictly liable for such ordinary negligence and thereby would receive no benefit from either the liability ceiling in the bill or from the Fund which is intended to make payments when the liability ceiling is exceeded.

(2) Due to the continuing lack of unanimity relative to its passage, Title IV, which implements the 1984 Protocols to the Civil Liability and Oil Spill Fund Conventions, should be deleted. Enabling legislation for this purpose should be considered after the Protocols are ratified.

Mr. Chairman, in your letter of February 27, 1985, you asked our specific view regarding certain points covered in H.R. 1232, and we would like to share with you our comments regarding same:

(1) The limits on vessel and facility owner liability set out in H.R. 1232, including the limit of $50,000,000 for an offshore facility and the greater of $3,000,000 or $420 per gross ton applicable to mobile offshore drilling units, appear reasonable and, with other changes included in H.R. 1232, appear to alleviate a number of the concerns of insurance companies and underwriters as to insurability, although it is becoming increasingly clear that the costs of such insurance coverage, if and when available, will be considerable.

(2) The mechanism described in H.R. 1232 for the handling of claims for damages suffered as the result of oil pollution appears to be workable in most respects. However, once actions are brought against a responsible party and a copy of the complaint is filed with the Marine Oil Pollution Insurance Corporation, it appears unreasonable in our view for the plaintiff to lose the right to recover from the Corporation any sums not paid by the defendant, and the defendant to be denied the limitation of liability otherwise permitted, for a technical failure to file a copy of a minor

pleading upon the Corporation. If the Corporation intervenes in the litigation, it will be entitled to receive copies of all pleadings. If it does not, it will, at least, have notice of the pending legislation and access to the court records regarding same.

(3) NOIA and IADC would prefer a continuation of the present legal standards set out in Title III of the Outer Continental Shelf Lands Act of 1978 with the changes reflected in H.R. 1232 applicable to offshore oil and gas activities on the OCS, as the present proposal contained in H.R. 1232 would in effect result in the Offshore Oil Pollution Compensation Fund being used to pay outstanding vessel oil pollution claims unrelated to OCS activities. The record of the offshore oil industry on the OCS has, in our view, been noteworthy in the avoidance of any major pollution incident since 1969, and every effort is and will continue to be made to maintain the unblemished record. That record would, as a result of the consolidation of funds, be tarnished with vessel oil pollution claims unrelated to OCS activities.

(4) Our associations have in the past always supported a clear delineation between the areas under federal and state jurisdiction. We therefore feel it is important that any comprehensive system of financial responsibility for pollution emanating from vessels and offshore facilities

located on the OCS should fall exclusively within the federal jurisdiction to the exclusion of the states. To the extent there is existing state legislation in place to the contrary, the phase out system proposed in H.R. 1232 appears to be a reasonable approach to eliminating the overlapping jurisdiction.

(5) In our review of H.R. 1232, we have noted a few additional points that in our view need to be clarified. As these do not appear to be matters of substance, we request your permission to provide our suggestions separately to your staff for consideration as the bill proceeds through markup.

Mr. Chairman, you properly note that this sixth attempt to enact a comprehensive pollution liability and compensation fund is an idea that should at long last get "out of the Congress and into the lawbooks where it belongs." We agree absolutely. Insurance costs for the industry are likely to mount in the face of uncertainty as to limits of liability. The Coast Guard continues to call for Congressional certification of its mandate to administer Title III of the OCS Lands Act Amendments of 1978. We urge expeditious action on this important legislation.