# Appendix 5

TRANSCRIPT OF HOUSE BILL 915

BEFORE THE COMMITTEE ON

CIVIL LAW AND PROCEDURE


MAY 26, 1981

Mr. Gaudin:            Mr. Thompson, you want to explain the bill?

Mr. Thompson:          I will start it off, Mr. Chairman, and then I will
                       turn it over to Mr. Haynie who will introduce the
                       other proponents of the legislation.

Mr. Gaudin:            All right. I think we have discussed prior to now
                       the plan of 25 minutes for the proponents of the
                       measure, 30 minutes for the opponents, and 5 minutes
                       to close. Now, we are limited by the time. I have
                       20 minutes of 2. The speaker has insisted that we
                       stop at 2:30. If we do not finish, and I don't
                       think we will, we will convene this committee at
                       adjournment to finish this bill and to take up
                       several other bills. Now, I understand you are
                       going to have some amendments so I would suggest
                       that we go ahead and present the bill. I think the
                       committee has heard this--well, we know the committee
                       has heard this bill on other occasions, so we might
                       want to go into the amendments early in the game.

Mr. Thompson:          Mr. Chairman, members of the committee, this bill
                       is brought to the legislature to solve a unique
                       problem existing in the oil and gas industry. The
                       purpose of this bill is to declare invalid certain
                       types of hold harmless and indemnity contracts.
                       The practice that is occurring is that people in
                       the industry who are in a superior economic position
                       are insisting that a contractor sign a contract
                       agreeing to hold them harmless from all responsibility
                       in money for damages. Even those damages which are
                       caused by the fault of the person granting the contract.

Now, we feel that that permits a party to contract out of responsibility for his fault.  It has two effects.  If you don't sign the contract, you don't work; if you do work, you have to assume the responsibility of the major company.  If you assume the liability of the major company you must have enough money and be given enough to buy insurance or to be self-insured.  First effect, it restricts competition within the industry.  It keeps small people from coming into the industry.  The second effect is that if one does not have to respond financially for damages caused even by its own employees, then that person has no responsibility, has no penalty for its fault.  That person has no encouragement then to assist in providing a safe place for the people of our state to work.  I'm going to turn this matter over to Mr. Haynie and let him continue the case from here.

Mr. Haynie:    Mr. Chairman, members of the committee, ladies and gentlemen.  We have heard over 10 hours of testimony in the last 12 months of this year on this issue. And I think we all know the high points and the low points.  Within the last three months there has been over 120 hours dedicated to this bill by oil industry companies and oil industry leaders, to look it over, to change parts, to scrutinize and to look for a clear answer to solve the problem in Louisiana's oil fields.  There have been many

amendments which have been put together which clean up the bill in many, many different areas.  We have met with industry throughout this state to make sure that this bill only touches the oil and gas industry of Louisiana.  Now, we have many of the industries in this room, to sit here and to guarantee that that bill only touches the oil and gas industry of this state where there is a crucial problem.  I think at this time, to speed things up, we should let Bobby Waddell, at this time, introduce the amendments.

Mr. Waddell:     Mr. Chairman, I have already given them to you. I don't know how you want to handle them because they are lengthy amendments.

Mr. Gaudin:     All right.  They are a set of 16 amendments.  Are any of these amendments technical amendments?

Mr. Waddell:     Yes, sir.  I believe number five through nine are technical in nature.  They are just changing like the word "and" to "a", they are changing also the word "estates" to the word "estate.

Mr. Gaudin:     All right.  Lets go ahead and try to go through the amendments.  Members of the committee, if you would follow through with me on these.  Amendment number one, on page one, line 16, after the words "gas or water or"...

Mr. Leach:     Mr. Chairman, would it be permissible for us to have a copy of the amendments?

Mr. Gaudin:     To the best of my knowledge, Mr. Leach, this is the only copy that is available.  We could stop and have

them made, but we just don't...we have just one copy.
O.K.  Amendment number one, after the words "gas or
water or"the word "mines" should be removed and in
its place the word "drilling" added.  Amendment
number two,...that was on line 16.

Mr. Waddell:    One through four are basically the same.  They are
changing the word "mines" to "drilling" where it
appears in the bill.

Mr. Gaudin:     O.K.  Amendment number two, page two, line two, the
same amendment, substitute the word "drilling" for
"mines".  Amendment number three, on page 2, line 13,
the same amendment substituting the word "drilling"
for "mines".  Amendment number four, on page two,
line 17, the same amendment, substituting the word
"drilling" for "mines".  Amendments five, six, seven,
eight, and nine are technical amendments.  Amendment
number 10, page two, line 32, after the word "contract"
add the words "except as otherwise provided in this
act."  Amendment number 11, on page two, line 33, after
the words "deprive a" add the word "full".  Amendment
number 12, on page two, line 33, after the word "owner"
add the words "or usufructuary".  Amendment number 13,
on page three, line 30, in the earlier amendments
"Section 3" was made into "Section 2", between lines
30 and 31,a new "Section 3" should be added to read
as follows:  "The provisions herein shall apply to
any injury which occurs after the effective date of
this Act."  I'll read that again. "The provisions
herein shall apply to any injury which occurs after

Mr. Waddell:        In any contract with regard to any injury prior to
                    the date we come in I think would come under your
                    old contract.  This bill is effective on the signature
                    of the governor assuming we get that far.  Then this
                    would be...in other words no retroactive contracts.
                    In other words you can't go back and hold a contract
                    that is already negotiated invalid.

Mr. Jenkins:        Well, then I don't understand why you are putting in
                    that language about injuries occurring after the effec-
                    tive date, if that's true.  If you don't intend this
                    bill to have any retrospective application why would
                    you put in this?  Obviously, if it applies only to
                    new contracts then we are talking about injuries that
                    occur in new contracts no injuries that occur in new
                    contracts could occur before this bill takes effect.

Mr. Waddell:        All this is doing is clarifying that to make sure
                    that we are going from henceforward,  Personally
                    I  think it is not necessary because I think (inaudible)
                    But at any rate we put it in there just to clarify
                    it because there were some people who said they
                    wanted to make sure, so we added it.

Mr. Jenkins:        Well, it seems maybe what you are trying to do is
                    say that this bill will effect injuries that occur
                    under all contracts.  If it is an injury after the
                    effective date regardless of the contract.

Mr. Waddell:        No, I disagree with you.  All it does is state the
                    effective date of the bill, that is all it does.

Mr. Gaudin:         Mr. Cusimano.

Mr. Cusimano:       Bobby, I take issue with that, too.  I think it is

|  | going to make all contracts null and void as of the time that this bill comes into effect. |
|---|---|
| Mr. Haynie: | What we are trying to do, the reason that wordage is in there is to clarify and make sure it didn't have to go through the courts for the courts to determine when this bill would go into effect.  The bill states that it will go into effect after it is signed into law when there is an injury.  O.K.  Its very clear, very simple.  This is only after the law is into effect and there is an injury. |
| Mr. Cusimano: | But in his question Woody also asked whether or not all the provisions in any contract previously entered into would automatically be declared null and void. (Inaudible)  previously entered contracts would be valid. |
| Mr. Waddell: | That would be my interpretation... |
| Mr. Cusimano: | Bobby, if you read line 17 on page 1 "it is the intention of this legislature by this Act to declare as null and void and against public policy any provisions in any agreement which requires defense or indemnification".  I think that that would have an immediate effect, in reading the bill. |
| Mr. Jenkins: | Well, on page three, lines 21 through 25 says "any agreements arising out of the operation, services, or activities listed in Subsection C which require waivers of subrogation, additional named insured endorsements, or any other form of insurance protection shall be null and void and and of no force and |

effect".  It seems to me that is attempting to say that existing agreements are null and void, that any agreement shall be null and void.

Mr. Gaudin:  Mr. Jenkins, I think that that is what the intent of that provision says, very plainly.  "It shall apply to any injury which occurs after the effective date of this Act".  It doesn't really indicate one way or another what the contractual effect is, but if someone is injured after the effective date of this Act then it is not applicable.

Mr. Jenkins:  What you are saying is that if there exists a contract today which contains this hold harmless provision and an injury occurs after the effective date of this Act involving those parties that the hold harmless clause is null and void.  So, what it attempts to do then is to abrogate existing contracts in violation of the Louisiana and American Constitutions.  Is that it?

Mr. Gaudin:  I think you could take that position very validly, Mr. Jenkins.  I think it is a matter of making a decision whether you think thats invalid or not, but I don't think we ought to be judging the bill as to whether it is constitutional or not.  I think we ought to decide if we understand it and whether we agree with that provision or not.  But I don't think we ought to second-guess down the road someone may have an injury and it may raise a constitutional issue.  I think we have got to move on, and I think we understand the amendment, gentlemen.  Is there

any objection to the amendment?   There is objection.
If you are in favor of amendment number 13 signify
by saying yes, opposed no, and the secretary will
call the roll.   ROLL CALL   Six to Six, chairman
votes,yes.   Amendment number 14, on page three,
line two through line five, inclusive the entire
Section E as it exists shall be deleted from the
Act.   Section E is to be replaced with the following
language:  "This Act shall have no application to
public utilities, the forestry industry, or companies
who drill with the Frafch process so long as the work
being performed is not any of the operations, services,
or activities listed in Subsection C above except to
the extent those services or activities include drilling
through the Frafch process".   Mr. Waddell.

Mr. Waddell:      I would like to say it is only a technical change but
                  it goes a little bit further and adds exclusions and
                  I think it is self-explanatory it just says who this
                  Act is not applicable to.   If you are for the oil
                  contractors you vote yes, if you don't want the
                  exclusion you vote no.

Mr. Gaudin:       Is there any objection?

Mr. Chaisson:     Yes.   Again I don't see how we can pass substantive
                  law in Louisiana dealing with total concepts of law,
                  policy declarations, contra bonas mores and have it
                  only apply to certain people.

Mr. Gaudin:       Any other comments?   All right.   Mr. Waddell offers
                  amendment number 14 to which there is objection.   If

you are in favor of the amendment signify by voting

yes, opposed no, and the secretary will call the roll.

ROLL CALL  Four yeas, eight nays and the amendment

is not adopted.  Amendment number 15.  There are three

amendments in this amendment number 15.  Page two,

line six, delete the word "either".  Page two, line

seven, delete the words "or injury to property or".

Page two, line eight, delete words "loss, damage, or

expense".  Mr. Waddell.

Mr. Waddell:      At all the subcommittee hearings we have dealt with

have been personal injuries.  The whole purpose of

the bill will be for personal injury.  All this does

is delete damage to property from the bill and make

this a personal injury bill.

Mr. Gaudin:       Any questions?

Mr. Chaisson:     Yes.  I don't understand that, Bobby.  How can you

do that, make it a personal injury bill?

Mr. Waddell:      Injuries to the workmen and does not deal with property

such as oil spills or environmental problems.  It is

strictly for the personal injury, workmen's comp type

bill or this is what it is intended to do.

Mr. Gaudin:       O.K.  Is there any objection to the adoption of...

Mr. Leach:        Can I make an observation about that?  Without debating

the merits of it again all the indemnity that we

producers are required to give is largely in the

area of property damage.  What this has done is

further limit the bill and say we can be required to

indemnify for property damage but the other things

are taken care of.  So, this is a very restrictive

Page 16

amendment.

Mr. Gaudin:      Mr. Leach, I don't mean to cut you off but you are
going to have an opportunity to address those measures.
Is there any objection by members of the committee
as to the adoption of this amendment number 15?

Mr. Cusimano:    Yes, I object.

Mr. Gaudin:      All right.  There is objection.  If you are in favor
of amendment number 15 signify by saying yes, opposed
no, and the secretary will call the roll.  ROLL CALL
Four yeas, eight nays, and one abstention and the
amendment number 15 is rejected.  We have one final
amendment members of the committee and it is a little
lengthy so please bear with me.  On page three, line
six through line 20 the entire Section F as it exists
should be deleted from the Act.  It is to be replaced
with the following language:  "The provisions of this
Act do not apply to loss or liability for damages or
any other expenses arising out of or resulting from
1) bodily injury or death to persons arising out of
or resulting from radioactivity, or 2) bodily injury
or death to persons arising out of or resulting from
the retainment of oil spills and clean-up and removal
of structural waste subsequent to a wild well, failure
of incidental piping or valves and separators between
the well head and the pipelines and/or failure of
pipelines so as to protect the safety of the general
public and the environment, 3) bodily injury or death
arising out of or resulting from the performance of
services to control a wild well so as to protect the

safety of the general public and/or to prevent depletion of vital natural resources". And it goes on to define the term wild well. I think everybody has read that before. Mr. Waddell, you want to explain that amendment?

Mr. Waddell:     I'm going to let Randy explain this one because it is lengthy (inaudible) it also limits the liability also from blow-outs, or something like that with wild wells. They can still indemnify somebody with special hazards, say Red Adair or somebody like that so they won't refuse to come on the job.

Mr. Chaisson:    I hope you will address the issue of injuries from radioactivity.

Mr. Gaudin:      Mr. Haynie, would you want to comment on that?

Mr. Haynie:      In the area of radioactivity and in the area of possible nuclear waste plants anything in the future in case there is a hazard where somebody has to go in and try to solve the problem there is nobody in the area who will go in unless you indemnify them. Plus, the state of Texas has this in their legislation, New Mexico, Wyoming which have passed laws on the area of oil and gas industry in the area of hold harmless but only Texas has mentioned radioactivity so we thought we would put it in.

Mr. Chaisson:    And that is for nuclear power plants.

Mr. Haynie:      We have no idea of exactly who is covered, whatever radioactivity falls under.

Mr. Gaudin:      Any further discussion in regard to amendment number 16?

|                |                                                                                      |
|----------------|--------------------------------------------------------------------------------------|
|                | Any objection to the adoption of amendment number 16?                                |
| Mr. Cusimano:  | Yes, I believe I object.                                                             |
| Mr. Gaudin:    | Mr. Waddell has offered up amendment number 16 to which there is objection.  If you are in favor of the amendment signify by saying yes, opposed...  ... ... |
| Mr. Bleich:    | We didn't hear from the opposition on the amendment. If there is some objection I would like to know why they are objecting. |
| Mr. Gaudin:    | Mr. Bleich, I think the committee understands this amendment.  If it is not adopted the opposition, I don't think is going to have any problem, if it is adopted then we can take it up at that time.  If you are in favor of it signify by saying yes, opposed no, and the secretary will call the roll.  ROLL CALL Four yeas, nine nays, and the amendment is objected. Now, we have disposed of these amendments.  Are there any other amendments which are pending? |
| Mr. Thompson:  | I want to tell you that we have a presentation to make about the unique situation in the oil industry.  So far the bill is still restricted to the oil industry. |
| Mr. Gaudin:    | All right.  Would you want to proceed at this time? I had indicated to the proponents and the opponents that Mr. Dimos would not offer his amendment until after you had had an opportunity to make your presentation.  Proceed, please. |
| Mr. Haynie:    | Mr. Chairman, what time do you have and what time do you plan on breaking? |
| Mr. Gaudin:    | I have 2:23 right now.                                                               |
| Mr. Haynie:    | Is that seven minutes before we break?                                               |

| | |
|---|---|
| Mr. Gaudin: | Yes, you can take that time. |
| Mr. Haynie: | I feel that we would like to stop and probably wait until we get back. |
| Mr. Gaudin: | Mr. Dimos moves that we recess this committee hearing until after adjournment.  Is there any objection?  Without objection we will recess. |
| Mr. Gaudin: | Eleven members present, and a quorum.  I apologize for the delay which we had in getting back to this bill.  If any proponent or opponent feels that having this continuation of this bill at this time presents unreasonable burden then I would ask that you come forward at this time.  If we postpone the hearing of this bill the earliest we could hear it would be Monday of next week.  I would presume that the pro- ponents wish to continue and unless I hear to the contrary I would like to ask that we proceed.  I think that the proponents had used up approximately 10 minutes of their time this morning before we got into the amendments.  That would leave you 15 minutes additional at this time.  After the additional 15 minutes we are going to hear from the opponents who will have up to 30 minutes and then we will have five minutes for the closing.  Mr. Downer. |
| Mr. Downer: | You made the comment, Mr. Chairman, that the proponents had used up 10 minutes.  If I remember correctly I don't think they had a chance to say anything.  We moved right into amendments. |
| Mr. Gaudin: | Mr. Downer, I was very careful to watch the time, they did use at least 10 minutes.  Mr. Waddell. |

Mr. Waddell:     At the beginning, as I recall, just for a point of

order, Mike introduced himself and he turned it over

to Randy for my amendments and I started right off

the bat which started the whole unfortunate ball

rolling the wrong way this morning.

Mr. Gaudin:     Mr. Waddell, I would think that since the proponent,

Mr. Thompson, and others have not made any comment

about being penalized in the amount of time do you

think it might be all right if we let them try to

present their bill in the time that they have, and

if they feel like they need some additional time I

will try to accommodate them.  You think we might

move on now?  Mr. Thompson, you want to proceed?

Mr. Haynie.

Mr. Haynie:     Mr. Chairman, members of the committee, at this time

we would like to introduce Hal Broussard who has been

with Judge Richard J. Putnam for the last year.  He

is the U.S. District senior judge.  Hal has extensive

experience in the type of suits that we are going to

be discussing.  We consider him an expert in the area

so we are going to turn it over to him and please, any

member of the committee who does not understand any of

the points of this bill, this is the time to bring out

some of your questions.  Hal Broussard.

Mr. Broussard:     I know that all of the arguments have been very thoroughly

briefed and given to you by way of memoranda and special

hearings.  I have two legal arguments that I would like

to point out at this time that I feel are the strongest

policy reasons for the passage of this legislation.
Article 2315 of the Louisiana Civil Code says:  "Every
act whatever of man that causes damage to another
obliges him by whose fault it happened to repair it."
Article 2317 makes a person responsible for injuries
caused by things in his custody, and Article 2322 makes
a person responsible for ruin of his building.  These
three articles are the primary sources of law that
create the liability which we, as oilfield contractors
are having to pay under indemnity agreements.  Not one
of these articles states that a contractor, subcontrac-
tor, a third party under the hire of one who commits
the wrong, or any other person other than the one who
is responsible should pay the damages.  They provide
that the person responsible for the injury pays for it.
Furthermore, the Louisiana courts have held that the
duty owed by each person under these articles is a
non-delegable duty.  We cannot say to another person
it is your duty to be sure that I am not negligent.
We have to be accountable for our own acts.  I submit
to you that allowing indemnity agreements to exist in
the oilfield is a serious undermining of Louisiana
statutory and jurisprudential law in this regard.
These agreements allow  a person held responsible for
the wrong under the law to force the duty he owes to
redress that wrong on another's pocketbook, this other
person owing no legal duty himself.  The second legal
point I would like to go over concerns the workmen's

compensation considerations of this bill.  These
employers are forced to sign waivers of subrogation
in these contracts thereby they have to pay for their
injured employee's workmen's compensation and then
they have to turn around and pay for the tort judgment
rendered against the third party.  In 1914 when this
legislature passed the Workmen's Compensation Act it
promised employers, if you will pay a subsistence to
all of your employees we will free you of paying luc-
rative judgments to a few of your employees.  We will
free you of that responsibility.  However, today under
the present contractual indemnity arrangement a company
by the waiver of subrogation not only does the employer
have to pay the workmen's compensation, but he also
has to pay the tort judgment.  So now instead of ending
up with one or the other he has to pay both.  Again,
we have a serious undermining of a legislative promise
that was made by this legislature to employers in
Louisiana.  The final point I would like to bring out
is a side issue, there has been a bill proposed in the
Senate, as we understand it, that will do away with the
statutory employer defense, it is designed to repeal it
and we would just plead with this committee and call to
your attention that if this bill that we are proposing
does not go into law, to please consider what you are
doing with that Section six bill in the future because
you will probably double our indemnity if that bill
goes into law and this one does not.  What it will do

Page 23

is it will allow a lot more third party suits and we are going to pick up the tab for them under indemnity agreements irregardless of fault.   Thank you.

Mr. Gaudin:    Members of the committee, I am not going to recognize anyone for questions now.   I am going to give the proponents the amount of time that they have allotted and then we will ask them questions because they are entitled to the 20 minutes that they have allotted.   Mr. Haynie:

Mr. Haynie:    Mr. Chairman, next is Mike Hoagland, an insurance broker.   Mike is here basically today to answer and really address many of the comments made by production companies in the special hearings.

Mr. Hoagland:    A question of the economics has come up with regard to these contractual obligations.   What I did was arbitrarily established figures and parameters and went to a legitimate underwriter.   I arbitrarily chose a payroll of $5 million per year and I arbitrarily selected a receipts figure of $25 million annually. We went to an underwriter who goes by the name of Martin Excess Underwriters in New Orleans.   Some of the members of the association are insured through these underwriters.   They used an "A" rated company, rated by Best, by the name of Western Preferred Insurance Company.   What we asked this underwriter to do is, using these payroll figures and these receipts figures would they please furnish us the cost of insurance for general liability and excess or catastrophe liability for a drilling contractor.   You have

two proposals.  One with the insurance costs for in-
surance with the agreement and one without.  There
is a noticeable difference.  This underwriter charged
the rate according to their reinsurance treaties.
These are legitimate costs.  The excess insurance over
and above the primary general liability policy is affec-
ted by the basic general liability premium because the
excess underwriter expresses his excess cost as a per-
centage of the underlying premium.  Therefore, if your
general liability premium is greater, the excess cost
is greater and this is is predetermined within the
parameters of the reinsurance treaties.  As you will
see the cost differential is significant.  Another
consequence of the absence of this legislation will
be this.  There are currently few standard insurance
companies who write insurance for Louisiana oilfield
contractors.  Now make no mistake, that is fact.  The
current companies who write insurance for oil and gas
companies are primarily specialty companies with
limited financial capacity.  In the event that our
national economic problems are rectified to any sig-
nificant extent those companies who are currently in
a cash flow underwriting attitude, which simply means
that they are willing to accept losses for their short
term investment gain that is currently in existence.
If that turns around significantly the Louisiana oil-
field contractors will face a very similar problem
to one five years ago when general liability coverage
was virtually impossible to purchase.  And it is about

to come again.  Now, from an insurance standpoint all
I would ask is that you consider your oil and gas con-
tractors of this state and protect their insurability
to guarantee their existence.  And that is it.

Mr. Haynie:    Mr. Chairman, members of the committee, next we have
the chairman of the Louisiana Oilfield Legislative
Committee, George Crain who will speak on behalf of
the 500 companies within this group.

Mr. Crain:    Gentlemen, we came here several years ago, I believe
around 1977.  We had approximately 30 companies in
Louisiana Oilfield Contractors and when we came we
were trying to fight this same problem we just did not
have the support from the various oil service companies.
But since that time the agreements have gotten such
that, not that they have gotten any worse, they just
haven't got any better and more people are concerned
about them.  And now we have grown from 30 companies
to 500 companies and I think this should show this
group that there is a very definite need in our indus-
try to combat this type of agreement.  Each of these
companies throughout generally south Louisiana employs
many people and this is their general livelihood so
these agreements do affect us and how we are able to
work and perform our duties.  The legal arguments you
have heard   are well founded and I feel they support
the passage of this legislation.  Mainly we are here
again after several years of trying to ask you for your
help in passing this legislation and trying to relieve

us of a burden that we feel where we are not able to bargain (inaudible).

Mr. Haynie:     We will go ahead and open for questions on insurance, legal, whatever.

Mr. Gaudin:     All right.  You have used up about 11 minutes and we've got roughly six or seven minutes for questions.  Mr. Bleich you want to ask a question?

Mr. Bleich:     Thank you, Mr. Chairman.  To whoever wants to answer the question.  The first gentlemen who spoke, you recited various provisions of our tort law.  Do you agree that we've got a clash, if you will, between those provisions and our constitution that refers to freedom of contract at least as the constitution is written.

Mr. Price:      Mr. Bleich, my name is Edwin Price.  I am with the firm of Anderson  & Price in Lafayette.  I am one of the legal advisors to the association.  It is our position in connection with this bill that it is not an infringement upon the constitution of the state of Louisiana.  We feel, as I am sure all of the members of the committee do, that everything should be done to avoid interference, governmental interference, with private contractual matters unless there is a strong compelling reason to do so.  In this situation we think that there has been an abuse of the free market of our private enterprise system by the oil companies forcing the oilfield service contractors to sign these agreements and that we need legislation to correct this abuse.  The United States Congress several years

ago recognized this same problem in the longshoring, vessel type situation and passed (inaudible) of the Longshoremen's/Harborworker's Compensation Act which now prevents a vessel from getting indemnity from an injured longshoring employer which is in essence the same thing that we have here.  After the passage of this Act the argument was made in numerous cases that the application of this law to existing contracts was unconstitutional and all of these arguments were rejected summarily by the courts.

Mr. Bleich:     O.K.  I've got two other questions.  I've got a number but I want to defer to other committee members.  I'm led to believe, and I'll tell you exactly where I get this, I'm referring to a transcript of the remarks of Mr. W. B. Huthnance.  In reading excerpts of that it appears to be, at least his position, and I would like you to comment on it, is that although the oilfield contractor is paying the insurance, buying the policy, that in effect the cost of that is passed directly to the oil company.  Would someone comment on that?

Mr. Hoagland:  Mr. Bleich, I would like to address that.  First of all comparing the exhibits, the difference in the cost. I would like to make the point that there is a significant difference that the absence of a hold harmless agreement or indemnity agreement ...number one, every party, including the major oil operator would be buying or purchasing a limited form of contractual liability. So, in effect there would be a significant decrease in the cost of insurance for everybody.  The chief difference

is going to be that oil operators are going to have to start carrying insurance or paying the losses. Now, the situation as far as the insurance goes that who buys what, it is an economic situation. If an oil operator needs a contractor he will negotiate the terms of that contract. If a Louisiana contractor who does not have that economic leverage is such that the operator can pick a number of contractors, at that point to make a living the Louisiana contractor is going to engage in that contract. So, there is not fair competition in the sense that your economic size determines which kind of contract you are going to sign.

Mr. Haynie: Gentlemen, to put it in oil patch talk, and I think your question is..there is the difference in the oil patch, you are either on day rates, O.K., or you are on a bidding schedule. Some drillers are on a day rate. If you are on a day rate you can pass the cost on of insurance. We are not arguing that point. Many men, four hundred and something in our association are on a bid rate. All right. We bid jobs. What happens is if I own a company and I have three accidents in one year, just like car insurance your modifier goes up at the end of the year. If George didn't have any accidents that year and paid no claims his insurance would be lower. All right. Both of our insurance comes due. Without a doubt, mine is going to be higher. His will probably stay the same or increase the normal increases which happen. If we both bid on another job, without a doubt for me to recoup the money I paid out in claims and

had to pay in higher insurance costs, without a doubt.
I will bid higher and he will be the low bid and receive
the work.  Folks in the oil patch who are on bid work
without a doubt  who have more accidents in one year
which we do not cause and have to pay higher insurance
claims cannot pass that cost on and if we are going
to be competitive.  And that is the point of this
whole issue.

Mr. Bleich:       One other question.  A problem I have and it seems to
cut across this whole issue.  It seems to me the com-
plaint is that, what I will refer to as the general
contract, or the oil company has so much economic power
that they are putting their (inaudible) on the oilfield
contractor and coercing these contracts.  If that is so
are we really accomplishing anything by passing this
when common sense tells me that if they have this power
they are going to pass this cost of outlawing the hold
harmless or whatever it will be down anyway.  Now that
is not theoretical, that is a factual question.  It seems
to me that if they've got this much influence that you
may win the battle but still not win the war.

Mr. Haynie:       Mr. Bleich, without a doubt you are probably correct.
But as a matter of principle and pride we are tired of
being forced to sign agreements if we want to work.
You know, we are up here testifying and some of us
have felt the pressure, O.K.  In Texas when this bill
was passed Texas companies didn't testify.  They left
it up to their lobbyists.  Last year when I came up
here my guys didn't come if ya'll remember.  All right.

They were worried about it.  You guys called for a
special hearing so we came, and we came in numbers.
Our necks are on the line right now testifying for
something we believe in.  And without a doubt, if we
pass this bill possibly they will get around it and
somehow put us right back in a financail spot.  But
as a matter of pride we are up here for a reason, and
we are tired of being forced to sign these agreements.
It is degrading.  When we went into business many years
ago a lot of our contractors didn't have to sign these
agreements.  Now that their companies are off the
ground and things are rolling to stay in business we
are forced to sign.  To answer your question, possibly
they will get around it somehow.

Mr. Gaudin:          Mr. Cusimano.

Mr. Cusimano:        I have several questions.  First, I would like to address
this to Hal.  Who do you work for?

Mr. Broussard:       I am now employed with the law firm of Anderson & Price
in Lafayette.

Mr. Cusimano:        The one who represents the oilfield contractors?

Mr. Broussard:       That is correct.

Mr. Cusimano:        You were basing your argument on Article 2315 and 2317
and 2322.  Therefore you are making a policy argument
against hold harmless.  That was the basis of your
argument.  The number one issue.  You said you had two
issues to make and the first one was that it violated
2315, 2317 and 2322.

Mr. Broussard:       Well, it doesn't really violate them per say.  What it

does is it violates the theory that they represent.
They represent that a person when he commits wrong on
another individual should pay for it, and one of the
big arguments we've made is that/the person does not
                        if
pay under this duty then there really wasn't a duty
to begin with.

Mr. Cusimano:     So you're saying that as a policy matter any indemnity
agreement should be outlawed because it violates in
principle or in theory it is against our code.  I'm
just trying to get it straight.

Mr. Broussard:   In the oil industry we have a very special situation
because of the way these agreements come about.  There
is no trading procedure, there is no consideration
given in exchange, there is no free market system.

Mr. Cusimano:     Can you say that for a fact?

Mr. Broussard:   With the representation of the people that we represent
in this group we can say that for a fact.  There is
nothing that they receive in exchange.  They either
sign the agreement or they are not allowed to participate
in the bidding process.  That is the bottom line.

Mr. Cusimano:     In all cases.  (inaudible)

Mr. Haynie:       Chuck, not to be petty, but without a doubt every con-
tract signed in the oil patch is different, every com-
pany you work for is different, some companies scratch
out certain parts.  What we do is as soon as we bid
for a job they will send us their contract.  What we
do usually is try to scratch out some parts and send
it back to them and hope they will accept it.  And
what they do is call and say, look guys if you want

to work you've got to take this part and we're sending
you back another contract.  Sometimes they accept it.
We can scratch things out every once and a while.  But
each company is different.  It depends on the job, depends
on what you are doing.

Mr. Cusimano:   Isn't that the free market system, what makes it great?
And isn't it a fact...a lot of times when he deals with
oilfield contractors and you want a job done they will
send you back their contract and you go to strike it
out and they say well we are working under these con-
ditions, forget it.  And, you know, that is how you
operate in the fields.  But I just wanted to find out,
it is basically a policy issue.

Mr. Broussard:  Yes.

Mr. Cusimano:   As far as the indemnity goes then how do you coincide
that with the basic insurance.  Say driving a car where
you have an insurance company indemnify you against
your own negligence?

Mr. Brousard:   Well, I don't think that contracting company should be
made to provide gratuitous insurance.  That is my only
answer.

Mr. Cusimano:   There has never been a point made here that it is gra-
tuitous insurance.

Mr. Broussard:  The point was just made by Mr. Haynie that it is impossible
in the bidding process to pass the cost of additional
insurance premiums on because you just won't have the
winning bid, you will not receive the work, therefore,
you have got to pick up the tab for the additional

|                   |                                                                      |
|-------------------|----------------------------------------------------------------------|
|                   | insurance.                                                           |
| Mr. Cusimano:     | In answering questions, or whatever, lets deal in                   |

Mr. Cusimano:     In answering questions, or whatever, lets deal in
factual situations.  And if that is Mr. Haynie's
statement that it is impossible in bidding type form
to pass on the cost of insurance then lets talk on
that issue.  How can that be, Mr. Haynie, with many
industries work on a bidding type procedure where they
are involved with insurance and they are involved with
many other aspects.  It may not be just insurance.  It
may be in the airline industry where larger airlines
can operate cheaper, but fuel cheaper or whatever.  So,
therefore we are supposed to go in and regulate the
airline industries in regard to fuel.  Or, and I'm using
that as one example, there may be many other examples.

Mr. Gaudin:       Lets not be argumentative with these witnesses.  They
are presenting their case.  We are going to be here
half the night if we don't limit some of these questions.
Mr. Cusimano, ask your questions, let him answer them,
and if he says something that is unresponsive you can
say it again.  Don't argue with them because we don't
have time for that.  Now, come on, lets go.

Mr. Cusimano:     Is it a factual situation that in bidding processes they
can pass the cost on?

Mr. Haynie:       We are not in those businesses.  All we know is the oil
and gas business which we are here representing.  We
know that in our business we cannot pass the cost on.

Mr. Cusimano:     I've got another question then I will be finished.
Randy, you testified last time, I believe I asked the

question or maybe it was right after the meeting.   And that was how many companies do you show that have gone out of business, oilfield contractors.

Mr. Haynie:   You want numbers?  We don't have numbers.  We have many people, though, without a doubt who got out of the business either because they couldn't find the insurance, the insurance modifier got too high or just decided that it wasn't worth the risk.

Mr. Hoagland:   I would like to address that question myself.  And I will tell you that this is fact, that on numerous occasions that I do meet with oilmen who work for oil companies who want to start on their own and part of their (inaudible) is their insurance package. and (inaudible) they are purchasing insurance with the problem that they face insuring against the indemnity agreements that they in fact checking bid lists in areas where they do have to be competitive that this does put a strain on your ability l) it hurts his money and 2) to pass that cost off assuming they got work or to attempt to get work.  And yet I cannot tell you how many people do not go into business but I can tell you there are many people who do not go into business because of the insurance costs.

Mr. Gaudin:   Mr. Jenkins.

Mr. Jenkins:   I was wondering if Mr. Haynie could answer this, or any member of the group.  Just how far do you think we as a political body on this committee and in the legislature should go in writing or specifying the terms of contracts

between and among private parties.

Mr. Haynie:    Well, I guess to answer that question the best way I
know how, several other oil producing states in this
country have gone to this length as an act of legis-
lation only dealing with the oil and gas industry.
We are sitting here in Louisiana signing these agree-
ments and saying well, you guys in these areas had a
problem and went to your legislature and they solved
it.  And that is why we are here.  We don't know.  You
tell us why.  You tell us how far you can go, and that
is why we are in front of you today.

Mr. Jenkins:   Well, let me say this.  You know we have been listening
to the same argument as this on bills such as the fran-
chise dealership bill that was proposed here that pro-
posed that the terms of every franchise restrict the
distances and number of franchise outlets we give in
the city because there was this so called inequality
of bargaining power.   We also have the landlord and
tenant legislation presented to us every year.
(Tape Change) ...being in the apartment business you
have to sign this type of contract because the tenant
doesn't have bargaining power.  So, what I am wondering
is if we adopt this legislation won't we really be setting
the precedent to pass all of these other bills?  Or, I'm
asking you what is this distinction or where do we
draw the line in our determining the terms of contracts
in the private sector?

Page 36

Mr. Thompson:     Well, Woody, in the case of a franchise motel or
restaurant you can go into that business whether
you get the franchise or not, whether you purchase
that franchise or not.  In this case the majors control
the only game in town, and you either play their game
or you don't play at all.  You don't go into the business.
It restricts competition.  It is like an anti-trust
practice, and I say you can go far enough, as far as
it takes to curb such an anti-trust practice which
limits competition and is an abuse of the free market.

Mr. Broussard:    I would additionally point out to that, sir, that you
have the policy considerations that we've already
mentioned in addition supporting the passage of this
act.  The tort considerations, the workmen's comp
consideration which are very strong.  These guys pass
under both systems instead of one or the other which
I think are very legitimate policy reasons supporting
passage of this act.  I feel more so legitimate when
you consider that there really isn't a free market
system we're talking about.  This bill would make it
more of a free market system than it is.

Mr. Jenkins:      So you are saying, you are special.  Very much like
I think it was Congressman Breaux said in his address
today about every time they try to deregulate an industry,
whether it is an airline, or trucking, or whatever,
or when they try to pass the cuts in spending in
Washington all of the lobbyists come and say oh, you
are right we are all for deregulation, we are all for

cuts in spending, but we are different.  But, gentlemen, it is just my opinion that you are not different.  You are part of the free enterprise system, and if we start writing your contracts for you pretty soon you are going to have a system that is not a free enterprise system, and I don't think you are going to be able to survive in it.  I think you will do a lot better if you have the right to negotiate in the free market rather than have politicians...because I will tell you what in the long run I think the oil companies will probably be able to come to this legislature and get more if they want to start trying to write contracts that is advantageous to them than you are able to get if that is how we are going to write contracts by legislative edict.  So I submit that to you for your consideration.

Mr. Gaudin:       O.K.  I think that takes up all of the questions that we had and the time that was utilized for the questions will not be charged against the proponents.  Mr. Dimos has asked to be recognized for some amendments to the bill.

Mr. Dimos:        Mr. Chairman, I have some questions first.  Mr. Hoagland, you prepared two proposals here.  Are these actual case proposals or just an example for us to review?

Mr. Hoagland:     That is an example of what it would cost a drilling contractor if that was his payroll and receipts.

Mr. Dimos:        All right.  Now is this based on a bid rate type or is it based on a day rate?

Mr. Hoagland:    That makes no difference to us.  That is from an
                 insurance proposal standpoint.  All we are concerned
                 with is what is your payroll estimate and what are
                 your annual receipts estimates and what do you do.

Mr. Dimos:       Then if this is not going to make any actual difference
                 and if we take this statement and what Mr. Randy Haynie
                 just got through saying then the difference will be
                 made up by the contractor.  Is that not true? __

Mr. Hoagland:    There is a difference because I gave you two proposals
                 and if you will note the significant premium differences
                 (inaudible) in how the charges made for the contractual
                 liability.  You will notice that the one that insures
                 the contractor for contracts of his own negligence is
                 almost half.

Mr. Dimos:       The figures are $443,335.

Mr. Hoagland:    That is for that contractor who signs an indemnity
                 agreement agreeing to assume the liability of a third
                 party.

Mr. Dimos:       My question to you is did you base those on a daily
                 rate or on a bid rate?

Mr. Hoagland:    That has nothing to do with insurance.

Mr. Dimos:       So, then if it has nothing to do with insurance.

Mr. Hoagland:    You don't understand.  The variable...

Mr. Dimos:       I'm trying, believe me.

Mr. Hoagland:    Well, I thought it was pretty clear.  The premium
                 charges are based on estimates of payroll and receipts
                 and you determine coverages.  The significant difference
                 in coverage is contractual liability.  There is a

limited form charge and there is a broad form charge.
And we priced it two ways.  Now we don't care if the
guy does a turn key or how he does the job, day rate,
we don't care.  All we want to know is what are your
annual receipts projected and your annual payroll
projected.

Mr. Dimos:      All right.  So I think you and I are on the same wave
length.  We both understand the rate structure.  The
point is that Mr. Bleich had asked and then Mr. Haynie
said it makes a difference whether it is day rate type
premium charge or bid rate.

Mr. Hoagland:   He is not relating that to insurance cost exactly.  What
he is saying is that if you bid on these rates, O.K.
I assumed all the best.  I assumed this was a super
good contractor with no losses, didn't pick up any
losses through third party, manual rates, no adverse
modifiers.  So I gave you benefit of all the best to
give you a comparison of what the book rates are according
to this underwriter with his reinsurance treaties.  All
the good things.  The bad things, yes, Randy did explain
that they are affected by modifiers and not all are
equal.  Because if this particular contractor has
adverse experience and incurs losses through these
indemnity agreements because of third party negligence
then his rates go up because then he gets an experience
modifier published by the rating bureau and then all
of a sudden he is not competitive.  And those losses
have nothing to do with his negligence.  His insurance
costs have gone up because of someone else's negligence

and now he has to bid against some other party who
may be so big that he can dictate the terms of his
contract or he will have to compete with some guy
who was lucky and did not incur any liability through
this contractual obligation.

Mr. Dimos:     All right.  Would it be fair then to say because of
the indemnity agreements the cost of insurance is
greater?

Mr. Hoagland:  That is correct.

Mr. Dimos:     All right.  Thank you.  Now, lets go to Mr. Hal Broussard.
You made some legal points that I want to cover with
you.  Article 2315.  Every act, I believe you said,
that causing an injury to someone that person must
recompense actual damages sustained by the person
that sustained the injuries.  You said that that was
one of the premises for this particular measure.  You
wanted to get away from unfair signing of those indem-
nity agreements because of this particular article.
You further said that the courts have held that these
type of things should be nondelegable type of agreements.

Mr. Broussard:  What the courts say is that a person can't make someone
else responsible for insuring against...they don't allow
you to tell somebody else you make sure that I am not
negligent.  In other words, you've got to be accountable
for your own acts.  That is the nondelegable duty that
is created.

Mr. Dimos:     Then you said in addition to carrying insurance to
indemnify for the wrongful and tortious acts you must

|                   | also carry compensation insurance. |
| Mr. Broussard: | That is correct. |
| Mr. Dimos: | That's correct.  Now, what my amendment is going to do, it's going to help everybody, because I believe as you do that there are are too many wrong things and these indemnity agreements totally against public policy should be so.  So what my amendment will do is help you.  I believe in the same theories that you are expounding here today.  We should not have these indemnity agreements.  And Mr. Chairman, at this time I would like to offer my amendment and make it applicable to all industries. |
| Mr. Gaudin: | Do we have copies of the amendment, Mr. Dimos?  Members of the committee, Mr. Dimos' amendment is in the folders.  This concludes the proponents...  Mr. Bleich?  I am going to give both sides and opportunity of...Mr. Dimos. |
| Mr. Dimos: | Basically, Mr. Chairman, let me save some time.  A lot of this is technical.  Basically, what it does, your bill on page one begins "legislature finds an inequity is fostered on certain contractors..."  All the amendment does is affect everybody. |
| Mr. Gaudin: | Mr. Dimos, are you going to insist on offering your amendment at this time? |
| Mr. Dimos: | Yes. |
| Mr. Gaudin: | All right.  Mr. Dimos has offered up amendments.  I'm going to give the proponents an opportunity to comment on the amendments and I am also going to give the opponents an opportunity to comment if they choose to |

do so.  Mr. Waddell.

Mr. Waddell:  Just for the record I want to say I oppose the amend-
ments.

Mr. Gaudin:  Does the committee understand what the amendments do?
Most of the amendments are technical if anybody wants
to take a look at the amendments.  But the language
that I think is pertinent is amendment number seven
which says "the provision which requires a waiver of
subrogation, additional named insured, and endorsements
or any other form of insurance protection for such
purposes shall be null and void and of no force or
effect".  Is there any discussion or questions by mem-
bers of the committee on Mr. Dimos' amendment?  Mr.
Thompson do you want to comment on the amendment?

Mr. Haynie:  Yes, we are going to have Hal Broussard comment at
this time if everybody would listen seriously to the
comments that are getting ready to be made.

Mr. Broussard:  Gentlemen, the point that we would make on the amend-
ment is that it is right.  The policy reasons that we
are here with today support the amendment.  We cannot
deny that.  But there is not one person on this panel,
there is not one person in this room who doesn't know
that if this bill with that amendment goes on the House
floor it is going to be killed just the way it was
killed three years ago in that posture when we only
received 10 votes.  Now, the philosophy is there, and
it is good.  We have spent untold hours presenting our
case to you showing how in the oil industry the problem
exists.  We feel that we can get the bill passed as it

Page 43

relates to the oil industry and we are asking you
to give us the chance to do that.  If you send us
there with a total bill you've got all of the philosophy
but you don't have the votes.  We've got the philosophy
and we feel we've got the votes.  So, to be consistent
with your position lets not send a dead horse to the
floor.  Lets send a bill that can pass.

Mr. Gaudin:      Mr. Leach, do you or any other member wish to make a....

Mr. Leach:       Mr. Chairman, to be very honest with you I'm kind of
confused about what we ought to speak on.  You know
we haven't gotten up to speak on the merits of the
bill.

Mr. Gaudin:      I understand that, Mr. Leach, and I apologize for that
because I assured you that Mr. Dimos would not insist
on his motion, but he did.  So you find the measure
as it is.  Would you like to make a comment on Mr.
Dimos' amendment?

Mr. Leach:       Mr. Chairman, I really would like some guidance from
the committee as to exactly how we ought to approach
                          and
this problem/without losing my time let me tell you
what we have here.  We have representatives of Inter-
national Association of Drilling Contractors and drilling
contractors from Shreveport and Jena who have come in
here about 6:30 this morning and they have been here
all day and they have been kind enough to wait to
really present testimony tonight on House Bill 915
as it has been originally introduced.  Now, I don't
know where this leaves us in commenting on Jimmy's
amendment, whether we lose our right to come back,

because these gentlemen have a lot of things to respond to, Jimmy, that the oilfield contractors have said on House Bill 915.

Mr. Dimos: Mr. Chairman, let me just point out that my amendment doesn't really change the bill. They come in here trying to deal with indemnity agreements only as to their industry, mine makes it applicable across the board. So you can speak on the merits of the measure, really.

Mr. Leach: Would it be the desire of the committee at this point in time that we present the testimony that we originally planned on House Bill 915.

Mr. Gaudin: I don't think that would be in order at this time, Mr. Leach. We can go ahead and dispose of the amendment and if the amendment is added on then you could address the bill as it appears at that time. All right. Apparently the committee is willing to hear your testimony at this time , if you wish to address the bill in the posture in which you find it right now.

Mr. Leach: All right. Mr. Chairman, our whole purpose is to try to bring information to the committee about the bill. I would like at the outset to introduce the gentlemen at the table and we will divide our time accordingly. We have Mr. Jerry Bonhagen, a staff attorney with Gulf Oil in New Orleans. Second from the left is Mr. Jim Justiss who is the president of Justiss Drilling Company in Jena, Louisiana, who is the former president of the International Association of Drilling Contractors and Jim is here today speaking both as a Louisiana

Page 45

drilling contractor and on behalf of the IADC.  And
to my left is Mr. Tom Hogan who is the president of
Wheless Drilling Company out of Shreveport.  And, of
course, as most of you know I am an attorney with
Shell in New Orleans.  And what we would like to do
is let Mr. Bonhagen open, to be followed by Jim Justiss,
Tom Hogan, and then I would like to close.  Is our 30
minutes limited to the original bill and the amendment
all together?

Mr. Gaudin:     We are going to give you 30 minutes uninterrupted to
proceed and present your case and then we will vote
on the amendment and then we will give the proponents
five minutes to close and we are going to vote on the
bill.  Mr. Bonhagen.

Mr. Bonhagen:   Mr. Chairman, members of the committee, I am Jerry
Bonhagen, attorney for Gulf Oil Corporation.  We have
a limited amount of time here today so I will try to
refrain from as much as possible beating a dead horse.
If memory serves me correctly this bill or a bill
containing similar language has been around for five
or six years.  During that time we have heard basically
the same arguments presented by the proponents.  That
is, indemnity agreements will put contractors out of
business.  And every year we ask the question where
are these contractors who have been put out of business.
We don't know of any.  Mr. Haynie couldn't give us
(inaudible)  Maybe there are none.  One of the pro-
ponent contractors who testified at an earlier hearing
stated that he was tired of paying claims for people

who were injured who were not employees of his com-
pany. He went on to say he thought this made him
non-competitive in bidding. Well, we did some check-
ing up on that particular contractor. He was a drill-
ing contractor. We found out that many years ago
he started off in the oil patch as an employee of an
offshore company. And today he controls assets in
excess of $100 million. He has a success story that
is unparalleled. Now, if anybody is taking advantage
of him I would like somebody to take advantage of me
in the same way. By the way, he is a member of the
IADC. IADC has recently voted 272-12 to oppose this
bill. And by the way these two gentlemen here next
to me are members of the IADC and they will talk in
just a few minutes. As in recent years the proponents
of this bill seem to be concentrated in Lafayette.
And I ask you in all fairness why should certain con-
tractors in Lafayette dictate terms of contracts to
other contractors all over the state of Louisiana,
both offshore and onshore. For five or six years
legislators like yourselves have looked at this type
of legislation and have seen fit not to pass it. And
you know why? It is a bad bill. The business community
does not want government to interfere with their private
contracts. Every industry known to man uses indemnity
agreements. Why is it that Lafayette has a problem
that no other parish has? I'm willing to bet you that
if you ask the proponent-contractors what they thought

of government interference in their business (inaudible)
But like the old saying it is a question of whose ox is
being gored.·· I submit, gentlemen, this is not a sufficient
reason to upset proven methods of doing business and
interfere with the rights of parties to freely contract.
I would like to make one other comment about this Texas
bill that was alluded to earlier.  That bill really
doesn't do what this bill is doing.  That bill was a
watered down bill, has very little effect, did call
for some certain ceilings of insurance and allowed the
parties to be named as additional insureds.  That bill
didn't do anything in Texas.  So I wouldn't point to
Texas as leading the way to anything.  Now, I would
like Mr. Jim Justiss to say a few words.

Mr. Justiss:    Gentlemen, my name is Jim Justiss.  I'm appearing
before you in a dual role this evening. ··I represent
the Justiss Oil Company, a Louisiana corporation
domiciled in Jena, Louisiana and at the same time I
am representing the IADC.  I am a past president of
that organization and am currently a member of the
executive committee and the officers of that association
have asked me tonight to assure you that the opinions
that you hear will adequately reflect the opinions of
IADC.  That association has some 903 drilling contrac-
tor members representing about 98% of the drilling
rigs in the lower domestic United States and of that
number about 1/6 of them are domiciled or represented
by regional offices in the state of Louisiana.  I had

some points that I wanted to bring to your attention
tonight but before doing that I feel I have to comment
on some of the remarks that I heard a few minutes
earlier here.  Quite frankly, I am astounded and baffled
by some of the comments I have heard.  It is my sincere
opinion that an oilfield contractor would have to be
a candidate for the Central Louisiana Mental Institution
to go out of business with the market that he finds
himself in today.  Surely, all of you gentlemen are
aware of the level of activity that is going on in
the search for new oil and gas reserves in the domes-
tic United States.  If you are not I would certainly
urge that you check with your own Department of Con-
servation here, they can give you some facts and
figures, the number of permits that are being issued.
(Inaudible) we are experiencing quantum leaps and levels
of activity.  I spend about 80% of my time trying to
tell one of my customers, no, I can't drill a well
for him and the other other 20% dodging some old cus-
tomer on the phone that I can't tell no to.  So, that,
basically, is the situation that all drilling contrac-
tors find themselves in.  My company is also involved
in well servicing operations and many other contracting
activities involved in production.  We are having the
same problem there and everywhere I go I hear the same
story.  The boom is on, we have never had it so good,
and yet in the same environment I come here to this
meeting tonight and am baffled by the statements I

hear about people going out of business, contractors
being pressured.  These are things that are completely
foreign to me in my operation.  In fact, frankly I
don't understand it.  So with that I would like to
give you three points that I wanted to bring to your
attention tonight after reading the bill as it was
presented to me.  I think the best illustration I
could give you is the fact that my company has been
operating in Jena, Louisiana since 1946.  We have yet
to be involved in one single judicial proceeding regard-
ing indemnification or a contract dispute on who was
negligent or on the job with one of our customers.
And that is a pretty impressive record.  The point I
am getting at is that we have been in the marketplace
30 something years where we could negotiate the best
contract we could get.  The things that we couldn't
get we were able to insure to cover our position
because all we were guaranteed was the profit that we
could make for the effort that we put out.  I have
listened to quite a bit of discussion about insurance.
Insurance is just as much a part of my administrative
general cost as my salary is or your state sales taxes
or government income tax or anything else.  Insurance
is a wrapped in part of that cost.  I pass it on to
my customer.  If he pays it, fine.  If he doesn't pay
it I pass him up, I go get another job.  Competition
is the name of the game that everybody in the drilling
contracting industry plays.  And we play that game

when times are tough and we still play it when times are good.  That is the basis of the whole contracting industry and as far as I know it includes every facet of the oilfield contracting industry.  So, the first point I am trying to emphasize is that/we really don't need your help in negotiating or bidding on work.  We would like to maintain the marketplace without any gentlemen telling us we need to be making certain type contracts or we don't need to be making certain type contracts.  The second point that I would like to make is in the form that was presented to me this morning is that this is a highly discriminatory bill.  It not only singles out the oilfield contractors depending on your point of view whether you think this is a good piece of legislation or a bad piece of legislation.  If it is good lets all have the benefit of it as Mr. Dimos said and if its bad don't penalize us for it just penalize the whole contracting industry in the state.  In my opinion it is not only discriminatory in that respect but it exempts a number of operations within the scope of oilfield contracts.  It is discriminatory and it exempts all contracts, it exempts the surface owner even though he may be directly involved in the operations that are being conducted.  It is discriminatory in that it exempts injuries from radioactivity.  It is discriminatory in that it exempts reservoir and underground damage and wild well control or actions to prevent depletion of natural resources.  If we are

going to be entirely fair about this thing, the fair thing to do is let everybody stand on his own feet. Let me be responsible for my people and let the operator be responsible for his. Gentlemen, I can assure you that fairness in this instance would be disastrous. The realities of the situation are that no drilling contractor in the state of Louisiana can afford to take on the liability that might result from underground damage. No contractor that I know can take on the gigantic exposure that is his as a result of possible fines levied from some of the major oil spills that can occur as a result of his negligence of his own employees. We cannot absorb that fairly. What we are looking at are realities and the realities are this. We contractors have to have that indemnification from our customers in order to operate because the risk is too much to accept for the profit involved. We are not starting from the same ground zero as our customers. He has a potential here of discovering an oil reserve that might mean hundreds of millions of dollars to him. The only potential I have is the profit that I can make (inaudible) So, I would urge you regardless of the contents of this bill at this time or what happened to the bill on the floor. I'm not familiar with the legislative proceedings. But if we lose that indemnification from our operators the drilling contracting industry will desert Louisiana like rats leaving a

sinking ship.  We will go to to other states.  We
cannot accept this responsibility.

(TAPE CHANGE)

The third point I wanted to make is the question came
to my mind as I read this, just who is going to be
the beneficiary from this bill.  And I couldn't come
up with anybody in particular that was associated with
the contracting industry or the operators.  It seems
to me that probably since these operations are a
joint effort by an operator and a contractor, they
are both out there with one goal in mind and that is
to drill a well and to search for oil and gas.  We
both have supervisors on there and we both have the
same goal in mind, we both have employees on the job
and quite often they are making joint decisions.  And
if we have to...when problems arise if we start trying
to say well this negligence was yours, and this neg-
ligence was yours, or whose negligence was it that
caused this problem if we have legislation prohibiting
us from coming to some mutually acceptable agreement
here, and it seems to me that the legal profession
will probably be the biggest beneficiary because I
can visualize and I have never been in court in my
life on a contract but I can see how I could wind up
in court two weeks out of the month trying to determine
whose responsibility is what under a contract  that
I am unable to perform because of the law prohibiting
me from doing so.  And the only other beneficiary I

could come up with is the insurance companies who
would certainly have every opportunity to say that
certain undesirable types of insurance that they don't
wish to carry anyway, there business is competitive
just like mine is.  They take the bad with the good
to get the complete package and if we want to furnish
them an excuse to say, well, I'm sorry, we can't
write that insurance for you because it is illegal,
prohibited by the state of Louisiana from doing so
then someone has got to absorb that risk and I
personally don't care to have it on my own shoulders.
I would prefer to pass it on to my customers as I
do and have been doing for many years.  That concludes
my remarks.  I thank you for the opportunity of being
here and if you have any questions I would delighted
to try to answer them.

Mr. Gaudin:      To let you know where you are, Mr. Leach.  You have
used up 18 minutes, you have got 12.

Mr. Hogan:       I'm Tom Hogan, president of Wheless Drilling Company
in Shreveport, Louisiana.  We have been a drilling
contractor in the state of Louisiana since 1923, 58
years.  We currently operate 11 drilling rigs, 7 in
south Louisiana of the inland barge variety and 4
land rigs in north Louisiana.  We have offices in
Lafayette and Houma in addition to our office in
Shreveport.  I'm also representing the IADC as the
vice president which I was made last year.  I am
opposed to both the bill and the amendment for

philosophical reasons.  I do not think we need anymore governmental intrusion into our contract making abilities. We do not need it, we do not want it.  The bill as I see it seems primarily more  geared to limiting competition than promoting competition.  We, as Jim pointed out, receive indemnity from the oil companies as well as giving it.  There are some things that we can neither accept, nor even find insurance for as drilling contractors.  It is a quid quo pro situation.  We receive something for what we give.  I find it hard to believe that an association who has grown from 30 members to 500 members in such a short time could be having any serious problems with contractors.  They claim the majors are the only game in town.  That is patently false.  The majors are not the only game in town, they are not even the biggest game in town. The independents drill far more wells in the United States than the majors drill.  And I think when we go out and approach this thing it is the great big major oil companies against the little bitty guy we lose sight of the fact that what we need is basically a free market system where I can compete with Jim Justiss and I can fight with Shell Oil, or I can fight with Gulf or I can fight with Texaco and we can come to some agreement.  There is a (inaudible) on all of these contracts that have evolved over the (inaudible)  On both sides.  It has been a give and take for many, many years.  There have been times when rigs were scarce and there have been times when

rigs were plentiful.  Things ebb and flow.  I don't
think that the state of Louisiana should take lightly
the fact that these contracts have evolved over that
time and have evolved from the give and take between
individuals and between companies.  Now, we have got
to a point that many people have worked a lot of years
to reach and we are getting  in most instances now
contracts where Wheless Drilling Company is respon-
sible for our employees, Texaco is responsible for
their employees, the mud company is responsible for
their employees, the logging company is responsible
for their employees and on and on and on.  Because
you are not talking about two companies on a well,
you are talking about multiple, multiple, multiple
companies participating in the various phases of
drilling an oil well and completing that oil well.
And if I understand the bill correctly we would no
longer be able to take care of our employees, or the
major oil company, or the big independent, or the
small independent would no longer be able to assume
total liability for his employees.  Because by doing
that we would be assuming somebody else's negligence.
That would be totally gone and the only people who
would win are the people who make their money in the
court room, and I realize that a lot of you are plain-
tiff attorneys, have make good livings out of it for
a lot of years but that is the bottom line.

Mr. Leach:    Mr. Chairman, I realize that I don't have very much
time.  I want to make just a couple of key points.

You gentlemen on the committee have heard this legis-
lation now over a period of four months and I want
to point out to you a couple of misrepresentations
that have been made to the committee.  And I think
that these misrepresentations have been...they may
well have been made in good faith but in February
you heard Bill Huthnance testify to you about the
question of insurance.  One of the basic charges that
have been made, it was made here today, is that the
contractors do not pass the cost of insurance on.
Now, gentlemen, I'm telling you I've been in this
business for 12 years.  Jim Justiss tells you he has
been in this business for 30 something years.  Mr.
Hogan tells you he has been in this business for
decades and we tell you that these contractors routine-
ly and without exception pass these insurance costs
on to we operators.  And I say to you that anybody
who comes before this committee and tells you other-
wise is misrepresenting to you.  They reflect it in
their day rates, they reflect it in their contract
bid price.  Shell Oil Company, Gulf, Texaco, we all
pay it.  We have always paid it.  We don't question
paying it.  It is a cost of doing business.  When we
look at these contractors and we present an indemnity
agreement to them and they evaluate it and they
determine how much insurance is required to cover it,
they reflect it in their cost.  We expect them to, we
expect to pay it.  It is the price we pay for getting

the job done.  And I say to you, gentlemen, you've
got two drilling contractors from Louisiana sitting
here right now today and they tell you that we pay
their insurance costs.  Bill Huthnance testified to
you in February that we pay those insurance costs.
And I say to you, gentlemen, it's an undisputed fact
that we pay them.  And any contractor who comes before
you and tells you that he is being put out of business
because of insurance costs is simply not telling you
the truth.  If anybody is to be put out of business
it is the operators because we are the ones paying
the insurance.  The second point I want to make to
you Mr. Chairman is that this has been represented
as a big company/little company issue.  And I say to
you, gentlemen, it is not.  It is not.  The International
Association of Drilling Contractors is the industry
organization that is designed for the sole and express
purpose of representing drilling contractors.  They
don't represent my company.  Shell Oil Company can't
even be a member of IADC.  We are not a driller.  And
that organization is established for the sole and
exclusive purpose of looking after the interests of
the drilling contractors, I'm telling you, gentlemen,
voted at their board meeting 272-12 to come over here
and oppose this bill.  And I ask you, gentlemen, in
good faith if they thought that this legislation was
necessary to protect the contractors why would they
come over here and oppose this legislation.  And they
represent a broad spectrum of drilling contractors.

Some of them, as Mr. Hogan said may only have one
rig.  So this is not a big/little issue.  And on that
point I want to make one other point.  We met with
the drilling contractors about one month ago to dis-
cuss a compromise on this issue and the statement
was made to us by a representative of the drilling
contractors, one who testified right here at this
table tonight, and I am not going to tell you who he
is, but he said, if we were worried about the Shells
and the Exxons and the Gulfs we wouldn't have any
problems.  But, he said, we can't deal with the
general Mid-Continent members because the problem is
not the big companies.  The problem is not the big
companies.  The problem is the little independent
operator out there who isn't a member of the Mid-
Continent and isn't a member of your trade association
and you don't have any control over him.  Now, I sub-
mit to you that that admission in itself shows you
that it is not a big versus little issue and it never
has been.  Another point that I want to mention to
you, gentlemen, is the fact anyway you cut it, whether
you are talking about the bill as it is presently
written or any amendment.  It is government intrusion
in the contract. Now, we are not talking about govern-
mental entities.  We are not talking about police juries,
we are not talking about public tax monies, we are
talking about private parties and their contracts.
And the statement made here to you today that indemnity
agreements somehow violate the articles of the Civil

asking others to indemnify you.  We can understand that.
You did pass that legislation but you retained in that
legislation the right to be a co-insurer in insurance.
Now, in this proposed legislation you are going against
that (inaudible) denying even insurance.  So you would
be denying for the private bodies what you have retained
for the public bodies.  We see an inconsistency in
that and we wonder how far that will go.  It will
effect many people which have no complaint about this
situation whatsoever.

Mr. Gaudin:     Thank you very much, Mr. Thevenot.  Mr. Clayton Smith.

Mr. Smith:      Mr. Chairman, I think they have covered everything that
needs to be covered and I will be quiet.

Mr. Gaudin:     Mr. Smith, that is very impressive at this time of the
evening.  All right, I have Mr. Bleich.

Mr. Bleich:     To whoever wants to answer the question.  Two questions.
One, I've heard all of these number of membership and
I hear that there are some 900 and some odd drilling
contractors in these various states and that the IADC
represents some 98% of them which to me means 2% of
that 900 is about 18, and then I am told that this
other group has 500 members who are drilling contrac-
tors.  Those figures don't jive.  What is the answer
to that?

Mr. Justiss:    Gentlemen, I am not aware of the structure of these
gentlemen's associations.  I assume that the regional
or local associations made up strictly of south
Louisiana contractors who may or may not be drilling

contractors.  They could be board road contractors, they could be people who go out and do survey work, any number of contracting operations other than drilling.

Mr. Bleich:  Are you saying that they are not drilling contractors?

Mr. Justiss:  Yes, sir.  There may be a smattering of drilling contractors (inaudible)

Mr. Bleich:  The next question I have.  I've heard again a lot of arguments about indemnifies from personal injury, indemnifies from pollution and oil spills and underground problems, and I'm not familiar with all of them and so on.  And I haven't heard any real statistics from either side as to what it is costing in the sense of judgments.  Everybody complains when they get sued.  I remember when this was brought to the committee last year the gentlemen who complained said, I've been sued.  My point is this.  Does anyone have any information as to what the generals are paying, so to speak, in dollars, that would have maybe been the responsibility of the oilfield contractors.  These will be what they are paying which would have been your responsibility.?

Mr. Hogan:  Mr. Bleich, as a drilling contractor that operates over water in south Louisiana the primary problem that we run into on this concerns Jones Act suits and Longshoremen/Harborworker's Act suits of which there is federal legislation and I don't believe that what the state of Louisiana does with that is going to affect whatsoever on that one way or another.  That's

primarily the biggest third party suits that we run
into as drilling contractors.

Mr. Bleich:     My point is this. We are hearing some, you know, con-
vincing, theoretical arguments on both sides. I haven't
heard any numbers as to...in dollars what it is costing
the contractor, so to speak, how many judgments there
have been, how many millions of dollars in judgments
there have been.

Mr. Hogan:      We have only had one non-Jones Act third suit that I
know of in the past 10 years.

Mr. Bleich:     Was that a personal injury suit or a...

Mr. Hogan:      It was a truck driver who backed into a butane tank...

Mr. Bleich:     What about the costs that the general contractors are
paying for...that would have been the responsibility
of the oilfield contractors. What are you picking up
(inaudible) indemnity agreement? For pollution, or
environmental problems?

Mr. Hogan:      I don't know that I could put an exact figure on that.
We don't look at it that way. It is just a total
business decision as far as we are concerned. We
want to see what we are getting from the operator
versus what we are having to give.

Mr. Bleich:     O.K. Just one other quick question. I've been led
to believe that the market is a oilfield contractors
market if I can go back to the old law of supply and
demand, and I throw that out to both sides. Is that
your position?

Mr. Hogan:      At the present time we are in demand, yes. But what
it will be next year, what it was three years ago could

be two different things.

Mr. Gaudir:     O.K.   Mr. Waddell.

Mr. Justigs:    To further answer your question.  There are instances

where we negotiate these pollution clauses because

sometimes we have had negotiations where we they would

ask the contractor to furnish the first $100,000 of

pollution damage and then they would pick up at that

point and pay the balance.  That puts you in a ball

game that you can play in because you can either

insure that first $100,000 or usually what I do is

add a few thousand dollars extra profit and take that

risk myself.  There again it's a matter of whether

you want to take that risk or if you feel like

(inaudible) You do have negotiation even on the

pollution clauses.

Mr. Waddell:    Mr. Leach, first of all I do want to say that I do

agree with part of what you said.  I agree with you

that I don't think it is big oil versus little con-

tractor.  I think we are talking about a policy of

whether you think it is right or wrong and who ought

to accept the responsibility for the injury.  I want

to ask you one thing.  Are you for or against Jimmy's

amendment?

Mr. Leach:      I'm against the legislature restricting anybody's right

of having indemnity in a contract.  I just have to say

to you, philosophically, Bobby, I'm against that.  I

can't tell you otherwise.  The statement was made here,

well, this is a ploy to kill the bill.  It has never

been a ploy on our part to because I think Jimmy feels

strongly on this point and has in the past.  But I am
philosophically like these other gentlemen of the
legislature getting into anybody's contract.  Whether
it is the architects, or the oil and gas producers,
or the contractors, or anybody else so I have to say
I am philosophically against it.  Plus, I know what
it would do to the indemnity that we give these gen-
tlemen if it were outlawed.  They couldn't operate,
and if they couldn't operate we couldn't get the
job done.

Mr. Waddell:          I want to talk a lot about insurance.  Say Woody and
I are both drilling contractors and we are bidding on
open market, and I win one with your company Shell and
he wins one with Texaco.  Unfortunately for me there
is an accident with one of your employees, Shell's
employee who has come out there who I have no control
over whatsoever, and he is hurt.  And my insurance
irregardless of whose fault it is has to pay for it.
Is that correct?

Mr. Leach:            Well, Bobby, that is one of the main points.  That is
not always the case and I'm not trying to evade...

Mr. Waddell:          Let me back up on my hypothet.  I sign the broad form
indemnity and so did Woody on his.  So, I do have to
pay.  Is that right?  My insurance would have to pay.

Mr. Leach:            On that particular point.

Mr. Waddell:          O.K.  A year rolls around and I'm going to renew my
insurance.  Now, when I go to get my liability com-
prehensive coverage am I not right in assuming that
my insurance is going to go up because my insurance

|                |                                                                        |
| -------------- | ---------------------------------------------------------------------- |
|                | paid a bigger claim last year.  Is that right?                         |
| Mr. Leach:     | Bobby, I'm not trying to evade the question.  I'd rather let a drilling contractor answer. |
| Mr. Justiss:   | That is right to an extent.  Let me point this out to you.  We have our own safety program.  That Shell man that comes out to our job is expected to abide by our safety rules just the same as any of our employees.  If you are on a Texaco job and you have a laxer safety program and you get a man injured then the fact that I have a better safety program, my record is better than yours, means I am entitled to (inaudible) and the fact that your insurance rate goes up and penalizes you is not my problem. |
| Mr. Waddell:   | O.K.  I want to take that a step further, Mr. Justiss.  You say you have a program for your employees.  Now, say you are drilling for me and I'm Texaco and I send my man out there.  You can't run my man off that rig can you? |
| Mr. Justiss:   | I tell him he has to maintain the safety standards that we have set... |
| Mr. Waddell:   | All right.  You tell me you want me to get off and I just won't get off and I'm hurt, even though you have already told me to get off that rig isn't your insurance guy going to have to pay that claim?  Whether you want to or not your insurance is going to have to pay that claim. |
| Mr. Justiss:   | If we have an injury and we have indemnified anybody obviously we are going to pay.  The point I'm trying to get at is we make every effort to avoid these |

Page 69

injuries.  We have a program and we spend thousands
and thousands of dollars every year to emphasize this
to our employees and everyone on that drill site.

Mr. Waddell:    Mr. Justiss, I agree with that.  And I think you
ought to be rewarded for doing it.  My point is very
clear.  Even if you have a rig site and Shell or
Texaco or anybody else comes on there and is injured
your insurance has to pick up that tab, and next year
your insurance is going to go up.  O.K.  Woody doesn't
have that accident, so next year we are put on an
equal keel to come at you.  We both have to sign that
broad form indemnity.  But yet I've got to pay $166,000
more for my insurance premium, if these folks are
correct, than Woody does because he didn't have an
accident last year.  So, although you are saying you
are passing it on to me I'm having to bite the bullet
on the increased premium.

Mr. Hogan:      You signed the contract.  You're a consenting adult.
The people who can compete continue to compete.  The
people who can't go under.  It is no different than
any other...than having to go to somebody who has
to borrow  money to buy equipment and say because you
have to pay 20% we're going to pick up your interest
charges so you can compete with me because I've got
all of my equipment paid for.  What is the difference?

Mr. Waddell:    I see a big difference because I can't control whether
your man is on my rig or not.  That is the whole point.
My insurance is going up and it gives them an advantage

|              | and we're on equal keel next time. |
|--------------|-------------------------------------|
| Mr. Hogan:   | I've accepted that risk as a businessman. |
| Mr. Waddell: | Let me ask you this.  You made the statement that you're going to go under.  What were you making reference to there?  You mean the company is going to go broke? |
|              | (TAPE CHANGE) |
| Mr. Hogan:   | I'm saying that some companies are going to go under. Some companies are going to go under regardless of whether you pass this legislation or not.  Some people are going to operate better than others, some people are going to make a lot money.  Some people are going to go broke. |
| Mr. Waddell: | Let me ask you one other thing. |
| Mr. Hogan:   | I've got a right to go broke, I've got a right to make money.  I'd just as soon not have the IRS man come in and say he's going to help me. |
| Mr. Waddell: | Let me ask you one other question.  Back here in your original testimony you made the statement and I'm taking it out of context, and I want to ask you what you meant.  You said, if you had to be responsible for your employees you could not accept the responsibility for your people.  And my question is what did you mean by that statement.  Because aren't you accepting your own responsibility for your own people right now and their's too? |
| Mr. Hogan:   | If you pass this bill I will not be able to do that. We will not be able to write contracts where we can accept total responsibility for our people, the oil companies can accept responsibility for their people |

Page 71

because it will be a form of hold harmless.  There is
no question about it.  Because if we are not allowed
to disregard negligence and take care of these people,
or this group of people what we have worked so hard
for is going to go out the window.

Mr. Waddell:   I disagree with that because I think  it will be more
readily definable what your limits of liability will
be.  We made reference to the radioactivity and
also the property damage.  If we take the exclusion
out of the property element would that then put you
in a better position and then would you support the
bill?

Mr. Hogan:   If you took out my ability to get indemnification from
the oil companies from pollution, reservoir damage,
radioactivity damage or any other thing that has open-
ended liability I would do what I'm lucky enough to
do with movable equipment I can move it to another
state and I would do so.  All I'm saying is we give
and we take.  We give indemnity to the oil companies
(inaudible) they give us indemnity on some things
that we are not able to assume, and that is all that
I'm saying, Bobby.  Not to be argumentative, we get
something for what we give...

Mr. Waddell:   I understand that you are saying right now that you
think the bill is bad.  If I amend out the property
damage limitations.  In other words it would not have
any affect with respect to property damage.  Do you
think that would make a bad bill better?

Mr. Hogan:           I'm just philosophically opposed to the whole thing.
It would make a bad bill better, certainly.

Mr. Gaudin:         Mr. Downer.

Mr. Downer:        Let me ask anyone.  My question would be directed
(inaudible) sole negligence, waiver of subrogation,
and the naming of additional insureds, all of which
are provisions generally in one of these broad form
contracts.  Now, lets start off with sole negligence.
Do you think it is fair to require of a contractor
who is going out to do work for another one to pick
up and indemnify and hold that party for that third
party's sole negligence?  Do you think that is fair?

Mr. Bonhagen:     I think you've got to understand the typical operation
that goes on out there.  (inaudible)  We don't have
many people out there.  We fly in and fly out in
about five minutes time to see what is going on.  We
don't have any people doing anything, causing any
accidents.  The indemnity allows us get a defense in
a suit by their employees...we'd go broke on defense
costs.  So, it is fair in that sense that we're really
not going to be involved in a practical matter.

Mr. Downer:        O.K.  My worker is a one man worker who is a roustabout.
Let's use Gulf since it is you and I talking.  Gulf Oil
needs an extra roustabout to unload a boat off of this
platform below.  It is a Gulf Oil crane operated by
a Gulf Oil hand under Gulf Oil supervision who swings
this crane around and drops this load of something on
top of this worker.  That poor worker didn't do anything
but was unloading what he was supposed to be doing.

Under the broad form, sole negligence, that employee (inaudible)  Let's take for example a self-insured program (inaudible)  I have an employee who is dead. (inaudible)  Now, I've got to pay twice (inaudible) On top of that I've got a waiver of subrogation so when he collects for his tort I can't come back and get my money back out of the tort claim.  Now, you think that is fair for me to lose twice, to pay twice, and to assume your defense and pay for your sole negligence?

Mr. Bonhagen:  I think you loaded the dice on me.  You've got Gulf, Gulf, Gulf, Gulf, Gulf.  Since I've been with Gulf for eighteen years I know of two cases where it was Gulf, Gulf, Gulf, Gulf, that I am aware of.  And we split it.  We made a settlement and we split it because we couldn't see someoneone paying that whole thing when it is Gulf, Gulf, Gulf, Gulf.  But things don't happen that way and you know it.  First of all, that crane operator, 99% of the time is going to be another contractor.  He is not going to be Gulf.

Mr. Downer:  Jerry, I understand all of that.  But my point is just as we have all given examples, ya'll have painted a beautiful picture and just as the contractors have painted a beautiful picture there are these examples of sole negligence and your contracts deal with sole negligence.

Mr. Bonhagen:  O.K.  Let me ask you something.  That isolated instance you are talking about.  Do you think that is worthy of your time to pass this bill to help out one in a thousand cases?  Is this what we are up here for?

(Inaudible)

Mr. Bonhagen:     Without that you are in 150 lawsuits because the other
                  (inaudible)

Mr. Downer:       Isn't it true that a lot of times we are all still in
                  that litigation because we are not going to assume
                  your defense and we are going to have to third party
                  (inaudible)

Mr. Leach:        Can I respond to that?  You know we talk about the broad
                  form, the fact of the matter is that is very rarely
                  used and imposed on oilfield contractors today.  That
                  is just not true.  We are going back and taking a form
                  that was used in the 1960's.  This is a seller's market,
                  Hunt.  This is a seller's market.  Now, let me tell
                  you what this bill would do.  I've said it before.
                  I think the main thing this bill would do is it would
                  impede the marketplace.  This whole question of indem-
                  nity, I've said it before, is an evolving process.  You
                  always have evolving process when you let the free
                  market work.  These gentlemen will tell you that it
                  is a seller's market today.  We are giving them what
                  they have to have because we have to have them to do
                  work.  They pick and chose between us because they
                  have so many requests.  It is an evolving market.
                  Shell today is just one company.  But we are more and
                  more going to the basis of status in our indemnity
                  agreements.  What we are saying to these contractors
                  is you go out there and you work on a Shell job and
                  if your man is hurt or your equipment is damaged you

are going to indemnify Shell, even though Shell's
negligence may have contributed to it.  We tell
them if Shell's equipment or Shell's people are
hurt or damaged we are going to indemnify you.  That
is acceptable to contractors.  That is basically what
the IADC contract says.  We don't look to who is
negligent or who is not negligent.  We look at the
status of the parties.  Because what we have done is
we have allocated the risk between us, Hunt.  And to
go back and talk about that broad form that just like
it is used today widely in the industry it is just
like Jerry said you are probably talking about one
contract out of 5000.  It is just not that widespread.

Mr. Gaudin:     We are covering ground that we have covered so many
times that we ought not be talking about it.  We are
going to take up Mr. Dimos' amendments.  Do all of
the members of the committee understand the amendment?
Do you want any further clarification?  Do you want
to make any comments about it?  All right.  Is there
any objection to Mr. Dimos' amendment?  All right.
To which there is objection.  Mr. Dimos do you want
to close?

Mr. Dimos:      I realize the politics of everything.  You know, basic-
ally the big oil companies are against this (inaudible)
the little drillers want the exception but they can't
go with my amendment because they are worried about
their bill getting killed on the floor.  The architects
are involved and I don't know why.  I guess they are

worried about assuming responsibility for which they
caused(inaudible)  Therefore, they don't want it.
I had the mayor of the city of Monroe called me today
and said we don't want your amendment.  That would
open it up to city's liability.  So, you see there
are a lot of problems with this amendment even though
it is probably the best thing we have offered all
day.  I think for many years the contractual agree-
ments have been in violation of Article 2315 because
that article places the responsibility on that man
who causes the damage or the injury.  But here now
we get around all of that by getting to the deep
pocket theory and so forth.  And I know what is going
to happen to my amendment but I still offer it and I
urge the committee to adopt it.

Mr. Gaudin:    Mr. Dimos offers an amendment to which there is
objection.  If you are in favor of the amendment sig-
nify by saying yes, opposed, no, and the secretary
will call the roll.  ROLL CALL   Three yeas and nine
nays.  The amendment fails.  Mr. Chaisson has an amend-
ment.  All right, I'm sorry.  Mr. Bleich had an amend-
ment before yours.  I think this one will be very
brief.  On page three, between lines 30 and 31 delete
the committee amendment designated as number 13 and
proposed by Mr. Waddell and adopted on May 26, 1981
and insert in lieu thereof the following: "Section 4.
The provisions herein shall apply to contracts entered
into after the effective date of this Act."  Mr. Bleich.

Mr. Bleich:     Mr. Chairman, members of the committee, it is self-
                explanatory.  The amendment adopted this morning I
                have got very, very serious problems with the way it
                is worded.  Clearly, the big issue today is whether
                or not we are going to regulate these contracts or
                not.  But with the amendment that was adopted this
                morning the present posture of the bill would not
                only regulate future contracts but we are abrogating
                contracts in existence in my judgment.  The contracts
                have already been entered and if an injury occurs
                later we are abrogating a provision of present con-
                tracts.  This simply is a clarification if we pass
                the bill or if we don't that those contracts entered
                into after the effective date would be those it applies
                to.  Not those that are presently in existence.

Mr. Gaudin:     Mr. George has reminded me that there is another
                technical amendment that we need to adopt, too.  Is
                there any discussion on Mr. Bleich's amendment?  Mr
                Thompson.

Mr. Thompson:   Mr. Gaudin, members of the committee, this amendment
                really prevents us from getting at the root of the
                problem.  The root of the problem is that there is
                a master service agreement and any subsequent work
                or any subsequent bid you submit is all subject to
                the terms of this master agreement.  So, if you have
                ever in the past done any work, let's say for Texaco
                they have on file a master service agreement.  And if
                you say contracts after the date of this Act well then
                it puts someone in doubt whether that new agreement

is not still subject to that master service agreement
which you previously signed which always exists in
their file forever  and ever and ever, because they
never tear it up.  So, in my opinion that would help
those who are going to go into the business in the
future but it wouldn't help those who are in the
business and whose master service agreement is on
file.

Mr. Gaudin:       O.K.  Mr. Waddell.

Mr. Waddell:      I just have one question, Mike.  Can't you just cancel
                  that original master service agreement and start off
                  new again.  I don't understand your reasons.  I think
                  you can always cancel that original contract.

Mr. Haynie:       Speaking for the associations involved.  We just
                  huddled on the amendment and we are willing to accept
                  it.

Mr. Gaudin:       Any objection to the adoption of the amendment?  Then
                  without objection the amendment is adopted.  We have
                  an amendment offered by Mr. Chaisson.  Amendment number
                  one, on page one, line 21, after the word "is" and before
                  the word "negligence" insert the word "sole".  Mr.
                  Chaisson you want to explain your amendment?

Mr. Chaisson:     Mr. Chairman, I think that amendment is self-explanatory.
                  I feel that if this bill does get out, which I don't
                  know that I can vote for the bill since it doesn't
                  apply across the board to everybody, nonetheless, I
                  believe that indemnity agreements only where there is
                  sole negligence on (inaudible) of the indemnity should

be in the bill.  If you have a quid pro quo, if there is concurrent negligence, joint negligence, there are certain types of indemnity agreements that would be O.K.  But if you have sole negligence, I don't think you can contract away your sole negligence.

Mr. Gaudin:   All right.  Any comments?  Any discussion on the amendment?  Is there objection?

Mr. Broussard:   I would like to point something out, please.  If you limit it just to sole negligence, if the employer is the person paying the indemnity and he was one percent concurrently negligent somehow then you just, I mean we have comparative negligence in this state and we don't know what the courts are going to do with that because they really haven't gotten far enough into it yet to decide.  But the point I would make is that if the guy is the employer and he shouldn't be liable anyway because he has already paid the comp, and if he was one percent concurrently negligent he is going to have to pay the full indemnity if we limit it to sole negligence.

Mr. Gaudin:   Any further discussion?  Any objection to the adoption of the amendment by Mr. Chaisson?  To which there is objection.  If you are in favor of Mr. Chaisson's amendment signify by saying yes, opposed, no and the secretary will call the roll.  ROLL CALL   Three yeas, nine nays and the amendment is rejected.  Do you want to close on your bill?  Sorry, my error.  This is a one page amendment.  This is an amendment that we discussed earlier in the day and we substituted the

word drilling in every place where the word mine was.
Is that correct?

Mr. Waddell:     It substitutes the word "drilling" for "mines" because we
                 are dealing with rig sites...

Mr. Chaisson:    Point of order, Mr. Chairman, that amendment was defeat-
                 ed and laid on the table and he can't come back with it
                 now.

Mr. Gaudin:      You object, Mr. Chaisson?

Mr. Chaisson:    Yes, I do.

Mr. Gaudin:      Mr. Chaisson objects to the amendment, Mr. Waddell, and
                 I think his point is well taken and unless the committee
                 overrules me I am not going to hear the amendment at
                 this time.

                 (Discussion on whether the amendment could be offered
                 and whether Mr. Downer could move the previous question
                 on the entire subject matter)

Mr. Price:       Thank you very much, Mr. Chairamn.  As I indicated
                 earlier, my name is Edwin Price and I am one of the
                 legal counsels for the contractors association.  Mr.
                 Leach brought up the question of misrepresentations
                 to the committee and in my experience there has been
                 one serious misrepresentation made to the committee
                 by them.  The inference has been made to you that the
                 system that we have now in handling oilfield litigation
                 is a neat, central system and that by passing this
                 bill the lawyers and the insurance companies will be
                 the true beneficiaries.  Based upon my nine years
                 experience of handling this type of litigation nothing
                 could be further from the truth.  Myself and Represen-

tative Dorner handle basically the same type of
litigation representing these oilfield service con-
tractors in lawsuits.  Every so often when there is
a serious accident I am called to go out to the scene.
When I get there not only do I bring my experts, my
photographers, and all of my people but everybody is
was there on the job location also brings theirs.  So
you start out in the beginning with everybody being
represented by attorneys, everybody having experts,
everybody having photographers.  (TAPE CHANGE)
Everyone has contracts.  The claims, the lawsuits are
filed, the claims for indemnities are made and it turns
into the biggest hooplala anyone has every seen.  I
would suggest to you that in at least 90% of the
cases the indemnity agreements are not initially honored,
causing other attorneys to become involved in the
suit.  The statement has been made to you that the
true beneficiary of this bill will be the attorneys
and the insurance companies.  I submit to you that
they will not.  The bill that we are supporting will
simplify the system and that the true beneficiary
besides our organization will be the plaintiffs them-
selves.  Now, the reason for that is when a lawsuit
such as the one I just described is tried the judge
usually reserves for himself the question of the
indemnity agreement.  So the plaintiff goes into
court and if he is able to prove his case he obtains
a judgment.  But he can't collect on the judgment
because the judge has to consider all of the various

indemnity agreements.  Now, this can take as long
as three to six months which delays in the injured
person getting the money that he has already been
awarded.  We would just submit to you that the bill
will result in not only the association obtaining
benefit but also will result in the injured person
obtaining the money that they are awarded at the
earliest possible time.  Thank you.

Mr. Broussard:     I would like to make a brief comment in reference
to the indemnity for property damage as relates to
pollution being given at this time as we are told
by the majors to members of the   IADC.  We have spoken
with David Stang in Washington, D.C. who is the
lobbyist for the National Ocean Industry Association,
which these people are a part of.  They are currently
attempting to amend the Outer Continental Shelf Lands
Act in contravention of what the courts of the United
States have held that the operator is responsible when
a blowout occurs as a result of the activity of his
company man.  They are trying to amend that act to
make the drilling contractor responsible for pollution
as a result of blowouts.  I suggest to members of the
IADC that they look into this bill.

Mr. Thompson:      Gentlemen, Mr. Haynie has a lot of points to cover
but I want to cover one point which impresses me most
about the unfairness of this situation.  I just can't
see with this hold harmless agreement an employer
being responsible to his employees in comp, and then

that employer turning around and ultimately paying the tort claim. And that is what is happening and that is why this is a bad practice and that is why it ought to be against public policy. Because you get around the tort law in one case by the guilty party and you saddle the innocent party with the comp and the tort liability and that is why I am bringing this bill to you and that is why I ask you to report it out.

Mr. Haynie: Mr. Chairman and committee members, I am going to try to respond to as many of the comments made by the opposition to this bill. First of all I think I must clarify (inaudible) We are five associations of different types of oil patch people. One of those associations is drilling. These are the small drilling contractors. Mr. Justiss and Mr. Hogan were testifying and they kept speaking about a reciprocal agreement. An agreement which they take care of their own, production takes care of their own. Gentlemen, in the oil patch today there are probably only 10% of the people in the patch who get these agreements. Ninety percent of us sign a blanket form. Without a doubt, we have passed these out before, if you need to look at them again we've got them. Sole negligence. We are basically on land, and we have no way out. We totally have to accept the sole and total negligence. Some large drilling contractors have gotten to a

position of bargaining.  And I don't blame Mr. Justiss
or Mr. Hogan for the comments they made.  They were
true.  They are in a better bargaining position.  And
they kept talking about a trade off.  There are a heck
of a lot of us in the oil patch which pollution does
not affect.  We do not get a trade off.  There are a
bunch of other things we need to go over but the key
thing is we (inaudible)  A lot of company owner started
with a prayer and borrowed money many years ago.  And
we wouldn't be here before you to try to get government
to interfere.  A lot of points brought out were finan-
cial and safety is still an important thing to us and
I address this point.  We feel safety in the oil patch
and if everybody is responsible for his own negligence
would be a better rate than it is.  The oil patch
accident rate is probably one of the highest in this
country, and for sure in Louisiana.  Right now we
are drilling deeper and deeper into the Tuscaloosa
sands, we are going further and further out into the
Gulf., and the point I want to make is there are a
lot of unknowns and a lot of dangers, and we are the
guys who have to accept the risk, the judgment decisions
that production is making to drill deeper and deeper.
And closing comments, gentlemen, four years ago when
this bill was brought before you for the first time
there were three men and not all from Lafayette, came
before you with a bill.  The next year there were five
men.  Last year we came with 30 and this year we've
got 500 people who believe in what we are doing.

Gentlemen, it affects a lot of people in Louisiana. It is not two percent, it is a large portion of the oil patch people in this state.

Mr. Gaudin:         Thank you, Mr. Haynie.  Any comments by members of the committee?  Mr. Jenkins.

Mr. Jenkins:        Mr. Chairman, the best argument that I have heard for this legislation today the case made very eloquently by Mr. Downer about the situation that occurred as some tort, workmen's comp case.  Of course the problem is that the legislature has been the one that has created that situation through our laws that we've passed here.  It hasn't been in the private market, it is not the fault of the drillers, or the oil companies, it is the politicians fault.  And it ought to be cured by amending those laws.  We have a lot of good businessmen here tonight in support of this legislation and they have been writing and calling. Some of my good friends have called.  And I would not presume for a moment to lecture them on the benefits of the free enterprise system because I believe everyone them believe in the free enterprise system.  And I want to say a word about why our free enterprise system is in trouble.  To me the reason it is in trouble is precisely because of bills like this.  We are being regulated to death in the market today.  And it is because everybody, whether it is the consumer, doctors, lawyers, drillers, some of the big energy

companies, everybody thinks they are different.  And
that they have special circumstances and that they
need  certain exceptions to the normal rules of the
game for them.  And in this case what has happened is
that a decision, an economic decision, normally made
in the marketplace by private citizens made by nego-
tiations is being transmitted from an economic decision
made privately into the political arena to be made by
politicians.  And you notice in the discussion about
who is for and against this bill we talked about how
many drillers and oil company, we never talked about
the citizens.  What if we were talking about the
citizens and what they thought.  Is that the way this
decision should be made, by majority vote?  Do you
want your contracts to be written by majority vote.
(Inaudible)  I think you have blinders on about this
one issue.  The problem in America in the economic
system is that we are not looking at just this one
provision of this one contract (inaudible)
you are inviting government to come in and look at
all of the provisions of your contracts and write
them as the politicians think they would be most
desirable.  That is why we are in trouble.  Everybody
thinks they are different.  (Inaudible)  And that is
why I am going to have to vote against not just this
bill but the landlord/tenant bills and the franchise
regulations and every other measure that is presented
like this (inaudible) write contracts in the free

Mr. Gaudin:       What is the pleasure of the committee?  Mr. Bleich?

Mr. Bleich:       Mr. Chairman, members of the committee (inaudible)
                  There are instances where government does regulate
                  contracts and there are many, many examples which
                  are (inaudible) anti-trust legislation, things of
                  that nature.  I am very hesitant to vote for this
                  matter but I am going to vote to report the matter
                  as amended to the entire house for its consideration.
                  I think this is an extremely close question and in
                  all candor to the proponents of this measure I want
                  to tell you that I don't quite think that the ball
                  has been carried.  And there are a number of questions
                  that I have unanswered and unless all of them are
                  answered I assure you I will vote against the measure
                  on the floor.  Now, the proposition as to who actually
                  pays the insurance made by Mr. Leach I believe was
                  not rebutted that it was paid, I don't cast my vote
                  based on membership, how many are on one side or the
                  other, but I've got some serious questions there
                  (inaudible)  I was not given any information as to
                  although there are supposedly these miriads of law-
                  suits what actually has economically happened as a
                  result of final judgments.  The Department of Correc-
                  tions gets sued many, many times (inaudible)  I think
                  that at this point in time rather than to defer again,
                  and study again I think that would be meaningless and
                  I think it is something that should go to the entire
                  membership.

Mr. Gaudin:          Mr. Cusimano.

Mr. Cusimano:        Thank you, Mr. Chairan.  I will be brief.  What bothers
                     me is to see an industry that has survived severe
                     government regulations (inaudible) coming here and
                     requesting some type of government intervention so
                     that they may survive.  In looking at this and in
                     taking it a step further, looking at the contractors
                     and I'm wondering how many contractors in the oil
                     industry have got unions.  And I can't recall too
                     many that have unionized (inaudible)  possibly maybe
                     we should look into this situation and maybe we ought
                     to propose legislation to (inaudible)

Mr. Gaudin:          Mr. Chaisson.

Mr. Chaisson:        Just a few words to tell you why I am going to vote
                     against the bill.  Unfortunately you saw fit not to
                     support Mr. Dimos' amendment.  Here again we have
                     exemptions and exceptions (inaudible).  I can't go
                     along with passing laws for special groups.

Mr. Gaudin:          Mr. Downer, you have a motion?

Mr. Downer:          I move favorable as amended.

Mr. Chaisson:        As a substitute I move an unfavorable report.

Mr. Gaudin:          All right.  Mr. Downer moves that the bill be reported
                     favorably, Mr. Chaisson as a substitute moves that the
                     bill be reported unfavorably.  The vote will occur on
                     the substitute motion by Mr. Chaisson to report the
                     bill unfavorably.  Is there any objection to the motion
                     by Mr. Chaisson?  To which there is objection.  If you
                     are in favor of the motion for an unfavorable report