## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" | * | |
| in the Gulf of Mexico, | * | SECTION: J |
| on April 20, 2010 | * | |
| | * | JUDGE BARBIER |
| This Document Relates to: | * | |
| *All cases, 2:10-cv-2771 and 2:10-cv-04536* | * | MAGISTRATE SHUSHAN |
| | * | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**<u>PLAINTIFF UNITED STATES' MEMORANDUM IN OPPOSITION TO DEFENDANT TRANSOCEAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST BP TO ENFORCE BP'S CONTRACTUAL OBLIGATIONS, INCLUDING BP'S OBLIGATION TO DEFEND, INDEMNIFY AND HOLD TRANSOCEAN HARMLESS AGAINST POLLUTION CLAIMS</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

   A.  Transocean's Motion Lacks Factual Basis and is Premature. ........................................ 2

   B.  The Contractual Provision Purporting to Indemnify a Regulated Entity from Clean Water Act Civil Penalties Is Contrary to Public Policy and Therefore Unenforceable. 4

      1.  The CWA Reflects a Strong Public Policy that Civil Penalties be Paid by the Party Responsible for the Violation, Especially in Light of the Dangerous Nature of the Conduct and the Seriousness of the Violation. ........................................... 5

      2.  The Serious Nature of the CWA Violations, and the Willfulness of Transocean's Conduct, Counsel Against Permitting Indemnification for Civil Penalties. ......... 10

      3.  Nothing in the CWA or OPA permits Indemnification for CWA Civil Penalties.13

      4.  The Cases Cited by Transocean Do Not Support Enforcement of an Ex Ante Express Indemnity Provision With Respect to CWA Civil Penalties................... 16

      5.  Transocean's Argument That Public Policy Dictates the Enforcement of the Indemnity Provision Lacks Merit. ....................................................... 18

CONCLUSION .................................................................................................. 21

i

## **TABLE OF AUTHORITIES**

FEDERAL CASES

*Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.,* 482 F.3d 408 (5th Cir. 2007) ...................... 2

*Carrizales v. State Farm Lloyds,* 518 F.3d 343 (5th Cir. 2008) ................................... 1

*Kelly v. EPA*, 203 F.3d 519 (7th Cir. 2000) ............................................. 6

*Montauk Oil Transportation Corp. v. Tug El Zorro Grande*,
 54 F.3d 111 (2d Cir. 1995) ............................................................16

*Odd Bergs Tankrederi A/S v. S/T Gulfspray*, 650 F.2d 652 (5th Cir. 1981) ............................... 14

*Royal Ins. Co. Of America v. Southwest Marine,* 194 F.3d 1009 (9th Cir. 1999) ....................... 13

*Scholastic Inc. v. M/V Kitano*, 362 F. Supp. 2d 449 (S.D.N.Y. 2005) ...................................... 18

*Town of Newton v. Rumery*, 480 U.S. 386 (1987) ........................................................ 4

*Tug Ocean Prince v. United States*, 436 F. Supp. 907 (S.D.N.Y. 1997), *aff'd in part & rev'd in
 part on other grounds*, 584 F.2d 1151 (2d Cir. 1978) ........................................... 3, 8

*United States v. City of Twin Falls*, 806 F.2d 862 (9th Cir. 1986) ............................... 18

*United States v. Coastal States Crude Gathering Co.*,
 643 F.2d 1125 (5th Cir. 1981) ......................................................... 6

*United States v. General Dynamics Corp.*, 755 F. Supp. 720 (N.D. Tex. 1991) ....................... 16

*United States v. J & D Enters. of Duluth*, 955 F. Supp. 1153 (D. Minn. 1997) ........................... 9

*United States v. Locke*, 529 U.S. 89 (2000) ............................................... 14

*United States v. Tex-Tow, Inc.*, 589 F.2d 1310 (7th Cir. 1978) ................................... 8

*United States v. Thorson*, 300 F. Supp. 2d 828 (W.D. Wis. 2003) ......................................... 6, 17

*United States v. Tull*, 481 U.S. 412 (1987) .................................................. 6

*United States v. Ward*, 448 U.S. 242 (1980) ............................................... 6

*USG Corp. v. Brown*, No. 89 C 2874, 1997 WL 89229 (N.D. Ill. Feb. 25, 1997) ..................... 17

STATE CASES

*Beerman Realty Co. v Alloyd Asbestos Abatement Co.*,
   653 N.E. 2d 1218 (Ohio Ct. App. 1995) ...................................................................... 9

*City of Ft. Pierre v. United Fire and Casualty Co.*, 463 N.W.2d 845 (S.D. 1990) ........................ 8

ADMINISTRATIVE ADJUDICATIONS

*Alliant Techsystems, Inc. & Riteway Servs., Inc.*, EPA Docket
   No. CAA-III-075, 1997 EPA ALJ Lexis 142 (ALJ Dec. 4, 1997) ............................................... 9

*County of Bergen & Betal Envir. Corp.*, EPA Docket Nos. RCRA 02-2001-7110 and 7108,
   2002 EPA ALJ LEXIS 13 (ALJ Mar. 7, 2002) ............................................................. 9

FEDERAL STATUTES

Oil Pollution Act of 1990. P.L. No. 101-380, 33 U.S.C 2701, 104 Stat. 484 (1990) .......... 7, 13, 15

33 U.S.C. § 1321 ............................................................................................................. 6, 13

33 U.S.C. § 1321(b)(6) ...................................................................................................... 10

33 U.S.C. § 1321(b)(12) ................................................................................................ 19, 21

33 U.S.C. § 1321(b)(7) ...................................................................................................... 5

33 U.S.C. § 1321(b)(7)(A) ................................................................................................ 11

33 U.S.C. § 1321(b)(7)(D) ............................................................................................ 10-12

33 U.S.C. § 1321(b)(8) .............................................................................................. 6, 7, 19

33 U.S.C. § 1321(h) ...................................................................................................... 9, 13

33 U.S.C. § 2702 ........................................................................................................ 8, 11, 19

33 U.S.C. § 2702(a) ...................................................................................................... 5, 15

33 U.S.C. § 2702(b) ...................................................................................................... 5

33 U.S.C. § 2702(d) ............................................................................................... 15

33 U.S.C. § 2704(a) .......................................................................................... 11, 12

33 U.S.C. § 2704(c)(1)(A) .................................................................................... 11

33 U.S.C. § 2704(c)(3) ......................................................................................... 12

33 U.S.C. § 2709 .................................................................................................. 14

33 U.S.C. § 2710 .............................................................................................. 5, 14

33 U.S.C. § 2712 .................................................................................................. 11

33 U.S.C. § 2713 .................................................................................................. 11

42 U.S.C. § 6901 .................................................................................................. 10

42 U.S.C. § 7413(e)(1) ........................................................................................... 9

42 U.S.C. § 9607(e) ............................................................................................... 5

## FEDERAL RULES

Fed. R. Civ. P. 56(a) ............................................................................................... 2

## FEDERAL REGULATIONS

40 C.F.R. 19.4 ................................................................................................. 10, 11

## LEGISLATIVE HISTORY

H.R. Rep. No. 101-653 (Aug.1, 1990) (Conf. Rep.),
 *reprinted in* 1990 U.S.C.C.A.N. 779 ............................................................. 6, 15

Oil Pollution Act of 1990, H.R. 1465, 101st Cong. (1989-1990) .................... 7

S. Rep. No. 101-94 (July 28, 1989), *reprinted* in 1990 U.S.C.C.A.N. 722 ................................. 12

136 CONG. REC. H6933-02, H6940 (1990)................................................................. 7

iv

TREATIES

*The International Convention for the Prevention of Pollution From Ships*,
  1973, 12 I.L.M. 1319, as amended by 1978 Protocol,
  17 I.L.M. 546 (MARPOL 73/78)................................................................. 20

*The United Nations Convention on the Law of the Sea*,
  1982, 21 I.L.M. 1245, 21 I.L.M. 1261 (LOS)............................................... 20

OTHER AUTHORITIES

*Black's Law Dictionary* (9th ed. 2009) .......................................................... 14

Restatement (Second) of Contracts § 178 (1981) ............................................ 4, 10, 12

Daniel B. Shilliday *et al., Contractual Risk−Shifting in Offshore Energy Operations,*
  81 Tulane L.Rev. 1579 (2007) ...................................................................... 13

22 Op. O.L.C. 141, 1998 WL 1180050 (July 22, 1998). ............................... 16

57A Am.Jur.2d *Negligence* § 58 (2004) ....................................................... 13

## INTRODUCTION

Before this Court is Transocean's "Motion for Partial Summary Judgment Against BP to Enforce BP's Contractual Obligations, Including BP's Obligation to Defend, Indemnify and Hold Transocean Harmless Against Pollution Claims" [Dkt. 4477].  Transocean requests, *inter alia*, an order requiring BP "to honor its promise to indemnify Transocean for [Clean Water Act] (and any other) civil penalties arising from pollution or contamination" [Dkt. 4477-1, at p. 41].

Transocean's motion seeks to resolve issues of remedy and allocation of damages and penalties before an adjudication of liability.  The motion is premature.  The motion seeks to resolve issues that must be analyzed based on evidence yet to be presented.  Thus, material factual disputes remain, precluding summary judgment.  *Carrizales v. State Farm Lloyds,* 518 F.3d 343, 345 (5th Cir. 2008).  Notably, even if the Court were to accept all of Transocean's arguments (and it should not), the indemnity provision at issue does not cover any liabilities that resulted from willful misconduct.  At trial, the United States respectfully believes it will establish that Transocean's acts and omissions in this case amounted to willful misconduct that obviates the indemnity, rendering the issue of the enforceability of the indemnity provision moot.

In any event, to the extent Transocean seeks to avoid civil penalties under the Clean Water Act ("CWA," also known as the Federal Water Pollution Control Act, "FWPCA") on the basis of a contract provision that predates the *Deepwater Horizon* incident, the motion should be denied as contrary to public policy.  The purposes of CWA civil penalties are punishment and deterrence, and the Act's penalties are therefore tailored to each individual violator.  While prudent parties may plan in advance to allocate the risk of damages from an accident caused by negligence, through indemnity agreements or simply through insurance, a party may not take on responsibility for the safety of a sophisticated and potentially dangerous operation like

1

*Deepwater Horizon*, engage in gross negligence and willful misconduct, and then expect another party to pick up the tab when civil penalties are imposed.  Tolerating indemnity in these circumstances would eviscerate Congress's endorsement of stiff penalties under the CWA.  Unlike post-violation surety bonds or other provisions, which are designed to ensure payment of a penalty or fine without the need to detain an operating commercial vessel in port, a pre-violation contract to immunize a responsible party from CWA civil penalties undermines the incentive to operate safely and comply with federal regulations.

This case stands in stark contrast to the equitable indemnity and contribution cases upon which Transocean primarily relies.  Those doctrines apply after the violation has occurred, to apportion or assign fault to the party that bears responsibility for the damage.  Here, Transocean seeks the opposite result:  to avoid civil penalties regardless of who is at fault.  However, just as equity demands (post-violation) that the wrongdoer pay penalties for causing harm, public policy demands that a pre-violation indemnification agreement is void, when its implementation would relieve the wrongdoer of the responsibility to pay civil penalties for its actions.

Accordingly, the United States respectfully requests that the Court deny the motion.

<u>**ARGUMENT**</u>

**A.      Transocean's Motion Lacks Factual Basis and is Premature.**

Summary judgment is only proper if the pleadings, depositions, documents, answers to interrogatories, admissions, and declarations or affidavits, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "'material' if its resolution could affect the outcome of the action." *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.,* 482 F.3d 408, 411 (5th Cir. 2007).

2

Transocean's motion makes a variety of factual claims, especially regarding the nature of its own conduct leading up to the fire, explosion, sinking, and oil spill associated with the *Deepwater Horizon*.  None of these factual claims are appropriate for resolution or consideration at this time.  The facts have not yet been presented, but the United States intends to prove that the discharge of oil from the Macondo Well was caused in part by Transocean's willful misconduct.  [10-4536, Dkt. 1, at p. 19, ¶ 69.]  Willful misconduct may be established by showing a "combination of factors" that, taken together, "indicate[] a reckless disregard of the consequences."  *Tug Ocean Prince v. United States*, 584 F.2d 1151, 1164 (2d Cir. 1978) ("*Tug Ocean Prince II*").  Once the evidence is in, the United States will show at trial that acts and omissions on the part of Transocean, taken together, demonstrate willful misconduct.

If this Court finds that Transocean engaged in willful misconduct, the indemnity provision in Transocean's contract, by its own terms, would not apply, as the indemnity provision does not even purport to indemnify penalties arising from willful misconduct.  Drilling Contract, Articles 24.2, 25.1.  [Dkt. 4477-1, App. A-3 at pp. 25-26.]  Accordingly, the necessary inquiry into the willfulness of the violation warrants denial of Transocean's motion for partial summary judgment because the motion is premature.

Moreover, as discussed below, full consideration of whether the indemnity provision is contrary to public policy may require an inquiry into the seriousness of the misconduct — an inquiry that requires an analysis of facts not yet presented.  The Court cannot find that Transocean is entitled to partial summary judgment without resolving genuine issues of material fact going to Transocean's conduct.

3

**B.**     **The Contractual Provision Purporting to Indemnify a Regulated Entity from Clean Water Act Civil Penalties Is Contrary to Public Policy and Therefore Unenforceable.**

If the Court does not find that Transocean's acts and omissions constitute willful misconduct, public policy still demands denial of Transocean's motion as to indemnification for CWA civil penalties.  An agreement that is contrary to public policy is void and unenforceable. *See* Restatement (Second) of Contracts § 178 (1981).  "The relevant principle is well established: a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement."  *Town of Newton v. Rumery*, 480 U.S. 386, 392 (1987).  In weighing the public policy that might be harmed by enforcement, courts examine "(a) the strength of that policy as manifested by legislation or judicial decisions, (b) the likelihood that a refusal to enforce the term will further that policy, (c) the seriousness of any misconduct involved and the extent to which it was deliberate, and (d) the directness of the connection between that misconduct and the [contractual] term."  Restatement (Second) of Contracts, § 178(3) (1981).  In weighing the interest in enforcing a contractual term, courts examine "(a) the parties' justified expectations, (b) any forfeiture that would result if the enforcement were denied, and (c) any special public interest in enforcement of the particular term."  *Id*. § 178(2).

As set forth in more detail below, application of this balancing approach compels a finding that the contractual provision purporting to indemnify Transocean from CWA civil penalties is contrary to public policy in the circumstances presented here.  Particularly in an instance involving dangerous activity that can result in substantial harm, coupled with serious allegations of gross negligence and willful misconduct, the strong public policy embodied in CWA penalty provisions outweighs any expectation on the part of Transocean that, as a violator

of the CWA, it could nevertheless escape CWA civil penalties.  The circumstances here differ from instances where the United States, as an enforcement agency, chooses, in is discretion, to accept indemnification of penalties *after* a violation has been discovered, to allow commerce to flow, or for other good reasons (*e.g.*, when the Coast Guard allows a ship to be released from detention after a CWA violation once a surety has been posted).  Because of government control and acceptance in the latter scenario, the two have different policy implications and should be so distinguished.

> **1.  The CWA Reflects a Strong Public Policy that Civil Penalties be Paid by the Party Responsible for the Violation, Especially in Light of the Dangerous Nature of the Conduct and the Seriousness of the Violation.**

It can be both legal and appropriate for indemnification agreements to cover liabilities for costs and damages specified by OPA section 1002(b), 33 U.S.C. § 2702(b), that result from oil spills.  *See* OPA section 1010, 33 U.S.C. § 2710; *see also* CERCLA section 107(e), 42 U.S.C. § 9607(e).  The OPA provisions that establish liability for costs and damages serve to reimburse the United States for costs incurred in response to discharges of oil, and to make whole parties that have suffered injuries as a result of discharges of oil.  OPA section 1002(a) & (b), 33 U.S.C. § 2702(a) & (b).  Insurance and indemnification agreements can be instrumental in achieving these goals, particularly when an insured or indemnified liable party lacks sufficient resources for a timely cleanup, but can obtain and provide such resources through insurance policies or indemnification agreements.

However, indemnification between wrongdoers who caused or contributed to the incident should not extend to civil penalties for discharges of oil established under CWA section 311(b)(7), 33 U.S.C. § 1321(b)(7).  The overarching goals of CWA civil penalties are punishment and general and specific deterrence.  "The legislative history of the [CWA] reveals

that Congress wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties." *United States v. Tull*, 481 U.S. 412, 422 (1987) (citations and internal quotation marks omitted); *Kelly v. EPA*, 203 F.3d 519, 523 (7th Cir. 2000) ("Civil penalties under the Clean Water Act are intended to punish culpable individuals and deter future violations, not just to extract compensation or restore the status quo."); *United States v. Thorson*, 300 F. Supp. 2d 828, 834 (W.D. Wis. 2003) ("Under the Clean Water Act, civil penalties are punitive in nature.").[1] These goals of deterrence and punishment would be frustrated if violators were allowed to contract away their liability for civil penalties.

Transocean's contention that CWA civil penalties are remedial rather than punitive is misplaced. The case on which Transocean relies, *United States v. Ward*, 448 U.S. 242 (1980), merely held that CWA penalties are not so punitive as to render them criminal or "quasi-criminal," and therefore they do not trigger the Fifth Amendment's Self Incrimination Clause. *Id.* at 255. Nothing in *Ward* casts doubt upon the acknowledged purpose of CWA penalties to punish existing violations and deter future violations.

Indeed, Congress tailored CWA civil penalties specifically to the liable violator, based on factors such as the violator's "degree of culpability," the economic impact of the penalty *on the violator*," the violator's "history of prior violations," "efforts *of the violator* to minimize or mitigate the effects of the discharge," and "economic benefit *to the violator*." CWA section 311(b)(8), 33 U.S.C. § 1321(b)(8) (emphasis added). This tailoring furthers the goals of specific deterrence and specific punishment, which would be undermined if the violator were allowed to

---

[1] *See also United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1128 (5th Cir. 1981) ("The purpose of the FWPCA and of section 1321 [CWA section 311] is to achieve the result of clean water *as well as deter conduct causing spills.*" (emphasis added)); House Conference Report, Oil Pollution Act of 1990, H.R. Conf. Rep. 101-653 (Aug. 1, 1990), 1990 U.S.C.C.A.N. 779, 833 ("Typically, oil spills involve a large element of human error. Civil penalties should serve primarily as an additional incentive to minimize and eliminate human error and thereby reduce the number and seriousness of oil spills.").

contract away liability for a penalty specifically tailored to that violator.  Such contracting-away would also mean that time and resources spent by Environmental Protection Agency ("EPA") and Coast Guard officials and the courts to apply these factors to develop an appropriate violator-specific penalty — as mandated by Congress[2] — would be wasted.

Civil penalty provisions in strict-liability statutes like the CWA are often used to protect the public and regulate potentially dangerous or harmful activities, by ensuring that *every actor* involved with the activity, no matter how large or small its role, has a concrete incentive to minimize the potential danger or harm at issue.  At the same time, some of the CWA penalty factors, such as "economic impact of the penalty on the violator" and "degree of culpability," serve to protect small or relatively blameless violators from a penalty that is disproportionate to their size or culpability.[3]

Under these provisions, BP would pay a civil penalty specifically tailored to BP.[4] Transocean, in turn, would pay a civil penalty specifically tailored to Transocean.  Granting Transocean's motion would lead to an incongruous procedure in which the Court assesses penalties on the basis of Transocean's degree of culpability and the economic impact of a fine on Transocean — even though Transocean would not pay the fine.  This result invites responsible

---

[2] *See* CWA section 311(b)(8), 33 U.S.C. § 1321(b)(8) ("In determining the amount of a civil penalty … the [EPA] Administrator, Secretary [of the Department in which the Coast Guard is operating], or the court, as the case may be, *shall* consider …[list of penalty factors]." (emphasis added)).

[3] *See* Remarks of Rep. Arlan Stangeland on the increase in CWA civil penalties for discharges of oil, proposed by H.R. 1465, later enacted as P.L. No. 101-380, the Oil Pollution Act of 1990:

> I support tough penalties.…  We need to make the polluter pay.  But we also need to give agency officials and judges some basic parameters to follow.…  Therefore … the conferees have specifically included various factors to be considered in determining the amount of penalties. Particular weight should be given to the degree of culpability, the economic impact of the penalty on the violator, efforts taken to mitigate the spill, and other matters as justice and fairness require.

136 Cong. Rec. H6933-02, H6940 (Aug. 3, 1990), 1990 WL 111529 (Cong. Rec.).

[4] The United States has also asserted a CWA civil penalty claim against BP based, *inter alia*, upon BP's gross negligence and willful misconduct.  [10-4536, Dkt. 1, at p. 19, ¶¶ 69, 75.]

parties to violate the CWA, or even engage in grossly negligent or reckless conduct, without being held specifically financially responsible for the penalties associated with that conduct.

The strong public policy reflected in the CWA is supported by judicial decisions as well as analogous statutes. Courts that have examined the issue of indemnity for CWA civil penalties have arrived at results consistent with the goals of the CWA and the purposes of CWA civil penalties. For example, in *Tug Ocean Prince v. United States*, 436 F. Supp. 907 (S.D.N.Y. 1997), *aff'd in part & rev'd in part on other grounds*, 584 F.2d 1151 (2d Cir. 1978), the court allowed indemnification of costs and damages arising from a barge's discharge of oil, but declined to extend the indemnity to cover CWA civil penalties. *See id.* at 926. Likewise, in *United States v. Tex-Tow, Inc.*, 589 F.2d 1310 (7th Cir. 1978), while the Seventh Circuit left the "ultimate question of liability unresolved," it noted that refusing to extend indemnity to CWA civil penalties would be consistent with the purpose of the civil penalty provision. *See id.* at 1314-15. And in *City of Ft. Pierre v. United Fire & Cas. Co.*, 463 N.W.2d 845 (S.D. 1990), the court held that an insurer had no duty to defend its insured against a claim for CWA civil penalties. *See id.* at 848-49. The court explained that, "as a general rule, it is against public policy to allow the insured wrongdoer to shift the burden of payment of punitive damages to its insurer"; analogously, permitting the insured wrongdoer to shift responsibility for civil penalties to the insurer would allow the insured to "act with impunity." *Id.* at 849. As a result, the insured "would not be punished, nor would it be deterred from similar actions." *Id.*

Moreover, in other similar contexts, courts have prohibited indemnification for civil penalties. For instance, the CWA and the Clean Air Act ("CAA") are both strict-liability environmental statutes, with similar civil penalty provisions. Neither statute provides for a third-party defense to liability for civil penalties and both take into account violator-specific factors to

8

establish the appropriate amount of a civil penalty.  *See* CAA section 113(e)(1), 42 U.S.C. §

7413(e)(1) (establishing penalty assessment criteria, including, *inter alia*, "economic impact of

the penalty on the business," "the violator's full compliance history and good faith efforts to

comply," and "the seriousness of the violation"); *see also Beerman Realty Co. v Alloyd Asbestos

Abatement Co.,* 653 N.E. 2d 1218, 1223 (Ohio Ct. App. 1995) ("Courts have … recognized that

parity exists between the penalty provisions of the Clean Air Act and the Clean Water Act.")

(citing cases). [5]

      Courts interpreting the CAA have consistently concluded that civil penalties should not

be subject to indemnification.  *See, e.g.*, *Beerman Realty Co.*, 653 N.E. 2d at 1223 (holding that

it would "violate the public policy and contravene the purpose of the Clean Air Act" to allow

indemnification for a CAA civil penalty); *United States v. J & D Enters. of Duluth*, 955 F. Supp.

1153, 1159 (D. Minn. 1997) (holding, in a case where there was no express contractual

indemnity provision, that allowing indemnification of civil penalties under the CAA would

"contravene public policy" and "effectively remove any incentive … to comply with the

governing air quality regulations"); *see also Alliant Techsystems, Inc. & Riteway Servs., Inc.*,

EPA Docket No. CAA-III-075, 1997 EPA ALJ LEXIS 142, at *6 (ALJ Dec. 4, 1997) (excluding

an indemnity agreement and stating in dicta that "it would defeat the underlying purposes of the

[Clean Air] Act to allow an individual who has been held liable for a civil penalty to receive

indemnification for such penalties" and "it would be improper to excuse responsibility by

contracting it away."); *County of Bergen & Betal Envir. Corp.*, EPA Docket Nos. RCRA 02-

2001-7110 and 7108, 2002 EPA ALJ LEXIS 13, at *14 n.2 (ALJ Mar. 7, 2002) (citing *Alliant*

---

[5] Transocean argues that Clean Air Act cases are not on point regarding indemnification of civil penalties, citing the existence of CWA section 311(h), 33 U.S.C. § 1321(h), and the absence of a similar provision in the Clean Air Act. However, as discussed below (p. 13 *infra*) CWA section 311(h) does not apply to cases, such as this one, in which liability is established under OPA section 1002, 33 U.S.C. § 2702.

and suggesting that indemnification of civil penalties would also be inapplicable under the

Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., another strict-liability

environmental statute).  *Id.*

> **2.   The Serious Nature of the CWA Violations, and the Willfulness of
>        Transocean's Conduct, Counsel Against Permitting Indemnification for Civil
>        Penalties.**

As noted above, it is against public policy to permit pre-violation contractual

indemnification of any CWA civil penalty, regardless of the degree of culpability of the violator.

In addition, where, as here, allegations of gross negligence and willful misconduct have been

made, the "seriousness of the misconduct" at issue, as well as "the extent to which it was

deliberate," Restatement (Second) of Contracts § 178(3)(c), weigh heavily in favor of denying

Transocean's motion.  In addition, the existence of material factual disputes regarding these

allegations requires denial of the motion.

In enacting OPA, Congress also recognized the particular need to deter and punish

conduct that rises to the level of gross negligence or willful misconduct.  Prior to the 1990

amendments to the CWA, heightened civil penalties under CWA section 311 could only be

imposed by a showing of willful misconduct, and even then, the penalty was capped at $250,000.

CWA section 311(b)(6), 33 U.S.C. § 1321(b)(6) (1989).  By contrast, after the 1990 amendments

to the CWA, heightened civil penalties may be imposed by a showing of willful misconduct *or*

gross negligence.  CWA section 311(b)(7)(D), 33 U.S.C. § 1321(b)(7)(D).  And when the gross

negligence or willful misconduct of the violator has been established, the violator is subject to a

penalty of *at least* $100,000, and up to $4,300 per barrel of oil discharged.  CWA section

311(b)(7)(D), 33 U.S.C. § 1321(b)(7)(D), as adjusted by the Civil Monetary Penalty Inflation

Adjustment Rule, 40 C.F.R. 19.4 (Table 1).  The per-barrel penalty for discharges arising from

gross negligence or willful misconduct is nearly four times the per-barrel penalty for discharges that do not arise from such conduct. *Compare* CWA section 311(b)(7)(A), 33 U.S.C. § 1321(b)(7)(A), as adjusted by 40 C.F.R. 19.4 (Table 1) *with* CWA section 311(b)(7)(D), 33 U.S.C. § 1321(b)(7)(D), as adjusted by 40 C.F.R. 19.4 (Table 1).

Additionally, while responsible parties' liability for costs and damages specified by OPA section 1002, 33 U.S.C. § 2702, is limited to certain amounts, based on the type of vessel or facility involved in the incident, OPA section 1004(a), 33 U.S.C. § 2704(a),[6] those limits do not apply if the proximate cause of the incident is gross negligence or willful misconduct. OPA section 1004(c)(1)(A), 33 U.S.C. § 2704(c)(1)(A). Accordingly, the public-policy considerations against indemnifying a CWA civil penalty are especially strong when the penalty is based in gross negligence or willful misconduct.

Moreover, deterring future acts and punishing past acts of gross negligence and willful misconduct is particularly important when the consequences of such conduct can be catastrophic, as they clearly can be in the context of offshore and deepwater drilling. Recognizing that the potential consequences of an oil spill from an Outer Continental Shelf ("OCS") facility far exceed a spill from a tanker or other vessel, Senators Chafee, Lieberman, Graham, and Durenberger noted:

> OCS spills … can involve prodigious and seemingly unlimited quantities of crude oil. The size of such spills can be enough to fill hundreds or even thousands of tankers the size of the *Exxon Valdez*. … OCS spills are often difficult to control. Welding steel plates below the waterlines of a leaking supertanker is extraordinarily difficult. But it is much more difficult to cap a well which has blown out three miles beneath the oceans surface.

---

[6] OPA section 1002 costs and damages over and above the liability limit are paid from the Oil Spill Liability Trust Fund. *See* OPA sections 1012, 1013, 33 U.S.C. §§ 2712, 2713.

Additional Views of Senators Chafee, Lieberman, Graham, and Durenberger, S. Rep. No. 101-94 (July 28, 1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 748-749.  In the case of the fire, explosion, and spill from the *Deepwater Horizon*, the consequences were indeed catastrophic: Eleven people lost their lives, and millions of barrels of oil flowed into the Gulf of Mexico.  [10-4536, Dkt. 1, at p. 1, ¶ 1.][7]

As discussed in Section A., above, the United States intends to prove willful misconduct on the part of Transocean.  But even if the Court finds only that Transocean engaged in grossly negligent conduct, the dangerous nature of the activity involved here and the seriousness of the violations all operate to show that, to the extent the indemnity provision immunizes Transocean for civil penalties based in gross negligence, that provision should be held unenforceable.  Under the legal standard set forth in the Restatement (Second) of Contracts, a judicial finding of gross negligence by Transocean would decidedly tip the balance against enforcement of the indemnification provision.  Moreover, by adding gross negligence to the heightened penalty provision, CWA section 311(b)(7)(D), 33 U.S.C. § 1321(b)(7)(D), Congress expressly gave grossly negligent conduct the same penalty exposure as willful misconduct.  It would contradict Congress's intent in equally penalizing these levels of culpability, if CWA civil penalties based in gross negligence were subject to indemnification under the contract provision, but penalties based in willful misconduct were not.

Additionally, secondary sources support the position that an exemption from liability for gross negligence or willful misconduct in a maritime contract is contrary to public policy. *See,*

---

[7]  Congress and federal agencies have recognized the serious nature of incidents involving offshore and deepwater drilling.  Removal costs incurred by the government in response to discharges from OCS facilities are not subject to the limitations of liability established by OPA section 2004(a), 33 U.S.C. § 2704(a).  OPA section 1004(c)(3), 33 U.S.C. § 2704(c)(3).  Furthermore, offshore and deepwater drilling is subject to numerous safety and environmental regulations. *See, e.g.*, 40 C.F.R Part 250, Subparts A, C, D, H, and O.

*e.g., Royal Ins. Co. of Am. v. Southwest Marine,* 194 F.3d 1009, 1016 (9th Cir. 1999) (citing

various secondary sources); 57A Am. Jur. 2d *Negligence* § 58 (2004) ("It has been held that a

person may not exonerate himself or herself from liability for intentional torts, for willful or

wanton misconduct, or for gross negligence by the use of exculpatory language; such a provision

is void as against public policy"); Daniel B. Shilliday *et al., Contractual Risk–Shifting in*

*Offshore Energy Operations,* 81 TUL. L. REV. 1579, 1604 (2007) ("Courts sitting in admiralty are

clear that it is against public policy for a party to a maritime contract to be indemnified for its

own gross negligence.").

### 3. Nothing in the CWA or OPA permits Indemnification for CWA Civil Penalties.

Transocean cites two statutory provisions to support its argument that the CWA and OPA

permit indemnity for civil penalties.  Neither provision, however, applies here.

Transocean first cites CWA section 311(h), which provides that "[t]he liabilities

established by this section shall in no way affect any rights which (1) the owner or operator of a

vessel or of an onshore facility or an offshore facility may have against any third party whose

acts may in any way have caused or contributed to such discharge . . . ."  33 U.S.C. § 1321(h).

But as Transocean admits, this section does not apply to an "incident for which liability is

established under section 1002 of [the Oil Pollution] Act."  [Dkt. 4477-1, at p. 37.]  *See also* P.L.

101-380 § 2002(a).  In this case, the United States has alleged liability under section 1002 of

OPA.  Accordingly, CWA section 311(h) does not apply.

Transocean seeks to overcome this critical flaw by arguing that CWA section 311(h) was

essentially replaced by OPA section 1009, which states:  "A person may bring a civil action for

*contribution* against any other person who is liable or potentially liable under this Act or another

law." 33 U.S.C. § 2709 (emphasis added).  Nothing in this OPA section suggests that a pre-violation contract provision for indemnity is enforceable.  Contribution is a right grounded in equity.  *See Odd Bergs Tankrederi A/S v. S/T Gulfspray*, 650 F.2d 652, 654 (5th Cir. 1981); *see also* Black's Law Dictionary 378 (9th ed. 2009) (defining "contribution" as a right of multiple persons "to recover proportionately from each other" and to assign shares "determined as percentages of causal fault").  The establishment of a right to seek contribution from a party who was also at fault does not support an attempt to avoid fault entirely by indemnifying a party against civil penalties based upon that party's conduct.

Moreover, although OPA section 1009 does not specify the liabilities for which a civil action for contribution may be brought, the best interpretation of that section provides only for contribution for liabilities established pursuant to OPA's Title I.  *See, e.g.*, *United States v. Locke*, 529 U.S. 89, 105-106 (2000) (finding the placement of OPA's savings clauses in Title I to be significant and concluding that these provisions "do not extend to subjects addressed in the other titles of the Act or other acts.")  Accordingly, OPA section 1009 does not create a right of contribution for liabilities established outside the scope of the OPA title in which it is found (Title I) and therefore does not create a right of contribution for CWA civil penalties, much less a right to indemnification.

Transocean's reliance upon OPA section 1010 fares no better.  That section provides: "Nothing *in this Act* prohibits any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability *under this Act*."  33 U.S.C. § 2710 (emphasis added).  However, the OPA provision referring to "liability under this Act" should not be interpreted as applying to civil penalties awarded *under the CWA*, especially where allowing indemnity for civil penalties in the face of significant violations would undermine the purpose of both statutes.  The civil

14

penalties at issue here were authorized not by OPA, but by the CWA.  Congress merely *amended* the CWA penalty provisions at the same time it enacted OPA.  *See, e.g.*, OPA section 4301, P.L. No. 101-380 § 4301 (titled "*Federal Water Pollution Control Act*" penalties (emphasis added)); OPA section 4301(b), P.L. No. 101-380 § 4301(b) ("PENALTIES FOR DISCHARGES AND VIOLATIONS OF REGULATIONS — Section 311(b) of the Federal Water Pollution Control Act (33 U.S.C. § 1321) is *amended* by striking paragraph (6) and inserting the following new paragraphs…." (emphasis added)); H.R. Conf. Rep. 101-653 (Aug.1, 1990), *reprinted in* 1990 U.S.C.C.A.N. 779, 832 ("Section 4301 of the Conference agreement increases penalties *under the Federal Water Pollution Control Act* for discharge of oil or hazardous substances …" (emphasis added)).

At the same time, Congress added new provisions in OPA itself that imposed liability for cleanup as well as compensatory damages.  OPA section 1002(a), (d), 33 U.S.C. § 2702(a), (d).  Those are the provisions to which OPA section 1010 refers.  Thus, the phrase "liability under this Act" is appropriately interpreted as referring to the specific liabilities provided in OPA itself — compensatory damages and cleanup costs.  That Congress specified in OPA that nothing "in this Act" prohibits indemnity agreements for the liabilities "this Act" creates says nothing about whether the civil penalty provisions of the CWA can be circumvented through an indemnity agreement.  Congress did not intend to eliminate incentives to obey federal safety and environmental protection statutes and regulations when conducting inherently dangerous offshore drilling activities — let alone to immunize drillers from civil penalties for reckless behavior that causes catastrophic damage.  Given the strong public policy considerations weighing against indemnification of CWA civil penalties, if Congress intended to allow their indemnification, it would have done so expressly.

15

**4.  The Cases Cited by Transocean Do Not Support Enforcement of an Ex Ante Express Indemnity Provision With Respect to CWA Civil Penalties.**

Transocean cites a series of cases to support its contention that its pre-violation indemnity agreement is enforceable even as to civil penalties.  Those cases, however, are inapposite.  Two of the cases Transocean cites concern not pre-violation indemnity agreements, but post-violation *equitable* indemnity claims.  Those claims, however, are fundamentally different from the situation presented here, and have no application to this case.

In *Montauk Oil Transp. Corp. v. Tug El Zorro Grande*, 54 F.3d 111 (2d Cir. 1995), for instance, a CWA civil penalty was imposed on the owner of a barge from which oil was discharged.  *See id.* at 114-15.  The tug towing the barge admitted that its negligence had caused the discharge of oil, and the barge owner sought indemnification from the tug.  After examining the facts and circumstances giving rise to the violation — most notably, the tug's admitted negligence — as a matter of equity, the court found the barge owner entitled to indemnification. *See id.*;[8] *see also United States v. General Dynamics Corp.*, 755 F. Supp. 720, 724-25 (N.D. Tex. 1991) (denying summary judgment on a claim seeking indemnity of CAA civil penalties).

Equitable indemnity apportions between the parties based on their relative level of culpability, permitting the court to evaluate the facts and circumstances giving rise to the violation, as well as the gravity of the violation, and ultimately to determine who is primarily at

---

[8] Transocean claims that "[t]he Department of Justice has cited with approval *Montauk*'s holding that indemnifiable liabilities include civil penalties," citing an opinion of the Office of Legal Counsel.  [Dkt. 4477-1, at p. 36, fn *l*.] Transocean mischaracterizes the nature of that opinion and its brief mention of *Montauk*.  The opinion, entitled "Appropriate Source for Payment of Judgments and Settlements in *United States v. Winstar Corp.* and Related Cases," considered whether the Judgment Fund or the Federal Savings and Loan Insurance Corporation ("FSLIC") Resolution Fund (established to assume all assets and liabilities of FSLIC when it was abolished) was the appropriate source for payment of a judgment against the United States arising from the breach of a contract that FSLIC had been party to.  The opinion did not consider the question whether civil penalties are indemnifiable.  It merely cited *Montauk* to stand for the proposition that the term "liability" is a broad term, in its analysis of whether or not the "liabilities" of FSLIC included liabilities that were merely contingent at the time FSLIC was abolished. 22 Op. O.L.C. 141, 1998 WL 1180050, at *15, *19 (July 22, 1998).

fault.  Transocean seeks precisely the opposite result here.  It seeks to avoid civil penalties regardless of who is at fault, short-circuiting the process by which the Court will weigh the circumstances of the incident, the culpability of the parties and their degree of fault, and impose civil penalties specific to each individual violator as required by the CWA.

Also distinguishable is *USG Corp. v. Brown*, Nos. 89 C 2874, 1997 WL 89229, at *8 (N.D. Ill. Feb. 25, 1997), in which the court denied a summary judgment motion seeking indemnification under a merger agreement that indemnified the buyer from liabilities arising from pre-merger noncompliance with environmental laws and regulations.  The court found that the penalty imposed under the Resource Conservation and Recovery Act ("RCRA") resulted from both pre- and post-merger noncompliance, and that issues of fact remained that prevented the court from determining the appropriate allocation of the penalty between the parties as a matter of law.  But even if one assumed that indemnity was appropriate for a buyer saddled with penalties imposed as a result of pre-merger pollution, that result – based on the culpability of the seller – would have no application where, as here, Transocean seeks to avoid penalties regardless of its culpability.

The remaining cases upon which Transocean relies involved indemnity agreements governing compensatory damages and cleanup costs.  *See, e.g.*, *United States v. Thorson*, 300 F. Supp. 2d 828, 834 (W.D. Wis. 2003) (noting that under insured's general liability insurance policy that excluded recovery for punitive damages, costs of restoring illegally filled wetlands would be presumptively recoverable, but CWA civil penalties would not be).[9]  Contrary to

---

[9] The *Thorson* court did indicate in *dicta* that the policy "might" have provided coverage for the civil penalty, absent its specific exclusion for punitive damages.  *Thorson*, 300 F. Supp. 2d at 834.  Other insurance policies at issue in the case did not contain the same exclusions for punitive damages, but the court found the recovery sought by the insured to be outside the scope of those policies on other grounds.  *See id.* at 834-835.  Ultimately, the court found

Transocean's contention that the court in *Scholastic Inc. v. M/V Kitano*, 362 F. Supp. 2d 449 (S.D.N.Y. 2005) permitted "contractual indemnity for all 'losses, damages, liabilities, civil penalties and expenses,'" [Dkt. 4477-1, at p. 39, fn n.], neither party in that case sought indemnity for civil penalties. In fact, the only type of indemnity awarded in that case was for attorney's fees and expenses. *See* 362 F. Supp. 2d at 461.[10]

Plainly, those cases have no bearing on the public-policy implications of permitting pre-violation indemnity agreements for civil penalties between two responsible parties. As noted above, the United States does not argue that indemnification of cleanup costs and compensatory damages is contrary to public policy, nor does its argument implicate the validity of the use of post-violation bonds or other sureties by the maritime shipping industry. A pre-violation indemnification agreement between two responsible parties for CWA civil penalties in a case such as this, involving egregious and willful violations of a statute important to public and environmental health and safety, implicates more urgent public-policy considerations. In that context, the contractual provision purporting to indemnify Transocean from responsibility for civil penalties under the CWA should be held void as contrary to public policy.

> **5. Transocean's Argument That Public Policy Dictates the Enforcement of the Indemnity Provision Lacks Merit.**

Transocean argues it would be against public policy to void the indemnity provision. Transocean warns that "public policy would be turned on its head were drilling contractors or

---

no duty to defend or indemnify under any of the policies, and did not decide whether civil penalties could be subject to an indemnity agreement. *See id.* at 836.

[10] It is unclear if the indemnity sought in *United States v. City of Twin Falls*, 806 F.2d 862 (9th Cir. 1986) included civil penalties. The City claimed it should be indemnified by its allegedly negligent contractor for "any and all loss occasioned by recovery by the United States." *City of Twin Falls*, 806 F.2d at 866. Recovery by the United States was contained in a consent decree, *see id.*, and it is unknown if that recovery included civil penalties, or merely injunctive relief. Regardless, the court in *City of Twin Falls* simply found ancillary and pendent jurisdiction over the claim. *Id.* at 880. The court did not address the merits of the claim, including whether the claim included indemnity for civil penalties, or whether such indemnity could be allowed.

other oilfield service providers required to bear financial risks for losses in excess of their capital worth and exposure beyond that which can be insured." [Dkt. 4477-1, at p. 10.]  But while losses stemming from the discharge of oil can be substantial, in terms of liability for *costs* and *damages* under OPA section 1002, 33 U.S.C. § 2702, and could exceed the capital worth of a small business, the United States does not argue that such costs and damages should necessarily be excluded from indemnification agreements.  A party *can* be indemnified against liability for damages and cleanup costs without contravening public policy embodied in law.

The United States only argues that the indemnification provision should be void as to CWA civil penalties.  Accordingly, Transocean's fear that its monetary liability will exceed its worth is unfounded, as the CWA expressly requires consideration of "the economic impact of the penalty on the violator" when determining the appropriate amount of a civil penalty.  CWA section 311(b)(8), 33 U.S.C. § 1321(b)(8).

Transocean also argues that because CWA section 311(b)(12), 33 U.S.C. § 1321(b)(12) "allows for the posting of a bond or other surety to allow departure of a vessel that owes or may owe a civil penalty … [a]ny holding that fines are not subject to indemnity would jeopardize this essential maritime practice."  [Dkt. 4477-1, at p. 40.]  Again, Transocean's fear is unfounded.  A decision that voids Transocean's *ex ante* express indemnity provision under the extraordinary circumstances presented here would have no bearing on the bonds and sureties that are routinely available to vessel owners as contemplated by CWA section 311(b)(12).

Under CWA section 311(b)(12), if a vessel owes or may owe a civil penalty, the Coast Guard or EPA "shall" refuse or revoke the necessary clearances that allow the vessel to depart from port.  33 U.S.C. § 1321(b)(12).  However, if presented with a bond or other surety that is satisfactory to the Coast Guard or EPA, the clearance "may" be granted.  *Id.*  Such bonds and

other sureties are used in an entirely different context — and balance entirely different public-policy considerations — than the indemnity provision at issue here.

Bonds and sureties pursuant to CWA section 311(b)(12) are actually used as an enforcement tool by the federal government.  They ensure the payment of the civil penalty ultimately imposed by securing a promise to pay from a party with a legal presence and significant assets within the United States.  Without such a promise, especially in the case of a foreign-owned and highly mobile vessel, the detention of the vessel may be the only way for the federal government to secure any assets to satisfy the penalty.  But such detention of a vessel could have a negative impact on maritime commerce: the vessel and its innocent cargo will not reach the intended destination at the intended time.  In light of these important public-policy concerns, maritime treaties require that vessels be released without undue delay.[11]  Detention of the vessel could also cause a foreign owner to abandon the vessel, leaving the United States as its caretaker.

None of the public policy considerations that weigh in favor of granting a bond or surety as an alternative to vessel detention are found in this case.  First and foremost, the *Deepwater Horizon* is not a vessel loaded with cargo that needs to reach its destination on schedule.  The United States' ability to collect a penalty from Transocean is not based on whether the *Deepwater Horizon* is located in U.S. waters.  Treaty obligations and risk of vessel abandonment are not a concern.

---

[11] *See, e.g.*, International Convention for the Prevention of Pollution From Ships, art. 7, 1973, 12 I.L.M. 1319, 1973 U.S.T. Lexis 322, at *15, as amended by 1978 Protocol, 17 I.L.M. 546 ("MARPOL 73/78"); *see, also*, The United Nations Convention on the Law of the Sea, art. 226, 1982, 21 I.L.M. 1245, 21 I.L.M. 1261, 1982 WL 186633 (I.L.M.) ("LOS").  States are liable for damages arising from undue delay.  Art. 232.  The United States is not a party to LOS, but considers it reflective of customary international law.

Additionally, procedures set forth in CWA section 311(b)(12) allow the Coast Guard or EPA to consider the facts and circumstances of a given violator, a given violation, and a given guarantor, and weigh the competing public policy interests presented by a given case to decide whether or not to accept the bond or surety.  The indemnity provision that Transocean seeks to enforce does not give the government such a choice.

In sum, voiding an indemnity provision under which Transocean seeks to avoid civil penalties for the consequences of its conduct with respect to the hazardous operation of a deepwater offshore rig, in a case involving gross negligence and willful misconduct, will neither expose companies generally to liabilities in excess of their capital worth, nor prevent commercial vessel owners from taking advantage of the bond and surety provision of CWA section 311(b)(12).

## **CONCLUSION**

Transocean's Motion for Summary Judgment should be denied because it would require the Court to resolve disputed issues of material fact.  The motion is also premature because a finding of willful misconduct on the part of Transocean would render this issue moot, since the indemnity provision does not even purport to indemnify penalties arising from willful misconduct.  Moreover, the pre-violation indemnity provision Transocean seeks to enforce undercuts the purpose of CWA civil penalties as violator-specific means of punishment and deterrence.  As a matter of public policy, the provision should not be enforced to the extent it permits Transocean — a party accused of gross negligence or willful misconduct in connection with its responsibility for the safety of a sophisticated and potentially dangerous operation like *Deepwater Horizon* — to avoid CWA civil penalties.  This Court therefore should deny the motion on that ground as well.

21

For these reasons, and the reasons set forth above, the United States respectfully requests that, to the extent Transocean's motion seeks to allow indemnity for civil penalties under the Clean Water Act, the Court deny Transocean's Motion for Partial Summary Judgment Against BP to Enforce BP's Contractual Obligations, Including BP's Obligation to Defend, Indemnify and Hold Transocean Harmless Against Pollution Claims [Dkt. 4477.]


                                                    Respectfully submitted,


IGNACIA S. MORENO                                   TONY WEST
Assistant Attorney General                          Assistant Attorney General
Environment & Natural Resources Division            Civil Division

JAMES NICOLL                                        PETER F. FROST
Senior Counsel                                      Director, Torts Branch, Civil Division
NANCY FLICKINGER                                    Admiralty and Aviation
Senior Attorney                                     STEPHEN G. FLYNN
SARAH HIMMELHOCH                                    Assistant Director
Senior Litigation Counsel                           MICHELLE DELEMARRE
DEANNA CHANG                                         SHARON SHUTLER
SCOTT CERNICH                                        JESSICA SULLIVAN
A. NATHANIEL CHAKERES                               JESSICA MCCLELLAN
JUDY HARVEY                                          DAVID PFEFFER
MATT LEOPOLD                                         MALINDA LAWRENCE
ERICA H. PENCAK                                      Trial Attorneys
Trial Attorneys                                     Torts Branch, Civil Division
Environment & Natural Resources Division            P.O. Box 14271
P.O. Box 7611                                       Washington, D.C. 20044-4271
Washington, DC 20044-7611


22

/s/Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-514-2779/202-514-0180
Facsimile: 202-514-2583
E-mail: steve.o'rourke@usdoj.gov

/s/  R. Michael Underhill
R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg., Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone: 415-436-6648
Facsimile: 415-436-6632
E-mail: mike.underhill@usdoj.gov

JIM LETTEN
United States Attorney
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
Hale Boggs Federal Building
500 Poydras Street, Ste. B-210
New Orleans, LA 70130

Attorneys for the UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, today.

Date:  December 8, 2011

/s/ Steven O'Rourke