**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:   Oil Spill by the Oil Rig "Deepwater | : | MDL No. 2179 |
| Horizon" in the Gulf of Mexico, on | : | |
| April 20, 2010 | : | SECTION: J |
| | : | |
| This Document Relates To: All Actions | : | JUDGE BARBIER |
| | : | MAGISTRATE JUDGE |
| …………………………………………... | : | SHUSHAN |

**BP'S RESPONSE TO PSC'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY
AND ARGUMENTS REGARDING REGULATORY COMPLIANCE**

BP has gone to extraordinary lengths in this case to meet its discovery obligations, producing over five million pages in documents and presenting 92 witnesses for deposition, including 21 Rule 30(b)(6) deponents. The PSC now contends, without citing any specific prejudice, that one of BP's 30(b)(6) witnesses, Andrew Frazelle, was unprepared and lacking knowledge regarding the topics of (1) "regulatory compliance in selecting the BOP and its component parts," and (2) the temporary abandonment procedure.  Mr. Frazelle was presented 2 days on these narrow topics, answering numerous questions and establishing that he was more than adequately prepared to testify "about information known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6).

The PSC's complaint with Mr. Frazelle's testimony (which it aired for the first time with this motion over 40 days after the deposition) focuses on isolated testimony and generalized contentions.  But in the context of his full testimony, the PSC's motion does not establish that he was either unprepared or lacked knowledge, and certainly not to the extent to justify the exclusion-of-evidence sanction that the PSC seeks. *See Boland Marine & Mfg. Corp. v. M/V Bright Field*, No. CIV. A. 97-3097, 1999 WL 280451, at *3 (E.D. La. 1999); *see also Laforest v. Honeywell Int'l Inc*., 2004 WL 1811415 at *3 (W.D.N.Y) (finding that, in determining adequacy,

"it is necessary to consider the challenged testimony in the context of [the] complete testimony.").

I.     **Background**

A.     **Mr. Frazelle Testified Fully Regarding BOP Regulatory Compliance.**

As a "supplement" to Topics 13 and 23, BP presented Mr. Frazelle on "regulatory compliance in selecting the BOP and its component parts."[1] (Ex. A, Order 6-7, July 18, 2011, Dkt. 3354).

As a Wells Operations Manager with 28 years of experience working with deepwater drilling operations, Mr. Frazelle had familiarity with BOP-related federal regulations and how they apply.  (Ex. C, Frazelle Dep. 11:17-12:7; 78:22-79:3; 80:8-17, Sept. 26-27, 2011).   In preparation, Mr. Frazelle supplemented his knowledge, holding numerous conversations with BP employees, including Jim Grant from BP's Regulatory Group, and reviewing various federal regulations and prior deposition testimony.  (*Id.* at 79:8-17.   And Mr. Frazelle did testify on several subjects related to BOP regulatory compliance:  (1) calculation of maximum anticipated surface pressure ("MASP"), as used in 30 C.F.R. § 250.440 (*id.* at 92:6-12, 104:14-25, 106:7-15, 674:4-675:1); (2) BOP pressure rating under 30 C.F.R. § 250.440 (*id.* at 147:9-149:20); (3) BOP testing under 30 C.F.R. § 250.440 (*id.* at 122:19-123:15); and (4) BOP training and its correlation to well control training under 30 C.F.R. § 250.1503, subpart O (*id.* at 86:12-87:25). Although Mr. Frazelle was prepared, many of the relevant federal regulations, as set forth in 30 C.F.R. § 250.440 *et seq.*, were not discussed.

---

[1] The PSC incorrectly contends that this is the second time that BP has presented a witness to testify on "regulatory compliance in selecting the BOP." (PSC Mem. at 9).  Prior to Mr. Frazelle, BP had presented another witness on original Topics 13 and 23.   PSC complained that this witness was not prepared to testify on BOP regulatory compliance issues, but the Court found that BP was reasonable in concluding that the as-drafted 30(b)(6) topics did not "encompass whether the suitability of the BOP complied with regulations." Nonetheless, the Court proposed that BP present a witness on BOP regulatory compliance as a "supplement" to Topics 13 and 23.  (Ex. B, Tr. Status Conference Proceedings, 57:19-20, July 15, 2011).

The PSC seemingly does not dispute that Mr. Frazelle was generally prepared and knowledgeable, but instead alleges that he could not answer specific questions regarding one federal regulation—30 C.F.R. § 250.416(e) (2010). This regulation, which focuses on whether certain information was contained in the Application for Permit to Drill ("APD") that is submitted to MMS for approval of drilling operations, provides:[2]

> You must include in the diverter and BOP descriptions . . . (e) [i]nformation that shows the blind-shear rams installed in the BOP stack (both surface and subsea stacks) are capable of shearing the drill pipe in the hole under maximum anticipated surface pressures.

Specifically, the PSC complains that Mr. Frazelle was unable to answer 8 questions regarding this regulation. (PSC Mem. at 9, Nov. 5, 2011, Dkt. 4484-1). As the table below shows, for each of these questions either it was not asked, it was answered or it has been answered by another witness:

| Question | Response |
|---|---|
| Who at BP is responsible for Section 250.416(e) compliance? | Mr. Frazelle was asked who at BP is responsible for making sure that information under 30 C.F.R. § 250.416(e) is provided in the APD. (Ex. C, Frazelle 155:20-156:7; 157:8-9). Although Mr. Frazelle could not answer this question, Mr. Rich, who was BP's Rule 30(b)(6) designee for "chain of command in connection with the Macondo well, including decision making systems and authority," testified that the APD submission process went through BP's Drilling Engineers and then BP's Regulatory group. (Ex. D, Rich Dep. 412:10-17, June 1, 2011). |
| Has BP designated a person responsible for Section 250.416(e) compliance? | Mr. Frazelle was not asked whether BP has designated a person to be responsible for 30 C.F.R. § 250.416(e) compliance. Mr. Frazelle was asked if he knew the name of the person who submits this information to the MMS, and he did not. (Ex. C, Frazelle 157:8-9). Mr. Rich testified that the APD submission process went through BP's Drilling Engineers and then BP's Regulatory group. (Ex. D, Rich 412:10-17). Brett Cocales also testified about the submission of APDs. (Ex. I, Cocales Dep. 333:7- 334:21, April 25-26, 2011). |

---

[2] At the time of the incident, although 30 C.F.R. § 250.416(e) (2010) provided that the APD include information that shows the blind shear rams "are capable of shearing the drill pipe in the hole under maximum anticipated surface pressures," there was no regulation in 30 C.F.R. § 250.440 *et seq.* that set forth that the BOP have blind shear rams that had this capability.

| Question | Response |
|---|---|
| Does BP have a system for insuring regulatory compliance with Section 250.416(e)? <br><br> What actions have been taken to insure compliance with Section 250.416(e)? | Mr. Frazelle was not asked whether "BP [has] a system for insuring regulatory compliance with Section 250.416(e)", and "what actions have been taken to insure compliance" with this regulation. |
| Why is there nothing in the Application for Permit to Drill on the Macondo well that shows compliance with this particular regulation? | Mr. Frazelle was asked, "Do you even know if [the information of 30 C.F.R. § 416(e)] was submitted?" Mr. Frazelle requested to review a copy of the APD, and Mr. Frazelle was denied the opportunity. Mr. Frazelle did not deny or admit whether the information was submitted in the APD that MMS approved. (Ex. C, Frazelle at 157:10-22) |
| What audit procedure, if any, exists within BP to insure regulatory compliance? | Mr. Frazelle was not asked this question. Mr. Frazelle, however, was asked "what audit system is in place to make sure that the Wells Operations Manager and the Wells Team Leader actually [make sure that Transocean was calculating shearability with the MASP]." In response, Mr. Frazelle testified that he was "not aware of one." (*Id.* at 113:19-23). He further testified that "there is no system in place for that particular check or audit action," but that there was no need for such a check on a well-by-well basis if the MASP falls within the boundary conditions. (*Id.* at 115:3-19). |
| What safety process system, or safety management system, is in place that would apply to Gulf of Mexico regulatory compliance, particularly with regard to this particular issue? | Mr. Frazelle was not asked this question. Mr. Frazelle, however, was asked whether there was a "Safety Management System ever being utilized to ensure this particular function, namely, that Transocean correctly calculates shearability using the MASP," and responded, "I do not believe that's stipulated in -- in DWOP, no, sir." (*Id.* at 114:16-115:6) He further testified that "there is no system in place for that particular check or audit action," but that there was no need for such a check on a well-by-well basis if the MASP falls within boundary conditions. (*Id.* at 115:3-19) |
| What supervisory personnel are responsible for insuring compliance by their employees with this particular regulation? | Mr. Frazelle was not asked what supervisory personnel are responsible for insuring compliance by their employees with 30 C.F.R. § 250.416(e). With respect to who "was supposed to make sure that Transocean was calculating shearability with the MASP" when necessary, Mr. Frazelle testified that the Wells Team Leader had the communication with Transocean's rig Operations Manager, and as far as supervising the employee on this task "it would be the Wells Operations Manager . . . since he supervises." (*Id.* at 112:15-113:18) |

It seems that the PSC's primary complaint with respect to 30 C.F.R. § 250.416(e) is that

Mr. Frazelle could not answer "who at BP was responsible" for assuring the APD contained this

information. (PSC Mem. at 3). In addition to Mr. Rich's 30(b)(6) testimony, BP presented

Scherie Douglas, BP's Regulatory Advisor for Macondo.  Ms. Douglas, who was deposed after

Mr. Frazelle, was questioned regarding the APD submission process, the calculation of MASP in

the APD and 30 CFR § 250.416(e) specifically. (Ex. E, Douglas Dep. 25:6-26:5, 29:11-21,

43:17-44:20, 286:3-13, Oct. 11, 2011) (testifying that she would make the APD submission to

MMS with information obtained from the drilling engineer).  Also, the Drilling & Completions

"RACI" chart identifies those employees by role who are "accountable" and "responsible" for

both "Regulatory Approval" and "MMS Policy Adherence."  (Ex. J, MDL Dep. Ex. 2519).

In sum, Mr. Frazelle was adequately prepared to testify regarding BOP regulatory

compliance, and presented to the PSC the vast majority of information that it sought.  To the

extent certain isolated questions were not answered, the answers have been available through

other discovery, including other BP witnesses.

### B.    Mr. Frazelle Testified Fully Regarding the Temporary Abandonment Procedure.

BP also designated Mr. Frazelle as its 30(b)(6) witness on Topic 7:[3]

> The background, basis (or bases), intent, preparation, drafting,
> submission and approval of BP's Application for Permit to Modify
> the temporary abandonment procedure on or around April 16,
> 2010, including the deviations, if any, between that procedure and
> the procedure(s) described in (a) the April 12, 2010 Drilling Plan,
> (b) the April 14, 2010 Morel "Forward Ops" E-Mail, or (c) the
> April 20, 2010 "Ops Notes."

(Ex. G, Agreed 30(b)(6) Deposition Notice, March 3, 2011). Mr. Frazelle also confirmed that he

had prepared to testify on Topic 7.  (Ex. C, Frazelle 10:20-22, 506:5-8, 649:3-14).  Although he

was not personally involved in the procedure at issue, Mr. Frazelle, with 28 years experience at

---

[3] With respect to Mr. Sustala, BP viewed Topic 7 as regulatory in nature and designated and prepared Mr. Sustala to testify on the regulatory aspects of the temporary abandonment procedure.  The other parties disagreed about the scope of Topic 7 and, the day before the scheduled deposition, determined that they did not want to proceed with Mr. Sustala's regulatory-focused deposition.  (Ex. F, Email From D. Haycraft to S. Herman et al., July 28,2011, LNFS 38973304).

BP, has been involved in the authoring and implementation of temporary abandonment procedures for other deepwater wells in the Gulf of Mexico. (*Id.* at 11:6-10, 11:16-12:4). He provided several hours of testimony regarding Topic 7, filling approximately 135 transcript pages. (*Id.* at 10-77, 138-47, 459-70, 474-76, 491-93, 505-24, 532-50, 648-51, 698-99). Mr. Frazelle provided detailed, substantive testimony about each of the four documents of Topic 7 and any deviations among them:

- The April 12, 2010 Drilling Plan, the temporary abandonment procedure in that plan, and any changes made to that procedure (including setting a deeper cement plus) and the reasons for those changes. (*Id.* at 19:19-39:5, 537:15-543:23);

- The April 14, 2010 Morel "Forward Ops" E-Mail, the procedures set out in that e-mail and their contemplated order, and the relationship among that e-mail and other documents listed in Topic 7. (*Id.* at 39:6-49:10, 541:6-544:13);

- BP's April 16, 2010 Application for Permit to Modify and any deviations between that procedure and the procedure(s) reflected in the earlier documents and/or the April 20 "Ops Note." (*Id.* at 59:1-66:9, 544:14-550:14);

- The April 20, 2010 "Ops Notes" and any deviations between that procedure and the procedure in the April 16 Application for Permit to Modify. (*Id.* at 59:1-66:9).

The PSC ignores this extensive testimony and focuses on a few isolated questions that allegedly Mr. Frazelle could not answer. (PSC Mem. at 6-7). The PSC's challenges are meritless.

First, the PSC asserts that Mr. Frazelle was not knowledgeable about the "details" of John Guide's involvement in the temporary abandonment procedure. (*Id.* at 6). Mr. Frazelle did provide testimony regarding John Guide's role, however. (Ex. C, Frazelle 31:18-32:14, 33:19-38:23, 507:1-10; 507:17-508:5). Moreover, the PSC and the other parties deposed John Guide himself for two days in May 2011 and had the opportunity to—and did—question him directly about the temporary abandonment procedure. (Ex. H, Guide Dep. 283:20-286:22, 385:9-386:19, 785:8-788:4, May 9, 2011). Given that opportunity, the PSC cannot legitimately complain about

the level of knowledge that a 30(b)(6) witness like Mr. Frazelle possessed about the "details" of an already-deposed fact witness' involvement.

Second, asserting that Mr. Frazelle could not provide "reasons for the changes" to the temporary abandonment procedure (PSC Mem. at 6), the PSC points to a single question-and-answer in which Mr. Frazelle testified that he did not know the "exact reasons" for a change in sequence regarding the lockdown sleeve.  (PSC Exh. 18, citing Frazelle 21:17-19).  Mr. Frazelle, however, did direct the questioner (who did not follow up) to "documentation and some discussions going back and forth between the manufacturer and also from the Drilling Engineers about when to set [the lockdown sleeve] and -- and what it entailed."  (Ex. C, Frazelle 21:20-22:4).  In addition, Mr. Frazelle gave detailed, substantive testimony about whether he believed there were or were not changes among the procedures in the documents listed in Topic 7.  (*Id.* at 22:22-23:9, 538:18-550:14,).

Third, the PSC argues that Mr. Frazelle could not answer "many questions" regarding the background and authorship of several documents.  (PSC Mem. at 6-7).  In fact, Mr. Frazelle provided his understanding of and BP's position on the documents at issue—the role of a 30(b)(6) witness.  (Ex. C, Frazelle 39:6-43:9, 59:1-63:7).  Even though, when pressed by the questioner, he understandably acknowledged that only the author of the emails could speak to the author's intent in writing them.  (Ex. C, Frazelle 43:21-44:5).[4]

Fourth, the PSC's assertion that Mr. Frazelle could not "communicate an alternative method of running the negative test in tandem with the displacement of seawater" (PSC Mem. at 7) misstates the nature of the question and Mr. Frazelle's response.  Mr. Frazelle was asked a hypothetical question and, after explaining how the issue would need to be analyzed, stated that

---

[4] As Mr. Frazelle testified, the author of the April 14 Morel "Forward Ops" E-Mail -- Brian Morel -- is on administrative leave from BP and was not available to Mr. Frazelle as part of his preparation to testify as a 30(b)(6) witness.  (Ex. C, Frazelle 651:11-22).

he had "not done the math to understand" if there might be a different way to run the test. (Ex. C, Frazelle 24:23-26:21).  A 30(b)(6) witness cannot be expected to answer all hypotheticals posed on the spot, particularly those requiring calculations.

The PSC's position is also undermined by the fact that, in addition to Mr. Frazelle, multiple other BP witnesses have testified about the temporary abandonment procedure.  From the engineering and well design standpoint, two other BP 30(b)(6) witnesses, Jim Cowie and Ian Little, were questioned at length about the temporary abandonment procedure and alleged deviations among the documents listed in Topic 7.  Multiple BP fact witnesses also testified about these topics, including Brett Cocales (Drilling Operations Engineer), Scherie Douglas (regulatory), John Guide (Wells Team Leader), Lee Lambert (DWH Wellsite Leader Trainee), Heather Powell (regulatory) Ronnie Sepulvado (DWH Wellsite Leader), and Greg Walz (Engineering Team Leader).

## II.   BP Has Met Its Discovery Obligations Under Rule 30(b)(6).

A 30(b)(6) corporate designee shall be prepared to testify "about information known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6); *see also Promega Corp. v. Applera Corp.*, No. 01-C-244-C, 2002 WL 32340886, at *4 (W.D. Wis Nov. 27, 2002) (noting that it is "unrealistic to expect a deponent to be intimately familiar with the details of every individual transaction").  A 30(b)(6) deponent need not "answer completely every one of movants' questions," and the inability to answer every question is "not tantamount to a complete failure to appear." *Boland Marine*, 1999 WL 280451, at *3.

BP, in good faith, designated Mr. Frazelle as its 30(b)(6) deponent on the two topics at issue, and, given his two full days of testimony and numerous substantive answers, it cannot be said that Mr. Frazelle did "not possess the requisite knowledge to testify about the matters specified in the notice." *Boland Marine*, 1999 WL 280451, at *3 (citing 8A RICHARD MARCUS,

FED. PRAC. & PROC. §2103 (3d ed. 2011)).   Although Mr. Frazelle inevitably was unable to answer a few questions out of the hundreds asked, no sanction is appropriate on that basis. *Boland Marine,* 1999 WL 280451, at *3.   Similarly, Mr. Frazelle's preparation is far in excess of that found adequate by the Court in *Boland Marine.*   1999 WL 2800451, at *3 (holding that a deponent "was adequately prepared" where "defense counsel had faxed to him on the morning of the deposition the documents that movants' counsel wanted him to have before").

To support sanctions, "the inadequacies in a deponent's testimony must be egregious and not merely lacking in desired specificity in discrete areas."  *Boland Marine*, 1999 WL 280451, at *3 (quoting *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi,* No. 94 CIV. 1942 (DC), 1995 WL 686715, at *8 (S.D.N.Y. 1995)).   Where a 30(b)(6) witness cannot answer every question posed, but is otherwise prepared to answer questions, the remedy is not the exclusion of evidence, as sought by the PSC, or even a second deposition.   Instead, faced with such situations, courts refer parties to other discovery modes.  *See Boland Marine*, 1999 WL 280451, at *3 ("The few questions that [the designee] was unable to answer would either be better addressed to individually identified and deposed fact witnesses or can be more easily determined by submitting an interrogatory or by reference to particular documents.").

More fundamentally, the extreme sanction sought by the PSC here is wholly inappropriate and disproportionate—not only given Mr. Frazelle's more-than-adequate testimony but even if the facts were what the PSC alleges them to be.  The Fifth Circuit has made clear that "the flagrancy of a party's behavior must be directly proportionate to the severity of the sanction imposed." *Chilcutt v. United States*, 4 F.3d 1313, 1322 (5th Cir. 1993).   Sanctions under Rule 37(b) must be "just" and "specifically relate" to the particular claim at issue.  *See,* e.g., *Chilcutt*, 4 F.3d at 1321, 1323 (5th Cir. 1993) (finding that fairness of sanction against government "was

supported by ample warnings" and "repeated unfulfilled promises to comply").  In addition, "[a]lthough lesser sanctions may be imposed without a showing of prejudice, more severe sanctions are justified only if the opposing party has suffered some palpable prejudice."  *Martin v. Fidelity Nat'l. Title Ins.*, Civil Action No. 09-4195, 2011 WL 4625335, at *2 (E.D. La. Oct. 3, 2011).  Given that that the PSC has not claimed—and could not claim—any specific prejudice, the requested sanction is not "just" in accordance with *Chilcutt*.

*Resolution Trust Corp. v. S. Union,* 985 F.2d 196 (5th Cir. 1993)—the case on which the PSC relies for its requested sanction (PSC Mem. at 10)—involved complete ignorance of multiple 30(b)(6) designees for all topics and other discovery misconduct.  *Resolution Trust*, 985 F.2d at 196-97. Under the extreme violations in that case, the court imposed sanctions far less severe than what the PSC requests here.  *See id*. at 197-98 (affirming the award of attorney's fees and costs); *see also Mike Hooks Dredging Co. v. Eckstein Marine Serv.*, 2011 WL 2559821, at *1, *4 (E.D. La. June 28, 2011) (finding that a sanction excluding evidence relating to unanswered areas of inquiry was too severe).

## III.   Conclusion

For the foregoing reasons, the PSC's requested sanction to exclude testimony and evidence is neither supported nor commensurate with the alleged discovery deficiencies and should be denied.

Dated:  December 9, 2011    Respectfully submitted,

           /s / Don K. Haycraft
           Don K. Haycraft (Bar #14361)
           R. Keith Jarrett (Bar #16984)
           LISKOW & LEWIS
           One Shell Square
           701 Poydras Street, Suite 5000
           New Orleans, Louisiana 70139-5099
           Telephone: (504) 581-7979
           Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Timothy A. Duffy, P.C.
(tim.duffy@kirkland.com)
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
(mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Exploration &
Production Inc. & BP America Production
Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing motion has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 9th day of December, 2011.

/s/  Don K. Haycraft