Exhibit C

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
 3   IN RE:  OIL SPILL       )  MDL NO. 2179
     BY THE OIL RIG          )
 4   "DEEPWATER HORIZON" IN ) SECTION "J"
     THE GULF OF MEXICO, ON )
 5   APRIL 20, 2010          )  JUDGE BARBIER
                             )  MAG. JUDGE SHUSHAN
 6
 7
 8
 9
10
11
12
13
14
15
16
17              * * * * * * * * * * * * * * * * *
                        VOLUME 1
18              * * * * * * * * * * * * * * * * *
19
20
           Deposition of Andrew Eric Frazelle,
21   Individually and as Corporate Representative,
     taken at the Pan-American Building, 601 Poydras
22   Street, 11th Floor, New Orleans, Louisiana,
     70130, on the 26th day of September, 2011.
23
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1       A.  Yes, sir.

2       Q.  The topic of the Deposition Notice that

3   I'm going to ask you about has been referenced as

4   Topic 7.  Judge Shushan issued an Order, which

5   for the record is Document 3650, as to the ground

6   rules on this particular topic.

7           Have you had a chance to review the

8   Deposition Notice?

9       A.  Yes, sir.

10      Q.  Topic 7 states:  "The background, basis

11  (or bases), intent, preparation, drafting,

12  submission, and approval of BP's Application for

13  Permit to Modify the temporary abandonment

14  procedure on or around April 16, 2010, including

15  the deviations, if any, between that procedure

16  and the procedure(s) described in (a) the April

17  12, 2010 Drilling Plan, (b) the April 14th, 2010

18  Morel 'Forward Ops' E-mail, or (c) the April 20,

19  2010 'Ops Note.'"

20          Have you prepared yourself to testify

21  regarding that particular topic?

22      A.  Yes, sir.

23      Q.  When did you find out that you were going

24  to appear on behalf of BP to address what I'm

25  going to call Topic 7?

1    A.   H'm, approximately two weeks ago.

2    Q.   Prior to two weeks ago, did you have any

3 involvement whatsoever as a BP employee in the

4 Macondo Temporary Abandonment Process?

5    A.   No, sir.

6    Q.   Have you ever as an employee for BP or

7 any other company been involved in the authoring

8 and implementation of the Temporary Abandonment

9 Procedure of a Gulf of Mexico deepwater well?

10    A.   Yes, sir.

11    Q.   When was that?

12    A.   During abandonment of -- temporary

13 abandonment of THUNDER HORSE wells.

14    Q.   And can you give me an approximate time?

15    A.   I've been in the Gulf of Mexico since

16 November of 2006.  So it's the 2008 time frame.

17    Q.   All right.  When -- how long have you

18 worked for BP?

19    A.   For 28 years --

20    Q.   And --

21    A.   -- in November.

22    Q.   Okay.  What's your background?

23    A.   My background is I've got a Degree in

24 Petroleum Engineering, and my primary background

25 is in Wells, Drilling & Completion Operations,

1  ranging from Drilling Engineering to spending

2  time as a Well Site Leader to a Wells Team

3  Leader.   Then the last role before the -- the

4  incident was a -- as a Wells Operations Manager.

5      Q.   All right.  And were you a Wells

6  Operations Manager as of April of 2010?

7      A.   Yes, sir.

8      Q.   Did -- were you based in Houston?

9      A.   Yes, sir.

10      Q.   Did that job involve any contact

11  whatsoever with the planning and drilling of

12  Macondo?

13      A.   In "contact," I mean, what type of

14  reference are you -- are you referring to?

15      Q.   Well, what -- in -- in the job that you

16  just described, would you have had any

17  involvement in the Macondo Well at all?

18      A.   I had early involvement when there was

19  some discussion going on when the MARIANAS was --

20  was going to drill the well.  I had

21  responsibility for the MARIANAS in its -- in its

22  previous role when it was in completion mode and

23  drilling then the Nakika H2.

24      Q.   Okay.  Did -- did your job

25  responsibilities follow the rig?  In other words,

**PURSUANT TO CONFIDENTIALITY ORDER**

1  were you assigned to MARIANAS as it would go from

2  rig -- from well to well?

3      A.  Yes, sir.  When it was in the rest of the

4  Gulf, but when it went into the Exploration and

5  Appraisal Group, then I handed over

6  responsibilities from myself to Ian Little as the

7  Wells Operations Manager.

8      Q.  All right.  So would Ian Little have been

9  the person functioning or handling the duties and

10 responsibilities you handled with respect to

11 MARIANAS, would Ian Little have then taken those

12 over for MARIANAS and then subsequently for

13 DEEPWATER HORIZON for the Macondo Well?

14     A.  Yes, sir.

15     Q.  Okay.  All right.  Having said that, when

16 was the first time you read any of the Temporary

17 Abandonment Procedures authored by BP with

18 respect to Macondo?

19     A.  It's during the -- during the preparation

20 phase.

21     Q.  Okay.  So in the last two weeks or so?

22     A.  Yes, sir.

23     Q.  Prior to reading those Temporary

24 Abandonment Procedures, did you attend any

25 meetings -- not lawyer involved meetings, BP

**PURSUANT TO CONFIDENTIALITY ORDER**

1    meetings -- where the Temporary Abandonment

2    Procedure for Macondo was discussed either before

3    or after April 20, 2010?

4        A.   No, sir.

5        Q.   Have you ever spoken to Brian Morel about

6    the Temporary Abandonment Procedure at Macondo?

7        A.   No, sir.

8        Q.   Have you ever spoken to either of the

9    Well Site Leaders, Mr. Vidrine or Mr. Kaluza,

10   about the Temporary Abandonment Procedures?

11       A.   No, sir.

12       Q.   Have you spoken to anyone who was

13   involved with either the authoring or

14   implementation of the Macondo Temporary

15   Abandonment Procedure?

16       A.   The only people that I've had in

17   conversation was with John Guide, and that was

18   within the first few days of the incident, after

19   responded to -- after the incident occurred.

20       Q.   All right.  And why -- was there any

21   particular reason or reasons why you and

22   Mr. Guide spoke?

23       A.   I was one of the first responders the

24   night of the incident, and then Mr. Guide was in

25   the office the next couple of days, and it was

**PURSUANT TO CONFIDENTIALITY ORDER**

1   just about what went on.  No big details.  I

2   mean, everybody was pretty much in -- in trying

3   to work on the BOPs to get them closed.  So it

4   was about, you know, what could have gone wrong.

5   And John was there evaluating some of the mud

6   logs, and "What do you see, John?  Is there -- is

7   there any type of anomalies or anything?"  So --

8        Q.  Okay.

9        A.  -- not really around the planning, just

10   events of the evening.

11        Q.  Okay.  So the -- the -- the discussion,

12   was it just one that you can recall, a discussion

13   with Mr. Guide?

14        A.  There was probably a couple, since we

15   were -- we were around there for the first seven

16   to ten days.

17        Q.  All right.  Was any of the discussions

18   specifically focused on the preparation and

19   implementation of the Temporary Abandonment

20   Procedure?

21        A.  No, sir.

22        Q.  Do you know if Mr. Guide played any role

23   at all in the preparation or implementation of

24   the Temporary Abandonment Procedure?

25        A.  The -- my knowledge is -- is obtained

**PURSUANT TO CONFIDENTIALITY ORDER**

1   through the preread in some of the -- the

2   E-mails.  And his -- his discussion and his

3   testimony, I did -- I did review that.

4        Q.  Okay.  What is your knowledge, as you sit

5   here today, of Mr. Guide's involvement of both

6   the preparation and then implementation of what

7   became the final Temporary Abandonment Procedure

8   on April 20?

9                MS. HARDING:  Object to the form.

10       A.  Can you describe "involvement," I mean,

11   what that -- what that might entail?

12       Q.  (By Mr. Sterbcow) I will.  Do you know

13   whether or not Mr. Guide ever had any discussions

14   with either Mr. Hafle or Mr. Morel about how to

15   go about temporarily abandoning Macondo?

16       A.  From the E-mail discussion, it was

17   Mr. Guide stipulated to do the negative test

18   by -- by displacing of seawater at depth.

19       Q.  All right.  Beyond the seawater

20   displacement issue, did Mr. Guide have any

21   further involvement, to your knowledge, regarding

22   how the negative test itself would be performed?

23       A.  No, sir, I can't.

24       Q.  Did Mr. Guide have any involvement

25   whatsoever to your knowledge about the decision

**PURSUANT TO CONFIDENTIALITY ORDER**

1   on the depth that the cement plug would be set?

2   MS. HARDING:  Object to the form.

3   A.  As far as what depth are you referring

4   to?

5   Q.  (By Mr. Sterbcow) As -- the -- the final

6   depth decided on in the April 20th Ops Note.

7   MS. HARDING:  Object to the form.

8   A.  One more time, if you would, please.

9   Q.  (By Mr. Sterbcow) Well, let me make it

10   more broad --

11   A.  Okay.

12   Q.  -- do you know if John Guide had any

13   involvement in any decisionmaking with respect to

14   the depth at which a cement plug would be placed

15   in the Macondo Well?

16   MS. HARDING:  Object to the form.

17   A.  As the Wells Team Leader, John Guide

18   would be involved in that, yes, sir.

19   Q.  (By Mr. Sterbcow) In terms of the details

20   of his involvement, do you have any further

21   knowledge?

22   A.  No, sir.

23   Q.  All right.  Do you have any specific

24   knowledge about the interaction between

25   Mr. Morel, Mr. Hafle, and Mr. Guide on what

1   exact -- on what ultimately became the April 20,

2   2010 Temporary Abandonment Procedure?

3       A.  No, sir, only from what's in the

4   documentation.

5       Q.  All right.  Have you reviewed -- let's go

6   to -- well, let me be more broad than that.

7           Can you describe for me, just list for me

8   documents that you have reviewed in preparation

9   to testify on behalf of BP on this specific

10  topic.

11      A.  Things that I've reviewed have to do with

12  a DWOP, what's our -- you know, what's our

13  internal requirements; understanding about what

14  MMS requires as far as Temporary Abandonment;

15  I've reviewed the -- the APDs; I review --

16  reviewed the -- the various E-mails that have

17  gone back and forth; and then some of the -- the

18  testimony that's -- that's been provided on this.

19      Q.  Okay.

20      A.  So I've prob -- probably a -- a stack as

21  big --

22      Q.  Right.

23      A.  -- as that.

24      Q.  About as big as a binder, huh?

25      A.  About 2 inches thick.

19

1      Q.  All right.  Based on -- on that review

2  and any conversations you've had in any other

3  preparation, have you formed an -- an -- an

4  opinion and are you prepared to testify on behalf

5  of BP today as to whether the April 20, 2010

6  Temporary Abandonment Procedure published by

7  Brian Morel that was implemented on the rig met

8  MMS requirements for Temporary Abandonment

9  Procedures --

10              MS. HARDING:  Object to the form.

11      Q.  (By Mr. Sterbcow) -- in the Gulf?

12      A.  Yes, sir.

13      Q.  And what's your opinion?

14      A.  My opinion is that it did, sir.

15      Q.  And what do you base that on?

16      A.  Just a variety of notes that have gone

17  back and looking at what was submitted on the

18  16th and then what the final Op Notes stated.

19      Q.  Do -- have you formed an opinion as to

20  whether the April 12, 2010 Plan met MMS

21  requirements?

22              MS. HARDING:  Object to the form.

23      Q.  (By Mr. Sterbcow) If you can recall?

24      A.  Can I review that document?  There's --

25      Q.  Yes.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   I believe that there's a couple that come

2   from the --

3      Q.   Let's --

4      A.   -- 12th, and make sure that we're on the

5   same page.

6      Q.   Let's walk through these.   This is Tab 2,

7   and it's been marked as -- previously as

8   Exhibit 4830.

9      A.   Okay.

10      Q.   And I'm looking at Page 10 of 19, and the

11   Bates stamp on this page MDL 00057790 at the

12   bottom.

13      A.   Yes, sir.

14      Q.   Is this Section 9.4 part of the Temporary

15   Abandonment Procedure for Macondo?

16            MS. HARDING:   Object to the form.

17      A.   This -- this --

18      Q.   (By Mr. Sterbcow) At least as of that

19   date, that's April 12th.

20      A.   As -- as of this date, and without the

21   understanding whether it was a shallow or

22   deep-set plug, this was -- this was the basis.

23      Q.   All right.   Based on this document, was

24   the -- was it the intent at that point to set the

25   lockdown sleeve first, or can you tell from

1   looking at this document?

2       A.   From that page, no, sir, you cannot tell,

3   but previous 9.3 describes setting the -- the

4   lockdown.

5       Q.   All right.   And based on reading 9.3 in

6   conjunction with 9.4, can you tell whether or not

7   setting the lockdown sleeve was going to occur

8   first in a series of events in a Temporary

9   Abandonment Procedure?

10      A.   As per this -- this program on April

11  12th, the -- the impression was to set the -- the

12  lockdown sleeve first, yes, sir.

13      Q.   Okay.   And my understanding is that that

14  Plan, at least that part of the Plan, changed

15  over time?

16      A.   Yes, sir.

17      Q.   Do you know the reason or reasons for the

18  change?

19      A.   The exact reasons, no, sir.

20      Q.   All right.   Do you know who in terms

21  of -- of names participated in the decision to

22  change the original intent to set the lockdown

23  sleeve first?

24           MS. HARDING:   Object to the form.

25      A.   There is some documentation and some

1    discussions going back and forth between the

2    manufacturer and also from the Drilling Engineers

3    about when to set it, and -- and what it

4    entailed.

5        Q.  (By Mr. Sterbcow) All right.  And -- and

6    from BP's perspective, the Drilling Engineers, do

7    you recall who was involved in that?

8        A.  No, sir, I would have to review that

9    document.

10       Q.  Are those E-mails going back and forth?

11       A.  Yes, sir.

12       Q.  Okay.  Based -- going back now to -- to

13   Tab 2, to what we were looking at --

14       A.  Yes, sir.

15       Q.  -- does it appear that the intent, as of

16   April 12, was to displace to saltwater or

17   seawater to approximately 1,000 feet below the

18   mud line?

19              MS. HARDING:  Object to the form.

20       A.  Yes, sir.  Step 2, says:  "Displace to

21   salt water from 6000'..."

22       Q.  (By Mr. Sterbcow) All right.  Did that

23   portion of the Temporary Abandonment Procedure

24   change from April 12 to April 20?

25       A.  Yes, sir.

**PURSUANT TO CONFIDENTIALITY ORDER**

1       Q.   And how did it change?

2       A.   It went from a shallow set surface plug

3  to a deep -- deeper set plug.

4       Q.   And do you know the reason or reasons for

5  that change?

6       A.   Yes, sir.  It was to allow sufficient

7  weight underneath the -- the lockdown sleeve

8  running tool in order to set that.  It requires a

9  minimum weight.

10      Q.   Did the decision to increase the amount

11  of seawater displacement affect the timing of

12  setting the lockdown sleeve?

13      A.   What are you referring to as "timing"?

14      Q.   No -- did -- did -- did the decision to

15  displace deeper or displace more seawater cause

16  the lockdown sleeve setting to change from the

17  first part of the Procedure to later in the

18  Procedure, is there a correlation between those

19  two?

20              MS. HARDING:  Object to the form.

21      A.   I do not -- I do not believe there is a

22  correlation.

23      Q.   (By Mr. Sterbcow) All right.  Was the

24  sole -- to your knowledge, was the sole reason

25  for displacement of additional seawater from a

**PURSUANT TO CONFIDENTIALITY ORDER**

1    thousand feet down to 8300 and change to provide

2    enough weight to ensure proper setting of the

3    lockdown sleeve?

4              MS. HARDING:  Object to the form.

5        A.  Can you repeat that, please?

6        Q.  (By Mr. Sterbcow) Was the sole basis for

7    the reason to displace with more seawater,

8    additional seawater, from April 12 to April 20,

9    related to setting the lockdown sleeve?

10       A.  Yes, sir.

11       Q.  Was there any reason why a plug could not

12   be inserted in the well as an additional

13   hydrocarbon barrier before displacement to 8300

14   feet of saltwater occurred?

15             MS. HARDING:  Object to the form.

16       A.  There -- to have done that, first, you

17   would not have tested the barrier that was in

18   place that had been established as the lower

19   barrier in the well.

20       Q.  (By Mr. Sterbcow) And that was the cement

21   job?

22       A.  Yes, sir.

23       Q.  So setting the cement plug first would

24   have prevented testing the cement job as part of

25   the Temporary Abandonment Procedure?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        A.   Yes, sir.
 2        Q.   Was there any other way to test the
 3   efficacy of the cement job other than to displace
 4   to seawater to 8300 feet and run a negative test?
 5               MS. HARDING:   Object to the form.
 6        A.   Can you describe "efficacy" for me,
 7   please, as --
 8        Q.   (By Mr. Sterbcow) Was there any way --
 9        A.   -- what you're referring to.
10        Q.   -- available to determine whether or not
11   the cement job was effective in terms of zonal
12   isolation, at this point in time in the life of
13   the well, other than to displace to 8300 feet
14   seawater and run a negative test?
15               MS. HARDING:   Object to the form.
16        A.   The only -- the only reason for the
17   negative test was to test its effectiveness as
18   a -- a -- as a barrier during the Temporary
19   Abandonment phase.
20        Q.   (By Mr. Sterbcow) Test the cement job?
21        A.   Test the -- the plug, yeah.
22        Q.   The plug, the cement?
23        A.   The cement -- the cement in the shoe
24   track --
25        Q.   Okay.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   -- effectiveness as a barrier.

2      Q.   All right.  And that was the intent of

3  the negative test?

4      A.   Yes, sir.

5      Q.   All right.  Could that test have been

6  run, based on your review of these documents, in

7  a manner that would not have required

8  displacement to seawater to 8300 feet and the

9  resulting decrease in hydrostatic pressure on the

10  well?

11             MS. HARDING:  Object to the form.

12      A.   I'm trying to think about how you -- how

13  else -- the -- the intent of the negative test

14  and the requirement to test that is to test it to

15  a negative differential that it will see to the

16  maximum.  And that will occur when you displace

17  to seawater at that depth prior to setting the

18  cement plug, so as far as another way of -- to be

19  able to achieve that type of differential, I have

20  not done the math to understand if there's a -- a

21  different way to do it.

22      Q.   (By Mr. Sterbcow) Did BP, at this time,

23  pursuant to Group Practice 10-60, require two

24  barriers to zonal isolation, to your knowledge?

25      A.   Yes, yes, sir.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  Was that Requirement in effect as of the

2    time the displacement to seawater occurred in

3    preparation for the negative test, and by that I

4    mean did Group Practice 10-60 require BP to

5    ensure that it had two barriers in place in the

6    well before starting to displace with seawater in

7    preparation for the negative test?

8              MS. HARDING:  Object to the form.

9    A.  I do not believe Group Defined Practices

10   defines that, because by definition of if you're

11   testing the lowermost barrier, that's the one

12   that you're testing.  The other barriers that you

13   have in place is -- at this point in time, is

14   your BOP stack.

15   Q.  (By Mr. Sterbcow) So given that, you --

16   you interpret GP 10-60 to require only the cement

17   job as the barrier in place when the portion of

18   the Temporary Abandonment Procedure involving

19   displacement to seawater and running the negative

20   test begins?

21   A.  Yes, sir, because that is the purpose of

22   the negative test.

23   Q.  All right.  And if that's the case and

24   the cement job is -- is no good, and has not

25   provided appropriate zonal isolation --

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.  Yes, sir.

2    Q.  -- is the only method of detecting a bad

3  cement job, once the hydrostatic pressure has

4  been decreased through displacement to seawater,

5  proper interpretation of the negative test?

6              MS. HARDING:  Object to the form.

7    Q.  (By Mr. Sterbcow) Is that the only way

8  you know?

9    A.  Yes, sir, you have to interpret that test

10  accurately.

11    Q.  And if the test is not interpreted

12  accurately, and the cement job is not good, and

13  zonal isolation has not been achieved, is it,

14  therefore, imperative for the negative test to be

15  interpreted properly, so that steps can be taken

16  as quickly as possible to deal with the potential

17  of hydrocarbon or failure of zonal isolation?

18              MS. HARDING:  Object to the form.

19    A.  Can you re -- repeat that?  There's lots

20  of --

21    Q.  (By Mr. Sterbcow) If, in fact, given what

22  you just told me, if the negative test result is

23  either equivocal or is not good, is it fair to

24  conclude that that test result requires immediate

25  response to diagnose and deal with what may be a

PURSUANT TO CONFIDENTIALITY ORDER

1   failure of zonal isolation?

2            MS. HARDING:  Object to the form.

3    A.  Yes, sir.

4    Q.  (By Mr. Sterbcow) And does that

5   responsibility lay, at least in part, on Well

6   Site Leaders and BP personnel involved in the

7   Temporary Abandonment Procedure?

8    A.  Yes, sir.

9    Q.  Do you know, based on your review of

10  documents, what knowledge Mr. Morel possessed at

11  this time of how to go about temporarily

12  abandoning a Deepwater Gulf of Mexico well like

13  Macondo?

14    A.  No, sir.

15    Q.  Do you know what knowledge Mr. Kaluza

16  possessed on this issue, the Well -- Well Site

17  Leader, Bob Kaluza?

18    A.  As far as the requirements for a

19  Temporary Abandonment?

20    Q.  And how to go about doing it properly.

21    A.  I would say Mr. Kaluza had the -- the

22  necessary competency and skills to do that.

23    Q.  And is that based on your experience with

24  him at THUNDER HORSE?

25    A.  I've had dealings with Mr. Kaluza both at

30

1    Mad Dog and at THUNDER HORSE, yes, sir.

2       Q.  And have you had dealings with him where

3    he had to implement Temporary Abandonment

4    Procedures of wells similar to Macondo?

5              MS. HARDING:  Object to the form.

6       A.  I do not recall if Mr. Kaluza was on a

7    Temporary Abandonment of a well.  There was one

8    while -- during his tenure there, but whether he

9    was physically onboard the rig at that time, I

10   cannot recall.

11      Q.  (By Mr. Sterbcow) Okay.  Do you remember

12   which well that was, the name?

13      A.  It was 822, No. 5.

14      Q.  A20 --

15      A.  8 --

16      Q.  Oh, 8?

17      A.  -- 22, No. 5.

18      Q.  And when was that, about?

19      A.  2009 time frame.

20      Q.  Do you have any knowledge of

21   Mr. Vidrine's experience in implementing

22   Temporary Abandonment Procedures in deepwater

23   wells in the Gulf of Mexico?

24      A.  I believe Mr. Vidrine was -- he was

25   associated with the MARIANAS when we drilled a

**PURSUANT TO CONFIDENTIALITY ORDER**

1  well at the Marlin Field that ended up being a

2  dry hole, and I don't recall whether that was a

3  permanent abandonment or a Temporary Abandonment,

4  because we -- we didn't remove the wellhead or

5  anything.

6      Q.  Okay.  And that -- that time there --

7  there was -- there was a dry hole, as you put it?

8      A.  Yes, sir.

9      Q.  All right.  Are you familiar with the

10  DEEPWATER HORIZON Rig's experience generally, in

11  terms of the BP personnel assigned to the HORIZON

12  at the end of Macondo, their experience

13  generally, with having to author and implement

14  Temporary Abandonment Procedures in deepwater

15  Gulf of Mexico wells?

16      A.  Which personnel are you referring to?

17      Q.  Well, you -- we've talked about Kaluza,

18  Vidrine.  What about Guide, do you have any

19  familiarity with his experience doing this?

20      A.  Mr. Guide is a very experienced Well Site

21  Leader that I had interactions with when he was

22  at Mad Dog, and I was in Holstein.  And then on a

23  continuous basis through biweekly operations and

24  meetings, and him bringing in "Lessons Learned,"

25  and what was going on in his rig.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.  All right.  So Mr. Guide, at least, would

2  have, based on your knowledge, extensive

3  experience on the appropriate method to

4  temporarily a -- abandon a well like Macondo?

5      A.  Yes, sir.

6      Q.  And, obviously, he should bring that

7  experience to bear in reviewing and participating

8  in the Temporary Abandonment of this well?

9              MS. HARDING:  Object to the form.

10     Q.  (By Mr. Sterbcow) That would be required

11  using the "Lessons Learned," if you will?

12              MS. HARDING:  Object to the form.

13     A.  As the Wells Team Leader, he would review

14  the program.

15     Q.  (By Mr. Sterbcow) All right.  And he

16  would -- I would think he would review it with an

17  eye toward what he's learned in the past, and to

18  the extent mistakes may have been made in the

19  past, to make sure similar mistakes were not made

20  in the future, and the "future" being Ma -- the

21  Macondo Well?

22              MS. HARDING:  Object to the form.

23     A.  Yes, sir.

24     Q.  (By Mr. Sterbcow) Am I correct that the

25  April 12, 2010 Temporary Abandonment Procedure

**PURSUANT TO CONFIDENTIALITY ORDER**

33

1    did not include a negative test?

2        A.   Is this the -- the document --

3        Q.   That's the document --

4        A.   -- that -- that you're --

5        Q.   -- right, we're looking at.

6        A.   -- referring to?

7        Q.   Right.

8        A.   (Reviewing document.)  I would have to

9    review it real quick, if I can.

10       Q.   Okay.  Sure.  Go ahead.

11       A.   Let me go back into it. (Reviewing

12   document.)

13                MR. STERBCOW:  I'm going to mark

14   this.

15                THE COURT REPORTER:  (Indicating.)

16       (Exhibit No. 5350 marked.)

17       A.   That is correct, it does not specifically

18   mention a negative pressure test in there.

19       Q.   (By Mr. Sterbcow) All right.  Is it fair

20   to conclude that, at minimum, Mr. Morel and

21   Mr. Guide either authored or reviewed the April

22   12, 2010 Proposed Temporary Abandonment Procedure

23   that's before you?

24                MS. HARDING:  Object to the form.

25       A.   Yes, sir.

```
 1      Q.  (By Mr. Sterbcow) Given that, and given
 2  your testimony that the negative test is the test
 3  to determine whether the cement job, being the
 4  only barrier in the well, has achieved zonal
 5  isolation, can you think of any reason why either
 6  one or both of these gentlemen would not have
 7  required a negative test be included in the April
 8  12, 2010 Proposed Temporary Abandonment
 9  Procedure?
10              MS. HARDING:  Object to the form.
11      A.  I believe that this is a -- a High Level
12  Procedure.  There's probably other things that
13  were required as part of the T&A that were not
14  also included in this.
15      Q.  (By Mr. Sterbcow) Well, do you have any
16  reason to believe that, despite the fact that it
17  was not written down in this document, had the
18  April 12, 2010 document been the Final Temporary
19  Abandonment Procedure, that a negative test would
20  have even been run at Macondo?
21              MS. HARDING:  Object to the --
22      A.  I --
23              MS. HARDING:  -- form.
24      A.  -- I can't answer the -- the
25  conversations that were held outside of this
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    document.

2        Q.   (By Mr. Sterbcow) Okay.  So as of today,

3    you don't know whether or not either Morel or

4    Guide or anybody else with BP would have required

5    a negative test be performed on April 20, 2010,

6    if the proposed April 12, 2010 Plan had been

7    implemented, you just don't know one way or the

8    other?

9        A.   No, there was -- there was many -- there

10   was other variations and improvements and

11   discussions --

12       Q.   Okay.

13       A.   -- based on this document right here.

14       Q.   All right.  But you would agree with me

15   that the negative test was critical, the crucial

16   test to determine whether or not zonal isolation

17   had been achieved prior to removal of the BOP

18   stack at Macondo?

19       A.   No, sir, that is not correct.  The

20   negative test is strictly to test the integrity

21   of the barrier that is in the shoe track.  So

22   zonal isolation did not come into play with that

23   test.

24       Q.   Well, what's the difference between

25   checking the cement barrier and ensuring that

**PURSUANT TO CONFIDENTIALITY ORDER**

1    there's zonal isolation?

2        A.  They're two different things.  Zonal

3    isolation occurs in the annulus between the

4    casing and the formation.

5        Q.  Okay.  I see what you're saying.

6            Then let me ask it a different way.

7    Would you agree with me that the negative test is

8    the critical test to determine whether or not the

9    cement job has provided a barrier to prevent the

10   flow of hydro -- gas and hydrocarbons back up

11   through the well, through the riser, to reach the

12   rig?

13              MS. HARDING:  Object to the form.

14       A.  One more -- one more time on that,

15   please.

16       Q.  (By Mr. Sterbcow) Is the negative test

17   the definitive critical test run on a well like

18   this to make sure that there is a barrier

19   preventing the flow of hydrocarbons back up

20   through the well, not the annulus, through the

21   pipe --

22       A.  Yes, sir.

23       Q.  -- back toward the rig?

24       A.  Yes --

25              MS. HARDING:  Object to the form.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   -- yes, sir.

2    Q.   (By Mr. Sterbcow) Okay.  And would you

3  also agree with me, then, that had the April 12,

4  2010 Temporary Abandonment Procedure been the one

5  that was implemented, it did not include a test

6  to determine whether or not there was a barrier

7  to prevent hydrocarbon flow back up through the

8  pipe and through the well toward the rig?

9              MS. HARDING:   Object to the form.

10    Q.   (By Mr. Sterbcow) At least as it's

11  written in this document?

12    A.   As it's written in this document, on Page

13  10 of 19.

14    Q.   All right.  And I think you've told me

15  this before, you don't know, in terms of names or

16  job positions, the person or persons who actually

17  authored this document?

18    A.   No, sir.

19    Q.   Okay.

20    A.   I don't think it has a signature page on

21  it.

22    Q.   It doesn't and that's why I asked.  All

23  right.  And -- and having said that, I'm assuming

24  you don't know who, if anybody, would have

25  reviewed this independently from those who

1   authored it to -- from those who authored the

2   document for BP?

3       A.  Historically, the Engineering Team Leader

4   reviews the -- the Procedures, and the Wells Team

5   Leaders.

6       Q.  All right.  So in this case, Wells Team

7   Leader would have been Mr. Guide, had it been

8   reviewed?

9       A.  Yes, sir.

10      Q.  And Engineering Leader would have been

11  Mr. Sims?

12      A.  No.  That would have been Greg Walz, who

13  would have --

14      Q.  Walz, that's right, because we had the

15  switch.

16      A.  Yes, sir.

17      Q.  Okay.  So Walz and Guide historically.

18  Not -- you're not saying that happened here?

19      A.  No.

20      Q.  But going by history and Procedure, those

21  would have been -- been the two gentlemen who

22  would have looked at that document?

23      A.  Yes, sir.

24      Q.  Okay.  Are you aware, having reviewed the

25  documents that you reviewed, of any Risk

 1   Assessment having been done on the April 12, 2010

 2   Procedure?

 3              MS. HARDING:  Object to the form.

 4        Q.  (By Mr. Sterbcow) As written.

 5        A.  No, sir.

 6        Q.  All right.  Let's turn to Tab 3 in the

 7   binder.  This is -- it's Wednesday, April 14,

 8   2010, 2:07 p.m., an E-mail from Brian Morel to a

 9   James Wilson and Ronnie Sepulvado.  And

10   Mr. Sepulvado, my understanding, was still a Well

11   Site Leader on the rig at this point.  Are you

12   aware of that, or are you not?

13        A.  Yes, sir --

14        Q.  Okay.

15        A.  -- I'm aware of that.

16        Q.  All right.

17              THE COURT REPORTER:  Previously

18   marked?

19              MR. STERBCOW:  Previously marked as

20   Exhibit 1997.

21        A.  I guess, oh, okay.

22        Q.  (By Mr. Sterbcow) Yeah.

23        A.  I was looking for the number down on the

24   bottom, and it wasn't on mine.

25        Q.  Okay.  Now, this plan, as I read it,

**PURSUANT TO CONFIDENTIALITY ORDER**

1  calls for cementing -- excuse me, setting a -- a

2  surface cement plug in mud.  Am I interpreting

3  that correctly, or am I wrong about that?

4      A.  Let me --

5            MS. HARDING:  Object to the form.

6      A.  Let me replace -- let me --

7      Q.  (By Mr. Sterbcow) Yeah, go ahead.  Go

8  ahead.

9      A.  (Reviewing document.)  And your question

10  was?  I'm sorry?

11      Q.  Does this Plan call for setting a surface

12  cement plug in mud, rather than seawater?

13      A.  (Reviewing document.)  Yes, sir.

14      Q.  And has it also now moved the -- it's

15  called "run lockdown sleeve," I was calling it

16  "setting the lockdown sleeve" -- from first to

17  last, just prior to pulling the riser in terms of

18  the steps in the Procedure?

19      A.  Yes, sir.

20      Q.  Does it also call for running the

21  negative test before displacement to 8300 feet --

22  before displacement to seawater to a depth of

23  8300 feet?

24      A.  No, sir.  It has the -- the negative test

25  after the -- the top cement plug has been set.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.  All right.  So if -- if the April 14

2  Proposed Procedure had been done, can I conclude

3  that the top cement plug would have been set,

4  displacement would have occurred, and the

5  negative test would have been run, in that order?

6                MS. HARDING:  Object to the form.

7      A.  Yes, sir.

8      Q.  (By Mr. Sterbcow) Do you know the reason

9  for those changes from the April 12, 2010

10  Procedure, reason or reasons?

11      A.  Understanding who this was sent to, this

12  is -- this was set to James Wilson.  "Nick" is

13  his -- his go-by name --

14      Q.  M-h'm.

15      A.  -- is the Rig Clerk responsible for the

16  logistics.  And my interpretation of this, is

17  Brian is just giving Nick a heads-up about

18  potential plans going forward to make sure that

19  we've got the right equipment.  So I would not

20  use this as a -- as a Plan that was actually

21  going to be implemented.  It's -- it's a go-by

22  for ordering equipment.

23      Q.  So having said that, then, as of

24  April 14, is the plan, the Temporary Abandonment

25  Plan, authored and proposed to be implemented by

**PURSUANT TO CONFIDENTIALITY ORDER**

42

1    BP for Macondo, still the April 12, 2010 document

2    that you looked at previously?

3                    MS. HARDING:   Object to the form.

4        A.   I do not know what was going on in the

5    background, but they were in preparation of a

6    Plan to get MMS approval, the APD, which was on

7    the 16th.   And so there -- there had to be some

8    discussions going on around the various ways that

9    they should proceed.

10       Q.   (By Mr. Sterbcow) All right.   And in

11   terms of a writing that we could look at to give

12   us guidance on what Plan was being contemplated,

13   is there any writing in your exist -- in -- in

14   existence, to your knowledge, other -- at least

15   as of April 14, if I understand you correctly,

16   other than the April 12, 2010 writing?

17       A.   Not that I'm aware of.

18       Q.   Okay.   And it's your testimony, on behalf

19   of BP, that the April 14 E-mail that we're

20   looking at is not so much an alteration of the

21   April 12 Plan, but just communications with the

22   Clerk to make sure that the appropriate and

23   necessary equipment would be available to

24   implement the Temporary Abandonment Procedure?

25       A.   Yes, sir.

**PURSUANT TO CONFIDENTIALITY ORDER**

43

1    Q.  So the changes, in terms of how they're

2  listed -- the Procedures are listed, can't be

3  taken as formal changes to the April 12, 2010

4  Procedure?

5    A.  That is correct.

6    Q.  Has anybody told you that, or is that

7  something that you've deduced based on review?

8    A.  That's just my -- that's what I had

9  deduced based on review.

10    Q.  Okay.  And would you agree with me that

11  the person who can answer that question and all

12  of the questions regarding the mindset of BP

13  going forward in this Temporary Abandonment

14  Procedure would be Mr. Morel?

15            MS. HARDING:  Object to the form.

16    A.  He --

17    Q.  (By Mr. Sterbcow) I mean, he wrote the

18  E-mail?

19    A.  Yes, he wrote the E-mail, but can you

20  repeat your other question.  I'm sorry, I --

21    Q.  Would you agree with --

22    A.  -- didn't answer that.

23    Q.  -- me that Mister -- if -- if we really

24  wanted to know whether or not the April 14th

25  E-mail constituted a formal change to the

44

1    April 12 Plan, or whether it was just a note to

2    the Clerk about what was needed, the person who

3    we really have to ask that question is the person

4    who wrote the E-mail?

5        A.   That is correct.

6        Q.   And that's Mr. Morel?

7        A.   That's correct.

8        Q.   And you have not had any conversation

9    with him about what he was thinking?

10       A.   No, sir.

11       Q.   All right.  Do you know if Mr. Morel has

12   told anybody what his intent was in writing this

13   E-mail?

14       A.   I do not know the answer to that

15   question.

16       Q.   Okay.  And do you know of anybody else

17   who would have that knowledge beyond Mr. Morel?

18   And -- and by that, I mean -- let me make my --

19   my question clear:  Have you talked to anybody or

20   seen any documents where someone else says, "I

21   spoke to Brian Morel and he meant A, B, C,"

22   whatever that is?

23       A.   The only -- the only other people would

24   be Ronnie Sepulvado --

25       Q.   All right.

1    A.   -- as -- because it was sent to him.  If

2  he had any followup conversation with Brian over

3  what he intended --

4    Q.   Okay.

5    A.   -- I cannot -- I can't testify to that.

6    Q.   We ask Ronnie that question?

7    A.   Yes, sir.

8    Q.   Okay.  As a person speaking for BP, do

9  you have any criticism of the Plan here to set --

10  or at least as stated in this E-mail, to set the

11  surface cement plug in mud?

12            MS. HARDING:  Object to the form.

13    A.   My main objection to this, is that we

14  haven't tested the lower barrier as required.

15    Q.   (By Mr. Sterbcow) The lower barrier?

16    A.   Yeah.

17    Q.   Oh, you mean the cement?

18    A.   Yes, sir.

19    Q.   All right.  Well, how would you change

20  this?

21    A.   You would have to go in and do exactly

22  like they did on the 20th.  You would have to go

23  into 8367 and displace the seawater to get that

24  negative test on that lower plug.

25    Q.   Okay.  And do that before you set the

1    surface cement plug for the reasons you talked

2    about earlier?

3       A.  Yes, sir.

4       Q.  All right.  And do you think on this well

5    that it was necessary to displace to that extent,

6    to the 8367 seawater, to obtain the conditions

7    necessary to run a proper negative test?

8             MS. HARDING:  Object to the form.

9       A.  A proper negative test puts a pressure on

10   that plug to the lowest differential that it will

11   see.  And that lowest differential is when it's

12   displaced to seawater.  That's why you displace

13   to seawater, and the displacement to seawater is

14   to actually give you a better condition for

15   setting the cement plug.

16       Q.  (By Mr. Sterbcow) Okay.  Is there any

17   question in your mind as to whether the seawater

18   displacement could have been less than 8367 feet

19   and still allowed the crew to run an accurate

20   negative test?

21       A.  Now, that I can't answer.

22       Q.  All right.  Can anybody answer that, to

23   your knowledge?

24       A.  It would be plus or minus 8367.  It

25   depends upon the amount of weight required below

**PURSUANT TO CONFIDENTIALITY ORDER**

1   the aug down sleeve setting tool.  The

2   difference -- you're looking at the difference in

3   height of the cement plug and the amount of

4   weight required.  That -- that was the reasoning

5   for the deep-set plug.

6       Q.  All right.  Are you aware -- having

7   looked at these documents, are you aware of any

8   alternative procedure that BP could have authored

9   and required be implemented to set up the

10  conditions necessary to run a proper negative

11  test, other than the procedure that was authored

12  on April 20 and implemented that day?  Was there

13  any alternative to what they did?

14              MS. HARDING:  Object to the form.

15      A.  Yes, sir, there are alternatives.

16      Q.  (By Mr. Sterbcow) And what would the

17  alternatives be?

18      A.  One alternative would be to run and set a

19  packer, RTTS some sort of packer down at that

20  depth, displace in the same manner, and then pull

21  back out with the RTTS.

22      Q.  And -- and what would the packer do, if

23  anything, in terms of providing any additional

24  barrier to hydrocarbon flow back up through the

25  well?

1          MS. HARDING:  Object to the form.

2     A.   Once released, and you're pulling out of

3  the hole, it would provide no barrier.

4     Q.   (By Mr. Sterbcow) No barrier?

5     A.   No.

6     Q.   Okay.  And what -- what advantages, if

7  any, would the packer have provided in this

8  particular procedure?

9     A.   It wouldn't have provided any advantages.

10     Q.   And what's the difference in terms of the

11  two procedures?

12     A.   It's primarily the amount of seawater

13  that is -- that is displaced.  I mean, you can --

14  instead of going all the way around, displacing

15  all the way around and -- and -- and monitoring

16  on both the kill and the drill pipeline, what you

17  would have to do is you -- you could not achieve

18  this test as required of monitoring on the kill

19  line, because the only way you could monitor that

20  would be coming back up through the drillstring,

21  because it would be isolated with the packer.

22     Q.   Okay.  So would the packer then allow

23  less seawater displacement and still -- and still

24  would have allowed the crew to run an appropriate

25  negative test?

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MS. HARDING:  Object to the form.

2     A.  It would still require the same amount.

3  It's about achieving the U-tube at the end of the

4  drill pipe.  That's the --

5     Q.  (By Mr. Sterbcow) Okay.

6     A.  That's really the required amount.

7     Q.  All right.  Any other alternative besides

8  the -- the procedure involving running the

9  packer?

10     A.  Not that I'm aware of.

11     Q.  Okay.  If you look at Tab -- actually,

12  how is this set up?

13          Let me go back to Tab -- it's not in

14  Tab 3.

15          MR. STERBCOW:  Where's the 4/15

16  Procedure?

17          MR. TAYLOR:  (Indicating.)

18          MR. STERBCOW:  It's up here

19  someplace.  Oh, it's Tab 2, isn't it?  Yeah.

20     Q.  (By Mr. Sterbcow) If you would turn to

21  Tab 2.  We first looked at Exhibit 4830, which

22  is 19 pages of the April 12 Temporary Abandonment

23  Procedure.  If you go past that, and the first

24  Bates-stamp number is MDL00057816, and it says

25  "Pages 1 of 21" and it's dated April 15, 2010.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MS. HARDING:  In Tab 2?

2          MR. STERBCOW:  It is in mine, but it

3   may not be in yours.  That's why I'm asking.

4          MS. HARDING:  It's not here.

5          MR. STERBCOW:  Okay.  Then I have a

6   different book.  Let me see something.  That's

7   exactly why I asked.

8       A.  You've got to be careful with the numbers

9   that you quote, because mine are cut off at the

10  bottom.  I'm sorry.

11      Q.  (By Mr. Sterbcow) Okay.  That's all

12  right.  I have a copy.  Let me just give you --

13  what I'm going to show you -- the copy that I'm

14  going to show you is 21 pages entitled "GoM

15  Exploration Wells, Macondo Prospect, 7" x 9-7/8"

16  Interval," and it's dated April 15, 2010.  And

17  the copy I have is Bates-stamped CEC 021281

18  to 021301.

19          MR. TAYLOR:  It's in Tab 16.

20          MR. STERBCOW:  Ah, okay.

21      Q.  (By Mr. Sterbcow) Try Tab 16.

22      A.  Tab 2 wouldn't make any sense, I'm sorry.

23      Q.  Tab 2 wouldn't make any sense, you're

24  right.  That wouldn't be the first time.

25      A.  Okay.

**PURSUANT TO CONFIDENTIALITY ORDER**

1     Q.   And --

2          (Discussion off the record.)

3               MR. STERBCOW:   What is it?

4     Q.   (By Mr. Sterbcow) Okay.   For the record,

5     this has already been marked as 1803.   Have you

6     ever seen this document?

7     A.   I can't say that I've seen this one.

8     Q.   Okay.   So do you have -- as you sit here

9     today, do you have any idea how this document

10    would have played any role in the evolution of

11    the Macondo Temporary Abandonment Procedure?

12    A.   Well, it is chronologically between

13    the 12th and the 16th, so it should have some

14    bearing on that, yes, sir.

15    Q.   Okay.   Let me -- let me ask you a few

16    questions about it, since you haven't seen it,

17    and we won't talk a lot about it, but --

18    A.   Which page in particular?

19    Q.   First go to Page 5, if you will, at the

20    bottom -- we'll use the bottom, Page 3, 4, 5

21    of 21 -- Page 5.

22    A.   M-h'm.

23    Q.   If you look at the top, just above No. 2,

24    it says, "Attach slip on centralizers very joint

25    from 7-21."   Am I correct in concluding that the

```
 1   use of centralizers is not part of a Temporary
 2   Abandonment Procedure?
 3        A.   That --
 4             MS. HARDING:  Objection, form.
 5        Q.   (By Mr. Sterbcow) That's something that's
 6   different?
 7        A.   That -- that comes before the Temporary
 8   Abandonment, yes, sir.
 9        Q.   Okay.  So when we -- and I'll -- this --
10   and the reason I'm asking is I want to make sure
11   we're on the same page.  When we talk about
12   Temporary Abandonment Procedure, use of one, 20,
13   a hundred, whatever centralizer use was decided
14   upon has already occurred, and we're at a
15   different phase?
16        A.   That is correct.
17        Q.   Okay.  Page 8 of 21.
18             MS. HARDING:  Paul, if we're going
19   to ask him as the corporate rep about the doc --
20   he said he hasn't seen it yet -- I think -- can
21   we take a break and let him read it?
22        Q.   (By Mr. Sterbcow) You want to take five
23   and -- and read it?
24        A.   If I can.
25        Q.   Sure.  And I'm not going to go into
```

```
 1   chapter and -- and if you would, really, what I'm
 2   going to look at is Page 8 of 21, because I think
 3   that's all we're talking about.
 4       A.  Okay.
 5                   MR. STERBCOW:  Okay.  So we -- let's
 6   take five.
 7                   MS. HARDING:  Yeah, I think that
 8   will be fine.
 9                   MR. STERBCOW:  Okay.  We'll go off
10   the record.
11                   THE VIDEOGRAPHER:  We're off the
12   record at 9:23, end Tape 1.
13          (Recess from 9:23 a.m. to 9:33 a.m.)
14                   THE VIDEOGRAPHER:  Everybody ready.
15                   MR. STERBCOW:  We're ready when
16   y'all are.
17                   THE VIDEOGRAPHER:  One second.
18          We're on the record at 9:33, start
19   Tape 2.
20       Q.  (By Mr. Sterbcow) Okay.  Back on the
21   record now, Mr. Frazelle, and we're going to
22   concentrate, as we said right before the break,
23   on Page 8 of 21.  Having looked at the document,
24   it looks like Section 9.2.4 "Surface Cement Plug"
25   is where what we're calling the Temporary
```

1  Abandonment Procedure is referenced.  Is -- is

2  that fair?

3      A.  That is correct.

4      Q.  Okay.  In Step 1, it says:  "If cement

5  job is not successful (no returns or lift

6  pressure seen)," goes through a series of three

7  steps:  "Set wear bushing, Run IBC-CBL log, Wait

8  on decision to do remedial work (MMS and BP)."

9          In review of your documents, do you know

10  what was done to determine whether or not the

11  cement job was, in fact, successful?

12      A.  No, sir.

13      Q.  Okay.  That's not part of what you looked

14  at?

15      A.  That's -- I'm not prepared to answer

16  that.  I did not review any documents in

17  relationship to that or the evaluation of the

18  cement job.

19      Q.  Okay.  So -- and -- and I want to make

20  sure I'm clear on this, you have no information

21  because you have not looked into it, as to

22  whether or not anything was done, and if so, what

23  was done on the rig, to determine whether or not

24  they achieved a successful cement job before the

25  Temporary Abandonment Procedure began?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   That is correct.

2      Q.   All right.   No. 2 says -- and we'll --

3  we'll skip it, but it talks about what to do if

4  the cement job is successful.

5          It goes to Step 3, which is:   Run in the

6  hole "to 8367 feet and displace to seawater."

7  And then goes through the rest of the steps.

8          It appears that this, based on this

9  document, as of April 15, 2010, the intent was to

10  cement -- to -- excuse me, to set a cement plug

11  in seawater, correct?

12      A.   That is correct, yes, sir.

13      Q.   All right.   And do you have any criticism

14  of that?

15      A.   No, sir.

16      Q.   All right.   By doing so, displacement to

17  seawater to 8,367 feet would necessarily have

18  already occurred before the cement plug is set,

19  correct?

20      A.   That is correct.

21      Q.   Does BP, to your knowledge, as part of a

22  Temporary Abandonment Procedure at any point

23  re -- rely on the fluid column in the well as a

24  barrier to prevent hydrocarbon flow back up

25  through the well?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      MS. HARDING:  Object to the form.

2   A.  During -- during what period, I'm sorry?

3   Q.  (By Mr. Sterbcow) Is -- is fluid -- is

4 the col -- the weight of the fluid column in the

5 well a barrier to hydrocarbon flow back through

6 the well --

7   A.  Yes.

8   Q.  -- first of all?

9   A.  Yes, sir.

10   Q.  All right.  Can we agree, then, that that

11 barrier has now been removed once the 8,367-foot

12 displacement has occurred prior to the 300-foot

13 cement plug being set?

14   A.  Yes, sir.

15   Q.  Having said that, then, then we have one

16 barrier at the time that the negative test

17 begins, that barrier being the cement itself?

18      MS. HARDING:  Object to the form.

19   A.  I believe the second barrier is, is when

20 they're displacing this, since they're going down

21 the drill pipe, they have either the annular or

22 the BOP closed, and that would be a se -- that

23 would be the second barrier while they're

24 displacing to seawater.

25   Q.  (By Mr. Sterbcow) Okay.  So while they're

**PURSUANT TO CONFIDENTIALITY ORDER**

1  displacing to seawater, and then the negative

2  test is the next step, the two barriers in place

3  are the cement at the bottom and the closing

4  of -- of the -- the BOP?

5       A.  Yes, sir.

6       Q.  Okay.  And the fluid column, if you will,

7  that we talked about would no longer be

8  considered a barrier because we've displaced to

9  seawater, reduced the hydrostatic head to get

10 ready to do the negative test?

11      A.  Yes, sir.

12      Q.  Okay.  Do you -- having not reviewed

13 this -- well, I have one other question.  Do you

14 have any idea whether or not this document that

15 you're looking at now, the April 15, 2010

16 document, played any role whatsoever in the

17 evolution of what became the Final Temporary

18 Abandonment Plan?

19      A.  Yes, sir.

20      Q.  And how -- it -- did it play a role?

21      A.  Yes, sir.

22      Q.  Okay.  How?

23      A.  This is -- this is pretty much the -- the

24 Procedure as far as displacing and doing the

25 negative test, monitoring that for 30 minutes.

**PURSUANT TO CONFIDENTIALITY ORDER**

58

1     Q.  All right.

2     A.  So this is -- this is where -- this is

3  what we would like to do, pending MMS approval.

4  I mean it stipulates that, if approved.

5     Q.  Okay.

6     A.  So --

7     Q.  So this, what we're looking at now, the

8  April 15, 2010 Procedure, is consistent with what

9  Mr. Morel published to the rig via E-mail the

10  morning of April 20?

11          MS. HARDING:  Object to the form.

12     A.  One more time.  I'm sorry.

13     Q.  (By Mr. Sterbcow) Is -- is -- if I

14  understand what you're telling me, is the

15  April 15, 2010 Procedure that we're looking at

16  consistent with the April 20, 2010 Ops note

17  prepared by Mr. Morel?

18          MS. HARDING:  Object to the form.

19     A.  Yes, sir.

20     Q.  (By Mr. Sterbcow) Okay.  Now, I think

21  we've got to go back and look at Tab 4.  Is that

22  where the --

23          MR. TAYLOR:  The application?

24          MR. STERBCOW:  Yeah.

25          MR. TAYLOR:  Okay.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.  (By Mr. Sterbcow) I've got to make you

2  turn back.  Tab 4, and this has been previously

3  marked as Exhibit 570.  My understanding is, is

4  that this is the BP "Application for Permit to

5  Modify," that being BP's effort to obtain MMS

6  approval of a Temporary Abandonment Procedure.

7      A.  Yes, sir.

8      Q.  Okay.  And this is the one that applied

9  to Macondo?

10      A.  H'm, let me look at this for

11  confirmation.

12      Q.  Sure.

13      A.  Yes, sir.  252 No. 1.

14      Q.  All right.  On page -- if you go back

15  after the third -- the first two pages, the form

16  that was filled out.  The third page appears to

17  be the Recommended BP "Temporary Abandonment

18  Procedure" submitted to MMS for approval.  Is

19  that fair?

20      A.  That is correct.

21      Q.  All right.  Is this Procedure consistent

22  with the -- the April 20, 2010 Ops Note?

23              MS. HARDING:  Object to the form.

24      A.  Is this -- this Procedure consistent with

25  the April 20th?

PURSUANT TO CONFIDENTIALITY ORDER

1    Q.  (By Mr. Sterbcow) Right.

2    A.  Can I look at the April 20th, please?

3    Q.  Sure.

4    A.  Which is under --

5    Q.  Tab 5, I think.  Yes, Tab 5, if yours is

6  consistent with mine.

7    A.  (Reviewing document.)

8    Q.  It should be the -- the -- the Morel

9  E-mail of Tuesday, April 20.  I think that's it

10  in front of you.

11    A.  "Ops Note."

12    Q.  Right.  It's called an "Ops Note"?

13    A.  Right.  "Test casing per APD to 250..."

14  Run in hole.  "Displace to seawater..."

15  "...close...and do a negative test."  Okay.

16    Q.  All right.  First, let me ask, based on

17  your document review, is the document attached to

18  the form, the "Application For Permit to Modify,"

19  Exhibit 570, Page 3 that we're looking at, is

20  this the Procedure that was submitted and

21  approved by MMS for temporarily abandoning

22  Macondo to your knowledge?

23    A.  To my knowledge, yes.

24    Q.  Did this Procedure change in any way from

25  April 16 to April 20 based on review of

1   Mr. Morel's April 20 E-mail called "Ops Note"?

2            MS. HARDING:   Object to the form.

3       A.   I don't believe there was any change.

4   There was clarification as how they were going to

5   achieve it in the April 20th.

6       Q.   (By Mr. Sterbcow) All right.   And what do

7   you mean by that?

8            MS. HARDING:   Object to the form.

9       A.   Is -- the -- the wording in Step No. 1

10  where it says "Negative test casing to seawater

11  gradient...," is -- is really what the next two

12  steps is going to do, in my opinion.   Because

13  it's going to be achieved by tripping in the hole

14  with the three and a half inch stinger and then

15  displacing to seawater.   And so that's pretty

16  much clarified where it says run in hole,

17  displace, and then do the negative test.

18      Q.   Okay.   Otherwise -- other than taking the

19  one-step Procedure from April 16 and turning it

20  into two steps descriptively on April 20, is the

21  rest of the April 20 E-mail consistent?

22            MS. HARDING:   Object to the form.

23      A.   I believe so.

24      Q.   (By Mr. Sterbcow) Do you know whether or

25  not any Risk Assessment was performed internally

**PURSUANT TO CONFIDENTIALITY ORDER**

1   by BP on the April 16 Procedure submitted to the

2   MMS for approval?

3                    MS. HARDING:   Object to the form.

4        A.   I am not aware of a formal Risk

5   Assessment, nor as have I seen that document, if

6   there is one.

7        Q.   (By Mr. Sterbcow) Did the April 16

8   Procedure submitted to MMS change over time from

9   the April 12 to the April 15 to April 16?

10                    MS. HARDING:   Object -- objection,

11   form.

12        A.   Once again, let me go back and look at

13   12.

14        Q.   (By Mr. Sterbcow) Sure.

15        A.   And that is -- this is the one under

16   Tab 2, correct?

17        Q.   Tab 2.

18                    MR. TAYLOR:   (Nodding.)

19        A.   Yes, there is clarification that they're

20   going to go ahead with the deep set plug, and

21   the 12th, it referred to a shal -- stead --

22   shallow set plug and then a different timing on

23   setting the LDS.   So there is an evolution

24   between the 12th and the 16th, yes, sir.

25        Q.   (By Mr. Sterbcow) Do you have any

**PURSUANT TO CONFIDENTIALITY ORDER**

1    information, based on your document review on

2    behalf of BP, as to who was involved in that

3    evolutionary process that occurred from April 12

4    to April 16?

5        A.   Only in the E-mails where Brian sent some

6    stuff to Ronnie, and Ronnie responded back about,

7    you know, needing to do different things in that.

8        Q.   All right.  Do you have any indication

9    from your review that Brian ever asked anyone

10   above him at BP to review the evolution of the

11   Temporary Abandonment Procedure for either

12   approval or comment?

13       A.   I cannot testify to that.  I do not know.

14       Q.   All right.  Your question is prob -- I

15   mean, my -- your answer is probably going to be

16   the same as before, but in terms of what Brian

17   Morel actually meant in sending that Ops Note the

18   morning of April 20th, 2010, and whether he

19   intended any changes from April 16, he's the only

20   one that can answer that question, correct?

21       A.   He is the only one that can answer that.

22       Q.   All right.

23       A.   The -- the purpose of this note is just

24   to clarify the way forward.

25       Q.   Okay.  And that's how you've interpreted

**PURSUANT TO CONFIDENTIALITY ORDER**

1    it based on your document review?

2        A.   That's -- that's how I interpreted it.

3    This is around clarifying that -- the way

4    forward, make sure everybody was on the same

5    page.

6        Q.   All right.  And so he is now clarifying

7    the Temporary Abandonment Procedure for Macondo

8    by sending the E-mail to -- back to himself, to

9    both Well Site Leaders, to the Well Site Leader

10   Trainee, Mr. Lambert, to Mr. Lee, who was

11   actually I think also a Well Site Leader but not

12   on the rig, and copying Well Team Leader Guide,

13   his fellow Engineer, Mr. Hafle, Mr. Cocales, who

14   was the Operations Engineer, and Mr. Walz, his

15   Superior, at that point in time?

16       A.   That is correct.

17       Q.   All right.  In terms of -- and that's

18   your interpretation.

19            If Mr. Morel, in fact, intended anything

20   other than clarification, though, he's the only

21   one who would know the answer to that question.

22            MS. HARDING:  Object to the form.

23       Q.   (By Mr. Sterbcow) Correct?

24       A.   Well --

25       Q.   Because you -- you have to interpret what

1    he did?

2       A.   I have to interpret what he did by what I

3    see.

4       Q.   All right.  Have you come to the

5    conclusion, then, that the -- the formal written

6    Temporary Abandonment Procedure that was decided

7    upon and implemented at Macondo is the one that's

8    attached to the April 16, 2010 Application For

9    Permit to Modify, that Page 3 that we looked at?

10      A.   (Reviewing document.)

11           Yes, sir.

12      Q.   And as you sit here today on behalf of

13   BP, you have no knowledge, have seen no documents

14   as to exactly how this Abandonment Plan was

15   authored, who authored it, or who reviewed it to

16   determine whether or not Risk Assessment or any

17   changes needed to be made.

18           MS. HARDING:  Object to form.

19      Q.   (By Mr. Sterbcow) Correct?

20      A.   Correct.

21      Q.   And we can agree that this Plan as

22   implemented provided, according to you, two

23   barriers to flow backup in the well; the first

24   being the cement job, the second being operation

25   of the blowout preventer?

1    A.  During the --

2    Q.  During --

3    A.  -- during the displacement to seawater?

4    Q.  Correct.

5    A.  Yes.

6    Q.  As part of the Temporary Abandonment

7  Procedure?

8    A.  As part of the Temporary Abandonment

9  Procedure, yes, sir.

10    Q.  All right.  Okay.  Did you read any

11  documents at all that described any conversations

12  that took place on the DEEPWATER HORIZON the

13  morning of April 20th regarding any part of the

14  Temporary Abandonment Procedure?

15    A.  No, sir.

16    Q.  All right.  Are you aware of any

17  discussions that took place between Mr. Morel and

18  Mr. Kaluza on the rig that morning regarding the

19  Temporary Abandonment Procedure?

20    A.  No, sir.

21    Q.  Are you aware of any discussions that

22  took place between Mr. Morel, Mr. Kaluza, and the

23  SWACO Mud Engineer, Leo Lindner, regarding how to

24  go about implementing the Temporary Abandonment

25  Procedure?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   I do not know about that, but there is

2  some testimony from Mr. Leo in one of the many

3  documents that I've reviewed --

4    Q.   M-h'm.

5    A.   -- whether it was the MBI Report, there

6  is some mention to a conversation about

7  finalizing the Procedure.

8    Q.   All right.  Do you recall there being

9  conversations that Mr. Lindner interpreted as

10 being Mr. Kaluza and Mr. Morel seeking his

11 knowledge and advice on whether or not the

12 Temporary Abandonment Procedure should be run as

13 written?

14              MS. HARDING:   Object to the form.

15   A.   No, sir, I can't.

16   Q.   (By Mr. Sterbcow) Do you have any opinion

17 on behalf of BP as whether it's appropriate for

18 BP to consult with the SWACO hand on the rig

19 regarding BP's Temporary Abandonment Procedure?

20   A.   And the SWACO hand that you're referring

21 to --

22   Q.   Is Mr. Lindner in this case.

23   A.   And his position on the rig is --

24   Q.   Mud Engineer.

25   A.   As the Mud Engineer?  Yes, sir, they

 1    would involve him in the Procedure.

 2        Q.  All right.  And should they, in fact,

 3    seek Mr. Lindner's advice and opinion on whether

 4    or not any part or all of the Temporary

 5    Abandonment Procedure, at least in his mind,

 6    appears to be appropriate for that particular

 7    well?

 8              MS. HARDING:  Object to the form.

 9        A.  I'm not sure that they would solicit his

10    opinion.  I think that they would pre -- they

11    would present him with a copy of the Procedure

12    and then ask -- well, I guess they would be

13    asking his opinion.

14        Q.  (By Mr. Sterbcow) Okay.

15        A.  Not necessarily for a decision, but

16    "Is this doable?  How do we line this up?  Make

17    sure that you have the proper fluids for the

18    displacement."

19              So he would be involved and consulted and

20    asked questions about that.

21        Q.  All right.  Can we agree that the goal of

22    the Temporary Abandonment Procedure is to make

23    sure that the Macondo Well is in such a

24    condition, a secured condition, that at the end

25    of the day the BOP stack can be removed, the

 1   riser can be removed, and the rig can leave

 2   location?

 3       A.  That is correct.

 4       Q.  And all of that should occur without

 5   there being any hydrocarbon flow backup through

 6   the well and certainly into the Gulf of Mexico?

 7       A.  That is correct.

 8       Q.  What part, if any, of the Temporary

 9   Abandonment Procedure in your opinion failed?

10               MS. HARDING:  Object to the form.

11       A.  Theoretically none of the Procedure

12   failed, but it was the interpretation of the

13   negative test and then the subsequent

14   nonmonitoring of the wellbore and the influx that

15   occurred.

16       Q.  (By Mr. Sterbcow) Okay.  And I just want

17   to make sure that -- you said this, I want to

18   make sure I'm clear on the record.  In terms of

19   what was done --

20               MS. HARDING:  Paul, I'm sorry.  I

21   can't -- there's something wrong.  It's been five

22   minutes.  Can we get it fixed?  It won't -- I

23   tried to fix it.  It won't -- I can't --

24               MR. STERBCOW:  You're not getting

25   it?

**PURSUANT TO CONFIDENTIALITY ORDER**

1                    MS. HARDING:  Right.  I tried -- I

2    kind of let it go for a while, but now I'm kind

3    of --

4                    MR. STERBCOW:  Time out.

5                    MS. HARDING:  Sorry.

6                    MR. STERBCOW:  That's okay.  I'm

7    almost done.

8                    MS. HARDING:  I -- I fixed it

9    before.  I hit -- hit "realtime."  It's not

10   working.

11                   THE VIDEOGRAPHER:  Let me get over

12   here.

13                   MS. HARDING:  I apologize.

14                   THE VIDEOGRAPHER:  Did you hit that?

15                   MS. HARDING:  I did hit that.

16                   THE WITNESS:  You need me to call my

17   13-year-old?

18                   MS. HARDING:  Yes.

19                   MR. STERBCOW:  Go ahead, man.

20                   MS. HARDING:  That would be what I

21   would do at home.

22                   THE WITNESS:  Fix the remote on the

23   TV or the computer, anything electrical.

24                   MR. STERBCOW:  That's right.

25                   THE COURT REPORTER:  Mark, close it

1    out completely and start all over.

2              MS. HARDING:  I'm sorry.

3              MR. STERBCOW:  That's all right.

4              THE COURT REPORTER:  No, the

5    other -- bottom right, close out of that.

6         Make sure you're on 11.

7              THE VIDEOGRAPHER:  That's the

8    problem.

9              THE COURT REPORTER:  It jumped to

10   another network.  When Barbara hit that, it

11   jumped to another network.

12             MS. HARDING:  So it was my fault?

13             THE COURT REPORTER:  You don't think

14   I was going to take responsibility, do you?

15             THE WITNESS:  Are you following

16   somebody else's deposition over there?

17             THE COURT REPORTER:  Yeah, in

18   London.

19        (Laughter.)

20             THE COURT REPORTER:  Good job.

21             MS. HARDING:  We'll just -- all

22   right.  Thank you.

23             MR. STERBCOW:  All right.

24             THE COURT REPORTER:  Barbara, next

25   time if you'll run your credit card through the

**PURSUANT TO CONFIDENTIALITY ORDER**

 1  top of the computer.

 2          MS. HARDING:  I'll try that.

 3      (Worldwide Technician enters room.)

 4          THE COURT REPORTER:  Oh, thanks for

 5  showing up.

 6          MR. STERBCOW:  We ready?

 7          THE COURT REPORTER:  We never went

 8  off.

 9          MR. STERBCOW:  Oh, we never went

10  off.  All right.

11      Q.  (By Mr. Sterbcow) You have no knowledge

12  because of the area you've been designated in --

13  and this is a question, let me confirm this:

14  Isn't it a fact that because of the area you've

15  been designated in you don't have any knowledge

16  whatsoever of the circumstances surrounding

17  testing, confirmation, or the actual procedure

18  for cementing the well, correct?

19      A.  That is correct.

20      Q.  Okay.  Would you agree with me that the

21  top plug that was being set, the 300-foot cement

22  plug, is not intended to be a barrier to

23  hydrocarbon flow back through the well?

24      A.  I can't agree with that.  That is the

25  second barrier.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   That is the --

2    A.   In --

3    Q.   -- second barrier?

4    A.   In the -- in the event of the failure of

5    the first one, that is the second bayer --

6    barrier.

7    Q.   All right.  And the second barrier, then,

8    is put in -- according to this Procedure, the

9    300-foot cement plug, being the second barrier,

10   would be put in place once the negative test was

11   run and interpreted?

12   A.   Yes, sir.

13   Q.   All right.  During the negative test,

14   we've got two barriers, but the second one's the

15   BOP, not the cement plug?

16   A.   That is correct.

17   Q.   So is -- then BP's Procedure and your

18   testimony is that the top -- the -- the cement

19   plug essentially takes the place of the BOP as

20   Barrier No. 2 when, in this case, the DEEPWATER

21   HORIZON leaves the rig in an abandoned state,

22   temporarily abandoned state?

23   A.   Theoretic -- theoretically the -- the

24   lower cement plug is the primary barrier.

25   That -- that prevents flow of hydrocarbons to the

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1   seafloor, and the second one is the redundant

 2   barrier that's in place that replaces the BOP,

 3   yes, sir.

 4        Q.  Okay.  All right.  Very good.

 5                MR. STERBCOW:  Okay.  I don't have

 6   any further questions.  Thanks.  Do you want to

 7   go off the record because we're going to need

 8   to --

 9                MS. HARDING:  Okay.  And, you know,

10   I'm -- I'm going to object to -- I don't know

11   what the -- I sent an E-mail to just check.  I

12   just want to check to make sure there aren't any

13   Orders in place that prevent the questioning of

14   different people for the same party.

15                MR. STERBCOW:  Oh, I don't know.

16   We've done it before.

17                MR. WILLIAMSON:  We've done it.

18                MR. STERBCOW:  All along.

19                MS. HARDING:  Okay.

20                MR. WILLIAMSON:  We've done it 40

21   times.

22                MR. STERBCOW:  Yeah.

23                MS. HARDING:  Okay.  Without --

24   without -- it just has not happened in the

25   depositions that I've been involved in.  So I
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    just wanted to --

2                   MR. STERBCOW:  Okay.

3                   MS. HARDING:  -- to confirm.

4           So I'm going to take y'all's word that

5    you've done it without objection from BP.

6                   MR. WILLIAMSON:  Correct.

7                   MS. HARDING:  Okay.  Thank you.

8                   MR. WILLIAMSON:  It has been done in

9    the first one.

10                   MS. HARDING:  Okay.  Thank you.

11                   MR. STERBCOW:  Thank you for your

12    time.

13                   THE WITNESS:  Okay.

14                   MS. HARDING:  Are we still on the

15    record?  I'd like to stay on the record because I

16    do want to object to the audible responses from

17    attorneys in the audience during the -- during

18    the responses of the witness and object to

19    playing any video recording where that occurs at

20    trial.

21                   MR. STERBCOW:  What?

22                   MS. HARDING:  You all may not have

23    heard it, but I did.

24                   MR. STERBCOW:  That's why I'm

25    looking at you.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              THE VIDEOGRAPHER:  We're off the

 2   record at 9:57.

 3           (Recess from 9:57 a.m. to 10:06 a.m.)

 4              MR. WILLIAMSON:  I'm ready.

 5              THE VIDEOGRAPHER:  All set?

 6           We're on the record at 10:06, start

 7   Tape 3.

 8                     EXAMINATION

 9   QUESTIONS BY MR. WILLIAMSON:

10       Q.  Mr. Frazelle, my name is Jimmy

11   Williamson.  I also represent the Plaintiffs.

12   I'm here to ask you a few questions.  Fair

13   enough?

14       A.  Yes, sir.

15       Q.  Okay.  My first question was -- relates

16   to the very last topic you just discussed where

17   you said the top plug was a second barrier.  Did

18   I understand your testimony correctly?

19       A.  Yes, sir.

20       Q.  Okay.  Did you pressure test it?

21       A.  We never got to set it.

22       Q.  No.  If you were going to set it, if it

23   gets set, is it BP's Policy to pressure test the

24   top plug?

25              MS. HARDING:  Object to the form.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   You confirm it's existence by setting

2   down weight, and it stipulates putting 15K down

3   to confirm that it's in place.

4      Q.   (By Mr. Williamson) Okay.   So the only

5   test that's done -- there's no pressure test

6   done, the only test that's done in order to

7   confirm the second barrier, the top plug,

8   according to you, is to put 15,000 pounds on it?

9      A.   Yes, sir.

10     Q.   Okay.   So you do not -- BP does not

11  pressure test what you are calling the second

12  barrier, the top plug, correct?

13     A.   That's correct.

14     Q.   All right.   Is it BP's Policy not to

15  pressure test the second barrier?

16              MS. HARDING:   Object to the form.

17     A.   Not to test it, I assume that you could

18  test it if you wanted to, but the standard

19  methodology is by weight testing it.

20     Q.   (By Mr. Williamson) So therefore, the

21  answer is no, BP does not have a Policy of

22  pressure testing the second barrier?

23              MS. HARDING:   Object to the form.

24     A.   That's correct.

25     Q.   (By Mr. Williamson) Okay.   I'm going to

**PURSUANT TO CONFIDENTIALITY ORDER**

1    turn to the blowout preventer.

2        A.   Okay.

3        Q.   You understand that you've been

4    designated as a witness with regard to blowout

5    preventer Regulatory issues?

6        A.   Yes, sir.

7        Q.   Okay.  And on that subject, I'm asking

8    you to speak for BP today, you know that?

9        A.   Yes, sir.

10       Q.   And I'm going to ask you to go with

11   telling me what BP knows, you understand that?

12       A.   Yes, sir.

13       Q.   Because your answers are going to be used

14   to state what BP's knowledge is, correct?

15               MS. HARDING:  Object to the form.

16       Q.   (By Mr. Williamson) You know that?

17       A.   That is correct.

18       Q.   Okay.  Do you have experience with

19   blowout preventers?

20       A.   What type of experience are you referring

21   to, sir?

22       Q.   Any experience.  What's your experience

23   with blowout preventers?

24       A.   My experience of blowout preventers is as

25   a Well Site Leader and as an Operators

1  Representative onboard the rigs.  I am not a

2  Subsea Engineer who maintains or has that type of

3  experience.

4      Q.  Okay.  So you don't really consider

5  yourself an expert in blowout preventers

6  themselves?

7      A.  That is correct.

8      Q.  Okay.  And what did you do to prepare,

9  then, to testify with regard to blowout preventer

10  Regulatory Requirements?

11     A.  There was numerous conversations around

12  looking at different CFRs, what their

13  interpretation is.  There was conversations with

14  Jim Grant with Regulatory, that -- that talked

15  about various aspects of interaction.  I read

16  through just basically some of the testimony

17  around, you know, from John Guide, et cetera.

18     Q.  Okay.  The -- did you have much

19  familiarity with the Code of Federal Regulations,

20  what we usually call the CFRs, before you started

21  preparing for this deposition?

22     A.  Not in this level of detail, no, sir.

23     Q.  Okay.  Did you have much familiarity with

24  the CFRs -- did I understand correctly that you

25  actually are a Wells Operation person in

1    connection with the Gulf of Mexico Operations?

2       A.  Yes, sir, that was my role preincident.

3       Q.  And I assume that we can agree that Gulf

4    of Mexico Drilling Operations are governed by the

5    Code of Federal Regulations, Chapter 250,

6    correct?

7       A.  Yes, sir.

8       Q.  Okay.  What familiarity did you have, as

9    a Wells Operations person in the Gulf of Mexico,

10   with CFR Chapter 250 before they asked you to get

11   ready for this deposition?

12      A.  Primarily just knew of it -- its -- of

13   its existence and how it applies, and how our

14   Regulatory people, you know, my -- my

15   participation was more through our Regulatory

16   Compliance people, understanding we were in

17   compliance.

18      Q.  Okay.  So as a Wells Operation person,

19   you didn't have to have a detailed knowledge of

20   the CFRs in your performance of your job at BP?

21              MS. HARDING:  Object to the form.

22      A.  No, sir.

23      Q.  (By Mr. Williamson) That's correct?

24      A.  That's correct.

25      Q.  And tell me, again, now, I've heard the

1  you, Mr. Frazelle, were violating BP Policy?

2          MS. HARDING:  Did you get that?

3          THE COURT REPORTER:  (Nodding.)

4      A.  I can't answer that question, sir.

5      Q.  (By Mr. Williamson) Okay.  So you don't

6  know -- as you sit here today, BP does not know

7  whether Andrew Frazelle, the Wells Operation

8  Manager, was violating BP Policy with regard to

9  training on the CFRs?

10          MS. HARDING:  Object to the form.

11      A.  That's correct.

12      Q.  (By Mr. Sterbcow) Okay.  Okay.  You are

13  aware of 250.1503 that requires a training

14  program, aren't you?

15      A.  Yeah, Subpart O.

16      Q.  Right.

17      A.  That's in well control.

18      Q.  Right.

19      A.  (Nodding.)

20      Q.  Okay.  But you're saying with regard to

21  the blowout preventer, there was no training for

22  Well Site Leaders, Well Team Leaders, or Well

23  Operations Managers?

24          MS. HARDING:  Object to form.

25      A.  And the training you're referring to, is

PURSUANT TO CONFIDENTIALITY ORDER

 1    that in the operation, the understanding?  What

 2    type of training are you referring to?

 3        Q.  (By Mr. Williamson) Well, that's kind of

 4    what I'm asking you.  You know, under 250 -- 30

 5    CFR 250.1503 --

 6        A.  Yes, sir.

 7        Q.  -- dealing with the fact that BP is

 8    required to have a training program -- you'll

 9    agree with that?

10        A.  Yes, sir.

11        Q.  Okay.  What training program did BP have

12    for its Well Site Leaders, Well Team Leaders, and

13    Well Operations Managers, Gulf of Mexico, with

14    regard to blowout preventer use?

15        A.  In well control, sir --

16        Q.  Okay.

17        A.  -- we required -- we required drilling --

18    we required Supervisor level subsea well control

19    training for our people.

20        Q.  I want to be a little more specific.

21    Blowout preventers, was there any training that

22    you've ever received while you were at BP on

23    blowout preventer emergency activation?

24            MS. HARDING:  Object to the form.

25        A.  A blowout preventer activation.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    this deposition, did you ever know what that

2    phrase meant?

3         A.  Yes, sir.

4         Q.  Okay.  What was your understanding of

5    what that phrase meant?

6         A.  That is -- the phrase that we referred to

7    that is -- is in the APDs when they calculate

8    MASP, and the requirement is -- for the MMS is

9    the -- I'd have to look at the -- at the

10   verbiage, but it's -- there is some reasonably to

11   be expected, and that's how we calculated and

12   submitted MASP in the past.

13        Q.  Okay.  I'm going to ask you these

14   questions speaking for BP, not for Andrew

15   Frazelle personally.  Do you understand that?

16        A.  Yes, sir.

17        Q.  Okay.  You know, what does the word

18   "maximum" mean when the -- when the MMS uses the

19   word "maximum anticipated surface pressure"?

20                MS. HARDING:  Object to the form.

21        A.  They also use the terminology

22   "reasonable" in there.  I don't know where the --

23   there's a document that I reviewed that -- that

24   says what they look at.

25        Q.  (By Mr. Sterbcow) Okay.

1    A.   Yes, sir.

2    Q.   Right.  How is MASP used by BP in

3  connection with the blowout preventer?   My

4  question is, by the way, before April 20th, 2010,

5  I'll -- I'll just make that for all my questions.

6    A.   Okay.

7    Q.   Is that fair?

8    A.   That's fair.

9    Q.   Okay.  When I talk about BP Policies, I'm

10 going to be talking about before April 20, 2010,

11 to be fair to you.

12   A.   Okay.

13   Q.   Okay?

14        How does BP utilize MASP in connection

15 with the blowout preventer before April 20th,

16 2010?

17   A.   You double-check.  You calculate the

18 MASP, and you ensure that the BOP system is -- is

19 rated for that.

20   Q.   How?

21   A.   By coming up with the MASP number.  If

22 the MASP number is 7,000 and -- and the wor --

23 rated working pressure of the BOP system is

24 15,000, then -- then it -- it is acceptable to

25 use that.

PURSUANT TO CONFIDENTIALITY ORDER

1    understand the capabilities of the blind shear

2    rams and the casing shear rams and understanding

3    what -- what is shearable and what's not.

4        Q.  (By Mr. Williamson) Well, doesn't the

5    MASP change per -- well by well?

6        A.  Yes, sir.

7        Q.  The MASP is different for every well?

8        A.  Yes, sir.

9        Q.  Because every well is capable of

10   producing at different pressures, correct?

11       A.  That is correct.

12       Q.  And, also, the -- the shearability will

13   depend also on the water depth, correct, because

14   that affects the hydrostatic head?

15       A.  Yes, sir.

16       Q.  Okay.  But BP does not have a policy of

17   checking the MASP, M-A-S-P, against shearability,

18   on every well?

19             MS. HARDING:  Object to the form.

20       Q.  (By Mr. Williamson) Did I understand your

21   answer correctly?

22       A.  I can't answer that.  I -- I don't

23   remember the -- the policy.  I'm sorry.

24       Q.  Okay.  Speaking for BP, you don't know if

25   there's a policy to check maximum anticipated

```
 1                    MS. HARDING:  Object to the form.
 2         A.  Yes, sir.
 3         Q.  (By Mr. Williamson) Okay.  Who at BP is
 4    in charge of making positively sure that
 5    Transocean does it?
 6         A.  That, I can't answer.
 7                    MS. HARDING:  Object to the form.
 8         Q.  (By Mr. Williamson) Okay.  BP doesn't
 9    know, speaking for BP, as your corporation, BP
10    doesn't know who at Transocean calculates that?
11         A.  The -- the calculation with that is with
12    the -- with the Subsea Engineers and the
13    Engineering Department.  As far as a particular
14    name, I --
15         Q.  You can give me a title.  Who does BP
16    think does that for Transocean?
17                    MS. HARDING:  Object to the form.
18         A.  The communication between BP is between
19    the -- the Wells Team Leader and the -- and the
20    rig Operations Manager --
21         Q.  (By Mr. Williamson) Okay.
22         A.  -- to request that information.
23         Q.  So John Guide, the Wells Team Leader on
24    the HORIZON, was supposed to figure out if
25    Transocean was calculating shearability using
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1   MASP?

2           MS. HARDING:  Object to the form.

3      Q.  (By Mr. Williamson) Do I understand your

4   answer correctly?

5      A.  Could you repeat that, please?

6      Q.  Sure.  John Guide, the Wells Team Leader

7   on the HORIZON, was supposed to make sure that

8   Transocean was calculating shearability with the

9   MASP.  Did I understand your answer correctly?

10          MS. HARDING:  Object to form.

11     A.  Yes, sir.

12     Q.  (By Mr. Williamson) Okay.  Who's supposed

13  to check to see if John Guide does that?

14          MS. HARDING:  Object to the form.

15     A.  Theoretically, it would be the Wells

16  Operations Manager --

17     Q.  (By Mr. Williamson) Okay.

18     A.  -- since he supervises.

19     Q.  And what audit system is in place to make

20  sure that the Wells Operations Manager and the

21  Wells Team Leader actually do that?

22          MS. HARDING:  Object to the form.

23     A.  I'm not aware of one.

24     Q.  (By Mr. Williamson) Okay.  So BP doesn't

25  have an audit or a supervisory or a Safety

1   Management System in order to make sure that this

2   occurs --

3               MS. HARDING:  Object to the form.

4       Q.  (By Mr. Williamson) -- that you know of?

5       A.  BP has a Safety Management System, yes,

6   sir.

7       Q.  I know.  I'm asking -- I -- I agree, BP

8   has a Safety Management System.

9       A.  (Nodding.)

10      Q.  What I'm asking is:  Do you know of that

11  Safety Management System ever being utilized to

12  ensure this particular function, namely, that

13  Transocean correctly calculates shearability

14  using the MASP?

15              MS. HARDING:  Object to the form.

16      Q.  (By Mr. Williamson) There's no Safety

17  Management System and process for that particular

18  item, is there?

19              MS. HARDING:  Object to the form.

20      A.  I do not believe that's stipulated in --

21  in DWOP, no, sir.

22      Q.  (By Mr. Williamson) So the answer is,

23  "No, we never checked.  The Wells Operations

24  Manager does not check to see if the Wells Team

25  Leader does that"?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              MS. HARDING:  Object to the form.
 2       A.  I can't say that he never does.
 3       Q.  (By Mr. Williamson) But there's no system
 4  in place to ensure that it happens?
 5       A.  There is no system in place for that
 6  particular check or audit action.
 7       Q.  M-h'm.  The -- well, speaking for BP,
 8  there should be such a system in place, shouldn't
 9  there?
10              MS. HARDING:  Object to the form.
11       A.  I don't think that on a -- on a
12  well-by-well basis, I think that you need to
13  understand what the boundary conditions are if --
14  if there is shearability at 10,000 or 15,000, and
15  you understand the capabilities of your shear
16  rams, and the MASP falls within that, that --
17  that it has to be done on a daily basis or on a
18  well basis.  You have to ensure that it falls
19  within that predetermined range.
20       Q.  (By Mr. Williamson) Okay.  So your answer
21  is, "BP does not think there should be a system
22  process in place to check this on a well-by-well
23  basis"?
24              MS. HARDING:  Object to the form.
25       A.  To calculate it on a well-by-well basis,
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    record at 11:04, start Tape 4.

2        Q.  (By Mr. Williamson) I want to turn back

3    to Exhibit No. 6169.  Do you have it in front of

4    you?

5        A.  No, sir.  Here it is.

6        Q.  Okay.  We've talked about the design of

7    the system, and the fact that we both agreed that

8    the design must be able to seal and shear the

9    wellbore under MASP, correct?

10               MS. HARDING:  I'm going to object to

11   the form.

12       A.  The design that you're referring to, is

13   that to the blind shear rams or the design --

14       Q.  (By Mr. Williamson) Correct.

15       A.  -- of the BOP in -- in general?

16       Q.  The particular question I asked, you're

17   correct, dealt with the blind shear rams.

18       A.  Yes, sir.

19       Q.  Okay.  I want turn now to another word

20   that's in Exhibit 6169, which is the CFR 440.

21   That says "test," you must test the BOP system to

22   ensure Well Control, correct?

23               MS. HARDING:  Object to the form.

24       A.  The actual terminology says:  "...test,

25   and use the BOP system and system components to

1    ensure well control."

2        Q.  (By Mr. Williamson) Correct.

3        A.  Yes, sir.

4        Q.  Okay.  I'm dealing with the testing part

5    of the Requirement.  You understand my question?

6        A.  Yes, sir.

7        Q.  Okay.  What is BP's Policy regarding

8    testing the BOP to maximum anticipated surface

9    pressure when the BOP is subsea?

10               MS. HARDING:  Object to the form.

11       A.  The BOP -- I mean, excuse me.  I'm

12   confusing BP and BOP.  BP's Policy is -- is to

13   test to 500 psi above the maximum anticipated

14   surface -- surface pressure that is submitted in

15   the APM on a biweekly basis.

16       Q.  (By Mr. Williamson) You say "APM."  Is

17   that the same as "APD"?

18       A.  APD.  I'm sorry.  Yes, sir.

19       Q.  That's okay.  I want to make sure I'm

20   talking about --

21       A.  Yes, sir.

22       Q.  -- the same document, Application For

23   Permit to Drill.

24       A.  Yes, sir.  Right to modify.

25       Q.  Okay.  Okay.  So BP's Policy is that if

138

1    A.  That was an untested barrier, yes, sir.

2    Q.  Okay.  Well, I meant the bottomhole

3  cement.  Let's take the conditions as they

4  actually existed because the top plug --

5              MS. HARDING:  Object to form.

6    Q.  (By Mr. Williamson) -- top plug hasn't

7  been set yet.  I'm just giving you context of

8  where I'm taking you on that question.  You

9  understand where I'm taking you?

10             MS. HARDING:  Object to the form.

11   A.  Yes, sir.

12   Q.  (By Mr. Williamson) I'm talking -- I'm no

13  longer talking about hypotheticals.  I'm talking

14  about the conditions that actually existed on

15  April 20th, 2010 at approximately 8:30, 9:00

16  o'clock p.m.

17   A.  Yes.

18   Q.  Fair?

19   A.  That's fair.

20   Q.  Okay.  At that point in time,

21  displacement had occurred, and the fluid column

22  was no longer a barrier, correct?

23   A.  The barrier that was in place was a

24  closed BOP as part of the -- as part of the

25  negative test.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  Okay.  I'm sorry.  I didn't quite ask

2  that question.  I'm going to get there.

3    A.  Okay.

4    Q.  Okay.  But first, I want to talk about

5  the barriers.  One barrier, mechanical barrier,

6  was the bottomhole cement job, correct?

7    A.  That is correct.

8    Q.  And, of course, we now know that

9  failed --

10    A.  Yes, sir.

11    Q.  -- correct?

12    A.  (Nodding.)

13    Q.  Okay.  And what you were saying -- and we

14  know the fluid column was no longer a barrier

15  because it had been displaced and, therefore,

16  underbalanced, correct?

17            MS. HARDING:  Object to the form.

18    A.  The well had been displaced to seawater,

19  that is correct.

20    Q.  (By Mr. Williamson) Okay.  And then the

21  second barrier that you think should be in place

22  was the blowout preventer?

23    A.  Well, actually, the bottom plug was not

24  just -- it said that the bottom plug was not --

25    Q.  Well, it hadn't been set yet?

PURSUANT TO CONFIDENTIALITY ORDER

1      A.   No, the bottom plug had been set, but the

2  results of the test were incorrectly interpreted,

3  so, theoretically, that was not a verified

4  barrier that was in place.

5      Q.   I agree.  It was supposed to be a

6  verified barrier, but we now know it wasn't,

7  correct?

8      A.   That is correct.

9      Q.   Okay.  I'm talking about -- I'm trying to

10  figure out what you think the second barrier was.

11  You agree you need two barriers.  Didn't I

12  understand that to be true?

13      A.   When you go through -- when you go

14  through a Temporary Abandonment and you confirm

15  the validity of the bottom plug and then you

16  displace to seawater in anticipation of setting

17  the upper plug, that would be your second

18  barrier.  But that's making the assumption that

19  you have a tested barrier.  In that process, you

20  have a BOP stack that is on that well to be shut

21  in the event that something goes wrong.

22      Q.   Okay.  That wasn't quite responsive to my

23  question.  I'm trying --

24      A.   I'm sorry.

25      Q.   I am trying to hurry because I am under a

1    time limit because you've got some more questions

2    to ask -- answer from my colleague.

3         A.   Okay.

4              MS. HARDING:   Object to form.

5         Q.   (By Mr. Williamson) So I am trying to

6    hurry.   Let me see if I can get it straight.

7         A.   Yes, sir.

8         Q.   You think there should be two barriers,

9    and in this case you think those two barriers

10   were the bottomhole cement job and the blowout

11   preventer, correct?

12             MS. HARDING:   Object to the form.

13        A.   Yes, sir.

14        Q.   (By Mr. Williamson) Okay.   Now, the

15   bottomhole cement job we now know failed, but if

16   it had worked, it should have been a barrier,

17   correct?

18             MR. FLEMING:   Objection, form.

19             THE COURT REPORTER:   Who was that?

20             MR. FLEMING: (Indicating.)

21        A.   Yes, sir.

22        Q.   (By Mr. Williamson) Okay.   I'm trying to

23   figure out where the second barrier is, and

24   you're saying "the second barrier."   There should

25   be a second barrier in place at all times.   We

1  agree on that, don't we?

2     A.  A second barrier that -- that can be

3  utilized, which is the BOP stack, yes, sir.

4     Q.  I know.  So the answer is "Yes, there

5  should be a second barrier"?

6     A.  Yes, sir.

7     Q.  And what you're saying is the BOP, in

8  your opinion, acts as the second barrier?

9               MS. HARDING:  Object to the form.

10    A.  Yes, sir.

11    Q.  (By Mr. Williamson) And that's because

12  you think the annular was closed?

13              MS. HARDING:  Object to the form.

14    A.  I am not -- I do not know whether the

15  annular was closed.

16    Q.  (By Mr. Williamson) Okay.  If the annular

17  is not closed during the Displacement Procedure,

18  then the BOP is not acting as a barrier, correct?

19              MS. HARDING:  Object to form.

20    A.  During the Displacement Procedure,

21  there's two things:  There's the negative test

22  and displacing down and -- and checking for flow,

23  and then there is the continuation, which is

24  continuing to displace out the riser.

25    Q.  (By Mr. Williamson) I know.

**PURSUANT TO CONFIDENTIALITY ORDER**

1       A.   And so that's -- that's -- that's mud.

2    During the closed-in situation, to do a -- a

3    negative test down the drill pipe, back up the

4    kill line, and monitor in both or one of those

5    and to have heavier mud in the annulus, one of

6    the BOP components has to be closed to provide

7    that -- that separation.

8       Q.   Right.  Up until the time you displace

9    with seawater, you have two barriers:  One's the

10   fluid column.  One's the cement job, correct?

11      A.   The fluid column or the seawater in

12   combination with the -- yes, sir.

13      Q.   Well, I'm --

14      A.   Or before --

15      Q.   -- talking about prior to displacement.

16   There's no --

17      A.   Oh, before -- before displacement, yes,

18   sir.

19      Q.   There's no seawater?

20      A.   That is correct.

21      Q.   You have the fluid column, and you have

22   the bottomhole cement.  You have two barriers,

23   correct?

24      A.   Of course, you have the BOPs.

25      Q.   Okay.

144

1      A.   You still have those.

2      Q.   Which are a contingent barrier?

3      A.   Yes, sir.

4      Q.   Okay.  When you displace to seawater, you

5    no longer have the fluid column.  We've agreed on

6    that, correct?

7      A.   That is correct.

8      Q.   And what you're saying is you have the

9    blowout preventer because the annular is closed,

10   correct?

11              MS. HARDING:  Object to the form.

12     A.   During the negative testing, you have the

13   annular closed, yes, sir.

14     Q.   (By Mr. Williamson) Okay.  And with the

15   annular closed, the blowout preventer acts as a

16   second barrier?

17     A.   That is correct.

18     Q.   But when the annular is open, you only

19   have one barrier; namely, the bottomhole cement

20   job after displacement, correct?

21              MS. HARDING:  Object to the form.

22     A.   That is correct.

23     Q.   (By Mr. Williamson) Okay.  And that's

24   okay with BP, to have a wi -- well where the

25   only barrier -- where you only have one barrier

1    between an active hydrocarbon zone and the

2    surface.

3              MS. HARDING:  Object to the form.

4         Q.  (By Mr. Williamson) That's in accordance

5    with BP Policy the way you see it?

6         A.   One fully tested and one barrier that has

7    integrity, yes, sir, as a continuation to the

8    program.

9         Q.   And you think that's a good policy for BP

10   to have, that if they have an active hydrocarbon

11   zone and they only have one barrier to surface,

12   speaking for BP, BP's okay with that policy?

13             MS. HARDING:  Object to the form.

14        A.   And the second barrier being the

15   contingent barrier, which is the BOPs --

16        Q.  (By Mr. Williamson) In fairness to --

17        A.   -- that --

18             MS. HARDING:  Let him finish.

19        A.   -- that -- that can be closed in the

20   event that flow is detected.  So that's your

21   second barrier.

22        Q.  (By Mr. Williamson) Fine.  I'll -- I'll

23   rephrase it to make sure I include that.  Okay?

24            It's okay with BP if in -- they -- if

25   they have an active hydrocarbon zone and they

1   only have one active barrier and they have the

2   blowout preventer as a contingent barrier, that's

3   okay with BP, as far as you know?

4                   MS. HARDING:  Object to the form.

5        A.   As far as that active barrier is fully

6   tested to the maximum that -- that it will see

7   during -- during exposure.

8        Q.   (By Mr. Williamson) Okay.

9        A.   And so that's the -- the intent of the

10  30-minute no flow is to confirm that that barrier

11  has integrity.

12       Q.   Okay.  So one barrier -- under that

13  circumstance you just described, one barrier, one

14  active barrier, meets BP's Policies the way you

15  see it?

16                   MS. HARDING:  Object to the form.

17       A.   One active barrier plus the contingent

18  barrier of the BOPs that can be closed in the

19  event of an emergency.

20       Q.   (By Mr. Williamson) So the answer's

21  "Yes," with the -- with the -- with the addition

22  you made in your answer?

23       A.   The two barriers are the fully tested

24  cement in the shoe track that has been positively

25  tested, that has been -- been successfully

1    negatively tested is a barrier.  The second

2    barrier en route to setting the permanent second

3    barrier would be the BOP stack, yes, sir.

4        Q.  Okay.  And we agree the BOP stack is a

5    contingent barrier?

6                MS. HARDING:  Object to the form.

7        A.  It's contingent until activated, yes,

8    sir.

9        Q.  (By Mr. Williamson) By the way, do you

10   know what annular -- were you aware the -- the

11   Macondo Well took a kick on March 8, 2010?

12       A.  That was in -- in the information that

13   I -- that I read, yes, sir.

14       Q.  Do you know what component of the blowout

15   preventer was used to shut in the well on

16   March 8, 2010?

17       A.  I do not recall.

18       Q.  Okay.  If the lower annular was only

19   rated to 5,000 psi and if MASP was higher than

20   5,000 psi, should the lower annular have been

21   used to shut in the well?

22                MS. HARDING:  Object to the form.

23       Q.  (By Mr. Williamson) According to BP

24   Policy?

25       A.  Can you -- can you rephrase that, please?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.   Sure.   If MASP was greater than 5,000

2   psi -- you got that part?

3      A.   Yes, sir.

4      Q.   -- and if the lower annular was only

5   rated to 5,000 psi -- you got that part?

6      A.   Yes, sir.

7      Q.   -- you know, and the well took a kick on

8   March 8th -- you got that part?

9      A.   Yes, sir.

10     Q.   Okay.

11          -- should the lower annular have been the

12  component that was used to shut in the well --

13               MS. HARDING:   Object --

14     Q.   (By Mr. Williamson) -- according to BP

15  Policy?

16               MS. HARDING:   Object to the form.

17     A.   (Coughing.)   Sorry.   It went down the

18  wrong hatch.

19          The purpose of shutting in an annular

20  when you have perceived flow during the drilling

21  event is so that you can then space out to make

22  sure that you don't have a tool joint across the

23  variable bore rams.   And so in a minor well

24  control event -- I don't know what the shut-in

25  pressures were or anything else like that --

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1   standard procedure is to shut an annular so that

 2   you can then space out.  And really it doesn't

 3   matter at that point in time which annular you

 4   shut in --

 5       Q.  (By Mr. Williamson) Okay.

 6       A.  -- for that purpose.

 7       Q.  So your answer is if they shut in the

 8   well on March 8, 2010 with the lower annular,

 9   they were not violating BP Policy?

10       A.  They --

11            MS. HARDING:  Objection to the form.

12       A.  In my opinion they are not violating

13   that -- that policy.

14       Q.  (By Mr. Williamson) Okay.  Even though

15   they're shutting in the well with a component

16   that's less than MASP?

17       A.  That is correct.

18       Q.  H'm.  And you don't see a problem with

19   that policy?

20       A.  No, sir.

21       Q.  M-h'm.  By the way, I want to refer you

22   back to B-39.

23       A.  Yes, sir.

24       Q.  Are you back to that page?

25       A.  Yes, sir.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1     A.   Are we finished with this one?

2     Q.   Yes.

3          I'm going to hand you what's been marked

4  as Exhibit 5351, and it's CFR 250.416.

5          (Exhibit No. 5351 marked.)

6     Q.   (By Mr. Williamson) Have you ever seen

7  that before?

8     A.   (Reviewing Exhibit 5351.)

9     Q.   I actually highlighted the one that's

10 actually in the record so that you could tell the

11 part I'm going to ask about.

12    A.   M-h'm.  Yes, sir.  I've seen this.

13    Q.   Okay.  What this says is:  "You must

14 include in the diverter and BOP descriptions,"

15 and "you" means BP, right?  We've agreed on that?

16    A.   Well --

17    Q.   This provision out of the CFRs, Exhibit

18 No. 5351, applies to BP, correct?

19    A.   Yes, sir.

20    Q.   Okay.  I'm going to talk about 416(e) as

21 in "egg."  Okay?  You have to give to MMS:

22 "Information that shows the blind-shear rams

23 installed in the BOP stack (both surface and

24 subsea stacks) are capable of shearing the drill

25 pipe in the hole under maximum anticipated

1    surface pressures."

2         Did I read it correctly?

3    A.  Yes, sir.

4    Q.  Okay.  Who at BP is responsible for

5    making sure that gets done?

6    A.  I cannot answer that on behalf of BP.  I

7    cannot give you a name or a role on that.

8    Q.  Okay.

9    A.  I'm not prepared to answer that.

10   Q.  I'm asking you for BP:  BP, as they sit

11   here today, does not know who can comply or who's

12   responsible for Compliance with the Requirement

13   in Exhibit 5351?

14           MS. HARDING:  Object to the form.

15   A.  I'm answering on behalf of myself, it is

16   not on behalf of BP, because I was not prepared

17   to answer that question.  So I cannot answer on

18   behalf of BP.

19   Q.  (By Mr. Williamson) Okay.  All right.  So

20   you're my second witness to come in to be

21   designated on BOP Regulatory.  You do agree this

22   is a BOP Regulation, right?

23   A.  Yes, sir.

24   Q.  And you do agree that this is a BOP

25   Regulation that applies to the Gulf of Mexico?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   Yes, sir.

2      Q.   And you're simply not prepared to answer

3  that question as you sit here today?

4            MS. HARDING:   Object to the form.

5      A.   That is correct.

6      Q.   (By Mr. Williamson) Because you don't

7  know?

8      A.   I do not know the person who submits that

9  to the MMS.

10     Q.   Do you even know if it was submitted?

11     A.   I would have to go back through --

12           MS. HARDING:   Object to form.

13     A.   -- the APD to see if it was submitted.

14     Q.   (By Mr. Williamson) So the answer is

15  "No," you don't know if it was submitted to MMS?

16           MS. HARDING:   Object to form.

17     A.   I would have to review the APD to see if

18  it was.

19     Q.   (By Mr. Williamson) No, no.  Do you know

20  as you sit here today without reviewing at the

21  APD?

22     A.   I do not know that without reviewing it.

23     Q.   Do you even know if the calculation was

24  done that would show that the blind shear rams

25  were capable of shearing and sealing the drill

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2
3    IN RE:  OIL SPILL        )   MDL NO. 2179
     BY THE OIL RIG           )
4    "DEEPWATER HORIZON" IN )   SECTION "J"
     THE GULF OF MEXICO, ON )
5    APRIL 20, 2010           )   JUDGE BARBIER
                              )   MAG. JUDGE SHUSHAN
6
7
8
9
10
11
12
13
14
15
16
17              * * * * * * * * * * * * * * * * *
                         VOLUME 2
18              * * * * * * * * * * * * * * * * *
19
20
         Continuation of the deposition of Andrew
21   Eric Frazelle, Individually and as Corporate
     Representative, taken at the Pan-American
22   Building, 601 Poydras Street, 11th Floor, New
     Orleans, Louisiana, 70130, on the 27th day of
23   September, 2011.
24
25

**PURSUANT TO CONFIDENTIALITY ORDER**

1  basis.

2      Q.  You agree, don't you, that Transocean

3  relies on BP to make the MASP calculation and to

4  provide the data sufficient to make the

5  calculation?

6              MS. HARDING:  Object to the form.

7      A.  I don't know whether they rely

8  specifically on that, or whether you guys also

9  take that and -- and -- and calculate that

10  independently.  I don't know Transocean's

11  Policies or what they do.

12      Q.  (By Mr. Baay) What I'm asking is, it's --

13  you understand it's BP's responsibility to make

14  the MASP calculation?

15      A.  Yes, sir.

16      Q.  And you have the unique access to the

17  data that allows you to make that calculation by

18  knowing the well design and the well data?

19              MS. HARDING:  Object to the form.

20      A.  Yes, sir.  We understand the -- the pore

21  pressures and the -- the well -- for the well

22  design.

23      Q.  (By Mr. Baay) I believe I understood you

24  yesterday testifying that BP did not perform a

25  Risk Assessment for the change in the Temporary

1    Abandonment issues that occurred prior to

2    April 20th, 2010; is that true?

3                    MS. HARDING:  Object to the form.

4        A.  I'm not aware of what you're referring to

5    as a Management of Change.

6        Q.  (By Mr. Baay) I don't think I said

7    "Management of Change."

8        A.  Oh, I'm sorry.

9        Q.  My memory was from your testimony that BP

10   did not perform a Risk Assessment for the changes

11   that were made to the Temporary Abandonment

12   Procedure?

13                   MS. HARDING:  Object to the form.

14       A.  I'm not too sure that there were changes

15   made to that, that that process was -- was an

16   evolution, and I believe we walked through what

17   that evolution of that -- that program was, and

18   so to do a Risk Assessment on every individual

19   piece, I'm sure there was conversations, but --

20       Q.  (By Mr. Baay) Did -- did you see anything

21   from BP about performing a Risk Assessment on any

22   part of this evolution --

23                   MS. HARDING:  Object to --

24       Q.  (By Mr. Baay) -- that you're describing?

25                   MS. HARDING:  Object to the form.

**PURSUANT TO CONFIDENTIALITY ORDER**

1   A.  I did not see that, and I did not review

2   that as part of my prep, so I didn't -- I'm not

3   aware of that existence.

4   Q.  (By Mr. Baay) Do you agree that the

5   failure to perform a Risk Assessment for a

6   Temporary Abandonment Procedure is a violation of

7   BP's own policies?

8           MS. HARDING:  Object to the form.

9   A.  If -- if they failed to recognize the

10  risk and to discuss, which I don't think

11  occurred --

12  Q.  (By Mr. Baay) My question is different.

13          MS. HARDING:  Wait.  Let him finish.

14  Q.  (By Mr. Baay) Go ahead.  Go ahead.

15  A.  Okay.  Go ahead.  I'm sorry.  I was

16  answering.

17          MS. HARDING:  Finish your answer.

18          THE WITNESS:  No, that's -- I'm --

19  I'm fin --

20  A.  I'm fine.

21  Q.  (By Mr. Baay) My question is:  Is the

22  failure to perform the Risk Assessment a

23  violation of BP's Policies?

24          MS. HARDING:  Object to the form.

25  A.  I do not know whether there was a -- a

**PURSUANT TO CONFIDENTIALITY ORDER**

 1  Risk Assessment.  There is a recommended practice

 2  to -- to provide a Risk Assessment.  The level of

 3  detail varies between procedures.

 4      Q.  (By Mr. Baay) Okay.  You understand and

 5  agree that you were designated by BP to be the

 6  spokesperson for Topic 7, which is the Temporary

 7  Abandonment?

 8      A.  Yes, sir.

 9      Q.  And as part of that process, you were

10  tasked to understand and know the Risk

11  Assessments that were performed in connection

12  with the Temporary Abandonment Procedure?

13              MS. HARDING:  Object to form.

14      Q.  (By Mr. Baay) Is that true?

15      A.  I was tasked to review the documentation

16  that was put forward and review the -- the

17  documents that were presented to me, but I was

18  not tasked to -- to try to understand

19  conversations and things that went on the rig.

20  I'm sorry.

21      Q.  And I'm not asking about conversations on

22  the rig.  I'm simply making a point that you were

23  responsible for coming here and telling us what

24  BP's position is on the Risk Assessments

25  performed on the Temporary Abandonment Procedure.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Do you agree with that?

2              MS. HARDING:  Object to the form.

3         A.  I don't understand whether that was

4    the -- the Risk Assessment was part of -- was

5    part of that.

6         Q.  (By Mr. Baay) Topic 7, as I read it,

7    states:  "The background, basis...intent,

8    preparation, drafting, submission and approval of

9    BP's Application for Permit to Modify the

10   temporary abandonment procedure on or around

11   April 16, 2010, including the deviations, if any,

12   between" the "procedure and the procedure(s)

13   described in the April 12, 2010 Drilling Plan,

14   the April 14, 2010...E-mail," and "the April 20,

15   2010 'Ops Note.'"

16             Does that sound like an accurate

17   representation of the topic?

18        A.  Yes, sir.

19        Q.  Okay.  And so as part of that process,

20   did you review anything that showed you that BP

21   performed a Risk Assessment on the Temporary

22   Abandonment Procedure?

23        A.  I did not review anything -- a Risk

24   Assessment on that.

25        Q.  Okay.  And so on behalf of BP, it's your

1    position that they did not perform a Risk

2    Assessment for the Temporary Abandonment

3    Procedure?

4              MS. HARDING:  Ob -- object to form.

5         A.  No, sir, I -- I think that even though

6    there was not a documented Risk Assessment, I

7    believe with the conversations that were held, I

8    was not privy to them, but as you walk through

9    a -- the development of a procedure to take it

10   from a draft procedure, you understand the risks

11   associated with -- with the different steps, and

12   you end up with your final process.

13        Q.  (By Mr. Baay) But you're talking about

14   your own experience.  You have no idea whether

15   one was done in this case?

16             MS. HARDING:  Object to the form.

17        A.  I did not review a Risk Assessment for

18   this.

19             THE VIDEOGRAPHER:  Five minutes.

20        Q.  (By Mr. Baay) Are you aware that on

21   April 14th, part of the procedure that was

22   described or defined by BP was to set a cement

23   plug at 300 feet?

24        A.  Yes, sir.

25        Q.  And then, as I understand it, as the

460

1    process evolved, or as the procedure changed,

2    that detail, specifically the cement plug at 300

3    feet, was removed from the plan.  Do you agree

4    with that?

5              MS. HARDING:  Object to the form.

6         A.   The -- the -- the cement procedure and

7    the evolution stipulates going from the shallow

8    set cement plug to a deeper set cement plug.

9         Q.   (By Mr. Baay) And if I understood you

10   correctly, yesterday you testified that the

11   reason for that was that your negative pressure

12   test could only test your bottomhole cement job

13   if you did not have the surface cement plug; is

14   that accurate?

15             MS. HARDING:  Object to the form.

16        A.   The -- the purpose of -- of going down to

17   that depth was that as part of the process for

18   setting the top cement plug was a -- was putting

19   a negative differential onto the test so that you

20   could displace to seawater, and it was to confirm

21   the integrity of the -- the bottom plug.

22        Q.   (By Mr. Baay) But my point really is:

23   You are saying that you could not set this

24   surface cement plug because it would interfere

25   with the negative pressure test's ability to test

1  the cement job; is that accurate?

2            MS. HARDING:  Object to the form.

3      Q.  (By Mr. Baay) To test the bottomhole

4  cement job?

5      A.  Well, we could -- we could not set the

6  top plug until we -- we tested the bottom plug,

7  so --

8      Q.  If that is true, then why did the

9  April 14th plan call for a negative pressure test

10  before displacement and for a cement plug to be

11  set at 300 feet?

12            MS. HARDING:  Object to the form.

13      A.  I don't believe -- well, which plan is

14  that?  Let's -- let's review which one that is.

15      Q.  (By Mr. Baay) Certainly.

16      A.  I've looked at so many documents, that --

17  I'm sorry.

18      Q.  It's premarked Exhibit 1997.

19  (Tendering.)  It's the E-mail from Brian Morel

20  dated April 14th, 2010.

21      A.  Yes, sir.

22      Q.  Okay.  If you look down the middle part

23  of this E-mail he says, "RIH set wear bushing

24  continue to 8367' set 300' cement plug."  Did I

25  read that accurately?

462

1      A.   Yes, sir -- yes, sir, you did.

2      Q.   So do you agree as --

3      A.   I'm losing my voice.

4      Q.   -- as of April 14th, 2010, the procedure

5   was -- as formulated by BP Engineers, was calling

6   for a 300-foot cement plug?

7      A.   I believe that my testimony -- and we can

8   go back to it yesterday, was -- this was an

9   E-mail that was sent from Brian Morel primarily

10  to James Wilson, also called Nick.  Nick was the

11  logistics coordinator out there, and this was a

12  heads-up as to "these are the various things

13  that -- make sure that we are able to do this, if

14  this is the -- the -- the forward program."

15  There's no approval for this process.  This is

16  Brian having a communication with our logistics

17  coordinator.

18     Q.   Okay.  All I'm simply asking is:  Do you

19  agree that the 300-foot cement plug was an idea

20  as proposed by Mr. Morel on April 14th, 2010?

21     A.   That is correct.

22     Q.   Do you agree that having more barriers

23  reduces the risk of your displacement operation?

24     A.   What I would agree with is that once you

25  set a barrier, you need to test it in order for

1   it to become absent, to be counted as a barrier.

2   And then you build on that process in a

3   systematic way.

4      Q.  Okay.  My question is:  Do you agree that

5   a well with more barriers allows for a

6   Displacement Procedure that is less risky?

7              MS. HARDING:  Object to the form.

8      A.  If those barriers are not tested in the

9   proper way, then they you do absolutely no good.

10     Q.  (By Mr. Baay) Let's assume you have a

11  tested and verified 300-foot cement plug.  Does

12  the fact that you have an additional barrier make

13  the Displacement Procedure less risky?

14             MS. HARDING:  Object to the form.

15     A.  The -- the reason for the displacement

16  prior to the 300-foot plug is primarily around

17  ensuring that you get the best opportunity for

18  setting an effective barrier.  By going with

19  seawater and setting it in a clean environment is

20  a -- is a better way to get a -- a -- basically

21  a -- a better plug, a competent plug.

22     Q.  (By Mr. Baay) Mr. Frazelle, my question

23  is simply:  If the more barriers you have, the

24  less risky your Displacement Procedure is going

25  to be.  Do you agree with that or not?

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MS. HARDING:  Object to the form.

2      A.  If you have more barriers prior to the

3   displacement --

4      Q.  (By Mr. Baay) It will be a less risky

5   procedure; is that true?

6      A.  Yes, sir.

7          MS. HARDING:  Objection, form.

8      Q.  (By Mr. Baay) So the procedures following

9   April 14th, 2010 removed the number of barriers,

10  by definition, it's a riskier procedure?

11         MS. HARDING:  Object to form.

12     A.  That is not correct, because you have to

13  follow the procedure in a systematic way.  You've

14  set your first barrier, and then you have to --

15  you have to test that barrier, and then you can

16  move forward.

17         MR. BAAY:  Mr. Frazelle, those are

18  all my questions.  Thank you for your time.

19         THE WITNESS:  Thank you.

20         THE VIDEOGRAPHER:  We're off the

21  record at 10:28, end Tape 11.

22       (Recess from 10:28 p.m. to 10:46 a.m.)

23         MR. FLEMING:  I'm ready.

24         THE VIDEOGRAPHER:  All set?

25       We're on the record at 10:46, start

PURSUANT TO CONFIDENTIALITY ORDER

465

1   Tape 12.

2                    EXAMINATION

3   QUESTIONS BY MR. FLEMING:

4       Q.  Good morning, Mr. Frazelle.  My name is

5   Sean Fleming, and I represent Halliburton.

6           Before we talk about some of the

7   specifics of the Displacement Procedure, I'd like

8   to ask a question that I don't know that I have

9   ever really heard a good answer for.

10          You've discussed the Displacement

11  Procedure that went on in the Macondo quite a bit

12  yesterday and today.  You recall that testimony?

13      A.  Yes, sir.

14      Q.  And the Displacement Procedure was

15  associated with the Temporary Abandonment

16  Procedure, correct?

17      A.  Yes, sir.

18      Q.  Okay.  Here is my question, Mr. Frazelle:

19  What are the benefits of doing a Displacement

20  Procedure along the lines that we've been

21  discussing over the last day and a half,

22  specifically with an emphasis of displacing mud

23  to seawater?  What are the benefits of doing that

24  specific procedure?

25      A.  Well, the benefits of doing that

1  particular procedure is to test the integrity of

2  the lower plug at this particular time, and then

3  as a follow-on after achieving that is cementing

4  operations, or you end up with a better plug in a

5  seawater environment versus a mud environment.

6      Q.  Okay.  I understand that.  I guess what

7  I'm asking, though, is:  Are there any

8  advantages -- well, let me rephrase it this way:

9  Would it be safer to leave the mud in the well in

10  a Temporary Abandonment Procedure?

11          MS. HARDING:  Object to the form.

12      A.  The first thing you have to do is you

13  have to verify the integrity of your plugs and

14  you have to displace and go below that -- that

15  mud gradient, and that is what was being done at

16  that point in time --

17      Q.  (By Mr. Fleming) Okay.

18      A.  -- you have to do that.

19      Q.  Why do you need to do that in a Temporary

20  Abandonment Procedure?

21      A.  Because that's part of our -- our BP

22  Policy, to test the -- the lowermost plug,

23  preferably in the direction of flow.

24      Q.  Okay.  And your testimony is that the

25  only way that you can test that is by doing a

**PURSUANT TO CONFIDENTIALITY ORDER**

1    displacement to seawater all the way down to the

2    lowermost plug?

3                    MS. HARDING:  Object to the form.

4        A.  No, that's not what I said.

5        Q.  (By Mr. Fleming) Okay.  So I'm confused.

6        A.  The top of the lowermost plug was defined

7    as the top of the -- the cement in the -- in the

8    shoe track --

9        Q.  Okay.

10       A.  -- and so the displacement was going to

11   occur at 8367, which is at the bottom of the

12   upper plug, of the second plug.

13       Q.  I see.  So, again, what I'm trying to

14   figure out is:  Are there any procedures -- and,

15   again, I'm focusing specifically on a Temporary

16   Abandonment Procedure -- are there any

17   circumstances where you would not displace to

18   seawater but you would instead leave the mud in

19   the well and then plug it?

20                   MS. HARDING:  Object to the form.

21       A.  Not -- not in my knowledge.  You have to

22   test the -- the lowermost plug.  You have to

23   confirm your barriers.

24       Q.  (By Mr. Fleming) Okay.  And you confirm

25   those barriers by doing a displacement?

PURSUANT TO CONFIDENTIALITY ORDER

1      A.   By performing the negative test.

2      Q.   Okay.

3      A.   Which is, in this case, the

4   displacement -- partial displacement through the

5   drill pipe and up through the kill line.

6      Q.   Okay.  And at the time of the Macondo

7   incident, is it correct, sir, that BP did not

8   have any written guidelines for performing a

9   negative pressure test, correct?

10             MS. HARDING:  Object to the form.

11     A.   As far as BP Guidelines, you're referring

12   to is it in an ETP or a standard?

13     Q.   (By Mr. Fleming) I'm talking about any

14   written guidelines that would be promulgated to

15   the Well Site Leaders for their use on the rigs.

16     A.   I'm not --

17             MS. HARDING:  Object to the form.

18     A.   I'm not aware of a standardized procedure

19   at that time.

20     Q.   (By Mr. Fleming) Does BP have one now?

21     A.   Yes, sir.

22     Q.   Okay.  Is that what is currently being

23   used in the Gulf of Mexico operations?

24             MS. HARDING:  Object to the form.

25     A.   I cannot testify to what's being -- what

**PURSUANT TO CONFIDENTIALITY ORDER**

469

1   is going on in the Gulf of Mexico.  I'm not --

2   I'm not part of the Gulf of Mexico anymore.  I'm

3   sorry.

4       Q.  (By Mr. Fleming) How often is a Temporary

5   Abandonment Procedure done for wells in the Gulf

6   of Mexico?

7           MS. HARDING:  Object to the form.

8       A.  I have no idea on the numbers.

9       Q.  (By Mr. Fleming) Okay.  Let me rephrase

10  the question:  Is a Temporary Abandonment

11  Procedure a typical operation that you would see

12  on a deepwater rig in the Gulf of Mexico?

13          MS. HARDING:  Object to the form.

14      Q.  (By Mr. Fleming) Or is it something that

15  is more unusual?

16          MS. HARDING:  Same objection.

17      A.  A -- a Temporary Abandonment Procedure

18  would be performed in a wellbore that had future

19  use, either as a -- to come back as a producer or

20  as a potential sidetrack candidate for further --

21  further evaluation.  That's when a Temporary

22  Abandonment Procedure would be implemented or

23  planned.

24      Q.  (By Mr. Fleming) So you're talking about

25  transitioning an exploration well to a production

1  well; is that correct?

2      A.  That's --

3                 MS. HARDING:  Object to the form.

4      A.  -- not the only thing.  Is -- it's --

5  it's not necessarily a transitioning.  It's --

6  you've drilled, you've evaluated, and -- and then

7  the determination needs to be made whether you're

8  going to come back, so -- versus doing something

9  that you really can't recover from in a permanent

10  abandonment state.  You -- you leave it in a

11  temporary abandonment state.

12      Q.  (By Mr. Fleming) Okay.  And as part of

13  the Temporary Abandonment Procedures that BP uses

14  today, does BP require the use of a negative

15  pressure test?

16      A.  Yes, sir.

17      Q.  Okay.  Did they as of April 20th, 2010?

18      A.  Did they require a negative pressure

19  test?  Yes, sir.

20      Q.  Okay.  But there were no written

21  guidelines as to how that negative pressure test

22  should be conducted, correct?

23                 MS. HARDING:  Object to the form.

24      A.  As far as I'm aware, that is correct.

25      Q.  (By Mr. Fleming) Okay.  Mr. Frazelle, let

 1   around that time they had finished drilling a

 2   section, and there was some discussions going on

 3   around the -- the way forward as to what they

 4   were going to run to -- to complete the well.

 5        Q.  Okay.  Were you involved in any of the

 6   discussions about the Temporary Abandonment

 7   Procedure?

 8        A.  No, sir.

 9        Q.  Okay.  If you could turn to Tab 58, and

10   mark this as Exhibit 5374.

11        A.  I'm sorry, fifty -- 58?

12             MR. BENNION:  This has already been

13   marked before.

14        Q.  (By Mr. Fleming) I'm sorry.  This has

15   already been marked as 529.  And this is an

16   E-mail from Brian Morel to Murry and Ronnie

17   Sepulvado.

18        If you look down at the bottom, from

19   Murry Sepulvado to Brian Morel.  Mr. Sepulvado

20   says:  "Brian we need procedures for running

21   casing, cementing and T&A work, we are in the

22   dark and nearing the end of logging operations."

23        Do you see that?

24        A.  Yes, sir.

25        Q.  Were you aware of any of these issues

1  concerning the "we are in the dark" that Murry

2  Sepulvado makes reference to here?

3       A.  No, sir.

4       Q.  Looking at the time here, this is April

5  12th, 2010, 7:19 a.m.  Was this sent at a time

6  when you were in operational control of the

7  HORIZON?

8            MS. HARDING:  Object to the form.

9       A.  There is -- you know, in your definition,

10  what -- could you define that a little bit

11  further when you talk about "operational

12  control"?

13       Q.  (By Mr. Fleming) Well, you tell me.  How

14  do you define it?  You were the delegate of David

15  Rich, correct?

16       A.  The -- the primary person in -- in

17  operational control is -- the -- the structure

18  that is in place is the -- the Wells Team Leader

19  is the person who handles day-to-day operations

20  and then there's an Engineering Team Leader who

21  has Engineers that report to him that help

22  develop procedures, and -- and that the -- any

23  operational decisions that -- that needed to be

24  elevated above the Wells Team Leader, then goes

25  to the Wells Operations Manager.  And then if

**PURSUANT TO CONFIDENTIALITY ORDER**

1    there's something that's out with what the Wells

2    Operation Manager wants to discuss or feels he

3    needs guidance on, that is then elevated to the

4    Wells Manager or the Wells Director.  That's --

5    that's how the Operations Managers worked.

6        Q.   Okay.  And what role was David Rich in?

7        A.   He was the -- the Wells Manager or the

8    Wells Director, whatever the title was at that

9    time.

10       Q.   Okay.  Who reported to David Rich?  And

11   we're talking specifically from the HORIZON crew,

12   obviously.

13       A.   From the HORIZON?

14       Q.   I'm sorry.  Well, the Macondo/HORIZON.

15   You understand what I'm talking about, correct?

16       A.   At the time on April 20th --

17       Q.   Correct.

18       A.   -- who reported to -- to David Rich?

19       Q.   (Nodding.)

20       A.   The -- the three Operations Managers:

21   David Sims, myself, Chris Harder.  I don't re --

22   it's -- I think Erick Walker as the Wells

23   Intervention Manager reported to -- to Mr. Rich,

24   if I'm -- there was -- there was a -- a break up.

25   There was a change in the organization.  I know

1   that using a long string was going to make the

2   cement job more difficult?

3                    MS. HARDING:   Object to the form.

4        A.   I don't think we discussed the level of

5   difficultness.   It was, was the cement job

6   achievable?   And the modeling shows that it was.

7        Q.   (By Mr. Fleming) Okay.   Turn with me to

8   Tab 77, please.   This is the Temporary

9   Abandonment Procedure.   Tab 77 is -- been

10  previously marked as Exhibit 4032.   Now, and I

11  believe you saw a copy of this yesterday.   I -- I

12  think it's the same document, just a different

13  number.

14       A.   Yes, sir.   I've seen this.

15       Q.   Okay.   And this is the Temporary

16  Abandonment Procedure that was sent to MMS?

17       A.   Yes, sir.

18       Q.   Okay.   Did you review this Temporary

19  Abandonment Procedure before it was sent to MMS?

20       A.   No, sir.

21       Q.   Were you aware that it was being

22  prepared?

23       A.   In the process of abandonment, I'm aware

24  that you have to get the approval of the MMS,

25  yes, sir.   So it had to have been being prepared

1  in the background.

2      Q.  Were you aware of any of the Regulations

3  concerning Temporary Abandonment?

4              MS. HARDING:  Object to the form.

5      Q.  (By Mr. Fleming) When I say

6  "Regulations," I'm talking specifically about the

7  CFR Regulations and the MMS Regulations.

8              MS. HARDING:  Same objection.

9      A.  No, I'm not aware of the Regulations.

10  I'm just aware of -- of how we submit our -- our

11  procedures and how they're approved.

12      Q.  (By Mr. Fleming) Okay.  The reason I ask

13  that, Mr. Frazelle, is because my recollection is

14  that when the lawyer for the Plaintiffs' Counsel,

15  Plaintiffs Steering Committee, showed you this

16  document yesterday, and asked you whether you

17  thought it was in compliance with all

18  Regulations, I believe your testimony was that,

19  "Yes," it was.  Do you recall that testimony?

20              MS. HARDING:  Object to the form.

21      A.  Yes.

22      Q.  (By Mr. Fleming) Okay.  Is that still

23  your testimony?  Do you believe that Exhibit 4032

24  was submitted in compliance with all MMS

25  Regulations?

PURSUANT TO CONFIDENTIALITY ORDER

1    A.  And my basis for that is the fact that it

2    was submitted and ultimately approved and,

3    therefore, the MMS was -- was satisfied with the

4    level of detail that was provided or -- or

5    otherwise they would have asked for clarification

6    and additional information.  So that's the basis

7    of -- of my opinion that this was in compliance

8    with what the MMS wanted.

9        Q.  Okay.  And you're aware that the MMS

10   actually relies upon BP, as the Operator, to

11   provide them accurate data, correct?

12              MS. HARDING:  Object to the form.

13       A.  Yes, sir.

14       Q.  (By Mr. Fleming) Okay.  Are you aware of

15   the CFR Regulation that requires the placement of

16   top of cement?

17       A.  I believe that that is -- the CFR that is

18   being referenced in here.  I don't -- don't

19   recall it specifically.  I would have to -- to

20   review it, please.

21       Q.  Let me show you what we're going to mark

22   as Exhibit --

23              MR. BENNION:  5374.

24       Q.  (By Mr. Fleming) -- 5374.

25              MR. FLEMING:  And we've got hard

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.  I do not know that.

2      Q.  Let's turn to the negative -- the

3   Temporary Abandonment Procedure in 4032.  And I

4   believe you talked quite a bit about this

5   yesterday with the -- Mr. Sterbcow, I believe?

6               MS. HARDING:  Object to the form.

7      A.  Yes, sir.

8      Q.  (By Mr. Fleming) And I don't want to put

9   words in your mouth, but my recollection from

10  your testimony yesterday is that in your view,

11  Nos. 2 and 3 under the Temporary Abandonment

12  Procedure are subcategories of No. 1; is that

13  correct?

14     A.  Yes, sir.  They are how you would achieve

15  No. 1.

16     Q.  Okay.  So in your view, Nos. 1, 2, and 3

17  are not sequential?

18     A.  They are not sequential.

19     Q.  Okay.  Do you know Ronnie Sepulvado?

20     A.  I -- I'm aware who Ronnie is, yes, sir.

21     Q.  Who was Ronnie Sepulvado?

22     A.  Ronnie Sepulvado, at the time, was a Well

23  Site Leader assigned to the HORIZON.

24     Q.  Okay.  Are you aware -- have you reviewed

25  his deposition transcript?

PURSUANT TO CONFIDENTIALITY ORDER

1      A.   Maybe three or four pages of it.

2      Q.   Did you review the portion of his

3  deposition transcript where he talked about this

4  specific procedure?

5      A.   I'm not aware of what -- I've reviewed

6  multiple hundred pages, and I don't know whether

7  that was actually in that.   I would have to --

8  to -- to go back and see what that was.

9      Q.   Okay.   Are you aware that Mr. Sepulvado

10  testified, that in his view, these three steps,

11  Nos. 1, 2, and 3, were, in fact, separate

12  sequential steps?   That's -- we're on Pages 631

13  to 636 of his deposition transcript.

14           MS. HARDING:   Object to the form.

15      A.   No, sir, I'm not aware of that.

16      Q.   (By Mr. Fleming) Okay.   Who would be in a

17  better position to know about that, Mr. Sepulvado

18  or you?

19           MS. HARDING:   Object to the form.

20      A.   About what Mr. Sepulvado knows and

21  understands?

22      Q.   (By Mr. Fleming) No.   No, sir.   About

23  whether these were, in fact, separate sequential

24  steps.

25           MS. HARDING:   Object to the form.

**PURSUANT TO CONFIDENTIALITY ORDER**

507

1     A.   I think that the -- the people that need

2  to be looked at as to whether these were

3  sequential or one would be the -- the Wells Team

4  Leader and the Engineering Team Leader --

5     Q.  (By Mr. Fleming) Okay.  And --

6     A.   -- who are the decision-makers on this.

7     Q.  And that would be Mr. Sepulvado?

8          MS. HARDING:  Object to the form.

9     A.   No.  The Wells Team Leader is Mr. Guide,

10  and the Engineering Team Leader is Mr. Walz.

11    Q.  (By Mr. Fleming) Okay.  So Mr. Sepulvado

12  wouldn't really know whether this was, in fact,

13  three separate sequential steps?

14          MS. HARDING:  Object to the form.

15    A.   I don't know what Mr. Sepulvado -- I

16  don't know what -- what his interpretation was.

17    Q.  (By Mr. Fleming) Okay.  I'm trying to

18  understand.  I mean, there is a difference

19  between his interpretation of this and your

20  interpretation of this, as the Corporate

21  Representative of BP.  What I'm trying to

22  understand, sir, is that which of those

23  interpretations have more validity to them?

24          MS. HARDING:  Object to the form.

25    A.   As -- as part of my review process, I did

**PURSUANT TO CONFIDENTIALITY ORDER**

1  review part of Mr. Gregg Walz's testimony, and

2  also part of Mr. Guide's testimony, and both of

3  those guys as being -- both of those gentlemen

4  were under the impression that only one negative

5  test was going to be performed.

6      Q.  (By Mr. Fleming) Okay.  Are you aware

7  that Frank Patton was under the impression that

8  these three steps were sequential?

9      A.  Once again, I can't --

10          MS. HARDING:  Object to the form.

11     A.  -- I can't testify to what Frank Patton

12 knew or thought.

13     Q.  (By Mr. Fleming) I will represent to you

14 that in his deposition on Pages 304, 301, and

15 305, he testified that he thought these three

16 steps were sequential?

17          MS. HARDING:  Object to the form.

18     Q.  (By Mr. Fleming) So my question to you,

19 sir, is if the MMS believed that these three

20 steps were sequential, did BP take any steps to

21 correct their misunderstanding of that?

22          MS. HARDING:  Object to the form.

23     A.  Once again, there was -- in my review of

24 the documentation, and the information going back

25 and forth between the -- the various Parties, I

1   do not believe or do not recall seeing anything

2   where Mr. Patton asked for clarification on

3   this -- on this particular issue.

4        Q.  (By Mr. Fleming) Whose responsibility is

5   it to ask for clarification if it's something

6   like this, where it appears that 1, 2, 3, and 4

7   are listed as separate sequential steps?  Is that

8   Mr. Patton's responsibility or is that BP's

9   responsibility to clarify it?

10               MS. HARDING:  Object to the form.

11       Q.  (By Mr. Fleming) I'm asking you this as a

12  Corporate Representative, sir.

13               MS. HARDING:  Object to the form.

14       A.  As a Corporate witness, if there's any

15  discrepancy -- not discrepancy, but if there's

16  any clarification from the documentation that

17  I've talked to and to the interactions between

18  our Regulatory people and our -- and the MMS, is

19  that if there is a clarification required, prior

20  to approval, they come back to us and ask for

21  that clarification.

22       Q.  (By Mr. Fleming) So it is your testimony,

23  sir, as the BP Corporate Representative, that if

24  BP discovers something that is unclear in their

25  own documentation, they do not have an obligation

510

1   to submit something for clarification of that to

2   the MMS unless the MMS actually asks them about

3   it?

4          MS. HARDING:  Object to the form.

5      Q.  (By Mr. Fleming) Is that your testimony,

6   sir?

7      A.  No.

8          MS. HARDING:  Object to the form.

9      A.  I don't believe that there was any -- any

10  evidence of BP, as -- as we stipulate, requiring

11  clarification.  If the Wells Team Leader and the

12  Engineering Team Leader were in agreement, that

13  is it is one process.  So there was -- there

14  was -- there was clarification on their part.

15     Q.  (By Mr. Fleming) Okay.  Was that

16  clarification ever sent to MMS?

17         MS. HARDING:  Object to the form.

18     A.  I do not believe -- I am not aware of

19  whether there's any requirement whether we knew

20  that Frank Patton had requested a clarification,

21  whether there was any concern on Frank's part.

22     Q.  (By Mr. Fleming) Okay.  And you -- let me

23  be clear about my question here.

24         BP, after it sent this document, 4032, to

25  MMS, never clarified any of these points that

**PURSUANT TO CONFIDENTIALITY ORDER**

 1   you're discussing here today, with MMS, correct?

 2       A.  I believe that there is a -- a document

 3   that is represented as the Ops Note that was sent

 4   out as the 20 that verifies this is the process

 5   that we're going to go through.

 6       Q.  Okay.  Do you know whether that Ops note

 7   was sent to MMS?

 8       A.  I am not aware of that.

 9       Q.  Let me ask you to turn the pa -- to Tab

10   25.  Do you run a --

11       A.  Hold on one -- one second.

12       Q.  Volume 1.

13       A.  Oh, I'm sorry.

14           (Discussion off the record.)

15       A.  This only goes to 17.  I'm sorry.

16       Q.  (By Mr. Fleming) That's not ours.  That's

17   ours.

18       A.  Oh, I'm sorry.

19       Q.  It's Tab 25, previously marked as Exhibit

20   2926.  This is an E-mail from Kevin Lacy to you,

21   dated July 14, 2009.  Subject is "Early Heads Up

22   on the Marianas Situation."  You see that?

23       A.  Yes, sir.

24       Q.  You recall this E-mail?

25       A.  Yes, sir.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  What was the sit -- what was the
2  background behind this E-mail?
3              MS. HARDING:  Object to the form.
4    A.  I think it was to give them a hur -- an
5  early heads up that we may not indeed be able to
6  finish the Nakika H-2 before our August 15
7  drop-dead date.
8              THE COURT REPORTER:  August what?
9    A.  August 15th, I'm sorry.  Excuse me.
10   Q.  (By Mr. Fleming) Sir, in this --
11              THE WITNESS:  Can -- can I get some
12  more water, please?
13   Q.  (By Mr. Fleming) Sure.
14              THE COURT REPORTER:  We've got it.
15              MS. HARDING:  You've got it.  Thank
16  you.
17              THE COURT REPORTER:  Got it.
18              MS. HARDING:  Do you want to take a
19  break?
20              THE WITNESS:  No.  I'm okay right
21  now.
22              MR. FLEMING:  Okay.  How much
23  longer?  How much longer?
24              THE VIDEOGRAPHER:  About eight
25  minutes on the tape.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              MR. FLEMING:  Okay.
 2      Q.  (By Mr. Fleming) On this document, are
 3   you discussing a Temporary Abandonment Procedure
 4   for the MARIANAS?
 5      A.  I don't believe -- can I reread it,
 6   please?
 7      Q.  Sure.
 8      A.  I'm -- I'm sorry.  I don't remember if it
 9   was a Temporary Abandonment or the -- the --
10      Q.  If --
11      A.  -- the continuation of what was required
12   as part of the -- the completion.
13      Q.  If you turn to the second page of this,
14   down at the very bottom, it's the paragraph that
15   says, "Mannie is currently headed to New
16   Orleans..."  Do you see that?  The second
17   sentence there says, the "best option may be to
18   temporarily abandon this one and move to Macando
19   to do the open water work."  Does that help
20   refresh your recollection?
21              MS. HARDING:  Object to the form.
22      A.  Yes, sir.
23      Q.  (By Mr. Fleming) Okay.  So was this -- so
24   in this -- the situation that is being discussed
25   in this E-mail string, does this involve a
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1   Temporary Abandonment Procedure?

2      A.   It -- it discusses the -- the option to

3   temporarily abandon this H2 well and --

4      Q.   Okay.

5      A.   -- move to Macondo, yes, sir.

6      Q.   Do you recall whether that was, in fact,

7   done?

8      A.   No, sir.  The well was -- was gone ahead,

9   and we completed the well --

10     Q.   Okay.

11     A.   -- prior to hurricane season.

12     Q.   My question is -- there's an E-mail from

13  Harry Thierens, and is Harry -- at this time, is

14  Harry Thierens your Supervisor or --

15     A.   Yes, sir.  He was the -- I believe his

16  title was Wells Director.

17     Q.   Okay.  It says, "Andy, We should at least

18  run a CBL before coming off the well.  That will

19  help to plan ahead on" the "remediation."  What

20  is a CBL?

21     A.   Cement Bond Log.

22     Q.   Okay.  What is Mr. Thierens referring to

23  here?

24     A.   He's referring his -- before we -- you

25  know, to whether there was -- just want to make

1   sure that we evaluated the cement job -- the

2   Cement Bond Log or the cement job that we just

3   performed -- or I can't remember.  I guess we had

4   already at this time set the long string and

5   cemented, and so it's if we come off of it, let's

6   make sure that we have as much information so

7   that we can do a proper evaluation and plan for

8   it when we come back.

9        Q.  Okay.  And Mr. Lacy states, "Get the CBL

10  run so we know what we are facing."  Was a CBL

11  actually done on this well?

12       A.  Yes, sir, a CBL was actually performed to

13  evaluate the effectiveness of the primary cement

14  job.

15       Q.  And when was that done?

16       A.  I don't remember the dates, but it was as

17  part of the -- the completion procedure.

18       Q.  Okay.  Do you know whether a CBL was run

19  on the Macondo?

20       A.  From previous testimony only, that the

21  CBL was not run.

22       Q.  Do you know why?

23       A.  I was not involved in that decision, no,

24  sir.

25       Q.  If you had been involved in that

516

 1    decision, would you have required a CBL?

 2                MS. HARDING:  Object to the form.

 3        A.  I do not understand, nor was I privy

 4    to -- or evaluate the cement job as part of that,

 5    so you need to understand what the -- what your

 6    primary cement job was.

 7        Q.  (By Mr. Fleming) Okay.  Do you see any

 8    disadvantages of running a CBL?

 9                MS. HARDING:  Object to the form.

10        A.  The disadvantages to -- to running the

11    CBLs are that sometime their -- their

12    interpretation is -- is difficult and they --

13    they don't -- they're difficult to interpret, so

14    it's not definitive --

15        Q.  (By Mr. Fleming) Okay.

16        A.  -- as the information that you get.

17        Q.  Given the choice, would you rather have a

18    difficult-to-interpret CBL or no CBL at all --

19                MS. HARDING:  Object to the form.

20        Q.  (By Mr. Fleming) -- if you were going to

21    be -- if you have questions about the integrity

22    of the cement?

23                MS. HARDING:  Objection, form.

24        A.  And are we referring to the Macondo Well

25    or the MARIANAS situation --

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        Q.  (By Mr. Fleming) Macondo.

 2        A.  -- I'm sorry?

 3        Q.  Macondo.

 4        A.  In Macondo?  I --

 5             MS. HARDING:  Objection, form.

 6        A.  Once again, I do know the -- the -- the

 7   issues with the MARIANAS cement and some

 8   questions about it, but I don't know whether

 9   the -- the team had concerns about the quality of

10   the cement job.

11        Q.  (By Mr. Fleming) Were there questions and

12   concerns on the MARIANAS about the cement job?

13        A.  Yes, sir.

14        Q.  Okay.  And what specifically were those

15   concerns, if you recall?

16        A.  It was around lift and around whether we

17   had zonal isolation to make sure that we could

18   complete the well without requiring a squeeze

19   job, since there was water on the bottom of that

20   formation.

21        Q.  And how did you verify whether, in fact,

22   zonal isolation was achieved on the MARIANAS?

23        A.  With the -- with the CBL on.

24        Q.  With the CBL?

25        A.  I believe it was a CBL.  It may have been
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1   a USEIT or one of the other HiTec wells logs.  I

2   don't remember exactly which one it was.

3       Q.   Again, do you know whether that was done

4   on the Macondo?

5       A.   That was not done on Macondo.

6       Q.   Do you know of any reason why it was not

7   done on the Macondo?

8                 MS. HARDING:  Object to the form.

9       A.   I was not aware of that discussion.

10      Q.   (By Mr. Fleming) Okay.  Just to clarify,

11  at the time these decisions were being made, you

12  were in operational control of the Macondo

13  pursuant to your delegation by David Rich,

14  correct?

15                MS. HARDING:  Object to the form.

16      A.   I was not in operational control.  Those

17  were decisions that were being discussed upon at

18  the Wells Team Leader and at the -- with the

19  Operations Manager, it's the same sort of

20  decision that had I been the Operations Manager,

21  that I would have evaluated, and with the team,

22  made a decision about the way forward, and then I

23  doubt very seriously that I would have kicked

24  that decision up to Dave Rich.

25      Q.   (By Mr. Fleming) Okay.  At the time that

**PURSUANT TO CONFIDENTIALITY ORDER**

1   you were in Dave Rich's position through his

2   delegation, do you believe that you had the

3   authority to contact the Well Site Leaders on the

4   HORIZON and tell them that they needed to run a

5   CBL before they did the displacement?

6                   MS. HARDING:  Object to the form.

7       A.   That -- that type of -- of communication

8   straight from a Wells Director is -- would be

9   very few and far between, and -- and that -- that

10  conversation would be held through the Chain of

11  Command, which is the Wells Team Leader to the

12  Well Site Leader.

13      Q.   (By Mr. Fleming) Okay.  Was this a

14  situation that you were aware of at the time?

15  Let me rephrase that.

16              Were you aware of any concerns on the

17  part of anyone from the BP well site crew on the

18  HORIZON about the cement being able to achieve

19  zonal isolation as of April 15th, 16th, 17th,

20  18th, 19th, 20th?

21      A.   No, sir, I was --

22                   MS. HARDING:  Objection, form.

23      A.   -- aware of those.  If there were any

24  concerns, I was not aware of them.

25      Q.   (By Mr. Fleming) Had you been made aware

520

```
1   of those concerns, would you have done anything

2   differently in your role as David Rich's

3   delegate?

4                MS. HARDING:  Object to the form.

5        A.   The only thing differently that I would

6   have done was -- was called David Sims and said,

7   "David" -- who was the Wells Operations Manager,

8   "Is there a concern, and -- and if so, you know,

9   let's talk about it."

10       Q.   (By Mr. Fleming) Okay.  So you would have

11  done nothing more than just talk about it?

12               MS. HARDING:  Object to the form.

13       A.   I would have understood the facts and --

14  and talked through any potential concerns that

15  Mr. Sims may have had.

16       Q.   (By Mr. Fleming) Okay.  Would you have

17  felt comfortable telling Mr. Sims that he needed

18  to get a CBL?

19               MS. HARDING:  Object to the form.

20       A.   Under what circumstances are you --

21       Q.   (By Mr. Fleming) Let me rephrase --

22       A.   -- referring to?

23       Q.   -- the question.

24       A.   I mean, that's a pretty open --

25       Q.   Let me rephrase the question.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1     A.   Okay.

2     Q.   Did you have authority by virtue of the

3   fact of the delegation of David Rich's

4   responsibilities to you to tell David Sims that

5   David Sims needed to tell the Well Site Leaders

6   to get a CBL before displacement operations --

7               MS. HARDING:  Object to the form.

8     Q.   (By Mr. Fleming) -- on the Macondo?

9     A.   As the Wells Director and David Sims

10  having reported up to me, then, yes, I -- I -- I

11  had that right to exercise.

12    Q.   And you did not do that, correct?

13              MS. HARDING:  Object to the form.

14    A.   I was -- I did not make that decision or

15  exercise that, because I was not aware of the

16  concern.

17    Q.   (By Mr. Fleming) Right.  You weren't even

18  aware of the situation going on, correct?

19              MS. HARDING:  Object to the form.

20    A.   That is correct.

21    Q.   (By Mr. Fleming) And you were not aware

22  of any concerns that anyone may have had about

23  any of the cement job operations?

24              MS. HARDING:  Object to the form.

25    A.   That's about three "anys."  I mean, when

**PURSUANT TO CONFIDENTIALITY ORDER**

1   you start with --

2       Q.  (By Mr. Fleming) Let me rephrase the

3   question then.

4           You were not aware of any concerns about

5   the cement job being able to achieve zonal

6   isolation --

7               MS. HARDING:  Object to the form.

8       Q.  (By Mr. Fleming) -- correct?

9       A.  The cement job, as I was aware and as it

10  was planned, could achieve zonal isolation.

11      Q.  Okay.  And no one told you about any

12  potential for a severe gas flow potential that

13  had been predicted in an OptiCem model, correct?

14              MS. HARDING:  Object to the form.

15      A.  That is correct.

16              THE VIDEOGRAPHER:  One minute.

17      Q.  (By Mr. Fleming) If someone had told you

18  prior to the Displacement Procedure being

19  conducted that there was, in fact, an OptiCem

20  model out there that showed that there would be a

21  severe gas flow potential, what would you have

22  done --

23              MS. HARDING:  Object --

24      Q.  (By Mr. Fleming) -- differently, if

25  anything?

**PURSUANT TO CONFIDENTIALITY ORDER**

1        MS. HARDING:  Object to the form.

2    A.  At what particular phase?  I mean, we've

3  gone around, is this part of the original

4  cementing job, is this part of T&A, is this -- I

5  mean --

6    Q.  (By Mr. Fleming) No, this is part of the

7  actual Temporary Abandonment Procedure and the

8  Displacement Procedures.

9        MS. HARDING:  Object --

10    Q.  (By Mr. Fleming) Before the Displacement

11  Procedure is to occur, if someone had shown you

12  or informed you of the OptiCem model that

13  predicted a severe gas flow potential, what would

14  you have done?

15        MS. HARDING:  Object to the form.

16    A.  I think that once the -- the cement job

17  was put into place and you evaluate the quality,

18  which I'm not aware of, and then you say, "Okay,

19  this was elevated as -- as a potential to

20  actually occur," and you look at, "did it happen,

21  what's the risk, what's the concern," and then

22  the still -- the thing you still have to do is

23  you have to test that bottom plug.

24    Q.  (By Mr. Fleming) Okay.  And how would you

25  evaluate the quality?

**PURSUANT TO CONFIDENTIALITY ORDER**

524

1          MS. HARDING:  Object to the form.

2      A.  The quality of what?

3      Q.  (By Mr. Fleming) It was your statement.

4  I'm asking yous -- you stated that, I think, once

5  the cement job was put into place and you

6  evaluate the quality, so I'm asking you, how

7  would you evaluate the quality of the cement job?

8          MS. HARDING:  Object to the form.

9      A.  You would evaluate the quality of the

10  cement job that was in the shoe track for the

11  Temporary Abandonment Procedure by exerting the

12  negative test on it to expose it to the maximum

13  pressures that it would see after the

14  displacement, to ensure that there was no flow.

15  That's how you evaluate that quality of that

16  cement.

17      Q.  (By Mr. Fleming) Okay.

18          THE VIDEOGRAPHER:  We need to change

19  the tape.

20          MR. FLEMING:  Okay.

21          THE VIDEOGRAPHER:  We're off the

22  record at 11:48, end Tape 12.

23      (Recess from 11:48 a.m. to 11:57 a.m.)

24          MR. FLEMING:  I have 13 minutes

25  left.

**PURSUANT TO CONFIDENTIALITY ORDER**

1     Q.   (By Mr. Fleming) Okay.   I'm sorry.
2  "Being wired to the test ram"?
3     A.   Being misplumbed into the test ram.
4     Q.   Okay.
5     A.   I don't think that was the -- the -- the
6  one.
7     Q.   Okay.
8     A.   We're getting outside my area of
9  expertise, so I'm kind of speculating on that
10  right now.
11     Q.   Okay.
12     A.   So I'm going to have -- I'm going to have
13  to tell you that going forward.
14     Q.   Okay.   So you're just not aware of this
15  issue?
16     A.   I'm aware that one was misplumbed, yes,
17  but which hot stab to -- to which ram is
18  something that I haven't reviewed in -- you know,
19  since the early days.
20     Q.   Okay.   Let me ask you, going back to the
21  Temporary Abandonment Procedure, according --
22  assuming that I have told you accurately what
23  Frank Patton has testified about, does it give
24  you any concern that MMS was apparently approving
25  a different procedure than you apparently

PURSUANT TO CONFIDENTIALITY ORDER

```
 1   believed that was promulgated to MMS?

 2              MS. HARDING:  Object to the form.

 3       A.  I can't make any testimony about what

 4   Frank Patton thought at the time or what Frank

 5   Patton thought after the event or --

 6       Q.  (By Mr. Fleming) Sir --

 7       A.  -- the circumstances leading up to it.

 8              MS. HARDING:  Let him finish.

 9       Q.  (By Mr. Fleming) Sir, let me be very

10   clear in my question.  I'm not asking you to put

11   yourself in Frank Patton's position, okay?  I'm

12   asking you to assume with me that Frank Patton's

13   testimony was as I have represented it to you.

14          I'm asking you, from BP's perspective, do

15   you, either as a BP Manager or as the Corporate

16   Representative of BP, have any concern that MMS

17   was apparently approving a different procedure

18   than what you are now saying that this procedure

19   was supposed to have actually indicated?

20              MS. HARDING:  Object to the form.

21       Q.  (By Mr. Fleming) Does BP have any

22   concerns about that?  Not MMS, does BP have any

23   concerns that MMS is approving a different

24   procedure?

25              MS. HARDING:  Object -- are you
```

1    done?  Object to the form.

2        A.  I think the -- the concern that BP would

3    have is that if it puts forward the procedure

4    that within the -- the mindset of the Team

5    Leaders that -- that are approving it and going

6    to implement it, that if MMS has a different

7    opinion, that they need to put forward the

8    clarification and make sure that the procedures

9    that they are approving is, indeed, the

10   procedures that we're going to implement.

11       Q.  (By Mr. Fleming) Okay.  And you --

12             THE VIDEOGRAPHER:  Two minutes.

13       Q.  (By Mr. Fleming) And you believe that

14   that is MMS's responsibility to contact BP and

15   not BP's responsibility to contact MMS?  Is that

16   correct?

17             MS. HARDING:  Object to form.

18       A.  In preparing for this, this testimony,

19   there was various conversations that were held

20   about how people interacted with -- with

21   different Regions, and the HORIZON being an

22   Exploration and Appraisal rig, and it, unlike

23   some of the other rigs, it went through from

24   Region to Region to Region, and there was various

25   interactions between District Engineers, between

PURSUANT TO CONFIDENTIALITY ORDER

1  Engineers, and so we got to the point where the

2  Regulatory people were comfortable with the

3  Engineers that they would speak up, and if they

4  had any concern or required any clarification,

5  that they would go back and do it.

6       So different Engineers required a

7  different level of things.  And so you -- you got

8  to the point where you understood, and with the

9  fact that Mr. Patton did not express any concerns

10  about ambiguity, then he was approving the

11  procedure that we put forward.

12            MR. FLEMING:  Okay.  I'm going to

13  object to that as being nonresponsive.

14  Q.  (By Mr. Fleming) My question, sir, was,

15  and you believe that it is MMS's responsibility

16  to contact BP and not BP's responsibility to

17  contact MMS; is that correct?

18            MS. HARDING:  Object to the form.

19  A.  If MMS requires a clarification, then I

20  believe it is MMS's responsibility to ask BP for

21  that clarification and before it seeks approval.

22            THE COURT REPORTER:  Time.

23            MR. FLEMING:  Okay.  I'm sorry?

24            THE COURT REPORTER:  Time.

25            THE VIDEOGRAPHER:  Time.

**PURSUANT TO CONFIDENTIALITY ORDER**

536

1          MR. FLEMING:  Okay.

2       Thank you much, sir.

3          THE WITNESS:  Thank you.

4          THE VIDEOGRAPHER:  We're off the

5   record at 12:11, ending Tape 13.

6       (Recess from 12:11 p.m. to 1:17 p.m.)

7          MR. FITCH:  I'm ready.

8          THE VIDEOGRAPHER:  All set?

9       We're on the record at 1:17, start

10  Tape 14.

11                  EXAMINATION

12  QUESTIONS BY MR. FITCH:

13     Q.  Mr. Frazelle, again, let me introduce

14  myself, this time formally.  I'm Tony Fitch, and

15  I'm -- I'm accompanied -- or I'm accompanying,

16  since he's so much older than I, Steve Brody.

17  And we are both attorneys with the law firm of

18  Bingham McCutchen, Steve in New York City and me

19  in Washington, DC, and we both represent the two

20  Anadarko entities that are the Defendants in this

21  case.  Although throughout the questioning like

22  this, everybody just for shorthand refers to the

23  two of them as Anadarko.

24     A.  Okay.

25     Q.  I'm going to ask you a -- a roughly

 1   limited number of questions, and every one of my

 2   questions will be of you in your capacity as BP's

 3   designated Representative on the Topic 7.  Is

 4   that understood?

 5        A.  Yes, sir.  Topic 7 is --

 6        Q.  Yes.

 7        A.  -- is the Plug and Abandonment Procedure?

 8        Q.  Yes, sir.

 9        A.  Okay.

10        Q.  That's correct.

11        A.  (Nodding.)

12        Q.  And I'm going to try not to repeat what

13   Mr. Sterbcow and others have asked.  So I'll skip

14   around, be in and out just a few minutes.

15            Turn to -- if you would, please, sir, to

16   Tab 1 of the binder.  You see that's the --

17   the -- the April 12 E-mail from Mr. Morel to

18   Mr. Sepulvado and Mr. Sepulvado, correct?

19        A.  Yes, sir.

20        Q.  And it has attached to it the G -- the

21   document entitled "GoM Exploration Wells" that

22   Mr. Sterbcow explored with you yesterday, the

23   April 12th version?

24        A.  Yes, sir.

25        Q.  Okay.  And I would tell you that this

**PURSUANT TO CONFIDENTIALITY ORDER**

1    one's been marked as Exhibit -- previously marked

2    as Exhibit 1989.  I think that Mr. Sterbcow used

3    a -- a differently marked Exhibit 4830 with you.

4         Does -- does BP know of Transocean having

5    any role or involvement in preparing the

6    Temporary Abandonment Procedures that appear in

7    this document?

8        A.  This -- this April 12th version?

9        Q.  Yes, sir.

10       A.  I am not aware of any involvement --

11       Q.  Okay.

12       A.  -- by Transocean.

13       Q.  Does BP know of anyone else other than BP

14   having any role or involvement in preparing the

15   Temporary Abandonment Procedure in this April 12

16   document?

17       A.  No, sir, I'm not aware of that.

18       Q.  Okay.  Now, you testified previously, did

19   you not, that -- that this Plan does not contain

20   a negative pressure test, correct?

21       A.  Let me refer myself --

22       Q.  Sure.  And --

23       A.  -- to the document, please.

24       Q.  It's around Pages 8 and 9 of yours,

25   yours --

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   Pages 8 and 9?

2    Q.   M-h'm.

3    A.   (Reviewing document.)

4    Q.   In this document it's -- it's 9 --

5    A.   I believe it's --

6    Q.   -- 9 and 10.

7    A.   -- 9 and 10.

8         That is correct.

9    Q.   Does BP know why this document that was

10   distributed by Mr. Morel contains no negative

11   pressure test procedures?

12   A.   I think this is the -- the understanding

13   from the E-mails that I've reviewed is that this

14   is the first draft by Brian Morel to get

15   something out to the rig in response to -- to --

16   for preparation of -- of moving forward.

17   Q.   And is -- is it -- does BP believe that

18   Mr. Morel just inadvertently omitted the negative

19   pressure test from this version?

20            MS. HARDING:  Object to the form.

21   A.   I don't think BP has an opinion as to

22   what Mr. Morel was thinking when he --

23   Q.   (By Mr. Fitch) Okay.

24   A.   -- issued this.

25   Q.   Does BP know of anyone other than

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Mr. Morel that I could ask that question of?

2        A.  Not that --

3              MS. HARDING:  Object to form.

4        A.  -- I'm aware of.

5        Q.  (By Mr. Fitch) Okay.  Does BP know of

6    anyone other than Mr. Morel that I could obtain

7    any informa -- from whom I could obtain any

8    information about the preparation of the document

9    that constitutes Tab 1, Exhibit 8 -- 1989?

10       A.  Mister --

11             MS. HARDING:  Object to the form.

12       A.  Mr. Morel was working closely with

13   Mr. Hafle --

14       Q.  (By Mr. Fitch) Okay.

15       A.  -- in -- in this well.  The two of them

16   were working together as the -- the Senior

17   Engineer and more Junior Engineer.

18       Q.  And does BP know of any communications

19   between Mr. Hafle and Mr. Morel about the

20   preparation of the Temporary Abandonment

21   Procedures that appear in Exhibit 1989?

22             MS. HARDING:  Object to form.

23       A.  There is a -- an E-mail conversation

24   that's -- that was in the documents that -- but I

25   do not know without refreshing myself on it

1  whether it was pre-April 12th or after

2  April 12th.

3      Q.  (By Mr. Fitch) Okay.  And that's the only

4  one that you're aware of?

5      A.  Yes, sir.

6      Q.  Okay.  I need to ask you to look at

7  Tab 2, please, sir, previously marked as Exhibit

8  537 and also previously marked as Exhibit 1997.

9          Much the same question:  Does -- does BP

10  know of Transocean having any role or involvement

11  in preparing the TA Procedures that appear in

12  this document?

13      A.  No, sir, we do not have any information

14  on that.

15      Q.  Okay.  And does BP have any information

16  of involvement by anyone else other than BP in

17  the preparation of the document that appears as

18  Exhibit 537?

19      A.  No, sir.  In my preparation, I was not

20  made aware -- aware of any documents that exist.

21      Q.  Okay.  And you'll agree, as you

22  previously testified, that there are differences

23  between the Temporary Abandonment Procedure set

24  out in the April 12 document and the Temporary

25  Abandonment Procedure set out in the April 14th

**PURSUANT TO CONFIDENTIALITY ORDER**

1    E-mail, correct?

2              MS. HARDING:  Object to the form.

3        A.  Yes, sir, there are -- there are

4    differences.

5        Q.  (By Mr. Fitch) Okay.  Now, one of those

6    differences is that the -- the plug is being set

7    in mud in the April 14th document rather in

8    water, correct?

9        A.  Well, I previously testified that -- that

10   this particular procedure was a communication

11   between Brian Morel and -- and Nick Wilson or

12   James Wilson.  And it's more a -- a "Here's some

13   different ways that we've been looking at it.

14   You know, be prepared from a logistic standpoint

15   to -- to run either of these."

16            It's not a -- to me, it's not a defined

17   procedure because it hasn't gone through a -- a

18   review with the Team Leaders.

19       Q.  Okay.  You'll agree that the April 14th

20   document provides for the plug to be set in mud

21   as opposed to being set in water as specified in

22   the April 12th document, correct?

23             MS. HARDING:  Object to form.

24       A.  Yes, sir, this is --

25       Q.  (By Mr. Fitch) Okay.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   This says set in mud.

2    Q.   And you'll agree that the April 14th

3 document provides for the setting of a -- a

4 lockdown sleeve last instead of first as in the

5 April 12th Plan, correct?

6    A.   That is correct.

7    Q.   When you say that this appears to be a --

8 an attempt by Mr. Morel to provide information to

9 Mr. Wilson about possible equipment needs, that's

10 based on your interpretation of the documents; is

11 that right?

12    A.   Yes, sir.

13    Q.   Okay.  Are -- is BP aware of any

14 communications between any two individuals that

15 substantiate that theory?

16    A.   Not that I'm aware of.

17    Q.   Okay.  And when you provide us with that

18 theory, that characterization of the April 14th

19 E-mail, is that your personal opinion, or is that

20 BP's position now?

21          MS. HARDING:  Object to the form.

22    A.   After reviewing the various documents and

23 as being BP's witness, that's BP's position.

24    Q.   (By Mr. Fitch) Okay.  Does BP have any

25 information about the -- the -- the basis or the

1    reasons for the particular steps and the

2    particular order of those steps that Mr. Morel

3    set out in his April 14 E-mail?

4              MS. HARDING:  Object to the form.

5        A.   The -- the basis is -- is going back

6    through some of the -- the documentation as -- as

7    it includes a couple of different aspects, as one

8    is, you know, the deep set 8367 plug is

9    referenced here, but at this -- at this point in

10   time, it says run in hole continue to set the

11   300-foot plug.  We -- we don't have approval to

12   do that.  It's -- we're yet to submit the -- the

13   permit to the MMS to get that -- that approval.

14       Q.   (By Mr. Fitch) Okay.  Look at Tab 3 with

15   me, please, sir.  That's the -- the APM of April

16   16, and the version you have is previously marked

17   as Exhibit 570, the same version that

18   Mr. Sterbcow used.

19       A.   Yes, sir.

20       Q.   I need to start with the same question:

21   Does -- does BP know if Transocean had any role

22   or involvement in preparing the Temporary

23   Abandonment Procedure that's included in this

24   APM?

25       A.   No, sir, we do not have any -- any proof

**PURSUANT TO CONFIDENTIALITY ORDER**

1    that that -- or documents that show that.

2        Q.  And does BP know of anyone else -- anyone

3    else other than BP having any role or involvement

4    in preparing the Temporary Abandonment Procedure

5    that's included in the April 16th APM?

6        A.  No, sir.

7            MS. HARDING:  Object to form.

8    Sorry.

9        Q.  (By Mr. Fitch) Now, it's BP's position

10   that the Temporary Abandonment Procedure that's

11   set out on the third page of the APM -- I'll

12   strike that question.

13           It's -- is it BP's position that the

14   Temporary Abandonment Procedure set out on Page 3

15   of the APM includes one negative pressure test?

16       A.  Yes, sir.

17       Q.  Okay.  Does BP believe that the -- the

18   Temporary Abandonment Procedure set forth in the

19   APM differs from the procedures set out in the

20   April 12th Well Plan?

21           MS. HARDING:  Object to the form.

22       A.  Whew.

23       Q.  (By Mr. Fitch) Which is Tab 1.

24       A.  Oh, okay.  I'm going to have to --

25       Q.  Fair enough.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1        A.   I believe that there's a difference.  The

2    question is -- Page 9 and 10.

3             (Reviewing document.)

4             Yes, sir, it -- it is different.

5        Q.   Okay.  One way it's different is that

6    the -- the April 16th APM contains a negative

7    pressure test, correct?

8        A.   Yes, sir.

9        Q.   Okay.  And another difference is the

10   depth at which the plug is going to be set,

11   correct?

12       A.   Yes, sir, that is correct.

13       Q.   Okay.  Was the Risk Assessment done by BP

14   as the basis for submitting the APM on

15   April 16th?

16             MS. HARDING:  Object to the form.

17       A.   I was not made aware there's a written

18   Risk Assessment that was generated for that.

19       Q.   (By Mr. Fitch) Okay.  Does BP believe

20   that a Risk Assessment should have been done,

21   under BP Policy in effect at that time, as this

22   April 16th APM was being developed and submitted?

23       A.   Yes, sir, is that a Risk Assessment

24   should occur.  They do occur in various formats.

25   Whether it's -- it's written and whether
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    something was done on the rig or a verbal walking

2    through the Procedures to identify the risks,

3    whether that occurred --

4         Q.  Okay.

5         A.  -- there's -- I'm not aware of.

6         Q.  Okay.  Look with me to Deposition Exhibit

7    4 -- I -- I -- let me strike that.

8              Look with me, please, to Tab 4, and this

9    has previously been marked as Exhibit 1816.  You

10   see that it's an E-mail exchange between

11   Mr. Morel and Mr. Guide, correct?

12        A.  Yes, sir.

13        Q.  Okay.  Did you see this document during

14   preparation?

15        A.  Yes, sir.

16        Q.  Okay.  You see that in the first E-mail,

17   chronologically at the bottom of the page, it's

18   from Morel to Guide -- to -- from Mr. Morel to

19   Mr. Guide, correct?

20        A.  Yes, sir.

21        Q.  And he says, does he not -- tell me if

22   I've read this correct -- "Plan is to do a

23   negative test with base oil on the bottom plug.

24   Then we will displace (a second negative test to

25   greater value will happen) and following that

548

1   set the cement plug.  Are you ok with this, or do

2   you think we should remove the first base oil

3   test and just use the displacement as a

4   negative test (shut down at the end and do a flow

5   test)?"

6       A.  Yes, sir, that's what that --

7       Q.  Okay.

8       A.  -- says.

9       Q.  Does BP agree that this indicates that

10  Mr. Morel was envisioning two negative pressure

11  tests to take place at this point in time?

12              MS. HARDING:  Object to form.

13      A.   I think that he was -- he was

14  contemplating here but contemplating two, because

15  it references a second negative test.

16      Q.  (By Mr. Fitch) Okay.  Was any Risk

17  Assessment done to BP's knowledge with respect to

18  the contemplation that was going on between April

19  16th and April 18th among Mr. Guide and

20  Mr. Morel?

21      A.  No, sir, I'm not aware of that.

22      Q.  Did BP believe that a -- a Risk

23  Assessment should have taken point in light of

24  the contemplation that's going on here?

25              MS. HARDING:  Object to form.

**PURSUANT TO CONFIDENTIALITY ORDER**

1        A.   As far as -- which particular aspect are

2   you referring to, I'm sorry, to -- to Risk

3   Assessment?

4        Q.   (By Mr. Fitch) The -- you -- you've

5   testified that BP believes that one negative

6   pressure test is envisioned in April 16th, and

7   you've indicated there's contemplation here of

8   two negative pressure tests as of April 18th.

9   And I'm asking if -- and you've told me there's

10   no Risk Assessment done.  And I'm asking you

11   whether BP believes that a Risk Assessment should

12   have been done under these circumstances?

13        A.   I don't believe a -- a risk -- a formal

14   Risk Assessment, because the Plan was for a

15   negative test as part of the -- the displacement

16   to run in hole, and that -- that exerts a greater

17   pressure than -- than any with base oil.

18        Q.   And --

19        A.   It's a more severe test.

20             I'm sorry.

21        Q.   And -- and BP believes that even though

22   two negative tests were being contemplated here;

23   is that right?

24        A.   I think when -- there was some other

25   documentation for where I think it was a -- it's

PURSUANT TO CONFIDENTIALITY ORDER

550

1    not in here that you've presented, but it was

2    dated April 15th, there was a -- a reference to a

3    negative test that was after setting casing,

4    and -- and I believe that that negative test

5    was -- was for the casing hanger is what that was

6    referencing to versus testing the bottom plug

7    there.

8        Q.   The --

9        A.   It was on that form.

10       Q.   The -- the April 15th Well Plan also

11   included only one negative pressure test,

12   correct?

13               MS. HARDING:   Object to form.

14       A.   Yes, sir, for the bottom plug.

15               MR. FITCH:   Okay.  I have nothing

16   further.

17           We'll go off the record for just a

18   minute, one minute.

19               THE VIDEOGRAPHER:   We're off the

20   record at 1:35.

21           (Recess from 1:35 p.m. to 1:38 p.m.)

22           (Exhibit No. 5376 marked.)

23               MR. BRODY:   I'm ready.

24               THE VIDEOGRAPHER:   All set?

25           We're on the record at 1:38.

**PURSUANT TO CONFIDENTIALITY ORDER**

1  you know, there would be more that -- that would

2  have to come into it, as long as -- you know,

3  what the second one is, whether it was any more

4  reliable than the first.

5      Q.  (By Mr. Vigen) Go to Tab 41 in the small

6  binder.  It's previously marked as Exhibit 537.

7  We've seen various -- various marked exhibits of

8  this same E-mail.  This is the forward Ops E-mail

9  on April 14th, 2010.  And then just for

10  reference, Tab 43, previously marked Exhibit 97,

11  this is the April 20th, 2010 Ops Note.  Do you

12  agree that both of these E-mails are authored

13  by -- both these original E-mails -- the first

14  E-mail in the chain are authored by Brian Morel?

15      A.  Yes, sir.

16      Q.  And do you understand that these two

17  E-mails specifically are noticed in the 30(b)(6)

18  Notice of Deposition that you're here to testify

19  for on behalf of BP today?

20      A.  Yes.

21          MS. HARDING:  Object to the form.

22      A.  Yes, sir.

23      Q.  (By Mr. Vigen) Do you understand it was

24  your duty to prepare to answer questions related

25  to these E-mails as noticed in the 30(b)(6)

PURSUANT TO CONFIDENTIALITY ORDER

649

1    Notice of Deposition Topic 7?

2        A.  Yes, sir.

3        Q.  And what did you do specifically as it

4    relates to these two documents, the Ops Note and

5    the forward Ops E-mails, what did you do to

6    prepare to familiarize yourself with BP's

7    knowledge related to these topics?

8        A.  Is I reviewed the -- the available

9    E-mails, bits and pieces of testimony from --

10   from different people, from John Guide, there was

11   some from Ronnie Sepulvado, there was some from

12   Gregg Walz, and so just -- just the -- the

13   available information that was out there that I

14   was -- that I was provided with.

15       Q.  Okay.  You have testified yesterday and

16   today, however, that Mr. Morel would be the only

17   person that would actually know whether there

18   were conversations held outside of these E-mails

19   related to the subjects discussed in these

20   E-mails, correct?

21               MS. HARDING:  Object to form.

22       A.  It would be Mr. Morel and whoever else he

23   had those conversations with, yes, sir.

24       Q.  (By Mr. Vigen) And also you testified

25   that BP does not know whether -- or I'm sorry --

**PURSUANT TO CONFIDENTIALITY ORDER**

1    that a risk -- a written Risk Assessment was not

2    done in relation to the Temporary Abandonment

3    that was done on April 20th; is that correct?

4         A.  I did not review one, or I'm not aware of

5    one to review for that -- for that procedure.

6         Q.  Now, you've also testified, isn't it

7    correct, that Mr. Morel might have done one

8    orally in a conversation with various people on

9    the rig?

10        A.  Yes, sir, I did testify to that as -- as

11   a followup, and the reason I -- I came to that

12   conclusion is there is E-mail traffic that talks

13   about Mr. Morel going out to the rig to -- to

14   have conversations with the Well Site Leader and

15   make sure that everybody understood the

16   forward -- the forward plan, so that's what I

17   based that -- that on.

18        Q.  And to confirm, you can't speak to those

19   conversations, can you?

20        A.  No, sir.  I was not privy to them.

21        Q.  Is Mr. Morel still employed by BP?

22        A.  Yes, sir.

23        Q.  Would you agree, then, that BP's

24   knowledge on those conversations resides with

25   B -- Mr. Morel?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   Yes, sir.

2      Q.   Did you attempt to speak with Mr. Morel

3  in order to prepare to answer questions as to

4  BP's knowledge as it rel -- as it relates to

5  those conversations?

6      A.   No, sir.  That's not allowed.

7      Q.   You were not allowed?

8      A.   (Shaking head.)

9           MS. HARDING:  Object to the form.

10     A.   No, sir.

11     Q.   (By Mr. Vigen) Without getting into any

12  conversations you had with Counsel, why were you

13  not allowed?

14     A.   It's just that I know that -- that

15  certain individuals are on administrative leave,

16  and -- and you're not to contact them.

17     Q.   Is Mr. Morel on administrative leave?

18     A.   Yes, sir.

19     Q.   And who directed you not to contact him?

20     A.   I believe it was a -- an HR

21  Representative that -- that talked to us after

22  the incident.

23           MR. VIGEN:  Let me take a break to

24  see if I have any other questions.

25           THE VIDEOGRAPHER:  We're off the

674

1          THE COURT REPORTER:  5382.

2          MS. HARDING:  -- as 5382.

3      (Exhibit No. 5382 marked.)

4      Q.  (By Ms. Harding) And it's a document at

5  the top titled CF -- "30 CFR 250.413."  Could you

6  take a look at that, please?

7          Actually, I put the sticker on the wrong

8  one.  Let me hand -- let me hand you that back,

9  okay.  Thank you.

10         Have you seen this document before?

11     A.  Yes, ma'am, I have.

12     Q.  Okay.  In what context?

13     A.  It was one of the documents that -- that

14  I reviewed during preparation.

15     Q.  Okay.  Did you -- have you relied on this

16  document in connection with your testimony today?

17     A.  Yes, ma'am, I have.

18     Q.  In what -- in what way have you relied

19  upon it?

20     A.  It's under Section (f), and there's been

21  lots of discussions around Maximum Anticipated

22  Surface Pressure.  And it says:  "...For this

23  section, maximum anticipated surface pressures

24  are the pressures that you" can "reasonably

25  expect to be exerted upon a casing string and its

**PURSUANT TO CONFIDENTIALITY ORDER**

1  related wellhead equipment."

2      Q.  Okay.

3          (Discussion off the record.)

4              MS. HARDING:  Is that --

5          (Discussion off the record.)

6              MS. ALEXANDER:  Yeah.

7      Q.  (By Ms. Harding) Looking at Exhibit 4751,

8  which is the "Application for Permit to Drill a

9  New Well," which I think you've looked at many

10  times in the last couple of days, can you show me

11  if -- and its application -- actually, what is

12  this document?

13      A.  It is the -- it is Document 4751, that is

14  the -- the Original Application and Permit to

15  Drill for the 252 No. 1 Well.

16      Q.  Okay.  And are -- do you know whether or

17  not BP provided the formulas that it was using to

18  calculate the Maximum Anticipated Surface

19  Pressures for this document?

20      A.  Those -- those formulas are -- are

21  used --

22      Q.  Yeah.  Oh, sorry.  Go ahead.  I was --

23  I -- I'm sorry.  Go ahead.  I used the --

24      A.  The -- this -- this information was

25  submitted to the MMS, and these formulas were

**PURSUANT TO CONFIDENTIALITY ORDER**

1        We're on the record at 5:42.

2                  REDIRECT EXAMINATION

3    QUESTIONS BY MR. BARR:

4        Q.  All right.  Mr. Frazelle, I want to

5    follow up on a few things I've heard, based on

6    your testimony.

7            In your preparation to testify yesterday

8    and today on -- as BP's Corporate Representative

9    on Topic 7, the Temporary Abandonment issues, in

10   your preparation to testify, did you find any

11   evidence or documents showing communications

12   between BP and Transocean prior to April 20th

13   regarding the changes that took place in the

14   Temporary Abandonment planning?

15       A.  No, sir, I did not review any documents

16   between BP and Transocean during that time

17   period.

18       Q.  So, in your preparation, you didn't see

19   any documents --

20       A.  I did not --

21       Q.  -- showing that?

22       A.  I did not see any in reference to that,

23   no, sir.

24       Q.  Did you have any discussions with anyone

25   to inform yourself on that issue?

**PURSUANT TO CONFIDENTIALITY ORDER**

1     A.  As far as the -- the discussions that I

2  had were around reviewing the -- the documents

3  that -- as they were presented, the various

4  E-mails that -- that are on record and the -- the

5  different variations or different -- I guess

6  the -- the evolution of the -- of the -- the

7  Temporary Abandonment Procedure, and the

8  different versions of it.

9     Q.  Okay.  But you didn't have any

10  discussions in the -- with anyone regarding

11  communications that took place between BP and

12  Transocean prior to April 20th, on the changes?

13     A.  No, sir.

14     Q.  Okay.  You've testified -- a couple

15  times, you've said that one of the concerns,

16  well, the primary concern that BP had with going

17  BOP-on-BOP, as far as a Capping Plan, was the

18  broach, the -- the rupture of the casing.  Do you

19  remember that?

20     A.  Yes, sir.

21     Q.  And -- and what you said was, was BP was

22  concerned about going BOP-on-BOP because it was

23  concerned, that once it shut the rams, it

24  wouldn't be able to open them.  Do you remember

25  that?