# Exhibit H

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3
        IN RE:  OIL SPILL     MDL NO. 2179
 4      BY THE OIL RIG
        "DEEPWATER HORIZON"   SECTION:  J
 5      IN THE GULF OF
        MEXICO, ON APRIL      JUDGE BARBIER
 6      20, 2010              MAG. JUDGE SHUSHAN

 7
```

12

13
              Deposition of **A. JOHN GUIDE**, taken
14    in the Pan American Life Center, Bayou
      Room, 11th Floor, 601 Poydras Street, New
15    Orleans, Louisiana 70130, on Monday, May 9,
      2011.
16

17
      **APPEARANCES:**
18

19
              COTCHETT, PITRE & MCCARTHY
20            (By:  Bryan Payne, Esquire)
              San Francisco Airport Office Center
21            840 Malcolm Road
              Suite 200
22            Burlingame, California 94010
                  (Attorneys for MDL 2185
23                  Securities plaintiffs subclass)

24

25

                    **GAUDET KAISER, L.L.C.**
                 Board-Certified Court Reporters

1  the casing hanger seal as the single
2  barrier for temporary abandonment.  The
3  attached decision tree --
4          A.    Tree.
5          Q.    -- addresses these options.
6          A.    Yeah.
7          Q.    A perf and squeeze operation
8  could be performed to add a second barrier
9  in the annulus.
10         A.    Yeah.
11         Q.    That's all the text I've ever
12 seen since last summer and nowhere do I see
13 any type of approval for adopting less than
14 a thousand foot above, you know, above the
15 permeable zone.  But you think this is the
16 MOC that you saw?
17         A.    I thought there was a
18 dispensation.  Maybe I was mistaken, or
19 maybe it's in the attachments.
20         Q.    Let me ask you one more, I got a
21 couple of minutes is all I have and then I
22 have to go.  But isn't it true that at
23 10:43 a.m., BP forwarded an ops note for
24 the temporary abandonment that had been
25 approved by MMS and what it did was, is

```
 1    that it elevated the procedure to displace
 2    seawater with the mud prior to running the
 3    negative test, thereby underbalancing the
 4    rig, underbalancing the well.
 5         MS. KARIS:
 6              Object to form.
 7         THE WITNESS:
 8              The way that I understood it was
 9    that the displacement of the seawater was
10    going to be in a controlled environment and
11    a negative test conducted prior to the
12    final displacement.
13    EXAMINATION BY MR. PENTON:
14         Q.   But you're aware that they
15    displaced seawater before the negative test
16    and put that ahead of the negative test in
17    the forward ops note?
18         A.   It was always going to be that
19    way.
20         Q.   Let me show you the temporary
21    abandonment procedure, April 16th.
22         MS. KARIS:
23              The videographer indicated that
24    your time is up.
25         MR. PENTON:
```

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC   Document 4850-8   Filed 12/09/11   Page 5 of 13
285

1                 I understand.  It's my last
2     question, is that okay?
3            MS. KARIS:
4                 Okay.  For a question.
5     EXAMINATION BY MR. PENTON:
6          Q.    If you don't mind, these are the
7     e-mails I was telling you about where the
8     procedure changed here.
9                 Here's the e-mail here and
10    here's the procedure.  And just look at it
11    and I want you to tell me whether or not on
12    April the 20th the ops note here changed
13    the order of the seawater displacement.  It
14    was April 14th, April 16th and April 20th.
15         A.    These aren't the real
16    procedures, these are just snippets from
17    them.
18         Q.    Well, they are actually -- no.
19    They're actually part of the temporary
20    abandonment approval, the documents are,
21    and then the forward ops note is obviously
22    an e-mail from Brian Morel.
23                But really my only question, you
24    know, isn't it true that, that on April the
25    20th at 10:43 Brian Morel, or someone at BP

GAUDET KAISER, L.L.C.
Board-Certified Court Reporters

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC   Document 4850-8   Filed 12/09/11   Page 6 of 13
286

1   changed the order of the seawater

2   displacement to be the number one procedure

3   here on April the 20th, before the negative

4   test, whereas the negative test was the MMS

5   permitted procedure on April the 16th.

6            It was negative test and then

7   trip in the hole and then displacement.

8   Whereas the ops note, not approved by MMS,

9   put seawater displacement first and

10  negative test second?

11       MS. KARIS:

12            Object to form.

13  EXAMINATION BY MR. PENTON:

14       Q.   Were you aware of that?

15       MS. KARIS:

16            Object to form.

17       THE WITNESS:

18            My answer is no, that I was

19  always under the impression that we were

20  going to do the negative test with seawater

21  at 8367 feet and that is, indeed, what this

22  said, what the MMS approved.

23       MS. KARIS:

24            And you're out of time.

25       MR. PENTON:

```
 1   been given an explanation or been able to
 2   come up with a theory to explain why that
 3   was done?
 4          MS. KARIS:
 5              Object to form.
 6          THE WITNESS:
 7              No.
 8   EXAMINATION BY MS. LAWRENCE:
 9       Q.   There's a couple of questions
10   about the negative test.  You had questions
11   about this morning that was done on the
12   rig.  Can you turn to Tab 27?  This has
13   previously been admitted as Exhibit 570.
14              You may have been asked to look
15   at this this morning, clearly an MMS
16   document.  But it has on the third page a
17   procedure and I think you were asked some
18   questions about this this morning.
19              And then I want you to, so when
20   you look at that at Tab 27 and then turn to
21   Tab 28.  I want you to compare these two
22   documents for me.  Tab 28 is previously
23   been marked as Exhibit 566.  That's an
24   e-mail from Brian Morel to yourself and
25   other individuals, including Don Vidrine
```

1   and Robert Kaluza, dated Tuesday,
2   April 20th at the time of 10:43 a.m.
3   entitled ops note.  And the first line of
4   the e-mail reads ops notes for the next few
5   days.
6              Did you testify earlier that the
7   ops notes for the next few days was a
8   series of numbered tasks?  Was this a
9   procedure relating to the negative test
10  that was sent out to the crew on the rig?
11       A.    Yes.
12       Q.    And did it differ from the
13  temporary abandonment procedure in Tab 27?
14       A.    No.
15       Q.    So as you see it, they're
16  exactly the same?
17       A.    The, you know, the wording is
18  slightly different.  But the, the procedure
19  is the same thing.
20       Q.    Mr. Guide, you've had over a
21  year now to think about the April 20th,
22  2010 DEEPWATER HORIZON blowout.  Can you
23  tell me what actions you believe you took
24  as the wells team leader, if any, that led
25  to the blowout?

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3
     IN RE:  OIL SPILL      MDL NO. 2179
 4   BY THE OIL RIG
     "DEEPWATER HORIZON"    SECTION:  J
 5   IN THE GULF OF
     MEXICO, ON APRIL       JUDGE BARBIER
 6   20, 2010               MAG. JUDGE SHUSHAN

 7
```

13

14                       **VOLUME II**

15          Deposition of **A. JOHN GUIDE**, taken
     in the Pan American Life Center, Bayou
16   Room, 11th Floor, 601 Poydras Street, New
     Orleans, Louisiana 70130, on Tuesday, May
17   10, 2011.

18


19   **APPEARANCES**:

20
             COTCHETT, PITRE & MCCARTHY
21           (By:  Bryan Payne, Esquire)
             San Francisco Airport Office Center
22           840 Malcolm Road
             Suite 200
23           Burlingame, California 94010
                 (Attorneys for MDL 2185
24                 Securities plaintiffs subclass)

25

                    **GAUDET KAISER, L.L.C.**
                 Board-Certified Court Reporters

```
 1    out the field yet.
 2               So I don't know how this was
 3    going to be.  But I can tell you how it was
 4    actually done.  But I don't think this was
 5    actually in its state of implementation
 6    when we were drilling the Macondo well.
 7    EXAMINATION BY MS. KUCHLER:
 8         Q.    You testified earlier that if
 9    there was a question about the negative
10    test, you would have expected that there
11    would be a discussion with the well site
12    leader, the OIM, the driller, the
13    toolpusher, and if they still had questions
14    they should call you.  Do you recall that?
15         A.    Yes, ma'am.
16         Q.    Did that call ever occur?
17         A.    No, ma'am.
18         Q.    So none of these folks, the well
19    site leaders or any of these other folks
20    called you to get your input on the
21    negative test at any time?
22         A.    That's correct, ma'am.
23         Q.    You mentioned that there were
24    several engineering decisions that were
25    later recommended to be changed, such as
```

```
 1   the addition of the 30 barrels of spacer
 2   during the displacement of the cement.  But
 3   I don't think anyone asked you what other
 4   engineering decisions were recommended to
 5   be changed.
 6        A.    Well, the -- I'm trying to
 7   remember.  The one that I referenced in my,
 8   in my e-mail was the, was the 30 barrels.
 9   Oh, I -- the other one that just came to my
10   mind was the addition of the six barrels of
11   base oil that was in the spacer that was --
12   and I, I didn't understand, I really didn't
13   understand that.
14             So that was just another example
15   and I was, you know, expressing that, you
16   know, frustration to Mr. Sims.
17        Q.    Of course, I'm not just talking
18   about that one e-mail but of course there
19   had been several modifications to the
20   temporary abandonment procedure; correct?
21        A.    Yeah.  There were numerous,
22   there were several draft procedures.
23        Q.    Including up until the morning
24   that the negative test was to be conducted
25   there was an additional change when
```

**GAUDET KAISER, L.L.C.**
Board-Certified Court Reporters

1    Mr. Morel issued his ops note; correct?
2         MS. KARIS:
3              Object to form.
4         THE WITNESS:
5              The way that I saw it and still
6    do understand it, is that that wasn't a
7    change, that was just a clarification to
8    make sure that the -- because we had for
9    some reason told the MMS we were going to
10   monitor the results on the kill line, we
11   wanted to make sure that we were in
12   compliance with what we had told the MMS we
13   were going to do.
14   EXAMINATION BY MS. KUCHLER:
15        Q.   What you had originally told the
16   MMS you were going to was displace to the
17   seafloor first; right, the mud line, and
18   then proceed before doing the displacement.
19             So the negative test was to be
20   done at the mud line, according to the
21   permit originally issued by the MMS; isn't
22   that right?
23        A.   No, ma'am.  That's not the way I
24   interpreted it.
25        Q.   So you interpreted it to mean

```
 1    that the displacement all the way down to
 2    8300 feet would take place at the time of
 3    the negative test?
 4         A.    Yes, ma'am.
 5         Q.    And there had been some going
 6    back and forth on whether to use a long
 7    string or a liner for some period of time
 8    before a final decision was made; is that
 9    right?
10         A.    Well, yeah, the original plan
11    was a long string as per the basis of
12    design.  But then the liner came in at a
13    later date.
14         Q.    So that was another change that
15    had been made on an engineering level that
16    the crew on the rig didn't know until
17    relatively late in the game what the final
18    decision would be; is that right?
19         MS. KARIS:
20              Object to form.
21         THE WITNESS:
22              It was an option that was made
23    available so we had to get equipment to the
24    rig.  That was another option, yes, ma'am.
25    EXAMINATION BY MS. KUCHLER:
```

**GAUDET KAISER, L.L.C.**
Board-Certified Court Reporters