UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | § § § § | MDL NO. 2179  SECTION J |
| This Document Relates To: *All cases, 2-10-cv-2771 and 2:10-cv-04536* | § § § § § | JUDGE BARBIER  MAGISTRATE JUDGE SHUSHAN |

**TRANSOCEAN'S REPLY MEMORANDUM TO UNITED STATES MEMORANDUM OPPOSING TRANSOCEAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT FOR INDEMNITY FROM BP**

Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC and Triton Asset Leasing GmbH (collectively "Transocean") hereby reply to the Memorandum of the United States Opposing Transocean's Motion for Partial Summary Judgment (Dkt. 4840).

1. **Transocean's motion is not premature.**  The United States argues that, because it intends to attempt to prove that Transocean's conduct was even more than gross negligence, the present motion is premature.  The government's trial plans should have no bearing on this motion.  The drilling contract does not provide for indemnity in the event of intentional or willful misconduct in excess of gross negligence, and Transocean has not sought a ruling that it can be indemnified for such misconduct.  Transocean and BP -- the parties to the drilling contract -- have filed cross motions for summary judgment and both parties have asked the court to decide the issues presented including whether alleged gross negligence would void indemnity.  A ruling on this and the other issues will advance the ultimate resolution of these cases.

2. **Transocean's claim for indemnity for Clean Water Act fines arises only if Transocean is held liable under the CWA for the underwater discharge from the well.**

The principal issue briefed by the United States concerns indemnity for civil penalties under the Clean Water Act (CWA). Before turning to the indemnity issue itself, it is useful to review the United States' claims for civil penalties under the CWA and examine how the issues on those claims intersect with the indemnity issues raised by the present motion.  The CWA claims are themselves one of the subjects of the United States' recent motion for partial summary judgment.  Dkt. 4820. While this is not the time or place to argue the CWA liability issues raised by the government's motion, it is important for purposes of this indemnity motion to recognize that Transocean's claim for indemnity for CWA fines arises only if Transocean is held liable under the CWA for the **underwater discharge** from the well.

The CWA imposes a per barrel civil penalty on the owner, operator or person in charge

of a vessel or offshore facility "from which" oil was discharged. 33 U.S.C. § 1321(b)(7). On first blush, the liability issue appears simple. Transocean owned and operated the Deepwater Horizon. BP, Anadarko and Moex owned the Macondo Well, which was an offshore facility. Since it owned and operated the vessel, Transocean would be liable for a CWA civil penalty with respect to any "oil" – broadly defined in the CWA – that was discharged from the vessel during the incident, such as any diesel fuel that was discharged **above the water's surface** from tanks that ruptured in the incident. Since it owned and operated the Macondo Well, BP would be liable for a CWA civil penalty for any oil that was discharged **underwater** from the well – all the oil that flowed from the well into the Gulf after the vessel sank.

If this were the end of the liability analysis – and Transocean submits it should be – there would be no issue as to indemnity for CWA civil penalties and no need to decide whether the reciprocal contractual indemnities for fines and penalties violate public policy. Transocean would be liable for any civil penalties for oil discharged from the vessel above the surface of the water, and BP would not owe indemnity. BP would be liable for any civil penalties for oil discharged from the well below the surface of the water, and Transocean would not owe indemnity. As the Court has already ruled, the reciprocal indemnity undertakings in the drilling contract use the water's surface as the dividing line to determine which party bears the risk of pollution-related claims. "Article 24.1 allocates to Transocean liabilities for pollution originating on or above the surface of the water. The Deepwater Horizon Incident entailed a subsurface release; thus Transocean did not assume these liabilities under Article 24.1 of the Drilling Contract, BP assumed them under Article 24.2's catch-all provision ….." Order and Reasons, Dkt. 4588, at 41.

Unfortunately, some parties believe the law cannot be that simple. In responses to requests for admissions, Anadarko took the position that, because the underwater discharge flowed from the reservoir through the BOP and riser before exiting into the Gulf and because the

2

BOP and riser are appurtenances of the vessel, the oil was discharged "from" the vessel and not "from" the well.[1]  In its recently-filed motion for partial summary judgment, the United States takes a different tack and asserts that the underwater discharge was "from" **both** the well and the vessel. Dkt. 4820-5, at 5-6.  In addition, the United States has preserved the allegation in its complaint that Transocean should be considered an operator of the well (although not seeking a ruling on that issue in its present motion for summary judgment). Dkt. 4820-5, at 2 n.5.

It is only if the court ultimately adopts one or more of these novel CWA liability theories that an indemnity issue would arise.  If Transocean is held liable for civil penalties with respect to the underwater discharge (either on the theory that the discharge was "from" the vessel or on the theory that Transocean is an "operator" of the well), only then would Transocean be forced to invoke the indemnity provision of the drilling contract with respect to CWA civil penalties.  The issue thus now before the court is: if Transocean is held liable for CWA civil penalties based on underwater discharge, is the indemnity provision for fines and penalties enforceable?

     3. **Since OPA itself provides that a MODU's liability should be limited to discharges on or above the surface of the water, it cannot be against public policy for Transocean to use contractual indemnity to shift liability for an underwater discharge to BP.**

In OPA, Congress specifically provided for the very same division of responsibility that is reflected in the pollution indemnity in the drilling contractor.  The drilling contractor -- the owner/operator of the MODU -- is liable for discharges on or above the water's surface.  The well owner is liable for everything else.  Congress recognized that a MODU is a vessel capable of use as an offshore facility.  33 U.S.C. § 2701(18).  When a MODU is used as an offshore

---

[1] In Request for Admission No. 5, the United States requested Anadarko to "Admit that oil flowed from the Macondo Well into the Gulf of Mexico … following the blowout on April 20, 2010." Anadarko's response was "Deny."  In Response to Interrogatory 2(a) explaining the denial, Anadarko stated: "Responding Party denies RFA 5 because, based on the discovery to date, the oil discharged from the *Deepwater Horizon* and its appurtenances, e.g., the blowout preventer and riser."  Supplemental Objections and Responses of Defendant Anadarko Petroleum Corporation to Revisions to the United States First Set of Interrogatories, Requests for Production of Documents, and Requests for Admissions, served September 20, 2011.

facility, the owner/operator of the MODU is responsible only for discharges on or above the surface of the water, subject to the liability limits applicable to tank vessels. "For purposes of determining the responsible party and applying this Act … a mobile offshore drilling unit which is being used as an offshore facility is deemed to be a tank vessel **<u>with respect to the discharge … of oil on or above the surface of the water.</u>**" 33 U.S.C. § 2704(b)(1). For any excess liability, the MODU is "deemed to be an offshore facility," for which the responsible party under OPA is the lessee/permittee of the drilling site -- here BP, Anadarko and Moex. 33 U.S.C. § 2704(b)(2) (deemed to be an offshore facility); § 2701(32)(C) (responsible party for offshore facility is lessee or permittee of the area in which the facility is located).

    The Senate Report states:

> A major deficiency of title III of the Outer Continental Shelf Lands Act Amendments of 1978 is corrected by the reported bill. Under that title, the owner or operator of an OCS facility is held liable. Often, that owner or operator is an independent drilling contractor and not the actual holder of the rights to produce the oil. . . . The reported bill restores the balance among leaseholders and drilling contractors on the OCS . . . by defining "owner or operator" for OCS facilities to mean the lessee or permittee of the area in which the facility is located (or the holder of the OCS rights). *Where a mobile offshore drilling unit is being used as an OCS facility, and there is a discharge of oil on or above the surface of the water, the owner or operator of the unit is liable*, up to the limits established by the reported bill for tankers. If costs exceed that limit, the excess costs must be borne by the lessee or permittee. *If a discharge of oil from a mobile offshore drilling unit occurs below the surface of the water, the lessee or permittee is liable.*

S. Rep. No. 101-94 at 12 (emphasis added). This court previously found the same Senate Report persuasive in its Order on the B-1 motions to dismiss. Dkt. 3830, at 21.[2]

Since Congress itself apportioned liability amongst drilling contractors and well owners at the water line, it should not be against public policy for the parties to use the indemnity

---

[2] As we will argue in our forthcoming opposition to the United States' motion for summary judgment, the last sentence of the quoted portion of the Senate Report demonstrates that, even if an underwater discharge came "from" the MODU -- for example, from an underwater leak from the semi-submersible vessel's ballast tank -- Congress intended that the liable party should be the lessee/permittee of the drilling site, not the owner/operator of the MODU.

4

provisions of their drilling contract to achieve the very same apportionment, whether for compensatory damages or for the strict liability fines imposed under the CWA.  It makes no sense that, having specifically provided in Title I of OPA that a MODU owner/operator should not be held strictly liable for underwater discharges from an offshore facility, Congress intended that the same MODU owner/operator must incur strict liability for underwater discharges under the per barrel penalty provisions which Title IV of **the same Act** added to the CWA.  "Indeed, the Senate Report provides that the Act "builds upon section 311 of the Clean Water Act to create a **single federal law** providing cleanup authority, penalties, and liability for oil pollution.""  B-1 Order, Dkt. 3830, at 21, quoting S. Rep. 101-94, at 730 (1989) (emphasis added).

If civil penalties are imposed on Transocean with respect to an underwater discharge, shifting those penalties to BP is fully consistent with the allocation of liability Congress approved.  "[I]t is primarily the office of Congress, not the federal courts, to prescribe national policy in areas of special federal interest." *American Electric Power Co. v. Connecticut,* ____ U.S. ____, 131 S.Ct. 2527, 2537 (2011).

    4. **Section 2710 of OPA authorizes indemnity for any liability under the Act, including the per barrel civil penalties enacted by Title IV of OPA.**

The United States recognizes that OPA section 1010, 33 U.S.C. § 2710, authorizes indemnity, but argues that the reference to liabilities "under this Act" should not be interpreted as applying to civil penalties.  Dkt. 4840, at 14.  This is not an instance where there is any ambiguity requiring "interpretation."  OPA is a comprehensive Act containing nine titles. Section 1 of OPA, Public Law 101-380, states: "**This Act** may be cited as the Oil Pollution Act of 1990."  Section 2 of OPA states: "The contents of **this Act** are as follows:" and then lists the nine titles, including Title IV which added the CWA per barrel penalties.  Contrary to the government's assertion, in specifically providing in section 2710 that there is no prohibition on

5

"any agreement to … indemnify a party … for any liability under this Act," Congress used the very term "Act" as it defined the word in section 1 of Public Law 101-380, to mean the entire "Act", including Title IV.  Where Congress intended to refer only to Title I, it used the term "this title."  *See, e.g.*, 33 U.S.C. § 2702 (c), (d)(1)(A), 2712(h)(1), 2717(e).

Moreover,  it makes no sense that Congress would have so carefully crafted provisions in Title I to ensure that MODU owner/operators were not held liable for subsurface discharges, only to force them to bear potentially billions in civil penalties for underwater discharges by virtue of the per barrel penalties enacted into law in the very same Act.  It is form over substance to suggest that is what is controlling is that the new per barrel penalties were codified into the pre-existing CWA.  In OPA, Congress created a new statutory term -- "responsible party" -- and the legislative history shows that Congress expected the new per barrel civil penalties in Title IV to be borne by the same "responsible party" liable under Title I.

In explaining the purpose of Section 4301 of OPA, which dealt with "Federal Water Pollution Control Act Penalties," the OPA Conference Report states:

> Each spill will involve a unique set of circumstances.  Typically, oil spills involve a large element of human error.  Civil penalties should serve primarily as an additional incentive to minimize and eliminate human error and thereby reduce the number and seriousness of oil spills.  There are strong operational and economic incentives within the Conference substitute that should encourage *responsible parties* to prevent oil spills.  In determining the amount of a civil penalty, particular weight should be given to the rapidity and effectiveness of the response actions *by the responsible party*.

H.R. Conf. Rep. 101-653, 101st Cong., 2nd Sess. 1990, 1990 WL 132747, 1990 U.S.C.C.A.N. 779 (Leg. Hist.) at 833 (emphasis added).

"Responsible party" is a defined term in OPA.[3]  The Conference Report thus

---

[3] 33 U.S.C. § 2701(32).  The Conference Report explains that the defined term "responsible party" was taken from the House Bill.  H.R. Conf. Rep. 101-653, *supra,* at 779-80.  The Conference Report uses the term "responsible party" throughout to refer to the defined "responsible party."  *Compare id.* at 781

6

demonstrates that Congress expected that the party that would pay the new per barrel civil penalties enacted in Title IV of OPA would be the same "responsible party" Congress specified would be strictly liable for response costs and economic damages under Title I of OPA. If a MODU owner/operator can be held liable for civil penalties for an underwater discharge, Congress' purpose can only be accomplished by allowing the MODU owner/operator to transfer that liability via contractual indemnity to the well owner who is the designated "responsible party" for underwater discharges from an offshore facility under Title I of OPA.

### 5. **The United States' attempts to distinguish equitable indemnity from contractual indemnity and to characterize CWA fines as purely punitive miss the mark.**

The United States' attempt to distinguish contractual indemnity from the long line of cases permitting equitable indemnity is illogical. The government's argument -- that the civil penalties assessed under the CWA are always fair and perfectly tailored to match each violator's culpability -- is flatly contradicted by the very notion of equitable indemnity. That equitable indemnity for CWA penalties is sometimes necessary in fact proves that such penalties are *not* perfectly matched to a violator's culpability.

Nor are they intended to be, as the statute itself makes clear. CWA penalties are assessed based on strict liability and are *mandated* whenever there is a violation, regardless of blame. 33 U.S.C. 1321(b)(7) (discharge "shall be subject to a civil penalty."); *Weber v. Trinity Meadows Raceway, Inc.*, 1996 WL 477049 at *15 (N.D. Tex. June 20, 1996) ("'Civil penalties are mandatory once Clean Water Act violations are found . . . ."). The factors set forth in Section 1321(b)(8) are considered in determining the *amount* of the mandatory penalty, and the degree of culpability is only one of several factors in this determination. 33 U.S.C. 1321(b)(8). The reason courts permit equitable indemnity for CWA fines is that multiple policies underlie the

---

(explaining that the "responsible party" for a vessel or facility is liable for response costs and damages under section 1002(a) of the Act) *with id.* at 833 (explaining that the "responsible party" will be liable for civil penalty under Title IV of the Act).

CWA's strict liability regime, and fines can be imposed for remedial, economic, and general deterrent purposes, not merely punitive purposes, as the United States suggests.

While the United States cites selectively from several cases to support its position that CWA fines are exclusively punitive, see Opposition at pp. 5-6, those cases, read in their entirety, make clear that CWA penalties have *multiple* goals, including punishment, deterrence, compensation, and restoring the status quo. See *Kelly v. EPA*, 203 F.3d 519, 523 (7th Cir. 2000); *United States v. Tull*, 481 U.S. 412, 422 (1987) (acknowledging retribution, deterrence and restitution as goals of CWA); *United States v. Thorson*, 300 F.Supp.2d 828, 834 (W.D. Wis. 2003) (describing CWA penalties as "punitive" in reliance on *Kelly, supra*, which acknowledges multiple goals of CWA).  *See also United States v. Ward*, 448 U.S. 242, 254 (1980) (finding CWA penalty analogous to "traditional civil damages" and finding "quite weak evidence" of punitive purpose).[4]

The cases on which the United States relies also make clear that CWA penalties result from factors other than culpability in connection with the violation.  In *United States v. Tex-Tow, Inc.,* the court sustained civil penalties against a party who was culpable not because of any negligence or wrongdoing in connection with the violation, but rather only because it conducted business in an industry prone to inevitable violations.  The court sustained these penalties against the non-culpable but "responsible" party because to do otherwise would ignore "the absolute nature of the civil penalty liability, as well as the penalty's remedial and economic rather than deterrent objectives."  *United States v. Tex-Tow, Inc*., 589 F.2d 1310, 1312 (7th Cir. 1978).[5]

---

[4] Although the United States and BP both dismissively "distinguish" *Ward*, without analysis, simply by pointing out that *Ward* was decided in the context of determining whether CWA penalties were criminal or quasi-criminal in nature for Fifth Amendment purposes, neither explains why that context would undermine the Supreme Court's analysis of the nature of the CWA fines and determination that a CWA fine is more akin to civil damages than a penalty.  *Id.*

[5] As evidence of the remedial aspect of CWA civil penalties, the court noted that such penalties are used to help finance government enforcement activities.  *Tex-Tow, 589 F.2d* at 1315; *accord* 33 U.S.C. 1321(s) (amounts received in civil penalties shall be deposited in the Oil Spill Liability Trust Fund).

Given that CWA fines are not merely punitive and do not always track culpability, equitable indemnity has been allowed on the theory that the party on which the fine was imposed has been fined more than his proper share and therefore should have the right in equity to shift the fine to another party. By the same token, since OPA itself recognizes that the responsible party for underwater discharges should be the lessee of the well and not the owner/operator of a MODU, Transocean should have the right to use contractual indemnity to shift any CWA fines **on account of underwater discharge** to BP.

6. **The public policy cases cited by the United States are distinguishable, and in fact the policies they articulate are consistent with enforcing the contractual indemnity here.**

The United States does not cite a single case voiding as against public policy a contractual indemnity agreement covering CWA penalties that contains reciprocal indemnity provisions shifting the risk of each circumstance to the entity in the best position to avoid a violation. Instead, the United States cites to a number of cases decided in circumstances that are meaningfully different than those here. For example, *City of Ft Pierre v. United Fire and Casualty Co.* is hardly the broad proclamation against insuring for CWA penalties that the United States would have this Court believe. Opposition at p.8. In *City of Ft. Pierre*, an intentional wrongdoer sought to shift the cost of his CWA penalties to an insurance company that had provided an E&O policy; the court, after holding that the violator's intentional conduct fell outside of the E&O coverage, held that "in this instance," the penalties were not insurable. *Id.* at 849. In marked contrast to the facts here, the violator was seeking to shift the cost of penalties based on *intentional* wrongdoing (which is excluded from the indemnity at issue here), and it was trying to shift the cost to a non-culpable third party, not the party in the best position to prevent the loss in the first place (like BP was here). The remaining cases upon which the United States relies are inapposite as well. For example, none of the government's cited cases involves reciprocal contractual indemnities where both parties retain substantial exposure, and

9

none involves indemnities that mutually apportioned risk in the exact same way that Congress apportioned risk in the governing statute.

Indeed, the economic and remedial policies noted in these same cases *support* the contractual indemnity in the Drilling Contract. In *Tex-Tow*,[6] for example, the court sustained a penalty against a barge owner, even though a third party's fault caused the discharge, because "it makes sense to place the cost of pollution on the enterprise (here water transport of gasoline) which statistically will cause pollution . . ." at 1314-15, and the entity engaged in that enterprise "is in the best position to estimate the risk of accidental pollution and plan accordingly." *Id.* at 1314. Equitable indemnity is necessary to achieve desirable cost allocation where there isn't a contractual relationship between the parties. The rationale for enforcement of contractual indemnity is even stronger, as the parties themselves have estimated the risk of pollution, allocated the risk and planned accordingly.

The Government's doomsday scenario whereby permitting pre-violation contractual indemnity would remove all incentives for companies to comply with the CWA defies common sense. As an initial matter, as the government itself points out, if Transocean were found guilty of willful misconduct (an allegation Transocean vehemently denies), it would not be able to invoke the indemnity provisions, so Transocean would not be immunized from the sort of intentional conduct the government suggests. More fundamentally, there are other, strong incentives not to engage in violations that could result in environmental disasters, loss of lives, and loss of property. This is especially true where, as here, the indemnities in the agreement are reciprocal, and do not exonerate either party from risk, but rather allocate that risk in a way that actually *increases* incentives for safety.

---

[6] As the United States concedes, *Tex-Tow* did not decide the issue of whether indemnity for the barge owner's penalty was proper. *Id.* at 1314 (". . . the question of ultimate liability remains unresolved, as Tex-Tow may still have an indemnity cause of action . . . .").

10

Respectfully submitted,

By: /s/ Steven L. Roberts
Steven L. Roberts (Texas, No. 17019300)
Rachel GiesberClingman (Texas, No. 00784125)
Kent C. Sullivan (Texas, No. 19487300)
Sutherland Asbill& Brennan LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
Email: steven.roberts@sutherland.com,
rachel.clingman@sutherland.com,
kent.sullivan@sutherland.com,

By: /s/ Kerry J. Miller
Kerry J. Miller (Louisiana, No. 24562)
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8169
Facsimile: (504) 599-8154
Email: kmiller@frilot.com

-and-

By: /s/ Brad D. Brian.
Brad D. Brian (California, No. 79001)
Allen M. Katz (California, No. 054933)
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 683-5180, (213) 683-4018
Email: brad.brian@mto.com,
allen.katz@mto.com

-and-

By: /s/ Edwin G. Preis, Jr.
Edwin G. Preis, Jr. (Louisiana, No. 1070)
Richard J. Hymel (Louisiana, No. 20230)
Preis& Roy PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone: (337) 237-6062
Facsimile: (337) 237-9129
-and-
601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone: (504) 581-6062
Facsimile: (504) 522-9129
Email: egp@preisroy.com, efk@preisroy.com

Of Counsel:
John M. Elsley (Texas, No. 0591950)
Royston, Rayzor, Vickery & Williams LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 224-8380
Facsimile: (713) 225-9945
Email: john.elsley@roystonlaw.com

Daniel O. Goforth (Texas, No. 08064000)
Goforth Geren Easterling LLP
4900 Woodway, Suite 750
Houston, Texas 77056
Telephone: (713) 650-0022
Facsimile: (713) 650-1669
Email: dangoforth@goforthlaw.com

*Counsel for Transocean*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been electronically filed through the Court's CM/ECF system and served on all counsel of record though LexisNexis File & Serve, in accordance with Pretrial Order No. 12, which will send a notice of electronic filing to all counsel of record on this 12th day of December, 2011.

/s/  Kerry J. Miller
         KERRY J. MILLER