# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | § § § § | MDL NO. 2179<br><br>SECTION J |
| This Document Relates To:<br>*All cases, 2-10-cv-2771 and 2:10-cv-04536* | § § § § | JUDGE BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

**TRANSOCEAN'S REPLY TO BP'S RESPONSE TO TRANSOCEAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND TRANSOCEAN'S OPPOSITION TO BP'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC and Triton Asset Leasing GmbH (collectively "Transocean") respectfully submit their Reply to BP's Response to Transocean's Motion for Summary Judgment, Dkt. 4826, and BP's Cross Motion for Summary Judgment, Dkt. 4827.

Exposed to its essentials, the Brief of BP asks this Court to negate the indemnity provisions of a 1998 contract BP executed with Transocean. BP admits it contractually accepted risks—risks it now claims it did not read or understand; and, it contends these risks are the fault of others. Notwithstanding BP's decade-long, and ongoing, pattern of accepting these standard oil field risk allocation provisions with subcontractors at Macondo and throughout the Gulf of Mexico, BP has the audacity to argue to this Court that BP's practices are "irrelevant." Notably, when BP seeks indemnity from Transocean and others, BP's contract is "sacred" and public policy "requires" contracts to be honored.[1,2] Yet, BP inconsistently proposes a legal regime in which every oil patch incident involving contractual indemnity would be litigated to determine issues of alleged breaches of contract and/or gross negligence on the part of other indemnitees. When convenient for BP, the practical and commercial need for contractual certainty, the integrity of the industry, and judicial need for litigation economy are wholly "irrelevant." Toward this end, BP urges this Court *to adopt a rule the Fifth Circuit has never laid down*: that reciprocal indemnity provisions including gross negligence are void as a matter of public policy. In contrast, Transocean simply asks the Court to enforce the unambiguous, traditional risk

---

[1] BP's Memorandum provides: "[W]hether BP and others enter into drilling contracts that purport to indemnify for gross negligence, is irrelevant. *See* TO Mem. at 34." BP Mem. at 12. As noted previously, in a Fifth Circuit Court of Appeals brief, BP ironically argued "[t]here is perhaps, no higher public policy of the state than to uphold contracts validly entered into and legally permissible in subject matter . . . 'It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because, if there is one thing which more than another public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice. Therefore you have this paramount public policy to consider: That you are not lightly to interfere with this freedom of contract.'" TO Mem., at 10 and App. D-1, Brief of Appellees BP *et al.* in *Fina, Inc. v. ARCO*. This maxim is hardly novel: It can be traced to 1875 and attributed to British Judge Sir George Jessel, one of the single most influential commercial law and equity jurists.

[2] To illustrate: When BP sought indemnity from Transocean for claims of Transocean's many deceased and injured workers, BP insisted Transocean completely indemnify BP—even for BP's own grossly negligent behavior. *See,* TO Mem., at App. A-7: Letter from Godfrey (Counsel for BP) to McDole (Counsel for Transocean). Moreover, all settlements executed to date have included gross negligence of all parties.

apportionment to which the parties agreed.

## I.   BP's Tortured Interpretation is Unreasonable and Results in an Absurdity.

BP argues that inclusion of "negligence or fault" in Article 24.2 excludes all other causes (*e.g.*, gross negligence, strict liability) from its pollution indemnity obligations to Transocean. BP's interpretation of 24.2 is unreasonable in light of the applicable language and leads to an absurdity not within the contemplation of the parties.[3]  Article 25, "**INDEMNITY OBLIGATION**," defines the breadth and scope of the specific indemnities in the Contract: Article 21 (personal injury/death), Article 22 (loss of/damage to equipment), Article 23 (loss of hole/reservoir), and Article 24 (pollution).  Article 25.1 expressly provides that "**SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS**"—occurring in each of Articles 21 through 24—is to be given the broadest meaning and effectively includes any imaginable cause of or remedy for liability.  Article 25.1 clarifies that this broad definition applies to all the Contract's indemnities, "**EXCEPT TO THE EXTENT ANY SUCH OBLIGATION IS SPECIFICALLY LIMITED TO CERTAIN CAUSES ELSEWHERE IN THIS CONTRACT . . . .**" (the "**EXCEPT**" phrase).  BP's case hangs on a strained and unreasonable reading of the "**EXCEPT**" phrase, arguing that 24.2 is an example of an exception from 25.1's broad definition of the indemnity obligations.  But, by its own terms, 25.1's "**EXCEPT**" language applies only where indemnity obligations are "**SPECIFICALLY LIMITED TO CERTAIN CAUSES**."  Specific limitations to indemnities in 22.3 and 23.1 were negotiated by the parties, but, contrary to BP, no limitation is found in Article 24.

---

[3] BP argues the only BP entity bound by the indemnity is BPAP, the party to the Contract. This is manifestly wrong: BPXP filed a claim for contribution against Transocean, alleging Transocean breached the Contract. The only possible bases for BPXP to do so would be as assignee of BPAP or a third-party beneficiary. In either case, BPXP is precluded from seeking contribution from Transocean for any amount for which Transocean is entitled to be indemnified. "An assignee 'stands in the shoes' of the assignor but acquires no greater rights than the assignor possessed." *John H. Carney & Assoc. v. Tex. Prop. & Cas. Ins. Guar. Ass'n*, 2011 WL 3796176, at *5 (Tex. App.— Austin Aug. 26, 2011) (citing *Deer Park Bank v. Aetna Ins. Co.*, 493 S.W.2d 305, 306 (Tex. Civ. App.—Beaumont 1973, no writ), quoting *Gulf Coast Factors, Inc. v. Hamilton Supply Co.*, 389 S.W.2d 341, 346 (Tex. Civ. App.—Houston 1965, no writ)).  "Where there is a contract, the right of a beneficiary is subject to any limitations imposed by the terms of the contract." RESTATEMENT (SECOND) CONTRACTS (2011) § 309.  "[T]he beneficiary who seeks to take advantage of the contract must take it subject to the defenses and inherent equities between the promisor and promisee." *U.S. v. Campbell*, 139 F.2d 424, 426 (4th Cir. 1943).

In the second paragraph of 22.3, BP agreed to "**PROTECT, RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS**" Transocean for certain of its in-hole equipment "**UNLESS SAID LOSS OF OR DAMAGE IS A RESULT OF CONTRACTOR'S NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT**," at which point the indemnity ends.  Similarly, in 23.1 BP obligated itself to "**PROTECT, RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS**" Transocean for loss of or damage to the hole, except "**IF THE HOLE IS LOST OR DAMAGED DUE TO CONTRACTOR'S NEGLIGENCE, GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR ITS AGENTS', OR SUBCONTRACTORS' OR THEIR FAILURE TO COMPLY WITH [BP]'S INSTRUCTIONS**."  These carve-outs from 25.1's broad definition of indemnity are examples of the parties' indemnity obligations being "**SPECIFICALLY LIMITED TO CERTAIN CAUSES**."  In other words, 22.3 and 23.1 demonstrate that when the parties wanted to except a cause, such as gross negligence, from 25.1's broad indemnity obligations, they knew how to do so and, in fact, did so.

Turning to 24.2, which BP attempts to place alongside 22.3 and 23.1 as carve-outs from 25.1, BP's argument breaks down.  By its own terms, 24.2—unlike 22.3 ("unless") and 23.1 ("notwithstanding the previous sentence")—does not contain words of specific limitation, which must be present for the "**EXCEPT**" language of 25.1 to apply.  There are in fact no words of limitation in Article 24.2 whatsoever—whether specific or more general.  As it incorporates 25.1, 24.2 reads as follows:

> **COMPANY SHALL ASSUME FULL RESPONSIBILITY FOR AND SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY, AND HOLD CONTRACTOR HARMLESS [FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES . . . WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF, INCLUDING . . . UNSEAWORTHINESS OF ANY VESSEL . . ., BREACH OF REPRESENTATION OR WARRANTY, . . . BREACH OF CONTRACT, STRICT LIABILITY, TORT, OR THE NEGLIGENCE OF ANY PERSON . . ., WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR**

3

> **CONCURRENT, ACTIVE PASSIVE OR GROSS,] FROM AND AGAINST ANY LOSS, DAMAGE, EXPENSE, CLAIM, FINE, PENALTY, DEMAND, OR LIABILITY FOR POLLUTION OR CONTAMINATION, INCLUDING CONTROL AND REMOVAL THEREOF, ARISING OUT OF OR CONNECTED WITH OPERATIONS UNDER THIS CONTRACT HEREUNDER AND NOT ASSUMED BY CONTRACTOR IN ARTICLE 24.1 ABOVE, WITHOUT REGARD FOR NEGLIGENCE OF ANY PARTY OR PARTIES AND SPECIFICALLY WITHOUT REGARD FOR WHETHER THE POLLUTION OR CONTAMINATION IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OR FAULT OF CONTRACTOR.**

Article 24.2 is quoted with 25.1 incorporated to demonstrate that its last clause—"**AND SPECIFICALLY WITHOUT REGARD FOR WHETHER THE POLLUTION OR CONTAMINATION IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OR FAULT OF CONTRACTOR**"—pulls nothing back from the broad definition of indemnity in 25.1, which it expressly incorporates by using "**PROTECT, RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS**," defined only in 25.1.[4] If the same convention (pasting 25.1 over the PROTECT, RELEASE, etc. language) is followed with 22.3 and 23.1, it is plain to see that, in *those* articles, 25.1 gives coverage for a broad array, and the specific limitation in that article strips it away by unequivocal language. Article 24.2 does not do that. BP, in effect, argues that because 24.2 reiterates a portion of 25.1's covered causes for emphasis, the restatement is an implicit negation of everything it just incorporated from 25.1 *other than* negligence and fault. But because 25.1 only permits exception where an indemnity is "***SPECIFICALLY* LIMITED TO CERTAIN CAUSES**"—which the parties accomplished succinctly and unequivocally in 22.3 and 23.1—24.2 cannot be implicitly excepted from 25.1's broad definition.

Beyond the plain language unreasonableness of BP's position, when the negotiating context of the parties is considered, BP's interpretation of 24.2 is absurd. The subject of Article

---

[4] Article 25.1 defines indemnity as covering all degrees of negligence, including gross. Assuming *arguendo* that BP's restrictive interpretation of "negligence or fault" in 24.2 applies—despite the plainly non-exclusive nature of 24.2's language—the Contract defines "negligence" broadly so that BP's pollution indemnity in 24.2, by (1) using that term and by (2) incorporating 25.1, encompasses gross negligence.

4

24 is "**POLLUTION**" and 24.1 and 24.2 detail each party's responsibility. The parties obviously had in mind OPA and the CWA when they drafted provisions of a Contract dealing with operations in the Gulf of Mexico off the coast of Louisiana. Why would the parties have entered into practically meaningless indemnities for pollution-related losses, limited by concepts of "negligence or fault," when the very basis for their liability under OPA/CWA is strict? The obvious answer is that they would not have and, indeed, did not do so. The "**EXCEPT**" clause in 25.1 applies to the specific limiting carve-outs in 22.3 and 23.1, but not to 24.2, which contains no specific limiting carve-outs to the parties' pollution indemnity obligations.

Similarly, BP, looking only to 24.2 of the Contract, argues the Contract is insufficiently worded to allow indemnity for punitive damages. Article 25.1, defining the scope of indemnity, says otherwise by expressly providing that the indemnity obligations include

> **ANY AND ALL . . . DAMAGES . . . WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF, INCLUDING . . . THE NEGLIGENCE OF ANY PERSON OR PERSONS, INCLUDING THAT OF THE INDEMNIFIED PARTY, WHETHER SUCH NEGLIGENCE BE . . . GROSS . . . .**

More all-encompassing language cannot be imagined, and damages from gross negligence, of course, include punitive damages. *Ruehs v. Alliance Offshore, LLC*, on which BP relies, did not have such all-encompassing language specifically targeting damages from gross negligence. *Ruehs* relied on *In re Torch, Inc.*, where the court stated, "this indemnity agreement is silent with respect to gross negligence . . . and punitive damages . . . ." *In re Torch, Inc.*, No. 94-2300, 1996 WL 185765, at *9 (E.D. La. Apr. 16, 1996). Article 25.1, in contrast, explicitly requires indemnity for "**ANY AND ALL DAMAGES . . . WITHOUT LIMIT**" from "**GROSS**" negligence. *Ruehs* and *Torch* are factually inapposite. Further, where statutes contain "all damages" wording, courts interpret the phrase to include punitive damages. In *Morrow v. Air Methods, Inc.*, 884 F.2d 1353, 1357 (D. Minn. 1995), the court observed:

5

> Compensatory and punitive damages are generally permitted for intentional torts. While the statute does not explicitly refer to "punitive damages" it does provide for the recovery of "any and all damages recoverable at law."  Minn. Stat. § 181.935(a).  Legal relief is commonly understood to include compensatory and punitive damages.

*Accord Overman v. Southwestern Bell Tel. Co.*, 675 S.W.2d 419, 425 (Mo. App. 1984) ("Certainly, the term 'all damages' would include those punitive in nature . . . .").

Article 25.1 expressly, clearly and unequivocally uses the all-encompassing term "**ANY AND ALL DAMAGES . . . WITHOUT LIMIT**" from "**GROSS**" negligence. Generally, "indemnity provisions should not be interpreted to impose liability for losses that are not expressly within the terms of the agreement or are not reasonably inferred from the language of the agreement." *Denesse v. Island Operating Co., Inc.*, 2006 WL 1560794, at *3 (E.D. La. June 1, 2006) (Barbier, J.) (citing *Corbitt v. Diamond M Drilling Co.*, 654 F.2d 329, 333 (5th Cir. 1981)). Thus, even though the term "punitive damages" is not used, it can only be "reasonably inferred" that the parties intended "**ANY AND ALL DAMAGES . . . WITHOUT LIMIT**" from "**GROSS**" negligence to include punitive damages.[5]

Finally, BP points to 34.1, "**CONSEQUENTIAL DAMAGES**," which includes the words "exemplary" and "punitive," and argues that the parties must not have intended 24.2 or 25.1 to include punitive damages. BP fails to recognize that 34.1 *excludes* recovery of punitive damages in connection with consequential damages. Had the parties intended to *exclude* punitive damages from the all-encompassing language of 25.1, they would have provided for that exclusion specifically, as 34.1 illustrates.[6]

---

[5] Just as it seeks to render the term "all damages" meaningless, BP argues that the duty to "defend" stated in 15.1 has no operative effect other than requiring the payment of attorneys' fees after the fact. BP argues, in essence, that the duty to defend has operative effect only in insurance policies. But the cases previously cited in Transocean's Memorandum in Support of its Motion for Partial Summary Judgment demonstrate an independent duty to defend in <u>indemnity</u> cases.

[6] BP argues that alleged breaches of the Contract provide an additional basis for relieving BP of its indemnity obligations. BP's argument is rebutted in 25.1 of the Contract, which provides that the phrase "SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS" includes "BREACH OF REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED" and "BREACH OF CONTRACT." None of the decisions on which BP relies for its argument dealt with drilling contracts, much less drilling contracts with comprehensive risk-allocation provisions as contained in the Contract. Accepting BP's argument would serve to always nullify every carefully crafted risk-allocation provision in indemnity agreements—notably

6

**II.     BP's "Public Policy" Position Rings Hollow.**

After attempting to wordsmith its way out of the Contract, BP next turns to "public policy" as a means of avoidance.  According to BP, indemnities for gross negligence, punitive damages, and fines/penalties should be disallowed for fear that such agreements would undermine the intended deterrent effect of those potential liabilities.  Irreconcilably, BP argues in this litigation about the dangers of such indemnity arrangements, yet it continues to negotiate and execute agreements containing the very same provisions it now contends invite unsafe conduct.  Query: Why, outside the exigencies of this lawsuit, does BP continue to enter voluntarily into contracts containing the indemnity provisions at issue if BP *genuinely* believes such agreements threaten lives or the environment?  Answer: From a public policy perspective, such agreements are practical and *encourage*—not discourage—safe conduct.  Careful review of BP's arguments reveals its legal position regarding public policy conflicts with its ongoing business practices.

First, while BP warns against the dangers of "waiver[s] of liability" and "shielding a party from liability for gross negligence," BP fails to note that Transocean *retains* significant exposure for liabilities under the Contract.  Specifically, Transocean accepts liability for its crew members, the rig, and certain liabilities relating to the rig.  TO Mem., at App. A-3, Arts. 21.1, 22.1.  The fact that Transocean shoulders substantial responsibility for its own conduct under the indemnity provisions undermines BP's position that Transocean is somehow "shielded" from liability.  Second, in addition to retaining significant exposure, Transocean accepts responsibility for BP's grossly negligent conduct in certain regards.[7]  Likewise, BP accepts certain liabilities

---

those under which the entire offshore industry has functioned for decades.  How else could a party be at fault, except by allegedly negligently performing its obligations under the contract?  BP's argument would destroy all indemnity agreements as a valid means of risk-allocation.  Moreover, for every contractual provision BP claims was breached, BP possesses the right to oversee and disapprove of Transocean's performance.  BP exercised those rights by having its Company Men on the rig, overseeing the work of Transocean (and other BP's subcontractors) and extensively auditing Transocean's rig and equipment.  Not once did BP complain that Transocean breached the contract; not once did BP seek rescission of the Contract.

[7] The Contract requires Transocean to name BP as an additional insured under Transocean's policies to back up Transocean's indemnity obligations.  In contrast, BP self insures its indemnity obligations.  To the extent Transocean owes BP indemnity (*e.g.*, for Transocean employees' personal injury claims against BP), BP can obtain protection under Transocean's policies—including losses for gross negligence, punitive damages, and civil fines/penalties.  Were the court to hold that an indemnity agreement

7

for Transocean's conduct under the Contract, including BP's agreement to indemnify Transocean for pollution from the well, notwithstanding fault. This reciprocity goes to the heart of the purposeful allocation of risk between an operator and its contractor. With each party retaining significant responsibility for its own conduct and also accepting certain liabilities for the other party's conduct, the deterrence factor that BP disingenuously champions to eradicate its obligations remains a motivating force. By allocating specific risks to each party for the other party's actions, an infrastructure develops to mutually incentivize each party to serve as a check on the other's conduct. As one commentator described the arrangement:

> [C]oncerns about potential legal responsibility for safety issues are reduced when parties enter into a reciprocal indemnity agreement. When the liability of the parties involved is determined not by relative fault, but by the more random chance of who the person is that is injured, the parties are in a better position to work together on safety matters. Both parties have an equal incentive to make the work place safe for all, because either party can be responsible for an accident, even if it was not their fault.

Christopher L. Evans, *Reciprocal Indemnity Agreements in the Oil Industry: The Good, The Bad, and The Ugly*, 77 DEF. COUNS. J. 226, 228-29 (2010).

The incentives for exercising oversight of the other party's conduct are not ethereal or aspirational. Collaboration as to safety is encouraged by the reciprocal indemnity obligations and the plain language of the Contract in several respects. First, *mutual* responsibility for safe operations begins before the rig begins work pursuant to Article 14.1.2, which provides BP the right to inspect and reject the rig prior to commencement of operations. Further, Exhibit D to the Contract describes the Safety, Health, and Environmental Management System on the rig and specifies that "CONTRACTOR and COMPANY will work together to incorporate an individual safety incentive program . . . ." TO Mem., at App. A-3, Ex. D, ¶ 10. These and many other examples reflect an intertwined relationship whereby both parties are empowered and

---

cannot provide the same coverage for gross negligence, punitive damages, or fines/penalties that the law governing insurance policies provides, the net result would be one-sided and unfair.

encouraged to ensure the other acts responsibly.

If the Court is to void any aspect of this Contract, the only basis would be on the ground that the public will be disserved in some way. But, that is not the case; the exact opposite is true. Here, the indemnity program is designed to encourage safe conduct by each party and *also* for each party to support the safe operations of the other; thus, there simply is no basis to conclude the indemnity provisions before the Court should be void on public policy grounds. BP's efforts to argue one thing in litigation, yet operate in a diametrically opposed manner should be rejected.

### III.    OPA § 2710 Permits Indemnity Agreements for "Any" Liability Under OPA.

BP also attempts to bootstrap its disingenuous public policy arguments into escaping its OPA indemnity obligations to Transocean. Notwithstanding a public policy determination under maritime law, Congress has made clear that indemnity under OPA for grossly negligent conduct is permissible. BP argues that § 2710 simply means OPA does not bar indemnity agreements, but in no way provides any affirmative authorization. In BP's view, any alleged preexisting maritime law rule against indemnification for gross negligence is "untouched." BP Mem., at 12. BP's argument belies common sense, precedent, and settled principles of statutory construction.

First, the obvious purpose of § 2710 was to allow parties to use contractual indemnification with respect to the new and substantial liabilities that OPA created. If Congress did not intend to affect maritime law, why have any such section? Maritime law already permitted indemnity contracts. Second, BP ignores the numerous cases cited by Transocean in its Memorandum in Support, holding that the purpose and effect of § 2710 (or the similar CERCLA section on which it was modeled) is to "permit," "endorse," "authorize," "recognize the enforceability of" and "provide for" indemnity. Third, settled principles of statutory interpretation establish that, when Congress referred to "any liability" "under this Act" it necessarily included uncapped liability that the Act imposes in the event of a gross negligence

9

finding. Congress lifted the liability caps for gross negligence and willful misconduct, then carefully provided in § 2716(f)(1) that a financial guarantor was liable *except* when the incident was caused by the "willful misconduct" of the responsible party. Congress determined that a pre-incident financial guarantee was enforceable in the event of gross negligence. If a pre-incident financial guarantee does not violate public policy, how can BP presume that § 2710—despite its use of the term "any liability"—must incorporate an alleged maritime law rule that pre-incident indemnity violated public policy? Fourth, maritime law continues to be applicable despite OPA's comprehensive scope because the statute has a savings clause. Section 2751(e) provides: "Except as otherwise provided in this Act, this Act does not affect (1) admiralty and maritime law." The plain language of § 2710 would prohibit reading § 2751(e) as "saving" any maritime rule against indemnity for gross negligence. Section 2710 states that "[n]othing in this Act" should be read as prohibiting "any agreement" to provide indemnity for "any liability" under the Act. Section 2751(e) is part of the Act. Interpreting § 2751(e) as carrying forward a pre-existing maritime law rule against enforcing an indemnity agreement for gross negligence would mean that something in the Act, namely § 2751(e), prohibits an agreement to indemnify a party for one type of liability arising under the Act. Finally, BP fails to cite any legislative history indicating congressional intent to preclude parties from expressly allocating liability for all forms of negligence, including gross. To the contrary, both Senate and House Conference Reports describe the Act's provisions regarding indemnification agreements in broad terms, noting that nothing in the Act bars "any such agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section." S. REP. NO. 101-94, at 14; *see also* H.R. CONF. REP. NO. 101-653, at 111 (1990), reprinted in 1990 U.S.C.C.A.N. 779, 789 (Section 2710 "does not preclude agreements where one party agrees to pay for all or part of the liability to which another party is subject" under the Act).

Respectfully submitted,

By: /s/ Steven L. Roberts
Steven L. Roberts (Texas, No. 17019300)
Rachel Giesber Clingman (Texas, No. 00784125)
Kent C. Sullivan (Texas, No. 19487300)
Sutherland Asbill & Brennan LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
Email: steven.roberts@sutherland.com,
rachel.clingman@sutherland.com,
kent.sullivan@sutherland.com,

By: /s/ Kerry J. Miller
Kerry J. Miller (Louisiana, No. 24562)
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8169
Facsimile: (504) 599-8154
Email: kmiller@frilot.com

-and-

By: /s/ Brad D. Brian.
Brad D. Brian (California, No. 79001)
Allen M. Katz (California, No. 054933)
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 683-5180, (213) 683-4018
Email: brad.brian@mto.com,
allen.katz@mto.com

-and-

By: /s/ Edwin G. Preis, Jr.
Edwin G. Preis, Jr. (Louisiana, No. 1070)
Richard J. Hymel (Louisiana, No. 20230)
Preis & Roy PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone: (337) 237-6062
Facsimile: (337) 237-9129
-and-
601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone: (504) 581-6062
Facsimile: (504) 522-9129
Email: egp@preisroy.com, efk@preisroy.com

11

Of Counsel:
John M. Elsley (Texas, No. 0591950)
Royston, Rayzor, Vickery & Williams LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 224-8380
Facsimile: (713) 225-9945
Email: john.elsley@roystonlaw.com

Daniel O. Goforth (Texas, No. 08064000)
Goforth Geren Easterling LLP
4900 Woodway, Suite 750
Houston, Texas 77056
Telephone: (713) 650-0022
Facsimile: (713) 650-1669
Email: dangoforth@goforthlaw.com

*Counsel for Transocean*

### CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been electronically filed through the Court's CM/ECF system and served on all counsel of record though LexisNexis File & Serve, in accordance with Pretrial Order No. 12, which will send a notice of electronic filing to all counsel of record on this 12th day of December, 2011.

/s/  Kerry J. Miller
KERRY J. MILLER