UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | : : : : : | MDL NO. 2179 SECTION: J |
| THIS DOCUMENT RELATES TO: | : | JUDGE BARBIER MAG. JUDGE SHUSHAN |

1. *Bill's Oyster House v BP et al* (C.A. 10-1308)
2. *Howard Buras v BP et al* (C.A.10-2994)
3. *Armand's Bistro v BP et al* (C.A. 10-4489)
4. *Faye Loupe et al. v BP et al* (C.A. 10-2764)
5. *Laura Gautreaux v BP et al* (C.A. 10-1539)
6. *Brent Rodrigue, Sr. et al. v BP et al* (C.A. 10-1325)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .


PLAINTIFFS' MEMORANDUM IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT AGAINST
HALLIBURTON ENERGY SERVICES, INC.


MAY IT PLEASE THE COURT:


### A.  INTRODUCTION


### B. FACTS:
1. **Background, The Final Casing String, The Cement**
2. **Halliburton's Own Tests Have Proved Its Cement**
    (a) **Was not Stable and**
    (b) **Did Not "Channel".**


### C. LAW:
1. **General Maritime Law; Negligence, Products Liability**
2. **Louisiana Products Liability Law**
3. **Summary Judgment Standards**
4. **Judicial Notice of Facts On Federal Government Websites**


### D. CONCLUSION.

A. **INTRODUCTION:**

These Plaintiffs previously filed a similar Motion for Summary Judgment against Halliburton, on April 12, 2011 (Doc #1927). That Motion was not set for hearing and was denied in this Court's October 14, 2011 Order (Doc. #4294). Since then, however, more evidence of Halliburton's liability has come to light, most particularly Halliburton's own admission that its very own tests on its cement slurry failed. (See BP's Motion For Spoliation Sanctions, Doc. # 4799, filed December 5, 2011.)

Also, the Order questioned the admissibility of some of the evidence the Motion had cited. Accordingly, this Memorandum also addresses the issue of the admissibility of federal agencies records and reports available on the internet.

B. **FACTS**

1. **BACKGROUND, THE FINAL CASING STRING, HALLIBURTON'S CEMENT:**[1]

In March 2008, BP leased from the United States' Department of the Interior a nine-square-mile area in the northern Gulf of Mexico, 42 miles southeast of Venice, Louisiana, known as "Macondo".

BP  hired Transocean to provide the rig and crew to dig a well for oil and gas production. Transocean's *Marianas* rig dug the well in October and November 2009, but had to leave when Hurricane Ida approached. After that Transocean sent its *Deepwater Horizon* rig to take over.

BP hired Halliburton Energy Services, Inc. (Halliburton) to provide and set the cement for the well.

---

[1] All facts in this Subsection "1"are from the Chief Counsel's Final Report, National Commission on the BP Deepwater Horizon Oil Spill and  Offshore Drilling, available at: http://www.oilspillcommission.gov/

On January 31, 2010, *Deepwater Horizon* began work on the well.

Below the wellhead stretched four telescoping "casing strings" that had been installed by *Marianas* to reinforce the hole. The *Deepwater Horizon* crew proceeded to drill deeper, cementing each new string into place to anchor the well and seal it from the surrounding rock.

In early April the Transocean crew finally reached the "pay zone" that BP had spent $38 million for. But it kept going deeper.

On April 9 it suffered a setback. At 18,193 feet the downward pressure caused by the weight of the drilling mud exceeded the strength of the rock formation and the mud cracked the formation and escaped into it instead of circulating back up to the rig.

The crew had to stop drilling until it sealed all the fractures.

Drilling mud is used to lubricate and cool the drill bit during drilling, but it also plays a critical role in controlling the pressure in a well. The weight of the huge column of mud creates the enormous downward pressure needed to counterbalance the upward pressure from the hydrocarbons in the formation. If the mud weight is too low, oil and gas will enter the well and rise up, causing a "kick". But if the mud's weight is too high, it squeezes into and fractures the rock, which is called "lost returns" – leakage of mud into the rock formation. The crew, therefore, must constantly monitor and adjust the weight and density of the mud while the well is being drilled.

After stabilizing the situation, the crew stopped the drilling, at 18,360 feet – 3 and ½ miles below the earth's surface and 4 and ½ miles below *Deepwater Horizon*. It was one of the deepest wells in history.

The well was stable.

3

BP and its contractors, including Transocean and Halliburton, spent the next five days (April 11 – 15) "logging" the open hole with sophisticated instruments. They then decided they had drilled into a hydrocarbon reservoir of sufficient size that would be worthwhile to install the final "production casing" string that would ultimately be able to remove the oil and gas, then close the wellhead and leave, with another rig to come to reopen the well and remove the oil and gas.

The lost circulation problems, the extraordinary depth of the well, and the unusually delicate rock formation should have made the crew especially cautious as it installed the casing, finished the cement job and abandoned the well.

After the crew lowered the final casing into position, Halliburton would cement it into place, pumping a very unique type of cement, blended with nitrogen gas to make the cement lighter, down the casing. When the cement reached the bottom, it flowed out and up into the open "annular" space between the casing and the hole. Once it hardened, the cement was to bond to the formation and the casing and seal off the annular space. When the production rig would later arrive and reopen the well to remove the oil and gas, it would perforate holes through the cement and the oil and gas would flow up and out the well.

Halliburton had cemented all the previous casing strings in Macondo, but this job would be especially important, called the "primary cement job". It must seal off the hydrocarbon-bearing zone from the annular space around the casing and from the inside of the casing itself.

Even moving at top speed, with tools traveling through the well at about only ¼ mile per hour, the *Deepwater Horizon* crew needed more than 18 hours just to lower a tool, such as a drill bit, from the well head to the bottom of the well, 18,000 feet below sea level. Assembling the

4

production casing section-by-section and lowering the lengthening string down into the well would require about 37 hours.

On the morning of April 18, the crew finally began assembling and lowering the final casing string into position.

On the afternoon of April 19, it was installed and put in its final position. Halliburton was ready at last to pump its experimental nitrogen-blended-cement.

In the days leading up to the final cementing process, BP and Halliburton engineers had focused heavily on their biggest challenge: the risk of fracturing the formation and losing "returns" during the cementing process. There was much concern that too much pressure on the geologic formation might trigger another "lost returns" event like the one on April 9. But such an event would now be much more catastrophic - it would be cement, not mud, that would flow into the formation, leaving the annular space at the bottom of the well open for the hydrocarbons to enter.

To address this concern Halliburton used "nitrogen foam cement" – a cement lightened with tiny bubbles of nitrogen gas, injected into the cement slurry just before it goes down the well.  The trouble, though, was that the nitrogen gas could – and, in fact, did, migrate out of the cement and create an opening for the oil and gas to flow through and up the well. After it flowed past the cement it shot up the drill pipe, through the blowout preventer and riser and onto the *Deepwater Horizon*, where it exploded.

At 12:40 a.m. on April 20, 19 hours before the explosion, Halliburton finished pumping its experimental cement and told BP that the job was a success. Indeed, at the 7:30 a.m. daily morning meeting a few hours later, BP told the Schlumberger cement-testing crew it would not need to test the cement after all and sent it back to shore.

Once the Schlumberger crew was sent home, Transocean's crew began the "temporary abandonment" of Macondo and the final phase of its work – sealing the well closed.

## 2. HALLIBURTON'S OWN TESTS HAVE PROVED THAT ITS CEMENT (a) WAS NOT STABLE AND (b) DID NOT "CHANNEL":[2]

Not only have numerous tests performed by and for federal agencies and commissions unequivocally show that Halliburton's cement slurry failed and was a cause of the blowout (as identified in more detail in the accompanying Statement of Uncontested Facts), but most recently, it has become clear that results from Halliburton's own non-privileged, post- incident testing contradict both of Halliburton's core positions.   As set forth below, deposition testimony by Halliburton witnesses and Halliburton internal documents show that:

(a) Halliburton's own post-incident, non-privileged cement testing indicates that the Macondo well cement slurry was not stable, and

(b) Halliburton's own post-incident, non-privileged, proprietary computer modeling indicates that there was no "channeling" of the cement in the Macondo well.

### (a) HALLIBURTON'S OWN TESTS HAVE PROVED THAT ITS CEMENT WAS UNSTABLE:

1.  In late April or early May of 2010, Halliburton directed its employees to prepare and test a batch of the cement slurry — testing that appears likely to have used (and so destroyed) limited cement additives from the Macondo well project. (*See, e.g., Ex. 1 (Morgan Dep.) at 16:16-19, 17:3-20:5; Ex. 2 (Quirk Dep.) at 88:23-89:2.*)

2.  According to deposition testimony, Halliburton's post-Incident testing in Duncan, Oklahoma, showed that (1) the Macondo well slurry settled, meaning that solids in the cement mixture were separating from liquids; and (2) the base slurry could not be foamed. *Ex. 2 (Quirk Dep.) at 124:23-25;* ▓▓▓▓

---

[2] This Subsection "2", including its citations to exhibits, is taken from "BP's Memorandum in Support of Motion For Sanctions" against Halliburton, filed on December 5, 2011 (Doc. #47799-1)

6

*(Ex. 3 (Faul Dep.) at 264:2-11).*

3.  Such sedimentation is an indication of instability. Rickey Morgan in the Duncan lab also reported that the slurry looked "thin" to him, meaning that the slurry could be unstable once poured into the well.
    *(Ex. 1 (Morgan Dep.) at 20:23-22:9.)[3]*

4.  One of Halliburton's Duncan employees, Rickey Morgan, testified under oath that he destroyed test results in order to keep the information from being "misinterpreted" in ways adverse to Halliburton in litigation.
    *(See, e.g., id. at 101:7-23.)*

5.  After the Duncan experiments showed settling, Ron Faul asked another Halliburton lab to replicate the tests.*(See Ex. 2 (Quirk Dep.) at 88:23-88)*

    The new tests indicated foam instability. ( *Id. at 333:6-10; 480:13-481:2.)*

6.  Upon reviewing these latest testing results, Halliburton employees destroyed records of the testing as well as the physical cement samples used in the testing.
    *(See, e.g., id. at 331:21-24; 393:11-21.)*

## (b) HALLIBURTON'S OWN TESTS HAVE PROVED THAT THE CEMENT DID NOT CHANNEL:

7)  Similarly, Halliburton conducted modeling of the Macondo well cement job using Halliburton's proprietary Displace 3D Simulator. ( *Ex. 4 (Roth Dep.) at 495:14-496:5).* Tommy Roth, Halliburton's Vice President in charge of its cement business at the time of the  incident, stated  in  a  July 25, 2010 e-mail that this post-incident  modeling demonstrates that there was no channeling in the Macondo well: "[S]pacer was sufficient to sweep channel. Subsequent testing with 3D confirms

---

[3]BOEMRE's Final Report also concluded that Halliburton's cement that was a cause of the *blowout*: *"Conclusions on Well Design, Cementing, and Flow Path: A. Cause of the Failure of the Cement Barrier:* Contamination or displacement of the shoe track cement, or nitrogen breakout or migration, could have caused the shoe track cement barrier to fail. The Panel found evidence that the most likely reason the shoe track cement slurry failed is due to contamination in the rat hole portion of the wellbore and inversion of fluids due to different densities (the mud in the shoe track was lighter than the unfoamed cement slurry). However, the Panel could not definitely rule out nitrogen breakout, migration, or over-displacement in the shoe track. **The Panel concluded that a combination of contamination, overdisplacement, and/or possibly nitrogen breakout of the shoe cement were causes of the blowout."**
 --BOEMRE's "Report Regarding the Causes of the April 20, 2010 Macondo Well Blowout", September 14, 2011 at p.68.
-Available at:  http://www.boemre.gov/pdfs/maps/dwhfinal.pdf

statement that spacer was sufficient."

8) Notwithstanding the relevance of this post-incident modeling, and its responsiveness to BP discovery requests, Halliburton did not produce the results generated by its proprietary Displace 3D modeling software or additional documents associated with that modeling.
*(See Ex. 7 to BP's Motion For Spoliation Sanctions, Doc. # 4799) (11/22/2011 letter, B. Harding to J. Martinez).* Even Tommy Roth's e-mail describing the results of the Displace 3D modeling was not produced until July 2011, near the end of fact discovery.

9) On August 15, 2011, after discovering the critical Roth email and searching for and failing to find the documents associated with the modeling, BP promptly requested an immediate production of documents and communications pertaining to the Displace 3D modeling.
*(See Ex. 8 to BP's Motion For Spoliation Sanctions, Doc. # 4799 (08/15/2011 letter, B. Harding to J. Martinez); Ex. 9 to BP's Motion/(9/22/2011 e- mail, X. McKeever to J. Martinez).*
BP ultimately moved to compel, and the Court ordered Halliburton to produce, all non-privileged, post-incident investigative materials by October 12, 2011.
*(See Ex. 10 to BP's Motion For Spoliation Sanctions, Doc. # 4799 (9/27/2011 Order).*

10) Halliburton responded by producing thousands of pages of documents in the days leading up to October 12, 2011. Still, Halliburton failed to notify BP that it did not produce the modeling referenced in Tommy Roth's July 25, 2010 e-mail despite BP's repeated requests. Nor did Halliburton inform BP that the modeling was "gone."

11) After still more waiting, and still further requests, BP arranged a meet-and-confer session. During this meet-and-confer session, Halliburton stated for the first time that these critical modeling results were now "gone."
*(See Ex. 11 to BP's Motion For Spoliation Sanctions, Doc. # 4799 ) (11/11/2011 letter, B. Harding to J. Martinez).* Halliburton has not explained to BP or the Court why or how such essential evidence could, and apparently did, simply vanish.
*( See Ex. 7 to BP's Motion For Spoliation Sanctions, Doc. # 4799 (11/22/2011 letter, B. Harding to J. Martinez).*

12) Nonetheless, Halliburton continues to contend that the Halliburton cement job failed, not because of Halliburton's own errors in designing the slurry, but rather because BP's decisions caused the Halliburton cement to "channel." Most recently, Halliburton submitted expert reports espousing this very theory, despite apparently having conducted post-incident modeling using proprietary software that indicated the exact opposite.

## C. LAW:

## 1 General Maritime Law; Negligence and Products Liability:

As the Fifth Circuit has noted:

  The analysis of a maritime tort is guided by general principles of negligence law. Casaceli v. Martech Int'l., Inc., 774 F.2d 1322 (5th Cir.1985); Daigle v. Point Landing, Inc., 616 F.2d 825 (5th Cir.1980). Under those principles a tortfeasor is accountable only to those to whom a duty is owed. ...

  Determination of the tortfeasor's duty, and its parameters, is a function of the court. . . .That determination involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party. ...      "Duty ... is measured by the scope of the risk that negligent conduct foreseeably entails." *Consolidated Aluminum Corp. v C.F. Bean Corp.* 833 F.2d 65 (5th Cir., 1987), rehearing denied en banc.

Also, as the Fifth Circuit more recently noted noted:

[N]egligence is an actionable wrong under general maritime law. In Leathers v. Blessing, 105 U.S. (15 Otto) 626, 26 L.Ed. 1192 (1881), the Supreme Court recognized the maritime tort of negligence which exists as a counterpart to state law negligence. Id. at 630 . . . The elements of a maritime negligence cause of action are essentially the same as land-based negligence under the common law. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 630, 79 S.Ct. 406, 409, 3 L.Ed.2d 550 (1959); Canal Barge Co., Inc., 220 F.3d at 376-77; 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW 182-93 (4th ed. 2004) (discussing the elements in depth). *Withhart v Otto Candies 431 F.3d 840, at 842 (5th Cir., 2005)*

Also, see *In re Incident Aboard the D/B Ocean King on August 30, 1980*, 813 F.2d 679

(5th Cir. 1987), which involved several property damage claims, under theories of negligence and

strict liability, against the Hydril Company for damages resulting from a offshore blowout

caused by a defective  blowout preventer it had manufactured.

## Products Liability Law:

As recently stated by Judge Fallon in *Daigle v L & L Marine Trans. Co.* 322 F.S.2d 717,

(E.D. La. 2004):

> "The doctrine of strict liability is part of the general maritime law." [citations omitted]
> There is also no dispute that Section 402A of the Restatement (Second) of Torts (1965)
> applies in maritime products liability cases . . .. [citations omitted]
>
> "Under the Restatement a seller as well as a manufacturer may be held liable for harm
> caused by a defective product placed in the stream of commerce. Section 402(A) of the
> Restatement  (Second) of Torts (1965) provides:
>
> (1) One who sells any product in a defective condition unreasonably dangerous to the
> user or consumer or to his property is subject to liability for physical harm thereby
> caused to the ultimate user or consumer, or to his property, if:
>
> (a) The seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the
> condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although:
>
> (a) the seller has exercised all reasonable care in the preparation and sale of his product,
> and
>
> (b) the user or consumer has not bought the product from or entered into any contractual
> relationship with the seller.
>
> Thus, § 402A requires the Plaintiff to prove: **(1) that the defendant sold or
> manufactured the product; (2) that the product was unreasonably dangerous or was
> in a defective condition when it left the defendant's control; and (3) that the defect
> resulted in the injury to the plaintiff.** Restatement (Second) of Torts § 402(A)(g)
> (1965); Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW § 5-6, at 206.
>
> According to comment (g) of § 402A, the rule applies only where the product is, at the
> time it leaves the seller's hands, in a condition not contemplated by the ultimate
> consumer, which will be unreasonably dangerous to the ultimate consumer. "The seller is
> not liable when he delivers the product in a safe condition, and subsequent mishandling
> or other causes make it harmful by the time it is consumed." Restatement (Second) of
> Torts § 402(A)(g) (1965).
>
> The burden of proof that the product was in a defective condition at the time it left the
> hands of a particular seller is upon the plaintiff. According to comment (g), "unless
> evidence can be produced which will support the conclusion that it was then defective,

10

then the burden is not sustained." A product is not in a defective condition when it is safe for normal handling and consumption. Restatement (Second) of Torts § 402(A)(g) (2003).

Comment (i) to § 402A provides a definition of "unreasonably dangerous." According to the comment, "the article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, which the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts § 402(A)(i) (2003).

The *Vickers* Court applied § 402A, including the comments, and explained that, in admiralty cases, the "normal" use of a product includes all reasonably foreseeable uses, including foreseeable misuse. *Vickers,* 822 F.2d at 538. In such cases, to prevent a product from being unreasonably dangerous,"a seller may be required to give directions or instructions for use." *Id;* Restatement (Second) of Torts § 402(A)(j) (1965). Liability is imposed upon sellers or manufacturers who fail to warn of a defective condition if the defect was known and the manufacturer or seller, by exercising reasonable diligence, could have made such warnings available to the user. *See Vickers v. Chiles Drilling Co., et al.,* 822 F.2d 535, 538-39 (5th Cir.1987).
*Daigle v L & L Marine Trans. Co.* 322 F.S.2d 717, at 726-727 (E.D. La. 2004) (emphasis added)

## 2. The Louisiana Products Liability Act:

In the event this Court believes that Louisiana Products Liability Act and not the general maritime law applies to this issue, Halliburtonwould still be liable for the damages  caused by its blowout preventer.

The Louisiana Products Liability Act ("LPLA") states:

"This Chapter [i.e., "The Louisiana Products Liability Act", LSA R.S. 9:2800.51 through 2800.60] establishes the exclusives theories of liability for manufacturers for damage caused by their products".

Section 2800.54 of the LPLA lists the requirements required to prove a products liability action:

§2800.54.  Manufacturer responsibility and burden of proof

11

**A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product** by the claimant or another person or entity.

**B. A product is unreasonably dangerous if and only if:**

(1)  The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;

**(2)  The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;**

(3)  The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or

(4)  The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.

C.  The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer. **The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56** or 9:2800.57 **must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.**

**D.  The claimant has the burden of proving the elements of Subsections A, B and C of this Section.**[4] *(emphases added)*

## 4. Summary Judgment Standards:

Summary judgment is appropriate "if the pleadings, the discovery, and disclosure materials on file . . . show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law".[5]

The principal purpose of the summary judgment rule is to "isolate and dispose of factually unsupported claims and defenses".[6]

---

[4] La. Rev. Stat. Ann. § 9:2800.54
[5] Fed. R. Civ. P. 56(c)(2)
[6] *Celotex v Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 2553 (1986)

Rule 56 ("Summary Judgment") "mandates the entry of summary judgment . . . against a party who fails to make sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial".[7]

The moving party bears the initial responsibility of identifying the basis for its motion and the parts of the record that support its claim that no such genuine issue of material facts exists.[8] Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to demonstrate that the court should not grant summary judgment.[9] Top do so, the non-moving party must "go beyond the pleadings" to identify specific facts that establish a genuine issue or trial.[10] Rule 56 expressly requires as much, stating as follows:

> When a motion for summary judgment is properly made and supported, an opposing party may not merely rely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in the rule – set out specific facts showing a genuine issue for trial.[11]

Indeed, it is established that "the non-movant may not rely upon the theoretical possibility that its claim is valid.[12] Rather, a party opposing a motion for summary judgment must present "significant probative evidence" to defeat the motion.[13] If the non-moving party submits evidence that is "merely colorable" or "not significantly probative", or establishes only a "metaphysical doubt", the movant is entitled to summary judgment.[14]

## 4. Judicial Notice Of Facts On Federal Government Websites:

---

[7] *Celotex* at 322. Moore v Miss. Valley State Univ., 871 F.2d 545, 549 (5th Cir., 1989)
[8] *Burge v Parish of St. Tammany*, 187 F.3d 452, 465 (5th Cir., 1999)
[9] *Ragas v Tenn. Gas Pipeline Corp.,* 136 F.3d 455, 458 (5th Cir., 1998)
[10] Celotex, at 324
[11] Fed. R. Civ. P. 56(e)(2)
[12] Pennington v Vistron Corp., 876 F.2d 414, 426 (5th Cir., 1989)
[13] Conkling v Turner, 18 F.3d 1285, 1295 (5th Cir., 1994)
[14] Hawking v Ford Motor Credit Co., 210 F.3d 540, 545 (5th Cir., 2000)

A court may take judicial notice "at any stage of the proceeding" of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b) & (f). *See also Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 & n.9 (5th Cir. 2005) (information available, *inter alia*, "on [an] agency's website" was "capable of accurate and ready determination by resort to a source whose accuracy on the matter cannot reasonably be questioned"); *Terrebonne v. Blackburn*, 646 F.2d 997, 1000 n.4 (5th Cir. 1981) ("Absent some reason for mistrust, courts have not hesitated to take judicial notice of agency records and reports."); *In re Katrina Canal Breaches Consol. Litig.*, 533 F. Supp. 2d 615, 632 (E.D. La. 2008) (explaining that courts may take judicial notice of information published on government websites and compiling cases discussing same); *Hamilton v. Paulson*, 542 F. Supp. 2d 37, 52 n.15 (D.D.C. 2008) ("[D]ue to the fact that the document is located on the website for the United States [agency], it is 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned,' and therefore subject to judicial notice by the Court" under Fed. R. Evid. 201. (quoting Fed. R. Evid. 201(b)).

## C. CONCLUSION:

The Plaintiffs have met their burden of showing that no genuine issue of material facts exists as to whether the failure of the Macondo well and resulting damages were caused by the negligence of Halliburton , through both its defective cement design  and its negligent testing and application of tis cement, under the general maritime law of negligence and product liability as well as under the Louisiana Products Liability Act, with the result being the damages caused by the

release of the oil and gas from the Macondo well.

Accordingly, it is respectfully submitted that Halliburton Energy Services, Inc., be held

liable, jointly and in solido, for these damages.

Respectfully submitted,

/s/ Daniel E. Becnel, Jr.
DANIEL E. BECNEL, JR. (#2926)
BECNEL LAW FIRM, LLC
P. O. Drawer H
106 West Seventh Street
Reserve, Louisiana 70084
Telephone: (985) 536-1186
Facsimile: (985) 536-6444
E-mail: dbecnel@becnellaw.com
**Attorneys for Plaintiffs in:**
1. *Bill's Oyster House v BP et al* (C.A. 10-1308)
2. *Howard Buras v BP et al* (C.A.10-2994)
3. *Armand's Bistro v BP et al* (C.A. 10-4489)
4. *Faye Loupe et al. v BP et al* (C.A. 10-2764)
5. *Laura Gautreaux v BP et al* (C.A. 10-1539)
6. *Brent Rodrigue, Sr. et al. v BP et al* (C.A. 10-1325)

### CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Memorandum has been served on
All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance
with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court
of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF
System, which will send a notice of electronic filing in accordance with the procedures
established in MDL 2179, on this  12th  day of December   , 2011.

/s/ Daniel E. Becnel, Jr.

15