Exhibit 3

Ron Faul Deposition

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3       IN RE: OIL SPILL          )   MDL NO. 2179

        by the OIL RIG            )

4       "DEEPWATER HORIZON" in    )   SECTION "J"

        the GULF OF MEXICO, ON    )

5       APRIL 20, 2010            )   JUDGE BARBIER

                                  )

6                                 )   MAG. JUDGE

                                  )   SHUSHAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    VOLUME 1 OF 2

21

22          Deposition of RONALD RAY FAUL, taken

23       at Pan American Life Center, 601 Poydras

24       Street, Ponchartrain Room, New Orleans,

25       Louisiana, on the 29th of June, 2011.

1    that software was not the same as that

2    which Halliburton uses in its labs; is

3    that correct?

4         A.   Yeah, I'm not --

5              MR. CHEN:  Objection, form.

6         A.   I'm not sure what features would

7    be different.

8         Q.   (BY MR. THORNHILL)  Have you

9    looked at the off-the-shelf version that

10   Halliburton sells and compared it to what

11   Halliburton uses in its labs?

12        A.   I have not.

13        Q.   All right.

14        A.   And we -- you know, that wouldn't

15   be in the lab as well; it would be the

16   engineering design software.

17        Q.   Okay.  All right.  I gotcha.

18             Now, tell me -- tell me a

19   little bit about what you had Mr. Quirk

20   do.  Did you call him on the phone or did

21   you send him an e-mail and say, I want you

22   to do some tests?

23        A.   Okay.  I called him on the phone

24   and asked him to get lab stock

25   materials --

```
 1            Q.  Uh-huh.
 2            A.  -- and repeat the test that was on
 3       the final BP Macondo production liner,
 4       production casing report, repeat the
 5       stability test specifically.
 6            Q.  Yeah.  Yeah.  Now -- now, you did
 7       that, as I understand it, because somebody
 8       in Duncan had told you that they had
 9       attempted a duplication of the test, and
10       they found that the cement settled, right?
11            A.  Yes.
12            Q.  All right.  So when you called
13       Mr. Quirk, it was probably within a week
14       or two after the blowout had started,
15       right?
16            A.  It would have been in May
17       sometime.
18            Q.  In May?
19            A.  Yes.
20            Q.  The blowout's April 20, so in
21       early May you were calling and saying --
22            A.  Probably --
23            Q.  -- let's --
24            A.  Probably a little later in May.
25            Q.  Now --
```

264

1          A.   After the 15th.

2          Q.   Okay.  You had from Duncan a

3    report that the cement was settling,

4    and -- I got that right, correct, you --

5    that they -- they told you the cement

6    samples that they tested that they thought

7    were samples similar to the Macondo job,

8    they -- they were settling, right?

9          A.   Yes.  He called me and said that

10   the sample he mixed up was showing some

11   signs of settling.

12         Q.   Had you guys sent up to Duncan

13   some of the samples that you had on hand

14   at that time so that they could perform

15   the tests?

16         A.   We had sent up lab stock.

17         Q.   That'd be some of the same samples

18   you and I just went over in tab 60, right?

19         A.   No.  Tab 60, I believe, was

20   samples from the Macondo well specific to

21   the Macondo well, and those were isolated.

22   So lab stock would have been samples in

23   the lab that -- that had -- we -- we

24   didn't touch the -- those were under lock

25   and key.

1          Q.   Okay.  Now, when you say lab

2     stock, though, for Duncan to test the

3     cement blends similar to what was used in

4     the Macondo production casing job, you

5     know, the 7-inch job --

6          A.   Yes.

           Q.   -- they would have needed to have

8     blended into the cement essentially the

9     same materials that were blended into the

10    cement for the Macondo 7-inch production

11    job?

12         A.   We could have sent them samples of

13    Lafarge cement and samples of materials

14    from the lot numbers that we had in the

15    lab, but we didn't send them any of the

16    material from the -- from the rig --

17         Q.   Okay.

18         A.   -- Macondo.

19         Q.   Okay.  All right.  So you sent

20    them the cement -- the Lafarge cement.

21    Did --

22         A.   Yeah.

23         Q.   -- you take that out of the bin

24    down in Port Fourchon?

25         A.   I don't know where they got it.

1      It would have been just cement that was in
2      the lab, representative of what was in
3      Port Fourchon.
4          Q.  Yeah.  So it's fair for me to say,
5      isn't it, that you wouldn't have sent them
6      somebody else's cement, you'd have sent
7      them the cement from -- from that which
8      you sent out to the rig, right, out of
9      that Port Fourchon bin, I guess, huh?
10         A.  Out of the Port -- yes, out of
11     Port Fourchon that was current at that
12     time.
13         Q.  Sure.  Sure.  So you get out of
14     the Port Fourchon bin some cement, the
15     Lafarge Class H cement, API rated, all
16     right, and that's the same stuff that was
17     used on the job, the -- the Macondo job,
18     and you get some of the -- the additives
19     that you had in the lab that were the same
20     additives that you used out on the job and
21     you sent it up to Duncan and they tested
22     it?
23         A.  Yes.
24         Q.  Is Duncan the headquarters?
25         A.  Duncan is our technology center.

268

1          Q.   You just sent it up to Duncan?

2          A.   Correct.

3          Q.   All right.  So they -- they get

4     cement out of the bin and they get the

5     additives out of the -- out of the lab in

6     Broussard and they test it.  And then did

7     they send you a written result?

8          A.   We did not do a foam stability

9     test.  These samples were sent up to do a

10    conductivity test --

11         Q.   Uh-huh.

12         A.   -- and which I did get a -- a

13    written result on.

14         Q.   Uh-huh.  Now, BP asked you to do

15    the conductivity test --

16         A.   That's --

17         Q.   -- correct?

18         A.   -- correct.

19         Q.   I got that right.

20              Now, tell me, did I get this

21    wrong?  Did -- did Duncan's lab write down

22    or print up the results?

23         A.   All I got was --

24              MR. HILL:  Object to form.

25         Q.   (BY MR. THORNHILL)  Did it?  This

269

```
 1        is the conductivity test that you're
 2        talking about having been done for BP.  I
 3        can pull out the e-mails, if you want to,
 4        where they're asking you to do it.
 5             A.   Yeah.
 6             Q.   Yeah.  And so they asked you to do
 7        the test?
 8             A.   Yes.
 9             Q.   And you have the test run in -- in
10        Duncan?
11             A.   That's correct.  I had the
12        conductivity test run in Duncan.
13             Q.   You picked up the phone or
14        e-mailed or somehow or another told the
15        guys in Duncan what to do, right?
16             A.   Yes.
17             Q.   All right.  Who did you talk to up
18        there?
19             A.   I talked to a number of people.
20        From the beginning, I started talking with
21        Tom Daly, David Jones and traded e-mails
22        with several people.  On the results, I
23        was dealing with Ricky Morgan.
24             Q.   Okay.  And so did Ricky send to
25        you the results in an e-mail?
```

1          A.   Ricky would send me the results of

2     the conductivity test in an e-mail.

3          Q.   Yeah.   How about the test that

4     showed the settling; did Ricky send you

5     that?

6          A.   No, he called me.

7          Q.   What did he do with those results

8     that showed the settling?

9               MR. HILL:   Object to form.

10         A.   I don't know what he did with the

11    results.

12         Q.   (BY MR. THORNHILL)   What did Ricky

13    tell you he did with those results?

14         A.   He didn't tell me anything he'd

15    done with them.

16         Q.   Did you tell Ricky to do what you

17    told Mr. Quirk to do, i.e., destroy the

18    test results?

19              MR. HILL:   Object to form.

20         A.   I don't recall telling Mr. Quirk

21    to do that.

22         Q.   (BY MR. THORNHILL)   Have you read

23    Mr. Quirk's deposition?

24         A.   No, I have not.

25         Q.   Have you talked to Mr. Quirk?

1      A.   I have talked to him, but not
2   about this topic.
3      Q.   Well, you obviously talked to him
4   to tell him what to do, didn't you?
5      A.   Yes, I did.
6      Q.   And he talked to you and you
7   talked to him when he had the results,
8   didn't he?
9      A.   He called me with the results.
10      Q.   And when he called you, are you
11   telling us that you told Mr. Quirk not to
12   destroy the results?
13      A.   I'm saying that I did not tell him
14   to destroy the results.
15      Q.   What did you tell him?
16      A.   I just told him to call me with
17   the results.
18      Q.   Well, where are the results from
19   the tests in -- in Duncan that were done
20   on the exact same cement that you've just
21   identified for us and -- and the same
22   additives?
23                  MR. HILL:   Object to form.
24      Q.   (BY MR. THORNHILL)   Where are
25   those results?

1                    With -- with BP, you shared

2        this information from your hard drive,

3        correct?

4            A.  With BP, I shared that document on

5        conductivity test results.

6            Q.  Did you send that to BP by e-mail?

7            A.  Yes.

8            Q.  Who'd you send it to?

9            A.  Ken Allen.

10           Q.  Spell it again.

11           A.  Kenneth Allen.

12           Q.  A-L-L-E-N or A-L-A-N?

13           A.  A-L-L-E-N, I believe.

14           Q.  Where is Mr. Allen?  Where does he

15        work?

16           A.  He has a BP e-mail address.  He

17        was at Westlake, the BP office.

18           Q.  Did you meet him at the Westlake

19        office?

20           A.  I didn't meet him.  I just

21        corresponded with him by e-mail.

22           Q.  You had more than one e-mail with

23        him?

24           A.  Yes.

25           Q.  All righty.  And --

```
 1                  (Discussion off the record.)
 2         Q.  So let me see if I got it right.
 3    Mr. Allen got the information.  Did he
 4    e-mail you back that he had received it?
 5         A.  Yes.
 6         Q.  Did the two of you discuss in
 7    e-mails the results of the test?
 8         A.  Nope.
 9         Q.  Did the -- did the results of the
10    tests show that the -- that the cement had
11    any particular characteristics that we
12    could identify as being good or bad,
13    according to conductivity tests?
14         A.  The only results in that e-mail
15    were on the conductivity test itself.
16         Q.  What's a conductivity test
17    intended to show?  Explain --
18         A.  The --
19         Q.  -- that to the jury.
20         A.  The conductivity are the
21    resistance of the cement itself.  My
22    understanding is that the directional
23    drillers wanted this information to assist
24    in locating the relief well to the
25    original well.
```

```
 1            Q.   Okay.  Now, would you expect the
 2     cement that has set up and hardened for a
 3     long time to have less conductivity or
 4     more conductivity than that which is wet
 5     and first going in the hole?
 6            A.   No, it -- we would have more.
 7            Q.   More conductivity?
 8            A.   Yes, as it -- as it gains
 9     strength.
10            Q.   All right.  And what did the
11     conductivity tests show on the cement that
12     was tested in -- in Duncan?
13                 MR. HILL:  Object to form.
14            A.   Just -- just numbers.
15            Q.   (BY MR. THORNHILL)  Okay.  Was
16     there any other information sent to you by
17     the Duncan lab to show the results of
18     tests?
19            A.   No.
20            Q.   So Ricky called you but didn't
21     send you anything in writing to show the
22     settling of the cement that was tested?
23            A.   That's correct.
24            Q.   Was the cement he was testing that
25     showed the settling the same cement that
```

386

1    requested the retarder concentration be

2    increased?

3        A.  No, I don't really -- I don't

4    really know that.

5        Q.  Do you know -- I think earlier you

6    spoke with Mr. Thornhill about some

7    additional testing that was done after the

8    blowout.

9        A.  Yes.

10       Q.  We know that you worked on some

11   foam stability testing and then some

12   contamination testing that you did with

13   the foam and you also -- and also the

14   conductivity and resistivity testing that

15   was done at the Duncan labs.  I'm not

16   going to go back into that because he

17   covered those areas pretty well.

18               I do want to know about the

19   clean foam stability without the

20   contamination.  I know you asked Mr. Quirk

21   to run that test.  Correct?

22       A.  I asked Mr. Quirk to perform a

23   foam stability test with lab stock

24   materials to repeat the test that was

25   given on the final BP report.

365

1          Q.   And I know you were asked earlier

2     today whether or not you told Mr. Quirk to

3     destroy his -- his notes or any results

4     that he had gotten.  You testified that

5     you didn't instruct him to do that at all.

6          A.   I don't remember instructing him

7     to destroy any -- any work that he had

8     done.  I did ask him not to put it in the

9     Viking system because it was not

10    associated with a customer need.  It was

11    internal Halliburton information.

12         Q.   Okay.  So you told him not to put

13    it into the Viking system --

14         A.   That's correct.

15         Q.   -- which is an -- that's an

16    electronic sort of process, isn't it?

17         A.   Yes.

18         Q.   Did you also instruct him not to

19    generate a report in connection with the

20    testing he was conducting?

21         A.   He gave me all the information

22    that I wanted when -- over the phone call.

23    I didn't tell him to -- to generate a

24    report.

25         Q.   Okay.  But that -- I appreciate

1    that.  But my question is, did you
2    specifically tell Mr. Quirk not to
3    generate a report in connection with the
4    foam stability test he was running for you
5    after the blowout?
6        A.  He would have had to put it in
7    Viking to do that, and I asked him not to
8    put it in Viking.
9        Q.  And I know today you've talked
10   about -- and just so I understand, you've
11   talked quite a bit about information
12   gathering, that you -- you were -- you
13   were conducting these tests after the fact
14   so you could gather facts and information,
15   and you used some of that information to
16   brief and educate some of the -- the other
17   people at Halliburton about what had
18   happened on Macondo; is that right?
19       A.  To give information to them so
20   that they could build -- we could build
21   presentations and they could go to
22   Washington and -- and present that
23   information.
24            We specifically did not do any
25   investigation.  We didn't look into how it

1    happened or why it happened, just what
2    happened, and that's it.
3        Q. So you were -- you were handling
4    gathering factual information? That was
5    what your job was?
6        A. I was one of the people, yes.
7        Q. Okay. Well, I'm a little
8    confused, so I wanted to let you look at
9    an e-mail that I have behind tab 20. And
10   maybe you can help clear this up for me.
11               You're not a -- you're not a
12   recipient of this e-mail, but this is an
13   e-mail dated June 12th, 2010 from Ronald
14   Sweatman.
15       A. Yes.
16       Q. Is he a Halliburton employee?
17       A. Yes, he is.
18       Q. And what's his position?
19       A. Ron is on the GBTS, global
20   business and technical solutions, team.
21       Q. Okay. And he's sending an e-mail
22   to several folks, and he -- and this
23   e-mail's about kick and casing modeling
24   teams. And it's my appreciation, after
25   reviewing this e-mail -- and particularly

1    if you turn the page, there's an agenda

2    that some kick simulation and modeling was

3    being performed by Halliburton with

4    respect to the Macondo well, and please

5    take a moment to look at it.

6        A.  Okay.  I'm not familiar with this

7    work.

8        Q.  You're not familiar with this?

9        A.  No.

10       Q.  So do you know if this was being

11   used as part of an investigation by

12   Halliburton as to what happened on

13   Macondo?

14       A.  I don't know what they were doing.

15       Q.  Fair enough.

16          MS. SULLIVAN:  I'm going to

17   mark Exhibit 20 as 3116.

18          (Exhibit Number 3116 marked.)

19          MR. HILL:  I'm sorry, 31 --

20          MS. SULLIVAN:  16.

21       Q.  (BY MS. SULLIVAN)  All right.  So

22   we know there wasn't a static gel strength

23   transition time test conducted before

24   Macondo?

25       A.  That is correct.

416

```
 1              UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF LOUISIANA
 3    IN RE: OIL SPILL        )   MDL NO. 2179
      by the OIL RIG          )
 4    "DEEPWATER HORIZON" in  )   SECTION "J"
      the GULF OF MEXICO, ON  )
 5    APRIL 20, 2010          )   JUDGE BARBIER
                              )
 6                            )   MAG. JUDGE
                              )     SHUSHAN
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20                  VOLUME 2 OF 2
21
22        Deposition of RONALD RAY FAUL, taken
23    at Pan American Life Center, 601 Poydras
24    Street, Ponchartrain Room, New Orleans,
25    Louisiana, on the 30th of June, 2011.
```

508

1    and figure out what went wrong?

2                   MR. HILL:  Object to form.

3         A.  I'm -- I'm not in charge of this

4    event.

5         Q.  (BY MR. CHEN)  Right.  If you were

6    in charge of this event --

7         A.  I don't know what I'd do.

8         Q.  Don't know what you'd do.  But

9    possibly what you'd normally do, if there

10   were a charge that your cement failed?

11        A.  That -- that's not my decision to

12   make.

13        Q.  Now, you also said one of your

14   conclusions was that there was severe

15   channeling.

16                   Now, channeling is an

17   effective displacement efficiency, right?

18        A.  That's correct.

19        Q.  Yesterday we talked about two

20   different displacement programs, the --

21   the new program you have, iCem, and also

22   Displace 3D?

23        A.  Correct.

24        Q.  Does Halliburton have any other

25   displacement programs?

509

1      A.   No.   Those are -- those are the

2   programs that we have.

3      Q.   Now, were either of those two

4   programs run to analyze the displacement

5   for the April cement job?

6      A.   I don't --

7           MR. HILL:   Object to form.

8      A.   I don't think so.

9      Q.   (BY MR. CHEN)   Okay.   Based on all

10  your review of materials and your talking

11  to people, those -- Halliburton did not

12  run a displacement program to analyze

13  displacement for the April cement job?

14          MR. HILL:   Object to form.

15     A.   Halliburton ran the OptiCem

16  program.

17     Q.   (BY MR. CHEN)   Okay.   Does OptiCem

18  have a displacement program within it?

19     A.   It does not have Displace 3D in

20  it, no.

21     Q.   But does it have a displacement

22  program in it to calculate displacement?

23     A.   There is a calculation that

24  OptiCem can do that deals with -- not

25  particularly displacement, but

510

```
 1          displacement efficiency, I guess.
 2               Q.  Okay.  So OptiCem can calculate
 3          displacement efficiency?
 4               A.  Based on -- it can estimate some
 5          bypassed mud and make some estimates about
 6          top of cement based on that.
 7               Q.  And when you say bypassed mud, is
 8          that the same thing as displacement of mud
 9          and displacement efficiency?
10               A.  It --
11                    MR. HILL:  Object to form.
12               A.  It's -- it's mud that would --
13          would not be displaced in the well bore on
14          the bore hole.
15               Q.  (BY MR. CHEN)  Okay.  I -- I
16          skipped over one thing earlier.  Did your
17          team reach any conclusions regarding the
18          float collar?
19                    MR. HILL:  Object to form.
20               A.  No.
21               Q.  (BY MR. CHEN)  Did -- I mean, but
22          you examined some information about the
23          float collar, right?
24               A.  We read the information in the
25          report about the -- the number of times
```