UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | MDL NO. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |

THIS DOCUMENT RELATES TO:
1. *Bill's Oyster House v BP et al* (C.A. 10-1308)
2. *Howard Buras v BP et al* (C.A.10-2994)
3. *Armand's Bistro v BP et al* (C.A. 10-4489)
4. *Faye Loupe et al. v BP et al* (C.A. 10-2764)
5. *Laura Gautreaux v BP et al* (C.A. 10-1539)
6. *Brent Rodrigue, Sr. et al. v BP et al* (C.A. 10-1325)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## PLAINTIFFS' STATEMENT OF MATERIAL UNCONTESTED FACTS

Pursuant to Local Rule 56.1 (Motions For Summary Judgment), Plaintiffs submit the following statement of material facts which they contend present no genuine issue.

1) When *Deepwater Horizon* arrived at Macondo, it had on board a large quantity of Halliburton cement dry blend.
   *-Jesse Gagliano (Halliburton) interview with staff of The National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling ("The Presidential Commission"), Sept. 10, 2010, cited in The Presidential Commission's "Chief Counsel's Report", February 17, 2011, at p. 114*
   - Note: *This Report is at: http://www.oilspillcommission.gov/chief-counsels-report*

2) Halliburton's Broussard, Louisiana laboratory had conducted several tests on this dry blend in February 2010, including two foam stability tests, using almost exactly the same "recipe" as it used on Macondo.
   *-Internal Halliburton document (HAL_DOJ 61-62, 67-68), in Chief Counsel's Report, 114*

3) The two foam tests indicated serious instability.
   *- Confidential industry expert with Spill Commission Staff, Chief Counsel's Report, 115*

1

4) The first test showed that (1) the lab was unable to generate a proper foamed slurry, (2) gas bubbles migrated within the foamed slurry, and/or (3) gas escaped from the slurry before it would harden.
    - *Confidential industry expert with Spill Commission Staff, Chief Counsel's Report, 115*

5) The second test showed that nitrogen must have escaped from the tested slurry before it could harden, or the lab had been unable to generate a proper foamed slurry.
    - *Confidential industry expert with Spill Commission Staff, Chief Counsel's Report, 115*

6) Halliburton did not report any of the February testing data to BP until March 8, 2010.
    - *Internal BP document (BP-HZN-MBI-109218, 109223-24), Chief Counsel's Report, 115*

7) On that date, Halliburton's Jesse Gagliano (a technical adviser for the Macondo well) attached an highly technical data report of the test results to an email, in which he discussed an unrelated matter. The importance of this information was not mentioned to or discussed with BP.
    - *Chief Counsel's Report, 115*

8) Halliburton did additional testing in April. Gagliano appears to have ordered that additional testing on April 12.
    -*Gagliano interview with Spill Commission, Chief Counsel's Report, 115;*
    -*Internal Halliburton document (HAL DOJ 35), Chief Counsel's Report, 115;*

9) For these tests the Broussard lab used a design recipe that was nearly identical to the one that Halliburton eventually pumped.
    -*Gagliano interview; Chief Counsel's Report, 115.*

10) It appears the lab performed a foam stability test on this recipe on or about April 13. The test results indicated serious foam instability.
    - *Chief Counsel's Report, 115. (Note: Halliburton contended the lab performed the test improperly, Donald Godwin letter to Commission, November 18, 2010)*

11) On April 17, Gagliano sent an email to BP and attached two lab reports on the April 13 test. Neither data report included the results of the April 13 foam stability test (or any other foam stability test). **Halliburton did not otherwise alert BP to the foam stability test results**.
    -*Chief Counsel's Report, 116*

12) On April 18, the Broussard lab appears to have conducted a second foam stability test. The results showed the cement to be <u>denser</u> than it had been formulated to be, which meant one of two things: either (1) that it would be difficult to obtain the proper foam density in the field and the slurry should be redesigned, or (2) some nitrogen may have escaped from the slurry as it set,

2

making it denser.
-*Chief Counsel's Report, 117*

13) After the explosion, BP commissioned CSI Laboratories, an independent cement consulting company, to create a slurry like that which Halliburton had used.
   -*BP's "Deepwater Horizon Accident Investigation Report, headed by Mark Bly, BP's Head of Safety and Operations ("BP's Bly Report"), September 8, 2010", p. 58 and Appendix K;*
   -*Note: BP's Bly Report is available at:*
   *http://www.bp.com/sectiongenericarticle.do?categoryId=9034902&contentId=7064891*
   -*Chief Counsel's Report, 119.*

14) CSI said the slurry it made was "sufficiently similar to support certain conclusions concerning the slurries actually used in the Macondo well".
   - *BP's Bly Report, 59*
   -*Chief Counsel's Report, 119*

15) CSI reported the foamed cement generated from the model was unstable under several test conditions. Based in large part on this analysis, BP's investigation team concluded in its report that "the nitrified foamed cement slurry used in the Macondo well probably experienced nitrogen breakout, nitrogen migration and incorrect cement density".
   - *BP's Bly Report, 60*
   -*Chief Counsel's Report, 119*

16) The Presidential Commission worked with an independent expert and cement experts from Chevron to conduct its own independent tests of cement slurry stability.
   -*Craig Gardner (Chevron) letter to Commission, October 26, 2010; Chief Counsel's Report, 119*

17) Halliburton provided off-the-shelf cement and additives of the same kind used at Macondo. Although they did not come from the specific batches used at Macondo, they were in all other ways identical.
   -*Chief Counsel's Report, 119*

18) Chevron conducted numerous tests to examine foam stability but "was unable to generate stable foam with any of the tests", strongly implying that the foamed cement slurry used at Macondo was unstable.
   -*Gardner letter, 2; Chief Counsel's Report, 119*

19) Halliburton had refused to provide the Presidential Spill Commission with full details of the methods and protocols its laboratory used to conduct its February and April tests. Most notably,

Halliburton had refused to provide any information on whether and how its staff had conditioned the cement before conducting foam stability tests. (At the time Chevron conducted its tests, Halliburton had not yet produced any internal laboratory documents to the Commission. It later did provide some internal documents that disclosed conditioning times.)
-*Chief Counsel's Report*, 119

20) When the Spill Commission sought input from BP and other parties regarding these issues, Halliburton demanded that the Commission refrain from doing so.
-*Chief Counsel's Report*, 119

21) Halliburton repeatedly flatly refused the Commission's requests for documents or recorded testimony regarding many unsupported assertions from Halliburton's lawyers regarding these matters.
-*Chief Counsel's Report*, 120

22) The Commission concluded: "Halliburton personnel should have redesigned the slurry after receiving the February pilot test studies. Both of the February foam stability tests clearly indicated that the pilot design was severely unstable."
-*Chief Counsel's Report*, 122

23) The Deepwater Horizon Study Group (DHSG), is the independent group studying the causes of the disaster, under the leadership of Professor Robert, Ph. D., P.E., U.C., Berkeley. In a January 2011 working paper, Gary Marsh of the Study Group noted that "The latest BP investigative report indicates from results of independent testing that the nitrogenated cement used on the 7 in. x 9 7/8 in. tapered production string was likely flawed, and was likely to have suffered Nitrogen separation downhole".
-"*Cementing 7" x 9 7/8 Production Casing at MC 252 #1 Well*", 1, by Gary Marsh. B.S.M.E., Retired, Shell. Drilling Engineering Advisor, Houston.
-Note: Available online at: http://risk.berkeley.edu/deepwaterhorizonstudygroup/dhsg_resources.shtml

24) DHSG, in a November 24, 2010 letter to the Presidential Commission, agreed with the Commission's findings that the experimental nitrogen-infused-cement Halliburton used contributed to the explosion:

"**The available evidence indicates that the "experimental" nitrogen foamed cement**, the pre- and post- cementing processes (e.g. partial bottoms-up circulation, positive pressure testing before cement cure), the hardware used near and at the bottom of the long-string production casing (e.g. minimum centralizers, float collar and shoe, the characteristics of the well at the bottomed (e.g. clearance between production casing and weak formation, clearance between the bottom reamer and the bottom of the well – the "rat hole"), and the reservoir characteristics (high

pressures, high temperatures, gaseous hydrocarbons, relatively weak formation) **all contributed to the failure of the cement near and at the bottom of the Macondo well".**
*-November 24, 2010 Letter from DHSG to Spill Commission, Appendix A, p. 1.*
*-Note: Available online at:*
*http://risk.berkeley.edu/deepwaterhorizonstudygroup/dhsg_reportsandtestimony.shtml*


### (a) HALLIBURTON'S OWN TESTS HAVE PROVED THAT ITS CEMENT WAS UNSTABLE:

25) In late April or early May of 2010, Halliburton directed its employees to prepare and test a batch of the cement slurry — testing that appears likely to have used (and so destroyed) limited cement additives from the Macondo well project.
*-See, e.g., Ex. 1 (Morgan Dep.) at 16:16-19, 17:3-20:5; Ex. 2 (Quirk Dep.) at 88:23-89:2.*

26) According to deposition testimony, Halliburton's post-Incident testing in Duncan, Oklahoma, showed that (1) the Macondo well slurry settled, meaning that solids in the cement mixture were separating from liquids; and (2) the base slurry could not be foamed.
*-Ex. 2 (Quirk Dep.) at 124:23-25; Ex. 3 (Faul Dep.) at 264:2-11;* ▮
Such sedimentation is an indication of instability. Rickey Morgan in the Duncan lab also reported that the slurry looked "thin" to him, meaning that the slurry could be unstable once poured into the well.
*-Ex. 1 (Morgan Dep.) at 20:23-22:9.*[1]

27) After the Duncan experiments showed settling, Ron Faul asked another Halliburton lab to replicate the tests. ▮
*- See* Ex. 2 (Quirk Dep.) at 88:23-89:18. The new tests indicated foam instability.

---

[1] BOEMRE's Final Report also concluded that Halliburton's cement that was a cause of the *blowout:* **"Conclusions on Well Design, Cementing, and Flow Path: A. *Cause of the Failure of the Cement Barrier:*** Contamination or displacement of the shoe track cement, or nitrogen breakout or migration, could have caused the shoe track cement barrier to fail. The Panel found evidence that the most likely reason the shoe track cement slurry failed is due to contamination in the rat hole portion of the wellbore and inversion of fluids due to different densities (the mud in the shoe track was lighter than the unfoamed cement slurry). However, the Panel could not definitely rule out nitrogen breakout, migration, or over-displacement in the shoe track. **The Panel concluded that a combination of contamination, overdisplacement, and/or possibly nitrogen breakout of the shoe cement were causes of the blowout."**
--BOEMRE's *"Report Regarding the Causes of the April 20, 2010 Macondo Well Blowout", September 14, 2011 at p.68.*
*-Available at: http://www.boemre.gov/pdfs/maps/dwhfinal.pdf*

5

*Id.* at 333:6-10; 480:13-481:2.

28) Upon reviewing these latest testing results, Halliburton employees destroyed records of the testing as well as the physical cement samples used in the testing.
- *See, e.g., id.* at 331:21-24; 393:11-21.

### (b) HALLIBURTON'S OWN TESTS HAVE PROVED THAT THE CEMENT DID NOT CHANNEL:

29) Similarly, Halliburton conducted modeling of the Macondo well cement job using Halliburton's proprietary Displace 3D Simulator.
- *Ex. 4 (Roth Dep.) at 495:14-496:5.*
Tommy Roth, Halliburton's Vice President in charge of its cement business at the time of the incident, stated in a July 25, 2010 e-mail that this post-incident modeling demonstrates that there was no channeling in the Macondo well: "[S]pacer was sufficient ▮▮▮▮▮▮▮▮▮▮ to sweep channel. Subsequent testing with 3D confirms statement that spacer was sufficient."

Respectfully submitted,

*/s/ Daniel E. Becnel, Jr.*
DANIEL E. BECNEL, JR. (#2926)
BECNEL LAW FIRM, LLC
P. O. Drawer H
106 West Seventh Street
Reserve, Louisiana 70084
Telephone: (985) 536-1186
Facsimile: (985) 536-6444
E-mail: dbecnel@becnellaw.com
**Attorneys for Plaintiffs in:**
1. *Bill's Oyster House v BP et al* (C.A. 10-1308)
2. *Howard Buras v BP et al* (C.A.10-2994)
3. *Armand's Bistro v BP et al* (C.A. 10-4489)
4. *Faye Loupe et al. v BP et al* (C.A. 10-2764)
5. *Laura Gautreaux v BP et al* (C.A. 10-1539)
6. *Brent Rodrigue, Sr. et al. v BP et al* (C.A. 10-1325)

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that the above and foregoing Statement of Uncontested Material Facts has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this _12th_ day of_December_, 2011.

_/s/ Daniel E. Becnel, Jr._