# EXHIBIT 11

# MACONDO PROSPECT
# WELL PARTICIPATION AGREEMENT
# DEEPWATER GULF OF MEXICO

This Well Participation Agreement (this "Agreement") dated effective as of October 1, 2009 ("Effective Date"), is made by and between **BP Exploration & Production Inc.**, a Delaware corporation ("BP"), **Anadarko Petroleum Corporation**, a Delaware corporation ("APC"), and **Kerr-McGee Oil & Gas Corporation**, a Delaware corporation ("KMG").

## RECITALS

A. BP is the current owner or holder of an undivided sixty five percent (65%) Record Title Interest in lease OCS-G 32306, Mississippi Canyon Block 252, Deepwater Gulf of Mexico, U.S.A. (the "Macondo Prospect Area"), further described in Exhibit A.

B. APC owns an undivided twenty five (25%) working interest in the Macondo Prospect Area following execution of the Lease Exchange Agreement (as hereinafter defined) and a subsequent assignment from its Affiliate Anadarko E&P Company, LP ("AEP") of AEP's Record Title Interest in the Macondo Prospect Area.

C. APC intends to participate in the Initial Exploratory Well (as hereafter defined) as set forth in this Agreement.

D. BP and KMG are owners of that certain production Platform A (ID# 24130 1), located in Viosca Knoll Block 989 (the "Pompano Platform").

E. In consideration of the mutual promises set out in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, BP, APC and KMG agree to be bound by the terms of this Agreement.

## AGREEMENT

1. DEFINITIONS, INTERPRETATION AND EXHIBITS

1.1 <u>**Definitions.**</u> Capitalized terms defined in the Macondo Operating Agreement (as hereafter defined) and not otherwise defined or modified in this Agreement have the meanings defined in the Macondo Operating Agreement. Additionally, the following words and phrases shall have the following meanings:

EXHIBIT # 1943
WIT: Bryan



L25533

"AFE" means the Well Plan and Authorization for Expenditure attached as Exhibit B.

"Affiliate" means any legal entity which controls, is controlled by, or is under common control with, another legal entity. An entity is deemed to "control" another if it owns directly or indirectly at least fifty percent (50%) of either of the following:

(A) The shares entitled to vote at a general election of directors of such other entity.

(B) The voting interest in such other entity if such entity does not have either shares or directors.

"Agreement" means this Well Participation Agreement, including the Recitals and all Exhibits.

"Commenced Drilling Operations" means the start of actual drilling operations.

"Exhibit" means a document referred to in Section 1.3.

"IEW" or "Initial Exploratory Well" means the well currently being drilled by Operator on the Macondo Prospect Area in which APC will participate under the terms of this Agreement. "IEW" and "Initial Exploratory Well" include Substitute Well(s), as defined in the Macondo Operating Agreement, for the IEW. The interest in the IEW assigned to APC consists of all tangible personal property in the well, including the tubular and wellhead costs as set forth in the AFE.

"Lease" or "Macondo Lease" means the oil and gas lease identified on Exhibit A, sometimes referred to herein as the Macondo Prospect Area.

"Lease Exchange Agreement" means the Lease Exchange Agreement dated effective October 1, 2009, wherein BP assigned to APC and AEP a combined undivided twenty five percent (25%) of 8/8ths Record Title Interest in the Macondo Lease pursuant to the terms and conditions therein.

"Macondo Operating Agreement" or "Macondo OA" means that certain operating agreement dated effective October 1, 2009, by and between BP and MOEX Offshore 2007 LLC, attached hereto as Exhibit C.

"Objective Depth" means the first of the following to occur: (a) 19,561' TVD SS; (b) a depth sufficient to encounter the first in-situ occurrence of the foraminfera Roblus L. or its stratigraphic equivalent, as encountered at 24,220' MD in the MC 696 OCS-G 16641 #1 well; or (c) an onset of

pressure beyond 18,561' TVD SS that requires a new casing string to continue drilling.

"Operator" means BP.

"Party" means BP, APC or KMG, as applicable, and "Parties" means all of them.

"Person" means an individual, corporation, company, state, statutory corporation, government entity or any other legal entity.

"Pompano OA" means that certain operating agreement dated effective May 1, 1988, among BP Exploration Inc. (predecessor-in-interest to BP), KMG (an indirect wholly owned subsidiary of APC) and Kerr-McGee Federal Limited Partnership I-1981, as amended, covering and affecting the following Federal offshore leases: (i) OCS-G 6898 (Viosca Knoll Block 989); (ii) OCG-G 6899 (Viosca Knoll Block 990); (iii) OCS-G 7923 (Mississippi Canyon Block 27); (iv) OCS-G 9771 (Mississippi Canyon Block 28); and (v) OCS-G 6894 (Mississippi Canyon Block 72).

"Record Title Interest" means, as to all depths, with respect to any federal OCS oil & gas lease, the undivided, fractional or percentage share of all right, title, and interest in such lease granted to the original lessee (or lessees) by the MMS, including, without limitation, an equal undivided fractional or percentage share of the operating rights in such lease.

"APC's Working Interest Share" means APC's working interest ownership in the Macondo Prospect Area of twenty five percent (25%) of 8/8ths.

"TVD" means Total Vertical Depth.

"Well Costs" means all costs to drill, evaluate, and abandon the IEW.

1.2 **Incorporation of Provisions from the Macondo OA.** The Macondo OA is incorporated herein by reference, except as specifically modified in this Agreement.

1.3 **Exhibits.** All of the Exhibits that are attached to the body of this Agreement are an integral part of, and are incorporated by reference into, this Agreement, including:

(A) Exhibit A – Lease Description

(B) Exhibit B – Well Plan and Authorization for Expenditure

(C) Exhibit C – Macondo Operating Agreement

(D) Exhibit D – Form of AMI Assignment

(E) Exhibit E – Tax Partnership Provisions

1.4 **Conflicts and Enforceability.** If there is a conflict or inconsistency between a provision of this Agreement and that of any Exhibit, the provision of this Agreement will prevail, except insofar as this Agreement has become ineffective by its own terms.

1.5 **Interpretation.** Unless the context expressly requires otherwise, all of the following apply to the interpretation of this Agreement:

(A) The plural and singular words each include the other.

(B) The masculine, feminine and neuter genders each include the others.

(C) The word "or" is not exclusive.

(D) The word "includes" and "including" shall be construed to mean "including without limitation to the generality."

(E) The headings in this Agreement are included for convenience and do not affect the construction or interpretation of any provision of, or the rights or obligations of a Party under, this Agreement.

(F) References to "Sections" shall unless the context provides otherwise be references to sections of this Agreement.

2. EFFECTIVE DATE AND TERM. This Agreement is effective as of the Effective Date and will terminate upon rig release from the IEW or its Substitute Well.

3. INITIAL EXPLORATORY WELL (IEW)

3.1 **Commencement.** BP commenced Drilling Operations for the IEW on October 6, 2009, utilizing the Transocean Marianas Rig. Due to the facts and circumstances surrounding the damages sustained by the Marianas Rig as a result of Hurricane Ida, BP plans to utilize the Transocean Horizon Rig to resume drilling operations of the IEW and will drill the IEW to the Objective Depth subject to the terms of this Agreement. Such resumption of drilling operations of the IEW is expected to occur on or before April 1, 2010, which will be immediately following BP's contemplated plug and abandonment operations at Viosca Knoll 914 which will follow the the conclusion of BP's current well operations at Mississippi Canyon 727.

3.2 **Operating Agreement and Well Participation.** Notwithstanding the fact that BP commenced drilling operations on the IEW at its sole risk and expense on October 6, 2009 without APC's participation and prior to APC

owning an interest in the Macondo Lease, and such operations are ongoing as of the date of execution of this Agreement:

(a) BP and APC agree to continue the drilling of the IEW as follows: APC shall execute and deliver to BP a copy of Exhibit B, the Macondo Well Plan and Authorization for Expenditure, simultaneous with its execution of this Agreement, signifying APC's agreement to participate in the drilling of the IEW and any and all operations in connection with the drilling of the IEW effective October 1, 2009, subject to Section 4 below, and otherwise in accordance with and subject to the provisions of the Macondo OA; and

(b) BP and APC deem that BP's delivery of the Macondo Well Plan and Authorization for Expenditure to APC and APC's execution and delivery thereof to BP is in compliance with the Macondo OA.

BP represents that, as of the date of this Agreement, there are no pending, current, or accrued obligations (other than those that may have occurred in the ordinary course of the planning and drilling of the IEW) pursuant to any agreement regarding the drilling of wells, installation or construction of facilities/platforms, or any other capital expenditure exceeding $100,000 for which BP would be responsible, except as set forth in the AFE.

3.3 The Parties agree that any Development Plan proposed by either APC or BP pursuant to the Macondo OA shall provide for processing and handling of all production from the Macondo Prospect Area via a subsea tieback to the Pompano Platform; provided that BP determines it is safely, technically, and economically feasible to do so. In the event BP determines that it is not safely, technically, and economically feasible to tie-back Macondo Prospect Area production to the Pompano Platform, then any Development Plan proposed by BP that provides for a subsea tieback of Macondo Prospect Area production to any other BP owned and/or operated offshore facility shall require approval by both BP and APC. Further, BP and KMG agree that, pursuant to Article 13 of the Pompano OA, they each hereby consent and approve the construction, installation and operation of Facilities, equipment, pipelines, risers and umbilicals (and any modifications to the Pompano Platform in connection therewith) for use in connection with processing and handling of all production from the Macondo Prospect Area.

4. COST-BEARING INTEREST:

4.1 Pursuant to this Agreement, APC shall pay thirty-three and one-third percent (33.33%) of the Well Costs for the IEW to the Objective Depth as set forth in the AFE, and any Substitute Well therefore, if any, agreed to under the Macondo OA. This obligation shall apply only until the earlier of: (a) the IEW Objective Depth has been drilled and evaluated as set forth in the AFE, (b) if applicable, the IEW has been plugged and abandoned, or (c)

the cumulative Well Costs for the IEW and any agreed-upon Substitute Well, if any, reaches one hundred and ten percent (110%) of the amount set forth in the AFE, excluding overhead (as "overhead" is defined in the COPAS provisions for the Macondo OA); provided that: (i) Section 4.1(b) shall only apply following the expiration of the applicable period for proposing Substitute Well(s) under the Macondo OA, and (ii) an Election by either Party not to participate in a Substitute Well(s) shall be governed by the applicable provisions of Article 16 of the Macondo OA. The AFE includes the estimated costs to drill, evaluate, and abandon the well. Upon the earlier to occur of subsections (a), (b) and (c) above, APC shall only be obligated to pay APC's Working Interest Share of any further operations conducted pursuant to the Macondo OA. APC will execute BP's AFE contemporaneously with the execution of this Agreement. BP shall invoice APC its applicable share of the Well Costs incurred as of the date of execution, in accordance with this Agreement, and APC shall pay the same in accordance with this Agreement and the Macondo OA. Thereafter, BP will invoice APC on a monthly basis as provided in the Macondo OA. BP uses an SAP-based accounting system that cannot automatically track and bill out vendor invoices at different cost interests. Therefore, when an operation reaches the point in which the cost interest should change as provided in the Section 4.1 above, the estimated well cost as reflected in BP's DIMS (Drilling rig cost estimator) at that point will be used as the mechanism for a cost interest change in BP's accounting system. Accordingly, any vendor invoices processed thereafter will be billed to APC at APC's Working Interest Share in accordance with Section 4.1.

4.2 In determining the above-referenced threshold for expenditures, the costs and expenses of the IEW and, if applicable, the agreed-to Substitute Well(s) shall be considered cumulatively. For example, if the Parties expend one hundred percent (100%) of the amount set forth in the AFE in Well Costs on the IEW before abandoning it and then agree to drill a Substitute Well, then, subject to subsections (a), (b) and (c) of Section 4.1, APC's obligation to pay thirty-three and one-third percent (33.33%) of the Well Costs on the Substitute Well shall terminate after ten percent (10%) of the amount set forth in the AFE has been expended in the Substitute Well, with APC paying APC's Working Interest Share thereafter.

5. LEASE EXCHANGE AGREEMENT AND MACONDO OPERATING AGREEMENT: Prior to the execution of this Agreement, BP and APC executed the Lease Exchange Agreement and delivered the respective Assignments as defined therein, and APC adopted, ratified, and executed the Macondo Operating Agreement. If there is any conflict between the terms of this Agreement and the Lease Exchange Agreement, the terms of this Agreement shall prevail. If there is any conflict between the terms of this Agreement and the Macondo OA, the terms of this Agreement shall prevail.

6. AREA OF MUTUAL INTEREST: The Parties agree to establish an area of mutual interest ("AMI"), effective as of the Effective Date until December 31, 2011, as follows:

6.1 AMI Area. Mississippi Canyon, Blocks 208, 209, and 253.

6.2 AMI Percentage. BP 75.00%
APC 25.00%

6.3 AMI Terms. Should either Party ("Acquiring Party") by reason of a farm-in agreement or by purchase from third parties or through purchase pursuant to an OCS lease sale, or by any other means (other than as a result of a merger, reorganization or other Affiliate transfer, as well as transfers between BP and APC, or the acquisition of all or substantially all of a third party's assets located in the Gulf of Mexico) acquire an interest in leasehold record title, leasehold operating rights, production, reserves, facilities, or any other interest within the AMI Area as defined in Section 6.1 herein, then the Acquiring Party shall, within thirty (30) days after such acquisition, give written notice of such acquisition including a description of the right, title, and interest, and all terms and conditions relating thereto or equivalent terms for a non-cash or exchange transaction (other than as excluded above) to the other Party hereto ("Non-Acquiring Party") including the purchase price or other consideration offered (which shall include the monetary equivalent in U.S. Dollars based upon the reasonable market value of any consideration other than cash). The Non-Acquiring Party shall have the option for a period of thirty (30) days after such notice is received to elect in writing to the Acquiring Party to acquire its pro rata share of the Acquiring Party's interest. Such pro rata share shall be equal to each Party's applicable AMI Percentage, as defined in Section 6.2 herein, multiplied by the interest acquired by the Acquiring Party. Should the Non-Acquiring Party elect to acquire its pro rata share of the Acquiring Party's interest as aforesaid, then within thirty (30) days after its election to acquire its share, it shall reimburse the Acquiring Party for the pro rata share of the costs attributable to the interest and shall assume its respective pro rata share of the Acquiring Party's rights and obligations, if any, attributable to such interest. The Acquiring Party shall assign to the Non-Acquiring Party its proportionate share of the interest to be assigned contemporaneously with the aforementioned reimbursement. Said assignment shall be in the same form and content in all material respects as the Form of AMI Assignment attached hereto as Exhibit D, modified only insofar as is necessary to reflect the percentage and location of the interest assigned. Any interests acquired by the Non-Acquiring Party pursuant to this Section 6 shall be subject to an operating agreement that designates BP as operator and is otherwise identical in all material respects to the Macondo Operating Agreement, modified only insofar as is necessary to reflect the percentage

and location of the interest assigned; provided, however, if such interest is subject to a pre-existing operating agreement with a third party, the pre-existing operating agreement shall govern such interest. Failure to respond in writing within the time period specified above is deemed to be an election not to participate in such acquisition. Subject to a pre-existing operating agreement with a third party, if any, BP shall be designated Operator of any interest BP acquires pursuant to this AMI provision, In such case, APC will execute the requisite documentation required by the MMS within thirty (30) days of receipt of such documents from BP.

7. <u>RELATIONSHIP OF THE PARTIES AND TAX PROVISIONS</u>: It is not the purpose or intention of this Agreement to create, and this Agreement shall not be construed as creating, a joint venture, mining partnership or other relationship whereby any Party will be held liable for the acts or omissions of any other Party, and the liabilities of each of the Parties hereto shall be several and not joint or collective. For Federal Income Tax purposes, however, each Party acknowledges that this Agreement creates a partnership for tax purposes between the Parties with respect to the Initial Exploratory Well which is subject to the application of all provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, as amended (the Code), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. The Parties agree that they shall not elect out of partnership treatment and shall execute and file with the Internal Revenue Service and/or any state taxing authority, any returns or documents necessary to evidence or effectuate this election to be treated as a tax partnership with respect to the Initial Exploratory Well pursuant to all Federal and/or State laws and regulations. The tax partnership created hereunder shall be governed by the Tax Partnership Provisions attached hereto as Exhibit E.

8. GENERAL PROVISIONS

8.1 **Notices.** All notices and communications required or permitted under this Agreement shall be made in accordance with the Macondo OA.

8.2 **Public Announcements.** No Party shall issue a press release concerning this Agreement unless all Parties have approved the issuance and content of the press release.

8.3 **Prior Agreements.** This Agreement and all Exhibits attached hereto comprise the complete and exclusive agreement between the Parties regarding the subject matter of this Agreement, and supersede all oral and written communications, negotiations, representations or agreements in relation to that subject matter made or entered into on or before the Effective Date.

8.4 **Waiver**. The failure by either Party to pursue remedies for breach of this Agreement does not constitute a waiver by that Party of any breach of this Agreement by the other Party or raise any defense against Claims for breach of this Agreement. The waiver or failure to require the performance of any covenant or obligation contained in this Agreement or to pursue remedies for breach of this Agreement does not waive a later breach of that covenant or obligation.

8.5 **Preparation.** Preparation of this Agreement has been an effort of the Parties and the resulting Agreement must not be construed more severely against one of the Parties than against the other.

8.6 **Severability.** Each provision of this Agreement is severable and if any provision is determined to be invalid, unenforceable or illegal under any existing or future law by a court, arbitrator of competent jurisdiction or by operation of any applicable law, such invalidity, unenforceability or illegality does not impair the operation of or affect those portions of this Agreement that are valid, enforceable and legal.

8.7 **Amendment.** No change to this Agreement is effective unless made in writing and signed by both Parties. Any contemplated assignment or reassignment under this Agreement will be in a form (i) mutually agreeable to all Parties, (ii) approvable by the Minerals Management Service, Gulf of Mexico Region, and (iii) warranted by, through and under each respective Party.

8.8 **Counterparts.** This Agreement may be executed in any number of duplicate counterparts, each of which will be deemed an original of this Agreement, and which together will constitute one and the same instrument; provided that neither Party will be bound to this Agreement unless and until both Parties have executed a duplicate counterpart.

8.9 **Survival.** Upon termination as defined in Section 2, the rights and obligations of the Parties with respect to the Macondo Prospect Area shall thereafter be governed by the Macondo OA. Notwithstanding the termination of this Agreement, Sections 6 and 7 shall survive, and all causes of action which arose prior to termination shall survive until, by their respective terms, they are no longer operative or are otherwise limited by an applicable statute of limitations.

8.10 **Binding Effect.** The terms and conditions of this Agreement shall be governed by the laws of TEXAS and shall be binding upon, and shall inure to the benefit of each Party and its respective successors and assigns, but may not be assigned without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned, or delayed.

8.11 **Further Assurances.** Each of the Parties hereto shall execute, acknowledge and deliver to the other such further documents and take such other action, as may be necessary in order to carry out the purposes of this Agreement. Unless otherwise provided in this Agreement, the Parties agree to prepare and execute such documents within thirty (30) days of receipt of a written request for such documents from the other Party.

8.12 **Representation and Acknowledgement.** BP represents that it owns the record title interest in the Lease set forth in Exhibit A, the Lease is in full force and effect, and BP is in compliance with each of the material terms and conditions of the Lease.

8.13 **Dispute Resolution Procedure.** Any Dispute arising out of, relating to, or in connection with this Agreement or an activity or operation conducted under this Agreement shall be resolved under the Dispute Resolution Procedure in the Macondo OA.

The remainder of this page is intentionally left blank.

The Parties have executed this Agreement as evidenced by the following signatures of the authorized representatives of the Parties, but is effective for all purposes as of the Effective Date:

BP Exploration & Production Inc.

By: ____________________

Title: Attorney-in-Fact

Date: 12/17/09

Anadarko Petroleum Corporation

By: ____________________ NW

Title: Agent and Attorney-in-Fact

Date: December 17, 2009

Kerr-McGee Oil & Gas Corporation

By: ____________________ NW

Title: Attorney-in-Fact

Date: December 17, 2009

**Exhibit A – Lease Description**

Attached to and made a part of that certain Well Participation Agreement dated effective October 1, 2009, by and between BP Exploration & Production Inc., Anadarko Petroleum Corporation, and Kerr-McGee Oil & Gas Corporation

BP LEASE - MACONDO PROSPECT AREA

**Lease Description:**

Federal OCS Oil & Gas Lease Serial number OCS-G 32306 dated June 1, 2008 between the United States of America and BP Exploration & Production Inc., covering all of Mississippi Canyon Block 252, OCS Official Protraction Diagram NH 16-10, containing approximately 5,760 acres as to all depths and bearing a royalty of 18.75%.

Exhibit B – Well Plan and AFE

Attached to the Well Participation Agreement dated October 1, 2009, among BP Exploration Production Inc., Anadarko Petroleum Corp., and Kerr-McGee Oil Gas Corp.

bp

# AUTHORIZATION FOR EXPENDITURE

| AFE | X2-000X8 |
|---|---|
| Originator | YES - SPECIAL - Exploration |
| Sending Cost Center | |

| | | | |
|---|---|---|---|
| DATE PREPARED: | 25-Aug-2009 | FINANCIAL MEMO NO: | GoM-SPU-FM-2009-5 |
| OPERATOR: | BP | AFE NO: | X2-000X8 |
| LEASE/UNIT/FACILITY: | OCS-G-32306 | START DATE: | 1-Oct-2009 |
| LEASE/FAC FLAC ID: | Mississippi Canyon 252 | END DATE: | 29-Dec-2009 |
| WELL DESC/NAME/NO: | MC 252 #1 | SURFACE LOCATION: | X=1,202,803 Y=10,431,617 |
| WELL FLAC: | | BOTTOM HOLE LOC: | X=1,202,803 Y=10,431,617 |
| BUSINESS UNIT: | GoMX | PROPSD TOTAL DEPTH: | 19,561' TVD SS* |
| BP ET AL WORKING INTEREST: | 75.000% | COUNTY/STATE: | Offshore - GoM / LA |
| JOINT OPRTG AGRMNT NO: | | OPERATING FIELD: | Macondo - Wildcat |
| SAP COST CENTRE: | | HORIZON: (formation/prospect) | Miocene |

| | |
|---|---|
| Project ID | X2 Exploratory Drilling |
| Project Type | X2 Capital - Exploration authority |
| | X2 Exploration Well Costs |
| | Consolidated Adjustment - n/a |
| Project Co | |
| | Oil Well |
| | Exploratory Well |
| | Not a Joint Ther |
| | Drilling |

| PROJECT DESCRIPTION/COMMENTS | Project Name: Macondo ( MC 252 #1 ) |
|---|---|

Authority is requested to fund the drilling and evaluation of the Macondo exploration well. The well will be drilled with the Transocean "Marianas," semi-submersible in 4,992' of water. Six (6) strings of casing are planned to be run to reach TD. Also included is a contingency expandable liner, risked at 50%. Abandonment costs are also included in this AFE. The well is designed as a "keeper," and in the success case, the well will be temporarily abandoned for future completion. The well is estimated to require ~ 77 days and $96.1M to drill and temporarily abandon. *Objective Depth shall be the first to occur of the following: (a) 19,561' TVD SS, (b) a depth sufficient to encounter the first in-situ occurrence of the foraminifera Robulus L, or its stratigraphic equivalent, as encountered at 24,207' MD in the MC 496 #1 well (OCS-G 16641), or (c) an onset of pressure beyond 19,561' TVD SS that requires a new casing string to continue drilling.

| Working Interest OWNERS | Initial WI % | Final WI % | WI COST | NOTES |
|---|---|---|---|---|
| BP, et. al. | 66.667% | 75.000% | $ 64,066,987 | |
| Anadarko | 33.333% ** | 25.000% | $ 32,033,013 | **Until Objective Depth or 110% of Total Costs described herein, whichever occurs first |
| | | | $ - | |
| | | | $ - | |
| | Total 100% | Total 100% | Total Costs $ 96,100,000 | |

| TANGIBLE / INTANGIBLE | DESCRIPTION | ESTIMATED GROSS COST | |
|---|---|---|---|
| | | PROJECT / PRODUCER | DRY HOLE |
| INTANGIBLE | Rig MOB, prep, drill, evaluate, and abandonment costs | $ 87,457,000.00 | $ 87,457,000.00 |
| TANGIBLE | Tubular (36", 28", 22", 18", 16", 13-5/8", 11-7/8" csg), and wellhead costs | $ 8,643,000.00 | $ 8,643,000.00 |
| | TOTAL PROJECT COST | $ 96,100,000.00 | $ 96,100,000.00 |

| PROJECT CONTACTS: NAME | TITLE | EMAIL | PHONE |
|---|---|---|---|
| Mark Hafle | Drilling Engineer | mark.hafle@bp.com | 281-366-4237 |
| Andreas M. Kraus | D&C Project Services Team Lead | andreas.m.kraus@bp.com | 281-366-4703 |

PARTNER APPROVAL: YES ✓ NO ______ DATE 12/17/09

NOTICE TO NONOPERATORS: Costs shown are estimates only. Nonoperators should not consider these estimates as establishing any limit on the monies which will be required to perform the proposed operation. Overhead will be charged in accordance with the Joint Operating Agreement.

COMPANY NAME / NONOPERATOR: Anadarko

PRINT NAME: Stuart Strife TITLE: VP Exploration GOM

SIGNATURE:

BP APPROVAL: PRINT NAME: SIGNATURE: DATE:

Attorney-in-Fact Kemper Howe

Exhibit B - Continued



Exhibit 5 - Continued



Exhibit C – Macondo Prospect Operating Agreement

Attached to and made a part of the certain Well Participation Agreement dated Effective October 1, 2009, by and between BP Exploration & Production Inc., Anadarko Petroleum Corporation and Kerr-McGee Oil & Gas Corporation

# MACONDO PROSPECT OPERATING AGREEMENT