# EXHIBIT

# A

1

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF LOUISIANA

3

4

    IN RE:  OIL SPILL              MDL NO. 2179
5    BY THE OIL RIG
    "DEEPWATER HORIZON"           SECTION:  J
6    IN THE GULF OF
    MEXICO, ON                    JUDGE BARBIER
7    APRIL 20, 2010                MAG. JUDGE SHUSHAN

8

9



14

15

16                    **VOLUME 1**

17

18

19        Deposition of **MATTHEW JOHN LUCAS**, 501

20    Westlake Park Boulevard, Houston, Texas

21    77210, taken in the Pan American Life Center,

22    Bayou Room, 11th Floor, 601 Poydras Street,

23    New Orleans, Louisiana 70130, reported on

24    Thursday, February 24th, 2011.

25

**GAUDET, KAISER, L.L.C.**
Board-Certified Court Reporters

1      A.      Yes, you're correct.  But I

2  think this sentence is saying something else.

3      Q.      Well, yes, I wanted to ask you

4  something, they use the term "systemic

5  causes."  What does that mean to you?

6      A.      Systemic causes that are at a

7  deeper level than immediate and system

8  causes.

9      Q.      Okay.  And did your team

10 investigate systemic causes of the DEEPWATER

11 HORIZON disaster?

12     A.      No.

13     Q.      And that's because the terms of

14 reference said you didn't have to?

15     A.      That's correct.

16     Q.      And do you know why your terms

17 of reference excluded systemic causes?

18     A.      No.

19     Q.      Would you as the global head of

20 root cause analysis investigations, had you

21 been designing the terms of reference, would

22 you have considered going further down the

23 line and investigating possible systemic

24 causes?

25     A.      I would have considered it, yes.

```
 1          Q.      Okay.  Did you give any input
 2   into, or ask any questions why we're not
 3   going further and investigating possible
 4   systemic causes?
 5          A.      Yes.
 6          Q.      Who did you ask about that?
 7          A.      Mr. Bly.
 8          Q.      And how did you -- tell me about
 9   that conversation.
10          A.      I told him that there was a
11   difference between our group defined practice
12   and the terms of reference that we had been
13   given and that we needed to close that gap,
14   either to come up with an exception to that,
15   exception to the GDP, or to go through to
16   systemic root causes, one of the two to close
17   the gap.
18          Q.      Okay.  So you had a group
19   defined practice; correct?
20          A.      Correct.
21          Q.      And that group defined practice
22   said that you should investigate systemic
23   causes?
24          A.      Correct.
25          Q.      And you saw the terms of
```

1    reference, it said you should not?

2        A.      Right.

3        Q.      So you bring that to Mr. Bly,

4    and you say, "Look, either we investigate

5    systemic causes in accordance with the GDP or

6    we get an exception to the GDP"?

7        A.      Correct.

8        Q.      And what did Mr. Bly say?

9        A.      He said a few things.  He said

10   it wasn't certain what evidence was going to

11   be available and whether there would be

12   enough evidence available to get to that deep

13   of a level, and he also asked me to discuss

14   it with counsel.

15       Q.      What did he mean by he wasn't

16   sure that there would be enough evidence to

17   get that deep into it?

18       A.      That -- well, some examples

19   would be the people that we needed to

20   interview were not available and some of the

21   mechanical equipment and parts and evidence

22   that we're going to have, we're going to be

23   extremely limited.

24       Q.      Okay.  Who did you need to

25   interview to get to the systemic causes that

1   you couldn't interview?

2          A.       I don't know.

3          Q.       Without naming names, would you

4   give me some categories of people you would

5   think likely to interview if you were

6   investigating systemic problems in the

7   organization?

8          A.       Transocean, Halliburton.

9          Q.       So you're talking about their

10  systemic causes, their systemic problems,

11  right, Transocean's and Halliburton's?

12      MS. KALIS:

13          Object to form.

14      THE WITNESS:

15          Systemic issues can involve all,

16  some, combinations, and this rig was operated

17  by multiple entities, so you need to look at

18  it on a holistic level.  We had access to

19  some of our people, but we didn't have access

20  to others.

21      EXAMINATION BY MR. DART:

22          Q.       You could have investigated

23  systemic problems within the BP organization;

24  couldn't you?

25      MS. KALIS:

1          Object to form.

2     THE WITNESS:

3          If the evidence was available.

4     EXAMINATION BY MR. DART:

5     Q.     What evidence would not have

6   been available to investigate organizational

7   management problems within BP?

8     A.     Yeah, again, you know -- I don't

9   think-- I think what I would want to refer

10  back to is -- in our terms of reference it

11  was determined to get an exception and to

12  investigate according to the terms of

13  reference.

14    Q.     All right.  That's fine, please

15  answer my question.  What evidence was not

16  available to you to have conducted a systemic

17  investigation of BP's organizational

18  structure?

19    A.     I can't tell you that.

20    Q.     You can't?

21    A.     No.

22    Q.     Why not?

23    A.     Because when you do an

24  investigation, you work down into

25  successively deeper and deeper areas and

1    until you go -- without drilling down, you

2    don't know what it is that's going to be

3    three layers deep without working your way

4    down.

5         Q.    That's fine.  So how could you

6    know in the beginning whether there would not

7    be sufficient evidence with which to do a

8    systemic investigation if you don't know what

9    evidence you're going to need?

10        A.    We didn't know.

11        Q.    So why did you decide in

12   advance, or why did Mr. Bly decide in advance

13   that there wasn't enough evidence, when he

14   didn't know what evidence you needed?

15       MS. KALIS:

16            Object to form.

17       EXAMINATION BY MR. DART:

18        Q.    Can you answer that?

19        A.    No, I can't put myself in the

20   shoes of Mr. Bly.

21        Q.    Did you ask him, what are you

22   saying, Mark?

23        A.    I -- I think I have that answer

24   already, that he told me we would wait and

25   see what evidence would come up, but then we

1    decided, well, we should get an exception in

2    place anyway.

3         Q.      And who decided that the

4    exception should be obtained?

5         A.      Mr. Bly.

6         Q.      Mr. Bly.  And he decided that

7    based on what?

8       MS. KALIS:

9            Object to form.

10      THE WITNESS:

11           I can't say how he based his

12   decision.

13       EXAMINATION BY MR. DART:

14        Q.      Did he ever tell you?

15        A.      No, not beyond what I've already

16   told you.

17        Q.      Okay.  So in answer to your

18   query to him, "Do we follow the GDP or do we

19   follow the terms of reference?"

20           He said, "I'm getting an

21   exception, we're going to follow the terms of

22   reference"; right?

23        A.      Yes.

24        Q.      And he got the exception;

25   correct?

1  A.     The exception was granted, so I
2  have to look at the sheet -- yes.
3  Q.     Who did he apply to for this
4  exception and who granted it?
5  MS. KALIS:
6       Object to form.
7  THE WITNESS:
8       I would have to look at that sheet
9  again, wherever it was.
10 EXAMINATION BY MR. DART:
11 Q.     What sheet?
12 A.     The exception.  I would have to
13 look at the exception itself.
14 Q.     Where is that?  I don't know
15 what you're talking about.
16 MS. KALIS:
17      Object to form.
18 EXAMINATION BY MR. DART:
19 Q.     What exception are you referring
20 to?  You saw a document?
21 A.     The exception to the GDP.
22 Q.     Where -- is that an exhibit you
23 saw today?
24 A.     No.
25 Q.     Where did you see the exception

```
 1           THE WITNESS:
 2                There was a difference between what
 3      we normally do on an investigation and this
 4      investigation.
 5           EXAMINATION BY MR. DART:
 6           Q.      Right.  But for the terms of
 7      reference, you as the head investigator -- or
 8      as an investigator would have investigated
 9      systemic causes, correct, pursuant to the
10      GDP?
11           A.      Under normal circumstances, yes.
12           Q.      Right.  And that would have
13      applied in the DEEPWATER HORIZON case were it
14      not for the terms of reference; correct?
15           MS. KALIS:
16                Object to form.
17           THE WITNESS:
18                That, I don't know.
19           EXAMINATION BY MR. DART:
20           Q.      Isn't that what the GDP tells
21      you to do?
22           A.      Yes.
23           Q.      Okay.  You would have at least
24      looked into it?
25           A.      Yes.
```

# EXHIBIT

# B

1

1     UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF LOUISIANA

2

3

 IN RE:  OIL SPILL  MDL NO. 2179
4 BY THE OIL RIG
 "DEEPWATER HORIZON" SECTION:  J
5 IN THE GULF OF
 MEXICO, ON APRIL  JUDGE BARBIER
6 20, 2010    MAG. JUDGE SHUSHAN

7

8

9   Deposition of **KEVIN FONTENOT**, taken
in the Pan American Life Center, Bayou
10 Room, 11th Floor, 601 Poydras Street, New
Orleans, Louisiana 70130, on Thursday,
11 January 20, 2011.

12

13 **APPEARANCES**:

14

 ON BEHALF OF THE PLAINTIFFS
15
 STEERING COMMITTEE:

16

17   LEWIS, KULLMAN, STERBCOW
    & ABRAMSON
18   (By:  Paul M. Sterbcow, Esquire)
    601 Poydras Street
19   Suite 2616
    New Orleans, Louisiana  70130
20

21

    CUNNINGHAM BOUNDS, LLC
22   (By:  Robert T. Cunningham, Esquire,
     (Pro Hac Vice) and William E.
23   Bonner, Esquire)
    1601 Dauphin Street
24   Mobile, Alabama  36604

25

**GAUDET KAISER, L.L.C.**
Board-Certified Court Reporters

147

1    folks, the process hazard analysis folks in

2    the building of this Fault Tree that you

3    designed, I guess?

4         A.     Yes, sir.

5         Q.     You did?

6         A.     (Witness nods head).

7         Q.     And in what way did you interact

8    with those people?

9         A.     The same as with the rest.  I

10   would facilitate a discussion around the

11   Fault Tree and the organization of the

12   Fault Tree.

13        Q.     Okay.  And was it ever suggested

14   to you that process hazard problems, or

15   process safety problems were a contributing

16   factor to this incident?

17        A.     I don't recall that discussion.

18        Q.     Right.  Because if you would

19   have had that discussion, you would have

20   put that as one of the main factors that

21   you would then develop a Fault Tree;

22   correct?

23        A.     It depends on if it was, if the

24   facts played it out, yes, sir.

25        Q.     Sure.  Let's talk about root

**GAUDET KAISER, L.L.C.**
Board-Certified Court Reporters

Suggested line for running header

```
1          Q.      He did not?  Okay.  Did
2    Mr. Erick Cunningham ever say anything to
3    you that led you to believe that the
4    cement, alleged cement failure should have
5    been included in any Fault Tree Analysis?
6          A.      No.   We did not discuss Fault
7    Tree Analysis with Mr. Cunningham.
8          Q.      Did Mr. Erick Cunningham, sir,
9    ever say anything that led you to conclude
10   that you should have included cement
11   failure in a Fault Tree Analysis?  Whether
12   he requested it be put in or not, did he
13   ever say anything that led you to believe
14   that it ought to be included, those words?
15         A.      I didn't make a conclusion one
16   way or the other whether cement should or
17   should not have been included.
18         Q.      Thank you, sir.
19                 Now, you have there this
20   document, I'll just show it to you, to help
21   you.
22         A.      Okay.
23         Q.      You have that one and it's
24   marked BP HZN BLY 00080588.
25                 You have that, sir?
```

**GAUDET KAISER, L.L.C.**
Board-Certified Court Reporters

Suggested Line for Running Header

226

```
1        A.    Yes, sir.  I do.
2        MS. KARIS:
3              And Mr. Godwin, the same thing.
4    Since this one does not appear to have an
5    original Bates number label on it, I'll
6    accept the representation, I'll state for
7    the record that the subject of this at the
8    top says subject matter experts, just to
9    make sure we have the same documents when
10   we go back.
11       MR. GODWIN:
12             It is.  It is.  And this is
13   going to be Exhibit No. 15.
14             (Whereupon, the document
15   referred to was marked as Exhibit No. 15
16   for identification.)
17   EXAMINATION BY MR. GODWIN:
18       Q.    You have before you there what I
19   have marked as Exhibit 15?
20       A.    Yes, sir.
21       Q.    And this is a document I'll
22   represent we did receive from BP in
23   connection with document production.  And
24   it says subject matter experts, incident
25   team members, and it has several people
```

1    there listed with BP; does it not, on the

2    left-hand side?

3         A.    It says -- yes, sir.  I see

4    company, BP.

5         Q.    Okay, sir.  And it has a number

6    of others there down below with Baker Risk,

7    house -- Hose International, Boots-n-Coots,

8    Boots-n-Coots and Add Energy; does it not?

9         A.    Yes, sir.  It does.

10         Q.    And if you will look at the

11    position and title and there's -- subject

12    matter experts are listed for a number of

13    different specialties, if you will.

14              But there's nothing listed there

15    insofar as BP as of the writing of this

16    document having a cementing expert; is

17    there?

18         A.    I don't see that on here.

19         Q.    Thank you, sir.

20              Now, I'm going to hand you what

21    I've marked here as Exhibit 16.

22              (Whereupon, the document

23    referred to was marked as Exhibit No. 16

24    for identification.)

25    EXAMINATION BY MR. GODWIN:

# EXHIBIT

# C

# Executive Summary

On the evening of April 20, 2010, a well control event allowed hydrocarbons to escape from the Macondo well onto Transocean's *Deepwater Horizon*, resulting in explosions and fire on the rig. Eleven people lost their lives, and 17 others were injured. The fire, which was fed by hydrocarbons from the well, continued for 36 hours until the rig sank. Hydrocarbons continued to flow from the reservoir through the wellbore and the blowout preventer (BOP) for 87 days, causing a spill of national significance.

BP Exploration & Production Inc. was the lease operator of Mississippi Canyon Block 252, which contains the Macondo well. BP formed an investigation team that was charged with gathering the facts surrounding the accident, analyzing available information to identify possible causes and making recommendations to enable prevention of similar accidents in the future.

The BP investigation team began its work immediately in the aftermath of the accident, working independently from other BP spill response activities and organizations. The ability to gather information was limited by a scarcity of physical evidence and restricted access to potentially relevant witnesses. The team had access to partial real-time data from the rig, documents from various aspects of the Macondo well's development and construction, witness interviews and testimony from public hearings. The team used the information that was made available by other companies, including Transocean, Halliburton and Cameron. Over the course of the investigation, the team involved over 50 internal and external specialists from a variety of fields: safety, operations, subsea, drilling, well control, cementing, well flow dynamic modeling, BOP systems and process hazard analysis.

This report presents an analysis of the events leading up to the accident, eight key findings related to the causal chain of events and recommendations to enable the prevention of a similar accident. The investigation team worked separately from any investigation conducted by other companies involved in the accident, and it did not review its analyses, conclusions or recommendations with any other company or investigation team. Also, at the time this report was written, other investigations, such as the U.S. Coast Guard and Bureau of Ocean Energy Management, Regulation and Enforcement Joint Investigation and the President's National Commission were ongoing. While the understanding of this accident will continue to develop with time, the information in this report can support learning and the prevention of a recurrence.

The accident on April 20, 2010, involved a well integrity failure, followed by a loss of hydrostatic control of the well. This was followed by a failure to control the flow from the well with the BOP equipment, which allowed the release and subsequent ignition of hydrocarbons. Ultimately, the BOP emergency functions failed to seal the well after the initial explosions.

During the course of the investigation, the team used fault tree analysis to define and consider various scenarios, failure modes and possible contributing factors.

BP-HZN-BLY00000009

The investigation team developed a series of recommendations to address each of its key findings, and these recommendations are presented in this report. (Refer to *Section 6. Investigation Recommendations.*) The recommendations are intended to enable prevention of similar accidents in the future, and in some cases, they address issues beyond the causal findings for this accident. These recommendations cover contractor oversight and assurance, risk assessment, well monitoring and well control practices, integrity testing practices and BOP system maintenance, among other issues.

With this report, the investigation team considers the *Terms of Reference* of this investigation fulfilled. (Refer to *Appendix A. Transocean Deepwater Horizon Rig Incident Investigation Into Facts and Causation [April 23, 2010].*)

Additional physical evidence may become available following the recovery of subsea equipment. Ongoing activities, investigations and hearings may also provide further insight. BP will consider how best to examine and respond to further evidence and insights as they emerge.

It may also be appropriate for BP to consider further work to examine potential systemic issues beyond the immediate cause and system cause scope of this investigation.

Finally, given the complex and interlinked nature of this accident, it may be appropriate to further consider its broader industry implications.



**Figure 1.** Macondo Well.

BP-HZN-BLY00000012

# EXHIBIT

# D

389

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL BY     MDL NO. 2179
THE OIL RIG
"DEEPWATER HORIZON"      SECTION:  J
IN THE GULF OF
MEXICO, ON APRIL 20,     JUDGE BARBIER
2010                     MAG. JUDGE SHUSHAN



**VOLUME 2**

Deposition of **MARK ROBERT BLY**, 501

Westlake Park Boulevard, Houston, Texas

77210, taken in the Pan American Life Center,

Louisiana, on Friday, February 18, 2011.

**GAUDET, KAISER, L.L.C.**
Board-Certified Court Reporters

```
 1                    I think that's been provided,
 2      and I think it's probably on the second page
 3      there.
 4                    Okay.   The -- Let me ask you --
 5      There was a lot of discussion yesterday about
 6      this issue of the cementing and how the
 7      cement was tested and other things.
 8                    Tell me a little bit about your
 9      team as it relates to that particular issue.
10      Who was the expert here that was --
11           A.       So Kent Corser in terms of the
12      team leads.
13           Q.       Okay.  And what was his -- He
14      was responsible for engineering issues?
15           A.       Yeah.   We broadly called it
16      engineering, and so that -- that captured
17      that -- everything to do with cementing,
18      cement placement, you know, the float
19      equipment.   All that part of the
20      investigation was under Kent's purview.
21           Q.       Can you tell me, since you know
22      a little bit, about Mr. Corser's background?
23           A.       I know he's -- he's spent his
24      career in drilling.  I think he's an
25      exceptionally good drilling engineer --
```

1            Q.        Okay.  What --

2            A.        -- someone who I trust.

3            Q.        Would you consider him to be one

4    of BP's cementing experts?

5            A.        I wouldn't call him a cementing

6    expert.  He's a general drilling engineer.

7            Q.        Okay.

8            A.        And, now, I think that means

9    he'll have a pretty good sense of cementing,

10   because that's a -- you know, that's part of

11   drilling engineering, but as a -- a cementing

12   technical expert, I don't think I would

13   describe him that way.

14           Q.        Was -- Does BP have cementing

15   experts in-house, people who you would

16   consider --

17           A.        A few, yeah.

18           Q.        Okay.

19                     Were any of them involved in

20   working with Mr. Corser in this

21   investigation?

22           A.        I think they were interviewed as

23   part of the investigation.  They -- I don't

24   believe they were directly involved on the

25   team.

1    Q.      They were involved in terms

2  of -- How do we say it? -- participating in

3  any of the technical discussions?  Would they

4  have done that?

5    A.      It would have been in the form

6  of being interviewed as part of the

7  investigation as opposed to being on the

8  team.

9    Q.      So more of an interview as --

10   A.      Yeah.

11   Q.      -- as opposed to

12 participating -- or participating in any of

13 the technical conclusions.  They wouldn't

14 have been at the table for those?

15   A.      No.  No.  That's right.  They --

16 They would have been interviewed, but the

17 conclusions would have been drawn by Kent

18 Corser's team with -- with input from the

19 experts that he brought together.

20   Q.      Why didn't BP have someone at

21 the table on the team who was an expert in

22 cement?  Can you tell me why you would have

23 left that person out or that particular

24 piece?

25   A.      Well, I mean Ke -- you know, as

```
 1    I said, Kent's a good general guy, and when
 2    we realized what we -- general eng --
 3    drilling engineering, when we realized what
 4    kind of specialist input we wanted, it just
 5    made sense to go out and get the best we
 6    could get in the industry.
 7         Q.      And who was that that you went
 8    out to get?
 9         A.      The company called CSI.
10         Q.      CSI.  Okay.
11                 As you sit here today, if you
12    can answer this, knowing what you know now,
13    how would you change the report?
14         A.      I -- I wouldn't change it.
15         Q.      You're comfortable with it now,
16    with no additions.  If you could go back and
17    say, "Now I know something different," would
18    you add anything else to it?
19         A.      I wouldn't.  I mean I think
20    it -- You know, what was delivered on the 8th
21    of September, I think, was a good product
22    then, and I've -- I haven't seen anything
23    that counter -- you know, changes the views
24    of this.  In fact, anything I've seen
25    strengthens a couple of things that we were
```

# EXHIBIT

# E

01-37309
PW

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO.  2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO,  on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

## *CONFIDENTIAL*

### *WorldwideVIEW*™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



## Galina Skripnikova

**VOLUME 1**

JULY 7, 2011

## *COPY*



*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

211

```
 1        Q.      Sure.

 2        A.      Such a tiny, small zone.  We

 3   decide to highlight it, as a probable gas.

 4        Q.      Okay.  So as I understand it, on

 5   April 13th you told Mr. Bodek the shallowest

 6   hydrocarbon sand is 17,803 feet.  After you

 7   got back to the office and you looked at the

 8   logs more closely you-all highlighted and

 9   determined at 17,487 there was probable gas,

10   right?

11        MR. LANCASTER:  Object to form.

12        A.      Based on the data I had on the

13   rig --

14        Q.      (BY MR. WATTS)  Okay.

15        A.      -- this 17 -- this 17,803 sand

16   is the hydrocarbon zone I sent in that

17   e-mail.

18        Q.      Sure, I know that.  But the

19   point is is after you sent that e-mail you

20   came back to the office, you looked at the

21   log, and determined that it was probably,

22   because you highlighted it, that there was

23   2 feet of gas at 17,467 feet?

24        MR. LANCASTER:  Object to form.

25        A.      There was more data available
```

01:45   5
01:45  10
01:45  15
01:46  20
01:46  25

**PURSUANT TO CONFIDENTIALITY ORDER**

212

and more people in the room. We decided

to -- to highlight the zone as a possible

hydrocarbon -- possible gas bearing zone.

Q. (BY MR. WATTS) Okay. So here's

01:46 my question: When was this more data

available such that this analysis which

caused you-all to highlight as a probable

hydrocarbon zone, the one at 14,467, when was

that analysis done?

01:46 A. The analysis was done the day of

the incident.

Q. The day of the incident?

A. Yes.

Q. After the cement job was done,

01:46 right?

A. Yes.

Q. Okay. You are aware from the

e-mails, if not from other, that there are

MMS regulations as to where the top of cement

01:46 needs to be located relative to the

shallowest hydrocarbon-bearing sand, right?

A. As I know from MMS regulations,

it's 500 above the shallowest

hydrocarbon-bearing zone.

01:47 Q. Okay. So do you believe that BP

**PURSUANT TO CONFIDENTIALITY ORDER**

1  feet, correct?

2      A.      Yes.

3      Q.      All right.  All right.

4  Yesterday you touched briefly on a -- on a

5  conclusion that was reached on April 20th

6  wherein I believe you testified that various

7  other petrophysicists and other people

8  determined that -- that the determination of

9  the location of the most shallow hydrocarbon

10  sand was different than what was originally

11  determined on April 13th, I believe; is that

12  right?

13      MR. LANCASTER:  Object to form.

14      A.      Yes, that...

15      Q.      (BY MR. THIBODEAUX)  My only

16  question about that is did you -- did you

17  inform the Macondo drilling engineers that

18  a -- a shallower hydrocarbon sand was

19  identified?

20      A.      That change was done after

21  the -- the date after the incident.  So

22  the -- we did these permeable zones and we

23  gave it to -- I -- I don't know exactly.

24  There were several people asking for the

25  information about the possible permeable

**PURSUANT TO CONFIDENTIALITY ORDER**

434

1    petrophysicists.  It's a very uncertain

2    evaluation highlighted to make sure that

3    there is civility, we called it gas.

4         Q.    Okay.  We'll talk about that.  I

5    guess what I really want to know is right

6    now, it is BP's considered judgment after

7    relying on the experience, opinions of its

8    own engineers, that the sand named M57B is a

9    gas-bearing sand, correct?

10        MR. LANCASTER:  Objection; form.

11        MR. MONICO:  Objection; form.

12        A.    I can't talk for BP.  I can talk

13   about myself.

14        Q.    (BY MR. HILL)  Is it your

15   understanding that the M56B is a gas-bearing

16   sand?

17        MR. LANCASTER:  Object to form.

18        A.    It's probable gas.

19        Q.    (BY MR. HILL)  Probable gas.

20        A.    Likely -- it's probable gas.

21        Q.    So when you say "probable gas,"

22   it is a formation that we need to assume is

23   hydrocarbon-bearing?

24        MR. LANCASTER:  Object to form.

25        A.    There is a high uncertainty in

**PURSUANT TO CONFIDENTIALITY ORDER**

1  evaluation of this sand.  Looking -- if I

2  recall back when I didn't call it sand, back

3  to the rig, I would still want to call it

4  because I think -- I think it was wet.

5       Q.    (BY MR. HILL)  Okay.  Well, let

6  me --

7       A.    And then looking at the

8  analysis, why it changed, because later so

9  when we highlighted it as a -- as a gas sand,

10  as a group, right.  So that input went to

11  all -- to all other groups of people working

12  on the -- why -- why it happened, what caused

13  it.

14            But then after we received the

15  analysis of -- of all the sands within the

16  last open hole section done by Schlumberger

17  and ELAN it kind of confirms my understanding

18  what I was thinking on -- on the rig.

19       Q.    And what was your under- --

20       A.    And why I called it -- I didn't

21  call it hydrocarbon bearing.

22       Q.    What -- what did it -- what did

23  it confirm, to your understanding?

24       A.    It confirmed that that

25  resistivity elevated -- relatively elevated

**PURSUANT TO CONFIDENTIALITY ORDER**

441

1   hydrocarbon bearing?

2        A.    No.

3        Q.    So yesterday when you said that

4   there was a determination that it was and

5   that determination was made by the date of

6   the incident, what were you referring to?

7        A.    I was referring to the data

8   after the incident.  I probably kind of

9   didn't made it clear.  So the first -- when I

10  came back from -- from the rig and started

11  working with the -- with the logs, I didn't

12  work with that sand.  My focus was on the --

13  on the evaluating of production sands.

14            And so after the incident

15  happened, next day we had this meeting with

16  other petrophysicists in the room looking at

17  the big screen, and that's where it was

18  highlighted.  So...

19       Q.    In that meeting after the

20  incident, what data was available to that

21  room that wasn't available to you

22  pre-incident?

23       A.    The data -- first -- there were

24  several factors.  First of all --

25       Q.    Please answer my question.  I

**PURSUANT TO CONFIDENTIALITY ORDER**

1  asked you what data was available.

2      MR. LANCASTER:  Again, you can answer

3  the question as you need to answer the

4  question.

5          I would respectfully ask counsel

6  to stop interrupting the witness.  It's rude.

7      A.     There were much more detail

8  available right at that time.  For the

9  analysis with other petrophysicists, we used

10 process only data, we looked at CMR data all

11 together, and triple combo -- final version

12 of triple combo.  And I'm not saying that all

13 of that were contributed into our

14 considerations and our discussion, like --

15 like, for instance, CMR data did not

16 contribute much into -- into helping.  Or,

17 for instance, sonic data, we looked at that.

18 But, unfortunately, it was below the

19 resolution of the sonic tool to get much

20 more information about that.

21          But since it was on the big

22 screen, we zoomed in into depths and into

23 scale, which we did see that neutron density,

24 there was 2-foot sand and they actually do

25 form one data point crossover.

**PURSUANT TO CONFIDENTIALITY ORDER**

1     Q.    (BY MR. HILL)  Okay.

2     A.    So there were more people in the

3 room looking at that, so -- I didn't see the

4 crossover on the rig because it doesn't look

5 like that.

6     Q.    Okay.

7     A.    It looks like touch.

8     Q.    Okay.  So -- I'm sorry, are you

9 done?

10     A.    So those factors.  So we did

11 look at the mud data, that's for sure, but it

12 did not contribute into the analysis.

13     Q.    Okay.  So to be clear, the data

14 that you looked at post-incident was

15 basically the same data that was provided by

16 Schlumberger on the wireline loggings

17 pre-incident; you just looked at it a little

18 closer, right?

19     A.    No.  There was --

20     Q.    What changed?

21     A.    There was -- there was CMR data

22 available at that point and plotted together,

23 is triple combo, was sonic data available at

24 that point, put together.  There was triple

25 combo.  There was the OBMI data available put

**PURSUANT TO CONFIDENTIALITY ORDER**

1   together.  So there was a big --

2        Q.      Okay.

3        A.      -- plot-out on the big screen

4   looking into the detail in every sand.

5        Q.      Okay.

6        A.      That's how it was.  So I'm not

7   saying everything is contributed to it.  So

8   my biggest expectation would be sonic, but it

9   was below the resolution.  So -- and it was

10  the opinion in the room, it was very

11  difficult to identify the saturation of this

12  sand to highlight uncertainty respecting the

13  crossover be- -- with the sand.

14       Q.      Now, so that the record's clear

15  and so that the Court understands, when I

16  asked you earlier about the triple combo log,

17  one of the things I asked you about was the

18  density neutron crossover, right?  That's the

19  crossover you're talking about right now?

20       A.      I am talking about the crossover

21  on the density neutron log, yes.

22       Q.      And you're -- and I think I

23  understand your testimony to be that

24  post-incident, when you guys looked a little

25  bit close -- when you and your group or

**PURSUANT TO CONFIDENTIALITY ORDER**