## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In re:  Oil Spill by the Oil Rig "Deepwater  :
   Horizon" in the Gulf of Mexico, on  :
   April 20, 2010       :
                :
This Pleadings applies to:     :
   CASE NO. 11-cv-0516;   :
   CASE NO. 10-cv-03059   :
…………………………………………... :

MDL No. 2179

SECTION: J

JUDGE BARBIER
MAGISTRATE JUDGE SHUSHAN

### THE BP PARTIES' ANSWER TO THE STATE
### OF LOUISIANA'S FIRST AMENDED COMPLAINT

Defendants BP Exploration & Production Inc. ("BPXP"), BP America Production Company ("BPAP"), BP Corporation North America Inc. ("BPCNAI"), BP America Inc. ("BPA"), and BP p.l.c. (collectively, the "BP Parties"), by their undersigned counsel, and pursuant to Rule 8 of the Federal Rules of Civil Procedure, hereby answer the State of Louisiana's First Amended Complaint as follows:

### INTRODUCTION

1.

The State of Louisiana is the epicenter of the environmental and economic harms suffered as a result of the *Deepwater Horizon* disaster and resulting oil spill. The well blowout, explosion and sinking of the *Deepwater Horizon*, resulting in the largest marine oil spill in U.S. history, occurred approximately fifty miles off Louisiana's coast. Louisiana's shoreline, which was and continues to be significantly oiled as a result of the Gulf Oil Spill, constitutes a vitally important and valuable natural resource of national significance that provides numerous economic, environmental, cultural and recreational benefits. Louisiana's citizens, waters, marshes, wetlands, shoreline, ecology, economy, tourism, fisheries, and wildlife have been profoundly impacted by the Gulf Oil Spill, and will continue to be impacted for years to come.

### ANSWER:

The BP Parties admit that on April 20, 2010, there was a loss of control of the well being drilled by the vessel *Deepwater Horizon* in the Gulf of Mexico, and that there followed one or more fires and explosions, the sinking of the vessel, and a release of oil into the Gulf of Mexico,

some of which reached the shorelines of Louisiana.  The BP Parties further state that from the outset the BP Parties have expressed their commitment to pay all legitimate claims under the Oil Pollution Act, 33 U.S.C. 2701 *et seq.*, and the BP Parties' actions reflect this commitment.  In early May 2010, BPXP accepted the designation as an OPA "responsible party" and quickly established a claims process.  While operating that claims process, the BP Parties paid nearly $400 million to individuals and businesses.  On August 23, 2010, the BP Parties transitioned their individual and business claims process to the Gulf Coast Claims Facility ("GCCF"), which is administered by Kenneth R. Feinberg.  To date, over $5.73 billion has been paid from the GCCF to individuals and businesses.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

2.

The economic and environmental impacts to Louisiana resulting from this Incident are widespread and severe. The State and its people have suffered and are continuing to suffer vast economic damages as a consequence of this oil spill and the resulting response efforts. Likewise, Louisiana's coastal environment and ecosystem have incurred and are continuing to incur broad injuries that could fundamentally alter Louisiana's most defining natural resources and that may prove to be generational in both scope and duration.  In every respect, the damages that the Defendants have caused Louisiana are as insidious as the oil itself, still appearing and mounting daily without an apparent end in sight.  The State of Louisiana now files this First Amended Complaint to ensure that Louisiana, its environment and its citizens are made whole and the Defendants are brought to answer for the catastrophic consequences of their conduct, and of this disaster of historic proportions.

**ANSWER:**

The BP Parties state that from the outset the BP Parties have expressed their commitment

to pay all legitimate claims under the Oil Pollution Act, 33 U.S.C. 2701 *et seq*., and the BP

Parties' actions reflect this commitment.  In early May 2010, BPXP accepted the designation as

an OPA "responsible party" and quickly established a claims process.  While operating that

claims process, the BP Parties paid nearly $400 million to individuals and businesses.  On

August 23, 2010, the BP Parties transitioned their individual and business claims process to the

Gulf Coast Claims Facility ("GCCF"), which is administered by Kenneth R. Feinberg.  To date,

over $5.73 billion has been paid from the GCCF to individuals and businesses.  The BP Parties

deny the remaining allegations of this paragraph to the extent they concern the conduct or

liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074,

the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against

Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party

Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party

Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron

International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties

admit the remaining allegations of this paragraph to the extent they are alleged by one or more of

the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations

of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074,

2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief

about the truth of the remaining allegations of this paragraph to the extent they are not directed at

the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075,

2082, and 2064, and therefore deny those remaining allegations.

3.

Among the other claims asserted herein the State of Louisiana hereby brings claims for
natural resource damages and other forward looking claims for long term economic impacts and
lost revenues associated with the Spill in an abundance of caution.  These claims are subject to
ongoing assessments by the State, the costs of which the State is seeking herein. The State
acknowledges that these claims are not currently ripe for adjudication and that they may be
appropriately phased into the litigation, if ultimately necessary, at such time as the claims and
damages are properly assessed and quantified. However, because Louisiana has a residual one-
year prescription period and the State could not risk the Defendants' arguments that the State's
claims were time-barred or that the State was impermissibly splitting its claims, the State has
included these claims in this Complaint.

**ANSWER:**

The BP Parties admit that the State purports to assert claims for natural resource

damages, economic impacts, and lost revenues.  The BP Parties deny that the State has stated

valid claims for natural resource damages, and economic impacts and lost revenues.

**NATURE OF ACTION**

4.

This civil action arises from the blowout that occurred as the mobile offshore drilling unit
("MODU") *Deepwater Horizon* was performing temporary abandonment procedures on the
Macondo Well on April 20, 2010, catching the rig on fire and causing the rig to sink on April 22,
2010. The well blowout, explosion and sinking of the *Deepwater Horizon* resulted in the
unauthorized discharge of oil, gas and other pollutants from the wellhead, through *Deepwater
Horizon*'s blowout preventer ("BOP"), lower marine riser package ("LMRP") and a riser pipe,
all of which were connected to the Macondo Well, into the Gulf of Mexico and ultimately into

and upon the waters and coastline of the State of Louisiana (hereinafter referred to as the "Incident" or "*Deepwater Horizon* disaster").

**ANSWER:**

The BP Parties admit that on April 20, 2010, there was a loss of control of the well being drilled by the vessel *Deepwater Horizon* in the Gulf of Mexico, and that there followed one or more fires and explosions, the sinking of the vessel on April 22, 2010, and a release of oil into the Gulf of Mexico, some of which reached the shorelines of Louisiana.  The BP Parties deny the remaining allegations of this paragraph.

5.

The resulting oil, gas and other pollutants discharged from the Macondo Well and from the *Deepwater Horizon* and its equipment (hereinafter referred to as the "Gulf Oil Spill") invaded Louisiana's waters and adjoining coastline, severely injuring Louisiana's natural resources including its wetlands, shorelines, habitat and wildlife, and endangering the health, safety and welfare of the citizens of Louisiana. These impacts are ongoing.  The Gulf Oil Spill is the largest marine oil spill in U.S. history with an approximate release of over 4.9 million barrels of oil, methane gas and other pollutants.  Louisiana has been, and will continue to be, profoundly impacted by the *Deepwater Horizon* disaster and has incurred, and will continue to incur, significant costs and damages.

**ANSWER:**

The BP Parties admit that some oil discharged from the Macondo Well reached the shorelines of Louisiana.  As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business

claims.   The BP Parties have also settled numerous claims brought to them by local governments.  The BP Parties deny the remaining allegations of this paragraph.

<div align="center">6.</div>

The State of Louisiana files this civil action seeking declaratory relief, statutory damages, compensatory damages, response costs, civil penalties, punitive damages, and all other relief to which the State is entitled.

**ANSWER:**

The BP Parties admit that the States purports to state a claim for declaratory relief, statutory damages, compensatory damages, response costs, civil penalties, and punitive damages. The BP Parties deny the State has stated a valid claim for declaratory relief, statutory damages, compensatory damages, response costs, civil penalties, and punitive damages.

<div align="center">7.</div>

The State seeks a declaration as to certain Defendants' unlimited, joint and several liability and responsibility for all removal costs and damages to the State of Louisiana under the Oil Pollution Act, 33 U.S.C. § 2701 *et seq.*, ("OPA") and the Louisiana Oil Spill Prevention and Response Act, La. R.S. 30:2452 *et seq.* ("OSPRA").

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or

more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties deny that OPA and LOSPRA liability is joint and several where divisibility can be established.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

8.

The State asserts claims against certain Defendants under the federal Oil Pollution Act, the Louisiana Oil Spill Response and Prevention Act, federal maritime law, and state tort law for removal costs and damages arising from the Gulf Oil Spill.  The State alleges specifically that Defendants were negligent, grossly negligent, and/or willful; that certain Defendants manufactured, supplied, or sold defective products or engaged in ultra hazardous activities; that certain Defendants' actions created a public nuisance; and that certain Defendants' actions amount to trespass. Due to the wanton and willful nature of actions by BP and Transocean, the State seeks an award of punitive damages against these Defendants.

**<u>ANSWER:</u>**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP

7

Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.   The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

9.

The State of Louisiana has also filed a Complaint against several Transocean Entities for Declaratory Relief under OPA and Louisiana's OSPRA (Case No. 10-cv-03059).

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

10.

The State also asserts claims against certain Defendants herein for civil penalties and costs under the Louisiana Environmental Quality Act, La. R.S. 30:2001 *et seq.*, for the unauthorized discharge of vast quantities of oil, gas and other pollutants which entered the waters of the State of Louisiana and adjoining coastline of Louisiana as a result of the Gulf Oil Spill beginning on or about April 20, 2010 and continuing through the present and into the future.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

11.

The Defendants from which the State of Louisiana seeks relief are BP Exploration & Production, Inc. ("BP E&P"), BP Corporation North America, Inc., BP America, Inc., BP America Production Company, BP p.l.c. (unless stated otherwise, collectively referred to as "BP"), Anadarko Exploration & Production LP ("Anadarko Exploration"), Anadarko Petroleum Corporation ("Anadarko Petroleum") (Anadarko Exploration and Anadarko Petroleum, unless stated otherwise, collectively shall be referred to as the "Anadarko Defendants" or "Anadarko"), MOEX Offshore 2007 LLC ("MOEX 2007"), MOEX USA Corporation ("MOEX USA"), Mitsui Oil Exploration Co., Ltd. ("MOECO") (MOEX 2007, MOEX USA and MOECO, unless stated otherwise, collectively shall be referred to as "MOEX"), Transocean Holdings LLC, Triton Asset Leasing GmbH, Transocean Deepwater, Inc., Transocean Offshore Deepwater Drilling, Inc., Transocean Ltd. (Transocean Holdings LLC, Triton Asset Leasing GmbH, Transocean Deepwater, Inc., and Transocean Offshore Deepwater Drilling, Inc., and Transocean Ltd., unless stated otherwise, collectively shall be referred to as the "Transocean Defendants" or "Transocean"), Cameron International Corporation f/k/a Cooper-Cameron Corporation ("Cameron"), Halliburton Energy Services, Inc. ("Halliburton"), M-I, LLC ("M-I"), and Weatherford U.S. L.P. ("Weatherford").

**ANSWER:**

The BP Parties admit that the State has named the above entities in this action. The BP Parties deny that BPNACI and BPA are proper parties to this litigation. They did not own the MC 252 leasehold, had no employees on the *Deepwater Horizon*, and were not parties to the drilling contract with Transocean. The BP Parties deny the remaining allegations of this paragraph.

## PARTIES

### 12.

The State of Louisiana is a sovereign state of the United States. Louisiana brings this action on its own behalf to protect the State's economic and environmental resources and revenue, and as *parens patriae* on behalf of the citizens of Louisiana who have been, and will continue to be, impacted by the Gulf Oil Spill. Louisiana has standing, as *parens patriae*, to seek relief from impacts of the Defendants' acts and omissions upon the State as well as Louisiana's citizens and businesses.

**ANSWER:**

The BP Parties admit that the State of Louisiana is a sovereign state of the United States.

The BP Parties deny the remaining allegations of this paragraph.

### 13.

Under OPA and OSPRA, the Louisiana Oil Spill Coordinator's Office ("LOSCO"), along with other State Natural Resource Trustees, are authorized to undertake a process for assessing, pursuing and resolving natural resource damages resulting from an oil spill. 33 U.S.C. § 2706; La. R.S. 30:2480. The State Natural Resource Trustees are the Louisiana Department of Environmental Quality ("LDEQ"), the Louisiana Department of Wildlife and Fisheries ("LDWF"), the Louisiana Department of Natural Resources ("LDNR") and "other agencies of the state of Louisiana designated by the governor according to the Oil Pollution Act of 1990 as state natural resource trustees." Louisiana Administrative Code 43:XXIX.101(A). By letter dated May 20, 2010, from Governor Bobby Jindal to President Barack Obama, Governor Jindal appointed the Louisiana Coastal Protection and Restoration Authority ("CPRA") as the lead trustee agency for the purposes of the Gulf Oil Spill. That letter also designated LOSCO as lead administrative trustee and LDEQ, LDWF and LDNR as additional trustees. LOSCO, CPRA, LDEQ, LDWF and LDNR are collectively referred to herein as the "State Trustees."

**ANSWER:**

The BP Parties deny this paragraph to the extent it is inconsistent with 33 U.S.C. § 2706.

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

### 14.

The Louisiana Attorney General and the State Trustees are authorized and obligated to take affirmative action in order to protect those resources that are held in trust for the benefit of

the citizens of Louisiana. The claims for declaratory relief sought herein against Defendants are asserted so that the State may properly and adequately protect, assess and recover for those public resources injured by Defendants, as well as for any other damages allowed pursuant to OPA and OSPRA.

**ANSWER:**

The BP Parties admit that the State purports to assert a claim for declaratory relief.  The

BP Parties deny that the State has stated a valid claim for declaratory relief.  The BP Parties lack

knowledge or information sufficient to form a belief about the truth of the remaining allegations

of this paragraph, and therefore deny them.


15.


BP Exploration & Production, Inc. is a foreign corporation organized and existing under the laws of the State of Delaware and is licensed to and is doing business in the State of Louisiana.  BP E&P conducts its deepwater drilling and completion operations through its Gulf of Mexico Strategic Performance Unit ("GoM SPU").

**ANSWER:**

The BP Parties admit that BPXP is a Delaware corporation which is licensed to and doing

business in the State of Louisiana, and has a Gulf Of Mexico Strategic Performance Unit.  The

BP Parties deny the remaining allegations of this paragraph.


16.


BP Corporation North America, Inc. is a foreign corporation domiciled in the State of Indiana, with its principal place of business in the State of Illinois, and which is licensed to do business and is doing business in the State of Louisiana and this District.

**ANSWER:**

The BP Parties admit that BPCNAI is a foreign corporation organized under the laws of

the State of Indiana, and that it is licensed to do business in the State of Louisiana.  The BP

Parties deny that BPCNAI is a proper party.  The BP Parties deny the remaining allegations of

this paragraph.

17.

BP America, Inc. is a Delaware corporation with its principal place of business in the State of Illinois and is licensed to do business and is doing business in the State of Louisiana and this District. BP America, Inc. is the direct parent company of BP Exploration & Production, Inc.

**ANSWER:**

The BP Parties admit that BPA is a Delaware corporation and is licensed to do business in the State of Louisiana.  The BP Parties deny that BPA is a proper party.  The BP Parties deny the remaining allegations of this paragraph.

18.

BP America Production Company is a Delaware corporation with its principal place of business in Houston, Texas. BP America Production Company was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the *Deepwater Horizon* vessel. BP America Production Company is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

**ANSWER:**

The BP Parties admit that BPAP is a Delaware Corporation registered to do business in Louisiana, has a registered agent in Louisiana, and that BPAP, as successor to Vastar Resources Inc., and Transocean Holdings LLC, as successor to R&B Falcon Corp., were parties to a drilling contract concerning the use of the *Deepwater Horizon*.  The BP Parties deny the remaining allegations of this paragraph.

19.

BP p.l.c. is a foreign corporation with its principal place of business in London, England, and is doing business in the State of Louisiana and this District.  BP p.l.c. has conducted continuous and systematic activities within the United States and this District for at least the last ten years, directly and through its wholly owned and controlled subsidiaries.  Those activities are partly responsible for the cause of the Incident as described herein.  It was reasonably foreseeable that BP p.l.c.'s activities would lead to the possibility of being sued in this District.

**ANSWER:**

The BP Parties admit that BP p.l.c. is a British Public Limited Company organized under the laws of England and Wales, which is publicly traded with its headquarters in London, England, and that BP p.l.c. is not contesting the jurisdiction of this Court in this case.  The BP Parties deny the remaining allegations of this paragraph.

20.

Anadarko E&P Company, LP is a foreign business organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Texas and is doing business in the State of Louisiana and in this District.

**ANSWER:**

The BP Parties admit that Anadarko E&P Company LP ("Anadarko E&P") is a Delaware limited partnership.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

21.

Anadarko Petroleum Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Texas, and is doing business in the State of Louisiana and in this District.

**ANSWER:**

The BP Parties admit that Anadarko Petroleum Corporation ("Anadarko") is a Delaware corporation.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

22.

MOEX Offshore 2007, LLC is a foreign business organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Texas, and is doing business in the State of Louisiana and in this District.

**ANSWER:**

The BP Parties admit that MOEX Offshore 2007 LLC ("MOEX Offshore") is a Delaware Corporation.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

23.

MOEX USA Corporation is a foreign business organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Texas and is doing business in the State of Louisiana and in this District.

**ANSWER:**

The BP Parties admit that MOEX USA Corporation ("MOEX") is a Delaware Corporation.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

24.

Mitsui Oil Exploration Co., Ltd. is a foreign business organized and existing under the laws of Japan and has its principal place of business in Tokyo, Japan.  MOEX Offshore 2007, LLC and MOEX USA Corporation are wholly owned subsidiaries of Mitsui Oil Exploration Co., Ltd.

**ANSWER:**

The BP Parties admit that MOECO is an affiliate of MOEX and MOEX Offshore.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

25.

MOEX 2007 and MOEX USA are not distinct corporate entities and they do not perform autonomous business activities; rather, they are directly and wholly controlled by their ultimate parent company, MOECO.  As an alter ego of its subsidiaries, MOECO is liable to the same extent as MOEX 2007 and MOEX USA.

14

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

26.

Transocean Holdings LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal office located in the State of Texas, and is doing business in the State of Louisiana and in this District.

**ANSWER:**

The BP Parties admit that Transocean Holdings, LLC ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

27.

Triton Asset Leasing GmbH is a limited liability company organized and existing under the laws of the Swiss Confederation, with its principal office in Zug, Switzerland, and is doing business in the State of Louisiana and in this District. Triton Asset Leasing GmbH has conducted continuous and systematic activities within the United States and this District for at least the last ten years. Those activities are partly responsible for the cause of the Incident as described herein.

**ANSWER:**

The BP Parties admit that Triton is a Swiss corporation with its principal place of business in Zug, Switzerland. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

28.

Transocean Deepwater, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal office located in the State of Texas, and is doing business in the State of Louisiana and in this District.

**ANSWER:**

The BP Parties admit that Transocean Deepwater Inc. ("Transocean Deepwater") is a Delaware corporation with its principal place of business in Houston, Texas.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

29.

Transocean Offshore Deepwater Drilling, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal office located in the State of Texas, and is doing business in the State of Louisiana and in this District.

**ANSWER:**

The BP Parties admit that Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

30.

Transocean Ltd. is a corporation organized and existing under the laws of the Swiss Confederation, with an office in the State of Texas, and is, upon information and belief, doing business in the State of Louisiana and in this District.

**ANSWER:**

The BP Parties admit that Transocean Ltd. is a Swiss Corporation that, on information and belief, maintains substantial U. S. offices in Houston, Texas either directly or through its affiliates.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

31.

Cameron International Corporation f/k/a Cooper-Cameron Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal office located in the State of Texas, and is doing business in the State of Louisiana and in this District.

**ANSWER:**

The BP Parties admit that Cameron is a Delaware corporation with its principal place of business in Houston, Texas.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

32.

Halliburton Energy Services, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal office located in the State of Texas, and is doing business in the State of Louisiana and in this District. Sperry Drilling Services (formerly Sperry Sun Drilling Services) is a division of Halliburton.

**ANSWER:**

The BP Parties admit that Halliburton is a Delaware corporation with its principal place of business in Houston, TX and that Sperry Drilling Services is a division of Halliburton.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

33.

M-I, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal office located in the State of Delaware, and is doing business in the State of Louisiana and in this District.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

34.

Weatherford U.S. L.P. is a limited liability company organized and existing under the laws of the State of Delaware, with its principal office located in the State of Texas, and is doing business in the State of Louisiana and in this District.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

## JURISDICTION AND VENUE

35.

Jurisdiction is proper in this Court under 33 U.S.C. § 2717(b), which grants the United States District Courts exclusive original jurisdiction over all controversies arising under the Oil Pollution Act, without regard to the citizenship of the parties or the amount in controversy, and 33 U.S.C. § 2717(f)(2) which authorizes this Court to enter a declaratory judgment on liability for removal costs or damages that will be binding on any subsequent action or actions to recover removal costs or damages.  28 U.S.C. § 2201(a) further grants this Court the authority to declare the rights of the parties hereto.

**ANSWER:**

The BP Parties admit that this Court has jurisdiction over this action pursuant to the Oil Pollution Act.  The BP Parties deny the remaining allegations of this paragraph.

35.

Jurisdiction also exists pursuant to Article III, Section 2 of the United States Constitution which empowers this Court to hear "all claims of admiralty and maritime jurisdiction."

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

36.

The Court has supplemental jurisdiction over the State's civil penalty and state law claims pursuant to 28 U.S.C. § 1367(a) because these claims are so related to other claims in the action within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

**ANSWER:**

The Court dismissed the State's state law claims in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

37.

Venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391(a)(2), 33 U.S.C. § 2717(b) and La. R.S. 30:2025 because a substantial part of the events or omissions giving rise to the State's claims occurred in this District and substantial damage occurred in that part of the State encompassing this District.

**ANSWER:**

The BP Parties admit that venue is proper in this district in accordance with the Order of this Court and the JPML, consistent with the limits of what may be properly adjudicated in multidistrict litigation.  The BP Parties reserve all of their rights under *Lexecon, Inc. v. Milberg Weiss Bershad Hines & Lerach*, 523 U.S. 26 (1998).  The BP Parties deny the remaining allegations of this paragraph.

**FACTUAL ALLEGATIONS**

**The Defendants and Their Wrongful Conduct**

38.

BP E&P is the holder of Lease No. OCS-G 32306 granted by the United States Minerals Management Service ("MMS")[1] through Lease Sale #206 for Mississippi Canyon Block 252 (the "Lease"). The Lease became effective on June 1, 2008.  This Lease allowed the Defendants BP,

---

[1]   Secretary of Interior Ken Salazar changed the name of the Mineral Management Service on June 21, 2010, to the Bureau of Ocean Energy Management Regulation and Enforcement.

Anadarko and MOEX to drill for oil and perform oil production-related operations at the Macondo Prospect. BP Corporation North America, Inc. was registered with MMS as the financial guarantor for BP E&P.

**ANSWER:**

The BP Parties admit that on March 19, 2008, BPXP acquired a ten-year lease from the MMS to Mississippi Canyon Block 252 (Lease No. OCS-G 32306), which contains the Macondo Well, and that the lease started on June 1, 2008. The BP Parties further admit that BP Corporation North America Inc. was registered with the MMS as the Areawide Guarantor for BPXP. The BP Parties deny the remaining allegations of this paragraph.

39.

Pursuant to a series of agreements, including an Assignment of Record Title Interest in Federal OCS Oil and Gas Lease, and as evidenced by the Macondo Prospect Offshore Deepwater Operating Agreement, or Joint Operating Agreement ("JOA"), filed with and approved by MMS, BP E&P maintained a 65% ownership and operation stake in the Lease, or "Macondo Prospect," and assigned ownership stakes of 25% to Anadarko and 10% to MOEX. BP E&P is the designated "operator and local agent (designated operator) with full authority to act in the lessee's behalf in complying with the terms of the lease and applicable regulations" pursuant to a "Designation of Operator" for the Macondo Prospect.

**ANSWER:**

The BP Parties admit that, on or about November 2009, BP Exploration & Production Inc. and MOEX Offshore 2007 LLC entered into the Macondo Prospect Offshore Deepwater Operating Agreement ("Macondo Operating Agreement"), with an effective date of October 1, 2009. The BP Parties further admit that, on or about December 17, 2009, BP Exploration & Production Inc., Anadarko E&P Company LP ("Anadarko E&P"), and Anadarko Petroleum Corporation ("Anadarko") entered into a Ratification and Joinder of Operating Agreement Macondo Prospect, in which Anadarko E&P and Anadarko "do hereby ratify, confirm, and adopt and join the" Macondo Operating Agreement. The BP Parties admit that the November 18, 2009 Lease Exchange Agreement between BP Exploration & Production Inc. and MOEX Offshore

2007 LLC provided MOEX Offshore 2007 LLC with a 10% record title interest in Mississippi Canyon Block 252.  The BP Parties further admit that, on or about December 17, 2009, BP Exploration & Production Inc., Anadarko, and Anadarko E&P entered into a Lease Exchange Agreement, which provided Anadarko E&P with a 22.5% record title interest in Mississippi Canyon Block 252 and provided Anadarko with a 2.5% record title interest in Mississippi Canyon Block 252.  The BP Parties admit that BP Exploration & Production Inc. retained a 65% record title interest in Mississippi Canyon Block 252.  The BP Parties deny the remaining allegations of this paragraph.

<div align="center">40.</div>

On or about May 22, 2009, the MMS approved BP E&P's application for a permit to drill (APD) exploratory well No. 1 on the Macondo Prospect: the "Macondo Well."

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

<div align="center">41.</div>

On or around October 2009, the Defendants began drilling the Macondo Well using the Transocean Marianas, which was owned by Transocean Defendants and operated pursuant to one or more contractual agreements between BP E&P and Transocean.

**ANSWER:**

The BP Parties admit that drilling at the Macondo Well began on or around October 2009 using the Transocean Marianas.  The BP Parties further admit that the *Marianas* was owned by one ore more Transocean affiliates and that BP America Production Company and Transocean Offshore Deepwater Drilling Inc. were parties to the contractual agreements for the *Marianas*. The BP Parties deny the remaining allegations of this paragraph.

<div align="center">21</div>

42.

On or around February 2010, the MODU *Deepwater Horizon*, a dynamically positioned, semi-submersible drilling rig owned and operated by the Transocean Defendants, replaced the *Transocean Marianas* and the exploratory drilling operations of the Macondo Well continued through April 9, 2010. Immediately thereafter, procedures for the temporary abandonment of the Macondo Well were begun, and were in progress at the time of the Incident.

**ANSWER:**

The BP Parties admit that in February 2010, the MODU *Deepwater Horizon*, which is a

dynamically positioned semi-submersible drilling rig owned and operated by one or more

Transocean affiliates replaced the *Marianas* at the Macondo Well.  The BP Parties further admit

that exploratory drilling operations continued through April 19, 2010, when temporary

abandonment procedures began.  These procedures were in progress at the time of the Incident.

The BP Parties deny the remaining allegations of this paragraph.

43.

The *Deepwater Horizon* rig included various pieces of operating equipment such as sub-sea equipment and appurtenances, including, but not limited to, a blowout preventer ("BOP"), a lower marine riser package ("LMRP"), and a marine riser and associated piping ("riser pipe"). All of this equipment was attached to the wellhead, and was part of the facility at the time of the Incident.

**ANSWER:**

The BP Parties admit that the BOP, LMRP, marine riser, and riser pipe were all

appurtenances of the *Deepwater Horizon*.  The BP Parties deny the remaining allegations of this

paragraph.

44.

M-I, also known as M-I SWACO, was a contractor involved in oil and gas drilling on the Deepwater Horizon. Specifically, M-I provided BP and Transocean with drilling fluids (sometimes referred to as mud or drilling mud) that were used during the ill-fated attempt to temporarily abandon the Macondo Well.  Additionally, M-I provided support and supervisory personnel, including mud engineers and drilling fluid specialists, to oversee and manage the use

of drilling fluids in the well.  M-I employees therefore planned, supervised, and/or participated in the mud displacement activities that preceded the blowout of the Macondo Well on April 20, 2010. The proper use of drilling fluids, including the selection of appropriate spacer materials as well as the displacement and circulation of the drilling mud, was a crucial step in the efforts to temporarily plug the Macondo Well.

**ANSWER:**

The BP Parties admit that M-I and/or its affiliates provided products and services related to drilling fluids used at the Macondo Well, including supervising key fluid-related activities. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

45.

Despite the importance of drilling fluids, BP and M-I elected to utilize an inappropriate and unusually large amount of spacer fluid during the mud displacement operations.  Spacer fluid is used to create a division between different types of fluids.  In the case of the *Deepwater Horizon* operations, spacer fluid was required to separate the drilling mud from the seawater that was to displace it.  By selecting an inappropriate and untested spacer fluid, BP and M-I increased the risk that the mud displacement cementing operations would be ineffective, interfered with requisite testing of the integrity of the cementing operations, and/or adversely impacted the condition of the BOP.  Similarly, the use of a high volume of spacer fluid, far more than was otherwise required, also jeopardized the success of the mud displacement procedure.  Upon information and belief, BP and M-I selected the unconventional spacer fluid for the purpose of circumventing environmental regulations regarding the proper disposal of materials contained in the spacer fluid.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

46.

Weatherford manufactured the float collar that was utilized during drilling operations on the *Deepwater Horizon*. The float collar is a casing component that is installed at the bottom of

the casing string.  The float collar, which is essentially a one-way valve, is responsible for eliminating backflow of drilling fluids and cement and also prevents hydrocarbons from escaping from the well and traveling up the casing to the drilling rig.

**ANSWER:**

The BP Parties admit that Weatherford and/or its affiliates provided products and services related to the casing used at the Macondo Well.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

47.

During drilling operations, personnel aboard the Deepwater Horizon—including Weatherford personnel—encountered problems with the float collar, including difficulties closing (or converting) the float collar after it was installed. The failure of the float collar to seal properly and/or any other defects in the float collar could have allowed hydrocarbons to leak into the casing, thereby contributing to the blowout and explosions.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

**BP p.l.c. –Single Business Enterprise**

48.

BP p.l.c. is a global energy company operating in eighty countries, with its headquarters in London, England. Although BP has myriad corporate subsidiaries, in reality it operates itself as a single business enterprise, through "groups" organized by industry segments.  These include Exploration & Production, Refining & Marketing, and Alternative Energy.  Each group includes a large number of corporate subsidiaries around the world, and some corporate subsidiaries' activities are included in more than one group.

**ANSWER:**

The BP Parties admit that BP p.l.c. is a British Public Limited Company organized under the laws of England and Wales, which is publicly traded with its headquarters in London, England.  The BP Parties deny the remaining allegations of this paragraph.

49.

In all substantive respects, the corporate structure of BP's subsidiaries is disregarded.  BP p.l.c. directs and controls the overall operations of its subsidiaries through its group management structure. For example, BP p.l.c. implemented a corporate-wide operating management system ("OMS") which, according to BP, "provides a single framework for all BP operations to follow, covering all areas from process safety, to personal health, to environmental performance."  BP also creates Group Practices ("GP") or Group Defined Practices ("GDP") and Engineering Technical Practices (ETP), which require detailed operations and procedures across all BP entities.  For example, the Exploration & Production group has issued GPs for Well Operations, Zonal Isolation, Working with Pressure, and Well Control.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

50.

BP E&P is part of BP p.l.c.'s Exploration & Production group.  As such, all of its drilling and completion operations were directed and controlled by BP p.l.c. through, among other things the OMS, and the issuance of GPs, GDPs and ETPs.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

51.

Upon information and belief: (1) the corporate chain of ownership of BP E&P, through BP America, Inc. and other entities up to BP p.l.c. gives BP p.l.c. actual working control of these subsidiaries; (2) BP E&P, BP America, Inc. and BP p.l.c. share common directors or officers and/or have promoted officers of these subsidiaries to officer and/or director positions at BP p.l.c.; (3) BP p.l.c. exercises unified administrative control of its subsidiaries, including BP E&P and BP America, Inc., through groups whose business functions are similar or supplementary; (4) the directors and officers of BP E&P and BP America, Inc. act independently in the interest of BP p.l.c.; (5) BP p.l.c. finances BP E&P and BP America, Inc.; (6) BP p.l.c. (or its

predecessor in name) caused the incorporation of BP E&P and BP America, Inc.; (7) BP E&P, BP America, Inc. and BP p.l.c. use each other's property, services, and personnel as their own; (8) BP E&P and BP America, Inc. and BP p.l.c. share common employees; (10) BP E&P, BP America, Inc. and BP p.l.c. render services to each other by the employees of one corporation on behalf of the other corporation; (11) BP E&P, BP America, Inc. and BP p.l.c. share common offices; (12) BP E&P, BP America, Inc. and BP p.l.c. share centralized accounting; (13) BP E&P, BP America, Inc. and BP p.l.c. file consolidated U.S. income tax returns; and (14) there is excessive fragmentation of a single enterprise into separate corporations.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.


52.

The Incident and the resulting unauthorized discharge of oil, gas and other pollutants into the waters and onto the land of Louisiana were caused by the acts, omissions, fault, negligence, gross negligence, reckless, willful and wanton behavior, and/or breach of federal and state law and regulations, by the Defendants, which renders them jointly and severally liable to Louisiana for all of its damages as set forth below.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are

not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

53.

The Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Louisiana's marine and coastal environments and estuarine areas, and the State's coastal zone.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

54.

The Macondo Well was difficult to drill, especially in light of its location in 5,000 feet of water. Before April 20, 2010, the well had experienced several lost circulation events and kicks. One such event on March 8, 2010 nearly resulted in a catastrophic blowout of the well. As the

drilling went deeper, the tolerance between pore pressure and fracture gradient became extremely tight, increasing the risk of a blowout.  All Defendants knew, or should have known, of these problems and should have taken precautions to prevent the Incident.

**ANSWER:**

The BP Parties admit that the Macondo Well experienced a kick on March 8, 2010.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

55.

The Defendants failed to observe and/or comply with federal regulations and/or industry standards including, but not limited to, federal regulations and/or industry standards regarding the design, installation, maintenance, surveillance, repair, observation and operation of drilling equipment and/or operations.  These regulations and industry standards include 30 C.F.R. § 250 *et seq.*, as well as American Petroleum Institute (API) recommended practices including API RP 65 and API RP 75.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

56.

At the time of the Incident, the Macondo Well was months behind schedule and significantly over budget. Defendants made and/or authorized a number of reckless decisions concerning well design, cementing, and integrity testing in the interest of speed and cost savings, at the expense of safety and industry best practices.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim

and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and

Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against

Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP

Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or

more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining

allegations of this paragraph to the extent they are inconsistent with the allegations in Document

Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to

form a belief about the truth of the remaining allegations of this paragraph to the extent they are

not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos.

2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.


<div align="center">57.</div>

BP E&P's casing design for the Macondo Well was flawed.  Before the Incident BP E&P
knew that the casing used in the Macondo Well might collapse under the high pressures
encountered in the well. Just a few weeks before the Incident, BP E&P changed the original
casing design to use a "long string" casing for the final casing string rather than a "liner/tieback"
design, which would have provided more barriers against a well blowout. BP E&P knew that the
long string design was a risky option for the Macondo Well, given the problems that had already
been encountered with the well.

**<u>ANSWER:</u>**

The BP Parties admit that they chose a "long string" casing design for the Macondo Well.

The BP Parties deny the remaining allegations of this paragraph.


<div align="center">58.</div>

Before cementing the well for temporary abandonment, BP E&P elected to use only six
centralizers (which are used to center the casing in the well to avoid cement channeling), despite
notice from Halliburton, the cement contractor, that using less than 21 centralizers could cause a
severe gas flow problem.

**ANSWER:**

The BP Parties admit that they chose to use six centralizers.  The BP Parties further admit that Halliburton provided an OptiCem report to BP indicating that use of ten centralizers, as placed by Halliburton, would result in a Gas Flow Potential value that correlated with a "moderate" gas flow problem.  Halliburton also provided an OptiCem report to BP indicating that use of seven centralizers, as placed by Halliburton, would result in a Gas Flow Potential value that correlated with a "severe" gas flow problem.  Additional centralizers were available on the *Deepwater Horizon*.  Despite this revised OptiCem report, on April 28, 2010, Halliburton circulated a cement procedure containing its recommended cement plan and procedure for pumping the job.  The BP Parties admit that in an email, Brett Cocales agreed with the decision to run six centralizers and stated that it would probably be fine and result in a good cement job: "But, who cares, it's done, end of story, will probably be fine and we'll get a good cement job.  I would rather have to squeeze than get stuck above the WH.  So Guide is right on the risk/reward equation."  The BP Parties deny the remaining allegations of this paragraph.

59.

In order to save time, BP E&P decided to forego a "bottoms up" circulation of drilling mud before cementing the well.  This would have allowed for testing the mud for gas influx, release of gas pockets, and removal of debris from the bottom of the well so that the cement would not become contaminated. A "bottoms up" circulation likely would have indicated the gas flow problem that caused the Incident in time to prevent it.

**ANSWER:**

The BP Parties admit that circulation of one-and-a-half "bottoms up" was performed on April 16, 2010 before the cement job.  The BP Parties deny the remaining allegations of this paragraph.

60.

Because of the tight downhole pressure conditions of the Macondo Well, Halliburton recommended the use of nitrified foam cement slurry to seal the formations in the well.  BP E&P knew, or should have known, that Halliburton's foam cement slurry design would be unstable and could cause nitrogen breakout. Nevertheless, BP E&P decided to use the cement slurry before receiving the lab tests which would have indicated the instability.  Given the instability of the cement slurry design, BP E&P and Halliburton should have mixed fluid loss additives in the slurry mix to prevent formation losses, but did not do so.

**ANSWER:**

The BP Parties admit that Halliburton recommended a foamed cement for the production

interval cement job.  Foam cement is cement that has been injected with nitrogen gas to lower its

density.  The BP Parties deny the remaining allegations of this paragraph to the extent they

concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by

reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against

Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining

allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in

Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are

inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or

information sufficient to form a belief about the truth of the remaining allegations of this

paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are

not addressed in Document No. 2082, and therefore deny those remaining allegations.

61.

Halliburton performed a variety of services on the rig, including cementing, and had four employees stationed on the rig at the time of the accident.  As a result of testing that it performed prior to the start of final cementing operations on April 20, Halliburton knew that its cement slurry design was unstable and yet elected to use the design anyway.  Halliburton and BP were also aware that prior test results of a similarly designed cement slurry demonstrated that the slurry was unstable, and yet an alternative design was never utilized or requested.  Despite these warning signs, Defendants proceeded with cementing operations with Halliburton's slurry design.

**ANSWER:**

The BP Parties admit that Halliburton provided cementing services on the *Deepwater Horizon*, and had numerous employees on the rig at the time of the Incident.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and therefore deny those remaining allegations.

62.

As part of the cementing process, BP E&P used an improper base oil spacer mix just ahead and behind the cement slurry that, coupled with the small volume of cement used, may have contaminated the cement slurry.  BP E&P and Halliburton knew, or should have known, that the cement design and implementation had a very low probability of ever becoming an effective barrier to well flow.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny

33

the remaining allegations of this paragraph to the extent they are inconsistent with the allegations

in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief

about the truth of the remaining allegations of this paragraph to the extent they are not directed at

the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and

therefore deny those remaining allegations.

<div align="center">63.</div>

The spacer used in the cement job was a combination of Forma-set and Form-a-squeeze loss containment material (LCM) pills.  This was leftover material that government regulations prohibited from discharge directly into the Gulf.  However, if these materials are circulated in the well, a loophole in the regulations allowed them to be dumped overboard.  BP E&P intentionally used these materials as a spacer in order to save the cost of having to transport them to shore and properly dispose of them, all the while knowing that they were not designed for that application and that cement contamination could result.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served

on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph

to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny

the remaining allegations of this paragraph to the extent they are inconsistent with the allegations

in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief

about the truth of the remaining allegations of this paragraph to the extent they are not directed at

the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and

therefore deny those remaining allegations.

64.

After the cement job, BP E&P and Transocean ran a negative pressure test, designed to test the integrity of the cement. The negative pressure test was abnormal.  Transocean personnel advised the well site leader that the abnormal readings were due to the "bladder effect" and that the test results were normal.  The "bladder effect" is an unknown phenomenon and both BP E&P and Transocean had actual and/or constructive knowledge before the Incident that a negative pressure test indicated that the cement had failed to seal the hydrocarbon-bearing formation. Nevertheless, BP E&P and Transocean elected to ignore the abnormal test results without shutting in the well.

**ANSWER:**

The BP Parties admit negative pressure tests were conducted to confirm that the cement barrier and mechanical barriers (the shoe track, production casing and casing hanger seal assembly) were capable of withstanding an underbalanced condition.  The BP Parties admit that BP's Internal Investigation Report states that the "pressure of 1,400 psi on the drill pipe was misinterpreted by the rig crew and the well site leaders.  According to witness accounts, the toolpusher proposed that the pressure on the drill pipe was caused by a phenomenon referred to as 'annular compression' or 'bladder effect.'  The toolpusher and driller stated that they had previously observed this phenomenon.  After discussing this concept, the rig crew and the well site leaders accepted the explanation."  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.

65.

BP E&P had a Schlumberger team on the rig to perform a cement bond log (CBL) to test the integrity of the cement.  In spite of the abnormal negative pressure test results, BP E&P sent the Schlumberger team home without doing the CBL.  MMS regulations (30 CFR 250.428) require the running of a CBL when there is an indication of an inadequate cement job, such as the abnormal negative pressure test. The cement bond log test would have conclusively determined the integrity of the cement job, and BP E&P knew that it should have been performed and elected to violate Federal regulations requiring it.

**ANSWER:**

The BP Parties admit that there was a Schlumberger team on the rig to run a cement bond log (CBL) to check for top of cement in the event of lost returns or the lack of lift pressure during the cement job.  The BP Parties further admit that Halliburton reported there were no lost returns and lift pressure during the cement job and, as such, the Schlumberger team was released without running a CBL.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and therefore deny those remaining allegations.

66.

As part of its casing design and well plan, BP E&P decided not to deploy the long string casing hanger lockdown sleeve for the long string casing before cementing the well.  This lockdown sleeve would have locked the top of the long string casing at the wellhead, thereby providing an extra layer of protection against a blowout.  The long string wellhead seal at some

point was likely lifted out of place by pressure from below, resulting in a flow path for hydrocarbons to escape into the Gulf of Mexico.

**ANSWER:**

The BP Parties admit that a casing hanger lockdown sleeve ties down the seal assembly at the top of a well, and that a casing hanger lockdown sleeve was not used before cementing the well.  The BP Parties deny the remaining allegations of this paragraph.

67.

As long as the BOP, LMRP and Marine Riser are attached to the wellhead, a conduit directly to the rig exists through which well data will be obtained in real time.  As long as a direct conduit from the well to the rig exists, constant monitoring to ensure that well control is maintained is required.  Transocean is responsible, regardless of the other operations that were occurring, for ensuring that well control is maintained at all times.  In the critical hours before the blowout, Transocean and BP E&P decided to offload drilling mud to a waiting vessel, which caused rig workers to become distracted and fail to properly monitor well conditions. Additionally, the mud offloading process prohibited certain rig workers from monitoring the Sperry Sun data. The mud offloading should have been delayed until after the well was finally secured.

**ANSWER:**

The BP Parties admit that the Deepwater Horizon Accident Investigation Report published by BP's Incident Investigation Team indicates that from approximately 13:28 to 17:17 hours, mud was offloaded to the supply vessel *M/V Damon Bankston*.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to

the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP

Parties lack knowledge or information sufficient to form a belief about the truth of the remaining

allegations of this paragraph to the extent they are not directed at the conduct or liability of the

BP Parties and are not addressed in Document Nos. 2074 and 2075, and therefore deny those

remaining allegations.

<div align="center">68.</div>

Warning signs of well flow were being transmitted to the rig, to Halliburton's Houston office and BP E&P's Houston office in real time for almost an hour before hydrocarbons reached the rig, alerting rig workers to shut down the well.  Nevertheless, the rig workers apparently ignored these warning signs until it was too late.  Moreover, during that critical hour before the well blowout, there was no one at the Halliburton or BP E&P offices to monitor this data and issue the appropriate warnings. This data was also available on any BP E&P employee's laptop computer yet none of them were monitoring that data.

**ANSWER:**

The BP Parties admit that indications of influx were discernable in real-time pressure

data being monitored by the Transocean drilling crew and the Sperry Sun mudloggers on the rig

approximately forty-five minutes before the Transocean rig crew took any action to control the

well.  By the time the crew took action to control the well, hydrocarbons were likely already past

the BOP and in the riser.  Transocean policy states that the driller is responsible for monitoring

the well and shutting it in if influx is suspected.  Sperry Sun mudloggers were responsible for

also monitoring real-time pressure and other data from which influx was discernable.  The BP

Parties further admit that BP, Anadarko, MOEX, and other personnel had access to certain real-

time data on shore, but the responsibility for continuously monitoring real-time data fell to

Transocean and Sperry Sun rig-based personnel, and onshore personnel with access to the real-

time date were not responsible for continuously monitoring the well.  The BP Parties deny the

allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.

The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, or 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2082, and therefore deny those remaining allegations.

69.

When drilling mud started gushing onto the rig floor, the vessel crew diverted the flow from the well into the mud-gas separator (MGS), a device used to separate gas out of the drilling fluid and vent it safely into the air in the event of a kick.  The MGS vent was designed for small gas releases and the massive amount of gas flowing through it vented down onto the deck of the rig, causing the explosion and fire on the rig.  Another larger alternative diverter pipe was available, which would have vented the gas overboard, making it less likely to have ignited.  The rig crew should have employed that option, but failed to do so.

**ANSWER:**

Witness statements indicate that shortly after drilling mud shot up to the crown block, Transocean rig personnel diverted the flow from the well to the MGS, resulting in mud and hydrocarbons flowing out of the MGS and back onto the rig floor.  The diverter allowed the drilling crew to select whether to divert flow overboard through a 14-inch pipe on either side of the rig, or attempt to circulate through the MGS degassing components to remove gas from the

fluid.  As reflected in the Transocean Well Control Handbook, in the event of a large influx or

blowout, such as occurred on April 20, 2010, the rig crew should have opted to divert the flow

overboard.  Transocean Well Control Handbook, Sec. 8.4 at pp. 22-23 ("At any time, if there is a

rapid expansion of gas in the riser, the diverter must be closed (if not already) and the flow

diverted overboard.").  The Transocean crew's decision to divert through the MGS, instead of

through the alternative 14-inch diverter, increased the probability of combustible gas reaching an

ignition source aboard the *Deepwater Horizon* on April 20, 2010.  The BP Parties deny the

remaining allegations of this paragraph.


<div align="center">70.</div>

On information and belief, the initial explosion on the *Deepwater Horizon* on the night of
April 20, 2010, was caused when an engine in the rig's engine room sucked in the gas vapors
from the MGS vent pipe, causing the engine to overspeed.  Gas sensors designed to help avoid
explosions by shutting down these engines and closing air intake manifolds when flammable gas
is present were not operational on the night of the Incident.  Gas alarms which would have
alerted the crew to shut down the rig had been intentionally disarmed.

**ANSWER:**

The BP Parties admit that a flammable mixture was likely transferred into the engine

rooms because the *Deepwater Horizon* engine room HVAC fans did not shut down automatically

upon gas detection.  The BP Parties further admit that at least one engine went into overspeed

and may have been a source of ignition.  The BP Parties deny the remaining allegations of this

paragraph.


<div align="center">71.</div>

The rig's Emergency Disconnect System (EDS), which was designed to separate the
vessel from the Marine Riser in case of an emergency, failed to activate, allowing gas to continue
flowing through the riser and fueling the fire on the *Deepwater Horizon*, resulting in her sinking
two days later.

<div align="center">40</div>

**ANSWER:**

The BP Parties admit that the subsea supervisor attempted to activate the emergency disconnect sequence ("EDS") some time after the explosion, and that there were no indications that the sequence activated.  The BP Parties further admit that one or more fires and explosions resulted in the sinking of the *Deepwater Horizon* on April 22, 2010.  The BP Parties deny the remaining allegations of this paragraph.

72.

MMS regulations and industry standards required a blowout preventer as the last line of defense to a well blowout. The regulations and industry standards mandated a minimum configuration of annular preventers and blind sheer rams to shut off the well in the event of a blowout. They also required backup systems and controls, as well as periodic maintenance, to ensure that the BOP functioned when necessary.

**ANSWER:**

The BP parties admit that the MMS promulgated regulations, the text of which speaks for itself, regarding the use of blowout preventers.  The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with the MMS promulgated regulations regarding the use of blowout preventers.

73.

The *Deepwater Horizon*'s BOP and its control systems, manufactured, designed, and installed by Defendant Cameron, were not properly configured, improper modifications were made to them, and they were not properly functioning at the time of the Incident.  In addition, required inspections and maintenance on the BOP was not performed.  Rig audits of the *Deepwater Horizon* in September 2009 and April 2010 placed BP E&P and Transocean on notice of these deficiencies, yet these Defendants did nothing to correct them in time to prevent the Incident.

**ANSWER:**

The BP Parties admit that the BOP was manufactured, designed, and installed by Cameron, and that a Rig Audit was conducted in September 2009, the text of which speaks for

itself.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern

the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-

Claim and Third Party Complaint Against Transocean, which were served on all counsel on

April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent

they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the

remaining allegations of this paragraph to the extent they are inconsistent with the allegations in

Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to

form a belief about the truth of the remaining allegations of this paragraph to the extent they are

not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos.

2074 and 2075 and therefore deny those remaining allegations.

74.

BP made numerous ill-fated decisions before the disaster, including but not limited to: (1)
selecting an inappropriate well-design for the reservoir; (2) adopting risky well-design and
operations procedures; (3) failing to implement process safety changes to address a dysfunctional
safety culture; (4) failing to perform tests and misinterpreting test results; (5) improperly
messaging employees and contractors to put other concerns ahead of safety; (6) inadequately
supervising employees and contractors; (7) failing to communicate with employees and
contractors; (8) failing to properly train employees and contractors; (9) indemnifying contractors
for negligent acts that also discourages best practices; and (10) instituting other procedures that
deviated from industry norms.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

75.

For example, BP chose a risky well casing over more traditional equipment because it
would save the company three days and $7 million to $10 million. BP knew, or should have
known, that it was the wrong design for this particular job.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

76.

Again BP decided to take an untraditional approach when it attempted to remove drilling mud before capping. It ordered a loading sleeve but did not install it until drilling mud was removed from the site.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

77.

Ronald Sepulvado, one of the BP p.l.c. employees overseeing the rigs operations, told federal investigators on July 20, 2010, that workers detected a leak in the hydraulic system that controls the blowout preventer, the huge stack of valves on the sea floor that is supposed to shut down a well in an emergency.  Several individuals were aware of and reported that the BOP's yellow pod (one of two) was leaking hydraulic fluid:  Tyrone Benton, a remotely operated vehicle ("ROV") technician for Oceaneering, reported this to BP personnel while on the rig; Billy Stringfellow, a Transocean subsea superintendent, has testified he knew of the leak; Ronnie Sepulvado, BP's wellsite leader, stated he reported the leak to John Guide, another wellsite leader, just before leaving the rig four days before the explosion, stating: "I assumed everything was ok, because I reported it to the team leader and he should have reported it to MMS." Ultimately, Guide testified on July 22, 2010, that: "We did not feel the leak affected functionality of the BOP and therefore it did not rise to the level it needed to be reported to the MMS."

**ANSWER:**

The BP Parties admit that the above persons testified before the Marine Board of

Investigation, the record of which speaks for itself.[2]   The BP Parties deny the remaining

allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the

remaining allegations of this paragraph, and therefore deny them.

---

[2] By referencing MBI testimony, the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the referenced statement.

78.

BP violated federal regulations when it continued drilling even though it knew that either, or both, of the blowout preventers' two control systems did not work properly. Federal Regulations, specifically, 30 CFR 250.451(d), state that in the event of a "BOP control station or pod that does not function properly," drilling operations must be suspended "until that station or pod is operable."

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

79.

BP also violated federal regulations through its failure to examine and test the BOP every three to five years as required by law.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

80.

The standard for inspection and certification was created by the industry-run API.  API institutes standards that regulators adopt and become mandatory as part of the law. *See e.g.* National commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, Report to the President, *Deep Water, The Gulf Oil Disaster and the Future of Offshore Drilling,* p. 225. Washington, D.C.; U.S. Government Printing Office, January 2011.

**ANSWER:**

The BP Parties admit that API recommends standards for inspection and certification.[3]

The BP Parties lack knowledge or information to form a belief about the truth of the remaining

allegations of this paragraph, and therefore deny them.

---

[3] By referencing these documents, the BP Parties neither admit nor imply that the documents are admissible into evidence and expressly reserve all objections to the use or admissibility of the documents.

81.

A maintenance audit conducted by BP in September 2009 found that Transocean had left 390 maintenance jobs undone, requiring more than 3,500 hours of work.  The BP audit referred to this amount of deferred work as "excessive".

**ANSWER:**

The BP Parties admit that a Rig Audit was conducted in September 2009, the text of which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with the September 2009 Rig Audit.

82.

When the rig exploded on April 20, 2010, BP was approximately forty-three days behind schedule. This delay cost the company more than $21 million in additional rig rental rates.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

83.

Once the well began to flow out of control, vital safety systems on the rig failed, resulting in an uncontrolled disaster. Successful deployment of the safety systems should have prevented or lessened the severity of the disaster.

**ANSWER:**

The BP Parties admit that there was a loss of control of the well, and that there followed one or more fires and explosions aboard the *Deepwater Horizon*.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of

which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

<div align="center">84.</div>

Michael Williams, the vessel's chief electrician and an employee of Transocean Ltd., testified on July 23, 2010, at a federal hearing, that the general alarm system aboard *Deepwater Horizon* was disabled before the explosion.

**ANSWER:**

The BP Parties admit that Michael Williams testified before the Marine Board of Investigation, the record of which speaks for itself.[4]  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to

---

[4] By referencing MBI testimony, the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the referenced statement.

the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP

Parties lack knowledge or information sufficient to form a belief about the truth of the remaining

allegations of this paragraph to the extent they are not directed at the conduct or liability of the

BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those

remaining allegations.

85.

In addition, the rig's emergency power failed, systems that were designed to shut down
engines before they could spark an explosion failed, and the rig's emergency disconnect system,
which is supposed to shut down the well and disconnect the rig so it can float free, failed.  The
Forensic Examination of *Deepwater Horizon* Blowout Preventer performed by Det Norske
Veritas for the Department of the Interior ("DNV BOP Report") dated March 21, 2011, indicates
that the BOP's remaining operable pod, the blue pod, may have had battery issues that kept the
deadman function (EDS) from allowing the rig disconnection.

**<u>ANSWER:</u>**

The BP Parties admit that alarm systems were installed on the *Deepwater Horizon* which

were meant to shut down potential ignition sources but failed to do so.  The BP Parties further

admit that the subsea supervisor attempted to activate the emergency disconnect sequence

("EDS") some time after the explosion, and that there were no indications that the sequence

activated.  The BP Parties admit that Det Norske Veritas published a report, the text of which

speaks for itself.[5]  The BP Parties adopt and incorporate by reference Document 2074, the BP

Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean

and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint

Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit

the remaining allegations of this paragraph to the extent they are alleged by one or more of the

---

[5] By referencing DNV Report, the BP Parties neither admit nor imply that the referenced document is admissible
into evidence and expressly reserve all objections to the use or admissibility of the referenced document.

BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

<div align="center">86.</div>

The injuries and damages suffered by the State were caused not only by the Defendants' deficient and risky decision-making, but also by the Defendants' violations of numerous statutes and regulations, including, but not limited to, statues and regulations issued by OSHA and the United States Coast Guard, including the requirement to test the sub-sea BOPs at regular intervals.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are

not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

87.

Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Louisiana's marine and coastal environments and estuarine areas, and the coastal zone.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

88.

Pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq*., lessees must file an Exploration Plan outlining the proposed drilling activities.  According to OCSLA, and regulations implementing the Act, the proposed activities should not:

(1)     Cause serious or undue harm or damage to life, property,... or the marine, coastal, or human environment;

(2)     Unreasonably interfere with other uses of the area;

(3)     Interfere with or endanger operations on other leases;

(4)     Result in pollution;

(5)     Create hazardous or unsafe conditions; or

(6)     Disturb any site, structure, or object of historical or archaeological significance.

*See* 43 U.S.C. § 1340(g) and 30 C.F.R. 251.6(a). The BP Defendants did not prepare such a plan.

**ANSWER:**

The BP Parties admit that 43 U.S.C. § 1331 *et seq*. and regulations issued pursuant to that statute partially contains the above quoted language.   The BP Parties deny the remaining allegations of this paragraph.

89.

In 2005, after extensive public notice and comment, the MMS adopted regulations that set national standards governing oil and gas drilling on the Outer Continental Shelf ("OCS"). 30 C.F.R. 200 *et seq*. These regulations require that every Exploration Plan contain public disclosures of a blowout scenario, including the highest volume of hydrocarbons that could be discharged from an uncontrolled well blowout, the maximum flow rate, duration and volume of such a blowout, the likelihood that the blowout could be stopped by surface intervention, rig package constraints and the availability of a rig to drill a relief well, as well as the time needed to drill such a relief well. 30 C.F.R. 250.213(a). The regulations also require the oil company to submit an Oil Spill Response Plan containing, inter alia, a description of a "worst case" spill scenario from an exploration well. 30 C.F.R. 250.219 & 250.250. Together, these requirements ensure that operators consider and plan for what can go wrong and how to prevent disasters, or mitigate the damage.

**ANSWER:**

The BP Parties admit that 30 C.F.R. 200 *et seq*. contain regulations governing oil and gas drilling, the text of which speaks for itself.  The BP Parties deny the allegations of this paragraph to the extent they are inconsistent with 30 C.F.R. 200 *et seq*.

90.

In 2009, the MMS proposed a rule that would have required companies to have their safety and environmental management programs audited once every three years.  The BP Defendants submitted a formal objection to this rule, claiming, in part, that: "BP currently operates under our Operating Management System (OMS), which includes all of the elements proposed in this rulemaking. While BP is supportive of companies having a system in place to reduce risk, accidents, injuries and spills, we are not supportive of the extensive, prescriptive regulations as proposed in this rule.  We believe industry's current safety and environmental statistics demonstrate that the voluntary programs implemented since the adoption of API RP 75 have been and continue to be very successful."

**ANSWER:**

The MMS' proposed rule and BP America Inc.'s comments regarding that rule speak for themselves.  The BP Parties deny the allegations of this paragraph to the extent they are inconsistent with the MMS' proposed rule and BP America Inc.'s comments regarding that rule.

91.

Jim Hackett, the CEO of Anadarko Petroleum, testified that "mounting evidence clearly demonstrates that this tragedy was preventable and the direct result of BP's reckless decisions and actions."  Anadarko also asserted that "publicly available information . . . indicates BP operated unsafely and failed to monitor and react to several critical warnings during the drilling of the Macondo well.  BP's behavior and actions likely represent gross negligence or willful misconduct and thus affect the obligations of the parties under the operating agreement."

**ANSWER:**

The BP Parties admit that Anadarko issued a statement on or about June 18, 2010, the text of which speaks for itself.[6]  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.

92.

Rex Tillerson, ExxonMobil's CEO, testified:   "[T]he API already has a number of standards and recommended practices for cement and cementing operations; and I think, had those been followed, at least that element in this case might have been eliminated.  [I]t appears

---

[6] By referencing Anadarko's statement, the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the referenced statement.

clear to me that a number of design standards were — that I would consider to be the industry norm were not followed. . .We would not have drilled the well the way they did." June 15, 2010 U.S. House Energy and Commerce, Subcommittee on Energy and the Environment hearing on "Offshore Drilling Operations and Safety."

**ANSWER:**

The BP Parties admit that Rex Tillerson testified before Congress, the record of which speaks for itself.[7]  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

93.

Similarly, John Watson, the CEO of Chevron, testified:  "At Chevron one goal overrides all others: making sure everyone goes home safe every day. We have multiple systems to prevent a tragedy like the *Deepwater Horizon*. Our drilling policies and procedures are rigorous.  We require continuous training.  We certify our drilling personnel to ensure they are qualified to manage unusual circumstances, and we verify that contractors have the skills to execute well control. . . .   There are several areas that appear, based on the information we've seen in the joint industry task force and based on the information we've been able to gather, that suggest the practices that we would not put in place were employed here."   June 15, 2010 U.S. House Energy and Commerce, Subcommittee on Energy and the Environment hearing on "Offshore Drilling Operations and Safety."

**ANSWER:**

The BP Parties admit that John Watson testified before Congress, the record of which speaks for itself.[8]  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties lack knowledge or

---

[7] By referencing Congressional testimony, the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the referenced statement.

[8] By referencing Congressional testimony, the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the referenced statement.

information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

<div align="center">94.</div>

The President of Shell Oil, Marvin Odum, likewise testified that "[F]rom the information that was in your letter and what we know about the well, a similar statement, that it's not a well that we would have drilled with that mechanical setup, and there are operational concerns." June 15, 2010 U.S. House Energy and Commerce, Subcommittee on Energy and the Environment hearing on "Offshore Drilling Operations and Safety."

**ANSWER:**

The BP Parties admit that Marvin Odum testified before Congress, the record of which speaks for itself.[9]  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

<div align="center">95.</div>

In 2000, a chemical plant in Grangemouth, Scotland, owned and operated by a BP p.l.c. subsidiary, had a number of chemical releases and fires.  A subsequent investigation by the U.K. authorities attributed the accidents to systemic failures in BP's safety management system.  In 2005, a catastrophic explosion occurred at the Texas City, Texas refinery owned and operated by BP America, Inc.  An independent report by the Baker Commission cited BP for systemic failures in its safety management systems.  In 2006, an oil pipeline leak occurred in Alaska at a BP America, Inc. facility.  Once again, an independent report by Booz, Allen, Hamilton cited BP for systemic failures in its safety management systems.

**ANSWER:**

The BP Parties admit that in May and June of 2000, a power distribution failure, a steam main rupture, and a fire occurred at the Grangemouth petrochemical complex, on or about July 28, 2005, an explosion occurred at the Texas City Refinery, and in March 2006, an oil transit line

---

[9] By referencing Congressional testimony, the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the referenced statement.

in Prudhoe Bay, Alaska released a certain amount of crude oil into the in substantial part due to a rapidly acting type of corrosion in the line called Microbial Induced Corrosion. The BP parties further admit that the Health and Safety Executive prepared a report examining the incidents at the Grangemouth complex, the BP U.S. Refineries Independent Safety Review Panel (chaired by former Secretary of State James A. Baker, III) prepared a report examining the incident at the Texas City Refinery, and Booz Allen Hamilton prepared a report examining the incident on the Prudhoe Bay oil transit line. The BP Parties deny the remaining allegations of this paragraph.

96.

After each of the foregoing events, BP p.l.c. announced that it was enacting sweeping reforms to its safety management systems. As each succeeding incident occurred, these alleged reforms did not prevent the next disaster.

**ANSWER:**

The BP Parties admit that after each of the events identified in their answer to paragraph 95, BP conducted internal investigations into and/or commissioned independent third parties to investigate the underlying incidents. In each instance, BP reflected on the results of those investigations and took appropriate actions in response. The BP Parties deny the remaining allegations of this paragraph.

97.

The latest iteration of BP p.l.c.'s safety management system is called the Operating Management System (OMS). BP p.l.c. intended to implement its OMS in all of its divisions or groups, including the GoM SPU division of BP E&P, before the design and drilling of the Macondo Well. The OMS included implementation of Group Defined Practices which affected the design and operation of the Macondo Well.

**ANSWER:**

The BP Parties admit that as part of BP's efforts to further enhance safety and overall performance, BP developed a new, comprehensive management system to integrate its existing

54

standards, processes and practices, known as the Operating Management System ("OMS"). OMS was rolled out through BP's organization in waves.  The GoM Strategic Performance Unit was one of the first BP business units to adopt OMS, issuing its local OMS manual in December 2008.  The GoM Drilling & Completions organization issued its local OMS manual in November 2009, building upon various practices and standards for deepwater drilling that had already been well established within the GoM D&C organization.   OMS incorporated various new and already-existing Group Defined Practices, which applied to different aspects of the BP organization as applicable and when effective.  The BP Parties deny the remaining allegations of this paragraph.

<div align="center">98.</div>

A critical element of BP's OMS is the concept of continuous improvement of procedures and practices. As stated by BP p.l.c. "Our performance improvement cycle is at the heart of OMS, driving and sustaining change and improvement in local business processes. It incorporates the concept of continuous improvement (CI), which provides the tools and frame of mind needed to engage the entire organization in tackling challenges and ensuring that problems are eliminated and operations run at maximum efficiency."

**ANSWER:**

The BP Parties admit that the OMS framework operates by applying a Performance Improvement Cycle to local business processes.  Generally, the Performance Improvement Cycle helps identify, prioritize, plan, implement and imbed improvement opportunities, and provides a common approach to drive and embed improvements through its annual application and link to the annual planning process.  The BP Parties deny the remaining allegations of this paragraph.

<div align="center">99.</div>

After the *Deepwater Horizon* disaster, BP E&P conducted an internal investigation of the causes of the Incident. The investigation specifically did not address systemic problems as potential causes of the Incident. Nevertheless, recommendations by the investigative report indicated significant failures in BP E&P's OMS before the Incident.  Had OMS been properly

<div align="center">55</div>

implemented by BP p.l.c. at BP E&P, the problems pointed out in the recommendations of the investigative report should have been addressed and cured before the design and drilling of the Macondo Well, and the Incident would have been less likely to occur.

**ANSWER:**

The BP Parties admit that BP established an Internal Investigation team which published the Deepwater Horizon Accident Investigation Report, the text of which speaks for itself.[10]  The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with the Report.  The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the conduct or liability of the BP Parties.

100.

BP p.l.c.'s OMS contained inherent weaknesses which did not ensure an adequate safety management system. BP p.l.c. took on the obligation to implement OMS across its subsidiaries, but did not insure that they properly did so.  The inherent weaknesses in BP p.l.c.'s OMS and the failure to properly implement and supervise the OMS contributed, in part, to the cause of the Incident.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

101.

The GoM SPU's OMS document created a detailed Central Team Model responsible for well design and management centered around two core groups: Engineering and Operations. However, just months before the Incident, the GoM SPU rearranged its management structure. This led to confusion in critical decisions made affecting the management of the Macondo Well which resulted, in part, in the Incident.

**ANSWER:**

The BP Parties admit the GoM D&C Operating Plan / Local OMS Manual provides for a

Central Team Model that revolves around the core groups of Engineering and Operations.  The

---

[10] By referencing the Deepwater Horizon Accident Report, the BP Parties neither admit nor imply that the referenced document is admissible into evidence and expressly reserve all objections to the use or admissibility of the referenced document.

BP Parties further admit that in 2009, BP decided to change certain aspects of the global organizational structure of its E&P business segment.  Implementation of the new organizational structure began in early 2010 and was largely complete by the end of April 2010.  The BP Parties deny the remaining allegations of this paragraph.

102.

According to BP E&P it gave or made available to its co-owners, Anadarko and MOEX, documents that showed the well design and changes to the well design.  BP E&P also identified major well control events encountered during drilling operations and personnel from the co-owners engaged in periodic communications with BP about well design and other issues related to the well.

**ANSWER:**

The BP Parties admit that BPXP provided Anadarko, Anadarko E&P, and MOEX Offshore documents reflecting the Macondo Well design.  The BP Parties further admit that BPXP notified Anadarko and MOEX Offshore of well control events during drilling operations at the Macondo Well.  The BP Parties further admit that BPXP communicated with Anadarko and MOEX Offshore about the well design and other issues related to the well.  The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the conduct or liability of the BP Parties.

103.

On information and belief, Anadarko and MOEX were aware of design choices for the well, including the decision to use a so-called "long string casing", and the number of centralizers being used to stabilize the long string, rather than the safer alternative of hanging a liner to the lower end of the casing with a "tieback."

**ANSWER:**

The BP Parties admit that BPXP provided Anadarko, Anadarko E&P, and MOEX Offshore documents reflecting the Macondo Well design, including the use of a long string

casing and the number of centralizers used at the Macondo Well. The BP Parties lack

knowledge or information sufficient to form a belief about the truth of the remaining allegations

of this paragraph, and therefore deny them.

104.

The operating agreement among BP E&P, Anadarko and MOEX: (1) required that copies
of all APDs, IADC daily reports, core data, logs, surveys, all digitally recorded data, well test
results, bottomhole pressure surveys, hydrocarbon analyses, drilling prognoses, and forty-eight
(48) hours' advance notice of logging, coring, or testing operations be provided to Anadarko and
MOEX; (2) gave Anadarko and MOEX the right to request copies of any Health, Safety and
Environmental ("HSE") audits conducted of the drilling operations on the subject well; (3) gave
Anadarko and MOEX the right of access to activities and operations and access to Operator's
HSE files as provided for in this Operating Agreement; (4)  gave Anadarko and MOEX the right
to request the Operator to present to the Non-Operators, at a meeting called in accordance with
the Operating Agreement, a sufficient overview of its Health, Safety and Environmental
Management systems to evidence compliance with an effective Health, Safety & Environmental
Management Plan or Plans, in accordance with API RP75, or an equivalent standard, including
Operator's internal policies, for all operations conducted under the Operating Agreement; and
(5) required Anadarko and MOEX to give cooperation and support to the Operator to:

   a)   design and manage activities or operations to standards intended to achieve
        sustained reliability and promote the effective management of HSE risks;

   b)   apply structured HSE management systems and procedures consistent with those
        generally applied in the petroleum industry to effectively manage HSE risks and
        pursue sustained reliability of operations under this Agreement; and

   c)   conform with locally applicable HSE related statutory requirements that may
        apply.

**ANSWER:**

The BP Parties admit that the Macondo Prospect Offshore Deepwater Operating

Agreement required BPXP to furnish to Anadarko, Anadarko E&P, and MOEX Offshore certain

information about the Macondo Well, as specified and under terms and conditions specified in

the Macondo Prospect Offshore Deepwater Operating Agreement. The BP Parties further admit

that the Macondo Prospect Offshore Deepwater Operating Agreement gave Anadarko, Anadarko

E&P, and MOEX Offshore the right to "have access to all drilling rigs, Production Systems, and

Facilities to observe and inspect operation and wells in which it participates (and the pertinent records and other data)" under terms and conditions specified in the Macondo Prospect Offshore Deepwater Operating Agreement.  The BP Parties further admit that the Macondo Prospect Offshore Deepwater Operating Agreement provided that "the Operator shall, with the support and cooperation of the Non-Operators, while it conducts activities or operations under this Agreement: (a) design and manage activities or operations to standards intended to achieve sustained reliability and promote the effective management of HSE risks; (b) apply structured HSE management systems and procedures consistent with those generally applied in the petroleum industry to effectively manage HSE risks and pursue sustained reliability of operations under this Agreement; and (c) conform with locally applicable HSE related statutory requirements that may apply," under terms and conditions specified in the Macondo Prospect Offshore Deepwater Operating Agreement.  The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the conduct or liability of the BP Parties.

105.

The foregoing contractual rights and obligations placed Anadarko and MOEX in the position of being able to oversee all of the operations at the Macondo Well and to intervene to prevent the Incident from occurring.  Anadarko and MOEX failed to properly exercise their rights or obligations under the operating agreement which caused, in part, the Incident.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they are directed at the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

106.

Prior to the Incident, all Defendants had actual and/or constructive knowledge of significant problems related to the *Deepwater Horizon*'s equipment, its maintenance, and the negligent design and operation of the Macondo Well.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

107.

One or more of the foregoing actions or inactions constitute violations of federal regulations, particularly 30 C.F.R. § 250, *et seq*.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

<div align="center">108.</div>

The Defendants' failures to observe and/or comply with federal regulations and/or industry standards include, but are not limited to, failures to observe and/or comply with federal regulations and/or industry standards regarding the design, installation, maintenance, surveillance, repair, observation and operation of the Defendants' equipment and/or drilling operations.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against

Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP

Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or

more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining

allegations of this paragraph to the extent they are inconsistent with the allegations in Document

Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to

form a belief about the truth of the remaining allegations of this paragraph to the extent they are

not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos.

2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

## The Disaster and Its Impact on Louisiana

### 109.

The well blowout, explosion and sinking of the *Deepwater Horizon*, resulting in the largest marine oil spill in U.S. history, occurred approximately fifty miles off Louisiana's coast. The economic and environmental impacts on Louisiana resulting from this Incident are widespread and severe. Louisiana's shoreline, which was and continues to be significantly oiled as a result of the Gulf Oil Spill, constitutes a vitally important and valuable natural resource of national significance that provides numerous economic, environmental, cultural and recreational benefits.  Louisiana's citizens, waters, marshes, wetlands, shoreline, ecology, economy, tourism, fisheries, and wildlife have been profoundly impacted by the Gulf Oil Spill, and will continue to be impacted for years to come.

### ANSWER:

The BP Parties state that from the outset the BP Parties have expressed their commitment

to pay all legitimate claims under the Oil Pollution Act, 33 U.S.C. 2701 et seq., and the BP

Parties' actions reflect this commitment.  In early May 2010, BPXP accepted the designation as

an OPA "responsible party" and quickly established a claims process.  While operating that

claims process, the BP Parties paid nearly $400 million to individuals and businesses.  On

August 23, 2010, the BP Parties transitioned their individual and business claims process to the

Gulf Coast Claims Facility ("GCCF"), which is administered by Kenneth R. Feinberg.  To date,

over $5.73 billion has been paid from the GCCF to individuals and businesses.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

110.

The initial leak of 1,000 barrels per day that BP initially reported on April 24, 2010, was grossly underestimated and was repeatedly replaced by exponentially growing figures.  The government-chartered Flow Rate Technical Group "FRTG" estimated on June 10, 2011, that the oil was flowing out of the well at a rate of 20,000 to 40,000 barrels per day.  This estimate was subsequently revised to 35,000 to 60,000 barrels per day.  Final estimates from the FRTG and the U.S. Department of Energy place the flow rate at 53,000 to 62,000 barrels per day. Repeated efforts to curtail or stop the flow of oil leaking from the Macondo Well failed until approximately 87 days after the initial explosion, resulting in a total estimated discharge of over 4.9 million barrels of oil.

**ANSWER:**

The BP Parties admit that on April 20, 2010 the Macondo Well experienced a blowout and on July 15, 2010 the well was successfully capped.  Estimates by the FRTG speak for themselves.[11]   The BP Parties deny the remaining allegations of this paragraph.

111.

On April 29, 2010, shortly after the well blowout, explosion and sinking of the *Deepwater Horizon,* Louisiana Governor Bobby Jindal declared a state of emergency, requesting additional resources from the federal government to assist the State in preparations for the impacts of the *Deepwater Horizon* disaster. Governor Jindal's declaration was based upon the "predicted impact of oil along the Louisiana coast leaking from the *Deepwater Horizon* which threatens the state's natural resources, including land, water, fish, wildlife, fowl and other biota, and likewise threatens the livelihoods of Louisiana's citizens living along the coast which increases the economic impact of this incident."

**ANSWER:**

The BP Parties admit that on April 29, 2010, Louisiana Governor Bobby Jindal issued an Executive Proclamation declaring a state of emergency, the text of which speaks for itself.[12]  The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with the Executive Proclamation.

112.

On or around April 30, 2010, oil began washing up on the shoreline of Venice, Louisiana and nearby beaches. On May 6, 2010, federal, state and BP officials confirmed that oil was found on the beach at Chandeleur Islands, a small group of uninhabited barrier islands northeast of the Mississippi Delta.

---

[11] By referencing the FRTG etsimates, the BP Parties neither admit nor imply that the referenced estimates, documents, or statements are admissible into evidence and expressly reserve all objections to the use or admissibility of the referenced estimates, documents, and statements.

[12] By referencing the Executive Proclamation, the BP Parties neither admit nor imply that the referenced document is admissible into evidence and expressly reserve all objections to the use or admissibility of the referenced document.

**ANSWER:**

The BP Parties admit that some oil reached the shorelines of Venice, Louisiana on or around April 30, 2010 and the Chandeleur Islands on or around May 6, 2010.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore deny them.

113.

On May 31, 2010, the Secretary of the LDEQ issued to BP Exploration and Production, Inc. a Consolidated Compliance Order and Notice of Potential Penalty, which ordered BP to immediately take any and all measures necessary to eliminate the unauthorized discharge of oil and other pollutants into waters and property located in the State of Louisiana, and to remediate all oil contaminated media to the extent practicable. Similar compliance orders were issued to the Transocean defendants on October 12, 2010.

**ANSWER:**

The BP Parties admit that the Secretary of the Louisiana Department of Environmental Quality sent a Consolidated Compliance Order and Notice of Potential Penalty to BPXP, the text of which speaks for itself.[13]  The BP Parties deny the allegations of this paragraph to the extent they are inconsistent with that Order and Notice.

114.

On August 10, 2010, the United States Judicial Panel on Multidistrict Litigation issued a Transfer Order centralizing and transferring litigation arising from the *Deepwater Horizon* disaster to the Eastern District of Louisiana.  Explaining its decision, the Panel noted in the Transfer Order that, "[w]ithout discounting the spill's effects on other states, if there is a geographic and psychological 'center of gravity' in this docket, then the Eastern District of Louisiana is closest to it."

---

[13] By referencing Notice and Order, the BP Parties neither admit nor imply that the referenced document is admissible into evidence and expressly reserve all objections to the use or admissibility of the referenced document.

**ANSWER:**

The BP Parties admit that the U.S. JPML issued a Transfer Order on August 10, 2010, the text of which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with that Order.

115.

Southern Louisiana contains 40 percent of the coastal wetlands in the continental United States, with a coastal zone containing more than 4,500 square miles of wetlands that are world-renowned for their natural productivity and economic significance.  This complex coastal ecosystem supports diverse habitats and wildlife and provides many benefits to the environment and the citizens of Louisiana. Louisiana's abundant natural resources, including the fisheries and wildlife contained therein, are the epicenter for Louisiana's culture, its way of life and its economy.

**ANSWER:**

The BP Parties admit that Louisiana contains more than 4,500 square miles of wetlands, that those wetlands have been estimated to comprise approximately 40 percent of the United States' coastal wetland territory, and that those wetlands are part of ecosystems that include many species of wildlife.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny those allegations.

116.

Louisiana's wetlands constitute a unique and precious resource, providing a multitude of goods, benefits and services of both ecological and environmental value including flood control, water purification, storm buffer, wildlife habitat, nursery grounds for aquatic life, and recreational areas. Wetlands provide a significant environmental benefit by acting as a filter for pollution and excess nutrients thereby improving water quality.  Wetlands also protect shorelines of rivers, lakes, and oceans from erosion by decreasing the amount of sediment entering into water bodies.

**ANSWER:**

The BP Parties admit that a publication of the National Oceanic and Atmospheric Administration states that wetlands in the Gulf of Mexico region "provide a host of benefits for fish, wildlife, and coastal communities," that those wetlands "provide flood and storm surge protection," and that those wetlands "prevent soil erosion.[14]" The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny those allegations.

117.

Additionally, wetlands contain an extraordinary diversity of environments, including swamps and marshes that provide crucial habitats for hundreds of species of wildlife and migratory birds. With over 5 million birds wintering in Louisiana, including colonial waterbirds, seabirds, shorebirds, and waterfowl, Louisiana's coastal wetlands, barrier islands, and chenieres are a crucial habitat to these birds, as well as to neotropical migratory songbirds and other avian species who use the wetlands as a crucial stopover habitat. Louisiana wetlands also provide crucial nesting habitats for many species of water birds, including the endangered brown pelican.

**ANSWER:**

The BP Parties admit that wetlands in Louisiana are part of ecosystems that provide habitat and nesting grounds to a variety of local and migratory bird species. The BP Parties deny that the Brown Pelican is listed as an endangered species by the U.S. government. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny those allegations.

118.

Louisiana's estuaries have significant value to the entire Gulf ecosystem. Ninety percent of the species in the entire Gulf of Mexico and 98 percent of the commercially-harvested species in the Gulf are dependent upon Louisiana's estuaries for sustainability. Louisiana's coastal zone

---

[14] By referencing the National Oceanic and Atmospheric Administration publication, the BP Parties neither admit nor imply that the referenced document or statements are admissible into evidence and expressly reserve all objections to the use or admissibility of the referenced document or statement.

is also home to 77 percent of the 26 threatened and endangered species in Louisiana, including the Bald Eagle, the Pearshell Clam and the Gulf Sturgeon.  An additional 103 plants and 64 animals in the coastal zone have been listed as important species of concern.

**ANSWER:**

The BP Parties admit that estuaries in Louisiana are part of ecosystems in which the commercial harvesting of some species of wildlife is permitted, and that approximately 98 percent of commercially harvested species in the Gulf of Mexico region and approximately 90 percent of animal species in the Gulf of Mexico region have been estimated to be part of ecosystems that include estuaries.  The BP Parties further admit that admit that the National Heritage Foundation has listed an additional 103 plants and 64 animals in the Louisiana coastal zone as "species of concern."  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny those allegations.

119.

The estuaries and coastal waters of Louisiana contain an abundance of resources that contribute significantly to wildlife populations. Louisiana's marshes and coastal wetlands serve as critical nurseries for many fish and crustaceans of fishery value, in part due to the high production of flora, as well as the protection from predation that these flora and associated shallow-water, complex habitats offer.  The prosperity of these resources depends on an infrastructure of healthy, functioning ecosystems, such as salt marshes, open bay bottoms, barrier island shores, and coastal waters.

**ANSWER:**

The BP Parties admit that Louisiana's coastal ecosystems include estuaries, are inhabited by various species of wildlife, and also provide habitat and nursing grounds for several aquatic species, some of which have commercial value.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny those allegations.

120.

Louisiana's natural resources have been, and continue to be, severely impacted and injured by the Gulf Oil Spill.  The Louisiana State Trustees (CPRA, LOSCO, LDEQ, LDWF and LDNR), in cooperation with other state and federal trustees and BP, are currently cooperatively assessing the injuries to natural resources resulting from the Gulf Oil Spill pursuant to the Natural Resource Damage Assessment ("NRDA") process set forth in OPA and OSPRA. Although this Complaint includes claims under OPA and OSPRA for damages to natural resources over which Louisiana has trusteeship, the State requests that these claims be appropriately phased into litigation in light of ongoing assessment efforts.

**ANSWER:**

The BP Parties admit that there were impacts to natural resources as a result of the *Deepwater Horizon* incident, and that they are participating in a natural resource damages assessment ("NRDA") of those impacts that is being conducted by federal and state agencies, including the National Oceanic and Atmospheric Administration, the US Department of Interior, and agencies from Louisiana and other States.  The BP Parties further admit that this Complaint purports to assert claims presented under OPA and OSPRA.  The BP Parties deny that the State has stated valid claims under OPA and OSPRA.  Furthermore, the Court dismissed the State's state law claims in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

121.

Louisiana's precious barrier islands, wetlands, marshes, and beaches have been, and continue to be, injured and/or threatened by the deleterious effects of the Gulf Oil Spill and the actions undertaken in response.  Oil, gas and other pollutants from the *Deepwater Horizon* disaster have, in one or more forms, invaded, and continue to invade, significant portions of Louisiana's waters and shoreline. Hundreds of miles of Louisiana's shoreline have been and continue to be impacted by the Gulf Oil Spill.

**ANSWER:**

The BP Parties admit that there were impacts on barrier islands, wetlands, marshes, and beaches in Louisiana as a result of the *Deepwater Horizon* incident, and that they are participating in a natural resource damages assessment ("NRDA") of those impacts that is being conducted by federal and state agencies, including the National Oceanic and Atmospheric Administration, the US Department of Interior, and agencies from Louisiana and other States. The BP Parties deny that oil or other materials from the *Deepwater Horizon* or the MC 252 Well are currently appearing on significant portions of the shoreline of Louisiana. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

122.

These impacts are ongoing. One year after the Incident, many areas remain oiled and continue to be re-oiled, resulting in further injuries. Impacts will continue as oil continually and/or periodically washes ashore due to the disturbance of oiled sediment and surface and subsurface waters moved by various tropical and subtropical weather phenomena commonly experienced in the Gulf of Mexico, and as oil is released from entrapments by summer weather and other causes, and is otherwise disturbed or redistributed by various causes.

**ANSWER:**

The BP Parties admit that there were impacts on barrier islands, wetlands, marshes, and beaches in Louisiana as a result of the *Deepwater Horizon* incident, and that they are participating in a natural resource damages assessment ("NRDA") of those impacts that is being conducted by federal and state agencies, including the National Oceanic and Atmospheric Administration, the US Department of Interior, and agencies from Louisiana and other States. The BP Parties deny that oil or other materials from the *Deepwater Horizon* or the MC 252 Well are currently appearing on significant portions of the shoreline of Louisiana. The BP Parties lack

knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

123.

The full extent of the short- and long-term impacts of the Gulf Oil Spill to Louisiana's natural resources and citizens are currently unknown. The oil, pollutants and dispersants from the Gulf Oil Spill, and their impacts, are likely to persist in the environment long into the future.

**ANSWER:**

The BP Parties admit that there were impacts on barrier islands, wetlands, marshes, and beaches in Louisiana as a result of the *Deepwater Horizon* incident, and that they are participating in a natural resource damages assessment ("NRDA") of those impacts that is being conducted by federal and state agencies, including the National Oceanic and Atmospheric Administration, the US Department of Interior, and agencies from Louisiana and other States. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

124.

Louisiana's coastline is home to over 2 million citizens who use and enjoy Louisiana's natural resources. Many of Louisiana's citizens derive their livelihood from Louisiana's coast, which supports an array of industries such as commercial fishing and shrimping, oil and gas production, and shipping. Louisiana's coast is fundamental to the prosperity and well-being of Louisiana citizens who reside, recreate and/or work along the coast.

**ANSWER:**

The BP Parties admit that more than two million people live in coastal areas of Louisiana, and that many residents of Louisiana are employed in commercial fishing and shrimping, oil and gas production, and shipping. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore deny them.

71

125.

Substantial economic benefits are derived from activities occurring in Louisiana's coastal zone, including commercial and recreational fishing, hunting, non-consumptive fish and wildlife recreating, recreational boating, alligator harvesting, reptile and amphibian collecting, and fur harvesting. Louisiana has a $3 billion fishing industry and is the source of one third of the seafood consumed in the United States, according to the Louisiana Seafood Marketing and Promotion Board, a state-run agency.

**ANSWER:**

The BP Parties admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill. Following the incident, the BP Parties quickly established a claims process. And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses. Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid. The GCCF has paid over $5.73 billion for individual and business claims. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore deny them.

126.

The negative impact of this spill on Louisiana fishermen, processors, charter boat operators, home ports and supporting infrastructure including cold storage, marinas, boatyards, suppliers, repair yards and transportation businesses, will be long-lasting and profound.

**ANSWER:**

The BP Parties admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill. Following the incident, the BP Parties quickly established a claims process. And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses. Following a June 16,

2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore deny them.

127.

In response to the spill, Louisiana closed a considerable amount of fishing areas within its territorial waters, which has further impacted the approximately 27,000 Louisianans employed by the seafood industry.  Louisiana's shellfish industry has been significantly damaged, as the State has been forced to close oyster beds along over one hundred miles of coastline.  At considerable expense, Louisiana continually samples oysters from open beds—along with other seafood—to ensure that the public is protected.

**ANSWER:**

The BP Parties admit that Louisiana temporarily closed some of its fishing areas and oyster beds.  The BP Parties admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill.  Following the incident, the BP Parties quickly established a claims process.   And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore deny them.

128.

In addition to Louisiana's fishery closures, the National Oceanic and Atmospheric Administration (NOAA) began prohibiting all commercial and recreational fishing, including catch and release, in federal waters between the mouth of the Mississippi River to waters off Florida's Pensacola Bay on May 2, 2010. As the oil continued to spread, NOAA expanded the area closed to fishing on a regular basis.

**ANSWER:**

The BP Parties admit that on May 2, 2010, the federal government prohibited fishing in

an area described as between "the mouth of the Mississippi River [and] waters off Florida's

Pensacola Bay," and that the federal government later prohibited fishing in other areas of the

Gulf of Mexico.  The BP Parties lack knowledge or information sufficient to form a belief about

the truth of the remaining allegations of this paragraph, and therefore deny them.


129.

The Gulf Oil Spill has caused, and continues to cause, damage to and destruction of Louisiana's coastal wetlands, reducing this resource and causing coastal land loss that increases the catastrophic risk posed by hurricanes to the citizens, businesses, property, and environment of the State. Wetlands loss threatens valuable fish and wildlife production and the viability of residential, agricultural, energy, and industrial development in coastal Louisiana.  La. R.S. 43:214.1(A).

**ANSWER:**

The BP Parties admit that as a Responsible Party under OPA they have expressed their

commitment to pay all legitimate OPA claims caused by the Spill.  Following the incident, the

BP Parties quickly established a claims process.  And while operating its OPA claims process,

the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16,

2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims

process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund

from which individual and business claims, state and local government claims, NRD and NRDA,

and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual

and business claims.  Furthermore, the Court dismissed the State's state law claims in its Order

and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana,

Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP

Parties are therefore not required to respond to these allegations.  To the extent the BP Parties

may be deemed to be required to respond to these allegations, the BP Parties deny them to the

extent they are directed at the BP Parties.

<p style="text-align:center">130.</p>

As a result of the Gulf Oil Spill, the State of Louisiana has suffered, and will continue to
suffer, extensive injury to its natural resources as well as damage to its real and personal
property, loss of subsistence use of its natural resources, loss of taxes, rents, royalties and fees
due to the injury to, loss or destruction of its real property, personal property and natural
resources.  Further, Louisiana, through its agencies, has incurred substantial costs in responding
to this disaster and providing increased and additional public services.  Additionally, many of
Louisiana's coastal citizens have experienced a loss of subsistence use of the State's natural
resources that has resulted in additional losses of State revenue, such as decreased fishing
licenses and oyster tags.

**ANSWER:**

The BP Parties admit that Louisiana temporarily closed some of its fishing areas and

oyster beds.  The BP Parties admit that as a Responsible Party under OPA they have expressed

their commitment to pay all legitimate OPA claims caused by the Spill.  Following the incident,

the BP Parties quickly established a claims process.   And while operating its OPA claims

process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June

16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims

process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund

from which individual and business claims, state and local government claims, NRD and NRDA,

and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual

and business claims.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore deny them.

131.

The Gulf Oil Spill has caused, and will continue to cause, loss of revenue to persons and businesses that cannot, due to the extensive and ongoing contamination of Louisiana's waters and shoreline, use the Gulf of Mexico and Louisiana's Coastal Zone for diverse activities, including commercial and recreational fishing, recreation, working and earning a living, and/or otherwise subsidizing their earnings and providing for themselves and their families.

**ANSWER:**

The BP Parties admit that Louisiana temporarily closed some of its fishing areas and oyster beds.  The BP Parties admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill.  Following the incident, the BP Parties quickly established a claims process.   And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore deny them.

132.

Efforts undertaken in response to the Gulf Oil Spill have caused further injuries and damages to property, the environment and natural resources of Louisiana.  (*See, e.g.,* Kim Murphy, *Death by Fire in the Gulf*, LA Times, June 17, 2010; WDSU, *Officials*: *Cleanup Crews Trampling Pelican Nests, accessed at* http://www.WDSU.com/print/23909922/detail.html (last updated June 16, 2010 and captured July 6, 2010)).

**ANSWER:**

The BP Parties admit that Louisiana temporarily closed some of its fishing areas and oyster beds.  The BP Parties admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill.  Following the incident, the BP Parties quickly established a claims process.   And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore deny them.

133.

The State of Louisiana has sustained, and will continue to sustain, substantial removal and response costs including "removal costs" and "damages" as defined by the OPA, OSPRA and related regulations. Pursuant to 33 U.S.C. § 2701(30), "removal activities" include not only removal of oil from water and shorelines, but also "the taking of other actions as may be necessary to minimize or mitigate damage to the public health or welfare, including but not limited to fish, shellfish, wildlife, and public and private property, shorelines and beaches." *See also* La. R.S. 30:2454(25) (identifying removal costs).

**ANSWER:**

The BP Parties admit that Louisiana temporarily closed some of its fishing areas and oyster beds.  The BP Parties admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill.  Following the incident, the BP Parties quickly established a claims process.   And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June

16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  Furthermore, the Court dismissed the State's state law claims in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## **Economic Impact of Deepwater Drilling Moratorium**

### 134.

On May 27, 2010, the United States Department of the Interior ordered a six-month moratorium on deepwater drilling, thereby suspending activity at the twenty-two (22) deepwater drilling rigs that had been operational off the Louisiana coast, and crippling the staging and support activities for the offshore oil industry located in Louisiana.

**ANSWER:**

The BP Parties admit that effective May 30, 2010 the MMS issued a notice implementing a six-month moratorium on deepwater drilling in the Gulf of Mexico which effected approximately twenty-two deepwater drilling rigs off the Louisiana coast.  The BP Parties deny the remaining allegations of this paragraph.

### 135.

On October 12, 2010, the United States Department of the Interior announced that the federal government would lift the drilling moratorium.  However, although the moratorium was officially lifted, drilling has not resumed and has lagged far behind its pre-spill pace due to the

federal government's imposition of additional regulations and requirements as a result of the Gulf Oil Spill.

**ANSWER:**

The BP Parties admit that on October 12, 2010, the U.S. Department of Interior's Bureau of Ocean Energy Management, Regulation and Enforcement announced that the federal government would lift the drilling moratorium. The BP Parties deny that drilling has not resumed. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

136.

The May 27, 2010 moratorium and the de facto moratorium that has continued since the official lifting of the moratorium are direct results of the *Deepwater Horizon* disaster. All losses and damages associated with the moratorium are, accordingly, the direct result of, and proximately caused by, the acts and omissions of each Defendant as alleged herein.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

**The BP Claims Procedure and Its Impacts on Louisiana's Economy**

137.

OPA requires that BP establish a procedure for the payment or settlement of claims for interim, short-term damages. 33 U.S.C. § 2705. Pursuant to OPA, BP established the Gulf Coast Claims Facility (GCCF) for private claimants in Louisiana and along the Gulf. BP and GCCF have failed to fully, finally and adequately compensate Louisiana claimants for either short term losses or long term impacts, and this Court has been asked to oversee GCCF's interactions with the public accordingly.

**ANSWER:**

The BP Parties admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill. Following the incident, the BP Parties quickly established a claims process. And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses. Following a June 16,

2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims

process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund

from which individual and business claims, state and local government claims, NRD and NRDA,

and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual

and business claims.  The BP Parties deny the remaining allegations of this paragraph.

138.

The State of Louisiana has suffered economic losses and costs flowing from the individual and business losses suffered by the citizens of the State who have not obtained the full measure of their damages.  Failure of BP and its agent, GCCF, to make full restitution has resulted in direct and indirect costs to the State, including but not limited to increased unemployment claims, increased costs of public services, and myriad lost tax revenues from closed businesses, lost sales tax revenues, and decreased income tax revenues.  BP's and GCCF's acts and omissions in the context of their claims procedures have also interfered with the State's ability to mitigate its own damages.  For example Louisiana's Office of Workforce Development's oil spill related costs are in excess of $20,000 per day due to an increased number of recruiting events, staffing and other costs, including the operation of mobile units deployed to affected areas.

**<u>ANSWER:</u>**

The BP Parties admit that as a Responsible Party under OPA they have expressed their

commitment to pay all legitimate OPA claims caused by the Spill.  Following the incident, the

BP Parties quickly established a claims process.  And while operating its OPA claims process,

the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16,

2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims

process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund

from which individual and business claims, state and local government claims, NRD and NRDA,

and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual

and business claims.  The BP Parties deny the remaining allegations of this paragraph.

**Economic Impacts on the State of Louisiana**

139.

The economic impacts, costs and damages to the State of Louisiana arising from the *Deepwater Horizon* disaster and the resulting Spill are wide-spread and extensive, permeating every corner of the State's economy.  As a result of the Defendants' conduct, the public, citizens and businesses of Louisiana have suffered from a variety of impacts to the State's natural resources, its seafood and tourism industries, and its critical oil and gas sector.

**ANSWER:**

The BP Parties admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document

Nos. 2074, 2075, 2082, and 2064. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

<div align="center">140.</div>

The oil and necessary response actions have caused untold ecological and environmental harms to Louisiana's coast, its fisheries, and its entire eco-system. Vast economic damages were done to the State and its people as a result.

**ANSWER:**

The BP Parties admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill. Following the incident, the BP Parties quickly established a claims process. And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses. Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid. The GCCF has paid over $5.73 billion for individual and business claims. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on

April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

<div align="center">141.</div>

Likewise, as a result of the Deepwater Horizon explosion, the resulting Spill, and resulting harms, the State's oil and gas sector was dramatically impacted.  The May 27, 2010, Moratorium has resulted in losses and damages and are accordingly the direct result of and caused by the acts and omissions of each Defendant as alleged herein. Likewise, the *de facto* shallow water moratorium substantially impacted the near-shore segments of Louisiana's economy.

**<u>ANSWER:</u>**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document

Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

<div align="center">142.</div>

The State of Louisiana is still assessing the full impacts of the *Deepwater Horizon* event and Spill. However, it is clear that the State has suffered property damages, response costs, increased costs of public services, revenue and tax losses, and injuries to the Louisiana brand and similar impacts to the State's earning capacity as a result of the Defendants' conduct.  As set forth in the claims below, the State of Louisiana is entitled to be made whole and recover all of the costs and damages flowing from this tragedy.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

<div align="center">84</div>

## Presentment Procedure and
## Presentment by the State of Louisiana

### 143.

Given the size of the Spill, the enormous scope of the impacts and response efforts occasioned thereby, and the complexity of the many issues raised thereby, the State has been regularly presenting to (and negotiating with) BP a variety of the State's claims since the first days following the Spill. The GCCF and presentment processes created thereunder explicitly do not apply to the State or other public/governmental entities. To the extent that presentment is possible, even if not required for Government claims, the State has directly presented BP with its claims. Though Government claims should not and do not require presentment before proceeding to litigation, especially under the circumstances found here, Louisiana has worked diligently to present and resolve those claims that it could prior to filing this Complaint.

### ANSWER:

On November 14, 2011 the Court ruled in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, that States and their local governments are just as subject to the OPA presentment requirement as private claimants are therefore the BP Parties are not required to respond to these allegations. The BP Parties continue to maintain, notwithstanding that Order, there is no legal basis for concluding that the fact that these are MDL proceedings or that NRD assessments are involved exempts the Plaintiff from OPA's presentment requirements. The BP Parties deny the remaining allegations of this paragraph.

### 144.

The State has previously presented claims to BP for voluminous removal costs, increased costs of public services, loss of revenues and earning capacity, property damages, and other damages, including but not limited to, Department of Natural Resources' claims for lost royalties and severance taxes associated with shut in wells; Department of Wildlife and Fisheries' claims for lost fishing license revenue; Department of Transportation and Development's claims for transportation infrastructure repairs; costs to repair the harm to the State's tourism industry; claims to address seafood safety and response; response costs; and claims associated with coastal restoration and berm projects. As such, the State has repeatedly satisfied any presentment requirements and should not be required to repeatedly present government claims especially as to those categories of claims which are a direct result of the incident and for which BP has actual or constructive notice.

**ANSWER:**

The BP Parties continue to maintain, despite the November 14, 2011 Order, that OPA does not contain an exception that eliminates the presentment requirement because (i) presentment might have to occur on a repeated basis and (ii) claims may not sufficiently ripen for that purpose all at once, especially in a fashion that can satisfy the requirement in 33 U.S.C. § 2701(3) that claims presented to an OPA responsible party request a "sum certain." The BP Parties deny the remaining allegations of this paragraph.

145.

For example, in an effort to facilitate the protection of the State's seafood industry and mitigate the damage to Louisiana's economy and welfare of its citizens, a long-term Seafood Sampling and Assurance program was developed and proposed to BP as outlined in correspondence to Tony Hayward, dated May 29, 2010. The proposal was presented as a coordinated effort among Louisiana Department of Wildlife and Fisheries Secretary Robert Barham, Secretary Alan Levine of the Louisiana Department of Health and Hospitals, Louisiana Department of Environmental Quality Secretary Peggy Hatch, Louisiana Department of Economic Development Secretary Steven Moret, and Louisiana Department of Agriculture and Forestry Commissioner Mike Strain. These efforts were to include:

**ANSWER:**

The BP Parties admit that a letter addressed to Tony Hayward and signed by Robert Barham, Alan Levine, Peggy Hatch, Steven Moret, and Mike Strain, was sent on May 29, 2010. The BP Parties admit that the letter describes a proposal for assisting the Louisiana seafood industry, and that the text of it speaks for itself. The BP Parties admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill. OPA, however, does not require BP to establish any form of program or to offer up the establishment of a program in order to settle a particular claim and avoid litigation. Instead, it requires only that BP consider offering monetary compensation for a documented claim. The BP Parties admit that the State has presented claims to GCCF, and that the GCCF has paid some of

those claims.  The BP Parties admit that the State purports to assert claims for natural resource and economic damages.  The BP Parties deny that the State has stated valid claims for natural resource and economic damages.  Furthermore, the Court dismissed the State's state law claims in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore deny them.

<div align="center">146.</div>

The implementation of a science-based seafood safety testing program with transparent metrics of safety and quality;

**<u>ANSWER:</u>**

The BP Parties admit that a letter addressed to Tony Hayward and signed by Robert Barham, Alan Levine, Peggy Hatch, Steven Moret, and Mike Strain, was sent on May 29, 2010. The BP Parties admit that the letter describes a proposal for assisting the Louisiana seafood industry, and that the text of it speaks for itself.  The BP Parties admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill.  OPA, however, does not require BP to establish any form of program or to offer up the establishment of a program in order to settle a particular claim and avoid litigation.  Instead, it requires only that BP consider offering monetary compensation for a documented claim.  The BP Parties admit that the State has presented claims to GCCF, and that the GCCF has paid some of those claims.  The BP Parties admit that the State purports to assert claims for natural resource

and economic damages.  The BP Parties deny that the State has stated valid claims for natural resource and economic damages.  Furthermore, the Court dismissed the State's state law claims in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore deny them.

147.

The implementation of a certification program for quality and processing of certified Louisiana seafood.

**ANSWER:**

The BP Parties admit that a letter addressed to Tony Hayward and signed by Robert Barham, Alan Levine, Peggy Hatch, Steven Moret, and Mike Strain, was sent on May 29, 2010. The BP Parties admit that the letter describes a proposal for assisting the Louisiana seafood industry, and that the text of it speaks for itself.  The BP Parties admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill.  OPA, however, does not require BP to establish any form of program or to offer up the establishment of a program in order to settle a particular claim and avoid litigation.  Instead, it requires only that BP consider offering monetary compensation for a documented claim.  The BP Parties admit that the State has presented claims to GCCF, and that the GCCF has paid some of those claims.  The BP Parties admit that the State purports to assert claims for natural resource and economic damages.  The BP Parties deny that the State has stated valid claims for natural

resource and economic damages.  Furthermore, the Court dismissed the State's state law claims in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore deny them.

<div align="center">148.</div>

Both a short-term and sustained long-term consumer information campaign designed to reassert the Louisiana brand.

**<u>ANSWER:</u>**

The BP Parties admit that a letter addressed to Tony Hayward and signed by Robert Barham, Alan Levine, Peggy Hatch, Steven Moret, and Mike Strain, was sent on May 29, 2010. The BP Parties admit that the letter describes a proposal for assisting the Louisiana seafood industry, and that the text of it speaks for itself.  The BP Parties admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill.  OPA, however, does not require BP to establish any form of program or to offer up the establishment of a program in order to settle a particular claim and avoid litigation.  Instead, it requires only that BP consider offering monetary compensation for a documented claim.  The BP Parties admit that the State has presented claims to GCCF, and that the GCCF has paid some of those claims.  The BP Parties admit that the State purports to assert claims for natural resource and economic damages.  The BP Parties deny that the State has stated valid claims for natural resource and economic damages.  Furthermore, the Court dismissed the State's state law claims

<div align="center">89</div>

in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and

Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011,

and the BP Parties are therefore not required to respond to these allegations.  To the extent the

BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny

them to the extent they are directed at the BP Parties.  The BP Parties lack knowledge or

information sufficient to form a belief about the truth of the remaining allegations, and therefore

deny them.

<div align="center">149.</div>

In addition to sending a detailed proposal for a 20-year, multi-agency initiative, the State
requested that BP make $457 million available for implementation of the program.  Although
these expenditures are recoverable under the OPA, BP refused to fund the program.

**ANSWER:**

The BP Parties admit that a proposal for assisting the Louisiana seafood industry was sent

on or about May 29, 2010, and that the text of it speaks for itself.  The BP Parties admit that the

proposal as written would have cost $457,519,269.  The BP Parties admit that as a Responsible

Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused

by the Spill.  OPA, however, does not require BP to establish any form of program or to offer up

the establishment of a program in order to settle a particular claim and avoid litigation.  Instead,

it requires only that BP consider offering monetary compensation for a documented claim.  The

BP Parties admit that the State has presented claims to GCCF, and that the GCCF has paid some

of those claims.  The BP Parties admit that the State purports to assert claims for natural resource

and economic damages.  The BP Parties deny that the State has stated valid claims for natural

resource and economic damages.  Furthermore, the Court dismissed the State's state law claims

in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and

<div align="center">90</div>

Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011,

and the BP Parties are therefore not required to respond to these allegations.  To the extent the

BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny

them to the extent they are directed at the BP Parties.  The BP Parties lack knowledge or

information sufficient to form a belief about the truth of the remaining allegations, and therefore

deny them.


<div align="center">150.</div>

After negotiations, Louisiana accepted funding for a $78 million Seafood Testing,
Marketing, and Tourism Program as a starting point for mitigating the damages to Louisiana's
citizens, fisheries, and economy, without waiving rights to sue.  A more comprehensive Seafood
Testing and Quality Assurance program is still needed to ensure long-term testing of Louisiana
seafood, in order to confirm the safety of Louisiana seafood and to restore its pre-spill
desirability in the seafood market.

**ANSWER:**

The BP Parties admit that they have funded extensive seafood testing, seafood marketing,

and tourism marketing programs in Louisiana.  The BP Parties deny that a more comprehensive

seafood testing and quality assurance program is required.  The BP Parties admit that as a

Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA

claims caused by the Spill.  OPA, however, does not require BP to establish any form of program

or to offer up the establishment of a program in order to settle a particular claim and avoid

litigation.  Instead, it requires only that BP consider offering monetary compensation for a

documented claim.  The BP Parties admit that the State has presented claims to GCCF, and that

the GCCF has paid some of those claims.  The BP Parties admit that the State purports to assert

claims for natural resource and economic damages.  The BP Parties deny that the State has stated

valid claims for natural resource and economic damages.  Furthermore, the Court dismissed the

State's state law claims in its Order and Reasons As to Motions to Dismiss the Complaints of the

States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on

November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.

To the extent the BP Parties may be deemed to be required to respond to these allegations, the

BP Parties deny them to the extent they are directed at the BP Parties.  The BP Parties lack

knowledge or information sufficient to form a belief about the truth of the remaining allegations,

and therefore deny them.


151.

Some of the State's presented claims have been paid by BP, but many claims have been
rejected by BP due to the State's refusal to accept unreasonable conditions, while other claims
have been subjected by BP to circular rejections and perpetual reservations due to impossible
documentation requirements, although such are unnecessary to establish proof of legitimate
claims.

**ANSWER:**

The BP Parties admit that as a Responsible Party under OPA they have expressed their

commitment to pay all legitimate OPA claims caused by the Spill.  The BP Parties admit that the

State has presented claims to GCCF, and that the GCCF has paid some of those claims.  The BP

Parties admit that the State purports to assert claims for natural resource and economic damages.

The BP Parties deny that unreasonable conditions, circular rejections, perpetual reservations, or

impossible document requirements exist.  The BP Parties deny that the State has stated valid

claims for natural resource and economic damages.  Furthermore, the Court dismissed the State's

state law claims in its Order and Reasons As to Motions to Dismiss the Complaints of the States

of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on

November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.

To the extent the BP Parties may be deemed to be required to respond to these allegations, the

BP Parties deny them to the extent they are directed at the BP Parties.  The BP Parties lack

knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore deny them.

<div align="center">152.</div>

In addition to the many claims and categories of damages previously presented, the State has included in this Complaint claims for natural resource damages and other forward looking costs and economic damages that the State is entitled to recover under OPA and LOSPRA but which are incapable of quantification at this time. In an abundance of caution, the State had to assert such claims now, but the State is seeking that the Court phase these claims into the litigation at an appropriate time, after appropriate assessment and quantification work has been performed. The State simply could not risk Defendants' arguments that these claims were later barred by Louisiana's residual one-year prescription period or that the State impermissibly spilt its claims by withholding them from this filing.

**ANSWER:**

The BP Parties admit that the State purports to assert claims for natural resource and economic damages. The BP Parties deny that the State has stated valid claims for natural resource and economic damages. Furthermore, the Court dismissed the State's state law claims in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## CLAIMS FOR RELIEF

### COUNT I

### Against BP, Anadarko, MOEX and Transocean Defendants

### Declaratory Judgment That Defendants Are Jointly, Strictly and Severally Liable Under OPA

153.

Paragraphs 1 through 152 are realleged and incorporated herein by reference.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 152 herein by reference.

154.

This Count is alleged against BP, Anadarko, MOEX and Transocean Defendants.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are

not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

<div align="center">155.</div>

The Declaratory Judgment Act allows a federal court to declare the rights and other legal relations of any interested party seeking such declaration in an actual controversy within its jurisdiction. 28 U.S.C. § 2201.

**ANSWER:**

The BP Parties deny this paragraph to the extent it is inconsistent with 28 U.S.C. § 2201.

<div align="center">156.</div>

The facts and circumstances alleged herein present an actual and existing controversy between the BP, Anadarko, MOEX and Transocean Defendants and the State.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

<div align="center">95</div>

157.

OPA, 33 U.S.C. § 2701 *et seq*., as enacted in 1990, establishes a strict liability scheme which holds responsible parties strictly liable for damages and removal costs related to oil spills. OPA also provides that each responsible party for a vessel or facility from which oil is discharged "into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages . . . that result from such incident." 33 U.S.C. § 2702(a).

**ANSWER:**

The BP Parties admit that OPA partially states the above quoted language. The BP

Parties deny this paragraph to the extent it is inconsistent with 33 U.S.C. § 2702(a).

158.

Responsible parties for an offshore facility include the lessee or permittee of the area in which the facility is located or the holder of a right to use and easement granted under applicable state law or the Outer Continental Shelf Lands Act, 43 U.S.C. § 1301 *et seq*., for the area in which  the facility is located.  Responsible parties also include any person owning, operating, or demise chartering the vessel. 33 U.S.C. § 2701(32).

**ANSWER:**

The BP Parties deny this paragraph to the extent it is inconsistent with 33 U.S.C. § 2701.

159.

As a result of the various contractual and other agreements alleged and identified herein, and the corporate relationships among the parties, the BP, Anadarko, MOEX and Transocean Defendants are responsible parties within the meaning of OPA, and are jointly and severally responsible to the State of Louisiana for removal costs and damages, as defined in 33 U.S.C. § 2702(b)(2), including (1) all removal costs; (2) damages to natural resources; (3) damages to real or personal property; (4) subsistence use of natural resources; (5) net loss of revenues to a state or political subdivision thereof; (6) lost profits and earning capacity; and (7) damages for net costs of providing increased or additional public services during or after removal activities.

**ANSWER:**

The BP Parties admit that BPXP, Transocean, Anadarko, and MOEX have been named as

responsible parties under OPA.  As a Responsible Party under OPA, the BP Parties have

expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP

Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties deny that OPA liability is joint and several where divisibility can be established.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

<div align="center">160.</div>

Louisiana has incurred, and will continue to incur, removal costs related to the unauthorized discharge or threat of discharge of oil, gas and other pollutants and the costs related to preventing, mitigating, and minimizing oil pollution which has impaired or threatens to impair Louisiana's waters, coast line, and natural resources.

<div align="center">97</div>

**ANSWER:**

The BP Parties state that as a Responsible Party under OPA, they have expressed their commitment to pay all legitimate OPA claims. Following the incident, the BP Parties quickly established a claims process. And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses. Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid. The GCCF has paid over $5.73 billion for individual and business claims. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

161.

The BP, Anadarko, MOEX and Transocean Defendants are strictly liable for damages to natural resources belonging to, held in trust by, managed by, controlled by or appertaining to the State of Louisiana. 33 U.S.C. § 2706(a)(2). Natural resources are broadly defined and include "land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by…any State." 33 U.S.C. § 2701(20). The measure of natural resource damages is the cost of restoring, rehabilitating, replacing or acquiring the equivalent of the damaged natural resources; the diminution in value of those natural resources pending restoration; plus the reasonable costs of assessing those damages. 33 U.S.C. § 2706(d)(1).

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims. Following the incident, the BP Parties quickly established a claims process. And while operating its OPA claims process, the BP Parties paid nearly $400

million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

162.

The BP, Anadarko, MOEX and Transocean Defendants are strictly liable to Louisiana for damages associated with injury to, or economic losses resulting from, the destruction of real or personal property owned or leased by the State.  33 U.S.C. § 2702(b)(2)(B).

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a

claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

163.

The BP, Anadarko, MOEX and Transocean Defendants are strictly liable to Louisiana for lost revenues associated with the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property or natural resources.  33 U.S.C. § 2702(b)(2)(D).

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

164.

The BP, Anadarko, MOEX and Transocean Defendants are strictly liable to Louisiana for net costs of providing increased or additional public services during or after removal activities,

including protection from fire, safety, or health hazards caused by the discharge of oil.  33 U.S.C. § 2702(b)(2)(F).

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

165.

The actions and inactions of the BP, Anadarko, MOEX and Transocean Defendants, as described above, constitute gross negligence and/or willful misconduct and/or constitute violations of Federal safety, construction or operating regulations.  Therefore, the BP, Anadarko MOEX and Transocean Defendants' liability pursuant to OPA is unlimited pursuant to 33 U.S.C. § 2704 (c)(1)(A) and 33 U.S.C. § 2704 (c)(1)(B).

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or

liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

<div align="center">166.</div>

The State requests that this Court enter a Declaratory Judgment finding that the BP, Anadarko, MOEX and Transocean Defendants have unlimited joint, several and strict liability under OPA for the State of Louisiana's removal costs and damages resulting from the *Deepwater Horizon* disaster, and that the State is entitled to relief as set forth above, and such further relief as may be deemed appropriate pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 2202, *et seq.*

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties deny that OPA liability is joint and several where divisibility can be established.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

<div align="center">167.</div>

Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and Rule 57 of the Federal Rules of Civil Procedure, as well as OPA, 33 U.S.C. § 2717(f)(2), the State seeks a judicial declaration, which shall be binding on subsequent actions by the State to recover

<div align="center">104</div>

damages and removal costs, that the BP, Anadarko, MOEX and Transocean Defendants are responsible parties under OPA, 33 U.S.C. § 2701 *et seq*. and are liable for all removal costs and damages arising out of the *Deepwater Horizon* disaster.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.   The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

## COUNT II

### Against BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants

### Declaratory Judgment That Defendants Are Jointly, Strictly and Severally Liable For Costs and Damages under OSPRA

168.

Paragraphs 1 through 167 are realleged and incorporated herein by reference.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 167 herein by reference.   The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss

the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C",
Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required
to respond to these allegations.  To the extent the BP Parties may be deemed to be required to
respond to these allegations, the BP Parties deny them to the extent they are directed at the BP
Parties.

<div align="center">169.</div>

This Count is alleged against the BP, Anadarko, MOEX, and Transocean, Cameron and
Halliburton Defendants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the
Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document
No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond
to these allegations.  To the extent the BP Parties may be deemed to be required to respond to
these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">170.</div>

The Declaratory Judgment Act allows a federal court to declare the rights and other legal
relations of any interested party seeking such declaration in an actual controversy within its
jurisdiction. 28 U.S.C. § 2201.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the
Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document
No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond
to these allegations.  To the extent the BP Parties may be deemed to be required to respond to
these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

171.

This suit is ripe for adjudication as there exists a real controversy between the State of Louisiana, which has been damaged because of the Gulf Oil Spill, and the BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the

Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document

No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to

these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

172.

Louisiana has suffered significant injury to its natural resources and has incurred and will continue to incur costs related to removal of the oil as well as economic damages associated with the *Deepwater Horizon* disaster.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the

Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document

No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to

these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

173.

OPA does not preempt states from imposing additional requirements or liability for the discharge of oil. 33 U.S.C. §§ 2718(a)(1) and 2718(c)(1).

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the

Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document

No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">174.</div>

The Louisiana Legislature recognized Louisiana's unique exposure to oil spills when it enacted OSPRA, codified at La. R.S. 30:2451, *et seq*.. La. R.S. 30:2452(A). In passing OSPRA, the Legislature expressly recognized the constitutional duties of the State of Louisiana to "protect, conserve and replenish the natural resources of [Louisiana]." La. R.S. 30:2453(A) (*citing* La. Const. art. IX Sec. 1). Louisiana's constitutional duty of protecting the environment is based on the public trust doctrine which is recognized in the State Constitution. Article IX, Section 1 of the Louisiana Constitution provides:

> The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.

OSPRA applies "in the event that an unauthorized discharge of oil or the substantial threat of an unauthorized discharge of oil to state waters results in injury to natural resources." Louisiana Administrative Code 43:XXIX.101(A).

### **ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">175.</div>

Responsible parties under OSPRA include "[t]he owner or operator of a vessel or terminal facility from which an unauthorized discharge of oil emanates or threatens to emanate." La. R.S. 30:2454(22)(a). Responsible parties also include any person "who causes, allows, or permits an unauthorized discharge of oil or threatened unauthorized discharge of oil."  La. R.S. 30:2454(22)(c).

<div align="center">108</div>

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

176.

The BP, Anadarko, MOEX, and Transocean Defendants were each owners and/or operators of the Macondo Well and the *Deepwater Horizon* rig and as such are responsible parties under OSPRA. *See* La. R.S. 30:2454(20).

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

177.

Additionally the BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants each caused, allowed or permitted the unauthorized discharge of oil from the Macondo Well and *Deepwater Horizon* rig. As such, they are responsible parties under OSPRA. La. R.S. 30:2454(22)(c).

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">178.</div>

OSPRA defines "discharge of oil" broadly to include "an intentional or unintentional act or omission by which harmful quantities of oil are spilled, leaked, pumped, poured, emitted, or dumped into or on coastal waters of the state or at any place where, unless controlled or removed, they may drain, seep, run, or otherwise enter coastal waters of the state."  La. R.S. 30:2454(7).

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">179.</div>

Under the provisions of OSPRA, the BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants, as responsible parties, are strictly, jointly, and severally liable for this oil spill.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

180.

The State requests that this Court enter a Declaratory Judgment finding that the BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants have unlimited, joint and several, and strict liability under OSPRA for all of the State of Louisiana's removal costs an damages resulting from the *Deepwater Horizon* disaster, and that the State is entitled to relief as set forth above.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## COUNT III

### Against BP, Anadarko, MOEX and Transocean Defendants

### Civil Penalties for Violations of the Louisiana Environmental Quality Act

181.

Paragraphs 1 through 180 are realleged and incorporated herein by reference.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 180 herein by reference. The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

182.

This Count is alleged against the BP, Anadarko, MOEX and Transocean Defendants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

183.

La. R.S. 30:2072 provides that the waters of the state of Louisiana are among the State's most important natural resources and their continued protection and safeguard is of vital concern to the citizens of this State.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

184.

La. R.S. 30:2076(A)(1) prohibits the discharge into any waters of the State of any waste or any substance of any kind that will tend to cause water pollution in violation of any rule, order, or regulation. La. R.S. 30:2076 (A)(3) prohibits the violation by a person of any rule or regulation adopted under the Louisiana Water Control Law, La. R.S. 30, Subtitle II, Chapter 4 or under authority of that Subtitle.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

185.

Defendants caused and/or allowed the unauthorized discharge of oil, gas and other pollutants into the waters and onto the coastline of the State of Louisiana.  Defendants' unauthorized discharge of pollutants constitute continuing violations of La. R.S. 30:2075, La. R.S. 30:2076(A)(1)(a) and (A)(3) and LAC 33:IX.1701.B.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

186.

La. R.S. 30:2025(E)(1)(a) authorizes the assessment of civil penalties against each Defendant of not more than thirty two thousand five hundred dollars ($32,500) for each day of violation of the Louisiana Environmental Quality Act. A penalty of up to $50,000 may be assessed against each Defendant for each day of violation of a compliance order issued by LDEQ.  La. R.S. 30:2025(E)(2). However, when any such violation is done intentionally, willfully, or knowingly or results in a discharge or disposal which causes irreparable or severe damage to the environment or if the substance discharged is one which endangers human life or health, such person may be liable for an additional penalty or not more than one million dollars ($1,000,000) for each penalty event. La. R.S. 30:2025(E)(1)(a); LAC 33:I.703;  LAC 33:I.705. For violations lasting more than one 24-hour day, each such day of violation may be treated as a separate penalty event.  LAC 33:I.703.A.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

187.

The presence of oil, gas and other pollutants in Louisiana coastal waters continues to this day, and has caused severe damage to the environment, endangering human life and health, and is likely to continue to do so for an unspecified period of time, in violation of Louisiana law.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

188.

As a result of Defendants violations, each Defendant is liable under La. R.S. 30:2025 for a civil penalty of not more than $32,500 for each day of violation ($50,000 for each day of violation of a compliance order issued by LDEQ), and for an additional penalty of not more than $1,000,000 for each day of violation.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">189.</div>

The State of Louisiana further requests an award of costs incurred in this litigation, including attorney fees, to the extent recoverable under the Louisiana Environmental Quality Act.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">

**COUNT IV**

**Against All Defendants**

**Recovery of Response Action Costs**

190.

</div>

Paragraphs 1 through 189 are realleged and incorporated herein by reference.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 189 herein by reference.  The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to

<div align="center">115</div>

respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

192.

191.

This Count is alleged against all Defendants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

192.

The State has incurred response action costs associated with the discharge.  Many of these costs have not been paid by Defendants to date.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

193.

As of February 15, 2011, the State has incurred significant and unpaid response costs. The State will continue to incur response costs in the future.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

194.

Pursuant to La. R.S. 30:2025, Defendants are liable to the State for response action costs the State incurs in responding to the discharge.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

**COUNT V**

**Against BP, Anadarko, MOEX and Transocean Defendants**

**Oil Pollution Act Claim for Costs and Damages**

195.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 194 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 194 herein by reference.

196.

The State of Louisiana is hereby asserting claims for natural resource damages and other forward looking claims for long term economic impacts and lost revenues associated with the Spill in an abundance of caution. These claims are subject to ongoing assessments by the State, the costs of which the State is seeking herein. The State acknowledges that these claims are not currently ripe for adjudication and that they may be appropriately phased into the litigation, if ultimately necessary, at such time as the claims and damages are properly assessed and quantified. However, because Louisiana has a residual one-year prescription period and the State could not risk the Defendants' arguments that the State's claims were time-barred or that the State was impermissibly splitting its claims, the State has included these claims in this Complaint.

**ANSWER:**

The BP Parties admit that the State purports to assert claims for natural resource damages and economic impacts and lost revenues. The BP Parties deny that the State has stated valid claims for natural resource damages, and economic impacts and lost revenues.

197.

This Count is alleged against the BP, Anadarko, MOEX, and Transocean Defendants.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are

not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos.

2074 and 2075 and therefore deny those remaining allegations.

<center>198.</center>

OPA establishes a strict liability scheme that holds responsible parties strictly liable for damages and removal costs related to oil spills. OPA, 33 U.S.C. § 2702(a), provides that each responsible party for a vessel or facility from which oil is discharged, "into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages . . . that result from such incident."

**ANSWER:**

The BP Parties admit that OPA partially states the above quoted language.  The BP

Parties deny this paragraph to the extent it is inconsistent with 33 U.S.C. § 2702(a).

<center>199.</center>

Responsible parties for an offshore facility include the lessee or permittee of the area in which the facility is located or the holder of a right to use and easement granted under applicable state law or the Outer Continental Shelf Lands Act (43 U.S.C. § 1301 *et seq.*) for the area in which the facility is located.  Responsible parties also include any person owning, operating, or demise chartering the vessel. 33 U.S.C. § 2701(32).

**ANSWER:**

The BP Parties deny this paragraph to the extent it is inconsistent with 33 U.S.C. § 2701.

<center>200.</center>

OPA also provides for a limitation of liability for $75 million for offshore facilities.. This limitation does not apply if the oil spill was caused by gross negligence or willful misconduct or a violation of an applicable Federal safety, construction, or operating regulation by the responsible party. 33 U.S.C. § 2704(a)-(c).  The Gulf Oil Spill was caused by the gross negligence or willful misconduct, and/or violation of applicable Federal safety, construction, and/or operating regulations by BP, Anadarko, MOEX, and Transocean Defendants, and therefore this limitation is inapplicable.

**ANSWER:**

The BP Parties deny this paragraph to the extent it is inconsistent with 33 U.S.C. § 2704.

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or

<center>119</center>

liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

201.

The United States Coast Guard has designated Transocean Holdings Incorporated and BP Exploration and Production Inc. as responsible parties for the oil spill in letters dated April 28, 2010.

**<u>ANSWER:</u>**

The BP Parties admit the allegations of this paragraph.

202.

BP has waived the limitation of liability provisions contained in OPA.  *See* "Statement Of BP Exploration & Production Inc. Re Applicability Of Limit Of Liability Under Oil Pollution Act of 1990" (10/18/10) (Rec. Doc. 559); *see also* "Order re: Applicability of Limit of Liability Under Oil Pollution Act of 1990 to BP Exploration & Production Inc. (and its affiliates)." (12/23/10) (Rec. Doc. 925).

**<u>ANSWER:</u>**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a

claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties admit the allegations of this paragraph.

<div align="center">203.</div>

OPA describes the categories of recoverable costs and damages in 33 U.S.C. § 2702(b) which include: (1) all removal costs; (2) damages to natural resources; (3) damages to real or personal property; (4) subsistence use of natural resources; (5) net loss of revenues to a state or political subdivision thereof; (6) lost profits and earning capacity; and (7) damages for net costs of providing increased or additional public services during or after removal activities.

**ANSWER:**

The BP Parties deny this paragraph to the extent it is inconsistent with 33 U.S.C. §2702(b).

<div align="center">204.</div>

Pursuant to OPA, Defendants are responsible to the State of Louisiana for removal costs and damages which include natural resource damages, lost revenues and costs related to "providing increased or additional public services during or after removal activities" resulting from the Gulf Oil Spill as alleged throughout this Complaint.  33 U.S.C. §§ 2702.

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President

Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

205.

Louisiana has incurred, and will continue to incur, removal costs related to the discharge or threat of discharge of oil and other pollutants as well as the costs related to preventing, mitigating, and minimizing oil pollution which has impaired or threatens to impair Louisiana's waters, coast line, and natural resources.

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400

million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

<div align="center">206.</div>

Defendants are strictly liable for damages to natural resources belonging to, held in trust by, managed by, controlled by or appertaining to the State of Louisiana.  33 U.S.C. § 2706(a)(2). Natural resources are broadly defined to include "land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by…any State." 33 U.S.C. § 2701(20).

**<u>ANSWER:</u>**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP

Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

<div align="center">207.</div>

The measure of natural resource damages is the cost of restoring, rehabilitating, replacing or acquiring the equivalent of the damaged natural resources; the diminution in value of those natural resources pending restoration; plus the reasonable costs of assessing those damages. 33 U.S.C. § 2706(d)(1).

**ANSWER:**

The BP Parties deny this paragraph to the extent it is inconsistent with 33 U.S.C. §2706(d)(1).

<div align="center">208.</div>

Natural resource damages include the "reasonable costs of assessing the damage." 33 U.S.C. § 2702(b)(2).

**ANSWER:**

The BP Parties admit that 33 U.S.C. § 2702(b) partially contains the above quoted language. The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with 33 U.S.C. §2702(b).

209.

"Natural resource damage assessment" means the process of collecting and analyzing information to evaluate the nature and extent of injuries resulting from an incident, and determine the restoration actions needed to bring injured natural resources and services back to baseline and make the environment and public whole for interim losses..." 15 C.F.R. § 990.30.

**ANSWER:**

The BP Parties admit that 15 C.F.R. § 990.30 partially contains the above quoted language. The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with 15 C.F.R. § 990.30.

210.

15 C.F.R. § 990.30 defines "reasonable assessment costs" as "assessment costs that are incurred by trustees in accordance with this part. In cases where assessment costs are incurred, but trustees do not pursue restoration, trustees may recover their reasonable assessment costs provided they have determined that assessment actions undertaken were premised on the likelihood of injury and need for restoration."

**ANSWER:**

The BP Parties admit that 15 C.F.R. § 990.30 partially contains the above quoted language. The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with 15 C.F.R. § 990.30.

211.

The oil, gas, and other pollutants, including dispersants, associated with the spill have contaminated Louisiana waters, and injured or killed wildlife including numerous birds, fish, turtles, dolphins, and other marine wildlife. Louisiana's beaches, barrier islands, wetlands, and marshes have also been, and continue to be, damaged by the Gulf Oil Spill as the oil washes ashore and invades wetlands and marshes. The oil, pollutants and dispersants continue to spread and/or wash ashore and will continue to injure Louisiana's precious natural resources.

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims. Following the incident, the BP Parties quickly established a

claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

212.

Defendants are strictly liable to Louisiana for lost revenues associated with the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property or natural resources which shall be recoverable by the State.

**<u>ANSWER:</u>**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP

Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

<div align="center">213.</div>

Defendants are strictly liable to Louisiana for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards caused by the discharge of oil.

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of

the BP Parties.   The BP Parties adopt and incorporate by reference Document 2074, the BP

Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean

and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint

Against Transocean, which were served on all counsel on April 20, 2011.   The BP Parties admit

the remaining allegations of this paragraph to the extent they are alleged by one or more of the

BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this

paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and

2075.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of

the remaining allegations of this paragraph to the extent they are not directed at the conduct or

liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore

deny those remaining allegations.


### 214.

Defendants are liable to the State for removal costs it incurs in cleaning up and
remedying the impacts from the Gulf Oil Spill. Cleanup and removal costs include costs related
to actions to prevent, minimize, mitigate, or clean up an oil spill.

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to

pay all legitimate OPA claims.   Following the incident, the BP Parties quickly established a

claims process.   And while operating its OPA claims process, the BP Parties paid nearly $400

million to individuals and businesses.   Following a June 16, 2010 meeting with President

Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by

Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business

claims, state and local government claims, NRD and NRDA, and settlements and judgments can

be paid.   The GCCF has paid over $5.73 billion for individual and business claims.   The BP

Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

215.

Defendants are liable for damages directly related to the injury to natural resources and/or to require restoration or replacement of natural resources as well as the loss of benefit/use of those resources while they are offline.  Damages include the reasonable costs of assessing the damage. 33 U.S.C. § 2702(b)(2)(A).

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can

be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

<div align="center">216.</div>

Defendants are liable for damages for injury to, or economic losses resulting from destruction of, real or personal property are recoverable to the extent the State owns or leases property which has been directly impacted by the oil spill. 33 U.S.C. § 2702(b)(2)(B).

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business

claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

<div align="center">217.</div>

Defendants are liable for loss of subsistence use of natural resources where those resources have been injured, destroyed, or lost.  33 U.S.C. § 2702(b)(2)(C).

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business

claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid. The GCCF has paid over $5.73 billion for individual and business claims. The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

218.

Defendants are liable to the State of Louisiana for the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources. 33 U.S.C. § 2702(b)(2)(D).

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims. Following the incident, the BP Parties quickly established a claims process. And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses. Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by

Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

<div align="center">219.</div>

The State and its political subdivisions or agencies may recover loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources.  33 U.S.C. §2702(b)(2)(E).

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President

Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

<p style="text-align:center">220.</p>

Defendants are liable to the State for the net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by a discharge of oil. 33 U.S.C. §2702(b)(2)(F).

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400

million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

221.

Louisiana has suffered and will continue suffer damages associated with the discharge of oil and other pollutants as well as continue to expend costs that are recoverable under OPA.

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400

million to individuals and businesses. Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid. The GCCF has paid over $5.73 billion for individual and business claims. The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

## COUNT VI

**Against BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants**

**Louisiana Oil Spill Prevention and Response Act Claim for Costs and Damages**

222.

The State realleges and incorporates each of the allegations contained in paragraphs 1 - 221 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 221 herein by reference. The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

223.

The State of Louisiana is hereby asserting claims for natural resource damages and other forward looking claims for long term economic impacts and lost revenues associated with the Spill in an abundance of caution. These claims are subject to ongoing assessments by the State, the costs of which the State is seeking herein. The State acknowledges that these claims are not currently ripe for adjudication and that they may be appropriately phased into the litigation, if ultimately necessary, at such time as the claims and damages are properly assessed and quantified. However, because Louisiana has a residual one-year prescription period and the State could not risk the Defendants' arguments that the State's claims were time-barred or that the State was impermissibly splitting its claims, the State has included these claims in this Complaint.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

224.

This Count is alleged against BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

225.

OPA expressly allows states to impose additional requirements or liability for the discharge of oil. 33 U.S.C. §§ 2718(a)(1) and 2718(c)(1).

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

226.

The Louisiana Legislature recognized Louisiana's unique exposure to oil spills when it enacted OSPRA, codified at La. R.S. 30:2451, *et seq.*. La. R.S. 30:2452(A). In passing OSPRA, the Legislature expressly recognized the constitutional duties of the State of Louisiana to "protect, conserve and replenish the natural resources of [Louisiana]." La. R.S. 30:2453(A) (citing La. Const. art. IX Sec. 1). Louisiana's constitutional duty of protecting the environment is based on the public trust doctrine that is recognized in the State Constitution. Article IX, Section 1 of the Louisiana Constitution provides:

> The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

227.

OSPRA applies "in the event that an unauthorized discharge of oil or the substantial threat of an unauthorized discharge of oil to state waters results in injury to natural resources." Louisiana Administrative Code 43:XXIX.101(A).

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

228.

Responsible parties under OSPRA include "[t]he owner or operator of a vessel or terminal facility from which an unauthorized discharge of oil emanates or threatens to emanate." La. R.S. 30:2454(22)(a). Responsible parties also include any person "who causes, allows, or permits an unauthorized discharge of oil or threatened unauthorized discharge of oil." La. R.S. 30:2454(22)(c).

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

229.

The BP, Anadarko, MOEX and Transocean Defendants were each owners and/or operators of the Macondo Well and/or the *Deepwater Horizon* rig and as such are responsible parties under OSPRA. La. R.S. 30:2454(20).

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

230.

Additionally the BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants each caused, allowed or permitted the unauthorized discharge of oil from the Macondo Well and *Deepwater Horizon* rig. As such, they are responsible parties under OSPRA. La. R.S. 30:2454(22)(c).

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

231.

OSPRA defines "discharge of oil" broadly to include "an intentional or unintentional act or omission by which harmful quantities of oil are spilled, leaked, pumped, poured, emitted, or dumped into or on coastal waters of the state or at any place where, unless controlled or removed, they may drain, seep, run, or otherwise enter coastal waters of the state." La. R.S. 30:2454(7).

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the

Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document

No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to

these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

232.

Under the provisions of OSPRA, the BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants, as responsible parties, are strictly, jointly, and severally liable to the State of Louisiana (along with any other responsible party) for all costs and damages resulting from this oil spill.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the

Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document

No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to

these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

233.

Defendants are liable to the State of Louisiana for damages associated with injury to or economic loss resulting from destruction of, immovable or corporeal movable property, which shall be recovered by a person who owns or leases that property.  La. R.S. 30:2454(5)(b).

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

234.

Defendants are liable to the State of Louisiana for damages equal to the net loss of taxes, royalties, rents, fees or net profit share due to the injury, destruction, or loss of immovable or corporeal movable property or natural resources.  La. R.S. 30:2454(5)(c).

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

235.

Defendants are liable to the State of Louisiana for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by a discharge of oil. La. R.S. 30:2454(5)(d).

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">236.</div>

In addition, Defendants are liable to the State of Louisiana for natural resource damages which are defined to include: damages for injury to, destruction of, or loss of natural resources including the reasonable and any direct, documented cost to restore, rehabilitate, or replace injured natural resources, or to mitigate further injury, and their diminution in value after such restoration, rehabilitation, replacement, or mitigation.  La. R.S. 30:2454(5)(a)

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">237.</div>

Accordingly, the State of Louisiana may recover costs attributable to the performance of its assessment of damages and the development, implementation, and monitoring of any restoration plan including:

(a)     salaries, benefits, transportation, overhead, and state per diem costs;

(b)     costs of sampling, and analyses of oil and natural resources;

(c)     costs of laboratories, contractors, and other experts retained by the trustees in assessing injury and determining damages;

(d)     costs of mediation; and

(e)     lost revenues.

Louisiana Administrative Code 43:XXIX.129(B)(1).

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

238.

Louisiana has suffered damages and expended costs as a result of the discharge of oil and other pollutants, including dispersants. The State will continue to suffer damages and expend costs, all of which are recoverable under OSPRA.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## COUNT VII

**Against BP, Anadarko, MOEX, Transocean,  Halliburton, Cameron M-I Defendants**

**Negligence Under Maritime Law**

239.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 238 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 238 herein by reference.

240.

This Count is alleged against the BP, Anadarko, MOEX, Transocean, Halliburton, Cameron and M-I Defendants

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties continue to maintain, notwithstanding the B1 Order, that OPA displaces maritime law.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

241.

The fire, explosion and resulting oil spill was caused by the concurrent negligence (including gross negligence and/or willful misconduct) of the Defendants.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties continue to maintain, notwithstanding the B1 Order, that OPA displaces maritime law.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

242.

Defendants owed and breached duties of ordinary and reasonable care to the State in connection with the drilling operations and maintenance of the *Deepwater Horizon* and its equipment, apparatuses, and personnel.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties continue to maintain, notwithstanding the B1 Order, that OPA displaces maritime law.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

<div align="center">243.</div>

Defendants also owed and breached duties of ordinary and reasonable care to the State to guard against, prevent, and/or mitigate the risk of an oil spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or

more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties continue to maintain, notwithstanding the B1 Order, that OPA displaces maritime law.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

<div align="center">244.</div>

Defendants also owed and breached duties of ordinary and reasonable care to the State by providing, supplying, using, and/or controlling equipment and products including, but not limited to, the BOP, which Defendants knew or should have known to be defective.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties continue to maintain, notwithstanding the B1 Order, that OPA displaces maritime law.   The BP Parties lack knowledge or information

sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

245.

Upon information and belief, Defendants were negligent (and or grossly negligent or willful) in the following non-exclusive particulars:

a. Failing to properly operate the *Deepwater Horizon* and apparatuses associated therewith;

b. Operating the *Deepwater Horizon* and apparatuses in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill;

c. Failing to properly inspect the *Deepwater Horizon* and apparatuses to assure that its equipment and personnel were fit for their intended purpose;

d. Acting in a careless and negligent manner without due regard for the safety of others;

e. Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the *Deepwater Horizon* which, if they had been so promulgated, implemented, and enforced, would have averted the fire, explosion, sinking and oil spill;

f. Operating the *Deepwater Horizon* with untrained and unlicensed personnel;

g. Inadequate and negligent training and hiring of personnel;

h. Failing to take appropriate action to avoid or mitigate the accident;

i. Negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico.

j. Employing untrained or poorly trained employees and failing to properly train their employees;

k. Failing to ascertain that the *Deepwater Horizon* and its equipment were free from defects and/or in proper working order;

l. Failure to timely warn;

m. Failure to timely bring the oil release under control;

n. Failure to provide appropriate accident prevention equipment;

149

o. Failure to observe and read gauges that would have indicated excessive pressures in the well;

p. Failure to react to danger signs;

q. Providing BOPs, float collars, and other equipment and/or products that do not work properly;

r. Providing cement, cement slurry and/or cement slurry designs that resulted in improper and inadequate cementing;

s. Conducting well and well cap cementing operations improperly;

t. Disregarding known risks to human safety, human life, and the safety and health of the environment;

u. Acting in a manner that justifies imposition of punitive damages;

v. Failing to ensure that the drilling fluids utilized on the *Deepwater Horizon,* including any spacer solutions, were used in a reasonably safe manner; and

w. Such other acts and omissions of negligence, gross negligence, and willful misconduct that violated Defendants' duty of care.

### **ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064. The BP Parties continue to maintain, notwithstanding the B1

Order, that OPA displaces maritime law.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

246.

Defendants' duties of reasonable care are imposed by general maritime law.

**ANSWER:**

The BP Parties deny the allegations of this paragraph and also continue to maintain notwithstanding the B1 Order, that OPA displaces maritime law.

247.

As a direct and proximate result of Defendants' negligence, gross negligence, and/or willful misconduct:

a.   the State has suffered, and will continue to suffer, damage to, loss of, or destruction of its natural resources, real and personal property, industry, and economy;

b.   the State has incurred, and will continue to incur, substantial costs and expenses in responding to this disaster and providing increased and additional public services;

c.   the State has lost, and will continue to lose, revenues from taxes, rents, royalties, and fees due to the injury to, loss of, or destruction of, its real property, personal property, and natural resources;

d.   the State has suffered the loss of use and enjoyment of property;

e.   the State has suffered the diminution in the value of property;

f.   the State has incurred and will continue to incur removal and restoration costs;

g.   the State has incurred and will continue to incur economic losses;

h.   the State has incurred and will continue to incur other consequential and incidental damages.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties continue to maintain, notwithstanding the B1 Order, that OPA displaces maritime law.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

248.

The Incident and resulting Gulf Oil Spill were caused by the joint and concurrent negligence of Defendants, which renders them jointly and severally liable to the State under general maritime law.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties continue to maintain, notwithstanding the B1 Order, that OPA displaces maritime law and that OPA liability is not joint and several when divisibility can be established.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

## COUNT VIII

### Against BP, Transocean, Anadarko, MOEX, Halliburton, M-I, and Cameron Defendants

### Public and Private Nuisance Under Maritime Law

249.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 248 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 248 herein by reference.  The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required

to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">250.</div>

This Count is alleged against the BP, Transocean, Anadarko, MOEX, Halliburton, M-I, and Cameron Defendants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">251.</div>

As a result of the explosion on the *Deepwater Horizon*, oil, hydrocarbons, and dispersant chemicals invaded and continue to invade the State's real and personal properties and natural resources and have resulted in both public and private nuisances for which Defendants are responsible.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

252.

The presence of oil, hydrocarbons, and dispersant chemicals unreasonably interferes with public health, safety, peace, comfort, or convenience.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

253.

The presence of oil, hydrocarbons, and dispersant chemicals unreasonably interferes with the State's use of its real and personal properties.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

254.

The State has suffered significant harm different in kind from that suffered by the general public.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<center>255.</center>

The State has sustained particular damages, different from and greater than the damages suffered by the general public.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<center>256.</center>

General maritime law imposes liability for creating and/or maintaining a nuisance.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<center>257.</center>

As a direct and proximate result of the nuisance:

a.  the State has suffered, and will continue to suffer, damage to, loss of, or destruction of its natural resources, real and personal property, industry, and economy;

<center>156</center>

b.   the State has incurred, and will continue to incur, substantial costs and expenses in responding to this disaster and providing increased and additional public services;

c.   the State has lost, and will continue to lose, revenues from taxes, rents, royalties, and fees due to the injury to, loss of, or destruction of, its real property, personal property, and natural resources;

d.   the State has suffered the loss of use and enjoyment of property;

e.   the State has suffered the diminution in the value of property;

f.   the State has incurred and will continue to incur removal and restoration costs;

g.   the State has incurred and will continue to incur economic losses;

h.   the State has incurred and will continue to incur other consequential and incidental damages.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

258.

Defendants jointly and concurrently engaged in negligent, reckless, and/or willful conduct that caused the nuisance, rendering them jointly and severally liable to the State under general maritime law.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## COUNT IX

### Against BP, Transocean, Anadarko, MOEX, Halliburton and Cameron Defendants

### Trespass Under Maritime Law

259.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 258 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 258 herein by reference.  The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

260.

This Count is alleged against the BP, Transocean Anadarko, MOEX, Halliburton and Cameron Defendants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

261.

At all times relevant to the causes of action alleged in this Complaint, the State owned and/or lawfully possessed property on, near or adjacent to the Louisiana Gulf Coast.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

262.

Defendants released, discharged or otherwise permitted the escape of oil and other pollutants in a manner they knew or should have known would invade the State's property, thereby interfering with the State's exclusive possessory rights.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

263.

The continuing migration on and around the State's property of oil and other pollutants originating in the Gulf of Mexico has resulted in a trespass to the State's property for which Defendants are responsible.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document

No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">264.</div>

Defendants acted negligently, recklessly, and /or intentionally in causing the invasion of the State's property, in failing to prevent the migration of oil and other pollutants onto the State's property, and in failing to correct the invasion.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">265.</div>

The presence of oil and other pollutants on the State's property is unauthorized.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">266.</div>

Defendants have not sought nor obtained the State's consent to store its hazardous substances and oil on the State's  properties.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

267.

General maritime law imposes liability for trespass.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

268.

As a direct and proximate result of Defendants' trespass:

a.  the State has suffered, and will continue to suffer, damage to, loss of, or destruction of its natural resources, real and personal property, industry, and economy;

b.  the State has incurred, and will continue to incur, substantial costs and expenses in responding to this disaster and providing increased and additional public services;

c.  the State has lost, and will continue to lose, revenues from taxes, rents, royalties, and fees due to the injury to, loss of, or destruction of, its real property, personal property, and natural resources;

d.  the State has suffered the loss of use and enjoyment of property;

e.  the State has suffered the diminution in the value of property;

f.   the State has incurred and will continue to incur removal and restoration costs;

g.   the State has incurred and will continue to incur economic losses;

h.   the State has incurred and will continue to incur other consequential and incidental damages.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

269.

Defendants jointly and concurrently engaged in negligent, reckless, and/or willful conduct that caused the trespass onto Plaintiff's property, rendering them jointly and severally liable to the State under general maritime law.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## COUNT X

**Against Cameron, Halliburton and Weatherford Defendants**

**Strict Products Liability Under Maritime Law**

270.

The State realleges and incorporates of the allegations contained in paragraphs 1 through 269 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 269 herein by reference.

271.

This Count is alleged against the Cameron, Halliburton and Weatherford Defendants.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2082 or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2082 and 2064. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2082 and 2064, and therefore deny those remaining allegations.

272.

Defendant Cameron manufactured, designed, supplied, and/or installed at the Macondo wellhead the *Deepwater Horizon*'s blowout-preventer ("BOP"), a sub-sea emergency device whose uses include closure of the well to prevent blowout. The BOP at all relevant times was an appurtenance of the vessel and part of the equipment of the vessel.

**ANSWER:**

The BP Parties admit that Cameron manufactured, designed, supplied, and/or installed the *Deepwater Horizon's* blowout preventer, an appurtenance of the *Deepwater Horizon* and part of the vessel's equipment. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

273.

Cameron was in the business of designing, manufacturing, marketing, selling, and/or distributing the BOP used in connection with the drilling operations on the *Deepwater Horizon*.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

274.

Cameron sold and delivered the BOP at the *Deepwater Horizon* to Defendant Transocean in 2001.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

275.

Cameron's BOP was used in the manner intended, or in a reasonably foreseeable manner, in connection with drilling operations on the *Deepwater Horizon*.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference

Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

276.

The BOP was defectively designed and/or manufactured in that it failed to operate as intended on April 20, 2010, causing the blowout and resultant explosion and oil spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

277.

Cameron failed to provide reasonable instructions or warnings to reduce or avoid the foreseeable risk of harm posed by the BOP that it would fail to operate as intended on April 20, 2010, causing the blowout and resultant explosion and oil spill.   The failure to provide reasonable instructions or warnings rendered the BOP unreasonably dangerous.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.   The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

278.

Cameron knew or should have known about the unreasonably dangerous condition of the BOP at the time it was supplied for use by *Deepwater Horizon*.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.   The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining

allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

279.

Defendant Halliburton manufactured, designed, supplied, and/or installed the cement and/or nitrogen foam cement slurry mixture (the "Cement") that was used in connection with drilling operations by the *Deepwater Horizon*. The Cement is intended to seal the well and prevent the uncontrolled release of oil and other hydrocarbons.

**ANSWER:**

The BP Parties admit that Halliburton manufactured, designed, supplied, and/or installed the cement and/or nitrogen foam cement slurry mixture for cementing operations on board the *Deepwater Horizon* meant to seal the well against an influx of hydrocarbons.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

280.

Halliburton was in the business of designing, manufacturing, marketing, selling, and/or distributing the Cement used in connection with the drilling operations on the *Deepwater Horizon*.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

281.

Halliburton sold and delivered the Cement used to temporarily seal the Macondo Well in 2010.

**ANSWER:**

The BP Parties sold and delivered the Cement used to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

282.

Halliburton's Cement was used in the manner intended, or in a reasonably foreseeable manner, in connection with drilling operations on the *Deepwater Horizon*.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and therefore deny those remaining allegations.

283.

The Cement was defectively designed and/or manufactured in that it failed to operate as intended on April 20, 2010, causing the blowout and resultant explosion and oil spill. Halliburton failed to provide reasonable instructions or warnings to reduce or avoid the foreseeable risk of harm posed by the Cement that it would fail to operate as intended on April 20, 2010, causing the blowout and resultant explosion and oil spill. The failure to provide reasonable instructions or warnings rendered to Cement unreasonably dangerous.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and therefore deny those remaining allegations.

284.

Halliburton knew or should have known about unreasonably dangerous condition of the Cement at the time it was supplied for use by *Deepwater Horizon*.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at

the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and therefore deny those remaining allegations.

<div align="center">285.</div>

Defendant Weatherford manufactured, designed, supplied, and/or installed the float collar, which was used in connection with drilling operations by the *Deepwater Horizon*. The float collar is intended to prevent backflow of fluids and hydrocarbons into the casing.

**<u>ANSWER:</u>**

The BP Parties admit that Weatherford and/or its affiliates provided products and services related to the float collar used at the Macondo Well.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

<div align="center">286.</div>

Weatherford was in the business of designing, manufacturing, marketing, selling, and/or distributing the float collar appurtenant to the vessel and used in connection with the drilling operations by the *Deepwater Horizon*.

**<u>ANSWER:</u>**

The BP Parties admit that Weatherford and/or its affiliates provided products and services related to the float collar used at the Macondo Well.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

<div align="center">287.</div>

Weatherford sold and delivered the float collar at the *Deepwater Horizon* to Defendant Transocean in 2001.

**<u>ANSWER:</u>**

The BP Parties admit the allegations of this paragraph.

<div align="center">170</div>

288.

The float collar was used in the manner intended, or in a reasonably foreseeable manner, in connection with drilling operations by the *Deepwater Horizon*.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

289.

The float collar was defectively designed and/or manufactured and/or Weatherford failed to provide reasonable instructions or warnings rendering the float collar unreasonably dangerous such that it did not operate as intended on April 20, 2010.  Such failure caused the blowout and resultant explosion and oil spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

290.

Weatherford knew or should have known about the unreasonably dangerous condition of the float collar at the time it was supplied for use by the *Deepwater Horizon*.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

291.

As a direct and proximate result of Defendants' defectively designed and/or manufactured products and/or Defendants failure to provide reasonable instructions or warnings:

  a.  the State has suffered, and will continue to suffer, damage to, loss of, or destruction of its natural resources, real and personal property, industry, and economy;

  b.  the State has incurred, and will continue to incur, substantial costs and expenses in responding to this disaster and providing increased and additional public services;

  c.  the State has lost, and will continue to lose, revenues from taxes, rents, royalties, and fees due to the injury to, loss of, or destruction of, its real property, personal property, and natural resources;

  d.  the State has suffered the loss of use and enjoyment of property;

  e.  the State has suffered the diminution in the value of property;

  f.  the State has incurred and will continue to incur removal and restoration costs;

  g.  the State has incurred and will continue to incur economic losses;

  h.  the State has incurred and will continue to incur other consequential and incidental damages.

**<u>ANSWER:</u>**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2082 or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2082 and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the

extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2082 and 2064, and therefore deny those remaining allegations.

<div align="center">292.</div>

The Incident and resulting Gulf Oil Spill were caused by the joint and concurrent negligence of Defendants, which renders them jointly and severally liable to the State under general maritime law.

**<u>ANSWER:</u>**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2082 or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2082 and 2064.   The BP Parties continue to maintain, notwithstanding the B1 Order, that OPA displaces maritime law and that OPA liability is not joint and several when divisibility can be established.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2082 and 2064, and therefore deny those remaining allegations.

## COUNT XI

### Against the BP, Transocean, Anadarko, and MOEX Defendants

### Negligence/Louisiana Civil Code Articles 2315 & 2316

293.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 292 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 292 herein by reference.  The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

294.

This Count is alleged against the BP, Transocean, Anadarko, and MOEX Defendants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

295.

The fire, explosion and resulting oil spill was caused by the concurrent negligence (including gross negligence and/or willful misconduct) of the Defendants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the

Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document

No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to

these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

296.

Upon information and belief, the State avers that the fire, explosion, and resulting oil spill was caused by the joint gross negligence and fault of the Defendants in the following non-exclusive particulars:

  a.  Failing to properly operate the *Deepwater Horizon* and apparatuses associated therewith;

  b.  Operating the *Deepwater Horizon* and apparatuses in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill;

  c.  Failing to properly inspect the *Deepwater Horizon* and apparatuses to ensure that its equipment and personnel were fit for their intended purpose;

  d.  Acting in a careless and negligent manner without due regard for the safety of others;

  e.  Failing to promulgate, implement and enforce rules and procedures pertaining to the safe operations of the *Deepwater Horizon* and apparatuses which, if they had been so promulgated, implemented, and enforced, would have averted the fire, explosion, sinking and oil spill;

  f.  Operating the *Deepwater Horizon* and apparatuses with untrained and unlicensed personnel;

  g.  Inadequate and negligent training and hiring of personnel;

  h.  Failing to take appropriate action to avoid or mitigate the Incident;

i.  Negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico.

j.  Employing untrained or poorly trained employees and failing to properly train their employees;

k.  Failing to ensure that the *Deepwater Horizon* and its equipment and apparatuses were free from defects and/or in proper working order;

l.  Failure to timely warn;

m.  Failure to timely bring the oil release under control;

n.  Failure to provide appropriate accident prevention equipment;

o.  Failure to observe and read gauges that would have indicated excessive pressures in the well;

p.  Failure to react reasonably to danger signs;

q.  Utilizing BOPs that do not work properly;

r.  Conducting well and well cap cementing operations improperly and unreasonably;

s.  Acting in a manner that justifies imposition of punitive damages; and

t.  Such other acts of gross negligence and omissions as will be shown at the trial of this matter; all of which acts are in violation of the laws of Louisiana as well as Federal Law applicable on the Outer Continental Shelf.

**<u>ANSWER:</u>**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

297.

In addition, and in the alternative, the fire, explosion, and sinking of the *Deepwater Horizon* and resulting oil spill were caused or aggravated by defective equipment, including the BOP, which were in the care, custody, and control of Defendants, and over which the Defendants

had garde. Defendants knew or should have known of these defects and Defendants are, therefore, liable for them.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

298.

The injuries to the State were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with the operations.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

299.

In addition to the negligent actions described above, and in the alternative thereto, the injuries and damages suffered by the State were caused by the acts and/or omissions of the Defendants that are beyond proof by the State but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the fire, explosion, sinking and oil spill resulted from the gross negligence of Defendants. Furthermore, the fire, explosions, sinking and the resulting oil spill would not have occurred had the Defendants exercised the high degree of care imposed on them and the State, *therefore*, pleads the doctrine of *res ipsa loquitur.*

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

300.

By reason of the foregoing acts and omissions, the State is entitled to recovery from Defendants for the damages and injuries identified herein.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## COUNT XII

**Against BP, Transocean, Anadarko, MOEX, Halliburton and Cameron Defendants**

**Nuisance/Louisiana Civil Code Art. 667**

301.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 300 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 300 herein by reference.  The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss

178

the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C",
Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required
to respond to these allegations.  To the extent the BP Parties may be deemed to be required to
respond to these allegations, the BP Parties deny them to the extent they are directed at the BP
Parties.

<div align="center">302.</div>

This Count is alleged against the BP, Transocean, Anadarko, MOEX, Halliburton and
Cameron Defendants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the
Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document
No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond
to these allegations.  To the extent the BP Parties may be deemed to be required to respond to
these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">303.</div>

At all times relevant to the causes of action alleged in this Complaint, the State has
ownership and/or proprietary interests in certain real and personal property in areas affected by
the oil spill released into the Gulf of Mexico.  The State also has the right to the exclusive use
and quiet enjoyment of their property.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the
Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document
No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond
to these allegations.  To the extent the BP Parties may be deemed to be required to respond to
these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

304.

The Defendants' actions or omissions which resulted in an explosion and oil spill, and including allowing the migration of oil into Louisiana's waters and upon Louisiana's shoreline, resulted in oil invading and contaminating the State's properties. This contamination has severely impacted the State's interest in the private use and enjoyment of its land, thereby resulting in a private nuisance for which Defendants are responsible.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the

Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document

No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations. To the extent the BP Parties may be deemed to be required to respond to

these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

305.

As a result of the Defendants' actions, the State has suffered annoyance, inconvenience, and discomfort arising from the nuisance created by defendants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the

Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document

No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations. To the extent the BP Parties may be deemed to be required to respond to

these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

306.

Unless the nuisance is abated, the State's properties and its right to use and enjoy its property and their interests will be progressively further jeopardized.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

307.

By reason of the nuisance, the State is entitled to recover damages for the following, including, but not limited to: (1) the loss of use and enjoyment of property; (2) the diminution in value of property; (3) restoration costs; (4) economic loss; (5) diminution of property value; (5) consequential and incidental damages; (6) disgorgement of profits realized; and (7) unjust enrichment.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## COUNT XIII

### Against BP, Transocean, MOEX and Anadarko Defendants

### Trespass

308.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 307 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 307 herein by reference.  The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

309.

This Count is alleged against the BP, Transocean, Anadarko and MOEX Defendants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

310.

At all times relevant to the causes of action alleged in this Complaint, the State owned, and/or lawfully possessed property on, near or adjacent to the Louisiana Gulf Coast.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

311.

The continuing migration on and around the State's properties of the oil spill originated in the Gulf of Mexico and resulted from Defendants' deep water well operations and has resulted in a trespass to the State's properties for which Defendants are responsible.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

312.

The presence of oil contamination on the State's properties is unauthorized.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

313.

The Defendants have not sought nor obtained the State's consent to store its hazardous substances and oil on the State's properties.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

314.

The Defendants have failed to prevent the migration of oil onto the State's properties.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

315.

By reason of the trespass, the State is entitled to recover damages for the following, including, but not limited to: (1) the loss of use and enjoyment of property; (2) the diminution in value of property; (3) restoration costs; (4) economic loss; (5) consequential and incidental damages; (6) disgorgement of profits realized; and (7) unjust enrichment.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## COUNT XIV

### Against the BP, Transocean Anadarko and MOEX Defendants

### Strict Liability/Garde/Louisiana Civil Code Art 2317

316.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 315 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 315 herein by reference.  The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

317.

This Count is alleged against the BP, Transocean, Anadarko and MOEX Defendants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

185

318.

The *Deepwater Horizon* and the Macondo Prospect were and continue to be in the Defendants' custody and control.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

319.

The *Deepwater Horizon* and the Macondo Prospect, which were and continue to be in the care and custody of Defendants, caused damage to the State.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

320.

The *Deepwater Horizon* and the Macondo Prospect had a vice or defect which created an unreasonable risk of harm.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

186

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

321.

The State's damages and injuries were caused by the vice or defect in the *Deepwater Horizon* and Macondo Prospect.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

322.

By reason of the foregoing vice or defect, the State is entitled to recovery from Defendants for the damages and injuries identified herein.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## COUNT XV

**Against the BP, Transocean, Anadarko, MOEX and Halliburton Defendants**

**Abnormally Dangerous/Ultra Hazardous Activity**

323.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 322 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 322 herein by reference. The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

324.

This Count is alleged against the BP, Transocean, Anadarko, MOEX and Halliburton Defendants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

325.

The Defendants' drilling operation is an abnormally dangerous and ultra hazardous activity in that:

A.      There exists a high degree of risk of serious harm to the environment, persons, land, chattels of others, including plaintiffs, which cannot be eliminated by the exercise of reasonable care;

B.      There is a strong likelihood that great harm will result from oil drilling and release of oil;

C.      The discharge of oil into the Gulf of Mexico in large quantities is not a matter of common usage such as would be carried on by the great mass of mankind or many people in the community;

D.      The manner in which Defendants operated the drilling rig and released such materials was inappropriate

**<u>ANSWER:</u>**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

326.

As a direct and proximate result of Defendants' actions and abnormally dangerous and ultra hazardous activities, the State has suffered, and continues to suffer, damages and detriment herein alleged.

**<u>ANSWER:</u>**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

327.

By reason of the foregoing activities, the State is entitled to recovery from Defendants for the damages and detriment identified herein

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## COUNT XVI

### Against Halliburton

### Negligence/Louisiana Civil Code Articles 2315 & 2316

328.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 327 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 327 herein by reference.  The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to

respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

329.

This Count is alleged against Halliburton.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

330.

Halliburton was responsible at the time of the accident for cementing operations aboard the *Deepwater Horizon*. Halliburton was responsible for performing the cementing of casing at the Macondo Well at all relevant times leading up to the blowout. Halliburton provided expertise including testing of cement properties and materials, as well as engineering services and onshore support for its *Deepwater Horizon* operations. Halliburton also provided technical and expert advice regarding cement design, modeling, testing, and ultimate placement of cement at the Macondo well. In addition, Halliburton (through its subdivision Sperry Drilling Services, f/k/a Sperry Sun Drilling Services) was responsible for mudlogging personnel and equipment on the *Deepwater Horizon*, including downhole drilling tools. At all relevant times, Halliburton participated in drilling operations and provided onshore support and engineering expertise for operations at the Macondo well.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

331.

As the entity responsible for cementing operations aboard *Deepwater Horizon*, Halliburton owed a duty to the State to exercise ordinary and reasonable care in conducting its aforementioned operations and carrying out its aforementioned responsibilities, and breached this duty by the following actions and/or omissions:

a. negligently failing to ensure the safety and reliability of the nitrogen foam cement used in the Macondo Well during the temporary well abandonment operations leading up to the blowout, specifically by failing to employ adequate testing standards for its nitrogen foam cement, failing to report unfavorable test results to BP and rig personnel, and failing to report the final foam cement test results before the pumping of the cement job in the days leading up to the blowout;

b. negligently conducting the cement operation without ensuring a full "bottoms-up" circulation of the drilling mud in the well, in the process violating industry standards and regulations;

c. negligently ignoring the results of a negative pressure test which indicated that the cement job had failed;

d. negligently failing to ensure the performance of cement bond log test to ensure the integrity of the cement job, and/or ignoring the fact that such a test was not performed; and

e. negligently failing to employ a casing hanger lockdown sleeve to lock the production casing and wellhead in place, and thereby avert the blowout that occurred.

**<u>ANSWER:</u>**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

332.

Halliburton's breaches of duty resulted in the fire, explosion, and sinking of the *Deepwater Horizon*, and resulting oil spill, and thereby proximately caused and/or contributed to the State's injuries and damages. Halliburton's breaches were both the actual and legal cause of the State's damages, and the risk of harm suffered by the State was within the scope of protection afforded by the duty breached.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

333.

By reason of the foregoing acts and omissions, the State is entitled to recovery from Defendant for the damages and injuries identified herein.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

**COUNT XVII**

**Against Halliburton**

**Trespass**

334.

The State realleges and incorporates each of the allegations contained in paragraphs 1through 333 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 333 herein by reference.  The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss

the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C",
Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required
to respond to these allegations.  To the extent the BP Parties may be deemed to be required to
respond to these allegations, the BP Parties deny them to the extent they are directed at the BP
Parties.

335.

This Count is alleged against Halliburton.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the
Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document
No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond
to these allegations.  To the extent the BP Parties may be deemed to be required to respond to
these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

336.

Halliburton had knowledge of the risk of a well blowout on the *Deepwater Horizon* and a
resulting explosion and oil spill, and was further aware that such a blowout could result in a fire,
explosion and oil spill such as that which has devastated Louisiana and its natural resources,
including property owned and/or leased by the State.  It was reasonably foreseeable to
Halliburton that such a disaster would result in the invasion of the State of Louisiana's property
and harm to Louisiana as a result of the pollutants discharged by the disaster.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the
Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document
No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">337.</div>

Halliburton wrongfully discharged a polluting substance onto the State of Louisiana's property. Halliburton, through its actions resulting in the disastrous oil spill, entered, invaded, and intruded on the properties of the State.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">338.</div>

By its gross negligence and willful, wanton and reckless indifference for the rights of the others, Halliburton breached the duty it had to use reasonable care not to enter, intrude on, or invade the State's property, and to exercise reasonable care in all of its cement and mud-logging operations related to the Macondo Well.  This breach resulted in the entry, intrusion, or invasion on the property of the State.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

339.

By reason of the trespass, the State is entitled to recover damages for the following, including, but not limited to: (1) the loss of use and enjoyment of property; (2) the diminution in value of property; (3) restoration costs; (4) economic loss; (5) consequential and incidental damages; (6) disgorgement of profits realized; and (7) unjust enrichment.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

**COUNT XVIII**

**Against Cameron**

**Negligence/Louisiana Civil Code Articles 2315 & 2316**

340.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 339 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 339 herein by reference.  The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

341.

This Count is alleged against Cameron.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

342.

Cameron manufactured, designed, supplied, and/or installed at the Macondo wellhead the *Deepwater Horizon*'s blowout-preventer ("BOP"), a sub-sea emergency device whose uses include closure of the well to prevent blowout.  The BOP at all relevant times was an appurtenance of the vessel and part of the equipment of the vessel.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

343.

Cameron's BOP failed to operate as intended on April 20, 2010, causing the blowout and resultant explosion and oil spill.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document

No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

344.

Cameron owed a duty to the State to exercise ordinary and reasonable care in the manufacture, design, supply and installation of the BOP at the Macondo wellhead on the *Deepwater Horizon*. Cameron breached this duty by failing to exercise such ordinary and reasonable care and instead designing, manufacturing, supplying and/or installing a BOP that was defective and failed to work as intended in preventing a well blowout.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

345.

Cameron's breach resulted in the fire, explosion, and sinking of the *Deepwater Horizon* and resulting oil spill and thereby proximately caused and/or contributed to the State's injuries and damages.  Cameron's breach was both the actual and legal cause of the State's damages, and the risk of harm suffered by the State was within the scope of protection afforded by the duty breached.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

346.

By reason of the foregoing acts and omissions, the State is entitled to recovery from Defendant for the damages and injuries identified herein.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

**COUNT XIX**

**Against Cameron**

**Trespass**

347.

The State realleges and incorporates each of the allegations contained in paragraphs 1through 346 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 346 herein by reference.  The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

348.

This Count is alleged against Cameron.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

349.

Cameron had knowledge of the risk of a well blowout on the *Deepwater Horizon* and a resulting explosion and oil spill, and was further aware that such a blowout could result in a fire, explosion and oil spill such as that which has devastated Louisiana and its natural resources, including property owned and/or leased by the State.  It was reasonably foreseeable to Cameron that such a disaster would result in the invasion of the State of Louisiana's property and harm to Louisiana as a result of the pollutants discharged by the disaster.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

350.

Cameron's actions resulted in the wrongful discharge of a polluting substance onto the State of Louisiana's property.  Cameron, through its actions resulting in the disastrous oil spill, entered, invaded, and intruded on the property of the State.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

351.

By its gross negligence and willful, wanton and reckless indifference for the rights of the others, Cameron breached the duty it had to use reasonable care not to enter, intrude on, or invade the State's property, and to exercise reasonable care in designing, manufacturing, supplying and/or installing a BOP that was defective and failed to work as intended in preventing a well blowout.  This breach resulted in the entry, intrusion, or invasion on the property of the State, causing harm to the State.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

352.

By reason of the trespass, the State is entitled to recover damages for the following, including, but not limited to: (1) the loss of use and enjoyment of property; (2) the diminution in value of property; (3) restoration costs; (4) economic loss; (5) consequential and incidental damages; (6) disgorgement of profits realized; and (7) unjust enrichment.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document

No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

353.

By reason of the foregoing acts and omissions, the State is entitled to recovery from Defendant for the damages and injuries identified herein.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

**COUNT XX**

**Against Cameron**

**Louisiana Products Liability Act**

354.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 353 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 353 herein by reference.  The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to

respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div style="text-align:center">355.</div>

This Count is alleged against Cameron.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div style="text-align:center">356.</div>

Cameron manufactured, designed, supplied, and/or installed at the Macondo wellhead the *Deepwater Horizon*'s BOP. The BOP at all relevant times was an appurtenance of the vessel and part of the equipment of the vessel.  Cameron's BOP failed to operate as intended on April 20, 2010, causing the blowout and resultant explosion and oil spill.  The failure of the BOP caused and will continue to cause harm to Louisiana's natural resources including but not limited to water, wildlife, fisheries, oyster beds, and shorelines.  As a result the Louisiana will suffer economic damages and damages to its natural resources.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

357.

As a manufacturer, Cameron is liable to the State of Louisiana for damages proximately caused by the failure of its BOP.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

358.

The BOP was being used by Transocean, BP and/or Halliburton at the time of the blowout in a manner which constitutes a reasonably anticipated use of the product.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

359.

The BOP was defective in design as the product was unreasonably dangerous due to numerous factors, including that Cameron failed to ensure that the BOP's shearing rams would effectively seal a well in the event of a blowout that bends the drill pipe; failed to ensure the BOP was suitable for the types of drill pipe and casing assembly design ultimately and foreseeably used at the Macondo well; designed the BOP so that it was vulnerable to a single-point failure; failed to install a backup activation system for the BOP; and failed to provide adequate warnings, instructions and guidelines on the permissible uses, modifications, and applications of the BOP appurtenant to the vessel.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

360.

Cameron is liable for the damages that were proximately caused by the BOP.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## COUNT XXI

### Against Halliburton

### Louisiana Products Liability Act

361.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 360 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 360 herein by reference.  The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C",

Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

362.

This Count is alleged against Halliburton.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

363.

Halliburton manufactured, designed, supplied, and/or installed the cement slurry mixture (the "Cement") used to temporarily seal the Macondo wellhead. Halliburton's Cement failed to operate as intended on April 20, 2010, causing the blowout and resultant explosion and oil spill. The failure of the Cement caused and will continue to cause harm to Louisiana's natural resources including but not limited to water, wildlife, fisheries, oyster beds, and shorelines. As a result the Louisiana will suffer economic damages and natural resource damages.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

364.

As a manufacturer, Halliburton is liable to the State of Louisiana for damages proximately caused by the failure of its Cement.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

365.

Halliburton's Cement was being used by Transocean and/or BP at the time of the blowout in a manner which constitutes a reasonably anticipated use of the product.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

366.

The Cement was defective in design as the product was unreasonably dangerous due to numerous factors, including that Halliburton failed to ensure that the cement would effectively seal a well and thereby prevent a blowout; failed to ensure the cement would prevent the uncontrolled transmission of nitrogen and other gases to the *Deepwater Horizon*; and failed to provide adequate warnings, instructions and guidelines on the permissible uses, modifications, and applications of the Cement.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

367.

Halliburton is liable for the damages that were proximately caused by its cement.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## COUNT XXII

### Against BP, Transocean and Halliburton Defendants

### Fraudulent Concealment & Negligent Misrepresentation

368.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 367 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 367 herein by reference.  The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C",

Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required

to respond to these allegations.  To the extent the BP Parties may be deemed to be required to

respond to these allegations, the BP Parties deny them to the extent they are directed at the BP

Parties.

<div align="center">369.</div>

This Count is alleged against BP, Transocean and Halliburton.  The State is entitled to recover any and all damages and other relief available at law and in equity against BP, Transocean and Halliburton for their fraudulent concealment and misrepresentation of material facts concerning their safety procedures and capacity to manage an oil spill, the safety and condition of their respective materials and equipment, and the severity of the Spill and their capacity to address the Spill for months following the *Deepwater Horizon* explosion.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the

Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document

No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to

these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">370.</div>

BOEMRE regulations require that those seeking to engage in offshore drilling have an adequate response plan in the event of a catastrophe.  *See, e.g.*, 30 C.F.R. §§ 254.1(a); 254.30; 254.2. Specifically, the regulations require that an emergency response action plan include "methods to ensure that containment and recovery equipment as well as response personnel are mobilized and deployed at the response site."  30 C.F.R. §§ 254.23(g)(5).  A lessee must also certify in writing that it has the capability to respond "to the maximum extent practicable, to a worst case discharge or a substantial threat of a discharge."  30 C.F.R. §§ 254.2(b).

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the

Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document

<div align="center">209</div>

No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

371.

BP repeatedly misrepresented its safety procedures and capacity to manage and remediate an oil spill. BP overstated its ability to a handle a blowout in its Exploration Plan, wherein it claimed that in the event of a blowout resulting in an oil spill, it was "unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses."

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

372.

As it turned out, BP was wholly unprepared to effectively stop a deepwater oil well blowout. BP did not have proven equipment and technology to respond to the Spill.  In fact, following the Spill, most of the containment efforts were improvised and wholly untested.  As stated in their May 17, 2010 letter to Attorney General Eric Holder, Congress noted that it did not "appear that there was 'proven equipment and technology' to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico." Confirming this, on May 10, 2010, BP admitted that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to

these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

373.

Similarly, BP misrepresented the capacity to mobilize and respond to the Spill.  As
detailed in the BOEMRE Decision Memorandum, as late as March 2010, BP submitted its report
on cleanup capacity, projecting the regional capacity "to skim and remove 491,721 barrels of oil
per day." Moreover, as of July 5, skimming operations were averaging less than 900 barrels per
day equivalent. BP clearly lacked the capabilities and the resources to respond to the Spill,
despite its prior representations to the contrary.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the

Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document

No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to

these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

374.

After the Spill, BP also attempted to downplay and conceal the severity of the Spill.  BP's
initial leak estimate of 1,000 barrels per day was found by government investigators to be a
fraction of the actual leakage amount of over 60,000 barrels of oil per day.  Moreover, in the
aftermath of the explosions, BP did not provide complete and timely announcements and
warnings about the severity, forecast and trajectory of the Spill.  The severity, forecast and
trajectory of the Spill, and BP's ability to respond to the Spill, were material facts that BP had a
duty to communicate because of the dire circumstances of this case and the risks attendant with
the failure to disclose.  BP's failure to accurately report the accuracy of the Spill negatively
impacted the response rates and efforts.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the

Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document

No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to

these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">375.</div>

Defendant Transocean misrepresented, concealed and suppressed the condition of the *Deepwater Horizon* and the known hazards associated with the disabling of, and/or failure to maintain, its safety features and appurtenances, including, *inter alia*, its BOP.  Transocean misrepresented, suppressed, and concealed the condition of the BOP rams and failsafe valves, which had not been fully inspected for ten years before the blowout, and at least 36 components and systems on the vessel that were in "bad" or "poor" condition, and which it was aware might lead to loss of life, serious injury, or environmental damage.  Transocean also misrepresented and concealed the safety record of the vessel, which was based on false data supplied by its personnel. The foregoing known hazards, poor condition, and maintenance and safety issues associated with the Deepwater Horizon and its appurtenances and equipment were material facts that Transocean had a duty to communicate because of the dire circumstances of this case and the risks attendant with the failure to disclose.

**<u>ANSWER:</u>**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the

Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document

No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to

these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">376.</div>

Likewise, Defendant Halliburton misrepresented and concealed the stability of the cement used at the Macondo Well, despite having performed three tests before the blowout, all of which demonstrated that the foam cement used at Macondo was unstable.  The instability of the cement used at the Macondo Well and the results of the testing performed before the blowout were material facts that Halliburton had a duty to disclose because of the dire consequences of these facts and the risks attendant with the failure to disclose.  Moreover, BP was aware, before the blowout, that Halliburton's testing had revealed that the concrete foam was unstable, yet it concealed this material fact.

<div align="center">212</div>

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

377.

Defendants BP, Transocean and Halliburton failed to disclose, suppressed and/or concealed the foregoing material facts, and their failure to do so induced the State and others to act or to refrain from acting to protect its property, the environment, economy of the State, businesses, livelihoods, and income.  As a direct result of the fraudulent concealment of the foregoing material facts by these Defendants, the State has and will continue to incur damages, including, but not limited to, damages to natural resources and State properties, lost tax and other revenues, and direct and indirect costs associated with Spill response actions.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

378.

Moreover, the conscious or deliberate acts of misrepresentation, suppression, and concealment of the foregoing material facts by BP, Transocean and Halliburton were willful, wanton, and/or in callous disregard for the safety of others and, accordingly, the State is entitled to an award of compensatory and punitive damages.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## COUNT XXIII

**Against BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants**

**Unjust Enrichment**

379.

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 378 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 378 herein by reference.  The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

380.

This Count is alleged against the BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

381.

At all times relevant to the causes of action alleged in this Complaint, the State has ownership and/or proprietary interests in certain real and personal property, waters, resources, submerged lands and shores in areas affected by the oil spill released into the Gulf of Mexico.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

382.

The State is entitled to recover its damages due to the unjust enrichment of the Defendants pursuant to common law, and civilian doctrine and jurisprudence, as well as pursuant to La. Civil Code Art. 2298 which provides that "[a] person who has been enriched without cause at the expense of another person is bound to compensate that person."

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">383.</div>

The Defendants' actions or omissions which resulted in an explosion and oil spill, and including allowing the migration of oil into Louisiana's waters and upon Louisiana's shoreline, resulted in tremendous economic and other damages to the State and its citizens.  The Defendants also breached certain obligations owed to the State and its people that rendered State waters, resources, submerged lands and shorelines incapable of use or capable of only limited use which resulted in damages to the State and its citizens.  Defendants' made economic and financial decisions in their operations which enriched themselves and resulted in economic and other losses to the State. As a result of the Defendants' actions and omissions and their breach of obligations owed to the State and its citizens, the Defendants without cause have been unjustly enriched to the detriment of the State and its citizens.  Moreover, the Defendants have caused the State to suffer economic and other harm resulting from its inability to use or fully use its waters, resources, submerged lands and shores.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">384.</div>

While the Defendants' actions and omissions and their breach of obligations owed to the State and its citizens, have caused harm to the State and its citizens, the Defendants have unjustly benefited from their acts, omissions and breach of obligations.  The State and its citizens are entitled to be compensated for the losses caused by the Defendants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond

<div align="center">216</div>

to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">385.</div>

By reason of the Defendants' unjust enrichment, the State is entitled to recover damages for the following, including, but not limited to: (1) the loss of use and enjoyment of the property, waters, resources and shores of the State; (2) the diminution in value of property; (3) restoration costs; (4) economic loss; (5) diminution of property value; (5) consequential and incidental damages; (6) disgorgement of profits realized; and (7) all losses to the State associated with the moratorium and the de facto moratorium.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the Complaints of the States of Alabama and Louisiana, Part of the Pleading Bundle "C", Document No. 4578, filed on November 14, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

<div align="center">

**COUNT XXIV**

**Against BP and Transocean Defendants**

**Punitive Damages**

386.

</div>

The State realleges and incorporates each of the allegations contained in paragraphs 1 through 385 above.

**ANSWER:**

The BP Parties reallege and incorporate their answers to paragraphs 1 through 385 herein by reference.

<div align="center">217</div>

387.

As set forth in the preceding paragraphs, the actions and omissions of BP and Transocean caused the largest oil spill in U.S. history, resulting in the release of more than 4.9 million barrels of oil, methane gas and other pollutants.  BP and Transocean engaged in gross negligence, reckless, willful, wanton and outrageous behavior and breached federal and state law and regulations, and this irresponsible and reprehensible conduct created an ecologic and economic disaster for the State of Louisiana, with no end to the damage in sight. The State specifically incorporates paragraphs 108 through 151 above, which detail the enormity of the damage to the State, ranging from pollution of the State's marshes and coastal wetlands and the further endangering of threatened and endangered species to the closure of fisheries and oyster beds and a devastating decline in tourism and tax revenue. Punitive damages are available and warranted under maritime and common law, to punish BP and Transocean's reprehensible conduct and to deter its future occurrence.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

388.

BP and Transocean consistently made reckless decisions concerning, for example, well design, cementing, and integrity testing that put speed and cost savings – that is, their own profits –above safety, the State's natural resources, and the economic interests of the people of the State

of Louisiana. The consistent and ingrained culture of BP and Transocean for many years has been to put profits above safety, health and the environment, and that culture caused the reckless decisions resulting in the release of nearly 5 million barrels of oil and other pollutants.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

389.

Examples of BP and Transocean's reckless and deplorable conduct which put their financial interests above the health and safety of others and the environment while they engaged in ultrahazardous, abnormally dangerous activities, include the following:

a. BP and Transocean performed a critical well pressure test with untrained and unqualified personnel and recklessly ignored and/or misinterpreted abnormal pressure test results which should have raised a red flag;

b. Transocean, with reckless disregard for human life, disabled the flammable gas alarm system aboard the *Deepwater Horizon* and prevented that system from operating properly and preventing or containing the explosions, fire and loss of life;

c. BP and Transocean used a well design with too few barriers to gas flow;

d. BP and Transocean failed to use a sufficient number of "centralizers" to prevent channeling during the cement process;

e. BP and Transocean failed to run a bottoms up circulation of the drilling mud prior to beginning the cement job;

f. BP and Transocean used an inappropriate cement mixture for the type of rock formation surrounding the well, and failed to appropriately test that cement mixture prior to using it in the well;

g. BP and Transocean failed to run a cement bond log to evaluate the integrity of the cement job;

h. BP and Transocean failed to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well;

i. BP and Transocean used an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes;

j. BP and Transocean grossly and inadequately maintained and recklessly and improperly operated the BOPs appurtenant to the *Deepwater Horizon*;

k. BP and Transocean failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon*;

l. BP and Transocean consistently disregarded proper drilling, casing, mudding and cementing procedures;

m. Transocean failed to perform 390 maintenance jobs, which would have required more than 3,500 hours of work to perform;

n. BP and Transocean failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill;

o. BP failed to utilize reasonably safe dispersant chemicals in responding to the spill and as a result worsened the pollution of the Gulf of Mexico.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-

Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

390.

BP and Transocean engaged in outrageous, oppressive, willful, wanton, malicious, reckless and/or grossly negligent conduct each time they:

a.  failed to properly maintain the *Deepwater Horizon*;

b.  operated the *Deepwater Horizon* such that the safety and integrity of the vessel and the well were disregarded in order to save time and money;

c.  ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

d.  failed to implement and enforce proper rules and regulations to ensure the safe operation of the *Deepwater Horizon*;

e.  violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

f.  failed to take appropriate action to avoid or mitigate the spill;

g.  failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

h.  failed to ensure that the *Deepwater Horizon* and its equipment was free from defects, properly maintained and in proper working order;

i.  failed to provide appropriate disaster prevention equipment; and

j.  failed to have an appropriate emergency spill response plan or readily available spill response equipment.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

391.

Some wrongs are more blameworthy than others.  BP and Transocean's consistent and flagrant violations of state and federal law and industry standards in favor of their own pocketbook, and the sheer enormity of the resulting and foreseeable economic and ecologic devastation to the State, justify an award of punitive damages against it at the highest possible level. BP and Transocean created the worst oil spill in U.S. history; punitive damages are warranted and necessary to impose effective and optimal punishment and to deter these Defendants and others from breaking this dubious record and creating an even more devastating natural disaster. This State, its economy, and the environment cannot afford another such catastrophe.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

## RESERVATION OF RIGHTS

392.

The full extent of the costs expended and damages suffered by the State of Louisiana is not yet known. The investigation of other potential claims and parties continues, as does the assessment of environmental and economic damages as well as the performance of removal activities.  The State of Louisiana reserves its right as provided by law, including but not limited to 33 U.S.C. § 2717(f)(2), to amend this Complaint and/or file subsequent complaints under OPA or any other theory of law, statutory or otherwise, to assert claims for removal costs, damages, penalties or any other legal and/or equitable remedies, against the Defendants named herein and/or any other additional parties.  The State reserves the right to amend this Complaint once additional information becomes available regarding the continuing harms which are occurring as a result of Defendants' acts and omissions as well as the increased costs incurred and damages occasioned by Defendants.

## ANSWER:

The BP Parties deny that the State may amend this Amended Complaint except to the extent allowed under the Federal Rules of Civil Procedure and the Rules and Orders of this Court.  The BP Parties deny the remaining allegations of this paragraph.

## DEMAND FOR JURY TRIAL

393.

The State hereby demands a trial by jury on all issues so triable.

## ANSWER:

The BP Parties deny that the States is entitled to a trial by jury except as required under

the laws applicable to a trial of its claims.

## PRAYER FOR RELIEF

WHEREFORE, the State of Louisiana respectfully prays that this Court enter judgment in its favor and against Defendants, and that the Court:

1. Declare that the BP, Anadarko, MOEX and Transocean Defendants are responsible parties pursuant to OPA, and are jointly, severally, and strictly liable, along with all other responsible parties, for unlimited removal costs and damages resulting from the *Deepwater Horizon* disaster pursuant to the Declaratory Judgment Act and Rule 57 of the Federal Rules of Civil Procedure.

2. Declare that the BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants are responsible parties pursuant to OSPRA, and are jointly, severally, and strictly liable, along with all other responsible parties, for unlimited removal costs and damages resulting from the *Deepwater Horizon* disaster pursuant to the Declaratory Judgment Act and Rule 57 of the Federal Rules of Civil Procedure.

3. Enter judgment of joint, strict and several liability against the BP, Anadarko, MOEX and Transocean Defendants for response costs and damages under OPA in a sum within jurisdictional limits of this Court;

4. Enter judgment of joint, strict and several liability against the BP, Anadarko, MOEX, Transocean, Cameron and Halliburton Defendants for response costs and damages under OSPRA in a sum within jurisdictional limits of this Court;

5. Enter judgment against all Defendants for response costs and damages under Louisiana law;

6. Enter judgment against the Defendants as identified herein for damages for negligence, products liability, nuisance, and trespass as permitted by maritime law.

7. Enter judgment against Transocean BP, Anadarko and MOEX Defendants and award the State of Louisiana civil penalties of not more than $32,500 for each day of violation, up to $50,000 for each day of violation of a compliance order and an

additional penalty of not more than $1,000,000.00 for each day of violation with legal interest from the date of judicial demand until paid.

8.    Enter judgment against all Defendants and award the State of Louisiana its unpaid response action costs in the amount of at least $342,612 with legal interest from the date of judicial demand until paid.

9.    Enter judgment against all Defendants and in favor of the State of Louisiana, ordering Defendants to reimburse the State for all reasonable costs it may incur responding to the oil spill described herein.

10.   Pre-judgment and post judgment interest at the maximum rate allowable by law.

11.   Enter judgment against the BP and Transocean Defendants for punitive damages.

12.   Retain jurisdiction of this action to ensure compliance with its orders.

13.   Award the State's costs incurred in pursuing this action, including attorney fees as allowed by law; and

14.   Order such other and further relief as the Court may deem just and appropriate.

**ANSWER:**

WHEREFORE, the BP Parties respectfully request that the Court dismiss the State's claims against the BP Parties with prejudice.  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties deny that OPA and

225

LOSPRA liability is joint and several where divisibility can be established.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

The allegations of the Complaint fail to state a claim upon which relief may be granted.

### SECOND DEFENSE

The blowout, explosion, and subsequent oil spill were caused by the unseaworthy condition(s) of the MODU *Deepwater Horizon*, and/or unseaworthy conditions, breach of contract or breaches of duty and breaches of warranty, express or implied, attributable to other entities, and the negligence of employees, agents, officers and directors of those other entities. The aforesaid unseaworthiness and negligence was within the knowledge or privity of those other entities and accordingly, Plaintiff's claims should be dismissed as to the BP Parties.

### THIRD DEFENSE

Plaintiff's damages or injuries, if any, were the result of an occurrence and/or accident unforeseeable by the BP Parties and for which the BP Parties cannot be held legally responsible.

### FOURTH DEFENSE

The events culminating in the injuries and damage to Plaintiff were not the result of any negligence, fault, or want of due care on the part of BP Parties.  Furthermore, Plaintiff has the burden of proof on this issue, and Plaintiff cannot meet that burden.

**FIFTH DEFENSE**

Any alleged negligence by the BP Parties, which the BP Parties specifically deny, was not the proximate cause or sole proximate cause of Plaintiff's alleged damages and there is no causal connection between the acts complained of and the damages and injuries alleged. Similarly, BP denies that the applicable causal test or tests established by the Oil Pollution Act can be met by the Plaintiff.

**SIXTH DEFENSE**

Plaintiff's alleged damages or injuries, if any, were caused or contributed to by acts and/or omissions that constitute independent, intervening and/or superseding causes for which the BP Parties are not legally responsible, and which preclude the finding of liability against the BP Parties.

**SEVENTH DEFENSE**

In accordance with the *Exxon Co., U.S.A. v. Sofec, Inc.,* 517 U.S. 830 (1996), one or more superseding and/or intervening causes preclude any finding of liability on the part of the BP Parties.

**EIGHTH DEFENSE**

To the extent the BP Parties are found liable to Plaintiff for any damages or injuries, the BP Parties are entitled to have any reward or recovery mitigated or reduced accordingly by the contributory or comparative negligence of other individuals, entities, or vessels.

**NINTH DEFENSE**

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to contractual indemnity from other parties or entities.

**TENTH DEFENSE**

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to indemnity from other parties or entities.

## ELEVENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to contribution from other parties or entities.

## TWELFTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to subrogation from other parties or entities.

## THIRTEENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiff for any damages, the BP Parties are entitled to a set-off or other equitable reduction in liability for any compensation paid by the BP Parties or other parties or entities.

## FOURTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff is not entitled under the law to the damages that it seeks, the alleged damages sought are too speculative and uncertain, and because of the impossibility of the ascertainment and allocation of such damages.

## FIFTEENTH DEFENSE

Plaintiff's damages are barred, in whole or in part, by a failure to mitigate damages.

## SIXTEENTH DEFENSE

The BP Parties deny that they are liable to any extent as alleged in the Complaint, and claim exoneration from any and all liability for all losses, damages, and injuries incurred by Plaintiff as a result of the allegations contained in the Complaint and for any other damages or claims which exist or may arise, but have not been specifically pled.

## SEVENTEENTH DEFENSE

The Oil Pollution Act of 1990 displaces the causes of action under maritime law alleged in this Master Complaint to the extent Plaintiff seeks damages potentially recoverable under the Oil Pollution Act against the BP Parties or another responsible party under that statute.

## EIGHTEENTH DEFENSE

The Outer Continental Shelf Lands Act, the legal nature of the Outer Continental Shelf as a federal enclave, and the Clean Water Act (as this Court held in its Bundle C Order involving Plaintiff's claims) preempt Plaintiff's state law claims.  And if the Oil Pollution Act is held not to displace maritime law causes of action, then maritime law also preempts Plaintiff's state law claims, as this Court held in its Bundle B1 Order.

## NINETEENTH DEFENSE

Many of the claims in this Master Complaint fail to comport with one or more requirements of presentment as defined by the Oil Pollution Act of 1990 and its case law.

## TWENTIETH DEFENSE

The BP Parties may only be held liable for their own conduct and may not be held liable derivatively for the conduct of any other entity.  Similarly, one BP entity may not be held derivatively liable for the conduct of any other BP entity.

## TWENTY-FIRST DEFENSE

The BP Parties cannot be held liable for the negligence of the BP Parties' subcontractors or other parties as the actions of independent contractors cannot be imputed to the BP Parties.

## TWENTY-SECOND DEFENSE

The BP Parties cannot be held liable for any damages resulting from actions taken pursuant to federal, state, or local government control, direction, delegation, or authorization. Similarly, the BP Parties may not be held liable for any damages resulting from the actions of any BP Parties exacerbated by federal, state, or local government actions.

## TWENTY-THIRD DEFENSE

The BP Parties did not violate any federal, state, or local statute, regulation, or other legally imposed mandate, restriction, or guidance.

## TWENTY-FOURTH DEFENSE

To the extent the BP Parties are found liable to Plaintiff for any damages or injuries, the BP Parties are entitled to have any reward or recovery mitigated or reduced accordingly by any prior payment to and/or release of liability from Plaintiff who received funds through the BP claims process and/or the GCCF.  Furthermore, any settled claims accompanied by releases of rights against the BP Parties may no longer be maintained.

## TWENTY-FIFTH DEFENSE

State law-based claims asserted in this Complaint are barred, on the basis of the Bundle B1 and C Orders (State) issued by this Court, under the doctrines of claim or issue preclusion (*res judicata* or collateral estoppel) or law of the case.

## TWENTY-SIXTH DEFENSE

To the extent Plaintiff's claims implicate the decision making of federal agencies, and they are otherwise valid, they are potentially subject to the doctrine of primary jurisdiction.

## TWENTY-SEVENTH DEFENSE

The BP Parties are not liable jointly and severally under OPA or LOSPRA to the extent divisibility can be established.


The BP Parties specifically reserve the right to amend or supplement their affirmative defenses and this Answer as additional facts concerning their defenses become known to them.


Dated:  December 14, 2011                    Respectfully submitted,


                                             /s/ Don K. Haycraft_____
                                             Don K. Haycraft (Bar #14361)
                                             R. Keith Jarrett (Bar #16984)
                                             LISKOW & LEWIS
                                             701 Poydras Street, Suite 5000
                                             New Orleans, Louisiana 70139-5099

Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Timothy A. Duffy, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Parties*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 14th day of December, 2011.

/s/  Don K. Haycraft