# Attachment 1

**Types of Documents Potentially Located On BOEMRE's Zantaz Server
Responsive to BP's Document Requests**

- Emails referring or relating to any application for the MC252 Well filed by BP, including BOEM evaluation, approval, or disapproval of any such submission. (RFPs 2 and 3)

- Emails referring or relating to any health, safety, or environment issues on board Transocean's *Deepwater Horizon* rig. (RFP 4)

- Emails referring or relating to any inspection or audit of Transocean's rigs (including the *Deepwater Horizon*) and/or blowout preventers, including any certification of the *Deepwater Horizon*'s blowout preventer. (RFPs 5-7 and 42-43)

- Emails revealing who at the BOEM received, reviewed, analyzed, evaluated, approved or disapproved of BP's submissions to BOEM related or referring to the MC252 Well, Transocean's *Deepwater Horizon* rig or Oil Spill Response Planning in the Gulf of Mexico. (RFP 8)

- Emails that relate or refer to BOEM guidelines, procedures, policies or practices for the evaluation of submissions related to deepwater wells in the Gulf of Mexico. (RFP 10)

- Emails relating or referring to BOEM guidelines, procedures, policies, practices or evaluations related to well control and safety training programs of deepwater well operations in the Gulf of Mexico from January 1, 2008 up until April 20, 2010. (RFP 11)

- Emails referring to and/or analyzing BOEM safety index calculations for each operator in the Gulf of Mexico. (RFP 16)

- Emails referring to and/or analyzing BOEM statistics tracked in OCS Performance Measure Program for each operator in the Gulf of Mexico. (RFP 17)

- Emails identifying, reflecting or relating to recipients of, or candidates considered for, the BOEM Safety Award for Excellence in the Gulf of Mexico, and all underlying documents or data supporting or relating to those selections or considerations. (RFP 18)

- Emails referring to or analyzing annual production by operator, by well, and by total associated well depth, for operations in the Gulf of Mexico. (RFP 19)

- Emails showing the government's view of the adequacy of BP's OSRP was and why the government repeatedly approved the response plan, including who was involved in such analysis, how they performed such analysis, as well as their conclusions. (RFP 21 and 23)

- Emails showing the government's view of the adequacy of BP's Exploration Plan, including the section's discussion spill response abilities. (RFPs 22-26)

- Emails indicating federal / industry standards for safety, including oil spill response. (RFP 22)

- Emails revealing the government's view of BP's and industry's well control or spill response safety training. (RFP 23-25)

- Emails revealing the government's interactions with BP in the creation of the Oil Spill Response Plan. (RFPs 25-26)

- Emails revealing BOEM's participation in Area Committee/Contingency Planning for federal government-run response. (RFP 26)

- Emails describing the government's view of industry standards of response readiness, including well control and other response methods.  Government's view toward whether industry standards were adequate.

- Emails regarding BOEM's review or participation in joint training exercises on spill response. (RFPs 24-26)

- Emails relating to, referring to, and/or analyzing the use of a long string, liner, or liner with a tie back production casing in deepwater wells in the Gulf of Mexico. (RFP 27)

- Emails relating to, referring to, and/or analyzing the use of a lockdown sleeve in deepwater wells in the Gulf of Mexico. (RFP 28)

- Emails relating to, referring to, and/or analyzing the use of barriers (including surface cement plugs) in deepwater wells in the Gulf of Mexico. (RFP 29)

- Emails relating to, referring to, and/or analyzing the use of spacers for deepwater wells in the Gulf of Mexico. (RFP 30)

- Emails relating to, referring to, and/or analyzing temporary abandonment procedures for deepwater wells in the Gulf of Mexico. (RFP 31)

- Emails relating to, referring to, and/or analyzing positive or negative pressure tests for deepwater wells in the Gulf of Mexico. (RFP 32)

- Emails relating to, referring to, and/or analyzing cementing procedures (including the design, testing, and execution of foamed cement) for deepwater wells in the Gulf of Mexico. (RFP 33)

- Emails relating to, referring to, and/or analyzing the use of centralizers for deepwater wells in the Gulf of Mexico. (RFP 34)

- Emails relating to, referring to, and/or analyzing the use (or decision not to use) a cement evaluation tool (including a cement bond log) in deepwater wells in the Gulf of Mexico. (RFP 35)

- Emails relating to, referring to, and/or analyzing tubular or casing design for deepwater wells in the Gulf of Mexico. (RFP 36)

- Emails relating to, referring to, and/or analyzing drilling fluids in deepwater wells in the Gulf of Mexico. (RFP 38)

- Emails relating to, referring to, and/or analyzing responses to well control events for deepwater wells in the Gulf of Mexico. (RFP 39)

- Emails relating to, referring to, and/or analyzing blowout preventers for deepwater wells in the Gulf of Mexico. (RFP 40)

- Emails relating to, referring to, and/or analyzing any citations, warnings, notices, Incidents of Noncompliance, admonishments or violations issued to Transocean and/or

Halliburton related to its operations or training of personnel in the Gulf of Mexico on or after January 1, 2008. (RFPs 44-47)

- Emails relating to, referring, and/or analyzing any United States regulation, requirement, policy or guidance concerning annual Certificate of Compliance examinations. (RFP 189)

- Emails relating to, referring to, and/or analyzing procedures, guidelines, policies, recommended practices or regulations related to formation integrity or leak off tests. (RFP 207)

# Attachment 2



**U.S. Department of Justice**

Environment and Natural Resource Division

*P.O. Box 7611*
*Washington, DC 20044*
*202-514-0180*
*Sarah.Himmelhoch@usdoj.gov*

August 3, 2011

**BY ELECTRONIC MAIL**

Robert R. Gasaway
Kirkland & Ellis, LLP
655 15th Street, NW
Washington, DC  20005
robert.gasaway@kirkland.com

    Re: MDL 2179 – Production of Email from DOI

Dear Rob:

  As you may recall, during a recent status conference, I mentioned to Magistrate Judge Shushan and the assembled masses that the Department of the Interior ("DOI") has encountered a problem with searching one repository of potentially responsive information.  I write to more fully explain the problem and our proposed solution. I invite you review the information contained in this letter and then contact me with any questions or concerns.

  In addition to the emails that are maintained and used in ordinary business in the active and in house archives at the Department, DOI also has an email archiving system that is operated by a vendor called "Autonomy."  The archive was established in 2001 and captures all email sent or received by employees in certain bureaus, including the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE") and the Secretary's Office.  (This email archive does not collect from the U.S. Geological Survey, Fish and Wildlife Service, or National Park Service).

  DOI can retrieve email from the archive by paying Autonomy to search for and produce the email based on simple search terms such as author, recipient, and date range.  In this case, DOI used the archive to retrieve the email of the four BOEMRE employees who were deposed last month.  However, the search technology of the email archive is out-dated and cannot support a search using a complex string, such as the search terms the parties have been using in the MDL.  As a result, for the four custodians, DOI had to: (1) retrieve all of the email sent or received by the four deponents within the agreed-upon date range; (2) ingest all of the email into the document review platform of the Department of Justice's contractor; and (3) then run the

Himmelhoch to Gasaway
August 3, 2011
Page 2

agreed-upon search terms to locate the potentially relevant email.  The total cost for this was $26,000, including $2,000 for retrieval and $24,000 for ingestion and hosting.

After lengthy efforts to negotiate a solution for the remaining 130 custodians, DOI has reluctantly concluded that replicating this process for the remaining 130 agreed-upon custodians is unreasonably burdensome.  As a threshold matter, Autonomy has indicated that it would likely take 6-12 months to provide all of the email for the 130 custodians.  That is because the server associated with the archive is not able to process and transmit more than one gigabyte of email per day.  Moreover, capturing and processing the email by this method would likely cost Interior approximately $840,000.  That cost estimate is based on the initial fee to Autonomy of $65,000[1] to retrieve all of the email and then approximately $775,000 to the Department of Justice's contractor to ingest, cull, and host the emails in the review platform.  As an alternative, Autonomy has proposed installing a more powerful server and deploying a tool that could filter the email based on the agreed-upon search terms for an estimated cost of $400,000. That option would likely take 3-6 months to implement.

Both of these options present an unreasonable burden to Interior.  Indeed, under these scenarios Interior would be devoting between one and two-thirds of the money remaining in its budget for document discovery in the MDL to collect, ingest and host the email.  Moreover, even under the best case scenario production could not be completed in less than 6 months.

By contrast, the IT division at BOEMRE can accomplish the collection of in house emails at a fraction of the cost and far more quickly, resulting in a faster turn-around for production.  Interior proposes, therefore, to produce email for the 130 custodians from the BOEMRE email server and any internal archives that may have been created.  For post-spill emails, we do not believe this proposal will have much significance because, since the implementation of the litigation hold in early May 2010, employees have been instructed to maintain all Deepwater Horizon related emails in the active email environment or in in-house archives.  For pre-spill emails, the United States believes this search will result in the identification and production of the most relevant emails.  We acknowledge, however, that for pre-spill emails the collection in-house is likely to be less complete than the Autonomy archive.  We believe, however, that the difference is not significant enough to warrant the expenditure of $850,000 to capture the difference.

---

[1] The Investigations and Review Unit (IRU) in BOEMRE has a license to search the archive directly. Theoretically, Interior could avoid the search fee to Autonomy by having the IRU conduct the search, but it is unlikely IRU has the staff to do this and it would fully occupy their search capability for 6-12 months.

Himmelhoch to Gasaway
August 3, 2011
Page 3

     I look forward to hearing from you once you have had an opportunity to review this information.

                           Sincerely,

                           /s/ Sarah D. Himmelhoch

                           Sarah D. Himmelhoch
                           Senior Litigation Counsel for E-Discovery

cc:    Liaison Counsel

# Attachment 3

---

**From:** Nomellini, Mark J.
**Sent:** Tuesday, August 30, 2011 3:27 PM
**To:** Sarah.Himmelhoch@usdoj.gov
**Cc:** Spector, Rachel; Doverspike, Sarah; Irish, Tony; Pixton, Allan
**Subject:** Re: Deepwater Horizon: Autonomy v. DOI Emails


Sarah,

Thanks.

BP has contract attorneys who could do this.

We agree with BP not seeing the privilege terms for this process.  You could provide them to BP's vendor to run the privilege screen.

Let us know if you would like us to take a crack at the confidentiality agreements.

Let us know of any other expenses you foresee.

And let us know what you think the next steps are.

Finally, I do think that while we are going through this process it may make sense to explore the parallel path of getting a more detailed timing estimate and cost estimate from Autonomy regarding a database that is more searchable (since getting the detailed estimate shouldn't cost anything), but I understand that may not be your preference at this time.

Thanks for your cooperation on this.


Regards,

Mark


| | | | |
|---|---|---|---|
| **"Himmelhoch, Sarah (ENRD)" <Sarah.Himmelhoch@usdoj.gov>** | To | "Mark Nomellini" <mnomellini@kirkland.com> | |
| 08/30/2011 03:17 PM | cc | "Spector, Rachel" <rachel.spector@sol.doi.gov>, "Irish, Tony" <Tony.Irish@sol.doi.gov>, "Doverspike, Sarah" <sarah.doverspike@sol.doi.gov> | |
| | Subject | Deepwater Horizon:  Autonomy v. DOI Emails | |


Mark –

In general concept, we are okay with the idea of sending the native live email file and the native Zantaz export to a contractor with a specific confidentiality agreement restricting the information that BP could see to the statistics regarding duplicates with the Zantaz collection. This would have to be at BP's expense.

We extracted the entire mailbox and any .pst files created outside the mailbox for these individuals, much of won't be relevant. Therefore, before doing a comparison between Zantaz and the live mailbox, the contractor would also have to run the relevance terms and our privilege search terms against the Zantaz and live collections. We would want an agreement that BP would not be privy to the privilege search terms.

We are happy to cooperate with BP in the process, but I do want to note that even if the comparison shows that there is a gap between the two collections, the United States still believes searching the Zantaz collection for all of the affected custodians will take longer than the schedule will permit and costs more than the benefit of conducting those searches. We encourage BP to focus on identifying a small number of custodians whose Zantaz emails we can collect, search, and produce before the February 2012 trial.

Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
202-514-0180 (phone)

# Attachment 4

**From:** Himmelhoch, Sarah (ENRD) [mailto:Sarah.Himmelhoch@usdoj.gov]
**Sent:** Tuesday, December 13, 2011 4:41 PM
**To:** Pixton, Allan
**Cc:** Gasaway, Robert R.; Nomellini, Mark J.; tony.irish@sol.doi.gov; Berman, Lisa (ENRD); Mike.Underhill@usdoj.gov; O'Rourke, Steve (ENRD); Frost, Peter (CIV); Mariani, Tom (ENRD); Hanger, Robin L. (CIV); deepwater.horizon@usdoj.gov
**Subject:** RE: DWH - Production from Zantaz Archive

Alan,

Thank you for your email.  You are correct that we have discussed this issue at length.  While we appreciate the efforts you have undertaken, we continue to have concerns regarding the accuracy of the analysis of the difference between the Zantaz email archive and the production from the live system.  Moreover, the analysis you did was on only four custodians, and is not necessarily representative of the difference that would exist for other custodians.

I also appreciate your enumerating the types of emails you are looking for, but again you have not addressed the fundamental question we have posed.  While the United States does not dispute that there will be unique *documents* contained within the Zantaz system, we remain unconvinced that there is unique, relevant *information* contained in those documents.  The list BP sets forth below makes it clear that BP is seeking information related to design of wells in the Gulf of Mexico and the policies and procedures for approving well design.  The United States has produced the entire eWell collection for the agency formerly known as MMS.  That file, in connection with the production of policies and procedures made during phase I provides ample information regarding the types of wells approved and the policies and procedures for doing so.  Given the expense of searching for the emails that would exist in the archive, BP's extensive access to information in DOI's active files, the time it would take to collect and produce these emails, and their marginal relevance, we cannot agree to search for and produce emails for even 61 custodians.

We appreciate the professionalism with which you approached this meet and confer but believe we have reached an impasse and recommend that, if BP feels it must seek these emails, that BP file its motion to compel.

Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
202-514-0180 (phone)

**From:** Pixton, Allan [mailto:allan.pixton@kirkland.com]
**Sent:** Tuesday, December 13, 2011 5:25 PM
**To:** Himmelhoch, Sarah (ENRD)
**Cc:** Gasaway, Robert R.; Nomellini, Mark J.; tony.irish@sol.doi.gov; Berman, Lisa (ENRD)
**Subject:** DWH - Production from Zantaz Archive

Sarah,

I write in an effort to resolve the dispute between BP and the United States with respect to production from the DOI's Autonomy- Zantaz email archive ("Zantaz Archive") for the agreed-upon DOI custodians.

As you know, BP and the United States have been meeting-and-conferring regarding this issue since early August. The United States, after producing from the Zantaz Archive for four custodians, notified the parties that it did not intend to produce from the Zantaz Archive for the remainder of the agreed-upon custodians, stating that the United States' production from live email stores (through an in-house collection) would "result in the identification and production of the most relevant emails." However, in the same letter, the United States acknowledged "that for pre-spill emails the collection in-house is likely to be less complete than the [Zantaz Archive]." As a result of ongoing meet-and-confers regarding the marginal utility of producing from the Zantaz Archive, BP--with the consent of the United States--engaged Michael Amaral from Edox USA and Brandon Leatha from Jessen and Associates to analyze the benefit of producing from the Zantaz Archive by comparing the unique, responsive, non-privileged documents found within the Zantaz Archive (for the four custodians previously produced from the Zantaz Archive) to the unique, responsive, non-privileged documents found in the live email stores. BP shared the results of this analysis (which showed a vastly greater quantity of responsive, non-privileged documents in the Zantaz Archive) with the United States on November 11 and requested that the United States immediately begin to produce from the Zantaz Archive. The United States agreed to an extension until December 15 for the motion-to-compel for this issue in order to "allow the parties time to discuss this issue."

In the intervening month, we have met-and-conferred on at least two occasions. On November 16, after our contractors explained the process they used to conduct the analysis and provided their full report to you, you requested that our contractors de-duplicate *across* the data sets in order to identify the *unique*, responsive, non-privileged emails and documents found within the Zantaz Archive that are not found within the live email stores. Our contractors conducted the analysis you requested and we provided the results to you on November 30. This analysis showed that the Zantaz Archive is a target-rich environment with substantially more unique, *responsive*, *non-privileged* pre-incident emails (of the four custodians produced from the Zantaz Archive, more than 60% of their pre-incident emails would not have been produced but for the Zantaz Archive).

On December 2 you advised us that you had identified an issue in our contractors' analysis where certain emails were reported as being within the live email stores only (and not found in the Zantaz Archive as they should have been). Our contractors looked into the issue you identified and we advised you on December 6 that our contractors had analyzed and isolated the issue, which tended to *under*-report the number of Zantaz emails due to the methodology used in conducting the searches in the Zantaz Archive. This issue does not undermine the findings of our contractor's original analysis -- that the Zantaz Archive has thousands of *unique*, *responsive*, *non-privileged* emails and that there is a very strong reason to produce from the Zantaz Archive. Moreover, despite requests on more than one occasion, we have not received any further feedback or criticism of the analysis conducted by our contractors. Nevertheless, based on information you provided on and after our December 12 meet-and-confer, our contractors have corrected this issue. We will provide the final results of the analysis you requested by tomorrow morning.

The United States has requested on multiple occasions to know why BP wants the United States to produce from the Zantaz archive. On each such occasion we have responded that we are seeking information that is responsive to our requests for production and the agreed-upon search terms negotiated between the United States and BP. For the sake of moving this issue along without the need to involve the court, I have summarized below a non-exhaustive list of the types of email we are seeking, and to which we believe we are entitled discovery. The production of this information, which covers important areas regulated by the MMS like well design, well operations, and spill response plans, is critical for BP to establish its defenses and its affirmative case in a suit in which the United States (and other parties) are seeking billions of dollars in damages from BP.

Additionally, we believe we are entitled to production from all of the 138 agreed-upon custodians, but in the spirit of trying to resolve this dispute without the need to involve the court, we have narrowed the list of custodians from whom we are requesting production from Zantaz to the 61 agreed-upon DOI custodians identified in the attached list.

Further, in the interest of compromise, we are requesting production only of the Zantaz archive for up-to and including the date the United States put their litigation hold in place in early May 2010.

With the motion-to-compel deadline looming, I can make myself available at your convenience to discuss.

Thanks,

Allan

- Emails referring or relating to any application for the MC252 Well filed by BP, including BOEM evaluation, approval or disapproval of any such submission. (RFPs 2 and 3)
- Emails referring or relating to any health, safety or environment issues on board Transocean's *Deepwater Horizon* rig. (RFP 4)
- Emails referring or relating to any inspection or audit of Transocean's rigs (including the *Deepwater Horizon*) and/or blowout preventers, including any certification of the *Deepwater Horizon*'s blowout preventer. (RFPs 5-7 and 42-43)
- Emails revealing who at the BOEM received, reviewed, analyzed, evaluated, approved or disapproved of BP's submissions to BOEM related or referring to the MC252 Well, Transocean's *Deepwater Horizon* rig or Oil Spill Response Planning in the Gulf of Mexico. (RFP 8)
- Emails that relate or refer to BOEM guidelines, procedures, policies or practices for the evaluation of submissions related to deepwater wells in the Gulf of Mexico. (RFP 10)
- Emails relating or referring to BOEM guidelines, procedures, policies, practices or evaluations related to well control and safety training programs of deepwater well operations in the Gulf of Mexico from January 1, 2008 up until April 20, 2010. (RFP 11)
- Emails referring to and/or analyzing BOEM safety index calculations for each operator in the Gulf of Mexico. (RFP 16)
- Emails referring to and/or analyzing BOEM statistics tracked in OCS Performance Measure Program for each operator in the Gulf of Mexico. (RFP 17)
- Emails identifying, reflecting or relating to recipients of, or candidates considered for, the BOEM Safety Award for Excellence in the Gulf of Mexico, and all underlying documents or data supporting or relating to those selections or considerations. (RFP 18)
- Emails referring to or analyzing annual production by operator, by well, and by total associated well depth, for operations in the Gulf of Mexico. (RFP 19)
- Emails showing the government's view of the adequacy of BP's OSRP was and why the government repeatedly approved the response plan, including who was involved in such analysis, how they performed such analysis, as well as their conclusions. (RFP 21 and 23)
- Emails showing the government's view of the adequacy of BP's Exploration Plan, including the section's discussion spill response abilities. (RFPs 22-26)
- Emails indicating federal / industry standards for safety, including oil spill response. (RFP 22)
- Emails revealing the government's view of BP's and industry's well control or spill response safety training. (RFP 23-25)
- Emails revealing the government's interactions with BP in the creation of the Oil Spill Response Plan. (RFPs 25-26)
- Emails revealing BOEM's participation in Area Committee/Contingency Planning for federal government-run response. (RFP 26)
- Emails describing the government's view of industry standards of response readiness, including well control and other response methods. Government's view toward whether industry standards were adequate.
- Emails regarding BOEM's review or participation in joint training exercises on spill response. (RFPs 24-26)
- Emails relating to, referring to, and/or analyzing the use of a long string, liner, or liner with a tie back production casing in deepwater wells in the Gulf of Mexico. (RFP 27)
- Emails relating to, referring to, and/or analyzing the use of a lockdown sleeve in deepwater wells in the Gulf of Mexico. (RFP 28)
- Emails relating to, referring to, and/or analyzing the use of barriers (including surface cement plugs) in deepwater wells in the Gulf of Mexico. (RFP 29)
- Emails relating to, referring to, and/or analyzing the use of spacers for deepwater wells in the Gulf of Mexico. (RFP 30)

- Emails relating to, referring to, and/or analyzing temporary abandonment procedures for deepwater wells in the Gulf of Mexico. (RFP 31)
- Emails relating to, referring to, and/or analyzing positive or negative pressure tests for deepwater wells in the Gulf of Mexico. (RFP 32)
- Emails relating to, referring to, and/or analyzing cementing procedures (including the design, testing, and execution of foamed cement) for deepwater wells in the Gulf of Mexico. (RFP 33)
- Emails relating to, referring to, and/or analyzing the use of centralizers for deepwater wells in the Gulf of Mexico. (RFP 34)
- Emails relating to, referring to, and/or analyzing the use (or decision not to use) a cement evaluation tool (including a cement bond log) in deepwater wells in the Gulf of Mexico. (RFP 35)
- Emails relating to, referring to, and/or analyzing tubular or casing design for deepwater wells in the Gulf of Mexico. (RFP 36)
- Emails relating to, referring to, and/or analyzing drilling fluids in deepwater wells in the Gulf of Mexico. (RFP 38)
- Emails relating to, referring to, and/or analyzing responses to well control events for deepwater wells in the Gulf of Mexico. (RFP 39)
- Emails relating to, referring to, and/or analyzing blowout preventers for deepwater wells in the Gulf of Mexico. (RFP 40)
- Emails relating to, referring to, and/or analyzing any citations, warnings, notices, Incidents of Noncompliance, admonishments or violations issued to Transocean and/or Halliburton related to its operations or training of personnel in the Gulf of Mexico on or after January 1, 2008. (RFPs 44-47)
- Emails relating to, referring, and/or analyzing any United States regulation, requirement, policy or guidance concerning annual Certificate of Compliance examinations. (RFP 189)
- Emails relating to, referring to, and/or analyzing procedures, guidelines, policies, recommended practices or regulations related to formation integrity or leak off tests. (RFP 207)

**R. Allan Pixton** | **Kirkland & Ellis LLP**
300 North LaSalle Street | Chicago, Illinois 60654
Direct: (312) 862-2453 | Fax: (312) 862-2200

```
************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
************************************************************
```

# Attachment 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELOUISE PEPION COBELL, et al.,          )
                                        )
                    Plaintiffs,         )
        v.                              )
                                        )
GALE NORTON, SECRETARY OF               )        No. 1:96CV01285 RCL
    THE INTERIOR                        )        (Hon. Alan L. Balaran, Special Master)
    et al.,                             )
                                        )
                    Defendants.         )
_____ )

### INTERIOR DEFENDANTS' MOTION AND MEMORANDUM REGARDING PROPOSAL TO
### (1) RESTORE AND SEARCH RETAINED BACKUP TAPES CONTAINING E-MAIL; (2) IMPLEMENT REAL-TIME CAPTURE OF E-MAIL TRAFFIC AND INCORPORATION OF E-MAIL INTO A SEARCHABLE ARCHIVE; AND (3) REPLACE INDEFINITE RETENTION OF BACKUP TAPES CONTAINING E-MAIL WITH BACKUP OF SEARCHABLE E-MAIL ARCHIVE

The United States, on behalf of the Interior Defendants, respectfully submits to the Special Master this consolidated motion and memorandum, with accompanying proposed order, regarding (1) restoration and search of retained backup tapes containing e-mail, (2) implementation of real-time capture of e-mail traffic and incorporation into a searchable archive; and (3) replacement of the indefinite retention of backup tapes containing e-mail with backup of the searchable e-mail archive (items 1-3 collectively, "E-Mail Proposal").

As described preliminarily in the February 20, 2002 letter to the Special Master and Counsel for the Plaintiffs and accompanying attachments, attached and incorporated by reference ("February 20 Letter"; see Exhibit 1), the Interior Defendants have been working to address discovery-related issues involving the search and potential production of e-mail from system backup tapes containing e-mail ("e-mail backup tapes"), as addressed in the Special Master's July

27, 2001 Opinion (entered July 30, 2001 and adopted by this Court on March 29, 2002) ("July 2001 Opinion"), and earlier related orders.  The Interior Defendants have now developed the E-Mail Proposal and satisfied funding and legal requirements to a degree that permits the E-Mail Proposal to be presented formally for approval, rather than informally as was done in the February 20 Letter.[1]

Because the cost of the E-Mail Proposal is significant (just the restoration of e-mail from retained e-mail backup tapes will cost millions of dollars) and because the Interior Defendants' implementation of the E-Mail Proposal is so closely tied to discovery-related issues in the current litigation, the Interior Defendants will await the Special Master's approval of the E-Mail Proposal before entering into a final contract with ZANTAZ, Inc. and beginning to implement the E-Mail Proposal.

On August 8, 2002, Interior and ZANTAZ made a presentation regarding the E-Mail Proposal to the Special Master and to counsel for the Plaintiffs.  See Exhibit 2 (transcript of August 8 presentation).  At that presentation, the Interior Defendants and ZANTAZ agreed that the Special Master's experts could contact ZANTAZ directly to discuss any ZANTAZ-related technical or security aspects of the E-Mail Proposal.

On August 8, 2002, counsel for the Interior Defendants consulted with counsel for the

---

[1]The Interior Defendants recognize and acknowledge that, between their submission of the February 20 Letter and this Motion, the Plaintiffs filed a motion for an order to show cause why the Interior Defendants and other named individuals should not be held in contempt for the Office of the Solicitor's failure to preserve e-mail backup tapes ("Contempt Allegation").  This Motion addresses a different set of issues – restoration and search of e-mail from existing e-mail backup tapes and capture of future e-mail traffic – than does the Contempt Allegation, which has been responded to separately.  This Motion is intended to be without prejudice to any rights, liabilities, or defenses that may be asserted by any party or named individual in connection with the Contempt Allegation.

Plaintiffs regarding this Motion, as required by LCvR 7.1(m).  Consistent with the August 8

presentation and the Special Master's request for a motion, counsel jointly agreed that this motion

for approval of the E-Mail Proposal would be filed.


## BACKGROUND

Basis for E-Mail Proposal

In connection with the Plaintiffs' Third Formal Request for Production of Documents and

related proceedings, the July 2001 Opinion denied a motion for a protective order that would

have made it unnecessary for the Interior Defendants to search e-mail backup tapes for

potentially responsive e-mails from the Office of the Solicitor.

The Interior Defendants' backup systems were designed not for the search and retrieval of

individual e-mails, but for the restoration of data in the event of a system failure.  See, e.g., July

2001 Opinion at 4 ("[t]hese systems are backed-up . . . onto a variety of tape media which are

utilized to recover lost data in the event a catastrophic disaster causes the computer system to

crash" (citing November 20, 1998 Declaration of Glenn Schumaker at ¶¶ 3, 4)).  Because the

Interior Defendants' existing e-mail backup system is not designed to accomplish the tasks

required by the Special Master's orders, the Interior Defendants investigated their options and

consulted with potential contractors regarding methods for searching e-mail backup tapes for

responsive materials.  The Interior Defendants ultimately determined that the most cost-effective

way to address the July 2001 Opinion and related orders and discovery issues would be to

implement a completely new system for handling e-mail based on a searchable e-mail archive

backed up, maintained, and administered off-site by a third-party contractor.  The alternative was

3

a time-consuming, administratively burdensome, and expensive search of all retained e-mail backup tapes <u>each time</u> a discovery request from the Plaintiffs or a document request from the Special Master was received.  <u>See</u>, <u>e.g.</u>, July 2001 Opinion at 12 (noting Interior Defendants' calculations that one search of "206 tapes" for responsive e-mails "required over 700 hours of staff time, 350 hours of attorney review time, and cost more than $32,000" (citing July 12, 2000 Declaration of Sabrina McCarthy at ¶¶ 3-6)); Exhibit 2 at 8:2-8.

Because the cost of restoring e-mail from existing backup tapes and incorporating that e-mail into a searchable e-mail archive depends on the number of e-mail backup tapes, the Department of the Interior ("Interior") tasked Ernst & Young with conducting a physical inventory of retained e-mail backup tapes for the purposes of developing a cost estimate.  <u>See</u>, <u>e.g.</u>, United States' Status Report to the Special Master ("Biweekly Report") of December 18, 2001 and its Attachment A; Biweekly Report of January 22, 2002 and its Attachment A.  That physical inventory was conducted not only throughout the Office of the Solicitor (main and regional offices) but also throughout the other offices and bureaus statutorily identified as having trust responsibilities or otherwise believed by the Interior Defendants to have e-mail traffic relevant to Individual Indian Money accounts and the current litigation.  <u>See</u> 25 U.S.C. § 4043(b)(1) ("Special Trustee shall oversee all reform efforts within the Bureau [of Indian Affairs], the Bureau of Land Management, and the Minerals Management Service relating to the trust responsibilities of the Secretary"), Exhibit 2 at  26:11-17.  The identified Interior offices and bureaus are Bureau of Indian Affairs; Office of the Special Trustee; Office of Historical Trust Accounting; Minerals Management Service, Bureau of Land Management, Office of the Secretary; Office of the Assistant Secretary for Indian Affairs; Office of Hearings and Appeals;

4

and Office of the Assistant Secretary for Policy, Management and Budget (collectively,

"Designated Offices").[2]

The physical inventory indicated that the Designated Offices had a total of 7,088 e-mail

backup tapes that were generated between May 1, 1999, and November 30, 2001.  The costs used

to estimate the restoration portion of the E-Mail Proposal include the costs not only for those

e-mail backup tapes but also for the post-inventory e-mail backup tapes that are generated by the

Designated Offices from December 1, 2001 until implementation of the real-time capture of e-

mail traffic eliminates the need to continue indefinitely retaining e-mail backup tapes (see section

III, below).  Until the e-mail backup tapes are restored and reviewed, however, there is no way of

knowing the volume of unique, non-duplicative e-mail that will be present on those tapes, much

less the volume of unique, non-duplicative e-mail that, when searched according to agreed-upon

terms, will relate to issues in this litigation.

The Interior Defendants determined that ZANTAZ – a company that works primarily with

the financial services sector to provide investigation- and litigation-oriented e-mail archival

solutions that comply with the rigorous e-mail retention, search, and verification requirements of

the Securities and Exchange Commission standards, see Exhibit 1 at DEF0043318, 43329,

43337; Exhibit 2 at 5:16 – 7:8; Exhibit 3 (ZANTAZ handout from August 8 presentation) at 1, 3,

12 – was best positioned to provide the e-mail restoration, archive, and search capabilities sought

---

[2]Given the substantial cost of implementing the E-Mail Proposal and the fact that the
Designated Offices are those most directly involved with the issues relating to this litigation, the
Interior Defendants determined that the remaining offices and bureaus (including Bureau of
Reclamation, Fish and Wildlife Service, National Business Center, National Park Service, Office
of Surface Mining, and United States Geological Survey) did not merit inclusion in the E-Mail
Proposal.  In addition, the Office of the Inspector General is not currently participating in the E-
Mail Proposal.

by the Interior Defendants and to relieve the Interior Defendants of the burdens associated with retaining and searching an increasingly large number of e-mail backup tapes.  ZANTAZ ran a small-scale pilot test in the Office of the Solicitor to verify that its archive was compatible with the Interior Defendants' various e-mail systems and also reviewed sample backup tapes in a number of different formats on a number of different media from the Designated Offices to ensure that their restoration process and real-time capture of e-mail traffic would be compatible with the Interior Defendants' e-mail systems.  See, e.g., Biweekly Report of December 18, 2001; Exhibit 2 at 14:14-16; 34:4 – 36:23.

After completion of the inventory of e-mail backup tapes, the pilot test, and the review of sample e-mail backup tapes, the Interior Defendants and ZANTAZ developed a cost estimate for the E-Mail Proposal.  Although the Interior Defendants had not been able to confirm the availability of the funding necessary to implement the E-Mail Proposal as of the February 20 Letter, that funding commitment is now in place in the form of Fiscal Year 2002 funds that will need to be obligated to a final contract as early as possible in September 2002.

The Interior Defendants are now in a position to finalize the E-Mail Proposal, but they will not sign a final contract or begin implementation until the Special Master confirms that the E-Mail Proposal i) addresses the July 2001 Opinion and related orders regarding the search and production of e-mails from retained e-mail backup tapes and from future e-mail traffic; and ii) relieves the Interior Defendants of the financial and administrative burden of indefinitely generating and retaining e-mail backup tapes as soon as ZANTAZ has implemented its real-time capture of e-mail traffic and its own backup procedures, as discussed in section III, below.

6

Additional Considerations

Because the E-Mail Proposal will involve a government contract, several additional

considerations could affect the timing and implementation of the E-Mail Proposal, even after the

Special Master's approval.

1.   Decision to Procure the Services from a Sole Source – ZANTAZ – Rather than
Through Competitive Bidding

Given the specific technical requirements and the exigencies of this case, the Interior

Defendants plan to enter into a contract with ZANTAZ as the sole source provider for all of the

services described in the E-Mail Proposal rather than proceed with a competitive bidding

process.  The Interior Defendants have received the necessary internal clearances to proceed with

a sole source procurement and do not expect substantive opposition to the procurement or to the

use of ZANTAZ as the sole source provider, but any administrative or legal challenge could

delay implementation of the E-Mail Proposal.

2.   Privacy Act – 5 U.S.C. § 552a

The Interior Defendants' current backup systems are not designed to allow the search for

and retrieval of individual e-mails, but only to restore systems in the event of catastrophic failure.

The Interior Defendants determined that the ZANTAZ e-mail solution – permitting the search of

individual e-mails by a number of terms and parameters, including individual names – could

constitute a new system of records for purposes of the Privacy Act.  See 5 U.S.C. § 552a(a)(5)

(applying to "a group of any records under the control of any agency from which information is

retrieved by the name of the individual or by some identifying number, symbol, or other

identifying particular assigned to the individual").  Because of the potential Privacy Act

implications, the Interior Defendants are required to provide public notice of the proposed system of records, allow for a comment period, and address any comments received before implementing the system described in the E-Mail Proposal. See 5 U.S.C. § 552a(e)(4), (11).

The notice and comment portion of the Privacy Act process normally requires 40 business days: 30 business days for the Privacy Act notice requirement, plus an additional 10 business days required by the Office of Management and Budget ("OMB") in connection with Circular A-130 (although OMB has the discretion to waive that additional 10-day period). The Interior Defendants published the required Privacy Act notice in the Federal Register on July 12, 2002, see Exhibit 4, and also requested that OMB waive the additional 10-day period. The notice-and-comment period will close on August 23, 2002 if OMB grants a waiver, and on September 9, 2002 otherwise.

Although Interior does not expect any opposition to implementation of a new Privacy Act system of records in the form of the ZANTAZ searchable e-mail archive, any comments received during the notice period will need to be addressed and any subsequent administrative or legal challenges based on those comments could delay implementation of the E-Mail Proposal. To date, the Interior Defendants have not received any comments relating to the Privacy Act notice.

3.  Statement of Work

Interior has worked closely with ZANTAZ to develop a draft Statement of Work ("SOW"). See Exhibit 5 (Draft SOW dated August 8, 2002). Because of the cost and significant impact of undertaking the E-Mail Proposal, the draft SOW will not be finalized, a contract will not be executed, and funds will not be obligated until the Special Master approves the E-Mail Proposal. The final SOW and contract, as well as the final contract price, will need to reflect any

8

refinements or alterations that result from the Special Master's consideration of the E-Mail Proposal. To the extent that the scope of work or cost of the E-Mail Proposal is affected significantly by the process of obtaining final approval, that may impact the Interior Defendants' ability to fund and implement the E-Mail Proposal, because Interior cannot execute a contract for which committed funding is not yet available. See, e.g., 31 U.S.C. § 1341 (Anti-Deficiency Act).

## THE E-MAIL PROPOSAL

As discussed in the February 20 Letter, the E-Mail Proposal can be thought of as consisting of three steps. The first step – the physical inventory of e-mail backup tapes as necessary to estimate and allocate the approximate costs for the remaining steps – has been completed for the Designated Offices. The second step, discussed in section I, below, consists of restoring e-mail from those backup tapes, reducing multiple occurrences of an identical e-mail to a single unique e-mail ("de-duping"), uploading all unique e-mails to a searchable storage medium, and searching those unique e-mails using agreed-upon terms. The third step, discussed in section II, below, involves capturing all current and future e-mail traffic at the e-mail servers for each Designated Office and routing it to an off-site, searchable e-mail archive that will be backed up, maintained, and administered by ZANTAZ. Once this capture and archive have been verifiably implemented throughout the Designated Offices, the Interior Defendants would, as discussed in section III, below, be relieved of the burden of indefinitely retaining e-mail backup tapes and be allowed to return to the standard system backup and backup tape retention procedures.

I.      RESTORATION AND SEARCH OF E-MAIL FROM RETAINED BACKUP TAPES

ZANTAZ will restore, de-dupe, and search the e-mails contained on the e-mail backup tapes retained by the Designated Offices – those tapes already inventoried for the period between May 1, 1999 and November 30, 2001, as well as those e-mail backup tapes that have accumulated since December 1, 2001, and that will continue to accumulate until the real-time capture and archive of e-mail traffic has been verifiably implemented. See Exhibit 1 at DEF0043319-43321, 43326-29; Exhibit 2 at 8:9-19; Exhibit 3 at 2, 4, 5; Exhibit 5 at ¶ 3. Those unique e-mails will then be incorporated into an Interior Department e-mail archive that will be backed up, maintained, and administered by ZANTAZ on behalf of Interior. See Exhibit 1 at DEF0043323-25; Exhibit 3 at 2-4, 7, 11; Exhibit 5 at ¶¶ 3.2.6, 5.2.4, 5.2.5, 6.2, 6.5.

A.      Transportation and Handling of Backup Tapes

The restoration and capture of all e-mail that may exist on the backup tapes from the Designated Offices will take place at ZANTAZ's headquarters in Pleasanton, California. ZANTAZ will dedicate a separate lab within its data center for this purpose, and the separate lab will have a single-door entrance controlled by biometric access (palm reader). Only those employees who are authorized to work on the project and who have signed the necessary non-disclosure and Privacy Act agreements will have access to the lab and to the backup tapes. See Exhibit 5 at ¶¶ 3.1.1, 8, 9, 11. For additional information regarding ZANTAZ's security policies and procedures, see Exhibit 1 at DEF0043330-36, 43338–400; Exhibit 3 at 7-12.

Although ZANTAZ can work with either originals or copies of backup tapes, Exhibit 5 at ¶ 3.1.3, ZANTAZ reports that a majority of its customers provide it with original rather than copies of backup tapes containing e-mails to be incorporated into ZANTAZ's searchable archive.

10

Like ZANTAZ's commercial customers, the Interior Defendants have determined that it would

be prohibitively expensive – and time consuming – to copy thousands of e-mail backup tapes and

verify the integrity of each copy before providing it to ZANTAZ. As a result, the Designated

Offices will provide original e-mail backup tapes to ZANTAZ for processing. ZANTAZ

confirms that its commercial customers transport their original backup tapes to ZANTAZ for

processing by using commercial carriers that allow shipments to be tracked dock to dock (for

example, Federal Express or UPS). Given the sensitivities of e-mail–related issues in this case

and the handling of potential IIM-related information, the Interior Defendants are currently trying

to determine whether an alternative such as a direct courier or personal delivery from each

location of the Designated Offices to ZANTAZ would be economically and practically feasible

and – equally important – more reliable than shipment with an established and experienced

commercial carrier.

ZANTAZ and Interior will use a chain-of-custody procedure in which each tape to be sent

to ZANTAZ from a particular office will be inventoried prior to packing and transport and will

be confirmed by ZANTAZ immediately upon receipt. <u>See</u> Exhibit 1 at DEF0043320; Exhibit 5

at ¶ 3.1.1. Interior will package its backup tapes for transportation as recommended by ZANTAZ

and standard industry practice, generate a signed certification by the designated person that

identifies each backup tape included in each package being transported, and provide a copy of the

certification and shipping inventory to ZANTAZ, together with information about the method of

transport. Upon receipt of a shipment of backup tapes, ZANTAZ will notify the originating

office of receipt, inventory and verify the shipment, and notify the originating office of any

exceptions. The backup tapes will be placed into fireproof safes, except when ZANTAZ

11

personnel are working directly with a particular backup tape.  <u>See</u> Exhibit 2 at 19:7-11; Exhibit 5 at 3.1.1.

ZANTAZ will only accept and process between 500 and 1,000 backup tapes at a time to allow close control of tapes and to ensure that all tapes can be properly secured and stored.  Once a batch of backup tapes from a particular office or bureau have been processed and all e-mail has been captured from those backup tapes, ZANTAZ will return those backup tapes – complete with a status report, index, and certification that all e-mails contained on those tapes were incorporated into a searchable archive – via commercial carrier or as otherwise instructed by Interior, to the originating office and to the authorized person assigned to handle the returned backup tapes.  <u>See</u> Exhibit 5 at ¶¶ 3.1.4, 3.2.3, 3.2.4, 3.2.11, 3.3.3, 3.3.4, 3.3.7.  ZANTAZ will coordinate with the Interior Defendants to operate on a Just In Time basis, so that backup tapes will be returned to the originating office after they have been processed, and additional tapes will be made available for ZANTAZ to process on a rolling basis.  <u>See</u> <u>id</u>. at ¶¶ 3.1.3, 3.2.11.

B.      Restoration of E-Mail from Backup Tapes

ZANTAZ has previously reviewed the backup systems used by the Designated Offices and has confirmed that it will be able to use an automated, verifiable search of each backup tape to identify and capture a copy of each e-mail contained on that tape.  Exhibit 2 at 34:4 – 36:23.  No e-mail files will be removed or deleted from the original backup tapes.  ZANTAZ's regular progress reports to the Interior Defendants will include a listing of all e-mail backup tapes that cannot be restored and searched using industry standard restoration and recovery techniques because of a problem with the media or with the programming.  <u>See</u> <u>id</u>. at 35:11-23; Exhibit 5 at ¶ 3.3.5.  The progress reports will include the identifying information for the particular tape(s),

the efforts made to recover the contents, the nature of the problem (if known), and whether any other non-destructive or destructive methods of accessing the e-mail on the backup tape(s) exist. See Exhibit 2 at 35:11-23; Exhibit 5 at ¶¶ 3.1.4, 3.2.3, 3.2.4, 3.2.4.1, 3.3.5. The Interior Defendants will, in consultation with the Special Master, determine how to handle any backup tapes that cannot be restored and searched by ZANTAZ.

Once all e-mails have been isolated and captured from a particular backup tape, ZANTAZ will de-dupe the e-mails and incorporate all unique (i.e., non-duplicate) e-mails into a searchable archive. See Exhibit 5 at ¶¶ 3.1.2, 3.2.5, 3.2.6. Once all e-mail from all backup tapes for a particular Designated Office has been restored, the archive will be searched for e-mails responsive to specified search terms. See id. at ¶¶ 3.1.1, 3.2.5, 5.2.3, 6.2. Both the automated search process and the results can be certified by ZANTAZ. See Exhibit 1 at DEF0043319; Exhibit 5 at ¶¶ 3.2.6, 3.2.7, 3.2.9. The Interior Defendants propose that the parties, together with the Special Master, develop an agreed-upon list of search terms to be used for the e-mails restored from e-mail backup tapes, and that the search be performed progressively as soon as e-mail restoration has been completed for a particular Designated Office (rather than waiting much longer until e-mail restoration has been completed for all Designated Offices).

C.    Priority of Restoration

ZANTAZ plans to operate two shifts to complete the restoration process as quickly as possible, but it nevertheless expects that it will take from eight to nine months to complete its capture and search of e-mail from the e-mail backup tapes generated by all of the Designated Offices. The Interior Defendants propose that the restoration and archive of e-mail from backup tapes be completed for all locations of one Designated Office before beginning the process for

13

another Designated Office. The Interior Defendants also propose that the order of processing be

prioritized according to which Designated Offices are most likely to have relevant e-mail traffic

and which Designated Offices have previously been the focus of production requests. Thus, the

Interior Defendants propose that ZANTAZ begin by restoring e-mail from backup tapes for the

Office of the Solicitor, then continue in the following order: Bureau of Indian Affairs; Office of

the Special Trustee; Office of Historical Trust Accounting; Minerals Management Service,

Bureau of Land Management, Office of the Secretary; Office of the Assistant Secretary for Indian

Affairs; Office of Hearings and Appeals; and Office of the Assistant Secretary for Policy,

Management and Budget.


II.     IMPLEMENTATION OF REAL-TIME CAPTURE OF E-MAIL TRAFFIC AND
        INCORPORATION OF UNIQUE E-MAILS INTO A SEARCHABLE ARCHIVE

        ZANTAZ provides a system for capturing all internal and external incoming and outgoing

e-mail traffic at each e-mail server and automatically routing it – via a protected pathway – to an

off-site, secure, searchable e-mail archive that is backed up, administered, and maintained by

ZANTAZ. Exhibit 1 at DEF0043323-25; Exhibit 3 at 3, 5, 12; Exhibit 5 at ¶¶ 4-5. The Interior

Defendants currently plan to use protected lines to route all e-mail traffic for the Designated

Offices from Interior to ZANTAZ. The capture, routing, and archive of e-mails is invisible to

e-mail users and does not require e-mail senders or recipients to take any special steps after the

system is in place at the server. See Exhibit 1 at DEF0043324; Exhibit 2 at 17:10 – 18:11;

Exhibit 3 at 4; Exhibit 5 at ¶ 5.1.2. Systems administrators for the Designated Offices do not

need to do anything more than continue to monitor server activity using the procedures currently

14

in place.

The ZANTAZ system captures all internal and external e-mail traffic at the mail servers for the Designated Offices and archives not only an exact copy of each unique e-mail and its attachment(s) but also all headers and routing information.  See Exhibit 1 at DEF0043321-24, 43326-29; Exhibit 2 at 15:12 – 16:4, 27:21 – 29:17; Exhibit 3 at 5, 6; Exhibit 5 at ¶¶ 5.1.2, 5.2.1. For example, an e-mail sent by one user to 50 recipients, including 10 "cc:" and 5 "bcc:" recipients would be archived as a single e-mail with all "to:", "cc:", and "bcc:" information intact, not as 50 copies of the same e-mail.  If a user subsequently forwards that e-mail – with or without additional comments – that new e-mail will likewise be captured in the archive as a unique e-mail.  Once a particular e-mail has been captured and routed to ZANTAZ, all identifying information is captured and encoded, a unique digital signature is added to disclose any later alteration or degradation, and the data are stored in two secure systems located in separate geographic areas.  See Exhibit 1 at DEF0043324; Exhibit 2 at 6:18 – 7:3, 10:12-13; Exhibit 3 at 2, 4; Exhibit 5 at ¶¶ 5.2.1, 5.2.2, 5.2.4.  Once the e-mails have been incorporated into the archive, ZANTAZ is responsible for backing them up according to the retention instructions issued by Interior.  Exhibit 1 at DEF0043324-25, 43329; Exhibit 3 at 11; Exhibit 5 at ¶¶ 5.2.4, 5.2.5.

Although ZANTAZ will be responsible for backing up, maintaining, and administering the e-mail archive on behalf of Interior, the e-mails themselves will remain the property of Interior.  Exhibit 5 at ¶¶ 5.2.5, 6.5.  Furthermore, should the contract with ZANTAZ be terminated, all archived e-mails will be returned in a format and media selected by Interior.  Id.

Once archived, the e-mails can be searched based on a number of parameters (including

names, dates, and specific words or phrases appearing in the body of the e-mail) and retrieved and provided to the Interior Defendants in the as-sent form. See Exhibit 1 at DEF0043326-28; Exhibit 3 at 3, 12; Exhibit 5 at ¶ 5.2.3. Again, the search process and the results can be certified by ZANTAZ. Exhibit 1 at DEF0043319. The Interior Defendants propose that, for future searches of captured e-mail traffic, the parties, together with the Special Master, develop an agreed-upon list of terms before starting each search.

To control costs, the Interior Defendants will, in consultation with the Special Master, determine a reasonable period for restored and captured e-mail to remain "live," i.e., on-line and readily searchable. See Exhibit 2 at 44:1-17; Exhibit 5 at ¶ 6.3. After that time, the e-mails will be loaded by ZANTAZ onto DLT tapes (which can be restored to a searchable archive and searched for an additional cost) and maintained by ZANTAZ in a secure storage facility. See Exhibit 2 at 44:19 – 45:9, 46:9-12; Exhibit 5 at ¶¶ 6.3, 6.5.

ZANTAZ can begin to implement the real-time capture of e-mail in the Designated Offices while the process of restoring and capturing e-mail from the backup tapes for the Designated Offices is underway. Implementation of e-mail capture and archive in a particular location will involve only minimal disruption and will allow the real-time capture of e-mail traffic to begin almost immediately. See Exhibit 1 at DEF0043329; Exhibit 2 at 17:3 – 18:11. ZANTAZ expects that implementation of the real-time capture and archive of e-mail in all locations of all of the Designated Offices could be completed in four to six weeks, barring any carrier-associated delays.

Implementing the real-time e-mail capture and archive while restoration is underway will also allow the Interior Defendants to verify that e-mail traffic within the Designated Offices is

certifiably being captured in and retained by the ZANTAZ archive, and will, as discussed in section III, below, allow the Interior Defendants to be relieved of the cost and administrative burden of indefinitely retaining e-mail backup tapes and to return to their normal system backup and tape retention procedures.

III.    REPLACEMENT OF INDEFINITE RETENTION OF E-MAIL BACKUP TAPES WITH
        ZANTAZ BACKUP, MAINTENANCE, AND ADMINISTRATION OF THE
        SEARCHABLE E-MAIL ARCHIVE

Because of the overall cost of the E-Mail Proposal and the burden associated with continuing to generate and indefinitely retain e-mail backup tapes, the Interior Defendants need confirmation that their verified implementation of the real-time capture and archive of e-mail traffic in the Designated Offices, together with ZANTAZ's undertaking to backup, maintain, and administer that archive of all unique e-mail traffic for the Designated Offices, see Exhibit 5 at ¶¶ 5.2.4, 5.2.5, 6.5, will relieve the Interior Defendants of the burdens of continuing to indefinitely retain e-mail backup tapes, see Exhibit 2 at 42:2 – 43:8.  The e-mail archive implemented and managed by ZANTAZ will not only serve the same function as the Interior Defendants' indefinite retention of e-mail backup tapes but also provide the significant additional benefit of making those e-mails searchable, a capability that the Interior Defendants do not currently have with their retained e-mail backup tapes.

Interior's ability to fund the E-Mail Proposal depends in large part on its ability to relieve its offices and bureaus of the cost and administrative burden of departing from standard system backup and retention procedures and indefinitely retaining backup tapes containing e-mail.

Accordingly, the Interior Defendants move for an order relieving them of the burden of

17

indefinitely retaining e-mail backup tapes and allowing them to return to standard system backup and tape retention procedures according to the following process:

  (1)   The Interior Defendants will provide the Special Master with two documents to confirm that e-mail capture has been implemented:

      (a)   a letter from Interior declaring that it identified to ZANTAZ all mail servers providing e-mail to a particular Designated Office, and

      (b)   a letter from ZANTAZ confirming that the real-time capture and archive of e-mail traffic has been implemented for all identified mail servers providing e-mail to a particular Designated Office and has operated for two weeks in accordance with ZANTAZ's standards for monitoring and documenting e-mail capture;

  (2)   The Special Master will have two weeks from receipt of that letter from the Interior Defendants to verify or otherwise follow-up with the Interior Defendants and/or ZANTAZ regarding operation of the real-time capture and archive of e-mail traffic for that particular Designated Office;

  (3)   Upon the earlier of the Special Master's approval or passage of the two-week period without any response from the Special Master, unless extended by order of the Special Master for a particular Designated Office, that office will be released from any further obligation to indefinitely retain e-mail backup tapes and may return to its standard system backup and tape retention procedures; and

  (4)   Compliance with these procedures will relieve Interior from indefinitely retaining e-mail backup tapes, and Interior will have no further e-mail backup and retention obligations relating to this case – apart from those performed by ZANTAZ – unless and until the contract with ZANTAZ is terminated or ZANTAZ otherwise notifies Interior that it is unable or unwilling to perform e-mail backup and retention on behalf of Interior.

## CONCLUSION

For all of the reasons stated above, the Interior Defendants request approval of the E-Mail Proposal. Two supporting declarations and a proposed order accompany this Motion.

Dated: August 14, 2002

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General
STUART E. SCHIFFER
Deputy Assistant Attorney General
J. CHRISTOPHER KOHN
Director

SANDRA P. SPOONER
Deputy Director
D.C. Bar No. 261495
JOHN T. STEMPLEWICZ
Senior Trial Counsel
PETER B. MILLER
Trial Attorney
Commercial Litigation Branch
Civil Division
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875
(202) 514-7194

## CERTIFICATE OF SERVICE

I declare under penalty of perjury that, on August 14, 2002 I served the foregoing *Interior Defendants' Motion and Memorandum Regarding Proposal to (1) Restore and Search Retained Backup Tapes Containing E-mail; (2) Implement Real-time Capture of E-mail Traffic and Incorporation into a Searchable Archive; and (3) Replace Indefinite Retention of Backup Tapes Containing E-mail with Backup of Searchable E-mail Archive* by facsimile upon:

Keith Harper, Esq.
Native American Rights Fund
1712 N Street, N.W.
Washington, D.C. 20036-2976
(202) 822-0068

Dennis M Gingold, Esq.
Mark Kester Brown, Esq.
1275 Pennsylvania Avenue, N.W.
Ninth Floor
Washington, D.C. 20004
(202) 318-2372

and by U.S. Mail upon:

Elliott Levitas, Esq.
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4530

Copy of the Motion, without attachments, served by facsimile on August 14, 2002; a complete copy to be delivered by hand the morning of August 15, 2002 upon:

Alan L. Balaran, Esq.
Special Master
1717 Pennsylvania Avenue, N.W.
12th Floor
Washington, D.C. 20006
(202) 986-8477

Courtesy Copy by U.S. Mail upon:

Joseph S. Kieffer, III
Court Monitor
420 - 7th Street, N.W.
Apartment 705
Washington, D.C. 20004

Kevin P. Kingston

# Attachment 6

### Explanation of Cost Discussion

The United States' adjusted quoted price for performing the required query is approximately $394,182. This estimate is based on the following: On August 3, 2011, the United States relayed to BP a quote from Autonomy that priced exporting the email for all 130 custodians at $65,000. (*See* Attachment 3.) This works out to $500 per custodian. Assuming 61 custodians, the cost of exporting Zantaz email is now $30,500. The United States then explained it would cost approximately $775,000 to "ingest, cull, and host" the email for 130 custodians, which works out to $5,962 per custodian. Using 61 custodians, instead of 130, the cost to "ingest, cull, and host" the email would be approximately $363,862. Adding in the $30,500 export costs, the United States' estimated cost to process these emails for 61 custodians would be $394,182.

Using a reasonable assumption, for just this purpose, that there are 6 gigabytes of data per custodian, the United States is claiming it will cost approximately $1,077 per gigabyte to retrieve and process these emails. That figure far exceeds the industry standard, which is between $280 and $380 per gigabyte—for a maximum total of approximately $140,000.

The United States provided BP with a second cost estimate, but this one involved upgrading its system entirely. Notably, these quoted prices are less than the United States' original estimate. (*See* Attachment 7, Autonomy's Ltr to T. Irish (Sept. 20, 2011).)

# Attachment 7

**Autonomy**

**Autonomy, Inc.**
*3120 Fairview Park Drive, Suite #200*
*Falls Church, VA 22042*
*Main: 703.289.8800*

September 20, 2011

Mr. Tony Irish
Office of the Solicitor
US Department of the Interior
1849 C Street, NW
Washington, DC 20240

Dear Tony,          SUB.:      Special Audit Server to support Deepwater EDiscovery needs
                                          of the DOI Office of the Solicitor

This has reference to our recent discussions regarding a Special Audit Server to be provided under *Task 6 DOI-Performed Searches* of the Electronic Email Archiving System (EEAS) Contract # NBCC09001 awarded by the US Department of the Interior ("DOI") to Zantaz Inc. ("Contractor"), an Autonomy company. This Special Audit Server is intended to support the needs of the DOI Office of the Solicitor (SOL) in addressing eDiscovery requests related to Deepwater Horizon litigation.

Following is the estimated cost and corresponding details of the proposed Special Audit Server:

| S. NO. | Item Name | Number of Simultaneous Named Users | Annual Audit Center Subscription Fee | Audit Center Annual Support | Total Cost |
|---|---|---|---|---|---|
| OPTION #1 | Special Audit Server with 30 GB/day Throughput | Up to 15 Users | $ 229,500.00 | $ 108,000.00 | **$ 337,500.00** |
| OPTION #2 | Special Audit Server with 24 GB/day Throughput | Up to 12 Users | $ 183,600.00 | $ 86,400.00 | **$ 270,000.00** |
| OPTION #3 | Special Audit Server with 16 GB/day Throughput | Up to 8 Users | $ 122,400.00 | $ 57,600.00 | **$ 180,000.00** |

<u>Terms and Conditions</u>:
- Terms and conditions of the existing EEAS Contract will apply.
- The pricing provided above is valid until October 31, 2011.
- The following media services are included in the price provided above:
  - If data delivery is requested for data size less than or equal to 30GB, delivery will be provided on DVDs.
  - If data delivery is requested for data size greater than 30 GB, delivery will be made on a SHDD. Total number of SHDDs provided during the audit center subscription period will be limited to ten 250 GB SHDDs.

Autonomy

Please feel free to contact me at any time if you have questions or need clarifications.


Yours Sincerely,


Raj Srivatsan
Account Executive
Phone: 703.498.4254 | Email: rajan.srivatsan@autonomy.com