# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" in the | § | |
| GULF OF MEXICO, | § | SECTION:  J |
| on APRIL 20, 2010 | § | |
| | § | JUDGE BARBIER |
| Applies to:  All Cases | § | |
| 2:10-cv-02771 | § | MAG. JUDGE SHUSHAN |
| | § | |
| | § | |

### HALLIBURTON ENERGY SERVICES, INC.'S RESPONSE IN OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS

# TABLE OF CONTENTS

Index of Authorities ............................................................................................................. iii

Exhibits Index ...................................................................................................................... iv

I.     INTRODUCTION .........................................................................................................1

II.    FACTUAL BACKGROUND ........................................................................................3

    A.     Securing the Samples ........................................................................................3

    B.     Ronnie Faul Requests Post-Incident Testing of Lab Stock Materials. ....................4

    C.     Testing at the Duncan Lab. ................................................................................5

    D.     Testing at the Broussard Lab. ............................................................................7

    E.     BP Has Known About the Post-Incident Testing Since at Least March 2011.........................................................................................................................8

    F.     The 3D Modeling ...............................................................................................9

III.   ARGUMENTS AND AUTHORITY ...........................................................................10

    A.     An Adverse Finding of Fact Against HESI is Not Warranted..............................10

        1.     Requirements for An Adverse Finding of Fact Based Upon Spoliation. ...............................................................................................10

        2.     The Retarder does not constitute "unique, relevant evidence that might be useful" to BP. .......................................................................11

        3.     Quirk's use of 0.07% of the lab stock retarder does not constitute the "destruction" or "spoliation" of unique, relevant evidence.................13

    B.     Neither Faul, Morgan, Quirk, nor HESI Acted in "Bad Faith."............................14

        1.     Because the results were favorable to HESI, there can be no finding of bad faith.....................................................................................16

        2.     Any bad faith acts should not be imputed to HESI....................................17

    C.     Because BP's Ability to Defend Itself Has Not Been Compromised, It Has Not Been Prejudiced. .......................................................................................18

    E.     If A Forensic Search Does Not Locate the Modeling, BP Can Perform the Same Modeling Using HESI's 3D Software.......................................................19

III.   PRAYER.....................................................................................................................21

CERTIFICATE OF SERVICE ...........................................................................................23

# INDEX OF AUTHORITIES

## CASES

*Ashton v. Knight Transportation, Inc.*, 772 F. Supp. 2d 772 (N.D. Tex. 2011) ......... 11, 12, 15, 19

*Burlington Northern & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013 (10th Cir. 2007).................. 19

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)............................................................. 21

*Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403 (5th Cir. 2004) ............................... 20

*Consolidated Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335 (M.D. La. 2006) .................. 15, 17

*Duque v. Werner Enter., Inc.* 2007 WL 998156 (S.D. Tex. Mar. 30, 2007) ............................... 20

*Equal Employment Opportunity Comm'n v. Gen. Dynamics Corp.*, 999 F.2d 113 (5th Cir.
    1993) ............................................................................................................ 14

*Gonzalez v. Trinity Marine Group, Inc.*, 117 F.3d 894 (5th Cir. 1977) ...................................... 21

*King v. Illinois Central R.R.*, 337 F.3d 550 (5th Cir. 2003) ...................................................... 14

*Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598 (S.D. Tex. 2010) ........ 12, 17

*Stahl v. Wal-Mart Stores, Inc.*, 47 F. Supp. 2d 783 (S.D. Miss. 1998)........................................ 19

*Vick v. Texas Employment Comm.*, 514 F.2d 734 (5th Cir. 1975)........................................... 14, 15

*Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497 (D. Md. 2010).................................. 15

*Whitt v. Stephens Cnty.*, 529 F.3d 278 (5th Cir. 2008) ................................................................ 21

*Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110 (2d Cir. 2009)............................ 19

## OTHER AUTHORITIES

THE SEDONA CONFERENCE, COMMENTARY ON LEGAL HOLDS:  THE TRIGGER & THE
    PROCESS (2010), *available at* http://www.thesedonaconference.org/-
    dltForm?did=legal_holds_sept_2010.pdf ..................................................... 12

THE SEDONA CONFERENCE, THE SEDONA PRINCIPLES: BEST PRACTICES
    RECOMMENDATIONS & PRINCIPLES FOR ADDRESSING ELECTRONIC DATA PRODUCTION
    (2d ed. 2007), *available at* http://www.thesedonaconference.org/-
    dltForm?did=TSC_PRINCP_2nd_ed_607.pdf ........................................... 11, 12, 20

## EXHIBITS INDEX
(All filed under seal)

Rickey Morgan Deposition (10/17/2011) (complete condensed version) ..........................Exhibit 1

Timothy Quirk Deposition (3/21/2011 and 3/22/2011) (complete condensed version) ...............................................................................................Exhibit 2

Ronnie Faul Deposition (6/29/2011 and 6/30/2011) (complete condensed version) .........Exhibit 3

Thomas Roth Deposition (7/25/11) (complete condensed version) ..................................Exhibit 4

Richard Dubois Deposition (7/19/11) (excerpt) ...............................................................Exhibit 5

Attachment "C" to Halliburton's Energy Services, Inc.'s Response to U.S. Chemical Safety & Hazard Investigation Board's Subpoena Hal 1SUBDOC8..................Exhibit 6

"Material Transfer Ticket" to U.S. Government (11/16/10)................................................Exhibit 7

Nathaniel J. Chaisson Deposition (3/16/11) (excerpt)......................................................Exhibit 8

Faul spreadsheet (Dep. Ex. 807) and Cement Weigh-Up Sheets (HAL0050582-94)[*]...............................................................................................................Exhibit 9

Plaintiffs' Omnibus Discovery Requests...........................................................................Exhibit 10

U.S. Joint Investigation Team Subpoena (2/24/11).........................................................Exhibit 11

HESI's Response to the Subpoena, March 15, 2011 Letter from HESI to the Department of Interior ...................................................................................................Exhibit 12

Transmittal Letter from Carolyn Raines, dated March 28, 2011, enclosing HAL_0506938 .................................................................................................................Exhibit 13

HESI's Objections and Responses to BP's First Set of Interrogatories (5/23/11).............Exhibit 14

Email from X. McKeever to J. Martinez re: Post-Incident 3D Testing (9/22/11)............Exhibit 15

Glen Benge Deposition (11/17/11) (excerpt)...................................................................Exhibit 16

Robert Marion Beirute Deposition (8/29/2011 and 8/30/2011) (excerpt) ........................Exhibit 17

Fred Sabins Deposition (5/25/2011) (excerpt).................................................................Exhibit 18

Greg Garrison Deposition (11/04/2011) (excerpt)...........................................................Exhibit 19

---

[*]One page, HAL0050582, of this exhibit was used as Dep. Ex. 807. In addition, BP's Exhibit 20 includes pages from Exhibit 9's bates range.

Craig Gardner Deposition (8/17/2011) (excerpt)..............................................................Exhibit 20

David Brown Deposition (6/14/2011) (excerpt).................................................................Exhibit 21

Contract for Gulf of Mexico Strategic Performance Unit Offshore Well Services
between BP Exploration and Production, Inc. and Halliburton Energy Services,
Inc., BP-HZN-2179MDL00055809 (excerpt) ...................................................................Exhibit 22

Photograph of SCR-100L, Lot #6264 ("Retarder") ..........................................................Exhibit 23

Benjamin James Richard Deposition (10/14/11) (excerpt)................................................Exhibit 24

Email from Brett W. Cocales to Brian P. Morel (4/16/10) Dep. Ex. 1517, BP-
HZN-2179MDL00033080 ..................................................................................................Exhibit 25

Affidavit of Elizabeth Marie Schimmell, with attachment (*in camera*) ...........................Exhibit 26

Duncan Testing Written Records, Dep. Ex. 5670s (HAL_0707659-64)..........................Exhibit 27

Halliburton Energy Services, Inc. ("HESI") respectfully submits this response opposition to BP Exploration & Production, Inc. and BP America Production Co.'s (together, "BP") Motion for Spoliation Sanctions and Memorandum in Support (Rec. Doc. 4799) (hereafter, the "Motion").

## I.
## INTRODUCTION

BP seeks sanctions for the failure to create a record and the alleged destruction of materials that were created *after* the events of April 20, 2010, *not* materials actually used in the Macondo well.  In an effort to convince the Court that such extraordinary relief is warranted, BP attempts to suppress the truth by mischaracterizing the testimony and omitting material facts.  Moreover, BP raises the issue of post-incident testing (the "Post-Incident Testing") for the first time now, weeks from trial, after having idled with the information for over half a year.  BP asserts prejudice by ignoring core facts:  (1) no rig samples were destroyed, or even used — the physical evidence subject to the preservation orders remains intact; (2) all the Post-Incident Testing conducted by certain HESI employees can be fully replicated with plentiful quantities of available lab stock, the materials used in the Post-Incident Testing; (3) testing in accordance with pre-Incident Macondo procedures by Rickey Morgan and Tim Quirk demonstrated a stable slurry design — *i.e.*, to the extent relevant, the results favor HESI; (4) BP's own experts expressed skepticism about analyses from post-Incident test results that did not use rig samples — an opinion generally shared by the cement experts for the United States (Benge) and HESI (Lewis); and (5) there was no obligation to record post-Incident observations.

Finally, BP cherry-picks testimony in an attempt to create an illusion of "bad faith" and "intentional destruction" of "unique" and probative evidence.  BP accuses HESI of "intentionally destroying" a litany of evidence, including test results, samples, modeling, and cement additives.

Mot., pp. 1-2. But in truth, HESI and HESI employees did no such thing. The Post-Incident Testing occurred when Ronnie Faul ("Faul"), the Technology Manager for HESI's Gulf of Mexico Region–Cementing, asked two subordinates in separate HESI labs, Rickey Morgan ("Morgan") in Duncan, Oklahoma and Tim Quirk ("Quirk"), in Broussard, Louisiana, to conduct certain tests using laboratory stock materials based on the cement recipe used in the Macondo well. In contrast, the rig materials actually used in the Macondo well and in HESI's final pre-Incident testing remain under control of this Court.

A review of the actual and complete testimony creates no illusions — there has been no spoliation or destruction of unique evidence and BP is not entitled to an adverse finding against HESI. With respect to the Post-Incident Testing, BP's selective quoting of HESI's witnesses is unsupported by the *actual* and *complete* testimony regarding the Post-Incident Testing:

| <ins>BP's Representations</ins> | <ins>Accurate and Complete Testimony</ins> |
|---|---|
| • That HESI's Post-Incident Testing "appears likely to have used (and so destroyed) limited cement additives from the Macondo well project."[1] | • HESI's Post-Incident Testing did not use the cement additives pumped in the Macondo well.[2] |
| • Morgan reported that the "slurry looked 'thin' to him, meaning that the slurry could be unstable once poured in the well."[3] | • Morgan testified that when he followed Pre-Incident testing procedures, the slurry he tested was stable.[4] |
| • Morgan "testified under oath that he destroyed test results in order to keep the information from being 'misinterpreted' in ways adverse to Halliburton in litigation."[5] | • Morgan initially testified that he was not "concerned" the test results would be "used in litigation against the company," and subsequently agreed that he discarded the testing samples, in part, as BP asked because "you were worried about it being |

---

[1] Mot. p. 2, 7 (*citing* Ex. 1, Morgan Dep., 16:16-16:19, 17:3-20:5; Ex. 2, Quirk Dep., 88:23-89:2).
[2] Morgan Dep., 113:15-23; Ex. 3, Faul Dep., 700:13-701:14; Quirk Dep., 93:9-94:4, 98:25-99:11, 104:17-105:23.
[3] Mot. p. 2 (*citing* Morgan Dep., 20:23-22:9).
[4] Morgan Dep., 107:8-18, 197:7-199:15.
[5] Mot. pp. 5-6 (*citing* Morgan Dep., 101:17-23).



misinterpreted."[6]

• Roth has no firsthand knowledge about the Post-Incident Testing, and Morgan testified that he was able to "successfully foam" the slurry after it was conditioned in a manner similar to the final pre-Incident test.[8]

• Faul "explained that the cement sample tested by Morgan . . . showed signs of 'settling,' an indicator of possible instability."[9]

• Morgan testified that he did not notice any signs of settling in either the first test or the properly conditioned slurry.[10]



• Faul testified that he did not instruct Quirk to destroy any test results.[12]

• HESI's Post-Incident Testing in the Broussard lab "indicated foam instability."[13]

• Quirk testified that the slurry appeared to be stable.[14]

Because no "unique" or probative evidence was compromised,[15] the testing was ultimately favorable to HESI's position, and the information was disclosed to all the parties, including BP, in March 2011, BP is not entitled to an adverse finding or any other relief.

## II.
## FACTUAL BACKGROUND

### A.    Securing the Samples

On April 26, days after the Incident and before the issuance of any preservation order,

---

[6] Morgan Dep., 22:23-23:6; 101:17-23.
[7] Mot. p. 5 (*citing*
[8] Roth Dep., 346:10-347:21, 349:10-24, 355:25-356:16, 483:9-20; Morgan Dep., 29:20-30:13; 98:9-99:17; 107:8-18.
[9] Mot. p. 6 (*citing* Faul Dep., 264:2-16).
[10] Morgan Dep., 191:13-192:7; 197:7-199:15.
[11] Mot. p. 2 (*citing*
[12] Faul Dep., 271:10-272:1, 704:21-706:9.
[13] Mot. p. 2 (*citing* Quirk Dep., 333:6-10, 480:13-481:2).
[14] Quirk Dep., 120:18-121:11, 121:24-122:8, 586:6-587:10; Ex. 5, Dubois Dep., 99:13-100:12; 102:4-20; 131:12-132:7; Faul Dep., 593:6-16.
[15] These subsequent tests are not evidence at all concerning what happened at the Macondo well.  HESI will file a motion *in limine* to that effect.

Shortly after the Incident, HESI also secured all sample cement ingredients received from the *Deepwater Horizon* under lock and key.   *See* Ex. 6 (Attachment "C" to Halliburton's Energy Services, Inc.'s Response to U.S. Chemical Safety & Hazard Investigation Board's Subpoena Hal 1SUBDOC8); Ex. 2, Quirk Dep., 93:22-94:20; Ex. 3, Faul Dep., 700:13-701:14.   The off-the-shelf liquid additive, SCR-100L, Lot #6264 (the "Retarder"), originated in the same production facility and batch as the retarder used on the rig.   Because the Retarder was lab stock material, the 2.25 gallons of the Retarder on hand in the Broussard Lab were not initially secured with the rig samples.   After instruction from counsel, the 2.25 gallons of the Retarder were placed in the same secure location as the rig samples.   The Retarder and rig samples remained under lock and key until November 16, 2010, when they were released to the Joint Investigation Team ("JIT") pursuant to this Court's October 15, 2010 Order.   *See* Rec. Doc. 494, 565 (granting HESI's motion to release materials to the JIT); Ex. 7 Material Transfer Ticket. HESI currently has an additional 32 gallons of SCR-100L, Lot #6264 at several of its bulk plants.

## B.   Ronnie Faul Requests Post-Incident Testing of Lab Stock Materials.

After the Incident and out of his own curiosity, Faul asked two of his subordinates, Morgan and Quirk, to conduct certain lab tests.   Faul specifically requested that Morgan and Quirk conduct the tests using lab stock materials — not actual rig samples.   *See* Faul Dep., 10:2-6; 700:13-701:14.   Faul requested the Post-Incident Testing on his own account, and "nobody" at HESI instructed or asked him to have the testing conducted.   *Id.*, 286:21-23.   Faul routinely asked his subordinates for informal "offline" testing when it did not involve a customer request, and he explained his rationale for the Post-Incident Testing as follows:

> . . . [F]rom time to time when I want some information about what
> might happen, I call Tim . . . and just ask[] him to do a test for me.

> I'd like to get this information . . . .   It's not associated with a customer.  It's a Halliburton internal for information purposes only.

Faul Dep., 291:19-292:10.  Thus, Faul routinely asked his subordinates for informal testing.

## C.    Testing at the Duncan Lab.

In late April or May 2010, Faul asked Morgan "to take a look" at the Macondo slurry composition and to give his opinion of it.  Morgan Dep., 15:20-16:6; 16:16-22; 17:13-18:6.  As Morgan testified, that constituted Faul's entire request.  For his tests, Morgan believed he used the same recipe as the slurry pumped at Macondo.  *See id.*, 10:14-20; 18:7-20:5; 92:7-93:6.  However, Morgan used lab stock; he did not use rig samples in any of the testing that he performed.  *See id.*, 113:15-23; 190:9-19.

Morgan performed two separate mixing tests.  *See id.*, 24:11-27:21; 102:14-21.  These mixing tests, also referred to as "unset foam stability tests," consist of visual inspection of the unset foamed slurry to assess stability and whether settling occurs prior to hardening.  *Id.* 107:8-18; 199:5-15.  The first test was performed on a slurry that had not been conditioned.  *Id.* at 100:8-13.  Conditioning, which is understood to better simulate conditions during a cement job,[16] was performed by HESI when it conducted the pre-Incident testing of the rig samples.  Morgan orally reported to Faul that the unconditioned slurry in the first test appeared "thin" to him.  *Id.*, 23:7-16.  Thinness does not reflect how the slurry will perform downhole, after it sets, and further it does not necessarily indicate that the slurry is unstable.  *See id.*, 21:9-19; 27:3-8; 97:3-98:14; 197:7-11.   Since BP was worried about fracturing the formation, the slurry was designed to be thin.

---

[16] *See* Ex. 8, Chaisson Dep. 304:12-21; Dubois Dep. 268:17-269:3; Quirk Dep. 151:25-152:13.

Several days later, Morgan performed a second test after conditioning the slurry in the same manner that the Macondo slurry had been conditioned in the final pre-Incident test.  *See* Morgan Dep., 102:14-21.  The conditioned slurry still looked thin to Morgan, however:

> (1)     he was able to "successfully foam" the slurry that he tested;[17]

> (2)     he did not notice any settling;[18] and

> (3)     the slurry was "stable."[19]

Thus, once Morgan used a methodology closer to that utilized during the final pre-Incident testing, he obtained a stable slurry.  The unset foam slurry could not have been preserved because it would set, and thus change forms.  Although Morgan did keep some notes, he communicated the test results to Faul by telephone.  *See* Ex. 27.  Although the test results were ultimately favorable to HESI, Morgan explained his decision to not write them down as follows:

> Q.     You didn't tell it to anyone?
> A.     I didn't record it.  I told it to Ronnie Faul
>                           . . .
> Q.     Now, did Ronnie tell you not to write it down?
> A.     No, sir.
> Q.     You just chose not to?
> A.     Yes, sir.
> Q.     **And was that because you were concerned that it might be considered something that could be used in litigation against the company?**
> A.     **No, sir.**  He was asking for my opinion, and I gave him my opinion.  I didn't want to put anything on an e-mail that could be twisted, and turned . . . .
>                           . . .
> Q.     You didn't want your words turned around – down the road?
> A.     Twisted, exactly, taken out of context.

Morgan Dep., 22:12-24:2 (emphasis added).

---

[17] *See* Morgan Dep., 98:9-24.
[18] *See id.*, 191:13-18.
[19] *See id.*, 107:8-107:18; 197:7-199:15.

Faul's recollection of Morgan's testing results is similar.  He recalled that Morgan's first mixing test showed signs of settling, but that the second, properly conditioned slurry showed no signs of settling and was, by all indicators, stable.  *See* Faul Dep., 586:10-587:4.

**D.   Testing at the Broussard Lab.**

After the Incident, Faul asked Quirk to conduct certain testing at HESI's Broussard lab. *See* Quirk Dep., 88:22-90:6. The first test Faul asked Quirk to run was a foam stability test using lab stock materials.  *See id.*, 88:22-90:6; *see also* Faul Dep., 262:17-264:1; 294:14-297:2.  The request was an informal one, not related to a particular project or customer, so Faul told Quirk "not to input the results into Viking."[20]   Contrary to BP's assertions, Quirk testified that Faul simply told him that he did not want a written report of the findings.  Quirk Dep., 129:18-22; 130:16-20.  Quirk conducted the foam stability test using the off-the-shelf lab materials and orally reported to Faul that the results were good and the foam slurry was stable.  *See* Faul Dep., 294:14-297:2; 593:6-9.

Sometime later, Faul asked Quirk to conduct mud contamination testing on the foamed cement.  *See id.*, 282:4-9.  Faul also requested that, consistent with his practice for non-customer-related testing, the procedure be conducted "offline," or apart from HESI's tracking system.  *Id.*, at 377:25-388:8.  During this test, which did not utilize all ingredients from the Macondo recipe, Quirk used only lab stock materials and analyzed whether different amounts of synthetic oil-based mud affected the foam stability of the cement.  *See id.*, 282:4-284:9; Quirk Dep., 394:18-495:11.  Quirk reported his findings to Faul over the phone, and Faul entered the data into a spreadsheet.  *See* Faul Dep., 282:4-284:9; Ex. 9 at HAL0050582.  BP questioned Quirk about these notes during his deposition on March 21, 2011.  *See* Quirk Dep. 389:9-393:10; *see* Ex. 9,

---

[20] Faul Dep., 704:22-705:10.  Viking is HESI's tracking database.

Dep. Ex. 807.  After reporting the numbers to Faul, Quirk discarded the notes.  *See* Quirk Dep., 393:12-21; 491:9-492:5.  Quirk later confirmed that the data in the spreadsheet matched his recollection of the results he had reported to Faul.  *See* Quirk Dep., 390:19-25; 393:22-394:1.

Finally, on May 28, 2010, Quirk conducted a static gel strength test, during which he used 6.13 grams, or less than 0.07% of the SCR-100L, Lot #6264, from the lab stock materials in the Broussard lab, as reflected in the weigh up sheet.  Ex. 9; *see also* Mot., Ex. 20 (recorded results of the static gel strength test at HAL 0050590).

All of these tests are and continue to be replicable.  The Macondo recipe and lab stock and additives continue to be available, and may be used to conduct either the foam stability or static gel tests.

### E.   BP Has Known About the Post-Incident Testing Since at Least March 2011.

On October 5, 2010, the PSC sought the production of all documents produced to the Coast Guard, MMS, MBI, and/or Congress, as well as copies of any corresponding subpoenas. *See* Ex. 10, Pls.' Omnibus Disc. Req., at p. 2.  On February 24, 2011, the JIT issued a subpoena to HESI that requested information related to the Post-Incident Testing, including the date of these tests, the identity of people involved, the custodian(s) of the test, and whether actual rig samples were used in the testing.  *See* Ex. 11, JIT Subpoena.  HESI responded to the JIT Subpoena on March 15, 2011, and identified Morgan and Quirk as individuals involved in Post-Incident Testing.  *See* Ex. 12, HESI's Resp. to the JIT Subpoena, at p. 2.  The response further noted that "certain tests were performed after April 20, 2010, but the results were either not recorded or recorded only by notation which can no longer be found."  *Id.*  Pursuant to the PSC's discovery requests, on March 28, 2011, HESI produced its Response to the JIT Subpoena to all parties.  *See* Ex. 13, Transmittal Ltr. from Carolyn Raines, dated March 28, 2011, enclosing HAL_0506938.  HESI's May 23, 2011, Responses to BP's Interrogatories again disclosed the

Post-Incident Testing performed by Morgan and Quirk, and provided information relating to the discarded notes. *See* Ex. 14, HESI's Resp. to BP's First Set of Interrog., at pp. 20 & 39. BP has known about this Post Incident Testing since March, including the fact that not all of it was recorded.

**F.     The 3D Modeling.**

Sometime in May 2010, Anthony Badalamenti and Tommy Roth requested 3D-Modeling of the cement job on the production casing in the Macondo well to be performed utilizing HESI's Displace 3D software ("the Modeling"). The Modeling was performed by David Bedford and Mark Savery using inputs from the OptiCem report prepared by Jesse Gagliano. The results were shown to Badalamenti and Roth. The models were deleted from Beford and Savery's computers, but can be replicated by using the same inputs that were originally used by Gagliano in his OptiCem report.

OptiCem and 3D displacement show different types of channels. A 3D model that shows spacer sweeping the annulus can still have channeling. In fact, BP's experts should know that the channeling shown in OptiCem is different than the channeling shown in a Displace 3D model. More importantly, the channeling shown in OptiCem shows gas flow potential ("GFP") whereas GFP is not a result shown in Displace 3D. The spacer sweeping the annulus could show possible contamination that would not be shown by the OptiCem, but has no bearing on GFP or channeling shown in OptiCem.

On July 26, 2011, BP questioned Roth about the Modeling. *See* Roth Dep. 496:6-18. Roth testified that he did not know whether the Modeling was included in the materials that he turned over to counsel. *See id.* at 496:19-24. Approximately two months after this deposition, BP requested that HESI produce the Modeling if it had not been produced already. *See* Ex. 15, X. McKeever email (9/22/11). In response to BP's request, HESI searched electronic files at the

logical level for any files containing a .d3d file type extension.  The initial search did not turn up any results.  A "forensic" search of the computers used for the modeling is currently under way, and any results will be turned over.  Currently, a search of Savery's computer has not recovered the Modeling but the search is continuing.  A search of Bedford's computer is likewise being performed.  Both computers will also be made available for searching upon a reasonable basis, either by agreement between BP and HESI or Court order as described below on pages 19-20.

### III.
### ARGUMENTS AND AUTHORITY

**A.     An Adverse Finding of Fact Against HESI is Not Warranted.**

BP asks the Court to impose an adverse finding against HESI under Federal Rule of Civil Procedure 37 or its inherent powers for the alleged spoliation of "uniquely relevant evidence." Mot. at 15-17, 20-21.   An adverse finding is not warranted in this case because the record demonstrates that neither Faul, Morgan, Quirk, nor HESI acted in "bad faith" and that no "unique physical and documentary evidence" was "destroyed."   Indeed, neither HESI Executive Management nor the Law Department authorized or had even been aware of the testing.  None of the materials identified by BP, with the possible exception of 6.13 grams of SCR 100L, constitute evidence of any pre-Incident conduct that has been the subject of this litigation. Furthermore, there can be no inference of "bad faith" because the Post-Incident Testing from which BP urges the Court to make an adverse finding were largely favorable to HESI (to the extent that they are even probative).   Moreover, the cement slurry tests and Displace 3D Modeling can be fully replicated.

**1.     Requirements for An Adverse Finding of Fact Based Upon Spoliation.**

The party seeking spoliation sanctions bears the burden of proof.  *Ashton v. Knight Transportation, Inc.*, 772 F. Supp. 2d 772, 800 (N.D. Tex. 2011).  To obtain the remedy of an

adverse fact finding for spoliation, BP must prove: (1) the spoliation of evidence that HESI had a duty to preserve; (2) a culpable breach of that duty, namely bad faith; and (3) a resulting prejudice to its case. *Ashton*, 772 F. Supp. 2d at 800; *see* THE SEDONA CONFERENCE, THE SEDONA PRINCIPLES: BEST PRACTICES RECOMMENDATIONS & PRINCIPLES FOR ADDRESSING ELECTRONIC DATA PRODUCTION 70, PRINCIPLE 14 (2d ed. 2007), *available at* http://www.thesedonaconference.org/dltForm?did=TSC_PRINCP_2nd_ed_607.pdf [hereinafter THE SEDONA PRINCIPLES].

### 2. The Retarder does not constitute "unique, relevant evidence that might be useful" to BP.

A duty to preserve exists when a party knows or should know that certain evidence is relevant to pending or future litigation. *Ashton*, 772 F. Supp. 2d at 800. Once litigation is anticipated or ongoing, as is the case here, a party must not destroy "unique, relevant evidence that might be useful to an adversary." *Id*. The duty to preserve extends to a party's employees who are likely to have relevant information, or the "key players." *Id*.

The duty to preserve has some limits. "Just as organizations need not preserve every shred of paper, they also need not preserve every email or electronic document and every back up tape." THE SEDONA PRINCIPLES at 28, COMMENT 5a. Instead, the scope of the duty to preserve is bound by reasonableness. *Id*. at PRINCIPLE 5 & COMMENT 5a; *accord Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010). Determining the extent of the duty requires careful analysis of the specific facts and circumstances, and a bright line rule is difficult to draw, particularly "with the benefit (and distortion) of hindsight." *Rimkus Consulting Group, Inc.*, 688 F. Supp. 2d at 613.

██████████████████████████████████████████████████

██████████████████████████████████████████████████████; *see*

*Ashton*, 772 F. Supp. 2d at 800; THE SEDONA PRINCIPLES at 32, COMMENT 5.d; THE SEDONA CONFERENCE, COMMENTARY ON LEGAL HOLDS:  THE TRIGGER & THE PROCESS 28, GUIDELINE 6, (2010), *available at* http://www.thesedonaconference.org/dltForm?did=legal_holds_sept_2010.-pdf.   Additionally, in order to prevent the alteration or destruction of the rig samples, HESI secured them in a cabinet in the Broussard lab.  *See* Ex. 6 (Attachment "C"); Quirk Dep., 93:22-94.13; Faul Dep., 700:13-701:14.

HESI did not initially secure generic lab stock materials because such materials do not constitute "physical evidence" connected with the accident pursuant to the May 5, 2010 order ("the Preservation Order").  *See* Mot., Ex. 14.  Out of an abundance of caution, however, HESI secured the generic lab stock materials a few months after the Incident until it turned all stored materials over to the JIT.

Unlike the rig samples, the lab stock materials were never used in the Macondo well and have little or no relevance to the events that occurred on April 20, 2010.  *See* Ex. 16, Benge Dep. 276:10-277:6, 313:14-314:4 (ranking the probative value of testing with pre-Incident testing the "most relevant" followed by the Chevron rig sample testing, its lab stock testing, then the CSI testing as "not relevant").  Experts in this case, including BP's own experts, agree that testing should be done using rig samples — not lab stock materials.[21] ██████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ Because the lab stock

---

[21] Robert Beirute, a cementing consulting expert for BP, opined that there is a difference between "rig sampling and shelf sampling" because "cements do change from batch to batch . . . field waters may change, and even additives from batch to batch may change, so there might be differences" and therefore it is "possible" that "shelf samples could test differently than the rig samples."  Ex. 17, Beirute Dep., 323:10-19; 326:15-327:14.  Fred Sabins, BP's recently disqualified cement expert, "would recommend testing . . . with the materials that were going to be used on the job itself."  Ex. 18, Sabins Dep., 585:6-586:3.  Greg Garrison, the JIT's cementing expert, agreed that lab stock gives "some indication" but that rig sampling testing is preferred out of "concerns for representativeness of testing."  Ex. 19, Garrison Dep., 73:7-12, 177:15-179:12; *see also* Ex. 20, C. Gardner Dep., 289:18-291:24 (same); Ex. 21, D. Brown Dep., 239:2-12 (same).

material was not actually used in the Macondo well, and the experts agree that rig samples should be used for representative testing, the Retarder and subsequent tests on lab stock samples are not evidence at all.  Accordingly, HESI has fully complied with its duty to preserve relevant evidence and the Preservation Order.

Morgan and Quirk complied with the Preservation Order as well:  all rig samples were preserved.  BP incorrectly ascribes relevance to materials that were not covered by the Preservation Order.  First, materials related to any Post-Incident Testing of lab stock materials are not "documents pertaining to the April 20, 2010 explosion."  Preservation Order, Mot, Ex. 14.  Second, even assuming that the "subsequent events" referenced in the Preservation Order include Post-Incident Testing documents, Morgan and Quirk acted reasonably because the results were not "unique" and can be replicated using the same lab stock materials.  And as described above, the lab samples tests are not evidence of what happened at the Macondo well at all.

### 3. Quirk's use of 0.07% of the lab stock retarder does not constitute the "destruction" or "spoliation" of unique, relevant evidence.

Quirk used 6.13 grams, or less than 0.07% of the Retarder in stock at the Broussard Lab in May 2010.  This use does not give rise to any spoliation claim because using only .07% of the Retarder does not amount to "destruction". Even if a miniscule quantity of the Retarder constituted "physical evidence" under the Preservation Order, more than 99% of the Retarder remained and was turned over to the JIT.  *See* Ex. 7 ("Material Transfer Sheet"); *see also* Mot. Ex. 20.  The JIT took possession of the remaining 2.25 gallons and utilized a portion of it during its testing.  *See* Ex. 23 (photo with Bates DJIT004-000983 indicating that the JIT took possession of a sample of SCR-100L, Lot #6264).  There is an ample amount of Lot #6264 remaining for use by experts in this litigation.

## B.     Neither Faul, Morgan, Quirk, nor HESI Acted in "Bad Faith."

To establish entitlement to an adverse inference, the movant must show that the opposing party acted in bad faith.  *See King v. Illinois Central R.R.*, 337 F.3d 550,  556 (5th Cir. 2003) (citing *Vick v. Texas Employment Comm*., 514 F.2d 734, 737 (5th Cir. 1975)); *accord Equal Employment Opportunity Comm'n v. Gen. Dynamics Corp*., 999 F.2d 113, 117 (5th Cir. 1993) (reversing sanction that amounted to dismissal of a claim in the absence of bad faith). "Mere negligence is not enough, for it does not sustain an inference of consciousness of a weak case." *Vick*, 514 F.2d at 737 (citing McCormick, EVIDENCE § 273)).   The level of culpability required for spoliation sanctions in the Fifth Circuit exceeds negligence, gross negligence, and willfulness.  *Ashton*, 772 F. Supp. 2d at 800; *Victor Stanley, Inc. v. Creative Pipe, Inc*., 269 F.R.D. 497, 542 (D. Md. 2010) (analyzing spoliation standards circuit-by-circuit).

The actions of Faul, Morgan, and Quirk do not rise to "the degree of fault" required for imposing an adverse fact finding.   "Bad faith" is conduct involving fraudulent intent or a desire to suppress the truth.  *Consolidated Aluminum Corp. v. Alcoa, Inc*., 244 F.R.D. 335, 344 (M.D. La. 2006); *Ashton*, 772 F. Supp. 2d at 800.  Courts also describe it as "destruction for the purpose of depriving the adversary of the evidence."  *Victor Stanley*, 269 F.R.D. at 530.   The circumstances of the alleged spoliation act must "manifest bad faith." *Ashton*, 772 F. Supp. 2d at 800 (citing *Vick*, 514 F.2d at 737).

Faul, acting on his own accord, to satisfy his own personal interest, requested informal testing.   None of these tests utilized rig samples, and therefore none constitute "evidence." Morgan did not hesitate to report to Faul that the slurry he mixed looked thin, but he hesitated to write his observation in an email as it might be "manipulated."  Morgan Dep., 22:18-24:2. Moreover, Morgan's tests were merely visual evaluations of the unset foam cement.  After he

tested the properly conditioned slurry and reported the favorable results to Faul, there was no way to "preserve" the unset slurry and no need to record his observations.[22]

Because tests using lab stock materials can be easily recreated, Quirk did not consider it necessary to maintain the results of his tests, nor was there any HESI protocol that required him to do so:

> Q:   I believe this morning you testified that the results of your set foam stability test performed in the normal manner were similar to the results obtained in the second April test; is that correct?
>
> A.   Yes.  I don't remember the numbers that I -- that I reported to Ronnie.  It's been quite a while now.  I don't remember exactly what those were.  And they were using, you know, lab stock back then.  **I didn't really think much of it, you know, it's just lab stock additives.   You know, it can be reproduced at any time.**  I just ran the test and told them that -- you know, gave them the numbers and I remember commenting that --that **the specimen looked good**, you know.  I just don't remember the -- the visual part is what I remember of the specimen, you know, that it looked good.  But I don't -- I don't recall the number that I reported and the densities from the top and on the bottom.

Quirk Dep., 332:7-333:5 (emphasis added).[23]  Quirk discarded his notes with the knowledge that his testing could be replicated using the same lab stock additives.  Quirk was not trying to hide the results; in fact, he discussed them with Richard Dubois.  Ex. 5, Dubois Dep., 99:13-100:12, 102:4-20; 131:12-132:7.   Quirk's actions were not wrong, much less to the degree of fault necessary to trigger an adverse finding based upon spoliation.

BP does not, and cannot, present evidence of fraudulent intent, a desire to suppress the truth, or destruction for the purpose of depriving BP of the information.  Accordingly, there is no evidence to support a bad faith finding necessary to warrant an adverse finding against HESI.

---

[22] The slurry sample cannot be preserved because its physical properties change as it sets.
[23] *See also* Ex. 24, Richard Dep. 265:6-14 (sections cut from foam stability tests are routinely discarded).

### 1. Because the results were favorable to HESI, there can be no finding of bad faith.

BP argues that a reasonable inference can be drawn that the missing evidence would have been harmful to HESI, *i.e.* that an adverse fact finding should be entered to the effect that "the testing performed by Morgan and Quirk showed Halliburton's slurry design to be unstable." (Mot. at 22). In the adverse finding analysis, there is no presumption of relevance or prejudice. *Rimkus Consulting Group, Inc*., 688 F. Supp. 2d at 618. Rather, there must be a nexus between the proposed adverse finding and the information lost. *Id.* at 617 (discussing *Consolidated Aluminum Corp.*, 244 F.R.D. at 340). Consequently, tests that were ultimately favorable — or even if they are construed as having mixed results — cannot support an inference that the Post-Incident Testing resulted in an unstable slurry.[24] Moreover, the discarded test results cannot be harmful to HESI's case (and no inference can be drawn from the results, whether discarded or not) because no testing of non-rig samples can substitute for the vastly more probative weight given by cement experts and industry practices to the lab work done on rig samples just prior to pumping the job. Even the testing of rig samples is probative only of how cement slurry performs under lab conditions. Lab testing is no substitute for verifying that zonal isolation has been achieved — something BP failed to do when it canceled the cement bond log and failed to recognize when it incorrectly interpreted the negative pressure test.

When Morgan conditioned the slurry, that is, when he used a methodology that he understood was used in the final Broussard lab pre-Incident test for foam stability, the slurry was observed to be stable. Morgan Dep., 107:8-18, 197:7-199:15. Quirk also found that the resulting

---

[24] █████████████████████████████████████████████████████████
█████████████████████████████

slurry appeared to be stable.  *See* Quirk Dep., 120:18-121:11; 121:24-122:8; 586:6-587:10.[25] The failure to fully record tests that were ultimately *favorable* to HESI, if deemed at all relevant, completely undermines any notion of "bad faith" and thus cannot carry an inference of consciousness of a weak case.

Oilfield Testing and Consulting ("OTC") performed the cement testing for the JIT Report.  *See* Ex. 19, Garrison Dep., 15:6-16:17.  The "MAC4" slurry was the most relevant slurry tested, because it was the only slurry tested by OTC that used actual rig samples.  *Id*. at 176:7-23; 181:4-9.  Greg Garrison, an OTC representative, admitted in his deposition that the unset foam stability tests of the MAC4 slurry showed it to be stable.  *Id*. at 207:9-13.  More specifically, the slurry was capable of being foamed in less than the required fifteen seconds; bubble breakout was observed to be minor and not excessive; and the OTC testing did not reveal free fluid, an excessive measuring gap, density segregation or settling.  *Id.* at 191:13-207:13. Because none of the API 10B-4 standards for "instability" was observed in the OTC lab testing, Garrison acknowledged that the slurry using actual rig samples was stable.  *Id*. at 200:21-207:13.

BP's request for an adverse inference should be denied because it is not reasonable when evaluated in light of the entire record.  Accordingly, there is no logical basis to support an adverse finding of fact that the missing evidence would have been harmful to HESI.

**2.    Any bad faith acts should not be imputed to HESI.**

"Bad faith is personal" and not "automatically visited on others."  *Ashton*, 772 F. Supp. 2d at 803, n.14 (quoting *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d

---

[25] BP alleges that Quirk testified that Faul told him that Morgan's slurry had experienced settling; however, Quirk knows little about what Morgan actually did in that lab.  He does not have firsthand knowledge of the results of the testing conducted at the Duncan lab, he does not have firsthand knowledge of what testing procedures were used in Duncan, and he does not know whether settling was observed.  Quirk Dep., 123:20-124:18; 125:20-24; 327:24-329:1.  In fact, Faul and Morgan, the two people most involved with the Duncan tests, both testified that they were not aware of any settling issues after the slurry was properly conditioned.  *See* Faul Dep., 586:10-587:4 and Morgan Dep., 191:13-18.

Cir. 2009)).   Courts should not find bad faith against a party-company based on the unratified actions of its employees.   *See id.*; *Stahl v. Wal-Mart Stores, Inc.*, 47 F. Supp. 2d 783, 787 (S.D. Miss. 1998) (refusing to find bad faith where employee mistakenly discarded evidence and did not know of company preservation-of-evidence policy).   Accordingly, even if Faul, Morgan, or Quirk's acts rose to the level of bad faith, their actions were not requested by HESI, were not known by HESI, and should not be imputed to HESI.

**C.    Because BP's Ability to Defend Itself Has Not Been Compromised, It Has Not Been Prejudiced.**

A movant is prejudiced under a spoliation theory where the missing evidence is relevant to the factual or legal issues in the case, including claims and defenses, and the movant's ability to present or defend its case is compromised.   *Ashton*, 772 F. Supp. 2d at 801.   The movant should put on meaningful evidence that it was "actually, rather than merely theoretically, prejudiced."   *Burlington Northern & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032-33 (10th Cir. 2007).   "Destruction of tangentially relevant information, or information that is duplicative and has been produced from other sources, does not constitute prejudice."   THE SEDONA PRINCIPLES 70, COMMENT 14.c.

As noted above, tests conducted on lab stock materials are not "evidence."   No rig stock materials were used or destroyed to conduct Post-Incident Tests, the materials used were not unique and the tests can be replicated.   The individuals who conducted the informal tests have freely testified about the materials used, the procedures performed, and the observations made. As a result, BP has benefitted from the comprehensive information about Post-Incident Testing that HESI and its employees have candidly provided.   Furthermore, even assuming that the Post-Incident Tests were "tangentially . . . relevant," if BP had been truly prejudiced, it would have sought relief months ago.   Indeed, BP and the other parties questioned Faul, Morgan, and Quirk

at length about the testing.  HESI notified BP about the Post-Incident Testing as early as March 2011.  *See* Exhs. 12, 13.

The law also disfavors BPs' request for relief.  First, BP's authorities are inapplicable to the facts of this case.  *See e.g., Duque v. Werner Enter., Inc.* 2007 WL 998156 (S.D. Tex. Mar. 30, 2007) (adverse inference permitted when evidence of damage to a tractor was destroyed when the tractor was repaired); *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403 (5th Cir. 2004) (sanctions imposed against a party that abused discovery process by frustrating adversary's ability to obtain discovery for over two years).  Furthermore, BP relies on cases where no sanctions were awarded despite failures to preserve actual evidence — records created prior to the incident at issue.  *Whitt v. Stephens Cnty.*, 529 F.3d 278 (5th Cir. 2008) (failure to preserve prison surveillance camera footage).

Unlike any of the parties that were awarded sanctions in the cases BP cites, BP's ability to defend itself has not been compromised in any way.  Because the tests can be recreated, there is no actual prejudice.  Dozens of engineers working for multiple parties have performed post-Incident cement testing using lab stock materials.  BP has not been prejudiced by the lack of access to HESI's Post-Incident Testing.[26]

## E.    If A Forensic Search Does Not Locate the Modeling, BP Can Perform the Same Modeling Using HESI's 3D Software.

As to the issue of the 3D-Modeling, BP primarily seeks forensic testing of Mark Savery's computer to attempt recovery of the missing files.  BP's complaint is largely mooted because HESI is currently conducting its own forensic search of this computer, and it will agree to submit

---

[26] A primary aspect of the court's restrained discretion is fashioning an appropriate sanction for the relevant conduct.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991); *Gonzalez v. Trinity Marine Group, Inc.*, 117 F.3d 894, 898 (5th Cir. 1977).  In the present case, while HESI believes sanctions are totally inappropriate, if the Court disagrees, any sanction should not involve depriving the fact finder from considering all the facts to arrive at a correct decision.  That is the result sought by BP.

the computer for third-party forensic examination, if necessary.  In the Motion, however, BP reserves its right to seek adverse findings of fact in the event it establishes "sufficiently wrongful conduct" or "bad faith" on the part of HESI.  Mot. pp. 23-25.  If warranted, BP seeks an adverse finding "as to what this proprietary modeling would have shown," or a finding that "the missing proprietary modeling showed no channeling occurred at the Macondo well."  *Id.*

Adverse fact findings are entirely unwarranted in this case because there is simply no issue "as to what this proprietary modeling would have shown."  In the event that the Modeling cannot be located, HESI will agree to make its software available under the same conditions set forth in the Software Escrow Agreement that allowed BP to access HESI's proprietary version of OptiCem.  The inputs used by Savery for this modeling consisted exclusively of data from the OptiCem modeling, which has already been provided to BP.  Thus, BP can use this software, and add the requisite inputs, to determine for itself "what this proprietary modeling would have shown."  There is no mystery here, and no need to make inferences or adverse fact findings as to what the Modeling would have shown.

Because there is no insoluble mystery as to what the Modeling revealed to Savery in the past, and may show for BP in the near future, there is certainly no basis for a fact finding that the Modeling showed "no channeling occurred at the Macondo well."  As explained above, the 3D-Modeling is of limited relevance to assessing what happened at Macondo, because the model cannot model foam cement as accurately as the models created in OptiCem.  In effect, BP seeks to prove there was no channeling at the Macondo well through the use of a 3D model which is wholly unsuitable for that purpose, and based on the incorrect assumption that there is some mystery as to what this software would show if given the OptiCem inputs.  BP's overreaching in this regard is likely motivated by the fact that BP's engineers clearly understood the risk of

channeling if an inadequate number of centralizers were utilized, and clearly accepted the risks of such channeling when they chose to ignore HESI's advice in this regard.[27]

## III.
## PRAYER

HESI prays that upon considering its Response in Opposition to Motion for Spoliation Sanctions, the Court deny the motion.  In the alternative, HESI requests an opportunity to present evidence  supporting its defenses to the Court in an evidentiary hearing.  HESI also prays for all other relief, legal and equitable, to which it is justly entitled.

Dated:  December 19, 2011.

---

[27] For example, after deciding to use only six centralizers and ignore HESI's advice to use twenty-one centralizers, Brett Cocales, a BP engineer, referred to BP's decision in an e-mail, stating:  "But, who cares, it's done, end of story, will probably be fine and we'll get a good cement job.  I would rather have to squeeze than get stuck above the WH. So Guide is right on the risk/reward equation."  Ex. 25, Dep. Ex. 1517, at BP-HZN-2179MDL00033080.  BP should not be permitted to use an unwarranted spoliation motion to manufacture facts in an effort to mask its grave "risk/reward equation" error of using too few centralizers.

Respectfully Submitted,

**GODWIN RONQUILLO PC**

**By:**  /s/  *Donald E. Godwin*
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
dgodwin@GodwinRonquillo.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
bbowman@GodwinRonquillo.com
Jenny L. Martinez
State Bar No. 24013109
jmartinez@GodwinRonquillo.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
fhartley@GodwinRonquillo.com
Gavin E. Hill
State Bar No.  00796756
ghill@GodwinRonquillo.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

and

R. Alan York
AYork@GodwinRonquillo.com
Jerry C. von Sternberg
JVonSternberg@GodwinRonquillo.com
Misty Hataway-Coné
MCone@GodwinRonquillo.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone:  713.595.8300
Facsimile:  713.425.7594

**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Halliburton Energy Services, Inc.'s Response in Opposition to Motion for Spoliation Sanctions was filed electronically with the Clerk of the Court using the CM/ECF system and that notice of this filing will be sent to all counsel through the CM/ECF system on this 19th day of December 2011.

/s/ Donald E. Godwin
Donald E. Godwin