# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois  60654

Andrew Langan, P.C.
To Call Writer Directly:
(312) 862-2064
andrew.langan@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

December 2, 2011

**By E-mail**

The Honorable Carl J. Barbier
United States District Judge
United States District Court
500 Poydras Street, Room C-268
New Orleans, LA  70130

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court
500 Poydras Street, Room B-345
New Orleans, LA 70130

Re:  BP's Reply to the PSC's November 28, 2011 letter re Interview Notes and E-Mail Strings

Dear Judge Barbier and Magistrate Judge Shushan:

In its November 28, 2011 letter, the PSC "generally takes the position that documents produced by Defendants in this litigation, (including both notes of interviews conducted in accordance with the defendants' own established protocols and 'mixed recipient' e-mail strings), are the producing party's Business Records, admissible for all purposes, against all defendants, under Federal Rule of Evidence 803(6)." BP respectfully submits that the PSC's broad position is inconsistent with the Federal Rules and is unsupported by the law or by exhibits that the PSC has identified.

A corporate defendant will inevitably produce many documents from its files that are not business records, such as documents copied from the internet or news clippings, documents prepared in anticipation of litigation, documents that do not communicate information witnessed "at or near" the time of the writing, and documents which the company did not impose a business duty to prepare. The PSC's proposed rule would make any of these produced documents a business record, excepted from the hearsay rule. This construction of the business records exception is plainly incorrect - a document is not an admissible business record just because it was produced by a corporation. *See, e.g., U.S. Commodities Futures Trading Commission v. Dizona*, 594 F.3d 408, 415-16 (5th Cir. 2010) (finding that exhibits produced by defendant's employer were improperly admitted under business records exception because exhibits' proponent failed to produce a witness to provide foundation); *Knauff v. Dorel Juvenile Group*, civ. no. SA:08-CV-336-XR, 2010 WL 114014, at *5 n.5 (W.D. Tex. Jan. 6, 2010) (finding that party seeking to offer documents produced by defendant would have to establish that documents fell within a hearsay exception). Notably, the text of Fed. R. Evid. 803(6) does not specify that

# KIRKLAND & ELLIS LLP

The Honorable Carl J. Barbier
The Honorable Sally Shushan
December 2, 2011
Page 2

any document produced by a defendant is admissible as a business record. Rather, Fed. R. Evid. 803(6) only excepts from the hearsay rule records that meet its multiple requirements:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. Fed. R. Evid. 803(6).

Even the PSC's own exhibits demonstrate that its interpretation of the business records exception is overbroad. For example, TREX-06027, which is included in the PSC's "List of 300," is an internet article published on May 17, 2010 by "IWatch News" entitled "Renegade Refiner: OSHA Says BP Has 'Systemic Safety Problem.'"Another version of this article, formatted differently and posted on the Center for Public Integrity's internet site, can be found in BP's production at BP-HZN-2179MDL03425300 - BP-HZN-2179MDL03425303 (enclosed with this letter). Based on the PSC's construction of the business records rule, this article - which is, according to the Fifth Circuit, "classic, inadmissible hearsay," *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005) - would be admissible for all purposes against all defendants because it was produced by BP, notwithstanding that BP had nothing to do with the article's creation. This is not a valid application of the business records exception. *Knauff*, at *5. This and other examples discussed in the parties' letters to date which come from the PSC's own "List of 300" (such as TREX-01178, a Transocean subpoena response, and TREX-03092, a Halliburton e-mail which contains a Cobalt employee's discussion of MBI hearings), demonstrate that the business-records exception needs to be addressed on a case-by-case basis, and that the PSC's proposed rule that all documents produced by defendants are business records is extremely overbroad.

The PSC states in its Nov. 28, 2011 letter that it does not intend to "engage in a line-by-line analysis of each document." BP respectfully submits that effectively eliminating the prohibition against hearsay by admitting for any purpose any document produced by a defendant is even less desirable. Even the PSC's own hand-picked documents from the PSC's "List of 300"[1] establish that a careful analysis of exhibits is the best approach.

---

[1] If the Court wishes, BP can provide other examples from beyond the PSC's selected "List of 300."

# KIRKLAND & ELLIS LLP

The Honorable Carl J. Barbier
The Honorable Sally Shushan
December 2, 2011
Page 3

      As always, we appreciate the Court's time and consideration in this matter.

      Respectfully submitted,

      /s/ Andrew Langan, P.C.

      Andrew Langan, P.C.

cc:    Steve Herman
       James Roy
       Defense Liaison Counsel
       Mike Underhill
       Hon. Attorney General Luther Strange
       Cory Maze
       Ben Allums
       Mike O'Keefe



LATEST FROM THE CENTER

# Renegade Refiner: OSHA Says BP Has "Systemic Safety Problem"

97% of Worst Industry Violations Found at BP Refineries

By Jim Morris and M.B. Pell | May 16, 2010

Two refineries owned by oil giant BP account for 97 percent of all flagrant violations found in the refining industry by government safety inspectors over the past three years, a Center for Public Integrity analysis shows. Most of BP's citations were classified as "egregious willful" by the Occupational Safety and Health Administration and reflect alleged violations of a rule designed to prevent catastrophic events at refineries.

Like    1,399 people like this.

181 tweets

retweet

BP is battling a massive oil well spill in the Gulf of Mexico after an April 20 platform blast that killed 11 workers. But the firm has been under intense OSHA scrutiny since its refinery in Texas City, Texas, exploded in March 2005, killing 15 workers. While continuing its probe in Texas City, OSHA launched a nationwide refinery inspection program in June 2007 in response to a series of fires, explosions and chemical releases throughout the industry.

Refinery inspection data obtained by the Center under the Freedom of Information Act for OSHA's nationwide program and for the parallel Texas City inspection show that BP received a total of 862 citations between June 2007 and February 2010 for alleged violations at its refineries in Texas City and Toledo, Ohio.

Of those, 760 were classified as "egregious willful" and 69 were classified as "willful." Thirty of the BP citations were deemed "serious" and three were unclassified. Virtually all of the citations were for alleged violations of OSHA's process safety management standard, a sweeping rule governing everything from storage of flammable liquids to emergency shutdown systems. BP accounted for 829 of the 851 willful violations among all refiners cited by OSHA during the period analyzed by the Center.

Top OSHA officials told the Center in an interview that BP was cited for more egregious willful violations than other refiners because it

Related:



Data Mine: Coast Guard Database Keeps Oil Spill Penalties Under Wraps



Coast Guard Logs Reveal Early Spill Estimate of 8,000 Barrels a Day



BP-HZN-2179MDL03425300

failed to correct the types of problems that led to the 2005 Texas City accident even after OSHA pointed them out. In Toledo, problems were corrected in one part of the refinery but went unaddressed in another. Jordan Barab, deputy assistant secretary of labor for occupational safety and health, said it was clear that BP "didn't go nearly far enough" to correct deficiencies after the 2005 blast.

Training Exercises Showed Gaps in Government Preparedness Before BP Oil Spill

"The only thing you can conclude is that BP has a serious, systemic safety problem in their company," Barab said.



### BP Accounts for Most "Willful" Violations Among Refineries, Regulator Says

Two refineries operated by BP account for 97 percent of all "egregious willful" citations issued by the Occupational Safety and Health Administration since June 2007, according to a Center for Public Integrity analysis.

OSHA has proposed penalties of $87 million for alleged violations at BP's refinery in Texas City, Texas, and $3 million for deficiencies at its refinery in Toledo, Ohio. The agency is in the process of inspecting refineries around the country. The map below shows past inspections, number of violations the agency cited at the plants, and OSHA's proposed penalties for the citations.

The head of OSHA, David Michaels, said the safety problems aren't limited to BP. "We are very concerned about the commitment of the refining industry to worker health and safety," he said.

BP officials did not respond to requests for comment about the OSHA data.

According to the company's website, "BP's commitment to safety begins at the most senior levels of our organization—with robust systems to implement, audit, report on and improve our performance.

"Creating a safe and healthy working environment is essential for our success. Since 1999, injury rates and spills have reduced by approximately 75 percent," the BP website says.

### BP FACES $90 MILLION IN FINES

BP, which calls itself the country's largest oil and gas producer, operates five U.S. refineries that collectively process about 1.5 million barrels of crude oil per day. Last October, OSHA proposed a record $87 million fine against the Texas City refinery. The agency proposed a fine of $3 million against the Toledo refinery in March. BP is contesting both penalties.

Separately, BP's Cherry Point refinery in Blaine, Wash., was cited by state regulators for 13 serious violations earlier this month. Penalties totaling $69,200 have been proposed. These citations are not included in data analyzed by the Center.

No other oil company inspected by OSHA since June 2007 was even close to BP in the number of citations issued. Sunoco Inc. was cited for 127 alleged violations, eight of which were willful. ConocoPhillips Co. was cited for 119, four of which were willful, and Citgo Petroleum Corp. for 101, two of which were willful.

OSHA defines a willful violation as one "committed with plain indifference to or intentional disregard for employee safety and health." An egregious willful violation is considered so severe that it can result in a penalty each time a violation occurs, rather than a single penalty for all violations of a regulation. A serious violation is described as one creating a "substantial probability" of death or serious injury. OSHA can refer cases involving worker deaths and wanton disregard for safety rules to the Justice Department for criminal prosecution.

### OSHA Citations to U.S. Refineries
### June 2007 - February 2010

| | BP | Other Refineries |
|---|---|---|
| **Egregious Willful Citations** Issued for each instance of a willful and flagrant violation | 760 | 1 |
| **Willful Citations** Issued for violations with intentional disregard for employee safety and health | 69 | 22 |
| **Serious Citations** Issued for violations with a "substantial probability" of death or serious injury | 30 | 1,521 |
| **Repeat Citations** Issued when employer was previously cited for same hazard in past three years | 0 | 43 |
| **Unclassified Citations** Issued as a settlement tool to avoid lengthy litigation | 3 | 213 |

Source: OSHA database obtained by Center for Public Integrity

Under the nationwide program, OSHA has finished inspecting, or is in the process of inspecting, 55 refineries under federal OSHA jurisdiction, with 12 left to inspect. Another 23 U.S. refineries are exempted because they participate in a voluntary program for employers that have agreed to adopt safety rules stricter than what OSHA requires. Some inspections were performed by regulators in states such as Washington and California, which have their own worker safety programs. There are 55 refineries in these states.

In a letter to refinery managers last year, OSHA's enforcement director, Richard Fairfax, wrote that in the previous 15 years, the refining industry had recorded "more fatal or catastrophic incidents related to the release of highly hazardous chemicals ... than any other industry sector covered by the [process safety management] standard." OSHA inspectors, Fairfax wrote, were finding "many of the same problems repeatedly."

### A TROUBLED INDUSTRY

After the BP refinery in Texas City blew up on March 23, 2005, the U.S. Chemical Safety Board, an independent federal agency, concluded that the disaster was caused by "organizational and safety deficiencies at all levels of the BP Corporation. Warning signs of a possible disaster were present for several years, but company officials did not intervene effectively to prevent it."



The Center for Public Integrity on Facebook

Like

The Center for Public Integrity has 3,907 fans

Facebook social plugin

Several other major incidents – including a pipe failure that caused $30 million in damage – occurred at the same BP refinery just months after the explosion, the safety board found. An investigative panel chaired by former Secretary of State James Baker also documented management lapses and questionable cost-cutting at BP. But the Baker panel's report added: "We are under no illusion that deficiencies in process safety culture, management, or corporate oversight are limited to BP."

Indeed, on April 2 of this year, a fire at the Tesoro Corp. refinery in Anacortes, Washington, killed seven workers. The cause of that accident has not been determined.

BP-HZN-2179MDL03425302



On April 2, 2010, a fire at the Tesoro Corp. refinery in Anacortes, Washington, killed seven workers. The refinery was cited in October 2008 for 17 serious process safety management violations, 14 of which were dropped after the company negotiated with the Washington State Department of Labor & Industries. (*Courtesy of Walter Siegmund / CC BY 3.0*)

But Bill Hoyle, former manager of investigations for the safety board and chief investigator of the 2005 BP disaster, said it provides further evidence that the industry is cutting corners. "The industry across the board has process safety problems. Fires and explosions and fatalities are continuing unabated. Texas City should have served as a wake-up call, but they didn't wake up," Hoyle told the Center.

Now a safety consultant for the United Steelworkers, which represents about 30,000 refinery employees, Hoyle said the OSHA inspection program is "a flash in the pan which looks at only a tiny percentage of each refinery – one or two process units." He questioned its effectiveness, noting that the Tesoro refinery in Anacortes was cited in October 2008 for 17 serious process safety management violations, 14 of which were dropped after the company negotiated with the Washington State Department of Labor & Industries. A proposed penalty of $85,700 was reduced to $12,250.

Refineries are inherently dangerous places. In the course of turning crude oil into gasoline, diesel, propane and other products, workers come in close contact with extremely flammable and toxic materials. These materials are under high temperatures and pressures, creating fire and explosion hazards. OSHA's process safety management standard requires refinery and chemical plant operators to have systems in place to identify and mitigate these hazards.

Kim Nibarger, a health and safety specialist with the Steelworkers, happened to be in Anacortes when the Tesoro refinery caught fire last month. Six of the seven workers killed belonged to the union. "I was almost sick to my stomach," Nibarger said. "I thought, 'When is it going to stop? What's it going to take for this industry to wake up?'"

In his view, many of the problems in the industry can be traced to growing intervals between refinery "turnarounds," when equipment is taken offline for cleaning, repair or replacement. Not long ago, Nibarger said, turnarounds were scheduled every two to three years. Now, as oil companies try to cut costs, it's every three to five years.

Gregory Scott, executive vice president of the National Petrochemical & Refiners Association, defended the industry. "Safety is the highest priority at our member plants," he told the Center.

Scott said the industry is developing uniform standards to improve process safety management at refineries. "Clearly, we're taking the steps to implement process safety metrics," he said. "Chastising the industry for not doing it earlier may or may not be accurate."

But OSHA's Barab said the refining industry group continues to treat calamities like those in Texas City and Anacortes as isolated incidents. Refiners also point misleadingly to their industry's relatively low "recordable" illness and injury rates, which he says are not reliable predictors of catastrophic incidents. Federal law requires employers to record and report all occupational deaths, injuries, and illnesses.

"BP had a very low recordable injury and illness rate before they blew up the [Texas City] plant," Barab said. If the industry persists in using such rates as a measure of overall safety, he said, "It's hard to take their commitment seriously."

© 2010, The Center for Public Integrity®. All Rights Reserved. Read our privacy policy and the terms under which this service is provided to you.

The Center for Public Integrity® | 910 17th Street NW | Suite 700 | Washington, DC 20006 | USA | (202) 466-1300