Exhibit A

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### Commonwealth of Massachusetts

| | |
|---|---|
| In re: Oil Spill by the Oil Rig<br>"Deepwater Horizon" in the Gulf<br>Of Mexico, on April 20, 2010 | )<br>)<br>)<br>)<br>)<br>) |

Civil Action No. MDL No. 2179

(If the action is pending in another district, state where:

Eastern District of Louisiana

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: Massachusetts Institute of Technology
Through: Kirk D. Kolenbrander, Vice President & Secretary o f the Corporation
Room 3-207, Massachusetts Institute of Technology
77 Massachusetts Avenue, Cambridge, MA 02139-4307

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: | Office of the Vice President & Secretary of the Corporation<br>Room 3-207<br>Massachusetts Institute of Technology, 77<br>Massachusetts Avenue, Cambridge, MA 02139-4307 | Date and Time:<br>12/23/2011 10:00 am |
|---|---|---|

The deposition will be recorded by this method: Court Reporter

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

See attached Notice of Deposition by Written Question

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: 11/30/2011

_____
CLERK OF COURT

OR

_____
Signature of Clerk or Deputy Clerk

_____
Attorney's signature

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are:
Anthony Tarricone; Kreindler & Kreindler LLP; 277 Dartmouth Street, Boston, Massachusetts 02116 (617)424-9100

Case 2:10-md-02179-CJB-SS Document 4806 Filed 12/03/11 Page 2 of 69

AO 88A  (Rev.  06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  MDL No. 2179

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | : | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | : | |
| of Mexico, on April 20, 2010 | : | Section J |
| | : | |
| | : | Judge Barbier |
| | : | |
| | : | Magistrate Judge Shushan |

## PLAINTIFFS' NOTICE OF DEPOSITION BY WRITTEN QUESTIONS

To:   **Massachusetts Institute of Technology**
Through:
Kirk D. Kolenbrander
Vice President and Secretary of the Corporation
Room 3-207, Massachusetts Institute of Technology
77 Massachusetts Avenue, Cambridge, MA 02139-4307

**PLEASE TAKE NOTICE** that, under Rule 31 of the Federal Rules of Civil Procedure, the attorneys for Plaintiffs will take the deposition of the **Massachusetts Institute of Technology** by written questions on the **23rd day of December, 2011 at 10:00 a.m.**, at 77 Massachusetts Avenue, Cambridge, MA 02139-4307.

Pursuant to Federal Rule of Civil Procedure 30(b)(6), **Massachusetts Institute of Technology** will designate one or more officers, agents, or other persons who is the most knowledgeable to testify on its behalf with respect to matters set forth in Exhibit "A", which is attached hereto and made a part hereof.

The deposition will be taken by court reporter, unless sufficient responses are provided in writing to undersigned counsel by December 23, 2011 in which case the responses may be certified before a notary public.

A copy of the questions to be asked at the deposition is attached.

Under Federal Rules of Civil Procedure 30 (b)(6), 31(a)(1), and 45(a)(1)(C), **Massachusetts Institute of Technology** is also required to produce the information set forth in Exhibit "A," which is attached hereto and made a part hereof, at the deposition.

Respectfully submitted,

<table>
<tr>
<td>

  /s/  Stephen J. Herman<br>
**Stephen J. Herman**, La. Bar No. 23129<br>
**HERMAN HERMAN KATZ & COTLAR LLP**<br>
820 O'Keefe Avenue<br>
New Orleans, Louisiana 70113<br>
Telephone: (504) 581-4892<br>
Fax No. (504) 569-6024<br>
E-Mail: sherman@hhkc.com<br>
*Plaintiffs Liaison Counsel*

</td>
<td>

  /s/ James Parkerson Roy<br>
**James Parkerson Roy**, La. Bar No. 11511<br>
**DOMENGEAUX WRIGHT ROY & EDWARDS LLC**<br>
556 Jefferson Street, Suite 500<br>
Lafayette, Louisiana 70501<br>
Telephone: (337) 233-3033<br>
Fax No. (337) 233-2796<br>
E-Mail: jimr@wrightroy.com<br>
*Plaintiffs Liaison Counsel*

</td>
</tr>
</table>

## PLAINTIFFS' STEERING COMMITTEE

<table>
<tr>
<td>

Brian H. Barr<br>
LEVIN, PAPANTONIO, THOMAS,<br>
MITCHELL, ECHSNER & PROCTOR, PA<br>
316 South Baylen St., Suite 600<br>
Pensacola, FL 32502-5996<br>
Office: (850) 435-7045<br>
Telefax: (850) 436-6187<br>
E-Mail: bbarr@levinlaw.com

</td>
<td>

Robin L. Greenwald<br>
WEITZ & LUXENBERG, PC<br>
700 Broadway<br>
New York, NY 10003<br>
Office: (212) 558-5802<br>
Telefax: (212) 344-5461<br>
E-Mail: rgreenwald@weitzlux.com

</td>
</tr>
<tr>
<td>

Jeffrey A. Breit<br>
BREIT DRESCHER & IMPREVENTO<br>
999 Waterside Drive, Suite 1000<br>
Norfolk, VA 23510<br>
Office: (757) 670-3888<br>
Telefax: (757) 670-3895<br>
E-Mail: jbreit@bdbmail.com

</td>
<td>

Rhon E. Jones<br>
BEASLEY, ALLEN, CROW, METHVIN,<br>
PORTIS & MILES, P. C.<br>
218 Commerce St., P.O. Box 4160<br>
Montgomery, AL 36104<br>
Office: (334) 269-2343<br>
Telefax: (334) 954-7555<br>
E-Mail: rhon.jones@beasleyallen.com

</td>
</tr>
<tr>
<td>

Elizabeth J. Cabraser<br>
LIEFF, CABRASER, HEIMANN &<br>
BERNSTEIN, LLP<br>
275 Battery Street, 29th Floor<br>
San Francisco, CA 94111-3339<br>
Office: (415) 956-1000<br>
Telefax: (415) 956-1008<br>
E-Mail: ecabraser@lchb.com

</td>
<td>

Matthew E. Lundy<br>
LUNDY, LUNDY, SOILEAU & SOUTH, LLP<br>
501 Broad Street<br>
Lake Charles, LA 70601<br>
Office: (337) 439-0707<br>
Telefax: (337) 439-1029<br>
E-Mail: mlundy@lundylawllp.com

</td>
</tr>
</table>

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL 36660
Office: (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA 70726
Office: (225) 664-4193
Telefax: (225) 664-6925
E-Mail: calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail: ervin@colson.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130
Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Office: (214) 521-3605
Telefax: (214) 599-1172
E-Mail: ssummy@baronbudd.com

Mikal C. Watts
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail: mcwatts@wgclawfirm.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Memorandum has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this ___ day of _____, 2011.

s/ James Parkerson Roy and Stephen J. Herman

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL No. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | : | |
| OF MEXICO, ON APRIL 20, 2010 | : | SECTION J |
| | : | |
| | : | JUDGE BARBIER |
| | : | |
| | : | MAGISTRATE JUDGE |
| | : | SHUSHAN |

---

## DEPOSITION BY WRITTEN QUESTIONS

## INSTRUCTIONS

1.      If, in compiling the information responsive to Ex. "A", you encounter any ambiguities when construing a request, you shall notify undersigned counsel of the alleged ambiguity at least one week prior to the scheduled deposition in order to allow undersigned counsel an opportunity to clarify said ambiguities.

2.      If you object to responding to any of the requests set forth in Ex. "A", in whole or in part, you shall notify undersigned counsel in writing of the objection, basis for the objection, and provide all factual and legal justifications that you believe support your objection or failure to respond at least one week prior to the scheduled deposition in order to allow undersigned counsel an opportunity resolve any such objection.

3.      If you deem any request set forth in Ex. "A" to call for privileged information, and assert such privilege so as to avoid divulging such information, at least one week prior to the scheduled deposition you shall notify undersigned counsel of same, in writing, including providing all of the information set forth below, in order to allow undersigned counsel an opportunity resolve any such objection.

Provide a list with respect to each item of information or each document so withheld, stating:

a.      Description of allegedly privileged information, communication or document withheld;

b.      Persons present during or participating in the allegedly privileged communication, or Author, recipient, and/or possessors of the information or document withheld;

    c.      Date of the allegedly privileged communication and/or that the information or document was created;

    d.      Subject matter of the allegedly privileged information, communication or document withheld;

    e.      Type of information, communication or document withheld (e.g., letter, memorandum, photograph, computer database);

    f.      Nature of privilege(s) claimed.

    4.      The request for information set forth in Ex. "A" is continuing in nature.  If other information comes into your possession or are brought to your attention, timely supplementation of the responses in accordance with the F.R.C.P. is required.

## GENERAL DEFINITIONS

    **"YOU," "YOUR,"** and/or **"M.I.T."** means **Massachusetts Institute of Technology** and/or its subsidiaries, affiliates and/or brother/sister corporations, partnerships, limited liability companies, programs, departments, schools, and/or academies (including, but not limited to, the Operations Academy and/or Projects Academy), and/or any and all of its administrators, executives, members, employees, representatives, faculty, agents, attorneys, and/or other persons acting on its behalf and/or under its direction and/or control.

    **"REPRESENTATIVE"** means administrators, executives, members, employees, agents, and/or other persons acting on its behalf and/or under its direction and/or control.

    **"BP"** means British Petroleum and/or its subsidiaries, affiliates and/or brother/sister corporations, partnerships, limited liability companies, programs, departments, schools, and/or academies (including, but not limited to, the Operations Academy and/or Projects Academy), and/or any and all of its administrators, executives, members, employees, representatives, faculty, agents, attorneys, and/or other persons acting on its behalf and/or under its direction and/or control.

    **"DOCUMENT"** means all information recorded in any form including, but not limited to, writings, drawings, charts, graphs, photographs, video recordings, or any other data compilations.

    **"IDENTIFY"** or **"IDENTIFICATION"** when used with respect to an individual means to state his full name, his present or last known employer, his present or last known job title, and his present or last known address.

"IDENTIFY" or "IDENTIFICATION" when used with reference to a document, tangible item and/or information means to state the type of document, information or item (e.g; documents, electronically stored information ("ESI"), originals, drafts, and/or complete and legible copies thereof, photographs, and/or recordings of every kind or nature including, but not limited to letters, records, logs, diaries, correspondence, memoranda, contracts, telegrams, telexes, reports, notes, maps, transcripts, cover sheets, transmittal sheets, invoices, lists, internal or interoffice communications, directives, records of meetings, telephone or other communications, vouchers, accounting records, tallies, calculations, diagrams, charts, advertising brochures, computer printouts, pictures, newspaper clippings, books, magazines, texts, pamphlets, tapes, video or audio, computer tapes, drawings, slides, power-point presentations, sketches, and drafts of any of the foregoing), its current or last known location and custodian, and the date it was prepared and/or created.

"OPERATIONS ACADEMY" means the program developed by you for BP and/or between you and BP, started in or around 2007, and includes any and all programs, sessions, courses, lectures, portions or otherwise of said Academy.

"PROJECTS ACADEMY" means the program developed by you for BP and/or between you and BP, started in or around 2003, and includes any and all programs, sessions, courses, lectures, portions or otherwise of said Academy.

"INFORMATION" when used herein means, but is not limited to, documents, ESI, photographs, recordings of every kind or nature including, but not limited to letters, records, logs, diaries, correspondence, memoranda, contracts, telegrams, telexes, reports, notes, maps, transcripts, cover sheets, transmittal sheets, invoices, lists, internal or interoffice communications, directives, records of meetings, telephone or other communications, vouchers, accounting records, tallies, calculations, invoices, bills, payments, diagrams, charts, advertising, brochures, printouts, pictures, newspaper clippings, books, magazines, texts, pamphlets, tapes, video or audio, computer tapes, drawings, slides, power-point presentations, sketches, and drafts of any of the foregoing.

"ESI" when used herein means any type of electronically stored information in your possession, custody or control, in whatever form or medium it is kept in the usual course of business. ESI includes, but is not limited to, emails, text messages, word processing files, imaged documents, electronic spreadsheets, electronically generated reports, sound files, video files, data compilations, databases, and electronic computer files of any type, and all metadata associated with ESI of any type or medium.

"COMMUNICATION" or "EXCHANGE" means the transmittal of information in the form of facts, ideas, inquiries or otherwise in any form or fashion. This includes, but is not limited to, information provide by you to BP and vice versa.

"**REGARDING**" means relating to, referring to, describing, evidencing, concerning or constituting.

The following rules of construction apply to all discovery requests:

1.  The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

2.  The use of the singular form of any word includes the plural and vice versa.

3.  The use of the masculine when referring to an individual includes the feminine and vice versa.

4.  In addition to the definitions given to the terms set forth above, the common and/or dictionary definitions to those terms shall also apply.

The deposition will continue from day to day until completed or adjourned by the mutual agreement of counsel. You are invited to attend and exercise such rights to which your are entitled under the law.

## DEPOSITION BY WRITTEN QUESTIONS

1.  Please state your full name, occupation, and official title.

ANSWER:


2.  Have you been provided with a subpoena for the production of the information set forth in Exhibit "A"?

ANSWER:


3.  Do you understand that the subpoena requires the **Massachusetts Institute of Technology** to provide all information in its possession, custody, or control regarding the items set forth in Exhibit "A"?

ANSWER:

4.     Are you the custodian of records for **Massachusetts Institute of Technology**?

ANSWER:


5.     As part of your duties for **Massachusetts Institute of Technology**, are you the custodian of all information responsive to Exhibit "A" attached hereto?

ANSWER:


6.     Are you an authorized representative of **Massachusetts Institute of Technology** that is competent and qualified to confirm that the information provided is responsive to the subpoena?

ANSWER:


7.     Have you conducted a thorough search for all information regarding the items set forth in Exhibit "A"?  If other persons assisted in performing said search, identify each and every person and specify to which item or items in Exhibit "A" that person was assigned and/or what information he found.

ANSWER:


8.     Please hand the originals or exact duplicates of the information regarding the items set forth in Exhibit "A" to the court reporter taking your deposition for photocopying and attachment to this deposition, unless copies are provided to undersigned counsel before December 23, 2011.  If said information has not been clearly identified as to which item or items in Exhibit "A" it applies and/or relates, specify to which item each applies.

ANSWER:


9.     Have you now given true and correct originals or exact duplicates of all information in the possession, custody, and/or control of **Massachusetts Institute of Technology** regarding the items set forth in Exhibit "A" to the court reporter taking your deposition? If not, identify for the court reporter the information that you did not produce, explain why you did not produce them, and specify which item or items in Exhibit "A" to which they apply.

ANSWER:

10.     Was all of the information that you provided kept in the regular course of the business of
        **Massachusetts Institute of Technology**?

ANSWER:


11.     How long does **Massachusetts Institute of Technology** maintain the information that
        you have provided, and does **Massachusetts Institute of Technology** ever destroy its
        files?  If your answer varies depending on the particular piece of information, provide a
        specific answer for each item of information.

ANSWER:


12.     Are you aware of any other person or entity that may have possession of information
        identified in and/or responsive to Exhibit "A," other than the information that you
        produced?  If so, please identify each and every such entity or person.

ANSWER:


13.     Has the **Massachusetts Institute of Technology** ever been requested or directed by any
        person or entity to withhold, protect, or destroy for any reason, any and/or all of the
        information  identified in and/or responsive to Exhibit "A"?

ANSWER:


14.     Has any person or entity suggested that the **Massachusetts Institute of Technology**
        should withhold, protect or destroy for any reason, any and/or all of the information
        identified in and/or responsive to Exhibit "A"?  If so, please identify each and every
        person or entity who conveyed this information to the **Massachusetts Institute of
        Technology** and when that event occurred.

ANSWER:


15.     Do you know or have reason to believe that the information that you have produce has in
        any manner been edited, purged, culled, removed, deleted, destroyed, or otherwise
        altered?  If so, please identify the specific information and why it was edited, purged,
        culled, removed, deleted, destroyed, or otherwise altered.

ANSWER:

16.    Identify each and every person that attended the Operations Academy.  For each person identified, provide:

A.  The full name and job title each person;

B.  The date(s) said person attended;

C.  If the Academy was divided into specific courses or topics, provide the name of each such course or topic attended by said person;

D.  If information was provided to that person during, before, or after the Operations Academy, specify all such information, and the form/manner in which it was provided (documents, power point, etc.).

ANSWER:

A:

B:

C:

D:

17.    Identify each and every person that attended the Projects Academy.  For each person identified, provide:

A.  The full name and job title each person;

B.  The date(s) said person attended;

C.  If the Academy was divided into specific courses or topics, provide the name of each such course or topic attended by said person;

D.  If information was provided to that person during, before, or after the Academy, specify all such information, and the form/manner in which it was provided (documents, power point, etc.).

ANSWER:

A:

B:

C:

D:

## EXHIBIT "A"

1.  All information regarding the Operations Academy including, but not limited to:

    A.  All information exchanged between you and BP <u>during</u> the Operations Academy;

    B.  All information exchanged between you and BP <u>before</u> the Operations Academy;

    C.  All information exchanged between you and BP <u>after</u> the Operations Academy;

2.  For each and every BP representative that attended the Operations Academy, provide all information regarding that person including, but not limited to:

    A.  The full name of each person that attended;

    B.  The date or dates of said person's attendance;

    C.  The location of said person's attendance;

    D.  The total number of hours and/or time said person spent attending said Academy;

    E.  If the Operations Academy was divided into separate courses, topics, or otherwise, provide the title and subject matter of each course attended by said person;

    F.  The employer and job title of said person;

    G.  Sign-in sheets and/or other information relating to the attendance by said person;

    H.  Any other information indicating said person attended and/or completed Academy and/or a portion thereof including, but not limited to, certificates and/or awards.

3.  All recordings of the Operations Academy or any portion thereof. This includes, but is not limited to, audio, video, or written recordings.

4.  All information regarding the Projects Academy including, but not limited to:

    A.  All information exchanged between you and BP <u>during</u> the Projects Academy;

    B.  All information exchanged between you and BP <u>before</u> the Projects Academy;

    C.  All information exchanged between you and BP <u>after</u> the Projects Academy.

5.  For each and every BP representative that attended the Projects Academy, provide all information regarding their attendance including, but not limited to:

    A.  The full name of each person that attended;

B.    The date or dates of said person's attendance;

C.    The location of said person's attendance;

D.    The total number of hours and/or time said person spent attending said Academy;

E.    If the Operations Academy was divided into separate levels, courses, topics, or otherwise, provide the title and subject matter of each course attended by said person;

F.    The employer and job title of said person;

G.    Sign-in sheets and/or other information relating to the attendance by said person;

H.    Any other information indicating said person attended and/or completed Academy and/or a portion thereof including, but not limited to, certificates and/or awards.

6.    All recordings of the Projects Academy or any portion thereof. This includes, but is not limited to, audio, video, or written recordings.

7.    To the extent that you have not previously provided in response to one or more of the foregoing, information exchanged between you and BP regarding, in whole or in part:

A.    BP's operations, safety, process safety, culture, corporate culture, improvement, behavior, risk assessment, management systems, audits, procedures, measurement, evaluation, planning, corrective action, ethics, mentoring, and/or leadership;

B.    Accidents and/or incidents involving BP and/or its facilities including, but not limited to, the Texas City refinery, Thunder Horse, and/or Alaska North Slope/Prudhoe Bay pipelines.

C    Other accidents and/or incidents involving offshore blowouts, explosions and/or oil spills, including but not limited to Piper Alpha, Montera and Deepwater Horizon.



# KREINDLER & KREINDLER LLP

### TRADITION OF EXCELLENCE

277 Dartmouth Street
Boston, MA 02116-2805
(617) 424-9100
Fax: (617) 424-9120
www.kreindler.com

atarricone@kreindler.com
imccallister@kreindler.com

November 30, 2011

Mr. Kirk D. Kolenbrander
Vice President & Secretary of the Corporation
Massachusetts Institute of Technology
77 Massachusetts Avenue
Cambridge, MA 02139-4307

Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the
     Gulf of Mexico, on April 20, 2010

Dear Mr. Kolenbrander:

In connection with the above matter we are serving the attached deposition
subpoena to you on behalf of the plaintiffs.

We are available to answer any questions or concerns which you or MIT's legal
representatives have regarding this request. Please contact either Anthony
Tarricone or myself with if you wish to discuss this matter.

Thank you for your attention to this matter.

Sincerely,

Ian McCallister

New York Office
750 Third Avenue, New York, NY 10017-2703
Tel: (212) 687-8181  Fax: (212) 972-9432

California Office
707 Wilshire Boulevard, Los Angeles, CA 90017-3613
Tel: (213) 622-6469  Fax: (213) 622-6019

## RETURN OF SERVICE

November 30**, 2011**

I this day summoned the within named  **Massachusetts Institute of Technology;
Through Kirk D. Kolenbrander, Vice President and Secretary of the Corporation**

to appear as within directed by delivering to:  **Doris Drake, Person in charge of the
legal department**

In Hand, to wit :  **77 Massachusetts Ave.**

in the  **Cambridge**  District of  **Massachusetts**  an attested copy of the

subpoena together with  **0.00**  fees for attendance and travel.

Service and Travel  **$46.00** .

_____
Server

Paid Witness  **$0.00**

Total  **$46.00**

Subscribed and sworn before me,  James M. Desrosiers

this  **30th**  day of  **November**  , 2011.

_____
**Notary Public**
**My commission expires March 5, 2015**

Exhibit B

## Independent Expert

# Annual Report
## 2008

**Monitoring of BP Progress in Implementing the Recommendations
of the  BP U.S. Refineries Independent Safety Review Panel**

## May 2008

**Submitted by:** _____*Original Signed by L. Duane Wilson*_____.
L. Duane Wilson, Independent Expert

CONFIDENTIAL

*Blank Page*

CONFIDENTIAL

BP-HZN-2179MDL04438871

# INDEPENDENT EXPERT
# FIRST ANNUAL REPORT
# MAY 2008

## I. INTRODUCTION

In its January 2007 Report, the BP U.S. Refineries Independent Safety Review Panel recommended that the BP Board engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's Recommendations and related commentary (collectively, the "Recommendations"). In May 2007, the Board engaged an Independent Expert (IE) to fulfill this role. This document is the IE's first annual report to the Safety, Ethics and Environment Assurance Committee of the BP Board ("SEEAC").

## II. EXECUTIVE SUMMARY

Following the Texas City incident in March 2005, BP initiated a comprehensive review of its approach to safety and operational integrity. As a result, BP began implementing a number of changes, even before the Panel issued its Report. Upon receipt of the Report, BP committed to fully implementing the Recommendations at its five U.S. refineries.

A task of the scope that BP has undertaken requires strong management support and a considerable period of time to implement. The BP Board, executive management, and refinery leadership have each demonstrated strong support for a multi-year program for improving process safety performance. Significant effort has been devoted to initiating activities that address each of the ten Recommendations. Considerable progress has been made at the Group level and in each of BP's five U.S. Refineries. Substantial resources have been deployed for implementation of the Recommendations, and plans are in place to address the extensive work remaining to complete the journey. This report summarizes some areas of significant progress made to date and highlights a few areas where increased emphasis is needed.

Instead of making the implementation of the Recommendations a separate initiative, BP elected to incorporate implementation of the Recommendations into its holistic efforts to improve process safety management. Refining chose to manage these efforts through the development and issuance of risk-prioritized strategic implementation plans (SIPs).

Refining established a project plan in the second quarter of 2007 with milestones for completing the SIPs. The milestones were not met, and, in fact, these SIPs have only recently been completed. However, the refineries did not wait on completed SIPs to begin addressing the Recommendations – progress has been made.

CONFIDENTIAL

BP-HZN-2179MDL04438872

Some areas of notable progress include:

- All five U.S. refineries have made progress addressing Recommendations related to the higher-risk areas of facility siting, safety instrumented systems, and area electrical classification. The scope of work in these areas was known to be large, and completion will take time.

- The numbers of open (particularly, overdue) process safety action items from incident investigations, process hazard analyses, audits, etc., have been reduced significantly

- A comprehensive audit program within Safety & Operations has been established and staffed. Safety & Operations audits were completed at two U.S. refineries in 2007. An expanded process safety management (PSM) component has been developed and incorporated into the audit program.   This PSM component will be included in the audits of three U.S. refineries planned for 2008.

- Extensive programs for training/enhancing process safety competencies are well underway for most levels of the organization, and additional programs are under development.

- The architecture, framework and minimum requirements for a new Operating Management System (OMS) that focuses on achieving consistent, efficient implementation of operating processes and systems across the Group was developed. Implementation activities are beginning in the U.S. refineries.

More focused attention in the following areas is required to address particular Recommendations:

- Despite a revised, more restrictive, overtime policy developed in conjunction with the United Steel Workers, overtime hours remain at a level that could compromise the performance of plant personnel.

- Tracking of open action items by Refining line management should be expanded beyond audit action items, and the overdue items in that expanded list should be reported to all levels of the Group.

- In order to provide more effective support to U.S. refinery personnel, additional clarity around the roles and responsibilities of process safety support staff outside the U.S. refineries is needed.

In summary, BP appears to be making substantial progress in changing culture and addressing needed process safety improvements. BP has stated its intent to become less bureaucratic, reduce complexity, and simplify activities, and continued work in this area will likely help the company in implementing the Recommendations. A significant amount of work remains to be done on the process safety journey. Successful completion of the task will require the continued support and involvement of the Board, executive management, and refinery leadership along with a sustained effort over an extended period of time.

CONFIDENTIAL

BP-HZN-2179MDL04438873

## III. THE PANEL REPORT AND RECOMMENDATIONS

The BP U.S. Refineries Independent Safety Review Panel (Panel) was formed by BP on October 24, 2005, in response to an urgent safety recommendation issued by the U.S. Chemical Safety and Hazard Investigation Board (CSB). The CSB recommended that BP commission such an independent panel to assess and report on the effectiveness of BP Products North America's corporate oversight of safety management systems at its five U.S. refineries and on its corporate safety culture. BP directed the Panel, in its charter, to examine and recommend any improvements to BP's corporate safety oversight, corporate safety culture, and corporate and site safety management systems.

The Panel Report (Report) issued on January 16, 2007, contained ten Recommendations to BP which, the Panel believed, "if implemented and sustained… can significantly improve BP's process safety performance." The Recommendations were "designed to ensure that measures taken will sustain improvement…" Some of the Recommendations were made specifically to BP's Board and Executive Management, others to Refining leadership, and some to BP's five U.S. refineries. The Recommendations from the Report are reproduced in Appendix I.

In Recommendation #9, the Panel proposed that BP should "for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Recommendations (including the related commentary)." This individual, designated as the Independent Expert or IE), was engaged by BP on May 1, 2007. The roles and responsibilities of the IE are described further in section V of this report.

## IV. BP'S RESPONSE TO THE PANEL RECOMMENDATIONS

In January 2007, BP committed to fully implementing the Recommendations at the five U.S. refineries, with the goal of transforming itself into a recognized industry leader in process safety management. This report focuses on the activities related to implementing the Recommendations at the five U.S. refineries and on related activities within the management chain supporting and providing oversight of the five refineries.

Following the Texas City incident in March 2005, BP began a comprehensive review of its approach to safety and operational integrity. BP implemented a number of high-level changes in response, some of which pre-dated the Panel's January 2007 Report. These actions were consistent with the Panel's eventual Recommendations, and were intended to achieve early risk reductions and to enable system-wide continuous improvement in the longer term. BP's response to the Recommendations is occurring primarily at four levels within the Group, as discussed below.

<u>Board Level Activities:</u> The Ethics and Environment Assurance Committee was renamed in 3Q 2006 as the SEEAC to emphasize its monitoring role in safety matters. The Group Chief Executive (GCE) now attends SEEAC meetings, and he routinely leads the discussion on safety performance, including process safety. This change demonstrates to the Board, management,

CONFIDENTIAL

BP-HZN-2179MDL04438874

and staff the GCE's focus on, and commitment to, safety.  As discussed further in Section VII, the Board monitors the implementation of the Recommendations primarily through the SEEAC.

Group Level Activities:   Actions at the Group level prior to the Report included:

- Formation of the Safety & Operations (S&O) function (May 2005).   The key role of S&O is to improve BP's approach to safety and operational excellence at the Group level by helping to standardize efforts in these critical areas.  The S&O agenda was designed to build upon the efforts already underway, such as the development and implementation of the Integrity Management (IM) and Control of Work (CoW) standards.

- Announcement of the 6-Point plan defining early response priorities (July 2006).   This initiative addresses the following emphasis areas:
  - Completing the commitments relating to temporary buildings and blow down stacks in heavier than air light hydrocarbon service
  - Conducting Major Accident Risk assessments, and taking appropriate action based upon the results
  - Implementing the CoW and IM Group Standards
  - Ensuring complete compliance with laws and regulations relevant to operations
  - Rapidly closing out findings from past audits
  - Ensuring the competence of teams in matters of safety and operations

- Creation of the Group Operations Risk Committee (GORC) to provide senior executive oversight of the new risk reduction initiatives (October 2006).  The GORC conducts monthly reviews of incidents, examines in detail the progress of safety-related activities, and identifies areas where additional focus or effort may be required.  The GORC's review is part of an ongoing process to ensure, among other things, that Group activities and initiatives address the Recommendations.  Emphasis is placed on ensuring that Group-initiated activities do not overload the businesses with new requirements and/or inadvertently detract from managing higher-priority local risks.

- Initiation of the quarterly HSE and Operations Integrity Report ("Orange Book") as an enhanced method for tracking safety performance (4Q 2006) for Group leadership.   The Orange Book captures refinery site-specific data on safety performance and management system implementation.

In late 2006, BP began designing a new Operating Management System (OMS) focusing on achieving consistent, efficient implementation of operating processes and systems across the Group. OMS is central to BP's process safety management improvement plan.  It builds upon BP's safety management system for "getting HSE right" (gHSEr) and embeds elements of the 6-Point Plan (e.g., the IM and CoW standards) and other improvement initiatives into the BP culture.   Working within the framework of OMS, BP has sought to respond to the Panel's Recommendations by initiating carefully considered and targeted actions for improvement on a risk-prioritized basis.

The OMS framework provides a set of Group Essentials (minimum requirements) and a systematic way to continuously improve local business processes to deliver these essentials using

- 4 -

BP-HZN-2179MDL04438875

a performance improvement cycle.  Each refinery must create a local OMS (LOMS) using the OMS framework to translate BP requirements, relevant legal obligations, and business needs into practical plans to help continuously reduce risk and to support sustainable improving performance.

The Group Essentials were issued in July 2007 for application at those sites selected for early implementation of OMS.  These "Wave 1" sites included all five U.S. refineries. The Group Essentials address many, and in some instances go beyond, the Panel's process safety management recommendations made to BP's U.S. Refining business. They cover diverse aspects of operating activity, including legal compliance, process and environmental safety, and basic operating practices.

U.S. Refining (USR) Level Activities:  To achieve the desired standardization of efforts, USR has elected to develop an integrated strategic implementation plan (SIP).  The USR SIP is the overarching mechanism by which Refining will implement, within the OMS framework, (1) the Recommendations that apply to USR and (2) other needed process safety improvements.  Some activities in the USR SIP are to be accomplished above the refinery level and others (i.e., the "site-impacting" activities) have been cascaded downward for implementation at the five U.S. refineries.  Activities in the USR SIP were mapped to the OMS elements and sub-elements to ensure consistency with the OMS framework.

The USR SIP describes a multi-year program intended to achieve highest priority risk reductions in the early years, followed by continuing improvements in the later years. To this end, the SIP uses a "Catalyst, Build, Sustain" model.  "Catalyst" activities are activities that quickly mitigate risk, initiate change, or lay a foundation for subsequent improvements.  "Build" activities, which follow the "Catalyst" activities, focus on improvements requiring significant development, such as process improvements, practice definition, organizational alignment, or culture change.  Subsequent "Sustain" activities support continuous improvement and establish ongoing structures and processes; i.e., they are intended to embed new actions and behaviors within the organization in a sustainable manner.

USR Business Unit (i.e., Refinery) Level Activities:   Each USR BU was required to use the USR SIP as a template for creating a BU-specific SIP for local implementation of the Panel Recommendations and other improvements.  The stated philosophy behind the development of the SIPs is to give first priority to routine, day-to-day (base) activities related to safe operation and maintenance.  The BU SIPs thus focus on activities that go beyond base activities and include those activities that are directly intended to help implement the Recommendations (which cascade down from the USR SIP) along with other locally identified safety-related activities.  Such local activities might include those arising from incident investigation reports, past audits, process hazard analyses (PHAs), management of change (MOC) reviews, recommendations arising from plant and equipment inspections, and gaps identified during implementation of process safety related standards and practices.  Monitoring of implementation progress associated with these additional local activities is not within the IE's scope of work.

Implementation timelines for Catalyst activities associated with the Recommendations were mandated by the Global Refining Leadership (GRL), and accountability for implementation now

CONFIDENTIAL

rests with USR management. The significant number of additional local activities necessitated that BP develop and implement a consistent risk assessment/prioritization process to establish implementation timelines for those local items. This process was used at each of the five U.S. refineries, considering all relevant human resource constraints. Activities were then scheduled to ensure that highest risk items are addressed first.

## V.   THE INDEPENDENT EXPERT'S ROLES AND RESPONSIBILITIES

The Role of the IE

The IE is accountable to the Board for providing an objective and independent assessment of BP's progress in implementing the Recommendations. The IE reports to the SEEAC which, on behalf of the Board, oversees the IE's work and reviews the IE's assessments and reports. The scope of the IE's efforts is limited to BP activities addressing the Recommendations.

The IE is required to follow specific processes developed by the Board for ensuring the independence of the IE and any experts engaged by IE. While maintaining this independence, the IE and any experts seek to operate in a transparent manner through frequent interactions with BP representatives at all levels of the organization.

The Team Supporting the IE

The IE is authorized to engage advisors who are knowledgeable of the various elements of process safety covered by the Panel Recommendations. In November 2007, the IE retained two consultants who have significant process safety management expertise and experience (W. L. Frank, P.E. and J. L. McCavit). Both consultants worked in support of the Panel during its review. This small team, comprised of the IE and the two consultants (i.e., the IE Team), serves as the nucleus of the assessment effort. Additional consultants, subject matter experts (SMEs), and support staff may be retained by the IE on an as-needed basis.

The IE Work Plan

The IE was required to submit a work plan to the SEEAC to describe how the IE would assess BP's progress in implementing the Recommendations. This Work Plan was submitted to the SEEAC, which endorsed the plan in late January 2008.

The Work Plan serves as a guidance document that describes the activities of the IE Team. It identifies general avenues of inquiry and defines some of the basic questions that the IE Team seeks to answer in monitoring BP's progress in implementing the Recommendations. The Work Plan addresses the IE's three principal work activities:

1.  ***Evaluation of BP's Plans for Addressing the Recommendations.*** The IE Team must understand BP's plans to implement the Recommendations and, where appropriate, provide commentary on those plans. To do so, the IE Team has focused on, and will continue to assess, the significant activities that BP deems necessary to fully implement the

- 6 -

BP-HZN-2179MDL04438877

Recommendations.   (For example:  Are the identified activities sufficient?   Are other activities required?   Have all Recommendations been addressed?)

2. ***Monitoring of BP's Progress in Implementing the Recommendations***.  The IE Team has begun monitoring BP's implementation of the activities required to fully address the Recommendations.   This requires broad monitoring of progress and status, schedule compliance, and results for all activities.  The IE Team relies heavily on BP's reports and systems for information related to BP's implementation progress.   Verification through selective sampling will be utilized to validate the status and progress reported by BP.  Selective, in-depth monitoring, evaluation, and confirmation will be conducted for certain key activities as determined by the IE.  In addition, the IE Team is evaluating the adequacy of the SIP governance process.  This governance process addresses monitoring and reporting of progress and status, management of changes and updates to implementation plans, validation of activity completion and closure, etc.

3. ***Reporting on BP's Implementation Progress***.  Key observations and conclusions are shared with BP in real time.  In addition, the IE makes periodic informal reports to the SEEAC, and/or the Board as requested.   To preserve independence, the IE and SEEAC have developed confidential lines of communication including private sessions as appropriate.  The IE will issue formal progress reports to the SEEAC annually and this is the first such report.

<u>IE/IE Team Activities during the Reporting Period</u>.

Since assuming responsibilities on May 1, 2007, the IE has necessarily focused on gaining familiarity with the BP organization and systems, understanding BP's intent regarding the Panel's Recommendations, and structuring and planning the SIP evaluation and monitoring efforts.  During this process, BP has been extremely transparent and cooperative in terms of providing requested documents and materials for review and making personnel available for discussion.  Key milestones/accomplishments for this period include:

- Familiarization with the roles and responsibilities of the SEEAC, GORC, S&O organization, and various individuals and groups who provide process safety support to the five U.S. refineries

- Attendance at each SEEAC meeting since assuming the role of IE on May 1, 2007, to provide observations and perspectives regarding BP's efforts toward implementation of the Recommendations

- Attendance at GORC meetings to provide feedback on implementation activities and to observe GORC processes and procedures

- Attending, as an observer, selected sessions of the Operations Academy at MIT

- Observing selected elements of the S&O Control of Work audit at the Texas City Refinery and the full S&O Audit at the Whiting Refinery

- Becoming familiar with BP's various process safety related standards, practices, processes and systems

- Reviewing BP reports and metrics related to process safety performance

CONFIDENTIAL

- Review of the communication process for the results of the Panel's process safety culture survey and involvement in the planning for the follow-up survey

- Retention of two staff consultants in November 2007

- Preparation of the IE Work Plan and presentation of the Work Plan to the SEEAC for endorsement and approval

- Review of the draft and final SIPs in January through March 2008 (see Section VI, below)

- Initial visits by the IE Team to all five refineries to gain familiarity with the BU SIPs and to initiate monitoring of progress toward implementation of the Recommendations

Detailed monitoring of Refining's progress in implementing the Recommendations was delayed due to late delivery of the finalized SIPs (as discussed in Section VI, below). However, monitoring is now in progress and will accelerate over the next few months.


## VI.  SIP DEVELOPMENT AND IE TEAM REVIEW

As noted previously, activities identified by BP Refining as being required for implementation of the Recommendations are defined in the USR and BU SIPs. BP Refining has devoted considerable effort to the development of the SIPS, beginning in 2Q 2007 and concluding with the release of BP-approved SIPs in late March 2008.

The Evolution of the SIP

An initial draft of the USR SIP (then known as the "SPU SIP") prepared by the GRL was issued for peer review in June 2007, and the IE participated in that review; however, much work remained to be completed at that time. Additional elements of the USR SIP and key elements of the BU SIPs were available for IE review in October 2007.

Completed versions of the USR and BU SIPs (now referred to as $SIP_0$) were provided to the IE in late December 2007 after internal peer review and approval. A subsequent, detailed review of the SIPs by the IE Team identified significant issues. Some examples of issues identified include the following:

- Inconsistencies and undue complexity in the "Catalyst, Build, Sustain" sequence for some series of activities.

- Numerous Catalyst activities with delayed start dates (2009 and beyond) which appeared inconsistent with the stated objective of the Catalyst activities.

- Implementation dates for many activities were inconsistent with activities already underway or planned at the sites.

- Inconsistencies in the scheduled dates for similar activities at the various refineries (e.g., the completion dates for some activities appeared to be inordinately later for some refineries when compared to the peer refineries).

- 8 -

BP-HZN-2179MDL04438879

The IE discussed these issues with BP's executive management and the SEEAC, after which BP management determined the need to substantively revise and re-issue the SIPs.

The Revised SIPs (SIP$_1$)

BP Refining made significant revisions to the USR and U.S. BU SIPs and provided the revised and approved SIPs to the IE on March 21, 2008 (SIP$_1$). The USR SIP, which serves as the basis for the U.S. BU SIPs, was reviewed in detail with the Refining OMS SIP Team on March 24-25. The U.S. BU SIPs were subsequently discussed with refinery staff during visits to all five refineries during the period March 26 through April 14. These preliminary reviews by the IE Team indicated that the SIPs had been markedly simplified, were better organized, and addressed the issues identified by the IE in the review of SIP$_0$.

Significant in the revision of the SIPs was the reconciliation of the schedule dates for the site-impacting activities. Through detailed discussions between the Refining OMS SIP Team, GRL members, and refinery personnel, Refining established a consistent set of mandatory deadlines for these activities. While the foundation for these deadlines was based, in part, on prior risk ranking activities, the schedules for these activities are now firmly and uniformly established across all of the refineries and will only be modified through a formal management of change (MOC) process described in the BP SIP governance document.

The SIP development process has placed special emphasis on defining 2008 activities in detail. Similar definition of activities for 2009 will occur in conjunction with the 2009 planning process. All additions, deletions, and modifications to SIP activities, as well as closure of completed activities, will be administered under the formalized MOC process.

The SIPs are intended to be evergreen documents that will evolve as part of the performance improvement cycle and as BP gains additional insight into the implementation of the Recommendations. The IE Team's review of the SIP$_1$ was completed on April 16-17. During this review SIP activities were mapped to the Recommendations to confirm that all Recommendations were being addressed by SIP activities. As a result of this review it was determined that some relatively minor gaps exist. The IE Team currently regards the SIPs to be sufficiently well developed and internally consistent to support implementation without further substantive revisions. The gaps that were identified will be addressed, either via the MOC process for 2008 activities or, for later year activities, by incorporation into the next update of the SIPs.

## VII. EVALUATION OF BP's PROGRESS TO DATE IN IMPLEMENTING THE RECOMMENDATIONS

Previous sections of this Annual Report described background information and activities related to the Panel's Recommendations and BP's plan for addressing them. This section describes some of the more significant areas of progress perceived by the IE Team to have been made to date in implementing the Recommendations. This section is not intended to be a comprehensive list of all process-safety related activities undertaken or progress made by BP in implementing

CONFIDENTIAL

the Recommendations.  Likewise, this section may not identify all the areas requiring more focused attention.

It should be noted that some activities described below support the implementation of more than one Panel Recommendation.  However, for simplicity of presentation, each activity is listed under the Recommendation that it most closely, or most significantly, addresses.

For each of the ten Recommendations, this section of the report provides the exact wording of the main recommendation (refer to Appendix I for the Recommendations and related commentary).  A summary of the IE Team's perception of the current state of BP's progress in satisfying the recommendation is next, followed by descriptions of the activities that have been reported, or observed, to have been completed during this first year of the IE's engagement.

The following information is based largely upon progress reports provided by BP, meetings with BP personnel, and visits to all five refineries.  While verification through selective sampling and selective, in-depth monitoring, evaluation, and confirmation has occurred for some activities, it was not as comprehensive as described in the IE's Work Plan.  Following delivery and review of the SIPs as described above, the IE Team now has the information required to conduct a more extensive verification and review in the future.

## Recommendation #1 – Process Safety Leadership

**The Board of Directors of BP p.l.c, BP's executive management (including its Group Chief Executive), and other members of BP's corporate management must provide effective leadership on and establish appropriate goals for process safety. Those individuals must demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.**

## Progress Summary

*Following the Texas City incident, BP initiated a comprehensive review of its approach to safety and operational integrity. Upon receipt of the Panel's Report, BP committed to fully implementing the Recommendations at its five U.S. refineries.  A number of high-level changes have been made or are underway in response. Messages at all levels have been strengthened to make it clear that delivering safe and reliable operations, including process safety, is BP's first priority.*

*The Board of Directors is providing strong support for management's efforts to improve process safety performance and has taken several steps to reinforce its role with respect to monitoring safety matters. The Board's monitoring committee charged with oversight of HSE matters has increased its focus on process safety. Each meeting includes a report on operations risk and a review of process safety performance, and specific process safety incidents are reviewed in detail. To emphasize its monitoring role with respect to safety, the committee was renamed the Safety, Ethics and Environment Assurance Committee (SEEAC) in late 2006. Further, members of SEEAC and other Board Members have visited three BP refineries during the past year. These visits have created additional visibility with respect to the Board's focus on process safety.*

CONFIDENTIAL

BP-HZN-2179MDL04438881

*BP's executive leadership has sought to modify the organization above the refinery level to make it more responsive to the needs of the refining line organization. Executive leadership has asserted a more frequent presence at the refineries, and has cascaded expectations down to the refineries that local leadership will be more evident "in the field." The intended increased contact between site leadership and employees is occurring.*

*The executive team's commitment to the S&O agenda is reflected in a number of visible leadership actions that have built a strong foundation upon which to enhance the safety culture of the company.*

Activities Reported or Observed

The Board of Directors has taken a number of steps to demonstrate strong support for management's efforts to improve process safety performance and reinforce its role with respect to monitoring safety matters. The Board's monitoring committee charged with oversight of HSE matters has increased its focus on process safety. Each meeting includes a report on operations risk and a review of process safety performance, and specific process safety incidents are reviewed in detail. To emphasize its monitoring role with respect to safety, the committee was renamed the Safety, Ethics and Environment Assurance Committee (SEEAC) in late 2006.

*"Tone at the Top"* – The priorities of BP's Executive Management – as repeatedly communicated within the organization, to investors, and to the media – are Safety, People, and Performance, in that order. This message stresses a view of safety and operations that is more balanced on the importance of both personal and process safety, than that communicated in the past. The message is shared within the organization via written communications to all employees, town hall meetings, and site visits. A significant change from past practices is that communications now often go directly to First Level Leaders (front line supervisors and above), and in many cases, to all employees. In the past, communications were more typically sent to Group Leaders with the expectation that Group Leaders would cascade them to their teams.

*Executive Focus* – All members of the executive team who are responsible for operations, including the segment chief executives of Exploration & Production and Refining & Marketing, are members of the GORC. The group vice president (GVP) for S&O is also a member. The GORC, which meets monthly, has been chaired by the GCE since August 2007. The GORC actively reviews actions taken that are related to or supportive of process safety, approves enhancements to BP's agenda for safety and operations, and makes executive interventions where appropriate.

*Executive Oversight* – The GORC monitors BP's safety and operations performance, and reports its findings to the BP Board, both directly and via the SEEAC. This monitoring includes regular 6-Point Plan and Orange Book reviews and a regular review of incidents.

*"The Forward Agenda: Changing Behaviors"* – In October 2007, the GCE announced a number of changes designed to simplify the BP organization, improve productivity, enable consistent execution, and focus on performance. Central to this message was the communication of key behaviors expected of all leaders within BP. These behaviors are intended to support effective process safety leadership and focus on listening (particularly to the

- 11 -

BP-HZN-2179MDL04438882

front line), accountability, standardization, "silent running" (delivering superior operational performance through stable and high reliability/availability operations), and finishing what is started. BP regards these behaviors to be critical to its agenda for safety and operations, forming the basis for how people are assessed and rewarded.

*Visible leadership* – BP has placed significant emphasis on enhancing executive leadership visibility at the refineries. For example, the GCE visited four of the U.S. refineries in the month preceding and the three months subsequent to his appointment. The segment chief executive of Refining and Marketing (R&M) visited all U.S. refineries (including Texas City three times and Whiting twice) in the first 7 months after assuming responsibility for R&M.

Members of the SEEAC, and other Board members, have visited the BP refineries at Gelsenkirchen, Texas City and Rotterdam. These visits have created additional visibility in the BP organization of the Board's focus on refining safety.

GRL leaders have also been more present at the U.S. refineries throughout 2007 and 2008. A significant feature of such visits is the increased time spent by the leaders in the field listening to employees about process safety issues. In this period, the Group VP of Refining made 11 visits, the Refining Regional VP made a total of 26 visits to the 5 US refineries. The EVP Refining visited all US refineries in March and April, 2008.

U.S. BULs have emphasized regular and substantive "time in the field" activities and have made this a formal expectation of their refinery leadership teams (LTs). As a 'Catalyst' activity, each of the U.S. refineries is required to demonstrate how their LTs are spending regular, frequent and meaningful time in the field. Each refinery has formalized a program setting aside a portion of each morning as a meeting-free period to allow LT members the time to make these field visits.

Additional resources were provided to achieve process safety goals. In response to unique needs at the Whiting and Toledo refineries, nineteen engineers, technical network leaders, technical advisors, and process specialists from the Refining Technology group were assigned to the refineries for eight months during 2007. This temporary staff supported efforts for closure of action items and provided project support, coaching, and mentoring to site workers. A parallel initiative, the Process Safety Work Stream (PSWS – a program of contractor staff augmentation to support process safety initiatives), is active at four of the five refineries.

### Recommendation #2 – Integrated And Comprehensive Process Safety Management System

**BP should establish and implement an integrated and comprehensive management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.**

### Progress Summary

*BP has made progress towards development and implementation of a comprehensive OMS that provides the framework for addressing the majority of the Recommendations and sub-Recommendations, included in Recommendation No. 2. Implementation activities are beginning in the U.S. refineries.*

CONFIDENTIAL

*In addition to the progress noted for OMS, other significant IE Team observations for Refining include:*

- *Over 1,000 overdue action items have been closed since the Panel's Report.*

- *The refineries have made progress in addressing some of the higher risk, long-term issues such as (1) SIS development and implementation, (2) area electrical classification, and (3) relocation of occupied portable buildings from vapor cloud explosion hazard zones.*

- *Preliminary reviews of progress made at the five refineries have indicated varying degrees of progress on certain initiatives, such as replacement of occupied permanent buildings (e.g., satellite control rooms) with blast-resistant structures.*

- *The five U.S. refineries could benefit from a common action tracking system for the five refineries, noting that many refineries are devoting resources to maintain or improve legacy systems that may not support future needs for timely aggregation and reporting of data to executive leadership.*

- *Despite a revised, more restrictive, overtime policy developed in conjunction with the United Steel Workers, overtime hours remain high. These high overtime rates could compromise the performance of plant personnel and should be addressed.*

Activities Reported or Observed

Implementation of a new OMS is the key mechanism by which Refining will provide integrated and comprehensive management systems that systematically and continuously identify, reduce, and manage process safety risks at its U.S. refineries.

Although not a panel recommendation, a significant achievement in the area of risk reduction has been the removal from service of all blow down stacks for Heavier Than Air Light Hydrocarbons (HTALHC). No BP U.S. refinery currently has a HTALHC blow down system in service. A number of modifications to relief systems have been made across U.S. Refining; for example, Texas City has installed three new permanent flares and one temporary flare to facilitate the elimination of HTALHC blow-down stacks.

Refining is collaborating with S&O in the update of seven Engineering Technical Practices (ETPs) that have been specified for mandatory application across the Group (i.e., they have been designated as Group Defined Practices or GDPs).

In addition, S&O has issued three operating practices that have been classified as GDPs. These three operating GDPs are:

- Assessment, prioritization and management of risk;
- Incident Investigation, and
- Reporting of HSSE and operational incidents.

The ten GDPs described above (seven engineering and three operations), along with the Group Essentials, which incorporate the Group Standards, are mandated across the Group.

- 13 -

CONFIDENTIAL

In addition to the ten GDPs, Refining has identified three additional topics for which Refining ETPs will be developed. These Refining ETPs will be used to assess gaps at the U.S Sites, and implementation plans to close these gaps will be developed by the end of 2009.  These topics are:

- Relief Systems (and specifically Relief Valves)
- Occupied Portable Buildings and Permanent Buildings
- Area Electrical Classification (U.S. only)

PSWS staff has assisted BP in improving process safety processes, practices, and procedures.

Additional outside resources remain at four of the five U.S. refineries to assist with closure of action items, with over 1,000 overdue items closed to date.

Overdue S&O audit action items and overdue inspections are reported to Refining Line Management on a monthly basis and to BP Group via the Orange Book on a quarterly basis.

Reports to refining line management on open action items should be expanded to include all the items listed in the Recommendations.  That list includes action items arising from:

- process safety compliance audits or other process safety reviews and assessments,
- gaps identified during implementation of process safety related standards and practices, including BP's 2006 Group Integrity Management Standard and engineering technical practices,
- process hazard analyses,
- near misses, high potential incidents, and other incident investigations,
- management of change reviews, and
- inspections of plant and equipment.

The Refining Engineering Authority (EA) and U.S. site EAs and electrical engineers collaboratively developed a new Refining ETP (issued in early April 2008) for Area Electrical Classification (AEC) in line with the API 500 industry standard.  Because refinery representatives were familiar with the content of draft versions of the standard, several refineries have made significant progress in updating their AEC drawings, implementing facility upgrades, and making repairs consistent with the content of the drafts.

Refining appointed an Investigation and Learning Support Leader in January 2008. This Leader's role is to assist the refineries with (1) developing local capabilities for incident investigations, (2) providing specific training on Root Cause Analysis (RCA), (3) coaching on the implementation of the new GDPs for incident reporting and investigation, and (4) helping ensure that learnings are captured and embedded throughout the organization.

The GRL has assumed direct oversight of the high-severity incident investigation process and follow-up. On a monthly basis, a sub-group of the GRL team, including the Refining Executive VP/Chief Operating Officer and the Regional Vice-Presidents, reviews major incident reports. The BULs also lead discussions on incident investigations at their refineries on the BULs' regularly scheduled teleconferences.

- 14 -

CONFIDENTIAL

All U.S. refineries have met new requirements for Occupied Portable Buildings (OPB), with only three variances which were approved by the Refining EA. This activity required the modification or relocation of nearly 500 OPBs. A review of all occupied permanent buildings has also been conducted using the Major Accident Risk (MAR) ETP to identify priorities across the refineries. Individual refineries are addressing the options available to mitigate risks associated with certain permanent buildings, by (1) strengthening buildings, (2) reducing the number of personnel located in the buildings, or (3) relocating staff to new buildings that are either remote to process hazards or designed to withstand the pressures anticipated from an explosion. With regard to the third option, several refineries have made significant progress in moving personnel out of older satellite operator buildings into blast resistant operator shelters. However, the pace of progress is not consistent across all five refineries. Some refineries anticipate relocating all personnel out of the older satellite buildings by as early as 4Q 2009, while other refineries have schedules that extend beyond this.

Effective August 1, 2007, all BP employees (as well as vendors, suppliers and contractors employed on-site by a third party) were subject to new administrative standards on "reasonable hours of work and fatigue" that were developed with the USW as part of the Joint Initiative on Health and Safety.[1] These new standards limit individuals to working (1) nineteen consecutive days, after which a minimum of two days off from work is required and (2) a maximum of either sixteen or eighteen hours in a twenty-four hour period, depending upon the site shift pattern. Exceptions to the standards can be made with approval. Notwithstanding the new standards, personnel can work extensive amounts of overtime and still be in compliance with the new policy, which can lead to fatigue.

The percentages of overtime worked in the past several months by the ten employees at each site with the most overtime were reviewed, and very high overtime rates were observed. The need to implement the Panel Recommendation regarding worker fatigue thus remains. Reducing overtime, which is the most direct way to address this Recommendation, will require agreement with the USW at the USW represented sites.

Four of the five U.S. refineries have been receiving support from the PSWS in revising existing site hazard identification and evaluation processes in line with external best practices, and in conducting LOPA, HAZOP and PHA studies.

The Process Safety Management Review process has been implemented at the U.S. refineries. There is a formal schedule for monthly reviews in 2008, with specific topics and session owners identified. At these reviews, subject matter experts present information about the effectiveness of specific process safety systems for review by the LT. The LT members are the key participants in these meetings.

All of the refineries are actively addressing their need for safety instrumented systems. Safety integrity levels (SILs) are being defined for instrumented protective systems (IPSs), and management systems are being developed. Based on reviews at each of the refineries, significant progress is being made; however, much remains to be done on this long-term project.

---

[1] This agreement between BP and the USW is sometimes referred to as the 10-plant plan.

CONFIDENTIAL

**Recommendation #3 – Process Safety Knowledge And Expertise**

**BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of process safety knowledge and expertise.**

**Progress Summary**

*Good progress has been made in defining and implementing process safety-relevant training programs for most levels of the organization, with further programs under development.*

Activities Reported or Observed

Group-developed training / education programs

BP has targeted three levels of leadership for priority education and training in process safety. Each has a program to address the process safety essentials required at that level. These programs provide specific technical knowledge and skills and also develop management, behavioral, cultural and leadership skills to drive and sustain multi-year progress in process safety.

- The Operator Essentials Program is targeted towards maintenance, operations and safety supervisors and managers responsible for managing front line staff and contractors. This is a comprehensive offering which is still being developed and will be completed in 2008. It covers the behavioral, management and technical elements of process safety.

- The Operations Academy was developed in partnership with MIT, and commenced in July 2007. This program, aimed at senior operational leaders, is devoted to safety and operational issues and the Recommendations of the Independent Panel. Fifteen Refining managers and senior refining executives from U.S. refineries have participated in the program so far.

- The Executive Operations Program is targeted at group vice presidents and executive leaders with accountability for leading multiple operations or large complex sites. The first module is delivered in partnership with MIT. Additional modules are planned; they may be delivered by BP staff or external experts to small groups of executives and will cover specific process safety issues. In addition, last year the group chief executive and his executive team attended the first module of the Operations Academy program.

A 'Process Safety Fundamentals' training program targeted at all discipline engineers, operations supervisors and HSSE professionals has been developed and implemented (or scheduled for implementation later this year) at four of the U.S. refineries (Cherry Point runs a separate, but very similar, process safety fundamentals program). Process Safety Fundamentals helps people understand process hazards, both in operating plants and field operations. The workshop teaches process safety, risk management, and engineering integrity concepts to personnel involved in design, operations, field safety, and maintenance.

Refining-developed training/education programs

As a foundation for a consistent process safety development curriculum, a process safety competency matrix is in development for all job families defining required process safety

- 16 -

BP-HZN-2179MDL04438887

competency levels.  The matrix is being created by the Refining Process Safety team and the Process Safety Community of Practice (PSCoP) with the support of S&O, the USW, and outside consultants.

The Superintendent Program, a training program targeted at mid-level Refining leaders, has been developed to address site-specific team leadership job requirements. There have been three implementations of the program with a total of 30 superintendents and 4 managers taking the training to date (from 3 of the 5 refineries).

Training in Process Hazard Analysis (PHA), including on-the-job training and coaching for specific PHAs, has been provided by outside consultants at two refineries.

The PSCoP has developed a suite of process safety training materials.  The materials include reconstructions of major incidents that have occurred in industry, including footage of interviews with subject matter experts explaining how the events transpired.  Shorter Flash animation packs ("Process Safety Moments") have been regularly used in routine briefings at all five refineries.

### Recommendation #4 – Process Safety Culture

**BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.**

### Progress Summary

*Visible leadership actions are building a strong foundation upon which to enhance BP's safety culture.  Management at each refinery has increased the amount of time spent in the field.  The USW/BP Joint Initiative on Health and Safety is a positive step toward aligning management and worker interests.  Each refinery is implementing a number of programs intended to enhance employee engagement in process safety program development and implementation.  Various employee involvement initiatives addressing numerous process safety issues have been implemented or continued at each of the five refineries.  Surveys are being conducted to assess progress in strengthening the BP safety culture.*

Activities Reported or Observed

U.S. refineries that are represented by the USW have endorsed the USW/BP Joint Initiative on Health and Safety, which identifies areas of opportunity and mutual interest in support of process and personal safety.  Areas of agreement include teamwork, education, staffing levels, limitations on consecutive days of work, and the establishment of joint process safety committees.  This type of collaboration between management and the workforce is already a well-established feature of the organizational culture at non-union Cherry Point.

Each refinery shared the learnings from the 2006 Process Safety Culture Survey with the workforce during June and July 2007. This was typically done in relatively small groups that allowed for interactive dialogue, to further promote open communications and demonstrate management responsiveness to employee feedback.  In accordance with Panel Recommendation No. 4, a follow-up Process Safety Culture Survey to measure the effectiveness of BP's effort to improve process safety culture was developed and is currently being conducted.

- 17 -

Various employee involvement initiatives have been implemented or continued at each of the five refineries. These initiatives address diverse issues such as individual hazard identification and evaluation, near-miss reporting, and employee authority and responsibility to stop work if the employee believes that it would be unsafe to continue.

Refinery leadership participation in the Process Safety Management Review process is providing an opportunity to influence the organization's perception of the importance of process safety, management's commitment to successful process safety implementation, and clear performance expectations. In addition, at represented refineries, each of the Management Review teams includes the local USW chairman to ensure that workforce interests are represented.

Refinery Process Safety Committees are active at each of the refineries, providing specific focus on process safety performance issues.

At the Group level, other surveys have been used to help determine progress being made to embed desired changes into the organization. They include:

- "Pulse Surveys" were administered in October 2007 and in January 2008, and are planned on a quarterly basis going forward. The survey is administered by an external agency via telephone interviews for senior managers and online for a sample of first level leaders. Each interview comprised 29 questions covering communication, engagement, awareness and understanding, confidence, trust and commitment. The results of the October 2007 survey were reviewed and discussed by the GORC in January 2008.

- Every two years, BP conducts a group-wide People Assurance Survey (PAS). The survey provides important information on trends in employee morale. The PAS was recently modified to include eight additional safety-related questions. These new questions, along with four questions that were already in place, allow BP to calculate a specially designed "safety index." The PAS allows BP to evaluate a broad cross-section of areas that may require further attention, while the safety index enables a closer look from a safety perspective.

**Recommendation #5 – Clearly Defined Expectations And Accountability For Process Safety**

**BP should clearly define expectations and strengthen accountability for process safety performance at all levels in executive management and in the refining managerial and supervisory reporting line.**

**Progress Summary**

*BP has made substantial progress in integrating expectations and accountability for process safety performance into performance contracts and Variable Pay Plans (VPPs). The degree of successful implementation of the Refining SIPs is explicitly integrated into the 2008 VPPs.*

- 18 -

BP-HZN-2179MDL04438889

Activities Reported or Observed

The Board Remuneration Committee (RemCo) has included safety performance in determining rewards for the executive directors.  The current Group performance contract includes two safety and operations measures:

- ▪ Satisfactory and improving results on key metrics (Orange Book)
- ▪ Good progress on addressing the Recommendations and advancing OMS plans.

RemCo also consults with the SEEAC chairman each year in making its quantitative and qualitative assessment of performance in non-financial areas.

Accountabilities of the GCE, including those for HSE, are clearly defined in the Board's Governance Principles.  These include an explicit requirement that the GCE will not engage in, cause, or permit any practice, activity, or decision to be taken without considering its health, safety, and environmental consequences.  These principles have been reviewed by the Board and have been made publicly available on BP's web site.

The individual performance and reward processes across BP were modified for the 2008 performance year, materially changing variable reward structures for all employees, both in the amount of variable incentive opportunity and the method by which the incentive payments will be determined.

Process safety goals have been included in the performance contracts of the Regional Vice Presidents, BULs and their LTs, and these include metrics related to overtime.

The VPPs for Refining include process safety metrics under the theme "Delivering Progress in Safe Operations and OMS."  This theme accounts for 25% of the total available payout.  The metrics under Delivering Progress in Safe Operations and OMS are:

- ▪ Recordable Injury Frequency (RIF)
- ▪ Total Spills (>1 bbl)
- ▪ Uncontrolled Releases
- ▪ Overdue Inspections (% overdue inspections and number of overdue inspection recommendations)
- ▪ OMS SIPs (% complete versus plan and % complete on time)

The significant changes to the VPPs for 2008 are designed to allow greater differentiation of rewards based upon actual performance.

**Recommendation #6 – Support For Line Management**

**BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.**

- 19 -

BP-HZN-2179MDL04438890

**Progress Summary**

*The reorganization announced by the GCE in October 2007 has had an impact on process safety support within Refining by reducing the number of interfaces, clarifying the roles of those working within the line organization, and placing resources at the right level.*

*There have also been a number of organizational changes within Refining designed to increase process safety support for the U.S. Refining line organization, but, in order for that support to be more effective, additional clarity around the roles and responsibilities of process safety support staff outside the U.S. refineries is needed.*

*Reorganization of the process safety support structure above the refinery level has occurred, although the appointment of the Refining Global Head of Process Safety took more than a year, and the roles and responsibilities of the team are yet to be fully defined.*

*BP has recruited several additional personnel in process safety leadership and support roles.*

*Considerable work has been done to describe process safety responsibilities and accountabilities for existing personnel in the line organization and in functional groups that support process safety, but there is no consolidated document that describes those roles and the coordination between those groups.*

Activities Observed or Reported

The October 2007 reorganization was designed to accomplish the following:

- **Reduce interfaces:** The Projects and Engineering groups were merged into Group S&O so that all technical functions necessary to support the line are in one organization. Further, the S&O organization for North America was merged with the group function to reduce interfaces.

- **Place resources at the right level:** A key principle of reducing complexity and increasing clarity of accountability is that S&O functional staff is placed first in the SPUs (e.g., the Refining SPU) where the accountability for safe operations lies. Where activity should be consolidated above the SPU level, such as specific technical expertise, it is consolidated at the Group level, as discussed below. If there is a justifiable business case, limited high-quality resources will be put in place at the R&M segment level to support the SPUs and the segment chief executive in his performance assurance role.

- **Clarify Group S&O role:** The role of the S&O function at the Group level is to work with the segments to build technical capability, enhance safety culture, and strengthen processes to help the line organization deliver safe and reliable operations. For example, S&O staff at the Group level has responsibility for Group level policy and standards, and for implementing an independent audit function.

The Refining Global Head of Process Safety has only recently been appointed and assumed his duties. Consistent with the Panel Recommendation, this individual sits within the Refining SPU and has a dotted line to the Group Vice President for Safety & Operations; he also sits on the leadership team for the RVP-U.S. Region. This structure provides a pathway that allows issues to be raised, when necessary, directly with the GVP for S & O. The Refining Global Head of

- 20 -

CONFIDENTIAL

BP-HZN-2179MDL04438891

Process Safety is currently developing a plan to define the roles, responsibilities and accountabilities for specific members of his Process Safety team and the interaction with the process safety leads at the 5 U.S. refineries.

Since the March 2005 incident at Texas City there has been focus on recruiting across the group to support operations and to strengthen capability. To support the various Group level programs, a number of senior S&O roles have been created and filled with external recruits.

Each refinery has appointed an IM SPA and an Engineering Authority (EA). New 'Heads of Discipline' roles have been created at the SPU level. The Heads of Discipline have technical knowledge of a specific discipline, including experience in a refinery or similar facility, and are empowered to set direction and provide leadership and a consistent approach across the SPU. Advisors and/or Technical Authorities also provide day-to-day support to the refineries in their specific areas of discipline.

## Recommendation #7 – Leading And Lagging Performance Indicators For Process Safety

**BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries by BP's refining line management, executive management (including the Group Chief Executive), and Board of Directors. In addition, BP should work with the U.S. Chemical Safety and Hazard Investigation Board and with industry, labor organizations, other governmental agencies, and other organizations to develop a consensus set of leading and lagging indicators for process safety performance for use in the refining and chemicals industries.**

## Progress Summary

*A suite of leading and lagging indicators has been developed, and there is increased reporting to, and monitoring of, process safety performance data at all levels of senior management including the GORC and Board levels. BP intends to further develop/refine the metrics that are monitored, including adoption of the new consensus lagging process safety incident index developed by CCPS/API. BP has also adopted a modified version of the CCPS consensus lagging safety incident severity index. There is a significant lag between the end of a quarter and the quarterly publication of the Orange Book, which may limit the utility of this important information.*

## Activities Reported or Observed

As noted previously, the Orange Book, established in 1Q 2007, captures HSE and operations performance data at the Group, Segment, and site level. It provides a mechanism for reporting data on safety, integrity management, BP 6-Point Plan implementation status, and standards implementation progress. This information is provided to executive management and the SEEAC. A new GDP, "Reporting of HSSE and Operational Incidents," was issued for Group implementation effective February 18, 2008. As a result of this new practice, data on fires, explosions and hazardous releases will now be included in the Orange book beginning 1Q 2008. Refining has been compiling data on fires, explosions and hazardous releases since the beginning of 2007. The SPU HSSE team also manages a SharePoint site where this information is

- 21 -

BP-HZN-2179MDL04438892

consolidated for all refineries.

Audit action items have been tracked from 4Q 2006. Overdue inspections and tests were captured from 1Q 2007, and total inspections and percent overdue YTD, reported from 3Q 2007. These indicators are reported monthly within Refining and quarterly in the Orange Book.

Refining leadership began tracking a "Process Incident Index" (PII) in 1Q 2007. Refining is working with the Group to develop this further. Starting in 2008 BP will use the CCPS/API process safety incident index and the index will be reported in the Orange Book. In addition BP will begin calculating a modified version of the CCPS consensus lagging process safety incident severity rate. Though the BP severity rate metric is similar to the CCPS metric, modifying the CCPS metric may limit the ability to compare BP results to results from other companies.

In 2007 the GRL began regularly monitoring these and other metrics via the Refining Monthly Performance Management report and GRL HSSE quarterly and annual reviews. These reports provide the refining leadership with additional information, including details and discussion of injuries, incidents, PII, and lessons/learnings. The quarterly and annual reviews include analysis of incidents across the SPU with insights for leadership review.

## Recommendation #8 – Process Safety Auditing

**BP should establish and implement an effective system to audit the process safety performance at its U.S. refineries.**

## Progress Summary

*BP has implemented a comprehensive restructuring of its auditing function, developed new auditing protocols and procedures, and added a highly competent audit staff to implement a well designed auditing program. Included in the program are protocols for closely monitoring and validating audit action item closure. The effectiveness of this program in ensuring process safety program content and implementation will be evaluated when process safety compliance audits in the US are conducted in 2008.*

## Activities Reported or Observed

A group level S&O audit function independent of the line organization has been put in place to provide comprehensive audits and action item verification. This S&O audit capability includes the resources required to satisfy process safety auditing requirements. A team of 60 auditors, addressing all HSSE disciplines (including process safety), had been recruited as of February 2008.

Audit protocols have been developed, addressing existing BP Standards and systems (namely gHSEr, compliance, and process safety management). Audits based on this protocol (excluding PSM) have already been conducted at the Texas City (Control of Work element only), Toledo, and Whiting refineries. At Cherry Point and Texas City, full S&O audits (including a full PSM audit) have been scheduled in 2Q 2008 followed by a full S&O audit (including PSM) at Carson in 3Q 2008.

CONFIDENTIAL

BP-HZN-2179MDL04438893

The Audit team draws on a wide range of internal and external expertise from both within the Refining industry and beyond. Typically, these auditors have over 15 years' experience. The team is also supplemented by subject matter experts from other BP refineries and from central Refining teams (Advisors, CoP Performance Leaders, individuals from the Process Safety organization).

Action items are captured and tracked in a common and consistent Safety & Operations Audit database, with a senior refinery leader assigned to each action item. Audit items not closed out by their due date are reported in the Orange Book. The satisfactory closure of S&O audit actions is verified and tracked by the S&O Group.

### Recommendation #9 – Board Monitoring

**BP's Board should monitor the implementation of the Recommendations of the Panel (including the related commentary) and the ongoing process safety performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's Recommendations (including the related commentary). The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.**

### Progress Summary

*In May 2007, BP engaged L. Duane Wilson, a member of the Panel, to serve as Independent Expert to the Board. Additional information on the IE's efforts was provided in Section V. The SEEAC serves as the principal conduit of information to the Board with respect to BP's process safety performance and progress in implementation of the Recommendations. The Board reported BP's progress in addressing process safety matters and implementing the Recommendations in the 2007 Annual Report and Accounts.*

### Activities Reported or Observed

The Board monitors the implementation of the Recommendations primarily through the SEEAC. Each SEEAC agenda includes a report from the Independent Expert on BP's activities related to implementing the Recommendations. In addition, progress on BP's on-going efforts on the safety and operations agenda, including process safety performance, is presented by the GCE and the GVP for S&O. Information communicated to the SEEAC via the Orange Book was summarized under Recommendation 7. In addition, the SEEAC receives regular reports from the GVP of S&O on the activities and findings of the S&O Audit function. The GVP S&O also reports to the Board on safety training and capability.

Duane Wilson, who served as a member of the Independent Safety Review Panel, was engaged in May 2007 as the IE to monitor and report progress to the Board on BP's progress in implementing the Recommendations. The IE has been given full access to BP material, information, and personnel to enable a comprehensive review and to inform his reporting to SEEAC.

The IE has reported to the SEEAC at each of its meetings since his engagement. He has also

CONFIDENTIAL

BP-HZN-2179MDL04438894

participated with the Committee during its review of the GORC report and has had private sessions with the Committee as appropriate.

In addition, each Board meeting addresses safety updates within the Executive Directors' reports and receives a briefing by the SEEAC Chairman on the Committee's work.

The Board has reported to shareholders in its 2007 Annual Report and Accounts on BP's response to process safety issues through the implementation of the Six Point Plan, OMS, and its commitment to adopt the Recommendations. BP will also include a synopsis of the IE's report in the Sustainability Report to be published in May 2008.

## Recommendation #10 – Industry Leader

**BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management.**

## Progress Summary

*BP is striving to become an industry leader in process safety and has begun the journey by promptly acting upon the Recommendations. BP is involved with several industry process safety groups to learn from others and to share their own key learnings. The most important step in becoming an industry leader will be to sustain outstanding process safety performance over an extended period of time.*

### Activities Reported or Observed

BP is devoting considerable effort to the implementation of OMS. If effectively done, OMS implementation will help ensure implementation of Recommendations 1 through 8 and could produce a level of process safety performance that would position BP to become an industry leader in process safety management.

BP is striving to learn best practices from others and is transferring its key learnings across industry as part of its effort to become an industry leader in process safety. BP participates in many industry-wide fora covering a wide variety of geographical and sector issues. It is seeking to achieve alignment among major integrated multinationals in the sector, both through these fora and through membership on a small number of high influence organizations such as the Center for Chemical Process Safety (CCPS) and the American Petroleum Institute (API).

In a meeting BP called with its five industry peers in October 2007, an agreement was reached to share each company's approach on lagging metrics, and particularly on fatalities and major process safety incidents. BP has agreed with its five industry peers to support and promote alignment between the CCPS and API to develop additional leading indicators in 2008.

Other examples of BP's external influence include:

- Major contribution to a CCPS publication entitled "Process Safety Leading and Lagging Metrics" (issued in December 2007), which includes contributions from 40 organizations and focuses on a lagging process safety incident metric. The guide also contains preliminary suggestions for leading indicators on mechanical integrity, action items follow-up, management of change, process safety training and competency, and safety culture.

- 24 -

BP-HZN-2179MDL04438895

- In 2007 BP chaired the API committee on process safety lagging metrics. It was agreed that a lagging process safety incident metric covering loss of primary containment (LOPC) resulting in hazardous releases, fires, explosions, injuries or property damage would be developed. API has published this metric and will request reporting on this metric from U.S. refineries in 2008. This work was aligned with CCPS initiatives.

- API/USW and CCPS are, with BP input, producing guidance on leading indicators in 2008. BP will, internally and in parallel, produce aligned guidance for local reporting. This work addresses in principle the Recommendation that BP should work with the CSB to develop metrics, as the CSB recommended that BP work with the API/USW in their final report issued in March 2007. The API & USW work responds to a CSB recommendation to employ a multi-lateral ANSI-based process to develop standards on process safety indicators.


## VIII. CONCLUSION

In summary, BP appears to be making substantial progress in changing culture and addressing needed process safety improvements. BP has stated its intent to become less bureaucratic, reduce complexity, and simplify activities, and continued work in this area will likely help BP in implementing the Recommendations. A significant amount of work remains to be done on the process safety journey. Successful completion of the task will require the continued support and involvement of the Board, executive management, and refinery leadership along with a sustained effort over an extended period of time.

CONFIDENTIAL

BP-HZN-2179MDL04438896

*Blank Page*

CONFIDENTIAL

BP-HZN-2179MDL04438897

# Appendix I

-------------------------------------------------------------------

## PANEL'S RECOMMENDATIONS
## SECTION

### THE REPORT OF
### THE BP U.S. REFINERIES INDEPENDENT SAFETY REVIEW PANEL

### JANUARY 2007

CONFIDENTIAL

*Blank Page*

CONFIDENTIAL

BP-HZN-2179MDL04438899

# VII. PANEL'S RECOMMENDATIONS

The Panel was charged with making recommendations to improve BP's corporate safety culture, corporate oversight of process safety, and process safety management systems. The Panel believes that these recommendations, together with the related commentary below, can help bring about sustainable improvements in process safety performance at all BP U.S. refineries.

The Panel's recommendations are based on findings developed during 2006. Since March 2005, BP has expressed a major commitment to a far better process safety regime, has committed significant resources and personnel to that end, and has undertaken or announced many measures that could impact process safety performance at BP's five U.S. refineries. For a brief listing of the measures that BP has undertaken or announced since March 2005, see "BP Post-Texas City Measures" in Appendix F. In making its findings and recommendations, the Panel is not attempting to deny the beneficial effect on process safety that these measures may have. BP is a large corporation, and the Panel recognizes that it is especially challenging to make dramatic and systemic changes in short time frames. Whether measures already undertaken or announced will be effective, and whether BP will promptly and thoroughly implement the Panel's recommendations, remains to be seen. The ultimate effectiveness and sustainability of BP's intended improvements to its process safety performance can be determined only over time. The Panel believes that BP has much work remaining to improve the process safety performance at its five U.S. refineries. BP should assess its future steps, including actions already planned as of the date of this report, against the Panel's findings and recommendations (and related commentary) contained in this report.

The Panel's recommendations and related commentary contain elements designed to ensure that measures taken will sustain improvement in process safety performance. The Panel believes this emphasis on sustainability is particularly important given BP's failure to fully and comprehensively implement across BP's U.S. refineries the lessons from previous serious accidents, including the process incidents that occurred at BP's facility in Grangemouth, Scotland in 2000. The Panel's recommendations, and the process safety excellence that those recommendations contemplate, should not be abandoned or neglected. They should not become lesser priorities as changes occur in the economic, business, or regulatory climate for the U.S. refining industry; as refinery margins decline from their current high levels; as changes occur at BP, including changes in management; or as mergers and acquisitions take place.

The Panel believes that the investments in BP's refining business and its refining workforce that this report suggests can benefit the company in many ways over time. Such investments should help reduce the economic or opportunity costs associated with a refinery operating at less than full capacity or not operating at all. Other potential benefits of investments in operations and process safety, such as improved workforce morale and increased productivity, may be difficult to measure but are no less important. The Panel believes that as process safety is embedded in all aspects of corporate culture, management systems, and operations relating to BP's U.S. refineries, BP's U.S. refining business will benefit.

The Panel recognizes that the task ahead of BP is significant and will take a concerted and lasting effort. It will not be easy, especially as time passes and the collective recognition of the importance of the task begins to fade. The ultimate effectiveness and sustainability of many measures intended to improve process safety performance can be determined only over time. The Panel believes, however, that the BP refining workforce is ready, willing, and able to participate in a sustained, corporate-wide effort to move BP towards excellence in process safety performance as called for in this report. Over the past twelve months, the Panel interacted with a large number of BP employees, contractors, managers, and executives. The Panel generally came away with favorable impressions of these people. As a group, they appear hardworking and conscientious. Most importantly, they appear sincerely interested in improving BP's management of process safety so as to prevent future incidents like the Texas City tragedy. This was the case at the Carson, Cherry Point, Texas City, Toledo, and Whiting refineries and in BP's corporate offices in Chicago and London.

- 1 -

BP-HZN-2179MDL04438900

Finally, the Panel believes that all companies in the refining, chemical, and other process industries should give serious consideration to its recommendations and related commentary. While the Panel made no findings about companies other than BP, the Panel is under no illusion that the deficiencies in process safety culture, management, or corporate oversight identified in the Panel's report are limited to BP. If other refining and chemical companies understand the Panel's recommendations and related commentary and apply them to their own safety cultures, process safety management systems, and corporate oversight mechanisms, the Panel sincerely believes that the safety of the world's refineries, chemical plants, and other process facilities will be improved and lives will be saved.

The commentary below is an integral part of the recommendations, and each commentary should be read in conjunction with the related recommendation.

CONFIDENTIAL

BP-HZN-2179MDL04438901

# RECOMMENDATION #1—PROCESS SAFETY LEADERSHIP

**The Board of Directors of BP p.l.c, BP's executive management (including its Group Chief Executive), and other members of BP's corporate management must provide effective leadership on and establish appropriate goals for process safety. Those individuals must demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.**

**Commentary**

(1)   *"Provide effective leadership on and establish appropriate goals"*—Process safety leadership in an organization must start at the top. The Board of Directors of BP p.l.c., its Group Chief Executive, and corporate management as a group must set the process safety "tone at the top" and establish appropriate expectations regarding process safety performance. Those expectations must reflect an unwavering commitment to process safety and infuse into BP's workforce the mindset that process accidents are not acceptable. Those expectations must also be translated into measurable goals designed to move BP toward the achievement of excellence in process safety performance.

(2)   *"Demonstrate their commitment to process safety by"*—

(a)   *"articulating a clear message on the importance of process safety"*—BP's corporate management should communicate a clear, frequent, and consistent message to its stakeholders on the importance of process safety. This message should

- express BP's process safety performance expectations in terms of verifiable objectives and the means by which the company will achieve them, and

- be reinforced through timely reporting on BP's progress in meeting its objectives.

The company's strategy for delivering this message should emphasize discussion of BP's process safety performance expectations with U.S. refinery line managers, supervisors, and staff. These discussions should occur during frequent visits by executive and corporate management to the U.S. refineries, as well as regular and frequent time in the field by refinery leadership team members.

(b)   *"matching that message both with the policies they adopt and the actions they take."*—BP's Board of Directors, its executive management, including its Group Chief Executive, and other members of corporate management should also demonstrate their commitment to process safety through their actions. If senior management evidences its belief in the importance of process safety, consistently communicates that belief to other managers and the workforce, and then provides the appropriate resources to promote process safety excellence, shared beliefs and practices will follow in the rest of the organization. Decisions about corporate level initiatives, operations, financial performance, resource allocation, capital projects, personnel changes, compensation, and other aspects of the U.S. refining operations must visibly and tangibly demonstrate BP's commitment to process safety excellence. In particular, BP should make appropriate adjustments to its performance contract system and other incentive-based compensation plans to better align that system and those plans with the pursuit of process safety excellence. In addition, BP should take steps to promote greater continuity of refinery plant managers and other refinery-level managers having significant process safety leadership roles at the U.S. refineries.

- 3 -

CONFIDENTIAL

BP-HZN-2179MDL04438902

# RECOMMENDATION #2—INTEGRATED AND COMPREHENSIVE PROCESS SAFETY MANAGEMENT SYSTEM

**BP should establish and implement an integrated and comprehensive management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.**

**Commentary**

(1)      *"integrated and comprehensive management system"*—In order to be effective, a management system for process safety must be comprehensive; a weak or fragmented system will not address all of the numerous process safety risks that exist in BP's U.S. refineries. Among other things, this comprehensive management system should

(a)   provide guidance on implementation of generally accepted hazard identification procedures, qualitative and quantitative risk analysis and assessment procedures, verifiable process risk tolerance criteria, and expectations on when implementation must be achieved;

(b)   utilize an integrated set of leading and lagging performance indicators for process safety as described in Recommendation #7 (and the related commentary);

(c)   develop a uniform approach for prioritizing and implementing

- internal and external process safety standards and best practices, and

- external good engineering practices, including, recognized and generally accepted good engineering practices;

(d)   utilize an effective management of change process for organizational and personnel changes at all levels;

(e)   develop and implement a process to evaluate the extent to which any corporate initiatives adversely impact process safety performance;

(f)   ensure completion of identified process safety action items within prescribed and reasonable time periods;

(g)   ensure that reports on open process safety action items are delivered to refining line management on a periodic basis. Open action items would include those arising from

- process safety compliance audits or other process safety reviews and assessments,

- gaps identified during implementation of process safety related standards and practices, including BP's 2006 Group Integrity Management Standard and engineering technical practices,

- process hazard analyses,

- near misses, high potential incidents, and other incident investigations,

- management of change reviews, and

- inspections of plant and equipment.

- 4 -

CONFIDENTIAL

BP-HZN-2179MDL04438903

(h)   report overdue action items to executive management and to the Board of Directors of BP p.l.c.;

(i)   implement a policy regarding area electrical classification that

■   is consistent with the intent of API Recommended Practice 500, and

■   addresses control of vehicle ignition sources on roadways;

(j)   develop an accelerated plan to determine the application of and to implement applicable external standards on safety instrumented systems including ISA-84.01;

(k)   develop improved procedures and practices on reporting, investigating, and monitoring of trends relating to, and on learning from, near miss events;

(l)   implement a plan to provide safer shelters for personnel situated close to process unit areas;

(m)   review overtime policies and practices to ensure that excessive overtime work does not compromise the performance of plant personnel;

(n)   revise process hazard analysis procedures to ensure that all significant process safety hazards are addressed including those arising in non-normal operating modes; and

(o)   establish a refinery-level monthly management review system that monitors important aspects of process safety management performance and systems on prescribed frequencies, including items (a) through (n) above.

(2)   *"that systematically and continuously identifies, reduces, and manages process safety risks"*—The overarching goal of the process safety management system should be systematic and continuous risk reduction. While recognizing the importance and role of process safety system audits, an audit is not a substitute for ensuring that a system exists for appropriate levels of designated managers and employees to monitor critical safety indicators continuously. BP's management system should not rely solely on audits to achieve systematic and continuous identification, reduction, and management of process safety risks.

- 5 -

CONFIDENTIAL

# RECOMMENDATION #3—PROCESS SAFETY KNOWLEDGE AND EXPERTISE

**BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of process safety knowledge and expertise.**

**Commentary**

(1) *"develop and implement . . . "*— BP's effort to develop and implement a system to ensure process safety knowledge and expertise will benefit greatly from the input of various stakeholders, including employee representatives and contractors. Those stakeholders should be involved in developing, reviewing, and implementing such a system. BP should also seek input and advice from external groups with appropriate process safety expertise to help design, develop, and implement this system. Such groups might include, but are not limited to, the Center for Chemical Process Safety (CCPS); American Institute of Chemical Engineers (AIChE); the American Society of Safety Engineers (ASSE); and the American Industrial Hygiene Association (AIHA).

(2) *"a system to ensure . . . an appropriate level of process safety knowledge and expertise"*— Specifically, this system should

(a) define the level of process safety knowledge and expertise required for U.S. refining personnel and contractors and those managers above the refinery level who have managerial oversight of, or who provide staff support for, U.S. refining operations. This group includes

  ■ executive management for refining and all levels of refining line management, including corporate management above the refinery level;

  ■ health, safety, security, and environmental staff personnel for refining operations;

  ■ refining engineering personnel and chemists; and

  ■ other members of the refining workforce, including contract personnel, having some process safety responsibilities. Knowledge and expertise for refinery level managers, supervisory personnel, workers and contractors should include an appropriate level of process knowledge for operating units under their management or supervision or on which they work.

(b) establish, implement, and maintain a process safety training curriculum for line managers; supervisors; health, safety, security, and environmental personnel; engineers; chemists; and operations and maintenance personnel. The training should be completed within the first two years of employment for newly hired personnel, and it should be updated and reinforced annually for experienced personnel;

(c) provide education on an annual basis to all refinery line management on BP's expectations about

  ■ reporting of potential process safety incidents and near misses, and

  ■ sharing of both the reports and actions taken in light of the reports;

(d) on at least an annual basis provide awareness training about reporting of potential process safety incidents and near misses to operations and maintenance personnel;

- 6 -

CONFIDENTIAL

(e)   educate refinery personnel on how to conduct root cause analyses in a manner that thoroughly examines all possible causal factors, including systemic and management causal factors; "determines if root causes of process incidents were identified or should have been identified in the relevant process hazard analysis;" and leads to appropriate recommendations to address the findings;

(f)   educate and provide training to enable internal BP process hazard analysis leaders and team members to conduct effective process hazard analyses using the latest recognized and generally accepted practices; and

(g)   audit contractors regularly to determine compliance with applicable process safety knowledge and expertise standards.

- 7 -

CONFIDENTIAL

BP-HZN-2179MDL04438906

# RECOMMENDATION #4—PROCESS SAFETY CULTURE

**BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.**

**Commentary**

(1)   *"involve the relevant stakeholders"*—In order to achieve outstanding process safety performance, it is important that BP consult and work with stakeholders at its U.S. refineries in developing and conducting the actions listed in Comment (2) below. BP should ensure that mechanisms exist that effectively promote and facilitate two-way communication between BP managers and all relevant stakeholders. The relevant stakeholders include salaried, hourly, and contract employees; employee representatives; contractors; and where appropriate, members of the community in close proximity to BP's U.S. refineries.

(2)   *"develop a positive, trusting, and open process safety culture"*—In order to promote the development of a positive, trusting, and open process safety culture, BP should take the actions listed below. The listed actions are not intended to be an exhaustive list, and BP should consider other opportunities to improve the process safety culture at its U.S. refineries. At a minimum, BP should

(a)   share the results of the process safety culture survey conducted on behalf of the Panel with the U.S. refinery workforce on a refinery-by-refinery basis within six months from the date this report is issued;

(b)   review the effectiveness of existing refinery-level process safety related policies, practices, and procedures that have a significant potential to affect BP stakeholders and develop and implement new refinery level process safety goals, policies, practices, and procedures that take into account stakeholder interests and input;

(c)   review the effectiveness of existing safety committees in promoting process safety and develop and execute a plan to improve such effectiveness. Existing safety committees should be able to assume roles that will have a more significant impact on process safety culture and promote adherence to good process safety practices. This review should involve all relevant stakeholders and include an assessment of each committee's composition and purpose and the extent to which its role overlaps with the role(s) of other committees;

(d)   review practices with contractors for the purpose of eliminating inappropriate inconsistencies, as compared with BP employees, for training, discipline, incentives, and communications;

(e)   implement changes necessary to achieve and maintain compliance with applicable policies, practices, and procedures;

(f)   distinguish more clearly between acceptable and unacceptable employee acts such that the vast majority of unsafe acts or conditions can be reported without fear of punishment. A strong process safety culture facilitates the sharing of information that will reduce safety risks. As a result, BP's refineries should operate in such a way as to permit the reporting of the vast majority of unsafe acts or conditions by employees and contractors without fear of punishment. While unsafe acts that are reckless or particularly egregious may warrant some type of sanctions, the culture of each U.S. refinery should promote sharing of information relevant to safety even when that information indicates that workers have made mistakes;

- 8 -

CONFIDENTIAL

BP-HZN-2179MDL04438907

(g)   establish a climate in which

■   workers are encouraged to ask challenging questions without fear of reprisal, and

■   workers are educated, encouraged, and expected to examine critically all process safety tasks and methods prior to taking them;

(h)   involve all relevant stakeholders in

■   investigating and preventing accidents, incidents, and near misses,

■   reviewing the results of process safety management audits,

■   developing recommendations for corrective actions when audit deficiencies are identified, and

■   tracking recommendations to completion in a timely manner; and

(i)    measure the effectiveness of this effort to improve process safety culture by conducting periodically an anonymous process safety culture survey among the U.S. refineries. The first survey should be conducted approximately one year from the date of this report.

CONFIDENTIAL

BP-HZN-2179MDL04438908

# RECOMMENDATION #5—CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY

**BP should clearly define expectations and strengthen accountability for process safety performance at all levels in executive management and in the refining managerial and supervisory reporting line.**

### Commentary

(1)  *"clearly define expectations and strengthen accountability"*—Ultimate accountability and responsibility cannot be delegated and rests at the top of the organization. BP must strengthen accountability and responsibility for process safety performance in executive management and in the U.S. refining managerial and supervisory reporting line. Delegations of authority and related accountabilities must be made with operational clarity and specificity about process safety expectations and performance criteria. Accountability should include

- ensuring that process safety performance goals, objectives, and expectations are included in performance contracts, employees goals and objectives, and discretionary compensation arrangements for line managers, supervisors, and workers in BP's U.S. refineries,

- making a significant portion of total compensation of refining line managers and supervisors contingent on satisfactorily meeting process safety performance indicators and goals in the U.S. refineries,

- making a significant portion of the variable pay plan for non-managerial workers in BP's U.S. refineries contingent on satisfactorily meeting process safety performance objectives, and

- making process safety performance and leadership significant considerations in career advancement and succession planning.

(2)  *"for process safety performance"*—Because major process safety incidents occur relatively infrequently, process safety performance cannot be measured effectively by the occurrence of such incidents alone. Accordingly, BP should establish performance expectations that (a) eliminate on a prescribed schedule gaps in process safety practices at the U.S. refineries as compared with applicable internal and external standards and practices, including best practices and other recommended external practices and standards, and (b) include identified process safety performance indicators as described in Recommendation #7 (and the related commentary).

(3)  *"at all levels in executive management and in the refining managerial and supervisory reporting line"*—All levels of management and supervision play an important role in process safety performance, from the Group Chief Executive to refinery level supervisors and first level leaders. At each of these levels, process safety accountabilities should be defined in operational terms that are understood—and then enforced. Managers and supervisors must know that a failure to perform according to operationally defined process safety expectations will have consequences.

BP should also ensure that each U.S. refinery plant manager is primarily responsible for the safe operation of the refinery. The first priority for the top line manager at each U.S. refinery must be to operate the refinery safely. Commercial responsibilities should not take priority over safety for this key line manager.

- 10 -

BP-HZN-2179MDL04438909

# RECOMMENDATION #6—SUPPORT FOR LINE MANAGEMENT

**BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.**

**Commentary**

(1) *"more effective . . . process safety support"*—While emphasizing that the refining managerial reporting line has primary responsibility for and ownership of process safety performance, BP should designate and establish a full-time leader for process safety who reports to a refining line manager above the refinery level. This leader should provide strategic guidance on process safety direction for the U.S. refineries and, in doing so, should facilitate consistent process safety implementation across the U.S. refineries. The lead process safety person at each U.S. refinery should have a joint reporting relationship with the refinery manager and with this leader. This leader should have substantial knowledge and experience in process safety management and sufficient positional authority to contribute meaningfully to the most significant decisions, financial or otherwise, made at all levels above BP's U.S. refineries that affect process safety performance at those refineries. This leader should reside in the line organization and report jointly to the line manager indicated above and to the leader of BP's Safety and Operations function.

(2) *"better coordinated process safety support"*—While BP should improve the effectiveness of process safety support by establishing a leader as described above, it should not add more complexity to the complex organization that currently supports process safety performance in BP's five U.S. refineries. In order to support refining line managers effectively, process safety support staff at all levels of the BP organization must be able to communicate directly with appropriate line managers and must have their process safety responsibilities clearly defined in relation to line managers and in relation to other support staff. While refining line managers should have primary responsibility for process safety performance, BP should harmonize the roles and efforts of its existing staff personnel in the line organization and in functional groups (*e.g.*, Safety and Operations, Technology, and HSSE) that support line managers' implementation of process safety. To do this, BP should develop and implement a written plan that describes clearly and succinctly process safety responsibilities and accountabilities for existing staff personnel in the line organization and in functional groups that support process safety. The plan should describe (a) the specific roles and responsibilities of such staff and functional groups in setting process safety performance standards and expectations, acting as subject matter advisors, auditing compliance, and monitoring performance, and (b) how BP will ensure coordination among these staff members and functional groups at the Group, Refining and Marketing, Refining, and U.S. refinery levels.

CONFIDENTIAL

BP-HZN-2179MDL04438910

# RECOMMENDATION #7—LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY

**BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries by BP's refining line management, executive management (including the Group Chief Executive), and Board of Directors. In addition, BP should work with the U.S. Chemical Safety and Hazard Investigation Board and with industry, labor organizations, other governmental agencies, and other organizations to develop a consensus set of leading and lagging indicators for process safety performance for use in the refining and chemicals industries.**

**Commentary**

(1)  *"develop . . . an integrated set of leading and lagging performance indicators"*—BP should develop an integrated set of leading and lagging indicators to measure how the U.S. refineries are performing in regard to process safety. Performance expectations should be set and periodically reviewed for each of these indicators. The performance indicators should include both leading and lagging indicators. The indicators should be reasonably designed to address and monitor how effectively the most significant process safety risks at the U.S. refineries are being controlled. In developing an integrated set of performance indicators, BP should refer to guidance from and literature prepared by regulatory and other authoritative bodies; public interest and industry organizations, including the U.K. Health and Safety Executive, the CCPS, and the American Chemistry Council; and the USW. BP should also consider the examples of potential leading and lagging indicators provided in such guidance and literature. As indicated in such guidance, BP should implement an integrated set of indicators since no single performance measure addresses all process safety risks. The indicators should also be integrated in a manner that addresses process risks as identified through an evaluation of such risks and ensures feedback on the effectiveness of the leading indicators.

(2)  *"implement . . . an integrated set of leading and lagging performance indicators"*—Not having an integrated set of performance indicators represents a substantial gap in a process safety management system. While such indicators should be carefully developed, the prompt implementation of a reasonable set of integrated performance indicators should be treated as a top priority. Prolonged delays in employing a reasonable set of indicators because of an extended search for some perfect set of performance indicators will likely do more harm than good. Accordingly, BP should develop and implement within six months from the date this report is issued a reasonable set of integrated performance indicators. BP should involve its Board, executive management (including the Group Chief Executive), refining line management, and U.S. refinery employee representatives in developing and implementing such performance indicators.

The Panel recommends that the set of performance indicators initially include as a lagging indicator a process incident index that addresses

- all fires,

- all explosions (as defined to include certain physical overpressures),

- hazardous releases, and

- injuries/fatalities relating to a process incident.

- 12 -

BP-HZN-2179MDL04438911

The process incident index would have a numerator that takes into account the items listed immediately above and would have a denominator that allows the index to be used to compare performance across refineries of different size and scale and to address worker exposure to process risks. Annex I in this Section VII provides an example of this type of index. This process incident index is intended to be temporary. When a consensus set of leading and lagging indicators becomes available that addresses the elements of this process incident index, BP should adopt such consensus indicators, which would replace this incident index.

(3)   *"periodically update"*—The leading and lagging indicators selected should not be considered static. Rather, the effectiveness and value of each performance indicator should be evaluated regularly, and at least every two years. Over time, the effectiveness of the set of indicators should improve, with resulting improvements in process safety performance.

(4)   *"monitoring . . . by BP's refining line management, executive management (including the Group Chief Executive), and Board of Directors"*—Because of the potential catastrophic nature of process safety incidents, performance of the U.S. refineries against selected indicators should be reviewed carefully and analyzed for trends within individual refineries and BP's refineries as a group. Performance and information regarding trends should be reported to, and monitored by, BP's executive management (including the Group Chief Executive), and Board of Directors. In order to monitor process safety management effectively, BP should develop minimum performance targets for each chosen indicator, even though BP's ultimate goal may be perfection, and hold line management accountable for meeting at least these minimum targets.

(5)   *"work with the U.S. Chemical Safety and Hazard Investigation Board and with industry, labor organizations, other governmental agencies, and other organizations to develop a consensus set of leading and lagging indicators"* —The Panel believes that the development of a consensus set of leading and lagging performance indicators would benefit not only BP, but also both the refining and chemicals industries. As a result, in addition to developing leading and lagging indicators for its own use, the Panel recommends that BP work with other stakeholders to develop a consensus set of leading and lagging indicators. The Health and Safety Executive in the United Kingdom, working in conjunction with British industry, has recently provided valuable guidance in the area of developing process safety performance indicators. In addition, the CCPS has included a discussion of metrics in its soon to be published *Guidelines for Risk Based Process Safety* book and has begun a project relating to the development of process safety metrics. In addition, the USW, public interest organizations, and/or organizations from other industries, such as the Institute of Nuclear Power Operations (INPO) in the nuclear electric generating industry, have expertise and experience in metrics that would be valuable resources. The Panel believes that the CSB should provide leadership in developing a consensus set of leading and lagging indicators for process safety performance for use in the refining and chemicals industries. BP should work with the CSB and with industry, labor organizations, other governmental agencies, and public interest organizations in this process. BP should include in the set of performance indicators that it uses from time to time any such consensus set of leading and lagging indicators.

CONFIDENTIAL

BP-HZN-2179MDL04438912

# RECOMMENDATION #8—PROCESS SAFETY AUDITING

**BP should establish and implement an effective system to audit the process safety performance at its U.S. refineries.**

**Commentary**

1.    *"establish and implement an effective system to audit the process safety performance"*—In order to be effective, the audit system should, among other things,

(a)   confirm not only that the appropriate process safety management system is in place, but also that actual refinery operations in the field and throughout the line management chain of command conform to the system;

(b)   ensure a cross functional team of qualified and trained auditors, including auditors with substantial expertise in the various elements of process safety management, refining technology, maintenance, and operations;

(c)   provide adequate time to conduct thorough audits, taking into consideration the size and complexity of the refinery being audited and the number of auditors involved;

(d)   periodically use audit teams independent of BP for the process safety audits for each U.S. refinery;

(e)   require (i) consultation between the refinery leadership team and the auditors on proposed remedial measures and appropriate deadlines for the completion of those measures and (ii) notification of executive management and refining line management above the refinery level if and when agreed deadlines are not met, as well as if and when any renegotiated extended deadlines are subsequently not met;

(f)   provide for the timely verification of remedial measure completion by personnel independent of the audited refinery; and

(g)   upgrade the current audit finding significance ranking system to ensure consistent evaluation and prioritization of the significance of findings.

CONFIDENTIAL

BP-HZN-2179MDL04438913

# RECOMMENDATION #9—BOARD MONITORING

**BP's Board should monitor the implementation of the recommendations of the Panel (including the related commentary) and the ongoing process safety performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's recommendations (including the related commentary). The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.**

## Commentary

(1) *"monitor the implementation of the recommendations"*—The Panel believes that it is critically important that steps be taken to ensure the sustainability of the Panel's recommendations and the implementation of systemic changes contemplated by the recommendations. The Panel believes that timely implementation of the recommendations can result in long-lasting improvements in process safety performance at BP's U.S. refineries. To this end, BP's Board should monitor the performance by executive, corporate, and refining line management above the refinery level within BP in implementing the recommendations, including the need to hold executive management and refining line managers and supervisors at all levels accountable for process safety performance.

To assist in this monitoring role, the Board should, for a period of at least five (5) calendar years, engage an independent person or persons to act as a special monitor to report annually to the Board on BP's progress in implementing the Panel's recommendations. BP should provide the special monitor with access to required administrative and technical support or services and required resources, including process safety, corporate culture, and refining industry knowledge and expertise. The Board should (a) develop a specific process for ensuring the independence of the special monitor and any experts, and (b) make the resulting report publicly available on an annual basis.

(2) *"monitor . . . the ongoing process safety performance of BP's U.S. refineries"*—Because of the potential catastrophic nature of process safety incidents, BP's Board should monitor the ongoing process safety performance of the U.S. refineries. In order to do this effectively, the Board may determine that it needs additional process safety resources and/or expertise. To this end, the Board should assess what resources it needs to monitor effectively and to be able to challenge the process safety performance as reported to it by BP management.

(3) *"report publicly on the progress of such implementation and on BP's ongoing process safety performance"*—The Panel also believes that sustainability and implementation of its recommendations will be served by having BP report publicly on its progress in implementing the Panel's recommendations and on its process safety performance generally. Accordingly, BP should, on a periodic and at least annual basis, report publicly in reasonable detail on (a) BP's progress in implementing the Panel's recommendations, and (b) the process safety performance in the U.S. refineries using leading and lagging indicators as discussed in Recommendation #7 (and the related commentary). This reporting of information should be at least as prominent as the company's current reporting of its personal safety and environmental performance.

CONFIDENTIAL

BP-HZN-2179MDL04438914

# RECOMMENDATION #10—INDUSTRY LEADER

**BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management.**

**Commentary**

(1)   *"transform the company into a recognized industry leader"*—The Panel recognizes that in some areas, notably reduction of greenhouse gases and promotion of alternative forms of energy, BP is seeking a leadership position in the energy sector. The Panel challenges BP to do the same in the area of process safety management. Such leadership can help make not only BP's refineries safer, but also encourage other companies in the refining, chemicals, and other process industries to make their plants safer for workers and the public. BP has shown an ability to respond to challenges by taking leadership positions in the past; the lessons learned from Texas City and the Panel's report provide another important opportunity to do so.

(2)   *"in process safety management"*—The Panel believes that in order to become an industry leader in process safety management, BP should take a leading role in existing or new industry organizations to promote process safety. In taking such a leading role, BP should be informed by the efforts of public interest organizations and/or organizations from other industries, such as the INPO in the nuclear electric generating industry. Leadership opportunities for making ongoing changes and improvements in process safety include the following:

(a)   improving reviews and inspections of refineries against applicable legal and leading industry practices. While the reviews and inspections would be based on applicable OSHA, EPA, and recognized and generally accepted good engineering practices, the goal should be to go beyond minimum requirements and to achieve excellence;

(b)   improving process safety training standards, refinery workforce and management knowledge and expertise, and process safety management audits, management reviews, and inspections; and

(c)   sharing within the refining and chemicals industries information about learnings from near miss and accident investigations.

- 16 -

CONFIDENTIAL

BP-HZN-2179MDL04438915

# ANNEX I—PROCESS INCIDENT INDEX EXAMPLE

**Summary**

This example process incident index is provided to help BP understand the Panel's expectations on the content of a lagging index that could be used to measure actual process safety performance and thereby quickly establish a lagging indicator that measures overall process safety performance. BP should evaluate this example and consider modifications as appropriate.

The process incident index would be a lagging indicator that captures overall process safety performance through counts of fires, system overpressures and explosions, chemical releases, and injuries/fatalities. The denominator for the index would use worker hours in the same manner as the OSHA injury index.

The process incident index would be calculated in a manner similar to the OSHA injury index. The annual number of process safety incident counts would be divided by the total hours worked in the facility and then multiplied by 200,000 in order to create a normalized annual index for each 100 workers. (Since an employee works approximately 2,000 hours per year, 200,000 hours represents the approximate annual number of hours that would be worked by 100 employees.)

**Example:**

Assume:

    (1)   a plant has 200 employees, each of whom worked 2,000 hours in a calendar year; and

    (2)   incidents with a total of five counts occurred in the plant that year.

Calculation of the Process Incident Index:

Step 1:   Divide the five counts by 400,000 hours worked in the calendar year.

Step 2:   Multiply the count by 200,000, producing a Process Incident Index of 2.5 for the year.

**Process Incident Index Count Threshold—Definitions and Examples**

**Definition of "Fire":** *Unintentional fires of any magnitude and unintentional electrical arcs.*

Set forth below are examples of items that add to the count total:

- a leak that results in a flame;
- a tangible indication of a fire (*e.g.*, soot on the inside of distillation tower) where no flame was actually seen;
- a fire on a scaffold board in a process unit;
- a fire in a vehicle parked by an operating unit;
- a 120 volt shorted switch;
- a ground fault on electrical heat tracing;
- a phase to ground or phase to phase short on electrical power distribution;
- a fault in a motor control center; and
- a fault in a electrical switch gear.

- 17 -

CONFIDENTIAL

BP-HZN-2179MDL04438916

The following items are examples of items that do *not* add to the count total:

- a fire in a trash can in an office building (not in the process);

- a fire from residue in heat exchanger in a shop (not in the process);

- a fire in a laboratory (not in the process);

- smoldering rags in a pump house (no flame);

- a fire in a vehicle in a parking lot outside the refinery fence; and

- catalyst destroyed by overheating (no flame).

**Definition of "Explosion":** *Explosions of any kind, including detonations, deflagrations, and physical overpressures that result in any physical damage.*

The following items are examples of explosions or overpressures that add to the count total:

- a "puff" during a furnace startup that results in damage to the refractory or bends the walls; and

- a failure of a pressure control system on a tank that results in an overpressure that bulges a tank.

The following are examples of items that do *not* add to the count total:

- an overpressure that results in the activation of a relief valve;

- an overpressure that results in the burst of a rupture disk; and

- a "puff" during a furnace startup that results in no damage to the furnace.

**Definition of "Hazardous Release":** Any non-permitted environmental release that meets the following criteria:

- an episodic release of 500 pounds of a flammable material; or

- a release of a substance subject to the notification requirements under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) or the Emergency Planning and Community Right-to-Know Act (EPCRA) because it exceeds the reportable quantity but without regard to whether the refinery must notify the applicable governmental authority of the release.

**Definition of "Injury/Fatality":** The definition would include both on site and off site occurrences:

- on site—"Injury/Fatality" includes each serious injury or fatality to an employee or contractor that results from a release of energy or material from a process.

- off site—"Injury/Fatality" also includes each injury to a member of the public that is seen by a physician or a fatality to a member of the public as a result of a release of energy or material from a process.

- 18 -

BP-HZN-2179MDL04438917

A serious injury includes any injury that is required to be reported on the OSHA 300 log. For purposes of determining the count for the numerator in the Process Incident Index, a fatality would have a multiplier of 10 to reflect the seriousness of the event. See example calculation below.

The following are examples of items that add to the count total:

- an OSHA 300 log injury that results from a splash while an operator is catching a sample;

- a fatality that results from a mechanic falling from an elevated work surface when the fall was caused by a sudden release of steam; and

- an OSHA 300 log injury to a responder to an incident that is a release of material or energy from a process.

The following are examples of items that do *not* add to the count total:

- an OSHA 300 log injury that results from a splash while a lab technician is running a unit sample (not in the process);

- a small cut to an operator in the unit that does not result in an OSHA 300 log injury;

- a broken leg that occurred in an operating unit when an operator slipped and fell on ice;

- an OSHA 300 log injury that results from a wrench falling from an elevated work surface in an operating unit; and

- a fatality that results from a mechanic falling from an elevated work surface in an operating unit when the fall was caused by a slip.

**Example Calculation**

Assumptions:

- In a calendar year a plant with 400 employees (800,000 hours worked) had 10 fires.

- One of the fires resulted in a serious injury and a fatality.

- One of the fires resulted from a release of 2,000 pounds of flammable material.

- A hot condensate release resulted in two injuries.

- There were also 8 releases that were reportable under CERCLA.

- No members of the public were directly impacted by the incidents.

    10 counts—from the 10 fires
    3 counts—from the injuries
    10 counts—from the single fatality
    1 count—from the release of more than 500 pounds of flammable material
    8 counts—from the 8 CERCLA reportable releases.

    32 total process incident index counts

    Process Incident Index Calculation:

    32 counts, divided by 800,000 hours worked, multiplied times 200,000 = 8.0

- 19 -

CONFIDENTIAL

BP-HZN-2179MDL04438918

*Blank Page*

CONFIDENTIAL