IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL by the OIL RIG "*DEEPWATER HORIZON*" in the GULF OF MEXICO, on April 20, 2010 | MDL NO. 2179<br><br>SECTION: J |
| **THIS PLEADING APPLIES TO:**<br>2:2010-md-02179 and 2:2010-CV-02771 | JUDGE BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

## DEFENDANT DRIL-QUIP, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST ALL CLAIMS

### I.   Introduction

On various dates after April 20, 2010, a few Plaintiffs sued Dril-Quip for damages resulting from the Macondo Well MC252 ("Macondo Well") blowout, subsequent, explosion on board the offshore drilling rig *Deepwater Horizon* and the ensuing oil spill. Dril-Quip moves for summary judgment on all of Plaintiffs' claims for the following reasons:

(1)   The evidence conclusively disproves that Dril-Quip's wellhead system was a cause in fact of the incident because the flow path of the blowout was through the production casing; and

(2)   There is no expert testimony showing that either Dril-Quip's wellhead system or anything it did or failed to do contributed to the incident.

Plaintiffs are all plaintiffs, cross-claimants and counterclaimants who have asserted any claim against Dril-Quip or claims to which Dril-Quip has been joined with issue by virtue of Transocean's Rule 14(c) Third-Party Complaint ("Transocean's Rule 14(c) Tender") filed in Cause No. 10-2771 (the "Limitation Action"). The consolidating effect of MDL-2179 and the procedural effect of Transocean's Rule 14(c) Tender in the Limitation Action make it difficult to identify the precise nature of each of Plaintiffs'

1

claims.[1]  Such specification is ultimately unnecessary, however, because any theory of liability against Dril-Quip requires a causal connection between Dril-Quip's wellhead system and the incident or evidence of some causative fault on Dril-Quip's part.  As discussed below, the former is conclusively disproved and latter is not supported by any evidence.

## II.     Statement of Facts[2]

Dril-Quip designs and manufactures precision-engineered subsea wellhead systems for and provides related installation services to the offshore oil and gas industry.  Pursuant to a Master Service Agreement between Dril-Quip and BP, and through a series of related sales orders and rental orders, Dril-Quip supplied BP an SS-15 Big Bore II subsea wellhead system for installation on the Macondo Well (the "Macondo Wellhead System").  The bulk of the work was executed at Dril-Quip's onshore manufacturing facility in Houston, Texas, and Dril-Quip's involvement in the Macondo Well was limited to:

- Manufacturing and supplying the Macondo Wellhead System;[3]
- Responding to requests for information about the Macondo Wellhead System;[4] and

---

[1]     As pointed out in Dril-Quip's various pending motions to dismiss, Plaintiffs have not stated enough facts in the Master Complaints for Pleading Bundles B1, B3 and C to show a plausible claim for relief against Dril-Quip. Indeed, Dril-Quip is not named in those complaints but is a party to them solely as a result of Transocean's Rule 14(c) Tender.

[2]     The statement of facts for which there is no genuine material dispute is attached, as required by Local Rule 56.1, as Appendix A.

[3]     Exh. A, Expert Report of John H. Barker (Depo. Exh. 7921) at 23 to 29; Exh. B, Hardware Systems Design and Manufacturing Services Contract Subsea Wellheads (Depo. Exh. 2794) at BP-HZN-2179MDL00054726 to BP-HZN-2179MDL00054751.

- Providing a serviceman on the rig to advise BP about the installation and any subsequent maintenance of the Macondo Wellhead System.[5]

Dril-Quip's wellhead systems consist of a series of sophisticated interlocking components that are assembled together as the well is constructed. Once installed, a wellhead system becomes a semi-permanent fixture on the seafloor and remains in place throughout the life of the well. The wellhead system serves as an intermediary between the blowout preventers and the riser, which are above the wellhead, and the casing, which is suspended from the wellhead.

A wellhead system performs three functions. First, it provides structural support for the various casing strings run by the operator from the mud line down to the target formation.[6] Second, it acts as a transition point for downhole operation–every downhole tool, pipe, or other device used to drill; evaluate; and complete a well and all hydrocarbons produced from it must pass through the wellhead.[7] Third, because a wellhead itself is not a dynamically operated pressure control device (it is rated to certain pressures but once installed cannot be dynamically modified to respond to observed pressures), it provides for and interfaces with drilling and production pressure control devices such as the blowout preventers.[8] Specific components of the Macondo Wellhead

---

[4] *Id.*

[5] *Id.;* Exh. C, Testimony of Shane Albers at 247:23 to 248:5, 250:10 to 250:13, 251:13 to 251:16.

[6] Exh. D, Dril Quip SS-15 Big Bore II Subsea Wellhead Systems Sales Manual (Proposed TREX 91,014) at DRQ00047129.

[7] *Cf.* Exh. E, Subsea Wellhead Functional Specification (Proposed TREX 91,099) at BP-HZN-2179MDL000368476 to BP-HZN-2179MDL000368477.

[8] *Id.* at BP-HZN-2179MDL000368456 to BP-HZN-2179MDL000368457.

System and other well features that are relevant to Dril-Quip's motion are discussed in greater detail below.

Other than manufacturing and supplying the Macondo Wellhead System, Dril-Quip had negligible information about or involvement with the Macondo Well.[9] Dril-Quip's other involvement was limited to responding to the BP's requests for information about the Macondo Wellhead System,[10] providing a service technician to advise BP on the installation of the Macondo Wellhead System,[11] and providing general installation procedures for the Macondo Wellhead System that apply to any rig or well.[12]

### III.   Arguments and Authority

Summary judgment is proper in a case in which there is no genuine dispute of material fact. Fed. R. Civ. P. 56(a); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party asserting that no genuine dispute exists must support the assertion by: 1) citing to particular parts of materials in the record; or 2) showing that the adverse party cannot produce admissible evidence to support the disputed fact. Fed. R. Civ. P. 56(c)(1).

---

[9]   Exh. F, GoM Exploration and Appraisal Communication Plan (September 2009, Rev. 3) (Depo. Exh. 1695) ; Exh. G, Testimony of Martin Breazeale at 657:7 to 658:6; Exh. H, Testimony of Murray Sepulvado at 495:18 to 495:24.

[10]   Exh. A, Expert Report of John H. Barker (Depo. Exh. 7921) at 24 to 25.

[11]   Exh. B, Hardware Systems Design and Manufacturing Services Contract Subsea Wellheads (Depo. Exh. 2794) at BP-HZN-2179MDL00054750 to BP-HZN-2179MDL00054751; Exh. C, Testimony of Shane Albers at 247:23 to 248:5, 250:10 to 250:13, 251:13 to 251:16.

[12]   *Compare* Exh. I, Dril-Quip Installation Procedure for the Lead Impression Tool and Lock Down Sleeve (Depo. Exh. 2785) *with* Exh. J, BP-Macondo Lead Impression Tool (LIT) and Lock Down Sleeve (LDS) Running Procedure (Depo. Exh. 0834).

4

The party moving for summary judgment need not support its motion with evidence "*negating* the opponent's claim." *Celotex Corp.,* 477 U.S. at 323. Rather, a party may show that a non-movant cannot produce admissible evidence to carry its burden at trial. *See* 2010 Advisory Committee Notes Fed. R. Civ. P. 56 at ¶ 11. The burden then shifts to the non-moving party or parties that bear the burden of proof to present evidence that can uphold a jury verdict. *Johnson v. Diversicare Afton Oaks, LLC*, 597 F.3d 673, 675 (5th Cir. 2010); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994) (en banc). "Conclusory allegations or unsubstantiated assertions are insufficient to show a genuine issue of material fact." *Johnson v. Diversicare Afton Oaks, LLC*, 597 F.3d 673, 675 (5th Cir. 2010). These standards entitle Dril-Quip to summary judgment on all of Plaintiffs' claims for the following reasons:

1) The evidence conclusively proves that Dril-Quip's wellhead system was not a cause in fact of the incident given the conclusively proven flow path of the blowout; and

2) Plaintiffs have not developed any expert evidence showing that Dril-Quip's wellhead system or its services caused or contributed to the incident.

### A. There Is No Genuine Dispute as to Whether Dril-Quip's Wellhead System Caused or Contributed to the Incident Because the Evidence Conclusively Proves That It Did Not

All claims against Dril-Quip related to its products are ultimately grounded in negligence or product liability.[13] The elements of negligence are: 1) breach of 2) a duty

---

[13] To the extent there are claims against Dril-Quip for contribution, common law indemnity, and/or subrogation, those claims require the complaining party to show "fault" or "liability" on Dril-Quip's part in order to shift all or part of its own liability to Dril-Quip. *See, e.g.,* 33 U.S.C. §2709 (Oil Pollution Act ("OPA") contribution to be asserted against "liable or potentially liable" persons). As stated, the only grounds for "fault" alleged or suggested by any party against Dril-Quip are negligence and product liability. Therefore, claims against Dril-Quip for contribution, common law indemnity or subrogation fail because there is no evidence of causation or fault to support the negligence and product liability claims.

5

owed to plaintiff 3) causing 4) damage or injury.  *Canal Barge Co. v. Torco Oil Co*., 220 F.3d 370, 376 (5th Cir. 2000).  The elements of product liability are: 1) breach of 2) a duty owed by manufacturer to plaintiff 3) causing 4) injury to plaintiff. [14]  *See Vickers v. Chiles Drilling Co*., 822 F.2d 535 (5th Cir 1987).  Although different causation standards may apply to these legal theories, such as proximate cause, producing cause, or substantial cause, each requires at minimum proof of cause in fact.[15]  The evidence here,

---

[14] The elements of negligent products liability are the same as those for negligence.  *See Syrie v. Knoll Intern.*, 748 F.2d 304, 307 (5th Cir. 1984).

[15] *Moser v. Texas Trailer Corp*., 623 F.2d 1006, 1012 (5th Cir. 1980) ("Before a court turns to the policy considerations embraced by the term 'proximate cause,' it must first determine whether the defendant's alleged negligence in fact caused the defendant's injury."); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994) (en banc) ("[O]bviously there must be a causal connection between the defect and the injury."); *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992) (discussing negligence under general maritime law, the court wrote "[L]egal cause is something more than 'but for' causation, and the negligence must be a 'substantial factor' in the injury."); *Flock v. Scripto–Tokai Corp*., 319 F.3d 231, 238 (5th Cir. 2003) (same); *Stahl v. Novartis Pharmaceuticals Corp*., 283 F.3d 254, 261 (5th Cir. 2002) (product liability claims under Louisiana law require a showing of proximate cause); *Austin v. Will-Burt Co*., 361 F.3d 862, 869 (5th Cir. 2004) (failure to warn claims under Mississippi law require a showing of proximate cause); Miss. Code. Ann. § 11-1-63 (providing a cause of action where a product causes an injury); Restatement (Third) of Torts: Prod. Liab. § 15 (1998) (requiring causal connection between defect and harm); Restatement (Second) of Torts § 430 (1965) ("[I]t is necessary not only that the actor's conduct be negligent toward the other, but also that the negligence of the actor be a legal cause of the other's harm.").  The substantial factor standard generally produces the same results as does the "but for" rule of causation which states that a defendant's conduct is a cause of the injury if the injury would not have occurred "but for" that conduct.  *Rutherford v. Owens-Illinois, Inc*., 16 Cal. 4th 953, 969, 941 P.2d 1203, 1214 (1997) (citing Prosser & Keeton on Torts (5th ed.1984) § 41, p. 266).  Many courts define the substantial factor test as a "but for" test.  *Donaghey v. Ocean Drilling & Exploration Co*., 974 F.2d 646, 649 (5th Cir. 1992) ("The term 'substantial factor' means more than 'but for the negligence, the harm would not have resulted.'").  *See also Parks v. AlliedSignal, Inc*., 113 F.3d 1327, 1332 (3rd Cir. 1997) ("The substantial factor test has replaced the 'but for' causation test in strict liability contexts precisely because in design defect cases it is typically a matter of speculation whether the presence of a safety device would, in a given instance, have actually prevented a harm.").

6

however, conclusively shows that Dril-Quip's wellhead system was not a cause in fact of the incident.[16]

Although Dril-Quip's wellhead systems are complex pieces of equipment, it is only necessary to consider certain parts of the Macondo Wellhead System and well to understand why the evidence conclusively shows that the Macondo Wellhead System did not cause or contribute to this incident. These parts are: (1) the wellhead housing, (2) the casing hangers, (3) the production casing, (4) the production casing annulus, (5) the seal assembly, and (6) the lock down sleeve. A diagram of these items, and an explanation of each, is shown below:



---

[16] Evidence that has been designated confidential or highly confidential has been submitted sealed as required by Court order.

**The Wellhead (or Wellhead Housing)**

In simplest terms, the wellhead is a large cylindrical metal tube at the mudline that extends above and below the sea floor.

**The Casing Hangers**

Various strings of casing – essentially long metal hollow tubes like drinking straws – are inserted into the wellbore attached to casing hangers. The casing hangers are, in turn, connected to the inside of the wellhead (or to other casing strings deep within the well).[17]

**The Production Casing**

During drilling operations, multiple strings of casing were inserted in the wellbore. The casing strings decreased in diameter as they proceeded downhole, from 36 inches at the top, to 28 inches, 18 inches, 16 inches, 13-5/8 inches, 11-7/8 inches, and finally, 9-7/8 x 7 inches at the level of the producing formations. The last, 9-7/8 x 7 inches string of casing is referred to as the production casing. The production casing with production tubing is the pathway through which hydrocarbons are produced from the well through the wellhead. Although they are hung from the wellhead, the casing strings are not part of the wellhead system and are not supplied by Dril-Quip.

**The Production Casing Annulus**

The production casing annulus is a space exterior to the production casing, between the production casing and the other larger diameter casing strings.

---

[17] Exh. E, Subsea Wellhead Functional Specification (Proposed TREX 91,099) at BP-HZN-2179MDL000368467 to BP-HZN-2179MDL000368469.

**The Seal Assembly**

There are flow ports in the production casing hanger that communicate with the production casing annulus, allowing fluids in the annulus to flow through the wellhead and up to the riser.[18] The flow ports are used to circulate wellbore drilling fluids from the production casing annulus. Once that procedure is completed, the seal assembly is installed on top of the production casing hanger to seal off the flow ports.[19]

In the Macondo Well, the seal assembly was installed on top of the casing hanger in the first hours of April 20, 2010.[20] The seal assembly was then positive pressure tested.[21] The tests confirmed that the casing hanger and seal assembly were properly seated in the wellhead.[22] Later that day, the casing hanger and seal assembly were again tested when the integrity of the production casing above the float collar[23] was also tested. This test further confirmed the position of the casing hanger and seal assembly in the

---

[18] Exh. K, Dril-Quip Service Agreement, Macondo 4/12/10 (Depo. Exh. 2796) at DRQ00040566 to DRQ00040567.

[19] Exh. E, Subsea Wellhead Functional Specification (Proposed TREX 91,099) at BP-HZN-2179MDL000368469 to BP-HZN-2179MDL000368470.

[20] Exh. L, Daily Operations Report Macondo, 4/19/10 at BP-HZN-2179MDL00258467 to BP-HZN-2179MDL00258468; Exh. M, Transocean DWH Morning Report, 4/19/10 at TRN-MDL-00652208.

[21] *Id.*

[22] Exh. A, Expert Report of John H. Barker (Depo. Exh. 7921) at 34; Exh. K, Dril-Quip Service Agreement, Macondo 4/12/10 (Depo. Exh. 2796) at DRQ00040566; Exh. N, MC252 #1 Macondo Production Casing Positive Pressure Tests (Proposed TREX 91,104).

[23] The float collar was located in the production casing at 18,115 feet measured depth, approximately 189 feet from the bottom of the Macondo Well.

wellhead and showed that the production casing above the float collar was structurally sound.[24]

Installing the casing hanger, seal assembly, and production casing was part of the completions work that was required to transition the Macondo Well from an exploration well to a production well that could commercially produce hydrocarbons.[25] During production, hydrocarbons would flow from the reservoir, or producing formations, up the interior of the production casing (generally contained within subsequently placed production tubing), and past the interior of the wellhead system.

**The Lock Down Sleeve**

The lock down sleeve is a component that sits on the casing hanger and locks the seal assembly and casing hangers into place in the wellhead. The lock down sleeve was not installed at the time of the blowout.[26] Nevertheless, the Macondo seal assembly sealed off the inside of the wellhead from the production casing annulus, and the casing hanger and seal assembly remained properly seated in the wellhead.

**Flow Path**

In the Macondo wellbore, two possible avenues existed for hydrocarbons to reach the riser from the reservoir. One possible avenue was up the production casing annulus and past the casing hanger and seal assembly. The other possible avenue was up the production casing and through the interior of the wellhead system.

---

[24] Exh. N, MC252 #1 Macondo Production Casing Positive Pressure Tests (Proposed TREX 91,104).

[25] Exh. O, Expert Report of David Lewis (Depo. Exh. 8098) at 9.

[26] Exh. P, Testimony of James Cowie at 231:19 to 232:3; Exh. Q, Testimony of John Sprague at 213:20 to 214:2, 215:4 to 215:11; Exh. R, Testimony of David Wall at 256:2 to 256:23.

**The Evidence**

The expert witnesses have concluded, and the evidence establishes, that the flow path of the hydrocarbons to the surface was up the production casing and through the interior of the wellhead system.[27] The significance of this evidence is that the Macondo Wellhead System could not have caused or contributed to the incident. The casing hanger and seal assembly were not involved in any way because no hydrocarbons flowed to the surface in the space where they were located, in the production casing annulus that was *exterior* to the 9-7/8 x 7 inch production casing. The hydrocarbons, instead, flowed through the *interior* of the production casing which is not designed to inhibit the flow of hydrocarbons.[28] Thus, the Macondo Wellhead System functioned properly, and it did not cause or contribute to the incident—the casing hanger and seal assembly were properly

---

[27] Experts who opined in their reports that the flow path of hydrocarbons was up the production casing include: Exh. S, Expert Report of William Abel (Depo. Exh. 7737) at 44, 45; Exh. A, Expert Report of John H. Barker (Depo. Exh. 7921) at 29 to 50; Exh. T, Expert Report of Morten Haug Emilsen (Depo. Exh. 7400); Exh. U, Expert Report of Richard Heenan (Depo. Exh. 7528) at 7.

Experts who testified that the flow path of hydrocarbons was up the production casing include: Exh. V, Testimony of Calvin Barnhill at 220:20 to 222:14, 364:8 to 364:13, 407:12 to 407:19; Exh. W, Testimony of Robert Grace at 318:19 to 322:9; Exh. X, Testimony of John Hughett at 203:2 to 203:17, 476:1 to 476:9, 521:3 to 521:25.

Experts who assumed that the flow path of hydrocarbons was up the production casing include: Exh. Y, Testimony of J.J. Azar at 293:22 to 294:10; Exh. Z, Testimony of Glen Benge at 298:5 to 298:12, 495:5 to 496:21; Exh. AA, Testimony of Ian Frigaard Vol. 2 at 101:5 to 101:17; Exh. BB, Testimony of Lindell McGuire at 207:23 to 208:12; Exh. CC, Testimony of Richard Strickland at 104:1 to 105:5; Exh. DD, Testimony of Marion Woolie at 72:22 to 73:12.

[28] Exh. EE, Testimony of Patrick Campbell at 42:24 to 43:20; Exh. FF, Testimony of Mark Mazzella at 225:10 to 229:12, 332:1 to 332:18; Exh. GG, Testimony of Mark Bly at 59:2 to 59:18, 60:7 to 60:14; Exh. HH, Testimony of Paul Tooms at 573:15 to 574:22; Exh. II, Testimony of David Wall at 259:7 to 259:25; Exh. JJ, Testimony of Doug Suttles at 827:25 to 828:23; Exh. KK, Testimony of Patrick O'Bryan at 832:16 to 832:25.

installed in the Macondo well before the blowout and remained properly seated in the wellhead throughout the blowout.

No party or expert providing opinions regarding flow path disputes that the flow path of hydrocarbons was up the production casing. After the Macondo Well was killed, the flow path of hydrocarbons was conclusively established by forensic evidence showing that the casing hanger and seal assembly remained properly seated in the Macondo Wellhead System.[29]

- On September 9, 2010, the Dril-Quip lead impression tool was run in the wellbore before installing a lock down sleeve to determine the position of the casing hanger and seal assembly in the wellhead housing.[30] The lead impression tool was lowered into the Macondo wellbore and landed in the profile of the casing hanger and seal assembly, and the lead blocks made an impression of the profile of the casing hanger and seal assembly. The impression showed that the casing hanger and seal assembly were properly seated in the wellhead housing.

- On September 10, 2010, the 9-7/8 x 7 inches production casing was positive pressure tested at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. A straight line was charted during the test, and the test was interpreted as successful.[31] The positive pressure test examined the integrity of the casing hanger and seal assembly and confirmed that the casing hanger and seal assembly remained properly seated in the wellhead housing.

- On September 11, 2010, a lock down sleeve was installed in the Macondo Well. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[32] The lock down sleeve could not have been

---

[29] Exh. LL, Additional Facts Relevant to Hydrocarbon Flow Path Up to the Wellhead at Mississippi Canyon Block 252 (Proposed TREX 91,120); Exh. MM, Testimony of John Sprague at 797:10 to 813:22; Exh. NN, Testimony of Billy Ambrose at 685:15 to 687:8; Exh. OO, Testimony of Gary Hurta at 153:11 to 154:6; Exh. PP, Testimony of Paul Tooms at 571:13 to 572:10.

[30] Exh. QQ, Daily Operations Report DDII, 9/9/10 (Proposed TREX 91,121).

[31] Exh. RR, Daily Operations Report DDII, 9/10/10 (Proposed TREX 91,122).

[32] Exh. SS, Daily Operations Report DDII, 9/11/10 (Proposed TREX 91,123).

installed unless the casing hanger and seal assembly were properly seated in the wellhead housing.

- The casing hanger and seal assembly were removed from the Macondo Well on October 13, 2010.[33] Everyone who has inspected or reviewed pictures of the casing hanger and seal assembly concludes that the flow was up the production casing because the exterior of the casing hanger and seal assembly show no signs of flow erosion.[34]



- When the casing hanger was removed from the Macondo Well, white paper on the exterior of the casing hanger remained visible.[35] The white paper remained intact because no hydrocarbons flowed past the exterior of the casing hanger and seal assembly.



---

[33]    Exh. TT, Daily Operations Report DDII, 10/13/10 (Proposed TREX 91,131).

[34]    Exh. UU, Testimony of John Sprague at 808:17 to 811:16; Exh. VV, Testimony of Billy Ambrose at 691:1 to 691:6; Exh. WW, Testimony of Gary Hurta at 219:2 to 221:19; Exh. XX, Testimony of Mark Bly at 107:16 to 108:12; Exh.YY, Testimony of Patrick O'Bryan at 834:15 to 835:5.

[35]    Exh. ZZ, Photograph of the Macondo Casing Hanger (Depo. Exh. 0911).

13

- The Macondo seal assembly's elastomeric seals were recovered after the casing hanger and seal assembly were removed from the Macondo Well. The recovered pieces of the elastomeric seal are significant because they show no evidence of flow erosion and indicate that the seal assembly was properly seated in the wellhead housing during the static kill.[36]



Further evidence that the flow path was up through the production casing is the forensic evidence demonstrating that the production casing annulus still contained drilling mud that was left there prior to the blowout.

- After the lock down sleeve was installed, the relief well intercepted the production casing annulus of the Macondo Well at 17,220 feet true vertical depth. The lack of significant pressure response at the time the Macondo Well was intercepted indicated that the production casing annulus was filled with drilling mud, not hydrocarbons. Furthermore, no evidence of hydrocarbons was present during the bottoms up circulation conducted shortly after the Macondo Well was intercepted.[37]

- On September 22, 2010, Schlumberger used an isolation scanner to log the characteristics of the fluid in the annulus of the production casing at 5,050 and 9,318 feet measured depth. Schlumberger reported that this logging indicated that no free gas was present.[38]

---

[36]   Exh. A, Expert Report of John H. Barker (Depo. Exh. 7921) at 45-46.

[37]   Exh. AAA, Gulf of Mexico SPU, GoM Drilling and Completions, Technical File Note for DD3 Relief Well, Mechanical and Hydraulic Intersection Indicators (Proposed TREX 91,605).

[38]   Exh. BBB, Schlumberger Isolation Scanner Log Summary (Proposed TREX 91,124).

14

- On October 7, 2010, the production casing was perforated between 9,176 and 9,186 feet and monitored for pressure and returns. During this time, the Macondo Well remained static, and no u-tube effect was detected.[39] The absence of significant flow was because drill mud, not hydrocarbons, was in the production casing annulus.

- On October 11, 2010, the production casing was cut at 9,150 feet.[40] The next day, mud was circulated out of the wellbore and taken for testing.[41] The removed mud consisted of the same density of mud left in the production casing annulus before the blowout. Moreover, an analysis of the mud showed no presence of low-density hydrocarbons, which is consistent with the flow path being up the production casing.[42]

In addition to the forensic evidence, flow path modeling for the Macondo blowout showed that the flow path of hydrocarbons was up the production casing.

- Modeling utilizing the wellbore schematic, drilling data, and witness accounts show that hydrocarbons flowed up the production casing.[43]

- [44]

Several reports about the Macondo blowout determined that the flow path was up the production casing and that Dril-Quip's products did not cause or contribute to the blowout.

---

[39]    Exh. CCC, Daily Operations Report DDII, 10/7/10 (Proposed TREX 91,125).

[40]    Exh. DDD, Daily Operations Report DDII, 10/11/10 (Proposed TREX 91,126).

[41]    Exh. EEE, Daily Operations Report DDII, 10/12/10 (Proposed TREX 91,127).

[42]    Exh. FFF, Sample Program for DDII Annulus Displacement (Proposed TREX 91,128).

[43]    Exh. T, Expert Report of Morten Haug Emilsen (Depo. Exh. 7400); Exh. GGG, Transocean Investigation Report (Depo. Exh. 4304) at Appendix G: Report, Hydraulic Analysis of Macondo, Section 5.4.

[44]    Exh. HHH, Static Kill Operation-Flowpath Analysis (Proposed TREX 91,112).

- The BP Investigation concluded that the flow path was up the production casing and that the casing hanger and seal assembly remained properly seated in the wellhead.[45]

- The Transocean Investigation Report stated that "there were no failure points associated with the subsea wellhead system or its components . . . that contributed to the Macondo incident."[46]

No wellhead system is designed to stop fluids from flowing through the interior of the wellhead housing, as the hydrocarbons did during the Macondo Well blowout. Therefore, the evidence conclusively shows that the Macondo Well blowout would have occurred regardless of Dril-Quip's wellhead system and the system was not a cause in fact of the incident.

**B. There is No Genuine Dispute as to Whether Dril-Quip's Wellhead System or Services Caused or Contributed to the Incident Because There is No Expert Testimony That Dril-Quip's Wellhead System or Services Caused or Contributed to the Incident**

Dril-Quip seeks summary judgment on all of the Plaintiffs' claims because there is no genuine issue of material fact with respect to whether the Macondo Wellhead System or any alleged act or omission by Dril-Quip caused or contributed to the incident. Based on the evidence, no fair-minded fact finder could return a verdict against Dril-Quip on any theory of liability. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986).

The causes of the Macondo blowout are not within the ambit of common, lay knowledge. Expert testimony is required to show that Dril-Quip's wellhead system or its

---

[45] Exh. III, Deepwater Horizon Investigation Report, (Depo. Exh. 0001) at 10. BP in a memorandum issued after BP's Investigation Report was released stated that evidence collected during the abandonment of the Macondo Well further confirmed the Investigation's conclusion that the flow path was up the production casing. Exh. LL, Additional Facts Relevant to Hydrocarbon Flow Path Up to the Wellhead at Mississippi Canyon Block 252 (Proposed TREX 91,120).

[46] Exh. JJJ, Macondo Well Incident Transocean Investigation Report, Volume 1, (Depo. Exh. 3808) at 44.

16

conduct was a cause of the blowout. Without such evidence, no genuine fact dispute exists. *See Villegas v. Waste Mgmt. of Louisiana LLC*, 133 F. App'x 966, 968 (5th Cir. 2005) (upholding summary judgment because the non-movant failed to present expert testimony on causation).

Fact discovery regarding the cause of the blowout is complete and all expert witness reports and Rule 26 expert witness disclosures have been submitted. None of these reports or disclosures includes any opinions that Dril-Quip's wellhead system or its services caused or contributed to the incident in any way.[47] Similarly, all but rebuttal experts and James Friedheim have been deposed to date, and consistent with their reports and disclosures, none has opined that Dril-Quip's wellhead system or services caused or contributed to the Macondo Well blowout.[48]

A defendant should not be required to bear the unnecessary costs of trial to defend against claims that have no merit. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994) (en banc). Nor is it fair to the other parties and the Court to try meritless claims and present evidence on undisputed issues when those issues can be resolved by summary judgment. *Id*. Because the record lacks any evidence supporting any theory that Dril-Quip's wellhead system or conduct caused the incident, its motion for summary judgment should be granted.

---

[47] BP's, Transocean's, and the Chief Counsel's investigative reports about the Macondo Well blowout also express no opinions that Dril-Quip's wellhead system or services caused or contributed to the blowout. Exh. III, Deepwater Horizon Investigation Report (Depo. Exh. 0001) at 10; Exh. JJJ, Macondo Well Incident Transocean Investigation Report, Volume 1, (Depo. Exh. 3808) at 44.

[48] *See e.g.,* Exh. KKK, Testimony of Leo Abel at 591:6 to 591:25; Exh. LLL, Testimony of J.J. Azar at 441:8 to 451:21; Exh. MMM, Testimony of Fredrick Beck at 540:19 to 541:2; Exh. NNN Testimony of Robert Grace at 318:1 to 318:13; Exh. OOO Testimony of John Hughett at 498:23 to 499:3.

## IV. Conclusion

For the reasons stated, Dril-Quip respectfully requests that the Court enter summary judgment in its favor on all claims against it.

Date:   December 23, 2011

Respectfully submitted,

**WARE, JACKSON, LEE & CHAMBERS, LLP**

By:   /s/ Don Jackson
     Don Jackson
     Texas Bar No. 10476000
     Fed ID No. 6915
     C. Dennis Barrow, Jr.
     Texas Bar No. 00796169
     Fed ID No. 20624
     2929 Allen Parkway, 42nd Floor
     Houston, TX 77019
     Phone: (713) 659-6400
     Fax: (713) 659-6262
     Counsel for Defendant, Dril-Quip, Inc.

## **CERTIFICATE OF SERVICE**

      I certify that the above and foregoing document will be served on all counsel by electronically uploading the same to LexisNexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 23 day of December, 2011.

      /s/ Don Jackson  
      Don Jackson