

**U.S. Department of Justice**

Environment and Natural Resource Division

*P.O. Box 7611*
*Washington, DC 20044*
*202-514-0180*
*Sarah.Himmelhoch@usdoj.gov*

December 21, 2011

**BY ELECTRONIC MAIL**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the
 Eastern District of Louisiana
Hale Boggs Federal Building
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

> Re:   MDL 2179: BP's Motion to Compel Production from the Zantaz/Autonomy
>        Archive

Dear Judge Shushan:

 BP's Motion to Compel seeks to require the United States to spend $850,000 to recover emails created before the spill that are at best marginally relevant to the issues in Phase I and even less relevant to Phase II.  The United States opposes this motion.  As set forth below, the information already provided by the United States, the burden of collection and production, and the physical limitations on the United States' ability to complete collection prior to the Phase I trial all demonstrate that the burden and delay imposed by searching the Zantaz archive far outweigh any benefit of the requested discovery.

 BP erroneously argues that the United States is resisting discovery because of the unique status of the United States or the budget limitations facing the United States.  *See* BP Letter at 5 (citing *Bradley v. United States*, 866 F.2d 120, 126 (5th Cir. 1989)).  To the contrary, the United States has fully participated in discovery in this litigation.  It has searched more custodians' files and produced more documents and pages than *any other party* in this litigation.  While the litigation money may be harder to come by for the United States than BP, the United States' resistance to searching the Zantaz archive is based on the requirement to balance the benefit derived from the discovery against the cost of the discovery.

**I.      BOEMRE Emails are not Centrally Relevant to the Issues to be Tried in Phase I**

 In its motion to compel, BP seeks to obscure the central question to be addressed in Phase I. Judge Barbier has defined the Phase I trial as addressing:

Phase One ["Incident" Phase] of the Trial will address issues arising out of the conduct of various parties, third parties, and non-parties allegedly relevant to the loss of well control at the Macondo Well, the ensuing fire and explosion on the MODU DEEPWATER HORIZON on April 20, 2010, and the sinking of the MODU DEEPWATER HORIZON on April 22, 2010, and the initiation of the release of oil from the Macondo Well or DEEPWATER HORIZON during those time periods (collectively, the "Incident"). Phase One will include issues asserted in or relevant to counterclaims, cross-claims, third-party claims, and/or comparative fault defenses as appropriate.

Amended PTO 41 § I.  In other words, this first trial is focused on what actions or inactions of BP and its co-defendants caused or contributed to the death of eleven people and the largest environmental disaster in the history of this country.

While BOEMRE may have information relevant to issues of regulatory compliance, it is clear that the central information to Phase I is not held by the United States.  One indicator of this fact is that, in a Phase of discovery in which approximately 249 fact witnesses were deposed (approximately 98 of those were employees of BP), BP elected to depose only *six* BOEMRE employees (including three Rule 30(b)(6) designees).

## II.    BP Has Already Received Access to the Relevant Information

BP provides a laundry list of emails it is seeking as justification for requiring the search of the Zantaz archive.  Many of these categories are just subsets of the general proposition that BP is seeking emails relating to the design, review, and approval of its own wells and those of its competitors.  *See* BP Letter at Att. 1.  For instance, BP seeks "emails referring or relating to any application for the MC252 Well filed by BP . . . ."  BP Letter at Att. 1.   The discovery record is clear that BP has already received exhaustive discovery of the best and most complete sources for this information.

Review and approval of not only BP's, but all operators, plans and applications are tracked in BOEMRE's Technical Information Management System (TIMS) and the E-Well web-based permitting system.  These systems incorporate any substantive emails relating to the permitting, review, or approval process.  *See* Ex. 1 ¶ 3.  The United States has given BP unprecedented and discomfiting access to the information contained in TIMS and E-Well.  Because of the importance of this litigation and BP's asserted need to compare itself to other operators for purposes of its defenses, the United States provided all the relevant tables from TIMS and all documents that reside in E-Well for the period of April 20, 2005 through April 20, 2010.[1]  This was a remarkable discovery concession on the part of the United States because it gave BP access to closely held proprietary and deliberative information relating to all of BP's Gulf of Mexico competitors.  This information already provided by the United States gives BP

---

[1] Evidence of the United States' work with BP to produce the relevant information from TIMS can be found in the attachments to the United States' November 22, 2011 opposition to BP's motion to compel answers to interrogatories.

ample information regarding the review and approval of its own permit applications, as well as the review and approval of all other similarly situated operators.

Similar analysis can be performed for the other topics identified by BP as potentially touched-upon by emails in the Zantaz archive. Many of the topics have been addressed by the United States through Rule 30(b)(6) testimony and many others have been addressed by substantial document productions. *See, e.g.,* Ex. 2; Ex. 3. Thus, the question is not whether BP has been provided substantial *information* in response to its purported discovery needs, but whether the United States should be required to expend $850,000 to find additional, marginally relevant emails on these same topics.

## III.    The Search of the Zantaz Archive Is Unduly Burdensome

BP's argument that the search of the Zantaz archive is appropriate and not unduly burdensome is premised upon an improperly narrow reading of the law and a selective analysis of the facts. When all of the factors are considered, BP's motion should be denied.

### A.    The Legal Standard

BP emphasizes in its motion that the stakes in this case are very high and, therefore, that expensive discovery is nearly *per se* appropriate whenever potential relevance can be found. BP de-emphasizes, however, the most important factor to be weighed in deciding this motion to compel: the importance of the discovery in resolving the issues. A case that demonstrates the importance of this factor is *US ex rel. McBride v. Halliburton Co.*, 272 F.R.D. 235, 239-41 (D.D.C. 2011). In declining to order searches of thirty-five additional email custodians, the court ruled that: "[a]ll discovery, even if otherwise permitted by the Federal Rules of Civil Procedure because it is likely to yield relevant evidence, is subject to the court's obligation to balance its utility against its cost." *Id*. at 240 (citing Fed. R. Civ. P. 20(b)(2)(C)). Though the court found that that the *McBride* case raised "important, vital issues" and that the amount in controversy was "great," it still declined to order additional discovery. *Id*. at 241. In so doing, the court stated:

> On the other hand, the defendants protest, and relator does not deny, that they have already spent a king's ransom on discovery in this case–$650,000– without the addition of attorneys' fees. . . . They have produced more than two million paper documents, thousands of spreadsheets, and over a half a million e-mails. . . .

> Given the discovery that relator has had, what defendants have already spent, and the detailed showing made of how much more time and money will likely have to spent to search an additional thirty-five custodians, surely relator has to make a showing that the e-mails not produced are crucial to her proof. . . .

> In this context, it is telling that relator does not show from the e-mails she has received that there is good reason to believe that the ones she claims are missing are highly probative of some fact. Indeed, there is no showing whatsoever from what has been produced that those e-mails not produced will make the existence of some crucial fact more likely than not.

*Id*. at 241.  Applying this standard to BP's proposed discovery, the motion to compel should be denied because BP has failed to show that the Zantaz materials will make the existence of some crucial fact more likely than not.

> **B.      These Searches are Burdensome and Cannot be Completed in a Reasonable Time[2]**

The search for the emails of the sixty-one custodians within the Zantaz archive will be burdensome.  BP asserts that the United States' cost estimates are exaggerated.  As demonstrated in the declaration of the Department of the Interior's project manager for this discovery project, the United States' cost estimate is grounded in experience and the best information offered by the third party vendor who operates the Zantaz archive.  Notably, searches for responsive emails cannot be conducted within the archive as it exists now.  The platform simply does not support the complex search strings that the United States is required to use for the searches.  *See* Ex. 4 ¶ 8.  Accordingly, the United States has determined that the only feasible option would be to export all of the emails for the specified custodians for the agreed upon time period and then search those emails in a separate platform.  Using reasonable statistics derived from experience, the Department's project manager estimates that this additional collection, culling, hosting, privilege review, and production would cost at least $850,000.  *Id*. ¶ 25.  BP's unsworn challenges to these estimates overlook the full costs and underestimate the burden imposed by what BP is demanding.

Further, BP has not addressed the limitations on data transmission speeds that would prevent completion of these searches in the time available before Trial 1.  As Mr. Irish attests, Autonomy has estimated that any of the various options for collecting these emails will take more than two months.  This time frame does not even include the necessary time after collection to process, review, and produce the documents in accordance with Pretrial Order 16.  It was for this reason, that the United States advised BP:

> We are happy to cooperate with BP in the process, but . . . even if the comparison [between Zantaz and the live system] shows that there is a gap between the two collections, the United States still believes that searching the Zantaz collection for all of the affected custodians will take longer than the schedule will permit and cost[] more than the benefit of conducting those searches.  We encourage BP to focus on identifying a small number of custodians whose Zantaz emails we can collect, search, and produce before the February 2012 trial.

---

[2] In this case, the United States is not arguing that the Zantaz archive is, in all instances, "not reasonably accessible." Rather the United States contends that the particular searches and number of custodians in this instance are unduly burdensome.  Therefore, BP's arguments based on the analysis of Rule 26(b)(2)(B) are not relevant.  If these arguments were relevant, BP's citation to a motion filed nine years ago in *Cobell v. Norton* would still be inapposite.  That motion described the *intended* use of the Zantaz email system and does not speak to its actual capabilities or use. In fact, Department has never used Zantaz to perform the kind of complex and extensive searches BP seeks to compel. Ex. 4 ¶ 4.

BP Letter Att. 3 at 2.  What was true in August is even truer today – time does not permit the search of the Zantaz archive, even if the Court were to determine that the search was worth the exorbitant expense.

### C.    BP's Numerical Analysis Does Not Demonstrate Relevance of the Emails

BP attempts to overcome the burden imposed by searching the Zantaz archive by presenting a numerical analysis of the number of emails found in Zantaz as opposed to the live system to demonstrate that there are unique documents in Zantaz.  The United States does not deny that there are unique emails in Zantaz.  That point, however, does not demonstrate that the unique emails contain *information* that is otherwise unavailable and it certainly does not demonstrate that these unique emails are "are crucial to [BP's] proof" as required by *McBride* and similar decisions.  *See*, *e.g.*, 272 F.R.D. at 241.

There are many ways in which the numbers BP presents are likely to overestimate the number of unique emails found in Zantaz.  *See* Ex. 4 ¶¶ 28-34.[3]  First, by their very nature emails will be found in at least two and usually more than two mailboxes – of necessity emails must have a sender and a recipient.  BP's analysis was limited to only four custodians' mailboxes and only analyzed the difference between Zantaz and the live email system for each individual custodian.  Thus, BP's analysis does not show whether the Zantaz only emails would be found in other custodians' live email boxes.  A simple example of this point is that at least ninety-five of the Zantaz-only messages were addressed to "all employees."  An analysis of only four of the 138 live custodial mailboxes overlooks the distinct possibility that some or all of the emails addressed to multiple recipients would be found in another custodians' live mailbox.

Second, BP's analysis does not address other ways in which copies of emails could be found in the live system.  Many emails are sent in chains and many individuals have a practice (when not under a litigation hold) of only keeping the final email in the chain – thus if there were eleven emails in the chain, the live mailbox could show only one email where Zantaz would show eleven.  Nonetheless the substantive information in those emails would be fully captured in the live mailbox.

Moreover, numbers alone simply do not answer the question of central relevancy.  BP's analysis does not speak to the quality of the information contained in what it calls the "large quantity of non-privileged documents" that are responsive to the search terms and found only in Zantaz.  In fact, as BP has often complained, the search terms agreed upon by the parties are very broad and have at times resulted in the production of completely irrelevant information.  A quick review of the emails that BP designated "Zantaz only" shows that 185 of these messages have the subject of "Your Password," 183 have a subject line of "Mail delivery failed," and 165 have the subject of "Registration Confirmation," strongly suggesting that a large number of the "responsive" emails are non-substantive and far from "highly relevant."  *See* Ex. 4 ¶ 33.

---

[3] The United States does not concede that BP's analysis is actually accurate (*see* Ex. 4 ¶ 28), but does not press that point here because, even assuming BP's analysis is accurate, it does not prove the necessary point.

BP asserts that the United States has listed three Zantaz emails as exhibits and that therefore that "crucial" documents remain to be found in the Zantaz archive.  BP Letter at 7.  BP's argument, however, is misplaced.  The United States agreed that the four custodians determined to be central enough to be deposed in Phase I warranted a Zantaz search.  BP has made no showing that the additional sixty-one custodians have similarly central involvement.  Moreover, BP does not demonstrate that the *information* found in these three emails could not be found among the other documents the United States has produced.

Even if accurate, BP's numerical analysis does not address the substance – the actual relevance of the emails sought and the absence of similar proof from other sources.  BP has received productions from the live mailboxes of 138 custodians, the hard drives and shared drives of those same custodians, the entire E-Well database, the relevant tables from the TIMS database, and relevant documents from central paper and electronic files.  Accordingly, any benefit of the additional emails found in Zantaz is far outweighed by the $850,000 price tag and the fact that searches and production could not be completed before the Phase I trial begins.

## III.   Conclusion

BP's own objections to discovery in this action demonstrate that *no party* has been required to produce every single email or document that could be relevant in this matter.  BP's general objections have routinely stated that it would conduct only reasonable searches and that it was "not offering or promising to search for and produce every document or piece of information that may exist in the possession, custody, or control of any of the[] tens of thousands of employees and agents where any such items are not included within the results of a reasonable search . . . ."  Ex. 5 at 380.     BP should not be permitted to hold the United States to a different standard.  The United States has conducted a reasonable search and has granted BP unprecedented access to the most likely repositories of the relevant information, particularly with respect to Phase I.  For these reasons, BP's motion to compel should be denied.

Sincerely,

/s/ Sarah D. Himmelhoch

Senior Litigation Counsel for E-Discovery
Environment & Natural Resources Division

cc:     Liaison and Coordinating Counsel

# Exhibit 1

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**In re: Oil Spill by the Oil Rig**      **MDL NO. 2179**
**"Deepwater Horizon" in the Gulf**
**of Mexico, on April 20, 2010**      **SECTION J**

**Applies to:** *All Cases*      **JUDGE BARBIER**
     **MAGISTRATE JUDGE**
     **SHUSHAN**

### DECLARATION OF MICHAEL T. PRENDERGAST

I, Michael T. Prendergast, hereby declare as follows:

1. I am the Deputy Regional Director in the Gulf of Mexico Outer Continental Shelf Region (OCS Region) at the Bureau of Safety and Environmental Enforcement at the Department of the Interior.

2. I have been employed at the OCS Region for 28 years and have personal knowledge of the policies and procedures governing the approval of well designs, well operations, well control, and spill preparedness plans in the OCS Region.

3. Pursuant to OCS policies and procedures associated with well operations that have been fully in place since approximately 2004, information pertaining to such approvals is recorded in the Technical Information Management System (TIMS) and the e-well web-based permitting system. This would include email communications of any significance that are scanned as attachments to the databases.

4. Since the oil spill occurred, the Office of the Solicitor has worked with the OCS Region to collect documents and data for production in the oil spill litigation, including information stored on the hard drives and network share files of the agreed-upon document custodians, and data from the TIMS and e-well systems.

5. It is extremely unlikely that any significant information pertaining to the approval of well designs, well operations, well control, or spill preparedness plans would reside solely in the email of OCS document custodians and not also be reflected in the information that has already been collected by SOL.

6. All of the information set forth in this declaration is based upon my personal knowledge or upon information furnished to me in my official capacity.

In accordance with 28 U.S.C. § 1746, I declare that the foregoing is true and correct to the best of my knowledge.

Executed December 20, 2011.

*Michael T. Prendergast*

Michael T. Prendergast

**Exhibit 2**



**U.S. Department of Justice**

Environment and Natural Resource Division

*P.O. Box 761*
*Washington, DC 20044*
*202-514-0180*
*Sarah.Himmelhoch@usdoj.gov*

August 3, 2011

**BY ELECTRONIC MAIL**

Gary Yen-Nan Chyi, Esq.
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
gary.chyi@kirkland.com

   Re: MDL 2179: Remaining Custodians Requested by BP

Dear Mr. Chyi:

   I write in response to your letter of July 29, 2011 raising a series of questions regarding the United States' responses to BP's first set of document requests.

**1. Data Dictionary Information, Data Lookup Tables, and Merge Keys-Linking Information**

   You are correct that, as a result of miscommunication between me and the Department of the Interior, the replacement TIMS database addressed only a portion of the issues raised in your earlier letter. I apologize for the inconvenience and delay.

   I have been working with the Department of the Interior ("DOI") to address your questions. Unfortunately, the primary individual with knowledge of these issues has been out of the office since we received your letter. He is expected to return on Monday. In the meantime, we were working with other staff familiar with TIMS in an attempt to collect and provide the information to you by today. We have compiled some information, which I attach to make a good faith showing that we are working towards resolving this issue and in the hopes that it may serve useful to you during the time it takes us to complete our response. I can commit to you that as soon as possible next week we will provide you with what we understand to be the data dictionaries, lookup tables, and merge keys for the database we previously produced to you.

   Once you have had an opportunity to review the additional information we provide, we stand ready to assist in understanding the data and suggest that it might make sense to handle additional questions by setting a call between the individuals on your team seeking to use TIMS

and the individuals who created the access version of the database for you.  In that way, you can be assured of timely responses to any follow up questions you may have.

**2-5.    BP's Requests for Production 16-19**

You next inquire regarding the United States' responses to Requests for Production 16-19.  I have been informed by DOI that the TIMS data relevant to these requests were included in the access database provided.  We acknowledge, however, that additional information is responsive to your request.  As I reported during the Discovery Working Group Conference last Friday, DOI did not quite complete all the custodial productions for the Event related discovery and, among those that have not yet been completed, are the files of Randall Josey, William Hauser and a newly identified custodian Mr. Dannenberger.  DOI expects to be able to produce the results of the searches of these custodial files within the next two weeks.  In addition, it appears that there may be additional records on the shared drive of BOEMRE that were not captured.  DOI is expediting the production of that shared drive information and we will produce it to BP as quickly as practicable.

You reference several objections we made in response to the discovery requests and challenge their appropriateness.  BP's requests did not simply seek non-privileged data.  The requests also sought all information "referring or relating" to that data, so the assertion of privilege was appropriate.  We will provide privilege logs as required by Pretrial Order 14 (subject to our request for an extension of time to complete those logs).   With respect to our objections based on confidential business information, we have not withheld any documents based upon this objection.

You also indicate that you seek the BOEMRE documents for these requests for events occurring between April 20, 2005 and April 20, 2010 "regardless of their date of creation."  As you know, we negotiated specific search terms and date ranges for our searches and we will be applying those date ranges and terms.

You further ask us to identify the custodial files that we are searching.  I direct you to the United States' Third Response to BP's First Set of Requests for Production, which identifies all BOEMRE custodians whose files are being searched.  All of the search terms applicable to BOEMRE requests will be applied to all custodians.  These custodians were selected based on information obtained from a survey of custodians, conference with supervisors and managers, and review of time records.  Based on this research, we identified those individuals most likely to have information responsive to the requests served by BP.  In addition, we agreed to add further individuals specifically requested by BP.  Accordingly, we believe we have selected those individuals "most likely to have possession of relevant information."

In the meantime, we did locate several printouts from TIMS that may provide some of the more critical information you are seeking.  These will be included in our supplemental productions, but are also attached to this letter for your convenience.

**6.      Well Design Files**

DOI has confirmed that all information responsive to this request has been produced. These documents can be found in the containers IMS064 to IMS114.  Please advise if you have difficulty locating these documents.

Sincerely,

/s/ Sarah D. Himmelhoch

Sarah D. Himmelhoch

cc:      Liaison Counsel

# Exhibit 3

**Himmelhoch, Sarah (ENRD)**

| | |
|---|---|
| **From:** | Himmelhoch, Sarah (ENRD) |
| **Sent:** | Thursday, August 18, 2011 12:03 PM |
| **To:** | 'Gary Chyi'; Gasaway, Robert R.; 'Eisert, Joseph A.'; 'Alexander, Mary Rose'; 'Barrow, Dennis'; 'Colby, Paul'; 'Delgado, Connie Salcido'; 'Funderburk, John C.'; Horizon, Deepwater; 'LeBouef, Susan '; 'Leith, Cheryl'; 'Lemoine, Michael'; 'Lerner, Daryl'; 'Maher, Erin'; 'Maze, Corey'; 'Mills, Patricia'; 'Nelson, Thomas'; 'Ng, Patrick'; 'O'Brien, Sean'; 'Raines, Carolyn'; 'Savoy, Paul'; 'Schexneider, Angela '; 'Schubert, Daniel'; 'Scofield, Denise'; 'Strange, Luther'; 'Tanner, Hugh'; 'Tsekerides, Theodore'; 'Weigel, Alan M.'; Berman, Lisa (ENRD); 'Cynthia A Vide'; 'Deepwater'; 'Henry, Camille (CIV) (CHenry@civ.usdoj.gov)'; 'Josh Hebert'; 'Steve Salaj'; 'Beck, David J.'; 'Centralized Mailbox'; 'Flanders, Edward'; 'Godwin, Donald E.'; 'Haycraft, Don K.'; 'Kirby, Ky E.'; 'Kuchler, Deborah D.'; 'Langan, Andrew'; 'Lyle, Michael J.'; 'Miller, Kerry J.'; 'Wittman, Phillip A.'; 'Alabama -- Tambling, R.'; 'Florida -- Kent, Russell'; 'Louisiana -- Peterson, Lillie'; 'Louisiana -- Terrell, Megan'; 'Mississippi -- Wood, M.'; 'Texas -- Canaday, Nicholas '; 'Barr, Brian'; 'Herman, Stephen J.'; 'Roy, James Parkerson' |
| **Subject:** | Deepwater Horizon:  US Production of OCS Performance Measures Information |
| **Attachments:** | 2005_2010 OSI.pdf; Operator Safety Index Explanation.pdf |

```
Counsel --

Attached are two documents related to BP's inquiry related to OCS Performance Measures
Program data.  Attached are the calculations for 2005-2010 and an explanation of the
calculations.  These will be produced in the formal discovery process but I know BP was
anxious to receive this information as soon as possible.  DOJ has received the Form 131s that
were used in calculating these measures and will produce those as soon as possible (I will
try to make sure that we note the collection in which these documents are contained).

Sarah Himmelhoch
```

**Exhibit 4**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig
"Deepwater Horizon" in the Gulf
of Mexico, on April 20, 2010

Applies to: *All Cases*

MDL NO. 2179

SECTION J

JUDGE BARBIER
MAGISTRATE JUDGE
SHUSHAN

## DECLARATION OF ANTHONY C. IRISH

I, Anthony C. Irish, hereby declare as follows:

1. I am the Project Manager of the BP Deepwater Horizon Oil Spill Discovery Project ("Discovery Project") in the Office of the Solicitor at the United States Department of the Interior ("Interior").

2. In my capacity as Project Manager, I have engaged in discussions with Autonomy, the third-party vendor provider of an e-mail archive called "Zantaz" that captures all e-mail messages sent or received by employees at the Bureau of Ocean Energy Management (BOEM) and Bureau of Safety and Environmental Enforcement (BSEE).

3. The Zantaz archive is physically located with the third-party vendor and the vendor controls access to its contents.   The vendor provides email search and retrieval services to Interior for a fee.   Alternatively, the vendor offers licenses for a fee, whereby customers may conduct searches and retrieve e-mails themselves.

4. The Zantaz archive was established to address e-mail preservation concerns in the *Cobell* litigation.   However, the Zantaz archive is not a panacea for the Department's electronic discovery practice.   Implementation of Zantaz was limited to the trust bureaus and components of the Department that had some relation to the *Cobell* matter. Furthermore, some bureaus and components that implemented Zantaz in response to *Cobell*, including the Office of the Secretary, have since migrated to alternate e-mail journaling systems.   Although the Department does access the Zantaz archive from time to time for relatively simple keyword searches for limited numbers of custodians, it is my understanding that Zantaz has never been used by the Department to conduct complex searches across the scope sought by BP.

5. In late May 2011, I initiated discussions with a representative of Autonomy concerning the retrieval of e-mail for four early deponents in the multidistrict litigation.   I directed the vendor to retrieve all of the e-mails sent or received by the four custodians during the agreed-upon date range.   The resulting set of unculled e-mail that was provided to Interior by the vendor consisted of 230,059 messages, comprising 42,235 megabytes of data, at a cost of $2,000.

6. Subsequently, I initiated discussions with the vendor concerning the retrieval of e-mail for approximately 135 additional custodians at BOEM/BSEE.   At that time, the vendor informed me that the approach we were taking with the four early deponents of retrieving all of their email for the agreed-upon date range could not be accomplished in a

timely way for the approximately 135 additional custodians because of the throughput limitations of the system.

7.   More detailed conversations with the vendor regarding the retrieval of e-mail for 135 custodians began in July.   Autonomy continued to assert that the existing infrastructure would be inefficient or incapable of conducting the searches and delivering the volume of e-mail expected.

8.   On July 18, 2011, Autonomy proposed that Interior acquire a license for a Special Audit Server, a more advanced product offered by Autonomy to retrieve the e-mail for the 135 additional custodians.   The vendor explained that the existing Zantaz system did not have sufficient "plumbing" to meet the data throughput needs expected. Additionally, the vendor explained that the existing Zantaz system could not run the query of agreed-upon search terms without alteration due to the presence of "stop words."   The vendor further indicated that the Zantaz system would not be able to handle the complexity of the required searches without breaking them up into dozens of discrete searches that would produce a high volume of duplicative hits.

9.   At the July 18, 2011 meeting, Autonomy proposed migrating the e-mail in Zantaz system to the distinct Special Audit Server environment.   The new server would allow for up to 30 gigabytes of download capacity per day.   The total cost of this solution, as indicated on a PowerPoint presentation, was $337,500.   I inquired as to whether there were any lower cost solutions that could still meet the retrieval requirements, such as doing a bulk, date-limited but unsearched extraction of e-mail for the 135 custodians similar to what was done for the four deponents.   The vendor informed me that an extraction of that magnitude would be considered a "data return" and the costs would be significant.   In addition, regardless of cost the extraction would likely take six to twelve months to complete.   Autonomy did not provide written documentation at this meeting.

10.   When Autonomy requested feedback on the July 18, 2011 proposal, I indicated that we could not justify the proposed costs for the marginal expected benefits. Autonomy's account executive called to discuss alternatives, but did not offer a lower cost proposal.

11.   Autonomy was extremely reluctant to provide a written documentation of the costs associated with their e-mail retrieval proposals as requested by Interior in anticipation of a meet and confer with other parties.

12.   When Autonomy eventually provided a written proposal for the requested e-mail retrieval on September 13, 2011, it reflected a lower cost Special Audit Server option with reduced data throughput (16 gigabytes per day for a total cost of $180,000). This was the first time Autonomy offered an alternative Special Audit Server proposal.

13.   On September 20, 2011 Autonomy provided a written cost proposal with three options for a Special Audit Server subscription.   Option 1 was the original cost proposal presented on July 18, Option 3 was the revised proposal first presented on September 13, and Option 2 was a new proposal with throughput and costs in between Options 1 and 3 that had not previously been offered.

14.   Each e-mail retrieval proposal for the remaining 135 custodians presented by Autonomy would engender significant costs for Interior, as well as take a significant period of time to complete.

15.   By Autonomy's estimate the lowest cost option, bulk e-mail delivery, would take six to twelve months to complete.   The retrieved e-mails would be unculled except for date range limitations, and Interior would have to use a separate technology solution to search for responsiveness.

16.   The highest cost solution would likewise be lengthy to complete.   Autonomy indicated that it would take four to six weeks to migrate the e-mail from Zantaz to the higher cost Special Audit Server solution before searches could be conducted.   Moreover, the complex agreed-upon search terms would likely have to be broken down into smaller, discrete searches run for each custodian, requiring at least one full-time technician to perform the searches.   Furthermore, if the Special Audit Server solution proved wholly unable to conduct the agreed-upon search queries, based on the 30 gigabyte per day throughput and the average of 10.6 gigabytes of e-mail returned for each of the four deponents, it would take an additional two to three months to retrieve unculled e-mail for the 135 deponents.

17.   Absent considerations of cost, production of non-privileged e-mail responsive to the agreed-upon search terms from the Zantaz archive by January 15, 2012, does not appear to be technically possible.   Even with the reduced scope of BP's current request, based on prior assertions made by Autonomy the bulk e-mail retrieval as envisioned in Attachment 6 of the motion to compel would take three to sixth months, and Interior would then have to cull and review the material.   Likewise, if Interior were to acquire the enhanced Special Audit Server at additional cost, it would still take Autonomy four to six weeks to establish the system before Interior would be able to attempt to search or extract e-mail.

18.   The cost of just retrieving e-mail for the 61 requested custodians ranges from $30,500 to $337,500.   The pricing of the Special Audit Server options were based on daily maximum data throughput, not number of custodians, and would not be reduced in lieu of the reduced scope.   The lowest cost option would take three to sixth months to retrieve the unsearched e-mail.

19.   In addition to the costs and time required to extract and cull responsive e-mail, Interior would incur additional costs and require additional time to conduct a reasonable review of the e-mail for privilege and produce non-privileged e-mail and associated attachments.

20. When the e-mail for the four deponents was retrieved from Zantaz, ingested into a document review platform, and searched for responsiveness, a total of 136,207 documents hit agreed upon search terms.   Of those 136,207 documents, 54,798 of them were also responsive to Interior's privilege search terms, requiring review for privilege. The remaining 81,409 documents did not hit privilege search terms.

21.   The analysis of BP's contractor indicates that there were 24,294 documents in Zantaz for the four deponents that were dated prior to May 1, 2010 that hit responsiveness search terms but not privilege search terms.   This is approximately 30% of the total volume of documents retrieved from Zantaz that hit the agreed upon search terms but not the privilege search terms.

22.   Assuming a similar 30% ratio holds, roughly 16,352 documents retrieved from Zantaz for the four deponents are dated prior to May 1, 2010, hit the agreed upon

search terms, and hit upon privilege search terms, thereby requiring manual review for privilege.   This is an average of 4,088 documents requiring privilege review per custodian.

23.   Based on this analysis, production of e-mail dated prior to May 1, 2010 for the 61 requested custodians would require Interior to review approximately 249,368 additional documents for privilege.

24.   Based on document review time and costs recently incurred in the multidistrict litigation, the additional review would cost Interior approximately $450,000 and take approximately 7,700 review-hours to accomplish.

25.   Accepting the estimated ingestion, culling, and hosting cost of $363,862 asserted by BP, retrieving, ingesting, culling, hosting, and reviewing the additional e-mail would cost Interior between an estimated $850,000 to $1,150,000 and take months to accomplish.

26.   All of the information set forth in this declaration is based upon my personal knowledge or upon information furnished to me in my official capacity.

27.   In my capacity as Project Manager I have also been engaged in the meet and confer process with BP and its contractors regarding accessing the Zantaz archive.

28.   While the description of the process BP's contractors used to perform the quantification appear sound, it is not certain that in practice the results are valid.   After reviewing the metadata comparison of the initial quantification, I discovered a significant flaw.   BP's contractor indicated that over one thousand messages were available only as live e-mails and not located in the Zantaz archive.   A quick, non-exhaustive analysis of immediately available resources demonstrated that 22 of 30 supposed live-only e-mails that had easily searchable subject lines were in the Zantaz archive for the same custodian. This discovery led to a revised quantification by BP's contractor.

29.   Even assuming that the quantified comparison of messages responsive to the agreed-upon search terms between the Zantaz archive and the live e-mail environment of the four deponents' performed by BP's contractor is correct, this comparison does not account for several scenarios under which identical e-mails or the substantively identical e-mails may still be available in the live environment.   95 of the Zantaz-only messages identified by BP's contractor have the term "ALL EMPLOYEE MESSAGE" in the subject line, and are likely to be preserved by at least one custodian if there is any potential substantive value.

30.   The quantification performed by BP's contractor only compares a specific custodian's live e-mail environment against messages available for that same custodian in the Zantaz archive.   Consequently, if an e-mail sent to two custodians at BOEM/BSEE was saved by one and not by the other, the quantification would consider there to be one e-mail available only in the Zantaz archive even though the exact e-mail is available in live environment of another custodian.

31.   Additionally, the quantification performed by BP's contractor does not account for e-mail strings that are commonly generated during the back and forth of business operations.   Consequently, if a custodian prior to the institution of the litigation hold conducted a back and forth conversation with another individual spanning twelve

e-mails, deleting the first eleven but retaining the twelfth the substantively contained the entire contents of the conversation, the quantification would consider there to be eleven e-mails only available in the Zantaz archive, even though the substance of the e-mails is available in the live environment for the same custodian.

32.   Furthermore, the quantification performed by BP's contractor fails to account for the possibility that the substantively relevant elements of an e-mail may exist in other production sources.   These sources included the printed files of custodians, as well as centralized databases such as TIMS and eWell.

33.   The agreed-upon search terms were negotiated in good faith, however they are extremely broad and overinclusive.   Consequently, the fact that e-mails hitting the agreed-upon search terms were not saved by a custodian is not reliably indicative of a failure to save e-mail in the live environment with probative value in the multidistrict litigation.   For example, 185 of the Zantaz-only messages identified by BP's contractor have the subject of "Your Password," 183 of the identified messages have the subject of "Mail delivery failed," and 165 have the subject of "Registration Confirmation."

34.   In an effort to evaluate the actual responsiveness of Zantaz-only e-mails, on December 6, 2011 I was provided a list of 11 exhibits on BP's list that appeared to originate from the Zantaz-based production of the 4 deponents.   They were exhibits 4028, 4031, 4050, 4731, 4732, 4733, 4739, 4744, 4755, 4759, and 47566.   For two of the exhibits (4731 and 4739), the documents at the indicated Bates Numbers were inconsistent with the stated subject and I could not determine what Bates Numbers were intended.   For six of the exhibits (4028, 4050, 4732, 4755, 4759, and 47566) it was evident from the metadata comparison provided by BP's contractor the same e-mail was found in the live environment for the same custodian.   For two of the exhibits (4031 and 4744), I was able to quickly determine that the same e-mail was found in the live environment of a different custodian.   For the last exhibit (4733) I was not able to readily identify its presence in the live environment, although I did notice that the three recipients of the e-mail in question were on the domain bp.com.   Eight of the nine identifiable Zantaz-based exhibits I was aware of at the time would have been discovered and produced if only the live e-mail environment was searched, and the remaining exhibit was at one time in BP's possession during the ordinary course of business.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 21, 2011.

Anthony C. Irish

# Exhibit 5



34758413

Dec  8 2010
10:01PM

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179<br><br>SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER<br>MAGISTRATE SHUSHAN |
| ……………………………………………... | : | |

### THE BP PARTIES' RESPONSES AND OBJECTIONS TO PLAINTIFFS' INTERROGATORIES, REQUESTS FOR PRODUCTION, AND REQUESTS FOR ADMISSION

Defendants BP America Inc. ("BPA"), BP America Production Company ("BPAP"), and BP Exploration & Production Inc. ("BPXP") (collectively, "the BP Parties"), by their undersigned Counsel, and, pursuant to Rules 26, 33, and 34 of the Federal Rules of Civil Procedure, hereby submit the following responses and objections to plaintiffs' Interrogatories, Requests for Production, and Requests for Admission.

### SPECIFIC RESPONSES AND OBJECTIONS

The BP Parties respond as follows to plaintiffs' specific interrogatories, requests for production, and requests for admission, subject to and without waiving their general objections, each and every one of which are specifically incorporated into each individual response below.[1]

### INTERROGATORY NO. 1:

Please describe in detail the general chain of command and organizational structure for the Deepwater Horizon during the relevant time period, beginning with the lowest ranking person aboard the rig, up to and through the highest ranking person on-shore.

---

[1] The BP Parties' general objections are set forth at pages 370-382.

**IRRELEVANT PAGES OMITTED TO SAVE SPACE**

## GENERAL OBJECTIONS

The BP Parties assert the following objections to each and every one of plaintiffs' interrogatories, requests for production, and requests for admission, including any definitions or instructions associated therewith (collectively, "Plaintiffs' Discovery Requests").  These general objections are incorporated by reference into each specific response set forth by the BP Parties and are neither waived nor limited by any specific responses.

1.      The BP Parties object to Plaintiffs' Discovery Requests to the extent they call for information, seek discovery, or attempt to impose any obligations beyond that permitted or authorized by the Federal Rules of Civil Procedure or the Rules and Orders of this Court.

2.      The BP Parties object to Plaintiffs' Discovery Requests to the extent they call for the production of ESI in any manner other than required under Federal Rule of Civil Procedure 34, the Rules and Orders of the Court, and ongoing negotiations and discussions among counsel.

3.      The BP Parties object to Plaintiffs' Discovery Requests to the extent they seek information or documents protected by the attorney-client privilege, the work-product doctrine, the joint defense or common interest privilege, or any other applicable privilege, exemption, or immunity.  The BP Parties will identify specific documents withheld on these grounds in accordance with the schedule set forth in, and provide the information required by, the Court's Pretrial Order #14, and such further Orders of the Court and ongoing negotiations and discussions among counsel.  The BP Parties incorporate their forthcoming privilege logs and all related information into this general objection to the extent necessary to preserve against any waiver of any applicable privilege or immunity from discovery.

4.      The BP Parties object to Plaintiffs' Discovery Requests to the extent they seek information or documents relating to the settlement or potential settlement of disputes on the grounds that such information is not relevant to any party's claim or defense, is not admissible at

trial and not reasonably calculated to lead to the discovery of admissible evidence, is protected from disclosure and dissemination under Federal Rule of Evidence 408, and that discovery of such information would be prejudicial to the efforts of the BP Parties and any opposing parties to resolve their disputes in a fair and efficient manner.

5.      The BP Parties object to Plaintiffs' Discovery Requests to the extent they call for information or documents not within the BP Parties' possession, custody, or control.  All responses are made on behalf of the BP Parties only, are limited to information and documents within the BP Parties' possession, custody, or control.

6.      The BP Parties object to Plaintiffs' Discovery Requests to the extent they are unduly burdensome, duplicative, premature, oppressive, and/or overbroad, including, without limitation, as to subject matter and/or time period, and where compliance with specific requests would be unreasonably difficult as well as prohibitively expensive or time-consuming.

7.      The BP Parties object to Plaintiffs' Discovery Requests to the extent they are not limited to information or documents relevant to any party's claim or defense, or to the extent they seek discovery of information or documents not admissible at trial and not reasonably calculated to lead to the discovery of admissible evidence, including, but not limited to, requests seeking information or documents concerning other incidents, accidents, or other events at BP facilities or locations other than the Macondo Well or that are otherwise unrelated to the *Deepwater Horizon*.

8.      The BP Parties object to Plaintiffs' Discovery Requests to the extent they seek the disclosure of information or documents that contain or constitute trade secrets, proprietary information, or other confidential business information without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

9.      The BP Parties object to Plaintiffs' Discovery Requests to the extent they seek the disclosure of information or documents that would violate the rights of privacy of third parties, or any similar judicially recognized protection or privilege, including, but not limited to, restrictions imposed in connection with proceedings before the MBI, and the protections of the Health Insurance Portability and Accountability Act ("HIPAA"), or that would result in disclosure of any confidential information or conduct without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

10.      The BP Parties object to the requests to the extent they seek documents already in the possession of plaintiffs or equally available to plaintiffs from sources other than the BP Parties, including publicly available sources.

11.      The BP Parties object to plaintiffs' "Definitions" to the extent they seek to impose any meaning or interpretation onto the requests other than that evident from the plain and ordinary meaning of the words used therein.  The BP Parties further object to, and will read and respond to, plaintiffs' "Definitions" (labeled to correspond to plaintiffs' list) as follows:

(i)      Plaintiffs' definition of "Deepwater Horizon" is vague and overbroad; it includes any equipment used in connection with the exploration for or production of oil.  The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "Deepwater Horizon" means the vessel of that name and that, unless expressly otherwise specified, concerns the operation of the *Deepwater Horizon* in connection with the Macondo Well.

(j)      Plaintiffs' definition of "Macondo Well" is vague and overbroad; it includes a broad geographic area and is not limited to any well, much less the well at issue in this

litigation.  The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "Macondo Well" means the MC 252 #1 Macondo Well.

(k)     Plaintiffs' definition of "incident" is overly narrow; it is limited to the explosion that occurred on the *Deepwater Horizon*.  The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "Incident" means the loss of control of the Macondo Well and the explosions and fire aboard, and resulting sinking of, the *Deepwater Horizon*.

(l)     Plaintiffs' definition of "oil spill" is vague and overbroad; it includes any release of hydrocarbons over a large geographic area, without regard to whether such releases had anything to do with the Incident.  The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "oil spill" means the oil released from the Macondo Well as a result of the Incident.

(m)     Plaintiffs' definitions of "BOP" and "blowout preventer" is vague and overbroad; they include any equipment used to control any well.  In addition, it confusingly and inaccurately implies that the BP Parties "created" blowout preventers.  The BP Parties will read and respond to plaintiffs' requests with the understanding that the terms "BOP" and "blowout preventer" means a blowout preventer like the one in use at the Macondo Well at the time of the incident.

(n)      Plaintiffs' definition of "Deepwater Horizon Blowout Preventer" confusingly and inaccurately implies that the BP Parties "created" the blowout preventer used on the *Deepwater Horizon*.  The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "Deepwater Horizon Blowout Preventer" means the blowout preventer in use on the Macondo Well at the time of the Incident.

(o)      Plaintiffs' definition of "clean up" is vague and overbroad; it includes any clean up efforts from any release of hydrocarbons over a large geographic area, without regard to whether such releases had anything to do with the incident.   The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "clean up" means any efforts to clean up the oil spill.

(p)      Plaintiffs' definition of "relevant time period" is overbroad; it covers close to 14 years, and would convert many of plaintiffs' individual requests into nonsensical inquiries into historical events with no conceivable relevance to this litigation or any respect for the practicalities of resolving it.  In addition, by extending the definition to "the current date," many of plaintiffs' requests, which by their context clearly seek information from the time prior to and including the incident, confusingly seek unrelated information generated after the incident and ignores that it is impossible for the BP Parties to provide meaningful responses without some cut-off date to allow for locating and processing information in order to provide it to plaintiffs. The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "relevant time period" means January 1, 2009 through April 20, 2010, unless:  (i) the request clearly seeks specific, available, relevant information that pre-dates January 1, 2009 (*e.g.*, rig audits of the *Deepwater Horizon*); and (ii) the request clearly seeks relevant information or documents that post-date the incident, in which case and to which extent, the time period is, or includes as the context requires, April 20, 2010 through 30 days prior to the date in which any response to any request is made.  In addition, when used in reference to the operation of the *Deepwater Horizon*, the *Transocean Marianas*, the blowout preventer, or any other equipment that was used in connection with work that did not involve the Macondo Well, the BP Parties will read and respond to plaintiffs' requests with the understanding that the term "relevant time

period" means the period of time during which the rig or equipment referred to was used at the site of the Macondo Well, prior to and including April 20, 2010 as stated above.  Unless otherwise specified, all requests and responses are deemed to be limited to the relevant time period as defined above by the BP Parties.

(q)     Plaintiffs' definitions of "you," "your," and "BP" are extremely vague and overbroad; they include a vast array of entities that have had no involvement whatsoever in the events giving rise to this litigation, and confusingly and improperly sweep in hundreds of thousands of individuals as opposed to the corporate entities that have been named as defendants in this litigation.   The BP Parties will read and respond to plaintiffs' requests with the understanding that the terms you," "your," and "BP" mean one or more of the BP Parties, as the context requires.

(r, s, t, u, v, w, x)     Plaintiffs' definitions of "Anadarko," "Cameron," "Halliburton," "M-I SWACO," "MOEX," "Transocean," and "Weatherford" are similarly vague, overbroad, and confusing.  The BP Parties will read and respond to plaintiffs' requests with the understanding that these terms refer to the respective corporate entities commonly referred to by these names that have been named in this litigation and played some role in the events relevant to this litigation.

(y)     Plaintiffs' definition of "person" is vague and overbroad; it includes any number of things that are not people in any sense of the word.  The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "person" means a person.

(z)     Plaintiffs' definition of "employee" is vague and overbroad; it includes any number of persons who were or are not employees.  The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "employee" means an employee.

(aa)    Plaintiffs' definition of "Investigation Team" is unobjectionable.

(bb)    Plaintiffs' definition of "government" is vague and overbroad; it includes a bewildering array of entities as well as any number of people who are "the government."  The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "government" means the U.S. federal government or the government of a U.S. state, including any branch or agency thereof.

(cc)    Plaintiffs' definition of "communication" is vague and overbroad; it includes practically everything written or said by any person, regardless of whether it was actually communicated in any meaningful sense.  The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "communication" means talking to someone or sending them a message of some sort.

(dd)    Plaintiffs' definition of "statement" is vague and overbroad; it may or may not include any speech or writing depending on what is meant by "adopted and approved."  The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "statement" means a recorded statement authenticated by its maker or the circumstances of its recording.

(ee)    Plaintiffs' definition of "meeting" is vague and overbroad; it includes any number of things that no person would reasonably conclude constitute a meeting, such as a casual greeting exchanged in a hallway, sending an e-mail, or posting a message on a bulletin board.  The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "meeting" refers to a gathering of two or more people.  It does not include electronic communications unless specified.

(ff)     Plaintiffs' definition of "document" is improper to the extent it includes items outside the scope of Federal Rule of Civil Procedures 34(a)(1)(A).  The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "document" means the items listed in Federal Rule of Civil Procedure 34(a)(1)(A).

(gg)     Plaintiffs' definition of "electronically stored information" or "ESI" is improper to the extent it includes items outside the scope of Federal Rule of Civil Procedures 34(a)(1)(A).  The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "electronically stored information" or "ESI" means the electronically stored information listed in Federal Rule of Civil Procedure 34(a)(1)(A).

(hh)     Plaintiffs' definition of "computer" is vague and overbroad; it includes every device that processes or stores information, including any number of things that no person would reasonably conclude constitute a computer, such as a clock, voice recorder, camera, or cell phone.  The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "computer" means a mainframe, desktop, laptop, or tablet computer.

(ii)     Plaintiffs' definition of "privilege log" is improper to the extent it seeks to impose any obligation on the BP Parties beyond that specified in the Court's Pretrial Order #14. The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "privilege log" means the privilege log referred to in the Court's Pretrial Order #14.

(jj)     Plaintiffs' definition of "control" is improper to the extent it seeks to impose any obligation on the BP Parties beyond that imposed under Federal Rule of Civil Procedure 34(a)(1).  The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "control" means "possession, custody, or control" as used in Federal Rule of Civil Procedure 34(a)(1).

(kk)    Plaintiffs' definitions of "relating," "referring," regarding," "concerning," "computer," and "with respect to," is vague and overbroad; they render these and innumerable other words void of any independent meaning.   The BP Parties will read and respond to plaintiffs' requests with the understanding that these terms have their plain and ordinary meaning in standard English usage.

(ll, mm, nn)    Plaintiffs' definition of "identify" is overbroad; it includes a request for detailed information far beyond whatever may be reasonably necessary to distinguish one individual, one document, or any ESI, from any other.   It is also improper in that it would inject an additional six (for persons) or eight (for documents) or three for (ESI) interrogatories into each identified person or document in any interrogatory response, thereby exceeding the limitations imposed upon discovery under the Federal Rules of Civil Procedure and the Court's Pretrial Order #11 dated October 19, 2010, which limits plaintiffs to propounding 50 interrogatories to any defendant.   The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "identify" means, in the context of an individual, an individual's name, and where the context reasonably requires, his or her employer and title, and in the context of a document or ESI, a Bates number or other available information necessary to isolate the document or ESI.

(oo)    Plaintiffs' definitions of "and" and "or" is vague, overbroad, and confusing; they render the words equivalent and therefore deprive them of independent meaning and inconsistent with standard English usage.   The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "and" means and, and the term "or" means or.

(pp)    Plaintiffs' definition of "any" is vague, overbroad, and confusing; it renders the word unnecessarily ambiguous and necessarily converts many of plaintiffs' requests

into nonsensical requests for duplicative information.  The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "any" means any.

(qq)    Plaintiffs' definition of "including" is unobjectionable.

(rr)    Plaintiffs' definitions of "each" and "every" is vague, overbroad, and confusing; they render the words equivalent and therefore deprive them of independent meaning and inconsistent with standard English usage.  The BP Parties will read and respond to plaintiffs' requests with the understanding that the term "each" means each and the term "every" means every.

(ss)    Plaintiffs' instruction to treat all nouns and pronouns as plural nouns and pronouns is vague, overbroad, and confusing; it renders many of plaintiffs' requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to plaintiffs' requests as written, not as imagined to give the "broadest possible application."

(tt)    Plaintiffs' instruction to treat all verbs as possessing all possible tenses is vague, overbroad, and confusing; it renders many of plaintiffs' requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to plaintiffs' requests as written, not as imagined to give the "broadest possible application."

(uu)    Plaintiffs' instruction to treat all terms of a specific gender as referring to all genders is vague, overbroad, and confusing; it renders many of plaintiffs' requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to plaintiffs' requests as written, not as imagined to give the "broadest possible application."

(vv)    Plaintiffs' instruction to treat all terms as if they encompass all grammatical variations of the term is vague, overbroad, and confusing; it renders many of plaintiffs' requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will

read and respond to plaintiffs' requests as written, not as imagined under instructions to set aside standard English usage.

12.     These responses are made without waiving, in any manner, the BP Parties' right to object to the use of any information or documents provided in response to these requests at any trial or evidentiary hearing on grounds of privilege, relevance, materiality, authenticity, hearsay, or any other ground permitted by any applicable law or rule.

13.     To the extent the BP Parties state they will produce documents in response to the requests, the BP Parties will produce such documents on a rolling basis with such reasonable speed as the BP Parties can locate and process them, without sacrificing a meaningful review for responsiveness, privilege, and confidentiality, as this is the only feasible and physically possible method given the scope and breadth of the requests.

14.     To the extent that the BP Parties respond that they will search for and produce responsive documents, the BP Parties are only undertaking to make a good faith effort to conduct a reasonable search of non-privileged documents of the files and records of those individuals likely to have meaningful information responsive to a requests as maintained in the ordinary course of business, and/or to apply a reasonable set of search terms to similar available collections of ESI as maintained in the ordinary course of business reasonably likely to yield a meaningful amount of information responsive to a request.  The BP Parties are not offering or promising to search for and produce every document or piece of information that may exist in the possession, custody, or control of any of their tens of thousands of employees and agents where any such items are not included within the results of a reasonable search as described above.

15.     The BP Parties object to plaintiffs' interrogatories on the grounds that they exceed the limitations imposed upon discovery under the Federal Rules of Civil Procedure and the

Court's Pretrial Order #11 dated October 19, 2010, which limits plaintiffs to propounding 50 interrogatories to any defendant.  Plaintiffs have served each of the BP Parties with 43 separately enumerated requests, several of which (including, but not limited to, Interrogatory Nos. 2, 3, 4, 8, 11, 16, 18, and 27)  actually contain more than one request.  For purposes of these responses, however, the BP Parties, while reserving all rights on this issue, have only refused to respond to plaintiffs' Interrogatory Number 43, which seeks detailed information with regard to each denial of all or part of any response to a Request for Admission.  This request alone thus poses some 215 interrogatories in light of the fact that the BP Parties are only able to offer unqualified admissions to six of plaintiffs' Requests for Admission.

16.     The BP Parties object to plaintiffs' Requests for Admission as improper in form in that Federal Rule of Civil Procedure 36 provides only for the service of requests "to admit . . . the truth of [a] matter," but all of plaintiffs' request ask the BP Parties to "admit or deny" some statement.  This implies, improperly, that a denial has the effect of establishing the opposite of the assertion, when, in fact, a denial does not establish anything.  A denial of a request for admission simply means that the BP Parties deny that the assertion is true.  It does not establish any fact.  None of the BP Parties' denials should be construed as admissions of any express or implied assertions by plaintiffs.

17.     The BP Parties' decision, now or in the future, to provide information or documents notwithstanding the objectionable nature of any of the definitions or instructions, or the interrogatories or document requests themselves, should not be construed as:  (a) a stipulation that the material is relevant or admissible, (b) a waiver of the BP Parties' general objections or the objections asserted in response to specific requests, or (c) an agreement that requests for similar information will be treated in a similar manner.

18.     The BP Parties reserve the right to modify, amend, or supplement their responses, which are made based on the current status of their knowledge, understanding, belief, and searches for documents.  The investigation of facts and information relating to these requests is continuing, and, therefore, these responses are not intended as an admission or a representation that additional information or documents do not exist.

## VERIFICATION

I, Bill Kirton, an officer of BP America Inc., BP America Production Company, and BP Exploration & Production Inc., having undertaken a reasonable inquiry under the circumstances into the process by which the foregoing responses to interrogatories were compiled, hereby certify, under penalty of perjury, that, to the best of my knowledge, information, and belief, the foregoing responses to interrogatories accurately reflect the information available to BP America Inc., BP America Production Company, and BP Exploration & Production Inc. as specified therein.

State of Texas       :
                     :       ss.
County of Harris     :

Sworn and ascribed to before me
this 8th day of December , 2010

Notary Public

ROBERT D. SHAW
Notary Public, State of Texas
My Commission Expires 09-04-2012

Dated:  December 8, 2010

Respectfully submitted,

**AS TO RESPONSES TO INTERROGATORIES**

By:  /s/ Bill Kirton_____

BP America Inc.
501 Westlake Park Blvd.
Houston, Texas 77079

*BP America Inc., BP America Production
Company, and BP Exploration & Production Inc.*


**AS TO OBJECTIONS AND TO RESPONSES
TO REQUESTS FOR DOCUMENTS AND
REQUESTS FOR ADMISSION**

By:  /s/ J. Andrew Langan, P.C._____

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Timothy A. Duffy, P.C.
(tim.duffy@kirkland.com)
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone: (312) 862-2000

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana  70139-5099
Telephone:  (504) 581-7979
Facsimile:  (504) 556-4108

*Attorneys for BP America Inc., BP America
Production Company, BP Exploration &
Production Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice in accordance with the procedures established in MDL 2179, on this 8th day of December, 2010.

/s/   J. Andrew Langan, P.C.___