# Attachment A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | MDL NO. 2179<br><br>SECTION: J |
| THIS DOCUMENT RELATES TO: ALL CASES | JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |

## DECLARATION OF JOHN H. JESSEN

I, John H. Jessen, declare as follows:

1. I am over twenty-one years of age and make this declaration based on my own personal knowledge.

2. I have been asked to provide an affidavit regarding the documents requested by the BP parties ("BP") in *IN RE*: OIL SPILL by the OIL RIG "*DEEPWATER HORIZON*," MDL No. 2179, that are stored in the United States' ZANTAZ email archive system[1] ("ZANTAZ"). My understanding is that the United States has declined to search and retrieve responsive, non-privileged documents from ZANTAZ for 61 agreed-upon Department of Interior ("DOI") Custodians, but instead wishes to limit its discovery to certain "live" repositories, (the United States' "Live" repository), such as hard drives.

---

[1] ZANTAZ is an electronic data archiving system that organizations implement in order to automate the storage and retrieval of electronic data, such as electronic mail. It is a more advanced technology than back-up tapes and is implemented for very different purposes. While back-up tapes are used for disaster recovery efforts and are in general expensive to restore, ZANTAZ is a database-enabled archive that is intended to be searchable and much more cost-effective to use for retrieval of data such as email.

3. My affidavit will be divided into the following sections. *First,* I will describe my background and experience in the area of electronic discovery. *Second,* I will discuss the issues I was asked to evaluate: (1) the purposes and utility of a ZANTAZ archive system generally; and (2) how costly and time-consuming retrieval from ZANTAZ should be. *Third*, I will set forth a summary of the information I reviewed or consider relevant. *Finally*, I will set forth my opinions about the issues I was asked to address.

I.   **BACKGROUND**

4. From its earliest origins, I have been involved in what is now referred to as electronic discovery. I founded Electronic Evidence Discovery, Inc. ("EED") in 1987, the first, and, for a number of years, the only company to be focused on electronic discovery. I served as EED's Chief Executive Officer until 2007 and as a Board Member until 2010. In 2010, to meet the need for independent consulting and assessment services in the legal discovery market, I founded Jessen and Associates, where I currently serve as the Managing Director. I am a 1984 graduate of the University of Washington, with a degree in Finance and Quantitative Methods. I am also a graduate of the Owner/President Management Program at the Harvard School of Business. I have attached as Exhibit 1 my curriculum vitae.

5. During my career, I have assisted attorneys, corporate counsel and jurists (federal and state) in the identification, location, preservation, retrieval, assessment, review, production and presentation of electronic data in the discovery process in hundreds of litigations. I have personally restored and analyzed thousands of backup tapes and analyzed thousands of computer systems in order to determine the types and quantities of data residing thereon and the role such data may play in a discovery matter. I have personally designed, implemented, audited and advised on hundreds of data retention, discovery, and presentation programs.

6. I have served on the board of the Harvard University Law School's Digital Discovery Project, which provided training on electronic data issues in litigation to Federal and State judges throughout the United States. In connection with the Harvard Digital Discovery Project and otherwise, I have made presentations to many hundreds of state and federal judges on electronic discovery issues. I have also served on the California State Council to the Civil and Small Claims Advisory Committee Working Group on Electronic Discovery, which was active in developing California state law rules concerning the use of electronic data in discovery. Over the past 20 years, I have lectured extensively on electronic data issues to law firms, State and Federal bar associations, judicial groups, corporations, professional organizations and at continuing legal education seminars.

7. As explained in greater detail herein, I am the Co-Chairman of the Executive Committee of The Sedona Conference® and one of the founding members of The Sedona Conference® Working Group on Electronic Document Retention and Production, a group of lawyers, jurists and academics who, with my technical assistance, have endeavored to help set reasonable best practices standards for the collection and production of electronically stored information.

8. I am also a Steering Committee Member on The Sedona Conference® Working Group on International Electronic Information Management, Discovery and Disclosure, and I was the Technical Expert to the Canadian effort to develop and implement best-practice guidelines on addressing electronically stored information in discovery, resulting in the release in January 2008 of *The Sedona Canada Principles.* I am currently serving as the Chair and Editor-in-Chief of The Sedona Conference® "Discovery 2.0" Drafting Team developing a new model

for modern discovery and best practices for more efficient and effective discovery, review, and document production.

9. I have served as an expert for federal and state judges and for special masters deciding electronic discovery issues. I have also served as an intermediary expert for the Federal Trade Commission and the Securities and Exchange Commission in determining the role of electronic data in regulatory discovery.

10. I am a contributor to the book "Electronic Discovery and Digital Evidence: Cases and Materials" by the Honorable Shira Sheindlin, United States District Court Judge for the Southern District of New York, and Daniel J. Capra, Phillip Reed Professor of Law at Fordham Law School, and The Sedona Conference®. Judge Sheindlin is well-known for her contributions to the development of standards for electronic discovery through her frequently-cited opinions in *Zubulake v. UBS Warburg*.

11. Through my direct personal involvement in hundreds of cases, my awareness of the work done by others at EED and at Jessen and Associates, my routine and substantial interactions with lawyers and judges at The Sedona Conference®, my participation in legal seminars, presentations to law firms, and bar association and other meetings, among other things, I have accumulated a significant amount of knowledge about the ways parties attempt to search for and produce electronic information, the problems that can and do arise relating to these efforts, and the potential solutions to those problems. As a result, I am well-qualified to evaluate and opine on the results of the searches described herein, the costs and other burdens of such searches, and on the qualities of email archive systems.

## II.   WHAT I WAS ASKED TO ADDRESS

12. I was asked to evaluate and provide my opinions on the following two topics: (1) the general purpose and utility of a ZANTAZ archive; and, (2) utilizing reasonable industry

standards, the cost and time it should take to retrieve email from ZANTAZ, search and cull it using responsiveness and privilege terms, and host it in a review platform.

13.     *First*, I was asked to opine on the purpose and utility of ZANTAZ archives generally. ZANTAZ is an automated data archive platform that is specifically designed to ingest, store, and produce data so that the data will be preserved even if deleted or altered by Users in live repositories, such as email inboxes. According to its website, "Autonomy ZANTAZ is the leader in the archiving, eDiscovery and Proactive Information Risk Management (IRM) markets." (*See* http://www.autonomy.com/content/News/Releases/2008/0307.en.html, last accessed Dec. 22, 2011) Autonomy is a data management company that has owned the ZANTAZ technology since 2007. The United States pays Autonomy to host and maintain its ZANTAZ archive rather than doing so "in-house" with its own IT professionals, and Autonomy considers the United States Department of Interior—the very client and archive that is at issue here—to be important and significant enough to specifically mention on its website. (*Id*.)

14.     *Second*, I was also asked to opine on the costs and time it should take to access and process email from a ZANTAZ archive and to evaluate estimates of these provided by the United States.

### III.   SUMMARY OF THE INFORMATION I REVIEWED AND CONSIDERED

15.     In arriving at my opinions, I considered the following information: (1) the results of the analysis of the data processing by BP's contractor that showed that, with regard to four custodians for whom documents from ZANTAZ have been searched and produced, approximately 75% of unique, responsive, non-privileged documents were found only in ZANTAZ, and not in "Live" sites; (2) information about ZANTAZ generally, including marketing materials and knowledge I have gained over the years as a professional in the electronic discovery industry; (3) court-filed motions and orders in *Cobell v. Norton*, No. 96-cv-

01285 (D.D.C.), that relate to the US's original decision to implement ZANTAZ; (4) various correspondence between the US and counsel for BP about retrieval and search of ZANTAZ, including information about the cost and time estimates of such an endeavor; (5) various other cost and time estimates provided by the United States for retrieval and searching of ZANTAZ; and (6) the letter brief and exhibits submitted by the United States in this matter, including but not limited to the Declaration of Anthony C. Irish (found at Ex. 4 to US Ltr. Br., Dec. 21, 2011). These categories of information are more fully described below;

## IV. MY OPINIONS CONCERNING THE RETRIEVAL OF DATA FROM THE ZANTAZ ARCHIVE

### A. When Properly Installed and Maintained, The ZANTAZ Archive Allows Cost-efficient Access to Information Precisely in Circumstances Such as These.

16. The purpose of an email archive system such as ZANTAZ is to intercept and store email messages as they flow through the email system so that they are preserved in case a User deletes or modifies the original email message, the email file (the PST file) is deleted or modified, the email is purged by the email server, or some other system-level or user-level intervention occurs. An archive system such as ZANTAZ retains the email, thereby preserving it when it would otherwise be lost or altered. It is my understanding that BP is only seeking ZANTAZ emails dated prior to the date the United States implemented its litigation hold.

17. ZANTAZ archive systems are designed from the outset to be highly accessible and searchable. Indeed, one of the selling points of the ZANTAZ system is that it is designed to make it easier for an entity to comply with electronic discovery requests in a timely and economic manner. According to Autonomy's own materials, "Autonomy provides end-to-end eDiscovery for the largest and most complex legal and regulatory matters, supported by 6,000 servers across five data centers. This comprehensive technology and services solution provides

data preparation, analytics for Early Case Assessment (ECA), legal hold, full EDD processing, advanced review and production, all on a powerful platform. Through automatic processing of all electronically stored information (ESI), whether email, audio or video, Autonomy enforces legal hold policies and enables eDiscovery across the organization based on the meaning and relevance of information to litigation." [2]

18.     It is my understanding that the United States originally implemented the ZANTAZ archive precisely so it would have the means to reliably store and retain email and to then be able to easily and inexpensively retrieve that email when required to do so for legal and related purposes. (Aug 14, 2002 US Mot. & Mem. for Approval to Implement ZANTAZ at 14-17 (found at Attachment 5 to BP Ltr. Br., December 15, 2011); Ex. 1 (Jan. 17, 2003 Special Master Op. Granting US's Aug. 14, 2002 ZANTAZ Motion); Ex. 2 (Feb. 7, 2003 Or. Adopting Jan. 17, 2003 Special Master Op.))

19.     Because they are designed to be used for discovery purposes, ZANTAZ archives do not generally impose a special cost burden on the producing party so long as they are properly set up and maintained. Rather, ZANTAZ systems are intentionally installed by organizations to reduce future production costs. So long as an organization properly establishes and maintains its ZANTAZ archive system—which typically includes both hardware and software upgrades—it will allow for the identification and retrieval of electronic mail in a cost and time efficient manner, especially as compared to other methods, such as retrieval from back-up tapes or the re-population of lost email from other sources such as non-custodial recipients.

20.     In my opinion, any special cost burden associated with producing from a ZANTAZ archive is created by the producing party themselves, which, after determining the need to purchase an email archive, decided for cost reasons to initially purchase a basic platform

---

[2]   *See* http://www.autonomy.com/content/News/Releases/2008/0722.en.html, last accessed Dec. 22, 2011.

and/or, after the installation, to save on the costs of upgrading the platform over time. In my experience, when organizations make the decision to install an archiving system they try to balance the features of the system with the type of discovery that they anticipate in the future. When the decision is made to choose a minimal system and/or to forego hardware and software upgrades during the system's life cycle, it is because of a determination that such a strategy will provide a net cost benefit for the organization as it avoids these costs and instead waits to see if an actual need arises that the system cannot meet. Very simply, the organization determines that the savings from the initial purchase and/or from not upgrading the system over time will outweigh the future ad-hoc costs that it legitimately will have to incur periodically when a need arises that the system cannot handle. Ad-hoc costs that come about from periodic, non-standard discovery need should not be a reason to not conduct that discovery.

**B.     Producing the ZANTAZ Archive Email Should Be Less Onerous Than the United States Estimates.**

21.    My understanding is that the United States now asserts that it cannot search the ZANTAZ Archive directly because its technology is outdated and therefore cannot support the searches such as those required by the agreed-upon search terms. (S. Himmelhoch Aug. 3, 2011 ltr. to R. Gasaway (found at Attachment 2 to BP Ltr. Br., Dec. 15, 2011)) I have no opinion about whether this claim is true because I do not have direct knowledge of the exact technology that the United States is relying upon to operate its ZANTAZ environment. It is my understanding that the United States did upgrade its ZANTAZ software on or around June 24, 2011. The United States implies that this upgrade is not sufficient to search ZANTAZ directly using responsiveness and privilege terms.

22. Assuming it is the case that due to technological limitations the United States cannot directly search and export from its own ZANTAZ archive, there is still a viable, cost-effective option for producing for the 61 Custodians desired by BP.

23. The United States acknowledges that the lowest cost option for retrieving and reviewing ZANTAZ email of the 61 requested Custodians is to export all of this email out of ZANTAZ and then import it into another system that could search it for the search term and privilege hits, cull out the appropriate items, and then host for review the set of responsive documents that hit on a privilege term. (Irish Declaration ¶15 (found at Ex. 4 to US Ltr. Br., December 21, 2011))  This method would likely require the help of an outside vendor.  The exported ZANTAZ email data set for all 61 Custodians should be approximately 366 gigabytes in size.  This estimate is based on the calculation of United States' own vendor, Autonomy, who hosts and manages the ZANTAZ archive system, that there is approximately six gigabytes of email per Custodian in the ZANTAZ archive.  (Ex. 3 (July 18, 2011 Autonomy PPT Slide Estimates))

24. The United States estimates that it would cost $30,500 for its vendor, Autonomy, to bulk export all of the email for the 61 Custodians from ZANTAZ.  (Irish Declaration ¶18; Attachment 2 to BP Ltr. Br., Dec. 15, 2011)   Based on reasonable industry standards and my professional experience, the cost to import, search, cull and host the email into an ediscovery platform is between $200 and $300 per gigabyte.  Accordingly, a reasonable industry cost to import, search, cull and host the ZANTAZ-sourced email for the 61 Custodians would be between $73,200 and $109,800.  The processing cost plus the export cost would put the total price between $103,700 and $140,300 or, using the 6 gigabytes per Custodian average, between $283 and $383 per gigabyte.

25. Based on reasonable industry standards and my professional experience, this type of data can be exported from systems such as ZANTAZ at an average rate of 30 gigabytes per day, so long as these systems are properly established and maintained. Once exported, a reasonable industry standard for importing, searching, culling, and hosting the data into an ediscovery platform is also an average rate of 30 gigabytes per day. It is standard industry practice for the process of importing, searching, culling, and hosting data to run in parallel with the process of exporting this data after a lead time of a day or two. Accordingly, under a reasonable industry standard processing speed of 30 gigabytes per day, the time required to export the ZANTAZ-sourced data and then import, search, cull and host the data for the 61 Custodians would be approximately 12-14 days. These estimates assume that all of the data is stored in ZANTAZ and not stored in some other backup system that is substantially more costly and burdensome to access, such as backup tapes.

26. As stated above, the United States estimates that it would cost $30,500 for its vendor, Autonomy, to export all of the email for 61 Custodians from ZANTAZ, and $363,862 to ingest (*i.e.*, import), cull (for responsiveness and privilege search terms), and host in a review platform the ZANTAZ-sourced documents. This total comes to $394,362, or, using the 6 gigabyte per Custodian average to estimate a total of 366 total gigabytes, $1,077 per gigabyte. Based on my experience and professional judgment, this is 2 to 3 times more than industry standard costs.

27. The United States has stated that their vendor, Autonomy, estimates 6 to 12 months just to export ZANTAZ archived data for 61 custodians, with additional time to cull this data for search terms. (Irish Declaration ¶15) It is not clear what estimate of the size of the ZANTAZ data the United States is using to propose this estimate. Using Autonomy's estimate

of 6 gigabytes per Custodian, or 366 gigabytes for the 61 requested Custodians, this estimate breaks down to a processing rate of 1 gigabyte per day (yielding 12 months of export time) to 2 gigabytes per day (yielding 6 months of export time). However, the United States also suggests that its estimate is an average of 10.6 gigabytes of data per Custodian, or approximately 647 gigabytes total for the 61 Custodians. (*Id*. ¶16) This breaks down to a slightly higher processing rate of approximately 1.8 - 3.6 gigabytes per day.

28.     Whether the United States' estimated processing time is 1-2 gigabytes per day or 1.8-3.6 gigabytes per day, this speed is far below a reasonable industry standard of 30 gigabytes per day. Based on my experience and professional judgment, a reasonable industry standard for exporting data from a system such as ZANTAZ is an average rate of 30 gigabytes per day, and a reasonable industry standard to import, search, cull, and host this data in an ediscovery platform is this same average rate. Per standard industry practice these two processes are run in parallel, for a total extraction and processing time of approximately 12-14 days. The United States' estimate of 6-12 months to extract the ZANTAZ data of the 61 Custodians is well above industry norms. Any time spent that is substantially longer than 12-14 days is not consistent with the efficient processing times that are available in the marketplace for electronic discovery and processing vendors.

29.     The United States asserts that the highest cost solution to searching ZANTAZ email of the 61 custodians for responsiveness and the United States' privilege terms would be to pay Autonomy to upgrade to a Special Audit Server environment at a cost of $337,500. (Irish Decl. ¶9) The United States claims that this upgraded server would process data at 30 gigabytes per day and would allow the search terms to be properly run against the data, which is not possible with the current ZANTAZ server. (Irish Decl. ¶8) Under reasonable industry standards

11

this option should also take approximately 12-14 days for a reasonable electronic discovery platform to complete. Under a reasonable industry standard of 30 gigabytes per day of processing speed, it would take 12 to 14 days to migrate the ZANTAZ email of the 61 custodians to the upgraded Special Audit Server, assuming that this data would even need to be migrated. This Special Audit Server would then run the search terms against this data at a rate of 30 gigabytes per day. (Irish Decl. ¶¶9, 16) The industry norm is for the search process to be run in parallel with the migration process with a lead time of a day or two. This option, therefore, should take approximately 14 days to complete at a cost of $337,500.

30. In my opinion, the United States' estimates of the costs and time associated with accessing and processing the ZANTAZ archive email for the 61 Custodians being requested by BP are well above reasonable industry norms. The United States' least inexpensive estimate breaks down to an export and processing cost of over $1,000 per gigabyte, when the same type of services can be found in the electronic discovery marketplace for $283 to $383 per gigabyte. Further, the United States' estimate of the time the least inexpensive option would take is based on an estimated processing rate of 1-3.6 gigabytes per day, which is substantially below reasonable industry rates of 30 gigabytes per day, with many vendors able to process in excess of 100 gigabytes per day. In addition, under reasonable industry standards for processing capacity, the most expensive option according to the United States should also involve migration and processing of email at a rate of 30 gigabytes per day for a total time of approximately 14 days.

31. In my opinion, organizations involved in litigation usually insist on using their existing email archive systems for discovery in lieu of the traditionally more expensive and error-prone processes associated with collecting from live sources. Here we have an organization that purposely established an email archive for discovery purposes, upgraded it over

12

time, used it to collect and store their Users' email, and yet now insists that it is inappropriate for discovery purposes. In my experience, this runs counter to expected discovery practices.

*************

I make this Declaration under penalties of perjury pursuant to 28 U.S.C. § 1746, and I state that the facts set forth herein are true and correct.

Executed on: December 23, 2011

_____
JOHN H. JESSEN