UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | MASTER DOCKET NO: 10-MD-2179 |
| THIS DOCUMENT RELATES TO: 11-CV-02766 | CIVIL ACTION NO: 11-CV-2766 |
| HONG VAN TRUONG, ET AL., | SECTION: "J" |
| vs. | DIVISION: "1" |
| BP AMERICA PRODUCTION COMPANY, ET AL. | |

**FIRST AMENDED COMPLAINT**

**INTRODUCTION**

1. Plaintiffs are shrimpers, crabbers, and oystermen ("Fishermen" or "Plaintiffs") who participated in BP's Vessels of Opportunity" ("VoO") program but have not been paid the amounts Defendants owe them for the use of their boats.

2. BP America Production Company and BP Exploration and Production, Inc.'s (collectively "BP") *Deepwater Horizon* oil spill placed the livelihoods of the Fishermen at profound risk. Shortly after the explosion of the *Deepwater Horizon*, BP and the other named Defendants hired the Fishermen to assist BP in responding to the cataclysmic spill that BP caused. Rather than honor their contractual commitments to pay the Fishermen for helping to clean up BP's mess, Defendants refuse to pay what is unequivocally owed under their contracts with the Fishermen.

1

3. Moreover, in many instances, Defendants have made it impractical for the Fishermen to use their boats for any purpose other than the VoO program by failing to decontaminate the boats. As a result, Defendants have forced Fishermen to keep their boats idle at the docks and available for BP's use at any time. Yet Defendants refuse to pay for this exercise of control over the Fishermen's boats.

4. BP has responded to the Fishermen's claims for compensation with a campaign of deceit designed to manipulate the Fishermen and deprive them of their rights. Among other things, BP has attempted to induce the Fishermen to substitute contracts long after the fact that change the Fishermen's rights under the original contract. BP has also misled Vietnamese-speaking fishermen while failing to provide key legal documents in Vietnamese including the contract itself.

5. The Fishermen bring this action to hold BP and the other Defendants responsible for their breach of contract and ongoing pattern of misconduct related to the VoO program.

## THE PARTIES

**A. Plaintiffs**

6. Plaintiff Mr. Hong Van Truong is a commercial shrimper and resident of Jackson County, Mississippi. He was hired by BP on May 2, 2010, to participate in the VoO program, and he actively participated in the program. Mr. Truong owns two fishing vessels that participated in the VoO program: f/v *Mimi II* and f/v *Way of Life*. Mr. Hong Van Truong grew up in a fishing family in Vietnam before escaping to the United States in 1984 and building an extremely successful commercial fishing operation here.

7. Plaintiff Barisich Inc. is a Louisiana company that owns and operates fishing vessels. It is owned by Mr. George Barisich and Mr. Joseph Barisich, who reside in Baton Rouge, Louisiana. Barisich Inc. was hired by United States Maritime Services, LLC

(collectively with United States Maritime Services, Inc., "USMS") on June 6, 2010, to participate in the VoO program, and its f/v *Camille Marie* actively participated in the program.

8. Plaintiff Mr. Michael Huff is a commercial fisherman and resident of Arabi, Louisiana. Mr. Huff was hired by United States Environmental Services, LLC ("USES") on June 6, 2010, to participate in the VoO program, and he actively participated in the program. Mr. Huff owns one fishing vessel that actively participated in the VoO program: *LA-1539-CA*.

9. Plaintiff Mr. Darrin P. Helmer, Sr. is a commercial fisherman and resident of Barataria, Louisiana. Mr. Helmer was hired by DRC Emergency Services, LLC ("DRC") on June 6, 2010, to participate in the VoO program, and he actively participated in the program. Mr. Helmer owns one fishing vessel that actively participated in the VoO program: f/v *My Three Daughters*.

10. Attached as Exhibit A is a list of 495 Plaintiffs who were also hired by BP, USMS, USES, or DRC (collectively "Defendants") under contract to participate in the VoO program.

11. Attached as Exhibit C is a list of 105 additional Plaintiffs who were also hired by BP, USMS, USES, or DRC (collectively "Defendants") under contract to participate in the VoO program.

12. BP drafted and executed contracts governing participation in the VoO program entitled Master Vessel Charter Agreement ("MVCA"). All Defendants proffered and executed contracts with VoO participants having material terms identical to BP's MVCA.

13. Virtually all of the Plaintiffs are commercial fishermen whose boats are used for shrimping, crabbing, and harvesting oysters.

14. Many of the Fishermen are Vietnamese immigrants with limited English abilities and no ability to read legal documents in English.

**B. Defendants**

15. BP America Production Company is a Delaware corporation doing business within the jurisdiction of this District. Its registered agent for service of process is CT Corporation System, 5615 Corporate Boulevard, Suite 400B, Baton Rouge, LA 70808.

16. BP Exploration and Production Company, Inc. is a Delaware corporation doing business within the jurisdiction of this District. Its registered agent for service of process is CT Corporation System, at 5615 Corporate Boulevard, Suite 400B, Baton Rouge, LA 70808.

17. United States Maritime Services, Inc. is a Louisiana corporation doing business within the jurisdiction of this District. Its registered agent for service of process is Barry J. Thibodeaux, at 365 Canal Street, Suite 2500, New Orleans, LA 70130. United States Maritime Services, LLC is a closely related entity that does business in this District and shares the same registered agent for service of process.

18. USES is a Louisiana limited liability company doing business within the jurisdiction of this District. USES is closely related to USMS and shares with USMS both the same ownership and registered agent for service of process.

19. DRC is an Alabama limited liability company doing business within the jurisdiction of this District. Its registered agent for service of process is Robert Isakson, at 740 Museum Dr., Mobile, AL 36608.

## JURISDICTION AND VENUE

20. This Court has jurisdiction of this matter pursuant to Article III of the Constitution of the United States and 28 USC § 1333, as this matter falls within the Court's

admiralty and maritime jurisdiction. This claim is being filed pursuant to Rule 9(h) of the Federal Rules of Civil Procedure.

21. The MVCA is the contract at issue in this action. The MVCA specifies New Orleans, Louisiana as a venue for disputes related to the contract. Accordingly, venue in this District is proper.

## FACTUAL BACKGROUND

### A. The VoO program

22. On April 20, 2010, the *Deepwater Horizon* exploded 42 miles southeast of Venice, Louisiana. For 87 days, oil from the well gushed into the Gulf of Mexico at estimated rates of between 2,000 and 40,000 barrels a day. Just ten days after the explosion, oil began washing ashore in Louisiana and has continued to wash ashore in all five Gulf states ever since.

23. In a purported attempt to combat the effects of the spill, BP enlisted local fishing vessels in the VoO program to identify locations of oil slicks, skim oil from the Gulf, tend and maintain boom, collect sheen and light oil in shallow waters, find and remove tar balls from the water, and transport supplies, personnel and wildlife.

24. BP began executing written contracts with fishermen just days after the *Deepwater Horizon* explosion. The contracts were drafted by BP, and the terms were non-negotiable for any vessel owner seeking to participate in the VoO program. As a result, every fisherman who participated in the VoO program in 2010 was subject to the same contract and contractual language.

25. For example, on May 2, 2010, Mr. Truong committed both of his vessels to the VoO program by signing identical MVCAs for each vessel.

26. BP demanded exclusive use of vessels as a condition for participating in the VoO program. Article 2 of the MVCA expressly states that participating vessels must be used exclusively for the VoO program during the entirety of the charter term:

> A. During each CHARTER TERM, the VESSEL **shall be employed exclusively for CHARTERER'S use** as a vessel of opportunity in the carriage of CHARTERER'S employees, contractors, business invitees, equipment and provisions and in the performance of various tasks associated with oil spill response and containment efforts as directed by CHARTERER . . . **. The VESSEL shall be available and at CHARTERER's disposal for operation twenty-four (24) hours per day**. The **VESSEL shall not be used for any purpose** other than performance of SERVICES during the CHARTER TERM.
>
> B. The **whole reach of the VESSEL's deck and accommodation spaces shall be at CHARTERER's disposal**, reserving only proper and sufficient space for VESSEL OWNER's crew.

(Emphases added.)

27. BP's MVCA requires that Fishermen provide BP with complete, exclusive, and absolute control of vessels throughout the entire "charter term." The MVCA expressly defines the start and end of the charter term:

- "The term of the CHARTER shall commence on the date of the departure of the Vessel from the mutually agreed location of delivery. . ."  (Article I.A.)

- ""The VESSEL shall be redelivered to VESSEL OWNER at the close of each CHARTER TERM to the original point of delivery by CHARTERER, **as determined by off-hire dispatch notification**. . . ."  (Article I.B.)

- "The termination of the CHARTER TERM (termination of dispatch) is determined by the time the VESSEL is secure in its moorings at the original point of delivery during drills and exercises, and secure at its mooring **after final decontamination** after an oil spill response (which process shall be as undertaken without delay)."  (Article 10.E.) (Emphasis added.)

Thus, the MVCA unequivocally defines the charter term to run from a vessel's date of departure through "final decontamination" and "off-hire dispatch notification."

28.	Thus, according to the unequivocal terms of the MVCA, the charter term does not terminate until two events have occurred:  1) BP has issued an "off-hire dispatch notification" to the vessel owner; and 2) the vessel has received "final decontamination."

29.	Off-hire dispatch notifications were provided by BP via a document entitled "Notice of Non-renewal of Master Vessel Charter."  Drafted by BP, the notices explicitly state: "Please be advised that pursuant to the terms of the Master Vessel Charter Agreement ('MVCA'), **BP is providing this 'Off Hire Dispatch Notification'** which terminates the MVCA immediately as of the date below."  (Emphasis added.) Thus, the earliest possible termination of a charter term occurs when a Notice of Non-renewal provides the vessel owner with the off-hire dispatch notification.

30.	Under the MVCA, a charter term does not terminate until an activated vessel has also been decontaminated.  This contractual term recognizes the reality that a vessel cannot practicably be used for any other purpose until decontamination, and, in so defining the charter term, BP provided a contractual assurance to the Fishermen that BP would compensate vessel owners until decontamination is final.

31.	Additionally, BP routinely and systematically informed Fishermen who signed the MVCA that their boats must remain at the docks and ready for activation or a return to active participation.  BP instructed Fishermen that, as a condition for participation in the program, they should not use their boats for fishing and should be available for immediate activation. Relying on this instruction, many Fishermen refrained from using their boats for any other economically useful purpose.

32.	Consistent with the exclusive nature of the MVCA and the vessel owner's obligations, the MVCA promises to pay participants a daily rate for every day of the charter

term. The daily rate specified in the MVCA ranges from $1200 to $3000 per day, depending on vessel size.

33. BP contracted with USMS, USES, and DRC to assist in operating and coordinating the VoO program. USMS, USES, and DRC directly contracted with many of the Fishermen using contracts identical in all material respects to the MVCA drafted by BP.

34. Mr. Truong worked the f/v *Mimi II* continuously in the VoO program until on or around July 22, 2010, and the f/v *Way of Life* until on or around July 30, 2010, when BP sent his vessels back to the docks.

### B. BP's Failed Decontamination Program

35. Decontamination is a critical component of the VoO program. Boats that have participated in an oil spill response would bear substantial risks of severe regulatory and marketplace consequences by fishing without having been decontaminated. Indeed, boats caught fishing without having been decontaminated may be subject to fines, forfeitures, and penalties that can be devastating to fishermen's livelihoods. Oil contamination may also result in processors refusing to purchase shrimp that a fisherman has invested significant time and money to catch.

36. The MVCA recognizes the legal significance of decontamination by extending the charter term through the date of final decontamination. This provision ensures that the boats are subject to BP's exclusive control until decontaminated. Additionally, BP's promise to decontaminate boats offers Fishermen a contractual assurance critical to the decision to participate in the program. For all practical purposes, Fishermen cannot use their boats for anything other than VoO until decontaminated.

37. Unfortunately, BP's decontamination program was a fiasco. BP did not commission nearly enough resources to ensure that boats could be decontaminated in a timely

8

manner.  BP's failure to decontaminate boats resulted in an enormous backlog of contaminated boats, leaving hundreds of vessels moored in a contaminated condition at the docks after returning from active participation in VoO.

38.     Many vessel owners spent weeks and months attempting to have BP decontaminate their boats.  BP has failed to decontaminate some vessels to this day.  In the meantime, BP enjoys an exclusive and absolute lease to these vessels, and the vessel owners cannot use the boats for any other purpose.

39.     For example, while Mr. Truong's f/v *Mimi II* was sent back to the dock on July 22, 2010, BP failed to decontaminate the vessel until October 5, 2010.  Mr. Truong's f/v *Way of Life* was not decontaminated until October 7, 2010.  BP stored VoO materials and property on the vessels through the date of decontamination.

40.     As another example, Plaintiff Justin Lassabe has two vessels that have never been decontaminated.  While BP has never decontaminated his vessels, it did place a device on both of his boats that record each time they leave the dock.  Mr. Lassabe has tried repeatedly to contact BP to arrange for decontamination, but BP will not return his calls.  The devices remain on Mr. Lassabe's boats, and he continues to be unable to use them to earn a living by fishing.  BP has placed similar devices on other VoO boats.

41.     Plaintiff Anthony Johnson contacted BP repeatedly to arrange to have his boat decontaminated.  BP never responded.  Unable to use his boat, Mr. Johnson paid himself out-of-pocket to have his boat decontaminated in December 2010 but has never been reimbursed.

42.     Kim Le has two vessels that have never been decontaminated.  After months of attempts, Mr. Le informed Mark Holstein, from BP's Office of General Counsel, that Mr. Le's vessels remain contaminated and under BP's control.  Continuing BP's pattern of delay, inaction,

and false promises, Mr. Holstein promised to check on the status of Mr. Le's vessels, but Mr. Le's boats still have not been decontaminated to this day.

43. Many vessels that participated in the VoO program have never been decontaminated. The charter terms for these vessels continue to run, with Defendants contractually obligated to pay the daily rate until the vessels have been decontaminated and the charter term has ceased.

### C. BP's Schemes To Avoid Paying

44. Under the MVCA, Defendants must pay the Fishermen the daily rate specified in the MVCA until the boats have received the Notice of Non-renewal and have been subject to final decontamination. In every case, Defendants have breached the MVCA by failing to do so.

45. For example, BP did not pay Mr. Truong for the exclusive use of the f/v *Mimi II* from July 23, 2010, until it was decontaminated on October 5, 2010, nor did it pay for the exclusive use of the f/v *Way of Life* from July 31, 2010, until it was decontaminated on October 7, 2010. BP owes Mr. Truong payment, day-to-day, for the exclusive uses of his vessels from initial activation of Mr. Truong's contracts through the final decontamination of his vessels and receipt of a Notice of Non-renewal. BP has failed to pay him for this time.

46. Rather than pay the promised amounts, BP has hatched various schemes to manipulate the Fishermen. For example, by early this year, BP had significantly reduced the vessels actively in the VoO program. At the same time, BP was in the process of denying claims for payment of the daily rate through the end of the charter term.

47. In an attempt to evade the MVCA and its obligation, BP sent "Transitional Master Vessel Charter Agreement" to VoO participants in April and May 2011. A true and correct copy of the Transitional Master Vessel Charter Agreement ("Transitional MVCA") is attached as Exhibit B.

48.     By its terms, the Transitional MVCA "supersede[s] all other Master Vessel Charter Agreements."  The Transitional MVCA eliminated reference to decontamination in the definition of charter term and disavowed payment for so-called "stand-by days."  On information and belief, the Transitional MVCA was sent to hundreds of vessel owners possessing claims under the original MVCA, despite the fact that BP had no intention of ever activating these vessels.

49.     BP has not provided the original MVCA or Transitional MVCA to Vietnamese VoO participants in any language other than English.  BP notes in the Transitional MVCA that vessel owners should "read the terms carefully," while knowing that a significant percentage of VoO participants have no ability to do so.

50.     The Transitional MVCA was a ruse designed to allow BP to avoid the contractual obligations set forth in the original MVCA.  BP drafted and delivered the Transitional MVCA because it knows that the original MVCA unambiguously obligates BP to pay contracted daily rates through date of decontamination and receipt of the Notice of Non-renewal.  BP expected that many vessel owners would sign the Transitional MVCA hoping to continue work in the VoO program, the only material source of income for many Fishermen since the Deepwater Horizon spill.

51.     BP has acted in bad faith.  Knowing that it has assumed control over the Fishermen's vessels and that it owes the Fishermen money, BP has stalled, made false promises, and resorted to deception to avoid paying the Fishermen what it owes them.

## COUNT I
## BREACH OF CONTRACT

52.     Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

53.     Defendants and the Fishermen entered into MVCAs.  By the terms of those contracts, Defendants were obligated to pay Fishermen for the exclusive use of their vessels from the day they were activated until the vessels received final decontamination and the Notice of Non-renewal providing an off-hire dispatch notification.

54.     At all relevant times, the Fishermen complied with the terms of the MVCAs and fulfilled their contractual obligations.

55.     Defendants have failed to pay the Fishermen the contracted daily rates for their vessels through the entire charter term as contractually required.

56.     Defendants have breached its contracts with the Fishermen.

57.     As a result of Defendants' breach of the MVCAs, Defendants the Fishermen have suffered damages.

## COUNT II
## QUASI-CONTRACT

58.     Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

59.     The Fishermen made their vessels available for Defendants' exclusive use in the VoO program from the first day they began working until they were finally decontaminated and received a Notice of Non-renewal.

60.     Defendants knew that once the Fishermen's vessels began working in the VoO program, those vessels could not be used for any other purpose until they were finally decontaminated.

61.     Defendants also knowingly stored and placed equipment on the Fishermen's vessels and requested that the vessels not be used for any other purpose until the day they were finally decontaminated.

62. Defendants benefited from storing their equipment on the Fishermen's vessels and retaining the exclusive right to use their vessels in the VoO program until they were finally decontaminated and received a Notice of Non-renewal.

63. Defendants represented to Fishermen that they must remain available for activation or re-activation, and Fishermen avoided using their vessels for any other purpose until receipt of a Notice of Non-renewal.

64. The Fishermen reasonably expected that they would be compensated for Defendants' use of their vessels for each and every day until they were finally decontaminated and received a Notice of Non-renewal.

65. The Fishermen have suffered damages and Defendants have been unjustly enriched as a result of their failure to pay daily rates for use of the Fishermen's vessels.

## COUNT III
## UNJUST ENRICHMENT

66. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

67. The explicit terms of the MVCAs prohibited the Fishermen from using their vessels for any purpose other than the Defendants' VoO program until they were finally decontaminated and received a Notice of Non-renewal.

68. Defendants benefitted from use of the Fishermen's vessels and from retaining exclusive control over the Fishermen's vessels.

69. The Fishermen were harmed by Defendants' failure to compensate them for their use of their vessels.

70. The Fishermen have suffered damages and Defendants have been unjustly enriched as a result of their failure to pay daily rates for use of the Fishermen's vessels.

## COUNT IV
## DECLARATORY JUDGMENT

71.     Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

72.     Defendants entered into contracts with the Fishermen.

73.     By the express terms of those contracts, Defendants are required to pay the Fishermen for each and every day of the charter term.

74.     The charter term begins when the vessel is placed on active duty and terminates when the vessel is secured in its moorings at the original point of delivery after final decontamination and the vessel owner has received an off-hire dispatch notification.

75.     The Defendants are contractually obligated to pay the daily rate for each contracted vessel from the date a vessel was placed on active duty through the date that the vessel was finally decontaminated and received a Notice of Non-renewal providing an off-hire dispatch notification.

## COUNT V
## CONVERSION

76.     Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

77.     Defendants knew that Plaintiffs' vessels are rightfully owned by the Plaintiffs.

78.     Defendants knowingly and intentionally assumed control and dominion of the Plaintiffs' vessels by rendering them unfit for any purpose other than Defendants' uses.

79.     Defendants wrongfully detained the vessels, excluded the Plaintiffs from use of their vessels, and exercised dominion and control over the vessels without compensating Plaintiffs.

80.     Plaintiffs suffered damages from loss of the use of their property due to Defendants' misconduct.

**WHEREFORE,** the Plaintiffs pray this Honorable Court to issue a judgment in favor of the Plaintiffs against Defendants for:

1) Unpaid time at the vessel and crew rates specified in the MVCA from formal activation through both final decontamination and receipt of the Notice of Non-renewal, in accordance with the MVCA and/or quasi-contract and/or unjust enrichment;

2) Punitive and exemplary damages;

3) Entry of a declaratory judgment that Defendants violated the MVCA by not paying Plaintiffs for each day from formal activation through final decontamination and receipt of Notice of Non-renewal;

3) Unpaid property damages;

4) Pre-judgment and post-judgment interest;

5) Attorneys' fees and litigation costs and expenses; and

6) All such other relief as they may show themselves justly entitled to receive.

Plaintiffs demand a jury trial.

Dated: December 29, 2011.

RESPECTFULLY SUBMITTED:

BY: /s/ *Stephen S. Kreller*_____

THE KRELLER LAW FIRM

Stephen Kreller (LA # 28440)
4224 Canal Street
New Orleans, LA  70119
Telephone: 504-484-3488
Facsimile: 888-294-6091
Email: ssk@krellerlaw.com

15

FAEGRE & BENSON

Gerard M. Nolting
William L. Roberts
Craig S. Coleman
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402
Telephone: 612-766-7000
Facsimile: 612-766-1600
Email: gnolting@faegre.com
Email: wroberts@faegre.com
Email: ccoleman@faegre.com

LANGSTON & LOTT, P.A.

Duncan Lott
Casey L. Lott
100 South Main Street
Booneville, MS  38829
Telephone: 662-728-9733
Facsimile: 662-728-1992
Email: clott@langstonlott.com

**ATTORNEYS FOR PLAINTIFFS**

**PLEASE SERVE:**

**BP AMERICAN PRODUCTION COMPANY**
Through its registered agent for service of process:
CT Corporation System
5615 Corporate Boulevard, Suite 400B
Baton Rouge, Louisiana 70808

**BP EXPLORATION AND PRODUCTION COMPANY**
Through its registered agent for service of process:
CT Corporation System
5615 Corporate Boulevard, Suite 400B
Baton Rouge, Louisiana 70808

**UNITED STATES MARITIME SERVICES, INC.**
**UNITED STATES MARITIME SERVICES, LLC**
Through its registered agent for service of process:
Mr. Barry J. Thibodeaux
365 Canal Street, Suite 2500
New Orleans, Louisiana 70130

**UNITED STATES ENVIRONMENTAL SERVICES, LLC**
Through its registered agent for service of process:
Mr. Barry J. Thibodeaux
365 Canal Street, Suite 2500
New Orleans, Louisiana 70130

**DRC EMERGENCY SERVICES, LLC**
Via Long-Arm Statute
Through its registered agent for service of process:
Mr. Robert Isakson
740 Museum Drive
Mobile, Alabama 36608

fb.us.7852248.02