## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" in the | § | |
| GULF OF MEXICO, | § | SECTION:  J |
| on APRIL 20, 2010 | § | |
| | § | JUDGE BARBIER |
| Applies to:  All Cases | § | |
|              2:10-cv-02771 | § | MAG. JUDGE SHUSHAN |
| | § | |
| | § | |


## HALLIBURTON ENERGY SERVICES, INC.'S SURREPLY IN OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS

Halliburton Energy Services, Inc. ("HESI") respectfully submits this surreply in opposition to the Motion for Spoliation Sanctions and Memorandum in Support (Rec. Doc. 4799) ("Motion") and Reply thereto (Rec. Doc. 5024)  ("Reply") filed by BP Exploration & Production, Inc. and BP America Production Co.'s (together, "BP").  For the reasons set forth below,  BP's Motion should be denied.

# I.
# INTRODUCTION

Steering clear of the facts raised in HESI's Response in Opposition ("Response"), and desperate to avoid the consequences of its own misguided decisions, BP in its Reply parrots the unsupported allegations in its original Motion.  In so doing, BP fails to counter the most critical fact attendant to this issue: the failure to retain data and materials from post-incident tests performed with materials different from the Macondo slurry, and under lab, not downhole, conditions, does not constitute spoliation of evidence.[1]  BP cannot manufacture the bad faith finding necessary to support sanctions through cherry-picked deposition quotes and misleading characterizations of documents.  An examination of the complete record and the applicable law fatally undermines BP's lamentations of bad faith.

BP has also lingered far too long to complain of spoliation.  It has been nearly *nine months* since HESI disclosed to BP the random, informal post-incident testing that was conducted.  *See* Resp. at 8-9, Exs. 12-14.  Had BP been prejudiced in any significant or genuine way, it would have filed its Motion well before it did.  Nonetheless, at any time, the Motion is devoid of merit.

---

[1] On the Macondo well, BP ignored its own internal guidelines and never even reviewed the final foam stability test using rig samples before deciding to proceed with the cement job; a fact that makes BP's Motion and attempt to ascribe importance to post-incident testing using non-rig cement all the more disingenuous.  *See, e.g.,* Sims Dep. 467:10-23; Walz Dep. 200:18-201:22.

BP asks this Court for the remedy of an adverse inference that Morgan's and Quirk's post-incident testing "*showed* that [HESI's] Macondo slurry poured on April 19, 2010 was unstable" and that the "testing . . . showed [HESI's] slurry design to be unstable."  Reply at 3 (emphasis in orig.); Mot. at 22.   However, there must be a nexus between the inference made and the information lost.  BP seeks an inference that is well beyond the scope of any information lost from the post incident testing.   More importantly, Morgan and Quirk both testified that the testing results were initially mixed but ultimately showed that the slurry was *stable*.   The information allegedly lost does not support an inference that the Macondo slurry was unstable. To make such an inference, this Court would have to find that Morgan and Quirk lied under oath. A review of all of the evidence, including their testimony, precludes any such finding.

## II.
## ARGUMENT

**A.    BP omits the full factual record surrounding the testing and its knowledge thereof.**

In its Reply, BP continues to distort the facts and the law.  For example, BP disregards the Response and nonetheless claims that "despite a series of [HESI] cement slurry tests, there are no records reflecting the nature and results of this testing."  Reply at 1-2.  To the contrary, this litigation is replete with records that "reflect[] the nature and results of this testing."  *See* Resp. at 15-17; Motion Ex. 4 (Roth's notes) (HAL 1243816); Resp. Ex. 9 (Faul's notes), Resp. Ex. 27 (Morgan's notes).  BP also misrepresents the contents of Roth's notes, claiming repeatedly that Roth concluded the slurry "would not foam."  Reply at 2, 3, 4, 7, 8.  To the contrary, the notes provide that a "stable foam [was] observed" after the slurry was conditioned — a critical fact that BP continues to ignore.  Motion Ex. 4 (HAL_1243816).[2]

---

[2] These notes were inadvertently produced and are covered by protections applicable to attorney work product as the documents were created at counsel's direction.  However, HESI has not sought to claw them back, as they are

BP also claims that HESI employees acknowledged that the lab sample slurry was "thin," settled, and would not foam.  Reply at 5.  That assertion is false.  HESI's Response challenged the assertions that the slurry settled and "would not foam."  *See* Resp. at 5-7 (citing Morgan Dep., 22:12-24:2; 98:9-24; 191:13-18; 107:8-18; 197:7-199:15; Faul Dep., 262:17-264:1; 282:4-284:9; 294:14-197:2; 377:25-388:8; 586:10-587:4; 593:6-9; Quirk Dep., 129:18-22; 130:16-20; 389:9-393:10; 394:18-495:11).

### B.   To find spoliation, much less bad faith, there must be a duty to preserve unique, relevant evidence — which does not include post-incident testing.

Spoliation is the "destruction for the purpose of depriving the adversary of the evidence." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 530 (D. Md. 2010).  To obtain the remedy of an adverse fact finding for spoliation, BP must prove:  (1) the spoliation of evidence that HESI had a duty to preserve; (2) a culpable breach of that duty (in the Fifth Circuit, "bad faith"); and (3) a resulting prejudice to its case.  *Ashton v. Knight Transportation, Inc.*, 772 F. Supp. 2d 772, 800 (N.D. Tex. 2011); *see* THE SEDONA CONFERENCE, THE SEDONA PRINCIPLES: BEST PRACTICES RECOMMENDATIONS & PRINCIPLES FOR ADDRESSING ELECTRONIC DATA PRODUCTION 70, PRINCIPLE 14 (2d ed. 2007), *available at* http://www.thesedonaconference.org/dltForm?did=TSC_PRINCP_2nd_ed_607.pdf [hereinafter THE SEDONA PRINCIPLES].  To comport with the duty to preserve, a party must not destroy "unique, relevant evidence that might be useful to an adversary."  *Ashton*, 772 F. Supp. 2d at 800.  Thus, a predicate to a finding of spoliation is the destruction of "unique, relevant evidence." *Id*.

---

material to the issues in this spoliation dispute and HESI wishes to act with candor to the Court.  HESI reserves the right to claw the notes back and does not waive any privilege by using them defensively against BP's motion.

**HESI'S SURREPLY IN OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS**          **PAGE 3**

HESI did not have a duty to preserve post-incident test results or materials because they were not unique or relevant. The post-incident tests were performed on lab stock that remains available today. Materials that may be replicated cannot be "unique." Nor were the tests relevant to the underlying events. Such tests were conducted *after* the blowout and cannot constitute evidence of anything that occurred *before* the blowout. The lab stock that was used for the post-incident tests was not used in either the final pre-incident testing or in the Macondo well itself. And because the lab stock differed in composition from the rig stock, tests using lab stock cannot evidence how the slurry pumped on April 19, 2010, performed downhole.

Moreover, BP has not shown any prejudice. BP questioned the engineers who performed the preliminary tests at length and under oath regarding the results. As noted, the materials that are the subject of the Motion are different from those actually used in the Macondo well, and plenty of material remains for duplicate tests. Thus, the tests are hardly important or "unique" evidence in this case.

HESI's initial legal hold notice, sent out promptly on April 26, 2010, focused on information "relevant to an explosion that occurred on April 20, 2010, on the MODU Deepwater Horizon," and "data regarding all work on the well being drilled on April 20, 2010." Resp. Ex. 26 (submitted *in camera*). BP does not – and indeed cannot – claim that evidence relevant to the explosion or data regarding work on the well was destroyed.

BP further complains that HESI "nowhere explains" why Quirk did not save slices of the solidified cement sample. Reply at 11. This is but another example of BP avoiding the facts. HESI provided the Court with testimony that sections cut from foam stability tests are not items that HESI lab technicians routinely kept, or were required to keep. Resp. at 15 n. 23 (citing Ex. 23, Richard Dep. 265:6-14). Further, given the tens of thousands of tests conducted in HESI labs

every year, common sense dictates that retaining these items would prove impossible.  Since, Quirk and Morgan were simply following routine practice, no ill-intent can be inferred from their not saving all materials related to the ad-hoc testing.

> **1.    The post incident testing is not particularly relevant evidence, if it is "evidence" of the April 20, 2010 Incident at all.**

BP relies exclusively upon *Zubulake v. UBS Warburg LLC,* 216 F.R.D. 280, 286 (S.D.N.Y. 2003), for the proposition that the readily reproducible and irrelevant test results are "evidence" for which HESI should be sanctioned under a spoliation theory.  BP argues that "one man's trash is another man's treasure."  *See* Reply at 12 (citing *Zubulake,* 216 F.R.D. at 286). But *Zubulake* does not help BP.  In *Zubulake*, the court found that although e-mails that had been withheld from production had "some tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" under Federal Rule of Evidence 401, none of the emails were "direct evidence" of the main claim in the case.  Thus, the failure to produce the emails did not weigh in favor of sanctions.  *Zubulake*, 216 F.R.D. at 286.

Here, BP questioned at length the HESI employees who performed the post-incident tests and had access to documents related to the testing.[3]  As previously explained, the post-incident tests were performed on lab samples, not the actual ingredients contained in the slurry that was tested before the incident or that was pumped in the Macondo well.  *See* Resp. at 8.  The lab samples differ in composition from the rig stock that was tested pre-incident and pumped into the well.  Therefore, as in *Zubulake,* the materials BP complains of are not "direct evidence" of the main claims in this suit, and sanctions are not warranted.  *Id.*

---

[3] Resp. Ex. 9; *see also* Mot., Ex. 20 (recorded results of the static gel strength test at HAL 0050590).

**HESI'S SURREPLY IN OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS**          **PAGE 5**

### 2. The testimony and documents show that the allegedly spoliated, post-incident testing information was *not* harmful to HESI's position.

HESI has already demonstrated that the testing was ultimately favorable to it, as both Morgan and Quirk observed the cement to be stable. Resp. at 16-17. Ignoring these facts, BP repeatedly implies that Morgan's recollection that the slurry was "thin" indicates that it was "bad" or "unstable." BP cites no evidence for this specious interpretation. *See* Reply at 7. And in fact, a "thin" slurry can still be a stable slurry. Morgan specifically testified, in response to BP's questions, that the slurry may have indeed been designed to be "thin." *See* Morgan Dep. at 97:3-98:2.[4] Furthermore, Morgan stated unequivocally that the slurry he tested foamed all the way to fill up the container and there were no signs of gas break out, free fluid, or streaking. *Id.* at 98:9-99:17. BP's feigned ignorance of the fact that thinness may have been part of the slurry design should be rejected.

BP also complains that HESI does not "explain" Quirk's statements that the weight of the slurry he tested indicated that it lost about a quarter of the nitrogen. Reply at 8 (citing Quirk Dep. 333:6-10, 334:9-11. 480:13-481:2). First, BP failed to even mention this testimony in its Motion. Second, Quirk's full testimony speaks for itself: he did not view any density issue to be determinative of the slurry's stability. *See* Quirk Dep. at 481:17-483:23.

Undeterred by the facts or the law, BP argues that a reasonable inference can be drawn that the missing "evidence" would have been harmful to HESI, *i.e.,* that an adverse finding of fact should be made that "the testing performed by Morgan and Quirk showed Halliburton's slurry design to be unstable." Mot. at 22; Reply at 5-7. But in the adverse finding analysis, there is no presumption of relevance or prejudice; instead there must be a nexus between the proposed

---

[4] Morgan testified that he "didn't know what [the cementing engineers'] design parameters was, if they had a tight hole, that kind of stuff." Morgan "assumed they designed it like they wanted it." Morgan Dep., 97:11-18.

adverse finding and the information lost. *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 617-18 (S.D. Tex. February 19, 2010) (discussing *Consolidated Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 340 n.6 (M.D. La. 2006)).  The post-incident testing showed mixed results that were ultimately favorable to HESI.  At most, the post-incident testing showed how *non-rig* ingredients performed when tested under *lab conditions*, not how rig stock performed when pumped downhole.  Accordingly, no reasonable inference can be drawn from this record that the missing information was harmful to HESI.

In order to reach the inference that BP urges — that the slurry tested post-incident using lab ingredients and lab conditions was unstable — this Court would have to find that (i) testing of non-rig ingredients under lab conditions is somehow an indication of a cement slurry's stability under actual downhole conditions (which would be contrary to industry practice, the BP/HESI Agreement, and the expert testimony of Benge, Lewis, and Beirute); (ii) that both Morgan and Quirk lied under oath about the results of the testing each of them performed; and (iii) that either Faul and Dubois lied under oath about how Morgan and Quirk characterized the results of the tests that Morgan and Quirk performed, or that Morgan and Quirk lied about the results when discussing them with Faul and Dubois.  None of the evidence can reasonably support such a finding.

### B.   Rickey Morgan did not act in bad faith.

BP faults Rickey Morgan for not creating notes of his post-incident testing and characterizes that omission as "purposeful destruction"  That assertion is nonsensical.  It further claims that the failure to create notes constitutes an express admission that Morgan "destroyed evidence precisely because he was 'worried about it being misinterpreted in the litigation'."  Reply at 5-6 (citing Morgan Dep. at 101:9-23).  This allegation lacks even a shred of credibility

because the misleading words "worried about it being misinterpreted in the litigation" are not

even Morgan's words:

> Q. **And was that because you were concerned that it might be considered something that could be used in litigation against the company?**
>
> A. **No, sir**.  He was asking for my opinion, and I gave him my opinion.  I didn't want to put anything on an e-mail that could be twisted, and turned . . . .
>
> . . .
>
> Q. You didn't want your words turned around – down the road?
>
> A. Twisted, exactly, taken out of context.  [Questioned by PSC's attorney, Erwin Gonzalez]

Morgan Dep., 22:12-24:2 (emphasis added).  By casting Morgan as a willful spoliator of

evidence, BP is doing exactly what Morgan feared: taking his words and work out-of-context

and manipulating them to serve BP's purposes in litigation.  BP also ignores that Morgan acted

in good faith with respect to notes he did create, which were preserved and produced to BP.

Resp. Ex. 27 (Morgan's notes).

"Bad faith" is conduct involving fraudulent intent or a desire to suppress the truth.

*Consolidated Aluminum Corp. v. Alcoa, Inc*., 244 F.R.D. 335, 344 (M.D. La. 2006); *Ashton*, 772

F. Supp. 2d at 800.  Morgan's testimony is no evidence of fraudulent intent or desire to suppress

the truth.  BP claims that the acts of Faul, Quirk, and Morgan were in bad faith because they

"destroyed testing evidence," there are inconsistencies in the testimony about their test results,

and HESI purportedly failed to disclose "certain documents" related to the testing.  Reply at 6.

BP relies on *Brown v. ICF Int'l.*, 2009 WL 7127925, at *3 (M.D. La. Apr. 24, 2009) and

*Yelton v. PHI, Inc.*, 2011 WL 6100445, at *13-14 (E.D. La. Dec. 7, 2011) for the proposition that

HESI's alleged "destruction" of evidence is somehow worthy of sanctions.  However, both cases

are readily distinguishable.  The evidence in *Brown* was handwritten notes upon which the

gender discrimination plaintiff in the case depended for support of her claims and defenses, *i.e.*,

the notes were central to the case.  *Brown*, 2009 WL 7127925, at *3.  The evidence at issue in

*Yelton* was irreplicable data files.  *Yelton*, 2011 WL 6100445, at *13-14.  The evidence destroyed in *Brown* and *Yelton* was not verbal, replicable, or described in detail and under oath by multiple deponents.

C.      **BP's Reference to *Kolon Indus., Inc*., is Misguided.**

Citing agency theory, BP argues that HESI is automatically responsible for the acts of a few of its employees.  Reply at 9-10 (citing *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, --- F. Supp. 2d ----, 2011 WL 2966862, at *32-33 (E.D. Va. July 21, 2011)).  First, *Kolon Industries* involved a vastly different fact situation:  a company-executive orchestrated campaign to systematically identify harmful emails and delete them.  *Kolon Indus., Inc.*, 2011 WL 2966862, at *6.  There, the defendant attempted to argue that employee actions outside official company policy were not within the scope of employment and thus could not be attributed to the company.  *Id*. at *32-33**.**  *Kolon* is in no way analogous to this case.  There is not a scintilla of proof in this matter of any "orchestration" or "campaign" involving company executives and absolutely no deletion of harmful emails.

D.      **As stated in the Response, HESI will produce any computer hard drives on which the Modeling may have been saved.**

The Displace 3D Modeling ("D3D") described in the July 25, 2010, email was requested after the Incident by Tommy Roth, Anthony Badalamenti and Simon Turton.  The D3D modeling examines a different kind of channeling than that displayed in the OptiCem models, which displays "erodability." *See* Exhibit A, Bolado Dep. at 252:5-262:8.  HESI will, to the extent available, produce for testing forensic images of any hardware used for the D3D modeling either via agreement with BP or with this Court.

More importantly, and in order to moot all issues associated with the D3D modeling, HESI will agree to allow BP access to the D3D software under the same conditions previously

agreed to with respect to HESI's OptiCem software.  BP's experts can run the same model described in the July 25, 2010 email.  If requested, HESI will supply the inputs.  While HESI is confident that BP's internal experts and its new testifying expert may be knowledgeable enough about cement modeling to use the software, if BP has difficulty operating the D3D software, HESI will make a technician available, as it did with the OptiCem software.

### III.
### PRAYER

HESI prays that upon considering its Surreply and Response in Opposition to Motion for Spoliation Sanctions, the Court will deny the motion.  In the alternative, HESI requests an opportunity to present evidence supporting its defenses to the Court in an evidentiary hearing. HESI also prays for all other relief, legal and equitable, to which it is justly entitled.

Dated:  January 4, 2012.

Respectfully Submitted,

**GODWIN RONQUILLO PC**

**By:** /s/ *Donald E. Godwin*
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
dgodwin@GodwinRonquillo.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
bbowman@GodwinRonquillo.com
Jenny L. Martinez
State Bar No. 24013109
jmartinez@GodwinRonquillo.com
Elisaveta Dolghih
State Bar No. 24043355
edolghih@GodwinRonquillo.com
Michael W. Leach
State Bar No. 24065598
mleach@GodwinRonquillo.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

and

R. Alan York
AYork@GodwinRonquillo.com
Jerry C. von Sternberg
JVonSternberg@GodwinRonquillo.com
Misty Hataway-Coné
MCone@GodwinRonquillo.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone:  713.595.8300
Facsimile:  713.425.7594

**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Halliburton Energy Services, Inc.'s Surreply in Opposition to Motion for Spoliation Sanctions was filed electronically with the Clerk of the Court using the CM/ECF system and that notice of this filing will be sent to all counsel through the CM/ECF system on this 4th day of January 2012.

/s/ Donald E. Godwin
Donald E. Godwin

# EXHIBIT A

01-38909
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO.  2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO, on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

## CONFIDENTIAL

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# David L. Bolado
**VOLUME 1**

DECEMBER 22, 2011

## *COPY*



*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
 3   IN RE:  OIL SPILL      )   MDL NO. 2179
     BY THE OIL RIG         )
 4   "DEEPWATER HORIZON" IN )   SECTION "J"
     THE GULF OF MEXICO, ON )
 5   APRIL 20, 2010         )   JUDGE BARBIER
                            )   MAG. JUDGE SHUSHAN
 6
 7
 8
 9
10
11
12
13
14
15
16
17              * * * * * * * * * * * * * * * * *
                        VOLUME 1
18              * * * * * * * * * * * * * * * * *
19
20
          Deposition of David L. Bolado, taken at
21   the Pan-American Building, 601 Poydras Street,
     11th Floor, New Orleans, Louisiana, 70130, on the
22   22nd day of December, 2011.
23
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    would I assume that it does.

2        Q.   Okay.  And as you can tell, Mr. Roth is

3    saying three times that the spacer volume was

4    sufficient to sweep the annulus, correct?

5        A.   (Reviewing document.)

6             Okay.  He -- he says that spacer was

7    sufficient three times.

8        Q.   Sufficient to sweep the annulus three

9    times?

10       A.   On the last one, he doesn't say that.

11   But, again, he says it's "sufficient to sweep" --

12   or "sufficient" three times; twice, once annulus

13   and once channel.  So it changes each time,

14   but --

15       Q.   Okay.  And do you understand him to be

16   discussing Displace 3D modeling that he had

17   performed?

18       A.   I would think that that's what this is

19   referring to.

20       Q.   And it's -- it's addressed in your

21   Report, also.  Did -- did you know who prepared

22   the Displace 3D modeling for Mr. Roth?

23       A.   I am not sure who did that modeling.

24       Q.   Do you know if Mark Savery did modeling

25   or David Bedford?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.  I've heard those names, and I've also

2 heard that Mike Viator may have done modeling.  I

3 don't know which one of them did Displace 3D

4 modeling, or if any of them did.

5    Q.  Okay.  Now, as an Engineer charged with

6 investigating the modeling performed on this job,

7 wouldn't you be interested in seeing this

8 modeling that Mr. Roth had performed?

9    A.  In this case I would not particularly

10 want to look at this -- this model.  Again, I

11 think the accurate information that we have is

12 the OptiCem Program, which models erodibility of

13 the mud for channeling and gas flow potential,

14 where Displace 3D does not take either of those

15 into account and just looks at fluid velocities,

16 intermixing of fluids, as -- as they're pumped in

17 the wellbore geometry.

18       So the key input -- or one of the key

19 inputs for Displace 3D is you need to have

20 accurate intermixing of the fluids used.  You --

21 so you need the rheologies of all the fluids that

22 can intermix, and you need at least three

23 combinations for each one.  So to run an accurate

24 model, you would need all those combinations.

25 And to my knowledge on -- in this particular

**PURSUANT TO CONFIDENTIALITY ORDER**

1    case, I don't believe they had hardly any of

2    those available to them to run an accurate model.

3        Q.  Okay.  So you indicated that it doesn't

4    consider the erodibility and it doesn't consider

5    certain other things, Displace 3D doesn't,

6    correct?

7        A.  Correct, it does not.

8        Q.  Now, does that mean you can believe that

9    3D modeling would show that the spacer volume was

10   sufficient to sweep the annulus?

11       A.  Again, because it does not take into

12   account the gel strength of the mud, that, no, I

13   would not rely on that.

14       Q.  My question was slightly different.  Does

15   this mean that you can believe Mr. Roth's

16   statement that 3D modeling would show that the

17   spacer volume was sufficient to sweep the

18   annulus?

19       A.  Okay.  You're going to have -- read --

20   read that one more time for me, please.

21       Q.  Does this mean that you can believe

22   Mr. Roth's statement that 3D modeling would show

23   that the spacer volume was sufficient to sweep

24   the annulus?

25       A.  A 3D model in this case could show

**PURSUANT TO CONFIDENTIALITY ORDER**

254

1   anything, because, again, you don't have the --
2   the right inputs to run this model.  So, I mean,
3   you could make up numbers or try to estimate
4   numbers on the high side or the low side, and you
5   could get the model to show probably anything,
6   because you don't have -- again, this model looks
7   at the intermixing of fluids.  So probably the
8   most important input is what the rheologies of
9   those fluids are that are intermixed.  So if you
10  don't have those, again, I don't know if this
11  model shows you anything.
12      Q.  Okay.  Do you remember what my question
13  was?
14      A.  If -- if you want to repeat it again.
15      Q.  Okay.  So here Mr. Roth is saying three
16  times spacer volume was sufficient for the job,
17  correct?
18      A.  Spacer volume was sufficient to sweep the
19  annulus.  Okay.
20      Q.  And -- and --
21      A.  From 3D -- 3D testing, three --
22      Q.  And the thrust of his statement is that
23  spacer -- there was no channeling because the
24  spacer volume was sufficient under modeling in
25  3D, correct?

**PURSUANT TO CONFIDENTIALITY ORDER**

1         MR. STEVENSON:  Object to form.

2    A.  It says that the spacer was sufficient to

3 sweep channel.

4    Q.  (By Mr. Chen) And what would the spacer

5 sweep the channel of?

6    A.  It would sweep the channel of whatever

7 fluids are there.  It would be all your fluids.

8 Again, they intermix.  So it would be your -- all

9 the fluids previous to it.  So it would be --

10 you'd look at mud, base oil.  I believe that's

11 what it would be saying there.

12    Q.  So what it's saying is the spacer was

13 sufficient to remove all the mud, correct?

14         MR. STEVENSON:  Object to form.

15    A.  Again, I did not see the model.

16 There's -- there's a few things that we -- we

17 look at other than just removing the mud.  One of

18 the common things is do we get spacer

19 uncontaminated all the way around.  I don't know

20 for sure what he's -- what he's saying here.

21    Q.  (By Mr. Chen) So let me ask my question

22 again:  So what it's saying is that the spacer

23 would be sufficient to remove all the mud,

24 correct?

25         MR. STEVENSON:  Object to form.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.  I'd -- I'd say that's a -- that's an easy

2    assumption to make, but I do not know that --

3    Q.  (By Mr. Chen) Okay.

4    A.  -- that it's saying that.

5    Q.  Now, my earlier question was:  Given what

6    you know about Displace 3D --

7    A.  M-h'm.

8    Q.  -- is that possible that that modeling

9    showed that the spacer removed all the mud?

10   A.  Again, they could -- it -- it's possible,

11   if you put in the -- the right inputs to -- to

12   make the outputs come out that way.

13   Q.  It's possible, right?

14   A.  It's --

15          MR. STEVENSON:  Object to form.

16   A.  Again, it's possible, but you do not have

17   the inputs to -- to really run that model

18   accurately.  So you can make an inaccurate model

19   show that, yes.

20   Q.  (By Mr. Chen) Okay.  And do you think

21   that Mr. Roth would create an inaccurate model to

22   tell everyone that the spacer volume was

23   sufficient to sweep the annulus?

24   A.  I do not know Mr. Roth's knowledge of

25   this program itself.

**PURSUANT TO CONFIDENTIALITY ORDER**

257

1    Q.   Would --

2    A.   In this case I would say unless there's

3   some data out there that has not been presented

4   then, yes, I would say that he's running an

5   inaccurate model.

6    Q.   Okay.  Would you say that he's

7   intentionally running an inaccurate model to get

8   a result?

9    A.   I would say that that was probably not

10  his intention, to run an inaccurate model.

11   Q.   So you would agree with me that

12  Mr. Roth -- he's -- he's an Executive at

13  Halliburton, right?

14   A.   Correct.

15   Q.   You don't think -- you would agree with

16  me that he's probably trying to model the job in

17  a different software?

18   A.   Again, I -- I do not think that Mr. Roth

19  could run this model or has the knowledge of --

20  of how this model exactly works.  So I do not

21  think he was the one that ran it.  So he might be

22  asking somebody else to run it.

23   Q.   Correct.  And do you know Mark --

24  you Mark -- you know Mark Savery, correct?

25   A.   Yes, I do.

**PURSUANT TO CONFIDENTIALITY ORDER**

1     Q.  And did Mark -- does Mark Savery have the

2  knowledge to run this model?

3     A.  Yes, he does.

4     Q.  Okay.  And given that Mr. Roth asked

5  Mr. Savery to run the model, do you think that

6  Mr. Roth was trying in good faith to run a good

7  model, or do you think he was trying to trick the

8  model to get a result?

9              MR. STEVENSON:  Object to form.

10    A.  I think, again, he's -- he's asking

11 for -- for this information because he thought

12 this might be a tool to use, and, again, him

13 being an Executive, whoever he asked, would --

14 would probably run it.  But I would think that at

15 some point there would have been communications

16 that -- that this model is not -- is not -- have

17 the detail or the accuracy or the inputs, to give

18 an accurate model.

19    Q.  Have you seen any communications from

20 Halliburton indicating that the model that

21 Mr. Roth had run was not accurate?

22    A.  I have not seen any information that

23 shows that this -- this model is inaccurate, but

24 I have not seen anybody produce any of the

25 rheologies of the combination of fluids anywhere

**PURSUANT TO CONFIDENTIALITY ORDER**

1   to show that it would be possible to run an

2   accurate model.

3       Q.  So you said it would be important to see

4   what type of rheologies they inserted in the

5   model to make it work, correct?

6       A.  No, I wouldn't worry about what they

7   inserted.  I mean, that's to me kind of

8   irrelevant unless you had the actual data of what

9   the rheologies were, not what the inputs were.

10       Q.  Okay.  But the fact that they have a

11   working model that shows full displacement, that

12   doesn't interest you at all?

13       A.  Again, unless -- unless they can show

14   that they've run lab tests on the different muds

15   and cements and spacers and base oil

16   combinations, then, no, I'm not -- not

17   really interested in that data.

18       Q.  Okay.  And did you investigate within

19   Halliburton whether or not they had correct

20   rheologies for the inputs?

21       A.  I did ask Counsel --

22           MR. STEVENSON:  Object --

23           THE WITNESS:  Oh, I'm sorry.

24           MR. STEVENSON:  I would caution you

25   not to reveal --

**PURSUANT TO CONFIDENTIALITY ORDER**

1           THE WITNESS:  Yeah.  Sorry.

2           MR. STEVENSON:  -- any

3    communications with Counsel --

4           THE WITNESS:  Sorry.

5           MR. STEVENSON:  -- under the guise

6    of privilege.  You can, however, testify as to

7    other information you considered or saw separate

8    from your discussions with the attorneys.

9      A.   I looked at the Lab Reports that were

10   available.  I looked at the different Expert

11   Reports that were out there.  I looked at the

12   Drilling Reports.  What else did I look at?

13          We looked at all the Reports -- I looked

14   at most of the Reports that I -- that I had

15   access to, the Bly Reports and -- and those type

16   of Reports from Transocean and Chief Counsel, and

17   I did not see data anywhere that would show that

18   you could run an accurate model.

19     Q.   (By Mr. Chen) And you know Mark Savery,

20   correct?

21     A.   Yes, I do.

22     Q.   Did you go talk to Mr. Savery and ask him

23   how he ran his model?

24     A.   No, I did not.

25     Q.   Did you take the data that you had -- you

**PURSUANT TO CONFIDENTIALITY ORDER**

1   have access to "i-Chem," right?

2       A.  "i-Sem"?

3       Q.  iCem.

4       A.  Yes, I do.

5       Q.  And did you take the data that you had

6   and try to replicate their run in iCem?

7       A.  Again, there's -- there -- the inputs

8   don't exist, that I know of, so if I'm going to

9   just randomly put in inputs or try and put in

10  inputs that -- in another fluid maybe, it just

11  didn't make sense to me to try and make that run.

12      Q.  And you didn't ask Mr. Savery what

13  assumptions he made?

14      A.  No, I did not.

15      Q.  It could have been that Mr. Savery and

16  Mr. Roth came up with very good assumptions, to

17  insert into the model, correct?

18      A.  The number of assumptions that you'd have

19  to make are -- I would say your chances are

20  probably better of winning the Lottery than --

21  than guessing right on these, so to say it's not

22  a possibility, I wouldn't -- wouldn't say that,

23  but, again, it's -- it's very far-fetched.

24      Q.  And have you communicated to anyone

25  within Halliburton that this is far-fetched, and

**PURSUANT TO CONFIDENTIALITY ORDER**

1  Mr. Roth should let Mr. Badalamenti and

2  Mr. Turton know that his statement was incorrect?

3      A.  No, I have not.  Again, I did not

4  followup on this E-mail, or what I had -- what

5  I'd seen from it, with Tommy or Simon or Anthony.

6      Q.  And you did not attempt to do the

7  modeling yourself, either?

8      A.  Correct, I did not.

9      Q.  Now, I'm going to hand you what's been

10  previously marked as Exhibit 726.  Do you

11  recognize this document?

12      A.  I believe I've seen this.

13      Q.  And this is the Lab Results for the

14  testing on the spacer, correct?

15      A.  Yes, that's what it appears to be.

16      Q.  What is the -- what is yield point of the

17  spacer based on their testing?

18      A.  The number shown here is 27.

19      Q.  Okay.  Now, if you turn to the April 18th

20  OptiCem Report, which is Exhibit -- which is

21  Exhibit 717A, Tab 16, in your binder?

22      A.  (Complying.)

23      Q.  You go to Page 12.  What is the yield

24  point used in the OptiCem model?

25      A.  The number is 30.

**PURSUANT TO CONFIDENTIALITY ORDER**