UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * * * * * | MDL NO. 2179<br><br>SECTION: J<br>JUDGE BARBIER<br>MAGISTRATE JUDGE SHUSHAN |
| THIS DOCUMENT RELATES TO ALL ACTIONS | * * * * | |

**********************************************************************

# BP'S REPLY MEMORANDUM IN SUPPORT OF
# MOTION FOR SPOLIATION SANCTIONS

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: 202-662-5985
Facsimile: 202-662-6291

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: 504-581-7979
Facsimile: 504-556-4108

Robert R. Gasaway
Jeffrey Bossert Clark
Aditya Bamzai
Kirkland & Ellis LLP
655 Fifteenth Street, NW
Washington, DC 20005
Telephone: 202-879-5000
Facsimile: 202-879-5200

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: 312-862-2000
Facsimile: 312-862-2200

*Attorneys for BP Exploration & Production Company*

December 28, 2011

# **TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................4

ARGUMENT ..........................................................................................................................5

I.  THE COURT SHOULD SANCTION HALLIBURTON'S PURPOSEFUL SPOLIATION OF POST-INCIDENT CEMENT SLURRY TESTING MATERIALS AND RESULTS. ...............................................................................5

   A.  Halliburton's Arguments That Halliburton Employees Did Not Display "Bad Faith" Lack Merit. ...............................................................5

   B.  Halliburton's Arguments That The Testing Results Support Its Position Lack Merit. ............................................................................................7

   C.  Halliburton's Arguments That It Is Not Responsible For Its Employees' Actions Lack Merit. ...................................................................9

   D.  Halliburton's Arguments That Sanctions Should Not Be Imposed Because The Tests Can Be Replicated Lack Merit. ........................................10

   E.  Halliburton's Arguments That The Tests Are Not "Evidence" Lack Merit. .........12

II. THE COURT SHOULD ENSURE THAT HALLIBURTON RECTIFIES ITS WRONGFUL FAILURE TO PRODUCE NON-PRIVILEGED, PROPRIETARY, POST-INCIDENT "DISPLACE 3D" MODELING RESULTS. ......................................13

CONCLUSION ....................................................................................................................15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ashton v. Knight Transp., Inc.*,
  772 F. Supp. 2d 772 (N.D. Tex. 2011) ................................................................................. 9

*Brown v. ICF Int'l*,
  2009 WL 7127925 (M.D. La. Apr. 24, 2009) ..................................................................... 6

*Chan v. Triple 8 Palace*,
  2005 WL 1925579 (S.D.N.Y. Aug. 11, 2005) ..................................................................... 5

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
  --- F. Supp. 2d ----, 2011 WL 2966862 (E.D. Va. July 21, 2011) ....................................... 9

*Goodman v. Praxair Servs., Inc.*,
  632 F. Supp. 2d 494 (D. Md. 2009) ...................................................................................... 9

*Rimkus Consulting Grp. v. Cammarata*,
  688 F. Supp. 2d 598 (S.D. Tex. 2010) .......................................................................... 5, 6, 7

*Stahl v. Wal-Mart Stores, Inc.*,
  47 F. Supp. 2d 783 (S.D. Miss. 1998) .................................................................................. 9

*Swofford v. Eslinger*,
  671 F. Supp. 2d 1274 (M.D. Fla. 2009) ............................................................................... 9

*Turner v. Hudson Transit Lines, Inc.*,
  142 F.R.D. 68 (S.D.N.Y. 1991) ............................................................................................ 9

*Valentine v. Mercedes-Benz Credit Corp.*,
  1999 WL 787657 (S.D.N.Y. Sept. 30, 1999) ....................................................................... 9

*Wolters Kluwer Fin. Servs. v. Scivantage*,
  564 F.3d 110 (2d Cir. 2009) ............................................................................................... 10

*Yelton v. PHI, Inc.*,
  2011 WL 6100445 (E.D. La. Dec. 7, 2011) ......................................................................... 6

*Zubulake v. UBS Warburg LLC*,
  216 F.R.D. 280 (S.D.N.Y. 2003) ........................................................................................ 12

**Rules**

Fed. R. Civ. P. 37(b)(2)(A) ............................................................................... 1, 3, 9, 13, 15

**INTRODUCTION**

Halliburton's Opposition admits all the essential facts underlying BP's motion for spoliation sanctions under Fed. R. Civ. P. 37(b)(2)(A) and this Court's inherent authority to oversee civil discovery in a pending case.  Crucially, Halliburton either affirmatively admits or effectively fails to deny the following:

- A Halliburton employee acting purposefully "discarded [ ] notes" made to reflect the conduct and results of non-privileged, post-incident testing.  Opp. Br. 8.

- A Halliburton employee recalled that Halliburton's unrecorded post-incident testing showed that the slurry "looked thin," Opp. Br. 5-6, while another Halliburton employee recalled that testing of unconditioned slurry "showed signs of settling," *id.* at 7, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- A Halliburton employee "discarded the testing samples, in part, . . . because [he was] worried about it being misinterpreted [in the litigation].'"  Opp. Br. 2-3 (quotation marks omitted; second alteration omitted by Halliburton but contained in the deposition testimony).

- The only known copies of modeling results of the Macondo Well cement job created using Halliburton's Displace 3D software "were deleted from [Halliburton employees'] computers."  Opp. Br. 9.

In the face of these facts, which establish purposeful destruction of evidence, Halliburton's Opposition Brief offers a series of lame excuses, all of which aim to explain why discarding this evidence is not all that significant and should be left unremedied.

With respect to cement slurry testing, Halliburton puts forward five contentions — all of them meritless.  ***First***, Halliburton contends that its employees' actions do not rise to the level of "bad faith."  Opp. Br. 14.  But, as noted above, this contention conflicts directly with the candid admission of one Halliburton employee that he discarded evidence precisely to keep the evidence from being "misinterpreted in the litigation," Ex. 1 (Morgan Dep.) at 101:9-23, as well as with the cumulative evidence establishing that, despite a series of Halliburton cement slurry tests,

there are no records reflecting the nature and results of this testing.  When one considers this testing's larger context — including cement testing results from the Joint Investigative Team and BP suggesting Halliburton's cement slurry was not stable — the lack of documented results, together with other evidence, is telling.  *See infra* I.A.

*Second*, Halliburton insists that its employees' observations that the testing revealed cement that was "thin," "showed signs of settling," ▉▉▉▉▉▉▉▉▉▉▉ are either not relevant or (more incredibly) supportive of Halliburton's litigation position.  But as explained below, these manufactured-for-litigation interpretations find no support in the contemporaneous record and, ultimately, strain credulity beyond the breaking point.  *See infra* I.B.

*Third*, Halliburton makes an astonishing (and legally incorrect) contention that it should bear no legal responsibility as a corporate defendant in civil litigation for the intentional spoliation of evidence at the hands of its own employees.  *See infra* I.C.

*Fourth*, Halliburton contends that its employees could destroy such evidence because the testing can be "recreated."  But the fact that lab sample testing might be redone on comparable materials (though BP currently lacks access to such materials) does not mean that parties are at liberty to discard records of the non-privileged testing they perform.  *See infra* I.D.

*Fifth and finally*, Halliburton contends that destruction of evidence was permissible here because "the lab samples tests are not evidence of what happened at the Macondo well at all," Opp. Br. 13, and because "no testing of non-rig samples can substitute for the vastly more probative weight given . . . to the lab work done on rig samples just prior to pumping the job," *id.* at 16.  But the fact that testing on rig samples could potentially be more probative than testing on lab samples does not mean that lab sample testing is "not evidence" at all.  Just because "more probative weight," even vastly "more probative weight," *might* appropriately be "given" to other

2

evidence that could be adduced does not mean that discarded evidence was worthless or not germane.  Hence, even if BP agreed with these false premises (it does not), the Court and parties would still find themselves where they are now precisely because Halliburton (concededly) destroyed non-privileged, post-incident testing results.  Without this destruction, the parties' experts would be positioned to weigh competing testing results on a level playing field as Halliburton suggests they should.  It is Halliburton's purposeful spoliation that forecloses such a possibility.  *See infra* I.E.

Against this backdrop, it is critical to bear in mind what BP does and does not request as a remedy under Fed. R. Civ. P. 37(b)(2)(A) and this Court's inherent authority to supervise civil discovery.  BP does *not* seek a factual finding that the Macondo slurry poured on April 19, 2010 was *in fact* unstable.  Rather, BP seeks only a finding that Halliburton's own internal, non-privileged testing *showed* that Halliburton's Macondo slurry poured on April 19, 2010 was unstable.  Halliburton's assertions that the discarded testing evidence is not probative and may be recreated are no response to BP's request for this limited finding.  Indeed, if Halliburton were correct, it would be free to argue these points at trial and would not be overly disadvantaged by the imposition of such a court-ordered finding.  Resolving this Motion is straightforward so long as one bears in mind Halliburton's intentional conduct and BP's narrow, and reasonable, requested response.

With respect to the Displace 3D Modeling, Halliburton admits for the first time ─ after months of BP inquiries, cajoling and conferring — that the modeling has somehow been "deleted."  Opp. Br. 9.  Halliburton further assures the Court that BP's motion has become moot because Halliburton has now belatedly decided to conduct its own forensic analysis into the reasons for this deletion — an intention never mentioned during the lengthy meet-and-confer

3

process. In light of the impending February 27 trial date, and the many months that Halliburton has withheld information about its modeling and computers, BP respectfully submits that the Court should direct Halliburton to turn over the relevant computers to the Court's Special Master, Captain Englebert, so that the Court itself can supervise the forensic examination. In this way, the Court will be best positioned to ensure a fair and transparent analysis.

## BACKGROUND

In light of Halliburton's Opposition Brief ("Opposition" or "Opp. Br.") the following facts are no longer in serious dispute.

**Post-incident Duncan lab testing**. Rickey Morgan observed that the cement slurry he prepared using the same recipe as the slurry used in the Macondo well "looked thin," Ex. 1 (Morgan Dep.) at 19:11-15, 20:23-24, and was "not as viscous as [he] was expecting it to be," *id.* at 21:2-3, which "determines how stable a slurry is once it's pumped and mixed," *id.* at 21:5-8; *see also id.* at 104:18-105:3. He testified that, "as an experienced person, it was something that [he] felt was noteworthy." *Id.* at 22:6-9; *see also id.* at 187:21-25 ("It was something that I wasn't expecting to see."). Timothy Quirk and Ron Faul reported that Morgan's tests indicated "settling," another condition that can indicate slurry instability. Ex. 2 (Quirk Dep.) at 124:19-125:3; 127:5-19; Ex. 3 (Faul Dep.) at 264:2-11, 269:24-270:11. ▮▮▮▮▮▮▮▮▮▮▮▮ Morgan testified that he did not "document the test and [ ] threw out the sample because [he was] worried about it being misinterpreted in the litigation." Ex. 1 (Morgan Dep.) at 101:9-23.

**Post-incident Broussard lab testing**. ▮▮▮▮▮▮▮▮▮▮▮▮ Although Quirk conditioned the cement for three hours, he testified that the slurry weighed close to fifteen pounds per gallon,

4

which he admitted reflected "a substantial reduction in the foam quality" and meant that "about a quarter of the nitrogen has been lost from the sample." *Id.* at 333:6-10; 334:9-11; 480:13-481:2. Quirk then "discarded" the cement and his notes about the testing. *Id.* at 331:21-24.

## ARGUMENT

I.   **THE COURT SHOULD SANCTION HALLIBURTON'S PURPOSEFUL SPOLIATION OF POST-INCIDENT CEMENT SLURRY TESTING MATERIALS AND RESULTS.**

It is well established that "'[t]he burden placed on the moving party to show that the lost evidence would have been favorable to it ought not be too onerous, lest the spoliator be permitted to profit from its destruction.'" *Rimkus Consulting Grp. v. Cammarata*, 688 F. Supp. 2d 598, 616 (S.D. Tex. 2010) (quoting *Chan v. Triple 8 Palace*, 2005 WL 1925579, at *7 (S.D.N.Y. Aug. 11, 2005) (alteration in original)). Halliburton's Opposition does not dispute that its employees conducted non-privileged post-incident testing; observed that the testing showed the slurry was unusually "thin," "settled," and ███████████; and then purposefully discarded the materials and results of that testing. Instead, in light of these uncontested facts, Halliburton argues that (1) its employees did not act in "bad faith," (2) the testing supported Halliburton's position, (3) Halliburton is not responsible for any bad-faith destruction of evidence by its employees, (4) BP has not been prejudiced because the testing can be recreated, and (5) BP has not been prejudiced because the destroyed slurry testing and results are "not evidence." All these arguments are meritless.

   **A.   Halliburton's Arguments That Halliburton Employees Did Not Display "Bad Faith" Lack Merit.**

Halliburton's contention that its employees did not act with "bad faith" lacks all merit. It is rare, to say the least, to find a case in which an individual expressly admits that he destroyed evidence precisely because he was "worried about it being misinterpreted in the litigation." Ex.

5

1 (Morgan Dep.) at 101:9-23.  In light of this admission of purposeful destruction, it is difficult to imagine any case in which bad faith should be found if not this one.

It is significant that such candid admissions or other direct evidence are not necessarily required to establish bad faith in federal civil practice.  For instance, the court in *Rimkus* found bad faith on the basis of a lesser showing:

> The evidence that the defendants knew about the litigation with Rimkus when they deleted the emails; the inconsistencies in the explanations for deleting the emails; the failure to disclose information about personal email accounts that was later revealed as having been used to obtain and disseminate information from Rimkus; and the fact that some of the emails reveal what the defendants had previously denied.

688 F. Supp. 2d at 644.

Though, of course, every case is factually unique, many of the salient facts here find parallels to those in *Rimkus*.  Here, Faul, Quirk, and Morgan knew of the litigation when they destroyed testing evidence; there are inconsistencies in testimony about the results of the testing; Halliburton failed to disclose until a very late date certain documents relating to the testing ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇; and these late-breaking documents tend to reveal precisely what Halliburton previously had denied.  *See also Brown v. ICF Int'l*, 2009 WL 7127925, at *3 (M.D. La. Apr. 24, 2009); *Yelton v. PHI, Inc.*, 2011 WL 6100445, at *13-14 (E.D. La. Dec. 7, 2011) (Magistrate Judge Roby).  Halliburton's argument that some additional showing is also required — beyond even Morgan's admission that he destroyed evidence precisely because he was "worried about it being misinterpreted in the litigation," Ex. 1 (Morgan Dep.) at 101:9-23 — comports neither with the law concerning federal civil discovery nor common sense.  Again, if this showing does not suffice to establish bad faith, it is difficult to imagine a case in which bad faith could successfully be shown.

### B. Halliburton's Arguments That The Testing Results Support Its Position Lack Merit.

In the face of a factual record showing that its slurry was "thin," "settled," and ▮▮▮▮▮▮ Halliburton argues that the results of the testing reflected favorably on Halliburton's cement slurry — largely by asserting that the notes and recollections of its own employees are untrustworthy. There is no plausible basis to accept these claims. Given that evidence has been destroyed, Halliburton cannot now place an "onerous burden" on BP to show which Halliburton employee is accurately recalling the results of which particular tests, lest Halliburton be "permitted to profit from its destruction" of evidence. *Rimkus*, 688 F. Supp. 2d at 616.

*First*, Halliburton concedes that Morgan's testing of the cement slurry indicated slurry that was unusually "thin," but contends (without citation to any record evidence) that "the slurry was designed to be thin," because "BP was worried about fracturing the formation." Opp. Br. 5. This is all news to BP. To be sure, BP was concerned about fracturing the formation (among other safety issues it was attempting to address) and Halliburton was charged with designing a cement program that maintained the formation's integrity. But Halliburton never told BP before the incident that the slurry was designed to be "thin"; or that there would be stability problems with the cement; or that one of Halliburton's experienced engineers would find the cement's thinness "noteworthy" upon testing it. Halliburton's argument appears to be little more than a *post hoc* rationalization of the problems that Morgan's post-incident testing revealed.

*Second*, Halliburton asserts that this Court should ignore the accounts of Faul, Roth, and Quirk that Morgan's testing showed signs of "settling" and that the ▮▮▮▮▮▮ during these tests.

Most importantly, Halliburton dismisses ▮▮▮▮▮▮ ▮▮▮▮▮▮ on grounds

7

that "Roth has no firsthand knowledge about the Post-Incident Testing."  Opp. Br. 3.  ███

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████  It is thus important that Halliburton did not produce ███

███ until October 17, 2011, well after ████████████████████ and BP therefore had

no opportunity █████████████████████████████████████  Indeed, Halliburton's

dilatory production ████████████ belies its claim that BP has "idled with" information

regarding spoliation.  Opp. Br. 1.  Surely BP cannot be faulted for not acting until after a careful

and thorough investigation into the facts, █████████████████████████████

███████████████████████████████████████

      Similarly, Halliburton asserts that Quirk's recollection that Morgan's slurry had experienced "settling" should be ignored.  Here again, Halliburton emphasizes that Quirk would not have "firsthand knowledge about what Morgan actually did in that lab."  Opp. Br. 17 n.25.  But here again, Quirk's recollections nonetheless remain probative ― and certainly more probative than Halliburton's after-the-fact litigation assertions.  Finally, Halliburton finds itself at a complete loss to explain Faul's recollection that Morgan's unconditioned slurry experienced "settling," other than to say that this recollection conflicts with Morgan's own memory.

      Lastly and significantly, Halliburton fails entirely to explain Quirk's statement that, even when he conditioned the cement for three hours, the slurry weighed close to fifteen pounds per gallon, which he admitted reflected "a substantial reduction in the foam quality" and meant that "about a quarter of the nitrogen has been lost from the sample."  Ex. 2 (Quirk Dep.) at 333:6-10; 334:9-11; 480:13-481:2.  Loss of "about a quarter of the nitrogen" indicates nitrogen "break out" and foam instability.

8

### C. Halliburton's Arguments That It Is Not Responsible For Its Employees' Actions Lack Merit.

Halliburton argues it cannot be held responsible for the actions of Faul, Morgan, and Quirk because "neither HESI Executive Management nor the Law Department authorized or had even been aware of the testing." Opp. Br. 10. But even if this were true, it would not preclude the Court from making the limited adverse factual finding BP requests under Fed. R. Civ. P. 37 and this Court's inherent authority to supervise civil discovery.

As Halliburton recognizes, "the duty to preserve extends to a party's employees who are likely to have relevant information." Opp. Br. 11 (citing *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 800 (N.D. Tex. 2011)); *see Swofford v. Eslinger*, 671 F. Supp. 2d 1274, 1279 (M.D. Fla. 2009) (citing *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68 (S.D.N.Y. 1991).

To determine if corporations are meeting their preservation obligations under the Federal Rules of Civil Procedure, courts around the country apply normal agency principles. *See, e.g.*, *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, --- F. Supp. 2d ----, 2011 WL 2966862, at *32-33 (E.D. Va. July 21, 2011) (noting that "[s]tandard principles of agency law govern the attribution of employee's spoliation to the company" and rejecting the argument that "short of a corporate policy or directive encouraging spoliation of relevant materials, then employees' spoliation of relevant evidence should not be imputed to" the company); *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 522 n.16 (D. Md. 2009); *Valentine v. Mercedes-Benz Credit Corp.*, 1999 WL 787657, at *4 (S.D.N.Y. Sept. 30, 1999). Indeed, Halliburton's cases are not to the contrary. *See Ashton*, 772 F. Supp. 2d at 803 n.14 (finding it unnecessary to impute bad faith to employer in light of ample other evidence of employer's bad faith); *Stahl v. Wal-Mart Stores, Inc.*, 47 F. Supp. 2d 783, 787 (S.D. Miss. 1998) (correctly refusing to find bad where corporate employee was merely "negligent" in discarding evidence in violation of corporate policy); *see*

9

*also Wolters Kluwer Fin. Servs. v. Scivantage*, 564 F.3d 110, 115 (2d Cir. 2009) (not a spoliation case).

Here, there is no serious dispute that Faul, Morgan, and Quirk each acted as an agent of Halliburton with respect to the discarded testing. Each of these Halliburton employees holds a senior role with respect to cementing. Faul supervises approximately twenty employees, including Quirk. Ex. 3 (Faul Dep.) at 24:2-7; Ex. 2 (Quirk Dep.) at 29:24-30:1. Quirk now holds the title of area lab manager for the Gulf of Mexico Region, overseeing four labs. *Id.* at 22:18-20; 29:5-17. And Morgan now holds the title of Global Adviser in Gulf Cementing. Ex. 1 (Morgan Dep.) at 10:20. Against this backdrop, Halliburton should not be allowed to sidestep that these employees were acting within the scope of their corporate responsibility and that their actions are properly attributable to Halliburton. In fact, Quirk confirmed ― contrary to Halliburton's litigation position ― that he *did* consult senior management before conducting his testing. Ex. 2 (Quirk Dep.) at 93:19. Especially given the limited relief BP requests, Halliburton's efforts to distance itself from its employees' actions should not be credited.

### D.  Halliburton's Arguments That Sanctions Should Not Be Imposed Because The Tests Can Be Replicated Lack Merit.

Halliburton next contends that its purposeful destruction of evidence was permissible because BP can reproduce the destroyed results. This argument fails both on its facts and under the law.

As a factual matter, Halliburton overlooks that it has consistently declined to grant BP's requests for cementing materials for use in testing. Specifically, the BP Incident Investigation Team ("IIT") requested that Halliburton provide materials for lab testing as early as April 2010, but these requests were refused on grounds that Halliburton had no contractual obligation to provide the requested materials. █████████████████████████████████ It is

10

the height of irony for Halliburton to turn 180 degrees and argue at this juncture that the materials it previously refused to provide BP could be consumed in Halliburton's own testing and then discarded with impunity

Moreover, Halliburton simply mischaracterizes the record by contending that the "individuals who conducted the informal tests have freely testified about the materials used, the procedures performed, and the observations made." Opp. Br. 18. As one example, Halliburton nowhere explains why Quirk, ▮▮▮▮ and reporting them to Faul, then "discarded" the remaining slices so that BP cannot independently verify these ▮▮▮▮ *See* Ex. 2 (Quirk Dep.) at 122:16-20, ▮▮▮▮ 331:22-24. As another example, Halliburton does not explain how BP could possibly recreate Quirk's experiments given that Quirk could not recall ▮▮▮▮ the densities of the cured foam, or other essential testing conditions. *Id.* at ▮▮▮▮ 333:2-5.

More fundamentally, Halliburton employees were not at liberty as a legal matter to destroy testing results simply because they thought similar results might be obtained in future testing. Indeed, Halliburton's own experts contend that cement testing is inherently somewhat variable, such that any post-incident testing attempting to replicate Halliburton's destroyed results would undoubtedly be challenged by Halliburton, just as Halliburton has previously challenged testing conducted by the Presidential Commission, Joint Investigative Team, and BP. *See* Expert Report of Hamlin M. Jennings at 3-13 (arguing that there is inherent variability in cement testing due to numerous factors). The potential reproducibility of Halliburton's testing in no way excuses the destruction of Halliburton's own testing results.

E.     **Halliburton's Arguments That The Tests Are Not "Evidence" Lack Merit.**

Halliburton lastly argues that the slurry testing is not "evidence" because "no testing of non-rig samples can substitute for the vastly more probative weight given . . . to the lab work done on rig samples just prior to pumping the job." Opp. Br. 16. This argument is not only mistaken, it cuts in favor of awarding the specific relief BP seeks under the Federal Rules of Civil Procedure and case law concerning this Court's inherent authority.

To be sure, Halliburton might (or might not) be correct that testing on rig samples is "more probative" than testing on non-rig samples. But even if this were correct, it would not support Halliburton's sweeping contention that testing of non-rig samples lacks all probative value or that Halliburton was free to destroy the results of such testing at its sole discretion. Halliburton is a party to litigation — not a judge. It may not seize the trier-of-fact mantle and decide for itself which kinds of non-privileged post-incident testing results may be destroyed. *See Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 286 (S.D.N.Y. 2003).

More importantly, Halliburton's argument about probative value of the destroyed evidence cuts in favor of awarding the relief BP requests. As emphasized above, BP requests only a limited factual finding to the effect that the Halliburton "testing performed by Messrs. Morgan and Quirk showed Halliburton's slurry design to be unstable." Mem. 22. If Halliburton believes this testing was indeed non-representative, because it was not conducted on rig samples, it may introduce evidence challenging the importance of this factual finding at trial. Indeed, the more correct Halliburton is about the limited importance of testing non-rig samples, the less Halliburton will be disadvantaged by the specific factual finding BP requests. Halliburton's determination to be oppositional at every turn winds up knocking down Halliburton's own arguments.

To be clear, BP disagrees deeply with Halliburton on the probative valve of Halliburton's internal testing and similar testing by outside entities. BP believes that the Court's entry of an appropriate finding of fact will eventually prove both important and not susceptible to rebuttal. The important point today, however, is not whose predictions — BP's or Halliburton's — are more likely to be proved correct in the fullness of time. It is, rather, that to the extent Halliburton's predictions are vindicated, that is all the more reason to grant the narrow, tailored relief BP seeks under Fed. R. Civ. P. 37 and this Court's inherent authority.

## II. THE COURT SHOULD ENSURE THAT HALLIBURTON RECTIFIES ITS WRONGFUL FAILURE TO PRODUCE NON-PRIVILEGED, PROPRIETARY, POST-INCIDENT "DISPLACE 3D" MODELING RESULTS.

For several months, BP fruitlessly asked Halliburton to produce its non-privileged, post-Incident Displace 3D modeling results. And for just as long, Halliburton avoided giving straight answers. Only now, in its response to this Court, has Halliburton revealed that "[t]he models *were deleted* from Be[d]ford and Savery's computers." Opp. Br. 9 (emphasis added). To address this potential spoliation of evidence (about which BP was unaware until Halliburton's recent brief), Halliburton has offered — again, for the first time — "to submit the computer [containing the modeling results] for third-party forensic examination," Opp. Br. 19-20, and to allow BP to use Halliburton's proprietary software, *see id.* at 20.

In light of Halliburton's late-breaking concessions, it is worth recounting a short history of BP's attempts to secure access to this modeling data. BP first learned of Halliburton's 3D Modeling from ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Aware that such modeling results were responsive to

13

numerous BP discovery requests, BP first searched without success for documents related to the 3D modeling, then requested in writing that Halliburton produce such modeling. *See* ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. (Note here that Halliburton's contention that BP did not request this modeling data until September 2011, "[a]pproximately two months after [the] deposition [of Tommy Roth]," Opp. Br. 9, mischaracterizes the record.)

Hence, beginning in August 2011, BP engaged in an extensive, several-months-long effort that culminated in Halliburton's bold assertion that these modeling results were "gone," without saying they had been "deleted." Before filing its Motion, BP asked Halliburton to account for the status of the Displace 3D modeling so that it could accurately represent that status to the Court. Halliburton declined to provide such an accounting, instead saying simply that the modeling results could not be located on the computer. Mem. 11-14.

In view of this history, BP respectfully submits that the Court should direct Halliburton to transfer the relevant computer to the Court's Special Master, Captain Englebert. Captain Englebert already maintains custody of the electronic brains of the *Deepwater Horizon* BOP in a climate controlled environment pursuant to this Court's September 13, 2011, Order, *see* Ex. 8 (Record Doc. 4013), and she is responsible pursuant to another order for the safe custody of the electronic hard drives created by KPMG to store Phase 2 BOP testing results. *See* Ex. 9 (Letter from R. Gasaway to Judge Shushan dated Nov. 3, 2011); Ex. 10 (Record Doc. 4486). A modest expansion of Captain Englebert's current role (and corresponding amendments to the September 13 Order as necessary) would permit her to safeguard the integrity, and oversee the testing, of the relevant electronic information on Halliburton's computers. In light of the many months it has taken to reach this point — during which Halliburton engaged in what might charitably be described as delaying tactics — BP respectfully submits that giving possession of the computer

to a Special Master who is already responsible for similar electronic evidence is the best way to manage the process of discovering how and when Halliburton's modeling results "were deleted" and whether they can be restored.

As a final matter, it bears noting that Halliburton is premature in claiming that, if the modeling cannot be retrieved, "[t]here is no mystery here, and no need to make inferences or adverse fact findings as to what the Modeling would have shown." Opp. Br. 20. Halliburton blithely asserts that, upon being given access to Halliburton's proprietary 3D Modeling software, BP "can use this software, and add the requisite inputs." Opp. Br. 20. Of course, BP has never before used the software and does not know what the "requisite inputs" might be. Moreover, Halliburton conveniently asserts that "3d-Modeling is of limited relevance to assessing what happened at Macondo," Opp. Br. 20 — an assertion seemingly at odds with the testimony of its own employee and advertising for Displace 3D, *see* Ex. 11 (Dugas Dep.) at 295:12-296:3; Ex. 12 (Displace 3D Simulator Data Sheet) (explaining that Displace 3D "allows operators to predict causes of cement slurry contamination and mud channeling"). In light of the now undisputed fact that the modeling was "deleted" from Halliburton's computers, Halliburton should not be heard to prematurely cabin this Court's future remedial discretion. BP respectfully reserves its right to seek adverse findings of facts, if and as appropriate, depending on the outcome of the upcoming forensic analysis.

## CONCLUSION

For these reasons, BP respectfully requests that the Court impose the remedies requested herein under Fed. R. Civ. P. 37 and this Court's inherent authority over civil discovery, plus reasonable attorneys' fees, to redress Halliburton's purposeful misconduct and rectify the resulting prejudice to BP, other parties, and this Court's adjudicative process.

Dated: December 28, 2011	Respectfully submitted,

/s/ Don K. Haycraft

| | |
|---|---|
| Robert C. "Mike" Brock | Don K. Haycraft (Bar #14361) |
| Covington & Burling LLP | R. Keith Jarrett (Bar #16984) |
| 1201 Pennsylvania Avenue, NW | Liskow & Lewis |
| Washington, DC 20004-2401 | 701 Poydras Street, Suite 5000 |
| Telephone: 202-662-5985 | New Orleans, Louisiana 70139-5099 |
| Facsimile: 202-662-6291 | Telephone: 504-581-7979 |
| | Facsimile: 504-556-4108 |
| | |
| Robert R. Gasaway | Richard C. Godfrey, P.C. |
| Jeffrey Bossert Clark | J. Andrew Langan, P.C. |
| Aditya Bamzai | Kirkland & Ellis LLP |
| Kirkland & Ellis LLP | 300 North LaSalle Street |
| 655 Fifteenth Street, NW | Chicago, IL 60654 |
| Washington, DC 20005 | Telephone: 312-862-2000 |
| Telephone: 202-879-5000 | Facsimile: 312-862-2200 |
| Facsimile: 202-879-5200 | |

***Attorneys for BP Exploration & Production Company***

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 28th day of December, 2011.

/s/ Don K. Haycraft
Don K. Haycraft