# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In re:  **Oil Spill by the Oil Rig**
*Deepwater Horizon* **in the Gulf**
**Of Mexico, on April 20, 2010**

**This document applies to:**
*2:10-cv-04536*

**MDL No. 2179**

**SECTION: J**

**JUDGE BARBIER**

**MAGISTRATE SHUSHAN**

### TRANSOCEAN DEFENDANTS':

### (1) OPPOSITION TO UNITED STATES' SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT (Dkt. 4820);

### (2) CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT THAT THE TRANSOCEAN DEFENDANTS ARE NOT LIABLE UNDER OPA OR THE CLEAN WATER ACT WITH RESPECT TO THE UNDERWATER DISCHARGE OF OIL FROM THE MACONDO WELL;

### AND

### (3) COMBINED MEMORANDUM OF LAW

**TABLE OF CONTENTS**

**Page**

I.   TRANSOCEAN IS NOT LIABLE AS A RESPONSIBLE PARTY UNDER OPA
     FOR THE UNDERWATER DISCHARGE OF OIL FROM THE MACONDO
     WELL ................................................................................................................2

     A.   Under OPA, the owner/operator of a MODU used as an offshore facility is
          a responsible party only with respect to a discharge on or above the
          water's surface ...........................................................................................2

     B.   Because the undisputed facts submitted by the United States do not
          establish any above-surface discharge, Transocean is not liable under Title
          I of OPA ......................................................................................................6

     C.   There is no reason for the Court to consider at this time whether there
          would be joint and several liability for the entire spill if the United States
          could prove both an above-surface release of oil and a below-surface
          release ........................................................................................................7

II.  TRANSOCEAN IS NOT LIABLE FOR CIVIL PENALTIES UNDER THE
     CLEAN WATER ACT FOR THE UNDERWATER DISCHARGE FROM THE
     MACONDO WELL ............................................................................................9

     A.   Transocean is not liable for civil penalties because the oil discharged
          underwater was discharged "from" the Macondo Well within the meaning
          of the CWA and not "from" the Deepwater Horizon ...........................................9

          1.   The statutory words "from which" -- by their plain meaning --
               refer to the origin or source of the discharge, not the outlet
               "through which" oil may flow before reaching the water ......................10

          2.   Courts hold that "from" denotes a point of origin, not a conduit
               "through" which something passes ......................................................13

     B.   The CWA penalty provisions that were enacted through Title IV of OPA
          should be applied to underwater discharges consistent with the allocation
          of liability in Title I of OPA ...........................................................................15

          1.   The civil penalty provision of CWA and OPA's limitation of
               MODU owner/operator liability are part of the same statutory
               scheme ...............................................................................................16

          2.   The legislative intent was that, for all purposes of the Act, the
               liable party for an underwater discharge would be the
               owner/operator of the offshore facility from which the oil was
               discharged ..........................................................................................20

     C.   As a matter of law, Transocean is not the "operator" of the Macondo Well
          from which oil was discharged .......................................................................22

III. CONCLUSION ..................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*City of Dallas v. FCC,*
118 F.3d 393 (5th Cir. 1997) .......................................................................... 23

*Gatlin Oil Co. v. United States,*
169 F.3d 207 (4th Cir. 1999) ............................................................................ 8

*Gen. Universal Sys., Inc. v. Lee,*
379 F.3d 131 (5th Cir. 2004) ............................................................................ 1

*Green Atlas Shipping S.A. v. United States,*
306 F. Supp. 2d 974 (D. Or. 2003) .................................................................. 22

*Gustafson v. Alloyd Co., Inc.,*
513 U.S. 561 (1995) ...................................................................................... 4, 5

*Hickman v. Texas,*
260 F.3d 400 (5th Cir. 2001) .......................................................................... 16

*In re Bluewater Network,*
234 F.3d 1305 (D.C. Cir. 2000) ...................................................................... 18

*In re Pierrotti,*
645 F.3d 277 (5th Cir. 2011) .......................................................................... 18

*In re Taira Lynn Marine Ltd. No. 5, LLC,*
444 F.3d 371 (5th Cir. 2006) ............................................................................ 8

*INS v. Nat'l Ctr. for Immigrants' Rights, Inc.,*
502 U.S. 183 (1991) .......................................................................................... 5

*Jackson v. Birmingham Bd. Of Educ.,*
544 U.S. 167 (2005) ........................................................................................ 10

*Matter of Bell Petroleum Servs., Inc.,*
3 F.3d 889 (5th Cir. 1993) ................................................................................ 7

*National Shipping Co. of Saudi Arabia (NSCSA) v. Moran Mid-Atlantic Corp.,*
924 F. Supp. 1436, 1446-47 (E.D. Va. 1996), *aff'd*, 1997 WL 560047 (4th Cir. Sept.
9, 1997) (unpublished) ...................................................................................... 8

*Peconic Baykeeper, Inc. v. Suffolk County,*
600 F.3d 180 (2d Cir. 2010) ...................................................................... 13, 14

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Pilot Life Ins. Co. v. Dedeaux,*
    481 U.S. 41 (1987)................................................................................................ 16

*Sierra Club v. Espy,*
    38 F.3d 792 (5th Cir. 1994) ................................................................................ 20

*Taylor Energy Co. LLC v. U.S. Dep't of the Interior,*
    734 F. Supp. 2d 112 (D.D.C. 2010) ................................................................... 22

*Teknowledge Corp. v. Akamai Technologies Inc.,*
    2004 WL 2042864 (N.D. Cal. Sept. 11, 2004) .................................................. 15

*Thibodeaux v. Grasso Prod. Mgmt.,*
    370 F.3d 486 (5th Cir. 2004) .............................................................................. 16

*Tran Enters., LLC v. DHL Exp. (USA), Inc.,*
    627 F.3d 1004 (5th Cir. 2010) .............................................................................. 1

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001)............................................................................................... 18

*U.S. Cellular Corp. v. City of Wichita Falls,*
    364 F.3d 250 (5th Cir. 2004) ................................................................................ 1

*United Savings Ass'n v. Timbers of Inwood Forest,*
    484 U.S. 365 (1988)....................................................................................... 15, 17

*United States Fid. & Guar. v. Lehigh Valley Ice Arena, Inc.,*
    03 Civ. 5700, 2004 WL 741365 (E.D. Pa. Mar. 4, 2004),
    *aff'd* 121 Fed. App'x. 976, 2005 WL 388659 (3d Cir. 2005) ............................. 13

*United States v. Bestfoods,*
    524 U.S. 51 (1998)............................................................................................... 22

*United States v. Locke,*
    529 U.S. 89 (2000)......................................................................................... 17, 18

*United States v. Spurlin,*
    -- F.3d --, 2011 WL 6225151 (5th Cir. 2011)..................................................... 10

### STATE CASES

*Minus v. Workmen's Compensation Appeal Board,*
    496 A.2d 1340 (Pa. Commw. Ct. 1985)............................................................. 15

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Silva v. MacAuley,*
　135 Cal. App. 249 (1933) ................................................................................................. 14

*Simmons v. Commonwealth,*
　431 S.E.2d 335 (Va. Ct. App. 1993) .............................................................................. 15

**FEDERAL STATUTES**

33 U.S.C. § 1321 ................................................................................................................. 16

33 U.S.C. § 1321(a)(6)(B) .................................................................................................. 19

33 U.S.C. § 1321(b)(7) ......................................................................................................... 9

33 U.S.C. § 1321(b)(7)(A) ........................................................................................... passim

33 U.S.C. § 1321(b)(8) ................................................................................................. 20, 21

33 U.S.C. § 1321(j) ............................................................................................................. 21

33 U.S.C. § 2701(9) ............................................................................................................ 21

33 U.S.C. § 2701(18) ............................................................................................................ 3

33 U.S.C. § 2701(32) ..................................................................................................... 17, 20

33 U.S.C. § 2701(32)(C) ...................................................................................................... 3

33 U.S.C. § 2702 ................................................................................................... 4, 18, 19, 20

33 U.S.C. § 2702(a) ..................................................................................................... 4, 5, 8

33 U.S.C. § 2702(d) ............................................................................................................. 8

33 U.S.C. § 2703(a) ............................................................................................................ 18

33 U.S.C. § 2703(b) ............................................................................................................ 18

33 U.S.C. § 2704 ........................................................................................................... 4, 16

33 U.S.C. § 2704(a)(1) ......................................................................................................... 3

33 U.S.C. § 2704(b) ..................................................................................................... 2, 4, 5

33 U.S.C. § 2704(b)(1) ............................................................................................... passim

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

33 U.S.C. § 2704(b)(2) ........................................................................................... 3

33 U.S.C. § 2704(d)(1) ......................................................................................... 20

33 U.S.C. § 2714 ................................................................................................... 12

33 U.S.C. § 2714(a) .............................................................................................. 12

Pub. L. 92-500, 86 Stat. 816 (1972) .................................................................... 19

Pub. L. 95-372, 92 Stat. 629 (1978) .................................................................... 19

Pub. L. 95-576, 92 Stat. 2467 (1978) .................................................................. 16

Pub. L. 101-380, 104 Stat. 484 (1990) ................................................................ 17

## FEDERAL RULES

Fed. R. Civ. P. 56 .................................................................................................. 1

## FEDERAL REGULATIONS

30 C.F.R. § 250.105 ........................................................................................ 22, 23

30 C.F.R. § 250.143(b) ......................................................................................... 23

30 C.F.R. § 250.146(c) .......................................................................................... 23

30 C.F.R. section 254.1(a) ..................................................................................... 21

30 C.F.R. § 254.6 ................................................................................................... 21

## LEGISLATIVE MATERIALS

H.R. Conf. Rep. 101-653, 101st Cong., 2nd Sess. 1990, 1990 WL 132747, 1990
    U.S.C.C.A.N. 779 (Leg. Hist.) ................................................................... 20, 21

S. Rep. No. 101-94 (1989) .......................................................................4, 17, 19, 20

## OTHER AUTHORITIES

American Heritage Dictionary (4th ed. 2006) ..................................................... 11

Merriam-Webster's Collegiate Dictionary (1999) ............................................... 11

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Oil & Gas Field Technical Terms Glossary, http://oilgasglossary.com/category/o/page/2 (last visited Dec. 30, 2011) .................................................................................................. 23

Oxford English Dictionary, Vol. VI (2d ed. 1989) ...................................................................... 11

Schlumberger Oil Field Glossary, http://glossary.oilfield.slb.com (last visited Dec. 30, 2011) ........................................................................................................................... 23, 24

United States Department of the Interior, *Notice to Lessees and Operators of Federal Oil, Gas, and Sulphur Leases and Pipeline Right-of-Way Holders in the Outer Continental Shelf, Gulf of Mexico OCS Region*, *available at* http://tinyurl.com/d4g8ptp ........................ 21

Webster's New Twentieth Century Dictionary (2d ed. 1979) ..................................................... 12

Webster's Ninth New Collegiate Dictionary (1989 ed.) ............................................................. 15

Webster's Third International Dictionary Unabridged (2002) .................................................... 14

Webster's Third New International Dictionary (2002) ............................................................... 11

Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC and Triton Asset Leasing GmbH (collectively "Transocean" or the "Transocean Defendants") hereby oppose Plaintiff United States' Second Motion for Partial Summary Judgment (Dkt. 4820). Also filed contemporaneously are Transocean's Evidentiary Objections to the United States' Separate Statement of Material Facts and Transocean's Response to the United States' Separate Statement of Material Facts.

Transocean agrees that the important legal issues raised by the government's motion can be resolved through a partial summary judgment, but it is Transocean -- not the United States -- who is entitled to summary judgment. Accordingly, TRANSOCEAN HEREBY CROSS-MOVES pursuant to Rule 56 of the Federal Rules of Civil Procedure for partial summary judgment that it is not liable with respect to the underwater discharge of oil from the Macondo Well under either Title I of the Oil Pollution Act of 1990 (OPA) or the per barrel penalty provisions of the Clean Water Act (CWA) that were enacted in Title IV of OPA.[1]

It is, of course, undisputed that oil was discharged underwater from the Macondo Well. As this Court has observed, this case concerns "liabilities pertaining to subsurface oil releases from the Macondo well." Order and Reasons, Dkt. 4588, at 40. "The Deepwater Horizon Incident entailed a subsurface release …." *Id.* at 41.

---

[1] Because the United States bears the burden of proof on its OPA and CWA claims, the Transocean defendants may obtain summary judgment simply by "correctly point[ing]" to the reasons why the claims fail as a matter of law. *Tran Enters., LLC v. DHL Exp. (USA), Inc.*, 627 F.3d 1004, 1010 (5th Cir. 2010). Indeed, the Court would have authority to grant summary judgment to the Transocean Defendants even in the absence of a cross-motion. *See Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 145 (5th Cir. 2004) (holding that a defendant may obtain summary judgment, on claims for which it does not bear the burden of proof, by asserting its entitlement to the judgment in its opposition brief to the plaintiff's motion); *U.S. Cellular Corp. v. City of Wichita Falls*, 364 F.3d 250, 255 n.6 (5th Cir. 2004) ("[A] district court may grant summary judgment against a movant even if the non-movant has not filed a cross-motion.").

Under the special OPA provision dealing with MODU's, 33 U.S.C. § 2704(b), the owner and operator of a MODU is a responsible party only with respect to oil discharged on or above the surface of the water.  Hence it is Transocean, not the United States, that is entitled to partial summary judgment on the issue of liability for response costs and damages under OPA Title I.

It is also undisputed that the oil discharged underwater originated from the Macondo Well, and then flowed through the BOP and/or the riser, which are appurtenances of the vessel. As a matter of law, it was the well facility -- not the vessel -- "from which" the oil was discharged within the meaning of the per barrel penalty provisions which Title IV of OPA added to the Clean Water Act.  Transocean, therefore, can have no liability for per barrel penalties under the Clean Water Act and it is Transocean, not the United States, who is entitled to partial summary judgment on this issue.

In its memorandum, the United States asks the Court to save for a later day another Clean Water Act liability theory alleged in the government's complaint -- suggesting that Transocean will somehow be shown to have been the "operator" of the Macondo Well from which the oil was discharged.  Dkt. 4820-5, at 2 n.5.  Transocean submits that this issue also can and should be resolved now as a matter of law.  A drilling contractor like Transocean is a *contractor* hired by BP, the *operator* of the well.   This definitional distinction is so clearly established in industry practice and regulatory terminology that the Court can rule as a matter of law that Transocean is not the operator of the well and, therefore, is not liable for civil penalties for the underwater discharge of oil from the Macondo Well under any of the theories asserted by the government.

I.      **TRANSOCEAN IS NOT LIABLE AS A RESPONSIBLE PARTY UNDER OPA FOR THE UNDERWATER DISCHARGE OF OIL FROM THE MACONDO WELL**.

A.      **Under OPA, the owner/operator of a MODU used as an offshore facility is a responsible party only with respect to a discharge on or above the water's surface.**

In OPA, Congress specifically and expressly provided that the owner/operator of a mobile offshore drilling unit (MODU) being used as an offshore facility is the responsible party

only for discharges on or above the surface of the water.  The well owner is the responsible party for everything else.

Congress recognized that a MODU is a vessel capable of use as an offshore facility.  33 U.S.C. § 2701(18).  When a MODU is used as an offshore facility,[2] under section 2704(b)(1) the owner/operator of the MODU is the responsible party only for discharges on or above the surface of the water, subject to the liability limits applicable to tank vessels set forth in 33 U.S.C. § 2704(a)(1).  Section 2704(b)(1) provides:

> *For purposes of determining the responsible party and applying this Act* . . . a mobile offshore drilling unit which is being used as an offshore facility is deemed to be a tank vessel with respect to the *discharge . . . of oil on or above the surface of the water.*  (emphasis added.)

For any excess liability above the limit set out for a tank vessel in section 2704(a)(1) resulting from a discharge on or above the surface of the water, the MODU is "deemed to be an offshore facility."  33 U.S.C. § 2704(b)(2).  Under 33 U.S.C. § 2701(32)(C), the responsible party for liability of an "offshore facility" is "the lessee or permittee" of the drilling site -- here BP, Anadarko and MOEX.  *See* United States Separate Statement of Material Facts ("SMF"), Dkt. 4820-6, ¶¶ 1, 23-27, 30-34.

Congress' intent that a MODU being used as an offshore facility is only liable for a discharge on or above the surface of the water is made clear by the Senate Report for the OPA legislation:

> A major deficiency of title III of the Outer Continental Shelf Lands Act Amendments of 1978 is corrected by the reported bill.  Under that title, the owner or operator of an OCS facility is held liable.  Often, that owner or operator is an independent drilling contractor and not the actual holder of the rights to produce the oil. . . .  The reported bill restores the balance among leaseholders and drilling contractors on the OCS . . . by defining "owner or operator" for OCS facilities to mean the lessee or permittee of the area in which the facility is located (or the

---

[2] The United States agrees that "the *Deepwater Horizon* was in use as an offshore facility at the time of the April 20, 2010 incident."  United States Mem., Dkt. 4820-5, at 6 n.14; *see also id*. at 6 n.12 (setting forth statutory definitions of "facility" and "offshore facility").

holder of the OCS rights). *Where a mobile offshore drilling unit is being used as an OCS facility, and there is a discharge of oil on or above the surface of the water, the owner or operator of the unit is liable*, up to the limits established by the reported bill for tankers.  If costs exceed that limit, the excess costs must be borne by the lessee or permittee.  ***If a discharge of oil from a mobile offshore drilling unit occurs below the surface of the water, the lessee or permittee is liable.***

S. Rep. No. 101-94 at 10 (1989) (emphasis added).  *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 580 (1995) (citing statements in House Report) ("If legislative history is to be considered, it is preferable to consult the documents prepared by Congress when deliberating.  The legislative history of the Act concerning the precise question presented supports our interpretation with much clarity and force.")  This Court previously found the same Senate Report persuasive in its Order on the B-1 motion to dismiss.  Dkt. 3830 at 21.

The United States apparently takes the position that section 2704(b) simply provides a "limit" on the MODU's liability and does not provide that a MODU has *no liability* except for liability arising from a discharge *"on or above the surface of the water."*  The United States thus proposes that the Court find Transocean liable for the entire spill from the Macondo Well under the general liability section of OPA, 33 U.S.C. § 2702(a),[3] and then defer to a later date consideration of the extent to which Transocean's liability is limited under Section 2704.[4]  But

---

[3] Section 2702(a) provides:

> Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

[4] The proposed Order the United States submitted provides:

> The Transocean Defendants are jointly and severally liable under the Second Claim for Relief as Responsible Parties under Section 1002 of the Oil Pollution Act, 33 U.S.C. § 2702, for the removal costs and damages that result from the Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010.  The applicability of any limitation of liability set forth in Section 1004 of OPA, 33 U.S.C. § 2704, remains to be determined.

4

the United States is wrong.  The procedure that the United States proposes is inconsistent with the language of both section 2702(a) and section 2704(b).  Section 2704(b)(1) is not just a limit of a MODU's liability, but precludes liability for also a MODU *unless* there is a discharge "on or above the surface of the water."

First, the argument that a MODU used as an offshore facility is liable for an underwater discharge is flatly inconsistent with the legislative history quoted in the text, "concerning the precise question presented," *Gustafson*, 513 U.S. at 580, reflecting that "the lessee or permittee," not the MODU, is liable "[i]f a discharge from a mobile offshore drilling unit occurs below the surface of the water."

Second, the United States' position is inconsistent with the language of section 2702(a) which provides that its general liability provisions are "subject to the provisions of the Act," including the limitation of a MODU's liability under section 2704(b)(1).

Third, the United States' position is inconsistent with the title of section 2704(b)(1), "Division of liability for offshore drilling units."  This title shows that the section addresses the liability of a MODU operating as an offshore facility generally. It is not limited to a MODU's liability only for a discharge on or above the surface of the water, leaving liability of a MODU for an underwater discharge unaddressed.  If Section 2704(b)(1) only addressed liability for on or above the surface discharges and did not also preclude liability of a MODU for a below-the-surface discharge, its title would be different, *i.e.*, "Division of liability for offshore drilling units – discharges on or above the surface of the water."  But that is not the Section's title.  *See INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text.")

---

Proposed Order, Dkt. 4820-3, at 2, ¶3.  *See* United States Mem., Dkt. 4820-5, at 15 n.31 ("This motion does not address the Transocean Defendants' limit of liability, if any applies.")

As set forth in the next section, the United States has not submitted undisputed facts to establish that there was a discharge "on or above the surface of the water." This is not surprising. As we pointed out earlier, this Court has already recognized that the oil spill in this litigation involves an *underwater* release of oil. The United States therefore has not shown any basis for liability of any Transocean Defendant as a responsible party under OPA, and there is no issue to be decided later of the "applicability of any limitation of liability."

> **B.      Because the undisputed facts submitted by the United States do not establish any above-surface discharge, Transocean is not liable under Title I of OPA.**

The United States has submitted no evidence that there was a discharge from the *Deepwater Horizon* on or above the water's surface, and therefore it fails to establish that any Transocean Defendant is liable as a responsible party with respect to any discharge. 33 U.S.C. § 2704(b)(1). The evidence submitted by the United States establishes only a discharge below the surface of the water. *See* SMF, Dkt. 4820-6, ¶¶ 14, 15, 16. While the United States includes in its SMF paragraphs 15 and 16 the statement that oil was "discharged to the Gulf of Mexico from the Deepwater Horizon," it does not submit any evidence (let alone admissible evidence) to support that there was any discharge of oil "on or above the surface of the water." Instead, all of the evidence cited indicates only that oil flowed from the Macondo Well, through the BOP and riser, into the Gulf of Mexico. The United States does not even argue in its Memorandum that any discharge originated from the *Deepwater Horizon* much less one on or above the surface of the water. *See* United States Mem., Dkt. 4820-5, at 5 ("oil flowed or leaked from the Macondo Well into the Gulf of Mexico"; "oil flowed from the Macondo Well through the BOP and riser into the Gulf of Mexico"). The well, the BOP and the riser are, of course, all below the surface of the water. Accordingly, because the United States has not submitted undisputed facts that establish there was an above-surface discharge, it is not entitled to summary judgment that any of

the Transocean Defendants is liable under OPA. Instead, Transocean is entitled to partial summary judgment on this issue.[5]

>    **C.**     **There is no reason for the Court to consider at this time whether there would be joint and several liability for the entire spill if the United States could prove both an above-surface release of oil and a below-surface release.**

Although the issue need not be addressed now since the government has not submitted any facts showing any basis for Transocean liability under OPA, Transocean provides a brief response to the United States' assertion that, if Transocean's liability for an above-surface discharge could be established, Transocean's liability would then be "joint and several" for the entire spill, including the underwater discharge. *See* United States Mem., Dkt. 4820-5, at 4. Again, the United States is wrong.

OPA does not expressly provide for joint and several liability, and that term appears nowhere in the Act. The United States quotes selectively from the legislative history and case law to suggest that joint and several liability was intended. Congress undoubtedly expected that joint and several liability would be appropriate in certain instances -- where, for example, there are co-owners or lessees of a facility, or where one company is the owner and another company is the operator of a facility from which there is a discharge. To the extent the cases the United States cites are anything more than general *dicta* on the issue, that is type of the situation they address. *See* United States Mem., Dkt. 4820-5, at 4.

Moreover, analogous case law under CERCLA establishes that joint and several liability for all responsible parties is not mandated in all cases. *See, e.g., Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889 (5th Cir. 1993) ("reasonable basis for apportionment" to determine liability). It

---

[5] Even if the United States had submitted admissible evidence that oil from the Macondo Well reached the *Deepwater Horizon* itself – and it has not submitted any such evidence – there would be a disputed fact whether any such oil reached the surface of the water or instead burned before it reached the water. *See* Transocean Defs' Resp. to the United States Statement of Material Facts ¶¶ 15, 16, and evidence cited therein.

would be absurd to interpret section 2702(a) to mean that, if there was even one barrel of above-the-surface discharge for which Transocean was the responsible party, Transocean would then be liable for all damages from the entire spill.  Such a result would be inconsistent with the structure of OPA and with the clear distinction drawn by Congress between liability for above-the-water and below-the-water discharges.

In briefs filed in other OPA litigation, the United States has itself argued that section 2702(a) should be interpreted to avoid similar absurd results.  *Gatlin Oil Co. v. United States,* 169 F.3d 207 (4th Cir. 1999) (Brief and Reply available at 1997 WL 33544576 and 1998 WL 34097533).  The United States argued in *Gatlin* that the term "such incident" in section 2702(a) is ambiguous.  Therefore, the government argued, "such incident" should be interpreted in harmony with OPA's neighboring provisions and in a way that avoids absurd results.  If Transocean were a responsible party, the "such incident" for which Transocean would be liable would be only the discharge of oil on or above the surface of the water which gave rise to Transocean's liability.  *In re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d 371, 383 (5th Cir. 2006) ("[a] party is liable under OPA if, inter alia, the claimant's damages '*result from such incident,*' i.e., the discharge or threatened discharge of oil."  (emphasis in original))..

Even if section 2702(a) could be interpreted to make Transocean liable for the entire Macondo "incident," that would not end the statutory analysis.  Section 2702(d) titled "Liability of third parties," would then be applicable because Transocean would be a third party with respect to the underwater discharge.  Section 2702(d) would limit Transocean's liability under section 2702(a) to the liability for which Transocean is a "responsible party" under Section 2704 -- that is, to liability only for any above-the-surface discharge.  *National Shipping Co. of Saudi Arabia (NSCSA) v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436, 1446-47 (E.D. Va. 1996), *aff'd*, 1997 WL 560047 (4th Cir. Sept. 9, 1997) (unpublished),

Indeed, private plaintiffs have admitted that Transocean is not jointly and severally liable under OPA for the entire spill.  In their opposition to the motions to dismiss the B-1 master complaint, private plaintiffs argued that, whatever effect OPA might have on maritime law claims against BP, Anadarko and MOEX, OPA could not effect maritime law claims against Transocean because it was not jointly and severally liable under OPA.  "[T]here is no basis for the preemption of general maritime law claims … against other parties, *such as Transocean*, Cameron, or Halliburton *who are not rendered strictly liable to a broad and expansive class of plaintiffs by operation of OPA*."  Dkt. 1821, at 32 (emphasis added).

In sum, because the United States has not yet established that Transocean is a responsible party, determination of the joint and several liability issue is premature.  If the United States proves in Phase II that there was some above-the-surface discharge for which Transocean is a responsible party, Transocean requests an opportunity to provide the Court more comprehensive briefing on the issue of joint and several liability at that time.

## II.   TRANSOCEAN IS NOT LIABLE FOR CIVIL PENALTIES UNDER THE CLEAN WATER ACT FOR THE UNDERWATER DISCHARGE FROM THE MACONDO WELL.

### A.   Transocean is not liable for civil penalties because the oil discharged underwater was discharged "from" the Macondo Well within the meaning of the CWA and not "from" the *Deepwater Horizon*.

The CWA imposes a per barrel civil penalty on the owner, operator or person in charge of a vessel or offshore facility "from which" oil was discharged.  33 U.S.C. § 1321(b)(7).[6]  A Transocean entity owned the *Deepwater Horizon*, and a Transocean entity operated the vessel,[7]

---

[6] The provision reads in full: "Any person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility *from which* oil or a hazardous substance is discharged in violation of paragraph (3), shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged." (emphasis added).

[7] The United States asks the Court to determine that all four Transocean entities owned and operated the vessel, but the admissions cited by the United States do not support such a finding.

and so by the plain language of the statute, these entities would be liable for any CWA civil penalty with respect to any oil discharged "from" the vessel.  BP, Anadarko and MOEX were the lessees and operators of the Macondo Well, which was an offshore facility, and these entities therefore would be liable for the CWA penalty for the oil that was discharged "from" the well

The United States, however, seeks to cast a wider net.  The government seeks a ruling that because the oil flowed *from* the Macondo Well and *through* the blow-out preventer ("BOP") and riser -- appurtenances of the *Deepwater Horizon* -- the oil was discharged "from" *both* the Macondo Well and the vessel within the meaning of section 1321(b)(7)(A).  In other words, the United States interprets the operative statutory language -- "any vessel . . . *from which* oil . . . is discharged" -- to impose liability on vessel owners/operators if oil *originating from another source* passes *through* an underwater vessel appurtenance before it is discharged.  The government's novel interpretation contradicts the plain meaning of the statute and turns Congress' deliberate allocation of liability on its head, and accordingly should be rejected.

### 1. The statutory words "from which" -- by their plain meaning -- refer to the origin or source of the discharge, not the outlet "through which" oil may flow before reaching the water.

The first step in statutory interpretation "is to look at the plain meaning of the statutory language." *United States v. Spurlin*, -- F.3d --, 2011 WL 6225151, at *9 (5th Cir. 2011).  Words are to be given their "ordinary or natural meaning." *E.g., Jackson v. Birmingham Bd. Of Educ.*, 544 U.S. 167, 185 (2005) (internal quotation marks and citation omitted).  Where the ordinary meaning of the statutory terms is clear, the inquiry ends, and that meaning should be given effect. *See, e.g., Spurlin,* 2011 WL 6225151 at *9.

---

In its answer, cited in the United States' motion (*see* United States Mem. at 6) and in its Separate Statement (see SMF ¶¶ 42-44), Transocean admitted that "one or more" of the Transocean entities was the owner and "one or more" of the Transocean entities was the operator.  But there is no evidence before the Court as to which entity owned the vessel and which entity operated the vessel.

The words "from" and "through" are not synonymous. Transocean can only be liable for penalties under the statute if the discharge came *from* the BOP and riser, and by the ordinary meaning of the word "from," it did not. Looking at dictionary definitions of the word "from," the common thread is that the word denotes a source or starting point. *See* The American Heritage Dictionary 706 (4th ed. 2006) ("used to indicate a specified place or time as a starting point."); Merriam-Webster's Collegiate Dictionary 468 (1999) ("used as a function word to indicate a starting point of a physical movement"); Oxford English Dictionary, Vol. VI, 210-11 (2d ed. 1989) ("governing a n[oun] which indicates a point of departure or place whence motion takes place . . . . Indicating the starting point"). Indeed, the United States' own brief contains a similar definition: "[t]he ordinary meaning of the word 'from' connotes a physical relationship, such as 'a point or place where an actual physical movement*** *has its beginning*.'" United States Mem., Dkt. 4820-5, at 21 (quoting Webster's Third New International Dictionary 913 (2002)) (emphasis added). This is consistent with the common sense usage of the word as well; if a person boards a flight in Los Angeles and ultimately arrives in New Orleans, that person has flown to New Orleans "from" Los Angeles and "through" (not "from") all of the cities on the route between the two cities.

Not only is Transocean's position supported by the dictionary and common sense usage of the word "from," but it is supported by the ordinary usage of the word "from" by the government itself (as well as other parties) in previous assertions in this very case. Although the government presumably carefully edited its current motion to eliminate such usage, in its previous motion for partial summary judgment filed on May 31, 2011, it unequivocally took the position that the discharge was "from" the Macondo Well: "The undisputed material facts show that … on April 20, 2010, the Macondo Well blew out, and oil flowed **from the well** into the waters of the Gulf of Mexico and continued to flow into the Gulf of Mexico for months." Dkt. 2587-2, at 1 (emphasis added).

11

The government also propounded a request for admission to Anadarko to "[a]dmit that oil flowed **from the Macondo Well** into the Gulf of Mexico . . . ."  *See* Revisions to the United States' First Set of Interrogatories, Requests for Production of Documents, and Requests for Admission to Anadarko Petroleum Corp., at 6 (Sept. 9, 2011) (emphasis added).  Moreover, BP has admitted (against its own interest) that "oil and gas flowed ***from* the MC252 well into the Gulf of Mexico** until July 15, 2010, when BP sealed the well."  *See* BP Cross-Complaint, Dkt. 2075, ¶ 54 (emphasis added).[8]  This Court's recent Order and Reasons in the insurance actions frequently referred to the parties' characterization of the case as involving "oil emanating from the Macondo Well."  Dkt. 4588, at 2, 3, 40 (emphasis added).

Finally, OPA itself confirms that "from" does not mean "through."  Section 2714, entitled "Designation of source and advertisement," explains the process by which the executive branch identifies the parties responsible for removal costs and damages:  "[T]he President shall, where possible and appropriate, designate the source or sources of the discharge or threat.  If a designated source is a vessel or a facility, the President shall immediately notify the responsible party."  33 U.S.C. § 2714(a).  A party's responsibility under this provision depends on whether its vessel or facility was the *source* of the discharge.  Just as dictionaries define "from" to connote "source," they define "source" as the "first cause" or "place of origin *from which* something comes or develops."  Webster's New Twentieth Century Dictionary 1734 (2d ed. 1979) (emphasis added).  The plain meaning of section 2714(a) thus reinforces the plain meaning of section 1321(b)(7)(A): a party is liable for an oil spill if the oil comes *from* the party's vessel or facility -- that is, if the vessel or facility was the source of the discharge.  Here, the Macondo Well, not the *Deepwater Horizon*, was the source of the underwater discharge.

---

[8]  As discussed in Transocean's Response to the United States' Statement of Undisputed Material Facts, the government's attempt to prove discharge from the *Deepwater Horizon* by pointing to self-serving statements to that effect by BP or Anadarko is unavailing, as those parties' responses cannot be used as admissions against *Transocean's* interests.

### 2.   Courts hold that "from" denotes a point of origin, not a conduit "through" which something passes.

Although the inquiry here can end with the dictionary definition, other courts examining the plain meaning of the word "from" in a number of different circumstances have held that the word "from" designates a source or starting point rather than a conduit through which something passes.

In *United States Fid. & Guar. v. Lehigh Valley Ice Arena, Inc.*, 03 Civ. 5700, 2004 WL 741365, at *6 (E.D. Pa. Mar. 4, 2004), *aff'd* 121 Fed. App'x. 976, 2005 WL 388659 (3d Cir. 2005), members of an ice hockey team were injured by fumes that emanated from a zamboni machine and then passed through a ventilation system into the locker room.  The applicability of an insurance exclusion depended on whether the fumes came "from" the ventilation system, and the court held that they had not.  The court reasoned that the ventilation equipment "was merely a conduit and not a source of the pollutants."  *Id.*  The court looked to the plain meaning of the word "from," including dictionaries defining "from" as a "starting point" and an indication of "source." *Id.*  The court held that the dictionary "definition does not permit us to define 'from' as meaning 'through.'"  *Id.*  Because the ventilation equipment was "merely a conduit and not a source of the pollutants," the pollutants did not come "from" the equipment. *Id.*  Here, the BOP and riser are exactly like the ventilation system-- a conduit through which the oil passed before being discharged into the water; here, as in *United States Fidelity & Guaranty,* the plain meaning of the words "do[] not permit us to define 'from' as meaning 'through.'"

Similarly, in *Peconic Baykeeper, Inc. v. Suffolk County*, 600 F.3d 180 (2d Cir. 2010), the defendant owned and operated trucks and helicopters that released pollutants into the air, and those pollutants traveled through the air into the water.  The issue was whether, under the CWA, a pollutant had been discharged "from any point source" belonging to the defendant.  The district court held that the pollutants were not "from" the defendant, but rather were discharged into the

water "from" the air, which was the last source through which the pollutants passed before entering the water.  The Second Circuit reversed, holding that the helicopters and trucks were the *source* of the pesticides, and therefore the pesticides were discharged "from" the helicopters and trucks, and *not* "from" the air, even though the pollutants had passed through the air immediately before reaching the water.  *Id.* at 188.  The Court reasoned that the "word 'from' is defined 'to indicate a starting point,' and also denotes the 'source or original or moving force of something' . . ."  *Id.* at 188-189 (citing Webster's Third International Dictionary Unabridged 913 (2002)). Here, the BOP and riser, like the air in *Peconic*, were merely conduits through which oil traveled "from" the Macondo Well and into the water.  As the Second Circuit held, the pollutants cannot be said to come "from" that conduit simply because they traveled through it.

In *Silva v. MacAuley*, 135 Cal. App. 249, 253 (1933), a state prohibited shipping crabs "from" a designated district within that state.  The plaintiff had transported crabs from a district north of the prohibited district and had traveled with the crabs through the prohibited district; after having his crabs seized for violating the prohibition, he sued.  The court held that the plaintiff had not violated the statute because, although the crabs traveled "through" the prohibited district, they did not come "from" that district.  The court looked to the plain meaning of the words, including the dictionary definition of the word "from," and found that the word "'from' always implies a starting point, whether it be of time, place or condition.'"  *Id.* at 254. The court emphasized the distinction between "from" and "through":  "The legislature has declared it a public offense to ship crabs *from* a designated district to another, but has not prohibited such shipment *through* the district.  If it had been the intention of the legislature to forbid the transportation *through* a district, it could readily have so enacted."  *Id.* (emphasis in original).  Similarly, here, Congress was well aware of the use of BOPs and risers; if Congress had wished to impose civil penalties on vessel operators for oil that passes through an underwater appurtenance, it could have written the word "through" into the statute.

14

Other courts similarly have held that "from" indicates a starting point or source. *See Teknowledge Corp. v. Akamai Technologies Inc.*, 2004 WL 2042864, at *5 (N.D. Cal. Sept. 11, 2004) (in patent claim construction, holding that phrase with the word "from" is "susceptible to only one meaning," and that "from' indicates a "starting point" or "source"); *Minus v. Workmen's Compensation Appeal Board,* 496 A.2d 1340, 1342 (Pa. Commw. Ct. 1985) (claimant whose paperwork and telephone calls went through Philadelphia location did not work "from" that location, as "from" is a "function word indicating a starting point or source."); *Simmons v. Commonwealth*, 431 S.E.2d 335, 336 (Va. Ct. App. 1993) (prisoner did not escape "from" facility because "from" indicates a "'starting point: as (1) a place where a physical movement begins.'") (citing Webster's Ninth New Collegiate Dictionary 494 (1989 ed.)).

Notably, the United States-- whose argument on this point is confined to a single paragraph, *see* United States Mem., Dkt. 4820-5, at 21-- fails to cite a single case consistent with its proposed statutory reading that "from" includes "through."  Simply put, the plain meaning of the statutory language precludes the relief the government seeks against Transocean.

> **B.      The CWA penalty provisions that were enacted through Title IV of OPA should be applied to underwater discharges consistent with the allocation of liability in Title I of OPA**

If a court looks beyond the plain meaning of statutory language (which Transocean submits is unnecessary here), it should interpret statutory provisions to harmonize with other provisions of the same act and with the legislative purpose embodied in those other provisions. This court has already noted that Section 311 and OPA are in pari materia.  "OPA Section 2718 must [be] construed *in pari materia* with CWA Section 311(*o*)(2), because these statutes address common topics. *See* 82 C.J.S. § 476 (2011)."   Order and Reasons (on motions to dismiss Alabama and Louisiana complaints), Dkt. 4578, at 12.  *See, e.g., United Savings Ass'n v. Timbers of Inwood Forest*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the

permissible meanings produces a substantive effect that is compatible with the rest of the law."); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54-56 (1987) (interpreting ERISA's preemption-savings clause to conform to the legislative purpose evident in ERISA's civil enforcement clause); *Thibodeaux v. Grasso Prod. Mgmt.*, 370 F.3d 486, 491 (5th Cir. 2004) ("[I]n expounding a statute, we must . . . look to the provisions of the whole law, and to its object and policy.") (quoting *Hickman v. Texas*, 260 F.3d 400, 403 (5th Cir. 2001)).

As already noted, through section 2704(b)(1) of OPA, Congress -- familiar with the role of underwater appurtenances such as blow-out preventers-- deliberately decided to make lessees of the drilling location liable for underwater discharges, and *not* MODU owner/operators.  It would be absurd to suggest that Congress intended to protect MODU owner/operators from liability for underwater discharges in Title I, only to subject them to potentially billions of dollars in strict liability fines in Title IV.  To avoid eviscerating the import of section 2704, the Court should construe the civil penalty provision as *not* reaching an underwater discharge that merely passes through a MODU appurtenance before being discharged into the water.

### 1. The civil penalty provision of CWA and OPA's limitation of MODU owner/operator liability are part of the same statutory scheme.

Any suggestion that section 2704 and section 1321 are not part of the same statutory scheme and need not be read in harmony is belied by the history of the Act and the statutory language itself.[9]  Congress enacted the current CWA penalty provisions at the same time it enacted OPA.  The pre-OPA predecessor to what is now section 1321(b)(7)(A) authorized a maximum civil penalty of $50,000 per violation.  Pub. L. 95-576, 92 Stat. 2467, 2468 (1978). OPA changed this limit to $1,000 per barrel or $25,000 per day -- figures portending potential

---

[9] The United States previously has argued that the civil penalty provisions codified at 33 U.S.C. § 1321 do not form part of OPA for interpretive purposes: "The civil penalties . . . were authorized not by OPA, but by the CWA.  Congress merely *amended* the CWA penalty provisions at the same time it enacted OPA."  Plaintiff United States' Mem. in Opp. to Def. Transocean's Mot. for Partial Summ. J., Dkt. 4840, at 14-15.

total penalties that dwarf the former $50,000 limit.  Pub. L. 101-380, 104 Stat. 484, 536 (1990).

In other words, section 1321(b)(7)(A), as it exists today, is a product of OPA, was enacted in

Title IV of OPA, and belongs to the statutory scheme governing oil pollution that OPA created.

Indeed, as this Court has observed, OPA's legislative history shows that Congress intended the

Act to "'build[] upon section 311 of the Clean Water Act to create **a single federal law** . . . for

oil pollution.'"  B-1 Order, Dkt. 3830, at 21, quoting S. Rep. 101-94, at 730 (1989) (emphasis

added).  As two components of this "single federal law," section 1321(b)(7)(A) and section

2704(b)(1) should be read together so that the one does not undermine the purpose of the other.

*See United Savings Ass'n*, 484 U.S. at 371.

That the language in the two sections is not identical does not alter this conclusion.  It is

true that section 2704(b)(1) employs the term "responsible party" -- which the Act defines at

section 2701(32) -- while section 1321(b)(7)(A) uses the phrase "owner, operator, or person in

charge of any vessel or . . . offshore facility."  But to argue that this distinction requires the Court

to interpret section 1321(b)(7)(A) to contravene the clear object of section 2704(b)(1) would

ignore both the language and context of the statutory enactment.

By its own terms, section 2704(b)(1) applies to *all* of OPA, not just to those subsections

that use the term "responsible party":

> For purposes of determining the responsible party *and applying this Act* . . . a
> mobile offshore drilling unit which is being used as an offshore facility is deemed
> to be a tank vessel with respect to the discharge . . . on or above the surface of the
> water.

33 U.S.C. § 2704(b)(1).[10]  It would render the italicized language superfluous to interpret the

exclusion of MODU-operator liability for underwater discharges to apply only to those OPA

---

[10] The United States has relied incorrectly upon *United States v. Locke*, 529 U.S. 89 (2000), for
the proposition that provisions in OPA Title I do not apply to other titles in the Act.  Plaintiff
United States' Memorandum In Opposition to Defendant Transocean's Motion for Partial
Summary Judgment, Dkt. 4840, at 14-15.  *Locke* found that the preemption-savings clauses of
OPA Title I did not limit the preemptive effect of provisions unrelated to oil spills in OPA's

provisions that speak of "responsible parties."  *See In re Pierrotti*, 645 F.3d 277, 280 (5th Cir. 2011) ("[I]t is 'a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that ... no clause, sentence, or word shall be superfluous' . . . .") (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)).  Where Congress sought to limit the applicability of an OPA provision to a particular portion of the Act, it did so expressly and without contradicting itself.  *See, e.g.*, 33 U.S.C. § 2703(a) (enumerating defenses to liability) ("A responsible party is not liable for removal costs or damages *under section 2702 of this Title* if the responsible party establishes . . . ."); 33 U.S.C. § 2703(b) (similar).  Section 2704(b)(1), in contrast, states that it applies to the entire "Act."  It simply does not say what the government advocates: that it applies only to liability for removal costs and damages "under section 2702 of this Title."

The statutory history further explains why Congress specifically described section 2704(b)(1)'s exclusion of MODU-operator liability for underwater discharge in Title I but did not incorporate the same "responsible party" language into Title IV of the Act.  The idea was not to create an inconsistent statutory scheme under which MODU owner/operators would bear no damages liability for underwater discharges while potentially facing billions of dollars in civil penalties for the same underwater discharges.  Rather, Congress placed the MODU-liability exclusion into Title I's removal costs and damages provisions because that is where clarifying language was needed.  The law that preceded those provisions -- the Outer Continental Shelf Lands Act of 1978 ("OCSLA") -- made the "owner or operator" of an offshore facility strictly

---

other titles.  *See* 529 U.S. at 105.  The Court based this ruling on language in the savings clauses that expressly limited their scope to laws "relating to the discharge" of oil or other pollution, *id.* at 104-05, and upon indications in the statute and its legislative history that Congress did not intend for OPA to disturb the "established federal-state balance in matters of maritime commerce."  *Id.* at 107.  The government's expanded reading of *Locke* has been expressly rejected.  As the D.C. Circuit has held, "[a]t no point in [Locke's] analysis did the Court profess to interpret the phrase 'this Act' or suggest that it was limited to Title I of the OPA. . . .  *Locke* gives us no reason to depart from the natural interpretation of 'this Act' [as referring to all nine titles of OPA]."  *In re Bluewater Network*, 234 F.3d 1305, 1312 (D.C. Cir. 2000).

liable for damages and removal costs caused by any oil spill from the facility, *see* Pub. L. 95-372, 92 Stat. 629, 675 (1978), but defined the term "operator of an offshore facility" so broadly that it encompassed MODU operators. *Id.* at 672 ("[I]n the case of an offshore facility, ['operator' means] any person . . . who is responsible for the operation of such facility *by agreement* with the owner.") (emphasis added).[11]   As discussed above, Congress enacted section 2704(b)(1) specifically to fix this defect.   S. Rep. No. 101-94 at 9 ("A major deficiency of Title III of the Outer Continental Shelf Lands Act [is that] . . . the owner or operator [of an offshore facility] is [often] an independent drilling contractor and not the actual holder of the rights to produce the oil.").

The civil penalty provision that pre-dated OPA, on the other hand, did not contain the same defect.   Its much narrower definition of the "owner or operator" of an offshore facility did not encompass vessel operators who merely contracted with well owners.   Pub. L. 92-500, 86 Stat. 816, 862 (1972) ("'[O]wner or operator' means . . . in the case of . . . an offshore facility, any person owning or operating such . . . offshore facility.").   Thus, when Congress re-wrote the provision as part of OPA, it replaced the penalty structure but it did not change the "owner or operator" language, because that language, then as now, did not subject a vessel owner to penalties for discharges flowing "from" an underwater well facility.   *See* 33 U.S.C. § 1321(a)(6)(B) (retaining the original definition of "owner or operator" of an offshore facility). The most meaning that one can attach to Congress's omission of an express incorporation of the MODU-liability exclusion into section 1321(b)(7)(A) is that the legislators did not anticipate that the Department of Justice would seek to expand the ordinary meaning of language to advocate that a discharge from a well on the ocean floor came "from" a surface vessel.

---

[11]   As drilling contractors, MODU operators worked under "agreement" with well owners and, pursuant to the expansive OCSLA definition, faced liability for underwater leaks.

**2.**    **The legislative intent was that, for *all* purposes of the Act, the liable party for an underwater discharge would be the owner/operator of the offshore facility from which the oil was discharged.**

Courts also may look to the "legislative message" behind an act to give meaning to its language.  *See Sierra Club v. Espy*, 38 F.3d 792, 799 (5th Cir. 1994).  Here, this message is that Congress intended to allocate liability-- including penalties -- for underwater spills to offshore facility operators and not MODU operators.  As discussed at length above, in enacting OPA, Congress expressed its clear intent to ensure that "[i]f a discharge of oil from a mobile offshore drilling unit occurs below the surface of the water, the lessee or permittee is liable."  S. Rep. No. 101-94 at 10.

This intent was not limited to the removal costs and damages provisions of OPA.  The OPA Conference Report elaborates on the purpose of the civil penalties and discusses such penalties as supplemental liabilities to be incurred by the *same* "responsible parties" liable for removal costs and damages under section 2702:

> Civil penalties should serve primarily as an *additional incentive* to minimize and eliminate human error . . . .  There are strong operational and economic incentives within the Conference substitute that should encourage *responsible parties* to prevent oil spills.

H.R. Rep. No. 101-653, 1990 WL 132747, at 833 (Conf. Rep.) (emphasis added).  A MODU operator is not a "responsible party" for underwater discharge, *see* §§ 2701(32), 2704(d)(1), so it is not subject to the "additional" liabilities that OPA sought to impose on "responsible parties" in the form of civil penalties.

The structure for determining the amount of the CWA penalty also suggests that Congress intended that CWA fines should be imposed on the same party responsible for cleaning up a spill.  Section 1321(b)(8) mandates, "[i]n determining the amount of a civil penalty . . . the court . . . shall consider [among other factors] . . . the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge . . . ."  33 U.S.C. §

1321(b)(8); *see also* H.R. Rep. No. 101-653, 1990 WL 132747, at 833 (Conf. Rep.) ("In determining the amount of a civil penalty, *particular weight should be given* to the rapidity and effectiveness of *the response actions of the responsible party*.") (emphasis added).

Under the authority of section 1321(j), the Minerals Management Service (now the Bureau of Safety and Environmental Enforcement, or "BSEE") promulgated regulations requiring the operator of an offshore facility -- not the MODU operator -- to create an oil spill response plan for exploration activities involving MODUs. *See* 30 C.F.R. § 254.1(a) (requiring the owner or operator of an offshore "facility" to submit spill-response plans);[12] United States Department of the Interior, *Notice to Lessees and Operators of Federal Oil, Gas, and Sulphur Leases and Pipeline Right-of-Way Holders in the Outer Continental Shelf, Gulf of Mexico OCS Region*, at 23, , *available at* http://tinyurl.com/d4g8ptp (detailing the requirements that a well-lessee's spill plan must meet if its operations include MODUs).  Here, the parties required to contain and clean up the spill were the lessees of the Macondo Well-- BP, Anadarko and MOEX[13] -- not Transocean. Had Congress wished to impose civil penalties on parties not legally responsible for clean-up, it would not have emphasized clean-up as a central factor in the penalty determination.

In sum, the government's proposed interpretation of section 1321(b)(7)(A) -- pursuant to which an underwater discharge comes "from" a vessel if it passes "through" an underwater appurtenance -- would create an absurd structural inconsistency in the statutory scheme by which section 2704(b)(1) would absolve MODU operators of liability for underwater discharges, but section 1321(b)(7)(A) would expose MODU operators to enormous levels of liability for

---

[12] Like OPA, the regulations define "facility" to exclude a vessel.  30 C.F.R. § 254.6; 33 U.S.C. §§ 2701(9).

[13] Under these parties' Joint Operating Agreement, BP acted for the other two entities and created the BP Gulf Coast Regional Oil Spill Response Plan to comply with these regulations. The Plan is available at http://info.publicintelligence.net/BPGoMspillresponseplan.pdf.

underwater discharges.  This interpretation ignores the plain meaning of the statute, as well as basic rules of statutory construction, and should be rejected.

> **C.     As a matter of law, Transocean is not the "operator" of the Macondo Well from which oil was discharged.**

There is no reason to put off for a later date the issue of whether Transocean can be held liable for CWA civil penalties on the alternative theory that it was somehow the "operator" of the Macondo Well.  This is not one of those cases where there is an issue of fact as to the parties' relationship.  *See, e.g.*, *United States v. Bestfoods,* 524 U.S. 51 (1998) (issue of fact under CERCLA as to whether parent corporation was an "operator" for CERCLA purposes of a facility nominally owned and operated by a subsidiary).

The BSEE regulations governing day-to-day operations of offshore facilities include the following definition of the term "operator":

> *Operator* means the person the lessee(s) designates as having control or management of operations on the leased area or a portion thereof.  An operator may be a lessee, the BSEE-approved . . . designated agent of the lessee(s), or the holder of operating rights under a [Bureau of Ocean Energy Management]-approved operating rights assignment.

30 C.F.R. § 250.105.  It is undisputed that BP Exploration was designated the "operator" of the Macondo well under the regulations.  This Court already has said as much, when it considered the negligence claims against Anadarko and MOEX:   "Under the JOA, BP was solely responsible for the drilling operations."  Order and Reasons (B-1 Motion to Dismiss), Dkt. 3830, at 28.  A court may look to the regulations in interpreting the statutory term "operator."  *Green Atlas Shipping S.A. v. United States,* 306 F. Supp. 2d 974, 978 (D. Or. 2003) (holding that captain of vessel was not an "operator" even though he arguably "operated" the vessel, and relying on definition of "operator" in financial responsibility regulations); *see also Taylor Energy Co. LLC v. U.S. Dep't of the Interior*, 734 F. Supp. 2d 112, 121 n.6 (D.D.C. 2010)

(relying on the section 250.105 definition of "operator").  In arguing why Anadarko is also an "operator" under the statute, the United States relies on these regulations in its memorandum:

> While the regulations provide that a lessee may designate an "operator [i.e., BP] to act on your [i.e., Anadarko's] behalf and to fulfill your obligations under the Act, the lease, and [applicable] regulations," 30 C.F.R. § 250.143(b), those regulations expressly provide that co-lessees "are jointly and severally responsible" for fulfilling the obligations imposed by the regulations and the statute.  *Id*. § 250.146(c) ("the lessee, operator . . . and the person actually performing the activity to which the requirement applies are jointly and severally responsible for complying with the regulation.").

United States Mem., Dkt. 4820-5, at 24.

Whatever force these arguments have as to Anadarko's status as an operator, the regulatory scheme confirms that a drilling contractor such as Transocean is not an "operator." Contractors do not have "control or management of operations on the leased area."  As a drilling contractor, Transocean is neither the lessee, the designated agent of a lessee, nor the approved assignee of the lessee.

Additionally, the regulations are consistent with industry practice and terminology with which this Court is undoubtedly familiar.  A court may properly rely upon industry practice when interpreting a statute.  *See City of Dallas v. FCC*, 118 F.3d 393, 395 (5th Cir. 1997) (industry practice is a "prime source" for determining congressional intent).  In the oil exploration industry, the term "operator" has an established meaning.  As defined in the Oil & Gas Field Technical Terms Glossary, "operator" is:

> The person or company, either proprietor or lessee, actually operating an oilwell or lease.  Generally, the oil company by whom the drilling contractor is engaged.

Oil & Gas Field Technical Terms Glossary, http://oilgasglossary.com/category/o/page/2 (last visited Dec. 30, 2011).  The Schlumberger Oilfield Glossary contains a similar definition of "operator":

> The company that serves as the overall manager and decision-maker of a drilling project. Generally, but not always, the operator will have the largest financial

stake in the project. . . . As far as the drilling contractor and service companies are concerned, the designated operator is paying for the entire operation.

Schlumberger Oil Field Glossary, http://glossary.oilfield.slb.com (last visited Dec. 30, 2011).

Much like the regulation, these sources make clear that BP, as the "overall manager and decision-maker" of the Macondo Well, was the well's "operator," and that Transocean, the drilling contractor, was not the "operator."

## III.   **CONCLUSION**

For the foregoing reasons, the United States' Second Motion for Partial Summary Judgment should be denied as to the Transocean Defendants.  The Court should enter partial summary judgment in favor of Transocean to the effect that Transocean is not liable for the underwater discharge of oil from the Macondo Well under either Title I of OPA or the civil penalty provisions of the CWA enacted in Title IV of OPA.

Respectfully submitted,

By:    /s/ Steven L. Roberts
Steven L. Roberts (Texas, No. 17019300)
Rachel GiesberClingman (Texas, No. 00784125)
Kent C. Sullivan (Texas, No. 19487300)
Sutherland Asbill& Brennan LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
Email: steven.roberts@sutherland.com,
rachel.clingman@sutherland.com,
kent.sullivan@sutherland.com,

By:    /s/ Kerry J. Miller
Kerry J. Miller (Louisiana, No. 24562)
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8169
Facsimile: (504) 599-8154
Email: kmiller@frilot.com

-and-

By:    /s/ Brad D. Brian.
Brad D. Brian (California, No. 79001)
Allen M. Katz (California, No. 054933)
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 683-5180, (213) 683-4018
Email: brad.brian@mto.com,
allen.katz@mto.com

-and-

24

By: ____/s/ Edwin G. Preis, Jr._____
Edwin G. Preis, Jr. (Louisiana, No. 1070)
Richard J. Hymel (Louisiana, No. 20230)
Preis& Roy PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone: (337) 237-6062
Facsimile: (337) 237-9129
-and-
601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone: (504) 581-6062
Facsimile: (504) 522-9129
Email: egp@preisroy.com, efk@preisroy.com

Of Counsel:
John M. Elsley (Texas, No. 0591950)
Royston, Rayzor, Vickery & Williams LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 224-8380
Facsimile: (713) 225-9945
Email: john.elsley@roystonlaw.com

Daniel O. Goforth (Texas, No. 08064000)
Goforth Geren Easterling LLP
4900 Woodway, Suite 750
Houston, Texas 77056
Telephone: (713) 650-0022
Facsimile: (713) 650-1669
Email: dangoforth@goforthlaw.com

**Counsel for Triton Asset Leasing GmbH,**
**Transocean Holdings LLC, Transocean**
**Offshore Deepwater Drilling Inc. and**
**Transocean Deepwater Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been electronically filed through the Court's CM/ECF system and served on all counsel of record though LexisNexis File & Serve, in accordance with Pretrial Order No. 12, which will send a notice of electronic filing to all counsel of record on this 9th day of January, 2012.

/s/  Kerry J. Miller_____
        KERRY J. MILLER