**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER MAGISTRATE JUDGE |
| …………………………………………….. | : | SHUSHAN |

**BP'S MEMORANDUM IN SUPPORT OF ITS MOTION IN LIMINE
TO EXCLUDE NON-FACTUAL FACT WITNESS TESTIMONY**

The Federal Rules of Evidence explicitly limit the scope of permissible, admissible fact witness opinion testimony.  Under Rule 701, testimony which is not based on the witness's own observations, is not helpful toward a better understanding of the witness's general testimony or factual issues in the case, or which invades the province of Rule 702 expert testimony is inadmissible.  Despite this straightforward prohibition, BP's party opponents have elicited just such inadmissible, non-factual testimony from fact witnesses on numerous occasions.  This testimony must be excluded from the MDL.

Under Rule 701, "[i] If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  The reason for these limitations is expressly acknowledged in the Rule's own committee notes, and worth highlighting given this Court's own ongoing efforts to efficiently and effectively manage the course of litigation.  As a general matter, the limitations are designed to advance the "traditional objective of putting the trier of fact in possession of an accurate reproduction of the event."  Fed. R. Evid. 701 Advisory Committee Notes.  *Second*, regarding

the limitation in 701(c), the Rule's drafters were specifically attuned to quashing "the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." *Id.*

In instances where parties have sought to introduce fact witness opinion testimony beyond the scope of Rule 701, courts in this circuit have aggressively excluded it. *E.g.*, *United States v. Riddle*, 103 F.3d 423, 429 (5th Cir. 1997) (rejecting government's assertions that witness was functioning merely as a fact witness when he testified on general banking industry practices and finding such testimony properly excluded as falling outside scope of Rule 701); *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 459-60 (5th Cir. 1996) (affirming district court's exclusion of fact witness's testimony about "'toxic chemicals and other toxic substances'" as beyond the scope of Rule 701 due to testimony being outside either witness's "or any other ordinary person['s]" personal knowledge and thus more appropriately addressed through Rule 702 expert testimony, if at all); *United States v. Marshall*, 762 F.2d 419, 426 & n.8 (5th Cir. 1985) (overturning lower court's admission of fact witness's testimony purporting to explain procurement records as "little more than an inadmissible opinion by a non-expert witness" and therefore outside the scope of Rule 701); *Butler v. Polk*, 592 F.2d 1293, 1297 (5th Cir. 1979) (affirming district court's exclusion of fact witnesses' testimonies as failing to satisfy Rule 701 and amounting to unhelpful statements which were "meaningless assertions which amount[ed] to little more than choosing up sides" (quoting Fed. R. Evid. 701 Advisory Committee Notes)); *Maggette v. BL Development Corp.*, Nos. 2:07CV181–M–A, 2:07CV182–M–A, 2011 WL 2134578, at *4 (N.D. Miss. May 27, 2011) (excluding "any portion(s) of reports which offer opinions by non-expert witnesses . . . regarding the cause of the accident in this case" on grounds that such content constitutes testimony beyond the scope of Rule 701); *In re Mega Systems*,

*L.L.C.*, Bankruptcy No. 03–60190, 2006 WL 6571681, at *2 (granting motion in limine to exclude witness's testimony on valuation of patent as impermissible fact witness opinion testimony beyond scope of Rule 701).

The ways and means by which parties will attempt to circumvent the clear limitations imposed in Rule 701 are plentiful.  One favorite technique in this case has been to have fact witnesses read e-mails or other documents generated by another party's employees and ask them to opine as to the import of these communications.  In other cases, it is simply fishing for expert opinions on the subjects relevant to the witness's factual testimony.  Sometimes parties have solicited opinion testimony on matters which are clearly the sole preserve of actual Rule 702 experts.

All of these methods run afoul of Rules 701 and 702.  *See, e.g.*, *Doddy*, 101 F.3d at 460 (recognizing that, given nature of subject matter factual witness offered testimony about, "it is rather doubtful that, in the absence of any specialized training or experience in these areas, [the witness]--or any other ordinary person--could have personal knowledge about" that subject and thus finding witness's testimony as a purported factual rather than expert witness inherently beyond the scope of Rule 701); *Riddle*, 103 F.3d at 429 (rejecting factual witness's testimony on general banking practices as attempt to have witness "functioning" not as a lay witness but a "knowledgeable bank examiner"); *In re Mega Systems*, 2006 WL 6571681, at *2 (rejecting supposedly "factual" testimony on matters of patent valuation as, in actuality, expert testimony by a clearly non-qualified expert both beyond the scope of Rule 701 and not satisfying the requirements of Rule 702).  They also violate Rule 26(a), since they seek the introduction of expert testimony without the mandatory disclosures required under the Rules.

For example, Transocean employee Randy Ezell, was led by the nose through internal BP e-mail exchanges he had never seen before and then asked to opine on various aspects of BP's conduct.  The transcript speaks for itself:

25 Q. Mr. Ezell, we're back and we're
Page 161
1 going to enter the afternoon session, and I
2 will be finishing up with you. I would like
3 you to review the Deposition Exhibit 1127
4 consisting of two pages. Have you done that?
5 A. Yes, sir.
6 Q. If you would, look at the second
7 page of that e-mail. I direct your attention
8 to David Sims' e-mail to John Guide on
9 March 13th, which I told you, represented to
10 you, that's five days after -- five days
11 after the well control event where the string
12 was stuck, and Sims is saying to Guide,
"What
13 did I do to make you mad?" You're aware
14 David Sims in the BP hierarchy is above
David
15 Guide (sic), are you not?
16 A. John Guide, yes.
17 Q. John Guide. And John Guide
18 comes back to David Sims, a senior
management
19 person, and says, "You did not listen," and I
20 want to ask you, on March the 13th, or any
21 time after that, were you aware that there
22 was a potential rift between the top of the
23 management chain, David Sims, and the well
24 site -- the well team leader, John Guide,
25 that was exclusively over the DEEPWATER
Page 162
1 HORIZON?
2 A. No, sir, I was not.
3 Q. When you go to the first page
4 and read this David Sims' e-mail to John
5 Guide, I direct your attention to the first
6 paragraph where Guide says, "I did listen. I
7 don't think you did." And he goes on to say,
8 Sims goes on to say that he didn't hear his
9 well team leader for the Macondo step up to
10 the plate and weigh the facts and opinions
11 and then offer logical fact-based decisions.
12 Were you aware through
13 information on the rig from BP or from
anyone
14 that -- that David Sims was questioning John
15 Guide's ability to step up and make logical
16 decisions as this well required?
17 MR. GODFREY:
18 Objection as to form.
19 EXAMINATION BY MR. PENTON:

20 Q. Did anybody ever tell you that?
21 A. No, sir, I was unaware of that.
22 Q. If you look at the third
23 paragraph, they're talking about a particular
24 bleedoff casing pressure issue with the well,
25 and it says -- they're talking about the
Page 163
1 bottom hole pressure, and it goes on in the
2 last sentence to say: "Everyone, even the
3 well site leaders" -- in this case, we're
4 talking about, we're talking about Ronnie;
5 correct, as well --
6 MR. GODFREY:
7 Objection to form.
8 MR. PENTON:
9 Say again?
10 MR. GODFREY:
11 Objection to form.
12 MR. PENTON:
13 Okay.
14 EXAMINATION BY MR. PENTON:
15 Q. The well site leaders at that
16 time, at the time of this e-mail, were who?
17 Was it -- David Vidrine was one?
18 A. You're asking me?
19 Q. Yes.
20 A. At the time of the e-mail?
21 Q. Yes. Do you know? I think you
22 were --
23 A. Just from reading -- from
24 reading the e-mail, it appears it was Ronnie
25 Sepulvado and Murray is what it appears to
Page 164
1 be.
2 Q. Is that -- I never got that
3 straight -- is that his son or his brother?
4 A. Brother.
5 Q. His brother, okay. But you will
6 see that Sims is saying: "Even the well site
7 leaders agreed that even if they bleed trap
8 pressure, you would still have to go to 12.3
9 ppg at least, so why chance it."
10 Do you see that?
11 A. Yes, sir.
12 Q. Did you know that John Guide was
13 making decisions based upon chance as
opposed
14 to logical, fact-based decisions?
15 MR. GODFREY:
16 Objection as to form.
17 THE WITNESS:

18 No, sir, I didn't.
19 EXAMINATION BY MR. PENTON:
20 Q. If you look at the next
21 paragraph, you will see that the issue is
22 being addressed by Sims about bleeding
23 arbitrary volumes of mud off to see if you
24 have trapped pressure. Do you see that.
25 A. Yes, sir, okay.
Page 165
1 Q. And you see that Sims says
2 that's the wrong thing to do and he
3 challenged him to find a single well control
4 expert that would disagree. Do you see that?
5 A. Yes, sir, I do.
6 Q. It's a strong disagreement;
7 isn't it?
8 A. It appears to be.
9 Q. By someone above John Guide;
10 correct?
11 A. Correct.
12 Q. And he also goes on to say that
13 the well site leaders are not well control
14 experts.
15 Did you consider these well site
16 leaders from BP to be out there and BP did
17 not hold them at a level that they would be
18 experts at well control just like yourself?
19 MR. GODFREY:
20 Objection as to form.
21 EXAMINATION BY MR. PENTON:
22 Q. Does that surprise you?
23 A. It does.
24 Q. Don't you -- didn't you count on
25 them being experts on this well since they
Page 166
1 designed it and they planned it?
2 MR. GODFREY:
3 Objection as to form.
4 THE WITNESS:
5 I did count on them.
6 EXAMINATION BY MR. PENTON:
7 Q. And they made daily and even
8 hourly decisions, correct, with what
9 procedures you and your crew would execute;
10 correct?
11 A. Correct.
12 Q. And many of those decisions, if
13 wrong, if not logically based upon the facts
14 and analysis, could cause loss to the well as
15 well as endangerment to human life and
16 health, could it not?

17 MR. GODFREY:
18 Objection as to form.
19 THE WITNESS:
20 True.
21 EXAMINATION BY MR. PENTON:
22 Q. And then there's this comment in
23 the next paragraph talking about, "I had to
24 go outside." This is something that Sims
25 heard Guide say, "I had to go outside to save
Page 167
1 my family from being killed."
2 Do you see that?
3 A. (Nodding head affirmatively.)
4 Q. Have you ever heard Guide say
5 something off the wall like that?
6 A. No, sir. I've heard a lot of
7 discussions from Guide, but nothing like
8 that.
9 Q. You've been around Guide and
10 heard from Guide, have you not?
11 A. Yes, sir, I have.
12 Q. We will talk about that in a
13 minute.
14 And then down in the last three
15 paragraphs, it says: You seem to be the
16 victim. It's always everyone else's fault.
17 You criticize nearly everything we do on the
18 rig, but you don't realize -- and I'm
19 paraphrasing -- that you're responsible for
20 everything that we do on the rig.
21 Do you see that?
22 A. Yes, sir.
23 Q. Doesn't that make you feel very
24 insecure that at -- at the time of this well
25 control event and the response to this that
Page 168
1 BP operations and engineering was in a state
2 of dysfunction? That's what I've represented
3 to you. Do you believe that now that you've
4 seen this?
5 MR. GODFREY:
6 Objection as to form.
7 MR. PENTON:
8 You've got it. No problem.
9 Noted.
10 THE WITNESS:
11 I definitely did not know that
12 this type of situation existed, and it is a
13 little disturbing.
14 EXAMINATION BY MR. PENTON:
15 Q. The next paragraph says: "You

16 seem to think that running is more important
17 than well control."
18 Do you see that?
19 A. I do.
20 Q. Mr. Ezell, is anything more
21 important than well control?
22 A. No. That's our primary goal.
23 Q. Yes, sir. And then the comment
24 is made by Mr. Sims, "Left to go run in the
25 middle of trying to pull the stuck logging
Page 169
1 tool free."
2 Do you see that?
3 A. I do.
4 Q. Of course, he's in Houston, so
5 you wouldn't know anything about that;
6 correct?
7 A. No.
8 Q. Then he makes a comment about he
9 has to -- Guide has to slip out of the room
10 to call the rig. And then you can just read
11 it on. It talks about him arguing. He
12 thinks that young engineers are throwing out
13 all kind of wild ideas.
14 What's your impression of that?

15 You've got David Sims, correct, who is at the
16 top, basically, of the Gulf of Mexico for BP;
17 correct?
18 A. I know that he's way up in the
19 hierarchy, but I don't know if he's the top.
20 Q. I understand, but he's near the
21 top --
22 A. Yes, sir.
23 Q. -- of the BP hierarchy?
24 A. Yes.
25 Q. And he is noting that Guide is
Page 170
1 representing that young engineers are
2 throwing wild ideas around.
3 How comfortable are you with
4 that kind of behavior by this engineer?
5 MR. GODFREY:
6 Objection to form.
7 EXAMINATION BY MR. PENTON:
8 Q. Now that you see this?
9 MR. GODFREY:
10 Objection to form.
11 THE WITNESS:
12 It's disturbing.

\*\*\*

21 Q. I want to show you this string
22 of e-mails, and it's from Gregg Walz, who
you
23 know by name, to John Guide, who you
know,
24 and you will, we will see here that Mr. Walz,
25 who is an engineer in BP, hired at a higher
Page 179
1 level, he took -- I represented to you, and
2 you knew something about it -- he took
3 Mr. Sims' place as of April the 1st, and this
4 is April the 16th, where Gregg Walz is
5 telling John Guide that the six centralizers
6 are not in keeping with Halliburton's model
7 and that you have to honor the modeling and
8 use the full number of centralizers in order
9 to prevent channeling.
10 Take a look at that. And that
11 bleeds over from that e-mail?
12 A. That's right.
13 Q. You read the bottom one, and
14 then you go to the second page and then you
15 go back up to the top.
16 A. (Reading.)
17 Q. Do you see that?
18 A. Yes, sir, I do.
19 Q. Did you have any earthly idea
20 that that kind of communication was going
on?
21 A. No, sir. I never knew that they
22 were having these discussions.
23 Q. Have you ever seen anything like
24 that in your years in the oilfield?
25 MR. GODFREY:
Page 180
1 Objection as to form.
2 THE WITNESS:
3 I really don't know how to
4 exactly answer that particular question
5 there, but this seems to be highly unusual,
6 though.
7 EXAMINATION BY MR. PENTON:
8 Q. You see on the second page where
9 it says that Walz is acknowledging that BP's
10 planning has been lagging behind the
11 operations. Do you see that?
12 A. Yes, sir.
13 Q. Is that a safe and best practice
14 for engineering and operations of a well
15 operator, its planning to be behind what
16 you're actually doing in operations?

17 MR. GODFREY:
18 Objection as to form.
19 THE WITNESS:
20 No, sir.
21 EXAMINATION BY MR. PENTON:
22 Q. I want to show you another
23 document, and it's Deposition Exhibit 1144.
24 If you would take a couple of minutes -- it's
25 a two-page document, but it's all found on
Page 181
1 this one page.
2 A. Okay.
3 Q. I would like you to read that,
4 if you could.
5 A. (Reading.)
6 Q. And probably read -- let's see,
7 the earliest one is 8:40 a.m. Do you see the
8 one down below, from John Guide to David
9 Sims?
10 A. Yes, sir, I see it.
11 Q. That's earlier in time that
12 morning on Saturday. Remember, this is
13 Saturday before Tuesday.
14 A. Okay.
15 Q. Okay.
16 A. (Reading.)
17 Q. When you finish reading the
18 first one, we'll talk about it.
19 A. I read the first part.
20 Q. You read the first part?
21 A. (Nodding head affirmatively.)
22 Q. Now, John Guide on Saturday
23 morning, three days before the blowout of the
24 well, is writing to his supervisor and saying
25 there were so many last-minute changes to
the
Page 182
1 operation that the well site leaders have
2 finally come to their wit's end.
3 Did, at this time, on the 17th
4 of April, did Robert Kaluza or Don Vidrine
5 disclose to you that they were at their wit's
6 end, that they were having problems with BP
7 in Houston?
8 A. No, sir, we never had any
9 discussions like that.
10 Q. And then the quote is "flying by
11 the seat of our pants."
12 Do you see that?
13 A. I do.
14 Q. Is that the kind of operations

15 that is the safe and best operations for the
16 very serious work being done on that well?
17 MR. GODFREY:
18 Objection as to form.
19 THE WITNESS:
20 No, sir, and it's not the type
21 of operation we were accustomed to having.
22 EXAMINATION BY MR. PENTON:
23 Q. You can't "fly by the seat of
24 your pants" with very serious downhole
25 decisions, can you?
Page 183
1 MR. GODFREY:
2 Objection as to form.
3 THE WITNESS:
4 No, sir.
5 EXAMINATION BY MR. PENTON:
6 Q. And then it talks about the high
7 level of paranoia from engineering leadership
8 is driving chaos. Do you see that?
9 A. I do.
10 Q. Doesn't this give you the
11 impression that the entire BP operations and
12 engineering is in the state of chaos just
13 like I told you?
14 MR. GODFREY:
15 Objection as to form.
16 THE WITNESS:
17 One could only think that that's
18 what it's indicating here.
19 EXAMINATION BY MR. PENTON:
20 Q. It's written here; isn't it?
21 A. Yes, sir.
22 Q. These are not well site leaders
23 on the rig. This is the top of the top on
24 the beach with these problems, is it not?
25 MR. GODFREY:
Page 184
1 Objection as to form.
2 THE WITNESS:
3 It's shore-based management for
4 sure.
5 EXAMINATION BY MR. PENTON:
6 Q. And then it says, "Brian" --
7 which is Brian Morel, correct, on the rig --
8 "has been trying to make sense of all the
9 insanity," and then it says, "last night's
10 emergency was centered around 30 barrels of
11 spacer."
12 Do you see?
13 A. Yes, sir, I do.

14 Q. And they worried about if it
15 would affect the bond logging. Do you see
16 that?
17 A. Yes, sir.
18 Q. Did anybody ever tell you from
19 BP that they were worried about if they did
20 the bond log that 30 barrels of spacer may
21 cause a difficulty?
22 MR. GODFREY:
23 Objection as to form.
24 THE WITNESS:
25 Never heard it.
Page 185
1 EXAMINATION BY MR. PENTON:
2 Q. Does it make you wonder why they
3 didn't do the bond log because of the
4 30 barrels of spacer, if you read that
5 document?
6 MR. GODFREY:
7 Objection as to form.
8 THE WITNESS:
9 Possibly.
10 EXAMINATION BY MR. PENTON:
11 Q. If a bond log had been run and
12 they found that the cement had channeled and
13 it wasn't what it should have been, based
14 upon your years of experience, BP could
have
15 remediated that, couldn't they?
16 A. Sure could.
17 Q. You could squeeze it, can't you?
18 A. Yes, sir, there are actions that
19 we could have taken.
20 Q. So is it better, if you think,
21 just like these e-mails show and these models
22 show from Halliburton, if you think there is
23 a severe risk of gas flow, a severe risk of
24 channeling if you're not using the right
25 centralization, a potential problem with the
Page 186
1 cement, you want to test it, you don't want
2 to take the chance, do you? You don't want
3 to take that chance that that cement barrier
4 is no good, do you?
5 MR. GODFREY:
6 Objection as to form.
7 THE WITNESS:
8 I wouldn't have thought so. I
9 didn't realize we were taking a chance.
10 EXAMINATION BY MR. PENTON:
11 Q. Is that -- is that appropriate

12 safety risk assessment and analysis to be
13 functioning like these documents say the
14 leadership in BP were functioning?
15 MR. GODFREY:
16 Objection as to form.
17 MR. KINCHEN:
18 Object to form.
19 THE WITNESS:
20 This is not the BP I'm used to
21 working with, what I'm seeing.
22 EXAMINATION BY MR. PENTON:
23 Q. I understand. You see that
24 Brian was even talking to Guide about trying
25 to find another job, do you see that?
Page 187
1 A. I do.

2 Q. And you see Guide in the last
3 paragraph is asking Sims, because of the,
4 basically the reorganization and the
5 separation of engineering and engineering,
6 John Guide did not know what his authority
7 was. Do you see that?
8 A. Yes, sir.
9 Q. And that is not conducive to the
10 safe and best practice where decisions are
11 being made by John Guide on that rig; was
it?
12 MR. GODFREY:
13 Objection as to form.
14 THE WITNESS:
15 I wouldn't think so.

Ezell Tr. at 160:25 – 170:12; 178:21 – 187:15.  There are several other examples:

- Transocean's Daun Winslow gave similar testimony to that of Ezell. Winslow Dep. at 94:6 – 97:4.

- John Keeton, Transocean's Rig Manager, was also read e-mails between BP personnel and then on that basis asked to comment on the "leadership" of BP's John Guide and opined that Guide could "improve on his listening skills."  Keeton Tr. at 5320 - 61:9.

- Keeton also rendered several other speculative opinions that went well beyond the scope of any appropriate factual testimony.  *Id.* at 105:7-13 (again opining on Guide's leadership); 545:16-22 (claiming knowledge as to BP's experience with negative pressure tests); 653:11-19 (opining as to BP's responsibilities to interpret test); 679:21-25 (and authority over the *Deepwater Horizon*).

- Several MMS employees where asked to, and did, opine outside the scope of their knowledge as fact witnesses – rendering legal opinions on BP's conduct:

  o David Trocquet was questioned – and speculated – as to BP's compliance with MMS regulations on the basis of several e-mails and documents that he had never seen before.  Trocquet Tr. at 255:10 – 258:14; 265:2 – 268.

  o Frank Patton was similarly confronted with and asked to opine on BP's conduct based not on any first-hand knowledge of BP's

interactions with the MMS, but on the basis of internal BP e-mails he had never seen before.  Patton Tr. at 317:24 – 321:2.

o     Michael Saucier was similarly asked to – and did – opine as to BPs' conduct based on nothing more than reading e-mails at his deposition.  Saucier Tr. at 449:25 – 450:20.

Asking witnesses to opine on events and correspondence of which they had no first-hand knowledge was a common practice at depositions.  A full listing of the designated deposition testimony to which BP has objected on Rule 701 grounds is attached as Exhibit A.

In short, there has been a proliferation of testimony from factual witnesses well beyond the testimonial purview contemplated by Rule 701.   Such testimony stands both as attempts to circumvent the applicable rules, and to permit these and similar instances to come into evidence at trial would thwart the "traditional objective of putting the trier of fact in possession of an accurate reproduction of the event" as provided for under the Rule.

<u>**Conclusion**</u>

For these reasons, BP respectfully requests that the Court enter an Order excluding all non-factual testimony by fact witnesses (either live or through deposition designations) as beyond the plain scope of Rule 701.

Dated: January 9, 2012                              Respectfully submitted,


                                                    /s / Don K. Haycraft

                                                    Don K. Haycraft (Bar #14361)
                                                    R. Keith Jarrett (Bar #16984)
                                                    LISKOW & LEWIS
                                                    One Shell Square
                                                    701 Poydras Street, Suite 5000
                                                    New Orleans, Louisiana 70139-5099
                                                    Telephone: (504) 581-7979
                                                    Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Timothy A. Duffy, P.C.
(tim.duffy@kirkland.com)
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
(mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Exploration &
Production Inc. & BP America Production
Company*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 9th day of January, 2012.

/s/  Don K. Haycraft__