UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER MAGISTRATE JUDGE |
| ……………………………………………... | : | SHUSHAN |

**BP'S MEMORANDUM IN SUPPORT OF ITS MOTION IN LIMINE TO LIMIT THE DRAWING OF ADVERSE INFERENCES FROM TESTIMONY IN WHICH A WITNESS HAS INVOKED THE FIFTH AMENDMENT**

Certain deponents in this litigation invoked their Fifth Amendment right against self-incrimination and refused to answer any substantive questions concerning the *Deepwater Horizon* incident. The PSC and other parties used these depositions to pose a number of specific, substantive questions – questions to which they knew they would not get answers – as a vehicle for presenting adverse inferences supporting their theories of liability.

BP submits that this "testimony" should not generally be used (or reprised with live witnesses if they appear) to draw adverse inferences as suggested by the PSC and others. While there are circumstances in which it is permissible to draw an adverse inference against a party when he invokes the Fifth Amendment in a civil case, there has been no showing that those circumstances exist in this case. Allowing wholesale inferences will improperly grant counsel carte blanche to establish whatever "facts" they wish with regard to some of the most critical events that led to the sinking of the *Deepwater Horizon* and the resulting oil spill.[1]  There has

---

[1] BP notes that, despite an obvious eagerness to seek adverse inferences from these witnesses' "testimony," neither the PSC nor any other party has come forward with any specific designation of precisely what they seek in terms of such inferences – much less provided any justifications for such inferences. BP respectfully requests that the Court require any party seeking an inference do so in a manner that allows BP and other parties to respond to that request with specificity.

been no showing that there are any legitimate inferences to be drawn against BP from this "testimony."

Alternatively, the court could simply defer its decision on the use of this testimony until all phases of this trial are complete, as there is a non-trivial chance that the circumstances that gave rise to the decisions to invoke the Fifth Amendment will have changed, at which point BP expects that these individuals may be in a position to testify in full.

## BACKGROUND

So far, a total of nineteen deponents have invoked the Fifth Amendment during their depositions. Of those, only three deponents – Mark Hafle, Robert Kaluza, and Brian Morel – were employed by BP. Eleven worked for Transocean, three for Halliburton, and two for OCS. Generally speaking, the parties attending these depositions received notice that the deponent would invoke his or her Fifth Amendment privilege to all substantive questions about the *Deepwater Horizon* incident and resulting oil spill. The deponents generally answered basic background questions, such as name, address, marital status, and prior deposition experience. But once counsel asked any question that went to a substantive issue in this case, they read a pre-written response invoking the Fifth Amendment. From that point forward through the remainder of the deposition, these deponents answered each question by saying "Same answer" to indicate he or she was invoking the privilege to that question. The pre-written statements give some insight into why particular witnesses invoked the privilege. For example, Mark Hafle explained:

> This is not an easy decision for me because I personally would like to testify, and I know that BP, my employer, would definitely like for me to testify. It would be my hope that the investigation being conducted by the Department of Justice will soon be completed or progressed to a stage where I can freely and openly discuss the case with all concerned. At that time, I'll be glad to answer all questions about whether—whatever information I may have. But until that point, I must follow my attorney's advice and invoke my Fifth Amendment rights and privileges.

2

M. Hafle Tr. at 12:17-13:3.

The PSC and other parties seized on the difficult circumstances these individuals found themselves in as an opportunity to ask specific, substantive questions for the purpose of generating adverse inferences to support their theories of liability. This "questioning" quickly turned into a free-for-all. Counsels' questions simply advanced their preferred version of events, knowing the witnesses would offer no contradictions. One favorite strategy was to ask Transocean or Halliburton employees to testify about BP's employees and actions, and then using that information to draw an adverse inference against BP (or vice versa). These "questions" and "answers" infer only what various counsel would like the facts to be.

Though no party has formally requested any particular adverse inference be drawn from this "testimony," the deposition-designation and deposition-summary processes have made it clear that the PSC and other parties intend to use these invocations of the Fifth Amendment to draw sweeping, wholesale inferences as to the facts to which these witnesses did not testify. While BP agrees that there may be some room in these proceedings for specific inferences based a witness's specific invocation of the right not to testify, nothing in the record to date supports the blanket permission the PSC and others apparently seek to draw inferences. [2]

### ARGUMENT

### I.    The Circumstances of this Case Weigh Against Admitting Adverse Inferences.

In *Baxter v. Palmigiano*, the Supreme Court held that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]" 425 U.S. 308, 318 (1976). But inferences are never

---

[2] BP does not seek to preclude the fact that a witness, or group of witnesses, has invoked the Fifth Amendment from the available evidence at trial. *See*, *e.g.*, *First Nat. Bank of Louisville v. Lustig*, CIV. A. 87-5488, 1993 WL 411260 at *1-2 (E.D. La. Oct. 7, 1993) ("[T]he court finds that reference to the invocations is not unfairly prejudicial because counsel may attempt to explain them . . . . However, no reference may be made to specific questions asked during the depositions because such would be unfairly prejudicial.").

mandatory. The Fifth Circuit has repeatedly recognized "that a witness's invocation may be so prejudicial in certain circumstances as to warrant its exclusion[.]" *Hinojosa v. Butler*, 547 F.3d 285, 294 (5th Cir. 2008); *see also Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 674 (5th Cir. 1999); *Harrell v. DCS Equip. Leasing Corp.*, 951 F.2d 1453, 1464-65 (5th Cir. 1992). "Courts that have addressed this issue have rejected bright-line rules, and instead have concluded that the party urging the use of the inference must show that the circumstances of the particular case justify the imputation of the negative inference." *State Farm Mut. Auto. Ins. Co. v. Abrams*, 96 C 6365, 2000 WL 574466 at *6 (N.D. Ill. May 11, 2000); *F.D.I.C. v. Fid. & Deposit Co. of Maryland*, 45 F.3d 969, 978 (5th Cir. 1995) (requiring evaluation on a case-by-case basis).

In *Libutti v. United States*—arguably the leading case on this issue—the Second Circuit suggested several non-exclusive factors to be considered in making this determination: (1) the nature of the relationship between the party against which the inference is sought and the witness; (2) the degree of control the party against which the inference is sought has over the witness; (3) the compatibility of interests of the party against whom the inference is sought and the witness in the outcome of the litigation; (4) the role of the invoker in the litigation; and (5) *"the overarching concern [of] whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth."* 107 F.3d 110, 123-24 (2d Cir. 1997). Applying these factors here shows that drawing adverse inferences across the board would be improper.

### A.   No Inferences May Be Drawn Against BP from the Invocation of the Fifth Amendment by Non-BP Employees.

Drawing an adverse inference from a non-BP employee's invocation of the Fifth Amendment against BP would be improper because these deponents owe no loyalty to BP; are not controlled by BP; and don't share compatible interests with BP. The nature of the

4

relationship between the witness and party against whom the inference is sought "should be examined . . . from the perspective of a non-party witness's loyalty to the plaintiff or defendant, as the case may be." *Id.* at 123.  The reasons courts have articulated for imputing an employee's silence against her employer simply don't apply to Transocean or Halliburton employees who invoked the privilege to questions about BP.  The absence of an employee-employer relationship between these deponents and BP means their testimony wouldn't otherwise be a vicarious admission.  *See Rad Servs., Inc.*, 808 F.2d at 276.  And non-BP employee deponents have no incentive to speak up in response to questions about BP.  *See id.* (holding inferences should be imputed from employee to employer because "an employee's self-interest would counsel him to exculpate his employer, if possible").  On the contrary, these deponents stand to benefit from remaining silent to questions about ***BP***, because the adverse inference would lay fault with BP, not ***their*** employer.  *See id.*  Because non-BP employees have no incentive to remain loyal to BP in this litigation, drawing adverse inferences against BP from their invocations would be improper.

Second, BP has no degree of control over these non-BP witnesses.  Here, too, the concern is that an employer has "vested in [the witness] key facts regarding the litigation in the instant case."  *Emerson v. Wembley USA Inc.*, 433 F. Supp. 2d 1200, 1213 (D. Colo. 2006).  Obviously, this factor cuts sharply against any attempt to draw inferences against BP from the "testimony" of individuals with no relationship to BP.  Finally, BP does not share any compatible interests in the outcome of the litigation with Transocean and Halliburton's witnesses.  Here "the trial court should evaluate . . . whether the assertion of the privilege advances the interests ***of both the witness and the affected party*** in the outcome of the litigation."  *Libutti*, 107 F.3d at 123 (emphasis added).  There is no support for the argument that the non-BP employee deponents

5

shared compatible interests with BP.  If anything, Transocean's and Halliburton's employees have opposing interests because adverse inferences against BP help their employers.

### B. Inferences Drawn Against BP from BP Employees' Invocations.

Admittedly, the employer-employee relationship between BP and its employees who invoked the Fifth Amendment calls for closer scrutiny.  As the Fifth Circuit held in *Curtis v. M&S Petroleum, Inc.*, care must be taken to ensure that barring adverse inferences from an employee to an employer does not "circumvent[] the Supreme Court precedent that corporate entities may not assert a Fifth Amendment privilege."  174 F.3d at 674.  Still, several courts have refused to admit adverse inferences drawn from the invocations of employee witnesses.  *See, e.g.*, *Akinyemi v. Napolitano*, 347 F. App'x 604, 607 (2d Cir. 2009); *United States v. Zerjav*, 4:08CV00207 ERW, 2009 WL 912821 (E.D. Mo. Mar. 31, 2009); *Miller v. Pilgrim's Pride Corp.*, 5:05CV00064, 2008 WL 178473 (W.D. Va. Jan. 16, 2008).  The mere presence of a relationship is secondary to the "nature" of that relationship.  *See Kontos v. Kontos*, 968 F. Supp. 400, 408 (S.D. Ind. 1997) (refusing to impute silence of defendant's *sister* to defendant).

Barring adverse inferences from BP employees will not "circumvent Supreme Court precedent."  In *Curtis*, the Fifth Circuit allowed the adverse inferences against the employer, but only because the employer chose the witness as its corporate representative for the deposition in which the privilege was invoked.  174 F.3d at 674-75.  Here the three BP deponents who invoked the Fifth Amendment were not proffered as corporate representatives of BP.  None of BP's *twenty-two* corporate-representative deponents invoked the Fifth Amendment, and no witness in this case did so at the request or urging of BP.  BP encouraged its employees to cooperate with investigations, and it ultimately acknowledged that each employee must decide for himself or herself whether to testify or invoke their rights under the Fifth Amendment to the U.S.

Constitution. No party has come forward with any evidence that BP has taken any steps to conceal information behind the shield of the privilege against self-incrimination – because there is no such evidence. The BP employees chose to invoke their constitutional rights on their own and with the advice of separate, independent counsel. Each of these individuals was (and is) represented by separate, independent counsel, and each decided to invoke the privilege for their own respective reasons.

Before drawing any adverse inferences from these BP employees against BP, the court should consider their invocations in the context of the litigation as a whole. In weighing the role of the invoker in the litigation, courts look to whether the invoking witness was "a key figure in the litigation and played a controlling role in respect to any of its underlying aspects." *Libutti*, 107 F.3d at 123-124. The BP employees at issue consist of a well-site leader and two drilling engineers. Although these individuals were involved in some of the key events that occurred at the Macondo Well, and do likely possess some unique knowledge, that does not mean that their invocation of the Fifth Amendment is so significant in the context of *the litigation as a whole* that the court must draw broad adverse inferences against BP.

### C. Trustworthiness and Advancement of the Truth

The court's "overarching concern" in drawing adverse inferences is whether each inference "is trustworthy under all of the circumstances and will advance the search for the truth." *Id.* at 124. Courts have held that sweeping or overbroad inferences that unfairly favor a party's case are not trustworthy. *Emerson*, 433 F. Supp. 2d at 1213-14. In *Emerson v. Wembley USA, Inc.*, the defendant's former employee invoked the Fifth Amendment to virtually all questions at his deposition because he was awaiting a separate criminal trial in connection with the employer. *Id.* at 1209. The plaintiff argued that this deponent "would have" made

7

statements supporting her claims against the defendants so she was entitled to an adverse inference against the defendants on each unanswered question. *Id.* at 1211.

The court, however, refused to admit any adverse inferences because: (1) the plaintiff sought inferences on all of the questions the deponent refused to answer, making the scope of the request overbroad and unreasonable; (2) the deponent was not the sole source of the answer to several of Plaintiff's questions; and (3) the plaintiff asked a number of questions without laying any foundation that the deponent had a role in the subject of the question, rendering any adverse inference on such questions "unfair." *Id.* at 1213-14.  Under these circumstances, the court held that "[t]o grant an adverse inference in Plaintiff's favor . . . would allow Plaintiff to bypass several required steps in proving her case" and that the plaintiff could not "use her fruitless deposition as a crutch to prop up her claims." *Id.* at 1214.

Here, like *Emerson*, the deponents refused to answer nearly all of the questions posed to them because of the threat of an underlying criminal investigation.  And here, like *Emerson*, opposing counsel "seeks to bypass several required steps in proving her case" by asking for adverse inferences that: (1) are massive in scope; (2) have been answered by other witnesses, such as BP's twenty-two corporate-representatives; and (3) are based on questions posed without the slightest bit of foundation.  The deponents invoked the Fifth Amendment to virtually all of the hundreds of questions posed to them.  Nevertheless, opposing counsel continued to pepper them with questions about every aspect of this litigation, knowing full well that the corporations' corporate-representatives could have answered—or had already answered—the same questions.  Counsel also frequently posed questions without laying a suitable foundation, asking Transocean and Halliburton employees about what BP employees knew or thought, and about the

responsibilities of other defendants and their personnel (and vice versa). The end result: attorney-generated scripts with no tether of legitimacy to the truth.

As the Fifth Circuit once wrote, "[t]he assertion of the [Fifth Amendment] privilege, particularly on the advice of counsel, is an ambiguous response. An attorney might advise her or his client not to answer questions simply as a safety measure lest the client disclose information that she or he may not even know to be criminal." *Farace v. Indep. Fire Ins. Co.*, 699 F.2d 204, 210-211 (5th Cir. 1983). Courts guard against improper inferences through a series of factors designed to determine whether the inferences sought advance the search for the truth. Here, they don't. If admitted, they'd only reward counsel for unjustly testifying on behalf of the deponents.

## II. Alternatively, the Court Should Defer Ruling Until After All Phases of the Trial are Complete.

Considering that opposing counsel has not come forward with any specific designation of precisely what they seek in terms of such inferences, this Court could alternatively defer any use of this testimony and adverse inferences until after all phases of this trial are complete and all evidence gathered. *See, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 02 CIV 3288 DLC, 2005 WL 375315 at *5 (S.D.N.Y. Feb. 17, 2005) (deferring a ruling on adverse inferences until it was possible to judge on a complete record the evidence available to all parties). There is a non-trivial chance that the issues that forced these individuals to invoke the Fifth Amendment issues will be resolved and that these deponents might be able to testify in full at a later date. Any drawing of inferences now is thus likely premature and avoidable.

At the very least, this court should set strict guidelines to ensure that opposing counsel cannot use just any invocation to draw an inference against BP. This court has previously compromised competing interests by allowing the party seeking an inference to note a witness's silence, but not reference the actual questions posed to it. *See First Nat. Bank of Louisville v.*

9

*Lustig*, CIV. A. 87-5488, 1993 WL 411260 at *1-2 (E.D. La. Oct. 7, 1993). But even if the court allows reference to particular questions, it should require that those questions seek information ***solely*** within the scope of the witness's personal knowledge, *see Emerson*, 433 F. Supp. 2d at 1213-14, and thus not constituting conclusory or ultimate issues of this litigation.

Further, "[b]efore an adverse inference may be drawn from a party's refusal to testify in a civil case, there must be independent corroborative evidence to support the negative inference beyond the invocation of the privilege." *Kontos*, 968 F. Supp. at 408; *see also In re Nat'l Liquidators, Inc.*, 182 B.R. 186, 195 (S.D. Ohio 1995). And, along those lines, the court should not draw an inference if there is enough other evidence and testimony to decide the issue without the aid of the inference. *State Farm*, 96 C 6365, 2000 WL 574466 at *7 (deciding summary judgment motion "without relying on Fifth Amendment adverse inferences" because it could); *Farace*, 699 F.2d at 211 (refusing to draw an adverse inference where "the defendant ha[d] ample opportunity to impeach its witness by other means").[3]

## CONCLUSION

BP respectfully requests that the Court enter an order limiting adverse inferences to be drawn from invocations of the Fifth Amendment during depositions or, alternatively, that the Court defer this issue until a later phase of the trial.

---

[3] As noted above, BP does not seek at this time an order from the Court categorically prohibiting all potential Fifth Amendment inferences in this litigation. BP agrees that specific instances may arise where an inference may properly be allowed, provided a specific inference is sought and justified under the parameters discussed above. No party has made any such request, or showing, to date, and there certainly has been no justification for broad, wholesale inferences that do nothing more than use the invocation of the Fifth Amendment as a sounding board for whatever "facts" counsel wishes to assert.

Dated: January 9, 2012

Respectfully submitted,

/s / Don K. Haycraft

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Timothy A. Duffy, P.C.
(tim.duffy@kirkland.com)
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
(mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Exploration & Production Inc. & BP America Production Company*

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 9th day of January, 2012.

      /s/  Don K. Haycraft__