**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In re: Oil Spill by the Oil Rig    *      **MDL No. 2179**

"Deepwater Horizon" in the Gulf    *

of Mexico on April 20, 2010    *      **SECTION "J"**

   *      **JUDGE BARBIER**

**This Document Relates to:**    *

**10-cv-04536**    *      **MAGISTRATE NO. 1**

   *      **MAGISTRATE SHUSHAN**

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*


**ANADARKO'S COMBINED MEMORANDUM OF LAW:**

(1)     **IN OPPOSITION TO THE PLAINTIFF UNITED STATES' SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE LIABILITY OF BP EXPLORATION AND PRODUCTION, INC., THE TRANSOCEAN DEFENDANTS, AND THE ANADARKO DEFENDANTS [REC. DOC. 4836];**

**AND**

(2)     **IN SUPPORT OF ANADARKO'S CROSS-MOTION FOR SUMMARY JUDGMENT AS TO ANADARKO'S NON-LIABILITY UNDER THE CWA.**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ............................................................................................................ vi

FACTUAL BACKGROUND ............................................................................................ 1

ARGUMENT ................................................................................................................... 3

I.      Standard of Review Under Fed. R. Civ. P. 56. ................................................... 3

II.     Anadarko is Not Liable for CWA Civil Penalties .............................................. 4

       A.     Anadarko was not an Owner, Operator, or Person in Charge of an
Offshore Facility or Vessel from which Oil Discharged into the Gulf of
Mexico ................................................................................................... 5

              1.     The Macondo Well and the *Deepwater Horizon* are separate and
distinct for purposes of the CWA. .......................................... 6

              2.     It is undisputed that oil discharged only from the *Deepwater
Horizon* and its appurtenances. .............................................. 8

              3.     Anadarko was not an owner, operator, or person in charge of the
*Deepwater Horizon* ................................................................ 9

       B.     The United States' Argument that there was a Single Discharge of Oil
from Both the *Deepwater Horizon* and the Macondo Well is
Unprecedented and Contrary to the Plain Text of the CWA. ............................. 10

              1.     The presumption against broad interpretations of penalty statutes
and the rule of lenity defeat the United States' interpretation ................ 11

              2.     The United States' contention that oil discharged from *both* the
Macondo Well and from the *Deepwater Horizon* is foreclosed by
the plain text of the CWA. ....................................................... 12

              3.     Only the owners and operators of the *Deepwater Horizon* had
"operational responsibility" over the source of the discharge ................ 17

       C.     The United States' "Operator as a Matter of Law" Theory is Meritless ............. 18

              1.     The CWA does not impose operator liability on non-operating
lessees ..................................................................................... 19

               2.     The Supreme Court's *Bestfoods* test for determining "operator"
status governs this case ........................................................... 21

               3.     Even if OCSLA and its regulations could be used to define terms
in the CWA, the "operator as a matter of law" theory still fails ............. 22

III.    The Court Should Deny the United States' Motion For  Summary Judgment on
the OPA Liability Cap ....................................................................................... 24

      CONCLUSION ................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACC Chemical Co. v. Halliburton Co.*,
 932 F. Supp. 233, 237-38 (S.D. Iowa 1995) ........................................................................17

*Acker v. Comm'r of Internal Revenue*,
 258 F.2d 568 (6th Cir. 1958), *cert. denied*, 358 U.S. 940 (1959)...........................................11

*Ambraco, Inc. v. PROJECT EUROPA MV*,
 119 Fed. Appx. 676 (5th Cir. 2005).......................................................................................25

*Chevron U.S.A., Inc. v. Watt*,
 564 F. Supp. 1256 (E.D. La. 1983).........................................................................................23

*Diamond Roofing Co. v. Occupational Safety and Health Review Comm'n*,
 528 F.2d 645 (5th Cir. 1976) ..................................................................................................23

*Freemanville Water Sys., Inc. v. Poarch Band of Creek Indians*,
 563 F.3d 1205 (11th Cir. 2009) ..........................................................................................7, 21

*Fruge ex rel. Fruge v. Parker Drilling Co.*,
 337 F.3d 558 (5th Cir. 2003) ..................................................................................................24

*Harris v. Oil Reclaiming Co.*,
 94 F. Supp. 2d 1210 (D. Kan. 2000).......................................................................................22

*Hatfried, Inc., v. C.I.R.*,
 162 F.2d 628 (3d Cir. 1947)....................................................................................................11

*In re: Cameron Int'l Corp.*,
 No. 11-30987, at 6-7 (5th Cir. 2011) ........................................................................................8

*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*,
 Civ. A. No. 10-MDL-2179 (E.D. La. Nov. 18, 2011) .................................................... passim

*Joy v. Hay Group, Inc.*,
 403 F.3d 875 (7th Cir. 2005) (Posner, J.) ...............................................................................14

*Leocal v. Ashcroft*,
 543 U.S. 1 (2004)....................................................................................................................12

*Lightfoot v. MXEnergy, Inc.*,
 No. 10-2794, 2011 WL 1899764 (E.D. La., May 19, 2011) (Lemelle, J.) ...........................7, 8

*Little v. Liquid Air Corp.*,
   37 F.3d 1069 (5th Cir. 1994) ..........................................................................................4

*Mississippi Poultry Ass'n v. Madigan*,
   992 F.2d 1359 (5th Cir. 1993) ......................................................................................14

*Niagara Mohawk Power Corp. v. Jones Chemical Inc.*,
   315 F.3d 171 (2d Cir. 2003)..........................................................................................15

*Pac. Operators Offshore, LLC*,
   181 Interior Dec. 165, 2011 WL 3364982 (IBLA 2011)........................................................23

*Quindlen v. Prudential Ins. Co. of Am.*,
   482 F.2d 876 (5th Cir. 1973) ..........................................................................................7

*Russello v. United States*,
   464 U.S. 16 (1983)........................................................................................................7

*Shell Oil Co. v United States*,
   538 F.2d 346 (Ct. Cl. 1976) ..........................................................................................13

*Sierra Club, Inc. v. Tyson Foods, Inc.*,
   299 F. Supp. 2d 693 (W.D. Ky. 2003)..............................................................................22

*St. Paul Fire & Marine Ins. Co. v. Pham*,
   Civil Action No. 06-2597, 2007 WL 1466747 (E.D. La., May 18, 2007) (Feldman, J.) ........19

*Tull v. United States*,
   481 U.S. 412 (U.S. 1987)........................................................................................11, 21

*Union Petroleum Corp. v United States*,
   651 F.2d 734 (Ct. Cl. 1981) ......................................................................................17, 18

*United States v. Bestfoods*,
   524 U.S. 51 (1998)..............................................................................................9, 21, 22

*United States v. BP Exploration & Prod., Inc.*,
   No. 10-cv-04536 (E.D. La. Dec. 15, 2010)........................................................................6

*United States v. The Catherine*,
   116 F. Supp. 668, 669 (D. Md. 1953) ..............................................................................17

*United States v. Chotin Transportation, Inc.*,
   649 F. Supp. 356, 358 (S.D. Ohio 1986) ..........................................................................16

*United States v. Mendoza*,
   565 F.2d 1285, *on reh'g*, 581 F.2d 89 (5th Cir. 1978)..........................................................14

*United States v. Mobil Oil Co.*,
464 F.2d 1124 (5th Cir. 1972) .................................................................. 9

*United States v. Plaza Health Labs., Inc.*,
3 F.3d 643 (2d Cir. 1993) ....................................................................... 12

*United States v. Thompson/Center Arms Co.*,
504 U.S. 505 (1992) (plurality opinion) ................................................ 12

*World Ins. Co. of Omaha, Neb. v. Pipes*,
255 F.2d 464 (5th Cir. 1958) ................................................................. 11

STATUTES

33 U.S.C. § 1319(c) ..................................................................................... 12

33 U.S.C. 1321(a)(2) ................................................................................. 5, 14

33 U.S.C. § 1321(a)(3) ................................................................................... 6

33 U.S.C. § 1321(a)(6) ................................................................................ 6, 9

33 U.S.C. § 1321(a)(11) ............................................................................. 6, 7

33 U.S.C. § 1321(b)(6)-(7) ........................................................................... 22

33 U.S.C. § 1321(b)(7)(A) (hereafter "CWA section 311(b)(7)(A)") ............... 1, 11, 19

33 U.S.C. § 2701(18) ..................................................................................... 7

33 U.S.C. § 2701(32)(C) ............................................................................... 20

33 U.S.C. § 2702 ............................................................................................ 1

33 U.S.C. § 2704(c) ...................................................................................... 24

33 U.S.C. § 2704(c)(1) .............................................................................. 24, 25

43 U.S.C. § 1348(b) ............................................................................. 19, 22, 23

43 U.S.C. § 1348(b)(2) .................................................................................. 23

33 U.S.C. § 1321(b)(3) ................................................................................... 5

70 C.J.S. Penalties § 4 ................................................................................... 11

Pub. L. No. 95-372, 92 Stat. 629, § 301 (1978) ............................................ 20

Pub. L. No. 101-380, 104 Stat. 484, § 4301(b) ....................................... 20, 21

**OTHER AUTHORITIES**

30 C.F.R. § 250.105 ..................................................................................................23

30 C.F.R. § 250.143(a) ...............................................................................................2

30 C.F.R. § 250.146(b) ..............................................................................................24

1990 U.S.C.C.A.N. 722 (1990) ..............................................................................7, 20

1990 U.S.C.C.A.N. 779 ..............................................................................................16

Fed. R. Civ. P. 56 ........................................................................................................3

FED. R. CIV. P. 56(a) ...................................................................................................3

H.R. CONF. REP. 101-653 (1990) ..............................................................................16

RESTATEMENT (SECOND) OF TORTS § 430 (2011) .......................................................25

S. REP. NO. 101-94 ..............................................................................................7, 20

## TABLE OF EXHIBITS

### Contracts/Agreements

1.  *Amendment No. 38 to Drilling Contract No. 980249*, Dep. Ex. 1488, BP-HZN-CEC041475 (9/28/2009) (excerpts) *(Confidential; Pending Motion to File Exhibit Under Seal)*

2.  *Assignment of Record Title Interest in Federal OCS Oil and Gas Lease*, Dep. Ex. 2317, ANA-MDL-000023861 (executed 4/15/2010) ("Assignment") *(Confidential; Pending Motion to File Exhibit Under Seal)*

3.  *Drilling Contract: RBS-8D Semisubmersible Drilling Unit [the Deepwater Horizon], Vastar Resources, Inc. and R&B Falcon Drilling Co., Contract No. 980249*, Dep. Ex. 4271, BP-HZN-MBI00021460 (12/9/1998) ("Drilling Contract") (excerpts) *(Confidential; Pending Motion to File Exhibit Under Seal)*

4.  *Lease Exchange Agreement among BP, AE&P, and APC*, Dep. Ex. 2824, BP-HZN-2179MDL02319086 (10/1/2009; executed 12/17/2009) ("Lease Exchange Agreement") (excerpts) *(Confidential; Pending Motion to File Exhibit Under Seal)*

5.  *Lease Exchange Agreement between BP and MOEX*, Dep. Ex. 1244, DWHMX00000247 (10/1/2009; executed 11/18/2009) (excerpts) *(Confidential; Pending Motion to File Exhibit Under Seal)*

5A. *Exhibit B to Lease Exchange Agreement between BP and MOEX*, BP-HZN-2179MDL00339265 *(Confidential; Pending Motion to File Exhibit Under Seal)*

6.  *Macondo Prospect Offshore Deepwater Operating Agreement*, Dep. Ex. 1243, APC-HEC1-000001601 (ratified by APC and AE&P on 12/17/2009) ("Operating Agreement") (excerpts) *(Confidential; Pending Motion to File Exhibit Under Seal)*

7.  *Macondo Prospect Well Participation Agreement, Deepwater Gulf of Mexico*, Dep. Ex. 2825, BP-HZN-2179MDL02319125 (10/1/2009; executed 12/17/2009) ("Well Participation Agreement") (excerpts) *(Confidential; Pending Motion to File Exhibit Under Seal)*

### Reports

8.  Robert D. Grace, *Expert Report on Behalf of BP* [BP Expert Report] ("Grace Report") (excerpts) *(Confidential; Pending Motion to File Exhibit Under Seal)*

9.  Richard Heenan, *BP Macondo - Deepwater Horizon: Report for the United States of America* [U.S. Expert Report], Dep. Ex. 7528 ("Heenan Report") (excerpts)

10. Geoff Webster, *Deepwater Horizon Explosion on April 20, 2010. FRCP Rule 26 Report of Geoff Webster* [PSC Expert Report] ("Webster Report") (excerpts)

11. *Deepwater Horizon Accident Investigation Report*, Dep. Ex. 1 (9/8/2010) ("Bly Report") (excerpts)

12. *Macondo Well Incident: Transocean Investigation Report*, Vol. 1, Dep. Ex. 4248 (6/2011) ("Transocean Report") (excerpts)

**Other Deposition Exhibits and Documents**

13. *MMS Online Agency Records Serial Register Page*, IMS059-014814 ("Agency Records")

14. *Application for Permit to Drill a New Well for MC 252* [Macondo APD], Dep. Ex. 4021, BP-HZN-SNR00000122 (5/26/2009) (excerpts)

15. *Halliburton Deepwater Horizon Investigation presentation* ("Halliburton Investigation"), Dep. Ex. 5270, HAL_1150082 (9/20/2010) (excerpts) *(Confidential; Pending Motion to File Exhibit Under Seal)*

16. *MC 252 #1 Macondo Prospect Drilling Program January 2010 Final*, Dep. Ex. 291, TRN-HCJ-00093526 (1/27/2010) (excerpts) *(Confidential; Pending Motion to File Exhibit Under Seal)*

17. *E-mail from Mike Daly (BP) to David Rainey and Jasper Peijs re: Macondo deals*, Dep. Ex. 3239, BP-HZN-2179MDL01833704 (10/22/2009) *(Confidential; Pending Motion to File Exhibit Under Seal)*

18. *E-mail from Paul Tooms to various BP and U.S. Government personnel re: Drawings as requested on the call today (with attachments)*, Dep. Ex. 6215, BP-HZN-2179MDL01616040 (5/16/2010) *(Confidential; Pending Motion to File Exhibit Under Seal)*

19. *Smit Salvage Daily Progress Report*, Dep. Ex. 5309, SMIT_00501 (4/22/2010)

20. *Authorization for Expenditure*, Dep. Ex. 1919, APC-SHS2A-000001082 (12/17/2009) *(Confidential; Pending Motion to File Exhibit Under Seal)*

21. *Authorization for Expenditure*, Dep. Ex. 1920, ANA-MDL-000030713 (2/18/2010) *(Confidential; Pending Motion to File Exhibit Under Seal)*

22. *Second Supplemental Authorization for Expenditure*, Dep. Ex. 1921, ANA-MDL-000030687 (3/30/2010) *(Confidential; Pending Motion to File Exhibit Under Seal)*

23. *Authorization for Expenditure*, Dep. Ex. 1922, ANA-MDL-000030726 (4/15/2010) *(Confidential; Pending Motion to File Exhibit Under Seal)*

24. *January 2010 Invoice from BP to APC*, Dep. Ex. 4204, BP-HZN-2179MDL02752577 *(Confidential; Pending Motion to File Exhibit Under Seal)*

25.    *February 2010 Invoice from BP to APC*, Dep. Ex. 4206, BP-HZN-2179MDL02379545 *(Confidential; Pending Motion to File Exhibit Under Seal)*

26.    *March 2010 Invoice from BP to APC*, Dep. Ex. 4208, BP-HZN-2179MDL02379484 *(Confidential; Pending Motion to File Exhibit Under Seal)*

27.    *April 2010 Invoice from BP to APC*, Dep. Ex. 4210, BP-HZN-2179MDL02379499 *(Confidential; Pending Motion to File Exhibit Under Seal)*

28.    *May 2010 Invoice from BP to APC*, Dep. Ex. 4212, ANA-MDL-000073379 *(Confidential; Pending Motion to File Exhibit Under Seal)*

29.    *MMS Designation of Operator Form*, BP-HZN-2179MDL02319165 (12/17/2009) *(Confidential; Pending Motion to File Exhibit Under Seal)*

## Court Documents

30.    Order and Reasons as to Motions to Dismiss the B1 Master Complaint, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La. Aug. 26, 2011), ECF No. 3830 ("B1 Order") (excerpts)

31.    The BP Parties' Responses and Objections to Defendant Anadarko E&P Company LP's First Requests for Admissions, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La. May 27, 2011) ("BP First Responses") (excerpts)

32.    The BP Parties' Supplemental Responses and Objections to Defendant Anadarko Petroleum Corporation's First Requests for Admissions, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La. Sept. 23, 2011) ("BP Supplemental Responses") (excerpts)

33.    United States of America's Revised Responses to the Applicable Requests Contained within the Various Defendants' Second Joint Discovery Requests to Plaintiffs, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La. Sept. 19, 2011) ("U.S. Revised Responses") (excerpts)

34.    Response on Behalf of Triton Asset Leasing GMBH, Transocean Holdings LLC, Transocean Deepwater Inc., and Transocean Offshore Deepwater Drilling Inc. to BP Parties' First Set of Requests for Admission, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La. July 15, 2011) ("Transocean First Responses") (excerpts)

## Testimony

35.    Deposition of Michael Beirne, Vol. 1 and Vol. 2, dated June 27-28, 2011 (excerpts)

36.     Deposition of Gordon Birrell, Vol. 1 and Vol. 2, dated September 14-15, 2011 (excerpts)

37.     Deposition of Mark Bly, Vol. 1 and Vol. 2, dated February 17-18, 2011 (excerpts) *(Confidential; Pending Motion to File Exhibit Under Seal)*

38.     Deposition of Robert Bodek, Vol. 2, dated April 12, 2011 (excerpts)

39.     30(b)(6) Deposition of Jerry Byrd, dated July 13, 2011 (excerpts)

40.     30(b)(6) Deposition of James Cowie, Vol. 1 and Vol. 2, dated June 29-30, 2011 (excerpts)

41.     Deposition of John Guide, Vol. 2, dated May 10, 2011 (excerpts)

42.     30(b)(6) Deposition of Darrell Hollek, dated June 22, 2011 (excerpts)

43.     Deposition of Ian Little, Vol. 2, dated June 10, 2011 (excerpts)

44.     Deposition of Jim McWhorter, Vol. 2, dated July 21, 2011 (excerpts)

45.     30(b)(6) Deposition of Patrick O'Bryan, Vol. 2, dated July 15, 2011 (excerpts)

46.     Deposition of Frank Patton, Vol. 2, dated July 14, 2011 (excerpts)

47.     30(b)(6) Deposition of Robert Quitzau, Vol. 1 and Vol. 2, dated May 25-26, 2011 (excerpts)

48.     Deposition of David Rainey, Vol. 2, dated June 3, 2011 (excerpts)

49.     30(b)(6) Deposition of David Rich, Vol. 1, dated June 1, 2011 (excerpts)

50.     Deposition of Steve Robinson, dated January 27, 2011 (excerpts)

51.     30(b)(6) Deposition of Michael Saucier, Vol. 2, dated July 28, 2011 (excerpts)

52.     Deposition of Jonathan Sprague, Vol. 2, dated March 22, 2011 (excerpts)

53.     Deposition of Vincent Tabler, Vol. 2, dated June 14, 2011 (excerpts)

54.     30(b)(6) Deposition of Paul Tooms, Vol. 1, dated June 16, 2011 (excerpts)

55.     Deposition of Gregory Walz, Vol. 2, dated April 22, 2011 (excerpts)

56.     30(b)(6)   Deposition   of   Kirk   Wardlaw,   dated   June   9,   2011   (excerpts)

## INTRODUCTION

The United States has moved for partial summary judgment that Anadarko Petroleum Corporation ("APC") and Anadarko E&P Company LP ("AE&P") (together "Anadarko") are liable for damages and removal costs under the Oil Pollution Act ("OPA"), and liable for civil penalties under the Clean Water Act ("CWA"), 33 U.S.C. § 1321(b)(7)(A) (hereafter "CWA section 311(b)(7)(A)") [Rec. Docs. 4836; 4836-1] ("U.S. Mem.").  Anadarko opposes the United States' Motion, and cross-moves for summary judgment that Anadarko is not liable under CWA section 311(b)(7)(A), because oil discharged into the Gulf of Mexico only from the vessel *Deepwater Horizon* and its appurtenances, and Anadarko was not an owner, operator, or person in charge of the *Deepwater Horizon*.  The United States' arguments to the contrary are meritless.

APC does not contest its responsible party status under OPA.  However, the Court should deny the United States' Motion for summary judgment that APC is not entitled to assert the OPA liability cap, because that issue turns on issues of disputed material fact.[1]

## FACTUAL BACKGROUND

The undisputed facts relevant to Anadarko's Cross-Motion for Summary Judgment are set forth in Anadarko's Combined Response to the United States' Statement of Material Undisputed Facts and Anadarko's Statement of Undisputed Material Facts In Support of Cross-

---

[1]        AE&P has moved to dismiss the United States' OPA claim against it on the ground that, as a matter of law, AE&P was not a lessee of the area in which the *Deepwater Horizon* was operating at the time of the discharge, and therefore AE&P is not a responsible party under OPA, 33 U.S.C. § 2702.  *See* AE&P Motion to Dismiss the Complaint of the United States, and Memorandum in Support [Rec. Docs. 1861,1861-1]; AE&P's Reply in Support of Motion to Dismiss [Rec. Doc. 3113].  That motion is still pending.  The Court declined to dismiss the B1 Plaintiffs' similar OPA claim against AE&P on the pleadings, holding that the Plaintiffs had alleged a "colorable" OPA claim against AE&P.  B1 Order [Rec. Doc. 3830] at 35.  The evidentiary record is sufficiently developed that summary judgment as to AE&P's responsible party status under OPA is proper, and, in the interest of preserving judicial and litigant resources, AE&P respectfully reasserts the legal arguments set forth in its already pending Motion to Dismiss and Memoranda in Support, as if set forth herein.

Motion for Summary Judgment (hereafter "SMF") filed herewith.[2]  Those undisputed facts are summarized as follows.

BP Exploration and Production, Inc. ("BP"), acquired an oil and gas lease for Mississippi Canyon Block 252, OCS-G32306 ("the Macondo Lease" or "the Macondo leasehold") from the United States effective June 1, 2008.  [SMF at 2, ¶ 1].  On December 17, 2009, APC, AE&P, and BP executed three agreements regarding the Macondo leasehold, each effective October 1, 2009: (a) the Lease Exchange Agreement, governing the parties' interests in the Macondo Lease; (b) the Well Participation Agreement, governing participation in the initial exploratory well on the Macondo Lease (the "Macondo Well"); and (c) the Ratification and Joinder of the Macondo Prospect Offshore Deepwater Operating Agreement ("Operating Agreement"), governing oil and gas operations on the leasehold.   [SMF at 12-15, ¶¶ 27, 31, 33; *see also* 24 at ¶ 1].   The Operating Agreement designated BP as the "Operator" of the Macondo lease, [SMF at 25, ¶ 2], and BP therefore was solely responsible for conducting or causing to be conducted all oil and gas operations on the Macondo leasehold, including, but not limited to, drilling and exploration operations.[3]   [SMF at 25-26, ¶ 3].   Anadarko was a non-operating investor in the Macondo Lease.  [SMF at 26, ¶ 4].

On April 20, 2010, while preparing to temporarily abandon the Macondo Well, the *Deepwater Horizon* lost control of the well, and a blowout occurred.  [SMF at 30, ¶ 17].   The

---

[2]      To the extent there are any material facts in dispute relevant to the United States' claim that Anadarko is liable for civil penalties under CWA Section 311(b), all parties agree that such issues must be resolved by a jury. *See* Transcript of Nov. 18, 2011 Status Conference at 66:20-24, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, Civ. A. No. 10-MDL-2179 (E.D. La. Nov. 18, 2011) (Statement of Mr. O'Rourke) (agreeing that whether Anadarko is an "owner, operator or person in charge" for purposes of CWA liability "would be subject to a jury claim[.]").

[3]      Pursuant to 30 C.F.R. § 250.143(a), when, as here, there is more than one lessee on a leasehold, BOEM/BSSE regulations <u>require</u> the lessees to designate a single "Operator" by submitting a Designation of Operator form (Form MMS-1123).  On October 1, 2011, the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE), formerly the Minerals Management Service (MMS), was replaced by the Bureau of Ocean Energy Management (BOEM) and the Bureau of Safety and Environmental Enforcement (BSEE).

production casing cement job failed to achieve zonal isolation and failed to prevent hydrocarbons from migrating into the wellbore from the formation. [SMF at 5-6, ¶ 11; 31-32, ¶ 18]. Hydrocarbons from the formation flowed through the well and the *Deepwater Horizon's* blowout preventer ("BOP"), and proceeded up the *Deepwater Horizon*'s riser. [SMF at 31-32, ¶ 18]. As hydrocarbons shot up through the derrick toward the crown block of the *Deepwater Horizon*, the vessel's crew responded by routing the hydrocarbons through the *Deepwater Horizon's* mud-gas separator. [SMF at 32, ¶ 19]. The flow of hydrocarbons overwhelmed the *Deepwater Horizon's* mud-gas separator, at which point hydrocarbons discharged from multiple vents onto and out of the operating deck of the *Deepwater Horizon* and into the Gulf of Mexico. [SMF at 32, ¶ 19]. Despite several attempts by the vessel's crew to activate the *Deepwater Horizon's* BOP, the BOP failed to seal off the riser, allowing hydrocarbons to continue to discharge from the vessel. [SMF at 32, ¶ 20]. The hydrocarbons discharging from the vessel ignited, causing explosions and fire. [SMF at 32, ¶ 21]. The *Deepwater Horizon's* crew attempted to activate the vessel's emergency disconnect system, which failed to cut the drilling riser and disconnect the *Deepwater Horizon* from its BOP. [SMF at 32, ¶ 21].

The fire onboard the *Deepwater Horizon* continued until April 22, 2010, when the hull became structurally unsound and the operating platform and derrick sank, causing the attached riser pipe to bend and break. [SMF at 30, 33, ¶¶ 17, 22]. Thereafter, oil continued to discharge from the vessel's broken riser into the Gulf of Mexico. [SMF at 33, ¶ 23].

## **ARGUMENT**

## I.     **STANDARD OF REVIEW UNDER FED. R. CIV. P. 56.**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' . . . by

'conclusory allegations,' . . . by 'unsubstantiated assertions,' . . . or by only a 'scintilla' of evidence . . . We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Davis v. Chevron U.S.A., Inc*., 14 F.3d 1082 (5th Cir. 1994); *Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994)) (internal citations omitted).  If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted.

## II.     ANADARKO IS NOT LIABLE FOR CWA CIVIL PENALTIES.

Two factors are crucial to the resolution of these motions.  First, the unlawful discharge in this case came "from" the *Deepwater Horizon*, including the vessel's appurtenances.  As the Court has repeatedly observed, this case arises "from the April 20, 2010 explosion, fire, and sinking of the DEEPWATER HORIZON mobile offshore drilling unit ("MODU"), which resulted in the release of millions of gallons of oil into the Gulf of Mexico . . . ."  *E.g.*, B1 Order at 1.  In concluding that maritime law governs this case, the Court held that "the blowout, explosions, fire, and subsequent discharge of oil, occurred on or from the DEEPWATER HORIZON and its appurtenances . . . ."  *Id.* at 8.  As these holdings recognize, this is a case about the operation of a vessel.  All parties agree that the owners and operators of the vessel and their on-board contractors failed to maintain control of the Macondo Well, and as a result of that failure, hydrocarbons discharged from the vessel and its appurtenances into the Gulf of Mexico.

Second, it is indisputable, and this Court's Orders make clear, that the non-operating investors in the lease had no operational control over the vessel or its activities on the Macondo leasehold, and were not at fault for the discharge of oil.  *Id.* at 28.

Nevertheless, the United States seeks to impose potentially massive CWA penalties not just on the owners and operators of the *Deepwater Horizon*—the obvious and intended targets of the CWA—but also on the non-operating investors in the mineral lease, Anadarko and MOEX Offshore 2007.   In its unprecedented grab for additional penalties from the non-operating investors, the United States stretches the text of the CWA beyond its breaking point.

No court has ever imposed CWA penalties on blameless non-operating investors in a mineral lease.  This Court should not be the first.  There is no genuine factual dispute that the discharge came from the *Deepwater Horizon*, and no factual dispute that the non-operating investors were not "operators" of anything.  Thus, in its effort to impose penalties on Anadarko, the United States must convince the Court of two counterintuitive propositions.  First, the United States argues that the oil that <u>in fact discharged</u> from the vessel should be considered to have also been "discharged" from the subsurface well.  Second, the United States argues that despite the Court's rulings that the non-operating investors did not <u>in fact operate</u> the well, they should nonetheless be held liable as "operators" as a matter of law.  The United States' contortions are unprecedented, illogical, and contrary to settled law.

A.     **Anadarko was not an Owner, Operator, or Person in Charge of an Offshore Facility or Vessel from which Oil Discharged into the Gulf of Mexico.**

The CWA prohibits the unpermitted discharge of oil, *i.e.*, the "spilling, leaking, pumping, pouring, emitting, emptying or dumping" of oil, into navigable waters.  33 U.S.C. §§ 1321(a)(2), (b)(3).  Under CWA section 311(b)(7)(A), "[a]ny person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility **from which oil . . . is discharged**" is liable for civil penalties (emphasis added).   The United States must therefore prove that Anadarko was an "owner, operator, or person in charge" of a vessel or offshore facility "from which" oil was discharged.

The undisputed facts prove Anadarko has no liability for CWA penalties.  All parties agree that oil spilled from the *Deepwater Horizon* and its appurtenances.  No party contends that Anadarko was an owner of the *Deepwater Horizon*, and it is undisputed, as this Court has repeatedly held, that Anadarko was not an operator or person in charge of the vessel.  Only the owners, operators, and/or persons in charge of the *Deepwater Horizon* may be liable for CWA penalties.[4]   There is no basis for imposing CWA liability on Anadarko.

> **1.**     **The Macondo Well and the *Deepwater Horizon* are separate and distinct for purposes of the CWA.**

The CWA draws distinct lines between a "vessel" and an "offshore facility."  For purposes of the CWA, the *Deepwater Horizon* was at all times a "vessel."  33 U.S.C. §§ 1321(a)(3), (6).  The CWA defines a "vessel" as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water other than a public vessel."  33 U.S.C. § 1321(a)(3).  As this Court has held, "[u]nder clearly established law, the DEEPWATER HORIZON was a vessel, not a fixed platform" and "was at all material times a vessel in navigation."  B1 Order at 5, 37.  It is further undisputed, as the United States expressly alleges, that the *Deepwater Horizon's* BOP and riser were appurtenances of the vessel.  U.S. Compl. at ¶ 12, *United States v. BP Exploration & Prod., Inc.*, No. 10-cv-04536 (E.D. La. Dec. 15, 2010) [Rec. Doc. 1].

Under the CWA, the Macondo Well is an "offshore facility."  33 U.S.C. § 1321(a)(11).  *See* U.S. Mem. at 19.  The CWA defines an "offshore facility" as "any facility of any kind

---

[4]      Transocean has admitted that it is both an owner and an operator of the *Deepwater Horizon*. Transocean Answer [Rec. Doc. 1420] at ¶¶ 19-21, 74.  BP contracted the *Deepwater Horizon* from Transocean, and was held to be "solely responsible" for operations on the leasehold."  B1 Order at 28.  BP therefore also may be found to be an operator of the *Deepwater Horizon* under the CWA.  33 U.S.C. § 1321(a)(6) (defining "owner or operator" of a vessel as "any person owning, operating, or chartering by demise, such vessel . . . .").  The United States has alleged but not sought summary judgment at this time as to whether BP was also an "operator" of the *Deepwater Horizon*. U.S. Mem. at 2 n.5.

located in, on, or under, any of the navigable waters of the United States, and any facility of any kind which is subject to the jurisdiction of the United States and is located in, on, or under any other waters, **other than a vessel or a public vessel**."   33 U.S.C. §1321(a)(11) (emphasis added).   Offshore facilities are thus defined primarily in terms of what they are not: <u>vessels</u>. Consequently, any form of vessel, including a MODU like the *Deepwater Horizon*, cannot also be an offshore facility, and cannot itself be a component of an offshore facility.   Accordingly, as the United States recognizes, only the "wellbore, wellhead, casings, and tubulars" of the Macondo Well constitute an "offshore facility," and the Macondo Well is separate and distinct from the *Deepwater Horizon* and its appurtenances.[5]  U.S. Mem. at 19.

Congress's treatment of facilities and vessels as mutually exclusive categories carries over into CWA Section 311(b)(7)(A), which uses the disjunctive "or" to impose civil penalties on the owners and operators of "any vessel, onshore facility, **or** offshore facility" from which oil discharges.   As a general rule, "the use of a disjunctive in a statute indicates alternatives and requires that those alternatives be treated separately." *Quindlen v. Prudential Ins. Co. of Am.*, 482 F.2d 876, 878 (5th Cir. 1973); *Lightfoot v. MXEnergy, Inc.*, No. 10-2794, 2011 WL 1899764, at *2 (E.D. La., May 19, 2011) (Lemelle, J.) ( "[T]he statute's use of the disjunctive 'or' means . . . not both . . . .").   Thus, under the CWA, a single discharge of oil must come either "from" an offshore facility or "from" a vessel, but a single discharge cannot be "from" both.

---

[5]       OPA defines MODUs as "vessels" that can be used as "offshore facilities," 33 U.S.C. § 2701(18). Conversely, the CWA does not distinguish between MODUs and other types of vessels.   Congress could have amended the CWA's language to include OPA's definition of a MODU, but chose to retain the CWA's original language strictly separating all vessels from all facilities.   *See* S. REP. NO. 101-94, *reprinted at* 1990 U.S.C.C.A.N. 722, 733-34 (1990) (committee report noting that OPA's treatment of MODUs differs from CWA).   "[W]here Congress knows how to say something but chooses not to, its silence is controlling."   *Freemanville Water Sys., Inc. v. Poarch Band of Creek Indians*, 563 F.3d 1205, 1209 (11th Cir. 2009) (citation and quotation marks omitted); *see also Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation and quotation marks omitted).   Thus a MODU can <u>never</u> be an "offshore facility" for purposes of CWA Section 311(b)(7)(A), even though a MODU can be treated as an "offshore facility" under OPA.

### 2. It is undisputed that oil discharged only from the *Deepwater Horizon* and its appurtenances.

The United States concedes that "[o]il from the MC 252 reservoir flowed through the Macondo Well and was <u>discharged</u> to the Gulf of Mexico <u>from the *Deepwater Horizon*</u> and then <u>from the broken riser pipe and/or BOP</u> after *the Deepwater Horizon's* sinking." U.S. Statement of Facts [Rec. Doc. 4836-2] at ¶ 15 (emphases added). The United States further concedes that the discharge "emanated <u>from</u> the *Deepwater Horizon* vessel, including from its appurtenances the BOP and riser, into the Gulf of Mexico." *Id.* at ¶ 16.[6]

In addition, the Court has already held that maritime law governs this case because "the blowout, explosions, fire, and <u>subsequent discharge</u> of oil, occurred on or <u>from the DEEPWATER HORIZON and its appurtenances</u> . . . ." B1 Order at 8 (emphases added). In so holding, the Court expressly rejected Cameron's contention that "the oil spill occurred at the wellhead, not from the DEEPWATER HORIZON." *Id.* at 6-7. The Court held that the discharge from the *Deepwater Horizon's* BOP and riser is a discharge from the vessel, because maritime law "'ordinarily treats an "appurtenance" attached to a vessel in navigable waters as part of the vessel itself.'" *Id.* (internal citation omitted).

No party contends that there was more than one discharge. No party alleges that oil discharged directly from the Macondo Well into the Gulf of Mexico. Thus, it is an undisputed fact that the discharge in this case came only from the *Deepwater Horizon* and its appurtenances.

---

[6]       BP also agrees that oil from the formation flowed through Transocean's BOP, and discharged from the *Deepwater Horizon's* broken riser pipe into the Gulf of Mexico. BP Answer to U.S. Compl. [Rec. Doc. 1858] at ¶ 61 (admitting that "at certain times on or after April 20, 2010, oil flowed, *inter alia*, through the BOP stack, the marine riser, and/or other equipment"). Transocean also concedes (as it must) that oil discharged from the *Deepwater Horizon's* broken riser pipe and BOP into the Gulf of Mexico, and that the BOP and riser are appurtenances of the *Deepwater Horizon* and therefore parts of the vessel itself. *See* Transocean's Response to Petition for Writ of Mandamus, *In re: Cameron Int'l Corp.*, No. 11-30987, at 6-7 (5th Cir. 2011) [Rec. Doc. 00511658682] (noting that the BOP and drillstring are appurtenances of the vessel and "were attached to the vessel at the time of the incident" and that the "BOP was certainly central to the mission of the vessel, and it was still attached to an controlled from the vessel when the incident occurred.")

### 3.     Anadarko was not an owner, operator, or person in charge of the *Deepwater Horizon*.

Because oil discharged only from the *Deepwater Horizon* and its appurtenances, for Anadarko to be liable for CWA penalties, the United States must prove that Anadarko was an "owner, operator, or person in charge" of the *Deepwater Horizon*.  Anadarko was none of these.

Under the CWA, the term "owner or operator" means "in the case of a vessel, any person owning, operating, or chartering by demise, such vessel . . . ."  33 U.S.C. § 1321(a)(6).  No party alleges that Anadarko was an owner or charterer of the *Deepwater Horizon*.  With respect to the other potential bases of CWA liability, the United States does not allege, and therefore waives, any claim that Anadarko was, as a factual matter, an "operator" or "person in charge" of the *Deepwater Horizon*.  *See* U.S. Compl. at ¶ 72; U.S. Mem. at 2 n.5.  In any event, Anadarko is entitled to summary judgment that it is not liable for civil penalties under the CWA based on "operator" or "person in charge liability."  To be an "operator" of a vessel or facility, one "must manage, direct, or conduct operations specifically related to pollution . . . ." *United States v. Bestfoods*, 524 U.S. 51, 66 (1998) (construing term "operator" for purposes of liability under CERCLA).  Along the same lines, the Fifth Circuit has defined a "person in charge" of a vessel or a facility under the CWA as one who has: (a) "the capacity to make timely discovery of oil discharges;" (b) "power to direct the activities of persons who control the mechanisms causing the pollution;" and (c) "the capacity to prevent and abate damage." *United States v. Mobil Oil Co.*, 464 F.2d 1124, 1127 (5th Cir. 1972).  This Court's holdings that Anadarko lacked operational control over BP's and its contractors' activities on the leasehold, and that "BP was solely responsible for drilling operations" (B1 Order at 28), preclude any finding that Anadarko is liable as an "operator" or "person in charge" of anything.

**B.** **The United States' Argument that there was a Single Discharge of Oil from both the *Deepwater Horizon* and the Macondo Well is Unprecedented and Contrary to the Plain Text of the CWA.**

Because neither APC nor AE&P was an owner, operator, or person in charge of the *Deepwater Horizon*, the only way that the United States can impose CWA liability on APC is as a partial owner of the Macondo Well.[7]  But no oil discharged from the Macondo Well into the Gulf of Mexico.  In light of this fatal flaw, the United States has to invent a new construction of the CWA under which a "single and continuous discharge" of oil from the *Deepwater Horizon's* broken riser pipe can be a discharge "from" <u>both</u> the Macondo Well and the *Deepwater Horizon* at the same time.  U.S. Mem. at 21.  This attempt to bootstrap the discharge from the *Deepwater Horizon* into a discharge from the Macondo Well is groundless.  <u>No court or agency</u> has ever imposed CWA penalties for <u>one</u> discharge on <u>both</u> the owners or operators of a facility <u>and</u> the owners or operators of a vessel.

Indeed, the United States' novel construction of the CWA makes no practical sense in the context of this case.  Had the main body of the *Deepwater Horizon* not sunk, no one could have reasonably argued that the oil discharged from the *Deepwater Horizon's* vents and diverter systems was a discharge "from" the subsurface well miles below.  Because the owners and operators of the *Deepwater Horizon* had operational control over the discharge, the discharge of oil by the vessel's crew would have been rightly regarded as a discharge <u>from the vessel</u>.  That commonsense conclusion is not altered by the fact that the main body of the *Deepwater Horizon* subsequently sank and broke off the vessel's attached riser pipe, such that the discharge

---

[7]       The United States does not allege that AE&P had any ownership interest in the Macondo Well itself, nor can it.  U.S. Statement of Facts at ¶ 51.  It is undisputed that AE&P had no ownership interest in the Macondo Well or the components thereof.  SMF at 10-12, 14, ¶¶ 25, 28, 32.

continued from the vessel's appurtenances below the water's surface instead of above it.[8]

### 1. The presumption against broad interpretations of penalty statutes and the rule of lenity defeat the United States' interpretation.

The United States seeks a sweeping extension of the CWA in order to impose penalties on the non-operating investors, but provides no support for its argument except the bald assertion that "[n]othing in CWA 311(b)(7)(A) says that a discharge cannot be from <u>both</u> an 'offshore facility' and a 'vessel'. . . ." U.S. Mem. at 21 (emphasis in original). The United States is wrong—the CWA is clear that a single discharge can come only from <u>either</u> a vessel <u>or</u> a facility. But even if the United States were correct, if the best argument it can muster is that the CWA does not expressly <u>forbid</u> its creative new interpretation, the United States must lose.

First, the United States' argument is barred by the presumption against broad interpretations of penalty statutes.[9] "Penalties in civil actions are not favored by the courts, and should not be imposed except in cases that are clear and free from doubt." *World Ins. Co. of Omaha, Neb. v. Pipes*, 255 F.2d 464, 472 (5th Cir. 1958) (citation and quotation marks omitted). "Further, it is well-settled that in the application of penalties 'all questions in doubt must be resolved in favor of those from whom the penalty is sought.'" *Hatfried, Inc., v. C.I.R.*, 162 F.2d 628, 633 (3d Cir. 1947) (citation omitted); *Acker v. Comm'r of Internal Revenue*, 258 F.2d 568, 573 (6th Cir. 1958) (same), *cert. denied*, 358 U.S. 940 (1959); *see also* 70 C.J.S. Penalties § 4 ("Statutory provisions for penalties must be strictly construed, and may not be extended by construction to acts that are not within the intention of the legislature to penalize. Thus one who seeks to recover a penalty imposed by statute must bring his or her case clearly within the terms

---

[8] Any distinction that OPA draws between discharges above and below the surface of the water are irrelevant to liability under the CWA. In any event, it is indisputable that the discharge began from the vessel above the surface of the water.

[9] *See Tull v. United States*, 481 U.S. 412, 423 (U.S. 1987) (civil penalties under the CWA intended to punish and deter).

of the statute.").  Because the United States concedes that nothing in the CWA says that a single discharge <u>can</u> be "from" both a vessel and a facility at the same time, the statute cannot be interpreted so broadly.

Second, because the CWA penalty provisions at issue can be enforced both civilly and criminally, *see* 33 U.S.C. § 1319(c), the rule of lenity applies.  *See United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517-18 and n.10 (1992) (plurality opinion); *see also Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) (holding that where a statute "has both criminal and noncriminal applications," courts should interpret the statute consistently in both criminal and noncriminal contexts).  The rule of lenity requires that "any ambiguities in the statute be resolved in the defendant's favor" and that courts "cannot add to the statute what Congress did not provide."  *United States v. Plaza Health Labs., Inc.*, 3 F.3d 643, 649 (2d Cir. 1993) (holding that rule of lenity applies to CWA prosecution for illegal discharge, and that term "point source" cannot be construed to include a human being where not expressly provided).

For both these reasons, even if the United States were right that the CWA is unclear about whether a single discharge can be "from" both a vessel and an offshore facility, the statute must be construed against the United States, and any extension of liability beyond the CWA's plain and express terms is prohibited.

> **2.      The United States' contention that oil discharged from *both* the Macondo Well and from the *Deepwater Horizon* is foreclosed by the plain text of the CWA.**

In any event, the CWA's plain text, its legislative history, and judicial precedent all unambiguously preclude the United States' theory that the single discharge in this case came "from" both the vessel and an offshore facility.

**a.      The text of the CWA requires that a single discharge come from either a vessel or a facility, but not both.**

Because the CWA defines vessels and offshore facilities as mutually exclusive categories, holding that a discharge from a vessel is also a discharge from a facility would contravene the statute.  As noted above, CWA Section 311(b)(7)(A) uses a disjunctive "or" to divide vessels, offshore facilities, and onshore facilities into three mutually exclusive categories. The United States' interpretation would require the Court to replace "or" with "and," so that the text would read that penalties may be imposed on the owner, operator or person in charge of "any vessel, onshore facility, <u>and</u> offshore facility from which oil . . . is discharged."  This is not permitted—the statute must be strictly construed.

The Court of Claims rejected a similar argument for this reason.  In *Shell Oil Co. v United States*, Shell owned and operated an onshore facility—a boat slip—to which were moored an oil tanker and fuel barge, neither of which was owned or operated by Shell.  538 F.2d 346 (Ct. Cl. 1976).  Oil discharged from the oil tanker and fuel barge, and Shell incurred costs to clean up the spill.  Shell sued the United States to recover its costs pursuant to CWA Section 311(i), which provides that the owner-operator of a vessel or facility "from which" oil is discharged may seek reimbursement from the United States if the discharge was caused solely by a third party. Shell argued that because the vessel was moored to its boat slip, the discharge from the vessel should also be regarded as "from" Shell's onshore facility.  The United States argued that Shell was not entitled to reimbursement because the discharge of oil came "from" the <u>vessel</u>, not "from" Shell's onshore facility.  The United States prevailed.  The court reasoned that holding the discharge from the vessel was also a discharge from the onshore facility "would render that statutory term meaningless, contrary to settled rules of construction."  *Id*.  That is the same argument Anadarko makes today.

The United States now flips and tries to take the other side of the argument, but the result should be the same. As in *Shell Oil*, the United States' argument that a <u>single</u> discharge came from <u>both</u> a vessel and an offshore facility would impermissibly render the statutory distinction between a vessel and an offshore facility "meaningless" and must be rejected.

> **b.**    **The United States' interpretation erroneously focuses on where the oil originated instead of from where the oil "discharged."**

The United States also argues that the "single and continuous discharge" of oil can be regarded as coming from <u>both</u> the vessel and the offshore facility because one dictionary definition of the word "from" is a reference to "a point or place where an actual physical movement has its beginning." U.S. Mem. at 21 (citing Webster's Third new International Dictionary 913 (2002)).[10] From this, the United States argues that because oil <u>originated</u> in the Macondo Well, flowed into the *Deepwater Horizon's* riser, and was then discharged from the *Deepwater Horizon* into the Gulf of Mexico, the oil should be construed as discharging "from" the Macondo Well. U.S. Mem. at 21. This interpretation fails because it wrongly imposes penalties on the owner or operator of the facility that is the <u>source of the oil</u>, instead of the owner or operator of the facility that is the <u>source of the "discharge"</u> itself.[11]

The United States' faulty reading would impermissibly change the meaning of the statute and lead to absurd results. *See, e.g.*, *United States v. Mendoza*, 565 F.2d 1285, 1288, *on reh'g*, 581 F.2d 89 (5th Cir. 1978) (courts must avoid "construction of the words of a statute [that]

---

[10]    "Dictionaries give a range of linguistic possibilities; rarely do they help a court decide which one the drafter . . . intended . . . ." *Joy v. Hay Group, Inc.*, 403 F.3d 875, 877 (7th Cir. 2005) (Posner, J.). In any event, this particular definition of the word "from" is no help to the United States. The question is whether "from" refers to the point where the "actual physical movement" of oil began <u>generally</u> (the well), or the point where the "actual physical movement" of oil <u>into the Gulf of Mexico</u> began (the vessel and its appurtenances). The CWA addresses only the latter. The United States' reading of "from" divorced from the statutory context fails. *See Mississippi Poultry Ass'n v. Madigan*, 992 F.2d 1359, 1363-64 (5th Cir. 1993) ("[S]pecific words within a statute may not be read in isolation from the remainder of the entire statutory scheme").

[11]    The CWA defines "discharge" as the <u>act</u> of "spilling, leaking, pumping, pouring, emitting, emptying, or dumping . . . ." 33 U.S.C. § 1321(a)(2). Neither oil, nor its movement, standing alone is a "discharge."

14

would lead to an absurd, unjust, or unintended result . . . .").  All oil originates in a well, but not all subsequent discharges of oil are therefore discharges "from" a well subject to penalties under the CWA.  Under the United States' interpretation of the word "from," if a tanker carrying oil from the Macondo Well discharged oil a thousand miles away, <u>both</u> the owners and operators of the Macondo Well and the owners and operators of the distant tanker ship would be subject to civil penalties for the discharge.  Likewise, if a tank farm that receives and stores oil from various pipelines has a tank rupture and oil is discharged into an adjacent navigable water, under the United States' theory both the owner of the oil itself and the owner of the pipeline could be held liable under the CWA as the "source" of oil that is discharged.  Nothing in the CWA supports such a result, and there is no precedent for the United States' construction.

> c.   **Even a broad definition of the term "discharge" does not encompass a transfer of oil from a facility to a vessel.**

The CWA defines the term "discharge" as including, but not limited to, "'any spilling, leaking, pumping, pouring, emitting . . . .'" U.S. Mem. at 21 (quoting 33 U.S.C. § 1321(a)(2)). The United States argues that the words "include" and "any" evince a legislative intent that the term "discharge" be construed broadly.  U.S. Mem. at 21.  No matter how broadly "discharge" is construed, the undisputed facts are that no oil "spilled, leaked, pumped, poured or emitted" from the Macondo Well into the Gulf of Mexico.  The definition of the term "discharge" connotes some activity or action, and here all relevant activity occurred on the *Deepwater Horizon*.[12]

The ordinary use of the phrase "discharge from" in this context refers to the place or point where oil actually enters the environment.  In the United States' own words, "[o]il from the MC 252 reservoir flowed through the Macondo Well and was <u>discharged</u> to the Gulf of Mexico

---

[12]      As the Second Circuit found in interpreting the definition of "disposal" in CERCLA, the terms "discharge" and "disposal" "have in common that they are set in motion by human agency," and there is no human agency in the "passive flow" of a pollutant from one property to another. *Niagara Mohawk Power Corp. v. Jones Chemical Inc.*, 315 F.3d 171, 178 (2d Cir. 2003).

from the *Deepwater Horizon* and then <u>from the broken riser pipe and/or BOP</u> after the *Deepwater Horizon's* sinking."   U.S. Statement of Facts at ¶ 15 (emphasis added).   What the United States describes is not a "discharge" from the Macondo Well in ordinary English.   At most, the United States describes a <u>transfer</u> of oil from a facility to a vessel, and then a subsequent discharge from the vessel.   For example, had oil been transferred from the well to the *Deepwater Horizon*, then pumped from the *Deepwater Horizon* to the *Damon Bankston* for storage, and then subsequently discharged from a leaky tank on the *Damon Bankston*, no one would call the discharge from the *Damon Bankston* a discharge "from" the well.

Both the legislative history of the CWA and case law under analogous statutes confirm that Congress and the courts do not consider a <u>transfer</u> of oil from a facility to a vessel to be a "discharge" from a facility—even if the oil is subsequently discharged from the vessel.   When Congress amended the CWA in 1990 as part of its passage of OPA, it specifically considered that "a spill may occur when oil is being transferred between a vessel and an onshore facility." H.R. Conf. Rep. 101-653 (1990), *reprinted at* 1990 U.S.C.C.A.N. 779, 789.   The House Conference Report explains that if "the discharge comes from the vessel, it is the vessel that will be the responsible party . . . ."   *Id.*   Nothing in the legislative history even suggests that a discharge under these circumstances could be regarded as coming from <u>both</u> the onshore facility and the vessel.

Courts considering cases involving a transfer of oil (or other pollutants) have also viewed any subsequent discharge as coming "from" the recipient of the oil that allowed the oil to escape into the environment.   For example, in *United States v. Chotin Transportation, Inc.*, a tank barge was being loaded with gasoline from a facility, and during the loading operation the tank overflowed "and gasoline was discharged directly into the Ohio River."   CWA penalties were

assessed only against <u>the vessel</u>.  649 F. Supp. 356, 358 (S.D. Ohio 1986).  Likewise, in *United States v. The Catherine*, a steamship was bunkering fuel oil from a barge alongside when, due to a malfunction, oil seeped from a valve, overflowing onto the steamship's deck and into a harbor. 116 F. Supp. 668, 669 (D. Md. 1953).  The district court viewed the discharge as coming only from the steamship, and not from the barge pumping the oil.  *Id.* at 670.  Similarly, in *ACC Chemical Co. v. Halliburton Co.*, for purposes of liability for releases "from" a facility under CERCLA, the district court held that a truck pumping pollutants into a landfill was a "facility," but the landfill from which the hazardous substances were released into the environment, not the truck, was the relevant "facility from which there is a release . . . ."  932 F. Supp. 233, 237-38 (S.D. Iowa 1995) (citation and internal quotation marks omitted).

For all the above reasons, the Court should reject the United States' unprecedented contention that the discharge from the *Deepwater Horizon* may be regarded as coming from <u>both</u> the Macondo Well and the *Deepwater Horizon* for purposes of imposing CWA penalties.

### 3. Only the owners and operators of the *Deepwater Horizon* had "operational responsibility" over the source of the discharge.

As noted, no court or agency has ever held that a single discharge can come "from" <u>both</u> a vessel <u>and</u> a facility for purposes of assessing civil penalties under the CWA.  However, when presented with an analogous question, the Court of Claims held that where a single discharge could be regarded as coming from one of multiple facilities owned and operated by different parties, the discharge comes "from" the facility whose owners and/or operators possessed "operational responsibility" over the source of the discharge.  *Union Petroleum Corp. v United States*, 651 F.2d 734, 743 (Ct. Cl. 1981).

In *Union Petroleum*, the owner-operator of an onshore facility (Union) sued the United States under CWA Section 311(i)(1) to recover its cleanup costs after vandals opened valves on

two railroad tank cars resulting in the discharge of fuel oil.  *Id.* at 745.  The tank cars had been

filled with oil at Union's facility, but were owned by third parties and were no longer at Union's

facility.  The question presented was "whether the relevant 'facility' is plaintiff's oil terminal, of

which the tank cars were an integral although temporary part, or whether the 'facility' is

narrowly to be construed as the tank cars alone, which plaintiff did not lease or operate."  *Id.* at

743.  The court noted that "[a]ll parties concerned considered Union to be primarily responsible

for the tank cars as a part of its oil terminal," and it was undisputed that Union was

"operationally responsible" for the filling and movement of the tank cars.  *Id.*  The court held

that the "concept of 'operational responsibility' . . . disposes of [the] contention that . . . the tank

car parked outside of plaintiff's property was not part of its 'facility.'"  *Id.*  Because Union had

operational control over the tank cars "from which" the oil discharged, the discharge was "from"

Union's facility.

Applying the same reasoning here, because the BOP and riser were appurtenant to the

vessel and at all times subject to the "operational responsibility" of the owners and operators of

the vessel, the discharge must be construed as coming "from" the *Deepwater Horizon*.

## C.    The United States' "Operator as a Matter of Law" Theory is Meritless.

As another attempt to avoid this Court's finding that Anadarko had no operational control

over the drilling operations, the United States invents another unprecedented theory of CWA

liability, asserting that even though Anadarko did not <u>actually</u> operate anything, because

Anadarko is a lessee, Anadarko is an "operator" within the meaning of the CWA "as a matter of

law."[13]  U.S. Mem. at 23.  The United States' argument is not based on any provision of the

CWA, which imposes penalties only on "owners, operators or persons in charge" of a facility or

---

[13]      The United States does not argue that Anadarko is an "operator as a matter of law" of the *Deepwater Horizon*, and its Complaint fails to allege that Anadarko was an owner, operator or person in charge of the *Deepwater Horizon*.  U.S. Mem. at 2, n. 5; U.S. Compl. at ¶72.

vessel, not lessees.  Had Congress intended to extend CWA liability to "lessees," as it did with respect to OPA liability, it would have done so expressly.

Congress did not, so the United States instead concocts an argument based solely on an unrelated provision of OCSLA, which provides that it is the "duty of any holder of a lease . . . to . . . maintain all operations within such lease area . . . in compliance with regulations intended to protect persons, property, and the environment on the outer Continental Shelf . . . ."  43 U.S.C. § 1348(b).  The United States contends that because a lessee under OCSLA has a "duty to maintain operations" on the leasehold, every lessee is therefore an "operator" for purposes of the CWA—without regard to whether the lessee actually conducts any operations on the leasehold. This is nonsense.  The United States' argument is foreclosed by the plain text of the CWA, and is wholly unsupported by any judicial or administrative ruling.

### 1. The CWA does not impose operator liability on non-operating lessees.

There is no basis in the text for the United States' oxymoronic assertion of a non-operating "operator."  The CWA imposes penalties on "[a]ny person who is the owner, operator or person in charge" of a vessel or facility from which oil is discharged.   33 U.S.C. § 1321(b)(7)(A).  The CWA defines the term "owner or operator" as:

> (A) in the case of a vessel, any person owning, operating, or chartering by demise, such vessel, and
>
> (B) in the case of an onshore facility, and an offshore facility, any person owning or operating such onshore facility or offshore facility . . . .

*Id.* § 1321(a)(6) (emphasis added).  Congress's use of the present participle "operating" in the definition establishes that to be liable as an "operator" under the CWA, one must actually and actively operate.  *See St. Paul Fire & Marine Ins. Co. v. Pham*, Civil Action No. 06-2597, 2007 WL 1466747, at *4 (E.D. La., May 18, 2007) (Feldman, J.) ("The use of a present participle

expresses a <u>state of action</u> in progress.") (emphasis added) (citation omitted).  The text requires one to be an "operator in fact" to be liable for penalties.  The United States would impermissibly change the definition of an "operator" under the CWA from one who is actually "operating,", to "one who has a duty to maintain operations" under an entirely separate statute.  Had Congress intended such a definition, it would have said so expressly.

The United States' theory also fails because it would impermissibly add a new class of potentially liable parties to Section 311(b)(7)(A) that Congress did not expressly include: <u>lessees</u>. Had Congress intended to include "lessees" among "owners, operators and persons in charge," it would have done so expressly.  "Lessees" cannot be read into the statute *ex ante*.

Indeed, legislative history establishes that the omission of lessees from the class of CWA liable parties was not accidental.  Like the CWA, prior to OPA, OCSLA's oil spill compensation and damages provisions applied only to "owners and operators" of OCS facilities.  Pub. L. No. 95-372, 92 Stat. 629, § 301 (1978).  Congress sought to change this for potential liability under OPA, recognizing that "[o]ften, that owner or operator is an independent drilling contractor and not the actual holder of the rights to produce the oil."  S. REP. NO. 101-94, *reprinted at* 1990 U.S.C.C.A.N. 722, 733 (1990).  Accordingly, Congress amended OPA to expressly provide that lessees under OCSLA can be responsible parties for discharges from offshore facilities.  33 U.S.C. § 2701(32)(C).  If the United States were correct that OCSLA treats <u>all</u> lessees as "operators as a matter of law," Congress's express addition of "lessees" to the list of potentially responsible parties under OPA would have been unnecessary.

At the same time it passed OPA, Congress also amended the CWA, including the civil penalty provisions of Section 311(b).  Pub. L. No. 101-380, 104 Stat. 484, § 4301(b).  While making these "conforming amendments" to the CWA based on the new OPA provisions,

Congress had ample opportunity to amend CWA Section 311 to expressly hold <u>lessees</u> liable for civil penalties.  *Id.* at § 4201(a).  Having just replaced OCSLA's language making only the "owners or operators" of a facility liable in the event of a discharge for purposes of OPA liability, Congress knew full well that unless the CWA was similarly amended, a non-operating <u>lessee</u> could be liable for oil spill damages and removal costs under OPA, but the same lessee would not be liable for civil penalties under the CWA.  "[W]here Congress knows how to say something but chooses not to, its silence is controlling."  *Freemanville Water Sys., Inc. v. Poarch Band of Creek Indians*, 563 F.3d 1205, 1209 (11th Cir. 2009) (citation and quotation marks omitted).

Congress's decision not to impose civil penalties on non-operating lessees is consistent with CWA's legislative purposes of deterring and punishing those at fault for discharges.  *See Tull*, 481 U.S. at 423 (U.S. 1987).[14]  Any effort to deter and punish non-operating lessees would be misdirected.  Non-operating lessees cannot be "deterred" (except from investing in future leases, clearly a result that Congress did not seek), and are undeserving of punishment.  The United States' "operator as a matter of law" theory ignores the plain text of the CWA, and contravenes Congress' intent in imposing civil penalties.

> ## 2. The Supreme Court's *Bestfoods* test for determining "operator" status governs this case.

The United States' attempt to import a new definition of "operator" into the CWA from OCSLA is a transparent attempt to avoid the factual analysis the Supreme Court requires courts to undertake to determine if a party is an "operator."  *United States v. Bestfoods*, 524 U.S. 51

---

[14]     This fact is not lost on the United States, which has expounded at length on the punitive and deterrent purposes of CWA section 311(b)(7)(A). U.S. Opposition to Transocean's Motion for Partial Summary Judgment [Rec. Doc. 4840] at 5 ("The overarching goals of CWA penalties are punishment and general and specific deterrence.").

(1988).  The United States cannot use an unrelated provision of OCSLA to make an end-run around binding precedent and the plain statutory language.

In *Bestfoods*, the Supreme Court held that for purposes of CERCLA, an operator "directs the workings of, manages, or conducts the affairs of a facility . . . [and] must manage, direct, or conduct operations specifically related to pollution . . . ." *Id.* at 66.  The definition of "operator" under CERCLA tracks the definition of "operator" under the CWA.  Thus the Supreme Court's reasoning is controlling here.  *See Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693, 718 (W.D. Ky. 2003) (because definition of "operator" is the same under EPCRA and CERCLA, *Bestfoods* controls operator liability analysis under EPCRA); *see also Harris v. Oil Reclaiming Co.*, 94 F. Supp. 2d 1210, 1213 (D. Kan. 2000) (applying *Bestfoods* to OPA "operator" analysis).

The *Bestfoods* "operator" standard is fatal to the United States' claim because Anadarko had no control over operations on the Macondo leasehold.  *See* B1 Order at 28.  The United States' effort to avoid *Bestfoods* by using OCSLA to supply a new definition of "operator" fails.

> **3.** **Even if OCSLA and its regulations could be used to define terms in the CWA, the "operator as a matter of law" theory still fails.**

The United States' argument that OCSLA regulations somehow define the scope of liability under CWA Section 311 is specious.  The BOEM and BSEE (formerly the MMS) have no authority to implement or enforce Section 311(b) of the CWA—that authority is granted to the Environmental Protection Agency ("EPA") and the Coast Guard.  33 U.S.C. § 1321(b)(6)-(7).  But even if the United States were correct that OCSLA and its regulations can supply a new definition of the term "operator" for purposes of the CWA, the United States' "operator as a matter of law" theory fails even under the plain text of OCSLA and its regulations.

First, the provision of OCSLA on which the United States relies says nothing about the CWA.  OCSLA section 1348(b) states that the holders of a lease or permit have the duty to

"maintain all operations . . . in compliance with <u>regulations</u> intended to protect persons, property, and the environment on the outer Continental Shelf . . . ."  43 U.S.C. § 1348(b)(2) (emphasis added).  CWA Section 311(b)(7)(A) is not a "regulation."  Section 1348 of OCSLA therefore provides no fair notice that a "lessee" under OCSLA is also automatically an "operator" under the CWA, potentially subject to CWA penalties.  *See Diamond Roofing Co. v. Occupational Safety and Health Review Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976) ("[S]tatutes and regulations which allow monetary penalties against those who violate them . . . must give . . . fair warning of the conduct it prohibits or requires, and it must provide a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority . . . .").

Second, BOEM/BSEE regulations specifically define the term "operator" for purposes of identifying the party responsible for compliance with regulations: "Operator means the **person the lessee(s) designates as having control or management of operations** on the leased area or a portion thereof."  30 C.F.R. § 250.105 (emphasis added).  This conclusively establishes that the BOEM/BSEE (and their predecessor MMS) do not regard non-operators such as Anadarko to be "operators" for purposes of OCSLA.  43 U.S.C. §1348(b).  *See, e.g.*, *Pac. Operators Offshore, LLC*, 181 Interior Dec. 165, 2011 WL 3364982, at *2 (IBLA 2011) (the designated operator is responsible for complying with lease and regulations); *see also* Exhibit 51, 30(b)(6) Dep. of Michael Saucier, BOEMRE Regional Supervisor, at 363:8-25. "[T]he statutory interpretation by an agency charged with executing the statute is entitled to great weight or deference." *Chevron U.S.A., Inc. v. Watt*, 564 F. Supp. 1256, 1261 (E.D. La. 1983) (citations omitted).

Finally, the United States' contention that, because BOEM/BSSE regulations make the "duty to maintain operations" joint and several among lessees, <u>all</u> lessees are therefore "operators" for purposes of the CWA, is contrary to both agency practice and long-established

business expectations.[15]  U.S. Mem. at 15.  Regulations promulgated under OCSLA imposing joint and several liability on co-lessees allow the BOEM/BSSE to order co-lessees to conduct operations if the designated operator defaults.  *See* Exhibit 29, MMS Designation of Operator Form, BP-HZN-2179MDL02319165 (12/17/2009) ("In case of default on the part of the designated operator, the lessee will make full and prompt compliance with all regulations . . . ."); 30 C.F.R. § 250.146(b); *see also Fruge ex rel. Fruge v. Parker Drilling Co*., 337 F.3d 558, 561 (5th Cir. 2003) ("This regulation further allows the Regional Supervisor to require any or all co-lessees to fulfill obligations under the regulations or the lease, if the designated operator fails to fulfill obligations under the regulations.").  In other words, OCSLA and its regulations at most provide that a non-operating lessee has the potential to be an "operator" in certain circumstances not relevant here.  But the CWA does not impose penalties on potential operators.

Thus, as a non-operating lessee, Anadarko was not an "operator" for purposes of CWA penalties, and the United States' "operator as a matter of law" theory fails even on its own terms.

## III.   THE COURT SHOULD DENY THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT ON THE OPA LIABILITY CAP.

The Court should deny the United States' motion with respect to the OPA liability cap because Anadarko's entitlement to the cap turns on material disputed issues of fact.  33 U.S.C. § 2704(c).  An OPA responsible party is entitled to the OPA cap unless the discharge was proximately caused by its gross negligence, willful misconduct, or violation of federal statute or regulation, or by that of an agent, employee, or "person acting pursuant to a contractual relationship with the responsible party . . . ."  33 U.S.C. § 2704(c)(1).  Since this Court has

---

[15]     Indeed, taken to its logical conclusion, the United States' argument would have unintended consequences far beyond the boundaries of this case.  Under the United States' newly adopted view, in addition to the designated operators, all non-operating lessees would for the first time be required to comply with, *e.g.*, federal labor laws, wage and hour laws, and occupational health and safety laws covering persons working in the lease area.  The United States' opportunistic interpretation of the statute to advance its litigation strategy would work a vast regulatory expansion, and grant BOEM/BSSE enforcement authority that Congress never provided.

already held that Anadarko had no duty to intervene somehow to prevent the incident, no act or omission by Anadarko could have "proximately caused" the discharge.  B1 Order at 28; *see* RESTATEMENT (SECOND) OF TORTS § 430 (2011) (unless an actor is negligent, "the question of the causal relation between it and the other's harm is immaterial.").

Thus, the only issue relevant to the availability of the OPA cap to Anadarko is whether the discharge was "proximately caused" by the gross negligence, willful misconduct, or violation of federal statute or regulation by BP.  33 U.S.C. § 2704(c)(1).  Proximate causation is a question of fact. *Ambraco, Inc. v. PROJECT EUROPA MV*, 119 Fed. Appx. 676, 677 (5th Cir. 2005).  Whether conduct by BP "proximately caused" the blowout and discharge is disputed; indeed, this highly technical and complicated dispute goes to the very heart of the Phase One trial.  BP denies, at the very least, that it was grossly negligent, and it contends that allegedly grossly negligent acts and omissions on the part of its contractors are intervening causes of the discharge. *See, e.g.*, BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation [Rec. Doc. 2074] at ¶ 1 (alleging that omissions by Transocean proximately caused casualty).  Summary judgment on the OPA cap issue is precluded when the central purpose of the Phase One trial is the factual determination of the proximate cause or causes of the discharge.  Accordingly, the Court should deny the United States' motion for summary judgment with respect to the OPA liability cap.

## CONCLUSION

For all the foregoing reasons, the Court should Deny the United States' Second Motion for Partial Summary Judgment and grant Anadarko's Cross-Motion for Summary Judgment as to Anadarko's Non-Liability under the CWA.

Respectfully submitted,

DATED: January 9, 2012                BINGHAM McCUTCHEN, LLP

                                      /s/*James J. Dragna*
                                      James J. Dragna
                                      jim.dragna@bingham.com
                                      Bingham McCutchen LLP
                                      355 South Grand Avenue, Suite 4400
                                      Los Angeles, California 90071-3106
                                      Telephone (213) 680-6436
                                      Facsimile (213) 680-8636

                                      Ky E. Kirby
                                      ky.kirby@bingham.com
                                      David B. Salmons
                                      david.salmons@bingham.com
                                      Michael B. Wigmore
                                      michael.wigmore@bingham.com
                                      Warren Anthony Fitch
                                      tony.fitch@bingham.com
                                      Sandra P. Franco
                                      sandra.franco@bingham.com
                                      Randall M. Levine
                                      randall.levine@bingham.com
                                      2020 K Street, NW
                                      Washington, DC 20006-1806
                                      Telephone (202) 373-6000
                                      Facsimile (202) 373-6001

                                      KUCHLER POLK SCHELL
                                      WEINER & RICHESON, LLC

                                      Deborah D. Kuchler, T.A. (La. Bar No. 17013)
                                      dkuchler@kuchlerpolk.com
                                      Janika Polk (La. Bar No. 27608)
                                      jpolk@kuchlerpolk.com
                                      Robert Guidry (La. Bar No. 28064)
                                      rguidry@kuchlerpolk.com
                                      1615 Poydras Street, Suite 1300
                                      New Orleans, LA  70112
                                      Tel:  (504) 592-0691
                                      Fax:  (504) 592-0696

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, pursuant to Pre-trial Order No. 12, I have caused the foregoing to be served on all counsel via the Lexis Nexis File & Serve system, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, who will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on January 9, 2012.

_____ /s/ *James J. Dragna* _____
James J. Dragna