# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico on April 20, 2010 | * | SECTION "J" |
| | * | JUDGE BARBIER |
| This Document Relates to: | * | |
| | * | MAGISTRATE NO. 1 |
| 10-cv-04536 | * | MAGISTRATE SHUSHAN |
| | * | |
| * * * * * * * * * * * * * | * | |


**(I)    ANADARKO'S RESPONSES TO THE UNITED STATES' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF UNITED STATES' SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT [REC. DOC. 4836-2];**

**AND**

**(II)   ANADARKO'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AS TO ANADARKO'S NON-LIABILITY UNDER THE CWA.**

Anadarko Petroleum Corporation ("APC") and Anadarko E&P Company LP ("AE&P") (together "Anadarko"), pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1 (Feb. 2011), respectfully submit the following Responses to the Statement of Undisputed Material Facts in Support of Plaintiff United States' Second Motion for Partial Summary Judgment [Rec. Doc. 4836-2], and Statement of Undisputed Material Facts in Support of Cross-Motion for Summary Judgment as to Anadarko's Non-Liability Under the CWA, and in support thereof state as follows:

I.      **ANADARKO'S RESPONSES TO THE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF UNITED STATES' SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**

**U.S.'s Alleged Undisputed Material Facts Relevant to Drilling the Macondo Well**

**U.S. STATEMENT 1:**

1. BP acquired Lease OCS-G 32306 for Block 252, Mississippi Canyon, OCS Official Protraction Diagram, NH 16-10 ("Lease"), effective June 1, 2008.

**ANADARKO RESPONSE:**

Anadarko does not dispute that BP Exploration & Production, Inc. ("BP") acquired Lease OCS-G 32306 for Block 252, Mississippi Canyon, effective June 1, 2008 ("Macondo Lease").

**U.S. STATEMENT 2:**

2. An exploratory well was constructed on Block 252, Mississippi Canyon, the "Macondo Well."

**ANADARKO RESPONSE:**

Anadarko does not dispute that the Macondo Well, an exploratory well, was being constructed on Block 252, Mississippi Canyon.

**U.S. STATEMENT 3:**

3. The Macondo Well is located on the Outer Continental Shelf approximately 50 miles from the Mississippi River delta.

**ANADARKO RESPONSE:**

Anadarko does not dispute that the Macondo Well is located on the Outer Continental Shelf, approximately 50 miles from the Mississippi River delta.

**U.S. STATEMENT 4:**

4. From at least October 1, 2009, the MODU *Transocean Marianas* was owned and/or operated by the Transocean Defendants.  In or about October 2009, the *Transocean Marianas* began to be used for drilling of the Macondo Well.

**ANADARKO RESPONSE:**

Anadarko does not dispute that from at least October 1, 2009, the *Transocean Marianas*, a mobile offshore drilling unit ("MODU"), was owned and/or operated by the Transocean Defendants, and that in October 2009, the *Transocean Marianas* was used for drilling the Macondo Well.

**U.S. STATEMENT 5:**

5. Beginning on or about February 2010, the MODU *Deepwater Horizon* replaced the *Transocean Marianas* for the purpose of continuing the drilling of the Macondo Well. Drilling of the Macondo Well using the *Deepwater Horizon* continued in February 2010 and through March and a portion of April 2010.

**ANADARKO RESPONSE:**

Anadarko does not dispute that the MODU *Deepwater Horizon* replaced the *Transocean Marianas* for the purpose of continuing drilling of the Macondo Well, and that drilling of the Macondo Well by the *Deepwater Horizon* continued in February 2010 and through March and a portion of April 2010.

**U.S. STATEMENT 6:**

6. The *Deepwater Horizon* is a vessel.

**ANADARKO RESPONSE:**

Anadarko objects to U.S. Statement 6 because whether the *Deepwater Horizon* was a "vessel" for purposes of applicable law is a question of law, not a question of fact.  Nevertheless, Anadarko does not dispute that, as a matter of law, the *Deepwater Horizon*, including its appurtenances, the blowout preventer and riser, was a vessel.  *See* Order and Reasons as to Motions to Dismiss the B1 Master Complaint, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La. Aug. 26, 2011), ECF No. 3830 (Ex. 30 hereto) ("B1 Order"), at 4-7.

**U.S. STATEMENT 7:**

7.  The *Deepwater Horizon* is a mobile offshore drilling unit.

**ANADARKO RESPONSE:**

Anadarko does not dispute that the *Deepwater Horizon* was a mobile offshore drilling unit.

**U.S. STATEMENT 8:**

8.  Casings, tubulars, the well head and/or other components of the Macondo Well were installed in the wellbore prior to April 20, 2010.

**ANADARKO RESPONSE:**

Anadarko objects to U.S. Statement 8 because the reference to "and/or other components" is vague and ambiguous.  Nevertheless, Anadarko does not dispute that certain casings, tubulars, and the wellhead were components of the Macondo Well, and were installed in the Macondo wellbore prior to April 20, 2010.

**U.S. STATEMENT 9:**

9.  The Macondo Well is an "offshore facility" for purposes of the Clean Water Act, 33 U.S.C. § 1321(b), and the Oil Pollution Act, 33 U.S.C. § 2701 *et al*.

**ANADARKO RESPONSE:**

Anadarko objects to U.S. Statement 9 because whether the Macondo Well is an "offshore facility" for purposes of the Clean Water Act, 33 U.S.C. § 1321(b), and the Oil Pollution Act, 33 U.S.C. § 2701 *et seq.*, is a question of law, not a question of fact.  Nevertheless, Anadarko does not dispute that, as a matter of law, the Macondo Well, excluding the attached appurtenances of the *Deepwater Horizon*, constitutes an "offshore facility" within the meaning of the Clean Water Act, 33 U.S.C. § 1321(a)(11) and (b), and the Oil Pollution Act, 33 U.S.C. § 2701 *et seq.*

**U.S.'s Alleged Undisputed Material Facts Related to the April 20, 2010 Incident and Subsequent Discharge of Oil**

**U.S. STATEMENT 10:**

10. The Macondo Well cement job was critical for maintaining well control.

**ANADARKO RESPONSE:**

Anadarko objects to U.S. Statement 10 to the extent that the phrase "Macondo Well cement job" is vague and ambiguous.  Anadarko further objects to the extent that the term "critical" is vague, ambiguous, and a statement of opinion, not a statement of fact.  Nevertheless, Anadarko does not dispute that the Macondo Well's production casing cement job was a means of maintaining well control.

**U.S. STATEMENT 11:**

11. The Macondo Well's cement job failed to prevent hydrocarbons from migrating into the wellbore.

**ANADARKO RESPONSE:**

Anadarko objects to the extent that the phrase "the Macondo Well's cement job" is vague and ambiguous.  Nevertheless, Anadarko does not dispute that the Macondo Well's production

casing cement job failed to prevent hydrocarbons in the formation from migrating into the wellbore.

**U.S. STATEMENT 12:**

12. On April 20, 2010, there was a blowout of the Macondo Well, and fires and explosions on the drilling rig *Deepwater Horizon*.

**ANADARKO RESPONSE:**

Anadarko does not dispute that on April 20, 2010, there was a blowout of the Macondo Well, and fires and explosions on the drilling rig *Deepwater Horizon*.

**U.S. STATEMENT 13:**

13. Eleven men died as a result of the blowout.

**ANADARKO RESPONSE:**

Anadarko objects because U.S. Statement 13 is not a statement of fact that is material to any of the issues raised in the United States' Motion for Partial Summary Judgment. Anadarko further objects to the extent that the phrase "as a result of the blowout" is vague and ambiguous. Anadarko does not dispute that eleven men lost their lives as a result of the blowout, explosions, and fires on the *Deepwater Horizon*.

**U.S. STATEMENT 14:**

14. Following the blowout on April 20, 2010, there was a discharge of oil into the Gulf of Mexico.

**ANADARKO RESPONSE:**

Anadarko does not dispute that following the blowout on April 20, 2010, there was a discharge of oil into the Gulf of Mexico.

**U.S. STATEMENT 15:**

15. Oil from the MC 252 reservoir flowed through the Macondo Well and was discharged to the Gulf of Mexico from the *Deepwater Horizon* and then from the broken riser pipe and/or BOP after the *Deepwater Horizon's* sinking.

**ANADARKO RESPONSE:**

Anadarko does not dispute that oil from the MC 252 reservoir flowed through the Macondo Well and was discharged to the Gulf of Mexico from the *Deepwater Horizon* and then from the broken riser pipe and/or BOP after the main body of the *Deepwater Horizon's* sinking.

**U.S. STATEMENT 16:**

16. The discharge also emanated from the *Deepwater Horizon* vessel, including from its appurtenances the BOP and riser, into the Gulf of Mexico.

**ANADARKO RESPONSE:**

Anadarko objects to the United States' mischaracterization of the discharge as "also" emanating from the *Deepwater Horizon*.  Anadarko does not dispute that the discharge emanated from the *Deepwater Horizon* vessel, that the BOP and riser were appurtenances of the *Deepwater Horizon*, and that oil discharged from the BOP and riser into the Gulf of Mexico.

**U.S. STATEMENT 17:**

17. The oil caused a film or sheen or discoloration on the surface of the water.

**ANADARKO RESPONSE:**

Anadarko does not dispute that the oil caused a film, sheen, or discoloration on the surface of the water of the Gulf of Mexico.

**U.S. STATEMENT 18:**

18. The discharge of oil was in such quantities as may be harmful.

**ANADARKO RESPONSE:**

Anadarko objects to the extent that whether oil is discharged "in such quantities as may be harmful" is a question of law, not a question of fact.  Anadarko further states that, for purposes of Section 311(b)(4) of the Clean Water Act, 42 U.S.C. § 1321(b)(4), the Environmental Protection Agency ("EPA") has determined that discharges of oil that "[c]ause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines" are "harmful to the public health or welfare or the environment of the United States." 40 C.F.R. § 110.3.  Anadarko does not dispute that, under the applicable regulations, the discharge of oil from the *Deepwater Horizon* was in such quantities as may be harmful to the public health or welfare or the environment of the United States.

**U.S. STATEMENT 19:**

19. Some of the oil spread to within 200 nautical miles of the United States' coastline.

**ANADARKO RESPONSE:**

Anadarko does not dispute that some of the oil discharged from the *Deepwater Horizon* spread to within 200 nautical miles of the United States' coastline.

**U.S. STATEMENT 20:**

20. Some of the oil spread to within 3 miles of the coastline of the United States and onto adjoining shorelines.

**ANADARKO RESPONSE:**

Anadarko does not dispute that some of the oil discharged from the *Deepwater Horizon* spread to within three miles of some of the coastline of the United States and onto some adjoining shorelines.

**U.S. STATEMENT 21:**

21. The uncontrolled flow of oil continued for several months thereafter.

**ANADARKO RESPONSE:**

Anadarko objects to the extent that the phrase "several months thereafter" is vague and ambiguous.   Anadarko does not dispute that oil discharged from the *Deepwater Horizon's* broken riser until July 15, 2010.   The amount of oil flowing from the *Deepwater Horizon* and efforts to control such discharge are to be addressed in Phase Two Discovery, which is ongoing.

**U.S. STATEMENT 22:**

22. The Macondo Well was capped on July 15, 2010.

**ANADARKO RESPONSE:**

Anadarko objects to the extent that the phrase "the Macondo Well was capped" is vague and ambiguous.   Anadarko does not dispute that the discharge of oil from the *Deepwater Horizon's* appurtenances ceased on July 15, 2010.

### U.S.'s Alleged Undisputed Material Facts Related to the Contractual Agreements Among the Lessees

**U.S. STATEMENT 23:**

23. On or about November 18, 2009, BP and MOEX executed a Lease Exchange Agreement, whereby BP assigned to MOEX a 10% interest in the Lease.  (Ex. 1 hereto).

**ANADARKO RESPONSE:**

Anadarko does not dispute that on November 18, 2009, BP and MOEX Offshore 2007 ("MOEX") executed a Lease Exchange Agreement.  Anadarko further states that under the Lease Exchange Agreement, BP agreed to assign to MOEX a 10% Record Title Interest in the Macondo Lease.  Such assignment was to be in the form of that found in Exhibit B to the Lease Exchange Agreement executed by the parties.  *Lease Exchange Agreement between BP and*

*MOEX*, Dep. Ex. 1244, DWHMX00000247 at §§ 1.3, 2(a) (10/1/2009; executed 11/18/2009) (Ex. 5 hereto); *see also Exhibit B to Lease Exchange Agreement between BP and MOEX*, BP-HZN-2179MDL00339265 (Ex. 5A hereto).

**U.S. STATEMENT 24:**

24. After MOEX and BP executed the assignment, it was submitted to MMS, which approved the assignment on February 23, 2010.

**ANADARKO RESPONSE:**

Anadarko does not dispute that after MOEX and BP executed the assignment pursuant to the Lease Exchange Agreement between the two entities, it was submitted to the Minerals Management Service ("MMS"), which approved the assignment to MOEX on February 23, 2010.  Anadarko further states that such assignment was effective October 1, 2009, as approved by MMS.  *MMS Online Agency Records Serial Register Page*, IMS059-014814 at 4814 (Ex. 13 hereto) ("Agency Records").

**U.S. STATEMENT 25:**

25. BP assigned a 22.5% Record Title Interest in the Lease to AE&P Company LP ("AE&P"), effective October 1, 2009.  BP executed the assignment on or about December 17, 2009, AE&P submitted the assignment to MMS on February 11, 2010, and MMS approved the assignment on February 23, 2010.

**ANADARKO RESPONSE:**

Anadarko does not dispute that, on December 17, 2009, BP executed an assignment of a 22.5% Record Title Interest in the Macondo Lease to AE&P.  Anadarko does not dispute that AE&P submitted the assignment to the MMS on February 11, 2010, and that the MMS approved the assignment on February 23, 2010.

Anadarko further states that it is undisputed that the Lease Exchange Agreement between BP, APC, and AE&P contemplated a like-kind exchange of interests in various leases.  *Lease*

*Exchange Agreement*, Dep. Ex. 2824, BP-HZN-2179MDL02319086 at §§ 1-2, 4 and Exhibit A-2

(10/1/2009; executed 12/17/2009) (Ex. 4 hereto) ("Lease Exchange Agreement").  Anadarko also

submits that the Lease Exchange Agreement provided that AE&P would not retain any interest in

the Macondo Lease, and would not participate in the exploration of the Macondo Prospect.  The

Agreement provided that AE&P would assign its 22.5% interest in the Macondo Lease to APC

upon the transfer from BP, such that APC would hold a 25% interest in the Macondo Lease.  *Id.*

at § 2.2 and Exhibit A-2.  It is undisputed that BP and APC contemplated that APC would

ultimately hold the full 25% Macondo Lease interest transferred from BP.  Deposition of

Michael Beirne, BP Offshore Land Negotiator (Ex. 35 hereto) ("Beirne Dep."), at 242:16-19;

242:21-243:5.  After BP assigned its interest to AE&P, as contemplated by the Lease Exchange

Agreement, AE&P then executed an assignment of its interest to APC on April 15, 2010, with an

effective date of April 1, 2010.  *Assignment of Record Title Interest in Federal OCS Oil and Gas*

*Lease*, Dep. Ex. 2317, ANA-MDL-000023861 at 3862-63 (executed 4/15/2010) (Ex. 2 hereto)

("Assignment").

### U.S. STATEMENT 26:

26. BP assigned a 2.5% Record Title Interest in the Lease to APC.  BP executed the
assignment on or about December 17, 2009, APC submitted the assignment to MMS on
or about February 12, 2010, and MMS approved the assignment on February 23, 2010.

### ANADARKO RESPONSE:

Anadarko does not dispute that BP assigned a 2.5% Record Title Interest in the Macondo

Lease to APC, and that BP executed the assignment on December 17, 2009.  Anadarko also does

not dispute that APC submitted the assignment to the MMS on or about February 12, 2010, and

that the MMS approved the assignment on February 23, 2010.  This assignment was also

effective October 1, 2009.  Agency Records at 4814 (Ex. 13 hereto).

**U.S. STATEMENT 27:**

27. On or about December 17, 2009, APC, AE&P and BP executed a Lease Exchange Agreement, whereby BP assigned to APC and AE&P collectively a 25% interest in the Lease. (Ex. 2 hereto).

**ANADARKO RESPONSE:**

Anadarko does not dispute that on December 17, 2009, APC, AE&P, and BP executed a

Lease Exchange Agreement, whereby BP agreed to assign to APC and AE&P collectively a 25%

interest in the Macondo Lease. *See* Anadarko Response to U.S. Statements 25-26, *supra*.

**U.S. STATEMENT 28:**

28. AE&P assigned its 22.5% Record Title Interest in the Lease to APC. AE&P submitted the assignment to MMS on or about April 20, 2010, and MMS approved the assignment on April 28, 2010. APC and AE&P had agreed to an effective date of April 1, 2010.

**ANADARKO RESPONSE:**

Anadarko does not dispute that AE&P assigned its 22.5% Record Title Interest in the

Macondo Lease to APC, that AE&P submitted the assignment to the MMS on April 20, 2010,

and that the MMS approved the assignment on April 28, 2010. Anadarko also does not dispute

that APC and AE&P had agreed to an effective date of April 1, 2010.

Anadarko submits that it is also undisputed that on April 15, 2010, APC and AE&P

executed the Assignment of Record Title Interest by which AE&P assigned its 22.5% interest in

the Macondo lease to APC. Assignment at 3862-63 (Ex. 2 hereto). It is undisputed that the

Assignment provided that it was "effective . . . as of April 1, 2010," and that MMS approved

such effective date. *Id.* at 3862-63. It is also undisputed that MMS records state, on April 28,

2010, that APC held a 25% record title interest in the Macondo lease, and AE&P held no interest

therein, "effective 04/01/2010[.]" *See* Agency Records at 4815 (Ex. 13 hereto).

**U.S. STATEMENT 29:**

29. As of April 20, 2010, MMS had not approved the AE&P reassignment of its interest in the Lease, and AE&P held 22.5% of the Lease.

**ANADARKO RESPONSE:**

Anadarko objects to U.S. Statement 29 because whether AE&P held an interest in the Macondo Lease as of April 20, 2010 for purposes of applicable law is a question of law, not a question of fact.  Anadarko disputes the United States' legal conclusion that AE&P held a 22.5% interest in the Macondo Lease as of April 20, 2010.  Anadarko does not dispute that as of April 20, 2010, the MMS had not yet approved AE&P's assignment of its interest in the Macondo Lease to APC.

**U.S. STATEMENT 30:**

30. After its assignments to MOEX, APC and AE&P, BP retained a 65% interest in the Lease.

**ANADARKO RESPONSE:**

Anadarko does not dispute that BP retained a 65% interest in the Macondo Lease after its assignments to MOEX and Anadarko.

**U.S. STATEMENT 31:**

31. On or about December 17, 2009, BP, APC and an APC subsidiary, Kerr-McGee Oil and Gas Corporation, also entered into a Well Participation Agreement for the Macondo Prospect, whereby APC would own a 25% interest in the Macondo Well.  (Ex. 3 hereto).

**ANADARKO RESPONSE:**

Anadarko does not dispute that on December 17, 2009, BP, APC, and Kerr-McGee Oil and Gas Corporation entered into a Well Participation Agreement for the Macondo Prospect, whereby APC would own a 25% interest in the Macondo Well.

Anadarko further states that it is undisputed that the Well Participation Agreement provides that "APC owns an undivided twenty five (25%) working interest in the Macondo Prospect Area following execution of the Lease Exchange Agreement . . . and a subsequent assignment from its Affiliate Anadarko E&P Company, LP ('AEP') of AEP's Record Title Interest in the Macondo Prospect Area." *Macondo Prospect Well Participation Agreement*, Dep. Ex. 2825, BP-HZN-2179MDL02319125 (10/1/2009; executed 12/17/2009) (Ex. 7 hereto) ("Well Participation Agreement") at 9125; *see also* Anadarko's Response to U.S. Statement 28, *supra*.

**U.S. STATEMENT 32:**

32. As consideration for its 25% proportionate share of the Macondo Well, BP and APC agreed that APC would pay "1/3 for 1/4," or 33.33% of up to 110% of the estimated costs of the Macondo Well as set forth in the Initial Authorization for Expenditure.

**ANADARKO RESPONSE:**

Anadarko does not dispute that in exchange for a 25% share in the Initial Exploratory Well ("IEW") being drilled on the Macondo leasehold, BP and APC agreed that APC would pay 33.33% of up to 110% of the estimated costs of the IEW, as set forth in the Initial Authorization for Expenditure.

**U.S. STATEMENT 33:**

33. On or about November 18, 2009, BP and MOEX executed a Joint Operating Agreement that set forth their agreement among themselves as to their rights and responsibilities, operational duties, accounting mechanism, and many other terms as to the Macondo Prospect. The Anadarko Defendants executed a Ratification and Joinder of the Joint Operating Agreement on or about December 17, 2009. All signatories agreed that the Joint Operating Agreement would be retroactively effective as of October 1, 2009.

**ANADARKO RESPONSE:**

Anadarko does not dispute that on November 18, 2009, BP and MOEX executed the Macondo Prospect Offshore Deepwater Operating Agreement ("Operating Agreement") that set forth their rights and responsibilities, operational duties, accounting mechanism, and many other

terms as to the Macondo Prospect.  Anadarko also does not dispute that BP, APC, and AE&P executed a Ratification and Joinder of that Operating Agreement on December 17, 2009, and that all signatories agreed that the Operating Agreement would be effective as of October 1, 2009.

Anadarko further submits that it is undisputed that the Operating Agreement designated BP as the "Operator" of the Macondo Lease, making BP solely responsible for conducting or causing to be conducted all operations on the Macondo leasehold, including, but not limited to, drilling and exploration operations.   Operating Agreement, Dep. Ex. 1243, APC-HEC1-000001601, at Art. 2.49, 4.1 (ratified by APC and AE&P on 12/17/2009) (Ex. 6 hereto); *see also* 30(b)(6) Deposition of Patrick O'Bryan, BP's Vice President of Drilling & Completions and Interventions for Gulf of Mexico Deepwater (Ex. 45 hereto) ("O'Bryan 30(b)(6) Dep."), at 768:2-5; 768:17-20; 768:22; Deposition of David Rainey, BP Vice President of Exploration for the Gulf of Mexico (Ex. 48 hereto) ("Rainey Dep."), at 394:20-23.  It is further undisputed that MMS records reflect this formal designation pursuant to MMS regulatory requirements.  Agency Records at 4814 (Ex. 13 hereto); *see also MMS Designation of Operator Form*, BP-HZN-2179MDL02319165 at 9165-66 (12/17/2009) (Ex. 29 hereto).

### **U.S.'s Alleged Additional Undisputed Material Facts Relevant to BP's Liability**

#### **U.S. STATEMENT 34:**

34. BP is liable as an "operator" of the Macondo Well under the CWA, 33 U.S.C. § 1321(b)(7).

#### **ANADARKO RESPONSE:**

Anadarko objects to U.S. Statement 34 because whether BP is liable as an "operator" of the Macondo Well under the CWA, 33 U.S.C. § 1321(b)(7), is a question of law, not a question of fact.  Anadarko disputes the United States' erroneous legal conclusion that BP is liable as an

"operator" of the Macondo Well under the CWA, 33 U.S.C. § 1321(b)(7), because no oil discharged from the Macondo Well into the Gulf of Mexico.

**U.S. STATEMENT 35:**

35. Pursuant to BP's obligations under its Agreements with MOEX and Anadarko, BP prepared an Authorization for Expenditure for the drilling of the initial exploratory well, Macondo Well.  The AFE was executed by BP, MOEX, and Anadarko (Exs. 6, 7 hereto).

**ANADARKO RESPONSE:**

Anadarko objects to the extent that U.S. Statement 35 is not a statement of fact material to any issue raised in the United States' Motion.  Anadarko does not dispute that pursuant to BP's obligations under its Agreements with MOEX and Anadarko, BP prepared an Authorization for Expenditure ("AFE") for the drilling of the initial exploratory well, the Macondo Well.  Anadarko also does not dispute that the AFE was executed by BP, MOEX, and Anadarko, and further submits that APC and AE&P executed the AFE on December 17, 2009. *See Authorization for Expenditure*, Dep. Ex. 1919, APC-SHS2A-000001082 at 1082 (12/17/2009) (Ex. 20 hereto).  It is also undisputed that BP and Anadarko did not consider an AFE under the Operating Agreement to be a request for input from Anadarko with regard to well design or drilling operations.  Beirne Dep. at 392:4-17 (Ex. 35 hereto).

**U.S. STATEMENT 36:**

36. Two supplemental AFEs were prepared to cover additional costs related to the drilling of the Macondo Well.  These AFEs were executed by BP, MOEX, and Anadarko. (Exs. 6, 8, 9 hereto).

**ANADARKO RESPONSE:**

Anadarko objects to the extent that U.S. Statement 36 is not a statement of fact material to any issue raised in the United States' Motion.   Anadarko does not dispute that two supplemental AFEs were prepared to cover additional costs related to the drilling of the

Macondo Well, and these AFEs were executed by BP, MOEX, and Anadarko.  Anadarko further submits that APC and AE&P executed these AFEs on February 18, 2010, and March 30, 2010. *See Authorization for Expenditure*, Dep. Ex. 1920, ANA-MDL-000030713 at 0714 (2/18/2010) (Ex. 21 hereto); *Second Supplemental Authorization for Expenditure*, Dep. Ex. 1921, ANA-MDL-000030687 at 0690 (3/30/2010) (Ex. 22 hereto).

**U.S. STATEMENT 37:**

37. A fourth AFE was prepared to authorize funding for the production casing for the Macondo Well.  This AFE was executed on or around April 15, 2010, by BP, MOEX and Anadarko.  (Exs. 6, 10 hereto).

**ANADARKO RESPONSE:**

Anadarko objects to the extent that U.S. Statement 37 is not a statement of fact material to any issue raised in the United States' Motion.  Anadarko does not dispute that a fourth AFE was prepared to authorize funding for the production casing for the Macondo Well, and that this AFE was executed on April 15, 2010, by BP, MOEX, APC, and AE&P.  *See, e.g.*, *Authorization for Expenditure*, Dep. Ex. 1922, ANA-MDL-000030726 at 0727-28 (4/15/2010) (Ex. 23 hereto).

**U.S. STATEMENT 38:**

38. From January through May, 2010, BP sent "Joint Interest Billings" (JIBs) or invoices to co-owners MOEX and APC, which requested reimbursement to BP for the MOEX and APC's proportionate share of costs of casing and other physical components of the Macondo Well.

**ANADARKO RESPONSE:**

Anadarko objects to the extent that U.S. Statement 38 is not a statement of fact material to any issue raised in the United States' Motion.  Anadarko does not dispute that from January through May, 2010, BP sent invoices to MOEX and APC, which requested reimbursement to BP for MOEX's and APC's proportionate share of costs of casing and other physical components of the Macondo Well.  Anadarko further submits that it is undisputed that BP did not send such

invoices to AE&P.  *See, e.g.*, Dep. Ex. 4204, 4206, 4208, 4210, and 4212 (Exs. 24, 25, 26, 27, and 28 hereto) (January-May 2010 invoices from BP to APC, which do not list AE&P as a recipient); *see also* 30(b)(6) Deposition of Jerry Byrd, Anadarko Manager of Joint Interest Accounts and former Manager of Accounts Payable in the AFE Group (Ex. 39 hereto) ("Byrd 30(b)(6) Dep."), at 87:18-22; 87:24-88:11; 88:13-16; 93:1-5 (in reference to Dep. Ex. 4208 (Ex. 26 hereto), Byrd testified, "Anadarko Petroleum Corporation . . . [is] the only party that's being billed on this invoice for 33 percent."  He further stated, "I have only seen invoices addressed to Anadarko Petroleum Corporation").

### U.S. STATEMENT 39:

39. The JIBs itemized tangible equipment – physical assets, such as the well head and casing – which was included as part of the proportionate costs to be reimbursed by APC and MOEX.

### ANADARKO RESPONSE:

Anadarko objects to the extent that U.S. Statement 39 is not a statement of fact material to any issue raised in the United States' Motion.  Anadarko does not dispute that the invoices itemized tangible equipment—physical assets, such as the wellhead and casing—which was included as part of the proportionate costs to be reimbursed by APC and MOEX.

### U.S. STATEMENT 40:

40. The JIBs for Macondo well costs did not include BP's proportionate share of the Macondo Well.  BP retained a 65% ownership interest in the Macondo Well.

### ANADARKO RESPONSE:

Anadarko objects to the extent that U.S. Statement 40 is not a statement of fact material to any issue raised in the United States' Motion.  Nevertheless, Anadarko does not dispute that the invoices for Macondo Well costs did not include BP's proportionate share of the Macondo Well and that BP retained a 65% interest in the Macondo Well.

**U.S. STATEMENT 41:**

41. BP is a Delaware corporation.

**ANADARKO RESPONSE:**

Anadarko does not dispute that BP Exploration & Production, Inc. is a Delaware corporation.

**U.S.'s Alleged Additional Undisputed Material Facts**
**Relevant to Transocean's Liability**

**U.S. STATEMENT 42:**

42. The Transocean Defendants admit[] that one or more of the Transocean Defendants were the owners, owners *pro hac vice*, and/or operators of the MODU *Deepwater Horizon*.

**ANADARKO RESPONSE:**

Anadarko does not dispute that the Transocean Defendants admit that one or more of the Transocean Defendants were the owners, owners *pro hac vice*, and/or operators of the MODU *Deepwater Horizon*.

**U.S. STATEMENT 43:**

43. The Transocean Defendants have admitted their ownership of the *Deepwater Horizon* in pleadings, discovery, and public reports.

**ANADARKO RESPONSE:**

Anadarko does not dispute that the Transocean Defendants have admitted their ownership of the *Deepwater Horizon* in pleadings, discovery, and public reports.

**U.S. STATEMENT 44:**

44. The Transocean Defendants have admitted their operation of the MODU *Deepwater Horizon* in pleadings and discovery.

**ANADARKO RESPONSE:**

Anadarko does not dispute that the Transocean Defendants have admitted their operation of the MODU *Deepwater Horizon* in pleadings and discovery.

**U.S. STATEMENT 45:**

45. The Transocean Defendants are corporations.

**ANADARKO RESPONSE:**

Anadarko does not dispute that Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH are corporations.

**U.S.'s Alleged Additional Undisputed Material Facts**
**Relevant to Anadarko**

**U.S. STATEMENT 46:**

46. Beginning in January, 2010, and continuing through May, 2010, APC received requests for payment from BP for costs associated with the construction of the Macondo Well in the form of invoices and cash call advances, which it paid timely.  APC paid invoices from BP for its proportionate share of the costs of the components that were installed in the Macondo Well.

**ANADARKO RESPONSE:**

Anadarko objects to the extent that U.S. Statement 46 is not a statement of fact material to any issue in the United States' Motion.  Anadarko does not dispute that from January through May, 2010, APC received requests for payment from BP for costs associated with the construction of the Macondo Well in the form of invoices and cash call advances, which it paid timely.  APC does not dispute that it paid invoices from BP for its proportionate share of the costs of the components that were installed in the Macondo Well.  Anadarko further submits that it is undisputed that AE&P received no requests for payment from BP between January and May, 2010.  *See* Anadarko Response to U.S. Statement 38, *supra*.

**U.S. STATEMENT 47:**

47. In the invoices, which also include costs associated with other Wells, the costs for the Macondo Well are identified and tracked by the reference number to the Authorization for Expenditure executed by APC for the Macondo Well.

**ANADARKO RESPONSE:**

Anadarko objects to the extent that U.S. Statement 47 is not a statement of fact material to any issue in the United States' Motion. Anadarko does not dispute that in the invoices, which also include costs associated with other wells, the costs for the Macondo Well are identified and tracked by the reference number to the Authorization for Expenditure executed by APC for the Macondo Well.

**U.S. STATEMENT 48:**

48. The invoices were itemized to include strings of casing, cement, production casing, casing hanger, casing accessories, and the well head.

**ANADARKO RESPONSE:**

Anadarko objects to the extent that U.S. Statement 48 is not a statement of fact material to any issue in the United States' Motion. Anadarko does not dispute that the invoices were itemized to include strings of casing, cement, production casing, casing hanger, casing accessories, and the wellhead.

**U.S. STATEMENT 49:**

49. APC paid its 33.33% (or, 25% after 110% of the well costs of the initial AFE was exceeded) proportionate share of costs associated with the Macondo Well, including the costs of the tangible personal property, from October 1, through April 20, 2010. It did not pay any of the costs of the incident or response to the explosion and spill. The final costs were paid through draw-down of a cash advance or cash call.

**ANADARKO RESPONSE:**

Anadarko objects to the extent that U.S. Statement 49 is not a statement of fact material to any issue in the United States' Motion. Anadarko does not dispute that APC paid 33.33% (or

25%, after 110% of the estimated well costs in the initial AFE were exceeded) of costs associated with construction of the Macondo Well, including the costs of the tangible personal property, incurred between October 1, 2009 and April 20, 2010.

Anadarko further submits that it is undisputed that prior to its settlement with BP on October 16, 2011, APC did not reimburse BP for any of the costs of the incident or response to the explosion and spill.  Anadarko further states that it is undisputed that, like many other oil and gas exploration companies, Anadarko voluntarily contributed certain personnel and equipment to assist in the oil spill response effort led by the United States Coast Guard.

Anadarko further states that it is undisputed that BP invoiced APC for costs associated with drilling the Macondo Well through May 2010, and that APC paid the portion of the May 2010 invoice addressing pre-incident costs through advance payments.  *See May 2010 Invoice from BP to APC*, Dep. Ex. 4212, ANA-MDL-000073379 (Ex. 28 hereto); Byrd 30(b)(6) Dep. at 94:13-21; 94:23-95:2; 96:7-9; 96:11-19; 97:9-16 (Ex. 39 hereto).   It is further undisputed that APC believed that it had paid BP for its entire share of the cost related to drilling the Macondo Well pursuant to the AFE.  Byrd 30(b)(6) Dep. at 92:11-13; 96:21-97:8 (Ex. 39 hereto).

Anadarko further submits that it is undisputed that AE&P did not receive any invoices from BP for any costs incurred in association with the construction of the Macondo Well between October 1, 2009 and April 20, 2010, and it is further undisputed that AE&P did not reimburse BP for any such costs.  *See* Anadarko Response to U.S. Statement 38, *supra*.

**U.S. STATEMENT 50:**

50. APC paid the proportionate share of costs sent to it on its own behalf.

**ANADARKO RESPONSE:**

Anadarko objects to U.S. Statement 50 because the phrase "proportionate share of costs sent to it on its own behalf" is unintelligible.

**U.S. STATEMENT 51:**

51. APC was a partial owner of the components that were installed in the Macondo Well, including the strings of casing, cement, production casing, casing hanger, and the well head.

**ANADARKO RESPONSE:**

Anadarko does not dispute that APC was a partial owner of the components comprising the Macondo Well that were installed in the wellbore, including the strings of casing, cement, production casing, casing hanger, and the wellhead.

**U.S. STATEMENT 52:**

52. APC was a partial owner of tangible personal property comprising the Macondo Well.

**ANADARKO RESPONSE:**

Anadarko does not dispute that APC was a partial owner of tangible personal property comprising the Macondo Well.

**U.S. STATEMENT 53:**

53. APC was an owner of the Macondo Well.

**ANADARKO RESPONSE:**

Anadarko objects to U.S. Statement 53 to the extent that the statement that APC is an "owner" of the Macondo Well for purposes of the Clean Water Act, 33 U.S.C. § 1321, or other applicable law, is a statement of law, not a statement of fact. Nevertheless, Anadarko does not dispute that, as a matter of law, APC was a partial owner of the Macondo Well.

**U.S. STATEMENT 54:**

54. Anadarko E&P is a limited liability company incorporated in the State of Delaware.

**ANADARKO RESPONSE:**

Anadarko does not dispute that AE&P is a limited liability company incorporated in the State of Delaware.

**U.S. STATEMENT 55:**

55. Anadarko Petroleum Corporation is a corporation incorporated in the State of Delaware.

**ANADARKO RESPONSE:**

Anadarko does not dispute that APC is a corporation incorporated in the State of Delaware.

## II. ANADARKO'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AS TO ANADARKO'S NON-LIABILITY UNDER THE CWA

In addition and supplemental to Anadarko's Responses to the foregoing Statement of Undisputed Material Facts in Support of Plaintiff United States' Second Motion for Partial Summary Judgment, Anadarko respectfully submits the following Statement of Further Undisputed Material Facts in Support of the Anadarko's Cross-Motion for Summary Judgment as to Anadarko's Non-Liability under the CWA, filed concurrently herewith.

<u>**Undisputed Material Facts with Respect to the MC Block 252 ("Macondo") Lease and Operating Agreement between Anadarko, BP, and MOEX Offshore 2007 LLC**</u>

1.      On December 17, 2009, APC, AE&P, and BP executed the Lease Exchange Agreement, Dep. Ex. 2824, BP-HZN-2179MDL02319086 (Ex. 4 hereto), governing the parties' interests in the Macondo Lease.  That same day, BP and APC executed the Well Participation

Agreement,[1] Dep. Ex. 2825, BP-HZN-2179MDL02319125 (Ex. 7 hereto), governing the parties' interests in the Macondo Well equipment.  Also on December 17, 2009, BP, APC, AE&P, and MOEX executed a Ratification and Joinder of the Operating Agreement, Dep. Ex. 1243, APC-HEC1-000001601 (Ex. 6 hereto), governing operations on the Macondo leasehold.  All three of these documents were effective October 1, 2009.  *See* Anadarko Response to U.S. Statements 23-33, *supra*.

### A.    The Macondo Prospect Offshore Deepwater Operating Agreement

2.    BP, APC, and AE&P ratified and joined the Operating Agreement on December 17, 2009, and the Operating Agreement formally designated BP as the "Operator" of the Macondo Lease.  *See* Anadarko Response to U.S. Statement 33, *supra*; *see also* United States of America's Revised Responses to the Applicable Requests Contained within the Various Defendants' Second Joint Discovery Requests to Plaintiffs, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La. Sept. 19, 2011) (Ex. 33 hereto) ("U.S. Revised Responses") at No. 64 (Anadarko "designated BP as the 'operator' for the Macondo Well . . . .").

3.    The terms of the Operating Agreement grant BP, as Operator, "the exclusive right and duty to conduct (or cause to be conducted) all activities or operations under this Agreement" and provide that "[t]he obligations, duties, and liabilities of the Parties under this Agreement are several and not joint or collective, and . . . nothing in this Agreement shall be construed to create a partnership, joint venture, association, or other form of business entity recognizable in law for any purpose."   Operating Agreement at Art. 5.1, 22.1  (Ex. 6 hereto); *see also* 30(b)(6) Deposition of Kirk Wardlaw, BP Senior Negotiator for the Western Hemisphere (Ex. 56 hereto)

---

[1]    It is undisputed that AE&P was not a party to the Well Participation Agreement.  *See* Anadarko Response to U.S. Statement 31, *supra*.

("Wardlaw 30(b)(6) Dep."), at 247:23-248:5; 250:16-19; 251:1-5, 252:7-18; 252:22-23; 253:8-12.  It is undisputed that the Operating Agreement provides that as Operator, BP was "not subject to the control or direction of [Anadarko or MOEX]" and functioned as an independent contractor.  Operating Agreement at Art. 5.1 (Ex. 6 hereto).  Article 5.1 of the Operating Agreement grants BP the sole right to select employees, contractors, and consultants; to set their hours and compensation; and to employ drilling rigs and accompanying machinery and personnel at the Macondo Prospect.  *Id.*

4.      Under the Operating Agreement, Anadarko was a Non-Operating Party ("NOP"). Operating Agreement at Art. 2.43 (Ex. 6 hereto) (a "Non-Operating Party" is "A Party other than the Operator").

<u>**Undisputed Material Facts with Respect to**</u>
<u>**Planning, Design, and Drilling Operations**</u>
<u>**on the Macondo Leasehold**</u>

**A.      Drilling Operations on the MC Block 252 Leasehold.**

5.      BP completed and approved the pre-drilling planning and design phase for the well to be drilled on the Macondo leasehold, and drilling operations on the Macondo leasehold commenced before Anadarko entered into the Operating Agreement with BP on December 17, 2009.  Deposition of Ian Little, Former BP Wells Manager, Exploration & Appraisal, for the Gulf of Mexico (Ex. 43 hereto) ("Little Dep."), at 454:17-456:4; Deposition of Robert Bodek, BP Operations Geologist, Gulf of Mexico Exploration (Ex. 38 hereto) ("Bodek Dep.") at 653:13-17; 653:23; *see also* Anadarko Response to U.S. Statements 4, 33, *supra*.

6.      The *Deepwater Horizon* was performing temporary abandonment operations on the Macondo Well at the time of the April 20, 2010 blowout and, therefore, the Macondo Well was not completed at the time of any discharge of oil because it had not been plugged and abandoned.  30(b)(6) Deposition of Paul Tooms, BP Vice President of Engineering (Ex. 54

hereto) ("Tooms 30(b)(6) Dep."), at 162:4-6.  It is undisputed that at the time of any discharge, the Macondo Well was "not a general production well" and "was still effectively under construction and had not got completion tubing in it."  *Id.*

**B.    Responsibility for Well Design and Drilling Operations.**

7.      It is undisputed that Anadarko performed no work or otherwise assisted BP in connection with BP's designing of the Macondo Well, or in any of the subsequent changes to that well design once drilling began.  Anadarko did not make any operational or other decisions with respect to the design of the Macondo Well before or after drilling operations on the Macondo leasehold began.[2]  Bly Dep. at 738:3-739:2 (Ex. 37 hereto); Bodek Dep. at 673:2-9 (Ex. 38 hereto); Little Dep. at 529:14-21, 529:23-24 (Ex. 43 hereto); *see also* The BP Parties' Supplemental Responses and Objections to Defendant Anadarko Petroleum Corporation's First Requests for Admissions, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La. Sept. 23, 2011) (Ex. 32 hereto) ("BP Supplemental Responses") at No. 28.

8.      It is undisputed that "BP was solely responsible for the drilling operations [on the Macondo leasehold]" and that, as a matter of law, Anadarko owed no duty to third parties in connection with BP's operations on the leasehold, and owed no duty to intervene in BP's or its contractors' operations.  B1 Order at 28 (Ex. 30 hereto); *see also E-mail from Mike Daly (BP) to David Rainey and Jasper Peijs re: Macondo deals*, Dep. Ex. 3239, BP-HZN-

---

[2]      "Well design" encompasses the well's casing, wellhead, mud, and coring programs.  "Information pertaining to well design" includes hole size, mud weight, fracture gradient, liner top depth, casing size, grade, and weight, well depth, pore pressure, and cement formulas and volumes.  Deposition of Jonathan Sprague, BP Drilling Engineering Manager for Exploration Appraisal, Development and Production for the Gulf of Mexico (Ex. 52 hereto) ("Sprague Dep."), at 555:1-22; *MC 252 #1 Macondo Prospect Drilling Program January 2010 Final*, Dep. Ex. 291, TRN-HCJ-00093526 at §§ 1.1-1.3.7 (1/27/2010) (Ex. 16 hereto); *Application for Permit to Drill a New Well for MC 252* [Macondo APD], Dep. Ex. 4021, BP-HZN-SNR00000122 at 0127-29 (5/26/2009) (Ex. 14 hereto).

2179MDL01833704 (10/22/2009) (Ex. 17 hereto) ("Need to be sure to retain clear control in Macondo").

9.      Anadarko made no operational decisions regarding the drilling operations on the Macondo leasehold.  Bly Dep. at 738:3-739:2 (Ex. 37 hereto); Bodek Dep. at 673:2-9 (Ex. 38 hereto); Deposition of John Guide, BP Wells Team Leader for the Macondo Well (Ex. 41 hereto) ("Guide Dep."), at 774:14-17; 30(b)(6) Deposition of Darrell Hollek, Anadarko Vice President of Operations and Development in the Gulf of Mexico (Ex. 42 hereto) ("Hollek 30(b)(6) Dep."), at 142:2-4; 30(b)(6) Deposition of Robert Quitzau, Anadarko Drilling Engineering Consultant (Ex. 47 hereto) ("Quitzau 30(b)(6) Dep."), at 42:9-11; 42:15; 622:16-623:4; 670:11-13; 670:17-21; 670:25; 30(b)(6) Deposition of David Rich, BP Wells Manager for the Gulf of Mexico, Drilling & Completions (Ex. 49 hereto) ("Rich 30(b)(6) Dep."), at 55:1-58:10; Deposition of Gregory Walz, BP Drilling Engineering Team Leader on the Macondo Well (Ex. 55 hereto) ("Walz Dep."), at 706:18-707:3; *see also* BP Supplemental Responses at No. 28 (Ex. 32 hereto).

10.      No Anadarko personnel worked on the design of the cement used for the Macondo Well's production casing.  U.S. Revised Responses at No. 63(b-c) (Ex. 33 hereto); The BP Parties' Responses and Objections to Defendant Anadarko E&P Company LP's First Requests for Admissions, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La. May 27, 2011) (Ex. 31 hereto) ("BP First Responses"), at No. 2; Deposition of Vincent Tabler, Halliburton Cement Service Supervisor (Ex. 53 hereto) ("Tabler Dep."), at 562:22-563:2; 563:11-16.

11.      Anadarko had no communications with the MMS with respect to the design of the Macondo Well or drilling operations carried out by the *Deepwater Horizon* on the Macondo leasehold.  Deposition of Frank Patton, Drilling Engineer for the New Orleans District of the

Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE," formerly the MMS) (Ex. 46 hereto) ("Patton Dep."), at 455:21-456:1; 456:5-22; 30(b)(6) Deposition of Michael Saucier, BOEMRE Regional Supervisor, Field Operations (Ex. 51 hereto) ("Saucier 30(b)(6) Dep."), at 362:13-363:7.

12.    MMS personnel do not regard non-operating investors like Anadarko as having the same obligations to comply with drilling regulations as designated operators.   Saucier 30(b)(6) Dep. at 363:8-25 (Ex. 51 hereto) (testifying that MMS regulations do not require Non-Operating Parties to submit documents related to changes in well design or drilling progress, such as Applications for Permits to Drill ("APDs"), Applications for Permits to Modify ("APMs"), or Weekly Activity Reports, because the MMS does not view those activities as the responsibility of Non-Operating Parties).

### Undisputed Material Facts with Respect to the Ownership and Operation of the Mobile Offshore Drilling Unit *Deepwater Horizon*

13.    In 1998, BP's predecessor (Vastar) contracted with Transocean's predecessor (R&B Falcon) to construct the *Deepwater Horizon* and then to operate it for BP.  *See Drilling Contract: RBS-8D Semisubmersible Drilling Unit [the Deepwater Horizon], Vastar Resources, Inc. and R&B Falcon Drilling Co., Contract No. 980249* ("Drilling Contract"), Dep. Ex. 4271, BP-HZN-MBI00021460 at 1461 (12/9/1998) (Ex. 3 hereto).  It is undisputed that the *Deepwater Horizon* was leased to BP for most of its operating life.  *Macondo Well Incident: Transocean Investigation Report*, Vol. 1, Dep. Ex. 4248 (6/2011) ("Transocean Report") at 17, 19 (Ex. 12 hereto); Geoff Webster, *Deepwater Horizon Explosion on April 20, 2010.  FRCP Rule 26 Report of Geoff Webster* [PSC Expert Report] (Ex. 10 hereto) ("Webster Report") at 2.  The Drilling Contract was later amended and remained in effect at the time of the blowout on April 20, 2010.

*See Amendment No. 38 to Drilling Contract No. 980249*, Dep. Ex. 1488, BP-HZN-CEC041475 at 1476 (9/28/2009) (Ex. 1 hereto) (renewing the Drilling Contract).

14.    The Drilling Contract required Transocean to furnish the *Deepwater Horizon's* blowout preventer ("BOP") and riser.  Drilling Contract at 1473, 1572 (Ex. 3 hereto).  Article 7.1.1 provides that "[Transocean] shall furnish and maintain at its sole expense all items designated in Exhibit B under the heading FURNISHED BY CONTRACTOR."  "Blowout preventers . . . Wellhead connector and . . . [a]ll other well control equipment components and replacement parts, including . . . riser" are included in the "FURNISHED BY CONTRACTOR" category.  *Id.* at Exhibit B-3, §§ 1.20-1.22.

15.    It is undisputed that Anadarko had no ownership, lease, or charter interest in the *Deepwater Horizon*, that Anadarko had no contractual relationship or communications with Transocean with respect to operations on the Macondo leasehold, and that Anadarko personnel never visited the *Deepwater Horizon*.  U.S. Revised Responses at No. 68 (Ex. 33 hereto); BP First Responses at No. 1 (Ex. 31 hereto); Deposition of Jim McWhorter, Transocean Senior Subsea Supervisor (Ex. 44 hereto) ("McWhorter Dep."), at 387:18-388:7.

16.    Anadarko had no operational control over operations aboard the *Deepwater Horizon*, and no control over the *Deepwater Horizon's* drilling schedule.  B1 Order at 28 (Ex. 30 hereto); O'Bryan 30(b)(6) Dep. at 749:6-10 (Ex. 45 hereto).

**Undisputed Material Facts with Respect to the
Discharge of Hydrocarbons from the *Deepwater Horizon* and its Appurtenances**

17.    On April 20, 2010, the *Deepwater Horizon* lost control of the Macondo Well during preparation for temporary abandonment operations, resulting in a blowout, and a discharge of hydrocarbons from the *Deepwater Horizon*. The hydrocarbons discharging from the *Deepwater Horizon* ignited, causing explosions and fire.  The fire onboard the *Deepwater*

*Horizon* continued for 36 hours until the hull became structurally unsound, and the hull, operating deck, and derrick sank.  *See Deepwater Horizon Accident Investigation Report* ("Bly Report"), Dep. Ex. 1, at 9 (9/8/2010) (Ex. 11 hereto); *Smit Salvage Daily Progress Report*, Dep. Ex. 5309, SMIT_00501 at 0501-02 (4/22/2010) (Ex. 19 hereto); *see also* Deposition of Mark Bly, BP Executive Vice President of Safety and Organizational Risk (Ex. 37 hereto) ("Bly Dep."), at 384:18-21.

### A.   The Loss of Well Control, Flow Path, and Discharge from the *Deepwater Horizon*

18.   No oil discharged directly from the Macondo Well into the Gulf of Mexico.  The flow of hydrocarbons from the formation flowed through the incomplete well into the *Deepwater Horizon's* BOP and riser, proceeded up the *Deepwater Horizon*'s riser, and was discharged from the riser onto, and out of, the operating deck and derrick of the *Deepwater Horizon*.  Response on Behalf of Triton Asset Leasing GMBH, Transocean Holdings LLC, Transocean Deepwater Inc., and Transocean Offshore Deepwater Drilling Inc. to BP Parties' First Set of Requests for Admission, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La. July 15, 2011) (Ex. 34 hereto) ("Transocean First Responses") at Nos. 191-92; *E-mail from Paul Tooms to various BP and U.S. Government personnel re: Drawings as requested on the call today* (with attachments), Dep. Ex. 6215, BP-HZN-2179MDL01616040 (5/16/2010) (Ex. 18 hereto); Bly Dep. at 59:12-18; 814:6-815:21; 817:12-818:4 (Ex. 37 hereto); 30(b)(6) Deposition of James Cowie, Member, BP Macondo Investigation Team and Former BP North Sea Platforms Manager (Ex. 40 hereto) ("Cowie 30(b)(6) Dep."), at 332:14-22; 448:24-449:25; Deposition of Steve Robinson, Member, BP Macondo Investigation Team and BP Vice President of Wells in Alaska (Ex. 50 hereto) ("Robinson Dep."), at 193:7-9; *see also Halliburton Deepwater Horizon Investigation*

*presentation* ("Halliburton Investigation"), Dep. Ex. 5270, HAL_1150082 at 0091-92 (9/20/2010) (Ex. 15 hereto); Bly Report at 10, 54 (Ex. 11 hereto).  The United States' Expert agrees: "The flow path of the hydrocarbons was down the outside of the casing (through the cement sheath), up the inside of the shoe track, and up through the float shoe . . . The formation fluid then flowed up the inside of the casing, through the BOP and up the drilling riser . . . At some time subsequent to the first explosion on the rig, the flow also began to flow up the drillpipe."  Richard Heenan, *BP Macondo - Deepwater Horizon: Report for the United States of America* [U.S. Expert Report], Dep. Ex. 7528 (Ex. 9 hereto) ("Heenan Report") at 7.

19.     As hydrocarbons shot up through the derrick toward the crown block of the *Deepwater Horizon*, the vessel's crew responded by routing the hydrocarbons through the *Deepwater Horizon's* mud-gas separator.  Transocean First Responses at No. 193 (Ex. 34 hereto); Bly Report at 28, 103-04, 118 (Ex. 11 hereto); Heenan Report at 25-26 (Ex. 9 hereto); Halliburton Investigation at 0106 (Ex. 15 hereto).  The flow of hydrocarbons overwhelmed the *Deepwater Horizon's* mud-gas separator, at which point hydrocarbons were observed discharging from multiple vents onto and out of the operating deck of the *Deepwater Horizon* and into the Gulf of Mexico. Transocean First Responses at No. 193, 199-200 (Ex. 34 hereto); Heenan Report at 25-26 (Ex. 9 hereto); *see also* Halliburton Investigation at 0101, 0107-08, 0120 (Ex. 15 hereto).

20.     The *Deepwater Horizon's* crew attempted to activate the *Deepwater Horizon's* BOP to seal off the riser.  The BOP failed to seal off the riser, allowing hydrocarbons to continue to discharge from the *Deepwater Horizon* into the Gulf of Mexico.  Transocean First Responses at Nos. 194-95 (Ex. 34 hereto); Halliburton Investigation at 0104 (Ex. 15 hereto); Bly Report at 28, 103 (Ex. 11 hereto).

21.     The hydrocarbons discharging from the vessel ignited, causing explosions and fire.  Transocean First Responses at Nos. 233, 322-23 (Ex. 34 hereto); Robert D. Grace, *Expert Report on Behalf of BP* [BP Expert Report] ("Grace Report") (Ex. 8 hereto), at 22-23; *see also* Halliburton Investigation at 0109, 0111 (Ex. 15 hereto); Bly Report at 29 (Ex. 11 hereto).  The *Deepwater Horizon's* crew attempted to activate the *Deepwater Horizon's* emergency disconnect system, which failed to cut the *Deepwater Horizon's* drilling riser and disconnect the *Deepwater Horizon* from its BOP.  Transocean First Responses at Nos. 197, 322-23 (Ex. 34 hereto); Halliburton Investigation at 0116 (Ex. 15 hereto); Bly Report at 29 (Ex. 11 hereto).

**B.     The Sinking of the main body of the *Deepwater Horizon* and Initiation of Discharge from *Deepwater Horizon's* BOP and Riser**

22.     As a result of the fire, the damaged hull, operating deck, and derrick of the *Deepwater Horizon* sank, causing the attached riser pipe to bend, buckle, and then break.  Bly Report at 163-65 (Ex. 11 hereto) (illustrating the riser kink and the pre- and post-blowout positions of the riser); Deposition of Gordon Birrell, BP Vice President of Operations (Ex. 36 hereto) ("Birrell Dep."), at 463:1-6.  The flow of hydrocarbons into the marine environment continued from the broken riser and BOP.  Birrell Dep. at 21:24-22:8; 465:17-466:2 (Ex. 36 hereto); Bly Report at 165 and Fig. 5D.15 (Ex. 11 hereto).

Respectfully submitted,

DATED: January 9, 2012                BINGHAM McCUTCHEN, LLP


/s/ *James J. Dragna*
James J. Dragna
jim.dragna@bingham.com
Bingham McCutchen LLP
355 South Grand Avenue
Suite 4400
Los Angeles, California 90071-3106
Telephone (213) 680-6436
Facsimile (213) 680-8636

Ky E. Kirby
ky.kirby@bingham.com
David B. Salmons
david.salmons@bingham.com
Michael B. Wigmore
michael.wigmore@bingham.com
Warren Anthony Fitch
tony.fitch@bingham.com
Sandra P. Franco
sandra.franco@bingham.com
Randall M. Levine
randall.levine@bingham.com
2020 K Street, NW
Washington, DC 20006-1806
Telephone (202) 373-6000
Facsimile (202) 373-6001

KUCHLER POLK SCHELL
WEINER & RICHESON, LLC

Deborah D. Kuchler, T.A. (La. Bar No. 17013)
dkuchler@kuchlerpolk.com
Janika Polk (La. Bar No. 27608)
jpolk@kuchlerpolk.com
Robert Guidry (La. Bar No. 28064)
rguidry@kuchlerpolk.com
1615 Poydras Street, Suite 1300
New Orleans, LA  70112
Tel:  (504) 592-0691
Fax:  (504) 592-0696

## <u>CERTIFICATE OF SERVICE</u>

      I HEREBY CERTIFY that, pursuant to Pre-trial Order No. 12, I have caused the foregoing to be served on all counsel via the Lexis Nexis File & Serve system, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, who will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on January 9, 2012.

                                          _____ */s/ James J. Dragna*_____
                                                 James J. Dragna