# EXHIBIT 34



Jul 15 2011
6:23PM

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" In the GULF OF MEXICO on April 20, 2010 | * | MDL NO. 2179 |
| | * | SECTION: J |
| | * | JUDGE BARBIER |
| Applies to: *All Cases* | * | MAG. JUDGE SHUSHAN |

**RESPONSE ON BEHALF OF TRITON ASSET LEASING GMBH, TRANSOCEAN HOLDINGS LLC, TRANSOCEAN DEEPWATER INC., AND TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC. TO BP PARTIES' FIRST SET OF REQUESTS FOR ADMISSION[1]**

Pursuant to Federal Rules of Civil Procedure 26 and 34, TRITON ASSET LEASING GMBH, TRANSOCEAN HOLDINGS LLC, TRANSOCEAN DEEPWATER INC., AND TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC. (collectively, "Respondents") object to the BP Parties' ("BP") First Requests for Admission ("BP's Requests for Admission") as follows:

---

[1] Although BP's Requests for Admission also name Transocean Ltd. and Transocean Inc., these parties object generally to BP's Requests for Admission, and to each individual Request for Admission, on the grounds that this Court lacks personal jurisdiction over Transocean Ltd. and Transocean Inc. Transocean Ltd. and Transocean Inc. so object with full reservation of rights, and by appearing now do not waive personal jurisdiction. On May 6, 2011, this Court entered a Special Appearance by Transocean Ltd. and Transocean Inc. and ordered a standstill of jurisdictional discovery, allowing counsel to accept service of process without waiver of jurisdiction (Docket Number 2274). Transocean Ltd. and Transocean Inc. have not consented to personal jurisdiction, and therefore, pending resolution of the standstill, BP's Requests for Admission as to Transocean Ltd. and Transocean Inc. are not proper.

**RESPONSE TO REQUEST FOR ADMISSION NO. 190:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that, between approximately 21:31 and 21:34, hydrocarbons continued to flow into the well after the pumps stopped, pushing heavy fluid into the annulus above the end of the drill string and causing increased drill pipe pressure.  Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny that the increase in drill pipe pressure indicated to the crew that a kick was in progress.

**REQUEST FOR ADMISSION NO. 191:**

Admit that on April 20, 2010, at approximately 21:38, hydrocarbons passed from the MC252 Well into the *Deepwater Horizon*'s riser.

**RESPONSE TO REQUEST FOR ADMISSION NO. 191:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that at approximately 21:36, the driller directed a floor hand to bleed pressure from the drill pipe until it equalized with the kill line.  This was done for a minute-and-a-half and is indicative of the drill crew diagnosing a plugged line or valve in the system. When the bleed stopped, pressure returned, but to a lower level than previously.

Respondents further state that at 21:39, while the drill crew was diagnosing the anomaly, post-incident analysis revealed that the influx of hydrocarbons reached the end of the drill string at a depth of 8,367 ft. and began to fill the annulus. This influx resulted in a rapid decline in drill pipe pressure and triggered the typical pressure signal of a kick. By 21:42, post-incident analysis indicates that hydrocarbons reached the top of the casing and began to flow into the riser. At that time, the drill crew was changing the flow path to the trip tank to check for flow. The rapid increase in volume in the trip tank alerted the drill crew to an influx.

**REQUEST FOR ADMISSION NO. 192:**

Admit that on April 20, 2010, at approximately 21:40, drilling fluid flowed onto the *Deepwater Horizon*'s rig floor.

**RESPONSE TO REQUEST FOR ADMISSION NO. 192:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission. Respondents further state that the flow of hydrocarbons reached the rig floor between 21:43 and 21:45.

**REQUEST FOR ADMISSION NO. 193:**

Admit that on April 20, 2010, at approximately 21:41, drilling fluid shot up through the *Deepwater Horizon*'s derrick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 193:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by

Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission. Respondents further state that the flow of hydrocarbons reached the rig floor between 21:43 and 21:45. The drill crew activated the diverter to direct fluid to the mud-gas separator ("MGS") and called the BP well site leader, the senior toolpusher, and the bridge to alert them that a well-control event was occurring. Initially, the crew stopped the flow on the rig floor by diverting to the MGS. However, the volume and force of the flow overwhelmed the MGS, and fluid began pouring out of its outlet lines.

**REQUEST FOR ADMISSION NO. 194:**

Admit that on April 20, 2010, the *Deepwater Horizon*'s drilling crew did not take any well control action in response to the kick until approximately 21:41.

**RESPONSE TO REQUEST FOR ADMISSION NO. 194:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the drill crew activated the upper annular BOP element at 21:43. Respondents further state that at that time, the well was flowing at an estimated 92 bbl per minute at the surface. An increase in kill line pressure at this time indicates that the annular did close. The subsequent decline in pressure indicates, however, that the annular did not hold a seal.

**REQUEST FOR ADMISSION NO. 195:**

Admit that on April 20, 2010, the *Deepwater Horizon*'s drilling crew did not attempt to activate any of the *Deepwater Horizon* blowout preventer's annular preventers in response to the kick until approximately 21:41.

**RESPONSE TO REQUEST FOR ADMISSION NO. 195:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the drill crew activated the upper annular BOP element at 21:43. Respondents further state that at that time, the well was flowing at an estimated 92 bbl per minute at the surface. An increase in kill line pressure at this time indicates that the annular did close. The subsequent decline in pressure indicates, however, that the annular did not hold a seal.

**REQUEST FOR ADMISSION NO. 196:**

Admit that on April 20, 2010, the *Deepwater Horizon*'s drilling crew did not attempt to activate any of the *Deepwater Horizon* blowout preventer's pipe rams in response to the kick until approximately 21:46.

**RESPONSE TO REQUEST FOR ADMISSION NO. 196:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General

Objections, Respondents admit that between 21:46 and 21:47, the crew activated one or more of the BOP variable bore rams ("VBRs") to seal the annular space. Respondents further state that at 21:47, the drill pipe pressure increased and the kill line pressure decreased, indicating that a ram had successfully closed and sealed the annular space.

**REQUEST FOR ADMISSION NO. 197:**

Admit that on April 20, 2010, the *Deepwater Horizon*'s drilling crew did not attempt to activate the *Deepwater Horizon* blind shear ram in response to the kick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 197:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission. Respondents further state that crew members on the bridge attempted to activate the emergency disconnect system ("EDS"), which is designed to close the blind shear rams ("BSRs") and detach the LMRP so that the rig can move away. The explosions on the rig severed the communication link between the BOP stack and the rig, preventing surface control of the EDS. As a result, efforts to activate the EDS from the bridge were unsuccessful.

**REQUEST FOR ADMISSION NO. 198:**

Admit that on April 20, 2010, the *Deepwater Horizon*'s drilling crew routed flow from the kick to the mud-gas separator.

133

**RESPONSE TO REQUEST FOR ADMISSION NO. 198:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the drill crew had already lined the diverter packer to direct the flow from the well to the MGS pursuant to BP and Transocean standard practice. Therefore, the drilling crew could not have routed flow from the riser to the MGS, as it was already lined up to go to the MGS.

**REQUEST FOR ADMISSION NO. 199:**

Admit that on April 20, 2010, the *Deepwater Horizon* drilling crew's use of the mud-gas separator in response to the kick caused gas and drilling fluids to flow down onto the rig.

**RESPONSE TO REQUEST FOR ADMISSION NO. 199:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the drill crew closed the diverter packer to redirect the flow from the well to the MGS pursuant to BP and Transocean standard practice. Respondents further state that when the drill crew detected flow on the trip tank, the flow rate was within the capacity of the MGS, as measured on the trip tank. After flow was diverted to the MGS, the increasing rate of flow exceeded the design capacity of the MGS. At approximately 21:48 witnesses said

mud began flowing out of the MGS vacuum breaker line located halfway up the derrick, and fluid overflow from the MGS filled the mini trip tank.

**REQUEST FOR ADMISSION NO. 200:**

Admit that on April 20, 2010, the *Deepwater Horizon*'s drilling crew did not route the flow from the kick through an overboard diverter.

**RESPONSE TO REQUEST FOR ADMISSION NO. 200:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the drill crew closed the diverter packer to redirect the flow from the well to the MGS pursuant to BP and Transocean standard practice. When the drill crew detected flow on the trip tank, the flow rate was within the capacity of the MGS, as measured on the trip tank. After flow was diverted to the MGS, the increasing rate of flow exceeded the design capacity of the MGS. Respondents further state that it does not appear actions were taken to direct flow through the main overboard diverter lines prior to the explosion. It is impossible given the magnitude of the blowout to know if the diverter packer would have kept flow diverted overboard and if the gas ignition could have been prevented.

**REQUEST FOR ADMISSION NO. 201:**

Admit that on April 20, 2010, the *Deepwater Horizon*'s drilling crew could have routed the flow from the kick through an overboard diverter.

pose significant safety problems on a rig; they increase the risk of injuries, cause interruptions to operations, and can lead to what is known as "alarm fatigue." For example, smoke detectors, which operate not by specifically identifying smoke in the air but rather by detecting any small particles (e.g., soot, dust, cement, steam, water vapor, and sand particles), are prone to triggering frequent false alarms when the system is in automatic mode. Likewise, sensors on the exterior of the rig can trigger alarms due to their exposure to the elements. If these false alarms were to sound regularly, as has been the case when marine alarm systems are set in automatic mode, crew responsiveness would be likely to decline and injuries would be likely to increase. The manual activation system prevents this "alarm fatigue" problem, assuring that the alarms will continue to be heeded.

**REQUEST FOR ADMISSION NO. 233:**

Admit that on April 20, 2010, none of Transocean's crew members aboard the *Deepwater Horizon* sounded the general alarm after the gas detectors activated.

**RESPONSE TO REQUEST FOR ADMISSION NO. 233:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission. Respondents further state that at approximately 21:45, a member of the drill crew called the bridge to report a well-control situation and then hung up. The bridge team attempted to return the call to get more information but got no response. Moments later, at about 21:47, the gas-detection system alarm panel on the bridge began to activate, first indicating the presence of gas in the shale shaker house, then the

154

drill floor, and then other areas of the *Deepwater Horizon*. As trained, the bridge team immediately called the shale shaker house to alert personnel and gather information, but they got no response. Shortly thereafter, the bridge team received a call from the engine control room and informed the crew member of a well-control situation. The bridge team called the *Bankston* at about 21:48 and instructed her to move a safe distance away from the rig to a standby position. Senior rig personnel from both Transocean and BP were notified of the well-control event before the first alarms sounded and were attempting to respond to requests for assistance when the rig lost power and the first explosion occurred. Following the first explosion at about 21:49, the bridge team sounded the general alarm and made a PA announcement instructing personnel to muster in the galley and cinema.

**REQUEST FOR ADMISSION NO. 234:**

Admit that on April 20, 2010, after approximately 21:49, the *Deepwater Horizon*'s Emergency Response Team No. 1 did not take any action to fight the fire on the rig.

**RESPONSE TO REQUEST FOR ADMISSION NO. 234:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that that *Deepwater Horizon* crew members with emergency response duties attempted to proceed to their muster stations, such as the ECR and fire-fighting stations. However, the conditions aboard the *Deepwater Horizon* precluded fire-fighting activities. Once the rig lost power at approximately 21:49, the fire pumps were not operational.

of the incident on April 20, 2010, the extreme flow rate from the well created sufficient force to lift the drill string, moving the tool joint up and partly into the upper annular BOP element.

**REQUEST FOR ADMISSION NO. 322:**

Admit that on April 20, 2010, the *Deepwater Horizon*'s EDS did not shut in the MC252 Well in response to the kick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 322:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the explosions and fire on April 20, 2010 severed the communication link between the BOP and the rig, preventing activation of the EDS.

**REQUEST FOR ADMISSION NO. 323:**

Admit that on April 20, 2010, the *Deepwater Horizon*'s EDS did not disconnect the lower marine riser package from the blowout preventer.

**RESPONSE TO REQUEST FOR ADMISSION NO. 323:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the explosions and fire on April 20, 2010 severed the communication link between the BOP and the rig, preventing activation of the EDS.