# EXHIBIT 36

TB/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) ) ) ) ) ) ) | MDL NO. 2179 <br><br> SECTION: J <br><br> JUDGE BARBIER <br><br> MAG. JUDGE SHUSHAN |

## *CONFIDENTIAL*

### *WorldwideVIEW*™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



## Gordon Birrell
**VOLUME 1**

SEPTEMBER 14, 2011

## *COPY*



Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

```
 1    that purpose prior to the explosion of the
 2    DEEPWATER HORIZON?
 3         A.    So I was physically in there
 4    shortly after -- around about this time, as I
 5    recall.  So I guess -- I think it was open.
 6    I think I was physically there managing the
 7    volcanic issue.
 8         Q.    Once the DEEPWATER HORIZON
 9    exploded, did that crisis group immediately
10    switch over to the DEEPWATER HORIZON crisis,
11    or did you stay focused on the Icelandic
12    volcanos?
13         A.    What happened was, the Gulf of
14    Mexico team came into the crisis center and
15    said, we've had an incident offshore.  We
16    need the crisis center facilities.  Could you
17    move elsewhere?
18               So I moved my team back to one
19    of their other offices, and the Gulf of
20    Mexico team occupied the crisis center from
21    that point on.  But I left and finished off
22    the work I was doing on the Icelandic crisis.
23         Q.    Okay.  But there came a point in
24    time where you came back?
25         A.    I did.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        Q.    Into the crisis center?
 2        A.    There was.
 3        Q.    And when was that?
 4        A.    A couple of days later.  I don't
 5   exactly remember, but one or two days later,
 6   I guess.  The -- the DEEPWATER HORIZON had
 7   already gone down, so however many days that
 8   was.  So it was roughly one or two days.
 9        Q.    So it was after April 22nd when
10   it sank?
11        A.    Yes.
12        Q.    Okay?  And -- and were you given
13   any specific responsibilities?  I assume this
14   was at incident command, is what we call it
15   now?
16        A.    I was --
17        MR. ROSENBERG:  Object to form.
18        A.    The -- the request specifically
19   came from James Dupré and that my specific
20   responsibilities were to lead a small -- or
21   to set up and then lead a small engineering
22   team to evaluate the integrity of the riser
23   that had fallen over.
24              So it was now laying
25   horizontal -- horizontally along the seabed,
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    and we were concerned that the -- we had a
2    kink.  The so-called kink was in the riser
3    bent over at 90 degrees.  We were worried
4    about the integrity of that kink.
5            Q.    Were you -- you were worried
6    about erosion and that kind of stuff from
7    flow coming out of the well, correct?
8            A.    Correct.
9            Q.    Just looking at the -- the
10   documents that were in your custodial file,
11   you're copied on a lot of documents dealing
12   with flow rate, dealing with source control
13   options.
14                 You're not saying, as we sit
15   here today, that your only responsibility was
16   to look at the riser kink, are you?
17           A.    In the first few days, the
18   answer is, yes, I was only responsible for
19   the riser kink evaluation.
20           Q.    Okay.  But after those first few
21   days, you moved on to looking at other
22   things?
23           A.    My role changed three times
24   during the incident response.  So initially,
25   it was the riser kink, and then after that, I

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1    was -- that did evolve into looking at other
 2    options.
 3         Q.    By other options, you mean,
 4    other options to either kill the well or
 5    contain the spill?
 6         A.    Not -- not kill the well.  I was
 7    not involved in options to kill the well, and
 8    early on, not to -- so the options were to
 9    cap the well using different methods.
10         Q.    Okay.  But -- maybe I should
11    state that better.
12               You -- you were involved, at
13    least to some degree, in the work of the --
14    of the capping stack, correct?
15         A.    Only -- so later on, I had an
16    operational role, and I was -- I was -- I had
17    a responsibility when we're running the
18    capping stack.  I was not involved in the
19    design of the capping stack or the -- or
20    indeed, the construction of the capping
21    stack.
22         Q.    But you were involved in
23    discussions of whether or not to use it or to
24    implement it, correct?
25         A.    I was, yes.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) ) ) ) ) ) ) | MDL NO. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAG. JUDGE SHUSHAN |

### CONFIDENTIAL

### *WorldwideVIEW*™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



## Gordon Birrell
**VOLUME 2**

SEPTEMBER 15, 2011

### COPY



Systems Technology for the Litigation World

Litigation Group◆Court Reporting◆Video Production◆Videoconferencing
**For U.S. & International Services**
800 - 745 - 1101

```
 1         VIDEOGRAPHER:  This is volume 2 of the
 2   deposition of Gordon Birrell in regards to
 3   the oil spill of the oil rig DEEPWATER
 4   HORIZON in the Gulf of Mexico on April 20th,
 5   2010.  Today's date is September 15th, 2011.
 6   The time is 8:28 a.m., and we are now on the
 7   record.
 8                GORDON BIRRELL,
 9   having been first duly sworn, testified as
10   follows:
11                  EXAMINATION
12   BY MR. HEBERT:
13        Q.    Good morning, Mr. Birrell.
14        A.    Good morning.
15        Q.    I introduced myself earlier.
16   I'm C.J. Hebert.  I'm here with Ben
17   Alexander.  We are here to represent
18   Transocean.
19        A.    Okay.
20        Q.    I want to focus for a little
21   while this morning on that period of time
22   when you first were directed to work on the
23   DEEPWATER HORIZON incident.  We heard your
24   testimony that you're already at the crisis
25   center.  And that occurred at -- sometime
```

1  subsequent to April 22nd.  If I recall your
2  testimony yesterday, you said the DEEPWATER
3  HORIZON had fallen off of location, sunk, and
4  in so doing, a kink in the riser was created.
5           Do you recall all of that?
6      A.   I do, yes.
7      Q.   All right.  And you were
8  directed after that to -- to evaluate the
9  kink insofar as its integrity.
10          Was my understanding correct
11 about all of that?
12     A.   That is correct.
13     Q.   Okay.  So -- so about what time
14 is it that you get that direction?  Is it on
15 April 22nd?  The 23rd?  When exactly was
16 that?
17     A.   I don't recall exactly when it
18 was.  But the -- the -- the riser was
19 horizontal at that point, so the -- the rig
20 had gone down, and that's all I recall.  When
21 I arrived in the crisis center, the -- the --
22 it was horizontal.  That's all I recall.
23     Q.   All right.  And -- and the fact
24 that the riser was horizontal, that had been
25 developed through ROV-type intervention so

1  that they could see what was going in the
2  position of the riser?
3        A.    Yes, that's correct.
4        Q.    And I guess through pure
5  physics, you know, if it -- if the rig moved
6  off location, ultimately sunk, something had
7  to happen to the riser, right?
8        A.    I would imagine so, yeah.
9        Q.    Okay.  So -- and -- and I think
10 your testimony was that the riser was bent
11 over more than 90 degrees?
12       A.    Correct.
13       Q.    Okay.  With that backdrop, you
14 were called in, and you were to evaluate the
15 integrity of the riser kink?
16       A.    Correct.
17       Q.    Why?
18       A.    Because in my normal job at that
19 time, I had a small engineering team who
20 reported to me, so I had access to the
21 expertise to do this.  I -- I didn't
22 personally have the expertise, but I had full
23 access to the -- to the expertise because I
24 had a -- a small engineering team who
25 primarily worked on surface engineering, not

**PURSUANT TO CONFIDENTIALITY ORDER**

Case 2:10-md-02179-CJB-DPC Document 5113-40 Filed 01/09/12 Page 11 of 13

465

```
 1    drilling engineering or wells, but plant,
 2    production plant, et cetera.
 3         Q.   Well, I recall you saying
 4    earlier yesterday that you also had some
 5    involvement in your vice president role
 6    dealing with corrosion and maybe that was
 7    also a reason, perhaps, why you were
 8    selected?
 9         MR. ROSENBERG:  Object to form.
10         A.   No.  Corrosion was not a
11    concern.  It was primarily erosion.
12         Q.   All right.
13         A.   But I did -- I did have people
14    who have expertise in that area.
15         Q.   Okay.  In erosion?
16         A.   In erosion.
17         Q.   Okay.  So you -- you and your
18    team are charged with evaluating the
19    potential effects of erosion on the kink.
20              Why?
21         A.   We were concerned, or there was
22    a concern coming of Unified Command, that the
23    kink being bent over could be holding back
24    flow.  It could be creating a pressure drop
25    and holding back flow.  And if it failed,
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1  then more flow could -- could leak to the
2  ocean.  It was as simple as that.
3         Q.    Meaning that if erosion occurred
4  at the kink site, more release would occur?
5         A.    It did -- could occur, yes.
6         Q.    Could occur?
7         A.    Although, we knew nothing about
8  what was happening inside the well at that
9  point.  So it was just a theory, that if the
10 kink eroded, more flow could flow into the
11 ocean.
12        Q.    I understand.  And you made some
13 assumptions.  You talked about yesterday in
14 terms of flow rate and so on and so forth.
15 But I want to make sure the -- the record is
16 clear.
17              What factors could affect
18 erosion?
19        A.    Sand in the flow.
20        Q.    You mentioned that.
21        A.    Metallurgy, the type of metal
22 the -- the riser was made from.
23        Q.    You had that available to you?
24        A.    I don't think we did straight
25 away.  We did obtain, as I recall, some

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1    metallurgy, but not -- not in the first
 2    couple of days.  So I believe we made some
 3    assumptions about metallurgy.
 4         Q.    All right.
 5         A.    So sand, metallurgy, flow rate,
 6    and geometry of the bent, the kink, and what
 7    was inside the kink.
 8         Q.    Right.  And you mentioned
 9    yesterday about the pipes.  There were pipes
10    actually in the riser at that point, were
11    there not, in the kink?
12         A.    We did not know for sure.
13         Q.    But I think you concluded -- I
14    gathered from your testimony yesterday, that
15    jetting was occurring as a result of the
16    location or proximity of the pipes in the
17    vicinity of the kink, and that enhanced the
18    erosion?
19         A.    We did not know that for sure.
20    And indeed to this day, I haven't gone back
21    and checked that jetting occurred.  Just
22    something -- something was happening inside
23    that kink.  It could be jetting.  Again, I
24    didn't check.
25         Q.    Okay.
```

**PURSUANT TO CONFIDENTIALITY ORDER**