# EXHIBIT 47

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3
     IN RE:  OIL SPILL           MDL NO. 2179
 4   BY THE OIL RIG
     "DEEPWATER HORIZON"         SECTION:  J
 5   IN THE GULF OF
     MEXICO, ON                  JUDGE BARBIER
 6   APRIL 20, 2010              MAG. JUDGE SHUSHAN

 7

 8

 9
```

15

16                     **VOLUME 1**

17

18         Deposition of **ROBERT QUITZAU**, 1910

19   Driscoll Street, Houston, Texas 77019, taken

20   in the Ponchartrain Room, 601 Poydras Street,

21   New Orleans, Louisiana 70130, on Wednesday,

22   May 25th, 2011.

23

24

25

```
 1              Object to form.
 2        THE WITNESS:
 3              I'm not aware of that.
 4   EXAMINATION BY MR. FINEMAN:
 5        Q.    With respect to the kinds of --
 6   or the method with which Anadarko received
 7   information regarding operations at Macondo,
 8   you've testified already about WellSpace.
 9   I'm going to come back to WellSpace in a
10   little bit.  Were there any other sources of
11   information that you or others at Anadarko
12   used to obtain information about what was
13   going on at Macondo?
14        A.    At various times, people could
15   access InSite Anywhere.  There were e-mail
16   correspondences and phone calls.
17        Q.    Were there any regularly
18   scheduled meetings between Anadarko personnel
19   and BP to discuss what was going on at the
20   well?
21        A.    Not that I'm aware of.
22        Q.    Were there any meetings between
23   people at Anadarko and BP about what was
24   going on at the well?
25        MS. WILMS:
```

1          Object to form.
2       THE WITNESS:
3          I'm not aware of those meetings,
4   if they occurred.
5   EXAMINATION BY MR. FINEMAN:
6       Q.   Sorry.  I broke my own rule.
7   Did you participate in any such meetings?
8       A.   I'm not aware of any meetings.
9       Q.   To your knowledge, was Anadarko
10  allowed to make any decisions regarding
11  operations at Macondo?
12      MS. WILMS:
13          Object to form.
14      THE WITNESS:
15          We did not make any decisions.
16  EXAMINATION BY MR. FINEMAN:
17      Q.   Was Anadarko permitted to make
18  recommendations or to raise questions,
19  disagreements, concerns or objections to BP
20  regarding operations at the well?
21      MR. DAVID:
22          Object to form.
23      THE WITNESS:
24          We were allowed to communicate and
25  track progress and ask questions.

```
 1   EXAMINATION BY MR. FINEMAN:
 2       Q.    Do you have -- was there any
 3   procedure or policy in place at Anadarko for
 4   how any questions would be communicated to
 5   BP?
 6       A.    There's no standard procedure
 7   that I was aware of.
 8       Q.    Can you recall any specific
 9   examples of questions, disagreements,
10   concerns or objections concerning operations
11   at Macondo that you personally participated
12   in?
13       MS. WILMS:
14            Object to form.
15       THE WITNESS:
16            I sent some e-mails with questions
17   to Bobby Bodek on at least one or two
18   occasions.
19   EXAMINATION BY MR. FINEMAN:
20       Q.    Concerning what?
21       A.    I believe it was concerning
22   activities surrounding drilling through the
23   productive interval.
24       Q.    So that drilling depth?
25       A.    Sorry?
```

1           UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:  OIL SPILL BY    MDL NO. 2179
     THE OIL RIG
5    "DEEPWATER HORIZON"      SECTION:  J
     IN THE GULF OF
6    MEXICO, ON APRIL 20,    JUDGE BARBIER
     2010                    MAG. JUDGE SHUSHAN
7

8

16                **VOLUME 2**

17

18        Deposition of **ROBERT QUITZAU**, 1910

19   Driscoll Street, Houston, Texas 77019, taken

20   in the Pontchartrain Room, 601 Poydras

21   Street, New Orleans, Louisiana 70130, on

22   Thursday, May 26, 2011.

23

24

25

**GAUDET, KAISER, L.L.C.**
**Board-Certified Court Reporters**

1   A.   There was no discussion on
2 safety concerns.  The wellbore integrity
3 issues were discussed about what -- you know,
4 what we couldn't do, as documented in the
5 e-mails.
6   Q.   And that relates to the mud
7 weight issues with the narrow drilling
8 margin?
9   A.   With the mud weight issues and
10 losses, yes.
11   Q.   Okay.  In the context of the
12 meetings that you were having at Anadarko
13 between April 12th and 14th about the TD
14 issue, did wellbore integrity issues -- were
15 they discussed in those meetings?
16   A.   You're talking about those two
17 meetings, that one on April 12th -- I don't
18 recall that they were.
19   Q.   Okay.  Were safety concerns
20 discussed in any of those meetings?
21   A.   I don't recall that they were.
22   Q.   Do you know whether anybody with
23 Anadarko was monitoring the Macondo well from
24 a safety perspective?
25   MS. WILMS:

```
 1                  Object to form.
 2           THE WITNESS:
 3                  To my knowledge, no one was
 4    monitoring an Anadarko well from a safety
 5    perspective.
 6           MS. WILMS:
 7                  Macondo well.  You misspoke.
 8           THE WITNESS:
 9                  Macondo well.
10    EXAMINATION BY MR. HARTLEY:
11           Q.     Was anybody from Anadarko
12    monitoring the well in terms of reviewing the
13    propriety of procedures being employed?
14           A.     What do you mean by "the
15    propriety of the procedures being employed"?
16           Q.     Looking at, for example, the T&A
17    procedure, determining whether there was an
18    agreement by Anadarko as to the progress, as
19    to the decisions being made?
20           A.     We didn't look at any
21    operational procedures.
22           Q.     You just assumed BP, as the
23    operator, made those decisions and sort of
24    watched as -- as the well was making progress
25    towards total depth?
```

1    A.    We assumed that they were making
2 all -- we knew that they were making all the
3 decisions, and we -- we tracked the progress
4 toward reaching the geological objectives.
5    Q.    In response to Mr. Fineman's
6 questions yesterday morning, you talked about
7 the root -- he asked you whether you thought
8 the well design was what caused the incident.
9          I think your response was
10 that -- that you disagreed and that your view
11 of the root cause was the misinterpretation
12 of the negative test and that the
13 displacement of a lot of large volume of
14 hydrocarbons come into the well.
15         Is that accurate?
16   A.    That's correct.
17 MS. WILMS:
18         Object to form.
19 THE WITNESS:
20         That's correct.
21 EXAMINATION BY MR. HARTLEY:
22   Q.    And that's your opinion as to
23 the root cause of the incident?
24   A.    That's my personal opinion;
25 correct.

Case 2:10-md-02179-CJB-DPC   Document 5113-51   Filed 01/09/12   Page 10 of 12
624

1      Q.   And in response to Mr. Hymel's
2  questions, you talked about the negative test
3  a little bit as well.
4           I think, if I heard you
5  correctly, you said that if -- if an anomaly
6  was identified as a negative test was being
7  conducted, it's your opinion that operations
8  would stop until the anomaly is resolved?
9      A.   The anomaly should be resolved;
10 that's correct.
11     Q.   You would not continue towards
12 displacement of the riser until that anomaly
13 is resolved?
14     A.   That's correct.
15     Q.   I'm going to hand you what I've
16 marked as Exhibit 2665.  It's in Tab 128.
17          (Exhibit No. 2665 marked for
18 identification.)
19 EXAMINATION BY MR. HARTLEY:
20          This is a series of e-mails on
21 June 1st of 2010 between you and Vic Estes.
22          Do you see that?
23     A.   I do.
24     Q.   I had to ask because -- in the
25 bottom e-mail, Mr. Estes sends you a

GAUDET, KAISER, L.L.C.
Board-Certified Court Reporters

```
 1   No. 6.
 2              (Whereupon, a brief recess was
 3   taken.)
 4       THE VIDEOGRAPHER:
 5              We are still on videotape No. 6.
 6   It's 3:28.
 7   EXAMINATION BY MS. WILMS:
 8       Q.   Good afternoon Mr. Quitzau.  As
 9   you know, I'm Nancy Wilms.  Just a couple of
10   questions.
11              Was it Anadarko's role to
12   communicate with BP regarding operational
13   decisions that were made on the Macondo well?
14       MR. DAVID:
15              Object to form.
16       THE WITNESS:
17              No, it was not.
18   EXAMINATION BY MS. WILMS:
19       Q.   Was it Anadarko's role to
20   evaluate BP's operational decisions that were
21   made on the Macondo well?
22       MR. DAVID:
23              Objection to form.
24       THE WITNESS:
25              No, it was not.
```

```
 1   EXAMINATION BY MS. WILMS:
 2        Q.    And can you find the exhibit on
 3   WellSpace that was marked in the Gisclair
 4   deposition as Exhibit 613, please.  And if
 5   you could turn to page that ends with the
 6   Bates numbers 579, please.
 7        A.    Okay.
 8        Q.    And based on this document, can
 9   you tell us what documents it appears that
10   you downloaded from WellSpace on April 20th,
11   2010?
12        A.    It appears like I downloaded the
13   daily drilling report for April 18th and the
14   mud log report -- Sperry report labeled 0 --
15   079.
16        Q.    And what time were those
17   downloads?
18        A.    The daily drilling report was at
19   7:25 a.m. and the mud log report was at
20   7:26 a.m.
21        Q.    And based on this document that
22   Halliburton produced, can you tell us when
23   Bobby Bodek uploaded the April 19th daily
24   operating report?
25        MR. DAVID:
```