# EXHIBIT 52

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2

 3   IN RE:  OIL SPILL      )    MDL NO. 2179
     by the OIL RIG,        )
 4   DEEPWATER HORIZON in   )    SECTION "J"
     the GULF OF MEXICO,    )
 5   April 20, 2010         )    JUDGE BARBIER
                            )
 6                          )    MAG. JUDGE
                            )    SHUSHAN
 7

 8
```



```
14

15               **************
                    VOLUME 2
16               **************

17

18            Deposition of JONATHAN SPRAGUE,
     taken at Pan-American Building, 601 Poydras
19   Street, 11th Floor, New Orleans, Louisiana,
     70130, on the 22nd of March, 2011.
20

21
     APPEARANCES:
22

23   Mr. Duke Williams
     WILLIAMS LAW GROUP, LLC
24   909 Poydras Street, Suite 1650
     New Orleans, Louisiana 70112
25
```

                    **GAUDET KAISER, L.L.C.**
                   Board-Certified Court Reporters

```
 1   correct?
 2        A.    Yes.
 3        Q.    And one part of team buy-in is
 4   offshore; isn't that correct?
 5        A.    Yes.
 6        Q.    Okay.  And who does that
 7   include?
 8        A.    That would typically --
 9   typically, what it is the well site leaders
10   and the cementing company -- the cementers
11   on the rig, typically, is what that refers
12   to.
13        Q.    Okay.  And you're not -- there's
14   no part of the beyond the best process that
15   would include buy-in from the rig crew?
16        A.    Okay.  We do a crew engagement
17   at the beginning of the well to get buy-in.
18   So the pre-spud meeting is -- that's where
19   we essentially get the buy-in of the -- of
20   the rig crew.
21        Q.    How can you get the buy-in of
22   the rig crew at the time of spudding the
23   well when you haven't tested or selected
24   the cement slurry that you're supposed to
25   use?
```

```
 1           A.    The buy-in is to the basis of
 2   design, which will include the casing
 3   program, pore pressure, the mud weights,
 4   and the recommended slurries per
 5   Halliburton's proposal.  And that's
 6   typically shown at a crew engagement.
 7           Q.    You're saying that the casing
 8   program had been finalized at the time of
 9   spudding the well?
10           A.    The initial basis of design was
11   finalized.  At the time of spudding the
12   well, there was a basis of design, yes.
13   There were some changes made due to
14   downhole conditions, but the original basis
15   of design had been set at the spudding of
16   the well.
17           Q.    Had the selection of the type of
18   cement slurry to be used been made at the
19   time of spudding the well?
20           A.    That's what I was told.  It was
21   the recommendation from our cementing
22   contractor.
23           Q.    So you're saying that you
24   achieved the buy-in of the rig crew at the
25   time of spudding of the well for the cement
```

```
 1    process?  Is that what your testimony is?
 2         A.   No.  No, I didn't say that.
 3    I -- I said it is typically done at the
 4    time of a crew engagement.  And the
 5    primary -- primarily, what buy-in means
 6    here is the well site leaders and the
 7    cementing contractor.
 8         Q.   So in the beyond the best
 9    process flowchart, your understanding is
10    that there's no mechanism for BP to get
11    buy-in from the rig crew in terms of the
12    cementing process?
13              MS. KARIS:
14                   Object to form.
15         A.   No.  I think I explained that
16    the cementing program given to BP by
17    Halliburton would have been part of the
18    basis of design that was to be discussed at
19    the crew engagement meeting.
20         Q.   And are you aware of whether or
21    not, in fact, that occurred?
22         A.   I don't know because I wasn't
23    involved with this well at that time.
24         Q.   Should it have occurred?
25         A.   I would have expected the basis
```