**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, | * * * * | MDL No. 2179 |
| | * | Section: J |
| This Pleading applies to: | * * | Judge Barbier |
| | * | |
| *All Cases* (*including Case No. 2:10-cv-04536 (United States v. BP Exploration & Production Inc., et al.)*) | * * * | Magistrate Judge Shushan |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**BP EXPLORATION & PRODUCTION INC.'S RESPONSES TO THE
UNITED STATES' STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO
THE LIABILITY OF BP EXPLORATION & PRODUCTION INC.,
THE TRANSOCEAN DEFENDANTS, AND THE ANADARKO DEFENDANTS**

1. BP acquired Lease OCS-G 32306 for Block 252, Mississippi Canyon, OCS Official Protraction Diagram, NH 16-10 ("Lease"), effective June 1, 2008.

   **RESPONSE:** Uncontested for purposes of this Motion.

2. An exploratory well was constructed on Block 252, Mississippi Canyon, the "Macondo Well."

   **RESPONSE:** Uncontested for purposes of this Motion.

3. The Macondo Well is located on the Outer Continental Shelf approximately 50 miles from the Mississippi River delta.

   **RESPONSE:** Uncontested for purposes of this Motion.

4. From at least October 1, 2009, the MODU *Transocean Marianas* was owned and/or operated by the Transocean Defendants. On or about October 2009, the *Transocean Marianas* began to be used for drilling of the Macondo Well.

   **RESPONSE:** Uncontested for purposes of this Motion.

5. Beginning on or about February 2010, the MODU *Deepwater Horizon* replaced the *Transocean Marinas* for the purpose of continuing the drilling of the Macondo Well. Drilling of the Macondo Well using the *Deepwater Horizon* continued in February 2010 and through March and a portion of April 2010.

    **RESPONSE:** Uncontested for purposes of this Motion, provided that the government intended to refer to the *Transocean Marianas.*

6. The *Deepwater Horizon* is a vessel.

    **RESPONSE:** Uncontested for purposes of this Motion.

7. The *Deepwater Horizon* is a mobile offshore drilling unit.

    **RESPONSE:** Uncontested for purposes of this Motion.

8. Casings, tubulars, the well head and/or other components of the Macondo Well were installed in the wellbore prior to April 20, 2010.

    **RESPONSE:** It is uncontested for purposes of this Motion that, as the authority cited by the government indicates, "As of April 20, 2010, various sub-sea equipment and components of the Macondo Well had been installed on or below the seafloor of the Outer Continental Shelf, including, but not limited to, the well casing and the well head." *See* BP Answer ¶ 45.

9. The Macondo Well is an "offshore facility" for purposes of the Clean Water Act, 33 U.S.C. § 1321(b), and the Oil Pollution Act, 33 U.S.C. § 2701 et al.

    **RESPONSE:** Uncontested for purposes of this Motion.

### Undisputed Material Facts Related to the April 20, 2010 Incident and Subsequent Discharge of Oil

10. The Macondo Well cement job was critical for maintaining well control.

    **RESPONSE:** Uncontested for purposes of this Motion.

11. The Macondo Well's cement job failed to prevent hydrocarbons from migrating into the wellbore.

    **RESPONSE:** It is uncontested for purposes of this Motion that the cement job failed to prevent *all* hydrocarbons from migrating into the well bore. It is contested whether the cement job reduced the amount of hydrocarbons entering the wellbore. Additionally, issues related to flow rate are scheduled to be adjudicated in Phase 2.

12. On April 20, 2011, there was a blowout of the Macondo Well, and fires and explosions on the drilling rig Deepwater Horizon.

    **RESPONSE:** Uncontested for purposes of this Motion.

13. Eleven men died as a result of the blowout.

    **RESPONSE:** Uncontested for purposes of this Motion.

14. Following the blowout on April 20, 2010, there was a discharge of oil into the Gulf of Mexico.

    **RESPONSE:** Uncontested for purposes of this Motion.

15. Oil from the MC 252 reservoir flowed through the Macondo Well and was discharged to the Gulf of Mexico from the Deepwater Horizon and then from the broken riser pipe and/or BOP after the *Deepwater Horizon*'s sinking.

    **RESPONSE:** It is uncontested that oil that once existed deep inside the Outer Continental Shelf travelled during the spill out of the Macondo reservoir, through the well, and then through Transocean-owned vessel appurtenances including the BOP and riser, before discharging into Gulf of Mexico waters or being captured by various containment methods. BP contests the government's legal conclusions premised on this paragraph for the reasons stated in the accompanying memorandum of law filed by BP.

16. The discharge also emanated from the *Deepwater Horizon* vessel, including from its appurtenances, the BOP and riser, into the Gulf of Mexico.

    **RESPONSE:** BP does not contest that the discharge emanated from the *Deepwater Horizon* vessel, including its appurtenances, the BOP and riser, into the Gulf of Mexico. BP does contest the United States' use in this paragraph of the word "also," which implies that oil was also discharged from structures other than the *Deepwater Horizon* and its appurtenances. As noted in the response to paragraph 15 above, BP contests the government's legal conclusion that a discharge occurred "from" the Macondo well or any offshore facility to which BP has the requisite legal nexus under the Clean Water Act.

17. The oil caused a film or sheen or discoloration on the surface of the water.

    **RESPONSE:** Uncontested for purposes of this Motion.

18. The discharge of oil was in such quantities as may be harmful.

    **RESPONSE:** Uncontested for purposes of this Motion exclusively as it relates to the phrase "in such quantities as may be harmful as determined by the President under paragraph (4) of this subsection" appearing in Clean Water Act Section 311(b)(3), 33 U.S.C. § 1321(b)(3). However, BP reserves all of its legal defenses in (a) its Answer concerning the extent of any harm alleged to have occurred to person, property, or the environment, as well as in (b) its Answer to the B1 and B3 Master Complaints.

19. Some of the oil spread to within 200 nautical miles of the United States' coastline.

    **RESPONSE:** Uncontested for purposes of this Motion.

20. Some of the oil spread to within 3 miles of the coastline of the United States and onto adjoining shorelines.

3

**RESPONSE:** Uncontested for purposes of this Motion.

21. The uncontrolled flow of oil continued for several months thereafter.

    **RESPONSE:** It is uncontested for purposes of this Motion that, as indicated in the authority relied upon by the government, oil flowed into the Gulf of Mexico for a period of approximately 85-87 days. *See* BP Answer ¶ 1. BP disputes, and the authority cited by the government does not establish, that the flow was "uncontrolled" during the entirety of that period. *See id.*

22. The Macondo Well was capped on July 15, 2010.

    **RESPONSE:** Uncontested for purposes of this Motion.

### The Contractual Arrangements Among the Lessees

23. On or about November 18, 2009, BP and MOEX executed a Lease Exchange Agreement, whereby BP assigned to MOEX a 10% interest in the Lease. (Ex. 1 hereto).

    **RESPONSE:** It is uncontested for purposes of this Motion that BP and MOEX executed such an Agreement. The Lease Exchange Agreement speaks for itself. Its interpretation is a question of law.

24. After MOEX and BP executed the assignment, it was submitted to MMS, which approved the assignment on February 23, 2010.

    **RESPONSE:** It is uncontested for purposes of this Motion that BP and MOEX executed such an assignment. The assignment speaks for itself. Its interpretation is a question of law.

25. BP assigned a 22.5% Record Title Interest in the Lease to A E&P Company LP ("A E&P"), effective October 1, 2009. BP executed the assignment on or about December 17, 2009, A E&P submitted the assignment to MMS on February 11, 2010, and MMS approved the assignment on February 23, 2010.

    **RESPONSE:** It is uncontested for purposes of this Motion that BP executed such an assignment. The assignment speaks for itself. Its interpretation is a question of law.

26. BP assigned a 2.5% Record Title Interest in the Lease to APC. BP executed the assignment on or about December 17, 2009, APC submitted the assignment to MMS on or about February 12, 2010, and MMS approved the assignment on February 23, 2010.

    **RESPONSE:** It is uncontested for purposes of this Motion that BP executed such an assignment. The assignment speaks for itself. Its interpretation is a question of law.

27. On or about December 17, 2009, APC, A E&P and BP executed a Lease Exchange Agreement, whereby BP assigned to APC and A E&P collectively a 25% interest in the Lease. (Ex. 2 hereto).

    **RESPONSE:** It is uncontested for purposes of this Motion that BP, A E&P and APC executed such an Agreement. The Lease Exchange Agreement speaks for itself. Its interpretation is a question of law.

28. A E&P assigned its 22.5% Record Title Interest in the Lease to APC. A E&P submitted the assignment to MMS on or about April 20, 2010, and MMS approved the assignment on April 28, 2010. APC and A E&P had agreed to an effective date of April 1, 2010.

    **RESPONSE:** It is uncontested for purposes of this Motion that A E&P executed such an assignment. The assignment speaks for itself. Its interpretation is a question of law.

29. As of April 20, 2010, MMS had not approved the A E&P reassignment of its interest in the Lease, and A E&P held 22.5% of the Lease.

    **RESPONSE:** The assignment speaks for itself. Its interpretation is a question of law.

30. After its assignments to MOEX, APC and A E&P, BP retained a 65% interest in the Lease.

    **RESPONSE:** The agreements speak for themselves. Their interpretation is a question of law.

31. On or about December 17, 2009, BP, APC and an APC subsidiary, Kerr-McGee Oil and Gas Corporation, also entered into a Well Participation Agreement for the Macondo Prospect, whereby APC would own a 25% interest in the Macondo Well. (Ex. 3 hereto).

    **RESPONSE:** It is uncontested for purposes of this Motion that BP, APC, and an APC subsidiary, Kerr-McGee Oil and Gas Corporation, entered into such an Agreement. The Well Participation Agreement speaks for itself. Its interpretation is a question of law.

32. As consideration for its 25% proportionate share of the Macondo Well, BP and APC agreed that APC would pay "1/3 for 1/4," or 33.33% of up to 110% of the estimated costs of the Macondo Well as set forth in the Initial Authorization for Expenditure.

    **RESPONSE:** The Well Participation Agreement speaks for itself. Its interpretation is a question of law.

33. On or about November 18, 2009, BP and MOEX executed a Joint Operating Agreement that set forth their agreement among themselves as to their rights and responsibilities, operational duties, accounting mechanism, and many other terms as to the Macondo Prospect. The Anadarko Defendants executed a Ratification and Joinder of the Joint Operating Agreement on or about December 17, 2009. All signatories agreed that the Joint Operating Agreement would be retroactively effective as of October 1, 2009.

**RESPONSE:** It is uncontested for purposes of this Motion that BP and other parties entered into such an agreement. The Joint Operating Agreement and Ratification and Joinder speak for themselves. Their interpretation is a question of law.

### Additional Undisputed Facts Relevant to BP's Liability:

34. BP is liable as an "operator" of the Macondo Well under the CWA, 33 U.S.C. § 1321(b)(7).

    **RESPONSE:** This statement is a legal conclusion rather than a statement of fact and is contested for the reasons stated in BP's accompanying memorandum of law. Moreover, given that BP admits that it is a partial owner of the Macondo well, this issue is unnecessary to resolve as to BP in the context of the present Motion.

35. Pursuant to BP's obligations under its Agreements with MOEX and Anadarko, BP prepared an Authorization for Expenditure for the drilling of the initial exploratory well, Macondo Well. The AFE was executed by BP, MOEX, and Anadarko (Exs. 6, 7 hereto).

    **RESPONSE:** It is uncontested for purposes of this Motion that BP prepared such an Authorization that was executed by BP, MOEX and Anadarko. That Authorization and the Agreements speak for themselves. Their interpretation is a question of law.

36. Two supplemental AFEs were prepared to cover additional costs related to the drilling of the Macondo Well. These AFEs were executed by BP, MOEX, and Anadarko. (Exs. 6, 8, 9 hereto).

    **RESPONSE:** It is uncontested for purposes of this Motion that BP prepared such supplemental Authorizations that were executed by BP, MOEX, and Anadarko. The supplemental AFEs speak for themselves. Their interpretation is a question of law.

37. A fourth AFE was prepared to authorize funding for the production casing for the Macondo Well. This AFE was executed on or around April 15, 2010, by BP, MOEX and Anadarko. (Exs. 6, 10 hereto).

    **RESPONSE:** It is uncontested for purposes of this Motion that BP prepared such a fourth Authorization that was executed by BP, MOEX and Anadarko. The fourth AFE speaks for itself. Its interpretation is a question of law.

38. From January through May, 2010, BP sent "Joint Interest Billings" (JIBs) or invoices to co-owners MOEX and APC, which requested reimbursement to BP for the MOEX and APC's proportionate share of costs of casing and other physical components of the Macondo Well.

    **RESPONSE:** It is uncontested for purposes of this Motion that BP sent Joint Interest Billings ("JIBs") or invoices to MOEX and APC. The JIBs speak for themselves. Their interpretation is a question of law.

39. The JIBs itemized tangible equipment – physical assets, such as the well head and casing – which was included as part of the proportionate costs to be reimbursed by APC and MOEX.

    **RESPONSE:** The JIBs speak for themselves. Their interpretation is a question of law.

40. The JIBs for Macondo well costs did not include BP's proportionate share of the Macondo Well. BP retained a 65% ownership interest in the Macondo Well.

    **RESPONSE:** The JIBs speak for themselves. Their interpretation is a question of law.

41. BP is a Delaware corporation.

    **RESPONSE:** BP Exploration & Production Inc. is a Delaware corporation.

### Additional Undisputed Facts Relevant to Transocean Defendants' Liability:

42. The Transocean Defendants admits that one or more of the Transocean Defendants were the owners, owners *pro hoc vice*, and/or operators of the MODU *Deepwater Horizon*.

    **RESPONSE:** Uncontested for purposes of this Motion, provided that the government intended to describe the Transocean Defendants as owners *pro hac vice*.

43. The Transocean Defendants have admitted their ownership of the *Deepwater Horizon* in pleadings, discovery, and public reports.

    **RESPONSE:** Uncontested for purposes of this Motion.

44. The Transocean Defendants have admitted their operation of the MODU *Deepwater Horizon* in pleadings and discovery.

    **RESPONSE:** Uncontested for purposes of this Motion.

45. The Transocean Defendants are corporations.

    **RESPONSE:** Uncontested for purposes of this Motion.

### Additional Undisputed Facts Relevant to Anadarko Defendants' Liability:

46. Beginning in January, 2010, and continuing through May, 2010, APC received requests for payment from BP for costs associated with the construction of the Macondo Well in the form of invoices and cash call advances, which it paid timely. APC paid invoices from BP for its proportionate share of the costs of the components that were installed in the Macondo Well.

**RESPONSE:**  Disputed in part.  It is undisputed for purposes of this Motion that APC timely paid the JIBs for January 2010 through March 2010 operations at the Macondo Well.  The agreements speak for themselves, and their interpretation is a matter of law. The remaining assertions in this paragraph are unsupported by and/or contradicted by the evidence.  *See* Ex. 1 (J. Byrd Dep.) at 91:24–93:11.

47. In the invoices, which also include costs associated with other Wells, the costs for the Macondo Well are identified and tracked by the reference number to the Authorization for Expenditure executed by APC for the Macondo Well.

    **RESPONSE:** The JIBs speak for themselves.  Their interpretations represent a question of law.

48. The invoices were itemized to include strings of casing, cement, production casing, casing hanger, casing accessories, and the well head.

    **RESPONSE:** The JIBs speak for themselves.  Their interpretations represent a question of law.

49. APC paid its 33.33% (or, 25% after 110% of the well costs of the initial AFE was exceeded) proportionate share of costs associated with the Macondo Well, including the costs of the tangible personal property, from October 1, through April 20, 2010.  It did not pay any of the costs of the incident or response to the explosion and spill. The final costs were paid through draw-down of a cash advance or cash call.

    **RESPONSE:** Disputed in part.  It is undisputed for purposes of this Motion that APC timely paid the JIBs for January 2010 through March 2010 operations at the Macondo Well.  The agreements speak for themselves, and their interpretation is a matter of law. The remaining assertions in this paragraph are unsupported by and/or contradicted by the evidence.  *See* Ex. 1 (J. Byrd Dep.) at 91:24–93:11.

50. APC paid the proportionate share of costs sent to it on its own behalf.

    **RESPONSE:** Disputed in part.  It is undisputed for purposes of this Motion that APC timely paid the JIBs for January 2010 through March 2010 operations at the Macondo Well.  The agreements speak for themselves, and their interpretation is a matter of law. Any remaining assertions in this paragraph are unsupported by and/or contradicted by the evidence.  *See* Ex. 1(J. Byrd Dep.) at 91:24–93:11.

51. APC was a partial owner of the components that were installed in the Macondo Well, including the strings of casing, cement, production casing, casing hanger, and the well head.

    **RESPONSE:** This statement represents a legal conclusion rather than a statement of fact.

52. APC was a partial owner of tangible personal property comprising the Macondo Well.

**RESPONSE:** This statement represents a legal conclusion rather than a statement of fact.

53. APC was an owner of the Macondo Well.

   **RESPONSE:** This statement represents a legal conclusion rather than a statement of fact.

54. Anadarko E&P is a limited liability company incorporated in the State of Delaware.

   **RESPONSE:** BP lacks knowledge or information sufficient to form a belief about the truth of this paragraph to the extent it is not directed at the conduct or liability of BP. The authority cited by the government establishes only that A E&P was incorporated in Delaware. *See* Answer of Anadarko Petroleum Corporation ¶ 16.

55. Anadarko Petroleum Corporation is a corporation incorporated in the State of Delaware.

   **RESPONSE:** Uncontested for purposes of this Motion.

## Admissibility of Exhibits

A court may take judicial notice "at any stage of the proceeding" of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b) & (f). *See also Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 & n.9 (5th Cir. 2005) (information available, inter alia, "on [an] agency's website" was "capable of accurate and ready determination by resort to a source whose accuracy on the matter cannot reasonably be questioned"); *Terrebonne v. Blackburn*, 646 F.2d 997, 1000 n.4 (5th Cir. 1981) ("Absent some reason for mistrust, courts have not hesitated to take judicial notice of agency records and reports."); *In re Katrina Canal Breaches Consol. Litig.*, 533 F. Supp. 2d 615, 632 (E.D. La. 2008) (explaining that courts may take judicial notice of information published on government websites and compiling cases discussing same); *Hamilton v. Paulson*, 542 F. Supp. 2d 37, 52 n.15 (D.D.C. 2008) ("[D]ue to the fact that the document is located on the website for the United States [agency], it is 'capable of accurate and ready determination by resort to sources whose

accuracy cannot reasonably be questioned,' and therefore subject to judicial notice by the Court" under Fed. R. Evid. 201. (quoting Fed. R. Evid. 201(b)).

> **RESPONSE:** This statement represents one or more legal conclusions rather than a statement of fact.

## BP'S ADDITIONAL GENUINE DISPUTES OF MATERIAL FACT AND OTHER RESERVED DEFENSES

Notwithstanding the government's insistence that its Motion should be granted without consideration of most of the critical facts underlying this litigation, BP submits that there are genuine issues of material fact on numerous topics, each of which prohibits the government from obtaining the relief that it prematurely seeks. The following represents a non-exhaustive list of such topics:

**BP's Claimed "Operator" Status:** As explained in BP's memorandum of law accompanying this statement, BP disagrees that it is an "operator as a matter of law" of the Macondo well or that this legal issue is necessary to reach in adjudicating this Motion, given that BP is not contesting that it is a partial owner of the Macondo well. BP also states that whether BP was an "operator" of the Macondo well for purposes of the Clean Water Act presents an issue of fact upon which the government bears the burden of proof. *See* Mem. at 17-21. The government does not address any relevant facts in this regard in its Memorandum of Law or its Statement of Undisputed Facts, let alone contend that they are undisputed. Hence, summary judgment cannot be granted as to whether BP is an "operator" of the well.

**"Unreasonable" Conditions:** The government contends in its opening brief that conditions at Macondo violated 30 C.F.R. § 250.300(a), which provides that lessees "shall not create conditions that will pose an unreasonable risk to public health, life, property, aquatic life, wildlife, recreation, navigation, commercial fishing, or other uses of the ocean." *Id. See* U.S. Mem. at 16. As explained in BP's accompanying memorandum of law, however, determining whether risk is "unreasonable" necessarily requires a factual determination. *See* Mem. at 13-14. The government has made no attempt whatsoever to demonstrate, using facts, that the conditions at Macondo preceding the blowout presented an "unreasonable" risk of harm; it simply argues from the fact of the blowout that the conditions must have been unreasonably dangerous. The government has failed to meet its factual burden.

**Joint and Several Liability:** As explained in BP's accompanying memorandum of law, BP is entitled to a divisibility defense under the Oil Pollution Act if it establishes that "a reasonable basis for apportionment exists." See Mem. at 9-10. As BP has explained, whether a reasonable basis for apportionment exists presents questions of fact that cannot be resolved in a vacuum. *See id.*; *see also* Doc. # 4392, at 13-15. The government does not suggest that the facts demonstrate that BP is not entitled to a divisibility defense, and indeed it does not even address any of the relevant facts. BP submits that the government has failed to meet its burden of showing, as a factual matter, that there is no "reasonable basis for apportionment" such that the government is entitled to joint and several liability.

10

**Prematurity, Unnecessary Issues, and Trial Phasing:** The government's Motion seeks to prematurely adjudicate certain BP defenses relating to claims splitting and divisibility. *See* U.S. Mem. at 4; U.S. Proposed Order. This approach should be rejected for the reasons explained in BP's memorandum of law. *See* Mem. at 4-10. Additionally, the government's Motion seeks to resolve against BP the unnecessary issue of whether BP was an "operator as a matter of law" of the Macondo well despite the fact that BP is not contesting that it is the partial owner of the Macondo well. *Compare* U.S. Mem. at 23-26 *with* Mem. at 17. Finally, BP reserves all of the defenses as to the resolution of disputed factual issues planned for the phased trial process, as explained in BP's memorandum of law. *See* Mem. at 4, 11, 14.

Dated:   January 9, 2012                          Respectfully submitted,

/s/ Don K. Haycraft

Robert R. Gasaway
Jeffrey Bossert Clark
Aditya Bamzai
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
202- 879-5000 (Tel)
202- 879-5200 (Fax)

Joel M. Gross
Brian Israel
Allison Rumsey
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC  20004-1206
E-Mail: Joel.Gross@aporter.com
Telephone:  202- 942-5000
Facsimile:  202- 942-5999

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone:  504 -581-7979
Facsimile:  504 -556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
312- 862-2000 (Tel)
312- 862-2200 (Fax)

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
202- 662-5985

***Attorneys for BP Exploration & Production Inc.***

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 9th day of January, 2012.

                                          /s/ Don K. Haycraft
                                          Don K. Haycraft