UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * * * * * | MDL NO. 2179<br><br>SECTION: J<br>JUDGE BARBIER<br>MAGISTRATE JUDGE SHUSHAN |
| THIS DOCUMENT RELATES TO ALL ACTIONS | * * * * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**BP'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
<u>MOTION FOR SPOLIATION SANCTIONS</u>**

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: 202-662-5985
Facsimile: 202-662-6291

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: 504-581-7979
Facsimile: 504-556-4108

Robert R. Gasaway
Jeffrey Bossert Clark
Aditya Bamzai
Kirkland & Ellis LLP
655 Fifteenth Street, NW
Washington, DC 20005
Telephone: 202-879-5000
Facsimile: 202-879-5200

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: 312-862-2000
Facsimile: 312-862-2200

*Attorneys for BP Exploration & Production Inc.*

January 9, 2012

# **TABLE OF CONTENTS**

                                                            **Page**

INTRODUCTION ..............................................................................................................................1

ARGUMENT ....................................................................................................................................1

I.      THE SURREPLY'S REITERATED ARGUMENTS FAIL. ...............................................1

II.     THE SURREPLY'S NEW, OR NEWLY EMPHASIZED, ARGUMENTS FAIL.............3

          A.      Halliburton's Conditioned Slurry Testing Supports BP's Requested Relief. ..........3

          B.      Halliburton's Vouching For The Credibility Of Its Employees Cannot
Substitute For Destroyed Testing Results. ...............................................................5

          C.      The Surreply Contains Telling Factual And Logical Errors. ..................................7

III.    HALLIBURTON PRESENTS NO JUSTIFICATION FOR DELETING
COMPUTER MODELING RESULTS. .............................................................................9

CONCLUSION.................................................................................................................................9

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*White v. Schoenfeld*,
   117 F.2d 131 (2d Cir. 1941) .................................................................................................. 5

### RULES

Fed. R. Civ. P. 37(b) ................................................................................................................ 8, 9

Fed. R. Evid. 401 ......................................................................................................................... 1

**INTRODUCTION**

The regular spoliation briefing from both sides established reasons why this Court should make a tailored factual finding that the post-incident, non-privileged testing performed by Halliburton's Rickey Morgan and Timothy Quirk indicated Halliburton's cement slurry was not stable. Nothing in Halliburton's recent Surreply changes this bottom-line conclusion.

**ARGUMENT**

**I.   THE SURREPLY'S REITERATED ARGUMENTS FAIL.**

The Surreply adds little to what Halliburton previously had urged. Most importantly, BP has already rebutted Halliburton's flimsy contention that a "failure to retain data and materials from post-incident tests performed with materials different from the Macondo slurry, and under lab, not downhole, conditions, does not constitute spoliation of evidence," and that tests "conducted *after* the blowout … cannot constitute evidence of anything that occurred *before* the blowout." Sur. 1, 4.

As previously explained, Halliburton's contentions are premised on fanciful notions that if evidence is not the most probative imaginable, it ceases to be evidence at all. *See* Reply 12-13. The Federal Rules say the opposite: "Evidence is relevant if it has *any* tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401 (emphasis added). Halliburton's post-incident testing (all of which should have been preserved) readily meets this Rule 401 standard — indeed, its "tendency" to reveal facts regarding cement stability and make those facts "more or less probable" is the whole reason Halliburton performed the testing. Surely, choices made by Halliburton engineers in investigating the Macondo accident, including post-incident testing of non-rig samples, provide a more realistic and reliable indicia of evidentiary value than counsel's *post hoc* rationalizations. *See* Reply 12-13.

Nor is there merit to Halliburton's renewed claim that BP should have instantly moved

for sanctions "nearly nine months" ago instead of carefully examining as many of the facts as could be learned through discovery. Sur. 1. Surely, as argued before, BP "cannot be faulted for not acting until after a careful and thorough investigation into the facts, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Reply 8. Halliburton says not one word in response.

Halliburton suggests, again, that sworn testimony and handwritten notes from its own employees (Timothy Quirk, Ron Faul, and Tommy Roth) showing that post-incident testing indicated that Halliburton's unconditioned slurry "settled" and ▮▮▮▮▮▮▮▮▮▮ ought not be credited merely because a fourth Halliburton employee (Morgan) said otherwise. Sur. 3. But even Morgan stated that the slurry was "thin." *Id.* The best Halliburton can do to prop up Morgan's lonely testimony is to suggest that "a 'thin' slurry *can* still be a stable slurry," *id.* at 6 (emphasis added). But this rejoinder hardly proves that, in fact, this particular thin slurry *was* a stable (albeit thin) slurry. Halliburton cannot escape an adverse finding simply "by asserting," unpersuasively, "that the notes and recollections of its own employees are untrustworthy." Reply 7.

Indeed, Halliburton's argument underscores the merits of BP's motion. It is precisely because Halliburton deliberately destroyed testing evidence that lawyers are now left to debate whether or not this evidence showed the tested slurry to be "thin" or "unstable." As the Court knows, two labs have tested Halliburton's slurry and found it to be unstable, while Halliburton has been openly critical of the validity of those tests. But we now know that Halliburton secretly conducted tests using the same materials (lab stock) that Halliburton criticizes others for using and then destroyed evidence of this testing after it saw the results. If Halliburton had followed the law and preserved the evidence — as every other testing laboratory in this litigation has done

2

— there would be no debate. We would know what "thin" means because the evidence of "thinness" would exist to be scrutinized by the parties.

Against this backdrop, Halliburton's assertion that the testing results showed the slurry was stable beggars common sense. If the results truly had shown a stable slurry — a revelatory outcome given the unstable results obtained by other labs — then Halliburton would naturally have gone an extra mile to preserve this favorable evidence. The more likely inference to be drawn is that spoliation occurred because those missing results confirmed the reliability of the independent testing results and testing methods Halliburton has sought to criticize. Halliburton should not be allowed to profit from something that looks like a calculated attempt to deprive the Court and parties of key evidence and the truth.

Finally, Halliburton takes another run at convincing the Court that it should not be held responsible for purposes of this civil discovery sanctions motion as a corporation for its employees' intentional destruction of unique evidence. *See* Sur. 9. This is not, however, a case of low-level employees unaware of litigation or their duties in regards to evidence preservation for civil litigation. Nor is this a case of employees acting outside the scope of their employment. If taken seriously, Halliburton's argument would mean that — so long as there is no company-wide evidence-destruction campaign — corporate managers, acting within the scope of their corporate responsibilities, may purposefully spoliate evidence with impunity, even where they acknowledge an express purpose of preventing damaging evidence from being "misinterpreted" at trial. Needless to say, this is not the law. *See* Reply 9-10.

## II.   THE SURREPLY'S NEW, OR NEWLY EMPHASIZED, ARGUMENTS FAIL.

### A.   Halliburton's Conditioned Slurry Testing Supports BP's Requested Relief.

Halliburton's new and newly emphasized arguments fare no better. Halliburton places new emphasis on a contention that failing to preserve *unconditioned* slurry testing results and

3

samples is not sanctionable because *conditioned* slurry alone is relevant. *See* Sur. 2. But just because Halliburton's current litigation position regards unconditioned slurry as irrelevant does not make it so — especially since Halliburton employees chose to test unconditioned slurry and the slurry that was actually used on the rig was not conditioned. If testing on unconditioned slurry is so entirely irrelevant, why did experienced Halliburton engineers bother to test such slurry in the wake of the Macondo accident? Halliburton provides no answers for this basic question, other than its say-so and its fanciful notions that so long as evidence is not the most probative imaginable, it ceases to be evidence at all.

In any event, Halliburton is incorrect about the relevance of testing on unconditioned slurry. Conditioning is an artificial process to allow the laboratory to investigate the stability of the foam at approximate downhole temperatures. But the conditioning process itself poses a challenging complexity: ████████████████████████████████

████████████████████████████████████████████████████

████████ In contrast, rather than foaming the slurry at ambient temperature, Morgan conditioned his slurry at 134 or 135 degrees for a period of two to three hours before foaming. Mot. Ex. 1 (Morgan Dep.) at 102:18-103:25. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ there are substantial reasons to think Halliburton's testing of slurries that are conditioned before foaming may well be considerably less realistic than its testing of unconditioned slurries. ████

████████████████████

Aside from ignoring the complexities of assessing the comparative merits of testing (un)conditioned slurries, there is another obvious flaw in Halliburton's argument: Halliburton's

4

post-incident testing of *conditioned* slurry also showed indicia of instability. Specifically, Quirk's testing on the conditioned slurry "indicated foam instability" because the foamed slurry lost "'about a quarter of the nitrogen.'" Mot. 2 (citing Mot. Ex. 2 (Quirk Dep.) at 333:6-10; 480:13-481:2); Reply 8 (citing Reply Ex. 2 (Quirk Dep.) at 333:6-10; 334:9-11; 480:13-481:2). Halliburton protests that BP's Motion "failed to even mention" this critical loss of foam stability, Sur. 6, but that is false. BP has contended from the outset that Halliburton's spoliated testing results for both unconditioned *and* conditioned slurry indicated serious signs of instability. *See* Mot. 2 ("The new tests [performed by Quirk] indicated foam instability."); Reply 8 ("Halliburton fails entirely to explain Quirk's statement that, even when he conditioned the cement for three hours, the slurry … reflected 'a substantial reduction in foam stability' ….").

### B. Halliburton's Vouching For The Credibility Of Its Employees Cannot Substitute For Destroyed Testing Results.

Halliburton also claims a court-directed factual finding is not appropriate because the litigation testimony of Halliburton employees can substitute for destroyed testing results. *See* Sur. 7. But that would allow a company to destroy evidence, so long as it could put forward its own employees as witnesses to testify in favor of the company's interpretation of that evidence. Such a rule would all but assume away the relevance of documentary discovery into issues on which testimony might be had and would seriously undercut the force of litigation-hold orders. As a matter of common sense, courts hesitate to take a party's "word [as] necessarily conclusive in the absence of confirmation." *White v. Schoenfeld*, 117 F.2d 131, 132-33 (2d Cir. 1941).

Indeed, the facts here make clear why testimony often needs to be cabined and supplemented by documentary discovery — for Halliburton employees' testimony has not been a model of consistency. In short, the accounts of Faul, Roth, and Quirk indicate Morgan's testing showed signs of "settling" and ████████████████ *See* Reply at 7-8. That Morgan

5

may have a different recollection does not mean that the spoliated evidence is irrelevant. To the contrary, this inconsistency underscores forcefully just how important the spoliated evidence truly was.

Nowhere are these testimonial conflicts more apparent than in the deposition testimony of Halliburton's Vice President for Cementing, Tommy Roth. As Halliburton concedes, ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ But at his deposition, Mr. Roth testified to the contrary:

> Q. Were you made aware of the results of those tests from —
> A. No, I was not.
> Q. You didn't ask Mr. Faul what the test results indicated?
> A. No, I did not. I have not had a conversation with Mr. Faul since that test was identified to me by Halliburton legal staff.
> Q. So you haven't seen any — any written results or any — any indications as to what the results of those tests were?
> A. I have not.
> Q. Have you asked for them?
> A. I have not.
> Q. Are you interested to know what the results are?
> MR. HILL: Objection, form.
> A. No, I'm not.

Opp. Ex. 4 (Roth Dep.) at 347:2-21. To put the matter bluntly (and accurately), Halliburton is in no position to vouch for the recollection of its own employees when the employees themselves cannot accurately remember whether or what they were told about key testing results.

Nor is there validity to the contention that, in order to impose a court-directed factual finding, the Court must first find "that Morgan and Quirk lied under oath" when they testified that the "testing results were initially mixed but ultimately showed that the slurry was stable." Sur. 2; *see also id.* at 7. **First**, there are any number of reasons why deposition testimony can be inaccurate — including the faulty memory of a deponent. The critical point here is that

Halliburton (as the party that purposefully spoliated evidence) should bear the consequences of faulty recollections in this litigation, not BP. ***Second***, Quirk was unable to remember the precise results of his testing, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, *see* Mot. Ex. 2 (Quirk Dep.) at ▇▇▇▇▇▇▇ 333:2-5, whereas Morgan's recollection of his testing conflicted with the recollections of Quirk and Faul, *see* Reply 7-8. This Court should not be forced to make a Hobson's choice between concluding that Morgan and Quirk lied or accepting Morgan and Quirk's after-the-fact *characterizations* of testing results, when those results have now been destroyed and when neither testifier can recall the results with any specificity.

  **C.**  **The Surreply Contains Telling Factual And Logical Errors.**

Halliburton's Surreply includes other false and illogical statements that bear emphasis:

- Halliburton suggests it is unreasonable to expect it to save cement slices from its slurry testing because it conducts "tens of thousands of tests … every year." Sur. 4-5. No doubt. But there is a world of difference between routine cement testing and the very specific testing that was done after April 20, 2010, to investigate what went wrong on the *Deepwater Horizon* — a maritime disaster. The key here, moreover, is that Quirk discarded his notes as well as the sample. Mot. Ex. 2 (Quirk Dep.) at 393:11-21.

- Halliburton claims that BP could simply rerun the relevant post-incident tests using "lab stock that remains available today." *Id.* at 4. But that simply is not true. BP cannot just rerun the tests — even if Halliburton were to reverse course and grant BP access to the lab stock — because the relevant testing parameters are forever gone. One of the salient points of this motion is that what has been lost is irreplaceable. *See* Reply 10-11.

- Halliburton still presents no evidence that BP requested a "thin" slurry. The Opposition cited literally nothing to support this claim, and the Surreply cites only Morgan's testimony, *see* Sur. 6 — but in fact Morgan testified he had no idea "what [the] design parameters" of the slurry were. Opp. Ex. 1 (Morgan Dep.) at 97:11-18. In other words, Halliburton has twice asserted to the Court that the slurry was "designed to be thin" — but with no evidentiary support for this statement.

- Halliburton's privilege claims over the ████████████ baffling footnote two can hardly be taken seriously, given that (1) ████████████, and (2) even if they had once been privileged, ████████████ ████████████ Tellingly, Halliburton did not list ██████ on a privilege log or otherwise claim privilege before now.  This belated claim underscores how devastating ████████ are to Halliburton's case.

- Halliburton selectively quotes Morgan's transcript to suggest, when all is said and done, that Morgan was not "worried about [his testing] being misinterpreted in this litigation." Sur. 8.  But Halliburton ignores the relevant portion of the transcript.  Halliburton never explains why Morgan expressly agreed — under oath — that "part of the reason" he "threw out the sample was because [he was] worried about it being misinterpreted in the litigation." Mot. Ex. 1 (Morgan Dep.) at 101:9-23.

Despite rounds of briefing, Halliburton has said nothing substantial to suggest a court-directed factual finding is inappropriate.  Halliburton would not be making arguments like the ones examined above if it had good justifications for its employees' conduct.  And Halliburton would have much more to worry about if BP had been less restrained in framing its requested relief, or if a jury were likely to be its primary trier of fact.

It cannot be said too often that BP seeks only a tailored factual finding, pursuant to Fed. R. Civ. P. 37(b) and this Court's inherent authority over the civil discovery process, that the post-incident testing conducted by Morgan and Quirk showed cement instability.  *See* Mot. 22; Reply 12.  When and if such a finding is directed, Halliburton will remain free to argue, as best it can, that other cement testing is more meaningful.  It will remain free to argue, if it can, that the instability of its cement should be laid at BP's door, or that cement instability did not cause the accident, or that cement instability happens all the time and should have been anticipated by Transocean and BP.  When and if Halliburton makes such arguments, BP will address them as appropriate.  All that matters for now is that BP asks only that the Court require the laying of an initial (keystone) brick in the evidentiary wall that BP needs to build for its case against Halliburton.  PTO #41 contemplates a bench trial.  There is no risk of this one key evidentiary

8

brick being unduly exaggerated, or misinterpreted by Judge Barbier, or taking on more significance than what is warranted. And putting this first Phase 1 factual finding in place is surely preferable to the only possible alternative — allowing intentional misconduct to taint a civil trial by depriving the Court and parties of evidence Halliburton feared would be "misinterpreted in litigation."

### III. HALLIBURTON PRESENTS NO JUSTIFICATION FOR DELETING COMPUTER MODELING RESULTS.

It now appears Halliburton has conceded error as to its deleted Displace 3D Modeling results — although it still cannot explain how the testing results were deleted, or why it engaged in months of delay instead of promptly advising the Court and parties that a deletion had occurred. For reasons previously explained, the Court should direct Halliburton immediately to transfer the computer to Captain Englebert for forensic testing.

### CONCLUSION

BP respectfully requests that the Court impose the requested remedies pursuant to Fed. R. Civ. P. 37(b) and this Court's inherent authority over the civil discovery process, plus reasonable attorneys' fees.

Dated:  January 9, 2012                              Respectfully submitted,

                                                      /s/ Don K. Haycraft

Robert C. "Mike" Brock                               Don K. Haycraft (Bar #14361)
Covington & Burling LLP                              R. Keith Jarrett (Bar #16984)
1201 Pennsylvania Avenue, NW                         Liskow & Lewis
Washington, DC 20004-2401                            701 Poydras Street, Suite 5000
Telephone:  202-662-5985                             New Orleans, Louisiana 70139-5099
Facsimile:  202-662-6291                             Telephone:  504-581-7979
                                                     Facsimile:  504-556-4108


Robert R. Gasaway                                    Richard C. Godfrey, P.C.
Jeffrey Bossert Clark                                J. Andrew Langan, P.C.
Aditya Bamzai                                        Kirkland & Ellis LLP
Kirkland & Ellis LLP                                 300 North LaSalle Street
655 Fifteenth Street, NW                             Chicago, IL 60654
Washington, DC 20005                                 Telephone:  312-862-2000
Telephone:  202-879-5000                             Facsimile:  312-862-2200
Facsimile:  202-879-5200

*Attorneys for BP Exploration & Production Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 9th day of January, 2012.

/s/ Don K. Haycraft
Don K. Haycraft