01-37560
TC

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) ) ) ) ) ) ) | MDL NO. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAG. JUDGE SHUSHAN |

## *CONFIDENTIAL*

### *WorldwideVIEW*™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Ellis Armstrong

**VOLUME 1**

JULY 13, 2011

## *COPY*



WORLDWIDE

*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

3     IN RE: OIL SPILL          )   MDL NO. 2179

      by the OIL RIG           )

4     "DEEPWATER HORIZON" in   )   SECTION "J"

      the GULF OF MEXICO, ON   )

5     APRIL 20, 2010           )   JUDGE BARBIER

                               )

6                              )   MAG. JUDGE

                               )   SHUSHAN

7

8

9

10

11

12

13

14

15

16

17

18

19                  VOLUME 1 OF 1

20

21        Deposition of ELLIS ARMSTRONG, as the

22     30(b)(6) representative of BP, taken at

23     Pan American Life Center, 601 Poydras

24     Street, Room Bayou 4, New Orleans,

25     Louisiana, on the 13th of July, 2011.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1                     A P P E A R A N C E S
 2        APPEARING FOR THE PLAINTIFFS' STEERING
          COMMITTEE:
 3
          Mr. Mikal Watts
 4        Mr. David McLendon
          Mr. Wilfred Denis
 5        WATTS GUERRA CRAFT, LLP
          4 Dominion Drive, Building 1
 6        San Antonio, Texas 78257
 7        APPEARING FOR BP, INC.:
 8        Mr. Scott W. Fowkes
          Ms. Katheleen Ehrhart
 9        KIRKLAND & ELLIS
          300 North LaSalle
10        Chicago, Illinois 60654
11        Ms. Karen Gase
          BP America, INC.
12        4101 Winfield Road-4W
          Warrenville, Illinois 60555
13
          APPEARING FOR TRANSOCEAN:
14
          Mr. Robert L. Blankenship
15        PREIS & ROY, PLC
          102 Versailles Boulevard
16        Suite 400
          Lafayatte, Louisiana 70501
17
          APPEARING FOR ANADARKO PETROLEUM COMPANY:
18
          Mr. Steven Brody
19        BINGHAM MCCUTCHEN LLP
          399 Park Avenue
20        New York, New York 10022-4689
21        APPEARING FOR HALLIBURTON:
22        Mr. Donald E. Godwin
          Ms. Stefanie K. Major
23        Mr. James E. Johanns
          GODWIN RONQUILLO
24        1201 Elm Street, Suite 1700
          Dallas, Texas 75270-2041
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1          A P P E A R A N C E S (Continued)
2     APPEARING FOR WEATHERFORD:
3     Mr. Michael A. Chernekoff
      JONES, WALKER, WAECHTER, POITEVENT,
4     CARRERE & DENEGRE, L.L.P.
      First City Tower
5     1001 Fannin Street, Suite 2450
      Houston, Texas 77002
6
      APPEARING FOR DRIL-QUIP, INC.:
7
      Ms. Wendy Ware Bishop
8     WARE, JACKSON, LEE & CHAMBERS
      America Tower, 42nd Floor
9     2929 Allen Parkway
      Houston, Texas 77019-7101
10
      APPEARING FOR MOEX OFFSHORE 2007, L.L.C.,
11    and MOEX USA:
12    Ms. Catherine C. McCulley
      PILLSBURY
13    2 Houston Center
      909 Fannin Street, Suite 2000
14    Houston, Texas 77010-1018
15    APPEARING FOR M-I SWACO:
16    Mr. Steven A. Luxton
      MORGAN, LEWIS & BOCKIUS, L.L.P.
17    1111 Pennsylvania Avenue, NW
      Washington, DC 20004
18
      APPEARING FOR THE UNITED STATES:
19
      Mr. A. Nathaniel Chakeres
20    U.S. DEPARTMENT OF JUSTICE
      Environment & Natural Resources
21    Division
      601 D Street, N.W.
22    Washington, D.C. 20004
23    Lt. Brooke Grant
      UNITED STATES COAST GUARD
24    2100 2nd Street SW
      Washington, DC 20593
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1        A P P E A R A N C E S (Continued)
2        APPEARING FOR CAMERON:
3        Mr. Brad Coffey
         BECK REDDEN & SECREST
4        One Houston Center
         1221 McKinney Street
5        Suite 4500
         Houston, Texas 77010
6
7        ALSO PRESENT:
8        Mr. Michael Flores, Videographer
9        REPORTED BY:
10            THERESE J. CASTERLINE, CSR, RMR, CRR
              Certified Shorthand Reporter
11            State of Texas
              Certified Shorthand Reporter
12            State of Louisiana
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1                    I N D E X
 2                                        PAGE
 3       Appearances                        2
 4
 5       WITNESS:  ELLIS ARMSTRONG
 6       EXAMINATION BY MR. WATTS           15
 7       EXAMINATION BY MR. CHAKERES       337
 8       EXAMINATION BY MR. GODWIN         352
 9       EXAMINATION BY MR. BRODY          388
10       EXAMINATION BY MS. McCULLEY       414
11       EXAMINATION BY MR. BLANKENSHIP    418
12       EXAMINATION BY MR. FOWKES         421
13       Changes and Signature            481
14       Reporter's Certificate           483
15
16                    EXHIBITS
17                                        PAGE
18       Exhibit No. 3814 - 8-18-03 Major  33
         Incident Investigation Report
19
         Exhibit No. 3815 - January 2007   34
20       The Report of the BP US Refineries
         Independent Safety Review Panel
21
         Exhibit No. 3816 - 2006 BPXA GPB OTL  35
22       Incidents BP America, Inc.
         Final Report, dated 3-30-07
23
         Exhibit No. 3817 - 2005 BP        50
24       Health, Safety and Environment
         (HSE) Report,
25       BP-HZN-2179MDL02286546 to BP-HZN-2179MDL
```

```
 1                        EXHIBITS
 2                                          PAGE
 3       Exhibit No. 3818 - BP's Six-Point    53
         Plan
 4
         Exhibit No. 3819 - 10-24-07 Plea     70
 5       Agreement, United States of America
         vs. BP Products North America, Inc.
 6
         Exhibit No. 3820 - 10-25-07 Press    71
 7       Release:  BP America announces
         resolution of Texas City,
 8       Alaska, propane trading, law
         enforcement investigations
 9
         Exhibit No. 3821 - BP's Six-Point   154
10       Plan
11       Exhibit No. 3822 - PLC Involvement   89
         With SEEAC/GORC Meetings, 1-9-08
12       to 11-10-10
13       Exhibit No. 3823 - 1-9-08            91
         Safety, Ethics & Environment
14       Assurance Committee Minutes,
         BP-HZN-2179MDL02004462 to
15       BP-HZN-2179MDL02004465
16       Exhibit No. 3824 - 1-22-08 Group     94
         Operations Risk Committee Minutes,
17       BP-HZN-2179MDL02212862 to
         BP-HZN-2179MDL02212863
18
         Exhibit No. 3825 - 1-29-08           97
19       Safety, Ethics & Environment
         Assurance Committee Minutes,
20       BP-HZN-2179MDL02004466 to
         BP-HZN-2179MDL02004467
21
         Exhibit No. 3826 - 2-15-08 Group     99
22       Operations Risk Committee Minutes,
         BP-HZN-2179MDL02212860 to
23       BP-HZN-2179MDL02212861
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1                         EXHIBITS
 2                                              PAGE
 3          Exhibit No. 3827 - 3-6-08 Group        99
            Operations Risk Committee Minutes,
 4          BP-HZN-2179MDL02212858 to
            BP-HZN-2179MDL02212859
 5
            Exhibit No. 3828 - 3-13-08            99
 6          Safety, Ethics & Environment
            Assurance Committee Minutes,
 7          BP-HZN-2179MDL02004468 to
            BP-HZN-2179MDL02004470
 8
            Exhibit No. 3829 - 4-15-08 Group     103
 9          Operations Risk Committee Minutes,
            BP-HZN-2179MDL02214802 to
10          BP-HZN-2179MDL02214804
11          Exhibit No. 3830 - 5-7-08            106
            Safety, Ethics & Environment
12          Assurance Committee Minutes,
            BP-HZN-2179MDL02004471 to
13          BP-HZN-2179MDL02004474
14          Exhibit No 3831 - 5-23-08 Group      109
            Operations Risk Committee Minutes,
15          BP-HZN-2179MDL02214271 to
            BP-HZN-2179MDL02214273
16
            Exhibit No. 3832 - 6-13-08 Group     110
17          Operations Risk Committee Minutes,
            BP-HZN-2179MDL02212558 to
18          BP-HZN-2179MDL02212560
19          Exhibit No. 3833 - 7-10-08 Group     111
            Operations Risk Committee Minutes,
20          BP-HZN-2179MDL02212128 to
            BP-HZN-2179MDL02212130
21
            Exhibit No. 3834 - 7-23-08           113
22          Safety, Ethics & Environment
            Assurance Committee Minutes,
23          BP-HZN-2179MDL02004475 to
            BP-HZN-2179MDL02004478
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1                      EXHIBITS
 2                                            PAGE
 3        Exhibit No. 3835 - 9-3-08 Group      114
          Operations Risk Committee Minutes,
 4        BP-HZN-2179MDL02212832 to
          BP-HZN-2179MDL02212834
 5
          Exhibit No. 3836 - 10-9-08 Group     115
 6        Operations Risk Committee Minutes,
          BP-HZN-2179MDL02213189 to
 7        BP-HZN-2179MDL02213191
 8        Exhibit No. 3837 - 10-23-08          116
          Safety, Ethics & Environment
 9        Assurance Committee Minutes,
          BP-HZN-2179MDL02004479 to
10        BP-HZN-2179MDL02004482
11        Exhibit No. 3838 - 11-12-08          117
          Safety, Ethics & Environment
12        Assurance Committee Minutes,
          BP-HZN-2179MDL02004483 to
13        BP-HZN-2179MDL02004484
14        Exhibit No. 3839 - 12-4-08 Group     118
          Operations Risk Committee Minutes,
15        BP-HZN-2179MDL02212153 to
          BP-HZN-2179MDL02212156
16
          Exhibit No. 3840 - 1-7-09            119
17        Safety, Ethics & Environment
          Assurance Committee Minutes,
18        BP-HZN-2179MDL02004485 to
          BP-HZN-2179MDL02004489
19
          Exhibit No. 3841 - 2-4-09 Group      120
20        Operations Risk Committee Minutes,
          BP-HZN-2179MDL02212852 to
21        BP-HZN-2179MDL02212857
22        Exhibit No. 3842 - 3-12-09           121
          Safety, Ethics & Environment
23        Assurance Committee Minutes,
          BP-HZN-2179MDL02004490 to
24        BP-HZN-2179MDL02004493
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBITS

                                                      PAGE

Exhibit No. 3843 - 4-29-09 Group        123
Operations Risk Committee Minutes,
BP-HZN-2179MDL02212490 to
BP-HZN-2179MDL02212496


Exhibit No. 3844 - 5-6-09               123
Safety, Ethics & Environment
Assurance Committee Minutes,
BP-HZN-2179MDL02004494 to
BP-HZN-2179MDL02004497


Exhibit No. 3845 - 7-22-09              125
Safety, Ethics & Environment
Assurance Committee Minutes,
BP-HZN-2179MDL02301472 to
BP-HZN-2179MDL02301477


Exhibit No. 3846 - 7-31-09 Group        126
Operations Risk Committee Minutes,
BP-HZN-2179MDL02212530 to
BP-HZN-2179MDL02212535

Exhibit No. 3847 - 10-22-09             127
Safety, Ethics & Environment
Assurance Committee Minutes,
BP-HZN-2179MDL02004503 to
BP-HZN-2179MDL02004506

Exhibit No. 3848 - 11-6-09 Group        129
Operations Risk Committee Minutes,
BP-HZN-2179MDL02212981 to
BP-HZN-2179MDL02212987


Exhibit No. 3849 - 11-11-09             130
Safety, Ethics & Environment
Assurance Committee Minutes,
BP-HZN-2179MDL02004507 to
BP-HZN-2179MDL02004508


Exhibit No. 3850 - 2-3-10 Group         131
Operations Risk Committee Minutes,
BP-HZN-2179MDL02212519 to
BP-HZN-2179MDL02212523

**PURSUANT TO CONFIDENTIALITY ORDER**

```
                      EXHIBITS
 1

 2                                          PAGE

 3        Exhibit No. 3851 - 2-24-10        133
          Safety, Ethics & Environment
 4        Assurance Committee Minutes,
          BP-HZN-2179MDL02004509 to
 5        BP-HZN-2179MDL02004512

 6        Exhibit No. 3852 - 3-24-10        133
          Safety, Ethics & Environment
 7        Assurance Committee Minutes,
          BP-HZN-2179MDL02004513 to
 8        BP-HZN-2179MDL02004516

 9        Exhibit No. 3853 - 5-14-10 Group  134
          Operations Risk Committee Minutes,
10        BP-HZN-2179MDL02214102 to
          BP-HZN-2179MDL02214106
11
          Exhibit No. 3854 - 5-20-10        135
12        Safety, Ethics & Environment
          Assurance Committee Minutes,
13        BP-HZN-2179MDL02004517 to
          BP-HZN-2179MDL02004519
14
          Exhibit No. 3855 - 7-21-10        136
15        Safety, Ethics & Environment
          Assurance Committee Minutes,
16        BP-HZN-2179MDL02004520 to
          BP-HZN-2179MDL02004524
17
          Exhibit No. 3856 - 8-2-10 Group   140
18        Operations Risk Committee Minutes,
          BP-HZN-2179MDL02212751 to
19        BP-HZN-2179MDL02212756

20        Exhibit No. 3857 - 8-24-10        140
          Safety, Ethics & Environment
21        Assurance Committee Minutes,
          BP-HZN-2179MDL02004525 to
22        BP-HZN-2179MDL02004526

23        Exhibit No. 3858 - 9-17-10        141
          Safety, Ethics & Environment
24        Assurance Committee Minutes,
          BP-HZN-2179MDL02004527 to
25        BP-HZN-2179MDL02004529
```

**PURSUANT TO CONFIDENTIALITY ORDER**

11

```
 1                          EXHIBITS
 2                                              PAGE
 3          Exhibit No. 3859 - 10-21-10         142
            Safety, Ethics & Environment
 4          Assurance Committee Minutes,
            BP-HZN-2179MDL02004530 to
 5          BP-HZN-2179MDL02004533
 6          Exhibit No. 3860 - 11-10-10 Group   143
            Operations Risk Committee Minutes,
 7          BP-HZN-2179MDL02212497 to
            BP-HZN-2179MDL02212496
 8
            Exhibit No. 3861 - 6-7-05 Baxter    145
 9          e-mail to Mogford,
            BP-HZN-2179MDL02289093 to
10          BP-HZN-2179MDL02289053,
            BP-HZN-2179MDL02310564,
11          BP-HZN-2179MDL02212498 to
            BP-HZN-2179MDL02212501
12
            Exhibit No. 3862 - BP's Six-Point   152
13          Plan, BP Group's Involvement in
            Implementing its Six-Point Plan
14
            Exhibit No. 3863 - 9-19-05 Rogers   156
15          e-mail to Baxter, Rajalingam,
            BP-HZN-2179MDL02275198 to
16          BP-HZN-2179MDL02275204
17          Exhibit No. 3864 - BP HSE &         162
            Operations Integrity Report,
18          4Q 2009 (Quarterly) data, with
            January 2010 Commentary,
19          BP-HZN-CEC083197 to
            BP-HZN-CEC083250
20
            Exhibit No. 3865 - 3-1-10 Dupree    200
21          e-mail to Davis,
            BP-HZN-2179MDL00277701 to
22          BP-HZN-2179MDL0027703 with
            attachment
23
            Exhibit No. 3866 - 5-12-10 Grounds  201
24          e-mail to Baxter,
            BP-HZN-2179MDL02206786 to
25          BP-HZN-2179MDL02206795
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1                         EXHIBITS
2                                              PAGE
3          Exhibit No. 3867 - BP HSE &         208
           Operations Integrity Report,
4          1Q 2010 (Quarterly) data, with
           April 2010 Commentary,
5          BP-HZN-2179MDL02005250 to
           BP-HZN-2179MDL02005291
6
           Exhibit No. 3868 - 1-16-10 BP Gulf  209
7          of Mexico SPU, BP-HZN-2179MDL02206796
           to BP-HZN-2179MDL02206902 with
8          attachments and BP-HZN-02206909
9          Exhibit NO. 3869 - BP's Six-Point   215
           Plan
10
           Exhibit No. 3870 - 11-5-09          273
11         Illingworth e-mail to Daly, et al.,
           BP-HZN-2179MDL01991439 to
12         BP-HZN-2179MDL01991442
13         Exhibit No. 3871 - 12-3-09          274
           Illingworth e-mail to Daly, et al.,
14         BP-HZN-2179MDL01787703 to
           BP-HZN-2179MDL01787705
15
           Exhibit No. 3872 - 2-24-10          276
16         Illingworth e-mail to Daly, et al.,
           BP-HZN-2179MDL00044451 to
17         BP-HZN-2179MDL00044453
18         Exhibit No. 3873 - 3-4-10 Suttles   278
           e-mail to Yilmaz, et al.,
19         BP-HZN-2179MDL00281190
20         Exhibit No. 3874 - 2-18-09 Trefgarne 282
           e-mail to Inglis, et al.,
21         BP-HZN-CEC082599 to BP-HZN-CEC082614
22         Exhibit No. 3875 - 6-6-09 Mayson    287
           e-mail to Inglis, et al.,
23         BP-HZN-2179MDL01434343 to
           BP-HZN-2179MDL01434344
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

13

```
 1                        EXHIBITS
 2                                          PAGE
 3        Exhibit No. 3876 - 6-17-09 Wallace   289
          e-mail to Armstrong,
 4        BP-HZN-2179MDL01780076 to
          BP-HZN-2179MDL01780080
 5
          Exhibit No. 3877 - 5-28-09 Myers     292
 6        e-mail to Cavanagh, et al.,
          BP-HZN-2179MDL02029324 and
 7        BP-HZN-2179MDL02029331
 8        Exhibit No. 3878 - 6-17-09           299
          Armstrong e-mail to Latta
 9        BP-HZN-2179MDL01767372
10        Exhibit No. 3879 - 7-29-09 Shaw      300
          e-mail to Prevallet,
11        BP-HZN-CEC078204 to BP-HZN-CEC078221
12        Exhibit No. 3880 - 8-13-09 Peijs     307
          e-mail to Tapley,
13        BP-HZN-2179MDL01767997 to
          BP-HZN-2179MDL01768012
14
          Exhibit No. 3881 - 3-19-09           308
15        Armstrong e-mail to Inglis,
          BP-HZN-2179MDL02111223 to
16        BP-HZN-2179MDL02111225
17        Exhibit No. 3882 - 8-28-09           311
          Armstrong e-mail to Inglis, et al.,
18        BP-HZN-2179MDL01462359 to
          BP-HZN-2179MDL01466488
19
          Exhibit No. 3883 - 12-4-09           316
20        Armstrong e-mail to Suttles,
          BP-HZN-2179MDL01449396 to
21        BP-HZN-2179MDL01449398 with
          attachment
22
          Exhibit No. 3884 - 1-15-10 Wu        319
23        e-mail to Inglis, et al.,
          BP-HZN-2179MDL01463845 to
24        BP-HZN-2179MDL01463872
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

                          EXHIBITS
                                                PAGE
     Exhibit No. 3885 - 2-2-10 Armstrong      322
     e-mail to Suttles, Price,
     BP-HZN-2179MDL01453107 to
     BP-HZN-2179MDL01453155

     Exhibit No. 3886 - 5-29-09 Inglis       338
     e-mail to G MOR Upstream SLT,
     BP-HZN-2179MDL00981512 to
     BP-HZN-2179MDL00981513
     Exhibit No. 3887 - BP Cash              351
     Dividends per Ordinary Share

     Exhibit No. 3888 - Integrity            393
     Management:   Learning from past
     major industrial incidents,
     BP-HZN-2179MDL02268840 to
     BP-HZN-2179MDL02268962

     Exhibit No. 3889 - 12-2-02 BP HSE       453
     Lessons Learned Workshop,
     BP-HZN-2179MDL03019074 to
     BP-HZN-2179MDL03019196
     Exhibit No. 3890 - Lessons from         454
     Grangemouth, a case history,
     BP-HZN-2179MDL03019567 to
     BP-HZN-2179MDL03019436

     Exhibit No. 3891 - BP Group HSE         456
     Standard (with Commentary) -
     Process Safety/Integrity
     Management,
     BP-HZN-2179MDL03019430 to
     BP-HZN-2179MDL03019437
     Exhibit No. 3892 - December 2002        457
     BP Group Process Safety/
     Integrity Management Standard,
     BP-HZN-2179MDL03019324 to
     BP-HZN-2179MDL03019383

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1                          EXHIBITS
2                                              PAGE
3        Exhibit No. 3893 - Gulf of Mexico     464
         SPU Operating Plan (OMS Handbook)
4        BP-HZN-2179MDL01160034 to
         BP-HZN-2179MDL01160075
5
         Exhibit No. 3894 - Part 4 - OMS       467
6        Governance and Implementation
         BP-HZN-2179MDL00333137 to
7        BP-HZN-2179MDL00333154
8        Exhibit No. 3895 - Milestones and     471
         KPIs, BP-HZN-2179MDL03019139 to
9        BP-HZN-2179MDL03019151
10       Exhibit No. 3896 - Update to the      472
         SEEAC on BP's Group-level response
11       to the Independent Panel's
         recommendations - December 2008,
12       BP-HZN-2179MDL02005085 to
         BP-HZN-2179MDL02005097
13
         Exhibit No. 3897 - 8-22-06 Skelton    476
14       to Bray, BP-HZN-2179MDL03021153 to
         BP-HZN-2179MDL03021155
15
16
17
18
19
20
21
22
23
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1                 P R O C E E D I N G S

2                      THE VIDEOGRAPHER:  This is the

3       30(b)(6) deposition of Ellis Armstrong in

4       regards to the oil spill of the oilrig

5       Deepwater Horizon in the Gulf of Mexico on

6       April 20th, 2010.

7                      Today's date is July 13th,

8       2011.  The time is 8:37 a.m.  We're now on

9       the record.

10                      Will the court reporter please

11      swear in the witness.

12                      ELLIS ARMSTRONG,

13      having been first duly sworn, testified as

14      follows:

15                      EXAMINATION

16      BY MR. WATTS:

17           Q.  What is your name, please?

18           A.  My name is William Ellis

19      Armstrong.

20           Q.  You go by Ellis?

21           A.  I go by Ellis.

22           Q.  Okay.  Mr. Armstrong, my name is

23      Mikal Watts.  I'm a lawyer from San

24      Antonio.  We met before the deposition

25      briefly.

PURSUANT TO CONFIDENTIALITY ORDER

1          I want to start off by getting

2     some background information on you.  How

3     old a man are you, sir?

4          A.  I'm 54 years old.

5          Q.  All right.  And as I understand it

6     from Googling you, you attended college at

7     the Imperial College of London?

8          A.  Yes.

9          Q.  Received an undergraduate degree

10    and a Ph.D. there?

11         A.  Yes.

12         Q.  After getting your Ph.D. from the

13    Imperial College of London in civil

14    engineering in 1983, did you enter the

15    workforce at that point?

16         A.  Yes, I did.

17         Q.  Okay.  And who did you go to work

18    for?

19         A.  I worked for British Petroleum.

20         Q.  Okay.  How long did you work for

21    British Petroleum?

22         A.  Well, I've -- I've worked for --

23    until it changed its name to BP.

24         Q.  When did that happen?

25         A.  Gosh, I can't remember.  About 15

1   years ago.

2       Q.  Okay.

3       A.  It's been BP pretty much as long

4   as I can remember since then.

5       Q.  And with the understanding that it

6   was British Petroleum and is now BP, could

7   you take us through your 28 years at what

8   I'll call BP and basically take us through

9   your rise through the ranks, if you will,

10  in terms of positions and how long you

11  were in each position.

12      A.  I began in the sort of -- what was

13  originally the sort of information

14  technology area.

15      Q.  How long were you there?

16      A.  I haven't got the numbers

17  accurately in my head.  A couple of years.

18      Q.  Okay.  A couple of years.  And

19  we'll just do rough estimates.

20          What did you do after a couple

21  of years in the information technology

22  area?

23      A.  I then worked in the North Sea.

24      Q.  Okay.  And what did you do in the

25  North Sea?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.  I had a role originally in what

2   would be called reservoir engineering.

3      Q.  How long were you in reservoir

4   engineering in the North Sea?

5      A.  Probably a couple of years.

6      Q.  Okay.  What did you do then?

7      A.  I then had a commercial role in

8   the -- in the center in London.

9      Q.  Okay.

10      A.  And that was probably a couple of

11   years.

12      Q.  And what did you do in the

13   commercial role in the center in London?

14      A.  I was involved in doing commercial

15   transactions to basically lease space in a

16   pipeline system.

17      Q.  Okay.  And you did that for a

18   couple of years?

19      A.  Yeah.

20      Q.  Okay.  So that would take us to

21   about 1989/1990, somewhere in there?

22      A.  Yeah.

23      Q.  What did you do at that point?

24      A.  I had a role working as a -- a

25   small team of people on a

1    self-organizational change program, which

2    was initiated when John Browne took over

3    exploration and production.

4         Q.  And when did John Browne take over

5    exploration and production?

6         A.  It was sort of 1989/1990.

7         Q.  Okay.  And there was a

8    reorganization that you assisted with

9    formulating?

10        A.  I was involved in some -- some

11   aspects of -- of a reorganization that

12   took place at that time.

13        Q.  Okay.  What did you do after that?

14        A.  After that, I was actually given

15   the opportunity to work as -- I was given

16   the opportunity -- sorry, I -- I'm sorry

17   I'm not speaking clearly.

18             I was given the chance to work

19   as John Browne's executive assistant.

20        Q.  Okay.  And when did you begin as

21   John Browne's executive assistant?

22        A.  It would be late 1991, because I

23   worked for John at the end of 1991 through

24   1992.

25        Q.  Okay.  And what did you do after

1    working for John Browne as his executive

2    assistant?

3        A.  I was then transferred to Alaska.

4        Q.  Okay.

5        A.  I worked on the -- as a field

6    manager on the North Slope of Alaska.

7        Q.  How long did you do that?

8        A.  Probably 18 months as a field

9    manager, and then I was transferred into

10   the Anchorage office as the business -- it

11   was called then the business unit leader

12   for part of the operations in Alaska.

13       Q.  A so-called BUL?

14       A.  A BUL, right.

15       Q.  Yeah.  And how long were you the

16   business unit leader -- leader for --

17       A.  I guess that would probably be

18   about two and a half years.

19       Q.  Okay.  So that would take us up to

20   about 1997?

21       A.  1996, I think.

22       Q.  Okay.  And in 1996, what did you

23   begin to do?

24       A.  I then went to Stanford; I studied

25   at Stanford.  I did a business degree at

PURSUANT TO CONFIDENTIALITY ORDER

1    Stanford.

2       Q.  I noticed that you studied

3    business at Stanford.  Did you get a

4    degree?

5       A.  Yes.

6       Q.  What -- explain that.  You didn't

7    put MBA on it or something like that?

8       A.  No, there's a bit of a thing.  So

9    at Stanford, you can do -- there's a

10    two-year MBA program --

11       Q.  Right.

12       A.  -- and they also do a one-year

13    program called the Sloan Program.

14       Q.  Yeah.  You were in the Sloan

15    Program?

16       A.  I was in the Sloan Program.  And

17    you actually -- the degree you get is an

18    MSC rather than an MBA.

19       Q.  So you got an MSC through the

20    Sloan school in 1997.  You took that year

21    off while you were getting that degree,

22    right?

23       A.  Yes.

24       Q.  And then went back to BP?

25       A.  I went back to BP in Venezuela.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  How long were you in Venezuela?

2    A.  I was in Venezuela for a couple of

3  years.

4    Q.  Through about 1999?

5    A.  Yeah.

6    Q.  Okay.

7    A.  Just -- it was -- it was just

8  before -- it was the summer before

9  President Chavez was elected.

10   Q.  Okay.  You were there for the good

11  ol' days.

12   A.  Well, it's -- it was a good time.

13   Q.  Yeah, I'll bet.

14       Okay.  So in 1999, you leave

15  Venezuela.  What do you begin to do at

16  that point?

17   A.  I'm then the head of planning,

18  corporate planning, for BP following the

19  merger between BP and Amoco.

20   Q.  Okay.  When did BP acquire Amoco?

21   A.  I think the -- the merger took

22  place in that summer, so around -- it must

23  have been '97/'98.

24   Q.  Okay.  And so you did the planning

25  in terms of merging the two entities after

**PURSUANT TO CONFIDENTIALITY ORDER**

1    BP had acquired Amoco?

2         A.   Yeah, it was putting in place a --

3    after the merger, it was putting in place

4    a common -- a common planning system.

5         Q.   Now, in terms of that merger --

6    you know, obviously mergers happen for a

7    variety of different reasons.

8              Where was the geographical

9    strength of Amoco relative to that of BP

10   prior to the merger that made the merger

11   make sense?

12        A.   Let's see.  I'm -- I'm

13   actually --

14        Q.   Go ahead.

15        A.   I'm taking this time to think

16   because it's a -- it's a good question.

17             I think Amoco had -- at least

18   in the upstream, Amoco had clearly assets

19   in -- in Trinidad and in Egypt that

20   complemented largely the oil assets that

21   BP had at the time.

22        Q.   Fair enough.

23             In fact, BP's Trinidad

24   operations has been its number 1 producer

25   for a number of years, right?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              A.   In terms of volume, it's been an
 2         important part of our business.
 3              Q.   Sure.   Okay.
 4                   So BP acquires Amoco, takes
 5         over the gas assets in Trinidad and Egypt,
 6         but there's a number of things that need
 7         to be done from the standpoint of
 8         planning, and you spearheaded that on
 9         behalf of the corporate entity; is that
10         right?
11              A.   Correct.
12              Q.   Now, the corporate entity at that
13         time, was it known as BP p.l.c.?
14              A.   I'm not sure.
15              Q.   Okay.
16              A.   I'm not sure of the exact name of
17         the corporate entity.
18              Q.   Okay.   In terms of right now, I
19         see BP p.l.c.; I see a number of
20         references to the BP Group.   That would be
21         the same corporate entity, right?
22                   MR. FOWKES:   Object to the
23         form.
24              Q.   (BY MR. WATTS)  Go ahead.
25              A.   The -- I'm not exactly -- I'm not
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1       precisely sure of the definition of the

2       legal entities.  In my language, the BP

3       Group describes the entirety of our

4       operations.  So it would cover exploration

5       and production, refining and marketing,

6       our alternative energy business, and our

7       corporate center.

8               So when people refer to the BP

9       Group --

10       Q.  Right.

11       A.  -- at least inside the firm, it's

12      got that broad meaning.

13              I think BP p.l.c. is -- is a

14      legal entity, which is -- which is

15      different from the BP Group and has got

16      probably a narrower definition than the

17      word the BP Group.

18       Q.  Sure.  I traveled to London to

19      take depositions last month of a number of

20      BP p.l.c. employees.  Would it be accurate

21      for me to characterize BP p.l.c. within

22      the group as kind of the entity based in

23      London that sets standards throughout the

24      BP Group?

25              MR. FOWKES:  Object to the

1    form.

2         Q.  (BY MR. WATTS)  And does a certain

3    degree of management throughout the group?

4         A.  Yeah, I'm -- I'm trying to answer

5    the question carefully.  I think in -- in

6    a sense, I think that's accurate, but in

7    terms of the precise legal definition of

8    BP p.l.c., I'm not sure.

9                But in -- in the sense in

10   which you're asking the question, which is

11   they're a sort of center -- corporate

12   center in London that sets some standards

13   for the rest of the group --

14        Q.  Okay.

15        A.  -- I'm -- I think that's a -- a

16   reasonable description of that.

17        Q.  And then when you say for the rest

18   of the group, you have things like BP

19   exploration and production, BP refining

20   and marketing, BP's alternative energy

21   company, things like that, right?

22        A.  Yes.

23        Q.  And within exploration and

24   production, depending upon different

25   geographical areas, there are different

28

```
1      strategic performance units, SPUs, such as
2      Gulf of Mexico, right?
3            A.   That is -- that -- let me be --
4      I'm trying to be precise on this.  That --
5      that was correct up until the
6      reorganization that --
7            Q.   Which was when?
8            A.   -- Bob Dudley -- that Bob Dudley
9      put in place when Bob Dudley took over --
10           Q.   In the fall of 2010?
11           A.   -- in the fall of 2010.
12           Q.   Fair enough.
13           A.   So before -- before that, the
14     description of having SPUs, of which the
15     Gulf of Mexico is an SPU, is accurate.
16           Q.   Okay.  We got on a little
17     sidetrack dealing with organizational
18     structure, but I want to continue with
19     your background.
20                     After the merger with Amoco,
21     you're spearheading the corporate planning
22     on the merger between BP and Amoco.  How
23     long did you do that?
24           A.   I've got it -- until -- I think it
25     was 2- -- 2001.  It was -- and I can give
```

1        you -- the way you can get the date is, I

2        kind of took over at the time of September

3        11.  And I -- I was in sort of -- I had my

4        first management meeting to find out my

5        new job.

6             Q.  What was your new job?

7             A.  I was basically called the group

8        vice president for the Caribbean and Latin

9        America.  Caribbean, Caribbean.

10            Q.  And what?

11            A.  And Latin America.

12            Q.  And Latin America.

13                 Somebody coughed, and that's

14       why she couldn't hear it.  But that's

15       okay.

16                 Okay.  So how long did you

17       serve as the group vice president for the

18       Caribbean and Latin America?

19            A.  Until about 2004/2005.

20            Q.  Okay.  And at that point in time,

21       what position did you take?

22            A.  I then was given the role of

23       commercial director for exploration and

24       production.

25            Q.  And what does the commercial

**PURSUANT TO CONFIDENTIALITY ORDER**

1    director for exploration and production

2    do?

3         A.  I -- I run the -- the planning and

4    performance management process, the

5    investment appraisal process.

6         Q.  How long did you do that?

7         A.  I did that until 2005.

8         Q.  And in 2005, what position did you

9    take?

10         A.  I was then the group vice

11    president for technology and -- it was a

12    funny title.  It was group technology and

13    other functions.

14         Q.  So what did you do on a daily

15    basis?

16         A.  Well, I basically led the

17    technology agenda for the firm, and I also

18    had report to me supply chain and human

19    resources.

20         Q.  Okay.  How long did you do that

21    with respect to technology, supply chain,

22    and human resources?

23         A.  I think probably two years.

24         Q.  Okay.  So that would take us to

25    about 2007?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.  Yeah -- well -- 2007, yeah, that's

2    about right.

3      Q.  Okay.  And what position did you

4    take in 2007?

5      A.  My current position.

6      Q.  Which is?

7      A.  Chief financial officer for

8    exploration and production.

9      Q.  All right.  Now, you mentioned

10   that in the fall of 2010, Bob Dudley led a

11   reorganization, and I'm somewhat familiar

12   with that.

13           Did that affect your practical

14   day-to-day title or job function?

15     A.  No, my role -- it gained me a new

16   boss, but the same job.

17     Q.  Fair enough.

18           Now, when the videographer

19   announced this deposition, he said this is

20   the 30(b)(6) deposition, and I want to

21   talk to you about that.

22           I don't want to talk about

23   what your lawyers have told you, but

24   has -- have you become aware that in the

25   United States, we have a legal procedure

**PURSUANT TO CONFIDENTIALITY ORDER**

1    in federal court where a party, in this

2    case the plaintiffs, can send a defendant,

3    in this case BP, a corporate deposition,

4    and because a corporation can't talk,

5    except through its people, the corporation

6    can designate an individual to speak on

7    its behalf on given subjects?  Is that

8    your understanding?

9        A.   That is my understanding.

10        Q.   And as I understand it, you have

11    been designated to speak on BP's behalf on

12    a couple of subjects, and I want to talk

13    about the second one first.

14             Topic number 11 is

15    implementation in the Gulf of Mexico of

16    the safety management recommendations for

17    the UK HSE report of the Grangemouth,

18    Scotland incidents in 2000, the Baker

19    Commission report of the Texas City

20    explosion and fire in 2005, and the

21    Booz/Allen/Hamilton report on the BP

22    Alaska pipeline link in 2006.

23             Are you the individual that

24    the BP parties have designated to speak on

25    their behalf with respect to this topic?

**PURSUANT TO CONFIDENTIALITY ORDER**

1       A.   I am.

2       Q.   Okay.   Now, I want to visit with

3    you a little bit about that.   If you'll

4    pick up notebook number 1 and go to tab 2.

5    And what I'm going to do, Mr. Ellis, is as

6    I call out --

7               MR. FOWKES:   Mr. Armstrong.

8               MR. WATTS:   Mr. Ellis.   I'm

9    sorry.

10      Q.   (BY MR. WATTS)   What I'm going to

11   do, Mr. Armstrong --

12      A.   That's okay.   Hey, I --

13      Q.   Fortunately, we have a

14   videographer that's shooting digital

15   video, so when one of us lays an egg like

16   that, we can edit it out and pretend that

17   we were smarter than we were, okay?

18               So we'll try again.

19               Mr. Armstrong, tab 2, I'm

20   going to mark this as Exhibit 3814.   And

21   as I go through these exhibits, you won't

22   see an exhibit sticker on them, but we're

23   keeping a list so that we have a running

24   list, okay?

25               (Exhibit Number 3814 marked.)

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   Yeah.

2      Q.   (BY MR. WATTS)   Tab 2 is the

3  executive summary of the major incident

4  investigation report for BP Grangemouth,

5  Scotland prepared by the HSE on behalf of

6  the competent authority there in the UK;

7  is that right?

8      A.   That is what it says on the

9  document.

10      Q.   All right.   And if you would, go

11  to tab 8.

12           Tab 8, which I'll mark as

13  Exhibit 3815, is the report of the BP US

14  refineries independent safety review

15  panel, dated January of 2007.   And, again,

16  it ends at the end of the executive

17  summary.

18           Is that the so-called Baker

19  report?

20           (Exhibit Number 3815 marked.)

21      A.   It is the Baker report.

22           MR. FOWKES:   A portion of it.

23           MR. WATTS:   Just the executive

24  summary.

25      A.   That is -- that is absolutely the

1     executive summary, is what you said.

2          Q.  (BY MR. WATTS)  Exactly.

3               I figured instead of having

4     six notebooks, we'd just get to the part I

5     wanted to talk to you about, so I just

6     included the executive summaries, okay?

7          A.  Okay.

8          Q.  And then go to tab 10.

9               Tab 10, which I'll mark as

10    3816, again, is the executive summary of

11    the management systems review, 2006 BPXA

12    GPB OTL incidents by BP America, Inc.

13    final report.

14               This is the so-called

15    Booz/Allen/Hamilton report executive

16    summary, right?

17               (Exhibit Number 3816 marked.)

18          A.  It is.

19          Q.  (BY MR. WATTS)  Okay.  Fair

20    enough.

21               Now, using these three

22    documents as a reference, your role here

23    today is to talk about the implementation

24    of process safety improvements in the Gulf

25    of Mexico arising from these three

1    reports; is that right?

2              MR. FOWKES:  Object to the

3    form.

4         A.  That is my understanding of the --

5         Q.  (BY MR. WATTS)  Okay.

6         A.  -- of what you described as the

7    purpose of topic 11.

8         Q.  All right.  Now, if we could start

9    with tab 2, I just want to ask you a

10   couple of questions about it.

11             Go to page 9.  On the bottom

12   middle, you'll see the numbers.

13        A.  Okay.  I was kind of caught up

14   in the --

15        Q.  That's okay.

16        A.  -- Roman -- I was caught up in the

17   Roman numerals.

18        Q.  Yeah, it's after the Roman

19   numerals.  Number 9.

20             Do you see the bullet points

21   up at the -- the top, and it says, the

22   investigation also identified a number of

23   common themes, and then it talks about

24   some of those.

25             It says, these were.  One was

37

1    BP Group policies set high expectations,

2    but these were not consistently achieved

3    because of the organizational and cultural

4    reasons.

5                 Do you see that, sir?

6         A.   I see that sentence, yes.

7         Q.   And then it also says, BP Group

8    and complex management did not detect and

9    intervene early enough on deteriorating

10   performance.

11                Do you see that, sir?

12        A.   Yes.

13        Q.   Okay.  And then go to tab 8 for a

14   second.  And this time go to Roman numeral

15   XII.

16                Now, about two-thirds of the

17   way down the page is a paragraph entitled

18   Resources and Positioning of Process

19   Safety Capabilities.

20                Do you see that, sir?

21        A.   I do see that.

22        Q.   On the sixth line, it says, the

23   panel believes, however, that the company

24   did not always ensure that adequate

25   resources were effectively allocated to

**PURSUANT TO CONFIDENTIALITY ORDER**

1    support or sustain a high level of process

2    safety performance.

3                    Did I read that correctly?

4        A.  Yes, you did.

5        Q.  And then if you would go to tab

6    10, the Booz/Allen/Hamilton report, let's

7    start off on page 2, number 2.

8                    Under the executive summary

9    background, fourth line, it says, Greater

10   Prudhoe Bay, or GPB, production peaked in

11   1989 at 1.5 million barrels of oil per day

12   and has since fallen by nearly 75 percent.

13                   Do you see that, sir?

14       A.  Yes.

15       Q.  And go to the next page, page 3.

16   The last paragraph on the page begins,

17   throughout the 1990s and up to 2004, a

18   period of relatively low oil prices,

19   Alaska was under severe budget pressure

20   from BP and the other WIO to deliver flat

21   lifting costs (on the order of $2 per

22   barrel) even as production volumes

23   decreased.  Cost pressures to operate an

24   expensive field profitably led to an

25   environment of repairing rather than

**PURSUANT TO CONFIDENTIALITY ORDER**

1       replacing kit to keep production flowing

2       while adhering to safety and environmental

3       regulations.

4                   Did I read that correctly,

5       sir?

6           A.  You read that correctly.

7           Q.  And then if you go to page 7 and

8       8.  Let's go to the bottom of page 7.

9                   The last bullet point says,

10      BPXA had a deeply engrained cost

11      management ethic as a result of long

12      periods of low oil prices, constrained

13      budgets, and multiple cost, slash, head

14      count reduction initiatives.

15                  Did I read that correctly?

16          A.  You did.

17          Q.  And then under internal

18      communications, it says, CIC.

19                  Do you know what the CIC is?

20          A.  Yeah.  There was also another

21      sentence which you didn't read, but --

22          Q.  Sure.  No, you're right.

23                  Do you see the CIC?  What does

24      that mean?

25          A.  I think it refers to the corrosion

**PURSUANT TO CONFIDENTIALITY ORDER**

1    inspection group.

2         Q.   Okay.   Right.   Okay.

3              CIC made important project and

4    activity trade-off decisions to meet its

5    budget target.   The budget development

6    process provided little opportunity and no

7    shared communication mechanisms, e.g.,

8    risk assessment methodology, for

9    management to question these decisions.

10             Did I read that correctly?

11        A.   You did read that correctly.

12        Q.   Now, here's my question:   In three

13   different reports, there's some discussion

14   about the allocation of resources and

15   detection of deteriorating performance.

16   Were you involved after these three

17   reports came out with respect to BP p.l.c.

18   making budgetary decisions with respect to

19   dollars available for the Gulf of Mexico

20   drilling and completion?

21             MR. FOWKES:   Object to the

22   form.

23        A.   I'm -- I'm thinking about the --

24   I'm thinking about the -- the answer to

25   the question.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.  (BY MR. WATTS)  Sure.

2      A.  And what I -- what I would say is

3   that -- and I -- I could -- I'm going to

4   answer your question directly.  I could go

5   back and go over this other history from

6   Grangemouth, but in the specific of the

7   question, I was involved in the -- in the

8   planning process following these

9   instances, and part of the learning that

10  came from those -- all of the events was

11  that -- and Tony Hayward was very clear in

12  his intent at the time -- was that safety

13  was our highest priority, and we would not

14  compromise on investing what we needed to

15  invest to ensure safe, reliable

16  operations.  He was extremely clear to say

17  that his priorities were safety, people,

18  and performance, in that order.

19     Q.  And do you degree that in matters

20  of corporate management, that deeds are

21  more important than words?

22     A.  That's a -- that's a theoretical

23  question.

24     Q.  Do you agree with the theory that

25  deeds are more important than words?  I

**PURSUANT TO CONFIDENTIALITY ORDER**

1   mean, somebody can say, safety is my top

2   priority, but if they don't allocate

3   dollars, you know -- do you --

4       A.  But what I would say in the

5   substance of the -- and we had a -- we

6   have a thing called a performance contract

7   which would apply --

8       Q.  Sure.

9       A.  -- across our business, and the --

10  the first item on the performance contract

11  is safety and operational integrity, and

12  that was the first place that we allocated

13  dollars.

14              So I think in that sense, you

15  could say that the -- the deeds of

16  allocating dollars actually matched the

17  intent of saying safety was our highest

18  priority.

19      Q.  And do you agree that sacrificing

20  safety in order to save money would be

21  inappropriate, given the stated -- the

22  statements made by Tony Hayward, the chief

23  executive officer of the group?

24      A.  I -- I think in the context of

25  Tony's commitment, people making that

1    tradeoff would be against what his intent

2    was.

3        Q.  Okay.  So a company making the

4    tradeoff that you sacrifice safety in

5    order to change -- to save dollars, that

6    would be an inappropriate activity by a

7    corporation.  Do you agree?

8        A.  An inappropriate activity by a

9    corporation, I -- that's a sort of general

10   question.

11            I think as far as we're

12   concerned, we were clear that safety

13   was -- it was our highest priority, and we

14   did not want to undermine our investment

15   in safety.

16       Q.  You should never undermine your

17   investment in safety in order to achieve a

18   dividend objective.  That's true, right?

19       A.  That's a sort of big question, but

20   I think -- I think in the -- in the sense

21   of -- in the sense of the -- the company's

22   commitment to safety, you could make the

23   case to saying -- and there's a lot of

24   both technical and management theories to

25   say that if you actually invest in safe,

**PURSUANT TO CONFIDENTIALITY ORDER**

1    reliable operations, that does lead to

2    better business performance.

3         Q.   Sure.

4         A.   And we've got a whole series of --

5    of training with MIT in Boston that

6    supports that.

7         Q.   But let me get back to my

8    question.  In order to meet a cash need to

9    pay a dividend, safety dollars should

10   never be sacrificed.  Do you agree?

11        A.   I would agree with that.

12        Q.   Okay.  Now, with respect to your

13   involvement, I think what started this

14   discussion, theoretical as it may be, was,

15   were you involved in BP p.l.c.'s decisions

16   about the dollars to allocate for drilling

17   and completion in the Gulf of Mexico, and

18   I'm not sure I ever got an answer.

19             Do you -- were you involved

20   with the allocation --

21        A.   I was -- I was involved in the

22   process.

23        Q.   Okay.

24        A.   But I didn't make -- I didn't make

25   the kind of -- the sort of -- the actual

**PURSUANT TO CONFIDENTIALITY ORDER**

45

1    allocation decision.

2         Q.  Who made the allocation decision?

3         A.  Ultimately -- I'm trying to

4    think -- I'm trying to think through here

5    the details of the -- we have a formal

6    series of financial authorities and

7    delegations.

8         Q.  Who makes the ultimate authority

9    as to the dollars that are going to be

10   allocated for drilling and completions in

11   the Gulf of Mexico?

12              MR. FOWKES:  Object to the

13   form and the scope.

14        Q.  (BY MR. WATTS)  Go ahead.

15        A.  I think it would be -- depending

16   on the -- on the -- on the materiality,

17   some of it would be at the level of the

18   SPU leader --

19        Q.  Okay.

20        A.  -- who has a certain amount of

21   delegated authority.

22        Q.  Right.

23        A.  And he would make decisions within

24   that delegated authority.

25              The next level up in terms of

**PURSUANT TO CONFIDENTIALITY ORDER**

1    delegated authority would be Andy Inglis.

2        Q.   The chief executive officer of

3    exploration and production?

4        A.   Chief executive officer of

5    exploration and production.  That's --

6    that's -- actually, that's a good point.

7    The chief executive officer of exploration

8    and production because it's the -- and

9    then it would be the chief executive of

10   the BP Group.

11       Q.   Okay.  And let me just spend a

12   couple of minutes talking about the

13   interrelationship between the BP Group and

14   exploration and production.

15               During the time that he was

16   the chief executive officer of the

17   exploration and production, was Mr. Inglis

18   also on the board of p.l.c.?

19       A.   He certainly was at the end.  I'm

20   just -- what I'm trying to get clear on is

21   the -- is the exact time of when he was

22   appointed to the -- he was appointed at

23   the time to the main board at the time

24   when I think Lord Browne left.

25       Q.   In 2005 -- or 2007, I'm sorry?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   Yeah, Tony -- Tony Hayward was

2    given the job of chief executive, and then

3    I think Andy was then made to the board at

4    that time.

5    Q.   I think you're exactly correct.

6    And let me precisely ask the question.

7               From the time that Tony

8    Hayward took over in 2007 until the time

9    that he left in the late summer/early fall

10   of 2010, Andy Inglis, the chief executive

11   officer of exploration and production,

12   served on the board of BP p.l.c.?

13   A.   That is correct.

14   Q.   Okay.  Thank you.

15   A.   Kind of -- yeah, and even, I

16   think, a little bit beyond the time that

17   Tony left.

18   Q.   Yeah, I think you're right.

19               Okay.  Now, what I'd like to

20   do --

21   A.   That Tony Hayward left.  I think

22   Tony Hayward left and then Andy left a few

23   months later than Tony.

24   Q.   Now, I've heard about something

25   known as the six-point plan.  You know

```
 1          what I'm referring to --
 2              A.  Yeah --
 3              Q.  -- when I refer to the six-point
 4          plan?
 5              A.  -- I know --
 6                  MR. FOWKES:  You have to wait
 7          for him to finish and --
 8                  THE WITNESS:  Sorry.
 9                  MR. FOWKES:  -- he'll do the
10          same to you -- for you.
11                  MS. EHRHART:  That happens.
12              Q.  (BY MR. WATTS)  You and I are
13          having a delightful conversation, but we
14          both speak quickly, so we need to be wary
15          of jumping on each other, even though
16          we're completely understanding what the
17          other is saying, okay?
18              A.  Okay.  Sorry.
19              Q.  All right.  If you could go to tab
20          10, page 15.  This is the end of the
21          Booz/Allen/Hamilton report.
22                  On page 15, it -- in the
23          middle of the page, it talks about a
24          number of initiatives underway or planned,
25          and one of those initiatives is the
```

PURSUANT TO CONFIDENTIALITY ORDER

1    implementation of a global IM standard.

2            Do you see that?

3        A.   Global integrity management

4    standard.

5        Q.   Sure.  And then we have the

6    so-called S&OI six-point plan, right?

7        A.   Yes.

8        Q.   There's some reorganizations, and

9    then it also speaks about the

10   implementation of an operating management

11   system or so-called OMS, right?

12       A.   Yep.

13       Q.   All right.  I want to visit with

14   you first about a six-point plan.  In

15   terms of the answer to the basic question

16   of seeking somebody from BP to discuss

17   what it is that BP did in response to the

18   Grangemouth, Scotland incident and the

19   report, the Texas City incident and the

20   Baker report, the Alaska pipeline spill

21   and the Booz/Allen/Hamilton report, is the

22   six-point plan one of the critical

23   features of BP's responses to those

24   reports?

25       A.   It is.  And there was a

1    sequence -- there was a sequence of --

2    there's a sequence of incidents, as you

3    described, with Grangemouth, Texas City,

4    and Alaska, and the things listed --

5    the -- the integrity management standard,

6    the six-point plan, and the OMS were a

7    series -- a series of -- some of the

8    interventions that the leadership made in

9    response to those instances.  And there

10   was a -- there was a sequence to them, and

11   the three of them are related together and

12   sort of support each other.

13       Q.  Exactly.  And we're going to

14   discuss each of them in some detail.  I

15   want to start off with the six-point plan.

16            If you could go to tab 93

17   in -- in notebook number 2, please, sir.

18            MR. WATTS:  And I'm going to

19   mark this as Exhibit 3817.

20            (Exhibit Number 3817 marked.)

21       A.  Which tab am I going to, sir?

22       Q.  (BY MR. WATTS)  93.

23       A.  93.  Right at the back.

24       Q.  Okay.  Tab 93 is entitled 2005 BP

25   Health Safety and Environment HSE Report.

**PURSUANT TO CONFIDENTIALITY ORDER**

1       And it's prepared for the environmental

2       and ethics assurance committee of the

3       board of directors, and it's dated July 12

4       of 2006, is it not?

5            A.  It is.

6            Q.  Okay.  And the so-called

7       environment -- environmental and ethics

8       assurance committee is what -- it's a

9       subcommittee of the BP Group's board -- or

10      the BP p.l.c. board called the EEAC,

11      right?

12           A.  Yes, it's called the -- yeah, it's

13      now -- it's subsequently being called the

14      SEEAC, but at that time, it was called the

15      EEAC.

16           Q.  Okay.  And the SEEAC adds safety,

17      environmental and ethics assurance

18      committee, and now it's called SEEAC,

19      right?

20           A.  Correct.  That is correct.

21           Q.  All right.

22           A.  And that is -- that is, as you

23      say, a -- a subcommittee of the main board

24      of directors.

25           Q.  And the main board of directors,

**PURSUANT TO CONFIDENTIALITY ORDER**

1    certain members of it will serve on the

2    EEAC and then the SEEAC, right?

3        A.   That is correct.

4        Q.   Okay.  And if we go to Bates page

5    number ending 550 -- you see on the bottom

6    right-hand corner there's Bates numbers?

7        A.   Yeah, I got that.

8        Q.   Okay.  On the bottom half of 550,

9    there's a discussion about some issues and

10   previous years' reports at the very

11   bottom.

12       A.   Uh-huh.

13       Q.   And then there's some findings.

14            And if you go to 551, it says,

15   actions taken in 2005 and 2006 to rectify

16   the above issues include, and then there's

17   a number of things discussed there.  And

18   the last thing discussed is, and

19   enunciation of the six-point plan.

20            Do you see that, sir?

21       A.   Yes, I do.

22       Q.   And the six points are, 1,

23   complete Texas City response actions; 2,

24   major accident risk, open paren, MAR,

25   close paren, assessment and action plan;

1    3, integrity management and control of

2    work group standards implementation; 4,

3    compliance with applicable laws and

4    regulations; 5, close out audit actions;

5    6, staff training and development in

6    safety operations.

7              Did I read these six

8    components of the so-called six-point plan

9    correctly?

10        A.  Yes, you did.

11        Q.  Okay.  Now, let me get you to turn

12   back here.

13              MR. WATTS:  Let me have the

14   camera focus on this.

15              (Exhibit Number 3818 marked.)

16        Q.  (BY MR. WATTS)  This is 3818.

17              And here's what I'd like to do

18   with you just real briefly --

19              THE VIDEOGRAPHER:  Mr. Watts,

20   we're going to have to tilt it forward a

21   little bit.

22              MR. WATTS:  Are we getting a

23   glare?  Okay.  Sorry.

24        Q.  (BY MR. WATTS)  As we look at

25   3818, what we have is, we have a number of

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1          excerpts from the Grangemouth incident,
 2          and then we have a number of excerpts from
 3          the US refineries of the Baker Commission
 4          report, and then a number of excerpts from
 5          the Booz/Allen/Hamilton report.
 6                    And, first of all, with
 7          respect to the first element of the
 8          six-point plan that was in tab 93 that
 9          we've already discussed, the Texas City
10          response actions with respect to portable
11          buildings, it's your understanding that on
12          March the 23rd of 2005 in Texas City,
13          Texas, BP's refinery there had an
14          explosion that was basically determined to
15          have been caused by some hydrocarbons that
16          were blown down from a stack and ignited
17          by some temporary portable buildings; is
18          that right?
19          A.  I'm not exactly sure of the -- of
20          the detail.  If that was -- I'm not sure
21          if that was exactly the -- the -- the
22          precise detail of the incident.  I -- I
23          know that there was an explosion in the
24          ISOM unit and there were portable
25          buildings inside of the blast zone --
```

PURSUANT TO CONFIDENTIALITY ORDER

1    Q.  Sure.

2    A.  -- and people were killed as a

3    result of that.

4    Q.  Exactly.  And so the first point

5    of the six-point plan dealt with across

6    BP's refineries to get a separation

7    between these portable buildings and the

8    so-called hydrocarbons that may be

9    ignitable, right?

10    A.  That -- that is true.  It is also

11    true that one of the things that we did

12    following Texas City was to take the Baker

13    Panel report and extend it beyond

14    refineries to the rest of the business.

15    Q.  Perfect.

16    A.  So we actually implemented the

17    six-point plan across the whole of the BP

18    Group, as we have spoken about it, which

19    included, by definition, the Gulf of

20    Mexico.

21    Q.  Okay.  So let me break down your

22    answer.  And I think everything you've

23    said is correct, but I want to break it

24    down to make sure you and I are

25    understanding each other.

1            First of all, when the Baker

2      Commission recommendations came out, BP's

3      p.l.c. executive management made the

4      determination that it would be appropriate

5      to extend the process safety

6      recommendations of the Baker report not

7      merely to its refineries, but across the

8      entire panoply of the BP Group, including

9      exploration and production in the Gulf of

10     Mexico, right?

11          A.   That is correct.  It was -- let me

12     just be clear.  This was a watershed event

13     for the company.

14          Q.   Sure.

15          A.   And -- and we had a -- a

16     leadership intent and under commitment

17     that was backed up by action to sort of

18     implement the six-point plan across the

19     business.

20          Q.   Okay.  Who made the decision --

21     and, again, you're speaking for the

22     company, and I know you weren't

23     necessarily there, but you've done some

24     research getting ready.

25               From your understanding, as

1    the corporate representative, who was it

2    at BP that made the decision that it was

3    appropriate to apply the Baker Panel's

4    recommendation not merely to the

5    refineries, but to all of the assets in

6    which BP operated across the BP Group's

7    business?

8                MR. FOWKES:  Objection to the

9    form.

10        A.  I -- I don't -- I literally don't

11   know who made the decision.

12        Q.  (BY MR. WATTS)  Okay.  We know

13   it's at the board level; would that be

14   fair?

15        A.  It would be at that -- it would be

16   at that sort of -- at the -- at that

17   level.  I don't know if it was at the

18   board or the local level, and I'm not

19   aware of the exact decision-making

20   process.

21        Q.  Now, as we look at tab 2, the

22   Grangemouth incident report, page 10,

23   lesson 2, says, operators should give

24   increased focus to major accident

25   prevention in order to ensure serious

58

1    business risk is controlled and to ensure

2    effective corporate governance.

3                 And then in the Baker

4    Commission reports, it says, process risk

5    assessment and analysis.  The system, as a

6    whole, does not ensure adequate

7    identification and rigorous analysis of

8    those hazards.  The panel's recommendation

9    also identifies that the extent and

10   reoccurring nature of this deficiency is

11   not isolated but systemic.

12                And in the Booz/Allen/Hamilton

13   report, on page 11 and 12, it says, a

14   second priority is to address the

15   fundamental risk assessment and integrity

16   management issues without a rigorous and

17   methodical approach that integrates risk

18   assessment into risk management assurance

19   activities.  It will not be possible to

20   have a truly effective integrity

21   management program.

22                Out of those three reports

23   came the second element of the six-point

24   plan, and that is the so-called major

25   accident assessments, or the MAR, and

59

 1          response plan, fair?

 2              A.  No, that's --

 3                      MR. FOWKES:  Mr. Watts,

 4          your -- you created this document?

 5                      MR. WATTS:  I did.

 6                      MR. FOWKES:  I just want to --

 7          we haven't established that those words

 8          are actually found on the pages.  I'm not

 9          saying they're not, but I just want to

10          note -- note that for the record.

11                      MR. WATTS:  Okay.  Well, let

12          me note for the record the HSE words came

13          from page 10, lesson 2, the Baker

14          Commission report came from page XIII, and

15          the Booz/Allen/Hamilton report came from

16          page 11 and 12.

17                      MR. FOWKES:  And I'm not

18          saying they're not there, but we

19          haven't -- we're not going to take the

20          time now to go proofread it and make sure

21          it's there.

22                      MR. WATTS:  That's fine.  If

23          they're not there, I'm sure I'll hear

24          about it later.

25              Q.  (BY MR. WATTS)  But anyway, the

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1        bottom line is, these three

2        recommendations all led to the decision by

3        BP Group's board that one of the elements

4        of the six-point plan should be major

5        accident assessments, or so-called MARs,

6        and a response plan to what's identified

7        in those MARs.  Do you agree?

8                 MR. FOWKES:  Object to form.

9            A.   Well, no, I don't agree -- I don't

10       agree with the way that you've said it

11       because --

12           Q.   (BY MR. WATTS)  How would you say

13       it?

14           A.   Well, I think the -- the time

15       sequence -- as I said, these are sort

16       of -- they're events --

17           Q.   2000, 2005, 2007.

18           A.   I agree completely -- I agree

19       completely with the time sequence.

20           Q.   Yeah.

21           A.   Okay?  The six-point plan is, in a

22       sense, not fully in sequence because

23       the -- my memory of the -- of the sequence

24       of events is that Grangemouth happened,

25       and we did an investigation in
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1 Grangemouth.  The HSE -- it was a

2 competent authority, and we did -- we did

3 some actions following Grangemouth.

4  Q.  Sure.

5  A.  And the thing that we initiated

6 following -- the big change was we put in

7 place a process safety integrity

8 management standard.

9  Q.  Okay.

10  A.  And we had a plan to implement

11 that, okay?

12    Then -- so that -- I might

13 come to the six-point plan.

14  Q.  Keep going.

15  A.  Then we had the Texas City

16 incident.  Following Texas City, we put in

17 place the six-point plan.  So the --

18  Q.  I agree with you.

19  A.  The six-point plan was sort of

20 almost between 2005 and 2006, if you like.

21 It was sort of a response to Texas City.

22 And -- but contained in that was the --

23 the -- I'm going to come to the one below,

24 which is the integrity management and

25 control of work -- the integrity

**PURSUANT TO CONFIDENTIALITY ORDER**

1     management standard was the thing that we

2     had begun to create following the incident

3     in Grangemouth.

4         Q.  Sure.

5         A.  So that was kind of -- as I said,

6     these things like follow through.

7         Q.  Okay.

8         A.  Okay?  So then following --

9     following Texas City, the -- the idea was

10    to sort of say, this is in response to the

11    Baker Panel.  We need to put in place a

12    plan across the business.  And, again, the

13    Baker Panel was just for the refineries,

14    but we did it across the business --

15        Q.  Okay.

16        A.  -- to sort of do these things,

17    which are -- which are listed as a

18    six-point plan.  But I'm not -- I'm

19    agreeing with the six-point plan; I'm not

20    necessarily agreeing with the mapping of

21    the -- of the components of the six-point

22    plan with the words on the piece of paper.

23        Q.  I think what your point is -- and

24    I agree with you -- is that the components

25    of the six-point plan were largely in

**PURSUANT TO CONFIDENTIALITY ORDER**

1    response to the Baker Commission report

2    and things you had learned previously in

3    Grangemouth, and they may have already

4    been in place by the time the

5    Booz/Allen/Hamilton report came out.  Do

6    you agree?

7        A.   They -- we had -- I would say that

8    we had an implementation plan for the

9    six-point -- for the six-point plan that

10   covered the elements as -- as described on

11   the six-point plan, and we were in

12   progress on implementing them at the time

13   the incident in Alaska happened.

14       Q.   Okay.  And -- and for the record,

15   the Baker Commission report didn't come

16   out until January 2007.  The incident in

17   Alaska had already happened in March of

18   '06, and the report from

19   Booz/Allen/Hamilton came out in March of

20   '07.  But I get your point.

21            Now, here's my point:  With

22   respect to element 2 of the six-point

23   plan, the BP p.l.c. board enacted a

24   six-point plan that included element 2

25   requiring a major accident assessment, or

1      MAR, and documented response plans to what

2      the MAR figured -- came up with, right?

3          A.   That is correct.

4          Q.   Okay.  And the third element is

5      integrity management and control of work

6      standards and implementation.  And, again,

7      in the Grangemouth report at page 10,

8      lesson 1, it says, major hazard to

9      industry should be -- or should ensure

10     that the knowledge available from previous

11     incidents, both within their own

12     organization and externally, are

13     incorporated into current safety

14     management systems.

15              The Baker Panel report says,

16     BP should establish and implement an

17     integrated and comprehensive process

18     safety management system that

19     systematically and continuously

20     identifies, reduces, and manages process

21     safety risks.

22              And then the

23     Booz/Allen/Hamilton report says, an

24     effective response to address the findings

25     in this report would be to develop a

1    comprehensive risk management process for

2    pipeline integrity and then to implement

3    it across the entire BPXA infrastructure.

4              Again, the same question, not

5    necessarily related to

6    Booz/Allen/Hamilton, but after the Texas

7    City report came out, BP p.l.c.'s board

8    enacted a six-point plan that said, across

9    the company, we should implement a

10   so-called integrity management standard,

11   control of work standards, and -- and

12   caused them to be implemented not just in

13   the refineries, but across all of BP's

14   activities, right?

15        A.   That is -- that is my

16   understanding.

17        Q.   Now, as part of that -- and we're

18   going to talk about this ad nauseam in a

19   minute.  As part of this integrity

20   management standard, the integrity

21   management standard was implemented, and

22   then there's a process standard known as

23   the OMS that was also implemented across

24   BP's operations; is that right?

25        A.   Yeah.  Can I -- can I say -- yes,

```
 1        that is correct.
 2            Q.   Okay.   And what did you want to
 3        say about OMS?
 4            A.   What I wanted to say -- and you're
 5        right that I got -- perhaps the -- the
 6        exact time sequence between the six-point
 7        plan and the Baker -- but the sense -- the
 8        kind of -- the six-point plan was a
 9        response to Texas City.
10            Q.   Agreed.
11            A.   And I understand it was in place,
12        and the Baker -- final Baker report may
13        have been issued later than that.
14            Q.   Right.
15            A.   So the -- the idea then was -- so
16        we started with Grangemouth, we had the
17        process safety integrity management
18        standard.  We then put in place the --
19        amongst other things, we put in place the
20        six-point plan, which was a big -- a
21        major -- you know, a serious corporate
22        response to the events of Texas City.
23        Because you could say, you know, Texas
24        City followed on from Grangemouth, and we
25        needed to do more because everything still
```

PURSUANT TO CONFIDENTIALITY ORDER

1        wasn't as it should be.

2               What happened then -- and it's

3        the sort of Baker Panel implemented

4        integrated comprehensive process safety

5        management, OMS, so we then say we've

6        got --

7            Q.  Operations management system?

8            A.  Operations management system.

9            Q.  Okay.

10            A.  That was the -- that was and is

11        the comprehensive system to continuously

12        reduce risk and improve our operating

13        performance.

14               And you can then map --

15        sorry -- the sort of -- part of the

16        operating management system is the

17        integrity management system --

18            Q.  Okay.

19            A.  -- and the control of work system

20        and other -- and the risk management

21        process.

22            Q.  I think when we took Mr. Hayward's

23        deposition, he said that OMS was the

24        cornerstone of BP's safety response to

25        Texas City.  Would you agree?

1              MR. FOWKES:  Object to the

2       form.

3           Q.  (BY MR. WATTS)  Or how would you

4       characterize that in terms of importance

5       to the response to Texas City?

6           A.  It was -- well, the -- the

7       immediate response to Texas City was

8       the -- was a six-point plan.

9           Q.  Okay.

10          A.  Amongst other things.

11          Q.  It was a critical response; you

12      agree?

13          A.  It was part -- the six-point plan

14      was part of the response.  We did other

15      things -- you know, we brought in, you

16      know, external experts from DuPont, and we

17      did a bunch of other things.

18          Q.  What's your view of OMS and the

19      importance of it?

20          A.  OMS is -- is sort of -- is

21      fundamental to the way that we run the

22      firm.  And the six-point plan and the

23      elements of the six-point plan map into

24      OMS.

25          Q.  When you say OMS is fundamental to

PURSUANT TO CONFIDENTIALITY ORDER

1      the way we run the firm, it's fundamental

2      to reducing risk within the firm, agree?

3          A.  It is -- it is designed -- it is

4      designed to reduce risk in our business

5      and to be consistent with the goal of

6      safe, reliable operations.

7          Q.  Now, number 4 is compliance with

8      applicable laws and regulations.  And let

9      me just read into the record the

10     Grangemouth report.  On page 4, it says,

11     BP were prosecuted on indictment on

12     January 18, 2002 and pleaded guilty to two

13     charges.  BP Chemical, Limited were fined

14     250,000 pounds.  BP Oil Grangemouth

15     Refinery, Limited were fined 750,000

16     pounds.

17                   And then the Baker

18     Commission -- after Texas City, BP pled

19     guilty and was fined $50 million and put

20     on three years' probation.  You're

21     familiar with that, right?

22         A.  I'm -- I'm -- in -- in a general

23     sense, yes.  I'm not -- I'm not familiar

24     with the details.

25         Q.  If you want to look at tab 92,

1     it's the document right before the one

2     you're on.  It's the plea agreement.

3                    And if you look at paragraphs

4     1(b) and 1(c) -- I think it's on the

5     second page.  All right.

6                    MR. FOWKES:  Does this have an

7     exhibit number?

8                    MR. WATTS:  Tab 92 is what

9     exhibit?

10                    MR. McLENDON:  3819.

11                    (Exhibit Number 3819 marked.)

12     Q.  (BY MR. WATTS)  Go to the next

13     page -- I'm sorry, here it is.  Yeah.  I'm

14     sorry to reach over you.

15                    But you can see paragraph

16     1(b), that there's a $50 million fine, and

17     then paragraph 1(c), BP agrees to serve a

18     term of probation of three years.

19                    Do you see that?

20     A.  I see that.

21     Q.  Okay.  And then in response to the

22     Alaska incident, the -- the spill, BP was

23     sentenced to three years' probation and

24     fined $12 million.

25                    Were you aware of that?

PURSUANT TO CONFIDENTIALITY ORDER

```
 1          A.   I'm -- I'm aware that -- I'm --
 2     broadly, yes.  I'm not aware of the
 3     detail, but I'm -- and I can -- you know,
 4     I can read the book, and I'm sure that
 5     it's accurately written in the book.
 6          Q.   Go to tab 94.  I got this off of
 7     BP's Web site.
 8                    MR. WATTS:  And we'll mark
 9     this as Exhibit what, David?
10                    MR. FOWKES:  There is no 94.
11                    THE WITNESS:  There's no -- I
12     don't have a tab 94.
13                    MR. McLENDON:  Is that the one
14     you just --
15                    MR. WATTS:  Hold on just a
16     second.
17                    Hey, David, it's in the back
18     of my box.  Just get it real quick.  I
19     apologize.  We added a couple last night.
20     I told you about my computer problems.
21                    MR. McLENDON:  This will be
22     3820.
23                    (Exhibit Number 3820 marked.)
24          Q.   (BY MR. WATTS)  Let me hand you
25     3820.  And I'll give you my highlighted
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    version so that you've got a good copy of

2    it.

3              And if you'll go to page 2,

4    sir, you can see that under Alaska, second

5    paragraph, BPXA has agreed to a $12

6    million fine and three years' probation.

7    Under the agreement, BPXA will also pay

8    restitution of $4 million to the State of

9    Alaska, which has agreed not to prosecute

10   the company, and make a $4 million payment

11   to the National Fish and Wildlife

12   Foundation for arctic environmental

13   research.

14              Do you see that, sir?

15        A.   Yes, I do.

16        Q.   Okay.  And so we see now on BP's

17   Web site that it was sentenced to three

18   years' probation.

19              And then on page 11 of the

20   Booz/Allen/Hamilton report, they write,

21   the first priority is to respond to

22   regulatory compliance directives in a

23   timely manner.

24              Do you agree that that's an

25   important priority for a company operating

73

1          in different geographical areas, is to

2          comply with the law?

3              A.  Yes.

4              Q.  Okay.  Now, one of the things as

5          part of the six-point plan is -- of

6          course, everybody endeavors to comply with

7          the law, but BP's six-point plan set up

8          from the group level or from the p.l.c.

9          level a six-point plan to monitor

10         compliance to ensure compliance with a

11         given geographical area or country's legal

12         standards, agreed?

13             A.  Yes.

14             Q.  Okay.  So point number 4 of the

15         six-point plan was compliance with

16         applicable laws and regulations, and what

17         BP did under its six-point plan is

18         implement particular processes to ensure

19         that its operations were in compliance

20         with the law where they were operating,

21         right?

22             A.  Yeah, except -- except -- well,

23         the first -- the first thing they did was

24         to set a -- a leadership expectation,

25         would actually be the case.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.  All right.

2      A.  And then put in place a system to

3  ensure that that was happening.

4      Q.  In -- in other words -- and we've

5  talked about this reorganization a little

6  bit.  BP grew dramatically from the 1990s

7  through about 2006/'7 through a bunch of

8  acquisitions, including Amoco, right?

9      A.  Yes.

10      Q.  When you acquire a company,

11  although you try to integrate, you -- you

12  have different cultures that you're trying

13  to merge into the BP culture, right?

14      A.  I'm -- I'm not sure it's accurate

15  that -- that we -- you said you have

16  different cultures trying to merge into a

17  BP culture.  I accept that there are

18  different -- there are different cultures,

19  and you may be trying to create a single

20  culture from different cultures.

21      Q.  Okay.  Fair enough.

22            And so what -- what happened

23  in the six-point plan is -- is BP that

24  used to have these SPUs across the -- the

25  globe as part of the six-point plan said,

**PURSUANT TO CONFIDENTIALITY ORDER**

1    as a corporate entity, BP p.l.c. wants to

2    put processes in place so that p.l.c. can

3    ensure that its given SPUs are in

4    compliance with the regulations or the law

5    that's in place in the area where they

6    operate, right?

7         A.  That is -- that was the intent of

8    the -- of the six-point plan.

9         Q.  Okay.  Number 5.  As we look at

10   the Grangemouth incident report, on page

11   9, it says, BP failed to achieve the

12   operational control and maintenance of

13   process and systems required by law.

14              The Baker Commission on page

15   XV, says, BP has not implemented an

16   effective process safety audit system, and

17   on page XVII says, BP should establish and

18   implement an effective system to audit and

19   process safety performance.

20              And in the Booz/Allen/Hamilton

21   report, on page 7, it says, a number of

22   key assurance processes, e.g., audit

23   management of change, were not, quote,

24   closed loop, close quote, to ensure that

25   required changes were truly implemented

1    and documented.

2              Now, all of these deal with

3    what I would call audit.  Do you agree?

4         A.  I agree that audit is a -- is a

5    common theme across those three things.

6         Q.  Yeah.  And so what BP p.l.c. did,

7    as part of the six-point plan, is it said,

8    look, while individual business units or

9    strategic performance units may have

10   audits in place, we want to create a new

11   entity that is run by p.l.c. known as S&O

12   audit that will come in and perform

13   high-powered audits of the operations of

14   these different business units, come up

15   with deficiencies that they see, action

16   plans to finish them, and schedules to

17   close out the action plans.  Is that what

18   happened?

19        A.  Well, don't -- can I --

20        Q.  Please.

21        A.  -- make a -- because I -- I sort

22   of see it slightly differently.

23        Q.  Okay.

24        A.  And what you said was sort of in

25   part accurate.  The intent -- there was

**PURSUANT TO CONFIDENTIALITY ORDER**

1     sort of two things.  The first thing was

2     that all of the audits that you have had

3     in the past needed to be closed out,

4     because one of -- one of the gaps -- one

5     of the gaps that was identified in the --

6     in the Baker report was that, you know,

7     you did audits, and you may not close out

8     the actions in a timely manner.  So that

9     was --

10          Q.  Okay.  Let me stop you there just

11     for a second.  I'm going to get you to

12     number 2.

13              What you're saying is, it

14     doesn't do any good to do audits if you

15     don't follow up and correct the

16     deficiencies observed in the audit, right?

17          A.  Correct.  And the --

18          Q.  Okay.  Number 2.  Go ahead.

19          A.  The intention -- the intention was

20     to close out the past audit action -- the

21     intention was -- behind the six-point plan

22     was to close out past audit action items.

23          Q.  And I interrupted you, and there's

24     a second part of it that you --

25          A.  Well, the second part -- the

78

1    second part is what you described.  And

2    this was consistent with John and Tony

3    bringing in high-powered help.

4         Q.  Okay.  Tell me about this, this

5    S&O audit high-powered help.

6         A.  Well -- so there were -- there

7    were several components to it.  First off,

8    we brought in this guy, John Sieg, who

9    came in from DuPont, which is a recognized

10   process safety leader.  John Sieg from

11   DuPont.  We brought in John Baxter from

12   the nuclear industry.  And we brought in

13   this guy called Jim O'Brien to be the head

14   of S&OI audit, and he created an S&OI

15   audit team in the way that you described.

16        Q.  Now, let me stop you there for a

17   second.  And -- and I'm going to tell you

18   what I think, and you tell me if I'm

19   wrong.  I see a bunch of documents about

20   an S&O audit organization up until the

21   time of the Deepwater Horizon.  And then

22   after the Deepwater Horizon incident and

23   the reorganization, there's an S&OI

24   organization.  Am I correct or am I

25   mis- -- misguided in that regard?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1        A.   I'm -- I'm not -- I'm not exactly

2   sure.  But I -- what I -- the -- there was

3   a change post the Deepwater Horizon to

4   the -- the powers given to that

5   organization.

6        Q.   Okay.  Let me --

7        A.   And the name -- the name was

8   changed to reflect those powers.

9        Q.   All right.  Let me frame the time

10  period that I want to ask you about.

11  Between the time that Mr. Hayward showed

12  up in '07 until the time of the Deepwater

13  Horizon explosion on April the 20th of

14  2010.

15            As part of the six-point plan,

16  there was an S&O audit organization that

17  was a number of what you called

18  high-powered help that would come in, work

19  for BP p.l.c. and go to the business units

20  of exploration and production and refining

21  and marketing and do these high-powered

22  S&O audits to identify deficiencies, put

23  them on track for action items to fix

24  them, and to follow up and make sure

25  they're closed out, right?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. FOWKES:  Object to the

2     form.

3          Q.  (BY MR. WATTS)  Go ahead.

4          A.  There were -- there was a -- an

5     audit function created.  I'm just sort

6     of -- under Jim O'Brien that went out to

7     perform S&O safety and operations audits

8     on parts of our business, and the actions

9     from those were put into a system and

10    tracked to closure -- and are tracked to

11    closure.

12         Q.  Now, I've seen a number of

13    documents where Tony Hayward is talking

14    about this is one of the best things we've

15    ever done.  The S&O audit system is

16    extremely helpful, identifies thousands of

17    deficiencies that we're cleaning up.

18               Do you agree with the idea

19    that the S&O audit function was critical

20    to BP's safety response to what had

21    happened in Texas City?

22         A.  I would say that it was an

23    important part of it.

24         Q.  Okay.  The sixth element -- the --

25    the tab 93 that we looked at that was

**PURSUANT TO CONFIDENTIALITY ORDER**

1    shown to the EEAC committee says, number

2    6, staff training and development and

3    safety and operations.

4              One of the things that the

5    Baker Commission report said, BP should

6    develop and implement a system to ensure

7    that, among other things, personnel

8    possess an appropriate level of process

9    safety knowledge and expertise.

10             Element number 6 of the -- the

11   six-point plan is an independent effort on

12   staff training and development in safety

13   and operations.  Do you agree?

14        A.  Yes, I agree.

15        Q.  Okay.  Now, as we look at 3818,

16   these six points of the six-point plan, we

17   can agree that each of them are important

18   to BP's safety response to these

19   unfortunate incidents that have happened

20   in the past, right?

21        A.  They are -- they are an important

22   part of the response.

23        Q.  We can agree that BP's -- p.l.c.'s

24   board of directors made the decision that

25   we're not just going to apply this

1      six-point plan to refineries, that good

2      safety required that we apply this

3      six-point plan across the corporation.

4      That -- that happened, right?

5          A.  We -- we can agree that the

6      response was across the organization.  We

7      were --

8          Q.  I thought it was --

9          A.  We were -- yeah, we were unclear

10     as to where exactly that decision was

11     made.

12         Q.  Okay.  Fair enough.

13             Let me put the mike up, and

14     then I'll sit back down for a second.

15             Now, in addition to

16     formulating the six-point plan, one of the

17     recommendations of the Baker Commission

18     report was that BP's board of directors be

19     involved in not only the formulation of

20     the plan, but the follow-up of making sure

21     the plan was being implemented.  Do you

22     agree?

23         A.  I -- I agree.

24         Q.  All right.  Did BP's board of

25     directors, through the SEEAC committee,

1    try to see to it that the board of

2    directors of BP p.l.c. itself was involved

3    in monitoring whether the six-point plan

4    was being timely implemented throughout

5    BP's operations throughout the globe?

6              MR. FOWKES:  Objection, form.

7        A.  One of the things -- one of the

8    things that we did was to -- following the

9    six-point plan, we did two things.  One is

10   we -- as part of the response to sort of

11   Grangemouth and Texas City, we created

12   this -- well, we had a leadership intent.

13   We created the six-point plan -- a

14   leadership intent.  We created a

15   leadership intent and established safe,

16   reliable operations as a leadership

17   priority.

18        Q.  (BY MR. WATTS)  Okay.

19        A.  We put in place the six-point plan

20   and said that should apply across the

21   business.  We put in place some corporate

22   structure.  We put in place a group

23   operating risk committee.

24              MR. WATTS:  Okay.  Let me stop

25   you there because we're out of videotape.

1        And I want to start with the -- the GORC.

2        And if you have anything else you want to

3        say, I'm going to start the next video

4        with the opportunity to finish that, okay?

5        Because we have five seconds left.  I'm

6        sorry.

7                    THE WITNESS:  Okay.

8                    THE VIDEOGRAPHER:  We're off

9        the record, 9:35 a.m., ending tape 1.

10                   (Recess 9:35-9:49 a.m.)

11                   THE VIDEOGRAPHER:  Back on the

12       record, 9:49 a.m., beginning tape 2.

13            Q.  (BY MR. WATTS)  Mr. Armstrong,

14       finish your answer, please, sir.

15            A.  Okay.  Do you want me to read it

16       from the start or just --

17            Q.  We can just start the video as you

18       pick it up.

19            A.  Okay.  So what -- in response to

20       Texas City, we did several things.  One

21       was to create our leadership intent around

22       delivery of the six-point plan.  We also

23       created the group operating risk

24       committee.

25            Q.  GORC?

```
1          A.   The GORC, group operating risk
2      committee.
3          Q.   G-O-R-C?
4          A.   Yeah.  And to support the GORC and
5      its connection with the SEEAC, we created
6      a set of management information, which was
7      known as the orange book.  And the idea
8      here was to create a set of management
9      information that had the same level of
10     standing in the firm as financial
11     information --
12         Q.   Okay.
13         A.   -- to sort of attach equal
14     importance to it.
15         Q.   And -- and I've read elsewhere or
16     talked to other people that said that
17     originally you were responsible for
18     maintaining the orange book.  Is that --
19         A.   I was --
20         Q.   -- true?
21         A.   I was involved in the process that
22     created the orange book.
23         Q.   So you created the format of it
24     but didn't maintain it as the time went
25     by?
```

```
1          A.   No.   What happened was that John

2     Browne, who was the chief executive at the

3     time -- I was responsible for sort of

4     pulling together high-quality financial

5     information as part of my role.

6          Q.   In a cogent, organized way?

7          A.   And -- sort of.   And he wanted me

8     to do the same thing --

9          Q.   For safety?

10          A.   -- for safety information, and

11     there were two components to it.   One was

12     to -- and, again, this was consistent with

13     the findings of the Baker Panel.

14               One was to create a series of

15     measures that tracked process safety, not

16     just personal safety.   We introduced

17     leading and lagging indicators on process

18     safety.   That was kind of one part of it.

19          Q.   Yes, sir.

20          A.   And then the other part of it was

21     to adopt a consistent approach across the

22     group, by which I mean exploration and

23     production, refining and marketing, for

24     tracking progress against the elements of

25     the six-point plan.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.   Okay.

2      A.   And that's -- so I -- my

3  involvement was in sort of -- I -- I led a

4  workshop that created this product, and

5  then someone else, Bill Boil, actually,

6  who's actually -- Bill Boil --

7      Q.   Okay.

8      A.   -- was the person who was

9  responsible for maintaining it.

10      Q.   Okay.

11      A.   And that document -- this is the

12  answer to your question -- that document

13  was discussed.  It was the sort of basic

14  management information that supported the

15  GORC, the group operating risk committee,

16  and it was also used to inform the

17  SEEAC --

18      Q.   Yes, sir.

19      A.   -- as to our kind of progress on

20  implementing the six-point plan.

21      Q.   Excellent answer, and let me

22  follow up on it.  First of all, I've read

23  the orange book in the format, and I agree

24  with you, it's excellent from the

25  standpoint of communicating information to

**PURSUANT TO CONFIDENTIALITY ORDER**

1      the executives in management with respect

2      to safety.  That was its intent, right?

3          A.  That was -- it was -- well,

4      it's -- broadly, yes.

5          Q.  Okay.  And what would happen is,

6      is that after your group created the

7      architecture of what the orange book is

8      going to look like, somebody else was

9      charged with populating the orange book

10     with whatever the applicable safety

11     information was at the time; and then on a

12     quarterly basis, that information would be

13     delivered to upper-level management of

14     BP p.l.c. as a safety snapshot for the

15     company, right?

16         A.  Again, I'm sort of hung up

17     slightly on the sort of language p.l.c.

18     It was accurate to say that the

19     information was collected, it was used at

20     the group operating committee -- and, you

21     know, you can -- know who sits at the

22     group operating committee -- and I -- I

23     believe that it was actually used at

24     the --

25         Q.  SEEAC?

**PURSUANT TO CONFIDENTIALITY ORDER**

89

1          A.   -- at the SEEAC.

2          Q.   Okay.

3          A.   And it was also just -- and it was

4     also used inside of the businesses.  You

5     know, Andy Inglis used it with his

6     leadership team to talk about safety

7     performance and our progress on safety

8     performance --

9          Q.   All right.

10          A.   -- in a -- in a regular process.

11          Q.   Let me see if I can go about it

12     this way:  When we talk about the GORC and

13     the SEEAC, the group operating risk

14     committee and the safety -- or the SEEAC

15     committee, as we've already described it,

16     these are committees that contained the

17     very highest level of executive management

18     of the entire company, right?

19          A.   That is correct.

20          Q.   Let me show you a document that

21     I'm going to mark as Exhibit 3822.

22               (Exhibit Number 3822 marked.)

23          Q.   (BY MR. WATTS)  And let me hand

24     copies to counsel.  This is a summary that

25     I created of the documents that you and I

1    are going to go through.

2          MR. WATTS:  If you could pass

3    those out to everybody.

4       Q.  (BY MR. WATTS)  What I have in --

5    in your tabs is different tab numbers, the

6    date of the meeting, whether or not it was

7    a GORC meeting or a SEEAC, and then the

8    identity of some of the attendees that I

9    am familiar with.

10          And can you see that going

11    from the start of 2008 -- and I'll just

12    say on the record, there were some 2007

13    meetings, but I want to ask you about 2008

14    for a reason -- starting with 2008 and

15    going through the end of 2010, okay?

16          MR. FOWKES:  Mike, does this

17    list all of the attendees?

18          MR. WATTS:  Beginning in -- it

19    doesn't list all the attendees.

20          MR. FOWKES:  All right.

21          MR. WATTS:  But it -- I think

22    it captures all the meetings between

23    January of 2008 and the end of 2010, okay?

24       Q.  (BY MR. WATTS)  Now, what I'd like

25    to do, Mr. Armstrong, is use this exhibit

1     as our guide to go through these different

2     documents in the notebook and put these

3     into the record.

4                First of all, if you would go

5     to tab 13 of the first notebook, which is

6     going to be Exhibit 3823.

7                (Exhibit Number 3823 marked.)

8         Q.  (BY MR. WATTS)  Now, as we look at

9     tab 13, this is a SEEAC meeting minutes

10    for January the 9th of 2008, correct?

11        A.  Let me -- just give me a moment to

12    read it.

13        Q.  Sure.  And -- and I'm not going to

14    ask you anything about what's in it other

15    than the -- who's present and who's in

16    attendance, for now, okay?

17        A.  That is correct.

18        Q.  Okay.  Now, under Present, we have

19    Dr. W.E. Massey, Mr. A. Burgmans, Sir

20    William Castell, and Sir Tom McKillop.

21    Those are members of the board of

22    directors of BP p.l.c.?

23        A.  They are.  They're not -- they

24    are -- I don't know how -- they're

25    nonexecutive directors.

```
 1          Q.  Okay.
 2          A.  They're --
 3          Q.  They're on the board and then
 4     they're also on the subcommittee of the
 5     board known as SEEAC, right?
 6          A.  That is correct.
 7          Q.  Okay.  In addition, we have
 8     Mr. D.J. Pearl.  What was Mr. Pearl's
 9     position?
10          A.  He would be the -- the secretary
11     of the SEEAC.  He's an --
12          Q.  Okay.
13          A.  He's an employee of -- of BP.
14          Q.  Okay.
15          A.  And he's on the -- he's -- he's
16     present as the secretary.
17          Q.  Now, in addition, in this
18     particular meeting -- I'll just call out a
19     couple of the names -- we have Dr. A.B.
20     Hayward.  That's Tony Hayward, who's the
21     chief executive officer of the BP Group,
22     right?
23          A.  That is correct.
24          Q.  In addition, we have Mr. I.C.
25     Conn.  Can you tell us who Mr. Conn was?
```

1      A.   Yeah.   Iain Conn is the managing

2      director and executive director for

3      refining and marketing.

4           Q.   Okay.   We have Mr. Andy Inglis,

5      who was the chief executive officer of

6      exploration and production?

7           A.   Andy Inglis was the chief

8      executive officer of exploration and

9      production.

10          Q.   So what we have here is we have a

11     meeting that includes four board members,

12     and then we have the highest-level

13     executive from each of the business groups

14     within the BP Group, right?

15          A.   That is accurate.

16          Q.   Okay.   In addition, we have

17     Mr. John Mogford.   Can you tell us who

18     that is?

19          A.   John Mogford -- I'm not sure what

20     John -- what role John was playing.   John

21     had two roles.   John led the internal

22     investigation into Texas City.

23          Q.   Okay.   And then later he

24     became --

25          A.   And then later --

1      Q.  -- head of --

2      A.  -- he became head of --

3      Q.  Sorry.

4      A.  -- he became head of safety --

5      Q.  And operations.

6      A.  -- head of safety and operations.

7   And then after that, he went to be the --

8   part of the -- Iain Conn's executive team

9   to run the refining system -- part of Iain

10  Conn's executive team, where I think he

11  was accountable for running the US

12  refinery system.

13     Q.  All right.  So let's go to another

14  one, tab 14, if we could.  And I'll mark

15  this as 3824.

16          (Exhibit Number 3824 marked.)

17     Q.  (BY MR. WATTS)  This is the

18  minutes from the GORC, or the Group

19  Operation Risk Committee, on January 22nd

20  of 2008, correct?

21     A.  That is.

22     Q.  In terms of the members who are

23  present, we have Tony Hayward, who's the

24  chief executive officer of BP p.l.c.,

25  right?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   That is correct.

2    Q.   We have Andy Inglis, who's the

3    chief executive officer of exploration and

4    production, right?

5    A.   That is correct.

6    Q.   We have Iain Conn, who's the top

7    executive for refinancing and marketing,

8    right?

9    A.   That is correct.

10    Q.   We have John Mogford, who's the --

11    in charge of the safety and operations

12    group?

13    A.   Correct.

14    Q.   We have John Baxter, who is the

15    worldwide head of engineering and process

16    safety of p.l.c., right?

17    A.   That is correct.

18    Q.   And we --

19    A.   Hang on a second.  I'm not -- what

20    I don't know -- he is the worldwide head

21    of safety and engineering.  He's the guy

22    that we recruited from the nuclear

23    industry.

24    Q.   Exactly.

25    A.   I'm not sure the -- whether

**PURSUANT TO CONFIDENTIALITY ORDER**

1    precisely he's part of the p.l.c.

2         Q.  I am, because I took -- I took his

3    deposition last week, but I don't expect

4    you to know that.

5         A.  In that case, then --

6         Q.  Okay.

7         A.  If that's the case, then I agree

8    with you.

9         Q.  R. -- R. Feil or Feil?

10         A.  I think it's Richard Feil.

11         Q.  Okay.  Feil, and he's the

12    secretary of the GORC?

13         A.  He's the secretary of the GORC.

14         Q.  All right.  And so, likewise with

15    the SEEAC, what -- whereas we don't have

16    board members from the board of directors

17    of the BP p.l.c., what we have here is we

18    have the top management executives from

19    each of the large business groups within

20    BP, such as refining and marketing and

21    exploration and production, correct?

22         A.  Correct.

23         Q.  And then we also have Mr. Baxter,

24    who is the worldwide head of engineering

25    and process safety, right?

1      A.   Yeah.

2      Q.   And we have Mr. Mogford, who's in

3  charge of this safety and operations, this

4  S&O function, that runs the audits, right?

5      A.   Correct.

6      Q.   Okay.

7      A.   Can I just -- can I add a comment?

8      Q.   Please.

9      A.   I mean, I -- you know, what I

10  would say is, this is -- you know, this is

11  consistent with this sort of Baker Panel

12  report to say that the senior management

13  needed to spend, you know, more of their

14  own personal time on discussing process

15  safety, and this is a piece of process

16  that was designed to do that.

17      Q.   And I agree with you.  The GORC

18  and the SEEAC are the committee structures

19  that BP set up so that the very highest

20  level of BP p.l.c.'s management would have

21  direct knowledge and involvement in the

22  safety performance of the company, right?

23      A.   That is correct.

24          (Exhibit Number 3825 marked.)

25      Q.   (BY MR. WATTS)  All right.  Go to

98

1      tab 15, please, Exhibit 3825.  These are

2      the SEEAC committee minutes from

3      January 29 of 2008; is that right?

4           A.  Yes, they are.

5           Q.  We have Mr. Massey and

6      Mr. Burgmans, Mr. Castell, Mr. McKillop,

7      board members.  We have Mr. Pearl, the

8      secretary.  And, again, here we have

9      Dr. Hayward and John Mogford.  There's

10     also an S. Rataj, R-A-T-A-J.  I'm sure I

11     mispronounced that, but tell me who he is.

12          A.  It's a she.

13          Q.  It's a she.  Excuse me.

14          A.  It's a she.  It's a -- a woman

15     called Sue Rataj.

16          Q.  Okay.  And what was Sue Rataj's

17     position, if you remember?

18          A.  I'm -- I -- I don't recall

19     exactly.  She was an operation leader, and

20     I think at the time she was working on the

21     implementation plan of OMS in the US

22     refineries.

23          Q.  Okay.  Excellent.  Tab 16, please.

24               MR. WATTS:  We'll mark this as

25     3826.

**PURSUANT TO CONFIDENTIALITY ORDER**

1                    (Exhibit Number 3826 marked.)

2          Q.  (BY MR. WATTS)  These are the GORC

3     meeting minutes from February 15 of 2008,

4     correct?

5          A.  Yes.

6          Q.  The members who are present is

7     Tony Hayward, Andy Inglis, Iain Conn, John

8     Mogford, John Baxter and Richard Feil,

9     right?

10         A.  Yes.

11         Q.  Okay.  Go to tab 18, please.

12              MR. WATTS:  I'm going to mark

13     this as 3827.

14                    (Exhibit Number 3827 marked.)

15         Q.  (BY MR. WATTS)  This is, again,

16     GORC minutes from March the 6th of 2008.

17     The members present are Mr. Hayward,

18     Inglis, Conn, Bly, Baxter, Ms. Rataj, and

19     Richard Feil, correct?

20         A.  Yeah.  In addition to the others

21     listed, that's correct.

22         Q.  Sure.  If you would go to tab 19.

23              MR. WATTS:  Mark this as

24     Exhibit 3827.

25                    (Exhibit Number 3828 marked.)

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. WATTS:  I'm sorry.  Did I

2    already -- I apologize.  Let me -- let me

3    rephrase that.  I'm going to go to tab 19

4    and mark it as 3828.  This is why I have

5    him here to keep me from going astray.

6         Q.  (BY MR. WATTS)  Okay.  As we look

7    at tab 19, or Exhibit 3828, these are the

8    SEEAC meeting minutes from March 13 of

9    2008.  And we have the -- Dr. Massey, the

10   chairman; Mr. Burgmans; Mr. Castell and

11   Mr. McKillop; and the secretary,

12   Mr. Pearl, right?

13        A.  Yeah.

14        Q.  In addition, we have the chief

15   executive officer of BP Group,

16   Mr. Hayward; Iain Conn, in charge of

17   refineries.  I notice that Mr. Mogford is

18   not here anymore.  Did somebody else take

19   his position as head of refineries when he

20   took over safety and operations?

21             MR. FOWKES:  Object to the

22   form.

23        A.  I'm just looking at the date.

24        Q.  (BY MR. WATTS)  Not sure?

25        A.  Well, I'm not -- I'm not sure what

PURSUANT TO CONFIDENTIALITY ORDER

1     I --

2          Q.  Okay.

3          A.  It says, if you read the -- the

4     language, it says, Mr. Conn described the

5     role of Mr. Mogford and further change is

6     planned for the refining organization.

7          Q.  Yeah.

8          A.  And I --

9          Q.  Well --

10         A.  -- think --

11         Q.  Go ahead.  I'm sorry.  You think

12    what?

13         A.  Well, I think that there -- I

14    think what happened was, John -- as I said

15    earlier, John moved from being head of

16    safety to head of US refineries.  And I

17    think Mark Bly, at that time, replaced

18    John as head of safety and --

19         Q.  Operations.

20         A.  -- operations.

21         Q.  Okay.  And --

22         A.  I may not be completely accurate

23    on that, on the timing, but Mark Bly is in

24    attendance, and that would --

25         Q.  I think you've nailed it.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   -- that would be consistent.

2    Q.   Yeah, I think you've nailed it.

3  And Mr. Bly starts showing up at these

4  meetings about March of 2008, which --

5  which would be consistent with your

6  recollection.

7    A.   Yeah.  I also would point out that

8  they -- the subject here was actually --

9  one of the agenda items was on --

10  following up on the Baker Panel

11  recommendations, and then one is -- Duane

12  Wilson was also in attendance.

13    Q.   Okay.  And Duane Wilson was this

14  independent expert?

15    A.   Who's a -- who, I think,

16  technically, he was described as a

17  monitor.

18    Q.   Okay.

19    A.   He was part of the -- he was part

20  of the original Baker Panel.

21    Q.   Yes.

22    A.   And he was then appointed monitor

23  to make sure that we followed up on

24  implementing the recommendations of the

25  Baker Panel.

**PURSUANT TO CONFIDENTIALITY ORDER**

1              (Exhibit Number 3829 marked.)

2         Q.  (BY MR. WATTS)  Let's go to tab

3    20, which is Exhibit 3829.  Are these the

4    group operations risk committee minutes

5    for April 15 of 2008?

6         A.  (No response.)

7         Q.  Did I miss your answer?  I'm

8    sorry.

9         A.  Sorry, I didn't --

10            MR. FOWKES:  What's the

11    question?

12        A.  No, I didn't know if it was --

13        Q.  (BY MR. WATTS)  Are these --

14        A.  Sorry, sorry.

15        Q.  Are these the group --

16        A.  I thought -- I thought you said

17    these are, and I was waiting for the

18    question.

19        Q.  Let me rephrase the question.  I

20    apologize.

21            Are these -- Exhibit 3829, is

22    this the group operations risk committee

23    minutes for April 15 of 2008?

24        A.  Yes, they are.

25        Q.  Okay.  And in addition -- in

**PURSUANT TO CONFIDENTIALITY ORDER**

104

1    attendance is Tony Hayward, Iain Conn,

2    John Mogford.  There's a V. Cox.  Who is

3    V. Cox?

4         A.  Vivienne Cox.

5         Q.  And what position did Vivienne Cox

6    hold?

7         A.  Vivienne Cox was head of our

8    alternative energy business.

9         Q.  Okay.  C. Rhodes.  Who is C.

10   Rhodes?

11        A.  Chris Rhodes was head of safety

12   and operations for exploration and

13   production.

14        Q.  Okay.  Mark Bly, who you've

15   already explained.  John Baxter we know.

16   S. Rataj we know.

17        A.  Sue Rataj.

18        Q.  Rataj, I'm sorry.

19        A.  Sue Rat- -- now, I think, now,

20   I've -- it's -- I think what -- because at

21   an earlier meeting, Sue Rataj and C.J.

22   Warner were present, and I think that was

23   the handover.  C.J. Warner was head of

24   safety for refining and marketing, and I

25   think Sue Rataj replaced C.J. Warner --

**PURSUANT TO CONFIDENTIALITY ORDER**

1          Q.   Gotcha.

2          A.   -- as head of the -- head of

3     safety for refining and marketing,

4     which --

5          Q.   All right.

6          A.   -- is why she's attending.

7          Q.   Then Richard Feil, the secretary.

8               I want to ask you about three

9     of the people that are attending.  One is

10    J. Sieg, S-I-E-G.  Who is that, again?

11         A.   John Sieg was the guy I mentioned

12    earlier who was the expert that we

13    recruited from DuPont as an expert in

14    process safety, and he was one of the

15    architects of OMS.  And the way that the

16    language is written, a six-point plan, in

17    OMS, speaks to the evolution from the

18    six-point plan as being six points in a

19    plan to OMS as being a holistic operations

20    management system.

21         Q.   Okay.  G. James, who's G. James?

22         A.   I think he's Gareth James.

23         Q.   Okay.

24         A.   I may not be exactly right on

25    that.  I think Gareth James was one of the

1    technical experts who was part of John

2    Sieg's organization.

3         Q.   Perfect.  And S. Flynn.  Who is

4    Flynn?

5         A.   Steve Flynn is alternative energy.

6         Q.   Okay.

7         A.   HSSE.  And just to complete it,

8    Jim O'Brien is the guy who we brought in

9    externally that we spoke about a while ago

10   to head up S&O audit, and David Viles is

11   the -- is misnamed here.  He's actually

12   the chief auditor.

13        Q.   Okay.

14        A.   It's mis- -- misreferenced.

15             (Exhibit Number 3830 marked.)

16        Q.   (BY MR. WATTS)  All right.  Let's

17   go to the next document, Exhibit -- tab

18   21, Exhibit 3820 (sic).  These are the

19   SEEAC meeting minutes from May 7 of 2008,

20   correct?

21        A.   Yes.

22        Q.   All right.  We have Mr. Castell,

23   Mr. Burgmans, Mr. McKillop, Mr. Pearl, and

24   then there's one new name in attendance

25   that I want to ask you about.

1              With respect to D. Wilson,

2      that's Duane Wilson, the independent

3      expert that you talked about, right?

4          A.  The mon- -- the external

5      monitor --

6          Q.  Yeah.

7          A.  -- Duane Wilson.

8          Q.  The external monitor is reporting

9      to the SEEAC committee of the board of

10     directors with respect to something, and

11     that's why Mr. Duane Wilson is here,

12     right?

13         A.  That is correct.

14         Q.  All right.  Fair enough.

15             MR. FOWKES:  What exhibit did

16     you say tab 21 was?

17             MR. WATTS:  3820 -- 3830.  I'm

18     sorry.  Did I say 20?  Thank you.

19             MR. FOWKES:  Yes.

20             MR. WATTS:  You guys help me

21     out.  I need it.

22             MR. FOWKES:  I wanted to make

23     sure I'm awake.

24             MR. WATTS:  No.  I appreciate

25     you.  Thank you.

**PURSUANT TO CONFIDENTIALITY ORDER**

108

```
1          Q.  (BY MR. WATTS)  Let's go to

2     tab 22.  And this is going to be 3831.

3     These are the May 23 meeting minutes for

4     the GORC --

5          A.  No, hang --

6          Q.  -- for 2000- --

7          A.  -- on a second.  Hang on.  I've

8     got two tabs -- the tabs here are

9     switched.  I'm at a tab 23 now.

10         Q.  Yes, sir.

11         A.  Okay.

12         Q.  Okay.  Tab 23.

13         A.  Looks the same to me.  It's the

14    same as tab 21 in my book.

15              MR. McLENDON:  Tab 22.

16              MR. WATTS:  Oh, I'm sorry.

17    God, I did it again.  I apologize.

18         Q.  (BY MR. WATTS)  Go to tab 22.

19         A.  That's the same as well.

20         Q.  Okay.  Let's go to tab 22.  I

21    misspoke.  Go to tab 22, okay?

22         A.  Yeah, yeah.

23         Q.  All right.  And this is -- well --

24         A.  Yeah, this is the -- it's the

25    same as --
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              MS. EHRHART:  It's minutes.
 2         A.   It's document 4 -- ends in 4471.
 3         Q.   (BY MR. WATTS)  Here.  We have --
 4         A.   Which is the same --
 5         Q.   -- somebody that --
 6         A.   Which is the same as tab 21.
 7         Q.   Okay.  We have a mistake in -- who
 8    put together the notebook.
 9              MR. WATTS:  Let me mark as
10    Exhibit 3831 -- where's the sticker?
11    Thank you for catching that.  We send
12    these off about 10 o'clock at night and I
13    can't vouch for their complete accuracy,
14    so I'm glad you caught that.
15              (Exhibit Number 3831 marked.)
16         Q.   (BY MR. WATTS)  Let me hand you
17    what I'm marking as 3831, which is the
18    group operations risk committee minutes
19    for May 23 of 2008; is that correct?
20         A.   Yes, it is.
21         Q.   Okay.  In addition to Mr. Hayward,
22    Mr. Inglis, there's now a Mr. -- a Welch.
23    Who is Welch?
24         A.   Steve Welch was the chief
25    operating officer for refining and
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    marketing business.

2         Q.  Okay.

3         A.  So he would have been there as --

4    as a stand-in for Iain Conn --

5         Q.  Mr. --

6         A.  -- who sends his apologies.

7         Q.  Mr. Waligura?

8         A.  Starlee Waligura, she's a woman,

9    and she was the secretary.

10        Q.  Secretary, okay.  Good enough.

11             Let's go to tab 23 now, if I

12   could have that back so I can give it to

13   the court reporter.  My apologies on the

14   notebook.

15             Tab 23, which I'll mark as

16   Exhibit 3832, these are the GORC minutes

17   for June 13, 2008; is that right?

18        A.  Sorry.  Tab -- I've got -- I've

19   got another set of the 7th of May ones

20   again.  I've got three lots of the same

21   thing.

22        Q.  Well, here's hoping it stops soon.

23             (Exhibit Number 3832 marked.)

24        Q.  (BY MR. WATTS)  Let me hand you

25   Exhibit 3832.

111

1        A.   This is like Groundhog Day.

2        Q.   My copy guys went nuts on me last

3   night.

4                Let me hand you 3832.  Are

5   these the minutes from the GORC on

6   June 13, 2008?

7        A.   Yes, they are.

8        Q.   Okay.  That's going to be my only

9   question since we have a problem with that

10  one.

11               (Exhibit No. 3833 marked.)

12       Q.   (BY MR. WATTS)  Go to tab 24.

13  Instead of telling you what they are, let

14  me ask you:  3833, is this the July 10

15  minutes of the GORC?

16       A.   Yes, it is.

17       Q.   Okay.  Thank goodness, we're back

18  on track.

19               Here's my question:  There's a

20  new name here in terms of members present.

21  It's G. Birrell.  Who is that?

22       A.   That is Gordon Birrell.

23       Q.   And Gordon Birrell held what --

24       A.   Gordon --

25       Q.   -- position?

**PURSUANT TO CONFIDENTIALITY ORDER**

1       A.  Gordon Birrell was head of safety

2   and operations for exploration and

3   production.

4       Q.  Okay.

5       A.  And he replaced Chris Rhodes, who

6   was on an earlier meeting.  And I

7   think this -- this would be like Steve

8   Welch standing in for Iain Conn.  Gordon

9   would be representing Andy Inglis.

10      Q.  Okay.  And then we also have a T.

11  Harlan.  Who is Mr. Harlan?

12      A.  Again, I think we've got -- I

13  think it's a woman.  I think it's Terri

14  Harlan.

15      Q.  Okay.  I'm going to quit doing

16  that soon.

17      A.  Well, no, there's --

18      Q.  Who's Terri Harlan?

19      A.  It's tough -- it's tough to say

20  just from a --

21      Q.  If you guys would type out the

22  name, I wouldn't be making a fool of

23  myself.

24          Who's T. Harlan?

25      A.  I think Terri Harlan was in

PURSUANT TO CONFIDENTIALITY ORDER

```
 1        refining and marketing, but I'm not
 2        absolutely sure.  She may have been part
 3        of alternative energy.
 4            Q.  Okay.  Let's go to tab 25, please.
 5                    MR. WATTS:  And I'm going to
 6        mark this as Exhibit 3834.
 7                    (Exhibit Number 3834 marked.)
 8            Q.  (BY MR. WATTS)  You see under
 9        apologies -- by the was, this is the SEEAC
10        meeting minutes for July 23, 2008, is it
11        not?
12            A.  Uh-huh.
13            Q.  Okay.  Yes?
14            A.  Yes.
15            Q.  Okay.  And then under apologies it
16        says, Mrs. C.B. Carroll.  Is Mrs. Carroll
17        a new member of the board of directors?
18            A.  I think that is accurate.
19            Q.  Okay.  And do you have any
20        understanding of what Mrs. Carroll's
21        background was before she was named to the
22        board of directors of p.l.c.?
23                    MR. FOWKES:  Objection to the
24        form.
25            A.  No, I don't.  I don't know her
```

PURSUANT TO CONFIDENTIALITY ORDER

1    personal background.

2         Q.  (BY MR. WATTS)  All right.  Let's

3    go to tab 26, which is 3835.

4              (Exhibit Number 3835 marked.)

5         Q.  (BY MR. WATTS)  One of the -- here

6    we have Tony Hayward, Iain Conn, Andy

7    Inglis, Vivienne Cox, Mark Bly, Terri

8    Harlan, John Baxter and A. Rios -- looks

9    like a new secretary.  Do you know Mr. or

10   Mrs. Rios?

11        A.  I think she's -- I think it's

12   Alejandra Rios, but again, I'm not exactly

13   certain on that.

14        Q.  Alejandra or 'dro?

15        A.  'Dra.

16        Q.  'Dra.  Okay.  Key --

17        A.  Alejandra.

18        Q.  -- in this deposition --

19        A.  This is very key, that she's a

20   woman.  We have a very diverse

21   organization.  Alejandra --

22        Q.  Okay.

23        A.  -- Rios.  And I think she -- she

24   may have replaced Waligura --

25        Q.  Okay.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   -- as Mark Bly's executive

2      assistant, which was why she would have

3      been inheriting the role of being the

4      secretary of the -- of the GORC.

5           Q.   Okay.  If you could go to tab 27,

6      Exhibit 3836.

7                     (Exhibit Number 3836 marked.)

8           Q.  (BY MR. WATTS)  Are these the GORC

9      meeting minutes for October 9, 2008?

10          A.   They are.

11          Q.   Okay.  We have Mr. Hayward,

12     Mr. Conn, Mr. Inglis, Mr. Bly, Mr. Baxter,

13     Alejandra Rios, and then we have a new

14     attendee that I want to ask you about, an

15     N. Morris.  Do you know who that is under

16     -- with the title OMS?

17          A.   I think -- again, I may not be

18     100 percent accurate, but I think it's

19     Neil Morris.

20          Q.   And D. Wallace, who's that?

21          A.   I don't -- I have no idea who D.

22     Wallace is.

23          Q.   Okay.  Do you know what position

24     Neil Wallace -- Neil Morris held?

25          A.   I think -- I -- I think he was

```
 1      accountable -- he was involved with the

 2      implementation of OMS, given the -- the

 3      way that the list of attendees is

 4      described.

 5           Q.   Perfect.

 6                Go to tab 28.  I'll mark this

 7      as Exhibit 3837.

 8                (Exhibit Number 3837 marked.)

 9           Q.  (BY MR. WATTS)   These are the

10      SEEAC meeting minutes for October 23 of

11      2008, are they not?

12           A.  Yes.

13           Q.  We have Mr. Castell, Mr. Burgmans,

14      Mrs. Carroll, Mr. McKillop, Mr. Pearl.

15      Among the attendees we have Dr. Hayward,

16      John Mogford, Mr. Bly, Mr. Birrell.

17                My question is, who is T.

18      McCormick?

19           A.  I think it's Tom McCormick, and I

20      think he's head of ethics.

21           Q.  Okay.

22           A.  But let me -- let me -- if you

23      could just give me a moment to see that he

24      was in attendance for item 5, which is --

25      is head of, actually, ethics and
```

1    compliance.

2         Q.   Fair enough.  Let's go to tab 29,

3    which is Exhibit 3838.

4              (Exhibit Number 3838 marked.)

5         Q.   (BY MR. WATTS)  Are these the

6    SEEAC meeting minutes from the

7    Ritz-Carlton Hotel in Denver, Colorado, on

8    November the 12th of 2008?

9         A.   It would appear so.

10        Q.   Thus proving the maxim that safety

11   can be fun, right?

12             All right.  As we look at the

13   meeting minutes from November 12th of

14   2008, we have board members Castell,

15   Burgmans, Mrs. Carroll, Mr. McKillop,

16   secretary is D.J. Pearl; Mr. Hayward is in

17   attendance; Mr. Conn is in attendance.

18   There's a name I want to ask you about, a

19   Mr. R. Bondy.

20        A.   Rupert Bondy.

21             MR. FOWKES:  Object to the

22   form.

23        Q.   (BY MR. WATTS)  Okay.  Mr. Bondy,

24   what -- what was Rupert Bondy's role?

25        A.   I think Rupert Bondy is the chief

PURSUANT TO CONFIDENTIALITY ORDER

118

1     counsel.

2         Q.  Okay.  And D. Legge?

3         A.  I don't know.

4         Q.  D. Viles?

5         A.  David Viles.

6         Q.  What role did David Viles --

7         A.  He was the chief auditor.

8         Q.  Okay.  If you could go to tab 30,

9     Exhibit 3839.

10                 (Exhibit Number 3839 marked.)

11        Q.  (BY MR. WATTS)  Are these the

12    group operations risk committee minutes

13    for December 4 of 2008?

14        A.  Yes.

15        Q.  Okay.  Members present, Iain Conn,

16    Andy Inglis, Mark Bly, John Baxter,

17    Alejandra Rios, John Mogford.  Mr. Flynn's

18    down there.  Mr. Birrell's down there.

19                 The person I want to ask you

20    about is M. Considine.  Who is M.

21    Considine?

22        A.  I think he's Mike Considine.

23        Q.  And what was Mike Considine's

24    role?

25        A.  I'm not exactly sure, but behind

1      his name here it's integrity management

2      and major accident risk, so he may have

3      been part of John Baxter's group at the

4      time, but I'm not exactly sure.

5           Q.   Okay.  And I'll get back to Mike

6      Considine in a second.  And I'll just keep

7      going through these meeting minutes.

8                If you would go to tab 31,

9      which I'm going to mark as Exhibit 3840.

10               (Exhibit Number 3840 marked.)

11          Q.   (BY MR. WATTS)  Are these the

12     January 7, 2009 meeting minutes for the

13     SEEAC?

14          A.   They are.

15          Q.   Members present, Castell,

16     Burgmans, Carroll, McKillop, Pearl.  In

17     attendance includes Dr. Hayward, Mr. Conn,

18     Mr. Bondy, Mr. Mogford, Mr. Bly.  There's

19     a Dr. D. Bickerton.  Who is Dr. Bickerton?

20          A.   That is David Bickerton.

21          Q.   And what role did David

22     Bickerton --

23          A.   I'm not exactly sure what he was

24     doing in January 2009.  He's currently, I

25     think, head of communications.  I may have

**PURSUANT TO CONFIDENTIALITY ORDER**

1      got his title --

2          Q.  Okay.

3          A.  -- imprecise.  He's effectively

4      the head of corporate communications.

5          Q.  All right.  Let's go to tab 32,

6      please.  Tab 32, which is what I'll mark

7      as Exhibit 3841, is the GORC meeting

8      minutes from February 4, 2009.  Is that

9      true?

10         A.  Yes.

11              (Exhibit Number 3841 marked.)

12         Q.  (BY MR. WATTS)  In addition to

13     Mr. Hayward, Mr. Conn, Mr. Inglis,

14     Mrs. Cox, Mr. Bly, Mr. Baxter, Ms. Rios,

15     there's a new attendee, B. Stout?

16         A.  I don't know B. Stout.

17         Q.  Do you know who J. O'Brien with

18     audit is?

19         A.  Yeah.  It's -- that Jim -- that is

20     Jim O'Brien --

21         Q.  Okay.

22         A.  -- who is the guy who we brought

23     in for -- to -- to head up the new

24     audit -- safety and operational risk audit

25     function.

PURSUANT TO CONFIDENTIALITY ORDER

```
1        Q.  The S&O audit function?

2        A.  Correct.

3        Q.  Okay.  Thank you.

4        A.  And just so -- just to be

5   complete, you haven't yet asked me about

6   Graham Cattell.

7        Q.  Go ahead.  I'm sorry.  I meant to.

8   Thank you.

9        A.  Graham Cattell is head of

10  capability.  He was basically brought in

11  initially to head up the major projects

12  function, and he was the leader behind the

13  programs that we had with MIT --

14       Q.  Yeah.

15       A.  -- for both project leaders in the

16  projects academy and then the operations

17  academy.

18       Q.  Okay.  And I'm going to get to

19  those later, but I'm glad you brought that

20  up.  I didn't realize I'd neglected to

21  bring him up.

22            Go to tab 35, please, sir.

23  I'm going to mark this as Exhibit 3842.

24            (Exhibit Number 3842 marked.)

25       Q.  (BY MR. WATTS)  Are these the
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1   SEEAC meeting minutes from March the 12th

2   of 2009?

3       A.   Yes, they are.

4       Q.   In addition to the members,

5   Mr. Castell, Mr. Burgmans, Mrs. Carroll,

6   Mr. McKillop; and the secretary, D.J.

7   Pearl; among the attendees are Dr.

8   Hayward, Mr. Conn, Mr. Mogford, Mr. Bly,

9   Mr. Wilson, but there's also a new name on

10  the right-hand column, Mr. M. -- Mr. K.

11  Bailey.  Who is K. Bailey?

12      A.   I -- I don't know that name.

13      Q.   Okay.

14      A.   But if --

15      Q.   That's all right.

16      A.   If you'll give me a moment to read

17  the -- if it's important, I can sort

18  of --

19      Q.   Yeah, see if you can find it.

20      A.   I may be able to find out who he

21  is from the context of the meeting.  I can

22  tell it's about MIT, which is good.

23          I don't know.

24      Q.   Okay.  Fair enough.  Let's go to

25  tab 38, which is Exhibit 3843.

PURSUANT TO CONFIDENTIALITY ORDER

1              (Exhibit Number 3843 marked.)

2         Q.  (BY MR. WATTS)  And the members

3    are Tony Hayward, Iain Conn, Andy Inglis,

4    Vivienne Cox, Mark Bly, John Baxter and

5    Alejandra Rios, which a couple of names of

6    people attending I want to ask you about.

7              Do you know who H. Hofer is?

8         A.  No.

9         Q.  Okay.  Do you know who M. Nash is?

10        A.  No.

11        Q.  J. Morgan, do you know who that

12   is?

13        A.  John Morgan is head of alternative

14   energy.

15        Q.  Okay.  Good enough.  Go to tab 39,

16   which I'll mark as 3844.

17             (Exhibit Number 3844 marked.)

18        Q.  (BY MR. WATTS)  These are SEEAC

19   committee minutes from May the 6th of

20   2009, are they not?

21        A.  Yes, they are.

22        Q.  Members present are Sir William

23   Castell, Mr. Burgmans, Mrs. Carroll,

24   Mr. E.B. Davis --

25             Is Mr. E.B. Davis, Jr. a new

**PURSUANT TO CONFIDENTIALITY ORDER**

1      member of the board of directors of

2      BP p.l.c. at this point?

3          A.  I -- I'm not sure.  I think he

4      may -- I think he may have -- if it's Earl

5      Davis, I think he may have already been

6      on the -- on the main board.

7          Q.  Just joined the SEE- --

8          A.  I mean, he may have -- he may have

9      been reassigned from one board committee

10     to another.

11         Q.  Fair enough.

12         A.  Or he may have been attending this

13     meet- -- I don't know if he's in

14     subsequent meetings.  He may just have

15     been attending one meeting.

16         Q.  Okay.  Others in attendance

17     include Hayward and Inglis and Bly and

18     Baxter.  There's a name I want to ask you

19     about, a Mr. D.J. Jackson.  Do you know

20     who that is?

21         A.  Yeah.  I think he's also the --

22     the board -- I think he's the secretary of

23     the main board of directors.

24         Q.  All right.

25         A.  In the way that D.J. Pearl is the

PURSUANT TO CONFIDENTIALITY ORDER

1    secretary of the SEEAC.

2        Q.  Fair enough.

3        A.  And, again, I may not be

4    completely accurate on that, but that's my

5    understanding.

6        Q.  If you would, go to tab 45,

7    Exhibit 3845.

8            (Exhibit Number 3845 marked.)

9        Q.  (BY MR. WATTS)  Are these the

10   board minutes -- I mean, are these the

11   meeting minutes of the SEEAC on July 22,

12   2009?

13       A.  Yes, they are.

14       Q.  All right.  As we look at this

15   exhibit, members present, Sir William

16   Castell, Mr. Burgmans and Mr. Davis and

17   Pearl.  Among those in attendance, there's

18   a -- a Mr. R. Javanshir.  Do you know who

19   that is?

20       A.  Yeah.  It's Rashid Javanshir.

21       Q.  And do you know who -- what --

22   what position Rashid held?

23       A.  I think at this time he was head

24   of our business -- he was our -- basically

25   our SPU leader in -- in Azerbaijan.

**PURSUANT TO CONFIDENTIALITY ORDER**

126

```
1        Q.   Okay.  Fair enough.  Also at that
2    meeting are Mr. Flynn, Mr. Conn, Mr. Bly
3    and Mr. Hayward, among others, right?
4        A.   Yes, that's correct.
5        Q.   Okay.  Go to tab 47, which I'll
6    mark as 3846.
7               (Exhibit Number 3846 marked.)
8               MR. FOWKES:  38 --
9               THE WITNESS:  46.
10       Q.   (BY MR. WATTS)  This is the
11   meeting minutes for the group operation
12   risk committee on July 31 of 2009; is that
13   right?
14       A.   Yes, it is.
15       Q.   All right.  As we go to this
16   exhibit, Mr. Hayward, Mr. Conn,
17   Mr. Inglis, Mr. Westwell -- who is
18   Mr. Westwell again?
19       A.   Mr. Westwell is -- I -- again, I'm
20   going to -- I may not get his title
21   exactly right.  He's effectively the -- I
22   don't know what he is now, but then, at
23   the time, I think he was the chief of
24   staff for Tony Hayward.
25       Q.   All right.  Mr. Bly, Mr. Baxter,
```

**PURSUANT TO CONFIDENTIALITY ORDER**

127

1    Ms. Rios are members present.  In

2    addition, those attending include a D.

3    Suttles.  That's Doug Suttles, who is the

4    chief operating officer for exploration

5    and production, right?

6        A.  He -- he -- at the time, that's

7    what he -- that's what he was, yes.

8        Q.  D. Clarkson.  What position did

9    Clarkson hold at exploration and

10    production?

11        A.  David Clarkson was head of

12    projects.

13        Q.  Okay.  Graham McNeillie?

14        A.  Graham McNeillie was head of

15    engineering.

16        Q.  D. Campbell Brown, what is the

17    first name there?

18        A.  Donald Campbell Brown was one of

19    several chief engineers who worked for

20    Graham McNeillie.

21        Q.  Okay.  If you could go to tab 51,

22    I'll mark it as Exhibit 3847.

23             (Exhibit Number 3847 marked.)

24        Q.  (BY MR. WATTS)  Are these the

25    SEEAC meeting minutes for October 22,

1    2009?

2         A.   Yes, they are.

3         Q.   We have Sir William Castell and

4    Mr. Burgmans attending, along with D.J.

5    Pearl.   Others in attendance include

6    Dr. Hayward and Mr. Bly; is that right?

7         A.   Yes.

8         Q.   There's a Mr. J. Ridgway that I

9    wanted to ask you who that was.

10        A.   That's Jon -- I think it's

11   Jonathan Ridgway.

12        Q.   Okay.

13        A.   And let me just sort of -- can

14   I -- I just want to read ahead to see what

15   I can find to refresh.

16        Q.   The -- a next one actually says

17   Schiehallion incident review.   Does that

18   help you at all?

19        A.   Yeah, yeah.   No, he's actually --

20   he's --

21        Q.   Schiehallion incident review.

22        A.   Yeah.   He's head of -- he's head

23   of shipping.

24        Q.   Okay.   Good enough.   If you

25   would --

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.  That's -- that's consistent with

2    what we just said.

3    Q.  Yeah, exactly.

4         If you would go to tab 54,

5    which is Exhibit 3848.

6         (Exhibit Number 3848 marked.)

7    Q.  (BY MR. WATTS)  These are the GORC

8    meeting minutes for November the 6th of

9    2009, correct?

10   A.  Yes, they are.

11   Q.  Members include Tony Hayward, Iain

12   Conn, S. Westwell, Mark --

13   A.  Steve Westwell.

14   Q.  -- Steve Westwell, Mark Bly, John

15   Baxter, Alejandra Rios.  And among those

16   attending is a B. Grote or Grote.

17   A.  Grote.  Byron Grote.

18   Q.  Byron Grote.  And what was Byron's

19   responsibility?

20   A.  Byron was the chief financial

21   operating officer for the BP Group.

22   Q.  For the group, okay.

23        And then there's an H. Hofer.

24   I may have asked you about this, but --

25   A.  Yeah.  I don't know who H. Hofer

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        is.
 2             Q.   Okay.   Go to tab 55, which I'll
 3        mark as Exhibit 3849.
 4                      (Exhibit Number 3849 marked.)
 5             Q.   (BY MR. WATTS)   These are the
 6        SEEAC minutes for November 11 of 2009,
 7        correct?
 8             A.   Yes.
 9             Q.   We have members present:   Castell,
10        Burgmans, Davis and Carroll and Pearl.
11        Among those in attendance are Hayward and
12        Conn.
13                      And here's my question:   Do
14        you see Mr. L. McKay?   Who is Mr. L.
15        McKay?
16             A.   That is Lamar McKay.
17             Q.   And he's in charge of BP America?
18             A.   I believe that is his current
19        role.
20             Q.   Okay.
21             A.   I don't know what his role was
22        on -- on the 11th of November, 2009, but I
23        suspect he was -- that was his role then
24        also.
25             Q.   Okay.   And Mrs. -- or Ms. T. Long.
```

1    It says, boardroom review.  Do you know

2    who T. Long is?

3        A.  No, I don't, but I suspect it

4    might have been a -- sort of a technical

5    person looking at the logistics of the way

6    the boardroom is laid out.

7        Q.  Okay.  If you could go to tab 66,

8    please.

9        A.  66?

10       Q.  Yes, sir.

11               MR. WATTS:  I'm going to mark

12   this as Exhibit 3850.

13               (Exhibit Number 3850 marked.)

14       A.  Hang on just a second.

15       Q.  (BY MR. WATTS)  Okay.  Are these

16   the GORC meeting minutes for February 3rd

17   of 2010?

18       A.  They are.

19       Q.  Okay.  Members present include

20   Tony Hayward, Iain Conn, Andy Inglis,

21   Steve Westwell, Mark Bly, Alejandra Rios.

22   Among those attending, there is a new name

23   I want to ask you about, J. Minge.

24       A.  John Minge.

25       Q.  Minge.  Okay.

```
 1              A.   Yeah.

 2              Q.   John Minge?

 3              A.   John Minge.

 4              Q.   Okay.  Who is John Minge?

 5              A.   John Minge is the SPUL for Alaska.

 6      And you can see --

 7              Q.   For Alaska.

 8              A.   You can see by the agenda item --

 9              Q.   Uh-huh.

10              A.   -- given -- given the various

11      events that had occurred in Alaska.

12              Q.   Sure.

13              A.   There was a formal process for

14      following up on the S&O action plan, and

15      that John's role was to provide that

16      update.

17              Q.   I think I'd asked you before about

18      an M. Nash, and you said you didn't know

19      who that was, and it says legal now.  So

20      when -- it's was probably one of the

21      lawyers, right?

22              A.   I -- I guess so, but --

23              Q.   Okay.

24              A.   -- I don't know.

25              Q.   Go to tab 72, which I'll mark as
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Exhibit 3851.

2                    (Exhibit Number 3851 marked.)

3        Q.  (BY MR. WATTS)  Are these the

4    SEEAC meeting minutes for February 24,

5    2010?

6        A.  They are.

7        Q.  In addition to the members

8    present, being Sir William Castell and

9    Mr. Burgmans and Mr. Pearl, there's also

10   some others in attendance, including

11   Dr. Hayward, Mr. Conn, Mr. Bly, but then

12   there's a new name, Mr. A. Wilson, from

13   Ernst & Young.  And I noticed Ernst &

14   Young's at a lot of these meetings.

15                What was the purpose of having

16   Ernst & Young at the SEEAC meetings?

17       A.  Ernst & Young are our external

18   auditors, and Allister Wilson is the

19   senior partner with respect to our

20   relationship with Ernst & Young.

21       Q.  Okay.  Fair enough.

22       A.  So he would be there for the

23   purposes of information.

24       Q.  All right.  Let's go to tab 77.

25                (Exhibit Number 3852 marked.)

134

1          Q.  (BY MR. WATTS)  Are these the

2     SEEAC meeting minutes that I've marked as

3     Exhibit 3852?  Are these the SEEAC meeting

4     minutes for March 24th, 2010?

5          A.  Yes, they are.

6          Q.  Members present:  Sir William

7     Castell, Mr. Anderson, Mr. Burgmans,

8     Mrs. Carroll, Mr. Davis, Mr. Pearl.  Among

9     those in attendance, in addition to

10    Hayward, Conn, Inglis, Bly and others,

11    with respect to Mr. L.D. Wilson, do you

12    know who that is?

13         A.  That's Duane Wilson, the --

14         Q.  Oh.

15         A.  -- the monitor.

16         Q.  Okay.  I think they just put L.D.

17         A.  I think they put his full initials

18    in this time.

19         Q.  Okay.  Let's go to tab 84, please,

20    sir.  Tab 84, I'll mark as Exhibit 3853.

21              (Exhibit Number 3853 marked.)

22         Q.  (BY MR. WATTS)  Are these the GORC

23    meeting minutes for May 14 of 2010?

24         A.  They are, indeed.

25         Q.  Members present include Iain

**PURSUANT TO CONFIDENTIALITY ORDER**

135

1       Conn, as the, I think, temporary chair.

2       This is right after the accident, and I

3       think Mr. Baxter was in the -- in the

4       States.  Steve Westwell, John Baxter.

5       Among those attending, there's a T.

6       Overton.  Who is that?

7            A.  I think it's Tim Overton.

8            Q.  Do you know what position Tim

9       Overton held at this time?

10           A.  I'm not sure.

11           Q.  There's also a new name, K. Clode

12      or --

13           A.  And I -- I don't know who K. Clode

14      is.  I -- I think she may have been part

15      of Jim O'Brien's organization.

16           Q.  S&O audit?

17           A.  S&O audit.

18           Q.  All right.  Let's go to tab 85,

19      which I'll mark as Exhibit 3854.

20                (Exhibit Number 3854 marked.)

21           Q.  (BY MR. WATTS)  Are these the

22      SEEAC meeting minutes from May 20 of 2010?

23           A.  Yes, they are.

24           Q.  Okay.  Members present:  Sir

25      William Castell, Mr. Anderson,

**PURSUANT TO CONFIDENTIALITY ORDER**

1        Mrs. Carroll.  In attendance include Iain

2        Conn, John Baxter, D.J. Pearl.  And

3        there's a new name that I wanted to ask

4        you about, Mrs. A. Strank or Ms. A.

5        Strank.  Do you know who that is?

6            A.   She was Angela Strank.

7            Q.   And what role --

8            A.   Her name --

9            Q.   -- is Angela Strank --

10           A.   -- is Angela Strank.

11           Q.   She still is, yeah.

12           A.   She still is.

13           Q.   What role does she have?

14           A.   She's the head of technology --

15           Q.   Okay.

16           A.   -- for refining and marketing

17       business.

18           Q.   Good enough.  Go to tab 86.  I'll

19       mark this as 3855.

20               (Exhibit Number 3855 marked.)

21           Q.   (BY MR. WATTS)  Are these the

22       SEEAC meeting minutes for July 21 of 2010?

23           A.   Yes.

24           Q.   Members present:  Sir William

25       Castell, Mr. Anderson, Mr. Burgmans,

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Mr. Pearl.  Among those in attendance
2    include Dr. Hayward, Iain Conn, Andy
3    Inglis, John Baxter.  There's also a
4    Barbara Yilmaz.  What position did Barbara
5    Yilmaz hold?
6        A.  Barbara Yilmaz, at this time, was
7    the head of drilling for exploration and
8    production.
9        Q.  Okay.  For -- worldwide head of
10   drilling?
11       A.  Worldwide head of drilling --
12       Q.  Okay.
13       A.  -- for exploration and production.
14       Q.  Mr. S. Haden?
15       A.  Steve Haden was part of Barbara's
16   team.  I don't know his -- his exact role.
17       Q.  Mr. J. Lynch?
18       A.  Jack Lynch, I think -- he's a
19   lawyer, but I don't think -- Jack Lynch is
20   a lawyer, and I think at the time his
21   position might have been chief counsel for
22   exploration and production, although
23   I'm -- he's since moved into Lamar's
24   organization.  He may have already moved
25   at the time of this meeting.

PURSUANT TO CONFIDENTIALITY ORDER

1     Q.  By the way, just as an aside, when

2     you say Lamar's organization, BP America,

3     how does that fit within exploration and

4     production and refining and marketing?  I

5     mean, what -- what's the purpose of BP

6     America as opposed to part of the other

7     two?

8              MR. FOWKES:  Object to the

9     form.

10     Q.  (BY MR. WATTS)  Go ahead.  As you

11     understand it.

12     A.  I'm -- I'm thinking about the best

13     way to describe it.

14     Q.  Okay.

15     A.  And --

16     Q.  That's what I want.

17     A.  Yeah.

18     Q.  Go ahead.  Give me your best shot.

19     A.  That's a good question.  So

20     there -- there's a -- if you think about

21     regions of the world, so we -- we have

22     like a business today in -- in America,

23     some of which is exploration and

24     production, and some of which is refining

25     and marketing.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.  Yes, sir.

2      A.  So the exploration and production

3  would cover, for example, our operations

4  in the Gulf of Mexico and our operations

5  in North American gas.

6      Q.  Okay.

7      A.  And there would be an SPU leader

8  in those organizations that would have a

9  line reporting relationship to the chief

10  executive of exploration and production,

11  who would be Andy.

12      Q.  All right.

13      A.  There would be similar leaders in

14  refining and marketing for Texas City in

15  our US refineries, who would, I think,

16  report in to the chief operating officer,

17  Steve Welch, who would report in to Iain

18  Conn.  So that's the line organization.

19      Q.  Okay.

20      A.  Our business in America is so big,

21  we want someone just to sort of be present

22  in Washington --

23      Q.  Okay.

24      A.  -- and think about government

25  relations, all of that, you know, what's

**PURSUANT TO CONFIDENTIALITY ORDER**

1     the policy on climate change.  And -- and

2     Lamar was head of that organization, so he

3     didn't have line accountability.

4          Q.  I'm with you.

5          A.  Okay.

6          Q.  I thought that was it, but I

7     wanted to hear it --

8          A.  And I think what -- I then think

9     what happened was, when the -- the

10    incident happened, we created the Gulf

11    Coast Response Organization.  I think that

12    reported to Lamar as well.

13         Q.  Gotcha.  Okay.

14              (Exhibit Number 3856 marked.)

15         Q.  (BY MR. WATTS)  Tab 87, I've

16    marked as 3856.  These are the GORC

17    meeting minutes for August the 2nd of

18    2010; is that right?

19         A.  Yes, they are.

20         Q.  We have Iain Conn, Steve Westwell,

21    John Baxter and Andy Inglis attending; is

22    that right?

23         A.  That is correct.

24         Q.  Tab 88, I'll mark as Exhibit 3857.

25              (Exhibit Number 3857 marked.)

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  (BY MR. WATTS)  Are these the

2    SEEAC meeting minutes for August 24th,

3    2010?

4    A.  Yes, they are.

5    Q.  Members attending:  Sir William

6    Castell, Mr. Anderson, Mr. Burgmans,

7    Mrs. Carroll, Mr. Pearl.  In addition,

8    attendees include John Baxter, D.J.

9    Jackson, and R. Bondy.  And you told me

10   who Mr. Bondy was, but I forget.

11   A.  He's the chief general counsel.

12   Q.  General counsel.  Okay.  Thank

13   you.

14   A.  He's our head lawyer.

15   Q.  If you could go to tab 89, which

16   I'm marking as Exhibit 3858.

17            (Exhibit Number 3858 marked.)

18   Q.  (BY MR. WATTS)  Are these the

19   SEEAC meeting minutes for September 17,

20   2010?

21   A.  Yes, they are.

22   Q.  Members present:  Will -- Sir

23   William Castell, Mr. Anderson,

24   Mr. Burgmans, Mrs. Carroll, Mr. Pearl.  In

25   addition, those in attendance include

**PURSUANT TO CONFIDENTIALITY ORDER**

142

1      Dr. Hayward, and, for the first time,

2      Mr. Dudley, who became the chief executive

3      officer of BP Group after Dr. Hayward

4      stepped down; is that right?

5         A.  That is correct.  And I think at

6      this time he would have been the -- he

7      would have already been designated as

8      being the future chief executive officer.

9         Q.  All right.  And then we also

10     have Iain Conn and Mr. Baxter, among

11     others.

12              If we could go to tab 90,

13     which I'll mark as Exhibit 3859.

14            (Exhibit Number 3859 marked.)

15            THE WITNESS:  I'm just going

16     to have a drink, if that's okay.

17         Q.  (BY MR. WATTS)  Exhibit 3859 are

18     the SEEAC meeting minutes for October 21

19     of 2010; is that right?

20         A.  Yes, they are.

21         Q.  Members present:  Sir William

22     Castell, Mr. Anderson, Mr. Burgmans,

23     Mrs. Carroll, Mr. Pearl.  Among those in

24     attendance are Mr. Dudley, Mr. Bly,

25     Mr. Baxter.  And there's a Mr. J.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Sullivan.  Who is that?

2        A.  That's John Sullivan, who's head

3    of security.  And I think he would have

4    been there for the item on the --

5        Q.  Yeah.

6        A.  -- security update in Iraq.

7        Q.  And then Mr. D. Porter, do you

8    know who that is?

9        A.  I don't know who D. Porter is, no.

10       Q.  Okay.  What about Mr. C.

11   Buckingham?

12       A.  I don't know who C. Buckingham is.

13       Q.  Okay.  Go to tab 91, which is

14   Exhibit 3860.

15               (Exhibit Number 3860 marked.)

16       Q.  (BY MR. WATTS)  These are the GORC

17   meeting minutes for November 10, 2010.

18   The GORC is now chaired by the chief

19   executive officer of BP p.l.c.,

20   Mr. Dudley, right?

21       A.  That is correct.

22       Q.  In addition, members present

23   include Mr. Bly, Mr. Conn, Mr. Looney.

24   What was Mr. Looney's position at this

25   time?

144

```
1        A.  So at this -- at that -- I need to
2    just --
3        Q.  Post-reorganization?
4        A.  No -- pardon?
5        Q.  It's post-reorganization.  What
6    did Mr. Looney --
7        A.  It's post --
8        Q.  -- start to do?
9        A.  It's post -- very good.  I was
10   about to say.
11            Mr. Looney, Bernard Looney, is
12   now head of -- the newly created role of
13   head of developments.
14       Q.  Okay.  And --
15       A.  And then Bob Fryar --
16       Q.  Next question.  Jump to the
17   answer.
18       A.  Bob Fryar is the newly created
19   head of the production division.
20       Q.  All right.  Now, if I could, I
21   want to take you back all the way to
22   tab 3.
23            We're done with all the SEEAC
24   and GORC meeting minutes.  Thank you for
25   your help on that.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1        All right.  Tab 3, which I'll

2    mark as Exhibit 3861, is a series of

3    e-mails.

4            (Exhibit Number 3861 marked.)

5        Q.  (BY MR. WATTS)  And I want you to

6    start on page 2, if you would, of -- of

7    the e-mail chain.

8            The next page -- start on

9    page 2, please.  Okay.  This is an e-mail

10    from John Mogford to a number of people,

11    including yourself, on May 27 of 2005.  Do

12    you see that?

13        A.  Yes, I do.

14        Q.  And it's entitled, Safety and Ops

15    Capability.  It says, all, attached is a

16    first very preliminary thought about the

17    issues in question that I think I need to

18    answer in my new role.

19            And then there's an attachment

20    entitled, What should we be doing

21    differently --

22        A.  Uh-huh.

23        Q.  -- across GT, slash, HSSE.  What

24    is GT?

25        A.  GT would be group technology.

146

1      Q.  All right.  And as we look

2  further, we can see, improve BP cultural

3  model, long-term behavior; number 2,

4  consistent engagement and delivery on

5  integrity management, control of work,

6  driving and security standards.

7            Number 3 is, focus on

8  identifying and eliminating risk.

9  Number 4 is, define required level of

10 technical competency to run operations

11 safely; and number 5 is, greater learning

12 from incidents.

13            And here's my question:

14 Mr. Mogford sends this to you in May of

15 2005, among others.  And at this time, you

16 are the group vice president of technology

17 and other functions; is that right?

18            MR. FOWKES:  Mr. Watts, I

19 think there might be a little confusion

20 here because the way I read the e-mail

21 chain is what Mr. Mogford attached to his

22 first e-mail was a PowerPoint called

23 operations thoughts, and Mr. Baxter, in

24 the second e-mail, attached what -- what

25 we should be doing differently --

**PURSUANT TO CONFIDENTIALITY ORDER**

147

```
 1                 MR. WATTS:  You may be right.
 2      Okay.  Fair enough.  Let me -- let me
 3      clarify for the record.  That wasn't
 4      intentional, but it was a good catch.
 5          Q.  (BY MR. WATTS)  Okay.  But let me
 6      just ask you this:  At the time that
 7      you're sent this e-mail, what is your
 8      position?  You're the V -- the VP of
 9      technology and other functions?
10          A.  Technology and other functions.
11          Q.  Okay.  Now go to page 1 and let me
12      clarify the record for a second.
13                 On page 1, we have an
14      extension of the e-mail chain that you're
15      not included on from John Baxter.  He's
16      the gentleman from the nuclear industry
17      that you-all brought in to assist in these
18      changes, right?
19          A.  That is correct.
20          Q.  And he's e-mailed Mr. Mogford and
21      a number of other people, including this
22      Mike Considine.  And Mr. Considine's role,
23      again, is what?
24          A.  I said I wasn't sure, I think.
25      Mike Considine was the -- I think he was
```

**PURSUANT TO CONFIDENTIALITY ORDER**

 1          involved in integrity management.

 2              Q.   Okay.   Within Mr. Baxter's

 3          organization?

 4              A.   Within Mr. Baxter's organization,

 5          I think.

 6              Q.   Okay.   Now, the third paragraph

 7          that -- I just want to ask you a question

 8          about this.

 9                   It says, the FCG was highly

10          constrained by time and so all of the

11          integrity management related topics were

12          not addressed.   Notwithstanding that, I

13          believe we got the important messages

14          across about the slow progress of MAR --

15          on MAR studies and the need to keep up

16          momentum on the integrity management

17          define phase.   Mike Considine's figure of

18          a 1 in 15 chance per annum of another

19          10-plus fatality incident certainly caught

20          the meeting's attention.   Iain gave the

21          right responses on both integrity

22          management and the actions coming out of

23          the MAR studies to date.   What was not

24          covered was the principles and actions we

25          have developed under the theme "what

**PURSUANT TO CONFIDENTIALITY ORDER**

1      should we do differently" post-Texas City.

2                Do you see that, sir?

3      A.  I see that.

4      Q.  And here's my -- here's my

5      question:  It says this work was done by

6      Mike Considine.  I agree with your counsel

7      that the attachment, in fact, was attached

8      to Mr. Baxter's e-mail, to which you were

9      not copied.

10               Here's my question:  Did you

11     attend this FCG meeting that is being

12     referred to, the June FCG meeting?

13     A.  I've -- I can't remember.  I

14     don't -- I don't -- I -- from the tone of

15     this, I don't think so.

16     Q.  Okay.  So if Mr. Considine said

17     such a thing about a 1 in 15 chance per

18     year of another 10-plus fatality, you

19     don't recall being at that meeting; is

20     that fair?

21     A.  I don't recall being at that

22     meeting.

23     Q.  All right.  Now, back to the basic

24     concept of the SEEAC and the GORC.  Would

25     it be fair to characterize the role of the

**PURSUANT TO CONFIDENTIALITY ORDER**

1    SEEAC and GORC as a response to the Baker

2    Commission recommendation executive

3    management of BP p.l.c., you know, be

4    involved in monitoring the implementation

5    of the Baker Panel recommendations?

6        A.  I think that is consistent.  That

7    was -- and that was consistent with the

8    intent.

9        Q.  The GORC did not exist before the

10   Baker Panel recommendation; it was

11   established as a response to it, right?

12       A.  I'm -- I'm not sure if that's

13   completely accurate, because I -- I'm

14   going to get caught up in the timing of

15   when we did things and when the Baker

16   report was finally published.

17            What I -- what I will say is

18   that the -- the GORC was established post

19   Texas City.

20       Q.  Okay.

21       A.  As part of the company's desire --

22   part of the company's intent to learn from

23   the events of Texas City and improve

24   safety and operational performance, you

25   know, and it was consistent with the

151

```
 1      intent -- or the recommendation in the
 2      Baker Panel that executive management
 3      should be more involved in monitoring it.
 4      I'm not exactly sure of the -- of the
 5      sequence in time.
 6          Q.  And, likewise, the transformation
 7      of the EEAC subcommittee of the board of
 8      directors of BP p.l.c. becoming the SEEAC,
 9      adding the word "safety" to the front,
10      that was a response to the Baker Panel
11      recommendation that the board of directors
12      itself be involved in the implementation
13      of the Baker Panel recommendations.
14      That's true, right?
15          A.  I don't know whether -- I don't
16      know whether the -- I know the renaming of
17      the EEAC to the SEEAC was in response to
18      place greater operational -- a greater
19      focus on safety.  And I'm not sure --
20          Q.  By the board?
21          A.  By -- by the board, yeah.
22              I'm not sure whether it was
23      done -- that it was done before the Baker
24      Panel.  It was certainly consistent with
25      the Baker Panel report.  I don't know if
```

PURSUANT TO CONFIDENTIALITY ORDER

152

1           it was done in response to our own

2           internal findings or the Baker Panel.

3                Q.   Okay.   Now, let me just ask you

4           this, before we take another video break.

5           I've got the six-point plan on a board

6           here, and I've marked it as Exhibit 3862.

7                     (Exhibit Number 3862 marked.)

8                Q.   (BY MR. WATTS)   And here's my

9           question:   With respect to the

10          implementation of the six-point plan,

11          based on your own knowledge and who was at

12          all these GORC meetings and SEEAC

13          meetings, we can be sure that both the

14          board of directors, through its SEEAC

15          committee, and the very highest-level

16          executives of BP p.l.c. were intimately

17          involved in the monitoring of the

18          implementation of the six-point plan

19          across the company, right?

20                    MR. FOWKES:   Object to the

21          form.

22               A.   The only -- there -- the purpose

23          of the -- of the meetings was to set them

24          up so they had involvement.   I don't know

25          that it would be accurate to say that it

**PURSUANT TO CONFIDENTIALITY ORDER**

1    was intimately involved.  They were

2    involved at a level that the board

3    committees and the GORC could.

4              I would need to sort of -- I

5    wasn't present at the meeting, so I don't

6    know whether you would describe it as

7    intimate or detailed, but certainly the

8    design intent was that they should be more

9    involved in those -- in those discussions.

10        Q.  (BY MR. WATTS)  Part of that

11   involvement is, is they got a copy of the

12   orange book, which gave them an organized

13   fashion --

14        A.  Correct.

15        Q.  -- prepared by a genius.

16   Seriously, part of their -- part of that

17   involvement was, is that they got an

18   orange book that gave them, in an

19   organized fashion, the safety performance

20   of the company and the status of the

21   implementation of the six-point plan,

22   right?

23        A.  That is correct.

24              MR. FOWKES:  Object to the

25   form.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1                    MR. WATTS:  Okay.  Let's take
 2         our break, and we'll -- we'll start up
 3         with a new video.  Thank you.
 4                    THE WITNESS:  Okay.
 5                    THE VIDEOGRAPHER:  Off the
 6         record, 10:48 a.m.  Ending tape 2.
 7                    (Recess 10:48-11:02 a.m.)
 8                    THE VIDEOGRAPHER:  Back on the
 9         record, 11:02 a.m., beginning tape 3.
10                    (Exhibit Number 3821 marked.)
11              Q.  (BY MR. WATTS)  Mr. Armstrong, we
12         were looking at this six-point plan slide,
13         and I mistakenly called it 3862 when, in
14         fact, I had already marked it over here as
15         3821.
16                    And your question was -- is I
17         know the GORC and the SEEAC were involved,
18         but the -- with the question of intimate
19         involvement, I would need to look at the
20         minutes themselves to see the degree of
21         involvement.  Would you agree?
22              A.  That -- that was the substance of
23         my response to the question.
24              Q.  Okay.  Let me take you just
25         through a few of those -- not all of them,
```

1       again -- and let me show you what I've now

2       marked as 3862.  And these are just

3       examples of the BP Group or the BP p.l.c.

4       involvement in implementing its six-point

5       plan.

6                   What I'd like to do is just

7       take you to five or six documents.  If you

8       could start with tab 16.

9                   MR. FOWKES:  Do you have a

10      copy of this one, too, 3862?

11                  MR. WATTS:  I do.

12                  MR. FOWKES:  Thank you.

13                  MR. McLENDON:  It's previously

14      marked.

15                  MR. WATTS:  What was it marked

16      as?

17                  MR. McLENDON:  3826.

18                  MR. WATTS:  Okay.  Tab 16 was

19      previously marked as Exhibit 3826.

20          Q.  (BY MR. WATTS)  If you would -- if

21      you would go to September 19, 2005 as the

22      date.  If you would go to Bates page

23      number 199 and 200.

24          A.  Hang on -- hang on just a second.

25      Which tab am I in?

1      Q.  Tab 16.

2      A.  Yeah, this is the 16th of

3  February, 2008.

4      Q.  I blew it, didn't I?  Hold on just

5  a second.  Give me a second.

6          MR. McLENDON:  That was the

7  meeting.

8      Q.  (BY MR. WATTS)  Try tab 4.  I

9  apologize.  I'll mark tab 4 as

10  Exhibit 3863.

11          (Exhibit Number 3863 marked.)

12      A.  Hold on.  Tab 4?

13      Q.  (BY MR. WATTS)  Yes, sir.

14      A.  Okay.

15      Q.  All right.  And that document

16  should be dated September 19, 2005.  Is

17  that right?

18      A.  September 19th, 2005.

19      Q.  Okay.  And if you go to the Bates

20  page number 199 and 200.  199 is the 2006

21  through 2010 safety and operational

22  capability and HSSE plan that has

23  milestones for segments --

24      A.  Hang on just a second.  I'm just

25  sort of familiarizing myself.  I'm on page

PURSUANT TO CONFIDENTIALITY ORDER

1    200.

2       Q.   Okay.  And if you'll look at these

3    milestones on page 200, one of them is

4    with respect to all segments -- the second

5    row -- framework is the full

6    implementation of several things, and one

7    of them is the full implementation of

8    group standards currently under

9    preparation.

10             Do you see that, sir?

11      A.   No, I can't find it.

12      Q.   Okay.  Under number 2, there's

13   a -- there's a graph in A, and the second

14   column -- I mean, the second row, full

15   implementation, and then it includes group

16   standards currently under preparation?

17      A.   It says, full implementation of

18   the safety and operations excellence

19   framework incorporating so-and-so and

20   group standards currently under

21   preparation.

22      Q.   Okay.  So --

23      A.   I'm --

24      Q.   -- this -- this has a milestone

25   date for full implementation of group

PURSUANT TO CONFIDENTIALITY ORDER

1    standards, among other things, for the

2    fourth quarter of 2010.

3                   Do you see that, sir?

4         A.   I do.  I'm just sort of trying

5    to -- I'm trying to --

6                   MR. McLENDON:  It's a little

7    dark.

8                   THE WITNESS:  Pardon?

9                   MR. McLENDON:  It's dark on

10   the copy.

11        A.   I see that.  What I'm -- what

12   I'm -- I'm -- what I'm -- yes, I see

13   that -- I see that in the document.

14        Q.   (BY MR. WATTS)  Okay.

15        A.   I'm trying to figure out what --

16   whether -- what the document is.

17        Q.   All right.  And here's my

18   question:  With respect to the response to

19   the Texas City response actions, portable

20   buildings, do you know whether it was the

21   SEEAC, the GORC, the board of directors --

22   who was it that set the timetable as to

23   when the full implementation of group

24   standards presently under preparation

25   would be?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1            A.  I don't know, and I'm -- I'm
 2       not -- the reason why I'm hesitating is, I
 3       don't know the answer to the question, and
 4       I don't know what the -- the status of
 5       this plan document is.  This is -- this
 6       looks like a draft document.  I'm trying
 7       to understand what it is.  And it's -- it
 8       looks like it's something from Liz Rogers.
 9       So I don't know -- I don't know the status
10       of this document in relation to the -- you
11       know, the conversation that we've been
12       having around the minutes of the GORC or
13       of the SEEAC.
14            Q.  Okay.
15            A.  But I think -- I think the -- in
16       terms of the -- who would set the
17       timetable, it would obviously be someone
18       at a high level in the organization.
19            Q.  When you say somebody at a high
20       level in the organization, we're talking
21       about a timetable that's going to be
22       approved by people at the level of the
23       GORC or the SEEAC, right?
24            A.  Yeah, the final contract will be
25       approved by someone at the GORC level.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   Okay.   Now, let's go to the second

2    prong of the six-point plan, which would

3    be major accident assessment, the MAR.

4              In terms of setting the

5    timetable for when the major accident

6    assessment and response plans would be

7    done, again, that is something that is set

8    at the board level, right?

9    A.   Well, it would -- I don't know if

10   it would be accurate to say that it was at

11   the board level, but it would be at the

12   level of -- it would be -- I think it

13   would be more accurate to say it would be

14   at the level of the GORC rather than at

15   the board level.

16   Q.   Okay.

17   A.   It may -- it would be decided

18   probably at the level of the GORC and may

19   be approved by the board.

20   Q.   Okay.   But approved by the board

21   after decided by the GORC?

22   A.   I think that would be the

23   sequence.

24   Q.   Okay.   I'll take that.   That's

25   fair.

**PURSUANT TO CONFIDENTIALITY ORDER**

Let's look at tab 39, which we have already premarked. These are the SEEAC minutes from May the 6th of 2009.

A. Tab 39.

Q. Tab 39, page 2, the SEEAC minutes from May 6th of 2009, under major accident risk assessment. On page 2, it says, Mr. Baxter discussed the specific risk assessment process that had been established for all operations that had the potential for a major accident. He noted that a major accident is defined as one that could lead to multiple fatalities and/or severe environmental damage. Where risks are categorized as being above the group reporting line, they and their associated mitigation and risk reduction plans are reported in the orange book and presented to the GORC. Reference was made to the reporting of MAR assessments for E&P and refining and marketing in first quarter 2009 orange book.

First of all, what I just read in kind of confirms what you just said, right? The orange book is presented to

1          the GORC.  The GORC makes a decision.

2          That decision is then presented to the

3          SEEAC who either ratifies it or modifies

4          it, right?

5               A.  I think that's accurate.

6               Q.  Okay.  Fair enough.

7                    Let's go to the third element

8          of the six-point plan, which is integrity

9          management and control of work standards

10         implementation.  If you would go to tab

11         62.

12              A.  I don't -- it's in the next book.

13              Q.  Okay.  This is the BP HSE and

14         operations integrity report for the fourth

15         quarter of 2009 with quarterly data and

16         January 2010 commentary, and it's issued

17         on January the 27th of 2010; is that

18         correct?

19              A.  That is correct.

20                    MR. WATTS:  And the exhibit

21         number is?

22                    MR. McLENDON:  3864.

23                    MR. WATTS:  The exhibit number

24         is 3864, for the record.

25                    (Exhibit Number 3864 marked.)

PURSUANT TO CONFIDENTIALITY ORDER

1      Q.  (BY MR. WATTS)  If you could go to

2      Bates page number 221, please.

3                      Now, what I am looking at in

4      this exhibit --

5      A.  Hang on.  Can I -- can I just get

6      to the --

7      Q.  Oh, I'm sorry.  I thought you were

8      there.  I apologize.

9      A.  No, I'm not to the --

10      Q.  Okay.

11      A.  -- not to the page.  221.

12      Q.  221.  What I'm looking at in this

13      exhibit is an example of the orange book,

14      right --

15      A.  This is an --

16      Q.  -- for a particular quarter?

17      A.  This is an example of the orange

18      book.

19      Q.  You designed the structure of

20      this, and as we go to page 221, we have a

21      page that says, six-point plan group, and

22      then we go through these various six

23      elements to check on how we're doing on

24      getting them implemented, right?

25      A.  Yep.

**PURSUANT TO CONFIDENTIALITY ORDER**

164

1        Q.  Okay.  And, for example, with

2   respect to integrity management, the

3   second paragraph under standards says, for

4   integrity management standard, the group

5   headline for conformance -- strike that.

6              On the second paragraph under

7   standards, it says, for integrity

8   management standard, the group deadline

9   for conformance was the fourth quarter of

10   2008.  E&P and R&M have approved

11   extensions resulting in a fourth quarter

12   of 2012 target date for closure of all

13   actions.

14              Is that right?

15        A.  That is what the --

16        Q.  And that's -- that's what's on

17   this board that's Exhibit 3862, right?

18        A.  That is correct.

19        Q.  Okay.  Now, with respect to the

20   issue of implementation of the integrity

21   management standard, OMS, these kinds of

22   things, like the schedule for the MAR, the

23   schedule as to when integrity management

24   standard will be implemented, when OMS

25   will be implemented is set at the level of

**PURSUANT TO CONFIDENTIALITY ORDER**

1          the GORC and approved by the BP p.l.c.

2          board SEEAC subcommittee, right?

3                A.   I think that would be -- that

4          would be my understanding.

5                Q.   All right.  Now, this particular

6          document talks about -- well, the original

7          deadline was the fourth quarter of 2008,

8          but there have been extensions.

9                     As I understand the way it

10         worked, from talking to Mr. Baxter, if

11         somebody wanted to extend a deadline, they

12         had to go to BP p.l.c.'s worldwide head of

13         engineering and process safety and ask for

14         the extension and get approval from BP

15         p.l.c. before a deadline could be

16         extended.  Is that right?

17                     MR. FOWKES:  Object to the

18         form.

19               A.   John Baxter is better placed --

20         I'm not -- that's outside of my area of

21         competence.  That doesn't sound

22         unreasonable that someone would need to go

23         to -- otherwise, you could reset the

24         deadline yourself.

25                     Having to go to John sounds

PURSUANT TO CONFIDENTIALITY ORDER

1      like a reasonable thing to do, but I'm not

2      familiar with the precise mechanics

3      because it's not in my area of expertise.

4          Q.  (BY MR. WATTS)  And I've already

5      talked to John about this and -- and have

6      testimony on that.  But the reason I ask

7      you about it is -- is that when an

8      extension is granted for a deadline on

9      integrity management standard or OMS --

10     when that is granted by somebody at BP

11     p.l.c., then it's monitored through the

12     orange book; is that right?

13         A.  Yeah, it would continue -- it

14     would be monitored anyway.

15         Q.  Yeah.

16         A.  And then it should be -- I --

17     until I look -- I need to -- this is sort

18     of, you know, several iterations beyond

19     the original design, but that would --

20     that would seem to be a reasonable intent.

21     If you reset the deadline, then you need

22     to monitor delivery against the new

23     deadline.

24         Q.  And so the benefit is -- is that,

25     number 1, you don't have people giving

1    themselves deadlines, p.l.c has to approve

2    it.  But by putting it in the orange book,

3    the GORC and the SEEAC can monitor the

4    progress on meeting the extended deadline?

5        A.  That would -- that would seem

6    sensible.  But without -- without looking

7    at the detail of the -- this latest --

8    this orange book I have in front of me,

9    I'm not sure that's exactly right.  But

10   that would seem to be a reasonable intent.

11       Q.  Okay.  And the way you designed

12   the structure of the orange book -- and --

13   and I commend you for it -- I mean, you

14   can look in there and figure out what the

15   present status is on each of these six

16   points of the six-point plan, right?

17       A.  That is -- that was the original

18   design intent.

19       Q.  Okay.  Now, let's go to the fourth

20   component, which is compliance with

21   applicable laws and regulations.  And if

22   we could, go to tab 66, please.

23       A.  These are 3rd February, 2010?

24       Q.  Yes.  The GORC minutes from

25   February 3rd of 2010, right?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              A.   Yeah.
 2              Q.   Now, if we look at these GORC
 3       meeting minutes on Bates page number
 4       521 --
 5              A.   Yeah.
 6              Q.   -- at the very top, before
 7       section 3, it says, Tony Hayward asked to
 8       be kept informed at the next GORC on how
 9       E&P's compliance response compares with
10       that of other industry majors.  Do you see
11       that, sir?
12              A.   I do see that.
13              Q.   Okay.  And so that's what I put on
14       this graphic, and I -- I've translated
15       that correctly, right -- transferred it
16       correctly?
17              A.   Yes.
18              Q.   Okay.  And then let's go to
19       another SEEAC meeting minute of -- let's
20       go to tab 72, please, sir.
21                   And these are the SEEAC
22       meeting minutes for February 24th.  Again,
23       Dr. Hayward is there, as are several
24       members of the SEEAC committee, including
25       Sir William Castell from the board,
```

**PURSUANT TO CONFIDENTIALITY ORDER**

169

1        Mr. Burgmans from the board.

2                  And as we look at Bates page

3        number 510, the second page of the

4        document, the last line of the second

5        paragraph says, Dr. Hayward confirmed that

6        GORC were placing additional emphasis on

7        compliance reporting.

8                  Did I read that correctly?

9        A.   Hang on just a second.  I can't

10       find the text.  I'm on -- so to page 4510?

11       Q.   Right.  Second paragraph, last

12       line of the paragraph.  Dr. Hayward

13       confirmed that GORC were placing

14       additional emphasis on compliance

15       reporting.

16       A.   That is correct.

17                  MR. FOWKES:  This is exhibit

18       3851?

19                  MR. McLENDON:  Yes, it is.

20       Q.   (BY MR. WATTS)  All right.  And so

21       as the 30(b)(6) representative -- I mean,

22       we can see from these documents that with

23       respect to what BP p.l.c. was doing to

24       ensure that its business entities under it

25       were meeting the applicable laws and doing

1       it in a way that the group could keep an

2       eye on making sure that was happening,

3       this is an implementation that went all

4       the way to the level of the chief

5       executive officer of the BP Group,

6       Mr. Hayward, right?

7            A.   That is correct.

8            Q.   All right.   Number 5 is more

9       comprehensive safety audit process, close

10      out action items.

11               And you told me there's two

12      components of this.   Obviously the

13      predecessor versions of audits, to the

14      extent they had open items, they needed to

15      be closed out, and then the second version

16      was, we've got this new safety and

17      operations audit team, right?

18           A.   Led by Jim O'Brien.

19           Q.   All right.   And the safety and

20      audit -- operations audit team, as I

21      understand it, is a group of between 50

22      and 60 highly trained individuals that go

23      to the particular facilities, whether on

24      land or offshore, and do these

25      high-powered audits called S&O audits to

1      figure out what needs to be fixed in order

2      to achieve safety, right?

3          A.   I -- I don't know.  Well, let

4      me -- I don't know if the group's gone to

5      50 or 60.

6          Q.   Okay.

7          A.   And I -- I don't know about the

8      word high-powered.  But Jim has got a -- a

9      team of a certain size that is designed to

10     do S&O audits to a high standard.

11         Q.   Okay.  And I'll -- I'll take you

12     through some documents on S&O just so we

13     can prove that up.

14              But the bottom line is, as we

15     go to tab 47, please, of the first

16     notebook -- these are the GORC meeting

17     minutes from July 31 of 2009.  Tab 47.

18         A.   Tab 47?

19         Q.   Yes, sir.

20              MR. FOWKES:  3846?

21              MR. McLENDON:  That's right.

22              MR. FOWKES:  I just point that

23     out for the record.

24              MR. WATTS:  That's fine.  No,

25     go ahead.

**PURSUANT TO CONFIDENTIALITY ORDER**

172

1          MR. FOWKES:  People reading

2     along won't have their notebooks with

3     them.

4          MR. WATTS:  Have at it.  It's

5     fine.  As I said before, you're not

6     bothering me at all.  You're helping me.

7     A.  Tab 47.  Yes.

8     Q.  (BY MR. WATTS)  Okay.  These are

9     the GORC meeting minutes from July 31 of

10    2009, right?

11    A.  Correct.

12    Q.  And as we look at those meeting

13    minutes -- and go to the Bates page ending

14    534 -- we have an audit program update in

15    section 6 of the minutes.

16    A.  From Jim O'Brien.

17    Q.  Jim O'Brien discussed the plan

18    from migration of auditing of drilling and

19    well operation practice, DWOP, and well

20    integrity into the S&O audit program in

21    2010.  The GORC endorsed this plan.

22          Do you see that?

23    A.  I see that.

24    Q.  And then down at the very bottom

25    of that section, it says, the GORC

173

 1       endorsed the revised 2009 and proposed

 2       2010 audit schedules.

 3            A.   Let me just sort of -- I'm just

 4       kind of catching up with the reading here.

 5       So the GORC endorsed this plan.  Which

 6       paragraph is --

 7            Q.   The very last paragraph of the

 8       section.  It says, the GORC endorsed the

 9       revised 2009 and proposed 2010 audit

10       schedules.

11                 Do you see that?

12            A.   Oh, the last sentence.  I do --

13            Q.   Yes, sir.

14            A.   Yes, I do see that.

15            Q.   Okay.  So before we get into the

16       details of how good the S&O audit was, my

17       question is simply this:  With respect to

18       the scheduling of which facilities will

19       get audited and when, that is a decision

20       that was decided by GORC, approved by

21       GORC, and presented to the SEEAC, right?

22                 MR. FOWKES:  Object to the

23       form.

24            A.   That is -- that is accurate.

25            Q.   (BY MR. WATTS)  Okay.  Now, with

1    respect, in fairness, to these high

2    executives, they didn't actually do the

3    S&O audits; that's Jim O'Brien's function

4    that would go out there and do the audits,

5    right?

6         A.   That is correct.

7         Q.   But what Jim O'Brien's function

8    would do is after they conducted an S&O

9    audit, they would in writing prepare a

10   list of deficiencies that needed action

11   items to fix and a closeout schedule,

12   right?

13        A.   That is -- they would prepare an

14   audit report, and they would -- they would

15   categorize the gaps that they found

16   against the required standards and agree

17   to a set of actions with times to close

18   out those actions.

19        Q.   And then one thing that went into

20   the orange book, to your credit, is the

21   chief executive of BP p.l.c., the chief

22   executive of exploration and production,

23   the other members of the GORC would get

24   the orange book, and the orange book would

25   say, here's the number of open items that

1    are yet to be closed out, right?

2         A.   That is correct.

3         Q.   And that way, the highest level

4    management of the company could be aware

5    of which facilities had been S&O audited,

6    right?  That's true?

7         A.   Well, there would be also -- yes,

8    that is true.  They would be -- they would

9    be aware to begin with.  They would be

10   involved in selection -- in selecting

11   which ones would be audited.

12        Q.   Well, that's a good point.  The --

13   the GORC and the SEEAC would be involved

14   in deciding which facilities would get

15   audited on what schedule, right?

16        A.   Yes.

17        Q.   But to my point, after those

18   audits are done, the executives on the

19   GORC, including Tony Hayward and Andy

20   Inglis, would be presented with an orange

21   book that would tell them, of the ones

22   that have been audited, here are the

23   deficiencies, and here's the closeout

24   schedule, right?

25        A.   That's correct.

1          Q.  And, in addition, if there's an

2    overdue, in other words, the closeout

3    schedule wasn't met, the GORC and the

4    SEEAC became aware that there were S&O

5    audits that had been conducted,

6    deficiencies that had been identified,

7    action items that had been prescribed by a

8    certain date that were overdue, right?

9          A.  I think that is -- let me just

10   say, I think that is accurate to -- but --

11   and I haven't -- I haven't seen a recent

12   orange book that has that kind of

13   schedule, but I -- I think that's the

14   design intent.

15         Q.  Sure.  But going back to my

16   graphic in 3862, the bottom line is, with

17   respect to the schedule or the decision as

18   to which facilities are going to be S&O

19   audited and when, that is a decision made

20   by the GORC, which includes the chief

21   executive officer of BP p.l.c., right?

22         A.  Yes, that is correct.

23         Q.  Okay.  Let's go to number 6, which

24   is staff training and development and

25   safety and operations.  And if you could

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1            go to tab 19, please, sir.
 2                      MR. McLENDON:  For the record,
 3            that's Exhibit 3828.
 4                      MR. FOWKES:  Thank you.
 5            A.  Tab 19.  Yeah.
 6            Q.  (BY MR. WATTS)  All right.  And
 7            we're looking at SEEAC meetings from --
 8            minutes from March 13 of 2008, where BP
 9            p.l.c. board members Dr. Massey,
10            Mr. Burgmans, Sir William Castell, and Sir
11            Tom McKillop are there, together with
12            Mr. Pearl, right?
13            A.  Yep.
14            Q.  We have the chief executive
15            officer of BP p.l.c., Dr. Hayward, there,
16            together with Iain Conn and Mark Bly,
17            among others, right?
18            A.  That is correct.
19            Q.  Okay.  And as we go to Bates page
20            number 469, which is the second page of
21            the document --
22            A.  Yeah.
23            Q.  -- under operations risk report,
24            it begins, Dr. Hayward highlighted key
25            aspects of the first quarter HSE and
```

178

1    operations integrity report.  He reported

2    that an elevated level of personal

3    accidents had been observed in exploration

4    and production, principally within the

5    contractor community.  Interventions were

6    being made notably with drilling

7    contractors.

8                Do you see that, sir?

9       A.  I do see that.

10      Q.  Okay.  Now, here's my question:

11   With respect to staff training, the

12   academy with MIT that you referenced

13   already before, the GORC and SEEAC both

14   maintained an awareness as to how many

15   employees had gone through that staff

16   training at MIT and how many were still to

17   go, right?

18                MR. FOWKES:  Object to the

19   form.

20      A.  I'm -- now that -- I don't -- I

21   don't think that specifically was part of

22   the orange book, so I'm -- I'm not sure

23   how the GORC and the SEEAC got that exact

24   information.  I know that they would talk

25   about the -- the operations academy and

**PURSUANT TO CONFIDENTIALITY ORDER**

1    how many people went.

2         Q.  (BY MR. WATTS)  Yeah.

3         A.  I don't know if that -- I don't

4    know if there was a -- a regular reporting

5    on that or an annual reporting.  So I'm --

6    I'm not sure as to the exact nature of the

7    reporting.  But I can see from some of the

8    minutes in here already that Graham

9    Cattell went to one of the meetings and

10   spoke about that.

11        Q.  Yeah.  Okay.  So bottom line, as

12   we look at the entirety of 3862, with

13   respect to the implementation of the

14   six-point plan, how and when it was done,

15   we can be sure that the very highest level

16   executives of BP E&P, Andy Inglis; BP

17   p.l.c., Tony Hayward; and members of the

18   board of BP p.l.c. were involved in

19   monitoring and making decisions about the

20   schedule for the implementation of the

21   various provisions of the six-point plan,

22   agreed?

23        A.  Yes, that's accurate.

24        Q.  Okay.  Good enough.

25        A.  You know, by -- by design.  And

180

1          that was actually part --

2              Q.   Sure.

3              A.   -- if you go back, that was part

4          of the -- we go back to the -- the Baker

5          Panel report, that was --

6              Q.   That's part of what they should

7          have been doing under the Baker Panel's --

8              A.   That was -- that was part of --

9          that was part of being -- you know, being

10         serious about implementing the

11         recommendations in the Baker Panel report.

12             Q.   All right.  Now, when you were

13         first named the chief financial officer

14         of -- well, strike that.

15                  Let me handle two things that

16         you asked me to go over real quick with

17         respect to safety and operations.

18         Remember I promised to go back to that

19         with you just real quick?

20                  Give me a second, and I'll

21         find where we want to take you.

22                  Let's go to, for example, tab

23         20 first, with respect to safety and

24         operations audits.  These are the GORC

25         meeting minutes -- Exhibit 3829, the GORC

1      meeting minutes for April 15 of 2008; is

2      that right?

3           A.   That is correct.

4           Q.   If you go to Bates page number

5      beginning 840 -- or 084, excuse me.

6           A.   084, yeah.

7           Q.   Yeah, if you go to Bates page

8      ending 084, we can see under section 4 the

9      2007 S&O audit program review.

10               And it says, J. O'Brien

11     reviewed the findings from the 2007 audit

12     program.  The delivery and impact of the

13     S&O audit team was praised by members of

14     the GORC.

15               And then it says, proposed

16     changes to the 2008 audit program outlined

17     in the preread were agreed by GORC.

18               Do you see that?

19          A.   Yep.

20          Q.   All right.  So the way this would

21     work is that in the preread -- and you

22     guys at BP have got tons of prereads --

23     that's something that's sent out so that

24     people can read it before the meeting,

25     right?

**PURSUANT TO CONFIDENTIALITY ORDER**

 1          A.  That is correct.

 2          Q.  Okay.  So in the pre- -- in the

 3     prereads for these GORC meetings, the

 4     schedule that was being proposed for the

 5     S&O audit team and any proposed changes to

 6     a previously existing schedule are

 7     presented to the GORC for its approval or

 8     disapproval, right?

 9               MR. FOWKES:  Object to the

10     form.

11          A.  Yeah.

12          Q.  (BY MR. WATTS)  Okay.  Now, let me

13     take you -- just to -- to show this

14     process continued, let's go to tab 21 real

15     quick.

16               This is Exhibit 3830.  These

17     are SEEAC committee meeting minutes for

18     May 7 of 2008.  And go to the second page,

19     if you would.

20               In the second paragraph under

21     operations risk report, it says,

22     Dr. Hayward described progress in the S&O

23     audit function, the six-point plan and the

24     OMS implementation.  It was agreed that a

25     report on OMS in exploration and

1        production would be presented to SEEAC

2        later in the year.

3                    This is an example of once the

4        schedule with respect to S&O audit is

5        arrived at by the GORC, it's presented to

6        the board of directors through its

7        subcommittee, the SEEAC, for -- for their

8        approval, right?

9            A.   That is correct.

10           Q.   Okay.  Go to tab 24.  Tab 24 has

11       previously been marked as Exhibit 3833.

12                   These are the GORC minutes for

13       July 10 of 2008, right?

14           A.   That is correct.

15           Q.   Now, go to Bates page number 130,

16       third page of the document.

17                   Under section 7, the 2009 S&O

18       audit schedule was approved as presented

19       with no changes, right?

20           A.   That is correct.

21           Q.   All right.  So on multiple

22       occasions what we can see is that the GORC

23       and then the SEEAC are being made aware of

24       what is being audited and when and being

25       given the opportunity to approve or modify

PURSUANT TO CONFIDENTIALITY ORDER

184

```
 1        the schedule, right?
 2             A.  That is correct.
 3             Q.  Go to tab 47, please.  As we look
 4        at tab 47 -- this is Exhibit 3846 -- these
 5        are the GORC meeting minutes --
 6             A.  Hang on.  I'm getting --
 7             Q.  I'm sorry.  Go ahead.
 8                      MR. FOWKES:  It's a big
 9        notebook.
10                      MR. WATTS:  Oh, I know.
11             Q.  (BY MR. WATTS)  Tab 47.
12             A.  I don't want it to break apart.
13             Q.  You're all right.
14                      Tab 47 is the GORC meeting
15        minutes for July 31 of 2009, right?
16             A.  Correct.
17             Q.  Go to Bates page number 534,
18        please, sir.
19             A.  Uh-huh.
20             Q.  This is something we just looked
21        at, but, again, for both 2009 and 2010, we
22        have the GORC endorsing the revised 2009
23        and proposed 2010 audit schedules, right?
24             A.  That was -- that's exactly right.
25             Q.  Exactly.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1                    So in the last three documents
 2        we've just looked at, the GORC looked at,
 3        presented to the SEEAC for its discussion
 4        and approval the 2008 schedule, the 2009
 5        schedule, and the 2010 S&O schedule,
 6        right?
 7             A.   Correct.
 8             Q.   Okay.  Now, as the 30(b)(6)
 9        corporate representative selected by BP to
10        testify on its behalf, do you think that
11        the involvement of the BP p.l.c. board of
12        directors, through its SEEAC committee,
13        was appropriate and necessary to properly
14        respond to the Baker Commission
15        recommendations?
16                    MR. FOWKES:  Object to the
17        form.
18             A.   I'm not -- I'm -- it's a -- that's
19        a -- quite a difficult question.  I'm
20        not -- it is what we did, and it is in
21        line with the response.  Whether that was
22        necessarily what the Baker Panel was
23        saying, I haven't got that level of
24        detail.  But, I mean, the fact that they
25        appointed a -- an independent monitor,
```

**PURSUANT TO CONFIDENTIALITY ORDER**

186

1    which -- which suggests that that -- that

2    it was indeed the process that we've just

3    been talking about was consistent with the

4    intent of the Baker Panel recommendations.

5        Q.  Getting the board of directors and

6    the highest level executives of BP p.l.c.

7    involved in the decisions about how and

8    when to implement the six-point plan and

9    to monitor the implementation of the same,

10   that was the right thing for BP to do,

11   right?

12       A.  I think that was an appropriate

13   response to Texas City, given the

14   magnitude of the events at Texas City.

15       Q.  Sure.  And given the magnitude of

16   the events at Texas City and the lessons

17   learned in the Baker Commission report, if

18   BP failed to completely implement its

19   six-point plan, the failure would lie with

20   BP p.l.c.'s top executives and board of

21   directors, based on the documents that

22   we've just gone through; would you agree?

23              MR. FOWKES:  Object to the

24   form.

25       A.  I'm not sure I would -- I would

**PURSUANT TO CONFIDENTIALITY ORDER**

1    agree with that.  I think it's fair to

2    say -- everything we've said is sort of

3    fair to say.  It's slightly hypothetical

4    to say the -- the failure of

5    implementation, if -- if indeed there were

6    such a failure, it would need to be

7    investigated as to what the reasons for

8    the implementation were.

9         Q.  (BY MR. WATTS)  Okay.  After the

10   Deepwater Horizon explosion occurred and

11   those 11 men were killed and all this, you

12   know, oil spilled everywhere, were you

13   involved in any way with respect to the

14   investigation of the process safety at BP?

15             MR. FOWKES:  Object to the

16   form and the scope.

17        A.  No, I -- I had no direct

18   involvement.

19        Q.  (BY MR. WATTS)  Okay.  And I'll

20   stop there, but I just wanted to make sure

21   you weren't involved.

22             Let me ask you this:  Did you

23   ever -- as the author of the architecture

24   of the orange book, did you ever go back

25   and see whether or not the six-point plan

**PURSUANT TO CONFIDENTIALITY ORDER**

1   was actually implemented in a way that

2   affected the Deepwater Horizon?

3        A.  No, I did not.

4        Q.  Okay.  What I would like to do is

5   to go through each of those six points

6   with you in some detail and talk to you

7   about the implementation of it.

8             First of all, with respect to

9   the first point, the Texas City response

10  actions with respect to portable

11  buildings, can we agree that there were no

12  portable buildings on the Deepwater

13  Horizon?

14       A.  Well, I -- can I make a point at

15  the beginning of this, if I may -- and

16  it's just a point of distinction -- that,

17  A, I had no direct knowledge of the -- of

18  the Deepwater Horizon, is the first thing.

19            And the second thing, the --

20  the intent behind the six-point plan and

21  OMS is that -- and there's language in OMS

22  which is that it's -- it's designed to be

23  implemented to operations that BP is the

24  operator of.

25            There's a set of language to

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1            say if it's a joint venture operation,

 2            sort of operated by one of our partners,

 3            then we take a look at their management

 4            systems, which may be different from our

 5            management systems, and assure ourselves

 6            that their systems are up to scratch.

 7                      And for an operation which was

 8            managed by a contractor, then we've got to

 9            take a look at their systems, but there --

10            there should be an expectation that the --

11            the six-point plan or the OMS would sort

12            of directly apply to an operation that we

13            weren't the operator of.

14         Q.   Okay.  Well, let me see if we can

15            go about it this way:  The first thing I

16            heard is that the six-point plan was

17            designed to apply to all facilities that

18            BP owned.  That's true, right?

19         A.   BP owned.

20         Q.   And to all facilities where BP was

21            the operator of the activity on the

22            facility, right?

23                      MR. FOWKES:  Object to the

24            form.

25         A.   I now -- I now feel -- I feel as
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1   though I -- I'm not qualified to answer

2   that question as precisely as you've asked

3   it, because we were -- you know, I -- I'm

4   not an expert in the sort of -- Deepwater

5   Horizon isn't -- isn't sort of my area of

6   expertise.  And I am aware that there's a

7   conversation around the precise nature of

8   the -- who was accountable for what in

9   respect to that, and I'm not expert in

10  that area.

11       Q.  (BY MR. WATTS)  Yeah.  Really what

12  I want to talk about is your expertise in

13  the six-point plan and where it's being

14  applied and where it's not.

15            And I think what you told me

16  two minutes ago is that it was intended to

17  apply to facilities that we owned and

18  facilities that we operated.

19       A.  That is correct.

20       Q.  Okay.  Can you tell me who was the

21  operator of the Macondo 252 number 1 well?

22            MR. FOWKES:  Objection, form

23  and scope.

24       A.  I'm not -- I'm not clear on the

25  precise nature of the question.  It's

PURSUANT TO CONFIDENTIALITY ORDER

1    out- -- I think it's outside of my area of

2    expertise.

3         Q.  (BY MR. WATTS)  Well, let me just

4    ask you this:  You have been the group VP

5    for Caribbean and Latin American

6    operations.  You've been the CFO for all

7    of exploration and production.  You've

8    been in charge of Venezuela exploration.

9              Do you, as the CFO of

10   exploration and production with all that

11   experience that you've described for me,

12   know who the operator of the Macondo 252

13   number 1 well was?

14              MR. FOWKES:  Objection, form,

15   scope.

16        A.  I think -- and I -- this is -- I

17   may not be completely -- I think we were

18   operator of the well.

19        Q.  (BY MR. WATTS)  Yeah.

20        A.  I'm -- I'm not clear as to the

21   precise nature of the contractual

22   relationship between being the operator of

23   the well and the Deepwater Horizon.  And

24   that's -- that area -- I'm not qualified

25   to speak about that exact contractual

PURSUANT TO CONFIDENTIALITY ORDER

192

1    relationship.

2         Q.   Let me see if I can follow up,

3    because you have been very fair to me thus

4    far, and I'm not trying to be unfair to

5    you with this respect:  With respect to

6    the legal obligations that the United

7    States federal government, through what

8    was the MMS, places on the operator of a

9    well, are you familiar with what those

10   obligations are?

11        A.   No, I'm not familiar in detail

12   with those obligations.

13        Q.   Do you agree with me that even

14   though this is not your area of expertise,

15   that your understanding is -- is that BP

16   was the operator of the Macondo 252 number

17   1 well?

18             MR. FOWKES:  Objection, form,

19   scope.

20        A.   I believe -- to the best of my

21   knowledge, I believe that is accurate.

22        Q.   (BY MR. WATTS)  Okay.  Now, with

23   respect to the six-point plan, my first

24   question before we got off on this

25   aside -- and it was fine that we did so --

PURSUANT TO CONFIDENTIALITY ORDER

 1          is element 1, the Texas City response with

 2          respect to portable buildings.

 3                    You know, certain things are a

 4          good idea, but they just don't apply to

 5          all facilities.  You're not aware of any

 6          portable buildings that had been installed

 7          on the Deepwater Horizon, agreed?

 8          A.   That's -- it's outside of my level

 9          of knowledge.

10          Q.   Okay.

11          A.   And -- and so I'm -- I'm not

12          really -- I don't know the specifics

13          of the -- of the -- of the Deepwater

14          Horizon drilling rig.

15          Q.   Yeah.  And I guess really what I'm

16          asking is -- is, you know, the -- you're

17          the witness who was designated as the

18          re- -- you know, to tell us about the

19          response to these three reports, and part

20          of that response is the six-point plan.

21          A.   Well, in respect -- sorry.

22          Q.   Hold on.  Let me finish the

23          question.

24                    And I'm not picking on you

25          about it.  But I'm just saying, if you

**PURSUANT TO CONFIDENTIALITY ORDER**

194

```
 1        believe that the portable building

 2        standard element, element number 1, had

 3        any applicability to the Deepwater

 4        Horizon, tell me what you think in that

 5        regard.  I don't think it applies, but if

 6        you do, I want to hear it at this time, as

 7        the corporate representative.

 8             A.  Well, I'm not sure.  What --

 9                  MR. FOWKES:  Object to the

10        form.

11             Q.  (BY MR. WATTS)  Go ahead.

12             A.  The question that I'm saying is --

13        the design intent behind -- the six-point

14        plan was transformed into OMS.  So if

15        you -- if you think about the -- the Gulf

16        of -- at the level of the Gulf of Mexico,

17        the Gulf of Mexico had a process to

18        implement the six-point plan which was

19        tracked as a result of the processes that

20        we're talking about.

21             Q.  Because of the OMS?

22             A.  Because of -- no, no, the

23        six-point plan.

24                  Then they made a transition

25        from the six-point plan into OMS.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.  Right.

2      A.  And the -- the -- to the extent

3  that there were commitments in elements of

4  the six-point plan, like meet the

5  integrity management standard by a certain

6  time, that would be embodied in OMS.

7      Q.  Okay.  So --

8      A.  So they're now -- so they're now

9  operating under OMS.

10      Q.  I'm with you.  So -- oh, I'm

11  sorry.

12      A.  Let me -- just -- sorry.

13      Q.  You paused, and --

14      A.  So then what I'm saying is that

15  the -- so I'm -- I'm clear as to the

16  implementation of OMS inside of the Gulf

17  of Mexico, and the distinction I'm making

18  is that there are parts of OMS that are

19  designed to apply to BP-operated entities.

20  There are -- there's a provision inside of

21  OMS to say if it's operated by another --

22  by a joint venture, we've got to sort of

23  look at their management systems and say,

24  are they equivalent to OMS?  And if it's

25  work that is performed by a contractor,

1    then there's a different set of -- of

2    requirements.

3         Q.  So -- so let me see if I can

4    crystallize that response with respect to

5    the Texas City response action on portable

6    buildings.

7              I think what you're saying is,

8    look, Mr. Watts, I lack the understanding

9    of the Deepwater Horizon to tell you

10   whether it applied or not, but to the

11   extent that it did apply, it would be

12   wrapped into OMS and incorporated -- or

13   embedded within OMS?

14        A.  Yeah, it is part of OMS.  And this

15   is where my own level of detail with OMS

16   isn't -- isn't exact.  It would be a

17   requirement in OMS to say, if -- if it was

18   sort of a platform in the Gulf of Mexico

19   that we're the operator of, you know, like

20   Thunder Horse, we would then -- we would

21   sort of take a look and say, are there any

22   occupied portable buildings?  And we would

23   deal with them.

24              If it was a -- a joint venture

25   that was operated by Shell, like MARs, we

PURSUANT TO CONFIDENTIALITY ORDER

1      would kind of, you know, take a look, and

2      if it was an issue, we would seek to

3      influence them because we aren't the

4      operator.

5              And if it's an operation that

6      we're not -- and this is where I'm hung up

7      on the precise legal definition.  If we're

8      operator of the well, what does that mean

9      with respect to the operation?  And to the

10     extent that someone else is running the

11     operation, I -- what I don't know is

12     how -- how we actually apply that in that

13     circumstance.

14         Q.  Okay.  So with respect to element

15     number 1 -- and I think where we are, the

16     best I'm going to get is, A, you don't

17     know whether there were any portable

18     buildings on the Deepwater Horizon or not.

19     That's true, right?

20         A.  That's correct.

21         Q.  B, you don't know whether or not

22     element number 1 of the six-point plan

23     applies to the Deepwater Horizon or not by

24     virtue of the fact we don't know whether

25     there were any portable buildings, right?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   Yeah.   And the other thing I'm

2      saying is that by the time -- at the

3      time -- at the time we -- you know, we're

4      using the six-point plan in the sense that

5      it still existed at the time, but by then,

6      I think the Gulf of Mexico had

7      transitioned from the six-point plan to

8      OMS, and it would be OMS.

9                But then I would say that

10     the -- the sort of -- the technical

11     practice on occupied buildings would be

12     embedded in OMS, so it's still -- was

13     still relevant.

14     Q.   All right.   Let's go to gap

15     assessment.   Was there a gap assessment

16     done on the Deepwater Horizon before this

17     explosion?

18     A.   I don't know.

19     Q.   If you could go to tab 82.

20               By the way, tell me what a gap

21     assessment is as it relates to the MAR.

22     A.   The design intent behind -- the

23     design intent behind OMS is that it is

24     a -- this goes back to the Baker Panel --

25     and I'm -- I'm answering that question,

**PURSUANT TO CONFIDENTIALITY ORDER**

1          and then I'll go back to the terms.

2                    The design intent that it's --

3          it's a sort of comprehensive, sustainable

4          system to reduce risk and improve safety

5          performance, and as part of the design of

6          the system, you do what's called an annual

7          gap assessment against what the

8          requirements for reaching the elements

9          would be.

10                   So each -- each part of the

11         business that's operating under OMS would

12         do an annual gap assessment, and then they

13         would put in place a plan, a prioritized

14         plan, to close the gaps, and then they

15         would sort of do like the next year and

16         the next year.  So it's -- it's an ongoing

17         process to reduce risk.

18             Q.   Okay.  And my question to you is,

19         did BP do a gap assessment on the

20         Deepwater Horizon before this explosion?

21             A.   And I'm saying, I don't -- I don't

22         know.

23             Q.   Okay.

24             A.   And I'm also -- I'm caught up in

25         the -- still the how does OMS apply to the

PURSUANT TO CONFIDENTIALITY ORDER

1    Deepwater Horizon, given the nature of the

2    relationship of that activity?

3         Q.  Did BP do a MAR analysis on the

4    Deepwater Horizon before the explosion?

5         A.  I don't know.

6         Q.  If you would go to tab 96, please,

7    which is not in your notebook, so let me

8    hand you a copy.

9              MR. WATTS:  And I'm going to

10   mark this as Exhibit 3865.

11              (Exhibit Number 3865 marked.)

12        Q.  (BY MR. WATTS)  Now, I'm going to

13   ask you just to -- I'm sorry.  Tab 95.

14   Excuse me.  Hand those back.

15              MR. FOWKES:  Is this still

16   3865 that we're on?

17              MR. WATTS:  Yeah, we'll get to

18   it.  Just leave it there, and I'll ask you

19   about it later.  I grabbed the wrong

20   folder.  My apologies.

21              Tab 95, which I'm going to

22   mark as Exhibit 3867.

23              MR. McLENDON:  3866.

24              MR. WATTS:  Hold on just a

25   second.

201

```
 1                     Let's -- let's go off the
 2          record for a second.  I've got a little
 3          glitch in my numbering system.
 4                     THE VIDEOGRAPHER:  Off the
 5          record, 11:46 a.m.
 6                     (Recess 11:46-11:47 a.m.)
 7                     THE VIDEOGRAPHER:  Back on the
 8          record, 11:47 a.m.
 9                     (Exhibit Number 3866 marked.)
10             Q.  (BY MR. WATTS)  Okay.  As I
11          mentioned, we have a video that we can
12          edit so I can take out all my screw-ups.
13                     Let's do this clean.  If you
14          go to tab --
15             A.  Will it do the same for me?
16             Q.  Yeah, we'll try.
17                     Let's go to tab 83, which has
18          been marked as Exhibit 3866.
19                     This is an e-mail chain that
20          is dated May the 12th, and --
21             A.  May the 12th --
22             Q.  Of 2010.
23             A.  -- 2010?
24             Q.  Right.  And it --
25             A.  This is -- this is whilst the
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        incident is happening?
 2            Q.  Yes, after the explosion, while
 3        we're still spilling oil.
 4                    Let's start on the bottom of
 5        the first page.  It's an e-mail from John
 6        Baxter to Tim Overton, who I asked you
 7        about.
 8                    And it says, I am preparing a
 9        short brief for Tony Hayward at SEEAC 20
10        May (and will use it if necessary at GORC)
11        on how we apply risk assessment and how we
12        are using the ETMs (sic) in Gulf of
13        Mexico.  This has taken on a bit more
14        urgency as the chairman has asked to see
15        me tomorrow.  Topics not yet defined but
16        it will be on GOM, or Gulf of Mexico.
17                    Here's my question:  First of
18        all, the chairman -- what is the chairman
19        of the board of BP p.l.c. at this time?
20            A.  That is -- that's -- who is the
21        chairman at this time?
22            Q.  Yes.
23            A.  I think it would be Carl-Henric
24        Svanberg.
25            Q.  Okay.  And so Mr. Baxter is saying
```

1    the chairman is asking to see me, and I'm

2    about to brief Tony Hayward at the SEEAC

3    meeting on May the 20th.

4              Now, if you could, if you

5    could go to the top.  He gets a response

6    back from a Cheryl Grounds on the same day

7    saying, attached is a brief description of

8    risk management activities in the Gulf of

9    Mexico strategic performance unit,

10   including ETPs, GDP 3.1-0001 on risk, and

11   MAR.

12             And then if you would go to

13   the attachment beginning on Bates page

14   788, we have a document entitled Gulf of

15   Mexico SPU Risk Management SEEAC Brief.

16             Do you see that?

17        A.   This would be the document?

18        Q.   Yes, this is the attachment.

19        A.   This is the attachment that Cheryl

20   refers to?

21        Q.   Right.

22             MR. FOWKES:  What's the Bates

23   number again, sir?

24             MR. WATTS:  Well, we're going

25   to the one ending 788.

1     Q.  (BY MR. WATTS)  And what I want to

2  ask you about is what's on page 2 of that

3  attachment.

4     A.  Can I just -- just take a -- let

5  me just get my eye on the attachment.

6     Q.  Sure.  The second full paragraph

7  on page 2 is what I'll be asking you

8  about.

9            And let me just read it into

10  the record while you're looking at it.

11            It says, mobile offshore

12  drilling units (MODUs) are located some

13  distance from the existing assets,

14  frequently over subsea equipment, and are

15  owned/operated by other parties.  MODUs

16  have not been included in the Gulf of

17  Mexico MAR analyses to date.  There are

18  existing plans to include the MODUs when

19  the MAR analyses are revalidated.

20            Did I read that correctly?

21     A.  You read that correctly.

22     Q.  Okay.  Now, here's my question:

23  You are familiar with the fact that the

24  Deepwater Horizon is a mobile offshore

25  drilling unit, right?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1           A.   Uh-huh.

2           Q.   Yes?

3           A.   I am familiar with that.

4           Q.   Okay.  According to this document

5      that is being given to Mr. Baxter for his

6      meeting with the chairman of the board of

7      BP exploration and production -- I mean,

8      chairman of the board of BP p.l.c., there

9      had not been a MAR done with respect to

10     MODUs not owned by BP in the Gulf, right?

11              MR. FOWKES:  Object to the

12     form.

13          A.   Sorry.  Just could you -- could

14     you repeat the question again.

15          Q.   (BY MR. WATTS)  Sure.  According

16     to this document, which was prepared for

17     the worldwide head of engineering and

18     process safety, for his meeting with the

19     chairman of the board of BP p.l.c. and for

20     his briefing with the chief executive

21     officer of BP p.l.c., MODUs have not been

22     included in the Gulf of Mexico MAR

23     analysis to date, right?

24              MR. FOWKES:  Object to the

25     form.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

206

1      A.  That is correct.  And -- you know,

2      I haven't seen this document before, and

3      the -- it would appear that the -- that is

4      correct.

5          Q.  (BY MR. WATTS)  And then to follow

6      up, there are existing plans as of

7      May 12th of 2010 to include these MODUs

8      when the MAR analysis is revalidated,

9      right?

10         A.  That is what this statement says.

11         Q.  Okay.  Now, with respect to

12     element number 2, the major accident MAR

13     and response plan, whoever prepared the

14     schedule for when MARs would be done on

15     which facilities, we know now that no MAR

16     analysis had -- had been done on the

17     Deepwater Horizon, right?

18              MR. FOWKES:  Object to the

19     form.

20         A.  That -- that is -- that is

21     correct.  And I think -- I think the --

22     the reason for that in Cheryl Grounds'

23     note, which is what I was saying, is in

24     part because they're owned and operated by

25     other parties.

1       Q.  (BY MR. WATTS)  Well, they're

2   going to still be owned and operated by

3   other parties when there are existing

4   plans to include the MODUs when the MAR

5   analyses are revalidated, right?

6       A.   Correct.

7       Q.   There were no plans for BP to buy

8   the other MODUs from Transocean that --

9   that it was leasing from Transocean in the

10  Gulf of Mexico, right?

11              MR. FOWKES:  Object to the

12  form.

13       A.   That is -- that is correct.

14       Q.  (BY MR. WATTS)  So according to

15  Cheryl Grounds, although we have not yet

16  done a MAR, there are existing plans to

17  include these MODUs in a MAR analysis in

18  the future, right?

19       A.   That is what this document says.

20       Q.   Okay.  So the bottom line is,

21  whoever made the schedule as to which

22  facilities were going to get MAR analyses

23  and when, those schedules had not included

24  the Deepwater Horizon in the MAR analyses

25  as of the date of the explosion on April

208

1      the 20th of 2010, right?

2                    MR. FOWKES:  Objection to the

3      form, scope.

4          A.   That would appear -- that is --

5      appear to be correct on the basis of this

6      piece of paper I have in front of me.

7          Q.  (BY MR. WATTS)  And that is a

8      decision that you've already told me is

9      made by the high-level BP p.l.c.

10     executives, including Tony Hayward on the

11     GORC, and presented to the BP p.l.c. board

12     through its SEEAC committee, right?

13                   MR. FOWKES:  Objection to the

14     form.

15         A.   I -- I agree that the -- and we've

16     seen evidence that would support that --

17     this -- Tony Hayward would sign off on

18     the -- the MAR schedule.

19         Q.  (BY MR. WATTS)  Okay.  If we

20     could, I'd like to take you to tab 81.

21                   Now, the tab 81, which I'll

22     mark as Exhibit 3867, is the HSE and

23     operations integrity report.  The second

24     page shows it's for the first quarter of

25     2010.  Do you see that?

1          (Exhibit Number 3867 marked.)

2     A.   Yes.

3     Q.   (BY MR. WATTS)  Now, this is

4     issued on April the 27th of 2010, right?

5     A.   It is.

6     Q.   Now, before we get to what the --

7     this is the so-called orange book that's

8     presented to the GORC and the SEEAC,

9     right?

10     A.   That is correct.

11     Q.   Okay.  Before we get to that, I

12     want to take you back to tab 60.

13          Tab 60 I'm going to mark as

14     Exhibit 3868.

15          (Exhibit Number 3868 marked.)

16     A.   Hang on.  I'm in another book.

17     Q.   (BY MR. WATTS)  Oh, I'm sorry.

18     I'm going to give you a minute to get

19     there.  You're doing an exemplary job of

20     not tearing up the notebooks like most

21     witnesses, so I'm going to be patient.

22          Okay.  Back on the record --

23     well, we are on the record, but back on

24     something that's admissible.

25          Tab 60, Exhibit 3868, this is

1      the Gulf of Mexico SPU annual engineering

2      plan, if you look at the second page in

3      the title of the document, and it's dated

4      January 15, 2010.

5          A.   Correct.

6          Q.   All right.   Now, if you would go

7      to Bates page number 808.

8          A.   808.

9          Q.   808.   Now, under practices and

10     procedures, do you see where it says, OMS

11     element 4.1 (procedures and practices)?

12         A.   I do see that.

13         Q.   The second bullet point says, the

14     Gulf of Mexico's strategic performance

15     unit was granted an extension of the IM

16     conformance deadline for development of

17     site operating procedures (element 6)

18     until July 31, 2010.

19         A.   That is indeed what is said.

20         Q.   Now, site operating procedures

21     include the development of maintenance

22     procedures for all of the Gulf of Mexico

23     assets and the development of operating

24     procedures in various areas, including

25     drilling, right?

**PURSUANT TO CONFIDENTIALITY ORDER**

211

```
 1            A.  That is what it says.

 2            Q.  Now, in the next bullet point, the

 3      third subbullet point, it says, by July 1,

 4      2010, drilling and maintenance procedures

 5      will be complete.

 6                    Do you see that, sir?

 7            A.  I can see that.

 8            Q.  Now, July 1, 2010 comes after

 9      April 20, 2010; we agree?

10            A.  Yes.

11            Q.  The drilling procedures were not

12      yet due, according to the extension

13      granted to drilling and completions in the

14      Gulf of Mexico strategic performance unit,

15      as stated in the annual engineering plan,

16      dated January 15 of 2010, right?

17                    MR. FOWKES:  Objection, form

18      and scope.

19            A.  Sorry, just slow down here, just

20      to make sure.

21                    So we've got the annual

22      engineering plan dated '10.

23            Q.  (BY MR. WATTS)  Dated January 15,

24      2010.

25            A.  Yeah, which says that there's an
```

**PURSUANT TO CONFIDENTIALITY ORDER**

212

1    extension to the IM standard until

2    July 31st in the matter of site operating

3    procedures.  And it's saying that the

4    drilling and maintenance procedures will

5    be complete by July the 1st, 2010.

6         Q.  Now, you know from the group

7    standards that BP p.l.c. provides that in

8    order to get an extension of one of the

9    deadlines that the BP p.l.c. group has set

10   forth with respect to the implementation

11   of the IM standards, that they have to ask

12   for the extension which is granted by BP

13   p.l.c. through the GORC and the SEEAC,

14   right?

15        A.  No, I think that the process we

16   talked about was they would need to get

17   approval from John Baxter or someone like

18   John Baxter.

19        Q.  Okay.  And then that approval is

20   placed in the orange book, and the GORC

21   members and the SEEAC members, who are

22   either executives or board members of BP

23   p.l.c., are then made aware of it through

24   the orange book, right?

25        A.  They receive the orange book,

**PURSUANT TO CONFIDENTIALITY ORDER**

1    that's right.  And we've gone over the

2    process of discussing it.

3        Q.  Right.  High-level executives of

4    BP p.l.c. make the decision whether to

5    grant an extension of site operating

6    procedures, such as drilling and

7    maintenance procedures, right?

8                MR. FOWKES:  Object to the

9    form.

10       A.  Yeah, I'm not -- I'm not -- I'm

11   not exactly sure of the process in this

12   particular case, but the -- if -- the

13   substance is that the Gulf of Mexico can't

14   set its own deadlines; it needs to get

15   sort of approval for resetting a deadline.

16               And the -- the process is as

17   you describe it.  I'm not -- you know,

18   from this, it would say the GOM was

19   granted an extension from the IM standard.

20   Someone would have granted the extension,

21   and that person would be someone outside

22   of the Gulf of Mexico in a senior

23   position.

24       Q.  And it would be somebody inside of

25   BP p.l.c. sitting on the GORC or the

PURSUANT TO CONFIDENTIALITY ORDER

1      SEEAC?

2                  MR. FOWKES:  Objection to form

3      and scope.

4          A.  I'm not -- I'm not -- I'm not sure

5      in this -- this particular element --

6      there would be a record -- I'm not sure

7      whether it was -- it may have been John

8      Baxter who would be a part-time member of

9      the SEEAC.

10         Q.  (BY MR. WATTS)  Sure.

11         A.  But I don't know that for sure

12     because I don't know the detail of this.

13     But that -- in the sort of line of the

14     inquiry, I -- I think that's appropriate,

15     and I'd need to kind of understand the

16     detail.

17         Q.  Sure.  Our list of all the SEEAC

18     and GORC meetings, Baxter is there

19     repeatedly as a member of GORC and as an

20     attendee of various SEEAC meetings, right?

21         A.  Yeah.

22         Q.  Okay.

23         A.  But what I don't know is -- the

24     point I'm making is, I'm not sure if

25     there's a -- in the way that there are,

**PURSUANT TO CONFIDENTIALITY ORDER**

1      you know, clear financial delegations, I

2      don't know -- I don't know if -- at

3      exactly what level the extension would be

4      granted.  I'm assuming that it would be at

5      Baxter's level.

6         Q.  I think so.

7         A.  But I don't -- I don't know

8      precisely that that's the case.

9             MR. WATTS:  Let's go off the

10     record.  We're out of videotape.  Time for

11     our next break.

12            THE WITNESS:  Okay.

13            THE VIDEOGRAPHER:  Off the

14     record, 12 p.m., the end of tape 3.

15           (Recess 12:00-12:12 p.m.)

16           (Exhibit Number 3869 marked.)

17            THE VIDEOGRAPHER:  Back on the

18     record, 12:12 p.m., the beginning of tape

19     4.

20         Q.  (BY MR. WATTS)  Mr. Armstrong, I

21     put up a new poster that I've marked as

22     Exhibit 3869.  And what I'd like to do is,

23     just under each of the six-point plan --

24     we've kind of got a blank, because we're

25     not sure whether it applies here, and --

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1          and I'll leave it at that.  I agree with
 2          you, you know, based on your knowledge,
 3          that you can't answer that.
 4                   With respect to the major
 5          accident assessment, or the MAR, and
 6          response plan, we've already looked at
 7          tab 83, which is the document that says,
 8          MODUs have not been included in the Gulf
 9          of Mexico MAR analyses to date.  Do you
10          recall that?
11              A.  Yeah, I recall reading that --
12          that exhibit.
13              Q.  Okay.  And that exhibit number is
14          3866, so I'll just write a 3866.
15                   MR. WATTS:  Does anybody have
16          a better pen than this, a marker or
17          something?
18                   MR. FOWKES:  Do you have an
19          8-by-12 of the exhibit, by the way?
20                   MR. WATTS:  Yes.  David, give
21          him a copy of the 8-by-12.
22              Q.  (BY MR. WATTS)  Okay.  We've
23          already marked as Exhibit 3866 the
24          reference under the MAR section.  Now I
25          want to go to the integrity management
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    section.  We just finished looking at

2    tab 60, which is 3868, and this is the

3    engineering plan, dated January 15, 2010,

4    right?

5         A.  That is correct.

6         Q.  And this language came from the

7    engineering plan on Bates page 808 with

8    respect to, the GOM SPU was granted an

9    extension of integrity management standard

10   conformance deadline for the development

11   of site operating procedures, or

12   Element 6, until July 31, 2010.  And the

13   current status shown therein is, by -- I

14   think it's supposed to be July 31.

15             Does it say -- what does the

16   current status say, July 1 or July 31?

17   It's Bates page number 808.

18        A.  July 1.

19        Q.  Okay.  I wrote it right, then.  So

20   the current status says, by July 1, 2010,

21   drilling and maintenance procedures will

22   be complete.

23             I've correctly lifted that

24   from the document; is that right?

25        A.  That is correct.

**PURSUANT TO CONFIDENTIALITY ORDER**

218

```
 1          Q.  Okay.  And then with respect to

 2     compliance --

 3               MR. McLENDON:  For the record,

 4     that's 3868.

 5               MR. WATTS:  I'm sorry, 3868.

 6     Thank you.

 7          Q.  (BY MR. WATTS)  With respect to

 8     compliance with applicable laws and

 9     regulations, if you could go to tab 77,

10     please.  And this has been previously

11     marked as 3852.

12          A.  Tab 77?

13          Q.  Yes, sir.

14          A.  Yeah.

15          Q.  On 3852, if you go to Bates page

16     number 515, this is the SEEAC meeting

17     minutes on March 24, 2010, the third page.

18     Under US regulatory compliance, does it

19     read, Mr. Inglis and Mr. Conn reviewed the

20     approaches taken by E&P and R&M to US

21     regulatory compliance?

22          A.  Yes.

23          Q.  Do you see that, sir?

24          A.  Yes, I do.

25          Q.  Skipping a sentence, does it also
```

**PURSUANT TO CONFIDENTIALITY ORDER**

219

1          say, they noted the common elements of

2          their approaches included the

3          implementation of OMS across all operating

4          sites and the use of group S&O audits?

5          Did I read that correctly?

6               A.  You read that correctly.

7               Q.  Now, I think what this is saying,

8          as we look at those words on the board

9          here, is that the way that we keep track

10         in the United States of whether we are in

11         regulatory compliance is through the

12         implementation of the OMS requirements and

13         the audit thereof of the group S&O audits,

14         right?

15              A.  Just say that -- say that again.

16              Q.  Sure.  What Mr. Inglis and

17         Mr. Conn are saying here is that the way

18         that they see to it that you have

19         compliance with US regulatory compliance

20         is it's included within the OMS system and

21         it's being audited by the S&O audit group,

22         right?

23              A.  Well, what they -- what they

24         said that's -- nearly what they said was

25         they noted the common elements of their

1          approaches included the implementation of
2          OMS across all operating units and the use
3          of S&O audits.  So I think that's saying
4          that they're -- (a) compliance is
5          important because it's on the agenda.
6          They describe the actions taken to
7          mitigate compliance risks.
8                    And I don't -- what I don't
9          know is what that complete set of actions
10         is.  And then they're saying that this
11         included -- common elements of their
12         approaches included implementation of OMS
13         and the use of group S&O audits.
14                    So I think they're saying that
15         OMS is -- is part of what they're doing,
16         but there may be -- there may be other
17         actions taken to mitigate risks that go
18         beyond OMS and group S&O audits.
19         Q.  But we know now that OMS was not
20         in place on the Deepwater Horizon, right?
21                    MR. FOWKES:  Object to the
22         form, and scope.
23         A.  I -- what I -- I'm trying to kind
24         of think.  OMS was in place in the Gulf of
25         Mexico.  They had sort of made the

221

1    transition from the six-point plan to

2    the -- under OMS in the Gulf of Mexico.

3                    What's near -- what's not

4    clear to me, and it's beyond my area of

5    expertise, is what precisely that means in

6    terms of the management systems that were

7    used on the Deepwater Horizon.

8        Q.   (BY MR. WATTS)   Sir, do you know

9    whether OMS was being applied on the

10   Deepwater Horizon?

11                   MR. FOWKES:   Object to the

12   form and the scope.

13       A.   Technically, I don't know.   I'm

14   being -- I'm being very careful in my

15   answer because it's important.

16                   I know that OMS -- the Gulf of

17   Mexico had -- over a number of years,

18   they'd implemented the six-point plan, and

19   they'd implemented -- they'd made the

20   transition from the six-point plan to OMS,

21   and they've got an OMS handbook.

22                   Precisely how that applies in

23   our -- in our joint venture activities and

24   activities as operated by others, I'm --

25   I'm not clear, in the -- in a legal sense,

```
1     whether that -- what that means, whether

2     it's operating under OMS or operating

3     under the -- you know, the operator's own

4     management systems.

5          Q.  (BY MR. WATTS)  Okay.

6          A.  Which may or may not be, you know,

7     consistent.  If -- if I take a Shell

8     platform in the -- in the Gulf of Mexico,

9     they may be operating under a management

10    system that is a Shell management system

11    and it is an OMS.

12         Q.  Okay.

13         A.  And we would -- we would examine

14    that and say, is that sort of consistent

15    with our standards in OMS?  And if -- if

16    it is, then we will say, use your

17    management system.  And if it isn't, we

18    may seek them -- seek to influence the

19    other operator in areas where, you know,

20    the -- we think it's deficient.

21              What I don't know is

22    precisely the -- the link from OMS to the

23    actual management of operations on the

24    Deepwater Horizon.

25         Q.  Sure.
```

223

```
1        A.  I don't know if I -- how
2    much -- I'm --
3        Q.  Let me -- let me try again,
4    because you're the corporate
5    representative that's speaking on behalf
6    of the company, so we both need to be
7    precise.
8        A.  Yeah, yeah.
9        Q.  And let me just ask you this way:
10   If John Baxter told me two weeks ago that
11   OMS did not apply on the Deepwater
12   Horizon, do you disagree with him?
13            MR. FOWKES:  Object to the
14   form?
15       A.  If that's -- if that's what John
16   said, then I've got no -- I have the
17   greatest of respect for John Baxter.
18       Q.  (BY MR. WATTS)  Okay.
19       A.  I would agree with what he said.
20       Q.  And I know, you know, you can
21   only do --
22       A.  But I think that's --
23       Q.  -- as best as what you --
24       A.  -- I think the idea --
25       Q.  Go ahead.  We interrupted each
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    other.  Keep going.

2         A.   I'm sorry.  I think the -- the --

3    you know, the intent is, you know, that we

4    have got -- we have built, over a number

5    of years, a management system called OMS

6    that incorporates the six-point plan.

7              And the thing that I'm --

8    if -- if we don't operate the activity, if

9    someone else does, we look at their

10   management system and say, you know, is it

11   a -- is it a design of ours.

12             And I'm -- what I'm not clear

13   on, and what John obviously is, that we've

14   taken a look at the management system used

15   by Transocean, and it's not OMS.  It must

16   be something else -- or I should say the

17   operator of the rig.

18        Q.   So with respect to your answer as

19   BP's corporate representative, you cannot

20   tell me whether or not the Deepwater

21   Horizon had OMS or had something else; is

22   that fair?

23             MR. FOWKES:  Object to the

24   form and the scope.

25        A.   Yeah, I'm not -- I'm not -- I'm

PURSUANT TO CONFIDENTIALITY ORDER

1    not able to answer that question

2    accurately, so I'm not going to speculate.

3         Q.  (BY MR. WATTS)  Now back to the

4    regulatory compliance.  Mr. Inglis and

5    Mr. Conn are saying, you know, one of the

6    ways that we achieve that is the

7    implementation of OMS.

8              Can you tell me whether or not

9    the compliance with applicable laws and

10   regulations was achieved through OMS on

11   the Deepwater Horizon or not?

12             MR. FOWKES:  Object to the

13   form and the scope.

14        A.  I don't know.

15        Q.  (BY MR. WATTS)  Okay.  With -- he

16   also says, we achieve compliance with

17   applicable laws and regulations through

18   OMS, but we go back and we use the group

19   S&O audits to audit them.

20             Can you tell me whether or not

21   the compliance with US laws and

22   regulations was audited by the S&O audit

23   group on the Deepwater Horizon?

24             MR. FOWKES:  Object to the

25   form and the scope.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              A.  I -- I don't know for sure.
 2              Q.  (BY MR. WATTS)  Okay.  Let's see
 3         if we can go about it this way.  Let's go
 4         to element number 5, which is more
 5         comprehensive safety audit process.
 6                   If you would go to tab 86.
 7         And this is the SEEAC minutes from July 21
 8         of 2010, correct?
 9              A.  It is correct.
10              Q.  Now, on the first page, third
11         paragraph --
12              A.  Yeah.
13              Q.  -- Mr. Baxter had reviewed the
14         preliminary orange book.  In the second
15         line he referred to the S&O audit
16         findings.  Third line, he noted that 108
17         S&O audits had been conducted over the
18         past three years and that these had
19         generated around 11,000 actions, of which
20         nearly 9,000 had been verified as closed.
21         Those not closed out had either not
22         reached their closure date or an extension
23         had been agreed.
24                   Do you see that, sir?
25              A.  I do agree I see that.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1        Q.   All right.   So to the extent that

2    there was an S&O audit done and a

3    deficiency was noted and the closeout was

4    not done in time, somebody from BP's

5    p.l.c. through GORC or SEEAC approved the

6    extension; we agree?

7                MR. FOWKES:   Object to the

8    form and the scope.

9        A.   Yeah.   What I would say,

10   someone -- someone would have agreed to

11   the extension, and I think -- and this --

12   I think this is important, but I think --

13   I think the board would be aware that

14   someone had approved it, but it doesn't

15   mean the board went through, in a

16   line-by-line sense, approving every

17   extension themselves or, indeed, that John

18   would have done that at a meeting.   I

19   think I'd have said to John, you know, are

20   you happy with the ex- -- approving

21   extensions, and he would have said yes.

22       Q.   (BY MR. WATTS)   But the board knew

23   about the extensions?

24       A.   They would know about -- they

25   would know about the fact that extensions

1   were being approved.

2        Q.  Dr. -- Mr. Baxter and Dr. Hayward

3   noted that in line with plans agreed in

4   2009, certain functional audit activities,

5   including for drilling rigs and aviation,

6   would be transferred into S&O audit during

7   2010.  Did I read that correctly?

8        A.  You did read that correctly.

9        Q.  All right.  The fact of the matter

10  is, is that the Deepwater Horizon never

11  got an S&O audit.  You know that to be

12  true, right?

13            MR. FOWKES:  Objection to the

14  form and --

15       A.  I --

16            MR. FOWKES:  -- scope.

17       A.  I -- if -- if -- I don't know that

18  to be true.

19       Q.  (BY MR. WATTS)  Okay.

20       A.  If you're -- if you're --

21  that's -- I'm the -- that level of detail

22  in terms of the S&O audit, but it would --

23  from the -- from the statement here, given

24  that he was going to be transferred into

25  S&O audit during 2010, then it's clear

**PURSUANT TO CONFIDENTIALITY ORDER**

1    that they hadn't had an S&O audit before

2    that.

3         Q.  All right.  Are you aware of any

4    S&O audit that was done by BP's S&O audit

5    entity during 2010 before April 20th on

6    the Deepwater Horizon?

7         A.  No, I am not.

8              MR. FOWKES:  Objection, form,

9    scope.

10        Q.  (BY MR. WATTS)  Okay.  With

11   respect to staff training and development,

12   safety and operations, can you tell me how

13   many BP employees were on the Deepwater

14   Horizon on April the 20th of 2010?

15             MR. FOWKES:  Objection, form,

16   scope.

17        A.  I -- I don't know the -- I don't

18   know the exact number.

19        Q.  (BY MR. WATTS)  Can you tell me

20   which ones had been to the school at MIT?

21             MR. FOWKES:  Objection, form.

22        Q.  (BY MR. WATTS)  And which ones

23   hadn't?

24             MR. FOWKES:  Form, scope.

25        A.  I don't know which of them had

**PURSUANT TO CONFIDENTIALITY ORDER**

1    been to the school at MIT.

2        Q.  (BY MR. WATTS)  Can you tell me

3    whether any of the subcontractors or the

4    contractors that were on the Deepwater

5    Horizon had been to the BP school at MIT?

6            MR. FOWKES:  Objection, form,

7    scope.

8        A.  It's -- I -- I don't know -- no,

9    I -- I can't tell you because I don't

10   know.

11       Q.  (BY MR. WATTS)  Okay.  Fair

12   enough.

13           Let's go to tab 89, which is

14   the SEEAC meeting minutes that have been

15   marked as 3858.

16       A.  What -- can I -- I had a

17   comment on my -- no.

18       Q.  As we look at Exhibit 3858, the

19   SEEAC meeting minutes dated September 17

20   of 2010, and we go to Bates page 527,

21   which is the first page, do you see the

22   second paragraph?  Does it say,

23   Dr. Hayward referred to other actions

24   being taken by the company, which extended

25   beyond the narrow recommendations made in

1    the Bly report.  He noted specifically a

2    review of the oversight of contractors,

3    among other things.

4              Do you see that, sir?

5        A.  I do see that.

6        Q.  Now, here's my question:  What

7    steps did BP's group operation risk

8    committee or its board of directors,

9    through the SEEAC, take to see to it that

10   the training that its employees were

11   getting at MIT were being delivered to

12   contractors who were on mobile offshore

13   drilling units drilling wells that were

14   being operated by BP?

15             MR. FOWKES:  Objection to the

16   form.

17       A.  Can you -- can you repeat the

18   question, please?

19       Q.  (BY MR. WATTS)  Sure.  The

20   education and training that BP gave to

21   some of its own employees, what steps did

22   the GORC or the SEEAC take to see to it

23   that that training was being delivered to

24   contractors' employees who were on mobile

25   offshore drilling units drilling wells

**PURSUANT TO CONFIDENTIALITY ORDER**

 1      being operated by BP?

 2                  MR. FOWKES:   Objection to the

 3      form and scope.

 4           A.   I -- I don't know.

 5           Q.   (BY MR. WATTS)   Okay.   Now --

 6           A.   They -- they --

 7           Q.   Oh, I'm sorry.   I thought you were

 8      done.

 9           A.   The design -- the design behind

10      the training -- MIT was a very high-end

11      training program designed for senior

12      leaders in the organization.   And we've

13      cycled through -- I can't -- I don't know

14      the number of people.

15                  There was a -- the training

16      architecture had below that a series of

17      programs called operation essentials at

18      different -- at different levels, and I

19      think it's -- I'm not sure anybody from

20      a -- a contractor would have been invited

21      to the operations academy, because it was

22      designed for educating BP leadership.

23           Q.   Senior leadership?

24           A.   BP senior leadership.   I think --

25      I think they're -- what I don't -- what I

1    don't know is there may be programs that

2    sort of are linked to the -- the

3    educational content of MIT that other

4    leaders in the organization would go to.

5    What I don't know is whether that or not

6    includes -- includes contractors.  That's

7    a longer answer to the question.

8        Q.  The training that was given to BP

9    senior executives, that would include the

10   senior direction -- di- -- executives who

11   set the schedule of when the six-point

12   plan elements were going to be implemented

13   and on what facilities, right?

14       A.  I think --

15           MR. FOWKES:  Object to the

16   form.

17       A.  Let me -- again, I need to be

18   accurate.  There -- there were two par- --

19   there were two forms of the operations

20   academy.  There was an operations academy

21   program, which was designed for senior

22   operations.  It would be like a refinery

23   manager or a senior manager in the Gulf of

24   Mexico SPU.  And they did, indeed, attend

25   the academy.  And that program was

PURSUANT TO CONFIDENTIALITY ORDER

1    designed to be three two-week terms.  It

2    was -- you know, it was an expensive thing

3    to do, a big commitment, and took a period

4    of time.

5             There was, in addition, an

6    executive education version of both the

7    project academy and the operations

8    academy, and I think it's more likely that

9    the people who were members of the GORC

10   would have attended the executive

11   version of it --

12        Q.  (BY MR. WATTS)  Agreed.

13        A.  -- rather than the full version of

14   it.

15        Q.  I agree.  Okay.  So the executive

16   version of the training was given to the

17   people who set the schedules for the

18   implementation of the six-point plan and

19   made the decisions of which facilities got

20   implemented and which did not, right?

21             MR. FOWKES:  Object to form

22   and --

23        A.  I -- I --

24             MR. FOWKES:  -- the scope.

25        A.  That is -- that is -- that is

**PURSUANT TO CONFIDENTIALITY ORDER**

1    accurate.

2         Q.  (BY MR. WATTS)  Okay.

3         A.  I think -- I think the -- the

4    thing I say -- and I said earlier, I'm --

5    I'm not sure when they -- you know, you

6    take this sort of schedule to be approved.

7    Because I wasn't in the meeting, I don't

8    know to what extent the individual

9    directors sort of, you know, made a --

10   a -- and I -- a decision about, you know,

11   we've chosen this piece of -- you know,

12   this operation rather than this operation.

13   They did approve the final program.

14        Q.  Now, when we look at the

15   engineering plans, the people who set the

16   schedules made certain deadlines for

17   BP-owned facilities and deferred other

18   deadlines for mobile offshore drilling

19   units that were being owned by Transocean,

20   among others, drilling wells being

21   operated by BP.  That's true, isn't it?

22             MR. FOWKES:  Object to the

23   form and scope.

24        A.  That's -- can you repeat the

25   question, please?

236

1      Q.  (BY MR. WATTS)  Sure.  You guys

2   applied OMS, you applied S&O audit, you

3   trained your employees on BP-owned

4   facilities in the Gulf of Mexico, and you

5   did that before April the 20th of 2010,

6   right?

7      A.  Yes, that is -- that -- I -- in

8   general, that is correct.

9      Q.  You guys did MARs on BP-owned

10   facilities before April 20, 2010, right?

11   You did gap assessments as well?

12      A.  That is -- that is correct.

13      Q.  But with respect to mobile

14   offshore drilling rigs, like the Deepwater

15   Horizon, where BP was the operator on the

16   wells being drilled therein, BP did no

17   MAR, had no drilling and maintenance

18   procedures, did no safety or S&O audits,

19   and provided no MIT staff training like

20   you did for your own employees.  That's

21   true, right?

22             MR. FOWKES:  Objection to the

23   form and the scope.

24      A.  I'm just -- I think -- I think

25   that is -- that is accurate, and I think,

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1          again, the design -- the design of OMS

 2          and -- and the description of OMS was to

 3          say it applies to BP-operated entities,

 4          and there are other things that you do for

 5          joint venture.

 6                    You know, we didn't take Shell

 7          folks to an MIT academy --

 8               Q.  (BY MR. WATTS)  Well --

 9               A.   -- nor did we do it for the -- the

10          things that were operated by contractors.

11          There were provisions in OMS to say,

12          here's how we would apply it.  We'd want

13          to make sure that Transocean would have,

14          you know, management systems and competent

15          people, but we wouldn't necessarily train

16          them ourselves.

17                    MR. BLANKENSHIP:  Object to

18          the responsiveness.

19               Q.  (BY MR. WATTS)  Do you know what a

20          DWOP is?

21               A.   DWOP?

22               Q.   Yeah.

23               A.   I think that's the drilling

24          operating practice.

25               Q.   Are you aware that the DWOP was
```

**PURSUANT TO CONFIDENTIALITY ORDER**

238

1    not rolled out until the Deepwater Horizon

2    was already on site on the Marianas well?

3                MR. FOWKES:  Objection to form

4    and scope.

5         A.  I'm not aware of that.

6         Q.  (BY MR. WATTS)  Are you aware that

7    the training that BP gave with respect to

8    the DWOP on its BP-owned facilities was

9    not imparted to the employees working on

10   the Deepwater Horizon?  Did you know that?

11        A.  I did not --

12                MR. FOWKES:  Objection,

13   form --

14        A.  -- know that.

15                MR. FOWKES:  -- scope.

16        Q.  (BY MR. WATTS)  You do know that

17   BP delivered a schedule that, with respect

18   to its 2010 action plans, did not call for

19   evaluating barrier effectiveness with each

20   rig team until the fourth quarter of 2010,

21   right?

22                MR. FOWKES:  Objection to

23   form.

24        A.  I don't -- I don't know -- I don't

25   know what --

**PURSUANT TO CONFIDENTIALITY ORDER**

1     Q.  (BY MR. WATTS)  Well --

2     A.  -- document you're reading from

3     there.  I haven't seen that, I don't

4     think.

5     Q.  I'm reading from the document

6     which is tab 60, the Gulf of Mexico

7     engineering plan, Bates page number 818.

8     A.  Let me just get that.

9          MR. McLENDON:  3868.

10    A.  818?  Just can you read the text

11    again for me.

12    Q.  (BY MR. WATTS)  818.  Do you see

13    the 2010 action plan in the right-hand

14    corner?

15    A.  Yeah.

16    Q.  The second row, evaluate barrier

17    effectiveness with each rig team.  It

18    says, fourth quarter 2010, right?

19    A.  It does say that.

20    Q.  And that's with respect to assets

21    that include the Deepwater Horizon, right?

22    A.  I'm just -- I'm reading the -- the

23    scope of the statement.

24         All the document says is that

25    drilling and completing wells with the

```
 1        BP-owned drilling rig, Thunder Horse, and
 2        contracted MODUs -- sorry.  Am I allowed
 3        to read this?
 4           Q.  Yeah.  Read it out loud.
 5           A.  It says, drilling and completing
 6        wells with the BP-owned drilling rig,
 7        Thunder Horse, and contracted MODUs
 8        operating in the SPU fleet --
 9              MR. FOWKES:  You have to slow
10        it down.  Slow it down.  She's typing.
11           Q.  (BY MR. WATTS)  Here, let me read
12        it.  Drilling and completing wells with
13        the BP-owned drilling rig, Thunder Horse,
14        and contracted MODUs operating in the SPU
15        fleet potentially exposes the organization
16        to blowouts and environment spill.  As in
17        2008, the high pressure Thunder Horse
18        wells are considered to be the most
19        vulnerable to this risk.  Planned
20        activities towards managing blowout risks
21        for all BP-owned rigs are detailed below.
22              And do you see under Assets,
23        it's includes not only the BP-owned
24        Thunder Horse and Atlantis, but also the
25        Transocean-owned Horizon and Marianas?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   Yeah.

2      Q.   All right.  And under --

3      A.   I can only -- I can only say is

4   that I know -- I've now got myself

5   familiar with it.  It does say, develop

6   bow-tie identifying controls and recovery

7   measures; evaluate barrier effectiveness

8   with each rig team; 4Q 2010.

9      Q.   4Q 2010 is the fourth quarter of

10   2010, which is after April the 20th of

11   2010; we agree?

12      A.   That is correct.

13      Q.   All right.  Now, here is my

14   question:  Whoever made the decision to

15   not do a MAR analysis, to extend the site

16   operating procedures deadline, to not

17   require a safety and operations audit, to

18   not send employees of rigs where BP is the

19   operator, that person sits on the GORC or

20   the SEEAC of BP p.l.c.; we agree?

21           MR. FOWKES:  Objection to the

22   form and the scope.

23      A.   I think I agree -- I agree that

24   they -- that the person on the SEEAC

25   approved the timetables as we've

**PURSUANT TO CONFIDENTIALITY ORDER**

1    described.

2         Q.  (BY MR. WATTS)  And the scope?

3         A.  And the scope.

4         Q.  Therefore --

5         A.  I -- I --

6         Q.  I'm sorry.

7         A.  All right.  I'm -- I'm not -- I'm

8    not agreeing, because I wasn't in the

9    meetings, that there was an explicit

10   conversation around -- in a

11   line-item-by-line-item sense, you know,

12   this -- the -- the Deepwater Horizon.

13              I -- I agree that there's

14   language saying that in -- you know, in

15   2010, that the -- the rig audit will be

16   moved into the rig audit during 2010.

17              I -- I'm not sure in -- you

18   know, in 2009, 2008, how explicit the

19   conversation was around the scope of

20   the -- the program.

21        Q.  But you've already told me, with

22   respect to both the scope of the program

23   and the timetable for implementation, that

24   was monitored and schedules were set and

25   agreed upon by the GORC and the SEEAC.

1          A.   Agreed upon --

2                MR. FOWKES:   Objection to

3      form.

4          A.   -- by the GORC --

5          Q.   (BY MR. WATTS)   Okay.

6          A.   -- and -- and agreed -- and

7      there's -- there's documentary evidence

8      saying that they agreed to the -- the --

9      the schedule.

10         Q.   Now let me switch bases for you

11     for a second and just ask you this:   I am

12     told -- and you've been doing this a lot

13     longer than I am -- that -- that your

14     industry considers deepwater drilling

15     anything deeper than 3,000 feet.  Have you

16     heard that before or am I being

17     misinformed?

18         A.   I think that's a reasonable

19     caveat.

20         Q.   So let me just ask you this:

21     Every time BP drills a well that is 3,000

22     feet or deeper, before it does so, it has

23     to make a well permit application with the

24     MMS, right?

25         A.   That is my -- I --

**PURSUANT TO CONFIDENTIALITY ORDER**

244

1          MR. FOWKES:  Object to the

2     form.

3          A.  This is -- this is outside of my

4     area of understanding, but I don't have

5     a -- I don't -- that seems reasonable.

6          Q.  (BY MR. WATTS)  And there's a lot

7     of information that you and I won't go

8     through about the well that's included in

9     this well permit application, but one of

10    the pieces of information is which rig

11    it's going to be drilled with.

12         A.  Yes.

13         Q.  You know that, right?

14         A.  Yeah.

15         Q.  So somebody could go in and

16    collect all of the BP well permit

17    applications for a depth of 3,000 feet or

18    greater in the Gulf of Mexico and learn

19    how many wells BP has drilled with its own

20    BP-owned facilities and how many wells BP

21    has drilled with MODUs leased from others,

22    like Transocean?

23              MR. FOWKES:  Objection to the

24    form and the scope.

25         A.  Somebody -- you were saying

**PURSUANT TO CONFIDENTIALITY ORDER**

1    someone -- someone could do that?

2         Q.  (BY MR. WATTS)  Right.

3         A.  Yeah.

4         Q.  Assume with me that I have done

5    that.  If I told you that well more than

6    half of all the wells that BP has ever

7    drilled in the Gulf of Mexico greater than

8    3,000 feet are drilled by MODUs and other

9    facilities leased from others, would that

10   surprise you?

11             MR. FOWKES:  Objection, form,

12   scope.

13        A.  I -- I don't know one way or

14   another.  But if -- if you said a

15   significant proportion, without saying

16   that it was well over half -- I don't have

17   the -- the data in my mind, but it doesn't

18   seem -- it doesn't seem unreasonable.  And

19   if you've actually done the analysis, I've

20   got no reason to doubt the analysis, but I

21   haven't seen it.

22        Q.  (BY MR. WATTS)  Yeah.  And you've

23   been CFO long enough to understand that --

24   that while BP owns, I think it's eight

25   facilities in the Gulf of Mexico that are

1    listed in some of the documents, including
2    the one that you're looking at -- and we
3    could go through them -- it leases and
4    drills a -- a lot of wells with MODUs and
5    rigs leased from others, right?
6              MR. FOWKES:  Objection to the
7    form, scope.
8         A.   Yep.
9         Q.   (BY MR. WATTS)  You know that
10   because, as the CFO, you know how much BP
11   pays to lease all those, right?
12        A.   Yeah, I know -- I understand --
13        Q.   It's considerable?
14        A.   -- I understand that -- I
15   understand that we kind of lease rigs in
16   the Gulf of Mexico and other places from
17   other -- other operators.
18        Q.   And my point is, is that the
19   phenomenon that well more than half of all
20   of the deepwater wells that BP drills are
21   drilled with facilities and MODUs owned by
22   others and leased to BP; that has been
23   true for year after year while you've been
24   the CFO, right?
25              MR. FOWKES:  Object to the

1    form and the scope.

2         A.   Well, I'm not quite -- it's been

3    true for year after year while I've been

4    working for the organization, that's true.

5         Q.   (BY MR. WATTS)   Okay.   Fair

6    enough.

7              And knowing that, that would

8    not be a surprise to the people who are on

9    the GORC and the SEEAC, that well over

10   half of all the deepwater wells that BP

11   has drilled in the Gulf of Mexico are

12   drilled with the facilities and MODUs of

13   others; that's not unknown to the people

14   on GORC and SEEAC, either?

15             MR. FOWKES:   Objection to the

16   form and the scope.

17        A.   I wouldn't say that is -- it is

18   clearly not unknown.

19        Q.   (BY MR. WATTS)   True.

20        A.   I'm -- I'm not sure that they

21   would sort of -- they would -- they would

22   be aware of it, normally, without it being

23   pointed out in the way that you just

24   pointed it out.

25        Q.   Now, at the time that whoever on

248

1    the GORC and the SEEAC permitted the

2    implementation of the six-point plan to

3    not include a MARs analysis, to not

4    include site operating procedures, to not

5    include safety audits for compliance, to

6    not include safety audits on the Deepwater

7    Horizon and to not train the employees of

8    the MODUs who are drilling the wells that

9    BP is an operator for, at the time that

10   decision was made, it was known within BP

11   that most of the wells that are deepwater

12   wells drilled by BP in the Gulf of Mexico

13   were being drilled on facilities leased

14   from others?

15            MR. FOWKES:  Objection to the

16   form and the scope.

17       Q.  (BY MR. WATTS)  That was known,

18   wasn't it?

19            MR. FOWKES:  Same objection.

20       A.  I think I -- I would say that

21   knowledge existed --

22       Q.  (BY MR. WATTS)  Okay.

23       A.  -- but I'm not sure that it was

24   explicit in the minds of the people who

25   are making the decisions in -- in the same

1       way that of our -- a lot of our opera- --

2       a lot of our other operations are operated

3       by others.  You know, we have other

4       operators that run oilfields and other

5       parts of our operations.

6           Q.  Well, in terms of deepwater

7       drilling, the point is, when you-all made

8       the decision at the GORC and SEEAC level

9       about where to apply your six-point plan

10      and your operating management system, it

11      was done so with the knowledge that well

12      over half of the deepwater wells drilled

13      in the Gulf of Mexico were being drilled

14      on the facilities owned and leased from

15      others?

16                  MR. FOWKES:  Objection to the

17      form and the scope.

18          A.  Again, I think that knowledge

19      existed.  I'm not sure it was clear in the

20      minds of the people at the time that they

21      were making the decision.

22          Q.  (BY MR. WATTS)  Now let me see if

23      we can go to a separate issue for a

24      second.

25                  Another thing that was known

PURSUANT TO CONFIDENTIALITY ORDER

1      to you was the spiraling costs of the

2      Marianas (sic) 252 number 1 well, true?

3                  MR. FOWKES:  Objection to the

4      form and the scope.

5           A.  I think I -- again, I -- I don't

6      remember the specifics.  I'm not surprised

7      that the -- that the well was running

8      over -- over budget.  I do know

9      that -- sorry.

10          Q.  (BY MR. WATTS)  You do know what?

11          A.  I know that -- that the Marianas

12     stopped drilling the well, and we started

13     again with the Horizon sometime later.

14          Q.  Let me just ask you this:  I've

15     heard on, I think, three different

16     occasions that you don't know much about

17     the -- the Marianas well; would that be

18     fair?

19          A.  The Marianas well?

20          Q.  The Macondo 252 number 1 well.  I

21     apologize.

22          A.  I don't -- I don't know -- I don't

23     know much about the -- the -- I wasn't

24     involved in the -- in the sort of incident

25     itself, so I don't -- I've got some

**PURSUANT TO CONFIDENTIALITY ORDER**

1    knowledge of it, but I haven't got a

2    detailed knowledge of it.

3        Q.  Yeah.  In -- in terms of the

4    planning of Macondo 252 number 1, do you

5    have specific knowledge of that?

6        A.  In what -- in -- it depends what

7    you mean by planning.

8        Q.  Well, the well planning.  Do --

9    were you involved in that?  Do you have

10   knowledge of it?

11       A.  No, I wouldn't be involved.  I

12   would be involved -- my awareness would be

13   in terms of the business plan; there would

14   be a business plan for exploration.

15       Q.  Yeah.

16       A.  A business plan for exploration

17   would include a rig schedule, a well

18   schedule, so I would be aware that there

19   was a well being drilled.  I would not be

20   aware of the detailed planning of the

21   well.

22       Q.  Okay.  In terms of who was

23   present, who participated, who was

24   supervising the well, that was below your

25   pay grade and you didn't know about that?

1      A.  That is correct.

2      Q.  Okay.  In terms of the drilling of

3   the well, who was present, who

4   participated, who was supervising, you

5   don't have any knowledge of that --

6      A.  No.

7      Q.  -- true?

8           With respect to the completion

9   of the well, in terms of who was present,

10   who was participating, who was

11   supervising, you don't have any knowledge

12   of that?

13      A.  I have no knowledge of that.

14      Q.  In terms of the temporary

15   abandonment, in terms of who was present,

16   who participated, who was supervising, who

17   was involved, you don't have any knowledge

18   of that?

19      A.  I have no knowledge of that.

20      Q.  In terms of the -- excuse me.  In

21   terms of the capping procedures, did you

22   have any knowledge of who was present, who

23   was participating, who was supervising,

24   who was involved?  Do you have any

25   knowledge of that?

**PURSUANT TO CONFIDENTIALITY ORDER**

253

```
 1          A.   Hang on a second.  I'm being --
 2     I'm sort of making -- I'm making a switch
 3     now from the -- the well, to begin with.
 4               When you said the capping,
 5     I -- is that -- that's sort of, do I have
 6     knowledge of who was involved in the -- in
 7     the post --
 8          Q.   The capping of the well.
 9          A.   -- in the post -- yeah, I've got
10     some knowledge of that, but I have no
11     knowledge of who was involved in the --
12     other than what I've kind of, you know,
13     read in the -- in the sort of reports and
14     stuff.
15               MR. FOWKES:  Are you asking
16     now about his personal knowledge or his
17     30(b)(6) on topic 9?
18               MR. WATTS:  Right now I'm
19     asking the questions that I'm asking.
20          Q.   (BY MR. WATTS)  Do you have any
21     knowledge with respect to who was present,
22     who participated, who was supervising, who
23     was involved with respect to the control
24     of the Macondo well, other than what you
25     read in the paper just like me?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1        A.   The control of the well?

2        Q.   Sure.

3        A.   At what point in the well's

4    history?

5        Q.   Well --

6        A.   I mean, pre- -- pre-April the 20th

7    or after the April the 20th?

8        Q.   How about let's talk about

9    pre-April 20.  Do you have any --

10        A.   I have no knowledge pre-April the

11    20th.

12        Q.   Do you have any knowledge as to

13    the well control efforts that were

14    happening on April 19th or 20th?

15             MR. FOWKES:  Object to the

16    form.

17        A.   No.

18        Q.   (BY MR. WATTS)  Okay.

19             MR. FOWKES:  He is -- he is

20    knowledgeable about topic 9.  He's here

21    prepared to testify on that topic.

22             MR. WATTS:  You know what?

23             MR. FOWKES:  I took it your

24    questions were asking about his personal

25    knowledge, and you do -- you weren't

PURSUANT TO CONFIDENTIALITY ORDER

1          phrasing your questions in terms of B --

2          in terms of how the topic 9 is phrased, so

3          I just want to make sure we're -- there's

4          no miscommunication.

5                    MR. WATTS:  And -- and I think

6          that was a classic coaching comment that

7          you --

8                    MR. FOWKES:  No, no.

9                    MR. WATTS:  Hold on.  That is

10         prohibited --

11                   MR. FOWKES:  You're trying

12         to --

13                   MR. WATTS:  Excuse me.

14                   MR. FOWKES:  -- trick the --

15                   MR. WATTS:  Excuse me.

16                   MR. FOWKES:  -- witness.

17                   MR. WATTS:  Excuse me.  That

18         is prohibited by the rules.

19             Q.  (BY MR. WATTS)  Now, here's my

20         question:  How many people work for BP?

21             A.  About 80,000, I think.

22             Q.  Under Rule 30(b)(6), BP can select

23         any one of the 80,000 people to testify on

24         given subjects that we ask about.  Do you

25         agree?

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. FOWKES:  Object to the

2     form.

3          A.  I -- I don't know, but I'm -- if

4     you say that's accurate, then I think

5     that's accurate.

6          Q.  (BY MR. WATTS)  Now, I just asked

7     you questions about the presence,

8     participation, supervision or other

9     involvement of any aspect of the planning,

10    funding, drilling, completion, temporary

11    abandonment, capping and/or control of the

12    Macondo well.  And the way that I asked

13    the questions before this lawyer started

14    talking, you didn't know anything about

15    any of that.  Do you agree?

16         A.  No.  I said -- I said I -- I

17    didn't know -- I knew something about the

18    planning in the sense of the planning the

19    well.  I wasn't aware of the detailed

20    execution and drilling before the incident

21    took place.  Post the incident took place,

22    I was aware of people who were involved in

23    the -- in the capping of it.

24         MR. GODWIN:  Objection, form.

25         Q.  Now, what do you know about --

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1              MR. FOWKES:  Just to be clear,
2       you're -- you're mischaracterizing what
3       topic 9 says --
4              MR. WATTS:  Excuse me.
5              MR. FOWKES:  -- Counsel.
6              MR. WATTS:  Excuse me.  You're
7       not allowed to do that.  Now, you can
8       object to form --
9              MR. GODWIN:  I objected to the
10      form of the last answer and it didn't show
11      up.
12             THE REPORTER:  I didn't hear
13      you, sir.  I'm sorry.
14             MR. GODWIN:  That's okay.
15      Thank you.
16             MR. FOWKES:  Maybe we should
17      call the magistrate right now if you're --
18      well, if you're making an argument that
19      he's not prepared to talk about topic 9.
20             MR. WATTS:  You're talking
21      again.  You're not allowed to do that.
22             MR. FOWKES:  I am, sir.
23             MR. WATTS:  Okay.  You're not.
24      Now, let me ask my questions.  Let me ask
25      my questions, and you can be sure that we
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    are going to call the magistrate if you

2    keep talking.

3         Q.  (BY MR. WATTS)  And here's my

4    question, okay:  With respect to a lawyer

5    who obviously wants you to be the designee

6    on topic number 9 and you all of a sudden

7    have all this knowledge after he coaches

8    you -- here's my question:  (A), what is

9    your knowledge of the planning of this

10   well, and the participation of BP p.l.c.

11   members?

12                MR. FOWKES:  That's a

13   different question.

14                MR. WATTS:  You're talking

15   again.  You're not allowed to talk.

16   You're supposed to say, objection, form,

17   and zip.

18                MR. FOWKES:  I disagree.

19        Q.  (BY MR. WATTS)  Now, my

20   question --

21                MR. FOWKES:  Not if you're

22   misleading the witness.

23        Q.  (BY MR. WATTS)  -- is, what is

24   your knowledge?

25        A.  All right, let me -- I'm sorry.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Can you ask me the ques- -- I just need to

2    sort of --

3        Q.  Sure.

4        A.  -- make sure I'm --

5        Q.  Out of the 80,000 people that BP

6    has, you have been designated as the

7    person who is the corporate representative

8    on a subject.  And my question is, what is

9    your know- --

10       A.  The subject -- on the -- a

11   subject?

12       Q.  What is your knowledge with

13   respect to presence of anybody in the

14   planning of the Macondo well?

15               MR. FOWKES:  Object to the

16   form.

17       A.  The -- the only knowledge I have

18   with respect to the planning of the well

19   is this part of the -- in a

20   business-planning sense, we would plan the

21   well and say, we're going to drill this

22   well in the Gulf of Mexico as part of the

23   annual business plan.

24               We would then go into the Gulf

25   of Mexico SPU and it would be designed --

**PURSUANT TO CONFIDENTIALITY ORDER**

1    and at that point, I -- I have no

2    knowledge of the detailed design of the

3    well.

4         Q.   (BY MR. WATTS)   Okay.

5         A.   But I -- if I just may say, I

6    thought the -- the subject I was here was

7    with respect to the -- you know, the

8    implementation of OMS in the Gulf of

9    Mexico, which I am familiar with, OMS and

10   all of the things --

11              MR. FOWKES:  He's switching

12   topics --

13              THE WITNESS:  Okay.

14              MR. FOWKES:  -- Mr. Armstrong.

15              MR. WATTS:  You're talking

16   again.

17              THE WITNESS:  Sorry.

18              MR. FOWKES:  Let's call the

19   magistrate, Mr. Watts.

20              MR. WATTS:  Well, we'll --

21              MR. FOWKES:  If you're

22   misleading the witness like this, this is

23   unfair.

24              MR. WATTS:  I tell you what,

25   why don't you plan on being in front of

```
1      the magistrate on Friday morning, because
2      we need to discuss this.  And until then,
3      I'm going to keep asking my questions.
4          Q.  (BY MR. WATTS)  And my question
5      is, are you aware of who participated in
6      the planning, the funding, the drilling,
7      the completion, the temporary abandonment,
8      the capping or the control of the Macondo
9      well in any way, shape, form or fashion?
10                 MR. FOWKES:  Object to form.
11         A.  Let me -- ask -- okay.  Let me
12     ask -- ask -- ask me the question again.
13                 MR. WATTS:  Read the question
14     back to him, please.
15                 (Record read.)
16                 MR. FOWKES:  Object to the
17     form.
18                 MR. GODWIN:  Counsel, what is
19     the basis of the objection?  He's reading
20     almost direct from topic number 9.  What's
21     your objection?
22                 MR. FOWKES:  He's not reading
23     direct from topic 9.  That's --
24                 {SPEAKER3}:  What's your
25     objection?
```

```
 1              MR. FOWKES:  -- my objection.
 2              MR. GODWIN:  What's the basis
 3         of your objection you just made?
 4              MR. FOWKES:  That he's not
 5         reading from topic 9.  That's the basis.
 6                   {SPEAKER3}:  Okay, objection.
 7              MR. WATTS:  I'm free to ask
 8         the questions that I'd like --
 9                   {SPEAKER3}:  I object to the
10         form.
11              THE WITNESS:  Yeah, ask me the
12         question -- ask me the question again.
13              MR. WATTS:  Read the
14         question --
15              THE WITNESS:  Thank you.
16              MR. WATTS:  -- a third time.
17              THE WITNESS:  Well, I -- I
18         just want to be clear.  I want to be
19         clear.  I'm going to -- I'm going to hear
20         the question, and then I'm going to answer
21         the question.
22              MR. WATTS:  It's easy to do
23         without a bunch of people talking, I
24         agree.  So let's read the question and get
25         a direct answer with the idea that all the
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        objections are preserved.

 2                    THE WITNESS:  Can you read me

 3        the question again, please?

 4                    (Record read.)

 5            A.  In any --

 6                    MR. FOWKES:  Object to form.

 7            A.   In any way, shape or form or

 8        fashion, now that -- because I want to

 9        make sure I got the question clear, which

10        is am I -- am I aware of anyone who

11        participated or am I aware of all those

12        people who participated.

13                    I am aware of some of the

14        people who participated in the events that

15        you have described in -- in some form.

16        I -- I am not aware -- because it's not my

17        area of expertise.  I don't have an

18        exhaustive list of those people.  I am

19        aware of some people.

20            Q.  (BY MR. WATTS)  Okay.  List the

21        people that you're aware of.

22                    MR. FOWKES:  Object to the

23        form.

24            A.   I'm -- I'm now -- I'm now thinking

25        of the -- the list.  I -- I would say that
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1     in terms of -- what were the categories,

2     financial planning?

3                In terms of -- in terms of the

4     business planning -- in terms of the

5     business planning, that -- that

6     conversation would take place between, you

7     know, Andy Inglis; Mike Daly, who's head

8     of exploration; and Tony Hayward.

9          Q.  (BY MR. WATTS)   Okay.

10         A.   They would -- they would -- at the

11    business-planning level, they would do the

12    business planning.

13         Q.  Andy Inglis, Tony Hayward and who?

14         A.   Mike Daly, who's head of

15    exploration.

16         Q.  All right.

17         A.   And they -- they would decide

18    the -- you know, the business reason to

19    drill the well.

20         Q.  Who decided about the funding of

21    the Macondo well?

22         A.   So there's then a -- there's -- we

23    have a capital approval process inside of

24    the firm as part of our financial control,

25    and there's -- finance memoranda would be

PURSUANT TO CONFIDENTIALITY ORDER

```
 1        created that would say, here's the finance
 2        memoranda for drilling the well.  And
 3        that -- it depends on the -- there are
 4        financial approval limits.
 5                   I think for this well, it
 6        would fall within the delegation -- the
 7        delegated authority of Andy Inglis.
 8             Q.  Okay.
 9             A.  And he and Mike Daly would sign on
10        the -- the finance memoranda for the well.
11             Q.  Okay.  And, I'm sorry, tell me
12        Mike Daly's --
13             A.  Mike Daly --
14             Q.  -- position.
15             A.  -- is head of exploration and
16        production.  And he would be involved --
17             Q.  Now, when you say head of, I
18        thought Andy Inglis was the chief
19        executive officer.
20             A.  I'm sorry.
21             Q.  No, that's okay.  I mean, I'm not
22        trying to interrupt you, but I don't
23        think --
24             A.  No, I'm trying to be --
25             Q.  -- they could both be the heads.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.  Andy is the -- Andy is the chief

2   executive of --

3      Q.  Yes.

4      A.  -- exploration and production.

5      Q.  And Mike Daly --

6      A.  Is the head of exploration and

7   access.

8      Q.  Perfect.  Okay.

9      A.  So this -- this -- if you think

10  about the business model, we kind of do

11  exploration.

12     Q.  Okay.

13     A.  If we make a discovery, we develop

14  it and then we turn it into production.

15     Q.  With you.  Okay.

16     A.  Daly is the guy --

17     Q.  I thought that's --

18     A.  Daly's the guy --

19     Q.  -- what you meant.

20     A.  -- who designs -- he kind of picks

21  the places where we're going to drill the

22  wells.

23     Q.  Okay.  So, so far for business

24  planning we've got Tony Hayward, Andy

25  Inglis and Mike Daly.  For funding we've

1    got Andy Inglis and Mike Daly?

2         A.   Yeah.  So that -- the way the

3    process works, it would be sort of

4    identified in the business plan, and then

5    when you come to capital approval process,

6    which is my area of expertise, then there

7    would be a finance memorandum, which, you

8    know, the people who are -- you know,

9    accountable to that activity would sign

10   off.

11        Q.   In terms of people who

12   participated, supervised or were involved

13   in the drilling of the Macondo well, do

14   you have any knowledge of that?

15        A.   They would be people inside of the

16   Gulf of Mexico drilling organization, and

17   I don't know the names of those people.

18        Q.   Okay.  People involved with the

19   completion of the Macondo well?

20        A.   That would be -- they would be --

21             MR. FOWKES:  Object to the

22   form.

23        A.   -- that would be also the people

24   inside of the Gulf of Mexico organization,

25   in addition to, you know, the folks who

PURSUANT TO CONFIDENTIALITY ORDER

1    worked for the -- you know, the many

2    contractors and subcontractors who were

3    involved.

4         Q.  (BY MR. WATTS)  Okay.  So you

5    don't know who's --

6         A.  I don't know -- I don't know their

7    names.

8              MR. FOWKES:  Object to the

9    form.

10        Q.  (BY MR. WATTS)  In terms of the

11   temporary abandonment, do you know the

12   names of anybody that was involved there?

13        A.  No, I don't.

14        Q.  Okay.  In terms of the capping of

15   the well, do you know who was involved?

16             MR. FOWKES:  Object to the

17   form.

18        A.  I -- I know the names of some of

19   the people who were involved in the

20   response effort, a part of which was

21   capping the well.

22        Q.  (BY MR. WATTS)  Okay.  Who are the

23   names that you want to give me?

24        A.  The -- the names of the people

25   that I know that were involved in that

**PURSUANT TO CONFIDENTIALITY ORDER**

1       would be -- Andy was the se- -- Andy

2       Inglis was the senior VP person involved

3       in -- in sort of coordinating a range of

4       actives and sort of fronting up with

5       the -- you know, he was, obviously, part

6       of the unified command structure that was

7       established because of the -- the scale of

8       the incident, so he -- he was at least the

9       senior VP representative of that.

10          Q.   Okay.

11          A.   There were a whole range of

12      people, you know, from Thad Allen,

13      Secretary Salazar, Secretary --

14          Q.   We're talking about BP people.

15          A.   Okay.  So this -- but I'm making

16      the point that it was a sort of --

17          Q.   No.

18          A.   -- a coordinated effort involving

19      many people.

20          Q.   Tell me about BP --

21          A.   The B- --

22          Q.   -- people.

23          A.   The BP people that I know who were

24      involved -- you know, and I -- I wasn't --

25      I wasn't directly involved, so I just -- I

**PURSUANT TO CONFIDENTIALITY ORDER**

1      know the people who sort of were involved

2      because they weren't part of the normal

3      activity.

4           Q.  Right.

5           A.  We're talking -- well, Doug

6      Suttles wasn't involved in capping, but he

7      was involved in --

8           Q.  PR.

9           A.  -- in -- pardon?

10          Q.  PR.  He did all the interviews.

11          A.  Yeah, but he did -- he actually

12     did -- he did -- he did some of that, and

13     he did some of the managing the

14     environmental impact.

15          Q.  Okay.

16          A.  I think -- I was going to say,

17     Andy was involved.  Richard Lynch was one

18     person who was involved.

19          Q.  What was Richard's title?

20          A.  I don't know.  I don't know -- I

21     don't know what his title was --

22          Q.  Try --

23          A.  -- at the time.

24          Q.  Okay.

25          A.  Gordon Birrell was involved.

**PURSUANT TO CONFIDENTIALITY ORDER**

1     Q.   Okay.

2     A.   James Dupree, I think, was

3 involved in some context.

4     Q.   All right.  Are you aware of

5 anybody that was involved in the -- trying

6 to control the Macondo well during the

7 19th and 20th?

8          MR. FOWKES:  Object to the

9 form.

10    A.   No, I'm not.

11    Q.  (BY MR. WATTS)  Okay.  Andy --

12 Tony Hayward was an employee of BP p.l.c.

13 He was chief executive of p.l.c., right?

14    A.   That is correct.

15    Q.   Andy Inglis, while serving as

16 chief executive of exploration and

17 production, also served on the board of

18 BP p.l.c. at the time?

19    A.   He was the main board of director

20 of BP p.l.c.

21    Q.   Okay.  Mike Daly, the head of

22 exploration and access, was a senior

23 executive for exploration and production

24 for p.l.c.?

25    A.   I'm -- I'm not clear as to the --

272

1    sort of Mike's precise relationship.  What

2    I can say is that he was -- he was not

3    part of the Gulf of Mexico and he was part

4    of Andy's -- Andy Inglis' executive team.

5    Whether that means he's part of p.l.c. or

6    not, I don't know.

7         Q.  Okay.  He was not in the Gulf of

8    Mexico?

9         A.  He was not --

10        Q.  Okay.

11        A.  I can say clearly he was not part

12   of the Gulf of Mexico.

13        Q.  Doug Suttles was the chief

14   operating officer of exploration and

15   production?

16        A.  That is correct.

17        Q.  Richard Lynch held what position?

18        A.  I don't know.

19        Q.  Gordon Birrell held what position?

20        A.  I think, at the time, Ri- --

21   Gordon was the head of safety and

22   operations.

23        Q.  Of p.l.c.?

24        A.  I -- again, I don't know -- I

25   don't know precisely the definition of

**PURSUANT TO CONFIDENTIALITY ORDER**

1       p.l.c.  I know that Gordon --

2           Q.  It's the group function, not

3       the --

4           A.  He was not --

5           Q.  -- exploration and production.

6           A.  Well, no, no.  He was part of --

7       he was part of exploration and production,

8       but he was not -- he was not part of John

9       Baxter's group function.

10          Q.  Oh, okay.

11          A.  He wasn't -- and neither was he

12      part of the Gulf of Mexico.

13          Q.  Okay.  I'm with you.

14                  And James Dupree, what

15      position did James hold?

16          A.  James Dupree, at the time, I

17      think, was the SPUL for the Gulf of

18      Mexico.

19          Q.  Now if you would go to tab 53 very

20      briefly -- and we're almost done.  This is

21      Exhibit 3870.

22                  (Exhibit Number 3870 marked.)

23          Q.  (BY MR. WATTS)  And this -- this

24      is a document from Martin Illingworth, and

25      it shows up in your ex- -- your custodial

```
 1      file.  It's dated November the 5th of
 2      2009.  And let me just take you to Bates
 3      page 442.
 4                This is a document -- my
 5      impression is, is that arrives in your
 6      file because it's shipped out to a bunch
 7      of executives with respect to the progress
 8      of present drilling.
 9                Do you see where it says,
10      Macondo 252.  It says, at 9090, repairing
11      BOP, and the costs are $24.8 million?
12          A.  I see that.
13          Q.  You got this kind of status report
14      on a periodic basis, right?
15          A.  Not in -- not in this form.  What
16      I -- what I did get, as part of Andy's
17      team, was that Andy had a weekly meeting
18      where we got an oral update from his
19      members as to what was happening.  I -- I
20      wouldn't normally receive this level of
21      detailed information.
22          Q.  So you don't know how it got in
23      your custodial file?
24          A.  No, I do not.
25          Q.  Okay.  Let's go to tab 57, which
```

**PURSUANT TO CONFIDENTIALITY ORDER**

275

1          is Exhibit 3871, another one of these from

2          Martin Illingworth, December 3rd, 2009.

3                    (Exhibit Number 3871 marked.)

4               Q.  (BY MR. WATTS)  On the first page

5          it says, rig in dry dock; likely the well

6          be completed by a different rig in 2010;

7          will remove from weekly report until

8          drilling operations resume.

9                    Then we go to the next page.

10         It says, unlikely that Marianas will

11         complete Macondo as rig contract expires

12         on the 30th of December, 2009.  Likely

13         that well will be finished in 2010 by

14         another rig.  Costs are around 47 and a

15         half million dollars to date.

16                    Do you see that, sir?

17              A.  I do see that today.

18              Q.  Again, while this is in your

19         custodial file, your recommenda- -- I

20         mean, your recollection is you had a

21         weekly meeting with Andy where this

22         information would be imparted but you

23         didn't get it in this form, right?

24              A.  That is correct.  I would have an

25         oral update from Mike Daly at the weekly

1    meeting.

2         Q.  Let's go to tab 71.

3              MR. WATTS:  I'm going to mark

4    this as Exhibit 3872.

5              (Exhibit Number 3872 marked.)

6         Q.  (BY MR. WATTS)  Tab 71 is another

7    e-mail from Martin Illingworth that we

8    found in your custodial file.  It

9    discusses Macondo.  It says, fighting

10   losses at 12,350 MD.

11             The next page, on Bates 452,

12   says, current well status, having drilled

13   16 1/2 inch times 20 inch hole to 12,350

14   feet --

15        A.  Hang on just --

16        Q.  -- MD --

17        A.  Hang on just a second.  I'm just

18   sort of --

19        Q.  452.

20        A.  Okay.  451 -- 451 says, fighting

21   losses.

22        Q.  Okay.  451 says, Macondo fighting

23   losses at 12,000 --

24        A.  We're now reading 452.

25        Q.  Hold -- okay, hold on.  451 says,

```
 1            Macondo fighting losses at around 12,350
 2       feet MD.  452 says, current well status on
 3       Macondo 252 number 1, having drilled
 4       16 1/2 inch times 20 inch hole to 12,350
 5       feet MD, took losses and currently
 6       fighting them.  Look ahead is heal losses
 7       and drill ahead.  Costs are around
 8       $65 million.
 9                 Did I read that correctly?
10            A.  You read that correctly.
11            Q.  Again, this information would have
12       been imparted to you at Andy Inglis'
13       weekly meeting, but in a difference format
14       than what's shown in this document; is
15       that right?
16            A.  It -- it -- it may have been, if
17       Mike chose to impart it.
18            Q.  Okay.
19            A.  What I -- what I can't remember is
20       whether or not Mike -- I -- what
21       happened -- I think the process is
22       Mike's -- Martin Illingworth works for
23       Mike.
24                 Martin Illingworth works for
25       Mike Daly, and he would provide Mike Daly
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      with an update -- an operational update.

2      Mike Daly would show up at Andy's meeting

3      and -- and give an operational update,

4      which would cover various items on here,

5      but it may not be everything that was on

6      here.

7          Q.  Did you guys get pre-reads for

8      those meetings?  Maybe that's how it

9      got -- it got in your file but you --

10         A.  No.

11         Q.  -- you hadn't seen it?

12         A.  No, I didn't get pre-reads.

13         Q.  Okay.  All right.  Go to tab --

14         A.  Unless --

15         Q.  Oh, I'm sorry.

16         A.  -- I mean, the only -- the only

17     time I would get a pre-read for the

18     meeting, occasionally Mike or Doug

19     couldn't actually physically be at the

20     meeting, and they may send sort of a -- an

21     e-mail to say, I'm not going to be at the

22     meeting, so here's what I would have said

23     had I been at the meeting.

24         Q.  Fair enough.  Let's go to tab 95,

25     which is not in your notebook, so let me

1          hand it to you.  I'll mark this as 3873.

2                    (Exhibit Number 3873 marked.)

3          Q.  (BY MR. WATTS)  This is an e-mail

4      from Doug Suttles to Barbara Yilmaz, James

5      Dupree and yourself on March the 4th of

6      2010.

7                    And do you see how it's

8      referencing a rig call for the Gulf of

9      Mexico?

10         A.  Yeah.

11         Q.  And it includes a toll-free 1-866

12     number for here in the United States and a

13     United Kingdom dial-in number for over in

14     the UK.  Do you see that?

15         A.  I see that.

16         Q.  Did you ever participate in any of

17     the Gulf of Mexico rig calls where people

18     from England would call in on the Gulf of

19     Mexico rig call?

20         A.  No, I did not.

21         Q.  Let's go to tab 96, which also is

22     not in your notebook.  I previously marked

23     it as 3865.  This is the one where I was

24     confused, I think.

25                    And this is an e-mail from

**PURSUANT TO CONFIDENTIALITY ORDER**

1    James Dupree, dated March the 1st of 2008.

2    Do you see that, sir?

3         A.  Dated March the 1st -- I'm

4    sorry --

5         Q.  Do you see how it says, group

6    leader meeting in Orlando?

7         A.  Yeah.

8         Q.  You attended that group leader

9    meeting that occurred between the 8th and

10   the 10th of March in 2010, right?

11        A.  I did attend that meeting.

12        Q.  Tell me what happened at that

13   group leader meeting.

14        A.  I'm trying to remember.

15        Q.  Well, there were very high-level

16   executives from BP there, including Tony

17   Hayward, right?

18        A.  Tony Hayward -- Tony Hayward led

19   the meeting, so what -- my recollection is

20   that Tony had held a meeting, as soon as

21   he took over as chief executive, in

22   Phoenix, Arizona, at which point he -- he

23   got a group together, and then he did the

24   same thing in Orlando in March 2010.

25                 And I think it was

PURSUANT TO CONFIDENTIALITY ORDER

281

1      basically -- the purpose of the meeting

2      was for sort of -- you know, Tony to get

3      everybody together and, you know, talk

4      about where the firm was and how we were

5      doing against the priorities that he had

6      set, which would have been safety, people

7      and performance.

8          Q.   There were also some cost

9      priorities that were set in terms of how

10     much money each of the SPUs had to create

11     towards the 2010 dividend that were

12     discussed at this meeting -- dividend --

13     who was going to make the money to create

14     the cash to pay the dividend.  That was

15     discussed at this meeting, right?

16         A.   I would have -- I -- I -- I can't

17     remember that explicitly.

18         Q.   All right.

19         A.   I -- I do remember that Byron

20     Grote, who was the -- the chief financial

21     officer, made a presentation on the

22     business plan.  And I think as part of his

23     presentation on the business plan, he

24     would have had a conversation around, here

25     is the financial shape of the firm and

**PURSUANT TO CONFIDENTIALITY ORDER**

1      here's the financial structure of the

2      firm.

3           Q.  Let me take you to tab 33, which

4      has been marked as 3874.

5                (Exhibit Number 3874 marked.)

6           Q.  (BY MR. WATTS)  This is an e-mail

7      that you wrote.  Tab 33.

8           A.  Tab 33?

9           Q.  Yeah, the first notebook.

10               Tab 33 is an e-mail that you

11     wrote on February the 18th of 2009.  Do

12     you see that?

13          A.  Yes.

14          Q.  It's written to George Trefgarne.

15          A.  George Trefgarne.

16          Q.  Andy Inglis is copied?

17          A.  Yeah.

18          Q.  It says, all, have gone through

19     the outline following our meeting this

20     afternoon.  Have tightened it, removed

21     duplicative points and improved logic

22     flow.  I think it is true to our

23     conversation.

24               If you'd go to page 2 of the

25     document, which is the attachment that you

PURSUANT TO CONFIDENTIALITY ORDER

1    provided.

2                    On Bates page 600, you write,

3    2008 was a good year for E&P.  We

4    delivered resource replacement of over 200

5    percent; delivered reserve replacement

6    ratio of 121 percent, the 15th consecutive

7    year of reserves replacing ratio greater

8    than 100 percent; grew production by

9    5 percent, and it goes on; and held cash

10   costs flat with 2007, despite an

11   inflationary environment for the first

12   three quarters of the year.

13                    Is that in the document that

14   you provided that you had gone through and

15   tried to fix?

16        A.  This isn't -- this is a document

17   that I sent to the people at that time.

18   And what it --

19        Q.  Okay.

20        A.  What it -- what the document

21   is --

22        Q.  It's what Andy Inglis uses later,

23   right?

24        A.  It is -- this is an out -- this is

25   basically my doing what I said I'd do,

1    which -- we had a meeting to discuss the

2    annual investor presentation.

3         Q.  Sure.

4         A.  And the BP component -- the BP

5    exploration component of the investor

6    presentation.  This is my record of the

7    meeting that we had and the points that we

8    wanted to make to investors.

9         Q.  And this became the -- the prelude

10   for the speech that Andy Inglis gave to

11   the investors?

12        A.  This would be -- this --

13   eventually --

14        Q.  Yeah.

15        A.  -- several iterations later, it

16   would be the IR speech that Andy would

17   give to investors.

18        Q.  Last --

19        A.  The -- it would be -- this was

20   the -- sort of the beginnings of what

21   would eventually be Andy Inglis'

22   presentation to investors at our annual

23   strategy presentation.

24        Q.  The last bullet point on page 600,

25   we are responding to the current

**PURSUANT TO CONFIDENTIALITY ORDER**

1    environment by driving efficiency into

2    everything we do, cash cost efficiency and

3    capital efficiency.  Did I read that

4    correctly?

5         A.  You read that correctly.

6         Q.  Go to Bates page 609.

7              The second bullet point,

8    between 2006 and 2010, were have delivered

9    a 10 percent efficiency improvement in our

10   days per 10-K across our portfolio.  Do

11   you see that, sir?

12        A.  I do see that.

13        Q.  The next bullet point says, with

14   an annual drilling spend of $5 billion,

15   the 10 percent improvement of 500 million

16   is material.  Did I read that correctly?

17        A.  You read that correctly.

18        Q.  On Bates page 610, the next page,

19   first bullet point says, in 2008 we began

20   to drive sustainable cost efficiency into

21   our business.

22        A.  We also, just on the same page,

23   spoke about improving operational safety

24   by implementing the OMS and investing in

25   the capability of our operating leadership

**PURSUANT TO CONFIDENTIALITY ORDER**

1      by the projects at MIT.

2              MR. WATTS:  Okay.  Objection,

3      nonresponsive.

4          Q.  (BY MR. WATTS)  Page 610, first

5      bullet point, does it say, in 2008 we

6      began to drive sustainable cost efficiency

7      into our business?

8          A.  On page -- sorry.  Which page is

9      it again?

10         Q.  610.

11         A.  610.

12         Q.  First bullet point, does it say,

13     in 2008 we began to drive sustainable cost

14     efficiency into our business?

15         A.  It does say that.

16         Q.  Fourth bullet point:  In 2008 we

17     made a good start on improving cost

18     efficiency by holding our production costs

19     per boe flat despite higher energy costs

20     and sector specific inflation in the first

21     three-quarters of the year.  Did it say

22     that?

23         A.  It does say that.

24         Q.  Next bullet point:  We are now

25     taking advantage of the current

287

1    environment to begin to drive cost

2    deflation through our supply chains.  Does

3    it say that?

4         A.   It does say that.

5              MR. WATTS:  Let's take a break

6    for the videotape change.

7              THE VIDEOGRAPHER:  Off the

8    record at 1:11 p.m.  End of tape 4.

9              (Recess 1:11- 1:21 p.m.)

10             (Exhibit Number 3875 marked.)

11             THE VIDEOGRAPHER:  Back on

12   record, 1:21 p.m., beginning tape 5.

13        Q.   (BY MR. WATTS)  Mr. Armstrong, we

14   just looked at a draft dated February the

15   18th.  I want to take you to June the 6th.

16             If you would go to tab 42, a

17   document I'm marking as 3875, this is an

18   e-mail from Howard Mayson to Andy Inglis,

19   Ian Cavanagh, yourself, and Doug Suttles

20   with respect to a well work update.

21             It says, Andy, Ellis, and

22   Doug.  Latest view on well work for 2009

23   is 79mbd at an efficiency of 7.6, dollar

24   sign, mm, slash, mboed versus GFO little z

25   of 72mbd at 15, dollar sign, mm, slash,

1      mboed.  This represents a reduced spend of

2      circa $500 million at an efficiency

3      materially better than 2008.

4                   Did I roughly read that

5      correctly?

6          A.  You read that correctly.

7          Q.  If you go to the next page on

8      Bates page 344, with respect to the Gulf

9      of Mexico, we have a production moe -- I

10     mean, mboed -- the GFO zero is 4, and the

11     latest view is 6; is that correct?

12         A.  That is correct.  It's difficult

13     to read the production, but I think that's

14     what it is.

15         Q.  All right.  And then we have a

16     cost, dollar sign, per millions of 73

17     under the GFO zero and a 52 under the

18     latest view, right?

19         A.  That is correct.

20         Q.  And an efficiency, dollar sign,

21     mm, slash, mboed under GFO zero of 19, and

22     the latest view is 9, right?

23         A.  That is correct.

24         Q.  Okay.  With respect to the

25     efficiency matrix of dollar sign, mm,

1    slash, mboed, that is the cost per

2    thousand barrels of hydrocarbons

3    extracted, right?

4        A.  That is correct.

5        Q.  Okay.  Now, if we could go to tab

6    43, please, sir.  This is Exhibit 3876.

7            (Exhibit Number 3876 marked.)

8        Q.  (BY MR. WATTS)  It's an e-mail

9    from Jane Wallace to yourself on June the

10   17th of 2009.

11           It says, forward:  Please help

12   us print the attached documents for Ellis.

13           And then the attached document

14   says, Dr. A.B. Hayward, exploration and

15   production second quarter OPR.

16           Again, this is a document you

17   created as a draft that ultimately was

18   used by Dr. Hayward in his presentation to

19   investors made together with Andy Inglis,

20   right?

21       A.  No, that's not accurate.  What --

22   this is --

23       Q.  Okay.  What is it?

24       A.  This is -- this is a -- this is a

25   summary for an internal process.  This

290

1      wouldn't be made to investors; this would

2      basically be -- well, this -- this was

3      a -- a cover note summarizing the

4      performance of exploration and production

5      ahead of a discussion with Tony Hayward

6      about that performance ultimately made

7      from the results presentation.  But this

8      was basically an internal document.  It

9      was part of our --

10          Q.  I understand the distinction.

11          A.  -- internal process.

12          Q.  Okay.  And this is looking at 2009

13     performance, correct?

14          A.  This is looking at 2009

15     performance.

16          Q.  And bottom line, in 2009, under

17     production, it says the full year is now

18     up.

19              In terms of cash costs, cash

20     costs are down 1.9 billion on GFO zero,

21     right?

22          A.  Yep.

23          Q.  Noncash costs, the DD&A continues

24     to improve with a $50 million reduction

25     from the March GFO, correct?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.  Yeah.

2      Q.  If we go to the next page, the

3  capex -- that's capital expenditures,

4  right?

5      A.  Yeah.

6      Q.  It says, the bottom up forecast is

7  now at $15 1/2 billion, down 2 1/2 billion

8  from GFO zero, and 400 million from our

9  March GFO, right?

10      A.  Yeah.

11      Q.  GFO stands for what?

12      A.  Group financial outlook.

13      Q.  Okay.

14      A.  So it's basically the -- it's a

15  financial forecast.

16      Q.  And so this is saying that the

17  capex has been reduced $2 1/2 billion from

18  the group financial outlook at the

19  beginning of the year, and 400 million of

20  that came since the March group financial

21  outlook, right?

22      A.  That's correct.

23      Q.  Now, as we continue to go forward

24  to Bates page -- well, the same Bates page

25  under the purpose, second paragraph --

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1          A.   Now, this is a switch.  Just to --
 2     this is a -- we're switching now from the
 3     2009 performance to --
 4          Q.   2010 and '11.
 5          A.   -- the intention behind the
 6     business plan going forwards.
 7          Q.   Okay.  So in other words, what
 8     you're saying is, everything I've just
 9     read is with respect to 2009.  What we're
10     about to get into is the plan for 2010 and
11     '11?
12          A.   That is correct.
13          Q.   Okay.  Good enough.
14               The second paragraph says, we
15     are aiming to grow earnings by 5 percent
16     through a combination of 1 to 2 percent
17     volume growth and 3 to 4 percent
18     efficiency improvement, by creating a
19     sustainable approach to both cost
20     efficiency and capital efficiency.
21               Did I read that correctly?
22          A.   You read that correctly.
23          Q.   Now, I'd like to visit with you a
24     little bit about 2010.  If you could go to
25     tab 40, which is Exhibit 3877.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1                     (Exhibit Number 3877 marked.)
2         A.  Tab 40.
3                     MR. FOWKES:  And what was the
4         exhibit number for the one we were just
5         reading from?
6                     MR. WATTS:  3876.
7                     MR. FOWKES:  Okay.  Thank you.
8         Q.  (BY MR. WATTS)  Tab 40 I've marked
9         as 3877.  This is an e-mail from Martin
10        Myers dated May 28th of 2009 to a number
11        of people, but you're copied on it; is
12        that right?
13        A.  That is correct.
14        Q.  And it says -- down below, it
15        says, note from Randy on 2010 cash flow.
16                    Do you see that?  That's one
17        of the attached documents?
18        A.  I can see that.
19        Q.  You can?
20        A.  That is -- let me just read this.
21        Q.  Please find attached the following
22        documents.  The third attachment is note
23        from Randy on 2010 cash flow.
24                    Do you see that?
25        A.  I can see that, yeah.  I don't --
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    yeah.

2         Q.   And then what I've done is I've

3    attached that attachment, the note from

4    Randy.   It's Bates page number beginning

5    331.

6         A.   Yeah.

7         Q.   And it says, Andy.   And then 2010

8    cash flow.   It says, this note is intended

9    to give some context for the 2010 cash

10   flow projection in the financial frame.

11   The $4.8 billion is modeled based on 2009

12   cash flow plus known input changes from

13   2009 to 2010.

14              And then it says, the March

15   2009 group financial outlook is used as

16   the basis for 2009, which, as you know,

17   includes significant overviews.   The cash

18   flow bridge from 2009, 3.6 billion, to

19   2010, 4.8 billion, is presented in the

20   following table.

21              And then the total difference

22   is the billion 2 between 3.6 to 4.8.

23        A.   Wait a second.   You're just going

24   too fast even for me.

25        Q.   Okay.

295

1      A.  Okay.  The cash flow from 3.6 to

2  4.8.  I got that.

3      Q.  Now, below that table, it says, we

4  have informally collected top-down cash

5  flow estimates from the strategic

6  performance units.  These currently get us

7  into the range of 3.8 billion to 4.2

8  billion dollars, but we have maintained

9  the frame at $4.8 billion, recognizing

10  that some level of segment overview is

11  required based on history.

12          Do you see that, sir?

13      A.  I do see that.

14      Q.  And then it says, we'll continue

15  to scrub these numbers, with help from the

16  strategic performance units, and look for

17  insights from the June group financial

18  outlook, to increase our confidence ahead

19  of OPR.

20          What does OPR stand for?

21      A.  That is the -- that's operating

22  performance review, which they --

23      Q.  Okay.

24      A.  The previous -- the prior document

25  that we looked at here, which you said --

1    this -- this was the cover note for the

2    operating performance review.

3        Q.  Okay.

4        A.  So we have each quarter --

5        Q.  Is that Performanz Fest?

6        A.  No, that's different.

7        Q.  All right.

8        A.  Each -- each quarter, Andy would

9    have a -- a performance review with Tony

10   Hayward, which is called the operating

11   performance review, and -- and that's what

12   the OPR is.

13       Q.  Now, Randy writes, beyond the 4.8

14   billion, we can see some sources of

15   potential upside, as follows.  And he sees

16   $600 million posttax if you have a 1.5

17   percent production growth, $300 million in

18   capex, and North Sea gas price upside of

19   $300 million, for a total of a billion 2,

20   right?

21       A.  Yeah.

22       Q.  This would get us to around 6

23   billion at $50 oil and $4 gas -- it

24   doesn't say that, but 50, slash, 4, that's

25   what he's talking about, right?

1        A.   That's -- that is Brent oil price,

2   $50, and $4 Henry Hub gas price.

3        Q.   At this level, we would not

4   entirely cover the E&P share of the group

5   cash requirements, which is roughly 7

6   billion for dividend only to 8.8 billion,

7   dividend interest and OB&C.

8             What is OB&C?

9        A.   That stands for other businesses

10  and corporate.  It's basically --

11       Q.   Yeah.

12       A.   -- so the -- the point of the

13  comment is that exploration and production

14  is part of the -- part of BP.  So as part

15  of the business, we have to cover -- well,

16  the whole business is going to cover

17  the -- the dividend, the corporate

18  interest costs, and OB&C is basically the

19  cost of the corporate center.

20       Q.   Sure.

21       A.   The cost of that corporate center

22  gets split out, divvied out.

23       Q.   Okay.  So the bottom line is -- is

24  that in order to cover the dividend, the

25  corporate interest and the cost of the

PURSUANT TO CONFIDENTIALITY ORDER

298

1    corporate governance, for lack of a better

2    word, the OB&C --

3         A.  Yeah.

4         Q.  -- the different business units

5    have to come up with $8.8 billion to meet

6    the financial plan, right?

7              MR. FOWKES:  Objection to the

8    form and scope.

9         A.  Well, or 7 -- or 7, depending on

10   what -- on what -- well, no, the -- you're

11   right.  The dividend share is 7, and in

12   addition to the dividend, if it's the --

13   if there's a bit of everything else, it

14   would be 8.8.

15        Q.  (BY MR. WATTS)  Now, what Randy is

16   saying here is, look, maybe we can get

17   from 3.8 to 4.2 up to 4.8.  I can see a

18   way that we could get to 6, but we're

19   still going to be short of the 7 billion,

20   which is the E&P share of the dividend, or

21   8.8 billion, which is the E&P share of the

22   dividend, interest, and OB&C, right?

23              MR. FOWKES:  Object to the

24   form and the scope.

25        A.  Yeah, that is -- I think that is

**PURSUANT TO CONFIDENTIALITY ORDER**

1      an accurate interpretation of Randy's --

2      Randy's note.

3            Q.  (BY MR. WATTS)  Okay.

4            A.  This is an early -- early stage in

5      the planning process.

6            Q.  Sure.

7            A.  Because that's -- that's sort

8      of -- this is like, you know, initial

9      scoping.

10           Q.  Yeah.

11           A.  But in terms of initial scoping,

12     that would be an accurate statement.

13           Q.  In terms of the initial scoping,

14     you've either got to cut the dividend or

15     you've got to find the cash for E&P to

16     meet its share of the dividend?

17           A.  Yep, that is -- that is -- that

18     is -- or change the planning process, I'm

19     sure.

20           Q.  Let's go to tab 44, which is

21     Exhibit 3878.

22                  (Exhibit Number 3878 marked.)

23           Q.  (BY MR. WATTS)  This is an e-mail

24     that you wrote on June the 17th after

25     Randy's note in 2009.

**PURSUANT TO CONFIDENTIALITY ORDER**

It's entitled 2009

2OPR_pre-read, version 11, June1609.ppt.

If you go about five

paragraphs down to the paragraph that

begins, finally, you write, finally, we

need to care -- clarify the cash flow

options point on the cover note.

Do you see that, sir?

A.  Yep.

Q.  A sentence down from that, my

sense is that we have delivered 1.2

billion of options and reduced the working

capital overview by 500 million to 300

million of actual improvement and 250

million from removing the debtor days.

Did I read that correctly?

A.  You read that correctly.

Q.  You are working on how to get the

cash flow such that you-all at E&P can

meet your share of the dividend, the

corporate interest, and the corporate

overhead expenses?

A.  In a planning sense, that's --

that is correct.

Q.  Okay.  If you would go to tab 46,

**PURSUANT TO CONFIDENTIALITY ORDER**

1      please, which I'll mark as Exhibit 3879.

2               (Exhibit Number 3879 marked.)

3          Q.   (BY MR. WATTS)   What I want to ask

4      you about is the e-mail that you wrote at

5      the bottom of page 1 on July 29 to G MOR

6      Upstream SLT.

7               MOR is what?

8          A.   It's just a -- it's an e-mail

9      server.

10          Q.   Okay.   Upstream SLT is safety

11      leadership team?

12          A.   No, it's not.   It's the segment

13      leadership team.

14          Q.   Segment leadership team.

15          A.   So this -- this is -- the segment

16      leadership team consists of all of the SPU

17      leaders.

18          Q.   Okay.

19          A.   So the people who are leading the

20      SPU, and then all of the CFOs in the SPUs.

21          Q.   And they're getting together at a

22      September Performanz, with a Z, Fest.

23               And your note says, please

24      find attached a note and slides regarding

25      the September Performanz Fest, right?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   That is correct.

2      Q.   Now, here's what I want to ask you

3   about.

4           If you would go to page 208 of

5   the document, attachment 1 for the

6   Performanz Fest agenda, under 2, plan

7   shape, fourth bullet point says, cash

8   costs:  Contribution to -- to 9 billion in

9   2010.

10          Do you see that, sir?

11     A.   I can see that.

12     Q.   Now, in this plan shape, somebody

13  has changed the plan for E&P's

14  contribution to the dividend, corporate

15  interest, and overhead expenses from 8.8

16  billion to 9 billion for 2010, right?

17     A.   Well, that's what -- that's what

18  Randy was saying at the time he said it.

19     Q.   Well, Randy said 8.8.  This is now

20  saying it's got to be 9 billion for E&P's

21  portion of the dividend, the corporate

22  interest, and --

23     A.   No, no, no, no.  That's a

24  different interpretation.  That's --

25  sorry.  I need to be clear.

PURSUANT TO CONFIDENTIALITY ORDER

303

```
 1              Randy did -- Randy's piece of
 2     work was saying, when you looked at the
 3     plan shape that we had at that point in
 4     time, if you -- basically, the note that
 5     you read out was saying that we're doing
 6     an initial scoping study, and our share of
 7     the dividend is --
 8          Q.  Your cash cost?
 9          A.  No, no, no.  Hang on a second.
10          Q.  Okay.
11          A.  Now I need to be --
12          Q.  Go ahead.
13          A.  This is my area of expertise.  I
14     need to be precise.
15          Q.  Please.
16          A.  He was saying that our share of
17     the dividend plus the overhead costs was
18     8.8.
19          Q.  Gotcha.
20          A.  Okay.  This is saying that we
21     think that the total cash cost of the
22     exploration and production was $9 billion.
23          Q.  I gotcha.
24          A.  And that -- that's kind of part of
25     the financial plan, which ultimately would
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    deliver the 8.8.  But this was a -- this
2    was a cash cost number.
3        Q.  I agree with you, and I agree it's
4    apples and oranges, and I apologize to
5    you.  It wasn't intentional.
6            Okay.  Go to page 213.  Again,
7    under plan shape, we can see the cash
8    costs, contribution to 9 billion in 2010.
9    That is the amount of cash that's going to
10   be expended to generate the 8.8?
11       A.  Correct.
12       Q.  Okay.
13       A.  Well, it's the amount of -- it's
14   the amount of sort of day-to-day operating
15   costs as distinct from the amount of
16   capital investment.
17       Q.  Right.  And --
18       A.  So this --
19       Q.  I'm sorry.  Go ahead.
20       A.  So this -- this -- you know, this
21   would cover the -- you know, the -- the
22   operating costs of running the various
23   pieces of business.
24       Q.  The operating costs in the budget
25   for 2008 had gone down from 2007, true?

**PURSUANT TO CONFIDENTIALITY ORDER**

305

1      A.   I --

2             MR. FOWKES:  Objection to form

3      and scope.

4      A.   The operating costs -- I can't --

5      I can't remember -- I can't remember, but

6      the -- the presentation that you pointed

7      to said something about the trend from

8      operating costs, and it's -- that --

9      that's the point that you're talking

10     about, and I haven't got a number in my

11     head.

12     Q.   (BY MR. WATTS)  The operating

13     costs for 2009 went down from what it was

14     in 2008?

15             MR. FOWKES:  Objection to form

16     and scope.

17     A.   No, I'm not -- I don't know that.

18     I do know this -- what this statement is

19     saying is that we had a -- a goal to get

20     to $9 billion in 2010.

21     Q.   (BY MR. WATTS)  Sure.

22     A.   And I don't -- I don't have in my

23     head what the number was in 2008.

24     Q.   Okay.  The planned operating cost

25     for 2010 was less than in 2009?

**PURSUANT TO CONFIDENTIALITY ORDER**

306

1        MR. FOWKES:  Objection to the

2   form and the scope.

3        A.  I'm not -- I don't know that it

4   was planned to be lower.  This is saying

5   that we were planning for a number of $9

6   billion in 2010.

7        Q.  (BY MR. WATTS)  Okay.

8        A.  And we were planning to review the

9   trend in each SPU by cost type.  And one

10  of those cost types would have been

11  investment in safety and operational risk,

12  which would be committed to maintain.

13       Q.  Go to 214, please.  Under cash

14  costs, the presentation says, how are you

15  underpinning your share of the $9 billion

16  target for 2010?

17            Do you see that?

18       A.  I do see that.

19       Q.  Next bullet point, how do we get

20  greater traction on reducing SPU level

21  costs to ensure PSCM and efficiency gains

22  begin to show up in the financial results?

23            Did I read that correctly?

24       A.  You did.

25       Q.  If you would go to 217, please.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Again, we have a slide with respect to

2    cash costs.

3              The second-to-the-last bullet

4    point says, what other actions are you

5    planning to take to reduce SPU level

6    costs?

7              Do you see that, sir?

8         A.   Yeah.

9         Q.   All right.  Now, let me get you to

10   go to tab 48, please.

11              MR. WATTS:  And I'll mark this

12   as Exhibit 3880.

13              (Exhibit Number 3880 marked.)

14         Q.  (BY MR. WATTS)  And this is an

15   e-mail from Mr. Price to Andy Inglis and

16   yourself down at the bottom on August the

17   13th of 2009.  Do you see that?

18         A.   Uh-huh.

19         Q.   In preparation for the purple book

20   call -- what is the purple book?

21         A.   The purple book is an adjunct to

22   the orange book.  So the orange book has

23   got safety information in it, and the

24   purple book is focused on operating

25   information.

PURSUANT TO CONFIDENTIALITY ORDER

1    Q.  Okay.  Financial information as

2    well?

3    A.  No, no, no.  It's operating.  So

4    I've got the -- there's a GFO, which is

5    the financial, the orange book, which we

6    created -- I created for the safety, and

7    the purple book was the operating

8    information, which has got things like

9    days per 10,000 feet and other -- other

10   operating metrics that are in part

11   financial, but they're mostly

12   nonfinancial.

13   Q.  Let's go to 002, last two lines of

14   the page.

15   A.  Hang on.  002?

16   Q.  Yes, sir.

17        It says, the D&C community --

18   that's the drilling and completions

19   community -- remains engaged on many

20   fronts to reduce costs, improve

21   efficiency, and more effectively leverage

22   our overall capability and know-how.

23        Did I read that correctly?

24   A.  You read that correctly.

25   Q.  All right.  Go to tab 36, which is

 1       Bates -- which is going to be Exhibit

 2       3881.

 3                    (Exhibit Number 3881 marked.)

 4            Q.  (BY MR. WATTS)  On Bates (sic) 36,

 5       the middle of the page, there's an e-mail

 6       from you to Andy Inglis on March the 18th

 7       of 2009.

 8                    Do you see that, sir?

 9            A.  I do see that.

10            Q.  Now, as we look at Exhibit 3881

11       and what you wrote to Mr. Inglis, third

12       line, you say, attached is a data support

13       pack with the follow-up items we spoke

14       about on Sunday.  And the third bullet

15       point is --

16            A.  Hang on just a second.  I'm just

17       trying to find that.

18            Q.  Right here.

19            A.  Oh, yeah.  Also attached is the

20       data support pack.  Yeah.

21            Q.  Okay.  Also attached is the data

22       support pack with the follow-up items we

23       spoke about on Sunday.  And the third

24       bullet point says, progress on

25       underpinning the cash flow overview.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Did I read that correctly?

2      A.  Yes, you did.

3      Q.  Now, with respect to that Exhibit

4      3881 --

5      A.  Which is 3881?

6      Q.  This one.

7          MR. FOWKES:  No.

8      Q.  (BY MR. WATTS)  Go to Bates 225.

9      A.  All right.

10     Q.  We now see a memo from Andy Inglis

11     the same day to Dr. Hayward, and it

12     appears to forward attachments that you

13     forwarded on March the 19th of 2009 at

14     12:46.

15         You wrote this for Mr. Inglis,

16     didn't you?

17         MR. FOWKES:  Object to the

18     form.

19     A.  I would -- I would have -- I would

20     have written it, and Andy would have

21     modified it.

22     Q.  (BY MR. WATTS)  Sure.  Down at the

23     bottom, the paragraph that begins, we will

24     use the output from our conversations to

25     then steer the discussions in our April

PURSUANT TO CONFIDENTIALITY ORDER

311

1      Performanz Fest, where strategic

2      performance unit by strategic performance

3      unit we will look to shape the 2010/2011

4      capex and cash cost frame, including:

5      assumptions on execution efficiency

6      improvements; assumptions on unit cost

7      reductions through deflation; and biases

8      on highly graded activity set and pace.

9                That's what you wrote, right?

10         A.   That is -- well, that is -- that

11     is what I wrote and which Andy forwarded

12     to Tony.

13         Q.   All right.  If you would go to tab

14     49, please, sir.  This is Exhibit 3882.

15               (Exhibit Number 3882 marked.)

16         Q.   (BY MR. WATTS)  This is an e-mail

17     that you wrote on August the 28th of 2009

18     to Mr. Inglis, Mr. Daly, Mr. Suttles, Neil

19     Shaw, Andy Hopwood, and cc'd to others,

20     right?

21         A.   That is correct.

22         Q.   It says, all, attached is the

23     working version of the board strategy

24     update that will be discussed at the ETM

25     next week.

**PURSUANT TO CONFIDENTIALITY ORDER**

312

```
1        A.   That is correct.

2        Q.   Now, let me take you to the next

3   page.

4             Do you see the exploration and

5   production strategic update for the board

6   meeting that's going to occur on September

7   16-17, 2009?

8        A.   Uh-huh.

9        Q.   Yes?

10        A.   I see that, yes.

11        Q.   The board meeting is the BP p.l.c.

12   board, right?

13        A.   Yes, that is the BP p.l.c. board.

14        Q.   Now, in terms of the second page

15   of the slide for the strategic update for

16   exploration and production, it says, among

17   other things, we have restored operational

18   momentum; competitive volume growth

19   through strong delivery in both major

20   projects and existing operations;

21   competitive cost performance; competitive

22   reserve and resource replacement; dot,

23   dot, dot, we have more to do on improving

24   operating efficiency - cost and volume -

25   and capital efficiency.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

313

```
 1                    Did I read that correctly?
 2           A.   You did.  And there's other text
 3      that begins with saying, we have made
 4      significant progress in running safe and
 5      reliable operations, including
 6      improvements in personal safety and
 7      process safety.
 8                    MR. WATTS:  Objection,
 9      nonresponsive to everything after "you
10      did."
11           Q.   If you would go to Bates page
12      number 369, please, sir.
13                    The graph on the top of this
14      page, page 10 of the PowerPoint, says,
15      competitive cost performance:  In 2008 we
16      began to drive cost efficiency into our
17      business.
18                    And then there's a graph of a
19      chart which on the x-axis has 2003 through
20      the first half of 2009, and on the y-axis
21      has production costs, dollars per boe.
22                    Do you see that, sir?
23           A.   That is correct.
24           Q.   And, basically, it shows Exxon,
25      Shell, and Chevron, their dollars per boe
```

**PURSUANT TO CONFIDENTIALITY ORDER**

314

1     are continuing to rise between 2003 and

2     the first half of 2009.  But sometime in

3     the middle of 2007, towards the beginning

4     of 2008, BP's line begins to go down,

5     right?

6          A.  That is correct.

7          Q.  All right.  Go to the next page,

8     please, sir.

9               Page 11, the second bullet

10    point says, in 2008 we made a good start

11    on improving cost efficiency.  We held

12    both our absolute and unit production

13    costs flat despite higher energy costs and

14    sector-specific inflation in the first

15    three quarters of the year.

16               In the first half of 2009, our

17    unit production costs were down 11 percent

18    versus the same period in 2008.

19               Did I read that correctly?

20          A.  You did.

21          Q.  If you go to Bates page 382, sir.

22    This is the exploration and production

23    future presentation to the board meeting

24    September 16 and 17, right?

25          A.  Yeah.

**PURSUANT TO CONFIDENTIALITY ORDER**

315

1          Q.   And the next page, the second

2     bullet point, in the near term, we are

3     aiming to deliver competitive performance

4     from our existing portfolio by growing

5     earnings at 4 to 5 percent per year

6     through a combination of -- first bullet

7     point says, 1 to 2 percent volume growth.

8     The second bullet point says, 3 to

9     4 percent efficiency growth.

10          Did I read that correctly?

11     A.   Yes, you did.

12     Q.   Those are the words that you wrote

13     to Andy Inglis some months back that ended

14     up in the presentation to the board of

15     directors?

16     A.   That is correct.

17     Q.   All right.  And if you go to Bates

18     page number 405, we can see --

19     A.   Bates page 405.  Let me just find

20     my way through.

21     Q.   We can see a graphic that is

22     representative of what you had written

23     before, and that is 1 to 2 percent volume

24     growth plus 3 to 4 percent efficiency

25     improvement equals 4 to 5 percent earnings

**PURSUANT TO CONFIDENTIALITY ORDER**

316

1       growth, right?

2                   MR. FOWKES:  Objection to the

3       form and the scope.

4           A.  That is indeed what it says.

5           Q.  (BY MR. WATTS)  Okay.  Now, if we

6       could, I want to switch gears with you and

7       go to tab 58, please.  This is being

8       marked as Exhibit 3883.

9                   (Exhibit Number 3883 marked.)

10          Q.  (BY MR. WATTS)  And this is an

11      e-mail from you to Doug Suttles, the chief

12      operating officer of exploration and

13      production, on December the 4th of 2009,

14      and there are a lot of attachments.

15                  Do you see that, sir?

16          A.  Yes, I do.

17          Q.  And about four lines down in the

18      attachment, there is a 2010 SPUL IPC for

19      the Gulf of Mexico.

20                  Do you see that, sir?

21          A.  That is correct.

22          Q.  Now, if -- before we get to that

23      attachment, there is an e-mail below from

24      Christina Verchere to Kathy Wu, copied to

25      you.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          Who is Christina Verchere?

2      A.   Christina Verchere at the time

3  would have been Andy Inglis' chief of

4  staff.

5      Q.   Okay.  Dated December 3 of 2009.

6  It says, Andy went through the cover note

7  and the IPCs on the plane.

8          IPC is individual performance

9  contracts, right?

10      A.   That is correct.

11      Q.   Have attached the final draft sent

12  to the SPULs -- that would be the

13  strategic performance unit leaders.

14          He added a paragraph to the

15  cover note on the rationale for the

16  5 percent cash cost improvement for

17  exceptional performance.

18          Do you see that, sir?

19      A.   I see that.

20      Q.   Now, if you go to the

21  attachment -- and this is the

22  attachment -- one of the things that he

23  says under exceptional performance at the

24  bottom of the Bates page 397, aligned with

25  Performanz Fest discussions in September.

1    And then it says, included 5 percent cash

2    cost efficiency improvement versus 2010

3    base plan (without impacting S&OI).  The

4    rationale behind this is:  2010 plan

5    segment cash costs of 9.6 billion were set

6    when the forecast for the outturn for '09

7    cash cost was 10.2 billion - i.e., a $600

8    million improvement.

9              Going to the next page, 2009

10   forecast cash cost outturn is now 9.85

11   billion and is likely to come in circa 150

12   million lower at 9.7 billion.

13             A 600 million improvement 2010

14   versus 2009 would lead to 9.1 billion

15   outturn for 2010; this is a 5 percent

16   improvement versus the current plan of 9.6

17   billion.

18             Given the lack of volumetric

19   momentum 2010 versus 2009, it is

20   imperative that we maintain the cash cost

21   momentum; hence it is appropriate to

22   include the 5 percent improvement in cash

23   costs versus '09 as an exceptional target.

24             Did I read that correctly?

25             MR. FOWKES:  Object to the

319

1      form and the scope.

2           A.   Yeah, you read that correctly.

3           Q.   (BY MR. WATTS)   Now, you-all were

4      projecting that you were not going to have

5      the increase in volume of 1 to 2 percent

6      during 2010 that you needed to meet the 4

7      to 5 percent earnings increase that your

8      graph talked about, right?

9                MR. FOWKES:   Objection to the

10     form and the scope.

11          A.   That is the -- that is the sense

12     of the document.

13          Q.   (BY MR. WATTS)   And so what Andy

14     is saying is -- is that because we're not

15     going to have the increase in production,

16     we need to keep the cash cost momentum in

17     order to meet our target, right?

18               MR. FOWKES:   Objection to the

19     form and the scope.

20          A.   What he's saying is that we -- we

21     need to have a focus on cash cost

22     efficiency without impacting S&OI to meet

23     the 5 percent target.

24          Q.   (BY MR. WATTS)   Okay.   Now, if you

25     could go to tab 59 real quick.   Tab 59,

320

1    Exhibit 3884.

2              (Exhibit Number 3884 marked.)

3         Q.  (BY MR. WATTS)  This is from Kathy

4    Wu to a number of people, and you are

5    copied on this document, right?

6         A.  Yes.

7         Q.  It says, please find attached the

8    updated draft 2010 strategy presentation.

9              And then we have the

10   attachment, and the draft says, Andy

11   Inglis, chief executive, exploration and

12   production, right?

13        A.  Correct.

14        Q.  Now, as we look at this, the big

15   messages to take away here today, he says,

16   well, we continue to strengthen the

17   portfolio to underpin long-term value

18   (sic) growth.  I am now confident we can

19   sustain our production growth of 1 to

20   2 percent p.a. out to 2020.

21              We are resolutely focused on

22   sustainable capital and cost efficiency to

23   drive profit growth, greater volume

24   growth.  We have been making progress, but

25   there is much more to go.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1                      Did I read that correctly?
2                      MR. FOWKES:  Objection to the
3           form and the scope.
4               A.  You read that correctly.
5               Q.  (BY MR. WATTS)  Go to Bates page
6           871, please.
7                      MS. EHRHART:  What page was
8           that?
9                      MR. WATTS:  871.
10                     MS. EHRHART:  Thank you.
11              Q.  (BY MR. WATTS)  Under drilling
12          performance, it says, we spend around $6
13          1/2 billion a year on drilling and
14          completion, with 60 percent on drilling.
15          If we improve the drilling efficiency,
16          open paren, fewer days, close paren, of
17          our wells, we improve our drilling cost
18          performance.
19                     Did I read that correctly?
20              A.  You read that correctly.
21              Q.  Now, the next bullet point, second
22          subbullet point, says, with respect to
23          drilling performance, we have improved
24          circa 15 percent over the last two
25          years ...
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1          Now, it doesn't take a CFO of

2    a company to understand that when you're

3    paying a million dollars a day for a rig,

4    if you can bring a well home in less days

5    than more days, you save money, right?

6               MR. FOWKES:  Objection to the

7    form and scope.

8        A.   That is -- that is -- that is

9    correct.

10       Q.   (BY MR. WATTS)  Okay.  Would you

11   go to tab 64, which I'll mark as 3885,

12   please, sir.

13               (Exhibit Number 3885 marked.)

14       Q.   (BY MR. WATTS)  This is an e-mail

15   that you wrote on February the 2nd of 2010

16   to Doug Suttles and Bruce Price, right?

17       A.   Uh-huh, it is.

18       Q.   Doug Suttles is the chief

19   operating officer of exploration and

20   production.

21               Who is Bruce Price?

22       A.   Bruce Price is his executive

23   assistant.

24       Q.   And Richard Eaton, who is copied,

25   who is that?

PURSUANT TO CONFIDENTIALITY ORDER

323

1      A.   Richard would be my executive

2   assistant at the time.

3      Q.   Forwarding our next mission, the

4   SLT pack.   That's the segment leadership

5   team pack, right?

6      A.   Yeah.

7      Q.   This would be the pack that's put

8   together for a meeting of all the SPU

9   leaders and their CFOs?

10      A.   No, it would only -- the SLT would

11   only be the SPU leaders.

12      Q.   Okay.

13      A.   I copied the CFOs just to keep

14   them informed.

15      Q.   I gotcha.   Thank you.

16            And you say, basically, on the

17   second line, it will give you an idea of

18   the direction we're headed in, meaning the

19   attachment, so I want to talk to you about

20   the attachment.

21            If you'll go to Bates page

22   number 111, the 2009 year-end results,

23   market reaction and implications for 2010.

24   You say, as we reflect on our strong

25   delivery in 2009 and focus on the

**PURSUANT TO CONFIDENTIALITY ORDER**

 1          challenges in 2010, it's important that we

 2          keep our eyes on the frame to which we

 3          have committed in order to achieve sector

 4          leadership:  Sustained modest volume

 5          growth and sustained efficiency

 6          improvement so that earnings, slash,

 7          returns grow faster than volumes.

 8                      In this plan we expressed this

 9          as 1 to 2 percent volume growth plus 3 to

10          4 percent efficiency growth equals 4 to 5

11          percent earnings growth.  We believe this

12          will be competitive.

13                      We delivered this in 2009, but

14          we are short of momentum in 2010.

15                      Did I read that correctly?

16                      MR. FOWKES:  Objection to the

17          form and scope.

18              A.  You read that -- you read that

19          correctly.

20              Q.  (BY MR. WATTS)  Now, if you go to

21          the next page where we're talking

22          specifically about 2010, about four

23          paragraphs down, it says, given our track

24          record in 2009, when we did better than

25          plan on volume, cash costs and DD&A, we

**PURSUANT TO CONFIDENTIALITY ORDER**

 1      could create forward momentum through a

 2      combination of -- the first one is

 3      increasing production above the plan,

 4      right?

 5          A.   Uh-huh.

 6          Q.   And the second one is reducing

 7      cash costs below the plan, correct?

 8          A.   Right.

 9          Q.   Now, by the first quarter of 2010,

10      you-all realized that you were not going

11      to meet plan or you were under plan with

12      respect to production for the first

13      quarter of 2010, right?

14              MR. FOWKES:   Objection to the

15      scope.

16          A.   That would be the -- the

17      implication of the comment.

18          Q.   (BY MR. WATTS)   Now, if you go to

19      Bates page 114, down at the bottom, it

20      says, clearly, 2010 is a year where every

21      barrel counts.

22              Do you see that, sir?

23          A.   That is correct.

24          Q.   The reason every barrel counts

25      is -- is that you need to hit that 1 to

PURSUANT TO CONFIDENTIALITY ORDER

1    2 percent in order to make your growth of

2    profits plan, right?

3                    MR. FOWKES:  Object to the

4    scope.

5        A.  That is -- we had -- we had a

6    commitment to -- to meet a plan, and in

7    order to get to meeting the plan, volume

8    would be a -- a contributor and so would

9    cost savings.

10       Q.  (BY MR. WATTS)  You had a

11   commitment to meet the plan.  Who did you

12   make that commitment to?

13       A.  That would be a commitment from --

14   it would be a commitment from Andy to

15   Tony.  So Andy would have a performance

16   contract himself.

17       Q.  Okay.

18       A.  And then it was a commitment -- it

19   was a commitment expressed in the business

20   plan from Tony to the board of directors,

21   as you saw the plan presentation.

22       Q.  Okay.  It was also communicated to

23   the market, right?

24       A.  Not quite as explicitly.  The

25   communication to the market said -- to the

1    board, we said we can grow at 5 percent.

2    To the market, we said -- if you read it,

3    we said that we can grow earnings more

4    quickly than volume --

5        Q.  Right.

6        A.  -- without actually being explicit

7    about the -- the 5 percent.

8        Q.  All right.  Let's go to page 115.

9    We're talking about cash costs in 2009.

10   There's a reference in the middle to slide

11   7.

12            It says, on a reported basis,

13   unit cash costs were reduced by 15 percent

14   and unit production costs were reduced by

15   12 percent.

16            And then it says, see slides 8

17   and 10, right?

18       A.  Yeah.

19       Q.  Now, go to Bates page 116.

20            With respect to cash costs in

21   2010, down at the bottom, second paragraph

22   from the bottom, in any event, it remains

23   true that cost efficiency remains an

24   important lever for creating some earnings

25   momentum in 2010.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          Do you see that, sir?

2     A.   I do see that.

3     Q.   The next paragraph says,

4  delivering the original plan intent of a

5  600 million, slash, 6 percent year-on-year

6  reduction would mean an outcome of 9.2

7  billion, or a reduction of around 400

8  million, slash, 4 percent from the current

9  plan.

10          Do you see that?

11     A.   That is correct.

12     Q.   That's consistent with my question

13  to you before that 2009 was a higher cash

14  cost than 2010 was planned for, right?

15          MR. FOWKES:  Objection to the

16  form and scope.

17     A.   Yes, that is -- that is correct.

18     Q.   (BY MR. WATTS)  Go to Bates page

19  120.

20          Now, this is under the summary

21  that starts at 119, but what I have to ask

22  you about is -- is with respect to 120.

23  And it says, 2010 looks challenging in

24  terms of earnings momentum.

25          Production essentially flat,

1    and in current plan cost reductions more

2    than offset by increased DD&A.

3              DD&A stands for?

4         A.  Depletion -- it's basically

5    noncash costs.

6         Q.  Right.  So 2010 --

7         A.  Depletion, decommissioning, and

8    abandonment.

9         Q.  Sure.  2010 looks challenging in

10   terms of earnings momentum.

11             Production essentially flat,

12   and in the current plan cost reductions

13   more than offset by increased DD&A.

14             Without significant major

15   project start-ups, it's a year where every

16   barrel counts and every dollar counts.

17             Did I read that correctly?

18        A.  Correct.

19        Q.  Three paragraphs down, it says

20   maintain --

21        A.  Well, the next sentence says,

22   beyond S&OI, which remains our highest

23   priority, we need to deliver production

24   targets.

25        Q.  Sure.  That's the same S&OI that

1   never made its way out to Deepwater

2   Horizon, right?

3                  MR. FOWKES:  Object to the

4   form.

5        A.  Well, that's saying -- that's

6   saying that safe- -- that we -- whilst we

7   had -- whilst clearly we had a goal to

8   deliver an earnings target, we were

9   maintaining our commitment to safety and

10   ops integrity.

11       Q.  But you're maintaining a

12   commitment to safety that did not include

13   S&O audits on the Deepwater Horizon.

14   We've already established that, right?

15                  MR. FOWKES:  Object to the

16   form.

17       A.  Well, that -- we had that -- we --

18   we had that prior conversation.

19       Q.  (BY MR. WATTS)  Okay.  Now, back

20   to what I was asking about, it's a year

21   where every barrel counts and every dollar

22   counts.

23                  Down three paragraphs, it

24   says, maintain drive on cash costs - need

25   to deliver 6 percent improvement from 2009

1     outturn, i.e., 4 percent from current IPC

2     numbers - would get to $9.2 billion.

3                    Did I read that correctly?

4     A.   You read that correctly.

5     Q.   Go to 128.

6                    Now, on 128, we can see that

7     the production for the Gulf of Mexico went

8     from 284 to 439 from 2008 fiscal year to

9     2009, or an increase in production of 54

10    percent, right?

11    A.   That is correct.

12    Q.   The costs went from 1314 in fiscal

13    year '08 to 1229 in fiscal year '09, or a

14    decrease in 6 percent, right?

15    A.   That is correct.

16    Q.   The unit cash costs went from

17    12.63 to 7.67, or a reduction in unit cash

18    costs for the Gulf of Mexico of

19    39 percent, right?

20    A.   That is correct.

21    Q.   Now --

22                    MR. FOWKES:  Are you almost

23    finished?

24                    MR. WATTS:  I am, yeah.

25                    MR. FOWKES:  Okay.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.  (BY MR. WATTS)  Let me just ask

2   you this:  Up until the date of the

3   explosion on April the 20th of 2010, the

4   plan was for exploration and production

5   some way, somehow to meet its cash

6   contribution in order to pay the dividend

7   that was called for in the 2010 financial

8   plan, true?

9           MR. FOWKES:  Objection to the

10  scope.

11      A.  We had a -- we had a -- the group

12  had a financial framework, and we had a

13  plan that delivered our share of the

14  financial framework.

15      Q.  (BY MR. WATTS)  And if the plan

16  was 4 to 5 percent earnings growth

17  achieved by 1 to 2 percent production

18  growth and 3 to 4 percent cash efficiency

19  and you don't get the production increase,

20  you have to cut more costs in order to

21  meet your plan to pay the dividend?

22          MR. FOWKES:  Objection to the

23  scope.

24      A.  We have to -- we have to deliver

25  more efficiency, which is different from

**PURSUANT TO CONFIDENTIALITY ORDER**

1      cutting costs.

2              I -- I need just to explain a

3      bit behind this, because we -- we have --

4      you know, if you take our business in the

5      North Sea, we had bad planning, and we

6      were paying, you know -- we were paying

7      premium rates to contractors, so --

8      because all of the work was on an

9      unplanned basis.

10             So there were efficiency

11     improvements that could be made without

12     impacting S&OI which would reduce costs

13     but it wouldn't actually impact the

14     quality of the operation.

15        Q.  (BY MR. WATTS)  But the bottom

16     line is, it's a swinging lever.  You

17     either have more production or you've got

18     to come up with more cost efficiencies,

19     right?

20             MR. FOWKES:  Objection, scope.

21        A.  Yeah.  It's --

22        Q.  (BY MR. WATTS)  I mean, that's

23     fair, right?

24        A.  It was a combination of growing --

25     growing production and driving efficiency,

PURSUANT TO CONFIDENTIALITY ORDER

334

1      and in a year when production was lower,

2      we were saying we needed to increase

3      efficiency, which is not the same as

4      cutting costs.

5           Q.   Do you know who Kevin Lacy is?

6           A.   I do know who Kevin Lacy is.

7           Q.   He told me that during this time,

8      there was an incredible cost pressure

9      coming down from upper management.  And my

10     question to you is this:  From the

11     standpoint of meeting the plan, that is a

12     cost pressure that everyone was trying to

13     meet in order to have exploration and

14     production participate in its fair share

15     of the dividend that was due the BP p.l.c.

16     stockholders under the 2010 plan, right?

17               MR. FOWKES:  Objection to the

18     form and the scope.

19          A.   I think it's -- it's -- it's fair

20     to say there was pressure on efficiency,

21     and it's also fair to say that leadership

22     were completely clear that maintaining

23     safety and operation integrity was our

24     number 1 priority.  So there was a balance

25     against that.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  (BY MR. WATTS)  At least with

2    respect to BP-owned facilities.  We've

3    shown that, right?

4            MR. FOWKES:  Object to the

5    form.

6    A.  I'm saying that there was a focus

7    on -- a clear focus on managing safety and

8    operational risk, and that was the highest

9    priority, and I agree that there was

10   pressures on cost efficiency, which you

11   can see in the documents.

12   Q.  (BY MR. WATTS)  And that clear

13   focus was through MARs, it was through

14   OMS, IM standards, safety and operations

15   audit?

16   A.  It was -- it was through the

17   things that you've mentioned, which were

18   the systemic response at a -- at a

19   corporate level, so the events that we'd

20   had, and those -- those by definition

21   applied to the Gulf of Mexico because they

22   were part of the group.

23   Q.  And you needed that systemic

24   response because in the back of your mind,

25   you understood that if BP didn't change,

336

1    it would happen again?

2              MR. FOWKES:  Object to the

3        form.

4        A.  We had a commitment to -- we

5    had -- we had had a series of major

6    incidents, and we had a commitment to

7    improve in a sustainable way our safety

8    and operational performance through

9    implementing OMS, which was in line with

10   the recommendation from the Baker Panel.

11       Q.  (BY MR. WATTS)  In retrospect,

12   after the Deepwater Horizon disaster where

13   MAR didn't get out there, drilling

14   procedures didn't get out there, safety

15   and operations audit didn't get out there,

16   do you wish that BP had applied its

17   six-point plans to include mobile offshore

18   drilling units owned by others, leased to

19   BP, drilling wells where BP was the

20   operator?

21             MR. FOWKES:  Object to the

22       form, scope.

23       A.  It's a hyp- -- hypothetical, and

24   I -- I'm not really sure that's something

25   that I can give a qualified opinion on.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              MR. WATTS:  All right.
 2      Mr. Armstrong, those are all my questions.
 3      I appreciate your time.  You've been very
 4      polite to me, and I want to thank you for
 5      that.  Thank you.
 6              THE WITNESS:  Thank you very
 7      much.
 8              THE VIDEOGRAPHER:  Off the
 9      record at 2:05 p.m.
10              (Recess 2:05-3:25 p.m.)
11              THE VIDEOGRAPHER:  Back on the
12      record at 3:25 p.m., the beginning of tape
13      6.
14                 EXAMINATION
15      BY MR. CHAKERES:
16         Q.  Good afternoon, Mr. Armstrong.  My
17      name is Nat Chakeres with the United
18      States Department of Justice, and I'd like
19      to thank you for your patience here today.
20              And we don't have a whole lot
21      more to cover.  I'm not going to -- to go
22      over the same things you went over with
23      Mr. Watts, but there's just a few points
24      that we're going to -- we're going to talk
25      about.
```

338

1          If -- if you could, turn to

2     tab 9 in that binder in front of you, and

3     that should be an e-mail from Andy Inglis

4     to G MOR Upstream SLT on Friday, May 29th,

5     2009.

6          And this was in your custodial

7     file.  Do you know what G MOR Upstream

8     SLT -- what that group is?

9     A.    Yeah.  It's a -- it's an -- it's

10    an address list for the segment leadership

11    team.

12    Q.    Okay.

13    A.    So that would include Andy Inglis'

14    direct reports, which would include

15    myself --

16    Q.    Okay.

17    A.    -- and the SPU leaders and senior

18    function leaders in the organization.  So,

19    for example, it would include James

20    Dupree, who was the SPUL of our business

21    in the Gulf of Mexico at the time, and it

22    would have included Gordon Birrell --

23    Birrell, who was head of safety and

24    operations.  So it's -- it's about the top

25    35 managers in exploration and production.

**PURSUANT TO CONFIDENTIALITY ORDER**

339

```
 1              Q.  Okay.  Thanks.  We're going to go
 2       ahead and mark this as Exhibit 3886.
 3                      (Exhibit Number 3886 marked.)
 4              Q.  (BY MR. CHAKERES)  And as can you
 5       see on that e-mail, it says, attachments:
 6       SLT pre-read material, 290509.  Did I read
 7       that correctly?
 8              A.  Yes, you did.
 9              Q.  Okay.  And I'd like to -- you can
10       scan over the e-mail, if you want to
11       familiarize yourself and see if you
12       remember it, but the second bullet part --
13       point next to a star says, one of the
14       attachments is a summary of the Hanbury II
15       work that Doug has been leading, including
16       insights from within our organization and
17       externally via McKinsey.
18                      Do you remember the Hanbury II
19       work or do you have an understanding of
20       the Hanbury --
21              A.  I am --
22              Q.  -- II work?
23              A.  I am familiar with the -- the
24       intent of the Hanbury II work.
25              Q.  And what is that?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   It was a set of -- it was a set of

2   work which Andy commissioned and asked, I

3   think, Doug to lead, which was to say, it

4   was to take -- take stock of where we were

5   as a company.

6            And when -- when Tony Hayward

7   inherited the company, our performance was

8   weak and we were -- our goal was to

9   survive.  And having gone through that

10   phase, Andy's intention was to become a

11   great E&P company, and he asked Doug to do

12   a piece of reflective work looking at how

13   we were against competitors to say, what

14   would it take to become an even better

15   company.  And the -- it was -- that work

16   was originally labeled Hanbury II.

17            And Hanbury Manor is a hotel

18   in England, and it was called Hanbury II

19   because it was the second time we'd met in

20   that hotel, and the work eventually became

21   known as sector leadership, so you may see

22   things of -- sector leadership, which was

23   to say it was basically a strategic

24   refresh with the intention of becoming a

25   leader in the sector.

PURSUANT TO CONFIDENTIALITY ORDER

1        Q.   Okay.   Thank you.   I'd like to

2    just sort of make sure I -- I understand

3    the -- the highlights of what you just

4    said.

5              It grew out of an effort

6    initiated by Andy Inglis and led by Doug

7    Suttles to investigate how the company

8    could move to sector leadership?

9        A.   Correct, ultimately.

10       Q.   Okay.   Thanks.

11       A.   That's why, you know, there were

12   sort of books from Jim Collins on, you

13   know, how to go from good to great and all

14   that type of stuff.   That was their

15   thinking at the time.

16       Q.   Okay.   And McKinsey & Company was

17   interested --

18       A.   They -- they were involved to

19   give -- you know, to do some sort of --

20   give us an external view on that.

21       Q.   Okay.   Thanks.   If you could then

22   flip to the next tab -- that's tab 10 --

23   this is the attachment to that e-mail that

24   was previously entered as an exhibit,

25   Exhibit 2924.

342

```
 1              And if you could just flip
 2      to -- to Bates page 584.
 3          A.  5 --
 4          Q.  84.
 5          A.  -- 84.  That's a lot of pages.
 6      Okay.  Yes.
 7          Q.  Well, actually, you could go to
 8      582.
 9          A.  Yeah.
10          Q.  You see there it says, Hanbury II
11      pre-read?
12          A.  Yeah.
13          Q.  29th May, 2009?
14          A.  Yeah.
15          Q.  Okay.  Now, if you could flip on
16      to page 620.  So we're in the Hanbury II
17      pre-read section.
18          A.  Uh-huh.  I'm -- I'm getting it.
19          Q.  And the header of that slide -- I
20      want to see if -- I'll read it and tell me
21      if I read it correctly.
22              It says, operating
23      performance, views from inside and outside
24      the company.  The most consistently
25      suggested ideas from interviews and
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      brainstorming sessions by BP and McKinsey

2      included, and then the first bullet says,

3      compared to Exxon and Chevron, BP's

4      culture emphasizes -- there's a typo

5      there, but I think it meant, emphasizes

6      innovation over compliance.

7                Did I read that correctly?

8           A.  You read it correctly.

9           Q.  Okay.  Let's flip on to page 626.

10     And so it says, operating performance,

11     summary of observations, at the top,

12     correct?

13          A.  It does say that.

14          Q.  Okay.  And if you look at the

15     fourth bullet from the bottom, it says,

16     whilst BP's processes can be as good as

17     our competitors', a key differentiator is

18     BP's culture of noncompliance.  Often

19     there appear to be few consequences for

20     failure to comply.

21                Did I read that correctly?

22          A.  You read that correctly.

23          Q.  Okay.  As part of --

24          A.  Can -- can I make a distinction?

25     If I was --

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  You certainly may.

2    A.  I think the -- in the sense of it,

3    there's a -- compliance can mean many

4    things.  You know, we were absolutely

5    clear, as part of the six-point plan, that

6    being in compliance with external

7    regulation was one of the components of

8    the six-point plan.

9         The to- -- the sense of this

10    is compliance, in many ways to internal

11    processes, so there was a different --

12    there's a different sense between, you

13    know, compliance with the regulations in

14    the countries in which we operate, which

15    is an absolute requirement, and some

16    instances of noncompliance with internal

17    process, and that was the -- the sense, I

18    think, of the comment at the time.

19    Q.  Okay.  Well, did you -- do you

20    remember specifically discussing with Doug

21    Suttles what he meant when he said

22    noncompliance here?

23    A.  I think this was probably a --

24    a -- a distillation of a series of

25    comments from interviews that he'd done

PURSUANT TO CONFIDENTIALITY ORDER

1    with people inside of the firm and outside

2    of the firm.

3              At the time, we had brought in

4    people from other companies to strengthen

5    our executive team.  So, for example, we

6    had brought in a guy called Dave Connor,

7    who was heading up our supply chain

8    organization.

9       Q.   I'm sorry.  What was his name?

10      A.   Dave Connor.

11      Q.   Okay.

12      A.   He was head of supply chain at

13   Chevron, and we recruited him.  And we

14   had -- we have, in -- in BP, clear

15   processes for complying with the way that

16   we procure goods and service.

17             And his observation was that

18   people could sort of, you know, not pay

19   attention to the internal process and

20   just, you know, buy from their -- you

21   know, people who they knew rather than the

22   preferred supplier.

23             So it's sort of compliance in

24   the sense of complying with an internal

25   regulation, rather than, you know, meeting

346

1          an external regulatory compliance, which

2          is a different thing.

3               Q.   Compliance with internal

4          regulations would -- would also be

5          consistent with the recommendations from

6          the Baker report, for example?

7               A.   Yes, it would.

8               Q.   And, in fact, if we could move on

9          to tab 11, you'll see here at the front --

10          this has also been previously entered, as

11          Exhibit 2430.  This is the -- the Baker

12          report.  And I'm not as -- as kind as

13          Mr. Watts.  I included the whole thing in

14          order --

15               A.   You want me to read the whole

16          thing?

17               Q.   -- to -- to make us stronger.  But

18          if you want to flip to page 138 there --

19          and not Bates page, but actual in-text

20          page --

21               A.   Yeah.

22               Q.   -- 138.  And you see the header

23          says, compliance with internal process,

24          safety standards and programs.  So the

25          Baker Panel does --

**PURSUANT TO CONFIDENTIALITY ORDER**

347

```
1        A.   Yeah.
2        Q.   -- point out, as -- as one of the
3    causes of -- of the accident in Texas
4    City, compliance with internal standards
5    and programs.
6             And then if we go on to --
7    well, we'll leave that there.
8             Going back to -- to the
9    Hanbury II report, then, the tab 10,
10   Exhibit 2429, there was a discussion --
11       A.   Let me just find the -- do you
12   want me to find the page again?
13       Q.   I was just going to ask about --
14       A.   Okay.  You asked --
15       Q.   -- the exhibit again.
16       A.   -- me to find --
17       Q.   Generally, there -- there was
18   discussion at that time, around the end of
19   May, early June 2009, regarding
20   noncompliance in BP with what you state
21   as -- as internal procedures.
22       A.   There was a sense --
23       Q.   That --
24       A.   There kind -- there was a sense --
25   and I've got to try and convey this
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      accurately.  There was a sense that having

2      gone through the -- the period of Tony

3      Hayward's leadership, there was a -- you

4      know, a way to get to a new level of

5      performance.  And there was a sense that

6      greater compliance, in -- in a more

7      standardized way would give us an

8      opportunity to capture the benefits of our

9      scope and scale that would lead to better

10     performance.

11          Q.  Okay.  So there was a need at that

12     time to -- to improve compliance within

13     BP?

14          A.  I think -- I think that's what --

15     that was -- this was a sort of -- you

16     know, in a way, a cultural stereotype -- a

17     cultural caricature, but I think there was

18     a component that we'd said we needed to

19     improve our culture of complying inside of

20     BP.

21          Q.  Okay.  Thank you.  I just have one

22     more -- well, one more set of questions

23     for you.

24               You spoke a lot this morning

25     with Mr. Warts about cost cutting and --

**PURSUANT TO CONFIDENTIALITY ORDER**

 1          and reducing cash costs and capital

 2          expenditures and operating expenditures,

 3          and I just wanted to get your -- to get --

 4          to get some information from you about

 5          what exactly capital expenditures are and

 6          what exactly operating expenditures are.

 7          And I don't need precise definitions of

 8          everything that could be a capital

 9          expenditure, but, for example, leasing a

10          drilling rig, what kind of expenditure

11          would that be?

12                    MR. FOWKES:  Objection to the

13          form and scope.

14              A.  Can I -- so the first thing I

15          said, we had a commitment, as I discussed

16          this morning, to improve the efficiency of

17          those expenditures.

18              Q.  (BY MR. CHAKERES)  Yes.

19              A.  Not necessarily to reduce the

20          expenditures themselves, but to improve

21          the way that they were spent, so that the

22          quest- -- the precise question you're

23          asking is, it depends on the length of the

24          lease.

25                    If the lease is sort of over a

**PURSUANT TO CONFIDENTIALITY ORDER**

1      certain period of years and it adds up to

2      a certain amount, it would be classified

3      as a capital item.  And if it was a

4      shorter duration, it may be more of a --

5      an operating item.

6          Q.  The lease -- so the lease with

7      the -- with the drilling contractor?

8          A.  The lease with the drilling

9      contractor, by its nature, if it was

10     several years, it would be the nature --

11     that would part of our capital costs

12     rather than our day-to-day operating

13     costs.

14         Q.  Do you know what is -- what the

15     boundary point is between when something

16     is an operating cost or it's --

17         A.  No, but that's -- there's a sort

18     of set of accounting rules that would say,

19     if it falls within this definition, it's

20     capitalized, and if it falls within this

21     definition, it can be part of operating

22     costs.

23         Q.  Okay.  Are there any other

24     significant subsets of cash costs besides

25     capital expenditures and operating

**PURSUANT TO CONFIDENTIALITY ORDER**

351

1    expenditures?

2         A.  No.  We track -- and this is the

3    point I was making this morning, that

4    within cash costs we have got -- and

5    they're in some of the documentation -- we

6    categorize them as overheads, integrity

7    spend.  And one of the exhibits shows our

8    integrity spend.  At the time our total

9    costs were being reduced, our integrity

10   spend was actually increasing over that

11   time, which is consistent with our

12   commitment to improve safety and operation

13   performance, so there are -- there are

14   sub- -- we have subcategorizations of, you

15   know, field lifting costs, above field

16   lifting costs, integrity spend.

17        Q.  Okay.  If you flip to tab 30, the

18   last one, and it's actually printed on

19   legal-sized paper, so there's something to

20   flip out.  And this is going to be marked

21   as Exhibit 3887.

22             (Exhibit Number 3887 marked.)

23        Q.  (BY MR. CHAKERES)  This is, I'll

24   represent to you, a printout as of

25   yesterday from BP's Web site of the cash

**PURSUANT TO CONFIDENTIALITY ORDER**

1    dividends per ordinary share that were

2    issued each quarter since 1993.

3              And I want -- I'm not going to

4    go earlier than 2000, but if you look at

5    sort of -- the last column is dividend

6    plus tax credit pence per share.

7              If you look at first quarter

8    of year 2000, that was 3.578 cents per

9    share?

10              MR. FOWKES:  Object to the

11    form and the scope.

12         A.  Yeah, that's what's on this --

13    that is what's on this --

14         Q.  (BY MR. CHAKERES)  Okay.

15         A.  -- piece of paper.

16         Q.  And then fourth quarter '09, that

17    was 9.6433 cents per share?

18         A.  That is correct.

19         Q.  Okay.

20              MR. CHAKERES:  I don't have

21    any further questions.  Thank you.

22              THE VIDEOGRAPHER:  Off the

23    record at 3:40 p.m.

24              (Recess 3:40-3:44 p.m.)

25              THE VIDEOGRAPHER:  Back on the

PURSUANT TO CONFIDENTIALITY ORDER

```
 1          record 3:44 p.m.

 2                         EXAMINATION

 3     BY MR. GODWIN:

 4          Q.  Good aft- -- good afternoon,

 5     Mr. Armstrong.  How are you, sir?

 6          A.  I'm very well.  Thank you very

 7     much.

 8          Q.  Good.  I met you before the start

 9     of your deposition this morning, but for

10     the record, I'm Don Godwin and I represent

11     Halliburton.  And I'm here accompanied

12     during your deposition by my associate

13     James Johanns.

14                    You and I never discussed any

15     aspect of this case before, have we, sir?

16          A.  No, we have not.

17          Q.  Okay.  Thank you.

18                    I would like to ask you,

19     what -- what is your current title at this

20     time?

21          A.  I am the chief financial officer

22     for exploration and production.

23          Q.  Okay.  And how long have you --

24     and -- and that is like a CFO?

25          A.  A CFO, that's correct.
```

```
 1          Q.  Okay.  How long have you held a
 2     position as a CFO of -- of E&P?
 3          A.  Around four years.
 4          Q.  Around four years.  Were you at
 5     one point a group vice president and a
 6     commercial director of E&P?
 7          A.  I was, indeed.
 8          Q.  Okay.  Was that prior to the four
 9     years or --
10          A.  No, it was --
11          Q.  -- has it been --
12          A.  That was prior to that.
13          Q.  Okay.
14          A.  No, no, no.  It was -- it was much
15     before that.
16          Q.  Okay.  All right.  So in the -- in
17     the most recent past, which would have
18     included April 20 of 2010, you were the
19     CFO?
20          A.  I was, indeed.
21          Q.  Okay.  Did I understand you to say
22     that you -- that you report to Mr. Andy
23     Inglis?
24          A.  Yes, I -- I did at the time of --
25     the -- in question.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

355

```
1       Q.  Okay.  On --

2       A.  I --

3       Q.  -- April 20 --

4       A.  I reported --

5       Q.  -- of 2010?

6       A.  I reported to Andy Inglis.

7       Q.  Okay.

8       A.  I had a dual reporting

9   relationship, one to Andy Inglis and one

10  to the -- the deputy CFO of the group, who

11  is a guy called Ian McDonald.  But for all

12  exploration and production, I reported to

13  Andy Inglis.

14      Q.  And where was Mr. Inglis based as

15  of April 20, 2010?

16      A.  He was based at the time in

17  Houston.

18      Q.  Okay.  And is Mr. Inglis still

19  with BP?

20      A.  He's no longer with BP.

21      Q.  Okay.  And when did he leave BP,

22  sir?

23      A.  I don't know exactly, but it

24  was -- it was in the time frame October to

25  November 2010.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1          Q.  Okay.  Is it your understanding
 2      that he was asked to leave BP?
 3                  MR. FOWKES:  Objection,
 4      foundation -- excuse me --
 5          A.  I've got --
 6                  MR. FOWKES:  -- form.
 7          A.  -- no knowledge of that.
 8                  (BY MR. GODWIN)  Sir?
 9          A.  I -- I've got no -- I don't know.
10          Q.  You're the CFO of the company and
11      you reported to him and you don't know --
12      you don't know the circumstances
13      surrounding his departure from the
14      company?
15          A.  I know --
16                  MR. FOWKES:  Objection, scope
17      and form.
18          A.  I know that he left --
19          Q.  (BY MR. GODWIN)  Let him make the
20      objection.
21                  MR. FOWKES:  Yeah.  I don't
22      want to talk over each other.  Ellis, you
23      need to give me a little pause so I can
24      just --
25                  {SPEAKER3}:  Right.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      MR. FOWKES:  -- make my quick

2  objection and then you can answer.

3      THE WITNESS:  I'm sorry.

4      {SPEAKER3}:  Okay.  Thank you.

5   Q.  (BY MR. GODWIN)  Go ahead, sir.

6   A.  I -- I don't know any more than

7  that the -- any more than what's sort of

8  announced formally at the time.  Bob

9  Dudley was appointed as the new chief

10  executive officer when Tony -- when Tony

11  Hayward left.

12   Q.  Okay, sir.

13   A.  And Bob Dudley decided to

14  restructure exploration and production.

15  And as part of that restructuring, he

16  named a new team, and Andy left the

17  company at that time.

18   Q.  Okay.  How long after Mr. Dudley

19  named a new team for E&P was it that

20  Mr. Inglis left the company?

21   A.  It was shortly after that time.

22   Q.  Within a matter of days or hours

23  or weeks or --

24   A.  I would say probably days after

25  the new -- after the announcement of the

**PURSUANT TO CONFIDENTIALITY ORDER**

1   new team was made.

2   Q.   Okay.  Did you consider yourself

3   to be a friend of Mr. Inglis prior to his

4   departure from the company?

5            MR. FOWKES:  Objection, scope.

6   A.   Yes, I consider to be, myself, a

7   friend.

8   Q.   (BY MR. GODWIN)  Okay.  Do you

9   still consider him to be a friend?

10            MR. FOWKES:  Objection, scope.

11   A.   Yes, I still consider him to be a

12   friend.

13   Q.   (BY MR. GODWIN)  And you're

14   telling us that even though he was prior

15   to leaving the company and continues to be

16   a friend, that you don't know why

17   Mr. Inglis left the company; is that

18   correct?

19            MR. FOWKES:  Objection, scope

20   and form.

21   A.   That is -- that is --

22   Q.   (BY MR. GODWIN)  And you

23   understand you're under oath, sir?

24   A.   I understand -- I understand I am.

25   That's why I'm thinking very -- I'm

**PURSUANT TO CONFIDENTIALITY ORDER**

1      thinking very hard --

2          Q.  Okay.

3          A.  -- about the conversations that I

4      had with Andy --

5          Q.  Okay, sir.

6          A.  -- and the nature of those

7      conversations, and I -- I'm unclear, out

8      of the conversations I've had with him,

9      about exactly why he left.

10         Q.  Did Mr. Inglis tell you that --

11     that -- that he believed that his

12     departure had anything to do with the

13     horrific incident of April 20, 2010?

14             MR. FOWKES:  Objection, form.

15         Q.  (BY MR. GODWIN)  And him being

16     held accountable for that?

17             MR. FOWKES:  Form and scope.

18         A.  I have no memory of him telling me

19     that.

20         Q.  (BY MR. GODWIN)  Or anything to

21     that effect?

22             MR. FOWKES:  Same objection.

23         Q.  (BY MR. GODWIN)  I'm not asking

24     about the exact words, just anything to

25     that effect, sir.

PURSUANT TO CONFIDENTIALITY ORDER

```
 1              MR. FOWKES:  Same objection.
 2         A.   I'm -- I'm actually -- I'm
 3    thinking hard about the --
 4         Q.   (BY MR. GODWIN)  I know it.
 5         A.   -- about the nature of the
 6    conversations I've had.
 7         Q.   And I'm not suggesting that you
 8    aren't, and I -- and I just want you to
 9    tell us -- if you will respond to the
10    question, and I know you'll do so
11    truthfully.
12              MR. FOWKES:  Objection, form,
13    scope.
14         A.   I'm trying to think of -- I had a
15    conversation with Andy, and he said it
16    was -- he said something -- and this is --
17    I had a conversation with him before Bob
18    made the announcements, which said that
19    we've done a study thinking about what the
20    new structure of the organization is going
21    to be.
22              And Andy himself started that
23    work and that it was taken over by Bob
24    Dudley when Bob Dudley was appointed chief
25    executive.  And the design was that we
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1     would go to a model that didn't -- did not

2     have a -- a single chief executive, but

3     replaced the exploration and production

4     segment by three divisions, and have a new

5     division called -- so the three divisions

6     were exploration/appraisal, developments

7     and production.

8                    And Andy said that Bob had

9     decided to restructure, and as a result of

10    that restructuring, there was no place for

11    him in the firm and that he was leaving.

12    And that's what -- that's what he said to

13    me.

14         Q.   (BY MR. GODWIN)  Okay, sir.  And

15    were you involved in arranging or arriving

16    at any severance package for Mr. Inglis

17    from BP?

18                    MR. FOWKES:  Objection, form.

19         A.   No.  I had no -- I had absolutely

20    no links in that process.

21         Q.   (BY MR. GODWIN)  Okay.  To your

22    knowledge, was a severance package

23    arranged for Mr. Inglis commensurate with

24    his leaving BP?

25                    MR. FOWKES:  Objection, form,

```
 1        scope.
 2             A.   I -- I don't know for sure, but I
 3        think some -- there -- it would be normal
 4        practice for there to be some separation
 5        agreement for a senior executive when he's
 6        leaving, but I've got no direct knowledge
 7        of that.
 8             Q.   (BY MR. GODWIN)  Thank you, sir.
 9                  Okay.  To whom do you report
10        at this time, sir?
11             A.   To Andy Hopwood, who is -- he's
12        now the head of strategy and integration.
13        So I used to report to Andy.  As a result
14        of the new structure, I now report to this
15        guy called Andy Hopwood.
16             Q.   Hopwood?
17             A.   Andy Hopwood.
18             Q.   Okay.
19             A.   Another Andy.
20             Q.   And -- and is that H-O-P-W-O-O-D?
21             A.   That is correct.
22             Q.   Okay.  And where is Mr. Hopwood
23        based?
24             A.   He's based in Houston.
25             Q.   And what is his title?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.  He is head of strategy and

2    integration.

3      Q.  Okay.  Is there a CEO of E&P in BP

4    at this time?

5      A.  No.  No, because what Bob did when

6    he changed the organization, he -- it

7    replaced the CEO position with the

8    gentlemen that you've got listed on that

9    page, which --

10     Q.  Mr. Hopwood?

11     A.  Andy Hopwood, Bernard Looney, Bob

12   Fryar and Mike Daly.

13     Q.  Okay.

14     A.  Andy Hopwood; Bernard Looney,

15   who's head of developments; Bob Fryar,

16   who's head of production; and Mike Daly,

17   who's head of exploration and appraisal.

18     Q.  At the time of Mr. Inglis -- is it

19   pronounced Inglis?

20     A.  It is pronounced Inglis.

21     Q.  Thank you.  At the time or close

22   in time to his departure from the company,

23   after the April 20, 2010 horrific

24   incident, did you come to learn at BP that

25   there was a concern that under the Tony

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Hayward management, that safety had not

2    been taken as seriously as it should have

3    been?

4        A.   No.   I -- I would say quite the

5    reverse.   In my view, both Tony and Andy

6    were strongly committed to improving

7    safety and operational performance.

8             Tony, when he took over from

9    John, said, I've got three priorities,

10   which are safety, people and performance,

11   in that order.   And Tony was strongly

12   committed to that and I believe and I know

13   that -- they were -- Tony said, my agenda

14   is safety, people and performance, in that

15   order.   And Andy was entirely supportive

16   of that and was strongly focused on

17   safety.

18       Q.   With the --

19            MR. BRODY:   Objection to the

20   nonresponsive --

21       Q.   (BY MR. GODWIN)   -- Department of

22   Justice lawyer asking you questions a

23   moment ago, I wrote down a quote where you

24   said, quote, there was a need to improve

25   the culture and compliance of BP when Tony

PURSUANT TO CONFIDENTIALITY ORDER

1    Hayward left the company.

2             Do you remember making that

3    statement here a few moments ago?

4        A.  I said that -- what I -- I --

5             MR. FOWKES:  Objection, form.

6        Q.  (BY MR. GODWIN)  Go ahead, sir.

7        A.  What I said in response to a

8    question, which was a -- a document that

9    had been prepared by Doug Suttles, Tony --

10   at which point Tony Hayward was still in

11   the -- running the company.  Doug's view,

12   based on -- or Doug's document, which was

13   a collection of quotes from interviewing

14   people, was that a culture that was

15   biased -- it was a question of was bias

16   too much towards innovation and there was

17   not enough bias on compliance.

18       Q.  And when you say there was a need

19   to improve compliance, what -- what

20   compliance did you think needed to be

21   improved upon after Mr. Hayward left the

22   company?

23            MR. FOWKES:  Object to the

24   form and scope.

25       A.  I'm not -- I'm not sure.  That's

**PURSUANT TO CONFIDENTIALITY ORDER**

1     sort of -- I -- I commented on the

2     document that was referred to earlier, and

3     that was at a time well before Tony had

4     left the company.  So it's a dif- --

5     you're now asking me a different question,

6     which is, what needs to be improved when

7     Ton- -- since Tony left, which is, you

8     know, we're now in a different world and

9     that's, you know, part of Bob's

10    organization.  And there is --

11         Q.  (BY MR. GODWIN)  Well --

12         A.  -- a focus -- there is a

13    continuing focus on OMS and a need to

14    continue to improve the safety and

15    reliability of our operations.

16         Q.  Let me read you the quote again,

17    sir.  You said that, in response to a

18    question by the Department of Justice

19    lawyer, there was a need to improve the

20    culture and compliance of BP when Tony

21    Hayward left the company.

22              And I asked you about that,

23    and you said that und- -- as I understand

24    it, under Mr. Hayward, there was too much

25    focus on innovation and there needed to be

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1          more attention and focus on compliance.

 2                  Now, my question is:  What was

 3          the compliance -- what was the shortfall

 4          in compliance that you believe needed to

 5          be improved upon when Mr. Hayward left?

 6                  MR. FOWKES:  Object to the

 7          form.

 8              Q.  (BY MR. GODWIN)  Was it safety

 9          compliance?

10                  MR. FOWKES:  Objection to the

11          form and scope.

12              A.  Now, what I'm -- well, first off,

13          I -- I -- and I don't know what I -- what

14          I said now, but I didn't mean to say, when

15          Tony Hayward left the company.  That

16          was as -- so the -- the quote that was in

17          Doug's papers was at the time when Tony

18          Hayward was still with the company, not

19          after he had left.  So that -- I wanted to

20          make that clear.

21                  So I don't know -- I think my

22          quote might have been accurate up until

23          the point of saying when Tony Hayward left

24          the company.

25              Q.  (BY MR. GODWIN)  Well, did you
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    believe, at the time when Tony Hayward

2    left the company, that the company needed

3    to improve its compliance, as you used the

4    word compliance in an earlier answer?  Yes

5    or no, sir?

6              MR. FOWKES:  Objection, form

7    and scope.

8         A.  It's -- I think it's --

9         Q.  (BY MR. GODWIN)  It's a yes-or-no

10   question, sir.

11             MR. FOWKES:  Objection to

12   form.

13        A.  I think it's -- I think -- I don't

14   have a basis for -- at the time Tony left,

15   the question -- I've got no knowledge to

16   know what progress we've made since the

17   time Doug was making the statement in --

18   at the time -- whenever Doug made the

19   statement in the document that I referred

20   to with the Department of Justice.

21             That was sort of some period

22   of time.  That was ahead of the -- the

23   things that we did to change the

24   organization following Hanbury II and as

25   part of sector leadership, as I described,

 1          and we made significant progress in

 2          improving the standardized approaches that

 3          we were making.

 4                    I've got no evidence to say

 5          where those processes were at the time

 6          Tony Hayward left the organization, which

 7          was sometime later.

 8                    MR. GODWIN:  I'm going to move

 9          to strike as nonresponsive.  It's just an

10          objection I have to make for the record,

11          as your lawyer's making objections.  I'm

12          going to ask the question again.

13              Q.   (BY MR. GODWIN)  Do you believe at

14          the time Tony Hayward left the company

15          that there was a need to improve the

16          compliance of BP in any respect, as you

17          use the word com- -- you used the word

18          compliance in an earlier answer?

19                    MR. FOWKES:  Objection, form,

20          scope.

21              Q.   (BY MR. GODWIN)  It's a yes-or-no

22          question, sir.

23                    MR. FOWKES:  Same objection.

24              A.   I've -- I've got no set of

25          evidence on which to make a complete

1     judgment on that.

2         Q.  (BY MR. GODWIN)  At the time

3     with -- shortly after the April 20, 2010

4     horrific incident, do you believe there

5     was a need within BP to improve the

6     compliance and the culture of the company,

7     as you used those words in an earlier

8     answer?

9             MR. FOWKES:  Objection, form,

10    scope.

11        A.  I would need to see a full -- a

12    full analysis before -- before it would

13    be -- it would be a view that was sort of

14    uninformed.  I could -- I could, and I'm

15    now being, you know, pressed in this

16    regard -- I could find evidence without --

17    without -- this is -- I've got no direct

18    evidence.

19            I could find evidence where we

20    were in very good compliance.  And we're a

21    large organization, and I've -- there

22    would be part of the organization where we

23    may not have been in full compliance, but

24    I haven't got any evidence outside of my

25    own direct field to make that assessment.

**PURSUANT TO CONFIDENTIALITY ORDER**

371

1        Q.  (BY MR. GODWIN)  Okay.

2        A.  In the world -- you know, in the

3    world of financial accounting, we were in

4    full compliance, because that's kind of

5    part of my job, and I'm -- I'm an expert

6    in that area.  I'm not an expert in other

7    areas.

8        Q.  When you made the -- when you gave

9    the answer earlier, that the company

10   needed to improve the culture and

11   compliance, I'm asking you, in that

12   context of that answer you gave earlier --

13   and that's a quote -- do you believe that

14   after the April 20, 2010 horrific

15   incident, do you believe that BP needed to

16   improve the culture and compliance of the

17   company, as you used those words in an

18   earlier answer?

19              MR. FOWKES:  Objection to form

20   and scope.

21       Q.  (BY MR. GODWIN)  It's a yes-or-no

22   answer, sir --

23              MR. FOWKES:  Same --

24       Q.  (BY MR. GODWIN)  -- or question.

25              MR. FOWKES:  Same objection.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          A.   What I would say is that at the

2     time Doug made that assessment, there

3     was -- that was a thing that could be

4     improved.  I've got no -- and

5     that's -- that was Doug's --

6          Q.  (BY MR. GODWIN)  Sir, I'm not

7     asking --

8          A.   I know.

9          Q.   -- about what Doug said.

10          A.   I'm going to -- I'm --

11          Q.   I'm not asking you what Doug said.

12          A.   I know.

13               {SPEAKER3}:  I move to strike

14     that as nonresponsive.

15          Q.  (BY MR. GODWIN)  Now, please --

16               MR. FOWKES:  Well, you have to

17     let him finish.

18               {SPEAKER3}:  Wait a minute.

19     We can't sit here and use up my 27 minutes

20     with a free narrative, please.  Now, let

21     me ask a question.

22          A.   No, I'm going to go straight --

23     I'm going to --

24          Q.  (BY MR. GODWIN)  Let me -- let me

25     ask the question.  Do -- in the context of

1    the way you used the words that there was

2    a need to improve the culture and

3    compliance of BP, do you believe following

4    the horrific incident of April 20, 2010,

5    that there was a need to improve the

6    culture and compliance of BP at that time?

7              MR. FOWKES:  Objection, form,

8    scope.

9         A.   I would say in some respects there

10   probably was.

11        Q.   (BY MR. GODWIN)  Thank you, sir.

12              Now, you know Mr. Mark Bly,

13   don't you, sir?

14        A.   Yes, I do.

15        Q.   Mr. Mark Bly, B-L-Y.  You're aware

16   that -- that he was appointed to head up

17   an investigative team -- an internal

18   investigative team at BP following the

19   incident, are you not, sir?

20        A.   I am aware of that.

21        Q.   And when I say incident, I'm

22   talking about the incident of April 20,

23   2010.  We have that understanding, do we

24   not?

25        A.   We do.

374

1       Q.  Thank you, sir.

2           And did you -- at any time

3   after Mr. Bly was appointed to that

4   position, did you talk with him about what

5   he was going to be doing in any respect?

6           MR. FOWKES:  Objection, form.

7       Q.  (BY MR. GODWIN)  Concerning the

8   investigation.

9           MR. FOWKES:  Objection, form,

10  scope.

11      A.  No, not in any -- not in any -- I

12  may have had a -- a hallway conversation

13  with him, but I've -- I've -- I had no

14  direct involvement in the -- in the scope

15  or substance of that investigation.

16      Q.  (BY MR. GODWIN)  Thank you, sir.

17          As the B -- as the CFO of --

18  what is it, E&P?

19      A.  Yeah.

20      Q.  Okay.  As that CFO, did you read

21  all or any part of the Bly report before

22  it was -- before it was finalized for

23  publish -- publication?

24      A.  Not before it was finalized.

25      Q.  Did you read it after?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.  I read some of it.  I can't say

2    that I've read it from cover to cover and

3    every word, but I have -- I have read

4    parts of it.

5      Q.  Did anyone in the company ask you

6    to read it for any reason?

7              MR. FOWKES:  Objection, form,

8    scope.

9      A.  I'm not sure.

10     Q.  (BY MR. GODWIN)  Okay.  Well, did

11   you read any part or parts of it that

12   pertain to the cement job that was

13   performed by my client on the Macondo

14   well?

15     A.  I would have -- I would have

16   read -- sorry, not that I would have.  I

17   have -- I have read the report, and I'm

18   not in a position to comment on the -- you

19   know, the detailed, the sort of -- the

20   exact details of what happened because

21   it's -- it's not in my area of expertise.

22     Q.  And again, I'm not asking you

23   about what you know about the details of

24   it, but --

25     A.  But I know that --

PURSUANT TO CONFIDENTIALITY ORDER

376

1      Q.  -- I'm asking --

2      A.  I know that -- I know that it

3   covered -- I know that there were some

4   barriers, and one of the barriers was the

5   cement job.

6      Q.  And did you -- did anyone within

7   the company ask you to read any part of

8   the report, the Bly report, that pertained

9   to the cement job that was pumped -- that

10  was designed and pumped by my client?

11            MR. FOWKES:  Objection,

12  form --

13     A.  No one asked me --

14            MR. FOWKES:  -- scope.

15     A.  -- specifically.  No one, to my

16  knowledge, asked me specifically to read

17  that particular part of the report.

18     Q.  (BY MR. GODWIN)  Thank you, sir.

19            Do you know Mr. Pat O'Bryan

20  with BP?

21     A.  Yes, I know Pat O'Bryan.

22     Q.  Have you at any time discussed

23  with him any aspect of the incident of

24  April 20?

25     A.  No.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          Q.   Okay.

2                    (Off the record.)

3                    {SPEAKER3}:  I had 37, I

4     think, and then I gave away 10.

5                    MR. FOWKES:  No, I think you

6     have 35.

7                    MR. GODWIN:  Was it 35?

8                    MR. FOWKES:  Yeah.

9                    {SPEAKER3}:  I thought I had

10    37.  Thank you.  If I need a minute I

11    assume --

12                   MR. FOWKES:  Yes.

13                   MR. GODWIN:  Thank you.

14         Q.   (BY MR. GODWIN)  So you have not

15    spoken at any time to Pat O'Bryan about

16    anything that he observed there on the

17    Deepwater Horizon rig on the day of and

18    evening of the event?

19         A.   No, I have not.

20         Q.   Thank you, sir.

21                   You said earlier that you were

22    not surprised with the well running over

23    budget.  That was a quote that you made

24    earlier today.

25         A.   I did --

PURSUANT TO CONFIDENTIALITY ORDER

```
 1              MR. FOWKES:  Objection, form.
 2         A.  -- say that.
 3         Q.  (BY MR. GODWIN)  You did say that,
 4    did you --
 5         A.  Yes.
 6         Q.  -- not?
 7              Okay, sir.  Why were you not
 8    surprised with the well running over
 9    budget?
10         A.  Well, because part of my job is to
11    kind of look at the financial forecasts of
12    the firm.  And Mike Daly would have said
13    that, you know -- he does a -- as part of
14    the financial review, he would say how
15    much money he's going to spend in his area
16    of activity, so I would have been informed
17    that the well was running over budget, and
18    we created a -- a supplemental finance
19    memorandum to complete the well.
20         Q.  Were you aware that the original
21    AFE for the -- for the well was
22    approximately $96 million?
23         A.  I -- I wasn't aware of it -- I
24    wasn't aware of the detail.
25         Q.  Did you learn that at any time,
```

1     that it was approximately $96 million

2     budgeted for the well at the beginning?

3          A.   I -- I don't know the number is

4     exactly 96, but if you're asking me was I

5     aware of the -- that there was an original

6     estimate, the answer to that is yes, but

7     I'm not -- I can't remember now that it

8     was $96 million.

9          Q.   Did you learn at any time or have

10    you learned at any time, Mr. Armstrong,

11    that the actual cost of the well up to the

12    time of the blowout was approximately a

13    hundred and -- approximately $140 million?

14               MR. FOWKES:   Objection, form.

15          Q.   (BY MR. GODWIN)  Have you learned

16    that?

17               MR. FOWKES:   Form, scope.

18          A.   I don't -- again, I don't know

19    that the number's 140, but it doesn't

20    surprise me that the number's -- you know,

21    was 96 and is 140.

22          Q.   (BY MR. GODWIN)  Okay.  So it

23    doesn't surprise you that there was that

24    gap between what was budgeted and what it

25    ended up being?

PURSUANT TO CONFIDENTIALITY ORDER

1      A.  Yeah, because as I say, there was

2    an original budget number, then there was

3    a supplemental FM when we changed from one

4    rig to another rig.  We suspended the

5    operations and then continued the

6    operations.  I was aware of that.

7              I wasn't aware -- I have a lot

8    of numbers in my mind, but the two numbers

9    that you quoted me weren't numbers that I

10   had in my mind.

11     Q.  Okay.  What was -- what numbers,

12   in your mind, as being the total cost of

13   the well up to the time of the blowout?

14     A.  I don't know.  I wouldn't have

15   that -- I wouldn't have that number --

16     Q.  Okay.

17     A.  -- in my mind.  That wouldn't be

18   something I would --

19     Q.  I believe you said that Mr. Mike

20   Daly would report to you weekly on the

21   cost of the Macondo well?

22     A.  No.  He would give -- I said he

23   would give us -- he would give Andy,

24   weekly, an -- operational updates.  The

25   operational update would not include the

PURSUANT TO CONFIDENTIALITY ORDER

1      cost of the well.

2            Q.  Okay, sir.  Right quick I want to

3      go over with you, you've been designated

4      at BP's 30(b)(6) representative, our

5      witness with regard to a number of topics.

6      Your lawyer has the -- the list there.

7                  I want to ask you this very

8      quickly.  You said you've been asked about

9      the presence, participation or supervision

10     or other involvement of officers,

11     directors or other employees of BP,

12     p.l.e. -- p.l.c. in any aspect of the

13     planning -- and then it goes on -- of the

14     Macondo well.

15                 Do you have any knowledge --

16     other than the financial knowledge you

17     spoke of earlier, do you have any

18     knowledge about the planning of the well

19     that surrounded the cement job that was to

20     be pumped on the well?

21           A.  I have --

22                 MR. FOWKES:  Objection, form.

23           A.  -- no knowledge of that.

24           Q.  (BY MR. GODWIN)  Sir?

25           A.  No.

**PURSUANT TO CONFIDENTIALITY ORDER**

382

```
 1              Q.  Were you given an opportunity to

 2        read topic 9 at any time prior to when you

 3        were designated the company's 30(b)(6)

 4        representative on that topic?

 5                     MR. FOWKES:  Objection.

 6              Q.  (BY MR. GODWIN)  Were you, sir?

 7                     MR. FOWKES:  You're not asking

 8        him to disclose anything --

 9                     {SPEAKER3}:  I'm not asking --

10                     MR. FOWKES:  -- that's

11        privileged?

12                     {SPEAKER3}:  -- about what

13        lawyers have said to you or whatever, but

14        he's been designated as a 30(b)(6)

15        representative.  I want to know if he was

16        shown a document and/or shown that topic

17        and said, can you testify about these

18        things.

19                     MR. FOWKES:  If he was

20        actually shown a document, that's

21        different than actually discussing

22        anything orally.  So he's simply asking

23        you if you were actually shown it in

24        writing.

25              A.  I'm not -- I'm -- I can't remember
```

```
1       whether I was shown it in writing.  I
2       was -- I was told I was to be --
3                  MR. FOWKES:  Ellis, you're not
4       allowed --
5                  THE WITNESS:  Okay.
6                  MR. FOWKES:  Unless the
7       discussion is with a nonlawyer, you're not
8       to disclose any privileged --
9                  {SPEAKER3}:  Right.
10                 MR. FOWKES:  --
11      communications.
12                 THE WITNESS:  Okay.
13         Q.  (BY MR. GODWIN)  Well, I'm not
14      asking --
15         A.  I can't --
16         Q.  -- anything --
17         A.  I can't --
18         Q.  -- between lawyers.
19         A.  I can't remember.
20         Q.  Okay, sir.  Sir, do we under- --
21      right quick, I want to -- because I've
22      used a little time here, so I'm just going
23      to cover this and be through, but I want
24      to make certain I understand.
25                 You're telling the Court that
```

**PURSUANT TO CONFIDENTIALITY ORDER**

384

```
1          you have no knowledge of any part of the
2          planning of the -- pertaining to the
3          Macondo well as it related to my client's
4          cement job on the well; is that correct?
5                    MR. FOWKES:  Objection to the
6          form and the scope.  This is outside the
7          scope.
8                    {SPEAKER3}:  Well, no.  It
9          says, the planning, funding, drilling,
10         completion, temporary abandonment, capping
11         or -- and/or control of --
12                   MR. FOWKES:  But you're
13         not reading --
14                   {SPEAKER3}:  -- the Macondo
15         well.
16                   MR. FOWKES:  -- the first part
17         of the question.
18                   {SPEAKER3}:  The presence,
19         participation -- I did read that.
20                   MR. FOWKES:  Of BP p.l.c.
21                   MR. GODWIN:  Okay.
22                   MR. FOWKES:  Yeah.  Please --
23                   {SPEAKER3}:  Well --
24                   MR. FOWKES:  -- if you include
25         that, I think we'll be -- we'll be good.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              A.  I was aware of the -- I

 2       was -- I -- I was --

 3              Q.  (BY MR. GODWIN)  Let me ask it

 4       this way.

 5              A.  I'm -- I'm --

 6              Q.  Are you aware, sir, that BP p.l.c.

 7       and BP in North America are treated as one

 8       and the same entity --

 9                   MR. FOWKES:  Objection --

10              Q.  (BY MR. GODWIN)  -- for operation

11       purposes?

12                   MR. FOWKES:  -- form.

13              Q.  (BY MR. GODWIN)  All part of the

14       B- -- the BP Group; are you aware of that?

15                   MR. FOWKES:  Objection, form.

16              A.  I'm -- I -- I had this

17       conversation earlier, that I'm -- I'm

18       clear -- I'm not exactly clear on the

19       precise legal definition of BP p.l.c.  I

20       am clear that the BP Group applies to the

21       whole of the group.

22              Q.  (BY MR. GODWIN)  Okay, sir.

23              A.  And -- and that there's a

24       difference between the people who are

25       working in the Gulf of Mexico and p.l.c.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1          Q.   Okay, sir.

2          A.   And I am not -- I am not

3     crystal-clear on the precise legal

4     definition of who is in p.l.c.

5          Q.   Okay.

6          A.   As I answered this morning, I am

7     clear that there were, you know,

8     certain -- certain people who had

9     knowledge of the well at -- at -- at

10    certain times, in certain ways.

11         Q.   Okay, sir.  Let me ask this

12    quickly and go through it, then, with

13    that -- with that backdrop.

14              Do you have any knowledge

15    about any aspect of the temporary

16    abandonment of the Macondo well?

17              MR. FOWKES:  Objection,

18    form --

19         A.   Now, that is --

20              MR. FOWKES:  -- and scope.

21         A.   That is outside of my area of

22    expertise.

23         Q.   (BY MR. GODWIN)  Do you have any

24    knowledge with regard to the drilling of

25    the Macondo well?

```
 1                    MR. FOWKES:  Objection, form
 2        and outside --
 3            Q.  (BY MR. GODWIN)  Any aspect of it.
 4                    MR. FOWKES:  -- outside the
 5        scope.
 6            A.  The -- the only knowledge I have
 7        from the -- the only knowledge I have from
 8        the drilling of the well would be the
 9        operational briefings that I received from
10        time to time at -- as being a participant
11        at the meeting that Andy Inglis would have
12        that Mike Daly would be a part of.
13            Q.  (BY MR. GODWIN)  Other than what
14        you read in the Bly report, do you have
15        any knowledge whatsoever about any aspect
16        of my client's cement job that was pumped
17        there on the Macondo well?
18                    MR. FOWKES:  Objection to the
19        form and outside the scope.
20            A.  I have no -- no knowledge other
21        than what I may have read in the Bly
22        report.
23            Q.  (BY MR. GODWIN)  Thank you, sir.
24        Other than what you read in the Bly
25        report -- last question -- do you have any
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1     knowledge about any of the mud-logging

2     services that my client performed there on

3     the Macondo well?

4                  MR. FOWKES:  Objection, form.

5         A.   No --

6         Q.   (BY MR. GODWIN)  Other than what

7     you read in the Bly report.

8         A.   I have no knowledge --

9         Q.   Thank you, sir.

10        A.   -- other than what I read in the

11    Bly report.

12                MR. GODWIN:  Pass the witness.

13    Thank you, sir.

14                THE VIDEOGRAPHER:  Off the

15    record, 4:12 p.m.

16                (Recess 4:12-4:21 p.m.)

17                THE VIDEOGRAPHER:  Back on the

18    record, 4:21 p.m., beginning of tape 7.

19                    EXAMINATION

20    BY MR. BRODY:

21        Q.   Good afternoon.  My name is Steve

22    Brody.  I represent Anadarko, and I'm

23    going to ask you a few questions this

24    afternoon.

25                Do your 30(b)(6) topics

PURSUANT TO CONFIDENTIALITY ORDER

389

1 involve Anadarko at all?  This is not a

2 trick question.

3   A.  Not that I'm aware of.

4   Q.  Not that you're aware of.

5     Okay.  Now, do you agree that

6 successful implementation of

7 recommendations from the Baker report

8 required compliance with BP's written

9 standards and practices?

10   A.  I'm sorry, could you re- -- could

11 you repeat the question again?

12   Q.  Sure.  Do you agree that

13 successful implementation of

14 recommendations from the Baker report

15 require -- required compliance with BP's

16 written standards and practices?

17   A.  I -- I'm -- I -- I haven't got

18 the -- the documentation in front of me,

19 but I agree with the sense of what you're

20 saying.

21   Q.  Now, you testified earlier about

22 compliance.  Could you please tell me, in

23 what respect was compliance at BP in need

24 of improvement as of April 20th, 2010?

25   A.  I -- well, the sense of the -- of

**PURSUANT TO CONFIDENTIALITY ORDER**

390

1    the line of questioning that we had in the

2    previous session with the lawyer from

3    Halliburton was that at a -- at a period

4    in time, we did an organization review and

5    said that we needed to create a stronger

6    culture of compliance.

7              And the que- -- the exact

8    question was, in what respects were -- was

9    that culture needed to be improved at the

10   time that Tony left?

11             And my answer was, I didn't

12   have the exact knowledge of that.  I am

13   sure that -- and I'm not sure.  I -- you

14   know, the way to do a sort of detailed

15   evaluation on the day, there would be some

16   aspects where we had made progress and

17   there would be some areas where we needed

18   to improve further, but I have -- I've got

19   no direct knowledge to know precisely what

20   those areas were.

21        Q.  So you recall that there was a --

22   a need for improvement in the culture of

23   compliance consistent with the document

24   that had been written by Mr. Suttles?

25        A.  Yeah.  And I think it's also true,

391

1          you could probably find the same language

2          in the -- in the -- in the Baker report

3          itself, although I haven't -- I haven't

4          got the -- the detail from that.

5              Q.  And are you able to identify any

6          areas in which the culture of compliance

7          could have been improved as of April 20th,

8          2010?

9              A.  No.  What I'm saying is, could

10         I -- could I say that we were -- we had,

11         you know, created a culture of full

12         compliance in the sense that it was meant,

13         then there was probably still more to do

14         in some areas, but I'm not sure what those

15         areas would be.

16                     As I said, as I think about my

17         own area, you know, I -- I've got to sign

18         off to say we're in compliance with

19         accounting policy, and I have a good

20         process for doing that.

21                     There are other parts of the

22         firm where I have no knowledge, and I'm --

23         I'm making a -- a judgment that were we to

24         do, you know, a detailed analysis that you

25         may find there were still some areas where

```
 1          we needed to improve compliance, but I've
 2          got no direct knowledge of that.
 3               Q.  Are there any documents or other
 4          things that I could show you that would
 5          refresh your recollection as to the areas
 6          in which the culture of compliance
 7          could -- needed to be improved --
 8                    MR. FOWKES:  Object- --
 9               Q.  (BY MR. BRODY)  -- at BP?
10                    MR. FOWKES:  Objection,
11          form --
12               A.  I don't know.
13                    MR. FOWKES:  -- and scope.
14               A.  There may -- there may be, but I
15          don't know.
16               Q.  (BY MR. BRODY)  But it is your
17          perception that there -- there was a
18          culture of noncompliance, correct?
19               A.  No, I didn't say that.  I said
20          that there were areas where we probably
21          had got further to go in terms of
22          improving our compliance.
23                    We had a commitment, as part
24          of the six-point plan, to be in compliance
25          across all of our operations.  So that --
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    that is our intent, is to be in

2    compliance, to create a culture of

3    compliance.

4              What I'm saying is that -- and

5    I don't know for sure, but I have -- you

6    know, I'm giving the best view that I can,

7    that at the time of the Deepwater Horizon,

8    it may be that there were areas that we

9    needed to be more compliant, but that's --

10    that's outside of my immediate area of

11    expertise and I've got no actual knowledge

12    of what those areas were.

13       Q.   And do you -- did you discuss with

14    your counsel during the break the topic of

15    the culture of noncompliance?

16              MR. FOWKES:  Objection.

17              I instruct not to answer on

18    privilege grounds.

19       Q.   (BY MR. BRODY)  Are you going to

20    follow your counsel's direction?

21       A.   I am.

22       Q.   Could you please turn to tab 4 in

23    the book in front of you.  And this

24    document has been marked as Exhibit 3888.

25              (Exhibit Number 3888 marked.)

**PURSUANT TO CONFIDENTIALITY ORDER**

394

```
1          Q.  (BY MR. BRODY)  Have you seen this

2     document before, which is entitled

3     Integrity Management:  Learning from past

4     major industrial incidents, and bearing

5     the Bates numbers BP-HZN-2179MDL02268840

6     through 8962?  Have you seen this document

7     before?

8          A.  I'm just -- I'm reading through

9     it.  I don't think I have seen this

10    document before.

11         Q.  Could you please turn to the

12    second page of the document.  And you'll

13    see that here at the beginning of the

14    document, there's a quote in bolded

15    language -- and I'm going to read it.

16    It's from -- it's written by somebody

17    named Jesse Duco- -- Ducommun.  Have you

18    ever heard of Jesse Ducommun?

19         A.  No, I have not.

20         Q.  And it says, it should not be

21    necessary for each generation to

22    rediscover principles of process safety

23    which the generation before discovered.

24    We must learn from the experience of

25    others rather than learn the hard way.  We
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1        must pass on to the next generation a

2        record of what we have learned.

3                    Do you agree with that

4        statement by Mr. Jesse Ducommun -- -mun?

5                    MR. FOWKES:  Objection, form.

6            A.  It's a -- in -- in general, yes, I

7        agree with it.  And I would say that what

8        we've done with respect to learning from a

9        series of incidents, going from

10       Grangemouth to Texas City, is consistent

11       with having an investigation of an

12       incident, learning from that in an open

13       way and trying to improve our underlying

14       systems and processes.

15                   As a result of that -- and,

16       you know, I -- the thing I would say, I

17       think that, you know, leaving a generation

18       may -- may be too long a time frame.  It

19       doesn't -- it seems to me as though we

20       ought to be able to learn, you know,

21       faster than a generation.

22           Q.  (BY MR. BRODY)  Should be able

23       to -- to learn almost in realtime, yes?

24           A.  Well, it takes longer than that,

25       but I think -- I think it's -- you know,

PURSUANT TO CONFIDENTIALITY ORDER

1    in large organizations, it takes time to

2    learn, you know.

3              And I've -- I've said already

4    that we made real efforts following

5    Grangemouth and following Texas City to,

6    in an open way, understand what happened

7    and share those learnings in a substantive

8    way across the rest of the organization.

9         Q.  And was the orange book one way of

10   communicating the information needed by

11   senior management to form those lessons?

12        A.  I think it was part of -- as you

13   know, as we've said earlier, that's --

14   following -- following Grangemouth, we

15   created the integrity management standard

16   and we shared the lessons learned around

17   that.

18              Following Texas City, we

19   created the six-point plan, and then we

20   created the orange book as a way of

21   tracking -- tracking delivery of the

22   elements of the six-point plan and, in

23   addition, creating some high-quality

24   management information on safety

25   performance, both process safety and

PURSUANT TO CONFIDENTIALITY ORDER

1       personal safety.

2            Q.   Okay.   Let's turn, please, to the

3       document under tab 5, which has been

4       previously marked as Exhibit 98.   It is an

5       article from the BP magazine.

6                 Now, that is a -- an

7       internally published BP magazine, correct?

8            A.   Yes.

9            Q.   And this article discusses Texas

10      City.   If you turn to the third page of

11      the document, the second sentence says, a

12      key lesson of the investigation --

13           A.   Hang on just a second.   Is this

14      the -- which --

15           Q.   The third page.

16           A.   Which -- what is the ac- --

17           Q.   It says "safety" in big red

18      letters.

19           A.   Safety --

20           Q.   You're there.

21           A.   It's page -- it's -- yeah, okay.

22      It's the third page, page 12, right?

23           Q.   Yes.

24           A.   Yes.

25           Q.   And then you'll see under the box,

**PURSUANT TO CONFIDENTIALITY ORDER**

1    the second sentence -- and I'm going to

2    quote it -- a key lesson of the

3    investigation into Texas City is that we

4    must pay more attention to process as well

5    as personal safety.

6                   Do you agree with that

7    statement?

8         A.   I agree with that statement.

9         Q.   Okay.  Please turn to the page 14

10   in this same document.  And the last full

11   paragraph, there's a quote from you.  Do

12   you see that?

13        A.   I can see that.

14        Q.   And I'm going to read it.  Texas

15   City had a big impact on us.  One of the

16   first things we did was realize that it

17   could happen to us.

18                   What did you mean by "it"

19   there?

20        A.   It, I think the -- the "it" was

21   that we could have a -- a major incident

22   along the lines of Texas City.  It could

23   happen inside of exploration and

24   production.

25        Q.   That's the first time that you

1       realized that such a thing could happen;

2       is that right?

3           A.  Well, I wouldn't say it was the

4       first time, but I think what the -- what

5       Texas City -- the difference between --

6           Q.  Well, it's -- I have very limited

7       time, so --

8           A.  Pardon?

9           Q.  I have very limited time, so if

10      you could answer that yes or no, I would

11      appreciate it.

12                  MR. FOWKES:  Could you repeat

13      that?

14          A.  Could you repeat the question?

15          Q.  (BY MR. BRODY)  No, that would

16      take up more time.

17          A.  Okay, right.

18          Q.  Let's --

19          A.  One of the first --

20          Q.  Let's -- let's --

21          A.  One of the first things --

22          Q.  Let me --

23          A.  -- we did realize --

24          Q.  Let me --

25          A.  -- and I think it makes --

PURSUANT TO CONFIDENTIALITY ORDER

1    Q.  -- tell you what --

2    A.  -- it made --

3    Q.  Don't talk over me, please.  Let

4  me move forward.

5            We immediately analyzed

6  high-potential incidents in E&P and

7  realized we had experienced a number of

8  near misses that could have had a similar

9  consequence to Texas City.

10           What were those near misses?

11   A.  I -- I -- I can't remember all of

12  them.  I can remember two examples.

13   Q.  Please tell me them.

14   A.  So the first example would be we

15  had a -- a gas plant in Algeria where

16  the -- the process facility tripped.

17  There was a discharge of gas, and we found

18  that the discharge pipework for the gas

19  had been designed to be too small and the

20  pipework ruptured and, therefore, instead

21  of venting through the vent, there was

22  a -- a vent of gas around the process

23  facility because the -- the discharge

24  pipework was too small for the inventory

25  of gas that was in the system, which was

401

1    ultimately a design error, and there was

2    no ignition source.

3        Q.  Okay.

4        A.  And the second incident that I can

5    remember was in Trinidad -- I think it was

6    the Mahogany B platform -- where there was

7    a -- similarly, gas released during a

8    maintenance activity, which led to a

9    release of gas which did not ignite.

10       Q.  And what year did these two

11   events --

12       A.  I don't know.  I don't know -- I

13   don't know exactly the year.  But

14   following Texas City, as -- as part of

15   what we'd been doing since the

16   Grangemouth, was to sort of track process

17   safety instead of personal safety inside

18   of the integrity management network.  We

19   were able to discover that those two

20   incidents had happened.  And I'm not

21   exactly sure of the exact timing of them,

22   but they were before Texas City, which was

23   a way of demonstrating to exploration and

24   production that this wasn't just a

25   refining and marketing issue; it actually

402

1      could apply to our production facilities

2      inside of exploration and production.

3         Q.  And is that one of the reasons why

4      the recommendations of the Baker report

5      were applied outside of refineries and, in

6      fact, across all of BP's businesses?

7         A.  Yeah, I think it was.  We took --

8      we took a look at the instances of

9      high-potential events, which we'd been

10     tracking as a result of the work that we

11     had put in place since Grangemouth, and

12     said that this was something -- you know,

13     Texas City was a watershed event for us,

14     as a firm, and we needed to apply the

15     findings of the Baker Panel more broadly

16     than that, indeed, across the firm, as you

17     say.

18        Q.  Okay.  And let's turn, please, to

19     tab 62 in your binder, which is the very

20     last tab.  And this has previously been

21     marked as Exhibit Number 866.  It's a Gulf

22     of Mexico SPU operating plan.

23           Do you have that in front of

24     you?

25        A.  I do.

**PURSUANT TO CONFIDENTIALITY ORDER**

403

1          Q.   Okay.   Do you agree that

2     implementation of OMS required gap

3     analyses?

4          A.   It would -- gap analysis was a --

5     a core part of the design for OMS.

6          Q.   And gap analyses show whether an

7     SPU's actual practices were in line with

8     OMS, correct?

9          A.   That -- I would sort of say it's

10    slightly different from that.  I would say

11    that, as -- as part of OMS, there's a

12    series of expectations, and you can

13    achieve, you know, various levels of --

14    the idea is it's supposed to be continuous

15    improvement, so you're never going to

16    get to the -- there's always going to be

17    room to improve.

18               And the gap analysis is to

19    sort of assess where you are relative to

20    that scale of expectations.  So you can

21    say, I've got a gap and I will put in

22    place an action plan to close the gap, and

23    it's an annual process, which the idea is

24    never be complete, because you'll always

25    find room to improve.

**PURSUANT TO CONFIDENTIALITY ORDER**

1            It's sort of designed like the

2    Toyota manufacturing system.  So you'd

3    say, you know, there's a gap this year,

4    I've put in place a plan to close it.

5    Next year, I'll repeat the gap assessment

6    and I'll either have closed the gap or

7    still need to do more work, and then the

8    process continues.

9        Q.   Is there an expectation that the

10   gap, with respect to a specific item,

11   would be closed within a year?

12       A.   It -- it depends on the nature of

13   the gap, but you could identify a gap and

14   say, you know, the action to close the gap

15   is this gap and there's a time by which

16   that action would be complete.

17            Then when that action is

18   complete, you then say, with respect to

19   that element, you know, what's my gap

20   assessment now and how do I get to the

21   next level and the level beyond that?

22       Q.   Okay.  And -- and is that the --

23   and are your statements about gap analyses

24   applicable where the gap analysis is done

25   by the SPU itself?

1      A.   Yes, I think that's the design.

2  That's the -- that's the design intent

3  behind the application of OMS inside of

4  the SPU.

5      Q.   And let's turn, please, to the

6  page with the last four Bates numbers 3192

7  in this Exhibit 866.

8      A.   I'm not -- I'm not sure I have --

9      Q.   3192 --

10     A.   I'm not -- there's --

11     Q.   -- the last four digits.

12     A.   There's some -- there's some

13  pages that don't have -- oh, they've got

14  small pages.  Okay.

15     Q.   Okay.  And let's look at the --

16  well, the heading of this is, Priority SPU

17  Level Gaps for 2009.

18            And go down the left-hand

19  column.  It says, sub-elements, and then

20  it identifies risk assessment and

21  management, slash, process safety.  Do you

22  see that?

23     A.   I do.

24     Q.   Okay.  And then let's go across to

25  the third column, which is problem

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1     statement.

2              And if you go to the second

3     paragraph -- I'm going to read it.  I've

4     got to find something in bigger type to

5     read it.

6              As we have started to more

7     deeply investigate process safety

8     incidents, it's become apparent that

9     process safety, major hazards and risks

10    are not fully understood by engineering or

11    line operating personnel.  Insufficient

12    awareness is leading to missed signals

13    that precede incidents and response after

14    incidents, both of which increase the

15    potential for and severity of process

16    safety-related incidents.

17             Do you see that language?

18    A.  I can see that language.

19    Q.  Have you ever seen that language,

20    or words to similar effect, before?

21    A.  Yes.

22    Q.  And where is that?

23    A.  I've seen -- well, I've seen these

24    words before.  I've seen these in the --

25    in the -- the documents that I read in
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        preparing for this disposition.
 2             Q.  Deposition.
 3             A.  This dep- -- sorry.  It's been a
 4        long day.  This -- this --
 5             Q.  That's okay.  You're not
 6        originally from here.
 7             A.  This deposition.  And I say, you
 8        know, there -- there's a similar -- there
 9        may be a similar tone in -- in some of
10        the -- you could probably find a similar
11        tone in some of the other incident reports
12        that we've had.
13             Q.  Okay.  And -- and what -- have you
14        been able to learn the basis for this
15        problem statement?
16             A.  No, I haven't.  I don't -- I don't
17        know in detail.  I know that this is part
18        of their own -- their own assessment.
19             Q.  By "they" --
20             A.  The gaps --
21             Q.  -- you mean?
22             A.  The Gulf of Mexico SPU.
23             Q.  SPU.
24             A.  And I think at this point -- I'm
25        just checking -- I think the scope -- the
```

**PURSUANT TO CONFIDENTIALITY ORDER**

408

1      scope of this document related to the

2      production facilities and did not yet

3      relate to Thunder Horse or the -- the

4      drilling organization.  This was a sort of

5      first -- the drilling organization inside

6      of the Gulf of Mexico.

7                  {SPEAKER6}:  Let me -- let me

8      move to strike the nonresponsive portion

9      of your answer because --

10         Q.  (BY MR. BRODY)  My question is, do

11     you have an understanding for the basis of

12     the statements that do appear here on this

13     page 3192?

14         A.  No, I don't know in -- I don't --

15     I don't know in detail what they were

16     ref- -- well, they were referring to,

17     obviously, operating procedures, but I --

18     I don't know the -- beyond reading these

19     documents to prepare for the deposition,

20     I -- I don't have a detailed knowledge of

21     what the Gulf of Mexico is referring to

22     when they made these statements.

23                  I am -- I am aware of the fact

24     that the Gulf of Mexico was actually, as

25     evidenced here, going through the process

1    of implementing OMS.

2         Q.  Okay.  Were these -- was this

3    priority gap ever resolved?

4         A.  I don't know.

5         Q.  How -- how would --

6              MR. FOWKES:  Steve, I don't

7    know -- you're -- I don't know if you're

8    wrapping up.  You're out of time.

9              {SPEAKER6}:  I don't know if

10   I'm out of time.

11             MR. FOWKES:  Three minutes

12   ago.

13             {SPEAKER6}:  But -- and I'll

14   take --

15             MR. FOWKES:  Strike --

16             {SPEAKER6}:  I'll take back

17   that time.  What is that, 20 seconds you

18   were on there?

19             MR. FOWKES:  You got it.

20             {SPEAKER6}:  Okay.  Don't be

21   afraid of me.

22        Q.  (BY MR. BRODY)  Okay.  So -- and

23   what would -- what would the process have

24   been to address and resolve this sort of

25   problem statement?

1    A.  I think -- I think the Gulf of

2    Mexico would have put in place as a result

3    of the -- and this is at the level of a

4    design.  The design behind the operating

5    management system is the Gulf of Mexico

6    would do a gap analysis, and then they

7    would prepare an action plan and resource

8    the action plan to -- with a timetable to

9    take actions to close the gaps, and then

10   they would review that in a year's time.

11   Q.  Okay.  We had mentioned Tim

12   Overton briefly earlier today.  Do you

13   know why he left BP?

14   A.  No.

15   Q.  All right.  We had mentioned

16   Barbara Yilmaz earlier today.  What was

17   her reputation professionally?

18            MR. FOWKES:  Objection, form

19   and scope.

20   A.  Barbara was a well-respected

21   leader in the organization.

22   Q.  (BY MR. BRODY)  Did you ever hear

23   any criticisms of her performance or

24   competence?

25            MR. FOWKES:  Objection, scope.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          A.  Not to my knowledge.

2          Q.  (BY MR. BRODY)  Did you ever hear

3     anything secondhand, rumor, anything at

4     all?

5          A.  No.  I think Barbara was a

6     well-respected leader in the organization.

7          Q.  You testified earlier briefly

8     about Kevin Lacy.  Do you have any

9     information about why his employment was

10    terminated by BP?

11         A.  I have no information of that.  I

12    know Kevin, but I don't know why he left.

13         Q.  Okay.  Do you have -- let me

14    strike that.

15              Was OMS applicable to

16    drillings and completion in the Gulf of

17    Mexico?

18              MR. FOWKES:  Objection, form.

19         A.  I believe that as -- as part of

20    the -- as part of the implementation of

21    OMS in the Gulf of Mexico, they -- they --

22    the first document that we read -- at that

23    point, drilling and completions were out

24    of scope.  By the end of 2009, drilling

25    and completions was in scope.

**PURSUANT TO CONFIDENTIALITY ORDER**

1              So drilling and completions in

2       the Gulf of Mexico were under OMS by the

3       end of 2009, is my knowledge.  I might

4       have got the dates not exactly right.

5              Q.  (BY MR. BRODY)  Okay.  And why was

6       D&C initially outside the scope of OMS?

7              A.  I don't know.

8              Q.  Have you ever spoken to anybody

9       about that?

10              A.  No.

11              Q.  Was -- were MODUs outside the

12       scope of OMS?

13                   MR. FOWKES:  Objection, form.

14              A.  I think the -- the structure of

15       OMS, as I said earlier, is that it was

16       designed to be applied to BP-owned and

17       operated operations.  There are provisions

18       inside of OMS to say that if -- if we have

19       a -- a joint venture with another

20       operator, then we would look at their

21       management systems and say, are they

22       consistent with OMS?  And if they are,

23       that's fine.  And if they aren't, we might

24       want to change them.

25                   And with respect to

**PURSUANT TO CONFIDENTIALITY ORDER**

1      contractors who do operations for us, I

2      think the requirements of OMS -- and I may

3      not get the language exactly right -- to

4      say that we need to look at the

5      contractual arrangements that we have with

6      those contractors and say, ah, does the

7      contractual arrangements match the

8      requirements of OMS?  And if we have

9      existing contracts which aren't, we would

10     seek to change those contracts so they are

11     compliant with OMS.

12         Q.  (BY MR. BRODY)  Okay.  And even

13     where the contractor was allowed to use

14     its process safety, did BP have an ongoing

15     obligation to monitor that use of process

16     safety by the contractor?

17             MR. FOWKES:  Objection, form.

18         A.  I don't -- I don't know exactly,

19     but I think it would be -- it would be,

20     you know -- I don't know exactly, as it --

21     as it -- I know what I said there about

22     OMS is correct in terms of setting up the

23     contract.  I am not clear what the ongoing

24     monitoring requirement is.

25         Q.  (BY MR. BRODY)  And what is the

PURSUANT TO CONFIDENTIALITY ORDER

1      reason for contractor-owned and operated

2      MODUs being outside of OMS?

3          A.  I don't know.

4                MR. BRODY:  My time has run

5      out.  Thank you for your courtesy.

6                THE WITNESS:  Thank you.

7                THE VIDEOGRAPHER:  Off the

8      record at 4:45 p.m.

9                (Recess 4:45-4:49 p.m.)

10               THE VIDEOGRAPHER:  Back on the

11     record at 4:49 p.m.

12                     EXAMINATION

13     BY MS. McCULLEY:

14         Q.  Good afternoon, Mr. Armstrong.  My

15     name is Catherine McCulley.  I represent

16     MOEX Offshore and the related MOEX

17     companies in the litigation which is the

18     reason that you're here today.

19               Sir, you've served, I believe

20     you testified, for a period of about four

21     years as a chief financial officer for the

22     BP exploration and production activities,

23     which would include the Gulf of Mexico?

24         A.  That is correct.

25         Q.  During the course of your

415

1    position, in carrying out your duties in

2    that position as chief financial officer,

3    did you have occasion to have any dealings

4    with any representatives of MOEX Offshore

5    or any of the related companies?

6        A.  No.

7        Q.  Did there come a time where it

8    came to your attention that MOEX Offshore

9    obtained an interest in the Macondo well?

10       A.  I -- I -- I think I may have been

11   aware of that at the time that the --

12   just -- it was tak- -- it was done inside

13   of the Gulf of Mexico, but I may have been

14   made aware of it by, as I said earlier,

15   Mike Daly making an oral report at one of

16   Andy's meetings, saying, we farmed out

17   some of our interest, but I'm not exactly

18   sure.

19       Q.  Do you have any information with

20   regard to data or plans that were provided

21   to MOEX in connection with the Macondo

22   well?

23       A.  No.

24       Q.  Do you have any information with

25   regard to any discussions of a technical

**PURSUANT TO CONFIDENTIALITY ORDER**

1      nature in any respect with regard to the

2      drilling operations for the Macondo well

3      with regard to the MOEX folks?

4          A.   No.   As I said earlier, I think

5      my -- the -- the -- my level of expertise

6      is with respect to the p.l.c., and I think

7      the conversations that you're referring to

8      probably took place with -- inside of the

9      Gulf of Mexico organization.

10         Q.   So would your answer be the same

11     with regard to the temporary abandonment

12     procedure that was carried out in the

13     well; and that is, you have no information

14     about any involvement?

15         A.   No.   The details -- I don't

16     think the -- at -- at the p.l.c. level,

17     there was no involvement in the activity

18     until post the incident, when some p.l.c.

19     folks were involved in the response.

20         Q.   Okay.   And you, sir, have no

21     personal knowledge of any matters along

22     these lines?

23         A.   No, I -- nor was I involved in the

24     response.

25         Q.   Okay.   Have -- did you ever have

417

1     occasion to visit the Deepwater Horizon

2     during 2009, 2010?

3          A.   No.

4          Q.   Do you know whether any

5     representatives of MOEX Offshore or

6     related companies may have visited the

7     rig?

8          A.   I don't know.

9          Q.   Okay.  And you do know that BP was

10    the operator with regard to the Macondo

11    well?

12         A.   I know that --

13              MR. FOWKES:  Objection, form.

14              Go ahead.  Objection, form.

15              THE WITNESS:  Pardon me?  I'm

16    sorry.  I'm --

17              MR. FOWKES:  Objection, form.

18              THE WITNESS:  -- sorry.  I'm

19    sorry I'm interrupting.  I'm getting

20    tired.  It's been a long night.

21         A.   I know that BP was the --

22    technically, the operator of the Macondo

23    well.

24         Q.   (BY MS. McCULLEY)  And as the

25    operator, it had the exclusive right to

**PURSUANT TO CONFIDENTIALITY ORDER**

1    conduct operations with regard to the

2    well?

3        A.  I'm not --

4            MR. FOWKES:  Objection, form.

5        A.  I'm not sure -- I'm not sure what

6    their -- beyond knowing that we were the

7    operator, I'm not sure what the precise

8    nature of the -- the legal obligations

9    were after that fact or, indeed, have they

10   sort of relayed the contractual

11   relationship between BP and its partners'

12   and its contractors' work.  That's not in

13   my area of expertise.

14           MS. McCULLEY:  Okay.  Thank

15   you, sir.

16           THE WITNESS:  Thank you.

17           THE VIDEOGRAPHER:  Off the

18   record at 4:53 p.m.

19           (Recess 4:53-4:54 p.m.)

20           THE VIDEOGRAPHER:  Back on the

21   record at 4:54 p.m.

22               EXAMINATION

23   BY MR. BLANKENSHIP:

24       Q.  Mr. Armstrong, I just introduced

25   myself to you.  My name is Robert

1    Blankenship, and I represent Transocean in

2    this matter.  I just -- honestly, just one

3    question for you.

4              You've referenced several

5    times today -- and correct me if I'm

6    mischaracterizing your -- your

7    testimony -- but when talking about OMS

8    and whether it applies to MODUs, you

9    stated that part -- there's a part of OMS

10    that looks to the contractors' safety

11    management system and whether it

12    applies -- whether it falls within OMS or

13    whether it doesn't.

14              My question is simply, what

15    part of OMS is that?  Where can I find

16    that part?

17    A.   I -- I think if you look in the --

18    in the -- I don't have the OMS

19    documentation --

20    Q.   And I apologize for not --

21    A.   -- but you can go through the --

22    we can provide -- we can provide you with

23    the sort of OMS documentation that would

24    say, here's the scope, here's how it

25    applies to company-owned and operated

**PURSUANT TO CONFIDENTIALITY ORDER**

420

1    operations, here's how it applies to joint

2    ventures and here's how it applies to

3    contractors.

4        Q.  Is that the bridging document or

5    is it really --

6        A.  No, I think this is --

7        Q.  -- specific?

8        A.  This is in OMS itself.

9        Q.  It's not the local Gulf of Mexico

10   OMS; this is the broader --

11       A.  This is in the sort of core

12   description of OMS, there's some language

13   that describes that.  I -- I don't know

14   how it was applied to the Macondo, but

15   there is a provision inside of OMS that

16   says broadly what I've said, and I may

17   have got the words not precisely right,

18   but the intent is that we would look at

19   their management -- the management systems

20   of the contractor and, you know, seek to

21   match them to -- you know, check those to

22   see if they're consistent with OMS.

23       Q.  I understand that.  And I had kind

24   of understood that -- that principle

25   through the bridging document.  I'd never

421

1       heard of it actually referenced in a

2       specific part of OMS, and I didn't know if

3       you knew offhand it's -- I can go and find

4       it and look for it on my own.  I just

5       want --

6           A.  I don't know -- I don't know

7       what -- we can -- to save you the trouble,

8       we can -- I'm sure that we can sort of

9       send you exactly where to look.

10          Q.  That -- that's a part of my job.

11      And I apologize, I only had five minutes

12      and I'm not going to make you look through

13      that to figure that out.

14                  MR. BLANKENSHIP:  I appreciate

15      your time.

16                  THE WITNESS:  Okay.  Thank

17      you.

18                  THE VIDEOGRAPHER:  Off the

19      record, 4:57.

20              (Recess 4:57-5:06 p.m.)

21                  THE VIDEOGRAPHER:  Back on the

22      record at 5:06 p.m.

23                  EXAMINATION

24      BY MR. FOWKES:

25          Q.  Good afternoon -- or I suppose

**PURSUANT TO CONFIDENTIALITY ORDER**

1     it's almost evening now, Mr. Armstrong.

2     I'm Scott Fowkes representing BP.  We've

3     met before, haven't we?

4          A.  We have.

5          Q.  Okay.  Let me ask you some

6     questions about one of the topics you were

7     designated to testify here today on behalf

8     of BP.

9               Are you familiar with what's

10    been referred to today as topic 9?

11         A.  I am familiar with topic 9.

12         Q.  And was topic 9 in the list of

13    Rule 30(b)(6) topics one of the topics

14    that you came prepared to testify about

15    here today?

16         A.  It was one of the topics I came

17    prepared to testify to.

18         Q.  Let me read into the record topic

19    9.

20               The presence, participation,

21    supervision, or other involvement of

22    officers, directors, or other employees of

23    BP p.l.c. in any aspect of the planning,

24    funding, drilling, completion, temporary

25    abandonment, capping, and/or control of

**PURSUANT TO CONFIDENTIALITY ORDER**

1    the Macondo well.

2                  And did you come prepared to

3    testify about that topic on behalf of BP?

4        A.  I did.

5        Q.  And in preparing to testify about

6    that topic, did you distinguish, sir,

7    between the BP Group and BP p.l.c.?

8                  MR. GODWIN:  Object to form.

9        A.  I did.

10        Q.  (BY MR. FOWKES)  Let me ask,

11    does -- does topic 9 refer to the BP Group

12    or to BP p.l.c.?

13        A.  My --

14                  MR. GODWIN:  Object to form.

15        Q.  (BY MR. FOWKES)  You can answer.

16        A.  My -- my understanding is it

17    refers to BP p.l.c.

18        Q.  All right.  And do you

19    distinguish, sir, between BP p.l.c. and BP

20    Group?

21                  MR. GODWIN:  Object to form.

22        A.  Yes, I do.

23        Q.  (BY MR. FOWKES)  How?

24        A.  Yes, I do.

25                  BP Group covers the -- all of

**PURSUANT TO CONFIDENTIALITY ORDER**

1      the activities across the BP Group, and BP

2      p.l.c. is a smaller group of people, which

3      would include the equivalent of corporate

4      offices and senior executives.

5          Q.  And would it also include people

6      who are specifically employees of the BP

7      p.l.c.?

8          A.  And people who are --

9              MR. GODWIN:  Object to -- wait

10     a minute.

11             Object to form of the

12     question.

13         Q.  (BY MR. FOWKES)  You can answer.

14         A.  Yeah, it would -- it would include

15     people who were employees of BP p.l.c.,

16     and that is different from the employees

17     who are in the Gulf of Mexico.

18         Q.  And what did you do,

19     Mr. Armstrong, to prepare to testify on

20     topic 9 before you came here today?

21         A.  I spent time with you discussing

22     documents that related to the --

23             MR. GODWIN:  So you are

24     waiving attorney-client privilege at this

25     time?

1          MR. FOWKES:  No.

2      Q.  (BY MR. FOWKES)  Sir, I'm not

3  asking you what we -- I'm not asking you

4  what we discussed; I'm asking you what --

5  what you reviewed.

6      A.  What I did to prepare?

7      Q.  Yes.

8      A.  I reviewed documents.  I reviewed

9  documents and familiarized myself with the

10  conversations that took place at -- at the

11  SEEAC and at the GORC, and to the extent

12  that employees of the p.l.c. were involved

13  with the -- the planning of the well, the

14  financing of the well.

15          And I think, according to my

16  research, some members of the p.l.c. were

17  also involved in the response, and I

18  was -- I was clear in my answers to the

19  questions through the day of that sort of

20  distinction.

21          MR. GODWIN:  Object to form.

22      Q.  (BY MR. FOWKES)  When you told

23  counsel earlier today that you had no

24  knowledge, for example, of the cement job

25  that was performed by Halliburton -- let

1    me stop there -- do you recall that

2    general line of questioning with -- with

3    counsel?

4         A.  I recall the line of questioning.

5         Q.  All right.  And when you reviewed

6    information to prepare for your deposition

7    today, did you see any evidence to suggest

8    that any employees or directors or

9    officers of BP p.l.c. had any involvement

10   in -- or knowledge of the cement job on

11   the Macondo well?

12             MR. GODWIN:  Object to form.

13        A.  I saw -- I saw no knowledge of --

14   at that level.

15        Q.  (BY MR. FOWKES)  No evidence?

16        A.  No -- no evidence that any

17   directors or employees of BP p.l.c. had

18   any knowledge of the cement job.

19             MR. GODWIN:  Object to form,

20   nonresponsive.

21        Q.  (BY MR. FOWKES)  When you said

22   earlier today in your testimony -- do you

23   recall earlier today testifying that you

24   didn't know who was involved in the

25   planning, funding, drilling, and

1      completing of the Macondo well?  Do you

2      recall that?

3          A.  I recall making that statement.

4          Q.  And what did you mean when -- by

5      your answer?

6                MR. GODWIN:  Object to form.

7          A.  What I meant was --

8          Q.  (BY MR. FOWKES)  Go ahead.

9          A.  What I -- what I meant was that

10     I -- I knew which members of the p.l.c.

11     were involved, and they had involvement in

12     the planning stage, in the financing

13     stage, and some members had response --

14     had involvement in the response.

15                I didn't know the members -- I

16     didn't know those who were involved in the

17     sort of detail planning, design and

18     execution here in the Gulf of Mexico

19     organization.

20                MR. GODWIN:  Object to form.

21         Q.  (BY MR. FOWKES)  And were you

22     specifically asked by Mr. Watts, for

23     example, which officers, directors, or

24     employees of BP p.l.c. were involved in

25     the planning, funding, drilling, or

428

1    completing of the well?

2         A.   I was so asked, and I was -- I was

3    clear to the best of my knowledge, based

4    on the preparation that I did, which

5    officers and members of the p.l.c. were

6    involved in which stages of the activities

7    that you have listed.

8         Q.   All right.  Let me shift gears,

9    then, Mr. Armstrong, and ask you if you

10   recall earlier today testifying about --

11   well, actually, why don't we get the

12   binder.

13              Do you have the binders from

14   Mr. Watts in front of you now?

15        A.   I do have the binders in front of

16   me.

17        Q.   Could you please turn to tab 64,

18   which I believe is Exhibit 3885.

19        A.   Tab, 4, yes, I -- I have that.

20        Q.   Do you recall being asked

21   questions about this document,

22   Mr. Armstrong?

23        A.   Yes, yes, I do.

24        Q.   All right.  Could you turn to the

25   page that ends with the Bates label 120.

**PURSUANT TO CONFIDENTIALITY ORDER**

 1          A.   Yes, I can.

 2          Q.   Okay.  Do you recall being asked

 3     about various portions of this document by

 4     Mr. Watts?

 5          A.   Yes, I do.

 6          Q.   All right.  Could you look on that

 7     page at the bullet -- or the paragraph

 8     that starts with, beyond S&OI.  Do you see

 9     that, sir?

10          A.   Yes, I do.

11          Q.   Could you read that for us,

12     please.

13          A.   It says, beyond S&OI, which

14     remains our highest priority, we need to

15     deliver production targets, maintain the

16     drive on cash costs, and manage DD&A.

17          Q.   All right.  Did Mr. Watts ask you

18     about that portion of Exhibit 3885?

19          A.   He didn't -- I think he objected

20     when I mentioned that it said beyond

21     safety and operational integrity, which

22     remains our highest priority.

23          Q.   Do you recall testifying earlier

24     today regarding growing earnings by

25     increasing volume and increasing

1      efficiency?

2          A.  I did.

3          Q.  You can put that document aside

4      for now.

5          A.  Okay.

6          Q.  All right.  Can you explain, sir,

7      what you mean by growing earnings by

8      growing volume and increasing efficiency.

9          A.  Yeah, we had a -- as I explained,

10     at the time, we had a plan to grow

11     earnings through growing volume and

12     improving efficiency, and we were -- we

13     were very clear inside of the statement

14     improving efficiency, and there's --

15     there's evidence in these papers that we

16     were maintaining our investment on safety

17     and operation integrity.

18               And with respect to

19     efficiency, the whole idea was not just

20     about -- not about cost cutting, but

21     actually improving efficiency by reducing

22     waste and eliminating nonproductive

23     activity, which was a big opportunity for

24     us.

25         Q.  Could you look at tab 33, please,

1    which I believe is Exhibit 3874.

2        A.   Yeah.

3        Q.   Do you -- do you recall Mr. Watts

4    asking you questions about Exhibit 3874?

5        A.   Yeah.   This was the -- the -- the

6    preliminary outline for the investor

7    presentation that we made.

8        Q.   Could you turn to the page that's

9    marked with the Bates label ending in 609.

10       A.   I can.

11       Q.   All right.   Could you focus and

12   please read to us, please, the last four

13   or five bullet points on page 609.

14       A.   I can.   They say, we are now

15   implementing a similar approach to our

16   production operations through the

17   implementation of a common operating

18   management system, OMS.

19              This will allow us to

20   systematically drive bottom-up continuous

21   improvement throughout our business.

22              During 2008, we started the

23   migration to OMS and the majority of our

24   operations in North America Gas, the Gulf

25   of Mexico, Colombia, and the -- and the

1    Endicott field in Alaska were using OMS by

2    year-end.

3              In parallel, we are developing

4    the capability of our operating leadership

5    through the operations academy - an

6    intensive program being led by MIT, which

7    is building on the success of the projects

8    academy, also at MIT.

9              We are planning to fully

10   implement OMS in all of our operations by

11   end 2010.

12        Q.   Mr. Armstrong, I'm going to ask

13   you some questions in a little bit about

14   the OMS and the operations academy, but

15   for now, do you recall if Mr. Watts asked

16   you any questions at all about these

17   bullet points in this document?

18        A.   He asked me no questions about

19   these bullet points.

20        Q.   Could you turn to tab 49, please,

21   which I believe is Exhibit 3882.

22              And --

23        A.   Yep.

24        Q.   -- turn to the page that ends with

25   the Bates number 361, please.

1    A.   Yep.

2    Q.   Do you see in the slide where it

3    says, quote, we have continued to make

4    significant progress in running safe and

5    reliable operations, including

6    improvements in personal safety and

7    process safety, end quote?

8    A.   I see that.

9    Q.   When Mr. Watts asked you about

10   Exhibit 3882, did he ask you any questions

11   about that bullet point?

12   A.   No, he asked me about the second

13   bullet point, and I think I tried to refer

14   to the first bullet point and got an

15   objection at that time.

16   Q.   And -- and when you were trying to

17   refer to the first bullet point, what was

18   it that you were trying to say before

19   there was that objection?

20   A.   I was trying to say that the --

21   the first key message that we gave to the

22   board by way of talking about our strategy

23   was with respect to continuing to make

24   significant progress in running safe and

25   reliable operations, including

1     improvements in personal safety and

2     process safety, which were our highest

3     priority.

4         Q.  Okay.  And at the time you drafted

5     the e-mail that accompanies these slides

6     in 2009, did you believe that BP had

7     safety and reliable -- safe and reliable

8     operations as its highest priority?

9         A.  I --

10            MR. BRODY:  Objection.

11         A.  Yes -- yes, I did.  That was the

12     clear intent of both Tony Hayward, who

13     I've said has three priorities, which were

14     safety, people, and performance, and Andy

15     Inglis, who was my boss at the time, was

16     aligned with that agenda.

17         Q.  (BY MR. FOWKES)  Could you turn to

18     the page that ends with Bates label 364.

19         A.  Yep.

20         Q.  Do you see that slide -- and I

21     will read part of it into the record

22     here -- which says -- starts out by

23     saying, quote, with improvements in

24     personal safety and process safety.

25            And then under personal

**PURSUANT TO CONFIDENTIALITY ORDER**

1    safety, it says, RIF has been steadily

2    falling since 2Q07.  The RIF of 0.43 in

3    2008 represents one of our best years on

4    record, and the first half of 2009 has

5    continued this trend.

6              BP benchmarks second in the

7    industry for DAFWCF performance behind

8    Chevron.

9              And under process safety, it

10   says, no process safety related major

11   incidents since 3Q08.

12             Completion of safety critical

13   equipment maintenance on time across the

14   segment at 99 percent in 2Q09 - an

15   improvement of, brackets, more than

16   10 percent, close brackets, from the first

17   orange book in 1Q07.

18             High potential incidents,

19   parens, HiPos, close parens, on an

20   improving trend.

21             And number of oil spills

22   greater than -- what is that, one --

23        A.  Greater than one barrel.

24        Q.  -- one barrel on long-term

25   improving trend since 2007.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          Were you asked any questions

2    about this slide, Mr. Armstrong?

3          A.  No, I wasn't.  And it's an

4    important slide because in the context --

5          Q.  Why -- why is it important?

6          A.  It's --

7               MR. CHAKERES:  Objection,

8    form.

9          A.  It's an important slide in -- in

10   the context of talking to the main board

11   about our strategy.  It was important to

12   emphasize that we were making progress on

13   personal safety and process safety.

14               And the second bullet point

15   refers to something that the Baker Panel

16   asked us to do, which was to create both

17   leading and lugging indicators for process

18   safety, and a key leading indicator for

19   process safety is being complete on safety

20   critical -- safety critical -- safety

21   critical equipment maintenance, and being

22   at a level of 99 percent was a very high

23   level in terms of completion.

24          Q.  (BY MR. FOWKES)  Could you turn to

25   the page that ends in Bates label 370.

**PURSUANT TO CONFIDENTIALITY ORDER**

1     Let me read to you the last bullet point

2     on the page.

3               It says, quote, we are doing

4     this in a way that does not compromise --

5     it says comprise; I think that should be

6     compromise -- the safety and reliability

7     of our operations.

8               Do you see that?

9          A.  I do see that.

10         Q.  All right.  And were you asked any

11    questions about that bullet point, sir?

12         A.  No.  What I would say is, this --

13    this -- this was the facing page to the

14    slide that I was asked about, which showed

15    that the -- it's on -- it's on the prior

16    page, page Bates number 2369, and I was

17    asked questions about the fact that our

18    costs had been decreasing from the middle

19    of 2007 to 2009 whilst our competitors

20    were increasing.

21         Q.  Okay.

22         A.  I was asked --

23         Q.  Let me ask -- let me ask you about

24    the last paragraph on the -- on the page,

25    then, sir, and I'll -- I'll quote it.

```
 1                     We -- on this page that ends
 2          in 369, we will continue to do this in a
 3          way that advances our agenda to improve
 4          the safety and reliability of our
 5          operations and maintains our progress on
 6          building the capability of our
 7          organization.
 8                     What is the meaning of that
 9          paragraph there, sir?
10               A.   That means that --
11                     MR. CHAKERES:   Object to
12          form.
13                     THE WITNESS:  Sorry.
14               A.   That means that whilst we were
15          improving the -- the cost efficiency of
16          our business, because we are in a
17          business, we would determine to do this in
18          a way that was consistent with our agenda
19          to improve the safety and reliability of
20          our operations and maintain our progress
21          on building the capability of the
22          organization, which -- which I believe are
23          consistent with the findings of the Baker
24          report.
25               Q.   (BY MR. FOWKES)  Could you turn to
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1        the page that ends with Bates number 410.

2            A.  I can.

3            Q.  Okay.  Were you asked any

4        questions about this slide, Mr. Armstrong?

5            A.  No, I wasn't.

6            Q.  I would like to focus you on the

7        last bullet point.

8                    It says, the developments

9        company will focus on:  Creating the right

10       portfolio by selecting and shaping the

11       right major project activity set.

12                    Building capability and

13       deploying the best people for maximum

14       segment benefit.

15                    Rigorously applying the BP way

16       (common processes and standards) to drive

17       capital efficiency.

18                    And leveraging our scale by

19       implementing segment level project

20       contracting and learning.

21                    Do you see that?

22           A.  I see that.

23           Q.  And what is meant by that bullet

24       point, sir?

25                    MR. CHAKERES:   Object to

1     form.

2          Q.  (BY MR. FOWKES)  Do you have a --

3     do you have an understanding of what that

4     bullet point means?

5          A.  Yes, I understand -- I understand

6     exactly what it means.

7          Q.  And what's the basis for your

8     understanding?

9          A.  The basis -- well, let me -- can

10    I -- can I just take a moment to explain?

11    Because this is in the context of several

12    slides earlier.

13               I was asked about this notion

14    of -- there's a graphic showing 1 to

15    2 percent volume growth and 3 -- 3 to 4

16    percent efficiency improvement can lead to

17    better efficiency performance.

18               This was a slide that was

19    illustrating how we were intending to

20    improve capital efficiency, and this

21    particular example was speaking to the way

22    that we execute major projects.

23               We have got a large portfolio

24    of major projects, and we have set up a

25    developments company to follow -- focus on

```
 1        the quality execution -- we had set up a
 2        developments company to focus on improving
 3        the efficiency with which we do our major
 4        projects.  And you can see that the types
 5        of things that we were focusing on were
 6        building capability, deploying the best
 7        people, applying common processes, and
 8        leveraging our scale.  And that was a way
 9        of driving efficiency, which is not the
10        same as a -- a naive way to cut costs.
11                    For example --
12             Q.  Yeah, can give me some examples of
13        how --
14             A.  Yeah.  Well, by creating -- I
15        can --
16                    MR. GODWIN:  Object to form.
17             Q.  (BY MR. FOWKES)  I'm sorry.  One
18        at a time.  We have to --
19                    MR. GODWIN:  Object to form.
20             Q.  (BY MR. FOWKES)  Can you give me
21        some examples of how you might improve
22        efficiency?
23                    MR. GODWIN:  Object to form.
24             A.  Yeah, if you think about -- if you
25        think about the scale of our organization,
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    for example, by creating a -- a

2    centralized global projects organization,

3    we can adopt -- a centralized projects

4    organization, so a centralized approach to

5    the way that we do major projects, we can

6    standardize on the design of those major

7    projects, which means it's more efficient

8    to execute them, because instead of

9    repeating the design -- instead of doing a

10   new design every time, we can do one

11   design and build many.

12              So the idea was to design one,

13   build many, which leads to efficiency of

14   execution.  We can set up contractual

15   arrangements with our supply chain so that

16   we can have efficiencies through economies

17   of scale.

18              You know, a great example of

19   that is in Trinidad where we've

20   effectively built seven or eight platforms

21   to exactly the same design, and that's

22   kind of real efficiency when it's actually

23   not about cost cutting.  And we saw big

24   opportunities to improve efficiency by

25   that type of standardized approach by

PURSUANT TO CONFIDENTIALITY ORDER

1      creating a centralized organization.

2                      And that's -- I believe that's

3      fundamentally different from a sort of

4      penny-pinching, cost-cutting approach.

5      It's actually doing our business in the

6      right way, applying standard approaches,

7      and leveraging our scale.

8          Q.   (BY MR. FOWKES)  And can

9      increasing efficiency in the ways you've

10     just discussed and improving safety go

11     hand in hand?

12         A.   Absolutely.

13                  MR. BRODY:   Objection.

14         A.   Most of the -- in fact -- in fact,

15     the work that we would do at MIT through

16     the projects academy and the operations

17     academy exactly make this link.  There's a

18     strong correlation between high-quality

19     design execution and safety performance

20     and ongoing reliability, and that's --

21     that's kind of the intent that we had when

22     we spoke about driving efficiency.

23         Q.   (BY MR. FOWKES)  Could you turn to

24     tab 48, please.

25         A.   Yeah.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.  And I believe tab 48 has been

2  marked as Exhibit 3880.

3           Do you recall being asked some

4  questions about this exhibit,

5  Mr. Armstrong?

6      A.  Yes, I do.

7      Q.  Okay.  Could you turn to the page

8  that ends in Bates label 8006.

9      A.  I can.

10     Q.  All right.  Would you take a

11 minute just to read that to yourself.  I

12 know it's a long paragraph, and I don't

13 want to read it into the record.  Just

14 tell me when you've had a minute to read

15 that.

16     A.  I'm -- I'm sort of familiarized

17 with it.

18     Q.  All right.  And were you asked any

19 questions by Mr. Watts -- when he asked

20 you questions about Exhibit 3880, did he

21 ask you any questions about this page?

22     A.  No, he didn't.

23     Q.  All right.  Can you explain for

24 us, please, what is being discussed here

25 in -- on this page that ends in 006.

1        A.   Yeah, this is a -- this is a

2    description of an opportunity to improve

3    efficiency in our subsurface wells and

4    drilling communities.

5             And this is an important point

6    because it's -- it's a similar point to

7    the point that I made about projects, and

8    the -- the subject at issue here is the

9    level of nonproductive time, which is one

10   of the key metrics that we track in the

11   purple book, which the Department of

12   Justice also had as an exhibit.

13            And the statistic in question

14   is that the nonproductive time offshore

15   was 29 percent, which is a large

16   opportunity -- it's nonproductive time.

17   This is -- this isn't when the drilling

18   rig is drilling; it's when it's being

19   nonproductive, through broken equipment or

20   equipment not showing up on time.

21            I -- I think the number adds

22   up to something like 1,400 days, 1,400

23   days of nonproductive time.

24            So when we say that we had an

25   opportunity to improve the efficiency of

PURSUANT TO CONFIDENTIALITY ORDER

1     our business, it was more targeted at that

2     scale of opportunity, which is more around

3     waste elimination, elimination of

4     nonproductive time, than trying to, you

5     know, drive down -- you know, it's a

6     small-scale cost savings by the type of

7     things that people might think about.

8                    MR. CHAKERES:   Object to

9     form.

10                    MS. McCULLEY:   Objection to

11    form.

12         Q.  (BY MR. FOWKES)  And as a -- as a

13    reduction of nonproductive time from, say,

14    29 percent to 17 percent, is that a

15    significant reduction in cost?

16         A.  That would be a huge reduction in

17    cost.

18         Q.  And would there be any tradeoff

19    with respect to safety?

20         A.  There would be absolutely no -- no

21    tradeoff between cost and safety.  This is

22    simply -- this is in the category of -- of

23    waste elimination.  There's no -- there's

24    absolutely no tradeoff between -- and,

25    again, I think the -- the academic

PURSUANT TO CONFIDENTIALITY ORDER

```
 1        evidence would say that there's a -- a
 2        correlation between having a high-quality
 3        operation that's got low levels of
 4        nonproductive time and high levels of
 5        safety, and there's a sort of positive
 6        correlation the other way.  And that's
 7        part of the teaching in the project
 8        academy and the operations academy.
 9            Q.  Okay.  Could you turn to tab --
10        and I think it's in a different notebook
11        now -- tab 78.
12                 And I believe -- I'm not sure
13        the exhibit number on tab 78.  We'll -- we
14        can track that down after the deposition
15        ends.
16                 Do you -- do you recall being
17        asked some questions about this document?
18            A.  Yeah, this was the -- this was the
19        purple book that I described was the --
20        the parallel to the -- the orange book.
21        The orange book was around safety
22        performance, and we developed the purple
23        book to track operating metrics.
24            Q.  Could you turn to the page that
25        ends in Bates label 137.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1        A.   Yeah.

2        Q.   All right.  Do you recall being

3   asked any questions by Mr. Watts when he

4   asked you about this document about this

5   particular page?

6        A.   No, I did not.

7        Q.   And there's a graph and a chart

8   table on this page.  The title of the page

9   says, Drilling NPT as Percentage of Total

10  Dry Hole Drilling Time, parens, FY Wells

11  TD in 2009, close parens.

12             Did I read that right?

13       A.   You did.

14       Q.   All right.  What is the subject

15  that's being discussed and described here

16  on page 137?

17       A.   This is what I was speaking about

18  a moment ago.  This is nonproductive time,

19  and the -- it's -- it's the data chart

20  that informs the -- the memorandum that I

21  spoke to a moment ago, and it sets out the

22  breakdown of nonproductive time for

23  offshore operations and onshore operations

24  and shows that for offshore operations,

25  the nonproductive time was 1,397 days.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    And, again, reducing that, you know, by

2    any proportion would be a significant cost

3    saving.

4        Q.  And, again, would that be a cost

5    saving --

6        A.  Which, again, would have -- would

7    have no impact on -- on, you know, safety

8    or operational integrity.

9        Q.  Could you turn to the next page,

10   please.  And this page looks similar to

11   the page we just looked at.

12               What -- what is this page,

13   which ends in Bates number 138 -- what is

14   it, in particular, showing?

15       A.  This is showing nonproductive time

16   for completions.  So if you look at the

17   activity of drilling a well, we -- we

18   measure the nonproductive time for

19   drilling and then the nonproductive time

20   for completions, because whilst we're

21   completing the well, we're still paying

22   the full rate for the drilling rig.

23               And that shows that the -- it

24   shows, actually, that there was an

25   improvement from 2008 to 2009 offshore of

**PURSUANT TO CONFIDENTIALITY ORDER**

1    6 percent.  So the nonproductive time from

2    completions improved from 32 percent to 26

3    percent, which was a 6 percent

4    improvement.

5              And you recall, we were

6    looking at sort of efficiency improvements

7    of the range 2 to 3 percent, 5 percent.

8    There was still, in terms of absolute

9    days, 550 days of nonproductive time and

10   at a level of 26 percent, which, again, is

11   a significant -- from a business point of

12   view, is a significant improvement

13   opportunity in terms of efficiency, which

14   would have no impact on safety

15   performance.

16        Q.  Now, Mr. Armstrong, you were asked

17   a lot of questions earlier today about

18   increasing earnings and production and

19   decreasing costs to the extent possible.

20              In your experience at BP, as

21   the CFO of E&P, was that done in any way

22   to compromise safety?

23        A.  No, we were --

24              MR. CHAKERES:   Object to

25   form.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. GODWIN:  Object to form.

2       A.  We were clear that safety was our

3    highest priority.  And what I've tried to

4    do here is show that the intent to improve

5    efficiency was a -- was a real

6    opportunity, and it was targeted to the

7    types of things that I've been talking

8    about, which is efficient execution of

9    major projects and capturing our scale and

10   attacking these sorts of opportunities to

11   reduce nonproductive time, which would

12   have no impact on safety and operations.

13          MR. FOWKES:  They say we need

14   to take a short break to change the tape.

15          THE WITNESS:  Okay.

16          THE VIDEOGRAPHER:  Off the

17   record at 5:33 p.m., ending tape 7.

18          (Recess 5:33-5:36 p.m.)

19          THE VIDEOGRAPHER:  Back on

20   record, 5:36 p.m. -- oh, beginning tape 8,

21   sorry.

22       Q.  (BY MR. FOWKES)  Mr. Armstrong, do

23   you recall you were also designated to

24   testify today and you've been asked

25   questions throughout the day about the

**PURSUANT TO CONFIDENTIALITY ORDER**

1    recommendations arising out of the

2    incident in Grangemouth, at Texas City,

3    and the Booz/Allen report relating to the

4    Alaska incident?

5        A.  Yes.

6        Q.  All right.  Let's talk about

7    Grangemouth for -- for a few minutes,

8    please.

9            Could you describe the task

10    force that BP formed to investigate the

11    Grangemouth incident, in general?

12        A.  Yes, I can.  So at the time --

13    well, just -- I think as people know, we

14    had three incidents in the short space of

15    time during the summer of 2000.

16            In response to that, we

17    assembled what -- what was at the time the

18    largest task force to investigate an

19    incident inside of the company.  It was

20    around 30 people drawn from across the

21    firm.  It was led by Rick Porter, who is

22    one of our experienced refinery managers

23    from the US, a fresh pair of eyes, and

24    they did a detailed piece of work, which

25    we published in an open and transparent

1    fashion.

2              The competent authority, which

3    is the health and safety executive in the

4    UK, conducted an external investigation,

5    and the findings of the two investigations

6    were broadly similar.

7         Q.  Mr. Armstrong, I'm handing you

8    what's been marked as Exhibit 3889.

9              (Exhibit Number 3889 marked.)

10        Q.  (BY MR. FOWKES)  And let me -- let

11   me start before I ask you questions about

12   that document by asking you, generally,

13   did BP endeavor to share the lessons that

14   had been learned from Grangemouth with

15   others?

16        A.  We --

17              MR. GODWIN:  Objection.

18        Q.  (BY MR. FOWKES)  With BP and with

19   others?

20        A.  Yeah, we had a -- we had a strong

21   commitment and did many things, which I

22   can mention briefly, to share the lessons

23   internally and externally.

24              So internally, we used this as

25   an opportunity to create an active

1     workshop for safety leaders across the

2     firm, some of whom came from Texas City

3     and the US, in order not just to be

4     presented the lessons learned, but

5     actually to engage in thinking about how

6     we could take action to improve our

7     business as a result of those learnings.

8              We made all the information

9     available externally, and Mike Broadribb,

10    who is one of our leading process safety

11    engineers, conducted a number of external

12    presentations and wrote technical papers

13    which were presented to industry bodies to

14    share our learnings more broadly.

15         Q.  And is Exhibit 3889 an example

16    of -- of what you were just referring to?

17         A.  This is a -- this is a document

18    that describes the -- the lessons learned

19    workshop and some of the commitments to

20    action that came out of that workshop.

21         Q.  Thank you.

22              Let me hand you Exhibit 3890,

23    please.

24              (Exhibit Number 3890 marked.)

25         Q.  (BY MR. FOWKES)  Could you please

1    describe for the record Exhibit 3890.

2        A.   Yeah, this is a technical paper

3    presented to the Institution of Chemical

4    Engineers entitled Lessons from

5    Grangemouth - a Case History, which was

6    written by Mike Broadribb, that I

7    mentioned, Bill Ralph, and Neil

8    Macnaughton.

9              And just for the record, Bill

10   Ralph was the manager of process safety

11   management at Texas City.

12              And the date of the

13   publication, which was, again, published

14   in the Institution of Chemical Engineers,

15   was 2004.

16       Q.   The Institute of Chemical

17   Engineers?

18       A.   The Institute of Chemical

19   Engineers.

20       Q.   Okay.  And what was BP's response

21   to the findings with respect to process

22   safety arising out of Grangemouth?

23              MR. BRODY:  Objection.

24       Q.   (BY MR. FOWKES)  Pardon me?

25       A.   I'm waiting to -- I'm trying not

**PURSUANT TO CONFIDENTIALITY ORDER**

456

1      to speak over people.  And I'm getting

2      tired.

3           Q.  I'm sorry.

4           A.  The first -- the first thing we

5      did was actually come up with a detailed

6      list of recommendations that were tracked

7      to implementation inside of Grangemouth

8      itself.  At the corporate level we created

9      a process safety integrity -- integrity

10     management standard, and we went through a

11     process of implementing that standard

12     across the BP Group, in other words,

13     inside of exploration and production, not

14     just inside of the refinery system.

15          Q.  I'm handing you what's been marked

16     Exhibit 3891.

17               (Exhibit Number 3891 marked.)

18          Q.  (BY MR. FOWKES)  Could you

19     identify that for the record, please.

20          A.  Yes, I can.  This is an internal

21     document, which is entitled BP Group HSE

22     Standard - Process Safety/Integrity

23     Management.  And this -- this was the

24     standard that I was speaking about which

25     was developed in response to Grangemouth

1      to put in place a standard approach to

2      process safety and integrity management.

3          Q.  Did the process safety/integrity

4      management standard that arose out of the

5      Grangemouth incident apply to all the

6      business groups within BP?

7          A.  It applied to all of the business

8      groups inside of BP, including exploration

9      and production.

10          Q.  Let me hand you what's been marked

11      as Exhibit 3892, please.

12              (Exhibit Number 3892 marked.)

13          Q.  (BY MR. FOWKES)  Are you familiar

14      with Exhibit 3892?

15          A.  Yes, I am.  This is the --

16          Q.  What -- what is it?

17          A.  This is the upstream

18      implementation guide dated December 2002

19      for the BP Group process safety/integrity

20      management standard.

21          Q.  And what does that mean, upstream

22      implementation guide?

23          A.  This is the -- this is how

24      exploration and production was going to

25      implement the process safety and integrity

**PURSUANT TO CONFIDENTIALITY ORDER**

1    management standard that was written in

2    response to the events at Grangemouth.

3        Q.  Okay.  Could you turn to page 5 of

4    the document, which is -- ends with Bates

5    number 328.

6        A.  Yep.

7        Q.  Do you see the section that says,

8    scope of application of PS/IM standard in

9    the upstream operations?

10       A.  I can.

11       Q.  Are you familiar with that section

12   of the document?

13       A.  I am familiar with it.

14       Q.  And what does that tell you -- or

15   tell us about how the PS/IM standard was

16   to be integrated in upstream operations

17   specifically with respect to drilling?

18       A.  I'll read you a sentence which --

19            MR. BRODY:  Objection.

20       A.  I'll read you a sentence which

21   sets it out.

22            It says, the scope of the

23   standard -- the section is entitled Scope

24   of Application of the Process

25   Safety/Integrity Management Standard in

1      the Upstream Operations.  And it says, the

2      scope of the standard will, as

3      appropriate, extend from the reservoir

4      downstream to the point of custody

5      transfer, including critical protective

6      systems --

7          Q.  And --

8          A.  -- which includes -- the main

9      equipment types include drilling, downhole

10     casing and tubing, wellheads, Christmas

11     trees and associated well intervention

12     equipment, chokes, flowlines, and

13     production manifolds, process piping,

14     major support structures, transmission

15     pipelines.

16               So the intent was that the

17     process safety/integrity management would

18     apply from the -- the sand facing the

19     reservoir to the export flange of the

20     pipeline.

21         Q.  Let me ask you some questions now

22     about the Texas City incident and BP's

23     follow-up on that.

24               You testified earlier today

25     about the six-point plan.  Was that the

1    immediate response by BP to the Texas City

2    incident?

3              MR. GODWIN:  Object to form.

4        Q.  (BY MR. FOWKES)  Could you

5    describe the six-point plan briefly for

6    me.

7        A.  I can describe the six-point plan.

8    So the idea was that Texas City happened.

9    It was clearly a tragic incident, and we

10   wanted to respond in a material way.

11             John Mogford did, again, an

12   internal investigation, which we made open

13   and transparent.  We had the Baker Panel.

14   And we put in place the six-point plan as

15   a response to Texas City.

16             And the elements of the

17   six-point plan, which we've gone over

18   already, were, first of all, to follow up

19   on the Texas City requirements, which were

20   around occupied portable buildings and

21   blowdown stacks in refining and marketing.

22   In exploration and production, it referred

23   to hazardous -- so in our refineries, it

24   was blowdown stacks.  In exploration and

25   production, it was hazardous cold vents.

**PURSUANT TO CONFIDENTIALITY ORDER**

1        We put in place MAR assessment

2    across exploration and production.  That

3    was the second component.

4            The third component, which is

5    building on the -- and this is a key

6    point.  It's kind of -- it's building on

7    what we were already doing with respect to

8    the findings from Grangemouth, was to

9    fully implement the integrity management

10   standard, the process safety/integrity

11   management standard being rebranded

12   integrity management standard and control

13   of work.

14           The fourth thing was to close

15   out all of the action items that were

16   outstanding.

17           The fifth thing was to assess

18   and invest in the capability of our

19   workforce.

20           And the sixth thing was to be

21   fully compliant with all of the

22   regulations that existed in the places

23   where we operated.

24   Q.  Okay.  And -- and did the

25   six-point plan eventually, as -- I think

PURSUANT TO CONFIDENTIALITY ORDER

1      the word you used was morphed into the

2      operating management system?

3          A.  So I think one of the things that

4      the Baker Panel said was that we needed --

5      we needed a holistic safety management

6      system.  I think it was Baker Panel

7      finding number 3.

8                 And as we were progressing the

9      implementation of the six-point plan, what

10     we decided to do was actually create --

11     create a holistic operating management

12     system, which is OMS.

13                And then there was a formal

14     transition plan from making sure that all

15     of the elements of the six-point plan,

16     amongst other components of our -- of our

17     safety management system, were put into

18     one place, and that was called the

19     operations management system, OMS.

20         Q.  Okay.  And did the Gulf of Mexico

21     adopted the OMS?

22         A.  The Gulf of Mexico did adopt the

23     OMS, so -- the Gulf of Mexico actually had

24     a -- a team that was set up under a guy

25     called Tom Gray, who was a respected

1    operations leader, and Cindi Skelton to

2    implement the integrity management system.

3                  They then broadened that team

4    to implement the six-point plan.  And then

5    they broadened the team to implement OMS.

6    And the Gulf of Mexico -- there were three

7    sites that volunteered to be what was

8    known as part of wave 1 implementation of

9    OMS, and the three sites were the Gulf of

10   Mexico, North America Gas, and Alaska.

11       Q.  Okay.  And what do you mean by

12   wave 1?

13       A.  Well, we decided to implement

14   wave -- we decided to implement OMS in

15   waves.  It was led by a woman called

16   Maureen Johnson.

17                  And the idea was that wave 1

18   still had a -- a component of cocreation

19   of the detailed design.  And what we

20   wanted to do was sort of -- sort of road

21   test the -- the design that had been done

22   by the central team in the reorganization.

23                  And the wave 1 -- there was a

24   part of wave 1 which was around filling

25   out the central design so that we could

464

1      implement it in a practical way inside of

2      exploration and production.  And the three

3      initial sites were designed to do that.

4                    And then each of the sites was

5      then going to act as the guide for

6      implementation in two other sites, and

7      that would be part of wave 2.

8          Q.  Thank you.

9                    Let me hand you what has been

10     marked as Exhibit 3893.

11                    (Exhibit Number 3893 marked.)

12         Q.  (BY MR. FOWKES)  Do you recognize

13     that as the operating plan or OMS handbook

14     for the Gulf of Mexico SPU?

15         A.  I -- yes, I do.

16         Q.  And which -- which version of that

17     is this --

18         A.  I think this is the March '10

19     version, because it refers to -- there was

20     a third --

21         Q.  When you say March '10, you mean

22     March 2010?

23         A.  March -- I'm sorry -- the 1st of

24     March, 2010, which was the -- and the

25     first -- this was a revision on the

**PURSUANT TO CONFIDENTIALITY ORDER**

1    original document that was issued on the

2    3rd of December, 2008.

3         Q.   Okay.   Turn to the page that ends

4    in Bates number 44, please, 044.

5              Let me read to you the

6    paragraph that starts with OMS

7    implementation.

8              Implementation continued in

9    2009 with four additional entities

10   transitioning to OMS.   Thunder Horse

11   completed its MOC at the end of March,

12   major projects by November 30th, followed

13   by drilling and completions and

14   exploration in December 2009.   This put

15   every part of the SPU officially, quote,

16   on OMS, end quote, period.   Implementation

17   in 2009 also took the form of continuing

18   to embed knowledge of OMS as well as the

19   performance improvement cycle system

20   activities.   This was also the first --

21   the year of the first OMS-based safety and

22   operations audit.   This activity in itself

23   provided a strong sense of embedment for

24   function and Atlantis staff and leaders.

25              Do you see that paragraph?

PURSUANT TO CONFIDENTIALITY ORDER

1          A.   I see that paragraph.

2          Q.   As of December 2009,

3     Mr. Armstrong, had the Gulf of Mexico

4     adopted the OMS in its entirety and all of

5     the different assets and functions of the

6     Gulf of Mexico?

7          A.   It had.  It was officially

8     operating under OMS.

9          Q.   All right.  And is part of

10    operating OMS investigating gaps?

11         A.   It is.  That is -- that is a core

12    part of what is referred to in here as the

13    performance improvement cycle, which I had

14    spoken about earlier.  And the intent is

15    that every year, you assess yourself

16    against the gaps, and then you put in

17    place action plans to close the gaps, and

18    then you go through a performance

19    improvement cycle of managing the closure

20    of those gaps, and then sometime in the

21    future, you'll do a reassessment, and then

22    that process continues.

23              And, again, this is -- you

24    know, this is exactly the type of

25    sustainable operations safety management

1       system that the Baker -- the Baker panel

2       was referring to in its recommendations.

3           Q.  And are gaps to be expected as

4       part of the performance improvement cycle?

5           A.  They're a --

6               MR. BRODY:  Objection, form.

7           A.  They're a key part of the design

8       of the process, so gaps are to be

9       expected.  And you put in place plans to

10      close the gaps as part of the performance

11      improvement cycle.

12              (Exhibit Number 3894 marked.)

13          Q.  (BY MR. FOWKES)  Okay.  Let me

14      hand you what's been marked as Exhibit

15      3894, please.

16              Just take a minute and let

17      you -- I'm not asking you to read the

18      whole thing, but take a -- take a look at

19      it until you're sufficiently familiar with

20      it to be able to identify it for us,

21      please, then I'll direct to you a specific

22      page.

23          A.  Yeah, I'm -- I'm familiar with it.

24          Q.  Okay.  What is Exhibit 3894?

25          A.  This is part of the operating

468

1    management system framework.  It's part 4,

2    entitled OMS Governance and

3    Implementation.

4        Q.  And does Exhibit 3894 discuss

5    where and when OMS is applicable?

6        A.  It does.

7        Q.  And I'll direct you to page 14 out

8    of 16, which ends with Bates number 151.

9        A.  Aha.  Very good.

10        Q.  All right.

11        A.  Yep.

12        Q.  When counsel for Transocean was

13    asking you some questions a minute ago

14    about your understanding of the

15    applicability of the OMS to contractor

16    operations, was this the document you were

17    referring to?

18        A.  This is the document I was

19    referring to.

20        Q.  Okay.  And were you specifically

21    referring to any particular paragraph or

22    section here?

23        A.  Yeah.  I said that inside of

24    OMS -- and I've -- I've now got the words

25    in front of me that I was trying to

**PURSUANT TO CONFIDENTIALITY ORDER**

469

1    remember -- it's --

2         Q.  Could you tell us where you're

3    reading from?

4         A.  I'm reading on page 14 of 16 where

5    it says, OMS applicability -- this is --

6    appendix 7, OMS applicability.  This

7    section defines the applicability of OMS.

8              There's a subsection which

9    says, wholly owned and operated.  OMS

10   shall apply to each project, operation,

11   et cetera, that is wholly owned and

12   operated by BP.  Where this is not the

13   case -- where this is not the case, the

14   following applies.

15             And then there are categories

16   for exceptions to that.  One is --

17        Q.  Okay.  To one of -- is one of the

18   categories joint ventures?

19        A.  One of the categories is joint

20   ventures, non-BP-operated.

21        Q.  Okay.

22        A.  And the other is contractors.

23        Q.  All right.

24        A.  So as I was saying --

25        Q.  Let's read -- could you read the

1    section for us about contractors, and then

2    after you'd read it, maybe you could --

3         A.  I can.

4         Q.  -- explain it.

5         A.  So for Contractors it says, where

6    BP relies on a contractor to carry out

7    work, BP shall, as needed, include and

8    apply contract provisions such that the

9    work is carried out in a way that supports

10   and is consistent with BP's application of

11   OMS to BP's operating activities.  Where

12   such contract provisions are not included

13   in an existing contract, BP shall endeavor

14   to amend the contract as needed,

15   immediately or on renewal.

16             So that's -- the intent of

17   that was that there are operations that

18   others do for us, and we don't apply OMS

19   directly to it.  We take -- we look at the

20   clauses in the contract and see that

21   they've got management systems that are

22   consistent with our OMS.

23        Q.  And within OMS itself, are there

24   other provisions that discuss how BP

25   should go about hiring and -- and

471

```
 1      monitoring and supervising its contractor
 2      operations?
 3           A.  There are, and they speak --
 4               MR. CHAKERES:  Objection to
 5      form.
 6           A.  -- they speak to contractor safety
 7      performance and -- and all that stuff.
 8               (Exhibit Number 3895 marked.)
 9           Q.  (BY MR. FOWKES)  Let me hand you
10      what's been marked as 3895, Mr. Armstrong,
11      and ask you if Exhibit 3895 -- and
12      specifically I'm referring to page 2, the
13      second page of the document -- does that
14      generally describe how integrity
15      management and the six-point plan and OMS
16      were implemented over time in the Gulf of
17      Mexico?
18           A.  It does.  This -- this chart
19      describes what I was saying in words a
20      moment ago, which is that the Gulf of
21      Mexico set up a team to implement the
22      integrity management standard, which was
23      led by Tom Gray.
24               That evolved into the
25      six-point plan, and we -- we built on the
```

472

1     experience and the -- experience of the

2     team to implement the six-point plan.

3                   And then the six-point plan

4     evolved into a comprehensive and complete

5     management system, OMS, in line with the

6     recommendation with the Baker report.  And

7     the Gulf of Mexico was part of a wave 1

8     site in terms of implementing OMS in the

9     way that I described.

10         Q.   Okay.  Thank you.

11                   (Exhibit Number 3896 marked.)

12         Q.   (BY MR. FOWKES)  Let me hand you

13     Exhibit 3896, and ask if you are generally

14     familiar with Exhibit 3896 and sufficient

15     to describe for us what it is in -- in

16     overview?

17         A.   Yeah.  This is -- this is a

18     report -- a formal report to the -- the

19     SEEAC, which was spoken about today, on

20     BP's group level response to the

21     independent panel's recommendations, the

22     independent panel being the -- the Baker

23     panel.

24                   And, in essence, what it does

25     is it set out in a -- in a formal way to

**PURSUANT TO CONFIDENTIALITY ORDER**

1       the SEEAC our response.  And it's grouped

2       under the -- the -- each -- each theme

3       is -- is cross-referenced to the elements

4       of the -- of the Baker panel and sets out

5       how we responded to the elements of the

6       Baker panel.

7                    So there's a series of themes,

8       which are leadership, accountability,

9       capability, metrics in reporting,

10      technical compatibility.  And -- and each

11      section refers to the elements in the

12      Baker panel report and then sets out how

13      we've done against those elements of the

14      Baker report.

15          Q.  And does it -- does this document,

16      Exhibit 3896, provide a -- an accurate

17      summary of the group level initiatives by

18      BP to respond to the Baker panel's

19      recommendations as of December 2008?

20          A.  It does.

21          Q.  Let me hand you what's previously

22      been marked as Exhibit 277.  This is the

23      Booz/Allen report following the Alaska

24      incident.

25                    Are you generally familiar

1    with this as a result of preparing to

2    testify today?

3         A.  I am familiar with this report.

4         Q.  Okay.  Could you turn to page 1.

5         A.  Yeah.

6         Q.  It's actually the third page of

7    the document.  And I'll -- I'd like to

8    read to you the -- one minute.

9              I'd like to read you the

10   first -- the first paragraph.

11             BP America management

12   commissioned this project in light of two

13   leak incidents on the Prudhoe Bay oil

14   transit lines in order to identify

15   potential organizational process

16   information and governance issues that may

17   have contributed to these incidents.

18             The purpose of this report is

19   to assess the management system's

20   operational processes and risk management

21   approach for the OTL that were in effect

22   prior to the leaks and affect -- and

23   assess their present state.

24             Then I'll jump to the third

25   paragraph.  This report takes an

1      independent view of BP's organization,

2      structure, processes, information and

3      management practices as they relate to the

4      operation of the OTL.  It does not include

5      any analysis of other areas of BP's Alaska

6      operations, and its conclusions are

7      limited to the suitability of the

8      management systems for the operation of

9      the pipelines.

10                 Do you see where I am?

11         A.   I see where you are.

12         Q.   Okay.  Mr. Armstrong, what was the

13      scope of the Booz/Allen report?

14         A.   Well, I -- I set out -- this was

15      a -- a narrow investigation, looking at

16      the pipeline's part of BP's Alaska

17      operations.  So it was not even -- it was

18      focusing on that area.  And as set out, it

19      didn't include other areas of BP Alaska's

20      operations, nor did it look at areas

21      outside of Alaska.

22         Q.   Okay.  Nevertheless, did BP take

23      some actions outside of Alaska as a result

24      of the incident in Alaska?

25         A.   BP --

**PURSUANT TO CONFIDENTIALITY ORDER**

476

```
1        Q.  And --
2        A.  -- yes -- yes, we -- yes, we did.
3    Although -- although the -- the scope of
4    this investigation was focused on Alaska,
5    following the incident, we did take a
6    review of all of our pipeline -- all --
7    all relevant and appropriate pipeline
8    infrastructure across the group.
9        Q.  Okay.  Let me hand you what's been
10   marked as Exhibit 3897.
11              (Exhibit Number 3897 marked.)
12       Q.  (BY MR. FOWKES)  And after you've
13   had a chance to familiarize yourself with
14   it, let me just ask you to identify it and
15   describe it for the record, please.
16       A.  This is a -- an e-mail -- it's --
17   it's a copy of an e-mail, and the relevant
18   part is from Chris Rhodes, which was,
19   again, one of these long distribution
20   lists G MOR Upstream BULs TVPs.
21              So this was a request from
22   Chris Rhodes to all of the business unit
23   leaders across the upstream segment,
24   which -- I can read it out, if that's
25   okay.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1          It says, following the recent

2     incidents in Alaska -- what I'd like to do

3     is build a collective view of the current

4     status of pipeline inspection integrity

5     assessment.

6          And he had a request for each

7     part of the business to say where they

8     were with respect to adoption of our

9     existing engineering technical practice

10    for pipeline inspection.

11         So, you know, what are you

12    doing with respect to the existing --

13    already existing, which was part of our

14    series of engineering technical practices,

15    how are you doing on that, and

16    specifically how many pipeline segments

17    containing hydrocarbons do you have

18    greater than 6 inches in diameter,

19    operating at a pressure of more than 50

20    pounds.  And for each of those, state the

21    methodology that is being used to

22    ascertain the integrity of the pipeline

23    system -- ascertain the integrity of the

24    pipeline and, if it was piggable, has it

25    been pigged.

**PURSUANT TO CONFIDENTIALITY ORDER**

1       Q.   What does pigged mean?

2       A.   Pigged is you push a -- you push a

3   device through the pipeline to clean it

4   out.  And a smart pig is sort of an

5   intelligent device that can go through a

6   pipeline to take measurements.

7       Q.   And you said that this request for

8   all of the business units to review their

9   pipeline integrity assurance went out

10   across the upstream business?

11       A.   Yeah, which -- which was -- Chris'

12   note went to all -- all SPULs and BULs,

13   which would, by definition, include the

14   Gulf of Mexico.

15       Q.   And did the Gulf of Mexico follow

16   up on Mr. Rhodes' request?

17       A.   I believe --

18           MR. BRODY:  Object --

19       A.   -- they did.

20       Q.   (BY MR. FOWKES)  All right.  And

21   do you see an e-mail on Exhibit 3897 from

22   Mr. Kenny Lang to Cindi Skelton and Thomas

23   Gray that says, quote, Tom and Cindi,

24   appreciated you are already into action on

25   this -- thanks.  Looks like a formalish

1      feed is required with some urgency.  Can

2      you pull this together and let's have a

3      look late Thursday?  Signed, Kenny.

4          A.  Yeah.

5          Q.  Do you see that?

6              Who was Kenny Lang?

7          A.  Kenny Lang was the then SPUL -- he

8      was the senior business leader in our Gulf

9      of Mexico operations.  So that was Kenny's

10     response to Cindi Skelton and Tom Gray,

11     who I've mentioned before, to provide the

12     information that Chris was looking for.

13         Q.  In response to the Alaskan --

14         A.  In response to the -- in response

15     to the Alaskan incident.

16         Q.  And he's asking the -- his group

17     in the Gulf of Mexico to look at their

18     pipelines as a result of findings and

19     lessons learned from Alaska?

20         A.  Yeah.  And you remember that I

21     said that Tom Gray was the -- the

22     experienced leader who was actually

23     responsible for implementation of the

24     integrity management system and the

25     six-point plan in the Gulf of Mexico, and

**PURSUANT TO CONFIDENTIALITY ORDER**

1    that's who Kenny went to.

2                    (Off the record.)

3                    MR. FOWKES:  Mr. Armstrong, I

4    know it's been a long day.  Thank you very

5    much.

6                    THE WITNESS:  Thank you.

7                    THE VIDEOGRAPHER:  Off the

8    record at 6:03 p.m.

9        (Deposition concluded at 6:03 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

481

```
 1                 CHANGES AND SIGNATURE

 2      WITNESS NAME:  ELLIS ARMSTRONG

 3      DATE OF DEPOSITION:  JULY 13, 2011

 4      PAGE  LINE  CHANGE       REASON

 5           _____

 6           _____

 7           _____

 8           _____

 9           _____

10           _____

11           _____

12           _____

13           _____

14           _____

15           _____

16           _____

17           _____

18           _____

19           _____

20           _____

21           _____

22           _____

23           _____

24           _____

25           _____
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      I, ELLIS ARMSTRONG, have read the

2   foregoing deposition and hereby affix my

3   signature that same is true and correct,

4   except as noted on the attached Amendment

5   Sheet.

6          _____

7                           ELLIS ARMSTRONG

8   THE STATE OF _____)

9   COUNTY OF _____)

10      Before me, _____,

11   on this day personally appeared

12   ELLIS ARMSTRONG, known to me (or proved to

13   me on the oath of _____ or

14   through _____) to be the person

15   whose name is subscribed to the foregoing

16   instrument and executed the same for the

17   purposes and consideration therein

18   expressed.

19      Given under my hand and seal of office

20   this _____ day of _____,

21   2011.

22          _____

23          NOTARY PUBLIC IN AND FOR

24          THE STATE OF _____

25          My commission expires: _____

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              UNITED STATES DISTRICT COURT
 2             EASTERN DISTRICT OF LOUISIANA
 3      IN RE: OIL SPILL       )   MDL NO. 2179
        by the OIL RIG         )
 4      "DEEPWATER HORIZON" in )   SECTION "J"
        the GULF OF MEXICO, ON )
 5      APRIL 20, 2010         )   JUDGE BARBIER
                               )
 6                             )   MAG. JUDGE
                               )   SHUSHAN
 7

 8              REPORTER'S CERTIFICATION
 9        TO THE ORAL AND VIDEOTAPED DEPOSITION OF
10                   ELLIS ARMSTRONG
11            I, Therese J. Casterline,
12      Certified Shorthand Reporter in and for
13      the State of Texas and the State of
14      Louisiana, do hereby certify to the
15      following:
16            That the witness, ELLIS ARMSTRONG,
17      was duly sworn by the officer and that the
18      transcript of the oral deposition is a
19      true record of the testimony given by the
20      witness.
21         That the deposition transcript was
22      submitted on _____, 2011, to the
23      witness or to the attorney for the witness
24      for examination, signature and return to
25      Worldwide Court Reporters, Inc., by
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1        _____, 2011;

2             That the amount of time used by each

3        party at the deposition is as follows:

4                  Mr. Watts - 4 hours, 37 minutes

5                  Mr. Chakeres - 0 hours, 15 minutes

6                  Mr. Godwin -  0 hours, 28 minutes

7                  Mr. Brody - 0 hours, 24 minutes

8                  Ms. McCulley - 0 hours, 5 minutes

9                  Mr. Blankenship - 0 hours, 3

10       minutes

11                 Mr. Fowkes - 0 hours, 54 minutes

12            I further certify that I am neither

13       counsel for, related to, nor employed by

14       any of the parties or attorneys in the

15       action in which this proceeding was taken,

16       and further that I am not financially or

17       otherwise interested in the outcome of the

18       action.

19            Subscribed and sworn to by me this

20       14th day of July, 2011.

21

22       _Therese J. Casterline_

         Therese J. Casterline, CSR, RMR, CRR

23       Texas CSR 5001, Expires 12-31-11

         Louisiana CSR 25014, Expires 12-31-11

24       WORLDWIDE COURT REPORTERS

         3000 Weslayan, Suite 235

25       Houston, Texas 77027

**PURSUANT TO CONFIDENTIALITY ORDER**