UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE
GULF OF MEXICO ON APRIL 20, 2010

MDL No.: 2179

Section "J"

Judge Barbier

This Document Relates to: All Cases

Magistrate Judge Shushan

## AFFIDAVIT OF ROBERT J. MCKEE

BEFORE ME, the undersigned authority, personally appeared ROBERT J. MCKEE, and after being duly sworn deposes and states:

1) I represent approximately 1000 claimants ("Krupnick/Smith Claimants") who suffered damage and loss due to the subject oil spill and its subsequent clean-up activities;

2) In accordance with the requisites of the Oil Pollution Act ("OPA"), my clients, through the undersigned's law office efforts, exclusively developed proximate cause evidence and economic loss data upon which to make formal presentment of each of our clients' claims to the Responsible Party under the OPA and simultaneously to make a substantiated claim to the BP claims offices, and upon its formation, to the Gulf Coast Claims Facility ("GCCF");

3) Our clients' process for developing and submitting their claims using substantive evidence of both proximate cause and damage proofs commenced and was completed without the assistance, in any way, factually or financially, of the Plaintiffs' Steering

Committee. My clients' claims submissions and proofs have not utilized any evidence generated by the efforts of the PSC, but rather arise entirely from experts retained by the undersigned and thousands of hours of ongoing diligence by the lawyers and staff working with the undersigned;

4) The process utilized by our clients incorporated the requisites of the OPA and guidelines promulgated and required by the GCCF;

5) The GCCF was formed by recommendation from BP to the President of the United States, after initial efforts to provide OPA based interim payments for damages through multiple BP claims offices throughout the Gulf region;

6) The process by which our clients fulfilled their initial claim substantiation included: a) submission of scientific data to show their proximity to the oil spill and/or physical exposure of person or property to it, including extensive "fingerprint matching" of the samples at a plethora of sites across the Gulf region developed and obtained exclusively by their own counsel and experts; b) submission of multiple years of their own financial support from which reasonable determination of past and future losses could be analyzed and determined; c) their own expert CPA and/or economic analysis to support the claims.

7) After their initial application for interim payments and/or final settlements, the undersigned worked directly and closely with the GCCF in New York, Washington, D.C. and in the undersigned's office to process the claims. This would entail a progressive back and forth transmittal of requests for additional proofs or economic analysis to substantiate a claim through both informal written and oral communications, and by sequences of formal determination letters in serial progression on the claims. In many cases, an interim payment was directly wired to the undersigned's trust account by the

GCCF for particular clients, followed by a written GCCF analysis of the basis for the interim offer, and would incorporate a final offer.  In other cases, after the claimant submission, the GCCF would respond with a denial of the claim.  Upon receipt, the undersigned's staff would communicate directly with the GCCF appointed representatives and be able to obtain a subsequent written determination from the GCCF which resulted in an interim payment and/or a final offer of settlement.  Thus, through an ongoing process entirely unrelated to the litigation process within the MDL, and requiring substantial investment of time and money by the undersigned and his clients, interim payments and final settlements have been accomplished over an extended period of give and take effort between the undersigned and the GCCF.  Additionally, as granted by the OPA itself, no claimant needs to finally settle any of their OPA based claims until the damage has stopped occurring.  The OPA establishes a framework for ongoing interim payments based on successive and serial proof of ongoing harm, substantiating a right for ongoing interim payments for incurred financial losses as a result of the spill. The GCCF non-litigation protocol follows this procedure and allows for serial reapplication for payment for substantiated losses through the interim payment process. Thus,  participants in this process, such as our clients, avail themselves to  the mechanism anticipated by Congress through the OPA without cluttering the Court with ongoing litigation;

8)    The undersigned has been able to successfully resolve hundreds of his clients' interim claims and final settlements to the satisfaction of his clients throughout this period since the GCCF inception.  Additionally, as of December 30, 2011, in excess of 150 additional clients have received written determination letters which those clients are willing to

accept, subject to the resolution of issues regarding reimbursement of costs which the GCCF management had previously agreed to pay but which were not present in the subject determination letters.

9)   Our clients whose claims submissions to the GCCF have not yet been reached by it, have submitted essentially the same substantive information to the GCCF as those clients who have successfully received interim or final payments. The essential difference between the clients who have received written offers and/or interim or final payments and those who have not yet received a determination letter is simply the time it takes for the GCCF to process each claim, and to consider counteroffers or subsequent evidentiary submissions provided by the undersigned.

10)   The undersigned is not aware of any contribution by the PSC which effectuated a contribution to the issuance of an interim payment or of a final settlement or settlement offer from the GCCF regarding any of the undersigned clients;

11)   The undersigned has neither received nor utilized any evidence regarding any damage or proximate cause issue which has been developed by the PSC at any time to date. The undersigned is not even aware whether the PSC has developed evidence regarding damage or proximate cause which the undersigned would choose to use to support any of his clients' claims since the PSC has never offered to divulge information to the undersigned which indicated that the PSC possessed any probative evidence that would support the undersigned's clients' claims for interim payments or final settlement.

12)   The undersigned has not seen any evidence or received any communication that indicated that the PSC has done anything on behalf of the undersigned's clients to assist them with the process or support of their claims before the GCCF.

13) The Undersigned is not a member of the MDL leadership, PSC or any supporting committee. The undersigned counsel has no role or position in the MDL and, most importantly, he has not been privy to any work done there which would support his clients' GCCF claims. In short, the claimants represented by the undersigned have done nothing to purposefully avail themselves of the jurisdiction of this Court, nor have they made any effort to obtain any work product of the PSC. Virtually without exception, the undersigned's clients made informed decisions to not subject themselves to the jurisdiction of this Court.

14) The undersigned's clients were informed of the various applicable statutory and common law aspects which potentially applied to their claims. Upon consideration, each of these clients determined by express authorization that they wanted the undersigned to pursue their relief via application to the GCCF at a greatly reduced attorney fee, which reduction only applies to resolution through the GCCF non-litigation based claims process, and to avoid litigation unless and until that effort would prove futile. They expressly chose to not file actions in either the MDL or in the Transocean limitation of liability action which are currently pending, believing that their rights under the law could be fulfilled by way of the requisites of the OPA through interim or final settlements generated by the GCCF. They chose a non-litigation route with reliance upon the fact that their non-litigation resolutions through the GCCF would garner them an acceptable resolution at the smallest cost and fee expense. This reduction of attorney fees as a result of a GCCF pre-litigation resolution was relied upon our clients as they considered their GCCF claims resolutions and as a term of their retention of the undersigned.

15)     The undersigned's clients were informed of the various applicable statutory and common

law aspects which potentially applied to their claims, including all potential costs and the

attorneys' fee before entering into a contract for GCCF representation.  All of the

claimants represented by the Undersigned have a contract with greatly reduced attorney

fee from the standard contract for the exclusive purposes of GCCF claims processing and

resolution.  Among the factors considered in offering and entering into this substantially

reduced fee structure were: an understanding of the expected GCCF claims process; the

recognition that there was no issue of liability under the GCCF process; the focus of the

GCCF on client specific damages and causation issues; the ability to seek cost

reimbursement from the GCCF; the fact that the claim process was outside the MDL

process and any potential fee or cost contribution for PSC or otherwise.

FURTHER AFFIANT SAYETH NAUGHT.

DATED on this 12th day of January 2012.

ROBERT J. MCKEE


        SWORN and SUBSCRIBED to before me, the undersigned authority, on this 12th

day of January 2012.  Affiant is personally known to me.

NOTARY PUBLIC



HOLLY M. POTTS
Commission # DD 909063
Expires October 11, 2013
Bonded Thru Troy Fain Insurance 800-385-7019