UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | : | MDL NO.  2179 |
| 'Deepwater Horizon' in the Gulf | : | |
| of Mexico, on April 20, 2010 | : | SECTION:  J |
| | : | |
| This Document Relates to: | : | JUDGE BARBIER |
| *Civil Action* 10-4536 | : | MAG. JUDGE SHUSHAN |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .


UNITED STATES' COMBINED MEMORANDUM RE:


(1) REPLY IN SUPPORT OF SECOND MOTION OF UNITED STATES
FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY [4820]


And


(2) OPPOSITION TO ANADARKO'S CROSS-MOTION FOR
SUMMARY JUDGMENT [5113]


And


(3) OPPOSITION TO TRANSOCEAN'S CROSS-MOTION FOR
SUMMARY JUDGMENT [5103]

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

TABLE OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  vi

I.   BP, TRANSOCEAN, AND THE ANADARKO DEFENDANTS
     ARE EACH LIABLE UNDER THE CWA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.   "From" means "From" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     B.   OPA Section 2704(b) does not apply to CWA section 311(b) . . . . . . . . . . . . . 7

     C.   As No Defendant Disputes Their "Owner" Status,
          the Court Need not Reach the "Operator" Question . . . . . . . . . . . . . . . . . . . . . 9

II.  BP, TRANSOCEAN, AND THE ANADARKO DEFENDANTS
     ARE EACH LIABLE UNDER THE OPA, WITHOUT LIMITATION. . . . . . . . . . . . 10

     A.   Section 2704(b) of OPA Does not Exonerate Transocean . . . . . . . . . . . . . . . . 10

     B.   Regulatory Violations and Proximate Cause . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III. ENTRY OF DECLARATORY JUDGMENT OF JOINT & SEVERAL
     LIABILITY IS APPROPRIATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

     A.   Entry of Final Judgment on the Second Claim for Relief
          is Appropriate (Claim Splitting Does not Apply). . . . . . . . . . . . . . . . . . . . . . . . 19

          1.   Declaratory Judgment of OPA Liability, binding on Potential
               Future Litigation for OPA Costs or Damages, is Appropriate . . . . . . . . 20

          2.   The Potential *Res Judicata* Effect of an Un-scheduled Civil Penalty
               Assessment Trial in this Case Is Not Relevant to this Motion . . . . . . . . 22

     B.   Joint & Several Liability Applies; Common Law
          Notions of Divisibility Do Not. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

          1.   The Common Law Divisibility Defense
               Does not Exist Under OPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

          2.   Even if the Common Law Defense Did Exist Under OPA,
               it Would Not Apply in this Case as a Matter of Law. . . . . . . . . . . . . . . 27

     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

i

<u>TABLE OF AUTHORITIES</u>

FEDERAL CASES

*ACC Chemical v. Halliburton Co.*, 932 F. Supp. 233 (S.D. Iowa 1995)  . . . . . . . . . . . . . . . . . .  5

*Apex Oil Co., Inc. v. United States*, 208 F. Supp.2d 642 (E.D. La. 2002)  . . . . . . . . . . 11, 24, 29

*Atlantic Coast Line R. Co. v. Mitchell*, 157 F.2d 880 (5th Cir. 1946)  . . . . . . . . . . . . . . . . . . . . 18

*Burlington Northern & Santa Fe Ry. Co. v. United States*,
    556 U.S. 599, 129 S.Ct. 1870 (2009)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27, 28

*Certain Underwriters at Lloyds, London v. Inlet Fisheries, Inc.*,
    518 F.3d 645 (9th Cir. 2008)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889 (5th Cir.1993)  . . . . . . . . . . . . . . . . . . . . . . . 28

*Floyd v. CIBC World Mkts., Inc.*, 426 B.R. 622 (S. D. Tex. 2009)  . . . . . . . . . . . . . . . . . . . . . . 18

*GMD Shipyard Corp. v. M/V Anthea Y*, No. 03-cv-2748,
    2004 WL 2251670 (S.D.N.Y.  Oct. 6, 2004)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re Petition of Settoon Towing LLC*, 722 F. Supp. 2d 710 (E.D. La. 2010)  . . . . . . . . . . . . . 24

*Lightfoot v. MXEnergy, Inc.*, No. 10-2794,
    2011 WL 1899764, at *2 (E.D. La., May 19, 2011),  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Muhs v. River Rats, Inc.*, 586 F. Supp. 2d 1364 (S. D. Ga. 2008)  . . . . . . . . . . . . . . . . . . . . . . 18

*Peconic Baykeeper, Inc., v. Suffolk County*, 600 F.3d 180 (2nd Cir. 2010)  . . . . . . . . . . . . . . . 7

*Rapanos v. United States*, 126 S.Ct. 2208 (2006)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Shell Oil Co. v. United States*, 538 F.2d 346 (Ct. Cl. 1976)  . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*South Florida Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004)  . . . . . . . 6

*Test Masters Ed. Servs., Inc. v. Singh*, 428 F.3d 559 (5th Cir. 2005)  . . . . . . . . . . . . . . . . . . 20, 21

*Union Petroleum Corp. v. United States*, 651 F.2d 734 (Ct. Cl. 1981)  . . . . . . . . . . . . . . . . . . . 5

*United States v. Bodenger*, No. CV-03-272, 2003 WL 22228517 (E.D. La. Sept. 25, 2003)  . . 24

ii

*United States v. Burlington Northern & Santa Fe Ry. Co.*,
   520 F.3d 918 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Chem–Dyne Corp.*, 572 F. Supp. 802 (S.D. Ohio 1983) . . . . . . . . . . . . . 25-27

*United States v. Chotin Transp., Inc.*, 649 F. Supp. 356 (S.D. Ohio 1986) . . . . . . . . . . . . . . . 5

*United States v. Coastal Crude Gathering Co.,* 643 F.2d1125 (5th Cir. 1981) . . . . . . . . . . . . 15

*United States v. Hercules, Inc.*, 247 F.3d 706 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Lucas*, 516 F. 3d. 316 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Monsanto*, 858 F.2d 160 (4th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Ortiz*, 427 F. 3d 1278 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Saporito,et al.,* No. 07-3169, slip op., (N.D. Ill Feb. 9, 2010) . . . . . . . . . . . 29

*United States v. The Catherine*, 116 F. Supp. 688 (D. Md. 1953) . . . . . . . . . . . . . . . . . . . . . . 5

*USF&G v. Lehigh Valley Ice Arena*, No. Civ.A. 03-CV-05700,
   2004 WL 741365 (E.D.Pa. March 4, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Water Quality Ins. Syndicate v. United States*, 522 F. Supp. 2d 220 (D. D.C. 2007) . . . . . . . 17

## FEDERAL STATUTES

33 U.S.C. § 1311(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

33 U.S.C. § 1321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

33 U.S.C. § 1321(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

33 U.S.C. § 1321(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8

33 U.S.C. § 1321(b)(7)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

33 U.S.C. § 1321(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

33 U.S.C. § 1321(c)(4)(B)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

33 U.S.C. § 1321(c)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

33 U.S.C. § 1321(j)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

33 U.S.C. § 1321(c)(4)-(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

33 U.S.C. § 1362(12) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

33 U.S.C. § 1362(14) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

33 U.S.C. § 2701. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

33 U.S.C. § 2701(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

33 U.S.C. § 2701(14) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 26

33 U.S.C. § 2701(17) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

33 U.S.C. § 2701(18) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

33 U.S.C. § 2701(23). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

33 U.S.C. § 2701(32)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

33 U.S.C. § 2701(34) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

33 U.S.C. § 2702(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

33 U.S.C. § 2703(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

33 U.S.C. § 2703(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

33 U.S.C. § 2703(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

33 U.S.C. § 2704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

33 U.S.C. § 2704(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

33 U.S.C. § 2704(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

33 U.S.C. § 2704(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10, 12, 13

33 U.S.C. § 2704(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

33 U.S.C. § 2704(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12

33 U.S.C. § 2704(c)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

33 U.S.C. § 2706(c)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

33 U.S.C. § 2706(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

33 U.S.C. § 2717(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

33 U.S.C. § 2717(f)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

42 U.S.C. § 9601 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

43 U.S.C. § 1348(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

## FEDERAL REGULATIONS

15 C.F.R. pt. 990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

30 C.F.R. § 250.300(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

30 C.F.R. § 250.420(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

40 C.F.R. pt. 302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## LEGISLATIVE HISTORY

H.R. Rep. No. 91-940 (1970) (Conf. Rep.), *reprinted in* 1970 U.S.C.C.A.N. 2712   . . . . . . . . . . 5

H.R. Rep. No. 101-653, 1990 WL 132747 (1990)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

S. Rep. No. 101-94 (1989), *reprinted in* 1990  U.S.C.C.A.N. 722,
1989 WL 225005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 21, 24, 26

## OTHER AUTHORITIES

Erastus C. Benedict, *3 Benedict on Admiralty*, § 112(a)(2) (7th ed. rev. 2004) . . . . . . . . . . . .  24

Thomas J. Schoenbaum, *Admiralty & Maritime Law*, § 18-3 (5TH ed. 2011) . . . . . . . . . 10, 12, 13

Restatement (Second) of Torts § 876 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>TABLE OF EXHIBITS</u>

<u>Exhibit #</u>          <u>Description</u>

1.          Chart of United States' Statement of Undisputed Material Facts in Support of
            Motion for Partial Summary Judgment and Defendants BP, Transocean and
            Anadarko's Responses

2.          Excerpts from BP *Deepwater Horizon* Accident Investigation Report dated
            September 8, 2010

3.          Excerpts from Deposition of Mark Robert Bly dated February 17, 2011.

4.          Excerpts from Transocean Investigation Report, Macondo Well Incident, dated
            June 2011

5.          Excerpts from Macondo Operating Agreement (Dep. Ex. 1243) *(Confidential –
            Pending Motion to File Exhibit Under Seal)*

6.          Declaration of Lieutenant Alyssa Johnson and Exhibit 1 thereto *(Exhibit 1
            Confidential (NRC Incident Report #937721) – Pending Motion to File Exhibit
            Under Seal)*

7.          April 28, 2010 Letter to Transocean from United States Coast Guard re:
            Responsible Party Status

8.          Daily Operations Report – April 17, 2010 *(Confidential – Pending Motion to File
            Exhibit Under Seal)*

9.          SMIT Salvage Daily Progress Report dated April 22, 2010 (Dep. Ex. 5309)
            *(Confidential  – Pending Motion to File Exhibit Under Seal)*

10.         April 13, 2010 email from Michael Beirne to Nick Huch and Ishii Naoki re:
            Macondo TD & Draft Sub. Op. AFE (Dep. Ex. 1256)

11.         April 12, 2010 meeting invitation sent by Paul Chandler re: Macondo (Dep. Ex.
            1592)

12.         April 12, 2010 email from Paul Chandler to Robert Bodek re: Macondo TD (Dep.
            Ex. 1593)

13.         Emails forwarding April 5, 2010 email from Robert Quitzau re: Macondo update
            (Ex. 2630)

14.         April 14, 2010 email from Michael Beirne to members of BP Macondo Well
            Team re: Macondo JOA obligations (Dep. Ex. 2855)

15.      Excerpts from Deposition of Michael Beirne dated June 27, 2011 (Volume 1).

16.      Excerpts from Deposition of Michael Beirne dated June 28, 2011 (Volume 2).

17.      Excerpts from Deposition of Paul A. Chandler dated May 4, 2011.

18.      Excerpts from Deposition of Nicholas G. Huch dated May 16, 2011.

19.      Excerpts from Deposition of Robert Quitzau dated May 25, 2011.

20.      Excerpts from Deposition of Michael Keith Williams dated July 20, 2011

The Defendants oppose partial summary judgment in the three categories set out below.[1]

Notably, all three of these categories are pure questions of law (or application of law to fact), and

no defendant offers even a scintilla of evidence to dispute the facts of liability.

*First*, the Defendants offer legal interpretations to defeat entry of partial summary

judgment of strict liability under the Clean Water Act ("CWA") (First Claim for Relief).  The

Defendants' oppositions and counter-motions lack merit for the following reasons:

- The oil was discharged from *both* the well and the BOP and riser (*i.e.,* oil was discharged from the "offshore facility" and was also discharged from the "vessel");

- Transocean's attempt to graft OPA's limitation of liability for OPA costs and damages, 33 U.S.C. § 2704(b), onto the CWA's liability provision for civil penalties, 33 U.S.C. § 1321(b), is contrary to the plain language of the CWA; and

- As no defendant disputed their "owner" status, the Court need not reach the "operator" question; however, the OCSLA "operator as a matter of law" theory is valid and meritorious, if the Court does consider it.

*Second*, the Defendants offer legal interpretations to defeat entry of partial summary

judgment of unlimited liability under the Oil Pollution Act ("OPA") (Second Claim for Relief).

The Defendants' oppositions and counter-motions lack merit for the following reasons:

- Transocean's interpretation of the MODU limitation of 33 U.S.C. § 2704(b) is contrary to the language of Section 2704(b), and in any event the limit does not apply where the incident was caused by the violations of regulations by Transocean (or BP, with whom Transocean has a contractual relationship); and

- The regulatory violations were proved with no genuine issue of material fact, and were, as a matter of law, a "proximate cause" of the incident.

*Finally*, the United States seeks to have the partial summary judgment of unlimited joint

and several liability under the OPA (Second Claim for Relief) entered as a final judgment.  BP

---

[1] The United States moved against BP, Anadarko, and Transocean.  [4820].  BP opposed [5124], while Anadarko opposed and cross moved for non-liability [Doc. 5113-2], as did Transocean [5103].  This paper is a Reply in support of [4820] and an opposition to the motions of Transocean and Anadarko.

(no other party) posits that to do so would be "claim splitting," and that the damages may be "divisible."  Neither of these arguments denies unlimited OPA liability, and both of these legal arguments are wrong:

- As a matter of law, there is no divisibility defense to joint and several liability in the context of a share of OPA damages being assigned to the United States as a non-liable plaintiff; and

- BP ignores the express language of OPA which authorizes entry of declaratory judgment on liability to be enforced in a "subsequent action or actions" to recover damages.  33 U.S.C. § 2717(f)(2).  Moreover, even if no such provision were in OPA, this would not comprise claim splitting as the evidence in Phase One will have virtually no overlap with the evidence in any subsequent natural resource damages phase.

## I.  BP, TRANSOCEAN, AND THE ANADARKO DEFENDANTS ARE EACH LIABLE UNDER THE CWA.

The United States discussed the elements of CWA liability, and undisputed facts, in its Motion.  [4820] at 17-31.  None of the Defendants disputes the actual *facts* – that oil came out of the well, and the BOP and riser, into the ocean, and that each defendant owned the well or BOP or riser.  Rather, they argue the legal import of those facts.[2]

### A.  "From" means "From."

All three Defendants engage in linguistic gymnastics to argue about the meaning of the word "from."  BP [5124] at 15-16; Anadarko [5113-2] at 4 – 17; Transocean [5103] at 9-13.  The Court should apply the ordinary and common sense meaning.

For months, the nation was transfixed by images of oil gushing into the Gulf of Mexico at the Macondo well site, as a seemingly endless onslaught of hydrocarbons traveled up the well and apparently inoperative BOP and emerged at the end of the broken riser pipe.  The

---

[2] For the Court's convenience, we attach a chart that includes all of the statements of fact by the United States with the three Defendants' responses, *i.e.*, combines four documents in to one chart (Exhibit 1).

2

Defendants, acting in concert in funding, drilling, and constructing the 3-mile deep Macondo well from aboard the Deepwater Horizon, had also generated the most catastrophic oil spill in U.S. history.  Prior to the blowout, the main body of the Deepwater Horizon, afloat on the ocean, was physically connected to the well and BOP via the riser piping through which the well was drilled, and these components formed a mechanically integrated structure. As a result of the disaster, the physical connection via the riser broke apart.

Defendants now seek to avoid liability under the Clean Water Act for the massive discharge by arguing – in perfect contradiction of each other – that (1) the oil was not discharged "from" the Macondo well, but instead from the Deepwater Horizon, including the BOP and riser (BP and Anadarko) and that (2) the oil was not discharged "from" the Deepwater Horizon, including its BOP and riser, but instead from the well (Transocean).

These arguments defy both common sense and the common English usage of the word "from."   See U.S. Opening Br. At 21 (quoting dictionary definitions; "from" denotes among other things "departure or moving away.")  Taking the analogy posited by Transocean regarding air travel, Transocean would argue that if someone departed Los Angeles, traveled to St. Louis, and took a connecting flight to New Orleans, the traveler would have come from Los Angeles, but not from St. Louis; whereas BP and Anadarko would argue that the traveler would have come from St. Louis, but not from Los Angeles.  Certainly the traveler, after having spent hours in airports and airplanes, would know that he came from both Los Angeles and from St. Louis.

Here, there was a blowout of a physically connected and mechanically integrated structure comprised of the Deepwater Horizon, including the BOP and riser, and the Macondo well.  The oil gushed forth from what remained—the uncontrolled well, the BOP, and the broken riser pipe.  When the words of the statute are overlaid on the facts of this discharge, it is apparent

that each of the Defendants is liable. Transocean is "any person who is the owner, operator, or person in charge of any vessel . . . from which oil . . .[was] discharged . . . ."  33 U.S.C. §1321(b)(7).   Anadarko and BP are each "any person who is the owner, operator, or person in charge of any . . . offshore facility . . . from which oil . . .[was] discharged . . . ."  *Id.*   There is nothing in the statute that indicates that the disjunctive "or" between "vessel" and "offshore facility" somehow creates an exemption for persons who fall within its terms.[3]

As the Court need look no further than the language of the statute and the common English usage of the word "from," the United States will not address in detail the many pages of Defendants' arguments on this issue, all of which seek something other than a straightforward application of the statute.  However, a few points are worth noting.

First, the fallacy of their arguments is underscored by Anadarko's astounding summation that "*no oil discharged from the Macondo Well into the Gulf of Mexico,*" [5113-2] at 10 (emphasis added), a claim that BP also adopts.  [5124] at 16, n.2.

Second, none of the cases relied on by Defendants involved an offshore well, platform, or other drilling unit, and contrary to the suggestion in their briefs, none of the cases construed the word "from" in Section 311(b) of the CWA.   For example, in the case on which they chiefly rely, *Shell Oil Company v. United States*, No. 318-75, 1976 WL 23839, 538 F.2d 346 (Ct. Cl. 1976), a two-paragraph unreported opinion, the court construed the term "onshore facility" in the pre-1990 version of Section 311(i), not the term "from" in 311(b).   There, Shell sought to recover costs spent cleaning up an oil spill which originated from a tanker and fuel barge, neither

---

[3] None of the cases cited by Defendants regarding use of the disjunctive support their argument.  For example,  *Lightfoot v. MXEnergy, Inc*., No. 10-2794, 2011 WL 1899764, at *2 (E.D. La., May 19, 2011), explains that when two elements are joined by "or," only one need be present.  It does not stand for the proposition that both elements cannot be present.

of which were owned by Shell, but were moored alongside Shell's dock and situated in its slip. The court rejected Shell's argument that its "onshore facility" encompassed the dock and slip, reasoning that "an instrumentality which is afloat is not 'onshore.'" *Id.* The court concluded that Shell's "interpretation would render that statutory term meaningless." Thus, this decision is not germane to this case.[4]

Third, Anadarko's and BP's arguments that the term "discharge" is defined to require an "act" or that the term requires operational responsibility are inconsistent with the definition which explicitly "includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping…." 33 U.S.C. § 1321(a)(2). This definition plainly includes, for example, even passive seepage from a tank or drum. *See also C*onf. Rep. No. 91-940, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S.C.C.A.N. 2712, 2718 ("[t]he definition of discharge is designed to cover by its broad terms all possible means of fouling the waters with oil;" referring to the 1970 version of the CWA in which Congress initially used this definition of "discharge"). These arguments are unavailing.

---

[4] The other cases cited by Defendants are also inapposite. *See United States v. Chotin Transportation, Inc.*, 649 F. Supp. 356 (S.D. Ohio 1986) (no discussion of the word "from" and no discussion of liability of any persons other than the vessel owner); *United States v. The Catherine*, 116 F. Supp. 668 (D. Md. 1953) (no discussion of liability other than the steamship, and no discussion of the word "from"); *ACC Chemical Co. v. Halliburton Co.*, 932 F. Supp. 233, 237 (S.D. Iowa 1995) (CERCLA case concluding that the relevant facility was "the place where the hazardous substances were disposed of and where the government has concentrated its cleanup efforts"); and *Union Petroleum Corp. v. United States*, 651 F.2d 734, 228 Ct.Cl. 54 (1981) (construing the term "onshore facility" under Section 311(i)). In contrast, cases under Section 301 of the CWA have routinely imposed liability on defendants who discharged pollutants that traveled through intervening conduits before reaching a water body. *See, e.g.*, *United States v. Ortiz*, 427 F. 3d 1278 (10th Cir. 2005) (reversing judgment of acquittal of defendant who dumped chemical wastes into a toilet that traveled through a storm drain before emptying to a river); *Rapanos v. United States*, 547 U.S. 714, 743; 126 S.Ct. 2208, 2227 (2006) ("from the time of the CWA's enactment, lower courts have held that the discharge into intermittent channels of any pollutant that naturally washes downstream likely violates § 1311(a), even if the pollutants discharged from a point source do not emit 'directly into' covered waters, but pass 'through conveyances' in between") (plurality opinion).

Fourth, Transocean's arguments are equally flawed.   Its premise that the word "from" includes a requirement that a relevant vessel or facility be the original source of the oil is inconsistent with common English usage.   Furthermore, this argument cannot be squared with the statute and relevant precedent of the Supreme Court.

In *South Florida Water Management Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004), the Court construed the phrase "discharge of a pollutant" under Section 301(a) of the CWA, 33 U.S.C. §1311(a), which, as defined, prohibits "any addition of any pollutant to navigable waters *from* any point source."[5] 33 U.S.C. § 1362(12) (emphasis added).   The case involved a water district's pumping station that transferred polluted water from a canal over a levy to a reservoir. The water district argued that there was no addition of a pollutant from a point source (the pump station) unless the pollutant originated from that point source, and not when pollutants that originated elsewhere merely passed through the point source. *Id* at 104.   The Court rejected that argument as "untenable" and concluded that the statute "includes within its reach point sources that themselves do not generate pollutants." *Id* at 105.[6]   *See also United States v. Lucas*, 516 F.3d. 316, 332-333 (5th Cir. 2008)(the Supreme Court has "held that the Act 'makes plain that a point source need not be the original source of the pollutant; it need only convey the pollutant. . . ," quoting the plurality opinion in *Rapanos v. United States*, 126 S.Ct. 2208, 2227 (2006), in turn quoting *Miccosukee*, 541 U.S. at 105.)[7]

---

[5] "Point source" means "any discernible, confined and discrete conveyance, including but not limited to any pipe . . . conduit, well . . . or vessel or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

[6] The court did not decide whether there had been an "addition" of pollutants.

[7] As noted above, the term "discharge" is defined more broadly for purposes of Section 311 than the phrase "discharge of a pollutant" in 301 and "*includes, but is not limited to,* any spilling . . . leaking . . . or

The only CWA decision cited by Transocean does not support its position.  *Peconic Baykeeper, Inc., v. Suffolk County,* 600 F.3d 180, 188 (2nd Cir. 2010).  There, in a case under Section 301 involving aerial pesticide application, the district court had concluded that the spraying equipment did not constitute a "point source" because the pollutants first sprayed through the air before reaching the water, rendering the discharges indirect. The court of appeals rejected that conclusion and determined that the defendant could not avoid liability on that basis. *Peconic,* 600 at 188.  And, as discussed above, the Supreme Court's decision in *Miccosukee* forecloses any argument that a "point source" must be the original source of the pollutant.

None of the other cases cited by Transocean involve the CWA, and all are inapposite. For example, *USF&G v. Lehigh Valley Ice Arena*, No. 03-cv-05700, 2004 WL 741365, at *4 (E.D. Pa. March 4, 2004), involved a liability insurance policy that provided coverage for "bodily injury if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building."   Accordingly, that case involved issues of contract construction and causation not at issue here.

**B.  OPA Section 2704(b) does not apply to CWA Section 311(b).**

Transocean (no other defendant) argues an additional basis for non-liability:  that OPA's legislative history should be used to contravene the plain language of the CWA.  Transocean [5103] at 15- 21.  This argument fails based on the plain language of Section 311(b).[8]

---

emitting."  33 U.S.C. §1321(a)(2)(emphasis added).  It would thus be illogical to construe this definition in a manner more restrictive than provided for purposes of Section 301.

[8] The United States' motion did not address Section 2704, but now that Transocean has put the matter at issue, and cross-moved, the United States does request, and if necessary hereby moves for, summary judgment that Transocean is liable under OPA without limitation.  A new proposed order and judgment is supplied.

Section 311(b) makes "the owner . . . of any vessel . . . from which oil . . . is discharged" subject to a civil penalty.  33 U.S.C. §1321(b)(7)(A).  No defenses are provided, and there is no exemption for any type of owner, operator, or person in charge of a vessel or facility, and no exemption for, or even reference whatsoever to, mobile offshore drilling units.  Transocean cannot avoid liability by grafting nonexistent language onto the statute.

Where Congress intended to incorporate terms into Section 311 from OPA, it knew how to do so, and in fact did so explicitly.  For example, Section 311(c)(6) defines "responsible party" to have the "meaning given that term under section 1001 of the Oil Pollution Act of 1990 [33 U.S.C.A. § 2701 et. seq.]."  The preceding subparts 4 and 5 refer separately to "an owner or operator" and to "a responsible party," further showing their separate meanings.  33 U.S.C. § 1321(c)(4)-(6).  Transocean cannot rewrite this express and deliberate statutory scheme.

In enacting OPA, Congress did two very important things that are central to this case: it amended Section 311(b) to increase the civil penalties so as to strengthen the regime of deterrence provided in the Clean Water Act, and it enacted Title I of OPA.  The latter reflects a carefully calibrated compensatory scheme to ensure quick and comprehensive compensation for persons who have suffered damages as a result of oil spills, to ensure that funds are available for quick and effective removal actions, and to ensure recovery of removal costs and natural resource damages by the United States and other natural resource trustees.  The delineation of "responsible parties" under Title I and accompanying liability limits are part of that compensatory scheme, and should not be confused with the pre-existing and strengthened regime of deterrence through civil penalties embodied in 311(b).

As stated in the Senate report on which Transocean relies:

> [A]ny oil spill, no matter how quickly we respond to it or how well we contain it, is going to harm the environment. Consequently, preventing oil spills is more important than containing and cleaning them up quickly. . . . The Nation's continued dependence on oil will result in increasing transport of oil in tankers through U.S. waters and greater offshore exploration and production in deeper waters and harsher environments. These conditions can only increase the potential for future catastrophic oil spills and the need to prevent such pollution and minimize its damage.

Senate Rep. 101-94, at 2-3 (1989).  Congress's judgment with respect to the sweep of Section 311(b)'s penalty provisions, designed to prevent and deter such catastrophic oil spills, cannot be rewritten by Transocean or any other party who violates its provisions.

### C.  As No Defendant Disputes Their "Owner" Status, the Court Need not Reach the "Operator" Question.

Each defendant admits that it is an "owner."  [5124-1] at 6, ¶ 34 ("BP admits that it is a partial owner of the Macondo well"); [5103-1] at 26 - 27, ¶¶ 42, 43 (Transocean owned the Deepwater Horizon]; [5113-3] at 23 ¶¶ 51-53 ("APC was a partial owner of the Macondo Well.").  These undisputed facts are sufficient to impose liability as a matter of law.

Therefore, the Court need not address whether the Defendants are also "operators." Indeed, BP expressly agrees that operator status is not relevant once owner status is found.  BP [5124] at 17-18 ("in light of BP's admission that it is an owner of the Macondo well, there is no reason for the Court to . . . address the Government's 'operator as a matter of law' theory."); *see also,* [5124-1] at 6, ¶ 34 (refusing to admit that BP is an operator as unnecessary).  BP nevertheless also takes on the OCSLA lessee argument, BP [5124] at 17-21, as does Anadarko, [5113-2] at 18-24, arguing against the theory set out in the United States' Motion that as a lessee under the OCSLA, it is per se an "operator" due to its statutorily imposed duty to operate safely. Transocean also addresses OCSLA, [5103] at 22, and all three parties raise the issue of operator status under *Bestfoods.*  Anadarko [5113-2] at 21, Transocean [5103] at 22, BP [5124] at 18.  In

short, the United States agrees with BP that the Court need not consider any of these arguments, given the parties' admissions of "ownership."[9]

## II.    BP, TRANSOCEAN, AND THE ANADARKO DEFENDANTS ARE EACH LIABLE UNDER THE OPA, WITHOUT LIMITATION.

Defendants' oppositions related to OPA liability and limitation fall into two categories, addressed separately below.

### A.  Section 2704(b) of OPA Does not Exonerate Transocean.

Transocean argues that Section 2704(b) of OPA absolves them of liability, or limits their liability to surface water spills.  Transocean [5103] at 2-7.  The United States agrees that Transocean's liability may be presumptively limited, but like limitations in OPA for every other type of party, that limitation does not apply where there are violations of applicable regulations (or gross negligence/willful misconduct).  33 U.S.C. § 2704(c).

OPA is a comprehensive scheme designed to ensure oil spills are cleaned up, the parties responsible for the spill pay for the cleanup and damages resulting from the spill, and injured parties are fairly compensated.  OPA's goals are to expand, rather than contract, liability for oil spills.  OPA substantially increased "'pollution liabilities of entities engaged in . . . the production of oil within the . . . United States.'" *Certain Underwriters at Lloyds, London v. Inlet Fisheries, Inc.*, 518 F.3d 645 (9th Cir. 2008) (quoting Schoenbaum on Admiralty).  The Act "increased the financial consequences of oil spills by . . . expanding the scope of polluter liability by imposing strict liability for the clean-up costs and resulting damages . . .[and] raising the

---

[9] However, the United States disputes many of the facts set out in Anadarko's counter-statement of undisputed facts [5113-3] at 24-33.  Accordingly, the Court should deny Anadarko's motion as to "operator" status, to the extent triable issues are present.  Similarly, the Court should deny Transocean's countermotion (which supplied no statement of facts), as there are disputed facts about Transocean's role as "operator" of the Macondo well itself, beyond its role as owner/operator of the *Deepwater Horizon* and its BOP and riser.

liability limit for vessels, which limit could be superseded in the event of gross negligence, *inter alia*, on the part of a responsible party."  *Apex Oil Co. v. United States*, 208 F. Supp. 2d 642, 651 (E.D. La. 2002).

As noted, liability under OPA is not without limits; potential sources of discharges have different types and limits of liability, be they vessels, offshore facilities, or onshore facilities.  33 U.S.C. § 2704(a).  One thing all sources of discharge have in common, however, is that the limits of liability cease to apply if the relevant responsible party is guilty of gross negligence, willful misconduct, or a violation of an applicable federal regulation.  33 U.S.C. § 2704(c).

We now turn to the express statutory language as applied to this case.  First, under Section 2702, "each responsible party for a vessel or a facility" is liable, 33 U.S.C. § 2702(a), and the responsible party for a vessel is "any person owning, operating, or demise chartering the vessel."  33 U.S.C. § 2701(32)(A).[10]  With respect to this vessel, Transocean is a "responsible party."  The vessel includes the BOP and riser, and oil was discharged from the vessel, so Transocean is thus liable under Section 2702(a) for removal costs and damages for discharges from the vessel.[11]  Second, under Section 2704(a), a tank vessel, any other vessel, and an offshore facility each has a presumptive limitation; and each of those limits can be removed under Section 2704(c).  Transocean's MODU, as "any other vessel" (*i.e.,* other than a tank vessel) fits neatly into this mold: it has a limit under 2704(a)(2), and that limit can be removed under 2704(c).

_____

[10] A MODU – defined as a "vessel . . . capable of being used as an offshore facility," 33 U.S.C. § 2701(18) – is nothing more than a unique type of vessel, that may be treated as a vessel *and* an offshore facility when it is operating as such.

[11] The Court already has ruled that the BOP and riser are both part of the vessel.  Order Re:  Motions to Dismiss the B1 Master Complaint, August 26, 2011 [3830], and Transocean has admitted the same.  US SMF ¶ 7 and Exh 36 to US Motion.

That should be the end of the analysis.  However, Transocean cites to Section 2704(b), which concerns a "division of liability" for a MODU "with respect to the discharge . . . of oil on or above the surface of the water."  33 U.S.C. § 2704(b)(1).  Under this provision a MODU in use as an offshore facility is "deemed to be a tank vessel with respect to the discharge . . . of oil on or above the surface of the water."  *Id.*  To the extent that the liability for such a surface discharge exceeds "the amount for which a responsible party is liable (as that amount *may* be limited under subsection (a)(1) of this section), the mobile offshore drilling unit is deemed to be an offshore facility."  *Id.* (emphasis supplied).   By its own terms, then, this provision does not apply to discharges below the surface and is inapplicable.  Since 2704(b) does not apply, Transocean's MODU, as "any other vessel" still has a limit under 2704(a)(2), and that limit can be removed under 2704(c).

But, even if Transocean were correct that Section 2704(b) applies at all, that Section merely converts their limit to that of a "tank vessel" in this case, and as with any tank vessel, the limit can be removed under Section 2704(c).  This reading is supported by the use of the subjunctive in Section 2704(b)(2) (a MODU operator's liability "may" be limited under subsection (a)(1)).  This reading is also supported by treatment of the provision by Professor Schoenbaum in his exhaustive treatise on Admiralty:

> For mobile offshore drilling units liability is first allocated to the owner or operator up to the limit applicable to a tank vessel.  If that limit is exceeded, liability is allocated to the lessee or permittee of the area in which it is located, up to the liability limit applicable to an offshore facility, but reduced by the amount of liability allocated to the owner or operator.
>
> These liability limits do not apply if the incident in question was caused by the responsible party's gross negligence, willful misconduct, or a violation of an applicable federal safety, construction, or operating regulation.

THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW, § 18-3 at 291 (5th ed. 2011).  Professor Schoenbaum apparently declines to incorporate the "surface/subsurface" distinction in his treatment.  He does, however, recognize that all limitations remain dependent on the absence of gross negligence, willful misconduct, or violation of a federal safety or operating regulation that proximately caused the incident.  Thus, while, as 2704(b) notes, the vessel owner's liability "*may*" be limited, a showing of regulatory violation, gross negligence, or willful misconduct will eliminate that limit.

Throughout OPA, the limitations of liability and defenses to liability always carry the requirement of otherwise proper conduct.  Allowed defenses of act of God, act of war, or sole cause of a third party require a showing that the defendant otherwise exercised due care and took precautions against foreseeable acts or omissions and the consequences of those acts or omissions.  33 U.S.C. § 2703(a).   Claimants cannot proceed against responsible parties if the incident in question was caused by the claimant's own gross negligence or willful misconduct.  33 U.S.C. § 2703(b).  Even complete defenses under the statute are not available to a responsible party who fails to report an incident or cooperate with responsible officials.  33 U.S.C. § 2703(c). A blanket exemption from liability for a MODU for discharges *from that MODU* below the surface of the water would be utterly inconsistent with the history and purpose of OPA. Transocean's position, which would allow a MODU's owners and operators to escape all liability for removal costs and damages resulting from a discharge from that MODU, even if based on willful misconduct, and even if in violation of applicable federal regulations, would be anathema to OPA's legislative goals.  Just as gross negligence or other factors will eliminate limits under 2704(a), the limitation potentially provided by section 2704(b) is no different.

Finally, Transocean tries another tack:  that the language of 2704(b) insulates them from any and all liability for subsurface discharges.  This argument is wrong for two reasons:  plain language, and congressional intent.  First, nowhere in section 2704(b), or in any other statutory language, are discharges from the MODU below the water's surface addressed.   Transocean cites to a legislative comment to support its interpretation that the provision is intended to shift liability for any discharge below the water's surface to the lessee or permittee of the well; with respect, the statutory provision simply does not say that.  Congress could have stated explicitly that owners and operators of MODUs in use as facilities are not liable for any sub-surface discharge.  That is not, however, what the provision says.  Second, Transocean's interpretation would excuse all MODUs from any OPA liability (and according to Transocean, any CWA penalties) for anything related to drilling the well – which is what a MODU works on, where the greatest risks lie, and where disastrous oil spills are most likely to occur.  It makes no sense to transfer all responsibility for subsea discharges entirely to the lessees, who may not have any role on the MODU actually doing the drilling (and indeed, may never even have seen the MODU).  Excusing all MODU operators of all liability for things it they directly control would frustrate Congressional intent to hold all responsible parties to account for actions within their direct control.[12]

As stated, Section 2704(b) does not apply here, but what does it mean?  Rather than an additional limitation on liability for MODU vessels (as Transocean argues), section 2704(b)(1) is actually an *enhancement* of liability for both those vessels and for the facility owners who

---

[12] For the reasons stated, proof that the MODU discharged at the surface is immaterial to liability or limitation.  Nevertheless, in opposition to Transocean's Counter-Motion, we attach Exhibits 6, 7, 9 and 20, which show contemporaneous documentation of oil on the surface while the MODU was still afloat (between April 20 and 22, 2010).  Thus, there is a dispute of fact precluding Transocean's motion.

choose to employ them.  As for the MODU owner, under the plain language Section 2704(b),

when a MODU is being used as a facility, this provision *raises* its liability limit for its owner –

for surface spills – from the lower limit of "any other vessel" to the higher limit of a tank vessel

under Section 2704(a).[13]  As for the lessee, to the extent that tank vessel limit is exceeded, the

provision requires the lessee to pay.  Ensuring that the lessee does not escape liability was one of

the purposes of this provision, as demonstrated in the very same passage of the Senate Report

cited by Transocean, [5103] at 3-4:

> A major deficiency of title III of the Outer Continental Shelf Lands Act Amendments of
> 1978 is corrected by the reported bill. Under that title, the owner or operator of an OCS
> facility is held liable.  Often, that *owner or operator is an independent drilling contractor
> and not the actual holder of the rights to produce the oil*.  This technical feature of the
> 1978 act changed the way in which OCS leaseholders and drilling contractors had
> historically allocated liability . . . the reported bill restores the balance among
> leaseholders and drilling contractors on the OCS . . . by defining "owner or operator" for
> OCS facilities to mean the lessee or permittee of the area in which the facility is located
> (or the holder of the OCS rights).

Senate Report 101-94 to accompany S. 686 at 12 (July 28, 1989) (emphasis added).[14]  Thus, by

enhancing liability for both MODU owner and lessee, OPA ensured that the entirety of the clean-

---

[13] A MODU is not a "tank vessel," 33 U.S.C. § 2701(34), as MODUs do not transport petroleum as cargo.

[14] The key deficiency that Congress sought to correct in OCSLA was not that a rig or platform owner or
operator might be subjected to liability, but rather that "the holder of the rights to produce the oil" could
in some circumstances escape liability. *Id.*  OCLSA's definition of "operator" was constrained to mean
"in the case of an offshore facility, any person, except the owner, who is responsible for the operation of
such facility by agreement with the owner." PL 95-372, Section 302(20).  OPA corrected this deficiency,
and in so doing, harmonized the cost recovery and damages provisions in Title I of OPA with OSCLA's
statutory mandate that a lessee "maintain all operations within such lease area . . . in compliance with
regulations intended to protect persons . . . and the environment on the Outer Continental Shelf." 43
U.S.C. §1348(b).  No such amendments were necessary with respect to Section 311(b) of the CWA
because neither the broad definitions of "owner" or "operator" in CWA contained any such similar
constraint.  Section 311(b) has always placed "a major part of the financial burden for achieving and
maintaining clean water upon those who would profit by [their use] and who would pollute [the] same."
*United States v. Coastal States Crude Gathering Co*., 643 F.2d 1125, 1128 (5th Cir. 1981).

up costs for a surface spill will be borne by someone other than the government, *i.e.*, by the MODU owner or the lessee.  In light of this purpose, the Court should reject Transocean's attempt to use Section 2704(b) to exonerate themselves.[15]

B.  **Regulatory Violations and Proximate Cause.**

No Defendant contests the basic facts underlying the regulatory violations cited: they admit that the cement did not prevent hydrocarbon migration to the wellbore and ocean, that people died, and that the waters and shorelines were oiled.  BP's Responses to Statement of Undisputed Material Facts [5124-1] at ¶¶ 10-15, 17, 20; Transocean "Response" to Statement of Facts [5103-1] at ¶¶ 10-15, 17, 20;  Anadarko Response to Statement of Facts[5113-3] at ¶¶ 10-15, 17, 20.  These are clear violations of the cited regulations.

Instead, BP and Anadarko argue that the violations are not the legal "proximate" cause of the "incident."  BP [5124] at 11-15; Anadarko [5113-2] at 24-25.

Contrary to Defendants' assertion that regulatory violations only lift OPA's liability cap if they proximately cause an oil spill, (Anadarko [5113-2] at 25, BP [5124] at 11-15), OPA's limitation is lifted when a regulatory violation proximately causes an *incident*.  OPA defines "incident" as "any occurrence or series of occurrences…resulting in the discharge or substantial threat of discharge of oil."  33 U.S.C. § 2701(14).  Therefore, to properly frame OPA liability cap analysis, this Court should not "focus on any one occurrence, event or cause as *the* proximate

---

[15] As a final note on Transocean's OPA liability, regardless of Transocean's liability for *damages* discussed above, OPA provides that for a discharge from a facility on the Outer Continental Shelf, the United States or a state can recover all of its *removal costs* "from the owner or operator of such facility," regardless of the limits set out elsewhere for tank vessels.  33 U.S.C. § 2704(c)(3).  A MODU, which is a vessel that can operate as a facility, and its BOP and associated riser piping, may, when drilling, constitute a "facility" under OPA.  33 U.S.C. § 2701(9).  Thus, Transocean – as the "owner or operator of [that] facility" – is jointly and severally liable at the very least for all removal costs.

cause of the spill" but rather must look "at the series of occurrences or events that together constitute the incident that led to the spill." *Water Quality Ins. Syndicate v. United States*, 522 F. Supp. 2d 220, 229 (D. D.C. 2007) (emphasis added).

BP argues that the cited violations are not the proximate cause of the incident because the regulations cited by the United States are not the "type of regulatory violation" that can be used to lift OPA's liability limit. BP [5124] at 12. BP states, "if invoking such regulations were permissible, then no OPA responsible party could ever take advantage of OPA's Section 2704 liability caps, and those caps, established by Congress, would impermissibly go for naught." *Id.* at 13. BP's argument fails. First, BP does not deny that the OCLSA regulations are the "applicable" regulations for purposes of OPA's Section 2704, which is the legal test for which regulations to cite. Instead, BP posits that there must be a *subset* of the "applicable" regulations which are the "type" of regulations to rely on, but neither cites legal authority for this theory nor identifies the subset. Second, BP's slippery-slope argument fails because Congress in OPA instructed the Courts to look to the "applicable" regulations, so these MMS regulations will only apply to OCS oil spills. For example, if a truck spills diesel into a river in Arizona, the MMS cementing regulation would not be "applicable." Because Congress instructs courts to look at the "applicable" regulations, not "some applicable" regulations, the selective exclusion of regulations BP suggests is not permitted under OPA's Section 2704.

In addition to arguing the regulations the United States cited are not the "type" to be used under OPA's Section 2704, BP misconstrues those regulations. Section 250.420 does not outlaw oil spills, (BP [5124] at 12-13), but rather requires lessees and operators to case and cement a well to prevent oil spills. The regulation specifies: "You must case and cement all wells. Your casing and cementing programs must meet the requirements of this section…Your casing must

17

… prevent the direct and indirect release of fluids from any stratum through the wellbore into offshore waters."  Therefore, BP is right that the fact the blowout and spill occurred is proof that the Macondo Well's cement failed, but wrong that the spill is what triggers a violation of section 250.420: BP, its co-lessees, and contractors violated Section 250.420(a)(2) because the Macondo Well's cementing program failed to meet the regulations' requirements, and as a result millions of barrels of oil were discharged.

As to Section 250.300(a), the United States does not propose that every accident on a rig that results in a spill would violate this regulation, as BP suggests.  Rather, Section 250.300(a) is violated when the conditions pose an unreasonable risk to human health (*inter alia*).  We posit that the fact that 11 men are dead demonstrates, *res ipsa loquitur,* that there was an unreasonable risk to human health.  Neither BP nor Anadarko offers evidence to rebut the United States' charge that its practices created unreasonable risk of harm.

Anadarko does not argue that the violations are not the proximate cause of the oil spill, but rather that proximate cause is not an issue properly disposed of by summary judgment. Anadarko [5113-2] at 25.  This argument is incorrect when, as here, no genuine issues of material fact exist and no reasonable minds could differ as to whether the regulatory violations proximately caused the incident.  *See Atlantic Coast Line R. Co. v. Mitchell*, 157 F.2d 880, 883 (5th Cir. 1946); *Floyd v. CIBC World Markets, Inc.*, 426 B.R. 622, 649 (S. D. Tex. 2009); *Muhs v. River Rats, Inc.*, 586 F. Supp. 2d 1364, 1373 (S. D. Ga. 2008).

Legislative history explains that OPA's liability cap was only intended for parties who have made an honest and good faith effort to comply with applicable regulations:

> A limit on liability…should not be conferred…in instances where the conduct of the owner
> or operator indicates that such owner or operator is not, in good faith, attempting to comply
> with the applicable regulations or statutory requirements. In these instances, where

compliance *perhaps could have prevented or mitigated the effects of an oilspill* [sic], no such limits will apply.

S. Rep. 101-94, at 14 (1989) (emphasis added).  The regulations cited are those for which Defendants' violations are supported by facts that no parties dispute.[16]

## III.   ENTRY OF DECLARATORY JUDGMENT OF JOINT & SEVERAL LIABILITY IS APPROPRIATE.

BP (no other party) also raised two procedural arguments seeking to delay entry of final judgment on the Second Claim for Relief (OPA declaratory judgment).  BP's positions are curious, at best, for several reasons.  First, given BP's oft-touted promise to pay "all legitimate [OPA] claims," [5124] at 1, why do they seek to delay entry of a declaratory judgment of liability related to such claims?  Similarly, their promise to pay all OPA claims rings hollow in light of their attempt to divide up the liability into portions that BP should not be required to pay, (apparently including dividing a portion to blame on the United States for overseeing the cleanup of the spill that BP itself caused).  Finally, as BP acknowledges, [5124] at 3, the United States did not initially seek summary judgment against BP on OPA – no surprise in light of their promises to pay – yet they spend one third of their brief contesting entry of a final declaratory judgment of OPA liability.[17]  As such, the Court should enter judgment against BP.

### A.  Entry of Final Judgment on the Second Claim for Relief is Appropriate (Claim Splitting Does Not Apply).

---

[16] At trial, the United States will not limit itself to these two regulations, but will also prove violations of other regulations, such as those requiring that all operations be performed in a "workmanlike" manner.

[17] The United States' motion did not BP's OPA liability, but now that BP has put the matter at issue, the United States does request, and if necessary hereby moves for, summary judgment that BP is liable under OPA without limitation.  A new proposed order and judgment is supplied.

BP opposed the United States' motion for partial summary judgment against Anadarko, asserting BP's affirmative defense of "claim splitting."  BP complains that the United States' request for a declaratory judgment regarding alleged damages under OPA constitutes improper claim splitting and is barred by *res judicata*.  [5124] at 4 - 9.  BP's Opposition conflates two separate issues, which we address separately below.

### 1. Declaratory Judgment of OPA Liability, Binding on Potential Future Litigation for OPA Costs or Damages, is Appropriate.

BP admits "the fact" that the "full extent of removal costs and damages may not yet be known." [5124] at 7.  Pragmatically, one very significant type of damages for the United States will be the "natural resource damages" or "NRD" that BP mentions.  [5124] at 6.  So, BP is correct that the United States will – outside the context of this civil action – assess natural resource damages, and some day might return to court to recover specified damages.  BP is correct that we affirmatively seek entry of a final judgment (in the form of a declaratory judgment), to be binding on any subsequent actions (or amendments to this action) to recover such damages.  But BP is wrong that such a process is barred by *res judicata*.

The *res judicata* doctrine bars a subsequent action between the same parties when, *inter alia*, the subsequent lawsuit is based upon the "same claims or causes of action."  *Test Masters Ed. Servs., Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005).  The analysis includes the Court's pragmatic consideration of whether a particular grouping of facts forms "a convenient trial unit," whether the two cases are based on the "same nucleus of operative facts," and whether "the facts are related in time, space, origin, or motivation."  *Id*.

The instant motion is – like the Phase One trial –based on facts related to the facility, the vessel, and the *initiation* of discharges from the well.  The operative facts for the motion relate to

leasing the oil rights, drilling the well, and violations of regulations (and for the Phase One trial,

breaches of standards of conduct).   On the other hand, assessment of NRD will require

testimony of witnesses who are not part of the Phase I trial, such as experts in oil chemistry,

ecology, environmental restoration, and economics.

Further, the United States' efforts to pursue its remedies comports with the Court's

management of this case, especially in light of the phased trials.  The natural resource damage

issues will be complex and time-intensive, involving testimony of many witnesses in specialized

scientific fields.  Those witnesses are not the same engineers, rig workers, or oil drilling industry

personnel who will testify in Phase One.  Accordingly, judicial economy and the current trial

schedule favor a phased presentation of the many legal issues to be resolved as a result of the oil

spill.  As *res judicata* is a "judicial economy" doctrine, use of declaratory judgment in this case

is the most efficient means to manage the claims.  Accordingly, *res judicata* should not bar the

second suit, under the terms of the doctrine itself.  *Test Masters* at 571.

Moreover, OPA supersedes *res judicata* in these circumstances.  With respect to OPA,

BP seeks to avoid the plain language and structure of the statute.  In an action for removal costs,

the court "shall enter a declaratory judgment," which is binding on any "subsequent action or

actions to recover further removal costs or damages."  33 U.S.C. § 2717(f)(2).  The legislative

history states that the declaratory judgment is "binding on any subsequent action involving the

same parties," anticipating further legal action for natural resource damage.  S. Rep. No. 101-94,

at 16 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 738, 1989 WL 225005.  BP thus contradicts

the language of OPA and congressional intent in arguing that a declaratory judgment in this

action would preclude subsequent actions by the United States against BP.

Moreover, OPA specifies that factual and legal issues of NRD are to be pursued in a separate manner.  For example, 33 U.S.C. § 2706(c)(1)(C) requires federal trustees to develop a restoration plan, and the measure of damages under the statute hinges on the plan.  33 U.S.C. § 2706(d)(2).  Damage assessments conducted under § 2706(e) typically require scientific, engineering, and economic analysis, as well as a period for public comment.  *See, e.g.*, 15 C.F.R. pt. 990, "Natural Resource Damage Assessments."  Indeed, OPA's declaratory judgment provision is found in its statutes of limitations, which set out a tiered, iterative process.  Under Section 2717(f)(2), an action for removal costs must be commenced within 3 years, while under 2717(f)(1), an action for NRD need not be commenced until 3 years after the completion of the NRD assessment as described in the preceding sentences.  Because many years may elapse between the removal and the completion of the assessment, OPA provides for the declaratory judgment method.

This regulatory scheme demonstrates that some of the government's remedies are developed outside the court with public involvement, and may later end up in court.  BP's attempt to shoehorn all natural resource issues into the present litigation is contrary to the intent of Congress and the applicable administrative schemes.

> **2.**     **The Potential *Res Judicata* Effect of an Un-Scheduled Civil Penalty Assessment Trial in this Case Is Not Relevant to this Motion.**

BP raises concerns about the potential *res judicata* impact that might arise if the Court enters a final judgment on the *amount* of CWA civil penalties, apparently after the un-scheduled trial phase related to amount of penalty. [5124] at 6-7.  BP argues that the Court must weigh environmental harm as a factor in assessing a penalty amount, so entry of final judgment after such a penalty would bar a subsequent action for NRD.  [5124] at 7 (citing *Gurley Ref. Co.* to

discuss the *res judicata* effect of a final judgment in a CWA penalty action on a subsequently filed action for clean-up costs).

But, the United States has never suggested that the amount of civil penalties is at issue in the pending motion (or for that matter, in Phase 1, 2, or 3 of the case). Claim preclusion does not apply until after a "final judgment on the merits." *Test Masters*, 428 F.3d at 571. Any final judgment on CWA penalties will come after a future phase of the trial that has yet to be scheduled. Accordingly, to the extent CWA penalties might be deemed a "final judgment" as to the United States' other remedies (which the United States disputes), the issue would more appropriately be addressed at the CWA penalty phase of this case. In short, the Court should cross that bridge when we come to it, after Phase 1, 2, and 3 are closed and the yet-to-be scheduled penalty phase commences. This issue is unrelated to entry of a declaratory judgment on OPA liability, which will be enforceable in a future OPA action to recover OPA damages.

**B.  Joint & Several Liability Applies; Common Law Notions of Divisibility Do Not.**

BP and Transocean assert that under the doctrine of "divisibility," defendants should not be held jointly and severally liable for the full extent of removal costs or damages, and, according to BP, "issues of divisibility and joint liability should be reserved for trial." *BP* [5124] at 9; *Transocean* [5103] at 7. BP's and Transocean's positions are simply and fundamentally wrong, and should be resolved as a matter of law before trial.

**1.  The Common Law Divisibility Defense Does not Exist Under OPA.**

When it passed OPA, Congress could not have made clearer its intention that responsible parties would be held jointly and severally liable in all cases. Explaining the meaning of the terms "liable" or "liability" under OPA, 33 U.S.C. § 2701(17), OPA's Conference Report unambiguously stated that the term "is taken from the Senate amendment and is to be construed

to be the standard of liability which obtains under section 311 of the CWA for liability for removal costs and damages from discharges of oil.  That standard of liability has been determined repeatedly to be strict, joint and several liability."  H.R. Rep. No. 101-653, 1990 WL 132747 at *2 (1990) (Conf. Rep.).  The Senate bill is equally clear:

> The body of law already established under section 311 of the Clean Water Act [33 U.S.C. § 1321] is the foundation of the reported bill. . .  [OPA] continues to rely on [33 U.S.C. § 1321] as the basic law providing for cleanup authority . . . and, by adopting the standard of liability under [33 U.S.C. § 1321] as the standard of liability under this Act, for liability of dischargers for cleanup costs for the discharge of oil.  That standard of liability has been determined repeatedly to be strict, joint, and several liability.

S. Rep. No. 101-94 (1989), *reprinted in* 1990 USCCAN 722, 732-33, 1989 WL 225005 at *11.

This Court repeatedly has recognized that OPA liability is joint and several.  *In re Petition of Settoon Towing LLC*, 722 F. Supp.2d 710, 714 (E.D. La. 2010) ("When there is more than one responsible party under OPA, their liability is joint and several."); *United States v. Bodenger*, No. CV-03-272, 2003 WL 22228517 (E.D. La. Sept. 25, 2003) (OPA liability is "strict, joint and several"); *Apex Oil Co. v. United States*, 208 F. Supp.2d 642, 652-54 (E.D. la. 2002) (the standard of liability under OPA is "strict, joint, and several liability").  The Southern District of New York has similarly held that "[w]here there is more than one responsible party, the use of the word 'each' would indicate that such liability is joint and several."  *GMD Shipyard Corp. v. M/V Anthea Y*, No. 03-cv-2748, 2004 WL 2251670 at *12 n.3 (S.D.N.Y. Oct. 6, 2004) (quoting 3 Benedict on Admiralty § 112(a)(2) (7th ed. rev. 2004)).  Legal scholars have also explained that the legislative history of OPA is "quite unequivocal" on the point of OPA's joint and several liability.  3 Benedict on Admiralty § 112(a)(2) (7th ed. rev. 2004).

In support of their argument that joint and several liability under OPA should be subject to divisibility, BP and Transocean ignore OPA and instead focus on the Comprehensive

Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601, *et seq.*[18] BP's and Transocean's mutual reliance on a CERCLA case, *Burlington Northern & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 129 S.Ct. 1870 (2009) (holding that CERCLA defendants seeking to avoid joint and several liability bear the burden of proving that a reasonable basis for apportionment exists), is therefore misplaced, as the Supreme Court in *Burlington Northern* did not in any manner address OPA.  BP argues, for example, that "there is no difference between the two statutes that would justify a different divisibility doctrine under one as compared with the other," [5124] at 10, yet the legislative history and the case law demonstrate precisely why BP's argument is wrong.

CERCLA differs from OPA in that the scope of liability under CERCLA is not always joint and several but can be divisible following "traditional and evolving principles of common law." *United States v. Chem–Dyne Corp.*, 572 F. Supp. 802, 808 (S.D. Ohio 1983).    In *Chem-Dyne*, – which the Supreme Court calls the "seminal opinion on the subject of apportionment in CERCLA actions," *Burlington Northern*, 129 S.Ct. at 1881 – the court noted that CWA Section 311 was a joint and several liability standard, i*d*. at 805, and specifically considered importing the pure strict liability into CERCLA, but ultimately decided that "a blanket adoption of the joint and several liability standard of [CWA 311] would be inconsistent with the legislative history of CERCLA," and chose instead to adopt common law principles of divisibility.   *Id.* at 809-810. The *Chem-Dyne* court reached its conclusion following a detailed examination of the legislative history of CERCLA.  As explained by the court:

---

[18] CERCLA governs "hazardous substances," which are enumerated at 40 C.F.R. pt. 302, but exclude petroleum.  OPA applies to discharges of "oil," defined to exclude substances covered by CERCLA, thereby generally precluding overlapping coverage between the two statutes.  33 U.S.C. § 2701(23).

> A reading of the entire legislative history in context reveals that the scope of liability and term *joint and several liability were deleted to avoid a mandatory legislative standard applicable in all situations* which might produce inequitable results in some cases. . . . The deletion was not intended as a rejection of joint and several liability. . . .  Rather, the term was omitted in order to have the scope of liability determined under common law principles, where a court performing a case by case evaluation of the complex factual scenarios associated with *multiple-generator waste sites* will assess the propriety of applying joint and several liability on an individual basis.

*Chem–Dyne Corp.,* 572 F. Supp. at 808 (emphasis supplied).  Subsequently, other courts undertook similar analysis.  For example, the Fourth Circuit reasoned:

> While CERCLA does not *mandate* the imposition of joint and several liability, it *permits it in cases of indivisible harm*. In each case, the court must consider traditional and evolving principles of federal common law, which Congress has left to the courts to supply interstitially.

*United States v. Monsanto*, 858 F.2d 160, 171 (4th Cir. 1988) (emphasis added).  *Burlington Northern* expressly cited and affirmed the holding of *Chem–Dyne Corp,* that apportionment of damages *under CERCLA* is possible.  *Burlington Northern,* at 1881.  For CERCLA then, Congress and the courts recognized the unique character of such litigation, involving as it often does parties who may have contributed piecemeal over the course of many years to a long-term waste site.

As detailed in the provisions of OPA's legislative history quoted above, however, Congress there took a different path and instead *imposed* the burden of strict, joint, and several liability on responsible parties in all cases, for important public policy reasons,[19] and because OPA liability is for costs and damages resulting from a specific "incident," 33 U.S.C. § 2701(14), as opposed to a multi-party, multi-chemical, multi-year waste site.

---

[19] H.R. Rep. No. 101-653, *supra*, 1990 WL 132747 at *2 (1990) (Conf. Rep.); S. Rep. No. 101-94 (1989), *supra, as reprinted in* 1990 U.S.C.C.A.N. 722, 732-33, 1989 WL 225005 at *11.

The temporal relationship of the two statutes further supports this conclusion.  When Congress enacted OPA in 1990, the divisibility issues already had developed in CERCLA through amendment and litigation.  Had Congress wished to base OPA liability on "traditional and evolving principles of common law," it could have done so, but did not.  Accordingly, the case law on CERCLA divisibility does not apply here, and there is no such defense available under OPA.

> ### 2.   Even if the Common Law Defense Did Exist Under OPA, it Would Not Apply in this Case as a Matter of Law.

Even if the Court were to reject the foregoing argument and import the "traditional and evolving principles of common law" related to divisibility into OPA, divisibility is not available in this case, as a matter of law.

As the *Chem-Dyne* Court stated, based on the Restatement (Second) of Torts § 433A, "when two or more persons acting independently caused a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused."  *Chem-Dyne Corp.*, 572 F. Supp. at 810.  However, "where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm."  *Id*.  As Supreme Court cautioned:

> Not all harms are capable of apportionment, however, and . . . defendants seeking to avoid joint and several liability bear the burden of proving that a reasonable basis for apportionment exists. When two or more causes produce a single, indivisible harm, 'courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm.'

*Burlington Northern, supra*, 129 S.Ct. at 1881 (citations omitted).

On summary judgment, the Court may hold that the harm in this case is not theoretically capable of apportionment, as a matter of law, without considering any disputed facts.  This is

because where there is a single harm, courts employ a two-step analysis to determine whether the harm is divisible.  The first step is a purely legal question:  whether the harm is "theoretically capable of apportionment."  The Fifth Circuit looks first to whether there is a reasonable basis for apportioning the harm, an inquiry it considers a question of law (reviewed *de novo*).  As the second step, the court then examines, as a question of fact (reviewed under the clearly erroneous standard), whether sufficient evidence exists in the case to apportion liability.  *Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889, 897 (5th Cir.1993).[20]

In their papers, neither BP nor Transocean, who bear the burden, have posited any basis whatsoever for the divisibility defense, and thus the defense fails as a matter of law.[21]  Nor can they do so, as their own investigative reports (admissions) show that the harm is not capable of apportionment.  For example, in its accident report, BP affirmatively states that:

> [a] complex and interlinked series of mechanical failures, human judgments, engineering design, operational implementation and team interactions came together to allow the initiation and escalation of the *Deepwater Horizon* accident.  Multiple companies, work teams and circumstances were involved over time.

Bly Report at p. 31, TREX-00001; Mark Bly Dep. at 287-89, 294-98.  Transocean's own accident report also acknowledges the interconnected nature of the actors and the events leading up to the accident.  *See*, Transocean Report at 10-18, TREX-04248.  In such circumstances, there is not even a theoretical basis for apportioning harm, as a matter of law.[22]

---

[20] The Eighth and Ninth Circuits agree. *United States v. Hercules, Inc.*, 247 F.3d 706, 717 (8th Cir.2001); *Burlington Northern, supra,* 520 F.3d 918 (9th Cir. 2008).  The Supreme Court recognized the existence of the "theoretical" prong, but as the parties conceded this point it was not discussed further in the opinion. *Burlington Northern, supra,* 129 S.Ct. at 1881.

[21] Transocean did posit a special theory of divisibility based on its interpretation of OPA Section 204(b), [5103] at 7, which, as discussed above, is not valid.

[22] In the CERCLA context, courts have recognized that multiple parties, each of which partially contributes to contamination at a site, are akin to tortfeasors that "act in concert" and, therefore, are

BP, however, has previously suggested (although not in the current opposition) that its
divisibility defense is to be raised only in Phases 2 and 3, and would be based on "government
delays in authorizing various clean-up efforts resulted in more oil reaching the shoreline."
[4392] (BP's Opposition to PSC Motion related to "Alleged Fault of Non-Parties and/or Immune
Parties") at 15.[23]  Again, this construction fails as a matter of law because this case is not
"theoretically capable of apportionment" along those lines.  First, the Court already has held that
the United States has no liability in this case, November 18, 2011 Minute Entry [4642] (granting
the United States' Motion to Dismiss on sovereign immunity grounds), so the defendants cannot
base any contribution claims on the acts or omissions of the United States.  Second, it is black
letter law that OPA defenses are extremely limited, and that there is no defense that allows a
defendant to avoid liability based on the partial contribution of the plaintiff (*e.g.*, comparative
negligence), and no defense based on failure to mitigate damages.[24] This is apparently why BP
impermissibly tries to re-cast its case into a "divisibility' argument:  to eviscerate sovereign
immunity and to create a "failure to mitigate" defense out of whole cloth.  As a matter of law the

---

jointly and severally liable.  *See, e.g., United States v. Saporito, et al.*, No. 07-3169, slip op. at 24 (N.D.
Ill. Feb. 9, 2010) (citing Restatement (Second) of Torts § 876 (prescribing joint and several liability for
"Persons Acting In Concert," such as where one party "act[s] in concert with the other or pursuant to a
common design with him" or "knows that the other's conduct constitutes a breach of duty and gives
substantial assistance or encouragement to the other")).

[23] In replying to BP's Doc. 4392, the PSC stated, as we do here, that "liability under OPA is always joint
and several," and BP's argument for the application of the divisibility doctrine must fail. [4443] at 2 -3.
We also draw the Court's attention to Congress' express rejection of the diminishment of a responsible
party's liability for actions undertaken during a spill response and, even more importantly, its rejection of
any argument that liability may be imposed on the United States for response-related actions.  See 33
U.S.C. § 1321(c)(4)(B)(i) and (j)(8).

[24] "The only defenses to strict liability under ... OPA are that removal costs were caused *solely* by (1) an
act of God, (2) an act of war, or (3) a third party not in a contractual relationship with the responsible
party. See 33 U.S.C. § 2703(a)."  *Apex Oil Co. v. United States,* 208 F. Supp. 2d at 652.

Court should hold that in such circumstances, the divisibility defense does not permit BP to limit its liability based on the efforts of the United States to oversee clean up of BP's own oil spill.

Finally, as a matter of fact, BP and Transocean have adduced not even a scintilla of evidence supporting an argument for an actual apportionment of liability.

## CONCLUSION

None of the Defendants dispute any material fact, nor could they:  they own, respectively, the well, BOP, riser, and rig, each of which discharged oil to the ocean.

On the CWA side, the oil did come "from" the well, BOP, and/or the riser.  Moreover, Transocean's attempt to use the legislative history of OPA Section 2704(b) to override the plain language of CWA Section 311(b)) is unavailing.  Thus, the Court should enter partial summary judgment on the First claim for relief as set out in the proposed order.

On the OPA side, neither BP nor Anadarko denies liability, and no party denies the violation of the regulations.  Both instead seek mainly to delay entry of the final judgment, either through seeking a trial on proximate cause or by delaying entry of judgment (apparently until after the civil penalty trial).

Transocean's position, meanwhile, is simply overreaching, as they seek to immunize MODUs as the only class of vessel or facility whose limitation applies even in the face of their own violations of regulations, gross negligence, or willful misconduct.  As there is no just reason for delay, the Court can and should streamline this case by entering final judgment on the Second Claim for Relief as against all three parties.

Dated: January 16, 2012.

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

TONY WEST
Assistant Attorney General
Civil Division

JAMES NICOLL
Senior Counsel
NANCY FLICKINGER
Senior Attorney
SARAH HIMMELHOCH
Senior Attorney
DEANNA CHANG
SCOTT CERNICH
A. NATHANIEL CHAKERES
JUDY HARVEY
MATT LEOPOLD
JEFFREY PRIETO
GORDON YOUNG
ABIGAIL ANDRE
Trial Attorneys

PETER F. FROST
Director, Torts Branch, Civil Division
Aviation & Admiralty Litigation
STEPHEN G. FLYNN
Assistant Director
MICHELLE T. DELEMARRE
SHARON K. SHUTLER
JILL DAHLMANN ROSA
JESSICA SULLIVAN
JESSICA L. McCLELLAN
MALINDA LAWRENCE
DAVID J. PFEFFER
ROBIN HANGER
LAURA MAYBERRY
BRIENA STRIPPOLI
Trial Attorneys

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
U.S. Department of Justice
Environmental Enforcement Section
PO Box 7611
Washington, DC 20044
(202) 514-2779
steve.o'rourke@usdoj.gov

U.S. Department of Justice
Torts Branch, Civil Division
PO Box 14271
Washington, DC 20044
(202) 616-4100
(202) 616-4002 fax

/s/ R. Michael Underhill
R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
7-5395 Federal Bldg., Box 36028
450 Golden Gate Ave.
San Francisco, CA 94102-3463
(415) 436-6648
(415) 436-6632 fax
mike.underhill@usdoj.gov

31

JAMES LETTEN
United States Attorney

SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
Hale Boggs Federal Building
500 Poydras St., Suite B-210
New Orleans, LA 70130

Attorneys for the UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this16th day of January, 2012.

/s/  Steven O'Rourke
U.S. Department of Justice