EXHIBIT 4

In Support of

United States' Reply to Defendants' Oppositions to
United States' Second Motion for Partial Summary Judgment and
United States' Response to Cross-Motions for Summary Judgment



# MACONDO WELL INCIDENT
## Transocean Investigation Report
### Volume I

June 2011



4248

Exhibit No. _____
Worldwide Court
Reporters, Inc.

## Overview of Findings

The Macondo incident was the result of a succession of interrelated well design, construction, and temporary abandonment decisions that compromised the integrity of the well and compounded the risk of its failure. The decisions, many made by the operator, BP, in the two weeks leading up to the incident, were driven by BP's knowledge that the geological window for safe drilling was becoming increasingly narrow. Specifically, BP was concerned that downhole pressure — whether exerted by heavy drilling mud used to maintain well control or by pumping cement to seal the well — would exceed the fracture gradient and result in losses to the formation. While these and other contributing factors were complex, the Transocean investigation team traced them to four overarching issues:

### Risk Management and Communication

BP was responsible for developing detailed plans as to where and how the Macondo well was to be drilled, cased, cemented, and completed, and for obtaining approval of those plans from the Minerals Management Service (MMS). It retained full authority over drilling operations, casing and cementing, and temporary abandonment procedures, including approval of all work to be performed by contractors and subcontractors. Evidence indicates that BP failed to properly assess, manage, and communicate risk. For example, BP did not properly communicate to the drill crew the lack of testing on the cement or the uncertainty surrounding critical tests and procedures used to confirm the integrity of the barriers intended to inhibit the flow of hydrocarbons. It is the view of the investigation team that on April 20, 2010, the actions of the drill crew reflected its understanding that the well had been properly cemented and successfully tested.

### Well Design and Construction

The precipitating cause of the Macondo incident was the failure of the downhole cement to isolate the reservoir, which allowed hydrocarbons to enter the wellbore.

BP's original well plan called for use of a long-string production casing. While drilling the Macondo well, BP experienced both lost circulation events and kicks and stopped short of its planned total depth because of an increasingly narrow margin between the pore pressure and fracture gradients. In the context of these delicate conditions, cementing a long-string casing further increased the risk of exceeding the fracture gradient. Rather than adjusting the production casing design, BP adopted a technically complex nitrogen foam cement program. The resulting cement program was of minimal quantity, left little margin for error, and was not tested adequately before or after the cementing operation. Further, the integrity of the cement may have been compromised by contamination, instability, and an inadequate number of devices used to center the casing in the wellbore.

### Risk Assessment and Process Safety

Based on the evidence, the investigation team determined that during various operations at Macondo, BP failed to properly require or confirm critical cement tests or conduct adequate risk assessments.

Halliburton and BP did not adequately test the cement slurry and program despite the inherent complexity, difficulties, and risks associated with the design and implementation of the program and some test data showing that the cement would not be stable.

BP also failed to assess the risk of the temporary abandonment procedure used at Macondo. BP generated at least five different temporary abandonment plans for the Macondo well between April 12, 2010, and April 20, 2010. After this series of last-minute alterations, BP proceeded with a temporary abandonment plan that created risk and did not have the required approval by the MMS. Most significantly, the final plan called for a substantial and unnecessary displacement of drilling mud, thus underbalancing the well before setting a second surface cement plug and conducting a negative pressure test.

It does not appear that BP used risk assessment procedures or prepared Management of Change documents for these decisions, or otherwise addressed these risks and the potential adverse effects on personnel and process safety.



## Operations

The results of the critical negative pressure test were misinterpreted. The negative pressure test was inadequately set up because of displacement calculation errors, a lack of adequate fluid volume monitoring, and a lack of management of change discipline when the well monitoring arrangement was switched during the test. It is now apparent that the negative pressure test results should not have been approved, but no one involved in the negative pressure test recognized the errors. BP approved the negative pressure test results and decided to move forward with temporary abandonment.

The well became underbalanced during the final displacement, and hydrocarbons began entering the wellbore through the faulty cement barrier and a float collar that likely failed to convert. None of the individuals monitoring the well, including the Transocean drill crew, initially detected the influx.

With the benefit of hindsight and a thorough analysis of the data available to the investigation team, several indications of an influx during final displacement operations can be identified. Given the death of the members of the drill crew, and the loss of the rig and its monitoring systems, it is not known which information the drill crew was monitoring or why the drill crew did not detect a pressure anomaly until approximately 9:30 p.m. on April 20, 2010. At 9:30 p.m.,[A] the drill crew acted to evaluate an anomaly. Upon detecting an influx of hydrocarbons by use of the trip tank, the drill crew undertook well-control activities that were consistent with its training including the activation of various components of the BOP. By the time actions were taken, hydrocarbons had risen above the BOP and into the riser, resulting in a massive release of gas and other fluids that overwhelmed the mud-gas separator system and released high levels of gas around the aft deck of the rig. The resulting ignition of this gas cloud was inevitable.

Forensic evidence from independent post-incident testing by Det Norske Veritas (DNV) and evaluation by the Transocean investigation team confirm that the *Deepwater Horizon* BOP was properly maintained and did operate as designed. However, it was overcome by conditions created by the extreme dynamic flow, the force of which pushed the drill pipe upward, washed or eroded the drill pipe and other rubber and metal elements, and forced the drill pipe to bow within the BOP. This prevented the BOP from completely shearing the drill pipe and sealing the well.

In the explosions and fire, the general alarm was activated, and appropriate emergency actions were taken by the *Deepwater Horizon* marine crew. The 115 personnel who survived the initial blast mustered and evacuated the rig to the offshore supply vessel *Damon B. Bankston*. Mild weather conditions and the presence of the *Bankston* at the location aided in the survival of all individuals who evacuated.

## Structure of Report

The report is structured as follows:

*Chapter 1* provides an overview of the Macondo prospect, the *Deepwater Horizon* drilling rig, well operations through mid-April 2010, and the companies involved.

*Chapter 2* sets forth a chronological summary of the incident, highlighting the critical technical, logistical, and operational issues at Macondo.

*Chapter 3* details the technical analysis and findings of the investigation team.

*Chapter 4* is a summary of the overall findings by the investigation team surrounding the questions outlined above and the possible causes of the incident.

The information in this report and its appendices is available on the Transocean website at *www.deepwater.com*.

---

A    All references to time are displayed as Central Daily Time (CDT).



**1** The Macondo Prospect
and the *Deepwater Horizon*



## 1.1 The Macondo Well

In March 2008, BP Exploration & Production Inc. (BP) leased the Mississippi Canyon Block 252 (MC252) for oil and gas exploration and designated it the Macondo Prospect. BP subsequently sold interests in the prospect to Anadarko (25%) and MOEX (10%) but remained the operator and majority owner (65%).[A] As operator, BP was responsible for all aspects of the design and development of the Macondo well.

BP's original Application for Permit to Drill was submitted to the Minerals Management Service (MMS) on May 13, 2009, and was approved on May 22, 2009. The plan specified using the Transocean *Marianas* to drill a well about 50 miles off the coast of Louisiana, southeast of New Orleans, in 4,992 feet (ft.) of water. The total depth of the well was planned to be 20,200 ft.

Once a drilling permit is secured, the operator designs the well in accordance with the geological conditions of the prospect. The operator's engineers and geologists determine the type and strength of the well casing, cement, well head, and other equipment, and their interpretation is critical to ensuring well integrity and preventing its failure.

The operator then selects and manages various contractors to perform specific procedures such as drilling, cementing, well monitoring, vessel support services, and other well-related tasks. The operator has the final authority and responsibility to make decisions throughout the design, cementing, testing, and final temporary abandonment phases of drilling the well.

At Macondo, BP began exploration on Oct. 6, 2009, using the Transocean *Marianas* rig.[1] On Nov. 9, 2009, Hurricane Ida damaged the *Marianas*, and drilling on Macondo was suspended following the installation and cementing of the well casing. The *Marianas* was demobilized to a shipyard for repairs, and BP applied to the MMS for permission to use the Transocean *Deepwater Horizon* rig to continue drilling. MMS approved this change on Jan. 14, 2010.

The various responsibilities of the operator and examples of tasks assigned to its respective contractors are summarized below.

### Operator Responsiblities

- Conduct geological and geophysical surveys of the prospect
- Analyze proprietary geological and geophysical data when designing the well to specify the type and strength of casing, cement, centralizers, reamers, shock absorbers, well head, and other equipment and materials used to maintain well integrity
- Design and submit a detailed plan to MMS, now the Bureau of Ocean Energy, Management, Regulation and Enforcement (BOEMRE), specifying where and how the well is to be drilled, cased, cemented, and completed
- Serve as general contractor and hire various specialists to work on its lease and perform specific functions in the construction of the well, and direct contractors with respect to their areas of responsibility
- Retain full authority over drilling operations, casing and cementing processes, and temporary abandonment testing and procedures (quality assurance and quality control of well)
- Approve all work to be performed by contractors/subcontractors
- Assist with overall safety on the rig
- Advise and consult with various rig owner personnel on key decisions in heightened-risk situations
- Determine and implement appropriate well-control procedures
- Contain the well and address any pollution from the well

---

A   BP Exploration & Production Inc., Anadarko Petroleum Corporation, and MOEX Offshore 2007 LLC were the leaseholders in the specified percentages of lease number G32306 for MC252 at the time of the incident.



### Examples of Tasks Assigned to Contractors

- Provide rig and rig personnel for drilling operation (Transocean)
- Supervise cement operations, including but not limited to: designing cement program, maintaining equipment for cement jobs, maintaining inventory logs for cementing materials and equipment, and conduct cementing operations (Halliburton)
- Maintain logs of formations drilled during drilling operations (Sperry Sun)
- Monitor and report the presence and quantity of gas in drilling mud (Sperry Sun and Transocean)
- Provide separate measurement equipment for pit volumes, penetration rates, pump pressures, mud flow returns (loss/gain), and sample catching for geological analysis (Sperry Sun)
- Survey the hole and provide information to the operator with respect to the target (Sperry Sun and Schlumberger)
- Recommend mud additives and conduct mud testing (M-I SWACO)
- Calculate mud circulating times and volumes (M-I SWACO)
- Monitor mud properties of the drilling fluid and maintain drilling fluid logs (M-I SWACO)
- Design drilling fluid program and monitor fluid properties (M-I SWACO)
- Execute adjustments to mud properties and monitor mud weight (Transocean and M-I SWACO)

## **1.2** Companies Involved in Drilling the Macondo Well

The primary companies involved in drilling the Macondo well were:

### BP

BP personnel in Houston, Texas, managed the development and operation of the Macondo well, and provided direction and support to their personnel onboard the *Deepwater Horizon*. These onshore personnel consisted of three engineers, an engineer team leader, an operations team leader, and a manager. BP offshore personnel consisted of two well site leaders, a well site trainee, and three subsea personnel. The well site leaders exercised BP's authority on the rig, directed and supervised operations, coordinated the activities of contractors, and reported to BP's shore-based team.

*BP's contractors for the Macondo well included:*

### Transocean

BP contracted Transocean to provide the *Deepwater Horizon* drilling rig and the personnel to operate it. The Transocean team included the drill, marine, and maintenance crews. The senior Transocean personnel involved in day-to-day operations were the offshore installation manager (OIM) and the captain. The OIM was the senior Transocean manager onboard who coordinated rig operations with BP's well site leaders and generally managed the Transocean crew. The captain was responsible for all marine operations and was the ultimate command authority during an emergency and when the rig was underway from one location to another.

The Transocean drill team was led by a senior toolpusher, who supervised two toolpushers responsible for coordinating the round-the-clock drilling operations. The toolpushers supervised the drillers and assistant drillers, who operated the drilling machinery and monitored the rig instruments. At the time of the incident, there were 79 Transocean personnel onboard the *Deepwater Horizon*, including nine who lost their lives.



### Halliburton

BP contracted Halliburton to provide specialist cementing services and expertise and to support the BP teams both onshore and on the *Deepwater Horizon*. At the time of the incident, two Halliburton cementing specialists were onboard the *Deepwater Horizon*.

### Sperry Sun

BP contracted Sperry Sun to install a sophisticated well monitoring system on the *Deepwater Horizon*. Sperry deployed trained personnel, or mud loggers, to monitor the system, interpret the data it generated, and detect influxes of hydrocarbons, or kicks. At the time of the incident, there were two Sperry Sun mud loggers onboard the *Deepwater Horizon*.

### M-I SWACO

BP contracted M-I SWACO to provide specialized drilling mud and mud engineering services on the *Deepwater Horizon*, which included mud material, equipment, and personnel. At the time of the incident, there were five M-I SWACO personnel onboard the *Deepwater Horizon*, including two who lost their lives.

### Schlumberger

BP contracted Schlumberger to provide specialized well and cement logging services on the *Deepwater Horizon*, which included equipment and personnel. At the time of the incident, no Schlumberger personnel were onboard the *Deepwater Horizon*.

### Weatherford

BP contracted Weatherford to provide casing accessories, including centralizers, the float collar, and the shoe track on the *Deepwater Horizon*. Weatherford also provided specialist personnel to advise BP and the drill crew on the installation and operation of their equipment. At the time of the incident, two Weatherford personnel were onboard the *Deepwater Horizon*.

### Tidewater Marine

BP contracted Tidewater Marine to provide the offshore supply vessel the *Damon B. Bankston*. The *Bankston* carried supplies (such as drilling equipment, drilling chemicals, food, fuel oil, and water) to and from the *Deepwater Horizon*. At the time of the incident, the *Bankston* was alongside the *Deepwater Horizon* and provided emergency assistance.

Other personnel onboard the *Deepwater Horizon* included 14 catering staff, two BP executives, and 14 BP subcontractors for a total of 126 personnel onboard.

