UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" | * | |
| in the Gulf of Mexico, | * | SECTION: J |
| on April 20, 2010 | * | |
| | * | JUDGE BARBIER |
| This Document Relates to: | * | |
| 2:10-cv-04536 | * | MAGISTRATE SHUSHAN |
| | * | |

UNITED STATES' RESPONSE TO ANADARKO'S STATEMENT OF UNDISPUTED
MATERIALS FACTS IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY
JUDGMENT AS TO ANADARKO'S NON-LIABILITY UNDER THE CWA

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.2 of the Local Rules of this Court, Plaintiff United States hereby responds to the Separate Statement submitted by Anadarko in Support of its Cross-Motion for Summary Judgment as to Anadarko's Non-Liability under the CWA [Rec. Doc. 5113-3].[1]

| Anadarko's Facts[2] | United States' Response |
|---|---|
| 1. On December 17, 2009, APC, AE&P, and BP executed the Lease Exchange Agreement, governing the parties' interests in the Macondo Lease. That same day, BP and APC executed the Well Participation Agreement, governing the parties' interests in the Macondo Well equipment. Also on December 17, 2009, BP, APC, AE&P, and MOEX executed a Ratification and Joinder of the Operating Agreement, governing operations on the Macondo leasehold. All three of these documents were effective October 1, 2009.<br><br>It is undisputed that AE&P was not a party to the Well Participation Agreement. | For purposes of this motion, the United States does not dispute that, on or about December 17, 2009:<br><br>(1) APC, AE&P, and BP executed a Lease Exchange Agreement, which among other things transferred the parties' interests in certain leases and the Macondo Lease. *See* Lease Exchange Agreement, Ex. 2 to United States' Second Motion for Partial Summary Judgment ("United States' MSJ") [Rec. Doc. 4836].<br><br>(2) BP, APC and Kerr-McGee Oil and Gas Corporation entered into a Well Participation Agreement for the Macondo Prospect, and that the Agreement provided, among other terms, that the "interest in the [Macondo Well] assigned to APC |

---

[1] The United States also incorporates by reference its Statement of Undisputed Material Facts in Support of its Second Motion for Partial Summary Judgment [Rec. Doc. 4836-2].

[2] This chart omits Anadarko's citations in support of its facts, except where the fact incorporates a direct quote or Anadarko's citation is referenced in the United States' Response.

| | |
|---|---|
| | consists of all tangible personal property in the well, including the tubular and wellhead costs as set forth in the AFE." *See* Well Participation Agreement, Ex. 3 to United States' MSJ, at 2. It is also undisputed that AE&P was not a party to the Well Participation Agreement.<br><br>(3) BP, APC, AE&P and MOEX executed a Ratification and Joinder of the Operating Agreement, governing operations on the Macondo leasehold. *See* Macondo Operating Agreement, Dep. Ex. 1243 (Ex. 5 hereto).<br><br>(4) All three of these documents were effective October 1, 2009.<br><br>The United States does not agree with Anadarko's contention that all three agreements were in fact executed on December 17, 2009. *See* Deposition of Nicholas Huch, May 6, 2011, at 140:15-21; at 146-47 (Ex. 18 hereto). |
| 2. BP, APC, and AE&P ratified and joined the Operating Agreement on December 17, 2009, and the Operating Agreement formally designated BP as the "Operator" of the Macondo Lease. | For the purposes of this motion, the United States, does not dispute that BP, APC, and AE&P ratified and joined the Operating Agreement on or about December 17, 2009. The parties to the Operating Agreement agreed that BP would be the designated operator for the Macondo Lease area, and that APC and AE&P would to file the designation of operator forms with the MMS. *See* Macondo Operating Agreement, Article 4.1, at 14 (Ex. 5 hereto). The United States further submits that APC and AE&P filed such documentation with the United States. *See* Exs. 42, 43 to United States' MSJ. |
| 3. The terms of the Operating Agreement grant BP, as Operator, "the exclusive right and duty to conduct (or cause to be conducted) all activities or operations under this Agreement" and provide that "[t]he obligations, duties, and liabilities of the Parties under this Agreement are several and not joint or collective, and . . . nothing in this Agreement shall be construed to create a partnership, joint venture, association, or other form of business entity recognizable in law for any purpose."<br><br>It is undisputed that the Operating Agreement | For the purposes of this motion, the United States does not dispute that the Operating Agreement states that "[e]xcept as otherwise provided, the Operator [BP] has the exclusive right and duty to conduct (or cause to be conducted) all activities or operations under this Agreement" and that "[t]he obligations, duties, and liabilities of the Parties under this Agreement are several and not joint or collective, and . . . that nothing in this Agreement shall be construed to create a partnership, joint venture, association, or other form of business entity recognizable in the law for any purpose." Operating Agreement, Article 5.1 (Ex. 5 hereto). The United States does not dispute that the |

| | |
|---|---|
| provides that as Operator, BP was "not subject to the control or direction of [Anadarko or MOEX]" and functioned as an independent contractor.  Operating Agreement at Art. 5.1.<br><br>Article 5.1 of the Operating Agreement grants BP the sole right to select employees, contractors, and consultants; to set their hours and compensation; and to employ drilling rigs and accompanying machinery and personnel at the Macondo Prospect. | Operating Agreement states that BP, as Operator, is "not subject to the control or direction of [Anadarko or MOEX]," and is "an independent contractor."  Article 5.1 of the Agreement also provides that the Operator "shall select and determine" employees, contractors and consultants; to set their hours and compensation; and to employ drilling rigs and accompanying machinery and personnel at the Macondo Prospect.  *Id.*<br><br>The United States further does not dispute that, as set forth in Article 5.1, the parties to the Operating Agreement designated BP to conduct the day-to-day work and activities performed in connection with the drilling of the Macondo Well.  BP's rights and responsibilities as Operator, however, were subject to other provisions in the Operating Agreement, which enabled Anadarko to participate in the operations phase of the drilling of the Macondo Well.  *See, e.g.*, Operating Agreement, Art. 5.7 (providing for BP to supply to Anadarko real-time and other information about the daily operations at the well); Art. 6.2.2 (requiring BP to seek Anadarko's approval in the event of cost overruns associated with the drilling of the well); Arts. 10.2, 10.2.1 (requiring BP to seek approval from Anadarko before proceeding with subsequent operations after reaching total depth at the well, and allowing for Anadarko to make separate operational proposals) (Ex. 5 hereto). |
| 4. Under the Operating Agreement, Anadarko was a Non-Operating Party ("NOP").  Operating Agreement at Art. 2.43. | For purposes of this motion, the United States does not dispute that under the Operating Agreement, Anadarko was a "Non-Operating Party."<br><br>The United States objects to Anadarko's Statement No. 4 to the extent it implies that Anadarko's sole role with respect to the Macondo Prospect was as a "Non-Operating Party."  Under the Operating Agreement, Anadarko was also a "Participating Party" in the drilling of the Macondo well.  Operating Agreement, (Ex. 5 hereto), Art. 2.52 (defining "Participating Party" as one who shares in the risks and benefits of an approved operation); Art. 10.1 (providing for drilling of an exploratory well under an approved well proposal and Authorization for Expenditure, or "AFE").  *See also* Ex. 7 to United States' MSJ (Anadarko's executed AFE for the Macondo exploratory well). |

3

| | |
|---|---|
| 5. BP completed and approved the pre-drilling planning and design phase for the well to be drilled on the Macondo leasehold, and drilling operations on the Macondo leasehold commenced before Anadarko entered into the Operating Agreement with BP on December 17, 2009. | For the purposes of this motion, the United States does not dispute that BP completed and approved the pre-drilling planning and design phase for the well to be drilled on the Macondo leasehold, and drilling operations on the Macondo leasehold commenced before Anadarko entered into the Operating Agreement with BP on or about December 17, 2009.<br><br>The United States objects to Anadarko's Statement No. 5 to the extent that it implies that Anadarko was not aware of the well design contemplated for the well and had no ability to ask BP questions or provide comments on the well design. *See* Ex. 7 to United States' MSJ (Anadarko's executed AFE for Macondo exploratory well with attached well plan); Deposition of Michael Beirne ("Beirne Dep."), June 27-28, 2010, at 218-19 (acknowledging that when Anadarko signed AFE, it was also approving the well plan that was attached, and that Anadarko proposed no revision to the well plan prior to executing the AFE); at 391 (stating that the well plan attached to the AFE was "shown to [Anadarko] several times prior to them executing it" and "[t]hey certainly had the ability to provide input.") (Exhibit 15 and 16 hereto). |
| 6. The Deepwater Horizon was performing temporary abandonment operations on the Macondo Well at the time of the April 20, 2010 blowout and, therefore, the Macondo Well was not completed at the time of any discharge of oil because it had not been plugged and abandoned.<br><br>It is undisputed that at the time of any discharge, the Macondo Well was "not a general production well" and "was still effectively under construction and had not got completion tubing in it." 30(b)(6) Deposition of Paul Tooms, BP Vice President of Engineering, at 162:4-6. | The United States does not dispute that temporary abandonment procedures were being performed on the Macondo Well at the time of the April 20, 2010 blowout.<br><br>The United States objects to the remainder of Anadarko's Statement No. 6, which relates to the construction status of the Macondo Well and its production capabilities, as irrelevant. Anadarko has conceded that, as a legal matter, the Macondo Well constitutes an "offshore facility" within the meaning of the Clean Water Act, 33 U.S.C. § 1321(a)(11) and (b), and the Oil Pollution Act, 33 U.S.C. § 2701 *et seq*. *See* Anadarko's Response to United States' Statement of Material Facts [Rec. Doc. 5113-3] at No. 9. |
| 7. It is undisputed that Anadarko performed no work or otherwise assisted BP in connection with BP's designing of the Macondo Well, or in any of the subsequent changes to that well design once drilling began. Anadarko did not make any operational or other decisions with | For the purposes of this motion, it is undisputed that that, as between the parties to the Operating Agreement, BP was designated to conduct the day-to-day work and activities performed in connection with the drilling of the Macondo Well, including in the designing of the Macondo Well. |

4

| | |
|---|---|
| respect to the design of the Macondo Well before or after drilling operations on the Macondo leasehold began. | The United States disputes that Anadarko did not make "any operational or other decisions" with respect to the design of the Macondo Well. For example, Anadarko received and approved the well design for the Macondo Well attached to the initial Authorization for Expenditure (AFE). *See* Ex. 7 to United States' MSJ; Beirne Dep. at 217-18 (Ex. 15 hereto). In addition, Anadarko elected to participate in and executed an AFE for the setting of the production casing at the Macondo Well. *See* Ex. 10 to United States' MSJ (Anadarko's executed AFE); Dep. Ex. 2855, (Ex. 14 hereto), (April 14, 2010 email from Michael Beirne to members of BP Macondo Well Team, emphasizing that with regard to setting the production casing, "We need to be sure we have co-owner [Anadarko and MOEX] approval prior to initiating this operation.") |
| 8. It is undisputed that "BP was solely responsible for the drilling operations [on the Macondo leasehold]" and that, as a matter of law, Anadarko owed no duty to third parties in connection with BP's operations on the leasehold, and owed no duty to intervene in BP's or its contractors' operations. B1 Order at 28. | This statement represents a legal conclusion rather than a statement of fact and requires no response.<br><br>The United States further submits that the Court's statement regarding Anadarko's "duty" was in the context of ruling whether the private plaintiffs in the MDL had a cognizable claim based on the general maritime law of negligence. *See* B1 Order [Rec. Doc. 3830] at 28. Anadarko subsequently conceded that the B1 Order did not resolve any of the bases of Clean Water Act liability asserted against Anadarko by the United States. *See* Memorandum of Anadarko Petroleum Corporation and Anadarko E&P Company LP on the Effects of the Court's Order on the Motions to Dismiss the B1 Master Complaint [Rec. Doc. 3991] at 3, 10 n.3. |
| 9. Anadarko made no operational decisions regarding the drilling operations on the Macondo leasehold. | The United States does not dispute that, as between the parties to the Operating Agreement, BP was designated to conduct day-to-day activities and operations in connection with the drilling of the Macondo Well.<br><br>The United States disputes that Anadarko made "no operational decisions." Anadarko was actively involved in the operations phase of the drilling of the Macondo Well, as evidenced by its execution and approval of an initial AFE for the exploratory well, two supplemental AFEs due to cost overruns, and a |

5

| | |
|---|---|
| | fourth AFE to set the production casing. *See* Exs. 7-10 of the United States' MSJ (Anadarko's executed AFEs); Dep. Ex. 2855, (Ex. 14 hereto), (April 14, 2010 email from Michael Beirne to members of BP Macondo Well Team, emphasizing that with respect to setting the production casing, "We need to be sure we have co-owner [Anadarko and MOEX] approval prior to initiating this operation.") |
| | The United States further submits that Anadarko technical personnel routinely accessed and monitored information about the day-to-day operations at the Macondo Well through the drop-box, WellSpace, and real-time service, INSITEAnywhere. Deposition of Robert Quitzau, May 25, 2011, at 73:17-86:8; Deposition of Paul Chandler, May 4, 2011, at 105:24-107:4; at 123:1-124:23. Anadarko personnel also regularly communicated with BP about the drilling operations. E.g., Dep. Ex. 2630 (Ex. 13 hereto) (forwarding April 5, 2010 email from Robert Quitzau discussing communications with Bobby Bodek of BP regarding operations at Macondo, including mud weight used, mud losses, plans to set casing, and pressure data). |
| | In addition, after BP stopped drilling due to "safety concerns and wellbore integrity issues," Dep. Ex. 1256, (Ex. 10 hereto), Anadarko expressed to BP a desire to drill deeper. *See id.* (April 14, 2010 email from Nick Huch to Michael Beirne "evidenc[ing] Anadarko's approval to conclude drilling" even though objective depth had not been reached, and stating that Anadarko "would not oppose" drilling deeper.); Dep. Ex. 1592, (Ex. 11 hereto), (April 12, 2010 meeting invitation sent by Paul Chandler "to discuss our options for possibly drilling deeper beyond our current TD for the Macondo well."); Dep. Ex. 1593, (Ex. 12 hereto), (April 12, 2010 email from Paul Chandler to Robert Bodek, following up as to whether "BP has entertained the idea of drilling below our current TD" and that Anadarko "would support this position if BP was in agreement to proceed."). |
| 10. No Anadarko personnel worked on the design of the cement used for the Macondo Well's production casing. | The United States does not dispute that Anadarko personnel did not work on the design of the cement used for the Macondo Well's production casing. |
| | The United States further submits that BP informed Anadarko, before cement for the Macondo Well |

6

| | |
|---|---|
| | production casing was pumped, of certain aspects of the cement procedure for the production casing. Anadarko received and approved the AFE for the Macondo Well production casing on April 15, 2010. *See* Ex. 10 to United States' MSJ (Anadarko's executed AFE for purchase, cementing and installation of the production casing, casing hanger, lockdown sleeve, centralizers and float equipment). Anadarko was also provided with a Daily Operations Report for April 17, 2010, which informed Anadarko the "24 Hr Forecast" was to "Run 7 x 9 5/8" CASING, CEMENT SAME," and that the "Current Status" was "DISPLACING CEMENT W/ 14.0 PPG MUD." [Ex. 8 hereto]. |
| 11. Anadarko had no communications with the MMS with respect to the design of the Macondo Well or drilling operations carried out by the *Deepwater Horizon* on the Macondo leasehold. | The United States does not dispute that Anadarko had no communications with the MMS with respect to the design of the Macondo Well or drilling operations carried out on the Macondo leasehold. |
| 12. MMS personnel do not regard non-operating investors like Anadarko as having the same obligations to comply with drilling regulations as designated operators. Saucier 30(b)(6) Dep. at 363:8-25 (Ex. 51 hereto) (testifying that MMS regulations do not require Non-Operating Parties to submit documents related to changes in well design or drilling progress, such as Applications for Permits to Drill ("APDs"), Applications for Permits to Modify ("APMs"), or Weekly Activity Reports, because the MMS does not view those activities as the responsibility of Non-Operating Parties). | The United States does not dispute that MMS personnel do not regard non-operating leaseholders as having the same responsibilities with respect to certain day-to-day activities related to well design and drilling as designated operators, and it is not customary or a requirement that a non-operating leaseholder to submit forms such as Applications of Permits to Drill and weekly reports to MMS. *See* Saucier 30(b)(6) Dep. at 363 (Ex. 51 to Anadarko's Cross-Motion).<br><br>The United States further submits that the MMS Designation of Operator Forms, in which AE&P and APC designated BP as the operator for the Macondo Lease, state that such a designation "does not relieve the lessee of responsibility for compliance with the terms of the lease, laws, and regulations applicable to the area." *See* Exs. 42, 43 to United States' MSJ. |
| 13. In 1998, BP's predecessor (Vastar) contracted with Transocean's predecessor (R&B Falcon) to construct the *Deepwater Horizon* and then to operate it for BP.<br><br>It is undisputed that the *Deepwater Horizon* was leased to BP for most of its operating life.<br><br>The Drilling Contract was later amended and remained in effect at the time of the blowout on April 20, 2010. | For the purposes of this motion, undisputed. |

7

| | |
|---|---|
| 14. The Drilling Contract required Transocean to furnish the Deepwater Horizon's blowout preventer ("BOP") and riser. Drilling Contract at 1473, 1572 (Ex. 3 to Anadarko's Cross-Motion). Article 7.1.1 provides that "[Transocean] shall furnish and maintain at its sole expense all items designated in Exhibit B under the heading FURNISHED BY CONTRACTOR." "Blowout preventers . . . Wellhead connector and . . . [a]ll other well control equipment components and replacement parts, including . . . riser" are included in the "FURNISHED BY CONTRACTOR" category. *Id.* at Exhibit B-3, §§ 1.20-1.22. | For the purposes of this motion, undisputed. |
| 15. It is undisputed that Anadarko had no ownership, lease, or charter interest in the *Deepwater Horizon*, that Anadarko had no contractual relationship or communications with Transocean with respect to operations on the Macondo leasehold, and that Anadarko personnel never visited the Deepwater Horizon. | For the purposes of this motion, it is undisputed that Anadarko had no contractual relationship or communications with Transocean with respect to operations on the Macondo leasehold, and that Anadarko personnel never visited the Deepwater Horizon during the time it was conducting operations at the Macondo Well.<br><br>The United States objects to the remainder of Anadarko's Statement No. 15 as it is irrelevant. The United States does not contend that Anadarko is an owner of the *Deepwater Horizon*. |
| 16. Anadarko had no operational control over operations aboard the *Deepwater Horizon*, and no control over the *Deepwater Horizon's* drilling schedule. | For the purposes of this motion, the United States does not dispute that, as between the parties to the Operating Agreement, BP was designated to conduct day-to-day activities and operations in connection with the drilling of the Macondo Well by the *Deepwater Horizon*, including with respect to any decisions regarding the *Deepwater Horizon's* drilling schedule. *See* Operating Agreement, Article 5.1 (Ex. 5 hereto). |
| 17. On April 20, 2010, the *Deepwater Horizon* lost control of the Macondo Well during preparation for temporary abandonment operations, resulting in a blowout, and a discharge of hydrocarbons from the *Deepwater Horizon*. The hydrocarbons discharging from the *Deepwater Horizon* ignited, causing explosions and fire. The fire onboard the *Deepwater Horizon* continued for 36 hours until the hull became structurally unsound, and the | It is undisputed that on April 20, 2011, during the temporary abandonment operations, there was a blowout of the Macondo Well, and fires and explosions on the drilling rig *Deepwater Horizon*. It is also undisputed that the *Deepwater Horizon* sank the morning of April 22, 2011.<br><br>The United States objects to the remainder of Anadarko's Statement No. 17 as not relevant to this motion. The causes of the *Deepwater* |

8

| | |
|---|---|
| hull, operating deck, and derrick sank. | *Horizon*/Macondo Well incident will be adjudicated at the Phase I trial. <br><br> The United States also objects to the extent that this statement implies that hydrocarbons only "discharged from" the *Deepwater Horizon*. As set forth in the United States Memorandum in Support of its Motion for Summary Judgment ("U.S. Mem.") [Rec. Doc. 4836-2] at 20-21, and its Reply at 2-7, hydrocarbons were discharged from both the Deepwater Horizon and the Macondo Well. |
| 18. No oil discharged directly from the Macondo Well into the Gulf of Mexico. The flow of hydrocarbons from the formation flowed through the incomplete well into the Deepwater Horizon's BOP and riser, proceeded up the Deepwater Horizon's riser, and was discharged from the riser onto, and out of, the operating deck and derrick of the Deepwater Horizon. | Disputed. The United States contends that on April 20, 2010 there was a discharge of oil from the Macondo Well. U.S. Mem. at 18-21; U.S. Reply at 2-7. The United States does not dispute that oil flowed through the *Deepwater Horizon*'s BOP and riser before entering the Gulf of Mexico during the time the Well was uncontrolled. U.S. Statement of Undisputed Material Facts, No. 15 [Rec. Doc. 4836-3], at 7. <br><br> The United States objects to Anadarko's use of the phrase "discharged directly from the Macondo Well" to the extent it calls for a legal conclusion as to whether there was a "discharge" from an "offshore facility" within the meaning of the Clean Water Act, 33 U.S.C. 311(b)(3). *See* U.S. Reply at 2-7. The United States also objects to the extent that the statement implies that hydrocarbons only discharged "from" the *Deepwater Horizon*. As set forth in the U.S. Mem. at 18-21 and Reply at 2-7, hydrocarbons were discharged from both the Deepwater Horizon and the Macondo Well. |
| 19. As hydrocarbons shot up through the derrick toward the crown block of the Deepwater Horizon, the vessel's crew responded by routing the hydrocarbons through the Deepwater Horizon's mud-gas separator. <br><br> The flow of hydrocarbons overwhelmed the Deepwater Horizon's mud-gas separator, at which point hydrocarbons were observed discharging from multiple vents onto and out of the operating deck of the Deepwater Horizon and into the Gulf of Mexico. | For the purposes of this motion, the United States does not dispute that the vessel drilling crew activated the diverter to direct flow from the well to the mud gas separator, and that there were accounts of mud flowing up to the crown. It is also not disputed that the flow of hydrocarbons overwhelmed the Deepwater Horizon's mud-gas separator, at which point hydrocarbons were observed discharging from multiple vents onto and out of the operating deck of the Deepwater Horizon and into the Gulf of Mexico. <br><br> The United States also objects to the extent that the statement implies that hydrocarbons only "discharging from" the *Deepwater Horizon*. As set forth in the |

9

| | |
|---|---|
| | United States' Mem. at 18-21 and Reply at 2-7, hydrocarbons were discharged from both the Deepwater Horizon and the Macondo Well. |
| 20. The Deepwater Horizon's crew attempted to activate the Deepwater Horizon's BOP to seal off the riser. The BOP failed to seal off the riser, allowing hydrocarbons to continue to discharge from the Deepwater Horizon into the Gulf of Mexico. | For the purposes of this motion, the United States does not dispute that the BOP failed to seal the well, and that hydrocarbons continued to discharge from the *Deepwater Horizon* into the Gulf of Mexico.<br><br>The United States objects to the remainder as not relevant to this motion. The causes of the *Deepwater Horizon*/Macondo Well incident will be adjudicated at the Phase I trial.<br><br>The United States also objects to the extent that the statement implies that hydrocarbons only discharged "from" the *Deepwater Horizon*. As set forth in the United States' Mem. at 18-21 and Reply at 2-7, hydrocarbons were discharged from both the Deepwater Horizon and the Macondo Well. |
| 21. The hydrocarbons discharging from the vessel ignited, causing explosions and fire.<br><br>The Deepwater Horizon's crew attempted to activate the Deepwater Horizon's emergency disconnect system, which failed to cut the Deepwater Horizon's drilling riser and disconnect the Deepwater Horizon from its BOP. | For the purposes of this motion, undisputed.<br><br>The United States objects to the extent that the statement implies that hydrocarbons only discharged "from" the *Deepwater Horizon*. As set forth in the United States' Mem. at 18-21 and Reply at 2-7, hydrocarbons were discharged from both the Deepwater Horizon and the Macondo Well. |
| 22. As a result of the fire, the damaged hull, operating deck, and derrick of the Deepwater Horizon sank, causing the attached riser pipe to bend, buckle, and then break. The flow of hydrocarbons into the marine environment continued from the broken riser and BOP. | For the purposes of this motion, undisputed.<br><br>The United States objects to Anadarko's Statement No. 22 the extent that it implies that after the *Deepwater Horizon* sank, hydrocarbons were only discharged "from" the broken riser and BOP. As set forth in the United States' Mem. at 18-21 and Reply at 2-7, hydrocarbons were discharged from both the Deepwater Horizon and the Macondo Well. |

10

Dated: January 16, 2012.

                                    Respectfully submitted,

| | |
|---|---|
| IGNACIA S. MORENO | TONY WEST |
| Assistant Attorney General | Assistant Attorney General |
| Environment & Natural Resources Division | Civil Division |
| | |
| JAMES NICOLL | PETER F. FROST |
| Senior Counsel | Director, Torts Branch, Civil Division |
| NANCY FLICKINGER | Aviation & Admiralty Litigation |
| Senior Attorney | STEPHEN G. FLYNN |
| SARAH HIMMELHOCH | Assistant Director |
| Senior Attorney | MICHELLE T. DELEMARRE |
| DEANNA CHANG | SHARON K. SHUTLER |
| SCOTT CERNICH | JILL DAHLMANN ROSA |
| A. NATHANIEL CHAKERES | JESSICA SULLIVAN |
| JUDY HARVEY | JESSICA L. McCLELLAN |
| MATT LEOPOLD | MALINDA LAWRENCE |
| JEFFREY PRIETO | DAVID J. PFEFFER |
| GORDON YOUNG | ROBIN HANGER |
| ABIGAIL ANDRE | LAURA MAYBERRY |
| Trial Attorneys | BRIENA STRIPPOLI |
| | Trial Attorneys |
| /s/ Steven O'Rourke | U.S. Department of Justice |
| STEVEN O'ROURKE | Torts Branch, Civil Division |
| Senior Attorney | PO Box 14271 |
| U.S. Department of Justice | Washington, DC 20044 |
| Environmental Enforcement Section | (202) 616-4100 |
| PO Box 7611 | (202) 616-4002 fax |
| Washington, DC 20044 | |
| (202) 514-2779 | /s/ R. Michael Underhill |
| steve.o'rourke@usdoj.gov | R. MICHAEL UNDERHILL, T.A. |
| | Attorney in Charge, West Coast Office |
| | Torts Branch, Civil Division |
| | 7-5395 Federal Bldg., Box 36028 |
| | 450 Golden Gate Ave. |
| | San Francisco, CA 94102-3463 |
| | (415) 436-6648 |
| | (415) 436-6632 fax |
| | mike.underhill@usdoj.gov |

JAMES LETTEN
United States Attorney

SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
Hale Boggs Federal Building
500 Poydras St., Suite B-210
New Orleans, LA 70130

Attorneys for the UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 16th day of January, 2012.

      /s/  Steven O'Rourke
      U.S. Department of Justice