04-3976
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) ) ) ) ) ) ) | MDL NO. 2179  SECTION: J  JUDGE BARBIER  MAG. JUDGE SHUSHAN |

# CONFIDENTIAL

## WorldwideVIEW™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



## Craig Gardner
### VOLUME 1

AUGUST 17, 2011

## COPY



Systems Technology for the Litigation World

Litigation Group • Court Reporting • Video Production • Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1   A.   He's President of Chevron North America.
2   Q.   And did he explain to you what your
3   duties would be in this assignment?
4   A.   He and the Vice President of Drilling,
5   Mr. Dave Payne, P-a-y-n-e.  It was actually
6   Mr. Payne who called me and -- and explained that
7   they wanted us to test the -- the slurry design
8   used on the -- on the Macondo Well.
9   Q.   Were you given an outline of information
10  on what the slurry design should look like, or
11  were you given samples?  I know that's two
12  questions in one, but can you give us a feeling
13  for what you were given as a -- parameters for
14  the work that you were to do?
15  A.   Okay.  The work we did is based on the
16  Halliburton Lab Report of April 12th.
17  Q.   All right.
18  A.   The samples were supplied to us by
19  Halliburton Laboratory in Broussard at the
20  request of the Commission.
21  Q.   So you were given the April 12 Lab
22  Report; is that fair to say?
23  A.   That's correct.
24  Q.   And then you were provided samples by way
25  of the National Commission requesting from

1  Halliburton, correct?
2     A.  Yes, correct.
3     Q.  And then you did what?  What was your
4  next step?
5     A.  We -- the Team, my Team, there were --
6  there are several other Cementing Specialists on
7  the Team.  We had a meeting with Mr. Sankar, and
8  also the Commission's third-party Representative,
9  Erick Nelson, and we outlined, based on the 12th
10 Report, how we planned to go ahead with the tests
11 with respect to schedules and test protocols.
12    Q.  All right.  Now, it's my understanding
13 that you, through Chevron, told the National
14 Commission that there would be a fee for the
15 work?
16    A.  There -- there was no fee.
17    Q.  Okay.  So the work done was gratis, for
18 no charge?
19    A.  That's correct.
20    Q.  Were you given by the Commission any
21 instructions on how to perform tests that you
22 thought might need to be performed?
23    A.  No, they -- they did not instruct us in
24 the methods to be used.
25    Q.  Did they give you any instructions?

**PURSUANT TO CONFIDENTIALITY ORDER**

1  "They" being the National Commission.
2      A.   The National Commission?  The -- the
3  outline of the testing protocol was pretty much
4  up to us.
5      Q.   Did you design a testing protocol?
6  You -- you mentioned your Team, and I -- I don't
7  mean --
8      A.   Right.
9      Q.   -- to make this so wide open that it
10 takes us an hour to understand.
11     A.   Okay.
12     Q.   But did you and your Team establish a
13 procedure or protocol for the tests?
14     A.   Right.  Maybe I can make it a little
15 plainer.  We tested under appropriate API and ISO
16 protocols.
17     Q.   Okay.
18     A.   Within API and ISO protocols there's a
19 range of ways that any individual test could be
20 run.  And where we could determine from the April
21 12th Report, we used those protocols, those
22 variations of the protocol.  Where we could not
23 determine, then we tested acro -- a range of
24 protocols across likely scenarios.
25     Q.   Okay.  You mentioned that you received

1  samples, by way of the Commission, from
2  Halliburton.  Do you have or know of
3  documentation that outlines the samples that you
4  received?
5      A.  There is a copy -- certainly there's a
6  copy of our receiving -- of a sheet of our
7  receiving book, I -- I mean, I can't -- I
8  wouldn't find it right there, but there's a copy
9  of that.  There may be copies of the hot shot
10 tickets.
11     Q.  Okay.  So --
12         (Discussion off the record.)
13             MR. THORNHILL:  Thank you.
14     Q.  (By Mr. Thornhill) We have a book in
15 front of you, I'd ask you to open it.  It's --
16     A.  Tab --
17     Q.  It's at Tab seven zero, 70.
18     A.  Okay.
19             MR. THORNHILL:  Which, for the
20 record, we'll give a number.
21             MS. GEBHARDT:  4561.
22         (Exhibit No. 4561 marked.)
23             THE COURT REPORTER:  What tab?
24             MR. THORNHILL:  Seven zero.
25             MS. GEBHARDT:  70.

1  CVX80311 000000001 through 22.  At the top right
2  on the first page it says, "Halliburton Foam
3  Testing Procedures," correct"?
4     A.  Seventy-seven?
5     Q.  You're looking at it right there.  I
6  think that's the right number.
7             MS. GEBHARDT:  Yes.
8     A.  Okay.  I'm sorry, upper right.  "Standard
9  Testing," yes, sir.
10    Q.  (By Mr. Thornhill) "Halliburton Foam
11 Testing Procedures," correct?
12    A.  Yes, sir.
13    Q.  All right.  Did you consider the
14 information in this document for purposes of your
15 testing?
16    A.  We reviewed this, but were familiar with
17 this document as that it incorporates quite a bit
18 of RP 10B-2, 3, 4, various documents there, so --
19    Q.  Okay.  Was this a document that you
20 received from the Commission?
21    A.  This is a document that came from
22 Halliburton through the Commission.
23    Q.  Okay.  When you say that you reviewed the
24 document, does that mean that you and others on
25 your Team studied it and considered its contents

**PURSUANT TO CONFIDENTIALITY ORDER**

1  for purposes of your conducting the tests that
2  you were about to perform?
3      A.  It means we looked at it to try to glean
4  information if there were any
5  Halliburton-specific procedures we had not
6  accounted for in our protocol.
7      Q.  Were there any --
8      A.  No.
9      Q.  -- Halliburton procedures you had not
10 accounted for?
11     A.  There were not.
12     Q.  All right.
13             MR. THORNHILL:  Did we give this
14 document a number?
15             MS. GEBHARDT:  No, we did not.
16             MR. THORNHILL:  4567 is the document
17 number for that which we just read into the
18 record.
19         (Exhibit No. 4567 marked.)
20     A.  For clarity on this --
21     Q.  (By Mr. Thornhill) Please.
22     A.  -- and the reason a little for my
23 confusion at the beginning --
24     Q.  That's okay.
25     A.  -- is the upper right says, "Halliburton

**PURSUANT TO CONFIDENTIALITY ORDER**