# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

## In re: Oil Spill by the Oil Rig Deepwater Horizon
## In the Gulf of Mexico on April 20, 2010
## (MDL-2179)

**Rebuttal Expert Report**
**Of**
**James P Lang**

Submitted to:
The U.S. Department of Justice
Dated: Nov. 7, 2011

James P Lang

## I.  INFORMATION REQUIRED BY THE FEDERAL RULES OF CIVIL PROCEDURE

1.  This report contains my opinions, conclusions, and information supporting my opinions and conclusions.
2.  I am retained by the US DOJ to render expert advice.  I am instructed to produce a report of my expert opinion in relation to the incident, based on my own experience, materials reviewed, and industry standards and practices.  I reserve the right to update my report if more information becomes available.
3.  A detailed statement of my qualifications (resume) is contained in Exhibit A.
4.  Information considered is listed in Exhibit B.
5.  I am being compensated at a rate of $500 per hour for all work done for the US DOJ.
6.  In the last four years I have not testified as an expert witness in any case.

## II.  QUALIFICATIONS

1.  I have spent over 20 years as a strategy consultant, primarily focused on the global energy industry, fifteen of those as a partner and in critical leadership roles.  In those years I have helped upstream oil and gas (O&G) companies value assets, develop strategies to pursue, buy and sell assets (or portions thereof), and effectively lead joint project teams from multiple companies to more wisely pursue those assets.
2.  Most recently, I was the President of Cambridge Energy Research Associates ("CERA"), a leading energy research, advisory, and consulting firm. CERA is a leading private "think tank," in strategic issues relating to the future of the energy industry.  CERA's deep research covers the O&G markets, costs, technologies, etc.  CERA has numerous offices around the world.  CERA hosts the energy industry's premier annual event "CERAWeek" annually in Houston.
3.  CERA is owed by IHS, a $1B+ revenue public business information company.  Over half of IHS's business is in energy.  IHS's energy products include detailed databases on all upstream activity globally, including on seismic information, drilling information, development information, and production information, as well as detailed asset, cost, performance, and related information.  I made use of those assets in driving CERA's insights and new products and services to clients.
4.  From 1989-2006, I was with Strategic Decisions Group ("SDG"), a leading decision focused strategy consulting firm.  Beginning in 1997 I led our global O&G practice, and eventually led the firm as well, as President from 2000-2006.  I founded our Boston and Houston offices, and have worked significantly in many countries around the globe.  SDG was founded in 1981 as a spin out of Stanford Research Institutes' ("SRI") decision analytic practice.  One of SDG's founders was Stanford Professor Ron Howard, who is credited with inventing the field of decision analysis.  SDG has offices globally.
5.  SDG's global O&G practice was one of its two largest practices.  SDG's O&G practice focused on asset strategy (project decisions in the feasibility, define, select, and execute phases), asset portfolio strategy, technology strategy, business unit strategy, and corporate strategy.  SDG's role would often be to lead project teams (cross functional teams, typically with representation from all owners) through the decision making process.
6.  While at SDG, I personally worked for many of the leading O&G companies globally, including BP (and the acquired Amoco and Arco), Chevron (and the acquired Texaco),

Conoco Phillips (and the acquired Burlington Resources), Exxon (and the acquired Mobil), WAPET/Woodside Petroleum, and others.

7. I have supported exploration and development decision making on dozens of upstream assets, including those located in deepwater, and specifically GoM deepwater.

8. SDG has a decision education practice that has trained thousands of O&G executives and analysts in the leading approaches for decision making and valuation. I have personally led seminars in oil and gas decision making for hundreds of industry executives.

9. Also relevant to my qualifications is my direct involvement in the creation, negotiation, and execution of many business ownership transactions. While at SDG, I directly led five major transactions for our own business. In client work, I was part of teams involved in numerous client related transactions. While at IHS, I was regularly engaged with the corporate Merger and Acquisition (M&A) team, where we looked at approximately ten transactions a quarter, executing one or two.

10. I hold a BS summa cum laude in electrical and computer engineering from the University of New Hampshire and an MBA with Distinction from the Amos Tuck School of Business at Dartmouth, where I was named an Edward Tuck Scholar. I am currently a guest lecturer at the Tuck Business School in the areas of strategy and decision making.

## III. EXECUTIVE SUMMARY

I have reviewed the expert report of Roger Vernon put forward by Anadarko Petroleum Corporation and Anadarko E&P Company LP ("Anadarko") and the report of Gordon R. Cain submitted by MOEX Offshore 2007 LLC ("MOEX"). I conclude that both reports fail provide the proper industry context for the joint owner arrangement that existed at Macondo, fail to adequately describe the rights and abilities of Anadarko and MOEX as owners of the Macondo Well, and fail to properly characterize the evidence that demonstrates Anadarko and MOEX's exercising of their ownership rights. The following is a summary of my opinion regarding these matters:

1. Deepwater ventures around the world are among the most challenging and expensive in the industry, with the potential to be large, profitable long lasting projects.
   a. Lease agreements and joint operating agreements provide the basis in the energy industry for joint ownership and efficient and effective execution.
   b. They are commonplace in the industry. They are needed to allow companies to spread risk, access opportunities, share costs, and reduce exposure to low probability high impact events (like the Macondo Well / Deepwater Horizon spill).
   c. As sophisticated oil and gas companies with experience globally, Anadarko and MOEX were aware of the highly regulated nature of the industry and drilling activity.

2. BP, Anadarko and MOEX were owners of the Mississippi Canyon 252 lease, Macondo well, and associated facilities and hence jointly exposed to all consequences (good or bad) from the well drilling and planned development activity.

    a.    Cain and Vernon's expert reports on behalf of MOEX and Anadarko incorrectly conclude that these owners had no ability to affect operations at Macondo.

    b.    Shared ownership and a high degree of participation was defined in their transaction documents and course of dealings.

3.   Contrary to the conclusions of Vernon and Cain, Anadarko and MOEX actively participated in the operations phase of the Macondo well.

    a.    Their active participation is demonstrated by their sophisticated actions and behaviors, within the context of to the agreed upon framework. Their rights included shared information; an ability to vote independently (including the ability to enter the ownership and exit it); a forum and freedom to raise ideas, issues and exert influence. All of these conditions were met and demonstrated in the behavior between Anadarko, MOEX and BP.

    b.    Anadarko and MOEX's actions were entirely consistent with their business strategies. Anadarko wanted to grow in deepwater and leverage synergies at the Pompano production facility. MOEX wanted exposure to US deepwater, and to expand its relationship with BP. For both, upstream oil and gas exploration and development is their primary business.

    c.    Both MOEX and Anadarko had ample opportunity to influence BP, the designated operator.

4.   Any appropriate liabilities (costs, damages, penalties) assigned to the owners of the Macondo well will have limited impact on deepwater investment activity, while continuing to stimulate innovation in safety practices, technologies, tools and monitoring methods.

    a.    Inclusion of owners in liabilities will incentivize prudent behaviors. Owners are likely to increase their diligence and expand the monitoring of the designated operator's activities.

    b.    Owners (existing and prospective) will be more concerned about operator designation, with a much stronger focus on a designated operator's safety practices and track record.

## IV. OIL & GAS INDUSTRY CONTEXT

1.   Deepwater is an attractive area globally, forecasted to be a significant portion of the world's oil production over these next fifteen years.[1] Figure 1 shows how as the traditional production sources (onshore and offshore shallow) decline, offshore deepwater is the most sizable component of new global oil production. It is larger than oil sands, oil shale, biofuels, and other sources.

---

[1] Energyfiles and Douglas Westwood, 24 Mar 2009.



**Figure 1**

2. Deepwater exploration and development[2] is different from onshore and shallow water development in that the costs can be 10X-1000X more, and the technical challenges, chance of failure, and risks of problems enormously greater.

3. Energy companies have sophisticated and similar methods to evaluate the attractiveness of an individual project.  SDG, my prior firm, played a major role in bringing improved decision making methods to this industry.  These methods are embodied in a concept called "decision quality," which involves both process and methods and decision analytic tool sets.  These are embedded in the stage gate decision processes of the industry.  Chevron calls its process CHPDEP and its importance is emphasized in this recent video by Chevron current Vice Chairman, George Kirkland.[3]  All the other major global integrated O&G companies have developed similar approaches (Texaco's "Brave," ARCO's "Advantage," "Amoco Common Process," the forerunner of BP's processes, Shell's Process, etc.), many with SDG's help and the foundational work at Chevron.

4. These stage gate processes and embedded tools are designed to improve the quality of decision making and execution.

    a. The methods addressed the technical complexity of these decisions. They were specifically designed to allow an energy company to look at the full probability distribution (or the upside and downside) of a decision, and to make sure the highest value alternative was pursued.  These methods would support many types of asset decisions such as:  Should I buy into this asset or not?  How much should I own?

---

[2] The oil and gas industry is divided into three major segments.  Upstream, which involves the finding and eventual production of oil and gas.  Midstream, which refers to processing and transportation (pipelines, barges, tankers, etc.).  Downstream, which traditionally refers to the refining of crude oil to more refined products such as gasoline, and other fuels and lubricants, and the distribution and retailing of those products.  At a high level, all upstream oil and gas activity is similar.  It begins with lead generation (using seismic and other information to decide where to lease property).  Then specific prospects are generated from further information gathering and evaluation and drilling exploration well(s).  If successful, the next steps involve developing production wells, facilities and transportation assets to produce oil and gas, and finally operating those facilities.

[3] How Chevron Makes Decisions, http://www.youtube.com/chevron#p/u/12/JRCxZA6ay3M

What is its value?  What is the best development alternative?  Should I drill this next well?

5. The O&G industry learned several decades ago that it cannot make decisions without explicitly embracing the uncertain nature of its business.  On any given exploration well for instance, there could be as little as 15% or 20% chance of finding oil or gas reserves. Without tools and methods to explicitly address this uncertainty, it is impossible to make these decisions well.  The technical field is called "decision analysis," but may more commonly be referred to as risk analysis, probability analysis, or risked economics.

6. Because of the potential environmental impacts of unintentional hydrocarbon release, all aspects of the oil and gas value chain are regulated.  The industry is well aware of these laws and the specific permitting requirements.

## V.  UPSTREAM OIL & GAS INDUSTRY – BUSINESS STRATEGIES OF ANADARKO AND MOEX

1. Because of the enormous costs, complexity, and risks of the upstream business (including deepwater), joint lease agreements and joint operating agreements are commonplace.  These agreements allow companies to share in the significant range of outcomes (both upside and downside) associated with wells and projects.  They allow a player to have exposure to multiple opportunities, including opportunities to leverage one's own existing facilities.  They also promote knowledge sharing. According to the Bureau of Safety and Environmental Enforcement (BSEE), there are 5,933 current leases in the Gulf of Mexico.  Of the current leases, 59% percent are fully owned by one party.[4] The remaining 40% will have multiple owners, and it's customary to have a joint operating agreement.  Sole ownership is most common in the lease acquisition phase. As the lead is progressed into a prospect and well, offers to sell a lease interest to others occur, and the percentage of multi-party ownership expands.

2. Upstream companies, like BP (Exploration and Production), Anadarko, and MOEX, typically choose an overall business strategy by deciding:

   a. **What types of plays do I want to participate in?**  (Onshore, shale gas, deepwater, tar sands, etc.).  This consideration is important as the costs, risks, and technical competencies are different.

   b. **What regions of the world do I want to play in?**  (E.g. North America, South America, Africa, Middle East, Asia, etc.).  This consideration is important as government terms, and local political risks can affect the value of assets and operations.  It also changes the demand side markets that are accessible to the upstream companies.

   c. **How can I best leverage my current asset base?**  Typically, the industry is always trying to take existing assets (such as an existing producing facility), and produce new finds through them, saving the enormous cost of developing independent infrastructure.  This is commonly referred to as a "hub and spoke" or "corridor" infrastructure approach.

   d. **To what level do I want to be involved in a particular asset?  Where do I want to be in the value chain:  exploration, development, operations, all?**  These

---

[4] Bureau of Safety and Environmental Enforcement, Leasing Information, http://www.data.bsee.gov/homepg/data_center/leasing/leasing.asp

considerations are important because they require a company to build the requisite expertise, whether as operator or non-operator.

3. BP is a large global player across the full energy value chain. Its upstream segment (BP Exploration and Production) works in most play types, around the globe, with a large existing asset base.[5] BP works as both operator and non-operator. In the GoM, BP is currently designated operator in ~75% of its leaseholds, non-operator in the remaining 25%.[6] However, as typical for the industry, portions of projects are sold as they advance, often to entice others to be part of the project because of the value they can bring, or the advancement of a relationship. For projects that are currently in development globally at BP, BP is operator in 13 of 24 (54%), is the 100% owner in only 2, and has a working interest ranging from 14%-99% in the others.[7]

4. Anadarko is a US based company, with currently 89% of its production and reserves located in the US. Its historic asset base was onshore US, but it has been expanding rapidly in two new play types, onshore shale production, as well as deepwater in GoM, West Africa, Brazil and elsewhere.[8] In the GoM deepwater it is designated operator in ~60% of its leaseholds, 40% non-operator.[9] It has an average working interest of 63% in these leaseholds.[10] Again, as is typical in the industry, working interest goes down as projects advance, capital requirements go up, and other players become involved. For instance, in Anadarko's four active megaprojects (El Merk, Caesar/Tonga, Luscious, Mozambique LNG), its working interest is much less, ranging from 22%-37%.[11]

5. MOEX Offshore 2007 LLC is a wholly owned subsidiary of MOEX USA Corporation, a wholly owned subsidiary of Mitsui Oil Exploration Co Limited (MOECO). MOECO is the oil and exploration subsidiary of conglomerate Mitsui and Co. (70% owned). MOEX has two employees, and relies heavily on technical support from MOECO.[12] MOECO's core area of activity has been Asia, but over the last decade it has added the US, the Middle East, and West Africa "focus" areas, and is participating in several projects in these areas. Its strategy has been to take small ownership positions in projects, generally as non-operator. They are only operator in two exploratory blocks, in Thailand.[13]

6. Anadarko showed sophisticated independent work in its decision to buy and invest in the lease and Macondo well as follows:

---

[5] BP 2010 results and investor update (February 1, 2011),
http://www.bp.com/liveassets/bp_internet/globalbp/STAGING/global_assets/downloads/B/bp_fourth_quarter_2010_results_presentation_slides.pdf
[6] Supra note 4.
[7] Supra note 5 at page 45.
[8] Anadarko Petroleum Corporation (APC) 2010 10-K.
[9] Supra note 4.
[10] Id.
[11] Anadarko Petroleum Corporation (APC) 3rd Quarter Review: http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9MTEzMjQ4fENoaWxkSUQ9LTF8VHlwZT0z&t=1
[12] Deposition of Naoki Ishii at 45:2 - 50:5, 58:4 - 58:23, 141:11 - 147:11.
[13] MOECO Website, http://www.moeco.co.jp/en/moeco/business.html

a.  Anadarko had a cross functional team dedicated to evaluating and deciding to invest.[14]  Anadarko has experience both as operator, and non-operator across multiple GoM assets.[15]  Anadarko executed a sophisticated transaction, involving lease trades and a promote (paying higher costs to buy in to an asset) as part of this transaction.[16]  Anadarko was clear in its profit motive behind the decision to become involved in 2009.[17]  Moreover, Anadarko was expressly motivated by a potential tieback of any Macondo discovery to its existing Pompano production facility, owned by BP and a wholly-owned subsidiary of Anadarko.[18]  Anadarko created a completely independent evaluation of the prospect.   While they sought to understand what BP was presenting, they wanted a completely independent view.[19]

b.  Anadarko understood the upside and downside of this opportunity.  They believed it had a higher chance of finding oil than BP (76% vs. 67%) and slightly more upside (67MMBOE vs. 60MMBOE mean).  Moreover, even if the well was successful, they explicitly modeled the downsides and upside drivers of the economics with low and high cases of reserves, prices, and costs as shown in their sensitivity analysis.[20]

---

[14] Deposition of Alan O'Donnell at 35:19- 36:25 (describing Anadarko's development team, which included a geologist and reservoir engineer to evaluate the geologic and economic merits of the Macondo prospect); Deposition of Stuart Strife at 38 (summarizing Anadarko team's evaluation of the technical aspects of the Macondo prospect).

[15] Deposition of Alan O'Donnell at 28:12-24 (discussing some of Anadarko's operated and non-operated assets in Gulf of Mexico); supra note 12, (BSEE data indicating that Anadarko is designated operator in approximately 60% of its GoM leaseholds, and 40% non-operator).

[16] Deposition Exhibit 1942, Lease Exchange Agreement (at Exhibit A-2, listing pre- and post-exchange lease interests of the BP and Anadarko parties); Deposition Exhibit 1943, Well Participation Agreement (providing for Anadarko to pay BP 33.33% of well costs for the initial exploratory well, up to 110% of the initial costs, for a 25% share);  Deposition of Nicholas Huch at 52 (explaining with respect to the Macondo transaction, there were two components:  the promote percentage on the well and the lease exchange).

[17] E.g., Deposition Exhibit 1947 (Anadarko internal email chain, including November 11, 2009 email from Anadarko's Jim Bryan confirming that Anadarko will not sign agreements with BP for the Macondo prospect until obtaining status on damage to rig and increased costs); Deposition Exhibit 1941 (November 2009 Anadarko internal emails discussing need to rerun economic analysis in light of increased well costs at Macondo due to damage to rig); Deposition Exhibit 1918 (December 16, 2009 email from Alan O'Donnell to Darrell Hollek forwarding updated economic analysis with increased well cost information, and stating "economics did not change much and still look very strong.").

[18] The agreement between BP, Anadarko, and Anadarko subsidiary Kerr-McGee Oil and Gas Corporation (co-owner with BP of the Pompano Platform) contemplated a subsea tieback of all production from the Macondo Prospect to the Pompano Platform if feasible.  Deposition Exhibit 1943, Well Participation Agreement, Section 3.3, page 5.  The proposed tieback was important to Anadarko.  Deposition of Nick Huch at 70:10-71:5 (explaining that at the Pompano facility the volumes were "really low and in order to keep that facility up running at peak performance we needed the additional oil" and agreeing that "the tie-back at Pompano was an important deal at this stage" of the negotiations with BP for Macondo); at 238-39 (explaining that "Anadarko owned 25 percent of the [Pompano] facility, which means we could take our 25 percent product back to that facility and we wouldn't have to pay an addition processing cost or processing fee").

[19] E.g., Deposition Exhibit 1914 (an October 2009 Anadarko email chain and attached presentation with slides of BP's summary of the prospect and technical data with a side-by-side analysis of the data by Anadarko).

[20] Deposition of Paul Chandler at 37:15-17, 40:24-25, 57:9-13; Deposition Exhibit 1914 (ANA-MDL-000041079, -1105, -1111).

    c.    According to Anadarko, they viewed this as a medium size, low risk opportunity (i.e., drilling the well has a high chance of finding hydrocarbons).[21]

    d.    This is consistent with how the industry would view this prospect. High risk wells typically have the probability of finding hydrocarbons in the 10%-30% range, medium risk in the 30%-70% range. Low risk is 70% and above. Naturally, high risk wells are not undertaken unless the reserve size expectations are very large. Medium and low risk wells can be drilled with correspondingly lower expectations.

    e.    Additionally, the ability to develop this through a tieback to Pompano made the economics more favorable, and Anadarko ownership in Pompano would add to their interest.

7.    Similarly MOEX acted as a sophisticated investor to seize this attractive opportunity in its decision to participate in the lease and Macondo well. MOEX was the established operation in the US, whose purpose was to find and invest in GoM deepwater activities on behalf of MOECO.[22] Mr. Ishii and BP had numerous email exchanges describing both the merits of joint involvement in this GoM opportunity, as well as the broader benefits for expanding the BP MOECO relationship.[23]

    a.    In marketing the Macondo well, BP actively engaged MOEX as a potential investor. BP made trips to Japan.[24] Moreover, they negotiated a broader lease exchange involving another GoM lease and a cash payment.[25]

    b.    MOEX and its parent corporations also collected detailed well information to present the opportunity to the Japan Oil, Gas and Metals National Corporation (JOGMEC), a Japanese government-established entity that has as part of its mission to support Japanese companies in oil, natural gas exploration and production.[26] Ultimately JOGMEC declined.[27]

---

[21] Id.

[22] Deposition of Naoki Ishii at 41:5 – 41:13; MOECO U.S.A. Project/Gulf of Mexico (MOEX USA), http://www.moeco.co.jp/english/project/usa-moexusa.html

[23] Deposition Exhibit 3012 (Containing October 2, 2009 email from Naoki Ishii to Kirk Wardlaw of BP thanking BP for the "very exciting opportunity" presented by Macondo); DWHMX00075580 (October 13, 2009 email from Mr. Tsuruta of MOECO to Mr. Rainey and Mr. Wardlaw of BP regarding potential Macondo deal); BP-HZN-2179MD01837107 (March 12, 2010 email exchange between Mr. Tsuruta and Mr. Rainey discussing Macondo and potential interest in another prospect, Kasikda); Deposition of Kirk Wardlaw at 56:20-22 (testimony of BP land negotiator stating that he went to Tokyo "on several occasions" to visit with MOEX).

[24] Deposition of Kirk Wardlaw at 56:20-22; 64:22-65:6; 122:1-17; 170:6-8.

[25] Deposition Exhibit 1944, Lease Exchange Agreement (Agreement providing for BP and MOEX's exchange of lease interests, and a cash payment by MOEX of $1,920,000); Deposition of Kirk Wardlaw at 53:1-9 (Testimony of BP land negotiator describing his role in facilitating agreement of MOEX's exchange of its interest in the Gouda Prospect for an interest the Macondo Prospect).

[26] Deposition of Naoki Ishii at 79:9-14 ("A: During the time that we were discussing whether to invest in Macondo, we were also discussing the possibility of getting support from JOGMEC . . . and someone from JOGMEC wanted to come to Houston and listen to BP's explanation."), at 97 (Mr. Ishii explains that he obtained BP's oil spill response plan for Macondo for JOGMEC).

[27] Deposition of Naoki Ishii at 80:23-81:1.

    c.    MOEX also took the step of hiring reservoir engineer consultants in the Gulf of Mexico to analyze the reservoir at Macondo and its potential.[28]  Prior to signing on to the deal, MOEX also sought and obtained detailed information regarding anticipated well costs, as well as potential production scenarios and estimates.[29] MOEX questioned BP about technical aspects of the proposal for Macondo, including about potential drilling hazards.[30]  MOEX also requested and obtained from BP certain health, safety and environmental information related to the Macondo prospect.[31]

## VI. OWNERSHIP - INTRODUCTION

1.  Vernon and Cain give no weight to the fact that both Anadarko and MOEX were active owners and participants in the Macondo project as demonstrated by their active approvals, their active monitoring on the jointly shared information, their sophisticated independent work, and their attempts to influence BP.  Additionally, Vernon and Cain ignore the depth of information that was available to MOEX and Anadarko.

2.  Industry practice in these multi-partner projects is such that the parties are relying on each for more than capital.  Skills, expertise, and technology ideas, are often shared among the parties.  Moreover, often the parties are in other projects together, and any single project is often part of a larger relationship.

3.  Anadarko, MOEX, and BP designated BP as operator in their agreements with each other. This was outlined in the joint operating agreement, and executed in the filings with the MMS.[32]

4.  This designation had no impact on Anadarko's and MOEX's rights in the agreements. Vernon and Cain give no weight to the fact that Andarko and MOEX enjoyed a wide range of rights that allowed them to actively participate in the Macondo well.

    a.    Operating agreements, which define the relative roles and responsibilities of the parties with respect to decision making and executing the work, do not change ownership rights, and in particular the parties' pro-rata ability to be exposed to all upside and downside associated with that asset.[33]

---

[28] Deposition Exhibit 3007 (Email chain between MOEX and BP in preparation for BP's June 2009 presentation to MOEX on the Macondo prospect, indicating that four representatives from Knowledge Reservoir, MOEX's consultant, would be attending the presentation); Deposition of Naoki Ishii at 67:22-68:3.

[29] E.g., Deposition Exhibit 2818 (August 2009 email chain between BP to MOEX discussing anticipated well drilling and completion costs; costs of production wells and facilities; and estimated recovery from Macondo reserves).

[30] Deposition Exhibit 3017 (June 23, 2009 email from Tokio Kachi of MOEX to Jasper Peijs of BP asking, as follow up to BP's slide presentation, what "drilling hazard in the high pressure zone do you anticipate?  If there is, do you have countermeasures for it in the deepwater area?").

[31] Deposition of Michael Beirne at 206:17-207:25 (Testimony of BP land negotiator discussing his November 4, 2009 email to Mr. Ishii of MOEX, with subject "Macondo safety information," which attached documents including the EPA General Permit and Exploration Plan applicable to Macondo).

[32] Deposition Exhibit 1243 (Joint Operating Agreement, Section 4.1); ANA-MDL-000020295 - ANA-MDL-000020296 (Anadarko designation of operator); DWHMX00375903 (MOEX designation of operator).

[33] For example, Anadarko and MOEX were aware that leaseholders in the GoM had to show oil spill financial coverage to the government, Deposition Exhibit 1946 (Email from Nick Huch with attached "Designation of Applicant" for "Oil Pollution Act of 1990 Application of Certification for Oil Spill Financial Responsibility", "Responsible Party: Anadarko Petroleum Corporation".).  The partners were also likely aware of Minerals Management Service Regulations holding all lessees jointly and severally liable for leasehold obligations. 30 C.F.R. § 250.146(a).

    b.    The designation of operator is standard industry practice, as almost all large oil and gas projects globally have multiple owners, with one party designated to conduct day to day operations on behalf of the owners.

    c.    By entering these agreements, the authorized decision makers for BP, Anadarko, and MOEX held the fiduciary responsibility to protect the individual shareholders in their respective companies, both with respect to entering these agreements, and throughout the life of the ownership relationship.

## VII.    THE AGREEMENTS ENTERED INTO BY BP, ANADARKO AND MOEX

1. BP, Anadarko, and MOEX's actions in formulating and entering into these agreements is consistent with my knowledge of how upstream oil and gas companies typically partner to carry out an exploration venture.

2. BP, Anadarko, and MOEX entered simultaneously into lease exchange agreements and joint operating agreements that provided ownership percentages of 65%, 25%, and 10% respectively.[34]

3. BP and Anadarko entered into a separate "Well Participation Agreement" to gain alignment on the likely development scenario. The agreement gave Anadarko an interest in the physical equipment and ensured a tieback to the Pompano production facility if technically feasible.[35] This was an important precursor for Anadarko's involvement in the Macondo well.[36]

4. Consistent with industry practice, the Joint Operating Agreement (JOA) denotes that all costs (drilling operations, all the costs of all components installed on the well, etc.) be shared equally among the parties according to their ownership percentages, and that the proceeds of the asset, if discovered and eventually developed by the parties, be shared in value by all parties at that pro-rata amount. Hence the parties share pro-rata in upside cases (very high reserves are found) and downside cases (cost overruns, low or no oil found, problems or liabilities, etc.).

    a.    The JOA does not discriminate any categories of value to be distributed any differently than the pro-rata amounts.

    b.    Presumably to avoid ambiguity, the operating agreement specifically makes mention of liabilities, "Defense of Claims,"[37] and "Damages"[38] as obligated by participant share, unless in the case of one party's "gross negligence" or for penalties.[39]

5. Designation of an operator is pragmatic and the normal industry practice, to save the joint owners (the three in this instance) the cost of redundant work. The designated operator, in this case BP, is responsible for day to day execution of work on behalf of the three parties. However, as Cain states the designated operator "maintains control until a

---

[34] Deposition Exhibits: 1243 (ANA-MDL-000030610, "Ratification and Joinder of Operating Agreement Macondo Prospect"); 1244 (MOEX Lease Exchange Agreement); 1942 (Anadarko Lease Exchange Agreement).

[35] Deposition Exhibit 1943 (Well Particpation Agreement, Section 3.3); Deposition of Nick Huch at 258:14-20, 262:12 - 264:19 (reflecting Anadarko understanding of its interest in the tangible equipment.)

[36] Supra, note 19.

[37] Deposition Exhibit 1243 (JOA, Section 22.4).

[38] Deposition Exhibit 1243 (JOA, Section 22.5).

[39] Deposition Exhibit 1243 (JOA, Section 22.5, "Under no circumstances will a party be liable to another party for punitive damages, consequential, indirect, unforeseen, loss of profit, or other indirect or penalty damages either in law or equity.").

defined point in the operation . . .", and those decision points are when the joint owners of the well exercise their collective rights to proceed with additional operations or make other proposals.

6. Under the JOA, Anadarko and MOEX retained important rights and control.

    a. One important area of control possessed by all the owners was the approval of Authorizations for Expenditure (AFEs). Under the JOA, AFEs are the mechanism whereby the owners fund operations at the well.[40] Cain points out that "[u]sually, any party is allowed to propose AFEs…."[41] This is consistent with my knowledge of industry practices, and it was a possibility at Maconodo.

    b. The AFEs that were presented to MOEX and Anadarko by BP describe anticipated expenditures and the types of equipment that would be purchased with the authorized funding.[42]

    c. Under the JOA, all parties must approve the AFE to proceed with a particular operation. If one or more parties do not, the agreement specifies the consequences of not proceeding, which can eventually evolve to an exit if that party desires. [43] Parties are free to sign or not.

    d. There is language that specifies the opportunity for any party to "submit a higher priority proposal."[44] Meaning, a party has the right to offer up alternatives for pursuing the next stage differently.

7. The AFE form template uses the exact term "owners."[45]

8. Evidence shows Anadarko and MOEX regularly paid the joint interest bills for well equipment costs and operations.[46] In fact, after the April 20, 2010 blowout and subsequent interventions and clean up, BP submitted invoices for these costs to the other two parties, at their pro-rata share.[47]

## VIII.   ANADARKO'S AND MOEX'S APPROVAL OF AFES DEMONSTRATES THEIR ACTIVE PARTICIPATION IN AND CONTROL OVER THE MACONDO VENTURE

1. Cain and Vernon treat the AFE process as a purely procedural activity and give no weight to:

---

[40] Deposition Exhibit 1243 (JOA, Sections 2.7, 6.1, 6.2).

[41] Expert Report of Gordon R. Cain, October 17, 2011, page 5 para. 3.

[42] Deposition Exhibits 2878, 2879, 2847, and 2882 (AFEs signed by MOEX); Deposition Exhibits 1919, 1920, 1921, and 1922 (AFEs signed by Anadarko).

[43] Deposition Exhibit 1243 (JOA, Articles 8 and 16).

[44] Deposition Exhibit 1243 (JOA, Section 10.2).

[45] Deposition Exhibits 2878, 2879, 2847, and 2882 (AFEs signed by MOEX); Deposition Exhibits 1919, 1920, 1921, and 1922 (AFEs signed by Anadarko).

[46] Deposition Exhibits 2891, 2893, 2895, 2896 (Joint Interest Bills to MOEX); Deposition Exhibit 2889 (Emails between Naoki Ishii and BP evidencing payment); Deposition Exhibits 4204, 4206, 4208, 4210, and 4212 (Joint Interest Bills to Anadarko); Deposition Exhibits 4205, 4207, 4209, 42011 (Electronic Funds Transfers from Anadarko to BP); Deposition of Naoki Ishii at 176-77, 192-95 (discussing MOEX's payment of invoices); Deposition of Jerry Byrd at 74-97 (confirming Anadarko's payment of invoices for its proportionate share all Macondo well costs billed by BP).

[47] Deposition Exhibit 3019 (Email from Kirk Wardlaw, BP Chief Land Negotiator, to Anadarko referencing Joint Interest Bills issued to Anadarko on June 6, 2010 that were past due under BP's interpretation of the JOA).

    a.    The rationale behind why the form has the detail it has and why it requires all the signatures it does.

    b.    The level of independent communication, technical, and economic analysis done by Anadarko and MOEX prior to signing.

    c.    Anadarko's and MOEX's awareness of the cost overruns and their causes.[48]

    d.    That each party was perfectly free to not sign the AFE (with well established consequences).

2.    My industry experience is such that AFE's are taken by participants as a very serious step.  Even in its summary form, an AFE contains information on plans, equipment purchases, expected costs, etc.  It requires signatures by the relevant leads on the projects (e.g. AFE originator, drilling leader, commercial leader, responsible executive(s), financial and legal certification) and the authorized senior executives (fiduciary agents) of the owners.

    Vernon asserts that "BP was the ultimate decision maker"[49]; this is overreaching.  Anadarko and MOEX had complete freedom to sign the AFEs, which were the key decision points along the way.  Though BP had more than 50% of the ownership interest, they sought to gain agreement with owners, and not force any decision on them.[50]

3.    Anadarko and MOEX exercised their ownership decision rights by signing not just the original AFEs, but three additional expansion AFEs.[51]

    a.    The need for two of the additional AFEs was brought about because the original AFE for over $96 million was exceeded as a result of encountering operational difficulties that led to cost overruns.  The first unexpected event, which resulted in a supplement for $27.9 million, was the need to change drilling rigs after a hurricane damaged the Marianas, the Transocean rig that initiated the Macondo well.[52]  The second major event leading to cost overruns of an additional $27 million was a well control event on March 8, 2010 where kick went undetected for some time and led to a stuck pipe, losing a bottom hole assembly, and requiring a sidetrack of the well.[53]  The three AFEs together amounted to $151 million, almost $55 million more than what the three owners had initially planned to spend on the well.

---

[48] Deposition of Naoki Ishii,  127:15 – 134:17.

[49] Expert Report, Roger Vernon, Oct 17, 2011, page 3, para. 12.

[50] Deposition Exhibit 2855 (April 14, 2010 email from Michael Beirne "Macondo JOA Obligations" to members of the Macondo Well team.  Mr. Beirne emphasizes with regard to setting the production casing: "We need to be sure we have co-owner approval prior to initiating this operation." Also with regard to temporarily abandoning the well, Beirne states: "This will require approval from co-owners.").

[51] Deposition Exhibits 2878, 2879, 2847, and 2882 (AFEs signed by MOEX); Deposition Exhibits 1919, 1920, 1921, and 1922 (AFEs signed by Anadarko).

[52] Depositions Exhibits 1920 and 2879 (The first supplemental AFE explains that "Due to rig damage from Hurricane Ida, the well will be finished with the Transocean 'DW Horizon' semi-submersible between 2/1/2010 and 3/15/2010 (45 days)").

[53] Deposition Exhibits 1921 and 2847 (Signed on March 30, 2010, the second supplemental AFE explains "The first Supplemental AFE was exceeded due to unexpected lost circulation and well control events resulting in earlier than planned  setting of the 16" and 13-5/8' casing strings.  The well required both the risked contingency liner (11-7/8") and one additional contingency liner (9-7/8") to reach planned TD."); Exhibit 1072 (March 12, 2010 email from Jonathan Bellow a BP Operations Coordinator to members of the Macondo team discussing how signs of the March 8th kick could have been detected sooner.)

    b.    In connection with receiving these supplemental AFEs for approval, MOEX had discussions with its parent companies[54] and with BP[55] about cost overruns and operational difficulties.  Anadarko also evaluated whether to approve the supplemental AFEs.[56]  Both Anadarko and MOEX had individuals with technical expertise to review the AFEs to assist the partners in deciding whether to approve the AFEs.[57]

    c.    The fourth and final AFE for $3.5 million was for the purchase and the cementing and installation of the production casing, the casing hanger, the lockdown sleeve, the centralizers and the float equipment.[58]  A draft of this AFE was circulated to the co-owners ahead of time, and MOEX provided technical comments on the draft.[59]  Installation of this equipment occurred shortly before the blowout on April 20, 2010.[60]

    d.    In email exchanges among BP staff dated April 19, they refer to Anadarko and MOEX as "co-owners" who need to sign off on the decision to set the production casing and temporarily abandon the well.[61]

4.    In addition to approving the AFEs, Anadarko and MOEX paid monthly invoices, pursuant to their prior AFEs, known as Joint Interest Bills that provided a detailed account of the expenditures at the Macondo Well.  Each invoice specified the various services, equipments, expendables, and permanent facilities that the three owners were purchasing.[62]

---

[54] Deposition of Naoki Ishii at 127:15-128:15; Ex. 2898a (March 12, 2010 email from Mr. Ishii of MOEX to Mr. Naito of MOECO discussing the need for a supplemental AFE due to side track drilling).

[55] Ex. 2900(Ishii) (March 22, 2010 email between Mr. Ishii of BP and Mr. Beirne of BP concerning potential estimated well costs prior to approval of second supplemental AFE); Deposition of Michael Beirne at 264-65 (referencing questions from MOEX in connection with BP's issuance of supplemental AFEs).

[56] Deposition of Nicholas Huch at 193 (Mr. Huch references internal meetings at Anadarko to discuss operational progress at Macondo after receiving requests from BP for supplemental AFEs); at 298 (discussing Anadarko's process for approving AFEs).

[57] Deposition of Michael Beirne at 278:9-20 ("Q: ...And in conjunction with [the AFE process], there are individuals both within BP and within the nonoperating partners, Anadarko and MOEX, who have technical expertise to review that information that's contained in the AFEs to assist the nonoperating partners in deciding whether they want to approve or disapprove of the AFEs; is that correct? ... A: Yes, sir.")

[58] Deposition Exhibits 1922 and 2882 (Finally, the production casing AFE described all the tangible equipment (casing, lockdown sleeve, centralizer subs, and float equipment) as well as the intangibles (cement and costs to install).

[59] Deposition Exhibit 2850 (April 14, 2010 Email chain between  Mr. Naito of MOECO – writing on behalf of Mr. Ishii – to BP in which Mr. Naito makes a correction to the final casing size due to the fact that a 9-7/8" liner was needed to reach total depth).

[60] Chief Counsel's Report 2011, National Commission on BP Deepwater Horizon Oil Spill and Offshore Drilling, Chapters 4.3 and 4.5.

[61] Deposition Exhibit 2855 (April 14, 2010 email from Michael Beirne stating stating that we need co-owner approval to temporarily abandon the well. And, with regard to temporarily abandoning the well, Beirne states: "This will require approval from co-owners."); Deposition Exhibit 1221 (April 19, 2010 email from Michael Beirne stating he is going to get co-owners approval not to pursue further operations.).

[62] E.g., Deposition of Naoki Ishii at 177-78 (in reviewing January invoice for expenditures at Macondo, Ex. 2893, acknowledging that it contained items such as "casing line pipe, conductor . . . and so on" and that the costs of those are included in the total costs paid in the invoice); Deposition of Jerry Byrd at 76:1-21 (confirming that the January invoice for the Macondo Well, Ex. 4204, includes costs of "tangible controllable equipment").

IX. ANADARKO AND MOEX TOOK ADVANTAGE OF THEIR PARTNER POSITION
TO MONITOR CLOSELY THE ACTIVITIES TAKING PLACE AT MACONDO

1. Vernon and Cain acknowledge that MOEX and Anadarko had access to the key information tools available to the joint owners, WellSpace and INSITE Anywhere. However Vernon and Cain fail to give weight to the vast amounts of information available, the number of people regularly logging on, and the dialogue between owners motivated by information they were receiving.

2. WellSpace provided an enormous body of timely information about operations at the Macondo well (most added daily).[63]  The following are examples of the information available to the owners, and often times accessible within 24 hours after the specific operation.[64]

   a. "Daily Operations Reports" provided a summary of the last 24 hours of events on the rigs.  It included discussions of rig activities, rates of penetration, and the next 24 hour forecast for anticipated rig operations.[65]

   b.  "Daily Geologic Reports" provided analysis to the owners on the nature of the rock formation encountered while drilling.[66]

   c. "Sperry Drilling Services – Daily Operations Reports" provided information to the owners on key statistics monitored by the mudlogging crew on the rig.[67]

   d. "MiSWACO Synthetic-Based Mud Report" provided information to the owners on actions taken with respect to the drilling fluids, particularly the amount of fluid lost in the formation within the past 24 hours.[68]

   e. "Logging While Drilling (LWD) data" provided information to the owners on the geologic data.  Detailed date on resistivity, etc.[69]

   f. "Equivalent Static Density Calculations" provided information to the owners about fluid pressure.[70]

---

[63] Deposition of Robert Bodek at 355:9 – 358:19 (Mr. Bodek provides of a comprehensive description of what information was available to the partners through WellSpace a "data dropbox" and INSITE Anywhere a "real-time data transmission applet" that "streams real time data from the rig", both Halliburton products); Deposition of Paul A. Chandler at 98:1 – 22;  Deposition of Robert Quitzau at 37:2-14, 40:2-19; 72:13-20;  Deposition Exhibit 1258 (April 19, 2010 email from Paul Chandler to Robert Bodek requesting "drilling reports"); Deposition Exhibit 5547 (April 19, 2010 email from Forrest Burton of Anadarko providing information from  "AM mud log reports"),

[64] Apc-Shs2b-000000001 through Apc-Shs2b-000001028 represent over 1000 documents that were made available to the partners via WellSpace. Mr. Vernon's report Apendix B pages 18 – 37 lists these as Facts and Documents Considered.

[65] Apc-Shs2b-000000001 through Apc-Shs2b-000000134; DWHMX00078353 through DWHMX00078357; DWHMX00078362 through DWHMX00078370.

[66] Apc-Shs2b-000000135 through Apc-Shs2b-000000209; DWHMX00318191 through DWHMX00318192; DWHMX00318193 through DWHMX00318194.

[67] Apc-Shs2b-000000251 through Apc-Shs2b-000000427; DWRM0001866 through DWRM0001867; DWRM0001874 through DWRM0001875.

[68] Apc-Shs2b-000000432 through Apc-Shs2b-000000496; DWHMX00318023 through DWHMX00318026; DWHMX00318027 through DWHMX00318030, DWHMX00318031 through DWHMX00318034.

[69] Apc-Shs2b-000000512 through Apc-Shs2b-000000619; MDR020 0065-0109

[70] Apc-Shs2b-000000731 through Apc-Shs2b-000000733; DWHMX00318617 through DWHMX00318622; DWHMX00318623 through DWHMX00318628

---

g.   "Daily PPFG [pore pressure fracture gradient] Reports" provided information to the owners on the drilling margin window to ensure integrity of the wellbore. They also provided results of formation integrity tests and equivalent circulating density.[71]

3.   INSITE Anywhere, a Halliburton remote real time log monitoring service, provided a vast body of real time information to Anadarko and MOEX.

a.   The service made data from logging tools on the Deepwater Horizon available on a secure web site operated by Halliburton 24 hours a day on any computer with internet access.[72]

b.   The parameters that were available to Anadarko and MOEX included significant amounts of information about operations, and employees from both companies would do real time monitoring from time to time.  Some of the parameters available via INSITE Anywhere included: Block Position, Continuous Gas Percentage in Air, Depth, Flow In & Flow Out, Gas (Analysis), Hookload, Hydrocarbon Shows, Formation Lithology, Mud Density In and Out, Mud Temperature In & Out, Mud Volume, MWD Data, Pump Pressure (Stand Pipe Pressure), Choke Pressure, Pump Stroke and Mud Volume Pumped, and Rate of Penetration.[73]

4.   Access logs, emails and deposition testimony reveal that both MOEX and Anadarko had employees watch the real time information streaming from Macondo and download well and operations information at various stages of operations.

a.   For INSITE Anywhere, at least seven employees from Anadarko had access, at least five from MOEX (including its parent companies MOECO and MITSUI).[74]

b.   For WellSpace, at least 15 people from Anadarko had access, at least 4 from MOEX (including its parent companies MOECO and MITSUI).[75]

5.   Anadarko had a number of well trained experts constantly evaluating the progress of drilling operations at Macondo.[76]

---

[71] Apc-Shs2b-000000860 through Apc-Shs2b-000000882; DWHMX00318677 through DWHMX00318680; DWHMX00318681 through DWHMX00318683.

[72] Deposition of John Gisclair at 119:18 – 120:8, 155:15 - 156:6; Deposition Exhibit 617 (describing all the technical capabilities for INSITE the host program used by the mudloggers on the Deepwater Horizon, which include collecting downhole and surface sensor information and displaying that information through logs, charts and real-time display. INSITE Anywhere has the capability of displaying these same parameters, including logs, tables, and alarms).

[73] Deposition Exhibit 611, a Halliburton/Sperry Sun end of well report indicating the parameters monitored; Deposition of Paul A. Chandler at 212:15 – 221-2 (where Mr. Chandler indicates that he reviewed the following parameters listed in Exhibit 611: "gas information," "depth," "gas analysis," "hydrocarbon shows," "MWD data," and "rate of penetration").

[74] Deposition Exhibit 1215 (February 2, 2010 email from Robert Bodek to Jose Ortiz (Halliburton) requesting that a list of BP, Anadarko, and MOEX individuals be granted INSITE Anywhere access for Macondo).

[75] Deposition Exhibit 1213 (January 26, 2010 email from Robert Bodek to Pall Stap (Halliburton) requesting a list of Anadarko employees be granted access to WellSpace; Deposition Exhibit 613 (a WellSpace access log for Macondo listing the names of Anadarko and MOEX employees); Deposition of Paul A. Chandler at 100:10 – 102:5; Deposition Exhibit 2623 (March 11, 2010 email Showing Robert Quitzau being granted access to Well Space); Deposition of Naoki Ishii at 141.

[76] Deposition of Paul A. Chandler at 103:9 – 106-7(Stating that Anadarko personnel were tasked with gathering all the data that was posted on WellSpace and keeping it in a file room.  Mr. Chandler himself would also download information himself: "If we were drilling I would probably check it once a day to get information. As we got closer to our primary objective, I would check it more often"); Deposition Exhibit 1218 (Contains a March 24, 2010 email string titled "Macondo Casing Plan & Pore Pressure Update" from Robert Quitzau to Robert introducing himself as

---

    a.    Anadarko updated the valuation as new information from drilling was revealed in order to support their ongoing decision making and economic analysis.[77]

    b.    After the March 8th kick, Anadarko added a consultant drilling engineer to their team, Robert Quitzau, to monitor events at Macondo and report back to the company with daily updates. Quitzau accessed information from Wellspace and INSITE Anywhere in performing this function.[78]

6.   MOEX also monitored information and operations at Macondo by involving technical experts from its parent companies in Japan.

    a.    Mr. Ishii, MOEX's sole functioning employee, acted as a liaison with his technical experts at MOECO in Japan.[79]

    b.    Mr. Kanno, a drilling engineering in Tokyo, and other personnel, monitored and downloaded information from WellSpace. Others like Mr. Naito had access to and observed data from INSITE Anywhere.[80]

    c.    MOEX received updates on well control issues and challenges at the well from BP technical employees on a regular basis.[81]

## X. ANADARKO AND MOEX CONDUCTED INDEPENDENT ANALYSES, AND ATTEMPTED TO INFLUENCE THE ACTIONS OF BP

1.   Cain and Vernon give no weight to the fact that MOEX and Anadarko had the ability to request meetings, raise questions and concerns, and conduct independent proposals and demonstrated this influence on several occasions. Cain takes time to emphasize that the JOA does not describe a mechanism whereby the co-owners can influence operations, but he apparently never reviewed evidence demonstrating that Anadarko and MOEX did in fact attempt to influence operational decisions.[82]

2.   Specifically for Anadarko

---

the drilling engineer following drilling progress at the well, asking specific questions about expected pore pressures and two different sizes of casing that were planned to be used, and then reporting back his views on the safety of setting different size casings to Anadarko.").

[77] Deposition Exhibit 2697 (April 5, 2010 email entitled "Macondo supplement" that attaches an updated reservoir and economic analysis.).

[78] Deposition of Robert Quitzau at 73:17-86:8 (Quitzau describes his personal practice to download information from WellSpace each morning before a meeting in which he was expected to report to a drilling group within Anadarko on the status of the Macondo Well operations.).

[79] Deposition of Naoki Ishii at 139:12 -148:25 (Testimony of Mr. Ishii describing how employees of MOECO in Japan were assisting MOEX under a "service contract." One of the MOECO employees, Mr. Tsuji, circulated the daily drilling reports that he had downloaded from WellSpace. Another MOECO employee, Mr. Kanno, prepared weekly reports summarizing reports pulled from WellSpace); Deposition Exhibit 2871 (Service Agreement between Mitsui Oil Exploration Corporation, LTD and MOEX USA Corporation); Deposition Exhibit 2884 (April 21, 2010 email from Mr. Tsuji).

[80] Supra, note 70; Deposition of Naoki Ishii at 150 – 154.

[81] E.g., Deposition Exhibit 2842 (March 21, 2010 email from Mr. Bodek of BP to Mr. Ishii, relaying to Ishii information concerning stuck pipe event, sidetracking, and difficulties encountered in drilling the 13 5/8" casing section.); Deposition Exhibit 2852 (April 13, 2010 email from Mr. Beirne to Mr. Ishii and Mr. Huch informing them that BP was stopping drilling "due to safety concerns and wellbore integrity issues.")

[82] Expert Report of Gordon Cain, Exhibit B (List of documents reviewed and relied upon by Cain in forming his opinions).

     a.    In an email with Robert Bodek, the BP Operations Geologist, Robert Quitzau proposes various mud weights that BP might consider using.[83]

     b.    Emails from Alan O'Donnell and Paul Chandler (Anadarko) to others within the company indicate the company's plan to request that BP consider drilling past the Total Depth it had reached.[84] Mr. Chandler was appointed to call Mr. Bodek to communicate Anadarko's request, though BP informed them they could not drill deeper for safety reasons.[85] Mr. O'Donnell also called his counterpart at BP to discuss this issue.[86]

     c.    Ultimately, Anadarko approved the Total Depth call, although it indicated to BP that it would not oppose continued drilling to original agreed upon criteria if BP concluded it was safe to do so.[87]

     d.    In emails from Mr. Quitzau (Anadarko) he offers his view on the impact of completion casings on eventual production flow.[88]

3.   Specifically for MOEX

     a.    In connection with receiving supplemental AFEs for approval, MOEX had discussions with its parent companies[89] and with BP about cost overruns and operational difficulties.[90] Mr. Ishii acted as a liason between his technical experts at MOECO in Japan, and his BP counterparts.[91] At times, technical experts in MOECO communicated directly with BP.[92] Mr. Ishii asked for well plans on several occasions.[93] On other occasions he raised questions to BP and expressed views from his technical experts in Japan.[94]

---

[83] Deposition Exhibit 1219 (April 5, 2010 email "Macondo Update" from Robert Quitzau to Robert Bodek).

[84] Deposition Exhibit 1952 (April 12, 2010 email meeting invitation sent by Paul Chandler "to discuss our options for possibly drilling deeper beyond our current TD for the Macondo well."); Deposition Exhibit 1913 (April 9, 2010 email from Alan O'Donnell to Darrell Hollek, "It looks like BP is stopping here . . . . Maybe we can talk them into drilling deeper once pipe is set.")

[85] Deposition of Paul Chandler at 94:8-96:2.

[86] Deposition of Alan O'Donnell at 196:20-197.

[87] Deposition Exhibit 1256 (April 14, 2010 email from Nick Huch to Michael Beirne).

[88] Deposition Exhibit 2633 (April 8, 2010 email exchange with subject "Macondo Completion Question" between Robert Quitzau and Robert Bodek, Brad Simpson, Brian Morel and others).

[89] Deposition of Naoki Ishii, at 127:15-128:15; Deposition Exhibit 2898a (Email from Mr. Ishii of MOEX to Mr. Naito of MOECO dated 3/12/2010 concerning need for a supplemental AFE due to side track drilling).

[90] Deposition Exhibit 2900(Ishii) (Email between Mr. Ishii of BP and Mr. Beirne of BP dated 3/22/2010 concerning potential estimated well costs prior to approval of second supplemental AFE).

[91] Deposition of Naoki Ishii at 102:18-103 (Testimony of Mr. Ishii, stating that with respect to Macondo, "I was the one to ask questions, as the contact person for BP"); at 139:12-148:25 (Testimony of Mr. Ishii discussing his responsibilities to report on Macondo to MOECO, and to obtain technical information on Macondo from MOECO employees assigned to the project).

[92] E.g., Deposition Exhibit 2850 (Email chain dated April 14, 2010 from Mr. Naito of MOECO to Mr. Beirne of BP concerning draft AFE for production casing, which included BP drilling engineer's comments in response to Mr. Naito's questions concerning the precise size of the production casing and what costs were to be covered by the AFE).

[93] E.g., Deposition Exhibit 2877 (Email from Mr. Ishii to Mr. Beirne following up on request for a detailed drilling plan for Macondo).

[94] Deposition of Naoki Ishii at 103 (discussing his role of forwarding questions from the technical experts at MOECO, and transmitting the information back to MOECO).

4. Both Anadarko and MOEX agreed to setting production casing on April 15[95] which lowers the future cost of development.  They chose this as a lower cost option vs. setting a liner now and a production casing later.[96]
5. Both Anadarko and MOEX agreed to temporary abandonment on April 20 as contemplated in the JOA.[97]
6. Vernon and Cain claim that both Wellspace and INSITE Anywhere provided only partial information that is hard to interpret without fully knowing the activity on the rig.[98] However MOEX and Anadarko had the ability, which was exercised, to ask questions directly of the BP personnel,[99] and in fact to go out on the rig if desired.[100]

## XI. WHAT MORE COULD ANADARKO AND MOEX HAVE DONE?

1. Vernon and Cain give no weight to the fact that based on the agreements, and industry practice, both Anadarko and MOEX had options to do more to influence operations.
2. Vernon makes much of his proposition that Anadarko had no "obligation"[101] to assess and monitor the information from WellSpace and INSITE Anywhere.  I disagree, as owner they very much have the responsibility and right to monitor that information to whatever degree they want.
3. Vernon emphasizes that they never visited the rig during the drilling, ignoring the fact that they could have done so.[102]
4. They had the right to not approve the AFEs.
5. They had the right and ability to raise "higher priority proposals" for the next stage of activity.
6. They had the ability to call meetings, ask more questions, and more closely inspect the situation.
7. They could also employ as many technical personnel, or otherwise, to assist them in understanding the drilling operations.

## XII.  IMPACT OF LIABILITIES (COSTS, DAMAGES, PENALTIES) ON DEEPWATER ACTIVITIES

1. Based on the methods energy companies use for investment decision making, the application of any financial liability for "blowouts" should have minimal affect on GoM Deepwater development investment, but is likely to stimulate innovation.

---

[95] Deposition Exhibit 1922 (Anadarko's approval of AFE for the production casing); Deposition Exhibit 2882 (MOEX's approval).

[96] Chief Counsel's Report 2011, National Commission on BP Deepwater Horizon Oil Spill and Offshore Drilling, Chapter 4.2: Well Design, page 61.

[97] Deposition Exhibit 1931 (Anadarko's approval to temporarily abandon the Macondo well); Deposition Exhibit 2856 (MOEX's approval).

[98] Expert Report of Roger Vernon, page 6, paras. 20, 21; Expert Report of Gordon Cain, page 12.

[99] E.g., Deposition Exhibit 1219 (April 5, 2010 email "Macondo Update" from Robert Quitzau to Robert Bodek); Deposition Exhibit 1216 (February 12, 2010 email from Mr. Ishii to Mr. Bodek of BP concerning resumption of drilling at Macondo Well).

[100] Deposition Exhibit 1243 (JOA, Section 7.3); Deposition of Michael Beirne at 214-215.

[101] Expert Report of Roger Vernon, page 7, para. 23.

[102] Expert Report of Roger Vernon, page 8, para. 27.

2. A significant blowout, as occurred at Macondo on April 20, 2010, still remains what is often called a "low probability, high impact" event.   There is an entire field of study related to incorporating these possibilities into one's evaluation.

3. Statistically deep drilling has shown low frequency of blowout incidents.  An OGP report on Blowout Frequencies (which summarized decades of data from Scandpower and SINTEF databases)[103] measure blowout[104] frequencies (pre Macondo) for exploration drilling, deep wells, to be $3.1 \times 10^{-4}$ for normal wells and $1.9 \times 10^{-3}$ for high pressure high temperature wells.[105]   Rounded, in simpler terms, the risks are 3 in 10,000 for normal deep exploration wells and 2 in 1,000 for HTHP deep exploration wells. Note these frequencies are for any kind of blowout, from small to significant hydrocarbon release.   Hence the frequency of catastrophic rig damage and large release scenarios should be less than these statistics.[106]

4. Figure 2, shows the analysis of a typical exploration well, based loosely off of the Macondo situation.  If there is a 75% chance of finding hydrocarbons and the search is successful, the opportunity is worth $300MM in expected value.[107]  There is also a 25% chance of not finding anything, with the result that the exploration well drilling costs $100MM in this illustration.   The expected value of pursuing this is $200MM (.75 * $300MM + .25 * -$100MM).  Thus, it looks attractive to drill this opportunity.



FIGURE 2.

---

[103] Blowout Frequencies, OGP Risk Assessment Data Directory, Report No. 4342, March 2010, http://www.ogp.org.uk/

[104] Blowout is defined in this report as: An incident where formation fluid flows out of the well or between formation layers after all the predefined technical well barriers or the activation of the same has failed.  Whereas Well Release is defined as: An incident where hydrocarbons flow from the well as some point where flow was not intended and the flow was stopped by use of the barrier system that was available on the well at the time of the incident.

[105] HTHP wells are defined as: A well with an expected shut in pressure equal to or above 10,000psi and/or bottom hole temperatures equal to or above 300 degrees F.

[106] These databases did not include the Macondo well blowout (2010) nor the Montara blow out (2009) in Western Australia.  Revised frequency statistics will increase.

[107] Simply put, expected value is determined by multiplying the probability of a particular possibility happening, by the value if that possibility occurs.  In this case, many possibilities exist driven by various reserve outcomes, capital cost outcomes, price outcomes, etc.  Expected value is often casually referred to as probability weighted value, or average value.

5. If we were to expand this illustration to explicitly include the risk of a major blowout we would add a branch in our decision tree, with the consequence of this blowout and its chances. As an illustration, Figure 3 shows an HTHP risk of 2 in 1,000 and a total liability cost of damages of $20B.   See Figure 3.



FIGURE 3

6. Adding this to branch our analysis, our expected value is down slightly to $160MM.[108] This result does not change our decision. We would still drill the opportunity.   In fact, one could double the chance of significant blowout AND double the damages, and the conclusion would still be the same.

7. At some point, with high enough risk of a major blowout, and with the possible consequence of major damages, one would not pursue the specific prospect.  This incentivizes the consideration of the blowout risk, not drilling in significant blowout risk opportunities, and continuing to drive innovation to reduce this risk and its consequences are desirable incentives.

8. The application of liability to all owners will enhance safety processes because energy companies will seek avoid liability by lowering the chance of these low probability, but high impact events.

   a.   The industry is already quite active in discussing and implementing changes since Montara and Macondo, ranging from cross industry studies and best practice development from organizations like the OGP (International Association for O&G Producers)[109] to a $1B investment by GoM deepwater players in creating the non-profit Marine Well Containment Company[110]

---

[108] $160MM is the expected value calculation for a successful drill multiplied by the chance of no drilling problems plus the cost of a blowout times the chance of a blowout. [ ($200MM x .998) + (-$20B x .002) ]

[109] International Recommendations on well incident prevention, intervention and response, OGP, http://www.ogp.org.uk/downloads/GirgBrochure.pdf

[110] Marine Well Containment Company, http://www.marinewellcontainment.com/membership.php

      b.   Deposition testimony in this case has indicated that Anadarko is already taking new steps to monitor the safety of designated operators.[111]

9.   Possible consequences of not holding all owners liable.
      a.   If co-owners were not found liable in their joint activities, the industry would then find itself with very perverse incentives.
      b.   I can foresee a scenario in which the most likely outcome would then be to have the designated operator hold the smallest interest, and be thinly capitalized.
      c.   This would be counterproductive to all stakeholder interests, whether they are safe development, least cost production of energy, pursuit of promising opportunities, or environmental protection.

## XIII.  CONCLUSIONS

1.   The reports of Cain and Vernon fail to provide the proper industry context for the joint owner arrangement that existed at Macondo, fail to adequately describe the rights and responsibilities of Anadarko and MOEX as partners at the Macondo Well, and fail to properly characterize the evidence that demonstrates Anadarko and MOEX's exercising of their ownership rights.  Specifically:
      a.   They minimize the decision rights of Anadarko and MOEX to originally enter into the opportunity, and to approve continuing the project at key points in the operating phase.
      b.   They minimize the access Anadarko and MOEX had to all critical information associated with the drilling.
      c.   They minimize the demonstrated freedoms Anadarko and MOEX exercised in asking questions, and attempting to influence activities along the way.
2.   At Macondo, BP, Anadarko and MOEX were owners of the deepwater lease, Macondo well, and associated facilities and hence jointly exposed to all consequences (good or bad) from the well drilling and planned development activity.

3.   Any appropriate liabilities (costs, damages, penalties) assigned to the owners of the Macondo well will have limited impact on deepwater investment activity, while continuing to stimulate innovation in safety practices, technologies, tools and monitoring methods.

---

[111] Deposition of Nick Huch at 270:11–272:8 (describing post-Macondo risk analysis that Anadarko now does to determine whether an operator is prudent and capable of operating).