# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig Deepwater Horizon
In the Gulf of Mexico on April 20, 2010
(MDL-2179)

Expert Report

of

Gordon R. Cain

Submitted to:

Pillsbury Winthrop Shaw Pittman, LLP

on behalf of

MOEX Offshore 2007 LLC

Dated: October 17, 2011

*Gordon R. Cain*
Gordon R. Cain

CONFIDENTIAL

# EXPERT REPORT OF GORDON R. CAIN

## INFORMATION REQUIRED BY THE FEDERAL RULES OF CIVIL PROCEDURE

Following is a list of items required by the Federal Rules of Civil procedure:

1. This report contains my opinions, conclusions, and information supporting my opinions and conclusions.
2. A statement of my qualifications is contained in Exhibit A.
3. I am being compensated at the rate of $300 per hour for all work done for MOEX Offshore 2007 LLC ("MOEX").
4. The primary source for forming my opinions has been the *Macondo Prospect Offshore Deepwater Operating Agreement* ("the Macondo OA"), which MOEX signed on November 18, 2009, and effective as of October 1, 2009, as well as my knowledge of U. S. oil and gas industry practices in applying operating agreement provisions. I have also reviewed and relied upon the documents described in Exhibit B in forming my opinions.
5. I have not testified in any court proceedings or depositions in the last four years.

## SUMMARY OF FACTS AND CONCLUSIONS

1. The Macondo OA provided that BP Exploration & Production Inc. ("BP") would be the operator of the Macondo exploratory well.[1]
2. The *Lease Exchange Agreement*, signed by MOEX on November 18, 2009, and effective as of October 1, 2009, between BP and MOEX provided for an assignment by BP to MOEX of an undivided ten percent (10%) Record Title Interest in BP's Lease OCS-G 32306 covering Mississippi Canyon Block 252[2], which is the Block covered by the Macondo OA.[3]
3. BP, as operator, had the exclusive right and duty to conduct (or cause to be conducted) all activities or operations under the Macondo OA.[4] This exclusive control by the operator is consistent with industry practice both in the Outer Continental Shelf ("OCS") and onshore.
4. BP, as operator, was not subject to the control or direction of Non-Operating Parties.[5] This is consistent with industry practice as the industry deems it unworkable to provide non-operators with the right to provide input on critical drilling decisions that may need to be resolved quickly, sometimes immediately. Such decisions should be made by

---

[1] The Macondo OA, Article 4.1, page 14
[2] The Lease Exchange Agreement dated October 1, 2009, between BP and MOEX, Article 1.4, page 1, and Article 2.(a), page 2
[3] The Macondo OA, Exhibit "A"
[4] The Macondo OA, Article 5.1, page 20
[5] The Macondo OA, Article 5.1, page 20

Page 1

CONFIDENTIAL

the operator's person-in-charge on the rig, and should not be the result of consensus-building among other parties, particularly non-operating parties who are not aware of all of the ongoing rig activity as it occurs. I agree with the statement of the Chief Counsel of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling in his report, "Macondo, The Gulf Oil Disaster" ("Report"), that "experts and witnesses alike agree that industry practice requires the well site leader to make the final decision regarding whether [a critical] test [such as the negative pressure test] has passed or failed," and that, as between BP and Transocean employees, "The long time spent discussing the tests shows a desire for consensus. It is possible, even likely, that this desire obscured the parties' responsibilities." Report at 159. It logically follows that, if consensus had been sought with Non-Operating Parties who were not on the rig, the parties' responsibilities would been even further obscured.

5. MOEX was provided with an industry standard AFE form which consisted of one page giving high level details such as the cost estimate, surface and bottom hole locations, the proposed total depth, and a very brief project description. MOEX was also given a two page schematic with the AFE, and did not receive a detailed drilling plan. Article 6.2 in the Macondo OA provides that an approved proposal (an AFE) gives the Operator authority to commit and expend funds on the approved proposal. Industry practice is that, once the original AFE is approved, the Operator is empowered to make whatever changes in the well plan it deems necessary in order to drill the well safely to the approved objective depth. Under the Macondo OA, the operator did not have to obtain concurrence or input from non-operators on any change to the well plan, other than a major revision such as a change to the objective depth or if the proposed bottom hole location is moved more than 1,000'[6] prior to the commencement of actual drilling operations, until the actual costs associated with an original AFE or its approved supplemental AFE exceeded the permitted over expenditure by an amount equal to ten percent (10%).[7] The Operator also had the right to suspend drilling operations if in its sole opinion the operator deemed further well operations impractical.[8]

6. It is also industry practice that non-operating parties such as MOEX accept, and act in accordance with, the provisions of operating agreements which give the operator exclusive and full control over drilling operations. In particular, non-operating parties do not generally attempt to "second-guess," or become involved in, drilling operations. Although non-operating parties are given access to certain information about drilling operations, in my experience that information is provided to them for the sole purpose of being able to monitor costs and progress so that they can make timely decisions at the next AFE point. It is not industry practice that non-operating parties closely monitor such information in order to enable them to intervene in the drilling operations. Nor is it industry custom or practice for a non-operator to provide technical input to the Operator during drilling operations conducted by the Operator under an operating agreement.

---

[6] The Macondo OA, Article 10.1.1
[7] The Macondo OA, Article 6.2.2, page 26, and Article 6.2.2.1, page 27
[8] The Macondo OA, Articles 10.1.2 and 10.1.4.

CONFIDENTIAL

7. I understand that the Court has ruled in this case that ". . . Any access to information that MOEX may have had did not give rise to a duty to intercede in an independent contractor's [BP's] operations—especially because Plaintiffs have not alleged in their Complaint that Non-Operating Defendants had access to any information not already available to BP and Transocean personnel either onshore or on the rig." Page 28. The Court's ruling in that regard is consistent with industry practice. In fact, it is common knowledge in the industry that, without knowledge of ongoing rig activity, mere access to such data would not enable non-operating parties to determine whether any such data presented a real problem or not. As the Chief Counsel aptly stated in his Report, "Knowledge of ongoing rig activity 'is essential to accurate interpretation of the data.' Absent that knowledge, it is difficult to ascertain whether anomalous data are benign or problematic." Report at 187.

## INTRODUCTION

MOEX was a Non-operating Party in the Macondo well, which was operated by BP pursuant to the Macondo OA. Important issues to be determined relate to the rights and obligations that each party, the Operator and the Non-Operator Parties, had during the drilling of the well. The rights and obligations of the Operator and Non-Operating Parties were set forth in the Macondo OA, which was based on the *AAPL Model Form of Offshore Deepwater Operating Agreement, AAPL-810 (2007)* ("AAPL-810 (2007))." The Macondo OA defines the relationship of the Operator and the Non-Operator Parties during the entire life cycle of the Macondo prospect, from drilling the initial exploratory well, through appraisal operations, development operations, facility design and fabrication, and through the productive life of the field.

Before addressing the specific terms in the Macondo OA, I will give some background on my experience with operating agreements, and deepwater operating agreements in particular. Then I will give a general overview of pertinent operating agreement provisions, and then I will address the Macondo OA and how certain of its provisions relate to industry practice in the deepwater.

## BACKGROUND AND QUALIFICATIONS

I started work for Chevron U.S.A. Inc. in September of 1976 in its Southeast Louisiana Land District in New Orleans. I provided support to both an Exploration Division and a Production Division. In this three year initial assignment, I drafted several operating agreements which were based on a Chevron model form. I also administered a number of operating agreements that governed our relationships with other parties in producing fields that Chevron operated. After a short stint as a Chevron Tax Attorney, I moved back into Chevron's Land Department as Supervisor of its Southwest Louisiana District, then after two years into Chevron's Texas Coastal District. In both Land positions I was involved in negotiation of exploration agreements, which typically had operating agreements attached as an exhibit. I also provided support to production divisions in those jobs, which involved administration of operating agreements in

CONFIDENTIAL