# EXHIBIT D

```
                                                5
       INDEX
   VIDEOTAPED ORAL DEPOSITION OF
        JAMES P. LANG
        JANUARY 11, 2012
        VOLUME 1 of 1


                Page
APPEARANCES.......................... 2

EXAMINATION BY MR. FLANDERS...........   7
EXAMINATION BY MS. HUSER.............. 128
EXAMINATION BY MR. BEFFA.............. 172
EXAMINATION BY MR. STEINBERG.......... 223
EXAMINATION BY MR. LEOPOLD............ 226

CHANGES AND SIGNATURE................. 232
REPORTER'S CERTIFICATION.............. 234


            EXHIBIT INDEX

                Page
Exhibit No. 8198...................... 8
    Rebuttal Expert Report of
    James P. Lang dated November 7,
    2011; No Bates Numbers
Exhibit No. 8199...................... 53
    A Report to MOEX
    Corporation for Macondo Prospect,
    Mississippi Canyon, Block MC 252,
    Gulf of Mexico; prepared by
    Knowledge Reservoir dated 7/13/2009;
    Bates Numbers DWHMX00000750 through
```

```
                                                6
Exhibit No. 8200...................... 55
    Ratification and Joinder
    Agreement of Operating Agreement
    Macondo Prospect; dated 10/1/2009;
    Bates Numbers ANA-MDL-000030610
    through ANA-MDL-000030612 and
    APC-HEC1-000001601 through
    APC-HEC1-000001840
Exhibit No. 8201...................... 94
    E-mail from Naoki Ishii to
    Michael Beirne and others dated
    3/12/2010; Subject: Macondo
    Drilling; DWHMX00069738
```

```
                                                7
        THE VIDEOGRAPHER:
            This is the deposition of Mr. James
Lang taken in regards to the oil spill of the
DEEPWATER HORIZON in the Gulf of Mexico on
April 20, 2010.  Today is January 11, 2012, and
the time is 8:35 a.m.  We are now on the record.
        JAMES P. LANG,
having been duly sworn, testified as follows:
            EXAMINATION
BY MR. FLANDERS:
    Q.   Good morning, Mr. Lang.
    A.   Good morning, sir.
    Q.   My name is Ed Flanders.  I represent
MOEX Offshore 2007 LLC in this MDL proceeding.
I'm going to be referring to that company as
"Offshore" throughout my questions --
    A.   Uh-huh.
    Q.   -- to you.  Is that okay?
         Is -- is -- is it understood?  Yeah.
    A.   Yes, it's understood.  Yes.
    Q.   Let's just for starters mark your
report as an -- an exhibit, and it's in -- can be
found at Tab 1 of your binder.
    A.   Uh-huh.
         (Discussion held off the record.)
```

```
                                                8
         (Exhibit No. 8198 marked for
    identification.)
EXAMINATION BY MR. FLANDERS:
    Q.   As Exhibit 8198.  Actually we'll put
it on that one.
    MR. LEOPOLD:
         You'd like the witness to mark
the --
    MR. FLANDERS:
         Yeah, please.
    MR. LEOPOLD:
         -- exhibits?  Okay.  Go ahead.
    A.   Put it at the bottom right is
appropriate?
    MR. LEOPOLD:
         That's fine.
EXAMINATION BY MR. FLANDERS:
    Q.   That would be great.
         And Mr. Lang, is that your
November 7, 2011 report that you have submitted
in this case?
    A.   Yes, it is.
    Q.   Okay.  Does that report contain a
complete statement of all of your opinions and
the bases and reasons for your opinions?
```

```
                                                    9
 1        A.   Up until that point in time, it
 2   does.  Since then, of course, I've read
 3   additional materials, such as the Vernon and Cain
 4   depositions and some additional matters as well.
 5        Q.   Okay.  So after you prepared your
 6   report and prior to today, you reviewed the
 7   deposition transcript of Roger Vernon and Gordon
 8   Cain; is that correct?
 9        A.   Correct.
10        Q.   Okay.  Did your review of those
11   deposition transcripts change the opinions in
12   your November 7th report?
13        A.   Not significantly, sir.
14        Q.   Okay.  Did it change them in any
15   way?
16        A.   It -- they expounded on my opinions,
17   but not in a significant way.
18        Q.   Okay.  But my question is, is:  Did
19   your opinion change at all as a result of your
20   review of those deposition --
21        A.   No.
22        Q.   -- transcripts?
23        A.   No.
24        Q.   Okay.  Has the Department of Justice
25   asked you to offer any opinions other than those
```

```
                                                   10
 1   that are set forth in your November 7th report?
 2        A.   No.
 3        Q.   Okay.  Now, in your November 7 --
 4   7th report, you say that you reserve the right to
 5   update your report if more information becomes
 6   available.
 7             Do you recall that?
 8        A.   Correct, yes.
 9        Q.   Has any additional information
10   become available that will result in a revision
11   to your report?
12        A.   No.
13        Q.   Mr. Lang, have you offered -- excuse
14   me -- authored any publications on any topics in
15   the previous ten years?
16        A.   A -- not -- not in significant way.
17   In the prior firm I was with, Strategic Decisions
18   Group, we would issue white papers on topics
19   around decision-making and strategy and energy
20   practices, but those generally were under firm
21   authorship.  So . . .
22        Q.   Okay.  So you have not authored any
23   publications in the prior -- previous ten years?
24        A.   Previous ten years there may have
25   been a -- an -- a -- a publication around board
```

```
                                                   11
 1   decision-making and board decision quality.  It
 2   was either 10 years ago or 11 years ago,
 3   somewhere around that time.
 4        Q.   Okay.  Could you just go back and
 5   check and make sure that there are no
 6   publications that you've authored in the last ten
 7   years, and -- and if there are any, could you
 8   provide me with a copy of those?
 9        A.   Sure.
10        Q.   Thank you.
11             Have you ever testified as an expert
12   or a fact witness in either a deposition or any
13   other proceeding?
14        A.   Never been to a deposition before.
15        Q.   Okay.  How about a trial?
16        A.   Trial.  Never been to a trial
17   before.
18        Q.   Arbitration, hearing or any other --
19        A.   I've supported expert opinion in a
20   mediation about four or five years ago, but not
21   in this context.
22        Q.   Okay.  But you've never testified
23   before?
24        A.   Correct.
25        Q.   Thank you.
```

```
                                                   12
 1             Now, in your November 7th report,
 2   Mr. Lang, you were asked to rebut the expert
 3   reports --
 4        A.   Uh-huh.
 5        Q.   -- of Roger Vernon and Gordon Cain;
 6   is that correct?
 7        A.   Correct.
 8        Q.   And so you were not asked to offer
 9   any new opinions; is that correct?
10        A.   No, I'm a rebuttal expert, yes.
11        Q.   Okay.  If you could turn to page 19
12   of your report, at the bottom of the page,
13   there's a section that begins Roman Numeral XII,
14   entitled Impact of Liabilities (Cost, Damages,
15   Penalties) on Deepwater Activities.  Do you see
16   that?
17        A.   Uh-huh.
18        Q.   What part of the Vernon or Cain
19   reports were you rebutting in Section 12 of your
20   report?
21        A.   Certainly.  As a rebuttal to Vernon
22   and Cain, my opinion was to address and rebut the
23   rather narrow view they had on the relationships
24   amongst the three parties and the implications
25   and -- of those relationships as typically
```

PURSUANT TO CONFIDENTIALITY ORDER

```
                                                    13
 1   practiced in the industry.
 2           My rebuttal was a view that their
 3   position was overly narrow in the context of how
 4   parties relate to each other as owners and how
 5   they relate to each other as owners during the
 6   operating phase; whereas, I felt Cain and Vernon
 7   focused overly on how they relate to each other
 8   as operating in the day-to-day context.
 9           They also, I think, failed to
10   address how the industry participants tend to
11   work in projects around the globe and how those
12   relationships tend to affect their
13   decision-making on any particular one venture
14   that they're doing. And I was rebutting
15   basically Vernon and Cain's position that
16   basically was concluding that MOEX and Anadarko
17   had no involvement, and I believe that no
18   involvement conclusion would lead to perverse
19   outcomes in the industry and hence my comments on
20   that particular thing.
21      Q.   Can you point to any part of the
22   Vernon or Cain reports where they opined on what
23   impact liabilities would have on deepwater
24   activities?
25      A.   They did not specifically discuss
```

```
                                                    14
 1   liabilities.
 2      Q.   They -- they didn't generally
 3   discuss it either, did they?
 4      A.   Not that I recall.
 5      Q.   Okay. So you can't point to any
 6   part of their reports in which you are rebutting
 7   anything in their reports in your Section 12?
 8      A.   I --
 9   MR. LEOPOLD:
10           Objection --
11   THE WITNESS:
12           Sorry.
13   MR. LEOPOLD:
14           -- form.
15      A.   Yeah. I think it -- generally there
16   is a significant overemphasis on their part of
17   the noninvolvement of Anadarko and MOEX in the
18   activities during the exploration operation phase
19   in Macondo and are implying that that is a
20   reasonable view to take on the relationships
21   amongst those three parties. And I was
22   expounding in these sections around how that is
23   an unreasonable view, the industry doesn't
24   operate that way, and if -- in fact, if it did
25   operate that way, it would lead to some perverse
```

```
                                                    15
 1   outcomes in the industry as a way to demonstrate
 2   why they don't operate that way.
 3   EXAMINATION BY MR. FLANDERS:
 4      Q.   Okay. But I'm only talking about
 5   Section 12.
 6      A.   I understand.
 7      Q.   And I'm only talking about the
 8   impact of liabilities on deepwater activities.
 9      A.   Uh-huh.
10      Q.   And I believe your testimony before
11   was that it's your understanding that neither
12   Vernon nor Cain offered any expert opinion on the
13   impact of liabilities on deepwater activities,
14   correct?
15   MR. LEOPOLD:
16           Objection, form.
17      A.   Yeah, as I've stated, I believe
18   they -- they took an overly narrow view, which
19   leads to a conclusion on how that would impact
20   liabilities in an odd way. And I brought that
21   section in to demonstrate how I believe the
22   industry typically operates having been in the
23   industry for over 20 years at a senior level.
24   But they did not specifically talk about
25   liabilities.
```

```
                                                    16
 1   EXAMINATION BY MR. FLANDERS:
 2      Q.   And they didn't generally talk about
 3   it either.
 4      A.   I think that's overreaching, because
 5   I think their conclusions were that there was no
 6   involvement, and I think that's a -- too strong
 7   of a statement. But I'm not a lawyer and I'm not
 8   offering a legal opinion on that interpretation.
 9      Q.   Okay. So let's just briefly go
10   through your education, Mr. Lang. If you
11   could -- well, first off, you received a Bachelor
12   of Science in electrical and computer engineering
13   from the University of New Hampshire in 1987,
14   correct?
15      A.   Correct.
16      Q.   Okay. Take any petroleum
17   engineering courses during that time?
18      A.   Not at that time, no.
19      Q.   Ever?
20      A.   No.
21      Q.   Okay. I think you indicated in your
22   C.V. that you worked as an engineer at AT&T, Data
23   General Corporation, and Analog Devices --
24      A.   Correct.
25      Q.   -- is that correct?
```

PURSUANT TO CONFIDENTIALITY ORDER

### Page 233

SIGNATURE PAGE

I, JAMES P. LANG, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the correction page.

_____
JAMES P. LANG

### Page 234

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL      ) MDL NO. 2179
by the OIL RIG,       )
DEEPWATER HORIZON in  ) SECTION "J"
the GULF OF MEXICO,   )
April 20, 2010        ) JUDGE BARBIER
                      )
                      ) MAG. JUDGE SHUSHAN
                      )

REPORTER'S CERTIFICATION
DEPOSITION OF JAMES P. LANG
TAKEN JANUARY 11, 2012

I, Rene White Moarefi, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, JAMES P. LANG, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____, 2012, to the witness or to Attorney _____ for examination, signature and return to Worldwide Court Reporters, Inc., by _____, 2012.

That the amount of time used by each party at the deposition is as follows:

MR. EDWARD FLANDERS - 02:20
MS. MARY HUSER - 00:50
MR. DARIN T. BEFFA - 01:07
MR. MATTHEW M. STEINBERG - 00:03
MR. MATTHEW Z. LEOPOLD - 00:07

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

### Page 235

SUBSCRIBED AND SWORN to by me this 11th day of January, 2012.

*Rene Moarefi* [signature]

RENE WHITE MOAREFI, CSR, CRR, RPR
CSR NO. 3070; Expiration Date: 12-31-12
Worldwide Court Reporters
Firm Registration No. 223
3000 Weslayan, Suite 235
Houston, TX 77027
(713) 572-2000

PURSUANT TO CONFIDENTIALITY ORDER