UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: Oil Spill by the Oil Rig** | * | **MDL No. 2179** |
| **"Deepwater Horizon" in the Gulf** | * | |
| **of Mexico on April 20, 2010** | * | **SECTION "J"** |
| | * | **JUDGE BARBIER** |
| **This Document Relates to:** | * | |
| **10-cv-04536** | * | **MAGISTRATE NO. 1** |
| | * | **MAGISTRATE SHUSHAN** |
| * * * * * * * * * * * * | | |

**ANADARKO'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AS
TO ANADARKO'S NON-LIABILITY UNDER THE CWA**

**INTRODUCTION**

The plain text of the Clean Water Act compels the conclusion that Anadarko has no liability for CWA penalties in this case. The point at which oil and other hazardous substances were released into the marine environment was the vessel *Deepwater Horizon* and its appurtenances, not the Macondo Well. That point is now indisputable. In its response to Transocean's anemic attempt to raise doubts about whether oil discharged from the vessel before it sank, the Government clearly shows that oil discharged from the vessel. U.S. Reply [Rec. Doc. 5214] at 6. The Government nevertheless contends that a single discharge spewing out of a vessel can also be treated as coming "from" an offshore facility (*i.e.*, the well), based entirely on an expansive and out-of-context dictionary definition of the word "from." But although its opening Memorandum concedes the point, U.S. Mem. [Rec. Doc. 4836-1] at 26, the Government's reply utterly ignores the critical textual feature of the CWA's liability provision -- namely that the CWA carefully defines <u>mutually exclusive</u> sources of an oil discharge (onshore facility, offshore facility, or vessel), and expressly defines an offshore facility, such as the Macondo Well, to exclude a vessel, such as the *Deepwater Horizon*. By defining mutually exclusive sources of an oil discharge and identifying them with the disjunctive "or," Congress made clear that a single, continuous discharge out of a vessel cannot also be a discharge from an offshore facility.

The Government fails to respond to several important arguments made in Anadarko's Cross-Motion for Summary Judgment, including that (a) any doubts about liability must be resolved in favor of Anadarko under the Rule of Lenity and the presumption against broad constructions of penalty provisions, Anadarko Mem. [Rec. Doc. 5113-2] at 11; (b) the Government has abandoned and therefore waived any claim that Anadarko is an operator or person in charge of either the Macondo Well or the *Deepwater Horizon*, *id.* at 9; (c) the mere

1

movement of oil from a facility to a vessel is a "transfer" of oil, not a "discharge" of oil within the meaning of the CWA, *id.* at 15-17; and (d) Anadarko, as a non-operating investor, engaged in no conduct that warrants punishment or deterrence. *Id.* at 21. Because the Government failed to respond to these dispositive legal arguments, they are conceded. *See, e.g.*, *Lucarelli ex rel. Taylor v. DVA Renal Healthcare Inc.*, Civ. A. No. 08-0406, 2006 WL 6206923, at *2 (W.D. La. Mar. 11, 2006) (failure to respond to arguments assumed to be concessions).

In all events, the Government's and Transocean's faulty and unprecedented interpretations of the CWA must be rejected. They are based on the notion that the oil discharged from the *Deepwater Horizon* "originated" in the Macondo Well. But the CWA imposes penalties on the owners and operators of a facility or vessel "from which" there is a discharge -- meaning a release into the environment. CWA Section 311(b) is not concerned with the original source of oil, but with where it discharged into the environment. Anadarko's motion for summary judgment on CWA liability should be granted.[1]

## ARGUMENT

### A. The CWA's Definitions of Vessels and Offshore Facilities as Mutually Exclusive Sources of a Discharge Preclude the Government's Theory.

In its opening brief, Anadarko demonstrated that the CWA defines vessels, offshore facilities, and onshore facilities as mutually exclusive categories of potential "sources" of a discharge. 33 U.S.C. §§ 1321(a)(11), (b)(7)(A). Because vessels and facilities are mutually exclusive sources, under the CWA's plain terms, a single discharge -- which is what the Government alleges here -- can be either from a vessel or a facility, but not both. Treating a single discharge from a vessel as having two sources -- the vessel and an offshore facility (*i.e.*, the well) -- would undermine Congress's expressed intent to treat vessels and offshore facilities

---

[1] Because there remain issues as to whether BP is an "operator" of the *Deepwater Horizon*, only Anadarko, as a non-operating investor, is entitled to summary judgment on the ultimate issue of CWA liability at this time.

as distinct, mutually exclusive sources of a discharge.  Accordingly, because there is no genuine factual disagreement that there was a "single and continuous" discharge of hydrocarbons from the *Deepwater Horizon*, the same discharge cannot also be "from" the Macondo Well.

The Government has no response to Anadarko's argument.  Faced with yet another fatal flaw in its attempt to impose CWA penalties on the non-operators, the Government must invent yet another unprecedented theory of CWA liability.  The Government now suggests that because the *Deepwater Horizon* and the Macondo Well constituted a so-called "physically connected and mechanically integrated structure," a single discharge can be regarded as coming from both the well and the vessel.  U.S. Reply at 3.

This latest CWA liability theory fares no better than its predecessors.  The CWA's mutually exclusive definitions of vessel and offshore facility contain no exception for a situation in which separate sources are supposedly "physically connected and mechanically integrated." *See* 33 U.S.C. § 1321(a)(11) (defining offshore facility to exclude vessels without exception).  In enacting OPA and amending the CWA, Congress understood that when a MODU is in a drilling position, it is physically connected to the well.  Anadarko Mem. at 7 n.5.  Accordingly, for purposes of OPA liability, Congress added a new definition of a MODU as a vessel that can be used as an offshore facility.  Congress could have similarly amended the CWA's definitions of facilities and vessels, so that a single discharge from a MODU when it is connected to a well could be considered a discharge from both the facility and the vessel.  Congress did not do so. Instead, Congress chose to retain the CWA's original language strictly separating vessels from facilities without exception.  *See* S. REP. NO. 101-94, *reprinted at* 1990 U.S.C.C.A.N. 722, 733-34 (1990). "'[W]here Congress knows how to say something but chooses not to, its silence is controlling.'" *Freemanville Water Sys., Inc. v. Poarch Band of Creek Indians*, 563 F.3d 1205,

1209 (11th Cir. 2009) (citation omitted); U.S. Reply at 8 ("Where Congress intended to incorporate terms into Section 311 … it knew how to do so, and in fact did so explicitly.").[2]

Continuing its established pattern, the Government fails to cite even one case, administrative decision, or other authority supporting its "physically connected/mechanically integrated" construct.  This is not surprising; it is common in the industry for multiple, separately owned facilities and vessels to be connected and integrated with each other, so that oil can flow freely between them.  Tanker vessels take on fuel from onshore terminals, but oil discharged from the vessel is not also considered oil discharged "from" the onshore terminal.  *See, e.g.*, *Int'l Marine Carriers v. Oil Spill Liability Trust Fund*, 903 F. Supp. 1097 (S.D. Tex. 1994) (oil discharge from vessel bunkering fuel from onshore facility).  Also, by definition, all oil pipelines are attached to facilities.  Yet, when a pipeline ruptures, courts do not look to the owners and operators of the facilities at its terminal ends as additional "sources" of the same discharge.  *See, e.g.*, *United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125 (5th Cir. 1981) (CWA penalty imposed on owner/operator of oil pipeline).  In none of these ordinary circumstances are separate vessels and facilities considered to be a "physically connected and mechanically integrated structure" -- whatever that means -- for liability purposes.

At a minimum, Anadarko had no notice that it could be held liable under the CWA based on a finding that the well was somehow connected or integrated with the vessel.  Neither the CWA nor the reams of regulations enforcing it even mention such concepts, much less how they would be applied in practice.  By not disputing it, the Government concedes that such notice principles govern, and those principles doom the Government's latest theory as well.  *See Diamond Roofing Co. v. Occupational Safety and Health Review Comm'n*, 528 F.2d 645, 649

---

[2]   Even if the MODU could be treated as an offshore facility under the CWA, Anadarko would not be an owner, operator, or person in charge of that facility, and would not be liable for any discharge that came from it.

4

(5th Cir. 1976) ("[S]tatutes and regulations which allow monetary penalties against those who violate them . . . must give . . . fair warning of the conduct it prohibits or requires, and it must provide a reasonably clear standard of culpability . . . .") (emphasis added).

### B. The Government's and Transocean's Reliance on an Out-of-Context Dictionary Definition of "From" is Unavailing.

The Government's Reply, like its opening Memorandum, is devoid of any serious effort to interpret the CWA's penalty provision. Ignoring entirely Anadarko's many substantive arguments on the proper construction of the text, the Government doubles down on its bare reliance on a single dictionary definition of the word "from" -- "'a point or place where an actual physical movement has its beginning'" -- divorced from the statute's other terms, history, and context. U.S. Mem. at 21 (citation omitted). It asserts, without irony, that "'From' means 'From.'" U.S. Reply at 2. This unhelpful circularity confirms that the Government's argument lacks substance.

To be meaningful, "from" must be read together with both the noun ("vessel" or "facility") and the verb to which it relates: "discharged." *See Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 824 (8th Cir. 2009) ("a preposition serves to 'link [] an object (a noun or noun equivalent) to another word in the sentence to show the relationship between them.'") (quoting CHICAGO MANUAL OF STYLE at 187 § 5.162 (15th ed. 2003)). In considering the term "discharge" under CWA Section 401, which has no specific definition, the Supreme Court construed "discharge" in accordance with its ordinary and natural meaning. *S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 375 (2006). The Court further held that, as applied to a liquid, the CWA's term "'discharge' commonly means a 'flowing or issuing out.'" *Id.* (quoting WEBSTER'S NEW INT'L DICTIONARY at 742 (2d ed. 1954)). This is consistent with the terms used in the definition of "discharge" under Section 311 (*i.e.*, "spilling, leaking, pumping, pouring,

emitting, emptying or dumping"). Thus, applying the common meanings of the CWA's terms in context, the facility or vessel "from which" a "discharge" occurs refers to the "point or place" where oil "flows or issues out" from the vessel or facility into the environment.

In this case, it is clear that the "point or place" where oil "issued out" into the environment was the *Deepwater Horizon* and its appurtenances. Accordingly, under the plain meaning of the CWA's terms, including the plain meaning of the word "from" within its proper context, Anadarko is not liable for CWA penalties.

Transocean takes the Government's definition to its absurd conclusion, by arguing that "from" means "origin or source" and not a mere "conduit" of oil. But the CWA specifically focuses on the "proximate source" of a discharge, not the "original" source of the oil or pollutant discharged. *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 493 (2d Cir. 2001) (holding that the CWA imposes penalties only on "the proximate source from which the pollutant is **directly** introduced to the destination water body.") (emphases added).[3] The source "need not have created the pollution; it is enough that it conveys the pollutants from their original source to the navigable water." *Id.* (emphasis added). The same analysis is applicable here. To be a vessel or facility "from which" a discharge occurs, it is not necessary that the vessel or facility create the oil; it is only necessary that the vessel or facility is the point at which the oil is introduced into the environment.

None of the cases that the Government or Transocean cites is to the contrary. Neither of

---

[3] Indeed, accepting Transocean's misreading of "from" would lead to the absurd result that no party could ever be liable for CWA penalties for a discharge of oil, because an oil well also is a "conduit." Though Anadarko accepts the proposition solely for the purposes of argument in its opening brief, oil does not actually "originate" in a well. *See* Anadarko Mem. at 14. As the Government expressly recognizes, oil "originated" in the natural geologic formation underlying the Macondo prospect (which is neither a vessel nor a facility) and flowed "through" the well into the BOP and riser. U.S. Statement of Facts [Rec. Doc. 4836-2] at ¶ 15 ("Oil from the MC 252 reservoir flowed through the Macondo Well and was discharged to the Gulf of Mexico from the *Deepwater Horizon* and then from the broken riser pipe and/or BOP after the *Deepwater Horizon's* sinking.") (emphases added). If, as Transocean argues, the CWA penalizes only the owner or operator of a vessel or facility from which oil actually originates, then no one could ever be liable for CWA penalties for a discharge of oil.

6

the Government's cases, *United States v. Ortiz*, 427 F.3d 1278 (10th Cir. 2005), nor *Rapanos v. United States*, 547 U.S. 714 (2006), have anything to do with determining the relevant facility or vessel "from which" oil is discharged to the environment. The only CWA case that Transocean cites undermines its own argument.[4] In *Peconic Baykeeper, Inc. v. Suffolk County*, 600 F.3d 180, 188 (2d Cir. 2010), the Second Circuit held that trucks and helicopters that sprayed pollutants into the air above navigable waters were the sources "from which" there was a discharge of pollutants. The Second Circuit <u>did not hold</u> that the factory that created the pesticides discharged by the helicopters was the "source of the discharge," as Transocean's argument would absurdly require. The Second Circuit held that "the spray apparatus was attached to trucks and helicopters, and was **the source of the discharge** . . . ." *Id.* (emphasis added). "The pesticides were discharged 'from' the source, and not from the air" because a "discharge" within the meaning of the CWA comes "from" the point where a pollutant is first introduced into the environment. *Id.* at 188-89. *Peconic* is no help to Transocean.[5]

### C. OPA Section 2704 is Irrelevant to CWA Liability.

Anadarko agrees with the Government that Section 2704 of OPA has no effect on the CWA liability analysis. Whatever distinction OPA might draw based upon whether a discharge occurs above or below the waterline, that distinction is irrelevant to CWA liability. Congress

---

[4] Transocean's cases concerning errant zamboni fumes and 70-year-old seafood shipping regulations are not CWA cases, do not involve determining the location of a "discharge," and are thus utterly irrelevant here. In any event, neither is contrary to Anadarko's position. In Transocean's zamboni case, it was undisputed that harmful fumes entered the environment "from" the zamboni. *United States Fid. & Guar. Co. v. Lehigh Valley Ice Arena, Inc.*, No. 03-CV-05700, 2004 WL 741365, at *6 (E.D. Pa. Mar. 4, 2004), *aff'd*, 121 Fed. Appx. 976, 2005 WL 388659 (3d Cir. 2005). That is entirely consistent with Anadarko's argument; oil was introduced to the environment "from" the *Deepwater Horizon*. Even further afield is *Silva v. MacAuley*, 26 P.2d 887 (Cal. Dist. Ct. App. 1933), which concerns whether a California statute prohibiting any person to transport or carry any species of crabs "from" Humboldt county to any point outside the state of California. That case is no help in construing the word "from" in the CWA, because there the statute in question was primarily concerned with where the crabs <u>originated</u>. Here, the question under the CWA is where a "discharge" occurred.

[5] In any event, Transocean's contention that the BOP and riser were "mere conduits" like the air in *Peconic* or the vent in *Lehigh Valley*, is disingenuous. Transocean Mem. at 14. Unlike the air in *Peconic*, the BOP's <u>sole purpose</u> was to contain oil within the well, and the BOP's failure allowed oil to escape into the marine environment.

7

could have, but did not, amend the CWA to include a provision similar to OPA's section 2704, and its silence is dispositive. *See Bates v. United States*, 522 U.S. 23, 29-30 (1997) (if "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally").

In any event, in no sense does OPA "absolve" MODU operators of liability from damages resulting from a discharge -- whether above or below the waterline. Transocean Mem. at 21. Section 2704(b)(1) divides responsibility among lessees and MODU operators only with respect to a responsible party's front-line obligation to establish a claims facility and make initial payments to OPA claimants. MODU operators' and lessees' <u>ultimate liability</u> for damages is still based on a traditional maritime allocation of fault pursuant to OPA's contribution provision. 33 U.S.C. § 2709. OPA evinces no Congressional intent to relieve MODU operators of liability for discharges caused by their own fault.

Moreover, Transocean's artificial construction of OPA and the CWA would create perverse incentives. Under Transocean's interpretation (and as it has expressly argued), a MODU operator would avoid all CWA liability for a discharge even from the MODU's own ballast tanks so long as the discharge occurred an inch below the surface of the water. *See* Transocean's Reply to the United States' Opposition to Transocean's Motion for Partial Summary Judgment [Rec. Doc. 4862] at 4 n.2. Nothing supports a result so unfair and absurd.

Finally, there is <u>no inconsistency</u> between OPA's allocation of responsibility for damages resulting from a discharge between lessees and MODU operators, and the CWA's imposition of civil penalties only on the owners and operators of the vessel or facility from which there is a discharge. OPA is primarily concerned with ensuring the speedy removal of oil and compensation of claimants injured by the discharge. The CWA is concerned with punishing

8

those at fault for the discharge and deterring future discharges. U.S. Opposition to Transocean's Motion for Partial Summary Judgment [Rec. Doc. 4840] at 5 ("The overarching goals of CWA penalties are punishment and general and specific deterrence."). OPA's compensatory scheme and the punitive nature of CWA penalties serve different goals. And the reason for treating parties differently is illustrated perfectly by the facts of this case. As Transocean notes, Congress intended that civil penalties "'should serve . . . as an additional incentive to minimize and eliminate human error . . . .'" Transocean Mem. at 20 (quoting H.R. REP. NO. 101-653, *reprinted at* 1990 U.S.C.C.A.N. 722, 833 (Conf. Rep.)) (emphasis added). Here, the only relevant human activity that can be punished, or in the future deterred, occurred on the *Deepwater Horizon*, and none of it was Anadarko's.

### D. Anadarko is Entitled to Summary Judgment that APC and AE&P are not liable as "Operators" of Anything.

The Government concedes that its "operator as a matter of law" theory adds nothing, and need not be addressed.[6] Yet, the Government purports to contest that Anadarko is entitled to summary judgment on the issue of "operator" liability. The Government has already waived that issue, Anadarko Mem. at 9, but in any event, the Government's position reflects a profound unwillingness to accept the Court's clear and repeated holdings and should be roundly rejected. U.S. Reply at 10 n.9; U.S. Response to Anadarko's Statement of Facts at ¶¶ 4, 7-10. This Court has held, on factual allegations identical to the Government's, that Anadarko had no right of operational control over the activities on the leasehold, had no duty to intervene, was not negligent, and bears no culpability for the incident. *E.g.,* B1 Order [Rec. Doc. 2830] at 27-29. It necessarily follows that Anadarko is not an "operator." The Government appears to believe that

---

[6] By conceding that the Court need not address its "operator as a matter of law" theory, the Government abandons its only theory of CWA liability against AE&P. *See* U.S. Statement of Facts at ¶ 51.

9

it alone is entitled to relitigate the issue of Anadarko's level of control and alleged fault. The Government's unwillingness to accept this Court's prior judgments does not convert decided issues into "disputed facts" precluding summary judgment.[7] Accordingly, the Court should grant Anadarko's motion for summary judgment, and, to prevent the Government from attempting to further contravene this Court's holdings, should also grant Anadarko's still pending Motion *in Limine* to Exclude Evidence Regarding the Anadarko Entities' Knowledge or Access to Information [Rec. Doc. 4319].

### E. Summary Judgment on the OPA Liability Cap is Premature.

The Government agrees that the causes of the incident will be adjudicated at the Phase I trial. U.S. Response to Anadarko's Statement of Facts [Rec. Doc. 5216] at ¶ 17. Yet the Government claims that whether BP's asserted violation of certain regulations "proximately caused" the incident is a question of law that can be resolved before trial. That makes no sense. The Court will consider all questions of proximate cause during the Phase I trial. The Government's motion for judgment on the OPA cap is premature.

### CONCLUSION

For all the foregoing reasons, the Court should grant Anadarko's Cross-Motion for Summary Judgment as to Anadarko's Non-Liability under the CWA.

---

[7] Even if disputed facts as to Anadarko's operator status existed, they would be no help to the Government in its misguided but unflagging desire to introduce evidence against Anadarko in the Phase I trial. The Government has conceded to the Court that all disputed facts going to whether Anadarko is liable as an "operator" under the CWA must be heard by a jury. Thus, the Government's puzzling new assertion that there are "triable issues of fact" relevant to Anadarko's liability as an Operator only underscores why CWA issues have no place in the Limitations Trial.

Respectfully submitted,

DATED: January 17, 2012          BINGHAM McCUTCHEN, LLP

/s/*James J. Dragna*
James J. Dragna
jim.dragna@bingham.com
Bingham McCutchen LLP
355 South Grand Avenue, Suite 4400
Los Angeles, California 90071-3106
Telephone (213) 680-6436
Facsimile (213) 680-8636

Ky E. Kirby
ky.kirby@bingham.com
David B. Salmons
david.salmons@bingham.com
Michael B. Wigmore
michael.wigmore@bingham.com
Warren Anthony Fitch
tony.fitch@bingham.com
Sandra P. Franco
sandra.franco@bingham.com
Randall M. Levine
randall.levine@bingham.com
2020 K Street, NW
Washington, DC 20006-1806
Telephone (202) 373-6000
Facsimile (202) 373-6001

KUCHLER POLK SCHELL
WEINER & RICHESON, LLC

Deborah D. Kuchler, T.A. (La. Bar No. 17013)
dkuchler@kuchlerpolk.com
Janika Polk (La. Bar No. 27608)
jpolk@kuchlerpolk.com
Robert Guidry (La. Bar No. 28064)
rguidry@kuchlerpolk.com
1615 Poydras Street, Suite 1300
New Orleans, LA  70112
Tel:  (504) 592-0691
Fax:  (504) 592-0696

11

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, pursuant to Pre-trial Order No. 12, I have caused the foregoing to be served on all counsel via the Lexis Nexis File & Serve system, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, who will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on January 17, 2012.

                                                                                                                                  _____/s/ *James J. Dragna*_____
                                                                                                                                              James J. Dragna