# Exhibit A

16316764.1

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL      ) MDL NO. 2179
BY THE OIL RIG        )
"DEEPWATER HORIZON" IN ) SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010        ) JUDGE BARBIER
                      ) MAG. JUDGE SHUSHAN

Deposition of RICKEY LYNN MORGAN, taken at Pan-American Building, 601 Poydras Street, 11th Floor, New Orleans, Louisiana, 70130, on the 17th day of October, 2011.

## Page 2

APPEARANCES

APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
  Mr. Ervin A. Gonzalez
  Mr. Jeff Keiser
  COLSON HICKS EIDSON
  255 Alhambra Circle, Penthouse
  Coral Gables, Florida 33134

APPEARING FOR BP, INC.:
  Ms. Betty X. Yang
  KIRKLAND & ELLIS
  300 North LaSalle
  Chicago, Illinois 60654

APPEARING FOR TRANSOCEAN:
  Mr. John H. Fleming
  SUTHERLAND ASBILL & BRENNAN
  999 Peachtree Street, NE
  Atlanta, Georgia 30309-3996
  Ms. Lauren Woodard
  ROYSTON RAYZOR
  711 Louisiana Street, Suite 500
  Houston, Texas 77002

APPEARING FOR ANADARKO PETROLEUM COMPANY:
  Mr. Robert E. Guidry
  Mr. Mark Best
  KUCHLER POLK SCHELL WEINER & RICHESON
  1615 Poydras Street, Suite 1300
  New Orleans, Louisiana 70112

APPEARING FOR CAMERON INTERNATIONAL CORPORATION:
  Ms. Carmelite M. Bertaut
  STONE PIGMAN WALTHER WITTMAN
  546 Carondelet Street
  New Orleans, Louisiana 70130-3588

## Page 3

APPEARANCES (Continued)

APPEARING FOR WEATHERFORD:
  Mr. William J. Joyce
  JONES, WALKER, WAECHTER, POITEVENT, CARRERE & DENEGRE, LLP
  201 St. Charles Avenue
  New Orleans, Louisiana 70170

APPEARING FOR DRIL-QUIP, INC.:
  Ms. Wendy Ware Bishop
  WARE, JACKSON, LEE & CHAMBERS
  America Tower, 42nd Floor
  2929 Allen Parkway
  Houston, Texas 77019-7101

APPEARING FOR M-I SWACO:
  Mr. R. Sean Brennan, Sr.
  MORGAN, LEWIS & BOCKIUS, LLP
  1000 Louisiana Street, Suite 4200
  Houston, Texas 77002-5006

APPEARING FOR HALLIBURTON:
  Mr. Bruce W. Bowman, Jr.
  Ms. Leiza Dolghih
  GODWIN RONQUILLO
  1201 Elm Street, Suite 1700
  Dallas, Texas 75270-2041
  Mr. Richard W. Beckler
  Mr. Jim Caldwell
  BRACEWELL & GIULIANI
  2000 K Street NW, Suite 500
  Washington, D.C. 20006-1872

APPEARING FOR THE UNITED STATES:
  Mr. Steven O'Rourke
  U.S. DEPARTMENT OF JUSTICE
  ENVIRONMENTAL & NATURAL RESOURCES DIVISION
  601 D Street, N.W.
  Washington, D.C. 20004

## Page 4

APPEARING FOR THE STATE OF LOUISIANA:
  Mr. Lambert J. "Joe" Hassinger, Jr.
  GALLOWAY, JOHNSON, TOMPKINS, BURR AND SMITH
  701 Poydras Street, 40th Floor
  New Orleans, Louisiana 70139

ALSO PRESENT:
  Mr. Peter Jennings, Logistics Supervisor
  Mr. Ray Aguirre, Case Manager

**PURSUANT TO CONFIDENTIALITY ORDER**

Page 113

1  A. Lots of times we'll get samples
2  from the field that we test, because our
3  chemicals and cement may vary just a little
4  bit from what they're using. So we want to
5  use exactly what they were using.
6  Q. Okay. And so when he's
7  referring to is Lafayette going to send
8  samples, that was the rig samples that had
9  been put under lock and key after the
10 incident; is that right?
11 A. It could have been, or it could
12 have been some local stock that they had that
13 they were going to send us, because there
14 might not have been any samples left.
15 Q. Okay. And do you have any
16 understanding of where the samples that you
17 came -- got -- that you used for the testing
18 came from?
19 A. I don't recall if they were from
20 Duncan or from Broussard.
21 Q. Do you recall that they weren't
22 the actual rig samples?
23 A. Yeah, I'm sure they weren't.
24 Q. And there were -- you know,
25 whether it was from Duncan or Broussard, they

Page 114

1  were lab samples that you tested?
2  A. Yes, ma'am.
3  Q. And even though they were lab
4  stock samples, you relied on the results of
5  these tests to perform whatever these -- they
6  were used -- these results were used for in
7  the relief well operations?
8  A. Yes, ma'am.
9  Q. And you were confident that
10 these test results would be representative?
11 A. Could be. Should be.
12 Q. Enough for you to rely on
13 them --
14 A. Exactly.
15 Q. Okay, you can put that e-mail
16 away. Sorry, give me a minute to make sense
17 of my chicken scratch.
18 Okay. I'm going to ask you to
19 turn to tab 4 of the binder. Do you
20 recognize this document, sir?
21 A. Yes, ma'am.
22 Q. And these were documents that
23 were in your files?
24 A. Yes, ma'am.
25 Q. And, for the record, this is

Page 115

1  HAL_0707658, and it goes through HAL_0707664.
2  And I will ask you to take a sticker and mark
3  this document as Exhibit 5670, if you will,
4  on the first page.
5  A. On this page?
6  Q. Yes, sir, just anywhere you
7  won't block text.
8  Can you tell us what this
9  document is?
10 A. This is a Viking sheet for the
11 results of testing done in Broussard --
12 Q. And do you --
13 A. -- on this one.
14 Q. Do you recognize the
15 handwriting?
16 A. Yes, that's mine.
17 Q. Okay. And what were you doing
18 with this lab report?
19 A. I was looking over the results
20 that they got in Broussard to see what they
21 saw, to see what they had recorded.
22 Q. And why were you doing that?
23 (Witness converses with Mr. Bowman.)
24 MR. BOWMAN: We're actually going to
25 claim privilege, because this was being done

Page 116

1  in response to a request by lawyers of BP.
2  MS. YANG: Okay, fair enough.
3  Q. (BY MS. YANG) Can you explain
4  to me -- I'll ask you to just sort of go
5  through and sort of explain your notations on
6  this to me.
7  A. Okay.
8  Q. And on the top you've written
9  "BP Slurry Macondo"?
10 A. Yes, ma'am.
11 Q. And that's just to show that
12 this was the slurry used for the Macondo
13 well?
14 A. Yes.
15 Q. And next to that there -- it
16 says "5-20-10." Is that when you were
17 looking at these results and making your
18 notations?
19 A. I don't know exactly what that
20 date is. That may be the date I poured
21 the -- the conductivity testing.
22 Q. Okay. So you might have been
23 looking at these results while you were doing
24 the conductivity testing?
25 A. May have been.

PURSUANT TO CONFIDENTIALITY ORDER

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL        ) MDL NO. 2179
by the OIL RIG          )
"DEEPWATER HORIZON" in ) SECTION "J"
the GULF OF MEXICO, ON  )
APRIL 20, 2010          ) JUDGE BARBIER
                        )
                        ) MAG. JUDGE
                        ) SHUSHAN

VOLUME 1 OF 2

Deposition of RONALD RAY FAUL, taken at Pan American Life Center, 601 Poydras Street, Ponchartrain Room, New Orleans, Louisiana, on the 29th of June, 2011.

**Page 2**

APPEARANCES

APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:

Mr. Thomas Thornhill
THORNHILL LAW FIRM
1308 Ninth Street
Slidell, Louisiana 70458

APPEARING FOR BP, INC.:
Mr. Philip T. Chen
Mr. David Mitchell
KIRKLAND & ELLIS
333 South Hope Street
Los Angeles, California 90071

APPEARING FOR TRANSOCEAN:
Mr. Daniel Goforth
Ms. Kate H. Easterling
GOFORTH GEREN EASTERLING, LLP
4900 Woodway
Suite 750
Houston, Texas 77056

APPEARING FOR ANADARKO PETROLEUM COMPANY:

Ms. Janika D. Polk
Mr. Terrance Prout
KUCHLER POLK
1615 Poydras Street
Suite 1300
New Orleans, Louisiana 70112

APPEARING FOR HALLIBURTON:
Mr. Gavin Hill
Lauren L. Mitchell
GODWIN RONQUILLO
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041

**Page 3**

APPEARANCES (Continued)

APPEARING FOR HALLIBURTON:
Mr. Richard W. Beckler
Mr. Jason B. Hutt
BRACEWELL GULIANI
2000 K Street NW, Suite 500
Washington, District of Columbia 20006-1872

Ms. Stacy S. Russell
HALLIBURTON
10200 Bellaire Boulevard
Houston, Texas 77072

APPEARING FOR WEATHERFORD:
Mr. Wayne G. Zeringue, Jr.
JONES, WALKER, WAECHTER, POITEVENT, CARRERE & DENEGRE, L.L.P.
201 St. Charles Avenue
New Orleans, Louisiana 70170

APPEARING FOR DRIL-QUIP, INC.:
Ms. Margaret Bryant
WARE, JACKSON, LEE & CHAMBERS
America Tower, 42nd Floor
2929 Allen Parkway
Houston, Texas 77019-7101

APPEARING FOR M-I SWACO:
Mr. Paul E. Krieger
MORGAN, LEWIS & BOCKIUS, L.L.P.
1000 Louisiana Street, Suite 4000
Houston, Texas 77002-5006

APPEARING FOR THE UNITED STATES:

Ms. Jessica Sullivan
U.S. DEPARTMENT OF JUSTICE
TORT BRANCH, CIVIL DIVISION
1425 New York Avenue, N.W.
Suite 10100
Washington, D.C. 20005

**Page 4**

APPEARANCES (Continued)

APPEARING FOR CAMERON:
Ms. Kathleen A. Gallagher
BECK REDDEN & SECREST
One Houston Center
1221 McKinney Street
Suite 4500
Houston, Texas 77010

APPEARING FOR THE WITNESS:

Mr. John T. Floyd
Mr. Christopher Carlson
JOHN T. FLOYD LAW FIRM
2000 Smith Street
Houston, Texas 77002

ALSO PRESENT:

Ms. Melissa Bardwell, Videographer
Ms. Emily Gebhardt, Thornhill Law Firm

REPORTED BY:
  THERESE J. CASTERLINE, CSR, RMR, CRR
  Certified Shorthand Reporter
  State of Texas
  Certified Shorthand Reporter
  State of Louisiana

**PURSUANT TO CONFIDENTIALITY ORDER**

**Page 265**

1  Q. Okay. Now, when you say lab
2  stock, though, for Duncan to test the
3  cement blends similar to what was used in
4  the Macondo production casing job, you
5  know, the 7-inch job --
6  A. Yes.
7  Q. -- they would have needed to have
8  blended into the cement essentially the
9  same materials that were blended into the
10 cement for the Macondo 7-inch production
11 job?
12 A. We could have sent them samples of
13 Lafarge cement and samples of materials
14 from the lot numbers that we had in the
15 lab, but we didn't send them any of the
16 material from the -- from the rig --
17 Q. Okay.
18 A. -- Macondo.
19 Q. Okay. All right. So you sent
20 them the cement -- the Lafarge cement.
21 Did --
22 A. Yeah.
23 Q. -- you take that out of the bin
24 down in Port Fourchon?
25 A. I don't know where they got it.

**Page 266**

1  It would have been just cement that was in
2  the lab, representative of what was in
3  Port Fourchon.
4  Q. Yeah. So it's fair for me to say,
5  isn't it, that you wouldn't have sent them
6  somebody else's cement, you'd have sent
7  them the cement from -- from that which
8  you sent out to the rig, right, out of
9  that Port Fourchon bin, I guess, huh?
10 A. Out of the Port -- yes, out of
11 Port Fourchon that was current at that
12 time.
13 Q. Sure. Sure. So you get out of
14 the Port Fourchon bin some cement, the
15 Lafarge Class H cement, API rated, all
16 right, and that's the same stuff that was
17 used on the job, the -- the Macondo job,
18 and you get some of the -- the additives
19 that you had in the lab that were the same
20 additives that you used out on the job and
21 you sent it up to Duncan and they tested
22 it?
23 A. Yes.
24 Q. Is Duncan the headquarters?
25 A. Duncan is our technology center.

**Page 267**

1  They have field service labs and -- and
2  they do R&D work there.
3  Q. Yeah. R and --
4  A. Research headquarters -- research
5  and development or -- or technology
6  development.
7  Q. Okay. And that's essentially the
8  headquarters, right?
9  A. No. I -- I would call the
10 headquarters where the corporate office
11 is, and that's not where the corporate
12 office is.
13 Q. Now, the corporate office is in
14 Houston, right?
15 A. Yes.
16 Q. All right. But the -- the main
17 lab is still in Duncan?
18     MR. HILL: Object to form.
19 A. That is one of our technology
20 centers in Duncan. There's another one in
21 Pune, India, but that's -- that's where
22 our R&D lab is at.
23 Q. (BY MR. THORNHILL) Did you send
24 anything to India?
25 A. No.

**Page 268**

1  Q. You just sent it up to Duncan?
2  A. Correct.
3  Q. All right. So they -- they get
4  cement out of the bin and they get the
5  additives out of the -- out of the lab in
6  Broussard and they test it. And then did
7  they send you a written result?
8  A. We did not do a foam stability
9  test. These samples were sent up to do a
10 conductivity test --
11 Q. Uh-huh.
12 A. -- and which I did get a -- a
13 written result on.
14 Q. Uh-huh. Now, BP asked you to do
15 the conductivity test --
16 A. That's --
17 Q. -- correct?
18 A. -- correct.
19 Q. I got that right.
20     Now, tell me, did I get this
21 wrong? Did -- did Duncan's lab write down
22 or print up the results?
23 A. All I got was --
24     MR. HILL: Object to form.
25 Q. (BY MR. THORNHILL) Did it? This

PURSUANT TO CONFIDENTIALITY ORDER

**Page 416**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL         ) MDL NO. 2179
by the OIL RIG           )
"DEEPWATER HORIZON" in ) SECTION "J"
the GULF OF MEXICO, ON )
APRIL 20, 2010           ) JUDGE BARBIER
                         )
                         ) MAG. JUDGE
                         ) SHUSHAN

VOLUME 2 OF 2

Deposition of RONALD RAY FAUL, taken at Pan American Life Center, 601 Poydras Street, Ponchartrain Room, New Orleans, Louisiana, on the 30th of June, 2011.

**Page 417**

APPEARANCES

APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:

Mr. Thomas Thornhill
Ms. Emily Gebhardt
THORNHILL LAW FIRM
1308 Ninth Street
Slidell, Louisiana 70458

APPEARING FOR BP, INC.:

Mr. Philip T. Chen
Mr. David Mitchell
KIRKLAND & ELLIS
333 South Hope Street
Los Angeles, California 90071

APPEARING FOR TRANSOCEAN:

Mr. Daniel Goforth
Ms. Kate H. Easterling
GOFORTH GEREN EASTERLING, LLP
4900 Woodway
Suite 750
Houston, Texas 77056

APPEARING FOR ANADARKO PETROLEUM COMPANY:

Ms. Janika D. Polk
Mr. Terrance Prout
KUCHLER POLK
1615 Poydras Street
Suite 1300
New Orleans, Louisiana 70112

APPEARING FOR HALLIBURTON:

Mr. Gavin Hill
Lauren L. Mitchell
Mr. Bruce W. Bowman, Jr.
GODWIN RONQUILLO
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041

**Page 418**

APPEARANCES (Continued)

APPEARING FOR HALLIBURTON:

Mr. Richard W. Beckler
Mr. Jason B. Hutt
BRACEWELL GULIANI
2000 K Street NW, Suite 500
Washington, District of Columbia
20006-1872

Ms. Stacy S. Russell
HALLIBURTON
10200 Bellaire Boulevard
Houston, Texas 77072

APPEARING FOR WEATHERFORD:

Mr. Wayne G. Zeringue, Jr.
JONES, WALKER, WAECHTER, POITEVENT, CARRERE & DENEGRE, L.L.P.
201 St. Charles Avenue
New Orleans, Louisiana 70170

APPEARING FOR DRIL-QUIP, INC.:

Mr. Don Jackson
WARE, JACKSON, LEE & CHAMBERS
America Tower, 42nd Floor
2929 Allen Parkway
Houston, Texas 77019-7101

APPEARING FOR M-I SWACO:

Mr. Paul E. Krieger
MORGAN, LEWIS & BOCKIUS, L.L.P.
1000 Louisiana Street, Suite 4000
Houston, Texas 77002-5006

APPEARING FOR THE UNITED STATES:

Ms. Jessica Sullivan
U.S. DEPARTMENT OF JUSTICE
TORT BRANCH, CIVIL DIVISION
1425 New York Avenue, N.W.
Suite 10100
Washington, D.C. 20005

**Page 419**

APPEARANCES (Continued)

APPEARING FOR CAMERON:

Ms. Kathleen A. Gallagher
BECK REDDEN & SECREST
One Houston Center
1221 McKinney Street
Suite 4500
Houston, Texas 77010

APPEARING FOR THE WITNESS:

Mr. Christopher Carlson
JOHN T. FLOYD LAW FIRM
2000 Smith Street
Houston, Texas 77002

ALSO PRESENT:

Ms. Melissa Bardwell, Videographer

REPORTED BY:
THERESE J. CASTERLINE, CSR, RMR, CRR
Certified Shorthand Reporter
State of Texas
Certified Shorthand Reporter
State of Louisiana

1 (Pages 416 to 419)

**PURSUANT TO CONFIDENTIALITY ORDER**

592

1  MR. CARLSON: Objection, form.
2  A. It was for me.
3  Q. (BY MR. GOFORTH) Just typical,
4  just all in a day's work?
5  MR. CARLSON: Objection, form.
6  Q. (BY MR. GOFORTH) Right?
7  MR. CARLSON: Objection, form.
8  A. It was not unusual for me to call
9  Tim Quirk and ask him to do a test for me.
10 Q. (BY MR. GOFORTH) Okay. Now,
11 what -- what did -- did the foam -- what
12 were the additives, what -- what was the
13 design of the -- of the foam, the recipe
14 that he used?
15 A. He would have used the recipe that
16 was on the report, the final report to BP.
17 Q. Okay. Using the same additives?
18 A. Using lab stock additives that --
19 in the same concentrations.
20 Q. Did you have -- in that lab, did
21 you have all the additives that -- that
22 were part of the original recipe for the
23 Macondo well?
24 MR. HILL: Objection, form.
25 MR. CARLSON: Objection, form.

593

1  A. We had similar additives. I don't
2  think we used the -- I don't know if we
3  used the same lot numbers.
4  Q. (BY MR. GOFORTH) Okay.
5  A. But we had additives in the lab.
6  Q. Okay. And what were his results?
7  A. Tim told me that he had performed
8  the test, that the results were good, that
9  the foam slurry indicated it was stable.
10 Q. Okay. Did he provide you with any
11 of the details of the -- of the results?
12 A. If he did, I don't remember the
13 details. I trusted Tim's judgment that if
14 he looked at it, told me it was stable,
15 then I would -- I trusted his judgment and
16 his opinion.
17 Q. Okay. I take it that you had also
18 taken Jesse Gagliano's comments as -- as
19 accepted?
20 MR. CARLSON: Objection, form.
21 Q. (BY MR. GOFORTH) Correct?
22 MR. HILL: Object to form.
23 MR. CARLSON: Objection, form.
24 A. I don't know what comments you're
25 talking about.

594

1  Q. (BY MR. GOFORTH) His comments to
2  you of -- of April the 21st --
3  MR. HILL: Object to form.
4  Q. (BY MR. GOFORTH) -- when he --
5  when he told you that it was stable.
6  MR. HILL: Object to form.
7  MR. CARLSON: Objection, form.
8  A. I don't know as he told me that.
9  I can look at the report and make my own
10 judgment on that part.
11 Q. (BY MR. GOFORTH) Okay. And you
12 did look at that report?
13 A. I did.
14 Q. Do you know what the densities
15 were on that report?
16 MR. HILL: Object to form.
17 A. They're in the report.
18 Q. (BY MR. GOFORTH) Take a look.
19 A. Okay.
20 Q. 1.8?
21 A. 1.8, 1.8 specific gravity.
22 Q. What does 1.8 signify in terms of
23 pounds?
24 A. Approximately 15 pounds per
25 gallon.

595

1  Q. Okay. Was that the design?
2  A. The target weight was 14.5.
3  Q. Okay. What -- what is the
4  significance of having a density of 15
5  pounds when your target weight is 14.5
6  pounds?
7  A. I was looking more at the -- the
8  test results that said that we had the
9  same density top and bottom. That
10 indicated, in the absence of any other
11 information, that -- that it was stable.
12 Q. Okay. Can you answer my question
13 now?
14 MR. CARLSON: Objection, form.
15 A. Can you ask it again?
16 Q. (BY MR. GOFORTH) Yeah. What's
17 the significance to you, as a lab
18 specialist, of having a 15 pounds per
19 gallon density when you're looking for --
20 your target is 14.5?
21 MR. HILL: Object to form.
22 MR. CARLSON: Objection, form.
23 MR. GOFORTH: What's the
24 objection there?
25 MR. HILL: You called him a

PURSUANT TO CONFIDENTIALITY ORDER

**Page 700**

1  A. Yes, I do.
2  Q. And you were aware of that before,
3  right?
4  A. Yes.
5  Q. Let me ask you today, do you
6  think, in your experience, that a .01
7  gallons per sack difference in retarder
8  concentration would affect foam stability
9  results?
10  MR. CHEN: Objection, form.
11  A. I would not -- I would not expect
12  that to -- to make a difference.
13  Q. (BY MR. HILL) There was also some
14  questions that, in my opinion, confused
15  testing -- or I guess the source of -- of
16  cement that may have been tested
17  postincident by various individuals, and I
18  think one of them, for example, was you
19  when you asked Mr. Quirk to -- to test
20  foam stability.
21  I just want to be clear. To
22  your knowledge, has any individual at
23  Halliburton ever requested that a
24  postincident test be run on actual rig
25  cement?

**Page 701**

1  A. To my knowledge, we have not run
2  any tests on any of the --
3  Q. Okay.
4  A. -- postincident cement. It's all
5  been locked up.
6  Q. And I think you said this, but
7  I -- I just want to make sure the record
8  is clear, that to the extent any of the --
9  any of those -- to the extent anything was
10  used in those tests, it would have been
11  lab stock, correct?
12  MR. CHEN: Objection, form.
13  A. Everything would have been lab
14  stock; cement additives as well.
15  Q. (BY MR. HILL) Now, counsel for
16  the PSC also asked you several times that
17  in -- to the extent you used lab stock,
18  are those -- does that lab stock come from
19  the same bin at Port Fourchon. Do you
20  remember those question?
21  A. Yes.
22  Q. Can you tell me if -- can you
23  clarify for us whether or not that's
24  actually the case? Do you know what bin
25  at Port Fourchon lab stock comes from?

**Page 702**

1  A. I don't know which bin it would
2  have came out of in Fourchon. I really
3  don't know if it actually came from
4  Fourchon. It could have come from another
5  bulk plant. We have bulk plants in
6  Cameron and Venice and other areas, so the
7  lab stock could have come from any one of
8  those plants or any bin within that plant.
9  Q. Okay. You were also asked some
10  questions by BP's counsel regarding
11  displacement efficiency. And I think he
12  ran you through several different things
13  that help aid in displacement efficiency,
14  such as the use of Tuned Spacer. Do you
15  recall that conversation?
16  A. Yes, I do.
17  Q. There are a variety of things that
18  assist in -- with displacement efficiency
19  in a cement job, correct?
20  A. Correct.
21  Q. He went through some of them,
22  right?
23  A. Yes.
24  Q. All right. If you were to take
25  the universe of all the things that may

**Page 703**

1  help with displacement efficiency, are
2  there any in that universe that you think
3  are more important than others?
4  A. I think the centralization and
5  circulation would probably be the most --
6  two most important.
7  Q. And when you say central- --
8  MR. CHEN: Objection, form.
9  Q. (BY MR. HILL) When you say
10  centralization, do you mean adequate
11  centralization?
12  A. Adequate centralization, we -- our
13  best practice is a 70 percent standoff.
14  So adequate centralization and adequate
15  conditioning of the well bore.
16  Q. Okay. And do you have a sense of
17  what you would think is -- even as a
18  general rule of thumb, what would be an
19  adequate amount of pre-cement job mud
20  circulation to condition the well bore?
21  MR. CHEN: Objection, form.
22  A. We would like to see a bottoms up.
23  Q. (BY MR. HILL) Another -- and I
24  actually can't remember who asked the
25  question, but you were asked whether or

72 (Pages 700 to 703)

**PURSUANT TO CONFIDENTIALITY ORDER**

01-37767
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG ) MDL NO. 2179
"DEEPWATER HORIZON" in the )
GULF OF MEXICO, on ) SECTION: J
APRIL 20, 2010 )
) JUDGE BARBIER
)
) MAG. JUDGE SHUSHAN

## *CONFIDENTIAL*

### *WorldwideVIEW*™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Craig Gardner
**VOLUME 1**

AUGUST 17, 2011

# *COPY*



*Systems Techno ogy for the  itigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

## Page 225

1  are several dry components in this -- in this
2  blend. So with lab stock, you are combining
3  those into a blend in your lab. Had it been a
4  blend, then you would have accounted for that in
5  the calculations, taken the appropriate quantity
6  or mass of the blend, and then added the liquid
7  additives to it.
8  Q. M-h'm. More specifically, do you believe
9  that your testing is a reliable indication of
10 what would have happened if you tested the rig
11 blend?
12     MR. HILL: Objection, form.
13 A. I would have to test the rig blend to
14 answer that.
15 Q. (By Mr. Chen) Oh, okay. So was the
16 purpose of your -- well, was your charge just to
17 come to conclusions -- to test and come to
18 conclusions on the -- on the lab stock?
19 A. Our charge was to test the slurry design
20 in the April 12th Report and report the results
21 that we got.
22 Q. Okay.
23     THE COURT REPORTER: Two minutes.
24 Q. (By Mr. Chen) And based on your
25 experience, is -- I mean, you've tested, in your

## Page 226

1  experience, both pilot tests, which generally use
2  lab stock, correct?
3  A. Correct.
4  Q. And then you've later tested -- done rig
5  tests using rig samples?
6  A. Correct.
7  Q. Now, what is the variability of those? I
8  mean, if you have something that's unsuccessful
9  with the pilot test, do you think that magically
10 you'll have something successful with the rig
11 sample?
12     MR. SARVER: Object to form.
13     MR. HILL: Objection, form.
14 A. The differen -- the difference in the
15 question you're asking and normal operation is
16 I'm testing -- they should perform the same to
17 the extent that both samples are representative,
18 but I tested with materials that were supplied by
19 Halliburton to their design. I can't jump to
20 that and say this is -- if I were to test the
21 blend at the same time that it would have --
22 would -- would or would not have performed the
23 same.
24 Q. Okay.
25     MR. CHEN: Let's take a short break

## Page 227

1  to change the tape.
2      THE WITNESS: All right.
3      THE VIDEOGRAPHER: The time is 2:42
4  p.m. We're off the record, ending Tape 5.
5      (Recess from 2:42 p.m. to 2:51 p.m.)
6      MR. CHEN: I'm ready.
7      THE VIDEOGRAPHER: All set?
8  The time is 2:51 p.m. We're back on the
9  record, beginning Tape 6.
10 Q. (By Mr. Chen) Mr. Gardner, you said that
11 your testing would only be related to what's on
12 the rig if -- if you had -- if your materials
13 were representative, right?
14 A. Correct.
15 Q. Now take a look at the first page of your
16 letter to Mr. Sankar. Look at the last sentence
17 on the second paragraph.
18 A. Correct.
19 Q. Can you read that into the record?
20 A. "To our knowledge, these materials were
21 supplied by Halliburton as representative of
22 materials used on the Deepwater Horizon but are
23 neither bulk plant samples nor rig samples from
24 the actual job."
25 Q. So based on everything you understand,

## Page 228

1  the tests that you -- the material that you did
2  your testing on was representative --
3      MR. HILL: Object --
4  Q. (By Mr. Chen) -- of what was on the
5  DEEPWATER HORIZON?
6      MR. HILL: Object to form.
7  A. To our knowledge.
8  Q. (By Mr. Chen) And is there any
9  information that you have that would indicate it
10 was not representative?
11     MR. HILL: Object to form.
12 A. We didn't have control over the
13 collection and transport of the sample.
14 Q. (By Mr. Chen) Fair enough. But my
15 question is slightly different: Do you have any
16 information that would indicate to you that what
17 you tested was not representative of what was on
18 the rig?
19     MR. HILL: Object to form.
20 A. No, I do not have any information.
21 Q. (By Mr. Chen) Okay. Now, turning to
22 Page 12 of your Report, looking at that -- that
23 table again, Table 7, specifically focusing on
24 the second half, 5 -- the Test Numbers 5
25 through 9, now, there -- there's a range of

PURSUANT TO CONFIDENTIALITY ORDER

```
                                                         229
 1   densities coming out of the blender, would you
 2   agree? The densities run from 14.04 to 14.95 for
 3   that last set of five tests?
 4       A. Correct.
 5       Q. Now, none of those exactly landed on
 6   14.5, correct?
 7       A. Correct.
 8       Q. But all of those five tests were
 9   unstable, would you agree?
10       A. We were unable to create stable foam in
11   any of those tests, correct.
12       Q. And given that those five tests basically
13   run the range of low 14s to high 14s, would
14   you -- would -- would you understand that even if
15   you were able to blend out a perfect 14.5 out of
16   the blender, that slurry would also be unstable?
17           MR. HILL: Object to form.
18           MR. SARVER: Object to form.
19       You can answer, if you can.
20       A. Like I would say the -- the details of
21   the testing protocol are de -- in all cases, we
22   were aiming for the 14 -- where it says we were
23   aiming for 14.5, this is just reporting what
24   we've got with or without the --
25       Q. (By Mr. Chen) M-h'm.
```

```
                                                         230
 1       A. So the tests are designed to test the
 2   14.5 system.
 3       Q. Right.
 4       A. It's just these are the numbers that we
 5   got.
 6       Q. Okay. So even -- so, you wouldn't expect
 7   that if you had gotten exactly on 14.5, that the
 8   results would be different?
 9           MR. HILL: Object to form.
10       A. Correct.
11       Q. (By Mr. Chen) Now, if your -- if the
12   density -- now -- now, API 10B-4, says to take
13   numerous samples of the set cement, set foam
14   cement, right?
15       A. Does it say "numerous"?
16       Q. It says -- what -- what does it say
17   exactly?
18       A. We can -- we would have to check it.
19       Q. Well, does it say at least three slices?
20       A. I don't think it specifies.
21       Q. Oh, okay.
22           MR. CHEN: Do you have API 10B-4?
23           MS. YANG: Was it in the --
24       A. What's the tab?
25       Q. (By Mr. Chen) Well, I'll -- I'll just
```

```
                                                         231
 1   hand -- hand this over to you. It's -- it's
 2   Tab -- Tab 2 in the BP binder.
 3       A. Oh, okay.
 4           MS. YANG: Which was previously
 5   marked as Exhibit 6235.
 6           THE COURT REPORTER: Thank you.
 7       Q. (By Mr. Chen) And so this -- this is
 8   API 10B-4, correct?
 9       A. That's correct. ISO 426-4 equivalent.
10       Q. Okay.
11       A. Into at least three pieces.
12       Q. Okay. So -- and -- and that is what, in
13   fact, Chevron did in its testing, correct?
14       A. Correct.
15       Q. Now, Halliburton's results only report
16   two pieces?
17       A. Okay.
18       Q. And so you would agree that if
19   Halliburton only cut their cement into a top and
20   a bottom and weighed them, that would not be
21   consistent with API 10B-4?
22           MR. SARVER: Object to form.
23       A. Correct.
24       Q. (By Mr. Chen) Now, if -- if you -- if
25   your density measurements were uniform, or
```

```
                                                         232
 1   reasonably uniform, and -- but they were
 2   different from your target density, would you
 3   consider that to be a stable foam cement?
 4       A. The -- there are other indicators that
 5   are also mentioned in 10B-4, bubble breakout,
 6   striation, solid sedimentation, free fluid. In
 7   the absence of all of those, and if the numbers
 8   were reasonably uniform around the target 14.5
 9   value, then you would call it stable.
10       Q. Okay. And the Halliburton Lab Report
11   doesn't indicate that there's an -- doesn't have
12   any comments indicating any visual indications of
13   instability, right?
14       A. Correct.
15       Q. So if -- if we're -- so if we assumed
16   that there are no visual indications of
17   instability, how far off the target would it have
18   to be for a uniform measurement for you to
19   consider it unstable?
20       A. That's difficult to say. There's no --
21   there's no hard and fast threshold.
22       Q. M-h'm. If it were a pound per gallon
23   off, would you consider that unstable?
24       A. That would not be a good indication.
25       Q. Okay. So you would consider that
```

PURSUANT TO CONFIDENTIALITY ORDER

**Page 233**

1 unstable or --
2 A. I would consider that unsatisfactory
3 result.
4 Q. Okay. Have you ever seen any literature
5 stating that a -- that -- that -- that a one
6 pound per gallon difference between your target
7 density and your -- your -- your resulting
8 density would be acceptable?
9     MR. HILL: Object to form.
10 A. No.
11 Q. (By Mr. Chen) What if it were a half a
12 pound per gallon off, would that still raise
13 questions in your mind?
14     MR. SARVER: Object to form.
15     You can answer.
16 A. Half a pound is obviously better than a
17 pound. We would have to evaluate it in light of
18 all of the test results, rather than focusing on
19 just one number.
20 Q. (By Mr. Chen) Okay. But I think earlier
21 you said that that would raise a question and
22 require discussion?
23 A. Correct.
24 Q. Okay. I'd like you to turn to the "Fluid
25 Loss..." section of your Report which is

**Page 234**

1 Section 4.
2 A. Right.
3 Q. So your two tests show a fluid loss in
4 milliliters over 30 minutes of 578 milliliters
5 and 456 milliliters, correct?
6 A. Correct.
7 Q. Now, is that an acceptable fluid loss to
8 you?
9 A. It's a -- it's a slurry with moderate
10 fluid loss control.
11 Q. Okay. What does API recommend for an
12 ideal slurry?
13 A. They don't.
14 Q. Okay. It's -- in -- in API 10B-2, is
15 there a recom --
16     MS. YANG: 65.
17 Q. (By Mr. Chen) In API 65, is there a
18 recommendation of target fluid loss for cement
19 slurries?
20 A. 65-2, First Edition?
21 Q. Right. No. 65. The --
22 A. RP 65?
23 Q. RP 65?
24 A. RP 65 deals only -- the first part deals
25 only with shallow water flow --

**Page 235**

1 Q. Okay. And --
2 A. -- situations.
3 Q. Right. And in -- in those instances in
4 API 65, do they have a recommendation of what the
5 target fluid loss should be for a cement slurry?
6     MR. HILL: Object to form.
7 A. I don't recall.
8 Q. (By Mr. Chen) Okay. And so if -- if I
9 said it -- it was 50 milliliters per 30 minutes,
10 that wouldn't ring a bell?
11     MR. HILL: Same objection.
12 A. No.
13 Q. (By Mr. Chen) Okay. So just -- just
14 going with moderate fluid, this is -- this being
15 moderate fluid loss, would this be acceptable
16 coming out of your lab? Would you recommend
17 this -- that anyone go forward with this type of
18 result?
19 A. It would depend on --
20     MR. HILL: Object to form.
21 A. -- what the intended use of the cement
22 is.
23 Q. (By Mr. Chen) Okay.
24 A. This number 578, 456 depends on what --
25 what it would -- what -- what it is or what the

**Page 236**

1 cementing objectives of the job are.
2 Q. What if the cementing objectives are to
3 cement the production interval of a well?
4     MR. HILL: Object to form.
5 A. I wouldn't see anything particularly
6 wrong with the 578 and the 456. When it's
7 foamed, it will have some lower value. So the
8 fluid loss -- the fluid loss here is not a big
9 red flag.
10 Q. (By Mr. Chen) But you agree that the cap
11 was not foamed, and that was the reason that --
12 that you included this testing?
13 A. That's correct.
14 Q. And the cap is still exposed to the
15 formation and could --
16 A. Correct.
17 Q. -- dehydrate and use lose fluid to the
18 formation?
19 A. It could.
20 Q. And --
21 A. But I have no knowledge of any of the
22 formation characteristics, whether it would be
23 permeable, not permeable, et cetera.
24 Q. Okay. So --
25 A. I mean, I -- I tested the slurry they

PURSUANT TO CONFIDENTIALITY ORDER

Page 237

```
 1   had.  These are the values that -- that we got
 2   for it.
 3       Q.  M-h'm.
 4       A.  But as far as suitability for the
 5   intended condition, I couldn't tell you whether
 6   400 was or wasn't.
 7       Q.  Fair enough.  So without information
 8   about the formation conditions, you can't say
 9   whether that's acceptable or not?
10       A.  Correct.
11       Q.  Okay.  What about free fluid, is -- is
12   there a target in your mind that cement should
13   satisfy in terms of free fluid?
14       A.  I think you would prefer the base to have
15   minimal, if any, free fluid.
16       Q.  And so if I said 1 percent or less, would
17   that be -- would that make sense?
18       A.  That could -- that is a target that
19   sometimes -- that some people have used in some
20   instances.
21       Q.  M-h'm.  And for the second test, it says
22   "Channel present."  What does that mean?
23       A.  That means when it's inclined at a 45
24   degree angle, fluid was breaking out toward the
25   high side of the graduated cylinder and
```

Page 238

```
 1   manifesting itself as a lightweight channel at
 2   the top of the test at the -- on the high side of
 3   the graduated cylinder.
 4       Q.  Of the angled cylinder?
 5       A.  Correct.
 6       Q.  Now, is that a good thing?
 7       A.  No.
 8       Q.  Okay.  So you would say that if there's a
 9   channel present, that means it did not pass a
10   free fluid test?
11       A.  It would be something that you would --
12   you would look at and consider whether it was
13   satisfactory for your application.
14       Q.  But it would raise definitely a flag, and
15   it -- it would require discussion?
16       A.  Correct.
17       Q.  I'll ask you to turn to Tab 4 in the BP
18   binder.
19           MS. YANG:  (Tendering.)
20           MR. SARVER:  Thanks very much.
21       Q.  (By Mr. Chen) It's the small one.
22       A.  Oh, the small one, I'm sorry.
23       Q.  So Tab 4 is previously marked
24   Exhibit 808.  Have -- have you seen these pilot
25   test Weigh-up Sheets previously?
```

Page 239

```
 1       A.  If they're in the discovery, then it
 2   means we got them at some point.  As I discussed
 3   this morning, I'm not sure we had them before our
 4   testing was completed.
 5       Q.  Okay.
 6       A.  It would have come to the Commission.
 7       Q.  Okay.  I want to point you toward "Foam
 8   Details" in the middle of the first page.
 9           MR. HILL:  Can you tell us which
10   file you're referring to?
11           MR. CHEN:  It's Tab 4.
12           MR. HILL:  These are not --
13           MS. YANG:  It's not on the disc.
14           MR. HILL:  Could we have names, file
15   names?
16           MS. YANG:  It's not -- this one's
17   not on disc.  It was previously marked.
18           MR. CHEN:  Oh, yeah, it's -- it's
19   not on the disc because it's previously marked
20   Exhibit 808, Gavin.
21       I mean, do we have an extra one?
22       I'm sorry, Gavin.
23           MS. YANG:  But it's the
24   February 12th, 2010 "Cement Lab Weigh-Up Sheet."
25       Do you need the Bates --
```

Page 240

```
 1           MR. CHEN:  Yeah, it's Halliburton
 2   HAL_0502434.
 3       Q.  (By Mr. Chen) Okay.  So I want to point
 4   you, Mr. Gardner, to the middle of the page where
 5   it says "Foam Details, Final Foam Density."
 6       Do you see that?
 7       A.  I see that.
 8       Q.  And what is the target final foam density
 9   in -- in specific gravity units?
10       A.  1.737.
11       Q.  Okay.  Now, I'd like to ask you to turn
12   the page, and I want to just sort of run through
13   a series of these, and ask you whether or not you
14   think some of the notes and test results here
15   indicate a stable or unstable slurry.
16       So under "Foam Mix and Stability" at the
17   top, do you see that?
18       A.  Okay.
19       Q.  There's a specific gravity 2.02 top, and
20   specific gravity bottom 2.11.  Do you see that?
21       A.  Okay.  I see that.
22       Q.  Now, in light of the fact that the target
23   is 1.737, is that a stable test result?
24       A.  It's -- it's one of the indicators that
25   you should -- that you should look at.
```

PURSUANT TO CONFIDENTIALITY ORDER


**Page 241**

```
 1       Now, you're aware that the data you're
 2   having me review is not the slurry that we
 3   tested.
 4       Q. Correct.
 5       A. Okay.
 6       Q. This is a pilot test --
 7       A. Okay.
 8       Q. -- from early on.
 9       A. (Nodding.)
10       Q. But, you know, when -- when you have a
11   pilot test, that's to understand the design of
12   the slurry, correct?
13       A. Right. But I'm referring to that the
14   retarder load is different, and the temperatures
15   are different. Okay?
16       Q. Correct. But -- but, Mr. Gardner, I
17   mean, un -- unless you disagree, and -- and --
18   and then we'll -- we'll skip these, I
19   understood -- and -- and maybe you can confirm --
20   that pilot tests are done early on to confirm
21   whether or not the slurry design is appropriate.
22          MR. HILL: Object to form.
23       Q. (By Mr. Chen) Is that your understanding?
24       A. That is the reason for doing pilot tests.
25   What I am pointing out to you, is that the
```

**Page 242**

```
 1   particular weigh-up sheet that you're showing
 2   here, I'm merely noting that it is not -- the
 3   retarder load is different from the testing we've
 4   been discussing so far today, as is the
 5   bottomhole static and circulating temperatures.
 6       Q. Right.
 7       A. Okay.
 8       Q. So given that foam mix and stability test
 9   results, would that raise a flag in your mind
10   for --
11       A. For that target, you would -- it would be
12   something to look at.
13       Q. Would that be something that you would
14   want to redesign, possibly?
15          MR. HILL: Object to form.
16          MR. SARVER: Yeah. I'm going to
17   object to form, as well. Mr. Chen, you -- you
18   have seemed to be going beyond your subpoena,
19   again. And I -- I don't want to cut you off --
20          MR. CHEN: I --
21          MR. SARVER: -- prematurely, but
22   Mr. Gardner is not an Expert for BP or for
23   Halliburton or for anyone else. He did some
24   testing. He's happy to talk about that. And
25   here, I think you're going a little far.
```

**Page 243**

```
 1          MR. CHEN: Fair enough. And I'm --
 2   I'm just asking Mr. Gardner, in his individual
 3   capacity, if these are indications of unstable
 4   cement.
 5          MR. SARVER: But it's a test he
 6   didn't run. That's my concern, Mr. Chen.
 7          MR. CHEN: Okay. Fair enough.
 8   Well, what if I just do it generically without
 9   documents?
10          MR. SARVER: I'm trying not --
11          MR. CHEN: Okay.
12          MR. SARVER: -- to get in your way.
13          MR. CHEN: Okay. Thank -- thank
14   you. I appreciate that.
15       Q. (By Mr. Chen) So, Mr. Gardner, put --
16   putting the document aside, when -- when the
17   slurry is settling, is that a good sign?
18       A. It is one of the warning indicators
19   that's contained in 10B-4.
20       Q. And if a foam slurry is settling, is that
21   a sign that it's stable or unstable?
22       A. Unstable.
23       Q. Now, if you are conducting a crush
24   compressive test on a foam cube, and you take a
25   look at the cube, and it's -- and it is hard on
```

**Page 244**

```
 1   the bottom and soft on the top, is that a sign of
 2   stability or instability?
 3          MR. HILL: Object to form.
 4       A. Instability.
 5       Q. (By Mr. Chen) And if you are
 6   performing -- you are mixing a crush compressive
 7   strength test, and the technician makes a note
 8   that the slurry is settling out of the blender,
 9   is that a sign of stability or instability?
10          MR. HILL: Objection, form.
11       A. Instability.
12       Q. (By Mr. Chen) I -- I don't think I need
13   to go through all of these.
14       Well -- and when these visual indications
15   of instability come up, do you believe that this
16   is something that should be addressed through
17   either a -- a document or reflected in the Lab
18   Report, or something that needs to be discussed?
19       A. I'd say the API recommendation is to
20   consider a redesign.
21       Q. Okay.
22       A. In the system.
23       Q. And absent a redesign, should at least
24   this issue be raised so that people are aware of
25   this potential instability?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

245

1  MR. HILL: Object to form.
2  A. You would think.
3  Q. (By Mr. Chen) Okay. Now, one of the
4  things that Mr. Thornhill covered with you was
5  that many of the test results in your Report have
6  good agreement with Halliburton's Test Results.
7  For example, the rheology, you stated your
8  results were in good agreement with Halliburton's
9  results, correct?
10 A. I think I said reasonable agreement, but,
11 yes.
12 Q. Reasonable agreement. And also the --
13 the UCA tests were in reasonable agreement?
14 A. Correct.
15 Q. And then also the -- the thickening time
16 tests were in reasonable agreement?
17 A. Correct.
18 Q. And obviously, the -- the -- the --
19 the -- the proportions that you mixed up were the
20 same, in the same proportions in terms of
21 additive concentrations?
22 A. The slurry designs we used are -- the
23 slurry design we used is the one in the April
24 12th Report.
25 Q. And, now, does the fact that you mixed

246

1  the same slurry design, and that many of your
2  test results for the tests that you had all the
3  Halliburton conditions were reasonably the same,
4  indicate that your tests are a -- the material
5  that you tested is a good approximation of the
6  material on the rig?
7  MR. HILL: Object to form.
8  A. Some might make that interpretation, yes.
9  Q. (By Mr. Chen) Would you make that
10 interpretation?
11 MR. HILL: Object to form.
12 A. All I said was that they're in reasonable
13 agreement.
14 Q. (By Mr. Chen) Okay. So you would
15 reasonably assume that they would perform the
16 same?
17 MR. HILL: Object to form.
18 Q. (By Mr. Chen) Or perform reasonably the
19 same. Maybe I put "reasonably" in the wrong
20 place in the sentence, so let me ask that again.
21 You would expect them to perform
22 reasonably the same?
23 MR. HILL: The same objection.
24 A. And, again, all I said is that we --
25 our -- our tests were in agreement for me to --

247

1  because remember, the cement job is a combination
2  of both the slurry performance and the pumping
3  the job. To draw a direct line to what may or
4  may not happen on the rig is difficult.
5  Q. (By Mr. Chen) Right.
6  A. And there -- there's a lot of knowledge
7  about the job.
8  Q. Put -- putting aside the job, just
9  performance of the slurry, you would expect it to
10 be reasonably the same?
11 MR. HILL: Object to form.
12 Q. (By Mr. Chen) As to what you tested?
13 (Discussion off the record.)
14 A. All we said --
15 MR. SARVER: I'll object to form, as
16 well.
17 You -- you can answer.
18 THE WITNESS: Okay.
19 A. You know, in this, I said that many thing
20 was in reasonable agreement. The thing that
21 wasn't in reasonable agreement to what appears to
22 be presented, was the stability.
23 Q. (By Mr. Chen) Right.
24 A. So --
25 Q. Did -- did you understand that

248

1  Halliburton conditioned its slurry for three
2  hours befor -- for the conditioning time at 180
3  degrees Fahrenheit?
4  MR. HILL: Object to form.
5  A. I have no idea when -- what temperature
6  they used.
7  Q. (By Mr. Chen) So if they conditioned it
8  at a different temperature, at a higher
9  temperature, that could be one reason to explain
10 why their results were different?
11 A. But if they did everything at a higher
12 temperature --
13 MR. HILL: Excuse me. Object to
14 form of the question. I'm sorry.
15 A. But, again, with -- the Halliburton
16 results that were presented to us, are presented
17 as if -- I mean, the only temperature data in
18 them is the 135 degrees.
19 Q. (By Mr. Chen) Right. But assume with me
20 that the foam stability testing is conditioned at
21 180. Could that be a reason why their results
22 are different than yours?
23 MR. HILL: Object to form.
24 A. Yes.
25 Q. (By Mr. Chen) Okay. Given that, if they

PURSUANT TO CONFIDENTIALITY ORDER

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL      ) MDL NO. 2179
by the OIL RIG,       )
DEEPWATER HORIZON in  ) SECTION "J"
the GULF OF MEXICO,   )
April 20, 2010        ) JUDGE BARBIER
                      )
                      ) MAG. JUDGE
                      ) SHUSHAN

Videotaped deposition of GREG GARRISON, taken at Pan-American Building, 601 Poydras Street, 11th Floor, New Orleans, Louisiana, 70130, on the 4th of November, 2011.

**Page 2**

APPEARANCES

Mr. Frank M. Petosa
Mr. Rene Rocha
MORGAN & MORGAN
6824 Griffin Road
Davie, Florida 33314
Phone: 954-327-5366
    APPEARING FOR THE PLAINTIFFS'
    STEERING COMMITTEE

Mr. Philip Chen
Ms. Betty Yang
KIRKLAND & ELLIS, LLP
333 South Hope Street
Los Angeles, California 90071

    APPEARING FOR BP, INC.
Mr. Steven O'Rourke
Mr. Scott Cernich
UNITED STATES DEPARTMENT OF JUSTICE
P.O. Box 7611
Washington, D.C. 20044
Ms. Sarah Doverspike
U.S. DEPARTMENT OF INTERIOR
1849 C Street, N.W.
Room 6453
Washington, D.C. 20240
Phone: 202-208-6371 Fax: 202-208-6475

    APPEARING FOR THE UNITED
    STATES

Mr. Joseph Hart
KUCHLER, POLK, SCHELL, WEINER & RICHESON, LLC
1615 Poydras Street, Suite 1300
New Orleans, Louisiana 70112
    APPEARING FOR ANADARKO

**Page 3**

APPEARANCES:(Continued)
Ms. Kate Easterling
GOFORTH, GEREN, EASTERLING, LLP
4900 Woodway, Suite 750
Houston, Texas 77056

    APPEARING FOR TRANSOCEAN

Mr. Jim Taylor
BECK, REDDEN & SECREST
1221 McKinney Street, Suite 4500
Houston, Texas 77010-2010
    APPEARING FOR CAMERON
Mr. Gavin Hill
Mr. Kodie Bennion
GODWIN RONQUILLO
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
    APPEARING FOR HALLIBURTON
Mr. David A. Pote
KANNER & WHITELEY, L.L.C.
701 Camp Street
New Orleans, Louisiana 70130
Phone: 504-524-5777 Fax: 504-524-5763

    APPEARING FOR THE STATE OF
    LOUISIANA

Ms. Wendy Bishop
WARE, JACKSON, LEE & CHAMBERS
4929 Allen Parkway, 42nd Floor
Houston, Texas 77019
    APPEARING FOR DRIL-QUIP

**Page 4**

APPEARANCES:(Continued)

Mr. R. Sean Brennan, Jr.
MORGAN LEWIS
1000 Louisiana Street, Suite 4000
Houston, Texas 77002
Phone: 713-890-5750 Fax: 713-890-5001
    APPEARING FOR M-I SWACO

Mr. Etienne Balart
JONES WALKER
201 St. Charles Avenue
New Orleans, Louisiana 70170
    APPEARING FOR WEATHERFORD

**ALSO PRESENT:**
Mary Elizabeth Gaasch, videographer
REPORTED BY:

    THU BUI, CCR, RPR
    Certified Court Reporter
    State of Louisiana
    State of Texas

1 (Pages 1 to 4)

**PURSUANT TO CONFIDENTIALITY ORDER**

Page 13

```
 1  company.
 2      A.   How far back?  Just the oil
 3  field experience?
 4      Q.   I guess college, and then take
 5  us through your professional experience from
 6  there.
 7      A.   Okay.  I received a -- a BS in
 8  chemistry from Missouri State University.  I
 9  got my graduate degree in chemistry from
10  Oklahoma State University.  Spent a couple of
11  years -- two years from 1993 to '95 in a
12  pharmaceutical industry.  At that point, I
13  joined Schlumberger, which is an oil field
14  service company.
15      Q.   Okay.
16      A.   Spent approximately ten years
17  with them in multiple disciplines,
18  fracturing, acidizing and cementing.  Most of
19  my time was spent in cementing, the last
20  eight years with Schlumberger.  From '04 to
21  '07, I worked with an international group out
22  of Libya.  We supplied different -- different
23  oil field services in that country.  From '07
24  to about June of 2010, we had a cementing
25  company in Mexico, a basic startup service
```

Page 14

```
 1  company.  We started from the ground up,
 2  which involved buying equipment, putting
 3  together a bulk plant and putting together
 4  our slurries and our technology.
 5      Q.   And then after June of 2010, you
 6  moved into beginning the process of -- of --
 7  or planning for Oilfield Testing &
 8  Consulting?
 9      A.   Yes.
10      Q.   Okay.  And do you have any other
11  principals in the company with you?
12      A.   Yes.
13      Q.   Who are your partners or other
14  principals in the company?
15      A.   Well, on paper, no, just a
16  couple of financial guys that have, you know,
17  put the money behind the company to get us
18  started.
19      Q.   Okay.  And -- and as far as
20  staff goes, how many employees work for
21  Oilfield Testing & Consulting?
22      A.   We have three full time, not
23  including myself, and two part times.
24      Q.   Okay.  And it has a fully
25  operational lab?
```

Page 15

```
 1      A.   Yes.
 2      Q.   Okay.  All the current
 3  certifications, calibrations, and things like
 4  that?
 5      A.   Yes.
 6      Q.   Okay.  And it appears, sir, that
 7  you were hired at -- your company at least
 8  was hired at some point to do some testing on
 9  behalf of the joint investigation team with
10  regard to the cement slurries from the
11  Macondo well; is that correct?
12      A.   Yes.
13      Q.   Okay.  And did your company
14  actually perform that testing?
15      A.   Yes.
16      Q.   And did it receive certain
17  slurries and certain additives regarding
18  the -- the cement from the Macondo well or
19  representative samples of that?
20      A.   Yes.
21      Q.   Okay.  And is that information
22  set out in your report?
23      A.   Yes.
24      Q.   Okay.  And -- and actually, you
25  did produce a report, sir, your company at
```

Page 16

```
 1  least, dated August 1st of 2011.  If you open
 2  up the binder in tab 1, we have the report.
 3  It starts at Bates stamp DJIT and it ends in
 4  129.  We do not have the full Bates stamped
 5  copy.  I apology with some technical issues,
 6  but we have the first and last page of the
 7  Bates stamp, sir.  So the last page of -- of
 8  your report ends in Bates stamp 245.
 9      A.   Okay.
10      Q.   Is this report, sir, first page
11  dated August 1 of 2011, directed to a
12  Mrs. Silvia Murphy with the JIT, the joint
13  investigation team?  Is this the complete
14  report relative to the cement testing and
15  analysis that your company performed on
16  behalf of the JIT?
17      A.   Yes.
18      Q.   Okay.  We're going to go ahead
19  and mark that as exhibit 5937.  What I'm
20  going to ask you today, sir, is go ahead and,
21  if you would, put the sticker on the bottom,
22  kind of right-hand corner about where the
23  Bates stamp is.
24          (Exhibit Number 5937 marked.)
25      Q.   Or a little further above so it
```


4 (Pages 13 to 16)

PURSUANT TO CONFIDENTIALITY ORDER

```
                                                    17
 1    doesn't block anything.  There you go.
 2    That's --
 3         A.   Okay.
 4         Q.   Thank you.
 5         A.   Yes.
 6         Q.   Now, were you involved in -- in
 7    either the testing itself or supervising the
 8    testing that was performed?
 9         A.   Yes.
10         Q.   Okay.  And with respect to the
11    testing, were there specific protocols, the
12    testing protocols, that you followed?
13         A.   Yes.
14         Q.   And who provided those protocols
15    to you for the tests?
16         A.   The -- the JIT.
17         Q.   And if on a given test you were
18    going to perform if there was no specific
19    protocols within that test, was there any
20    other guidelines that you followed when you
21    performed those tests?
22         A.   Yes.  We followed API
23    guidelines.
24         Q.   Okay.  And is that something
25    that would be considered standard in the
```

```
                                                    18
 1    industry?
 2         A.   Yes.
 3         Q.   Okay.  Sir, I'd like to talk to
 4    you about your report and specifically refer
 5    you to page 27, section 9, the compressive
 6    strength.
 7         A.   27.  Okay.
 8         Q.   Now, so I understand it, you
 9    received these materials through the JIT; is
10    that correct?
11         A.   (Moves head up and down.)
12         Q.   And -- and other materials came
13    from certain other parties, correct?
14         A.   Yes.
15         Q.   And that's set forth on the
16    sample description on page 3.  I apologize.
17    If we can back up for me --
18         A.   Sure.
19         Q.   -- under section 1.
20              Now, with respect to the samples
21    that you received, the materials that were
22    received, are they all set forth on page 3 of
23    your report under section 1, sample
24    description?
25         A.   Yes.
```

```
                                                    19
 1         Q.   Okay.  Did you receive a
 2    representative sample, an actual sample, sir,
 3    of the Macondo cement slurry?
 4         A.   Yes.
 5         Q.   Okay.  And is that something
 6    that you also had the opportunity to test in
 7    some capacity as you were going through the
 8    different tests and procedures?
 9         A.   Yes.
10         Q.   Okay.  Let's go back to
11    section 9 on page 27, sir, the compressive
12    strength test.
13         A.   Okay.
14         Q.   What is this test attempting to
15    do?  What is it supposed to show?
16         A.   The basic test is to show you,
17    at a given time, and -- and temperature when
18    the cement actually sets.
19         Q.   Okay.  And your company
20    performed this test on the different
21    compositions of the slurry as set forth here
22    on page 27?
23         A.   Yes.
24              MR. HILL:  Object to form.
25         Q.   Sir, I'd like to refer you to
```

```
                                                    20
 1    page 30.  It -- it indicates under all the
 2    different, I guess, slurry formulations here,
 3    a test pressure of 3,000 psi.
 4              What does that mean?
 5         A.   That's the confining pressure.
 6         Q.   Okay.  Why is that the pressure
 7    that was chosen by your company?
 8         A.   Because we -- in -- in this
 9    particular case, we weren't given any other
10    guidelines, so we followed the API
11    recommendations.
12         Q.   Okay.  So API says that when
13    you're doing a UCA compressive strength test
14    that the standard pressure that you're
15    supposed to test at is at 3,000?
16              MR. CHEN:  Objection to form.
17              MR. HILL:  Same objection.
18         Q.   You can answer.
19         A.   Yes.  If -- if no other pressure
20    is given, the -- the standard pressure is --
21    is 3,000 psi.
22         Q.   Okay.  If you -- if you were to
23    use a different pressure that's a higher
24    pressure, let's say, 14,500 psi, what impact
25    would that have on the testing?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

Page 21

1  A.  I'm -- I'm not sure. I did not
2  test at that pressure.
3  Q.  Okay. So when you're doing the
4  UCA compressive strength test, if you
5  increased the test pressure, if you start out
6  with the standard of 3,000 and you continue
7  to increase the pressure to see the impact,
8  what -- what effect can that pressure
9  increase have on the test results?
10  A.  It can -- it can affect your
11  test results.
12  Q.  In what way?
13  A.  It can shorten the time to reach
14  a -- a certain strength, multiple things.
15  Q.  What other things?
16  A.  I -- in -- in some cases, it's
17  possible that -- exact cases, I don't know,
18  but I guess without testing, it's really hard
19  to say.
20  Q.  Okay.
21  A.  But --
22  Q.  Sir, with respect to the
23  different slurry formulations that you tested
24  at the test pressure of 3,000 psi, was there
25  any strength at 12 hours?

Page 22

1  A.  No.
2  MR. HILL: Object to form.
3  Q.  And what does that mean?
4  A.  It just means that at that -- at
5  that temperature and pressure, at the 12-hour
6  mark, there was no strength, which basically
7  is telling you that the -- the slurry is
8  still in liquid form.
9  Q.  Okay. Sir, I'd like to refer
10  you to page 34, section 11, the foam
11  stability test.
12      Now, in this test, sir, you
13  tested also a number of different
14  compositions of the cement slurry, correct?
15  A.  Yes.
16  Q.  Okay. And you also tested
17  something you have listed as MAC4.
18      What is that on page 35 in that
19  first box?
20  A.  That -- MAC4 is a specific
21  formulation using the cement from the rig.
22  Q.  Okay. So this test, the foam
23  stability test, not only did you -- not only
24  did your company test the different
25  compensations as they're -- as is set forth

Page 23

1  in this top box on page 35, you also actually
2  tested the cement samples that were provided
3  to you from the Macondo well?
4  A.  Yes.
5  Q.  Okay. Basically, the rig
6  samples themselves, correct, sir?
7  A.  The -- the cement, specifically
8  the cement.
9  Q.  Okay. Now, with respect to all
10  the tests, sir, that -- that you performed
11  for foam stability, I'd like to turn you to
12  page 38. You tested both the unset foam and
13  on page 39, the set foam, correct, sir?
14  A.  Yes.
15  Q.  Okay. And with respect to the
16  testing on page 38 of the unset foam, what --
17  what does it mean here, sir, where every
18  sample that you tested showed bubble
19  breakout? What does that mean?
20  MR. HILL: Object to form.
21  Q.  You can answer.
22  A.  The -- the -- the bubble
23  breakout is -- is just saying that once
24  the -- the foam is generated, we're seeing
25  bubble breakout, which is an indication that

Page 24

1  the -- the foam slurry is not stable.
2  Q.  Okay. And what about settling,
3  sir? It looks like some of the samples
4  evidence settling. What does that indicate
5  when you're doing the foam stability test?
6  MR. HILL: Object to form.
7  A.  Nothing specific about the foam
8  stability, but it just says something about
9  the stability of the slurry itself.
10  Q.  Okay. And also, it looks like
11  a -- a couple of the samples that were tested
12  for foam stability showed free fluid.
13      What does that mean?
14  MR. HILL: Object to form.
15  Q.  You can answer.
16  A.  It's -- it kind of goes hand in
17  hand with -- with settling. When you see
18  some settling, you typically have some free
19  water that's generated as well.
20  Q.  Okay. And, sir, would you agree
21  that at least for purposes of the testing
22  that you did on the unset foam slurry, you
23  would interpret the test of all of the
24  different compositions of the cement slurry,
25  including the Macondo well sample that you've

PURSUANT TO CONFIDENTIALITY ORDER