# Exhibit B

16316764.1


### Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL      ) MDL NO. 2179
BY THE OIL RIG        )
"DEEPWATER HORIZON" IN ) SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010         ) JUDGE BARBIER
                       ) MAG. JUDGE SHUSHAN

Deposition of RICKEY LYNN MORGAN, taken at Pan-American Building, 601 Poydras Street, 11th Floor, New Orleans, Louisiana, 70130, on the 17th day of October, 2011.

### Page 2

APPEARANCES

APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
  Mr. Ervin A. Gonzalez
  Mr. Jeff Keiser
  COLSON HICKS EIDSON
  255 Alhambra Circle, Penthouse
  Coral Gables, Florida 33134

APPEARING FOR BP, INC.:
  Ms. Betty X. Yang
  KIRKLAND & ELLIS
  300 North LaSalle
  Chicago, Illinois 60654

APPEARING FOR TRANSOCEAN:
  Mr. John H. Fleming
  SUTHERLAND ASBILL & BRENNAN
  999 Peachtree Street, NE
  Atlanta, Georgia 30309-3996
  Ms. Lauren Woodard
  ROYSTON RAYZOR
  711 Louisiana Street, Suite 500
  Houston, Texas 77002

APPEARING FOR ANADARKO PETROLEUM COMPANY:
  Mr. Robert E. Guidry
  Mr. Mark Best
  KUCHLER POLK SCHELL WEINER & RICHESON
  1615 Poydras Street, Suite 1300
  New Orleans, Louisiana 70112

APPEARING FOR CAMERON INTERNATIONAL CORPORATION:
  Ms. Carmelite M. Bertaut
  STONE PIGMAN WALTHER WITTMAN
  546 Carondelet Street
  New Orleans, Louisiana 70130-3588

### Page 3

A P P E A R A N C E S (Continued)

APPEARING FOR WEATHERFORD:
  Mr. William J. Joyce
  JONES, WALKER, WAECHTER, POITEVENT, CARRERE & DENEGRE, LLP
  201 St. Charles Avenue
  New Orleans, Louisiana 70170

APPEARING FOR DRIL-QUIP, INC.:
  Ms. Wendy Ware Bishop
  WARE, JACKSON, LEE & CHAMBERS
  America Tower, 42nd Floor
  2929 Allen Parkway
  Houston, Texas 77019-7101

APPEARING FOR M-I SWACO:
  Mr. R. Sean Brennan, Sr.
  MORGAN, LEWIS & BOCKIUS, LLP
  1000 Louisiana Street, Suite 4200
  Houston, Texas 77002-5006

APPEARING FOR HALLIBURTON:
  Mr. Bruce W. Bowman, Jr.
  Ms. Leiza Dolghih
  GODWIN RONQUILLO
  1201 Elm Street, Suite 1700
  Dallas, Texas 75270-2041
  Mr. Richard W. Beckler
  Mr. Jim Caldwell
  BRACEWELL & GIULIANI
  2000 K Street NW, Suite 500
  Washington, D.C. 20006-1872

APPEARING FOR THE UNITED STATES:
  Mr. Steven O'Rourke
  U.S. DEPARTMENT OF JUSTICE
  ENVIRONMENTAL & NATURAL RESOURCES DIVISION
  601 D Street, N.W.
  Washington, D.C. 20004

### Page 4

APPEARING FOR THE STATE OF LOUISIANA:
  Mr. Lambert J. "Joe" Hassinger, Jr.
  GALLOWAY, JOHNSON, TOMPKINS, BURR AND SMITH
  701 Poydras Street, 40th Floor
  New Orleans, Louisiana 70139

ALSO PRESENT:
  Mr. Peter Jennings, Logistics Supervisor
  Mr. Ray Aguirre, Case Manager

**PURSUANT TO CONFIDENTIALITY ORDER**

```
                                              13
 1   the mix?
 2        A.    They would come from the
 3   engineers.
 4        Q.    Engineers that are employed by
 5   Halliburton?
 6        A.    I think so, yes.
 7        Q.    What was your involvement with
 8   the Macondo well 252 project, if any?
 9        A.    After the well had issues I was
10   called by Ronnie Faul and asked to mix up a
11   slurry and give him my opinion of what I
12   thought about it.
13        Q.    All right.  When you say after
14   the well had its issues, are you -- are you
15   referring to after it blew?
16        A.    Yes, sir.
17        Q.    Okay.  And let's go before that.
18   Before the April the 20th, 2010 problem were
19   you involved with the Macondo well 252
20   project at all?
21        A.    No, sir.
22        Q.    Were you involved in the mix for
23   the cement at all?
24        A.    No, sir.
25        Q.    And when you say "at all," I
```

```
                                              14
 1   mean any capacity.
 2        A.    I didn't know there was a
 3   Macondo.
 4        Q.    Okay.  So not even a casual
 5   connection?
 6        A.    No, sir.
 7        Q.    Nothing?
 8        A.    None at all.
 9        Q.    Okay.  The reason I said it so
10   many times because I have to be very
11   specific.  That's the way lawyers talk.  If
12   we don't ask the question the right way, then
13   later someone could interpret that it wasn't
14   clear, ambiguous, and that you actually did
15   know; and it was my fault because I didn't
16   ask it the right way.  So I do apologize if I
17   sound like I'm repeating myself.
18        A.    That's all right.
19        Q.    So you first found out about the
20   Macondo well 252 project involving the
21   Deepwater Horizon rig when?
22        A.    I saw on the news that there was
23   a problem, and I didn't know Halliburton was
24   on it or not.
25        Q.    At what point did you become
```

```
                                              15
 1   aware that Halliburton was on that project?
 2        A.    I think there was an e-mail came
 3   out several days later that said Halliburton
 4   was on the rig and no one was hurt.
 5        Q.    No one from Halliburton?
 6        A.    Yeah.
 7        Q.    So when did you become involved
 8   with the project in any capacity?
 9        A.    When Ronnie Faul called me.
10        Q.    Tell us who Ronnie Faul is.
11        A.    He -- as far as I know, he's
12   the -- kind of the supervisor down on the
13   Gulf Coast over the technology engineers?
14        Q.    Is he an engineer?
15        A.    I have no idea what his
16   education is.
17        Q.    In the -- this is now 2010 when
18   he's contacting you, right?
19        A.    Yes, sir.
20        Q.    How much after the April 20th
21   explosion did he call you?
22        A.    He called me twice, I think.
23        Q.    And roughly how many weeks after
24   or days after?
25        A.    Roughly two weeks, two to four
```

```
                                              16
 1   weeks.
 2        Q.    So towards the end of April, or
 3   beginning of May?
 4        A.    Yes, sir.
 5        Q.    And that would be 2010?
 6        A.    Yes, sir.
 7        Q.    Where were you working at that
 8   time?
 9        A.    I was principal technologist in
10   the cementing, materials, and maintenance
11   group.
12        Q.    And the location?
13        A.    Duncan.
14        Q.    Oklahoma?
15        A.    Yes, sir.
16        Q.    What did Ronnie Faul want you to
17   do?
18        A.    He asked me to take a look at
19   the Macondo slurry.
20        Q.    What aspect of it?
21        A.    He didn't say.  He said, just
22   take a look at it.
23        Q.    Tell us what slurry means.
24        A.    Slurry is the wetted cement
25   mixed together.  Cemented mixed with the
```

**PURSUANT TO CONFIDENTIALITY ORDER**

## Page 17

```
 1   water.
 2       Q.   Now, I'm going to ask you to go
 3   back in time roughly to the time that
 4   Mr. Faul -- did he call you, or did he send
 5   you a text message?
 6       A.   Called.  Called.
 7       Q.   Or an e-mail?
 8       A.   Called.
 9       Q.   Okay.  In the old days we could
10   just say that he called you.  Now we have
11   five different ways he could contact you.
12       A.   Exactly.
13       Q.   And what -- to the best of your
14   knowledge, tell me everything you can
15   remember about that first conversation.
16       A.   He just asked me to take a look
17   at the slurry and give him my opinion of it.
18       Q.   Did you ask him any questions as
19   to what he meant or what the scope was?
20       A.   No.
21       Q.   So he -- he said, Mr. Morgan, I
22   want you to look at the slurry used on the
23   Macondo well 252?
24       A.   (Nodding head.)
25       Q.   "Yes"?
```

## Page 18

```
 1       A.   Yes.
 2       Q.   And then you said?
 3       A.   Okay.
 4       Q.   And what did -- what did you do?
 5       A.   I got the slurry sheet, and I
 6   went and mixed the slurry up.
 7       Q.   Where did you find the slurry
 8   sheet?
 9       A.   I got it from Brian Wall.
10       Q.   Who is he?
11       A.   He is a princ- -- I don't know
12   what his exact title is.  He's a technician
13   that works there at Halliburton in Duncan.
14       Q.   And what's on the slurry sheet?
15       A.   The recipe for the slurry.
16       Q.   So the exact -- is it the exact
17   slurry recipe that was used for the Macondo
18   well 252?
19       A.   I have no idea if it was.
20       Q.   Why did you pick that slurry
21   sheet?
22       A.   That's what was on Viking, where
23   they keep track of what the slurry designs
24   are.
25       Q.   Viking is a system where you
```

## Page 19

```
 1   keep a log of the type of slurry designs that
 2   are used in different projects --
 3       A.   Yes, sir.
 4       Q.   -- is that right?  And for the
 5   Macondo well 252 you picked the slurry sheet
 6   that you felt in the Viking system would be
 7   the one that was used in the Macondo well
 8   252; is that right?
 9       A.   No.  I got the slurry sheet from
10   Brian.
11       Q.   Okay.  And Brian was -- here's
12   my question:  You're trying to figure out the
13   slurry -- look at the slurry that was used in
14   the Macondo well 252, right?
15       A.   Yes, sir.
16       Q.   So it's important that you pick
17   the right recipe?
18       A.   Yes, sir.
19       Q.   So how -- what assurances did
20   you have that made you feel comfortable,
21   okay, I'm checking the right slurry?
22       A.   That was the slurry Brian was
23   using, as far as mixing his test -- he was in
24   the field service.
25       Q.   Okay.  And Brian was also
```

## Page 20

```
 1   testing the slurry for the Macondo 252?
 2       A.   Yes, sir.
 3       Q.   So you felt fairly comfortable
 4   that it was the right slurry recipe?
 5       A.   Yes, sir.
 6       Q.   Was it a foam slurry?
 7       A.   Yes, sir.
 8       Q.   How would you describe that
 9   slurry?
10            MR. BOWMAN:  Object to the form.
11            THE WITNESS:  What did you say?
12       Q.   (BY MR. GONZALEZ)  Oh, he
13   objected to protect the legal record.
14            MR. BOWMAN:  I objected to form, but
15   you can go ahead and answer the question,
16   unless I instruct you not to.  I have to make
17   objections for the legal record.
18            THE WITNESS:  Okay.
19            MR. GONZALEZ:  Otherwise, he doesn't
20   get paid.
21            MR. BOWMAN:  Right.  That's very
22   important.
23       A.   When I mixed it up it looked
24   thin to me.
25       Q.   (BY MR. GONZALEZ)  And what does
```

**PURSUANT TO CONFIDENTIALITY ORDER**

Page 189

1  Q. Are you aware of anyone else
2  from Halliburton communicating with Anadarko
3  about any decision regarding the Macondo
4  cementing process or lab testing?
5  A. No, sir.
6  Q. Are you aware of any lab test
7  conducted on any cement slurry for purposes
8  of the Macondo well being transmitted to
9  Anadarko at any point in time prior to
10 April 20, 2010?
11 A. No, sir.
12 Q. Are you aware of any lab tests
13 conducted after April 20, 2010 on
14 representative cement slurries for the
15 Macondo well being transmitted to Anadarko?
16 A. No, sir.
17 Q. Do you have any information
18 leading you to believe that Anadarko had any
19 involvement in the -- the design, testing, or
20 development of the cement program used on the
21 Macondo well?
22 A. No, sir.
23 Q. I'd like to ask you a couple
24 questions about the mixing test.
25 A. Yes, sir.

Page 190

1  Q. Which I think you termed it the
2  unofficial --
3  A. Yes.
4  Q. -- mixing test?
5  A. Yes, sir.
6  Q. Where was that mixing test
7  actually performed?
8  A. Duncan, Oklahoma.
9  Q. And where did the dry blend and
10 additives come from the --
11 A. It was our stock stuff in our --
12 I took it out of our chemical inventory.
13 Q. So that was?
14 A. In Duncan.
15 Q. Okay. So it was from the lab?
16 A. Yes, sir.
17 Q. And what type of water did you
18 use in order to conduct that test?
19 A. Just tap water.
20 Q. And I believe you testified that
21 it looked thin to you; is that correct?
22 A. Yes, sir.
23 Q. And in questioning, you also
24 testified when asked "What does it mean if
25 the slurry is too thick?"

Page 191

1  You said, "It would be hard to
2  pump."
3  And the follow-up question, "And
4  the same with respect to if it's too thin,
5  what are some of the problems that may
6  result?"
7  And you stated, "You could have
8  issues with it settling."
9  A. Yeah.
10 Q. And you already testified that
11 you thought this recipe was too thin.
12 A. Yes.
13 Q. Did you notice any settling
14 issues?
15 A. No, sir.
16 Q. And that goes for the original
17 test as well as a repeat test?
18 A. Yes, sir.
19 Q. If Mr. Quirk had reported to
20 Mr. Faul that the test showed signs of
21 settling, where would he have gotten that
22 information?
23 MR. BOWMAN: Objection; form.
24 A. I have no idea.
25 Q. (BY MR. GUIDRY) And so the

Page 192

1  thinning that you saw of the cement slurry
2  after you conducted your mixing test, that
3  didn't suggest to you that there was any
4  settling that had occurred?
5  A. No. Remember, I ran the
6  secondary test where I didn't see any
7  settling where I conditioned the slurry.
8  Q. But you -- you also did not see
9  any settling on the first slurry; is that
10 what you're saying?
11 A. I didn't say, but I just after I
12 mixed it up dumped it out.
13 Q. But --
14 A. It was just a visual, the
15 first -- first test was.
16 Q. But the thinning of the first
17 test didn't suggest to you there was any
18 settling?
19 A. There was a possibility of
20 settling, but I didn't see any.
21 Q. And did you report that
22 possibility to Mr. Quirk or Mr. Faul?
23 MR. BOWMAN: Objection; form.
24 A. To Mr. Faul, I told him the
25 slurry looked thin.



48 (Pages 189 to 192)

**PURSUANT TO CONFIDENTIALITY ORDER**

TIMOTHY L. QUIRK         March 21, 2011 SANDRA D. FILES, CCR

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL          MDL NO. 2179
BY THE OIL RIG
"DEEPWATER HORIZON"       SECTION:  J
IN THE GULF OF
MEXICO, ON APRIL          JUDGE BARBIER
20, 2010                  MAG. JUDGE SHUSHAN

        Videotaped deposition of TIMOTHY
L. QUIRK, 202 Founder Street, Lafayette,
Louisiana 70508, taken in the Pan American
Life Center, Bayou Room, 11th Floor, 601
Poydras Street, New Orleans, Louisiana
70130, on Monday, March 21, 2011.

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS
STEERING COMMITTEE

CUNNINGHAM BOUNDS, LLC
By:  Robert T. Cunningham, Esquire
1601 Dauphin Street
Mobile, Alabama 36604

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C      Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029  Board-Certified Court Reporters    Facsimile: (504) 525-9109

a5ef3c90-b76f-4c47-b943-8ff01ec896f2

Page 86

1   Q.  Okay. Understood. Which was an
2   aspect of temporary abandonment, correct,
3   if you recall?
4   A.  No, I'm referring to the -- the
5   -- well, the line of slurry that was
6   pumped.
7   Q.  Okay.
8   A.  That's the final -- I say the
9   final slurry. The slurry that was pumped
10  on April 20th is what I'm referring to.
11  Q.  All right. I understand. And
12  whatever we would -- however we would
13  describe it, it's the last one that took
14  place aboard the --
15  A.  Before the --
16  Q.  -- DEEPWATER vessel, correct?
17  A.  Right. Right.
18  Q.  Now, so you looked at the slurry
19  design. Where would you have found that?
20  A.  In the Viking cement lab
21  database.
22  Q.  Okay. And you looked at the
23  history of testing on that last project?
24  A.  Right.
25  Q.  And where would you have found

Page 87

1   that?
2   A.  In the Viking cement lab
3   database. And in the -- and in the lab
4   worksheets.
5   Q.  All right. When you looked at
6   the slurry design what was your purpose?
7   A.  Just reviewing it, just -- just
8   human nature to -- to take a look at what
9   was pumped.
10  Q.  Understood. And when you looked
11  at the test results --
12  A.  Uh-huh.
13  Q.  -- what were you looking for?
14  A.  Every test that we had -- just
15  looking at all the tests that were
16  performed on that -- on that project -- on
17  that -- on that slurry.
18  Q.  Do you recall -- can you give me
19  a date reference, did it begin in February
20  of 2010, the testing, test results that you
21  were looking at?
22  MR. BOWMAN:
23      Objection to form.
24  THE WITNESS:
25      I -- when I started looking

Page 88

1   at that I was looking at the -- the testing
2   performed in April.
3   BY MR. PALMINTIER:
4   Q.  Understood. Did you eventually
5   go back before April?
6   A.  Yes.
7   Q.  Okay. All right. If I
8   understood your testimony correctly, you
9   are saying that on your own, without any
10  instruction from your supervisors, you
11  looked at these materials you just
12  described to me, correct?
13  A.  I think that's a correct
14  statement.
15  Q.  Do you recall having gotten a
16  directive from your immediate supervisor or
17  anyone higher up to begin to look at slurry
18  design and testing results and -- and other
19  aspects of this project?
20  A.  You -- specifically just
21  evaluating the slurry design?
22  Q.  I understand. Let me -- let me
23  make it simpler. Do you recall having
24  gotten a directive from above saying we
25  want you to look at this cement job because

Page 89

1   of this blowout?
2   A.  Yes.
3   Q.  Who contacted you?
4   A.  Ronnie Faul.
5   Q.  Okay. And what did Mr. Faul
6   say?
7   A.  He just asked me to -- to foam
8   the, you know, foam the slurry and -- and
9   take a look at using lab stock additives.
10  And --
11  Q.  And did he give you a reason why
12  he wanted you to foam the slurry using lab
13  stock additives?
14  A.  He said that -- that they had
15  performed a test in -- in Duncan, Oklahoma
16  and that he wanted me to mix the slurry up
17  and see if, you know, see how it compared
18  to what they were seeing up there.
19  Q.  Okay.
20  A.  Mix it and -- and perform
21  stability. This was, you know, a foam
22  stability test and looking at different
23  concentrations of mud contamination with
24  the -- and the effects on cement --
25  Q.  Okay. All right.

23 (Pages 86 to 89)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C    Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029 Board-Certified Court Reporters    Facsimile: (504) 525-9109

a5ef3c90-b76f-4c47-b943-8ff01ec896f2

TIMOTHY L. QUIRK          March 21, 2011   SANDRA D. FILES, CCR

Page 90

1  A. Using lab stock additives.
2  Q. Understood. Do you recall when
3  Mr. Faul communicated that request to you?
4  A. I don't remember the exact date.
5  I would -- I would estimate maybe a few
6  weeks after April 20th.
7  Q. Okay. Now, who -- who did the
8  testing to which Mr. Faul referred up in
9  Duncan, Oklahoma?
10 A. I don't know who actually
11 performed the tests. I'm trying to think
12 of the gentleman's name. His name -- I
13 don't work very much with these guys. I
14 just can't -- I can't recall his name right
15 now.
16 Q. That's okay.
17 A. If I would see his name I could
18 confirm it. I just can't think of his name
19 right now.
20 Q. But is the Duncan, Oklahoma,
21 another -- that location, is it another
22 Halliburton lab?
23 A. Yes. Yes.
24 Q. All right. And you from time to
25 time through the years you have --

Page 91

1  A. Yeah.
2  Q. -- worked with those folks?
3  A. Time to time, yes.
4     Going back to the question that
5  you asked me, Ronnie -- in terms of cement
6  testing, after Ronnie Faul, and also
7  Anthony Badalamenti --
8  Q. Okay.
9  A. -- and Simon Turton were on a
10 call together to talk to me about
11 performing another test.
12 Q. Who is Anthony Badalamenti and
13 what was the other guy?
14 A. Simon Turton, T-U-R-T-E-N or
15 O-N. I don't recall exactly how it's
16 spelled.
17 Q. Who are those gentlemen?
18 A. I don't know their job titles,
19 but Anthony works in Houston; and Simon,
20 I'm not exactly sure where he works. I
21 haven't had a whole lot, you know, many
22 dealings with Simon.
23 Q. But they -- they work for
24 Halliburton?
25 A. Yes. Yes, they work for

Page 92

1  Halliburton.
2  Q. In cementing or --
3  A. Yes, they work in cementing.
4  Q. Okay.
5  A. Well, I think Anthony works,
6  still works in cementing. I'm not sure of
7  Simon's job title. Maybe -- it -- I
8  don't -- I don't know. I just don't know
9  their job titles.
10 Q. Okay. All right. So you spoke
11 with Ronnie Faul. Was that a phone call or
12 an e-mail?
13 A. A phone call.
14 Q. And then you had a phone call
15 with Mr. Badalamenti and Mr. Turton?
16 A. Right.
17 Q. The -- was Mr. Faul on that call
18 with --
19 A. He was not.
20 Q. All right. And how did that
21 call come? Did you call these two fellows,
22 Turton and Badalamenti, or --
23 A. No, they -- they -- they called
24 me.
25 Q. Okay. What did they call you?

Page 93

1  What did they ask you when they called you?
2  A. They asked me to run a static
3  gel strength test or transition time on the
4  -- on the cement slurry.
5  Q. Which slurry were they asking
6  you to --
7  A. The slurry that was pumped on --
8  on the job on April 20th.
9  Q. So both Mr. Faul and these two
10 gentlemen asked you to look at the slurry
11 design and use what you have at your lab to
12 recreate the slurry that was being used
13 offshore?
14 A. Initially -- well, Mr. Faul
15 asked that I, you know, use the lab
16 stock additives. Initially Anthony and
17 Simon asked that I use the rig samples but
18 we -- we did not use the rig samples. I
19 got with management and -- to confirm that
20 that was not going to be used. So we ended
21 up using lab stock additives.
22 Q. All right. Who at management
23 decided not to use the actual rig samples?
24 A. Tony Angelle.
25 Q. And what reason did Mr. Angelle

24 (Pages 90 to 93)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C        Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029 Board-Certified Court Reporters    Facsimile: (504) 525-9109

a5ef3c90-b76f-4c47-b943-8ff01ec896f2

TIMOTHY L. QUIRK          March 21, 2011 SANDRA D. FILES, CCR

Page 214

1  instructed to perform, you know, the foam
2  stability tests and -- and the transition
3  time tests.
4    Q.  Okay. Any other tests besides
5  the foam stability and the static gel or
6  the transition time test that you were
7  requested to have -- be conducted?
8    A.  No. Those were the -- those
9  were the two tests.
10   Q.  And with respect to the foam
11 stability tests, Mr. Faul requested that
12 test be performed, correct?
13   A.  Right. It was foam stability
14 tests to include some contamination of mud
15 with foam -- foam cement also. I think I
16 stated that earlier.
17   Q.  And you didn't recall the
18 densities that were produced from that
19 test; is that correct?
20   A.  I don't recall the densities.
21 It was -- it was a modified test procedure
22 where the -- we were contaminating mud with
23 foam spacer and I know I ran several tests
24 with different mud contaminations. I don't
25 recall exactly. I gave that information

Page 215

1  to -- to Ronnie Faul.
2    Q.  How many tests did you conduct?
3    A.  I would say three to four,
4  possibly five contaminated tests.
5    Q.  And were the results of each of
6  those tests a stable foam slurry?
7    A.  The -- the
8  slurry would -- essentially we had
9  different amounts of mud contamination and
10 I don't recall the numbers. The -- every
11 time that you add, you know, in a situation
12 where you contaminate oil based mud into --
13 into foam cement, the oil in the mud will
14 degrade the foam somewhat. And I don't
15 recall exactly what those numbers were. I
16 know that the more I increased the mud, I
17 remember that the -- it had an effect on
18 the -- on the foam slurry. I just don't
19 remember the values. I reported the
20 numbers.
21   Q.  Did you make any notes of the
22 numbers?
23   A.  I gave them to Ronnie Faul.
24   Q.  And to your recollection those
25 numbers indicated a stable foam?

Page 216

1    A.  Well, the -- the -- in
2  concentrations of mud, I remember that
3  there was an effect. I -- I don't know
4  what would be considered stable or
5  non-stable in -- in -- in regards to mud
6  contamination.
7    Q.  You also testified that you
8  requested a May 28th test or a static gel
9  test be conducted; is that correct?
10   A.  I was requested to perform,
11 right.
12   Q.  If you could turn to tab 12,
13 please. Who --
14   A.  A request was made to me.
15   Q.  Who made that request?
16   A.  That was Anthony Badalamenti and
17 -- and Simon Turton. It was a conference
18 call that involved both of those people,
19 both of those individuals.
20   Q.  And that request was made on the
21 telephone?
22   A.  Yes.
23   Q.  And do you recall approximately
24 when that telephone conversation occurred?
25   A.  I don't -- I can't recall

Page 217

1  exactly when that was. It would -- I would
2  say somewheres of within a month after. So
3  I don't recall exactly when it was.
4    Q.  Looking at tab 12, who does --
5  HAL_DOJ 21, this test was submitted by who
6  in this case?
7    A.  Well, it has my name on it
8  because the individuals that spoke to me
9  would not be in Viking system because they
10 are not associated with the lab. So I put
11 my name on it to have a contact
12 information. But this is -- this is the
13 test -- so this was -- this was May 28th,
14 so that would have been --
15   Q.  Is that around the time you
16 spoke on the phone with them?
17   A.  That would have been right
18 around the time. So I guess a little
19 bit -- a little bit longer than a month.
20   Q.  And as opposed to other tests,
21 did you actually perform this test as well?
22   A.  I didn't perform this test.
23   Q.  Do you know who did perform this
24 test?
25   A.  I know that Chad Broussard, one

55 (Pages 214 to 217)

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C      Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029  Board-Certified Court Reporters     Facsimile: (504) 525-9109

a5ef3c90-b76f-4c47-b943-8ff01ec896f2

TIMOTHY L. QUIRK    March 21, 2011 SANDRA D. FILES, CCR

Page 218

1  of our lab techs, was involved. I would
2  have to look at the weigh sheets, the
3  cement lab weigh sheets to maybe get a
4  better -- give you more information on
5  that.
6      Q.  Well, if you turn to tab 13,
7  does that give you any indication as to who
8  conducted this test? There's both the May
9  28th and May 29th weigh-up sheet, the very
10 beginning of tab 13.
11     A.  Okay. I'm trying to see the
12 second page of that. There are no initials
13 on this paperwork but I think that Chad --
14 I think I spoke to Chad Broussard about it
15 because I think that he was working at the
16 time.
17     Q.  Did you speak to him on the
18 phone or in person?
19     A.  I -- I really don't remember.
20     Q.  Do you -- did you give him any
21 instructions with respect to this test?
22     A.  Just -- just to run the test and
23 I told -- go back and look. I think we had
24 him run it on -- on -- either run it twice
25 or run it on two different machines to try

Page 219

1  to make sure that we, you know, got a good
2  representative number.
3      Q.  And did you monitor this test as
4  it was run by Mr. Broussard?
5      A.  As it was being performed?
6      Q.  Correct.
7      A.  I don't recall, you know,
8  sitting there monitoring it. I remember,
9  you know, looking at the results, but I
10 don't -- I can't recall whether or not I
11 was there monitoring the test as it was --
12 as it was running.
13     Q.  Who decided which of the
14 additives and particular cement would be
15 used for this test?
16     A.  That was Anthony Badalamenti and
17 Simon. They had -- as I stated earlier
18 this morning, they had requested that I use
19 the samples that were from the rig. But we
20 were instructed that we couldn't use it, so
21 we used the lab stock.
22     Q.  So was it your understanding at
23 the time this test was conducted that this
24 was the same slurry from the rig?
25     A.  Same design.

Page 220

1      Q.  Same design.
2      A.  That's correct, right.
3      Q.  But this -- this was a pilot
4  test so that these were chemicals used from
5  the lab as opposed to those actually --
6      A.  That's correct, yes.
7      Q.  And with respect to the
8  temperatures that were used in this test,
9  210 for the bottom hole stack temperature
10 and 135 for the bottom hole circulating
11 temperature, who determined that those were
12 the temperatures to be used?
13     A.  Well, I think it -- that was
14 just a case where we were repeating or
15 running the tests based on the well
16 conditions from the previous test. I
17 don't --
18     MR. CHEN:
19         Objection, form.
20 BY MS. MCCLELLAN:
21     Q.  Are there any protocols in the
22 lab for running static gel strength tests?
23     A.  Protocols?
24     Q.  If you could describe to me how
25 the test is run.

Page 221

1      A.  Essentially you -- you want a
2  description of how the machine works or you
3  want to describe -- what detail are you --
4  are you --
5      Q.  I guess I'm trying to find out
6  what you're testing.
7      A.  Okay. We're -- what we're doing
8  is we're simulating the job placement time,
9  pumping the cement down in place. And so
10 at that point the cement would still be
11 fluid, and then what we're looking for is
12 how long does it take for that cement
13 slurry to go from a liquid state to a gel
14 state.
15     Q.  And what was the result of this
16 test?
17     A.  Well, what we ended up
18 ultimately reporting, we -- which one you
19 want to know, each test that we ran or what
20 we reported? We looked at the -- we looked
21 at the designs -- I mean, at the results
22 and we had one case where the machine
23 wasn't holding pressure.
24     Q.  Okay.
25     A.  And then we evaluated, you know,

56 (Pages 218 to 221)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C    Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029 Board-Certified Court Reporters    Facsimile: (504) 525-9109

a5ef3c90-b76f-4c47-b943-8ff01ec896f2

TIMOTHY L. QUIRK       March 21, 2011   SANDRA D. FILES, CCR

Page 222

1  the testing that we performed and felt like
2  that one was a -- was a good fit for
3  what -- the testing that we performed on
4  that machine, on those machines.
5      Q.  So the transition time with
6  respect to the test that was conducted on
7  May the 28th or the weigh-up sheet at the
8  top says May 28th, HAL_DOJ 23 --
9      A.  Right.
10     Q.  -- that shows a transition time
11 of 146, correct?
12     A.  That's correct.
13     Q.  And that was not reported on tab
14 12, was it?
15     A.  Why is it not reported, did you
16 say?
17     Q.  I'm asking, was it reported?
18 One --
19     A.  No. It was not -- it was not
20 reported.
21     Q.  The transition on the 146. And
22 why not?
23     A.  Because we just -- when Anthony
24 called he just wanted to know what would be
25 the transition time for a slurry like that.

Page 223

1  So what we did was we -- we ran several
2  tests to make sure that we -- and based on
3  the results that we got, we determined that
4  that was the most representative and looked
5  like it appeared to be a good chart, a good
6  test.
7      MR. BOWMAN:
8          When you say that, you are
9  talking about the one reported?
10     THE WITNESS:
11         Yes, based on what -- what
12 we evaluated, based on what we -- the
13 results that we -- that we looked at
14 throughout the testing process.
15 BY MS. MCCLELLAN:
16     Q.  So what was ultimately reported
17 was a transition time of 129, correct?
18     A.  That's correct.
19     Q.  And was that derived from the
20 tests conducted on May 29th, which is tab
21 13, HAL_DOJ 22 -- 23 -- I'm sorry -- 22.
22     A.  That's correct, on -- on DOJ 22.
23     Q.  In looking at the notes, it
24 appears that there was, on one of the tests
25 there was a pressure problem?

Page 224

1      A.  Yeah, the equipment was losing,
2  losing pressure.
3      Q.  And that test reported a
4  transition time of two hours?
5      A.  Yes, but it's -- it's with the
6  -- with the pressure releasing it -- what
7  happens is the pressure releases and the
8  machine pumps back up. When it does that,
9  it tends to break the gel of the cement.
10 So it was not a -- a good test. That would
11 be a testing fail.
12     Q.  What did you do once you had the
13 results of this test?
14     A.  I sent them to Anthony
15 Badalamenti. I don't -- can't remember
16 whether or not I copied Simon on them, but
17 I know I sent them to Anthony.
18     Q.  Do you know when you sent them?
19     A.  It would be somewhere around
20 this time frame, within, you know, a day or
21 two of this, when the weigh sheet was
22 generated, the lab weigh sheet was
23 generated. Once we obtained results, sent
24 it to him.
25     Q.  I didn't see any e-mail,

Page 225

1  correspondence or facsimiles indicating the
2  transmittal of these results. What would
3  have been your standard practice to send
4  such results?
5      A.  There was no records that I sent
6  this? Is that what you're saying? That
7  there was no -- the records do not indicate
8  that I sent results on this?
9      Q.  None that have been located to
10 date. And I'm just trying to find out what
11 your --
12     A.  Maybe I'm mistaken. Maybe -- I
13 thought it e-mailed it to him. Maybe --
14 maybe I didn't.
15     Q.  Well, that very well could be
16 the case. Would you have also printed a
17 copy of the report and put it in the box
18 with all of the other reports dealing with
19 the Macondo well?
20     A.  Not likely, not likely.
21     Q.  Okay. Aside from the May 28th
22 report we have been discussing and the
23 unreported foam cement test that you
24 conducted at the request of Mr. Faul, were
25 there any other tests that you conducted

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C        Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029  Board-Certified Court Reporters    Facsimile: (504) 525-9109

a5ef3c90-b76f-4c47-b943-8ff01ec896f2

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL           ) MDL NO. 2179
by the OIL RIG             )
"DEEPWATER HORIZON" in     ) SECTION "J"
the GULF OF MEXICO, ON     )
APRIL 20, 2010             ) JUDGE BARBIER
                           )
                           ) MAG. JUDGE
                           ) SHUSHAN

VOLUME 1 OF 2

Deposition of RONALD RAY FAUL, taken at Pan American Life Center, 601 Poydras Street, Ponchartrain Room, New Orleans, Louisiana, on the 29th of June, 2011.

## Page 2

APPEARANCES

APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:

Mr. Thomas Thornhill
THORNHILL LAW FIRM
1308 Ninth Street
Slidell, Louisiana 70458

APPEARING FOR BP, INC.:
Mr. Philip T. Chen
Mr. David Mitchell
KIRKLAND & ELLIS
333 South Hope Street
Los Angeles, California 90071

APPEARING FOR TRANSOCEAN:
Mr. Daniel Goforth
Ms. Kate H. Easterling
GOFORTH GEREN EASTERLING, LLP
4900 Woodway
Suite 750
Houston, Texas 77056

APPEARING FOR ANADARKO PETROLEUM COMPANY:

Ms. Janika D. Polk
Mr. Terrance Prout
KUCHLER POLK
1615 Poydras Street
Suite 1300
New Orleans, Louisiana 70112

APPEARING FOR HALLIBURTON:
Mr. Gavin Hill
Lauren L. Mitchell
GODWIN RONQUILLO
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041

## Page 3

APPEARANCES (Continued)

APPEARING FOR HALLIBURTON:
Mr. Richard W. Beckler
Mr. Jason B. Hutt
BRACEWELL GULIANI
2000 K Street NW, Suite 500
Washington, District of Columbia
20006-1872

Ms. Stacy S. Russell
HALLIBURTON
10200 Bellaire Boulevard
Houston, Texas 77072

APPEARING FOR WEATHERFORD:
Mr. Wayne G. Zeringue, Jr.
JONES, WALKER, WAECHTER, POITEVENT,
CARRERE & DENEGRE, L.L.P.
201 St. Charles Avenue
New Orleans, Louisiana 70170

APPEARING FOR DRIL-QUIP, INC.:
Ms. Margaret Bryant
WARE, JACKSON, LEE & CHAMBERS
America Tower, 42nd Floor
2929 Allen Parkway
Houston, Texas 77019-7101

APPEARING FOR M-I SWACO:
Mr. Paul E. Krieger
MORGAN, LEWIS & BOCKIUS, L.L.P.
1000 Louisiana Street, Suite 4000
Houston, Texas 77002-5006

APPEARING FOR THE UNITED STATES:

Ms. Jessica Sullivan
U.S. DEPARTMENT OF JUSTICE
TORT BRANCH, CIVIL DIVISION
1425 New York Avenue, N.W.
Suite 10100
Washington, D.C. 20005

## Page 4

APPEARANCES (Continued)

APPEARING FOR CAMERON:
Ms. Kathleen A. Gallagher
BECK REDDEN & SECREST
One Houston Center
1221 McKinney Street
Suite 4500
Houston, Texas 77010

APPEARING FOR THE WITNESS:

Mr. John T. Floyd
Mr. Christopher Carlson
JOHN T. FLOYD LAW FIRM
2000 Smith Street
Houston, Texas 77002

ALSO PRESENT:

Ms. Melissa Bardwell, Videographer
Ms. Emily Gebhardt, Thornhill Law Firm

REPORTED BY:
    THERESE J. CASTERLINE, CSR, RMR, CRR
    Certified Shorthand Reporter
    State of Texas
    Certified Shorthand Reporter
    State of Louisiana

**PURSUANT TO CONFIDENTIALITY ORDER**

261

1  this case?
2     A. No. It was a -- it was part of
3  the Bly report, the only reason I saw it.
4     Q. All right. And you told us
5  earlier that you -- you thought it was a
6  real problem that CSI didn't have the
7  samples, right?
8     A. Yes. CSI did not have any of the
9  samples from the job or any of our
10 materials from the job.
11    Q. In fact, we also know they didn't
12 have the software that you used, or at
13 least they had a different version of it,
14 somebody said; is that correct?
15    A. Halliburton has a version of
16 OptiCem that is available to
17 non-Halliburton people. They can buy it
18 through -- through Landmark Corporation,
19 and it does not have all of the same
20 features that the full Halliburton OptiCem
21 has.
22    Q. So if Mr. Sabins' group had
23 difficulty running the software to achieve
24 results with the information input to that
25 software, that would not be unexpected if

262

1  that software was not the same as that
2  which Halliburton uses in its labs; is
3  that correct?
4     A. Yeah, I'm not --
5          MR. CHEN: Objection, form.
6     A. I'm not sure what features would
7  be different.
8     Q. (BY MR. THORNHILL) Have you
9  looked at the off-the-shelf version that
10 Halliburton sells and compared it to what
11 Halliburton uses in its labs?
12    A. I have not.
13    Q. All right.
14    A. And we -- you know, that wouldn't
15 be in the lab as well; it would be the
16 engineering design software.
17    Q. Okay. All right. I gotcha.
18         Now, tell me -- tell me a
19 little bit about what you had Mr. Quirk
20 do. Did you call him on the phone or did
21 you send him an e-mail and say, I want you
22 to do some tests?
23    A. Okay. I called him on the phone
24 and asked him to get lab stock
25 materials --

263

1     Q. Uh-huh.
2     A. -- and repeat the test that was on
3  the final BP Macondo production liner,
4  production casing report, repeat the
5  stability test specifically.
6     Q. Yeah. Yeah. Now -- now, you did
7  that, as I understand it, because somebody
8  in Duncan had told you that they had
9  attempted a duplication of the test, and
10 they found that the cement settled, right?
11    A. Yes.
12    Q. All right. So when you called
13 Mr. Quirk, it was probably within a week
14 or two after the blowout had started,
15 right?
16    A. It would have been in May
17 sometime.
18    Q. In May?
19    A. Yes.
20    Q. The blowout's April 20, so in
21 early May you were calling and saying --
22    A. Probably --
23    Q. -- let's --
24    A. Probably a little later in May.
25    Q. Now --

264

1     A. After the 15th.
2     Q. Okay. You had from Duncan a
3  report that the cement was settling,
4  and -- I got that right, correct, you --
5  that they -- they told you the cement
6  samples that they tested that they thought
7  were samples similar to the Macondo job,
8  they -- they were settling, right?
9     A. Yes. He called me and said that
10 the sample he mixed up was showing some
11 signs of settling.
12    Q. Had you guys sent up to Duncan
13 some of the samples that you had on hand
14 at that time so that they could perform
15 the tests?
16    A. We had sent up lab stock.
17    Q. That'd be some of the same samples
18 you and I just went over in tab 60, right?
19    A. No. Tab 60, I believe, was
20 samples from the Macondo well specific to
21 the Macondo well, and those were isolated.
22 So lab stock would have been samples in
23 the lab that -- that had -- we -- we
24 didn't touch the -- those were under lock
25 and key.

66 (Pages 261 to 264)

**PURSUANT TO CONFIDENTIALITY ORDER**

**Page 265**

1  Q. Okay. Now, when you say lab
2  stock, though, for Duncan to test the
3  cement blends similar to what was used in
4  the Macondo production casing job, you
5  know, the 7-inch job --
6  A. Yes.
7  Q. -- they would have needed to have
8  blended into the cement essentially the
9  same materials that were blended into the
10  cement for the Macondo 7-inch production
11  job?
12  A. We could have sent them samples of
13  Lafarge cement and samples of materials
14  from the lot numbers that we had in the
15  lab, but we didn't send them any of the
16  material from the -- from the rig --
17  Q. Okay.
18  A. -- Macondo.
19  Q. Okay. All right. So you sent
20  them the cement -- the Lafarge cement.
21  Did --
22  A. Yeah.
23  Q. -- you take that out of the bin
24  down in Port Fourchon?
25  A. I don't know where they got it.

**Page 266**

1  It would have been just cement that was in
2  the lab, representative of what was in
3  Port Fourchon.
4  Q. Yeah. So it's fair for me to say,
5  isn't it, that you wouldn't have sent them
6  somebody else's cement, you'd have sent
7  them the cement from -- from that which
8  you sent out to the rig, right, out of
9  that Port Fourchon bin, I guess, huh?
10  A. Out of the Port -- yes, out of
11  Port Fourchon that was current at that
12  time.
13  Q. Sure. Sure. So you get out of
14  the Port Fourchon bin some cement, the
15  Lafarge Class H cement, API rated, all
16  right, and that's the same stuff that was
17  used on the job, the -- the Macondo job,
18  and you get some of the -- the additives
19  that you had in the lab that were the same
20  additives that you used out on the job and
21  you sent it up to Duncan and they tested
22  it?
23  A. Yes.
24  Q. Is Duncan the headquarters?
25  A. Duncan is our technology center.

**Page 267**

1  They have field service labs and -- and
2  they do R&D work there.
3  Q. Yeah. R and --
4  A. Research headquarters -- research
5  and development or -- or technology
6  development.
7  Q. Okay. And that's essentially the
8  headquarters, right?
9  A. No. I -- I would call the
10  headquarters where the corporate office
11  is, and that's not where the corporate
12  office is.
13  Q. Now, the corporate office is in
14  Houston, right?
15  A. Yes.
16  Q. All right. But the -- the main
17  lab is still in Duncan?
18      MR. HILL: Object to form.
19  A. That is one of our technology
20  centers in Duncan. There's another one in
21  Pune, India, but that's -- that's where
22  our R&D lab is at.
23  Q. (BY MR. THORNHILL) Did you send
24  anything to India?
25  A. No.

**Page 268**

1  Q. You just sent it up to Duncan?
2  A. Correct.
3  Q. All right. So they -- they get
4  cement out of the bin and they get the
5  additives out of the -- out of the lab in
6  Broussard and they test it. And then did
7  they send you a written result?
8  A. We did not do a foam stability
9  test. These samples were sent up to do a
10  conductivity test --
11  Q. Uh-huh.
12  A. -- and which I did get a -- a
13  written result on.
14  Q. Uh-huh. Now, BP asked you to do
15  the conductivity test --
16  A. That's --
17  Q. -- correct?
18  A. -- correct.
19  Q. I got that right.
20      Now, tell me, did I get this
21  wrong? Did -- did Duncan's lab write down
22  or print up the results?
23  A. All I got was --
24      MR. HILL: Object to form.
25  Q. (BY MR. THORNHILL) Did it? This

67 (Pages 265 to 268)

**PURSUANT TO CONFIDENTIALITY ORDER**

```
                                           297
 1       A. And just call me back with the
 2   results.
 3       Q. Do you know of any other tests
 4   that Halliburton has conducted with what
 5   we could characterize as the same Class H
 6   cement and the same additives mixed in the
 7   same recipe as was on the Macondo 7-inch
 8   production casing job?
 9       A. I did not order any.
10       Q. Do you know of any others
11   conducted by Halliburton?
12       A. The knowledge I have of that
13   would -- would be in the presence of
14   counsel.
15       Q. Well, I'm not worried about what
16   you might have learned in their presence.
17   I don't want you to tell us what they told
18   to you or you told to them.
19           But did Halliburton tell you
20   of tests that it ran on that particular
21   cement slurry?
22           MR. HILL: I'll instruct the
23   witness not to answer if doing so is going
24   to divulge the content of discussions he
25   had with counsel.
```

```
                                           298
 1           MR. THORNHILL: All right.
 2   Well, it's a good time for us to take a
 3   break because we're about out of tape and
 4   we can talk about it off the record.
 5           THE VIDEOGRAPHER: The time
 6   now is approximately 3:13 p.m. and we're
 7   off the record.
 8           (Recess 3:13-3:26 p.m.)
 9           THE VIDEOGRAPHER: This begins
10   tape 6 of today's deposition of Mr. Ron
11   Faul. The time now is approximately 3:26
12   p.m., and we're back on the record.
13       Q. (BY MR. THORNHILL) Mr. Faul, I
14   think that I've got cleared with your
15   counsel this question, and I'm going to
16   ask again. Forgive me for repeating
17   myself.
18           In this question, I would like
19   to know about any communications of which
20   you're familiar -- about which you're
21   familiar regarding testing by Halliburton.
22   You know, the usual rules: If -- if you
23   talked to your lawyer or your lawyer talks
24   to you, I can't get to that. There's a
25   privilege against that. But if you talked
```

```
                                           299
 1   to somebody at Halliburton about
 2   anything -- doesn't matter who's there --
 3   that's fair game. So that's what I want
 4   to know about.
 5           Did anybody at Halliburton
 6   tell you that there was testing or did you
 7   participate in any testing -- do you know
 8   of any testing of any kind that was
 9   conducted by anybody that would show
10   issues with respect to the stability of
11   the foam cement job on the production
12   casing?
13       A. There were -- to my knowledge,
14   there were no additional tests done in
15   relation to foam stability.
16       Q. Were there any tests regarding
17   anything else regarding the cement on this
18   job?
19       A. Yes. One -- an individual in
20   Halliburton, Anthony Badalamente requested
21   a static gel strength test, again, using
22   lab stock materials, retarders, everything
23   that would have been in the lab. He
24   requested those results -- those --
25   testing. I was not aware of it until --
```

```
                                           300
 1   until I got the results of it. He -- once
 2   he got the results of the test, he sent me
 3   a copy of the lab test.
 4       Q. All right. And do you have those
 5   lab test results on your hard drive?
 6       A. Yes, I do.
 7       Q. And I'm assuming you turned over
 8   those results?
 9       A. They have been turned over, that's
10   correct.
11       Q. Okay. And who performed those
12   tests for him, the gel strength tests?
13       A. The -- the lab in Broussard
14   performed it. The correspondence was with
15   Tim Quirk. So I don't know who actually
16   did perform the test, but --
17       Q. Okay. Other than having received
18   the information on your hard drive, looked
19   at it briefly, and then turned it over to
20   counsel, did you involve yourself with the
21   details of the analysis in the gel
22   strength test?
23       A. No, I didn't.
24       Q. Did you discuss the analysis of
25   the gel strength test with anyone?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

385

you referring to? Because we've seen a collection of -- of lab tests that were being run on two different slurry compositions, one with the different amounts of retarder in it, quite a few tests were being run on that, and they were being run -- I mean, we've got some e-mails in here from Mr. Gagliano from April 15th through April 19th.
   How long does it typically take to run a static gel strength transition time test if, let's say -- let's just hypothetically -- let's say Mr. Gagliano, on April 15th, that that's not one of the tests included, could he have conducted that test on April 15th and would he have had enough time before April 19th to get the results?
   MR. HILL: Object to form.
   A. If he had done it on April 15th, yes.
   Q. (BY MS. SULLIVAN) What's your understanding -- or strike that.
   Do you have any understanding or -- or information about when BP

386

requested the retarder concentration be increased?
   A. No, I don't really -- I don't really know that.
   Q. Do you know -- I think earlier you spoke with Mr. Thornhill about some additional testing that was done after the blowout.
   A. Yes.
   Q. We know that you worked on some foam stability testing and then some contamination testing that you did with the foam and you also -- and also the conductivity and resistivity testing that was done at the Duncan labs. I'm not going to go back into that because he covered those areas pretty well.
   I do want to know about the clean foam stability without the contamination. I know you asked Mr. Quirk to run that test. Correct?
   A. I asked Mr. Quirk to perform a foam stability test with lab stock materials to repeat the test that was given on the final BP report.

387

   Q. And I know you were asked earlier today whether or not you told Mr. Quirk to destroy his -- his notes or any results that he had gotten. You testified that you didn't instruct him to do that at all.
   A. I don't remember instructing him to destroy any -- any work that he had done. I did ask him not to put it in the Viking system because it was not associated with a customer need. It was internal Halliburton information.
   Q. Okay. So you told him not to put it into the Viking system --
   A. That's correct.
   Q. -- which is an -- that's an electronic sort of process, isn't it?
   A. Yes.
   Q. Did you also instruct him not to generate a report in connection with the testing he was conducting?
   A. He gave me all the information that I wanted when -- over the phone call. I didn't tell him to -- to generate a report.
   Q. Okay. But that -- I appreciate

388

that. But my question is, did you specifically tell Mr. Quirk not to generate a report in connection with the foam stability test he was running for you after the blowout?
   A. He would have had to put it in Viking to do that, and I asked him not to put it in Viking.
   Q. And I know today you've talked about -- and just so I understand, you've talked quite a bit about information gathering, that you -- you were -- you were conducting these tests after the fact so you could gather facts and information, and you used some of that information to brief and educate some of the -- the other people at Halliburton about what had happened on Macondo; is that right?
   A. To give information to them so that they could build -- we could build presentations and they could go to Washington and -- and present that information.
   We specifically did not do any investigation. We didn't look into how it

PURSUANT TO CONFIDENTIALITY ORDER

```
                                                    409
 1   results, how did you use that information?
 2       A. I didn't really do anything with
 3   it.
 4       Q. Did anyone ask you for it after --
 5   did -- well, strike that.
 6              Was there anyone at
 7   Halliburton besides yourself aware that
 8   these tests were being conducted?
 9       A. I didn't tell anybody else that I
10   was conducting them. After the test, had
11   I been asked, I would have been glad to
12   provide that information.
13       Q. But did anyone ask you?
14       A. I don't recall anybody asking me
15   that.
16       Q. So you did these -- these tests
17   for -- for yourself; is that my
18   understanding?
19       A. I wanted to have a comfort level
20   that we could repeat that test and the
21   results would be okay.
22       MS. SULLIVAN: Okay. That's
23   all the questions I have for you today.
24   Thank you.
25       THE WITNESS: Thank you.
```

```
                                                    410
 1       THE VIDEOGRAPHER: The time is 5:50. Ron
 2   Faul's deposition, consisting of nine
 3   tapes, is now concluded.
 4       (Deposition concluded at 5:50 p.m.)
```

```
                                                    411
 1            CHANGES AND SIGNATURE
 2   WITNESS NAME: RONALD RAY FAUL
 3   DATE OF DEPOSITION: JUNE 29, 2011
 4   PAGE  LINE  CHANGE     REASON
```

```
                                                    412
 1       I, RONALD RAY FAUL, have read the
 2   foregoing deposition and hereby affix my
 3   signature that same is true and correct,
 4   except as noted on the attached Amendment
 5   Sheet.

 7            RONALD RAY FAUL
 8   THE STATE OF _____ )
 9   COUNTY OF _____ )
10       Before me, _____,
11   on this day personally appeared
12   RONALD RAY FAUL, known to me (or proved to
13   me on the oath of _____ or
14   through _____) to be the person
15   whose name is subscribed to the foregoing
16   instrument and executed the same for the
17   purposes and consideration therein
18   expressed.
19       Given under my hand and seal of office
20   this _____ day of _____,
21   2011.

23       NOTARY PUBLIC IN AND FOR
24       THE STATE OF _____
25       My commission expires: _____
```

103 (Pages 409 to 412)

**PURSUANT TO CONFIDENTIALITY ORDER**