UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates To: All Actions ………………………………………………... | : : : | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |

**BP'S OPPOSITION TO HALLIBURTON'S MOTION TO EXCLUDE EVIDENCE RELATING TO TESTING OF CEMENT BLENDS USING NON-RIG SAMPLES**

Halliburton has moved to exclude from evidence all references to testing of cement blends that did not use samples obtained from the *Deepwater Horizon*. This would include the testing done by two separate laboratories (on behalf of the United States)—Chevron and Offshore Testing & Consulting (OTC)—that found that cement samples provided by Halliburton were unstable. It would also, conveniently for Halliburton, eliminate the post-incident testing that Halliburton itself conducted and intentionally destroyed (which is the subject of a separate motion by BP).

Halliburton's three-page letter brief is, at best, an attempt to make the general argument that, all else being equal, a test performed on a rig sample is a better indication of the qualities of the rig cement than a test performed on a non-rig sample. Nothing in Halliburton's motion, however, establishes that non-rig-sample testing is ***irrelevant*** (or prejudicial or confusing). This is a quintessential question of the weight to be accorded the evidence derived from the various samples. Halliburton's motion thus not only ignores industry practice and its own practice, it also seeks to improperly substitute its judgment of what is relevant over that of the Court.

**ARGUMENT**

I.    **Halliburton offers no legal basis to exclude evidence of non-rig sample testing.**

Halliburton has offered no legal basis for excluding evidence on testing of non-rig samples. Instead Halliburton cites three irrelevant cases. Of these, *Steffy* is the only case that discusses any sort of "sample testing," and its facts are clearly distinguishable.[1] In *Steffy*, the plaintiffs sued Home Depot and a supplier for selling defective plywood which the plaintiffs used in their building. 2009 WL 4279878 at *1. The supplier tested plywood that was not used in the building and tried to offer the results as evidence. *Id.* at *11. The plaintiffs moved to exclude the test results because it was unclear who had manufactured the tested plywood and if the testing method had been consistent. *Id.* The court excluded the tests: "[G]iven the complete lack of evidence in the record about these manufacturers or their procedures and methods, the Court cannot find the product they produce is fungible." *Id.* Unlike the materials tested in *Steffy*, the non-rig samples used here can be traced to a single, well-known source: Halliburton. Further, no one disputes that the third-party testing was well-documented. Halliburton is free to argue that the lab-stock tests failed in some way to capture or account for the downhole conditions at the Macondo Well. (Indeed, the same could be said about testing of a sample obtained from the rig itself.) No testing, regardless of the source of the sample, is exempt from analysis, but this is precisely the type of issue that can and should be vetted through testimony, not swept under the rug under the misguided view that only a select set of tests can possibly provide useful information.[2]

---

[1] *Knox v. City of Monroe*, CIV. A. 07-606, 2009 WL 936965 (W.D. La. Apr. 6, 2009) (employment discrimination); *Araujo v. Treasure Chest Casino*, CIV A. 97-3043, 1999 WL 219771 (E.D. La. Apr. 14, 1999) (Jones Act); *Steffy v. Home Depot, Inc.*, 1:06-CV-02227, 2009 WL 4279878 (M.D. Pa. June 15, 2009). *Knox* and *Araujo* are cited only for the obvious notion that a court may exclude irrelevant and unduly prejudicial evidence.

[2] Courts have admitted similar cement testing in other case. *See, e.g.*, *A. J. Toups Co. v. Dixie Bldg. Material Co.*, 250 So. 2d 111, 112 (La. Ct. App. 1971), *writ refused,* 259 La. 803, 253 So. 2d 65 (1971) (admitting test conducted

In order for Halliburton to prevail, it must show that the facts associated with this testing have no tendency to make any fact "more or less probable than it would be without the evidence" or have no "consequence in determining the action." Fed. R. Evid. 401. To the extent Halliburton seeks to exclude this evidence under Rule 403, Halliburton must demonstrate that its probative value "is *substantially* outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added). Halliburton cannot meet either standard.

## II.     Non-Rig Sample Testing Is Relevant to BP's Claims Against Halliburton.

The claims of BP and other parties against Halliburton allege the foam cement that Halliburton designed and pumped in the Macondo Well failed to isolate the hydrocarbon zone. Thus, the "fact" of whether the foam cement was stable is of great consequence in this action, and any evidence that tends to make this fact more or less probable is relevant. By seeking to exclude testing not performed on rig samples, Halliburton would have this Court disregard its own post-incident testing *and* 33 tests conducted by independent labs on behalf of the government that *all* show the design was unstable.[3] These include:

- Halliburton's two post-incident foam stability tests conducted in late April or early May at the Duncan laboratory by Rickey Morgan at the direction of Ronnie Faul, a Halliburton internal expert, that showed the Macondo Well slurry design would not foam unless it was artificially conditioned at 135°F for three hours;

---

on seven day-old cement as evidence that the cement did not reach its specified 28-day strength); *Diamond Surface, Inc. v. State Cement Plant Comm'n*, 1998 SD 97, 583 N.W.2d 155, 159 (affirming trial court's decision to receive "evidence of several concrete tests conducted before, during, and after the project was completed" including testing "performed two years before the cement at issue was produced"). Of course, it is routine in a wide variety of cases for parties and their experts to perform reconstructions and tests using similar, but not identical, materials to those manufactured by a defendant. Such efforts are always subject to scrutiny for inaccuracies, but they are not automatically excluded (as Halliburton advocates here) because of the mere *potential* for error.

[3] This number excludes the foam stability tests on contaminated slurries that were not listed and the hundreds of CSI tests on simulated slurry.

- Halliburton's post-incident foam stability test conducted shortly thereafter at the Broussard laboratory by Tim Quirk that showed the Macondo Well slurry design performed similar to pre-incident testing based on his recollection;[4]

- CSI's numerous foam stability tests conducted in the summer of 2010 on a simulated slurry design (using generic versions of the Halliburton additives), which indicated that a slurry without defoamer or dispersants could be foamed, but cannot be foamed once those adverse additives are included;

- Chevron's 16 foam stability tests under varying conditions, performed at the request of the Presidential Commission and completed in October 2010, all of which indicated that the Macondo Well slurry design was unstable (two slurries that would not foam, seven failed unset-foam stability tests, and seven failed set-foam stability tests.); and,

- OTC's 17 foam stability tests completed in July 2011 under varying conditions, all of which indicated that the Macondo Well slurry design was unstable one slurry that would not foam, eight failed unset-foam stability tests, and eight failed set-foam stability tests.).

Halliburton would have the Court ignore these 35-plus foam stability tests indicating instability[5] and restrict the evidence to only six tests—two conducted by Halliburton in February 2010, two conducted by Halliburton in April 2010, and two conducted by OTC in July 2011. These are the only tests performed on rig samples. Even among these six tests, Halliburton argues that *all but one* should be ignored: (1) Halliburton claims that the two February tests should be disregarded because they were pilot tests;[6] (2) Halliburton claims the first April 2010 test (which its own witnesses testified showed instability) should carry no weight because of an

---

[4] The post-incident testing at the Duncan and Lafayette laboratories is described in BP's Memorandum in Support of Motion for Spoliation Sanctions (Rec. Doc. 4799) and related briefing. Halliburton's motion *in limine* attempts to moot that fully-briefed pending motion without even notifying the Court.

[5] This number excludes the foam stability tests on contaminated slurries that were not listed and the hundreds of CSI tests on simulated slurry.

[6] Lewis rebuttal Report at 23 ("The results of the pilot tests could not have established anything definitive with respect to the foamed cement that was ultimately pumped at Macondo.").

4

alleged weighing error,[7] and (3) Halliburton claims that the two OTC test results on rig sample (which showed instability) likewise carry little weight because the cement sample was aged.[8] Thus, Halliburton would have the Court consider *only a single foam stability test* (of Halliburton's choosing) to determine whether the Halliburton cement used at the Macondo Well was stable.

Contrary to Halliburton's assertion, evidence obtained from the testing of non-rig samples is probative of the inquiry into the cement pumped at the Macondo Well. The fact that there could be potential differences between lab-stock testing and rig-sample testing goes, at most, to the weight to be given each result based on the characteristics of the test. Indeed, experts sponsored by both Halliburton and the United States have testified to the similarity of the cement and additives used in these tests and those used on the rig. As both Dr. Lewis and Mr. Benge recognized, the Lafarge Class H cement used at the Macondo Well is the only API-monogrammed cement sold in North America, and is the most consistent cement available. Benge Dep. at 274: 11-14; Lewis Dep. at 89:13-24. Dr. Lewis also admitted that the other Halliburton additives used in the Macondo Well slurry exhibit only 1-2% variation from batch to batch. Lewis Dep. at 219:14-220:4.

That Halliburton's motion is clearly contradicted by its own practice, and industry practice, is further demonstrated by the three categories of relevant tests its motion seeks to exclude: (a) Halliburton's post-incident testing; (b) Chevron's and OTC's post-incident testing; and (c) CSI's testing.

---

[7] With regard to this testing, Dr. Sam Lewis, Halliburton's cement testing expert, argued, "I have reviewed Halliburton's lab weigh-up sheets related to the design. [T]he additives' mass was weighed incorrectly, and the resulting slurry had much less cement than designed. This test has no probative value." Lewis Rebuttal Rpt. at 26.

[8] Lewis rebuttal Report at 8 ("the OTC tests of actual albeit aged samples").

### A.   Both Halliburton's Own Practice and Industry Practices Establish the Relevance of Non-Rig Cement Sample Testing.

It is undisputed that Halliburton routinely conducts and relies upon testing using laboratory stock (*i.e.*, non-rig cement) to assess the quality of its cement blends. *See* Ex. 5569 (Tim Quirk email to Richard Vargo: "Roughly 75% of all Shelf jobs are pilot tested. The remaining 25% are both Pilot and Blend Tested. In Deepwater, approximately 90% of all tests are with Location Blend samples."). In fact, Halliburton's Dr. Lewis admitted that he uses the results of testing on non-rig samples to inform desk engineers—like Halliburton's Jesse Gagliano—about how he believes various additives and formulations will perform in the field. Lewis Dep. at 403:10-404:14. Halliburton's reliance on lab-stock testing is also consistent with industry practices. As OTC's Greg Garrison testified, lab stock testing "will give you some indication of how [a rig sample is] going to perform." Garrison Dep. at 17:18-20.

### B.   Post-Incident Testing of Non-Rig Cement Samples by Halliburton is Relevant.

Additionally, Halliburton itself used laboratory stock to perform relevant *post*-incident testing. Dr. Sam Lewis, Technical Professional Team Leader of the Research & Development group (and a Halliburton cementing expert in this case), testified that Ronnie Faul and Tim Quirk are internal Halliburton cement testing experts. Lewis Dep. at 211:8-16. As further described in BP's briefing in support of its motion for spoliation (Rec. Doc. 4799, 5061, 5126), Mr. Faul, Mr. Quirk, and others at Halliburton performed non-rig-sample testing *after* the incident to gain comfort that the *pre*-incident testing with rig samples was properly performed. Quirk Dep. at 98:14-100:4; R. Faul Dep. at 262:23-264:16 and 409:16-21 ("I wanted to have a comfort level that we could repeat that test and the results would be okay."). Mr. Faul also testified that based on the post-incident testing on non-rig samples, he "was satisfied that [the slurry design] was

6

stable," Faul Dep. at 408:2-20, further indicating that Halliburton's own internal experts consider lab-stock testing relevant to assessing the stability of the cement used at the Macondo Well.

It is disingenuous for Halliburton to now seek to exclude these tests solely because they were conducted with lab-stock material rather than rig samples. If the use of lab-stock materials rendered the test irrelevant, then there was no reason for Mr. Quirk and Mr. Faul to conduct the tests in the first place. Obviously, they believed that using lab stock would yield useful information. Indeed, Halliburton's own expert, Dr. Lewis, denied that these post-incident tests "made no sense" and stated that Mr. Faul and Mr. Quirk "certainly seemed to feel that there was some value" in performing them. Lewis Dep. at 217:2-218:1. Halliburton has no credible argument that these tests were not probative of the cement on the *Deepwater Horizon*. Its internal experts conducted these very tests to investigate the cause of the incident.

### C. Post-Incident Testing of Non-Rig Cement by Chevron and OTC is Relevant.

For the same reasons that Halliburton's own testing on non-rig cement blends is relevant to evaluating Halliburton's care in designing the cement slurry, the Chevron and OTC testing on lab stock provided by Halliburton[9] (all of which also showed the cement slurry was unstable) is also relevant. Halliburton's motion would also exclude testing by the BP Incident Investigation Team, which further demonstrated what the industry and Halliburton's own technical papers also said to be true: that the use of a "defoaming" agent and dispersing agent in a foamed cement are detrimental to stability.[10]

---

[9] Halliburton provided materials that were "representative" of the materials used on the Macondo Well. Gardner Dep. at 227:20-228:7 (Chevron); Garrison Dep. at 15:16-20 (OTC).

[10] This testing proved the validity of what Halliburton's own internal design manuals said: "Avoid using dispersants or defoamers additive [with foam cement.]" Dep. Ex. 4348 (Halliburton Cementing Technology Manual) at HAL-1124547; Dep. Ex. 745 (Halliburton Foam Cementing Operations Manual) at HAL-0046649 ("In general, defoamers and dispersants tend to destabilize foam cement. . ."); Dep. Ex. 4347 (Halliburton Global Laboratory Best Practices) at HAL-0677645 ("Avoid dispersing additives that are known to be detrimental to foam stability").

7

Halliburton provided cement and additives to Chevron and OTC for their third-party tests. Gardner Dep. at 224:13-16 (Chevron); Garrison Dep. at 177:20-25 (OTC). The materials Halliburton provided were "representative" of those used on the Macondo Well. Gardner Dep. at 227:20-228:7 (Chevron); Garrison Dep. at 15:16-20 (OTC). Additionally, the Chevron and OTC tests results are comparable to Halliburton's pre-incident testing on rig samples, further indicating that the lab-stock materials tested by Chevron and OTC are probative of materials onboard the *Deepwater Horizon*.[11] Lab-stock testing is particularly relevant where, as here, the lab-stock test results are reasonably comparable to test results from rig sample. Craig Gardner, Team Lead for Chevron's Cement Team, testified that he would expect the Macondo rig cement to have performed similarly to the lab stock he tested, given that his test results were in reasonable agreement with Halliburton's pre-incident testing on rig sample. Gardner Dep. at 248:25-249:22. Even Halliburton's expert, Dr. Samuel Lewis, admitted that two test samples are more similar if they share similar thickening time, UCA comprehensive strength, and rheology test results. Lewis Dep. at 203:9-205:13.

### D. CSI's Testing Is Relevant to Illustrate General Cementing Principles.

Halliburton's motion would also exclude CSI's testing, which merely confirms what the industry and Halliburton papers say about forming stable foam and how additives affect stability: (1) a stable foam can be generated at 60% quality if defoamer and dispersants are not used; and (2) the ability to generate and maintain a stable foam decreases as defoaming and dispersing additives are added. Although CSI did not use samples from the Macondo Well, its tests are not

---

[11] In support of its motion, Halliburton cites to the testimony of Dr. Garrison, OTC's principal, that the oil and gas industry routinely samples cement from rigs. Halliburton cites portions of Dr. Garrison's testimony where he suggested that the unset foam stability test conducted on the rig sample may indicate that the slurry is stable under the API. But Halliburton conveniently left out Dr. Garrison's testimony that the rig sample failed the set foam stability test. Garrison Dep. at 114:9-17 And, Dr. Garrison later clarified that the unset foam stability test result indicated that the foam was unstable. *Id*. At 269:9-270:21 (slurry was unstable even if it did not meet API criteria).

8

being offered to show what happened at the Macondo Well, but to illustrate these general slurry design principles. Even if there was some basis on which to bar the other testing—which there is not—Halliburton makes no argument that would justify excluding the CSI testing, which does not attempt to replicate the conditions at the Macondo Well, but rather serves as an illustration of general cementing principles.

## CONCLUSION

Halliburton's motion seeks the best of both worlds: support from a single rig sample test result that it claims indicates stability and exclusion of the vast array of other results indicating instability. This is driven by litigation strategy, not any infirmity in the evidence derived from non-rig cement samples. It is Halliburton's hope that this Court will ignore the vast majority of evidence telling the story that Halliburton designed an unstable slurry, that Halliburton knew its slurry was unstable when pumped down the Macondo Well, and that every independent lab that has tested the slurry design post incident has concluded that the cement slurry was unstable. Halliburton's motion should be denied.

Dated: January 17, 2012                    Respectfully submitted,

/s / Don K. Haycraft

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.

9

(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Timothy A. Duffy, P.C.
(tim.duffy@kirkland.com)
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
(mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Exploration & Production Inc. & BP America Production Company*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 17th day of January, 2012.

/s/  Don K. Haycraft__