1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
2

3

   IN RE:  OIL SPILL      MDL NO. 2179
4  BY THE OIL RIG
   "DEEPWATER HORIZON"   SECTION:  J
5  IN THE GULF OF
   MEXICO, ON APRIL      JUDGE BARBIER
6  20, 2010             MAG. JUDGE SHUSHAN

7

8

9



15                    **VOLUME II**

16        Deposition of **PAUL J. JOHNSON,** taken
   in the Pan American Life Center, Bayou
17 Room, 11th Floor, 601 Poydras Street, New
   Orleans, Louisiana 70130, on Tuesday, March
18 29, 2011.

19

   **APPEARANCES:**

20

21        LEGER & SHAW
          (By:  Walter J. Leger, Jr., Esquire
22             and Christine L. DeSue,
               Esquire)
23        600 Carondelet Street
          9th Floor
24        New Orleans, Louisiana  70130
               (Attorneys for PSC)
25

1    **APPEARANCES (continued):**

2

3              COTCHETT, PITRE & MCCARTHY
               (By:  Bryan M. Payne, Esquire)
4              San Francisco Airport Office Center
               840 Malcolm Road
5              Suite 200
               Burlingame, California 94010
6                  (Attorneys for MDL 2185
                    Securities plaintiffs subclass)
7

8

9              WILLIAMS LAW GROUP, LLC
               (By:  Conrad S.P. (Duke) Williams,
10                  III, Esquire)
               909 Poydras Street
11             Suite 1650
               New Orleans, Louisiana  70112
12                 (Attorneys for MDL plaintiffs)

13

14             BINGHAM MCCUTCHEN
15             (By:  Devin M. McDonell, Esquire
                    and Warren E. George, Esquire)
16             Three Embarcadero Center
               San Francisco, California 94111-4067
17                 (Attorneys for Anadarko
                    Petroleum and MOEX Offshore
18                  2007, LLC)

19

20             SUTHERLAND ASBILL & BRENNAN, LLP
21             (By:  Daniel Johnson, Esquire)
               First City Tower
22             1001 Fannin, Suite 3700
               Houston, Texas  77002-6760
23                 (Attorneys for Transocean)

24

25

422

1    __APPEARANCES (continued):__

2

3           PREIS & ROY
            (By:  M. Benjamin Alexander,
4                 Esquire)
            Versailles Centre
5           102 Versailles Boulevard
            Suite 400
6           Lafayette, Louisiana 70501
                 (Attorneys for Transocean)
7

8
            BECK, REDDEN & SECREST, L.L.P.
9           (By:  Patrice B. Childress, Esquire
                  and Geoff Gannaway, Esquire)
10          One Houston Center
            1221 McKinney Street
11          Suite 4500
            Houston, Texas  77010-2010
12               (Attorneys for Cameron
                  International Corporation)
13

14

15          HENRY DART, ATTORNEYS AT LAW
            (By:  Henry T. Dart, Esquire)
16          510 North Jefferson Street
            Covington, Louisiana  70433
17               (Special counsel for the
                  Louisiana Attorney General
18                representing the State of
                  Louisiana)
19

20
            OFFICE OF THE ATTORNEY GENERAL
21          STATE OF ALABAMA
            (By:  Winfield J. Sinclair, Esquire)
22          501 Washington Avenue
            P.O. Box 300152
23          Montgomery, Alabama  36130-0152
                 (Assistant Attorney General for
24                the State of Alabama)

25

1    **<u>APPEARANCES (continued):</u>**

2

3          GODWIN RONQUILLO
           (By:  Bruce W. Bowman, Jr., Esquire
4               and Israel R. Silvas, Esquire)
           1201 Elm Street
5          Suite 1700
           Dallas, Texas  75270-2041
6              (Attorneys for Halliburton)

7

8

           KIRKLAND & ELLIS LLP
9          (By:  Paul D. Collier, Esquire and
                Emily Dempsey, Esquire)
10         300 North LaSalle Street
           Chicago, Illinois  60654
11             (Attorneys for BP)

12

13

           JONES, WALKER, WAECHTER, POITEVENT,
14         CARRÈRE & DENÈGRE L.L.P.
           (By:  Michael A. Chernekoff,
15              Esquire)
           JPMorgan Chase Tower
16         Suite 6601, 600 Travis
           Houston, Texas  77002
17             (Attorneys for Weatherford)

18

19

20

21

22

23

24

25

424

1    **THE VIDEOGRAPHER:**

2

3            Mark Ancalade

4

5

6

7

8

9

10

11

12

13

14

15

16

17   **REPORTED BY**:

18

19            **JOSEPH R. KAISER, JR., CCR, RPR**
              Certified Court Reporter
20            State of Louisiana

21

22            *        *        *        *        *

23

24

25

**GAUDET KAISER, L.L.C.**
Board-Certified Court Reporters

1                    <u>**EXAMINATION INDEX**</u>

2

3                                              <u>Page No.</u>

4

5     By Mr. Bowman                            431

6

7

8     By Mr. George                            517

9

10

11    By Mr. Johnson                           545

12

13

14    By Mr. Leger                             571

15

16

17

18

19

20

21            *       *       *       *       *

22

23

24

25

426

**EXHIBITS**

**No.**                                                              **Page**

Exhibit 676                                                          486

Exhibit 677                                                          521

Exhibit 678                                                          521

Exhibit 679                                                          525

Exhibit 680                                                          525

Exhibit 681                                                          528

Exhibit 682                                                          538

Exhibit 683                                                          541

Exhibit 684                                                          541

Exhibit 685                                                          543

Exhibit 686                                                          553

Exhibit 687                                                          573

                    *        *        *        *        *

1    **EXHIBITS (Continued):**

2                                                              **Page**

3    **No.**

4

5    Exhibit 688                                              578

6
     Exhibit 689                                              579
7

8

9

10

11

12

13

14

15

16              *        *        *        *        *

17

18

19

20

21

22

23

24

25

1                **DESCRIPTIVE EXHIBIT INDEX**

2

3     **Exhibit 676** - file note

4
      **Exhibit 677** - e-mail dated 4/6/2010
5

6     **Exhibit 678** - e-mail chain

7
      **Exhibit 679** - e-mail chain
8

9     **Exhibit 680** - e-mail dated 4/15/2010

10
      **Exhibit 681** - e-mail chain
11

12    **Exhibit 682** - e-mail dated 2/18/2010

13
      **Exhibit 683** - e-mail dated 3/17/2010
14

15    **Exhibit 684** - e-mail chain

16
      **Exhibit 685** - e-mail chain
17

18    **Exhibit 686** - e-mail with attachment

19

20
                    *     *     *     *     *
21

22

23

24

25

1    **<u>DESCRIPTIVE</u> <u>EXHIBIT</u> <u>INDEX</u> (Continued):**

2

3    **Exhibit 687** - Transocean personnel on board
     list

4

5    **Exhibit 688** - Transocean operation event
     report

6

7    **Exhibit 689** - e-mail with attachment

8

9

10

11

12

13                    *      *      *      *      *

14

15

16

17

18

19

20

21

22

23

24

25

1        **S T I P U L A T I O N**

2

3           It is stipulated and agreed by and

4     between counsel for the parties hereto that

5     the deposition of the aforementioned

6     witness is hereby being taken for all

7     purposes allowed under Article 1421, *et*

8     *seq*., of the Louisiana Code of Civil

9     Procedure, in accordance with law, pursuant

10    to notice;

11           That the formalities of reading and

12    signing are specifically not waived;

13           That the formalities of filing,

14    sealing, and certification are specifically

15    waived;

16           That all objections, save those as

17    to the form of the question and the

18    responsiveness of the answer, are hereby

19    reserved until such time as this

20    deposition, or any part thereof, may be

21    used or sought to be used in evidence.

22           **JOSEPH R. KAISER, JR., CCR, RPR**

23    Certified Court Reporter in and for

24    the State of Louisiana, officiated in

25    administering the oath to the witness.

1                    P R O C E E D I N G S

2          THE VIDEOGRAPHER:

3               This is the continuation of the

4     videotape deposition of Paul Johnson,

5     today's date is March 29, 2011.  We're back

6     on the record at 8:29.  This is the

7     beginning of Day 2, Tape 1.

8               **PAUL J. JOHNSON**,

9     after having been previously duly sworn by

10    the above-mentioned Certified Court

11    Reporter, was examined and testified as

12    follows:

13    EXAMINATION BY MR. BOWMAN:

14         Q.    Mr. Johnson, how are you doing

15    today?

16         A.    Fine.  Thank you.

17         Q.    My name's Bruce Bowman, we

18    haven't met before, I don't believe, and I

19    represent Halliburton.  Okay?

20         A.    Okay.

21         Q.    And I think you understand the

22    process a little bit, I'm going to ask a

23    bunch of questions trying to find out what

24    you know about certain things and some

25    facts.  Okay?

```
 1              A.     Yes, sir.
 2              Q.     Let me ask you something before
 3     we really kind of start rolling.
 4                     Did BP tell you or anyone at TO
 5     where the pay zones were?  Do you know what
 6     I'm talking about?
 7              A.     Yes.
 8              Q.     Did they?
 9              A.     Yes, they did.
10              Q.     The reason I'm asking is the Bly
11     report, it seems like there was an extra
12     pay zone that they found out about in June
13     after the well blew out.  Have you seen
14     that?
15              A.     No, I have not.
16              Q.     Okay.  Well, who told you where
17     the pay zones were?
18              A.     Well, they didn't know exactly
19     where they are, that's the point of the
20     drilling.  We were looking for the pay
21     zones.  We had an idea where they would be,
22     roughly.
23              Q.     And how did you get that idea?
24              A.     From the well plan.
25              Q.     From the well plan from BP?
```

1       A.      Yes, sir.

2       Q.      Okay.  And so BP showed you,

3  generally, the depth of the pay zone?

4       A.      Correct.

5       Q.      Okay.  Did you have anything to

6  do with the logging, did you try to read

7  any of the logging about where the zones

8  were?

9       A.      No, I didn't.

10      Q.      Was that, as far as you're

11  concerned, totally BP?

12      A.      Yeah, I wouldn't know how to

13  interpret them.

14      Q.      I understand.  That's the thing

15  I'm trying to find out.  I assume that was

16  the case but until I ask the questions to

17  find out, I really don't know.

18      A.      Okay.

19      Q.      Now, then, let me ask you this:

20  Do you have any opinions, have you gotten

21  any opinions about any of the cement that

22  was actually done on the HORIZON well?

23      A.      Prior to the incident, or after?

24      Q.      Prior or after the incident.  I

25  mean, are you a cement person?

1      A.      No, I'm not.

2      Q.      And so prior to the incident did

3   you have anything to do with actually the

4   cement?

5      A.      No, I did not.

6      Q.      After the incident have you

7   tried to learn any facts one way or the

8   other about the cementing?

9      A.      Only what I've read in the press

10  and from the depositions.

11     Q.      Only what you read and you

12  have -- correct me if I'm wrong -- but from

13  what you read, you haven't tried to

14  determine whether what you've read is true

15  our false or right or wrong?

16     A.      I think there's still a lot more

17  information to come so I'm not ready to

18  form an opinion yet.

19     Q.      That's what I'm trying to find

20  out.  Ultimately there's going to be a

21  trial here and so I'm trying to find out

22  what you know right now.  So if it comes to

23  trial and you come up with something

24  different, that's what I'm trying to find

25  out.  Okay?

435

1      A.      Yes.  I understand.

2      Q.      Now, then, and from the mud

3    logging -- well, let me ask you this:  Have

4    you talked to anyone from Halliburton after

5    the incident?

6      A.      I haven't spoken to Halliburton

7    but just to be clear, I have sent two

8    e-mails to Halliburton, I believe, after

9    the incident.  It was in regard to the

10   specification of the cement units, nothing

11   to do with cementing.

12     Q.      That's fine.  And so you haven't

13   talked to anyone from Halliburton about the

14   incident at all?

15     A.      No.

16     Q.      Okay.  And by Halliburton, I'm

17   including Sperry.  You understand that?

18     A.      Yes, I know that.

19     Q.      Now, prior to the incident, say,

20   within a month or two before, have you

21   talked to anyone from Halliburton?

22     A.      No.  Just general cursory

23   conversations with Jesse in the morning

24   call, hello, how are you and that's it.

25     Q.      Besides Jesse Gagliano, have you

1    spoken with anyone else from Halliburton,

2    say, in the couple of months before the

3    incident?

4          A.    I don't recall, no.

5          Q.    Now, very good.  Now, then, the

6    OIM reported to you; correct?

7          A.    That's correct.

8          Q.    Okay.  And various people

9    reported to him?

10         A.    Yes.

11         Q.    Now, we're going to talk a

12    little bit about well control, all right.

13    I guarantee you, you know a whole lot more

14    about it than I do.

15         A.    Okay.

16         Q.    Because you do have experience

17    in well control?

18         A.    That's correct.  Right.

19         Q.    Now, from a simplistic

20    standpoint, do you try to keep it heavier

21    on top than it is underneath?

22         A.    That's a basic understanding,

23    yes.

24         Q.    And who tries to do that?  What

25    office?  Is it the driller?

```
 1          MR. JOHNSON:
 2               Object to the form.
 3          THE WITNESS:
 4               That's kind of an ambiguous
 5     question.
 6     EXAMINATION BY MR. BOWMAN:
 7          Q.   Okay.  Who's responsible for
 8     maintaining well control?
 9          MR. JOHNSON:
10               Object to the form.
11          THE WITNESS:
12               All parties are involved with
13     the drilling operation are responsible for
14     maintaining well control.  And the driller
15     has responsibilities, as does the
16     toolpusher, as does the BP company rep, as
17     does the mud loggers.  You know, everybody
18     involved in the drilling operation has well
19     control responsibilities.
20     EXAMINATION BY MR. BOWMAN:
21          Q.   Okay.  Well, if you see
22     something that's questionable, who has the
23     power to do something?
24          A.   All them people together.
25          Q.   Well, okay.  Maybe you are
```

438

1    telling me -- you're not telling the mud

2    loggers go out and activate the BOP?

3         MR. JOHNSON:

4              Objection to form.

5         THE WITNESS:

6              No, he cannot go out and

7    activate the BOP.  However, if he sees

8    something on the screen that indicates

9    there's a problem, his responsibility is to

10   inform the relevant people.

11   EXAMINATION BY MR. BOWMAN:

12        Q.    Correct.  Make sure I understand

13   that if the mud logger sees something on

14   his screen, his responsibility is to call

15   the relevant people and the relevant people

16   are someone on the rig floor?

17        A.    That would be the rig floor and

18   the company rep, yes, sir.

19        Q.    And then the rig floor and the

20   company rep would have some sort of time of

21   response?

22        MR. JOHNSON:

23              Object to the form.

24        THE WITNESS:

25              It would depend what that

1    information was given, you know.  It could

2    be, he's seen something very clear that

3    needs immediate action, it could be

4    something that's an indication so they

5    observe it.  There's a lot of responses to

6    that information.

7    EXAMINATION BY MR. BOWMAN:

8         Q.    And so actually who's the mud

9    logger originally called, the driller?

10        A.    He was called the driller.

11        Q.    And then the driller would

12   listen and look and see what he saw?

13        A.    That's correct.

14        Q.    And what does the driller

15   actually look at on his screen?

16        A.    He could look at all the

17   parameters, you know.  I mean, any number

18   of different things.

19        Q.    Okay.  And here's what I'm

20   getting at:  I've been in some depositions,

21   I've heard some testimony at the Coast

22   Guard about the Sperry data and something

23   called HiTech?

24        A.    Yeah.

25        Q.    And the Sperry data is different

1    from HiTech data; is that right?

2         A.    I'm not sure I understand what

3    you mean by different.  It can record

4    different things.

5         Q.    Okay.  Well, let's talk about,

6    HiTech is what Transocean uses?

7         A.    Yes.

8         Q.    Okay.  Describe that as best you

9    can.

10        A.    It's the same, it's an

11   electronic monitoring system that can -- it

12   will give you a readout of what you have

13   and for whatever parameter, you know.  All

14   the parameters that are involved in

15   drilling.

16        Q.    And so when the driller is

17   working on a screen from his cyber chair,

18   which we heard about yesterday, is he

19   looking at the HiTech data, the Sperry

20   data, or both?

21        MR. JOHNSON:

22             Objection.  Form.

23        THE WITNESS:

24             To be honest, I think you have

25   to ask that of the driller and toolpushers.

1    I couldn't comment on what they were

2    looking at.

3    EXAMINATION BY MR. BOWMAN:

4         Q.     Okay.   Is there anything as a

5    ultimate supervisor you would expect them

6    to be looking at?

7         MR. JOHNSON:

8              Object to the form of the

9    question.

10        THE WITNESS:

11             I can only comment what I would

12   do, I can't comment on what they would do.

13   EXAMINATION BY MR. BOWMAN:

14        Q.     What would you do?

15        A.     I would be looking at both.

16        Q.     And so then based on what they

17   see they would take some type of responsive

18   action or not?

19        MR. JOHNSON:

20             Object to the form of the

21   question.

22        THE WITNESS:

23             Depending on what they saw,

24   what -- directs what action they took.

25   EXAMINATION BY MR. BOWMAN:

1       Q.      Sure.  Okay.  Now, let me ask

2    you this:  Have you read the key counsel

3    report?

4       A.      No, I have not.

5       Q.      You have not at all?

6       A.      Let me be clear.  There was two

7    reports.

8       Q.      Right.

9       A.      And I can't remember the names

10   of which ones, I read sections of the first

11   one that came out, the presidential report.

12      Q.      Okay.  Have you gone back and

13   tried to ascertain when, from your

14   standpoint looking at data, you would have

15   thought that you would have first seen an

16   indication of a kick?

17      A.      I have looked at the Sperry-Sun

18   log that everyone's seen.

19      Q.      Sure.

20      A.      And the problem I have is that

21   it only gives me half a picture so, you

22   know, although I look at something with the

23   question of there, there's points in that

24   screen shot that would -- I would be asking

25   questions.

1            But, you know, I have no idea
2   what they were doing.  It could be simple
3   explanation, it could be no explanation.  I
4   don't know.  You know, I only got half a
5   picture on that.
6       Q.    When you say half a picture,
7   what's the other half you're missing?
8       A.    Being on the rig floor, knowing
9   what's taking place, knowing how things are
10  lined up, what they were doing at the time.
11  I don't have any of that information.
12      Q.    Are you saying that when you
13  looked at the data, you can see what it
14  shows but you also need to know what's
15  actually going on on the rig to be able to
16  interpret it correctly?
17      A.    Correct.
18      Q.    Now, did, from looking at the
19  data did it seem like at some point in
20  time, no matter what was going on on the
21  rig floor, you had a question about whether
22  there may have been a kick going on?
23      MR. JOHNSON:
24            Object to the form of the
25  question.

144

```
 1            THE WITNESS:
 2                 Looking at the data, there's
 3     points on there that raise me to ask
 4     questions, what's going on here.  But to
 5     say it was a kick, no, I can't say that.
 6     It's just a part from that sheet that would
 7     say, this doesn't seem right to me, I'd
 8     have to understand what was going on at
 9     these certain points so, you know, it's
10     nothing to tell me it was a kick, nothing
11     to say it was.  I don't know.
12     EXAMINATION BY MR. BOWMAN:
13          Q.    It was an anomaly?
14          MR. JOHNSON:
15                 Object to the form of the
16     question.
17          THE WITNESS:
18                 It was something that raised me
19     to ask more questions.
20     EXAMINATION BY MR. BOWMAN:
21          Q.    And had you been on the rig
22     floor as the company man, what would you
23     have been doing?
24          MR. JOHNSON:
25                 Object to the form of the
```

1    question.

2         THE WITNESS:

3              I don't know because I don't

4    know what they normally asked.  It could be

5    very easily explained and it wasn't an

6    issue, so it could have been an issue.  I

7    don't know.

8    EXAMINATION BY MR. BOWMAN:

9         Q.    Do you remember what times it

10   was that you saw on this data that you

11   thought there was a question?

12        MR. JOHNSON:

13             Object to the form of the

14   question.

15        THE WITNESS:

16             No.  I don't recall what time.

17   EXAMINATION BY MR. BOWMAN:

18        Q.    Let me ask you, I can show you

19   part of this report here, but there's an

20   indication that by at least no later than

21   9:30 the rig crew was actually doing

22   something to shut down the pumps.  You

23   understand that?

24        MR. JOHNSON:

25             Object to the form.

1          THE WITNESS:

2                I need to look at the chart.

3     EXAMINATION BY MR. BOWMAN:

4          Q.      Well, assume with me for a

5     moment that the pumps were shut down around

6     9:30, maybe 9:31.  On the 20th.  Would that

7     be an indication to you that the rig crew

8     thought something was amiss, that they had

9     to look at and try to figure out what was

10    going on?

11         MR. JOHNSON:

12               Object to the form.

13         THE WITNESS:

14               It could be anything, you know.

15    It could be that they thought they were

16    finished, it could be they thought it was a

17    problem, I have no idea what they thought,

18    why they stopped the pumps, if they did.

19    EXAMINATION BY MR. BOWMAN:

20         Q.      You don't know if they did stop

21    the pumps?

22         MR. JOHNSON:

23               Object to the form of the

24    question.

25         THE WITNESS:

1              You asked me about a sheet I

2    looked at months ago.  I can't recall, you

3    know.

4    EXAMINATION BY MR. BOWMAN:

5         Q.    That's fair.  I just thought it

6    maybe that's something you might remember.

7         MR. JOHNSON:

8              Object.  That's a question,

9    object to the form.

10   EXAMINATION BY MR. BOWMAN:

11        Q.    So you haven't looked at any of

12   that within the last week or two for your

13   deposition?

14        A.    That's correct.

15        Q.    Okay.  Would shutting the pumps

16   down be an indication that there may be a

17   question from the rig crew about what was

18   going on?

19        MR. JOHNSON:

20             Objection to form.

21        THE WITNESS:

22             You know, shutting down the

23   pumps could be -- again, you know, any

24   number of reasons.  You know, it could be

25   that they thought they finished the

1    displacement and they were doing the static

2    sheen test, it could be they thought it was

3    a problem, it could be they just wanted to

4    stop and recalculate.  I have no idea if

5    they stopped the pumps or why.

6         Q.    I think the pumps were clearly

7    stopped after the sheen test was completed.

8         MR. JOHNSON:

9             Object to the form of the

10   question, if it was a question.

11   EXAMINATION BY MR. BOWMAN:

12        Q.    Does that help you any?

13        A.    I need to look at the sheet

14   before I comment on that.

15        Q.    Okay.  I have a sheet.  I'm

16   sorry, this is not an exhibit.

17        MR. JOHNSON:

18             Counsel, just for the record,

19   this printout is intended to replicate what

20   was actually seen on the rig at the night

21   of the incident; correct?

22        MR. BOWMAN:

23             Well, we'll assume that's

24   correct.  It's supposed to be but I can't

25   tell you that it is.

1         MR. JOHNSON:

2              Okay.

3         MR. BOWMAN:

4              And I'm sure it's an exhibit

5    somewhere in Mr. Gisclair's deposition.

6              This little thing help you any?

7         THE WITNESS:

8              Yes, I need that.

9              No, this doesn't match up.

10   EXAMINATION BY MR. BOWMAN:

11        Q.    It doesn't help?

12        A.    It's the wrong scale.  It

13   doesn't match.

14        MR. JOHNSON:

15             Will the court reporter read

16   back the question?

17             (Previous testimony read).

18        MR. JOHNSON:

19             Just make the objection to make

20   sure, objection to form.

21        THE WITNESS:

22             Okay.  Can you ask the question,

23   what time are you referring to?

24        MR. BOWMAN:

25             Around 9:30.

 1          THE WITNESS:

 2              Okay.  So 9:30, he reports the

 3      flow in the pumps to stop.  So evidently

 4      the pumps are stopped there.  And I can't,

 5      I tell you, I don't know.

 6      EXAMINATION BY MR. BOWMAN:

 7          Q.    You don't know why.  Is that

 8      fair?

 9          A.    Yeah.  Without being there I

10      don't know why they stopped the pumps.

11          Q.    That's fine.

12              If a rig crew noticed an

13      anomaly, would proper action be to stop the

14      pumps before they, while they could figure

15      out what was going on?

16          MR. JOHNSON:

17              Object to the form.

18          THE WITNESS:

19              It could be one of the actions

20      depending on what they normally would, you

21      know.

22      EXAMINATION BY MR. BOWMAN:

23          Q.    Is another action being

24      activating the BOP?

25          MR. JOHNSON:

```
1              Objection to form.
2         THE WITNESS:
3              Again, depending on what the
4    anomaly was, if you would shut down the BOP
5    you wouldn't circulate.
6    EXAMINATION BY MR. BOWMAN:
7         Q.    And if you had any question
8    about whether there was a kick, I think
9    somewhere in one of your manuals doesn't it
10   say the first thing you'd do is to activate
11   the BOP?
12        MR. JOHNSON:
13             Object to the form of the
14   question.
15        THE WITNESS:
16             Well control policy states if
17   you're in doubt, unsure what the situation
18   is, you close in the BOP.
19   EXAMINATION BY MR. BOWMAN:
20        Q.    And have you ever heard of
21   something called the slug?
22        A.    Yes, I have.
23        Q.    What is the slug?
24        A.    A slug is a heavy pill of mud,
25   so it's heavier than the mud that's in the
```

1    system.  Therefore, when you pull your

2    drill pipe out of the hole, the pipe is

3    dry, covered in mud and it helps you more

4    accurately monitor that your fluids in the

5    well.

6         Q.    Okay.  Can you use a plug --

7    well, are certain pits used sometimes for

8    making plugs?

9         MR. JOHNSON:

10              Objection, form.

11        THE WITNESS:

12              Yes.

13   EXAMINATION BY MR. BOWMAN:

14        Q.    Or slugs.  I'm sorry.  Slugs.

15        A.    Dependent on what the volume is,

16   the idea being most slugs are of a smaller

17   volume so you use a smaller pit so you

18   don't waste material, contaminate the

19   system.  So you could use a slip pit for

20   what's called making the slug.

21        Q.    Is building a slug a type of

22   well control?

23        MR. JOHNSON:

24              Objection, form.

25        THE WITNESS:

1           Building a slug is not a type of
2    well control.  Maybe make that connection,
3    I don't know.  Any mud going in the well is
4    a form of well control, it's another fluid
5    going into the well.
6    EXAMINATION BY MR. BOWMAN:
7         Q.    And in this particular case, on
8    the 20th we had mud being displaced; right,
9    or had it already been displaced by 9:30,
10   do you know?
11        MR. JOHNSON:
12              Objection to form.
13        THE WITNESS:
14              I don't know.
15   EXAMINATION BY MR. BOWMAN:
16        Q.    But you do know it was being
17   displaced with seawater; correct?
18        A.    Yes, sir.
19        Q.    And if the driller or assistant
20   driller thought they might need some mud,
21   where would they get mud from?
22        MR. JOHNSON:
23              Objection, form.
24        THE WITNESS:
25              The question doesn't make sense.

454

```
 1    EXAMINATION BY MR. BOWMAN:
 2          Q.     It doesn't make any sense?
 3          A.     No.
 4          Q.     Well, here we go, we're having
 5    mud being displaced?
 6          A.     Yeah.
 7          Q.     If the driller thought they
 8    maybe needed some mud for a well control to
 9    put down the well, where would they get it
10    from?
11          A.     From the mud pit.
12          Q.     From the pit.  Okay.
13                 Any particular pit?
14          MR. JOHNSON:
15                 Objection, form.
16          THE WITNESS:
17                 Wherever the mud was, you know,
18    depends on the configuration at the time.
19    EXAMINATION BY MR. BOWMAN:
20          Q.     Can you tell from looking at
21    that whether they started adding any mud to
22    any pits around 9:15, 9:30?
23          MR. JOHNSON:
24                 Objection, form.
25          THE WITNESS:
```

```
 1                    Could you say the question
 2    again, please?
 3    EXAMINATION BY MR. BOWMAN:
 4         Q.    Yes.  Can you tell whether any
 5    mud was beginning to be added to a pit
 6    around between, let's say nine and 9:30?
 7         MR. JOHNSON:
 8                    Objection, form.
 9         THE WITNESS:
10                    I can't tell from this.
11    EXAMINATION BY MR. BOWMAN:
12         Q.    Okay.  That's fine.
13                    But from your standpoint, if
14    they did start adding mud to a pit, would
15    that indicate anything to you except
16    they're adding mud to a pit?
17         MR. JOHNSON:
18                    Objection to form of the
19    question.
20         THE WITNESS:
21                    You see, I have a problem, I
22    don't know where you can add mud, the
23    question doesn't make sense to me.  It
24    would have to come from somewhere, you
25    can't just add mud, you know.
```

 1    EXAMINATION BY MR. BOWMAN:

 2         Q.    If you had a pit that was not

 3    being used and they started using if for

 4    the first time and it was a slugging pit,

 5    would that indicate anything to you?

 6         MR. JOHNSON:

 7              Object to the form of the

 8    question.

 9         THE WITNESS:

10              No.  I'm sorry.  It doesn't make

11    sense to me.

12    EXAMINATION BY MR. BOWMAN:

13         Q.    It makes no sense.  All right.

14              So I'm going to make sure I'm

15    clear, we're sitting here today and have

16    you, personally, come up with an opinion as

17    to when you think the rig crew learned that

18    there was a problem?

19         MR. JOHNSON:

20              Object to the form of the

21    question.

22         THE WITNESS:

23              I haven't formed an opinion

24    based on this back of when the crew learned

25    they had a problem.  My only knowledge of

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC   Document 5260-1   Filed 01/17/12   Page 38 of 185
457

1    when I know there was a problem is when

2    they called the toolpusher.

3    EXAMINATION BY MR. BOWMAN:

4         Q.    Which was when?

5         A.    I don't know the time.

6         Q.    And how do you know that?  From

7    testimony?

8         A.    From testimony.

9         Q.    So you know whenever they called

10   the toolpusher, by that time they knew that

11   they had some type of situation?

12        MR. JOHNSON:

13              Objection to form.

14   EXAMINATION BY MR. BOWMAN:

15        Q.    Right?

16        A.    That's correct.

17        Q.    Okay.  And who was the

18   toolpusher?

19        A.    They called Randy Ezell.

20        Q.    And have you spoken with Randy

21   Ezell?

22        A.    Yes, I have.

23        Q.    And what did he say about that

24   call?

25        A.    He told me what was said in the

1    call.

2         Q.    What was said in the call?

3         MR. JOHNSON:

4              Objection to form.

5         THE WITNESS:

6              He relayed to me that he got a

7    call from the drill floor and that they

8    need his help, they had mud shooting up the

9    derrick and they needed his help.

10   EXAMINATION BY MR. BOWMAN:

11        Q.    So he told you by the time they

12   called, mud was already shooting up the

13   derrick?

14        MR. JOHNSON:

15             Objection to the form of the

16   question.

17        THE WITNESS:

18             That's what Randy Ezell told me.

19   EXAMINATION BY MR. BOWMAN:

20        Q.    And what did Randy tell you he

21   told them?

22        A.    I believe, not about to quote,

23   that he asked them if they shut it in.

24   They told him they had and he said he'll be

25   there in a minute.

1        Q.      Did you say they said they
2    already had shut it in, or were going to
3    shut it in?
4        A.      I believe -- I'm not 100 percent
5    sure.  I'm trying to remember.  The caller
6    called and said they had or they were in
7    the process of.  I'm not sure, to be
8    honest.
9        Q.      That's fine.  And did you ask
10   Randy had there been any indication of a
11   problem prior to that call, from his
12   standpoint?
13       MR. JOHNSON:
14              Objection to form.
15       THE WITNESS:
16              I had spoke to Randy about that,
17   if he was aware of any other issues, and he
18   was not.
19   EXAMINATION BY MR. BOWMAN:
20       Q.      He was not?
21              Did he indicate to you who
22   called him from the rig floor?
23       A.      Yes, he did.
24       Q.      And who was that?
25       A.      Steven Curtis.

```
 1          Q.     What was his position?

 2          A.     AD.

 3          Q.     Okay.  Did he speak with anyone

 4    else from the rig floor that evening that

 5    you know of, but him?

 6          MR. JOHNSON:

 7                 Objection to form.

 8          THE WITNESS:

 9                 Say the question again, please.

10    EXAMINATION BY MR. BOWMAN:

11          Q.     Did he speak to anyone else on

12    the rig floor that evening but the person

13    you just told me about?

14          MR. JOHNSON:

15                 Objection to form.

16          THE WITNESS:

17                 In that phone call?

18    EXAMINATION BY MR. BOWMAN:

19          Q.     Yes.

20          A.     That phone call, no.

21          Q.     Okay.  Did he have any other

22    phone call after that phone call discussing

23    what was going on?

24          MR. JOHNSON:

25                 Objection, form.
```

 1          THE WITNESS:

 2               No, he did not.

 3     EXAMINATION BY MR. BOWMAN:

 4          Q.    Okay.  So prior to the call he

 5     had told you that he saw, or was not --

 6     that he had not seen, nor was he told about

 7     any problems with the well.  Is that fair?

 8          A.    That's correct.

 9          Q.    Okay.  Now, did you try to find

10     out after the incident if anyone else had

11     been told or knew about any problems with

12     the potential kick that evening?

13          MR. JOHNSON:

14               Objection, form.

15          THE WITNESS:

16               You're asking if, the question

17     did I try and find out if there were any

18     problems?

19     EXAMINATION BY MR. BOWMAN:

20          Q.    Yes, sir.

21          A.    I spoke to Randy and Jimmy and

22     they both told me that they were not aware

23     of any issues.

24          Q.    Okay.  And when did you speak

25     with them?  Around that, few days after

1    that?

2         A.    Yeah.

3         Q.    Okay.  Now, besides Randy and

4    Jimmy, have you spoken to anyone else

5    trying to find out what happened that

6    evening, as far as the kick's concerned?

7         MR. JOHNSON:

8              I think there's an issue, I'm

9    sure you're not --

10   EXAMINATION BY MR. BOWMAN:

11        Q.    Well, if you talked to your

12   attorney, say I talked to my attorneys but

13   don't tell me what.

14        MR. JOHNSON:

15             Not that the conversation taking

16   place but if you had any conversations with

17   counsel about any issues he asked you

18   about, I'll instruct you not to answer.

19        THE WITNESS:

20             Okay.

21             When this first happened I was

22   consumed with -- I spoke to many people.

23   EXAMINATION BY MR. BOWMAN:

24        Q.    Sure.

25        A.    And I can't recall who, you

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC  Document 5260-1  Filed 01/17/12  Page 44 of 185
463

1    know.  I mean, I spoke to the guys when

2    they came off the rig, I met with them at

3    New Orleans, I met them all and spoke to

4    many people about what happened.

5         Q.    Okay.  Did any of them tell you

6    what they thought happened?

7         A.    No.  They couldn't understand

8    it.

9         Q.    Okay.  So everyone you talked

10   to, no matter who it was, had no inkling of

11   what happened.  Is that fair?

12       MR. JOHNSON:

13            Objection, form.

14       THE WITNESS:

15            The people I spoke to didn't

16   know what happened and couldn't understand

17   how it happened.

18   EXAMINATION BY MR. BOWMAN:

19        Q.    Okay.  Have you given any

20   statements to anybody?

21        A.    Yes, I have.

22        Q.    Who?

23        A.    Let me clarify that question.

24   You're talking about internal

25   investigations, everything, or --

1      Q.     The whole world.  I mean

2  internal, external, anything.

3      A.     I've not given internal

4  statement to the Transocean investigation

5  team and my deposition in New Orleans and

6  this deposition here.

7      Q.     Okay.  But no one else that you

8  know of?

9      A.     No.

10      Q.     Okay.

11      A.     Just maybe clarify it.  Does a

12  statement mean I read it and signed it and

13  I agreed, or just an interview?

14      Q.     A statement the way I was asking

15  it was kind of broad, so it could either

16  mean that you signed it or that you were

17  interviewed.

18      A.     I have no signed statements, but

19  I've been interviewed by the people I said.

20      Q.     The people you mentioned?

21      A.     Yes.

22      Q.     Now, prior to the blowout, were

23  you apprised of the problem with the

24  negative test?

25      MR. JOHNSON:

1              Objection to the form of the

2    question.

3         THE WITNESS:

4              No, I was not.

5    EXAMINATION BY MR. BOWMAN:

6         Q.    You were not?  Okay.  Prior to

7    the blowout, were you advised of any

8    problems in converting the float collar?

9         A.    I'm not sure.  The problem is I

10   know about it now, I can't remember if it

11   was brought up in a conversation before or

12   after.

13        Q.    Okay.  Let's talk about the

14   float collar for a moment.

15              Now, during your experience have

16   you ever seen, and you may have, it would

17   take nine times to try to convert a float

18   collar?

19        A.    Okay.  Now I remember it now.

20        Q.    Okay.

21        A.    And I was aware of that.

22        Q.    You were aware of that?

23        A.    Yes.

24        Q.    And who made you aware of that?

25        A.    The OIM.

1         Q.      Which one?

2         A.      Jimmy.

3         Q.      Jimmy.  And what did he say?

4         A.      I don't recall.  It's just I

5    know he had some problems doing it so we

6    got it done.  I don't recall what was said.

7         Q.      Is it fair that you don't recall

8    what was said but somehow he conveyed that

9    it got done?

10        MR. JOHNSON:

11              Objection to form.

12        THE WITNESS:

13              I can't remember the

14   conversation, but along them lines, yes.

15   EXAMINATION BY MR. BOWMAN:

16        Q.      Okay.  Do you remember if he

17   told you it took nine attempts?

18        A.      I don't recall that.

19        Q.      So I'm going to guess you don't

20   recall that it had to be pressured up with

21   3200 something PSI, as opposed to five or

22   600?

23        MR. JOHNSON:

24              Objection to form.

25        THE WITNESS:

1          No, I don't recall that.

2    EXAMINATION BY MR. BOWMAN:

3          Q.     Why did he even call you about

4    the float collar?

5          MR. JOHNSON:

6               Objection, form.

7          THE WITNESS:

8               That doesn't mean he didn't call

9    me about the float collar, it was in our

10   morning call.

11   EXAMINATION BY MR. BOWMAN:

12         Q.     Okay.  So during the conversion

13   he did not call you about any problems with

14   the float collar?

15         A.     That's correct.

16         Q.     Okay.  It was just something he

17   had mentioned during the morning call, I

18   guess the next day?

19         A.     I can't recall.  But I know we

20   talked, he mentioned that, I just can't

21   recall when.  But it was part of another

22   conversation.

23         Q.     Did you ask him very much about

24   it?

25         A.     No.

1          Q.     I'm going to guess, then, that
2     if he'd made it seem like it was much of an
3     issue you would have followed up on it.
4          MR. JOHNSON:
5               Objection to form.
6     EXAMINATION BY MR. BOWMAN:
7          Q.     Isn't that true?
8          MR. JOHNSON:
9               Objection, form.
10         THE WITNESS:
11              If Jimmy had made an issue of
12    anything, I would have followed up on it.
13    EXAMINATION BY MR. BOWMAN:
14         Q.     Now, you were asked yesterday
15    about the negative test and we'll talk
16    about that a little bit more.
17              You said you've done a lot of
18    negative tests; right?
19         A.     Yes, sir.
20         Q.     I haven't done any, but someone
21    said you basically underbalance the well
22    and then you try to make sure nothing's
23    leaking.  Is that sort of a general way to
24    do it?
25         MR. JOHNSON:

1                  Objection to the form and the

2       question.

3              THE WITNESS:

4                  The purpose of a negative test

5       is to certain negative pressure on the

6       barrier that you are testing, whatever that

7       barrier is.

8       EXAMINATION BY MR. BOWMAN:

9              Q.     Now, I know a lot has been

10      written about it.  When is the first time

11      that you were told there was a problem with

12      the negative test?

13             MR. JOHNSON:

14                 Object to the form of the

15      question.

16             THE WITNESS:

17                 The day after the blowout.

18      EXAMINATION BY MR. BOWMAN:

19             Q.     After the blowout?

20             A.     Yes, sir.

21             Q.     Okay.  And who told you that?

22             A.     I have no idea.  It was -- I

23      have no idea.  It was -- I can't recall.

24                 It was somebody in the Crowne

25      Plaza at New Orleans, you know, I spoke to

1    all of the guys, it was kind of an

2    emotional time, you know.  I don't recall

3    which individual told me about it.

4         Q.    Do you recall what that person

5    said?

6         A.    No.

7         Q.    Have you ever spoken to Jimmy

8    Harrell about the negative test?

9         A.    Yes, I think I have.  I'm just

10    not sure in what detail.

11         Q.    I was going to say, that doesn't

12    sound very definite.

13              Do you remember what he said?

14         A.    No.

15         Q.    When did you speak to him about

16    the negative test?

17         A.    Jimmy was really upset and still

18    is, you know, and I'm just struggling to

19    remember when I spoke about specific

20    things, you know.  I spoke to the guys

21    constantly all the time about a bunch of

22    things and I can't recall which

23    conversation took place when, you know.

24              This is a long time ago and many

25    conversations, you know.  And I don't

1    recall speaking in great detail with Jimmy

2    about the negative test.

3         Q.    Okay.  Now, I can appreciate all

4    of the emotion and all of the discussion

5    going on, but I do need to try to find out

6    what you know, what you're talking about.

7         A.    Okay.

8         Q.    Have you spoken to anyone in

9    detail about the negative test, including

10   your lawyers?

11        A.    Yes, I have.

12        Q.    Who?

13        A.    Randy Ezell.

14        Q.    Randy Ezell.  Okay.  And what

15   did he tell you?

16        A.    He told me --

17        MR. JOHNSON:

18             Object to the form.

19        THE WITNESS:

20             He described everything that

21   was, how the negative test took place and

22   the issues that they had.

23   EXAMINATION BY MR. BOWMAN:

24        Q.    Did he indicate how many times

25   it took to do the negative test?

1      MR. JOHNSON:

2             Objection, form.

3      THE WITNESS:

4             I'm trying to remember the

5  details of the conversation but I conversed

6  with, you know, how they did it the first

7  time and what were the results, you know,

8  and why the toolpusher was concerned and he

9  called a time-out and stopped.  And they

10  got together and looked at all the results

11  and they went in and did a second test.

12  I'm aware of that, yes.

13  EXAMINATION BY MR. BOWMAN:

14      Q.    Okay.  Let me make sure I

15  understand.

16             Who called a time-out?  Was it

17  Randy Ezell?

18      A.    I believe it was Wyman Wheeler.

19      Q.    Mr. Wheeler.  Okay.  And you say

20  that the team got together.  Who is your

21  understanding of the team that got

22  together?

23      A.    All the drilling folks.  You

24  know, the toolpusher, the driller, the

25  company man.  And I don't know who was in

1    that room, but the team, you know.

2         Q.    And Mr. Ezell said what happened

3    after they got together?

4         A.    They reviewed --

5         MR. JOHNSON:

6              Objection to form.

7         THE WITNESS:

8              They reviewed the results, they

9    spoke about what happened and formulated

10   the plan and moved forward.

11   EXAMINATION BY MR. BOWMAN:

12        Q.    Moved forward to doing another

13   negative test?

14        A.    Yes, sir.

15        Q.    Okay.  Did he tell you that

16   there was a question about how the negative

17   test was going to be done in the first

18   place?

19        A.    Yes.

20        Q.    That seems a little unusual to

21   me.  Is it unusual, based on your

22   experience, that you're, at a time where

23   you're getting ready to do a negative test

24   and no one seems to agree on procedure?

25        MR. JOHNSON:

1             Objection to form.
2       THE WITNESS:
3             I don't know if I can say it was
4   unusual.  I wasn't there so I don't know
5   how the conversation went, you know, about
6   the negative test.  And I know there was
7   discussions around using the kill line and
8   that's what the change in the regular
9   process was.
10  EXAMINATION BY MR. BOWMAN:
11      Q.     But you say you've done many
12  negative tests; correct?
13      A.     Yes, sir.
14      Q.     And this may have happened, but
15  were you getting to ready to do a negative
16  test sometime and you weren't quite sure
17  what procedure you were going to use?
18      MR. JOHNSON:
19            Objection to form.
20      THE WITNESS:
21            I have had conversations as a
22  driller and a toolpusher and I know I'm
23  lining up to do a negative test, people
24  have questioned to make sure we're doing
25  the right thing and challenging, someone

1    will say well, I've always done it this
2    way.  It's not unusual to have a
3    conversation about the line, how a negative
4    test is conducted.
5    EXAMINATION BY MR. BOWMAN:
6         Q.    And the conversation would be
7    between the driller and the company man and
8    the people on the rig floor?
9         MR. JOHNSON:
10             Objection to the form of the
11   question.
12        THE WITNESS:
13             Could be, yeah.
14   EXAMINATION BY MR. BOWMAN:
15        Q.    Okay.  So, you talked -- going
16   back now when you talked to Mr. Ezell about
17   the negative test and he said -- what did
18   he say happened in the first negative test?
19   Why did they have to do a second one?
20        MR. JOHNSON:
21             Objection to form.
22        THE WITNESS:
23             They weren't happy with the
24   results.  I can't recall which results, but
25   basically were not happy with the results.

```
 1    EXAMINATION BY MR. BOWMAN:
 2         Q.    Okay.  And whatever the reason
 3    is the second one, and so what did he tell
 4    you about the second one?
 5         A.    They conducted the second one
 6    and my understanding from the second one,
 7    you know, they did the second test, BP
 8    reviewed the results they were satisfied
 9    with them, they conveyed them to us and we
10    moved forward.  That's my understanding.  I
11    wasn't there.
12         Q.    I understand.  This is based on
13    your conversation with Mr. Ezell?
14         A.    Yes, sir.
15         Q.    So Mr. Ezell told you that BP
16    was satisfied with the second negative
17    test.  Did he use a person's name or did he
18    just say BP?
19         A.    You know, it's one or two guys
20    and I can't remember which one so I just
21    have to say the company rep.
22         Q.    The copy rep out there?
23         A.    Yes.
24         Q.    Whoever it was, Mr. Ezell said
25    he was satisfied with the negative test on
```

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC   Document 5260-1   Filed 01/17/12   Page 58 of 185
477

1    the second time, as far as the results.  Is

2    that fair?

3         A.    Say that question again.

4         Q.    Sure.  Whatever company man was

5    out there at the time, Mr. Ezell told you

6    that he made the decision that the second

7    negative test was okay?

8         A.    That's correct.  And also

9    because, you know, this is -- I do remember

10   speaking to Jimmy about this, you know.

11   And he was inside and he saw the company

12   rep come in the corridor and he asked how

13   it was and the company rep told him it was

14   a good negative test and they were

15   proceeding forward.

16        Q.    And by proceeding forward, what

17   does that mean?  What were they going to be

18   doing after that?

19        A.    As per plan, we should be doing

20   the displacement.

21        Q.    Displacing the mud with

22   seawater?

23        A.    Yes, sir.

24        Q.    Is that also called

25   underbalancing?

1          MR. JOHNSON:

2                    Objection form.

3     EXAMINATION BY MR. BOWMAN:

4          Q.    I'll put it this way.  Whether

5     it's called that, is that underbalancing

6     the well?

7          A.    You're displacing mud for

8     seawater and you're not necessarily

9     underbalancing but you're reducing the

10    hydrostatic.

11         Q.    And is it, obviously, important

12    to have a successful negative test before

13    you do that; is it not?

14         MR. JOHNSON:

15                   Objection to the form of the

16    question.

17         THE WITNESS:

18                   Yes, it is.

19    EXAMINATION BY MR. BOWMAN:

20         Q.    Okay.  Now, let me ask you a

21    couple of quick questions about that

22    evening.  How did you first find out about

23    the actual blowout?

24         A.    I got a phone call from a

25    colleague and off another vessel.  Informed

1    me that he heard maydays over the radio.

2          Q.     And what did you then do?

3          A.     And after he called me, a very

4    brief conversation, I told him I can't

5    believe it.  They're not doing -- I've had

6    no phone calls from the rig saying there's

7    any problems, I'm struggling to believe it.

8              At that point my phone started

9    beeping on the call waiting.  I said I got

10   to go and that was the U.S. Coast Guard

11   phoning me, asked if I was the rig manager

12   for the DEEPWATER HORIZON.  I said I was

13   and he informed me they'd received mayday

14   distress calls.

15         Q.     Did you contact someone from BP?

16         A.     At that point I was -- I put the

17   phone down and he requested -- I then at

18   that point called the rig.  I was -- the

19   line was dead, there was no response.

20             And I called John Guide to see

21   if he was aware of any issues and he did

22   not answer.  At that point, you know, this

23   is all like in a two-minute frame, and then

24   the Coast Guard called me back again and

25   confirmed the situation, that had a

1    different source confirming the situation.

2         Q.    Okay.  Did you talk to John

3    Guide after that?

4         A.    I then left the house, proceeded

5    to the office and the Coast Guard wanted a

6    POB.  And when I left, I'm not sure which

7    order, I made like two or three calls.  I

8    called, I called somebody, there was no

9    response, I don't recall who.

10             I then called John Guide again

11   and left a message on his voicemail this

12   time, call me, there's been an incident.

13   And after I returned to the office I

14   couldn't think of any telephone numbers.

15             So my father works for a company

16   so I phoned him and said I'm driving, I

17   need you to phone Jerry Canducci and my

18   bosses and most of the emergency response

19   team at Park 10.

20        Q.    Okay.  Let me switch a little

21   bit for just a moment.

22             Were you familiar with the fact

23   that Sperry was to leave this well

24   underbalanced while it was temporarily

25   abandoned?

1              A.     Say that again, please.

2              Q.     Certainly.  Were you aware that

3       part of the plan was to leave the well

4       underbalanced while it was temporarily

5       abandoned?

6              A.     Yeah.

7              Q.     Okay.

8              A.     I don't know by how much but I

9       know they we're going to be leaving it in

10      that condition, yes.

11             Q.     And is that something that has

12      been common in your experience, or not

13      common?

14         MR. JOHNSON:

15                Objection, form.

16         THE WITNESS:

17                I've seen it before.

18      EXAMINATION BY MR. BOWMAN:

19             Q.     Well, by seeing it before, have

20      you seen it often or have you seen it

21      occasionally?

22             A.     Most --

23         MR. JOHNSON:

24                Object to the form.

25         THE WITNESS:

1              I'm trying to recall, you know.

2     It's difficult to know, you have the

3     pressures involved and I just don't recall

4     to what extent you're leaving a

5     differential on or not.  Left it, I've seen

6     it done before.

7     EXAMINATION BY MR. BOWMAN:

8          Q.    If it were your choice, would

9     you have left it underbalanced?

10         MR. JOHNSON:

11              Objection to the form of the

12    question.

13    EXAMINATION BY MR. BOWMAN:

14         Q.    I know it wasn't your choice.

15    I'm asking were it your choice, would you

16    have left it underbalanced.

17         MR. JOHNSON:

18              Object to the form.

19         THE WITNESS:

20              I don't know.  I'm not sure.

21    The comment, you know, to the history of

22    plugs, there's a lot of variables that come

23    in to making that decision.

24    EXAMINATION BY MR. BOWMAN:

25         Q.    Okay.  Now, you were talking

1    about morning -- you were talking about

2    meetings yesterday that you would have.

3    Sounded like you would have meetings with

4    BP in the morning and then sometimes you

5    said third-party contractors.

6         A.    No.   There would be two morning

7    meetings.  I would have a morning meeting

8    with my team, just purely an internal

9    Transocean meeting.  And then I would go to

10   the BP morning meeting.

11           And at the BP morning call I

12   would be at that meeting, which would be

13   onshore and offshore for the rig team would

14   dial in on a conference call.  There would

15   be BP, Transocean and all the third parties

16   would participate in that stage in the

17   well.

18        Q.    Okay.  That's what I was trying

19   to make sure.  It was, some of it was in

20   person but some of it was also by call?

21        A.    Yes.

22        Q.    Okay.  Now, let me direct -- you

23   were asked a few questions yesterday about

24   the kick in March.  March 8th, I believe.

25        A.    Yeah.

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC   Document 5260-1   Filed 01/17/12   Page 65 of 185
484

1        Q.      What kind of responsibility did

2    you have, if any, in investigating that?

3        MR. JOHNSON:

4            Objection to the form of the

5    question.

6        THE WITNESS:

7            You know, I didn't have any

8    responsibility in investigating that.  We

9    spoke about it with the team to make sure

10   we understood what took place and if we

11   were satisfied with the actions, which we

12   were.

13   EXAMINATION BY MR. BOWMAN:

14       Q.      And you were satisfied with the

15   actions from whom?

16       A.      From the driller.

17       Q.      From the driller?  Did you try

18   to ascertain the actions from anybody else?

19       MR. JOHNSON:

20           Objection to form.

21       THE WITNESS:

22           What do you mean?

23   EXAMINATION BY MR. BOWMAN:

24       Q.      Well, being specifically, did

25   you try to ascertain the actions of the mud

1    logger at the time?

2         A.     Yes.  Well, let me be clear.  I

3    didn't ask about the actions of the mud

4    logger but the feedback was given to me

5    about the actions of the mud logger.

6         Q.     What feedback was given to you?

7         A.     At the time of the incident in

8    the morning I asked about what happened,

9    you know.  As much as occurred.  I asked,

10   you know, was the team satisfied with their

11   response, I asked if BP was satisfied with

12   their response.  The response back was they

13   were satisfied with the, the driller.  And

14   however they were the last satisfied with

15   the mud logger.  But that was the only

16   comment.

17        Q.     Okay.  Did you see any report

18   showing that the mud logger reported an

19   incident and the driller kept on drilling

20   for 30 minutes after being told that there

21   was a potential problem?

22        MR. JOHNSON:

23             Object to the form of the

24   question.

25        THE WITNESS:

```
 1              I've never seen the report, no.
 2   EXAMINATION BY MR. BOWMAN:
 3        Q.    You've never seen that?
 4              Have you ever seen a report --
 5   let's just look at, let's look at Tab 17 in
 6   your book.
 7        A.    This one?
 8        Q.    Yes.  I don't know what the next
 9   number is.  We'll mark it.  If you could,
10   why don't you put this little sticker on
11   there?
12        THE WITNESS:
13              On this page?
14   EXAMINATION BY MR. BOWMAN:
15        Q.    Yes, sir.  676.
16              (Whereupon, the document
17   referred to was marked as Exhibit No. 676
18   for identification.)
19   EXAMINATION BY MR. BOWMAN:
20        Q.    Have you seen this document
21   before?
22        A.    No, I have not.
23        Q.    You have not?  Well, go to the
24   last page, then, for a second, it's 444,
25   where it says conclusion.
```

1          A.      Yes.

2          Q.      And it says the quality of the

3    investigation is subsequent report produced

4    by Transocean is poor and does not

5    establish why it took the time it did to

6    shut in the well with the resulting volume

7    of influx.

8          A.      Uh huh.

9          Q.      So and then go to the next page.

10         A.      Okay.  Let me read it again.

11         Q.      Sure.

12    MR. JOHNSON:

13              If that was a question.

14    MR. BOWMAN:

15              I'm getting ready to ask the

16    question.

17    EXAMINATION BY MR. BOWMAN:

18         Q.      So no one has told you from BP's

19    standpoint that they thought that the

20    report from Transocean was poor and did not

21    establish why it took the time to shut in

22    the well?

23         A.      That's correct.  No one from BP

24    said that to me.

25         Q.      Okay.  And let's go to the next

1    page.

2                    It says conclusion, the driller

3    who was on tour during the Macondo well

4    blowout was also on tour during the

5    March 8th kick.

6                    Do you know if that's right or

7    wrong?

8         A.    The driller, did you say?

9         Q.    Yes, sir.

10        A.    Yes, it is.

11        Q.    Is that true?

12        A.    That's true.

13        Q.    Now, let me go to an internal

14   document here.

15                   Let's go to, looks like it's

16   deposition Exhibit 596.  It's previously

17   been marked and it's in your stack.

18        A.    Yes.

19        Q.    It's a Transocean well control

20   handbook.  You see that?

21        A.    Yeah.

22        Q.    Now, if you can go to page with

23   the last three digits 774?

24        A.    Yes, sir.

25        Q.    Just up here, general, and this

1    is going to be very general.  The chain of
2    command, the offshore installation manager.
3    Who was that in this case?
4         A.    Which case are you referring to?
5         Q.    I'm sorry, the HORIZON.
6         A.    When are you referring to?
7         Q.    April 20th?
8         A.    April 20th, Jimmy Harrell.
9         Q.    That was Jimmy.  The rig manager
10   performance, who was that?
11        A.    Me.
12        Q.    That was you.  Okay.  Operations
13   manager.  Who was that?
14        A.    Daun Winslow.
15        Q.    Daun Winslow and he's the one
16   that's officed next to you; right?
17        A.    Yes, sir.
18        Q.    Division manager, who's that?
19        A.    Division manager is Keelan
20   Adamson.
21        Q.    Business unit director, who is
22   that?
23        A.    The business unit no longer
24   exists, it didn't exist at that time.
25        Q.    So just cross that one out?

1        A.      Yeah.

2        Q.      Vice-president of the business

3   unit, who was that?

4        A.      The business unit didn't exist.

5        Q.      So that's gone, too?

6        A.      Yeah.

7        Q.      So the line of command is the

8   OIM, the rig manager, the operations

9   manager and the division manager, as of

10  April 20th?

11       A.      Yeah, but there's more.  The

12  structure of the company has changed

13  somewhat.  There's a position in --

14       Q.      As far as the people above?

15       A.      Yeah.  There's a position in

16  between Daun Winslow and the division

17  manager now.

18       Q.      Okay.  Who is that?

19       A.      Bill Sannan, general manager.

20       Q.      Okay.  Now, as rig manager

21  performance, how did you go about making

22  sure that, you know, the people on the rig

23  knew well control procedures?

24       MR. JOHNSON:

25            Objection, form.

1          THE WITNESS:

2                  All of my personnel that were

3      involved in well control were trained and

4      certified.  They're all, all their

5      certification and training was up-to-date

6      for well control.  And on my rig visits,

7      you know, we would talk about well control

8      and I would speak to the drillers when I

9      was onboard, look at trip sheets, you know,

10     lots of different ways how we would make

11     sure.

12     EXAMINATION BY MR. BOWMAN:

13         Q.     Okay.  Is that something that

14     you would formally do or is that something

15     that someone else was responsible for

16     primarily and you would just make sure it

17     was being done?

18         A.     The training is formal.

19         MR. JOHNSON:

20                 Objection to form.

21     EXAMINATION BY MR. BOWMAN:

22         Q.     That's why I was trying to make

23     sure.  Now, let's go to page 779.  It has a

24     lot of bullet points on the same page, kick

25     column, matrix.  You see that?

```
 1          A.     Yes, sir.
 2          Q.     Go down to the sixth bullet
 3   point.  It talks about whenever possible,
 4   limit circulation to a single active pit.
 5   Strictly enforce pit management and
 6   carefully monitor for any discrepancies
 7   during trip.  You see that?
 8          A.     Yes.
 9          Q.     Now, I'm sure you've read that
10   there was a lot of rig activity going on,
11   let's say, between 9:00 and 9:45 the
12   evening of the 20th; right?
13          MR. JOHNSON:
14                 Objection to the form of the
15   question.
16          THE WITNESS:
17                 I don't -- I can't comment on
18   that.  What's a lot, you know.  There was
19   activities going on.
20   EXAMINATION BY MR. BOWMAN:
21          Q.     Well, the reason I'm saying
22   that, the reason I'm asking that is the Bly
23   report, the presidential commission report
24   and the special counsel report have all
25   commented that there was unusual amount of
```

1    activity going on around 9:00 to 9:45.  And

2    you're saying that you're not sure that was

3    an unusual amount?

4         MR. JOHNSON:

5              Objection the form of the

6    question.

7         THE WITNESS:

8              I think, I don't think it was an

9    unusual amount of activities taking on.

10   There was numerous activities taken on but

11   not an unusual amount that can't be

12   managed.

13   EXAMINATION BY MR. BOWMAN:

14        Q.    And you knew that all those

15   activities were going forward because you

16   were part of the morning call?

17        MR. JOHNSON:

18             Objection to form of the

19   question.

20        THE WITNESS:

21             I don't know what activities

22   were actually taking place, you know, the

23   plans can change through the day, you know.

24   You get delays or you get ahead of

25   schedule, you know, it changes.  So I have

494

1    no idea what activities were taking place

2    at that time.

3    EXAMINATION BY MR. BOWMAN:

4        Q.    So activities can be taking

5    place on the rig without you knowing about

6    them?

7        MR. JOHNSON:

8            Objection to the form of the

9    question.

10       THE WITNESS:

11           That's not what I said.  What I

12   said was I had no idea what was taking

13   place at that time, you know.  The boat

14   schedule, the boat could come at 11:00, it

15   could come at 3:00.  I don't know the exact

16   time of all the activity.

17   EXAMINATION BY MR. BOWMAN:

18       Q.    Anyway, from your standpoint you

19   did not think it was an unusual amount of

20   activities?

21       MR. JOHNSON:

22           Object to the form of the

23   question.

24       THE WITNESS:

25           I don't know the amount of

1    activities that was taking place at the

2    time.

3    EXAMINATION BY MR. BOWMAN:

4         Q.    You did not question the amount

5    of activities going on at that time?

6         MR. JOHNSON:

7              Object to the form of the

8    question.

9         THE WITNESS:

10             I don't know what the activities

11   were at that time.

12   EXAMINATION BY MR. BOWMAN:

13        Q.    You did not question them;

14   right?

15        MR. JOHNSON:

16             Object to the form of the

17   question.

18        THE WITNESS:

19             I did not know what was going on

20   at that time.

21   EXAMINATION BY MR. BOWMAN:

22        Q.    Did you have the power to

23   question if you knew the amount of

24   activities and say this seems to be too

25   many activities going on?  Did you have

1    that right?

2        MR. JOHNSON:

3            Object to form.

4        THE WITNESS:

5            If I felt there was too many

6    activities going on, I had the right to

7    question it or stop it.

8        THE VIDEOGRAPHER:

9            We're going off the record at

10   9:26, this is the end of Tape 1.

11           (Off the record.)

12       THE VIDEOGRAPHER:

13           We're back on the record at

14   9:43, this is the beginning of Tape 2.

15   EXAMINATION BY MR. BOWMAN:

16       Q.    The morning meeting of the 20th,

17   okay.  Do you recall there being a morning

18   meeting on the 20th?

19       A.    Yes.

20       Q.    Do you remember much about it?

21       A.    No, I don't, to be honest.

22       Q.    Okay.  Now, during that morning

23   meeting, my understanding that there had

24   been discussions about what was going to

25   be, what had happened and what would happen

1    in the future; is that right?

2         A.    Yes.

3         Q.    Okay.  And that was pretty much

4    about when the well was getting ready to be

5    abandoned; right?

6         A.    Yes.

7         Q.    So what do you recall, if

8    anything, being discussed at that meeting?

9         A.    I can't, I just can't recall the

10   conversation.  I mean, you know, it wasn't

11   an extraordinary meeting, there's nothing

12   jumped out.  I just can't recall.

13        Q.    Okay.  That's fine.  Let me ask

14   you this way:  Assuming everything had gone

15   the way it was anticipated, how much longer

16   was the HORIZON going to actually be there?

17        MR. JOHNSON:

18             Object to the form of the

19   question.

20        THE WITNESS:

21             Once we finish displacing, it

22   was couple of days.  I'm not sure.

23   EXAMINATION BY MR. BOWMAN:

24        Q.    I don't recall seeing anything

25   definitive on it but from looking at

1    everything it seems like it was about ready

2    to be wrapped up and move on to its next

3    job?

4         MR. JOHNSON:

5              Object to the form of the

6    question.

7    EXAMINATION BY MR. BOWMAN:

8         Q.    Is that correct?

9         MR. JOHNSON:

10             Object to the form.

11        THE WITNESS:

12             I can't remember the timeline

13   now but there was still some activities to

14   take place.  We still had another cement

15   plug, or more than one, I can't remember.

16   Allow time to run and then the time to pull

17   the BOP and run it.

18             So there was still two or

19   three days of activity left, it wasn't

20   finished, you know.

21   EXAMINATION BY MR. BOWMAN:

22        Q.    Fair enough.  And where was it

23   going next?

24        A.    Nile.  I believe it was Nile.

25        Q.    Nile had already been scheduled

1    in?

2          A.      Yes.

3          Q.      And had you been responsible for

4    scheduling and booking it?  Was that part

5    of your job responsibility?

6          A.      No.

7          Q.      Who would have done that?

8          A.      BP.

9          Q.      Okay.  And I didn't ask you

10   this.  Have you talked to Mr. Winslow about

11   what he thinks happened, as far as the

12   blowout?

13         A.      Yes, I have.

14         Q.      And what does he say?

15         A.      He was the same as everybody

16   else and myself, you know.  Still don't

17   truly understand and didn't understand at

18   the time, you know.  It's just you

19   speculate, then you see something else that

20   would change your opinion.  So he's not, to

21   my knowledge, I would say, he's not formed

22   an opinion during our conversation.

23         Q.      Up to today as far as you know,

24   he has not formed an opinion; is that

25   correct?

1          MR. JOHNSON:

2              Objection to form.

3          THE WITNESS:

4              I don't know.

5     EXAMINATION BY MR. BOWMAN:

6          Q.    Well, I understand you can't

7     read his mind, but he has not told you that

8     he's formed an opinion; is that correct?

9          A.    I've not seen Daun for a while,

10    he's moved to a different location, so I

11    don't know.

12         Q.    And I believe you already told

13    me that -- what have you actually read?

14    Have you read the Bly report?

15         A.    No.

16         Q.    No?

17         A.    You know, you read certain

18    extracts of things and people have

19    conversations, you know.  I can't pick out

20    which bits of information come from where.

21    You know, so I'm -- the only thing I know

22    it's I'm not ready to form an opinion yet.

23         Q.    So I take it no one has actually

24    asked you to read any parts of the Bly

25    report or the National Commission report?

 1          A.     That's correct.

 2          Q.     Anything you've done, you've

 3     done on your own, as far as reading?

 4          A.     Yes.

 5          Q.     Did you know that after the

 6     sheen test that the blowout sensor of

 7     Sperry was being bypassed?

 8          MR. JOHNSON:

 9               Objection to form.

10          THE WITNESS:

11               I don't know for sure.

12     EXAMINATION BY MR. BOWMAN:

13          Q.     Okay.  Do you know if the

14     sensor, the blowout sensor from TO was, in

15     fact, not being bypassed after the sheen

16     test?

17          MR. JOHNSON:

18               Objection to form.

19          THE WITNESS:

20               I don't know for sure.

21     EXAMINATION BY MR. BOWMAN:

22          Q.     Okay.

23          A.     I'm sorry.

24          Q.     I appreciate that.  Who would?

25          MR. JOHNSON:

1              Objection to form.
2         THE WITNESS:
3              The personnel onboard that were
4    aware of the lineup would know for sure.
5    EXAMINATION BY MR. BOWMAN:
6         Q.    Who would that be?
7         MR. JOHNSON:
8              Objection to form.
9         THE WITNESS:
10             With due respect, sir, I'm not
11   sure if there's anyone alive left that knew
12   what the specific lineup was.  I don't
13   know.
14   EXAMINATION BY MR. BOWMAN:
15        Q.    I appreciate that.  Now, on this
16   HiTech data -- we've all seen Sperry data.
17   Okay.  Is there any way we can see the
18   actual HiTech data, or is that gone?
19        A.    That's gone.  I believe that's
20   gone.
21        Q.    Okay.  Is that -- well, it's not
22   real-time.  Is that something that would --
23   let me ask you this way:  For what period
24   of time could we see any HiTech data?
25        MR. JOHNSON:

1              Objection to form.

2         THE WITNESS:

3              I don't know how the system's

4    configured but I know it's kept locally on

5    the unit, so I don't know how far the data

6    goes back.  I don't know.  But it's on the

7    unit.

8    EXAMINATION BY MR. BOWMAN:

9         Q.    Well, if it's on the unit, do

10   you know if it ever gets from the unit

11   onshore?

12        A.    I don't believe so, no.

13        Q.    Okay.  Now, let me ask you a

14   little bit back about this negative test.

15   I'm sorry, but you had said you talked to

16   Mr. Ezell.  And they did it a different way

17   somehow the second time.  Can we go back

18   and can you tell me how you think they did

19   it the second time?

20        MR. JOHNSON:

21             Objection to form.  Sorry about

22   that, counsel.

23        MR. BOWMAN:

24             Okay.

25        THE WITNESS:

1          I'm struggling to -- I know what

2     the difference was but I can't remember

3     which way round it was done.  I know what

4     the difference was.

5     EXAMINATION BY MR. BOWMAN:

6          Q.     Okay.  Tell me the difference.

7          A.     The difference was incorporating

8     the choke line, the kill line I should say.

9     The kill line.  But I can't -- I don't

10    remember which way round it was.

11         Q.     I don't care which way.  Tell me

12    one way and then tell me the other way.

13         MR. JOHNSON:

14              Objection, form.

15         THE WITNESS:

16              The difference was, there was --

17    the rig team are not used to using the kill

18    line as a gauge while conducting a negative

19    test.  And predominantly use drill pipe

20    flow back into the cement unit.  And that's

21    where the discussion came up about using

22    the kill line because BP has put that in

23    their APD and that's why they wanted to use

24    that process.

25              But I'm not sure which way round

505

1    the order of that was.  I can't remember

2    now.

3    EXAMINATION BY MR. BOWMAN:

4         Q.     Maybe you just told me and I

5    missed it but tell me the two ways they did

6    it.

7         MR. JOHNSON:

8              Objection to form.

9         THE WITNESS:

10             It's my understanding that they

11   kind of did it the same way both times.

12   However, on one occasion they incorporated

13   the choke, the kill line, which means you

14   open up the kill line and that gives you a

15   secondary way of reading pressure.

16   EXAMINATION BY MR. BOWMAN:

17        Q.     And how did they do it the other

18   way?

19        A.     Without the kill line.

20        Q.     Without the kill line, only with

21   the choke line?

22        A.     No.  Only with the drill pipe.

23        Q.     Only with the drill pipe.  Okay.

24   And you don't know which way they

25   supposedly got the unsuccessful test and

```
 1   which way they supposedly got the
 2   successful test?
 3        A.     You know, I don't recall.
 4   MR. JOHNSON:
 5             Objection to form.
 6   THE WITNESS:
 7             I don't recall.
 8   EXAMINATION BY MR. BOWMAN:
 9        Q.     Do you recall any discussions
10   about the amount of -- well, does anyone
11   call out returns during a negative test?
12   MR. JOHNSON:
13             Objection to the form of the
14   question.
15        THE WITNESS:
16             You monitor.
17   EXAMINATION BY MR. BOWMAN:
18        Q.     You monitor?
19        A.     You monitor the flow back and
20   the bleed off rate and, you know, it should
21   come to zero.  So there is monitor and
22   that's traditionally done at the cement
23   unit through the cement line.
24        Q.     Did anybody tell you what the
25   amount of flow back was being called out by
```

1    the cement unit?

2         A.     No, they did not.

3         Q.     Would a flow back of 15 barrels

4    one time and 23 barrels another time -- let

5    me ask it this way:  If one time the flow

6    back was called at 15 barrels and another

7    time 23 barrels, what would that indicate

8    to you, if anything?

9         MR. JOHNSON:

10              Objection, form.

11        THE WITNESS:

12              You know, there's a lot --

13   again, there's a lot of variables in there.

14   And just to give me a number of that, it

15   doesn't mean much to me.  I'd have to know

16   the space out, the water depth, you know,

17   the differentials.  There's a lot of

18   variables in there.

19   EXAMINATION BY MR. BOWMAN:

20        Q.     Would you investigate to see

21   what variables had to be looked at if you

22   were told that was a flow back?

23        MR. JOHNSON:

24              Objection to the form of the

25   question.

1        THE WITNESS:

2                If it did not appear to be

3    correct, but I don't know if it was correct

4    or not.

5    EXAMINATION BY MR. BOWMAN:

6        Q.      And your discussion with

7    Mr. Ezell and also later with Mr. Harrell

8    indicated that from their standpoint there

9    wasn't any excessive flow back.  Is that

10   fair?

11       MR. JOHNSON:

12               Object to the form of the

13   question.

14       THE WITNESS:

15               I don't know what they

16   personally saw, whether they saw it or

17   whether they were going off the feedback

18   from the company rep, you know.

19   Traditionally it's in the cement unit with

20   the company man, so that's his role and

21   responsibility to approve the negative

22   test.

23               You'd have to ask him, I don't

24   know if they were there sort of themselves

25   or what they knew.  I don't know.

1    EXAMINATION BY MR. BOWMAN:

2         Q.    Okay.  So it's your experience

3    that the company man would be the one who

4    would actually be the final interpretation

5    of the test?

6         A.    A negative test, yes.

7         Q.    Yes, sir.  Okay.  And then what

8    role would the OIM or the toolpusher play

9    in the negative test?

10        MR. JOHNSON:

11             Objection to the form of the

12    question.

13        THE WITNESS:

14             Their role would be, as it would

15    in any task, you know, that if they see

16    something that they're not comfortable with

17    or they're not aware of, they're not sure,

18    they would challenge, call a time-out,

19    stop, gain an explanation, say good,

20    whatever, it depends.

21    EXAMINATION BY MR. BOWMAN:

22        Q.    We know there was one time-out

23    called on the first negative test but not

24    on the second one.

25        MR. JOHNSON:

```
 1              Objection to the form of the
 2   question.
 3        THE WITNESS:
 4              I don't know how the sequence of
 5   events were on the second negative test, I
 6   just know it was deemed acceptable.
 7   EXAMINATION BY MR. BOWMAN:
 8        Q.    Also reminds me, you're talking
 9   about the time-out for safety.  Did you
10   keep records that would show the number of
11   time-outs for safety that were called on
12   the HORIZON?
13        A.    Yes, I do.
14        Q.    And do those still exist?
15        A.    Yeah.  Some way I get them, but
16   the short answer is yes, I believe.
17        Q.    Okay.  And none of the time --
18   well, were any of the time-outs for safety
19   called because of well control problems?
20        MR. JOHNSON:
21              Objection to the form of the
22   question.
23        THE WITNESS:
24              You know, I was asked that
25   earlier on.  I can't recall off memory if
```

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC   Document 5260-1   Filed 01/17/12   Page 92 of 185
511

1    any of them were called on well control.  I
2    know one on that day.  But other ones, I
3    can't recall.
4    EXAMINATION BY MR. BOWMAN:
5        Q.    And this list of the time-outs
6    for safety, would it also show the results?
7        MR. JOHNSON:
8            Objection to form.
9        THE WITNESS:
10           How -- you know, I did not see
11   every single time-out for safety.  I would
12   get in my safety report that I put
13   together, it would have the number of
14   time-outs called, the number of stop
15   conversations, et cetera.
16           And then the rig team would
17   collect which was the most, the best three,
18   if you like.  You gather the most learnings
19   and share.  So I would see a select number
20   of the actual, what they were but I would
21   see the entire number of how many had taken
22   place.  And in that time-out for safety it
23   would have what the action was.
24   EXAMINATION BY MR. BOWMAN:
25       Q.    Okay.  And would the action

1    sometimes be nothing but talking to the

2    person and explaining why, if it wasn't a

3    safety risk?

4        MR. JOHNSON:

5            Objection to form.

6        THE WITNESS:

7            There's a whole raft of things

8    that could come from it.  It could be that,

9    it could be change equipment, it could be

10   stop, evaluate.  There's a lot of outcomes

11   from a time-out for safety.

12   EXAMINATION BY MR. BOWMAN:

13       Q.    Let's go to Exhibit 596.  I

14   think it's in front of you.

15       A.    Okay.

16       Q.    Let's go to the last three

17   numbers, it's 810.  And it shows primary

18   well control under well control principles.

19            You see that?

20       A.    Yes, sir.

21       Q.    And definition.  Now, it says

22   it's of the utmost importance that primary

23   control is maintained at all times by,

24   first bullet point, using drilling and

25   completion fluid of an adequate density.

1                You see that?

2        A.      Yeah.

3        Q.      Whose responsibility was that on

4   the HORIZON on April 20th?

5        MR. JOHNSON:

6                Objection to the form of the

7   question.

8        THE WITNESS:

9                The maintaining of the density

10  and is, again, is by, you know, various

11  parties because you need to know what your

12  downhole pressure is to maintain that

13  density.  So there's, everybody involved in

14  the well operation has a responsibility in

15  that.

16  EXAMINATION BY MR. BOWMAN:

17       Q.      Well, to get the downhole

18  pressure, you get that from whom?  BP?

19       A.      To get the downhole pressure, BP

20  would relay it to us.

21       Q.      Keeping the well full of an

22  adequate density fluid at all times, whose

23  responsibility is that?

24       MR. JOHNSON:

25                Objection to the form of the

1    question.

2         THE WITNESS:

3              Again, it's the same question.

4    We would keep the flow but we need to be

5    informed of what that density is, so both

6    parties, again.

7    EXAMINATION BY MR. BOWMAN:

8         Q.   Okay.  So TO would keep it full,

9    but who would tell you the density?

10        A.   BP.

11        Q.   BP?  Okay.  I understand that.

12   Continuously monitoring active pit volumes,

13   especially during tripping.

14             And whose responsibility is

15   that?

16        MR. JOHNSON:

17             Objection to form.

18        THE WITNESS:

19             To continually monitor it, I

20   would say it would be Transocean and

21   Sperry-Sun.

22   EXAMINATION BY MR. BOWMAN:

23        Q.   Okay.  And we've talked about

24   Sperry briefly.  If Sperry saw something

25   that they thought was unusual or raised a

1    question, their procedure was to call the

2    drill floor?

3           MR. JOHNSON:

4                  Objection to form.

5           THE WITNESS:

6                  I agree to that.

7    EXAMINATION BY MR. BOWMAN:

8           Q.    And in the last bullet point,

9    immediately detecting changes in the

10   density, volumes and flow rate of drilling

11   fluids from the wellbore and taking the

12   appropriate action.  Do you see that?

13          A.    Yeah.

14          Q.    You agree with that?

15          MR. JOHNSON:

16                 Object to the form.

17          THE WITNESS:

18                 Yeah.

19   EXAMINATION BY MR. BOWMAN:

20          Q.    And whose responsibility was it

21   to take appropriate action?

22          MR. JOHNSON:

23                 Objection, form.

24          THE WITNESS:

25                 There's numerous people, again,

1    for the appropriate action.  The driller

2    would certainly be in that list, as would

3    the toolpusher, as would the company rep,

4    as would the Sperry-Sun loggers.  There's

5    lots.  The mud logger, the mud engineer,

6    depending on what the appropriate action

7    was.

8    EXAMINATION BY MR. BOWMAN:

9         Q.    You say the Sperry rep.  I mean,

10   Sperry, all he can do is call and alert the

11   drilling rig?

12        MR. JOHNSON:

13             Objection, form.

14   EXAMINATION BY MR. BOWMAN:

15        Q.    Right?

16        A.    Let me clear.  You asked on this

17   bullet point and it says immediately

18   detecting changes.  So Sperry-Sun has a

19   responsibility in immediately detecting, as

20   well.

21        Q.    That's what we talked about

22   earlier?

23        A.    That's why I'm saying everybody

24   involved in drilling operations.

25        MR. JOHNSON:

```
 1              Counsel, you're out of time.
 2         MR. BOWMAN:
 3              I'm sure you'll be happy to let
 4    me ask a few more questions.
 5         MR. JOHNSON:
 6              I think we're done.
 7         MR. BOWMAN:
 8              Thank you.
 9         THE VIDEOGRAPHER:
10              We're going off the record at
11    10:00.
12              (Off the record.)
13         THE VIDEOGRAPHER:
14              We're back on the record at
15    10:08.
16    EXAMINATION BY MR. GEORGE:
17         Q.    Good morning, Mr. Johnson, my
18    name is Warren George, I represent Anadarko
19    and MOEX, I'll be asking you a few
20    questions.  Did you ever communicate with
21    anyone at Anadarko about the Macondo well?
22         A.    No, I did not.
23         Q.    Did you ever communicate with
24    anyone at MOEX about the Macondo well?
25         A.    No, I did not.
```

1          Q.     Do you know if others at
2    Transocean were communicating with Anadarko
3    about the Macondo well?
4          A.     I don't believe they were, no.
5          Q.     Do you know if any others at
6    Transocean were communicating with MOEX
7    about the Macondo well?
8          A.     No, I don't believe there were.
9          Q.     Do you have any knowledge about
10   communications between Anadarko and BP
11   prior to the blowout of April 20, 2010?
12         A.     Only that they took place.  I
13   have no idea what was communicated to them.
14         Q.     Do you know of the names of any
15   people who were involved in those
16   communications, since you seem to know that
17   they took place?
18         A.     No.  There was an individual
19   that come in the morning call.  And
20   occasionally he would ask questions,
21   clarification question, because he'd have
22   to go back to give this information to
23   partners, you know.  That's the extent of
24   my knowledge of the communication.  I
25   couldn't give you a single example.

1      Q.     All right.  And not a single
2    example and not a single name?
3      A.     That's correct.  I'm trying to
4    visualize who, but I can't recall.
5      Q.     All right.  Do you know who the
6    toolpusher was on duty at the time of the
7    kick on March 8th?
8      A.     No, I don't.
9      Q.     Do you know who the driller was
10   who was on duty at the time of the kick on
11   March 8th?
12     A.     Yes, I do.
13     Q.     Who was that?
14     A.     Dewey Revette.
15     Q.     Did BP's Robert Bodek come out
16   to the rig sometime shortly after the
17   March 8th kick incident?
18     A.     I'm not sure.  I don't recall
19   who he is.  I don't know who he is.
20     Q.     So that's not a name that's,
21   that you're familiar with?
22     A.     Correct.  I'm not sure of that.
23     Q.     I'd like to show you what we've
24   got as Tab 29 of the documents that we're
25   going to be talking about this morning.

1           A.      Which ones?   Are you just going

2    to hand it?

3           Q.      Yes.   Okay.   And this is a

4    one-page document, the identifying marks

5    are TRN MDL 00481727.

6                  This is an e-mail from, I gather

7    Jimmy Harrell to you; is that correct?

8           A.      That's correct, yes.

9           Q.      And it goes through some

10   promotions that are occurring and the top

11   one is the one I'm interested in.   Brandon

12   Burgess, who had been a driller, was to

13   replace Jason Anderson; is that correct?

14          A.      That's correct, yes.

15          Q.      And where was Jason Anderson

16   going to be stationed following this

17   replacement?

18          A.      Jason Anderson was being

19   promoted to a senior toolpusher.   He was

20   leaving us and going to another vessel as a

21   senior toolpusher and he was going to be

22   going to the DISCOVERY SPIRIT.

23          Q.      Let's just take a look at our

24   Tab 12?

25          A.      Okay.

```
 1           Q.      It's a two-page document, the

 2     identifying marks begin with TRN MDL

 3     00301050.

 4          MR. GEORGE:

 5               The previous exhibit, which was

 6     the e-mail, is Exhibit 677.

 7               (Whereupon, the document

 8     referred to was marked as Exhibit No. 677

 9     for identification.)

10          MR. GEORGE:

11               And then this current exhibit

12     will be 678, that being the e-mail from

13     Paul Johnson dated Tuesday, April 20, 2010.

14               (Whereupon, the document

15     referred to was marked as Exhibit No. 678

16     for identification.)

17          THE WITNESS:

18               Yes, sir.

19     EXAMINATION BY MR. GEORGE:

20           Q.      Is that my first one.  I'm

21     interested in the paragraph that begins our

22     downtime has dropped significantly and the

23     fighting between contractor and customer

24     has almost disappeared.  You see that

25     paragraph?
```

```
 1          A.      Yes, sir.

 2          Q.      Who was the contractor referred

 3     to there?

 4          A.      Transocean.

 5          Q.      And the customer?

 6          A.      BP.

 7          Q.      And what was the fighting

 8     between contractor and customer that you

 9     were referring to?

10     MR. JOHNSON:

11               Object to the form.

12     THE WITNESS:

13               Okay.  I do recall this e-mail.

14     When I took over there was -- whether it

15     was perception or not but that's what the

16     guys felt was the reality -- that there was

17     maybe some, it wasn't as easy as they would

18     like to get, maintenance time between

19     wells.

20               However, sitting down with our

21     customer I worked very hard and building

22     that relationship, showing them the way

23     forward and our opinion about how to

24     conduct this and they were very receptive

25     towards that.  And we came to a common goal
```

1   and a common alignment about how we move

2   forward.  So that was a positive step in

3   the right direction, I believe.

4   EXAMINATION BY MR. GEORGE:

5        Q.    The positive step in the right

6   direction had to do with what?

7   Accomplishing some of the maintenance that

8   hadn't been accomplished?

9        MR. JOHNSON:

10             Objection to the form of the

11   question.

12        THE WITNESS:

13             The guys felt like it was a

14   struggle.  They were getting the

15   maintenance time but it seemed to be a

16   challenge.  And I think a lot of that was

17   perception as opposed to reality.

18             So we made steps to make it

19   clearer to all parties and we had in our

20   role in that and that was to be, give them,

21   give our customer more notice about what we

22   wanted to do so they could plan better.

23             And we would demonstrate what it

24   is we wanted to do, why we're doing it,

25   what steps are involved, how long it would

1    take so they had an understanding and get

2    that agreement, this is the way forward.

3                But that was what the plan was

4    about, about installing maintenance time

5    between wells.

6    EXAMINATION BY MR. GEORGE:

7        Q.    Were there any particular

8    maintenance concerns at this time that

9    you're referring to in this paragraph?

10       A.    No.

11       MR. JOHNSON:

12                Object to the form.

13       THE WITNESS:

14                I'm sorry.  No.  This was about

15   showing that the rig team had done great

16   work.  They -- I'm trying to think of the

17   right word.  They had bridged many gaps,

18   you know, and they got a common aligned and

19   understanding.

20                And this is about demonstrating

21   to our supervisors, our boss, the BP senior

22   manager and the Transocean senior manager

23   how we'd done that and how effective it

24   was.  This is why I wanted them to

25   demonstrate what we were doing.

525

1    EXAMINATION BY MR. GEORGE:

2         Q.    I want to direct you next to

3    Tabs 10 and 11.  Tab 10 is marked BP HZN

4    2179 MDL 00312131.  That will be

5    Exhibit 679.

6              (Whereupon, the document

7    referred to was marked as Exhibit No. 679

8    for identification.)

9         MR. GEORGE:

10             And Tab 11 is marked BP HZN 2179

11   MDL 00312134.  And we'll mark that as

12   Exhibit 680.

13             (Whereupon, the document

14   referred to was marked as Exhibit No. 680

15   for identification.)

16   EXAMINATION BY MR. GEORGE:

17        Q.    You had a chance to review those

18   e-mails?

19        A.    Yes, I have.

20        Q.    Can you give us the context for

21   these e-mails?  That is, what it was that

22   you were needing from BP and why you were

23   needing it by way of the annular elements?

24        MR. JOHNSON:

25             Objection to form.

1          MR. COLLIER:

2                Object to form.

3      EXAMINATION BY MR. GEORGE:

4          Q.     You can answer.

5          A.     We approved, we agreed on a

6      scope of work and we provided that to BP of

7      all the things we were going to do between

8      the wells, maintenance.  And BP had

9      requested from us not to change out the

10     annular elements at this time.

11              And provided, you know, we would

12     inspect them and if they were good, and if

13     they were in poor condition we would change

14     them out.  You'd have to, you know.  But

15     due to the nature of the next well, which

16     was Nile, which was a short, it was a

17     workover well, and I can't recall the

18     details of what was involved, it wasn't

19     drilling a well, it was a workover.

20              They expressed a desire not to

21     change out the annular element if that was

22     acceptable.  So we had a look at the well

23     and came back and said, well, we believe

24     that's okay if we inspect them and they

25     pass inspection.  However, if you want us

1    to do that, BP, there could be a financial

2    risk.

3              There was no safety risk element

4    for this.  This was a case of if we have an

5    issue, it fails the pressure test or

6    whatever, we could end up having to pull

7    the BOP and that would be on Transocean's

8    dime.

9              So following the risk assessment

10   we were satisfied that we were okay safety

11   but there was a financial exposure.  And if

12   BP wanted to progress down the avenue, they

13   would have to indemnify us.

14             The second question was on the

15   drill line.  We had 900-foot of drill line

16   left, which is more than adequate for the

17   well.  However, you just never know,

18   drilling, and, you know, in drilling

19   operations, you know, in doing a

20   completion, you could get into some kind of

21   situation where your plan takes longer,

22   which means you may end up in a situation

23   where you would have to stop operations and

24   change out the drill line.

25             And again, no safety concern for

1    that, it's just an operational risk on the

2    financial side of things and I wanted BP to

3    be aware of that.

4          Q.    And the drill line you're

5    talking about was the drill line that was

6    going to be used for the Nile well?

7          A.    Yes.

8          Q.    Take a look next at Tab No. 15,

9    please.  It is marked TRN MDL 0030191792

10   and I'll mark that as Exhibit 681.

11               (Whereupon, the document

12   referred to was marked as Exhibit No. 681

13   for identification.)

14   EXAMINATION BY MR. GEORGE:

15         Q.    Have you had a chance to review

16   that document?

17         A.    Yes, sir.

18         Q.    And remind us, who is Michael

19   Fry?

20         A.    Michael Fry is one of our

21   subject matter experts on BOP, he works for

22   Transocean in the BOP department.

23         Q.    He mentions in the first of

24   these e-mails, which is sent to James Kent

25   and to you, that he just got a wake-up call

1    from Donnie and Ron Swan talking about

2    major BOP issues.  Please call me ASAP.

3                 Did I read that correctly?

4        A.     Yes.  Yes, sir.

5        Q.     Who is Donnie?

6        A.     Donnie Pirtle and I believe --

7    okay.  I'm assuming it's Donnie Pirtle, I

8    don't know.

9        Q.     And who is Donnie Pirtle?

10       A.     Donnie Pirtle is the head of our

11   maintenance department.

12       Q.     And Ron Swan, can you identify

13   Ron Swan for us?

14       A.     Ron is Donnie's boss.  So you

15   have Donnie is in charge of maintenance for

16   certain regions and then Ron Swan as his

17   boss is in charge of maintenance for

18   everybody, Transocean.

19       Q.     Following this e-mail there's an

20   e-mail from you to Michael Fry, subject,

21   BOP issues.  And it says Mike, you need to

22   get in ASAP.  Major problems that I can't

23   write about.  Did I read that correctly?

24       A.     Yes, sir.

25       Q.     And can you tell us what the

1   major problems that you couldn't write

2   about were at the time you wrote this

3   e-mail?

4           A.      Appreciate the timing, this was

5   after the blowout.  We --

6           Q.      I do appreciate that.

7           A.      We -- it was all hands on deck,

8   you know, we knew we had a blowout which

9   was going to require BOP intervention.  At

10  this point in time we didn't even know what

11  was taking place.  We were just bringing

12  everybody in to the office to assist.  This

13  is purely nothing more than consulting to

14  the office, we need help.

15          Q.      How soon did the group of you

16  gather in the office?

17          A.      You know, it was quick, you

18  know.  I can't recall the times, you know.

19  I was the first person in the office.  And

20  throughout the night there was a steady

21  stream of people coming in from all

22  departments, all areas of the company.

23          Q.      Did you have discussions when

24  you got together about the BOP and what had

25  happened, if anything, with the BOP?

1          A.      No, I did not.  I was not part

2     of that.

3          Q.      Do you know who was discussing

4     the BOP at the time there was this

5     gathering of people to respond to the

6     April 20th blowout?

7          A.      No, I do not.  At this point in

8     time, you know, we were still in emergency

9     management and it was not about BOP, it was

10    about personnel and the emergency and fire

11    at hand, you know.  We were just bringing

12    everybody in.

13         Q.      I'd like you to take a look at a

14    document that was previously marked as

15    Exhibit 952.

16         MR. GEORGE:

17               Why don't we go off the record

18    briefly and see if we can rustle that one

19    up?

20         THE VIDEOGRAPHER:

21               We're going off the record at

22    10:26.  This is the end of Tape 2.

23               (Off the record.)

24         THE VIDEOGRAPHER:

25               We're back on the record at

 1    10:29, this is the beginning of Tape 3.

 2    EXAMINATION BY MR. GEORGE:

 3         Q.    Mr. Johnson, do you now have in

 4    front of you Exhibit 952?

 5         A.    Yes, I do.

 6         Q.    Did you have any role in the

 7    drafting of this document?

 8         A.    No, I did not.

 9         Q.    Did you review it before it was

10    issued by Transocean?  It has an issue date

11    of May 6, 2010.

12         A.    No, I did not.

13         Q.    Do you know, taking a look at

14    the second page and paragraph number 9, do

15    you know if while you were the rig manager

16    performance for the DEEPWATER HORIZON,

17    whether the BOP shearing capabilities had

18    been confirmed?

19         MR. JOHNSON:

20              Object to form.

21         THE WITNESS:

22              I was of the understanding that

23    because we had talked about that with the

24    OIMs and the toolpushers about shear

25    capabilities, the casing shear rams onboard

1    the HORIZON were capable of shearing our

2    drill pipe.

3    EXAMINATION BY MR. GEORGE:

4        Q.    And who exactly did you have

5    those discussions with?

6        A.    Randy Ezell.  And let me

7    rephrase that.  The toolpushers and the

8    OIMs.  The conversation came up more than

9    once.

10       Q.    Were you talking about any rams

11   besides the casing rams in these

12   discussions that you had with the

13   toolpushers and the OIMs?

14       A.    No.  It wasn't like a topic we

15   sat down and discussed this.  It was just

16   this would come up in conversation.

17       Q.    What I'm getting at is, did you

18   discuss the capabilities of shearing the

19   pipe possessed by the blind shear rams?

20       MR. JOHNSON:

21           Object to form.

22       THE WITNESS:

23           No.  When the conversation come

24   up, you know, I was learning and to

25   understand about the running the non-shear

1    beams across the stack, what that procedure

2    was.

3              And that's what the rig team was

4    explaining to me, what the procedure was,

5    why they did it, when they did it.  And it

6    led to a conversation about how the shear

7    testing for our drill pipe, that we could

8    shear this pipe and when you're running

9    certain liner strings you couldn't.

10             That was why the question was

11   brought up, that's how I know we were

12   talking about it.  I didn't sit personally

13   and look at a shear test sheet myself and

14   review it again, I just remember seeing it

15   in the office on a wall.  Pretty vague but

16   I just know we talked about it.

17   EXAMINATION BY MR. GEORGE:

18        Q.    If you can take a look at

19   paragraph No. 10, the last sentence in that

20   paragraph states confirm there is adequate

21   accumulator pressure would mean to complete

22   the shear at the end of the actuator

23   stroke.

24             Is that something that you had

25   discussed with anybody onboard the

1    DEEPWATER HORIZON during your time as the

2    rig manager performance?

3        MR. JOHNSON:

4            Object to form.

5        THE WITNESS:

6            I had not discussed the

7    specifics in that, no.

8    EXAMINATION BY MR. GEORGE:

9        Q.    Do you know if there was any

10   testing done of the capabilities of the BOP

11   to have sufficient accumulator pressure

12   remaining to complete a sheer at the end of

13   an actuator stroke while you were the rig

14   manager for performance on the DEEPWATER

15   HORIZON?

16       MR. JOHNSON:

17           Object to the form of the

18   question.

19       THE WITNESS:

20           Can you say that question, again

21   please, to make sure it's right.

22       MR. GEORGE:

23           Would you read the question

24   back?

25           (Previous testimony read.)

 1          MR. GEORGE:

 2               Thank you.

 3          THE WITNESS:

 4               I have not personally reviewed

 5     that data.

 6     EXAMINATION BY MR. GEORGE:

 7          Q.     Do you know if there was anybody

 8     who was responsible for reviewing that data

 9     on the DEEPWATER HORIZON?

10          MR. JOHNSON:

11               Objection to form.

12          THE WITNESS:

13               It was my understanding that we

14     had the shear test data for our drill pipe.

15     Which BP had and they submitted in their

16     APDs for each well.  We had the same pipe

17     year on year and the only difference that

18     would be would be your water depth and your

19     wellbore pressure.

20               So I don't know when these tests

21     were done but I'm aware that they took

22     place because you wouldn't be able to have

23     an APD without that.  Is my understanding.

24     EXAMINATION BY MR. GEORGE:

25          Q.     With respect to paragraph 14,

1    that's the third page and then continuing

2    on over to the fourth page, 14 E, it says

3    for Cameron type dead men, AMS, ensure that

4    battery replacement program is adhered to

5    Cameron ED 891 D.

6            Did you have any role with

7    respect to ensuring the battery replacement

8    program for the Cameron type dead man was

9    adhered to by the DEEPWATER HORIZON?

10   MR. JOHNSON:

11           Object to the form of the

12   question.

13      THE WITNESS:

14           No, I did not.

15   EXAMINATION BY MR. GEORGE:

16      Q.    Do you know who did?

17      MR. JOHNSON:

18           Objection to form.

19      THE WITNESS:

20           That would be the subsea

21   engineer.

22   EXAMINATION BY MR. GEORGE:

23      Q.    Was there a particular subsea

24   engineer assigned to that task, to your

25   knowledge?

1          A.    No.  It would be -- well, let me
2     rephrase that.  It would be the senior
3     subsea engineer, whichever one was onboard.
4          Q.    And the senior subsea engineers
5     were Mark Hay and Owen McWhorter; is that
6     correct?
7          A.    That's correct, yes.
8          Q.    I'd like to show you the next
9     Tab 3, which is a one-page e-mail.
10              It's from the OIM Rod Ryan to
11     the subsea superintendent for the DEEPWATER
12     HORIZON.  It's dated February 18, 2010.
13              The identifying marks are TRN
14     MDL 00307667.  We'll mark that as
15     Exhibit 682.
16              (Whereupon, the document
17     referred to was marked as Exhibit No. 682
18     for identification.)
19     EXAMINATION BY MR. GEORGE:
20          Q.    All right.  At the date of this
21     e-mail, do you know why it was that the
22     DEEPWATER HORIZON did not have a BOP test
23     procedure, if, in fact, it didn't?
24          MR. JOHNSON:
25              Objection to form.

539

1             THE WITNESS:

2                    Okay.  The HORIZON did have a

3      BOP test procedure.  And this, one of the

4      lessons learned from the investigation of

5      the incident we had.  And we could improve

6      on our BOP test procedures so one of the

7      actions on the OIM was instead of

8      reinventing the wheel let's go out to our

9      fleet and see if any of the rigs have a

10     backup procedure.

11                    And they looked at one that was

12     pretty good and as we say here, we need to

13     develop one along these similar lines.  So

14     it was just, it was enhancing what we

15     already had.

16     EXAMINATION BY MR. GEORGE:

17          Q.     You said after the incident.

18     What incident are you referring to?

19          A.     I was referring to when we had

20     an incident where they failed to close the

21     BOP test ram.

22          Q.     The subject we were talking

23     about yesterday?

24          A.     That's correct.

25          Q.     So the goal, as you stated, was

540

1    to see if you could improve upon the BOP

2    test procedure that you already had

3    onboard?

4         A.     Yeah.  Which is typical of what

5    we do, you know.  Any incident at all is

6    always lessons learned, room for

7    improvement.  Even without an incident, you

8    know, we're continually trying to improve

9    and strive for improvement.  We're not too

10   proud to say of a bad system on a

11   particular subject, so it's continuing

12   improvement, we always try to do that, you

13   know.

14        Q.     Do you know if the test

15   procedure changed in any way as a result of

16   this reaching out to other rigs for their

17   test procedures?

18        A.     I can't recall if it changed.

19   There was some addition, you know, because

20   we did not have the verification of

21   functioning test rams in there which was in

22   the typical ones which I can remember.

23             So there was additions.  I'm not

24   sure changes is the right term.  You know

25   what I mean.

1          MR. GEORGE:

2               I'd like to mark next as Tabs 5

3     and 6, the first has the identifying marks

4     TRN MDL 00301181.  It's an e-mail from Paul

5     Johnson to the DWH DEEPWATER HORIZON OIM

6     dated March 17, 2010.  And the second

7     document is from Paul Johnson to John

8     Guide, it's dated March 18, 2010 and it has

9     the identifying mark BP HZN 2179 MDL

10    00289217.  I'll mark the first of those as

11    Exhibit 683.

12               (Whereupon, the document

13    referred to was marked as Exhibit No. 683

14    for identification.)

15         MR. GEORGE:

16               And the second one would be

17    Exhibit 684.

18               (Whereupon, the document

19    referred to was marked as Exhibit No. 684

20    for identification.)

21    EXAMINATION BY MR. GEORGE:

22         Q.    Looking at the first of these,

23    the Paul Johnson e-mail of March 17 which

24    is Exhibit 683, is that something that you

25    wrote, or did Rod Ryan write it?

1      A.      I did not write this e-mail.

2   Rod Ryan wrote this e-mail.  He was

3   covering for me while I was on vacation so

4   he was using my computer in the office.

5      Q.      So he was off the rig, in your

6   office at the time?

7      A.      Yes.  Did you have any

8   discussions with Mr. Ryan or, indeed,

9   anybody at Transocean about hazard

10  recognition and what you could do to

11  improve Transocean's hazard recognition in

12  the wake of the March 8th kick?

13      MR. JOHNSON:

14            Objection to the form of the

15  question.

16      THE WITNESS:

17            No.

18  EXAMINATION BY MR. GEORGE:

19      Q.      Was there anything about the

20  March 8th kick and the response of the crew

21  to it that troubled you in any way as the

22  rig manager for performance?

23      MR. JOHNSON:

24            Objection to form.

25      THE WITNESS:

1                    No, it did not.

2    EXAMINATION BY MR. GEORGE:

3         Q.     Take a look at Tab 8, please.

4    That on the first page is an e-mail from

5    Paul Johnson to James Kent re:  Annular

6    stripping element.  The identifying mark on

7    the first page is TRN MDL 00301669.  We'll

8    mark that as Exhibit 685.

9                    (Whereupon, the document

10   referred to was marked as Exhibit No. 685

11   for identification.)

12   EXAMINATION BY MR. GEORGE:

13        Q.     Mr. Johnson, have you had a

14   chance to look that chain of e-mails over?

15        A.     Give me a second, please.

16        Q.     Sure.

17        A.     Okay.

18        Q.     Do you know why there was a need

19   for an annular stripping element on the

20   DEEPWATER HORIZON BOP?

21        A.     Yes, I do.

22        Q.     Can you please tell us why?

23        A.     Yes.  We have two types of

24   annular element on a BOP, a regular element

25   and a stripping element.  Those are the two

1    annular elements that we have.  And as I

2    stated earlier on, you know, we were

3    pulling the BOP, come to the end of the

4    well.

5              So this is in preparation that

6    if, indeed, when we looked at it it was

7    damage and needed replacing, we had one

8    onboard to replace it.  So we had one on

9    order, it hadn't come through on time on

10   the delivery.  So we reached out to one of

11   our sister rigs and borrowed one of theirs

12   so we had one on-hand should we need it.

13        Q.    And the annular stripping, the

14   stripping annular is the lower annular of

15   the DEEPWATER HORIZON; correct?

16        A.    I can't remember.

17        Q.    Okay.

18        A.    It's the lowest with pressure

19   one, I can't remember.

20        Q.    So it's the 5,000 PSI pressure

21   one?

22        A.    Yes.

23        Q.    And the upper annular is 10,000

24   PSI?

25        MR. JOHNSON:

545

1                    Object to form.

2         THE WITNESS:

3              I can't remember.  One is 5K,

4    one is 10K.

5    EXAMINATION BY MR. GEORGE:

6         Q.    Do you know if -- well, let me

7    withdraw that question.

8         MR. GEORGE:

9              I think I'm done.  Thank you

10   very much.

11        THE VIDEOGRAPHER:

12             We're going off the record at

13   10:47.

14             (Off the record.)

15        THE VIDEOGRAPHER:

16             We're back on the record at

17   10:56.

18   EXAMINATION BY MR. JOHNSON:

19        Q.    For the record, my name is

20   Daniel Johnson and I represent Transocean.

21   I think this is obvious for everyone in the

22   room the past couple of days who have heard

23   you speak, Mr. Johnson, but we are not

24   related in any way, for those who are

25   reading the transcript; is that right?

```
1          A.      Yeah, that's right.
2          Q.      Okay.  I want to start with a
3    few questions about the 2009 BP audit, sir.
4          A.      Okay.
5          Q.      To be clear, when was that audit
6    conducted?
7          A.      It was conducted early
8    September, 2009.
9          Q.      Okay.  What was the operational
10   status of the DEEPWATER HORIZON at the time
11   of the BP inspection?
12         A.      The rig was in a plan that would
13   service period, so it was out of service
14   and doing maintenance.
15         Q.      Do you have an understanding as
16   to whether or not BP had the opportunity or
17   the right to demand that any issue be
18   resolved before it agreed that the rig
19   would go back into service?
20         A.      That was my understanding, yes.
21         Q.      Did that, in fact, happen?  Did
22   BP request that the rig not go back into
23   service until some issue was resolved?
24         A.      Yes, they did.
25         Q.      Did Transocean resolve that
```

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC   Document 5260-1   Filed 01/17/12   Page 128 of 185
547

1    issue to BP's satisfaction, as far as you

2    have an understanding?

3         A.    Yes, we did.

4         Q.    And what about Transocean, was

5    there anything that Transocean wanted to

6    resolve before sending the rig back into

7    service?

8         A.    Yes, there was.

9         Q.    And what was that, sir?

10        A.    We had an issue with the PRS,

11   which is the pipe racking system.  We did

12   extensive overhaul during that period and

13   then when we put it back together and

14   commissioned it, we thought we had it all

15   worked out but there was obviously was

16   another problem with it.

17              Which I suppose we could have

18   lived with and risk assessment and carried

19   on, and but after consultation with the OIM

20   and the rig team, the feelings were the

21   best thing was to stop and fix it, so

22   that's what we did.

23        Q.    Who made the decision to stop

24   and fix it, Mr. Johnson?

25        A.    Me.

1      Q.     Were you new in your position as

2  rig manager for performance at that time?

3      A.     Yes.  I'd only been there a

4  couple of weeks at that point, somewhere

5  around that.

6      Q.     Did you experience any

7  hesitation despite being new in your

8  position in informing BP that you wanted to

9  resolve an issue before the rig went back

10  into service?

11      A.     No.

12      Q.     Did you feel as if Transocean

13  management backed you on your decision?

14      A.     Yes.  Yes, they did.  And

15  although I was confident, you're still not

16  sure how that information will be received

17  when you inform your bosses.  So, you know,

18  I do recall actually the first time I went

19  was my first ever operation meeting I went

20  to.  And I went to the meeting and I

21  informed the team that we're talking about

22  rig schedule or something, I don't recall.

23          That's when I told them that the

24  rig was going to be an additional six or so

25  days -- I can't recall the time frame --

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC   Document 5260-1   Filed 01/17/12   Page 130 of 185
549

1    late.  They asked why and I informed them

2    why and they asked how long it was going to

3    be and I told them and they said okay to

4    that and we moved on to another subject.

5         Q.    Just to be clear, were those six

6    or seven days that it was going to take to

7    resolve the issue you wanted to resolve?

8         A.    Say that question again, please.

9         Q.    Was it going to take six or

10   seven days to resolve the issues that you

11   wanted to resolve?

12        A.    You know, I think it was planned

13   to take 10 days but it eventually only took

14   six days.  I'm not sure but it was around

15   that time frame.

16        Q.    That was that time, just to be

17   clear, was the effect of that decision of

18   the rig not going back into service, did

19   that have any financial impact on

20   Transocean?

21        A.    Yes.  We were on zero rate while

22   we made the change.

23        Q.    Did BP ever relay to you, sir,

24   that it was allowing the rig to go back

25   into service even though it believed it was

1    in an unsafe condition?

2          A.      Nobody relayed that to me, no.

3          Q.      As far as your experiences and

4    understanding as they relate to BP and your

5    interactions with them, do you have an

6    understanding whether BP was satisfied

7    enough that the rig would operate in a safe

8    condition despite having certain unresolved

9    issues identified in the audit?

10         A.      Yes, they were, because we had

11   meetings in that, you know, it wasn't just

12   to send in the sheet and they said okay.

13   We sat down and had a discussion and went

14   through the action items and what was

15   outstanding.  That was with myself and John

16   Guide and his team.

17               And then we also had a sit-down

18   meeting with John Guide's boss and

19   explained to him, he reviewed and he

20   accepted what he was happy for us to do, go

21   back to work.

22         Q.      Would you have permitted the rig

23   to go back in service if you believed it

24   was in an unsafe condition to operate, sir?

25         A.      No, I wouldn't.

1          Q.      Let's talk about Transocean's

2     efforts to close out some of these audit

3     items identified on the BP report.   First,

4     do you know approximately -- and I know we

5     looked at a document yesterday -- but do

6     you know approximately how many items there

7     were identified for Transocean to close out

8     at the beginning of the process?

9          A.      I didn't look at the ASI and I

10    can't remember, like 180 or something like

11    that.   I'm not sure.

12         Q.      Fair enough.   To your knowledge,

13    about what percentage of those items had

14    been closed out as of late March 2010?

15         A.      We had about 25 items so, you

16    know, it was over 80 percent, somewhere,

17    85 percent, 88 percent, somewhere around

18    there was complete.

19         Q.      So to the best of your

20    recollection, within a six-month period

21    Transocean had closed out approximately 80

22    to 85 percent of the items identified in

23    the BP audit?

24         A.      Yes.   We closed out all of the

25    items but we didn't just rest there, we had

1    an action plan in place for the remaining

2    items and we communicated that to BP

3    frequently, the status of them, open items.

4         Q.    Did you ever receive any

5    feedback from BP personnel regarding

6    Transocean's efforts to close out audit

7    items?

8         A.    Yes, I did.

9         Q.    Could you tell me what the

10   nature of that feedback was, Mr. Johnson?

11        A.    We received very positive

12   feedback from BP on our approach to

13   handling the issues, closing them out and

14   communicating to BP.  They were very

15   satisfied with our performance on the

16   action items.

17        Q.    From whom did you receive BP --

18   that type of feedback from BP?

19        A.    You know, we received written

20   feedback from Angel Rodriguez, you know,

21   and I sat and met regularly with Angel,

22   Brett Cocales, John and Joe Neumeyer and

23   they we.

24        Q.    Was this in one setting or

25   circumstance where you received all of this

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC   Document 5260-1   Filed 01/17/12   Page 134 of 185
553

1    feedback, or were there multiple occasions

2    where you received the feedback?

3         A.     No.  You know, we got written

4    e-mail, you know, we got written feedback,

5    you know, once or twice.  I'm not sure.

6    But we met regularly and we discussed these

7    items, you know, and it's kind of a theme

8    and a comment during each meeting.

9              Every time we went they were

10   pleased with what they were seeing and the

11   progress that was being made.

12        MR. JOHNSON:

13             I'm going to hand you,

14   Mr. Johnson, what I've marked as

15   Exhibit 686.

16             (Whereupon, the document

17   referred to was marked as Exhibit No. 686

18   for identification.)

19        MR. JOHNSON:

20             And for the record the Bates

21   label on the bottom is TRN MDL 00420217.

22   Is that what Exhibit 686 reflects on the

23   bottom of the page, sir?

24        THE WITNESS:

25             Yes, sir.

```
 1    EXAMINATION BY MR. JOHNSON:
 2          Q.    Is this -- who is this e-mail
 3    from?
 4          A.    Angel Rodriguez.
 5          Q.    And are you copied on the
 6    e-mail, Mr. Johnson?
 7          A.    Yes, I am.
 8          Q.    Okay.  And who is the e-mail to,
 9    if you don't mind?
10          A.    It's to the BP personnel, John
11    Guide, Brett and the offshore team leaders.
12          Q.    Okay.  If you would, would you
13    read for me the first three sentences of
14    that e-mail, Mr. Johnson?
15          A.    Yes.  Please find the attached
16    file titled BP audit working copy 3/29/10
17    for your respective reviews.  I wanted to
18    mention that the HORIZON's crew completed
19    63 out of 70 findings in a five-month
20    period, which is commendable.
21          Q.    Thank you, sir.  Is this the
22    type of positive feedback that you were
23    referring to earlier in your testimony,
24    Mr. Johnson?
25          A.    Yeah.
```

555

1        Q.     Let me ask you this:  Did you

2   ever receive any negative feedback from

3   anyone at BP during the process that

4   Transocean was working to close out these

5   audit items?

6        A.     No.

7        Q.     Of any nature, written, oral,

8   any type?

9        A.     No.

10       Q.     I want to ask you a couple of

11  questions about the BOP certification.  Do

12  you recall that several lawyers were asking

13  you questions about that over the last

14  couple of days?

15       A.     Yes.

16       Q.     Do you know, generally, if the

17  BOP certification issue was raised by BP in

18  the 2009 audit?

19       A.     I believe it was.

20       Q.     Okay.  Did BP, to your

21  knowledge, insist that the issue be

22  resolved before sending the rig back into

23  service?

24       A.     No, they did not.

25       Q.     Okay.  Did BP ever relate to

1    you, Mr. Johnson, that it believed that

2    certification of the BOP was required by

3    Federal regulations?

4         A.    No.

5         Q.    What's an INC, as far as you

6    know?

7         A.    I know what it is, I believe the

8    acronym is for an instance of nonconformity

9    or an issue of nonconformity.  It's a

10   nonconformity.

11        Q.    And I know the terminology may

12   have changed but at the time, would the MMS

13   be an agency that would issue an INC?

14        A.    Yes.

15        Q.    Let me ask you this:  Is an INC

16   issued to Transocean as a drilling

17   contractor, or is an INC issued to BP as an

18   operator, if you know?

19        A.    It's my understanding that the

20   INC would be issued to BP and maybe TO as

21   well, I'm not sure.  I never received one.

22        Q.    If BP had been issued an INC as

23   a result of any issue on the DEEPWATER

24   HORIZON during your time as rig manager,

25   would that be something that you would

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC   Document 5260-1   Filed 01/17/12   Page 138 of 185
557

 1    become aware of in your ordinary

 2    responsibilities?

 3          A.      Oh, yes.

 4          Q.      Were you ever informed of the

 5    United States government, through the MMS,

 6    issuing an INC to either BP or Transocean

 7    during your time as rig manager?

 8          A.      For the HORIZON, no.

 9          Q.      As far as -- and I just want to

10    be clear.  As far as you're aware, you've

11    never heard anything about BP or Transocean

12    receiving an INC having to do with

13    certification issues about the BOP; is that

14    correct?

15          A.      That's correct.  I'm not aware

16    of that.

17          Q.      Are you aware of whether or not

18    the MMS, the United States government,

19    through the MMS, came aboard the DEEPWATER

20    HORIZON to conduct inspections?

21          A.      Yes, they did.

22          Q.      How often did that happen,

23    Mr. Johnson?

24          A.      It was -- I don't know,

25    sporadic, you know.  You know, generally

1    every month but there was occasion where

2    they hadn't come for a couple of months.

3    So it's hard to say exactly off the top of

4    my head, but at least once as month, say,

5    with the odd exception.

6         Q.    Did you get any type of

7    communication or summary regarding these

8    inspections?

9         A.    Yes.  Every time we had an MMS

10   visit I would receive a report from the

11   senior toolpusher.  A summary of what

12   happened and what they looked at.

13        Q.    Did you ever learn, based on

14   these reports or any communication

15   otherwise from the rig, that the United

16   States government, through the MMS, was

17   dissatisfied in any way with Transocean's

18   BOP maintenance program?

19        A.    No.

20        Q.    So as far as you sit here today,

21   can you recall any time prior to April 20,

22   2010, where you were informed that an MMS

23   inspector sent by the United States

24   government raised the issue of BOP

25   recertification?

```
 1              A.      No, I don't believe they did.
 2              Q.      Okay.  I want to turn just a
 3      minute, if we can, to the culture aboard
 4      the DEEPWATER HORIZON.  DEEPWATER HORIZON.
 5      And I apologize in advance, Mr. Johnson, if
 6      some of these questions are difficult to
 7      answer.
 8              Did you have any impression
 9      about whether the men and women aboard the
10      DEEPWATER HORIZON took pride in their work?
11              A.      Yes, they did.
12              Q.      Did you consider the men and
13      women aboard the DEEPWATER HORIZON to be
14      well trained?
15              A.      Yes.
16              Q.      Did you consider the DEEPWATER
17      HORIZON to have a good safety culture?
18              A.      Yes, I did.
19              Q.      Why?
20              A.      Various reasons, you know.  I
21      have to characterize it -- I pushed
22      tirelessly on safety, that was kind of my
23      number one priority in building the
24      culture.  You can fix everything else,
25      okay, you can fix downtime, you can fix
```

1    everything but you can't fix safety.  If

2    you hurt somebody, you can't take it back.

3              So it was high on my list and we

4    talked about safety every day.  And it was

5    the start of our conversations, it was the

6    start of our meetings, it was in the

7    forefront of everything we did.

8         Q.    Was there anything else,

9    Mr. Johnson that was a higher priority than

10   the safety of the men and women aboard the

11   DEEPWATER HORIZON?

12        A.    No.

13        Q.    Have you actually read the

14   Lloyd's Register report?

15        A.    No, I haven't.

16        Q.    Did you ever receive any

17   feedback from it, about the report from

18   your supervisors?

19        A.    Yes.

20        Q.    Tell me about the nature of that

21   feedback, Mr. Johnson.

22        MR. GEORGE:

23              Object to the form.

24   EXAMINATION BY MR. JOHNSON:

25        Q.    You can answer.

1          A.     I got feedback from my boss'

2     boss, if you like.  Keelan Adamson sent me

3     a note and said we had a closeout meeting

4     with Lloyd's Register and that feedback was

5     very positive for DEEPWATER HORIZON.

6          Q.     I would like for you -- I think

7     you have Exhibit 929 close to you there.

8     And I opened to a page of the Lloyd's

9     Register report.

10               I think the last three digits in

11    the Bates label were 579.  Do you see that

12    page, sir?

13         A.     Yeah.

14         Q.     And before looking at this page

15    right now, you've never seen a copy of this

16    report; is that right?

17         A.     That's correct.

18         Q.     I'd like to, for you to go down

19    to the second full paragraph on the top,

20    the paragraph beginning rig leadership.

21               Do you see that, sir?

22         A.     Yes, I do.

23         Q.     Could you read that sentence

24    aloud for me, could you read that paragraph

25    for me out loud for the record?

1          A.      Yes.   The rig leadership was

2     identified as one of the strongest areas in

3     this review.   The rig, the rig performance

4     manager and the rig based manager was seen

5     in a very positive light.   The rig manager

6     performance clarified risk management

7     policies and procedures with a back to

8     basics approach, which gained high levels

9     of respect from crewmembers.

10               The OIMs, captains, chief

11     engineers and senior toolpushers were also

12     held in high regard amongst the workforce.

13               The rig manager performance

14     expectations was supported by them and the

15     impression this gives to the workforce is a

16     united leadership puts safety first and by

17     doing this provides the resources and time

18     to conduct the job safety.

19          Q.      Does that comport with the way

20     you tried to do your job, Mr. Johnson?

21          A.      Yes.

22          Q.      Did Transocean have to pay

23     Lloyd's Registry to come out and do this

24     audit?

25          A.      No, they didn't.

 1          Q.     As far as you know, is it
 2    required by any law or statute?
 3          A.     I don't believe so.
 4          Q.     I want to turn a minute to these
 5    North Sea advisories that you were asked
 6    about.
 7                 I think this is clear but I want
 8    to make sure.  Is there a difference
 9    between an alert and an advisory?
10          A.     Yes, there is.
11          Q.     What's the difference in terms
12    of the action required between the two?
13          A.     An alert has affirmative
14    actions, you know, those things that you
15    need to do from the alert, whatever that
16    may be.  An advisory is kind of what it
17    says, it's an advisory advising you of
18    certain things, or advising you of changes
19    that may be coming.  That's my
20    understanding.
21          Q.     Mr. Johnson, what, if anything,
22    does the fact that this advisory exists
23    tell you about the Transocean safety
24    management system and whether it's working?
25          A.     The advisory kind of lends to me

1    that it's working, you know.  We have

2    issues, we have incidents, we have things

3    that don't go according to plan.  We make

4    sure we're diligent in investigating them,

5    finding out root causes and then sharing

6    the lessons learned, if applicable, to the

7    units so they can learn from it.

8         Q.    If an advisory is issued, for

9    example, on a Monday, does that mean that

10   it's sent around to the entire Transocean

11   organization around the world on Tuesday?

12        A.    No, not necessarily.  No.

13        Q.    Tell me why that is.

14        A.    Different advisories have

15   different information to be shared.  Some

16   advisories are very straightforward and,

17   therefore, you can just send them out and

18   it's a done deal.  Other advisories, you'd

19   probably want to put an action plan

20   together on how you will allow, how you

21   communicate that information effectively.

22            You know, just sending out an

23   e-mail is not always effective.  There are

24   times when you want to plan how you

25   communicate that advisory to your team.

1          Q.      Have you been to well control
2    school, sir?
3          A.      Yes, I have.
4          Q.      And you had, at various points
5    in your career, well control
6    responsibilities, as I understand from your
7    testimony?
8          A.      That's correct.
9          Q.      Based on your review of the
10   advisory, did you see anything that changes
11   fundamental well control procedures?
12         A.      I don't think I agree with
13   fundamental changes.  There's some
14   additions and some clarifications.  Are we
15   talking specifically on that advisory?
16         Q.      Yes, sir.
17         A.      Yes.  I didn't see any
18   fundamental changes.  I did see
19   clarifications and some additions but
20   nothing fundamental, no.
21         Q.      On the face of the advisory, is
22   there anything that changes the well
23   control manual at the time it was issued?
24         A.      Say that question again.
25         Q.      Yes.  Based on your review of

 1    the North Sea advisory in this deposition,

 2    was there anything on the face of the

 3    document that changed the well control

 4    manual at that time?

 5         A.    I don't believe there's any

 6    changes.  It was clarification points.

 7         Q.    If the changes would, if there

 8    were going to be changes, would that be

 9    done at a future revision, as far as your

10    review of the document?

11              A future revision of the well

12    control manual.

13         MR. DART:

14              Object to the form.

15         THE WITNESS:

16              I'm trying to recall.  I thought

17    the advisory actually stated that these

18    additions would be in the next edition so

19    there was going to be change or additions,

20    should I say, clarifications coming in at a

21    future date.

22    EXAMINATION BY MR. JOHNSON:

23         Q.    I want to ask you some

24    questions, Mr. Johnson, about the men who

25    were responsible, in part, for closing the

 1    well on April 20, 2010.

 2              First, if you can tell us who on

 3    the Transocean DEEPWATER HORIZON crew would

 4    have had well control responsibilities as

 5    of the time of the incident in terms of

 6    activating the BOP?

 7         A.    Transocean personnel?

 8         Q.    Yes, sir.

 9         A.    Assistant drillers.  Drillers,

10    toolpushers.  OIM, subsea engineer.

11         Q.    What were their names,

12    Mr. Johnson?

13         A.    Steven Curtis, Tom Clark.  Dewey

14    Revette, Jason Anderson.

15         Q.    Were these hard workers,

16    Mr. Johnson?

17         A.    Yeah.

18         Q.    Were they good workers?

19         A.    Yes, they were.

20         Q.    Were they well trained?

21         A.    Yes.

22         Q.    They're the type of workers,

23    based on your experiences, that would have

24    become complacent in doing their jobs?

25         A.    No.

1      Q.      As you sit here today and at any

2   time since April 20, 2010, do you know what

3   was in the mind of Jason Anderson onboard

4   the DEEPWATER HORIZON at the time of the

5   incident or leading up to it?

6      A.      No.

7      Q.      Do you know what was in the mind

8   of Dewey Revette at the time of the

9   incident and the time period leading up to

10   it, Mr. Johnson?

11      A.      No.

12      Q.      Do you believe that as you sit

13   here today, you're in a position to second

14   guess in any way the actions of the drill

15   crew taken during the time of the incident?

16      A.      No.

17      Q.      Why not?

18      A.      I wasn't there.

19      Q.      I want to ask just a couple of

20   more questions about these morning meetings

21   that you attended with BP personnel.

22      A.      Uh huh.

23      Q.      Did you ever hear any discussion

24   about the number of centralizers to be used

25   in the Macondo well?

```
 1              A.      No, I did not.
 2              Q.      Were you ever made aware of any
 3    disagreements amongst BP personnel about
 4    the centralizer issues?
 5              A.      No, I was not.
 6              Q.      Was that ever discussed, as far
 7    as you recall, in these morning calls?
 8              A.      No.
 9              Q.      Were you aware prior to the
10    cement job being performed that no one
11    within BP had confirmed a successful cement
12    slurry stability test before proceeding
13    with the job?
14         MR. DART:
15              Object to form.
16         THE WITNESS:
17              Can you say that again, please?
18    EXAMINATION BY MR. JOHNSON:
19              Q.      Are you aware of whether or not
20    there's testing done on the stability of
21    cement slurry mixtures prior to cement
22    jobs?
23              A.      Yes, I am.
24              Q.      Were you aware at any time prior
25    to the incident that no one within BP had
```

 1    confirmed a successful test prior to

 2    proceeding with the cement job?

 3         MR. BOWMAN:

 4              Object to form.

 5         THE WITNESS:

 6              I was not aware of that.

 7    EXAMINATION BY MR. JOHNSON:

 8         Q.    Mr. Johnson, the men we were

 9    speaking about earlier, you knew them

10    personally?

11         A.    Yes.

12         Q.    Knowing them, knowing what you

13    knew about these men, how does it make you

14    feel that BP proceeded with the cement job

15    with knowledge that it hadn't confirmed

16    good cement test prior to beginning?

17         MR. BOWMAN:

18              Object to form.

19         MR. COLLIER:

20              Object to form.

21         THE WITNESS:

22              I can't believe it.

23         MR. JOHNSON:

24         Q.    Thank you, Mr. Johnson, those

25    are all the questions I have.

```
 1          THE VIDEOGRAPHER:
 2               We're going off the record at
 3     11:21, this is the end of Tape 3.
 4               (Off the record.)
 5          THE VIDEOGRAPHER:
 6               We're back on the record at
 7     11:30.
 8     EXAMINATION BY MR. LEGER:
 9          Q.    Mr. Johnson, I'm Walter Leger
10     again, we talked a little bit yesterday and
11     I've got a few questions for you and first
12     I'm going to do just a little bit of
13     housekeeping.
14               First I'm going to ask if you
15     know what this document is?
16          A.    Yes, I do.
17          Q.    What is that, sir?
18          A.    That's a, appears to be a
19     report, personnel onboard report.
20          Q.    And that document basically --
21     and that's dated April 20th of 2010;
22     correct?
23          A.    Yes.
24          Q.    And that document basically
25     reflects everyone that's onboard the vessel
```

1    on that date; correct?

2         A.    Correct.

3         Q.    At least that's what it's

4    supposed to?

5         A.    Yes.

6         Q.    That also reflects the time

7    period that they've been on the vessel;

8    right, the number of days?

9         A.    Yes.

10        Q.    Some had been on there for one

11   day, some had been on as much as 20 days;

12   right?

13        A.    Yes.

14        Q.    At the time in April of 2010,

15   had it become the policy of Transocean to

16   run hitches of 21 on and 21 off?

17        MR. JOHNSON:

18              Objection to form.

19        THE WITNESS:

20              It's not the policy, that was

21   the practice in the Gulf of Mexico, yes.

22   EXAMINATION BY MR. LEGER:

23        Q.    Had it always been 21 on and 21

24   off?

25        A.    No, it had not.

```
1          Q.     When did it become 21 on and 21

2     off?

3          A.     I'm not sure of the exact date.

4     It was round about when I came to the

5     vessel.  I can't remember exactly, but that

6     period.

7          MR. LEGER:

8               We're going to mark for

9     identification that exhibit.  Do we know

10    what number?  689.

11              (Whereupon, the document

12    referred to was marked as Exhibit No. 687

13    for identification.)

14    EXAMINATION BY MR. LEGER:

15         Q.     Have you seen or have you had

16    the opportunity to see a document which

17    appears to be -- it's been entered into

18    evidence as Exhibit 932.  It appears to be

19    a PowerPoint?

20         A.     Can I look it up first?

21         Q.     And it says Lloyd's Register

22    safety management systems and safety

23    culture climate reviews.

24         A.     Yeah.  I've seen this before.

25         Q.     Okay.  And I'm going to refer
```

1    you -- these are, it is found as a Bates

2    number TR MDL 00291896.PowerPoint.  But the

3    individual pages are not numbered and I'm

4    just going to refer you back to the fourth

5    page from the back.

6          A.      From the back?

7          Q.      Yes, sir.

8          A.      Okay.

9          Q.      One of the findings it says was

10   that there was an overwhelming concern

11   relating to 21 on and 21 off and long

12   sleeve coveralls; right?

13         A.      Okay.  I'm not -- okay.  I've

14   got the right page now.

15         Q.      Okay.  Now, the page before

16   that, had you ever heard the concern of

17   complaints of some of the crewmembers that

18   they had to wear long sleeve coveralls?

19         A.      Yes, I have.

20         Q.      And let me ask you to look at

21   the page before that.  The very last

22   comment that's quoting.

23         A.      Yep.

24         Q.      It's easier to make decisions on

25   coveralls when you're sitting in an air

1    conditioned office.   Right?

2         A.    Yes.

3         Q.     So the big complaint that the

4    guys had was 21 on and 21 off and they had

5    long sleeve coveralls; right?

6         MR. JOHNSON:

7              Object to the form.

8         THE WITNESS:

9              Yes.

10   EXAMINATION BY MR. LEGER:

11        Q.     With -- I want to ask you just

12   real quickly about the BOP inspection and

13   certification.

14              The BOP, when you came aboard

15   the vessel, she was out of service;

16   correct?

17        A.    Yes.

18        Q.     And the BOP was on the vessel;

19   is that right?

20        A.    Yes.

21        Q.     And at that time there was no

22   inspection performed where any of it was

23   taken apart and the manufacturer was

24   present; is that correct?

25        MR. JOHNSON:

```
 1                    Objection, form.
 2          THE WITNESS:
 3                  I'm not 100 percent sure if
 4    Cameron were onboard or not while we did
 5    the work.
 6    EXAMINATION BY MR. LEGER:
 7          Q.     Do you recall -- I'm sorry.
 8          A.     Yeah.  I'm not sure.  I don't
 9    think so, but I don't know for a fact that
10    Cameron were onboard or not.
11          Q.     In any event, you've never seen
12    a certificate of inspection?
13          A.     I have not.  Personally not.
14          Q.     And by the way, this INC process
15    by MMS, when they came aboard, the vessel
16    was usually on location; correct?
17          A.     Yes.
18          Q.     And so the BOP was not on the
19    surface where they could inspect the BOP;
20    correct?
21          MR. JOHNSON:
22                  Objection, form.
23          THE WITNESS:
24                  Every time that the MMS came
25    aboard while I had to control they didn't
```

1    come onboard when the BOP was on the

2    surface.

3    EXAMINATION BY MR. LEGER:

4         Q.    Now, the BOP is a part and an

5    appurtenance of the vessel, it goes with

6    the vessel where it goes; right?

7         MR. JOHNSON:

8              Objection to the form.

9         THE WITNESS:

10             For the most, yes.

11   EXAMINATION BY MR. LEGER:

12        Q.    You don't leave it behind, you

13   don't leave the BOP behind when you move

14   location; right?

15        A.    You could but it's not common

16   practice.

17        Q.    This BOP is over 50 feet tall;

18   right?

19        A.    They are a big piece of

20   equipment.

21        Q.    So you pick it up like, almost

22   like an anchor and put it on the vessel;

23   right?

24        A.    Yes.

25        Q.    Now, I'd like to refer you to an

1    exhibit at, found at Tab 37 that we'd like

2    to mark for identification.

3           MR. LEGER:

4               We'll mark it as 688.  I'm

5    sorry, it's already previously marked as

6    687.  No.  This is 688 now.  I got you.

7    Okay.

8               (Whereupon, the document

9    referred to was marked as Exhibit No. 688

10   for identification.)

11   EXAMINATION BY MR. LEGER:

12        Q.    Let me you that exhibit, please.

13   Can you tell me what that is?  Is that the

14   operation event report for an event on

15   March 8, 2010?

16        A.    Yes.

17        Q.    Have you seen it before?

18        A.    You know, I don't recall but I

19   probably have.

20        Q.    Is that something -- where would

21   that be generated?  That's a Transocean

22   document; right?

23        A.    Yes.

24        Q.    Where would that be generated?

25   Would it be generated on the vessel or out

```
 1    of your office?
 2         A.     On the vessel.
 3         MR. LEGER:
 4              Now, I'd like to show you a
 5    document that is found in Tab 35 that we
 6    will mark for identification as 689,
 7    Exhibit 689.
 8              (Whereupon, the document
 9    referred to was marked as Exhibit No. 689
10    for identification.)
11         MR. DART:
12              I thought 689 was the --
13         MR. JOHNSON:
14              It changed.  687.
15    EXAMINATION BY MR. LEGER:
16         Q.     I'm going to hand you that
17    document.  You have never seen that
18    document; have you, sir?
19         A.     No.
20         Q.     That appears to be an, actually
21    two e-mails.  One initially from Steve
22    Robinson, director and vice-president of
23    Alaska Drilling and Wells for BP
24    Exploration Alaska on Monday, July 12, 2010
25    to a Jim Cowie; is that correct?
```

1          A.     Yes.   That's what it says here,

2     yes.

3          Q.     And then it appears, he's

4     asking, he says, do you have the TOR for

5     the peer review that you put together?

6               My copy fell victim to my

7     inadequate filing system, I suspect.   And

8     Mr. Cowie responds and there's an

9     attachment; correct?

10         A.     I'm assuming this is the

11    attachment.

12         Q.     Well, let's just say that that's

13    how it's been produced to us and it's

14    sequential --

15         A.     Yes.

16         Q.     -- in Bates numbers.   BP HZN BLY

17    00096441, 442.

18         A.     Yep.

19         Q.     Through 447.   What I'd like you

20    to, I'd like you to take a look with me at

21    the next page.

22         A.     Yep.

23         Q.     And before you do it, you

24    understand that BP performed an

25    investigation after this horrible disaster;

1    correct?

2          A.      After the --

3          Q.      After the April 20th disaster?

4          A.      Yes.

5          Q.      And you understand that they

6    looked at documents and they performed,

7    they delivered a report in September of

8    2010; correct?  The Bly report; correct?

9          A.      Yes.

10         Q.      And you indicated you hadn't

11   really read the Bly report; right?

12         A.      Not in its entirety.

13         Q.      And this appears to be a file

14   note regarding a kick on the DEEPWATER

15   HORIZON on March 8, 2010; correct?

16         A.      Yes.

17         Q.      Does that appear to be the same

18   event that you just looked at on the

19   previous exhibit?

20         A.      Yes.

21         Q.      And the other document is the

22   Transocean document?

23         A.      Yes.

24         Q.      And they cite in here the

25   Transocean well control handbook states the

582

```
1   following:  The OIM must complete a well
2   control event report.
3              And this appears to be that well
4   control event report; correct?
5        A.    This is the well control event
6   report.
7        Q.    The previous exhibit; right?
8        A.    Yes.
9        Q.    688.  And then if you follow me
10  down, it says the Transocean operations
11  event report number and then it states the
12  number and then for a few pages it
13  basically quotes out of that event report?
14       A.    Yes.
15       Q.    And then, I'm sorry, for a page,
16  another page.  And then it says the quality
17  of this report is seen as poor.  And it
18  would appear that no indefinite
19  investigation was made.  That's what
20  they're saying; correct?
21       A.    That's what it says here.
22  That's what it says here, yes.
23       Q.    Do you agree that the quality of
24  that operations event report was poor?
25       MR. JOHNSON:
```

1              Objection to form.

2         THE WITNESS:

3              I think there's room for

4    improvement in that operations event

5    report.

6    EXAMINATION BY MR. LEGER:

7         Q.    In fact, that's what that report

8    says, that it's still open; correct?

9         A.    Yes.

10        Q.    Now, the next paragraph, they

11   are stating the BP drilling and wells

12   operations practice Section 15.2.12 states

13   a well control incident shall be completed

14   and documented within the Traction

15   reporting system following any well control

16   incident.  Is that what it says?

17        A.    Yes.

18        Q.    Do you know what the Traction

19   reporting system is?

20        A.    The Traction reporting system is

21   the -- Traction is the name of BP's

22   internal reporting system in tracking, per

23   se.

24        Q.    So apparently they're concluding

25   their own regulations require that they

1    prepare a report and recording in the

2    tracks, and recorded and entered into the

3    Traction system; right?

4          A.     That's what it says here, yes.

5          MR. COLLIER:

6                 Object to form.

7    EXAMINATION BY MR. LEGER:

8          Q.     They go on down and state to

9    date, no report can be found which refers

10   to the incident on March 8th?

11         A.     Yes.

12         Q.     Is that what it says?

13         A.     That's what it says, yes.

14         Q.     That's what that BP document

15   says; right?

16         A.     Yes.

17         Q.     But they do mention the driller

18   on tour when the kick was taken was Dewey

19   Revette?

20         A.     That's correct.  I can confirm

21   that.

22         Q.     And that Jason Anderson was

23   involved in the Macondo blowout, was on the

24   rig at the time, too.  That's what BP is

25   saying; right?

 1          A.      Yes.

 2          Q.      Now, if you turn to page 444.

 3          A.      Okay.

 4          Q.      They're saying conclusions.  And

 5     once again, they're saying the quality of

 6     the investigation of the report produced by

 7     Transocean is poor and does not establish

 8     why it took the time it did to shut in the

 9     well with resulting volume of influx;

10     right?

11          MR. JOHNSON:

12               Objection to form.

13          THE WITNESS:

14               Say that again.  I was reading

15     that.

16     EXAMINATION BY MR. LEGER:

17          Q.      I'm sorry, go ahead.

18          A.      I'm sorry, I was reading at the

19     same time you were speaking.  Would you say

20     again.

21          Q.      It says basically the quality of

22     Transocean's is poor?

23          MR. JOHNSON:

24               Object to form.

25     EXAMINATION BY MR. LEGER:

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC   Document 5260-1   Filed 01/17/12   Page 167 of 185
5586

1           Q.      And it does not establish why it
2    took the time that it did to shut in the
3    well with resulting volume of influx;
4    correct?
5           MR. JOHNSON:
6                   Object to form.
7           THE WITNESS:
8                   That's what it says here.
9    EXAMINATION BY MR. LEGER:
10          Q.      Once again, they conclude that
11   no record of BP's investigation can be
12   found in BP's Traction system; right?
13          A.      Yes, that's what it says here.
14          Q.      And the other two conclusions
15   are who the driller was, the same guy on
16   the Macondo, and who the tool pusher was,
17   the same guy on the Macondo; right?
18          A.      Yeah.
19          Q.      They say nothing about the fact
20   that the engineers at BP were the same
21   engineers?
22          A.      Exactly.
23          Q.      Right?  The same well site
24   leaders; right?
25          A.      Yeah.

```
 1          Q.    The same well -- the same
 2    executives that don't wear long sleeve
 3    coveralls back in their air conditioned
 4    offices; right?
 5          MR. COLLIER:
 6                Object to the form.
 7          THE WITNESS:
 8                Yeah.
 9    EXAMINATION BY MR. LEGER:
10          Q.    When you go to meet with the BP
11    executives at their office in Houston,
12    they're not wearing coveralls; are they?
13          A.    No.  No, they're not.
14          Q.    They got air conditioning;
15    right?
16          A.    Yes.
17          Q.    But these -- and but these
18    executives who are doing the investigation,
19    they're not wearing coveralls on these rig
20    either; right?
21          A.    That's correct.
22          MR. COLLIER:
23                Objection.
24    EXAMINATION BY MR. LEGER:
25          Q.    Now, that was March 8th.
```

                                                                588

1        Actually that was in July that they were

2        looking at your operations event report of

3        March 8th; correct?

4              A.     Yeah.  I saw the date on it,

5        that's what the date says, yes.

6              Q.     You remember the exhibit we

7        looked at yesterday, Exhibit No. 659?

8              A.     No.

9              Q.     That was one of those letters

10       you had never seen before.

11             A.     Oh.

12             Q.     I'm sorry, e-mails, a series of

13       e-mails.

14             A.     Okay.  Let me see which ones.

15       Yeah.

16             Q.     That's e-mails between David

17       Sims and John Guide and John Guide and

18       David Sims and a long e-mail from David

19       Sims to John Guide.  That's five days after

20       the March 8th event; correct?

21             A.     Yes.  Yes.

22             Q.     Now, can you take a look at the

23       two paragraphs, the third and the fourth

24       paragraph and tell me is it possible

25       they're talking about the event of

589

1    March 8th?

2         MR. COLLIER:

3              Object to the form.

4         THE WITNESS:

5              It's difficult for me to say

6    categorically but reading this and the date

7    associated with it it would leads me to

8    believe, but I don't know for a fact.

9    EXAMINATION BY MR. LEGER:

10        Q.    What does it appear to be that

11   they have had a discussion about, that

12   Mr. Sims has written to Mr. Guide about?

13   They have an event that's occurred?

14        MR. COLLIER:

15             Object to form.

16        THE WITNESS:

17             Yes.   They're talking about

18   something specific.

19   EXAMINATION BY MR. LEGER:

20        Q.    A specific event?

21        A.    Yes.

22        Q.    That perhaps involved a kick?

23        MR. COLLIER:

24             Object to the form.

25        THE WITNESS:

 1                    It could, you know.  I mean, I
 2      believe it is, but I don't know for a fact.
 3      EXAMINATION BY MR. LEGER:
 4           Q.     In fact, he states the WSLs,
 5      that's well site leaders; right?
 6           A.     Yes.
 7           Q.     Are not well control experts, is
 8      what he's saying.  They're fantastic
 9      drillers, the best in the CPU, if not the
10      industry.  However, they do not circulate
11      out kicks for a living.
12           A.     That's what it says.
13           Q.     That's what it's saying.  And he
14      spends his time telling Mr. Guide what
15      Mr. Guide's been doing wrong; right?
16           A.     Yes.
17           MR. COLLIER:
18                    Object to the form.
19      EXAMINATION BY MR. LEGER:
20           Q.     At the very end he says, in his
21      last paragraph, you will be able to do
22      whatever you want.  I would strongly
23      suggest for anyone's sake that you make
24      logical decisions based on facts after
25      weighing all the opinions.  Correct?

1          A.     Yes, that's what it says.

2          Q.     Now, you remember the Exhibit

3    No. 96, which was the e-mail from Mr. Guide

4    to Mr. Sims?

5          A.     Which one?  Yeah.

6          Q.     On April 17th, a Saturday?

7          A.     Yes.

8          Q.     And Mr. Guide was talking about

9    they were flying by the seat of the pants;

10   correct?

11        MR. COLLIER:

12              Objection to form.

13        THE WITNESS:

14              Yes, that's what it says.

15   EXAMINATION BY MR. LEGER:

16        Q.     And that the engineering was

17   creating chaos; correct?

18        A.     Yeah.

19        MR. COLLIER:

20              Object to form.

21   EXAMINATION BY MR. LEGER:

22        Q.     Do you note that even the last

23   sentence, this morning Brian called me and

24   asked my choice about explaining

25   opportunities, both inside and outside of

1    the company.  You see that?

2         A.    Yeah, he's asking for his

3    advice, yes.

4         Q.    Do you know who Brian is?  Is

5    there a Brian that works with John Guide?

6         A.    I don't know.  I assume he's

7    talking about Brian Morel but I don't know

8    for a fact.

9         Q.    Brian Morel, one of these

10   engineers that he's talking about; correct?

11        A.    Yeah.

12        Q.    Now, I'd like you to look at the

13   first page.  This e-mail is attached and it

14   is sent by Mr. Kent Corser, the drilling

15   engineering manager.

16        A.    Yes, sir.

17        Q.    On June 22nd, 2010.  Correct?

18        A.    Yes.

19        Q.    And it's copied to a Tony Brock,

20   Steve Robinson and, of course, to Jim

21   Cowie; right?

22        A.    Yes.

23        Q.    This is all after the accident;

24   right?

25        A.    Yes.

 1          Q.      So when they did, when these
 2     guys did their investigation and looked at
 3     your March 8th event report, they knew that
 4     John Guide -- they had this document in
 5     their hands and they knew that John Guide
 6     was complaining that their engineers were
 7     driving chaos.  They knew that their well
 8     site leaders were flying by the seat of
 9     their pants; right?
10          MR. COLLIER:
11                  Objection to form.
12     EXAMINATION BY MR. LEGER:
13          Q.      Is that right?
14          A.      Yeah.
15          Q.      They said your investigation was
16     poor; right?
17          A.      Yeah.
18          Q.      And they did not mention the
19     experience or the quality of their
20     engineers or seem to even investigate it,
21     at least according this document; right?
22          MR. COLLIER:
23                  Object to the form.
24          THE WITNESS:
25                  That's correct, yeah.

1    EXAMINATION BY MR. LEGER:

2         Q.    Do you remember after the

3    March 8th event, John Guide asked you to

4    consider how to improve the rig crew's

5    hazard awareness?

6         A.    I don't recall that, no.

7         Q.    According to the chief counsel's

8    report, chapter 5, page 244.  I'm going to

9    show you a page, counsel, page 244, the

10   chief counsel's report for the National

11   Commission of the DEEPWATER HORIZON oil

12   spill and ask you to look at the very last

13   paragraph.

14         And I wish I had the actual

15   document but this is what I have, so -- it

16   says after the March 8th kick on the

17   DEEPWATER HORIZON, Guide asked Transocean

18   rig manager Paul Johnson to consider how to

19   improve the rig's hazard awareness and

20   Johnson wrote back.

21         And does that look like -- do

22   you remember writing that back to

23   Mr. Guide?

24         A.    No, I didn't.  If you refer to

25   the other e-mails, it was Rod Ryan that

1    sent that from my computer.

2         Q.    So one of the people on the rig

3    sent that from your computer?

4         A.    Rod, he's the OIM but he was in

5    the office covering my vacation so he was

6    in the office attending to duties of the

7    rig manager.  He sent that e-mail.

8         Q.    But you remember reading this

9    e-mail; correct?

10        A.    No.

11        Q.    You did not read it?

12        A.    No.

13        Q.    When an e-mail was -- but you

14   know Rod Ryan sent it?

15        A.    Yeah.  It was brought earlier to

16   my attention today that Rod sent that from

17   my e-mail account while I was on vacation.

18        Q.    And what he said was, I thought

19   about this a lot yesterday and asked for

20   input from the rig and none of us could

21   come up with anything we're not already

22   doing.  You can tell them what the hazards

23   are but until they get used to identifying

24   themselves they are only following your

25   lead.  Correct?

1         A.      That's what --

2         Q.      That's what he wrote?

3         A.      Yes.   That's what it states

4    here, yes.

5         Q.      Of course, what we know sitting

6    here today is that after March 8th,

7    Mr. Guide didn't tell you or Mr. Ryan or

8    Mr. Alexander or Mr. Revette all of the

9    hazards; did they?

10        A.      He certainly didn't say anything

11   to me.   He certainly didn't say anything to

12   me.

13        Q.      Did he tell you about the

14   inexperience of their engineers?

15        A.      No.

16        Q.      Or that they're onshore in the

17   air conditioned office were driving chaos;

18   correct?

19        MR. COLLIER:

20              Object to form.

21        THE WITNESS:

22              That's correct.

23   EXAMINATION BY MR. LEGER:

24        Q.      You testified yesterday that you

25   asked to see a copy of the -- to get

597

```
 1    morning reports from BP; correct?
 2         A.     That's correct.
 3         Q.     And they told you they couldn't
 4    give them to you; right?
 5         A.     That's correct.
 6         Q.     Did you, also, ask to see a copy
 7    of the temporary abandonment procedure?
 8         A.     Yes, I did.
 9         Q.     And they refused to give that to
10    you?
11         A.     It wasn't ready, they didn't
12    have it.
13         Q.     So you never got it; right?
14         A.     No.  It went direct to the rig.
15         Q.     Did they give you assurances
16    that they would give you the information
17    you needed?
18         A.     Yeah.  Well --
19         Q.     What did they tell you?
20         A.     I can't recall specifically on
21    this, you know, but it was along the lines
22    that they would let me know what I needed.
23    It's difficult to remember now.
24         Q.     I'm going to read to you, sir,
25    and see if it refreshes your -- from your
```

1    testimony before the Marine Board --

2         A.    Okay.

3         Q.    -- of Inquiry, the United States

4    Coast Guard.  At page 331, you were asked

5    now, were you given now, even though you

6    requested documents and BP did not provide

7    them to you, were you given any assurances

8    that they would relay critical important

9    information to you.  And your answer was --

10   and I'm going to ask you to read it, sir?

11        A.    I answered yes.  I mean, I was

12   there every day and when the report wasn't,

13   you could -- couldn't you come through, all

14   of our other meetings, you know, it was

15   assured to me that I would get all the

16   information I needed.  I was to just trust

17   them.

18        Q.    You were to what?

19        A.    Trust them.

20        Q.    Did you trust them?

21        A.    You know, I did, yes.

22        Q.    Do you think they betrayed that

23   trust?

24        A.    Yes.

25        Q.    Sir, do you agree that the

3599

1    greater the risk, the greater the care

2    required?

3        A.    Definitely.

4        Q.    Do you agree that the greater

5    the risk, the more important that there be

6    focussed and responsible leadership in a

7    deepwater drilling environment?

8        A.    Yes, I do.

9        Q.    Do you agree that leadership

10   must be respected and make good decisions,

11   driven by logical analysis of the facts as

12   Mr. Sims told in writing to Mr. Guide?

13       A.    Yes, I do.

14       Q.    Would you agree that that

15   logical analysis of the facts should

16   include providing you and your crew with

17   all the information available of weaknesses

18   and shortcomings?

19       A.    Yes.  Yes, I do.

20       Q.    Would you have liked to have

21   known those things?

22       A.    You know, there's a whole bunch

23   of things here I would have liked to have

24   known.  I'm sorry.  I'm just frustrated.

25       Q.    Sir, Gordon Jones was an

1    employee of M-I SWACO.

2         A.    Yes.

3         Q.    Was a crewmember of that vessel

4    and he was the son of a friend of mine.

5               Did you know every man that

6    worked for Transocean on that vessel?

7         A.    I knew pretty much all of the

8    Transocean folks and I knew all of the

9    Transocean folks that passed away and some

10   of them were friends.

11        Q.    Gordon Jones was married and had

12   a wife and a child and was pregnant for

13   another child.  Every one of those other

14   guys had wives too; right?

15        A.    Yes.

16        Q.    Do you believe that BP

17   callously, wantonly, intentionally or

18   indifferently held back information from

19   you that would have been vital to you in

20   helping you to protect the lives and safety

21   of the men aboard that vessel, sir?

22        MR. COLLIER:

23               Object to form.

24        THE WITNESS:

25               You know, for the longest time I

Suggested line for Running Header
Case 2:10-md-02179-CJB-DPC   Document 5260-1   Filed 01/17/12   Page 182 of 185
601

1   wanted to believe that there was no

2   deliberate holding back of information, you

3   know.  We had a good relationship, we

4   trusted them, I did everything I could and

5   forwarded, you know, you saw the level of

6   detail we're talking about, drill line, I

7   told them everything.

8                   That's -- going through what

9   we've been going through these last

10  two days, my opinion is they held things

11  back from me, yes.

12  EXAMINATION BY MR. LEGER:

13        Q.      If you had known what you know

14  today, being armed with this information

15  about the experience of their engineers,

16  about their dysfunctional leadership, about

17  the difficulties they were having amongst

18  each other, would you have made different

19  decisions?

20        A.      Yes.

21        Q.      What would you have done?

22        A.      There's certain information, you

23  know, with regards to the cementing and the

24  centralizers and other procedures that I

25  trusted was fine and followed their

1    instructions.

2              Had I known that the issues and

3    all of the background information, I admit

4    I'm not a drilling engineer but I would

5    have gone and sought advice.

6         Q.    They were the drilling

7    engineers; right?

8         A.    Yeah.

9         Q.    Armed with what you know today,

10   would you have shut that well down until

11   you got answers?

12        A.    I would have stopped operations

13   until I get clarification, feedback,

14   assurances, yeah.

15        MR. LEGER:

16              Thank you, sir.  I have no

17   further questions.

18        THE VIDEOGRAPHER:

19              We're going off the record at

20   11:59.

21              (The deposition is concluded at

22   12:00).

23

24

25

1

2

3                    WITNESS' CERTIFICATE

4

5

6                         **VOLUME II**

7

8        I, **PAUL J. JOHNSON,** read or have had

9    the foregoing testimony read to me and

10   hereby certify that it is a true and

11   correct transcription of my testimony, with

12   the exception of any attached corrections

13   or changes.

14

15

16

17

18                    _____

19                    PAUL J. JOHNSON

20

21

22

23

24

25

1          <u>REPORTER'S</u> <u>CERTIFICATE</u>

2

3

4          I, **JOSEPH R. KAISER, JR.,** Certified

5    Court Reporter, State of Louisiana, do

6    hereby certify that the above-mentioned

7    witness, after having been first duly sworn

8    by me to testify to the truth, did testify

9    as hereinabove set forth;

10         That the testimony was reported by

11   me in shorthand and transcribed under my

12   personal direction and supervision, and is

13   a true and correct transcript, to the best

14   of my ability and understanding;

15         That I am not of counsel, not

16   related to counsel or the parties hereto,

17   and not in any way interested in the

18   outcome of this matter.

19

20         _____
           **JOSEPH R. KAISER, JR., CCR, RPR**
21         **Certified Court Reporter**
           **State of Louisiana**
22

23

24

25

**GAUDET KAISER, L.L.C.**
Board-Certified Court Reporters