# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater | * | |
| Horizon" in the Gulf of Mexico, | * | MDL No. 2179 |
| on April 20, 2010, | * | |
| | * | Section: J |
| This Pleading applies to: | * | |
| | * | Judge Barbier |
| All Cases (including Case No. 2:10-cv-04536 | * | |
| (United States v. BP Exploration & | * | Magistrate Judge Shushan |
| Production Inc., et al.)) | * | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## BP EXPLORATION & PRODUCTION INC.'S MEMORANDUM IN RESPONSE TO ANADARKO'S CROSS-MOTION FOR SUMMARY JUDGMENT [DOC. # 5113] AND TRANSOCEAN'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT [DOC. # 5103] AND SURREPLY MEMORANDUM IN RESPONSE TO UNITED STATES' REPLY IN SUPPORT OF SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT [DOC. # 5214]

Robert R. Gasaway
Jeffrey Bossert Clark
Aditya Bamzai
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  202-879-5000
Facsimile:  202-879-5200


Joel M. Gross
Brian D. Israel
Allison B. Rumsey
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC  20004-1206
E-Mail:  Joel.Gross@aporter.com
Telephone:  202-942-5000
Facsimile:  202-942-5999

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone:  504-581-7979
Facsimile:  504-556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone:  202-662-5985
Facsimile:  202-662-6291


*Attorneys for BP Exploration & Production Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

ARGUMENT ..............................................................................................................2

I.      TRANSOCEAN'S BID TO AVOID ALL LIABILITY FOR UNDERWATER OIL DISCHARGES LACKS MERIT. ...................................2

      A.     Transocean Is Subject To OPA Liability For Underwater Oil Discharges Emanating From The *Deepwater Horizon* Vessel It Owned And Operated. ...........................................................................3

           1.    OPA Section 1002 Establishes Incident-Wide Liability For Responsible Parties Such As Transocean. ...................................4

           2.    Section 1004(b)(1) Establishes Limits, Not A Complete Defense, To OPA Liability. ............................................................5

           3.    Transocean's Reliance On Legislative History Is Unpersuasive. ...............8

           4.    Transocean's Attempt To Extend Its "Surface Of The Water" Distinction To Clean Water Act Penalties Shows The Flaws Of Its Interpretation. .................................................................10

           5.    Transocean's Remaining Legal Arguments Lack Merit. ..........................12

           6.    Fact Issues Preclude Summary Judgment. .................................................14

      B.     Transocean's "Operator" Interpretation Lacks Merit. ...........................15

II.     ANADARKO'S STATEMENTS REGARDING BP'S OPERATOR LIABILITY ARE NOT GERMANE TO THE ISSUES BEFORE THE COURT. ...............................................................................................17

III.    THE UNITED STATES' ARGUMENTS ARE MISTAKEN. .........................18

      A.     The United States' Request For A Final Judgment On OPA Liability Constitutes Improper Claim Splitting. ....................................18

      B.     The United States Has Not Made A Sufficient Showing To Justify Imposition Of Joint And Several Liability ...........................................20

CONCLUSION ...........................................................................................................21

APPENDIX A ............................................................................................................23

APPENDIX B ............................................................................................................24

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>CASES</u>

*Ainsworth v. Shell Offshore, Inc.*,
   829 F.2d 548 (5th Cir. 1987) ................................................................................. 16

*Burlington N. & Santa Fe Ry. Co. v. United States*,
   129 S. Ct. 1870 (2009) ................................................................................. 13, 20

*Doe v. KPMG, LLP*,
   398 F.3d 686 (5th Cir. 2005) ................................................................................. 5

*GMD Shipyard Corp. v. M/V Anthea Y*,
   No. 03-Civ.-2748, 2004 WL 2251670  (S.D.N.Y. Oct. 6, 2004) ........................... 12

*Hohn v. United States*,
   524 U.S. 236 (1998) ................................................................................. 11

*In re Settoon Towing LLC*,
   722 F. Supp. 2d 710 (E.D. La. 2010) ................................................................. 12

*Lincoln Gen. Ins. Co. v. Reyna*,
   401 F.3d 347 (5th Cir. 2005) ......................................................................... 20, 21

*Mead Corp. v. Tilley*,
   490 U.S. 714 (1989) ................................................................................. 9

*Milner v. Department of the Navy*,
   131 S. Ct. 1259 (2011) ................................................................................. 10

*National Shipping Co. of Saudi Arabia (NSCSA)*
   *v. Moran Mid-Atlantic Corp.*,
   924 F. Supp. 1436 (E.D. Va. 1996) ................................................................. 14

*Ratzlaf v. United States*,
   510 U.S. 135 (1994) ................................................................................. 9

*Russello v. United States*,
   464 U.S. 16 (1983) ................................................................................. 11

*Sony BMG Music Entm't v. Tenenbaum*,
   660 F.3d 487 (1st Cir. 2011) ................................................................. 11

*United States v. Bestfoods*,
   524 U.S. 51 (1998) ................................................................................. 15, 16, 17

*United States v. Kerley*,
   416 F.3d 176 (2d Cir. 2005) ................................................................. 12

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*United States v. Youssef*,
547 F.3d 1090 (9th Cir. 2008) .................................................................................. 11

## STATUTES

33 U.S.C. § 2701 ........................................................................................ 3, 4, 7, 9, 14

33 U.S.C. § 2702 ............................................................................................ 4, 5, 9, 12

33 U.S.C. § 2704 ........................................................................................ 3, 5, 6, 7, 13

33 U.S.C. § 2717 ................................................................................................ 18, 19

## TREATISES

3 BENEDICT ON ADMIRALTY
§ 112(a)(2) (7th ed. 2004) ........................................................................................ 12

Oil Pollution Act of 1990,
Pub. L. 101-380, 104 Stat. 484 (1990) ...................................................................... 4

Senate Report 101-94 from the Committee on Environment and Public Works,
1990 U.S.C.C.A.N. 722 ................................................................................... 8, 9, 10

## **INTRODUCTION**

BP is the only party involved in the current round of summary judgment briefing that maintains that questions of Clean Water Act ("CWA") penalty liability should be resolved by trial and not summary judgment.  BP's recent Opposition to the United States' Second Motion For Partial Summary Judgment [Doc. # 5124 (1/09/12)] ("BP Opp.") thus focused on (i) those issues presented by the United States' Motion [Doc. # 4836 (12/06/11) ("Motion")] that need not be resolved at this juncture, and (ii) those issues, whether or not arising out of arguments directed at BP, where the United States was seeking a ruling that both would be legally erroneous and would adversely impact BP.  This memorandum continues along similar lines, in particular addressing the recent summary judgment cross-motions by Anadarko and Transocean, as well as briefly addressing points made for the first time in the United States' Reply Brief.

***First***, Transocean's cross-motion [*see* # Doc 5103. (1/09/12)] ("TO Opp.") contends Transocean bears no OPA compensatory liability for subsea spills because Congress supposedly exempted it from all liability for spills occurring below the "surface of the water."  (*See* Section I.A.1—I.A.5, *infra*.)  This argument, if accepted, could wrongly place substantially all OPA liability on BP alone.  As the United States correctly points out, Section 2704 in all of its subparts — including Section 2704(b)(1), relied upon by Transocean — establishes only certain potentially applicable *caps* on OPA liability, not an effective *defense* to OPA liability. Relatedly, even if Transocean's "surface of the water" arguments were meritorious (they are not) disputed issues of fact would remain for trial; hence, summary judgment freeing Transocean from all OPA liability would remain inappropriate.  (*See* Section I.A.6, *infra*.)

In attempting to deflect CWA liability away from itself and onto BP and other lessees, Transocean further contends that Outer Continental Shelf Lands Act ("OCSLA") lessees are

"operators as a matter of law."  As BP previously explained, CWA operator liability may not be imposed "as a matter of law" in this fashion.  *See* BP Opp. at 17-21.  Indeed, CWA operator status is properly determined according to the Supreme Court's *Bestfoods* test, which is highly fact-bound in nature and can be properly applied here only *after* the Phase 1 trial record has been compiled.  (*See* Section I.B, *infra*.)

**Second**, the Anadarko defendants in their recent cross-motion [*see* Doc. #5113 (1/09/12)] ("Anadarko Opp.") suggest that BP "*may* be found to be an operator of the *Deepwater Horizon* under the CWA."  *Id*. at 6 & n.4 (emphasis added).  Although this issue is not ripe for resolution, BP wishes to make clear that BP strongly disputes that it was in fact an "operator" of the *Deepwater Horizon* for Clean Water Act penalty purposes.  (*See* Section II, *infra*.)

**Finally**, the United States' Reply [Rec. #5214 (01/16/12)] ("U.S. Reply") presses two arguments for the first time.  Because these two arguments were not properly elaborated in the United States' original motion, they should be rejected outright.  But even if considered, these new arguments still should be rejected.  The United States' request for final OPA judgment is clearly premature.  (*See* Section III.A, *infra*.)  Likewise, the United States' claim that it is somehow entitled to final judgment reflecting joint and several liability runs headlong into BP's well pleaded divisibility defense.  (*See* Section III.3, *infra*.)

<u>**ARGUMENT**</u>

This memorandum comments, ***first***, on Transocean's cross-motion (*see* Section I, *infra*); ***second***, on Anadarko's cross-motion (*see* Section II, *infra*); and ***third***, on the United States reply (*see* Section III, *infra*).

**I.     TRANSOCEAN'S BID TO AVOID ALL LIABILITY FOR UNDERWATER OIL DISCHARGES LACKS MERIT.**

Transocean mounts closely interconnected arguments (i) that the Oil Pollution Act frees it

from all compensatory liability for subsea discharges of oil (construing OPA Section 2704(b)(1)) and (ii) that the Clean Water Act silently offers a similarly complete defense to liability for subsea discharges as to CWA penalty liability.  Most relevant to BP, Transocean's bid to avoid practically all compensatory liability under OPA improperly seeks to convert a mere cap on liability into a complete defense to liability, thus pushing Transocean's fair share of OPA liability onto other OPA "responsible parties" like BP.  (*See* Section I.A, *infra*.)  Moreover, Transocean's attempt to tag BP as an "operator as a matter of law" of the *Deepwater Horizon* is both legally flawed and not yet ripe for adjudication (*see* Section I.B, *infra*).

A.     **Transocean Is Subject To OPA Liability For Underwater Oil Discharges Emanating From The** *Deepwater Horizon* **Vessel It Owned And Operated.**

Notwithstanding its status as a "responsible party" under OPA, Transocean argues that it is not liable to pay either compensation or penalties for any oil spilled from the *Deepwater Horizon* solely because most of the discharged oil made contact with the waters of the United States *subsea* as opposed to above the surface of the water.

In this regard, Transocean claims the benefit of a supposed "special OPA provision" — rooted in OPA Section 1001 (18), 33 U.S.C. § 2701(18), and OPA Section 1004(b)(1), 33 U.S.C. § 2704(b)(1) — in order to avoid most or all OPA and Clean Water Act liability.  *See* TO Opp. at 2-3.  It is clear that, if accepted, this argument could place most or all OPA liability on BP's shoulders and would later be invoked by Transocean as a defense to BP's efforts to gain contribution from Transocean in accordance with applicable law.

### 1. OPA Section 1002 Establishes Incident-Wide Liability For Responsible Parties Such As Transocean.

In enacting major oil spill legislation in 1990, Congress both amended certain preexisting provisions of the Clean Water Act and newly enacted the Oil Pollution Act, 33 U.S.C. § 2701 *et seq*. *See* Oil Pollution Act of 1990, Pub. L. 101-380, 104 Stat. 484 (1990).

Most importantly, OPA Section 1002(a) governs designations of companies as "responsible parties" and provides as follows:

> *Notwithstanding any other provision or rule of law, and subject to the provisions of this Act*, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

33 U.S.C. § 2702(a) (emphasis added); *see also* 33 U.S.C. §§ 2702(b)(1)-(2) (specifying six specific categories of damages and removal costs attaching to § 2702(a) liability).

Here, the record indisputably shows that oil was discharged to water from the *Deepwater Horizon*'s riser system and blowout preventer ("BOP") and that the *Deepwater Horizon*'s BOP and riser are appurtenances of the larger *Deepwater Horizon* vessel. *See* Transocean's Response to Petition for Writ of Mandamus, *In re Cameron Int'l Corp.*, No. 11-30987, at 6-7 (5th Cir. 2011). Transocean concedes as much. *See* TO Opp. at 2. Accordingly, under OPA Section 2701(32)(A), Transocean — as both an owner and operator of the *Deepwater Horizon* vessel — is a "responsible party." 33 U.S.C. § 2701(32)(A).

Two important implications follow from Transocean's responsible party status. **First**, Transocean becomes "liable," under the plain text of section 2702(a), "for the removal costs and damages" that the Act specifies, except where it can prove a divisibility or other applicable OPA defense. **Second**, Transocean's OPA responsible party status attaches and is maintained

4

"[n]otwithstanding any other provision or rule of law."  33 U.S.C. § 2702(a) (emphasis added).

This plain reading of Section 2702(a) — pointing as it does to Transocean joining BP as a party liable under OPA — should be both the beginning and the end of the question of whether Transocean is liable under OPA.  As the Fifth Circuit has explained, "When interpreting a statute, we start with the plain text, and read all parts of the statute together to produce a harmonious whole."  *Doe v. KPMG, LLP*, 398 F.3d 686, 687 (5th Cir. 2005).

> ### 2.   Section 1004(b)(1) Establishes Limits, Not A Complete Defense, To OPA Liability.

As against the plain text of Section 2702(a) — including its emphasis that responsible party status attaches "notwithstanding any other provision or rule of law" — Transocean places heavy reliance on Section 2702(a)'s unsurprising proviso that responsible party status must always be construed as "subject to the provisions of this Act."  TO Opp. at 5.

BP agrees that OPA responsible party status must always be construed and applied "subject to" the various OPA provisions, as enacted by Congress and construed by the courts.  But BP disagrees that any OPA provision — including OPA Section 2704(B)(1) on which Transocean fixes attention — effectively negates Transocean's responsible-party status for purposes of this case.

Section 2704 of the OPA, examined in detail below, contains a limitation on liability for certain mobile offshore drilling units ("MODU") which applies to discharges of oil on or above the "surface of the water."  33 U.S.C. § 2704(b)(1).  Under Section 2704(b)(1), when owner or operator status as to a MODU gives rise to OPA "responsible party" status for claims stemming from oil discharges on or above the surface of the water, the liability of the MODU's owner and operator is governed by a particular OPA liability cap under Section 2704(a)(1) — one specifically chosen by Congress to apply to discharges from a MODU.  *See* 33 U.S.C. §§ 2702(a)

5

& 2704(a), (b)(1).

Despite Section 2704(b)(1) limited liability-capping purpose, Transocean contends that Section 2704(b)(1) should be read effectively to negate Section 2702(a)'s designation of Transocean as an OPA "responsible party." TO Opp. at 4-5, 8. To see the flaws in Transocean's contention that OPA Section 2704(b)(1) shields it from the implications of its responsible party status, and practically all OPA liability, it is useful to begin with the text of Section 2704(b) as a whole:

> **(a)** Division of liability for mobile offshore drilling units
>
> **(1)** Treated first as tank vessel
>
> For purposes of determining the responsible party and applying this Act and except as provided in paragraph (2), a mobile offshore drilling unit which is being used as an offshore facility is deemed to be a tank vessel with respect to the discharge, or the substantial threat of a discharge, of oil on or above the surface of the water.
>
> **(2)** Treated as facility for excess liability
>
> To the extent that removal costs and damages from any incident described in paragraph (1) exceed the amount for which a responsible party is liable (as that amount may be limited under subsection (a)(1) of this section), the mobile offshore drilling unit is deemed to be an offshore facility. For purposes of applying subsection (a)(3) of this section, the amount specified in that subsection shall be reduced by the amount for which the responsible party is liable under paragraph (1).

33 U.S.C. § 2704(b)(1). According to Transocean, these provisions absolve it from all liability for oil discharged "on or above the surface of the water." TO Opp. at 2-5.

Transocean's interpretation is not persuasive. *First*, Section 1004(b)(1) does not expressly, or even by implication, state that mobile offshore drilling unit ("MODU") owners and operators are "not liable" for discharges below "the surface of the water." Instead, Section

2704(b)(1) simply "deem[s a MODU] to be" a "tank vessel" for purposes of determining the applicable liability cap established by Section 2704(a).  33 U.S.C. § 2704(b)(1).

Critically, OPA's Section 2704(a) liability caps vary in dollar amount depending on the type of discharge source under the  Section 2702 "responsible party" designation.  In particular, Section 2704(a) establishes liability caps set at different dollar liability levels for "the liability of a responsible party under Section 2702."  *Id.*  These dollar liability levels then vary depending on whether responsible party status is imposed based on an oil discharge (or threat of discharge) from —

- "a tank vessel," *see* 33 U.S.C. § 2704(a)(1);

- "any other vessel," *see* 33 U.S.C. § 2704(a)(2);

- "an offshore facility except a deepwater port," *see* 33 U.S.C. § 2704(a)(3);

- "any onshore facility and a deepwater port," *see* 33 U.S.C. § 2704(a)(4).

In this manner, a responsible party's liability cap critically depends on the specific type of vessel or facility in question.  *Compare* Section 1004(a)(1) (setting a pre-inflation cap for tank vessels of $1,900 to $3,000 per gross ton).

Against this backdrop, Section 2704(b)(1) simply defines a MODU as a "tank vessel" for purposes of identifying which item on Section 2704(a)(1)'s menu of liability caps applies.  Without Section 2704(b)(1), MODUs might arguably be treated as "other vessels" — not as "tank vessels" (since real world MODUs are not intrinsically tank vessels).  Alternatively, absent Section 2704(b)(1), MODUs might arguably be treated for liability-cap purposes as "offshore facilities."  *See* 33 U.S.C. s 2701(18) ("'[M]obile offshore drilling unit' means a vessel . . . capable of use as an offshore facility.").  By including Section 2704(b)(1) in the statute, Congress clarified how the liability limits for MODU owners should be computed.  (Appendix A

contains a more detailed description of the computations steps required by OPA.)   This straightforward interpretation confirms Section 2704(b)(1)'s limited but important role.   Read together, subsections 2704(b)(1) and 2704(b)(2) make clear that Section 2704(b)(1) provides a set of instructions for computing the applicable OPA cap for MODUs, which are otherwise both vessels and offshore facilities when being used for drilling for oil.

As to BP, of course, the computation of an applicable liability limit is not relevant.   BP has indicated that it will not invoke OPA's liability-cap regime.   Transocean, in contrast, not only seeks to rely on the liability cap, but goes far further by misinterpreting OPA Section 2704(b)(1) as expanding Section 2704(b)(1)'s liability capping role into what for practical purposes is a complete defense to OPA liability and effective negation of Transocean's "responsible party" status.

### 3.   Transocean's Reliance On Legislative History Is Unpersuasive.

To overcome the plain language and overall structure of OPA, Transocean relies heavily on a snippet of legislative history published in a Senate committee report.   According to this snippet, "[i]f a discharge of oil from a mobile offshore drilling unit occurs below the surface of the water, the lessee or permittee is liable."   Oil Pollution Act of 1990, 1990 U.S.C.C.A.N. 722, 734 (Senate Report 101-94 from the Committee on Environment and Public Works).

Significantly, however, Congress did *not* enact the legislative language being construed in this committee report.   Instead, Senate Report 101-94 construes S. 686, *see* 1990 U.S.C.C.A.N. at 722 (said "[t]o accompany S. 686"), which included a much different definition of the term "owner or operator."   (*See* Appendix B setting forth the rejected definitions.)

Since liability under the unenacted Senate bill would clearly have attached to owners and operators, the unenacted bill might possibly have established a compensatory damages regime in

which spills on or above the waterline were the responsibility of MODU owners and operators whereas spills below the waterline were the responsibility of OCSLA lessees. *See* 1990 U.S.C.C.A.N. at 733 ("The bill *accomplishes* [its aims] *by defining 'owner or operator' for OCS facilities to mean the lessee or permittee of the area in which the facility is located (or the holder of the OCS rights).*") (emphasis added).

The critical fact, however, is that this possibility is not relevant because the Section 101(19) definition of "owner or operator" on which the Senate report that Transocean cites was commenting was *not* enacted. Instead, the OPA version Congress *did* enact makes *both* vessel owners and operators *and* OCSLA lessees liable for MODU discharges without regard to whether the discharges occurred above or below a waterline. *See* 33 U.S.C. § 2701(18) (defining MODUs as both vessels and offshore facilities); *id.* § 2701(32) (defining "responsible party" and thus making vessel owners and operators liable for vessel discharges and making permittees liable for offshore facility discharges); *id.* § 2702(a) (making responsible parties liable for oil discharges).

In overlooking the critical fact that a waterline-driven approach to allocating liability for spills was considered but ultimately rejected by Congress, Transocean makes a fundamental interpretive error. *See Ratzlaf v. United States*, 510 U.S. 135, 148 n.18 (1994) ("The dissent … features a House Report issued in 1991 in connection with an unenacted version of the Annunzio-Wylie Anti-Money Laundering Act. We do not find that Report, commenting on a bill that did not pass, a secure indicator of congressional intent at any time …."); *Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) (same principle). This Court thus should not allow "ambiguous

legislative history to muddy clear statutory language." *Milner v. Department of the Navy*, 131 S.

Ct. 1259, 1266 (2011).[1]

> **4.    Transocean's Attempt To Extend Its "Surface Of The Water" Distinction To Clean Water Act Penalties Shows The Flaws Of Its Interpretation.**

Although BP is not concerned *directly* with issues of what penalty liabilities Transocean

may or may not owe to the United States, BP is vitally concerned with the Clean Water Act's

proper interpretation and application to the facts of this case as well as with any CWA

interpretations that bear on Transocean's liability as a responsible party under OPA.  It is thus

critical to bear in mind that Transocean's attempt to put forward an integrated interpretation of

these two statutes is totally unpersuasive as to both.  As to the Clean Water Act specifically,

nothing resembling OPA's Section 2704(b)(1) appears in the text of the Act and this deliberate

difference between OPA and the Clean Water Act makes clear that the "waterline" principle,

even with its very limited role under the Oil Pollution Act, plays no role whatever under the

Clean Water Act.

Despite the absence of "surface of the water" phraseology in the Clean Water Act,

Transocean's cross-motion spins the fact that concurrent 1990 amendments to the Clean Water

Act's penalty regime were enacted at the same time as OPA's damages regime in an attempt to

support the proposition that the Clean Water Act imposes penalty liability *only for* discharges at

---

[1] Perhaps in appreciation of the fact Senate Report 101-94 analyzes unenacted legislative language that differs substantially from OPA as passed, Transocean notes that "[t]his Court previously found the same Senate Report persuasive in its Order on the B-1 motion to dismiss.  Dkt. 3830 at 21."  TO Opp. at 4.  But this Court's B1 Order cites Senate Report 101-94 only for the indisputably correct proposition that OPA "builds upon section 311 of the Clean Water Act to create a single Federal law providing cleanup authority, penalties, and liability for oil pollution." S. Rep. 101-94 [1990 U.S.C.C.A.N. at 730].  The B1 Order certainly did not consider, much less express agreement with, every jot and tittle of Senate Report 101-94.

or above the surface of the water.  *See* TO Opp. at 16-17 (CWA Section 311 "belongs to the statutory scheme governing oil pollution that OPA created.").

The cross-motion's arguments in this regard are easily answered.  To be sure, the complex regime of OPA liability caps, including the "surface of the water" language in OPA Section 2704(b)(1), was enacted at the same time that Congress amended certain provisions of the Clean Water Act.  But the most logical inference to be drawn from the fact that Congress concurrently embedded a limited "surface of the water" cap distinction in OPA but did not embed one in the CWA is that this difference in treatment was deliberate, not inadvertent.

Indeed, if Transocean were correct that OPA and the Clean Water Act should be viewed as different provisions appearing in a single statute, it only further weakens the case for Transocean's Clean Water Act interpretation.  When construing the same term used in different subsections of the same statute, the Supreme Court has explained that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion."  *Russello v. United States*, 464 U.S. 16, 23 (1983).   Under the *Russello* presumption, if Congress had intended to impose a "surface of the water" limitation on the Section 311(b) penalty liability, "it would have done so expressly."  *Id.*; *accord Hohn v. United States*, 524 U.S. 236, 250 (1998).

Tellingly, courts often apply this *Russello* presumption even when interpreting different, but related, statutory provisions such as the Clean Water Act and OPA provisions at issue here.  *See, e.g.*, *United States v. Youssef*, 547 F.3d 1090, 1094-95 (9th Cir. 2008) (per curiam) (discussing *Russello*); *see also Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 498-500 (1st Cir. 2011) ("Further, where Congress intended to create other exceptions for solely personal

or non-commercial use, it did so expressly."); *United States v. Kerley*, 416 F.3d 176, 180 (2d Cir. 2005) ("These closely related statutes make clear that when Congress intended to allow collateral challenges to support orders based on jurisdictional issues, it knew how to do so.").

In sum, a close examination of Transocean's Clean Water Act arguments only underscores the weaknesses of Transocean's overall interpretive approach.

### 5.      Transocean's Remaining Legal Arguments Lack Merit.

Transocean's scattershot submission of additional "waterline defense" contentions reinforces the weakness of Transocean's core arguments for escaping its obligations as an OPA "responsible party."

***First***, Transocean unpersuasively seeks to reframe the principles governing OPA joint and several liability for responsible parties.

Transocean is correct, of course, that OPA does not contain the phrase "joint and several liability."  *See* TO Opp. at 7.  But case law holds that OPA establishes a statutory form of tort liability intended to carry within it certain common law "joint and several" liability principles. *See, e.g.*, *In re Settoon Towing LLC*, 722 F. Supp. 2d 710, 714 (E.D. La. 2010).  Courts therefore have held that OPA Section 2702(a) partially incorporates, as appropriate, certain common law liability doctrines and limitations.  *See, e.g., GMD Shipyard Corp. v. M/V Anthea Y*, No. 03-Civ.-2748, 2004 WL 2251670, at *12 n.3 (S.D.N.Y. Oct. 6, 2004) ("OPA 90 provides that '*each* responsible party for a vessel or a facility from which oil is discharged ... is liable....'") (quoting 33 U.S.C. § 2702(a)) (emphasis in original); *see also* 3 BENEDICT ON ADMIRALTY § 112(a)(2) (7th ed. 2004) ("Where there is more than one responsible party, the use of the word 'each' would indicate that such liability is joint and several.").

Transocean is thus forced to concede that joint and several liability would "undoubtedly" be appropriate "in certain instances." TO Opp. at 7. But this concession undermines any weight Transocean's argument might otherwise carry. BP has elsewhere explained, *see* BP Opp. at 9-10, that OPA is not materially distinguishable in this respect from the CERCLA statute, in which the term "joint and several liability" also does not appear, *see Burlington N. & Santa Fe Ry. Co. v. United States*, 129 S. Ct. 1870, 1880-81 (2009), but which has been interpreted to incorporate certain joint and several liability principles — including, of course, a fact-intensive divisibility defense, *see id.* Under OPA as well, "responsible parties" are expected to share liability jointly and severally, subject to the divisibility rule and other applicable common law limitations.

**Second**, contrary to Transocean's contentions, there is nothing "absurd" about holding that MODU vessel owners (like Transocean) *and* OCSLA lessees (like BP) are *both* OPA responsible parties liable for subsea discharges. *See* TO Opp. at 8. Such an outcome is far from implausible, given Congress's adoption of joint and several liability principles and designation of various types of entities as OPA responsible parties.

**Third**, Transocean contends that there were multiple *Deepwater Horizon* discharge "incidents," *see* TO Opp. at 7-9, and so even if joint and several liability were applicable, Transocean should be liable only for its "above the water" incident but not for the continuation of oil discharges from the same Transocean BOP and riser after the *Deepwater Horizon* had sunk to the bottom. This fact-based defense, even if it were sustainable (which it is not), is not remotely ripe for adjudication on summary judgment and in advance of the Phase I trial.

**Fourth**, Transocean argues that, even if a unified incident were involved, Transocean is a "third party" under OPA Section 1004(d), 33 U.S.C. § 2704(d). But as regards the *Deepwater Horizon* spill, only parties such as Halliburton and Cameron — parties not defined as OPA

"responsible parties" — are properly OPA "third parties."  By contrast, Transocean fits squarely within OPA's definition of a "responsible party," OPA Section 1001(32)(A), 33 U.S.C. § 2701(32)(A), and it therefore cannot be a "third party."  The case Transocean cites for support, *National Shipping Co. of Saudi Arabia (NSCSA) v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436, 1446-47 (E.D. Va. 1996), is easily distinguishable because it involved a true "third party" — a tug boat which itself spilled no oil but nonetheless caused a spill from a different ship.

*Finally*, Transocean weakly contends that summary judgment is appropriate because the "private plaintiffs" in the (amended) B1 Master Complaint "have admitted that Transocean is not jointly and severally liable under OPA for the entire spill."  TO Opp. at 9.  BP wonders whether the Plaintiffs would agree to having made such a concession.  In any event, even if the Plaintiffs had conceded something along these lines, that concession does not bind BP (or the United States).

### 6.    Fact Issues Preclude Summary Judgment.

Even if, contrary to the interpretive evidence examined above, a driller like Transocean could not be held liable under OPA for subsea spills, summary judgment in Transocean's favor would still be inappropriate.  Here, record facts indicate the *Deepwater Horizon* spill began above — not below — the surface of the water.

Multiple reports from witnesses on or near the rig on April 20, 2010, indicate that oil and hazardous substances from the well, including petroleum-based drilling mud, was spilled from the *Deepwater Horizon* ███████████████████████████████████

███████████████████████

██████████████████████████████████

██████████████████████████████████



Against this backdrop it is clear that the *Deepwater Horizon* spill began above — not below — the surface of the water.  Accordingly, even under Transocean's own (incorrect) view of the law, summary judgment in favor of Transocean on the United States' OPA claims is not appropriate.

### B.    Transocean's "Operator" Interpretation Lacks Merit.

Lastly, it is worth noting that, in enumerating its defenses as to operator liability under Section 311 of the CWA, Transocean relies on legally flawed arguments of the type BP's summary judgment briefing has already examined.  *See* BP Opp. at 18.

***First***, BP has explained that *United States v. Bestfoods*, 524 U.S. 51, 66 (1998), sets forth the relevant, fact-intensive, test for operator liability under the Clean Water Act.  Transocean is therefore incorrect in suggesting that the parties' relationship is irrelevant in determining operator liability under the CWA.  *See* TO Opp. at 22.

***Second***, Transocean asserts, incorrectly, that regulations issued to implement the Outer Continental Shelf Lands Act by the Minerals Management Service — in relevant respect now the Bureau of Safety and Environmental Enforcement ("BSEE") — control operator liability under the CWA, a separate and distinct statutory regime.  Designation as an "operator" under BSEE's

regulatory regime does not make BP an "operator" for purposes of CWA penalty liability.  *See* BP Opp. at 20-21.  Indeed, it is axiomatic that OCSLA's delegation of responsibility to the Interior Department does not grant the Interior Department authority to issue regulations that control the implementation of the Clean Water Act.  *Id.*  Accordingly, it is irrelevant whether or not Transocean is "the lessee, the designated agent of a lessee, nor the approved assignee of the lessees."  TO Opp. at 23.  These are regulatory terms with meaning under OCSLA, but they do not affect operator liability under the Clean Water Act.

*Third*, this Court's prior ruling addressing the Joint Operator Agreement ("JOA") also does not affect the distinct question of Clean Water Act operator liability.  This Court's ruling addressed a discrete and distinguishable issue pertaining to maritime negligence claims brought against Anadarko and MOEX.  *See* Order and Reasons (B-1 Motion to Dismiss) [Doc. # 3830 (08/26/11)] ("B1 Order").  There, this Court resolved issues pertaining to Anadarko's defense to maritime liability by applying the framework set forth in *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548 (5th Cir. 1987).  *See* B1 Order at 28.  The Court's statement that BP was solely responsible for drilling operations vis-à-vis two joint interest owners reaches no farther than reflecting a contractual division of responsibility for drilling operations as between BP, on the one hand, and Anadarko and MOEX, on the other.  Nothing in this Court's Order addresses "operator" for purposes of CWA liability, or applies the Supreme Court's *Bestfoods* test.  *See Bestfoods*, 524 U.S. at 66-67 (making clear that contractual analysis may in certain circumstances be relevant but is not conclusive to determining operator status).

*Finally*, there is simply no basis for this Court to accept Transocean's invitation to create a new Clean Water Act test for operator liability — a so-called "industry practice" test — rather than to apply *Bestfoods*.  *See id.*  The Supreme Court has already established a fact-intensive test

16

for determining operator liability that is not susceptible to application at the summary judgment stage.

## II.   ANADARKO'S STATEMENTS REGARDING BP'S OPERATOR LIABILITY ARE NOT GERMANE TO THE ISSUES BEFORE THE COURT.

While BP has chosen to incorporate selected aspects of Anadarko's summary judgment briefing, *see* BP Opp. at 16 & n.2, there is one statement in Anadarko's brief that merits further discussion here.

Anadarko states the following in a footnote to its summary judgment cross-motion:

> Transocean has admitted that it is both an owner and an operator of the *Deepwater Horizon*. Transocean Answer [Rec. Doc. 1420] at ¶¶ 19-21, 74. BP contracted the *Deepwater Horizon* from Transocean, and was held to be "solely responsible" for operations on the leasehold."  B1 Order at 28. BP therefore also *may* be found to be an operator of the *Deepwater Horizon* under the CWA. 33 U.S.C. § 1321(a)(6) (defining "owner or operator" of a vessel as "any person owning, operating, or chartering by demise, such vessel . . . .").  The United States has alleged but not sought summary judgment at this time as to whether BP was also an "operator" of the *Deepwater Horizon*. U.S. Mem. at 2 n.5.

Anadarko Opp. at 6 n.4 (emphasis added).

While Anadarko's contention that BP "*may* be found to be an operator of the *Deepwater Horizon* under the CWA*," is literally true, it is true only in the sense that a possibility exists that — after trial — BP eventually "may be found" to be a *Deepwater Horizon* operator.  The most important point, however, is that such a finding should occur, if at all, *only* after trial.   BP strongly disputes that the facts that will be adduced at the Phase 1 trial will ultimately support a finding that BP was indeed the operator of the *Deepwater Horizon* for purposes of the Clean Water Act.  BP has elsewhere shown that the governing legal test for determining CWA operator liability is the highly fact-bound *Bestfoods* test established by the United States Supreme Court. *See* BP Opp. at 18-19.

Here, the United States has not sought summary judgment as to BP's alleged status as an operator of the *Deepwater Horizon*.  Accordingly, BP respectfully submits that no ruling as to BP's status as a *Deepwater Horizon* operator is ripe or may be made at this time.  *Id.*

## III.   THE UNITED STATES' ARGUMENTS ARE MISTAKEN.

The United States' Reply, for the first time, offers legal argument in support of (i) the United States' supposed entitlement to a final OPA judgment, even though the United States has not yet alleged, much less established, its entitlement to specific items of OPA costs or damages; and (ii) a final judgment reflecting joint and several liability, even though the United Sates has not yet established a factual basis for such liability.  These arguments should be rejected.

### A.   The United States' Request For A Final Judgment On OPA Liability Constitutes Improper Claim Splitting.

The United States' Reply seeks a final declaratory judgment that the Anadarko Defendants are liable under OPA, even though the United States has not alleged, much less established, its entitlement to any specific items of OPA costs or damages.  The United States further seeks, as part of this final judgment, a declaration that it can pursue OPA costs and damages, not in some later phase of this action, but in one or more future, possibly unrelated, actions.

In its opening brief, the United States offered no argument supporting its bid for such extraordinary relief, and its Reply fares no better.  In seeking to answer BP's claim-splitting objections, the United States makes three basic points, none of them persuasive.

***First***, the United States cites Section 1017(f)(2) of OPA, 33 U.S.C. § 2717(f)(2), for the proposition that "OPA supersedes *res judicata* in these circumstances."  U.S. Reply at 21.  But the United States did not raise arguments regarding Section 1017(f)(2) in its Motion; hence, these new reply-brief arguments are waived.  *See* BP Opp. at 8.  In any event, as BP has already

explained (in arguments the Reply fails to address), Section 1017(f)(2) does not provide that OPA actions may be brought *solely* to obtain declaratory judgments as to liability.  *See id.* Rather, it provides simply that a plaintiff that obtains a final OPA judgment as to certain specified costs in an initial action can seek a declaratory judgment as to liability for certain further costs to be proved in some later action.  Section 1017(f)(2) by its plain terms permits plaintiffs to bring later actions to recover these "*further* removal costs or damages."  33 U.S.C. § 2717(f)(2) (emphasis added).  Nothing in Section 1017(f)(2) suggests that a plaintiff has blanket authorization to delay its initial recovery of those removal costs or damages it has already incurred.

*Second*, the United States asserts that it is premature to address *res judicata* issues, contending that "the Court should cross that bridge when we come to it, after Phase 1, 2, and 3 are closed and the yet-to-be scheduled penalty phase commences."  U.S. Reply at 23; *see also id.* at 21.  BP agrees that the Court need not decide at this point whether, or how, or to what extent the United States will be permitted to seek removal costs and damages in a subsequent proceeding.  But notably, it was the United States — not BP — that filed the present motion seeking a "final judgment" enforceable in subsequent proceedings.  In seeking such a judgment, it was the United States, not BP, that put *res judicata* principles in issue.  The United States' concession that *res judicata* issues are premature amounts to an effective concession that its request for a final judgment should be denied.

*Finally*, the United States comments that, "given BP's oft-touted promise to pay 'all legitimate [OPA] claims,'" it is "curious, at best" that BP "seek[s] to delay entry of a declaratory judgment of liability related to [OPA] claims."  U.S. Reply at 19.  What is curious, however, is that it is the United States (and not BP or for that matter any other party) that seeks to delay until

19

some undefined subsequent proceeding the determination of which OPA claims are and are not "legitimate."  The fact that BP has agreed to pay all "legitimate" claims does not mean that BP does not want to sort out promptly and expeditiously which particular potential claims by the United States and other parties are legitimate and which ones are not.  As discussed in BP's Opposition, the Court has established a detailed, multi-year schedule to resolve the thousands of claims arising out of the Deepwater Horizon incident.  *See* BP Opp. at 6.  Having filed its Complaint, the United States' claims can and should be expeditiously resolved as part of this larger MDL 2179 proceeding.

### B.   The United States Has Not Made A Sufficient Showing To Justify Imposition Of Joint And Several Liability.

The United States argues that OPA responsible parties are jointly and severally liable because (i) the common law divisibility defense does not apply with respect to claims under OPA; and (ii) even if the defense were available, it would not apply here as a matter of law.  *See* U.S. Reply at 23-30.  The United States is wrong on both counts.

As to the first point, BP's Opposition explained that divisibility is an available defense to claims for joint and several liability under OPA.  See BP Opp. at 9-10.  Where liability remains divisible, the automatic imposition of joint and several liability is not appropriate.  *See Burlington*, 129 S. Ct. at 1883-84.

As to the second point, the United States has not met its burden of showing that there are no genuine issues of material fact such that this Court can find that divisibility unavailable as a matter of law.  Even if BP bears the burden of proof with respect to its affirmative defense of divisibility, the United States, as the moving party, bears the initial burden of identifying an "absence of a genuine issue of material fact."  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).  Only then does the burden shift back to the non-moving party to establish

genuine issues of fact for trial.  *Id.*  The United States failed to satisfy this initial burden in its opening brief, and its belated and cursory attempt to do so on reply is not sufficient.  In short, questions of divisibility and joint and several liability present issues of contested fact that should be resolved at trial.

<u>**CONCLUSION**</u>

For reasons stated herein, this Court's resolution of the United States' Second Motion for Partial Summary Judgment and the respective cross-motions should take account of the applicable legal principles set forth above.

Dated:      January 17, 2012                                      Respectfully submitted,


                                                                 /s/ Don K. Haycraft
Robert R. Gasaway                               Don K. Haycraft (Bar #14361)
Jeffrey Bossert Clark                               R. Keith Jarrett (Bar #16984)
Aditya Bamzai                                         Liskow & Lewis
Kirkland & Ellis LLP                               701 Poydras Street, Suite 5000
655 Fifteenth Street, N.W.                      New Orleans, Louisiana 70139-5099
Washington, D.C. 20005                         Telephone:  504 -581-7979
Telephone:  202- 879-5000                     Facsimile:  504 -556-4108
Facsimile:  202- 879-5200

                                                                 Richard C. Godfrey, P.C.
                                                                 J. Andrew Langan, P.C.
Joel M. Gross                                         Kirkland & Ellis LLP
Brian D. Israel                                         300 North LaSalle Street
Allison B. Rumsey                                  Chicago, IL 60654
Arnold & Porter LLP                               Telephone:  312- 862-2000
555 Twelfth Street, NW                          Facsimile:  312- 862-2200
Washington, DC  20004-1206
E-Mail:  Joel.Gross@aporter.com
Telephone:  202- 942-5000                     Robert C. "Mike" Brock
Facsimile:  202- 942-5999                      Covington & Burling LLP
                                                                 1201 Pennsylvania Avenue, NW
                                                                 Washington, DC 20004-2401
                                                                 Telephone:  202-662-5985
                                                                 Facsimile:  202-662-6291


*Attorneys for BP Exploration & Production Inc.*

## APPENDIX A

### COMPUTATION OF OPA'S MODU LIABILITY CAPS

As applied to the *Deepwater Horizon*, the computation of a Section 2704 liability cap under the Oil Pollution Act ("OPA") may be summarized as follows:

**Step One:**  Determine the amount of oil that was released as a result of the Incident at or above the surface of the water.

**Step Two:**  Determine the amount of damages associated as a result of the amount of oil released at Step One.

**Step Three:**   As to the amount of damages determined at Step Two, the applicable liability cap (pre-inflation adjustment) is determined by applying OPA Section 1004(a) to the *Deepwater Horizon*'s gross tonnage.

**Step Four:**  If there is excess liability (either for discharges above or below the surface of the water, or both) going beyond the cap associated with deeming the *Deepwater Horizon* MODU to be a tank vessel (as there undoubtedly is in this case given the magnitude of the billions of dollars of GCCF payouts to date), then the *Deepwater Horizon* MODU is subject to the second deeming rule set out in OPA Section 1004(b)(2), which treats the *Deepwater Horizon* as if it were an "offshore facility."  33 U.S.C. § 2704)(b)(2).

**Step Five:**  Apply the applicable cap to this excess liability, which for offshore facilities is, pursuant to Section 1004(a)(3), $75 million (pre-inflation adjustment).

In summary, Section 1004(b)(1) and (2) provide *two* forms of exposure for OPA responsible parties for vessel releases of oil:  (1) for oil discharged at or above the surface of the water, liability up to the Section 1004(a)(1) cap amount, *see* 33 U.S.C. § 2704(b)(1); *plus* (2) for any liability exceeding the Section 1004(a)(1) cap, liability up to the separate Section 1004(a)(3) cap, *see* 33 U.S.C. § 2704(b)(2).

## APPENDIX B

the term 'owner or operator' means—

\*\*\*

(B) with respect to a mobile offshore drilling unit being used as an Outer Continental Shelf facility, *from which oil is discharged <u>on or above</u> the surface of the water* (or which posed a substantial threat of such a discharge), *the owner or operator of the unit*, and such unit shall be deemed to be a tanker;

(C) with respect to a mobile offshore drilling unit being used as an Outer Continental Shelf facility—

(i) *from which oil is discharged <u>on or above</u> the surface of the water* (or which posed a substantial threat of such a discharge), to the extent removal costs or damages exceed the limitation specified in section 102(c)(1)(A), or

(ii) *from which oil is discharged <u>below</u> the surface of the water* (or which posed a substantial threat of such a discharge),

*the lessee or permittee of the area in which the unit is located*, or the holder of a right of use and easement granted under the Outer Continental Shelf Lands Act for the area in which the unit is located (where the holder is a different person than the lessee or permittee).

S. 686, Section 101(19) (emphasis added).

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 17th day of January, 2012.

/s/ Don K. Haycraft
Don K. Haycraft