
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | § § § § | MDL NO. 2179<br><br>SECTION J |
| This Document Relates To:<br>*2:10-cv-04536* | § § § § § | JUDGE BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

**TRANSOCEAN DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT THAT THE TRANSOCEAN DEFENDANTS ARE NOT LIABLE UNDER OPA OR THE CLEAN WATER ACT WITH RESPECT TO THE UNDERWATER DISCHARGE OF OIL FROM THE MACONDO WELL (Dkt. 5103)**

1

Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC and Triton Asset Leasing GmbH (collectively "Transocean" or the "Transocean Defendants") hereby submit this reply memorandum in support of their cross-motion for partial summary judgment that the Transocean defendants are not liable under OPA or the Clean Water Act with respect to the underwater discharge of oil from the Macondo Well (Dkt. 5103).

**I.     The United State's OPA arguments have no answer to the clear Congressional intent to exempt MODU owner/operators from liability for underwater discharges.**

The United States' crabbed and strained interpretation of OPA section 2704(b) fails to acknowledge, let alone explain, the clear expression of Congressional intent: "Where a mobile offshore drilling unit is being used as an OCS facility, and there is a discharge of oil on or above the surface of the water, the owner or operator of the unit is liable … **If a discharge of oil from a mobile offshore unit occurs below the surface of the water, the lessee or permittee is liable.**" S. Rep. No. 101-94, at 10 (1989) (emphasis added).

Congress' statement of its purpose could not be clearer.  It is apparently the government's position, however,  that -- despite this manifest intent -- there was some error in drafting Section 2704(b) such that, given a court's obligation to enforce statutes as written, this Court has no choice but to ignore Congressional intent.  US Mem. (Dkt. 5214) at 14.

But it is the government's reading of OPA, including Section 2704(b), that is strained. OPA recognizes that a MODU is a vessel, but a vessel that is capable of use as an offshore facility.  33 U.S.C. § 2701(18).  OPA then provides that, "in the case of an offshore facility" the responsible party is "the lessee or permittee of the area in which the facility is located …"  33 U.S.C. § 2701(32)(C).  The lessee is the responsible party "in the case of an offshore facility," whether or not a MODU is being used at the facility.  The definition of responsible party "in the case of an offshore facility" set forth in Section 2701(32)(C) has no exceptions.  The statute does

2

not say that, in the case of an offshore facility, the responsible party is the lessee, unless a MODU is being used as an offshore facility, in which case the owner/operator of the MODU is also a responsible party.

If the statute ended with these definitional provisions, and there was no Section 2704(b), the lessee would be the responsible party for all discharges "in the case of an offshore facility." Section 2704(b) makes an exception from this general rule so that, when a MODU is being used as an offshore facility, the owner/operator of the MODU will be the responsible party with respect to discharges on or above the surface of the water. Congress obviously concluded, for example, that if a spill of petroleum-based drilling mud occurred when loading or unloading mud onto the vessel, then the vessel's owner/operator should be the responsible party for that spill -- not the lessee of the drilling site. Contrary to the government's suggestion, to accomplish its legislative intent, Congress did not need to explicitly state in Section 2704(b) that a MODU owner/operator is not the responsible party for subsurface discharges. US Mem. at 14. The general provisions of OPA already provide that "in the case of an offshore facility", including the unexcepted case in which a MODU is being used as an offshore facility, the responsible party is the lessee.[1]

## II. Transocean's position is the only position that accomplishes the basic purposes of OPA.

The government is wrong in arguing that Transocean's reading of the statute somehow exonerates Transocean from all OPA liability. US Mem. at 14. As this Court is well aware,

---

[1] The government's reading of Section 2704(b) also defies common sense. According to the United States, OPA makes the MODU owner/operator liable up to the limits of $600 per gross ton for an underwater discharge (about $19.5 million in the case of a MODU the size of the Deepwater Horizon), and the purpose of Section 2704(b) is to increase the limits to $1200 per gross ton for an above surface discharge (about $39 million in the case of a MODU the size of the Deepwater Horizon). But there is no evidence whatsoever in the legislative history that Congress' purpose was to create a two-tiered liability cap for MODU's, and there is no obvious rationale for such a two-tiered cap.

OPA creates a first-payer strict liability regime. Where the "responsible party" is not wholly to blame for an incident, the responsible party remains free to pursue its right of contribution against any party who contributed to causing the incident. Those rights of contribution are, however, subject to any contractual rights of indemnity between the respective parties. Transocean's argument no more exonerates Transocean from OPA liability than it exonerates Halliburton from OPA liability. The fact is that Congress made the lessee the responsible party in the case of an offshore facility.

Moreover, adopting the government's (or BP's and Anadarko's) arguments would actually frustrate one of the key purposes of OPA. One of the primary purposes of OPA was to provide prompt identification of the responsible party so that it was clear who was responsible for efforts to control the discharge and begin cleanup. With this purpose in mind, it is easy to understand why Congress made the lessee the responsible party for underwater discharges, even when a MODU was being used at the facility.

Surely Congress did not want to have identification of the responsible party for an underwater blowout delayed until an ROV went under the surface to try to determine what pipe or piece of equipment was the point of exit for the oil.[2] Congress also no doubt expected that the lessee would be the responsible party even if the nature of the event was such that the formation had cracked, and oil was coming up through the seafloor rather than through any well component. Likewise, Congress could not have wanted to have identification of the responsible party for an underwater blowout delayed until a factual determination could be made as to whether the lessee or the owner/operator of the MODU was in control such that it could be deemed the "operator".

---

[2] Indeed, if who owned the piece of pipe at the end point where the oil exited into the Gulf were critical to CWA or OPA liability (both of which use the term "from which"), then BP -- or any lessee in BP's position in the future -- could refuse to accept the designation as the responsible party.

4

Moreover, if the exit point (the equipment/Gulf interface) were legally significant for either OPA or CWA purposes, parties involved in response and control efforts could be biased towards or against various control options based on legal liability concerns. Both statutes use the phrase "from which".  Assume that the lessee has taken initial responsibility for control efforts. Removing the riser or BOP as part of the control effort would tend to reduce the MODU owner/operator's legal exposure and increase the lessee's legal exposure.  Placing a capping stack or valve array on top of the BOP would tend to increase the lessee's exposure and reduce the MODU owner/operator's legal exposure as oil would flow through and out of that end point if, after installation, it could not be closed to staunch the flow of oil.

### III.     The cases on which the government relies agree that the source of the discharge is the controlling consideration for CWA liability.

The United States misconstrues Transocean's position as hinging on the "original source of the oil." (Rec. Doc. 5214 at 14).  To be clear, Transocean's position is that the relevant consideration is the original source of the discharge.  Here, the original source of the discharge was the facility – the Macondo well.  There would have been no discharge at all, but for the facility.

The United States cites an NPDES permit case, *South Florida Water Management Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004), for the proposition that a "point source" need not be the original source of the oil, it need only convey the oil.  The holding of *South Florida* was that the "point source" need not add a pollutant for liability to attach under the CWA; instead, the "point source" may include a conveyance through which the oil passes.  In *South Florida*, the conveyance was a pumping station.  The pumping station provided the moving force for the pollutant to enter navigable waters.  Without the pumping station, there would have been no pollution of the reservoir.  While Macondo is not an NPDES permit case,

5

here the facility (the Macondo well) was the moving force of the oil without which there would have been no pollution of navigable waters.

The United States criticizes the decision cited by Transocean of *Peconic Baykeeper, Inc. v. Suffolk County*, 600 F.3d 180, 188 (2nd Cir. 2010). But in *Baykeeper*, the spray apparatus was the source of the discharge from which the pollutant entered the navigable waters. As in *South Florida*, the spray apparatus was the "moving force" of the pollution. According to the Court of Appeals for the Second Circuit, the pesticides were discharged "from" the source and the word "from," in addition to indicating a "starting point," also denoted the "source or original or moving force of something…." *Id*. at 188-89, *quoting Webster's Third International Dictionary Unabridged* 913 (2002).

Indeed, authorities cited by the United States support Transocean's position that key consideration in attaching liability under the CWA is tracing the discharge back to the source from which the discharge came. *United States v. Ortiz*, 427 F.3d 1278 (10th Cir. 2005) (chemicals flushed down a drain); *United States v. Lucas*, 516 F.3d 316 (5th Cir. 2008) (septic tanks leaking into wetlands); *Rapanos v. United States*, 126 U.S. 715, (2006) (fill materials dumped into wetlands); *South Florida Water Management Dist.*, 541 U.S. 95 (pumping station pumped polluted canal water into wetland).

**IV.     <u>Conclusion</u>**

For the foregoing reasons, the United States' Second Motion for Partial Summary Judgment should be denied as to the Transocean defendants and the Transocean Defendants' motion for partial judgment that they are not liable under OPA or the Clean Water Act with respect to the underwater discharge from the Macondo well should be granted.

6

Respectfully submitted this 18th day of January, 2012,

By: /s/ Steven L. Roberts
Steven L. Roberts (Texas, No. 17019300)
Rachel GiesberClingman (Texas, No. 00784125)
Kent C. Sullivan (Texas, No. 19487300)
Sutherland Asbill& Brennan LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
Email: steven.roberts@sutherland.com,
rachel.clingman@sutherland.com,
kent.sullivan@sutherland.com,

By: /s/ Kerry J. Miller
Kerry J. Miller (Louisiana, No. 24562)
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8169
Facsimile: (504) 599-8154
Email: kmiller@frilot.com

-and-

By: /s/ Brad D. Brian.
Brad D. Brian (California, No. 79001)
Allen M. Katz (California, No. 054933)
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 683-5180, (213) 683-4018
Email: brad.brian@mto.com,
allen.katz@mto.com

-and-

By: /s/ Edwin G. Preis, Jr.
Edwin G. Preis, Jr. (Louisiana, No. 1070)
Richard J. Hymel (Louisiana, No. 20230)
Preis& Roy PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone: (337) 237-6062
Facsimile: (337) 237-9129
-and-
601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone: (504) 581-6062
Facsimile: (504) 522-9129
Email: egp@preisroy.com, efk@preisroy.com

Of Counsel:

John M. Elsley (Texas, No. 0591950)
Royston, Rayzor, Vickery & Williams LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002

Telephone: (713) 224-8380
Facsimile: (713) 225-9945
Email: john.elsley@roystonlaw.com

Daniel O. Goforth (Texas, No. 08064000)
Goforth Geren Easterling LLP
4900 Woodway, Suite 750
Houston, Texas 77056
Telephone: (713) 650-0022
Facsimile: (713) 650-1669
Email: dangoforth@goforthlaw.com

*Counsel for Transocean*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been electronically filed through the Court's CM/ECF system and served on all counsel of record though LexisNexis File & Serve, in accordance with Pretrial Order No. 12, which will send a notice of electronic filing to all counsel of record on this 18th day of January, 2012.

/s/ Kerry J. Miller
KERRY J. MILLER