UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON: IN THE | * | |
| GULF OF MEXICO, on APRIL 20, 2010 | * | |
| | * | |
| | * | |
| THIS DOCUMENT RELATES TO: | * | JUDGE BARBIER |
| | * | |
| *ALL CASES* | * | MAG. JUDGE SHUSHAN |
| | * | |

**********************************************************************

### AGREED 30(b)(6) DEPOSITION NOTICE OF BP DEFENDANTS
### (WITH 30(b)(2) DOCUMENT REQUESTS)

By agreement of Plaintiffs' Liaison Counsel, Defense Liaison Counsel, Coordinating Counsel for the States, Coordinating Counsel for the U.S., and Counsel for Defendants BP Exploration & Production, Inc., BP p.l.c., BP America Production Company, and BP North America Products, Inc., (collectively the "BP Defendants"), the BP Defendants shall—pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure and PRE-TRIAL ORDER NO. 17 (as supplemented and amended by PRE-TRIAL ORDER 27)—designate and produce one or more officers, managers, agents, employees, or other representatives of the BP Defendants to discuss the Areas of Inquiry identified below. The times and locations of the depositions will be scheduled in conjunction with the designees' fact depositions in their individual capacities, or otherwise as may be scheduled with Judge Shushan and the parties.

### Areas of Inquiry

1. For any and all attempts after April 20, 2010, to cap, control, contain, shut in, limit flow from, temporarily abandon and/or kill the Macondo Well by each of the following methods and any other method(s) used but not listed here: Actuation of the Deepwater Horizon BOP, Riser Insertion Tube Tool ("RITT"), Top Hat, Top

Kill, Junk Shot, Cofferdam, Capping Stack, BOP on BOP strategies, Macondo Relief Well No. 1 and Macondo Relief Well No. 2 (hereinafter, collectively referred to as "Methods"):

a. The total cost that BP incurred on each attempt and/or Method, including, but not limited to, labor, payments made to contractors and/or other entities working on BP's behalf, materials, overhead and the cost of removal of any replaced components, parts, equipment, material, and/or supplies;

b. The level of approval necessary to fund and implement each attempt and/or Method, including the identity of each person who gave final approval;

c. A description of the manner and methodology, including computer models, used to assess each attempt and/or Method;

d. A description of the explanations and/or justifications for each attempt and/or Method made or prepared for approval within BP;

e. Dates when planning began for each attempt and/or Method, including the length of time used to plan and budget;

f. An explanation of and timeline for the steps involved in planning and/or implementing each attempt and/or Method;

g. The identity of BP employees and contractors who planned, managed, and/or supervised the implementation of each attempt and/or Method;

h. A description of each office, department, or other organization at BP that participated in the planning, budgeting, engineering, approval, supervision, coordination, or implementation of each attempt and/or Method; and

i. For each Method actually attempted or performed by BP, BP's contractors and/or any other entity working on BP's behalf, an explanation of and timeline for the steps involved in performing the Method, the identity of BP employees and contractors who performed each Method, and the identity of documents (with custodians) recording the performance of each Method.

2. For any and all efforts considered, but not used, to cap, control, contain, shut in, limit flow from, temporarily abandon and/or kill the Macondo Well after April 20, 2010:

a. The total cost anticipated and/or actually incurred to research/investigate the effort including, but not limited to, labor, payments made to contractors and/or other entities working on BP's behalf, materials, overhead and the cost of removal of any replaced components, parts, equipment, material and/or supplies.

    b. The level of approval necessary to fund and/or implement each effort, including the identity of each person whose approval was necessary, and the reasons why approval was not given;

    c. A description of the manner and/or methodology, including computer models, used to assess each effort;

    d. A description of the explanations and/or justifications for each effort, including the reasons for not implementing each effort, made or prepared for approval within BP;

    e. Dates when planning or consideration for each such effort began, including the length of time used to plan and budget;

    f. An explanation of and timeline for the steps involved in planning and/or implementing each effort;

    g. The identity of BP employees and contractors who researched, investigated, planned, managed, and/or supervised the evaluation of each effort;

    h. A description of each office, department, or other organization at BP that participated in the planning, budgeting, engineering, evaluation, supervision, approval, and/or coordination of each effort; and

    i. For each effort evaluation, BP's contractors and/or any other entity working on BP's behalf, an explanation of the timeline for the steps involved in evaluating the effort, the identity of the BP employees and contractors who performed the evaluation, and the identity of documents (with custodians) recording the evaluation.

3. For any and all attempts between January 1, 2000 and April 20, 2010, to cap, control, contain, shut in, limit flow from, temporarily abandon and/or kill a flowing subsea Gulf of Mexico well by any of the Methods and any other method(s) used but not listed above:

    a. The total cost that BP incurred to complete each attempt and/or Method, including, but not limited to, labor, payments made to contractors and/or other entities working on BP's behalf, materials, overhead and the cost of removal of any replaced components, parts, equipment, material, and/or supplies;

    b. The level of approval necessary to fund and implement each attempt and/or Method, including the identity of each person who gave final approval;

    c. A description of the manner and methodology, including computer models, used to assess each attempt and/or Method;

    d. A description of the explanations and/or justifications for each attempt and/or Method made or prepared for approval within BP;

    e. Dates when planning began for each attempt and/or Method, including the length of time used to plan and budget;

    f. An explanation of and timeline for the steps involved in planning and/or implementing each attempt and/or Method;

    g. The identity of BP employees and contractors who planned, managed, and/or supervised the implementation of each attempt and/or Method;

    h. A description of each office, department, or other organization at BP that participated in the planning, budgeting, engineering, approval, supervision, coordination, and/or implementation of each attempt and/or Method; and

    i. For each Method actually performed by BP, BP's contractors and/or any other entity working on BP's behalf, an explanation of and timeline for the steps involved in performing the Method, the identity of BP employees and contractors who performed each Method, and the identity of documents (with custodians) recording the performance of each Method.

4. The manner, methodology and mode that BP, BP's contractors and/or any other entity working on BP's behalf, used to predict, estimate, characterize and/or measure the daily amount of discharge from the Macondo Well from:

    a. April 20, 2010 through July 15, 2010;

    b. July 16, 2010 through September 19, 2010; and

    c. September 20, 2010 through the present,

including the identity of individuals involved in each prediction, estimate, characterization and/or measurement and the identity of all documents (with custodians), data, observations, calculations and/or measurements that were predicted, taken, used, relied upon, or considered by BP, BP's contractors and/or any other entity working on BP's behalf.

5. The manner, methodology and mode that BP, BP's contractors and/or any other entity working on BP's behalf used to predict, estimate, characterize and/or measure the physical or chemical properties of any substance contained in the daily discharge from the Macondo Well from:

    a. April 20, 2010 through July 15, 2010;

    b. July 16, 2010 through September 19, 2010; and

    c. September 20, 2010 through the present,

including the identity of individuals involved in each prediction, estimate, characterization and/or measurement and the identity of all documents (with custodians), data, observations, calculations and/or measurements that were predicted, taken, used, relied upon, or considered by BP, BP's contractors and/or any other entity working on BP's behalf.

6. The manner, methodology and mode that BP, BP's contractors and/or any other entity working on BP's behalf used to predict, estimate, characterize and/or measure the potential or actual daily depletion of the hydrocarbon reservoir tapped by the Macondo Well from:

    a. April 20, 2010 through July 15, 2010;

    b. July 16, 2010 through September 19, 2010; and

    c. September 20, 2010 through the present,

including the identity of individuals involved in each prediction, estimate, characterization and/or measurement and the identity of all documents (with custodians), data, observations, calculations and/or measurements that were predicted, taken, used, relied upon, or considered by BP, BP's contractors and/or any other entity working on BP's behalf.

7. The manner, methodology and mode that BP, BP's contractors and/or any other entity working on BP's behalf used to predict, estimate, characterize and/or measure the pressure inside the Macondo Well, including but not limited to the reservoir pressure, and, in addition to any and all pressures inside the wellbore, the pressure at the BOP, and the pressure at the point where hydrocarbons were being released into the GoM for every day from:

    a. April 20, 2010 through July 15, 2010;

    b. July 16, 2010 through September 19, 2010; and

    c. September 20, 2010 through the present,

including the identity of individuals involved in each prediction, estimate, characterization and/or measurement and the identity of all documents (with custodians), data, observations, calculations and/or measurements that were predicted, taken, used, relied upon, or considered by BP, BP's contractors and/or any other entity working on BP's behalf.

8. The manner, methodology and mode that BP, BP's contractors and/or any other entity working on BP's behalf used to predict, estimate, characterize and/or measure the temperature of the discharge from the Macondo Well, including but not limited to the reservoir temperature, temperatures inside the wellbore, the temperature at the BOP, and the temperature at the point where hydrocarbons were being released into the GoM for every day from:

   a. April 20, 2010 through July 15, 2010;

   b. July 16, 2010 through September 19, 2010; and

   c. September 20, 2010 through the present,

   including the identity of individuals involved in each prediction, estimate, characterization and/or measurement and the identity of all documents (with custodians), data, observations, calculations and/or measurements that were predicted, taken, used, relied upon, or considered by BP, BP's contractors and/or any other entity working on BP's behalf.

9. Knowledge of the identity and role of all person(s) and/or entities charged with predicting, calculating, analyzing, determining, estimating, modeling, simulating, reporting, presenting, and/or releasing to the media and/or the public any information regarding the amount of hydrocarbons released from the Macondo Well into the atmosphere, ocean, and/or environment for every day from:

   a. April 20, 2010 through July 15, 2010;

   b. July 16, 2010 through September 19, 2010; and

   c. September 20, 2010 to the present.

10. All planning, preparations, discussions, evaluations and/or training with regard to a "Worst Case Scenario" well control / hydrocarbon discharge event, or an uncontrolled release of hydrocarbons subsea into the Gulf of Mexico prior to April 20, 2010.

11. Costs, expenses, or expenditures incurred—including both out-of-pocket costs and/or internal costs—in association with the planning, preparations, discussions, evaluations and/or training for a) a "Worst Case Scenario" well control/hydrocarbon discharge event or b) an uncontrolled subsea release of hydrocarbons into the Gulf of Mexico prior to April 20, 2010.

12. All planning, preparations, discussions, evaluations and/or training for a) a "Worst Case Scenario" well control/hydrocarbon discharge event, or b) an uncontrolled release of hydrocarbons subsea into the Gulf of Mexico after April 20, 2010.

13. Costs, expenses, or expenditures incurred, including both out-of-pocket costs and/or internal costs, associated with the planning, preparations, discussions, evaluations and/or training for a) a "Worst Case Scenario" well control / hydrocarbon discharge event or b) an uncontrolled release of hydrocarbons subsea into the Gulf of Mexico after April 20, 2010.

14. Knowledge of all communications made, transmitted, announced, drafted, discussed, sent, received, analyzed, reviewed, considered, and/or exchanged with the public, press, third parties, including, without limitation, scientists, engineers, educators, reporters, spokespersons, and/or representatives, officials, and/or designees of the United States, Louisiana, Mississippi, Alabama, Florida, and/or Texas regarding the amounts of hydrocarbons released from the Macondo Well from April 20, 2010 through the present including, without limitation, any communications criticizing, qualifying, discrediting, refuting, rejecting, and or denying the validity calculations or analysis by other person(s) and/or entities regarding quantification of hydrocarbons being released from the Macondo Well.

15. All equipment, products, and/or materials presently identified, reserved, set aside, under construction / development, purchased, and/or developed by, or at the request of, BP for use in a subsea release of hydrocarbons in the Gulf of Mexico.

16. Calculations, models, programs, data, discussion, analyses, and/or communications made, transmitted, announced, drafted, discussed, sent, received, analyzed, reviewed, considered, and/or exchanged both internally and with third parties regarding BP's determination of what the "Worst Case Scenario" was for the Macondo Well.

17. Calculations, models, programs, data, discussion, analyses, and/or communications made, transmitted, announced, drafted, discussed, sent, received, analyzed, reviewed, considered, and/or exchanged both internally and with third parties regarding the creation of BP's "Regional Oil Spill Response Plan."

18. All analyses, calculations, assumptions, and data cited and/or relied upon in "BP's Preliminary Response to the Flow Rate and Volume Estimates Contained in Staff Working Paper No. 3" submitted by BP to the National Oil Spill Commission on or about October 21, 2010.

19. All calculations and analyses performed to quantify the amount of oil flowing through the capping stack at any time between the installation of the capping stack and the shut-in of the Macondo Well, and the identity of all persons/entities providing same.

20. The configuration of the capping stack (including ram position at all times) and all pressure measurements (including calibration measurements) and temperature

    measurements taken from the capping stack between the installation of the capping stack and the commencement of the static kill.

21. All attempts, both successful and unsuccessful, BP, BP's contractors and/or any other entity working on BP's behalf made to measure the pressure and/or temperature of any portion of the Macondo Well or its discharge—either above or below the BOP—between April 20, 2010 and the static kill.

22. All attempts, both successful and unsuccessful, BP, BP's contractors and/or any other entity working on BP's behalf made to measure the size of the apertures through which hydrocarbons were being released at the Macondo Well – either above or below the BOP – between April 20, 2010 and the static kill.

23. All post-blowout knowledge of, or analysis by, BP, BP's contractors and/or any other entity working on BP's behalf of the M56 reservoir and its geological, geochemical, geophysical, and/or petrophysical characteristics, including but not limited to the analysis performed in the various drafts of BP's "Post-Well Subsurface Description of Macondo well (MC 252)" Technical Memorandum.

24. All post-blowout efforts by BP, BP's contractors and/or any other entity working on BP's behalf to calculate, estimate, predict, and/or model the shut-in wellhead pressure of the Macondo Well.

25. All analysis, calculations, modeling, or estimates by BP, BP's contractors and/or any other entity working on BP's behalf relating to the effect of obstructions in the wellbore, the BOP, and/or the riser on the rate of flow from the Macondo Well.

26. All knowledge or information that BP has regarding the responsibility and/or fault of any other party with regard to why flow of hydrocarbons from Macondo was not curtailed until July 2010.

### Document Requests

    The BP Defendants are further requested, in accordance with Rule 30(b)(2) of the Federal Rules of Civil Procedure, as well as Rule 26, Rule 34, and Pre-Trial Orders Nos. 16, 17 and 27, to produce, or identify by specific Bates Number(s) (if already produced), the following documents, at least ten (10) days prior to the time of the relevant designee's deposition:

**First Set of Requests**

For each Area of Inquiry identified above, please produce all documents provided to, reviewed with, utilized by, and/or relied upon by the deponent to prepare for his or her deposition testimony.

**Second Set of Requests**

For each Area of Inquiry identified above, please produce all documents which relate, pertain, evidence and/or reflect the issues, topics and/or events described therein or associated therewith.

**Third Set of Requests**

For each corporate designee, please produce a copy of his or her custodial file, current resume or CV, and a copy of any and all prior testimony, whether provided in an individual or representative capacity, including any and all deposition testimony, trial testimony, sworn statements, affidavits, declarations, expert reports, and/or testimony before a legislative, regulatory or investigative body or agency.

This \_\_\_\_ day of _____, 2011.


Respectfully submitted,


_____       _____

| | |
|---|---|
| Stephen J. Herman, La. Bar No. 23129 | James Parkerson Roy, La. Bar No. 11511 |
| Herman Herman Katz & Cotlar LLP | Domengeaux Wright Roy & Edwards LLC |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, Louisiana 70113 | Lafayette, Louisiana 70501 |
| Telephone: (504) 581-4892 | Telephone: (337) 233-3033 |
| Fax No. (504) 569-6024 | Fax No. (337) 233-2796 |
| E-Mail: Sherman@hhkc.com | E-Mail: jimr@wrightroy.com |

*Plaintiffs Liaison Counsel*         *Plaintiffs Liaison Counsel*

**CERTIFICATE OF SERVICE**

      WE HEREBY CERTIFY that the above and foregoing Motion will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

                                                    _____
                                               James Parkerson Roy and Stephen J. Herman