09:32AM

```
 1                   UNITED STATES DISTRICT COURT

 2                   EASTERN DISTRICT OF LOUISIANA

 3
     *******************************************************************
 4
     IN RE: OIL SPILL BY THE OIL
 5   RIG DEEPWATER HORIZON IN
     THE GULF OF MEXICO ON
 6   APRIL 20, 2010

 7                              CIVIL ACTION NO. 10-MD-2179 "J"
                                NEW ORLEANS, LOUISIANA
 8                              THURSDAY, JANUARY 19, 2012, 10:17 A.M.

 9
     THIS DOCUMENT RELATES TO
10   ALL CASES

11   *******************************************************************

12

13                TRANSCRIPT OF MOTIONS PROCEEDINGS
              HEARD BEFORE THE HONORABLE CARL J. BARBIER
14                 UNITED STATES DISTRICT JUDGE

15

16   APPEARANCES:

17

18   FOR THE PLAINTIFFS'
     LIAISON COUNSEL:          DOMENGEAUX WRIGHT ROY & EDWARDS
19                             BY:  JAMES P. ROY, ESQUIRE
                               P. O. BOX 3668
20                             556 JEFFERSON STREET
                               LAFAYETTE, LA  70502
21

22                             HERMAN HERMAN KATZ & COTLAR
23                             BY:  STEPHEN J. HERMAN, ESQUIRE
                               820 O'KEEFE AVENUE
24                             NEW ORLEANS, LA  70113

25
```

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR THE PLAINTIFFS:        BREIT DRESCHER IMPREVENTO & WALKER
                                BY:  JEFFREY A. BREIT, ESQUIRE
 4                              1000 DOMINION TOWER
                                999 WATERSIDE DRIVE
 5                              NORFOLK, VA  23510

 6

 7                              LEVIN PAPANTONIO THOMAS MITCHELL
                                RAFFERTY & PROCTOR
 8                              BY:  BRIAN H. BARR, ESQUIRE
                                316 SOUTH BAYLEN STREET, SUITE 600
 9                              PENSACOLA, FL  32502

10

11                              CUNNINGHAM BOUNDS
                                BY:  ROBERT T. CUNNINGHAM, ESQUIRE
12                              1601 DAUPHIN STREET
                                MOBILE, AL  36604
13

14

15                              LEWIS, KULLMAN , STERBCOW & ABRAMSON
                                BY:  PAUL M. STERBCOW, ESQUIRE
16                              PAN AMERICAN LIFE BUILDING
                                601 POYDRAS STREET, SUITE 2615
17                              NEW ORLEANS LA  70130

18

19                              LIEFF CABRASER HEIMANN & BERNSTEIN
                                BY:  ELIZABETH J. CABRASER, ESQUIRE
20                              275 BATTERY STREET, 29TH FLOOR
                                SAN FRANCISCO, CA  94111

21

22                              WILLIAMSON & RUSNAK
                                BY:  JIMMY WILLIAMSON, ESQUIRE
23                              4310 YOAKUM BOULEVARD
                                HOUSTON, TX  77006
24

25
```

1   APPEARANCES CONTINUED:

2

3

4                              WATTS GUERRA CRAFT
                               BY:  MIKAL C. WATTS, ESQUIRE
5                              4 DOMINION DRIVE
                               BUILDING 3, SUITE 100
6                              SAN ANTONIO, TX  78257

7

8                              WEITZ & LUXENBERG
                               BY:  ROBIN L. GREENWALD, ESQUIRE
9                              700 BROADWAY
                               NEW YORK CITY, NY  10003

10

11                             MORGAN & MORGAN
                               BY:  ALPHONSO M. ESPY, ESQUIRE
12                                  FRANK M. PETOSA, ESQUIRE
                               188 EAST CAPITOL STREET, SUITE 777
13                             JACKSON, MS  39201

14

15                             MARTÍNEZ, GONZALES, KALBAC & KANE
                               BY:  ERVIN A. GONZALEZ, ESQUIRE
16                             255 ALHAMBRA CIRCLE, PENTHOUSE
                               CORAL GABLES, FL  33134
17

18

19                             COSSICH SUMICH PARSIOLA & TAYLOR
                               BY:  PHILIP F. COSSICH, JR., ESQUIRE
20                             8397 HIGHWAY 23, SUITE 100
                               BELLE CHASSE, LA  70037

21

22                             DEGRAVELLES PALMINTIER HOLTHAUS & FRUGE
                               BY:  MICHAEL C. PALMINTIER, ESQUIRE
23                             618 MAIN STREET
                               BATON ROUGE, LA  70801
24

25

```
 1   APPEARANCES CONTINUED:

 2

 3                            BEASLEY ALLEN CROW METHVIN
                             PORTIS & MILES
 4                           BY:  RHON E. JONES, ESQUIRE
                             POST OFFICE BOX 4160
 5                           MONTGOMERY, AL   36013

 6

 7                            FAYARD & HONEYCUTT
                             BY:  CALVIN C. FAYARD, JR., ESQUIRE
 8                           519 FLORIDA AVENUE SW
                             DENHAM SPRINGS, LA 70726
 9

10                            LUNDY, LUNDY, SOILEAU & SOUTH
11                           BY:  MATTHEW E. LUNDY, ESQUIRE
                             501 BROAD STREET
12                           LAKE CHARLES, LA   70601

13

14                            WILLIAMS LAW GROUP
                             BY:  CONRAD S. P. WILLIAMS, ESQUIRE
15                           435 CORPORATE DRIVE, SUITE 101
                             HOUMA, LA   70360
16

17

18                            BARON & BUDD
                             BY:  SCOTT SUMMY, ESQUIRE
                                  CARLA M. BURKE, ESQUIRE
19                           3102 OAK LAWN AVENUE, SUITE 1100
                             DALLAS, TX   75219
20

21

22                            LEGER & SHAW
                             BY:  WALTER J. LEGER, JR., ESQUIRE
23                           600 CARONDELET STREET, 9TH FLOOR
                             NEW ORLEANS, LA   70130

24

25
```

```
 1   APPEARANCES CONTINUED:

 2

 3                              BARRIOS KINGSDORF & CASTEIX
                               BY:  DAWN M. BARRIOS, ESQUIRE
 4                             701 POYDRAS STREET, SUITE 3650
                               NEW ORLEANS LA 70139

 5

 6
                               MOTLEY RICE
 7                             BY:  JOSEPH D. RICE, ESQUIRE
                               28 BRIDGESIDE BOULEVARD
 8                             MOUNT PLEASANT, SC 29464

 9

10                             LUNDY, LUNDY, SOILEAU & SOUTH
                               BY:  MATTHEW E. LUNDY, ESQUIRE
11                             501 BROAD STREET
                               LAKE CHARLES, LA  70601

12

13
     FOR THE SIERRA CLUB
14   AND GULF RESTORATION
     NETWORK:                  WALTZER & WIYGUL
15                             BY:  CLAY J. GARSIDE, ESQUIRE
                               3715 WESTBANK EXPRESSWAY, SUITE 13
16                             HARVEY, LA  70058

17

18   FOR STATE INTERESTS:      ALABAMA ATTORNEY GENERAL'S OFFICE
                               BY:  LUTHER STRANGE, ESQUIRE
19                                  COREY L. MAZE, ESQUIRE
                               500 DEXTER AVENUE
20                             MONTGOMERY, AL  36130

21

22   FOR THE STATE OF
     LOUISIANA:                STATE OF LOUISIANA
23                             BY:  JAMES D. CALDWELL, ATTORNEY GENERAL
                               POST OFFICE BOX 94005
24                             BATON ROUGE, LA  70804

25
```

```
 1  APPEARANCES CONTINUED:

 2

 3                               KANNER & WHITELEY
                                BY:  ALLAN KANNER, ESQUIRE
 4                               701 CAMP STREET
                                NEW ORLEANS, LA  70130
 5

 6
    FOR THE PARISH OF
 7  JEFFERSON AND THE
    STATE OF LOUISIANA
 8  AND ITS MUNICIPALITIES,
    POLITICAL SUBDIVISIONS
 9  AND SERVICE DISTRICTS:  GAUDRY RANSON HIGGINS & GREMILLION
                                BY:  WADE A LANGLOIS, ESQUIRE
10                                    DARYL A. HIGGINS, ESQUIRE
                                OAKWOOD CORPORATE CENTER
11                               401 WHITNEY AVENUE, SUITE 500
                                GRETNA, LA  70056
12

13
    FOR THE FEDERAL
14  GOVERNMENT INTERESTS:   U.S. DEPARTMENT OF JUSTICE
                                TORTS BRANCH, CIVIL DIVISION
15                               BY:  R. MICHAEL UNDERHILL, ESQUIRE
                                450 GOLDEN GATE AVENUE
16                               7TH FLOOR, ROOM 5395
                                SAN FRANCISCO, CA  94102
17

18
    FOR THE UNITED STATES
19  OF AMERICA:             ENVIRONMENTAL ENFORCEMENT SECTION
                                U.S. DEPARTMENT OF JUSTICE
20                               BY:  STEVEN O'ROURKE, ESQUIRE
                                     SCOTT CERNICH, ESQUIRE
21                               P.O. BOX 7611
                                WASHINGTON, DC  20044
22

23

24

25
```

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR BP AMERICA INC.,
     BP AMERICA PRODUCTION
 4   COMPANY, BP COMPANY
     NORTH AMERICA INC.,
 5   BP CORPORATION NORTH
     AMERICA INC.,
 6   BP EXPLORATION &
     PRODUCTION INC.,
 7   BP HOLDINGS NORTH
     AMERICA LIMITED,
 8   BP PRODUCTS NORTH
     AMERICA INC.:            LISKOW & LEWIS
 9                            BY:  DON K. HAYCRAFT, ESQUIRE
                              ONE SHELL SQUARE
10                            701 POYDRAS STREET
                              SUITE 5000
11                            NEW ORLEANS, LA  70139

12

13                            KIRKLAND & ELLIS
                              BY:  J. ANDREW LANGAN, ESQUIRE
14                                 RYAN S. BABIUCH, ESQUIRE
                              300 N. LASALLE
15                            CHICAGO, IL  60654

16

17                            KIRKLAND & ELLIS
                              BY:  ROBERT R. GASAWAY, ESQUIRE
18                            655 FIFTEENTH STREET, N.W.
                              WASHINGTON, DC  20005
19

20

21   FOR TRANSOCEAN HOLDINGS
     LLC, TRANSOCEAN
22   OFFSHORE DEEPWATER
     DRILLING INC., AND
23   TRANSOCEAN DEEPWATER
     INC.:                    FRILOT
24                            BY:  KERRY J. MILLER, ESQUIRE
                              ENERGY CENTRE, 36TH FLOOR
25                            1100 POYDRAS STREET
                              NEW ORLEANS, LA  70163
```

```
 1   APPEARANCES CONTINUED:

 2

 3                             SUTHERLAND ASBILL & BRENNAN
                              BY:  STEVEN L. ROBERTS, ESQUIRE
 4                                 RACHEL G. CLINGMAN, ESQUIRE
                              1001 FANNIN STREET, SUITE 3700
 5                            HOUSTON, TX  77002

 6
                              ROYSTON RAYZOR VICKERY & WILLIAMS
 7                            BY:  JOHN M. ELSLEY, ESQUIRE
                              PENNZOIL PLACE
 8                            711 LOUISIANA STREET, SUITE 500
                              HOUSTON, TX  77002
 9

10                            GOFORTH LEWIS
                              BY:  DANIEL O. GOFORTH, ESQUIRE
11                            4900 WOODWAY, SUITE 750
                              HOUSTON, TX 77056
12

13
     FOR CAMERON INTERNATIONAL
14   CORPORATION:             STONE PIGMAN WALTHER WITTMANN
                              BY:  PHILLIP A. WITTMANN, ESQUIRE
15                                 CARMELITE M. BERTAUT, ESQUIRE
                              546 CARONDELET STREET
16                            NEW ORLEANS, LA 70130

17

18                            BECK REDDEN & SECREST
                              BY:  DAVID J. BECK, ESQUIRE
19                            ONE HOUSTON CENTER
                              1221 MCKINNEY STREET, SUITE 4500
20                            HOUSTON, TX  77010

21

22   FOR HALLIBURTON
     ENERGY SERVICES, INC.:   GODWIN RONQUILLO
23                            BY:  DONALD E. GODWIN, ESQUIRE
                                   JENNY L. MARTINEZ, ESQUIRE
24                                 STEFANIE K. MAJOR, ESQUIRE
                                   BRUCE W. BOWMAN, JR., ESQUIRE
25                            1201 ELM STREET, SUITE 1700
                              DALLAS, TX  75270
```

```
 1   APPEARANCES CONTINUED:

 2

 3                              GODWIN RONQUILLO
                               BY:  R. ALAN YORK, ESQUIRE
 4                             1331 LAMAR, SUITE 1665
                               HOUSTON, TX  77010
 5

 6
     FOR ANADARKO
 7   PETROLEUM CORPORATION,
     ANADARKO E&P COMPANY
 8   LP:                       KUCHLER POLK SCHELL
                               WEINER & RICHESON
 9                             BY:  DEBORAH D. KUCHLER, ESQUIRE
                               1615 POYDRAS STREET, SUITE 1300
10                             NEW ORLEANS, LA  70112

11

12                             BINGHAM MCCUTCHEN
                               BY:  JAMES J. DRAGNA, ESQUIRE
13                             355 SOUTH GRAND AVENUE, SUITE 4400
                               LOS ANGELES, CA  90071
14

15

16                             BINGHAM MCCUTCHEN
                               BY:  WARREN A. FITCH, ESQUIRE
17                                  KY E. KIRBY, ESQUIRE
                                    DAVID B. SALMONS, ESQUIRE
18                                  RANDALL M. LEVINE, ESQUIRE
                               2020 K STREET, NW
19                             WASHINGTON, DC  20006

20

21   FOR MOEX OFFSHORE
     2007 LLC:                 PILLSBURY WINTHROP SHAW PITTMAN
22                             BY:  EDWARD FLANDERS, ESQUIRE
                               1540 BROADWAY
23                             NEW YORK, NY  10036

24

25
```

```
 1   APPEARANCES CONTINUED:

 2

 3                              CARVER DARDEN KORETZKY TESSIER
                               FINN BLOSSMAN & AREAUX
 4                             BY:  PHILLIP D. NIZIALEK, ESQUIRE
                               1100 POYDRAS STREET, SUITE 3100
 5                             NEW ORLEANS, LA  70163

 6

 7   FOR M-I L.L.C.:          MORGAN, LEWIS & BOCKIUS
                               BY:  HUGH E. TANNER, ESQUIRE
 8                                  DENISE SCOFIELD, ESQUIRE
                               1000 LOUISIANA STREET, SUITE 4000
 9                             HOUSTON, TX  77002

10

11   FOR TRANSOCEAN
     EXCESS UNDERWRITERS:     PHELPS DUNBAR
12                             BY:  GEORGE M. GILLY, ESQUIRE
                               CANAL PLACE
13                             365 CANAL STREET, SUITE 2000
                               NEW ORLEANS, LA  70130
14

15
     FOR O'BRIEN'S RESPONSE
16   MANAGEMENT, INC.,
     SEACOR HOLDINGS, INC.,
17   SEACOR OFFSHORE LLC,
     SEACOR MARINE, LLC,
18   SEACOR WORLDWIDE, INC.,
     SEACOR MARINE, INC.,
19   SEACOR MARINE
     INTERNATIONAL, INC.,
20   AND SIEMENS FINANCIAL,
     INC.:                    WEIL GOTSHAL & MANGES
21                             BY:  MICHAEL J. LYLE, ESQUIRE
                               1300 I ST., NW, SUITE 900
22                             WASHINGTON, DC  20005

23
                               WEIL GOTSHAL & MANGES
24                             BY:  THEODORE E. TSEKERIDES, ESQUIRE
                               767 FIFTH AVENUE
25                             NEW YORK, NY  10153
```

09:53AM

```
 1  APPEARANCES CONTINUED:

 2

 3  FOR DRIL-QUIP,
    INC.:                   WARE, JACKSON, LEE & CHAMBERS
 4                          BY:  DON JACKSON, ESQUIRE
                                 C. DENNIS BARROW, JR., ESQUIRE
 5                          2929 ALLEN PARKWAY, 42ND FLOOR
                            HOUSTON, TX  77019
 6

 7

 8  FOR WEATHERFORD U.S.,
    L.P.:                   JONES WALKER
                            BY:  GLENN G. GOODIER, ESQUIRE
 9                          600 JEFFERSON STREET, SUITE 1600
                            LAFAYETTE, LA 70501
10

11

12  FOR MDL 2185:           MITHOFF LAW FIRM
                            BY:  WILLIAM STRADLEY, ESQUIRE
13                          3450 ONE ALLEN CENTER
                            500 DALLAS STREET
14                          HOUSTON, TX  77002

15

16  ALSO PRESENT:           [PLEASE SEE SIGN-IN SHEETS FILED IN THE
                            RECORD]
17

18

19  OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
                                CERTIFIED REALTIME REPORTER
20                              500 POYDRAS STREET, ROOM HB406
                                NEW ORLEANS, LA  70130
21                              (504) 589-7779
                                Cathy_Pepper@laed.uscourts.gov
22

23  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
    PRODUCED BY COMPUTER.
24

25
```

1                          **I N D E X**

2

3   AGENDA ITEMS                                    PAGE

4

5   PENDING MOTIONS......................................  13

6   UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT AS    13

7   TO THE LIABILITY OF BP, TRANSOCEAN, AND ANADARKO,

8   WHICH IS RECORD DOCUMENT 4836.........................

9   ANADARKO HAS OPPOSED THAT MOTION AND HAS FILED A       13

10  CROSS-MOTION FOR SUMMARY JUDGMENT, WHICH IS RECORD

11  DOCUMENT 5113.........................................

12  TRANSOCEAN HAS ALSO OPPOSED THAT MOTION AND FILED ITS    13

13  OWN MOTION FOR SUMMARY JUDGMENT, WHICH IS

14  RECORD DOCUMENT 5103..................................

15  BP HAS NOT FILED A CROSS-MOTION, BUT HAS OPPOSED THE    13

16  UNITED STATES' MOTION.................................

17

18

19

20

21

22

23

24

25

**P-R-O-C-E-E-D-I-N-G-S**

THURSDAY, JANUARY 19, 2012

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)

THE COURT:  Let's move on to the pending motions.

We have the United States' Motion for Partial Summary Judgment as to the liability of BP, Transocean, and Anadarko, which is Record Document 4836.

Anadarko has opposed that motion and has filed a cross-motion for summary judgment, Record Document 5113; and, Transocean has also opposed that motion and filed its own motion for summary judgment, which is Record Document 5103.

Then, BP, as I see things, has not filed a cross-motion, but has, of course, opposed the United States' motion.

So the United States is up.

MR. O'ROURKE:  Good morning, Your Honor.  Steve O'Rourke for the United States.

THE COURT:  Good morning.

MR. O'ROURKE:  Judge, you may remember the genesis of this motion --

THE COURT:  I'm going to have to ask you to speak up, Mr. O'Rourke.

10:18AM 1          MR. O'ROURKE:  Yes, sir.

10:18AM 2          THE COURT:  You're very soft spoken.  Speak up so we can

10:18AM 3  all hear you and the people on the phone can hear you.

10:18AM 4          MR. O'ROURKE:  You may remember how this motion came

10:18AM 5  about, Judge, was when we were here two months ago on Anadarko's

10:18AM 6  motion in limine to preclude evidence about Anadarko's knowledge

10:18AM 7  and access to information at the rig.

10:18AM 8          The United States opposed that, saying we might

10:18AM 9  need that information for our Clean Water Act or our

10:18AM 10 Oil Pollution Act claim, or that might be relevant to penalties

10:19AM 11 later on in the case.

10:19AM 12         You seemed concerned about their jury right.  You

10:19AM 13 seemed concerned about whether they were going to waive their OPA

10:19AM 14 limitation.  You also told us, well, if they are the owner, why

10:19AM 15 do you need any of this information.  So we promised you a motion

10:19AM 16 for summary judgment on ownership, and that's how this all got

10:19AM 17 precipitated.

10:19AM 18         So we filed against Anadarko.  We put in BP and

10:19AM 19 Transocean for good measure, since it's the same statutes and

10:19AM 20 same facts, really.

10:19AM 21         So I'm going to turn first to the Clean Water Act

10:19AM 22 part of the case.  I'm going to take the liberty of putting the

10:19AM 23 statute up on the screen here.

10:19AM 24         So the Clean Water Act, Your Honor, it's sometimes

10:19AM 25 also called the Federal Water Pollution Control Act.  If you read

10:19AM 1    in the cases, you'll see them used somewhat interchangeably.

10:19AM 2    We're relying on Section 311(b).

10:19AM 3               Judge, I think you told me to keep it under

10:20AM 4    15 minutes, so I'll check the clock.

10:20AM 5          THE COURT:  If you can, yes, please.

10:20AM 6          MR. O'ROURKE:  The statutory provision, in relevant

10:20AM 7    part, says, "Any person who is the owner of any vessel or

10:20AM 8    offshore facility from which oil is discharged shall be subject

10:20AM 9    to a civil penalty."  That's the operative language that we're

10:20AM 10   relying on.

10:20AM 11              Note, it's strict liability.  There is no standard

10:20AM 12   of care, no standard of performance.  There are no defenses.

10:20AM 13              You may even note it's in the passive voice, the

10:20AM 14   facility from which oil is discharged.  So these owners don't

10:20AM 15   have to cause the discharge, they don't have to do the discharge,

10:20AM 16   they don't have to do anything; they just have to be the owner.

10:20AM 17   It's a status-based liability.  That's the entire statutory

10:20AM 18   provision.

10:20AM 19              Turning to the facts, I think everybody knows the

10:20AM 20   facts.  The oil came out of the well, passed through the blowout

10:20AM 21   preventer and riser out into the ocean.

10:20AM 22              We'll go to the genuine issues here.  I'm putting

10:20AM 23   up just for a second here, just so you can see it, this chart.

10:21AM 24   We attached this as Exhibit 1 to the United States' reply.  It's

10:21AM 25   just a chart of our statements and the answers from each of the

10:21AM 1    three defendants put into a chart form for convenience; so, if

10:21AM 2    you're try to compare the facts, I'm going to recommend that's a

10:21AM 3    good place to look.

10:21AM 4         But which facts really matter?  We put in a lot of

10:21AM 5    facts because we didn't know exactly what they were going to

10:21AM 6    dispute; but, in the end, they did not dispute the crucial facts.

10:21AM 7         First, as to whether there was a discharge of oil,

10:21AM 8    the United States' Statements of Fact Number 14, 15 and 16.  You

10:21AM 9    can look at that chart and see that each of the defendants

10:21AM 10   admitted that the oil came out of the well -- out of the

10:21AM 11   formation, through the well, through the blowout preventer,

10:21AM 12   through the riser, and out into the Gulf of Mexico waters.  So

10:21AM 13   that's half the statute right there.

10:21AM 14        As to whether they are the owners, Transocean, at

10:21AM 15   Fact 42 through 44, admits that the Transocean entities owned and

10:22AM 16   operated the *Deepwater Horizon*, which, as you've already ruled,

10:22AM 17   Judge, the blowout preventer and the riser are part of the

10:22AM 18   *Deepwater Horizon*.  So they are owners and operators.

10:22AM 19        As to Anadarko, that's Facts 51, 52 and 53, they

10:22AM 20   admit ownership of the well.

10:22AM 21        As to BP, BP's opposition at page 1 admits it's the

10:22AM 22   owner of the well.

10:22AM 23        So, Your Honor, as to the statutory language,

10:22AM 24   again, they've admitted that they are owners, and they've

10:22AM 25   admitted discharge of oil from the well, from the blowout

10:22AM 1    preventer, from the riser into the ocean.

10:22AM 2            THE COURT:  The whole issue here, it seems to me, from

10:22AM 3    what you all have filed, is that the government takes the

10:22AM 4    position -- vessel or offshore facility from which oil is

10:23AM 5    discharged -- the government takes the position that in the

10:23AM 6    somewhat, I guess, unique facts of this case, that the oil was

10:23AM 7    discharged from the facility, from the well, and from the vessel,

10:23AM 8    because it came up through the appurtenances to the vessel, the

10:23AM 9    BOP and the riser pipe, and then escaped into the Gulf.  Is that

10:23AM 10   essentially the government's argument?

10:23AM 11           MR. O'ROURKE:  That's exactly right, Judge.  Transocean

10:23AM 12   is saying it came from the well, so that Anadarko and BP are

10:23AM 13   liable.  BP and Anadarko are saying it came from the vessel, so

10:23AM 14   that Transocean is liable.  We think they are both right.

10:23AM 15           THE COURT:  You're saying it came from both?

10:23AM 16           MR. O'ROURKE:  They are both right.  It came from both.

10:23AM 17           Just as I woke up in the Loews Hotel, Your Honor,

10:23AM 18   this morning, and I walked over from the Loews Hotel to the

10:23AM 19   courthouse, I signed in outside, walked in from the hallway to

10:23AM 20   the courtroom, and here I am; I came from the hotel, I came from

10:24AM 21   the hallway, and here I am.  Anadarko and BP think I woke up in

10:24AM 22   the hallway, which I know happens to people when they come to

10:24AM 23   New Orleans sometimes --

10:24AM 24           THE COURT:  Sometime on the street.

10:24AM 25           MR. O'ROURKE:  -- didn't happen to me today.

10:24AM  1        THE COURT:  Or in a Krystal.

10:24AM  2        MR. O'ROURKE:  I've got my hotel key to prove.  I wish I

10:24AM  3   could have that shown to my wife, too.

10:24AM  4             Transocean thinks I'm still in the hallway.  They

10:24AM  5   think I'm not even here.

10:24AM  6             So we're just saying it came from both.  It really

10:24AM  7   is that simple, Judge.  The statutory language is very plain, the

10:24AM  8   facts are absolutely not in dispute.  That's the Clean Water Act

10:24AM  9   claim.

10:24AM 10        THE COURT:  Now, under the Clean Water Act, the

10:24AM 11   government's position is that not only are all three owners, BP,

10:25AM 12   Transocean, and Anadarko, liable as owners under the

10:25AM 13   Clean Water Act for the discharge, but that the liability is

10:25AM 14   strict and joint and several; that's the government's position?

10:25AM 15        MR. O'ROURKE:  I don't entirely agree with that, Judge.

10:25AM 16   It certainly is strict liability.  There is no standard of

10:25AM 17   performance, no reasonable workmanlike behavior required.  It's

10:25AM 18   just if there is a discharge, there is liability.

10:25AM 19             The penalties aren't joint and several in the sense

10:25AM 20   that damages with can apply jointly and severally.  We do argue

10:25AM 21   that under the Oil Pollution Act, for sure, their liabilities are

10:25AM 22   joint and several to make us whole.

10:25AM 23        THE COURT:  You're not arguing joint and several under

10:25AM 24   the Clean Water Act?

10:25AM 25        MR. O'ROURKE:  That's correct, Judge.  Under the Clean

10:25AM 1   Water Act, the penalties -- you are going to be called on in some

10:25AM 2   penalty assessment phase to judge the behavior of each of those

10:25AM 3   defendants.

10:25AM 4           THE COURT:  Right.

10:25AM 5           MR. O'ROURKE:  They all acted in different ways, so they

10:25AM 6   very likely will all have a different penalty.  It can depend on

10:25AM 7   their finances, their behavior, etcetera, all those equitable

10:26AM 8   factors that you're going to consider later.

10:26AM 9           So we don't see it as joint and several.  We see it

10:26AM 10  as each gets their own punishment.  I don't want to analogize to

10:26AM 11  criminal, but different sentences for different parties, they

10:26AM 12  can't jointly and severally serve.

10:26AM 13          THE COURT:  Here is what I'm trying to understand of the

10:26AM 14  government's view.  The Clean Water Act penalties are based on a

10:26AM 15  per barrel of discharge, right?

10:26AM 16          MR. O'ROURKE:  The maximum is based on per barrel.

10:26AM 17          THE COURT:  It can be greater, obviously, it's a higher

10:26AM 18  per barrel cap if there is gross negligence or willful conduct.

10:26AM 19          MR. O'ROURKE:  Right, which is the Phase One issue.

10:26AM 20          THE COURT:  Yes.

10:26AM 21          Is it the government's position that if each of the

10:26AM 22  three defendants are found liable under the Clean Water Act, that

10:26AM 23  each can be liable up to that maximum?  In other words, let's put

10:26AM 24  aside that there is any gross negligence or willful conduct, and

10:26AM 25  the maximum is $1,000, 1,100 -- whatever it is --

10:26AM 1          MR. O'ROURKE:  For strict liability, it's 1,100.

10:27AM 2          THE COURT:  For strict liability, yes.  1,100?

10:27AM 3          MR. O'ROURKE:  Right.

10:27AM 4          THE COURT:  Is it the government's position that under

10:27AM 5     your argument, each of the three defendants could be penalized up

10:27AM 6     to $1,100 per barrel?

10:27AM 7          MR. O'ROURKE:  Yes, sir, up to $1,100 per barrel.  You

10:27AM 8     have to do the analysis of the facts --

10:27AM 9          THE COURT:  But each defendant could be penalized up to

10:27AM 10    $1,100 per barrel?

10:27AM 11         MR. O'ROURKE:  Separately --

10:27AM 12         THE COURT:  So, at least under your argument, strict

10:27AM 13    liability without any negligence, there could be a penalty of up

10:27AM 14    to $3,300 a barrel?

10:27AM 15         MR. O'ROURKE:  For each of them altogether, yes, but --

10:27AM 16         THE COURT:  Altogether, right.

10:27AM 17         MR. O'ROURKE:  -- we need to assess those separately

10:27AM 18    based on --

10:27AM 19         THE COURT:  No, I understand.  I was just trying to get

10:27AM 20    a clear picture of what your position was.

10:27AM 21         MR. O'ROURKE:  As in civil penalties, Judge, it's not

10:27AM 22    intended to make the government or the people whole; it's

10:27AM 23    intended to punish.  So each one should be punished according to

10:27AM 24    his own culpability.

10:27AM 25         THE COURT:  Obviously, taking all of the factors into

10:27AM 1   account that go into assessing Clean Water Act penalties, one

10:28AM 2   defendant could be assessed $1,100, and another could be assessed

10:28AM 3   a smaller percentage of that or a lesser percentage of that?

10:28AM 4       MR. O'ROURKE:  Yes, sir.  It's in your equitable

10:28AM 5   discretion.  I think it's illegal to offer a zero penalty; but,

10:28AM 6   you could make a low penalty if you decided that one of the

10:28AM 7   defendants deserved a lower penalty.  You could have it be the

10:28AM 8   maximum if you decided that one of the defendants deserved the

10:28AM 9   maximum.

10:28AM 10       THE COURT:  Go ahead with your argument.

10:28AM 11       MR. O'ROURKE:  As far as I'm concerned, we're done with

10:28AM 12   the Clean Water Act.  The language is clear, the facts are not in

10:28AM 13   dispute, unless you want something further.

10:28AM 14       THE COURT:  No.

10:28AM 15       So the whole issue, as you see it, on the

10:28AM 16   Clean Water Act claim is whether, as a matter of law, the Court

10:28AM 17   agrees that the oil was discharged from both the facility, the

10:29AM 18   offshore facility, i.e., the well, and the vessel?

10:29AM 19       MR. O'ROURKE:  Right.  The facts aren't in dispute.

10:29AM 20   It's application of law.

10:29AM 21       THE COURT:  The facts aren't in dispute.

10:29AM 22       MR. O'ROURKE:  Application of law to facts.

10:29AM 23       THE COURT:  Yes, exactly.

10:29AM 24       MR. O'ROURKE:  Exactly.

10:29AM 25       I just want to make one note.  There are a bunch of

10:29AM 1    cases cited by all the parties.  Just so it's clear, none of

10:29AM 2    those cases are Section 311(b) cases.  Those are all under a

10:29AM 3    different part of the water act called Section 301, which

10:29AM 4    prohibits the addition of a pollutant from a point source to a

10:29AM 5    water.  So they may be analogous, but, just to avoid any

10:29AM 6    confusion, they are not controlling.

10:29AM 7         THE COURT:  I did have one more question before you move

10:29AM 8    on from the Clean Water Act.

10:29AM 9         I am correct, am I not, that even under your

10:29AM 10   theory, if each of these parties, penalties are imposed, there

10:29AM 11   can be contribution claims under the Clean Water Act, right?

10:29AM 12        MR. O'ROURKE:  We don't agree with that, Judge.  It's a

10:30AM 13   punishment, and you can't --

10:30AM 14        THE COURT:  There cannot be contribution claims?

10:30AM 15        MR. O'ROURKE:  Right.  We wouldn't say that.

10:30AM 16        Again, in the penalty assessment phase, they can

10:30AM 17   raise equitable issues --

10:30AM 18        THE COURT:  I'm not talking about contractual indemnity

10:30AM 19   now --

10:30AM 20        MR. O'ROURKE:  No, sir, I understand.

10:30AM 21        THE COURT:  -- or contribution.  I'm talking about

10:30AM 22   equitable or legal indemnity or contribution.

10:30AM 23        MR. O'ROURKE:  That's fine in the Oil Pollution Act side

10:30AM 24   for the damages, whatever they may be.

10:30AM 25        On the penalty side, you will be called on to

10:30AM 1   tailor the punishment to the individual's activity.  So, if you

10:30AM 2   think --

10:30AM 3         THE COURT:  Here is the scenario I'm thinking of.

10:30AM 4   Putting aside the facts of this case, but, for example, if you

10:30AM 5   have two or more defendants, and they both are found liable for

10:30AM 6   Clean Water Act penalties, strictly liable, but defendant B

10:31AM 7   argues that defendant A really caused this, they were the

10:31AM 8   proximate or legal cause of what happened in causing the

10:31AM 9   discharge, there is no legal or equitable contribution claim

10:31AM 10  under that theory?

10:31AM 11        MR. O'ROURKE:  The appropriate step there, Your Honor,

10:31AM 12  would be for the judge to decide whether that's true and to

10:31AM 13  reduce the less culpable one's penalty accordingly.  Make the one

10:31AM 14  who is really at fault pay a lot, make the one who is not at

10:31AM 15  fault pay low.

10:31AM 16        THE COURT:  What if the one who is really at fault isn't

10:31AM 17  a party that can be penalized under the Clean Water Act, and they

10:31AM 18  caused the discharge?  Is it the government's position there's no

10:31AM 19  way to shift the penalties to anyone else?

10:31AM 20        MR. O'ROURKE:  We think that's the correct position.

10:32AM 21        THE COURT:  Under any scenario?

10:32AM 22        MR. O'ROURKE:  We think that's the correct position,

10:32AM 23  Your Honor.

10:32AM 24             Of course, on the Oil Pollution Act side,

10:32AM 25  contribution, indemnity, it's all fine.  On the penalty side, if

10:32AM 1   the Court decides that the defendant shouldn't be penalized very

10:32AM 2   much, you adjust it in the penalty assessment --

10:32AM 3          THE COURT:  Because somebody else caused it?

10:32AM 4          MR. O'ROURKE:  Right.  In the penalty assessment phase,

10:32AM 5   Judge, one of the statutory factors is that you consider any

10:32AM 6   matter that justice requires you to consider.

10:32AM 7          THE COURT:  All right.  Thank you.

10:32AM 8          Do you want to move on?

10:32AM 9          MR. O'ROURKE:  Thank you, Judge.

10:32AM 10          Now, on the Oil Pollution Act side, the liability

10:32AM 11   provision under the Oil Pollution Act, Section 2702, is almost

10:32AM 12   identical to the Clean Water Act section.  Responsible parties

10:32AM 13   are liable, and if there is a discharge of oil from a vessel or a

10:32AM 14   facility, the responsible parties are the lessees for the well,

10:32AM 15   the owner/operator for the vessel.  So it's quite similar.

10:32AM 16          What's different in OPA is the limitation.  There

10:33AM 17   is a presumptive limitation for every owner/operator.  Be it an

10:33AM 18   onshore facility, a vessel, a tank vessel, an offshore facility,

10:33AM 19   they all get a limit under Section 2704(a).

10:33AM 20          Under Section 2704(c), all of those limits can be

10:33AM 21   lifted or eviscerated if the plaintiff shows that the incident

10:33AM 22   was proximately caused by a violation of regulation or by gross

10:33AM 23   negligence or willful misconduct.

10:33AM 24          Of course, on summary judgment, we didn't go for

10:33AM 25   gross negligence or willful misconduct.  We instead went for

10:33AM  1    violations of regulations.

10:33AM  2              The regulations we picked, Judge, we picked ones

10:33AM  3    that don't involve -- I hope this gets here -- that don't involve

10:33AM  4    the standard of care, again, because it's summary judgment, and

10:33AM  5    we didn't want to dispute a fact.

10:33AM  6              So we looked to the regulations that are strict

10:33AM  7    liability and that, in this case, really are proven on a res ipsa

10:33AM  8    loquitur type of basis.

10:34AM  9              One of the regulations is that you must case in

10:34AM 10    cement all wells, and it must prevent the release of fluids from

10:34AM 11    any stratum through the wellbore into offshore waters.

10:34AM 12              I think, again, the facts that we cited, Fact 11,

10:34AM 13    all the parties admit that the cement did not prevent the influx

10:34AM 14    of hydrocarbons through the wellbore.  So that regulation has

10:34AM 15    been violated.

10:34AM 16              Similarly, they shall not create conditions that

10:34AM 17    pose unreasonable risk to public health or life, etcetera.  We

10:34AM 18    think that the fact that 11 men were killed shows that there was

10:34AM 19    more than an unreasonable risk.  There was, in fact, harm, not

10:34AM 20    just risk.

10:34AM 21              So these regulations are strict liability and --

10:34AM 22         THE COURT:  What would be the scenario where there could

10:34AM 23    be an oil spill that's a violation of OPA that doesn't violate

10:34AM 24    that type of regulation?

10:35AM 25         MR. O'ROURKE:  Well, Judge, what used to be MMS could go

10:35AM 1   out and inspect a rig and say, these conditions pose an

10:35AM 2   unreasonable risk because you're not monitoring correctly or

10:35AM 3   anything.  They could be cited for violations of those

10:35AM 4   regulations even if nothing ever happened.

10:35AM 5              Here, what we have is the conditions --

10:35AM 6         THE COURT:  No, but that's not the question I asked.

10:35AM 7   The question is if there is an oil spill --

10:35AM 8         MR. O'ROURKE:  That doesn't kill anybody and that

10:35AM 9   doesn't harm the environment.

10:35AM 10        THE COURT:  Well, can you envision an oil spill that

10:35AM 11  doesn't harm the environment, an oil spill in navigable waters?

10:35AM 12        MR. O'ROURKE:  Well, an oil spill offshore, 50 miles

10:35AM 13  out, of a very small amount that barely causes a sheen, you would

10:35AM 14  have to decide if that was an unreasonable risk to the

10:35AM 15  environment or not.

10:35AM 16             But, Judge, the limitation section,

10:35AM 17  Section 2704(c), says that you look to the applicable federal

10:36AM 18  regulations.  So there is not a slippery slope here where every

10:36AM 19  oil spill has no limitation --

10:36AM 20        THE COURT:  That's the other side of the argument to

10:36AM 21  your motion.  The opposition, they say that under your argument

10:36AM 22  there is a violation every time there is an oil spill, and every

10:36AM 23  time there is an oil spill -- the limit is meaningless.

10:36AM 24        MR. O'ROURKE:  Every time there is an oil spill that

10:36AM 25  causes an unreasonable risk, then the limitation would be lifted

10:36AM 1   on the Outer Continental Shelf for OCS drilling facilities, not

10:36AM 2   for any other kind of facility.  If those are the applicable

10:36AM 3   regulations, then they are.

10:36AM 4           I just want to note here, Judge, if we get to trial

10:36AM 5   on this, we will be pulling out a whole bunch of other

10:36AM 6   regulations that do have standards of care, that they have to

10:36AM 7   operate in a workmanlike manner, things of this nature, that they

10:36AM 8   have to --

10:36AM 9           THE COURT:  Why do I need to decide this now?

10:36AM 10          MR. O'ROURKE:  You need to decide it now to get rid of

10:36AM 11  Anadarko's OPA limitation.

10:37AM 12          You don't need to decide for BP.  We're willing to

10:37AM 13  accept that they have stated publicly here that they are going to

10:37AM 14  waive that limitation.

10:37AM 15          Frankly, Judge, if you don't want to decide it now,

10:37AM 16  you could still decide the Clean Water Act side, which does

10:37AM 17  eliminate Anadarko's jury right and eliminates a lot of issues.

10:37AM 18  It also probably eliminates the motion in limine issues from

10:37AM 19  Anadarko's motion in limine.

10:37AM 20          So you could refrain from weighing in on Anadarko's

10:37AM 21  limitation under the Oil Pollution Act if you decide you don't

10:37AM 22  want to rely on that regulation.

10:37AM 23          The cementing regulation, again, requires the

10:37AM 24  cement to stop oil from going through the wellbore to the sea.

10:37AM 25  It's undisputed that it happened.

10:37AM 1            So summary judgment is appropriate under both of

10:37AM 2   those regulations because there is no dispute, and they both

10:37AM 3   proximately caused the incident.  So the OPA limitation can be

10:37AM 4   lifted.

10:37AM 5            I guess I'll move on now to Transocean's arguments

10:38AM 6   under the Oil Pollution Act.  I think I'm pretty much out of

10:38AM 7   time.

10:38AM 8            What Transocean wants to rely on is

10:38AM 9   Section 2704(b), which, by its terms, applies to spills at the

10:38AM 10  surface, from a MODU that spills at the surface, so you might

10:38AM 11  imagine spills from their fuel tanks or something.

10:38AM 12           By the plain language of the text, it doesn't apply

10:38AM 13  to subsurface spills.  They want you to apply it to a subsurface

10:38AM 14  spill.  If you do --

10:38AM 15           THE COURT:  2704(b), right?

10:38AM 16           MR. O'ROURKE:  (b), yes.

10:38AM 17           THE COURT:  Yes.

10:38AM 18           MR. O'ROURKE:  If you do apply it to the subsurface

10:38AM 19  spill, what it says is the MODU owner/operator gets the limit of

10:38AM 20  a tank vessel, if such limit may apply, which is higher than the

10:38AM 21  vessel limit.  So it's actually raising the limitation from

10:38AM 22  vessel to tank vessel, if it may apply.

10:38AM 23           But the tank vessel limit, like all the other

10:38AM 24  limits in OPA, can be lifted by the showing of the gross

10:38AM 25  negligence, the willful misconduct or the violation of the

10:39AM  1  regulations.

10:39AM  2          So what they are arguing for is impunity,

10:39AM  3  effectively.  First, they say they are not liable at all if it's

10:39AM  4  a subsea spill.  Second, they say they are liable to the tank

10:39AM  5  vessel limit, and it can never be breached.  So that would make

10:39AM  6  them the only person -- the only industry under the Oil Pollution

10:39AM  7  Act whose limitation can't be breached no matter how bad they

10:39AM  8  are.

10:39AM  9          They also ask you to bring that over to the water

10:39AM 10  act side and absolve them from liability under the water act.

10:39AM 11  But I put up the text of 311(b).  It doesn't say anything about

10:39AM 12  MODUs or subsurface discharges in the water act.  That's a strict

10:39AM 13  liability scheme.

10:39AM 14          On the Oil Pollution Act side, we think that the

10:39AM 15  easiest reading is that they hit the tank vessel limit, but it's

10:39AM 16  breachable, just like any other limit under OPA, if they engaged

10:39AM 17  in gross negligence or willful misconduct.  Otherwise, they could

10:39AM 18  just say, we're going to take our riser and our vessel and leave,

10:40AM 19  we're going to leave the blowout preventer down there, we're

10:40AM 20  going to leave it wide open, and they are off the hook, no matter

10:40AM 21  how malicious it may be.

10:40AM 22          So we're just saying treat them like everybody else

10:40AM 23  under the statute.

10:40AM 24          THE COURT:  Thank you, Mr. O'Rourke.

10:40AM 25          Who's going to go first?

10:40AM 1          MR. SALMONS:  Good morning, Your Honor.

10:40AM 2          THE COURT:  Good morning.

10:40AM 3          MR. SALMONS:  David Salmons for Anadarko.

10:40AM 4              If it pleases the Court, I would like to begin with

10:40AM 5     why Anadarko cannot be liable for penalties under the

10:40AM 6     Clean Water Act.

10:40AM 7              Let's start with what I think is common ground.

10:40AM 8     Anadarko Petroleum Corporation, or APC, was a partial owner of

10:40AM 9     the Macondo well, but had no ownership or other interest in the

10:40AM 10    *Deepwater Horizon* and, as this Court has now repeatedly held, no

10:40AM 11    control over any of the drilling operations involved in this

10:40AM 12    case.  So, unlike BP and Transocean, there is no potential for

10:40AM 13    Anadarko to be found an operator or person in charge of the

10:41AM 14    *Deepwater Horizon*.

10:41AM 15         THE COURT:  Remind me, the two Anadarko entities,

10:41AM 16    Anadarko E&P and Anadarko --

10:41AM 17         MR. SALMONS:  APC and then Anadarko AE&P.  APC was a

10:41AM 18    partial owner in the well.  The government concedes --

10:41AM 19         THE COURT:  Anadarko Petroleum Corporation?

10:41AM 20         MR. SALMONS:  Yes, sir.  That's right, APC.  Yes, APC

10:41AM 21    was a partial owner in the well.  The government concedes that

10:41AM 22    AE&P was not.

10:41AM 23         THE COURT:  I didn't realize the government -- does the

10:41AM 24    government concede that?  I thought, in one of my prior rulings,

10:41AM 25    I said there is a factual issue --

10:41AM 1          MR. SALMONS:  Yes, Your Honor.

10:41AM 2          THE COURT:  -- or at least I didn't decide because there

10:41AM 3     was some issue -- right around the time this occurred, the lease

10:41AM 4     interest of Anadarko was being transferred from AE&P to APC.

10:41AM 5          MR. SALMONS:  Yes, you're remembering correctly.

10:41AM 6          THE COURT:  It was a question of the transaction

10:41AM 7     occurred before April 20th, but it wasn't finally approved by MMS

10:41AM 8     and became effective until after --

10:41AM 9          MR. SALMONS:  That's right.  The regulation provided for

10:41AM 10    it to relate back to the original date.

10:41AM 11         THE COURT:  Well --

10:42AM 12         MR. SALMONS:  That relates to whether they were a

10:42AM 13    leaseholder status for purposes of OPA --

10:42AM 14         THE COURT:  But that's not really what you're arguing

10:42AM 15    here this morning, that issue.

10:42AM 16         MR. SALMONS:  Well, that's right.  That relates to OPA

10:42AM 17    and to the leaseholder -- being a leaseholder in the area of a

10:42AM 18    facility can make you a responsible party in OPA.

10:42AM 19         THE COURT:  Right.

10:42AM 20         MR. SALMONS:  But under the Clean Water Act, you have to

10:42AM 21    be an owner, operator or person in charge, and the government

10:42AM 22    concedes that the leaseholder issue doesn't make AE&P an owner.

10:42AM 23    He can correct me if I'm wrong, but I --

10:42AM 24         THE COURT:  If you own the lease, you're not an owner of

10:42AM 25    the --

10:42AM 1          MR. SALMONS:  That they had a lease interest, but they

10:42AM 2   did not own the physical material of the well.

10:42AM 3          THE COURT:  All right.  I didn't mean to sidetrack you.

10:42AM 4          MR. SALMONS:  Not at all, Your Honor.

10:42AM 5          THE COURT:  We can have the government respond to that,

10:42AM 6   if they agree with what you just said or not.

10:42AM 7          MR. SALMONS:  So what all this means is that Anadarko

10:42AM 8   can be liable for penalties under the Clean Water Act only if the

10:42AM 9   Macondo well, as distinct from the vessel and its appurtenances,

10:42AM 10  was the offshore facility from which oil was discharged.

10:43AM 11         THE COURT:  I'm having trouble conceptually thinking

10:43AM 12  this through.  How is it that the oil did not escape from or

10:43AM 13  discharge from the well before it got into the riser and BOP?

10:43AM 14         MR. SALMONS:  Well, I think the --

10:43AM 15         THE COURT:  I mean, just as a matter of common sense, it

10:43AM 16  seems like it did, didn't it?

10:43AM 17         MR. SALMONS:  Just so I understand your question --

10:43AM 18         THE COURT:  Where did the oil originate from?

10:43AM 19         MR. SALMONS:  I think there are two features of this act

10:43AM 20  that I want to point out that I think answer Your Honor's

10:43AM 21  question.

10:43AM 22              The first is that it defines -- this is 311 of the

10:43AM 23  Clean Water Act -- it defines three mutually exclusive categories

10:43AM 24  of sources for a potential discharge:  Offshore facility, onshore

10:43AM 25  facility and vessel.

10:43AM 1      THE COURT:  Why would they be mutually exclusive?  It

10:43AM 2  says one, two or three.  That doesn't tell me that they are

10:43AM 3  mutually exclusive.  It means it could be one or two or three, or

10:43AM 4  one and two, or two and three, or one, two, and three.

10:43AM 5      MR. SALMONS:  Your Honor, it's not the word "or."  What

10:44AM 6  tells you it's mutually exclusive is the definition contained in

10:44AM 7  the act itself of an offshore facility.

10:44AM 8          This is Section 1321(a)(1).  It provides that, "an

10:44AM 9  offshore facility is any facility of any kind located in, on or

10:44AM 10 under any of the navigable waters of the United States other than

10:44AM 11 a vessel."

10:44AM 12          That's the definition of an offshore facility.  It

10:44AM 13 expressly excludes all vessels.  Vessel is defined to include any

10:44AM 14 vessel.

10:44AM 15          So -- and the government, I think, concedes this in

10:44AM 16 its opening brief on this issue, that these are mutually

10:44AM 17 exclusive categories.

10:44AM 18      THE COURT:  That still doesn't answer the question of

10:44AM 19 why can't it be a vessel --

10:44AM 20      MR. SALMONS:  Well, I think that's a partial answer.

10:44AM 21      THE COURT:  -- or an onshore facility or an offshore

10:44AM 22 facility or more than one?

10:44AM 23      MR. SALMONS:  Well, what we know for sure is that the

10:44AM 24 point at which the oil entered the marine environment was the

10:44AM 25 vessel and its appurtenances.  It began spewing out of the vents

10:44AM 1    at the top of the *Deepwater Horizon*, rained down upon the deck --

10:45AM 2        THE COURT:  I'm trying to think of some scenario, what

10:45AM 3    the result would be if I take your argument to its logical

10:45AM 4    conclusion.

10:45AM 5        If you've got an oil tank facility onshore, and

10:45AM 6    it's near a dock, and the tank ruptures and the oil spills; but,

10:45AM 7    before it hits the water, it hits a vessel, it falls on the

10:45AM 8    vessel and then spills over from the vessel into the water, there

10:45AM 9    is no liability for the tank owner --

10:45AM 10       MR. SALMONS:  Well, in that circumstance, you'd actually

10:45AM 11   say --

10:45AM 12       THE COURT:  -- because it went through the vessel first?

10:45AM 13       MR. SALMONS:  Well, I think actually, Your Honor, in

10:45AM 14   that circumstance, if I understand your hypo correctly, that the

10:45AM 15   discharge would have occurred from the tank because that's where

10:45AM 16   control was lost and where it entered the environment.

10:45AM 17       That some of it happened to flop over the deck of

10:45AM 18   the vessel is sort of beside the point; it was spilling

10:45AM 19   everywhere at that point, out of control.

10:45AM 20       THE COURT:  Isn't that sort of what happened here?  They

10:45AM 21   lost well control when they had the blowout.  That's what

10:46AM 22   started --

10:46AM 23       MR. SALMONS:  Well --

10:46AM 24       THE COURT:  There was a blowout which came from under

10:46AM 25   the sea bed and down in the well somewhere, where hydrocarbons

10:46AM 1   started escaping, caused a blowout, caused a fire, caused an

10:46AM 2   explosion.  Then, eventually, we know what happened.  The vessel

10:46AM 3   capsized, the riser broke, and the oil started spewing out.

10:46AM 4           MR. SALMONS:  Sure, sure.  A couple of responses to

10:46AM 5   that, Your Honor.

10:46AM 6           THE COURT:  Yes.

10:46AM 7           MR. SALMONS:  I think this is really important.

10:46AM 8               Let me, if I may, just start with going back to the

10:46AM 9   text for one more point about the actual language of the act.

10:46AM 10              The text directs the Court to determine not where

10:46AM 11  the oil was from, but where the discharge was from.  By "from,"

10:46AM 12  it means which of these three exclusive sources, mutually

10:46AM 13  exclusive sources --

10:46AM 14          THE COURT:  Well, you keep saying they are exclusive.

10:46AM 15  I'm not convinced that that's right; but, go ahead, make your

10:46AM 16  argument.

10:46AM 17          MR. SALMONS:  Well, let me try it this way, Your Honor.

10:46AM 18              If you think about OPA, Congress provided a

10:46AM 19  definition of a MODU in OPA that expressly says it can be a

10:47AM 20  facility.  The Clean Water Act has no such provision.

10:47AM 21              I think Mr. O'Rourke will confirm, if you ask him,

10:47AM 22  that they agree that an offshore facility cannot be a vessel, and

10:47AM 23  a vessel cannot be an offshore facility, because the definitions

10:47AM 24  are mutually exclusive.

10:47AM 25              But what's important is that it's not where the oil

10:47AM 1  is from, it's where the discharge is from.  A discharge occurs

10:47AM 2  when the pollutant enters the environment.

10:47AM 3        Oil might have transferred from the well to the

10:47AM 4  vessel.  That's what the vessel was for.  The *Deepwater Horizon*

10:47AM 5  and its BOP and its riser pipe, they weren't just a passive

10:47AM 6  conduit; they were designed to manipulate and control the flow of

10:47AM 7  hydrocarbons and drilling fluids back and forth between the well

10:47AM 8  and the vessel.

10:47AM 9        It's the vessel, those operating it and its

10:47AM 10  appurtenances that failed and that caused the incident.  What

10:47AM 11  happened is the discharge, the entering into the environment,

10:48AM 12  occurred from the vessel and its appurtenances.

10:48AM 13        I would just point out, Your Honor, that this is

10:48AM 14  very close to an issue that was litigated heavily at the

10:48AM 15  beginning of this case, in the B1 order that this Court issued.

10:48AM 16        Cameron, you may recall, and your order expressly

10:48AM 17  notes this, argued that the discharge came from the sea bed and

10:48AM 18  the well that was on the sea floor, not from the vessel; so,

10:48AM 19  therefore, state law applied.

10:48AM 20        This Court rejected that view and expressly said --

10:48AM 21  in fact, you know, the language this Court used was that maritime

10:48AM 22  law applied because the "blowout, explosions, fire and subsequent

10:48AM 23  discharge of the oil occurred on or from the *Deepwater Horizon*

10:48AM 24  and its appurtenances."

10:48AM 25        So we're here having --

10:48AM 1       THE COURT:  Well, first of all, that was in a totally

10:48AM 2  different context than what we're talking about here.

10:48AM 3           Secondly, I did not say that it did not discharge

10:49AM 4  from the well.

10:49AM 5       MR. SALMONS:  That's correct.  I'm not trying to suggest

10:49AM 6  that Your Honor is bound.  I just want to point out the very

10:49AM 7  close connection of these points.

10:49AM 8           Another point I would just make about the mutual

10:49AM 9  exclusivity of the sources under Section 311, Your Honor, is that

10:49AM 10 there is no case that the government can cite and no agency

10:49AM 11 enforcement action in the entire history of the Clean Water Act

10:49AM 12 that has found that there were multiple sources for a single

10:49AM 13 discharge under 311.  That's not the way the act has ever been

10:49AM 14 applied before.

10:49AM 15          We're talking about a statute that imposes severe

10:49AM 16 penalties and that also can carry criminal liability based on

10:49AM 17 these same definitions.  There are canons of construction that

10:49AM 18 mandate that any doubt about whether you could have multiple

10:49AM 19 sources for a single discharge has to be resolved against the

10:49AM 20 government because of the nature of the penalties involved.

10:49AM 21          The most the government could say is nothing in the

10:50AM 22 language of the act precludes you from doing so, and that's

10:50AM 23 simply not good enough.

10:50AM 24      THE COURT:  I'm trying to, again, go back to another

10:50AM 25 hypothetical.  I had a Clean Water Act case recently where --

10:50AM 1   these are not the exact facts, but I'm going to use the basic
10:50AM 2   premise of it -- it was an onshore chemical facility of some sort
10:50AM 3   on or near the river, Mississippi River, and there was some
10:50AM 4   seepage or leaking of waste liquids, chemicals, which was getting
10:50AM 5   into the river.
10:50AM 6           If that seeped into the neighbor's property, into a
10:50AM 7   ditch or a line or something, it sounds like, under your
10:50AM 8   argument, you could say, we're not liable because it didn't enter
10:50AM 9   the water from our facility, it entered from my neighbor's ditch.
10:51AM 10          MR. SALMONS:  I don't think so, Your Honor.  I think
10:51AM 11  that would actually -- if I understand the question correctly,
10:51AM 12  that would be under a different provision, 1311, which deals with
10:51AM 13  point sources, which Mr. O'Rourke just pointed out has very
10:51AM 14  different provisions and isn't particularly analogous to the way
10:51AM 15  311 works.
10:51AM 16          What you have with 311 is you have more severe
10:51AM 17  penalties and other consequences when you're dealing with a
10:51AM 18  discharge from either an offshore facility, an onshore facility
10:51AM 19  or a vessel.  Those are defined to exclude each other, and the
10:51AM 20  Court is directed to determine --
10:51AM 21          THE COURT:  Where is the definition that it excludes
10:51AM 22  each other?
10:51AM 23          MR. SALMONS:  This is Section 13 --
10:51AM 24          THE COURT:  You keep saying that, but I haven't seen
10:51AM 25  that.

10:51AM 1        MR. SALMONS:  It's Section 1321(a)(11), Your Honor.

10:51AM 2   It's the definition of offshore facility.

10:51AM 3        THE COURT:  Wait a minute, wait a minute, let me get

10:51AM 4   there.

10:51AM 5        MR. SALMONS:  Oh, sure.

10:51AM 6        THE COURT:  Okay, I'm there.  Definition of offshore

10:51AM 7   facility.

10:51AM 8        MR. SALMONS:  It says it means "any facility of any kind

10:52AM 9   located in, on or under any of the navigable waters of the

10:52AM 10  United States, and any facility of any kind which is subject to

10:52AM 11  the jurisdiction of the United States and is located in, on or

10:52AM 12  under any other waters, other than a vessel."

10:52AM 13        So an offshore facility is defined to exclude

10:52AM 14  vessels.

10:52AM 15        THE COURT:  Yes, but that doesn't mean you can't have a

10:52AM 16  vessel and an offshore facility next to each other --

10:52AM 17        MR. SALMONS:  You put --

10:52AM 18        THE COURT:  -- from which the oil -- I mean, these are

10:52AM 19  pretty unique facts here, but the *Deepwater Horizon* was a vessel;

10:52AM 20  you had the well, which was an offshore facility.  The fact that

10:52AM 21  the offshore facility excludes a vessel doesn't mean there wasn't

10:52AM 22  a vessel there.

10:52AM 23        MR. SALMONS:  Your Honor, let me try to --

10:52AM 24        THE COURT:  I'm really having trouble following your

10:52AM 25  argument here.

10:52AM 1        MR. SALMONS:  I would generally disagree that this is

10:52AM 2    that unusual of a fact pattern in the following sense:  You have

10:52AM 3    vessels that will frequently connect to a facility, whether it's

10:52AM 4    an onshore facility or an offshore facility, and will transfer

10:53AM 5    oil back and forth between them.

10:53AM 6            This happens all the time, and there are cases we

10:53AM 7    cite with regard to that, when they are bunkering oil and other

10:53AM 8    kinds of things, filling a tank.  They are physically connected.

10:53AM 9    They are integrated to allow the free flow of oil back and forth.

10:53AM 10           If the people that are operating the vessel allow,

10:53AM 11   for example, the tank to be overwhelmed or other things to

10:53AM 12   happen, so that there is a discharge and oil is released from the

10:53AM 13   point of the vessel, all those cases only hold the vessel --

10:53AM 14       THE COURT:  Well, what if, instead of that, that the

10:53AM 15   facility that's pumping the oil into the vessel explodes,

10:53AM 16   something happens, but, again, the oil goes through the vessel

10:53AM 17   into the water; you're going to say there is no Clean Water Act

10:53AM 18   violation on the facility itself?

10:53AM 19       MR. SALMONS:  I think what courts --

10:53AM 20       THE COURT:  Would that be your argument?

10:53AM 21       MR. SALMONS:  -- what courts do is they look to see --

10:53AM 22   now, and let me just say this.  Of course, there can be some

10:53AM 23   difficult lines at times; but, courts will look to who had

10:53AM 24   control over the situation, and then they will decide which of

10:54AM 25   the vessel or the facility was the source of the discharge, and

10:54AM  1    they will only apply 311 penalties to one of them.

10:54AM  2             There is no case and no agency example -- the

10:54AM  3    government hasn't pointed to one; we have looked, and we can't

10:54AM  4    find any in the entire history of the act -- where you have

10:54AM  5    multiple sources for a single discharge under 311.  The

10:54AM  6    government concedes this was a single discharge.

10:54AM  7         THE COURT:  Well, Transocean's argument would answer

10:54AM  8    that for you, right?

10:54AM  9         MR. SALMONS:  Which one of their arguments, Your Honor?

10:54AM 10         THE COURT:  They would put it all on you.  They would

10:54AM 11    state there was only one, you're right, and it's you.

10:54AM 12         MR. SALMONS:  I wish them luck, Your Honor, because the

10:54AM 13    one thing I think that's absolutely impossible to dispute is that

10:54AM 14    the discharge began from the top of the *Deepwater Horizon*.

10:54AM 15             Let me try this, Your Honor.  Imagine that the

10:54AM 16    vessel never caught fire.

10:54AM 17         THE COURT:  Well, I'll bet they disagree with that.  I

10:54AM 18    think they are going to say it began down in the well.  It began

10:55AM 19    down in the well.

10:55AM 20         MR. SALMONS:  Well, let me just say this, by discharge I

10:55AM 21    mean where it entered the environment.  That, I think, is the

10:55AM 22    critical definition of discharge.

10:55AM 23             What courts look to is at what point the substance

10:55AM 24    enters the marine environment.  If it doesn't enter the marine

10:55AM 25    environment, there is not a discharge.  Oil just flows back and

10:55AM 1   forth; and, you have a transfer, but you don't have a discharge.

10:55AM 2          What matters is where it enters the marine

10:55AM 3   environment.  What 311 asks you to do is decide, okay, did the

10:55AM 4   substance enter the marine environment from a vessel, from an

10:55AM 5   offshore facility or from an onshore facility.

10:55AM 6       THE COURT:  So, to get back to my example, if you cause

10:55AM 7   oil to escape from your facility onto a vessel or through a

10:55AM 8   vessel, and then it gets into the water, you're not liable under

10:55AM 9   the Clean Water Act, even though it emanated from your --

10:55AM 10      MR. SALMONS:  Well, I think, remember, you may very well

10:55AM 11  be an operator.  If you had that kind of control, I think you're

10:56AM 12  probably going to be considered to be an operator of whatever it

10:56AM 13  was that went wrong.

10:56AM 14         It's not just owner, it's owner, operator or person

10:56AM 15  in charge; but, the first step in the analysis is to define from

10:56AM 16  which of these three sources did the discharge occur.  That's

10:56AM 17  what the statute asks you to ask.  Then, the owner, operator or

10:56AM 18  person in charge of that source is potentially liable -- or is

10:56AM 19  liable, and then you determine the right amount.

10:56AM 20         One other point I would just make, Your Honor, is

10:56AM 21  that no other holding here really makes any sense.  Because, if

10:56AM 22  you think about Anadarko, this Court has already repeatedly held

10:56AM 23  that Anadarko had no control, had no duty to intercede, had no --

10:56AM 24      THE COURT:  But aren't those factors that would go to

10:56AM 25  the amount of the penalty, not whether there is a penalty?  I

10:56AM 1   mean, this is strict liability if you occupy the status of an
10:56AM 2   owner, right?
10:56AM 3          MR. SALMONS:  I think it goes to both.
10:57AM 4              Let me say, as to the amount, one of things we
10:57AM 5   really plead with the Court --
10:57AM 6          THE COURT:  In other words, let's remove the blowout
10:57AM 7   preventer and the riser from the equation, and the oil started
10:57AM 8   escaping from the well down below the surface.  You're not
10:57AM 9   arguing that Anadarko wouldn't be liable as --
10:57AM 10         MR. SALMONS:  No, we would be liable because the
10:57AM 11  discharge was from a facility that we were a partial owner of;
10:57AM 12  but, then you'd get to the factors and the fact we had no
10:57AM 13  control --
10:57AM 14         THE COURT:  Well, those would be factors that could be
10:57AM 15  argued.
10:57AM 16         MR. SALMONS:  That's right.  But, on the amount, I just
10:57AM 17  want to make this point, Your Honor, which is that the
10:57AM 18  government -- and I think this is largely the reason why we're
10:57AM 19  here now having this discussion -- is that the government seems
10:57AM 20  unwilling to accept that this Court's prior holdings with regard
10:57AM 21  to Anadarko's level of control, lack of duty to intercede, lack
10:57AM 22  of -- lack of culpability or fault, have any application to the
10:57AM 23  Clean Water Act claims that they have.
10:57AM 24             So, for example, in their response to our statement
10:58AM 25  of undisputed facts, they, yet again, say that there are disputed

10:58AM 1   facts or triable issues as to the level of Anadarko's control and

10:58AM 2   as to whether our failure to intercede was a cause of the

10:58AM 3   incident.

10:58AM 4          We would just ask the Court if it could find a way

10:58AM 5   to make clear that this Court's holdings apply to the government

10:58AM 6   as well as any other party.

10:58AM 7          THE COURT:  Well, I think I've already said that.

10:58AM 8          MR. SALMONS:  The best way to do it would be to grant

10:58AM 9   our motion in limine that's still pending to exclude evidence in

10:58AM 10  the Phase One trial related to what we knew and what we had

10:58AM 11  access to.

10:58AM 12         The degree to which the government treats things as

10:58AM 13  still open questions of fact simply because they don't accept

10:58AM 14  your orders is startling.

10:58AM 15         The last thing I'd say with regard to why our lack

10:58AM 16  of control still matters for purposes of liability, as well, is

10:58AM 17  because this is an incredibly severe penalty statute, and courts

10:58AM 18  do look to these principles of fair notice and strict

10:59AM 19  construction of such penalty statutes against the government to

10:59AM 20  make sure that people aren't unfairly put on the hook for these

10:59AM 21  things.

10:59AM 22         Anadarko had no notice whatsoever that it could be

10:59AM 23  held responsible for severe penalties that entered the marine

10:59AM 24  environment from a vessel over which it had no interest and no

10:59AM 25  control whatsoever.  There is no case, there is no example of any

10:59AM 1    enforcement history whatsoever of a nonoperating investor being

10:59AM 2    hit with such liability.  The text of the act, we submit, doesn't

10:59AM 3    allow it.

10:59AM 4              If the Court would like to hear argument about

10:59AM 5    their operator as a matter of law theory, I'm happy to present

10:59AM 6    it.

10:59AM 7         THE COURT:  No.  That's been briefed satisfactorily.

10:59AM 8    Thank you very much.

10:59AM 9         MR. SALMONS:  Thank you, Your Honor.

10:59AM 10        THE COURT:  Thank you.

10:59AM 11             Who is up next?  BP?  All right.

11:00AM 12        MR. LANGAN:  Your Honor, Andy Langan for BP.

11:00AM 13             I have very limited time, and I'm going to pick a

11:00AM 14   couple of issues that are sort of unique to BP here in the time

11:00AM 15   that I do have.

11:00AM 16             First of all, just in terms of what's not in

11:00AM 17   dispute, we're not disputing we're an owner of the Macondo well,

11:00AM 18   which is an offshore facility, for Clean Water Act purposes.

11:00AM 19             Secondly, the government agrees with us that you

11:00AM 20   don't need to reach the issue about whether we're an operator of

11:00AM 21   the well for purposes of this motion at this time, since we've

11:00AM 22   admitted we're an owner.  So that's kind of off the table.

11:00AM 23             I also want to mention that there is no cause for

11:00AM 24   the Court to determine now on summary judgment whether or not BP

11:00AM 25   was an operator of the vessel, the *Deepwater Horizon*.  The

11:00AM 1   government hasn't moved to say that we are.  That's going to be a

11:00AM 2   contest at trial, and you don't have to reach that issue at all.

11:00AM 3          So we're an owner of the facility, but there is no

11:00AM 4   issue for you to decide as to whether we're an operator of the

11:00AM 5   vessel at this time.  So I just wanted to clarify that.

11:00AM 6          Your Honor, one issue that hasn't come up, but it's

11:01AM 7   quite important for BP, is the government's request for a final

11:01AM 8   judgment on the Oil Pollution Act, OPA, as to BP.  We have a

11:01AM 9   great deal of concern about that because of the fact that we

11:01AM 10  believe it involves claim-splitting, improper claim-splitting.

11:01AM 11         The government should bring all of its claims in

11:01AM 12  this case before this Court in one complaint, and the claims

11:01AM 13  should be managed before you all at once.

11:01AM 14         We don't think there is any authority at this time

11:01AM 15  for you to enter a declaratory judgment under OPA at this time,

11:01AM 16  in part because we believe the statute contemplates that there

11:01AM 17  would have to be a finding of damages and costs, which hasn't

11:01AM 18  been done on this motion.

11:01AM 19         THE COURT:  Isn't it anticipated that the natural

11:01AM 20  resource damage assessments could take years?

11:01AM 21         MR. LANGAN:  It could, Your Honor, but that should

11:01AM 22  happen here when it does happen.  In other words, the government

11:01AM 23  should bring their claims.  If they have to be amended later, so

11:01AM 24  be it; but, they should bring their claims here to avoid any

11:02AM 25  issue of whether there is going to be a claim-split there.

11:02AM 1          What we're afraid of is, is that the government is

11:02AM 2  going to get a declaratory judgment on liability, and then

11:02AM 3  litigate those claims, perhaps elsewhere, years into the future.

11:02AM 4  We don't think that's what ought to be done in terms of

11:02AM 5  principles of case management.  We think they ought to be decided

11:02AM 6  here, and we ought not to get into an issue of whether or not

11:02AM 7  they can split their claims.

11:02AM 8          If you enter a judgment now, which is unnecessary,

11:02AM 9  but, if you do, then the issue about whether they have improperly

11:02AM 10 split their claims --

11:02AM 11      THE COURT:  There is a provision in OPA.  What's the

11:02AM 12 provision that talks about --

11:02AM 13      MR. LANGAN:  1017(f)(2).

11:02AM 14      THE COURT:  -- declaratory judgment?

11:02AM 15      MR. LANGAN:  1017(f)(2), I believe it is.

11:02AM 16          That one mentions the fact that an OPA action can

11:02AM 17 be brought and then another action brought later for more cleanup

11:02AM 18 costs.  So we don't think it provides any authority for entering

11:02AM 19 a declaratory judgment solely on liability without reference to

11:02AM 20 costs or damages.

11:03AM 21          The point being that, obviously, there were costs

11:03AM 22 and damages here, but they haven't been presented on this motion.

11:03AM 23 The fact that the statute provides that later on they can seek

11:03AM 24 additional or further costs and damages means there had to be

11:03AM 25 some for the first judgment.

11:03AM  1          So our legal point -- and this has been briefed,

11:03AM  2  Your Honor -- is that there is no authority for a liability-only

11:03AM  3  judgment without reference to costs or damages; and, therefore,

11:03AM  4  you shouldn't enter one at this time.

11:03AM  5          We think this can ought to be kicked down the road.

11:03AM  6  The government ought to bring all of their claims here and let

11:03AM  7  you manage them over a multiyear process, just like you've

11:03AM  8  managed Phase One, Phase Two and Phase Three of the coming trial.

11:03AM  9          Your Honor, I also want to mention briefly, on the

11:03AM 10  issue of the regulatory violations that Mr. O'Rourke talked

11:03AM 11  about, the problem is in order for the OPA cap to be busted --

11:03AM 12  which is an issue for Anadarko, really, and not for us, but it's

11:03AM 13  indirectly for us because of our agreement with Anadarko -- only

11:04AM 14  applies if the regulatory violation proximately caused the

11:04AM 15  incident.

11:04AM 16          We believe there will remain a contest at trial

11:04AM 17  about what the proximate cause was of the incident, was it

11:04AM 18  cement, was it the BOP, was it lack of well control, was it

11:04AM 19  failure of the crew to act properly to control the well.  Until

11:04AM 20  you determine proximate cause, there is really no basis to

11:04AM 21  determine that these claimed regulatory violations provide a

11:04AM 22  basis on which to bust through the OPA cap in terms of Anadarko's

11:04AM 23  liability.  We briefed this, but I wanted to mention it, as well.

11:04AM 24          Your Honor, the only other thing I wanted to

11:04AM 25  mention, unless Your Honor has questions, is, naturally, we

11:04AM 1   dispute Transocean's reading of OPA here and the reading of the

11:04AM 2   Clean Water Act as providing for some special kind of exemption

11:04AM 3   based on above-the-water-line discharges.

11:04AM 4          There is no doubt that Transocean is a responsible

11:04AM 5   party under the definition under 2701.32(A); there is no doubt

11:05AM 6   that oil was discharged to the water from the *Deepwater Horizon*

11:05AM 7   riser and BOP; and, there is no doubt that Transocean owned the

11:05AM 8   *Deepwater Horizon* or a Transocean affiliate owned the *Deepwater*

11:05AM 9   *Horizon*.

11:05AM 10         If you look at the definition of a responsible

11:05AM 11  party under OPA, they are one.  No matter what else happens, they

11:05AM 12  are an RP under OPA, and we think and agree with the government

11:05AM 13  here that their reading about 2704(b)(1) is simply wrong.

11:05AM 14         Finally, and needless to say --

11:05AM 15       THE COURT:  How do you interpret that provision, 2704 --

11:05AM 16       MR. LANGAN:  It provides a potential -- as Mr. O'Rourke

11:05AM 17  said, it provides a potential liability cap under certain

11:05AM 18  circumstances to provide a MODU owner the standing of a tank

11:05AM 19  vessel owner for determining the applicable cap; but, it is in no

11:05AM 20  way an exemption from OPA liability, and certainly not

11:05AM 21  Clean Water Act liability.  It has nothing to do with the

11:05AM 22  Clean Water Act.

11:05AM 23         Your Honor, the last thing I wanted to mention in

11:06AM 24  the time that I had was to answer Mr. O'Rourke's question about

11:06AM 25  what "from" means.  We agree with Anadarko that in this case the

11:06AM 1   discharge was from the vessel, the BOP and its appurtenances of

11:06AM 2   the vessel.

11:06AM 3         He talked about coming from the hotel, then to the

11:06AM 4   lobby, and then to -- well, think about it this way, all

11:06AM 5   hydrocarbons come from the ground somewhere, right?  Always, by

11:06AM 6   definition.

11:06AM 7         If you think about the Alaska Transocean

11:06AM 8   pipeline -- the Trans Alaska Pipeline System, you have

11:06AM 9   hydrocarbons that are coming from wells at the north slope of

11:06AM 10  Alaska at Prudhoe Bay, but then they travel 800 miles on the

11:06AM 11  Trans Alaska Pipeline System.

11:06AM 12        If there is a leak in the pipeline 500 miles away

11:06AM 13  that happens to discharge into the river, is the government going

11:06AM 14  to come along and say, well, that oil came from Prudhoe Bay, and,

11:06AM 15  therefore, the owner or operator of the field is liable under the

11:06AM 16  Clean Water Act?  They've never said that.  But that is the

11:06AM 17  import of Mr. O'Rourke's argument that it's from many different

11:07AM 18  places.

11:07AM 19        THE COURT:  Wouldn't the distinction there be -- I

11:07AM 20  thought about that.  I read that scenario in briefing.  Wouldn't

11:07AM 21  the difference be there that what happened in Alaska was not an

11:07AM 22  illegal discharge?

11:07AM 23        MR. LANGAN:  Well, out of the pipeline, it was.

11:07AM 24        THE COURT:  Yes, but that occurred down the line.  There

11:07AM 25  was no illegal discharge up when it --

11:07AM 1       MR. LANGAN:  I understand.

11:07AM 2       THE COURT:  -- came out of the ground into the pipeline

11:07AM 3  in Alaska.

11:07AM 4       MR. LANGAN:  I understand.

11:07AM 5       THE COURT:  The statute does refer to discharges in

11:07AM 6  violation of Paragraph 3, which, it seems to me, they are talking

11:07AM 7  about obviously harmful and illegal discharges.

11:07AM 8            In other words, there are a lot of opportunities

11:07AM 9  for hydrocarbons or oil to be discharged.  When it goes into a

11:08AM 10  tank, when it goes into a pipeline, when it goes into a truck

11:08AM 11  that delivers it to a service station, it's discharged --

11:08AM 12       MR. LANGAN:  Sure.

11:08AM 13       THE COURT:  -- but those are not violations of the

11:08AM 14  Clean Water Act, obviously.

11:08AM 15       MR. LANGAN:  Correct.

11:08AM 16       THE COURT:  So if you pump it into a truck and you

11:08AM 17  transport it to a service station and you put it in their tank,

11:08AM 18  and then their tank ruptures, I don't think anybody would make

11:08AM 19  the argument that the truck that delivered it was liable for the

11:08AM 20  fact that the tank in the ground at the service station ruptured;

11:08AM 21  at least, I don't think anybody would make that argument, but

11:08AM 22  they consistently surprise me.

11:08AM 23       MR. LANGAN:  You would be surprised.

11:08AM 24       THE COURT:  It just strikes me as very different, your

11:08AM 25  hypothetical.

11:08AM 1          MR. LANGAN:  Well, my hypothetical --

11:08AM 2          THE COURT:  All these hypotheticals we try to carry to

11:08AM 3  its logical absurdity.

11:08AM 4          MR. LANGAN:  Just to drive home this point, the

11:08AM 5  government, Mr. O'Rourke, is making the point that, well, of

11:08AM 6  course, it could be both from the facility and from the vessel;

11:08AM 7  of course, it can.

11:08AM 8              My point is, not so fast, it's not that simple.  In

11:09AM 9  other words, the owner of the well is not always automatically

11:09AM 10  liable for a discharge that happened somewhere else.  It's not

11:09AM 11  that simple.

11:09AM 12             We adopt Anadarko's point, it's one or the other;

11:09AM 13  and, here, it has to be the vessel.

11:09AM 14         THE COURT:  All right.  Thank you.

11:09AM 15         MR. LANGAN:  Thank you, Your Honor.

11:09AM 16         THE COURT:  Transocean.

11:09AM 17         MR. MILLER:  Good morning, Your Honor.  Kerry Miller for

11:09AM 18  Transocean.

11:09AM 19         THE COURT:  You say it didn't come from your vessel, it

11:09AM 20  came from the well, right?

11:09AM 21         MR. MILLER:  Absolutely, Your Honor.

11:09AM 22             I'm going to answer your question.  No one has told

11:09AM 23  you why --

11:09AM 24         THE COURT:  Okay.

11:09AM 25         MR. MILLER:  -- but I think I can give you some guidance

11:09AM 1  on that.

11:09AM 2         Judge, I agree with Mr. O'Rourke about one thing,

11:09AM 3  that is, none of the cases control this issue.  This is about

11:09AM 4  this Court applying its God-given common sense in interpreting

11:09AM 5  the statutes and the legislative history with some very simple

11:09AM 6  words.  It's based upon a concept that makes sense

11:09AM 7  post-*Exxon Valdez*.

11:09AM 8         Your Honor, with respect to what I call the

11:10AM 9  hole-in-the-pipe argument -- and that's what you heard from BP

11:10AM 10 and Anadarko, whoever has got the last hole, that's who the party

11:10AM 11 is -- that's what their argument is, and it makes no sense.

11:10AM 12        Here are some hypotheticals, but some real world

11:10AM 13 hypotheticals in this case.

11:10AM 14        Had Transocean known that two years ago or

11:10AM 15 20 months ago when the incident happened, we simply could have

11:10AM 16 taken that BOP up, pulled that riser up, and let the oil just

11:10AM 17 spew out of the earth under the sea.  Under that argument, the

11:10AM 18 hole in the pipe wouldn't work.

11:10AM 19        Your Honor, between April 20th when the incident

11:10AM 20 occurred and July 15th when the flow was stopped -- and, by the

11:10AM 21 way, to analyze all of the hypotheticals, the person that's

11:10AM 22 subject to fines here under the Clean Water Act is the source of

11:10AM 23 the flow, the source of the discharge.

11:10AM 24        So, in *Exxon Valdez*, it wouldn't have been when the

11:10AM 25 hydrocarbons came out of the ground, it wouldn't have been the

11:10AM 1  hydrocarbons in the pipeline, it wouldn't have been the loading

11:10AM 2  of the hydrocarbons from the pipeline into the tanker.  The oil

11:11AM 3  was just fine at all those points in time.

11:11AM 4           The problem was when that captain drank the vodka

11:11AM 5  and ran that vessel aground and punctured the hole in the ship.

11:11AM 6  That was when the oil started to flow in an improper way into the

11:11AM 7  environment.  When it's captured and contained, it's just fine.

11:11AM 8           The second point, all of the capping stack

11:11AM 9  activities, Your Honor.  If you were to accept the position of BP

11:11AM 10  and Anadarko, literally, on a daily basis, between April 20th and

11:11AM 11  July 15th, you would be changing responsibility.  One day it

11:11AM 12  would be Transocean, because it's coming out of the riser.  The

11:11AM 13  next day it would be BP, because they had the sombrero on top.

11:11AM 14  That was the hole at that point in time.

11:11AM 15           If you look at it, these are post-incident relief

11:11AM 16  efforts.  This just demonstrates the absurdity in

11:11AM 17  hole-in-the-pipe argument.

11:11AM 18           Okay.  April 20th, the oil -- April 22nd to

11:11AM 19  May 6th, the oil is coming out of the riser pipe, Transocean's

11:12AM 20  appurtenance.

11:12AM 21           On May 6th, BP puts a cofferdam on top of it.

11:12AM 22  Well, that's the last hole in the pipe.

11:12AM 23           On May 14th, they switch to the riser insert tube

11:12AM 24  tool.  Now that's the source.

11:12AM 25           Then they go to the top kill and the junk shot.

11:12AM 1    Now, that's the reason why the hydrocarbons are coming out.

11:12AM 2             Then they put the top hat on.  Now that's the last

11:12AM 3    hole.  That's the source of the oil coming out.

11:12AM 4             Then they bring the Q-4000 over from France, with

11:12AM 5    the sophisticated device to draw it up and burn it on the

11:12AM 6    surface.  Now the Q-4000 and its apparatus is the source of the

11:12AM 7    oil.

11:12AM 8             Then, finally, the thing that sealed it off before

11:12AM 9    they drilled the relief well was the capping stack.  That was the

11:12AM 10   BOP on top of the BOP.  But between July 12th and July 15th, they

11:12AM 11   didn't just -- because the flow was so great coming from the

11:12AM 12   well, they couldn't close it off in a matter of minutes.  It took

11:12AM 13   them three days to close it off.  So, for those three days

11:13AM 14   between July 12th and July 15th, it was the BOP on top of the BOP

11:13AM 15   that was the source of the flow.

11:13AM 16            Again, that just demonstrates the absurdity in what

11:13AM 17   this argument is.  The source of the discharge was the

11:13AM 18   Macondo well.  That's where it came from.

11:13AM 19        THE COURT:  Well, the statute doesn't use the word

11:13AM 20   "source," though; it uses the word "discharge," right?

11:13AM 21        MR. MILLER:  Yes.  From which.

11:13AM 22        THE COURT:  From which it was discharged.

11:13AM 23            Why can't it be that it, in fact, came from both,

11:13AM 24   both the well and the Transocean appurtenance?

11:13AM 25        MR. MILLER:  I think I'm the only guy with an answer for

11:13AM  1    you on that, because I haven't heard an answer yet.

11:13AM  2            THE COURT:  All right.  Good.

11:13AM  3            MR. MILLER:  We agree it can't come from both under this

11:13AM  4    context.

11:13AM  5                In order to make that determination, you have to go

11:13AM  6    back and look at OPA.  Okay.  We were talking about Clean Water

11:13AM  7    Act, but now we're looking at OPA; but, this Court has already

11:14AM  8    held, and I'll go back and look at that, that for these purposes

11:14AM  9    it's a single law, okay.

11:14AM 10                So the initial statute under OPA, it says,

11:14AM 11    "Notwithstanding any other provision or rule of law, and subject

11:14AM 12    to the provisions of this Act," that's 2702(a) of OPA.

11:14AM 13                You then go to 2704(b)(1).  It says, "For purposes

11:14AM 14    of determining the responsible party and applying this act" --

11:14AM 15            THE COURT:  Wait, wait.  You've moved on to OPA now.  My

11:14AM 16    question was really, I guess, directed to the Clean Water Act.

11:14AM 17            MR. MILLER:  Yes, and I'm going to answer it.  OPA

11:14AM 18    answers the question under both OPA and the Clean Water Act

11:14AM 19    because, as you've already held, it's a single law.

11:14AM 20            THE COURT:  Okay.

11:14AM 21            MR. MILLER:  So OPA says, under 2704(b)(1), a "mobile

11:14AM 22    offshore drilling unit," which is what Transocean owned in this

11:14AM 23    particular case, the DWH was a MODU -- "is deemed to be a tank

11:14AM 24    vessel with respect to the discharge of oil on or above the

11:14AM 25    surface of the water."

11:14AM  1          Okay, the answer to your question is Transocean,

11:14AM  2  the owner of the MODU in this particular case, is not responsible

11:15AM  3  for an undersea discharge.

11:15AM  4          Can we be responsible for other things?  Yes.

11:15AM  5      THE COURT:  That's under OPA?

11:15AM  6      MR. MILLER:  That's under OPA, but also the

11:15AM  7  Clean Water Act.

11:15AM  8          What no one wants to talk about, Your Honor, and

11:15AM  9  what you've relied upon already in the case, is the legislative

11:15AM 10  history when OPA was enacted and the Clean Water Act was amended,

11:15AM 11  post-*Exxon VALDEZ* in 1989, which is part of the same legislation.

11:15AM 12          What the legislative history says, if a discharge

11:15AM 13  of oil from a MODU, Transocean's property in this particular

11:15AM 14  case, occurs below the surface of the water, the lessee or

11:15AM 15  permittee is liable.  That's what answers the question that there

11:15AM 16  is one responsible party here, both for purposes of OPA

11:15AM 17  responsible party law and under the Clean Water Act for subject

11:15AM 18  to penalty provisions.

11:15AM 19          Your Honor has previously looked at this same

11:15AM 20  legislative history.  You looked in connection with your

11:16AM 21  Order and Reasons on the B1 master complaint, on page 21.  What

11:16AM 22  you say is, "Indeed, the Senate report provides that the act

11:16AM 23  builds upon Sections 311" -- Section 311 is the Clean Water Act

11:16AM 24  basic provision we've looked at already; they're synonymous --

11:16AM 25  "of the Clean Water Act to create a single federal law providing

11:16AM 1    cleanup authority, penalties and liability for oil pollution."

11:16AM 2            So what this Court has already held is that these

11:16AM 3    provisions that we're looking at under both the Clean Water Act

11:16AM 4    and OPA constitute a single federal law.

11:16AM 5            So it would be inconsistent for there to be a fine

11:16AM 6    and penalty on a MODU operator under the Clean Water Act for a

11:16AM 7    subsurface discharge and not OPA, or vice-versa.  We think it's a

11:16AM 8    single law, and the answer is very consistent.

11:16AM 9            The answer is, with respect to the subsurface

11:17AM 10   discharge, the lessee or permittee is the one that's liable to

11:17AM 11   penalties under the Clean Water Act and is the proper responsible

11:17AM 12   party under OPA.

11:17AM 13           That's the way it's functioned over the last

11:17AM 14   20 months.  BP --

11:17AM 15       THE COURT:  Is that a definition?  We know what, I

11:17AM 16   guess, common sense is, but is there a definition of subsurface

11:17AM 17   discharge?

11:17AM 18       MR. MILLER:  I think it is what it is.

11:17AM 19       THE COURT:  I'm thinking, again, of another

11:17AM 20   hypothetical.  What if the riser had not broken and the oil had

11:17AM 21   escaped somehow from the *Deepwater Horizon*, which was floating on

11:17AM 22   the surface, but the oil escaped under the surface from the

11:17AM 23   *Deepwater Horizon*, would that be a subsurface?

11:17AM 24       MR. MILLER:  I think it would be.  But I think the

11:17AM 25   answer to your --

11:17AM 1         THE COURT:  Or would that be surface because the vessel

11:17AM 2    is on the surface?

11:17AM 3         MR. MILLER:  I think the answer to your question is, is

11:17AM 4    if the source of the discharge is still from Macondo, the lessee

11:18AM 5    is responsible.

11:18AM 6         You know, the situation where Transocean could have

11:18AM 7    been responsible -- and there are issues here in the case with

11:18AM 8    respect to this issue, not presented by this motion -- is

11:18AM 9    Transocean had diesel tanks aboard the *Deepwater Horizon*, and

11:18AM 10   those diesel tanks had the capacity of about 17,000 barrels.

11:18AM 11        That diesel was lost in the fire and explosion and

11:18AM 12   the capsizing of the vessel.  So Transocean is potentially liable

11:18AM 13   under the Clean Water Act for that diesel.  That occurred on the

11:18AM 14   surface.  That occurred when the vessel exploded.

11:18AM 15        THE COURT:  What if, again, the riser had not broken,

11:18AM 16   and the oil had escaped up through the riser pipe onto the vessel

11:18AM 17   and then into the water?

11:18AM 18        MR. MILLER:  In that instance, I think the application

11:18AM 19   you're dealing with is the "from which" language.  You're still

11:18AM 20   looking at the source of the discharge.

11:18AM 21        THE COURT:  You still would be arguing that it is no

11:19AM 22   different than just coming through the riser pipe.

11:19AM 23        MR. MILLER:  It's Macondo.  Yes.  It's just a conduit.

11:19AM 24   You've got a longer straw as opposed to a shorter straw.  I mean,

11:19AM 25   in that hypothetical --

11:19AM 1      THE COURT:  That would be, obviously, an above-surface

11:19AM 2  release, at least from the vessel into the water above the

11:19AM 3  surface.

11:19AM 4      MR. MILLER:  I think the "from which" and the "on the

11:19AM 5  surface" versus "subsurface" relate to the common meanings of how

11:19AM 6  those terms are used in maritime commerce.

11:19AM 7      Surface means if the hydrocarbons come out of the

11:19AM 8  hull of a tanker, that *Exxon Valdez*, on the surface, then the

11:19AM 9  vessel owner is responsible and subject to penalties under the

11:19AM 10  Clean Water Act.

11:19AM 11      But, look, with respect to this situation,

11:19AM 12  Transocean is a lot like Halliburton.  We were a contractor

11:19AM 13  employed by BP to perform certain services out there in the

11:19AM 14  Gulf of Mexico.  Halliburton doesn't have any Clean Water Act

11:19AM 15  exposure.  Halliburton has the same OPA exposure as Transocean.

11:19AM 16  That's the right system.

11:19AM 17      That exposure is as follows.  According to what you

11:19AM 18  read on the Internet, BP has spent about 13 million dollars in

11:20AM 19  the cleanup efforts, accepting its role as the responsible party

11:20AM 20  and waiving the cap.

11:20AM 21      BP has asserted OPA contribution claims against

11:20AM 22  both Transocean and Halliburton for that particular expenditure

11:20AM 23  of money.  That issue is going to be decided by Your Honor in

11:20AM 24  connection with either, you know, the indemnity findings and/or

11:20AM 25  the Phase One trial.

11:20AM 1          But that's where Transocean's OPA exposure is for

11:20AM 2     the subsurface relief, it's in connection with BP's contribution

11:20AM 3     claims and the indemnity motion and the determinations you make

11:20AM 4     in Phase One, just like Halliburton.

11:20AM 5          THE COURT:  Thank you very much.

11:20AM 6          Where is Mr. O'Rourke?  I'll give you about two or

11:20AM 7     three minutes, okay, to wrap it up.

11:20AM 8          Respond to the initial argument by Anadarko that no

11:21AM 9     one has found a single case where more than one party -- maybe

11:21AM 10    that's not right, but that these are disjunctive; in other words,

11:21AM 11    it's got to be either the vessel or the facility, it can't be

11:21AM 12    both.

11:21AM 13         MR. O'ROURKE:  It's true that the statute has

11:21AM 14    definitions, facility, onshore facility, and vessel, and they are

11:21AM 15    not all the same; but, it's academic because the statute says,

11:21AM 16    any person who is the owner of any vessel from which oil is

11:21AM 17    discharged shall be subject to a civil penalty; and, it says, any

11:21AM 18    person who is the owner of an offshore facility from which oil is

11:21AM 19    discharged shall be subject to a civil penalty.  The definitions

11:21AM 20    don't matter; the controlling liability section is what matters.

11:21AM 21         As for the hypotheticals, Judge, Trans Alaska

11:21AM 22    pipelines and all of these things, what we have here is BP and

11:21AM 23    Anadarko own a well, the sole purpose of which is to make oil

11:22AM 24    come from the formation to the sea floor.

11:22AM 25         Transocean owns the blowout preventer.  It's

11:22AM 1  supposed to prevent blowouts, okay.

11:22AM 2          Now, they are all surprised.  When the blowout

11:22AM 3  preventer doesn't work, Transocean is surprised to find that they

11:22AM 4  are liable.

11:22AM 5          Anadarko was apparently not even -- doesn't even

11:22AM 6  have notice that when their well, designed to take oil from the

11:22AM 7  formation to the surface, causes an oil spill, that they are

11:22AM 8  liable under the water act.

11:22AM 9          BP says, oh, it came from the formation.  I guess

11:22AM 10 the earth is liable, but BP is not liable.

11:22AM 11         The plain language of the statute, Judge, any

11:22AM 12 person, any facility, any vessel shall pay a civil penalty.

11:22AM 13         Anadarko's other arguments mostly went to their

11:22AM 14 control; as we discussed, penalty factor.

11:22AM 15         We supplied a statement of disputes to their

11:22AM 16 statement of undisputed fact.  That's really all just recasting

11:22AM 17 of the evidence for that phase of the trial.  They are trying to

11:23AM 18 make themselves non-culpable.  It's not relevant to the owner

11:23AM 19 status.  Frankly, you don't even need to read either one of those

11:23AM 20 for purposes of this motion.

11:23AM 21         I also note that Anadarko has now decided that this

11:23AM 22 oil spill is just a transfer of oil from the well to the blowout

11:23AM 23 preventer.  We think it's actually a giant oil spill, Judge.

11:23AM 24         With respect to BP -- oh, finally, on Anadarko,

11:23AM 25 note they didn't even address their OPA liability or limitation.

11:23AM 1        With respect to BP, they agree with us regarding

11:23AM 2   Transocean.  So, in fact, Anadarko, BP and the U. S. all agree

11:23AM 3   that Transocean is liable under both statutes.

11:23AM 4        But BP is trying to escape liability under the

11:23AM 5   Clean Water Act by this argument about the blowout preventer

11:23AM 6   being the only vessel that the discharge came from.  We just

11:23AM 7   addressed that.

11:23AM 8        The other thing BP brought up was delay.  You know,

11:23AM 9   they constantly promise to pay all claims, but they don't want

11:24AM 10  you to enter a final judgment, they don't want you to rule on

11:24AM 11  Anadarko's limitation of liability.  It doesn't seem consistent

11:24AM 12  that they are going to pay the claims; if so, why won't they

11:24AM 13  submit to the entry of a final judgment on that claim.

11:24AM 14       With respect to the claim-splitting issue, it's a

11:24AM 15  Rule 15 question, Judge.  If we come back later with our NRD

11:24AM 16  claim, which, as you said, could take quite a while, you will

11:24AM 17  have to decide whether we are timely or not under Rule 15.

11:24AM 18  That's all there is to that; and, as you pointed out, OPA does

11:24AM 19  required declaratory judgment.

11:24AM 20       With respect to Transocean, Mr. Miller argues that

11:24AM 21  the Oil Pollution Act and the Clean Water Act are one act to be

11:24AM 22  grouped together.  If he's right about that, well, that means

11:24AM 23  that one part of the act, Section 2704(b), Congress knew how to

11:24AM 24  address the words "MODU," "surface water," and those terms; and,

11:25AM 25  in Section 311(b), the water act, they did not use any of those

11:25AM  1    terms.

11:25AM  2              So, express statutory language included in one

11:25AM  3    part, excluded in the other.  If he's right that they are one

11:25AM  4    act, the act speaks for itself.  So it's just, again, plain

11:25AM  5    language on the Clean Water Act side.

11:25AM  6              I think, unless you have something else, thank you.

11:25AM  7         THE COURT:  No, I do not.  Thank you very much.

11:25AM  8              Thanks to all of you.  Interesting arguments,

11:25AM  9    interesting issues, and I'll take this under advisement.

11:25AM 10              Does anyone else have anything else before we

11:25AM 11    break?

11:25AM 12              I want to thank everyone, again, for your continued

11:25AM 13    cooperation, professionalism, civility.  As Jim Roy says, there

11:25AM 14    is always next year, you know.

11:25AM 15         THE DEPUTY CLERK:  All rise.

11:25AM 16         THE COURT:  Have a good day, everyone.

        17         (WHEREUPON, at 11:25 a.m., the proceedings were

        18    concluded.)

        19                         *    *    *

        20

        21

        22

        23

        24

        25

REPORTER'S CERTIFICATE

I, Cathy Pepper, Certified Realtime Reporter, Registered Merit Reporter, Registered Professional Reporter, Certified Court Reporter for the State of Louisiana, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

Cathy Pepper, CCR, RMR, CRR
Certified Realtime Reporter
Official Court Reporter
United States District Court
(504) 589-7779
Cathy_Pepper@laed.uscourts.gov