**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 |
| These Pleadings apply to: *All Cases in Pleadings Bundle C* | : : : | SECTION: J JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |
| These Pleadings apply to: No. 10-2771 | : : | |
| …………………………………………….... | : | |

**THE BP PARTIES' ANSWER TO THE VOLUNTARY MASTER COMPLAINT, CROSS-CLAIM, AND THIRD-PARTY COMPLAINT FOR LOCAL GOVERNMENTAL ENTITIES (PTO NO. 11 [CMO NO. 1]  SECTION III(C) ["C BUNDLE"])**

Defendants BP Exploration & Production Inc. ("BPXP"), BP America Production Company ("BPAP"), and BP p.l.c. (collectively, the "BP Parties"), by their undersigned counsel, and pursuant to Rule 8 of the Federal Rules of Civil Procedure, hereby answer the Voluntary Master Complaint, Cross-Claim, and Third-Party Complaint for Local Governmental Entities (PTO No. 11 [CMO No. 1] Section III(C) ["C Bundle"]) as follows:[1]

**INTRODUCTION**

On April 20, 2010, a well blowout on the vessel Deepwater Horizon in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States.  The blowout and subsequent explosions, fire, and sinking of the vessel resulted in an oil spill of unprecedented proportions that damaged, depleted and destroyed marine, estuarine, and coastal environments in the Gulf of Mexico, Louisiana, Mississippi, Alabama, Texas, and Florida (the "Spill").  Although the blown-out well is now capped, the disastrous environmental and economic effects of the Spill are widespread and will likely remain so for decades.

---

[1] Discovery with regard to the subject matter of the allegations in plaintiffs' complaint is ongoing and not complete, and certain information thus remains unavailable to BP at this time, and the BP Parties therefore specifically reserve the right to amend or supplement their answers and affirmative defenses to the allegations in plaintiffs' complaint as additional facts and expert opinions become known to them.

Hundreds of individual and class actions were filed in state and federal courts on behalf of the thousands of victims of the Spill.  By order entered on August 10, 2010, the Multi-district Litigation Panel (the "MDL Panel") transferred all such actions then pending to this Court.  *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179, 2010 WL 3166434, 2010 AMC 1977 (JPML, August 10, 2010) (the "Transfer Order").  On October 19, 2010, this Court entered its Case Management Order No. 1 (hereinafter "PTO 11"), wherein it defines "Bundle C" pleadings to include claims brought by local governmental entities for, *inter alia,* loss of resources, loss of tax revenue, property damages, response or restoration costs, and civil penalties.

This Master Complaint is a voluntary and administrative pleading which may hereinafter be joined by local government entities that desire to assert the claims described herein.  This Master Complaint is designated as an admiralty or maritime case as provided in Rule 9(h)(1) of the Federal Rules of Civil Procedure, and is filed as a voluntary procedural device made available to local governmental entities suing in their own name and/or in a representative capacity for loss of resources, loss of tax revenue, property damages, response or restoration costs, civil penalties, and/or other remedies and relief arising out of the Spill, and as a class action.

Local Governmental Entities who desire to assert claims in this MDL proceeding *via* this Master Complaint, both for themselves and all others similarly situated, (the members of the proposed Class and Subclasses), respectfully submit this Master Complaint, Cross-Claim and Third-Party Complaint for actual, compensatory, and punitive damages, and other available relief, arising from the well blowout, vessel explosions, and subsequent oil spill by the Deepwater Horizon oil vessel in the Gulf of Mexico on April 20, 2010, and state as follows:

**ANSWER:**

The BP Parties admit that on April 20, 2010, there was a loss of control of the well being drilled by the vessel *Deepwater Horizon* in the Gulf of Mexico, and that there followed one or more fires and explosions, the sinking of the vessel, and a release of oil into the Gulf of Mexico, some of which reached the shorelines of Louisiana, Mississippi, Alabama, and Florida.  The BP Parties also admit that the well was capped, that hundreds of lawsuits related to the spill have been filed in state and federal courts, that this Court entered the orders referenced above, and that this is the local government entities' complaint for public damage claims, a/k/a the "C Bundle" claims.  The BP Parties further state that from the outset the BP Parties have expressed its commitment to pay all legitimate claims under the Oil Pollution Act, 33 U.S.C. 2701 et seq, and the BP Parties' actions reflect this commitment.  In early May 2010, BPXP accepted the

designation as an OPA "responsible party" and quickly established a claims process. While operating that claims process, the BP Parties paid nearly $400 million to individuals and businesses. On August 23, 2010, the BP Parties transitioned their individual and business claims process to the Gulf Coast Claims Facility ("GCCF"), which is administered by Kenneth R. Feinberg. To date, over $5.73 billion has been paid from the GCCF to individuals and businesses. The BP Parties deny the remaining allegations of this Introduction.

164.   On April 20, 2010, at approximately 9:45 p.m. CST, a well blowout caused explosions on the Deepwater Horizon, an oil vessel in the Gulf of Mexico, igniting a raging, gas-fueled fire on the vessel. After burning for two days, the vessel sank to the ocean floor.

**ANSWER:**

The BP Parties admit that on April 20, 2010, at approximately 9:49 p.m. CST, a well blowout caused one or more fires and explosions on the *Deepwater Horizon*, a drilling rig located in the Gulf of Mexico, and that on April 22, 2010 the *Deepwater Horizon* sank. The BP Parties deny the remaining allegations of this paragraph.

165.   As the Deepwater Horizon tipped into the sea, the long riser pipe connecting the vessel to the wellhead on the seafloor bent and broke, leaving the pipe leaking oil out of its now-open end as well as through two breaks along its length. An emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, causing the blown-out well to spew oil into the Gulf waters.

**ANSWER:**

The BP Parties admit that as the *Deepwater Horizon* sank it caused the riser to bend and break, that hydrocarbons escaped through portions of the riser, and that the blowout preventer installed on the *Deepwater Horizon* failed to seal the well, resulting in the further release of hydrocarbons into the Gulf of Mexico. The BP Parties deny the remaining allegations of this paragraph.

166.   Each day during the course of the Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out into a widening slick of oil, as well as spreading out in vast subsurface plumes.  On the surface, the shifting smear was large enough to be visible from outer space, at times covering tens of thousands of square miles, and spreading with the wind and currents towards the Gulf states' coastlines, where oil made landfall on white sand beaches and in ecologically sensitive marshes and estuaries, damaging the environment and real and personal property throughout the coastal zones of the Gulf states ("Coastal Zone").  Under water, huge plumes of oil and dispersant chemicals swirled through the entire water column and came to rest on the seafloor at many different depths, damaging ecosystems and privately owned and leased sea beds throughout the Gulf of Mexico.

**ANSWER:**

The BP Parties admit that hydrocarbons that once existed deep inside the Outer Continental Shelf travelled during the spill out of the Macondo reservoir, through the well, and then through Transocean-owned vessel appurtenances including the BOP and riser, before discharging into Gulf of Mexico waters or being captured by various containment methods, and that some hydrocarbons reached portions of the shorelines of Louisiana, Mississippi, Alabama, and Florida.  The BP Parties further admit that as permitted in the National Contingency Plan and with the approval of the Unified Command, dispersants were applied to mitigate the potential impacts of the oil spill.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

167.   The Deepwater Horizon's well blowout and the subsequent explosions, fire, sinking, and Spill were foreshadowed by a string of disastrous incidents and near misses in Defendants' operations on land and at sea, as well as poor decision-making by Defendants and their employees, as they ignored crucial safety issues, cut corners, and violated federal and state law to save time and money in favor of production and profit and at the expense of worker safety and environmental protection.  All the while, Defendants continued to evade and subvert industry regulations.

**ANSWER:**

The BP Parties admit that loss of well control was the result of a complex and interlinked series of mechanical failures, human judgments, engineering design, operational implementation and team interactions. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

168.    Defendants could have prevented this catastrophe by using deepwater drilling best practices, following required safety protocols and precautionary procedures, properly maintaining equipment, and using widely available emergency safety technology but, with little regard for the risk to the vessel workers or the environment, Defendants chose to violate or ignore operational discipline, and save money and time at the expense of safety. Their cost-cutting measures were outrageous — consistent with their long corporate histories of flagrant disregard for safety — and were taken with willful, wanton, and reckless indifference to the disastrous results to the workers aboard the vessel, the environment, and Plaintiffs.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

169.   Defendants repeatedly made decisions impacting the safety of the vessel, its workers, the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states in the direction of short-term gain, through reduced schedule and reduced cost, rejecting adequate and responsible risk analysis checks and balances to weigh cost and time versus risk and safety. The result was both predictable in outcome and unprecedented in scale.  Moreover, because their conduct endangered the health and safety of a large region and population, caused and increased the risk of serious injury and bodily and emotional harm, and affected a financially vulnerable population dependent upon the Gulf of Mexico, the degree of reprehensibility of Defendants' conduct is at the highest level.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

170.    The Spill has caused, and continues to cause, devastating environmental and economic damage.  For example, there have been thousands of square miles of waters closed to fishing, swimming and/or boating, and thousands of square miles of historic coastal marshes, delicate estuaries, cypress forests, barrier islands, and white sand beaches compromised. Fishermen and marine-related businesses have lost and continue to lose income and their businesses; the tourism industry and hotels, resorts, restaurants, and other tourism-reliant businesses have lost and continue to lose income; and real property owners have suffered the loss, damage, and/or diminution of the value of their properties throughout the Coastal Zone.

**ANSWER:**

The BP Parties admit that the Spill impacted many individuals, businesses and the environment around the Gulf, and that the Spill resulted in the closure of some areas of the Gulf of Mexico and adjacent lands, waters and wetlands.  But as a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following

a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the remaining allegations of this paragraph.

171.    The loss of income and property damage sustained by private individuals and entities in the Canal Zone has had a severe economic impact on local governmental entities in the Gulf States in the form of, *inter alia,* loss of revenue, royalties, rents, fees and net profit shares due to the loss of real and personal property.

**ANSWER:**

The BP Parties admit that the Spill impacted many individuals, businesses and the environment around the Gulf.  But as a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the remaining allegations of this paragraph.

172.    The Spill also caused Plaintiffs damage in the form of costs associated with increased public services, resulting in additional administrative costs, costs of additional personnel, out-of–pocket costs incurred for material and equipment; removal costs, including personnel salary costs, overtime travel and per diem expenses; costs for use of government-owned equipment and facilities, and actual expenses for goods and/or services supplied by contractors and/or vendors.

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the remaining allegations of this paragraph.

173.    In addition, certain local government entities own real and/or personal property that was lost, damaged, or diminished in value as a result of the Spill.

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the remaining allegations of this paragraph.

174.    This Voluntary Master Complaint, Cross-Claim, and Third-Party Complaint is submitted as: (1) an administrative device to serve the functions of efficiency and economy; and

(2) to afford Local Government Entities the opportunity to present certain common claims and common questions of fact and law for appropriate action by this Court, including class certification and trial, in the context of this multidistrict proceeding.

**ANSWER:**

The BP Parties admit that this Master Complaint, Cross-Claim, and Third-Party Complaint was submitted pursuant to this Court's CMO No. 1.  The BP Parties deny that common claims and questions of law and fact have been presented, or that class certification is appropriate at this stage of the proceedings and on the terms proposed by Plaintiffs.  The BP Parties deny the remaining allegations of this paragraph.

175.   This Voluntary Master Complaint, Cross-Claim, and Third-Party Complaint does not constitute a waiver or dismissal of any actions or claims asserted in the individual and class actions arising out of the Spill, nor by it do the Plaintiffs relinquish the right to add or assert, or seek leave to add or assert, additional claims, or name additional parties defendant, depending on further information learned through discovery or investigation.

**ANSWER:**

The BP Parties deny that this Master Complaint, Cross-Claim, and Third-Party Complaint does not constitute a waiver or dismissal of any actions or claims, or that Plaintiffs do not relinquish the right to add or assert additional claims and parties except as allowed by the Federal Rules of Civil Procedure and the Rules and Orders of this Court.  The BP Parties deny the remaining allegations of this paragraph.

176.   This Voluntary Master Complaint, Cross-Claim, and Third-Party Complaint makes allegations of, and places Defendants on notice that Plaintiffs may seek, certification of one or more classes and/or subclasses, as appropriate, for the classwide determination of common issues of law and/or fact relating to the liability of Defendants to the members of such classes and/or subclasses for actual, compensatory, and punitive damages for the damage and losses Plaintiffs have incurred as a result of Defendants' knowledge, conduct, acts and omissions as set forth herein.  Plaintiffs will seek to maintain this action as a class action, and/or the class certification of particular issues herein, under Rule 23 of the Federal Rules of Civil Procedure, including, as appropriate, Rule 23(a)(1)-(4); (b)(1)(B); (b)(2); (b)(3); (c)(4); and (c)(5).  Prior to any class certification motion, in sufficient time to place Defendants on fair notice and to enable appropriate discovery and briefing, with such scheduling subject to Court approval, Plaintiffs

will identify those persons who will serve as proposed representatives for the class and/or subclasses sought to be certified and, if necessary, add or join them as parties hereto.

**ANSWER:**

The BP Parties admit that Plaintiffs purport to make allegations of certification of one or more classes and/or subclasses under Rule 23 of the Federal Rules of Civil Procedure.  The BP Parties deny that any such class and/or subclasses are appropriate under Rule 23 of the Federal Rules of Civil Procedure at this stage of the proceedings and on the terms proposed by Plaintiffs. The BP Parties deny the remaining allegations of this paragraph.

177.    It is contemplated that Local Government Entities will likely join as plaintiffs in this action after the filing of this Master Complaint, Cross-Claim, and Third-Party Complaint, and those plaintiffs will adopt these allegations and join this action by completing a Local Government Short Form dedicated to that purpose and approved by the Court.  The Local Government Short Form has been filed with this Court in Civil Action No. 10-9999.

**ANSWER:**

The BP Parties deny that additional parties may join and adopt the allegations in this Complaint except as allowed by the Federal Rules of Civil Procedure and the Rules and Orders of this Court.  The BP Parties deny the remaining allegations of this paragraph.

## PARTIES, JURISDICTION, AND VENUE

### Parties

178.    Plaintiffs, Cross-Claimants in Limitation, and Third-Party Plaintiffs in Limitation (hereinafter "Plaintiffs") are local government entities or officials, including cities, towns, counties, villages, parishes, municipalities, special districts, school boards, sheriffs, district attorneys, public boards, institutions, departments, commissions, districts, corporations, agencies, authorities, and any agencies or subdivisions of any of these, and other local public or governmental bodies of any kind which are not state agencies, in Florida, Alabama, Mississippi, Louisiana and Texas, who have suffered damage, destruction, or diminution in value of property, loss of tax revenue, income and/or use, and/or costs of response, removal, clean-up, restoration and/or remediation and/or other damages, losses, and/or costs as a result of the oil spill by the oil rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

179.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois.  BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service[2] ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Spill originated.   BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990, 33 U.S.C. § 2714.  This court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

**ANSWER:**

The BP Parties admit that BPXP is a Delaware corporation, that it was a partial lease holder in the lease granted by the MMS/BOEMRE pursuant to which the performance of oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the area in which the Macondo Well was located and in which the Spill originated, and that BPXP was, together with other entities, designated as a Responsible Party under the Oil Pollution Act for the release of oil.  As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating their OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition its OPA claims process for individual and

---

[2]    The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010; however, it shall be referred to as the MMS throughout this document.

business claims to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties further admit that BPXP is subject to this Court's jurisdiction.  The BP Parties deny the remaining allegations of this paragraph.

180.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas.  BP America was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the Deepwater Horizon vessel.  This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

**ANSWER:**

The BP Parties admit that BPAP is a Delaware Corporation, that it is subject to this Court's jurisdiction, and that BPAP, as successor to Vastar Resources Inc., and Transocean Holdings LLC, as successor to R&B Falcon Corp., were parties to a drilling contract concerning the use of the *Deepwater Horizon*.  The BP Parties deny the remaining allegations of this paragraph.

181.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation BP p.l.c. is a British public limited company with its corporate headquarters in London, England.  BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo.  BP p.l.c. is one of the world's largest energy companies with over 80,000 employees and $239 billion in revenues in 2009.  BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division in which BP Exploration and BP America fall, through vertical business arrangements aligned by product or service groups.  BP p.l.c.'s operations are worldwide, including in the United States.  Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally.

**ANSWER:**

The BP Parties admit that BP p.l.c. is a British Public Limited Company organized under the laws of England and Wales, which is publicly traded with its headquarters in London,

England, and that BP p.l.c. is not contesting the jurisdiction of this Court in this case.  The BP

Parties deny the remaining allegations of this paragraph.

182.   BP p.l.c. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development.  A sampling of BP p.l.c.'s contacts with the U.S. are as follows:  (a) BP p.l.c.'s American Depository Shares are listed on the New York Stock Exchange and BP p.l.c. is the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP p.l.c. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP p.l.c.'s fixed assets are located in the U.S. or the European Union; and (e) BP p.l.c. reports having 2,100 U.S.-based employees in non-Exploration & Production, non-Refining & Marketing BP entities.

**ANSWER:**

The BP Parties admit that BP p.l.c. lists American Depository Shares on the New York

Stock Exchange and that it files an annual 20-F Report with the U.S. Securities and Exchange

Commission.  The BP Parties deny the remaining allegations of this paragraph.

183.   This Court has general jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm general jurisdiction provision (13 Louisiana Statute § 3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.  BP p.l.c. does business in Louisiana, has had continuous and systematic contacts with Louisiana (and the U.S. more generally), and has been served with a summons in individual complaints that are the subject of this Master Complaint and will be served with a summons on this Master Complaint.

**ANSWER:**

The BP Parties admit that BP p.l.c. has been served with a summons in some individual

complaints which are the subject of this Complaint.  The BP Parties deny the remaining

allegations of this paragraph.

184.   Alternatively, if BP p.l.c. contests that it is subject to jurisdiction under Louisiana's long-arm jurisdiction statute, then this Court may exercise personal jurisdiction over BP p.l.c. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, the federal long-arm jurisdiction provision, because claims in this action arise under federal law, the exercise of jurisdiction over BP p.l.c. is consistent with the United States Constitution and laws," and BP p.l.c. has been served with a summons in individual complaints that are the subject of this Master Complaint and will be served with a summons on this Master Complaint.

**ANSWER:**

The BP Parties admit that BP p.l.c. has been served with a summons in some individual complaints which are the subject of this Complaint, and that the claims in this action arise under federal law.  The BP Parties deny the remaining allegations of this paragraph.

185.   This Court also has specific jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm specific jurisdiction provision (13 Louisiana Statute § 3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.  Plaintiffs' causes of action arise out of wrongful conduct committed by BP p.l.c., directly or indirectly by its agents, that caused injury or damage in Louisiana by an offense or quasi offense committed through an act or omission outside of Louisiana, and BP, p.l.c. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana.  These acts or omissions took place both before the blowout resulting in the oil spill and in the negligent conduct of BP, p.l.c. after the blowout in attempting to contain the catastrophic damage caused by the oil spill.  In addition, BP p.l.c. has been served with a summons in individual complaints that are the subject of this Master Complaint and will be served with a summons on this Master Complaint.

**ANSWER:**

The BP Parties admit that BP p.l.c. has been served with a summons in some individual complaints which are the subject of this Complaint.  The BP Parties deny the remaining allegations of this paragraph.

186.   In addition, this Court also has personal jurisdiction over BP p.l.c. under agency principles, because BP p.l.c.'s agents, BP America and BP Exploration, do business in Louisiana. BP America and BP Exploration are both wholly-owned subsidiaries of BP p.l.c.  In BP p.l.c.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BP America and BP Exploration, BP p.l.c. states that it "controls" both BP America and BP Exploration, among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities . . . ."

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

187.   BP p.l.c.'s direct, joint and/or assumed responsibility and/or liability for safety and well control, both before and/or after the explosions and blowout on April 20, 2010, is further evidenced by the announcement of the Macondo Project on the BP website hosted and

copyrighted by BP p.l.c., the publication of information concerning the casualty and spill on the BP website hosted and copyrighted by BP, the express and/or implied acceptance of responsibility for the safety of BP operations in North America and the Gulf of Mexico in statements by officers of BP p.l.c., the presence (upon information and belief) of a BP p.l.c. officer or employee on the Deepwater Horizon for the celebration that occurred shortly before the explosions and fire, the direct participation of BP p.l.c. employees in the post-casualty investigation, the direct participation of BP p.l.c. officers and employees in the Governmental post-casualty investigations, the direct participation of BP p.l.c. officers and employees in the post-casualty well-control efforts, and the direct participation of BP p.l.c. in the establishment and/or funding of the Escrow Fund and/or Gulf Coast Claims Facility.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

188. BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as "BP." As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

**ANSWER:**

The BP Parties admit that Plaintiffs refer to BPXP, BPAP, and BP p.l.c. collectively as BP, but deny that this is appropriate. The BP Parties further admit that BPXP was the lease operator exclusively for purposes of the Outer Continental Shelf Lands Act and its regulations of Mississippi Canyon Block 252, which contains the Macondo Well and that BPXP had certain responsibilities with regard to assessing the geology of the prospect site, engineering the well design, obtaining appropriate regulatory approvals for well operations, and retaining and overseeing its contractors and working on various aspects of the well and drilling operations. The BP Parties deny the remaining allegations of this paragraph.

189. Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Transocean Ltd. ("Transocean Ltd.") is a Swiss corporation that maintains substantial U. S. offices in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. According to its Complaint and Petition for Exoneration from or Limitation of Liability, Transocean Ltd. was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

**ANSWER:**

The BP Parties admit that Transocean Ltd. is a Swiss Corporation that, on information and belief, maintains substantial U. S. offices in Houston, Texas either directly or through its affiliates. The BP Parties admit that Transocean Ltd. was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon* by exercising, directly or indirectly, complete control over various Transocean subsidiaries, (including Transocean Offshore Deepwater Drilling, Inc., Transocean Deepwater, Inc., Transocean Holdings, LLC and Triton Asset Leasing GmbH) and issuing and/or enforcing various policies and practices applicable to the *Deepwater Horizon*. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

190.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

**ANSWER:**

The BP Parties admit that Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas. The BP Parties admit that Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

191.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Transocean Deepwater, Inc. ("Transocean Deepwater"), is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Deepwater is affiliated

with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

**ANSWER:**

The BP Parties admit that Transocean Deepwater Inc. ("Transocean Deepwater") is a Delaware corporation with its principal place of business in Houston, Texas. The BP Parties admit that Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

192.   Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Transocean Holdings, LLC ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Holdings is affiliated with Transocean Ltd. and is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Spill originated. More specifically, Transocean Holdings is party to the contract with BP regarding the lease of the Deepwater Horizon for drilling operations in the Gulf of Mexico. On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the blowout by the Deepwater Horizon.

**ANSWER:**

The BP Parties admit that Transocean Holdings, LLC ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas. The BP Parties admit that Transocean Holdings is affiliated with Transocean Ltd. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*. The BP Parties further admit Transocean Holdings and various other Transocean Ltd. affiliates including Transocean Offshore, Transocean Deepwater, and Triton participated in the *Deepwater Horizon's* offshore oil drilling operations at the Macondo prospect. The BP Parties further admit Transocean

Holdings, as successor to R&B Falcon Drilling Co., and BP America Production Company, as successor to Vastar Resources, Inc., were parties to a drilling contract concerning the use of the *Deepwater Horizon*.  On information and belief, the BP Parties further admit that on April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for both discharges from the *Deepwater Horizon* on or above the surface of the water and for discharges from the *Deepwater Horizon* and its appurtenances.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

193.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Triton Asset Leasing GmbH ("Triton") is a Swiss limited liability company with its principal place of business in Zug, Switzerland.  Triton is affiliated with Transocean Ltd. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

**ANSWER:**

The BP Parties admit that Triton is a Swiss corporation with its principal place of business in Zug, Switzerland.  The BP Parties admit that Triton is affiliated with Transocean Ltd. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

194.    Defendants, Cross-Claim Defendants in Limitation, and/or Third-Party Defendants in Limitation Transocean Ltd., Transocean Deepwater, Transocean Offshore, Transocean Holdings, and Triton are hereinafter referred to collectively as "Transocean." At the Macondo site, Transocean provided the Deepwater Horizon vessel and personnel to operate it. At all times relevant to the Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems. Transocean also provided operational support for drilling-related activities on board the Deepwater Horizon, as well as onshore supervision and support for those drilling activities at all times relevant to the Spill.

**ANSWER:**

The BP Parties admit that Transocean was responsible for maintaining well control equipment, such as the blowout preventer and its control systems. The BP Parties further admit that Transocean was responsible for drilling the well, as well as onshore supervision and support for those drilling activities. The BP Parties deny the remaining allegations of this paragraph.

195. Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Halliburton Energy Services, Inc. is a Delaware corporation with its principal place of business in Houston, Texas. Halliburton is registered to do and does business in the State of Louisiana. Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the Deepwater Horizon, as well as onshore engineering support for those operations. Halliburton was responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo well. At and before the time of the blowout, Halliburton was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil.

**ANSWER:**

The BP Parties admit that Halliburton is a Delaware corporation with its principal place of business in Houston, TX and that Halliburton and/or its affiliates provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the *Deepwater Horizon*, as well as onshore engineering support for those operations. Halliburton was responsible for providing technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo Well. At, and before, the time of the blowout, Halliburton was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the well against the influx of hydrocarbons. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

196. Halliburton division Sperry Drilling Services (formerly Sperry Sun Drilling Services) was responsible for mudlogging personnel and equipment on the Deepwater Horizon,

including downhole drilling tools.  Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations.  Throughout this Master Complaint, Cross-Claim, and Third-Party Complaint, "Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

**ANSWER:**

The BP Parties admit that Halliburton, including but not limited to Sperry Drilling Services, was responsible for providing mudlogging personnel and equipment on the *Deepwater Horizon*, including downhole drilling tools.  Halliburton mudlogging personnel were responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

197.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation M-I, LLC ("M-I") is a Delaware limited liability company with its principal place of business in Wilmington, Delaware, and that at all relevant times was registered to do, and was doing, business in Louisiana and within this district.  M-I, also known as M-I SWACO, supplies drilling and completion fluids and additives to oil and gas companies in Louisiana and elsewhere, providing pressure control, vessel instrumentation, and drilling waste management products and services.  On the Deepwater Horizon, M-I provided mud products, including drilling fluids and spacers, engineering services, and mud supervisory personnel, such as mud engineers and drilling fluid specialists, to manage the properties of those fluids in the well.  M-I employees planned and/or supervised key fluid-related activities at Macondo, such as the mud displacement that was occurring at the time of the April 20, 2010, blowout.

**ANSWER:**

The BP Parties admit that M-I and/or its affiliates provided products and services related to drilling fluids used at the Macondo Well, including supervising key fluid-related activities. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

198.    BP, Transocean, Halliburton, and M-I are collectively referred to herein as the "Drilling Defendants," as they were all involved in the drilling, cementing, and other temporary well abandonment activities of the Deepwater Horizon, and thus their actions caused and/or contributed to the Spill.

**ANSWER:**

The BP Parties admit that Plaintiffs purport to refer to BP, Transocean, Halliburton, and M-I as the Drilling Defendants, but deny that this is appropriate.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

199.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Cameron International Corporation f/k/a Cooper-Cameron Corporation ("Cameron") is a Delaware corporation with its principal place of business in Houston, Texas.  Cameron is registered to do and does business in the State of Louisiana.  Cameron manufactured, designed, supplied, and/or installed the Deepwater Horizon's sub-sea emergency well-closure device known as a blowout-preventer ("BOP") , which is, and was at all material times, an appurtenance of the vessel and a part of the vessel's equipment.  The Cameron-made BOP that was installed at the Macondo wellhead failed to operate as intended at the time of the blowout on April 20, 2010,

was improperly designed, was inappropriate for the intended environment or use, and/or possessed product defects.

**ANSWER:**

The BP Parties admit that Cameron is a Delaware corporation with its principal place of business in Houston, Texas, that Cameron manufactured, designed, supplied, and/or installed the *Deepwater Horizon's* blowout preventer, an appurtenance of the *Deepwater Horizon* and part of the vessel's equipment, and that the BOP failed to operate as intended at the time of the blowout on April 20, 2010. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

200.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Weatherford U.S. L.P. ("Weatherford") is a Louisiana limited partnership that maintains its principal place of business in Houston, Texas, and that at all pertinent times was registered to do, and was doing business in Louisiana and within this district. Weatherford designed and manufactured, marketed, sold, and/or distributed the casing components such as the float collar, shoe, and centralizers appurtenant to the vessel, and provided the personnel and equipment for running the casing and casing components into the wellbore.

**ANSWER:**

The BP Parties admit that Weatherford and/or its affiliates provided products and services related to the casing used at the Macondo Well. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

201.    Drilling Defendants, Cameron, and Weatherford are jointly, severally, and solidarily liable under various principles of federal, maritime, and/or applicable State tort law, and under the Oil Pollution Act.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference

Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

202.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Anadarko Petroleum Corporation Co. ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas.  Anadarko is registered to do and does business in the State of Louisiana.  Anadarko is an oil and gas exploration and production company.

**ANSWER:**

The BP Parties admit that Anadarko is a Delaware corporation and is an oil and gas exploration and production company.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

203.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Anadarko E&P Company LP ("Anadarko E&P") is a Delaware limited partnership with its principal place of business in The Woodlands, Texas.  Anadarko E&P is registered to do and does business in the State of Louisiana.  Anadarko E&P is an oil and gas exploration and production company.

**ANSWER:**

The BP Parties admit that Anadarko E&P is a Delaware limited partnership.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them

204.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation MOEX Offshore 2007 LLC ("MOEX Offshore") is a Delaware corporation with its principal place of business in Houston, Texas.  MOEX Offshore does business in the State of Louisiana and/or in state and/or federal waters off the coast of Louisiana.  MOEX Offshore is a wholly-owned subsidiary of MOEX USA Corporation, which in turn is a wholly-owned subsidiary of Mitsui Oil Exploration Co., Ltd. ("MOECO").  However, MOEX Offshore is not a distinct corporate entity performing autonomous business activities, but is instead an entity wholly dominated and controlled by its ultimate parent company, MOECO, as alleged below.  At all relevant times, MOEX Offshore was a party to the Operating Agreement, and held a 10% ownership interest in the lease of the Macondo Prospect site in the Mississippi Canyon Block 252 in the Gulf of Mexico.

**ANSWER:**

The BP Parties admit that as a result of various agreements, BPXP and MOEX Offshore were co-lessees under the Lease and that MOEX Offshore held a 10% interest in the Lease as of April 20, 2010.  The BP Parties further admit, based on information and belief, that MOEX Offshore is a wholly-owned subsidiary of MOEX USA Corporation, and MOECO is the parent company of MOEX USA Corporation.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

205.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation MOEX USA Corporation ("MOEX USA") is incorporated in Delaware and has its principal place of business in Houston, Texas.  However, MOEX USA is not a distinct corporate entity performing autonomous business activities, but is instead an entity created solely to serve as a holding company for other corporate entities, including MOEX Offshore, and is dominated and controlled by its parent company, MOECO, as alleged below.  MOEX USA is named as a defendant herein because it is part of the corporate construct by which MOECO owns, dominates, controls, and benefits from the activities of MOEX Offshore.

**ANSWER:**

The BP Parties admit that MOEX USA is an affiliate of MOEX Offshore.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

206.     Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Mitsui Oil Exploration Co., Ltd. ("MOECO") is incorporated in Japan and has its principal place of business in Tokyo, Japan.  MOECO wholly owns MOEX USA, which in turn wholly owns MOEX Offshore.  As alleged more fully below, MOECO is named as a defendant herein because at all relevant times it dominated and controlled the activities of MOEX Offshore and MOEX USA, such that it is the alter ego of its subsidiaries, MOEX Offshore and MOEX USA, thus requiring that the liability of MOEX Offshore and/or MOEX USA be imputed to MOECO.  Alternatively, as also alleged below, MOEX Offshore and MOEX USA acted at all relevant times as agents of MOECO, and the liability of those entities should therefore be imputed to MOECO.

**ANSWER:**

The BP Parties admit that MOECO is an affiliate of MOEX and MOEX Offshore.  The

BP Parties lack knowledge or information sufficient to form a belief about the truth of the

remaining allegations of this paragraph, and therefore deny them.

207.     As alleged below, MOECO's activities in the United States, including in this and all relevant jurisdictions, have been continuous and systematic.  MOECO has purposely availed itself of the protections, benefits, and privileges of American law and should have reasonably anticipated being involved in this litigation in the United States.  Moreover, because at all relevant times MOECO asserted domination and control over the business, operations and policy decisions of MOEX Offshore and MOEX USA, those U.S. companies were merely the alter egos and/or agents of MOECO.  Thus, MOECO is subject to the exercise of both general and specific jurisdiction by this Court, an exercise of jurisdiction that will not offend traditional notions of fair play and substantial justice.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

208.     MOECO is a majority-owned subsidiary of Mitsui & Co., Ltd. ("Mitsui").  Mitsui is a publicly traded company, whose American depository shares are traded on the NASDAQ Global Select Market.  MOECO is listed in Mitsui's consolidated financial statements and filings with the U.S. Securities and Exchange Commission as a "major" subsidiary of Mitsui.  MOECO is engaged in the business of "exploration, development, production and sales of crude oil, natural gas and other mineral resources and investment in companies engaged in these activities."

26

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

209.    MOECO operates through its own activities and those of its subsidiaries and affiliates located throughout the world, including in the United States.  Since MOECO opened its office in Houston, Texas, in February 2002, "we have been expanding our business in the USA," and "striving to acquire assets with high potential" in the United States.  MOECO identifies the United States as a "Focus Area" that it seeks to continue to "develop into [a] Core Area[.]" MOECO has identified itself as having at least the following subsidiaries or affiliates in the United States: MOEX USA, MOEX Offshore, MitEnergy Upstream LLC ("MitEnergy"), Mitsui E&P USA LLC, MOEX Gulf of Mexico Corporation, and MOEX Oil & Gas Texas LLC.  Each of these subsidiaries of MOECO shares the same Houston, Texas, address, and many of the same directors and managers as each other and MOECO.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

210.    MOECO's expansion of its United States business ventures has included numerous oil and gas exploration and investment activities in the Gulf of Mexico.  For example, in May 2006, MOECO and Mitsui acquired a 50% interest in an oil and gas leasehold in the Gulf of Mexico.  The Japanese companies established MitEnergy for the purpose of holding that interest.  In November 2009, MOECO and Mitsui arranged for that company to sell their Gulf of Mexico oil and gas assets to a third party, the proceeds of which sale solely benefited MOECO.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

211.    In July 2007, MOECO entered into an agreement with BP E&P for a partial interest in an ultra-deep gas exploration project at the Gouda Prospect site in the Gulf of Mexico, noting in a press release that its participation in this project "provides an excellent opportunity to further expand its business in the U.S."  As alleged more fully below, MOECO later orchestrated a transaction in which it used MOEX Offshore to obtain a 10% working interest in the Macondo Prospect site through an exchange with BP E&P, swapping MOECO's interest in the Gouda Prospect for the 10% interest in the Macondo Prospect.

**ANSWER:**

The BP Parties admit that on or about July 24, 2007, Mitsui Oil Exploration Co., Ltd., issued a press release that "announce[d] that it has entered into Acquisition [sic] and Participation Agreement with BP Exploration & Production Inc. ('BP') on the 29th of June 2007 to participate in an ultra-deep gas exploration project in the Gulf of Mexico ('GOM') which is being actively pursued by BP," and went on to say that, "MOECO's participation in this project provides an excellent opportunity to further expand its business in the U.S." The BP Parties further admit that, on or about November 18, 2009, BP Exploration & Production Inc. and MOEX Offshore 2007 LLC entered into a Lease Exchange Agreement, in which MOEX obtained a 10% record title interest in Mississippi Canyon Block 252 and transferred a 10% record title interest in Garden Banks Block 997 to BP. The BP Parties deny the remaining allegations of this paragraph.

212.    More recently, in February 2010, MOECO reported that it had entered into yet another new business in the United States when "we [MOECO and Mitsui] entered into a definitive agreement with a partner to participate in the development and production of the Marcellus Shale Gas Project in the State of Pennsylvania."

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

213.    Although MOEX Offshore was the entity identified as the owner of the 10% leasehold interest in the Macondo Prospect – a 10% interest in the hydrocarbons extracted from that location – it was MOECO that was responsible for creating MOEX Offshore and its immediate holding company, MOEX USA, and for orchestrating the acquisition of the ownership interest in the Macondo Prospect. As alleged above, in July 2007, MOECO announced it had entered into an "Acquisition and Participation Agreement with BP Exploration and Production, Inc. … on the 29th of June, 2007 to participate in an ultra-deep gas exploration project in the Gulf of Mexico … which is being actively pursued by BP." That gas exploration project was the exploratory drilling exercise at the Gouda Prospect site in the Garden Banks

Block 997 in the Gulf of Mexico.  MOECO announced that it would own a 15% leasehold interest in the Gouda Prospect site (an interest apparently later reduced to 10%).

**ANSWER:**

The BP Parties admit that the November 18, 2009 Lease Exchange Agreement between BP Exploration & Production Inc. and MOEX Offshore 2007 LLC provided MOEX Offshore 2007 LLC with a 10% record title interest in Mississippi Canyon Block 252.  The BP Parties further admit that on or about July 24, 2007, Mitsui Oil Exploration Co., Ltd., issued a press release that "announce[d] that it has entered into Acquisition [sic] and Participation Agreement with BP Exploration & Production Inc. ('BP') on the 29th of June 2007 to participate in an ultra-deep gas exploration project in the Gulf of Mexico ('GOM') which is being actively pursued by BP," and went on to say that "interests in the project will be BP (75%), MOECO (15%) and other (10%)."  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations that "MOECO . . . was responsible for creating MOEX Offshore and is its immediate holding company, MOEX USA, and for orchestrating the acquisition of the ownership interest in the Macondo Prospect," and therefore deny them.  The BP Parties deny the remaining allegations of this paragraph.

214.    In September 2007, MOECO, through its agent/alter ego MOEX USA, established MOEX Offshore for the purpose of holding MOECO's interests in various Gulf of Mexico projects, including the Gouda Prospect, and later, the Macondo Prospect.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

215.    In November 2009, BP E&P and MOEX Offshore entered into a Lease Exchange Agreement (effective October 1, 2009), pursuant to which MOEX Offshore conveyed to BP E&P its interest in the Gouda Prospect site, and BP E&P, in exchange, conveyed to MOEX Offshore a 10% interest in the Macondo Prospect site.  A condition of the Lease Exchange

Agreement was that MOEX Offshore pay BP E&P "cash consideration of 1.92 million dollars," to be "allocated" to the Macondo Prospect lease.  The Lease Exchange Agreement also refers to a February 15, 2008, operating agreement between BP E&P, as operator, and the MOECO subsidiary, MitEnergy, as non-operator, concerning the Gouda Prospect lease.  Upon information and belief, Plaintiffs allege that it was in fact MOECO that caused and directed MOEX Offshore to enter into the Lease Exchange Agreement for the purpose of obtaining a leasehold interest in the Macondo Prospect.

**ANSWER:**

The BP Parties admit that, on or about November 18, 2009, BP Exploration & Production Inc. and MOEX Offshore 2007 LLC entered into a Lease Exchange Agreement with an "Effective Date" of October 1, 2009.  The BP Parties further admit that the November 18, 2009 Lease Exchange Agreement provided MOEX with a 10% record title interest in Mississippi Canyon Block 252 and transferred a 10% record title interest in Garden Banks Block 997 from MOEX to BP.  The BP Parties further admit that the November 18, 2009 Lease Exchange Agreement provided, "MOEX shall pay BP a cash consideration of one million nine hundred and twenty thousand dollars (US $1,920,000.00)," and that, "[t]he cash consideration shall be allocated to the BP Property."  The BP Parties further admit that the November 18, 2009 Lease Exchange Agreement defines "Gouda Operating Agreement" to mean "that certain Operating Agreement dated as of February 15, 2008, between BP Exploration & Production Inc., as operator, and MitEnergy Upstream LLC, as non-operator, covering Lease OCS-G 31687 (Garden Banks Block 997)."  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegation that, "it was in fact MOECO that caused and directed MOEX Offshore to enter into the Lease Exchange Agreement for the purpose of obtaining a leasehold interest in the Macondo Prospect," and therefore deny it.  The BP Parties deny the remaining allegations of this paragraph.

216.    On or about October 1, 2009, BP E&P, as the Operating Party, and MOEX Offshore, as a Non-Operating Party, entered into the Operating Agreement.  On or about

December 17, 2009, BP E&P, MOEX Offshore, Anadarko, and Anadarko E&P executed a "Joinder" of the Operating Agreement.  Subsequently, the parties to the Operating Agreement held the following working interest ownership percentages in the lease of the Macondo Prospect: BP E&P, 65%; MOEX Offshore, 10%; Anadarko E&P, 22.5%; and Anadarko, 2.5%.

**ANSWER:**

The BP Parties admit that, on or about November 2009, BP Exploration & Production Inc. and MOEX Offshore 2007 LLC entered into the Macondo Prospect Offshore Deepwater Operating Agreement ("Macondo Operating Agreement"), with an effective date of October 1, 2009.  The BP Parties further admit that, on or about December 17, 2009, BP Exploration & Production Inc., Anadarko E&P Company LP ("Anadarko E&P"), and Anadarko Petroleum Corporation ("Anadarko") entered into a Ratification and Joinder of Operating Agreement Macondo Prospect, in which Anadarko E&P and Anadarko "do hereby ratify, confirm, and adopt and join the" Macondo Operating Agreement.  The BP Parties admit that the November 18, 2009 Lease Exchange Agreement between BP Exploration & Production Inc. and MOEX Offshore 2007 LLC provided MOEX Offshore 2007 LLC with a 10% record title interest in Mississippi Canyon Block 252.  The BP Parties further admit that, on or about December 17, 2009, BP Exploration & Production Inc., Anadarko, and Anadarko E&P entered into a Lease Exchange Agreement, which provided Anadarko E&P with a 22.5% record title interest in Mississippi Canyon Block 252 and provided Anadarko with a 2.5% record title interest in Mississippi Canyon Block 252.  The BP Parties admit that BP Exploration & Production Inc. retained a 65% record title interest in Mississippi Canyon Block 252.  The BP Parties deny the remaining allegations of this paragraph.

217.    At all times relevant herein, MOECO has dominated and controlled the business, operations, policies, and actions of MOEX Offshore and MOEX USA to the extent that there is no meaningful distinction between them and MOECO, and they are more accurately described as agents and/or alter egos of MOECO, rather than simply its subsidiaries.  MOECO dominates and controls MOEX Offshore and MOEX USA through, inter alia: financial, operational, and policy

control; a lack of corporate formalities at MOEX Offshore and MOEX USA; and nearly identical directors, managers, and/or executive officers.   For example, the same six individuals are directors, managers, and/or officers of both MOEX Offshore and MOEX USA; four of them are also MOECO directors and executive officers, and the Texas Secretary of State lists MOECO's Tokyo address for all of the overlapping directors/officers.   MOEX USA and MOEX Offshore also share the same Houston, Texas, office and have a common president, Naoki Ishii.   Upon information and belief, Mr. Ishii is the only management-level employee of MOEX Offshore and MOEX USA, and he reports directly to MOECO directors and/or executive officers.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.


218.     Although Mr. Ishii has issued public statements with regard to the Deepwater Horizon disaster and the ensuing Spill, it has been MOECO, speaking on behalf of MOEX Offshore and itself, that has been the primary source of public statements concerning the Spill and its aftermath.   MOECO's parent, Mitsui, has also made numerous public statements about the potential impact of the Spill on its financial condition.   Upon information and belief, Plaintiffs allege that all public statements about the Spill and its aftermath by or on behalf of MOEX Offshore, as well as all operational and financial decision-making concerning the Spill and its aftermath (including the payment, or non-payment, of response and clean-up expense invoices from BP E&P), have been made and directed by MOECO (and in some instances, Mitsui).

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.


219.     Thus, neither MOEX Offshore nor MOEX USA are operated as corporations distinct from each other or from MOECO – rather, MOECO conducts its U.S. activities through these agent/alter ego entities, and all activities of MOEX Offshore and MOEX USA should be imputed to MOECO, subjecting MOECO to the exercise of general and/or specific personal jurisdiction in the United States and by this Court.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

220.    To the extent necessary, Plaintiffs specifically reserve the right to amend this Voluntary Master Complaint to name additional parties defendant, pursuant to future conduct, further information learned through discovery or investigation, or any other reason.

**ANSWER:**

The BP Parties admit that Plaintiffs purport to reserve the right to amend and name additional parties.  The BP Parties deny that Plaintiffs have the right to amend or name additional parties except as allowed by the Federal Rules of Civil Procedure and the Rules and Orders of this Court.

### Jurisdiction

221.    Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime jurisdiction."

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

222.    The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and Plaintiffs hereby designate this case as an admiralty or maritime case as provided in Rule 9(h).

**ANSWER:**

The BP Parties admit that Plaintiffs' claims fall within the jurisdictional grant of 28 U.S.C. § 1333 and that they are subject to the provisions of Rule 9(h) of the Federal Rules of Civil Procedure.  The BP Parties deny, however, that in cases where federal statutory law displaces admiralty law the existence of maritime jurisdiction brings with it maritime law.

223.    In addition, this Court has jurisdiction over this action pursuant to the Oil Pollution Act, 33 U.S.C. § 2717 (b) (the "OPA").

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

224.   This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.   To the extent, however, that Plaintiffs were to reassert any state law claims, the BP Parties admit that the Court would have supplemental jurisdiction over them, but also note that such claims would also be preempted (i) by both the Clean Water Act and the Outer Continental Self Lands Act, and (ii) because they attempt to create effects in or regulate the exclusive federal enclave of the Outer Continental Shelf.

225.   Jurisdiction also exists over this action pursuant to The Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

**ANSWER:**

The BP Parties deny this paragraph to the extent maritime law is displaced by federal statute.

**Venue**

226.   Prosecution of this action in this district is proper under 28 U.S.C. § 1391 because the events or omissions giving rise to the claims asserted herein occurred in this district.   Venue is otherwise appropriate in this district consistent with 28 U.S.C. § 1407 and the 2010 Transfer Order of the Judicial Panel on Multidistrict Litigation ("JPML").   *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179, 2010 WL 3166434, 2010 AMC 1977 (JPML, August 10, 2010).   Actions may also be filed in this Judicial District pursuant to the Direct Filing Order [PTO No. 20].

**ANSWER:**

The BP Parties admit that venue is proper in this district in accordance with the Order of this Court and the JPML, consistent with the limits of what may be properly adjudicated in multidistrict litigation.  The BP Parties reserve all of their rights under *Lexecon, Inc. v. Milberg Weiss Bershad Hines & Lerach*, 523 U.S. 26 (1998).  The BP Parties deny the remaining allegations of this paragraph.

## FACTUAL ALLEGATIONS

### A.    The Process of Deepwater Offshore Drilling

227.    On April 20, 2010, Drilling Defendants' workers on the Deepwater Horizon drilling vessel lost control of the subsea oil well they had almost completed.  When highly pressurized hydrocarbons leaked into the well, the vessel's emergency equipment failed to stop the oil and gas from blowing out of the well, which led to explosions and a fire on the Deepwater Horizon, and ultimately the sinking of the vessel and the resulting Spill.

**ANSWER:**

The BP Parties admit that on April 20, 2010, Transocean employees lost control of the Macondo Well and that the *Deepwater Horizon* blowout preventer failed to shut in the well, leading to one or more fires and explosions aboard the vessel, the sinking of the vessel, and the resulting Spill.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the

remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

228.    As described more fully below, the loss of well control was due to the failure of mechanical and cement barriers to seal off the well against the influx of highly pressurized hydrocarbons from the reservoirs surrounding the bottom of the well.  The many indications that hydrocarbons were leaking into the well were misinterpreted and/or overlooked by Deepwater Horizon workers for 51 minutes prior to the blowout.  Once the hydrocarbons reached the vessel decks, fire and gas prevention and alarm systems on the vessel failed to warn the crew and prevent ignition of a fire.  The vessel's subsea BOP also failed to seal the well and stop the flow of hydrocarbons fueling the fire, which exacerbated the disaster.

**ANSWER:**

The BP Parties admit that loss of well control was the result of a complex and interlinked series of mechanical failures, human judgments, engineering design, operational implementation and team interactions, including that cement barriers failed to seal the well, that Transocean personnel failed to identify and react to warning signs that the well was flowing, that alarm systems on the vessel failed to warn the crew and prevent ignition of a fire, and that the blowout preventer had failed to seal the well.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent

they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

229.    After the Deepwater Horizon sank, oil and gas gushed out of the damaged well and into the Gulf of Mexico for 12 weeks, fouling the environment, damaging and contaminating real and personal property, and doing immense and long-lasting damage to the environment and economy of Plaintiffs and the Gulf of Mexico.  Meanwhile, BP downplayed the severity of the Spill and was unprepared for the massive clean up effort required.

**ANSWER:**

The BP Parties admit that hydrocarbons were released into the Gulf of Mexico for several weeks following the sinking of the *Deepwater Horizon*.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

230.    All of these failures – to plan, monitor, control, contain, mitigate, and clean up – sprang from decades-long histories of organizational malfunction and myopia on the part of the Drilling Defendants.  As the co-chairman of the National Commission investigating the Spill said: "There is virtual consensus among all the sophisticated observers of this debacle that … leading players in the industry made a series of missteps, miscalculations and miscommunications that were breathtakingly inept and largely preventable."

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

### B.  The Macondo Lease, and BP's Exploration Plan and Drilling Permit

231.   Deepwater offshore drilling for hydrocarbons such as oil and natural gas is an immensely complex, technical process, and a relatively new one that has only developed over the last five years.  The first challenge is finding the hydrocarbons.  Seismic and/or magnetic surveys are taken of the geological formations deep in the Earth's crust below the sea floor, in the hopes of finding "traps:" rock formations that have trapped a reservoir of hydrocarbons beneath an impermeable layer, preventing them from migrating to the surface and escaping.

### ANSWER:

The BP Parties admit that deepwater drilling for hydrocarbons is a complex, technical process and requires locating hydrocarbon reservoirs contained in impermeable geological formations.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

232.    Upon locating a promising trap of hydrocarbons, drilling vessels such as the Deepwater Horizon are positioned on the sea surface above the proposed well site, and from there begin drilling an "exploratory" well to investigate the viability of the trap.  Once the trap is determined to be a worthwhile source of hydrocarbons, the drilling vessel performs "completion" operations to transform the exploratory well into a "production" well that will extract oil or gas from the trap.  At this point, wells are sometimes temporarily abandoned — sealed with cement so they are secure against any influx of hydrocarbons from the reservoirs they have penetrated — so they can be reopened by a production vessel at some later date, when the well owner is ready to begin extracting hydrocarbons for production.  At the time of the April 20, 2010, blowout, the Deepwater Horizon crew was in the process of preparing the Macondo well for temporary abandonment.

**ANSWER:**

The BP Parties admit that deepwater drilling involves positioning a drilling rig over the

site of the well, drilling an exploratory well to investigate the potential for retrievable

hydrocarbons, and, if successful, either converting the well to a production well or temporarily

sealing the well for future use as a production well.  The BP Parties also admit that on April 20,

2010, the Macondo well was in the process of being sealed.  The BP Parties deny the remaining

allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the

remaining allegations of this paragraph, and therefore deny them.


233.    An exploratory well begins with a wide-diameter "pilot" hole drilled into the seabed, generally to a depth of about 300 to 400 feet.  The pilot hole is then "cased," or lined with pipe.  "Casing" describes both the actual pipe lining a well, in addition to the act of lining the drilled hole — the well bore — with such pipe.

**ANSWER:**

The BP Parties admit that an exploratory well can begin with a "pilot" hole, though the

depth of the "pilot" hole can vary.  The BP Parties admit the remaining allegations of this

paragraph.


234.    The first section of casing pipe lowered into the pilot hole generally anchors a safety device known as a blowout preventer ("BOP"), which is an appurtenance of the drilling

vessel and a part of the vessel's equipment.  The BOP is an assembly of hydraulically-operated rams that can be used to partially or totally seal the well during routine drilling activities as well as in the event of a well control emergency.  In the event of an influx of hydrocarbons into the well, closure of the BOP rams can prevent a "kick" — a small leak of hydrocarbons into the well — from escalating into a "blowout" — the uncontrolled release of hydrocarbons from a well into the surrounding environment.  A BOP can be activated manually from the drilling vessel, or automatically via the automatic mode function ("AMF"), also known as a "deadman switch," which closes the device's most secure rams if both electrical and hydraulic connections to the drilling vessel are severed.  BOP functions can also be activated by using remotely operated vehicles ("ROVs") on the sea floor via the "hot stab" or autoshear functions, which are explained more fully below.

**ANSWER:**

The BP Parties admit that a BOP is a safety device that may be attached to a wellhead and which may include, among other things, hydraulically-operated rams that can be used to seal the well during routine drilling activities as well as in the event of a well control emergency. The BP Parties admit that the ram preventers of a subsea BOP stacks can prevent an influx of hydrocarbons from entering the riser and possibly releasing into the surrounding environment. The BP Parties further admit that subsea BOPs can be manually activated and may contain an automatic mode function which activates BOP components when certain conditions are met. The BP Parties admit that some BOP functions may be activated using ROVs.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

235.   The risk of a blowout is one of the most dangerous and common risks in deepwater drilling, hence the installation of the BOP so early in the well drilling process.  The reservoirs of hydrocarbons trapped in the rock formations miles beneath the sea floor are often highly pressurized, and managing the pressures in a well is a vital — and often volatile — task during drilling operations.  Proper well monitoring will catch small hydrocarbon influxes early, so a kick can be contained and the source of the leak repaired before well control is jeopardized. All workers on a drilling vessel have the authority to call for work on a well to stop if they have a safety concern, including any indication that hydrocarbons are leaking into the well.  The BOP is then a crucial last line of defense for a drilling vessel and its workers if all other attempts to balance well pressure and counter an influx fail, and the well begins to flow out of control.

**ANSWER:**

The BP Parties admit that a risk of a blowout is a risk in deepwater drilling and that there are multiple systems in place to reduce the possibility of a blowout and control a blowout if one occurs, including the BOP.  The BP Parties further admit that proper well monitoring can catch small hydrocarbon influxes, which can be contained.   The BP Parties further admit that all workers on the *Deepwater Horizon* had the authority to call for work on a well to stop if they had a safety concern, that the BOP was intended to seal the well in the event of loss of well control, and that the BOP is a crucial line of defense against a flowing well.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

236.    Once the BOP is properly positioned and secured over the pilot hole, the drilling apparatus and additional casing sections are lowered down through the BOP into the well, while a pipe called a "marine riser" connects the wellhead to the drilling vessel at the surface.

**ANSWER:**

The BP Parties admit that after the BOP is installed, the drill pipe, the casing sections and bottom hole assembly are run through the BOP assembly during drilling operations.  The BP Parties further admit that a marine riser connects the wellhead to the drilling vessel at the surface.  The BP Parties deny the remaining allegations of this paragraph.

237.    As the drilling apparatus moves downward drilling out the well bore hole, drilling fluid called "mud" is pumped down the center of the drill pipe.  Drilling mud is a thick mixture of barite, water, clay, and chemicals that cools and lubricates the drill bit and suspends and carries rock fragments and other drilling debris to the surface as the mud circulates.

**ANSWER:**

The BP Parties admit that deepwater drilling involves the use of drilling fluid called mud, which can be used to lubricate and cool the drill bit and to carry debris to the surface. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

238.   Drilling mud is carefully formulated so that its hydrostatic pressure[3] slightly exceeds that of the ambient pressure conditions in the various rock formations encountered during the drilling process. The weight of the mud pushes back against the pressure of the hydrocarbons in those formations, helping to control against the ever-present risk of kicks and blowouts in the well

**ANSWER:**

The BP Parties admit that seawater's density is approximately 8.6 ppg, that drilling fluid can have densities of 12-16 ppg (or other densities), and that, in addition to carrying away cuttings, drilling mud controls pressures inside the well as it is being drilled. The mud column inside a well exerts downward hydrostatic pressure that rig crews can control by varying the mud weight, which is used for well control during drilling operations. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

239.   As the well bore is drilled deeper and deeper, additional sections of casing are added to line each newly-drilled open hole section with pipe. Each casing section is secured with a plug of cement. If a well is to be temporarily abandoned before production, then when drilling reaches the hydrocarbon reservoir, the cementing contractor temporarily seals the well off from the hydrocarbon reservoir it has penetrated, isolating the oil and gas to prevent it from leaking into the well, and then places a temporary cement plug below the BOP at the top of the well.

---

[3]      Hydrostatic pressure is the pressure exerted by a fluid due to the force of gravity. The denser a fluid, the higher its hydrostatic pressure. Drilling mud is often very dense (12-16 pounds per gallon), so it can counter the highly pressurized hydrocarbons surrounding a well. In comparison, seawater is relatively light, only 8.6 ppg.

**ANSWER:**

The BP Parties admit that additional sections of casing are used to line and seal off open hole sections as the well is drilled deeper.  The casing sections are secured with cement.  If a well that has drilled through a hydrocarbon reservoir is to be temporarily abandoned, then the cementing contractor can seal the casing or liner from the hydrocarbon reservoir using cement to prevent the flow of oil and gas into the well and further place a cement plug below the BOP at the top of the well.  The BP Parties deny the remaining allegations of this paragraph.

240.    Assuming the design of the well is stable, and proper testing and analysis confirm the integrity of the cement plugs, casing string, and other well components, the drilling vessel can disconnect from the well, temporarily abandoning it until a permanent oil production platform is put into place on the sea surface above the well to begin extracting oil or gas.

**ANSWER:**

The BP parties admit that assuming the design of the well is stable, and proper testing and analysis confirm the integrity of the cement plugs, casing string, and other well components, the drilling vessel can disconnect from the well, temporarily abandoning it until a permanent oil production platform is put into place to begin extracting oil or gas.  The BP parties deny the remaining allegations of this paragraph.

C.    **The Deepwater Horizon's Poor Safety and Maintenance Record**

241.    On June 1, 2008, BP acquired a ten-year lease from the MMS to search for and exploit hydrocarbon reservoirs at the Macondo prospect site in Mississippi Canyon Block 252, 48 miles off the coast of Louisiana.

**ANSWER:**

The BP Parties admit that on March 19, 2008, BPXP acquired a ten-year lease to Mississippi Canyon Block 252, which contains the Macondo Well, and that the lease started on June 1, 2008.  The BP Parties also admit that the Macondo Well is located approximately 48

miles from the nearest shoreline.  The BP Parties deny the remaining allegations of this paragraph.

242.   Before BP could begin operations at the Macondo site, federal regulations required BP to submit an Exploration Plan ("EP") demonstrating that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices, and would not cause undue or serious harm or damage to human or marine health, or the coastal environment.  30 C.F.R. §§ 250.201, 250.202.

**ANSWER:**

The BP Parties admit that 30 C.F.R. § 250.201, the text of which speaks for itself, partially states that "Before you conduct the activities on your lease…you must submit, and MMS must approve, the listed plans and documents," which include an Exploration Plan.  The BP Parties further admit that 30 C.F.R. § 250.202, the text of which speaks for itself, partially states that an Exploration Plan "must demonstrate that you have planned and are prepared to conduct those proposed activities in a manner that: (a) Conforms to the Outer Continental Shelf Lands Act as amended (Act), applicable implementing regulations, lease provisions and stipulations, and other Federal laws; (b) Is safe; (c) Conforms to sound conservation practices and protects the rights of the lessor; (d) Does not unreasonably interfere with other uses of the OCS, including those involved with national security or defense; and (e) Does not cause undue or serious harm or damage to the human, marine, or coastal environment." The BP Parties deny the allegations of this paragraph to the extent they are inconsistent with 30 C.F.R. §§ 250.201, 250.202

243.   Federal regulations required that the EP be accompanied by "oil and hazardous substance spills information" and "environmental impact analysis information."   30 C.F.R. §§ 250.212, 250.219, 250.227.

**ANSWER:**

The BP Parties admit that 30 C.F.R. §§ 250.212, 250.219, 250.227, the text of which speaks for itself, partially states the above quoted language.  The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with 30 C.F.R. §§ 250.212, 250.219, 250.227.

244.    Among the information required to accompany the EP was a "blowout scenario," described as follows:

> A scenario for the potential blowout of the proposed well in your EP that you expect will have the highest volume of liquid hydrocarbons. Include the estimated flow rate, total volume, and maximum duration of the potential blowout. Also, discuss the potential for the well to bridge over, the likelihood for surface intervention to stop the blowout, the availability of a rig to drill a relief well, and rig package constraints. Estimate the time it would take to drill a relief well. 30 C.F.R. § 250.213 (g).

**ANSWER:**

The BP Parties admit that 30 C.F.R. § 250.213 (g), the text of which speaks for itself, partially states the above quoted language.  The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with 30 C.F.R. § 250.213 (g).

245.    The oil and hazardous spills information accompanying the EP was required to include an oil spill response plan providing the calculated volume of BP's worst case discharge scenario (see 30 C.F.R. 254.26(a)), and a comparison of the appropriate worst case discharge scenario in [its] approved regional [Oil Spill Response Plan] with the worst case discharge scenario that could result from [its] proposed exploration activities; and a description of the worst case discharge scenario that could result from [its] proposed exploration activities (see 30 C.F.R. 254.26(b), (c), (d), and (e)).  30 C.F.R. § 250.219.

**ANSWER:**

The BP Parties admit that federal regulations, including 30 C.F.R. § 254.26 and 30 C.F.R. § 250.219, the text of which speaks for itself, applied to certain exploration activities in the Gulf

of Mexico.  The BP Parties deny the remaining allegations of this paragraph to the extent they are not consistent with 30 C.F.R. § 254.26 or 30 C.F.R. § 250.219.

246.    Federal regulations required BP to conduct all of its lease and unit activities according to its approved EP, or suffer civil penalties or the forfeiture or cancellation of its lease. 30 C.F.R. § 250.280.

**ANSWER:**

The BP Parties admit that federal regulations including 30 C.F.R. § 250.280., the text of which speaks for itself, applied to certain exploration activities in the Gulf of Mexico.  The BP Parties deny the remaining allegations of this paragraph to the extent they are not consistent with 30 C.F.R. § 250.280.

247.    In February 2009, BP filed its 52-page Initial EP for the Macondo prospect site with the MMS.  In the Environmental Impact Analysis section, BP repeatedly asserted that it was "unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities."  In the unlikely event that a spill did occur, BP predicted a worst case discharge scenario of 162,000 gallons of oil per day, an amount it assured the MMS that it was prepared to respond to.  BP also claimed the well's distance from the nearest shoreline would preclude any significant adverse impacts from a spill.

**ANSWER:**

The BP Parties admit that BPXP filed an Initial Exploration Plan for Mississippi Canyon Block 252 with the MMS in February 2009, the text of which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with the February 2009 Initial Exploration Plan for Mississippi Canyon Block 252.

248.    Based on these assurances, the MMS approved BP's Initial EP for the Macondo prospect on April 6, 2009, including the approval of a "categorical exclusion" from the full environmental analysis normally required under the National Environmental Policy Act.  As detailed more fully below, the MMS' approval of BP's Initial EP and the categorical exclusion from environmental analysis were predicated on BP's flagrant misrepresentations about the risk of a surface or subsurface oil spill at Macondo, and its capability to respond to such a spill.

**ANSWER:**

The BP Parties admit that the MMS approved BPXP's February 2009 Initial Exploration Plan for Mississippi Canyon Block 252 on April 6, 2009, the text of which speaks for itself.  The BP Parties deny that BP made any "flagrant misrepresentations about the risk of a surface or subsurface oil spill at Macondo, and its capability to respond to such a spill."  The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with BPXP's February 2008 Initial Exploration Plan for Mississippi Canyon Block 252.

249.    After its EP was approved, BP sought a permit from the MMS authorizing it to drill up to a total depth of 19,650 feet at the Macondo site.

**ANSWER:**

The BP Parties admit that BPXP sought a permit from the MMS, the text of which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with the drilling permit sought for the Macondo Well.

**D.    Macondo: A Troublesome Well**

250.    Once the EP and drilling permits for Macondo were approved, BP then entered into an Operating Agreement with Anadarko, Anadarko E&P, and MOEX Offshore, as described in paragraph 232 above.

**ANSWER:**

The BP Parties admit that BP Exploration & Production Inc. and MOEX Offshore 2007 LLC entered into the Macondo Operating Agreement on or about November 2009, after the MMS approved BP's initial EP for the Macondo Well and after the MMS approved BP's Application for Permit to Drill for the Macondo Well.  The BP Parties further admit that BP Exploration & Production Inc., Anadarko E&P, and Anadarko entered into a Ratification and Joinder of Operating Agreement Macondo Prospect, in which Anadarko E&P and Anadarko "do

hereby ratify, confirm, and adopt and join the" Macondo Operating Agreement on or about December 17, 2009, after the MMS approved BP's initial EP for the Macondo Well and after the MMS approved BP's drilling permit for the Macondo Well. The BP Parties deny the remaining allegations of this paragraph.

251.    The Operating Agreement defined the roles and responsibilities of the three joint leaseholders, including a series of checks and balances regarding health, safety, and environment issues in which the non-operational leaseholders Anadarko, Anadarko E&P, and MOEX Offshore were to receive significant information from BP regarding those issues and had the right to demand further information, as well as to call for meetings on those subjects and conduct their own inspections of the Deepwater Horizon vessel.

**<u>ANSWER:</u>**

The BP Parties admit that the Macondo Operating Agreement defines the rights and obligations of BP Exploration & Production Inc., Anadarko, Anadarko E&P, and MOEX Offshore 2007 LLC with respect to the Macondo Prospect. The BP Parties further admit that the Macondo Operating Agreement allowed Anadarko, Anadarko E&P, and MOEX Offshore 2007 LLC access to certain information about health, safety, and the environment, as specified in the Macondo Operating Agreement and its exhibits. The BP Parties further admit that the Macondo Operating Agreement provides that, "[a]ny Party may call a meeting," and that, "[e]xcept as otherwise provided in Article 6.3(b) *(Default)* in Exhibit 'F,' each Participating Party shall have access to all drilling rigs . . . to observe and inspect operations and wells in which it participates . . . ." The BP Parties deny the remaining allegations of this paragraph.

252.    As a condition to acquiring their leasehold interests in the Macondo prospect, BP required Anadarko, Anadarko E&P, and MOEX Offshore to execute BP's well plan and Authorizations for Expenditure (AFEs) for Macondo. This put Anadarko, Anadarko E&P, and MOEX Offshore on notice of the following relevant provisions of that well plan: (a) location; (b) the anticipated time necessary to conclude the operation; (c) total depth and target zones; (d) the proposed drilling and completion plans, including the casing program and directional details; (e) details of all coring, logging, and other evaluation operations conducted; (f) information about

the drilling rig to be used.  The AFEs informed Anadarko, Anadarko E&P, and MOEX Offshore about the financial aspects of the well plan.

**ANSWER:**

The BP Parties admit that the November 18, 2009 Lease Exchange Agreement between BP Exploration & Production Inc. and MOEX Offshore 2007 LLC provided that, "MOEX shall execute and deliver to BP an executed copy of Exhibit 'C', the Macondo Well Plan and AFE . . . ."  The BP Parties further admit that, on or about December 17, 2009, BP Exploration & Production Inc., Anadarko, and Kerr-McGee Oil & Gas Corporation entered into a Macondo Prospect Well Participation Agreement Deepwater Gulf of Mexico, which provides that, "Anadarko shall execute and deliver to BP a copy of Exhibit B, the Macondo Well Plan and Authorization for Expenditure . . . ."  The BP Parties further admit that the Well Plan and Authorization for Expenditure disclosed information about the Macondo Well, including (a) location; (b) anticipated time necessary to conclude the operation; (c) proposed total depth and horizon (formation/prospect); (d) the proposed drilling and completion plans, including the casing program and directional details; (e) details of planned and optional coring, logging, and other evaluation operations; and (f) information about the drilling rig to be used.  The BP Parties deny the remaining allegations of this paragraph.

253.    The Operating Agreement also granted Anadarko, Anadarko E&P, and MOEX Offshore the rights to suggest their own proposed well plans for drilling exploratory and appraisal wells within the Macondo prospect, to place their own personnel on key drilling and well development teams, to receive substantial information and data about operations (including Insite real-time well data) on an ongoing basis, to call meetings with BP and other parties regarding any aspect of the Macondo prospect, and the right of unanimous approval of all press releases regarding the prospect.

**ANSWER:**

The BP Parties admit that the Macondo Operating Agreement provides that, "[a]ny Party may propose drilling an Exploratory Well within the Contract Area by giving notice of the

proposal (along with the associated AFE and Well Plan) to the other Parties," that, "[i]f an Exploratory Well is abandoned due to the conditions described under Article 10.1.4(b), then any Participating Party in the abandoned Exploratory Well may, within thirty (30) days after abandonment of that Exploratory Well, propose the drilling of a substitute well for the abandoned Exploratory Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Participating Parties in the abandoned Exploratory Well," that "[a]fter the conclusion of Exploratory Operations, any Party may propose drilling an Appraisal Well by giving notice of the proposal (along with the associated AFE and Well Plan) to the other Parties," and that "[i]f an Appraisal Well is abandoned due to the conditions described under Article 11.1.4(b), then any Participating Party in the abandoned Appraisal Well may, within thirty (30) days after abandonment of that Appraisal Well, propose the drilling of a substitute well for the abandoned Appraisal Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Participating Parties in the abandoned Appraisal Well . . . ."   The BP Parties further admit that the Macondo Operating Agreement gives Anadarko, Anadarko E&P, and MOEX Offshore 2007 certain rights to participate in a "Feasibility Team" and a "Project Team," as those terms are defined in the Macondo Operating Agreement.   The BP Parties further admit that the Macondo Operating Agreement allows Anadarko, Anadarko E&P, and MOEX Offshore 2007 the right to receive substantial information and data about operations (including Insite real-time well data) under terms specified in the Macondo Operating Agreement.  The BP Parties further admit that the Macondo Operating Agreement provides that, "[a]ny Party may call a meeting," and that, "[e]xcept as otherwise provided in Article 6.3(b) *(Default)* in Exhibit 'F,' each Participating Party shall have access to

all drilling rigs . . . to observe and inspect operations and wells in which it participates . . . ." The

BP Parties deny the remaining allegations of this paragraph.

254.    Moreover, a November 2009 amendment to the Operating Agreement gave Anadarko, Anadarko E&P, and MOEX Offshore the right to conduct "health, safety, and environmental inspection[s]" with a "right of access to activities and operations" on the rig, as well as to access BP's files, audits, and statistics on health, safety, and environmental issues.

**ANSWER:**

The BP Parties deny that there was a November 2009 amendment to the Macondo

Operating Agreement, and therefore deny the allegations of this paragraph.

**E.      Reckless Decision-Making in the Rush to Complete the Well**

255.    The Deepwater Horizon was a $560,000,000 dynamically-positioned, semi-submersible deepwater drilling vessel built for Transocean and put into service in February 2001.

**ANSWER:**

The BP Parties admit that the *Deepwater Horizon* was a dynamically-positioned, semi-

submersible deepwater drilling vessel built for and delivered to R&B Falcon, a predecessor of

Transocean Holdings LLC, in February 2001.  The BP Parties deny the remaining allegations of

this paragraph.

256.    At all times relevant herein, the Deepwater Horizon was owned by Transocean and leased to BP for drilling exploratory wells at the Macondo prospect site, pursuant to the December 9, 1998, Drilling Contract between Vastar Resources, Inc. and R&B Falcon Drilling Co. for RBS-8D Deepwater Horizon ("Drilling Contract"), and later amendments to that agreement.[4]

---

[4]      The parties to the 1998 Drilling Contract, Vastar Resources, Inc. and R&B Falcon Drilling Co., are now BP and Transocean entities, respectively.  The Deepwater Horizon, formerly known as RBS-8D, was in the process of being built for R&B Falcon Corp. between 1998 and 2001, during which time Transocean purchased R&B Falcon Corp.  Upon completion, the Deepwater Horizon was delivered to Transocean.  BP America is a successor-in-interest to Vastar Resources, Inc.  Amendments to the Drilling Contract were subsequently signed by representatives of Transocean and BP.

**ANSWER:**

The BP Parties admit that a Drilling Contract was originally executed between Vastar Resources Inc. and R&B Falcon Drilling Co. on December 9, 1998, which was later amended. The BP Parties further admit that one or more Transocean affiliates owned the *Deepwater Horizon* at all relevant times.  The BP Parties deny the remaining allegations of this paragraph.

257.    Prior to the Spill, Drilling Defendants had actual and/or constructive knowledge that their safety performance during offshore drilling operations was poor.  Transocean CEO Steven L. Newman admitted prior to the Spill that "we have to improve our safety performance." Just a month before the Spill, in response to "a series of serious accidents and near-hits within the global organization," Transocean commissioned a broad review of the safety culture of its North American operations, including the Deepwater Horizon.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

258.   Also prior to the Spill, Drilling Defendants had actual and/or constructive knowledge of significant problems related to the Deepwater Horizon's equipment and maintenance, including problems with the vessel's BOP, electronic alarm systems, ballast systems used to stabilize the vessel in the water, and other significant deficiencies that could "lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment."   These equipment and maintenance problems are discussed more fully below.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.   The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

259.   Even if Drilling Defendants' equipment and operations inspection reports were ostensibly in compliance with MMS regulations, reports have surfaced that oil companies often authored their own inspection reports, submitting them for rubber-stamping by the MMS.   Thus any seeming compliance with MMS inspection report regulations lacks credibility and does not protect Drilling Defendants' actions.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

**F.      Premature and Nonstandard Mud Displacement Begins**

260.    The Macondo prospect site is in the Northern Gulf of Mexico, an area notorious in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak, brittle rock formations.  At the Macondo site, the Deepwater Horizon was conducting drilling operations in excess of 18,000 feet.  Drilling Defendants knew or should have known that the threat of blowouts increases as drilling depths increase, especially in an area with such troublesome geology as the Northern Gulf of Mexico.

**ANSWER:**

The BP Parties admit that the Macondo Prospect is in the Northern Gulf of Mexico and that the *Deepwater Horizon* drilled to a total depth of 18,360 feet at MC252 #1.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074,

the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

261.    Drilling Defendants had been struggling with the Macondo well even before the catastrophic events of April 20, 2010.  In emails weeks before the blowout, BP employees referred to it as a "crazy," "nightmare" well.  At depths almost 3.5 miles below the sea floor, the pressures within and strengths of the various formation layers the Deepwater Horizon was drilling through varied widely and changed often, requiring constant adjustments to drilling fluid density and other factors.  In some places the subsea rock formations were so brittle that they fractured, letting gallons of expensive drilling mud escape into the cracked and porous rock around the drill.

**ANSWER:**

The BP Parties admit that the text of the emails described in this paragraph speak for themselves, however the entire text of the documents should be considered.[5]  The BP Parties deny the allegations of this paragraph to the extent that they differ or deviate from the original documents quoted from.  The BP Parties deny the remaining allegations of this paragraph to the

---

[5] By referencing these emails, the BP Parties neither admit nor imply that the documents or the referenced statements are admissible into evidence and expressly reserve all objections to the use or admissibility of the documents or the referenced statements.

extent they are directed at the BP Parties or are inconsistent with the emails described in this paragraph.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

262.   Deepwater Horizon workers reported that since drilling began on October 7, 2009, they had struggled to control the problematic well, as kicks of natural gas regularly burst into the well, halting the drilling progress.  According to a NOAA Flow Rate Technical Group report, the hydrocarbon reservoirs the Macondo well drilled through have high ratios of gas to oil.  The MMS had even warned BP that the gas buildup in this well was a concern and that BP should "exercise caution."

**ANSWER:**

The BP Parties admit that a kick occurred at the Macondo Well on March 8, 2010.  The text of the April 6, 2010 MMS approval of BPXP's February 2009 Initial Exploration Plan and the NOAA Flow Rate Technical Group report speak for themselves.  The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the April 6, 2010 MMS approval of BPXP's February 2009 Initial Exploration Plan and the NOAA Flow Rate Technical Group report.  The BP Parties lack knowledge or

information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

263.    As the drilling schedule fell farther behind due to these and other problems, Drilling Defendants, and BP in particular, increased the pressure on the Deepwater Horizon's crew to "bump up" the speed of the drilling effort at Macondo.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

264.    On March 8, 2010, Drilling Defendants experienced serious problems with the well, including a hydrocarbon influx into the well and loss of well control.  The hydrocarbons leaking into the well went unnoticed for about 33 minutes, allowing 40 barrels of hydrocarbons to flow into the well before it was shut in to restore well control — a "near miss" of what could have been a lethal blowout.

**ANSWER:**

The BP Parties admit that on March 8, 2010 the Macondo Well experienced a kick, that influx from the reservoir went unnoticed for approximately 33 minutes, and that approximately 35-40 bbls was brought into the well before shutting in the well.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

265.    The March 8, 2010, influx was caused by damage to the formation the Deepwater Horizon was drilling through — the brittle rock fractured, swallowing up drilling tools and fluids, in addition to allowing hydrocarbons into the well.  A BP analysis of the March 8, 2010 near miss deemed the drilling vessel team's 33-minute response time to the hydrocarbon influx was too slow.  A "lessons learned" document was distributed to BP employees, and both BP and Transocean leaders on the Deepwater Horizon were given verbal feedback about the handling of the event.  Several key individuals who were present during the March 8, 2010 incident were also working on the Deepwater Horizon six weeks later at the time of the April 20, 2010, blowout.

**ANSWER:**

The BP Parties admit that on March 8, 2010, a kick occurred while drilling the Macondo Well, that the influx from the reservoir went unnoticed by the Transocean crew for approximately 33 minutes, and that certain key individuals who were present during the April 20, 2010 Incident were also on tour during the March 8, 2010 well control event.  The text of the BP engineering analysis and "lessons learned" documents speak for themselves.  The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties or are inconsistent with the BP engineering analysis and "lessons learned" documents.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

266.    The formation damage from the March 8, 2010, incident was so severe that a length of drilling pipe became stuck in the open hole of the well bore, and Drilling Defendants were forced to abandon the lower part of the well bore, plug it with cement, and begin drilling anew in a different direction, setting then back several days and $25 million.  According to Mike Williams, a Transocean electronics technician on the Deepwater Horizon, it also caused BP and the other Drilling Defendants to further increase their demands that the drilling vessel's crew complete drilling operations at the well at a dangerously increased pace.

**ANSWER:**

The BP Parties admit that as a result of the March 8, 2010 kick drill pipe became stuck and the lower part of the wellbore was abandoned.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties, including allegations that the BP Parties increased demands which caused the crew to complete drilling operations at the well at a dangerous pace.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and

Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with Document Nos. 2074, 2075, 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2082, and therefore deny those remaining allegations.

267.   Pursuant to their Drilling Contract, BP was paying Transocean approximately $500,000 per day to lease the Deepwater Horizon, not including contractors' fees.  BP had planned for the drilling work at Macondo to take 51 days, at a cost of approximately $96,000,000.

**ANSWER:**

The BP Parties admit that the combination of costs incurred under the Drilling Contract with Transocean including day rate charges, day labor rate charges and other charges, totaled approximately $500,000 per day.  The BP Parties deny the remainder of the allegations of this paragraph.

268.   At the time of the blowout, drilling at Macondo was already months behind schedule, costing BP over $1 million per day in vessel lease and contractor fees and putting them increasingly over budget.  This excess cost put the Macondo project in conflict with BP's recent mandate of a 7% reduction in costs for all of its drilling operations in the Gulf of Mexico.  In spite of the difficult and dangerous nature of the Macondo well, Drilling Defendants made multiple decisions about the drilling plan for economic reasons, even though those decisions increased the risk of the catastrophic failure of the "nightmare" well.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

269.    After investigating the disaster, Robert Bea, an oil industry expert leading the Deepwater Horizon Study Group, wrote: "Pressures to complete the well as soon as possible and minimize costs as much as possible are evident in the cascade of decisions and choices that led to the blowout."

**ANSWER:**

The BP Parties admit that Robert Bea, a Professor at the University of California, Berkeley wrote the above quoted language in an article published by the Deepwater Horizon Study Group[6].  The BP Parties deny the remaining allegations of this paragraph.

270.    Drilling Defendants repeatedly chose to violate industry guidelines and government regulations, and ignore warnings from their own employees and contractors on the Deepwater Horizon to reduce costs and save time on the behind-schedule and over-budget Macondo well.  Testimony of employees on the drilling vessel highlights the time pressure BP and the other Drilling Defendants were putting on workers as they rushed them to double up on tasks and finish quickly so the well could be sealed and the Deepwater Horizon moved to another well prospect site to begin searching for even more oil.

---

[6] By referencing the Deepwater Horizon Study Group or Robert Bea, the BP Parties neither admit nor imply that their documents or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

271.    This emphasis on speed and thrift over safety led to errors and omissions by Drilling Defendants which, in turn, caused and/or contributed to the blowout and the subsequent Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties, including that the BP Parties placed an emphasis on speed and thrift over safety.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party

Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

### G.   The Well Fails Key Pressure Tests, Yet Drilling Defendants Press On

272.   By April 9, 2010, Drilling Defendants had finished drilling the last part of the well bore, after which only casing and cementing the final open-hole section remained. In their rush to complete the well, Drilling Defendants made reckless decisions about well design, cementing, and well integrity testing that prioritized speed and cost-savings over safety and industry best practices.

**ANSWER:**

The BP Parties admit that on April 9, 2010 the well was drilled to its final depth. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document

Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

273.   Since the Spill, a series of governmental investigations and hearings has gradually produced evidence and testimony about the bad decisions, tradeoffs, actions, and inactions that led to this disaster, revealing a "ghastly" story of Drilling Defendants making "one bad call after another," according to the chairmen of the presidential commission investigating the Spill at a November 10, 2010 hearing.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

274.   In short, as Robert Bea put it, "critical things were compromised for the wrong reasons in the wrong ways at the wrong times."

**ANSWER:**

The BP Parties admit that Robert Bea stated the above quoted language.[7]  The BP Parties

deny the remaining allegations of this paragraph.


275.   "Each company is responsible for one or more egregiously bad decisions" in "a
suite of bad decisions," many still inexplicable, involving tests that were poorly run, alarming
results that were ignored, proper warning systems that were disabled and safety barriers that
were removed prematurely at the high-pressure well, the presidential commission chairmen said.
Taken together, these actions constituted "a cascade of deeply flawed failure and signal analysis,
decision-making, communication, and organizational-managerial processes" that led to the
blowout, in the words of the independent experts in the Deepwater Horizon Study Group.

**ANSWER:**

The BP Parties admit that the Deepwater Horizon Study Group published a paper with

the above quoted language.[8]  The BP Parties admit that loss of well control was the result of a

complex and interlinked series of mechanical failures, human judgments, engineering design,

operational implementation and team interactions.   The BP Parties deny the remaining

allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.

The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-

Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in

Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against

Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against

Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the

remaining allegations of this paragraph to the extent they are alleged by one or more of the BP

---

[7] By referencing the statements of Robert Bea, the BP Parties neither admit nor imply that the referenced statement
is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the
referenced statement.

[8] By referencing the Deepwater Horizon Study Group, the BP Parties neither admit nor imply that their documents
or the referenced statement is admissible into evidence and expressly reserve all objections to the use or
admissibility of the document or the referenced statement.

Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

276.    Even BP has admitted that no one company's single action or inaction caused this disaster, but rather "a complex and interlinked series of mechanical failures, human judgments, engineering design, operational implementation and team interfaces" by "multiple companies, work teams and circumstances" came together to cause the blowout and the Spill.  Deepwater Horizon Accident Investigation Report, BP (September 8, 2010).

**ANSWER:**

The BP Parties admit that the Deepwater Horizon Accident Investigation Report, published by BP's Internal Investigation Team, the text of which speaks for itself, contains certain of the above quoted language.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

**2.      Cutting Corners on Well Design**

277.    For the behind-schedule and over-budget Macondo well, Drilling Defendants chose a vulnerable well design with relatively few barriers against the ever-present risk of hydrocarbon blowouts because the safer option — which had been part of their original well design and was recommended by their contractors — would have taken longer to complete and would have cost up to an additional $10 million.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

278.    In keeping with Macondo's intractable nature, the last section of the well had been difficult to drill because of the narrow margin between the minimum pressure needed to keep the hydrocarbons in the surrounding reservoirs from leaking into the well, and the maximum pressure the rock formations themselves could take before fracturing and causing damage, delay, or loss of well control.  The limited range of safe operating pressures in this last open-hole section of the well required careful choices to maintain well integrity and safety during the drilling and cementing processes.

**ANSWER:**

The BP Parties admit that drilling in deepwater Gulf of Mexico wells requires careful choices to maintain well integrity and safety during all drilling and cementing operations.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

279.    In order to strengthen the well design and provide multiple barriers against blowouts, drilling companies often use a redundant casing design called a "liner/tieback," which provides four barriers against blowouts, while the "long string" casing design chosen by BP only provided two: the cement sealing off the hydrocarbons in the reservoirs from entering the well and, more than 18,000 feet above that, the seal assembly at the top of the well.

**ANSWER:**

The BP Parties admit that they chose a "long string" casing design for the Macondo Well.

The BP Parties deny the remaining allegations of this paragraph.

280.    Although the liner/tieback design is more expensive and takes more time to install, it provides four barriers against hydrocarbons leaking into the well and causing blowouts: (1) the cement at the bottom of the well; (2) the hanger that attaches the liner pipe to the existing casing in the well; (3) the cement that secures the tieback pipe on top of the liner; and (4) the seal assembly at the wellhead.

**ANSWER:**

The BP Parties admit that liner, liner with a tieback, and long string production casing designs all provide multiple barriers to flow and that all are commonly used in the Gulf of Mexico.  The BP Parties deny the remaining allegations of this paragraph.

281.    Drilling Defendants were aware that the long string design was the riskier option. An undated BP "Forward Review Plan" recommended against the long string option because of the risks: "Long string of casing *was* the primary option" but a "Liner[/Tieback] … is now the recommended option."

**ANSWER:**

The BP Parties admit that the April 13, 2010 "MC 252 #1 (Macondo) TD Forward Review Plan: Production Casing & TA Options" ("Forward Review Plan"; BP-HZN-2179MDL00252084) stated that "Long string of 9-7/8" x 7" casing *was* the primary option." The BP Parties additionally admit that the Forward Review Plan also stated that "7" Liner (with 7" x 9-7/8 XO x 11-7/8" Versaflex hanger) is now the recommended option.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or

liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

282.    The BP Forward Review Plan identified several arguments against using the long string casing design, including the high risk of a failed cement job, the inability to comply with MMS regulations, and the need to verify the cement job with a cement bond log test and most likely perform remedial cement job(s).

**<u>ANSWER:</u>**

The BP Parties admit there was a document called a Forward Review Plan, the text of which speaks for itself.  The BP Parties further admit that the Forward Review Plan indicates that "Long String of 9-7/8" x 7" casing *was* the primary option," but was changed to a 7" Liner, in part, because (a) "cement simulations indicate it is unlikely to be a successful cement job due to formation breakdown"; (b) "[u]nable to fulfill MMS regulations of 500' of cement above top HC zone (thought to be 17,803')"; (c) open annulus to wellhead, the HC zone(s) open to 9-7/8 "seal assembly as only barrier"; and (d) "potential need to verify with bond log, and perform remedial cement job(s) prior to TA.  Or obtain a BP dispensation."  ("Forward Review Plan";

BP-HZN-2179MDL00252084, at 9.)  The BP Parties deny that the plan to use a long string of 9-7/8" x 7" casing posed a high risk for a failed cement job, would have violated MMS regulations, would have required verification of the cement job with a cement bond log test, and would have required remedial cement job(s).  The BP Parties deny the remaining allegations of this paragraph to the extent that they are inconsistent with the contents of the Forward Review Plan.

283.    The BP Forward Review Plan also noted a number of advantages to using the liner/tieback design, including the liner hanger acting as an additional barrier against influxes, a higher chance for a successful cement job on the first try, and the flexibility to postpone a remedial cement job, if it was found that one was required.

**ANSWER:**

The BP Parties admit there was a Forward Review Plan, the text of which speaks for itself.  The BP Parties further admit that the Forward Review Plan states that the "'7' Liner . . . is now the recommended option" because (a) "[l]ess issue with it landing shallow (we can also ream it down)"; (b) "[l]iner acts as second barrier for HC in annulus"; (c) "[p]rimary cement job has slightly higher chance for successful cement lift due to lower ECD"; (d) "[r]emedial cement job, if required, easier to justify to be left for later."  The BP Parties deny that the Forward Plan stated "a number of advantages to using the liner/tieback design" including acting as an additional barrier against influxes, a higher chance for a successful cement job on the first try, and the flexibility to postpone a remedial cement job, if it was found that one was required.

284.    The long string casing design was especially inappropriate for a difficult and kick-prone well like Macondo.  Documents show that BP had originally planned to use the safer liner/tieback design, but rewrote the drilling plan just weeks before the disaster — against the advice of its contractors and its own employees — because the project was behind schedule and over budget.  Internal BP emails from late March 2010 acknowledged the risks of the long string design but chose it as the primary option because it "saves a lot of time…at least 3 days," "saves a good deal of time/money," and is the "[b]est economic case."

**ANSWER:**

The BP Parties admit that the text of the emails described in this paragraph speak for themselves.  The BP Parties deny the allegations of this paragraph to the extent that they concern the conduct or liability of the BP Parties or are inconsistent with the emails described in this paragraph.  The BP Parties further deny that the long string casing design "was especially inappropriate for a difficult and kick-prone well like Macondo."  The BP Parties additionally deny that the liner/tieback design is "safer" than the long string casing design and that they rewrote the drilling plan in the weeks leading up to the incident on April 20, 2010 "because the project was behind schedule and over budget."

285.    Despite the known and documented operational risks and advantages to the respective well design options, one or more of the Drilling Defendants chose (or acquiesced to the choice) to install the long string casing instead of the safer liner/tieback design. There is no evidence that there was any motivation behind that decision other than the desire to save time and cut costs on the behind-schedule and over-budget well.

**ANSWER:**

The BP Parties admit that the long string casing design was used at the Macondo Well. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in

Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

286.    Drilling Defendants also made a risky choice for the casing pipe material itself, using metal well casings that raised concerns from their own engineers.  Federal investigators cited internal documents showing that as early as 11 months prior to the blowout, BP engineers worried that the metal casings BP wanted to use might collapse under the high pressure at the bottom of the well.  Senior drilling engineer Mark E. Hafle warned other BP employees that "I have seen it happen so know it can occur."  Using the metal casings also violated BP's own safety policies and design standards.  Nevertheless, the riskier metal casings were used after special permission was granted by BP supervisors.  The internal reports do not explain why BP allowed for such a risky departure from its own safety standards, nor why the other Drilling Defendants allowed BP to use unsafe casings inappropriate for use in the highly pressurized environment in the Macondo well bore.

**<u>ANSWER:</u>**

To the extent the allegations contained in the paragraph are extracted from a document (and the BP Parties make no representation that there is in fact a document containing such language), the text of which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The

BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

287.   In addition to the casing-related problems, the Weatherford-manufactured float collar installed on the final section of casing may have failed to seal properly, which could have allowed hydrocarbons to leak into the casing, contributing to the April 20, 2010 blowout.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

288.   A float collar is a component installed near the bottom of the casing string on which cement plugs land during the cementing job.  A check-valve assembly fixed within the float collar works like a one-way valve, allowing drilling fluids or cement to be pumped in one direction through the valve, but preventing backflow of the fluids or cement when pumping is stopped, and preventing any influx of hydrocarbons below the float collar from rising farther up the casing.  Failure of the Macondo well's float collar would have allowed hydrocarbons to flow up through the casing, towards the riser and the Deepwater Horizon at the surface, contributing to the blowout and the subsequent explosions, fire, sinking, and Spill.

**ANSWER:**

The BP Parties admit that the float collar is a component that can be installed near the bottom of the casing and it is where cement plugs can land during the cement job.  The BP Parties further admit that the check valves can, once the auto-fill tube is ejected, allow fluids to be pumped down the casing while preventing the backflow of cement and wellbore fluids.  If the cement pumped by Halliburton failed to isolate the casing from the hydrocarbons and allowed flow of hydrocarbons up the shoe track, then a failure of the Macondo Well float collar to convert would allow hydrocarbons to flow up the casing, and toward the riser and the *Deepwater*

*Horizon*.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

289.    To properly prevent against backflow of fluids or hydrocarbons into the casing, a float collar must be "converted," or closed after installation.  Prior to conversion, an "auto-fill tube" holds the float collar's one-way check valves open so that mud can flow through without having to be pumped through with high force that could damage the formation –especially important when working in brittle formations like those at the bottom of the Macondo well.  A float collar is converted by partially blocking the bottom of the autofill tube, which essentially pops the autofill tube out of the check valves, allowing them to close.

**ANSWER:**

The BP Parties admit that an "auto-fill" float collar must be converted to allow the check valves to close before the float collar will prevent the backflow of drilling fluids into the casing. Before conversion, an "auto-fill tube" can hold check valves open so that mud can flow into the casing.  This minimizes the surge forces and can be important when running casing in Gulf of Mexico formations.  A float collar can be converted by ejecting the auto-fill tube, which allows the check valves to close.  The BP Parties deny the remaining allegations of this paragraph.

290.    Drilling Defendants installed the Macondo well's float collar after the final casing was installed in the well.  When they attempted to convert the float collar, however, there seemed to be some blockage preventing the mud circulation that would have completed the conversion.  The drilling vessel crew made nine attempts to re-establish circulation by increasing pressure in the casing, eventually succeeding with a pressure of 3142 psi — six times higher than the normal pressure needed to convert a float collar.  In their report, BP's disaster investigation team questioned whether this burst of high pressure actually converted the float collar, or just cleared the blockage that had been preventing circulation in the first place.

**ANSWER:**

The BP Parties admit that when Transocean attempted to convert the float collar, there appeared to be some blockage preventing the mud from circulating.  The Transocean crew made nine attempts to establish circulation by increasing the pressure and eventually succeeded in establishing circulation at a pressure of 3142 psi.  In its report, the BP Incident Investigation

Team stated that it was not clear whether this pressure converted the float collar or if it simply cleared a plugged shoe. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

291.   Later, vessel workers had to use another burst of abnormally high pressure to rupture a "burst disk" in one of the well's Weatherford-manufactured wiper plugs. The burst disk did not rupture until 2900 psi was applied — three times the amount of pressure usually required. The various post-Spill investigations have been unable to explain the need for such atypically high pressures to convert the float collar (if it even converted at all) and to rupture the burst disk. At the time they occurred, these anomalies should certainly have raised concern in the minds of Drilling Defendants' and Weatherford's personnel.

**ANSWER:**

The BP Parties admit that the Transocean crew ruptured the burst disk in the bottom Weatherford wiper plug at 2,900 psi. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

### 3.      Using Too Few Centralizers

292.   Drilling Defendants also cut corners — again despite multiple warnings from their employees and contractors — with the number of centralizers used on the last piece of casing pipe. Centralizers ensure that the casing pipe is centered in the well bore; if the pipe is not centered, the cement placed around it often fails to create a secure seal against the highly-pressurized hydrocarbons surrounding the well. The cement around the casing is intended to seal the space (the "annulus") between the rock walls of the drilled out well bore hole and the casing that runs through the well bore. If the casing is not centered within the wellbore, the pipe can lay near or against the sides of the bore hole, creating too narrow of a space for the cement to set properly and leaving "channels" of empty space or weak areas in the cement. Those channels and imperfections can allow hydrocarbons to escape out of the formations and into the well, causing a kick or a blowout. An email from shore-based BP Operations Vice President Brett Cocales to rig-based BP drilling engineer Brian Morel acknowledged the importance of

centralizers, noting that "[e]ven if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it."

**ANSWER:**

The BP Parties admit that centralizers can assist in centering casing pipe in the well bore. The cement pumped around the casing is intended to fill the annulus and seal the hydrocarbons from entering the casing. If the casing is not centered, it can lay near or against the sides of the bore hole. An email from Brett Cocales to Brian Morel stated that "[e]ven if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it." The BP Parties further admit that centralization was not causal to the Incident, and that all evidence indicates that flow was down the annulus and up the casing across the well-centralized intervals. The BP Parties deny there was a causal link between the number of centralizers used and the Incident. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or

liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

293.    The American Petroleum Institute ("API") Recommended Practice 65 explains: "If casing is not centralized, it may lay [sic] near or against the borehole wall….It is difficult if not impossible to displace mud effectively from the narrow side of the annulus if casing is poorly centralized.  This results in bypassed mud channels and inability to achieve zonal isolation."

**ANSWER:**

The BP Parties admit that the API's Recommended Practice 65 - Part 2 states "If casing is not centralized, it may lay near or against the borehole wall.  Drilling fluid, washes, spacers and cement slurry flow most easily on the wide, less restricted side of the annulus.  It is difficult, if not impossible, to displace drilling fluid efficiently from the narrow side of the annulus if the casing is poorly centralized.  This results in bypassed mud channels, contaminated fluids and the inability to achieve zonal isolation."   The BP Parties deny the remaining allegations of this paragraph.

294.    On or about April 5, 2010, BP notified one or more of the other Drilling Defendants that it was planning to use only six centralizers on the final casing section at the Macondo well.  Halliburton engineer Jesse Gagliano spent a day running models to determine if six centralizers would be enough to prevent channeling that gaseous hydrocarbons could seep through.  Halliburton's analysis concluded that 21 centralizers was the recommended number to ensure a secure cement job; using ten would result in a "moderate" gas flow problem and using only six would result in a "severe" gas flow problem.  This information was provided to BP.  Additional centralizers were available on the Deepwater Horizon, but BP well site leaders erroneously believed they were the wrong type, and did not want to wait for more.  In the same email that had recognized the risks of proceeding with insufficient centralizers, BP official Brett Cocales shrugged off using only six, flippantly concluding, "who cares, it's done, end of story, will probably be fine."

**ANSWER:**

The BP Parties admit that they notified Halliburton and others that they planned to install six centralizers on the production casing.  Halliburton provided an OptiCem report to BP indicating that use of ten centralizers, as placed by Halliburton, would result in a Gas Flow

Potential value that correlated with a "moderate" gas flow problem. Halliburton also provided an OptiCem report to BP indicating that use of seven centralizers, as placed by Halliburton, would result in a Gas Flow Potential value that correlated with a "severe" gas flow problem. Additional centralizers were available on the *Deepwater Horizon*. Despite this revised OptiCem report, on April 28, 2010, Halliburton circulated a cement procedure containing its recommended cement plan and procedure for pumping the job. The BP Parties admit that in an email, Brett Cocales agreed with the decision to run six centralizers and stated that it would probably be fine and result in a good cement job: "But, who cares, it's done, end of story, will probably be fine and we'll get a good cement job. I would rather have to squeeze than get stuck above the WH. So Guide is right on the risk/reward equation." The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and therefore deny those remaining allegations.

295. Halliburton, hired for its cementing expertise, was fully aware that the number of centralizers BP chose to use was unsafe. Halliburton employee Marvin Volek had warned the BP well site team that BP's cementing plan "was against our best practices." Yet even after running the models that made it clear proceeding with only six centralizers would lead to "failure of the cement job," Halliburton did not stop work or insist that BP use additional centralizers, instead recklessly proceeding with the cement job it knew was destined to fail.

**ANSWER:**

The BP Parties admit that Halliburton was hired for its cementing expertise and knew the number of centralizers that BP had selected to install on the production casing days before the cement job.  On April 18, 2010, Halliburton circulated a cement procedure containing its revised OptiCem report using less centralizers and a recommended cement plan and procedure for pumping the job.  Halliburton did not stop work or insist that BP install additional centralizers on the production casing.  Instead, Halliburton proceeded with the cement job on April 19, 2010.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and therefore deny those remaining allegations.

### 4.	Skipping Critical "Bottoms Up" Mud Circulation

296.	Another questionable decision made by one or more of the Drilling Defendants was the failure to fully circulate the drilling mud through the entire length of the well before beginning the cementing job.  This procedure, known as "bottoms up," cleans the well bore and prepares the annular space for cementing by completely circulating the drilling fluids from the bottom of the well all the way to the surface.  A bottoms up circulation also ensures the removal of well cuttings and other debris from the bottom of the well, preventing contamination of the cement, permits a controlled release of gas pockets that may have entered the mud during the drilling process, and allows workers on the drilling vessel to test the mud for influxes of gas. Given that gaseous hydrocarbons leaking into the well was what ultimately caused the blowout, a

bottoms up circulation could have revealed the severity of the situation at Macondo before it was too late.

**ANSWER:**

The BP Parties admit that circulation of one-and-a-half "bottoms up" was performed on April 16, 2010 before the cement job.  Circulation, including circulation of "bottoms up," can clean the wellbore and prepare the annular space for cementing.  A "bottoms up" circulation is commonly understood as the volume of fluid to circulate drilling fluids from the bottom of the well to the surface.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent not addressed in Document Nos. 2074, 2075, and 2082, and therefore deny them.

297.    The API guidelines recommend a full bottoms up circulation between installing the casing and beginning a cementing job.  The recommended practice states that "when the casing is on bottom and before cementing, circulating the drilling fluid will break its gel strength, decrease its viscosity and increase its mobility.  The drilling fluid should be conditioned until equilibrium is achieved.  At a minimum, the hole should be conditioned for cementing by circulating 1.5 annular volumes or one casing volume, whichever is greater."

**ANSWER:**

The BP Parties admit that API Recommended Practice 65 – Part 2, the text of which speaks for itself, states "when the casing is on bottom and before cementing, circulating the drilling fluid will break its gel strength, decrease its viscosity and increase its mobility."  API Recommended Practice 65 – Part 2 further states "The drilling fluid should be conditioned until equilibrium is achieved . . .  At a minimum, the hole should be conditioned for cementing by circulating 1.5 annular volumes or one casing volume, whichever is greater."  The Special Notes to API Recommended Practice 65 – Part 2 caution that "API standards are published to facilitate the broad availability of proven, sound engineering and operating practices.[9]  These standards are not intended to obviate the need for applying sound engineering judgment regarding when and where these standards should be utilized.  The formulation and publication of API standards is not intended in any way to inhibit anyone from using any other practices."  The BP Parties deny the remaining allegations of this paragraph.

298.   Halliburton technical advisor Jesse Gagliano told BP that Halliburton's "recommendation and best practice was to at least circulate one bottoms up on the well before doing a cement job."  Yet again, Halliburton knew of the risk but did not insist that BP follow safe and recommended practices.

**ANSWER:**

The BP Parties admit that Jesse Gagliano was the Halliburton technical advisor assigned to be a member of the Macondo Well team.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-

---

[9] By referencing the API Recommended Practices, the BP Parties neither admit nor imply that the document or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and therefore deny those remaining allegations.

299.    Even BP's own April 15, 2010 operations plan for the Deepwater Horizon called for a full "bottoms up" procedure to "circulate at least one (1) casing and drill pipe capacity, if hole conditions allow."

**ANSWER:**

The BP Parties admit that one version of the drilling program for the production interval dated April 15, 2010 states:  "Circulate at least one (1) casing and drill pipe capacity, if hole conditions allow."  The BP Parties deny the remaining allegations of this paragraph.

300.    But a full bottoms up circulation would have taken up to 12 hours on the deep Macondo well, so against the recommendations of the API and Halliburton, and against industry standards and its own operations plan, BP chose to save time and money at the expense of safety by circulating only a small fraction of the drilling mud before beginning cementing.  This too put the cement job further at risk.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

301.     Notwithstanding all of Drilling Defendants' risky choices and skipped safety precautions up to this point, and despite knowing the risks of using insufficient centralizers and skipping the bottoms up circulation, Halliburton began the cementing job on the Macondo well.

**ANSWER:**

The BP Parties admit that Halliburton was aware of the number of centralizers installed on the production casing and the amount of circulation performed before it pumped the cementing job on the production interval.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent not addressed in Document Nos. 2074, 2075, and 2082, and therefore deny them.

**5.       Cementing:  the Incorrect Cement Mixture and a Failed Seal**

302.     Creating solid cement seals on a well is delicate, precise work, and among the most critical tasks to ensure the integrity and safety of the well.  Nevertheless, after cutting corners on well design and the number of centralizers, and incomprehensibly skipping the bottoms up circulation, Drilling Defendants made even more cost-cutting, careless decisions about the crucial cementing work in the Macondo well.

**ANSWER:**

The BP Parties admit that proper cement seals are important to the integrity and safety of the well.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent not addressed in Document Nos. 2074, 2075, and 2082, and therefore deny them.

303.    Drilling Defendants knew or should have known that poor cementing increases the risk of a blowout.  In a 2007 study, the MMS expressed concerns about drilling vessel blowouts caused by ineffective and/or improper cementing work.  Although the study noted that the overall risk of blowouts has been declining, it suggested that blowouts related to cementing work continue with some regularity, and most frequently in the Gulf of Mexico.  The study found that cementing problems were associated with 18 of 39 blowouts that occurred between 1992 and 2006, and in 18 of the 70 blowouts that occurred from 1971 to 1991.  Nearly all of the blowouts examined occurred in the Gulf of Mexico.

**ANSWER:**

The BP Parties admit that the MMS released a study in 2007 linking blowouts to cementing work, the text of which speaks for itself.  The 2007 study expressed concerns about blowouts caused by ineffective and/or improper cementing work.  Although the study noted that the overall risk of blowouts has been declining, it reported that blowouts related to cementing

84

continue in the Gulf of Mexico.  The study found that cementing problems were associated with 18 of 39 blowouts that occurred between 1992 and 2006, and in 18 of the 70 blowouts that occurred from 1971 to 1991.  Many of the blowouts examined occurred in the Gulf of Mexico.[10] The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

304.    Drilling Defendants also knew or should have known that careless, ineffective, negligent, or reckless cementing work by Halliburton caused an August 2009 blowout at the Montara well in the Timor Sea off the coast of Australia.  During that incident, a sequence of events almost identical to those at Macondo led to a similarly disastrous blowout, and a spill that gushed oil for ten weeks, causing environmental damage across a 200-mile radius.

---

[10] By referencing the 2007 MMS study, the BP Parties neither admit nor imply that the document or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

**ANSWER:**

The BP Parties admit that in August of 2009 the Montara Well experienced a blowout, and that Halliburton was involved in cementing operations at the well.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

305.    Prior to beginning cementing operations on the last section of the Macondo well, Halliburton had to make decisions about the type, volume, placement, and pumping of the cement, while taking into account the narrow range of safe operating pressures at the bottom of the well, in addition to the gaseous nature of the hydrocarbon reservoirs surrounding the well.[11] Halliburton also knew that BP had not properly prepared the annulus for the cement job by performing a bottoms up circulation, and that BP was not planning to use the recommended number of centralizers on the casing pipe.

---

[11]    The ratio of gas to oil in the hydrocarbon reservoirs is significant because it increases the likelihood that gas will permeate the cement as it is setting, channeling and weakening the cement, and preventing it from forming a secure seal against hydrocarbon pressure.

**ANSWER:**

The BP Parties admit that Halliburton was responsible for designing the cement program, including the type, volume, placement and pumping of the cement and other fluids.  Halliburton was required to take into account the well conditions when designing the cement program. Before pumping the cement job, Halliburton was aware that BP had installed six centralizers on the production casing and the planned volume of circulation.  The BP Parties further admit that centralization was not causal to the Incident, and that all evidence indicates that flow was down the annulus and up the casing across the well-centralized intervals.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and therefore deny those remaining allegations.

306.    This cementing job was intended to fill the annulus between the casing and the well bore and seal off the hydrocarbon-filled formations, as well as plug the bottom of the casing pipe to prevent an influx.  The composition of the cement mixture ("slurry") that Halliburton chose for the task would have to allow the cement to be effectively placed and fully set within the narrow range of safe operating pressures at the bottom of the well.  During placement, the slurry would have to be light enough to avoid fracturing the brittle formations surrounding the well, but once set, the slurry would have to be strong enough to resist the intense, nearly 12,000 psi pressure of the hydrocarbon reservoirs within those formations, securely sealing the annular space between the casing and surrounding formations, isolating the hydrocarbon reservoirs from the well.  Despite these challenges, Drilling Defendants, including BP and Halliburton,

improperly designed the cement slurry and failed to thoroughly conduct and/or review the results of laboratory testing of the cement slurry stability under conditions that would be found in the Macondo well.

**ANSWER:**

The BP Parties admit that the purpose of the Halliburton cement job was to fill the annulus between the casing and the wellbore with cement and seal off the hydrocarbons from entering the casing. The BP Parties further state that Halliburton was responsible for designing the cement program with consideration of the well conditions to achieve this result. Halliburton improperly designed the cement slurry and failed to conduct and/or review laboratory testing of the cement slurry stability. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

307.    Halliburton ultimately recommended a foamed cement mixture to seal the bottom of the Macondo well. Foam cement is cement that has been injected with nitrogen gas to lower

its density.  But high temperatures and pressures in wells like Macondo can have unpredictable effects on the nitrogen in the cement, leading to instability and weakness that prevents the cement from forming a secure seal in the well.

**ANSWER:**

The BP Parties admit that Halliburton recommended a foamed cement for the production interval cement job.  Foam cement is cement that has been injected with nitrogen gas to lower its density.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and therefore deny those remaining allegations.

308.    On October 28, 2010, Fred Bartlitt, Jr., the lead investigator for the presidential commission investigating the Spill, reported that tests conducted by Halliburton in February 2010 on a cement slurry similar to that used to secure the Macondo well showed instability under conditions like those found at the bottom of the Macondo well.

**ANSWER:**

The BP Parties admit that on October 28, 2010, Fred Bartlit, Jr. wrote a letter reporting that tests conducted by Halliburton in February 2010 indicated that the foam slurry design tested was unstable.[12]  The BP Parties deny the remainder of this paragraph.

309.   Halliburton and BP already knew the Macondo well was located in brittle, variable, challenging rock formations laced with volatile high temperature, high pressure, gaseous hydrocarbon reservoirs that had plagued drilling operations in the past.   Using Halliburton's recommended cement mixture in Macondo's rock formations was "a recipe for disaster," Robert Bea told the *Washington Post*.

**ANSWER:**

The BP Parties admit that Robert Bea stated the above quoted language.[13]  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and therefore deny those remaining allegations.

---

[12] By referencing the statements of Fred Bartlit, Jr., the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

[13] By referencing the statements of Robert Bea, the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

310.     The presidential commission's investigators asked Halliburton to provide them with samples of materials like those used at the Macondo well; independent testing of those samples could not generate stable foam cement in the laboratory using the materials provided by Halliburton, which, according to Bartlit, strongly suggests that the foam cement used at Macondo was unstable during that cement job as well.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.[14]

311.     Independent tests conducted for BP's investigation of the disaster were also unable to generate a stable slurry using a mixture as similar as possible to Halliburton's slurry in conditions like Macondo's.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

312.     Prior to using its slurry mixture in the Macondo well, Halliburton conducted at least four foam stability tests on it, or on similar formulations, but the tests were incomplete and substandard, and mostly indicated the slurry would not be stable in the Macondo well.

**ANSWER:**

The BP Parties admit that Halliburton conducted at least four foam stability tests for the production interval cement job. The results from these tests indicate that the slurry was not stable. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

313.     In February 2010, Halliburton conducted the first two tests on a cement slurry that was slightly different than that ultimately used; both tests indicated that this foam slurry design was unstable if used in Macondo conditions. According to Bartlit's report, Halliburton provided the results of the February testing to BP by e-mail on March 8, 2010.

---

[14] By referencing the statements of Fred Bartlit or the Presidential Commission report, the BP Parties neither admit nor imply that the referenced documents or statements are admissible into evidence and expressly reserve all objections to the use or admissibility of the documents or the referenced statements.

**ANSWER:**

The BP Parties admit that, in February 2010, Halliburton conducted two foam stability tests on a cement slurry that was slightly different than that which was ultimately used.  The results of the tests indicated that this foam slurry design was unstable.  The Chief Counsel's report speaks for itself.[15]  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

314.    Halliburton conducted two other foam stability tests in April 2010, this time using the actual slurry mixture and design ultimately used in the Macondo well.  On April 13, seven days before the blowout, testing indicated the foam slurry design was unstable.  Bartlitt reports that the results of this test were reported internally within Halliburton by at least April 17, 2010.  In a second April test, Halliburton modified the testing procedure and the data indicated, for the first time, that the foam slurry mixture would be stable if used at Macondo.  It is not clear if BP received the results of either of the April tests from Halliburton before it allowed Halliburton to begin cementing.

**ANSWER:**

The BP Parties admit that Halliburton conducted at least two foam stability tests in April 2010.  The results of the April 13, 2010 testing indicates that the foam slurry design was unstable.  Fred Bartlit stated "We believe that its personnel conducted the first of these two tests on or about April 13, seven days before the blowout.  Lab personnel used slightly different lab protocols than they had used in February.  Although there are some indications that lab personnel may have conducted this test improperly, it once again indicated that the foam slurry design was unstable.  The results of this test were reported internally within Halliburton by at least April 17, though it appears that Halliburton never provided the data to BP.[16]"  The BP Parties deny the

---

[15] By referencing the Chief Counsel's report, the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

[16] By referencing the statements of Fred Bartlit, Jr., the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

315.    Oil industry expert Robert Bea told the Washington Post that drillers will often run one test on a proposed cement mixture, then a second test as a backup.  Bea considered Halliburton's four tests "unusual… [T]hat's telling me they were having trouble getting to a stable design."

**ANSWER:**

The BP Parties admit that Robert Bea is quoted as having stated the above language.[17]

The BP Parties deny the remaining allegations of this paragraph.

316.    Despite the four tests Halliburton did run on the slurry mixture, the testing was not comprehensive, thorough, or consistent with industry standards.  For example, as BP's investigation team noted, Halliburton did not provide results for such commonly tested cement slurry parameters as fluid loss, free water, foam/spacer/mud compatibility, static gel strength transition time, zero gel time, or settlement.

**ANSWER:**

The BP Parties admit that the Deepwater Horizon Accident Investigation Report, published by BP's Internal Investigation Team stated that Halliburton's tests "did not include fluid loss, free water, foam/space/mud compatibility, static gel strength transition time, zero gel time or settlement."  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document

---

[17] By referencing the statements of Robert Bea, the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore deny them.

317.  Bartlitt reported to the presidential commission that, taken together, the Halliburton documents indicated that:

(a)  Only one of the four tests …. that Halliburton ran on the various slurry designs for the final cement job at the Macondo well indicated that the slurry design would be stable;

(b)  Halliburton may not have had — and BP did not have — the results of that test [showing stable results] before the evening of April 20, meaning that the cement job may have been pumped without any lab results indicating that the foam cement slurry would be stable;

(c)  Halliburton and BP both had results in March showing that a very similar foam slurry design to the one actually pumped at the Macondo well would be unstable, but neither acted upon that data; and

(d)  Halliburton (and perhaps BP) should have considered redesigning the foam slurry before pumping it at the Macondo well.

**ANSWER:**

The BP Parties admit that on October 28, 2010, Fred Bartlit, Jr. wrote a letter with the above quoted language.[18]  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore deny them.

318.  In addition to having seen slurry test results showing the instability of Halliburton's proposed cement mixture, BP was also aware of the incomplete, substandard nature of Halliburton's tests, which failed to provide results for several commonly tested parameters.  Nevertheless, BP did not insist that Halliburton reformulate its cement slurry or perform the missing standard tests before proceeding with this tricky and important final cement job.  Indeed, in its rush to complete the well, BP likely charged ahead having only ever seen

---

[18] By referencing the statements of Fred Bartlit, Jr., the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

Halliburton's first three slurry test reports – all of which indicated the cement would be unstable in the well.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and therefore deny those remaining allegations.

319.    Unstable foam cement slurry can result in nitrogen breakout, when bubbles of nitrogen create tiny holes in the cement as it is setting, leaving the cement porous and unable to form a seal against the hydrocarbon pressure.  Nitrogen breakout not only jeopardizes the foam cement itself, but can also contaminate the other types of cement it is pumped with, interfering with their proper placement and/or degrading their ability to form a secure seal.  Nitrogen breakout in the unstable foam slurry used at Macondo could have weakened the denser, non-foamed cement used to plug the very bottom of the last casing pipe, leaving it also unable to withstand the pressure of the hydrocarbons surrounding the well.

**ANSWER:**

The BP Parties admit that unstable foam cement slurry can result in nitrogen breakout.  Nitrogen breakout in the foam cement can also contaminate the other cement and interfere with their proper placement and/or degrading their ability to form a seal.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the

BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

320.    In addition to the formulation of the cement mixture, the volume of cement used is another factor in ensuring a successful cement job.  Halliburton used a small volume of cement for this last section of the Macondo well.  According to the interim report by the National Academy of Engineering ("NAE") scientists investigating the Spill, the concern with using a small volume of cement is "the potential for contamination of the entire slurry volume simply because less cement is present."  This was especially relevant at Macondo, where the high gas-to-oil ratio in the hydrocarbon reservoirs surrounding the well presented a risk of gas contaminating the cement during the setting process.

**ANSWER:**

The BP Parties admit that an interim report by the National Academy of Engineering ("NAE") states:  "One consideration in using a smaller volume is the potential for contamination of the entire slurry volume simply because less cement is present.[19]" ."  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

321.    The NAE panel also expressed concern that the flow rate Halliburton chose to use when pumping the cement into the well was too low to achieve "turbulent flow," a condition that helps push the mud out of the annulus during the cement placement.

**ANSWER:**

The BP Parties admit that an interim report by the National Academy of Engineering ("NAE") states:  "It is not clear that the flow rates used during cementing (which were kept low

---

[19] By referencing the NAE report, the BP Parties neither admit nor imply that this document or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

to avoid excess pressure at the bottom of the casing) were sufficient to achieve turbulent flow.[20]"
The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

322.    Given the extremely narrow range of safe operating pressures Drilling Defendants were faced with in this last section of the well, it was all the more important to monitor well flow during the cementing process, to ensure there were no indications of fluid loss or fracturing of the formations around the bottom of the well.  By monitoring the flow of drilling fluid out of the well as the cement is pumped in, it can be confirmed that every barrel of injected cement is associated with a barrel of drilling fluid flowing out of the well.  These "full returns" indicate that the cement is displacing mud from the annulus as planned.  If less mud flows out of a well than the amount of cement that is pumped in, fluid is being lost, most likely into fractures in the brittle formations.

**ANSWER:**

The BP Parties admit that monitoring the flow of drilling fluid out of the well as the cement is pumped in, it can be confirmed that each barrel of injected cement is associated with a barrel of drilling fluid flowing out of the well.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

323.    Although BP claimed there were full returns during the last cementing job at Macondo, Halliburton cementer Nathaniel Chaisson testified that there was no monitoring system in place that could have confirmed full returns during cementing operations.  Moreover, data presented to the congressional investigators by Halliburton cementer Vincent Tabler indicated that about 80 more barrels of cement were pumped into the well than barrels of mud that flowed out.  This fluid loss would indicate that the brittle formations at the bottom of the well had fractured during the cementing process, allowing fluids and cement to escape into the fissures in the rock, and ruining the cement job.  During its congressional testimony in

---

[20] By referencing the NAE report, the BP Parties neither admit nor imply that this document or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

September 2010, BP suggested that 50 barrels of the apparent fluid loss were due to compression of nitrogen in the cement.  Nevertheless, BP should have had a flow monitoring system in place during the cementing process, and any losses due to nitrogen compression should have been anticipated and compensated for during the interpretation of the flow monitoring data.

**ANSWER:**

The BP Parties admit that fluid loss during cementing can indicate that the formation has fractured, allowing fluids and/or cement to escape into the fissures in the rock.  The Transocean drillers and the Halliburton Sperry Sun mud loggers were responsible for monitoring the well at all times.  Halliburton pumped the cement job and indicated to BP that the cement job was pumped successfully with no lost returns.  Halliburton presented those findings at the morning meeting on April 20, 2010 to BP and the Macondo well contractors.  The *Deepwater Horizon* Joint Investigation Team performed a calculation that indicated a purported 80 barrels were lost.  During its testimony before Congress in September 2010, BP suggested that 50 barrels of purported fluid loss were due to compression of the nitrogen pumped with the cement.  The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

### 6.     Despite Red Flags, Drilling Defendants Skip Crucial "Bond Log" Test of Cement Integrity

324.    After having made risky choices on well design, casing choice, the number of centralizers, skipping the bottoms up circulation, and using an unstable cement slurry, all of which sharply increased the risk that the cement job would fail, BP then made the unfathomable decision to cancel the "cement bond log" test, which would have checked the integrity of the completed cement job by using an imaging tool to gauge the thickness of the cement, and to determine if the cement was properly bonded to the casing and the rock formations surrounding the well.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

325.    This decision was again contrary to BP's own original drilling plan, which included the cement bond log test.  Skipping the cement bond log was also contrary to BP's own internal standards, which do not consider full fluid returns a "proven cement evaluation technique," and furthermore require a cement bond log test if a well's cement design provides for less than 1000 feet of cement above the highest hydrocarbon layer — BP's Macondo plan only provided for 500 feet.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

326.    But despite its own drilling plan, internal standards, and the simulations predicting cement failure, and despite warnings from its contractors and its employees regarding the risk of cement failure due to well design and insufficient centralizers, BP again rewrote its drilling plan on the fly, cancelling the cement bond log test and turning back the team from Schlumberger Ltd. that had arrived on the drilling vessel specifically and solely to perform the test.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

327.    BP's only reasoning for skipping this absolutely critical and required test seems to have been a savings of approximately $128,000 and less than 12 hours of work.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

328.    Gordon Aaker, Jr., an engineering consultant hired by the Congressional committee investigating the disaster, testified that it was "unheard of" and "horribly negligent" not to perform a cement bond log test on a well using a single casing design like the Macondo's.

**ANSWER:**

The BP Parties admit that Gordon Aaker, Jr. stated the above quoted language to Congressional committee investigators.[21]  The BP Parties deny the remaining allegations of this paragraph.

329.    Moreover, skipping the test was a violation of MMS regulations, which require that a cement bond log test be conducted if there are indications of an inadequate cement job.  30 C.F.R. § 250.428.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

330.    Tommy Roth, a Halliburton Vice President of Cementing, also said BP should have conducted a cement bond log: "If the cement is to be relied upon as an effective barrier, the well owner must perform a cement evaluation as part of a comprehensive system integrity test." Yet on board the Deepwater Horizon, neither Halliburton nor any of the other Drilling Defendants called to stop work or otherwise insisted that BP run the cement bond log test before proceeding.

**ANSWER:**

The BP Parties admit that Tommy Roth stated the above quoted language to Congressional Committee staff.[22]  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document

---

[21] By referencing the statements of Gordon Aaker, Jr., the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

[22] By referencing the statements of Tommy Roth, the BP Parties neither admit nor imply that their documents or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

### 7.   The Casing Hanger Lockdown Sleeve: Another Skipped Safety Precaution

331.   As discussed above, the riskier long string well design Drilling Defendants chose for Macondo meant that there were only two barriers to a hydrocarbon blowout: Halliburton's cement job isolating the hydrocarbon reservoirs from the well and the seal assembly at the wellhead on the sea floor.  Given the insufficient number of centralizers, the failure to run a bottoms up mud circulation prior to cementing, and the results of Halliburton's and BP's own simulations, the risk of a failed cement job at Macondo was already high, making the strength and integrity of the seal assembly at the wellhead — the second and final barrier against a blowout — paramount.  Yet here again BP made a decision based on time and money rather than well, worker, and environmental safety: it did not deploy the casing hanger lockdown sleeve that would have prevented the wellhead seal from being broken by pressure from below, as it likely was on April 20, 2010.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20,

2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

332.    A casing hanger lockdown sleeve ties down the seal assembly at the top of a well, providing an extra layer of protection against a blowout, much like the wire cage over the cork on a champagne bottle.  During drilling, heavy mud counters the pressure from the hydrocarbons around the well, preventing their influx into the annulus and the casing.  Once the well is properly sealed, with the cement isolating the pressurized hydrocarbons from the well, the heavy mud is pumped out and replaced by less dense seawater.  Usually the casing hanger lockdown sleeve is deployed before the heavy drilling mud is pumped out of the well, so that it can offer an extra shield against any problems during and after the mud displacement process.

**ANSWER:**

The BP Parties admit that a casing hanger lockdown sleeve ties down the seal assembly at the top of a well, that during drilling, heavy mud can be used to counter the pressure from the formation around the well, and that once the well is sealed and hydrocarbons are isolated, mud is often pumped out and replaced by less dense materials for temporary abandonment.  The BP Parties deny the remaining allegations of this paragraph

333.    Contrary to industry standard, BP's plan was to deploy the casing hanger lockdown sleeve *after* the heavy mud had been displaced with seawater.  A well design expert at another major oil company expressed surprise at BP's choice to displace the mud before deploying the casing hanger lockdown sleeve, saying it was "not the norm."  BP had chosen to shake the champagne bottle with only a faulty cork — Halliburton's unsound cement job — standing in the way of disaster.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

### H.     Unorthodox Spacer Fluid Mixture and Volume Potentially Interfered with Pressure Tests and BOP Functionality

334.    BP and the other Drilling Defendants were so focused on speed that they could not even wait the 72 hours required for the cement job to fully set before pressing forward with the mud displacement.  Without the heavy drilling mud to counter the reservoir pressure, any hydrocarbon influx into the well could turn dangerous very quickly, with only comparatively light seawater blocking the path up through the well and the riser to the surface.  Given the danger of hydrocarbons springing through a faulty, unset cement job, Halliburton should not have permitted BP to begin mud displacement unless it was absolutely certain that its cement job had successfully isolated the hydrocarbon reservoirs and sealed the well, yet there is no evidence that Halliburton ever protested BP's premature mud displacement.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they

are not directed at the conduct or liability of the BP Parties and are not addressed in Document

Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

335.    Unlike Halliburton, Transocean officials did initially protest BP's displacement plan, getting into a "skirmish" with a BP official at a meeting about the drilling procedures.  But even so, Transocean never exercised its right to stop work on the well in protest of BP's unsafe plan, and indeed soon acquiesced to BP's desire to rush the mud displacement at Macondo.

**ANSWER:**

The BP Parties admit that Transocean never exercised its right to stop work on the

Macondo well due to the displacement procedure.  The BP Parties adopt and incorporate by

reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-

Claim and Third Party Complaint Against Transocean, which were served on all counsel on

April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent

they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the

remaining allegations of this paragraph to the extent they are inconsistent with the allegations in

Document Nos. 2074 and 2075.  The BP Parties deny the remainder of the allegations of this

paragraph.

336.    On the morning of April 20, 2010, the day of the blowout, BP informed M-I drilling fluid specialist Leo Lindner that the mud displacement would be more substantial than usual, displacing the top 8,367 feet of mud in the riser and drilling string, instead of the typical 300 feet.  In his congressional testimony, Lindner did not mention why BP was displacing almost 28 times the usual amount of heavy mud, nor did he say that he questioned the decision, despite its atypicality.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient

to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

337.    Lindner calculated a mud displacement plan according to BP's specifications, including the suspension of the displacement procedure partway through to allow for pressure testing of Halliburton's recently completed cement job.  Lindner testified that he distributed copies of his mud displacement plan to BP, Transocean, and M-I employees on the drilling vessel; thus some, if not all, of the Drilling Defendants were aware of and complicit in BP's plan to displace an unusually large amount of mud from the well, without the added safety of the casing hanger lockdown sleeve, and beginning before the cement had even fully set and been pressure tested.

**ANSWER:**

The BP Parties admit Mr. Lindner distributed copies of his mud displacement plan to individuals on the rig.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

## I.    Drilling Defendants Ignore and Overlook Warning Signs of the Imminent Blowout

338.    Two types of pressure tests are used to confirm the integrity of a well.  The integrity of the casing pipes and assembly is assessed with a "positive pressure" test, which involves increasing pressure in the casing string and observing the pressure response.  If the increase in pressure bleeds off, it indicates a problem with the pressure integrity of the casing: the pumped-in pressure is escaping through a leak somewhere along the line.  However, if the increased pressure stays constant, it does not necessarily mean the casing assembly is secure — the external pressure from the hydrocarbons around the well can be sufficient to maintain the increased pressure reading in the casing string even if there is a breach.  Thus, a negative result (where the pressure leaks off) is useful because it is diagnostic of a leaky casing string.  A positive result (where the pressure remains constant), is not diagnostic of a secure casing string or a leaky casing string, and basically tells workers nothing about the integrity of a well's casing and pipe assembly.

**ANSWER:**

The BP Parties admit that two types of pressure tests are used to measure the integrity of a well, one of which is the "positive pressure" test. The "positive pressure" test measures, among other things, the strength of the casing pipes and involves increasing pressure in the casing string and observing the pressure response. The BP Parties deny the remaining allegations of this paragraph.

339. On April 20, 2010, the Macondo well had a positive result to its positive pressure test, which neither confirmed nor denied the integrity of its casing string.

**ANSWER:**

The BP Parties admit the Macondo Well had a successful positive pressure test of the production casing on April 20, 2010. A positive pressure test confirms that the casing and wellhead seal assembly are capable of containing pressure inside the well. To test the integrity of the seal assembly and production casing, the *Deepwater Horizon* rig crew conducted a positive pressure test on the Macondo casing on April 20, 2010. The positive pressure test to 2,700 psi confirmed casing integrity. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.

340. At around noon on April 20, 2010, after the completion of the positive pressure test, drilling vessel workers began the mud displacement process. According to M-I's mud displacement plan, the displacement would proceed until the spacer fluid had been pumped down to a level 12 feet above the BOP, after which the displacement would be suspended for the negative pressure test.

**ANSWER:**

The BP Parties admit that drilling vessel workers began the mud displacement process after completion of the positive pressure test and pumped the displacement fluids according to their interpretation of the M-I Swaco mud displacement plan. The BP Parties deny the remaining

allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

341.    The BOP's annular preventer was closed to seal casing string for the negative test, but for some reason did not form a secure seal, which allowed about 50 barrels of spacer fluid to leak through the BOP and into the well.  This meant that dense, viscous spacer fluid was across the inlets to several small-bore pipes that were to be used for the negative pressure test, rather than the plain seawater that should have been across the pipe inlets.  Drilling Defendants were aware of this spacer fluid leakage and the potential for the viscous fluid to be blocking the small-bore pipes necessary for the negative pressure test, yet they took no steps to remedy the situation.

**ANSWER:**

The BP Parties admit that the annular preventer leaked when it was closed in preparation for the negative-pressure test, which resulted in approximately 50 bbls of the spacer fluid passing down through the leaking annular preventer into the BOP, across the choke and kill line entry points and into the annulus below.  In addition, the BP Parties admit, as indicated in Appendix Q to the Internal Investigation Team ("IIT") Report, that the spacer was displaced with approximately 30 bbls of fluid, which M-I SWACO indicated was fresh water, but may have also been tank washings from the spacer tank followed by seawater.  At the cessation of pumping, the additional 30 bbls of fresh water/pit wash would have also been across the kill line entry point. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are

alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

342. The negative pressure tests were intended to assess the security of Halliburton's cement job at the bottom of the Macondo well. With the casing string sealed, pressure was bled off from inside the well, "underbalancing" it by reducing the pressure in the casing until the external pressure from the hydrocarbon reservoirs surrounding the well was greater than the internal pressure within the casing itself. If Halliburton's cement job had securely sealed the hydrocarbon reservoirs off from the well, there would be little to no fluid flow out of the well and the pressure in the casing would remain at the reduced, underbalanced level. An increase in pressure or flow would indicate that the cement job was not secure, and was allowing hydrocarbons to flow into the well and repressurize the casing string.

**ANSWER:**

The BP Parties admit negative pressure tests were conducted to confirm that the cement barrier and mechanical barriers (the shoe track, production casing and casing hanger seal assembly) were capable of withstanding an underbalanced condition. The BP Parties further admit that the negative pressure tests simulated a hydrostatic condition of having seawater instead of mud in the riser, placing the well in an underbalanced state when hydrostatic pressure in the wellbore was reduced below reservoir pressure. The BP Parties also admit that a successful negative pressure test is indicated by no pressure increase inside the well and no flow from either the kill line or the drill pipe for a sustained period of time. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

343.    Drilling Defendants' two negative pressure tests on the Macondo well both yielded abnormal results.  In one instance, over four times the expected fluid returns spurted out of the well after the pressure was reduced to an underbalanced state.  In the other test, the pressure in the well *increased* from 50 psi to 1,400 psi – a highly diagnostic "red flag" result indicating that Halliburton's cement job had failed to seal off the well from the surrounding hydrocarbon reservoirs.  The 1,400 psi pressure response and the excess fluid returns were indications that hydrocarbons were flowing into the well, re-pressurizing it after it had been underbalanced for the negative pressure test.  The pressure tests themselves may have further damaged and weakened the cement in the well.  Not only were the tests performed before the cement had a full 72 hours to set completely, but contrary to common practice, the drill string was 10,000 feet above the bottom of the well during the tests.

**ANSWER:**

The BP Parties admit the negative pressure test results indicated that well integrity had not been established.  The BP Parties also admit that the excess flow from the drill pipe, with the well in an underbalanced condition during the first negative test, should have indicated to the rig crew a communication flow path with the reservoir through failed barriers.  Further, the BP Parties admit that the 1,400 psi on the drill pipe, coupled with no flow from the kill line during the second negative pressure test was an indication of communication with the reservoir.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

344.    It is also possible that the pressure tests themselves further damaged and weakened the cement in the well.  Not only were the tests performed before the cement had a full 72 hours to set completely, but contrary to common practice, the drill string was 10,000 feet above the bottom of the well during the tests.

**ANSWER:**

The BP Parties admit that the pressure tests were conducted less than 72 hours after the cement job was pumped.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or

information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

345.    Experts later testified that BP's interpretation of the pressure tests was not industry standard, while BP itself admitted to Congressional investigators that continuing work on the well after such alarming test results may have been a "fundamental mistake."  In May 2010, BP admitted to congressional investigators that these pressure test results were clear warning signs of a "very large abnormality" in the well.

**ANSWER:**

The BP Parties admit that a May 25, 2010 Congressional Committee on Energy and Commerce's Subcommittee on Oversight and Investigations Memorandum entitled "Key Questions Arising from Inquiry into the Deepwater Horizon Gulf of Mexico Oil Spill" states on page 2 in regards to the 1,400 psi on the drill pipe during the second negative pressure test: "BP's investigator indicated that a 'fundamental mistake' may have been made here because this was an 'indicator of a very large abnormality.'"  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

346.    Later, in its September 8, 2010, disaster investigation report, BP concluded that the negative pressure test result of 1,400 psi was misinterpreted by Transocean and BP employees on the Deepwater Horizon, leading the vessel crew to the erroneous view that the test was a success and well integrity had been established.  Moreover, BP's investigation found no evidence that the drilling vessel's workers consulted anyone outside their teams on the vessel or onshore about the abnormal pressure reading, as they should have, before coming to their incorrect conclusion that the well was secure.  The well site leader should have called experts on the drilling vessel or on the beach to discuss the results, BP Vice President Steve Robinson testified in congressional hearings in December 2010.

**ANSWER:**

The BP Parties admit that BP's Internal Investigation Report states that the "pressure of 1,400 psi on the drill pipe was misinterpreted by the rig crew and the well site leaders.

According to witness accounts, the toolpusher proposed that the pressure on the drill pipe was caused by a phenomenon referred to as 'annular compression' or 'bladder effect.'   The toolpusher and driller stated that they had previously observed this phenomenon.   After discussing this concept, the rig crew and the well site leaders accepted the explanation."  The BP Parties further admit that Steve Robinson made the above statement during a congressional hearing in December 2010.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

347.  Halliburton was also grossly negligent in ignoring the pressure test results and not insisting that a remedial cement job be done right away to correct the imperfections in the cement.  Given its experience and expertise with cementing wells, and the recent disaster its poor cementing work had caused at the Montara well off Australia, Halliburton was certainly aware of the environmental and safety risks of a failed cement job, yet it did not insist that the appropriate action be taken to correct the Macondo well's cement seal.

**ANSWER:**

The BP Parties deny that Halliburton was grossly negligent with respect to the negative pressure test. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny those remaining allegations.

348.    In their November 16, 2010, interim report, the NAE panel wrote that "it is clear that pressure buildup or flow out of a well is an irrefutable sign that the cement did not establish a flow barrier" against the entry of hydrocarbons into the well. At Macondo, there was both pressure buildup to 1400 psi and unexpected flow out of the well during the negative pressure tests.

**ANSWER:**

The BP Parties admit that the NAE November 16, 2010 interim report stated the above quoted language.[23] The BP Parties further admit that on April 20, 2010 there was 1,400 psi on the drill pipe and hydrocarbon influx during the negative test. The BP Parties deny the remaining allegations of this paragraph.

349.    There was only one appropriate response to these abnormal negative pressure test results: remedial cement work to correct Halliburton's obviously-flawed cement job and shore up the seal against the highly pressurized hydrocarbon reservoirs. Drilling Defendants, however, elected to ignore the "red flag" results of these, the only cement integrity tests they had even bothered to perform, and continue with their well completion plan as if Halliburton's cement job had been a success.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

---

[23] By referencing the NAE report, the BP Parties neither admit nor imply that this document or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

### J.      Attempts at Well Control:  Too Little, Too Late

350.   During the mud displacement process, two or more of the Drilling Defendants, specifically including BP and M-I, used an unconventional fluid mixture — and an unusually large volume of it — as "spacer" fluid. This novel composition and amount of fluid may have interfered with the negative pressure test results and/or caused damage or clogging in the BOP.

### ANSWER:

The BP Parties admit that it used loss circulation materials as a spacer in the displacement procedure. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and

2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with

the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or

information sufficient to form a belief about the truth of the remaining allegations of this

paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are

not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining

allegations.

351.    In oil wells, a "spacer" is a fluid used to create a division between two other
fluids, with the spacer fluid physically preventing the two other fluids from coming into contact
and mixing with or contaminating one another.  In the mud displacement process at Macondo,
the spacer was intended to separate the synthetic drilling mud from the seawater displacing it.

**ANSWER:**

The BP Parties admit that one of the purposes of spacer fluids in drilling operations is to

separate different fluids and to physically prevent the fluids from coming into contact with each

other and admit that one of the purposes of the spacer in the displacement process was to

separate synthetic drilling mud from seawater.   The BP Parties deny the remainder of this

paragraph.

352.    Spacer fluid is usually water-based mud, but according to testimony from M-I
drilling fluid specialist Leo Lindner, an uncommon mixture of fluids was used as a spacer during
the Macondo well's mud displacement process.  Instead of mixing a batch of the usual water-
based mud spacer fluid, Lindner combined two "pills"[24] of lost circulation material ("LCM") that
had been previously prepared for use in the event of any fluid loss during the cementing job.
Unlike the water-based mud typically used as spacer, LCM pills are highly viscous fluid that
coagulates to create an extremely thick, stringy mass intended to fill the lost circulation zone,
clogging fractures in the rock so that other drilling fluids can no longer escape into the
formation.  Lindner testified that it was "not common" to use LCM as a spacer, and that he had
never done so before, but that BP, Transocean, and MI employees on the Deepwater Horizon
were all aware of the unorthodox LCM-based spacer and either approved the use or allowed it to
occur without comment.

---

[24]      A "pill" is any small (<200 barrels) quantity of fluid particularly formulated for a specific task that regular
drilling fluid cannot perform, such as prevention of circulation fluid loss.

**ANSWER:**

The BP Parties admit to the definition of "pill" in the footnote and that a mixture of two LCM pills was used as spacer in the displacement procedure.  The BP Parties further admit that Leo Lidner made various statements, of which the transcripts' text speaks for itself.[25]  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

353.    In addition to the atypical composition of spacer Drilling Defendants used in the Macondo well, the volume of that fluid used was also nonstandard.  Lindner testified that normally a spacer is around 200 barrels of fluid, but in the Macondo well, the two LCM pills that were used as spacer had a combined volume over twice as large: 450 barrels.

---

[25] By referencing the statements of Leo Lidner, the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

**ANSWER:**

The BP Parties admit that the LCM pills used as a spacer had a volume of approximately 425 barrels.  The BP Parties further admit that Leo Lidner made various statements, of which the transcripts' text speaks for itself.[26]  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

354.    Upon information and belief, Drilling Defendants used this aberrant fluid composition and volume as spacer in the Macondo well solely to skirt environmental regulations that would have required more costly and time-consuming hazardous waster disposal procedures for the two unused LCM pills.

---

[26] By referencing the statements of Leo Lidner, the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

355.    As discussed above, the LCM used as a spacer leaked past the annular preventer through the BOP and into the well before the negative pressure test was run.  Drilling Defendants' unusual use of LCM as spacer fluid could have confounded the negative pressure test results by blocking the small-bore pipes used for the tests, and could have negatively affected the functionality and effectiveness of the BOP itself.

**ANSWER:**

The BP Parties admit that some of the spacer used during the displacement procedure leaked past the annular preventer, and that the LCM spacer could have complicated the interpretation of the negative-pressure test.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

**K.**  **Faulty Vessel Safety Equipment Exacerbates the Blowout, Causing Vessel Explosions, Fire, and Sinking**

356.   Constantly monitoring a well for signs of hydrocarbon influx is so vital for well safety that it is common practice in the industry for employees of several companies on a drilling vessel – the  mud-logging company, the drilling contractor, and the lease operator – to focus on it and be ready to take immediate remedial action, according to the NAE's interim report.

**ANSWER:**

The BP Parties admit that the NAE interim report states that "The possibility of hydrocarbons entering a well has such important implications for safety that it is common practice for the mud-logging company, drilling contractor, and operator to focus on determining whether this is occurring to ensure that remedial action can be taken immediately."[27]  The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

357.   After the litany of flippant, short-cutting operational decisions Drilling Defendants made to save time and money completing the Macondo well, they should have been especially attuned to any signs of trouble from the historically intractable well.  But instead of the requisite vigilance, Drilling Defendants had "turned to complacency in the haste to wrap up" operations at Macondo, according to the Deepwater Horizon Study Group, failing to properly monitor the well and ignoring and/or missing an increasingly ominous series of warnings and red flags exhibited by the well in the hours before the fatal blowout.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim

---

[27] By referencing the NAE report, the BP Parties neither admit nor imply that this document or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and

Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20,

2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are

alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the

remaining allegations of this paragraph to the extent they are inconsistent with the allegations in

Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient

to form a belief about the truth of the remaining allegations of this paragraph to the extent they

are not directed at the conduct or liability of the BP Parties and are not addressed in Document

Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.


358.    Pressure and flow data from well in the two hours before the blowout should have
put Drilling Defendants on notice that there was a problem and that hydrocarbons were leaking
into the well.  Post-spill review of the real-time data that was available on the drilling vessel on
April 20, 2010, showed that the first indications of hydrocarbons flowing into the well started at
8:52 p.m., and went unnoticed by Drilling Defendants.  Post-spill modeling indicated that by
9:08 p.m., 39 barrels of hydrocarbons had leaked into the well, but Drilling Defendants still had
not noticed the pressure and flow indications of the influx.  It was not until 9:41 p.m., a scant
four minutes before the blowout, that Drilling Defendants finally noticed that the well was
rapidly filling with hydrocarbons and that immediate well control action was needed.

### ANSWER:

The BP Parties admit that the Deepwater Horizon Accident Investigation Report

published by BP's Incident Investigation Team indicates that the well started to flow at

approximately 8:52 p.m., that by approximately 9:08 p.m. there was a gain of approximately 39

bbls, and that at approximately 9:41 p.m. the diverter was closed, the flow routed to the mud gas

separator, and an annular on the BOP was activated.  The BP Parties deny the remaining

allegations of this paragraph to the extent they are directed at the BP Parties.  The BP Parties

adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-

Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document

2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

359.    At 8:52 p.m., the pumps displacing the heavy mud with seawater were slowed, but instead of flow out of the well decreasing accordingly, as it should have, flow increased — a clear "red flag" indicating that hydrocarbon pressure from the reservoir below was pushing the mud out of the well faster than the seawater that was supposed to be displacing the mud was being pumped in.  Yet Drilling Defendants appear to have completely ignored this first red flag and simply carried on with the mud displacement process.

**ANSWER:**

The BP Parties admit that the Deepwater Horizon Accident Investigation Report published by BP's Incident Investigation Team indicates that at approximately 8:52 p.m. flow increased.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are

alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

360.    From 9:08 p.m. to 9:30 p.m. on the night of the blowout, when the mud displacement pump was either running at constant flow or was shut off, pressure in the well steadily increased.  Modeling data from BP's investigation of the disaster showed that at this point, hydrocarbons were flowing into the well at about nine barrels per minute.  Again, this pressure data should have triggered Drilling Defendants to start well-kill operations to restore control over the pressure, but instead the increasing pressure was ignored or overlooked.  In congressional testimony from December 2010, Halliburton mudlogger Joseph Keith admitted that he stepped away from his monitors for a coffee break on the night of the blowout; depending on when he took his break, Keith could have missed key data from the well.

**ANSWER:**

The BP Parties admit that the Deepwater Horizon Accident Investigation Report published by BP's Incident Investigation Team indicates that drill pipe pressure began to increase between approximately 9:01 p.m. and 9:08 p.m. and continued to increase until declining 400 psi between approximately 9:26 p.m. and 9:31 p.m.  The BP Parties further admit that the Report also indicates that OLGA well flow modeling calculated that in-flow to the well between approximately 9:08 p.m. and 9:14 p.m. was approximately 9 bbls/min.  Additionally the BP Parties admit that Joseph Keith testified before Congress that he stepped away from his monitors on the night of the Incident, and therefore could have missed key data.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against

Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

361.    Throughout the evening of April 20, 2010, the actions of the Deepwater Horizon workers were not consistent with a crew that was suspicious of any problems in the Macondo well.  In fact, according to congressional testimony, when contacted by a superior at 9:21 p.m., the toolpusher reported that the negative pressure test result had been "good" and that the mud displacement process was "going fine," neglecting to mention the increased flow out of the well or the increasing well pressure.

**ANSWER:**

The BP Parties admit that on May 28, 2010, Transocean *Deepwater Horizon* Senior Toolpusher Randy Ezell has said that he called the rig floor and talked to the Transocean *Deepwater Horizon* Toolpusher Jason Anderson at approximately 9:20 p.m. on April 20, 2010, who indicated the displacement was "going fine" and that the negative test "went good."  The BP Parties also admit OLGA well flow modeling indicates that hydrocarbons began to flow into the well from the reservoir at approximately 20:52 hours, however, the Transocean drill crew and Halliburton Sperry-Sun mudlogger either did not observe or did not recognize the increasing indications of flow given the fact that the first well control actions were not taken until around approximately 21:41.  The BP Parties deny the remaining allegations of this paragraph to the extent they

concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information

sufficient to form a belief about the truth of the remaining allegations of this paragraph, and

therefore deny them.

362.    The mud displacement pumps were shut down completely at around 9:30 p.m., at which point hydrocarbons had been continuously flowing into the well for 38 minutes. Modeling data from BP's disaster investigation showed that about 300 barrels of hydrocarbons had flowed into the well by this time.  A few minutes later, at 9:38 p.m., the steadily increasing level of hydrocarbons passed through the wide-open BOP into the riser.

**ANSWER:**

The BP Parties admit that the Deepwater Horizon Accident Investigation Report

published by BP's Incident Investigation Team indicates that at approximately 9:31 p.m. the

pumps were shut down, that OLGA well flow modeling suggests that by this time approximately

300 bbls of hydrocarbon influx would have been in the well, and that at approximately 9:38 p.m.

hydrocarbons passed through the well into the riser.   The BP Parties deny the remaining

allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the

remaining allegations of this paragraph, and therefore deny them.

363.    Although there may have been some discussion of "differential pressure" in the well once the mud displacement pumps were turned off, there is no other evidence that Drilling Defendants noticed or properly interpreted the many warning signs of the imminent blowout until drilling mud began to spill out of the riser onto the vessel deck at 9:41 p.m., just four minutes before the blowout.

**ANSWER:**

The BP Parties admit that the Transocean drill crew and Halliburton Sperry-Sun

mudlogger either did not notice or did not properly interpret the increasing indications of flow

given the fact that the first well control actions were not taken until approximately 21:41.  The

BP Parties deny the remaining allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

364. Inexperience may also have affected the choices and competency of the Deepwater Horizon workers during these critical hours. In BP's chain of command for Macondo operations, five employees had less than five months in their respective positions. BP's well site leader Robert Kaluza had mostly land-based drilling experience, and admitted he was working on the Deepwater Horizon "to learn about deepwater." BP also complained to Transocean that turnover on the drilling vessel had been high, including the replacement of experienced drillers with new hires. "Any further dilution of experienced personnel may be detrimental to the performance of the rig," BP told Transocean in an audit last year.

**ANSWER:**

The BP Parties admit that a Follow-Up Rig Audit, Marine Assurance Audit and Out of Service Period report in September 2009 commented on the turnover of Transocean personnel on the *Deepwater Horizon* rig and observed that "Any further dilution of experienced personnel may be detrimental to the performance of the rig." The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-

Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph as they relate to the employees of other Parties who were on the *Deepwater Horizon* on April 20, 2010, and therefore deny them.

365.    Investigators for the safety review commissioned by Transocean itself prior to the Spill found that a lack of hands-on experience for Transocean workers and managers contributed to safety concerns, as many workers were too readily promoted without sufficient on-the-job experience to fully appreciate the risks.  "[C]rews are potentially working with a mind-set that they believe they are fully aware of all the hazards when it is highly likely that they are not," the investigators wrote.  Moreover, the Deepwater Horizon Study Group found no evidence that any of the drilling vessel workers or onshore employees directly involved with the Macondo well had formal training or qualifications in risk assessment and management of complex systems such as were found aboard the Deepwater Horizon.

**ANSWER:**

The BP Parties admit that the above quoted language was part of a Lloyd's Register report on Transocean safety management and safety culture.[28]  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

366.    In addition to carelessness, nonchalance, and/or inexperience causing them to ignore or overlook the harbingers of a blowout, it is also possible that drilling vessel workers,

---

[28] By referencing the Lloyd's Register report, the BP Parties neither admit nor imply that this document or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

pushed by BP and the other Drilling Defendants to work faster and combine multiple tasks during these final completion operations, were too distracted to properly monitor the well and to notice the alarming signs of imbalance.  A BP well site leader said after the disaster that workers may have taken unusual steps "to save time," such as performing other tasks simultaneously during the mud displacement process.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

367.    One vessel worker testified that he was told to clean two tanks during his shift instead of the usual one: "To me it looked like they were trying to rush everything."  A mud logger later testified that he felt uncomfortable with the number of activities being done simultaneously on the day of the blowout.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

368.   As hydrocarbons were steadily filling the well and mounting towards the riser, vessel workers' attention was split between mud displacement and other simultaneous tasks like a "sheen test" (which required a change in flow line configuration, depriving workers of data from one of the two flow meters that had been measuring flow from the well until that point), preparations for the upcoming cement plug insertion, the investigation of a problem that had arisen with one of the mud pumps, and the entertainment of BP and Transocean executives ironically onboard to celebrate the Deepwater Horizon's supposedly spotless safety record.

**ANSWER:**

The BP Parties admit that simultaneous operations occurred during the preparation for

well suspension on April 20, 2010 and that the Deepwater Horizon Accident Investigation

Report published by BP's Incident Investigation Team indicates that at approximately 21:08 a

sheen test was conducted, after which time the flow line configuration was changed and flow no

longer passed through the Sperry Sun Flow Meter.   The BP Parties deny that the presence of

Transocean and BP executives affected the attention of any rig personnel directly involved with

the operations being conducted on April 20, 2010.   The BP Parties lack knowledge or

information sufficient to form a belief about the truth of the remaining allegations of this

paragraph, and therefore deny them.

369.   Several of these simultaneously occurring activities impaired vessel workers' ability to monitor pit fluid levels, effectively eliminating that important source of well flow monitoring information.[29]   A few hours after the mud displacement process began at noon, Drilling Defendants began a four-hour offload of mud to the nearby supply vessel M/V Damon Bankston.  In addition, some of the mud pits and the trip tanks were being cleaned and emptied during the course of the afternoon.   These activities all affected the pit fluid levels, compromising their usefulness as indications of well flow.  There is no evidence that Drilling Defendants had any reason to perform these activities during the mud displacement process other than time savings.

---

[29]   Pit fluid levels provide well flow information by indicating the volume of fluids at the surface.  If the volume of fluid pumped into the well equals the volume of fluid returned from the well, pit levels will remain constant.  If there is a hydrocarbon influx flowing into the well, the volume of fluid returned from the well will be larger than the amount pumped into the well.

**ANSWER:**

The BP Parties admit that the Deepwater Horizon Accident Investigation Report published by BP's Incident Investigation Team indicates that from approximately 13:28 to 17:17 hours, mud was offloaded to the supply vessel M/V Damon Bankston and that some of the mud puts and the trip tank were being cleaned and emptied, causing pit levels to change, which complicated the ability to use pit volumes to monitor whether the well was flowing. The BP Parties deny that there was no reason to perform simultaneous operations during the preparation for well suspension on April 20, 2010. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

370.    Even if there had been a compelling reason to perform the mud offload and pit cleaning activities simultaneously with the mud displacement process, Drilling Defendants could have preserved the useful monitoring function of pit fluid level information by isolating one or more of the pits for well flow monitoring. At the very least, Drilling Defendants could have begun monitoring pit fluid levels again at 5:17 p.m., once the mud offload task was complete, but there is no evidence that pit fluid levels were ever monitored again that afternoon or evening.

**ANSWER:**

The BP Parties admit that the Deepwater Horizon Accident Investigation Report published by BP's Incident Investigation Team indicates that at approximately 17:17 hours on April 20, 2010, the mud offload was completed and that it did not appear to the investigation team that pit volumes were effectively monitored for the remainder of the day. The BP Parties further admit that the Deepwater Horizon Accident Investigation Report published by BP's Incident Investigation Team indicates that the design of the mud pits could have allowed isolation of one or more pits to enable monitoring of the well. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties'

Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim

in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against

Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against

Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the

remaining allegations of this paragraph to the extent they are alleged by one or more of the BP

Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this

paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075,

and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the

truth of the remaining allegations of this paragraph to the extent they are not directed at the

conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and

2802, and therefore deny those remaining allegations.


371.    The multiple distractions and interference with well data caused by the drilling
vessel crew's multitasking left them unable to "detect, analyze, and effectively react to the
developing blowout," according to the Deepwater Horizon Study Group.  The Group also noted
that "perils of parallel processing" have underlain past oil and gas disasters such as the Piper
Alpha blowout in the North Sea, and the Exxon Valdez crash.  Just as sending text messages and
driving a car are each individually safe tasks that can be deadly when combined, the tasks the
Deepwater Horizon's crew were performing simultaneously fractured their attention at critical
times, with catastrophic results.

**ANSWER:**

The BP Parties admit that the Deepwater Horizon Study Group stated the above quoted

language.[30]  The BP Parties deny the remaining allegations of this paragraph to the extent they

concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information

---

[30] By referencing the Deepwater Horizon Study Group, the BP Parties neither admit nor imply that their documents
or the referenced statement is admissible into evidence and expressly reserve all objections to the use or
admissibility of the document or the referenced statement.

sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

### L.   **Drilling Defendants' Culture of Complacency**

372.    While the Deepwater Horizon's crew was distractedly working miles above, highly-pressurized hydrocarbons leaked through Halliburton's faulty, channeled cement and into the casing string of the Macondo well.   Several investigations have concluded that the hydrocarbons flowed into the well through the bottom of the last section of casing pipe, flowing up the casing string, and through the BOP and riser to the surface.

**ANSWER:**

The BP Parties admit that the initial flow path was through a leaking casing shoe and up

through the inside of the production casing.  The BP Parties deny the remaining allegations of

this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP

Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-

Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties

admit the remaining allegations of this paragraph to the extent they are alleged by one or more of

the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the

extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack

knowledge or information sufficient to form a belief about the truth of the remaining allegations

of this paragraph, and therefore deny them.


373.    Because of their inattention to proper well monitoring during the mud displacement process, the first sign of this hydrocarbon influx Drilling Defendants seemed to notice was the mud that began spilling out of the riser onto the vessel deck at about 9:41 p.m., 49 minutes after the leak had started at the bottom of the well.

**ANSWER:**

The BP Parties admit that hydrocarbons began to flow into the well from the reservoir at

approximately 20:52 hours.  However, the Transocean drill crew and Halliburton Sperry-Sun

mudlogger either did not observe or did not recognize the increasing indications of flow given the fact that the first well control actions were not taken until around approximately 21:41, 49 minutes after the leak had started at the bottom of the well. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

374.    For emergencies like this one, Drilling Defendants' policies and instructions regarding well control procedures for their vessel workers were woefully inadequate. The procedures only contemplated relatively small influxes into the well, and did not provide guidance on what to do if the initial procedures fail to stop the influx, or whether and when to activate emergency BOP functions such as the emergency disconnect system.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

375.    In response to the mud spurting out of the riser at 9:41 p.m., the drilling vessel crew diverted flow from the well into the mud-gas separator, a device used to separate gas out of the drilling fluid and vent it safely into the air.  This diversion would have been the correct protocol if this incident had been a mere kick.  But for a blowout caused by hundreds of barrels of hydrocarbons blasting out of the well, the decision to divert well flow through the mud-gas separator only exacerbated the disaster.

**ANSWER:**

The BP Parties admit that riser fluids were diverted through the mud-gas separator rather than overboard through the starboard diverter line.  The BP Parties deny that this diversion would have been the correct protocol if this incident had been a "mere kick."  The BP Parties deny the remaining allegations of this paragraph to the extent they are directed at the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about truth of the remaining allegations of this paragraph, and therefore deny them.

376.    Diversion to the mud-gas separator not only contributed to the explosions on the Deepwater Horizon, but it likely caused them to happen sooner than they might have if well flow had been directed overboard instead.  The gas venting pipes on the Deepwater Horizon's mud-gas separator were goose-necked, which meant they directed the vented gas downwards towards

the vessel. When huge volumes of gas began to hiss out of the Macondo well, these goosenecked vents effectively spread highly flammable gas all over the vessel's decks, increasing the likelihood that the gas would find an ignition source.[31]

**ANSWER:**

The BP Parties admit that the decision to divert the riser fluids through the mud-gas separator rather than overboard through the starboard diverter line increased the potential for the gas to reach an ignition source. The BP Parties also admit that the gooseneck design of both the MGS 12 inch vent line and the MGS 6 inch vacuum breaker vented gas directly down onto the rig. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

377.    The volume and pressure of the gas rushing out of the well eventually overwhelmed the mud-gas separator entirely, bursting its seals, and allowing the gas to spread directly under the vessel deck as well, effectively enveloping the Deepwater Horizon in a highly flammable cloud of gas.

**ANSWER:**

The BP Parties admit that the rate of fluid flow from the blowout caused system pressures to increase beyond design ratings of the mud-gas separator. Further, the BP Parties admit that the Transocean crew's decision to divert the escaping fluids and gases through the mud-gas separator rather than the starboard overboard diverter line vented gas directly down onto and throughout the rig, rather than to a safer location as intended by the overboard diverter line. The BP Parties deny the remaining allegations in this paragraph.

---

[31]    Hydrocarbons are in both gaseous and fluid forms in reservoirs, but since gas is less dense than oil, it blew out of the well ahead of the fluid oil. Thus gas spewed out of the well onto the Deepwater Horizon, and later oil (and gas-oil mix) gushed out of the well into the Gulf of Mexico.

378.   The blowout worsened as the high pressure gas flow caused the failure of surface equipment on the drilling vessel, most of which was rated to withstand only 60 – 100 psi.  As each of these seals and systems gave way under the immense pressure, additional flow paths were opened and the blowout gained strength.

**ANSWER:**

The BP Parties admit that the surface equipment on the *Deepwater Horizon* was rated to

withstand approximately 60 – 100 psi.  In addition, the BP Parties admit that the rate of fluid

flow from the blowout caused system pressures to increase beyond design ratings of the surface

equipment.  Further, the BP Parties admit that the Transocean crew's decision to divert the

escaping fluids and gases through the mud-gas separator rather than the starboard diverter

increased the potential for the gas to reach an ignition source and created additional paths for gas

flow.  The BP Parties deny the remaining allegations in this paragraph.


379.   The drilling vessel workers, following Transocean's insufficient well shut-in protocol, closed two of the BOP's non-shearing rams, which eventually sealed around the drill pipe at 9:47 p.m.  At this point, all flow paths from the well to the drilling vessel were sealed off except for the drill pipe.  Flow up the drill pipe was prevented by pressure in that pipe.  With the BOP rams now blocking hydrocarbons from entering the riser along the sides of the drill pipe, the blowout could have been contained at this point, had the gas on the drilling vessel not exploded.

**ANSWER:**

The BP Parties admit that real-time data indicates at approximately 21:47 hours, drill pipe

pressure rose from 1,200 psi to 5,730 psi within one minute.  This was likely caused by the

closure of one or two variable bore rams, which sealed the annulus.  The BP Parties deny the

remaining allegations of this paragraph to the extent they concern the conduct or liability of the

BP Parties.  Hydrocarbons entered the riser at approximately 21:38 hours and the first well

control actions did not occur until approximately 21:41.  Specifically, an annular preventer was

likely activated at approximately 21:41 hours, and it closed around the drill pipe.  It failed to seal

the annulus for approximately five minutes, allowing further flow of hydrocarbons into the riser

until the annulus was sealed at approximately 21:47 hours, likely by the closure of a variable

bore ram.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties'

Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim

in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against

Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the

remaining allegations of this paragraph to the extent they are alleged by one or more of the BP

Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to

the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP

Parties lack knowledge or information sufficient to form a belief about the truth of the remaining

allegations of this paragraph to the extent they are not directed at the conduct or liability of the

BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those

remaining allegations.

### M.   Defendants Misrepresent the Severity of the Spill and their Oil Spill Response Capabilities

380.    Investigations and testimony suggest that the initial explosion on the Deepwater Horizon on the night of April 20, 2010, was caused by an engine on the vessel deck that sucked in the gas blasting down on the decks from the mud-gas separator vents.

**ANSWER:**

The BP Parties admit that a flammable mixture was likely transferred into the engine

rooms because the *Deepwater Horizon* engine room HVAC fans did not shut down automatically

upon gas detection.  The BP Parties further admit that at least one engine went into overspeed

and may have been a source of ignition.  The BP Parties deny the remaining allegations of this

paragraph.

381.    Gas sensors, designed to shut down vessel engines when dangerous vapors are present, are critical to preventing explosions in such situations.  Testifying before investigators in

May 2010, the Transocean rig mechanic Douglas Brown said gas sensors — and the emergency engine shutdown systems connected to them — were not operational aboard the Deepwater Horizon on the night of the blowout.  Moreover, the automated feature that should have closed the engine's air intake valves upon sensing gas entering the engine room also failed.

**ANSWER:**

The BP Parties admit that gas sensors are critical to preventing released hydrocarbons from reaching potential ignition sources.  In addition, the BP Parties admit that Douglas Brown has made various statements, as to which the transcripts' text speaks for itself.[32]  The BP Parties deny the remaining allegations of this paragraph.

382.  Brown further testified that the Deepwater Horizon's engine room was not equipped with a gas alarm system that could have shut off the power.  The installation and maintenance of these sensors, alarms, and emergency shutdown systems on the Deepwater Horizon were the responsibility of Transocean, the vessel's owner.

**ANSWER:**

The BP Parties admit that Douglas Brown has made various statements, as to which the transcripts' text speaks for itself.[33]  The BP Parties further admit that the installation and maintenance of these sensors, alarms, and emergency shutdown systems on the *Deepwater Horizon* were the responsibility of Transocean.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent

---

[32] By referencing the statements of Douglas Brown, the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

[33] By referencing the statements of Douglas Brown, the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.   The BP Parties deny the remaining allegations of this paragraph.

383.    At approximately 9:48 p.m., the gas sucked into one of the Deepwater Horizon's engines caused it to begin to overspeed.  The vessel lost power less than a minute later, almost immediately followed by two explosions, which ignited the gas enveloping the vessel.  The blaze intensified as damage from the explosions and fire opened new flow paths for the flammable gaseous hydrocarbons spewing out of the well.  BP's investigators found potential flow paths through the mud pumps and through the top of the drill string, as well as the possibility that movement of the drill pipe broke the seal that the BOP rams had made around the drill pipe, re-opening the direct flow path from the casing into the riser.  Via all or some of these flow paths, gaseous hydrocarbons poured onto the vessel, feeding the inferno that engulfed the Deepwater Horizon and ultimately killed 11 crew members, injured 17 others, and destroyed the vessel.

**<u>ANSWER:</u>**

The BP Parties admit that at approximately 9:48 p.m. on April 20, 2010, at least one engine went into overspeed.  The BP Parties also admit that the vessel lost power approximately a minute later, which was immediately followed by two explosions.  The BP Parties further admit that the Transocean crew's decision to divert the escaping fluids and gases through the mud-gas separator rather than the starboard overboard diverter line vented gas directly down onto and throughout the rig, creating multiple ignition sources and flow paths for the gases.  Further, the BP Parties admit that rig drift-off following the loss of power may have caused the BOP seal around the drill pipe to fail, creating a flow path through the riser to the surface.  The BP Parties further admit that the blowout and explosions resulted in the death of 11 crew members, injured others, and destroyed the vessel.  The BP Parties deny the remaining allegations in this paragraph.

## 2.    The Failure of the BOP

384.    Immediately after the explosion, desperate vessel workers tried in vain to activate the emergency disconnect sequence on the Deepwater Horizon's BOP.  As reports and testimony have shown, problems and failures with each of the BOP's emergency activation methods prevented the use of the Deepwater Horizon's BOP to seal the well, paralyzing its powerful shear rams that should have slammed shut, severing the drill pipe, and quelling the blowout.

**ANSWER:**

The BP Parties admit that the BOP did not seal the well.  The BP Parties admit that the subsea supervisor attempted to activate the emergency disconnect sequence ("EDS") some time after the explosion, and that there were no indications that the sequence activated.  The BP Parties further admit that the automatic mode function ("AMF") of the BOP activates the blind shear rams to shear the drill pipe and seal the wellbore.  The BP Parties admit that the AMF initiation conditions were very likely met soon after the first explosion, but the AMF sequence very likely could not have been completed by either control pod.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore deny them.

385.    The Macondo well's Cameron-manufactured BOP had several emergency activation methods: the high-pressure closure of the blind shear ram, the emergency disconnect sequence[34] ("EDS"), the automatic mode function[35] ("AMF"), and activation via remotely operated vehicles (ROVs) on the seafloor using the "hot stab"[36] or autoshear[37] functions.  None of these were able to activate the BOP to seal the well.

----

[34]    The EDS disconnects the drilling vessel from the well by detaching the riser from the top of the BOP, allowing the vessel to move away from the well.  The EDS also triggers the closure of the blind shear ram to seal off the well itself.

[35]    The AMF is activated when electricity, hydraulics, and communications from the drilling vessel are all severed.  Powered by hydraulic pressure from accumulators and batteries on the BOP itself, the AMF's functionality is independent from the vessel and is not affected by loss of power or hydraulics on the vessel itself.

[36]    An ROV can activate certain BOP functions, such as the blind shear ram, by performing a hot stab, injecting hydraulic fluid into dedicated ports on the BOP to close the rams.

[37]    An ROV can activate the autoshear function by snipping a rod on the BOP, triggering the closure of the blind shear ram.

**ANSWER:**

The BP Parties admit that the BOP did not seal the well.  The BP Parties admit that the BOP was designed and manufactured by Cameron and had several emergency systems, including the high-pressure blind shear ram circuit, emergency disconnect sequence (EDS), the AMF/deadman system, ROV activation and the autoshear function.  The BP Parties further admit that the EDS disconnects the vessel from the well by detaching the LMRP from the BOP, and that depending on which of two sequences is selected, will either close the blind shear rams or close the casing shear rams and the blind shear rams.  The BP Parties further admit that the Deepwater Horizon Accident Investigation Report published by BP's Incident Investigation Team states that the control pods on the BOP were programmed to initiate the AMF/deadman sequence if electrical power, communications, and hydraulic power are all lost to both control pods.  The BP Parties deny the remaining allegations of this paragraph.

386.   The explosions and fire on the Deepwater Horizon disabled the only two emergency activation methods available to workers on the vessel: the high-pressure closure of the blind shear ram and the EDS.  From the BOP control panels on the vessel, workers could push buttons for either of these functions, but both required communication with the BOP itself via multiplex cables running from the vessel to the BOP on the seafloor.  On the vessel, these multiplex cables were not protected against explosions or fire; according to BP's disaster investigation, it is likely that they were damaged during or immediately after the first explosion, effectively disabling the vessel workers' ability to communicate with the BOP.

**ANSWER:**

The BP Parties admit that the operation of the high-pressure closure of the blind shear ram via the BOP control panel, as well as the EDS, were operable from control panels on the rig and required communication with the BOP via multiplex cables running from the vessel to the BOP.  The BP Parties further admit that the Deepwater Horizon Accident Investigation Report published by BP's Incident Investigation Team, the text of which speaks for itself, indicates that it is likely that the early explosion and fire damaged the multiplex cables and that the high

pressure blind shear rams and EDS were no longer operable from the controls on the rig.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.

387.    According to his own testimony, and that of several witnesses, Transocean subsea supervisor Christopher Pleasant pressed the EDS button after the explosions.  "Everything in the [BOP control] panel did like was supposed to at the panel, but it never left the panel," Pleasant testified, which supports the likelihood that damage to the multiplex cables on the vessel severed communication between the vessel and the BOP after the explosions.

**ANSWER:**

The BP Parties admit that Christopher Pleasant stated the above quoted language.[38]  The BP Parties further admit that the Deepwater Horizon Accident Investigation Report published by BP's Incident Investigation Team states that the control pods on the BOP were programmed to initiate the AMF sequence if electrical power, communications, and hydraulic power are all lost to both control pods, and that the AMF conditions were likely met upon the damage to the MUX cables and loss of hydraulic supply pressure after the explosion.  The BP Parties deny the remaining allegations of this paragraph.

388.    The AMF sequence initiates when electrical power, communications, and hydraulic pressure are lost to both control pods on the BOP, circumstances that were certainly satisfied once the multiplex cables and the also-unprotected hydraulic conduit hose on the Deepwater Horizon were damaged by the explosions and/or fire.  But poor maintenance of the BOP itself prevented the completion of the AMF sequence to close the blind shear ram.

**ANSWER:**

The BP Parties admit that the AMF sequence initiates when electrical power, communications, and hydraulic pressure are lost to both control pods on the BOP.  The BP Parties admit that the Deepwater Horizon Accident Investigation Report published by BP's

_____

[38] By referencing the statements of Christopher Pleasant, the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

Incident Investigation Team, the text of which speaks for itself, indicates that there were very likely prevailing dysfunctions with the yellow control pod and blue control pod at the time of the incident that would have rendered them incapable of completing the AMF sequence closing the high-pressure blind shear rams in the event of hydraulic and electrical power supply and communications failure on the rig. The BP Parties further admit that Transocean had responsibility for maintenance of the control pods, which may have contributed to their condition on April 20, 2010. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2074 and 2075.

389.   The Deepwater Horizon's BOP had two independent control pods, a redundancy intended to reduce the risk that control pod failure would jeopardize BOP functionality, but Transocean's shoddy BOP maintenance prevented either of the two pods from completing the AMF sequence on the night of the blowout. Examination and tests performed on the control pods after the disaster found a faulty solenoid valve and one battery with low charge in one pod, and two dead batteries in the other pod. Investigators concluded that these problems existed prior to April 20, 2010, and were significant enough to prevent either control pod from completing the AMF sequence to close the BOP's blind shear ram.

**ANSWER:**

The BP Parties admit that the Deepwater Horizon's BOP had two control pods that provided system redundancy. The BP Parties further admit that redundant control pods are intended to reduce risk. The BP Parties admit that the Deepwater Horizon Accident

Investigation Report published by BP's Incident Investigation Team, the text of which speaks for itself, indicates that there were very likely prevailing conditions with the yellow control pod and blue control pod at the time of the incident that would have rendered them incapable of completing the AMF sequence closing the high-pressure blind shear rams in the event of hydraulic and electrical power supply and communications failure on the rig.  The BP Parties admit that the conditions of the control pods included a fault in a critical solenoid valve in the yellow control pod and that the blue control pod had insufficient charge, and that these conditions likely existed at the time of the incident.   The BP Parties further admit that Transocean had responsibility for maintenance of the control pods, which may have contributed to their condition on April 20, 2010.   The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.

390.    BOP maintenance was Transocean's responsibility, but BP and the other Drilling Defendants were aware of Transocean's infrequent and inadequate maintenance of the device. The faulty solenoid valve on one of the control pods would have shown up on the BOP control diagnostic system on board the drilling vessel, which was accessible to all and should have alerted all of the Drilling Defendants to the problem.

**ANSWER:**

The BP Parties admit that BOP maintenance was Transocean's responsibility.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one

or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

391.   Transocean's BOP maintenance records from 2001 to 2010, which were also available to Drilling Defendants at all times, indicate that the control pod batteries were changed far less frequently than the manufacturer's recommended annual replacement.   Unlike the solenoid valve failure, the BOP's diagnostic function would not have shown a low battery charge, all the more reason for Transocean to proactively change the batteries frequently to avoid failure.  But, as the other Drilling Defendants knew, Transocean had neglected the BOP batteries before – a November 2007 activity report recorded that when the BOP was brought to the surface, all of the batteries in one of the pods were dead.

**ANSWER:**

The BP Parties admit that Transocean had responsibility for BOP maintenance and that Transocean's BOP maintenance records and other documentation, the text of which speaks for itself, indicate that during 2001 to 2010 the AMF batteries were changed on occasion at a frequency less than the manufacturer, Cameron, recommended.  The BP Parties further admit that a 2007 report recorded that "all batteries are dead" in the blue pod.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP

Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

392. Beyond these specific BOP maintenance issues, Drilling Defendants were also aware that during the entire duration of operations at Macondo, the Deepwater Horizon's BOP was out of certification and long overdue for extensive maintenance and repair. Although the BOP's manufacturer, Cameron, required manufacturer testing of the device every five years, the Deepwater Horizon's BOP had not been sent to Cameron for inspection since 2000.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with Document Nos. 2074, 2075, 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2082, and therefore deny those remaining allegations.

393.    The BOP had not undergone a thorough series of maintenance checks since 2005, despite the significant problems uncovered within the device during that inspection.  According to Transocean maintenance documents from the 2005 inspection, the BOP's control panels gave unusual pressure readings and flashed inexplicable alarm signals, while a "hot line" connecting the vessel to the BOP was leaking fluid badly.  An independent engineering company was hired to assess the BOP, but could not perform all of its examinations — including verification that the Deepwater Horizon's BOP could effectively shear drill pipe and seal off wells in high pressure, deepwater conditions — because the BOP was in use and inaccessible on the sea floor, and BP and Transocean would not stop work to bring it up.

**ANSWER:**

The BP Parties admit that Transocean maintenance documents, the text of which speaks for itself, indicate that during a 2005 inspection, the BOP control panel gave unusual readings, and that the hot line was leaking badly.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

394.    A Transocean-commissioned independent audit of the vessel in April 2010, just before the blowout, again revealed a range of problems with the Deepwater Horizon's BOP, including a leaking door seal, pump parts needing replacement, error-response messages, and "extraordinary difficulties" surrounding the maintenance of the BOP's annular valves.  BP well

145

site leader Ronald Sepulvado testified in August 2010 that he too had raised concerns about Transocean's maintenance of the BOP, reporting that several pieces of equipment had been out of service for extended periods of time, but that Transocean "always told me that they didn't have the parts" to make the necessary repairs.

**ANSWER:**

The BP Parties admit that Transocean commissioned an audit, the text of which speaks for itself, which Transocean received in or around April 2010.  The BP Parties further admit that Ronald Sepulvado testified in July 2010 before the Marine Board of Investigation, the record of which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

395.    In keeping with its lax approach to BOP maintenance, Transocean had also failed to recertify the Deepwater Horizon's BOP, as required by federal regulations, because recertification would require a full disassembly of the device and more than 90 days of downtime.  During his congressional testimony, one Transocean subsea supervisor brushed off the need for BOP recertification, testifying that Transocean considered it sufficient to simply monitor the device's condition while it was in use, rather than having to bring it to dry dock to get a full recertification.

**ANSWER:**

The BP Parties admit that Transocean witnesses provided congressional testimony, the text of which speaks for itself, regarding Transocean's so-called "condition-based maintenance." The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent

they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

396.    In its disaster investigation, BP noted that Transocean did not record well control-related equipment maintenance, including that of the BOP, accurately or completely in the regular maintenance management system, sometimes even recording work performed on the BOP that could not possibly have taken place since the BOP was in use on the seafloor at the time of the supposed repair.

**ANSWER:**

The BP Parties admit that the Deepwater Horizon Accident Investigation Report published by BP's Incident Investigation Team, the text of which speaks for itself, indicates that some Transocean BOP maintenance records were not accurately reported.  The BP Parties admit that on occasion certain of Transocean's maintenance records indicated work being performed on the BOP when the BOP was installed subsea and not accessible.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP

Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

397.   After the explosions, as the Deepwater Horizon was burning on the surface, emergency responders sent ROVs to the sea floor to attempt to close the blind shear ram using the "hot stab" or autoshear functions.  Several hot stab attempts to close the blind shear ram failed due to insufficient hydraulic pressure.  Over the course of these events, a number of leaks were discovered in the BOP's hydraulic system, as well as incorrect hydraulic plumbing from the ROV intervention panel to the pipe rams, which was likely the result of aftermarket modifications to the BOP.

**ANSWER:**

The BP Parties admit that following the explosions on the Deepwater Horizon, ROVs were used to activate certain BOP functions, including activation of the blind shear rams through "hot stab" with the ROV intervention panel and activating the autoshear function.  The BP Parties further admit that certain leaks with the BOP system were discovered after the incident. The BP Parties further admit that a modification to the BOP that Transocean and Cameron performed resulted in incorrect hydraulic plumbing from the ROV intervention panel to one of the pipe rams.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

398.   Hydraulic system integrity is critical to the proper functioning of a BOP. Hydraulic pressure supplies the force used to close the various rams in the device — if there is insufficient hydraulic pressure due to leaks, the system will not be powerful enough to close the rams with enough pressure to create a seal against highly pressurized hydrocarbons in the well.

**ANSWER:**

The BP Parties admit that hydraulic pressure supplied the force used to close rams in the BOP, and if there is "insufficient" hydraulic pressure to close the BOP rams, the system will necessarily not be able to close them.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

399.   Ultimately six leaks were discovered in the hydraulic system of the Macondo well's BOP.  From investigation and testimony, Drilling Defendants were aware of at least two, but likely almost all, of these leaks prior to April 20, 2010.  One leak was discovered as early as February 2010, but was never repaired or otherwise addressed by Drilling Defendants.  Vessel workers testified to awareness of other leaks during their congressional testimony.  Not least, the weekly BOP function tests should have made Drilling Defendants aware of the other hydraulic system leaks identified during the ROV intervention.

**ANSWER:**

The BP Parties admit that the Deepwater Horizon Accident Investigation Report published by BP's Incident Investigation Team found six leaks with the BOP hydraulic control system after the incident.  The BP Parties admit that at least one leak, which was not reported on any Transocean IADC Daily Report or the ROV Daily Dive Report, was found by Transocean in February 2010.  The BP Parties admit that MBI hearings included testimony, of which the transcripts' text speaks for itself, regarding a hydraulic fluid leak that was apparently in the lower annular preventer open circuit, and which was investigated but not found.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint

Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

400.    Drilling Defendants were also aware of the aftermarket modifications that hindered the emergency responders' ability to activate the BOP via hot stab procedures. In addition to incorrectly installed aftermarket hydraulic plumbing, Drilling Defendants had switched out one of the Deepwater Horizon's variable bore rams with a non-functional test ram. But after the blowout, emergency responders spent a day futilely trying to close that missing variable bore ram, not knowing it had been replaced with a useless test part, because Drilling Defendants hadn't updated the BOP's schematic diagram to reflect the aftermarket changes – a violation of 29 C.F.R. § 1910.119, which requires, *inter alia*, up-to-date process and safety system equipment drawings as a part of basic process safety management.

**ANSWER:**

The BP Parties deny that the test ram on the Deepwater Horizon was non-functional or useless. The BP Parties admit that a modification to the BOP that was performed by Transocean and/or Cameron resulted in incorrect hydraulic plumbing, which was unknown to the BP Parties prior to April 20, 2010, from the ROV intervention panel to the pipe rams. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint

Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint

Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties

admit the remaining allegations of this paragraph to the extent they are alleged by one or more of

the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of

this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074,

2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about

the truth of the remaining allegations of this paragraph to the extent they are not directed at the

conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and

2802, and therefore deny those remaining allegations.

401.    Drilling Defendant officials were aware of the faulty solenoid valve, poor battery maintenance, hydraulic fluid leaks, and aftermarket modifications on the Deepwater Horizon's BOP long before the April 20, 2010, but no action was ever taken to address the problems, perhaps because additional delays and costs would accrue as all well work stopped and the BOP was raised from the sea floor for repairs.  In addition to posing a significant safety risk, Drilling Defendants' choice to continue drilling with a faulty hydraulic system violated federal regulations, which require companies to disclose problems to the MMS and to stop drilling if either of a BOP's two control systems is not working properly.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim

and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and

Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20,

2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are

alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the

remaining allegations of this paragraph to the extent they are inconsistent with the allegations in

Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

402.    Despite vessel workers' efforts just after the blowout, and emergency engineers' efforts in the weeks after the blowout and sinking, the Deepwater Horizon's blind shear ram never successfully sealed the well.  Although tests determined that the ROVs had activated the high-pressure blind shear ram close function by cutting the autoshear rod, the well continued to spew oil into the Gulf of Mexico.  Investigations thus far have been unable to conclude why the blind shear ram failed to seal the well, but possible causes include insufficient hydraulic power to shear the drill pipe and seal the well, or seal failure due to the high pressure flow of hydrocarbons gushing through the BOP at the time the blind shear ram was attempting to close.

**ANSWER:**

The BP Parties admit that the high-pressure blind shear ram close function appears to have been activated by the cutting of the autoshear rod.  The BP Parties admit that the blind shear rams did not seal the well when the autoshear rod was cut, and that the well continued to release hydrocarbons into the Gulf of Mexico.  The BP Parties admit that investigations are continuing to evaluate why the blind shear rams did not seal the well, and admit that certain investigations have presented possible causes, including those identified in this paragraph.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

403.    As the time of this writing, the official investigation of the BOP retrieved from the seafloor at the Macondo well is still ongoing.  Thus Plaintiffs reserve the right to amend this Voluntary Master Complaint Cross-Claim and Third-Party Complaint for Local Governmental Entities once further information from that and any other future investigations becomes available.

**ANSWER:**

The BP Parties deny that Plaintiffs may amend this Complaint except to the extent allowed under the Federal Rules of Civil Procedure and the Rules and Orders of this Court.

404.    At the time of the disaster, Drilling Defendants were certainly aware that in addition to increasing the risk of blowouts, deep-sea drilling also increases the risk of BOP failure.  Drilling Defendants were also aware that the industry and government had major concerns about the reliability of BOPs like the one installed on the Deepwater Horizon.[39]  A 2004 study by Federal regulators showed that BOPs may not function in deep-water drilling environments because of the increased force needed to pinch and cut the stronger pipes used in deep-water drilling.  Only three of 74 vessels studied in 2004 had BOPs strong enough to squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth.  "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a Blowout," the study said.  Moreover, the study singled out Defendant Cameron, the manufacturer of the Deepwater Horizon's BOP, for relying on faulty calculations to determine the necessary strength for its BOP equipment to function properly at ultra-deepwater depths.

**ANSWER:**

The BP Parties admit that the 2004 West Engineering Services study, the text of which speaks for itself, contains the quoted language from this paragraph.[40]  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against

---

[39]      *See, e.g.* Joint Industry Project (Phase I-Subsea), "Final Report, Blow-out Prevention Equipment Reliability," Report to MMS (May 2009); E. Shanks, "Deepwater BOP Control Systems – A Look at Reliability Issues," Proc. Offshore Technology Conference (2003); Tetrahedron, Inc., "Reliability of Blowout Preventers Tested Under Fourteen and Seven Days Time Interval," Report to MMS (Dec. 1996); Per Holland, "Reliability of Deepwater Subsea Blowout Preventers," Society of Petroleum Engineers (2000); Per Holland and P. Skalle, "Deepwater Kicks and BOP Performance," Report to MMS (July 2001).

[40] By referencing the West Engineering Services study, the BP Parties neither admit nor imply that this document or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

405.    Despite being aware of the risk of the BOP failing at greater depths, Drilling Defendants did not install backup BOP activation systems, backup BOPs or other secondary redundant precautionary measures available to protect the vessel, its workers, Plaintiffs, and the environment from the catastrophic results of a well blowout.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they

are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

406.    The Deepwater Horizon's BOP was outfitted with only one blind shear ram.  But blind shear rams are vulnerable to a "single-point failure" — if just one of the small shuttle valves that carry hydraulic fluid to the ram malfunctions, the BOP cannot seal the well.  A 2000 report on the Deepwater Horizon's BOP concluded that the shuttle valve was the BOP's weak spot — consultants attributed 56 percent of the BOP's "failure likelihood" to this one small valve — and indeed, evidence suggests that when the Deepwater Horizon crew attempted to activate the BOP's blind shear ram, the ram's blades could not cut through the drill pipe because one or more of the shuttle valves leaked hydraulic fluid.

**ANSWER:**

The BP Parties admit that the Deepwater Horizon's BOP had one set of blind shear rams. The BP Parties further admit that a shuttle valve must direct hydraulic fluid from the control pods to the blind shear rams in order to close the blind shear rams.  The BP Parties admit that a 2000 study by EQE for Cameron Controls Corp., the text of which speaks for itself, stated that the final shuttle valve accounted for a 56% of the failure likelihood for the BOP control system to perform an EDS.[41]  The BP Parties deny the remaining allegations of this paragraph.

407.    Vulnerabilities like the BOP blind shear ram's single-point failure risk were well understood by Drilling Defendants and the rest of the oil industry.  In fact, offshore drillers now commonly add an extra layer of protection against this single-point failure risk by equipping their BOPs with two blind shear rams.  In 2001, when the Deepwater Horizon went into service, Transocean was already equipping its newer drilling vessels with BOPs that could accommodate two blind shear rams, and today 11 of Transocean's 14 Gulf of Mexico vessels have two blind shear rams.  (The three that do not were built before the Deepwater Horizon.)  Nevertheless, neither Transocean nor BP retrofitted the Deepwater Horizon's BOP with two blind shear rams. BP's explanation was that the drilling vessel needed to carry the BOP from well to well and there were space limitations, but oil industry experts have dismissed that explanation, saying an additional blind shear ram on the BOP would not necessarily have taken up any more space on the vessel.

---

[41] By referencing the EQE study, the BP Parties neither admit nor imply that this document or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

**ANSWER:**

The BP Parties admit they are aware of drillers currently using BOPs with two blind shear rams.  The BP Parties admit that the *Deepwater Horizon* had one set of blind shear rams.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

408.    Drilling Defendants were also well aware of the benefits of redundant blind shear rams.  In May 2003 the Discover Enterprise — a Transocean vessel operated by BP, just like the Deepwater Horizon — was rocked when the riser pipe connecting the vessel to the wellhead cracked open in two places.  The BOP was activated and the first blind shear ram closed.  After robots checking the integrity of the BOP noticed damage, the second blind shear ram was also closed to provide an extra layer of protection against a blowout.   Despite this firsthand experience of the necessity of redundant blind shear rams, BP and Transocean used one of the slots on the BOP for the non-functional test ram, which would save them money by reducing the time it took to conduct certain well tests, instead of installing a second blind shear ram there.  In a joint letter, BP and Transocean acknowledged their awareness that installing the test ram instead of a functional ram would "reduce the built-in redundancy" and raise the "risk profile" of the Deepwater Horizon.

**ANSWER:**

The BP Parties admit that the *Discoverer Enterprise* is a Transocean drillship and that BP contracted with Transocean for its services.  The BP Parties admit that on May 21, 2003, on the Transocean *Discoverer Enterprise* the lower blind shear rams were closed, sealing the wellbore, and that the upper blind shear rams were later closed by ROV.  The BP Parties further admit that in October 2004, BP America Production Company and Transocean executed a letter agreement for conversion of the VBR to a test ram, the text of which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with Document Nos. 2074, 2075, 2082.

409.  If the BOP on the Macondo wellhead had been functional and properly manufactured by Cameron and/or maintained by Transocean, it could have been manually or automatically activated right after the explosion, stopping the blowout at the wellhead, limiting the Spill to a minute fraction of its ultimate severity, and thereby sparing Plaintiffs millions of dollars in losses and damage.

**ANSWER:**

The BP Parties admit that if the BOP at the Macondo Well had been functional, properly maintained, and properly manufactured, its manual or automatic activation should have sealed the well.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim

in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2064, and therefore deny those remaining allegations.

410.    Defendants BP, Transocean, and one or more of the other Drilling Defendants, failed to ensure that the BOP present on the Deepwater Horizon possessed reasonably safe, adequate, functional technology to prevent blowouts.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient

to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

411.    Defendants Cameron, BP, and Transocean, and one or more of the other Drilling Defendants, failed to ensure that the Deepwater Horizon's BOP had sufficient, functional, built-in redundancy to eliminate single-point failure modes.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

412.    Defendants Cameron, BP, and Transocean, and one or more of the other Drilling Defendants, failed to ensure that all foreseeable repairs, if any, and foreseeable modifications, if any, to the Deepwater Horizon's BOP were performed, completed, and tested with the drilling vessel's operations shut down and the well secured.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

413.   Defendants Cameron, BP, Transocean, and one or more of the other Drilling Defendants, failed to ensure that the testing, if any, of the Deepwater Horizon's BOP was comprehensive, reviewed, and verified, and further failed to check and verify the BOP's entire operating and control system, including but not limited to, checking for leaks at ROV connection points, and verifying the functionality of the AMF and/or autoshear.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim

and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

414.    Defendant Cameron failed to ensure and verify that the BOP it designed, manufactured, marketed, and sold, and which was appurtenant to the Deepwater Horizon drilling vessel, was suitable for the types of drilling conditions, drill pipes, and casing assembly designs that would foreseeably be used during the Deepwater Horizon's drilling and exploration operations.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the

conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

415. Defendants BP, Transocean, Cameron, and one or more of the other Drilling Defendants, could have ensured that a BOP and/or back-up BOP with sufficient strength and reliability for deepwater drilling was present and available on the Deepwater Horizon, but did not do so.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

416. Defendants BP, Transocean, Cameron, and one or more of the other Drilling Defendants, could have installed a back-up acoustic trigger to activate the Deepwater Horizon's BOP in the event that the main trigger failed to activate. In fact, federal regulators at the MMS communicated to one or more of the Drilling Defendants in 2000 that MMS considered a backup BOP activation system to be "an essential component of a deepwater drilling system."

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

417.     Despite this notice, and although the back-up acoustic BOP trigger is a common drilling vessel requirement in other oil-producing nations, including other areas where Drilling Defendants operate, the Deepwater Horizon was not equipped with this back-up acoustic BOP trigger.

**ANSWER:**

The BP Parties admit that the *Deepwater Horizon* was not equipped with a back-up acoustic BOP activation system.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

163

418.    Defendant Cameron designed and manufactured the Deepwater Horizon's BOP device.  Defendant Cameron failed to effectively design the BOP, install sufficiently independent and redundant emergency activation systems on the BOP, or provide adequate warnings, instructions, and guidelines on permissible uses, modifications, and applications of the BOP. The failure of Defendant Cameron's BOP was a cause or contributing factor to the Spill.

**ANSWER:**

The BP Parties admit that Cameron designed and manufactured the *Deepwater Horizon* BOP.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

### 3.    Poor Vessel Maintenance and Reckless Bypass Of Safety Systems

419.    Unfortunately, the BOP was not the only part of the Deepwater Horizon that was poorly maintained and in disrepair at the time of the blowout.  Transocean, the vessel's owner, had a history of postponing and ignoring needed maintenance on the Deepwater Horizon, despite concerns raised by its own employees and other vessel workers.  In the weeks before the blowout, the Deepwater Horizon suffered power outages, computer glitches, and a balky propulsion system.  In some cases, Transocean officials even purposely overrode or disabled vital safety mechanisms and alarms.  When the Macondo well blew out, the Deepwater Horizon's shoddy maintenance facilitated a cascade of failures of multiple emergency systems, exacerbating the disaster.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

420.    According to testimony given before a federal panel by vessel engineers in August 2010, the Deepwater Horizon had a number of ongoing equipment problems at the time of the blowout, some of which contributed to the failure of backup generators that should have powered safety and shutdown devices immediately after the blowout.  Vessel-wide electrical failures had occurred two or three times before April 20, 2010, and the driller's control chair had lost power just a few days prior to the blowout.  The primary computer used to control all vessel drilling functions routinely crashed and had to be restarted, interfering with vessel workers' ability to monitor well data.  One of the vessel's thrusters, an underwater propeller that helps the floating vessel move and stabilize itself in the water, had been "having problems" for eight months prior to the blowout.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-

Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

421.    Further, the computerized system used to monitor routine maintenance aboard the vessel was not working optimally because glitches from a recent computer system migration had not yet been resolved.  Sometimes the computer called for maintenance to be done on equipment that did not exist aboard the vessel, while some pieces of equipment that were aboard the vessel and in need of maintenance were not registered by the computer.

**ANSWER:**

The BP Parties admit that Transocean's computerized maintenance system was switched from EMPAC to RMS and that certain issues had been identified with the system.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of

the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

422.    Even worse, some key safety systems and alarms on the Deepwater Horizon had been intentionally bypassed or disabled by Transocean.  Mike Williams, a chief electronics technician working for Transocean aboard the Deepwater Horizon, testified that on the night of the blowout, a pressure regulator valve, which automatically cuts off gas flow at a certain pressure point and could have helped stop the blowout, was in "bypass" mode when the gaseous hydrocarbons blew out of the Macondo well.  Williams had repeatedly expressed concern about bypassed safety systems to Transocean supervisors, only to be upbraided for his efforts.  In one instance, Williams activated a gas safety valve that he thought was erroneously in "bypass" mode.  Williams testified that Transocean subsea supervisor Mark Hay reprimanded him for it, saying: "'The damn thing has been in bypass for five years.  Why did you even mess with it?' … And [Hay] said, 'As a matter of fact, the entire fleet [of Transocean drilling vessels] runs them in bypass.'"

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

423.    Williams said a fire alarm system on the vessel was also partially disabled at the time of the blowout, and had been for at least a year since Williams first noticed it.  The system was set to "inhibited" mode, meaning that the control panel would indicate a problem, but a general alarm would not sound throughout the vessel unless manually activated.  Transocean supervisors told Williams "they did not want people to wake up at 3 a.m. due to false alarms." Williams testified that he complained regularly about the practice of disabling and bypassing alarms and safety systems; his most recent complaint was just three days prior to the blowout.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-

Claim and Third Party Complaint Against Transocean, which were served on all counsel on

April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent

they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the

remaining allegations of this paragraph to the extent they are inconsistent with the allegations in

Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to

form a belief about the truth of the remaining allegations of this paragraph to the extent they are

not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos.

2074 and 2075 and therefore deny those remaining allegations.


424.    Upon information and belief, had Transocean not disabled the alarm systems, the system would have sounded alarms just after the blowout, shut down all potential ignition sources, and activated the drilling vessel's EDS, which would have prevented the explosion and likely saved the lives of the 11 vessel workers who perished in the disaster.

**ANSWER:**

The BP Parties admit that had the alarm systems not been disabled, and if they were

functioning properly, that they should have sounded after the blowout and shut down potential

ignition sources.  The BP Parties adopt and incorporate by reference Document 2074, the BP

Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean

and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint

Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit

the remaining allegations of this paragraph to the extent they are alleged by one or more of the

BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this

paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and

2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of

the remaining allegations of this paragraph to the extent they are not directed at the conduct or

liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore

deny those remaining allegations.

425.    When the Deepwater Horizon lost power during the blowout, none of the backup
or emergency generators were working — equipment that was on board for the very purpose of
providing power to alarm and safety systems in just such an emergency. Transocean employee
and Deepwater Horizon chief engineer Stephen Bertone testified that there was no general alarm,
no internal communications, and no power to the vessel's engines.   "We were a dead ship."
Without power, the crew was also unable to engage the EDS that would have stopped the flow of
gas fuelling the fire on the vessel, and many other alarm and safety systems were rendered silent
and useless.

**ANSWER:**

The BP Parties admit that Stephen Bertone testified, the transcript's text of which speaks

for itself.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties'

Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim

in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against

Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the

remaining allegations of this paragraph to the extent they are alleged by one or more of the BP

Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to

the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP

Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

426.    An equipment assessment commissioned by Transocean in April 2010, just before the blowout, revealed many key components on the Deepwater had not been fully inspected since 2005, and at least 36 components and systems on the vessel were in "bad" or "poor" condition, which "may lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment." The equipment assessment also found problems with the vessel's ballast system that they noted could directly affect the stability of the ship. The assessment found a malfunctioning pressure gauge and multiple leaking parts, and also faulted the decision to use a type of sealant "proven to be a major cause of pump bearing failure."

**ANSWER:**

The BP Parties admit that Transocean, without participation from the BP Parties, commissioned an equipment assessment, the text of which speaks for itself. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

170

427.    The findings of the Transocean-commissioned equipment assessment echoed the results of a similar BP-commissioned audit that had been conducted in September 2009, which found that Transocean had "overdue planned maintenance considered excessive — 390 jobs amounting to 3,545 man hours [of needed maintenance work]."

**ANSWER:**

The BP Parties admit that Transocean, without involvement from the BP Parties, commissioned an equipment assessment, the text of which speaks for itself. The BP Parties admit that BP's Rig Audit Group conducted a follow-up rig audit in September 2009 and issued a report containing its findings, the text of which speaks for itself. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

428.    In a confidential worker survey conducted on the Deepwater Horizon just weeks before the blowout, Transocean employees voiced concerns about poor equipment reliability. One worker noted that the drilling vessel had not once in its nine-year career been taken to dry dock for necessary repairs: "we can only work around so much." Another worker described Transocean's policy of running equipment to failure before making just the bare minimum repairs: "[r]un it, break it, fix it. … That's how they work."

**ANSWER:**

The BP Parties admit that the above quoted language was part of a Lloyd's Register report on Transocean safety management and safety culture.[42]   The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.   The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

429.   The other Drilling Defendants were all aware of Transocean's poor maintenance of the Deepwater Horizon and its practice of disabling or bypassing vital safety systems, and alarms, yet none of them called for work to stop until vessel safety was improved, and none of them reported Transocean's actions and inactions to the MMS.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties adopt and incorporate by reference

---

[42] By referencing the Lloyd's Register report, the BP Parties neither admit nor imply that this document or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

## N.  The Spill's Impact on Plaintiffs

430.  All the evidence of Drilling Defendants' misguided priorities and imprudent decisions regarding the Macondo well and the Deepwater Horizon described above is part of a pattern of cocksure behavior — "a culture of complacency," as the chairmen of the presidential commission investigating the Spill called it during a hearing on November 10, 2010.  In essence, "[l]eaders did not take serious risks seriously enough and did not identify a risk that proved to be fatal," the commission chairmen said.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are

alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

431.    This complacency was especially deplorable considering the fact that workers and leaders on the Deepwater Horizon had just survived a near miss – the March 8, 2010, influx that went unnoticed for 33 minutes, allowing 40 barrels of hydrocarbons to leak into the well before it was shut in.  That brush with disaster should have been a lesson learned for Drilling Defendants, but to the contrary, just six weeks later their haste and carelessness again led them to miss signs of an influx, this time for even longer – 49 minutes – not noticing the breach until it was too late.

**<u>ANSWER:</u>**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they

are not directed at the conduct or liability of the BP Parties and are not addressed in Document

Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

432.    An independent group of scientists singled out BP in particular for its "lack of discipline" in its operations at Macondo, in an interim report released November 17, 2010. "Numerous decisions to proceed toward abandonment [well completion] despite indications of hazard, such as the results of repeated negative-pressure tests, suggest an insufficient consideration of risk and a lack of operating discipline," according to the 15-member panel of National Academy of Engineering scientists.

**ANSWER:**

The BP Parties admit that a group of National Academy of Engineering scientists stated

the above quoted language.[43]   The BP Parties deny the remaining allegations of this paragraph to

the extent they concern the conduct or liability of the BP Parties.

433.    Moreover, the panel found that BP suffered from a lack of "management discipline" and problems with "delegation of decision making" on board the Deepwater Horizon. Workers aboard the drilling vessel were often unsure about who was actually in charge, and there was a "lack of on board expertise and of clearly defined responsibilities," the NAE report said. Poor communication between employees of the various Drilling Defendants also contributed to the confusion on the vessel.

**ANSWER:**

The BP Parties admit that a group of National Academy of Engineering scientists stated

the above quoted language.[44]   The BP Parties deny the remaining allegations of this paragraph to

the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge

or information sufficient to form a belief about the truth of the remaining allegations of this

paragraph, and therefore deny them.

---

[43] By referencing the NAE report, the BP Parties neither admit nor imply that this document or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

[44] By referencing the NAE report, the BP Parties neither admit nor imply that this document or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

434.    As the Deepwater Horizon Study Group put it: "It is the underlying 'unconscious mind' that governs the actions of an organization and its personnel."   In the case of the Deepwater Horizon, the cultural influences permeating the Macondo teams – both on the vessel and on the beach – reflected "gross imbalances between production and protection incentives" and manifested in "actions reflective of complacency, excessive risk-taking, and a loss of situational awareness."

**ANSWER:**

The BP Parties admit that the Deepwater Horizon Study Group stated the above quoted language.[45]  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.

435.    Drilling Defendants' desultory approach to their respective responsibilities regarding the Deepwater Horizon Macondo well was in direct violation of federal regulations intended to maintain public safety.   Pursuant to 33 C.F.R. 250.107, Drilling Defendants were required to protect health, safety, property, and the environment by (1) performing all operations in a safe and workmanlike manner; and (2) maintaining all equipment and work areas in a safe condition.   They were further required to immediately control, remove, or otherwise correct any hazardous oil and gas accumulation or other health, safety, or fire hazard and use the "best available and safest technology" whenever practical on all exploration, development, and production operations.   Drilling Defendants' violation of these regulatory mandates caused and/or contributed to the Macondo well blowout and the subsequent explosions, fire, sinking, and Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties further deny any and all allegations of

wrongdoing against the BP Parties, including allegations that they have violated any federal

regulations.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties'

Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim

in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against

Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against

---

[45] By referencing the Deepwater Horizon Study Group, the BP Parties neither admit nor imply that their documents or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

436.   This culture of carelessness and impudence was not limited to Drilling Defendants' actions and decisions on the Deepwater Horizon at the Macondo well.  In fact, Drilling Defendants have a history of foolhardy, irresponsible behavior across their operations on land and at sea – a record littered with accidents, spills, regulatory violations, fines, and lawsuits.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties further deny any and all allegations of wrongdoing against the BP Parties, including allegations that they were careless or irresponsible.[46]  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph and therefore deny those remaining allegations.

437.   Defendant BP has an especially sordid history of cutting corners on safety to reduce operating costs.  In 2005, a blast at a Texas refinery killed 15 people and injured more than 170; Federal investigators found the explosions were in part due to cost-cutting and poor facility maintenance.  Also in 2005, a large production platform in the Gulf of Mexico began listing severely and nearly sank due to a defective control system.  And in 2006, four years after being warned to check its pipelines, BP had to shut down part of its Prudhoe Bay oilfield in

---

[46] Plaintiffs' references to any alleged past accidents, spills, regulatory violations, fines, or lawsuits are inadmissible into evidence and not relevant to this matter.

Alaska after oil leaked from a corroded pipeline.  As noted by the Deepwater Horizon Study Group in its second Progress Report, all the investigations of BP's previous disasters "noted that cost cutting, lack of training, poor communication, poor supervision and fatigue were contributors" to the various calamitous incidents.

**ANSWER:**

The BP Parties admit that in 2005, 15 people died and 170 others were injured as the result of an explosion at the Texas City Refinery.  The BP Parties further admit that the Thunder Horse semi-submersible platform located in Mississippi Canyon Block 778 in the Gulf of Mexico began listing in July 2005 but was subsequently repaired and that in 2006 a pipeline leak temporarily shut down the Prudhoe Bay oil field in Alaska after oil leaked from a corroded pipeline.[47]  The BP Parties further admit that the Deepwater Horizon Study group stated the above quoted language.[48]  The BP Parties deny the remaining allegations of this paragraph.

438.   Despite this history of catastrophes and close calls, BP has been chronically unable or unwilling to learn from its many mistakes.  The company's dismal safety record and disregard for prudent risk management are the results of a corporate safety culture that has been called into question repeatedly by government regulators and its own internal investigations.  BP has consistently demonstrated that it will choose profit before safety at the expense of human lives and the environment.  Moreover, the company's actions imply that it would rather pay fines than comply with U.S. law, as paying those fines — if and when its negligence is actually discovered — is ultimately a cheaper long-term strategy than regulatory compliance.  This deficient corporate culture has been cited as a primary contributor to previous disasters at BP facilities, and is ultimately to blame for BP's grossly negligent decisions concerning the Macondo well, decisions made with willful, wanton, and reckless indifference to the foreseeably tragic results to the workers aboard the drilling vessel, the environment, and Plaintiffs.

---

[47] Plaintiffs' reference to any alleged past accidents, spills, regulatory violations, fines, or lawsuits are inadmissible into evidence and not relevant to this matter.

[48] By referencing the Deepwater Horizon Study Group, the BP Parties neither admit nor imply that their documents or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.[49]

439.    Many of BP's workers at various facilities have voiced complaints about their employer's actions and policies, sometimes in the face of harsh retaliation from supervisors. Former employees, contractors, and oil field workers who worked for and with BP have reported that BP regularly cheated on pressure tests and failed to report leaks and spills to the proper authorities.  For example, a BP subsidiary in Carson, California, submitted falsified inspection results to air quality regulators for eight years before it was revealed that the refinery was in a frightening state of disrepair.  Instead of running at 99% compliance with regulations, as the falsified reports from BP had indicated, the refinery was actually operating with 80% *non*compliance.  Workers at BP's Alaskan oilfield accused the company of allowing "pencil whipping," or falsifying inspection data, as well as pressuring workers to skip key diagnostics, including pressure testing, cleaning of pipelines, and corrosion checks, in order to cut costs. Workers on the Deepwater Horizon also described "a corporate culture of …ignoring warning signs ahead of the [April 20th] blast," saying that "BP routinely cut corners and pushed ahead despite concerns about safety."  After all, as one Alaska worker was pointedly told when he raised a safety concern: "Safety doesn't make money."

**ANSWER:**

The BP Parties admit that in March 2005, BP West Coast Products LLC settled a lawsuit brought by the South Coast Air Quality Management District that included allegations of inadequate inspection and maintenance of facilities and equipment, inconsistencies in refinery record-keeping, and air emission releases.[50]  Various allegations of paragraph 470 purport to reference or quote various statements of unnamed individual BP employees and/or contractors but provide no citation or source information for these alleged statements.  Therefore, the BP Parties lack knowledge or information sufficient to form a belief about the truth of those allegations purporting to reference or quote these statements, and deny them.  The BP Parties deny the remaining allegations of this paragraph.

---

[49] Plaintiffs' reference to any alleged past accidents, spills, regulatory violations, fines, or lawsuits are inadmissible into evidence and not relevant to this matter.

[50] Plaintiffs' reference to any alleged past accidents, spills, regulatory violations, fines, or lawsuits are inadmissible into evidence and not relevant to this matter.

440.    Prior incidents, investigations and testimony from Congressional hearings has shown that BP actively discourages workers from reporting safety and environmental problems. Reports from multiple investigations of the Texas City and Alaska disasters all indicate a pattern of intimidating — and sometimes firing — workers who raise safety or environmental concerns. In Alaska, pressure for increased production with fewer safety reports created "an environment where fear of retaliation [for reporting problems] and intimidation did occur." Also in Alaska, a pipeline safety technician working for a BP contractor was scolded, harassed, and ultimately fired for reporting a crack in a pipe that was dangerously close to an ignition source, despite that other reports indicated he was one of the top-performing employees in his position. "They say it's your duty to come forward," he said of BP's official corporate policies, "but then when you do come forward, they screw you." In a more extreme example, in the 1990s a BP executive was involved in a scandalous scheme involving spies hired to track down a whistleblower who had leaked information about BP spills to the press.

**ANSWER:**

The BP Parties deny that "BP actively discourages workers from reporting safety and environmental problems.[51]" Various other allegations of paragraph 471 purport to reference or quote various statements in reports from multiple investigations and "testimony from Congressional hearings" but provide no citation or source information for the alleged statements. Therefore, the BP Parties lack knowledge or information sufficient to form a belief about the truth of those allegations purporting to reference or quote these statements, and deny them. The BP Parties deny the remaining allegations of this paragraph.

441.    When Tony Hayward took office as CEO of BP p.l.c. in 2007, he pledged to change BP's culture with a renewed commitment to safety. Yet according to the Occupational Safety and Health Administration ("OSHA"), over the past three years — during which time BP was under Mr. Hayward's leadership — BP has committed 872 safety violations — most categorized by OSHA as "egregious willful" — a number made even more shocking when compared to BP's competitors, who average about five violations each. Two refineries owned by BP account for 97 percent of all "flagrant" violations found in the refining industry by government safety inspectors over the last three years. According to a former EPA lawyer involved in the Spill investigations, "none of the other supermajors have an environmental criminal record like they do."

---

[51] Plaintiffs' reference to any alleged past accidents, spills, regulatory violations, fines, or lawsuits are inadmissible into evidence and not relevant to this matter.

**ANSWER:**

The BP Parties admit that when Tony Hayward took office as CEO of BP p.l.c. in 2007, he expressed a commitment to safe and reliable operations by BP. The BP Parties further admit that the Occupational Safety and Health Administration has over the past three years cited certain BP entities for alleged safety violations, but that the BP Parties have contested whether many of those citations constitute actual violations[52]. Plaintiffs do not provide a citation or source of information for the alleged statement of a "former EPA lawyer" and therefore the BP Parties lack knowledge or information sufficient to form a belief about the truth of those allegations relating to that alleged statement, and therefore deny them. The BP Defendants deny the remaining allegations of this paragraph.[53]

442. BP's marginal ethics are well known to its competitors and others in the oil and gas industry, yet other companies, including Defendants, continue to work with BP closely and frequently. For example, BP is one of Halliburton's largest oil drilling and cement operations customers. Halliburton has worked with BP on a great number of projects over the past decade, despite being aware of BP's flagrant and pervasive disregard for safety and constant reckless risk-taking in the pursuit of profits. Clearly, Halliburton values the preservation of its lucrative relationship with BP over its obligations to the MMS, the environment, its employees, Plaintiffs and all the many others plainly within the scope of the foreseeable risk when disaster inevitably struck at Macondo.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

---

[52] Plaintiffs' reference to any alleged past accidents, spills, regulatory violations, fines, or lawsuits are inadmissible into evidence and not relevant to this matter.

[53] The BP Parties object to these allegations on the ground that they are not allegations of fact, but are instead immaterial, impertinent, and inflammatory material, and thus should be stricken in accordance with Rule 12(f) of the Federal Rules of Civil Procedure.

443.    Like BP, Transocean's corporate culture is also skewed towards profits at the expense of safety, according to the results of the broad review of its North American operations made before the blowout.  Workers complained of poor equipment reliability that they attributed to "drilling priorities taking precedence over planned maintenance."  "[Transocean] won't send the rig to the shipyard for major refurb that is required in certain areas," said one worker.  Transocean's system for tracking health and safety issues on the Deepwater Horizon was "counterproductive," according to nearly all the workers surveyed.  Fake data entered into the program in order to circumvent it distorted the perception it gave of safety on the vessel.  Moreover, as Mike Williams testified, Transocean's entire fleet of drilling vessels bypassed certain vital safety systems as a matter of practice.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

444.    Investigators also found that a stifling bureaucracy imposed by onshore management bred resentment among Transocean vessel workers.  Workers complained that past problems were only investigated by the company in order to place blame, rather than to learn from the mistakes.  Although workers "often saw unsafe behavior at the rig" many expressed fears of reprisals for reporting problems, especially to supervisors based in Houston.  This tension between the vessel and the beach likely played a role in discouraging workers on Deepwater Horizon from reporting problems or anomalies like the abnormal negative pressure results to their supervisors onshore.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

445.    As Defendants internally prioritize profits over safety at every level of their companies, they continue to resist and evade regulation of the oil exploration and production industry.  For example, despite the known vulnerabilities and shortcomings of BOPs in deepwater drilling, this year BP helped finance a study to support their argument that BOP pressure tests should be required with less frequency — every 35 days rather than the current frequency of every 14 days.  This change would save the industry $193 million per year in "lost productivity."  BP has also actively opposed MMS rules requiring drilling vessel lessees and operators to develop and audit their own Safety and Emergency Management Plans, insisting that voluntary compliance will suffice.  The Deepwater Horizon disaster is a tragic example to the contrary.

**ANSWER:**

The BP Parties admit that they have participated in or sponsored studies regarding safety and efficiency in offshore oil and gas exploration and production, including deepwater drilling. The BP Parties admit that one of those studies suggested that because BOPs pass pressure tests more than 99.9% of the time, it would be reasonable to increase the testing interval from 14 to 35

days.[54]  The BP Parties further admit that they have participated in the regulatory rulemaking

process.  The BP Parties deny the remaining allegations of this paragraph to the extent they are

directed at the BP Parties, and to the extent that this paragraph relies on and/or characterizes

unidentified documents.  The BP Parties lack knowledge or information sufficient to form a

belief about the truth of the remaining allegations of this paragraph, and therefore deny them.


446.    Decisions tradeoffs, actions, and inactions by Drilling Defendants, including the risky well design, inadequately tested cement, tests that were skipped or misinterpreted, and procedures that deviated from industry norms, all contributed to, and practically ensured the blowout of the Macondo well.  At no time did any of Drilling Defendants report regulatory violations to the authorities, or call to stop work because of unsafe decisions, plans, actions, or conditions in the well or on the vessel.  The carelessness, nonchalance, inexperience, and distraction of Drilling Defendants resulted in insufficient well monitoring and overlooking the signs of an influx for 49 minutes prior to the blowout.  Once the well blew out, Drilling Defendants' poor vessel maintenance and intentional bypass of alarms and emergency systems contributed to the failure of safety mechanisms, exacerbated the disaster, and likely caused the unnecessary deaths and injuries of vessel workers, and the destruction of the Deepwater Horizon. Underlying it all, Drilling Defendants' corporate cultures of trading safety for speed, production, and profit, and encouraging their employees to do the same, sped the inevitable approach of catastrophe.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim

and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and

Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20,

2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are

---

[54] By referencing various studies, the BP Parties neither admit nor imply that the documents or the referenced statements are admissible into evidence and expressly reserve all objections to the use or admissibility of the documents or the referenced statements.

alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

O.   **Defendants Misrepresent the Severity of the Spill and their Oil Spill Response Capabilities**

447.    On the night of April 20, after the explosions ignited the vessel, the resulting gas-fueled fire on the Deepwater Horizon raged for two days, as the vessel listed progressively and finally sank on April 22, 2010.  On the sea surface, the Deepwater Horizon had been connected to the wellhead at the seafloor by a 5,000-foot marine riser pipe, and as the vessel sank to the seafloor, it dragged the riser down with it, bending and breaking the pipe before finally tearing away from it completely.  The riser, bent into a crooked shape underwater, now extended 1,500 feet up from the wellhead and buckled back down.  Immediately oil and natural gas began to gush from the open end of the riser and from at least two places along its twisted length.

**ANSWER:**

The BP Parties admit that one or more fires and explosions occurred on the *Deepwater Horizon* April 20, 2010, that the vessel sank on April 22, 2010, and that the riser bent and broke as the vessel sank, resulting in the release of hydrocarbons.  The BP Parties deny the remaining allegations of this paragraph.

448.    For 87 days, the surge of oil and gas from the gushing well continued unabated, and the Spill's fast-growing oil slick made landfall on April 30, 2010, affecting increasingly larger areas of the Coastal Zone as it was driven landward by currents and winds.  Once the oil reached the coasts, it damaged the pristine beaches and delicate wetlands, marshes, and estuaries that line the coasts of the Gulf States, destroying the habitats and spawning sites of marine life, as well as the tourism industry and property values in the Coastal Zone.

**ANSWER:**

The BP Parties admit that hydrocarbons that once existed deep inside the Outer Continental Shelf travelled during the spill out of the Macondo reservoir, through the well, and then through Transocean-owned vessel appurtenances including the BOP and riser, before discharging into Gulf of Mexico waters or being captured by various containment methods, from April 20, 2010 until the well was capped on or around July 15, 2010, and that some of the hydrocarbons reached the shorelines of Louisiana, Mississippi, Alabama, and Florida. The BP Parties deny that for 87 days the Spill went unabated. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

449. From the outset, BP attempted to downplay and conceal the severity of the Spill. BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of its actual measured leakage amount of 50,000 barrels per day. On or about June 20, 2010, Congressman Edward Markey released an internal BP document showing that the company's own analysis had shown that the rate of oil spillage could reach as high as 100,000 barrels, or 4,200,000 gallons, per day. BP's may have understated the Spill size because certain pollution-related fines against BP will ultimately be calculated based on the volume of oil and other pollutants spilled.

**ANSWER:**

The BP Parties admit that Congressman Edward Markey released a BP document that hypothesized that the flow rate up the casing could be as high as 100,000 barrels per day "if BOP and wellhead are removed and if we have incorrectly modeled the restrictions.[55]" BP-HZN-2179MDL01443509. The BP Parties deny any and all allegations of wrongdoing against the BP

---

[55] By referencing the BP-HZN-2179MDL01443509, the BP Parties neither admit nor imply that this document or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

Parties, including allegations that they downplayed, understated, or concealed the severity of the Spill. The BP Parties deny the remaining allegations of this paragraph.

450.    BP's obstructionist behavior regarding accurate data continued as the Spill progressed; BP did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the Spill, and stymied scientists' efforts to gauge the scope of the disaster on land and at sea. *The New York Times* reported on May 16, 2010, that "BP has resisted entreaties from scientists that they be allowed to use sophisticated instruments at the ocean floor that would give a far more accurate picture of how much oil is really gushing from the well."

**ANSWER:**

The BP Parties admit that the *New York Times* published the above quoted language.[56]

The BP Parties deny any and all allegations of wrongdoing against the BP Parties, including allegations that they did not provide complete or timely information to the appropriate entities.

The BP Parties deny the remaining allegations of this paragraph.

451.    Just as BP was now understating the severity of the Spill, it soon became clear that BP had previously overstated its ability to respond to a spill. In its Initial EP, submitted prior to beginning work at Macondo, BP had assured the MMS that it could effectively contain any spill of up to 250,000 barrels of oil per day, using "proven equipment and technology." In reality, BP was not at all prepared for an oil spill of any size. The spill-prevention plan BP had submitted to the MMS was an obvious cut-and-paste job that had not been updated to current conditions – not only did it reference Arctic wildlife not indigenous to the Gulf of Mexico, such as walrus, it also listed incorrect and out-of-date contact information for oil spill engineers and experts, including one wildlife expert who died in 2006.

**ANSWER:**

The BP Parties admit that the February 2009 Initial Exploration Plan for Mississippi Canyon Block 252 and the June 2009 BP Regional Oil Spill Response Plan - Gulf of Mexico, which each speaks for itself, were submitted to the federal government. The BP Parties deny any and all allegations of wrongdoing against the BP Parties, including allegations that they

---

[56] By referencing the *New York Times*, the BP Parties neither admit nor imply that their documents or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

understated the severity of the Spill, or inaccurately portrayed their ability to respond to a spill. The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with the February 2009 Initial Exploration Plan for Mississippi Canyon Block 252 and the June 2009 BP Regional Oil Spill Response Plan - Gulf of Mexico.  The BP Parties deny the remaining allegations of this paragraph.

452.    BP Chief Operating Officer Doug Suttles admitted on May 10, 2010, that BP did not actually have a response plan with "proven equipment and technology" in place that could contain the Deepwater Horizon Spill.  Later, BP p.l.c. CEO Tony Hayward told the BBC that "BP's contingency plans were inadequate," and that the company had been "making it up day to day."  In its official statement, BP made essentially the same admission:  "All of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

**ANSWER:**

The BP Parties admit that they released a statement that "All of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before," and that Doug Suttles and Tony Hayward stated the above quoted language.  The BP Parties deny the remaining allegations of this paragraph.

453.    Despite the constant risk of a spill at any one of its many Gulf of Mexico wells, BP did not have a realistic response plan, a containment barge, skimming vessels, a response crew, or recovery material like containment boom ready and available to deploy immediately in an emergency.  On the contrary, the Spill response could not begin until the U.S. government, including the Coast Guard and the Navy, brought in skimmers, boom, and other materials, and volunteers were found to assist with the clean up.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

454.    On May 17, 2010, U.S. Senators Barbara Boxer, Ben Cardin, Frank Lautenberg, Kirsten Gillibrand, Bernie Sanders, Amy Klobuchar, Tom Carper, and Jeff Merkely contacted U.S. Attorney General Eric Holder to specifically request that the U.S. Department of Justice

"open an inquiry into whether British Petroleum (BP) made false and misleading statements to the federal government regarding its ability to respond to oil spills in the Gulf of Mexico," noting:

> In the wake of the Deepwater Horizon oil spill, it does not in any way appear that there was "proven equipment and technology" to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico. Much of the response and implementation of spill control technologies appears to be taking place on an ad hoc basis.

**ANSWER:**

The BP Parties admit that the above Congressional members stated the above quoted language.[57]  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.

455.    Upon information and belief, BP also hindered efforts to kill the Macondo well and stop the flow of oil and gas into the Gulf waters.  Engineers knowledgeable about blowout responses told BP how to kill the well as early as June 2010, but BP, after conferring with its Macondo lease partners Anadarko, Anadarko E&P, and MOEX Offshore, chose to ignore the engineers' well-kill procedure, because BP did not want to damage the well – or its chance to make a profit at Macondo.  Because BP, along with its lease partners, hoped to retap the Macondo well and the large, valuable reservoirs beneath it, they ignored expert well-kill information that could stopped the Spill many weeks earlier.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

**P.    The Spill's Impact on Plaintiffs, the Environment, and the Coastal Zone Economy**

456.    Since the Spill began, unprecedented amounts of raw crude oil, emulsified and weathered oil, natural gas, chemical dispersants, and other toxic pollutants have contaminated the Gulf of Mexico and the Coastal Zone – a total petroleum discharge of 6.9 million barrels, not including the million gallons of chemical dispersants and any other toxic pollutants that were also released as a result of the Spill.

---

[57] By referencing the statements of Congressional members, the BP Parties neither admit nor imply that the referenced statements are admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

**ANSWER:**

The BP Parties admit that the Incident resulted in a release of hydrocarbons; that BP working as part of the Unified Command took action of unprecedented scale to respond to the Spill; and that as permitted by the National Contingency Plan and with the approval of the Unified Command, dispersants were applied to those hydrocarbons. The BP Parties deny the remaining allegations of this paragraph.

457. The oil released during the Spill contains benzene, toluene, polyaromatic hydrocarbons, and other compounds (collectively referred to as Total Petroleum Hydrocarbons, or "TPH"), all of which are known carcinogens. Discharge of the toxic pollutants, as identified in 40 C.F.R. § 401.15, likely includes, but is not limited to, benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (including, but not limited to, phenanthrene, benzanthracenes, benzophyrenes, benzofloranthene, chrysenes, dibenzanthracenes, and idenopyrenes), fluoranthene, arsenic, cadmium, copper, mercury, and nickel, all of which are hazardous to the health of humans and marine life. Upon information and belief, BP has analyzed and knows the exact concentrations of each of the toxic pollutants present in the oil coming from its wells.

**ANSWER:**

The BP Parties admit that oil released during the Spill, in common with other oil present in the Gulf of Mexico, likely contained benzene, toluene, polyaromatic hydrocarbons and other compounds, that benzene has been classified by the United States government as a human carcinogen, and that polyaromatic hydrocarbons are part of a larger group of chemicals, some of which have been classified by the United States government as probable human carcinogens based on animal studies. The BP parties further admit that any chemical substance can create hazards to human health, depending on factors such as concentration, potency, exposure and the sensitivity of the exposed person or population. The BP Parties deny the remaining allegations of this paragraph.

458. Moreover, the chemical dispersants used by BP during the Spill response may be harmful to the health of humans and marine life. Over two million gallons of chemical

dispersants were released into Gulf waters to disperse the oil coming from the damaged well. According to environmental experts in the Deepwater Horizon Study Group, oil recovery (such as skimming) is preferable to chemical dispersion because recovery actually removes the oil from the environment, rather than simply spreading it through the water column and sinking it to the sea floor, where it can continue to cause environmental damage to the Gulf ecosystem while no longer causing public relations damage to BP.  The environmental effects of using chemical dispersants in such magnitude and at such depths have never been tested.

**ANSWER:**

The BP Parties admit that according to the *Oil Budget Calculator* report prepared by the United States government, approximately 1.8 million gallons of chemical dispersants were used in the response; that those dispersants are permitted for such use by the National Contingency Plan and were used in the response with the approval of the Unified Command; that testing for potential environmental and health impacts was conducted throughout the response; and that monitoring for potential long-term effects is ongoing.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph attributed to the "Deepwater Horizon Study Group," and therefore deny those allegations.  The BP Parties deny the remaining allegations of this paragraph.


459.    The Spill has impacted and continues to impact Plaintiffs and the shorelines, beaches, shores, marshes, harbors, estuaries, bayous, bays, and waters of the Coastal Zone.

**ANSWER:**

The BP Parties admit that some portions of the shorelines, beaches, shores, marshes, harbors, estuaries, bayous, bays, and waters of the Coastal Zone were impacted by the Spill.  The BP Parties deny that all Plaintiffs, and all such areas, were impacted as a result of the Spill, and deny that any such impacts continue because clean-up efforts sponsored by BP are ongoing in locations where such efforts are necessary.  The BP Parties deny the remaining allegations of this paragraph.

460.    The Spill and the resulting contamination of the Coastal Zone have caused and will continue to cause a loss of revenue for individuals and entities that rely on the use of the Gulf of Mexico and/or its marine life.

**ANSWER:**

The BP Parties admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill, including such claims based on revenue losses sustained by those who rely on the Gulf of Mexico and its marine life. Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses. Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the remaining allegations of this paragraph.

461.    There are a wide variety of commercially valuable fish species in the Gulf of Mexico that have been and will continue to be harmed by the Spill, including, but not limited to, shrimp, crabs, oysters, menhaden,[58] and pelagic fish.

**ANSWER:**

The BP Parties admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill, including such claims based on impacts on commercially valuable fish species.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP

---

[58]    Menhaden are small, oily-fleshed fish that play a major role in the marine ecosystem on the East Coast of the United States, serving as an invaluable prey species for many predatory fish, such as striped bass, bluefish, mackerel, flounder, tuna, and sharks.  Menhaden are also a very important food source for many Gulf Coast birds, including egrets, ospreys, seagulls, northern gannets, pelicans, and herons.

Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the remaining allegations of this paragraph.

462.    The Spill caused the National Oceanographic and Atmospheric Administration ("NOAA") to restrict commercial and recreational fishing across large areas of the Gulf of Mexico – up to 88,552 square miles at the restriction's greatest extent – causing damage to the livelihoods of many of Plaintiffs' citizens.  Fishing of certain species and in certain areas of the Gulf is currently still restricted until further notice from NOAA.

**ANSWER:**

The BP Parties admit that NOAA, at one point in time following the Incident, decided to prevent commercial and recreational fishing in an area that at its peak amounted to 88,552 square miles.  The BP Parties deny the remaining allegations of this paragraph.

463.    According to the National Marine Fisheries Service, commercial fishermen harvested 1.4 billion pounds of fish from the Gulf of Mexico in 2009, resulting in $614.5 million in total landings revenue for the region.

**ANSWER:**

The BP Parties admit that the National Marine Fisheries Service reported the above information.

464.    Major shrimp species in the Gulf of Mexico, including, but not limited to, white, pink, Red Royal, and brown shrimp, are mainly located in coastal areas.  During the Spill, the Gulf's various shrimp species were harmed due to mortality of adults, as well as that of postlarval shrimp, whose migrations out of the inlets, shallows, and estuaries where they were born coincided precisely with the timing of the Spill, devastating current as well as future shrimp catches.

**ANSWER:**

The BP Parties admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill, including such claims based on impacts on shrimp population and habitats.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the remaining allegations of this paragraph.

465.    In 2009, Gulf of Mexico shrimp landings were the nation's largest at 241 million pounds, which was 80 percent of the national total and worth $313.8 million, according to NOAA sources.   Louisiana led all Gulf states with nearly 109.8 million pounds, worth $89.2 million; followed by Texas, almost 89.7 million pounds, worth $72.9 million; Alabama, almost 21.7 million pounds, worth $17.6 million; Mississippi, 10.1 million pounds, worth $8.2 million; and Florida's Gulf Coast, 9.7 million pounds, worth $7.8 million.

**ANSWER:**

The BP Parties admit that NOAA reported the above information.[59]  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

466.    According to NOAA, the Gulf region also leads the nation in the production of oysters in 2009, harvesting 22.1 million pounds of meats, a catch worth almost $85 million and making up over 62 percent of the nation's total.

---

[59] By referencing the NOAA report, the BP Parties neither admit nor imply that the referenced document or statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

**ANSWER:**

The BP Parties admit that NOAA reported the above information.[60]  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

467.    Several valuable crab species live in the Gulf of Mexico, including, but not limited to, blue crab, Gulf stone crab, and stone crab.  As with shrimp, crab spawning and larval seasons coincided disastrously with the Spill, putting future harvests at risk for years to come.

**ANSWER:**

The BP Parties admit that blue crab and stone crab live in the Gulf of Mexico.  The BP Parties further admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill, including such claims based on impacts on crab populations.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the remaining allegations of this paragraph.

468.    In 2009, the Gulf region harvested almost 40% of the nation's blue crab catch: 59.1 million pounds of hard blue crab landings worth $57.3 million, according to the National Marine Fisheries Service.  Louisiana alone landed approximately 33 percent of the total national blue crab catch:  50.78 million pounds, a catch worth $49.17 million.

---

[60] By referencing the NOAA report, the BP Parties neither admit nor imply that the referenced document or statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

**ANSWER:**

The BP Parties admit that NOAA reported the above information.[61]  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

469.    According to NOAA, surface-oriented marine life was most harmed by the early stages of the Spill, especially near-shore species and/or species that were spawning when the oil reached the shore.  But as the crude oil weathered, sank, or was dispersed throughout the water column, reef- and bottom-oriented fish (such as snappers and groupers) were also threatened.  In November and December 2010, scientists found evidence that thick swaths of sunken oil bearing the unique hydrocarbon signature of the Macondo well are covering large areas of the seafloor in the Gulf, killing seep water coral reefs and sediment-dwelling organisms that play major roles at the base of the Gulf food chain.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

470.    Moreover, as sunken and dispersed oil resurfaces, additional harm to marine ecosystems will occur and continue.  As noted by Dr. Lisa Kaplowitz of the U.S. Department of Health and Human services, in her June 15, 2010 testimony before Congress:  "Oil can remain toxic in the environment for years."

**ANSWER:**

The BP Parties admit that Dr. Lisa Kaplowitz stated the above quoted language[62].  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

---

[61] By referencing the NOAA report, the BP Parties neither admit nor imply that the referenced document or statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

[62] By referencing the statement of Dr. Lisa Kaplowitz, the BP Parties neither admit nor imply that the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

471.    The Spill has also harmed marine species at the top of the Gulf food chain, such as the Atlantic Bluefin tuna.  The Gulf of Mexico is one of only two major spawning grounds for this endangered tuna species; each year from March to June the fish converge there between latitudes 25-28°N to breed.  Not only did the Spill's timing coincide precisely with the peak of the Bluefin's Gulf of Mexico spawning season, but NOAA maps show that the Spill and its underwater plumes of oil and dispersants spread across latitudes 25-28°N, directly polluting the tuna's limited spawning area.

**ANSWER:**

The BP Parties deny that marine species at the top of the Gulf food chain were harmed as a result of the Spill.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

472.    During the spawning season, Bluefin tuna release their eggs near the surface of the water, meaning oil and dispersants from the Spill likely coated and destroyed millions of tuna eggs.  Oil skimming activities could also have physically damaged the eggs, or broken surface water tension, allowing the eggs to sink too deep to properly develop.

**ANSWER:**

The BP Parties admit that Bluefin tuna release their eggs near the surface of water.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

473.    The effects of the Spill will continue to threaten the Bluefin species for years to come.  Bluefin tuna are large, slow-growing fish that take ten years to reach sexual maturity. The destruction of, or severe damage to, an entire generation of fish in 2010 will therefore continue to affect the tuna population for at least a decade; if next year's spawning season is also affected by resurfacing oil or the remaining underwater plumes, the damage to the species will be catastrophic.   Already severely overfished, the Atlantic Bluefin tuna may not survive this massive disruption to an entire spawning season, let alone the potentially long-term devastation of one of its annual spawning sites.

**ANSWER:**

The BP Parties admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill, including such claims based on impacts on tuna populations.  Following the incident, the BP Parties quickly established a

claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny the remaining allegations of this paragraph.

474.    In addition, as part of its offshore containment response program, BP directed the use of vessels to recover oil coming to the surface of the Gulf of Mexico; the use of vessels to skim oil from the surface of the water; the use of vessels to conduct in situ burning of that reached the surface of the water; and the use of Vessels of Opportunity ("VoO").

**ANSWER:**

The BP Parties admit that as part of the response efforts oil recovery, skimming, and in situ burning were used.  The BP Parties further admit that Vessels of Opportunity were contracted to aid in the response efforts.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

475.    The VoO program is touted by BP as a key component to BP's response to the disaster. BP used at least 2,000 commercial and charter fishing vessels and other boats from communities along the shoreline to tow and deploy booms — floating barriers intended to contain, deflect, or hold back oil floating on the water's surface. Other VoO vessels worked with absorbent booms used to soak up some of the millions of gallons of oil coming to the surface of the Gulf. Still other VoOs supported in situ burning efforts. Some VoOs conducted skimming operations to skim oil off the surface. Other VoOs recover light oil and tar balls.

**ANSWER:**

The BP Parties admit that the VoO program was a program set up by the Unified Command through which BPAP and BPXP contracted directly with vessel owners in connection

with the response to MC 252 #1 Macondo Well oil spill, which occurred in connection with the sinking of the *Deepwater Horizon* mobile offshore drilling unit.  The BP Parties further admit that vessels in the VoO program performed a variety of response, recovery and containment activities, including towing and deploying of boom, skimming oil, locating and recovering tar balls, transporting supplies and personnel, and supporting controlled *in situ* burning operations.  The BP Parties deny the remaining allegations of this paragraph.

476.    Vessel owners who participated in the VoO program entered into Master Vessel Charter Agreements (the "Charter Agreements") under which Defendant BP chartered their vessels pursuant to the VoO program.

**ANSWER:**

The BP Parties admit that BPXP and BPAP, under the Unified Command established program, entered into Master Vessel Charter Agreements, the text of which speaks for itself, with certain vessel owners who participated in the VoO Program.  The BP Parties deny the remaining allegations of this paragraph.

477.    Pursuant to the Charter Agreements, BP agreed that the General Maritime Laws of the United States should govern "all matters of construction, validity and performance" of the Charter Agreements, and that only in the event that the general maritime laws of the United States do not apply, the laws of the State of Louisiana shall govern.

**ANSWER:**

The BP Parties admit that BPXP and BPAP entered into Master Vessel Charter Agreements, the text of which speaks for itself.  The BP Parties further admit that the Master Vessel Charter Agreements contain the following provision: "The rights and obligations of the Parties to this Charter including all matters of construction, validity and performance, shall in all respects be governed and enforced in accordance with the general maritime laws of the United

States.  In the event, but only in the event, the maritime laws of the United States do not apply, the laws of the State of Louisiana shall govern."

478.    The Charter Agreements were subsequently amended by letter agreement, stipulation and/or court order, and the amendments apply retroactively to the date of the initial signing of the Charter Agreements.

**ANSWER:**

The BP Parties admit the Master Vessel Charter Agreements were amended by letter agreement, stipulation and/or court order, the text of which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph.

479.    In addition, Defendant BP made various statements and representations in the press, in court proceedings, on BP's website, and/or otherwise, in which BP recognized and/or voluntarily assumed responsibility for the safety and protection of workers engaged in the VoO program.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

480.    Defendant BP is subject to a court order that prevents it from attempting to enforce any releases contained in Charter Agreements and/or other documents engaging those participating in the VoO program.

**ANSWER:**

The BP Parties admit that they entered into a Consent Judgment related to specific provisions of the Charter Agreements on May 4, 2010 in *Barisich v. BP, p.l.c., et al.*, case number 2:10-cv-01316-CJB-SS in the Eastern District of Louisiana, the text of which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph.

481.    The Charter Agreements provided that the charter terms continued until the vessels were detoxified and the boats received off charter dispatch notifications.  Many vessels were laid off in August and September of 2010 and were detoxified, but the owners were told

that they were not released from the charters until they received off charter dispatch notifications.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

482.   In most cases, off charter dispatch notifications were not received until November 26, 2010.  The owners of these vessels did not return to fishing because they understood that they were still under charter until they received the off charter dispatch notification.  Some VoO vessel owners did not receive off charter dispatch notifications until December, 2010 or January, 2011.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

483.   Despite its detention of the VoO vessels through November 26, 2010 and beyond, BP has refused to pay these vessel owners for the period between the initial detoxification and the off charter notification during which they were unable to return to their livelihoods.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

484.   The VoO vessels sustained substantial physical damage as the result of their participation in the program.  The oil remediation efforts required of the vessels participating in the VoO program required the vessels to navigate through oil contaminated waters, staining propellers, rudders, and engines.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

485.   Initially, BP instructed the VoO vessel owners that their vessels would regularly undergo detoxification when they returned to shore on standby.  However, although large commercial vessels regularly underwent decontamination, VoO vessels did not.  As a result, large quantities of oil and other toxins accumulated on and in the VoO vessels.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

486.    When decontamination and detoxification was finally performed on the VoO vessels, the procedure was often performed inadequately, without full environmental protection, causing damage to the VoO vessels, their hulls, decks, equipment and/or other appurtenances.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

487.    Because the vessels remained covered in oil and chemicals for weeks and, in some cases, months before detoxification, oil hardened like a varnish on hulls and decks of the vessels so that when detoxification was finally performed, the removal of the contaminants would cause paint to peel from the hulls, decks, equipment and appurtenances of the vessels.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

488.    In addition, BP installed its oil containment equipment for oil remediation on the back of VoO vessels and, when that equipment was removed, the decks were often damaged with holes and dents.  BP has failed to compensate the VoO vessel owners for this damage.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

489.    BP has failed to pay VoO vessel owners for the period during which their vessels were inoperable due to vessel damage to oil containment operations, inadequate detoxification, and/or damage due to removal of BP equipment.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

490.   Plaintiffs also suffered severe economic hardship as a result of the drilling moratorium issued after the Spill.  Many of Plaintiffs' citizens include deepwater drilling rig workers, rig support personnel, transport personnel and indirect support workers such as restaurant employees and fueling personnel.  They have suffered losses and damages as the result of the Six-Month Deepwater Drilling Moratorium issued by the United States Department of Interior on May 28, 2010, in response to the Spill, resulting in a loss of revenue for Plaintiffs.

**ANSWER:**

The BP Parties deny any and all allegations of wrongdoing against the BP Parties, including allegations that they caused the moratorium.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

491.   On May 28, 2010, the United States Department of the Interior Minerals Management Service, as a direct, proximate and foreseeable result of the Deepwater Horizon / Macondo Well blow-out and spill, issued a six-month moratorium on all new and existing deepwater drilling in the Gulf of Mexico, effectively shutting down oil and gas industry operations along the Gulf Coast.

**ANSWER:**

The BP Parties admit that effective May 30, 2010 the MMS issued a notice implementing a six-month moratorium on deepwater drilling in the Gulf of Mexico.  The BP Parties deny the remaining allegations of this paragraph.

492.   The Moratorium Notice to Lessees and Operators (NTL No. 2010-N04) states, "under current conditions, deepwater drilling poses an unacceptable threat of serious and irreparable harm or damage to wildlife and the marine, coastal and human environment."  The policy halted approval of any new permits for deepwater drilling and suspended production in the Gulf, affecting 33 offshore oil rigs operated by various oil companies. With 88% of U.S. offshore rigs located on Louisiana's Outer Continental Shelf ("OCS"), Louisiana businesses and coastal communities felt the majority of the moratorium's impact.

**ANSWER:**

The BP Parties admit that The Moratorium Notice to Lessees and Operators (NTL No. 2010-N04) states the above quoted language, and the Notice prohibited approval of new permits,

and suspended current drilling in the Gulf.[63]   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

493.    Following its directive to implement the Deepwater Moratorium, the Obama administration issued a second notice to lessees and operators of federal oil and gas leases (NTL No. 2010-N05) on June 8, 2010, calling for increased safety measures for energy development on the OCS.   The recommendations therein applied to all activities on the OCS, including deepwater drilling activity suspended under NTL No. 2010-N04.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.[64]

494.    On June 22, 2010, the United States District for the Eastern District of Louisiana granted a preliminary injunction, lifting the drilling moratorium.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

495.    The U.S. Department of the Interior's appeal was denied, and in response the agency issued new suspensions on July 12, 2010.   This new document is very similar to its predecessor, the first deepwater drilling moratorium, with more substantial rationale for the ban and a focus on technologies used in drilling rather than water depth stating "the new suspensions apply to drilling operations that use subsea blowout preventers (BOP) or BOPs on floating facilities."   The new version also allowed for the possibility of the moratorium being lifted before November 30, 2010.

**ANSWER:**

The BP Parties admit that that a new moratorium notice was issued on July 12, 2010 that

stated the above quoted language, in addition to allowing the moratorium to be lifted before

---

[63] By referencing The Moratorium Notice to Lessees and Operators (NTL No. 2010-N04), the BP Parties neither admit nor imply that the document or the referenced statements are admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

[64] By referencing NTL No. 2010-N05, the BP Parties neither admit nor imply that the document or the referenced statements are admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

November 30, 2010.[65]  The BP Parties lack knowledge or information sufficient to form a belief

about the truth of the remaining allegations of this paragraph, and therefore deny them.

496.    On October 12, 2010, the U.S. Department of Interior's Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE") announced that the federal government would lift the drilling moratorium.  The October announcement indicated an early end to the moratorium, which had been scheduled to run through the month of November 2010.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

497.    Although the moratorium was officially lifted on October 12, drilling did not resume quickly because of the need for more inspections and compliance with new regulations.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

498.    On January 3, 2011, BOEMRE notified 13 oil companies that they could resume previously approved exploration and production activities without submitting revised plans.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

499.    The economic impacts of the moratorium are diverse and far-reaching, affecting individuals and businesses in various industries across the Gulf Coast.  These impacts were direct (e.g., drilling rig workers) and indirect (e.g., drilling equipment suppliers and restaurants).

**ANSWER:**

The BP Parties deny any and all allegations of wrongdoing against the BP Parties,

including allegations that they caused the moratorium.  The BP Parties lack knowledge or

---

[65] By referencing NTL No. 2010-N05, the BP Parties neither admit nor imply that the document or the referenced statements are admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

500.    On January 13, 2011, the Greater New Orleans Inc. Regional Economic Alliance issued a report about the economic repercussions of the deepwater drilling moratorium.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

501. The report found that the moratorium shut down 33 deepwater rigs, affecting more than 13,000 workers.  It further found that, although the moratorium ended in October 2010, only two deepwater permits had been issued since then, compared with 5.8 per month issued before the Deepwater Horizon oil spill.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

502.    The report further found that deepwater drilling contributes about $2.3 million to $3.2 million in direct tax revenue to the State of Louisiana and parish governments each month and more than $7 million in indirect monthly revenue to state and local governments.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

503.    The report concluded that if the rate of issuance of drilling permits remains unchanged, unemployment will likely dramatically increase as businesses continue to diminish their savings.  This would be a huge blow to the State of Louisiana and coastal parishes - still recovering from the hurricanes of 2005 and 2008.   Additionally, rigs and entire drilling operations may move to other areas or even overseas, taking with them valuable jobs and tax revenue.  The report observed that many small, family-owned businesses which support the oil and gas industries are vulnerable.  The report claimed that without increased business in the form of drilling activity these companies may not survive.

206

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

504.    The Spill has not only had a severe impact on fisheries in the Gulf of Mexico, but it has also dealt a devastating blow to tourism in the Coastal Zone and the individuals and entities that ordinarily rely on tourism for their livelihood.   Tourism accounts for about 46 percent of the Gulf Coast economy annually.   The Spill will result in at least $7.6 billion in lost tourism revenue in 2010, according to a study done for the U.S. Travel Association.

**ANSWER:**

The BP Parties deny that tourism has suffered a devastating blow in the Coastal Zone as a result of the Spill.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.   But as a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.   Following the incident, the BP Parties quickly established a claims process.   And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.   Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid. The GCCF has paid over $5.73 billion for individual and business claims.

505.    The Spill may become the worst disaster in the history of Florida tourism.   Some analysts have preliminarily estimated that the impact on tourism along Florida's Paradise Coast could reach $3 billion.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.   But as a Responsible Party under

OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims. Following the incident, the BP Parties quickly established a claims process. And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses. Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid. The GCCF has paid over $5.73 billion for individual and business claims.

506.    During the Spill, the Mississippi coast had a 50 percent cancellation rate on reservations generally.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them. But as a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims. Following the incident, the BP Parties quickly established a claims process. And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses. Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid. The GCCF has paid over $5.73 billion for individual and business claims.

507.    Twenty-six percent of Americans who had planned to visit Louisiana stated they were no longer planning to visit after the Spill, according to a nationwide survey taken by the Louisiana Tourism Commission in May 2010. Prior to the Spill, Louisiana hosted 24.1 million visitors per year, whose purchases fueled a $9.4 billion tourism industry and sustained more than

200,000 direct and indirect jobs for Gulf residents, according to the Louisiana Tourism Commission.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.  But as a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims. Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses. Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.

508.    Alabama has also seen a dramatic drop in tourism, including a 60 percent drop in visitations and an 80 percent drop in home rentals.  Overall, the combination of tourism and fishing losses in Alabama in 2010 will probably yield adverse impacts of $1.7 billion in economic output, $498.9 million in earnings, and 24,880 jobs, according to a report by the Center for Business and Economic Research at the University of Alabama.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.  But as a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims. Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses. Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20

billion trust fund from which individual and business claims, state and local government claims,

NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73

billion for individual and business claims.

509.    The Spill and the Spill response have also caused damage to real property owned
and/or leased by Plaintiffs in the Coastal Zone, resulting in physical damage and diminution of
property values.  Not only have oil and other contaminants polluted real and private properties
throughout the Coastal Zone, but pieces of the destroyed Deepwater Horizon vessel have come
ashore in some places, damaging real and private property.  The Spill response has also resulted
in intrusion on and damage to property, including the annoyance, disruption and physical
damage caused by vehicles, heavy machinery, boom, staging areas, and other materials and
activities on or near Plaintiffs' properties.

**<u>ANSWER:</u>**

The BP Parties deny that there has been diminution of property values as a result of the

Spill.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of

the allegations of this paragraph, and therefore deny them.  But as a Responsible Party under

OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.

Following the incident, the BP Parties quickly established a claims process.  And while operating

its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.

Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition

their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20

billion trust fund from which individual and business claims, state and local government claims,

NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73

billion for individual and business claims.

510.    The Spill has also damaged submerged oyster beds that are the leased property of
some citizens.  The contamination of these submerged oyster beds has interfered with  their
ability to use their leased property as intended, damaging their livelihoods as well as the value of
their leased oyster bed properties.

**ANSWER:**

The BP Parties deny that oyster beds were damaged as a result of the Spill.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.  But as a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.28 billion for individual and business claims

511.    Because of the size and nature of the surface oil slick, the subsurface oil plumes, and weathered oil on shorelines, and the toxic effects of the oil and other substances released during the Spill on humans, marine life, and the Coastal Zone environment, there have been and will continue to be further economic losses and diminution of property values to individuals and entities owning and/or leasing residential or investment properties in the Coastal Zone.

**ANSWER:**

The BP Parties deny that there will be further economic loss or diminution of property values as a result of the Spill.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.  But as a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP

Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid. The GCCF has paid over $5.73 billion for individual and business claims.

512.    The foregoing losses in the private sector have caused severe damage to Plaintiffs in the form of lost income and tax revenues.  Plaintiffs have also lost royalties, rents, fees and net profit shares as a result of the Spill.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.  But as a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims. Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses. Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.

513.    Some Plaintiffs own or lease real property, and have suffered the loss, destruction, and/or diminution in value of their property as a result of the Spill.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.  But as a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.

Following the incident, the BP Parties quickly established a claims process. And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses. Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid. The GCCF has paid over $5.73 billion for individual and business claims.

514.    The Spill also required dramatic increases in expenditures for public services, including additional administrative costs, costs of additional personnel, and out-of–pocket costs incurred for material and equipment.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them. But as a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims. Following the incident, the BP Parties quickly established a claims process. And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses. Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid. The GCCF has paid over $5.73 billion for individual and business claims.

515.    Plaintiffs also incurred the costs of response, removal, clean-up, restoration and/or remediation after the Spill. These costs include increased personnel salary costs, overtime travel and per diem expenses; costs for use of government-owned equipment and facilities, and actual expenses for goods and/or services supplied by contractors and/or vendors.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.  But as a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims. Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses. Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.

516.    Because investigations are ongoing, there are many other potential effects from the Spill that have not yet become known, and Plaintiffs reserve the right to amend this Voluntary Master Complaint Cross-Claim and Third-Party Complaint for Local Governmental Entities, after additional information becomes available.

**ANSWER:**

The BP Parties deny that Plaintiffs may amend this Complaint except to the extent allowed under the Federal Rules of Civil Procedure and the Rules and Orders of this Court.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

**CLASS ACTION ALLEGATIONS**

517.    Plaintiffs seek certification of the following class ("the Class"):

All local government entities that claim losses due to damage, destruction, or diminution in value of property; loss of tax revenue, income and/or use; costs of response, removal, clean-up, restoration and/or remediation, including costs of increased public

214

services; civil and/or criminal penalties; and/or other damages, losses, and/or costs as a result of the April 20, 2010 explosions and fire aboard, and sinking of, the Deepwater Horizon, and the resulting Spill.

**ANSWER:**

The BP Parties admit that Plaintiffs purport to seek certification of the above defined Class. At this stage of the proceedings and on the terms proposed by Plaintiffs, the BP Parties deny any such certification is appropriate.

518. Plaintiffs may also seek certification, to the extent necessary or appropriate, of the following state-wide subclasses (the "Subclasses") of local government entities in the states of Alabama, Florida, Louisiana, Mississippi, and Texas, pursuant to the laws of their respective states.

The Alabama Subclass:

All local government entities in Alabama that claim losses due to damage, destruction, or diminution in value of property; loss of tax revenue, income and/or use; costs of response, removal, clean-up, restoration and/or remediation, including costs of increased public services; civil penalties; and/or other damages, losses, and/or costs as a result of the April 20, 2010 explosions and fire aboard, and sinking of, the Deepwater Horizon, and the resulting Spill.

The Florida Subclass:

All local government entities in Florida that claim losses due to damage, destruction, or diminution in value of property; loss of tax revenue, income and/or use; costs of response, removal, clean-up, restoration and/or remediation, including costs of increased public services; civil penalties; and/or other damages, losses, and/or costs as a result of the April 20, 2010 explosions and fire aboard, and sinking of, the Deepwater Horizon, and the resulting Spill.

The Louisiana Subclass:

All local government entities in Louisiana that claim losses due to damage, destruction, or diminution in value of property; loss of tax revenue, income and/or use; costs of response, removal, clean-up, restoration and/or remediation, including costs of increased public services; civil and/or criminal penalties; and/or other damages, losses, and/or costs as a result of the April 20, 2010 explosions and

215

fire aboard, and sinking of, the Deepwater Horizon, and the resulting Spill.

The Mississippi Subclass:

All local government entities in Mississippi that claim losses due to damage, destruction, or diminution in value of property; loss of tax revenue, income and/or use; costs of response, removal, clean-up, restoration and/or remediation, including costs of increased public services; civil penalties; and/or other damages, losses, and/or costs as a result of the April 20, 2010 explosions and fire aboard, and sinking of, the Deepwater Horizon, and the resulting Spill.

The Texas Subclass:

All local government entities in Texas that claim losses due to damage, destruction, or diminution in value of property; loss of tax revenue, income and/or use; costs of response, removal, clean-up, restoration and/or remediation, including costs of increased public services; civil penalties; and/or other damages, losses, and/or costs as a result of the April 20, 2010 explosions and fire aboard, and sinking of, the Deepwater Horizon, and the resulting Spill.

**ANSWER:**

The BP Parties admit that Plaintiffs purport to seek certification of the above defined Class and/or Subclasses.  The BP Parties deny the remaining allegations of this paragraph.

519.    This action is brought and may properly be maintained as a class action on behalf of the proposed Class and/or Subclasses as described above, and such other additional classes or subclasses as Plaintiffs may propose and/or the Court may designate, pursuant to the applicable and appropriate provisions of Rule 23(a)(1)-(4), (b)(3), (b)(1), (c)(4) and/or (c)(5).

**ANSWER:**

The BP Parties admit that Plaintiffs purport to bring this action as a class action.  The BP Parties deny the remaining allegations of this paragraph.

A.    **Numerosity of the Class and/or Subclasses — F.R.C.P. 23(a)(1)**

520.    The Class and/or Subclasses consist of tens of thousands of individuals and businesses who have been economically damaged by the spill, making joinder impracticable.

216

Class and/or Subclass members can be informed of the pendency of this action by print, internet, and broadcast notice.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

B.     **Commonality — F.R.C.P. 23(a)(2).**

521.   Common questions of law and fact exist as to all members of the Class and/or Subclasses.  Because Defendants' behavior here is governed by federal regulations, federal maritime law, and federal legislation like the Oil Pollution Act and the Clean Water Act, the Class and/or Subclass members will be subject to common questions of law.

**ANSWER:**

The BP Parties admit they are subject to the Oil Pollution Act and to certain aspects of

the Clean Water Act, but deny that they are liable for Clean Water Act penalties. The BP Parties

deny the remaining allegations of this paragraph.

522.   Furthermore, the factual bases of Defendants' outrageous conduct are common to all Class and/or Subclass members and represent a common thread of reckless conduct and decisions, gross negligence and willful, wanton, and reckless indifference for the rights of others, resulting in injury to all members of the Class and/or Subclasses.  Each Class and/or Subclass member's claim arises from the same course of planning, decisions, and events, and each Class and/or Subclass member will make similar legal and factual arguments to prove Defendants' outrageous, willful, reckless, wanton, and deplorable conduct and liability.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

523.   Defendants' conduct presents common factual questions, including:

(a)     Whether Defendants negligently, outrageously, willfully, wantonly, and/or recklessly caused and/or contributed to the blowout, explosions, fire, and the resulting Spill;

(b)     Whether Defendants knew or should have known of the risk of a blowout and/or major failure of the vessel such as those which caused the blowout, explosions, fire, and Spill;

     (c)     Whether Defendants' conduct in failing to utilize all available deepwater drilling best practices and drilling vessel safety mechanisms to prevent the Spill was outrageous, grossly negligent, willful, wanton, or reckless, or behavior even more deplorable;

     (d)     Whether Defendants acted outrageously or with willful, wanton, and reckless indifference to the risk of a major failure of the drilling vessel, its pipes, valves, and other machinery and materials.

     (e)     The degree of each Defendant's reprehensibility under the Supreme Court guidelines articulated in, for example, *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

**ANSWER:**

The BP Parties deny the allegations of this paragraph.


524.     Common questions of fact also exist with respect to the punitive damages liability of Defendants to the Class and/or Subclasses, including Defendants' outrageous, grossly negligent, willful, reckless, and wanton conduct; the calculation of the amount of punitive damages that may be imposed upon each of the Defendants consistent with due process; intra-class equity with respect to the allocation and utilization of punitive damages; and the most practicable and most equitable allocation, disbursement, and utilization of such damages for punishment of Defendants' wrongful conduct toward Plaintiffs, the Class and/or Subclasses, and society, and in fulfillment of the deterrent policy and purpose of punitive damages.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.


**C.**     **Typicality — F.R.C.P. 23(a)(3)**

525.     The claims in this Master Complaint are typical of the claims of the Class and/or Subclasses in that they represent the various types of non-governmental economic losses and property damage caused by the Spill. Each Class and/or Subclass member's claim arises from the same course of planning, decisions, and events, and each Class and/or Subclass member will make similar legal and factual arguments to prove Defendants' outrageous, grossly negligent, willful, reckless, and wanton conduct and liability.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

### D.   Adequacy of Representation — F.R.C.P. 23(a)(4)

526.    Plaintiffs will fairly and adequately represent and protect the interests of the Class and/or Subclasses.  Plaintiffs have retained counsel with substantial experience in prosecuting environmental, mass tort, and complex class actions, including actions involving environmental contamination and, specifically, catastrophic oil spills.  Among the undersigned counsel for Plaintiffs are counsel who represent claimants from each of the affected Gulf states and claimants with each type of claim (fishery-related, property-related, and business-related), and counsel with experience in complex class action litigation and trials, including the Exxon Valdez litigation, and counsel with particular expertise on punitive damages issues.  Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and/or Subclasses and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests adverse to those of the Class and/or Subclasses.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

### E.   Class Certification under F.R.C.P. 23(b)(3) — Predominance and Superiority

527.    Common issues of fact and law predominate concerning the claims of the Class and/or Subclasses.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

528.    Defendants' conduct presents predominant common factual questions. Fundamentally, all Plaintiffs' claims arise out of a single course of conduct by Defendants that caused the Macondo well blowout, the Deepwater Horizon explosions, and the subsequent Spill. Although this is a single-event, single-location mass disaster that has affected, and will continue to affect a large geographic area and many individuals and businesses, for a long time to come — its wide-ranging effects can be traced back to one single root: a chain of decisions and actions made jointly, severally, and solidarily by the small group of Defendants named here.  Plaintiffs will present common proof with respect to Defendants' failure to use deepwater drilling best practices or take adequate safety precautions in the operation and maintenance of the Macondo well and the Deepwater Horizon — proof that is the same for each member of the Class and/or Subclasses. Plaintiffs' proof of Defendants' outrageous, grossly negligent, willful, reckless, and wanton conduct will involve the same cast of characters, events, discovery, documents, fact witnesses, and experts.   Common questions of fact also predominate concerning the determination of the aggregate quantum of punitive damages, necessary to fulfill the punishment and deterrence goals of such damages.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

529.   Because Defendants' behavior here is governed by federal regulations, federal maritime law, and federal legislation like the Oil Pollution Act and the Clean Water Act, the Class and/or Subclass members will be subject to common questions of law.

**ANSWER:**

The BP Parties admit they are subject to the Oil Pollution Act and to certain aspects of

the Clean Water Act, but deny that they are liable for Clean Water Act penalties. The BP Parties

deny the remaining allegations of this paragraph.

530.   A class action is superior to the only other method available for the adjudication of Defendants' outrageous, grossly negligent, willful, reckless, and wanton conduct — individual litigation and multiple trials.  The repetitive individual litigation of Defendants' conduct by all members of the Class and/or Subclasses is inefficient, impracticable, economically infeasible, and potentially unfair, particularly in light of the unique context of Defendants' course of conduct and its unprecedented impact upon the Class and/or Subclasses, the American environment, economy, and society.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

531.   It would be unduly burdensome on the courts to undergo the individual re-litigation of the same facts and legal issues in thousands of cases.  The consideration of common questions of fact and law via this class action will conserve judicial resources and promote a fair and consistent resolution of these claims.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

**F.      Class Certification under F.R.C.P. 23(b)(1)**

532.   Individual litigation of Plaintiffs' claims would present a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, as well as the risk that adjudications for some individual class members could impair the ability for

other class members to protect their own interests, thereby making class certification of this action appropriate under Rule 23(b)(1)(A) and (B).

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

533.   Individual litigation could spawn inconsistent or contradictory judgments on issues of Defendants' knowledge, intent, recklessness, conduct, and duty — concepts that should not vary, as of any particular point in time, from Class member to Class member.  Individual litigation would also increase the delay and expense to all parties and the court system and could undermine public confidence and trust in that system.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

534.   In the particular context of punitive damages, piecemeal adjudications of punitive damages on economic loss and property damage claims on an individual, local, or statewide basis do not and cannot hold Defendants legally accountable for the total scope of their uniquely multi-state, region-wide course of conduct (which has impacted more individuals, groups, and categories of claims and claimants, on a more sustained basis, than any other course of tortious conduct).

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

535.   Plaintiffs here seek class-wide adjudication as to the issue of punitive damages, with respect to the total amount Defendants may be constitutionally or equitably required to pay into a nationwide punishment fund (the "limits of punishment"), and the appropriate allocation and distribution of such damages to any member of the Class and/or Subclasses for their benefit, and that of society.  The prosecution of separate actions by individual members of the Class and/or Subclasses on such claims and issues would create an immediate risk of inconsistent or varying adjudications.  These varying adjudications would be prejudicial to members of the Class, Subclasses, and Defendants, would frustrate the purposes and policies of punitive damages by fostering sub-optimal punishment and deterrence, and would establish incompatible standards of conduct for Defendants.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

536.    Piecemeal adjudications will frustrate the efforts of this or any court to determine and enforce the constitutional limits of aggregate punishment for this course of misconduct, thereby (a)  forcing victims to compete in a race for judgments in order to claim against a diminishing res, resulting in recoveries for some victims and worthless judgments for the rest; (b)  ignoring what the Supreme Court has termed the substantive limit that due process places on the amount of punitive damages that may be awarded; and (c)  thereby creating inequitable disparities among members of the Class and/or Subclasses.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

537.    Moreover, individual awards of punitive damages in the context of mass misconduct would frustrate the broader societal interest in not only punishing Defendants for their misconduct, but in directing an appropriate share of any award toward the greatest possible public benefit, e.g., without limitation, scientific research, environmental remediation programs, clean energy programs, programs geared toward sustaining and retraining those whose livelihoods were destroyed by the spill, improving the economic situation for those communities whose economies were based on tourism in the Gulf of Mexico, and amelioration and mitigation of spill-related diseases and damages.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

538.    Finally, piecemeal adjudications may under-deter Defendants' misconduct by failing to account for the full scope or total social costs, thereby frustrating the purpose of punitive damages – the vindication of society's interests in deterrence and punishment that is fully and fairly proportionate to the scope and nature of the misconduct and its harm to society as a whole.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

539.    By contrast, class treatment, as requested in this Master Complaint, will allow one single adjudication of the single course of Defendants' conduct that is the underlying cause of all the injuries suffered by Plaintiffs.  Class treatment presents far fewer management difficulties than repetitive individual litigation, and provides the benefits of economies of scale, exercise of equity jurisdiction, and comprehensive supervision by a single court, in order to achieve justice and proportionality, avoid underdeterrence, and determine the proper roles of the "limits of punishment" theory raised by the common questions of punitive damages under the unique circumstances of this case, without offending the due process constraints articulated by the Supreme Court.  Class treatment best ensures that Defendants pay for the economic and

environmental costs of their misconduct and that there is a fair distribution of compensatory and punitive damages among Class and/or Subclass members for their benefit, for the benefit of their beneficiaries, and for the benefit of society and the environment.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

**G.    Class Certification under F.R.C.P. 23(b)(2)**

540.    Defendants have acted or refused to act, and continue to act and refuse to act, on grounds that apply generally to the Class and/or Subclasses, so that final injunctive relieve and/or corresponding declaratory relief is appropriate respecting the Class and/or each of the Subclasses as a whole.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient

to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny

them.

**H.    Class Certification of Particular Issues under F.R.C.P. 23(c)(4) and Subclasses under 23(c)(5)**

541.    Certification of the Class and/or Subclasses with respect to common factual and legal issues concerning Defendants' outrageous, grossly negligent, willful, wanton, and reckless conduct and the resulting necessary and appropriate quantum of punitive damages, or ratio of punitive damages to actual harm, is appropriate under Rule 23(c)(4).

**ANSWER:**

The BP Parties deny that certification of the Class and/or Subclasses is appropriate under

Rule 23(c)(4).  The BP Parties further deny the allegations of this paragraph to the extent they

are directed at the BP Parties.  The BP Parties lack knowledge or information sufficient to form a

belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

## CLAIMS FOR RELIEF

### I.      Claims Under General Maritime Law

**A.      Negligence**

**All Plaintiffs v. All Defendants**

542.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.  The BP Parties further deny any and all allegations of wrongdoing against the BP Parties, including allegations that they were negligent.

543.    At all times material hereto, Drilling Defendants were participating in drilling operations onboard the Deepwater Horizon in the Gulf of Mexico.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they

are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

544.    At all times material hereto, Drilling Defendants owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the drilling operations of the Deepwater Horizon and the maintenance of the vessel, its appurtenances and equipment, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of an oil spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim

and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and

Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20,

2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are

alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the

remaining allegations of this paragraph to the extent they are inconsistent with the allegations in

Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient

to form a belief about the truth of the remaining allegations of this paragraph to the extent they

are not directed at the conduct or liability of the BP Parties and are not addressed in Document

Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

545.    In addition, Cameron and Weatherford as designers, manufacturers, and suppliers of the Deepwater Horizon's BOP and float collar, respectively, owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the design, manufacture and supply of the BOP and float collar.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

546.    Anadarko, Anadarko E&P, and MOEX had access to Halliburton/Sperry Sun INSITE real time feed data that was transmitted from the Deepwater Horizon on April 20, 2010 As such, they knew or should have known of the presence of hydrocarbons in the well on the evening of April 20, 2010, and they owed a duty to Plaintiffs to warn of the impending disaster in sufficient time to avert it. Anadarko, Anadarko E&P, and MOEX breached their duties to Plaintiffs by failing to warn the drilling vessel crew of the imminent blowout so that they could take evasive action.

**ANSWER:**

The BP Parties admit that Anadarko, Anadarko E&P, and MOEX Offshore 2007 LLC had access to the Halliburton/Sperry Sun INSITEAnywhere realtime data transmitted from the *Deepwater Horizon*.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

547.    The existence and breach of these legal duties are established under the general maritime law and the law of Florida, Alabama, Mississippi, Louisiana, and Texas as applicable herein.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local

Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc.

4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to

these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP

Parties.

548.    Plaintiffs, as local government entities and property owners at or near the coast of the Gulf of Mexico that are dependent upon the Gulf of Mexico's marine and coastal environments for, *inter alia,* tax revenue, royalties, rents, and fees were within an appreciable zone of risk and, as such, were obligated to protect them.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

549.    The blowout and explosions on the Deepwater Horizon, its sinking and the resulting Spill were caused by the joint and concurrent negligence of Defendants which renders them jointly, severally, and solidarily liable to Plaintiffs.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim

and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and

Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

550.    Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Plaintiffs and the Gulf of Mexico's marine and coastal environments and estuarine areas.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to

form a belief about the truth of the remaining allegations of this paragraph to the extent they are

not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos.

2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

551.    Defendants were under a duty to exercise reasonable care while participating in drilling operations on the Deepwater Horizon to ensure that a blowout and subsequent oil spill did not occur as a result of such operations.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

552.    Defendants were under a duty to exercise reasonable care to ensure that if crude oil discharged in the event of a blowout, that it would be contained and/or stopped within the immediate vicinity of the Deepwater Horizon in an expeditious manner.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

553.    Defendants knew or should have known that the acts and omissions described herein could result in damage to Plaintiffs.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim

and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and

Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against

Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP

Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or

more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining

allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

554.    Defendants, respectively and collectively, failed to exercise reasonable care while participating in drilling operations to ensure that a blowout and subsequent oil spill did not occur, and thereby breached duties owed to Plaintiffs.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

555.    Defendants, respectively and collectively, failed to exercise reasonable care to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the Deepwater Horizon in the event of a blowout, and thereby breached duties owed to Plaintiffs.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

556.    Defendants, respectively and collectively, failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico, and thereby breached duties owed to Plaintiffs.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and

Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

557.   The conduct of the Defendants with regard to the manufacture, maintenance and/or operation of drilling operations and oil rigs such as the Deepwater Horizon and its appurtenances and equipment is governed by numerous state and federal laws and permits issued under the authority of these laws. These laws and permits create statutory standards that are intended to protect and benefit Plaintiffs. One or more of the Drilling Defendants violated these statutory standards.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document

Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

558.    The violations of these statutory standards constitute negligence per se under Louisiana, Texas, Mississippi, Alabama, Florida, and the general maritime law.

**ANSWER:**

The BP Parties deny that state law is applicable.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

559.    At all times material hereto the Deepwater Horizon was owned, navigated, manned, possessed, managed, and controlled by Transocean.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

560.    As the owner and manager of the Deepwater Horizon, Transocean owed duties of care to Plaintiffs to, *inter alia*, man, possess, manage, control, navigate, maintain and operate the Deepwater Horizon with reasonable and ordinary care.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

561.    Transocean breached its duties to Plaintiffs by, *inter alia*, failing to properly manage, control, maintain and operate the Deepwater Horizon and its safety equipment, including the gas sensors, air intake valves, emergency shut down systems, and BOP, and in disabling vital alarm systems on the Deepwater Horizon before the blowout.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

562.    Transocean also breached its duties to Plaintiffs by making and/or acquiescing to a series of reckless decisions concerning, *inter alia*, well design, the use of centralizers, mudding operations, cementing, integrity testing, deployment of the casing hanger lockdown sleeve, spacer material, and simultaneous operations causing worker confusion and loss of focus.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are

not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

563.    Defendants also violated the International Safety and Management Code ("ISM"), as adopted by the International Convention for the Safety at Life at Sea ("SOLAS"), which provides rules and standards to ensure that ships are constructed, equipped, and manned to safeguard life at sea, by failing to properly maintain the vessel, train personnel, and perform appropriate risk assessment analyses.  *See* 46 USC §§ 3201-3205 and 33 CFR §§ 96.230 and 96.250.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

564.    At all times material hereto, the Deepwater Horizon was leased and operated pursuant to a contract between Transocean and BP.  Together, Transocean and BP and other Drilling Defendants were responsible for design and well control.

**ANSWER:**

The BP Parties admit Transocean was responsible for well control, and that the BP Parties were responsible for the design of the Macondo Well.  The BP Parties deny that they leased or operated the *Deepwater Horizon*, or that they were responsible for well control.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.

565.   BP owed duties to Plaintiffs to, *inter alia*, exercise reasonable care to design, create, manage and control the well and the flow of hydrocarbons therefrom in a safe and prudent manner and to conduct its drilling operations with reasonable and ordinary care.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

566.   BP breached its duties to Plaintiffs by, *inter alia*:

   (a)   choosing and implementing a less expensive and less time-consuming long string well design, which had few barriers against a gas blowout, instead of a safer liner/tieback design which would have provided additional barriers to gas blowout, despite its knowledge that the liner/tieback design was a safer option;

(b)     using pipe material that it knew, and which it recognized before the blowout, might collapse under high pressure;

(c)     using too few centralizers to ensure that the casing was centered into the wellbore;

(d)     failing to implement a full "bottoms-up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards;

(e)     failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective;

(f)     cancelling the cement bond log test that would have determined the integrity of the cement job;

(g)     failing to deploy the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below;

(h)     using an abnormally large quantity of mixed and untested spacer fluid;

(i)     failing to train drilling vessel workers and/or onshore employees, and to hire personnel qualified in risk assessment and management of complex systems like that found on the Deepwater Horizon; and,

(j)     requiring simultaneous operations in an effort to expedite the project, making it difficult for workers to track fluid volumes in the wellbore.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

567.     All of the foregoing acts and/or omissions by BP proximately caused and/or contributed to Plaintiffs' injuries and damages.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

568.     At all times material hereto, Halliburton was responsible for cementing the well that was the subject of the Spill, and further was engaged in testing, analysis, and monitoring of the aforementioned well.

**ANSWER:**

The BP Parties admit that Halliburton and/or its affiliates provided products and services related to cementing operations at the Macondo Well.   The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.   The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and therefore deny those remaining allegations.

569.    At all times material hereto, Halliburton owed duties to Plaintiffs to, *inter alia*, exercise reasonable care in conducting its cementing, testing, analysis and monitoring of the Deepwater Horizon's well.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.   The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.   The BP Parties lack knowledge or information sufficient to form a belief

about the truth of the remaining allegations of this paragraph to the extent they are not directed at

the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and

therefore deny those remaining allegations.

570.    Halliburton breached its duties to Plaintiffs by, *inter alia*, failing to exercise reasonable care in conducting its cementing, testing, analysis, and monitoring of the Deepwater Horizon's well.  Halliburton was negligent by, *inter alia*, failing to use a full "bottoms-up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards; failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective; cancelling, or acquiescing in the cancellation of, the cement bond log test that would have determined the integrity of the cement job; failing to deploy, or acquiescing in the decision not to deploy, the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below, all of which proximately caused and/or contributed to Plaintiffs' injuries and damages.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served

on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph

to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny

the remaining allegations of this paragraph to the extent they are inconsistent with the allegations

in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief

about the truth of the remaining allegations of this paragraph to the extent they are not directed at

the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and

therefore deny those remaining allegations.

571.    At all times material hereto, M-I was providing the drilling fluids or "mud" for the drilling operations onboard the Deepwater Horizon and was responsible for mud drilling, composition and monitoring, and for the provision of "spacer" solution.

**ANSWER:**

The BP Parties admit that M-I and/or its affiliates provided and had responsibility for products and services related to drilling fluids used at the Macondo Well.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

572.    At all times material hereto, M-I owed duties of care to Plaintiffs to, *inter alia*, exercise reasonable care in providing, controlling and monitoring the mud and spacer solutions used on the Deepwater Horizon.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

573.    M-I breached its duties to Plaintiffs by, *inter alia*, failing to provide, control, and monitor the mud and spacer solutions used on the Deepwater Horizon in a reasonably safe manner, proximately causing and/or contributing to Plaintiffs' injuries and damages.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

574.    At all times relevant hereto, Cameron designed, manufactured and supplied the BOP that was, at all times relevant herein, appurtenant to and a part of the vessel's equipment.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

575.    Cameron owed duties to Plaintiffs to, inter alia, exercise reasonable and ordinary care in the design and manufacture and supply of the BOP for the Deepwater Horizon.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

576.    Cameron breached its duties to Plaintiffs by failing to exercise reasonable care in the design, manufacture and supply of the BOP such that it failed to operate to prevent the blowout,, thereby proximately causing and/or contributing to Plaintiffs' injuries and damages.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining

allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

577.    Cameron breached its duties to Plaintiffs by, *inter alia*, failing to ensure and verify that the BOP it designed and manufactured was suitable for the types of drill pipe and casing assembly design which would foreseeably be used during the Deepwater Horizon's drilling and exploration operations; designing the BOP such that it was vulnerable to a single-point failure; failing to install a backup activation system for the BOP; and failing to provide adequate warnings, instructions and guidelines on the permissible uses, modifications, and applications of the BOP appurtenant to the vessel.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

578.    At all times relevant hereto, Weatherford designed, manufactured and supplied the float collar used in the Macondo well.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

579.    Weatherford owed duties of care to Plaintiffs to, *inter alia*, exercise reasonable and ordinary care in the design and manufacture of the float collar in the long string casing.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

580.    Weatherford breached its duties to Plaintiffs in designing and manufacturing a float collar that failed to seal properly and which allowed hydrocarbon backflow into the casing, which proximately caused and/or contributed to the blowout, explosions, fire, and Spill, resulting in Plaintiffs' injuries and damages.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

581.    In addition to the negligent actions described herein, and in the alternative thereto, the injuries and damages suffered by Plaintiffs were caused by the acts and/or omissions of Defendants that are beyond proof by the Plaintiffs, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the blowout, explosions, fire, sinking, and Spill resulted from the negligence of Defendants.  The blowout, explosions, fire, sinking, and the resulting Spill would not have occurred had the Defendants satisfied the duty of care imposed on them and Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur*.

244

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

582.    In addition to the foregoing acts of negligence, Plaintiffs aver that the blowout, explosions, fire, and resulting Spill were caused by the joint, several, and solidary negligence and fault of Defendants in the following non-exclusive particulars:

(a)    Failing to properly operate the Deepwater Horizon;

(b)    Operating the Deepwater Horizon in such a manner that a fire and explosions occurred onboard, causing it to sink and resulting in the Spill;

(c)    Failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purpose;

(d)    Acting in a careless and negligent manner without due regard for the safety of others;

(e)   Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the Deepwater Horizon which, if they had been so promulgated, implemented and enforced, would have averted the blowout, explosions, fire, sinking, and Spill;

(f)   Operating the Deepwater Horizon with untrained and unlicensed personnel;

(g)   Negligently hiring, retaining and/or training personnel;

(h)   Failing to take appropriate action to avoid or mitigate the accident;

(i)   Negligently implementing or failing to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

(j)   Failing to ascertain that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

(k)   Failing to warn in a timely manner;

(l)   Failing to timely bring the oil release under control;

(m)   Failing to provide appropriate accident prevention equipment;

(n)   Failing to observe and read gauges that would have indicated excessive pressures in the well;

(o)   Failing to react to danger signs; and

(p)   Such other acts of negligence and omissions as will be shown at the trial of this matter; all of which acts are in violation of the general maritime law.

**<u>ANSWER:</u>**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP

Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

583.    Plaintiffs are entitled to a judgment finding Defendants liable, jointly, severally, and solidarily, to Plaintiffs for damages suffered as a result of Defendants' negligence and awarding Plaintiffs adequate compensation therefor in amounts determined by the trier of fact.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are

not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

584.    The injuries to Plaintiffs were also caused by and/or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

585.    As a direct and proximate result of Defendants' acts and/or omissions, Plaintiffs have suffered, *inter alia*, property damage, inconvenience, damages resulting from the closure and pollution of the Gulf water areas, harbors, marinas, boat launches and waterways, including the loss of revenue, which directly depends upon a supply of fish, shrimp, oysters and crabs from the Gulf of Mexico, loss of tax revenue resulting from a decline in tourism and rentals, and damage to, and diminution in value of, property, and costs associated with additional public services, clean-up and removal, and are entitled to compensatory and punitive damages.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

    **B.**    **Gross Negligence and Willful Misconduct**

**All Plaintiffs v. Drilling Defendants and Cameron**

586.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.  The BP Parties further deny any and all allegations of wrongdoing against the BP Parties, including allegations that they were grossly negligent or engaged in willful misconduct.

587.   Drilling Defendants and Cameron owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the maintenance of, and drilling operation on, the Deepwater Horizon, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of the Spill.  The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

588.   Drilling Defendants and Cameron breached their legal duty to Plaintiffs and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent manufacture, maintenance, and/or operation of the Deepwater Horizon.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

589.    Drilling Defendants and Cameron knew or should have known that their wanton, willful, and reckless misconduct would result in a disastrous blowout and oil spill, causing damage to those affected by the Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or

more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

590.    Transocean acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, disabling the gas alarm system aboard the Deepwater Horizon.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

591.    BP and Transocean acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, failing to use a sufficient number of "centralizers" to prevent channeling during the cement

process; failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job; disregarding proper drilling, casing, mudding, and cementing procedures; failing to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

592.     BP, Transocean, and Halliburton acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, using an inappropriate cement mixture for the well; failing to appropriately test that cement mixture prior to using it in the well; failing to run a cement bond log to evaluate the integrity of the cement job; and failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

593.    BP, Transocean, and M-I acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are

254

not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

594.    BP, Transocean, and Cameron acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, defectively designing, recklessly maintaining and altering, and/or wantonly operating and/or using the BOP appurtenant to the Deepwater Horizon.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2064, and therefore deny those remaining allegations.

595.    As a direct and proximate result of Defendants' gross negligence and willful misconduct, Plaintiffs have suffered, *inter alia*, property damage, inconvenience, damages resulting from the closure and pollution of the Gulf water areas, harbors, marinas, boat launches and waterways, including the loss of revenue, which directly depends upon a supply of fish, shrimp, oysters and crabs from the Gulf of Mexico, loss of tax revenue resulting from a decline in tourism and rentals, and damage to, and diminution in value of, property, and costs associated with additional public services, clean-up and removal, entitling Plaintiffs to compensatory and punitive damages.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

### C.    Strict Liability For Manufacturing And/Or Design Defect

#### All Plaintiffs v. Cameron

596.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.

597.    Plaintiffs are entitled to recover from Cameron for its defective design and/or manufacture of the BOP that was appurtenant to and a part of the equipment of the Deepwater

Horizon, pursuant to Section 402A of the Restatement (Second) of Torts as adopted by maritime law.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with Document 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP parties and are not addressed by Document 2064, and therefore deny those remaining allegations.

598.    At all times relevant hereto, Cameron was in the business of designing, manufacturing, marketing, selling, and/or distributing the BOP used in connection with the drilling operations onboard the Deepwater Horizon.

**ANSWER:**

The BP Parties admit that Cameron International Corporation manufactured, designed, supplied, and/or installed the *Deepwater Horizon's* blowout preventer.  The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they

are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

599.    If operating as intended on the night of the disaster, the BOP could have been manually or automatically activated immediately after the explosion, cutting off the flow of oil at the wellhead, and limiting the Spill to a minute fraction of its ultimate severity and thereby sparing Plaintiffs millions of dollars in losses and damage.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

600.    Cameron sold and delivered the BOP at the Deepwater Horizon to Defendant Transocean in 2001.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

601.    Cameron's BOP failed to operate properly or at all, at the time of or following the blowout, and this failure caused and/or contributed to the Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

602.    Cameron failed to effectively design the BOP with a backup activation system, or provide adequate warnings, instructions, and/or guidelines on the permissible uses, modifications and applications of the BOP.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the

conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

603.    The BOP was defectively designed because its emergency modes of system operation did not provide a fully-independent means of closing the BOP, which rendered the BOP abnormally dangerous.  For instance, all of the emergency methods for closing the BOP provide different ways of closing a single blind shear ram, which must seal to isolate the wellbore.  As such, if the blind shear ram fails to operate for any reason, there is nothing the BOP can do to seal the well.  In addition, all emergency methods of operating the BOP, other than the autoshear and ROV hot stab, rely on an operational control pod which, if not functioning, renders those methods useless.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

604.    In addition, the two emergency methods of closing the BOP that can be activated from the vessel by personnel (the high pressure closure of the blind shear ram and the EDS) require the same communication, electrical and hydraulic components, meaning that if those components are destroyed or damaged, there is no method by which drilling vessel personnel can communicate with the BOP.

**ANSWER:**

The BP Parties admit that the two emergency methods of closing the blind shear rams that can be activated by rig personnel use the same method of communication with the control pods, and the same blind shear ram shuttle valve.  The BP Parties deny the remaining allegations of this paragraph.

605.    Moreover, Cameron's BOP was defectively designed and/or manufactured because its blind shear rams were vulnerable to the failure of a single shuttle valve carrying hydraulic fluid to the ram blades.  If the shuttle valve fails, the blind shear ram will be unable to seal the well.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

606.    Cameron's BOP was defectively designed and/or manufactured because it failed to operate as intended, if at all, and thus proximately caused and contributed to the blowout and subsequent Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

607.     Cameron's BOP was defectively designed and/or manufactured such that it did not operate as intended to prevent or minimize blowouts, which caused and/or contributed to the Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the

conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

608.    Cameron's BOP was in a defective condition and unreasonably dangerous to Plaintiffs when it left Cameron's control.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.   The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

609.    At all times, Cameron's BOP was used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to Cameron prior to April 20, 2010.

**ANSWER:**

The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.   The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations

of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties

and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

610. At the time the BOP left Cameron's control, it was in a defective condition unreasonably dangerous to Plaintiffs in that they were designed and manufactured with over 260 known defects and failure modes, including but not limited to:

(a) Inadequate, faulty, nonfunctioning and defective battery systems;

(b) Inadequate, faulty, nonfunctioning and defective dead man switches and related wiring;

(c) The absence of acoustic triggers;

(d) Inadequate, faulty, nonfunctioning and defective emergency disconnect systems (EDS);

(e) Improperly sealed, leaky hydraulic systems;

(f) Improperly designed, manufactured, and installed annular seals;

(g) Insufficiently robust blind shear rams;

(h) Insufficient warnings, instructions, and guidelines on permissible, foreseeable uses and modifications to the BOP and its component parts;

(i) Insufficient testing and design verification of the BOP and its component parts to ensure the shearing capability of the ram and other functioning of the BOP during reasonably foreseeable uses; and

(j) In such other particulars as the evidence may show.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference

Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel

April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent

they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining

allegations of this paragraph to the extent they are inconsistent with the allegations in Document

264

No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

611.    At the time the BOP appurtenant to the Deepwater Horizon left Cameron's control, Cameron knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

612.    At the time the BOP appurtenant to the Deepwater Horizon left Cameron's control, feasible design alternatives existed which would have to a reasonable probability prevented the harm suffered by Plaintiffs without impairing the utility, usefulness, practicality or desirability of the BOP.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

613.   At all relevant times, the BOP appurtenant to the Deepwater Horizon was used in an intended and/or reasonably foreseeable manner.

**ANSWER:**

The BP Parties admit that at all relevant times the BOP was appurtenant to the *Deepwater Horizon*. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2064. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2064, and therefore deny those remaining allegations.

614.    Plaintiffs were foreseeable bystanders and victims of the manifestation of the defects in the Deepwater Horizon's BOP.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

615.    Cameron had actual and/or constructive knowledge of the facts and circumstances relative to the BOP which caused or contributed to this incident, which in turn caused Plaintiffs' injuries, and its actions and/or inactions were grossly negligent, reckless, willful, and/or wanton.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the

conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

616.    As a result of the defective design and/or manufacture of the BOP, Plaintiffs have suffered, *inter alia*, property damage, inconvenience, damages resulting from the closure and pollution of the Gulf water areas, harbors, marinas, boat launches and waterways, including the loss of revenue, which directly depends upon a supply of fish, shrimp, oysters and crabs from the Gulf of Mexico, loss of tax revenue resulting from a decline in tourism and rentals, and damage to, and diminution in value of, property, as well as costs associated with additional public services, clean-up and removal, for which Plaintiff are entitled to actual and compensatory damages.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2064, BP's Cross-Claim Against Cameron International Corp., served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2064, and therefore deny those remaining allegations.

617.    In the alternative to the foregoing claim arising under the general maritime law against Cameron for its defective design and/or manufacture of the BOP, Plaintiffs seek relief pursuant to the Louisiana Products Liability Act (La. Rev. St. Ann. § 9:2800.51, *et seq.*); the Texas Products Liability Act of 1993 (Tex. Civ. Prac. & Rem. Code Ann. § 82.002, *et seq.*); the Mississippi Products Liability Act (Miss. Code Ann. § 11-1-63); and/or the Alabama Extended Manufacturer's Liability Doctrine.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

**D.    Strict Liability For Manufacturing And/Or Design Defect**

**All Plaintiffs v. Halliburton**

618.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.

619.    Pursuant to Section 402A of the Restatement (Second) of Torts, as adopted by maritime law, Plaintiffs are entitled to recover from Halliburton for its defective design and/or manufacture of the cement mixture, or "slurry," used to seal the well.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations

in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

620.    The cement provided by Halliburton was intended to fill the annulus between the casing and the well bore and seal off the hydrocarbon-filled formations, as well as plug the bottom of the casing pipe to prevent an influx.  The composition of the cement mixture that Halliburton chose for the task would have to allow the cement to be effectively placed and fully set within the narrow range of safe operating pressures at the bottom of the well.

**ANSWER:**

The BP Parties admit that the cement provided by Halliburton was intended to fill the annulus between the casing and the well bore and seal off the hydrocarbon-filled formations to prevent an influx, and to fill the shoe of the casing.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and therefore deny those remaining allegations.

621.    The slurry was required to be light enough to avoid fracturing the brittle formations surrounding the well, but once set, the slurry would have to be strong enough to resist the intense, nearly 12,000 psi pressure of the hydrocarbon reservoirs within those formations, securely sealing the annular space between the casing and surrounding formations, isolating the hydrocarbon reservoirs from the well.

**ANSWER:**

The BP Parties admit that slurry was required to be light enough to avoid fracturing the well formation but, once set, the slurry would have isolated the hydrocarbon reservoirs from the well.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document No. 2082, and therefore deny those remaining allegations.

622.    Halliburton, defectively designed the cement mixture and failed to thoroughly conduct and/or review the results of laboratory testing of the cement mixture's stability under conditions that would be found in the Macondo well.  The foamed cement mixture it provided, which had been injected with nitrogen gas to lower its density, was defectively designed considering the high temperatures and pressures in wells like Macondo, which can have unpredictable effects on the nitrogen in the cement, leading to instability and weakness that prevents the cement from forming a secure seal in the well.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny

the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

623.    The tests conducted by Halliburton in February 2010 on a cement slurry similar to that used to secure the Macondo well showed instability under conditions like those found at the bottom of the Macondo well and this, as Robert Bea told the *Washington Post,* was "a recipe for disaster."  Post-explosion testing also revealed that Halliburton's cement mixture was unstable.

**ANSWER:**

The BP Parties admit that, in February 2010, Halliburton conducted two foam stability tests on a cement slurry that was slightly different than that which was ultimately used.  The results of the tests indicated that this foam slurry design was unstable.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

624.    Unstable foam cement slurry can result in nitrogen breakout, when bubbles of nitrogen create tiny holes in the cement as it is setting, leaving the cement porous and unable to form a seal against the hydrocarbon pressure.  Nitrogen breakout not only jeopardizes the foam cement itself, but can also contaminate the other types of cement it is pumped with, interfering with their proper placement and/or degrading their ability to form a secure seal.  Nitrogen breakout in the unstable foam slurry used at Macondo could have weakened the denser, non-foamed cement used to plug the very bottom of the last casing pipe, leaving it also unable to withstand the pressure of the hydrocarbons surrounding the well.

**ANSWER:**

The BP Parties admit that unstable foam cement slurry can result in nitrogen breakout.  Nitrogen breakout in the foam cement can also contaminate the other cement and interfere with their proper placement and/or degrading their ability to form a seal.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

625.    At all times relevant hereto, Halliburton was in the business of designing, manufacturing, marketing, selling, and/or distributing cement to be used to seal oil wells.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

626.    Weatherford sold and delivered the cement slurry to be used to seal the Macondo well in April 2010.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

627.    On April 20, 2010, the Halliburton-designed cement mixture did not seal properly, which allowed hydrocarbons to leak into the casing, causing and/or contributing to the blowout and subsequent explosions, fire, sinking, and Spill.

**ANSWER:**

The BP Parties admit that the cement did not seal the well.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

628.    Hallibuton's cement mixture failed to operate properly or at all, at the time of or following the blowout, and this failure caused or contributed to the Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

629.   Halliburton's cement mixture was defective because it failed to operate as intended.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

630.   Halliburton's cement mixture failed to operate as intended, if at all, and thus proximately caused and contributed to the blowout and subsequent Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

631.    Halliburton's cement mixture was defectively designed and/or manufactured such that it did not operate as intended to prevent or minimize blowouts, which caused and/or contributed to the Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

632.    Halliburton's cement mixture was in a defective condition and unreasonably dangerous to Plaintiffs when it left Halliburton's control.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

633.    At all times, Halliburton's cement mixture was used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to Halliburton prior to April 20, 2010.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

634.    At the time Halliburton's cement mixture left Halliburton's control, Halliburton knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

635.    At the time the cement mixture left Halliburton's control, feasible design alternatives existed which would have to a reasonable probability prevented the harm suffered by Plaintiffs without impairing the utility, usefulness, practicality or desirability of the cement mixture.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

636.    Plaintiffs were foreseeable bystanders and victims of the manifestation of the defects in Halliburton's cement mixture.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

637.    Halliburton had actual and/or constructive knowledge of the facts and circumstances relative to its cement mixture that caused or contributed to this incident, which in turn caused Plaintiffs' injuries, and its actions and inactions were grossly negligent, reckless, willful, and/or wanton.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

638.    As a result of manufacturing and/or defects in Halliburton's cement mixture, Plaintiffs have suffered, *inter alia*, property damage, inconvenience, damages resulting from the closure and pollution of the Gulf water areas, harbors, marinas, boat launches and waterways, including the loss of revenue, which directly depends upon a supply of fish, shrimp, oysters and

crabs from the Gulf of Mexico, loss of tax revenue resulting from a decline in tourism and rentals, and damage to, and diminution in value of, property, as well as costs associated with additional public services, clean-up and removal, and are entitled to actual and compensatory damages.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, served on all counsel April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document No. 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document No. 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

639.    In the alternative to the foregoing claim arising under the general maritime law against Halliburton for its defective design and/or manufacture of the cement mixture, Plaintiffs seek relief pursuant to the Louisiana Products Liability Act (La. Rev. St. Ann. § 9:2800.51, *et seq.*); the Texas Products Liability Act of 1993 (Tex. Civ. Prac. & Rem. Code Ann. § 82.002, *et seq.*); the Mississippi Products Liability Act (Miss. Code Ann. § 11-1-63); and/or the Alabama Extended Manufacturer's Liability Doctrine.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

**E.**   **Strict Liability For Manufacturing And/Or Design Defect**

**All Plaintiffs v. Weatherford**

640.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.

641.   Plaintiffs are entitled to recover from Weatherford for its defective design and/or manufacture of the float collar on the Deepwater Horizon pursuant to Section 402A of the Restatement (Second) of Torts as adopted by maritime law.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

642.   At all times relevant hereto, Weatherford was in the business of designing, manufacturing, marketing, selling, and/or distributing the float collar appurtenant to the vessel and used in connection with the drilling operations by the Deepwater Horizon.

**ANSWER:**

The BP Parties admit that Weatherford and/or its affiliates provided products and services related to the float collar used at the Macondo Well.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

643.   Weatherford sold and delivered the float collar at the Deepwater Horizon to Defendant Transocean in 2001,

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

644.    The float collar is a check valve device that is installed to prevent backflow or ingress of fluids into the casing.  Hydrocarbons flowing into the casing from the bottom of the wellbore must first pass through the float collar.

**ANSWER:**

The BP Parties admit that hydrocarbons flowing into the casing must pass through the float collar.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

645.    On April 20, 2010, the Weatherford-manufactured float collar did not seal properly, which allowed hydrocarbons to leak into the casing, contributing to the blowout and subsequent explosions, fire, sinking, and Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

646.    Weatherford's float collar failed to operate properly or at all, at the time of or following the blowout, and this failure caused or contributed to the Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient

281

to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

647.    Weatherford's float collar was defective because it failed to operate as intended.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

648.    The float collar on the Deepwater Horizon supplied by Weatherford failed to operate as intended, if at all, and thus proximately caused and contributed to the blowout and subsequent Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

649.    The float collar used on the Deepwater Horizon was defectively designed and/or manufactured such that it did not operate as intended to prevent or minimize blowouts, which caused and/or contributed to the Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

282

650.     Weatherford's float collar was in a defective condition and unreasonably dangerous to Plaintiffs when it left Weatherford's control.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

651.     At all times, Weatherford's float collar was used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to Weatherford prior to April 20, 2010.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

652.     At the time the float collar used at the Deepwater Horizon site left Weatherford's control, Weatherford knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

653.     At the time the float collar used at the Deepwater Horizon site left Weatherford's control, feasible design alternatives existed which would have to a reasonable probability

prevented the harm suffered by Plaintiffs without impairing the utility, usefulness, practicality or desirability of the float collar.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

654.    At all relevant times, the float collar used on the Deepwater Horizon site was used in an intended and/or reasonably foreseeable manner.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

655.    Plaintiffs were foreseeable bystanders and victims of the manifestation of the defects in the Deepwater Horizon's float collar.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

656.    Weatherford had actual and/or constructive knowledge of the facts and circumstances relative to the float collar that caused or contributed to this incident, which in turn caused Plaintiffs' injuries, and its actions and inactions were grossly negligent, reckless, willful, and/or wanton.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

657.    As a result of manufacturing and/or defects in the Weatherford float collar, Plaintiffs have suffered, *inter alia*, property damage, inconvenience, damages resulting from the closure and pollution of the Gulf water areas, harbors, marinas, boat launches and waterways, including the loss of revenue, which directly depends upon a supply of fish, shrimp, oysters and crabs from the Gulf of Mexico, loss of tax revenue resulting from a decline in tourism and rentals, and damage to, and diminution in value of, property, as well as costs associated with additional public services, clean-up and removal, and are entitled to actual and compensatory damages.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

658.    In the alternative to the foregoing claim arising under the general maritime law against Cameron for its defective design and/or manufacture of the BOP, Plaintiffs seek relief pursuant to the Louisiana Products Liability Act (La. Rev. St. Ann. § 9:2800.51, *et seq.*); the Texas Products Liability Act of 1993 (Tex. Civ. Prac. & Rem. Code Ann. § 82.002, *et seq.*); the Mississippi Products Liability Act (Miss. Code Ann. § 11-1-63); and/or the Alabama Extended Manufacturer's Liability Doctrine.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP

Parties.

## II.      The Oil Pollution Act

### All Plaintiffs v. BP, Transocean, Anadarko, Anadarko E&P, and MOEX

659.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if

fully restated here.  The BP Parties further deny any and all allegations of wrongdoing against

the BP Parties, including allegations that they are liable under the Oil Pollution Act.

660.    The Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* (the "OPA"), imposes liability upon a "responsible party for a....vessel or a facility from which oil is discharged….into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs.  33 U.S.C. § 2702.

**ANSWER:**

The BP Parties admit that the Oil Pollution Act includes the above quoted language, and

deny the remaining allegations of this paragraph to the extent not consistent with the Oil

Pollution Act.

661.    The Coast Guard has named BP as the responsible party for the downhole release of oil and Transocean as the responsible party for the release of diesel on the surface.  Therefore, BP and Transocean are strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

**ANSWER:**

The BP Parties admit that the U.S. Coast Guard named BPXP and Transocean as

Responsible Parties under the Oil Pollution Act.  As a Responsible Party under OPA, the BP

Parties have expressed their commitment to pay all legitimate OPA claims.  Following the

incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  The BP Parties deny that Transocean's Oil Pollution Act liability can be limited.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

662.    Defendants Anadarko, Anadarko E&P, and MOEX held a leasehold interest in a lease granted by the MMS for Block 252, Mississippi Canyon (the "Macondo lease"), an oil lease on lands beneath navigable waters, before and/or at the time of the Spill.  As such, they were lessees of the area within which the well and drilling vessel, both offshore facilities, were located at the time of the Spill and are responsible parties pursuant to Section 2701 (16) and (32) of the OPA.  They are therefore strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

**<u>ANSWER:</u>**

The BP Parties admit that at certain times prior to April 20, 2010, BPXP, Anadarko E&P, Anadarko Petroleum, and MOEX Offshore were co-lessees under a lease granted by the MMS for Mississippi Canyon Block 252, but deny that Anadarko E&P held an interest in the lease as of April 20, 2010.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

663.    Defendants BP, Transocean, Anadarko, Anadarko E&P, and MOEX are not entitled to limit their liability under Section 2704(a) of the OPA because the Spill was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 33 U.S.C. § 2704(c).

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

664.    Pursuant to Section 2702(b)(1) of the OPA, the Plaintiffs are entitled to all removal costs they have incurred, or will incur, as a result of the Spill.

**ANSWER:**

The BP Parties admit that as a Responsible Party under OPA they have expressed their commitment to pay all legitimate OPA claims caused by the Spill.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims

288

process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund

from which individual and business claims, state and local government claims, NRD and NRDA,

and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual

and business claims.

665.    Plaintiffs are also entitled to damages pursuant to Section 2702(b)(2)(B), which provides for recovery of damages to real or personal property, including "[D]amages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property, including the diminution in the value of their property."

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-

Claim and Third Party Complaint Against Transocean, which were served on all counsel on

April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent

they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the

remaining allegations of this paragraph to the extent they are inconsistent with the allegations in

Document Nos. 2074 and 2075.  The BP Parties further deny that Section 2702(b)(2)(B) states

the above quoted language.  The BP Parties lack knowledge or information sufficient to form a

belief about the truth of the remaining allegations of this paragraph to the extent they are not

directed at the conduct or liability of the BP Parties and are not addressed in Document Nos.

2074 and 2075 and therefore deny those remaining allegations.  But as a Responsible Party under

OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.

Following the incident, the BP Parties quickly established a claims process.  And while operating

its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses. Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.

666.    Plaintiffs are also entitled to damages pursuant to Section 2702(b)(2)(D) "equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources…"

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.  But as a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims. Following the incident, the BP Parties quickly established a claims process.  And while operating

290

its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses. Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid. The GCCF has paid over $5.28 billion for individual and business claims

667.    Plaintiffs are further entitled to damages pursuant to Section 2702(b)(2)(F) "for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by" the Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations. But as a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims. Following the incident, the BP Parties quickly established a claims process. And while operating

its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses. Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.28 billion for individual and business claims

668.   To the extent required by law, and/or by consent or stipulation by BP, Plaintiffs have satisfied, or will have satisfied, all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), as to each and all defendants, by the submission of their claims to the Gulf Coast Claims Facility (the "GCCF") and/or BP and/or its agents or designees.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

669.   In its "Statement Of BP Exploration & Production Inc. Re Applicability Of Limitation Of Liability Under Oil Pollution Act of 1990" filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

**ANSWER:**

As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating its OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP Parties agreed to transition their OPA claims process to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $5.73 billion for individual and business claims.  Accordingly, the BP Parties admit the allegations of this paragraph.

### III.     State Law Claims For Relief

**A.     Public Nuisance**

**All Plaintiffs v. Drilling Defendants, Cameron, and Weatherford**

670.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.  The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

671.     Defendants' negligence caused and/or contributed to the blowout and subsequent Spill that invaded and polluted the water, land, and air of the States of Florida, Alabama, Mississippi, Louisiana, and Texas, damaging all persons who came within the sphere of its operation, including the cities, towns, counties, villages, parishes, municipalities, and other governmental entities and units near the Gulf, resulting in a devastating economic and ecological disaster that has interfered and will continue to interfere with the Plaintiffs' interests and the use an enjoyment of the waters, property, estuaries, seabeds, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the foregoing states, which constitutes a public nuisance under Florida, Alabama, Mississippi, Louisiana and Texas law.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

672.   Plaintiffs are entitled, either by statute or pursuant to their police power, to prevent injury or annoyances from anything dangerous or offensive and to cause all nuisances to be abated and assess damages and the cost of abating the same against the person creating or maintaining the same. *See* Tex. Civ. Prac. & Rem. Code § 125.002 (2010); Ala. Code §§ 1-47-117, 6-5-122; Miss. Code Ann. § 21-19-1 (2010); Fla. Stat. § 403.191 (2010); La. R.S. §§ 30:2055.2, 33:361 (2010).

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

673.   Defendants acted in an unreasonable manner in creating the nuisance described herein.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

674.   As a direct and proximate result of the creation and continuing creation of a public nuisance, Plaintiffs have suffered past, present, and future damages, including, but not

limited to, property loss, damage, and diminution in value; inconvenience; loss of income and revenue; and a substantial increase in expenditures by the Plaintiffs to combat, abate, and remedy the effects of the nuisance caused by the Defendants.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

675.    Defendants were under a duty to take positive action to prevent or abate the interference, and appropriate measures needed to abate such harm and threat of harm to Plaintiffs, but failed to do so.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

676.    As a direct and proximate result of the Defendants' creation of a public nuisance, and their failure to perform their duties and obligations, Plaintiffs have suffered and will continue to suffer losses and damages including, *inter alia,* those necessary to pay for services to protect the public health and the environment on behalf of their citizens, as well as inconvenience, loss of beneficial use, enjoyment, and exclusive possession of property, damage, destruction, and/or diminution in value of property, loss of tax revenue, income and/or use, and/or costs of response, removal, clean-up, restoration and/or remediation and/or other damages, losses, or costs, for which Plaintiffs are entitled to be compensated.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

677.    Defendants are liable to Plaintiffs to take all appropriate actions to remedy and abate the harm to the environment and public health caused by the public nuisance they created, and any other relief the Court deems just and appropriate.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

B.    **Nuisance**

**All Plaintiffs v. Drilling Defendants, Cameron and Weatherford**

678.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.  The Court dismissed Plaintiffs' state law claims in its Order and Reasons As

to the Local Government Entity Master Complaint and certain other cases within Pleading

Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required

to respond to these allegations.  To the extent the BP Parties may be deemed to be required to

respond to these allegations, the BP Parties deny them to the extent they concern the conduct or

liability of the BP Parties.


679.    Defendants' negligence caused and/or contributed to the blowout and subsequent
Spill which directly and proximately caused an invasion of air, water, and land, that has
interfered with the use and enjoyment of the waters, property, estuaries, seabeds, animals, plants,
beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources
located in the cities, towns, counties, villages, parishes, municipalities, and other governmental
entities in Florida, Alabama, Mississippi, Louisiana, and Texas, and have materially diminished
and continue to diminish the value thereof, constituting a nuisance.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local

Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc.

4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to

these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP

Parties.


680.    Plaintiffs are entitled, either by statute or pursuant to their police power, to
prevent injury or annoyances from anything dangerous or offensive and to cause all nuisances to
be abated and assess damages and the cost of abating the same against the person creating or
maintaining the same on behalf of their citizens.  *See* Tex. Civ. Prac. & Rem. Code § 125.002
(2010); Ala. Code §§ 1-47-117, 6-5-122; Miss. Code Ann. § 21-19-1 (2010); Fla. Stat. § 403.191
(2010); La. R.S. §§ 30:2055.2, 33:361 (2010).

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local

Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc.

4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

681.   Defendants were under a duty to take positive action to prevent or abate the interference, but failed to do so.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

682.   Defendants' creation of a private nuisance proximately caused past, present, and future damages to the Plaintiffs by allowing oil, chemical dispersants, and other materials and substances to contaminate Plaintiffs' property.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

683.    As a direct and proximate result of the Defendants' creation of a private nuisance, and their failure to perform their duties and obligations, Plaintiffs have suffered and will continue to suffer damages and losses, including, *inter alia,* those necessary to pay for services to protect the public health and the environment on behalf of their citizens, as well as inconvenience, loss of beneficial use, enjoyment, and exclusive possession of property, damage, destruction, and/or diminution in value of property, loss of tax revenue, income and/or use, and/or costs of response, removal, clean-up, restoration and/or remediation and/or other damages, losses, or costs, for which Plaintiffs are entitled to compensation.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

684.    Defendants are liable to Plaintiffs to take all appropriate actions to remedy and abate the harm to the environment and public health caused by the nuisance they created, and any other relief the Court deems just and appropriate.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

C.      **Trespass**

**All Plaintiffs v. Drilling Defendants, Cameron, and Weatherford**

685.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.  The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

686.    Defendants discharged a foreign polluting substance beyond the boundaries of the States of Florida, Alabama, Mississippi, Louisiana, and Texas, which it knew to a substantial certainty would, in due course, invade and intrude upon Plaintiffs' property, interfering with the Plaintiffs' exclusive possessory rights and causing damage to the waters, property estuaries, seabeds, animals, plants, beaches, shorelines, coastlines, islands, marshland and other natural and economic resources, materially diminishing the value thereof.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

687.    The invasion and resulting damage to Claimants was reasonably foreseeable by Defendants when they failed to exercise reasonable care in the design, execution, and operation of the Macondo well and the maintenance and operation of the Deepwater Horizon and its appurtenances and equipment, which conduct resulted in the entry, intrusion, or invasion on the Plaintiffs' property.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

688.    This deliberate invasion and contamination of property owned by Plaintiffs constitutes a trespass in violation of Florida, Alabama, Mississippi, Louisiana, and Texas law.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

689.    As a direct and proximate result of their unauthorized invasion, entry and contamination, Defendants have caused and continue to cause losses and damage to the Plaintiffs, including the creation of conditions harmful to human health and the environment, expenditures necessary to pay for services to protect the public health and the environment on behalf of their citizens, as well as inconvenience, loss of exclusive possession of property, damage, destruction, and/or diminution in value of property, loss of tax revenue, income and/or use, and/or costs of response, removal, clean-up, restoration and/or remediation and/or other damages, losses, or costs, for which Plaintiffs are entitled to compensation.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

690.    The outrageous, malicious, rude, oppressive, grossly negligent, willful, reckless, and wanton conduct of Defendants, as described herein, entitles Plaintiffs to compensatory and punitive damages.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations. To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

**D.    Fraudulent Concealment or Suppression of Material Facts**

**All Plaintiffs v. BP, Halliburton, and Transocean**

691.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here. The Court dismissed Plaintiffs' state law claims in its Order and Reasons As

to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

692.    To the extent available under state law, Plaintiffs are entitled to recovery against Defendants BP, Halliburton and Transocean for their fraudulent concealment of material facts concerning the Spill.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

693.    After the explosions, Defendant BP attempted to downplay and conceal the severity of the Spill.  BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual leakage amount of 50,000 barrels of oil per day.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

694.    Moreover, in the aftermath of the explosions, BP did not provide complete and timely announcements and warnings about the severity, forecast and trajectory of the Spill.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

695.    In addition, BP misrepresented its capabilities to respond to the Spill.  BP overstated its ability to a handle a blowout in its Exploration Plan, wherein it claimed that in the event of a blowout resulting in an oil spill, it was "unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses."

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

696.    In fact, BP did not have proven equipment and technology to respond to the Spill; instead, according to the letter to Attorney General Eric Holder by Members of Congress on May 17, 2010, it did not "in any way appear that there was 'proven equipment and technology' to respond to the spill, which could have tragic consequences for local economies and the natural

resources of the Gulf of Mexico."  As noted further in that letter, "much of the response and implementation of spill control technologies appear[ed] to be taking place on an ad hoc basis."

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

697.    BP admitted on May 10, 2010 that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

698.    Despite its inability to respond and control the Spill, BP resisted requests from scientists to use sophisticated instruments at the ocean floor that would have provided a more accurate picture of the amount of oil that was gushing from the well.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc.

4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

699.    BP did not in the aftermath of the blowout or since that time provide complete or timely announcements and warnings about the severity, forecast and trajectory of the Spill.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

700.    The severity, forecast and trajectory of the Spill, and BP's ability to respond to the Spill, were material facts that BP had a duty to disclose.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

701.    In addition, Defendant Halliburton misrepresented and concealed the stability of the cement used at the Macondo well, despite having performed three tests before the Spill, all of which demonstrated that the foam cement used at Macondo was unstable.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local

Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc.

4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to

these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP

Parties.

702.    The instability of the cement used at the Macondo well and the results of the testing performed before the Spill were material facts that Halliburton had a duty to disclose.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local

Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc.

4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to

these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP

Parties.

703.    Moreover, BP was aware, before the Spill, that Halliburton's testing had revealed that the concrete foam was unstable, yet it concealed this material fact.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local

Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc.

4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to

these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

704.    For its part, Transocean misrepresented and concealed the condition of the Deepwater Horizon and the known hazards associated with the disabling of, and/or failure to maintain, its safety features and appurtenances, including, inter alia, its BOP.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

705.    Transocean also misrepresented and concealed the safety record of the vessel, which was based on false data supplied by its personnel.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

706.    Transocean misrepresented and concealed the condition of many key components, including, inter alia, the BOP rams and failsafe valves, which had not been fully inspected for ten years before the blowout, and at least 36 components and systems on the vessel that were in

"bad" or "poor" condition, and which it was aware might lead to loss of life, serious injury or environmental damage.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

707.    The foregoing known hazards, poor condition, and maintenance and safety issues associated with the Deepwater Horizon and its appurtenances and equipment were material facts that Transocean had a duty to disclose.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

708.    Defendants Halliburton, BP, and Transocean failed to disclose or concealed the foregoing material facts, and their failure to do so induced Plaintiffs to act or to refrain from acting to protect their property, businesses, livelihoods and income.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc.

4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

709.    As a direct and proximate result of the fraudulent concealment of the foregoing material facts by Halliburton, BP, and Transocean, Plaintiffs suffered damage, including the creation of conditions harmful to human health and the environment, expenditures necessary to pay for services to protect the public health and the environment on behalf of their citizens, as well as inconvenience, damage, destruction, and/or diminution in value of property, loss of tax revenue, income and/or use, and/or costs of response, removal, clean-up, restoration and/or remediation and/or other damages, losses, or costs, for which Plaintiffs are entitled to compensation.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

710.    Moreover, the acts of misrepresentation and concealment of the foregoing material facts by Halliburton, BP, and Transocean were willful, wanton, and/or in callous disregard for the safety of others and, accordingly, Plaintiffs are entitled to an award of punitive damages.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

**E.      Strict Liability Pursuant To The Florida Pollutant Discharge Prevention And Control Act Fla. Stat. § 376.011,** *et seq.*

**Florida Subclass Members v. BP and Transocean**

711.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.  The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

712.    At all relevant times, Defendants BP, Transocean, Anadarko, and MOEX, had a statutory duty to Florida Subclass Members to maintain and operate the Deepwater Horizon and the Macondo well so as to not create or sustain hazardous conditions due to the discharge of pollutants as defined by the Florida Pollutant Discharge Prevention and Control Act (the "FPDPCA"), Fla. Stat. § 376.011, *et seq*.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP

Parties.

713.    Pursuant to Section 376.041 of the FPDPCA, the discharge of pollutants into or upon any coastal waters, estuaries, tidal flats, beaches, and lands adjoining the seacoast of the State of Florida is prohibited.  The FPDPCA holds "Responsible Parties" liable for the discharge of pollutants in violation of its provisions.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local

Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc.

4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to

these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP

Parties.

714.    Pursuant to Section 376.031(20)(a) of the FPDPCA, Transocean is a "Responsible Party" and is therefore liable under the FPDPCA, because it was the owner and operator of the Deepwater Horizon. Transocean was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local

Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc.

4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to

these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP

Parties.

715.    Pursuant to Section 376.031(20)(a) and (c) of the FPDPCA, BP is a "Responsible Party" and therefore liable under the FPDPCA, because it was an operator of the Deepwater

Horizon and a lessee of the area where the Deepwater Horizon and the Macondo well were located. BP was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local

Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc.

4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to

these allegations. To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP

Parties.

716. As co-lessees on the Macondo lease, MOEX and Anadarko also qualify as "Responsible Parties" under Section 376.031(20)(c), and are therefore liable under the FPDPCA.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local

Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc.

4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to

these allegations. To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP

Parties.

717. At all relevant times, Defendants BP, Transocean, Anadarko, and MOEX breached their statutory duty to Florida Subclass Members by discharging, or allowing to be discharged, crude oil and other pollutants and hazardous substances into the Gulf of Mexico and allowing the massive oil spill to migrate into Florida's marine and coastal areas, in violation of the FPDPCA.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

718.    Defendants BP, Transocean, Anadarko, and MOEX are liable under the FPDPCA for the discharge of pollutants or hazardous substances into or upon the surface waters of the state and lands, and failing to obtain required permits before discharging pollutants and hazardous substances into the surface waters of the state and lands. Fla. Stat. § 376.302.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

719.    Defendants are strictly liable to Plaintiffs and Florida Subclass Members under the Act, § 376.205, which provides in pertinent part:

> … any person may bring a cause of action against a responsible party in a court of competent jurisdiction for damages, as defined in § 376.031, resulting from a discharge or other condition of pollution covered by §§ 376.011-376.21. In any such suit, it shall not be necessary for the person to plead or prove negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it occurred.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

720.    The Florida Act provides that "[e]ach responsible party is liable to any affected person for all damages as defined in Section 376.031, excluding natural resource damages, suffered by that person as a result of the discharge." Fla. Stat. § 376.12(5).

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

721.    The Florida Act defines "damage" as "the documented extent of any destruction to or loss of any real or personal property . . . including all living things except human beings, as the direct result of the discharge of a pollutant. Fla. Stat. § 376.031(5).

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

722.   The Florida Act defines "person" as "any individual, partner, joint venture, corporation; any group of the foregoing, organized or united for a business purpose; or any governmental entity. Fla. Stat. § 376.031(14).

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

723.   As "persons" under the Florida Act, Florida Subclass Members are entitled to damages for the destruction to or loss of any real or personal property.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

724.   Defendants BP, Transocean, Anadarko, and MOEX are not entitled to a limitation or defense for the costs of removal, containment, and/or abatement of the Spill because the Spill resulted from their willful or gross negligence or willful misconduct, and/or the violation of applicable federal and/or state safety, construction or operating regulations and/or rules.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

725.    The immediate discharge from the Spill occurred into waters outside the territorial limits of Florida; however, lands and waters within the territorial limits of Florida have been directly affected by the discharge and are reasonably expected to continue to be so affected, and the Spill, therefore, is a prohibited discharge and pollutive condition under the FPDPCA.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

726.    Pursuant to Section 376.205, Florida Subclass Members are entitled to reasonable attorney's and expert witness fees.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

F.      **Strict Liability Pursuant To The Louisiana Oil Spill Prevention And Response Act, La. R. S. 30:2451, *et seq.***

**(And Liability for Penalties Pursuant to La. R.S. 56:40.1, *et seq*)**

**Louisiana Subclass Members v. All Defendants**

727.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.  The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

728.    The Louisiana Oil Spill Prevention and Response Act ("LOSPRA") imposes liability upon a responsible party for "intentional or unintentional act or omission by which harmful quantities of oil are spilled, leaked, pumped, poured, emitted, or dumped into or on coastal waters of the state or at any other place where, unless controlled or removed, they may drain, seep, run, or otherwise enter coastal waters of the state."  La. R.S. 30:2454.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

729.    Pursuant to the LOSPRA, the owner of an oil well discharging petroleum pollutants into a waterway is liable for damages arising from that discharge.  Furthermore, pursuant to La. R.S. 30:2482, the owner of the well must pay all pollution removal costs and damages, regardless of any defenses that the owner may assert.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

730.    LOSPRA defines "Person responsible", "responsible person", or "responsible party" as "(a) The owner or operator of a vessel or terminal facility from which an unauthorized discharge of oil emanates or threatens to emanate..." and (c) "Any other person, but not including a person or entity who is rendering care, assistance, or advice in response to a discharge or threatened discharge of another person, who causes, allows, or permits an unauthorized discharge of oil or threatened unauthorized discharge of oil."

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

731.   All Defendants qualify as responsible parties under the LOSPRA because they each caused, allowed, or permitted an unauthorized discharge of oil into the coastal waters of the State of Louisiana.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local

Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc.

4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to

these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP

Parties.

732.   Louisiana Subclass Members have sustained damage as a result of injury to, or economic loss resulting from destruction of immovable property (defined "tracts of land, with their component parts") and corporeal movable property (defined as "things, whether animate or inanimate, that normally move or can be moved from one place to another"), and are therefore entitled to damages pursuant to La. R.S. 30:2454(b).

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local

Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc.

4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to

these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP

Parties.

733.   In addition, Louisiana Subclass Members are entitled to damages pursuant to La. R.S. 30:2454(d) for public services, which includes "damages for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by a discharge of oil, recoverable by the state of Louisiana or any of its political subdivisions." La. R.S. 30:2454 (d)

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

734.    As a result of the Spill, the Louisiana Subclass Members have suffered the type of damage that may be recovered pursuant to the LOSPRA, and they demand compensation from Defendants in amounts to be determined by this Court.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

735.    As a result of the Spill, Defendants are also each liable for the killing of fish, wild birds, wild quadrupeds, and other wildlife and aquatic life, in violation of La. R.S. 56:40.1, *et seq.*

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

736.    The District Attorney for the Parish in which the violation occurred is authorized, pursuant to La. R.S. 56:40.4, to bring an action to recover penalties for the value of each fish, each wild bird, each wild quadruped, and other wildlife and aquatic life unlawfully killed, taken, caught, possessed or injured as a result of the conduct of each Defendant.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

737.    Each Defendant is therefore liable for the value of fish, each wild bird, each wild quadruped, and other wildlife and aquatic life unlawfully killed, taken, caught, possessed or injured, as determined in accordance with La. R.S. 56:40.2, and for attorneys' fees and costs of litigation, in accordance with La. R.S. 56:40.3(F), or otherwise as may be applicable by law.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

### G. Strict Liability Pursuant To The Texas Oil Spill Prevention And Response Act of 1991, Tex. Nat. Res. Code Ann. § 40.001, *et seq.*

### Texas Subclass Members v. All Defendants

738.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.  The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

739.   The Texas Oil Spill Prevention and Response Act of 1991 (TOSPRA) provides that any person responsible for an actual or threatened unauthorized discharge of oil from a vessel or a terminal facility shall be liable for the resulting response costs and damages. Tex. Nat. Res. Code Ann. § 40.202-203 (Vernon Supp. 1993).

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

740.   Persons responsible under the TOSPRA include: "(A) the owner or operator of a vessel or terminal facility from which an unauthorized discharge of oil emanates or threatens to

emanate;" and "(C) any other person who causes, allows or permits an unauthorized discharge of oil or threatened unauthorized discharge of oil. Tex. Nat. Res. Code Ann. § 40.003(19).

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

741.    All Defendants qualify as persons responsible under Tex. Nat. Res. Code Ann. § 40.003(19)(C), as each caused and/or contributed to the Spill.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

742.    Texas Subclass Members have suffered damages and are entitled to compensation pursuant to Tex. Nat. Res. Code Ann. § 40.003(6)(A)(i) for any loss of, injury to, or loss of use of any real or personal property injured by the Spill.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to

these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP

Parties.

743.    Texas Subclass Members have suffered damages and are entitled to compensation
pursuant to Tex. Nat. Res. Code Ann. § 40.003(6)(A)(ii) for any "direct, documented net loss of
taxes or net costs of increased entitlements or public services."

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local

Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc.

4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to

these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP

Parties.

744.    Texas Subclass Members have expended costs and are entitled to compensation
pursuant to Tex. Nat. Res. Code Ann. § 40.202 for all response costs incurred from Defendants'
unauthorized discharge of oil from the Deepwater Horizon.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local

Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc.

4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to

these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP

Parties.

745.   Because the Defendants' unauthorized discharge of oil was the result of gross negligence and/or willful misconduct, Defendants are liable for the full amount of all response costs and damages pursuant to Tex. Nat. Res. Code Ann. § 40.202 (c)(1).

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local

Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc.

4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to

these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP

Parties.

746.   As a result of the Spill, the Texas Subclass Members have suffered the type of damage that may be recovered pursuant to the TOSPRA, and they demand compensation from Defendants in amounts to be determined by this Court.

**ANSWER:**

The Court dismissed Plaintiffs' state law claims in its Order and Reasons As to the Local

Government Entity Master Complaint and certain other cases within Pleading Bundle "C," Doc.

4845, filed on December 9, 2011, and the BP Parties are therefore not required to respond to

these allegations.  To the extent the BP Parties may be deemed to be required to respond to these

allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP

Parties.

## IV.     Punitive Damages Under All Claims

### All Plaintiffs v. BP, Transocean, and Halliburton

747.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.  The BP Parties further deny any and all allegations of wrongdoing against the BP Parties, including allegations that they are liable for punitive damages.

748.    Under the General Maritime Law (including, but not limited to, by virtue of the Admiralty Extension Act) and/or under applicable State Law, Defendants BP, Transocean, and Halliburton engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire, and Spill, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence.  Plaintiffs, society and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by Defendants' misconduct herein.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

749.   BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

750.   BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of live; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

751.    Transocean callously and with reckless disregard for human life disabled the flammable gas alarm system aboard the Deepwater Horizon and prevented said system from operating properly and preventing or containing the explosions, fire and loss of life.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.   The BP Parties adopt and incorporate by reference

Document 2074, the  BP Parties' Counter-Complaint, Cross-Complaint and  Third Party

Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-

Claim and Third Party Complaint Against Transocean, which were served on all counsel on

April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent

they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the

remaining allegations of this paragraph to the extent they are inconsistent with the allegations in

Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to

form a belief about the truth of the remaining allegations of this paragraph to the extent they are

not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos.

2074 and 2075 and therefore deny those remaining allegations.


752.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by using a well design with too few barriers to gas flow.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.   The BP Parties adopt and incorporate by reference

Document 2074, the  BP Parties' Counter-Complaint, Cross-Complaint and  Third Party

Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-

Claim and Third Party Complaint Against Transocean, which were served on all counsel on

April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent

they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the

remaining allegations of this paragraph to the extent they are inconsistent with the allegations in

Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to

form a belief about the truth of the remaining allegations of this paragraph to the extent they are

not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos.

2074 and 2075 and therefore deny those remaining allegations.


      753.    BP and Transocean focused primarily on profit while disregarding public and
environmental health and safety while undertaking their ultra-hazardous activities on the
Deepwater Horizon by failing to use a sufficient number of "centralizers" to prevent channeling
during the cement process.

      **<u>ANSWER:</u>**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-

Claim and Third Party Complaint Against Transocean, which were served on all counsel on

April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent

they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the

remaining allegations of this paragraph to the extent they are inconsistent with the allegations in

Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to

form a belief about the truth of the remaining allegations of this paragraph to the extent they are

not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos.

2074 and 2075 and therefore deny those remaining allegations.

754.   BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

755.   BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that cement mixture prior to using it in the well.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

756.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by failing to run a cement bond log to evaluate the integrity of the cement job.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient

to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

757.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

758.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

759. BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by ignoring and/or misinterpreting abnormal, "red flag" pressure test results.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are

alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

760.    BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their grossly inadequate maintenance, and reckless and improper operation and use of the BOPs appurtenant to the Deepwater Horizon.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

761.    BP and Transocean recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the Deepwater Horizon in the event of a blowout.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

762. BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the

remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

763.    BP and Transocean willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075 and therefore deny those remaining allegations.

764.    BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

765.    In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality.  As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

766.    Defendants' conduct was oppressive, wanton, malicious, reckless, or grossly negligent each time they:

(a)    failed to properly maintain and/or operate the Deepwater Horizon;

(b)    operated the Deepwater Horizon in such a manner the safety and integrity of the vessel and the well were disregarded to save time and money;

(c)    ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

(d)    failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the Deepwater Horizon;

(e)    violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

(f)    (f) failed to take appropriate action to avoid or mitigate the accident;

(g)    failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

(h)    failed to ensure that the Deepwater Horizon and its equipment were free from defects, properly maintained and/or in proper working order;

(i)    failed to provide appropriate disaster prevention equipment;

(j)    failed to have an appropriate emergency spill response plan or readily available spill response equipment.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

767. Defendants' conduct, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because Defendants' conduct was motivated by financial gain; because it injured and endangered human and environmental health and safety; because it caused devastating damage and loss to Plaintiffs; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to Defendants; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish Defendants and deter further repetition by Defendants or others.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

768.    Accordingly, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

**<u>ANSWER:</u>**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they

are not directed at the conduct or liability of the BP Parties and are not addressed in Document

Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

## V.   Declaratory Relief:  Punitive Damages

769.   The Plaintiffs, the proposed Class and Subclasses, society, and the Gulf states have a legitimate and legally protected interest, additional to and independent of the interest or entitlement to compensation, in punishment and deterrence of reprehensible and harmful conduct, and in imposing full and effective punishment and deterrence of such conduct.  Punitive damages do not compensate for injury.   They are private fines, authorized by the General Maritime Law (and/or state law), to punish reprehensible conduct and deter its future occurrence. Punitive damages are specifically designed to exact punishment, in excess of actual harm, to make clear that the defendants' misconduct is especially reprehensible, to embody social outrage and moral condemnation of such misconduct, and to assure that it is not repeated.  Accordingly, plaintiffs seek a judicial declaration against Defendants and in favor of the class that any settlement provisions that purport, directly or indirectly, to release or to affect the calculation of punitive damages without a judicial determination of fairness, adequacy, and reasonableness are ineffective as contrary to law, equity and public policy.

### ANSWER:

The Court dismissed Plaintiffs' declaratory relief claims in its Order and Reasons As to

the Local Government Entity Master Complaint and certain other cases within Pleading Bundle

"C," Doc. 4845, filed on December 9, 2011, and the BP Parties are therefore not required to

respond to these allegations.   To the extent the BP Parties may be deemed to be required to

respond to these allegations, the BP Parties deny them to the extent they concern the conduct or

liability of the BP Parties.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class and/or Subclass Members demand judgment against Defendants, jointly, severally, and solidarily, as follows:

(a)   Economic and compensatory damages in amounts to be determined at trial;

(b)   punitive damages;

(c)   civil and/or criminal penalties;

341

(d)     pre-judgment and post-judgment interest at the maximum rate allowable by law;

(e)     attorneys' fees and costs of litigation;

(f)     declaratory and injunctive relief;

(g)     An order certifying the Class and/or Subclasses as set forth herein under the appropriate provisions of F.R.C.P. 23, appointing Plaintiffs as Class and/or Subclass Representatives, and appointing undersigned counsel as counsel for the Class and/or Subclasses for the purpose of determining the quantum or ratio of punitive damages to be assessed against each of the Defendants, to be paid ratably to Class and/or Subclass members who recover, through claims processes or litigation, actual damages and/or otherwise equitably utilized in accord with the societal purposes of punitive damages;

(h)     such other and further relief available under all applicable admiralty, maritime, state and federal laws, and any general or equitable relief the Court deems just and appropriate.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, and Document 2064, BP's Cross-Claim Against Cameron International Corp., all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, 2082, or 2064 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, 2082, and 2064.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are

not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, 2082, and 2064, and therefore deny those remaining allegations.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

The allegations of the Complaint fail to state a claim upon which relief may be granted.

### SECOND DEFENSE

The blowout, explosion, and subsequent oil spill were caused by the unseaworthy condition(s) of the MODU Deepwater Horizon, and/or unseaworthy conditions, breach of contract or breaches of duty and breaches of warranty, express or implied, attributable to other entities, and the negligence of employees, agents, officers and directors of those other entities. The aforesaid unseaworthiness and negligence was within the knowledge or privity of those other entities and accordingly, Plaintiffs' claims should be dismissed as to the BP Parties.

### THIRD DEFENSE

Plaintiffs' damages or injuries, if any, were the result of an occurrence and/or accident unforeseeable by the BP Parties and for which the BP Parties cannot be held legally responsible.

### FOURTH DEFENSE

The events culminating in the injuries and damage to Plaintiffs were not the result of any negligence, fault, or want of due care on the part of BP Parties.  Furthermore, Plaintiffs have the burden of proof on this issue, and Plaintiffs cannot meet that burden.

### FIFTH DEFENSE

Any alleged negligence by the BP Parties, which the BP Parties specifically deny, was not the proximate cause or sole proximate cause of Plaintiffs' alleged damages and there is no causal connection between the acts complained of and the damages and injuries alleged.

Similarly, BP denies that the applicable causal test or tests established by the Oil Pollution Act can be met by the Plaintiff.

## SIXTH DEFENSE

Plaintiffs' alleged damages or injuries, if any, were caused or contributed to by acts and/or omissions that constitute independent, intervening and/or superseding causes for which the BP Parties are not legally responsible, and which preclude the finding of liability against the BP Parties.

## SEVENTH DEFENSE

In accordance with the *Exxon Co., U.S.A. v. Sofec, Inc.,* 517 U.S. 830 (1996), one or more superseding and/or intervening causes preclude any finding of liability on the part of the BP Parties.

## EIGHTH DEFENSE

The claims of certain Plaintiffs are barred by the operation and effect of releases of claims and liability on the part of the BP Parties.

## NINTH DEFENSE

To the extent the BP Parties are found liable to Plaintiffs for any damages or injuries, the BP Parties are entitled to have any reward or recovery mitigated or reduced accordingly by the contributory or comparative negligence of other individuals, entities, or vessels.

## TENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiffs for any damages, the BP Parties are entitled to contractual indemnity from other parties or entities.

## ELEVENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiffs for any damages, the BP Parties are entitled to indemnity from other parties or entities.

## TWELFTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiffs for any damages, the BP Parties are entitled to contribution from other parties or entities.

## THIRTEENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiffs for any damages, the BP Parties are entitled to subrogation from other parties or entities.

## FOURTEENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiffs for any damages, the BP Parties are entitled to a set-off or other equitable reduction in liability for any compensation paid by the BP Parties or other parties or entities.

## FIFTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs are not entitled under the law to the damages that they seek, the alleged damages sought are too speculative and uncertain, and because of the impossibility of the ascertainment and allocation of such damages.

## SIXTEENTH DEFENSE

Plaintiffs' damages are barred, in whole or in part, by a failure to mitigate damages.

## SEVENTEENTH DEFENSE

The BP Parties deny that they are liable to any extent as alleged in the Complaint, and claim exoneration from any and all liability for all losses, damages, and injuries incurred by Plaintiffs as a result of the allegations contained in the Complaint and for any other damages or claims which exist or may arise, but have not been specifically pled.

## EIGHTEENTH DEFENSE

The Oil Pollution Act of 1990 displaces the causes of action under maritime law alleged in this Master Complaint to the extent Plaintiffs seek damages potentially recoverable under the Oil Pollution Act against the BP Parties or another responsible party under that statute.

## NINETEENTH DEFENSE

The Outer Continental Shelf Lands Act, the legal nature of the Outer Continental Shelf as a federal enclave, and the Clean Water Act (as this Court held in its Bundle C Order involving Plaintiffs' claims) preempt Plaintiffs' state law claims.  And if the Oil Pollution Act is held not to displace maritime law causes of action, then maritime law also preempts Plaintiffs' state law claims, as this Court held in its Bundle B1 Order.

## TWENTIETH DEFENSE

Many of the claims in this Master Complaint fail to comport with one or more requirements of presentment as defined by the Oil Pollution Act of 1990 and its case law.

## TWENTY-FIRST DEFENSE

The BP Parties may only be held liable for their own conduct and may not be held liable derivatively for the conduct of any other entity.  Similarly, one BP entity may not be held derivatively liable for the conduct of any other BP entity.

## TWENTY-SECOND DEFENSE

The BP Parties cannot be held liable for the negligence of the BP Parties' subcontractors or other parties as the actions of independent contractors cannot be imputed to the BP Parties.

## TWENTY-THIRD DEFENSE

The BP Parties cannot be held liable for any damages resulting from actions taken pursuant to federal, state, or local government control, direction, delegation, or authorization. Similarly, the BP Parties may not be held liable for any damages resulting from the actions of any BP Parties exacerbated by federal, state, or local government actions.

## TWENTY-FOURTH DEFENSE

The BP Parties did not violate any federal, state, or local statute, regulation, or other legally imposed mandate, restriction, or guidance.

## TWENTY-FIFTH DEFENSE

To the extent the BP Parties are found liable to Plaintiffs for any damages or injuries, the BP Parties are entitled to have any reward or recovery mitigated or reduced accordingly by any prior payment to and/or release of liability from Plaintiffs who received funds through the BP claims process and/or the GCCF.  Furthermore, any settled claims accompanied by releases of rights against the BP Parties may no longer be maintained.

## TWENTY-SIXTH DEFENSE

State law-based claims asserted in this Complaint are barred, on the basis of the Bundle B1 and C Orders (State) issued by this Court, under the doctrines of claim or issue preclusion (*res judicata* or collateral estoppel) or law of the case.

## TWENTY-SEVENTH DEFENSE

To the extent Plaintiffs' claims implicate the decision making of federal agencies, and they are otherwise valid, they are potentially subject to the doctrine of primary jurisdiction.

## TWENTY-EIGHTH DEFENSE

The BP Parties are not liable jointly and severally under OPA to the extent divisibility can be established

The BP Parties specifically reserve the right to amend or supplement their affirmative defenses and this Answer as additional facts concerning their defenses become known to them.

Dated:  January 23, 2012                              Respectfully submitted,

                                                     /s/ Don K. Haycraft_____
                                                     Don K. Haycraft (Bar #14361)
                                                     R. Keith Jarrett (Bar #16984)
                                                     LISKOW & LEWIS
                                                     701 Poydras Street, Suite 5000
                                                     New Orleans, Louisiana 70139-5099

Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Timothy A. Duffy, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Parties*

348

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 23rd day of January, 2012.

/s/  Don K. Haycraft