From:    "Jimmy Williamson" <jimmy@jimmywilliamson.com>
To:    <shushan@laed.uscourts.gov>, <mike_okeefe@laed.uscourts.gov>, "Steve Herman" <SHERMAN@hhkc.com>, "James Roy" <JIMR@wrightroy.com>, "Brian Barr" <BBarr@levinlaw.com>, "Langan, Andrew" <alangan@kirkland.com>
Cc:    "Duffy, Timothy A." <tduffy@kirkland.com>, <DefenseLiaison2179@liskow.com>, <liaison2179@liskow.com>
Date:    01/24/2012 04:44 PM
Subject:    30(b)(6) Notice, Phase II, to BP

Dear Judge Shushan:

We have now proposed a 30(b)(6) notice for BP to cover Phase II; a significant part of Phase II is, of course, source control. Accordingly, we have asked for detailed, specific information on the measures used and considered to stop the flow of oil from Macondo. The information that we seek was not covered in the Phase I discovery, and definitely was not covered in the detail requested now. The Phase II discovery sought is different than, and supplemental to, the Phase I discovery.

It seems incredibly obvious that Phase I discovery (what caused the explosion) is different from Phase II (what caused the well to flow for 87 days). In part, Phase I discovery was concerned with whether BP was prepared for well control contingencies, and if there was an oil spill, had BP made appropriate plans. In this regard, part of the 30(b)(6) notice to BP in Phase I was topics 4 and 5, which dealt with "potential methods" to control or shut in Macondo. In other words, the subject matter being sought dealt with BP's plan for shutting in a flowing well, contain a flowing well, or kill a flowing well (or failure to plan). BP's failure to anticipate a well control event of this magnitude, and failure to plan for same, is a part of Phase I. When showing that BP failed to plan for an event of this magnitude, it is relevant to show that BP failed to anticipate the consequences or difficulty of shutting in a well once control had been lost subsea. Hence topics 4 and 5 were legitimate topics for Phase I.

Phase II 30(b)(6) topics proposed by the PSC are also appropriate. The Phase II topics being discussed deal with _specific_ measures on source control, such as:

a. Specific source control costs incurred by BP on Macondo;
b. The approval process that BP utilized (which was both time consuming and caused delay) for various intervention measures;
c. Computer modeling and analysis that BP implemented for each source control measure;
d. Specific planning steps and timelines;
e. Identities of the individuals involved; and
f. Specific delineation of the authority/approval/steps needed organizationally to accomplish the intervention measures.

In other words, Phase I dealt with BP's failure to plan for an event of this magnitude. Phase II deals with the specific complications caused by that failure to plan. It is true that part of Phase II also deals with BP's failure to plan for an event such as this. Because BP failed to plan for an event of this magnitude, when it happened, BP had to take additional time (which caused delay) to evaluate each intervention measure and to determine the risk of same, and to determine whether to attempt same.

But just because BP failed to plan for an event of this magnitude, and failed to anticipate the consequences of an event of this magnitude, and that issue is relevant to both Phase I and Phase II, does not mean the discovery sought in Phase II is inappropriate.

## BP DID NOT ANTICIPATE OR PRODUCE WITNESSES OR DOCUMENTS TO ADDRESS SPECIFIC SOURCE CONTROL METHODS IN PHASE I

It is true that BP designated 5 witnesses to testify on topics 4 and 5 in Phase I 30 (b)(6) depositions. Those witnesses were not designated to deal with specific aspects of source control, nor did anyone expect them to.

For example, Harry Thierens was a BP management employee responsible for drilling oil wells in the Gulf of Mexico and implementation of BP safety protocols. BP designated him as a 30(b)(6) witness on BP BOP intervention. Please note what Mr. Thierens said in his deposition:

**Henry Matthew Thierens deposition, June 9, 2011:**
27:6-11
> Q. All right. Did you bear any particular expertise that you brought to bear in terms of BOP operation --
> A. No.
> Q. -- in that job?
> A. No.

28:13 to 29:2
> Q. All right. When you arrived on the scene in terms of assisting in the post-blowout control effort and were assigned the task of heading the BOP Team, did you have any particular knowledge of the history of performance of the BOP aboard the DEEPWATER HORIZON?
> A. No.
> Q. Did you bring knowledge of problems that the BOP had when it drilled prior wells in deepwater Gulf of Mexico from the DEEPWATER HORIZON?
> A. No, I had no knowledge.
> Q. Did anybody tell you and – or sit down with you and say, "We have these documents," or "We have these experience, these are the issues we faced with this same BOP prior to April 20, 2010?
> A. I don't recall having conversations like that.

261:13-24
> Q. Okay. Are you aware that you've been designated pursuant to Rule 30 (b) (6) to testify today?
> A. Yes.
> Q. Okay. And are you aware of what topics you've been designated to testify regarding?
> A. The BOP.
> Q. Okay. Do you know why you were chosen to testify re – regarding the BOP?
>      …
> A. No, I don't know why.

**Richard D. Lynch, designated on the capping stack, deposition May 19 and 20, 2011:**
328:12-17

      Q. … there's a theory that there was a ruptured disk, that those had collapsed.  Do you have any understanding of that?

      A. Yeah.  I – I mean, I understand that.  I'm probably not the best one to educate you on that.

…

329:8-11

      A.   … I mean, I don't – I don't know the analysis then that the engineering teams went through to understand the integrity of the well.  …

558:21 to 559:6

      Q. But the capping stack and the actual well device was a device that had been in existence for a long time, huh?

           I mean, it's a well – well-known tool in terms of containment; isn't it?

      A.  It certainly is on land, yes.  In a subsea application, I – maybe you can – I'm not as familiar with where a capping stack has been used for a underwater blowout control in the past, so.

      Q. Finished?

      A.  I'm finished.

**Kevin Kennelley, designated on containment, deposition June 29, 2011:**
131:11 to132:3

      Q. Was capping stack deemed to be the most potentially viable?

      A.  I – I wasn't involved in those other alternatives that may have been looked at.

      Q. I understand that, but there were – were you aware of any issues or problems related to implementation of any of these alternatives to fully cap or contain the well?

      For example, I have heard testimony about considerations with respect to the burst disk.  Are you familiar with that issue in relation to the containment?

      A. Yes I'm – well, again, I'm not an expert, but I understand the basic fundamentals.

**Paul Tooms, designated on well-integrity analysis, deposition June 16, 2011:**
107:3-12

      Q. What kind of research and technology went into the design of the rupture disk, if you know?

      A. So I know in general terms, although I wasn't in the – in the Drilling organization for all the period of – of the use of rupture disks – I was there when they were initially done – and I learnt more about them during the Macondo incident. …

108:20 to109:9

      Q. … I just want to know whether or not BP did any testing, any research at all, to ascertain whether or not its rupture disk design could allow for broaching of hydrocarbons, period  --

        – regardless of the – of the type of well or where it was or how deep it was, et cetera?

      A. So I've already ans – answered you once on that, that I don't specifically know of any –

      Q. Okay.?

      A.  – things. …

The rupture discs, by the way, directly impacted the well-integrity analysis.

Nor could the PSC have adequately covered the issue of source control in Phase I discovery.  The last of the 5 witnesses mentioned by BP as "Phase I 30(b)(6) witnesses" was deposed on June 29, 2011.  Since then, BP has produced approximately 400,000 documents, a tremendous number of which deal directly with Phase II issues.  Many deal with source control.  The PSC could not have

conducted discovery on documents it did not have. This is further proof that no one believed that Phase II discovery was being done in Phase I.

A very quick review of the document database, produced after June 29, 2011, for the 5 BP "Reps" turns up numerous documents that deal directly with Phase II issues. The following documents show examples which were produced after the respective deposition, and which contain relevant Phase II material:

Kennelley (6/30/11):
BP-HZN-2179MDL02646070-72 is an MC 252 CDP (containment & disposal project) schedule – produced 7/1/11
BP-HZN-2179MDL02769975-90 is a CDP decommissioning procedure – produced 7/2/11

Mazzella (5/24/11):
BP-HZN-2179MDL03348156-60 is an email with recommendations on spud locations for relief wells – produced 9/2/11
BP-HZN-2179MDL05022618-24 is an email discussing flow rates and pressure build up – produced 12/14/11
BP-HZN-2179MDL02172731-35 is an email listing bridging material for the top kill – produced 5/28/11

Lynch (5/19/11):
BP-HZN-2179MDL05062640-54 is an email forwarding study of the plumes by Stress - produced 12/14/11
BP-HZN-2179MDL05039906-07 is an email entitled "RITT flowback update and field orders" – produced 12/14/11
BP-HZN-2179MDL04931945-46 – is an email talking about stabilizing riser for RITT – produced 11/1/11

Henry Thierens (6/9/11):
BP-HZN-2179MDL04769261-78 is a three-ram capping stack installation procedure – produced 11/1/11

Tooms (6/16/11):
BP-HZN-2179MDL04870863-65 is an email discussing riser temperatures – produced 11/1/11
BP-HZN-2179MDL04903698-99 is an email concerning flow characteristics of the system with choke points – produced 11/1/11
BP-HZN-2179MDL03677567-76 is an email on kink erosion and its effect on junk shot risk – produced 9/1/11

We believe more documents could be cited, but these examples prove the point: Phase II depositions should be taken after Phase II documents have been produced.

The previous Phase I notice was more general in nature. In addition, most of the "corporate witnesses" designated had very significant Phase I knowledge. Thierens, for example, was a significant part of the GoM drilling team, and yet, though he knew nothing in particular about BOPs,

was designated on BOP intervention. Mark Mazzella was a BP technical authority on well control, and so spent most of his deposition time discussing well control procedures rather than the specifics of Phase II.

Of course, all parties knew that Phase II discovery would be done in the Phase II portion of the case, so this was not a problem. If the PSC is given the right to notice a significant number of individual depositions, this is probably not a problem. From the document database, we can identify several BP employees with significant roles in, for example, the burst disc analysis that led to hesitation in the selection of intervention efforts. For example, analysis for the burst disc was sent to the following BP employees, none of whom have been previously deposed: James Wellings, Gavin Kidd, Charles Taylor, Cindy Yeilding, David Rainey, Stephen Wilson, Marty Albertin, Doug Chester, James Grant, Peter Zwart, Gene Walton, Bryan Ritchie and Jon Turnbull (*See* BP-HZN-2179MDL01616494 *et seq.*)

The court, however, has made a decision, in the interest of efficiency, to conduct a fair amount of the Phase II discovery through 30(b)(6), and limit the number of individual depositions. The PSC, therefore, respectfully requests the right to thoroughly cover the material in the 30(b)(6) depositions. Alternatively, the PSC will be seeking numerous depositions of individual deponents.

Not only is BP seeking to improperly limit discovery, but, in addition, the result they seek is unfair. The PSC requests that the 30(b)(6) notice to BP in connection with specific source control measures undertaken after 4/22 be issued, and that BP produce appropriate corporate representatives on such subjects.

Respectfully,
Jimmy Williamson



**CONFIDENTIALITY NOTICE**

THIS EMAIL TRANSMISSION (AND/OR THE DOCUMENTS ACCOMPANYING IT) MAY CONTAIN CONFIDENTIAL INFORMATION BELONGING TO THE SENDER WHICH IS PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE. THE INFORMATION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION OR THE TAKING OF ANY ACTION IN RELIANCE ON THE CONTENTS OF THIS INFORMATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AT 713-223-3330 TO ARRANGE FOR RETURN OF THE DOCUMENT.