UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig           "Deepwater Horizon" in the           Gulf of Mexico, on April 20, 2010 | * * * * | MDL No. 2179  SECTION "J" |
| **THIS PLEADING APPLIES TO:** | * * | JUDGE: BARBIER |
| In Re The Complaint and Petition of Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc., and Transocean Deepwater Inc., as Owner, Managing Owners, Owners *Pro-Hac Vice*, and/or Operators of the MODU Deepwater Horizon, in a Cause for Exoneration from or Limitation of Liability | * * * * * * * * * * | MAGISTRATE: SHUSHAN |
| Civil Action Nos.: 2:10-cv-2771 and 2:10-md-2179 | * * | |

<u>**WEATHERFORD U.S. L.P. AND WEATHERFORD INTERNATIONAL, INC.'S MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY RELATING TO THE PURPORTED DISTURBANCE OF THE CEMENT AT THE BOTTOM OF THE MACONDO WELL**</u>

**MAY IT PLEASE THE COURT:**

Weatherford U.S., L.P. and Weatherford International, Inc. (collectively "Weatherford") respectfully submit this memorandum in support of motion *in limine* to exclude certain testimony by Halliburton Energy Services, Inc.'s experts Mr. John Hughett, Mr. David Bolado, and Dr. Frederick "Gene" Beck.

**I.    The Unsupported Speculation of Halliburton's Experts Regarding Upper Well Operations Disturbing the Bottomhole Cement Should Be Excluded under Daubert**

In accordance with *Daubert v. Merell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Weatherford seeks an order excluding the unsupported speculation of Halliburton's experts that operations in the riser and upper wellbore, in conjunction with the purported lack of an effective

{N2405793.3}

float collar seal, delayed the set time of the annulus and shoe track cement at the bottom of the well. The primary proponent of these opinions is Mr. Hughett, who opined:

> At just past midnight, at 12:36 am on April 20, 2010, the cement job was complete. Over the next sixteen (16) hours leading up the negative pressure test, BP conducted a series of activities on the Macondo Well that varied the differential pressure acting on the top wiper plug. These activities almost certainly moved the wiper plug during this critical cement curing time.
>
> * * *
>
> In my opinion, in absence of an effective float collar seal, the top wiper plug would have been repeatedly pushed up and down by BP's activities during the critical cement setting time. This could have increased the time the cement needed to set.
>
> ***
>
> It cannot be conclusively proven whether or not the cement in the well actually was set at the time of the blowout. But, any movement of the top wiper plug would have caused U-tubing of the cement in the shoe track and annulus which would have extended the setting time of the cement and thus extended the wait-on-cement time.[1]

Referencing Transocean's Daily Drilling Report of April 20, 2010, Mr. Hughett claims rig activities and pipe movement in the riser and upper wellbore between 51 feet and 8,367 feet could have disturbed the bottomhole cement at 18,304 feet[2] if the float collar either failed to convert or was damaged in conversion. Weatherford moves for exclusion on the grounds that no technical study, no scientific basis, no engineering analysis, and no peer reviewed literature

---

[1] Excerpts from the Report of John P. Hughett, Exhibit A at p. 35, 36 and 39.

[2] Exhibit A, Mr. Hughett's report at page 37 through 39 citing Transocean Daily Drilling report dated April 20, 2010, Exhibit B at BP-HZN-MBI00136947. According to the schematic found at page 31 of Mr. Hughett's report (Exhibit A), the top wiper plug was seated on the float collar at 18,115 feet. The 189 foot shoe track extended from the float collar down to the reamer shoe which was located at 18,304 feet. The annular cement was placed at the reamer shoe at 18,304 feet and up to the top of cement which Mr. Hughett's report (Exhibit A at p. 26) states was 17,500 feet, approximately 800 feet up the annulus.

supports the speculative opinion that swab and surge pressures associated with drill pipe movement were transmitted from the upper well bore through two to three miles of static, heavy, viscous and static drilling mud to the unset cement at the bottom of the well.

In *Daubert,* 509 U.S. 579 at 589 - 90 (1993), the Supreme Court set forth substantive guidelines for determining when expert testimony is reliable, probative, and admissible:

> The subject of an expert's testimony must be 'scientific . . . knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation. The term 'applies to any body of known facts or any body of known ideas inferred from such facts or accepted as truths on good grounds.'. . . In short, the requirement than an expert's testimony pertains to 'scientific knowledge' establishes a standard of evidentiary reliability.

## II.     Mr. Hughett's Unreliable Swab and Surge Opinions Should be Excluded

Halliburton, as the proponent of the expert testimony, bears the burden of establishing its admissibility by a preponderance of the evidence:[3]

> The proponent of the evidence must first prove that the offered testimony is based on sufficient facts or data. See FED. R. EVID. 702. Next, the party must "demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable .... The expert's assurances that he has utilized generally accepted scientific methodology is insufficient." *Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 276 (5th Cir. 1998) (*en banc*).[4]

Mr. Hughett admits his opinion is not based on sufficient data and that he has not done the analysis, testing and calculations necessary for scientific reliability:

> Q.   What engineering analysis have you performed, what testing have you performed, what calculations have you conducted

---

[3] *Martin v. Exxon Corp.,* 302 F.3d 448, 460 (5th Cir. 2002)

[4] *JRL Enterprises, Inc. v. Procorp Associates Inc.,* 2003 U.S. Dist Lexis 9397, *17-18 (E.D. La. 2003)

regarding your theory or opinion that swabbing and surging occurring two miles up in the column of mud and other drilling fluids would have an effect on the cement below?

A. I did look at the size of some of the tools, and there's some data missing. As a matter of fact, there is a lot of data missing here, just not available. You—you would like to know how fast the pipe was moved and that kind of thing but all the —which is HiTec data, and the—of course HiTec data is not available.[5]

Q. . . . What other data is missing besides how fast the pipe was moved?

A. Basically, they-they had a lot of data in HiTec, not just that, that-that I would have liked to reviewed . . . it's just not available.[6]

Q. Now you did no calculations, did you, concerning the pressure that it would take to break circulation of the two miles of mud above the top plug, did you?

A. No, sir. But I used my 40 years of engineering experience to allow me to make that opinion.[7]

\*\*\*

Q. . . . You did no scientific calculations as to the viscosity of the fluids either above or below the float collar, correct?

A. . . . I did not have a sample of the fluid to look at, no sir.[8]

\*\*\*

Q. Did you perform any calculations that would show what effect the activities you identify on pages 37 through 39 of your report would have on moving a wiper plug?

A. No, other than just engineering principles. It—period.[9]

---

[5] Excerpts from the Deposition of John P. Hughett, Exhibit C at 541.

[6] Id. at 541 – 542.

[7] Id. at 554.

[8] Id. at 556.

[9] Id. at 566.

> Q.   . . . You didn't perform any calculations, you haven't seen any studies. Did you perform any testing to see what effect these activities would have on moving a plug up and down?
>
> A.   No, ma'am.[10]

Mr. Hughett's swabbing and surging theory has never been published, has not been described in petroleum engineering or well cementing literature, and has never been the subject of peer review:

> Q.   Is this notion that you have, or this opinion, that swabbing or surging of the hole two miles above affected the cement two miles below, is that something you've published opinions on?
>
> A.   No, sir.[11]
>
> ***
>
> Q.   Have you seen any publications anywhere—API, SPE, any other Professional Society—that indicate . . .what effect these activities have on moving a wiper plug up and down in the fashion you suggest happened here?
>
> A.   I've never seen a study on a wiper plug moving up the hole in any publication, no ma'am.[12]
>
> Q.   And you certainly have never performed a study on a wiper plug moving up and down a hole, correct.
>
> A.   No, ma'am.[13]

Indeed, Mr. Hughett admits he has conducted no scientific analysis whatsoever:

> Q   Did you do any scientific analysis at all with respect to your swabbing and surging . . . opinion?

---

[10] Id. at 566-67.

[11] Id. at 542.

[12] Id. at 566.

[13] Id.

> A  No, sir.  But again I used my 40 years of engineering experience.[14]

The sole basis for Mr. Hughett's swab and surge theory is his purported "engineering experience," but Mr. Hughett admits that not once in his forty years has he ever experienced the phenomena on which Halliburton purports to have him opine:

> Q.  [Have] you ever seen a wiper plug move as a result of moving drill pipe at any depth?
>
> A.  No, ma'am.[15]

Mere reliance on "experience" is insufficient.[16]  Under *Daubert,* an expert's self-proclaimed reliability is not appropriate; the opinion must be supported by "more than subjective belief and unsupported speculation."[17]  An expert's assurance of scientific reliability is not enough.  The party presenting the expert must establish that the expert's findings are based on sound science which requires objective independent validation of the expert's methodology.[18]  The lack of testing, lack of technical analysis, lack of peer-reviewed literature and lack of scientific methodology for Mr. Hughett's swab and surge opinions precludes his testimony at

---

[14] Id. at 555.

[15] Id. at 565.

[16] *See Kumho Tire Co.*, 119 S. Ct. 1167 (excluding the expert's testimony because he simply relied on his "experience" as a substitute for testing and research)

[17] *Black v. Food Lion, Inc.* 171 F.3d 308, 311 (5th Cir. 1999), citing *Kumho*, 119 S.Ct at 1179, *Daubert,* 509 U.S. at 590; *Barnett v. Atlantic Richfield Co.*, 95 F.3d 375, 382 (5th Cir. 1996) (upholding exclusion of expert testimony where the testimony "would consist of unsupported speculation.")

[18] *Daubert,* 43 F. 3d at 1317.

trial.[19]  His opinions are no more than the *ipse dixit* of the expert, rather than verifiable scientific theory, which should be excluded from trial:

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.[20]

### III.   Similar Opinions of Mr. Bolado and Dr. Beck Should Be Excluded

Similar to Mr. Hughett, Mr. Bolado has opined:

> The float collar is used to prevent u-tubing.  When a float collar does not convert, there is a high risk of u-tubing.  As a result of possible u-tubing, the two wiper plugs (bottom and top) that had landed on the float collar could be pushed some short distance up the casing.  When the drill pipe was moved into the casing and/or the positive pressure test was run, those wiper plugs would be pushed back down onto the float collar.  Even a small movement of the wiper plugs would cause movement of cement beneath them.  This movement would cause the setting process of the cement to be interrupted.

\* \* \*

> [I]n the event that the cement in the shoe track and/or annulus had not set to adequate compressive strength at the time of the blowout, the failure of the cement job to provide a barrier to hydrocarbon flow would be attributable to BP because of its failure to wait sufficiently on cement before resuming operations.

\* \* \*

---

[19] *See Allstate Inc. Co. v. General Electric Co.,* 00-0521, 2002 U.S Dist. LEXIS 28256, at *25-26, 30-32 (5th Cir. Feb. 4, 2002) (excluding experts' testimony due to a lack of testing); *JRL Enterprises, Inc. v. Procorp Associates Inc.,* 2003 U.S. Dist. Lexis, 9397 (E.D. La. 2003) (excluding expert testimony where proponent failed to demonstrate any basis for the opinion); *Jaurequi v. Carter Manuf. Co., Inc.,* 173 F.3d 1076, 1084 (8th Cir. 1999) (granting summary judgment for defendant manufacturer because engineer's theories about warnings had not been tested.

[20] *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 143 (1997).

> Even small movement of cement is enough to disrupt the delicate process of forming a matrix that permits a cement to set and gives cement its compressive strength.[21]

Similar to Mr. Hughett, Mr. Bolado conceded that he has no peer-reviewed literature, no calculations and no analysis to support his opinions:

> Q. Have you ever seen in your experience in 20 years that pipe movement two miles away could cause swabbing and surging forces to disrupt the cement.
>
> A. I cannot cite anything specific to that.
>
> Q. Have you seen any literature in your 20 years that described that phenomena?
>
> A. Surging and swabbing, or directly related to surging and swabbing with how it affects cement?
>
> Q. How it affects cement from two miles away.
>
> A. No I cannot reference literature for that.
>
> Q. And did you review any analysis done by. . . Mr. Hughett related to how swabbing and surging could affect cement two miles away?
>
> A. I read through his report.
>
> Q. And did you see any analysis on that point; any calculations?
>
> A. I do not recall seeing calculations.
>
> Q. That's a trick question, because there were no calculations, right?
>
> A. Again, I do not recall.
>
> Q. But, you, yourself, did not perform any analysis or calculations on that point?
>
> A. I did not perform any calculations.[22]

---

[21] Excerpt from the Report of David Bolado, Exhibit D at pp. 39 and 40.

[22] Excerpts from the Deposition of David Bolado, Exhibit E at 427-428.

With no scientific analysis of his own, Mr. Bolado purports to adopt Mr. Hughett's unsupported theory that pipe movement in the riser and upper well moved the cement at the bottom. Mr. Bolado's unsupported speculation that upper well activities two to three miles above may have disturbed the cement at the bottom of the well does not meet the *Daubert* test of reliable scientific methodology. Mr. Bolado's unsupported speculation regarding swab and surge pressures, like Mr. Hughett's on which it is based, is not admissible expert opinion.[23]

In turn, Dr. Frederick "Gene" Beck has suggested that:

> BP's failure to convert the float equipment without damaging it allowed u-tubing to occur, which consequently would have extended the time required for the shoe track cement to set. The primary reason for using a float collar in cementing operations is the fact that cement needs to be in a static state as it sets. A damaged and unconverted float collar, like the damaged and unconverted float collar in the Macondo Well, permits movement of the cement—u-tubing—that can compromise the cement in the shoe track. Even seemingly small displacements of the cement during the setting process can affect how, when, or if the cement sets. Because moving cement will not set, u-tubing could have delayed the setting of the shoe track cement such that it was still somewhat liquid when BP began the negative pressure test discussed below.[24]

Dr. Beck's reports do not expressly address upper well bore swab and surge pressures disturbing the bottomhole cement, and on those grounds alone he should not be permitted to testify. In deposition, Dr. Beck latched on to Mr. Hughett's opinions and testified that movement of the bottomhole cement could "potentially" have been caused by upper well "rig activity."[25] In his report, Dr. Beck offered no testing, no calculations, no peer reviewed literature,

---

[23] *Barnett v. Atlantic Richfield Co.*, 95 F.3d at 375, 382 (5th Cir. 1996) (upholding exclusion of expert testimony where the testimony "would consist of unsupported speculation.")

[24] Excerpts from the Report of Dr. Fredrick "Gene" Beck, Exhibit F at p. 82.

[25] Excerpts from the Deposition of Dr. Fredrick "Gene" Beck, Exhibit G at p. 509.

no scientific analysis nor any technical basis to support the speculative theory that u-tubing of the bottomhole cement was potentially caused by upper wellbore rig activities in conjunction with an allegedly unconverted or damaged float collar. Like Mr. Hughett and Mr. Bolado, Dr. Beck's unscientific opinions should be excluded.

## IV.   CONCLUSION

The theory that upper well operations in a column of static, heavy, viscous drilling mud, two to three miles above the bottom of the well, in conjunction with an unconverted or damaged float collar, caused swabbing and surging pressures that affected the setting of the cement in the shoe track and annulus has no scientific basis. Halliburton cannot meet its burden of establishing that the opinions of its experts Mr. Hughett, Mr. Bolado and Dr. Beck with respect to the supposed disturbance of the bottomhole cement are reliable as based on scientific methodology. None of Halliburton's experts have conducted the necessary scientific or technical testing, study or analysis to support their opinions. They have not cited peer reviewed petroleum engineering or well cementing literature. Because the theories of Halliburton's experts are not supported by science their opinions should be excluded under *Daubert*.

Respectfully submitted:

*/s/ Glenn G. Goodier*
GLENN G. GOODIER (#06130)
RICHARD D. BERTRAM (#17881)
LANCE M. SANNINO (#29409)
JONES, WALKER, WAECHTER, POITEVENT,
 CARRÈRE & DENÈGRE, L.L.P.
201 St. Charles Avenue. 48th Floor
New Orleans, Louisiana  70170-5100
Telephone:     (504) 582-8174
Facsimile:      (504) 589-8174
ggoodier@joneswalker.com
rbertram@joneswalker.com
lsannino@joneswalker.com

MICHAEL G. LEMOINE, T.A. (#8308)
GARY J. RUSSO (#10828)
DOUGLAS C. LONGMAN, JR. (#8719)
JONES, WALKER, WAECHTER, POITEVENT,
 CARRÈRE & DENÈGRE, L.L.P.
600 Jefferson Street, Suite 1600
Lafayette, Louisiana  70501-5100
Telephone:     (337) 593-7624
mlemoine@joneswalker.com
grusso@joneswalker.com
dlongman@joneswalker.com

*Counsel for Weatherford U.S., L.P. and Weatherford International, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of January, 2012, the above and foregoing has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with the Court's Pretrial Order No. 12, on November 1, 2010.

*/s/  Glenn G. Goodier*

{N2405793.3}

11