# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" in the | § | |
| GULF OF MEXICO, | § | SECTION: J |
| on APRIL 20, 2010 | § | |
| | § | JUDGE BARBIER |
| Applies to: | § | |
| | § | MAG. JUDGE SHUSHAN |
| ALL CASES AND | § | |
| 2:10-CV-2771 | § | |

_____       _____

**HESI'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE
TESTIMONY OF EXPERT WITNESSES AND TO STRIKE EXPERT REPORTS**

# **TABLE OF CONTENTS**

Page

INTRODUCTION ....................................................................................................1

ARGUMENT AND AUTHORITIES ......................................................................2

I.     IN DETERMINING THE ADMISSIBILITY OF "EXPERT" TESTIMONY, THIS COURT IS GUIDED BY *DAUBERT* AND ITS PROGENY. ......................2

II.    THE OPINIONS OF WILLIAM WECKER FAIL TO MEET *DAUBERT's* THRESHOLD REQUIREMENTS. ..........................................................................4

     A.    Wecker's Opinion is Purely Abstract and Fails to Consider or Analyze Key Evidence...................................................................4

     B.    Wecker's Methodology is Also Fatally Flawed. ...........................7

     C.    Wecker Has Previously Been Disqualified Under *Daubert* Standards......10

III.   KATHLEEN SUTCLIFFE'S OPINIONS FAIL TO SATISFY *DAUBERT* STANDARDS................................................................................................11

     A.    Sutcliffe Failed to Analyze the Macondo Blowout or the *Deepwater Horizon* Incident. .......................................................................12

     B.    Sutcliffe's Claim That BP's Safety Culture is Irrelevant to Rig Operations is Mistaken and Evidences the Lack of Evidentiary Mooring For Her Opinions...........................................................................................14

     C.    Sutcliffe Cannot Opine Whether BP's Safety Culture Is Adequate or Effective......................................................................................16

     D.    Sutcliffe's Analysis of Un-Implemented Safety Changes Is Irrelevant. ....17

     E.    Sutcliffe Cannot Say What BP Learned from its  "Learning Culture." .....18

     F.    Sutcliffe Failed to Analyze Significant Data. .............................18

IV.   CHUCK SCHOENNAGEL'S LEGAL CONCLUSIONS SHOULD BE EXCLUDED BECAUSE THEY FAIL TO MEET *DAUBERT* EVIDENTIARY STANDARDS................................................................................................20

     A.    This Court Does Not Need An Unqualified Expert to Opine on Domestic Law. .............................................................................................20

     B.    Schoennagel Is Not Qualified As a Legal Expert. ....................21

C.     Schoennagel's Conclusions are Unreliable and Lack Proper Foundation..25

V.     THIS COURT SHOULD EXCLUDE J.J. AZAR'S OPINIONS BASED UPON HIS ADMITTED LACK OF EXPERTISE. ........................................................26

A.     Azar Admits a Lack of Expertise For Numerous Topics..........................26

B.     The Court Should Strike Those Portions of Azar's Report For Which He Admits a Lack of Expertise......................................................................30

VI.     THE *DAUBERT* STANDARDS REQUIRE EXCLUSION OF MORTEN H. EMILSEN'S OPINIONS....................................................................................31

A.     Emilsen Failed to Obtain or Utilize Important Input Data. ......................32

B.     Emilsen Improperly Employed "Fudge Factors" to Remedy the Absence of Data..................................................................................................34

C.     Emilsen Improperly Engaged in Reverse Engineering.............................35

CONCLUSION..................................................................................................................38

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

C<small>ASES</small>

*Allen v. Pa. Eng'g Corp.*,
   102 F.3d 194 (5th Cir. 1996) ...............................................................................33

*Anderson v. Raymond Corp.*,
   340 F.3d 520 (8th Cir. 2003) ...............................................................................30

*Araujo v. Treasure Chest Casino, L.L.C.*,
   No. 97-3043, 1999 U.S. Dist. LEXIS 5556 (E.D. La. Apr. 14, 1999).....................24

*Barrett v. Rhodia, Inc.*,
   606 F.3d 975 (8th Cir. 2010) ...............................................................................14

*Black v. Food Lion, Inc.*,
   171 F.3d 308 (5th Cir. 1999) ...............................................................................35

*BNY Mellon, N.A. v. Affordable Holdings, Inc.*,
   No. 1:09CV226-SA-JAD, 2011 U.S. Dist. LEXIS 75135 (N.D. Miss. July 12, 2011)...........20

*Burkhart v. Washington Metro. Area Transit Auth.*,
   112 F.3d 1207 (D.C. Cir. 1997) ...........................................................................20

*City of Wichita Kansas v. Trustees of APCO Oil Corp. Liquidating Trust*,
   306 F. Supp. 2d 1040 (D. Kan. 2003) ...................................................................33

*In re Complaint of Ingram Barge Co.*,
   187 F.R.D. 262 (M.D. La. 1999) ..........................................................................30

*Curtis v. M&S Petroleum, Inc.*,
   174 F.3d 661 (5th Cir. 1999) ........................................................................ 3-4, 6

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)...................................................................................*Passim*

*Free v. Bondo-Mar-Hyde Corp.*,
   25 F. App'x. 170 (4th Cir. 2002).................................................................... 30-31

*General Electric Co. v. Joiner*,
   522 U.S. 136 (1997)...............................................................................................3

*Green v. CBS Broadcasting, Inc.*,
　No. 3:98-CV-2740-T, 2000 U.S. Dist. LEXIS 19962 (N.D. Tex. Dec. 19, 2000) .................24

*Guillory v. Domtar Indus, Inc.*,
　95 F.3d 1320 (5th Cir. 1996) ..................................................................................................33

*Hayes v. Raytheon Co.*,
　808 F.Supp. 1326 (N.D. Ill. 1992) ..........................................................................................16

*IQ Products Co. v. Pennzoil Products Co.*,
　305 F.3d 368 (5th Cir. 2002) ....................................................................................................8

*Kerr-McGee Corp. v. Helton*,
　133 S.W.3d 245 (Tex. 2004)......................................................................................................7

*Kumho Tire Co. v. Carmichael*,
　526 U.S. 137 (1999)....................................................................................................................2

*Lake Michigan Contractors, Inc. v. The Manitowac Co., Inc.*,
　225 F. Supp. 2d 791 (W.D. Mich. 2002) ................................................................................37

*Lassiegne v. Taco Bell Corp.*,
　202 F. Supp.2d 512 (E.D. La. 2002) ......................................................................................30

*Lyondell Chem. Co. v. Albemarle Corp.*,
　No. 1:01-CV-890, 2007 U.S. Dist. LEXIS 101796 (E.D. Tex. May 31, 2007).....................35

*McClain v. Metabolife Int'l Inc.*,
　401 F.3d 1233 (11th Cir. 2005) ..............................................................................................37

*Miller ex rel. Miller v. Ford Motor Co.*,
　No. 01-545, 2004 U.S. Dist. LEXIS 29846 (M.D. Fla. July 22, 2004) ...........................10-12

*Mohney v. USA Hockey, Inc.*,
　138 F. App'x 804 (6th Cir. 2005)............................................................................................35

*Moore v. Ashland Chem. Inc.*,
　151 F.3d 269 (5th Cir. 1998) .........................................................................................*Passim*

*MSC, LLC v. Transmontaigne, Inc.*,
　No. 07-5153, 2009 U.S. Dist. LEXIS 11509 (W.D. Ark. Feb. 2, 2009)...................................3

*Mukhtar v. California State Univ.*,
　299 F.3d 1053 (9th Cir. 2002) ..................................................................................................2

*Munoz v. Orr*,
　200 F.3d 291 (5th Cir. 2000) .........................................................................................*Passim*

*Oglesby v. General Motors Corp.*,
190 F.3d 244 (4th Cir. 1999) ...................................................................................29

*Paz v. Brush Engineered Materials Inc.*,
555 F.3d 383 (5th Cir. 2009) ....................................................................................3

*Pipitone v. Biomatrix, Inc.*,
288 F.3d 239 (5th Cir. 2002) ..................................................................................33

*Renaud v. Martin-Marietta Corp.*,
749 F. Supp. 1545 (D.C. Ill. 1990) ........................................................................19

*Rosen v. Ciba-Geigy Corp.*,
78 F.3d 316 (7th Cir. 1996) ....................................................................................37

*Smith v. BMW N. Am., Inc.*,
308 F.3d 913 (8th Cir. 2002) ..................................................................................37

*Thomas v. FAG Bearings Corp.*,
846 F. Supp. 1382 (W.D. Mo. 1994) ...................................................................7, 16

*Watkins v. Telsmith, Inc.*
121 F.3d 984 (5th Cir. 1997) ....................................................................................2

*Woodard v. Andrus*,
No. 03-2098, 2009 U.S. Dist. LEXIS 6431 (W.D. La. Jan. 20, 2009) ...........................*Passim*

## OTHER AUTHORITIES

30 CFR § 250.410-418 .............................................................................................22

Federal Rule of Evidence 104(a) .........................................................................1-2

Federal Rule of Evidence 702 ...........................................................................*Passim*

Halliburton Energy Services, Inc. ("HESI") files this Memorandum in Support of its Motion to Exclude Testimony of Expert Witnesses and to Strike Expert Reports, and in support of the same, shows as follows:

## INTRODUCTION

HESI files this Memorandum in support of its motion seeking to exclude the testimony and strike the reports of several "expert" witnesses tendered by the BP Defendants.   The witnesses at issue include William Wecker, Kathleen Sutcliffe, Chuck Schoennagel, J.J. Azar, and Morten H. Emilsen.  A review of the testimony and reports at issue reveals that BP cannot carry its burden of establishing that these witnesses meet the standards for admissibility under *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 589 (1993) and Federal Rules of Evidence 104(a) and 702.

For example, Wecker's opinion is purely abstract; is not informed by an analysis of the key evidence; excludes key events and time periods, and uses inappropriate comparative metrics. Similarly, Sutcliffe purports to be an expert on "safety culture," yet she failed to analyze process safety and the safety culture on the Macondo well (or anything else relating to Macondo or the *Deepwater Horizon*).  Sutcliffe erroneously posits that BP's safety culture is irrelevant to the *Deepwater Horizon* incident.  To the extent it is relevant at all, Schoennagel's report offers nothing but legal conclusions concerning BP's supposed compliance with MMS regulations. Azar fails to meet admissibility standards because he admits (incredibly) that he is not actually an expert on several topics upon which he provided "expert" opinions in his report.  Finally, Emilsen's modeling lacks certain input data and he admits that he used "fudge factors" to overcome this lack of data.  Emilsen also engaged in an impermissible process of "reverse engineering," manipulating his model to reflect data actually observed.  In short, this Court, as

gatekeeper of these proceedings, must exclude the testimony of Wecker, Sutcliffe, Schoennagel, Azar and Emilsen.   Their testimony and reports fail to meet the minimal standards for admissibility under Federal Rules of Evidence 104(a) and 702.

### ARGUMENT AND AUTHORITIES

### I.       IN DETERMINING THE ADMISSIBILITY OF "EXPERT" TESTIMONY, THIS COURT IS GUIDED BY *DAUBERT* AND ITS PROGENY.

Pursuant to FED. R. EVID. 104(a), the trial court has the responsibility to determine whether an expert's proposed testimony is reliable and helpful to the trier of fact as required by Rule 702 of the Federal Rules of Evidence.   *Daubert*, 509 U.S. at 589; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Munoz v. Orr*, 200 F.3d 291, 301-303 (5th Cir. 2000).

In *Daubert*, the Supreme Court ruled that a district judge is required to function as a "gatekeeper" with respect to the screening of expert testimony to ensure that any and all scientific testimony is not only relevant, but reliable.   *Daubert*, 509 U.S. at 589; *see also Watkins v. Telsmith Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997).   The objective of the gatekeeping requirement is to make certain that an expert employs in the courtroom the same level of intellectual rigor that characterizes his practice in the relevant field.   *Kumho*, 526 U.S. at 152.

Rule 702 permits a witness qualified as an expert by "knowledge, skill, experience, training, or education" to testify if the witness' "scientific, technical, or other specialized knowledge will assist a trier of fact to understand the evidence or to determine a fact in issue." *See* FED. R. EVID. 702.   A court should exclude the testimony of an expert witness who is not qualified by knowledge, experience, training, or education to render an opinion based on scientific, technical, or other specialized knowledge.   *Id*.; *see also Mukhtar v. California State Univ.*, 299 F.3d 1053, 1065 n.9 (9th Cir. 2002).   Rule 702 requires that the expert's testimony be

(1) based on sufficient facts or data and (2) the product of reliable principles and methods.  FED. R. EVID. 702.

In order to meet the threshold requirements for admissibility, the opinion testimony offered must rise above the level of "subjective belief" or "speculation."  *See Daubert*, 509 U.S. at 590.  The proffered expert's reasoning and methodology underlying the testimony must be scientifically valid and reliable.  *Id*.  The *Daubert* Court enumerated a five-factor, non-exclusive test for district courts to consider when assessing whether the methodology is scientifically valid or reliable.  These factors include: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.  *Daubert*, 509 U.S. at 593-95.  If an expert's opinions cannot withstand such scrutiny, the opinions should not be admitted.[1]

Moreover, the court must determine whether the proposed expert used reliable methods to reach an opinion that is relevant to the facts of the case.  *MSC, LLC v. Transmontaigne, Inc.*, No. 07-5153, 2009 U.S. Dist. LEXIS 11509, at *9 (W.D. Ark. Feb. 2, 2009).  Where the data or studies relied on by an expert do not support the ultimate opinion offered, are dissimilar to the actual facts, or are not reliable, the expert's opinion is properly excluded.  *General Electric Co. v. Joiner*, 522 U.S. 136, 144-145 (1997).  If an expert's opinion is based on insufficient facts or data, the analysis is unreliable and inadmissible under Rule 702.  *Paz v. Brush Engineered*

---

[1] The proponent of expert opinion testimony bears the burden to demonstrate that the testimony is reliable and based upon a sound methodological foundation.  *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).  The proponent of the testimony must defend the reliability of its expert's methodology under a preponderance of the evidence standard.  *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 670-71 (5th Cir. 1999).

*Materials Inc.*, 555 F.3d 383, 389 (5th Cir. 2009); *Curtis v. M&S Petroleum, Inc.* 174 F.3d 661, 670-71 (5th Cir. 1999).

## II.  THE OPINIONS OF WILLIAM WECKER FAIL TO MEET *DAUBERT'S* THRESHOLD REQUIREMENTS.

Wecker is a statistician and applied mathematician, who engaged in an abstract statistical analysis of data to reach the conclusion that BP has a "superior and improving safety record" compared to other oil companies and other "comparable" hazardous industries.  Wecker Expert Report at 5.  But Wecker has no opinion on the causes of the April 20, 2010, Macondo blowout; made no study of it, and was not asked to do so.  Wecker Dep. at 64:16-18.[2]  Wecker testified "I have no opinion about the Macondo event.  I—I can't—so I have nothing to say about what is important to that analysis of that event."  *Id*. at 100:24-101:2.

### A.  Wecker's Opinion is Purely Abstract and Fails to Consider or Analyze Key Evidence.

BP's process safety and its causal relationship to the Macondo blowout is a key issue in this case and various experts have offered opinions relating to process safety.[3]  Wecker admits that he is not a process safety expert, except to the extent statistical or mathematical analysis is involved.  *Id*. at 13:17-21; 62:2-13 ("I'm a statistician and mathematician analyzing safety issues here, yes, but I don't know anything about these other—any other experts"); *id*. at 126:25-127:1 ("I don't want to hold myself out as a process safety person."); *see also id*. at 95:20-25.  Wecker has never published a paper on process safety in the oil and gas industry.  *Id*. at 14:6-8.  Indeed, Wecker appears to lack an understanding of what the discipline of process safety actually is, instead testifying that, in his opinion, it means oil spills.  *Id*. at 18:16-24. (Q: "Can you define

---

[2] Excerpts from Wecker's deposition referenced herein are attached as Exhibit A.

[3] The PSC submitted the expert report of Drs. Robert Bea and William F. Gale.  HESI submitted the expert report of Dr. Patrick Hudson.

process safety, as you understand it?"  A:  "Mostly when I read about process safety in the case, it either implicitly or explicitly means oil spills."); *id.* at 18:8-13 ("The short term for process safety, as I see it used in the context that brings us together here, is oil spills."); *id.* at 123:10-20 (asked to explain what process safety means, Wecker replied "one that makes the most sense to me, because it leaves nothing out, and what I read in materials that I've seen in the case, which seems to sensibly focus on oil spills."); *see also id.* at 78:10-19; 98:21-99:9.

Rather than assess process safety, Wecker engaged in an abstract "bean counting" analysis, failing to consider the substantive facts underlying the issues in this case.  As Wecker admits, "I intended to simply count accidents."  *Id.* at 59:1-2; 127:5-7 ("But remember, I'm just the measurement person.  I'm just counting the catastrophes.  I'm not figuring out why they happened.").  This sort of untethered, abstract analysis offers nothing reliable or relevant to the fact-finder in this litigation.

Wecker's unmoored statistical analysis fails to address the underlying facts.  Wecker did not read depositions in this case.  *Id.* at 33:20-34:7.  He formed no opinion as to whether deficiencies in process safety played a role in prior BP incidents, such as Texas City, Prudhoe Bay, or Grangemouth.  He did not study the causes of these incidents; nor did he review the investigation reports that followed these disasters, *e.g.*, the Baker Report, the Mogford Report, or the BP commissioned Tellus Group report.  *Id.* at 39:15-64:18.  Wecker was unaware that the Scottish Environmental Protection Agency blamed the three Grangemouth incidents on poorly maintained equipment and cost cutting and was likewise unaware of the Chief Counsel's and Presidential Commission's conclusions that cost cutting and equipment maintenance issues were also factors in the Macondo blowout.  *Id.* at 43:17-44:5.

Given Wecker's "investigation" into BP's safety history, it is not surprising that Wecker did not know whether BP actually adopted the recommendations of the Baker Report. *Id.* at 50:2-4. Nor was Wecker aware that BP implemented a 25% across-the-board cost cut in March 2005 while simultaneously mandating improvements to process safety. *Id.* at 48:4-11. He did not know that the 2005 Texas City refinery explosion resulted in a $21 million dollar OSHA fine, or that OSHA imposed an additional $87 million dollars in fines after a 2009 audit. *Id.* at 51:20-57:1. Wecker was unaware that the audit revealed more than 709 failures by BP to comply with the 2005 settlement of the Texas City matter. *Id.* Nor did he know that of the 709 citations, 339 related to willful, new violations of process safety management standards. *Id.* Again, Wecker had no knowledge of the audit or BP's noncompliance. *Id.* Wecker was not even aware that of the 761 willful and egregious violations levied against refineries in the previous three years, 760 of those violations have been levied against BP. *Id.* Despite proffering an "analysis" of BP's safety record, Wecker failed to do any investigation into BP's substantial, historical process safety failures. *Id.*

The failure to consider these significant underlying facts was no oversight or mistake. Wecker deliberately ignored and failed to analyze these facts because he simply dismissed them as irrelevant. *Id.* at 59:9-11 ("It's not what I intended to do. I just want to count accidents, incidents, other aspects of safety."); *id.* at 167:17-18 ("I didn't ask for them because it wasn't the sort of thing I wanted."); *id.* at 168:13-17 ("I wouldn't have used it if I had because I have the thing I like best, which is the actual outcomes.").

Wecker's opinion should be excluded because it lacks the proper factual foundation and relies solely on abstract reasoning and analysis unrelated to the actual facts of this case. *See, e.g., Curtis v. MMS Petroleum, Inc.*, 174 F.3d 661, 670-71 (5th Cir. 1999); *Moore v. Ashland*

*Chem. Inc*., 151 F.3d 269, 279 and n.11 (5th Cir. 1998); *Woodard v. Andrus*, No. 03-2098, 2009 U.S. Dist. LEXIS 6431, at *14 (W.D. La. Jan. 20, 2009) (excluding expert's testimony where expert's report did not offer any opinion as to what the underlying facts were, nor did it otherwise attempt to help the Court understand the evidence); *Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1382, 1393 (W.D. Mo. 1994) (the opinions of an expert need not be accepted where they are based on nothing more than personal opinion or belief, instead of an understandable scientific basis); *see also Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 254-58 (Tex. 2004) (expert's conclusion as to what a hypothetical gas well would have produced was unreliable; even if data the expert used was the type generally relied upon by petroleum engineers to estimate production, and underlying facts and data used were accurate, the expert provided no explanation of how such factors affected his calculations).

### B.   Wecker's Methodology is Also Fatally Flawed.

Wecker's report should be stricken and his testimony rejected because he engaged in a purely abstract exercise unrelated to the underlying, significant facts in this case.  But even if the Court was inclined to accept such a purely abstract, irrelevant statistical analysis, Wecker's fatally flawed methodology also requires rejection of his opinions.

### 1.   Counting Incidents of Personal Safety Improperly Skews the Analysis.

Wecker devotes a significant portion of his report to analyzing instances of *personal safety*, as opposed to process safety.  Wecker Expert Report at 6-23.  Personal safety involves ordinary injuries to individual workers, caused by, *e.g*., a worker falling from a ladder or slipping on a floor.  In contrast, process safety involves managerial procedures and processes designed to prevent large scale accidents or disasters.  As described in detail in the expert reports of Dr. Patrick Hudson and Dr. Robert Bea, personal safety and process safety are quite different

concepts.  *See* Bea Expert Report at x, xiii, xv, 26, 33 and n.111, 34, 61; Hudson Expert Report

at 23, 55, 57.  BP has a long history of improperly conflating these two concepts.  It is possible

for a company to have sound strategies regarding prevention of personal safety incidents, while

having very poor process safety systems, making conclusions about process safety that are based

on analyzing personal safety data misleading and irrelevant.  Because Wecker, by his own

admission, does not understand what process safety is, and lacks any expertise in that field, his

opinions unwittingly focus predominately on *personal* safety incidents, which are irrelevant to

the claims at issue in this case.  *See* Wecker Expert Report at 6-23.  Inclusion of data relating to

personal safety incidents improperly skews Wecker's analysis by diluting the significance of BP's

process safety deficiencies.

### 2.    Wecker's Choice of Comparative Metrics is Invalid.

Likewise, Wecker's methodology for choosing comparative metrics is unsound.  Wecker

compares BP to industries such as sewage treatment, finish carpentry, and computer

manufacturing.  *See* Wecker Expert Report at 8-12; 16-20;  Charts at A1-B25.  Although he has

no expertise in the oil and gas field, and no expertise in process safety, Wecker believes it takes

no special expertise to select appropriate metrics for comparison and analysis.

> Q:    As a self-described statistician and applied mathematician
> who has only been on an oil rig for a couple of hours, do you
> believe you have the expertise to select appropriate data to analyze
> a company's personal safety in the oil and gas industry?
>
> A:    Yes.
>
> Q:    Why?
>
> A:    Because it is self-evident when it comes to personal safety,
> measures of fatalities and injuries are the obvious measurement.  It
> take no deep understanding of oil rigs to know that.

Wecker Dep. at 66:3-15.  An expert cannot base his opinions on his own "common sense" absent

supporting analysis or actual expertise.  *IQ Products Co. v. Pennzoil Products Co.*, 305 F.3d 368,

376-77 (5th Cir. 2002).  Wecker's belief that selection of an appropriate metric is a "self evident" and "obvious" task apparently leads Wecker to his improper conclusion that it is relevant and appropriate to compare BP's injury rate to such disparate industries as sewage treatment, finish carpentry, agriculture, arts and entertainment, and computer manufacturing.  *See* Wecker Expert Report at 8-12; 16-20;  Charts at A1-B25.  Assuming, in its best light, that Wecker's analysis is a self-evident, number crunching exercise, then his analysis does not require any particular expertise, and Wecker's testimony offers nothing that this Court cannot observe on its own in reviewing the evidence.

### 3.      The Time Frames Chosen By Wecker Radically Bias His Conclusions.

Wecker's methodology for choosing the relevant time period to include as support for his opinions is equally untenable.  A glaring example of this is Wecker's <u>exclusion of data for the year 2010</u>.  His only explanation for this decision is that BP instructed him to analyze BP's safety record in the years prior to 2010.  Wecker Dep. at 26:19-23; 27:7-23.  By excluding 2010, Wecker *excluded the Macondo blowout itself*, arguably BP's worst process safety disaster and the largest accidental marine oil spill in the history of the petroleum industry.

The results-oriented nature of this carefully chosen analysis period is also seen by examining Figure 16, "Volume of Oil Spills," in Wecker's report.  The highest figure for volume of oil spills Wecker included in his study is somewhat more than 160,000 barrels in 1999 for Chevron.  Wecker Expert Report at 25 [Figure 16]); *see also* C.3 [chart]).  Of course, this Court will ultimately determine the volume of oil released from the Macondo blowout, but BP itself estimates the volume at 3.2 million barrels.  *See* BP's Annual Report and Form 20-F.  Thus, if Wecker had included the Macondo spill on his chart, even using BP's estimate of 3.2 million

barrels of oil spilled, the data point for the Macondo spill would appear slightly more than 4 <u>feet</u> above the zero line of Wecker's chart.

The soundness of Wecker's analytical charts is further undermined by the exclusion of BP's major accidents from his analysis.  The process safety experts offered by other parties in this case addressed the context of BP's accident history within their respective reports.  The Grangemouth incidents occurred between May and June of 2000; the Texas City disaster occurred in March of 2005; and the Prudhoe Bay oil spill occurred in March of 2006.  Many of Wecker's charts and tables fail to include these time periods, meaning that these key BP specific events are not reflected in that particular chart or Wecker's analysis.  For example, Wecker's chart illustrating "Major Incident Announcements" and the chart for "High Potential Incidents" both include the years 2007-2009—a time period that fails to include Macondo, Prudhoe Bay, Texas City, or Grangemouth.  *See* Wecker's Expert Report at 27-28 [Figures 17, 18].

The cumulative effect of Wecker's flawed and selective methodology illustrates the unreliability of his opinions.  Under the *Daubert* standard, this Court should exclude Wecker's opinions and report.

## C.    Wecker Has Previously Been Disqualified Under *Daubert* Standards.

Obvious methodological flaws in Wecker's analysis have caught the attention of other courts.  Pursuant to its *Daubert* gatekeeping function a United States District Court in Florida disqualified Wecker on the basis that his statistical analysis included extraneous data points and resulted in an irrelevant and prejudicial analysis.  *Miller ex rel. Miller v. Ford Motor Co.*, No. 01-545, 2004 U.S. Dist. LEXIS 29846, at *2-8 (M.D. Fla. July 22, 2004).

Wecker's abstract statistical analysis in *Miller* is strikingly similar to the irrelevant and untethered analysis offered in this case.  In *Miller*, Wecker opined that the data he chose from

three motor vehicle accident databases was "comparable" to the underlying accident: the rollover of a 1996 Ford Explorer caused by tread separation of the right rear tire that occurred at approximately 70 miles per hour. *See id.* The *Miller* court observed that Wecker's statistics were not based on substantially similar accidents and that his report "made no effort to limit consideration of other accidents to those similar to the ones involved in this case." *Id.* at *7. The databases Wecker mistakenly considered "comparable" contained data for four vehicles which had substantially shorter wheel bases than the Ford Explorer at issue. *Id.* The Middle District of Florida noted that the "generic propensity" for rollovers was not at issue in the case, and excluded Wecker's report as "far more likely to confuse the issues and create prejudice than to shed light on any relevant issue." *Id.* at *8.

The lack of relevance and the methodological flaws in Wecker's report offered in this case are even more egregious. In *Miller*, Wecker at least analyzed a database of automobiles that were involved in accidents. In this case, Wecker compares accident rates for sewage plants to BP's oil and gas operations and he opines that BP's volume of oil spilled is comparable to, and generally shows improvement, based on a chart that excludes the 3.2 million barrel Macondo blowout that would literally be "off the chart." As in *Miller*, Wecker's analysis is far more likely to confuse the legal issues and ultimately create prejudice. Accordingly, this Court should exclude Wecker's expert report and testimony.

## III. KATHLEEN SUTCLIFFE'S OPINIONS FAIL TO SATISFY *DAUBERT* STANDARDS.

Dr. Kathleen Sutcliffe is a Professor at the University of Michigan, holding a doctorate in Management. Sutcliffe Report at 2. She provides certain opinions about BP's "safety culture." Sutcliffe, much like Wecker, engages in an abstract analysis plagued by numerous methodological failures and shortcomings. Sutcliffe's safety analysis focuses, almost entirely, on

BP's self-serving, aspirational speeches and internal paperwork.  Based upon this subjective, one-sided analysis, Sutcliffe reaches the unfounded conclusion that BP has a strong safety culture and has learned from its past failures.  Sutcliffe Expert Report at 6-7, 54-66, 70, 91-92.  The most remarkable failure of Sutcliffe's analysis is that *she did not analyze the Deepwater Horizon or the Macondo well blowout*.  More generally, Sutcliffe fails to understand fundamental aspects of BP's process safety systems; she fails to determine whether BP actually enacted or effectively implemented its lofty safety rhetoric; and she fails to analyze relevant facts, instead opining about a variety of topics that are irrelevant to this case.

A.    **Sutcliffe Failed to Analyze the Macondo Blowout or the *Deepwater Horizon* Incident.**

One of the few potentially relevant conclusions Sutcliffe offered is that BP has a "strong safety culture" and that it would be "difficult, if not impossible," to conclude that BP's safety culture was the primary cause of the Macondo blowout, or even a cause of that tragedy.  *See* Sutcliffe Report at 4-5; 92.  Sutcliffe expressly attacks the conclusions of opposing experts to the contrary.  *Id*. at 71-91.  Sutcliffe's conclusions are fatally deficient under *Daubert*.

Sutcliffe failed to analyze anything having to do with the *Deepwater Horizon* or the Macondo blowout.  During her deposition, when asked if she had any basis to believe that any aspect of BP's general safety culture, as discussed in her report, was actually implemented on the *Deepwater Horizon*, Sutcliffe replied:  "You know, I would just say, I didn't study the *Deepwater Horizon* again."  Sutcliffe Dep. at 99:25-100:1.[4]  When directly asked if she could give an opinion whether BP's organizational and process safety systems contributed to the Macondo blowout, she testified:  "I did not study the Macondo blowout," and "I don't know the causal factor—factors in the blowout."  *Id.* at 101:6-13.  When asked if she had any opinion whether BP

---

[4] Excerpts from Sutcliffe's deposition referenced herein are attached as Exhibit B.

successfully implemented its process safety system on the Macondo project as of April 2010, Sutcliffe again repeated "Again, I didn't study Macondo." *Id.* at 121:3. Similarly, when asked if she analyzed BP's risk assessment procedures employed during the design phase of the Macondo well, she replied "I did not analyze—I did not analyze that. It was outside my scope" *Id.* at 124:15-16.

Indeed, Sutcliffe's ignorance of the Macondo well and the *Deepwater Horizon* was a constant refrain throughout her deposition:

- "I did not analyze the causes of the Macondo . . . I don't—I don't have an opinion on the causes of the Macondo blowout . . . I'm not qualified to do that . . . I didn't study the Macondo blowout . . . You know, I did not study the *Deepwater Horizon*, and I can't comment on that." *Id.* at 98:5-25.

- "I don't know what played a role in the Macondo blowout . . . I have not analyzed the Macondo blowout." *Id.* at 58:13-19.

- "I have not analyzed that because I did not analyze the Macondo blowout." *Id.* at 59:4-5.

- "You know, I—I didn't analyze any culture on the rig. I didn't analyze the rig. I didn't analyze anything relating to the rig." *Id.* at 62:3-9.

- "You know, I did not analyze the rig." *Id.* at 63:5-6.

- "No, I—I don't have any opinions on the Macondo. I didn't analyze safety on the Macondo." *Id.* at 65:14-22.

- "And second of all, I did not analyze the Macondo well." *Id.* at 80:16-17.

- "I didn't analyze Macondo so I don't know anything about it." *Id.* at 84:19-20.

- "You know, I didn't study the Macondo rig, so I can't really address any questions on that." *Id.* at 90:10-12.

- "I can't say anything about the Macondo well because I didn't study it." *Id.* at 91:3-4.

- "Yeah, I did not study Macondo, so I can't—I can't say." *Id.* at 95:7-8.

- "I did not look at Macondo and the rig in that way, no." *Id.* at 165:2-3.

- "I did not investigate the Macondo blowout." *Id.* at 180:9-10.

- "I did not investigate the safety culture on the rig." *Id.* at 182:24-25.

- "I have not analyzed the cause of the blowout and have no opinion." *Id.* at 184:9-10.

- "You know, I did not study the Macondo rig, so I can't really address that." *Id.* at 197:3-4.

- "And honestly, I did not study Macondo, so I can't really say much about that." *Id.* at 201:2-4.

- "I did not study the Macondo." *Id.* at 202:5.

- "I was not assessing the safety culture of the rigs." *Id.* at 250:20-21.

Sutcliffe's admitted failure to consider or analyze the Macondo blowout or the *Deepwater Horizon* rig casts serious doubt as to the evidentiary reliability of her analyses. *See Moore*, 151 F.3d at 279 and n.11 (noting that expert's conclusion is suspect when based on a "paucity of facts," even though there was a scientific basis for a conclusion if based on adequate facts); *Woodard,* 2009 U.S. Dist. LEXIS 6431 at *14 (excluding expert's testimony where expert's report did not offer any opinion as to the underlying facts). When considering the admissibility of Sutcliffe's report, this Court must "ensure" that Sutcliffe's report and testimony "is both reliable and relevant. . . [.]" FED. R. EVID. 702; *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010). Because it is neither, this Court should exclude Sutcliffe's testimony and opinions.

**B.      Sutcliffe's Claim That BP's Safety Culture is Irrelevant to Rig Operations is Mistaken and Evidences the Lack of Evidentiary Mooring For Her Opinions.**

Sutcliffe appears to believe, incorrectly, that the only relevant safety culture to the *Deepwater Horizon* is Transocean's safety culture. Sutcliffe opines that it is not possible to conclude whether BP's safety culture was a cause of the Macondo blowout. Sutcliffe Expert Report at 8, 71; Sutcliffe Dep. at 59:13-16; 156:9-16. When asked the basis for this belief, Sutcliffe replied that she only studied BP's safety culture and not Transocean's safety culture.

Sutcliffe Dep. at 59:20-23.  When asked if she knew that BP had operational authority over the operations of the Macondo well, Sutcliffe again replied that she did not analyze Transocean's safety culture and that she did not analyze Macondo or the *Deepwater Horizon* rig.  *Id.* at 60:7-10.  She later explained:

> I did not analyze the safety culture on the Macondo well, which I—which I would say is—is Transocean's safety culture . . . BP does not have a safety culture on the Macondo well . . . BP was on the rig, but in my opinion, there's no BP—no BP culture on the rig . . . The rig's culture was Transocean's culture . . . in my view, the top leadership of the rig was Transocean . . .

*Id.* at 81:5-25; 82:19-21; *see also* 84:14-15.

Sutcliffe's profoundly mistaken belief concerning BP's role on the *Deepwater Horizon* is readily explained by the fact that she failed to examine the relationship between owners and operators in offshore drilling and she has no personal experience with these relationships.  *Id.* at 139:3-11.  Sutcliffe was unaware that the BP company man is the final decision maker on the rig or that BP oversaw rig operations and directed the activities of contractors.  *Id.* at 142:2-144:22. Sutcliffe did not remember whether she reviewed the drilling contract between BP and Transocean and did not understand that the contract gave BP the right to oversee operations on the rig. *Id.* at 142:2-9.  Thus, although Sutcliffe purports to be an expert on BP's safety culture as it relates to this case, she lacks any knowledge concerning BP's role as operator and its control over the Macondo well.[5]  Such glaring deficiencies in Sutcliffe's understanding and analysis require exclusion of her report.

---

[5] Even if Sutcliffe were correct that BP's safety culture had nothing to do with the *Deepwater Horizon* rig, that conclusion would only serve to make her report irrelevant to this litigation.

## C.      Sutcliffe Cannot Opine Whether BP's Safety Culture Is Adequate or Effective.

Sutcliffe opines that BP has a "strong safety culture," that it has "demonstrated the attributes of a strong safety culture," and that BP has a "commitment of safety."  *See* Sutcliffe Report at 6-7.  The credibility of these vague and conclusory opinions is called into serious question by her admission that she cannot assess whether BP's safety culture is adequate to the challenges it faces.  For example, Sutcliffe testified that she did not have an opinion or analysis of the causes or key findings that arose from the disasters at Texas City, Prudhoe Bay, and Grangemouth, instead offering only her conclusion that BP's reaction to those disasters improved its safety culture.  Sutcliffe Dep. at 48:8-13.  Yet, Sutcliffe was unable to opine whether the safety changes that followed these incidents were adequate.  *Id.* at 48:17-22.  Sutcliffe was also unable to opine whether BP should have done more to improve its safety systems.  *Id.* at 56:6-13 (Q:  "Do you disagree with those who say that BP should have done more to improve its process safety in the wake of those disasters?" A:  "You know, again, I would say I—I don't have an opinion because I haven't studied process safety for BP, so I don't have an opinion.") (emphasis added).  Sutcliffe was asked if the changes BP made in the wake of the Texas City disaster were adequate to address the safety system flaws, and she replied, "Again, I would say I did not look at the technical—technical—I did not look at Texas City from a technical standpoint."  *Id.* at 67:22-25.  More generally, Sutcliffe opines that BP is making progress, but she was *not* able to give an opinion as to whether BP's efforts were adequate.  *Id.* at 76:3-7.

Mere observations and conclusory statements of an expert do not constitute sound methodology.  *Hayes v. Raytheon Co.*, 808 F.Supp. 1326, 1331 (N.D. Ill. 1992); *see also Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1382, 1393 (W.D. Mo. 1994) (opinions of an expert need not be accepted when they are based on nothing more than personal opinion or belief, instead of

an understandable scientific basis).  Sutcliffe's abstract conclusion that BP has enacted certain changes, or is trying to improve, or desires to have an improved safety culture, will not assist the trier of fact in this case.  This is especially true in the absence of evidence and analysis supporting Sutcliffe's opinions that shows that BP actually implemented changes that were adequate under the circumstances or that have the potential to be effective.  Because Sutcliffe failed to examine, much less offer any substantive opinion on that topic, this Court should strike her opinions and report.

### D.    Sutcliffe's Analysis of Un-Implemented Safety Changes Is Irrelevant.

Although Sutcliffe opines at length about various aspects of BP's safety culture, she admits she has no knowledge whether BP ever implemented any of its proposed and promised changes.   Sutcliffe Dep. at 165:4-166:17; 236:16-237:16.   Furthermore, Sutcliffe failed to analyze whether BP actually complied with its own policies and procedures.  *Id.* at 135:18-19. Sutcliffe was unaware whether any of the changes discussed in her report were implemented on the *Deepwater Horizon* or whether any of them were utilized in the design, planning or execution of the Macondo well.  *Id.* at 99:5-100:16.  She did not know whether BP implemented its process safety system on the *Deepwater Horizon* in April of 2010.   *Id.* at 121:3-6. Although she discussed a discretionary incentive award program BP contemplated offering to rig employees, she did not know if it was actually implemented.  *Id.* at 166:11-17.  Safety changes that are not implemented, or not implemented with respect to the incident at issue, are irrelevant in the trial of this case.

By way of example, Sutcliffe discusses BP's Operating Management System ("OMS"), and generally lauds BP for its development.  *See* Sutcliffe Expert Report at 17-20; 51-52. Clearly, Sutcliffe assumed that OMS fully applied to the Macondo well.  Sutcliffe Dep. at 125:4-

126:5; 237:5-16.  Yet, the evidence in this case establishes that BP's Gulf of Mexico operations had not fully adopted OMS and that the local OMS was not implemented at Macondo.  *See* Kalwant Jassel Dep. at 367:12-368:7; Kevin Lacy Dep. at 80:25-82:9.[6]

### E.    Sutcliffe Cannot Say What BP Learned from its "Learning Culture."

Sutcliffe also opines that BP regularly and continuously reflects on its safety performance and attempts to learn from it.  Sutcliffe Report at 7.  Sutcliffe states in her report that BP learned various lessons from the incidents at Grangemouth, Texas City, Prudhoe Bay, and from other events and near misses.  *Id*. at 55-62.  Yet, when asked at her deposition whether she could identify even one lesson that BP learned from the Prudhoe Bay incident, she tellingly replied: "You know, I mean—I guess since they're—I mean, I—I—I—I can't really answer that question."  Sutcliffe Dep. at 215:21-216:1.  Similarly, when asked what BP had learned from the Texas City disaster, Sutcliffe was unable to offer any meaningful response.  *Id*. at 213:22-214:4. Sutcliffe's unsupported opinions do not survive *Daubert* scrutiny.

### F.    Sutcliffe Failed to Analyze Significant Data.

In addition to the litany of methodological flaws previously outlined, Sutcliffe's report and opinions are also fatally flawed based upon the significant number of issues that Sutcliffe failed to consider or analyze.  Sutcliffe was unaware that in March 2005, BP implemented a 25% across the board cut in costs while simultaneously mandating improvements to process safety. Sutcliffe Dep. at 51:24-25, 52:1-6.  Nor was she aware that OSHA regulators found that 439 of the 709 citations against BP in 2009 were "willful" violations.  *Id*. at 71:5-72:4.  When questioned concerning the willful violations, Sutcliffe called the information "ambiguous" and claimed that she did not "know how to make sense of it."  *Id.* at 71:9-14.  When asked if she was

---

[6] Excerpts from the Jassel and Lacy depositions referenced herein are attached as Exhibit C.

aware that OSHA imposed an additional $50 million dollar fine for BP's failure to make required safety upgrades at Texas City, Sutcliffe replied "No, we—I mean, honestly, I don't remember whether—whether I saw that—that—those data or not, but—so I—" *Id.* at 73:12-74:4.

Sutcliffe also made no attempt to compare BP to any of the other super-major oil companies, such as Shell or Exxon. *Id.* at 95:20-22; 97:13-14. She failed to evaluate BP's risk assessment procedures in action during the design phase of the Macondo well. *Id.* at 124:15-16. She did not analyze the "management of change" process in place on Macondo. *Id.* at 125:12-13. She has no opinion of the safety implications of incentivizing BP Well Site Leaders to reduce non-productive time ("NPT") on the well. *Id.* at 131:23-132:2. She failed to analyze whether BP complied with its Drilling and Well Operations Practice ("DWOP") requirements and could not provide any opinions about any violations of the DWOP. *Id.* at 135:24-136:1. Although the temporary abandonment procedures are among the activities that led directly to the Macondo blowout, Sutcliffe did not bother to look at the temporary abandonment procedures. *Id.* at 141:5-6. Nor did Sutcliffe analyze each of the safety incidents in the five years preceding the Macondo incident to determine whether any of them were violations of BP's safety policies. *Id.* at 263:25-264:1. Sutcliffe also failed to look at safety outcomes related to fires, major releases, and well incidents from 2002 to 2010, as reflected on Exhibit 7153.[7] *Id.* at 283:15-16; 284:6-7. Sutcliffe's admitted failure to consider highly relevant data exposes fatal flaws in her methodology. *See Renaud v. Martin-Marietta Corp.*, 749 F. Supp. 1545, 1552-1553 (D.C. Ill. 1990) (evidentiary reliability is not present when the opinion is premised on fundamentally unsound bases or a fatally deficient amount of data).

---

[7] Exhibit 7153 is attached as Exhibit D.

As a result of her failed methodology and deficient analysis, and because Sutcliffe fails to meet the minimal requirements of admissibility under Rule 702, this Court should exclude Sutcliffe's testimony and report.

## IV. CHUCK SCHOENNAGEL'S LEGAL CONCLUSIONS SHOULD BE EXCLUDED BECAUSE THEY FAIL TO MEET *DAUBERT* EVIDENTIARY STANDARDS.

### A. This Court Does Not Need An Unqualified Expert to Opine on Domestic Law.

Chuck Schoennagel is a former Deputy Regional Director of the Minerals Management Service ("MMS") Gulf of Mexico Region.  Schoennagel's expert report consists primarily of legal conclusions concerning BP's supposed compliance with various MMS regulations.  *See* Schoennagel Expert Report at 19-29.  According to Schoennagel, he is an expert on MMS regulations, and the purpose of his report is to provide guidance to the Court with respect to how it should interpret the MMS regulations.   Schoennagel Dep. at 99:12-15; 7:12-17.[8] Schoennagel's expert report should be stricken pursuant to the well-settled principle that experts should not be permitted to offer opinions or testify as to matters of domestic law.[9]  As aptly stated by the D.C. Circuit, "[e]ach courtroom comes equipped with a legal expert [. . .] called a judge."  *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-14 (D.C. Cir. 1997); *see also BNY Mellon, N.A. v. Affordable Holdings, Inc.*, No. 1:09CV226-SA-JAD, 2011 U.S. Dist. LEXIS 75135, at *6 (N.D. Miss. July 12, 2011) (citing *Burkhart*); *Woodard,* 2009 U.S. Dist. LEXIS 6431, at *11 ("Courts have consistently been reluctant to permit legal experts to testify as to matters of domestic law.") (internal citations omitted).

---

[8] Excerpts from Schoennagel's deposition referenced herein are attached as Exhibit E.

[9] Legal experts are permitted to testify as to foreign law because judges in the United States are not presumed to be experts in non-U.S. law.

Ironically, BP recently acknowledged this bedrock principle by filing its Motion in Limine to Bar Fact or Opinion Testimony on Issues of Law.  *See* Dkt. No. 5108.  The first sentences of BP's motion correctly state:   "No witness – whether lay or <u>expert</u> – should be allowed to give testimony that amounts to assertions or conclusions as to the law or its application to the facts of this case.  This is a <u>bright-line rule</u>."  *Id*. at 1 (emphasis added).

Equally ironic is the fact that Schoennagel himself repeatedly recognizes this bright-line rule, correctly acknowledging that this Court, and not he, will decide whether BP complied with applicable law and regulations:

- "Again, I think that whether or not this issue or most issues in this case determining whether or not—who is in compliance with the regulations is Judge Barbier's decision."  Schoennagel Dep. at 156:3-14.

- "I think Judge Barbier is the final decision maker that's going to—as to the, I guess, plaintiff's lawsuit."  *Id*. at 171:9-17.

- "I think that's going to be a determination by Judge Barbier as to who is affected by these regulations."  *Id*. at 184:1-9.

- "I think that's going to be up to Judge Barbier to make that decision, not me."  *Id*. at 41:13-25.

- "I think that's Judge Barbier's decision to make, not mine."  *Id*. at 42:2-11.

- "Again, I think that's Judge Barbier's decision to make."  *Id*. at 44:2-12.

- "As far as who is going to determine full compliance for BP, I think that, again, is Judge Barbier."  *Id*. at 71:18-25.

- "Again, I think that's Judge Barbier's decision to make."  *Id*. at 75:4-17.

- "That is going to be up to Judge Barbier."  *Id*. at 77:6-14.

## B.        Schoennagel Is Not Qualified As a Legal Expert.

Even in the absence of a "bright-line rule" barring expert testimony about domestic law, Schoennagel is not qualified to opine as to these issues.  Schoennagel is not a law professor or a lawyer; instead he holds a B.S. degree in engineering science.

Schoennagel feigns legal expertise by touting his experience as a Deputy Regional Director of the MMS Gulf of Mexico region, as well as his experience as an accident investigator. *See* Schoennagel Expert Report at 1-2. But Schoennagel's experience is hardly sufficient to make him a legal expert on the MMS regulations at issue in this case. For example, Schoennagel opines that BP was fully in compliance with its reporting obligations to the MMS in accordance with 30 CFR § 250.410-418 (Subpart D).[10] *See* Schoennagel Expert Report at 20-21; Schoennagel Dep. at 56:21-57:16. Yet, he was unable to answer whether BP was required to take any further action if it modified its temporary abandonment plan, opining that this "would depend on the district you are dealing with and what their normal procedures would be . . . ." Schoennagel Dep. at 58:9-59:3. Schoennagel then admitted that the Macondo well was governed by the New Orleans District Office of the MMS and that he did not know whether the New Orleans District office would have required further information. *Id*. at 60:10-24. Schoennagel's supposed experience is inadequate to make him qualified to render legal conclusions.

Further, Schoennagel admitted that it has been at least 12 years since he was involved in discussions relating to changes to the Code of Federal Regulations ("CFR"), his last discussion being May 13, 1999. *Id*. at 275:15-276:25. The last revisions to the CFRs were made in February of 2003. *Id*. at 277:1-5. Schoennagel had no specific recollection of whether he commented on the 2003 revisions of the CFRs, nor did he recall being asked to comment on §250.427 (concerning requirements for pressure integrity tests). *Id*. at 277:11-24. Schoennagel

---

[10] 30 CFR § 250.410-418, Subpart D, deals with Oil and Gas Drilling Operations. Section 250.410 concerns the procedure for obtaining a permit to drill a well; section 250.411 concerns the information that is required for submission of a drilling permit; section 250.412 concerns the requirements of a location plat; section 250.413 concerns the requirements for the description of a well drilling design; section 250.414 concerns the requirements of the drilling prognosis; section 250.415 concerns the requirements of the casing and cementing programs; section 250.416 concerns requirements for the description of the diverter and BOP; section 250.417 concerns requirements for operators intending to use a MODU; and section 250.418 concerns additional information that must be submitted with an application for permit to drill.

admitted that while he was employed by MMS, it was never critical to his job function to interpret the application of MMS regulations that are fundamental to this case, such as sections 250.427 or 250.401 (concerning procedures for obtaining approval to drill a well).  *Id*. at 248:2-251:22.  In addition, section 250.428 (concerning actions required for certain cementing and casing situations) was never integral to any of his jobs at MMS while he was employed there.  *Id*. at 251:1-22.  Nor could Schoennagel recall an occasion in which he ever advised a client, as a private consultant outside of MMS, as to compliance with, or the meaning of sections 250.401, 250.427, or 250.428.  *Id*. at 234:2-10.  Schoennagel was unable to give even a single example of a situation in which a casing design might need to be revised pursuant to section 250.428, instead deferring that question to a drilling engineer.  *Id*. at 296:8-297:4.  Again, Schoennagel's own testimony establishes the lack of any basis for opinions offered in this case regarding application of MMS regulations.

As another example of the disconnect between Shoennagel's opinions and his experience, Schoennagel opines that MMS regulations do not require 500 feet of cement above every hydrocarbon bearing zone, or "stringer" identified in a wellbore.  Schoennagel Expert Report at 27.  In his view, the regulation only requires cementing a hydrocarbon bearing "stringer" if the zone is greater than 15 feet.  But Schoennagel admits that his MMS experience is <u>not</u> the basis of that opinion.  Indeed, Schoennagel testified that this very important issue to this case was never brought to his attention while he was at MMS.  Schoennagel Dep. at 114:13-131:8.  Likewise, he never expressed this opinion while employed at MMS and he is not aware of anyone ever getting a regulatory approval on the basis of his interpretation.  *Id*.  Instead, Schoennagel based his conclusion solely on his own investigation of the regulations themselves.  *Id*.  Far from relying on his MMS experience, Schoennagel engaged in pure legal research and analysis—he examined

the particular regulation at issue, discovered that the regulation as revised lacked a definition of a particular phrase, and then researched other MMS regulations to find definitions that he judged might shed light on the meaning of the regulation. *Id*. at 92:15-113:21. Schoennagel drew the legal conclusion that the absence of cross referencing between the sections he examined was not of legal significance. *Id*. This purely legal analysis obviously falls within the province of the Court—not a former regulator, and should be excluded.

Even if this Court permitted expert testimony as to legal matters, Schoennagel is not qualified to give such opinions, whether by virtue of his education (as an engineer), or by virtue of his MMS experience. Rule 702 requires that a proffered witness be qualified as an expert by knowledge, skill, experience, training or education. *Moore,* 126 F.3d at 684. Because the premise of receiving expert testimony is that such testimony will assist the trier of fact, the trial judge should insist that the proffered expert bring to the trier of fact more than the lawyers can offer in argument. *Araujo v. Treasure Chest Casino, L.L.C.*, No. 97-3043, 1999 U.S. Dist. LEXIS 5556, at *4 (E.D. La. Apr. 14, 1999) (internal citations omitted); *see also Green v. CBS Broadcasting, Inc.*, No. 3:98-CV-2740-T, 2000 U.S. Dist. LEXIS 19962, at *4 (N.D. Tex. Dec. 19, 2000) (recognizing that the "Fifth Circuit has repeatedly held that legal opinions are not a proper subject of expert testimony"); *Woodard*, 2009 U.S. Dist. LEXIS 6431, at *1-*2 (holding that legal expert could not testify concerning legal standards and noting that the rule against excluding expert testimony when it consists of legal conclusions makes no exception for situations in which the judge is the trier of fact versus a jury). Schoennagel offers nothing more than argument to legal questions this Court is fully capable of resolving and his opinions should not be allowed.

### C.      Schoennagel's Conclusions are Unreliable and Lack Proper Foundation.

As described above, Schoennagel is not qualified to opine on legal matters.  But even if he was a law professor specializing in the meaning and interpretation of MMS regulations, and he obviously is not, the legal analysis Schoennagel actually performed in this case fails to meet the *Daubert* standards because it is unreliable and lacks a proper foundation.

Schoennagel opines that there was prompt and full disclosure by BP to MMS of what was occurring on the well as it was being drilled.   Schoennagel Expert Report at 20.   But Schoennagel concedes that he never even attempted to actually verify that the information being reported by BP to MMS was, in fact, accurate.  *Id.* at 272:9-274:10.  Instead, Schoennagel simply "assumed" that since the forms had been received by MMS, MMS would have contacted the operator if they needed more information; therefore, there was no need for him to assess the accuracy of the data BP reported.  *Id.* at 273:6-274:10.  An expert's report is properly excluded where the expert merely relies on a party's own compilation of data, and fails to verify the information presented.  *Munoz*, 200 F.3d at 301-02 (citing *Sheats v. Bowen*, 318 F.Supp. 640, 644 (D. Del. 1970).  Therefore, Schoennagel's conclusions should be excluded.

And this was not an isolated failure.  When Schoennagel analyzed the Application for Permit to Drill ("APD") reports, he failed to confirm that all the information was submitted; instead Schoennagel merely "assumed" that if the information had not been provided, it would not have gotten through the front office of MMS, or that MMS would have sent a reply noting the deficiency.  *Id*. at 256:21-257:7.  Schoennagel also claims he can validly opine about BP's supposed compliance with MMS regulations without examining the IADC reports in depth.  *Id*. at 263:6-24.  Strikingly, Schoennagel did not examine the reports in detail because he did not

think he had the time to do so, and even if he did, he believed he might not be able to understand them because he is not a drilling engineer.  *Id.*

This Court does not need a witness to opine on issues of domestic law, or a witness who is not qualified to offer such testimony and who failed to examine the proper factual underpinnings relating to application of the law.  Thus, this Court should exclude Schoennagel's testimony and report under *Daubert*.

## V.    THIS COURT SHOULD EXCLUDE J.J. AZAR'S OPINIONS BASED UPON HIS ADMITTED LACK OF EXPERTISE.

### A.    Azar Admits a Lack of Expertise For Numerous Topics.

Dr. Azar is an Emeritus Professor of Petroleum Engineering at the University of Tulsa. Azar issued a fifty page expert report covering a wide range of topics including drilling, the role of contractors, well design, operational decisions and testing on Macondo, and kick detection. Azar Expert Report at 6-50.  However, in his deposition, Azar admitted that he does not claim to be an expert regarding all of the subjects discussed in his report.  Azar Dep. at 353:24-354:3[11] (Q: "Well, it's a fact that this report that you've provided does not purport to be an expert report regarding all the subjects in it, does it sir?"  A:  "Not all of the subjects, sir.").  This Court should exclude Azar's report and testimony relating to subject matters upon which Azar admitted a lack of actual expertise.

#### 1.    Azar Admits He Is Not an Expert on Cement and Cementing Operations.

Azar stated in his report that he thinks it is "unquestionable" that "the cement failed and that the failure resulted in the formation being capable of allowing a kick to occur on the evening of April 20, 2010."  Azar Expert Report at 36-37.  However, by his own admission, Azar is not

---

[11] Excerpts from Azar's deposition referenced herein are attached as Exhibit F.

an expert on cement.  *Id.* at 36 ("I am not an expert in cement."); Azar Dep. at 334:2-6 (Q: "And—I believe you have stated—and just to make it perfectly clear—that you are not a cement expert in any respect whatsoever."  A:  "That is correct."); *Id.* at 270:17-21 (". . . I'm not an expert in cement.").

Azar also expressed unsupported opinions about HESI's foam cement job, while admitting that he is neither a "cement expert," nor an expert in "the cementing operation."  Azar Dep. at 187:23-24; 202:18-23.  Azar further admitted he is not an expert in cement slurry curing and setting, and thus was unable to express an opinion as to whether one goal of using foam cement on the Macondo well was to reduce hydrostatic pressure.  *Id.* at 189:4-11.  Azar was also unable to offer an expert opinion as to whether gelled mud (which may have been present in the Macondo well due to an insufficient bottoms up circulation) had the capacity to contaminate the cement, and therefore inhibit its ability to achieve zonal isolation.  *Id.* at 357:5-8.  Azar conceded that he was not offering expert opinions about the quality of HESI's cement job in the Macondo well, because he is "not an expert in that area" and that this "is not the opinion I'm offering in my report."  *Id.* at 285:18-25.  Azar further conceded that he was not prepared to offer an expert opinion about HESI's execution of the cement job on the Macondo well in terms of cement placement.  *Id.* at 286:1-6.

Based upon his conceded lack of expertise on cementing issues, this Court should exclude any opinions or testimony offered by Azar on cement topics.

### 2.    Azar Admits He Is Not an Expert on Wait on Cement.

Another key issue concerning cementing operations is "wait on cement" ("WOC"), the time period that is allowed for the cement to harden.  As to this topic, Azar admitted that "I'm not an expert, so I can't really tell you all of that stuff, weight-on cement. . . I've heard about it.  I'm

not an expert on it.  I don't know."  *Id.* at 288:11-23.  Based on his admitted lack of expertise, this Court should exclude any Azar opinions relating to WOC.

### 3.      Azar Admits He Is Not an Expert on Cement Bond Logging.

Azar also admitted that "I'm not an expert in cement bond—cement bond logging."  *Id.* at 205:7-17.  Yet, in his report, Azar opines that BP's decision to forego a cement bond log was reasonable.  Azar Expert Report at 39-40.  When asked whether it was possible that running a cement bond log on April 20th would have provided useful information, Azar responded "[f]or top of cement, yes.  The quality of the bond—again, not being an expert in that area is—I don't know."  Azar Dep. at 206:20-207:6.  When asked about his conclusion that there was no certainty that a cement bond log conducted on April 20, 2010 would have revealed information sufficient to identify problems with the cement job poured hours earlier, as set forth on page 40 of his report, Azar admitted that the statement was merely "based on my general knowledge."  *Id.* at 206:7-8.  Based on his admitted lack of expertise, this Court should exclude any Azar opinions relating to cement bond logs.

### 4.      Azar Admits He Is Not an Expert on Centralizers.

The evidence in this case will show that BP ignored HESI's recommendation to use 21 centralizers, despite HESI's warning that its OptiCem modeling showed a "severe risk" of gas flow and serious channeling if seven centralizers were used.  In his report, Azar offers opinions concerning the centralizer issue.  Azar Expert Report at 37-39; Azar Dep. at 338:13-15.  Yet, in his deposition, Azar initially made reference to his so-called "general knowledge," but eventually admitted that he lacked actual expertise regarding the use of centralizers.  Azar Dep. at 338:16-339:12 (Q:  "I want to know, do you believe you have expertise to offer an opinion about the number of centralizers that BP should have run on the casing string in the Macondo well, yes or

no?"  A:  "No.").  Based on his admitted lack of expertise, this Court should exclude any Azar opinions relating to the use of centralizers.

### 5.      Azar Admits He Is Not an Expert on Float Collars.

Azar testified that any discussion of float collars in his report was simply an attempt to offer general information, not an expert opinion.  *Id.* at 350:15-19.  Likewise, Azar testified that he is not an expert on float collars, and is not offering any expert opinion about the float collars used in the Macondo well.  *Id*. at 349:21-25.  Azar also stated that "in regard to the float collar issue, I cannot give you an opinion on that, because I'm not an expert in that kind of particular downhole device."  *Id*. at 208:10-22.  Based on his admitted lack of expertise, this Court should exclude any Azar opinions relating to float collars.

### 6.      Azar Admits He Is Not an Expert on Mudlogging.

In his report, Azar discusses mudlogging services on the Macondo well and the effect of simultaneous operations on mudlogging operations.  Azar Expert Report at 11-12; 44-45.  But when questioned about his expertise, Azar conceded that he is not offering opinions as an expert, and that he merely had general knowledge of the topic, as opposed to any expertise.  Azar Dep. at 345:3-346:8.  Based on his admitted lack of expertise, this Court should exclude any Azar opinions relating to mudlogging.

### 7.      Azar Admits He Is Not an Expert on Blowout Preventers or Wireline Logging.

Azar also admitted that he is not an expert on blowout preventers ("BOP") or wireline logging.  *Id.* at 27:15-19; 417:12-25; 183:3-20.  Based on his admitted lack of expertise, this Court should exclude any Azar opinions relating to BOPs or wireline logging.

**B.     The Court Should Strike Those Portions of Azar's Report For Which He Admits a Lack of Expertise.**

A reliable expert's opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods. *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). Azar's admissions regarding his lack of expertise in cement, cementing operations, wait on cement, cement bond logging, centralizers, float collars, mudlogging, BOPs and wireline logging render his purported expert testimony on these topics inherently unreliable.

Courts have consistently found expert testimony to be unreliable and therefore inadmissible when an expert admits lack of qualification for a particular opinion. For example, in *In re Complaint of Ingram Barge Co.,* 187 F.R.D. 262, 266 (M.D. La. 1999), the district court excluded opinions offered beyond the scope of the expert's qualifications. The appellate court found no abuse of discretion and determined the expert's opinions to be "nothing more than unscientific speculation offered by a 'genuine scientist.'" *Id.* (*quoting Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996)). Likewise, in *Lassiegne v. Taco Bell Corp.*, 202 F. Supp.2d 512, 518 (E.D. La. 2002), a physician expert was properly disqualified after having admitted lack of qualification for a medical opinion outside her area of expertise. Also, in *Anderson v. Raymond Corp.*, 340 F.3d 520, 523-24 (8th Cir. 2003), a personal injury case involving an overturned lift truck, the district court properly excluded the expert's testimony where the expert admitted a lack of expertise in the design or engineering of stand-up lift trucks. And in *Free v. Bondo-Mar-Hyde Corp.*, which involved an exploding aerosol can, the court reasoned that because the expert's testimony was based on his belief and speculation, it did not meet with the indicia of reliability required by *Daubert*. *Free v. Bondo-Mar-Hyde Corp.*, 25 F. App'x. 170, 172-174 (4th Cir. 2002).

Consistent with these well-settled principles, this Court should exclude those portions of Azar's report and testimony that discuss topics for which Azar expressly admits a lack of expertise, including cement, cementing operations, wait on cement, cement bond logging, centralizers, float collars, mudlogging, BOPs and wireline logging.

## VI.  THE *DAUBERT* STANDARDS REQUIRE EXCLUSION OF MORTEN H. EMILSEN'S OPINIONS.

Mr. Emilsen is currently the Vice President, Software and Technology, of add wellflow, a Norwegian company offering drilling and production services.  Emilsen Expert Report at 6. Emilsen holds a Master's Degree in fluid mechanics.  *Id.*  Emilsen submitted an expert report focused on modeling the dynamic flow conditions experienced at the Macondo well during the blowout on April 20, 2010.  As Emilsen acknowledges, his report is largely based on OLGA modeling; more specifically, modeling using OLGA-Well-Kill, a type of "transient multiphase flow simulator."  Emilsen Dep. at 10:21-14:14; 126:23-127:8.[12]  Emilsen originally worked with BP as part of its Internal Investigation Team in the summer of 2010 and his initial findings were attached as Appendix W to the Bly report.  Emilsen Expert Report at ii; Emilsen Dep. at 15:12-18.  Emilsen's October 17, 2011 expert report purports to summarize his key findings from his work with the investigation team.  According to Emilsen, his "Case 7" modeling scenario represents what happened on the Macondo well during the blowout.  Emilsen Dep. at 10:21-14:14.

This Court should exclude Emilsen's report because his modeling is unreliable for a variety of reasons.  First, Emilsen failed to use inputs concerning various critical hydrocarbon bearing zones.  Second, he employed mathematical "fudge factors" to make the model work.  Third, he "reverse engineered" other key inputs to make the model's output match observed

---

[12] Excerpts from Emilsen's deposition referenced herein are attached as Exhibit G.

results.  As Emilsen himself concedes, his model is only as good as the inputs provided.  *Id.* at 21:11-14.

### A.      Emilsen Failed to Obtain or Utilize Important Input Data.

Emilsen explained that he needed "a lot of data regarding the fluid, the hydrocarbon fluid" in order to be able to model or predict the behavior of the fluids in the wellbore.  *Id.* at 20:15-25.  More specifically, he needed "compositional data" of the well fluids showing the proportion of various hydrocarbons such as ethane, methane, butane, etc.  *Id.* at 20:24-21:3.  The first glaring deficiency in Emilsen's modeling is that he only used compositional data for the three "pay sands," *i.e.* the target sands that BP sought to produce commercially, which had a pore pressure of 12.6 ppg (*i.e* the M56D, M56E, and M56F zones).  *Id.* at 44:4-8.  Emilsen admitted that he did *not* use compositional data for the M56A level sands with a pore pressure of 13.1 ppg.  *Id.* at 22:11-23:19; 164:22-165:6; 52:2-17.  Nor did he use compositional data for the M57B sands with a pore pressure of 14.1 ppg.  *Id.*  Emilsen admitted that he "was initially interested in all the various sands in the wellbore," but only received information about the "main target" sands from BP.  *Id.* at 23:20-24; 54:15-19.  Although he initially developed his model in the summer of 2010, and later became aware of the M56A 13.1 ppg sands and the M57B 14.1 ppg sands, Emilsen did <u>not</u> subsequently ask BP for the compositional data for either of these sands. *Id.*

This is a telling deficiency in Emilsen's modeling.  The M57B sand, with a pore pressure of 14.1 ppg, includes the hydrocarbon-bearing zone at 17,467 feet, which is the zone that BP failed to disclose to MMS as part of its reporting on its drill plan and top of cement, and which BP also failed to disclose to HESI in connection with planned cementing operations.  In other words, Emilsen's model does not include compositional data for the undisclosed zone at 17,467

feet.[13]   As to the 13.1 ppg M56A zone, Emilsen admitted that this zone was capable of flowing hydrocarbons, and in fact did flow hydrocarbons, during the negative pressure test.  *Id.* at 163:6-164:21.  Nevertheless, despite admitting that the M56A zone flowed hydrocarbons, Emilsen's flow model does not use compositional data for this zone.  Based upon Emilsen's failure to include this clearly relevant data in his modeling, and his conscious decision (in consultation with BP) to specifically exclude this and other relevant data, exclusion of Emilsen's opinions and testimony is proper.  *See Munoz*, 200 F.3d at 301 (citing *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1045 (7th Cir. 1988) (holding that an expert's report may be excluded for failure to consider other variables).

Courts must "ensure that an expert's testimony rests upon a reliable foundation." *Guillory v. Domtar Indus, Inc.*, 95 F.3d 1320, 1330-31 (5th Cir. 1996).  When reviewing the sufficiency of the underlying facts or data, the court must determine whether the expert considered enough facts to support the opinion.  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249 (5th Cir. 2002); *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 197 n. 4 (5th Cir. 1996) ("Courts should particularly pay close attention when expert witnesses depart from generally accepted scientific methodologies.").  In this case, Emilsen's methodology failed to follow even his own standards because he was unwilling or unable to ask BP for the compositional data for either the M56A 13.1 ppg or the M57B 14.1 ppg sands to perform his flow modeling.

The missing compositional data from the M56A 13.1 ppg and M57B 14.1 ppg sands renders Emilsen's ultimate findings speculative, unreliable, and inadmissible for lack of proper foundation.  A computer model is only an estimate and the accuracy of the estimate depends largely on the data selected for use in the computer model and the quality and reliability of that

---

[13] Emilsen decided to disregard the M57B zone with a pore pressure of 14.1 ppg on the grounds that it did not match with other simulations he ran regarding shut-in pressure simulations.

data.  *See City of Wichita Kansas v. Trustees of APCO Oil Corp. Liquidating Trust*, 306 F. Supp. 2d 1040, 1108 (D. Kan. 2003) (expert testimony on computer modeling of groundwater flows found insufficiently reliable where expert failed to correlate model results with field data, assumed relevant groundwater conditions without obtaining confirmation and deviated from usual modeling methodology); *see also Munoz v. Orr*, 200 F.3d 291, 301-02 (5th Cir. 2000) (expert's reliance on plaintiffs' data compilations, without seeking to verify information, "gives rise to a 'common sense skepticism' regarding the expert's evaluation."); *Moore*, 151 F.3d at 279 (excluding speculative expert testimony lacking in scientific validity).

Putting aside BP's motivation to exclude data that it failed to provide to the MMS or HESI, Emilsen's opinions are based on modeling that fails to take into account even sands that he concedes were flowing during the blowout.  This Court should not allow such a selective, results-oriented approach to alleged "expert" analysis, and should exclude Emilsen's opinions and testimony.

      **B.**    **Emilsen Improperly Employed "Fudge Factors" to Remedy the Absence of Data.**

The second major deficiency in Emilsen's report and opinions is Emilsen's use of a "fudge factor" to make his model deliver reasonable outputs, in the absence of actual physical data from the correct inputs.  FAN 70 data describes the physical properties, or rheology, of fluids.  During the displacement operations on the Macondo well on April 20, 2010, the well contained 14 ppg drilling mud, and also some 16 ppg lost circulation material ("LCM") that was being used as an unorthodox spacer.  Emilsen Dep. at 91:3-23.  Emilsen was unable to confirm whether he actually received FAN 70 data for the 14 ppg drilling mud or the very viscous LCM spacer material.  *Id.* at 29:3-10; 30:12-17.  Instead, he used "plastic viscosity" data supplied to him by BP.  *Id.* at 29:3-10.  But when he ran his model and attempted to simulate the flow

conditions including the 16 ppg LCM spacer, the results did not match up.  *Id.* at 31:16-33:5. Rather than attempt to match his model to actual data, Emilsen simply added a "friction component" to make the model deliver the desired outputs.  *Id.* Indeed, Emilsen candidly conceded that the OLGA models have been tested mostly on Newtonian fluids,[14] and thus he was not surprised that he needed to add a "friction component" to his model to make it deliver the desired outputs when modeling a very vicious LCM fluid in a **non**-Newtonian system such as the Macondo well.  *Id.*

An expert may not hazard an unsubstantiated guess masked as technical expertise. *Lyondell Chem. Co. v. Albemarle Corp.*, No. 1:01-CV-890, 2007 U.S. Dist. LEXIS 101796, at *9 (E.D. Tex. May 31, 2007) (internal citations omitted)*; see also Mohney v. USA Hockey, Inc.*, 138 F. App'x 804, 809 (6th Cir. 2005) (expert's opinion properly excluded as unreliable where expert employed estimates, rather than actual data, as inputs for calculations and performed Newtonian calculations to support his conclusions but conducted no testing).  Yet, that is exactly what Emilsen did.  Emilsen's use of "fudge factors" to deliver reasonable outputs in his modeling is speculative and result-oriented, and renders his opinions entirely unreliable.  *See Daubert*, 509 U.S. at 590 (courts should exclude expert testimony based merely on subjective belief or unsupported speculation); *Black v. Food Lion, Inc.*, 171 F.3d 308, 311 (5th Cir. 1999) (same).

### C.      Emilsen Improperly Engaged in Reverse Engineering.

The third and most significant deficiency in Emilsen's model concerns his artificial manipulation of the "net pay zone" input parameter.  Emilsen assumed that the Macondo well had a maximum of approximately 86 feet of "net pay zones" that were potentially capable of flowing.  Emilsen Dep. at 70:10-15.  This 86 feet is an actual physical dimension, *i.e.* 86 feet of

---

[14] The viscosity of a Newtonian fluid does not vary with changes in shear rates; in contrast, the viscosity of a non-Newtonian fluid varies with changes in shear rates.  *See* Emilsen Expert Report at 5.

pay zones at the bottom of the Macondo well. *Id*. at 45:25-46:12. Because there was a blowout, Emilsen assumed that some fraction of that 86 foot area did, in fact, flow hydrocarbons down the annulus, up the reamer shoe, through the float collar, and then up the casing string to the riser. *Id*. at 46:13-50:25. Emilsen repeatedly conceded that his modeling is "very sensitive" or "quite sensitive" to the narrow band of net pay input parameters he ultimately chose to use (13 to 16.5 feet). *Id.* at 64:8-20; 67:2-7; *see also* Ex. 7292.[15] He concedes that the "main limitation of his OLGA modeling is the accuracy of the input assumptions" and that the "net pay was probably the most uncertain parameter." Emilsen Dep. at 124:9-25; Emilsen Expert Report at 6. This conceded sensitivity showcases the problems with Emilsen's report and opinions, especially given the way Emilsen derived the "most uncertain parameter."

Obviously, the flow of hydrocarbons through the wellbore would be affected by physical factors such as the location, amount and physical properties of the cement in the annulus and the shoe track, restrictions within the float collar and its flapper valves, the size of the three flow ports in the reamer shoe, etc. But Emilsen did not attempt to directly measure the effect any of these actual physical factors would have on the flow of hydrocarbons. Emilsen Dep. at 69:1-72:3. Instead, he merely <u>manipulated the amount of "net pay zone" until the model delivered results he judged to match with observed surface data</u>. *Id.* at 71:21-72:3; 46:13-22; 48:5-49:11; 50:2-25.

Emilsen had to use input parameters between 13 to 16.5 feet of net pay zone to make his model appear to work. *Id.* However, Emilsen concedes that the 13 to 16.5 feet input parameters are <u>not</u> based on any actual measurement of the physical "net pay" zone that was capable of flowing, or measurements of the amount, location, or properties of cement, or the effect of the

---

[15] Exhibit 7292 is attached as Exhibit H.

restrictions in the float collar or reamer shoe.  *Id.* at 92:22-94:25; 167:18-169:3.   In fact, Emilsen's selection of an input parameter of 13 to 16.5 feet of net pay zone does not literally mean there were 13 to 16.5 feet of pay zone exposed in the Macondo well at the time of the blowout.  To the contrary, the net pay inputs are simply a mathematical function that Emilsen "reverse engineered" to make his model deliver the desired outputs.  *Id.* at 50:12-25; 96:6-23.

Emilsen admitted that he chose these input parameters because they were required to arrive at the output of the "unloading sequence," *i.e.* the flow of fluids during the blowout.  *Id.* at 46:13-17.   As Emilsen explained, "[t]he net pay was driven by a match of what I've discussed earlier, the surfacing of gas, and the pressure response on the drill pipe."  *Id.* at 71:21-72:3. Emilsen looked to see what the desired outcome should be and then he modified his inputs to more closely align with the outputs he was seeing.  *Id.* at 50:8-25.  Emilsen conceded that this was essentially "reverse engineering," in which you start with the end results and work backwards to see what might fit.  *Id.*

Courts have recognized that such "reverse engineering" is improper under the scientific method.  *See Lake Michigan Contractors, Inc. v. The Manitowac Co., Inc.*, 225 F. Supp. 2d 791, 803 (W.D. Mich. 2002) (holding an expert's opinions inadmissible where expert starts with conclusion and then works backward for reasons to explain the conclusion without focusing on specific facts and circumstances of the case).  Emilsen's calculations and modeling regarding the net pay zones involve a "leap of faith" unconnected by the scientific method and should be excluded as unreliable.  *See Rosen v. Ciba-Geigy Corp.,* 78 F.3d 316, 318 (7th Cir. 1996) ("The court room is not the place for scientific guesswork, even of the most inspired sort.  Law lags science; it does not lead it."); *see also McClain v. Metabolife Int'l Inc.*, 401 F.3d 1233, 1247 (11th Cir. 2005) (expert opinions that are speculative in nature are not admissible).  If there is no

independent basis to conclude that an input parameter is accurate, a computer model may be rejected under *Daubert*, regardless of whether the model "works" in the sense of delivering some kind of output.   *See, e.g., Smith v. BMW N. Am., Inc.*, 308 F.3d 913, 920-22 (8th Cir. 2002) (rejecting portion of expert report based on EDCrash computer program where expert made unsupported assumptions about frontal displacement of automobile involved in a collision).

In addition, Emilsen's "reverse engineering" amounts to an assumption that his model *can* accurately model what happened at the Macondo well during the blowout, despite the limited range of known data and the limitations of the transient multiphase flow simulator itself.   An expert is properly excluded when he lacks the necessary objectivity required to make the analysis credible, or starts with a preconceived assumption about an outcome.   *Munoz*, 200 F.3d at 301 (citing *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 423 n.2 (5th Cir. 1987)).   Emilsen simply assumes that his model is capable of providing probative information about the Macondo blowout and he ensured that his model "worked" by using whatever "fudge factors" or reverse-engineered input parameters were required to satisfy his assumption.   Such results-oriented procedures are not science and cannot meet the *Daubert* standards.

## CONCLUSION

**WHEREFORE,** Defendant Halliburton Energy Services, Inc. prays that upon final hearing, this Court grant its Motion to Exclude the Expert Testimony and to Strike the Reports of William Wecker, Kathleen Sutcliffe, Chuck Schoennagel, J.J. Azar and Morten Emilsen, and that the Court award Halliburton Energy Services, Inc. such other and further relief, both general and special, whether at law or in equity, to which it may show itself justly entitled.

Respectfully submitted,

**GODWIN RONQUILLO PC**

/s/  *Donald E. Godwin*
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
dgodwin@GodwinRonquillo.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
bbowman@GodwinRonquillo.com
Jenny L. Martinez
State Bar No. 24013109
jmartinez@GodwinRonquillo.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
fhartley@GodwinRonquillo.com
Gavin E. Hill
State Bar No.  00796756
ghill@GodwinRonquillo.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332
and
R. Alan York
ayork@GodwinRonquillo.com
Jerry C. von Sternberg
jvonsternberg@GodwinRonquillo.com
Misty Hataway-Coné
mcone@GodwinRonquillo.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594
**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Halliburton Energy Services, Inc.'s Memorandum in Support of its Motion to Exclude Expert Testimony and to Strike Expert Reports was filed electronically with the Clerk of the Eastern District of Louisiana using the CM/ECF system, and that notice of this filing will be sent to all counsel through the CM/ECF Notification System.

/s/   *Donald E. Godwin*
Donald E. Godwin

HESI'S MEMORANDUM IN SUPPORT OF ITS MOTION  TO EXCLUDE TESTIMONY OF                Page 40
EXPERT WITNESSES  AND TO STRIKE EXPERT REPORTS

1827115 v8-24010/0002 PLEADINGS