UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG    "DEEPWATER HORIZON" in    the GULF OF MEXICO, on    APRIL 20, 2010 | :<br>:<br>:<br>:<br>:<br>:<br>: | MDL NO. 2179<br><br>SECTION:  J<br>JUDGE BARBIER<br>MAG. JUDGE SHUSHAN<br><br>JURY TRIAL DEMANDED |

. . . .  . . . .  . . . .  . . . .  . . . .  . . . .  . . . .  . . . .  . . . .  . . . .  . . . .  . . . .  . . . .  . . .

MEMORANDUM IN SUPPORT OF CAMERON'S MOTION TO EXCLUDE
BOP SHEAR RAM DESIGN OPINIONS
OFFERED BY THE UNITED STATES' EXPERTS, TALAS ENGINEERING, INC.

The United States retained a team of experts from Talas Engineering, Inc. (Rory R. Davis, Patrick R. Novak, J. Neil Robinson, and Raymond Merala (collectively, the "Talas Team")) to offer certain opinions concerning the Deepwater Horizon blowout preventer ("BOP").  In their Expert Report (Ex. 1) and Expert Rebuttal Report (Ex. 2) submitted to the Court on January 17, 2012, the Talas Team offered opinions on, among other things, alternative blind shear ram designs, the purported inability of the Cameron "SBR" model blind shear rams to control the Macondo well "in foreseeable conditions," and the probability that the SBR rams would have sealed the well under different assumed conditions shortly after the explosions on the rig.  Consistent with the Supreme Court's opinion in *Daubert* and its progeny, such opinions should be excluded for two, independent reasons.  First, the Talas Team members are not qualified to offer expert opinions on BOP ram designs, the foreseeability of conditions inside the BOP during a blowout, or the sealing capability of ram BOPs.  Second, the Talas Team did not employ a reliable methodology in forming these proposed opinions.  Their opinions are, therefore, unreliable and should not be considered by this Court.

**I.     Applicable Law**

The admission of expert testimony is governed by Federal Rule of Evidence 702 ("Rule 702") and the principles outlined in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49 (1999) (extending application of *Daubert* factors to engineers and other non-scientific experts). In admitting expert testimony, Rule 702 requires a trial court to make two preliminary determinations. First, the proffered expert witness must be qualified as an expert by knowledge, skill, experience, training, or education. *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998). Second, the proffered expert's opinion, inference, or other testimony must be based on scientific, technical, or other specialized knowledge that will assist the trier of fact in understanding evidence or determining a fact in issue. *Id.* In *Daubert,* the Supreme Court explained that Rule 702 establishes two fundamental criteria: reliability and relevance.

Thus, a party seeking to admit expert testimony has the burden of demonstrating that the expert's findings and conclusions are based on sound principles and "intellectual rigor," so that a court may take comfort in relying on them. *Moore,* 151 F.3d at 276. "This requires some objective, independent validation of the expert's methodology." *Id*. Mere observations and conclusory statements of an expert do not constitute sound methodology. Thus, "where [the expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire*, 526 U.S. at 149.

A party offering expert testimony must also establish that the proffered testimony is relevant. To establish that an opinion is relevant, its proponent must not only show that it is "based on scientifically valid principles," but must also establish an adequate "fit" between the

2

opinions offered and the facts of the case. *Moore,* 151 F.3d at 276 (citing *Joiner v. General Elec. Co.*, 522 U.S. 136 (1997)). In this regard, proffered testimony may so clearly fail to show what it purports to show that it becomes irrelevant. *Pestel v. Vermeet Mfg. Co.*, 64 F.3d 382, 384 (8th Cir. 1995) (excluding as irrelevant opinion that attempted but wholly failed to establish existence of feasible alternative design).

## II.     The Talas Team Is Not Qualified To Testify About BOP Ram Design

A trial court should not qualify a witness to give expert testimony regarding the design of a device if the witness has no "knowledge, skill, experience, training or education" regarding that device. Fed. R. Evid. 702; *see also Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998). Indeed, even if the purported expert has broad scientific or technical expertise, he "cannot testify as an expert in regard to a mechanism if he has not had ample opportunity to practically apply his field of expertise to the mechanism at issue." *Poland v. Beaird-Poulan*, 483 F. Supp. 1256, 1259 (W.D. La. 1980). Here, the Talas Team is not qualified to offer expert opinions on alternative blind shear ram designs, the purported inability of the blind shear rams to control the well "in foreseeable conditions," and the probability that the blind shear rams would have sealed the well under different conditions.[1]

### A.     Dr. Rory R. Davis

Dr. Davis is the "lead author" of the Talas Team reports. (Davis Depo. (Ex. 3) at 14.) Prior to his engagement by the Department of Justice in this matter, Dr. Davis had never seen a

---

[1] Members of the Talas Team are undoubtedly qualified to offer opinions in certain areas. However, none of these gentlemen has ever applied his field of expertise to BOP ram design or performance or deepwater drilling. *See Poland*, 483 F. Supp. at 1259.

BOP.[2]  (*Id*. at 14, 28.)  He had never performed an assessment as to whether a BOP was adequate for a drilling operation.  (*Id*. at 29.)  He had never conducted any analysis as to whether a BOP had adequate shearing capacity for a drilling operation.  (*Id*.)  He had never worked for a BOP manufacturer, and he had never designed, maintained, or tested a BOP.  (*Id*. at 19, 25.)  In fact, as of the date of his deposition, Dr. Davis had never touched the "important parts" of any BOP, including the Deepwater Horizon BOP.  (*Id*. at 222.)  Further, he had no expertise or experience in deepwater drilling operations.  (*Id*. at 19, 20-21.)

      B.      <u>Patrick Novak</u>

Mr. Novak's experience is in the area of hydraulic equipment and valves.  (Expert Report, at 18, 49.)  He has never designed or operated a BOP.  (Novak Depo. (Ex. 4) at 84.)  By his own admission, he does not consider himself to be an expert in BOP ram design.  (*Id*. at 86.)  Further, he had no expertise or experience in deepwater drilling operations.  (*Id*. at 36, 86.)

      C.      <u>Dr. J. Neil Robinson</u>

Dr. Robinson's experience is in the area of metallurgy and materials engineering.  (Expert Report, at 18, 53.)  Prior to his engagement in this matter, he had no experience with BOPs.  (Robinson Depo. (Ex. 5) at 35-36.)  He had never seen a subsea BOP.  (*Id*. at 112-13.)  He had never worked for a BOP manufacturer, and he had never designed, maintained, operated, or tested a BOP.  (*Id*. at 31, 36-37, 113.)  Like Dr. Davis, as of the date of his deposition, Dr. Robinson had never touched a BOP.  (*Id*. at 114.)  Further, he had no expertise or experience in deepwater drilling operations.  (*Id*. at 34-36, 118, 129.)

---

[2] After he was contacted by the DOJ in the latter half of 2010, Dr. Davis went on the Internet where he "first saw blowout preventers, and specifically pictures of the blowout preventer in question." (Davis Depo. at 28, 221.)

4

D.     Raymond Merala

Mr. Merala's experience is in the area of accident reconstruction, particularly motor vehicle, recreational equipment, and industrial equipment accident reconstruction. (Expert Report, at 18, 59.) His contribution to the Talas Team reports dealt with battery testing, not BOP ram issues. (Expert Report at 18; Expert Rebuttal Report at 22.) Prior to the Macondo incident, he had never seen a subsea BOP. (Merala Depo. (Ex. 6) at 44.) He had never designed or operated a BOP. (*Id*. at 44.) Further, he had no expertise or experience in deepwater drilling operations. (*Id*. at 26-27.)

Based on these facts, it is plain that the Talas Team lacks the requisite "knowledge, skill, experience, training or education" required by Rule 702 to offer opinion testimony on alternative BOP ram designs, "foreseeable" conditions during deepwater drilling, or the probability that the blind shear rams would have sealed the well. Thus, any such opinions should be excluded from consideration by this Court. *See, e.g.*, *Sittig v. Louisville Ladder Grp. LLC*, 136 F. Supp. 2d 610 (W.D. La. 2001) (refusing to qualify expert because he had no experience designing the product at issue); *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (same).

**III.    The Talas Team Did Not Employ A Reliable Methodology In Forming Their Alternative Design Opinions**

Even if the Court were to consider the Talas Team as experts in BOP ram design, the opinions they offer on alternative BOP ram designs are inadmissible because they are based on an unreliable methodology. When offering an alternative design opinion, the expert must have some evidentiary basis for concluding that an alternative design actually exists and would work in the application. *Milanowicz v. The Raymond Corp*., 148 F.Supp.2d 525, 535 (D.N.J. 2001) (citing *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 992 (5th Cir. 1997)). It is not sufficient for an expert merely to describe some alternative. A reasonable alternative design "necessarily requires

5

a showing that the alternative design would in fact reduce the risks of the product." *LaBelle ex rel. LaBelle v. Philip Morris, Inc.*, 243 F. Supp. 2d 508, 518 (D.S.C. 2001). The Talas Team can point to no such evidence with respect to alternative BOP ram designs.

In their Expert Report, the Talas Team opined that "[r]ams with better centering characteristics and wider blades," namely Cameron "cDVS" model blind shear rams, may have performed better than the Cameron SBR rams that were in the Deepwater Horizon BOP. (Expert Report at 15.) According to the Talas Team, "[i]f the rams were either capable of centering the pipe or had blades the full width of the well bore, the pipe would probably have been successfully cut, providing a potential opportunity to bring the well under control." (*Id.*)[3] In their Expert Rebuttal Report, the Talas Team opined that the SBR blind shear rams "had poor ability to center pipe, especially in comparison to other designs," namely Cameron "DVS" model rams. (Expert Rebuttal Report at 17.) These opinions were based on no methodology or scientific principles.

When Dr. Davis was asked if he could identify any ram design that would have led to a different result in the Macondo incident, he responded that the DVS design "is one possibility." (Davis Depo. at 320.) To support this opinion, Dr. Davis stated that he performed a paper calculation of the "friction of the closure of the blades against the pipe." However, Dr. Davis admitted *in his Expert Rebuttal Report* that his "knowledge of the friction is not good." (Expert Rebuttal Report at 17.) Moreover, when asked if he made "any analysis whatsoever of whether the centering ability of a DVS would, in fact, have been able to center the off-center drill pipe,"

---

[3] In their Expert Report, the Talas Team relies on finite element analysis performed by DNV to suggest that the SBR rams were unable to shear the drill pipe. (Expert Report at 11-13.) As set forth in Cameron's Memorandum in Support of its Response to Other Parties' Motions Related to MBI/JIT Proceedings (Docket #4643), any opinions or conclusions drawn by DNV in connection with its examination of the BOP are inadmissible under 46 U.S.C. § 6308. Parties should not be able to circumvent that statute through the use of experts.

Dr. Davis conceded, "I have not specifically looked at that particular condition and related it to that analysis." (Davis Depo. at 320.)

Similarly, when Dr. Robinson was asked to identify *any* blind shear ram design that would have made a difference in the Macondo incident, he testified that he "think[s] it is very probable that the cDVS ram would have" based on the fact that cDVS rams have "much better centering abilities." (Robinson Depo. at 156-57.) However, Dr. Robinson conceded that he did no analysis of the force that would have been applied and would have been holding the drill pipe off center, noting that he "doubt[s] that that is possible because there is simply too many unknowns." (*Id*. at 158.)

Simply stated, the Talas Team did no analysis to show that any model blind shear ram would have performed differently than the Cameron SBR. Absent such analysis, their opinions regarding alternative ram designs are pure speculation. The Fifth Circuit has long held that the "proper methodology for proposing alternative designs includes more than just conceptualizing possibilities." *Watkins,* 121 F.3d at 992. Having offered nothing more than that, the Talas Team's opinions fail to meet the *Daubert* standard.

**IV.     The Talas Team's Opinion Concerning The Performance Of The Blind Shear Rams In "Foreseeable Conditions" Is Irrelevant And Unsupported**

In their Expert Report, the Talas Team opined that "the blind shear ram selected for this BOP is inadequate to ensure well control in foreseeable conditions and circumstances for subsea application." (Expert Report at 11.) As support, the Talas Team noted that "[o]ffset pipe in a BOP is certainly a foreseeable and common condition" in subsea applications. (*Id*. at 13.) Setting aside the Talas Team's complete lack of expertise or experience in subsea drilling, the fact that drill pipe can be off-center during drilling operations when the BOP is open says nothing about whether it was foreseeable to anyone that drill pipe could be off center under the

conditions during the Macondo incident. According to the Talas Team, at the time the blind shear rams were activated, the well was blowing out, the rig was on fire, the variable bore rams ("VBRs") were at least partially closed holding the drill pipe in the middle of the BOP bore below the blind shear rams, and the rig was drifting significantly off location forcing the drill pipe to bend to the side of the BOP bore. (Davis Depo. at 260-62, 267-68.) When asked if *those* conditions were foreseeable, Dr. Davis responded:

> Q. Is it your position that the conditions that we just discussed, that is, a well blowing out, a dynamically positioned vessel on fire, VBRs which were once closed and sealed but now forced open, and drill pipe to the side of the BOP as a result of rig drift action, are foreseeable conditions?
> A. Well, they are certainly foreseeable, yes.
> Q. Based on what?
> A. Based on the fact that it actually happened.
> Q. So because it happened, it's foreseeable?
> A. That -- that -- that is one thing that makes something foreseeable, *but it's in retrospect*.

(*Id*. at 268-69 (emphasis added).) Foreseeability in retrospect is an oxymoron, and it certainly cannot form a basis for a reliable expert opinion.

V.    **The Talas Team Did Not Employ A Reliable Methodology In Forming Their Opinions Concerning The Probability That The Blind Shear Rams Would Have Sealed The Well Under Assumed Conditions**

It is a well known fact – acknowledged by the Talas Team – that when shearing drill pipe, there is always a risk that the drill pipe will fragment and prevent a good seal. (Davis Depo. at 281.) It is also well known that in severe well control conditions, failure of ram packers (the rubber sealing elements on a BOP ram) can occur. (*Id*. at 386-88). Despite these known limitations, however, the Talas Team opined that "it is almost certain [the blind shear rams] would have cut the pipe and sealed the well" if they had been activated by the Automatic Mode

8

Function shortly after the explosions on the rig at a time when, they opine, the drill pipe was centered in the BOP bore. (Expert Rebuttal Report at 14.) As support for this opinion, the Talas Team points to "the fact that the capping stack using Hydril BOP's rams was able to stop the well flow on July 15, 2010." (*Id*. at 16.) This opinion and the Talas Team's rationale are unsupported.

The Talas Team has no basis to state, with any degree of probability (much less with "almost certainty") that the blind shear rams would have sealed the well when activated during the blowout. Simply stated, their analysis was nonexistent:

- The Talas Team did no analysis of the flow conditions that would have existed inside the BOP.

- The Talas Team did no analysis of erosion that could have occurred to the ram packers at any time after the blowout.

- The Talas Team did no analysis of the pressures in the drill pipe and the effect that those pressures could have had on the drill pipe or the packers when the blind shear rams were closed.

- The Talas Team did no analysis of damage to side packers that could occur during the shearing process.

(Davis Depo. at 284, 311-13; Novak Depo. at 93-94; Robinson Depo. at 150-51, 154.)

Further, the Talas Team's reliance on the closure of the capping stack as support for their opinion is unfounded. First, the Talas Team ignored the fact that the capping stack was closed on an open bore and did not shear drill pipe.[4] Moreover, like their analysis of the conditions in the BOP at the time the blind shear rams were closed, their analysis of the capping stack closure was nonexistent:

---

[4] Because there was no attempt to shear drill pipe with the capping stack, the Hydril rams were "not acting as shear rams, but were acting as blind rams." (Davis Depo. at 319.) Thus, there was no risk (as discussed above) of a drill pipe fracture preventing a seal.

9

- The Talas Team did no analysis of the sequence or process used to close the capping stack.

- The Talas Team did no analysis to determine if steps were taken to minimize the flow across the blind shear rams as the capping stack was closed.

- The Talas Team did no analysis of the flow velocity through the capping stack at any time during the closing sequence.

- The Talas Team did not study or analyze the effect that flow in the capping stack would have had on the sealing elements in the Hydril rams.

(Davis Depo. at 316-18; Novak Depo. at 91-92; Robinson Depo. at 155.) Most telling, the Talas Team did no analysis to determine whether the circumstances under which the capping stack was closed were similar to or different from the circumstances that existed when the blind shear rams were closed on the Deepwater Horizon BOP. (Davis Depo. at 317.)

Plainly, there is no support for the Talas Team's opinion that it is "almost certain" that the blind shear rams would have cut the drill pipe and sealed the well shortly after the explosions with the well in a full blowout. Without any analysis, that opinion is mere speculation.

## IV.  Conclusion

The Talas Team is not qualified to offer expert opinions on alternative blind shear ram designs, "foreseeable conditions" during well control events, or the probability that the blind shear rams could seal the well. Further, their opinions on these issues are unreliable. For the reasons set forth above, the Court should exclude such opinions in advance of trial.

Respectfully submitted,

| | |
|---|---|
| */s/ David J. Beck* _____ | |
| David J. Beck, T.A. | Phillip A. Wittmann, 13625 |
|   *dbeck@brsfirm.com* |   *pwittmann@stonepigman.com* |
| Joe W. Redden, Jr. | Carmelite S. Bertaut, 3054 |
|   *jredden@brsfirm.com* |    *cbertaut@stonepigman.com* |
| David W. Jones | Keith B. Hall, 24444 |
|   *djones@brsfirm.com* |    *khall@stonepigman.com* |
| Geoffrey Gannaway | Jared Davidson, 32419 |
|   *ggannaway@brsfirm.com* |    *jdavidson@stonepigman.com* |
| BECK, REDDEN & SECREST, L.L.P. | STONE PIGMAN WALTHER |
| One Houston Center | WITTMANN L.L.C. |
| 1221 McKinney St., Suite 4500 | 456 Carondelet Street |
| Houston, TX 77010 | New Orleans, Louisiana  70130 |
| Phone: (713) 951-3700 | Phone: (504) 581-3200 |
| Fax: (713) 951-3720 | Fax: (504) 581-3361 |

*Attorneys for Cameron International Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 24th day of January, 2012.

　　　　　　　　　　　　　　　　　　　　*/s/ David J. Beck* _____
　　　　　　　　　　　　　　　　　　　　　David J. Beck