UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater | : | MDL No. 2179 |
| Horizon" in the Gulf of Mexico, on | : | |
| April 20, 2010 | : | SECTION: J |
| | : | |
| This Document Relates To: All Actions | : | JUDGE BARBIER |
| | : | MAGISTRATE JUDGE |
| …………………………………………….. | : | SHUSHAN |

**BP'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF DR. ROBERT BEA AND DR. WILLIAM GALE**

The PSC has proffered Dr. Robert Bea and Dr. William Gale to opine on alleged process-safety and risk-management failings by BP. In their joint report, Drs. Bea and Gale opine that: (1) BP Management's "systematic Process Safety and Risk Management failings" were the root cause of the Macondo blowout; (2) BP "refused" to learn lessons from past incidents at Texas City, Grangemouth, and Prudhoe Bay, Alaska; and (3) certain decisions made during the drilling of the Macondo well increased the overall risk profile of the well.

Drs. Bea and Gale have not done the necessary analysis, and in some cases do not have the requisite expertise, to provide these opinions. *First*, Drs. Bea and Gale's opinion that BP Management's process-safety failures caused the Macondo blowout is unreliable because they considered only a biased sample of the evidence, and failed to consider and rule out other potential causes of the incident. *Second*, Drs. Bea and Gale's opinion that BP refused to learn from previous incidents is unreliable because, by their own admission, it does not take into account, and is inconsistent with, the many steps BP took to improve its process-safety management system after the prior incidents. *Third*, Drs. Bea and Gale are not qualified to render opinions regarding whether certain drilling decisions increased the risk profile at the Macondo well. These opinions lack reliability and should not be admitted into evidence at trial.

## ARGUMENT

**I.     Drs. Bea and Gale's Causation Opinion Is Unreliable.**

**A.     Drs. Bea and Gale relied on an incomplete, limited and biased sample of the available evidence.**

An expert's failure to consider all of the facts, or selective consideration of the facts, in and of itself renders the expert's testimony unreliable. *Bell v. City of El Paso*, No. EP-08-CA-331-FM, 2009 WL 6371618, at *4 (W.D. Tex. Dec. 18, 2009). *See Lee Green v. La. Dep't. of Pub. Safety & Corr.*, No. 2:06 CV 1018, 2010 WL 1628769, at *5-6 (W.D. La. Apr. 20, 2010) (expert's opinion regarding cause of patient's lung problems unreliable where expert failed to consider other potential causes); *Albert v. Jordan*, No. 05-516, 2007 WL 4124519 (W.D. La. Nov. 19, 2007) (expert's opinion regarding plaintiff's earning capacity unreliable where expert failed to consider prior wages, tax returns, or social security earnings).

Despite the far-reaching scope of their opinions, Drs. Bea and Gale relied on an incomplete and skewed selection of documents and testimony. They considered only 464 documents and fifty-one depositions (compared to the over 200 fact depositions taken in this case). Of the 464 documents they considered, 437 (ninety-four percent), were produced by BP. Report at Appx. E; Bea Dep. at 24-25. They considered only 16 documents produced by Transocean, six from Halliburton, and not a single document from Cameron. *Id.* Similarly, of the fifty-one deposition transcripts reviewed, forty-seven were depositions of BP employees, three were depositions of Transocean employees (all rig personnel), one was a deposition of a Halliburton employee, and none was a Cameron employee. Report at Appx. E; Bea Dep. at 26-7.

Drs. Bea and Gale purport to opine on BP's culture and conduct over a ten-year period, as well as offering opinions relating to various decisions made during the drilling of the Macondo

2

well. The fact that they are offering such sweeping opinions based on a biased and incomplete set of evidence is particularly problematic in that the evidence they did (and did not) review was chosen by the PSC attorneys. Bea Dep. at 22 ("Q. Did you have access to all of the depositions that were taken in this case or just the ones that were provided to you by the – by the lawyers? A. Just the ones provided by the lawyers."); *see also id.* at 218 (explaining that the plaintiffs' "legal team" provided him with the relevant documents through an "interactive" process). Drs. Bea and Gale admit there is an inherent bias to this approach, further calling into question the reliability of their opinions. *See id.* at 219; Gale Dep. at 195; *see In re Prempro Prods. Liab. Litig.*, 765 F. Supp. 2d 1113, 1119 (W.D. Ark. 2011) (finding expert's opinion unreliable where the expert's deposition testimony revealed that "the process was driven largely by the lawyers").

Given the limited number of Transocean, Halliburton and Cameron documents and testimony reviewed by Drs. Bea and Gale, any claim that they conducted a "root cause" or "systematic" analysis is simply not credible.

**B.     Drs. Bea and Gale's failure to consider other potential causes renders their causation opinion unreliable.**

Drs. Bea and Gale's failure to consider all the relevant facts made it impossible for them to consider or rule out other potential causes of the Macondo blowout. Where, as here, an expert purports to offer a causation opinion, failure to eliminate other potential causes renders that opinion unreliable. *See Michaels v. Avitech, Inc.*, 202 F.3d 746, 753 (5th Cir. 2000) ("A necessary ingredient of such theorizing [rendering opinions about causation] . . . is the exclusion of alternative causes."); *cf. Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 248 (5th Cir. 2002) (finding expert's opinion reliable where he meticulously ruled out other potential sources of contamination); *Johnson v. Samsung Elects. Am., Inc.*, Nos. 10-1146, 10-1549, 2011 WL 4344588, at *4 (E.D. La. Sept. 14, 2011) (finding expert's opinion reliable where he described

3

with particularity why and how he eliminated smoking materials and candles as potential ignition sources).

While Drs. Bea and Gale claim to have assessed Transocean's process-safety systems, they openly admitted that the proper methodology to assess a company's process-safety culture is to get a complete cross section of the company from "top to bottom." Bea Dep. at 185-86. Dr. Bea further admitted that it would be difficult to analyze whether a party caused or contributed to the blowout without reviewing any of the testimony of that party's witnesses or a number of that party's documents. *Id.* at 58.

Despite acknowledging that a thorough and comprehensive review of a company is necessary to assess its process-safety culture, Drs. Bea and Gale did not utilize that methodology to see whether process safety failures within Transocean, Halliburton or Cameron contributed to the cause of the Macondo blowout:

> Q. Right. You did not conduct the same level of top to bottom review of depositions of key executives of Transocean, Halliburton and Cameron that you did for BP, correct?
>
> A. That's correct.

*Id.* at 186. Thus, with respect to Transocean, Halliburton, and Cameron, Dr. Bea admitted that he and Dr. Gale did not follow the same methodology they applied to BP. *Id.* Not surprisingly, therefore, Dr. Bea confessed at his deposition that he was concerned he lacked a complete picture of Halliburton's and Transocean's process safety systems. *Id.* at 191.

Drs. Bea and Gale's superficial, or even non-existent, review of Transocean, Halliburton, and Cameron documents and testimony makes it impossible to conclude that they considered all the relevant facts. To the contrary, it demonstrates they essentially ignored the other parties involved and focused solely on BP. This flawed approach resulted in an odd disconnect during Drs. Bea and Gale's depositions. While Drs. Bea and Gale readily admitted there was evidence

4

of numerous mistakes made by Transocean and Halliburton with respect to the Macondo well, they could not say whether Transocean or Halliburton had process-safety failings that caused the blowout.[1]

One example demonstrates the seriousness of Drs. Bea and Gale's failings under *Daubert*. A central question in this case is why the Transocean driller missed several clear indicators that the well was flowing on April 20, 2010. The evidentiary record includes a study done by Lloyd's Register that specifically looked at Transocean's safety culture on the *Deepwater Horizon*. Dep. Ex. 4261. After visiting the rig, conducting interviews of the crew and focus groups and observing the crew work, Lloyd's issued a report – one month before the blow out – in which it found that a "weakness" was Transocean's switch from a 14/14 day hitch to a 21/21 day hitch. *Id.* at TRN-INV-00016761. In the words of one Transocean crew member: "On the last week you are so tired that you feel like a robot." The night of the blow out, the Transocean driller, Mr. Revette, was on his 20th day.

Dr. Bea, when confronted with this evidence during his deposition, conceded that this evidence raised serious "red flag[s]" which he and Dr. Gale had failed to investigate:

> Q. Right. So as a process safety – somebody interested in process safety, knowing that Mr. Revette was on the last day of his hitch, knowing that the Lloyd's Register found that this was a significant weakness, that they were - employees were saying so fatigued they felt like robots or in another world, doesn't that at least raise a red flag in your mind as to whether or not fatigue might have been a

---

[1] This biased focus on BP cannot be explained by arguing that the involvement of these other parties was somehow irrelevant to assessing the cause of the incident. Dr. Bea openly acknowledged that the actions of other parties, specifically Transocean and Halliburton, contributed to the incident. Bea Dep. at 45-52; 53-57. In fact, Dr. Bea cited seven different ways in which Transocean's conduct may have contributed to the incident including not repairing and replacing equipment, misinterpreting the negative pressure test, and improperly training the drilling crew. *Id.* Similarly, Dr. Gale testified that "Transocean was blind to major process safety system risks" which in his view "contributed to the cause of the DEEPWATER HORIZON blowout." Gale Dep. at 62-63; *see also id.* at 72.

> contributing factor as to the reasons why Mr. Revette missed three kick indicators?
>
> A.   Yes.
>
> * * *
>
> Q.   You did not do a specific investigation, looking at the issue of fatigue and -- and how that had perhaps related to the 21/20 [sic] off system in – in Transocean, did you?
>
> A.   That's correct.

Bea Dep. at 200-01; *see also* Gale Dep. at 290-91.

Dr. Bea further admitted that other aspects of Transocean's process safety system may have contributed to the Macondo blowout, but that he did not conduct the analysis necessary to offer an opinion on that subject. For example, Dr. Bea acknowledged that flaws in Transocean's process-safety system may have inhibited the ability of the drillers to detect the kick and shut in the well and may have prevented the drillers from properly operating the diverter systems, but that he could not opine on these matters because he did not analyze Transocean's documents or the deposition testimony of its key executives. *See* Bea Dep. at 188, 190. Similarly, Dr. Gale admitted that whether a company like Transocean had a history of well-control events is "certainly one of the pieces of data that would be important" to the assessment of a process safety culture, but he did not investigate. Gale Dep. at 201-02. The failure to consider these critical facts and potential alternative causes makes Drs. Bea and Gale's opinion unreliable.

At bottom, what Drs. Bea and Gale have done is the opposite of good science: they focused on BP from day one, considered only a limited number of documents and testimony spoon-fed to them by the PSC attorneys, ignored the process safety culture of the other parties, and then issued a report cataloguing alleged errors by BP without analyzing the conduct of any

6

other party, and concluded, unsurprisingly, that BP's conduct was the root cause of the incident. Tellingly, Dr. Gale admitted that he and Dr. Bea focused only on BP:

> Q. So your focus from day one has always been on BP?
>
> A. Correct, understanding the causal relationship between what happened and the management structure of BP.

Gale Dep. at 197.  By their own admission, this "analysis" is incomplete, flawed, and unreliable.

## II. Drs. Bea and Gale's Opinion that BP Refused to Learn from Previous Incidents Should Be Excluded As Unreliable.

In their report, Drs. Bea and Gale opine that BP Management "refused" to learn lessons from prior incidents at Grangemouth, Texas City, and Prudhoe Bay, Alaska. *See, e.g.*, Report at xii. Like their causation opinion, this opinion is based on a selective consideration of evidence and is therefore unreliable. In fact, Drs. Bea and Gale conceded at their depositions that, far from "refusing" to learn lessons, BP made numerous positive efforts to improve its process safety system following those incidents. *See, e.g.*, Bea Dep. at 101-04, 107-11, 167-68; Gale Dep. at 95-103. Yet none of these positive efforts are recognized or acknowledged in their expert report, undermining its reliability.

This lack of consideration of the positive safety initiatives put into place by BP after prior incidents is particularly problematic given that Drs. Bea and Gale admitted that many of these initiatives "demonstrated a positive commitment towards improving process safety in the years before the Macondo incident." Bea Dep. at 167-68; *see also* Gale Dep. at 95-103. For example, Dr. Bea testified:

> Q. Did BP take positive steps between 2005 and 2010 to improve its process safety management system?
>
> A. Yes.
>
> Q. Okay. What steps were those?

7

> A. Well, specifically the six-point plan that was advanced. That was one of the most notable and important process safety initiatives in BP.

Bea Dep. at 100. Dr. Gale concurred; and both admitted that following these incidents, BP took numerous steps to improve its process safety practices.

The following table summarizes Dr. Bea's and Dr. Gale's testimony regarding several positive process safety initiatives that BP implemented in the years before the Macondo incident, each of which Drs. Bea and Gale acknowledged were positive steps taken by BP to enhance process safety.

| Safety Initiative Taken After Prior Incident | Dr. Bea's Testimony | Dr. Gale's Testimony |
|---|---|---|
| Creating the **Safety, Ethics and Environment Assurance Committee** (a Board of Directors subcommittee to monitor process safety management) in 2006 | Agreed that the SEEAC was a "positive development by BP" and "evidence that BP was trying to improve its process safety oversight." Bea Dep. at 109 | Agreed it was a "positive step for a company to take in terms of improving its process safety management system." Gale Dep. at 95 |
| Formation of **Safety and Operations** function in 2005 to standardize BP's safety efforts | Agreed that the S&O function was "something BP created after Texas City," "a positive step towards attempting to improve its process safety system," and something he "would recommend any company do." Bea Dep. at 109-10 | Agreed it was a "positive step to be taken by BP improving its process safety management system." Gale Dep. at 96-97 |
| Creating the **Group Operating Risk Committee** (a committee of senior BP executives to manage non-financial risk and review key process safety indicators and data) in 2006 | Agreed that the GORC was "a positive step for BP to take in improving its process safety management system." Bea Dep. at 111 | "I think that's a good thing, yes." Gale Dep. at 98 |
| Creation of the **Orange Book** (a quarterly report of safety metrics across the company provided to the SEEAC and the GORC) | Agreed that the Orange Book was "further evidence that BP was attempting to improve its process safety management system in the years before | Agreed the Orange Book "was a good idea for BP to have done to enhance its process safety management system and allow senior executives to |

8

| | Macondo." Bea Dep. at 112 | have a better window into the safety performance of the company." Gale Dep. at 101 |
|---|---|---|
| Development of the **Operating Management System (OMS)** to integrate BP's safety standards and processes | Admitted that OMS was developed as one of the recommendations of the Baker Panel following Texas City and was "a step in that direction" to "improve [BP's] process safety management system" Bea Dep. at 101-02 | Agreed that OMS "was a good thing for BP to do to enhance its process safety system after the Texas City incident." Gale Dep. at 103 |

In addition, Dr. Bea acknowledged the following as evidence demonstrating that BP was taking positive steps to improve its process-safety management in the years following the Texas City incident:

- Statements by BP leadership showing a commitment to safety, Bea Dep. at 102-03;

- Hiring people from outside of BP with process safety expertise, *id.* at 103;

- BP sharing lessons learned from its prior incidents with others in the industry, *id.* at 107-08;

- A comprehensive review of all safety and operational integrity systems, *id.* at 108-09;

- A commitment after Texas City of significant resources and personnel to improving BP's process safety regime, *id*. at 123.

For several of these safety initiatives, Dr. Bea's and Dr. Gale's testimony was even more glowing. In describing the development and implementation of OMS, Dr. Bea characterized it as an "[o]utstanding step." *Id.* at 101. Similarly, when asked whether BP's creation of training programs in conjunction with MIT was a positive step following Texas City, Dr. Bea answered "Definitely. Yes." *Id.* at 126.[2]

---

[2] When asked at his deposition why he did not include these facts in the report, Dr. Bea testified candidly that the report "was not intended to include all of the positive steps BP had taken" to improve process safety. Bea Dep. at 168-69.

9

These admissions are impossible to square with Drs. Bea and Gale's opinion that BP "refused" to learn lessons from previous events. Their deposition admissions render their written opinion unreliable as a matter of law.

### III. Drs. Bea and Gale Are Unqualified to Opine that Certain Drilling Activities Increased the Risk Profile of the Macondo Well.

Drs. Bea and Gale opine that several decisions made during the drilling of the Macondo well increased the risk of an accident. Report at 58, 64. They point to eleven decisions they claim BP made and which they conclude made the drilling operations more "risky." Drs. Bea and Gale, however, provide no explanation or support for their conclusion that these decisions increased the risk of the Macondo well. *Id.*

Under *Daubert*, expert testimony must not only be reliable, it must also be relevant. *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010). To be relevant, the expert submitting the opinion must be qualified to render it. *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004). "District courts must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (citing Fed. R. Evid. 702). Thus, "[a] district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Id.*

Drs. Bea and Gale lack the necessary qualifications to render opinions regarding whether specific drilling decisions increased the risks at Macondo. Indeed, both Drs. Bea and Gale admitted as much. Bea Dep. at 38-40; Gale Dep. at 54-56. At the outset, both admit they have no expertise in how to drill a deepwater well. Bea Dep. at 40; Gale Dep. at 56. In addition, they do not have the more specific expertise necessary to render an opinion regarding specific decisions made during the Macondo operations. A comparison of the decisions Drs. Bea and

Gale claim increased the risks with their admitted lack of qualification in these areas makes the irrelevancy of their opinions clear:

**Criticism 1**:  Not using the correct number of centralizers.  Report at 64.

**Bea and Gale Qualifications**:  Both admit they are not experts in centralizers.  Bea Dep. at 38; Gale Dep. at 54-55.

**Criticism 2**:  Not waiting for foam stability tests.  Report at 64.

**Bea and Gale Qualifications**:  Both admit they do not have expertise in cement.  Bea Dep. at 38; Gale Dep. at 54.

**Criticism 3**:  Not running a cement bond log.  Report at 64.

**Bea and Gale Qualifications**:  Both admit they are not experts in cement.  Bea Dep. at 38, 40; Gale Dep. at 54.

**Criticism 4**:  Using lost circulation materials as spacer.  Report at 64.

**Bea and Gale Qualifications**:  Both admit they are not experts in lost circulation materials or in drilling fluids.  Bea Dep. at 38-39; Gale Dep. at 55.

**Criticism 5**:  Displacing the riser before setting the cement plug.  Report at 64.

**Bea and Gale Qualifications**:  Dr. Bea admits that he is not an expert in displacement procedures, and both admit they are not experts in cement.  Bea Dep. at 38-40; Gale Dep. at 54-56.

**Criticism 6**:  Not installing additional physical barriers during temporary abandonment. Report at 64.

**Bea and Gale Qualifications**:  Dr. Bea admits that he is not an expert in temporary abandonment procedures.  Bea Dep. at 39.  As noted above, Dr. Gale is not an expert in drilling a well. Gale Dep. at 56.

**Criticism 7**:  Not circulating bottoms up prior to the cement job.  Report at 64.

**Bea and Gale Qualifications**:  Both admit they are not experts in cement, and specifically are not experts in when a bottoms up is appropriate.  Bea Dep. at 38, 300-01; Gale Dep. at 55, 56.

**Criticism 8**:  Performing simultaneous operations during displacement.  Report at 64.

**Bea and Gale Qualifications**:  Dr. Bea admits he is not an expert in displacement procedures. Bea Dep. at 39.  Dr. Gale is not an expert in drilling a well.  Gale Dep. at 56.

**Criticism 9**:  Displacing the well to over 3000 feet below the mudline.  Report at 64.

**Bea and Gale Qualifications**:  Dr. Bea admits he is not an expert in displacement procedures. Bea Dep. at 39.  Dr. Gale is not an expert in drilling a well.  Gale Dep. at 56.

**Criticism 10**:  Using long string casing instead of liner.  Report at 64.

**Bea and Gale Qualifications**:  Both admit they are not experts in well design.  Bea Dep. at 39- 40; Gale Dep. at 55-56.

**Criticism 11**:  Converting the lower ram on the BOP to a test ram.  Report at 64.

**Bea and Gale Qualifications**:  Both admit they are not experts in BOPs or their component parts.  Bea Dep. at 39; Gale Dep. at 55.

Thus, by their own admission, Drs. Bea and Gale lack the necessary expertise to render any opinion as to the decisions made regarding these drilling practices.

## **CONCLUSION**

BP respectfully requests that the Court enter an order excluding Drs. Bea and Gale from offering the following opinions at trial: (1) that BP Management's process safety failures caused the Macondo well incident; (2) that BP refused to learn lessons from previous significant incidents; and (3) that the eleven drilling decisions discussed on page 64 of their report increased the risk profile of the Macondo well.

Dated: January 24, 2012                                     Respectfully submitted,

/s / Don K. Haycraft

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Timothy A. Duffy, P.C.
(tim.duffy@kirkland.com)
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
(mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Exploration & Production Inc. & BP America Production Company*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 24th day of January, 2012.

/s/ Don K. Haycraft