UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:   Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179  SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER MAGISTRATE JUDGE |
| ……………………………………………….. | : | SHUSHAN |

**BP'S MEMORANDUM IN SUPPORT OF ITS MOTION
TO LIMIT THE TESTIMONY OF DAVID BOLADO**

## INTRODUCTION

This motion seeks to preclude David Bolado from offering opinions concerning: (1) BP approval of Halliburton's inputs in the OptiCem program; (2) alleged "roping" in the shoe track at the Macondo well; (3) the character of the M57B sand or resulting effects; and (4) modeling with increased gel strength. The first two opinions are not based upon the facts in the record but on speculation designed to bolster Halliburton's positions. The third opinion is based on assumptions that Bolado did not confirm, and lacks the credentials to confirm. The last opinion relies on the now-withdrawn opinions by Dr. Ian Frigaard that Bolado also did not confirm, and on modeling that was not produced pursuant to the Court's order.

## BACKGROUND

First, Bolado opined that BP controlled all of the inputs to the OptiCem program used to formulate the cement used at the Macondo well. Opening Report at 8. To the extent there were input errors in OptiCem, Bolado claimed that BP approved those errors in an April 14, 2010 meeting: "At that meeting, Mr. Gagliano connected his laptop to a projector screen and ran OptiCem so that the BP personnel present could see the inputs and participate in the modeling process. Mr. Gagliano created a cement job model by typing in the well information as BP gave

it to him, and BP personnel watched the input process and reviewed the outputs." *Id.* at 8, 20, 33.  Bolado also opined that it was "clear that the inputs entered into the April 14 OptiCem model were scrutinized and approved by BP personnel." *Id.* at n.14.  At his deposition, Bolado testified that he "believed" that BP checked all of the inputs because it was his practice to verify inputs with the operator.  Bolado Dep. at 190-91.  However, he did not know if it was Gagliano's practice to do the same and he did not speak with Gagliano about this issue.  *Id.* at 191.  And Bolado did not know whether the OptiCem inputs were verified by BP for the Macondo well.  *Id.* at 191-92 ("Q. Okay.  So you don't know whether or not that's what they did?  A. I cannot say for sure that's what they did.").

Bolado was similarly unable to point to any support when directed to specific examples.  In his report, Bolado opined that "BP had the opportunity to correct the pore pressure data that was used in OptiCem on many occasions."  Opening Report at 33.  But when questioned, he testified there was no support for that statement.  Bolado Dep. at 193 ("Q. Okay.  So did you see anything saying that they were concerned about and reviewed the pore pressures?  A. I don't know if I can say they did.").

Second, Bolado opined that "[c]hanneling in the annulus would provide a path for hydrocarbons to travel from the hydrocarbon zones, including the high-pressure undisclosed zone, all the way to the casing shoe."  Opening Report at 34.  He posited that rathole swapping would compromise the shoe track cement through a mechanism called "roping."  *Id.* at 35.  At his deposition, Bolado admitted that the picture of "roping" was from a laboratory experiment and that he had not compared the conditions under which "roping" occurred in the laboratory with the conditions at the Macondo well.  Bolado Dep. at 437-38.  Moreover, Bolado has never observed "roping" in any of the 600 cement jobs with which he has been involved, and no one at

Halliburton has ever told him that they observed roping. *Id.* at 446. Bolado also did not perform any calculations to determine whether roping would occur across the 189-foot shoe track. *Id.* at 447.

Third, Bolado opined that "BP failed to tell Halliburton about a high pressure hydrocarbon sand," referring to the M57B sand, and about the resulting effects of that sand. Opening Report at 21-23. In multiple places, Bolado referred to the M57B sand as "hydrocarbon" and "permeable" and concluded as a result that "BP's failure to disclose the upper hydrocarbon zone at 17,467 ft [was] one of the most important causes of the apparent failure of the cement job to isolate the hydrocarbon zones in the Macondo Well." *Id.* At his deposition, Bolado testified that he "did not do [his] own analysis of – of that sand of what it might be, hydrocarbon bearing or what." Bolado Dep. at 168-69. And he testified he "did not do [his] own analysis of whether the sand – what the permeability was, or whether it could flow." *Id.* at 171. In fact, Bolado admitted that he has never been asked to determine or opine on whether a sand is permeable or hydrocarbon-bearing. *Id.* at 171.

Fourth, Bolado opined that "increased gel strength of drilling mud . . . increases the likelihood of channeling in the annulus." Rebuttal Report at 27. Bolado relied on estimates by Cameron's expert, Dr. Frigaard, that the mud achieved a gel strength between 50 and 200 lbf/100ft$^2$. *Id.* at 27. At his deposition, Bolado admitted that these gel strengths were taken from Dr. Frigaard's report without confirmation. Bolado Dep. at 322 ("I did not confirm that with any calculations . . . . I am taking these gel strength numbers from his Report."). In fact, he could not validate the accuracy of Dr. Frigaard's gel strength calculations. *Id.* at 320-21 ("I cannot validate the accuracy of . . . his calculations."). And Bolado did not use internal Halliburton tools to confirm Dr. Frigaard's calculations, or perform any calculations to calculate gel strengths. *Id.* at

3

321 ("I did not do calculations to come up with the gel strength, like he did."). Bolado then used the unconfirmed gel strength values to run OptiCem modeling. Rebuttal Report at 28-29. Bolado's rebuttal report also purported to "confirm" the analysis included in other experts' reports, including Dr. Frigaard's theory on rathole swapping. *Id.* at 37.

The Court's Order required the production of "any non-publicly available, previously unproduced Consideration Materials in rebuttal expert reports" by November 11, 2011. Rec. Doc. 3916 at 7. The modeling underlying Bolado's report using Dr. Frigaard's increased gel strengths was not produced by that date or before his deposition on December 22-23, 2011. Dr. Frigaard was withdrawn by Cameron on January 13, 2012. Rec. Doc. 5272 at 3.

## ARGUMENT

I. **Bolado's Opinion That The BP Macondo Team Approved Jesse Gagliano's OptiCem Inputs Is Not Based On Any Facts of Record And Should Be Stricken.**

Bolado's opinions regarding BP's approval of inputs for the OptiCem program should be stricken because they are "not based upon the facts in the record," but rather on "speculation" on what occurred. Bolado testified that his opinions were based on his past practice of confirming OptiCem inputs with the operator, and he did not know if Gagliano took the same steps.

Courts in the Fifth Circuit exclude expert testimony that relies on speculation or that is not supported by the facts in the record. For example, in *Guillory v. Domtar Industries, Inc.*, 95 F.3d 1320, 1330-31 (5th Cir. 1996), the Fifth Circuit excluded the testimony of an expert as unreliable because it was "not based upon the facts in the record but on altered facts and speculation designed to bolster [the] position [the defendant]." Similarly, in *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007), the Fifth Circuit excluded the affidavit of an expert, holding that his opinions depended "on the furtive inclusion of a number of supposed facts not in the record. . . . [and his] testimony therefore has neither the sufficient facts nor the reliable

4

methodology that would warrant its inclusion as evidence."

Bolado opined that BP controlled all of the inputs to the OptiCem program used to formulate the cement used at the Macondo well. To the extent there were input errors in OptiCem, Bolado opined that BP reviewed and approved them at an April 14, 2010 meeting. Opening Report at 20 ("This is a common practice between most operators and Halliburton, because it allows the operator to double-check the accuracy of the inputs."). Moreover, he argued that "BP had the opportunity to correct the pore pressure data that was used in OptiCem on many occasions" because, during the April 14 meeting, "five BP personnel watched Mr. Gagliano type inputs into OptiCem." *Id.* at 33.

At his deposition, Bolado testified that he "believed" that BP checked all of the inputs because it was his practice when he was an Account Representative to verify inputs with the operator. Bolado Dep. at 190-91. But he did not know if it was Gagliano's practice to do the same. *Id.* at 191 ("Do you know whether or not that's Mr. Gagliano's practice? A. I cannot say for sure that that's his practice. Q. And you didn't ask him? A. Again, I've not talked to Jesse about the Macondo."). And Bolado did not know whether the OptiCem inputs were in fact verified by BP for the Macondo Well. *Id.* at 191-92 ("Q. Okay. So you don't know whether or not that's what they did? A. I cannot say for sure that's what they did.").

Even on the specific inputs that were discussed in his report, Bolado was unable to identify any support for his statement. Bolado opined that pore pressures were an input that BP should have corrected: "BP had the opportunity to correct the pore pressure data that was used in OptiCem on many occasions." Opening Report at 33. But when questioned, he testified there was no support for that statement. Bolado Dep. at 193 ("Q. Okay. So did you see anything saying that they were concerned about and reviewed the pore pressures? A. I don't know if I can

5

say they did."). In fact, Bolado could not identify any document that indicated BP approved incorrect values to the OptiCem program: "Q. So you do not have anything in writing that you can point to where BP approved incorrect values to the OptiCem Program? A. I cannot point to anything in writing." *Id.* at 215-216.

Bolado's opinions that BP approved inputs for the OptiCem program are "not based upon the facts in the record" but on "speculation" that Gagliano performed the same steps that Bolado would have and are "designed to bolster [Halliburton's] position," *Guillory*, 95 F.3d at 1331. In fact, Bolado admitted that he did not know if Gagliano shared the same practice and that there was no information in the record supporting his belief. Thus, Bolado should be precluded from introducing speculative testimony that BP approved inputs for the OptiCem program.

## II. Bolado's Opinion on "Roping" In The Shoe Track Is Not Based On Any Facts Of Record And Should Be Stricken.

Bolado opined that the swapping between the cement in the shoe track and the mud in the rathole occurred through a process called "roping." As with his opinion that the BP team approved the inputs to the OptiCem program, Bolado's opinion is not based on any analysis of the facts in the record but on speculation.

As a preliminary matter, Bolado admitted that he had never seen, or even heard of, roping occurring in the field in his 20 years of experience. Bolado Dep. at 446. The only example of roping identified was from a laboratory experiment, but Bolado did not do any analysis to determine whether the conditions from the laboratory experiment were similar to the conditions at the Macondo well. *Id.* at 437:8-438:2. Further, Bolado did not do any calculations to determine whether roping could occur on the scale of the Macondo well – through 189 feet of shoe cement. *Id.* at 447:1-6. As a result, Bolado failed to "independently establish the necessary physical and mathematical bases for [his] opinion." *Rosado v. Deters*, 5 F.3d 119, 124 (5th Cir.

6

1993); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 992-993 (5th Cir. 1997) (holding that experts should perform calculations to demonstrate that their methodology, and therefore their opinions, is reliable).

Bolado's opinion that "roping" occurred to form a path through the shoe track cement is "not based upon the facts in the record" but on "speculation" that the unverified laboratory conditions existed at the Macondo well. Thus, Bolado should be precluded from introducing speculative testimony that "roping" occurred to create a channel through the shoe track cement.

**III. Bolado Lacks Expertise To Provide Opinions On The Character Of The M57B Sand Or The Resulting Effects.**

Bolado has no expertise in determining whether a sand is permeable or whether it is hydrocarbon-bearing. In offering his opinion, Bolado merely relied on Dr. Richard Strickland's opinions without attempting to assess the validity of those opinions. As a result, his opinions relating to the character of the M57B sand and any potential consequences must be stricken.

"District courts must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (citing Fed. R. Evid. 702). Thus, "[a] district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Id.* Additionally, courts in the Fifth Circuit have held that an expert may only "rely on the *reliable* opinion of another expert in forming his own opinion." *Johnson v. Samsung Elecs. Am., Inc.*, No. 10–1146, 1549, 2011 WL 4344588, at *3, *5 n.1 (E.D. La. Sept. 14, 2011) (emphasis added). Further, this Court has previously concluded that an expert may not adopt the opinions of another expert "without attempting to assess the validity of the opinions relied on." *Lightfoot v. Hartford Fire Ins. Co.*, No. 07-4833, 2011 WL 39010, at *4 (E.D. La. Jan. 4, 2011).

Bolado provided various opinions that the M57B sand was "permeable" and "hydrocarbon-bearing," and the consequences of such a sand. For example, he opined that "BP's failure to disclose the upper hydrocarbon zone at 17,467 ft [was] one of the most important causes of the apparent failure of the cement job to isolate the hydrocarbon zones in the Macondo Well." Opening Report at 23. Bolado further opined that "Halliburton would not have pumped the cement job without design changes had it known of the M57B zone." Rebuttal Report at 7. He also stated that the M57B zone was permeable and that the failure to isolate this zone likely contributed to the failure of the cement. *See id.* at 12, 18.

At his deposition, Bolado admitted that he was neither a petrophysicist nor a geophysicist, and that he did not intend to offer his personal opinions "as to whether a sand is hydrocarbon bearing or not." Bolado Dep. at 168. He admitted that he had not conducted his own analysis regarding this issue, and stated that he was merely repeating Dr. Strickland's conclusions that the M57B sand was hydrocarbon bearing in his report. *Id.* at 168-69 ("Q. Okay. And you have not done your own analysis as to whether or not that sand is hydrocarbon bearing or not? A. Correct. I did not do my own analysis of – of that sand of what it might be, hydrocarbon bearing or what."). Bolado also testified that he did not evaluate "whether or not the M57B sand had sufficient permeability to flow," and that he was relying on Dr. Strickland's opinions regarding permeability. *Id.* at 169, 171 ("I did not do my own analysis"). In fact, he had never been asked to determine or offer an opinion on whether a particular sand was permeable or hydrocarbon-bearing. *Id.* at 171.[1] Without attempting to assess the validity of Dr.

---

[1] Bolado similarly adopted the opinions of several other experts without conducting his own analysis. To the extent Bolado relied on the opinions of other experts without conducting his own independent review, these opinions should be stricken and he should not be permitted to testify regarding these matters at trial. *See*, *e.g.*, Opening Report at 40 (relying on Beck's opinion the float collar did not convert); Rebuttal Report at 35-36 (relying on Benge's opinion of the effects of centralization, and opinions by Dr. Frigaard, Trahan, Benge, Barnhill, and Calvert

Strickland's opinions, Bolado went on to opine on the effect of a permeable, hydrocarbon sand. Some of those opinions are admittedly speculative. *See*, *e.g.*, *id.* at 180-81 ("I'm speculating opinion based off of the other information that I've seen.").

Bolado has no expertise to evaluate Dr. Strickland's opinions concerning the character of the M57B sand and has not attempted to assess the validity of those opinions. As a result, he has reached opinions that lack foundation and are admittedly speculative.

### IV. Bolado's Opinions Relating To Increased Gel Strength Are Based On Unconfirmed And Withdrawn Assumptions, And Should Be Stricken.

Bolado's opinions relating to increased gel strength should be stricken for three reasons: ***First***, Bolado did not verify Dr. Frigaard's gel-strength calculations; ***second***, Dr. Frigaard's opinion has been withdrawn; and, ***third***, Halliburton did not produce the modeling underlying Bolado's work. As such, Bolado's opinions relating to increased gel strength should be stricken.

As described above, an expert may only "rely on the reliable opinion of another expert in forming his own opinion," and may not adopt the opinions of another expert "without attempting to assess the validity of the opinions relied on." *Johnson*, 2011 WL 4344588, at *3, *5 n.1; *Lightfoot*, 2011 WL 39010, at *4. District courts may exclude expert testimony if the expert failed to produce discovery materials that are relevant to the case. *See Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 380-82 (5th Cir. 1996). This Court has ordered that if an expert is withdrawn and not listed on the witness list, then no other party may "introduce that expert's opinions and report into evidence." Rec. Doc. 5327 at 6. The Court also ordered the production of "any non-publicly available, previously unproduced Consideration Materials in rebuttal expert reports" by November 11, 2011. Rec. Doc. 3916 at 7. Bolado's modeling cited in his expert report was not

---

regarding the float collar), *id.* at 37 (relying on the opinions of Dr. Lewis, Dr. Frigaard, Benge, and Trahan regarding the set time of cement slurries).

9

produced by November 11, 2011, or before his deposition on December 22, 2011.

First, Bolado did not confirm the underlying gel strengths that he copied from Dr. Frigaard's report. Bolado Dep. at 322 ("I did not confirm that with any calculations."; "I am taking these gel strength numbers from his Report."). In fact, Bolado admits that he could not validate the accuracy of Dr. Frigaard's gel strength calculations. *Id.* at 320 ("I cannot validate the accuracy of – of his calculations"). And he did not use available internal Halliburton tools to confirm Dr. Frigaard's calculations or perform any calculations to calculate gel strengths. *Id.* at 317 ("[T]here's an Excel spreadsheet that we can – we can put in those numbers that can kind of give you a prediction."); *id.* at 321 ("I did not do calculations to come up with the gel strength, like he did."). Second, Cameron withdrew Dr. Frigaard as an expert on January 13, 2012. Under the Court's order, no other party may introduce Dr. Frigaard's opinions into evidence. Bolado's opinion therefore relies on facts that are not, and cannot become, part of the record. Third, Bolado used Dr. Frigaard's unconfirmed and now-withdrawn gel strength values to run OptiCem modeling and reach conclusions. Rebuttal Report at 28-29; Bolado Dep. at 324-25 (admitting modeling was done). Although considered by Bolado in forming his opinion and identified in his expert report – indeed, outputs were pasted into the report – this modeling was not produced by the Court's November 11, 2011 deadline. Rec. Doc. 3916 at 1, 7.

For these three reasons, Bolado's opinions about modeling with increased gel strength should be stricken and he should not be permitted to provide these opinions at trial.

## **CONCLUSION**

BP respectfully requests that the Court prohibit Bolado from offering opinions on: (1) BP's approval of inputs for the OptiCem program; (2) the M57B sand and consequences; (3) purported roping; and (4) modeling with increased gel strength.

Dated: January 24, 2012                                Respectfully submitted,

/s / Don K. Haycraft

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Timothy A. Duffy, P.C.
(tim.duffy@kirkland.com)
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
(mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Exploration & Production Inc. & BP America Production Company*

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 24th day of January, 2012.

/s/  Don K. Haycraft