UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
|  | : | JUDGE BARBIER |
| This Document Relates To: All Actions | : : : | MAGISTRATE JUDGE SHUSHAN |
| ………………………………………………... | : |  |

**BP'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE
CERTAIN OPINIONS AND TESTIMONY OF GREG CHILDS**

Parties to this matter have alleged that the *Deepwater Horizon*'s automated "AMF/deadman" emergency system failed to successfully activate the blowout preventer (BOP) to secure the well on April 20, 2010 because of certain deficiencies with the BOP's control pods. Contrary to this, Greg Childs, Transocean's blowout preventer (BOP) expert, has offered the opinion that the control pods that operated the *Deepwater Horizon* BOP's AMF/deadman system were fully functional on the evening of April 20, 2010, and that the AMF/deadman worked.

Mr. Childs' opinion that the control pods were fully functional is based on certain tests that Transocean performed using BOP systems from rigs other than the *Deepwater Horizon*. This testing, for which sparse detail has been provided – and which was conducted without knowledge or input from any of the other parties – is neither reliable nor relevant, and Mr. Childs' opinions regarding it should not be admitted into evidence.

# BACKGROUND

**I.     The *Deepwater Horizon* BOP Had an AMF/Deadman System that Operated by Redundant Control Pods.**

A BOP is a critical safety device used to secure a well in case of emergency situations. The *Deepwater Horizon* BOP was equipped with several backup systems to insure that it would function even if manual activation failed. One of these, the AMF/deadman, was intended to automatically activate in emergency conditions to close the blind shear ram and seal the well. The AMF/deadman was operated by two redundant control pods, labeled "yellow" and "blue," each containing two Subsea Electronic Modules ("SEM") that operated through the use of batteries and solenoid valves. Either pod, if functional, should have been able to independently activate the AMF system. BP and other parties have taken the position, supported by independent testing, that neither the blue nor yellow pods were functional on April 20th, 2010. Specifically, the blue pod failed to activate because of a depleted 27-Volt battery, and the yellow pod failed to activate because of a miswired solenoid valve (*i.e.*, solenoid 103).

**II.    Mr. Childs Relies on Transocean's Unverified Control Pod Testing Performed Using BOP Equipment from Rigs Other Than the *Deepwater Horizon*.**

Although Mr. Childs is a mechanical engineer with many years experience with blowout preventers, he has no formal training in electrical engineering or electronic systems software, and admits to not being an electronics or software engineer. Childs Dep. at 14-16, 51. Mr. Childs nonetheless concludes that both the BOP control pods were functional based on battery and solenoid valve testing conducted exclusively under Transocean's control using equipment from rigs other than the *Deepwater Horizon*. Mr. Childs admits that he neither conducted the testing himself, nor that he was present for it. Childs Dep. at 53, 211-12, 385. And in fact, Mr. Childs admits that he only discussed the set up for the tests in general terms, as the details were otherwise "over his head" and out of his area of expertise. *Id.* at 54.

A.     **Battery Testing Used Equipment from the *Deepwater Nautilus*.**

To support the theory that the blue control pod was functional during the Macondo incident, Mr. Childs relies on testing that Transocean performed from October 20 to December 13, 2010 at West Engineering's Drilling Equipment Center. Childs Rebuttal Report at 5. This testing was done on a spare pod removed from a Transocean rig (*Deepwater Nautilus*) that was chosen because it was allegedly "functionally equivalent" to that on the *Deepwater Horizon*. *Id*. During this testing, which was not verified by any independent third party, partially depleted batteries were connected to the *Deepwater Nautilus* control pod in a variety of configurations in an attempt to show that the AMF/deadman system would make repeated attempts to reboot ***after*** firing under certain conditions. *Id.* at 5-6. Mr. Childs also admitted during his deposition that several tests used a power source instead of batteries. Childs Dep. at 150. According to Mr. Childs, this testing demonstrated that the blue pod's 27-Volt battery was not depleted on April 20th, but was subsequently drained by the pod's repeated attempts to reboot.

Mr. Childs made reference to this testing in his opening report, but provided no detail about how this testing was performed and no supporting documentation related to it. Childs Report at 34. In response to criticism regarding these unsubstantiated tests, Mr. Childs provided some detail in his rebuttal report and relied on a report that was prepared by the individual who performed the testing, Chris Tolleson. Childs Rebuttal Report at 4-6; Childs Dep. at 141. This report, which was crafted almost one year after the tests were performed, failed to provide sufficient detail necessary to evaluate the scientific validity of this testing, and Mr. Childs was unable to provide this information during his deposition. Childs Dep. at 144-54. Furthermore, Chris Tolleson's handwritten notes of this testing, which Mr. Childs revealed for the first time in his deposition that he reviewed and relied upon to support his opinion, have not been produced. *Id*. at 142.

3

### B.     Solenoid Valve Testing Performed Aboard the *Discoverer Enterprise*.

To support the theory that the yellow control pod was functional during the Macondo incident, Mr. Childs relies on testing that Transocean performed on August 4-5, 2011 on the *Discoverer Enterprise.* Transocean tested a properly wired solenoid valve to see if it could activate the AMF system and compared the results to the same set up using miswired solenoid valves.  Childs Rebuttal Report at 2-3.  Although these tests have not been verified by any independent third party, Mr. Childs interprets them to indicate that even though a solenoid was miswired, that would not prevent it from activating the AMF system.  *Id.*

Similar to the battery testing, Mr. Childs made reference to this solenoid valve testing in his opening report, but provided no detail regarding it and no reference to any supporting documentation.  Childs Report at 32.  Mr. Childs again provided some information regarding this testing in his rebuttal report and produced for the first time a formal report that Mr. Tolleson had prepared.[1]  Childs Rebuttal Report at 3-4.  The information that was provided, however, was still insufficient to substantiate the testing's validity, and Mr. Childs was unable to provide that information during his deposition.  Childs Dep. at 211-15.

## ARGUMENT

**I.     Mr. Childs's Opinions Regarding the Functionality of the Control Pods Are Not Relevant Because There Is Too Great of an Analytical Gap Between the Data and the Opinion Proffered.**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, as interpreted by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Under *Daubert*, expert opinions must be relevant to be admissible. *Daubert*, 509 U.S. at 591;

---

[1] Although Mr. Tolleson had prepared the report in August 2011, before Mr. Childs submitted his opening report, Mr. Childs did not produce the report until November 7 with his rebuttal report. In his opening report, Mr. Childs lists on his materials considered: "Testing Notes from Transocean Internal Investigation, August 4-6, 2011." However, this document is not identified by Bates number. It appears identified by Bates number for the first time in the rebuttal report. Rebuttal Report at 3, Documents Considered (see TRN-MDL-02971987-1993).

4

*Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007).  To be relevant, the opinions must "assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. For an opinion to be relevant, the expert submitting the opinion must be qualified to render it. *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) ("to qualify as an expert, 'the witness must have such knowledge or experience in his field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.'").  Additionally, testimony that contains "too great an analytical gap between the data and the opinion proffered," may be excluded as irrelevant. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

> **A.    Mr. Childs's Testimony Is Not Relevant Because the Testing Upon Which He Relies Does Not Provide Sufficient Support for His Conclusions About the *Deepwater Horizon* BOP.**

Mr. Childs' opinions are not relevant because there is too large of an analytical gap between the testing and the conclusions that he reaches regarding the purported functionality of the *Deepwater Horizon* control pods.  *Gen. Elec. Co.*, 522 U.S. at 146 (holding that where the ultimate conclusion drawn by an expert requires "too great an analytical gap between the data and the opinion proffered," it may be excluded as irrelevant).  To be relevant, the methodology employed must provide a "'relevant' link with the facts in issue," and is irrelevant where the experiments or studies relied upon do not provide sufficient support for the expert's conclusions. *Knight*, 482 F.3d at 355 (upholding the exclusion of expert testimony as irrelevant where none of the over 50 studies relied upon by the expert provided a plausible basis for his general causation opinion); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 279 (5th Cir. 1998) (finding the expert's opinion was properly excluded where there was too wide an "analytical gap" between the expert's causation opinion and the scientific knowledge used to support it).  Here, there is insufficient evidence to conclude that the tests conducted with the equipment of the *Deepwater*

5

*Nautilus* and *Discoverer Enterprise* had applicability to the *Deepwater Horizon* equipment during the Macondo incident.

With respect to the battery tests performed on the *Deepwater Nautilus,* Transocean failed to provide information about how it determined that a power supply could be configured to operate like a battery. A battery is different from a power supply because for batteries, both current and voltage vary. *See* Zatarain Report at 52-54. For power supplies, either current or voltage is held constant. *Id.* Even if BP had enough information to replicate Transocean's tests, the test would still be irrelevant. Because battery tests performed with power supplies provide no information about whether the *Deepwater Horizon* batteries had sufficient power to operate the AMF/deadman on the night of the incident

Regarding the solenoid valve tests performed on the *Discoverer Enterprise*, the solenoid valve test reports determined that the solenoid valve was successful because of an audible "clunk." Childs Dep. at 217. Mr. Childs provided no information about the reasons why a "clunk" means that the test was successful. The solenoid test reports lack any information about whether pressure was used. *Id.* And Mr. Childs' admitted that a solenoid valve test without pressure provides no information about whether the *Deepwater Horizon* solenoid valve was capable of functioning on the night of the incident. *See* Childs Report at 31.

During his deposition, Mr. Childs could not answer any questions regarding whether Transocean's battery and solenoid valve test reflect the operation and performance of the *Deepwater Horizon* batteries and solenoid valves on the night of the incident, Childs Dep. at 144-47, 212, including:

- Which tests on the *Deepwater Nautilus* were simulated using a power supply instead of a battery, *id*. at 150;

6

- Whether the power supply on the *Deepwater Nautilus* was calibrated to simulate battery variance based on deviations in temperature, *id.* at 153-54;

- How it was determined that the batteries tested on the *Deepwater Nautilus* had been in service for one year or how many times they were activated in that time period, *id.* at 155;

- What the voltages were on the *Deepwater Nautilus* batteries before they were tested in August of 2011, *id.* at 155-56;

- Where the batteries that were tested during the *Deepwater Nautilus* tests actually came from, *id.* at 502;

- What the voltage of the 9-V batteries was during the *Deepwater Nautilus* testing, *id.* at 158;

- Whether testing of the batteries from the *Deepwater Nautilus* was done under load, *id.* at 159, 163;

- Whether hydraulic pressure was applied to the solenoid valves during the *Deepwater Enterprise* testing, *id.* at 213;

- How much the shifting force in the solenoid valve would be reduced by based on miswiring, *id.* at 214;

- Whether the solenoids were placed in the exact same spot on the BOP stack during the testing as they were on the *Deepwater Horizon* BOP stack, *id.* at 453;

- What was done to compare the *Deepwater Horizon* software code to the *Deepwater Nautilus* software code, *id.* at 145;

- Whether the testing team on the *Deepwater Nautilus* even had SEM and AMF software for the *Deepwater Horizon, id.* at 146;

- Whether Cameron was consulted to verify whether the SEM and AMF software on the *Deepwater Nautilus* was functionally equivalent to the *Deepwater Horizon*. *Id.* at 146-47.

Without knowledge that the testing conditions mirror the actual conditions on the *Deepwater Horizon*, these test results cannot serve as the basis for a relevant expert opinion. As in *Moore*, several of the testing conditions are unknown, and as in that case, the expert testimony should be excluded as irrelevant. *Moore,* 151 F.3d at 279. Simply put, there is too wide of an

7

"analytical gap" between this testing and Mr. Child's conclusion that this testing proves the *Deepwater Horizon* control pods were functional on April 20, 2010. His opinions should therefore be excluded as irrelevant.

## II. Mr. Childs' Opinions Regarding the Functionality of the Control Pods Are Unreliable Because He Relies on an Unverified Testing Methodology.

To be admissible, expert testimony must not only be relevant but also reliable. *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010). To be reliable, the methodology that the expert uses in rendering his opinions must also be reliable. *Daubert*, 509 U.S. at 592-93. For an expert's methodology to be reliable, there must be some "objective, independent" validation of it. *Moore*, 151 F.3d at 276. In other words, an expert's assurance that his methodology is scientific or generally accepted within his field is insufficient. *Id.* The ultimate objective of the reliability analysis is to ensure an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

As discussed above, much is unknown about the testing methodology that Transocean used because the testing was poorly documented. In his opening report, Mr. Childs cites to no documentation in relation to these tests. Childs Report at 32, 34. And only in response to criticism that the testing was unsubstantiated did Mr. Childs produce any information regarding the testing in his rebuttal report, but that information was incomplete.[2] With the information that Mr. Childs has provided, it is impossible to provide any objective, independent validation of the methodology used for either test. We do not know whether or how this methodology has been tested, what the potential error rates are, or how this methodology relates to that used by other independent parties.

---

[2] As one example, Mr. Childs identified that he relied on handwritten notes of Mr. Tolleson to understand the testing, but these notes have not been produced. Childs Dep. at 142.

8

Further, Mr. Childs himself was unable to comment on the reliability of the testing methodology. Mr. Childs did not know how the testing methodology was developed, other than to say he was sure Mr. Tolleson "consulted a number of documents," and could not comment on what if anything was done to verify that the equipment was "functionally equivalent" to the *Deepwater Horizon*. *Id.* at 402-03. Mr. Childs did nothing to validate the results reported to him by Mr. Tolleson, *id.* at 480-81, and admitted that he did not know the specifics of these tests. *Id.* at 54. For example, Mr. Childs did not know what Mr. Tolleson relied upon to draw conclusions about various voltage batteries or the drain on batteries during recycling loops. *Id.* at 173-74. Mr. Childs even admitted that there was no data for him to review from several *Deepwater Enterprise* tests. *Id.* at 216.

This lack of information leaves nothing other than Mr. Childs' own assurances that this testing is reliable. Because those assurances are impossible to test, they are insufficient to support the testing's reliability. *Moore*, 151 F.3d at 276. As such, Mr. Childs' opinions regarding the functionality of the yellow and blue control pods should not be admitted into evidence.

## CONCLUSION

Mr. Childs' opinions regarding the functionality of the yellow and blue control pods on April 20, 2010 are both irrelevant and unreliable. BP respectfully requests that the Court exclude these opinions from evidence, and preclude Mr. Childs from providing testimony on this issue.

Dated: January 24, 2012                                     Respectfully submitted,

                                                            /s / Don K. Haycraft

                                                            Don K. Haycraft (Bar #14361)
                                                            R. Keith Jarrett (Bar #16984)

9

        LISKOW & LEWIS
        One Shell Square
        701 Poydras Street, Suite 5000
        New Orleans, Louisiana 70139-5099
        Telephone: (504) 581-7979
        Facsimile: (504) 556-4108

        and

        Richard C. Godfrey, P.C.
        (richard.godfrey@kirkland.com)
        J. Andrew Langan, P.C.
        (andrew.langan@kirkland.com)
        Timothy A. Duffy, P.C.
        (tim.duffy@kirkland.com)
        Kirkland & Ellis LLP
        300 North LaSalle Street
        Chicago, IL 60654
        Telephone: (312) 862-2000
        Facsimile: (312) 862-2200

        and

        Robert C. "Mike" Brock
        (mbrock@cov.com)
        Covington & Burling LLP
        1201 Pennsylvania Avenue, NW
        Washington, DC 20004-2401
        Telephone: (202) 662-5985

        *Attorneys for the BP Exploration & Production Inc. & BP America Production Company*

## **CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 24th day of January, 2012.

                                                                         /s/  Don K. Haycraft__