UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER MAGISTRATE JUDGE |
| ……………………………………………….. | : | SHUSHAN |

**BP'S MEMORANDUM IN SUPPORT OF ITS MOTION
TO LIMIT THE TESTIMONY OF JOHN HUGHETT**

**INTRODUCTION**

John Hughett is one of Halliburton's cement experts. The portions of John Hughett's reports containing his opinions regarding: (1) process safety; (2) the conversion of the float collar; and (3) the M57B should be stricken and he should not be permitted to testify regarding these opinions at trial. Hughett is not qualified to opine regarding process safety, and his opinions regarding the conversion of the float collar and the M57B are unreliable.

**BACKGROUND**

In the executive summary section of his opening report, Hughett provided process safety opinions, stating: "BP has certainly made mistakes. BP placed immediate profit as the number one concern above all else. This ingrained in BP a culture that was counter to good operational practices. BP ignored accepted industry practices." Opening Report at 7. Although, according to Hughett, BP's operating standards met industry requirements, BP "did not pay attention to these standards and in some instances purposely ignored these standards." *Id.* Hughett opined that BP's "myopic mindset" is illustrated by the 2005 *Thunder Horse* incident, the 2005 Texas City Refinery explosion, and the 2006 BP Alaska Pipeline spill, and that BP as a corporation "has not learned from its past mistakes." *Id.* Further, he stated that BP "violated at least a dozen of its

1

own Recommended Best Practices" while drilling the Macondo well.  *Id.*  Hughett also claimed

that,"[o]ver the years, BP has groomed a culture of operator hubris."  *Id*. at 10.  Hughett then

opined, in the body of his report, that "BP utilized an autocratic culture on Macondo, a culture

that did not invite or respect provider input."  *Id.* at 27.  Moreover, Hughett stated that

"[p]rograms such as Every Dollar Counts define BP as a company – one that is more constantly

focused on the expenses and profit."  *Id.* at 28.

　　　　Hughett also provided opinions regarding the conversion of the float collar in his opening

report.  He opined:

> It is highly unlikely that the float collar was ever converted due to the likelihood
> that the flow path for the blowout was up the casing . . . . [R]egardless of whether
> or not the ball blew out of the autofill tube, the mere failure to convert would
> prevent the float collar from sealing.  This would have left the flapper valves in
> the float collar wide open and created a direct path for cement back up the casing.

*Id.* at 34.  Hughett stated that, in his "opinion, in absence of an effective float collar seal, the top

wiper plug would have been repeatedly pushed up and down by BP's activities during the critical

cement setting time."  *Id.* at 36.  The movement of the wiper plug "could have increased the time

the cement needed to set," *id.*, and "cause[d] subsequent u-tubing of the shoe track cement," *id.*

at 37.

　　　　In his rebuttal report, Hughett again discussed the float collar issue, stating that BP failed

to convert the float collar.  Rebuttal Report at 5, 15.  He opined that "[t]he ball was likely ejected

from the auto-fill tube without converting the float collar."  *Id.* at 15.  As in his opening report,

Hughett stated that "failing to convert the float collar would have created a direct path for flow

up through the long string production casing."  *Id*. at 16.  Further, the "unconverted float collar

would have allowed cement in the shoe track to U-Tube, preventing the cement from setting."

*Id.* at 19.  Hughett reiterated his opinion that the movement of the top wiper plug as a result of

BP's "continuous rig operations" "disturb[ed] the shoe track cement and prevent[ed] it from setting." *Id.*

Hughett also devoted a section of his opening report to the M57B. He argued that BP did not provide Halliburton with information on the M57B. Opening Report at 25. Hughett opined that, "[b]ased on the electric logs and BP's analyses prior to April 20, 2010, BP knew that the uppermost hydrocarbon-bearing zone was at 17,467 feet (the M57B Zone) and failed to disclose this to Halliburton or the Minerals Management Service (MMS), the appropriate federal regulatory body." *Id.* According to Hughett, "[b]y not providing this critical information, BP prevented Halliburton from" utilizing the most accurate information for the OptiCem modeling. *Id.* at 26. Moreover, Hughett claimed that by not taking the M57B into account, BP violated its own best practices and the MMS regulations. *See id.*

## ARGUMENT

### I.     Hughett Is Not Qualified to Opine on Process Safety.

"District courts must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (citing Fed. R. Evid. 702). Thus, "[a] district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Id.* Hughett is not qualified to offer opinions on the issue of process safety.

In his opening report, Hughett provided opinions regarding process safety. He stated that BP has a culture that is counter to good operational practices, and specifically referenced the 2005 *Thunder Horse* incident, the 2005 Texas City Refinery explosion, and the 2006 BP Alaska Pipeline spill in support of this statement. At his deposition, however, Hughett admitted that he had "no formal education, [had] offered no lectures, and [had] no formal training in the area of Process Safety." Hughett Dep. at 78. He acknowledged that he did not consider himself to be a

process safety expert.  *Id.* at 79.  Hughett also admitted that he did very little research with respect to the three incidents he cited in his opening report.  He researched the *Thunder Horse* incident by reading information on BP's Internet website for a "couple of hours."  *See id.* at 81-84.  Similarly, Hughett testified that he spent several hours on BP's Internet website and other websites whose names he could not recall reading about the Texas City Refinery explosion, and that this was the sum total of his research concerning that incident.  *See id.* at 85-86.  Hughett reviewed only industry publications in connection with the Alaska Pipeline incident, and admitted that he did so in 2006 and not immediately prior to writing his reports.  *Id.* at 87-88.  Hughett further stated that he did not undertake an engineering analysis of any of these incidents.  *Id.* at 89.

Hughett admitted that he is not an expert in process safety.  Moreover, Hughett did essentially no research to support his process safety opinions.  Thus, the portions of Hughett's opening report dealing with his process safety opinions should be stricken, and he should not be permitted to testify at trial regarding the topic of process safety.

## II.    Hughett's Float Collar Conversion Opinion Is Unreliable.

The Fifth Circuit has held that, where applicable, experts should perform calculations to demonstrate that their methodology, and therefore their opinions, is reliable.  *See Watkins v. Telsmith, Inc.*, 121 F.3d 984, 992-993 (5th Cir. 1997).  In *Watkins*, the Fifth Circuit excluded the testimony of an expert who opined that a "conveyor design was defective and that alternative designs would have prevented the accident without sacrificing utility."  *Id.* at 992.  It observed that even though the expert may have made some calculations in support of his theory, he did not keep them.  *See id.* The *Watkins* court therefore reasoned that "the district court did not err in concluding that some such calculations were necessary to demonstrate the feasibility of [the

expert's] ideas . . . . [or] in concluding that [the expert] made his assessment of unreasonable dangerousness and proposed his alternative designs 'without . . . any scientific approach to the proposition at all.'" *Id.* at 992-93.

Hughett opined in his opening and rebuttal reports that the float collar did not convert and that the cement failed to set due to the lack of float collar conversion and because BP ordered rig operations to resume too soon.  At his deposition, Hughett acknowledged that he performed no "testing to determine whether the float collar converted."  Hughett Dep. at 312.  In fact, he conducted no engineering, scientific, or technical analysis of the Weatherford M45AP float collar.  *See id.* at 509-10.  He also did not perform "any calculations to determine whether there was sufficient surge pressure to convert the float collar."  *Id.* at 312-13. Further, Hughett acknowledged that in his forty years of experience, he had never seen a 60 psi pressure differential in a well move a wiper plug.  *Id.* at 563.  He had also never observed "a wiper plug move as a result of moving drill pipe at any depth."  *Id.* at 565.  Hughett acknowledged that he performed no "calculations that would show what effect the activities" taking place on the rig "would have on moving a wiper plug," *id.* at 566, and that he had "never seen [or performed] a study [or testing] on a wiper plug moving up the hole," *id.*

It is apparent that no scientific evidence supports Hughett's opinions regarding the conversion of the float collar.  Indeed, Hughett acknowledged that he had never seen the very phenomenon he posited had occurred with respect to the wiper plug, and no calculations, studies, or tests support his opinions.  As a result, Hughett's opinions regarding the conversion of the float collar must be stricken and he should not be permitted to testify as to these opinions at trial.

### III.    Hughett's M57B Opinion Is Unreliable.

This Court had held that "[a]n expert may rely on the reliable opinion of another expert in forming his own opinion," and that "testimony relying on any stricken opinions will be excluded." *Johnson v. Samsung Elecs. Am., Inc.*, Nos. 10–1146, 10–1549, 2011 WL 4344588, at *3, *5 n.1 (E.D. La. Sept. 14, 2011). Further, this Court has held that an expert may not adopt the opinions of another expert "without attempting to assess the validity of the opinions relied on." *Lightfoot v. Hartford Fire Ins. Co.*, Civil Action No. 07-4833, 2011 WL 39010, at *4 (E.D. La. Jan. 4, 2011). The *Lightfoot* Court concluded that "the fact that [the expert] relied upon the report did not relieve the plaintiffs from their burden of proving the underlying assumptions contained in the report." *Id.* (citation omitted); *see also Legier & Matherne, Apac v. Great Plains Software, Inc.*, No. Civ.A. 03–278, 2004 WL 1488597, at *3 (E.D. La. June 30, 2004).

In his opening report, Hughett opined that BP did not provide Halliburton with information on the M57B, Opening Report at 25, and that BP failed to take the M57B into account in violation of its own best practices and the MMS regulations, *id.* at 26. During his deposition, however, Hughett stated that he would defer to Dr. Richard Strickland for the determination "whether the M57B sand was capable of flowing." Hughett Dep. at 370. Moreover, he did not "recall" the MMS guidelines regarding hydrocarbon-bearing zones. *Id.* at 372. Finally, Hughett admitted that he was "not going to render any opinions in this case as to whether a hydrocarbon-bearing zone needs to be capable of flowing, in order to be considered for top of cement, under the MMS Regulations." *Id*. at 273. Because Hughett deferred to Dr. Strickland with respect to whether the M57B was a hydrocarbon-bearing zone, and admitted that he did not intend to independently opine that the M57B was a hydrocarbon-bearing zone, the

portions of Hughett's opening report discussing the M57B must be stricken and he should not be allowed to provide opinions regarding the M57B at trial.

## CONCLUSION

BP respectfully requests that the Court enter an order striking the portions of John Hughett's reports dealing with his opinions concerning process safety, the conversion of the float collar, and the M57B and prohibiting Hughett from testifying at trial regarding these opinions.

Dated: January 24, 2012                                      Respectfully submitted,


                                                             /s / Don K. Haycraft

                                                             Don K. Haycraft (Bar #14361)
                                                             R. Keith Jarrett (Bar #16984)
                                                             LISKOW & LEWIS
                                                             One Shell Square
                                                             701 Poydras Street, Suite 5000
                                                             New Orleans, Louisiana 70139-5099
                                                             Telephone: (504) 581-7979
                                                             Facsimile: (504) 556-4108

                                                             and

                                                             Richard C. Godfrey, P.C.
                                                             (richard.godfrey@kirkland.com)
                                                             J. Andrew Langan, P.C.
                                                             (andrew.langan@kirkland.com)
                                                             Timothy A. Duffy, P.C.
                                                             (tim.duffy@kirkland.com)
                                                             Kirkland & Ellis LLP
                                                             300 North LaSalle Street
                                                             Chicago, IL 60654
                                                             Telephone: (312) 862-2000
                                                             Facsimile: (312) 862-2200

                                                             and

Robert C. "Mike" Brock
(mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Exploration &
Production Inc. & BP America Production
Company*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 24th day of January, 2012.

/s/  Don K. Haycraft