UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179<br><br>SECTION: J |
| This Document Relates To: All Actions<br><br>………………………………………………….. | : : : | JUDGE BARBIER<br>MAGISTRATE JUDGE SHUSHAN |

**BP'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE
THE REPORT AND TESTIMONY OF DR. ANDREW HURST**

## INTRODUCTION

Dr. Andrew Hurst, a PSC expert, should not be permitted to testify as an expert in this case. His opinions are not reliable because they do not rely on an accepted theory. They are also irrelevant, as they do not relate to any issue in the case.

## BACKGROUND

Dr. Hurst's brief expert report is academic in nature and relies heavily on a handful of external sources, such as Dr. Paul Nadeau and Statoil, to discuss the so-called Golden Zone concept. He opined that the Macondo well was drilled in the "Golden Zone" and that this made the well susceptible to a blowout:

> Drilling the Macondo 252#1 well was rich in geological challenges and certainly not just an engineering nightmare. Drilling into the Golden Zone at this depth, temperature and location should have been predictably challenging and required appropriate and thorough pre-drill modeling of pore pressure evolution, and great caution. Anything less inevitably would contribute significantly to the blowout disaster as seen on April 20, 2010.

Expert Report at 3. Critically, however, Dr. Hurst did not present any opinions specific to the Macondo well, to BP's geological analysis, or to the procedures and practices implemented at the well.

Dr. Hurst also discussed the generic geological attributes of the Mississippi Submarine Canyon region, and opined that "[f]rom a geological perspective it is very unlikely that the drilling problems in Macondo 252 #1 are unique. Other wells located in the Mississippi Canyon's slump scars would behave similarly." *Id.* at 2.  He opined that the general geology of the Mississippi Canyon (including slump zones in upper level sediments, fracturing, and hydrocarbon seeps) may have meant that the leak off pressures (measured by leak off tests) were likely higher than the actual strength of the rock formation encountered in the MC252#1 well. *Id*. at 22.  But Dr. Hurst did not analyze the actual wellbore conditions or rock formations in the MC252#1 – he was content to make only general points regarding leak-off pressures in and around the Mississippi Canyon.

Dr. Hurst also opined as how the industry can improve its drilling operation practices.  In particular, Dr. Hurst suggested that the industry should:  (1) better incorporate surface seafloor stability determinations into subsurface geological predictions; and (2) adopt clearer definitions of the pressure and temperature contours that reflect the "Golden Zone" so that the "inherent risk" of drilling these geological formations can be better defined.  *Id.* at 7.  Dr. Hurst candidly admitted, however, that his analysis in this regard was not based on the pressure prediction practices of any particular oil company, including BP.  *Id.* at 27.

## ARGUMENT

Dr. Hurst's expert report should be excluded from evidence and Dr. Hurst should not be permitted to testify in this case because (1) his opinions are not reliable because they do not rely on an accepted theory; and (2) his opinions are irrelevant, as they do not relate to any issue in the case.

**I.      Dr. Hurst's Opinions Are Not Reliable.**

Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), in accordance with Federal Rule of Evidence 702 "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." In determining whether an expert's testimony is reliable, district courts must consider a five-factor, non-exclusive test.  *See id*. at 593-95.

> These factors include: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.

*Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275 (5th Cir. 1998).  "[T]he party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable.  This requires some objective, independent validation of the expert's methodology." *Id.* at 276.  Dr. Hurst's opinions do not rely on an accepted theory, and, as a result, he should not be permitted to provide expert testimony in this case.

In his expert report, Dr. Hurst himself admitted that that the Golden Zone theory has not been tested, stating "*[i]f* the claims made in publications by Statoil are correct, the GZ concept allows accurate and internally-consistent prediction of overpressure in the Gulf of Mexico (GoM)."  Expert Report at 6 (emphasis added).  Dr. Hurst openly acknowledged that he was "unaware of any similar concept in the public domain or the level to which the GZ concept is accepted and adopted in the oil industry." *Id.* at 10.  In fact, "papers dealing directly with the GZ concept have . . . low[ ] citations (<30 citations).  The citation indices do not give any indication of whether the Exploration and Production (E&P) industry is aware of or is applying GZ concepts." *Id.* at 12.  Further, at least one prominent scholar who authored a paper reviewing

3

basin modeling practice did not even acknowledge the Golden Zone theory. *See id.* at 15 ("In his paper, which reviews basin modelling practice, there is no evidence that Waples recognises the possible significance of thermal processes on pore pressure.").

Dr. Hurst repeatedly qualified the degree to which the Golden Zone is accepted in the industry and the scientific community, stating, at the end of his expert report, that "***[a]ssuming*** the global relevance of the GZ concept, the implication is that much greater effort within the oil industry to share drilling experiences and relevant data from 'problematic' HPHT wells will benefit industry partners and secure safer and more effective drilling practice." *Id.* at 25 (emphasis added). He explained that "[i]n the absence of any public domain offerings from other oil companies, it is impossible to ascertain whether similar heavily-data-dependent concepts [to the GZ concept] are in use elsewhere and whether the significance of thermally-driven mineral reactions is recognised and incorporated into basin models . . . ." *Id.* at 26.

At his deposition, Dr. Hurst acknowledged that "the Nadeau articles are the only ones that [he] list[ed] that [he was] aware of that would specifically tie drilling operations to drilling in these formations, be they fragile formations, formations with overpressure, formations with sort of different or narrow pore pressure, [or formations with] fracture gradient issues." Hurst Dep. at 95. Moreover, in one of his articles, Dr. Nadeau stated that "[i]t is important to acknowledge that the Golden Zone view for overpressure development is not shared by most basin modelers. . . .The commonly held view by analysts, as implemented in these numerical simulators, is that mechanical compaction disequilibrium is dominantly responsible for overpressure generation." *Id.* at 176-77. Dr. Hurst did not disagree with this statement. *Id.* at 176. In addition to Dr. Nadeau's articles, Dr. Hurst also heavily relied on a 2005 Statoil publication in his expert report. This publication states that the Golden Zone theory goes ***against***

"conventional wisdom," is "controversial," and presents "a radical shift in thinking away from the mechanical approach to modeling basinal fluids to a more self-regulatory system." *Id.* at 179-80, 183.

Dr. Hurst admitted that "[a]s . . . [of] today and certainly as of 2009 and 2010 there were no textbooks being utilized by colleges, schools, [or] institutions of higher learning that would have been teaching the modeling theories and concepts around temperature that are contained in [his] expert report." *Id.* at 286. He was also not "aware of any conferences, workshops, et cetera, that have been conducted in the United States where th[ese] [concepts] ha[ve] been presented." *Id.* at 293. Neither the industry, nor professional organizations, nor scientific groups have "talked about these concepts in the way that [Dr. Hurst] do[es]." *Id.* at 295-96.

When asked whether there is "direct confirmation that the Golden Zone or the three-fold zonation is. . . a recognized concept in the hydrocarbon exploration community," *id.* at 158, Dr. Hurst responded "I don't know what people think and what people do," *id.* Dr. Hurst admitted that "within the scientific community, there are geological arguments that counter the Golden Zone concept." *Id.* at 163. Moreover, he stated that "the Golden Zone concept or similar concepts are **not** routinely used to support safe and optimal drilling practice." *Id.* at 186-87 (emphasis added).

*Daubert* holds that "[w]idespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique which has been able to attract only minimal support within the community,' may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594 (citation omitted). Dr. Hurst's expert report and deposition testimony reveal that there is little support for the Golden Zone theory, and the few sources that advance the theory acknowledge that it is "controversial" and "radical."

5

## II.   Dr. Hurst's Opinions Are Irrelevant.

According to *Daubert*, Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'  This condition goes primarily to relevance. 'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'"  *Daubert*, 509 U.S. at 591 (citations omitted).  In other words, "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."  *Id.* at 591-92.  Dr. Hurst's opinions do not relate to any issue in the case, and, as a result, he should not be permitted to testify as an expert.

Courts in the Fifth Circuit have also held that "[r]elevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'"  *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (citation omitted); *see also Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003).  For example, in *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002), the Fifth Circuit excluded the testimony of Dr. Chad Millet, an orthopedic surgeon, holding that "Dr. Millet's testimony on causation is not helpful to the fact-finder because of his inability to conclude that it was more likely than not that the Synvisc caused the infection in Pipitone's knee.  A perfectly equivocal opinion does not make any fact more or less probable and is irrelevant under the Federal Rules of Evidence."  Similarly, in *In re Vioxx Products Liability Litigation*, MDL No. 1657, 2006 WL 6624015, at * 4 (E.D. La. Feb. 3, 2006), this Court held that scientific testimony is relevant when "there is an appropriate fit between the scientific testimony and the specific facts of the case.  Scientific evidence is irrelevant, however, when there is too great an analytical gap between the data and the opinion proffered."

In his expert report, Dr. Hurst acknowledged that he did not actually examine the Macondo well drilling process in reaching his conclusions. He cited another scholar for the proposition that

> "the local morphology of the sea floor combined with the occurrence of the April 2006 earthquake seems to indicate that sea-floor instability is active within 20km of the Deepwater Horizon site" and further "it is concluded that a combination of these factors contributed to the difficulties experienced while trying to control the well and its subsequent blowout."

Expert Report at 17. Amazingly, Dr. Hurst noted that in this scholar's work, "no direct evidence is presented that may lead one to assign how any of the information he presents could contribute to cause the Macondo 252 #1 disaster." *Id.* Dr. Hurst further admitted that he did not know "whether the team operating the Macondo well was aware or not of the underlying considerations described in [his expert report]." *Id.* at 21. Dr. Hurst actually stated that his "report [was] compiled in the absence of specific knowledge of what procedures oil companies operating in the Mississippi Submarine Canyon follow when creating a prognosis of the conditions to be encountered in a new well." *Id.* at 27.

During his deposition, Dr. Hurst attempted to salvage his opinions by testifying that "a lot of the things that [he] had opinions about would be generic and apply to Macondo as much as any other well." Hurst Dep. at 135. He acknowledged that he had formed his opinions about the Golden Zone "a long time before" becoming involved in this case. *Id.* But he was forced to admit that he did not know "what happened during the Macondo drilling . . . process" because it was not "his task to look at that in detail." *Id.* at 213. He also stated that he had not "compared or looked at any well-specific data for the Gulf of Mexico." *Id.* at 216. Indeed, Dr. Hurst did not "look at any Macondo-specific evidence or data to reach any of the conclusions that [he] render[ed] in this case," *id.* at 241, and "all the opinions that [he had] rendered in this case . . .

7

[had been] compiled . . . in [the] absence of any specific knowledge and data of what procedures oil companies operating in the Mississippi Submarine Canyon were following . . . . when drilling new wells," *id.* at 249-50.

Dr. Hurst's opinions essentially boil down to his belief that the area encompassing the Macondo well is characterized by certain attributes (the Golden Zone theory), and that operators' awareness of these attributes may lead to safer drilling in the future. Because Dr. Hurst did not examine any information specific to BP's drilling of the Macondo well, he cannot (and does not) offer any opinions about whether BP did or did not take these attributes into account in drilling the well or about how BP actually drilled the well. Moreover, beyond the general geographic location of the Macondo well, Dr. Hurst's opinions do not relate to any matter at issue here. As a result, Dr. Hurst's expert report and testimony will not "assist the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702.

## CONCLUSION

BP respectfully requests that the Court enter an order precluding Dr. Andrew Hurst from providing expert testimony in this case.

Dated: January 24, 2012                                      Respectfully submitted,

/s / Don K. Haycraft

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

8

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Timothy A. Duffy, P.C.
(tim.duffy@kirkland.com)
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
(mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Exploration & Production Inc. & BP America Production Company*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 24th day of January, 2012.

/s/  Don K. Haycraft