UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates To: All Actions …………………………………………………... | : : : | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |

**BP'S MEMORANDUM IN SUPPORT OF MOTION TO PRECLUDE UNRELIABLE OPINIONS ON THE FAILURE OF THE PRIMARY CEMENT JOB**

Federal Rule of Evidence 702 requires experts to offer opinions based on scientific, technical, or other specialized knowledge and the application of reliable methodology to facts or data. Yet a number of experts in this case have proffered opinions relating to the failure of the primary cement job that contravene this rule. These experts have offered opinions that general phenomena observed from time to time, or postulated to exist in the industry, *may have* contributed to the incident – without any analysis or investigation into whether those phenomena *actually occurred* at the Macondo well. Specifically, experts in this case have offered opinions that rig activities; lack of a full "bottoms up" circulation; "rat hole" swapping; a small cement volume; and the cement job pump rate *may have* compromised the cement job. But these experts have not employed any analysis, modeling, calculations, or experiments to support these "barstool" opinions. As such, these opinions are not the result of reliable methodologies and should be excluded as mere speculation or *ipse dixit* assertions of the experts.

**Background**

Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.' This condition goes primarily to relevance. 'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'"

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) (citations omitted). In other words, "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591-92.

Courts in the Fifth Circuit exclude expert testimony that relies on speculation or that is not supported by the facts in the record. For example, in *Guillory v. Domtar Industries, Inc.*, 95 F.3d 1320, 1330-31 (5th Cir. 1996), the Fifth Circuit excluded the testimony of an expert as unreliable because it was "not based upon the facts in the record but on altered facts and speculation designed to bolster [the] position [of the defendant]." Similarly, in *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007), the Fifth Circuit excluded the affidavit of an expert, holding that his opinions depended "on the furtive inclusion of a number of supposed facts not in the record. . . . [and his] testimony therefore has neither the sufficient facts nor the reliable methodology that would warrant its inclusion as evidence." *See also Manton v. Strain*, No. 09-0339, 2010 WL 4364480, at *2 (E.D. La. Oct. 21, 2010).

An expert must "independently establish the necessary physical and mathematical bases for [his] opinion." *Rosado v. Deters*, 5 F.3d 119, 124 (5th Cir. 1993); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 992-993 (5th Cir. 1997) (holding that experts should perform calculations to demonstrate that their methodology, and therefore their opinions, is reliable). And an opinion that fails to make a fact more or less probable "is irrelevant under the Federal Rules of Evidence." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (citing Fed. R. Evid. 401) (affirming the exclusion of expert testimony that failed to show causation). "This is why, when considering the relevance of experts' causation testimony, courts have repeatedly emphasized that an expert's testimony as to evidence which 'suggests' a correlation is insufficient to scientifically support a *causal* connection." *Anderson v. Bristol Myers Squibb*

*Co.*, CIV.A. H-95-0003, 1998 WL 35178199, at *4 (S.D. Tex. Apr. 20, 1998) (emphasis in original).

## I.     Opinions That Rig Activities Disturbed The Setting Of The Cement And Contributed To The Incident Are Speculative.

Experts have opined that rig operations may have disturbed the cement and prevented it from setting before the negative pressure test and, thus, contributed to the incident. For example, John Hughett opined that "[o]ver the next sixteen (16) hours leading up [to] the negative pressure test, BP continued a series of activities on the Macondo well that varied the differential pressure acting on the top wiper plug. These activities almost certainly moved the wiper plug during this critical cement curing time." Hughett Report at 35. While so-called "swabbing" and "surging" pressures are known phenomena in the drilling industry, the critical scientific question here is whether swabbing or surging from the activities on the *Deepwater Horizon* did in fact prevent the cement from setting. Thus, whether activities conducted remotely from the bottom of the wellbore would have transmitted sufficient pressures on the wiper plug to disturb the cement through roughly two to three miles of drilling mud is a question that must be answered by a sound scientific methodology such as fluid dynamics modeling or flow calculations – not the naked *ipse dixit* of the expert.

Each expert proffering this opinion, however, failed to perform ***any*** analysis as to whether this theory of surging and swabbing actually had an effect at the Macondo well. Hughett Dep. 541 ("Q. [W]hat engineering analysis have you performed, what testing have you performed, what calculations have you conducted regarding your theory or opinion that swabbing and surging occurring two miles up in the column of mud and other drilling fluids, would have an effect on the cement below? A. I – I did look at the size of some of the tools, and there's some data missing. As a matter of fact, there's a lot of data missing here, just not

available. You – you would like to know how fast the pipe was moved and that kind of thing, but all the – which is HiTec data, and the – of course, the HiTec data is not available."); Bolado Dep. at 428 ("Q. And did you review any analysis done by Doctor – by Mr. Hughett related to how swabbing and surging could affect cement two miles away? A. I read through his Report. Q. And did you see any analysis on that point, any calculations? A. I do not recall seeing calculations . . . . Q. But you, yourself, did not perform any analysis or calculations on that point? A. I did not perform any calculations."); Lewis Dep. at 553 ("Q. Okay. And you didn't perform any calculations as to what the positive or negative pressures that these surging or swabbing events may or may not have caused, right? A. That's correct."). Not surprisingly, these experts were also unable to identify any industry literature that described swabbing and surging pressures through two miles of drilling mud. Hughett Dep. at 542-43; Bolado Dep. at 428. Without any science to underpin their opinions, testimony that rig activities two to three miles away disturbed the cement is mere speculation that fails to rise to the level of admissible expert opinion. *Rosado*, 5 F.3d at 124.

## II.     Opinions That Lack Of A Full "Bottoms Up" Circulation Caused The Incident Are Speculative.

Several purported experts have opined that the decision not to circulate a full "bottoms up" of drilling fluid may have resulted in there being channels of mud in the annulus that prevented the cement from isolating the formation fluids and thus, again, *may have* contributed to the incident. For example, David Bolado opined: "Mud cake in the annulus may also contact the cement as it is being pumped up the annulus, especially if BP's lack of bottoms-up circulation, poor centralization, and low pump rates left channels of mud in the annular space." Bolado Report at 41. Once again, however, these opinions are unsupported by any science – there has been no analysis, modeling, or investigation by any of the experts providing this

4

opinion to determine whether the decision not to circulate a full "bottoms up" actually caused channeling or contamination.

Circulating less than a "bottoms up" does not inevitably lead to channeling – as these same experts conceded, the practice of not circulating "bottoms up" is common in the industry. Bolado Dep. at 146 ("Q. So let me ask my question again: With other Operators that you've worked with, have they circulated less than a bottoms up before the cement job? A. There are jobs that that has occurred."); Benge Dep. at 233 ("Did ExxonMobil cement wells where there was not a full bottoms-up circulated before the job? A. Yes, we did."). There is no record that any of these wells cemented without circulating bottoms-up had cement problems or a blowout. Further, Halliburton's post-incident modeling in this case, using a computer modeling program called Displace 3D, showed that there was *in fact* no channeling on the Macondo well cement job. *See* TREX 42049.

Bolado also conceded that the only modeling that he performed – using Opticem – did not model the effect of "bottoms up" circulation or the effect of any pre-job circulation at all. Bolado Dep. at 326. In fact, the OptiCem program discounts all of the pre-job circulation so it would not matter whether half, one, or two "bottoms up" were circulated. Bolado Dep. at 329 ("Q. So OptiCem discounts not only the pre-job circulation, but the gel –but the displacement of all the mud in front of the job has – has no effect on the annulus? A. I – I believe that to be correct."). And, at least in this respect, OptiCem does not reflect how the real world works. Bolado Dep. at 329-30 ("Q. Now, Mr. Bolado, you would agree with me that's not how it works in the real world? A. I would agree that that is not how it works in the real world."). Therefore, without representative modeling or analysis, vague assertions by experts postulating that the lack

of a full "bottoms up" may have contributed to the incident are merely speculation that does not rise to the level of admissible expert opinion.

**III.    Opinions That "Rat Hole Swapping" Contributed To The Incident Are Speculative.**

Experts have opined that the cement-job design that left an unfoamed cement slurry sitting on top of relatively lighter mud in the rat hole (the last sixty feet of the well below the casing) may have caused "swapping" of the mud with the cement in the shoe track (the 189 feet of casing between the shoe and the float collar). As posited by Bolado: "Having a lighter mud (14.0 ppg) in the rat hole underneath a heavier conventional cement (16.74 ppg) would tend to cause the mud to swap places with the cement in the shoe track, displacing the cement into the contaminated rat hole." Bolado Report at 35.

General tendencies do not establish what, in fact, happened at the bottom of the Macondo well. The industry often leaves drilling mud in the rat hole without replacing it with a "heavy pill." Benge Dep. at 233 ("Q. Did ExxonMobil cement wells where they did not spot a heavy pill in the rathole? A. Yes."); Bolado Dep. at 149 ("Q. And you've worked with other Operators on cement jobs where they did not spot a pill in the rat hole? A. I cannot recall off of the top of my head, but I'm sure I have."). Thus, where, as here, there is a prevalent and acceptable industry practice that is not demonstrated to inevitably result in "swapping" and cause a blowout, it becomes even more incumbent on the expert to demonstrate that he or she has employed an appropriate scientific methodology on the facts of this case to determine whether "rat hole swapping" would have occurred and contributed to the incident. One method would have been to construct an apparatus that simulated the downhole conditions of the Macondo well after the cement job and conduct an experiment to see if swapping would have actually occurred; another possibility might have been to employ appropriate fluid dynamics computer modeling. Nothing resembling a scientific methodology or investigation was employed here.

Indeed, the only expert that set forth a theory by which the swapping could cause a channel through the length of the shoe track cement was Bolado. He described a fantastic process he called "roping" by which the rat-hole mud would spiral in a "helical pattern" through the shoe-track cement. Bolado Report at 35 ("When a lighter density, oil-based mud swaps with cement, the mud travels upwards through the cement . . . . the mud rises and begins to displace cement above it. Because the fluids are sliding past each other, their paths begin to spiral. As the mud flows up in a continuous path, the cement flows down the opposite direction, creating a helical pattern.").

What science supports this fanciful hypothesis? For starters, Bolado has never seen, or even heard of, roping occurring in the field in his twenty years of experience. Bolado Dep. at 446. The only example of roping identified was from two articles describing controlled laboratory experiments and Bolado performed no analysis to determine whether the conditions from the laboratory experiment were similar to the conditions at the Macondo well. *Id.* at 437-38. Importantly, Bolado did not do any calculations to determine whether roping could occur outside of a laboratory, let alone on the scale of the Macondo well – through 189 feet of shoe cement. *Id.* at 447 ("Q. And other than performing a calculation to determine whether or not there's sufficient area for roping, you – did you perform any other calculation relating to how far it would rope, or whether it would rope across 189 feet? A. No, I did not.").

### IV. Opinions That The Volume Of Cement Or The Pump Rate Of The Cement Contributed To The Incident Are Speculative.

Some proffered experts have suggested that the volume of cement or the pump rate of the cement may have contributed to the incident. For example, Benge stated that "[p]oor centralization, use of the base oil pre-flush, limited pre-job circulation and low pump rates virtually assured the cement integrity would be compromised." Benge Report at 3; *see also*

7

Bolado Report at 42-43 ("The chance that a squeeze job must be done after a primary cement job is increased by well-specific factors, such as: (i) failure to do bottoms-up circulation, (ii) reduced centralization, (iii) low volumes of cement, and (iv) low pumping rates.").

The volume of cement and the pump rate of the cement are determined by the well conditions. Halliburton's proffered expert on modeling, Bolado, testified that the cement pump rate at the Macondo well was constrained by the fracture gradient of the formation (the pressure at which the formation would fracture), and that the selected pump rate already exceeded the fracture gradient based on OptiCem modeling. Bolado Dep. 281 ("Q. Okay. Now, let's talk about the rate the cement job was pumped. Now, you agree that that's determined also by well conditions and also the density of the cementing com – compounds that you're pumping? A. The rate is tied to – in this case, I believe it was tied to the frac gradient. Q. And, in fact, the OptiCem modeling showed that the fracture gradient might already be exceeded at a pump rate of four barrels per minute? A. I believe it did."). He also testified that it was "very likely" that he had pumped cement jobs using similarly "small" volumes of cement or even less cement. *Id.* at 281.

None of the experts have set forth analysis identifying how much more cement should have been pumped or how much faster it should have been pumped. Indeed, some experts have expressly denied having an opinion regarding this issue. Bolado Dep. at 279 (stating that Bolado had no opinion on whether more cement should be pumped); *id.* at 282 (stating that Bolado had no opinion on cement pump rate). The effect of more cement or faster pumping certainly could have been investigated with modeling or calculation – but none of the experts performed this analysis. Instead they merely speculated that the selected volume of cement and pump rate somehow contributed to the incident without any consideration as to whether the well formation

could have withstood additional cement or a faster pump rate. Because these statements are not based on any scientific methodology or analysis, they do not rise to the level of admissible expert opinions and should be excluded.

## CONCLUSION

BP respectfully requests that the Court enter an order precluding the experts in this case from rendering unreliable causation opinions that rig activities after the cement job, the pre-job circulation, the swapping of fluids in the rat hole, the cement volume pumped, or the pump rate caused or contributed to the incident. As described above, these opinions are based on *ipse dixit* analysis and lack the scientific methodology and investigation required to survive the Court's scrutiny as gate keeper.

Dated: January 24, 2012

Respectfully submitted,

/s / Don K. Haycraft.
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Timothy A. Duffy, P.C.
(tim.duffy@kirkland.com)
Kirkland & Ellis LLP

300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
(mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP p.l.c., BP Exploration & Production Inc, and BP America Production Company*

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 24th day of January, 2012.

                                                                             /s/ Don K. Haycraft