UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | MDL NO. 2179 <br><br> CIVIL ACTION NO. 2:10-MD-02179 <br><br> SECTION: J |
| THIS DOCUMENT RELATES TO: <br> All Cases <br> (including 10-2771) | JUDGE BARBIER <br> MAG. JUDGE SHUSHAN |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM IN SUPPORT OF MOTION FOR CERTIFICATION OF INTERLOCUTORY APPEAL UNDER 28 USC §1292(b)

### INTRODUCTION

Plaintiffs and Claimants respectfully request that this Court certify for interlocutory review its Order granting the Motion to Establish Account and Reserve for Litigation Expenses (Doc. 5274). The undersigned respectfully submit that the Court's order on this issue "involves a controlling question of law as to which there is substantial ground for difference of opinion and … and immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. §1292(b).

Plaintiffs and Claimants are filing the accompanying Motion for Certification for Interlocutory Review of this Honorable Court's January 18, 2012 Order in which it ordered, inter alia:

> "that Defendants, or any agent or representative acting on a Defendant's behalf, shall withhold and deposit an amount equivalent to six percent (6%) of the gross monetary settlements, judgments or other payments made on or after December 30, 2011, by or on behalf of one or more Defendants to any other plaintiff or claimant-in-limitation who has had, currently has, or may hereinafter have, a suit or claim-in-limitation pending in these MDL proceedings (with the exception of settlements, judgments or other payments to the United States), into a court-supervised escrow account, in order to establish a fund from

1

which common benefit litigation fees and expenses may be paid, if and as awarded by the Court, at an appropriate time, pursuant to procedures to be determined by future order of the Court. Specifically, this hold back requirement applies to all actions filed in or removed to federal court that have been or become a part of the MDL, whether or not a motion to remand has been filed, and to state court plaintiffs represented by counsel who have participated in or had access to the discovery conducted in this MDL."[1]

These Plaintiffs and Claimants respectfully request that this Honorable Court certify this Order for interlocutory appeal.

## ARGUMENT

### I. The Court's Determination to establish a 6% holdback is an important controlling issue of law.

The Court's order to establish a 6% holdback is an important controlling issue of law. "A question of law may be deemed 'controlling' if its resolution is quite likely to affect the further course of the litigation, even if not certain to do so." *Sokaogon Gaming Entm't Corp. v. Tushie-Montgomery Assocs.*, 86 F.3d 656, 659 (7th Cir. 1996).

#### a. Order Violates the Purpose and Spirit of the OPA

Under the Oil Pollution Act of 1990 ("OPA"), 33. U.S.C. Sec 2701 et seq., a "Responsible Party" is required to establish and advertise a claims process that, if successful, provides parties the opportunity to avoid lengthy litigation and ensures fair compensation to those harmed by an oil spill. 33 U.S.C. § 2714(b). In turn, the OPA requires claimants to present their claims of harm to the Responsible Party before they can resort to litigation, id. § 2713(a), and provides 90 days during which the parties must seek to resolve their claims before they may go to court. Id. § 2713(d). When an RP denies liability for a claim or the parties are unable to reach agreement within 90 days, the claimant may either present his or her claim in federal court or to the National Pollution Funds Center ("NPFC") for payment from the Oil Spill Liability Trust Fund

---

[1] Court's Order, at p. 3. (Doc. #5274; January 18, 2012)

("Fund"). Id. § 2713(c), (d). The OPA thus establishes an extra-judicial resolution opportunity that is, in important ways, different from the usual tort law process.

The OPA thus reflects a congressional response after the Exxon Valdez disaster and ensuing litigation, to give those harmed by an oil spill two separate opportunities to avoid litigation: a statutorily-mandated claims process with the RP, with incentives for both parties to resolve claims efficiently rather than facing costly litigation that may reach the same result, and, for those whose claims are not resolved, the option of pursuing an administrative resolution in the NPFC. OPA provides that this last choice – submitting a claim with the NPFC rather than filing suit – is entirely the claimant's.[2]

Withholding a portion of the settlement funds provided to a claimant who affirmatively declines to come before this Court by initiating or joining litigation, with the funds to be deposited in a litigation related fund, is a significant alteration of the policies reflected in the OPA. OPA is designed to provide a means for claimants to be fully compensated by the polluter or the Fund without resorting to costly and time-consuming litigation; the Order here would nevertheless tax litigation costs against those claimants. By reaching into the claims process and explicitly diminishing the amount possible to be realized by claimants, the withholding vitiates a significant benefit of avoiding litigation.

The order here may also upset the incentives that Congress created for claimants and Responsible Parties to resolve their claims through private settlements. Under the system of settlement incentives created under the OPA, just as a Responsible Party knows that it will ultimately have to reimburse the NPFC for payments made out of the Fund on proper claims that

---

[2] " The Principal concept of this bill is to provide ready and complete compensation for party suffering damages from the discharges of oil or hazardous substances. The Fund is to provide compensation for damage claims fully and promptly." Senate Report 101-94: Committee on Environment and Public Works, Sec. 10 (July 28, 1989) (emphasis supplied).

the Responsible Party refuses to settle, a claimant knows that if a Responsible Party offers the claimant his or her full losses, the claimant will do no better by pursuing the claim with the NPFC or in court. If a Responsible Party's offer to pay full losses is automatically reduced, claimants will have reason to reject an otherwise sufficient offer and pursue payment from the Fund. The Fund may then require more time to process and pay meritorious claims, and would ultimately have to proceed against the Responsible Party to obtain reimbursement for those payments. Such increased transaction time and cost are inconsistent with the goals of OPA.

      b.    **Lack of Robins Dry Dock Standing for Many Plaintiffs Defeats the Rationale of the PSC's Holdback Request.**

As even this Court recognized, in its August 26, 2011 Order Denying Defendants' Motion To Dismiss A Master Complaint,[3] most businesses and people economically impacted by the oil spill lack standing under general maritime law under the seminal case of *Robins Dry Dock & Repair v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927)[4] Any fair reading of the pleadings in this case, even the PSC's holdback motion, leads inextricably to the conclusion that the vast majority of work performed by the PSC has been focused on upcoming the February 27, 2012 three-phase trial, based on maritime law: first, events leading up to and including the explosion on April 20, 2010; second, source control and oil discharge quantification; and third and finally, remaining <u>liability issues</u>, including dispersants and cleanup.

---

[3] "Order And Reasons Granting In Part, Denying In Part Defendants' Motions to Dismiss the B1 Master Complaint" (covering claims for private or "non-governmental economic loss and property damages"); Doc. 3830; August 26, 2011.
Available on line on Pacer at:
http://www.laed.uscourts.gov/OilSpill/Orders/8262011RevisedOrder%28MotionsToDismissB1Complaint%29.pdf

[4] "This circuit and others have interpreted <u>Robins Dry Dock</u> to mean that there can be no recovery for economic losses caused by an unintentional maritime tort absent physical damage to property in which the victim has a proprietary interest." *Amoco Transport Company v. S/S Mason Lykes*, 768 F.2d 659, at 666 (5th Cir., 1985)

While the work preparing for that trial may benefit some who actually have standing under general maritime law (as articulated by *Robins Dry Dock* and this Court's August 26, 2011 ruling regarding the B-1 Master Complaint), that work does not, and cannot, benefit most. Those businesses and people economically impacted by the oil spill, but who lack physical impact to their property or who are not commercial fishermen, have only OPA claims against the "Responsible Party", i.e., BP.[5] And those claimants are simply following the requirements of OPA and the directives of this Court to "present" their claims to BP (as the Responsible Party) through the GCCF.[6] Until presentment occurs, those claimants cannot even legally file suit against BP.[7]

Even then, it is questionable whether any of the evidence developed by the PSC will be relevant to those OPA claims since OPA is essentially a strict liability statute. As this Court has recognized, "OPA allows recovery for economic losses "resulting from or due to" the oil spill, regardless of whether the claimant sustained physical damage to a "proprietary interest" and OPA allows recovery for "damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, or natural resources, which shall be recoverable by *any claimant*." 33 U.S.C. § 2702(b)(2)(E) (emphasis added)."[8]

---

[5] See the August 26, 2011 Order, regarding the Master Complaint, at pgs. 25-26.

[6] Id, at pg. 26: "Claimants' maritime causes of action against a Responsible Party are displaced by OPA, such that all claims against a Responsible Party for damages covered by OPA must comply with OPA's presentment procedure."

[7] See the Memorandum in Opposition to PSC's Motion, filed collectively by numerous attorneys on behalf of hundreds of Plaintiffs, detailing how BP is the "Responsible Party" in this matter and the steps for presentment to it; (Doc. 4682 pgs. 3 – 5; November 21, 2011)
Available online at Pacer at: https://ecf.laed.uscourts.gov/doc1/08515559981

[8] See the August 26, 2011 Order regarding the B-1 Master Complaint; Doc. 3830; p. 21.

Clearly, the advantages of OPA and the lack of standing under *Robins Dry Dock* are why most claimants economically impacted by the oil spill are seeking resolution of their claims primarily from the GCCF instead of suing BP, Halliburton, Cameron, or the many others whom the PSC has spent millions of dollars and countless hours pursuing. As stated by this Court, "one major remedial purpose of OPA was to allow a broader class of claimants to recover for economic losses than allowed under general maritime law."[9] Further, this Court recognized that the intent of OPA is "to encourage settlement and reduce the need for litigation."[10] It would be ironic, as well as grossly unfair and contrary to prior pronouncements of this Court, for claimants whose only possible recovery for their economic damages is through OPA and the GCCF to have those recoveries reduced for <u>work that even this Court has ruled cannot benefit them</u>. This Court's Order is also incorrect for this additional reason.

This order is a controlling issue of this matter as it will limit the opportunites for individuals to hire attorneys that have been working with the GCCF because if these attorneys have filed a case for another client, then those prospective clients would be liable for the 6 % holdback. It is also a controlling issue in that this holdback will be a factor in the clients' decision as to whether or not to accept an offer from the GCCF.

## II. There is Substantial Ground for Disagreement with the Court's Ruling

### a. Inconsistent Facts

There can be little question that Plaintiffs have substantial grounds to disagree with the court's order. First, the order contains a contradiction within itself. The court has excluded state

---

[9] Id.

[10] Id.

6

court cases, wherein plaintiff's counsel has or had no other cases in this MDL and who have not participated in or had access to the discovery conducted in the MDL, from paying the hold-back but if a claimant has retained an attorney that has just one case filed with the Court, those claimants must still pay the hold-back. The Court should look to whether or not the claimants have filed their claims with the court not whether their attorney has any client filed with the court.

Second, even for clients whose attorney out of an abundance of caution filed some of their cases in federal court and did not file other cases in federal court, the cases not pending in federal court should not have this hold-back apply to them, as they have not received a benefit from the PSC. The PSC has not held any meeting for the public to attend to learn what they are doing or the course of the litigation as they see it, the PSC has not shared any work-product with any of the plaintiffs and the PSC has had little to no communication with the claimant's counsel.

The PSC itself states that, "The only work entitled to compensation from a common benefit fund is work that has demonstrably provided a benefit to all plaintiffs, or to a defined group of plaintiffs as a whole — the common benefit work."[11] The PSC fails its own test. It has not — it cannot — articulate that it has performed work that has "demonstrably provided a benefit" to claimants represented by undersigned counsel who resolve their claims under the Oil Pollution Act (OPA) through negotiations with the Gulf Coast Claims Facility (GCCF). In particular:

- The PSC cannot take credit for creation of the GCCF Fund since the GCCF was created and publicly announced on June 16, 2010,[12] before the Judicial Panel on Multidistrict Litigation issued its transfer order, consolidating this MDL in this

---

[11] *PSC's Status Report and Memorandum in Support of Motion to Establish Account & Reserve. Doc. 4507-1*
[12] Fact Sheet: Claims and Escrow, The White House, Office of the Press Secretary, June 16, 2010 available at http://www.whitehouse.gov/the-press-office/fact-sheet-claims-and-escrow (last visited November 20, 2011).

7

> Court on August 8, 2010[13] and before the PSC was appointed by this Court on October 11, 2010.[14]
> - The PSC cannot take credit for the <u>creation</u> of the GCCF Fund since the GCCF was established due to BP's designation as a "Responsible Party" under the Oil Pollution Act of 1990 (OPA).
> - The PSC cannot take credit for <u>payments</u> from the GCCF Fund to undersigned counsel's clients since those payments are case specific, not in any way related to or dependent upon any of the work done by the PSC here.

The linchpin of the common benefit doctrine is that when work is done for the benefit of others, it is patently unfair to give the beneficiaries of that work "a free ride." But nowhere in the PSC's motion is there any evidence, even indication, of how the work done which, to date, appears to have been focused primarily on general liability and environmental damages — not individual economic damages -- has been offered to or used by any of undersigned counsel's clients. In fact, the PSC's motion indicates just the opposite. In footnote 14, the PSC admits that it "will not disclose the names of the experts retained nor the specific studies and projects the PSC has undertaken to establish the extent and duration of environmental and ecological damages."[15] Despite this admission, the PSC nevertheless seeks payment for that work from claimants in the GCCF who have never even seen, much less used, that work. There certainly could be no "demonstrable benefit" provided by that work when it is being held under such obviously tight wraps.

---

[13] United States Judicial Panel on Multi-District Litigation, Transfer Order for MDL No. 2179 to the Eastern District of Louisiana, *In re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010* (10-02179); Doc. R. 1.
[14] Pretrial Order #8 – Appointment of PSC and Plaintiff Executive Committee, *In re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010* (10-02179); Doc. R. 506.
[15] PSC Status Report and Memorandum in Support of Motion to Establish Account and Reserve, Doc. R.4507-1 at note 14.

### a. Many Plaintiffs Explicitly Renounced Use of Or Reliance upon PSC Work Product, so the *Latex Gloves* Case is Nonanaloguos.

Many of the Plaintiffs' participation in the federal litigation is limited strictly to filing claims in the Limitation Proceeding, i.e., they filed no suits against BP or the other parties and their only recourse for full compensation is still with the GCCF. When these Plaintiffs did file protective claims in the Limitation Proceeding they did so by very clearly stating that it was their intent to pursue OPA claims through the GCCF and would do so using their own work product and would not rely upon the PSC's work product. For example, Doc. 290 states clearly that the claimants *"object to this [Limitation] process"* and *"specifically state that this limited appearance by them"* did not evidence an agreement that the Limitation Proceeding was *"appropriate or legally cognizable"* or that their response *"served as acquiescence to the jurisdiction of this court to litigate their claims."*[16] Those claimants' specifically reserved any and all rights they had against all parties. Further, they specifically objected to the jurisdiction of this court to adjudicate their claims until they *"[filed] a lawsuit in the venue of Claimants' choosing."*

Of critical important for purposes of the PSC's holdback request, those claimants "specifically reserve[d] the right to pursue resolution of all claims it may have under all appropriate channels, including, but not limited to, the Gulf Coast Claims Facility." Anticipating such a holdback request, these claimants "similarly provide[d] notice that Claimants have engaged the undersigned attorneys to prosecute Claimants' claims, and Claimant's undersigned attorneys have been and shall continue to prosecute Claimant's claim(s) with their own independent judgment and work product. Claimant hereby does not adopt the Amended Master

---

[16] *See* Rec. Doc. *290* "Objection To Jurisdiction, Objection To Process, Other Objections, Reservation Of Rights, Notice Of Claims, And Original Answer Of Claimants " in *In Re: The Complaint and Petition of Triton Asset Leasing GmbH, et al.*, Civil Action No. 10-2771

9

Complaint pending against all Defendants, and objects to any party other than the Undersigned Attorneys prosecuting Claimants' claims without Claimants' written authorization and consent."

The PSC has not, and cannot, controvert this intent or the fact that the claimants have relied on no work product produced by the PSC to resolve claims in the GCCF. Further, at a minimum, the PSC cannot even show that any of its work product was even offered to others to help them resolve their claims. Such statements like the one in Doc. 290 are directly contrary to those in *In re Latex Gloves Products Liability Litigation*.[17] (As pointed out by BP in footnote 2 of its memorandum,[18] the Court in *Latex Glove* extended its jurisdiction over state court plaintiffs but only to those who were represented by plaintiff attorneys who had purposely availed themselves of work product produced in the MDL. In this situation, just the opposite occurred where attorneys have specifically disavowed work product produced in the MDL to resolve their claims.)

### c. The PSC Misled the Public in Regards to Filing in the Limitation Proceedings.

When the PSC first published information regarding the Limitation Proceedings, it provided answers and advice to claimants as why filing in the Limitation was necessary and the ramifications for filing or in the alternative not filing in the Limitation. Both the PSC's FAQ portion of their website and the FAQ of the website set up about the limitations explicitly state there is would not be a fee associated with filing in the Limitation.

> "Is there a fee to file a Short Form? Answer: No" [Question 15],
> http://www.oilspillcourtcase.com/commonlyaskedquestions.aspx

> "Is there a cost filing the short form? No"; "Do I need a lawyer to file? No"
> http://bpmdl2179.com/frequently-asked-questions

---

[17] 2003 U.S. Dist. LEXIS 18118 (E.D. Pa. Sept. 5, 2003).
[18] Rec. Doc. 5044-1, "Memorandum In Support Of Expedited Motion For Clarification and Reconsideration Of The Court's December 28, 2011 Order And Reasons As To The PSC's Motion To Establish Account And Reserve For Litigation Expenses"

10

An advertisement that ran for the Limitations Proceedings is attached hereto as Exhibit "A". An example of how the public interpreted these messages is best exemplified by the op-ed article in the Times Picayune by James Gill entitled "Big Fish in BP Claims Reel in Suckers" published on January 25, 2012. A copy is attached as exhibit "B". In this editorial, Mr. Gill explains how the attorneys appointed by the Court "suckered" the public into joining the litigation, at no benefit to them. "All they were preserving was their right to help make the trial lawyers rich."

### d. These Plaintiffs Have Not Benefitted From Any Work by the PSC.

The PSC has not shared any work product with the Becnel Law Firm (the undersigned counsel for these Plaintiffs) or numerous other firms representing claimants in the GCCF and/or plaintiffs in litigation that could help it in its negotiations with the GCCF or in any other aspect of this case; it has not received any updates from the PSC in any manner. It did receive one letter from liaison counsel, informing it that its assistance was unwanted and that it would receive no common benefit work from the PSC. The liaison counsel went so far as even to send this email to others, specifically the accountant, Mr. Philip Garrett. (Please see Exhibit C, a copy of the May 17, 2011 email.)

The PSC has not taken any action that led to the formation of a common fund or the GCCF, increased the previously established settlement fund, or protected this fund. In essence, the PSC is attempting to have all claimants that also are plaintiffs in this matter pay for things that benefitted no one but itself in this matter. The PSC has issued no reports or given anyone a voice to object to its intentions and plans. It is inconceivable that in a case where a party has already been deemed to be at fault and established a $20 billion compensation fund, that a PSC could have already spent (as over two months ago) almost $12 million in still uncompleted trial preparation alone.

The Becnel Law Firm always had at least one representative attend each Coast Guard hearing to record and analyze the testimony and evidence. The PSC rarely, if ever, attended any of these hearings. This is just one example of how the PSC has failed to act fiscally responsible for the class. Being named a PSC member does not give a person or firm carte blanche to spend money and incur unneeded costs. The PSC has a fiduciary duty to the rest of the litigants to incur only necessary costs. Most of the discovery in this case had already been done by other entities, both public and private and published in voluminous reports: the United States Coast Guard; the Presidential Commission; the Department of the Interior; Mineral Management Service (and its successors - the Bureau of Ocean Energy, Management and Enforcement; and the Bureau of Safety and Environmental Enforcement); over a dozen congressional agencies; and numerous other federal and state agencies as well as numerous private scientific and engineering foundations.

The PSC boasts of its 15,500 square foot warehouse with 70 computers and fulltime staffing. The only claimed benefit is that it allows the PSC "to be more effective and more efficient; facilitate interaction; promote the exchange of ideas among the group; yield better insight and strategies; and enable document reviews to maintain the pace required by the Court's schedule."[19] While a document depository might confer a benefit on the litigants, it does not help the GCCF claimants. The PSC claims that "the experience of centralizing common benefit work at the Depository has created an esprit d'corp and positive morale that has made the relocation sacrifice more than worthwhile". Id. These Plaintiffs and GCCF claimants should not be forced to contribute hundreds of millions of dollars to boost the PSC's sense of conviviality and morale.

---

[19] PSC's Memorandum in Support of its Motion to Establish Account and Reserve for Litigation Expenses by Plaintiffs' Co-Liaison Counsel, Doc. 4507-1, at p. 9; November 7, 20112;
Available on Pacer at: https://ecf.laed.uscourts.gov/doc1/08515536226 .

Further, the only claims made by the PSC for financial hardship are underwhelming at best, especially since the substantial financial contributions required for such litigation were known from the start of the case. In particular, the PSC has argued that "340 lawyers from ninety different firms . . . contributed over $11.54 million in out-of-pocket held and shared expenses for the common benefit."[20] However, the PSC never indicated how many of the hours or how much of the costs related to GCCF issues. To illustrate the incredibly aggressive nature of the holdback, simply consider the amount that could be placed into escrow from the GCCF payments alone. Between October 3, 2011 and January 3, 2012, the GCCF paid out $521 million or about $174 million a month. If the GCCF continues to pay claims at that rate, the escrow account could have received about $10.4 million dollars a month from GCCF. In little more than a month, the $11.6 million in claimed out-of-pocket expenses would be entirely covered by the GCCF payments alone. If the PSC prevails in this litigation, a holdback from these Plaintiffs and Claimants and those situated likewise will not be necessary to provide more than adequate compensation to the PSC.

### III. An Immediate Appeal from the Order Establishing an Account and Reserve would Materially Advance the Ultimate Resolution of this Litigation.

Finally, certification of the questions presented "may materially advance the ultimate termination of the litigation." 28 U.S.C. §1292(b). Courts across the country have recognized that this statutory element is satisfied where, as here, "immediate appeal would conserve judicial resources and spare the parties from possible needless expense if it should turn our that [the district court's] rulings are reversed." *APCC Servs., Inc. v. AT&T Corp.*, 2997 F. Supp 2d 101, 109 (D.D.C. 2003). Indeed, interlocutory appeal is especially useful and appropriate in a multi-district litigation such as this, since "the certification procedure of 28 U.S.C. §1292(b) was

---

[20] Id.; at pg. 9.

13

intended specifically to expedite the disposition of 'big' cases." *Zenith Radio Corp., v. Matsushita Electic* 494 F. Supp. 1190, 1244 (E.D. Pa. 1980).

Here, due to this order, the GCCF has withheld monies intended to compensate people for their lost income. While this order was amended to exclude claimants who only filed with the GCCF, it still penalizes claimants that hired an attorney if that attorney has other cases filed in the Court. The order should only apply to Claimants who received a benefit from the MDL. This order should be applied only to claimants who properly filed claims in a case either directly into this MDL or one that was transferred or removed to this MDL. Claimants that filed in the Limitation should also be excluded from this Order as they were misled by the PSC in that there would be no fee associated with filing in the Limitation.

The determination of this issue will help clients in determining whether or not they should accept an offer made to them by the GCCF because without this determination, a client cannot determine the proper amount they will receive and hence whether the offer is one they should accept.

**CONCLUSION**

For the reasons stated above, undersigned counsel and the plaintiffs they represent respectfully request that the Court certify for the Fifth Circuit's interlocutory review under 28 U.S.C. §1292(b) the question of the appropriateness of the hold-back of 6% for people who settle their claims with the GCCF.

14

Date: January 26, 2012                    Respectfully submitted,

/s/ Daniel E. Becnel, Jr.
Daniel E. Becnel, Jr. (2926)
Salvadore Christina, Jr. (27198)
Will Percy (01532)
BECNEL LAW FIRM, LLC
106 W. SEVENTH ST.
P.O. DRAWER H
RESERVE, LA 70084

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 26th day of January, 2012.

/S/ Daniel E. Becnel, Jr.
Daniel E. Becnel, Jr.