# EXHIBIT D

1    USCG/BOEM MARINE BOARD OF INVESTIGATION INTO THE MARINE

2     CASUALTY, EXPLOSION, FIRE, POLLUTION, AND SINKING OF

3    MOBILE OFFSHORE DRILLING UNIT DEEPWATER HORIZON, WITH

4           LOSS OF LIFE IN THE GULF OF MEXICO

5                  APRIL 21-22, 2010

6

7

8    ********************************************************

9              TUESDAY, AUGUST 24, 2010

10   ********************************************************

11

12

13        The transcript of the Joint United States Coast
     Guard, The Bureau of Ocean Energy Management, Regulation
14   and Enforcement Investigation of the above-entitled
     cause, before Toyloria L. Hunter, Certified Shorthand
15   Reporter and Registered Professional Reporter, Notary
     Public in and for the State of Texas, reported at the
16   Hilton Hobby Airport Hotel, 8181 Airport Boulevard,
     Houston, Texas 77061.

17

18

19

20

21

22

23

24

25

TRN-MDL-00282641

2

```
 1                  A P P E A R A N C E S

 2
     MEMBERS OF THE BOARD:
 3
          CAPT. HUNG M. NGUYEN, CO-CHAIR
 4        UNITED STATES COAST GUARD
 5        DAVID DYKES, CO-CHAIR
          THE BUREAU OF OCEAN ENERGY MANAGEMENT,
 6        REGULATION AND ENFORCEMENT
 7        HON. WAYNE R. ANDERSEN
 8        JASON MATHEWS
          THE BUREAU OF OCEAN ENERGY MANAGEMENT,
 9        REGULATION AND ENFORCEMENT
10        JOHN McCARROLL
          THE BUREAU OF OCEAN ENERGY MANAGEMENT,
11        REGULATION AND ENFORCEMENT
12        ROSS WHEATLEY
          UNITED STATES COAST GUARD
13
          CAPT. MARK R. HIGGINS
14        UNITED STATES COAST GUARD
15        LT. R. ROBERT BUTTS
          COURT RECORDER
16        UNITED STATES COAST GUARD
17
18
19
20
21
22
23
24
25
```

TRN-MDL-00282642

3

```
 1                A P P E A R A N C E S
 2   ATTORNEYS IDENTIFIED ON THE RECORD:
          MR. GREG LINSIN
 3        MARSHAL ISLAND
 4        MR. EDWARD KOHNKE
          TRANSOCEAN
 5
          MS. DEB KUCHLER and MS. KY KIRBY
 6        ANADARKO/MOEX OFFSHORE
 7        MR. DON GODWIN
          HALIBURTON
 8
          MR. CHAD JONES
 9        CAMERON
10        MR. MICHAEL LEMOINE
          WEATHERFORD INTERNATIONAL
11
          MR. STEVEN GORDON
12        DOUGLAS BROWN
13        MR. PATRICK FANNING
          JIMMY HARRELL
14
          MR. RICK SIMMONS
15        PATRICK O'BRYAN
16        MR. KYLE SCHONEKAS
          CAPTAIN KUCHTA
17
          MR. STEVE HAND
18        STEVE BERTONE
19        MR. SHAUN CLARKE
          ROBERT KALUZA
20
          MR. RONNIE PENTON
21        MICHAEL WILLIAMS
22        MS. HARIKLIA KARIS and MR. DON GODFREY
          BRITISH PETROLEUM
23
          MR. EDDIE CASTAING
24        DAVID SIMS
25        MR. SCOTT LASSAR
```

TRN-MDL-00282643

4

1                              INDEX

                                                     PAGE
2
Appearances.................................    2

3
4   DAUN WINSLOW
        Examination by Capt. Nguyen.............    7
5
        Examination by Lt. Butts................   34
6
        Examination by Mr. Adler................   69
7
        Examination by Lt. Butts................   72
8
        Examination by Capt. Nguyen.............   73
9
        Examination by Mr. Linsin...............   75
10
        Examination by Mr. Adler................   84
11
        Examination by Mr. Kohnke...............   95
12
        Examination by Mr. Godfrey..............  103
13
        Examination by Mr. Mathews..............  126
14
        Examination by Ms. Kirby................  129
15
        Examination by Mr. Gordon...............  138
16
        Examination by Mr. Fanning..............  170
17
        Examination by Mr. Schonekas............  175
18
        Examination by Mr. London...............  184
19
        Examination by Mr. Simmons..............  188
20
        Examination by Mr. Clarke...............  194
21
        Examination by Mr. Penton...............  201
22
        Examination by Capt. Nguyen.............  230
23
        Examination by Mr. Higgins..............  234
24
        Examination by Lt. Butts................  235
25

TRN-MDL-00282644

1    JESSE GAGLIANO
2         Examination by Mr. Mathews............... 240
3         Examination by Mr. McCarroll............ 270
4         Examination by Capt. Nguyen............. 272
5         Examination by Mr. Linsin............... 278
6         Examination by Mr. Godfrey............. 288
7         Examination by Mr. Kuchler............. 337
8         Examination by Mr. Gordon.............. 356
9         Examination by Mr. Fanning............. 362
10        Examination by Mr. Schonekas........... 365
11        Examination by Mr. Clarke.............. 369
12        Examination by Mr. Dykes............... 380
13        Examination by Mr. Penton.............. 381
14        Examination by Mr. Mathews............. 404
15        Examination by Mr. McCarroll........... 405
16        Examination by Capt. Nguyen............ 407
17   NATHANIEL CHAISSON
          Examination by Mr. Mathews............. 419
18
          Examination by Mr. Higgins............. 429
19
          Examination by Mr. Linsin............. 429
20
          Examination by Mr. Godwin............. 434
21
          Examination by Mr. Godfrey............ 440
22
          Examination by Mr. Clemeants.......... 443
23
          Examination by Ms. Kuchler............ 446
24
          Examination by Mr. Ball............... 448
25

TRN-MDL-00282645

1          Examination by Mr. Mathews.............   451

2          Examination by Mr. Dykes...............   452

3

   Reporter's Certificate........................   466

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TRN-MDL-00282646

1    attorney, but I'm the attorney for the company that

2    employees him.

3                    MR. MATHEWS:  Thank you very much.

4                    MR. GODWIN:  Thank you.

5                    JUDGE ANDERSEN:  Mr. Gagliano, you're

6    comfortable with Mr. Godwin sitting at the table with

7    you?

8                    THE WITNESS:  Yes, I am.

9                    MR. GODWIN:  Thank you, Your Honor.

10   Thank you, Captain.  Thank you, Mr. Dykes.

11                   JESSE GAGLIANO,

12   having been first duly sworn, testified as follows:

13                   EXAMINATION

14   BY MR. MATHEWS:

15       Q.   Mr. Gagliano, for the record, could you please

16   state your full name and spell your last.

17       A.   It's Jesse Marc, M-A-R-C, Gagliano,

18   G-A-G-L-I-A-N-O.

19       Q.   Thank you.  And by whom are you employed, sir?

20       A.   Haliburton.

21       Q.   And what position do you hold with Haliburton?

22       A.   Currently I hold a technical sales advisor

23   position.

24       Q.   And what office do you work at, sir?

25       A.   I work at Halliburton's Oak Park facility.

TRN-MDL-00282880

241

```
1        Q.   Do you work within BP's office as well?

2        A.   I no longer -- no.

3        Q.   Okay.  And how long did you work with BP's

4   office?

5        A.   I started with them approximately in January

6   of '06, and I was recently left probably sometime in

7   June, June of this year.

8        Q.   And how long have you been with Haliburton,

9   sir?

10       A.   Started in October '99, so a little bit --

11  about 11 years.

12       Q.   Prior to Haliburton, did you have any other

13  previous oil and gas experience?

14       A.   No.

15       Q.   Can you just briefly describe your job

16  responsibilities, sir.

17       A.   Working at BP's office, I was an account -- I

18  filled the role of account representative.  I was

19  responsible for doing basically the design for well,

20  cementing portion, doing OptiCem runs, providing

21  technical support in cementing operations, cementing lab

22  tests, things of that sort.

23            Also working with the guys on the rig in

24  logistics, ordering product for the jobs coming up.

25       Q.   And the guys on to rig, who would that be?
```

TRN-MDL-00282881

1    Would that be Haliburton employees or BP or

2    Transocean's?

3         A.   I worked directly with the Haliburton

4    employees.

5         Q.   And just so I have a better overview of your

6    authority, did the guys on the rig actually report to

7    you or did they report to personnel on the rig?

8         A.   They reported to a service coordinator in

9    Lafayette.  The didn't report directly to me.

10        Q.   And who is that service coordinator, sir?

11        A.   At the time, it was Danny Mooney.

12        Q.   While you were at BP, who did you work with,

13   sir?

14        A.   I mainly worked with the HORIZON exploration

15   group.  You need me to name all the names or just the

16   group?

17        Q.   Just the core group that you worked with down

18   there.

19        A.   Mainly with John Guide, Brett Cocales, Brian

20   Morel, Mark Hafle.  Those are specific to Macondo well,

21   but there were several other engineers I worked with on

22   other wells.

23        Q.   And what was your interaction with those

24   gentlemen?

25        A.   I worked in their office, and I officed on the

TRN-MDL-00282882

1   same floor with those gentlemen.  I attended the morning

2   calls every day with them, and I interacted on a daily

3   basis with them.

4       Q.   So every morning call throughout the duration

5   of Mississippi Canyon 252, Monday through Friday, you

6   participated in?

7       A.   That's correct.  And also on the weekends,

8   there were conference calls.

9       Q.   And I assume Mr. John Guide sat in on those?

10      A.   Yes, majority of them, yes.

11      Q.   And did you have any concerns about any of the

12   personnel that you worked with at -- on the DEEPWATER

13   HORIZON team with respect to your job responsibilities

14   or the respect of the OptiCem?

15      A.   As far as the people in-house?

16      Q.   Yes, sir.

17      A.   No, we work -- I worked with them for about

18   five years.  There was no major issues with --

19      Q.   You have recently just told me that you had

20   left in June of 2010?

21      A.   Yes, sir.

22      Q.   Was that on your own accord, or was there some

23   reason behind that?

24      A.   I had recently been promoted, March 1st, to

25   technical sales advisor position, and they were in the

TRN-MDL-00282883

1  process of trying to find a replacement for me to go in

2  to in-house at BP.  I had volunteered to stay through in

3  the Macondo well because of the issues going along.

4          And then once the incident took place, I

5  stayed there and worked on the relief well up to a

6  certain point in June.

7      Q.   At any time during the Macondo well, did

8  anyone within the DEEPWATER HORIZON team, the names that

9  you had mentioned earlier, did anyone address any

10 concerns to you about your performance?

11     A.   No.

12     Q.   Have you been replaced with someone else

13 within that team, sir?

14     A.   Yes.

15     Q.   And who would that be?

16     A.   Rick Gosen (phonetic).

17     Q.   Can you give me a brief synopsis of that, what

18 you actually do when you run the OptiCem models, like

19 what variable you're looking at, what you input to your

20 computer to get an output.

21     A.   Okay.  It's an OptiCem, the name of it.  But

22 basically, I get information from BP, pipe tallies, frac

23 gradient, pore pressures, directional data if available,

24 caliber data available.

25          The majority of the data I receive from BP

TRN-MDL-00282884

1    to model this software, and then I do a cement design,

2    spacer design based on the mud properties given to me,

3    and we run the simulation.

4              But those are the main variables we use.

5         Q.   Okay.  And all that data is supplied to you by

6    BP?

7         A.   Yes, all the well data is supplied to me by

8    BP.

9         Q.   Okay.  And how long -- how many actual models

10   did you run for this well?

11        A.   Specifically the production casing?

12        Q.   Yes, sir.

13        A.   We ran several.  We started modeling it

14   probably in February.  We knew the HORIZON was going to

15   get back -- go back to location.  We were looking at a

16   number of different scenarios, so countless.  I mean 30,

17   40, plus.

18        Q.   Did you ever run a model with a liner?

19        A.   Yes.

20        Q.   And when did you run that model --

21        A.   I know that's one --

22        Q.   -- or the last model?  Sorry.  I know you

23   probably ran multiple ones, but when was the last one

24   you ran for that?

25        A.   Probably several weeks, a couple weeks before

TRN-MDL-00282885

246

1   the job I think.

2        Q.    Were you involved in any of the discussions

3   between going with either a long string or a liner or

4   tie-back?

5        A.    No, I was not involved in discussions of which

6   options.

7        Q.    Did -- from you doing the model, did either

8   cementing option indicate that one was better from a

9   cementing standpoint?

10        A.    I know they preferred to go with the long

11   string.  They were basing everything -- the decision

12   based on if we could get cement in place.  And we -- you

13   know, the last model we ran on the 14th with the long

14   string, we were all satisfied with the results, thinking

15   that we could cement in place successfully.

16        Q.    And when you performed the OptiCem or -- I'm

17   sorry if I say it wrong again -- but OptiCem modeling,

18   was all the data that you had input for the last one,

19   April 18th, accurate, to the best of your knowledge?

20        A.    Yes, yes, it was.

21        Q.    And who actually verifies that that data is

22   correct?  Is it someone that you work with or is it

23   Brian Morel or Mr. John Guide?

24        A.    Well, I'll input the data, and then when I

25   generate the report, I'll send it out and usually I'll

TRN-MDL-00282886

1   get feedback from them saying, "Hey, this is off.  This

2   is off."

3                   But I got -- I received no feedback when

4   the 18th model ran.

5        Q.   Okay.  How reliable is that model, sir?

6        A.   I feel it is very reliable.

7        Q.   I actually have something in front of you that

8   actually references how reliable it is, and it's

9   Halliburton's Primary Cementing Best Practices.  There's

10  no Bates number on this, but it was provided to you.

11                  MR. GODWIN:  We have it.

12  BY MR. MATHEWS:

13       Q.   Can you take it out and I'm going to go -- I'm

14  sorry.

15                  If you can refer to Item No. 7, which is a

16  section that's entitled Gas Flow.

17       A.   Yes.

18       Q.   Can you read where it starts "The OptiCem"

19  through the end of that sentence -- or paragraph, sir?

20       A.   "The OptiCem program can be utilized as a tool

21  to determine the gas flow potential on any primary

22  cement job.  The Haliburton gas flow calculation, when

23  combined with local engineering experience, is a premier

24  industry solution to gas flow problems through unset

25  cement."

TRN-MDL-00282887

8/24/2010

248

1       Q.    And you stand by that statement, sir?

2       A.    Yes.

3       Q.    Had the model ever been questioned prior to

4   April 18th?

5       A.    Yes.

6       Q.    And who questioned the model, sir?

7       A.    I remember Brian Morel did.

8       Q.    Do you know why he questioned the model, any

9   specific reason?

10      A.    Through the several runs we did, some of the

11  outputs he didn't necessarily agree with or have

12  questions.  So I tried to do provide the best answer

13  possible to him.

14            Also on the 14th when we were modeling, we

15  were looking at -- there's a compressibility function on

16  the model that was different than what they were reading

17  off the logging tools, so there's a slight difference

18  there.

19            But the model -- my model, I could only

20  input base fluids for Baroid and we actually had M-I on

21  the rig so there would be a little bit difference in

22  compressibility there.  So that's what we encountered

23  the difference for.

24            So basically, we just unchecked it and

25  hard entered the compressibility they were reading off

TRN-MDL-00282888

```
 1   the logging tools.
 2       Q.   So as you completed the model on April 18th,
 3   you stand behind the actual output that you received for
 4   having less than seven centralizers?
 5       A.   Yes.  I mean, the output is based on the
 6   information and it calculates what's inputted
 7   accurately.
 8       Q.   Have you worked with any other OCS operators,
 9   sir?
10       A.   OCS operators?
11       Q.   I'm sorry, Outer Continental Shelf, Gulf of
12   Mexico production operators.  Sorry.
13       A.   Work in-house with them?
14       Q.   Yes.
15       A.   No.  I've worked mainly in-house with BP.
16       Q.   I'm going to refer to now the document that's
17   been presented a few times within this investigation,
18   and that is the report that you had supplied BP on
19   April 18th entitled 9-7/8ths-inch-by-7-inch Production
20   Casing Design Report, and the Bates number on that is
21   HAL_0010988.
22            Do you have that in front of you, sir?
23       A.   Yes, I do.
24       Q.   Okay.  From your standpoint, sir, which is the
25   most important component of that report?
```

TRN-MDL-00282889

250

1      A.   I feel there's several, but in this particular

2  case when I removed the 15 additional centralizers, it

3  showed that channelling would occur with the seven I

4  left in here.

5      Q.   Okay.  And what page is that on, sir?

6      A.   On Page 23, there's a wellbore schematic and

7  it's color-coded with the fluids in the hole.  And at

8  the bottom of the schematic, the yellow here

9  indicates --

10     Q.   And just so we're all on the same page, is

11 that the document on the top of the easel there, sir?

12     A.   Yes, it's the top picture on the easel.

13     Q.   Okay.  Thanks.

14     A.   The yellow indicates the cement, and the green

15 left behind indicates the mud that's been left behind

16 due to channelling.

17     Q.   Is there any other reference what's in that

18 report that makes the reader aware of gas flow potential

19 outside of the image?

20     A.   Yes.

21     Q.   And what page is that on, sir?

22     A.   On Page 18.

23     Q.   Okay.  Can you read what it says, please?

24     A.   It's under Section 5.4.  It's labelled Gas

25 Flow Potential.  In this case, the gas flow potential is

TRN-MDL-00282890

1    a 10.29, and it gives the reference depth at the

2    reservoir zone.  And it says, "Based on this analysis of

3    the above-outlined well conditions, this well is

4    considered to have a severe gas flow problem.  Wells in

5    this category fall into a Flow Condition 3."

6         Q.   Is there an executive summary or anything that

7    goes up in there?  We've had some testimony in front of

8    the Board about how they don't read the whole document

9    because it's 20-something pages, 30 pages.  Is there any

10   type of executive summary or anything in there that

11   indicates that there's a gas flow potential problem?

12        A.   No.

13        Q.   All right.  I'm going to refer now to an

14   e-mail on April 18th that you were sent out at 8:58 p.m.

15   It should be right in front of you.  And it has an -- it

16   actually a string of e-mails.

17             And it's a -- it was introduced last

18   hearing, and I think the top response was back to you

19   from Nathaniel Chaisson.  Is that what you're looking

20   at, sir?

21        A.   Yes.

22        Q.   Can you please read what your e-mail says at

23   8:58 p.m.?

24        A.   The e-mail I sent?

25        Q.   Yes, sir.

TRN-MDL-00282891

1      A.    It says, "Attached is the revised information

2   for the upcoming 9-7/8ths-by-7-inch production casing

3   job.  The compressor strength is not yet completed" --

4   not completed yet," excuse me, "and currently has 34

5   hours.  A chart of the progress is below.  Let me know

6   if you have any questions.  Thanks."

7      Q.    Okay.  And can you just do a quick review of

8   the To list and the CC list?

9      A.    The To list --

10      Q.    You don't have to read their names.  Just can

11   you take a quick look at it?

12      A.    Okay.

13      Q.    Are any of those employees work outside of BP

14   or Haliburton?

15      A.    No, I believe they're all employed with

16   Haliburton or BP.

17      Q.    Is there a reason -- and I'm only looking at

18   this from my side of hindsight -- is there any reason

19   why there's no warning or any type of indication that

20   there was a potential for gas flow in this e-mail or --

21      A.    No.  On April 18th -- I mean, excuse me, on

22   April 15th when I first noticed the problem, I printed

23   out a similar graph to the one above here that showed

24   the channelling.

25            Once I noticed that was occurring, I

TRN-MDL-00282892

1   printed out that -- not that exact graph, but a similar

2   OptiCem with similar results, I printed the graph out

3   and notified BP of the potential issue that we were

4   facing.

5        Q.    Okay.  And that only went to the same To list

6   here?

7        A.    No, I didn't send it out by e-mail.  I was

8   actually in the office working on it.

9        Q.    Okay.

10       A.    And when I noticed the problem, I printed it

11  out and I got up to go show BP.  And when I came around

12  the corner, I ran into Brett Cocales and Mark Hafle.

13  And I pointed it out to them and said, "Hey, I think we

14  have a potential problem here.  There's a potential for

15  flow due to the six centralizers.  I'm showing

16  channelling."

17            I remember the conversation that Mr. Mark

18  Hafle, who was on the way out to a meeting, and we

19  briefly discussed it.  He says, "We'll get with Brett,

20  see what we can do to fix the problem."

21            And then Mark left, and I stayed behind

22  with Brett Cocales.  And then later on, Greg Walz joined

23  us and we worked through the afternoon working different

24  scenarios with different centralizer options to see what

25  we could do to take care of the issue.

TRN-MDL-00282893

1       Q.    Now, I'm going to jump to the morning of

2    April 19th.  Did you participate until the morning call

3    to the rig, sir?

4       A.    Yes.

5       Q.    Was Mr. John Guide on that phone call with

6    you?

7       A.    I believe he was, yes.

8       Q.    And you sent this out to them, I believe, at

9    almost 9:00 o'clock the night before?

10      A.    That's correct.

11      Q.    Did anything come up in that morning meeting

12   with the personnel on board the rig about the gas flow

13   potential or the cement job that was pending?

14      A.    No, not -- no, I don't remember anything being

15   said about it.

16      Q.    To your knowledge, was it ever brought to

17   anyone's attention prior to doing the cement job on the

18   rig that they had the potential for severe gas flow?

19      A.    I know Brett Cocales had conversations with

20   Brian Morel about the channelling effects.  On the

21   evening of the 15th when I was -- we worked late that

22   evening trying to run different scenarios.

23            And when we finally came down to 21

24   centralizers would take care of the issue, he called

25   Brian, who he was on the rig at the time, and discussed

TRN-MDL-00282894

1   it with him, the results.

2        Q.   Sir, did the Haliburton personnel out on the

3   rig have any conversations with Mr. Morel?

4        A.   Not that I'm aware of.  I'm not sure.

5        Q.   Is it typical protocol for Haliburton to only

6   notify the operator, BP in this case, or, say, for

7   example, if you did work for, say, MOEX or Anadarko

8   because they're another operator here, but do you

9   normally just send it to the operator or do you have any

10  (inaudible) -- and within Haliburton?

11            MR. MATHEWS:  And I'm not trying to

12  indicate that they sent it to you.  I was just giving an

13  example of an operator, and I apologize for that.

14            MS. KIRBY:  Well, I just object to the

15  characterization in this situation that Anadarko and

16  MOEX are not operators.

17            MR. MATHEWS:  Understood.  It was poor --

18  I was just trying to explain an operator.  I apologize

19  for that, ma'am.  I just looked around the room and saw

20  an operator and picked your name.

21  BY MR. MATHEWS:

22        Q.   But is it protocol for you-all to just notify

23  to the operator?

24        A.   Yes, I just send it to BP.  I don't get

25  involved with the partners or any of that.

TRN-MDL-00282895

1      Q.    Okay.  Were you aware of the severe loss

2  returns experienced within this well set?

3      A.    Yes.

4      Q.    And did that have any affect on the design of

5  the cement job?

6      A.    Well, when we were modeling the production

7  casing job several days before that, I wasn't aware of

8  any losses.  When it came closer to the cement job, I

9  mean, they had terrible losses throughout the well.

10             But the main thing they were looking at

11  was modeling the liner compared to a long string, and

12  their preference was the long string to, you know, see

13  if we can get the cement job.  They were banking

14  everything on that if they could get the cement job in

15  place.

16      Q.    Is the model capable of indicating what would

17  happen to the cement if there was -- if it experienced a

18  negative test?

19      A.    No, I don't believe so.

20      Q.    Who actually proposed the use of nitrified

21  cement?

22      A.    I did make -- recommend it.  At first Brian

23  Morel, who was a drilling engineer, was back and forth

24  with it.  And then finally, he also came to me and said

25  we'll go ahead and nitrify.

TRN-MDL-00282896

```
 1              So I did recommend it, and he decided it
 2   would be a good option as well.
 3        Q.   And why did you make that recommendation?
 4        A.   I mean, it has good mechanical properties.
 5   This is a production casing job.  Also it gives you the
 6   ability to be very flexible, especially in this case
 7   with this well with mud weights changing a lot.  You can
 8   pretty much change it on the fly just by adjusting the
 9   nitrogen in your base slurry.  You can just test it.
10   You don't have to change that test again.
11        Q.   Did you actually prepare the design of the
12   cement job, sir?
13        A.   Yes, I did.
14        Q.   Are you a licensed engineer?
15        A.   A P.E.?
16        Q.   Yes, sir.
17        A.   No.
18        Q.   What's the time required to achieve a minimum
19   compressor strength with nitrified cement?
20        A.   Accord to the lab test?
21        Q.   Yes, sir.
22        A.   The compressor -- the crush test shows zero at
23   12 -- I don't have it in front of me -- but it showed
24   zero for a good portion of it.  That test is not done
25   under well conditions, though.  It's not done under
```

TRN-MDL-00282897

1    pressure.  And it's done, actually, at a cooler

2    temperature than the well experienced.

3        Q.    I'm not a nitrified cement expert, but does it

4    have any -- does it ever become effected if it comes in

5    contact with hydrocarbons?

6        A.    With the hydrocarbons?

7        Q.    Yes, sir.

8        A.    Actually, it combats the flow of any

9    hydrocarbons with the energized fluid.

10       Q.    Do you know why the cement design left a 16.17

11   pound per gallon cement slurry in the cement shoe track

12   above the open hole, which I think had 14. -- 14 pound

13   per gallon mud?

14       A.    I believe in this case there was some

15   discussion with completion they may have to go back and

16   drill out a little bit, and you don't want to have the

17   nitrified cement in there and drill out to have nitrogen

18   come back out up at you, so we unfoamed the shoe track.

19              Also for testing and casing purposes, it

20   sets up quicker.  And I don't know have the lab tests in

21   front of me, but you can see a compressor's trim develop

22   of that, and you know when you can test the casing and

23   test the shoe.

24       Q.    Is there any risk the cement can actually fall

25   into rathole under that type of scenarios?

TRN-MDL-00282898

1      A.   With a 14, yeah, there's potentially a good

2   swap, yes.

3      Q.   Did you y'all consider that risk when you

4   designed this thing?

5      A.   I don't recall having those discussions, no.

6      Q.   When and how did you learn about the number of

7   centralizers being run being reduced from 21 to 6?

8      A.   Nobody from BP told me.  I found out through

9   Haliburton personnel on the rig that that took place.

10      Q.   I want to refer to an e-mail just about this

11   discussion, and it's Bates No. BP-HZN-MBI-00128489.

12           Do you have that in front of you, sir?

13      A.   Yes.

14      Q.   I'm only going to refer to the top e-mail

15   which is from you to Mr. Morel and Mr. Hafle,

16   Mr. Cocales and Mr. Walz.

17           Can you -- I don't know if I highlighted

18   it on your e-mail, but do you see the second paragraph?

19      A.   Yes.

20      Q.   Can you please read what that says?

21      A.   "Can you also confirm if we are running the

22   additional centralizers or not?  I heard from the rig

23   that we were not going to run them.  If this is the

24   case, I will update the OptiCem to reflect."

25      Q.   Did you ever receive a response from either

TRN-MDL-00282899

1   one of those gentlemen according to the e-mail?

2        A.   No.

3        Q.   And who informed the rig?

4        A.   I'm not sure who informed the rig.

5        Q.   Do you know who made the final decision to go

6   from 21 to 6?

7        A.   No, I'm not sure.

8        Q.   At any time did you have any conversation with

9   the rig about the gas flow potential or Haliburton

10  personnel performing the job, what that would do to the

11  reduction of the centralizers?

12       A.   Did I talk to personnel on the rig?

13       Q.   Yes, sir.

14       A.   No, I talked to the individuals in the office.

15       Q.   And who was that?

16       A.   When I first noticed the problem, I talked to

17  Brett Cocales and then Greg Walz, and that's when we

18  started working on the different centralizer options in

19  the evening of the 15th.

20       Q.   And just for purposes of the audience, can you

21  please explain "channelling" and what "gas flow

22  potential" is?

23       A.   "Channelling" is when you circulate cement

24  around and you do not get the full circulation

25  displacement of mud.  You actually leave some mud behind

TRN-MDL-00282900

261

```
 1    to where you have, you know, cement on one side and mud
 2    on the other side.  That's considered channelling.
 3    You're not getting the complete zone insolation.
 4         Q.   And what is the point of having centralizers?
 5         A.   It keeps the casing centralized in the hole.
 6    Fluid will tend to go the path of the least resistance.
 7                   So if you have the casing laying on one
 8    side and you have a restriction, it would tend to go up
 9    the wider side and channel.
10         Q.   So if you have a reduction in centralizers,
11    the likelihood of channelling is increased?
12         A.   In this particular case, yes.
13         Q.   Does Haliburton have its own internal best
14    cement practices, sir?
15         A.   Yes, they do.
16         Q.   Such as minimal hole size versus casing size?
17         A.   Yes.
18         Q.   And circulate them bottoms up prior to pumping
19    cement?
20         A.   Yes.
21         Q.   Can you please refer back to the best
22    practices I asked you about earlier and refer to Item
23    No. 6 entitled Hole Size?
24                   Can you read Item No. 6, sir?
25         A.   "Best mud displacement under optimum rates is
```

TRN-MDL-00282901

1   achieved when annular tolerances are approximately 1-1/2

2   to 2 inches.  Centralization of a very small annuli is

3   very difficult.  The pipe movement and displacement

4   rates may be severely restricted.  Very large annuli may

5   require extreme displacement rates to generate enough

6   flow energy to remove the drilling fluid and cuttings.

7   Combined small and large intervals resulting from the

8   use of bicenter bits below small casing can be very

9   challenging.  Very careful hydraulics modeling is

10  required in such cases."

11        Q.   Okay.  What was the open hole size for the

12  7-inch production casings?

13        A.   It was 8-1/2-by-9 and -- I don't remember.

14        Q.   All the way at the bottom, at TD?

15        A.   Oh, at the T -- at very -- it was 8-1/2 at TD,

16  I believe.

17        Q.   Did that meet the best cement practices that

18  y'all have, sir?

19        A.   Yes, it did, 1-1/2 inches, yes.

20        Q.   Okay.  Are you familiar with API RP 65?

21        A.   Yes, I am.

22        Q.   Did it meet the best practices of API RP 65 --

23        A.   To my knowledge, I believe, yes.

24        Q.   -- 2 inches?

25                  Did you look at the procedure that was

TRN-MDL-00282902

USCG HEARING DAY 2                                                8/24/2010

263

```
 1   sent out to the rig for the cement job from BP?
 2         A.    The -- actually, the procedure was written on
 3   the rig and sent in to me.
 4         Q.    And you reviewed that?
 5         A.    Yes.
 6         Q.    Did it require them to circulate bottoms up?
 7         A.    No, the procedure did not say bottoms up.  It
 8   stated a certain volume, I believe 133 approximately at
 9   one stage.
10         Q.    Did that meet Halliburton's best practices?
11         A.    No, it did not.
12         Q.    Did anyone at BP or Haliburton -- I'm only --
13   and when I say "BP," I'm talking about the gentlemen
14   that you worked with in the office because you weren't
15   on the rig.
16         A.    Right.
17         Q.    But did anyone at BP or Haliburton use ever
18   consider using what they call a think stop card or stop
19   work, knowing the actual potential of risk they were
20   facing?
21         A.    Not that I'm aware of, no.
22         Q.    You are aware of those programs, are you not?
23         A.    Yes, I am.
24         Q.    What type of stop work authority do you think
25   you have within your office?
```

TRN-MDL-00282903

1     A.   If you deem the job unsafe, anybody can stop

2  the job.

3     Q.   Did you deem this job unsafe?

4     A.   No.  I mean, channelling does not equal a

5  blowout.  Channelling just equals, you know, increased

6  risk of mitigating a problem of a cement squeeze.

7     Q.   Were you aware that BP had set up Schlumberger

8  to be out at the rig to possibly run a cement evaluation

9  tool?

10     A.   Yes, I was.

11     Q.   Were you involved in any type of discussions

12  with BP or Haliburton at the rig on why that operation

13  was deferred?

14     A.   No.

15     Q.   Were you involved with a decision tree

16  developed by Mr. Brian Morel, Mr. Cocales on Mr. Hafle

17  on the production casing cement job which would indicate

18  that they would possibly need to run a cement evaluation

19  tool?

20     A.   I was not involved with the planning, but I

21  was aware of the decision tree.

22     Q.   Did that decision tree have anything to do

23  with channelling?

24     A.   My understanding of the decision tree was if

25  all indications that surface was that the job went fine,

TRN-MDL-00282904

1   we got full returns, that they would opt not to do the

2   cement bond log.  But if there was any indications that

3   we had losses or anything like that, that they would.

4   That was my understanding of the decision tree.

5        Q.   I want to jump back to nitrified cement.  How

6   many nitrified cement jobs have you been associated with

7   before, sir, prior to this well, not including this

8   well?

9        A.   In BP's office or through my career?

10        Q.   Your career.

11        A.   Over a hundred.  I've been involved

12   cementing -- foam cementing since I started with

13   Haliburton.

14        Q.   Had you ever used one at a depth that you were

15   using it here?

16        A.   Yes.

17        Q.   And where did you do that at?

18        A.   Actually, I did, besides this one, three other

19   ones at BP, and then I did also several when I was in

20   the field working out of Lafayette with other various

21   customers.

22        Q.   At this TD?

23        A.   I believe so, yes.

24        Q.   Are there any failures or problems or any type

25   of issues that you have concerns with using nitrified

TRN-MDL-00282905

1    cement?

2         A.    No.  I mean, I've used it on a regular basis.

3    I'm very familiar with it, and I have no issues with it.

4         Q.    How many high gas flow potential -- and when I

5    say "high gas flow potential," I think the indication in

6    the report is somewhere greater than a 7.

7         A.    Uh-huh.

8         Q.    Is that fair?

9              How many of those jobs have you done,

10   actually gone out and completed as -- to have that type

11   of potential?

12        A.    I can't remember.  I know I've been involved

13   in some, but I don't remember a number.  Most of them

14   were out in the field over five years ago, six years

15   ago.

16        Q.    And just to put it into perspective, and you

17   can correct me if I'm wrong, we were provided some

18   numbers by Haliburton through a subpoena.

19              And the accuracy of these numbers -- I'm

20   going to preface what I give you -- they weren't certain

21   on it just because the way the model was setup, a quick

22   query, but they went back and tried to give us the best

23   numbers that they had.

24        A.    All right.

25        Q.    It appears that they did 21 in the -- that had

TRN-MDL-00282906

1   a gas flow potential to be severe or higher on the Outer

2   Continental Shelf of the Gulf of Mexico.  Does that

3   sound correct to you?

4        A.   Yes, it could be possible, yes.

5        Q.   And about 53 in the Gulf-wide area?

6        A.   Yes.

7        Q.   Of those 21, it looked like BP only had two of

8   those.  So are there other operators that actually take

9   the chance and risk to go out and use this gas flow

10   potential that's higher than 7?

11        A.   That indicates they have, yes, sir.

12        Q.   Had you been involved with any other operators

13   that you're aware of?  I know you solely worked with BP

14   in the office.

15        A.   Right.

16        Q.   Were you aware of any other operators?

17        A.   When I was in the field, I know I did a couple

18   for some other major operators.  I don't recall the gas

19   flow potentials on those wells, but they were production

20   liners or casing jobs.

21        Q.   Are you aware of the e-mail that I talked to

22   you earlier about Mr. Nathaniel Chaisson sent you back

23   something.  I think you had indicated that you -- it's

24   his e-mail response was on Tuesday, April 20th at 5:44,

25   and it had a bunch of attachments on it?

TRN-MDL-00282907

1      A.    Yes.

2      Q.    And I think it was "Jesse."

3             It says, "We have completed the job and it

4   went well.  Full returns were observed throughout, and I

5   estimated that 100 psi of plug pressure before we bumped

6   the plug."

7             At any time, have you reviewed any

8   Sperry-Sun or any type of data that indicated that there

9   was not full return received?

10     A.    No, I did not analyze any data.

11     Q.    And what is all these attachments?

12     A.    This looks like the job data.  It's the

13  actual -- it's a SIMWIN program we have that captures

14  all the pressures, rates, everything to do -- associated

15  with the job.  And it uses -- e-mailing me the job data

16  for the job.

17     Q.    Okay.  Had you ever been out to the DEEPWATER

18  HORIZON?

19     A.    Yes, I have.

20     Q.    Okay.  Was it actually during a cement job, or

21  were you just out there to visit?

22     A.    When I was in the field when the HORIZON first

23  came into the Gulf of Mexico, I caught the very first

24  foam jobs out there, and I caught several jobs after

25  that while I was in the field.

TRN-MDL-00282908

1        Q.    Do you know what flow-in and flow-out meters

2   is?

3        A.    Yes.

4        Q.    Okay.  I'm going to refer to this chart over

5   here.  This is the during the cement job.  We looked at

6   the flow in and flow out?

7        A.    Right.

8        Q.    The top line, the blue line, being flow in and

9   the pink line being flow out, okay?

10              From the data during the cement job, it

11  indicates that there was about 80 barrels lost.  Do you

12  monitor the flow in and flow out during the cement job?

13       A.    I was not on location.

14       Q.    But when you were out on location when you did

15  a cement job, did you --

16       A.    No.  Usually when I was an engineer on

17  location, our priority was taking care of the job and

18  foam cement.  We would monitor the job.  We relied on

19  others to let us know if we had full returns or not.

20       Q.    Okay.  And how many barrels was this cement

21  job for this production casing?

22       A.    I'm trying to remember.  I think it was

23  roughly around 50, 55, 60 barrels.

24              MR. MATHEWS:  I have no other questions

25  at this time, but is there anything that we haven't

TRN-MDL-00282909

1    asked you that you can provide the Board that may be

2    beneficial to this investigation?

3                    THE WITNESS:  Not at this time.  I don't

4    believe so.

5                    MR. MATHEWS:  Okay.  Thanks for

6    testifying before us, sir.

7                    THE WITNESS:  No problem.

8                    JUDGE ANDERSEN:  Any other questions from

9    the Board?

10                   MR. MCCARROLL:  Yes, I have a couple of

11   follow up questions real quick.

12                          EXAMINATION

13   BY MR. MCCARROLL:

14       Q.   On the decision tree from BP, is that BP's

15   decision tree to start off with?

16       A.   That's correct.  It's BP's.

17       Q.   Is the decision tree flawed because -- and

18   here's my logic -- if you had channelling, you would

19   never see that on loss returns, and the decision tree,

20   it says look for lost returns?

21       A.   Correct.

22       Q.   Shouldn't the decision tree have something in

23   there to look for channelling to determine whether you

24   should run the Schlumberger log or not?

25       A.   The only way I know to verify if channelling

TRN-MDL-00282910

1    occurred was run the cement bond log.

2        Q.    Right.  I was just confused as to why the

3    decision tree didn't have something in there to make a

4    decision related to channelling since the centralizers

5    were changed at the last moment.  That was the only

6    reason I was asking.

7              MR. MCCARROLL:  Thank you.

8              JUDGE ANDERSEN:  Any other?

9                        EXAMINATION

10   BY MR. MATHEWS:

11       Q.    Mr. Gagliano, Mr. Mathews asked you earlier

12   about the model and what was the most important

13   information in that model.  Would you kind of recap for

14   us?  We never did get through a full answer for that.

15   But what is the most important information or the top

16   five pieces of information in this model that are most

17   important?

18       A.    For this particular job, in this case, the

19   direction was -- played an important factor in the

20   caliber log, and also the centralizer played a --

21   placement and the fluids information and, of course, the

22   casing information is probably the top five, I believe.

23       Q.    Okay.  And gas flow potential doesn't fall out

24   in there as being an important piece of information one

25   way or the other?

TRN-MDL-00282911

1       A.    Well, gas flow is calculated off a lot of

2   those things I just mentioned.

3       Q.    Okay.  But as a result of you punching in the

4   numbers, what is the most important information that is

5   fed back to the operator?

6       A.    Probably in this case the gas flow potential

7   and also the well schematic that indicated the potential

8   for flow.

9       Q.    Okay.  And that's what you provide to the

10  operator --

11      A.    Correct.

12      Q.    -- is the model?

13      A.    Yes.

14      Q.    Okay.  So there's no executive summary in this

15  model whatsoever that identifies here's the feedback

16  from your parameters that you gave me to plug into the

17  model?

18      A.    No, I mean, they can review the model for

19  accuracy of my inputs, but there's no executive summary.

20              MR. MATHEWS:  All right.  Thank you.

21              CAPTAIN NGUYEN:  Mr. Gagliano, just a few

22  questions regarding the OptiCem software.

23                      EXAMINATION

24  BY CAPTAIN NGUYEN:

25      Q.    I'm an outsider so I don't know whether the

TRN-MDL-00282912

1   software there, whether it's any good.  Can you give me

2   some idea about OptiCem as comes up.  Is it a industry

3   standard?  How does that -- if it's not, how does it

4   compare to industry standard software for this kind of

5   work?

6       A.   This software is Haliburton-specific.  I mean,

7   our competitors have their own versions.  My

8   understanding, they all provide very similar information

9   as far as ECDs and placement and fluid position at the

10  end of the job.

11           It is a model.  It is as good as the

12  information you put into it.  So the more accurate

13  information you have, the more accurate the output will

14  be.

15      Q.   So are there other cementers engaged in the

16  deepwater drilling besides Haliburton?

17      A.   Yes, we have competitors in the deepwater

18  market, yes.

19      Q.   Who are they?

20      A.   Schlumberger, and DOW -- BJ, excuse me.

21  That's the two major.

22      Q.   Do they have their own software to do this

23  kind of work?

24      A.   Yes, they do.

25      Q.   And all three, that's these software packages,

TRN-MDL-00282913

1    they based on the same theories, principle --

2    engineering principle how -- what is -- how the software

3    get --

4         A.   I'm not that familiar with them, but I'm

5    assuming it's based on --

6                   MR. GODWIN:  Just don't guess.

7         A.   I'm not familiar with their software, their

8    inputs or anything like that.

9    BY CAPTAIN NGUYEN:

10        Q.   But it should be based on the same theories,

11   that it's same operation here with Haliburton?

12        A.   I would think so, yes.

13        Q.   Okay.  Now, how do you know -- there is a

14   process where you continually improve the accuracy of

15   your software?

16        A.   As far as software upgrades?

17        Q.   Yes, sir.

18        A.   Yes.  They have -- we have a department in

19   Haliburton that -- that, you know, improves or adds

20   features to the models.

21        Q.   How do you -- what kind of feedback do you get

22   to cause you to upgrade a software to enhance the

23   accuracy?  What -- I don't know.  That's why, you know,

24   these questions.

25        A.   Yeah.

TRN-MDL-00282914

1      Q.    Is the cement bond log data -- how do you know

2   whether -- do you compare the simulation and the actual

3   results somehow so that you can go back and say, "Well,

4   you know, maybe we can tweak this parameter here and

5   there to make the software more accurate"?  Is that

6   something that you can --

7      A.    Yeah, you can go back in and take the actual

8   data and do what's called a recalc and it will

9   recalculate an OptiCem and compare actual versus

10  modeled.

11     Q.    And the actual data, what would that be?

12  Would that be the cement bond log data?  Would that be a

13  one of the source of data for your --

14     A.    Well, the cement bond log data I receive from

15  Schlumberger and I directly import into OptiCem.  But

16  the data it would take to do a recalc is the data we

17  collect from the Haliburton unit as far as rates and

18  pressures and volumes of the SIMWIN and we can import

19  that in OptiCem and do recalcs to compare actual versus

20  modeled.

21     Q.    Okay.  So -- so the cement -- if the cement

22  bond log, which was not done for this particular

23  operation, then it would not be -- the only data you put

24  into this -- you know, to assess the accuracy of the

25  software?

TRN-MDL-00282915

1      A.    That's correct, yeah.  Without the cement bond

2   log, we can't model that.  We can only take the SIMWIN

3   data we collected and model that.

4      Q.    So the cement -- maybe I'm not phrase my

5   question correctly.

6            If a cement bond log was conducted, will

7   you take that data and try to compare to the result of

8   your simulation and see whether your simulation was

9   accurate or not?

10     A.    Oh, you're referring to the -- if they ran a

11  cement bond log to actual output?

12     Q.    Yes, sir.

13     A.    Yes, we could compare that and look to see if

14  the cap of cements are actually seen were comparable to

15  what we modeled.

16            MR. NGUYEN:  All right.  Thank you, sir.

17            JUDGE ANDERSEN:  Any other questions from

18  the Board?

19            LT. BUTTS I just have a few questions,

20  mostly for clarification here.

21                    EXAMINATION

22  BY LT. BUTTS:

23     Q.    Earlier when Mr. Mathews was asking you a

24  couple of questions about differences between long

25  strings and liners, you indicated that BP indicated they

TRN-MDL-00282916

1    had a preference for a long string.  Did anybody at BP

2    ever articulate to you why that preference existed?

3        A.   No, I was not involved in the discussion on

4    why, no.

5        Q.   Are both the long string and the liner options

6    considered to be basically acceptable in industry

7    standards?

8        A.   The three prior production casing jobs that I

9    was involved with at BP were all long strings.  So my

10   experience with BP was standard.

11       Q.   Could you briefly outline for me basically the

12   advantages and disadvantages of each of those two

13   options?

14       A.   The long string doesn't provide only -- fewer

15   barriers.  They have a cement barrier, a mud barrier,

16   and then they have the seal assembly up top and then a

17   BOP.

18            If you did a liner, you have an additional

19   barrier there and then I would think they may run a

20   tie-back to tie it back which would require additional

21   casing run, more cement to be pumped, but it provides

22   more barriers than the long string.

23       Q.   In your opinion, does one give you a higher

24   level of integrity or safety?

25       A.   I'm not real familiar with the well

TRN-MDL-00282917

1    construction or integrity of the casing, so I really

2    can't comment on that.

3        Q.   Do you know is one of the other methods more

4    costly than the other, and if so, which one?

5        A.   I have not personally -- yeah, I'm not -- I

6    would think the liner and tie-back would be more costly,

7    but I have not done economic analysis myself on it.

8    That's just from what I heard.

9              LT. BUTTS:  Okay.  Thank you.  I have no

10   further questions.

11             JUDGE ANDERSEN:  Any other questions from

12   the Board?

13             Marshall Islands?

14             MR. LINSIN:  Thank you, Your Honor.

15                      EXAMINATION

16   BY MR. LINSIN:

17       Q.   My name is Greg Linsin, Mr. Gagliano.  I

18   represent the Marshall Islands.

19             Would you describe, please, sir, what

20   risks are created when you have channelling in a cement

21   job?

22       A.   The primary risk would be you have to go back

23   and do remediation.  In this case, it's production

24   casing.  The goal is to isolate the zone with cement,

25   and if channelling occurred, you would potentially have

TRN-MDL-00282918

1    to go back and perforate your casing and squeeze.

2         Q.    Okay.  Is it fair to state that if it was

3    determined that there was channelling in a cement job,

4    that it would weaken the integrity of that cement

5    barrier?

6         A.    If channelling occurred, would it weaken it?

7         Q.    Yes, sir.

8         A.    You would not have bond where it channelled.

9    You would not have the cement bond to the formation or

10   pipe or whatever -- wherever it channelled.

11        Q.    So it would weaken the ability of that cement

12   to actually create a barrier in that zone; is that

13   correct?

14        A.    When you say "weaken the cement," I'm thinking

15   compressing strength.  It would still get hard and

16   attain compressor strengths, but it would not obtain

17   zonal isolation.

18        Q.    All right.  When you created your OptiCem

19   report on April 18th, the report for the 9-7/8ths plus

20   7-inch production casing you were just questioned about,

21   do I understand correctly that you incorporated into

22   that model a recommended rate of flow for the spacer and

23   the -- for the circulation of the spacer and the cement

24   as it was being put in the hole; is that correct?

25        A.    Actually, that rates were designed initially

TRN-MDL-00282919

280

1    with BP on the 14th when we determined those rates, and

2    they were just carried over into this version.

3         Q.    Okay.  And I'm looking at Page 11 of that

4    report, sir.  Do I understand it correctly that the

5    critical rates that you incorporated into this model

6    presumed a rate of flow of 18.7 barrels per minute for

7    the spacer and 11.55 barrels per minute for the cement?

8    Does that -- am I reading that correctly, sir?

9              In the Section 1.1.2, Critical Velocity in

10   the Fracture Zone?

11        A.    Yes, you're reading that correct, yes.

12        Q.    All right.  Now, is it also accurate to say

13   that in determining what flow rate you want to build

14   into this model, one of your objectives is to achieve a

15   turbulent flow through the zone in order to most

16   effectively purge the zone of a -- and accomplish

17   complete mud removal; is that correct?

18        A.    Yes, that's ideal.  But in this case, we were

19   limited by the ECDs we had to stay under to attain the

20   objective of getting cement -- full cement returns to

21   the job.

22        Q.    And the ECDs are --

23        A.    Equivalent circulating density.

24        Q.    And as a matter of fact, if you -- I forget,

25   sir, do you have the post job report in front of you?

TRN-MDL-00282920

1       A.   No, I do not.

2               MR. GODWIN:  They didn't provide that.

3   We don't have that.

4   BY MR. LINSIN:

5       Q.   All right, sir.

6               MR. LINSIN:  If I may, the Bates number

7   for the document I'm about to show is

8   BP-HZN-MBI 00170993.  That is the page of this exhibit.

9   The exhibit actually begins on 0986.

10  BY MR. LINSIN:

11      Q.   Do you recognize that as the post job report

12  that you prepared, sir?

13      A.   I did not prepare the report.  Nathaniel

14  Chaisson, engineer on location, prepared it and sent it

15  to me.

16      Q.   All right.  Did you review it after receiving

17  it?

18      A.   Yes.

19      Q.   All right.  And the page that I referenced

20  there, does that -- does the graph on that page reflect

21  the actual rate of flow that was accomplished during the

22  pumping of the spacer and the cement?

23      A.   Yes, the rates indicated on here is not

24  color-coded so it's hard to see which line it is, but

25  it's on here.

TRN-MDL-00282921

1      Q.    All right.  Even without the color-coding -- I

2   apologize for that -- on the black-and-white copy, do

3   you recognize that the nearly horizontal line on the

4   right side of that chart indicates that the rate of

5   flow, once these materials were being pumped into the

6   annulus, was only about four barrels per minute?

7      A.    Yes, that was -- that was per design.

8      Q.    That was part of the design?  I don't

9   understand then.

10     A.    When we met on the 14th to run the OptiCem, I

11  met with several BP representatives going through the

12  OptiCem.

13              And it was told to me by BP that we needed

14  to keep our ECDs below a 14.7 in order to achieve full

15  returns.  In order to do that, we had a pump all the job

16  at four barrels a minute or less to achieve that goal.

17     Q.    All right.  So you were told that you had to

18  pump at four barrels or less, even though your initial

19  plan had been based upon rates of 18.7 and 11.55 barrels

20  per minute for the spacer and the cement; is that

21  correct?

22     A.    No.  The 18 -- those are calculated numbers.

23  Those weren't input numbers by me in the OptiCem.  It

24  shows 18.7.

25     Q.    Yes.  And who had calculated those numbers?

TRN-MDL-00282922

1      A.   It's automatically calculated in OptiCem when

2   it generates the report.

3           I guess I misunderstood you earlier.  We

4   weren't -- this was not designed to pump that fast.

5      Q.   I see.

6      A.   So the rates you should be looking at that are

7   inputted in already in the OptiCem.

8      Q.   Let me perhaps see if I can shorten -- well,

9   I'm sorry.

10          MR. GODWIN:  Let him finish.  He was

11   looking here at something.

12   BY MR. LINSIN:

13     Q.   Go ahead, sir.

14     A.   On Page 8 --

15     Q.   Of which document?

16     A.   -- of the OptiCem report --

17     Q.   Okay.

18     A.   -- dated April 18th --

19     Q.   Yes, sir.

20     A.   -- Under 1.6 called Pumping Schedule --

21     Q.   Yes, sir.

22     A.   -- these are designed rates for this job.  And

23   it shows four barrels and two barrels for the cement and

24   then four barrels of displacement.

25     Q.   All right.

TRN-MDL-00282923

1     A.    On Page 8, I'm sorry.

2     Q.    All right.  Under the column that says Rate;

3  is that correct?

4     A.    Yes, that's correct.

5     Q.    All right.  Well, let me ask you this.  Do you

6  believe that the pumping rate for the spacer and the

7  cement was adequate to achieve a turbulent flow?

8     A.    The foam system, when it turns the corner,

9  it's energized fluid, it will generate more energy to

10 remove the mud.  And based on the modeling with the 21

11 centralizers, we successfully removed all the mud.

12               Now, I don't know if it got to turbulent

13 flow in this case, but it did successfully remove all

14 the mud with 21 centralizers.

15    Q.    With 21 -- if 21 centralizers had been used?

16    A.    That's correct.

17    Q.    But what we wound up with in this case, if I'm

18 correct, is a -- less than a third of that number of

19 centralizers and a -- a flow rate that was below what

20 had initially been generated in this design report; is

21 that correct?

22    A.    I believe they kept these rates for the job

23 even with the fewer centralizers.

24    Q.    Sir, the four -- four barrels per minute; is

25 that correct?

TRN-MDL-00282924

285

1        A.     That's correct.

2        Q.     And then the two barrels per minute for the

3    cement?

4        A.     That's correct.

5        Q.     And do I understand your testimony then to be

6    that the slower rate and the lower number of

7    centralizers would have compromised the ability to have

8    cleared the -- to accomplish a complete mud removal?

9        A.     Yes, that the model indicated that would

10   occur.

11       Q.     Did you -- were you concerned about the volume

12   of the cement cap that was pumped in this job?

13       A.     Cement cap referring to the non-foamed

14   cemented head?

15       Q.     Yes, sir.

16       A.     No, I was not concerned, no.

17       Q.     You were shown an e-mail in your testimony a

18   moment ago indicating that the lift pressure was

19   approximately a hundred psi; is that correct, sir?

20       A.     Yes, I stated in an e-mail, yes.

21       Q.     All right.  Do you have an opinion as to

22   whether that psi is suggestive of channelling in this

23   job?

24       A.     It's hard to say because that includes -- I

25   believe that also includes friction pressure, so it's

TRN-MDL-00282925

1   hard to say how much is that friction pressure and how

2   much is lift.

3        Q.   All right.  Are you saying you would want more

4   information in order to evaluate that?

5        A.   Yes, I would need more information.

6        Q.   Did you receive information as you were

7   working on this job concerning the circulating pressures

8   for the mud?

9        A.   Referring to when they were pumping mud ahead

10  of the cement job?

11       Q.   Yes, sir.

12       A.   The only thing I was told was that for this

13  model, we had to keep the ECDs below 14.7.  My

14  understanding was that was the ECD they saw while

15  circulating mud without losses.

16       Q.   Well, let me ask you this.  Were you aware

17  that there were variations -- there's a significant

18  differential between the circulating pressure that had

19  initially been calculated by M-I SWACO and what was

20  actually achieved during did job?

21       A.   At what part of the job are you referring to,

22  sir?

23       Q.   During the what was to have been a bottoms up

24  procedure.

25       A.   Was casing -- are you referring to the casing

TRN-MDL-00282926

1   in the hole?

2        Q.   Yes, sir.

3        A.   Converting the floats?

4        Q.   I'm talking about the pumping of mud during --

5   prior to the cement job.

6        A.   Okay.

7        Q.   All right.  And are you aware of -- that there

8   were variations or differences between the circulating

9   pressure that was initially calculated and what was

10  eventually obtained during the job?

11       A.   That incident took place after they had

12  trouble converting the floats.  Once they were able to

13  convert to do floats, yes, they did notice a lower

14  pressure than expected while circulating.

15       Q.   Do you recall that, in fact, in this case, M-I

16  SWACO was actually asked to go back and rerun the

17  hydraulics after the job was completed?

18       A.   Yes.

19       Q.   All right.  And do you have any understanding

20  as to why there was that differential in the pressures

21  on this job?

22       A.   I do not know why the pressures were lower

23  than they initially modeled.

24       Q.   Is it a fair statement that both in comparison

25  between the initial modeling that M-I SWACO did and even

TRN-MDL-00282927

1    after the recalculations were done after the job, that

2    the actual pressures achieved were significantly lower

3    than you would expect based on the modeling?

4         A.   I did not run the model.  M-I ran the model.

5    But it's my understanding that he could not model the

6    lower pressures.

7                        MR. LINSIN:  I have no further questions.

8                        Thank you.

9                        JUDGE ANDERSEN:  Counsel for the witness

10   for Haliburton?

11                       MR. GODWIN:  No questions at this time,

12   Your Honor.

13                       JUDGE ANDERSEN:  BP?

14                       MR. GODFREY:  Thank you, Your Honor.

15                       EXAMINATION

16   BY MR. GODFREY:

17        Q.   Now, Mr. Gagliano, my name is Rick Godfrey.

18                       MR. GODFREY:  And if I may approach the

19   witness, Your Honor?

20                       JUDGE ANDERSEN:  Sure.

21                       MR. GODFREY:  Thank you.

22   BY MR. GODFREY:

23        Q.   After the DEEPWATER HORIZON rig sank on April

24   the 22nd of this year, did you send a post job report

25   about the quality and the successful nature of the

TRN-MDL-00282928

1   Haliburton cement job to BP?

2        A.   A post job was sent out, a Version 2.  Yes.

3        Q.   Was that sent to BP by you on April the 23rd

4   in the afternoon of this year?

5        A.   Do you have an e-mail in here referencing

6   that?  In the document so we need to follow up, I think

7   the board would full understand that what he means is no

8   and then he's adding some qualification.

9             MR. GODWIN:  What I think he said, Your

10  Honor, was to clarify that the issue involving the 21

11  centralizers was in the job report --

12            MR. GODFREY:  He did not --

13            MR. GODWIN:  -- which is not to say that

14  it's not here.  It's just in a separate document.

15            JUDGE ANDERSEN:  Right.  He did, and

16  obviously Mr. Godfrey characterized this as stand-alone,

17  and it is a separate document.  But, you know, we

18  understand there could be a dispute regarding that.  But

19  nothing in this job recommendation refers to the matters

20  that Mr. Godfrey asked about.  Okay.  Next question.

21  BY MR. GODWIN:

22       Q.   Okay.  So, now, let's turn to the document you

23  just referred to which is Tab 9, BP Exhibit 102.  This

24  is the design report, correct, sir?

25       A.   That's correct.

TRN-MDL-00282929

1       Q.     Dated April 18th?

2       A.     Yes.

3       Q.     Did you prepare this?

4       A.     Yes, I did.

5       Q.     And this has a number of centralizers in it,

6  does it not?

7       A.     Yes.

8       Q.     How many centralizers are listed in this April

9  18th report?

10      A.     This one reflects 7.

11      Q.     Doesn't reflect 21, does it, sir?

12      A.     No.

13      Q.     Okay.  And this was the design report that

14  accompanied the job recommendation that we just saw,

15  which was the previous exhibit, right, sir?

16      A.     That's correct.

17      Q.     Okay.  And is there anything in this exhibit

18  which is called the design report of April the 18th,

19  that says, "severe gas flow problem" or "potential is a

20  design or well that should not have cement poured down

21  it"?

22      A.     On Page 18 it reflects the gas flow potential

23  to be a 10.9.

24      Q.     Right.

25      A.     And also on the well schematic on Page 23

TRN-MDL-00282930

1    indicates there would be severe channelling for this job

2    if you had a color copy.

3         Q.   But nowhere on this report does Haliburton say

4    that when the OptiCem model predicts based upon the

5    inputs into it that the well condition is considered to

6    have a severe gas flow problem -- nowhere in this report

7    does Haliburton say that means you shouldn't use or pour

8    the cement that we're recommending, correct, sir?

9         A.   In the report on 2/15th, I had those

10   discussions with BP representatives in their office with

11   the concern of the potential for flow and that we had

12   channelling and it would not meet the objectives for BP

13   key reports to me.

14        Q.   I'm asking about the report on the 18th.  This

15   is the final report, sir.  Nowhere in this report do you

16   tell BP that a severe gas flow problem or prediction of

17   10.29 equals a warning for a well that should not have

18   cement poured down in it, correct?

19             MR. GODWIN:  Objection, Your Honor.  It's

20   been argumentive.  The document says there will be a

21   severe gas flow problem using 7 centralizers.  He could

22   just as easily say, "Nowhere in the report does it say

23   you shouldn't go swimming at night for fear you may be

24   eaten by sharks.

25             MR. GODFREY:  That's not what the

TRN-MDL-00282931

1    document says.

2                    MR. GODWIN:  I mean, he's just making up

3    words -- he's making up words to try to argue with the

4    witness.

5                    MR. GODFREY:  That's not what the

6    document says.  If it said that, I wouldn't be asking

7    the question.

8                    JUDGE ANDERSEN:  Obviously this is

9    important.  There's an important disagreement between

10   the parties here.  No one's surprised, I don't think, by

11   BP's disagreement with some of the testimony.  And I

12   think the board as well as the public that is here is

13   entitled to get the view of both parties.

14                   So as long as it's not overly repetitive

15   and as long as you're not beating on the witness because

16   it's not an easy spot for him, I think you're entitled

17   to ask your questions, and in this particular case,

18   there might be an opportunity, since he hasn't exercised

19   it yet perhaps at the end for when the witness makes a

20   statement for his lawyer to ask a few more questions.

21   So what's your next question?

22   BY MR. GODFREY:

23       Q.   Severe gas flow prediction number of 10.29 is

24   something that Haliburton routinely pours, correct?

25       A.   No.  It's pretty high.

TRN-MDL-00282932

1          Q.    All right.  Well, turn to Tab 6, please, which

2    is marked as BP Exhibit 88.  Have you seen this

3    Haliburton document before, sir?

4          A.    Some of it looks familiar, yes.

5          Q.    Sure.  So if you turn to the Bates stamp

6    number which ends in 1138 -- it's the upper right-hand

7    side horizontally, so it's 1138.

8                MR. MCCARROLL:  I hate to interrupt.

9    1138, that doesn't tell me a lot.  What's the full Bates

10   number?

11               MR. GODFREY:  Fair enough.  BP MDI

12   00171138.

13               MR. MCCARROLL:  Okay.

14   BY MR. GODFREY:

15         Q.    And this is a gas flow potential scale based

16   upon the OptiCem model that Haliburton uses, right?

17         A.    Yes.

18         Q.    And it divides the predictive numbers into

19   minor, moderate and severe, right?

20         A.    That's correct.

21         Q.    And the gas flow potential number of 8 to 15

22   is called Flow Condition 3, right?

23         A.    Yes.

24         Q.    And Flow Condition 3 is what was predicted on

25   to OptiCem model on the 18th of April with respect to

TRN-MDL-00282933

                                                                          294

1    the design report here?

2         A.    That's correct.  Yes.

3         Q.    And at what point does Haliburton say with

4    flow conditions being severe that it should redesign and

5    not pour cement?

6         A.    The reason in this case it shows severe is

7    because of the channelling that's occurred.

8         Q.    Well, the document says about 15 as the

9    number, right, sir?

10        A.    Yes.

11        Q.    And you personally have poured cement jobs

12   with severe gas flow potentials before, right, sir?

13        A.    Yes.

14        Q.    And, in fact, Haliburton markets itself as the

15   premier cementing organization of the world, right?

16        A.    Yes.

17        Q.    And one of the things you market -- that is,

18   you, Haliburton -- is your ability to solve channelling

19   and severe gas flow potential predictions, right, sir?

20        A.    If the best practices are in place, yes.

21        Q.    And you solve the channelling and the severe

22   gas flow potential predictions by adding nitrogen and

23   other additives to the cement, correct?

24        A.    No, not alone.

25        Q.    You do some other things as well, right?

TRN-MDL-00282934

1          A.    Add centralizers.

2          Q.    You had centralizers here, didn't you?

3          A.    Not enough.

4          Q.    You never told BP that in writing did you,

5    sir?

6          A.    No, I had verbal conversations with them on

7    the 15th.

8          Q.    So is it your testimony that you thought that

9    this cement job was not going to be successful because

10   of the lack of number of centralizers, and on the 18th

11   you sent two documents that didn't say that and on the

12   20th you sent another -- on the 23rd you sent another

13   document that didn't say that.  Is that your testimony,

14   sir?

15         A.    I sent documents to BP on the 15th indicating

16   21 centralizers would take care of the issues of

17   channelling.

18         Q.    And on the 18th you sent a design report with

19   a job recommendation where you designed a slurry that

20   was supposed to take care of the issues successfully,

21   right, sir?

22         A.    The slurry alone would not take care of the

23   issues in this case, sir.

24         Q.    Is it your testimony, sir, that you

25   recommended a job to BP that you thought was going to

TRN-MDL-00282935

1    fail for the lack of proper number of centralizers?

2         A.    I recommended a job to BP and designed one

3    with these 21 centralizers and foam that would meet the

4    objective set forth by BP to me. BP, in turn, decided

5    not to run the initial centralizers on their own, not

6    consulting me, nor are they in-house CMID specialists.

7         Q.    Well, sir, when you did the design report on

8    the 18th, which shows 7 centralizers, you obviously knew

9    at that point you weren't running 21 centralizers,

10   right?

11        A.    No, they had already started running casing.

12        Q.    Sir, you prepared the April 18th design

13   report, did you not?

14        A.    Yes, I did.

15        Q.    You're the one who put in 7 centralizers, are

16   you not?

17        A.    Correct.

18        Q.    You knew when you put it in there were 7

19   centralizers or less than 21, right, sir?

20        A.    Yeah, by that time I was notified by

21   Haliburton representative that BP did not run the

22   additional 15 as planned.

23        Q.    When BP hires or retains Haliburton, it

24   retains Haliburton for its expertise in designing cement

25   slurries, correct?

TRN-MDL-00282936

```
 1        A.   Yes.
 2        Q.   And one of the functions that BP retains
 3   Haliburton for is to design particularly challenging gas
 4   flow issues, correct?
 5        A.   In this case, yes.
 6        Q.   And that's what you were retained and paid to
 7   do, right?
 8        A.   Yes.
 9        Q.   And Haliburton charges more.  The more
10   difficult a job, the more Haliburton charges, right?
11        A.   Not necessarily, but in this case it was foam.
12   So it required additional equipment.
13        Q.   In this case because you thought it was a more
14   difficult job, you charged BP more money for it, right?
15        A.   I didn't charge -- I didn't design it for more
16   money.  I designed it for the best solution for BP.
17        Q.   And it was a solution that you recommended on
18   the April 18th job recommendation and design report a
19   solution that you thought would work successfully at
20   Macondo 252 well?
21        A.   The slurry design, yes.
22        Q.   And did you think it would address the
23   channelling and gas flow potential that you had
24   identified earlier?
25        A.   With centralization it would, yes.
```

TRN-MDL-00282937

298

1      Q.    Did you think it would address the channelling

2   and gas flow potential with the number of centralizers

3   used as reflected in your design report of April 18th?

4      A.    No. It indicates that channelling would occur.

5      Q.    So when you sent the job recommendation on the

6   18th to BP, you believed that there would be channelling

7   and the cement job would not work through the lack of

8   centralizers.  Is that your position?

9      A.    The model indicated there would be channelling

10   with a high probability of remedial squeezing would take

11   place.

12     Q.    What tests have you done or did you do at the

13   time to determine whether the cement slurry as designed

14   was a slurry that had a chance of success?

15     A.    I submitted lab testing to verify pump time,

16   compressor values, things of that sort, foam stability.

17     Q.    What specific test did you do?

18     A.    All of those.

19     Q.    Okay.  Did you test atmospheric pressure or

20   downhole pressure?

21     A.    The UCA was tested at downhole pressure and

22   temperature.  The foam crush test was done at

23   atmospheric and at 190 degrees less than the static.

24     Q.    Did you add any fluid loss additives?

25     A.    No. Foam takes care by itself.

TRN-MDL-00282938

1      Q.   Did you add any defoamers?

2      A.   They had some D-Air in it, yes.

3      Q.   What type of defoamers did you use?

4      A.   .25 percent D-Air.

5      Q.   And do you know whether or not there's any

6  recommendations by Haliburton regarding use of D-Air

7  3000 with foam cement?

8      A.   I'm not aware of one, but we have run jobs in

9  the past with them.

10     Q.   Do you know -- did you test the effect of the

11 defoamer D-Air 3000 on the nitrified cement that you

12 poured?

13     A.   Yes, we had a lab test showing that it was

14 stable system.

15     Q.   Now, when you do these tests, you actually mix

16 the slurry up on the rig, right?

17     A.   No, it's done in the lab.

18     Q.   Did you mix up any slurry up on the rig?

19     A.   When we pumped it downhole.

20     Q.   Did you keep any of that slurry as samples?

21     A.   We have some samples from location in the lab

22 that were tested.  We use representative samples from

23 the rig with rig water and do those tests in the lab.

24     Q.   By the way, do you have those samples today?

25     A.   I believe we do have some samples in the lab

TRN-MDL-00282939

1    still.

2         Q.    From the cement slurry actually used in

3    Macondo 252 well?

4         A.    To my knowledge, there is some left, yes.

5         Q.    And it's currently in your possession?

6         A.    It's at the Haliburton lab.

7         Q.    Okay.  And you maintained it in its original

8    state?

9         A.    Yes, we isolated all the samples.

10         Q.    Do you know, by the way, whether or not the

11    slurry design samples that you have, whether or not

12    they'll degrade over time?

13         A.    The ones in the lab?

14         Q.    Yes.

15         A.    Yes, they could potentially degrade over time,

16    yes.

17         Q.    So if the board, for example, or the

18    government wanted to test the slurry design to determine

19    whether it was as marketed and advertised to BP, they'd

20    need to test that sooner rather than later so that it

21    doesn't degrade on it, right?

22              MR. GODWIN:  Well, that would have to be

23    done pursuant to the MDO court in New Orleans.  And

24    we've been working with several parties here regarding

25    that, rather than having several different tests to

TRN-MDL-00282940

 1   fund.

 2              JUDGE ANDERSEN:  Who -- whoever wanted

 3   to -- I'm sure the Court there is interested on the off

 4   chance that that would become a subject of litigation.

 5   You know, obviously what counsel is saying is that

 6   parties have a duty to preserve.  And if you want to

 7   present to some other forum, or if the gentlemen here on

 8   this board decide they want to get tests, we'll let you

 9   know.

10              MR. GODWIN:  There's an order in place,

11   Your Honor, regarding preservation of evidence, and

12   Haliburton has and intends to fully comply.

13   BY MR. GODFREY:

14       Q.   My question was designed to determine -- and I

15   think the witness has given me the answer that the

16   sooner the test is run, the better, since it has the

17   possibility of degrading the sample over time.

18              MR. GODWIN:  That is -- I'm going to

19   object there, Your Honor, whether or not this witness

20   would know that.  He may not have the qualifications.

21   There's been no evidence that he's a chemist or would be

22   someone who would do the testing.  He may not -- he may

23   know.  He may not know, but the way if question is

24   phrased, it's questionable.

25              JUDGE ANDERSEN:  Okay.  If board members

TRN-MDL-00282941

1    want to get a test in the near future, we'll advise you,

2    and obviously with respect to any litigants or

3    litigation, they can let Haliburton know.  And if

4    Haliburton for some reason wants to resist that, then

5    the proper judicial official can decide.

6                    Okay.  So you've raised that point.

7                    MR. GODFREY:  Thank you, Your Honor.

8                    MR. GODWIN:  Thank you, Your Honor.

9                    JUDGE ANDERSEN:  And our board will

10   probably discuss it.

11   BY MR. GODFREY:

12       Q.    Did you perform any compatibility testing of

13   the slurry?

14       A.    Yes.

15       Q.    What type?

16       A.    Spacer mud, and I believe I did spacer cement

17   and cement mud, I believe.

18       Q.    Did you use an SGSA analyzer?

19       A.    I did reality compatibility testing with this

20   fluids --

21       Q.    Did you use an MASC -- MACS analyzer?

22       A.    A MAC analyzer.

23       Q.    MACS, but we'll call it a MAC but yeah?

24       A.    No, I did not.

25       Q.    Okay.  And the test results that Haliburton

TRN-MDL-00282942

1  has, did they show at the time that the cement slurry

2  design passed?

3      A.   Yes.

4      Q.   Let's go back to centralizers for a moment.

5  Centralizers are important to center the casing in the

6  hole, right?

7      A.   That is correct.

8      Q.   Okay.  That's the theory.

9      A.   Yes.

10      Q.   Now, if the hydrocarbons are coming up

11  Highway 1 of the well bore, centralizers have nothing to

12  do with that, right, sir?

13      A.   Centralizers help get cement around the casing

14  which would prevent that if isolation in place.

15      Q.   Has Haliburton ever reached a conclusion that

16  zonal isolation did not take place with respect to

17  cement job on April 20th?

18      A.   The only way to verify that was to run a

19  cement bond log.

20      Q.   I'll rephrase the question.  You already

21  answered that.  By the way, Haliburton does not

22  recommend nor are these recommendations ever recommended

23  to rub a bond log, right, sir?

24      A.   That is the call of BP.  It is not a

25  Haliburton direct place.

TRN-MDL-00282943

304

1      Q.    Well, as the cementer and the party that

2  designs and pours the cement, you don't have a

3  recommended best practice to tell your customers, always

4  recommend or always use a cement bond log, right, sir?

5      A.    Nobody asks me my opinion.  They just decide

6  to send them in with no discussion from me.

7      Q.    My question was:  Haliburton, as a cementing

8  expert, a world class cementing expert, in fact, has no

9  recommended best practice to its customers to run a

10  cement bond log, right, sir?

11              MR. GODWIN:  Objection, Your Honor.  He's

12  trying to impose a duty on Haliburton that is not

13  Halliburton's duty.  The witness has said that it

14  belongs to BP.

15              JUDGE ANDERSEN:  Okay.  And he has.  It's

16  somebody -- but then he didn't answer whether or not you

17  have the best practice.  And somebody else can decide

18  and maybe the board will have some recommendations

19  regarding who should recommend or make the decisions,

20  but does Haliburton itself have that as a best practice?

21      A.    I'm not aware of one, no.

22  BY MR. GODFREY:

23      Q.    Since April 20, has Haliburton concluded that

24  the cement job it poured failed?

25      A.    I do not know what happened on the incident on

TRN-MDL-00282944

1    that rig, sir.

2         Q.   Has Haliburton concluded that, not you

3    personally, but has Haliburton concluded the cement job

4    it poured failed?

5         A.   I'm not aware if there are any opinions out

6    there.

7         Q.   Since April 20, 2010, has Haliburton reached a

8    conclusion that the addition of centralizers would have

9    made a difference to this blowout?

10        A.   I'm not aware of any.

11        Q.   Since April 20, 2010, has Haliburton reached a

12   conclusion that if BP had conducted a full bottoms up,

13   that would have made a difference with respect to this

14   blowout?

15        A.   I have not taken -- been a part of any

16   investigation regarding this incident.  So I'm not aware

17   of anything being looked at by Haliburton.

18        Q.   Go back to Tab 9, please.  Find that OptiCem

19   Page 23.  Do you see that?

20        A.   Yes.

21             MR. GODWIN:  Your Honor, Page 23 of the

22   one we have is almost illegible as far as the well for

23   itself.  Is there one in color that --

24             MR. GODFREY:  Yes.

25             MR. GODWIN:  -- Counsel has?

TRN-MDL-00282945

1              MR. GODFREY:  I'm going to show you

2     blowups.

3              MR. GODWIN:  So do you want me to close

4     to book on these?

5              MR. GODFREY:  Well, I think you should

6     keep the book open.

7              MR. GODWIN:  Well, we can't see anything

8     from it, Mr. Godfrey.

9              JUDGE ANDERSEN:  If there's a problem

10    answering the question in view of the exhibit plus the

11    notebooks, the witness doesn't have to guess or have a

12    doubt, okay.

13    BY MR. GODFREY:

14       Q.   So what I put up here is the Page 23 that's

15    been used in this hearing for the past two sessions.

16    And this one's in color so you can see it, right, sir?

17              MR. GODWIN:  Just a minute.

18              MR. GODFREY:  Absolutely.  Take your

19    time.

20              (Sotto voce discussion between Mr. Godwin

21    and Mr. Gagliano.)

22       A.   I'm assuming that's the same thing 'cause the

23    date and time is not showing that.

24              MR. GODWIN:  The one we have here, Judge,

25    does not match what Mr. Godfrey has there.

TRN-MDL-00282946

1          MR. GODFREY:  Right.  That's -- that's

2    the point I'm getting to.

3          MR. GODWIN:  Okay.  The point being is --

4    I mean, not just on the color, but also there's material

5    at the bottom regarding a date and time.

6          MR. GODFREY:  That's the point I'm

7    getting to.  This language down here --

8          JUDGE ANDERSEN:  Wait.  A board member

9    has a question.

10          MR. McCARROLL:  Just for the record, Mr.

11   Godfrey, that is something we created, the board, to

12   populate two sections of the report onto one document.

13          MR. GODFREY:  Well, let's just make the

14   record clear then.

15          MR. McCARROLL:  That's fine.

16   BY MR. GODFREY:

17      Q.   Okay.  The actual page sent to BP that's

18   before you does not have this language down at the

19   bottom that says, "Based on the analysis of the above

20   outlined well conditions, this well is considered to

21   have a severe gas flow problem.  Wells in this category

22   fall into Flow Condition 3.  Page 23 of the original

23   sent to BP does not have that language, right, sir?

24      A.   No.

25      Q.   Am I correct on that?

TRN-MDL-00282947

```
 1        A.    That language is not on the bottom of this --

 2        Q.    Right.

 3        A.    -- this page.

 4        Q.    That language was part of the OptiCem

 5  tradition which got you to a 10.29 number, right?

 6                     MR. GODWIN:  Mr. Mathews, is that what

 7  y'all added?

 8                     MR. MCCARROLL:  Just for explanation --

 9                     MR. GODWIN  Somebody straighten it out

10  because he's trying to suggest that we did it, and we

11  didn't.

12                     MR. MCCARROLL:  No, I'm not suggesting

13  you did it.  I'm suggesting it showed up.  It's not --

14                     JUDGE ANDERSEN:  Let the board explain

15  how that language got on it.

16                     MR. MCCARROLL:  We developed some visuals

17  for a hearing, I think, the last hearing in New Orleans.

18  Instead of recreating all 23 pages, we took a section

19  obviously of the image that you're looking at on top,

20  and then the warning that's indicated below to indicate

21  what they're looking at.

22                     We never did say that it came from the

23  same page.  We actually talked about it in testimony --

24  you can probably refer back to it -- that says, "What

25  are we looking at here?"  And it actually has the
```

TRN-MDL-00282948

1   verbiage on the bottom and I even asked the question

2   earlier to Mr. Gagliano and said, "What section is the

3   image on," and then I asked him, "What page number is

4   the actual verbiage on ?"

5              I don't think the board's ever -- besides

6   putting it in front of anyone, I don't think we've ever

7   indicated that that verbiage was put on the same page to

8   present to BP.

9              MR. GODFREY:  Well, actually if one

10  reviews the transcript from the last session which I

11  have carefully done, this page referred to witnesses or

12  questions so that language on this page.  Mr. Guide was

13  questioned as though this was original language, and

14  that's why I asked him the question.  So I think we

15  understand.  So let ask it in one or two more questions,

16  Mr. Gagliano.

17             MR. MCCARROLL:  The original language?

18  That's just copied and pasted.

19  BY MR. GODFREY:

20     Q.   Well, let me just ask you a few more questions

21  about this page.  Put up the real page, Mr. --

22             MR. GODWIN:  Well, now, Your Honor, we

23  object to his reference to the real page.  My client

24  sent them a report.  The one he has in the book is the

25  accurate copy of what we sent.  The page was made by the

TRN-MDL-00282949

1   board by the panel, not by us, for him to suggest here

2   on the record on national TV that we're going to put up

3   the real page, tries to present some motive on the part

4   of Haliburton which is unfair and untrue.

5                JUDGE ANDERSEN:  No.  The board just

6   clarified.  Haliburton did not produce this exhibit, but

7   "real," why don't you say "original."  This is the

8   original page that was sent to BP, correct?

9                MR. GODFREY:  Yes.

10  BY MR. GODFREY:

11       Q.   That's what I'm getting to, right?

12       A.   Yes.

13       Q.   And on here it says, "Fluid positions at job

14  end."  Do you see that?

15       A.   Yes.

16       Q.   And nowhere on this page, the original page,

17  Page 23, does it say fluid positions at job end.  By the

18  way, there's a severe gas flow problem after you pump

19  the cement, right, sir?

20       A.   The channelling indicates you're not isolating

21  the zone.  In my conversations with BP representatives

22  on the 15th, they clearly understood that.  When we had

23  the discussions and asked why, they directed me to add

24  the additional centralizer models on the 15th.

25       Q.   This is dated to 18th, right, sir?

TRN-MDL-00282950

1      A.    That's correct.

2      Q.    And nowhere in the report on the 18th does it

3    say that Halliburton's cement slurry design will not

4    control and prevent the severe gas flow problem, right?

5      A.    It shows channelling.  So it suggests that you

6    have potential flow between zones or up the well bore.

7      Q.    Is there any document in writing at any time

8    precasualty, day of casualty, postcasualty where

9    Haliburton wrote to BP and said, "By the way, although

10   we've designed this slurry and although you're paying us

11   all this money, you should be aware that there's still

12   remains a severe gas flow problem with channelling and

13   that a blowout could occur"?

14     A.    A report on the 15th is a combined effort

15   between myself, Brett Cocales and Greg Walz in designing

16   this job to be successful, and that was the report that

17   was sent out.

18     Q.    On the 18th, 19th, 20th, you sent out

19   different reports, right, sir?

20          JUDGE ANDERSEN:   Asked and answered.

21   BY MR. GODFREY:

22     Q.    I'll move on.  One final question:  sitting

23   here today, would you pour the same cement job that you

24   poured before for BP?

25     A.    I am comfortable with the slurry design, yes.

TRN-MDL-00282951

1               MR. GODFREY:  Thank you.  No further

2    questions.

3               JUDGE ANDERSEN:  Thank you.

4               CAPTAIN NGUYEN:  We're going to go ahead

5    and take a ten-minute break and come back at 4:00

6    o'clock.

7               (Short recess.)

8               JUDGE ANDERSEN:  With respect to the

9    circulation of documents, Commander Bray and Miss Murphy

10   have been coordinating for it.  My explanation of it

11   might not be completely accurate.  While people are

12   filtering in, though, I do want to put on the record a

13   special thanks to yesterday's court reporters and

14   today's court reporters.  They've been working a hundred

15   percent of the time we've been in session and keeping

16   up.  So thank you very much.

17              And, Commander, you want to let them know

18   the plan?

19              CAPTAIN NGUYEN:  I just want to clarify

20   with the documents passing back and forth amongst the

21   PIIs, all we're requesting is you give myself and Sylvia

22   Murphy -- you can do it by e-mail -- the Bates numbers

23   of any documents that you plan on using for these

24   hearings.  All of those documents have to be up on

25   already.  It doesn't mean new documents or anything like

TRN-MDL-00282952

1   that.  It just means ones we've already received prior

2   to these hearings.  Thank you.

3           JUDGE ANDERSEN:  And then you want to do

4   a screening before the --

5           MR. BRAY:  Well, we need the Bates

6   numbers the day before just to make sure that -- Jeff

7   Bray, B-R-A-Y.  We need to -- we need the Bates numbers

8   in advance.  It can't be the morning of.  So we need you

9   to make sure that those documents are actually up on

10  Home Port, and you're not -- not that you would try to

11  trick us -- but trying to slip in other documents into

12  the hearing proceeding.  Okay.

13          JUDGE ANDERSEN:  They wouldn't try to

14  trick you unless it was really important.  Okay.  Before

15  we get to the next party in interest, the first party in

16  interest's examination, one of the board members has a

17  few questions that might be relevant to future questions

18  by the others.  Mr. Dykes?  And you're still under oath.

19          MR. DYKES:  Okay.

20  BY MR. DYKES:

21      Q.   Mr. Gagliano, I handed you at the break two

22  documents.  The first one is Bates Nos. HAL_0010648.

23  And then the second document that I handed him, I handed

24  him one page in particular, but it comes out some e-mail

25  traffic.  And it's BP-HZN-MBI 001284, and it starts with

TRN-MDL-00282953

314

```
 1   08 and it goes through 11.  28411.

 2                 Mr. Gagliano, referencing the first one,

 3   with HAL 0010648, that is an e-mail from Brian Morel to

 4   you, Mark Hafle, Brett Cocales and Greg Walz; is that

 5   correct -- that you have in your hand?

 6        A.    That's correct.

 7        Q.    Would you please read that e-mail for us,

 8   please.

 9                 MALE ATTORNEY:  What is the date, please?

10   I'm sorry.

11                 MR. DYKES:  The date is April the 10th,

12   2010, and it is 4:00 o'clock p.m.

13        A.    It says, "We have six centralizers.  We can

14   run them in a row, spread out, or any combination of the

15   two.  It's a vertical hole.  So hopefully the pipe stays

16   centralized due to gravity.  As far as changes, it's too

17   late to get any more product to the rig.  Our only

18   option is to rearrange placement of these centralizers.

19   Please see attached diagram for my recommendation.

20                 MR. GODWIN:  And for optional

21   completeness, Mr. Dykes, the e-mail was sent Thursday,

22   April 15 at 4:00 o'clock in the afternoon.

23                 MR. DYKES:  Yes, sir.  Thank you.

24                 MR. GODWIN:  Thank you.

25   BY MR. DYKES:
```

TRN-MDL-00282954

315

1      Q.   And, Mr. Gagliano, if you would, in that

2    e-mail string, if you would, please read the -- the

3    middle e-mail, who it is from and who it is to and the

4    date and time.

5      A.   If I'm looking at the correct one, it's from

6    Brian Morel to Brett Cocales, sent April 16th, 2010 at

7    4:04 p.m., subject is "Macondo STK Geodetic."

8              "This is why I don't understand Jesse's

9    centralizer requirements.  You can see from the plot we

10   aren't moving much in terms of footage over long

11   intervals."

12     Q.   Thank you.  And if you read -- if you're

13   looking at that e-mail traffic for the PPIs, it appears

14   that Mr. Morel was attempting to get a 3-D survey and

15   then a 2-D survey from 17,163 feet to total depth.

16              Now, Mr. Gagliano, if you would, please

17   read the top e-mail on that same page.

18     A.   It's from Brett Cocales to Brian.  "Even if

19   the hole is" --

20              MALE ATTORNEY:   Just a moment.  And the

21   date and time?

22     A.   Oh, I'm sorry.  It was sent Friday, April

23   16th, 2010 at 4:15 p.m.  "Even if the hole is perfectly

24   straight, a straight piece of pipe, even in tension,

25   will not seek the perfect center of the hole unless it

TRN-MDL-00282955

316

```
1    has something to centralize it.  But who cares.  It's

2    done.  End of story.  We'll probably be fine and we'll

3    get a good cement job.  I would rather have to squeeze

4    than get stuck above the WH.  So Guide is right on the

5    risk/reward equation.

6        Q.    Thank you, Matt.

7              MR. MCCARROLL:  I have one question,

8    though.  In the e-mail between Brian Morel and Brett

9    Cocales in the middle of that page, the second says --

10   the first sentence he references, he brings your name

11   into the topic.  "This is why I don't understand Jesse's

12   centralizer requirements."

13             You met with them on April 15th about the

14   centralizers?

15       A.    I met with Brett.  Brian was on the rig at

16   that time, so I did not meet with Brian.

17       Q.    So does this e-mail document that you had a

18   conversation with him with what you're -- I guess

19   Jesse's centralizer requirement.

20       A.    I had conversations with Brett Cocales and

21   Greg Walz in the office, and when we decided the 21

22   centralizers before I left, Brett was on the phone with

23   Brian on the rig.

24       Q.    Okay.  Thank you.

25             JUDGE ANDERSEN:  Any other regarding
```

TRN-MDL-00282956

1    questions at this point?

2                    Transocean, I think, is first.

3                         EXAMINATION

4    BY MR. CLEMENTS:

5        Q.    Good afternoon, Mr. Gagliano.  My name is

6    Miles Clements, C-L-E-M-E-N-T-S.  I represent

7    Transocean -- Transocean, sir.  I want to cover a little

8    bit of the ground that some of the other attorneys on

9    the board did with you, and I'm really trying to perhaps

10   clear some things up.  It may or may not need to be

11   cleared up, but let me delve anyway.

12                    Sir, you were asked some questions about

13   the report that was issued by Haliburton, I think, April

14   23rd after the DEEPWATER HORIZON had sunk.

15                    Your dialogue about this cement job on the

16   DEEPWATER HORIZON started when would you say, sir?

17       A.    In this particular production piece job?

18       Q.    This particular job.

19       A.    We started probably around February looking at

20   different options using OptiCem.

21       Q.    Okay.  And as I understand, there was a

22   dialogue, a discussion between you, sir, or Haliburton

23   and the engineers with BP about whether or not to use a

24   long string or a liner with tie-backs?

25       A.    We were modeling several scenarios and some of

TRN-MDL-00282957

1    the scenarios were liners and some were long strings.

2        Q.    And the cement job in relation to which option

3    was important, I think?

4        A.    My understanding BP preferred the long string

5    option.  It was always dependent on the success of the

6    cement job.

7        Q.    There was some question whether or not a long

8    string should be utilized here and whether a successful

9    cement job could be accomplished?

10       A.    We had several meetings.  On the 14th I had

11   meetings with several BP representatives.  We put Dobson

12   on the board.  We ran it through a number of scenarios

13   and we modeled it and we all concluded that we felt we

14   could get a full returns with the cement job over a long

15   string.

16            And it was my understanding that day is

17   when they decided to go with long string.

18       Q.    Okay.  So you felt that was a hurdle you had

19   cleared?

20       A.    That is correct.

21       Q.    Let's fast forward to mid April of this year

22   and the question of centralizers.  When, to your

23   recollection, did you first begin your discussion with

24   Mr. Cocales and the other engineers at BP regarding

25   centralizers?

TRN-MDL-00282958

1    A.   On the 15th I received the centralizer sub

2  information that I inputted into OptiCem.  I had also

3  additionally imported the directional data and the

4  caliper data.  And that's when I first noticed that

5  there would be a channeling issue with the design.  So I

6  then met with Brett Cocales and Mark Hafle in the hall

7  and told them we have an issue.

8    Q.   All right.  So you had that discussion face to

9  face with those BP engineers about this very problem,

10  did you not?

11    A.   That's correct.  Yes.

12    Q.   All right.  And you also had an exchange of

13  e-mails and correspondence, did you not?

14    A.   Yes, I did.

15    Q.   You sent them graphs.  You sent them models.

16  You sent them engineering information, did you not?

17    A.   Yes.  I did send them one OptiCem run out and

18  copy Brian Morel.  And I believe it showed a moderate --

19  it was ten centralizers at that time.

20    Q.   All right.  And the inputs with -- you went in

21  that -- you inputted these models.  That was all data

22  that came from BP?

23    A.   That's correct.

24    Q.   Regarding this well?

25    A.   Yes.

TRN-MDL-00282959

1      Q.    And let me state it a different way.  This was

2  not any information that came from my client,

3  Transocean?

4      A.    No, all information for the well came from BP.

5      Q.    Okay.  And you took all of your expertise and

6  the technology you had at your command at Haliburton,

7  and you determined as of April 15th that a certain

8  number of centralizers should be constructed in this

9  well, did you not?

10     A.    That's correct.  By the end of the evening, we

11 determined the 21 centralizers would take care of the

12 issue.

13     Q.    And was that your recommendation, sir?

14     A.    That was my recommendation, yes.

15     Q.    And did you tell the engineers at BP that?

16     A.    Yes.  Greg Cocales and Greg Walz stayed late

17 with me that evening.  We talked in depth about it.  And

18 they even made arrangements to fly the centralizers out

19 on a chopper the next morning.

20     Q.    Did you also issue a report to them with that

21 recommendation for 21 centralizers?

22     A.    Yes, I did.

23     Q.    And you sent that on April 15th, did you not?

24     A.    Yes, the evening of the 15th, yes.

25     Q.    All right.  Did your recommendation with

TRN-MDL-00282960

1    regard to the number of centralizers required to be run

2    with this long string casing ever change from 21?

3        A.  No, it did not.

4        Q.  All right.  Did you ever tell any of these

5    engineers at BP that you did change your recommendation?

6        A.  No, I did not change anything.

7        Q.  Okay.  Did they tell you several times, "It's

8    too late .  We can't get more product out there.  We'll

9    probably be okay with this anyway."  Those -- is that

10   the kind of feedback you got from BP on this?

11       A.  Yes.  Brian Morel was on the rig at the time.

12   He was not in the office, but he did send me an e-mail

13   stating that it was too late.  We had to deal with what

14   we had on the rig.

15       Q.  Did you issue a second report to Mr. Brian

16   Morel and to BP to attention Mr. Brian Morel from you,

17   sir, at Haliburton evaluating the result and the risk if

18   you used 10 centralizers on this job?

19       A.  Yes.  That e-mail is updating Brian, since he

20   was in not in the loop in the conversation, letting him

21   know, because he had been asking for the OptiCem report

22   and I was letting him know where I was at with it, what

23   I was getting, and what I was working on towards, and

24   that's what that e-mail stated to him.

25       Q.  So on April 15th and April 16th, you sent two

TRN-MDL-00282961

1    reports and with your 21 centralizers recommendation so

2    that we understand what sort of risk of gas flow would

3    there be if BP agreed with your recommendation to use 21

4    centralizers?

5        A.   I believe the gas bill had potential to drop

6    to ado about 2.59.  It was a lot lower than one that was

7    run with six centralizers.

8        Q.   It was very minimal, yes?

9        A.   Yes.

10       Q.   And the report that you formulated when you

11   were getting this pushback from BP about a scenario to

12   use 10 centralizers, what was the risk of gas flow with

13   that number?

14       A.   It showed it moderate.  I don't remember the

15   exact number, but it was in the middle of scale.

16       Q.   And I don't think it's really been stated for

17   the record, and I would like to make sure it is.  Do you

18   have the report, sir, in which you ran the model

19   utilizing 7 centralizers in front of you?

20       A.   This one here?

21             MR. MCCARROLL:  It should be provided in

22   the documents that I gave him at the top of the table,

23   at the bottom.

24             MR. GODWIN:  April 18th report.

25   BY MR. CLEMENTS:

TRN-MDL-00282962

1      Q.    Yes.   Would you look at Page 18, sir?

2      A.    Yes.   Okay.

3      Q.    And I think you mentioned this, the gas flow

4   potential -- and I think Mr. Godfrey covered this -- was

5   10.29 that was an index consistent with the severe gas

6   flow?

7      A.    That's correct.

8      Q.    All right.   And would you read into the record

9   the language that appears in narrative form below that

10  index?

11     A.    Based on the analysis of the above outlined

12  well conditions, this well is considered to have a

13  severe gas flow problem.   Wells in this category fall

14  into the Flow Condition 3.

15     Q.    And is there any emphasis on the word

16  "severe"?

17     A.    It's capitalized.

18     Q.    All cap?

19     A.    The whole word's capitalized.

20     Q.    Did you say this in these terms because you

21  thought the engineers at BP would be able to understand

22  what that sentence means?

23     A.    I did not type this sentence in. It's

24  automatically generated based on the number it shows.

25  It automatically populates moderate, severe and

TRN-MDL-00282963

1    automatically populated as capital.

2        Q.    And does it speak in the Haliburton

3    terminology?  Does it speak in language that you believe

4    the engineers at BP could understand?

5        A.    I believe it does.

6        Q.    Did you also discuss with BP during this

7    period of time, April 15 and 16th, the stand-off

8    percentages in the models you were running?

9        A.    When I was running through the numerous

10   scenarios on the 15th, I was running on my computer and

11   Brett Cocales would come up and I would show him where

12   we were at and show him the stand-offs.  I didn't just

13   jump to the 21 centralizers.  I went through a number of

14   scenarios and slowly added until I felt we were

15   comfortable with the output.

16       Q.    So 21 wasn't just a guess?

17       A.    No, we -- I ran several iterations that

18   afternoon.

19       Q.    What is a stand-off percentage?

20       A.    Stand-off percentage -- best practices

21   recommend 70 percent stand-off.  It has to do with the

22   pipe centralized in the hole.  I'm trying to think how

23   to explain it.

24       Q.    If the pipe is perfectly centered within the

25   well bore --

TRN-MDL-00282964

1       A.    It would be considered a hundred percent

2  stand-off if it's perfectly centered in the well bore.

3  If it's kicked off to one side, it could be 90/80,

4  depending on the area on both sides of the pipe.

5       Q.    All right.  And the phenomenon of channeling,

6  which was a concern here, how does that relate to the

7  stand-off percentage?

8       A.    The lower the stand-off, the higher the

9  probability of channelling to occur.  The fluid will

10 take the path of least resistance, which it would go on

11 the side that has the most area and flow up that side

12 and leave mud behind on the side with least amount of

13 area.

14      Q.    Is there a minimum acceptable stand-off

15 percentage that Haliburton or that you would recommend

16 to a customer?

17      A.    We try to shoot for at least 70 percent

18 stand-off.

19      Q.    Anything below 70 percent is considered

20 substantially problematic?

21      A.    It could potentially be, yes.

22      Q.    And the lower the percentage, the greater the

23 problem?

24      A.    Correct.

25      Q.    The greater the risk?

TRN-MDL-00282965

8/24/2010

326

1  A.  Correct.

2  Q.  Did you share your data with BP?  We reference

3 an e-mail to Mr. Brian Morel on April 16, 2010 at 3:22

4 p.m.  Excuse me.  It's part of a string.  This would be

5 from you to Mark Hafle, Brian Morel, Brett Cocales and

6 Greg Walz on Thursday, April 15th, at 3:35 p.m.

7    Do you remember during that period of time

8 giving specific projections with regard to the use of

9 centralizers?  Do you recall specifically a model

10 incorporating or based on the use of the 10

11 centralizers?

12  A.  Do you have a copy of the e-mail?

13  Q.  Yes, I do.

14    MR. CLEMENTS:  May I approach the

15 witness, Your Honor?

16    JUDGE ANDERSEN:  Sure.

17 BY MR. CLEMENTS:

18  Q.  Okay.  My copy has notes on it.  Let me show

19 you your part.  Does that refresh your recollection,

20 sir?

21    MR. GODWIN:  Can I read the notes?

22    MR. CLEMENTS:  I don't know.  Are they

23 any good?

24    JUDGE ANDERSEN:  Not unless he goes under

25 oath.

TRN-MDL-00282966

```
 1              MR. CLEMENTS:  Well, that's an option.
 2        A.   In the body of this e-mail, I did cut and
 3   paste at this time.  I had done a running centralizer
 4   and use of ten centralizers.  And it showed stand-off
 5   and placement of what I was looking at that point in
 6   time.
 7        Q.   Okay.  And you started at the top at the
 8   safest level that the 10 centralizers spot you had a
 9   stand-off percentage of about 80 percent?
10        A.   That's correct, yes.
11        Q.   And I think there's some deviation.  So the
12   ring is between 77 and 80 percent?
13        A.   Yes.
14        Q.   Okay.  And just cutting to the chase, going
15   down to the first centralizer, how low does that
16   percentage get?
17        A.   It goes down to 13.9 percent stand-off at the
18   top of the centralizer.
19        Q.   Substantially less than 70 percent?
20        A.   That's correct.
21        Q.   What -- do you recall the mud level of this
22   well?  Do you recall the -- at what level you first --
23   you dip below the 70 percent?
24        A.   Looks like --
25        Q.   Excuse me?  Yeah.  Which level?
```

TRN-MDL-00282967

1        A.      Around 18069 is where it's stuck, just 70

2   percent.

3        Q.      And then it drops dramatically, does it not?

4        A.      It goes down from there, yes.

5        Q.      And you provided this information to those BP

6   engineers for what purpose, sir?

7        A.      At the time Brian Morel was asking -- looking

8   for the OptiCem report, and I was giving him information

9   that we had an issue with stand-off.  I was working on

10  it.

11              And I cut and pasted here to show him what

12  10 looked like, but I was continuing to work on the

13  issue with Brett and Greg in the office.

14       Q.      Okay.  The board just -- when we came back

15  from the break -- showed you an e-mail in which you were

16  instructed that BP had 6 centralizers.  What is the date

17  of that e-mail?

18       A.      Dated Thursday, April 15th, 2010 at 4:00 p.m.

19       Q.      And were you being told at that e-mail that a

20  decision has been made?

21       A.      At this point Brian Morel was on a rig so he

22  was not in office and was not in the loop.  When I

23  received this e-mail, I brought it to Brett Cocales'

24  attention.  Brett said that Brian didn't know what was

25  going on, that we needed to continue looking at the

TRN-MDL-00282968

1    centralizers and that he would go talk about the

2    modeling centralizer placement, talk to Brian about it,

3    the modeling centralizer placement.

4         Q.    And did you continue to give them information,

5    modeling and recommendations?

6         A.    Yes, the whole evening, as I added

7    centralizers, I would run -- make a model run, and Brett

8    kill come to my computer.  And I would show him the

9    output and what it looked like and I continued to do

10   that.

11        Q.    A quick question:  With regard to any of the

12   three production casing design reports you formulated

13   during this period of time from April 15th through April

14   18th including the 21 centralizers reports the 10

15   centralizer report and the 7 centralizer report, were

16   any of those documents, were any of those reports ever

17   sent to Transocean?

18        A.    No. My distribution list does not include

19   anybody from Transocean.

20        Q.    Does BP consider the data or any of the data

21   in these reports to be proprietary?

22        A.    I don't know.  I believe it's shared with the

23   person on the rig because before the jobs they have job

24   procedures and job safety meetings and discuss the

25   procedures.

TRN-MDL-00282969

1      Q.    Would that be the Haliburton person and the BP

2   person?

3      A.    Yeah.  BP and Haliburton would be present in

4   those meetings.

5      Q.    Okay.  Let me ask you, sir.  It came up

6   yesterday.  Do you have your e-mail there, sir, dated

7   Sunday, April 18th, at 8:58 p.m.?

8      A.    Yes.

9      Q.    To a number of individuals, Cocales, Haire,

10  Mooney, Vidrine, Lee, you see all those people?

11     A.    Yes, I do.

12     Q.    Guide, Sepulveda, some Haliburton personnel.

13  Are there any Transocean personnel on that e-mail, sir?

14     A.    No.

15     Q.    What is an address, HORIZON foreman, an e-mail

16  address appearing here, HORIZON foreman and HORIZON

17  engineers.  Is that a Transocean -- are those Transocean

18  addresses, or are they some other addresses?

19     A.    My understanding is the HORIZON foreman is an

20  e-mail account that all the foremen have access to, and

21  the HORIZON performance engineers is the e-mail account

22  that all BP performance engineers have access to.

23     Q.    Are those then BP and Haliburton personnel?

24     A.    Everybody listed in this e-mail is either BP

25  or Haliburton.

TRN-MDL-00282970

1      Q.    Correct.   And there's no one from Transocean

2  listed on that e-mail?

3      A.    No.

4      Q.    Among the dozen or so individuals?

5      A.    None.

6      Q.    What does that e-mail read, sir, if you could

7  read it, please?

8      A.    It says, "Attached is a revised information

9  for the upcoming 9 7/8 by 7-inch production casing job.

10 The compressive strength is not yet completed.   It

11 currently has 34 hours.   The chart of the progress is

12 below.   Let me know if you have any questions.   Thanks."

13     Q.    All right.   Was this the production casing job

14 that was then undertaken?

15     A.    That's correct, yes.

16     Q.    With the 6 centralizers?

17     A.    I believe it's modeled 7 in this particular

18 one.

19     Q.    Do you know why they ended up using 6 and not

20 7?

21     A.    When I deleted the 21 down to 6, I

22 inadvertently left one in there by mistake.

23     Q.    All right.   Now, forgive me for jumping

24 around.   I want to go back to the April 15th, 2010

25 e-mail that was given to you when you came back by the

TRN-MDL-00282971

1    board when you came back from the break and get with --
2             JUDGE ANDERSEN:  And in doing that, if
3    you could avoid covering too much ground again because
4    it's getting late and --
5             MR. CLEMENTS:  Yes, thank you, Your
6    Honor.  It begins with "We have 6 centralizers"?
7        A.    Okay.
8        Q.    I made reference to this, but I'd like you to
9    read it, the third sentence, beginning with the third
10   sentence of that e-mail as far as changes.
11       A.    Third sentence states only option is to
12   rearrange placement of these centralizers.  Please see
13   attached diagram for my recommendation.
14       Q.    Okay.  It begins with "As far as changes, it's
15   too late to get any more product to the rig."  Is that
16   what it says?
17       A.    Yes, I'm sorry.  I started in the wrong place.
18       Q.    Was that statement accurate?
19       A.    At that time they only had six centralizers on
20   the rig.
21       Q.    Did they in the subsequent days did BP
22   actually get more centralizers to the rig?
23       A.    Yes, they pulled out a 15 additional
24   centralizers on the morning of the 16th.
25       Q.    At that point they were apparently willing to

TRN-MDL-00282972

1    accept your recommendation to use 21 centralizers?

2         A.   Yes.  That's correct.

3         Q.   And they got the centralizers out to the rig,

4    15 in number, totalling 21, but did they use them?

5         A.   No, they did not run them all.

6         Q.   Was there -- were they the right centralizers,

7    the wrong centralizers?  Do you know why they didn't run

8    them?

9         A.   I received no communications with BP on if

10   they were right or wrong or any decision to run them or

11   not.

12              I was informed by Haliburton personnel

13   they were not run.

14        Q.   To your knowledge, are centralizers generally

15   available in the oil field, to my knowledge?

16        A.   To my knowledge, yes.

17        Q.   Is BP a company able to order whatever number

18   of centralizers of whatever type it wants?

19        A.   I see no restriction.  I don't see why they

20   couldn't get what they needed.

21        Q.   You were asked whether the report -- these

22   three reports are all similar in form, are they not?   21

23   centralizer model, the 10 centralizer model, the 7

24   centralizer model?

25        A.   Yes, they're all similar, just different

TRN-MDL-00282973

1    centralizers.

2         Q.    And there's no executive summary on any of

3    them?

4         A.    No.

5         Q.    They're only about 30 pages in length, aren't

6    they?

7         A.    Approximately, yes.

8         Q.    Well, would that mean that the executive

9    should go straight to the data and not look for a

10   summary?

11        A.    Yeah.  I would believe you'd look at the

12   charts and the data in the back, yes.

13        Q.    I think you covered this, but the charts on

14   Page 25 and the narrative on Page 18 about the risk of

15   gas flow you would consider to be the most material

16   information in these reports?

17        A.    Yes, and this report is during board -- yes.

18        Q.    Would you say that there's anything any more

19   important than the risk of gas flow in these reports?

20        A.    In this particular job, no.

21        Q.    Now, sir, you had a lot of discussion with BP

22   about whether to use a long string or a liner with

23   tie-backs.  Then you got to that point on April 15th and

24   the subsequent days where you had recommended 21

25   centralizers and only 6 were being used.

TRN-MDL-00282974

1                You saw a severe risk of gas flow, and you

2    said so in your report and in your evaluation.  Under

3    those circumstances, in your opinion, was it appropriate

4    to do a cement bond log?

5        A.   If BP were to ask my opinion, I would have

6    suggested they toss around doing a cement bond log, but

7    I was never asked that.

8        Q.   To your knowledge, did at some point -- did BP

9    make arrangements for a CBL?

10       A.   On the morning calls there were referenced

11   that people were on the rig.

12       Q.   To do a CBL?

13       A.   CBL.

14       Q.   At that point they felt like a CBL would be a

15   good test?

16       A.   Yes.

17       Q.   Was it even more important to do a CBL in

18   light of the issue with centralizers and the discussions

19   of a long string versus liner with tie-backs?

20       A.   The only way to confirm if we had channeling

21   on this job would be to do CBL.

22       Q.   Would you agree that the greater the risk of

23   gas flow, the more important it is to do a CBL and get

24   that information?

25       A.   I would think so, yes.

TRN-MDL-00282975

1      Q.   Was there any reason, in your opinion, not to

2   do a CBL?  Is there any downside in doing a CBL?

3      A.   Not that I'm aware of, no.

4      Q.   Who canceled the CBL?

5      A.   I'm not sure the individual, but BP sent them

6   in.

7      Q.   Was that wise?

8            MR. KOHNKE:  Objection.  Lack of

9   foundation.

10           JUDGE ANDERSEN:  He already testified

11  that he would recommend the CBL.  So I think we can

12  infer from that that he doesn't think it's wise not to

13  have done it.

14           MR. CLEMENTS:  Thank you, Your Honor.

15  BY MR. CLEMENTS:

16     Q.   Well, counsel for BP was asking questions of

17  what Haliburton told its customer of BP after this

18  casualty.  And I take it you didn't send a note saying

19  "I told you so," did you?

20     A.   No.

21     Q.   You sent them the information with respect to

22  the job that was done?

23     A.   That's correct.  They asked for the post job

24  report.  It was an incident.  They wanted to collect as

25  much data as possible, start looking into what may have

TRN-MDL-00282976

1    caused it.

2        Q.   And in that report did you or Haliburton

3    make -- ever say any statement to suggest that you are

4    revoking or withdrawing your recommendation that 21

5    centralizers were the correct number to minimize the

6    direction of gas flow?

7        A.   I never did change my recommendation for 21

8    centralizers.

9        Q.   Thank you, sir.  That's all I have.

10            JUDGE ANDERSEN:  Thank you.  Anadarko?

11                 EXAMINATION

12   BY MS. KUCHLER:

13       Q.   Good afternoon.  My name is Deb Kuchler.  I

14   represent Anadarko and MOEX Offshore.

15            Did Haliburton have any input into the

16   temporary abandonment plan that was submitted to the

17   MMS?

18       A.   As far as placement of the --

19       Q.   As far as the plan itself that was presented

20   to the MMS.  Did Haliburton design that plan?

21       A.   No, the only thing I designed was the cement

22   flow.  I didn't have any part in the implementation of

23   MMS.

24       Q.   Now, Mr. Godfrey put up your post job report

25   and discussed it at length.  But the bottom line on the

TRN-MDL-00282977

1    post job report was that that report was meant to

2    outline the job Haliburton did, not to capture

3    recommendations Haliburton had made before the job was

4    done; is that right?

5        A.    That's correct.   The post job reflects

6    actually what took place on the job.

7        Q.    And in that job Haliburton was responsible for

8    pumping the job the way BP ultimately specified it

9    could; you agree with that?

10        A.    That is correct, yes.

11        Q.    And that's what Haliburton did?

12        A.    Yes.

13        Q.    Mr. Godfrey also asked you some questions

14    about your 4/18 report for the 9 7/8 by 7-inch

15    production casing.   And I'm specifically referencing the

16    questions he had on job recommendations.   You had -- you

17    said you prepared many models over the course of the

18    several months on the cement job, and each time you did

19    those models or many times that you did those models BP

20    came back to you and asked you to input different data

21    model, different assumptions; is that right?

22        A.    That's correct.   We modeled a lot of scenarios

23    per BP's instructions.

24        Q.    So you prepared those models and versions of

25    models and BP changed the data it wanted input?

TRN-MDL-00282978

1      A.   Correct.

2      Q.   So in the April 18 job recommendation section

3 of your report, that was based on data that BP had asked

4 you to input into the model; is that accurate?

5      A.   Are you referring to the OptiCem report?

6      Q.   Correct.

7      A.   Yeah.  All the data that was given to me by BP

8 was in the report.

9      Q.   So, in essence, those job recommendations were

10 actually BP's information because they were based on the

11 information BP had given you?

12     A.   That's correct.

13     Q.   Is that fair?

14         And what's in that report is what BP

15 recommended for Haliburton to do?

16     A.   Yes.

17     Q.   Now, besides the number of centralizers -- and

18 we've talked at length about that -- were there any

19 other recommendations that Haliburton had made to BP for

20 this cement job that BP did not follow?

21     A.   Yes, on the rig the engineer and coal team

22 leader suggested that they do a full bottoms up, and BP

23 did not want to do that.  They said they wanted to

24 pump --

25         MR. KOHNKE:  Objection as to hearsay.

TRN-MDL-00282979

1           JUDGE ANDERSEN:  Well, you can testify as

2  to your understanding.  Later on if -- and tell us the

3  basis for that why you think that was their decision.

4  We'll let you answer the question.  Obviously there

5  could be other witnesses -- there probably will be --

6  who have more direct knowledge and can swear or verify

7  your understanding.

8      A.   I received a letter from union rig, which then

9  in turn had a conversation with Nathan Chaisson, who was

10  on the rig, Haliburton engineer, and discussed that

11  procedure with them.

12           In the procedure given to me, they stated

13  the only plan on pumps -- and I don't remember, but 10

14  barrels ahead of the BP job, I recommended to BP the

15  suggestion of pump the bottoms up.

16           And hence in the procedure, he put that

17  amount as per BP company man to signify it was their

18  decision.

19      Q.   To?

20           CAPTAIN NGUYEN:  That Haliburton made a

21  recommendation on centralizers and BP didn't follow that

22  and Haliburton made a recommendation to run a complete

23  bottoms up and BP did not follow that.

24      A.   That's correct.

25  BY MS. KUCHLER:

TRN-MDL-00282980

1      Q.    Were there any other recommendations that

2  Haliburton made that BP did not follow?

3      A.    Not that I can think of right now.

4      Q.    And are you aware of any reason why BP could

5  not have circulated the full bottoms up?

6      A.    I'm not aware of why they could not.

7      Q.    Because, in fact, there was full return

8  reported before the cement job during the cement job.

9  So there was no indication that a full bottoms up could

10 not be done; is that right?

11     A.    That was my understanding, correct.

12     Q.    And are you aware that the American Petroleum

13 Institute describes bottoms up as a common cementing

14 practice?

15     A.    Yes, I am.

16     Q.    And would you agree that?

17     A.    Yes.

18     Q.    And that comports with Halliburton's practice

19 as well?

20     A.    Yes.

21     Q.    Is bottoms up a time-consuming process?

22     A.    Yes, it could be.

23     Q.    Do you know what the annual volume to the

24 wellhead was in this case in order to achieve bottoms

25 up?

TRN-MDL-00282981

1          A.    I don't recall what that actual bottoms was.

2          Q.    Was it around a thousand or 1100 sound about

3     right?

4          A.    It could potentially be that much, right.

5          Q.    And how much would bottoms uptake at the depth

6     of the Macondo well?

7          A.    It varies on the rate, but my understanding

8     they were only pumping several barrels a minute.  So

9     you're looking at several.

10         Q.    Maybe as much as 12 hours?

11         A.    Yes.

12         Q.    And what was the plan circulation volume for

13    the time before pumping the cement job?

14         A.    It was -- I don't remember the exact number,

15    but it was only a couple hundred barrels for the cement

16    job.

17         Q.    Were you aware of part of the BP program

18    saying that the they were going to circuit the casing

19    and drill pipe volume if able as part of the bottoms up

20    process?

21         A.    In the procedure that I received from the rig?

22         Q.    Correct.

23         A.    It stated a volume that they planned on

24    pumping ahead of cement.

25         Q.    And do you know how long they actually did

TRN-MDL-00282982

1    pump before beginning the cement job that day?

2        A.    Looking at this report, it was only a couple

3    hundred barrels if I remember right.

4        Q.    So about half an hour?

5        A.    Yes.

6        Q.    And do you know what the results were of the

7    partial bottoms up that they did on the conditioning

8    trial before running the casing?

9        A.    I was unaware of any losses.  So I think you

10   will find that --

11       Q.    Do you know who specifically at BP made the

12   decision not to run a full bottoms up?

13       A.    Talking to Nathaniel, it came up in the -- in

14   the meeting with procedure.  And the procedure he gave

15   me, he said as per company man.  Now, which one he

16   actually talked to, I don't know.  You probably have to

17   ask him.

18       Q.    And is it your opinion then that failing to

19   adequately circulate the mud was a serious mistake on

20   BP's part?

21       A.    As part of our best practice.  And I'd like to

22   have seen it happen in this case.

23       Q.    Would it have minimized the risk of a failure

24   of a cement job?

25       A.    Potentially, yes.

TRN-MDL-00282983

1      Q.   I'd like to talk a little bit about the tests

2  that were run on the cement.  I understand that the base

3  cement was already on the rig before the job started; is

4  that right?

5      A.   That's correct.

6      Q.   And did BP send a sample of the actual base

7  cement back from the rig for Haliburton to test?

8      A.   Yes, I had the cementer send in a sample from

9  the rig.

10     Q.   And so you did -- Haliburton did run tests on

11 the base cement that was on the rig?

12     A.   That's correct.

13     Q.   How much cement did the original plans call

14 for?

15     A.   Original plan referring to the plan before we

16 sputted the well or --

17     Q.   Based upon the wellbore diagram.

18     A.   Oh, the plan was to pump approximately 50 to

19 60 barrels of cement.

20     Q.   Which would equal what 750 sacks of cement?

21     A.   I don't recall, but it may be about that.

22     Q.   And do you know how many sacks BP actually

23 decided to use?

24     A.   I don't believe they went with our agreed plan

25 from were any tests run on the 16 pounds per gallon lead

TRN-MDL-00282984

1    other actual slurry, yes.

2         Q.   Can you tell me the pump time or

3    compressibility tests that would have been run on those?

4         A.   We actually ran two pump times.  One was about

5    5, 2 and on a 7-hour, two different charge

6    concentrations.

7         Q.   And you touched on this earlier that when you

8    tested the nitrified slurries for compressive strength

9    that the tests aren't done at downhole conditions?

10        A.   That's correct.

11        Q.   How do you relate the test results to actual

12   bottom hole conditions then?

13        A.   You can look at the UCA chart, which is an

14   foam cement system.  But for me compressions will follow

15   a similar compression in development so that it may not

16   get as high, but it will follow the same strength and

17   develop in the same amount of time.

18        Q.   Now, this use of foam cement, would you

19   consider it a critical or a noncritical application by

20   Haliburton's standards?

21        A.   Probably critical.

22        Q.   Okay.  Would you explain for us the difference

23   by Haliburton's standards of what's a critical

24   application versus noncritical?

25        A.   In this case if I understand your question

TRN-MDL-00282985

1    correctly -- given the potential for high gas flow
2    potential here, foam was the best option.  Take some
3    additional equipment and additional personnel to run the
4    guy and a lot of communications.  So I think it's a
5    critical job.
6         Q.    What was the bottom hole temperature of the
7    Macondo well?
8         A.    It was predicted about 2/10 of the cement job.
9         Q.    And what was the temperature used in the
10   compressive test?
11        A.    210.
12        Q.    Did you use the crush test to determine the
13   compressive strength of the nitrified slurry?
14        A.    I -- we use that mainly as a reference point
15   for the core.  They typically want to see a number --
16   what is it, what does it look like, does it get hard.
17   So the reason why we did a crush test is to say it does
18   get hard.
19        Q.    And what was the result here?
20        A.    I believe at 48 hours it was 11 -- 1100 plus
21   or minus psi.  I don't have the test in front of me.
22        Q.    And did you use a max analyzer to also test
23   the compressive strength?
24        A.    No.
25        Q.    Why not?

TRN-MDL-00282986

1      A.   We used a UCA for the compressor strength.

2   The max analyzer transition time.

3      Q.   Now, can nitrified slurry be contaminated by

4   mud?

5      A.   Yes.   Any slurry you put in the mud.

6      Q.   What happens to the slurry if it becomes

7   contaminated?

8      A.   Well, for me --

9      Q.   Uh-huh.

10      A.   -- it can potentially destabilize it a little

11   bit.

12      Q.   Were any tests run on the slurry under various

13   contaminations to see what the various --

14      A.   We do have tests that show various percentages

15   of the contamination.

16      Q.   And did you use a non-nitrified cap cement

17   during this operation?

18      A.   Yes, we pumped to a hundred feet of non -- of

19   cap.

20      Q.   What's the purpose of the non-nitrified cap?

21      A.   Just in case there is any contamination with

22   mud and you have a little bit of nitrogen breakout, it

23   would go to the cap.   And the cap leads to the some seal

24   and the cap stops any migration that might come up.

25      Q.   And how long was the cap?

TRN-MDL-00282987

1       A.    It was a hundred feet equivalent lengths.

2       Q.    Was it pumped ahead or behind the lead wiper

3  plug?

4       A.    It was pumped in between the two plugs to

5  isolate it on the way down.

6       Q.    And what happens if the cap cement becomes

7  contaminated?

8       A.    It can affect the compressor depending how

9  much mud.

10      Q.    What was the weight of the synthetic mud in

11 the whole?

12      A.    It was about a 14.2 I believe.

13      Q.    And was heavier mud maybe 16, 17 pounds per

14 gallon spotted in the bottom of the hole before pulling

15 out of the hole to run the casing?

16      A.    I wasn't aware of any mud.

17      Q.    What was the weight of the well left in casing

18 shift?

19      A.    1674.

20      Q.    Gravity mixing of the synthetic with 14 pounds

21 per gallon in cement, that's 16.7?

22      A.    There is a potential of swapping, yes.

23      Q.    How long -- how big a potential is that?

24      A.    In straight hole -- it's hard to say.  It

25 varies on the thickness of the fluid, the viscosities,

TRN-MDL-00282988

1    angle, thickness of that sort.

2         Q.    And is it common practice to spot heavy mud at

3    the base of the wellbore around the shoe joint to

4    prevent this contamination?

5         A.    It's a recommended practice, yes.

6         Q.    Was that done here?

7         A.    Not that I know of, no.

8         Q.    How long was it expected to take for the

9    cement to set on this job?

10        A.    I don't have the tests in front of me, but if

11   I remember right, eight to nine hours, I believe of psi.

12   I don't remember though.

13        Q.    Are you aware of Transocean's conclusion that

14   7-inch casing nitrified slurry would have zero

15   compressive strength after 24 hours?

16        A.    Transocean?

17              MR. GODWIN:  Can you show him the report

18   you're referring to.

19              MS. KUCHLER:  I actually don't have it up

20   here.  I was wondering if you were aware of that

21   conclusion.  If not, I'll move on.

22        A.    No, I've never seen any conclusion --

23   BY MS. KUCHLER:

24        Q.    Would BP normally discuss with you what lift

25   pressure to expect?

TRN-MDL-00282989

350

1        A.    That may come up sometime in some jobs.

2        Q.    How do you determine lift pressure?

3        A.    Lift pressure is basically on a heavier fluid

4   turn in corner and pushing it up the annulus.  It could

5   be affected by a number of variables and yet realized

6   assumptions, in some cases hole size, viscosity, things

7   of that sort.

8        Q.    In this situation, what did Haliburton's show

9   us the expected lift pressure?

10       A.    I know the models show what the hydrostatic

11   pressure is at the end of the job.  I don't know if it

12   shows what the core pressure.

13       Q.    How about the lift pressure in a static

14   setting; would the models show that?

15       A.    It would show a hydrostatic of a number, yes.

16       Q.    And would it be fair to say that the models

17   ranged for lift pressure between 18 and 38 psi?

18       A.    That sounds about right, yes.

19       Q.    Is 2020 pounds of static lift pressure enough

20   to see or detect?

21       A.    It would be difficult to see that small of a

22   volume -- or of a pressure.

23       Q.    You mentioned earlier that the hundred psi of

24   pressure mentioned in Mr. Chaisson's e-mail would have

25   included lift pressure.  And is there any way for us to

TRN-MDL-00282990

1    know how much of that psi would be from friction

2    pressure than lift prosecutor?

3        A.    It would be difficult to distinguish the two.

4        Q.    Is that something you do, psi calculations?

5    Do you read a meter?

6        A.    You can do a very, very rough calculation with

7    a lot of assumptions for lift; but I've done it before

8    per core lift, but I make sure to tell them that this is

9    a real guess.  So it's difficult to calculate.

10       Q.    So you wouldn't be able as we sit here today

11   to tell us even an estimate of how that might break down

12   in the hundred psi you reported?

13               MR. GODWIN:  Objection; calls for

14   speculation.

15               JUDGE ANDERSEN:  You don't have to

16   speculate.  Would that be a guess?  Next question.

17   BY MS. KUCHLER:

18       Q.    Mr. Gagliano, what's the purpose of the

19   floats?

20       A.    To prevent flow back of casing.

21       Q.    So what does the flow collar test look for?

22       A.    Flow collar test?

23       Q.    Uh-huh.  Would you be looking for a

24   significant hydrostatic pressure differential between

25   the fluids in the analyst and the fluids in the casing?

TRN-MDL-00282991

1        A.    I'm not sure if I understand your question.

2        Q.    Do you test the float in the course of the

3   cement job?

4        A.    In the job when you shut down, you check for

5   flow back.  And if there's no flow back then you assume

6   the floats are over holding.

7        Q.    So why is a differential test across the float

8   collar necessary?

9        A.    It just shows the float's holding to where you

10  won't have any mud or cement coming back in and

11  potential of contaminating the seal.

12       Q.    So you want to confirm the seal at the end of

13  the casing?

14       A.    That's correct.

15       Q.    How were the flows tested in this case, if you

16  know?

17       A.    My understanding is they were shut down and

18  the moderate flow back to the units.

19       Q.    Was that a procedure developed by BP or

20  Haliburton?

21       A.    I'm not sure who developed it.  It's just

22  standard procedure I've always used since I've been in

23  the field and been in the office.  I'm not sure.

24       Q.    When the floats were tested on this well, what

25  was the pressure of the fluids in the annulus and the

TRN-MDL-00282992

1    fluids in the casing?

2        A.    The hydrostatic on the outside ranged from 18

3    to 39.

4        Q.    So they were nearly identical?

5        A.    It was very close, yes.

6        Q.    Is that small of a differential pressure up to

7    38 pounds per square inch too small to effectively test

8    the ability of the float valve to prevent wellbore

9    fluids from entering the casing?

10       A.    I'm not sure, honestly.

11       Q.    Do you think that test was adequate to test

12   the float vast in this situation?

13       A.    I'm not -- I'm not sure.  I mean, I would

14   think you would have some flow back; but it was very

15   small pressure on the outside.  So it may be very

16   difficult to see.

17       Q.    Now, the low static differential pressure of

18   18 to 38 psi, that was information that was made

19   available to BP in the form of your December reports; is

20   that right?

21       A.    That's correct.

22       Q.    So they were aware of that small differential?

23       A.    Yes.

24       Q.    And whatever indications that had for the

25   availability of the flow test?

TRN-MDL-00282993

354

1        A.    That's correct.

2        Q.    Given the small differential, do you think it

3   would be prudent for BP to have used the mechanical

4   barrier such as a bridge plug or a cement retainer in

5   the 7-inch casing and then cap that with cement before

6   displacing to seawater?

7             MR. GODWIN:  Objection; Your Honor.

8   Calls for speculation.

9             JUDGE ANDERSEN:  If -- If you don't have

10  a strong -- if you don't have an opinion on it then you

11  can state that.  You don't have to guess or speculate.

12       A.    I don't have an opinion on that.

13  BY MS. KUCHLER:

14       Q.    Looking back, would you say that BP should

15  have never taken that drilling mud out of the hole to

16  displace with seawater when it did?

17            MR. GODWIN:  Objection; Your Honor.

18  Calls for speculation, guesswork what should have

19  happened.

20            JUDGE ANDERSEN:  Once again, you don't

21  have to guess or speculate; but if you have a -- based

22  on your knowledge of that particular well, if you know

23  what you would do and you have an opinion then you can

24  express that to the Court.

25       A.    I can just say on past jobs it was the

TRN-MDL-00282994

1    standard practice to displace the seawater before the

2    surface water.

3    BY MS. KUCHLER:

4        Q.   And you told us that BP and Haliburton first

5    started discussing the cement job several months before

6    it was actually run.  And the cement job itself being

7    done nearly the end of April and discussions having been

8    started at least back in February; is that right?

9        A.   That's correct.

10       Q.   So BP had February, March, almost three months

11   to prepare for this cement job and have the equipment

12   necessary on the rig to do it correctly; is that right?

13       A.   That's correct.  We were modeling different

14   wells.  And obviously this well had a lot of issues.  I

15   mean, it set some contingency casing points and every

16   time it changed we went back and reran the model to see

17   how to do production casing on the job.

18       Q.   And just one final point, on the hundred psi

19   of lift pressure, do you do -- does the OptiCem predict

20   the amount of lift pressure that should be expected or

21   is that a hand calculation?

22       A.   I think he referenced a hundred psi from the

23   similar data and looking at the pressure on from that.

24       Q.   What could make the actual lift pressure

25   higher or lower than the predicted amount?

TRN-MDL-00282995

```
 1         A.    Potentially channeling of the cement going up
 2   higher.  It can decrease the pressure.
 3         Q.    Thank you.  Those are all my questions.
 4               JUDGE ANDERSEN:  Thank you.  Keeping in
 5   mind that a gilded lily might not survive and that we
 6   had a pretty full discussion on both sides and in this
 7   particular case since Haliburton's attorney and the
 8   witness's attorney didn't ask any questions at the
 9   beginning, when we finish with everyone else you'll have
10   an opportunity.
11               I know that's out of the normal order,
12   but I thought it might help save time and it is 5:00
13   o'clock.  Okay.  Cameron?
14               MR. JONES:  No questions.
15               JUDGE ANDERSEN:  M-I SWACO?
16               ATTORNEY FOR M-I SWACO:  No, questions.
17               JUDGE ANDERSEN:  Weatherford.
18               MR. LEMOINE:  No questions.
19               JUDGE ANDERSEN:  Dril-Quip?
20               ATTORNEY FOR DRIL-QUIP:  No questions.
21               JUDGE ANDERSEN:  Douglas Brown?
22               MR. GORDON:  Three questions.
23                        EXAMINATION
24   BY MR. GORDON:
25         Q.    Steve Gordon and I represent Douglas Brown.
```

TRN-MDL-00282996

1   Mine will not be as technical.

2              I was looking at the BP document HZN-MBI

3   00171138.  And it's basically a graph of some sort.  Can

4   you tell me, please, this issue redesign, the word

5   "redesign," what does that mean?

6       A.   Redesign, that suggests that if you have an

7   actual potential of greater than 15 you should consider

8   different options, different cement, you know, just

9   looking at the whole job again.

10      Q.   Okay.  And you would tell for instance

11  hypothetically if it were BP you would tell the --

12              JUDGE ANDERSEN:  Is this number two?

13  BY MR. GORDON:

14      Q.   You would tell the owner of the well of the

15  lease you would tell them that it's a greater than 15,

16  correct?

17      A.   Yes.

18      Q.   Okay.  And that's if you poured it per your

19  plan.  I'm sure that you come up with your technical

20  plan as best you can, correct?

21      A.   That's correct.

22      Q.   All right.  Would you still pour it if a --

23  hypothetically if you poured it and it was greater than

24  15, would you still pour it if they said just go ahead

25  and pour it?

TRN-MDL-00282997

```
1                    MR. GODWIN:  Objection; Your Honor.  He's

2      not giving him all the factors in the hypothetical.

3      Other things that might be considered and so, you know,

4      the number of centralizers placed.  But there are a lot

5      of factors that alleviate that.  So he's asking him to

6      guess or speculate that.

7                    JUDGE ANDERSEN:  I'm going to sustain

8      that objection because we know this is a whole variety

9      of the variables not just that one.  Okay.  Next

10     question?

11     BY MR. GORDON:

12         Q.    All right.  As I understand it, you're a

13     technical advisor for Haliburton, correct?

14         A.    That's correct.

15         Q.    Okay.  And you, for instance, in this job knew

16     the facts and --

17                    JUDGE ANDERSEN:  We know he knows all the

18     facts.

19     BY MR. GORDON:

20         Q.    You came up with a severe rating, No. 3

21     rating, correct?

22         A.    That's correct.

23         Q.    And then that was using 21 or -- I'm sorry.

24     How many centralizers?

25         A.    We used six centralizers that showed severe.
```

TRN-MDL-00282998

1      Q.   Okay.  And that's ultimately what they used.

2    You knew that before you poured it, correct?

3      A.   Yes, they decide to run six.

4      Q.   Okay.  Did you do anything different between

5    that report that you generated that said it's going to

6    be severe, No. 3; did you do anything different in the

7    way that you had it poured when you knew that they were

8    going to use six centralizers?

9      A.   Well, I initially redesigned to 21

10   centralizers.

11     Q.   I apologize.  That's -- that's like not real.

12   In other words, in reality they poured -- they used six

13   centralizers and you knew that before they poured it,

14   correct?

15               MR. GODWIN:  Objection to the statement

16   that's not real.  That's what he went --

17               JUDGE ANDERSEN:  We went through the

18   facts.  The fact is they did poured -- you testified

19   that you changed the slurry mix and went with the

20   nitrogen and made a number of other changes.

21               But counsel if you want him to one more

22   time say what, if any, changes did you make in the

23   method of pouring of the cement as a result of the fact

24   that you knew they were going to use fewer centralizers,

25   can you answer that question?

TRN-MDL-00282999

```
1        A.    I did not change any of the cement design, no.
2   BY MR. GORDON:
3        Q.    Okay.  Have you ever requested that a cement
4   bond log be done, not for this job or any job?
5        A.    No, I have never requested that a cement bond
6   log be done, no.
7        Q.    Have you ever written in writing that a cement
8   bond log be done?
9        A.    No.
10        Q.    Does Haliburton have the capabilities to do a
11   cement bond log?
12        A.    Yes, we do have a logging department.
13        Q.    You testified that one was needed here,
14   correct?
15        A.    If BP would have asked me my opinion, I would
16   have suggested I would think they should run one.
17        Q.    Have you -- without the request of any lessor,
18   requested a cement bond log be run internally throughout
19   Haliburton within Haliburton?
20        A.    I'm sorry.  Can you repeat the question?
21        Q.    Yes.  Have you ever requested upper management
22   in Haliburton on any job say, look, the lessor doesn't
23   want to do it.  I think we need to do one.  Have you
24   ever done that?
25        A.    No.  In this case Schlumberger had the
```

TRN-MDL-00283000

1    contract for the HORIZON.

2       Q.   Have you ever seen the contract between

3    Haliburton and BP in this?

4              JUDGE ANDERSEN:  Now, really you did say

5    three questions.

6              MR. GORDON:  Just one more minute.

7              JUDGE ANDERSEN:  Okay.

8    BY MR. GORDON:

9       Q.   Have you ever seen the contract between BP and

10   Haliburton?

11      A.   Like a master contract or --

12      Q.   Any contract on this well.

13      A.   We have a master contract that all wells fall

14   under as far as pricing.

15      Q.   Okay.  In that contract does it say no matter

16   what the risk potential is, we will tell you about that

17   and if you decide to pour it, that you want us to pour

18   it, we will pour it no matter what?  Does it say that?

19             MR. GODWIN:  Objection; Your Honor.

20             JUDGE ANDERSEN:  Sustained.

21             MR. GODWIN:  The document speaks for

22   itself.  There's no foundation for that question.

23             MR. GORDON:  Okay.

24             JUDGE ANDERSEN:  All right.  Mr. Harrell?

25                         EXAMINATION

TRN-MDL-00283001

BY MR. FANNING:

    Q.   Mr. Gagliano, I heard you say -- and I believe

in response to a question by Mr. Clements that there was

no down side to doing a CBL.  Do you remember that?

    A.   Yes.

    Q.   Okay.  Well, in fact, if we stop and think

about that for a second for BP there was a down side to

running a CBL and that was cost, wasn't it?

          MR. KOHNKE:  Objection; foundation.  How

would he know that.

          JUDGE ANDERSEN:  Well, if he knows that

it cost money then he could answer the question, I

think.  So assuming that BP was paying.

    A.   It would take additional time and additional

cost.  I don't know the exact figures, but it would take

additional time.

BY MR. FANNING:

    Q.   Well, do you know who pays for a CBL when they

order a CBL?

    A.   Yes.

    Q.   Have you ever heard $128,000 as the cost of

running a CBL?

    A.   I've heard that.

    Q.   And that was the savings of not running a CBL

in this instance, right?

TRN-MDL-00283002

1        A.     That would.

2        Q.     In addition we've heard that the rig costs?

3        A.     Yes.

4        Q.     And when you're drilling an oil well, time is

5    money, right?

6        A.     Yes.

7        Q.     So that's an additional cost.  Similarly,

8    there was a reference in an e-mail that it was too late

9    to use more than six centralizers.  Do you remember

10   saying that?

11       A.     Yes.

12       Q.     That doesn't mean too late in the sense that

13   all the centralizers -- that all the centralizers in the

14   world are gone and not making it yet?

15       A.     Yes.

16       Q.     It means too late we don't want to spend the

17   money that it takes?

18              JUDGE ANDERSEN:  I'm going to sustain

19   that objection.  That e-mail speaks for itself, and I

20   don't think this witness -- unless somebody said,

21   "Here's why BP is making the decisions," it's making --

22   being asked to speculate as to BP's motive or the motive

23   of any ordinary institution involved here.

24              If that becomes relevant as an

25   adversarial, you want to argue that, that's out or make

TRN-MDL-00283003

364

1     argument to the court.  But I'm not going to ask this

2     witness to speculate on the unspoken motives of another

3     party.  Okay.  Next question.

4     BY MR. FANNING:

5          Q.   I heard you talk about vertical considerations

6     with people at BP; is that correct?

7          A.   Yes.

8          Q.   In which you told them about the severe risk

9     of gas flow with the lower number of the centralizers;

10    is that correct?

11         A.   Yeah, I told them that the potential for blow

12    out.

13         Q.   Who you told?  Who from BP told you that?

14         A.   I talked to Brett Cocales and Mark Hafle

15    initially when I ran into him in the hall.

16         Q.   Okay.  And I understand -- you know, I know

17    that you said you told him that.  But I didn't hear you

18    say what their response was to that?

19         A.   At the time Mark Hafle was on the way out for

20    a meeting.  He said what can we do about it.  And he

21    pointed to Brett and me and said, you know, y'all work

22    on it to see what you can take care of the issue.

23              And me and Brett worked on this that

24    afternoon and brought Walz present as well.

25         Q.   And you had conversations when?

TRN-MDL-00283004

 1        A.    That afternoon mainly with Brett and Greg.

 2        Q.    So you've given us a full account then of the

 3   response from BP to whatever you told them?

 4        A.    Correct.

 5              MR. FANNING:   That's all I have.

 6                        EXAMINATION

 7   BY SCHONEKAS:

 8        Q.    Mr. Gagliano, my name is Kyle Schonekas.   I'm

 9   going to refer you to an e-mail that was sent to you on

10   April 15th.   It has been Bates stamped BP-HZN 22690.

11              MR. SCHONEKAS:   May I approach the

12   witness?

13              JUDGE ANDERSEN:   Sure.

14              MR. SCHONEKAS:   Judge, it's a very low

15   budget production and I don't have an assistant.

16              JUDGE ANDERSEN:   This is going to be the

17   only new document.

18              MR. SCHONEKAS:   Judge, there's one other

19   e-mail that bears the same preface of the last numbers

20   of 22463 are the only other ones.

21              MR. GODFREY:   If we can have another

22   minute, I would have -- I'm sorry that was not.

23              JUDGE ANDERSEN:   I think the first

24   e-mail's so short 'cause you're just looking at the top

25   e-mail there.   Perhaps the witness can read it and then

TRN-MDL-00283005

1    everyone will know what you're answering questions

2    about.  So you want to read who that's from, the to and

3    from, the time read, the five line e-mail, and then

4    counsel can ask his question.  Reread the top one.

5              MR. SCHONEKAS:  If you like, judge, I'll

6    do it myself.

7    MR. SCHONEKAS:

8        Q.    This was from Mr. Morel to you; is that

9    correct, sir?

10       A.    That's correct.

11       Q.    And it was sent on Thursday April 15, at

12   15:59, correct?

13       A.    Correct.

14       Q.    And aside from you, another recipient is

15   another gentlemen by the name of Mr. Greg Walz?

16       A.    Yes.

17       Q.    And he was involved in this process?

18       A.    Yes.

19       Q.    And he was with BP?

20       A.    Yes.

21       Q.    What was his involvement with that process?

22       A.    He was the engineering team leader for the

23   project.

24       Q.    All right, sir.  And in the e-mail they say we

25   have --

TRN-MDL-00283006

1              JUDGE ANDERSEN:  You're going to read the

2    e-mail, right?

3              MR. GODWIN:  Before we go on, optional

4    completeness, I want to state that Mr. Mark Hafle of BP

5    also Brett Cocales, his engineer, that BP received this

6    document.

7              JUDGE ANDERSEN:  If you could read the

8    e-mail then everyone will be on the same paragraph.

9    MR. SCHONEKAS:

10        Q.   It states -- and, again, this is from

11   Mr. Morel, "We have six centralizers.  We can run them

12   in a row, spread them out, or any combination of the

13   two.  It's a vertical hole so hopefully the pipe stays

14   centralized due to gravity.  As far as changes, it's too

15   late to get anymore product to the rig."

16             JUDGE ANDERSEN:  Okay.  Let the record

17   reflect that's the way we began after this break,

18   reading that exact e-mail into the record and

19   questioning the witness on it.  Different Bates number,

20   but that's the e-mail we've actually gone over before --

21   before actually counsel or anybody has examined him.

22             But if you have a new question on it,

23   you're welcome to ask him.

24             MR. SCHONEKAS:  My purpose was to

25   identify Mr. Walz as one of the persons involved and the

TRN-MDL-00283007

 1    recipient.

 2              JUDGE ANDERSEN:  You could have said the

 3    e-mail that Mr. Dykes went over with you, wasn't it true

 4    that Mr. Walz received it as well.  But, anyhow, what

 5    was the question?

 6    MR. SCHONEKAS:

 7         Q.   The question is, did Mr. Walz relate to you

 8    the questions that he had with Mr. Guide concerning the

 9    issue with keeping only 6 centralizers?

10         A.   One on the 15th?

11         Q.   Yes, sir.  On the 16th, for that matter.

12         A.   No, I was not aware of any conversations

13    between Greg Walz and John Guide.  I did see e-mails

14    submitted into evidence after the fact, but I was not

15    aware at the time.

16         Q.   Did Mr. Walz ever tell you that he had had a

17    conversation with Mr. Guide in which he advocated to

18    adhering to Haliburton's model?

19              MR. GODFREY:  Objection, asked and

20    answered.

21              JUDGE ANDERSEN:  Sustained.  You've

22    already asked and answered that.  Next question?

23    MR. SCHONEKAS:

24         Q.   Were you ever told, sir, that there was a

25    concern about the number of hours that it would take?

TRN-MDL-00283008

1          A.    Nobody told me there was a concern, no.

2                    MR. SCHONEKAS:   Thank you.  That's all I

3     have -- actually one more.

4          Q.    Why did you use a VHT static of 210 degrees

5     for the OptiCem model, sir?

6          A.    I use a temperature model called Wellcat that

7     I model the job.  And it came out with 210 static.

8          Q.    And what was the flow line temperature; do you

9     recall?

10         A.    The model showed -- the numbers I got on the

11    numbers were static and circulated.  That's the two.

12                    MR. SCHONEKAS:   Thank you.

13                    JUDGE ANDERSEN:  Attach very much.  Okay.

14    Steve Bertone?

15                    ATTORNEY FOR MR. BERTONE:   No questions.

16                    JUDGE ANDERSEN:  Patrick O'Bryan?

17                    MR. SIMMONS:  No questions.

18                    JUDGE ANDERSEN:  Robert Kaluza?

19                         EXAMINATION

20    BY MR. CLARKE:

21         Q.    Good afternoon.  Mr. My name is Shaun Clarke,

22    and I represent Bob Kaluza.  You've never met Bob, have

23    you?

24         A.    No.

25         Q.    I'd like to make sure I understand and correct

TRN-MDL-00283009

1   me if I'm wrong -- of the events.  You had the

2   discussion with the BP engineers on the 15th and you

3   were told to go work on it with Brett Cocales.

4          At some point was a decision made that

5   they were going to go with 7 centralizers?

6      A.   That evening we ran it with 21.

7      Q.   Okay.  When -- at some point somebody decided

8   to go with 7, right?

9      A.   That's correct, yes.

10      Q.   When was that decided?

11      A.   Nobody from BP talked to me or communicated

12   with me when that change took place.  I actually found

13   out from the Haliburton representatives on the rig.

14      Q.   And when exactly did you find that out in the

15   chronology?

16      A.   I specifically remember I had a telephone call

17   from the cementer the morning of the 18th, which is

18   Sunday, that he said they definitely didn't run them

19   because they already set and running pipe in the hole.

20          I did send an e-mail out on the 17th.  I

21   had some information that they may not run them or they

22   weren't running them and Brian and other BP people

23   asking, I heard this that you may not be running this.

24   And nobody did give a reply.

25      Q.   And I'm sorry.  That was on the 17th?

TRN-MDL-00283010

371

1       A.    That was on the 17th, the morning of the 17th,
2    if I remember correctly.
3       Q.    Okay.  So as of the morning of the 17th, you
4    had some information that BP was going to run 7
5    centralizers?
6       A.    I had some information they may not run the
7    21, but never got it confirmed until Sunday morning.
8       Q.    And were you comfortable with that decision?
9       A.    Yes.
10      Q.    What did you do?
11      A.    As far as --
12      Q.    Well, did you speak to any of your supervisors
13   about it?
14      A.    No.
15      Q.    Did you call anyone within Haliburton and say
16   I'm concerned about this decision?
17      A.    No.
18      Q.    Do you have a direct supervisor?
19      A.    Yes.
20      Q.    Who is that?
21      A.    Currently (inaudible) Paul.
22      Q.    Well, at that time who was the direct
23   supervisor?
24      A.    It would have been Robert Dugas.
25      Q.    So have you ever had a situation where it's

TRN-MDL-00283011

1   something that you felt you needed help with and you

2   talked with Mr. Dugas about?

3       A.   Generally, I talk to the technical advisers or

4   my counterparts.

5       Q.   But you didn't talk to the technical advisers

6   here?

7       A.   No.

8       Q.   And you didn't talk to Mr. Dugas?

9       A.   No.

10      Q.   And a you didn't write anything indicating to

11  anyone at Haliburton that you were concerned about BP's

12  decision?

13      A.   No.

14      Q.   Now, so the 17th you send that e-mail and then

15  the next day if I can refer you to the BP Exhibits 8 and

16  9. Am I right that it's the next day that these reports

17  indicating are prepared for Brian Morel go out?

18      A.   On the 18th?

19      Q.   Yes.

20      A.   That's correct.

21      Q.   So on the 18th at this time, how many

22  centralizers do you think BP's planning to use?

23      A.   I was informed by a cementer they were running

24  the 6 centralizers.

25      Q.   So this -- these two exhibits in fact

TRN-MDL-00283012

1    referenced the use of 6 or 7 centralizers?

2         A.    Yes, the OptiCem report does -- well, in this

3    case referenced 7.

4         Q.    Okay.  And let me just make sure.  I mean, I

5    think you indicated you take pride in your work, right?

6         A.    Yes.

7         Q.    And Haliburton considers itself the very best

8    cementing company in the world, correct?

9         A.    Correct.

10        Q.    And you know that the Haliburton name and your

11   name mean something in the industry, correct?

12        A.    Yes.

13        Q.    You know the people rely on word coming from

14   you and coming from Haliburton?

15        A.    Yes.

16        Q.    They rely on you when you put your name on

17   something, correct?

18        A.    Yes.

19        Q.    Okay.  They rely on your honesty?

20        A.    Yes.

21        Q.    Just refer you to that BP Exhibit 8.  Now,

22   this is -- I think that -- yeah.

23              That's the forward of the document that

24   was sent to Brian Morel on April 18th, correct?

25        A.    That's correct.

TRN-MDL-00283013

374

```
 1        Q.   After you knew that BP decided to use 7

 2   centralizers, correct?

 3        A.   Yes.

 4        Q.   Enclosing a production casing design report

 5   based on 7 centralizers, correct?

 6             MR. GODWIN:  Your Honor, this is

 7   repetitious, asked and answered, and we object to it

 8   being repetitious.

 9             JUDGE ANDERSEN:  You think it's so

10   important that you don't want us to forget?  This is

11   really important, but we really went through all of

12   this.  Did you really believe this when you signed it or

13   something?  You're welcome --

14             MR. CLARKE:  I'm going to do my best,

15   Your Honor.

16             JUDGE ANDERSEN:  The importance of it is

17   not lost on the board, I'm sure.  But the purpose of the

18   questioning now is to gain new information.

19             MR. CLARKE:  I'm going to do my best.

20   BY MR. CLARKE:

21        Q.   That document with the Haliburton name, that

22   means something in the industry, prepared and submitted

23   by Jesse Gagliano that takes pride in his work and knows

24   the people relied on his intelligence?

25             MR. GODWIN:  Your Honor --
```

TRN-MDL-00283014

1                    JUDGE ANDERSEN:  We know --

2                    MR. GODWIN:  -- 'cause he keeps going

3     over Haliburton takes pride.

4                    JUDGE ANDERSEN:  Now we get to repeat it

5     again.

6                    (Laughter).

7     BY MR. CLARKE:

8         Q.    Okay.  In the Haliburton respect submitted

9     saying enclosed is our represented procedure correct?

10        A.    That's what it says.

11        Q.    It doesn't say that's BP's procedure?

12                   MR. GODWIN:  Objection, Your Honor.

13                   JUDGE ANDERSEN:  Sustained.  We went over

14    that sentence previously.  We know what it says and we

15    know what it doesn't say.  And the witness was

16    questioned about it, but it does say what it does say.

17    BY MR. CLARKE:

18        Q.    It always says that the proposal's based on

19    information from our field personnel, correct?

20        A.    Which line are you looking at?

21        Q.    The second sentence, "This proposal's based on

22    information from our field personnel," correct?

23        A.    That's what it states.

24        Q.    It says, "It's our intention --" it says

25    "Haliburton Energy Services recognizes the importance of

TRN-MDL-00283015

1   meeting society's need for health, safety, and

2   protection of the environment," correct?

3        A.    That's what it states, yes.

4        Q.    It says you want to work in an

5   environmentally-sound manner while protecting the

6   health, safety, and environment practices, correct?

7        A.    Yes.

8        Q.    Now, at this point in time, it's less than 36

9   hours before this job's going to be done, correct?

10       A.    On the 18th, approximately.  I don't know the

11  exact time.

12       Q.    And there's 120 or so guys out on that rig,

13  correct, Mr. Gagliano?

14       A.    Approximately, yes.

15       Q.    And you put the Haliburton name on a report

16  based on centralizers that you weren't comfortable with,

17  correct?

18       A.    Yes.

19       Q.    And you said it was our recommended practice.

20  Haliburton's and yours, correct?

21       A.    In the procedure section of the same document?

22  Where it states --

23              MR. GODWIN:  I object to --

24              JUDGE ANDERSEN:  I'm going to sustain.

25  Asked and answered.  He answered that question three

TRN-MDL-00283016

1    times already today.  Yes, he signed it.  It says

2    exactly what it says.  Next question.

3    BY MR. CLARKE:

4        Q.    Now, that wasn't the last opportunity you had

5    to speak to people on the rig about your concerns, was

6    it?

7        A.    They had already started running casings and

8    they were going to centralize it.

9        Q.    Well, it's your duty to stop the job any time

10   you felt it was not safe?

11       A.    A change doesn't equal a blowout on a rig.  It

12   equals channeling.

13       Q.    So you were kind of crossing your fingers and

14   hoping it worked?

15       A.    No, the model predicted it would create

16   channeling.  My concern was after I recommended 21

17   centralizers and do a cement bond log -- potentially do

18   a cement channeling and say, Haliburton, what's wrong

19   with the cement.

20       Q.    But you didn't say that to Roger Dugal, your

21   boss?

22       A.    No.

23       Q.    You didn't say that technical advisers,

24   correct?

25       A.    No, sir.

TRN-MDL-00283017

1      Q.    You sent out a report based on seven

2    centralizers, and then you had the morning call on the

3    19th, correct?

4      A.    Yes.

5      Q.    Guys were on that rig?

6      A.    Yes.

7      Q.    Guys who know the Haliburton name in the

8    industry?

9      A.    Yes.

10      Q.    And if I got your testimony correct, you don't

11    recall any discussion of the cement job with the people

12    on the cement --

13              MR. SCHONEKAS:   Objection by it's very

14    nature, Judge.

15              JUDGE ANDERSEN:   Overruled.   Any

16    conversations about your --

17      A.    No, we had no conversations on the morning of

18    the 19th.   I made my recommendations to BP.   BP decided

19    not to follow those, and go ahead with its own plan.

20    BY MR. CLARKE:

21      Q.    And you never told anybody, not one of those

22    120 guys on the rig, did you, before this cement job was

23    done?

24              MR. GODWIN:   Objection; it's already

25    done.

TRN-MDL-00283018

1          MR. CLARKE:  I'm just asking you, did

2    you.

3          JUDGE ANDERSEN:  We know about the

4    conversations.  Is there anyone who was on the rig with

5    you that you expressed the concern to?

6      A.    Yeah, Brian Morel was on the rig and fully

7    aware of what I was recommending.  Also, Haliburton knew

8    I was recommending 21 centralizers.

9              And, in fact, they're the ones that

10   informed me that BP decided to go against that

11   recommendation.

12   BY MR. CLARKE:

13     Q.    Did they know that you sent a report saying

14   that your recommendations accompanying the report were

15   based on seven centralizers?

16          MR. GODWIN:  Objection; Your Honor.

17   BY MR. CLARKE:

18     Q.    Why didn't you bring it up when they called on

19   the morning of the 19th?

20     A.    BP had made their decision.  And there is

21   another case they tried to do follow my recommendation.

22          MR. CLARKE:  I have no further questions

23   of this witness.

24          JUDGE ANDERSEN:  Okay.  Thank you.  I

25   have a question.

TRN-MDL-00283019

1                    MR. DYKES:  I have a question.

2                    JUDGE ANDERSEN:  Sure.  Mr. Dykes?

3                         EXAMINATION

4   BY MR. DYKES:

5        Q.   Since everybody is so concerned about the

6   procedures in that document, would you flip over to the

7   page that gets into the specifics and read those into

8   the record, please?  Specifically, the one where you're

9   stating, "As per the BP --"

10                   MR. GODWIN:  No. 2, Mr. Dykes?  On Page 8

11  of 12 and No. 8 in the book Mr. Godfrey gave?  Page 8 of

12  12 in Tab No. 8.  And it's looking at what's referred to

13  as the job procedure at the top of the page.

14       A.   Step No. 2 is the procedure to the rig states

15  with rig pumps, pump and circulate at one barrel a

16  minute.  Next simply as per company man.

17                   MR. CLARKE:  I think that question had

18  been asked and answered to Mr. Mathews respectfully,

19  Your Honor.

20                   MR. MATHEWS:  I'm Mr. Mathews.

21                   MR. CLARKE:  I mean, I got cut short.

22  And now Mr. Dykes is going over ground --

23                   MR. DYKES:  No, we have never got to that

24  procedure.  I have yet to get to that procedure.  We

25  never got to read that page.

TRN-MDL-00283020

```
 1                    JUDGE ANDERSEN:  Okay.  Anything else at
 2      this point?
 3                    MR. DYKES:  No, I just wanted to hear
 4      that.
 5                    JUDGE ANDERSEN:  We can, if you'd like --
 6      however, we want to give Mr. Williams a chance if he
 7      wants to exercise that.  Do you?
 8                    MR. PENTON:  I do.
 9                    JUDGE ANDERSEN:  It's your turn.  And
10      then we're going to -- in an extraordinary display,
11      we're going to let Haliburton's attorney examine his
12      witness, if you'd like.
13                    And then the board can come back and ask
14      some questions, perhaps.  And then we'll hopefully wrap
15      up with this witness.
16                              EXAMINATION
17      BY MR. PENTON:
18           Q.   Ronny Penton on behalf of Mike Williams.
19                    Mr. Gagliano, it's very difficult on the
20      end of this line to not repeat questions.  And I'm
21      certainly going to try to do that.  So this may be a bit
22      disjointed.  It's going to be bits and pieces from
23      everything you've done, okay?
24                    First of all, I know that you've talked
25      about an April 15th conversation at the BP offices with
```

TRN-MDL-00283021

```
1   Cocales and Walz, correct?
2        A.    That's correct.
3        Q.    Okay.  Just so that we know, you've told us
4   that you were officed there; is that correct?
5        A.    Correct.  I officed at BP.
6        Q.    Okay.  Where was your office in relation to
7   these engineers, Cocales, Walz?
8        A.    Morel, the whole group.  I was on the same
9   floor.  And if you talk loud enough, you can hear.  And
10  that's how close I was.
11       Q.    So you go to the same restaurant with them,
12  correct?
13       A.    Yes, not together.
14       Q.    Well, my partner Scott Bickford says it's
15  important for this board to know that it's not unusual
16  for you as Haliburton to not show you have a document to
17  show you have a conversation.
18             But you're actually the office mate for
19  these people; is that correct?
20       A.    Correct.
21       Q.    So you speak to them?
22       A.    I speak to them on a daily basis.
23       Q.    I understand.  Let's talk about the bottoms up
24  and the CBL.  First of all, I don't think that this is
25  in the record, and certainly not in the record from a
```

TRN-MDL-00283022

1    Haliburton technical person like yourself.  But just for

2    the record, would you please tell the board the three

3    reasons that you wanted to do a bottoms up prior to a

4    cement job?

5        A.    Three reasons?

6        Q.    I think there's three, but however -- how many

7    you have.

8        A.    I'd like to give an indication what you got on

9    bottom, is one.  Another reason is the condition of the

10   mud, to get the properties down.  And I would think the

11   third reason is to make sure there's no junk or any

12   objects in the well that would prevent you from getting

13   --

14       Q.    Okay.  And you don't -- because you don't want

15   to accommodate the cement, correct?

16       A.    Circulating the mud helps condition it, which

17   could help with contamination.

18       Q.    You want to clean the casing, correct?

19       A.    Yes.

20       Q.    To help the bonding of the cement, correct?

21       A.    Yes.

22       Q.    And you also want to clean the formation, the

23   earthen formation, correct?

24       A.    Yes.  You want to break the jells and the mud

25   and filter that.

TRN-MDL-00283023

384

1        Q.    And all of that is intended to hopefully

2    promote and support a good cement bond, correct?

3        A.    Yes, that's one of the best practices to try

4    to get a good cement job.

5        Q.    And you're aware of and the board has talked

6    about this API recommendations right on down?

7        A.    Correct.

8        Q.    As well as Haliburton best practices, correct?

9        A.    Yes.

10        Q.    All right.  Now, on the CBL, the cement bond

11    log, are you aware of -- and do you use the MMS

12    regulations in terms of when you predicted an inadequate

13    -- potentially inadequate cement job, are you aware of

14    the MMS regs that require certain testing if that

15    prediction is made in advance of a job?

16        A.    I'm not aware of specifically of that, no.

17        Q.    Okay.  Well, let me ask you like this:  Have

18    you ever heard if you predict a difficult complex cement

19    job that you would want to do a casing shoe pressure

20    test?  That's one thing you could do.  Have you ever

21    heard that?

22        A.    Are you referring to a casing test?

23        Q.    Yes.

24        A.    Yes.

25        Q.    You may want to do a temperature survey --

TRN-MDL-00283024

385

1        A.    Okay.

2        Q.    -- or you do a CVF.  Have you ever heard this

3   in the industry?

4        A.    Yeah.  You can do a temperature survey for a

5   CBL.  They can both give you indication where cement is.

6        Q.    Do you know if in this case if BP prescribed

7   and did any of those?

8        A.    I'm not aware of them running any CBL or

9   temperature.

10       Q.    This is about the barrels of cement slurry

11  that was used.  And Anadarko went almost to the

12  threshold of it, but I checked it on the transcript and

13  we didn't see it.

14             You testified that it was prescribed 50 to

15  60 barrels of cement slurry that would be used in this

16  project approximately, if I'm correct.  Now, was that

17  for the long string?

18       A.    Yes.

19       Q.    Did you calculate the barrels of cement slurry

20  that would have been used for the line or tieback

21  method?

22       A.    I know we did run some scenarios with the

23  liner.  I do not recall what those volumes were.  I

24  never did run a scenario for tie back we specifically

25  looked at the liner option.

TRN-MDL-00283025

1       Q.   We know it would with more cement, though,

2   correct?

3       A.   If they were in a 7-inch liner it would be the

4   same amount of cement because the object was to get

5   cement up to 17, 3 if I remember right.

6       Q.   All right.  So the centralizers are one of the

7   questions I heard you just answered that BP has rejected

8   Haliburton's cement models before, correct?

9       A.   Yes, they questioned the availability of the

10  model.

11      Q.   Has the BP engineers ever respected the

12  Haliburton centralizers opinions?

13      A.   I'm trying to recall the HORIZON predominantly

14  done pressure wells.  And we didn't set production

15  pieces that well.  The last production casing or liner

16  casing job we did was several years ago, and I just

17  don't recall any conversations regarding centralizers

18  then.

19      Q.   Okay.  Had -- did Haliburton work on the

20  Atlantis project?

21      A.   Yes.

22      Q.   And we've read e-mails that one of the e-mails

23  that in fact was referenced earlier by the board, I

24  believe in your interrogation was BP-HZN-CNF 022434.  In

25  that e-mail Mr. Walz was sending an e-mail to Mr. Hafle

TRN-MDL-00283026

1    and he talked about that they had questionable

2    centralizers going to the hole in the Atlantis job.

3              Were you aware of that, or did you do --

4    did Haliburton do that project?

5         A.   Haliburton was on that project.  I was not

6    over that project.  We had another account

7    representative working on that project.

8         Q.   So you don't know anything about that

9    centralizer?

10        A.   Being at BP didn't mean it didn't happen it

11   just -- I didn't hear about it.

12        Q.   Thank you.  At the last hearing we went over a

13   document that was called a plan review.  And in that

14   plan review there was a reference that in the mid April

15   plan review BP said -- and I quote, "cement simulations

16   indicate it is unlikely to be a successful cement job

17   due to formation breakdown."

18             Do you remember Haliburton possibly being

19   involved in that opinion about formation breakdown of

20   this well?

21        A.   What was the date of that document?

22        Q.   It says mid April.  All of my notes in the

23   documents I have.

24        A.   I know we ran some scenarios with the long

25   string where it showed it could break down, but as we

TRN-MDL-00283027

1    got more information from logging runs and things of

2    that sort, we updated it.  But I wasn't involved with

3    that document or presentation.

4        Q.   Okay.  Thank you.  Now, on April the 12th --

5    on April the 12th, you had a lab test for a casing --

6    and you've been asked about that twice today.

7             But I want to show you a document

8    BP-HZN-MV 100172019.

9             MR. GODWIN:  May I approach, Judge?

10            JUDGE ANDERSEN:  Yes.

11            MR. GODWIN:  One second counsel.

12            MR. GODFREY:  Can we have the number

13   again?

14            JUDGE ANDERSEN:  Sure do you want to --

15            MR. GODWIN:  It is the second page,

16   counsel.  Is that the one you're referring to?  Second

17   page?  Second page of the document?  Is that what you're

18   going to refer to?  BP-HZN-MV 100172019.

19            MR. GODFREY:  Thank you.

20   BY MR. PENTON:

21       Q.   Okay.  Help us with this document.  What is

22   this?

23       A.   This is the lab test to the slurry pump on the

24   job.

25       Q.   Okay.  And this is like a slurry sample that

TRN-MDL-00283028

1   is created there in the lab?

2        A.   No, this -- this is test the done with

3   location blend and location water.

4        Q.   Okay.  So actually the sample is done on the

5   rig?

6        A.   No.

7        Q.   It was taken?

8        A.   We capture samples from the rig; we fly them

9   with us to our lab.

10        Q.   Oh, I'm sorry.  You do the lab work onshore,

11   correct?

12        A.   Yes.

13        Q.   So you want the same water, correct, that

14   you're going to be using?

15        A.   Correct.

16        Q.   And so you're running a lab result to

17   determine among other things compressive strength; is

18   that correct?

19        A.   That's correct.

20        Q.   What role does compressive strength play in

21   the sealing characteristics of cement in terms of

22   sealing off the well?

23        A.   It's a number of compressor strength.  It

24   shows it gets hard and what psi rating it reaches.

25        Q.   So can you tell me what the compressive

TRN-MDL-00283029

1    strength characteristics were of this sample that was to

2    be used in this -- in this project?

3                   And what I want to know is I want to know

4    is what is the set time that is required to attain a

5    compressive strength that is adequate for its purpose to

6    seal this well from hydrocarbon influx into the pipe?

7        A.   What test for me or foam compression?

8        Q.   You look at all of it, if you would.  I was

9    looking at the compressive strength.

10       A.   This test shows that at 8 hours and 12 minutes

11   it reached 50 psi and then at 500 psi was reached in 8

12   hours and 48 minutes.

13       Q.   Okay.  What I want to know is what is the

14   compressive strength level that we need to be looking at

15   that would be appropriate to start their testing which

16   they have to do to positive test, correct, negative

17   test, et cetera, correct?

18       A.   Yes.

19       Q.   I mean, how long do you want it to set before

20   you want to start doing that testing?

21       A.   We shoot for about 500 psi.  So in this case

22   it would have been about 8 hours and 40 minutes.

23       Q.   8 hours and 40 minutes?

24       A.   Correct.

25       Q.   So then if it's 8 hours and 40 minutes then

TRN-MDL-00283030

1  you feel that the set time is -- is appropriate; is that

2  correct?

3      A.   Yes.

4      Q.   Now, where do you get the -- did you say 500

5  psi?

6      A.   Yes.

7      Q.   Where do you get that from?

8      A.   It's a recommended per drill out in testing,

9  you know.  You're not going to move the cement once it

10 reaches 500 psi so testing case.

11     Q.   Well, let me ask you this, does it bear any

12 relationship to the anticipated or experienced pressures

13 on the well down hole pressures?

14     A.   Okay.

15     Q.   Well, I'm asking you where does the 500 psi

16 bear any relationship to expected or historical

17 pressures down hole?

18     A.   This 500 psi rating in 8 hours 40 minutes is

19 tested under down hole conditions pressure and

20 temperature.

21     Q.   Pressure and temperature?

22     A.   Correct.

23     Q.   So then under 500 psi you would be able to

24 seal the well?

25     A.   Yes.

TRN-MDL-00283031

1      Q.   Do you agree with me -- do you agree with me

2   that in order for hydrocarbon to influx and to be

3   released, you have to have a failure of mechanical

4   barriers, the casing, the hanger seals, and/or the

5   cement?

6      A.   That would be included in that as well.

7      Q.   Now, and the channeling goes back, does it

8   not, to the cement bond log?  In other words, you detect

9   channeling with a cement bond log that BP decided not to

10  conduct?

11     A.   Yes.

12     Q.   So you can have a successful -- strike that.

13          You can have a successful cement job,

14  correct?  You can set up the 8 and a half hours to be

15  able to handle the psi correct?  And you can still have

16  channeling in a cement job, correct?

17     A.   Yes.  The channeling can be present and cement

18  still set up, yes.

19     Q.   And that's another reason for the bottoms up,

20  correct, to help with the bond and help with producing

21  channeling?

22     A.   That's one of the things to help produce it,

23  yes.

24     Q.   And if you discover channel with a cement bond

25  log then you can perforate and you can add more cement

TRN-MDL-00283032

1    to hopefully fill the channel; is that correct?

2         A.   Yes, it's a way to remediate.  You perforate

3    the cement and you seal up.

4         Q.   Then once you do that you can do another CBL

5    to know acoustically that you do not have channeling and

6    you shouldn't have hydrocarbon influx?

7         A.   Right.

8         Q.   And that was not done in this case?

9         A.   No.

10        Q.   I have maybe one other question -- maybe one

11   or two.  But there was a document I believe Mr. Dykes

12   used and HAL 0010648.  It was an e-mail.  It's been used

13   several times, but I'm not interested in that e-mail.

14             I'm interested in -- it's hooked to that.

15   It starts at HAL 00610649.  It's the second page and

16   right down at the bottom.  And I asked three or four of

17   my desk mates this to make sure that I wasn't -- or the

18   judge wouldn't put me in jail before the end of this day

19   and get out of here.  It says Thursday, April 15th at

20   3:35 p.m.

21             JUDGE ANDERSEN:  You are in jail now.

22             (Laughter).

23   BY MR. PENTON:

24        Q.   3:35 p.m.; do you see that?

25        A.   Yes.

TRN-MDL-00283033

1      Q.   And then you go over to the next page.  And
2  this really ties in to my question about you talked to
3  these BP engineers in the hallway at the BP offices in
4  Houston and you'll see this e-mail was --
5           JUDGE ANDERSEN:  We've been through it,
6  but if you want to remind him about that particular
7  e-mail that's fine.
8           MR. PENTON:  I missed it, and I'll ask
9  other people but --
10          JUDGE ANDERSEN:  You can go to that one
11 e-mail in the string to remind us all.
12 BY MR. PENTON:
13     Q.   And if you would look at HAL 0010650.  This
14 was an e-mail, sir, from you, correct, Mr. Gagliano?
15     A.   Correct.
16     Q.   And who did you send it to?
17     A.   It was to Mark Hafle, Brett Cocales, and Greg
18 Walz.
19     Q.   And the subject was the OptiCem report?
20     A.   Correct.
21     Q.   Is that right?  And, in fact, if you read it
22 it says that you're -- at that time updating the above
23 information now shows the cement channeling, correct?
24     A.   Correct.
25     Q.   And as a result of channeling and it says

TRN-MDL-00283034

395

1   you're going to run some scenarios to see if adding more

2   centralizers will help us or not, correct?

3        A.   Yes.  It's in the e-mail, yes.

4        Q.   And I don't think we've gone over this today

5   and I apologize if we have.  But you, in fact, did have

6   a writing where you said you were going to run other

7   models to see if adding some centralizers would work,

8   correct?

9        A.   Yes, I did.

10       Q.   And, in fact, you did do that and you've

11  already testified extensively today about that you ran

12  the 21 on the 15th, did you not?

13       A.   I did yes.

14       Q.   The 15th of April the same day that you sent

15  this e-mail.  I think you ran that at 6:12 p.m. that

16  evening this was at 3:35.  You ran it at 6:35 p.m. or

17  6:25 p.m. that evening and it showed that 21

18  centralizers, if used, would have minor potential for

19  gas flow; is that correct?

20       A.   That's correct.

21       Q.   Thank you, sir.

22            MR. PENTON:  That's all I have.

23            JUDGE ANDERSEN:  Thank you.  Mr. Kaluza,

24  to ask your --

25            MR. GODWIN:  A few questions, Your Honor,

TRN-MDL-00283035

1    very briefly.  I've got one short exhibit, Your Honor,

2    that I want to -- in rebuttal I want to refer to -- I'll

3    find it.  And it is part of the record.  May I?

4                   JUDGE ANDERSEN:  Sure.

5                   MR. GODWIN:  Thank you, judge.

6                   JUDGE ANDERSEN:  To establish closeness

7    in the office you could say we go to the same coffee

8    pot.  That might established the same thing.

9                   MR. GODWIN:  Following up on what counsel

10   was just saying about the notice, Your Honor, regarding

11   the centralizers and also following up on what Mr. Bob

12   Kaluza's lawyer asked about whether or not there was any

13   communication whereby Mr. Gagliano asking about it, I'm

14   going to refer to an exhibit that I didn't know I was

15   going to use.  So I didn't make copies, but it is in the

16   record.

17                   And it's BP-HZN-SNR 00019040.  And may I

18   approach the witness, Judge?

19                   JUDGE ANDERSEN:  Sure.

20                   MR. GODWIN:  Thank you, Your Honor.

21   BY MR. GODWIN:

22      Q.    Sir, I have here before you a document I just

23   read this Bates number.  Did you send an e-mail on April

24   17, Saturday morning at 10:00 a.m.?

25      A.    Yes, I do.

TRN-MDL-00283036

397

```
1        Q.    And would you tell the judge and the captain
2   and other members of the panel to whom you spent that
3   e-mail?
4        A.    Brian Morel, Greg Cocales, and Greg Walz.
5        Q.    And what's the subject matter in that?
6        A.    Revised centralizers with additional
7   centralizers.
8        Q.    Now, putting that in perspective, we go back
9   to the 15th when you were having conversations with
10  those gentlemen, some of those gentlemen on the morning
11  of the 15th regarding the OptiCem report that you showed
12  them; is that correct?
13       A.    Yes, on the evening of the 15th I had
14  consideration with Mark and Greg Walz, Brett Cocales.
15       Q.    And was Mark Hafle a part of those
16  conversations?
17       A.    Very briefly 'cause he was heading out to a
18  meeting.  I presented the problem to him and he said --
19       Q.    And did you then present the hold to dine
20  report on the evening of the 15th with the 21
21  centralizers?
22       A.    Yes, I did.
23       Q.    And did you come to understand that on the
24  16th of April the additional 15 were sent out to the
25  rig?
```

TRN-MDL-00283037

1        A.    My understanding was per the morning call the

2    additional centralizers had sent on the 16th.

3                MR. GODWIN:  Okay.  May I go back on over

4    here Your Honor?

5                JUDGE ANDERSEN:  Yes.

6    BY MR. GODWIN:

7        Q.    And if you will read here in the second

8    paragraph the entirety of that to Your Honor and the

9    captain and the panel members that you sent to those

10   gentlemen.

11       A.    "Can you also confirm if we are returning

12   additional centralizers or not.  I heard from the rig we

13   were not going to run them.  If this is the case, I will

14   update the OptiCem to reflect."

15       Q.    And that was sent on the morning of April 17th

16   at 8:03 that morning?

17       A.    Yes, sir, that's correct.

18       Q.    Now, at any time prior, did you receive a

19   response to that e-mail from Greg Walz?

20       A.    No.

21       Q.    Greg Cocales?

22       A.    No.

23       Q.    Brian Morel?

24       A.    No.

25       Q.    And who's the fourth one?

TRN-MDL-00283038

1        A.    Mark Hafle.

2        Q.    Mark Hafle.  Did anybody tell you they were

3   not going to run the additional centralizers?

4        A.    Nobody notified me, sir.

5        Q.    Okay.  Sir.  Now, with regard to the CBL

6   that's been talked about, were you asked by BP as to

7   whether or not it should send the Schlumberger crew home

8   who was out there to run the CBL?

9        A.    No, I was not asked.

10       Q.    To your knowledge, did BP ask anybody with

11  Haliburton its advice as to whether or not the crew

12  running the CBL should be sent home?

13       A.    No, not to my knowledge.

14       Q.    Thank you, sir.  You were also asked about --

15  you were asked about an e-mail that you sent on -- or a

16  report that you sent on April 18.  Do you remember that?

17       A.    Yes.

18       Q.    On the evening -- and that was a Sunday

19  evening?

20       A.    Yes, it was.

21       Q.    Okay.  Now, tell us if you will please what

22  was the -- your purpose in sending that report out?

23       A.    It was basically to document what actually

24  took place on the job.  We get several requests from

25  customers asking we could be doing this job last year

TRN-MDL-00283039

```
 1   how did we do this last year so I wanted to accurately
 2   document what took place on this job for future
 3   reference if asked.
 4        Q.    Now, was there a morning call at 7:30 in the
 5   morning on Saturday morning?
 6        A.    Yes, there was.
 7        Q.    And were BP representatives, Mr. Cocales,
 8   Mr. Morel, Mr. Hafle, Mr. Guide on that call?
 9        A.    I know Mr. Guide, Brian and Brett were.  I'm
10   not sure if Mr. Hafle was or not.
11        Q.    Okay.  Did any of those gentlemen say in that
12   call anything to do about centralizers on the morning of
13   the 17th of April?
14        A.    No.
15        Q.    How about on the morning of the 18th of April
16   on Sunday morning was there a morning conference call?
17        A.    Yes.
18        Q.    And who from BP participated in that call?
19        A.    I'm not sure 'cause they don't announce the
20   names.  But I remember John Guide and Brian and several
21   personnel and I was on it as well.
22        Q.    Did anybody in BP on that call on the morning
23   of the 18th respond to your e-mail of Saturday morning
24   April 17th when you asked them were you going to run the
25   additional centralizers?
```

TRN-MDL-00283040

401

1      A.   No, I never did receive a reply from this
2    e-mail.
3      Q.   Thank you, sir.  So you sent your design out
4    on the 81th for the reasons you stated?
5      A.   That's correct.
6      Q.   Okay.  Your honor asked about an engineer's
7    report, the post job report.  Did you prepare the post
8    job report?
9      A.   No, it was prepared by Nathan Chaisson on
10   location.
11     Q.   Okay.  May I approach Your Honor?
12          JUDGE ANDERSEN:  Yes.
13          MR. GODWIN:  Thank you, sir.
14   BY MR. GODWIN:
15     Q.   Here is the document that the panel had
16   presented us with.  It's one of exhibits.  Is that an
17   e-mail to you from Nathaniel Chaisson?
18     A.   Yes, it is.
19     Q.   With several exhibits?
20     A.   Yes.
21     Q.   And what time of the day was it sent?
22     A.   April 20th, 2010 at about 5:44.
23     Q.   Is that a.m. or p.m.?
24     A.   I'm assuming a.m. because it's military time.
25     Q.   Okay.  And what time of day on the 20th was

TRN-MDL-00283041

1   the cement job completed?

2       A.   It was completed right after midnight on the

3   20th or very earlier.

4       Q.   So within a few hours of the completion of the

5   cement job Mr. Chaisson there on the location on the rig

6   was sending you the post job report?

7       A.   That's correct.

8       Q.   And you were asked by a number of the counsel

9   about your sending that report.  Technically Mr. Godfrey

10  asked you about sending that report on the 23rd of April

11  with the implication that you were coming up with a

12  report later.

13           Why was that report sent by you on April

14  23 to the folks that you sent it to?

15      A.   It was requested by BP.  Since it took place

16  they were gathering of documents.

17           MR. GODWIN:  May I approach judge?

18           JUDGE ANDERSEN:  Uh-huh.

19           MR. GODWIN:  Thank you, sir.

20  BY MR. GODWIN:

21      Q.   And here again is a BP document, BP-HZN-MB

22  100170985.  And did you send the e-mail here in the

23  middle of the page?

24      A.   That's correct, yes.

25      Q.   To whom did you send that e-mail?

TRN-MDL-00283042

403

1      A.    This particular person, Mark Hafle, requested

2   it.  So I sent it to him.

3      Q.    And what does it say there in the body of the

4   e-mail?

5      A.    "See attached report from engineer on

6   location."

7      Q.    And engineer, does it capitalize "engineer" as

8   a proper term?

9      A.    Yes, it's capitalized.

10      Q.    And do you know what engineer is being

11   referred to in that e-mail?

12      A.    Nathan Chaisson was the engineer on that

13   location.

14      Q.    And that was the post job report that he

15   prepared and sent to you on the morning of April 30th?

16      A.    Yes.

17      Q.    Thank you, sir.

18            MR. GODWIN:  Nothing further, Your Honor

19   thank you for the time.

20            JUDGE ANDERSEN:  Thank you.  We may have

21   a few questions from the board.  I think that in

22   Mr. Williams' attorney's cross-examination of you, I

23   want to make sure I understand the reason you thought

24   there should be 21 centralizers was if there were fewer

25   centralizers then that might result in additional

TRN-MDL-00283043

1     expense because you'd have to re-pour cement and expend

2     the time before that portion of the job was completed,

3     correct?

4                    THE WITNESS:  Correct, my concern was

5     running the 6 centralizers was channeling.  And my

6     concern with that was doing a remedial job had to go in

7     and perforate and squeeze the production casing.

8                    JUDGE ANDERSEN:  Right.  At that portion

9     of the time I'm not hearing that you were afraid that

10    that gas could cause the whole well to blow out.  Was

11    that a concern in your mind at the time?

12                   THE WITNESS:  No, channeling does not

13    indicate a blowout of a well.  My major concern was

14    having to do remedial work on this well.

15                   JUDGE ANDERSEN:  Any other board

16    questions?

17                          EXAMINATION

18    BY MR. MATHEWS:

19        Q.    Earlier, we had discussions about bond hold

20    temperatures you put in the model 260, say 265.

21        A.    Using the same model retardant.

22        Q.    Same model?

23        A.    I would expect a higher temperature would set

24    it quicker.

25        Q.    And would it have any impact on the

TRN-MDL-00283044

1    compressibility at all?

2       A.   It would -- the cement would start quicker

3    than it would with the low temperature.  It may have

4    reached about the same overall strength over time, but

5    it would develop quicker time-wise.

6       Q.   And would the higher temperature possibly

7    indicate that you would have increased potential for

8    channeling?  Tougher temperature?

9       A.   Yes.

10                 MR. MATHEWS:  That's all I have.

11                 EXAMINATION

12   BY MR. MCCARROLL:

13      Q.   I have a couple followups.  I still don't

14   think we fully understand the lift mechanism.  Could you

15   just explain briefly again what you're talking about

16   when you say the well will experience some lifts and how

17   much lift a hundred, 200, 300 psi would indicate

18   channeling?

19      A.   Are you referring to lift of the heavy fluids

20   moving around?

21      Q.   Yes.  I don't think we fully under that and

22   the implication to channeling.  So could you briefly

23   explain it?

24      A.   Based on the modeling with the centralizers,

25   cement would be in this case about 17, 3 with the

TRN-MDL-00283045

1  planned cement with the 21 centralizers in there you

2  minimize or limit the channeling which you would get

3  your cement top about what you want it.

4          With the 6 centralizers channeling

5  occurred so you're not displacing all the mud out of the

6  well.  You're actually displacing the cement higher up

7  the wellbore because you leave mud behind which would

8  increase your cement lift pressure you would see on the

9  job.  Did I explain that well enough?

10     Q.    Is there some specific lift number you would

11  be looking for to define channeling?  'Cause someone

12  mentioned that had Haliburton recorded a hundred psi?

13     A.    Again, it would be kind of hard to determine

14  what the lift was and what the friction pressures were,

15  you know.  It could be difficult to see that.

16          I mean, the major concern with the

17  additional lift was we were exceeding the ECPs that was

18  given by BP.  I was given 14 top, stay below that.  And

19  the model predicted channeling and with that model we

20  would go over that ECP limit.

21          MR. MCCARROLL:  Thank you.

22          JUDGE ANDERSEN:  Any other board

23  questions, captain?

24                    EXAMINATION

25  BY CAPT. NGUYEN:

TRN-MDL-00283046

1      Q.    Within BP the highest the one that make the

2  decision whether or not to use the 21 centralizers or

3  the CBL would have to be to well leader Mr. John Guide?

4      A.    My understanding Mr. John Guide kind of had

5  final say on the routine.

6      Q.    For the items with the use of the number of

7  centralizers and also the CBL with Mr. John Guide he

8  would have final say on that?

9      A.    I believe so, yes.

10         JUDGE ANDERSEN:  Is there anything you

11 would like to say about this whole incident?  Is there

12 anything we forgot to ask you?

13     A.    Not at this time.

14         JUDGE ANDERSEN:  The chair indicated that

15 we'd like to take about a 15-minute recess so we can

16 figure out to what extent we should proceed this

17 evening.

18         CAPTAIN NGUYEN:  Again, thank you for

19 your time for being here.  And if we need you to appear

20 again for the board, are you available?

21         THE WITNESS:  Yes.

22         CAPTAIN NGUYEN:  Thank you, you are

23 dismissed.

24         (Short recess.)

25         CAPTAIN NGUYEN:  We're going to take the

TRN-MDL-00283047

# EXHIBIT E

1

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2

 3   IN RE:  OIL SPILL        )    MDL NO. 2179
     by the OIL RIG,          )
 4   DEEPWATER HORIZON in     )    SECTION "J"
     the GULF OF MEXICO,      )
 5   April 20, 2010           )    JUDGE BARBIER
                              )
 6                            )    MAG. JUDGE
                              )    SHUSHAN
 7
```



```
 8




14            * * * * * * * * * * * * *
15                   VOLUME 1
              * * * * * * * * * * * * *
16

17
                  Deposition of JESSE GAGLIANO,
18   taken at Pan-American Building, 601 Poydras
     Street, 11th Floor, New Orleans, Louisiana,
19   70130, on May 11, 2011

20
     APPEARANCES:
21

22   Mr. Tom Thornhill
     Ms. Emily Gebhardt
23   THORNHILL LAW FIRM
     1308 Ninth Street
24   Slidell, Louisiana 70458
     (800) 989-2707
25
```

2

**APPEARANCES (continued):**

Mr. Scott R. Bickford
MARTZELL & BICKFORD
338 Lafayette Street
New Orleans, Louisiana 70130
(504) 581-9065

-

Mr. Ronnie Penton
LAW OFFICES OF RONNIE G. PENTON
209 Hoppen Place
Bogalusa, Louisiana 70427
(985) 732-5651

APPEARING FOR THE
PLAINTIFFS' STEERING COMMITTEE

Mr. Philip Chen
KIRKLAND & ELLIS, LLP
333 South Hope Street
Los Angeles, CA 90071
(213) 680-8400

APPEARING FOR BP, INC.

Mr. A. Nathaniel Chakeres
Mr. Scott Cernich
U.S. DEPARTMENT OF JUSTICE
Civil Division, Torts Branch
1425 New York Avenue, Northwest, Suite 10100
Washington, D.C. 20005

APPEARING FOR THE UNITED
STATES

3

## APPEARANCES (continued):

Ms. Deborah Kuchler
Ms. Sara Iiums
Ms. Janika Polk
Mr. Lee Ziffer
KUCHLER, POLK, SCHELL, WEINER & RICHESON, LLC
1615 Poydras Street, Suite 1300
New Orleans, Louisiana 70112
(504) 592-0691

APPEARING FOR ANADARKO PETROLEUM
COMPANY AND MOEX OFFSHORE 2007,
LLC

Mr. Dan Goforth
GOFORTH GEREN EASTERLING, LLP
4900 Woodway, Suite 750
Houston, Texas 77056
(713) 650-0022

APPEARING FOR TRANSOCEAN

Mr. Floyd Hartley
GODWIN RONQUILLO
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
(214) 939-4412 Fax:  214-939-4803

APPEARING FOR HALLIBURTON

Mr. Eric J.R. Nichols
BECK, REDDEN & SECREST
515 Congress, Suite 1750
Austin, Texas 78701
(512) 708-1000

APPEARING FOR CAMERON

4

```
1                    APPEARANCES (continued):
2

3    Mr. Lambert J. "Joe" Hassinger Jr.
     GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH
4    701 Poydras Street, 40th Floor
     New Orleans, Louisiana 70139
5    (504) 525-6802

6                    APPEARING FOR THE STATE OF
                     LOUISIANA
7

8    Mr. Eric A. Kuwana
     KATTEN MUCHIN ROSENMAN, LLP
9    2900 K Street NW, Suite 200
     Washington, DC 20007
10   (202) 625-3500

11                   APPEARING ON BEHALF OF JESSE
     GAGLIANO
12

13   ALSO PRESENT:

14   Mr. Karl Stiegman, Videographer

15

16   REPORTED BY:

17
                     TAMARA CHAPMAN, CSR
18                   Certified Court Reporter
                     State of Texas
19

20

21

22

23

24

25
```

**GAUDET, KAISER, L.L.C.**
Board-Certified Court Reporters

5

# I N D E X

                                            PAGE

1  Appearances...............................1

   JESSE GAGLIANO

    Examination by Mr. Thornhill.............8

    Examination by Ms. Kuchler............187

    Examination by Mr. Goforth............286

    Examination by Mr. Chen...............292

    Examination by Mr. Thornhill..........370

   WITNESS' CERTIFICATE.....................379

   REPORTER'S CERTIFICATE..................380


# EXHIBITS

   NO.        DESCRIPTION               PAGE

   2031       Fifth Amendment Statement      36

   2032       The Transcript of The Joint
              United States Coast Guard, The
              Bureau of Ocean Energy
              Management - Tuesday, August 24,
              2010                           52

   2033       Telephone Interview of:  Jesse
              Marc Gagliano - Friday, June 11,
              2010                           53

   2034       9 7/8" Design Report - May 25,
              2009 Bates HAL_0554765 - 78    62

   2035       E-Mail - From Jesse Gagliano,
              Sent Thu Apr 29 08:46:28 2010 -
              Subject: Foamed Production Jobs
              at BP - Livelink 10 KB, Bates
              HAL_0559564                    375

**GAUDET,  KAISER,  L.L.C.**
Board-Certified Court Reporters

1                          **EXHIBITS (continued)**

2
     NO.            DESCRIPTION                      PAGE
3    2036           E-mail from Erick Cunningham,
                    sent Wed Feb 24 17:21:55
4                   2010 - Subject RE: Cementing
                    Planning - Livelink 29 KB
5                   Bates HAL_0534942 - 44              87

6    2037           [Brett.Cocales@bp.com] sent
                    Thursday, February 25, 2010,
7                   10:46 AM - Subject: RE: CST
                    info Bates HAL_0072120               88
8
     2038           E-mail from Erick Cunningham,
9                   sent Mon, Mar 22 14:32:58
                    2010 - Subject: FW: Production
10                  Cement 4l Job Bates
                    HAL_0537224                          93
11
     2039           E-mail sent Tuesday, April 13,
12                  2010 12:04 PM to VHG3@aol.com;
                    Brian P. Morel - Subject: RE: 7"
13                  float collar Bates HAL_0536145  94

14   2040           Macondo #1 - 9 7/8"X7"
                    PRODUCTION CASING DESIGN
15                  REPORT - For:  Brian Morel,
                    Date:  April 14, 2010                96
16
     2041           E-mail from Brian P. Morel,
17                  sent Thu Apr 15 15:59:51
                    2010 - Subject: RE: OptiCem
18                  Report - Livelink 92 KB
                    HAL_0535018 - 20                     99
19
     2042           E-mail from Mark E. Hafle, sent
20                  Fri Apr 16 14:30:35 2010 - 4l
                    Subject: RE: Production Casing
21                  and Design Proposal & OptiCem
                    Report BP-HZN-2179MDL00011184 -
22                  85                                  109

23   2043           Input Difference between OptiCem
                    Report on 4-15-10 & 4-18-10
24                  Bates HAL_0562829 - 35              117

25

## EXHIBITS (continued)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 2044 | E-mail from Jesse Gagliano, sent Wednesday, April 21, 2010 7:58 AM - Subject: RE: Casing test data?  Bates HAL_0113583 | 136 |
| 2045 | E-mail from Jesse Gagliano, sent Sat Apr 17 14:29:58 2010 - Subject: Updated OptiCem Bates HAL_0502625 - 38 | 144 |
| 2046 | E-mail from Jesse Gagliano, sent Sun Apr 18 11:29:03 2010 - Subject: Updated OptiCem | 144 |
| 2047 | Macondo #1 - 9 7/8"X7" PRODUCTION CASING DESIGN REPORT - For:  Brian Morel, Date:  April 18, 2010 | 144 |
| 2048 | E-mail from Brett W. Cocales, sent Sun Apri 25 08:56:54 2010 - Subject: RE: Macondo Cementing Records - Livelink 8 KB, Bates HAL_0537548 - 49 | 144 |
| 2049 | E-mail from Kent Corser, sent Thu Apr 29 19:35:00 2010 - Subject: FW: Post Job Reports, Bates BP-HZN-BLY00132170 - 265 | 144 |
| 2050 | Global Laboratories Best Practices, Vol. - Section 2: *Standard Testing Bates* HAL_0051624 - 46 | 150 |
| 2051 | E-mail from Jesse Gagliano, sent Saturday, May 01, 2010 8:18 AM - Subject: Lab test for Macondo Bates HAL_0084845 | 379 |

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the Gulf of MEXICO, April 20, 2010                    Reported by:
JESSE GAGLIANO                    May 11, 2011          TAMARA CHAPMAN, CSR

Page 15

```
 1    Coast Guard and gave testimony, your

 2    testimony was reduced to writing.  Have you

 3    seen that writing?

 4         A.    Yes.

 5         Q.    That transcript of your

 6    testimony?

 7         A.    Yes.

 8         Q.    You've seen that.  Have you

 9    reviewed it before today?

10         A.    Not recently, no.

11         Q.    Okay.  In connection with this

12    case, have you been told that you are the

13    subject of a potential criminal investigation

14    or an ongoing criminal investigation and

15    particularly that you are a target of that

16    investigation?

17         A.    Yes.

18         Q.    Were you so advised by people

19    with the Coast Guard or with one of the

20    federal agencies with which you spoke?

21         MR. KUWANA:  Objection.  Based on

22    privilege, I'll instruct him not to answer.

23    Only what he knows is through counsel.

24         Q.    (BY MR. THORNHILL)  Okay.  Eric

25    tells us that --
```

1        MR. THORNHILL:  And, I'm sorry, I need

2   to refer to you as Mr. Kuwana, Eric.

3        Q.    (BY MR. THORNHILL)  Mr. Kuwana

4   tells us that you have been advised only

5   through him that you're a target of an

6   investigation; is that correct?

7        A.    Yes.

8        Q.    Now --

9        MR. KUWANA:  Just to -- Counsel, to

10  clarify, he's not a target.  You used the

11  both subject and target in your first

12  questions --

13       MR. THORNHILL:  Okay.

14       MR. KUWANA:  -- actually, he's been

15  advised that he's a subject.

16       MR. THORNHILL:  Thank you for

17  clarifying that.  I did ask both, and thank

18  you for clarifying that.

19       Q.    (BY MR. THORNHILL)  So in this

20  case, it's my understanding, based upon the

21  representations of Mr. Kuwana, Mr. Gagliano,

22  that you've been told that you are a subject

23  of the investigation, a criminal

24  investigation involving the DEEPWATER

25  HORIZON; is that correct?

1          MR. KUWANA:  Again, I'm going to object

2     based on privilege.  The only way he knows

3     that information is through counsel.

4          MR. THORNHILL:  Okay.  I'll rephrase

5     the question.  Thank you, Mr. Kuwana.

6          Q.     (BY MR. THORNHILL)  Am I correct

7     in understanding that you understand that you

8     have been made the subject of a criminal

9     investigation involving the DEEPWATER

10    HORIZON?

11         A.     Yes, I was informed by counsel.

12    Yes.

13         MR. THORNHILL:  After all that.

14         Q.     (BY MR. THORNHILL)  Have you

15    testified in front of a state or a federal

16    grand jury?

17         A.     No.

18         Q.     Particularly involving the

19    DEEPWATER HORIZON explosion?

20         A.     No.

21         Q.     Have you, in connection with the

22    DEEPWATER HORIZON matter, been promised

23    anything by those who might be potentially

24    prosecuting you in this case?

25         MR. KUWANA:  Could you rephrase that,

1  Counsel?

2      Q.      (BY MR. THORNHILL)  Let's cut to

3  the chase.  Have you been promised immunity

4  from prosecution in exchange for cooperation

5  with the prosecutors?

6      MR. KUWANA:  Again, I'm going to

7  instruct him not to answer.  The only way he

8  would know any of that information is through

9  counsel.

10      Q.      (BY MR. THORNHILL)  Do you

11  understand, Mr. Gagliano, that if you

12  cooperate with the prosecutors that you will

13  not be prosecuted?

14      MR. KUWANA:  Again, I'm going to

15  instruct him not to answer.  The only way he

16  has any understanding of that is through

17  counsel.

18      Q.      (BY MR. THORNHILL) Are you

19  providing information to the prosecutors of

20  crimes arising out of the explosion of the

21  DEEPWATER HORIZON in exchange for immunity?

22      MR. KUWANA:  Again, any deals,

23  immunity, any arrangements with the

24  government is -- he only knows through

25  counsel, so I will instruct him not to

# EXHIBIT F

 LexisNexis®

4 of 4 DOCUMENTS

Copyright 2011 Factiva ®, from Dow Jones
All Rights Reserved

Dow Jones Factiva

Copyright 2011 Dow Jones & Company, Inc. All Rights Reserved.

## THE WALL STREET JOURNAL.

The Wall Street Journal Online

December 29, 2011

**SECTION:** BUSINESS

**LENGTH:** 946 words

**HEADLINE:** Criminal Charges Are Prepared in BP Spill

**BYLINE:** By Tom Fowler

**BODY:**

U.S. prosecutors are preparing what would be the first criminal charges against BP PLC employees stemming from the 2010 Deepwater Horizon accident, which killed 11 workers and caused the worst offshore oil spill in U.S. history, said people familiar with the matter.

Prosecutors are focused on several Houston-based engineers and at least one of their supervisors at the British oil company, though the breadth of the investigation isn't known. The prosecutors assert the employees may have provided false information to regulators about the risks associated with the Gulf of Mexico well while its drilling was in progress, these people said.

The felony charges-which might be disclosed early in 2012, if they are brought-could involve providing false information in federal documents, these people said. A conviction on such a charge carries a penalty of up to five years in prison as well as a fine.

The Department of Justice still could decide not to bring charges against the individuals, people familiar with the situation said. It's not unusual for prosecutors to use the threat of charges to pressure people to cooperate in investigations.

Legal experts say BP itself is expected to face broader criminal charges, including violations of the federal Clean Water Act; the company already is appealing what could amount to $36.6 million in administrative fines levied by U.S. regulators for safety violations. The size of the fines hasn't been finalized.

BP spokesman Daren Beaudo declined to comment on the potential for charges against employees or the company. The company has said it believed the accident was caused by a combination of events that involved multiple parties, not just BP.

A Justice Department spokeswoman declined to comment.

A federal task force based in New Orleans has spent the past 18 months investigating the April 2010 accident. Prosecutors have reviewed thousands of documents and conducted dozens of interviews, including bringing some individuals before a grand jury, according to people close to the investigation.

Criminal Charges Are Prepared in BP Spill The Wall Street Journal Online December 29, 2011

Prosecutors recently looked into a key safety measure in deep-water drilling: The difference between the minimum amount of pressure that must be exerted in a well's bore by drillers to keep the well from blowing out, and how much pressure would break apart the rock formation containing oil and gas. The narrower the margin between those two points, the more difficult a well is to control.

Federal regulations don't define what margin qualifies as safe, but companies are supposed to identify the margin in their applications for permits to drill. When a company cannot maintain that safety margin, it is supposed to suspend drilling and remedy the problem.

Among questions prosecutors are asking is whether information gathered during drilling that helped determine the safety margin in the Deepwater Horizon situation was properly reflected in amended drilling permit applications that had to be approved by federal regulators, said the people familiar with the investigation.

The prosecutors' questions appear to mirror concerns raised earlier this year in public filings by the Bureau of Safety and Environmental Enforcement, the new U.S. enforcement division spun out of the former Minerals Management Service in a reorganization after the accident.

The agency in publicly disclosed citations has accused BP, rig owner Transocean Ltd. and Halliburton Co., the company responsible for cementing the well after it was drilled, of violating several offshore drilling rules. BP faces four violations of a rule that requires a company to stop drilling when the safe drilling margin is violated. BP is contesting the civil charges.

Criminal charges have been brought in previous oil spills, most notably the 1989 Exxon Valdez accident, in which an Exxon oil tanker hit a reef off the Alaskan coast and spilled 11 million gallons of crude. Exxon, now Exxon Mobil Corp., faced five criminal charges, including two felonies for placing an incompetent crew on the ship and three misdemeanor charges of violating the Migratory Bird Treaty Act and the Clean Water Act.

The company later reached a settlement under which it pleaded guilty to four misdemeanors and paid $100 million in restitution. The company also paid $900 million to Alaska and the federal government for damaging natural resources.

The only individual charged in the Valdez case was captain Joseph Hazelwood, who was accused of three felonies-criminal mischief, operating the ship while intoxicated and reckless endangerment-and a misdemeanor charge of negligently discharging oil. A jury found him guilty only of the misdemeanor, and he was sentenced to 1,000 hours of community service and $50,000 in restitution.

The Deepwater Horizon criminal investigation is separate from a group of civil cases under way in U.S. District Court in New Orleans. The first trial, to determine the level of liability BP and other companies will face over the spill, is scheduled to begin Feb. 27, barring a settlement among the companies and the plaintiffs. BP has said it wasn't negligent and plans to mount a vigorous defense.

The judge in that case, Carl Barbier, also is set to conduct another trial to determine how much oil actually escaped from the well before it was sealed and to what degree the companies controlled the release. The third phase will cover how the companies did in containing and cleaning up the spill.

Write to Tom Fowler at tom.fowler@wsj.com

Corrections & Amplifications

The Exxon Valdez tanker spilled approximately 11 million gallons of crude off the Alaskan coast in 1989. An earlier version of this article incorrectly said the tanker spilled 11 million barrels.

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** December 30, 2011

# EXHIBIT G

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179<br><br>SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER<br>MAGISTRATE JUDGE |
| ………………………………………….. | : | SHUSHAN |

### BP'S MEMORANDUM IN SUPPORT OF ITS MOTION IN LIMINE TO LIMIT THE DRAWING OF ADVERSE INFERENCES FROM TESTIMONY IN WHICH A WITNESS HAS INVOKED THE FIFTH AMENDMENT

Certain deponents in this litigation invoked their Fifth Amendment right against self-incrimination and refused to answer any substantive questions concerning the *Deepwater Horizon* incident. The PSC and other parties used these depositions to pose a number of specific, substantive questions – questions to which they knew they would not get answers – as a vehicle for presenting adverse inferences supporting their theories of liability.

BP submits that this "testimony" should not generally be used (or reprised with live witnesses if they appear) to draw adverse inferences as suggested by the PSC and others. While there are circumstances in which it is permissible to draw an adverse inference against a party when he invokes the Fifth Amendment in a civil case, there has been no showing that those circumstances exist in this case. Allowing wholesale inferences will improperly grant counsel carte blanche to establish whatever "facts" they wish with regard to some of the most critical events that led to the sinking of the *Deepwater Horizon* and the resulting oil spill.[1] There has

---

[1] BP notes that, despite an obvious eagerness to seek adverse inferences from these witnesses' "testimony," neither the PSC nor any other party has come forward with any specific designation of precisely what they seek in terms of such inferences – much less provided any justifications for such inferences. BP respectfully requests that the Court require any party seeking an inference do so in a manner that allows BP and other parties to respond to that request with specificity.

been no showing that there are any legitimate inferences to be drawn against BP from this "testimony."

Alternatively, the court could simply defer its decision on the use of this testimony until all phases of this trial are complete, as there is a non-trivial chance that the circumstances that gave rise to the decisions to invoke the Fifth Amendment will have changed, at which point BP expects that these individuals may be in a position to testify in full.

## BACKGROUND

So far, a total of nineteen deponents have invoked the Fifth Amendment during their depositions. Of those, only three deponents – Mark Hafle, Robert Kaluza, and Brian Morel – were employed by BP. Eleven worked for Transocean, three for Halliburton, and two for OCS. Generally speaking, the parties attending these depositions received notice that the deponent would invoke his or her Fifth Amendment privilege to all substantive questions about the *Deepwater Horizon* incident and resulting oil spill. The deponents generally answered basic background questions, such as name, address, marital status, and prior deposition experience. But once counsel asked any question that went to a substantive issue in this case, they read a pre-written response invoking the Fifth Amendment. From that point forward through the remainder of the deposition, these deponents answered each question by saying "Same answer" to indicate he or she was invoking the privilege to that question. The pre-written statements give some insight into why particular witnesses invoked the privilege. For example, Mark Hafle explained:

> This is not an easy decision for me because I personally would like to testify, and I know that BP, my employer, would definitely like for me to testify. It would be my hope that the investigation being conducted by the Department of Justice will soon be completed or progressed to a stage where I can freely and openly discuss the case with all concerned. At that time, I'll be glad to answer all questions about whether—whatever information I may have. But until that point, I must follow my attorney's advice and invoke my Fifth Amendment rights and privileges.

M. Hafle Tr. at 12:17-13:3.

The PSC and other parties seized on the difficult circumstances these individuals found themselves in as an opportunity to ask specific, substantive questions for the purpose of generating adverse inferences to support their theories of liability. This "questioning" quickly turned into a free-for-all. Counsels' questions simply advanced their preferred version of events, knowing the witnesses would offer no contradictions. One favorite strategy was to ask Transocean or Halliburton employees to testify about BP's employees and actions, and then using that information to draw an adverse inference against BP (or vice versa). These "questions" and "answers" infer only what various counsel would like the facts to be.

Though no party has formally requested any particular adverse inference be drawn from this "testimony," the deposition-designation and deposition-summary processes have made it clear that the PSC and other parties intend to use these invocations of the Fifth Amendment to draw sweeping, wholesale inferences as to the facts to which these witnesses did not testify. While BP agrees that there may be some room in these proceedings for specific inferences based a witness's specific invocation of the right not to testify, nothing in the record to date supports the blanket permission the PSC and others apparently seek to draw inferences. [2]

## ARGUMENT

I.    **The Circumstances of this Case Weigh Against Admitting Adverse Inferences.**

In *Baxter v. Palmigiano*, the Supreme Court held that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]" 425 U.S. 308, 318 (1976). But inferences are never

---

[2] BP does not seek to preclude the fact that a witness, or group of witnesses, has invoked the Fifth Amendment from the available evidence at trial. *See, e.g., First Nat. Bank of Louisville v. Lustig*, CIV. A. 87-5488, 1993 WL 411260 at *1-2 (E.D. La. Oct. 7, 1993) ("[T]he court finds that reference to the invocations is not unfairly prejudicial because counsel may attempt to explain them . . . . However, no reference may be made to specific questions asked during the depositions because such would be unfairly prejudicial.").

mandatory. The Fifth Circuit has repeatedly recognized "that a witness's invocation may be so prejudicial in certain circumstances as to warrant its exclusion[.]" *Hinojosa v. Butler*, 547 F.3d 285, 294 (5th Cir. 2008); *see also Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 674 (5th Cir. 1999); *Harrell v. DCS Equip. Leasing Corp.*, 951 F.2d 1453, 1464-65 (5th Cir. 1992). "Courts that have addressed this issue have rejected bright-line rules, and instead have concluded that the party urging the use of the inference must show that the circumstances of the particular case justify the imputation of the negative inference." *State Farm Mut. Auto. Ins. Co. v. Abrams*, 96 C 6365, 2000 WL 574466 at \*6 (N.D. Ill. May 11, 2000); *F.D.I.C. v. Fid. & Deposit Co. of Maryland*, 45 F.3d 969, 978 (5th Cir. 1995) (requiring evaluation on a case-by-case basis).

In *Libutti v. United States*—arguably the leading case on this issue—the Second Circuit suggested several non-exclusive factors to be considered in making this determination: (1) the nature of the relationship between the party against which the inference is sought and the witness; (2) the degree of control the party against which the inference is sought has over the witness; (3) the compatibility of interests of the party against whom the inference is sought and the witness in the outcome of the litigation; (4) the role of the invoker in the litigation; and (5) *"the overarching concern [of] whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth."* 107 F.3d 110, 123-24 (2d Cir. 1997). Applying these factors here shows that drawing adverse inferences across the board would be improper.

### A.   No Inferences May Be Drawn Against BP from the Invocation of the Fifth Amendment by Non-BP Employees.

Drawing an adverse inference from a non-BP employee's invocation of the Fifth Amendment against BP would be improper because these deponents owe no loyalty to BP; are not controlled by BP; and don't share compatible interests with BP. The nature of the

4

relationship between the witness and party against whom the inference is sought "should be examined . . . from the perspective of a non-party witness's loyalty to the plaintiff or defendant, as the case may be." *Id.* at 123. The reasons courts have articulated for imputing an employee's silence against her employer simply don't apply to Transocean or Halliburton employees who invoked the privilege to questions about BP. The absence of an employee-employer relationship between these deponents and BP means their testimony wouldn't otherwise be a vicarious admission. *See Rad Servs., Inc.*, 808 F.2d at 276. And non-BP employee deponents have no incentive to speak up in response to questions about BP. *See id.* (holding inferences should be imputed from employee to employer because "an employee's self-interest would counsel him to exculpate his employer, if possible"). On the contrary, these deponents stand to benefit from remaining silent to questions about *BP*, because the adverse inference would lay fault with BP, not *their* employer. *See id.* Because non-BP employees have no incentive to remain loyal to BP in this litigation, drawing adverse inferences against BP from their invocations would be improper.

Second, BP has no degree of control over these non-BP witnesses. Here, too, the concern is that an employer has "vested in [the witness] key facts regarding the litigation in the instant case." *Emerson v. Wembley USA Inc.*, 433 F. Supp. 2d 1200, 1213 (D. Colo. 2006). Obviously, this factor cuts sharply against any attempt to draw inferences against BP from the "testimony" of individuals with no relationship to BP. Finally, BP does not share any compatible interests in the outcome of the litigation with Transocean and Halliburton's witnesses. Here "the trial court should evaluate . . . whether the assertion of the privilege advances the interests *of both the witness and the affected party* in the outcome of the litigation." *Libutti*, 107 F.3d at 123 (emphasis added). There is no support for the argument that the non-BP employee deponents

shared compatible interests with BP.  If anything, Transocean's and Halliburton's employees have opposing interests because adverse inferences against BP help their employers.

**B.   Inferences Drawn Against BP from BP Employees' Invocations.**

Admittedly, the employer-employee relationship between BP and its employees who invoked the Fifth Amendment calls for closer scrutiny.  As the Fifth Circuit held in *Curtis v. M&S Petroleum, Inc.*, care must be taken to ensure that barring adverse inferences from an employee to an employer does not "circumvent[] the Supreme Court precedent that corporate entities may not assert a Fifth Amendment privilege."  174 F.3d at 674.  Still, several courts have refused to admit adverse inferences drawn from the invocations of employee witnesses.  *See, e.g., Akinyemi v. Napolitano*, 347 F. App'x 604, 607 (2d Cir. 2009); *United States v. Zerjav*, 4:08CV00207 ERW, 2009 WL 912821 (E.D. Mo. Mar. 31, 2009); *Miller v. Pilgrim's Pride Corp.*, 5:05CV00064, 2008 WL 178473 (W.D. Va. Jan. 16, 2008).  The mere presence of a relationship is secondary to the "nature" of that relationship.  *See Kontos v. Kontos*, 968 F. Supp. 400, 408 (S.D. Ind. 1997) (refusing to impute silence of defendant's *sister* to defendant).

Barring adverse inferences from BP employees will not "circumvent Supreme Court precedent."  In *Curtis*, the Fifth Circuit allowed the adverse inferences against the employer, but only because the employer chose the witness as its corporate representative for the deposition in which the privilege was invoked.  174 F.3d at 674-75.  Here the three BP deponents who invoked the Fifth Amendment were not proffered as corporate representatives of BP.  None of BP's *twenty-two* corporate-representative deponents invoked the Fifth Amendment, and no witness in this case did so at the request or urging of BP.  BP encouraged its employees to cooperate with investigations, and it ultimately acknowledged that each employee must decide for himself or herself whether to testify or invoke their rights under the Fifth Amendment to the U.S.

6

Constitution.  No party has come forward with any evidence that BP has taken any steps to conceal information behind the shield of the privilege against self-incrimination – because there is no such evidence.  The BP employees chose to invoke their constitutional rights on their own and with the advice of separate, independent counsel.  Each of these individuals was (and is) represented by separate, independent counsel, and each decided to invoke the privilege for their own respective reasons.

Before drawing any adverse inferences from these BP employees against BP, the court should consider their invocations in the context of the litigation as a whole.  In weighing the role of the invoker in the litigation, courts look to whether the invoking witness was "a key figure in the litigation and played a controlling role in respect to any of its underlying aspects."  *Libutti*, 107 F.3d at 123-124.  The BP employees at issue consist of a well-site leader and two drilling engineers.  Although these individuals were involved in some of the key events that occurred at the Macondo Well, and do likely possess some unique knowledge, that does not mean that their invocation of the Fifth Amendment is so significant in the context of *the litigation as a whole* that the court must draw broad adverse inferences against BP.

### C.   Trustworthiness and Advancement of the Truth

The court's "overarching concern" in drawing adverse inferences is whether each inference "is trustworthy under all of the circumstances and will advance the search for the truth."  *Id.* at 124.  Courts have held that sweeping or overbroad inferences that unfairly favor a party's case are not trustworthy.  *Emerson*, 433 F. Supp. 2d at 1213-14.  In *Emerson v. Wembley USA, Inc.*, the defendant's former employee invoked the Fifth Amendment to virtually all questions at his deposition because he was awaiting a separate criminal trial in connection with the employer.  *Id.* at 1209.  The plaintiff argued that this deponent "would have" made

statements supporting her claims against the defendants so she was entitled to an adverse inference against the defendants on each unanswered question. *Id.* at 1211.

The court, however, refused to admit any adverse inferences because: (1) the plaintiff sought inferences on all of the questions the deponent refused to answer, making the scope of the request overbroad and unreasonable; (2) the deponent was not the sole source of the answer to several of Plaintiff's questions; and (3) the plaintiff asked a number of questions without laying any foundation that the deponent had a role in the subject of the question, rendering any adverse inference on such questions "unfair." *Id.* at 1213-14. Under these circumstances, the court held that "[t]o grant an adverse inference in Plaintiff's favor . . . would allow Plaintiff to bypass several required steps in proving her case" and that the plaintiff could not "use her fruitless deposition as a crutch to prop up her claims." *Id.* at 1214.

Here, like *Emerson*, the deponents refused to answer nearly all of the questions posed to them because of the threat of an underlying criminal investigation. And here, like *Emerson*, opposing counsel "seeks to bypass several required steps in proving her case" by asking for adverse inferences that: (1) are massive in scope; (2) have been answered by other witnesses, such as BP's twenty-two corporate-representatives; and (3) are based on questions posed without the slightest bit of foundation. The deponents invoked the Fifth Amendment to virtually all of the hundreds of questions posed to them. Nevertheless, opposing counsel continued to pepper them with questions about every aspect of this litigation, knowing full well that the corporations' corporate-representatives could have answered—or had already answered—the same questions. Counsel also frequently posed questions without laying a suitable foundation, asking Transocean and Halliburton employees about what BP employees knew or thought, and about the

responsibilities of other defendants and their personnel (and vice versa). The end result: attorney-generated scripts with no tether of legitimacy to the truth.

As the Fifth Circuit once wrote, "[t]he assertion of the [Fifth Amendment] privilege, particularly on the advice of counsel, is an ambiguous response. An attorney might advise her or his client not to answer questions simply as a safety measure lest the client disclose information that she or he may not even know to be criminal." *Farace v. Indep. Fire Ins. Co.*, 699 F.2d 204, 210-211 (5th Cir. 1983). Courts guard against improper inferences through a series of factors designed to determine whether the inferences sought advance the search for the truth. Here, they don't. If admitted, they'd only reward counsel for unjustly testifying on behalf of the deponents.

## II.    Alternatively, the Court Should Defer Ruling Until After All Phases of the Trial are Complete.

Considering that opposing counsel has not come forward with any specific designation of precisely what they seek in terms of such inferences, this Court could alternatively defer any use of this testimony and adverse inferences until after all phases of this trial are complete and all evidence gathered. *See, e.g., In re WorldCom, Inc. Sec. Litig.*, 02 CIV 3288 DLC, 2005 WL 375315 at *5 (S.D.N.Y. Feb. 17, 2005) (deferring a ruling on adverse inferences until it was possible to judge on a complete record the evidence available to all parties). There is a non-trivial chance that the issues that forced these individuals to invoke the Fifth Amendment issues will be resolved and that these deponents might be able to testify in full at a later date. Any drawing of inferences now is thus likely premature and avoidable.

At the very least, this court should set strict guidelines to ensure that opposing counsel cannot use just any invocation to draw an inference against BP. This court has previously compromised competing interests by allowing the party seeking an inference to note a witness's silence, but not reference the actual questions posed to it. *See First Nat. Bank of Louisville v.*

9

*Lustig*, CIV. A. 87-5488, 1993 WL 411260 at *1-2 (E.D. La. Oct. 7, 1993). But even if the court allows reference to particular questions, it should require that those questions seek information *solely* within the scope of the witness's personal knowledge, *see Emerson*, 433 F. Supp. 2d at 1213-14, and thus not constituting conclusory or ultimate issues of this litigation.

Further, "[b]efore an adverse inference may be drawn from a party's refusal to testify in a civil case, there must be independent corroborative evidence to support the negative inference beyond the invocation of the privilege." *Kontos*, 968 F. Supp. at 408; *see also In re Nat'l Liquidators, Inc.*, 182 B.R. 186, 195 (S.D. Ohio 1995). And, along those lines, the court should not draw an inference if there is enough other evidence and testimony to decide the issue without the aid of the inference. *State Farm*, 96 C 6365, 2000 WL 574466 at *7 (deciding summary judgment motion "without relying on Fifth Amendment adverse inferences" because it could); *Farace*, 699 F.2d at 211 (refusing to draw an adverse inference where "the defendant ha[d] ample opportunity to impeach its witness by other means").[3]

## CONCLUSION

BP respectfully requests that the Court enter an order limiting adverse inferences to be drawn from invocations of the Fifth Amendment during depositions or, alternatively, that the Court defer this issue until a later phase of the trial.

---

[3] As noted above, BP does not seek at this time an order from the Court categorically prohibiting all potential Fifth Amendment inferences in this litigation. BP agrees that specific instances may arise where an inference may properly be allowed, provided a specific inference is sought and justified under the parameters discussed above. No party has made any such request, or showing, to date, and there certainly has been no justification for broad, wholesale inferences that do nothing more than use the invocation of the Fifth Amendment as a sounding board for whatever "facts" counsel wishes to assert.

Dated: January 9, 2012                         Respectfully submitted,


                                               /s / Don K. Haycraft

                                               Don K. Haycraft (Bar #14361)
                                               R. Keith Jarrett (Bar #16984)
                                               LISKOW & LEWIS
                                               One Shell Square
                                               701 Poydras Street, Suite 5000
                                               New Orleans, Louisiana 70139-5099
                                               Telephone: (504) 581-7979
                                               Facsimile: (504) 556-4108

                                               and

                                               Richard C. Godfrey, P.C.
                                               (richard.godfrey@kirkland.com)
                                               J. Andrew Langan, P.C.
                                               (andrew.langan@kirkland.com)
                                               Timothy A. Duffy, P.C.
                                               (tim.duffy@kirkland.com)
                                               Kirkland & Ellis LLP
                                               300 North LaSalle Street
                                               Chicago, IL 60654
                                               Telephone: (312) 862-2000
                                               Facsimile: (312) 862-2200

                                               and

                                               Robert C. "Mike" Brock
                                               (mbrock@cov.com)
                                               Covington & Burling LLP
                                               1201 Pennsylvania Avenue, NW
                                               Washington, DC 20004-2401
                                               Telephone: (202) 662-5985

                                               *Attorneys for the BP Exploration &*
                                               *Production Inc. & BP America Production*
                                               *Company*

11

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 9th day of January, 2012.

/s/ Don K. Haycraft

# EXHIBIT H

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | | |
|---|---|---|---|
| In re: | Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 |
| | | | SECTION: J |
| This Document Relates To: All Actions | | : : | JUDGE BARBIER |
| …………………………………………….... | | : : | MAGISTRATE JUDGE SHUSHAN |

**BP'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION IN LIMINE TO PRECLUDE ADVERSE INFERENCES DRAWN FROM INVOCATIONS OF NON-PARTIES' INVOCATIONS OF THE FIFTH AMENDMENT DURING DEPOSITIONS**

BP, Transocean, M-I, and Halliburton moved to exclude or limit potential adverse inferences drawn from invocations of the Fifth Amendment at trial. Each party made two basic arguments: first, that the court should not admit any such inferences given the circumstances of this case; and second, in the alternative, that if the court does allow inferences, it should do so according to appropriate guidelines – none of which have yet been followed by the PSC or the United States to the extent they seek such inferences.

BP's first argument was that it would be inappropriate in any circumstances to allow adverse inferences to be drawn against BP from the invocation of the Fifth Amendment by a non-BP employee. Such inferences would be improper because these persons owed no loyalty to BP, were not controlled by BP, and did not share the same interests as BP. In short, they could not possibly satisfy any of the criteria set out by the Fifth Circuit to establish a basis for an inference against BP. BP Memo at 4-6. BP's second argument was that there was also no basis on which to draw any adverse inferences against BP from the invocation of the Fifth Amendment by BP employees. BP Memo at 6-7. Such inferences would be improper because these employees invoked the Fifth Amendment of their own volition and not at BP's urging, and

because that, considered in the context of the whole case, the testimony of these employees plays a marginal role given the extensive cooperation and full and complete testimony of BP's other employees, including its twenty-two corporate representatives. *Id.* BP also argued, in the alternative, that the Court could defer ruling on the admissibility of any adverse inference until all phases of the trial are complete and all evidence is in. BP Memo at 9-10. At the very least, the Court should "set strict guidelines to ensure that opposing counsel cannot use just any invocation to draw an inference against BP." *Id.* at 10.

In response, the PSC and the United States both argued that the Fifth Circuit does not require the existence of an employment relationship to draw adverse inferences, and that the court should therefore not bar adverse inferences against BP based on invocations of the Fifth Amendment by Transocean and Halliburton employees (or vice versa). PSC Response at 4-9; U.S. Response at 3. The PSC also objected to BP's alternative argument to defer any consideration of inferences "due to its potential to draw this issue out indefinitely. PSC Response at 9 n. 7. Halliburton argued that the deferral alternative was "illogical and inefficient" though it provided no explanation for this view. HESI Response at 2. All parties agreed that each inference should be decided on a case-by-case basis and with some, but not necessarily all, of the guidelines suggested by BP and Transocean. PSC Response at 10-12; U.S. Response at 5-6.

## ARGUMENT

### I.     No Party Has Established Any Appropriate Adverse Inferences in This Case.

The PSC and the United States spent a considerable part of their responses arguing that, in the Fifth Circuit, Courts may draw inferences against parties from a non-employee witness. This argument misses the forest for the trees. But BP never argued that an employment relationship was required before any inference could be drawn. Indeed, the whole point of BP's

motion was that adverse inferences must be evaluated on a case by case basis. BP Memo at 4

(citing *State Farm Mut. Auto. Ins. Co. v. Abrams*, 96 C 6365, 2000 WL 574466 at *6 (N.D. Ill. May

11, 2000); *FDIC v. Fid. & Deposit Co. of Maryland*, 45 F.3d 969, 978 (5th Cir. 1995) (requiring

evaluation on a case-by-case basis)). BP's point was simply that *in the circumstances of this case*

it would be improper for the court to admit adverse inferences against BP based on invocations

of the Fifth Amendment by non-BP employees, and by BP employees as well absent some

circumstance that met the applicable criteria.

> **A.    The circumstances of this case prohibit the drawing of adverse inferences against BP from invocations by Transocean and Halliburton employees.**

While it is true that the lack of an employment relationship is not an automatic bar to an

inference, there is no basis for any such non-employee inferences here. These non-employees

owe no loyalty to BP, are not controlled by BP in the sense that BP did not vest in them "key

facts" regarding this litigation, and do not share compatible interests with BP. BP Memo at 4-6.

The PSC and the United States argue non-employee inferences are permissible. PSC

Response at 4-9; U.S. Response at 3. ***Maybe so, but that does not mean the absence of an***

***employment relationship has no bearing on whether to admit an inference.*** The existence or

absence of an employment relationship is clearly an important circumstance courts consider

when determining whether to admit adverse inferences. Indeed, the leading case on this issue,

*LiButti v. United States*, lists the nature of the relationship between the party against which the

inference is sought and the witness as first among the factors courts to be considered. 107 F.3d

110, 123-124 (2d Cir. 1997). About this factor, *Libutti* and countless other cases have stated "the

closer the bond, whether by reason of blood, friendship or business, the less likely the non-party

witness would be to render testimony in order to damage the relationship." *Id.* at 123.

The PSC appears to believe the absence of an employment relationship should have no bearing on a court's decision because of the Fifth Circuit's holding in *FDIC*. *See* PSC Response at 4-6. But *FDIC* does not stand for the notion that the absence of an employment relationship is irrelevant to whether a court should admit an adverse inference by a non-party witness. In *FDIC*, the non-party (non-employee) witnesses whose invocations led to adverse inferences against one of the parties had no actual stake in the case and did not directly benefit from an imputation of their silence against the party. Here, however, the fourteen Transocean and HESI employees who invoked the Fifth Amendment will benefit from any adverse inference imputed to BP from their silence because such inferences lay fault with BP, not *their* employer (and not *them*). As explained throughout BP's brief, not only do Transocean and HESI employees have no incentive to testify in favor of BP, *they have an incentive to remain silent* beyond the mere privilege against self-incrimination. This was not true of the witnesses in *FDIC*, who were not employed by *any* of the parties, and whose silence could only be explained as protection against self-incrimination. All of this is to repeat, as *Libutti* stated clearly, that "the overarching concern is whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." 107 F.3d at 124. In *FDIC*, the adverse inferences were trustworthy because of the facts in that case. Here, the adverse inferences are not because of adversarial nature of the relationship between these individuals and the interests of BP.

**B.     The circumstances of this case prohibit the drawing of adverse inferences against BP from invocations of the three BP employees.**

Other circumstances dictate that the court should not admit any adverse inferences against BP from BP employees' invocations of the Fifth Amendment. Here the PSC has argued for a categorical rule based on the employment relationship: "[E]mployee invocations of the Fifth Amendment are generally deemed admissible against their employers." PSC Response at

4

4. But its authorities do not support such a broad rule. *FDIC* did not even involve an employee-employer relationship. *Id.* at 4-6. And while the court in *Rad Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271 (3d Cir. 1986), noted that "nothing forbids imputing to a corporation the silence of its personnel," it never stated that a court **must** impute such silence to the employer; it merely stated that if a court did, it "is not *per se* reversible error." *Rad Servs.*, 808 F.2d at 275, 277. Both of these cases in fact suggest that each inference must stand on its own facts and circumstances, and that in some cases, a court may impute an employee's silence to his employer and in others not. As explained in BP's opening memorandum, here it should not.

Moreover, all of these case demonstrate by their continued emphasis on the unique circumstances of every case and the degree to which specific facts obviously play a role in these determinations underscore the impermissibility of the PSC's approach to this issue to date: to take the invocation of the Fifth Amendment by a witness as the occasion for unfettered questioning solely in order to lay the foundation for free-form inferences that meet none of the criteria supported by every party to have briefed this issue except the PSC. No matter what general rules can and cannot be drawn, there is universal agreement that no party, including the PSC, has yet to establish the required foundation for any particular inference – indeed, they have not even identified the specific inferences they seek.

## II.    Deferring This Issue Would Be Neither Unfair Nor Inappropriate.

In the alternative, the Court could defer ruling on the admissibility of any adverse inference. *See, e.g., In re WorldCom, Inc. Sec. Litig.*, 02 CIV 3288 DLC, 2005 WL 375315 at *5 (S.D.N.Y. Feb. 17, 2005) (deferring a ruling on adverse inferences until it was possible to judge on a complete record the evidence available to all parties). This would not, as the PSC argues, draw out the issue "indefinitely." Nor would it be "illogical" or "inefficient", HESI Response at 2, because there is a non-trivial chance that the issues that forced these individuals to invoke the Fifth

5

Amendment will be resolved and that these deponents might be able to testify in full at a later date.

It is the drawing of inferences now that would be illogical, inefficient, and unfair.

Dated: January 23, 2012                          Respectfully submitted,

                                                 /s / Don K. Haycraft

                                                 Don K. Haycraft (Bar #14361)
                                                 R. Keith Jarrett (Bar #16984)
                                                 LISKOW & LEWIS
                                                 One Shell Square
                                                 701 Poydras Street, Suite 5000
                                                 New Orleans, Louisiana 70139-5099
                                                 Telephone: (504) 581-7979
                                                 Facsimile: (504) 556-4108

                                                 and

                                                 Richard C. Godfrey, P.C.
                                                 (richard.godfrey@kirkland.com)
                                                 J. Andrew Langan, P.C.
                                                 (andrew.langan@kirkland.com)
                                                 Timothy A. Duffy, P.C.
                                                 (tim.duffy@kirkland.com)
                                                 Kirkland & Ellis LLP
                                                 300 North LaSalle Street
                                                 Chicago, IL 60654
                                                 Telephone: (312) 862-2000
                                                 Facsimile: (312) 862-2200

                                                 and

                                                 Robert C. "Mike" Brock
                                                 (mbrock@cov.com)
                                                 Covington & Burling LLP
                                                 1201 Pennsylvania Avenue, NW
                                                 Washington, DC 20004-2401
                                                 Telephone: (202) 662-5985

                                                 *Attorneys for the BP Exploration &
                                                 Production Inc. & BP America Production
                                                 Company*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 23rd day of January, 2012.

/s/  Don K. Haycraft__