# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | SECTION:  J |
| | * | |
| Applies to:  *All Cases in Pleading* | * | JUDGE BARBIER |
| *Bundle Section III.B(3).* | * | |
| | * | MAGISTRATE SHUSHAN |
| * * * * * * * * * * * * * * * * * | * | |

## NALCO COMPANY, NALCO HOLDINGS LLC, NALCO FINANCE HOLDINGS LLC AND NALCO HOLDING COMPANY'S MEMORANDUM IN SUPPORT OF THEIR RENEWED MOTION TO DISMISS FIRST AMENDED MASTER COMPLAINT "B3 BUNDLE"

Thomas J. Heiden
Mary Rose Alexander
LATHAM & WATKINS LLP
233 South Wacker Dr.
Suite 5800
Chicago, IL 60606-6401
Phone: (312) 876-7700

January 31, 2012

# TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................1

II.    PLAINTIFFS' CLAIMS ARE PREEMPTED AS A MATTER OF LAW ........................3

    A.    The CWA/NCP Sets Forth A Comprehensive Response Scheme That Vests Control Over Oil Spill Responses In The President And His Delegates ..................................................................................................3

    B.    Under Implied Conflict Preemption Principles, The Mandatory Oil Spill Response Scheme Set Forth In The CWA/NCP Preempts Plaintiffs' Claims ...................................................................................6

    C.    The *Boyle* Test For Government Contractor Immunity Does Not Apply To Nalco ............................................................................................9

III.   THE RECORD FACTS SHOW THAT THE GOVERNMENT FOLLOWED THE LAW AND MADE THE DECISIONS REGARDING DISPERSANT USE THAT GIVE RISE TO PLAINTIFFS' CLAIMS AGAINST NALCO.  THUS, PLAINTIFFS' CLAIMS ARE PREEMPTED ..............................................................12

    A.    COREXIT® 9500 And COREXIT® 9527 Were Pre-Approved By The United States For Use During The Response .......................................13

    B.    The Record Facts Show That The FOSC Exercised Final Decision Making Authority During The Response, As Required Under The CWA/NCP .................14

    C.    The Record Facts Show That The FOSC Approved The Application Of COREXIT® 9500 and COREXIT® 9527 Immediately After The Explosion Of The *Deepwater Horizon* And Continued To Approve Their Use Throughout The Response. ...........................................................17

    D.    In Accordance With The CWA/NCP, The FOSC Determined Whether Dispersants Could Be Applied, When Dispersants Could Be Applied, Where Dispersants Could Be Applied, And The Volumes In Which They Could Be Applied ....................................................................................21

    E.    Plaintiffs Have No Facts To Suggest That The Use Of COREXIT® 9500 Or COREXIT® 9527 Was Other Than As Directed Pursuant To The Comprehensive Response Scheme Set Forth In The CWA/NCP .........................23

IV.   PLAINTIFFS' CLAIMS WILL CHILL FUTURE RESPONSE EFFORTS. ..................24

V.    CONCLUSION ..................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Al Shimari v. CACI Int'l, Inc.*,
  658 F.3d 413 (4th Cir. 2011) ................................................................. 10

*AT&T Mobility LLC v. Concepcion*,
  131 S. Ct. 1740 (2011) ........................................................................... 7

*Black v. N. Panola Sch. Dist.*,
  461 F.3d 584 (5th Cir. 2006) ................................................................. 1

*Boyle v. United Technologies Corporation*,
  487 U.S. 500 (1988) ................................................................... 9, 10, 11

*City of New York v. FCC*,
  486 U.S. 57 (1988) ................................................................................. 6

*David v. Assumption Parish Police Jury*,
  No. 02-765, 2003 WL 57039 (E.D. La. 2003) ......................................... 1

*Fireman's Fund Ins. Co. v. City of Lodi*,
  302 F.3d 928 (9th Cir. 2002) ............................................................... 24

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
  373 U.S. 132 (1963) ............................................................................... 6

*Geier v. American Honda Motor Company*,
  529 U.S. 861 (2000) ........................................................................... 7, 9

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) ....................................................................... 6, 7, 11

*Romero v. Becken*,
  256 F.3d 349 (5th Cir. 2001) ................................................................. 1

*Witty v. Delta Air Lines, Inc.*,
  366 F.3d 380 (5th Cir. 2004) ........................................................... 7, 12

## STATUTES

33 U.S.C. § 1321(c) ................................................................................. 13

33 U.S.C. § 1321(c)(1) .............................................................................. 4

33 U.S.C. § 1321(c)(2) ............................................................................. 25

33 U.S.C. § 1321(c)(2)(A) ................................................................................................ 4

33 U.S.C. § 1321(c)(3) ................................................................................................ 4, 25

33 U.S.C. § 1321(c)(4)(A) ................................................................................................ 2

33 U.S.C. § 1321(d)(1) ................................................................................................ 4

33 U.S.C. § 1321(d)(1)(G)(ii) ........................................................................................ 21

33 U.S.C. § 1321(d)(1)(G)(iii) ....................................................................................... 22

33 U.S.C. § 1321(d)(2)(F) ........................................................................................... 5, 9

33 U.S.C. § 1321(d)(2)(G) .............................................................................................. 5

33 U.S.C. § 1321(d)(4) ................................................................................................... 5

33 U.S.C. § 1321(o)(2) ................................................................................................... 9

## RULES

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 1, 3

Fed. R. Civ. P. 12(d) ....................................................................................................... 3

Fed. R. Civ. P. 56 ........................................................................................................... 3

## REGULATIONS

40 C.F.R. § 300 ........................................................................................................... 5, 9

40 C.F.R. § 300.135(a) .................................................................................................... 6

40 C.F.R. § 300.135(d) .................................................................................................... 6

40 C.F.R. § 300.305(d)(2) ......................................................................................... 6, 17

40 C.F.R. § 300.310(a) .................................................................................................... 5

40 C.F.R. § 300.322(b) .......................................................................................... 6, 17, 25

40 C.F.R. § 300.900 ........................................................................................................ 5

40 C.F.R. § 300.905(a) .................................................................................................... 5

40 C.F.R. § 300.910(a) .................................................................................................. 13

40 C.F.R. § 300.910(b) .................................................................................................. 14

40 C.F.R. § 300.915 ........................................................................................................... 11

40 C.F.R. § 300.915(a) ........................................................................................................ 5

40 C.F.R. § 300.920 ........................................................................................................... 5

40 C.F.R. § 300.920(d) ..................................................................................................... 11

47 Fed. Reg. 31,180 (1982) .............................................................................................. 5

58 Fed. Reg. 54,702 (1993) .............................................................................................. 9

59 Fed. Reg. 47,384 (1994) .............................................................................................. 9

## OTHER AUTHORITIES

Viet D. Dinh, *Reassessing the Law of Preemption*,
   88 Geo. L.J. 2085 (2000) ........................................................................................... 10

Defendants Nalco Company ("Nalco"), Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company (collectively, the "Nalco Entities") respectfully state as follows in support of their renewed motion to dismiss the First Amended Master Complaint "B3 Bundle" (the "B3 Master Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6):[1]

## I.      INTRODUCTION

The B3 Plaintiffs assert claims against Nalco arising from the use of COREXIT® 9500 and COREXIT® 9527 during the response to the oil spill resulting from the April 20, 2010 explosion of the *Deepwater Horizon* (the "Response").  As Nalco has previously represented to this Court, Nalco had no role in making any of the decisions that give rise to Plaintiffs' claims. (*See* Mem. in Supp. of Nalco's Mot. to Dismiss at 2 (Rec. Doc. 1409-1).)  Nalco did not decide to use dispersants.  Nalco did not decide which dispersants to use.  Nalco did not decide where to apply dispersants.  Nalco did not decide how to apply dispersants.  Nalco did not decide when to apply dispersants.  Nalco did not decide what quantities of dispersants could be applied safely. Indeed, Plaintiffs have never asserted that Nalco participated in any of those decisions.  Nor can they, because each of those decisions was made by the Federal On-Scene Coordinator ("FOSC"), acting pursuant to mandated authority under the comprehensive oil spill response scheme set forth in the Clean Water Act ("CWA"), as amended by the Oil Pollution Act ("OPA"), and the National Contingency Plan ("NCP").  Nalco simply acted in "a time of great national need" to supply COREXIT®, responding to urgent requests from the United States Coast Guard

---

[1]      The original B3 Master Complaint asserted claims against the Nalco Entities.  (Master Compl. In Accordance With PTO No. 11 [Case Management Order No. 1] Section III.B(3) ["B3 Bundle"] (Rec. Doc. 1812).)  On March 29, 2011, Plaintiffs filed their First Amended B3 Master Complaint, which does not name Nalco Holdings LLC, Nalco Finance Holdings LLC or Nalco Holding Company as defendants. (*See* B3 Master Compl. at *passim* (Rec. Doc. 1805-1).)  Because Plaintiffs no longer seek to recover from these Defendants, the claims against these Defendants should be dismissed.  *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006); *Romero v. Becken*, 256 F.3d 349, 354 n.2 (5th Cir. 2001); *David v. Assumption Parish Police Jury*, No. 02-765, 2003 WL 57039, at *8 (E.D. La. Jan. 6, 2003).

("USCG") for as much dispersant as Nalco could supply.  (Letter fr. Paul F. Zukunft, Rear

Admiral, USCG, FOSC, to The Nalco Company and Providers of Surfactant Supplies to the

Nalco Company (July 12, 2010) ("July 12, 2010 FOSC Letter"), Exh. A hereto.)  The Federal

Government asked

> Nalco and companies that provide the Nalco Company with surfactant supplies to
> continue to assist by making available, to the greatest extent possible, dispersant
> and the surfactant material to this response and clean-up effort. . . .  [W]hatever
> efforts you are undertaking in this regard are of invaluable benefit to this country.

(*Id.*)  Nalco supplied a product that was and had been listed on the Federal Government's list of

approved dispersants for decades and that the Government repeatedly approved for use during

the Response.  Because decisions about dispersant use were required to be made and were in fact

made by the FOSC, Plaintiffs' claims are barred under the doctrine of implied conflict

preemption.

On February 28, 2011, Nalco filed a Motion to Dismiss the B3 Master Complaint.

(Nalco's Mot. to Dismiss (Rec. Doc. 1409).)  On September 30, 2011, this Court issued an order

granting in part and denying in part Nalco's motion and those of various other B3 Defendants.

(Order and Reasons (Rec. Doc. 4159) (the "B3 Order").)  In its order, the Court observed that

although the preemption argument that Nalco and other Defendants advanced was "certainly

plausible," Defendants could "only avail themselves of preemption if they show that the

complained-of activity fell within the scope of the CWA/NCP."  (B3 Order at 15.)  The Court

also suggested that Defendants could renew their motions to dismiss at a later date.[2]  (*Id.*)

---

[2]      In the B3 Order, the Court held that the responder immunity provision in the CWA, 33 U.S.C.
§ 1321(c)(4)(A), did not apply to Nalco because it did not apply to personal injury claims, "such as the B3
claims."  (B3 Order at 6 n.8.)  In the B3 Master Complaint, the negligence and strict liability claims
against Nalco state that Plaintiffs seek damages for "diminution of the value of their real and/or personal
property, loss of income, loss of consortium and/or emotional distress."  (B3 Master Compl. ¶¶ 278, 326.)
Nalco respectfully requests that the Court clarify that, to the extent Plaintiffs continue to press claims to
recover these alleged damages, Nalco has immunity pursuant to § 1321(c)(4)(A).

Following the issuance of the B3 Order, the Parties agreed (at the suggestion of the Court) to conduct expedited discovery related to the preemption argument that Nalco and other Defendants raised, as well to the derivative immunity argument advanced by several other defendants involved in the Response (the "Responder Defendants").  Plaintiffs and Nalco have completed that specific discovery.  While Plaintiffs' claims are preempted as a matter of law regardless of whether the Government followed the law, *the record facts now indisputably demonstrate that the Federal Government did indeed act pursuant to the CWA/NCP*. Stipulations of fact from the United States and the sworn testimony of the BP witnesses who were there confirm that the Federal Government complied with this pervasive federal scheme. Nalco thus submits its renewed motion to dismiss the B3 Master Complaint and respectfully requests that the Court grant its motion and dismiss all claims against Nalco in the B3 Master Complaint.[3]

## II.     PLAINTIFFS' CLAIMS ARE PREEMPTED AS A MATTER OF LAW.

### A.     The CWA/NCP Sets Forth A Comprehensive Response Scheme That Vests Control Over Oil Spill Responses In The President And His Delegates.

In the wake of the Exxon Valdez oil spill, Congress enacted the Oil Pollution Act of 1990, amending the CWA and expanding federal authority over oil spill responses in order to improve the nation's ability to address such disasters.  The CWA and its implementing regulations, set forth in the NCP, are replete with compulsory language, reflecting Congress'

---

[3]     In submitting its motion, Nalco follows the B3 Order and renews its Motion to Dismiss the B3 Master Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  Nalco's motion is not a motion for summary judgment under Rule 56.   However, the Federal Rules of Civil Procedure allow for conversion to a motion for summary judgment as appropriate.  *See* Fed. R. Civ. P. 12(d).  As set forth below, the record facts conclusively demonstrate that the Federal Government made the relevant decisions regarding dispersant use throughout the Response, as required under the CWA/NCP.  Because there is no genuine issue of material fact as to the Government's control over dispersant use, if the Court converts Nalco's renewed motion to dismiss to a summary judgment motion, Nalco's motion should be granted and the B3 Master Complaint should be dismissed.

intent to vest the executive branch with exclusive control over various enumerated decisions critical to ensuring a rapid and coordinated response to oil spills.  The CWA expressly provides:

> The President *shall*, in accordance with the National Contingency Plan and any appropriate Area Contingency Plan, *ensure effective and immediate removal of a discharge*, and mitigation or prevention of a substantial threat of a discharge, *of oil* or a hazardous substance . . . .

33 U.S.C. § 1321(c)(1).[4]  To promote the President's ability to fulfill his obligation under § 1321(c)(1), Congress gave him broad and exclusive authority to control responses to oil spills and discharges of hazardous substances.  When responding to a substantial threat to public health or welfare, "the President *shall* direct all Federal, State, and private actions to remove the discharge or to mitigate or prevent the threat of the discharge."  *Id.* § 1321(c)(2)(A).  Federal and State entities as well as private persons *must* act in accordance with the President's directions.  *Id*. § 1321(c)(3) (such parties "*shall* act in accordance with the National Contingency Plan or as directed by the President").

To ensure that oil spill response resources can be deployed "effectively and immediately," the CWA mandates that the President "*shall* prepare and publish a National Contingency Plan for removal of oil and hazardous substances."  *Id.* § 1321(d)(1).  The NCP:

> *[S]hall* provide for efficient, coordinated, and effective action to minimize damage from oil and hazardous substance discharges, including containment, *dispersal,* and removal of oil and hazardous substances, and *shall* include, but not be limited to, the following:
> . . . .
>
> (F)  *Procedures* and *techniques* to be employed in identifying, containing, *dispersing*, and removing oil and hazardous substances.
>
> (G)  A schedule, prepared in cooperation with the States, identifying –
>
> (i) *dispersants*, other chemicals, and other spill mitigating devices and

---

[4]     Unless otherwise stated, all internal citations and quotations are omitted and all emphasis is supplied.

substances, if any, that may be used in carrying out the Plan,

(ii) *the waters in which such dispersants*, other chemicals, and other spill mitigating devices and substances *may be used*, and

(iii) *the quantities of such dispersant*, other chemicals, or other spill mitigating device or substance which *can be used safely in such waters* . . . .

*Id.* § 1321(d)(2)(F)-(G).  The NCP requires the Federal Government to identify dispersants that can be used in responding to an oil spill.  *See* 40 C.F.R. § 300.905(a) ("EPA *shall* maintain a schedule of dispersants and other chemical or bioremediation products that may be authorized for use on oil discharges . . . .").  Before adding a dispersant, like COREXIT®, to the NCP Product Schedule, the U.S. Environmental Protection Agency (the "USEPA") reviews detailed data submitted by the dispersant manufacturer.  *See id.* §§ 300.915(a), 300.920.  The data includes worker precautions for storage and field application, toxicity and effectiveness data, and the dispersant's components.  *Id.* § 300.915(a).[5]  Only after reviewing the required data does the USEPA (under authority delegated by the President) determine whether to list a particular dispersant, like COREXIT®, on the NCP Product Schedule.  *Id.* §§ 300.900-300.920.

"After publication of the National Contingency Plan, the removal of oil and hazardous substances and actions to minimize damage from oil and hazardous substance discharges *shall*, to the greatest extent possible, *be in accordance with the National Contingency Plan*."  33 U.S.C. § 1321(d)(4).  Under the NCP, "[d]efensive actions *shall begin as soon as possible* to prevent, minimize, or mitigate threat(s) to the public health or welfare of the United States or the environment."  40 C.F.R. § 300.310(a).  Importantly, the NCP requires the oil spill response to

---

[5]       Pre-listing of dispersants is important to ensure that dispersants are readily available to address an oil spill.  In revising the NCP in 1982, the USEPA decided to vest authority regarding dispersant use with the FOSC in order to facilitate prompt decisions as to whether dispersants should be used and if so which dispersants should be used.  *See* National Oil and Hazardous Substances Contingency Plan, 47 Fed. Reg. 31,180, 31,201 (July 16, 1982) (noting "[m]ost commenters urged that the decision making authority should not be with the Administrator or a designee in Headquarters but rather should be with the [F]OSC in order to enable rapid decision making") (codified at 40 C.F.R. pt. 300).

be coordinated by all interested parties, with ultimate decision making authority vested in the

FOSC.  The NCP states:

> **The basic framework for the response management structure is a system (e.g., a unified command system)**, that brings together the functions of the federal government, the state government, and the responsible party to achieve an effective and efficient response, **where the [FOSC] maintains authority**.

*Id*. § 300.135(d).

The FOSC "**shall** direct response efforts."  *Id.* § 300.135(a).  Where a spill poses a

"substantial threat to the public health or welfare of the United States . . ., the [FOSC] **must**

direct all response efforts, as provided in § 300.322(b) of this part.  The [FOSC] should declare

as expeditiously as practicable to spill response participants **that the federal government will**

**control the response**."  *Id*. § 300.305(d)(2).  Where a spill, such as the *Deepwater Horizon* spill,

poses a "substantial threat to the public health or welfare of the United States, the [FOSC] **shall**

direct all federal, state or private actions to remove the discharge."  *Id*. § 300.322(b).  The

CWA/NCP thus requires the President and his delegates to decide whether dispersants can be

used, which dispersants can be used, where they can be used, how they can be used, in what

quantities they can be used, in what waters they can be used safely, and to ensure those decisions

are implemented by controlling responses to oil spills.

### B.     Under Implied Conflict Preemption Principles, The Mandatory Oil Spill Response Scheme Set Forth In The CWA/NCP Preempts Plaintiffs' Claims.

Implied conflict preemption applies where, as here, a party cannot comply with both

state/maritime law and federal law or where the application of state/maritime law is an obstacle

to the accomplishment and execution of the full purposes and objectives of federal law.  *See Fla.*

*Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963); *Hines v. Davidowitz*, 312

U.S. 52, 67 (1941); *see also City of New York v. FCC*, 486 U.S. 57, 64 (1988) ("The statutorily

authorized regulations of an agency will pre-empt any state or local law that conflicts with such

regulations or frustrates the purposes thereof.").  Plaintiffs' claims pose a clear obstacle to the accomplishment of the objectives of the CWA and the NCP.  Plaintiffs challenge the decisions made by the President pursuant to the comprehensive oil spill response scheme set forth in the CWA/NCP.  Plaintiffs further challenge Congress' decision to require the President and/or his delegates to determine whether dispersants should be used, which dispersants should be used, how they should be used, where they should be used, and in what volumes they should be used.

*Geier v. American Honda Motor Company*, 529 U.S. 861 (2000), is instructive.  In *Geier,* the plaintiff alleged that her car, which was equipped with manual shoulder and lap belts, was defective under state law because it was not equipped with airbags.  Honda had complied with the Federal Motor Vehicle Safety Standard promulgated by the Department of Transportation under the authority of the National Traffic and Motor Vehicle Safety Act of 1966 requiring auto manufacturers to equip some but not all of their 1987 vehicles with passive restraints.  The Supreme Court held that the plaintiff's state law claim was preempted because it "stood 'as an obstacle to the accomplishment and execution of' the important means-related federal objectives [allowing a gradual passive restraint phase-in] that we have just discussed."  *Id*. at 881 (quoting *Hines*, 312 U.S. at 67); s*ee also AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1753 (2011) (California rule disfavoring arbitration preempted by Federal Arbitration Act ("FAA") because it "[stood] as an obstacle to the accomplishment and execution of" the FAA's goal of promoting arbitration); *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 385 (5th Cir. 2004) (plaintiff brought state law claim based on airline's failure to warn passengers of the risk of developing deep vein thrombosis from remaining seated during long flights; court held claim was preempted by the "pervasive regulatory scheme covering air safety concerns" and because it conflicted with a federal determination that passengers should remain seated).

Plaintiffs' claims – just like the state law claim in *Geier* – are a clear "obstacle" to the implementation of the mandatory requirements of the CWA and the NCP and thus are preempted.  Plaintiffs' claims are founded on the theory that COREXIT® is too dangerous to have been used in the Gulf on the Spill.  As the record evidence shows, the FOSC decided that it was not.  *See infra* at 12-24.  Moreover Plaintiffs' asserted claims are conflict preempted regardless of whether the Government actually followed the law it was required to follow.  Plaintiffs are not suing the Government for violating its obligations under the CWA/NCP.  Plaintiffs do not purport to stand in the shoes of the Government.  And if Plaintiffs sought to assert claims arising from the Government's alleged failure to follow the CWA/NCP, such a suit could include only federal statutory claims/issues.  Plaintiffs' claims conflict with the mandatory response scheme set forth in the CWA/NCP because Plaintiffs complain about the very decisions Congress has required the President and his delegates to make:

- Plaintiffs complain about the use of dispersants.

- Plaintiffs complain that COREXIT® should not have been used.

- Plaintiffs complain that COREXIT® was too dangerous to have been used.

- Plaintiffs complain about the volume of COREXIT® that was used.

- Plaintiffs complain about the waters in which COREXIT® was applied.

(B3 Master Compl. ¶¶ 132-135, 169, 184, 190-191.)

Yet, these are all decisions delegated by Congress **to the President.**  It is not for Plaintiffs to allege that the President's decisions were wrong.  It is not for courts and juries to second guess those decisions.  Private parties – like Nalco – should not be punished by such after-the-fact second guessing of their decision to follow the legal, proper, and required directives of the President.  In short, allowing Plaintiffs to pursue claims against Nalco would frustrate the

CWA's purpose of centralizing responsibility with the Federal Government for controlling spill responses, which the CWA achieves by mandating that the President or his designees determine what dispersants are listed on the NCP Product Schedule, whether dispersants may be used, how dispersants may be used, where dispersants may be used, and in what quantities they may be used.  *See* 33 U.S.C. § 1321(d)(2)(F)-(G).[6]  For these reasons, Plaintiffs' claims are preempted as a matter of law.[7]

C.   **The *Boyle* Test For Government Contractor Immunity Does Not Apply To Nalco**.

In the B3 Order, the Court referenced Nalco's argument that the claims against it should be dismissed because Nalco has derivative immunity.  (B3 Order at 6.)  However, as set forth above, Nalco's argument for dismissal of the claims against it is based on the application of well-established conflict preemption principles and not on a derivative immunity theory.  In the B3 Order, the Court cited *Boyle v. United Technologies Corporation*, 487 U.S. 500 (1988), in analyzing other Responder Defendants' derivative immunity argument.  (*Id.* at 8-9.)  The *Boyle* test for derivative immunity does not apply to the preemption argument that Nalco proffers here.

*Boyle* governs the availability of the government contractor defense, which in some circumstances shields companies from liability for injuries caused by products they designed under government contracts.  It did not involve a conflict between state law and federal law, as

---

[6]      *Cf.* National Oil and Hazardous Substances Pollution Contingency Plan, 59 Fed. Reg. 47,384, 47,399-400 (Sept. 15, 1994) (rejecting "view that a state could initiate more stringent measures than the [F]OSC when the latter is directing the response" and explaining that "all actions would have to be authorized or approved by the [F]OSC") (codified at 40 C.F.R. pt. 300); National Oil and Hazardous Substances Pollution Contingency Plan, 58 Fed. Reg. 54,702, 54,704 (proposed Oct. 22, 1993) (emphasizing the primary role of the FOSC in coordinating national response and explaining that "requiring implementation of the national response system ensures there will be one individual who makes decisions and provides instructions") (to be codified at 40 C.F.R. pt. 300).

[7]      The CWA's savings clause, 33 U.S.C. § 1321(o)(2), does not preclude the application of conflict preemption principles.  *See Geier*, 529 U.S. at 869 (a savings clause does not "foreclose or limit the operation of" implied conflict preemption principles).

exists here.  *See* 487 U.S. at 504.  Rather, in *Boyle*, the Supreme Court held that federal courts

have the authority to create a common law defense for government contractors where application

of state law would conflict with an area of "uniquely federal interests."  *Id.*  In federal common

law cases such as *Boyle*, "the legislative action" that forms the basis for express and implied

preemption "has been replaced by a common-law rule, and the reliance on congressional intent

has been replaced by a showing of uniquely federal interests."  Viet D. Dinh, *Reassessing the

Law of Preemption*, 88 Geo. L.J. 2085, 2109 (2000).  *Boyle* does not apply here because "[w]hile

*Boyle*'s preemption holding . . . functions to displace state law to protect 'uniquely federal

interests,' ***it did not rely on any act of Congress to animate the preemption***."  *Al Shimari v.

CACI Int'l, Inc.*, 658 F.3d 413, 417-18 (4th Cir. 2011).[8]

 Conflict preemption based on a Congressional statute and its implementing regulations –

like the CWA and NCP – is distinct from derivative immunity, which *Boyle* addressed.  Conflict

preemption asks whether federal law conflicts with state law and must therefore govern.

Derivative immunity shields a party from the application of state law because such party's

conduct falls within the province of government acts.  In the present case, unlike in *Boyle*,

Congress enacted a comprehensive oil spill response scheme that places authority and

responsibility for responding to spills squarely with the President and his delegates.  Under that

Congressionally devised scheme, the decisions about which Plaintiffs now complain – whether

to use dispersants, which dispersants to use, where to use them, how to use them, and how much

to use – are expressly reserved to the Federal Government.  Nalco's argument relies on federal

legislation and its implementing regulations, not on the Court's identification of "uniquely

---

[8] Although *Boyle* references the Federal Tort Claims Act (the "FTCA"), the Court did not apply
conflict preemption principles and hold that the FTCA preempted the plaintiffs' state law claims.  Rather,
the Court reasoned that the FTCA "suggest[ed] the outlines of 'significant conflict' between federal
interests and state law in the context of Government procurement."  487 U.S. at 511.

federal interests."  Plaintiffs' claims pose a clear and direct obstacle to the accomplishment of

Congress' goals in the CWA/NCP and are thus preempted.  *See Hines*, 312 U.S. at 67.

Plaintiffs claim that COREXIT® was unreasonably dangerous and that there is a broad

duty to warn which is a precondition to the attaching of a purely legal concept – federal

constitutional preemption.  Even assuming the truth of Plaintiffs' allegations, their claims are

preempted.  Preemption bars claims that conflict with federal law, regardless of whether or not a

plaintiff can adduce evidence to support an element of his claim.  If this were otherwise, it would

mean preemption only applies to meritless claims.

Similarly, Plaintiffs cannot defeat preemption by arguing that Nalco somehow failed to

satisfy the third prong of *Boyle*.  While the B3 Master Complaint ***does not allege*** that Nalco

withheld from the Federal Government any knowledge of risks associated with COREXIT®,

such a claim, if asserted, would demonstrate why the *Boyle* test is inapplicable to conflict

preemption.  The NCP sets forth in great detail the information dispersant manufacturers must

provide to the Federal Government, including: special handling and worker precautions;

recommended application procedures, concentrations, and conditions for use depending upon

water salinity, water temperature, and types and ages of the pollutants; results of effectiveness

testing; results of toxicity testing; data requirements from the Annual Books of American Society

for Testing and Materials Standards; and component information.  40 C.F.R. § 300.915.  The

USEPA evaluates this information and decides whether or not to put a product on the list.  After

the Federal Government decides to list a dispersant, the product is available as one option for the

President and his delegates to consider when responding to a national emergency, and going

forward, a manufacturer is only required to inform the USEPA of "changes in the composition,

formulation, or application of the dispersant."  40 C.F.R. § 300.920(d).

Like in *Witty*, allowing a plaintiff to impose, through the application of tort law, a broader duty on a manufacturer directly conflicts with the requirements of the NCP.  *See* 366 F.3d at 385.[9]

### III. THE RECORD FACTS DEMONSTRATE THAT THE GOVERNMENT FOLLOWED THE LAW AND MADE THE DECISIONS REGARDING DISPERSANT USE THAT GIVE RISE TO PLAINTIFFS' CLAIMS AGAINST NALCO.  THUS, PLAINTIFFS' CLAIMS ARE PREEMPTED.

In the B3 Order, this Court held that a ruling on Nalco's preemption argument was premature because the B3 Master Complaint arguably alleges that BP controlled the Response. (B3 Order at 11-12.)  However, after a period of targeted discovery on preemption and ample opportunity for development of the relevant facts, the record facts – including sworn testimony from key BP decision makers who participated in the Unified Area Command ("UAC") and formal admissions of fact from the United States – demonstrate that throughout the Response, the application of COREXIT® was authorized and directed by the FOSC, acting pursuant to the CWA/NCP.[10]  Put another way, the extensive factual record shows that the Federal Government, as required, fully complied with the CWA/NCP federal scheme in responding to the Spill.

---

[9]     Moreover, Exxon Chemical Corporation complied with the NCP by providing the United States with information regarding the toxicity and effectiveness of COREXIT® 9500 and COREXIT® 9527 long before the FOSC approved the use of either product in the Response, satisfying the third prong of the *Boyle* test.  Before they were listed on the NCP Product Schedule, the United States required Exxon Chemical, which manufactured the products at the time applications for the NCP Product Schedule were submitted, to perform toxicity and effectiveness testing on each product.  (United States' Stipulation Nos. 1-2, Exh. B hereto.)  In addition, the United States required Exxon Chemical to submit each dispersant's components.  (United States' Stipulation No. 3, Exh. B hereto; *see also* Letter fr. Elizabeth Walpac, Nalco Canada, to Leigh DeHaven, USEPA (May 6, 2006), Exh. C hereto.)  Before COREXIT® 9500 or COREXIT® 9527 were listed on the NCP Product Schedule, USEPA was provided with the results of toxicity and effectiveness testing on each product.  (*See* Letter fr. Marjorie A. Walsh, Exxon Chemical Company, to John Cunningham, USEPA (Mar. 10, 1994), Exh. D hereto; Annex X Technical Product Bulletin No. 8, Oil & Special Materials Control Division (Sept. 29, 1978),  Exh. E hereto.)  Thus, the United States knew the components, toxicity, and effectiveness of COREXIT® 9500 and COREXIT® 9527 well before the April 20, 2010 *Deepwater Horizon* explosion and oil spill.

[10]    Four USCG officers served as FOSC during the Response.  The Commander of the USCG Marine Safety Unit at Morgan City, Louisiana, was the first FOSC to direct the Response.  (United

A.   **COREXIT® 9500 And COREXIT® 9527 Were Pre-Approved By The United States For Use During The Response.**

COREXIT® 9500 and COREXIT® 9527 have been listed on the NCP Product Schedule for decades.  (USEPA, National Contingency Plan Product Schedule, Exh. G hereto.)  In addition, both products were pre-authorized for use in responding to oil spills under the regional dispersant pre-authorization plans for Regions IV and VI, the regions that comprise the Gulf Coast states.  (United States' Stipulation No. 4 (Nov. 18, 2011), Exh. B hereto;[11] RRT VI FOSC Dispersant Pre-Approval Guidelines and Checklist (Jan. 24, 2001), Exh. H hereto; RRT IV, Use of Dispersants in Region IV (1996), Exh. I hereto.)  Under the CWA/NCP, the FOSC had authority to approve the use of COREXIT® 9500 and COREXIT® 9527 in accordance with the dispersant pre-authorization plans for Regions IV and VI.  (United States' Stipulation No. 5, Exh. B hereto); *see also* 40 C.F.R. § 300.910(a).  RRT pre-authorization is consistent with the NCP, which requires RRTs to address the use of dispersants as part of their planning activities in order to effectuate the CWA's goal of an "effective and immediate" response to an oil spill.  *See* 33 U.S.C. § 1321(c); 40 C.F.R. § 300.910(a).  Pre-authorization promotes this goal by allowing the FOSC to make a decision regarding dispersant use soon after being notified of a spill.[12]  For spill

_____

States' Stipulation No. 7, Exh. B hereto.)  USCG Rear Admiral Mary Landry served as FOSC from April 23, 2010 to June 1, 2010.  (United States' Stipulation No. 8, Exh. B hereto.)  USCG Rear Admiral James Watson served as FOSC from June 1, 2010 to July 12, 2010.  (United States' Stipulation No. 9, Exh. B hereto.)  USCG Rear Admiral Paul Zunkunft served as FOSC from July 12, 2010 through the end of the period in which dispersants were applied.  (United States' Stipulation No. 10, Exh. B hereto; Letter fr. T.W. Allen, Admiral, USCG, to Congressman Edward J. Markey (Aug. 20, 2010) (stating that the Macondo well was capped on July 15, 2010 and dispersants had not been applied since July 19, 2010), Exh. F hereto.)

[11]   Although Plaintiffs have served objections to the United States' stipulations, their objections do not constitute evidence controverting the stipulations' truth.  To cast doubt on the stipulations' credibility, Plaintiffs must adduce evidence tending to contradict their veracity.  They have not done so – nor can they.

[12]   (*See* RRT VI FOSC Dispersant Pre-Approval Guidelines and Checklist at 1 (dispersant use preapproved in order to "give[] the dispersant operation the opportunity to begin in a timely manner that is consistent with attempting to maximize the effectiveness of dispersant use as a countermeasure to

situations that were not addressed by applicable regional dispersant pre-authorization plans, the FOSC had the authority to approve the use of COREXIT® 9500 and COREXIT® 9527 with the concurrence of state and federal agency representatives. 40 C.F.R. § 300.910(b); (United States' Stipulation No. 6, Exh. B hereto.)

> **B.** **The Record Facts Demonstrate That The FOSC Exercised Final Decision Making Authority During The Response, As Required By The CWA/NCP.**

Shortly after the April 20, 2010 explosion aboard the *Deepwater Horizon*, the USCG established a UAC to oversee the spill response. The UAC included representatives from BP, Transocean, the USCG, the USEPA, and other federal agencies, and met daily to manage the Response and to evaluate possible response measures. (Dep. Tr. of D. Suttles, excerpts attached as Exh. J hereto, at 225:8-18 (UAC included "key stakeholders"); *id.* at 619:14-620:2 (UAC met twice daily and considered ways to respond to the oil leaking from the Macondo well)). In performing those duties, the UAC consulted with the FOSC every day. (*Id.* at 619:6-22.) Indeed, Doug Suttles, BP's senior representative to the UAC, consulted the FOSC "[m]any, many times every day . . . to discuss issues, answer questions, [and] understand [the UAC's] requests." (*Id.*)

Although the UAC comprised individuals from various agencies and entities, the FOSC unquestionably had final authority over the approval or disapproval of response actions. According to the uncontroverted sworn testimony:

- **Mr. Suttles**: "We could not take action in the response without the approval of the FOSC." (*Id.* at 620:24-621:3.);

- **Mr. Morrison**: The FOSC "exercised ultimate authority over the response activities." (Dep. Tr. of R. Morrison, excerpts attached as Exh. K hereto, at 460:10-13.);

---

reduce the impact of oil spills"), Exh. H hereto; *id.* (preapproval "allows the FOSC to quickly arrive at a logical 'GO/NO GO' decision"); Use of Dispersants in Region IV at 33 ("Because effective use of dispersants has a limited and normally small window of opportunity, RRT IV strongly recommends that dispersant application begin as soon as possible following an oil spill when appropriate."), Exh. I hereto.)

- ***Mr. Rainey***:  "Q:  Were all of the actions, so far as you know, for responding to the oil that was released subject to the approval of the FOSC?  A:  Absolutely." (Dep. Tr. of D. Rainey, excerpts attached as Exh. L hereto, at 379:19-23.);

- ***Mr. Inglis***:  All decisions related to the Response "came through the unified command structure [and] were signed off by the federal on-scene commander" (Dep. Tr. of A. Inglis, excerpts attached as Exh. M hereto, at 417:13-19.).

The FOSC's authority over response actions included final approval as to whether or not dispersants could be used.  Indeed, the United States has stipulated that throughout the response the FOSC approved the application of COREXIT® 9500 and COREXIT® 9527, both to the surface of the Gulf of Mexico and subsea:

> At various times during the Oil Spill Response, the FOSC, with the appropriate concurrence of and/or consultation with other state and federal agency officials pursuant to 40 C.F.R. § 300.910 and the applicable regional dispersant pre-authorization plans, authorized the application of Corexit 9500 and Corexit 9527 [to the surface and below the surface] of the Gulf of Mexico.

(United States' Stipulation Nos. 11-12, Exh. B hereto.)

In approving the use of COREXIT® 9500 and COREXIT® 9527, the FOSC also acted pursuant to the CWA/NCP, which require the Federal Government to identify dispersants that may be used in responding to an oil spill, how those dispersants may be used, the waters in which those dispersants may be used, and the quantities of dispersants that may be used safely in those waters.  According to the United States:

> In authorizing the [surface and subsea use of COREXIT® 9500 and COREXIT® 9527,] the FOSC acted pursuant to the OPA, the CWA, including 33 U.S.C. §1321(d)(2), and the NCP, including 40 C.F.R. §§ 300.120, 300.135 and 300.910.

(United States' Stipulation Nos. 14-15, Exh. B hereto.)

Sworn testimony from participants in the UAC confirms that the FOSC had final authority to approve or deny requests from BP and/or the UAC to apply dispersant:

- **Mr. Rainey**:  "Q: Were you required to obtain permission from the FOSC before using any dispersant?  A: Yes."  (Dep. Tr. of D. Rainey, excerpts attached as Exh. L hereto, at 380:11-14.);

- **Mr. Suttles**: When it came to deciding whether to employ particular response measures, "the FOSC [had] 51 percent of the vote" and held final authority to approve or reject response measures proposed by the UAC.  (Dep. Tr. of D. Suttles, excerpts attached as Exh. J hereto, at 620:24-621:3.);

- **Mr. Suttles**:  The response "was under the direction of Unified Command where . . . the final authority sat with the FOSC."  (*Id.* at 343:12-17.);

- **Mr. Suttles**:  The response structure had "a Unified Area Command which is the ultimate authority, and the ultimate authority there is held by the FOSC."  (*Id.* at 628:14-20.);

- **Mr. Suttles**:  The FOSC "[sat] on top of the Unified Command" and BP had to get permission from the FOSC to use dispersants.  (*Id.* at 655:6-656:3.);

- **Mr. Suttles**:  "We could not take action in the response without the approval of the FOSC." (*Id.* at 621:1-3.);

- **Mr. Suttles**:  "We could only use dispersants with the approval of the - - of the FOSC and the Government . . . ." (*Id.* at 622:2-4.);

- **Mr. Morrison**:  Although members of the UAC "tried to collaborate clearly and . . . make joint decisions . . . . if there was ever a conflict or if there was ever a disagreement on to go . . . Option A or Option B, the Federal On-Scene Commander had the final word."  (Dep. Tr. of R. Morrison, excerpts attached as Exh. K hereto, at 460:4-9.).

Contemporaneous statements from high-ranking federal officials involved in the

Response confirm the FOSC's role as final decision maker regarding the use of dispersants:

- **NIC Commander Admiral Thad Allen**:  "[T]he FOSC assessed the daily conditions and determined . . . the tools to deploy . . . .  All FOSC dispersant use decisions were made with the concurrence of or in consultation with the  EPA, . . . DOI,  . . . DOC and the State of Louisiana as required by 40 C.F.R. § 300.910 and [RRT] VI guidelines."  (Letter fr. T.W. Allen, Admiral, USCG National Incident Commander, to Hon. Chairman Edward J. Markey (Aug. 20, 2010), Exh. F hereto.);

- **NIC Commander Admiral Thad Allen**:  "***It's a decision by the [FOSC] whether to approve the incident commander's recommendation to use dispersants*** . . . .  It's a very disciplined doctrinal process on how this works.  In the end it may be executed

16

> by BP through a contractor. **But these are all decisions made by the [FOSC] because that's where the responsibility rests.**"  (Joint Stipulations of Fact Between the Clean-Up Responder Defendants and the United States of America ("Joint Stipulations") (Jan. 31, 2012), Joint Stipulation No. 48, Exh. N hereto);

- **NIC Commander Admiral Thad Allen**:  "I'm satisfied that we only use [dispersants] when they're needed."  (*Id*. at Stipulation No. 49);

- **Admiral James Watson (FOSC)**: "I have been personally involved with daily dispersant application quantities and locations.  EPA observes and consults, but certainly is not the final approving authority.  That is my responsibility."  (Email from James Watson, FOSC, to Richard Brannon and Thad Allen (June 14, 2010), Exh. O hereto.).

Of course, deference to the FOSC's decisions was required under the NCP, which provides that the FOSC "**shall** direct all federal, state, or private actions to remove the discharge" when a spill constitutes a substantial threat to the public health or welfare of the United States.  40 C.F.R. § 300.322(b); *see also id.* § 300.305(d)(2) (FOSC "**must** direct all response efforts").

    **C.**    **The Record Facts Show That The FOSC Approved The Application Of COREXIT® 9500 And COREXIT® 9527 Immediately After The Explosion Of The *Deepwater Horizon* And Continued To Approve Their Use Throughout The Response.**

The Federal Government first authorized the use of dispersants immediately following the explosion aboard the *Deepwater Horizon*.  These are the record facts:

- **When the crisis occurred** the USEPA and the USCG gave BP "immediate authorization to move forward with the use of this approved dispersant on the affected water's surface . . . .  This authorization included specific conditions to ensure the protection of the health of residents in the affected areas and the environment."  (NIC Deepwater Horizon Response Situation Report at 36 (May 14, 2010), Exh. P hereto);

- **On April 21, 2010**, the FOSC and/or the FOSC's representatives completed the "Dispersant Pre-Approval Initial Call Checklist" and "FOSC Dispersant Use Checklist" and authorized the use of dispersants in response to the Incident.  (*See* Dispersant Pre-Approval Initial Call Checklist and FOSC Dispersant Use Checklist, Exh. Q hereto; Joint Stipulation No. 34, Exh. N hereto);

- *As of April 22, 2010*, the FOSC was directing responders "to conduct dispersant operations as required/approved."  (Dep. Tr. of R. Morrison, excerpts attached as Exh. K hereto, at 467:4-470:8.).

COREXIT® 9500 and COREXIT® 9527 were – and still are – on the NCP Product Schedule; thus, in approving the use of dispersants, the FOSC authorized the use of COREXIT®.

After the FOSC's initial authorization of dispersant use, daily approvals came in the form of the FOSC's approval of Incident Action Plans ("IAPs"), which were signed by the FOSC and/or the FOSC's representatives.

- *The United States* expressly stated "that the Incident Action Plans were reviewed, signed, and approved by the Federal On-Scene Coordinator or his representative." (United States' Second Response to BP's Second Set of Discovery Requests to the United States of America, Response to Request for Admission ("RFA") No. 157 (Aug. 29, 2011), excerpts attached as Exh. R hereto);

- *The United States* expressly stated that "the United States authorized and/or directed all spill response activities set forth in the [IAPs] as of the time each [IAP] was issued."  (Joint Stipulation No. 19, Exh. N hereto);

- *Doug Suttles* testified that, initially, approval to use dispersants came via the daily approval of the IAP.  (Dep. Tr. of D. Suttles, excerpts attached as Exh. J hereto, at 658:2-13);

- "[N]o plan could be approved without the approval of the FOSC."  (Dep. Tr. of *D. Suttles*, excerpts attached as Exh. J hereto, at 665:12-13.).[13]

---

[13]     The IAPs specified the overall and strategic objectives for their respective 24-hour response periods.  These objectives included the application of dispersants.  (*See, e.g.*, IAP for Period 11 at 18 (May 1-2, 2010), excerpts attached as Exh. S10 hereto; IAP for Period 13 at 13 (May 3-4, 2010) (strategic objectives include having the Dispersant Group "[c]ontinue to deploy dispersants as necessary/approved"), excerpts attached as Exh. S12 hereto.)  The IAPs, approved by the FOSC and/or the FOSC's representatives, also set forth the operational command's priorities, which included continued dispersant application.  (*See, e.g.*, IAP for Period 10 at 21 (April 30, 2010 to May 01, 2010), excerpts attached as Exh. S9 hereto.)  The IAPs, approved by the FOSC and/or the FOSC's representatives, included assignments for groups working with dispersants.  (*See, e.g.*, IAP for Period 11 at 31, 34-35 (May 1-2, 2010) (Subsea Dispersant Group "[a]waiting approval to continue dispersant injection"; Aerial Dispersant Group to "[a]pply dispersants as approved and appropriate"), excerpts attached as Exh. S10 hereto; IAP for Period 13 at 15 (May 3-4, 2010) (describing subsea dispersant application), excerpts attached as Exh. S12 hereto; IAP for Period 14 at 72 (May 4-5, 2010) (setting forth Aerial Dispersant Group resources, including available aircraft, dispersant, and dispersant application systems and directing group to "[a]pply dispersants as approved and appropriate"), excerpts attached as Exh. S13 hereto; IAP

Each day, the FOSC and other members of the UAC would review reports from the field, review the location of the oil, analyze risks, and determine how to deploy available resources, such as dispersants, in response.  Each day the FOSC considered the risks posed by the spreading oil and the tools available to minimize the damage resulting from the oil and to prevent the oil from reaching shore:

- *Mr. Morrison*:  "[T]he Area Command, Admiral Landry, and Doug would . . . engage with those Incident Commanders, and . . . see the surveillance of what we had, where the risks were and where the oil was moving, and they would, if we needed to, redirect resources to help mitigate the risk.  And we would do that in skimming, we would do that in aerial dispersants, and what have you."  (Dep. Tr. of R. Morrison, excerpts attached as Exh. K hereto, at 475:10-19.);

- *The FOSC* made daily determinations between April 22 and May 26, 2010 regarding whether to approve continued dispersant application.  (Interim Report: Aerial Dispersant Group – Houma Operations Plan (Aug. 12, 2010) at 8, Exh. T hereto.);

- "*[T]he Federal On-Scene Coordinator* approved application of dispersants as part of the Response Activities in various amounts and at various times between April 22, 2010 to on or about May 26, 2010."  (United States' Second Response to BP's Second Set of Discovery Requests to the United States of America, Response to RFA No. 201, excerpts attached as Exh. R hereto.)

On May 26, 2010, the USEPA issued Dispersant Monitoring and Assessment Directive – Addendum 3 ("Addendum 3"), which required each surface application of dispersants to be approved by the FOSC.  In addition, under Addendum 3 the application of dispersants subsea in excess of 15,000 gallons in a single day had to be approved by the FOSC.  (USEPA, Dispersant Monitoring and Assessment Directive – Addendum 3 (May 26, 2010), Exh. U hereto.)  In compliance with Addendum 3, the FOSC approved each specific application of COREXIT® from May 27, 2010 through the last application on July 19, 2010.  Indeed, the United States has

---

for Period 34 at 52 (May 24-25, 2010) ("Approval to apply Nalco EC9500A continues."), excerpts attached as Exh. S33 hereto.)

stated repeatedly that the FOSC – not BP, Nalco, or any other Defendant – approved each application of COREXIT® that occurred after Addendum 3 was issued:

- ***The United States*** has identified numerous specific dates between May 28, 2010 and July 19, 2010 on which the FOSC approved application of specific amounts of dispersants to the surface and below the surface of the Gulf of Mexico. (*See* United States' Second Response to BP's Second Set of Discovery Requests to the United States of America, Responses to RFA Nos. 204-292, 296-298, excerpts attached as Exh. R hereto; *see also* Joint Stipulation No. 40, Exh. N hereto);

- ***The United States*** has also stipulated that throughout the Response, the FOSC approved the application of COREXIT® 9500 and COREXIT® 9527 to the surface of the Gulf of Mexico and approved the application of COREXIT® 9500 subsea. (*See* United States' Stipulation Nos. 11-12, Exh. B hereto.);

- ***The United States*** has also stipulated that "[f]ollowing the issuance of . . . Addendum 3, BP and/or various Clean-Up Responder Defendants periodically submitted written requests to the FOSC and/or the FOSC's representative(s) and received written authorization for each aerial application of dispersants to oil slicks on the surface of the Gulf of Mexico." (Joint Stipulation No. 38, Exh. N hereto.)

The United States' formal admissions of fact are supported by the FOSC's approval of numerous letters from BP and the UAC requesting permission to apply dispersant on various dates between May 27 and July 19, 2010 (the "FOSC Approval Letters"). FOSC approval is documented on the signature page of each letter. (Exh. V hereto.)

Moreover, Nalco played no role in the final decisions over whether, when, where, how, or in what volumes dispersants were applied:

- ***Mr. Ramesh***: "Nalco does not have any role in the way the product is applied." (Dep. Tr. of M. Ramesh, excerpts attached as Exh. W hereto, at 66:4-6.);

- ***Mr. Ramesh***: "Q: And Nalco was not involved in determining when or where dispersants should be used, correct? A: That is correct, Nalco has never made any attempt to recommend or propose what dosage, what time, what application." (*Id.* at 80:19-24.);

- ***Mr. Ramesh***: "Q: Isn't it true that no Nalco representative had any decision-making authority with regard to the application of dispersants? A: That's correct." (*Id.* at 82:10-14.).

**D.      In Accordance With The CWA/NCP, The FOSC Determined Whether Dispersants Could Be Applied, When Dispersants Could Be Applied, Where Dispersants Could Be Applied, And The Volumes In Which They Could Be Applied.**

The record facts demonstrate that the FOSC – pursuant to the CWA/NCP – did in fact determine whether dispersants could be applied, where dispersants could be applied, the volumes in which they could be applied safely, when dispersants could be applied, and how dispersants could be applied.  Each action is undisputed.

_**Where:**_  The FOSC Approval Letters include approval to apply dispersant in particular geographic areas in the Gulf of Mexico.  (*See, e.g.*, Letter fr. Houma Unified Command to Rear Admiral James Watson, FOSC (June 10, 2010) (granting permission to apply COREXIT® 9500 to oil slicks identified on attached maps), Exh. X hereto; *see also* FOSC Approval Letters, Exh. V hereto at *passim*.)  Throughout the Response, "there were very clear guidelines which said where they could and could not use [dispersants]."  (Dep. Tr. of D. Suttles, excerpts attached as Exh. J hereto, at 622:16-623:4; *see also id.* (dispersants were applied subsea only with "explicit approval from the Government").)  Indeed, the United States has expressly stated that the FOSC – not BP, Nalco, or any other Defendant – determined where COREXIT® could be applied. (United States' Stipulation Nos. 11-13 (in authorizing the application of COREXIT®, the FOSC limited where COREXIT® could be applied), Exh. B hereto.)  FOSC approval thus included approval regarding where COREXIT® could be applied, in conformity with the NCP.  *See* 33 U.S.C. § 1321(d)(1)(G)(ii) (the NCP "***shall*** include . . . ***the waters in which such dispersants . . . may be used***").

_**Volume/How Much to Apply:**_  The FOSC approval letters include approvals to apply dispersants up to a particular maximum volume.  (*See, e.g.*, Letter fr. Houma Unified Command to Rear Admiral James Watson, FOSC (June 10, 2010) (granting permission to apply up to

15,300 gallons of COREXIT® 9500), Exh. X hereto; *see also* FOSC Approval Letters, Exh. V hereto at *passim*.)  FOSC approval thus included approval regarding how much COREXIT® could be applied, in conformity with the NCP.  *See* 33 U.S.C. § 1321(d)(1)(G)(iii) (the NCP "***shall*** include . . . ***the quantities of such dispersant . . . which can be used safely in such waters***").  The United States has expressly stated that the FOSC – not BP, Nalco, or any other Defendant – determined the quantity in which COREXIT® could be used safely.  (United States' Stipulation Nos. 11-13 (in authorizing the application of COREXIT®, the FOSC limited the quantity of COREXIT® that could be applied), Exh. B hereto; United States' Second Response to BP's Second Set of Discovery Requests to the United States of America, Response to RFA No. 188 ("The Federal On-Scene Coordinator approved the use of dispersants up to a maximum limit per authorization."), excerpts attached as Exh. R hereto; *see also* Dep. Tr. of D. Suttles, excerpts attached as Exh. J hereto), at 623:20-624:1 ("[T]he volumes that could be applied had to be approved[.]")

**<u>When</u>:**  The FOSC Approval Letters also specified particular dates on which dispersants could be applied.  (*See, e.g.*, Letter fr. Houma Unified Command to Rear Admiral James Watson, FOSC (June 10, 2010) (granting permission to apply up to 15,300 gallons of COREXIT® 9500 on June 11, 2010 "for a period not to exceed 12 hours"), Exh. X hereto; *see also* FOSC Approval Letters, Exh. V hereto at *passim*.)  Further, the United States has expressly stated that the FOSC – not BP, Nalco, or any other Defendant – determined when dispersants could be used.  (United States' Stipulation Nos. 11-13 (the FOSC authorized the application of COREXIT® to the waters of the Gulf of Mexico; these authorizations included limits on when COREXIT® could be applied), Exh. B hereto; *see also* Dep. Tr. of D. Suttles, excerpts attached as Exh. J hereto, at

624:18-625:4 (affirming that approvals and directives from the Federal Government and the FOSC included limitations on how long dispersants could be used).)

<u>*How*</u>:   The FOSC – not BP, Nalco, or any other Defendant – determined how dispersants could be applied.  (*See, e.g.*, Letter fr. Houma Unified Command to Rear Admiral James Watson, FOSC (June 11, 2010) (granting permission for aerial application of dispersants to oil slicks on the surface of the Gulf of Mexico), Exh. Y hereto; *see also* FOSC Approval Letters, Exh. V hereto at *passim*.)  Indeed, Doug Suttles testified that the "approvals and directions from the United States Government and the FOSC also include[d] . . . the manner in which the dispersants could be applied."  (Dep. Tr. of D. Suttles, excerpts attached as Exh. J hereto, at 623:13-19.)  The record evidence clearly shows that the decisions giving rise to Plaintiffs' claims were made by the FOSC, acting pursuant to his/her authority under the CWA/NCP.

### E.   Plaintiffs Have No Facts To Suggest That The Use Of COREXIT® 9500 Or COREXIT® 9527 Was Other Than As Directed Pursuant To The Comprehensive Response Scheme Set Forth In The CWA/NCP.

As set forth above, the record contains ample evidence that the FOSC, acting pursuant to his/her authority under the CWA/NCP, directed and approved the use of COREXIT® 9500 and COREXIT® 9527 during the Response.  BP executives who participated in the UAC testified that the FOSC had final veto authority over proposed response measures, including the use of dispersants.  Plaintiffs' counsel was present at these depositions; Plaintiffs examined each of those witnesses at length; yet Plaintiffs did not challenge that testimony nor did they elicit any testimony showing that the ultimate decision regarding which dispersant to use, where to apply it, how to apply it, when to apply it, and how much to apply were made by anyone other than the FOSC.  Moreover, Plaintiffs' counsel has not elicited such testimony during any of the dozens of depositions that have occurred to date.

In addition to the sworn deposition testimony of UAC participants, the FOSC's approval of dispersant use is further supported by record admissions of the United States.  The United States has repeatedly stated – in formal, voluntary admissions and stipulations – that the FOSC approved the use of Nalco's products during the response, and that the FOSC's approval included approval regarding when, where, and in what volumes dispersant was to be applied. Although Plaintiffs served objections to the United States' stipulations, these objections are not evidence and they do not controvert the United States' express admissions of fact that the FOSC authorized the use of COREXIT® and determined where it could be applied, how it could be applied, when it could be applied, and in what volumes it could be applied.  Plaintiffs have admitted to the Court and Defense counsel that they have no facts bearing on Nalco's preemption argument.  (*See* Email from Jim Klick to Magistrate Judge Shushan (Oct. 21, 2011), Exh. Z hereto.)

The record facts are undisputed and uncontroverted.  There can no longer be any question that the Federal Government followed the CWA/NCP pervasive federal scheme in responding to the Spill.  Thus, under applicable law (which does not even require such evidence), Plaintiffs' claims are preempted.

## IV.   PLAINTIFFS' CLAIMS WILL CHILL FUTURE RESPONSE EFFORTS.

In addition to conflicting with the comprehensive response scheme set forth in the CWA/NCP, the claims in the B3 Master Complaint also threaten the effectiveness of responses to future oil spills.  This is yet another reason why courts enforce the doctrine of conflict preemption.  Indeed, allowing Plaintiffs to maintain their action against Nalco would create uncertainty as to the potential liability of individuals and entities that assist NCP response activities at the direction of the President and his delegates.  *Cf. Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 951 (9th Cir. 2002) (holding provision of municipal ordinance was

24

preempted to the extent it allowed city to impose more stringent requirements than the NCP because allowing the provision to stand would foster uncertainty about potential liability and frustrate the underlying statutory goal of encouraging cleanup of contaminated sites).

The CWA and NCP provide that the President and the FOSC "shall direct . . . private actions to remove the discharge."  33 U.S.C. § 1321(c)(2); 40 C.F.R. § 300.322(b).  Federal law commands that each person participating in response efforts "shall act . . . as directed by the President."  33 U.S.C. § 1321(c)(3).  Permitting Plaintiffs' claims to proceed puts private parties assisting in future response actions in the position of making an impossible decision: whether to help respond to national emergencies by complying with federal law and acting "as directed by" the President and his delegates, even if doing so could subject them to liability; or whether to ignore the President's and the Nation's call for help by declining to provide goods or services that the USEPA and the FOSC deem safe and necessary.  Federal law encourages people and companies like Nalco to respond to human and environmental accidents and emergencies – to respond "in a time of great national need."  (July 12, 2010 FOSC Letter (Exh. A hereto).)

In this case, the comprehensive oil response scheme worked.  In the aftermath of the spill, the Government concluded that "dispersants were an effective response tool, and prevented millions of gallons of oil from impacting the sensitive shorelines of the GOM states."  (Joint Stipulation No. 50, Exh. N hereto.)  This Court cannot allow the fear of future state and maritime claims to trump and contradict federal law.  The B3 Master Complaint conflicts with federal law and should be dismissed.

## V.     CONCLUSION

For the foregoing reasons, Nalco respectfully requests that the Court dismiss the B3 Master Complaint in its entirety.

Dated:  January 31, 2012                    Respectfully submitted,

                                            By: /s/ Thomas J. Heiden
                                            Thomas J. Heiden (IL # 6281563)
                                            (thomas.heiden@lw.com)
                                            Mary Rose Alexander (IL # 6205313)
                                            (mary.rose.alexander@lw.com)
                                            LATHAM & WATKINS LLP
                                            233 South Wacker Dr., Suite 5800
                                            Chicago, IL 60606-6401
                                            Phone: (312) 876-7700
                                            Facsimile: (312) 993-9767

                                            *Attorneys for Nalco Company, Nalco Holdings
                                            LLC, Nalco Finance Holdings LLC and Nalco
                                            Holding Company*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the above and foregoing NALCO COMPANY, NALCO HOLDINGS LLC, NALCO FINANCE HOLDINGS LLC AND NALCO HOLDING COMPANY'S MEMORANDUM IN SUPPORT OF THEIR RENEWED MOTION TO DISMISS FIRST AMENDED MASTER COMPLAINT "B3 BUNDLE" has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 31st day of January, 2012.

/s/ Thomas J. Heiden
Thomas J. Heiden (IL # 6281563)
(thomas.heiden@lw.com)
Mary Rose Alexander (IL # 6205313)
(mary.rose.alexander@lw.com)
LATHAM & WATKINS LLP
233 South Wacker Dr.
Suite 5800
Chicago, IL 60606-6401
Phone: (312) 876-7700
Facsimile: (312) 993-9767

*Attorneys for Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company*