# Exhibit J

                                                                 1

```
         UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL BY      MDL NO. 2179
THE OIL RIG
"DEEPWATER HORIZON"       SECTION:  J
IN THE GULF OF
MEXICO, ON APRIL 20,      JUDGE BARBIER
2010                      MAG. JUDGE SHUSHAN
```

### VOLUME 1 OF 2

Deposition of **DOUG SUTTLES** taken in the Orleans Room, Pan American Life Center, 601 Poydras Street, New Orleans, Louisiana, on Thursday, May 19, 2011.

**APPEARANCES:**

ON BEHALF OF THE PLAINTIFFS STEERING COMMITTEE:

```
    WATTS GUERRA CRAFT, LLP
    (BY:  MIKAL WATTS, ESQUIRE
          DAVID V. McLENDON, ESQUIRE)
          W.D. DENIS, ESQUIRE)
    Four Dominion Drive, Bldg. 3, Suite 100
    San Antonio, Texas 78257
```

1  Q. Well, who -- who made the final
2  decisions on -- if you had a dispute over
3  something that was going to be done or
4  implemented, did you make that final decision
5  or did somebody else?
6  MS. KARIS:
7      Object to form.
8  A. Well, the structure for Unified
9  Command is set out -- I believe it's set out
10 in the National Contingency Plan and through
11 ICS is that the FOSC has the ultimate
12 authority. So it's a -- Unified Command
13 structure has the key stakeholders. Those
14 are set out in the plan. And it -- it tries
15 to achieve consensus, but the ultimate
16 decision rights are with the FOSC, which was
17 a Coast Guard admiral. It changed which one
18 throughout the spill.
19 EXAMINATION BY MR. BARR:
20 Q. And -- and just for the record,
21 could you state what FO -- FOSC is?
22 A. Federal on scene coordinator.
23 And I believe on an offshore spill, that's
24 the Coast Guard and an -- and on a offshore
25 spill, it's Coast Guard, and in shore I

```
 1  everything -- but includes those topics, yes.
 2       Q.     Okay.  Now, do you know whether
 3  or not it's important to determine a flow
 4  rate according to BP's own regional response
 5  plan?
 6       A.     I'm -- I'm sorry.  I don't
 7  understand your question.
 8       Q.     Does your region -- does BP's
 9  regional response plan that you were in
10  charge of implementing, does it require BP to
11  establish a flow rate?
12       A.     Well, I think first the response
13  was under Unified Command.  It -- it -- it
14  wasn't under me.  It was under the direction
15  of Unified Command where it was -- the --
16  the -- the final authority sat with the FOSC.
17  So we should make sure we understand that.
18              And the plan itself does outline
19  the -- the capabilities that we had available
20  at the time.  The plan was submitted at a
21  time, as I understand it, that we were
22  drilling the well.
23       Q.     That doesn't really answer my
24  question.
25              Do you know whether or not the
```

```
 1           UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
 2
      IN RE:  OIL SPILL BY    MDL NO. 2179
 3    THE OIL RIG
      "DEEPWATER HORIZON"     SECTION:  J
 4    IN THE GULF OF
      MEXICO, ON APRIL 20,    JUDGE BARBIER
 5    2010                    MAG. JUDGE SHUSHAN

 6
```

14                        **VOLUME 2 OF 2**

15      Deposition of **DOUG SUTTLES** taken in the

16   Mardi Gras Room, Pan American Life Center,

17   601 Poydras Street, New Orleans, Louisiana,

18   on Friday, May 20, 2011.

19

20   **APPEARANCES:**

21   ON BEHALF OF THE PLAINTIFFS STEERING
     COMMITTEE:
22        LEVIN, PAPANTONIO, THOMAS, MITCHELL,
          ECHSNER, RAFFERTY & PROCTOR, PA
23        (BY:  BRIAN H. BARR, ESQUIRE)
          316 S. Baylen Street, Suite 600
24        Pensacola, Florida 32502

25

```
 1        A.      Yes, it did.
 2        Q.      Sir, did you -- did you
 3   participate yourself personally with the
 4   Unified Command?
 5        A.      Yes, I did.
 6        Q.      Did you meet, yourself, with the
 7   FOSC?
 8        A.      Yes, I did.
 9        Q.      How often?
10        A.      Many, many, many times every
11   day.
12        Q.      Many, many times every day with
13   both the Unified Command and the FOSC?
14        A.      Yes, sir.  We had -- it -- it --
15   it changed during the response, but usually
16   twice daily UAC, Unified Area Command,
17   meetings, staff meetings, and then there'd be
18   numerous topics throughout the day outside of
19   that where I would meet with the FO -- FOSC
20   to discuss issues, answer questions,
21   understand their requests, these kind of
22   things.
23        Q.      Sir, were there requests and
24   suggestions about the efforts to deal with
25   the oil that was being released brought to
```

```
 1   the Unified Command and brought to the FOSC?
 2        A.      Yes, there were.
 3        Q.      Was that often?
 4        A.      Yes.  The way the ICS process
 5   works, effectively you have a -- a daily plan
 6   which describes the actions that would be
 7   taken in the response which has to be
 8   approved by the UAC, and that comes up for
 9   approval every single day during the
10   response.  And that occurs both at Unified
11   Area Command and in the incident command
12   posts.
13        Q.      Did you -- and by you here I
14   think I mean you and -- and BP -- undertake
15   to do anything with the surface burns or the
16   use of booms or the skimming of oil from the
17   surface or the use of dispersants without the
18   approval and direction of the United States
19   Government?
20        A.      Well, the way the Unified Area
21   Command works is, is that's where the
22   authority for action occurs, and it's a
23   process that's intended to create consensus.
24   But as -- the phrase being used consistently
25   throughout the response was the FOSC has
```

```
 1   51 percent of the vote.  We could not take
 2   action in the response without the approval
 3   of the FOSC.
 4        Q.      Sir, and -- and you say -- you
 5   testified that you could not take action
 6   without the approval of the FOSC.
 7                Sir, is it also true that you
 8   did not take those actions without the
 9   approval of the FOSC?
10        A.      Not response actions.  But we
11   did take actions such as providing grants to
12   the states to support -- provide them funds
13   to cover their costs to -- to make sure that
14   wasn't inhibiting their ability to support
15   the response.  And we also gave, for
16   instance, financial grants to support tourism
17   to try to mitigate and offset economic
18   impacts.  But response -- direct response
19   activities, I'm not aware of any actions we
20   took without the approval of the FOSC.
21        Q.      And if I could -- if I could
22   narrow your focus even more to dispersants,
23   did the approvals and direction by the United
24   States Government and the FOSC include
25   whether dispersants would be used at all on
```

```
 1  this spill?
 2       A.     We could only use dispersants
 3  with the approval of the -- of the FOSC and
 4  the Government, yes.
 5       Q.     And did those same approvals and
 6  directions from the Government and the FOSC
 7  also include which dispersants you could use?
 8       A.     My understanding of the -- the
 9  dispersants we used were we had an oil spill
10  response plan which referenced approved
11  dispersants.  I believe it's from the
12  National Contingency Plan.  And that was
13  the -- so we were using Government-approved
14  dispersants, and we only used those with the
15  Government's approval.
16       Q.     Sir, did the approvals and
17  directions by the United States Government
18  and the FOSC also include in which areas of
19  the Gulf of Mexico dispersants could be used?
20       A.     Yes, yes, sir, they did.
21       Q.     Did the approvals and directions
22  by the United States Government and the FOSC
23  include whether dispersants could be used on
24  the surface of the water?
25       A.     Yes, sir, there were very clear
```

```
 1  guidelines which said where they could and
 2  could not use and later in the response the
 3  exact locations were -- were -- were having
 4  to be formally approved.
 5       Q.   And did those same approvals
 6  from the Government and the FOSC include
 7  whether dispersants could be used -- applied
 8  subsurface, that is, below the surface of the
 9  Gulf of Mexico?
10       A.   Yes, we -- we only used subsea
11  dispersants with explicit approval from the
12  Government.
13       Q.   Mr. Suttles, did those same
14  series of approvals and directions from the
15  United States Government and the FOSC also
16  include the manner, for instance, by ship or
17  by plane, the manner in which the dispersants
18  could be applied?
19       A.   That's correct.
20       Q.   Did those same approvals or
21  directions by the United States Government
22  and the FOSC also include how much dispersant
23  could be used?
24       A.   Yes, they did, the -- the
25  volumes that could be applied had to be
```

```
 1   approved.
 2        Q.    And were those volumes, as you
 3   recall it, Mr. Suttles, approved daily by the
 4   FOSC and the Government?
 5        A.    At the outset I don't believe
 6   the volumes were reported every day.  I don't
 7   know that there was a -- so at the beginning
 8   it was aerial dispersant used.  The
 9   authorization for aerial dispersant was being
10   used, and the -- the -- the organization, the
11   part of the Unified Command which included BP
12   staff, Government staff, experts from spill
13   response communities, would put forward their
14   plan, and that would be applied.
15              Later on in the spill, the --
16   the daily volumes had to have explicit
17   written approval is my memory.
18        Q.    And, similarly, Mr. Suttles, did
19   those same approvals and directives from the
20   United States Government and the FOSC include
21   how long dispersants could be used?
22        A.    Help me understand what you mean
23   by "how long."
24        Q.    Well, for -- how -- for what
25   period of time in -- in the response to the
```

Case 2:10-md-02179-CJB-DPC   Document 5531-12   Filed 01/31/12   Page 12 of 18

625

```
 1  spill that dispersants could be used?
 2       A.    Yes, they did.  They were --
 3  they were explicit on that area, at least to
 4  my knowledge.
 5       Q.    And sitting here today, so far
 6  as you can recall, were any of those things
 7  that you and I just went through done without
 8  the approval and direction of the United
 9  States Government and the FOSC?
10       DEFENSE COUNSEL:
11            Object to form.
12       A.    In relation to dispersant use,
13  not to my knowledge.  This was an area that I
14  would characterize the Government's
15  involvement to be extreme.
16  EXAMINATION BY MR. HEIDEN:
17       Q.    Thank you, sir.
18       MR. HEIDEN:
19            Pass the witness.
20       THE VIDEOGRAPHER:
21            We're going off the record.
22  It's 10:02.  This is Videotape No. 2.
23            (Short recess.)
24       THE VIDEOGRAPHER:
25            Back on the record.  It's 10:02;
```

GAUDET, KAISER, L.L.C.
Board-Certified Court Reporters

Case 2:10-md-02179-CJB-DPC  Document 5531-12  Filed 01/31/12  Page 13 of 18

626

```
 1   Videotape No. 2.
 2   EXAMINATION BY MR. TSEKERIDES:
 3        Q.    Good morning, Mr. Suttles.  My
 4   name is Ted Tsekerides, and I represent two
 5   of the cleanup responders, O'Brien's Response
 6   Management and National Response Corporation.
 7              You've talked both today and
 8   yesterday about the FOSC.  That's the Federal
 9   On-Scene Coordinator, correct?
10        A.    Yes, that's correct.
11        Q.    Is that a person?
12        A.    It was a named individual, yes.
13        Q.    Okay.  Who was the first FOSC
14   that you recall?
15        A.    Admiral Mary Landry.
16        Q.    Okay.  And is she a Coast Guard
17   official?
18        A.    She's the -- a rear admiral in
19   the Coast Guard and I believe in charge of
20   the 8th district, which here -- is based here
21   in New Orleans.
22        Q.    Okay.  And how long -- for how
23   long was she the FOSC?
24        A.    I believe she was the FOSC from
25   the start of the -- from the -- from the
```

GAUDET, KAISER, L.L.C.
Board-Certified Court Reporters

1  have. It even has processes for things like
2  plannings and approvals and tracking of
3  activities and costs. It -- it lays much of
4  this out in -- in quite a bit of detail. And
5  these are things which are drilled upon and
6  practiced with the Coast Guard and oil and
7  gas companies including BP.
8            So when the accident occurred,
9  we all knew that that would be the structure
10 that would be used for the response. We were
11 familiar with that, we had individuals
12 trained in that. The Coast Guard, other
13 members of government agencies do, too.
14           And the structure has a Unified
15 Area Command which is the ultimate authority,
16 and the ultimate authority there is held by
17 the FOSC, and then you have incident command
18 posts which essentially mimic that structure.
19 So -- but -- but they're the more operational
20 units.
21           So the FO -- the Unified Area
22 Command is trying to set strategy and
23 direction. They're monitoring results,
24 intervening where necessary, playing a large
25 role in -- in external communications. And

```
 1   report to Unified Area Command.
 2        Q.    So all -- all roads lead up to
 3   Unified Command?
 4        A.    That -- that's my understanding,
 5   yes.
 6        Q.    Okay.  And then the FO -- FOSC
 7   sits on top of the Unified Command?
 8        A.    That's correct.
 9        Q.    Okay.  I think you were shown a
10   document yesterday and, I apologize, I
11   don't -- I don't have it, but let's see if I
12   can recall.  You sent the letter, I think, in
13   July of 2010 to one of the admirals, and this
14   was in connection with the dispersant use.
15              Was it the case that -- that BP
16   had to get permission -- and you touched upon
17   this a little bit today -- but that you had
18   to get permission from the Government to use
19   the dispersants?
20        A.    Yes, we did.  The -- the --
21   the -- the -- the requirements around
22   dispersant use changed over time and actually
23   became a daily requirement where we had to --
24   to -- and for some applications and for
25   others we could get it for a week or -- we
```

```
1   had to make a formal written request of the
2   FOSC to apply dispersants and the volumes and
3   the limits and the conditions and so forth.
4        Q.    How did the -- or strike that.
5              What role did the EPA play in --
6   in terms of what permission you needed?  Were
7   they involved in that process at all, as far
8   as you know?
9        A.    Extremely involved.
10       Q.    And how would you describe their
11  involvement?
12       A.    They were -- in many cases they
13  appeared to be the government entity setting
14  forth the requirements, in some cases
15  explicitly making requests of us outside of
16  the FOSC for data, for requirements, and
17  other things.  So they were very involved.
18             I -- my understanding was the
19  FOSC was -- particularly later on in the
20  spill was only granting authority with
21  consultation and support from the EPA on
22  dispersant use.
23       Q.    Now, as far as you knew, was the
24  structure that BP would have to ask the FOSC
25  and -- and you would be blind to whether they
```

```
 1  time we acted.
 2       Q.    Okay.  And how was that
 3  permission communicated to you?  Was there
 4  something in writing or would they call you
 5  on the phone, tell you in person?  How did
 6  that work?
 7       A.    Well, it -- it varied.  At the
 8  beginning, since it was a -- a formal or
 9  preapproved portion of the spill response
10  plan, I believe that -- that the approval
11  came to the daily approval of the -- I think
12  what's called the IAP, which is the -- the --
13  the daily plan.
14             Later on the Government
15  required -- usually required me in my role as
16  the BP area commander to formally write to
17  the FOSC for permission, and then they would
18  sign off on the letter or send me a response
19  granting permission for applications of
20  dispersants.
21       Q.    And then once you got that
22  permission, what did you do?
23       A.    Well, that information would be
24  conveyed back to the incident command posts,
25  and those teams would then implement their --
```

Case 2:10-md-02179-CJB-DPC   Document 5531-12   Filed 01/31/12   Page 18 of 18

665

```
1    Command reviewed a plan, didn't like it,
2    and -- and sent it back?
3         A.      There were elements of the plan
4    at times which were not approved, and -- and
5    changes were -- were -- were told to be made
6    to the plans.
7         Q.      Okay. And the decisions
8    ultimately at the Unified Area Command would
9    have been by the FOSC to determine at the end
10   of the day?
11        A.      The end -- the end of the day
12   we -- no plan could be approved without the
13   approval of the FOSC.
14        Q.      Okay. Focusing a little bit on
15   in situ burn -- and I'll apologize in advance
16   if you don't have personal knowledge, but
17   that's fine, just tell me.
18               Were you ever out when an
19   in situ burn activity was taking place? And
20   what I mean by that, were you ever out on a
21   vessel watching in situ burn taking place?
22        A.      I -- I observed at a distance
23   in situ burns while in aircraft over the
24   spill site and while on the drilling rigs
25   supporting the relief wells.
```

GAUDET, KAISER, L.L.C.
Board-Certified Court Reporters