**SUBMITTED TO THE COURT VIA E-MAIL AT 11:00 P.M. JANUARY 31, 2012 – NOT FILED**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER MAGISTRATE JUDGE |
| ……………………………………………... | : | SHUSHAN |

## DEFENDANTS' AGREED STIPULATIONS

The Defendants have agreed to the following proposed stipulations for purposes of the Phase I trial. Except where indicated otherwise, the numbering on this list corresponds to the list circulated to all counsel at approximately 6:30 P.M. on January 30, 2012 to which the PSC and the United States have filed objections:

1. The Bureau of Ocean Energy Management, and its predecessor, the Mineral Management Service, have approved long string production casing designs for certain deepwater wells in the Gulf of Mexico.

2. Between April 20, 2005 and April 20, 2010, the Mineral Management Service approved long string production casing designs for certain deepwater wells in the Gulf of Mexico.

3. The United States Government did not, on April 20, 2010, have written guidelines explicitly addressing the interpretation of negative pressure tests.

4. There were, on April 20, 2010, no Federal Statutes explicitly governing how to perform negative pressure tests during temporary abandonment procedures.

5. There were no safety advisories issued by the MMS in effect on April 20, 2010 expressly requiring backup control systems on blowout preventers above and beyond what is required by 30 C.F.R. § 250.440 - 250.451.

6. The Flag State did not identify any failures in Transocean's Safety Management System's risk assessment concerning the maintenance of, or material condition of, the Deepwater Horizon prior to April 20, 2010.

7. There is no evidence of any communications from the American Bureau of Shipping to Det Norske Veritas regarding possible Safety Management System deficiencies found aboard the Deepwater Horizon.

8. The United States Government approved BP's Application for Permit to Drill a New Well (Form MMS 123A/123S), dated May 13, 2009.

9. The United States Government approved BP's Application for Revised New Well (Form MMS 123A/123S), dated September 28, 2009.

10. The United States Government approved BP's Rig Movement Notification Report (Form MMS-144 - Electronic), accepted September 29, 2009.

11. The United States Government approved BP's Form MMS-124, dated October 21, 2009.

12. The United States Government approved BP's Application for Revised New Well (Form MMS 123A/123S), dated October 29, 2009.

13. The United States Government approved BP's Incident Report, dated November 30, 2009.

14. The United States Government approved BP's Form MMS-124, dated December 28, 2009.

15. The United States Government approved BP's Application for Revised New Well (Form MMS l23A/123S), dated January 12, 2010.

16. The United States Government approved BP's Rig Movement Notification Report (Form MMS-144 - Electronic), accepted January 28, 2010.

17. The United States Government approved BP's Application for Revised New Well (Form MMS l23A/123S), dated January 25, 2010.

18. The United States Government approved BP's Application for Bypass (Form MMS 123A/123S), dated March 15, 2010.

19. The United States Government approved BP's Application for Revised Bypass (Form MMS l23A/l23S), dated March 25, 2010.

20. The United States Government approved BP's Application for Revised Bypass (Form MMS 123A/l23S), dated March 26, 2010.

21. The United States Government approved BP's Application for Revised Bypass (Form MMS 123A/123S), dated April 14, 2010.

22. The United States Government approved BP's Application for Permit to Modify (Form MMS-124), dated April 16, 2010.

23. The United States Government approved BP's Application End of Operations Report (Form MMS 125), accepted April 21, 2010.

24. On June 30, 2003, the Deepwater Horizon performed an emergency riser disconnect using the BOP's Emergency Disconnect System ("EDS") operation during a hurricane.

25. On June 30, 2003, the Lower Marine Riser Package ("LMRP") of the Deepwater Horizon BOP disconnected from the BOP stack during an EDS operation.

26. Anadarko joined and ratified the Macondo Prospect Offshore Deepwater Operating Agreement ("Operating Agreement"), pertaining to Mississippi Canyon block 252, on or about December 17, 2009.

27. Article 4.1 of the Operating Agreement provides, in part, "BP Exploration & Production Inc. is designated as the Operator of the Contract Area." The "Contract Area" is defined in Article 2.10 and Appendix A of the Operating Agreement as Lease OCS-G-32306, covering Mississippi Canyon, Block 252.

28. Article 5.1 of the Operating Agreement, titled "Exclusive Right to Operate," provides, in part, "Except as otherwise provided, the Operator has the exclusive right and duty to conduct (or cause to be conducted) all activities or operations under this Agreement. . . . [T]he Operator is an independent contractor, not subject to the control or direction of Non-Operating Parties, except as provided in Article 8.2 (Voting and Election Procedures) or Article 8.5 (Approval by Unanimous Agreement)."

29. Drilling on the Mississippi Canyon 252 #1 well ("Macondo Well") began on October 6, 2009, more than two months before Anadarko joined and ratified the Operating Agreement on or about December 17, 2009.

30. Anadarko was not involved in the design of the well plan for the Macondo Well.

31. Anadarko was not involved in the design of the drilling plan for the Macondo Well.

32. Anadarko did not plan or execute any changes that may have been made in the well plan or the drilling plan for the Macondo Well.

33. Anadarko was not involved in the selection of the Marianas or the Deepwater Horizon as the drilling rig for the Macondo Well"

34. Under the Operating Agreement, BPXP had exclusive authority to select a drilling rig for the Macondo Well.

35. No one employed by Anadarko was on the Marianas or the Deepwater Horizon at any time during any drilling or other operations at or associated with the Macondo Well.

36. No one employed by Anadarko was on board the Deepwater Horizon on April 20, 2010.

37. Anadarko was not involved in any testing or maintenance of the BOP utilized by and on the Deepwater Horizon or any decisions relating thereto.

38. Anadarko was not involved in the design of the cement recipe for the cement job on the production casing in the Macondo Well or in any tests, evaluation or analyses of that cement recipe.

39. Anadarko was not involved in the design of the cement job on the production casing in the Macondo Well or in any decisions relating to that design.

40. Anadarko was not involved in any cementing operations undertaken at the Macondo Well.

41. Anadarko was not involved in designing, conducting or interpreting the negative pressure test(s) that was undertaken at the Macondo Well on April 20, 2010.

42. John Guide had no communications with Anadarko regarding any drilling or other operations at or associated with the Macondo Well.

43. Pat O'Bryan had no communications with Anadarko regarding any drilling or other operations at or associated with the Macondo Well.

44. John Sprague had no communications with Anadarko regarding any drilling or other operations at or associated with the Macondo Well before April 20, 2010.

45. David Rich had no communications with Anadarko regarding any drilling or other operations at or associated with the Macondo Well before April 20, 2010.

46. David Sims had no communications with Anadarko regarding any drilling or other operations at or associated with the Macondo Well.

47. Greg Walz had no communications with Anadarko regarding any drilling or other operations at or associated with the Macondo Well.

48. Mark Hafle had no communications with Anadarko regarding any drilling or other operations at or associated with the Macondo Well.

49. Brett Cocales had no communications with Anadarko regarding any drilling or other operations at or associated with the Macondo Well.

50. Robert Kaluza had no communications with Anadarko regarding any drilling or other operations at or associated with the Macondo Well.

51. Donald Vidrine had no communications with Anadarko regarding any drilling or other operations at or associated with the Macondo Well.

52. No one employed by Cameron had any pre-incident communications with Anadarko regarding any drilling or other operations at or associated with the Macondo Well.

53. No one employed by Transocean had any pre-incident communications with Anadarko regarding any drilling or other operations at or associated with the Macondo Well.

54. No one employed by Dril-Quip had any pre-incident communications with Anadarko regarding any drilling or other operations at or associated with the Macondo Well.

55. No one employed by Weatherford had any pre-incident communications with Anadarko regarding any drilling or other operations at or associated with the Macondo Well.

56. No one employed by M-I had any pre-incident communications with Anadarko regarding any drilling or other operations at or associated with the Macondo Well.

57. Anadarko did not access Insite Anywhere, or otherwise observe real-time data transmitted from the Deepwater Horizon, on April 20, 2010.

58. Pursuant to the November 18, 2009 Lease Exchange Agreement between BP Exploration & Production Inc. ("BPXP") and MOEX Offshore 2007 LLC ("Offshore"), Offshore obtained "an undivided ten percent (10.00%) of one hundred percent (100%) Record Title Interest in and to Lease OCS-G 32306 (Mississippi Canyon Block 252), excluding all tangible personal property such as the tubulars and wellhead set forth in Exhibit 'C', Macondo Well Plan and AFE."

59. On or about November 18, 2009, Offshore became a party to the Macondo Prospect Offshore Deepwater Operating Agreement ("Operating Agreement"), pertaining to Mississippi Canyon block 252.

60. Article 4.1 of the Operating Agreement provides, in part, "BP Exploration & Production Inc. is designated as the Operator of the Contract Area." The "Contract Area" is defined in Article 2.10 and Appendix A of the Operating Agreement as Lease OCS-G-32306, covering Mississippi Canyon, Block 252.

61. Article 5.1 of the Operating Agreement, titled "Exclusive Right to Operate," provides, in part, "Except as otherwise provided, the Operator has the exclusive right and duty to conduct (or cause to be conducted) all activities or operations under this Agreement. . . . [T]he Operator is an independent contractor, not subject to the control or direction of Non-Operating Parties, except as provided in Article 8.2 (Voting and Election Procedures) or Article 8.5 (Approval by Unanimous Agreement)."

62. Drilling on the Mississippi Canyon 252 #1 well ("Macondo Well") began on October 6, 2009, approximately six weeks before Offshore became a party to the Operating Agreement on or about November 18, 2009.

63. Neither Offshore nor any of its affiliates (together, "MOEX") were involved in the design of the well plan for the Macondo Well.

64. MOEX was not involved in the design of the drilling plan for the Macondo Well.

65. MOEX was not involved in the selection of the Marianas or the Deepwater Horizon as the drilling rig for the Macondo Well.

66. Under the Operating Agreement, BPXP had exclusive authority to select a drilling rig for the Macondo Well.

67. No one employed by MOEX was on the Marianas or the Deepwater Horizon at any time during any drilling or other operations at or associated with the Macondo Well.

68. No one employed by MOEX was on board the Deepwater Horizon on April 20, 2010.

69. MOEX was not involved in any testing or maintenance of the BOP utilized by and on the Deepwater Horizon or any decisions relating thereto.

70. MOEX was not involved in the design of the cement recipe for the cement job on the production casing in the Macondo Well or in any tests, evaluation or analyses of that cement recipe.

71. MOEX was not involved in the design of the cement job on the production casing in the Macondo Well or in any decisions relating to that design.

72. MOEX was not involved in any cementing operations undertaken at the Macondo Well.

73. MOEX was not involved in designing, conducting or interpreting the negative pressure tests that were undertaken at the Macondo Well on April 20, 2010.

74. John Guide had no communications with MOEX regarding any drilling or other operations at or associated with the Macondo Well.

75. Pat O'Bryan had no communications with MOEX regarding any drilling or other operations at or associated with the Macondo Well.

76. John Sprague had no communications with MOEX regarding any drilling or other operations at or associated with the Macondo Well before April 21, 2010.

77. David Rich had no communications with MOEX regarding any drilling or other operations at or associated with the Macondo Well before April 20, 2010.

78. David Sims had no communications with MOEX regarding any drilling or other operations at or associated with the Macondo Well.

79. Greg Walz had no communications with MOEX regarding any drilling or other operations at or associated with the Macondo Well.

80. Mark Hafle had no communications with MOEX regarding any drilling or other operations at or associated with the Macondo Well.

81. Brett Cocales had no communications with MOEX regarding any drilling or other operations at or associated with the Macondo Well.

82. Robert Kaluza had no communications with MOEX regarding any drilling or other operations at or associated with the Macondo Well.

83. Donald Vidrine had no communications with MOEX regarding any drilling or other operations at or associated with the Macondo Well.

84. No one employed by Cameron had any pre-incident communications with MOEX regarding any drilling or other operations at or associated with the Macondo Well.

85. No one employed by Transocean had any pre-incident communications with MOEX regarding any drilling or other operations at or associated with the Macondo Well.

86. No one employed by Dril-Quip had any pre-incident communications with MOEX regarding any drilling or other operations at or associated with the Macondo Well.

87. No one employed by Weatherford had any pre-incident communications with MOEX regarding any drilling or other operations at or associated with the Macondo Well.

88. No one employed by M-I had any pre-incident communications with MOEX regarding any drilling or other operations at or associated with the Macondo Well.

89. MOEX did not access Insite Anywhere, or otherwise observe real-time data transmitted from the Deepwater Horizon, on April 20, 2010.

90. **[Proposed stipulation 90 was deleted by Defendants after circulation to all counsel.]**

91. On December 9, 1998, R&B Falcon Drilling Co. ("R&B Falcon") and Vastar Resources, Inc. ("Vastar") entered into a drilling contract for the construction, use, and operation of the Deepwater Horizon (hereafter "Drilling Contract").

92. In 1999, R&B Falcon issued purchase orders to Cameron concerning specified blowout preventer ("BOP") equipment for the Deepwater Horizon, PO 087-00101 and PO 087-00015.

93. As of September 28, 2000, Transocean Offshore Deepwater Drilling Inc. and Cameron mutually executed a Master Service Agreement ("MSA").

94. Transocean Holdings, LLC became and is the successor to R&B Falcon under the Drilling Contract.

95. BPAPC became and is the successor to Vastar under the Drilling Contract.

96. On March 19, 2008, BPXP acquired a lease from the United States of 5,760 acres of property on the Outer Continental Shelf comprising Mississippi Canyon Block 252 ("MC 252 lease"). The ten-year lease started on June 1, 2008.

97. On May 22, 2009, the MMS approved BPXP's Application for Permit to Drill the Macondo well.

98. BPAPC contracted with Transocean Holdings, LLC to drill the Macondo Well.

99. On January 14, 2010, the MMS approved BPXP's Application for Revised New Well and the Macondo well plan was updated to reflect the replacement of the Marianas with the Deepwater Horizon.

100. BPXP assigned minority working interests in the MC-252 lease.

101. On April 20, 2010, BP took steps to shut in, secure and abandon the Macondo well for potential future production by another rig before disengaging the Deepwater Horizon. As part of the abandonment procedures, the rig crew used the blind shear ram of the BOP to conduct a positive pressure test. During this test, the blind shear ram closed and sealed as expected.

102. During the evening of April 20, 2010, the Macondo well blew out.

103. No Cameron personnel were on board the Deepwater Horizon on April 20, 2010.

104. No Cameron personnel were involved in the well design for the Macondo well.

105. No Cameron personnel were involved in the well abandonment process for the Macondo well.

106. No Cameron personnel were involved in the cementing process for abandonment of the Macondo well.

107. No Cameron personnel were involved in conducting or interpreting the negative pressure test on April 20, 2010.

108. No Cameron personnel were involved in monitoring the Macondo well during the well abandonment process.

109. The Deepwater Horizon BOP comprised two annular preventers, three preventers equipped with variable bore rams, one preventer equipped with a casing shear ram, and one preventer equipped with a shearing blind ram.

110. The AMF deadman system for the Deepwater Horizon BOP system uses non-rechargeable batteries in the BOP control pods to power the system.

111. The final production interval for BP Well MC252 #1 ("Macondo Well") consisted of 7" H513 x 9 7/8" H523 x-over production casing.

112. BP owned the 9 7/8" casing with Hydril 523 threads, and purchased the 7" casing with Hydril 513 threads from Nexen Petroleum ("Nexen"), a third party operator.

113. Weatherford did not own, sell, design, manufacture or inspect the 9-7/8" x 7" production casing.

114. The 7" portion of the 9-7/8" x 7" production casing installed on the Macondo Well included a reamer shoe, six centralizer subs, and a float collar manufactured by Weatherford.

115. In addition to the reamer shoe, six centralizer subs, and float collar, Weatherford manufactured and sold to BP in March 2010 cement wiper plugs. This plug set was a Weatherford 7" x 9-5/8" DWP HP N-R SSR Plug Set, part no. 13841169 (SRDWP0709HP), consisting of a top and a bottom plug with aluminum cores and wear resistant polyurethane flexible wiper fins.

116. BP hired an independent Hydril thread inspector to inspect the reamer shoe, six centralizer subs, and float collar on April 1, 2010 prior to delivery to the Deepwater Horizon rig.

117. The reamer shoe was a Weatherford 7" x 8-1/4" OD Reamer Shoe Part No. 1211284 (RD070082C-S13/S19) with a Hydril 513 box.

118. The six centralizer subs were Weatherford 7" 32 ppf HCQ125 HYDRIL 513 Model 541R Rotating Bow Spring Centralizer Subs with 36S (.171) bow springs 10.750 OD, part number 01366204, Legacy Number 541R070H513H12A005. These centralizers were built according to Nexen centralizer sub requirements in January 2010.

119. In addition to the six centralizer subs purchased by BP from Nexen in March 2010, on April 16, 2010, at BP's request, Weatherford delivered to BP's shore base 15 Weatherford 7" Single Bow Slip-On Rotating Bow Spring Centralizers with 30R bows and stop collars, part no. 01310283. Kits and material for installation were shipped with these centralizers. These 15 Slip-On centralizers came from BP's inventory with Weatherford.

120. A Weatherford service technician was flown to the Deepwater Horizon rig on April 16, 2010 to help install the 15 Slip-On centralizers on the 9-7/8" x 7" production casing.

121. BP did not to use the 15 Slip-On centralizers on the Macondo Well.

122. The Weatherford reamer shoe, M45AP float collar and cement wiper plug set installed on the 9-7/8" x 7" production casing have a temporary purpose. Once the cement has had sufficient time to set, it may be necessary to drill to a deeper depth. As a result, the internal components of the reamer shoe, float collar and the wiper plugs must be capable of being "drilled-out" by the drill string.

123. The dual flapper valves in the M45AP float collar are made of cast aluminum, a metal strong enough to meet the back pressure rating of the float collar to prevent the reverse flow of wet cement slurry from the annulus back into the casing, yet soft enough to be drilled with PDC (polycrystalline diamond compact) bits, a requirement of the drilling process.

124. The Weatherford Model M45AP Flow-Activated Mid-Bore Auto-Fill Float Collar was designed and manufactured to meet the performance criteria of API RP 10F Category III

C. Category III C is the most challenging test category recommended in API RP 10F, Recommended Practice for Performance Testing of Cementing Float Equipment.

125. API RP 10F was also adopted by the International Organization for Standardization, Technical Committee ISO/TC 67, Materials, equipment and offshore structures for petroleum and natural gas industries, SC3, Drilling and completion fluids, and well cements. It was originally named ISO 18165, and is now named ISO 10427-3.

126. API RP 65 Cementing Shallow Water Flow Zones in Deep Water Wells does not list a float collar as a well control device.

127. API RP 96 states that "Float collar valves are not designed to provide a gas-tight seal."

128. Schlumberger was standing by on the Deepwater Horizon on April 20, 2010, and could have performed a cement bond log on that date if requested to do so by BP.

129. The cement bond log that Schlumberger was standing by on the Deepwater Horizon to perform on the cement job for the production casing on the Macondo Well has been estimated by Schlumberger to cost less than $200,000.

130. 30 CFR §250.421 requires an operator to cement the annular space at least 500 feet above the casing shoe and 500 feet above the uppermost hydrocarbon-bearing zone.

131. The 13.1 ppg sand at the 17,788' – 17,791' depth on page 54, Figure 1 of the Bly Report, is the same sand labeled as M56A on page 215 of the Bly Report.

132. Figure 1 on page 54 of the Bly Report labels the 12.6 ppg sands as the "Primary Reservoir Sands."

133. Six centralizers were utilized on the production casing in the Macondo Well.

134. The computer screens in the Deepwater Horizon's driller's cabin were capable of displaying "real time information."

135. The lockdown sleeve was not set at the time of the Incident.

136. For use in the Macondo Well, Dril-Quip supplied the "subsea wellhead system" including: a) 18-3/4" rigid lockdown wellhead ("the high-pressure wellhead housing"), part no. 2-406862-02;  b) 18-3/4" x 9-7/8" casing hanger, part no. 2-409826-02; c) 18-3/4" x 13-3/8" Big Bore II dummy hanger, part no. 2-406385-03; d) 18-3/4" seal assembly, part no. 2-401845-02 (rev. L); e) 18-3/4" x 9-7/8" lockdown sleeve, part no. 2-409826-02, ("the Macondo Wellhead System").

137. Dril-Quip manufactured and supplied the Macondo Wellhead System pursuant to the Hardware Systems Design and Manufacturing Services Contract between BP America Production Company, BP Exploration & Production, Inc. and Dril-Quip (the "Subsea Wellhead Contract").

138. The Subsea Wellhead Contract provides for BP's selection from five base cases for 10K and 15K wellhead systems, with additional equipment requirements which may be utilized on a "special case" basis and purchased as options.

139. BP decided to use the Dril-Quip SS-15 Big Bore II Subsea Wellhead System in the Macondo Well, an exploratory well located on Mississippi Canyon Block 252. Pursuant to sales and rental orders nos. 30038998, 3003899, 3003586, 3004126, 3004864, and 3004508, Dril-Quip manufactured and/or supplied the Macondo Wellhead System at the time of the Macondo blowout on April 20, 2010.

140. In connection with BP's decision to use Dril-Quip's wellhead system in the Macondo Well, Dril-Quip issued sales order nos. 30038998 and 3003899 (the "Original Macondo Sales Orders") on May 12 and 13, 2009.

141. As shown on sales order 3003586 and the corresponding rental order 3004126, Dril-Quip supplied BP with a lockdown sleeve for the Macondo Well.

142. In October 2009, the Marianas rig spudded the Macondo Well with the successful installation of the Dril-Quip 36" low-pressure wellhead housing, the Dril-Quip high-pressure wellhead housing, and associated structural casing string, which was not manufactured or supplied by Dril-Quip.

143. On April 19, 2010, the Dril-Quip casing hanger and dummy hanger adapter were installed in the inner profile of the high-pressure wellhead housing in the Macondo Well. The 9-7/8" x 7" production casing was hung from the casing hanger.

144. On April 20, 2010 from 00:30 to 01:00, the Dril-Quip seal assembly was installed in the Macondo Well between the high-pressure wellhead housing and the top of the casing hanger. The seal assembly sealed off the casing hanger's 1" flow ports, sealing the wellhead from the annulus of the 9-7/8" x 7" production casing.

145. The blowout on April 20, 2010 occurred before the lockdown sleeve was installed in the Macondo Well.

146. No Dril-Quip personnel were involved in developing the basis of design for the well design of the Macondo Well.

147. The lockdown sleeve may be installed in either mud or seawater. Dril-Quip does not require that the lockdown sleeve be set in either mud or seawater.

148. Dril-Quip does not and did not specify how to achieve the 100,000 lbs. weight recommended for setting the lockdown sleeve.

149. No Dril-Quip personnel were responsible for well control.

150. No Dril-Quip personnel were involved in decisions about when or how to set the surface cement plug for temporary abandonment of the Macondo Well.

151. No Dril-Quip personnel were involved in the cementing process for temporary abandonment of the Macondo Well.

152. No Dril-Quip personnel were involved in conducting or interpreting the negative pressure test on April 20, 2010.

153. No Dril-Quip personnel were involved in monitoring the Macondo Well during the temporary abandonment process.

154. No Dril-Quip personnel provided input on the temporary abandonment procedure for the Macondo Well made between April 12, 2010 and April 20, 2010.

155. On September 9, 2010, the Dril-Quip lead impression tool was lowered into theMacondo wellbore and landed in the profile of the 18-3/4" x 9-7/8" casing hanger and seal assembly, and the lead blocks made an impression of the profile of the casing hanger and seal assembly. All the indicator pins of the lead impression tool were mashed, confirming that the lead impression tool landed on the casing hanger and seal assembly. The impression made on the lead blocks showed that the casing hanger and seal assembly were properly seated in the high-pressure wellhead housing.

156. On September 11, 2010, a lockdown sleeve was installed in the Macondo Well. The lockdown sleeve was pressure tested to 5,200 psi, and the Daily Operation Report for September 11, 2010 states "good test on LDS [lockdown sleeve] seal."

157. On October 7, 2010, the 9-7/8" x 7" production casing was perforated between 9,176 and 9,186 feet and monitored for pressure and returns. During this time, the Macondo Well remained static, and no u-tube effect was detected.

158. On October 13, 2010, the casing hanger and seal assembly installed before April 20, 2010 were removed from the Macondo Well. When retrieved from the Macondo Well, white paper on the exterior of the casing hanger remained visible.

159. Pieces of the seal assembly's elastomeric seal were retrieved from the Macondo Well after the casing hanger and seal assembly were retrieved on October 13, 2010.

160. The exterior of the casing hanger and seal assembly retrieved from the Macondo Well on October 13, 2010 showed no signs of flow erosion.

161. M-I L.L.C. and BP Exploration and Production, Inc. entered into the Contract for Gulf of Mexico Strategic Performance Unit Offshore Well Services, effective February 1, 2009, that governed M-I L.L.C.'s scope of work on the Macondo well.

162. M-I recommended a drilling fluids program for the Macondo well to BP based upon information provided by BP and M-I's experience drafting drilling fluids proposals. BP reviewed, revised, and approved the drilling fluids program for the Macondo well.

163. The BP/Deepwater Horizon Rheliant Displacement Procedure was based upon information provided by BP and the M-I drilling fluids specialist's experience drafting

12

such procedures on the Deepwater Horizon. The BP/Deepwater Horizon Rheliant Displacement Procedure was approved by BP.

164. The BP/Deepwater Horizon Rheliant Displacement Procedure was provided to representatives of BP, Transocean, and Halliburton/ Sperry-Sun and discussed at a pre-tour meeting before the displacement.

165. The BP/Deepwater Horizon Rheliant Displacement Procedure implemented on the Macondo well was the second draft of the procedure. The first draft of the procedure did not include a step requiring the displacement to stop for BP to conduct a negative test. The step requiring the displacement to stop for BP to conduct a negative test was added to the procedure based on instructions provided by BP.

166. M-I personnel had no responsibility for determining the depth to which the well would be displaced to seawater.

167. BP and M-I discussed using two LCM pills available on the rig in the spacer used during the displacement of the Macondo well to seawater.

168. BP approved using the two LCM pills in the spacer used during the displacement of the Macondo well to seawater.

169. No M-I personnel were involved in developing the basis of design for the well design of the Macondo well.

170. No M-I personnel were responsible for monitoring the Macondo well for well control purposes on the Deepwater Horizon.

171. No M-I personnel were responsible for decisions about when or how to set the surface cement plug for temporary abandonment of the Macondo well.

172. No M-I personnel were responsible for the cementing process for temporary abandonment of the Macondo well.

173. No M-I personnel were responsible for conducting or interpreting the negative pressure test on April 20, 2010.

174. Top kill operations and the BOP inspection revealed no evidence of a plug in the kill line.

175. As of April 20, 2010, Curt Kuchta held a valid license issued by the Republic of the Marshall Islands as Master (No Limitations).

176. The Deepwater Horizon search and rescue operations conducted by the US Coast Guard officially concluded on April 23, 2010.

177. The Fire & Gas System on the Deepwater Horizon was, at the time of its installation, approved by ABS as meeting classification society, international and US Coast Guard standards.

178. Det Norske Veritas (DNV) conducted ISM compliance audits of Transocean and the Deepwater Horizon as a recognized organization for the Flag State.

179. The watchstanders on the bridge of the Deepwater Horizon at the time of the casualty consisted of the Senior Dynamic Positioning Operator and the Dynamic Positioning Officer.

180. The Dynamic Positioning Officer on the bridge of the Deepwater Horizon at the time of the casualty was a licensed Officer in Charge of a Navigation Watch (3rd Mate/GMDSS).

181. The Deepwater Horizon was built in accordance with the 1989 MODU Code; the ABS Rules for the Building and Classing of Mobile Offshore Drilling Units, 1997; the International Convention on Load Lines, 1966, regulation 10(2), Annex 1; and US Coast Guard requirements, as the Deepwater Horizon was originally intended to be registered in the US.

182. ABS classified and certified the Deepwater Horizon as an X A1, Column Stabilized Drilling Unit, XAMS, XACCU, XDPS-3 (the highest rating for dynamically positioned vessels).

183. M-I personnel had no responsibility for determining whether BP would conduct a negative test during the displacement.

    **[Proposed Stipulation 183 was added by Defendants after circulation to all counsel; thus the PSC and the US have not yet had the opportunity to respond to it.]**

184. The reason for the zero pressure reading on the kill line during the negative test has not been definitively established.

    **[Proposed Stipulation 184 was added by Defendants after circulation to all counsel; thus the PSC and the US have not yet had the opportunity to respond to it.]**

Dated: January 31, 2012                             Respectfully submitted,

                                                    /s / Don K. Haycraft

                                                    Don K. Haycraft (Bar #14361)
                                                    R. Keith Jarrett (Bar #16984)
                                                    LISKOW & LEWIS
                                                    One Shell Square
                                                    701 Poydras Street, Suite 5000
                                                    New Orleans, Louisiana 70139-5099
                                                    Telephone: (504) 581-7979
                                                    Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Timothy A. Duffy, P.C.
(tim.duffy@kirkland.com)
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
(mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP p.l.c., BP Exploration & Production Inc., and BP America Production Compan*