1                    UNITED STATES DISTRICT COURT

2                  THE EASTERN DISTRICT OF LOUISIANA

3                          AT NEW ORLEANS

4

5    IN RE:  OIL SPILL BY THE OIL RIG      *   10-MD-2179-CJB-SS
                 *DEEPWATER HORIZON* IN THE     *
6             GULF OF MEXICO ON               *
              APRIL 20, 2010                  *   January 27, 2012
7                                             *
                                              *
8    Applies to:   All Cases                  *   9:30 a.m.
     *************************************

9

10

11                      DISCOVERY STATUS CONFERENCE

12               BEFORE THE HONORABLE SALLY SHUSHAN

13                  UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19   SUSAN A. ZIELIE, RPR, FCRR
     Official Court Reporter
20   HB 406
     500 Poydras Street
21   New Orleans, Louisiana 70130
     susan_zielie@laed.uscourts.gov
22   504.589.7781

23

     Proceedings Recorded by Computer-aided Stenography Transcription
24   Software.

25

```
 1   APPEARANCES:

 2

 3   Plaintiffs' Liaison          DOMENGEAUX WRIGHT ROY & EDWARDS
     Counsel:                     BY:   JAMES P. ROY, ESQ.
 4                                PO Box 3668
                                  556 Jefferson Street
 5                                Lafayette LA 70502

 6                                HERMAN HERMAN KATZ & COTLAR
                                  BY:   STEPHEN J. HERMAN, ESQ.
 7                                820 O'Keefe Avenue
                                  New Orleans LA 70113
 8
     For the Plaintiffs:          IRPINO LAW FIRM
 9                                BY:   ANTHONY IRPINO, ESQ.
                                  One Canal Place
10                                365 Canal Street
                                  Suite 2990
11                                New Orleans LA 70130

12   For the Plaintiffs:          BREIT DRESCHER IMPREVENTO & WALKER
                                  BY:   JEFFREY A. BREIT, ESQ.
13                                1000 Dominion Tower
                                  999 Waterside Drive
14                                Lafayette LA 70502

15   For the Plaintiffs:          LEVIN PAPANTONIO THOMAS MITCHELL
                                     RAFFERTY & PROCTOR
16                                BY:   BRIAN H. BARR, ESQ.
                                  316 South Baylen Street
17                                Suite 600
                                  Pensacola FL 32502
18
     For the Plaintiffs:          WILLIAMSON & RUSNAK
19                                BY:   JIMMY WILLIAMSON, ESQ.
                                  4310 Yoakum Boulevard
20                                Houston TX 77006

21

22

23

24

25
```

```
 1    APPEARANCES:

 2

 3    For the Federal          US DEPARTMENT OF JUSTICE
      Government Interests:     BY:  R. MICHAEL UNDERHILL, ESQ.
 4                             SARAH D. HIMMELHOCK, ESQ.
                               450 Golden Gate Avenue
 5                             Room 7-5395
                               San Francisco CA 94102
 6
      For the United States    ENVIRONMENTAL ENFORCEMENT SECTION
 7    Of America:              US DEPARTMENT OF JUSTICE
                               BY:  GORDON YOUNG, ESQ.
 8                             PO Box 7611
                               Washington DC 20044
 9
      For the State Interests: ATTORNEY GENERAL OF ALABAMA
10                             BY:  COREY L. MAZE, ESQ.
                               500 Dexter Avenue
11                             Montgomery Al 36130

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1
       For the Defendant:           LISKOW & LEWIS, APLC
 2                                  BY:  DON K. HAYCRAFT, ESQ.
                                    701 Poydras Street
 3                                  Suite 5000
                                    New Orleans LA 70139
 4
       For the Defendant:           KIRKLAND & ELLIS, LLP
 5                                  BY:  J. ANDREW LANGAN, ESQ.
                                         MARK J. NOMELLINI, ESQ.
 6                                  300 N. Lasalle
                                    Chicago, IL 60654
 7

 8     For the Defendant:           KIRKLAND & ELLIS, LLP
                                    BY:  ROBERT R. GASAWAY, ESQ.
 9                                  655 Fifteenth Street NW
                                    Washington DC 20005
10
       For the Defendant:           FRILOT, LLC
11                                  BY:  KERRY J. MILLER, ESQ.
                                    1100 Poydras Street
12                                  Suite 3700
                                    New Orleans LA 70163
13
       For the Defendant:           SUTHERLAND ASBILL & BRENNAN, LLP
14                                  BY:  RACHEL GEISBER CLINGMAN, ESQ.
                                    1001 Fannin Street
15                                  Suite 3700
                                    Houston TX 77002
16
       For the Defendant:           STONE PIGMAN WALTHER WITTMAN, LLC
17                                  BY:  PHILLIP A. WITTMAN, ESQ.
                                    CARMELITE M. BERTAUT
18                                  546 Carondelet Street
                                    New Orleans LA 70130
19
       For the Defendant:           GODWIN RONQUILLO, PC
20                                  BY:  DONALD E. GODWIN, ESQ.
                                         JENNY L. MARTINEZ, ESQ.
21                                  1201 Elm Street
                                    Suite 1700
22                                  Dallas TX 75270

23     For the Defendant:           GODWIN RONQUILLO, PC
                                    BY:  R. ALAN YORK, ESQ.
24                                  1331 Lamar
                                    Suite 1665
25                                  Houston TX 770101
```

```
 1      APPEARANCES:

 2


 3
        For the Defendant:          KUCHLER POLK SCHELL WEINER
 4                                      & RICHESON, LLC
                                    BY:  DEBORAH D. KUCHLER, ESQ.
 5                                  1615 Poydras Street, Suite 1300
                                    New Orleans LA 70112
 6
        For the Defendant:          BINGHAM MCCUTCHEN, LLP
 7                                  BY:  WARREN A. FITCH, ESQ.
                                    2020 K Street NW
 8                                  Washington DC 20006

 9


10      APPEARING TELEPHONICALLY:   DAVID BECK, ESQ.
                                    TED SKERITIES, ESQ.
11                                  DERICK BENSON, ESQ.
                                    SARAH HEMMELHOCK, ESQ.
12                                  MARK NOMILINI, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              NEW ORLEANS, LOUISIANA; FRIDAY, JANUARY 27, 2012

 2                             9:30 A.M.

 3              THE COURT:  All right.  So let's get started.

 4              Telephone participants, you can hear us okay?

 5              (No response.)

 6              THE COURT:  I guess they couldn't.

 7              (Pause in proceedings.)

 8              THE COURT:  Phone participants, can you hear me?

 9              PERSON ON TELEPHONE:  Yes, Judge, barely.

10              THE COURT:  How about now?

11              PERSON ON TELEPHONE:  Yes, Your Honor.

12              THE COURT:  Good.  A little technical difficulty.

13              All right.  Let's get ourselves going, guys.

14              As usual, I'd like this to be fast.  I'm not optimistic.

15              Okay.  BOP and capping stack.  Captain Engelbert

16    anticipates that the protocol for the capping stack and gate

17    valve will be completed this week.

18              She has recommended that the five remaining gator boxes

19    and their contents be considered for release.

20              We have told everybody to report to us by Wednesday,

21    February 15, relative to returning the various equipment in the

22    gator boxes, along with the capping stack and gate valve to their

23    owners.  So please pay attention to that and let us know if there

24    is a problem with doing that.

25              Halliburton has requested silicon castings of the blades
```

1    of the rams of the capping stack, and Captain Engelbert said that

2    could go forward on Monday, January 30.  And, unless there's an

3    objection -- and I believe maybe we have one -- I have said it

4    could go forward.  Rob?

5            MR. GASAWAY:  No objection, Your Honor.

6            I just wanted to mention that we're going to be sending

7    an email, the contents I've discussed with Alan, making sure that

8    we can be there, we can get the results.  There's some cost

9    issues we have to work out.  But we're fully prepared to have it

10   go forward on Monday.

11           THE COURT:  Yeah.

12           Come on up, Alan.

13           Certainly, if it's going to be used as demonstrative, it

14   will be made available to everybody for inspection.

15           MR. GASAWAY:  Yeah.  The results of whatever they come

16   up with after taking their impressions.

17           THE COURT:  Alan, anything to add to that?

18           MR. YORK:  Just Rob spoke to me before the hearing.

19   I've checked it with our BOP guy.  It's really the middle round

20   that they wanted the casting of.  It's already disassembled, and

21   no problem with sharing the results.  We will continue to work

22   amicably.

23           THE COURT:  Good.  You know what, I think that is a

24   truism.

25           MR. GASAWAY:  Can I just mention one other item?  You

 1   mentioned returning the capping stack to its owner.  I think,

 2   with Kerry and I -- Transocean and BP need to have a conversation

 3   about who the owner is.  I heard Kerry say in court it was BP, I

 4   think BP thinks it is BP.  At other points I think Transocean

 5   thinks it is Transocean's.  So I think there is some discussion

 6   that needs to happen about just who owns the capping stack.

 7           THE COURT:  Okay.  I think that's good.

 8           Kerry, you got anything to say about that?  Because, if

 9   you don't, don't feel compelled.

10           MR. MILLER:  We will have that discussion.

11           THE COURT:  We've got Mr. Gagliano scheduled for

12   February 7th and 8th for his deposition.

13           Has his custodial file been produced?

14           MS. MARTINEZ:  Yes, ma'am.

15           THE COURT:  Custodial file all done, that's good.

16           We are looking for BP's opposition -- no, opposition to

17   -- I'm sorry.  Replies are due to objections Monday, BP.

18   Thursday --

19           MR. GODWIN:  I think Halliburton's is due Monday.

20           THE COURT:  Halliburton's is due Monday, and then BP's

21   reply on Thursday.  And then we're going to try to get a ruling

22   out before the scheduled deposition.

23           MR. GODWIN:  Which is February 7th and 8th.

24           THE COURT:  That's right.  So that doesn't give me a lot

25   of time; does it, Don?

```
 1           MR. GODWIN:  Right now, we could probably decide it.
 2   They got Ron Crook, I should get Gagliano.
 3           But I did speak again yesterday late, and just to
 4   confirm again the lawyer for Mr. Gagliano said that he is still
 5   looking to giving his deposition and participating in trial.  So
 6   you never know with a witness that you don't control or have any
 7   influence over, but I did check on him before I came down.
 8           THE COURT:  Bet he's looking forward to it.
 9           MR. GODWIN:  I don't know about looking forward to it,
10   but he's going to be here.
11           Thank you, Judge.
12           THE COURT:  Thank you, Don.
13           We've got the issue of Steve Newman coming up.
14   Transocean's going to give us its opposition on Monday, and again
15   on Thursday we'll hear from BP.  And we'll try to get a ruling
16   out on that.  But only after we take care of Mr. Gagliano.
17           The fact witnesses, we're talking about reconvening the
18   30(b)(6) deposition of the US, and whether this is Phase One or
19   Phase Two discovery.
20           I think we were supposed to hear from the US and
21   Transocean on this issue; weren't we?
22           MR. MILLER:  Yeah.  I think they're coordinating a date.
23           THE COURT:  All right.  Good, good, good.
24           MR. YORK:  Is the reconvening of that 30(b)(6), is that
25   going to be Lieutenant Commander Houck again?
```

```
 1              MR. MILLER:  Yeah.  I'll look for the email.
 2              THE COURT:  Sarah, you think it's going to be Lieutenant
 3    Houck?
 4              MR. MILLER:  Yes.  It specifically is.
 5              THE COURT:  Kerry says it is, so don't worry about it.
 6              Fact witness for Phase One, BP submitted the joint list.
 7              And there looks like -- did we get a lot of
 8    modifications to that when -- it was the expert list that we had
 9    some trickle in on?  So we think that's pretty complete?
10              Okay.  Good.  Good, good, good.
11              Then, as to experts, the PSC submitted the list.  And
12    Halliburton wants to maintain Dril-Quip's expert Mr. Hurta as a
13    will-call witness.
14              How you all going to do that?
15              MR. YORK:  Good morning.  Alan York for Halliburton.
16              Actually, it was not an expert witness, he was a Rule 45
17    witness.  That the Dril-Quip had listed him as the Rule 45
18    witness that they were beginning to bring to trial.
19              And we recognize that the Court has now taken the
20    Dril-Quip out by means of a summary judgment -- and this is not
21    an attempt to pin liability on Dril-Quip.  But, to the extent
22    that there are still issues that may relate to the seal assembly
23    and since he was originally listed as a Rule 45 witness, we just
24    wanted to preserve our right to call him if we choose to.
25              THE COURT:  As a fact witness?
```

```
 1              MR. YORK:  As a fact witness.  Not as an expert witness.
 2              THE COURT:  Was he previously designated as an expert?
 3    Because I had thought he was.
 4              MR. YORK:  I can look on my list.  I thought he was
 5    designated as a Rule 45 fact witness.
 6              THE COURT:  Got you.
 7              MR. YORK:  And that's the only reason that we wanted to
 8    keep him on there, is as a preservation of our rights.  We're not
 9    saying that we will call him.  We likely won't.  But, since he
10    was on there originally, we wanted to preserve our rights, since
11    this is supposed to be our --
12              THE COURT:  I think you have him on your will-call list.
13              MR. YORK:  Well, because we only get one may-call.
14              THE COURT:  So there's a may-call and a will-call list.
15              MR. YORK:  But that happened after we had submitted our
16    list, and so -- again, it's just simply we're just preserving our
17    rights because we don't want to have an issue if something comes
18    up later.
19              THE COURT:  Okay.  Let's think about that, but I don't
20    think it's a big deal.  I just wanted to understand it.  And I
21    probably misunderstood that he was an expert.
22              MR. MILLER:  Your Honor, a couple of witness clean-up
23    issues.  Kerry Miller for Transocean.
24              Houck's deposition is going to be a Phase One
25    deposition, and the resumption is scheduled for February 8th.  So
```

 1    we can put that in the report.

 2            With respect to some other witness list clean-up issues,

 3    just wanted to make the Court aware, one of the Transocean

 4    company witnesses who was part of the Rule 45 process, Bill

 5    Ambrose, who is initially only requested by MI.  Your Honor

 6    issued an order on November 4th listing the Rule 45 witnesses,

 7    his name appeared on it, because of MI's request and because he

 8    was an officer and one of the limitation parties.

 9            Subsequent to that, MI withdraw the request.

10            When Halliburton and Cameron put together their witness

11    list, they listed all Rule 45 witnesses, including Mr. Ambrose.

12    I've reached out to Cameron and Halliburton.  I don't think they

13    really want to call him, but they wanted another couple days to

14    check to see.  But all they did was pick up the witnesses they

15    had before.

16            THE COURT:  Okay.  Good, good, good.

17            MR. MILLER:  The one other clean-up issue I'd wanted to

18    mention was Richard Coronado, who was listed as a Cameron

19    may-call fact witness.

20            However, he testified in deposition as both fact and

21    expert.  He was withdrawn as an expert, and is a may-call fact

22    witness.

23            I think consistent with the policy you put in place last

24    week or the week before, BP had requested that his designations

25    go in with round 14.  But I thought that you said, if you were on

1   a fact witness list, that the designations would be held back.

2   So it would make sense to hold back that designation, pending

3   whether or not he's called at trial.  I think that's the right

4   outcome based on the --

5           THE COURT:  I do think that is the right outcome.  And

6   now that we know that the fact witness list is final, we are

7   going to remove from Judge Barbier's reading list those witnesses

8   who have already been submitted to him by deposition.  So, if Mr.

9   Coronado is on someone's will-call and he has not yet been sliced

10  and diced, he should not be.

11          MR. MILLER:  He's going to come up in round 14.

12          MR. HERMAN:  I just wanted to point out -- Steve Herman

13  for the PSC -- we circulated the expert consolidated list this

14  morning, which I thought was correct.  But we added Coronado to

15  that.  I may have misunderstood Carmelite's email, but I thought

16  she was asking us to add him back to their expert list.

17          MS. BERTAUT:  I think I screwed up.  Because I had

18  forgotten we had withdrawan him.  He's on our witness list as

19  may-call.  But, if we withdraw him as an expert, that's my error

20  in telling you he needs to be put back as expert.  That's not any

21  change in strategy.

22          THE COURT:  Is he a may-call?

23          MR. MILLER:  He is a may-call.

24          THE COURT:  I know.  But is he a may-call fact witness

25  or is he a will-call fact witness?

 1          MR. MILLER:  He's the one Cameron may-call fact witness.

 2          THE COURT:  Then I think we have to slice and dice his

 3   deposition.

 4          MR. BECK:  If I may be heard.  We have not withdrawn

 5   Coronado as a potential expert witness, but it is clear he is

 6   only on our will-call list.  He's on our may-call list.

 7          THE COURT:  I'm going home.

 8          MS. KUCHLER:  Judge, if David Beck says he hasn't

 9   withdrawn as an expert, he's not withdrawn.  I'm okay.

10          THE COURT:  People, people, people, let's see if we can

11   get this straight with Mr. Coronado.

12          Mr. Coronado, David, do you want him listed as both a

13   fact and an expert?

14          MR. BECK:  That is correct, Your Honor.  On our may-call

15   witness list.

16          THE COURT:  He is your one may-call?

17          MR. BECK:  That is correct.

18          THE COURT:  On the fact?

19          MR. BECK:  That is correct.

20          THE COURT:  And he is a may-call on your expert list?

21          MR. BECK:  Yes.  He's essentially both -- can be both.

22          MS. BERTAUT:  He's an in-house employee, Your Honor.

23          THE COURT:  I know who he is.  I remember we had many

24   fights over him.  I shouldn't use the word fight.  We had many

25   discussions concerning Mr. Coronado.

1          Okay.  So does everybody have that straight, and is that

2     a problem?

3          MR. MILLER:  I guess I have it straight now; but I still

4     think that, given his multiple designations for trial, there's no

5     -- I mean, I think that his designation submission to Judge

6     Barbier, Judge Barbier ought to be heard in light of that.

7          MR. O'KEEFE:  The issue, in light of the US's position,

8     is whether you can have a may-call expert.

9          MR. MILLER:  That's another issue.

10         THE COURT:  We're going to come back to that and whether

11    you may have a may-call expert witness.  And I'm not sure about

12    that.  But at least we now are straight on Mr. Coronado.  I

13    figure that's progress.

14         MS. KUCHLER:  But are we doing designations for him, or

15    no?

16         THE COURT:  We're going to work our way through that

17    when we get to whether or not you may have a may-call expert.

18         MR. MILLER:  See all the clarity I bring to the table,

19    Your Honor?

20         THE COURT:  Thank you, Kerry.  You, as usual, are so

21    helpful.

22         Hold on Deb for a second.

23         So everybody agrees that we may take the fact witness

24    list and rely upon it to remove from Judge Barbier's reading

25    stack those depositions.  Okay.

```
 1              MR. MILLER:  Subject to the Bill Ambrose issue I brought

 2   up.

 3              THE COURT:  Correct.

 4              Moving on to expert witness list, you've got something

 5   to say?

 6              MS. KUCHLER:  I have something to say.  I have a

 7   question about final exhibit and witness list.

 8              The schedule says we're supposed to file the final

 9   exhibit and witness list on January 21st.  We all just filed

10   exhibit lists and witness lists.

11              So, are we all assuming there will be no changes?  In

12   which case, why do we have to file another one?

13              If there are changes --

14              MR. MILLER:  Remember, I brought that up two conferences

15   ago?  You might not have been here that time.

16              Disregard the January 31st date.

17              THE COURT:  Don't disregard.  You need your final

18   pretrial stipulation to be filed that day.

19              MR. MILLER:  Yes.  But for the exhibit list and witness

20   list, you scratched it off.

21              MS. KUCHLER:  We don't have to file any additional

22   witness lists on January 21.

23              THE COURT:  If you do, I'll be angry.

24              MS. KUCHLER:  So would we, because we didn't want to

25   have to scrub them and see what changes were made.
```

1    THE COURT:  While we're at it, Phil, you wanted to know

2 if we were going to discuss anything about whether to drawdown

3 about expert reports.  We are not going to discuss that today.

4 We are going to get the final briefing on that and we're going to

5 do one last clarification for all time.

6    MR. WHITTMANN:  That's in connection with the

7 withdrawing of opinions of experts?

8    THE COURT:  The drawdown of opinions of expert

9 witnesses, in whole or in part.

10    MR. WHITTMANN:  You're going to hold that until the next

11 session?

12    THE COURT:  No.  I'm going to get a ruling out before

13 the next session.

14    MR. WHITTMANN:  You got a ruling out, but we had

15 requested a clarification of the ruling.

16    THE COURT:  That is what I'm telling you I'm going to

17 get out.

18    MR. WHITTMANN:  Then I'm going to sit back down.

19    THE COURT:  I know you wanted to leave, and so you

20 wanted me to take care of that issue so you'd know we were going

21 to discuss it.  We're not going to discuss it.

22    MR. WHITTMANN:  I'm good until 11 o'clock.

23    MR. MILLER:  The only confusion on that is with respect

24 to 22.

25    THE COURT:  I think that is correct.

1          MR. MILLER:  One row change and three row change.  On

2    two, we didn't know this was a free for all for submission.  Can

3    other parties give you give a short paragraph or two?

4          THE COURT:  Bring it on.  By Monday.

5          MR. LANGAN:  That was going to be my question.  Thanks

6    to Mr. Miller for raising it.  We might put a paragraph in by

7    Monday, too.  Thank you, Your Honor.

8          THE COURT:  You're welcome.

9          Because we're going to do one last final clarification.

10         MR. LANGAN:  Andy Langan for BP.

11         I'm glad Mr. Miller thinks so.  We might even talk about

12    three.

13         THE COURT:  I would like to think that one and three are

14    done; but, if you don't think they're not, let me hear it.

15         Alan.

16         MR. YORK:  Alan York for Halliburton.

17         The only thing I wanted to raise with regard to the

18    exhibit lists is just a recognition that the deposition

19    designation process, while coming to an end, has two weeks left.

20    Trust me, we're counting them down on the calender.

21         THE COURT:  Speaking of counting, what is today?

22         MR. YORK:  The 27th.

23         THE COURT:  No, no.  How many days from commencement of

24    trial?

25         31.

1          MR. YORK:  And, as the Court is aware, on tail-end of

2     the cycle for the deposition designation process are the

3     highlighted exhibits that go in with regard to those depositions,

4     since -- I just wanted to raise the issue with the Court that we

5     may supplement our list with those ongoing, those last couple of

6     rounds of deposition designations.  Because we don't know exactly

7     what the exhibit's going to be until we get all the

8     counter-designations and everything else.  So I just wanted to

9     put that on as placeholder, as it were.

10          THE COURT:  That's good.  So we'll go from 21,000 to

11     22,000 exhibits.  Okay.  Seems fair.

12          MR. HERMAN:  Steve Herman for the PSC.

13          On the previous and in one respect still current January

14     30th date, for the exhibit list, we did file what was our

15     combined final exit list.  There were some complaints from

16     principally BP about having to go back and retroactively

17     identify, quote, unquote, new exhibits.

18          I'm told that at 9:27 this morning we circulated a round

19     of our revised final exhibit list that identifies new and cured

20     exhibits.  So, hopefully, for the plaintiffs, at least until we

21     seek leave to supplement or amend for good cause, hopefully

22     that's it.

23          The other thing was, on stipulations -- and I don't know

24     if Tim's on the phone.  You know, what we have right now is

25     really a spreadsheet.  And we submitted a letter this morning

```
 1    with our reservations, caveats, objections, et cetera.

 2           I'm not really sure if Tim or somebody is going to

 3    prepare before the 30th something that actually looks like a

 4    pleading that we can comment on.

 5           And, to the extent we haven't resolved some of our

 6    caveats, objections, et cetera, I wonder if it would be

 7    appropriate just to file a separate document with our -- stating

 8    our position for the record to the extent that we're trying to

 9    get -- I mean, we understand the desire to get a single document,

10    but we're still going to complain about a few things or give a

11    few caveats, et cetera.  Can we just file a separate pleading?

12           THE COURT:  Well, let's talk about that.

13           Mark, can you comment on that?

14           MR. LANGAN:  I don't know if Tim was able to join us.

15           THE COURT:  No.  Tim doesn't appear to be on the line.

16           MR. LANGAN:  All right.

17           So we've been making progress.  We sent the stips that

18    the defendants had agreed to all the parties on the 12th of

19    January.  We've gotten some updates since then.  And I think we

20    finally got some input from the PSC today.

21           So I'm sure we can incorporate that and send out a final

22    draft of the spreadsheet.

23           And, also, I don't think we'd object to turning the

24    spreadsheet into some very lengthy pleading, if that makes life

25    easier.  I'm sure we can do that.
```

```
 1              THE COURT:  Or we can just PDF the spreadsheet and put
 2    it in Judge Barbier's pretrial binder.
 3              MR. LANGAN:  Whatever preference the Court is, we can do
 4    either way.
 5              We might need a few days past January 31st.
 6              THE COURT:  I agree.
 7              What I'd rather do is put together the draft
 8    stipulations after reviewing PSC's comments, and let's see what
 9    is actually stipulated to.  Why don't we put that into a pleading
10    format that we can give to him for his pretrial conference
11    binder.
12              And then let's see what's left, Steve.
13              I don't know whether we want a separate submission from
14    you, or whether we put your comment on the same document.
15              I think maybe it would be easier to have it on the same
16    document.  I'm not sure how we do that, whether we do it by
17    footnote or whether we put -- how do you see your pleading being
18    constituted?
19              MR. HERMAN:  Well, I think both our letters from
20    December 30th and today reflect our concerns -- and this is, I
21    think, something that they're dealing with in the Phase Two
22    negotiations as well -- you can take a phrase that as stated we
23    can't dispute that it's true, but we think it's misleading or
24    potentially misleading if it's not put in proper context.  And,
25    you know, I don't have our letter in front of me, but just to
```

```
 1   give an example.  To the best that I can recall, and I'll
 2   probably mess up the language, you know, the stipulation is
 3   something along the lines of:  There's no MMS regulation that
 4   specifically tells you how to do a negative pressure test.
 5           Well, that statement in and of itself may be true, but
 6   it's somewhat, we would say misleading, because the reality is
 7   there are MMS regulations that, A, require them to maintain well
 8   control; and, B, require them to use best and safest technology.
 9           And, when we answered our admissions -- which is where
10   these stipulations come from, at least the PSC ones -- they were
11   responded to subject to our objections, et cetera.
12           And so what I would I guess, envision, because we're
13   never going to get BP to agree to put our language in, that we
14   would just file a separate pleading that says:  We think that the
15   stipulations to 21 through 57 should be modified by the
16   following.
17           THE COURT:  Okay.  So why don't we do this.
18           Andy, you'll take a crack at putting together the
19   stipulation.
20           MR. LANGAN:  Yes.
21           THE COURT:  And why don't you put a footnote to any
22   stipulation that the PSC has said they don't dispute the
23   substance but they do reserve the right to argue content or
24   something to that effect.
25           MR. LANGAN:  Understood.
```

1         THE COURT:  And then, Steve, you all put together your

2    separate response to stipulations.  Okay?

3         I'm not going to make you all put that together.

4         MR. LANGAN:  Okay.  Very good.

5         So it sounds like the goal is try to have that done

6    before the February 3rd final pretrial; is that right?

7         THE COURT:  Right.

8         What I'm figuring I'd like, if you all don't mind, is, I

9    think Judge Barbier is going to want to look at most of the

10   pretrial submissions maybe Wednesday or Thursday of next week, so

11   he'll be prepared for you all on Friday.

12        So, even if it's rough -- if you haven't gotten it done,

13   nobody's going to scream at you.  But let's have something that

14   he can chew on Wednesday and Thursday.  You know, even if it's

15   not filed.

16        MR. LANGAN:  Very good.  We'll do our best.  And, if

17   there's a problem, we'll let you know.  But we don't anticipate

18   one.

19        MR. FITCH:  Tony Fitch for Anadarko.

20        So that means that the Court is expecting the parties,

21   yes or no --

22        THE COURT:  I thought we talked about that a couple of

23   weeks ago.  You should have given your yes or no.

24        MR. FITCH:  I have, but others are obviously raising

25   questions about that.  That's why I say, I do think it's time to

```
 1    fish or cut bait.

 2            THE COURT:  I do, too.  I can only tackle so much, Tony.

 3            MR. FITCH:  I understand that, Judge.

 4            THE COURT:  Yeah.  We're going to get a discussion on

 5    that today.

 6            MS. HEMMELHOCK:  Sarah Hemmelhock.

 7            May I interrupt for just a minute?

 8            THE COURT:  Certainly.

 9            How are you today?

10            MS. HEMMELHOCK:  I'm good.

11            How are you?

12            THE COURT:  Good.

13            MS. HEMMELHOCK:  I just wanted to touch base.  I had

14    sent you a report on the United States' production, and I have to

15    step off now for the conference I referenced in my email last

16    night, and I just wanted to make sure that there is nothing you

17    needed to raise with me before I have stepped off.

18            THE COURT:  Listen, Sarah, I've read most of your

19    report, and I appreciate the update.

20            Andy, you want to comment?

21            MR. LANGAN:  Not on that, but when she's done I have one

22    issue that you've already covered.

23            THE COURT:  Thank you, Sarah.  You can pop off.

24            HEMMELHOCK:  Thank you very much, Your Honor.

25            MR. LANGAN:  On the expert thing, we're going to make
```

1    some admissions on Monday, you're going to rule on the requests

2    for clarification?

3              THE COURT:  Yes.

4              MR. LANGAN:  So does that toll the appeal period for the

5    prior order?

6              MR. O'KEEFE:  Yes.

7              THE COURT:  I guess it does.

8              You don't like my clarification, you have every right to

9    appeal the whole thing.

10             MR. LANGAN:  I don't know if anybody will, but somebody

11   asked me to ask.

12             THE COURT:  Well, as you know, I don't care.

13             MR. LANGAN:  I understand.

14             We don't relish the opportunity.  We prefer no appeals.

15             THE COURT:  But I don't care, seriously.  So, if you

16   think there's something I called wrong, please take it up to the

17   next man.

18             MR. LANGAN:  So, when you do clarify, it sounds like

19   there will be a new appeal time, it sounds like.

20             THE COURT:  Yes.  What we're going to try to do is pull

21   everything together.  Not look at this order or look at that

22   order.

23             MR. LANGAN:  Restate the whole thing.

24             THE COURT:  So let's get into expert witness list.

25             The PSC submitted a witness list that has five may-call

```
 1    witnesses.  So let's go through that, because we've got some
 2    emails with regard to that.
 3            The first one, the PSC has listed a will-call of Mr.
 4    Bea.  But he's got health issues.  So, if he can't testify, a
 5    substitute, Mr. Gale.
 6            Does anybody have a problem with that?
 7            MR. LANGAN:  No problem with that if that's their one
 8    and only may-call.  That's the issue.
 9            THE COURT:  Well, see, now there's the problem, is that
10    we never talked about may-call for experts.
11            I don't believe we did.  Did we?
12            MR. YORK:  Did not, Judge.
13            THE COURT:  So do we agree that that is a valid
14    may-call?  That Mr. Bea, as everybody knows, does have health
15    issues; and if, for health reasons, he can't testify.  We all
16    think that that's valid?
17            Any problem?
18            MR. LANGAN:  It's a broader issue, respectfully.  I
19    mean, isn't it?
20            THE COURT:  It is, depending on what the defendants
21    want.
22            MR. LANGAN:  I just think that the issue, what happens
23    if a party lists an expert and decides not to call them at trial,
24    the sort of what-happens-then issue applies to Mr. Bea, Mr. Gale
25    and others.
```

 1          THE COURT:  I agree.

 2          MR. LANGAN:  Hey, it sounds valid to me, but what's the

 3   effect of dropping an expert that you listed?  That's an issue

 4   that goes beyond Mr. Bea.  That's all I'm saying.

 5          THE COURT:  I agree.

 6          MR. LANGAN:  Thank you.

 7          THE COURT:  So, moving on, the United States lists -- is

 8   it Doughty?

 9          MR. HERMAN:  Correct, Your Honor.

10          THE COURT:  As a rebuttal expert who may be called.

11          And it seems to me that you should know whether you need

12   him or not.

13          MR. UNDERWOOD:  Mike Underwood on behalf of the United

14   States.

15          The answer is we -- here's our perspective we brought to

16   the table, Your Honor.  We wanted to be candid and

17   straightforward to the Court and all the parties and try to be

18   clear where we thought a witness fit in or didn't.

19          He's not a man that we would expect to call in our case

20   in chief.  We didn't want to sandbag other parties to have

21   somebody come in after they rest their case and say:  Here's a

22   rebuttal witness.

23          We're trying to be up-front about this.  I mean, we'd be

24   entitled to call a rebuttal witness, assuming it's appropriate

25   testimony.  We're trying to be straightforward about it and not

 1    hide the ball from anybody.  And we're concerned that we're being

 2    penalized for being straightforward with the parties and the

 3    Court.  And that's not what we're trying to do.  Just the

 4    opposite of not being straightforward.  So that's Mr. Doughty.

 5            The other three, Mr. Novak, Mr. Merala and Mr. Robinson,

 6    this was the issue we visited before.  Your Honor probably

 7    doesn't want to revisit it again, I suspect.

 8            Before their depositions, we indicated -- our BOP report

 9    has four co-conspirators authors.  Mr. Novak is our lead witness.

10    We intended to present him as our deposition witness.  BP

11    objected.  They won.  They took the deposition of the other

12    three.

13            They reversed course when it came to their own

14    co-authored expert.  We did not get that deposition.  Water under

15    the bridge, we get it.  We've moved on.

16            But, now, in terms of what we're doing at trial, it

17    presents the same issue.

18            Well, we've moved on most of the way.  Maybe one ore in

19    the water.

20            THE COURT:  You're not still bitter; are you?

21            MR. HERMAN:  No, not at all.

22            But we're addressing the same problem again.  We don't

23    want to call these guys.  We don't think they're needed.  But we

24    want to be straightforward to the Court and the parties, but we

25    don't want to be sandbagged.

```
 1            THE COURT:  The only time I see the sandbag issue coming
 2   up is if BP or another party would contend that Mr. Davis can't
 3   testify with regard to certain portions of the joint report.
 4            MR. HERMAN:  I think you're right.
 5            THE COURT:  So what I'd like to know is, is anybody
 6   going to do that?
 7            Because, if you're going to do it, I'm going to allow
 8   Mike to put these three guys on a may-call list.
 9            If you're not going to do it, and you're going to let
10   Mr. Davis testify with regard to the entire report, then they
11   come off the may-call witness.
12            MS. WOOD:  Your Honor, can I ask a question?
13            Rachel Clingman for Transocean.
14            I agree with your proposal, saying one lead testify and
15   we don't object.
16            We have the issue as well.  We have two co-authored
17   expert reports.  We only named the one lead person.  We haven't
18   addressed may-call experts.  We would -- I guess, if we have the
19   opportunity, we would name may-call witnesses.  But we did not do
20   that.
21            So we would like that to be expansive.  If there is a
22   multi-authored report, and one or the other is designated, that
23   that will be sufficient to admit the report in and allow the one
24   author to testify.
25            Which is what I think you're proposing for your expert.
```

```
 1            THE COURT:  And I guess -- and I haven't looked at the
 2   Daubert motions.  Haven't had the opportunity yet.  But ...
 3            MR. HERMAN:  Have you been able to open BP's zip file
 4   yet?  That was my first technical issue.
 5            THE COURT:  We got it.  We got it.
 6            I guess the issue is, are any of the Daubert motions
 7   raising this issue?
 8            MR. HERMAN:  I don't think so.
 9            MR. LANGAN:  I think not, Your Honor.
10            MS. CLINGMAN:  We think so.
11            THE COURT:  You think so.  As to whom?
12            MS. CLINGMAN:  No, we don't think so.
13            MR. LANGAN:  But I now have doubt.
14            MR. UNDERHILL:  Wait a minute.  We're only entitled to
15   one paranoid in the crowd.  Andy's squeezing my space here.
16            THE COURT:  Here's what I'd like you to do, guys.  I'd
17   like you go talk to the people you need to talk to and confirm to
18   each other that, as to co-authored reports, the lead that is
19   designated by any party is acceptable to testify concerning all
20   of the expert report and opinions.  And then those may-call
21   co-authors don't need to be listed.  Fair?
22            MR. UNDERHILL:  Yes.
23            THE COURT:  Thank you.
24            Andy.
25            MR. LANGAN:  So, Your Honor, I think our issue really
```

1    ties back to the issue you're going to rule on next week.  And I

2    think we're a little early.  So I think if there are going to be

3    as a matter of principle may-call experts, the rule should be the

4    same for everybody.

5         Now maybe what you're saying is it's only an issue for

6    co-authors.  That's the only place it's an issue.

7         But, if parties are allowed to say:  Well, I may-call an

8    expert, I may not.  Number one.

9         And, number two, the will-calls, if you drop them,

10   subject you to a different -- that's why we care.

11        Otherwise, we'd love to have all our experts be

12   may-call.  If there's a difference in how they're treated should

13   they be dropped.  That's the issue we're struggling with, I

14   believe.

15        THE COURT:  Well, I particularly understand the Bea/Gale

16   issue.

17        But I don't think that Gale has to be listed as a

18   may-call.  I think we all agree that, if there's a health issue,

19   legitimate, and there is a co-author, that's going to be some

20   good.

21        MR. LANGAN:  And they were both deposed.  To your point,

22   they were both deposed.

23        THE COURT:  Exactly.

24        So that would come before me on a good cause we need to

25   substitute the co-author for the six author and the guy comes in.

1           But, otherwise, I don't think they should be may-calls.

2           And then your last issue is what happens if they decide

3    to pull the will-call expert down

4           MR. LANGAN:  Right.  That's what you're going resolve

5    and have resolved and may clarify/may not clarify in the coming

6    days.

7           THE COURT:  Well, it's a little different, because what

8    we -- well, I guess we were.  We were talking about it in a

9    vacuum.  We weren't talking about, now that we have final

10   will-call witnesses, not calling them.  You see the difference?

11          MR. LANGAN:  I do.  I do.

12          THE COURT:  And so we've got to think about that.

13          I mean, if you know there are shifting sands --

14          MR. LANGAN:  Things happen at trial.  You make decisions

15   not to call, I don't need that guy anymore.  I mean, that happens

16   in every trial that's ever happened.

17          THE COURT:  And it looks to me like Steve wants to

18   comment on that issue.

19          MR. O'KEEFE:  Just as a point of clarification, though.

20          If it is a will-call fact witness, that witness cannot

21   be pulled down without the consent of the parties or leave of the

22   Court.

23          THE COURT:  Yeah.

24          For the telephone participants, Mike O'Keefe makes the

25   comment, and it is a correct one, that for fact witnesses, if

 1   they are on the will-call list of a party, they may not be pulled

 2   down without either a court order or agreement of the parties.

 3   They have to be made available.

 4        MR. HERMAN:  Steve Herman for the PSC.

 5        I understand why Gale is kind of a unique issue, but the

 6   reason why I stood up is that I don't think it's an apples to

 7   apples comparison when you have co-authored reports to reports

 8   that are not co-authored.  Because, assuming that somebody of

 9   that team that worked on the report takes the stand, irrespective

10   of whether the other ones do, the entire report presumably is

11   going to go into evidence, and the defendants or the other

12   parties are going to have the opportunity to cross that witness

13   presumably on anything that's in the report.  So it's already in.

14        And so it seems to me that that's a much different

15   situation than you have a single authored report, and everybody's

16   kind of thinking now that that evidence and the cross examination

17   of that evidence is going to be before the Court in some way, and

18   then that's pulled down all together.

19        So I think it's an apples and oranges situation.

20        Secondly, I agree with Your Honor, that we understood

21   withdrawn experts to mean withdrawn between whatever the date it

22   was in October and last week.

23        MR. MILLER:  Yes.

24        THE COURT:  And the final witness.

25        MR. HERMAN:  Correct.  We thought that, as of whenever

 1   the lists were served last week, once you list it, the experts

 2   then, they were not withdrawn.  They may herein after not be

 3   called by the sponsoring party, and that has whatever

 4   ramification it has.  But we thought Your Honor in that order was

 5   only dealing with experts that were withdrawn prior to the final

 6   witness list, not experts withdrawn now.

 7           THE COURT:  I agree.  I think that was the context in

 8   which we made the ruling.  And then we've been asked to modify it

 9   since then.  Yeah.

10           MR. HERMAN:  The only other comment that I have -- and

11   this I guess goes back to Andy's big point -- is, you know, we

12   have these will-call witnesses, and what our understanding is and

13   along the lines of what Mike O'Keefe just said, is, what that

14   means is we think that if the sponsoring party, for lack of a

15   better word, doesn't call them, he, she or it still needs to make

16   that witness available if somebody else wants to call them in

17   rebuttal.  But that doesn't mean that some other party will.  And

18   at some point the Court could still say it's cumulative.  Or, you

19   know, they might withdraw a witness and we don't want to call

20   them.  And then the witness doesn't have to testify.

21           THE COURT:  Well, they are other shifting sands.  What

22   if we have another party set?

23           MR. BECK:  Your Honor, this is David Beck.  May I be

24   heard?

25           THE COURT:  No.

```
 1            MR. BECK:  I agree with Mr. Herman.

 2            I know, I tried to rethink my position after I heard Mr.

 3    Herman, but I agree with him.  Because, in every trial, there's

 4    going to be a situation, particularly on the defense side, where

 5    you decide:  Look, I was going to call this expert, but there's

 6    no need to, because of the state of the evidence at the time.

 7            And so, it seems to me, that in trying to come up with a

 8    rule that is going to cover every conceivable situation really

 9    doesn't work.  It seems to me that Judge Barbier is going to have

10    to make a decision at the time based upon the state of the

11    evidence at the time.

12            So, for that reason, I agree with what Mr. Herman has

13    said.

14            THE COURT:  Well, look at that.

15            So what I'm hearing, David, is you are not going to have

16    any may-call experts?

17            MR. BECK:  I'm not going to have any what?

18            THE COURT:  May-call.

19            MR. BECK:  We have one may-call witness who is an

20    employee, and he's in this category where he's got factual

21    information but he also has expertise.  And that's Mr. Coronado.

22            THE COURT:  I understand.

23            But, if you're going to call him as an expert, I believe

24    we have agreed this morning that he's either going to be called

25    as an expert or he's not on your expert list.
```

 1                 Didn't we just cover that?

 2                 MR. BECK:  I thought we clarified that we had not

 3       withdrawn him as an expert.

 4                 THE COURT:  That's right.

 5                 But he can't be a may-call expert, is what I'm telling

 6       you.  You either put him on the list and he's a will-call witness

 7       as an expert --

 8                 MR. BECK:  What if he's in this category of this grey

 9       area where he's an in-house employee --

10                 THE COURT:  If he's giving expert testimony, he's an

11       expert.

12                 MR. MILLER:  He's category 2 and we'll deal with it next

13       week.  Your ruling.

14                 THE COURT:  Okay, guys.  David, are we done?  Can we

15       move on?

16                 MR. BECK:  I guess so.

17                 THE COURT:  Okay.

18                 So, next up.  As I said, I have not read the Daubert

19       motions, but I have to say that I was somewhat surprised to see

20       the number of them.  You all have retained experts.  I mean, what

21       is the basis for all these motions, guys?

22                 And I'm not suggesting you pull them down, but I am

23       suggesting the chances of Judge Barbier reading all of this prior

24       to trial is zero.

25                 MR. LANGAN:  Your Honor, he said all along he's going to

1    take them up as the experts come and the deadline was put in

2    place just because of Daubert.  We understand that.

3              THE COURT:  Okay.  I was just surprised by the number.

4              Now, we do need to talk about whether these really need

5    to be under seal.  We did it as a precautionary measure.  And it

6    seems to me we need to go back and take a look at what was filed

7    in your spare time and see if indeed they need to be under seal

8    or not.

9              So, if you all will start thinking about that, we'll

10   come back to it.

11             MR. HERMAN:  And we saw your order that you issued I

12   think yesterday or the night before.

13             THE COURT:  Right.

14             MR. HERMAN:  About the eventual need to unseal this, and

15   we appreciate that very much, Your Honor.

16             THE COURT:  Yeah, yeah.

17             MR. HERMAN:  On related to the broader issue of

18   confidentiality and seal motions, I mean, we're coming up on

19   trial.  And I think when we go to meet Judge Barbier next Friday

20   for a pretrial conference, I think we all need at least to have

21   the cards on the table and maybe even some idea of where we're

22   going.

23             Broader than the sealed motions -- and I have read all

24   the motions.  And, honest to goodness, I can't see how a single

25   one of them should be under seal.  I think there's a public right

1    to know and the parties' right to know.  And we'll figure that

2    out.

3           But the broader issue of trial that we have -- I don't

4    envision Judge Barbier kicking the public and the press and

5    non-parties out of the courtroom every time somebody raises a

6    confidentiality deposition.

7           And my perspective -- and certainly the Court may have a

8    different one, and some parties I suspect will -- is that the

9    only way realistically to handle this is that all of the

10   deposition designations have to be undesignated.  They just have

11   to be.  There's no way to try a public trial.

12          THE COURT:  Here's my thought.  Come trial, unless it's

13   the formula for Coca-Cola, it comes in.  And we're not going to

14   lock and unlock the door, or, you know, have proceedings that are

15   less than public.  So, if you're going to introduce the Coca-Cola

16   formula, let us know.

17          MR. UNDERHILL:  Pepsi.

18          THE COURT:  Pepsi.  Right.

19          But, unless it's something akin to that, we've got to

20   face the fact that anything that's presented at trial is of

21   record.

22          MR. UNDERHILL:  Thank you, Your Honor.

23          And we've been speaking about deposition designations,

24   and my comments were meant to include documents as well.

25          Just to inform the Court and the parties, that Mr.

```
 1    Langan wrote a letter last night.
 2           And, to partially respond to that letter about
 3    confidentiality issues, the United States in fact is under two
 4    statutory commands, the Privacy Act as well as the statute that
 5    protects the MMS database.
 6           The Privacy Act I deal with in my other practice, my
 7    usual job.  There are actually criminal and civil penalties for
 8    release of information that's protected under the Act.
 9           I don't know if Sarah mentioned when she was on the
10    phone, we've produce 55 million pages of documents.
11           THE COURT:  Her report told us that.
12           MR. UNDERHILL:  I did some math in my head.  If you
13    figure that -- I'm a reasonably fast reader -- if I read 1,000
14    pages a day, five-day work week, it would take me about 204 or
15    210 years to read those documents.  It's a fairly long time.
16           And what we did was push them out the door so that BP,
17    at BP's request, could get them in a very expeditious manner.
18    And we did that in a way that we didn't have to review the
19    Privacy Act material and the MMS database and spend 200 years
20    doing it.  That's why we did it.
21           Speaking to the issue of trial, that's a bit of a
22    different story.
23           What I'd suggest, as a practical way to move forward, is
24    that we separate going forward on Phase Two issues in
25    confidentiality designations -- we've got time to deal with that.
```

```
 1    We don't have time to deal with Phase One trial.  My suggestion
 2    would be, on Phase One, we open it up.
 3            We have -- we started this process ourselves with
 4    documents that we feel that we're under a statutory command to
 5    protect.  I think it's only about 300 trial exhibits.  I don't
 6    think any listed by us; they were listed by BP, Transocean,
 7    Halliburton, other parties.  We don't care if they come in.  We
 8    only care because they're protected information.
 9            One example, BP has requested the entire MMS database
10    for all its competitors as proprietary information, trade secret
11    information.  They got it because of the confidentiality.
12            In addition, we gave them their confidential
13    information, and all the other parties.
14            That's not our data we're protecting.  We're protecting
15    BP's data, other big oil companies and small oil companies.
16            We've narrowed down that list of documents, I think it's
17    -- I believe it's actually around 300.  And I think our cut to
18    date indicates that it's probably even only fewer than 100.  And
19    most of those are the well data for BP and its competitors.  And
20    so we're narrowing that down.
21            And we're trying to figure out ways, if we can narrow it
22    down to 50 or 100 or 150, ways to try to figure it out.  And we
23    might be able to do that by, if a party wants to introduce the
24    exhibit -- and, frankly, I don't think they're going to -- but,
25    if they do, perhaps to redact any information that would show
```

```
 1   which of BP's competitors it is and any identifying information,
 2   like a Macondo 252.  We may seek solutions.
 3             But we're trying to seek sunshine.  And that's what
 4   we're moving towards.  And we're trying to do that on our behalf.
 5   Because we want it to be an open and public trial.
 6             And, as far as the issue of embarrassment, you know
 7   what, documents are embarrassing.  Testimony is embarrassing.
 8   But that's the way it works.  That's how people do a better job.
 9             THE COURT:  Okay.  Well, obviously we have to look at
10   this in more detail.  I haven't read Andy's letter.
11             I'm behind the ball here, Andy.  But I intend to.
12             And so we can put this on our discussion list.
13             But that's my gut.  My gut is that we do have to think
14   about, at this point, Phase One starting.
15             MR. LANGAN:  Your Honor, I'm not sure I disagree with
16   anything Mr. Underhill said.  So, just to hit some highlights
17   here, I think we're really on the same page.
18             We understand the trial's public.  We understand that.
19   With probably virtually or maybe no exceptions, the trial's going
20   to be public.  And I can't think right now of a single thing
21   that --
22             THE COURT:  That wouldn't.
23             MR. LANGAN:  Yeah, no.
24             But I understand the point about the MMS database and
25   the competitors, and we'll work with Mike on that.  And other
```

```
 1    parties may have interest, too.
 2            THE COURT:  Good.
 3            MR. LANGAN:  I think the issue we were responding to was
 4    some of the discovery that's gone on and documents produced.
 5            Mike's point about getting documents out the door
 6    quickly for purposes of moving discovery along and being
 7    over-inclusive on confidentiality under statute or under
 8    discovery, same thing for us.
 9            I mean so --
10            THE COURT:  I have read that letter.
11            MR. LANGAN:  Yeah, same thing for us.
12            So we understand.
13            THE COURT:  So here's the deal.  You know, guys, the
14    dust-up that we had over that email, it was an April 22nd email,
15    it's over.  BP has withdrawn the designations.
16            Mike, I think it's clearly a Phase Two document.  It
17    didn't come up in response to Phase One search terms, and the
18    subject matter appears to be Phase Two.  So that's just water
19    under the bridge.
20            MR. UNDERHILL:  I may not disagree with you.  I think
21    actually it may relate to Phase One, but I don't think this is
22    going to be big battle and probably not one we have to have.
23            THE COURT:  I hear you.  But, if it didn't come up in
24    response to Phase One search terms, chances are it's not Phase
25    One.  You know?
```

 1          But, anyway, that --

 2          MR. LANGAN:  It certainly wasn't produced late, which

 3   was our point.

 4          THE COURT:  Right.

 5          So that dust-up is over.

 6          MR. LANGAN:  So I was just going to say, in terms of the

 7   process, under Pretrial Order 13, for people that want to raise

 8   confidentiality issues, as we talked about last week, the PSC has

 9   been systematic and hard working on this.  And we've worked very

10   well with them, and the other parties, over the course of many

11   months.

12          We invite the United States to joint that process.  And

13   it's hard to find the resources to keep up.

14          THE COURT:  You gave Mr. Irpino a compliment.

15          MR. LANGAN:  Absolutely.  And in our letter, too.  I

16   mean, the PSC has devoted a lot of resources to this.  And we've

17   tried to respond in kind, devote resources to it.  And we think

18   it's worked pretty well.

19          And we invite the United States to join us.

20          MR. UNDERWOOD:  Just to maybe put it on the radar screen

21   for Phase Two, because we're getting up to the point of

22   eventually taking depos.

23          One suggestion that we might make is that the Pretrial

24   Order 13 process is cumbersome, to say the least.  I don't think

25   it works very well.

1          One suggestion we have -- and I'd just put it on the

2     table -- is that, when a deposition is taken, there's a

3     presumption of non-confidentiality.  When a party introduces an

4     exhibit, then at that point, if it's the secret to Coca-Cola's

5     formula, and then if Coca-Cola is at the table, then Coca-Cola

6     says:  Hey, guys, I think that's my trade secret and I'd like to

7     conditionally or provisionally put it confidential or whatever,

8     and we can deal with that on a document by document process.

9          The way the pretrial order is structured, the onus is on

10    the party seeking the freedom of the document.  And it's too easy

11    for a party to put on the brakes and not have it released.  And I

12    think it should be the other way around.  The proponent of

13    keeping it secret should have the burden of keeping it secret.

14          THE COURT:  Okay.  Well, we'll put that on our Phase Two

15    agenda.

16          Mr. Roy.

17          MR. ROY:  Jim Roy from PSC.

18          THE COURT:  How are you?

19          MR. ROY:  I think that what Mr. Underhill just said is

20    actually also key to the use of Phase One documents that have

21    been marked confidential or testimony that's been designated

22    confidential by defendants.  It's critical for Phase One as well.

23          PTO 13 does not apply to trial.  It applies to

24    discovery.  To facilitate discovery.

25          THE COURT:  Right.

1          MR. ROY:  So, Your Honor, we certainly welcome your

2    remarks about, if it's the trade secret or it had better be the

3    trade secret to Coca-Cola, the formula; otherwise, no.

4          But the dilemma that all of the parties in this room

5    find themselves in, especially the PSC going first in the order

6    of presentation during the trial, is that we have exhibits and we

7    have testimony that are marked confidential.

8          And we're very sensitive to ever being accused,

9    rightfully or wrongfully, of potentially violating an order.

10   Especially involving something as sensitive as confidentiality.

11         So what we will do is file something early next week

12   that we believe is a mechanism to address the issue.

13         But we feel that we need an order of the Court to

14   protect all of us, on both sides, in that attempt to use

15   exhibits.

16         Otherwise, the Court is going to be put in the position

17   of, every time a defendant stands up and says:  Oh, wait a

18   minute, Mr. Roy, you know that's confidential, you know that, and

19   Your Honor we move to clear the courtroom -- that's just, we're

20   going to spend a whole year in trial.

21         THE COURT:  No, you're not.

22         MR. ROY:  I hope not.

23         THE COURT:  No, you're not.

24         Although, we're going to get to that in a minute,

25   because you might.

1          All right.  Guys, on Monday, you're going to be

2    submitting to me the issue of any email string, emails and email

3    string admissibility issues.  How are you coming on that?

4          MR. LANGAN:  Mr. Nomilini may be on the line.

5          We might ask for a day or two more.  I believe there was

6    a fairly productive meet-and-confer yesterday.  And I think, if

7    we could have a little more time, we might narrow the issues.

8          THE COURT:  Mark, how was your meeting yesterday?

9          MR. NOMILINI:  We had a terrific meeting with Jacksy

10   Bilsborrow -- excuse me if I'm mispronouncing his name -- - of

11   the PSC and some more folks from the PSC and the United States.

12         And if we could have maybe two more days, Your Honor,

13   until Wednesday, to make our submission, that would be terrific.

14         The other question that Jacksy and I had was, is Your

15   Honor expecting simultaneous submissions?  That's kind of how it

16   looked from the order.  But the other alternative would be that

17   we would make the submission on Wednesday, if Your Honor's okay

18   with that.  And then the PSC would respond.  And then we'd reply.

19         THE COURT:  Mark, that's fine.  I was hoping to get no

20   submissions, frankly.  But I guess that's not going to work; is

21   it?

22         MR. UNDERHILL:  Might, Your Honor.

23         MR. NOMILINI:  We've narrowed things down for Your Honor

24   to eight documents that we think will give us guidance as to the

25   rest.

1          THE COURT:  Good.

2          MR. NOMILINI:  And so we hope that that kind of lessens

3    everybody's load.

4          THE COURT:  Thanks, Mark.  I most appreciate it.

5          Mr. Breit, good morning.

6          MR. BREIT:  Jeffry Breit for the PSC, Your Honor.

7          Jacksy Bilsborrow and myself, as well as two

8    representatives from the United States Government, did meet and

9    confer over the last two days with Halliburton, Transocean, BP.

10         We have given each other an opportunity to exchange

11   about a dozen per defendant email strings.  We were able to

12   withdraw a few.  Halliburton lived up to part of its agreement to

13   provide a piece of a full king cake this morning in exchange for

14   our withdrawal.  BP has promised a deep dish pizza for two

15   exhibits we withdrew.  That has not arrived.

16         We are going to simultaneously brief.  We all thought we

17   were briefing on Monday the ten exhibits broken down by the

18   category as well as by exhibits so the Court can look at it and

19   say:  Okay, these ten look this way, acted accordingly.

20         But we have had pretty successful understanding of our

21   differences, but we could not bridge the gap.

22         THE COURT:  Okay.  I think that's helpful.  And I

23   appreciate your working on it, to reduce the number.

24         MR. MILLER:  I have a question on that issue.

25         THE COURT:  Yes.

1          MR. MILLER:  And that is, are we limiting the objections

2     to just hearsay issues?  Or does it go to Rule 404.2?

3          MR. NOMILINI:  I think -- Your Honor, correct me if I'm

4     wrong -- but I think the focus from the order was on, you know,

5     the business record/party admission issues so that we could all

6     get a set of guidelines on that to apply to the other documents.

7          MR. BREIT:  In addition, Your Honor -- and I don't know

8     if it's as big concern to everyone as it was to us -- a number of

9     these exemplars come from the list of 300.  We had a due date

10    back in September to object to the 300.  And, those objections,

11    we addressed and briefed and filed motions in limine.

12          It appears as though more than 50 percent of these

13    exemplars are from the 300, and they're all new objections, never

14    seen before.  So we've kind of said why are we doing this now

15    again.  And we plan to make that point very clear to the Court,

16    that we thought this happened; why are we having to go back now

17    with all new things from the same 300 that we objected to in

18    September; why did we brief it?

19          THE COURT:  Well, it seems like a valid question.

20          MR. BREIT:  I thought so.  And we're going to start our

21    brief with that and highlight with the exhibits from the 300.

22          THE COURT:  I bet you are.

23          MR. MILLER:  But for now it's more a business records

24    exercise.

25          MS. KUCHLER:  I have two questions, and maybe I am just

```
 1    being dense.  But I'm still not clear on what we're supposed to
 2    do by Monday.
 3              THE COURT:  I think it is the back thing that is
 4    overwhelming.
 5              MS. KUCHLER:  It might be, it might be.
 6              So are we only addressing the 300 initial PSC exhibits
 7    in this exercise?
 8              THE COURT:  Come on up, Mr. Breit.
 9              MS. KUCHLER:  That's my first question.
10              MR. BREIT:  We do not think so, Your Honor.
11              We picked exemplars from all of the exhibits, 7,000, as
12    it relates to these emails.
13              THE COURT:  And you've reduced the exemplars to how
14    many?
15              MR. BREIT:  Ten and 11.  And then one.
16              So I think we're down to 22 -- or is it 44 from one?
17              44 from BP, which are mostly from the 300.
18              And then, Halliburton, we're down to about ten.
19              And, Transocean, one, I believe, Your Honor.
20              THE COURT:  So, Deb, are you aware of those groupings?
21              MS. KUCHLER:  So I guess I just want to confirm there
22    are no Anadarko exhibits on your list of those that have issues?
23              MR. BREIT:  We all agreed that the admissions against
24    Anadarko would come in.
25              MS. KUCHLER:  That wasn't the answer I was looking for.
```

1          THE COURT:  You weren't at that meeting; were you, Deb?

2          MS. KUCHLER:  I guess I wasn't.

3          Maybe I need to get with Jeff after and discuss that

4     off-line.

5          But then we have objections on exhibits that happen to

6     be emails, but the objections are not because they are emails.

7     They might be on relevance or it's Phase Two not Phase One.

8          All we're supposed to be addressing on Monday are the

9     hearsay type things because it's in an email; is that correct?

10          THE COURT:  Yes.

11          Now, Mark asked for an extension of Monday's deadline --

12          MS. KUCHLER:  To Wednesday.

13          THE COURT:  -- to Wednesday so that they could continue

14     to see if they can narrow it.

15          But, Mark, as I understand what you said, you're going

16     to submit this grouping of email strings to me to rule on, and

17     you believe that will give you all sufficient guidance to go off

18     and look at all the email strings and act accordingly.

19          MS. KUCHLER:  So we have until Wednesday?

20          THE COURT:  Correct.

21          MR. NOMILINI:  That's exactly right, Your Honor.

22          THE COURT:  Okay.  Thanks, Mark.

23          MR. NOMILINI:  Thank you.

24          MS. BERTAUT:  Carmelite Bertaut for Cameron.

25          I don't have the order in front of me, but I am under

1    the impression based on my memo internally that what the

2    deadlines were originally for Monday was in document 5272, was

3    exclusively the PSC's list of 300.

4            And I think, although I don't have all those orders, the

5    reason there was additional meet-and-confers is because that's

6    what the Court directed us to do.

7            THE COURT:  It sounds like the guys have broadened their

8    discussion.

9            MS. BERTAUT:  And that's fine, Your Honor.  My concern

10   is, I knew the universe of 300.

11           I don't know that this applies to Cameron beyond the

12   list of 300.

13           THE COURT:  It may not.

14           But, guys, can you all circulate to all parties the

15   grouping of documents that you all are now discussing?  And let's

16   let everybody look at it.

17           And you'll be working, Carmelite, off the same set that

18   they're working off of.

19           MS. BERTAUT:  Because what I heard Mark or somebody say

20   is 7,000.

21           THE COURT:  No.

22           MR. NOMILINI:  No.

23           THE COURT:  Mark, you want to clarify?

24           PERSON ON TELEPHONE:  Actually, if that was Carmelite,

25   Carmelite, I think it's eight exhibits that we were going to

 1    present to the Court.

 2            MS. BERTAUT:  And, Judge, if I can just ask for

 3    clarification from Mark.

 4            I appreciate that you all are down to eight disputes.  I

 5    guess the question was the universe that you looked at to get to

 6    the eight.

 7            Because I understood the universe was 300.  Somebody

 8    said:  Oh, no, it was everything, 7,000.

 9            So -- and it may not impact Cameron at all, I don't

10    know.

11            MR. NOMILINI:  I don't know if there are any Cameron

12    documents in there.  I think that some of them are from the 300.

13    Some of them are outside the 300.

14            I think the goal was to get a good set of exemplars to

15    give the Judge so that we could get guidance in terms of how the

16    rules play out when it comes down to actual documents so that we

17    can extrapolate that to others.

18            MS. BERTAUT:  Thank you.

19            THE COURT:  Okay.  So, moving right along.

20            This is where, it seems to me, guys, we really need to

21    think long and hard about where we are.  We got the exhibit lists

22    in.  And we can do the math.

23            Who talked about doing the math this morning?  It was

24    Mr. Underhill, who is not in the room right now.  But you all

25    have listed 21,000 exhibits.  Please, people.

1          8,000 of them have objections; okay?

2          The list of exhibits covers almost 1,500 pages.  It's

3    1,472 PDF pages.

4          So, really, what do you think, how long would it take to

5    just admit those into evidence:  Your Honor, I offer and

6    introduce into evidence Exhibit 1.  And I'm not counting having a

7    witness testify to lay the foundation for admission of 21,000

8    exhibits.

9          So I would really, really, really, really like to

10   understand how in the world we came up with a 21,000 document

11   exhibit list.

12         Does anybody want to comment?

13         Mr. Breit, let me hear from you.

14         MR. BREIT:  How did I get that job?

15         I think that's unfair, Judge.

16         THE COURT:  Well, it may be, but that's the way the

17   cookie crumbled.

18         How in the world did it happen?

19         MR. BREIT:  Jeff Breit for the PSC.

20         What happened, Your Honor, from my understanding, is

21   there were 7,000 deposition exhibits that were introduced during

22   depositions.

23         We then had reliance exhibits that were attached to each

24   of the experts.

25         THE COURT:  Okay, that's fair enough.

 1              MR. BREIT:  That's a new list.

 2              THE COURT:  Good.

 3              MR. BREIT:  We then had depositions that were taken

 4      after July 31st of additional 80 witnesses, and then added to the

 5      list.

 6              And then there were depositions of the experts, 53 of

 7      them, where all new exhibits for purposes of cross examination or

 8      identification were added.

 9              THE COURT:  Okay.  So that's where the category of new

10      exhibits comes from?

11              MR. BREIT:  Most of the new exhibits come from too many

12      sources, Judge.  There were people during continued rolling

13      document production where all sides had teams reviewing and said:

14      Oh, my goodness, we would have loved to have used this for this

15      witness.  So they had to be put in.  And so that became a

16      continuing process.

17              There is the continuing de-duping process.  So I

18      understand that there's 21,000, but that may mean only 17,000

19      because the --

20              THE COURT:  Progress is being made.

21              MR. BREIT:  That's a big process.  I'm talking about 20

22      percent reduction.

23              The problem is that the Blye exhibit has 16 attachments.

24      Many of the lawyers chose to just use the attachments, and it got

25      a new exhibit number.

1      And that process is continuing with the tech people

2   trying to de-dupe.

3      THE COURT:  Okay.  So we'll get down to 17.

4      MR. BREIT:  How it exploded is not any one in

5   particular's fault.

6      THE COURT:  You don't want to finger anybody?

7      MR. BREIT:  There were 52 million pages from the United

8   States Government, and a lot of those are documents that quite

9   frankly people on the other side thought they might need.

10     As we shift through Phase One, Phase Two, the need is

11  unneeded.  So I anticipate on day one, with of course Mr. Roy and

12  Mr. Herman and Mr. Underhill deciding exactly at that moment how

13  to move all to the center of the pod, the Court's going to say:

14  Okay, they're in, there's objections, we can't rule on all the

15  objections, there's too many objections.

16     THE COURT:  Correct.

17     MR. BREIT:  So, if someone needs an exhibit and it's

18  needed for purposes of the Court in its final determination,

19  those objections will have to be decided at that point based on

20  rulings that have happened before, during and after trial.

21     THE COURT:  Bingo.  So we'll get to that in a minute.

22     Now, Kerry, you wanted to talk about the new exhibits?

23     MR. MILLER:  Oh, no.

24     I was going to say what Jeff said, that there was too

25  many sources to mention as to why there were 5,000 exhibits.  I

 1    agree with that.

 2            A couple of follow-up points to what Jeff said.

 3            Number one is you may be able to pare this down a little

 4    bit when you pull out the withdrawn experts' reliance materials.

 5    I think those materials ought to come out.  So that can be a

 6    project.  And I've put together a 21,000 line spreadsheet that

 7    tries to assemble everybody's exhibits and objections.

 8            And then the other thing I think that we should think

 9    about, in terms of possibly an easy way to deal with some of

10    these, is the foundational objections.  I think all of the

11    defendants got from Steve Herman this week a subpoena for their

12    records custodian.  And of course defendants have not subpoenaed

13    the other defendants' records.  Because we all have records from

14    other parties on our witness list to use as an admission against

15    interest or so on and so forth.

16            And it just seems to me, in this judge trial and what

17    Judge Barbier has ruled on and what you've said, that I can't

18    imagine that it's a good use of time or money to fight over

19    foundational objections.

20            THE COURT:  Totally agree.

21            So here's what I think my current thinking is.  And Mr.

22    Breit kind of got there.

23            So, okay, you've got objections to exhibits that were

24    used in deposition designations; right?  And there's a lot of

25    those exhibits.

1       Those objections may be, may be, resolved by Judge

2   Barbier's review of the deposition -- may.  They may be resolved

3   in connection with his preparation of his Findings of Fact and

4   Conclusions of Law.  And some may be excluded.

5       But, if Judge Barbier does not rule on an exhibit that's

6   attached to a deposition, the only thing I can think of is that

7   the deposition and the exhibits that have not been ruled on are

8   admitted into evidence.

9       If anybody has a brighter idea, please let me know.

10      Boy, Steve, you have a brighter idea?

11      MR. HERMAN:  No, Your Honor.

12      I was just going to bring up -- and I assume we'll talk

13  about this or maybe we won't next week at the pretrial -- but

14  just from a mechanical standpoint, I guess we were kind of

15  assuming that you've got all these deposition bundles that are

16  being submitted which include not only the deposition testimony

17  but the two-page exhibits and the exhibits that go with them.

18      THE COURT:  Correct.

19      MR. HERMAN:  And the two-page summaries.

20      At some point -- and I think we're assuming that there's

21  going to be some mechanism by which all of that gets into the

22  record --

23      THE COURT:  It is.  Because, remember, we've talked

24  about this I believe in our trial prep meetings, that when Judge

25  Barbier walks into the courtroom on February 27th, he will have

 1    done a lot of the work on those depositions.

 2         And so we anticipate that you all will have burned that

 3    information on to a CD or DVD, and you will offer and introduce

 4    into evidence the fact witness depositions and attached exhibits.

 5         MR. HERMAN:  Yeah.  And I think, you know, putting the

 6    specific mechanics aside, I think it's our kind of assumption

 7    that there will be a rolling list that's either maintained by us

 8    or by in inData or someone that at least keeps tracks of what's

 9    been actually offered.  I don't know what's actually been

10    introduced, but at least what's been offered.  So the Court will

11    already know that if Exhibit 2716 was already submitted with five

12    different depo bundles, it's already been offered.

13         THE COURT:  That's right.

14         And what I'm trying to work my way through with the

15    depositions, it seems to me we have no choice but to admit the

16    depositions and all of the exhibits that have not been ruled on.

17         So then, moving on from there, you are right.  It seems

18    to me that, for trial planning purposes, we need to agree who'll

19    be keeping track of the exhibits that are used during trial, if

20    they are presented during trial objections will be resolved

21    during trial, and those exhibits used where the objections were

22    overruled will come into evidence.  Right?

23         The third option, exhibits which are not admitted during

24    the live part of the trial and not designated in depositions

25    obviously will not be admitted.

 1          So, if you've got 21,000 exhibits, and 15,000 were not

 2    attached to depositions or used at trial, those do not come into

 3    evidence.

 4          MR. O'KEEFE:  Your Honor, may I interrupt you?

 5          THE COURT:  Sure.

 6          Speak up, Mike.

 7          MR. O'KEEFE:  If you take Steve's point and you go back

 8    to the first category that you discussed, which are the

 9    deposition designations, and what Steve I believe is saying is

10    that the morning of the trial when the plaintiffs present their

11    case, they offer Mr. Hayward's deposition bundle.  At that point,

12    the exhibits in Mr. Hayward's deposition bundle are offered.

13          THE COURT:  They are.

14          MR. O'KEEFE:  And what you're saying is that the

15    question of admitting those exhibits may have been resolved in

16    part by Judge Barbier as he goes through this process of reading

17    them.  Or, at the end, when he's liking at his findings, and he

18    decides to admit or exclude an exhibit.  But, if there's no

19    ruling by Judge Barbier excluding specific exhibits from the

20    Hayward deposition bundle, then all of those exhibits by the end

21    of the trial would be considered admitted into evidence, the

22    offer having been made at the beginning.

23          THE COURT:  Isn't that what I just said?  Or am I on a

24    parallel universe?

25          MR. O'KEEFE:  That's what you said, I thought.

 1          THE COURT:  Let me back up.

 2          If the deposition has 100 exhibits, Judge Barbier may,

 3  during his review of the deposition, rule on an objection.  We'll

 4  know about that.

 5          After the admission, after the trial, he may again have

 6  the opportunity to rule on an exhibit attached to a deposition,

 7  and we'll know about that.

 8          But, if he does not rule on an objection, the deposition

 9  is offered into evidence and all unruled exhibits will have to

10  come into evidence.

11          MR. O'KEEFE:  I agree.

12          THE COURT:  Does anybody disagree with that?  That's

13  when Steve stood up.

14          MR. O'KEEFE:  Yeah.

15          MR. HERMAN:  And at the time of the expert's testimony,

16  presumably when the expert's report is offered in direct or as

17  part of direct, then at that time the reliance exhibits that

18  accompany that report are -- I mean, we'll probably go through

19  the formality of saying it on the record -- but, from a

20  mechanical standpoint, they'll be offered at the same time as

21  well.

22          THE COURT:  Correct.

23          So they'll be offered and introduced into evidence, and

24  all of those will come in.  Unless he ruled on a particular

25  exhibit.

 1            MS. KUCHLER:  So just logistically -- Deb Kuchler from

 2    Anadarko.  Would it make sense to have a joint master spreadsheet

 3    of all the proposed exhibits with objections, whether they've

 4    been ruled upon, admitted?  Rather than the way we would normally

 5    do it, everybody would keep their own list of that.  But this is

 6    going to be particularly confusing.  Should there be a master

 7    list that we all try to agree on, so that we're all on the same

 8    page?  And, if so, how do we accomplish that?

 9            THE COURT:  Mark Nomilini, what is your thought?

10            MR. NOMILINI:  Your Honor, one suggestion that was made,

11    which I think is a good one, is that inData, and perhaps Jordan

12    Ray specifically, be the master in terms of keeping a tracking

13    chart.  Of course, with the help of all the parties.  I think

14    each party should have somebody assigned to make sure that their

15    list is consistent with Jordan's list.

16            I think I talked to Jordan about that awhile ago, but

17    I'd want to follow-up with him to make sure he's comfortable with

18    that role.

19            THE COURT:  Okay.  Let's talk about that and think about

20    it.  But it is something we have to keep track of, no question

21    about it.  Because the Court -- I can assure you that the

22    courtroom deputy cannot do this.

23            MS. KUCHLER:  But, ultimately, the courtroom deputy is

24    responsible for that.

25            THE COURT:  That's right.  And, in trial planning, which

1    I've got a little bit later on, what we're going to have do is

2    have a marshalling conference every Thursday.  At the conclusion

3    of every Thursday session, we're going to marshal our exhibits

4    with the courtroom deputy and make sure we've got it straight.

5    It will be a weekly marshalling meeting.

6         MS. KUCHLER:  Okay.

7         And then two related issues.

8         If the trial is paperless -- I assume though that if we

9    want to have a witness look at an exhibit, that witness has the

10   right to have a hard copy in case they want to put it in context.

11   Same thing when impeaching with a deposition transcript.  Should

12   we just plan that whoever is going use that exhibit is going to

13   bring the hard copy?

14        THE COURT:  If you want it.

15        MS. KUCHLER:  Or would Jordan have all of the exhibits

16   there, one master set, that we would pull from?

17        THE COURT:  I don't know.  You'll have to speak to

18   Jordan about that.

19        I don't think he's planning on having one master set.  I

20   think he's just planning on pushing buttons.

21        MS. KUCHLER:  So, if we're going to use two exhibits

22   with the witness, we'll bring a hard copy with the witness?

23        THE COURT:  That's my impression.  But call Jordan and

24   speak to him.

25        If you'd like him to provide that service, I'm sure

 1   he'll that for a fee.

 2           MR. LANGAN:  Andy Langan for BP.

 3           I think you're asking for comments on the process point.

 4           THE COURT:  I am.  I absolutely am.

 5           MR. LANGAN:  So I think we're fine with it.  But, just

 6   to make sure I understand, for the first set of deposition

 7   exhibits, attached to depositions which are offered at trial as

 8   part of the deposition cut process, there are hundreds of

 9   exhibits attached, and Judge Barbier may say that's out as part

10   of his review, he may say that's out as part of his findings and

11   conclusions.  But, otherwise is admission.

12           THE COURT:  I think that's right.

13           MR. LANGAN:  We're perfectly fine with that; because, as

14   part of this process, our objections will have been noted.  So it

15   isn't like we've given up anything for purposes of the record.

16   I'm not sure what more a party could ask for.

17           THE COURT:  I think that's right.  That's how I'm

18   looking at it and I think that's right.  I don't see any other

19   way of skinning the cat.

20           MR. LANGAN:  So default is admitted.

21           THE COURT:  That's right.

22           So, moving right along, we've got all these motions in

23   limine sitting on Judge Barbier's desk, and I believe we got one

24   out that was a priority.

25           Are there other priorities that you want me to

1    communicate to Judge Barbier, that, as he works his way through

2    the motions, he should put at the front?  And not everybody stand

3    up and say:  Mine, mine, mine, please.

4          MR. UNDERHILL:  I think he's actually got two out.

5    There was one on the MDI JIT exclusion, as well as the one for

6    Phase One, Phase Two.

7          THE COURT:  I didn't see any JIT exclusion.

8          MR. UNDERHILL:  On that one, we have -- seeking Your

9    Honor's guidance -- we think the ruling is great.  There's an

10   ambiguity that I think all the parties might want clarified, and

11   here it is.

12         THE COURT:  On which of the rules?

13         MR. UNDERHILL:  And here's where it is.  This is the

14   MBI, the 46 USC 6308 exclusion.

15         That, the ruling is very clear that neither one of the

16   reports come in.  That none of the testimony comes in.

17         The ambiguity comes over photographs and data.  Because

18   the judge -- and I'm paraphrasing from memory -- that the default

19   is that the photographs and data included in the report or the

20   JITs report doesn't come in.

21         However, the judge qualifies it by saying that:  If data

22   would have independently been generated -- and that's a

23   paraphrase -- then it can come in.

24         Here's the specifics -- thank you, Kerry.  Quoting from

25   Judge Barbier's order, page 2, Docket No. 5448, quote:  Joint

1    investigation testimony, photographs and other material within

2    Volumes 1 and 2 are excluded, though this does not prevent the

3    admission of evidence existing independently of the joint

4    investigation or that likely would have been created absent the

5    investigation.

6           Here's the issue.  The BOP examination was done by the

7    JIT, under their auspices.  DNV was working for them.

8    Destructive testing was conducted with the parties' protocols and

9    with Court approval.

10          I think what the Court was saying, that, for the BOP

11   testing, that the independent testing -- not the DNV report

12   itself -- but the use of the data, use of the photographs and

13   obviously the parties' experts' independent data and photographs

14   can come in.

15          But that's not clear from the record.  So we would like

16   some clarification.

17          Otherwise, I probably wasted a couple million dollars of

18   BOP experts attending the testing, because none of it comes.

19          THE COURT:  Whoops.

20          MR. MILLER:  I agree with you.  There was so much court

21   involvement with the process with DNV in terms of taking the

22   pictures and doing the measurements and being out at Michoud,

23   that we share Mike's interpretation that the DNV data --

24          MR. GODWIN:  Not opinion.

25          MR. MILLER:  -- DNV data was the independent material

 1    that's referenced in the report.

 2            THE COURT:  Right.  And Don makes a good distinction,

 3    it's the data, the photos, not opinions.

 4            MR. MILLER:  I think the opinions would be hearsay

 5    anyway.

 6            THE COURT:  Carmelite?

 7            MS. BERTAUT:  Judge, I'm certain Cameron's going to want

 8    to be heard on this, I believe.

 9            THE COURT:  On what?

10            MS. BERTAUT:  On the clarification and what we think the

11    judge was saying.

12            THE COURT:  I'm going to ask the judge what he was

13    saying.

14            MS. BERTAUT:  Well, that's fine.

15            THE COURT:  You can submit anything you want.  But I'm

16    going to tell him that the parties have raised the issue that

17    they need clarification relative to the DNV testing and data.

18            MS. BERTAUT:  I hear you, Judge.

19            THE COURT:  And we'll let him tell us what he meant.

20            MS. BERTAUT:  And so, if we have some comments that we'd

21    like the judge to consider as he considers the clarification, we

22    can have until Tuesday for that, Your Honor?

23            THE COURT:  Sure.  Sure.

24            MS. BERTAUT:  Thank you, Your Honor.

25            MR. UNDERHILL:  Judge, Mike Underhill again.

1          For Judge Barbier's benefit, who had the distinct

2     pleasure of not having to be at Michoud, the parties themselves,

3     as I understand it, were not allowed to take their own

4     photographs.  It was generally done by the DNV or the

5     photographer or the FBI.  And some of those photos -- I don't

6     know -- but I suspect some of those may be in the DNV report.

7     But we couldn't take our own photographs.

8          So, just to have that clarification.  Because, if the

9     judge says that:  Well, if it's included in the DNV report or

10    then published in the JIT report, a photograph, I'm hoping that

11    that's not going to be admissible.  Because that's all we've got

12    to work with generally, are photographs.  Not the interpretation,

13    not the conclusions, not DNV's interpretation.

14         THE COURT:  Not the opinion, okay.  Good enough.

15         Now let's talk about other priorities on the stack of

16    the elimination.

17         MR. MILLER:  Your Honor, before you move on to that,

18    going back to this one.  It's a related question.

19         The culmination of his ruling from yesterday says that

20    these reports and testimony are subject to the following.  And,

21    you know, and he says, and he says:  Any expert reports that rely

22    upon the inadmissible data are stricken or portions of reports

23    that rely upon the inadmissible data are stricken.

24         So, is there a process in place by which we identify

25    what expert reports and what portions of the expert reports are

1   going to be stricken and not part of the record based on this

2   ruling?

3          The ruling doesn't say what reports are stricken.  I

4   think it leaves it up to the parties to figure it out.

5          THE COURT:  It does leave it up to you all.  Because,

6   you see, there's just the four of us in the court working on this

7   case.  And three of us have other dockets besides the Deepwater

8   Horizon.

9          MR. LANGAN:  And you guys do one heck of a job, I might

10  add.

11         THE COURT:  So that's why it's put it back in your laps.

12         I don't think -- I mean, my recollection of reviewing

13  the expert reports is that they did not base their opinions

14  exclusively on these reports.  They may have based it on the DNV

15  data and photographs.  So I think that's a really important

16  distinction that we'll have to have him clarify for you.  But

17  that's my impression.

18         Is that your impression, Andy?

19         MR. LANGAN:  I'm just getting up on the other issue, but

20  I will say this.  I think some experts are more vulnerable than

21  others in terms of their reliance on what is now sort of

22  forbidden fruit, if you will.

23         THE COURT:  Well, you all knew that this ruling was out

24  there.

25         MR. LANGAN:  Absolutely.

```
 1              THE COURT:  So you proceeded at your own risk.  C'est la
 2    vie.
 3              MR. LANGAN:  Your Honor, I was just going to say that if
 4    you're asking for a wish list --
 5              THE COURT:  I would like a wish list.
 6              MR. LANGAN:  From BP's perspective, is what we call the
 7    other incidents motion.  It's sort of bang for the buck, if you
 8    will, in terms of narrowing the number of exhibits, narrowing all
 9    types of other stuff.  If it happens to come out in the correct
10    way, in our view.  So that's one.
11              THE COURT:  Okay, good.
12              Any others?  Solicitation?  Just take them in order,
13    huh?
14              Okay.  Good.
15              All right, moving on.  We've covered stipulations.
16    Demonstrative aids were on schedule for February 15th and
17    February 22nd for exchange and objections.
18              Did you all have any issue about office space or
19    otherwise?  Are you all working on that, it's going fine?
20    Nothing to report as far as my involvement?
21              (No response.)
22              THE COURT:  Good.
23              Contacting you the court reporters, are you all in gear
24    on that?  Any issues coming up?
25              (No response.)
```

1           THE COURT:  Good.

2           Information technology.  We've got the dry run on

3    February 16th and 17th starting at 8:30 a.m.  That will include

4    all the techs, all the court reporters.

5           They're going to want to talk about printers and other

6    items that you're going to need either in Judge Barbier's jury

7    room or in the courtroom.  So just have --

8           MR. NOMILINI:  Your Honor, may I be heard on that?

9           THE COURT:  Sure, Mark.

10          MR. NOMILINI:  We had a good call last week with Jordan

11   Ray of inData and all the other parties of getting all the

12   documents that are on the trial list to the trial tech so that

13   they can be put up on the screen.

14          We circulated a proposal this week based on the call,

15   and got some good comments from various parties.  And we'll be

16   submitting that to the Court hopefully early next week.

17          The other good news -- hopefully, we'll have the report,

18   Your Honor -- is we hear Your Honor's comments about narrowing

19   exhibit stuff.  And so I think that for the briefing to be

20   submitted next week.  Unless Your Honor or the PSC thinks

21   otherwise, we can narrow it down to four exhibits instead of

22   eight.

23          And, for Carmelite's benefit, those are 1917, 3112, 6221

24   and 6228.  And we'll email a copy of those to Carmelite as well.

25          THE COURT:  Okay, great.  Thanks.

1        MR. FITCH:  Judge, Tony Fitch with Anadarko.

2        With respect to the dry run, will that essentially be

3   100 percent information from inData and court personnel to

4   counsel for the parties?  Or will the Court expect counsel for

5   the parties to have any agenda or any presentation to try out

6   anything?

7        THE COURT:  I don't think so.

8        I want to make sure that all of your people who are

9   going to be making the presentation happen for you are there.

10       MR. FITCH:  Lawyers and support personnel?

11       THE COURT:  Right.

12       But I don't want 100 lawyers there, because that's just

13  not helpful.  Whoever is going to be interfacing with your tech

14  people and making the presentation, seems to me, should be the

15  people that are there.

16       MR. FITCH:  Agreed.

17       THE COURT:  Now, next week, at the pretrial conference,

18  Judge Barbier is going to want a small group as well, because

19  it's a pretrial conference.  It's not a free-for-all status

20  conference.  So he's looking for trial counsel and maybe second

21  chair.  Because we don't want hundreds of people there.

22       MR. FITCH:  I couldn't agree more.

23       THE COURT:  You know, it's not helpful to have hundreds

24  of people there, talking about pretrial matters.

25       MR. FITCH:  I just wanted to make sure there wasn't any

1      expectation for counsel on the dry run.

2              THE COURT:  No.  The dry run is to make sure that we get

3      everything straight as far as presentation; so that, if there are

4      any glitches, we have a week to get the glitches straightened and

5      make sure that on Monday the 27th all is smooth.

6              And you certainly can't help in that endeavor.  So you

7      should not be there.

8              MR. FITCH:  I intend not to be there, Your Honor, I can

9      assure you.

10             THE COURT:  Okay.  Here we go.  Where did we leave off

11     on allocation of opening statement?

12             Andy want to talks about it.

13             MR. LANGAN:  No.  I just remember.

14             At the end of October, you handed out a revised list

15     that I remember gave us back our 90 minutes for BP.  And I think

16     that has been circulated and is out there.

17             THE COURT:  It's out there.

18             Has anybody got comments, questions?  Otherwise?

19     Because, if not, I will then sit down with Judge Barbier, and

20     he'll be prepared to discuss that with you at the pretrial

21     conference next week.

22             MR. LANGAN:  If it's helpful to Your Honor, I can resend

23     to you what was passed out.

24             THE COURT:  I'm sure we have it.

25             MR. LANGAN:  If for whatever you can't find it, I can

1    find it easily and can send to you and all the parties.

2         THE COURT:  Yes.

3         MR. UNDERHILL:  The first time, Andy gave us enough time

4    to get our name out and our representation, and Andy decided to

5    take a couple of hours or five hours for BP.

6         So I just wanted to check to make sure he gives me a

7    little more time.

8         THE COURT:  Then, Andy, if you wouldn't mind, would you

9    circulate the list to everyone?

10        MR. LANGAN:  I will.

11        THE COURT:  And then everybody take a look at it; and,

12   if you've got comments, please give them to me early next week so

13   I can sit down with Judge Barbier and talk about it.

14        Corey, you got something on that?

15        MR. MAYES:  Yes.

16        Corey Mayes for the State.

17        Since the time that that list has been given out, we

18   have named coordinating counsel for the states.  Our

19   understanding is that whatever time comes out on the final list,

20   we would just split that amongst the states.

21        THE COURT:  I think that's right.

22        MR. MAYES:  We just wanted to get that clear.  So, when

23   you talk to Judge Barbier, that that's our understanding.

24        THE COURT:  That's right.  Thank you, Corey.

25        MR. LANGAN:  You passed out notes not for the record

 1    following the October 14th conference.  I think we made a pitch

 2    to get our 90 minutes back.  I think you said that was fine.  And

 3    you passed out a document shortly thereafter, and that's what I'm

 4    going to circulate.

 5              THE COURT:  Which was a draft allocation of opening

 6    statements.

 7              MR. LANGAN:  That's right.  And that's what I'm going to

 8    send around.

 9              THE COURT:  Perfect.

10              Okay.  So we already spoke about the exhibit

11    marshalling, but we're going to have weekly Thursday marshalling

12    meetings during the trial so that we keep ourselves straight at

13    the end of every trial week.

14              So that is the conclusion of our Phase One agenda.  So

15    anybody who is on the phone for Phase One may drop off.  Anybody

16    who is here in the courtroom only for Phase One may drop off.

17              And, those who are here for Phase Two, do you all want a

18    quick break, or are you ready to just keep rolling?

19              Roll.  Okay.

20              Those of you who need a break, go take a break and come

21    back in.

22              Phase Two stipulations.

23              MR. SKERITIES:  Your Honor, before we go to Phase Two,

24    it's Ted Skerities.  We can take it at the end, but we still do

25    have an issue on the B-3.

1           THE COURT:  You do.  And I'm just to take it up, Ted.  I

2   haven't read all the email traffic on it, I have to admit to you.

3   So I thought I'd defer it yet again, and I'm sorry to do it to

4   you.  But I haven't read all of the traffic -- something came as

5   of last night that --

6           MR. SKERITIES:  I couldn't hear that last part.  There

7   was some static on the line.

8           THE COURT:  I think you caused it.

9           But I haven't finished reading everybody's emails.

10          MR. SKERITIES:  So you want to put it off to the 3rd?

11          THE COURT:  If you don't mind, Ted.

12          And I should have told you that earlier on today's

13   conference.  I just am not ready to gather my thoughts and talk

14   sensibly about it.

15          MR. SKERITIES:  That's fine.  I'll actually be down

16   there on the 3rd, so that's fine.

17          THE COURT:  Thanks.  I appreciate it.

18          MR. UNDERHILL:  Good news.

19          THE COURT:  Good news.  We're back on Phase Two

20   stipulations.

21          MR. UNDERHILL:  Mike Underhill, US.

22          Your Honor, I think with your gentle and sometimes not

23   too gentle prodding, I think the parties can say that they've

24   accomplished what I thought would be impossible.

25          Out of 167 proposed stips on Phase Two, I think there's

1    agreement amongst the parties as to 133.

2              THE COURT:  Wow.

3              MR. UNDERHILL:  Which is, I thought would have been

4    impossible given the different interests of the parties.

5              THE COURT:  Wow.

6              MR. UNDERHILL:  So, with respect to those remaining few,

7    and I stress the word few, and Mr. Barr will speak I think that

8    the PSC -- I don't want to steal his lines -- but I think that

9    the PSC feels that if BP cooperates and they mutually try to work

10   together, they may be able to narrow down even a few more.  I'll

11   let Brian speak to that.  But I think that this is a huge victory

12   on the parties working together, and we thank the Court for

13   keeping our feet to the fire.

14             THE COURT:  I thank you guys for doing it.  So there you

15   go.

16             MR. UNDERHILL:  Now that I've given you payment in terms

17   of doing that, I'm going to ask for something back.  It's the way

18   it works, come on.  I think this is a simple one.

19             Part of the relationship of the Phase Two stips are to

20   the requests for admission.  There are a lot of reasons for doing

21   it.  One reason was to try to narrow our phase.  I think ours are

22   due on Monday.  And we'd request a two week extension for two

23   reasons.  To see if the parties can further narrow the gap.  That

24   will give us back some time so we don't have to scramble and

25   revise.  So if that's okay with the Court.

```
 1          THE COURT:  That's okay.  Unless somebody has a big
 2  objection to that, I think it's more helpful to do it by
 3  stipulation rather than struggle with a response to a request.
 4          MR. UNDERHILL:  Okay.
 5          THE COURT:  Brian, congratulations.
 6          MR. BARR:  Thank you, Your Honor.
 7          Brian Barr for the PSC.
 8          Like Mike said, we have 133 that I think all parties
 9  agree to.
10          THE COURT:  So we're just down to 34.
11          MR. BARR:  There were 25 that the PSC couldn't agree to.
12  There were 20 that Transocean couldn't agree to.  Of those, I
13  think 11 of Transocean's overlapped.  Nine of those were
14  different.
15          I'm hopeful -- from the PSC's perspective, there's four
16  or five that are just nonstarters for us.  Maybe we can tweak the
17  language, maybe we can't.  We're willing to keep working on it.
18          Of the remaining, there are ten that by striking of
19  rights we fixed them.
20          We don't -- it's a stipulation.  I'll give you an
21  example of where, it will be something like on May 25, 2010
22  industry representatives met and came up with this procedure.  We
23  don't like the term industry representatives, because it has
24  broad connotations that we have issues with.  We think the term
25  that -- BP gets the stipulation that the meeting occurred without
```

 1    industry representatives.  The fact is still there.

 2              THE COURT:  But who met?

 3              MR. BARR:  We don't know.  That's why we can't agree to

 4    it.  We think BP knows who was in the meeting, and we would be

 5    willing to agree to it if they would put who was there.

 6              THE COURT:  How about representatives of the Shell,

 7    Exxon, BP.

 8              MR. BARR:  That would be fine, Judge.

 9              THE COURT:  Could you live with that?

10              MR. BARR:  Yes, because then we know who is there.

11              But just agreeing in the blind like that is a problem

12    for us.

13              THE COURT:  Okay.  I understand.

14              MR. BARR:  There's another set of nine to ten dealing

15    with the word approval.

16              THE COURT:  I saw that.

17              MR. BARR:  We talked about that before.

18              THE COURT:  We talked about that.

19              MR. BARR:  And our view of legal of what approval means

20    in this context.  We think that can be fixed.  We've suggested

21    this to BP.  They haven't accepted it at this point.  But to put

22    the fact in the passive voice and to say on April 20, 2010 a

23    procedure to do X was finalized.  We think that fixes it, you get

24    the fact.

25              THE COURT:  Finalized or adopted.

1          MR. BARR:  Get the fact, it's agreed to.  What approval

2     means, we don't have to argue about that right now, because we

3     haven't done discovery.

4          THE COURT:  Okay.

5          MR. BARR:  That's our view.  We think a lot of this can

6     be fixed.

7          We can go further -- if we can't get it resolved, the

8     good news though is we do have a document.  It has 133

9     stipulations that all parties agree to.

10         And then I think what Mike is suggesting are the

11    remainder -- the remaining 34 are addressed in their request for

12    admissions --

13         THE COURT:  Well, the ones that you all can't resolve,

14    why don't we see if a quick conference call with me might get a

15    few more done.  I'm not going to force anybody to accept this or

16    that; but, you know, a new set of eyes sometimes helps.

17         So maybe we could, the second week of February, send me

18    the 15, 20 that you have not been able to agree on.  We'll have a

19    conference call and see if we can agree to a few more.

20         MR. BARR:  I think that works well for us.

21         The only thing I would add is there are 32

22    definitions -- and this is just so you have full disclosure of

23    where we are.  Of the 32 definitions, that are 29 that have been

24    agreed to.  So there's only three definitions that we haven't

25    been able to agree on.  So, like Mike said, I think we've made

```
 1    very good progress on this.

 2            THE COURT:  Thank you, Brian.  Most appreciated.

 3            Mr. Roberts, you've taken a seat at counsel for

 4    plaintiff's table?

 5            MR. UNDERHILL:  We didn't vote on that, by the way.

 6            THE COURT:  Come on up, Rob Gasaway.

 7            It's going to be like survivor and they're going to vote

 8    you out.

 9            MR. GASAWAY:  Quickly, Your Honor.  Rob Gasaway for BP.

10            We think the suggestion of a court-brokered call is

11    right on as to the stipulations.  We'll take the laboring ore in

12    terms of setting the table for that stating what all the

13    stipulations are.  Obviously, we know how busy the Court is.

14    But, the sooner that could happen, we think the better.  But

15    we'll get a table, we'll let you see what's agreed to, what's

16    not.

17            THE COURT:  You all name it.  We can set it now.  I

18    mean, we can set it today.

19            MR. GASAWAY:  We would be available next week.  I don't

20    know if the Court and the other parties are.

21            THE COURT:  Brian, do you all want to have more

22    meet-and-confers and try and narrow it further, or did you want

23    to just have a quick call, everybody dial in next week?

24            MR. BARR:  We've talked a lot about this, and I don't

25    want to say we've reached an impasse, but I don't know that
```

1    further conversations without at least some guidance maybe.  So I

2    think a call next week might be good.

3              THE COURT:  All right.  Well, why don't we look at --

4    what's today's date?

5              THE CLERK:  27th.

6              THE COURT:  I'm looking at today.  That's not helpful;

7    is it?

8              Well, how about Tuesday -- I don't know, Rob.  Things

9    are looking rough next week.

10             MR. BARR:  Maybe I can offer a suggestion.  If next week

11   doesn't work --

12             THE COURT:  No.  We'll find time next week.  I think

13   this is something we really need to focus on.

14             MR. BARR:  But I do think a couple of things you have

15   said so far today maybe have already provided us some guidance.

16             THE COURT:  Why don't we go for -- how do you all look

17   for Monday afternoon?

18             MR. BARR:  Fine with me, Your Honor.

19             MR. GASAWAY:  Monday the 30th?

20             Derick Benson, are you on by any chance?

21             MR. BENSON:  Yes, Rob, I am.

22             MR. GASAWAY:  Can you suggest a time that would be most

23   likely to work for you and Mike Cutso.  And we'll have to get

24   back to you, Your Honor, because Mike has been in the middle of

25   this conversation.  But let's try to set a tentative time Monday

1   afternoon.

2           What would you suggest, Dereck?

3           MR. BENSON I would suggest 3:00 o'clock Eastern Time, so

4   2:00 o'clock local.

5           And I will confer with Mr. Cutso as quickly as possible.

6           THE COURT:  Another question, guys, now that I'm

7   thinking about it.  Do we need a different email distribution

8   list for Phase Two?  Just think about it.  I don't want an answer

9   now, but it seems to me we might want --

10          MR. HAYCRAFT:  We may want to add to the existing.

11          THE COURT:  Add to, kind of like we're doing with the

12  state of Louisiana kind of stuff coming through.  You all might

13  want to think about whether we want to include additional people

14  on the Phase Two emails.

15          But why don't we tentatively say Monday, 2 p.m., we will

16  distribute an email giving you the guidance.

17          MR. BARR:  All right, Your Honor.  Thank you.

18          On the Rule 30(b)(6) for BP, the only issue that appears

19  to be outstanding is the records custodian topic.

20          MR. GASAWAY:  Yes, Your Honor.  Let me make a suggestion

21  with respect to that, if I may.

22          First of all, that letter that came in very late last

23  night from Mr. Langan, and I do recommend it to Your Honor's

24  attention, it's an excellent letter.

25          That has to do with a separate issue having to do with

 1    overlap.

 2              THE COURT:  Right.  I saw that.

 3              MR. GASAWAY:  So once Your Honor digests that letter and

 4    makes that ruling, that will put that to bed.

 5              On the record custodian issue, let me sort of review the

 6    bidding there for Phase Two.  It's not going to surprise Your

 7    Honor that this came up in the context of the Phase One record

 8    custodian issue that you're dealing with.

 9              THE COURT:  Right.

10              MR. GASAWAY:  It's also not going surprise Your Honor

11    that we agree with what Mr. Miller said when he was here about

12    this being raised by the PSC versus defendants, but also you can

13    imagine the same issue coming up from one defendant to another.

14    For instance, if they want to lay a foundation with the records

15    custodian for BP, should we want to do that with respect to these

16    various entities of the United States Government.  And it's

17    quickly becoming a more complex question.

18              You can also imagine that the specific language of the

19    records custodian deposition is of concern to us.  BP has an

20    organization of 400,000 employees, multiple systems, et cetera,

21    et cetera.

22              We have not seen a proposed topic.  What we have, you

23    know, is an email that we put into our report saying that they

24    wanted to have this.

25              What I would suggest -- and I'm suggesting off the top

01.27.12 Status Conference

```
 1   my head here based on the conversation with the Court -- is that
 2   we go ahead, finalize the issue raised in Mr. Langan's letter,
 3   finalize the BP topics as to everything else, let you work
 4   through the records custodian issues with respect to Phase One
 5   trial, which are more pressing.  We do have concerns about the
 6   breadth of that.  We do have the issue Mr. Miller raised about do
 7   we need one for others.  But let's just put the whole Phase Two
 8   record custodian inquiry at the back of the Phase One record
 9   custodian inquiry, if that's makes sense to the Court and the
10   parties.
11           THE COURT:  It does.  Good, good.  Thanks, Rob.
12           Corey.
13           MR. MAYES:  Corey Mayes for the states.
14           I've got a question in regard to Mr. Langan's letter
15   from last night, and also relates to Judge Barbier's order from I
16   think it was Thursday regarding the scope of the Phase One trial
17   when it comes to Phase Two evidence.
18           If I'm taking the Court's ruling correct -- and you'll
19   talk to Judge Barbier, I'm sure, about it -- if a witness has
20   Phase Two evidence, we are not allowed to get that Phase Two
21   evidence out from that witness during the Phase One trial?
22           THE COURT:  Well, you'll recall that we've talked about
23   that.  If it's just a limited amount of testimony for Phase Two
24   and calling him back, it seems to me would be a burden.
25           MR. MAYES:  Right.
```

 1              And what if some witnesses have extensive amount of

 2    Phase Two testimony, are we going to be allowed to bring the

 3    witness back for the Phase Two trial?

 4              THE COURT:  I think you're going to have to.  Because,

 5    you know, we are taking a long phase and making it longer if we

 6    take extensive Phase Two testimony.

 7              But I think that he would be willing to accommodate a

 8    witness that has limited Phase Two knowledge who is traveling

 9    from -- I don't know -- Indonesia, let's go ahead and get that

10    testimony out of the way.

11              But, if it's extensive, it seems to me that we're going

12    to have to bring that witness back.

13              MR. MAYES:  Are these things that we need to bring up at

14    trial or beforehand, identifying which witnesses we think have

15    extensive in Phase Two or Phase Three?  Is this just something

16    that's going to come up while we're at trial?

17              THE COURT:  Well, no, I don't think so.  I thought his

18    ruling -- and I didn't read it thoroughly -- but I thought his

19    ruling was I only want to hear Phase One.

20              MR. MAYES:  Okay.  That's the way understood I it.

21              MR. SKERITIES:  It's Ted Skerities.  I'm still on.

22              That was an issue we raised awhile back.  And my

23    understanding of the ruling was that it was only Phase One, so

24    people like us wouldn't have to worry about, for example, Phase

25    Three issues coming up during the Phase One trial.

1         THE COURT:  That's right.

2         But I can foresee a limited number of witnesses who

3  might have a modest amount of Phase Two that he would be willing

4  to --

5         MR. MAYES:  To allow us to bring them back.  In the

6  Phase Two trial, the same witness can come testify live again.

7  It's not like the deposition rule where it's one witness/one

8  deposition.

9         THE COURT:  Right.

10        What I'd rather you do is, if you have a witness that

11  has limited Phase Two testimony and you think oh, it would be

12  really timesaving not to have to bring the guy back because's

13  only got a half hour worth of testimony anyway on Phase Two, then

14  bring that to our attention.

15        MR. MAYES:  Understood.

16        THE COURT:  Rather than bringing in the guys that have

17  extensive Phase Two to our attention, because he's not going to

18  want to hear it.

19        MR. MAYES:  That leads to Mr. Langan's letter last

20  night.  It's obvious, after reading the letter, that the search

21  terms used for the custodial files for Phase One might not turn

22  up evidence that come up under the search terms form Phase Two.

23        There are certain witnesses -- I will bring up Lamar

24  McKay, for example, because this is the one we went back and

25  forth on.  He might have relevant Phase Two knowledge that we

 1  would not have gotten in the document production for the Phase

 2  One -- remember, we asked to have his search terms expanded

 3  because we were told this is the only time we were going to get

 4  to depose him.

 5          Are we going to need to submit a request either to BP or

 6  this court for persons who have already been deposed and their

 7  custodial file has been searched under the Phase One search

 8  terms, are we going to have to file either a letter or request to

 9  the Court from BP saying now we want you to go back to those

10  witnesses and search their files using the search Phase Two terms

11  and then the Phase Three when we get there?

12          THE COURT:  Let me make sure I understand.  For Phase

13  Two, you all are going to negotiate the Phase Two search terms?

14          MR. MAYES:  Yes.

15          THE COURT:  And you all are going to negotiate your

16  Phase Two custodials?

17          MR. LANGAN:  That's all done, Your Honor.

18          MR. MAYES:  It's been done.

19          THE COURT:  And Lamar McKay was a one of them.

20          MR. MAYES:  I'm using his testimony as an example.

21          What I don't want to happen is that the letter or the

22  email that started this change of letters, BP's response was:

23  Well, the reason you didn't get it in Phase One is because it

24  didn't meet the search terms.  I don't want to allow certain

25  other documents like that for other witnesses to slip through the

1    cracks because we didn't get to use the Phase Two search terms

2    for a witness that has been deposed the one and only time.

3         THE COURT:  Here's the thing.  Let's use Lamar McKay as

4    the example.  So you all have already done your Phase Two search

5    terms and custodians, and you presumably have some new documents

6    that have been produced for Lamar McKay that you didn't see in

7    Phase One or used during his Phase One deposition; right?

8         MR. MAYES:  I understand.  I see where you're going.

9         So, as long as we find those documents, then when Phase

10   Two preparation for trial comes up, then we just mark those

11   documents.

12        I'm just making sure that we're not missing something

13   for particular individuals.

14        THE COURT:  I don't think you are.  I don't think you

15   are.  But I want to make sure I understand your hypothetical.

16        So let's say new documents come up from your Phase Two

17   search, and you see a document that is a Phase Two document that

18   you think is incredibly important to your Phase Two presentation

19   of evidence.

20        MR. MAYES:  Right.

21        THE COURT:  So you raise that issue with us.  And you

22   say:  I didn't get to question Mr. McKay with regard to this

23   document, what are we going to do about it?

24        MR. MAYES:  Understood.  Okay.  I was just trying to

25   make sure.

1          THE COURT:  And look at Andy.  Andy's already sweating.

2          MR. LANGAN:  The answer is nothing.  Really, I mean,

3     again, did you want to hear my --

4          THE COURT:  No.

5          MR. LANGAN:  I don't need to make my speech?

6          There are trade-offs involved with the way --

7          THE COURT:  Yeah, yeah, yeah.  This can be an agenda

8     item.

9          MR. LANGAN:  But placeholder, this is what we bought

10    with a multi-phase hurry up approach.  It's to sort of -- the

11    trade-offs are inevitable.

12         THE COURT:  Got you.

13         MR. LANGAN:  Thank you.

14         MR. WILLIAMSON:  Your Honor, Jimmy Williamson for the

15    PSC.  I want to be heard.

16         I know the Court has before it the letters on what is

17    alleged to be an overlap issue.  But I want to make sure the

18    Court knows, we went back and checked the database.  All of these

19    people who allegedly were deposed --

20         THE COURT:  Allegedly deposed?

21         MR. WILLIAMSON:  Allegedly completely covered every

22    aspect of Phase Two when they were deposed.

23         I'll give the Court an example.  There's been 336,000 BP

24    documents -- not pages, documents -- 336,000 BP documents

25    produced after August 1st; okay?  Many of those deal with Phase

 1    Two issues.  Okay?

 2          And Phase Two, by definition, is source control.  That's

 3    what it is.  And that's what we started off to do.

 4          The Court -- and I want to remind the Court how

 5    important this issue is to us -- the Court -- we came up with a

 6    list of many, many many witnesses.  The Court says the Court

 7    didn't really like that approach.

 8          THE COURT:  I remember that.

 9          MR. WILLIAMSON:  And the Court imposed by general

10    directive that we were going to try to proceed through 30(b)(6)

11    because the Court thought that would be a more efficient way to

12    get to the point.

13          And so we have now said, okay, give us your 30(b)(6)

14    source control.

15          I'll give the Court one easy example.  There's extensive

16    computer modeling done on the ruptured disk and burst disk that

17    replaced the three different points in the casing design, and

18    that computer modeling led to the mathematical conclusion that

19    there was a risk of a sub-sea broach.  And that conclusion and

20    BP's mathematical computer modeling analysis led to many

21    decisions in terms of how they conducted specific intervention

22    efforts:  Not putting on a capping stack, worrying about a

23    capping stack being effective, reservoir depletion, how they

24    approached their top teal junk shot, et cetera.  None of that was

25    even allegedly thought about or covered in Phase One because it's

01.27.12 Status Conference

```
 1    not Phase One evidence.

 2              Now, we can depose the 20 or 30 individuals who have

 3    knowledge of those computer modeling.  But, if the Court wants to

 4    stick with its plan that you want us to do it by 30(b)(6) then we

 5    should have the right to do it by 30(b)(6).

 6              And I want to point out, as I point this out, that

 7    there's more than one category of evidence.  One category of

 8    evidence is Phase Two, one category of evidence is Phase One.

 9    There is a category of evidence, as the Court's kind of

10    struggling with in terms of efficiency, that relates to both

11    Phase One and Phase Two.

12              The fact that BP, in our opinion, completely failed to

13    anticipate a spill or the consequence or the magnitude of it we

14    think is both relevant to Phase One, why didn't you prevent the

15    explosion, and it's also relevant to Phase Two, this explains why

16    it took you so long.

17              So, in that regard, we want to make sure we are heard.

18    And I gave examples in my letter, and you now have my letter, you

19    have Mr. Langan's letter, obviously the joint issues on this.

20              But I want to make sure I reminded the Court that the

21    Court wanted this 30(b)(6) process, as opposed to having us

22    notice out 50 individual BP depositions and going at it that way.

23    Given that, we think it's only fair that we should be able to

24    engage in it.

25              The other thing I want to make clear is, when Paul
```

1    Sterbcow deposed Harry Thierens -- I'm going to use that as an

2    example.  I think you attended that deposition.  And Harry

3    Thierens was one of the lead people in the Gulf of Mexico when

4    the drilling explosion operated.  So Mr. Sterbcow appropriately

5    took his time to examine all of this information about Mr.

6    Thierens' safety policies, protocols, procedure, drilling, et

7    cetera.  You know.

8         The issue, if the Court remembers, the issue of BOP

9    intervention, of which Mr. Thierens admitted he did not have

10   knowledge or expertise in was not covered in any detail.

11        I just used the BOP intervention as one of the source

12   control issues.

13        So to say, oh, gee, they've already covered complete

14   analysis of the BOP intervention, number one, it's factually

15   false.

16        And, number two, the fact that those -- number two, the

17   fact that had Phase One relevance doesn't preclude us getting

18   Phase Two.

19        In my opinion -- and I'm not trying to interpret Judge

20   Barbier's order -- but Judge Barbier almost kind of has adopted

21   that in terms of saying, in his order that he issued this week,

22   saying I don't want Phase Two evidence in Phase One.  I mean, I'm

23   overstating what he said, and I'm not trying to be clever.

24        THE COURT:  No.

25        MR. WILLIAMSON:  But he's saying Phase One is Phase One

1    and Phase Two is Phase Two.  We think our approach to this is

2    consistent with Judge Barbier's order as I read it that he issued

3    this week.

4                THE COURT:  Okay.

5                Andy's going to stand up and say:  But discovery is

6    discovery.  Is that right Andy.

7                MR. LANGAN:  Maybe Rob has something to add.

8                I was also going to bring out another one of my canned

9    speeches, which is -- I'm not sure Jimmy was here when my good

10   friend Mr. Roy said last May that he was ready to try the source

11   control case, he was ready to go to trial.  Again, as I said

12   before:  Well, which is it?

13               So we've already had a bunch of 30(b)(6) stuff on these

14   same issues, we've demonstrated that.  And Jimmy said he was

15   ready to go to trial.  Clearly he doesn't feel that way.

16               THE COURT:  Wait.  But Jim's still ready to go to trial.

17               MR. WILLIAMSON:  No, no.  We are.

18               Judge, let us have our -- if you'd have given Mr. Roy's

19   data, I'm going to get in trouble.

20               THE COURT:  Mr. Roy, I don't want to hear from you on

21   this.

22               MR. WILLIAMSON:  If you'd told him he was going to be

23   going to trial on February 27th on source control --

24               THE COURT:  Then he would have done it.

25               MR. WILLIAMSON:  Then Brian Barr and Jimmy Williamson

1  would have been taking a whole lot of depositions on computer

2  modeling, ruptured disks, burst disks, casing design, et cetera,

3  and we would be before you today on those issues.

4           THE COURT:  And I appreciate that, Jimmy, but take Mr.

5  Roy back to your table with you.

6           MR. ROY:  Can I respond, Judge?

7           THE COURT:  No.  I know you're going to tell me you're

8  ready for trial.

9           MR. ROY:  No, I'm not, Your Honor.

10          But I am going to say that, you know, whether we're

11  ready or not, the Court has a process called discovery.  And it's

12  supposed to be fair discovery.  And --

13          THE COURT:  I've tried to live by that.

14          MR. ROY:  And you've done a wonderful job on it.

15          But Mr. Williamson's comments are correct in that there

16  were limitations in the Phase One discovery that need to be taken

17  care of in Phase Two.

18          THE COURT:  Okay.

19          And poor Rob has been standing up for about ten minutes.

20  So come on up, Rob.

21          MR. GASAWAY:  I will recommend to you Andy's letter as

22  supplemented by his speech today.  I won't say anything else.

23          THE COURT:  There you go.  Thank you.

24          Okay.  Thank you for working out the US 30(b)(6), that

25  is most appreciated.  And thank you guys for getting as close as

```
 1    you have on the BP 30(b)(6).

 2              Other Rule 30(b)(6).  It sounds like Halliburton is

 3    done, huh?

 4              MR. YORK:  Ryan and I spoke yesterday morning.  We have,

 5    I think, reached accommodations.  He's going to give me the new

 6    red line, and we're going to forward that to our client for

 7    approval.  But we believe we are almost there.

 8              MR. WILLIAMSON:  Jimmy Williamson on behalf of the PSC.

 9              This is probably paranoia.  Last week, your order,

10    there's a line in your order when we were talking about the

11    look-back provision that was agreement on the volume of the

12    spill.  I'm sure what the Court meant and what we all know what

13    the Court meant, since we haven't agreed on the volume of the

14    spill in toto --

15              THE COURT:  I was trying to slip that in.

16              MR. WILLIAMSON:  Exactly.  The entire quantification

17    case has now been resolved and we're happy to report that BP has

18    conceded to our position on amount.

19              THE COURT:  Thank you for stipulating to the amount of

20    the spill, because I've been trying to get you to do that for a

21    long time.

22              MR. WILLIAMSON:  Right.

23              I'm sure the Court was referring to the provision of the

24    look-back that we agreed to.

25              THE COURT:  Right, correct.
```

 1            But I still want you all to talk about stipulating to

 2   the quantity.

 3            We heard that Anadarko may have a couple of issues that

 4   the PSC is going to bring up with us.

 5            Is that correct, Tony?  Or have you worked that out?

 6            MR. FITCH:  No.  The former is correct.  I think Brian

 7   and I are suggesting that Anadarko will certainly move ahead with

 8   its designated representatives on the other topics, and will at

 9   the appropriate time come back to you.

10            THE COURT:  Okay.

11            MR. FISCH:  That's what I got from Brian, of course.

12            THE COURT:  What are you thinking an appropriate time

13   might be?

14            MR. FITCH:  Well, he can serve a notice maybe now or

15   next day or so.  I'm going to get my objections back to him.

16            And, if PSC, as he suggested yesterday and I agreed to,

17   wants to go ahead and take our other witnesses on the other

18   topics and get that out the way and see where we stand, that's

19   fine.  So it might be a month before we come back to you.  If

20   they change their mind, he may come back to you next Thursday.

21   It's really up to him.  I think we'll probably do it in stages.

22            THE COURT:  Okay.

23            I understand that you've agreed on the Cameron 30(b)(6).

24   You've finalized -- BP reported finalizing notices for BP

25   Institute and Add Energy.

01.27.12 Status Conference

1    We have objections from Wild Well and Cudd.  What's the

2  status of that?  Is that going to have to be brought on?

3        MR. BARR:  We're discussing it, and I'm hoping we're

4  going to be able to resolve it.  Discussions haven't progressed

5  far enough along to be able to specifically identify when that

6  can be done.  But I'm going focus on that next week.

7        THE COURT:  And have we heard anything from ExxonMobil,

8  Schlumbreger Stress Engineering and Oceaneering?

9        MR. BARR:  Not presently.  But they've just really been

10  served.

11        THE COURT:  We also were looking to see if there were

12  any updates DNV, WoodsHole, RRB, Pencor and Statoil.  Anybody

13  know anything?

14        MR. WILLIAMSON:  DNV has only recently been served or is

15  in the process of being served.  And we were working out the

16  language.

17        The others, I guess Rob -- may be knows.

18        PERSON ON TELEPHONE:  Your Honor, Matt Chambers for the

19  United States.

20        With Pencore, we anticipate that service happening today

21  or potentially Monday.

22        THE COURT:  Good.  Thank you, Matt, for the update.

23        MR. GASAWAY:  With respect to WoodsHole, the Court

24  should know that we've served a Rule 35 subpoena.  They've made

25  some objections.  We're trying to work that out.  But that's

 1    something that may require attention to get resolved in time to

 2    have that 30(b)(6) go forward.

 3              THE COURT:  Okay.

 4              MR. GASAWAY:  And as to other some of the other items on

 5    the list, Mr. Leco from our office will be following up with the

 6    parties trying to see if they're pushing back.

 7              THE COURT:  I'm pleased to report that it looks like the

 8    discovery document production by the State of Louisiana is going

 9    swimmingly and that's all good.

10              Now, Rob, on document production, US, we thought --

11              MS. HEMMELHOCK:  Your Honor, this is Sarah Hemmelhock.

12    I've rejoined.

13              THE COURT:  You came in.  Hello, Sarah.

14              MS. HEMMELHOCK:  Yes, I have.

15              THE COURT:  I was going to schedule a meeting without

16    letting you know.

17              MS. HEMMELHOCK:  That's sounds fine as long as Your

18    Honor doesn't expect me to be there.

19              THE COURT:  Sarah, we were going to get notice to you.

20              Do you think it would be helpful to have a telephone

21    call next week or -- what's your pleasure, and then we'll ask Rob

22    about his point of view.

23              MS. HEMMELHOCK:  I think next week makes a lot of sense.

24    Maybe some time after the 31st.

25              THE COURT:  Okay.  Let's take a look.

1          How do you guys look for Tuesday afternoon?

2          MR. GASAWAY:  I think Tuesday's the 31.  And I think

3  what she is saying is there is going to be a big production on

4  the 31st.  So I think Sarah's thought, which makes sense to me

5  certainly, is let's get the 31st behind us, let BP see what's

6  produced on the 31st and then talk.

7          Was that --

8          MS. HEMMELHOCK:  Yes, that's what I was thinking.

9          MR. GASAWAY:  That makes sense to me.

10          THE COURT:  Is Thursday the 2nd too early?

11          MS. HEMMELHOCK:  No.  I think that would make sense from

12  our perspective.

13          MR. GASAWAY:  Could we do something the afternoon on

14  Thursday -- no, that's out.

15          THE COURT:  Totally booked Thursday afternoon.

16          You want to try for Friday after the -- well, we've got

17  pretrial plus my conference.

18          MR. GASAWAY:  I could do it after your conference on

19  Friday.

20          MS. HEMMELHOCK:  Sure.

21          THE COURT:  If I'm still alive.

22          MR. GASAWAY:  If you're still alive.

23          THE COURT:  Why don't we do it for Friday afternoon, say

24  2:00 o'clock Central Time?  I mean, we do it by phone.

25          MR. GASAWAY:  That would be fine.

1        MS. HEMMELHOCK:  That works for me as well.

2        THE COURT:  Okay.  I guess what we'll do, since it's

3   just you two and me, we'll have Marie place the call rather than

4   a dial-in, or would you prefer a dial-in?

5        MR. GASAWAY:  I'll send an email to Marie depending on

6   where I'm going to be.

7        THE COURT:  I'll tell you what, we'll just have her do a

8   dial-in, and then you'll have it.

9        Sarah, it will be a dial-in.

10        MS. HEMMELHOCK:  Okay, thank you.

11        THE COURT:  Let's see what else we've got.  I think

12   that's all I want to cover today.  We've got scheduled, when we

13   get our minutes out from this meeting, we will have our Phase Two

14   conferences scheduled through March.

15        It's okay to participate by phone, guys.  We've got a

16   lot of people traveling back and forth, and I'm not sure that

17   it's necessary.  So, if you have something come up or if you want

18   to stay home -- Sarah, do you feel like you get a fair shake by

19   phone?

20        MS. HEMMELHOCK:  I absolutely do, Your Honor.

21        THE COURT:  Even though we talk behind your back when

22   you leave your desk?

23        So, seriously, guys, if you want to participate by

24   phone, it's fine.

25        The Phase One people will be happily dropping out, so

1    that pleases us.  And we're going to move forward from there.

2           Does anybody else have anything else they want to talk

3    about?

4           Rob?

5           MR. GASAWAY:  Very briefly, Your Honor.  I just wanted

6    to provide a bit more information on something that you didn't

7    cover in our report.

8           The Court asked about written Phase Two discovery to

9    non-BP US parties, where is that going.  We said we'd get back to

10   you.

11          Here's the basic story, and we can fill it out, is there

12   were not separate written discovery requests, document

13   productions, interrogatories, et cetera, served to the other

14   parties that have been subjected to 30(b)(6) Phase Two

15   depositions.  So you're talking about Halliburton, TO, Anadarko,

16   Cameron, MOEX, Weatherford.

17          THE COURT:  Right.

18          MR. GASAWAY:  There are issues embedded in generalized

19   discovery requests.  But, unlike for United States and BP and the

20   states, where there was kind of a second waive, there was no

21   second waive.  So, when we're looking at scheduling 30(b)(6)

22   depositions, I don't think we're going to see the same sort of

23   sequential issues that we're coming up with the United States

24   where, for instance, BP wants to get their discovery responses

25   and they then take the deposition.

```
 1              THE COURT:  Good.  Well, that's helpful.

 2              So we'll go ahead and schedule Halliburton first?

 3              MR. GASAWAY:  Halliburton is fine.  And any others.

 4              THE COURT:  Okay.

 5              Don?

 6              MR. GODWIN:  I was just staying quiet, staying out of

 7      harm's way.

 8              THE COURT:  Well, not really.

 9              Good, Rob, that's helpful.  So we have an understanding.

10              MR. GASAWAY:  While we're on Halliburton, one open issue

11      is your order on the displaced computer.  We got a call from Mr.

12      Bowman and Mr. Chin.  We're going work out that, and we'll be

13      coming to you quickly obviously because that's a Phase One issue.

14              But, as a first step, Alan and I just talked.  We just

15      would like to see the Halliburton computer get to Captain

16      Engelbert.  And then we can talk about who is going to

17      progressively test it and what is the protocol to be.

18              THE COURT:  We sent it to Captain Engelbert because we

19      thought it was the answer to the testing.  But if you all agree

20      on who the forensic tester is, we can take steps to skip Michoud

21      if you all agree.

22              MR. GASAWAY:  Here's kind of what we were thinking might

23      be appropriate.  We know how Captain Engelbert has been helpful

24      when we've done testing at Michoud.  The electronic components,

25      you remember the e-prompts and stuff.
```

1      THE COURT:  I do.

2      MR. GASAWAY:  And I guess -- maybe we should we talk to

3  Mr. Bowman about this, because Al told me he was in the lead.

4      But, as we were conceiving of this, she would be

5  monitoring, managing, et cetera, any issues that would come up.

6  So we were thinking that she would be involved with the tester,

7  whoever that was who had the specific experience.  Just like,

8  when a BOP expert comes out, she's there to make sure, if

9  something comes up, if there's a deviation in terms of the

10  protocol.  So we were thinking of them kind of tag-teaming.

11      THE COURT:  I agree with that, but the point being if

12  the forensic examiner finds it more helpful --

13      MR. GASAWAY:  Yes, we agree with that.

14      THE COURT:  -- not to go to Michoud but to take custody

15  of the computer, then I certainly will consider that.  And then

16  Captain Engelbert will have to go to the forensic examiner.

17      MR. GASAWAY:  That makes sense, Your Honor.  We'll try

18  to identify a forensic examiner in the next week, working with

19  Mr. Bowman on an agreed upon role.

20      THE COURT:  Yeah.  But so I just wanted to let you know

21  that there's flexibility there.  It doesn't have to happen at

22  Michoud, which is not a particular convenient place.

23      MR. GASAWAY:  Thank you, Your Honor.  That makes sense.

24  Thank you.

25      MS. HEMMELHOCK:  And, Your Honor, I think -- I don't

01.27.12 Status Conference

1    want to move us backward, but I think my colleague Mr. Chambers

2    has a question.

3              THE COURT:  All right.  Go ahead.

4              MR. CHAMBERS:  Yes, Your Honor.  Matt Chambers for the

5    United States.

6              We were -- there have been a few letters sent about the

7    scheduling of the 30(b)(6) depositions, and I understand that

8    it's probably not something we're going to tackle today.  But

9    there's one issue that I wanted to possibly float to the parties,

10   because it relates to the service process of some of the

11   third-party groups or organizations or entities.  And some of the

12   international ones might, you know, play games with accepting of

13   service.  And so we're trying to get through their objections as

14   quickly as possible.

15             One of the questions that I've had coming back from Add

16   Energy, and I think it's going to come up with Statoil, those are

17   two entities we've been working with, is, are their depositions

18   going to be one day or two days.

19             And I think Add Energy has already been subjected to a

20   deposition and Statoil I think worked for two days total in

21   relation to the spill.

22             So, from the United States' perspective, we think

23   they're appropriate for one day depositions.  But I don't know if

24   that's something that the parties are prepared to deal with

25   today, but a fast resolution of that issue will probably help

 1    effectuate the service on those parties.

 2              THE COURT:  Good.  I'm glad you raised the issue.

 3              Why don't we do this.  Matt, would you send me copies of

 4    those 30(b)(6) notices so that we can review them this week?  And

 5    we'll put it on the agenda for next week.

 6              And I'd like everybody to just think about whether it

 7    needs to be two days or it could be a one day deposition for both

 8    of them.

 9              And I guess, Matt, the other thing is, would you, on

10    your cover email, give me a little -- some background on what the

11    company's involvement was and for how long.  Because I won't know

12    that.

13              MR. CHAMBERS:  I will do so.

14              THE COURT:  I won't know that.

15              MR. CHAMBERS:  Thank you, Your Honor.  I will do so.

16              THE COURT:  No problem.  Thanks, Matt.

17              Okay.  Anything else?  You've had enough.  So have I.

18    Thank you.  We'll see you next week.

19              (11:51 a.m., Proceedings concluded.)

20

21

22

23

24

25

CERTIFICATE


        I, Susan A. Zielie, Official Court Reporter, do hereby
certify that the foregoing transcript is correct.



                              /S/ SUSAN A. ZIELIE, FCRR

                              _____
                                Susan A. Zielie, FCRR