From: Lucari, James L
Sent: Sat Jul 10 18:17:34 2010
To: Thorn, Barbara K
Cc: Corser, Kent; Robinson, Steve W (Alaska); Brock, Tony; Bly, Mark R
Subject: Final BP Incident Invewtigation Team Interview Summary Notes for Sims and Guide Interviews
Importance: High
Attachments: David Slms Interview Notes (June 24 2010).ZIP; BP Incident Investigation Team Interview Notes - John Guide.ZIP

Barbara –

Attached please find copies of the final interview summary notes for the Sims and Guide follow-up interviews. These incorporate input from the notes that Kent and Steve took during the interview meeting. Please post these to the team's Sharepoint site in the appropriate folders.

Best regards,


James Lucari
Managing Attorney
(630) 815-8973



EXHIBIT
151

CONFIDENTIAL

BP-HZN-BLY00124205

**BP Incident Investigation Team – Notes of Interview with David Sims**
**June 24, 2010 at BP Westlake 1 at 8:30am CDT.**

**Participants in Interview:**

David Sims, BP GOM Wells Operations Mangager
Eddie Castaing, Attorney and Personal Counsel to David Sims
Kent Corser, BP Incident Investigation Team
Steve Robinson, BP Incident Investigation Team
James Lucari, BP Legal/Counsel to BP Incident Investigation Team

*Ground rules*: BP Attorney Lucari explained that this was a non-privileged,
business led factual investigation of the causes of the April 20, 2010 Transocean
Deepwater Horizon Rig incident.   Mr. Sims and Mr. Castaing acknowledged that
no legal privilege would attach to any of the discussions during the interview and
that there was no joint defense or other privilege between the Company and Mr.
Sims.  Mr. Sims and Mr. Castaing further acknowledged that the BP Incident
Investigation Team expected to prepare a report of its work and that it would rely,
among other things, on statements and information provided by Mr. Sims in the
context of the interview, which could be cited in the report.  Furthermore, given
the non-privileged nature of the Company's investigation, the Company could not
provide any assurance that the Team's notes of the interview could be protected
and that the Team's work papers would likely be subject to subpoena or other
legal process.  Finally, Attorney Lucari told Mr. Sims and Mr. Castaing that Mr.
Sims was free to consult with his personal attorney at any time during the course
of the interview and that the BP Incident Investigation team would allow him to do
so privately if he wanted to do so.  Mr. Sims and Mr. Castaing acknowledged and
accepted this protocol and the interview commenced at approximately 8:35 am.

**Centralizers**  (Kent Corser led the interview)

Mr. Corser asked Mr. Sims to describe his recollection of any discussions by the
Macondo team about the use of centralizers in the well.  Mr. Sims pointed out
that the original well plan (Sept. 2009) and then a revised version of the well plan
(January 2010) called for the use of 6 plus 15 (21) centralizers running a 9-7/8"
long string.  Mr. Sims did not recall any specific discussion of centralizers until a
meeting on the afternoon of April 13, 2010.

The meeting was called to discuss the well design plan in light of a recent
Halliburton cement program modeling report.  Mr. Sims arrived after the meeting
had already begun (about mid-way through the meeting).  He recalled that the
main concern of the meeting was circulation of cement to satisfy BP policy and
MMS regulations.   He recalled that the Halliburton model showed exceedance of

BP-HZN-BLY00124206

the "frac gradient" and that the team was discussing whether they could avoid losing circulation and get a good cement job running the long casing string option.

Mr. Sims recalled that the mud weight/ECD plot (Powerpoint slide presentation) which was reviewed during the meeting, "did not look right" and the team took a "collective decision" to have Erick Cunningham, BP's cementing specialist, review the data inputs into the Halliburton model and check them for accuracy, after which they would have (Halliburton) re-run the model.

He did not recall any specific discussion of centralizers at that meeting; although he believes it was still the plan to run 6 centralizers (across the pay zone) based on his recollection of the well plan. [Kent asked him to clarify whether he meant the OptiCem plan but David said no, he was referring to the original well plan.]

David then described a conference call that occurred the following day (April 14) during an off-site Well Team leader meeting. Participants on the call included: Brian Morel, Mark Hafle, Brett Cocales, Jon Sprague, Greg Walz, John Guide and Terry Miglicco, Completions Team Leader. They discussed the results of the new OptiCem report and concluded that the results/data looked good (predictive of a successful cement job for the long string option). David again has no recollection that centralizers were discussed during this call. He then stated that Mark Hafle was tasked with writing up an MOC to document the discussion of risks and mitigations coming out of the meeting.

On April 15, Greg Walz encountered David and asked him whether he supported the notion of getting more centralizers (more then the six that were presently available); he explained to David that there were only six centralizers and he wanted to get more. Walz expressed some concern about running the type of centralizers that had "fallen off" and caused problems on Thunderhorse or Atlantis (David couldn't specifically recall which platform). David explained that he supported Walz's decision to try to obtain additional centralizers.

Kent asked whether Walz told him why he needed the additional centralizers. David said he couldn't remember "100% why – it may have been channeling, but he doesn't recall." Kent asked David how did Greg Walz know he needed more centralizers. David said he didn't know. David then said that the only Halliburton report he had seen was the first one

The next morning (April 16), David was on a conference call and heard someone report that the [additional] centralizers were on their way to the rig. [Kent then showed David an email exchange between David and John Guide that included a chain of emails between John Guide and Greg Walz discussing concerns about the use of centralizers with stop collars.]   David acknowledged the email and

CONFIDENTIAL                                              BP-HZN-BLY00124207

recalls receiving a voicemail message from Guide on his cell phone, but he does not recall the contents of the message or whether he had even listened to it. Sims recalled that John Guide's note described a two piece centralizer that included a stop collar, which was different than the integral stop collar centralizers that John wanted to run. David explained that Greg Walz talked to him about wanting to run the one piece style due to concerns that the two piece style could "come off." David doesn't recall that he was involved in any further discussions of centralizers.

[Kent then showed David a copy of power point slide pack that describes a study that was performed for Thunderhorse testing a variety of methods for running centralizers, including use of glue to improve bonding and prevent slippage.] David said he had never seen this study of centralizer performance.

**Incentives/Bonus Programs for the Macondo Well**

Kent asked whether there was any bonus or incentive program for the Macondo well. David explained that there was an incentive program for the well for the Marianas rig team, but that the bonus was never paid. David said no bonus program had been established for the Deepwater Horizon on the Macondo well. He explained that he had discussed the issue with John Guide, but they felt that there was no clear basis for starting an incentive program in the middle of a well and for completion of the well given all the delays that had already occurred.

Kent asked generally what factors are considered in designing a bonus plan for a rig team and David explained that they typically considered safety, environmental, INCs (incidents of non-compliance) and performance (time to drill - - p10 and p AFE curves) factors.

**Well Planning/MOCs**

Kent asked who is accountable for the Well Plan. David explained that the Well Plan is written by the Engineering team, but Operations also signs off. David said he doesn't know how the change from 21 (well plan) to 6 centralizers occurred without a formal MOC. He offered that the power point evaluating the change from the 10-3/4" casing to the 9-7/8" casing string (cement program) which discussed the long string and liner options was, in a sense, an MOC.

[Kent showed him the MOC document for the long string that had been prepared by Eric Mueller and approved by Hafle and others. This document included the power point presentation, the Halliburton April 14 OptiCem report and the Decision Tree.] David confirmed that this was the MOC document he had in mind.

3

**Gas Flow Potential**

David stated that he had never reviewed Halliburton's Gas Flow Potential test results report prior to the April 20 incident; he said that the Halliburton report which he recalled was the version attached to the MOC, showed only a "minor" gas flow potential with the cement job as designed.

Kent then asked about the Halliburton April 18 report.

David said he did not recall receiving the Gagliano e-mail nor does he recall participating in any discussions about a "severe" GFP for the cement program as designed.   In fact, he has no recollection of speaking with anyone from Halliburton about gas flow potential on the Macondo well.

**Roll-out of DWOP and ETPs**

Kent next asked questions about the roll-out within the GoM of the DWOP, including zonal isolation guidance.  David said he and his team became aware of the new guidance in January-February 2010 when the new DWOP was "rolled out."  Kent asked him to explain the roll-out program for GoM.  David said that Jake Skelton had developed a slide pack that was used to facilitate discussions about the new manual, which was distributed to team leads for use with their respective teams.  Jake had a roll-out plan to review the DWOP manual with all team leaders in GoM; in turn David had a roll-out of the DWOP with his team at staff meetings.

David noted that ETPs were aligned with sections of the DWOP and that DWOP reflected the ETPs, but that the ETPs were more detailed.

**Decision Pack/Well Plan (Zonal Isolation)**

Kent asked David to explain how the Well Plan addressed the new zonal isolation guidance, with regard to cement program design and Top of Cement. David said he couldn't recall a specific meeting dedicated to that subject, but that the plan was developed by Mark Hafle.  David also recalled that he reviewed the decision tree contained within the MOC, but that he couldn't recall any specific discussions within his Engineering team about the Macondo decision tree.

David stated that aspects of the decision tree, including circulation of cement, were discussed as part of the MOC and power point (well options) meetings.  He said he doesn't recall anyone discussing whether the MOC met the GP 10-60 (zonal isolation) expectation.

4

Kent asked whether there was any discussion about how the team was going to determine Top of Cement (TOC). David responded that full returns and lift pressure would be used to calculate TOC.

Kent asked about running the cement bond log (CBL). David said that CBL would be run at the time of completion to confirm integrity. Kent then asked who was involved in a discussion about whether the cement job was "good". David said that this discussion occurred on the DWH rig. David noted that Brian Morel sent an email to John Guide on the morning of April 20 describing full returns, bumped plug, floats held, 80 psi pressure and a seal assembly that looked good. Kent asked who had the authority to decide whether the cement job was a good one. David said that he believes John Guide had the decision authority.

Kent asked David whether he was aware of any call to discuss lower than expected pump pressure on the cement job (low circulation pressure) on the morning of April 19. David said he was not part of any such discussion.

**Cement Bond Log**

Kent asked if David knew who made the decision not to run CBL. David's understanding was that a CBL was going to be run only if there was some negative indication about the cement job. He said he thought that was consistent with the MOC decision tree. David confirmed that he was not involved in the discussion about whether to run the CBL. He further stated that he did not know who made the decision not to run the CBL. He believes that John Guide, as Wells Team Leader, would have accountability for that decision.

**Functional Reorganization** (Steve Robinson led the interview at this point)

Steve asked David if he could recall when GOM switched to the new functional organizational structure. David said that it occurred sometime around April 2, 2010. He said that hand-over of his Engineering role to Greg Walz occurred on March 27.

Steve asked whether David felt it was appropriate for Greg Walz to discuss the issue of centralizers with David, given David's new responsibility as Wells Operatons Manager. David said that he thought this was a matter of convenience because John Guide wasn't available, so he discussed the subject with Greg and supported his recommendation to run the additional centralizers. David noted that he disagreed with John's use of the term "approved" in the email from John Guide describing David's conversation with Greg.

5

BP-HZN-BLY00124210

Steve asked who had the accountability to ensure that the project conformed with all applicable ETPs. David responded that he believes that this was a shared accountability between Operations and Engineering. He acknowledged that this accountability is not well documented and that it is not very clear who has ultimate accountability – he said it is more like "we are all accountable."

Steve then asked whether David had any anxiety over the number of changes from the plan that were occurring late in the well. David said he didn't because he was not involved in the day-to-day discussions about the well. David said that he believes that John Guide may have been bothered by changes that came late in the well, including the changes in hole size – David wanted to make sure that John and Greg Walz were aligned, but he didn't have any particular anxiety at that time.

Steve asked whether there were clear enough lines of authority between Ops and Engineering. David explained that it was different – brand new. He recognized the need to ensure alignment with John Sprague as EA. He noted that with any new job or change in the organization, there are challenges. Steve asked whether the new organizational structure affected the ability to manage change. David said that it required attention and may have taken a little more time to ensure that there was alignment between Ops and Engineering teams.

Steve then asked whether the Decision Tree was Jon Sprague's accountability or David's accountability. David said that the Engineering Team Lead and the Wells Team Lead had accountability for managing decision tree and risks.

**Cement Program Risks** (Interview questions led by Kent Corser)

David Sims said that he was not involved in any conversations about the design of the cement program and risks associated with nitrogen, pore pressures and lost circulation. He recalled a phone call discussion about the model showing that the revised cement program would not exceed the pore pressure gradient; this discussion followed a meeting the day before in which concerns were raised about the equivalent circulating density (ECD) being too high; but then the model was re-run and the results looked good. David noted, however, that he was not involved in the design elements of the cement job.

Kent asked who had accountability to ensure a correct cement design. David stated that it was his opinion that it is Engineering that comes up with the plan, with assurance from Eric Cunningham in EPT; and coordinated with Ops to ensure that the plan is implementable.

6

BP-HZN-BLY00124211

Kent asked whether from the Operations perspective, David ever saw any risks in being able to run the cement job as designed. David said he did not recall any discussion about risks associated with the pumping the cement job. He also did not recall that he was part of any discussions that called into question the effectiveness of the cement job, including the use of nitrogen at depth.

David was then asked whether there was any discussion about whether placement of the final designed cement job would exceed the fracture gradient in the well bore. David responded that what he heard from the team that morning was that "it looked good and we would be able to stay below the 14.7 frac gradient."

**Accountability for Management of Totality of Risks**

Kent asked several questions concerning management of risks associated with the Well Plan, including changes thereto. He first asked David how the team accounted for changes from the Well Plan.

David explained that everyone knows that you need to prepare an MOC when there are "significant changes" to your plan, but there are no set rules. It was left up to John Guide and Greg Walz to decide when a formal MOC was required. Kent asked when Jon Sprague (GOM Drilling Engineering Manager) would get involved in reviewing any well design changes. David said that he doesn't get involved unless the team makes a specific request for his review. David said that Jon Sprague has accountability for all engineering work across the DW GOM, which includes approximately 6 active rigs at the moment.

David said that he has Operations accountability for 3 rigs, only one of which was active at the time of the incident –
- Clarion
- Ascension
- Deepwater Horizon
- West Sirius (which is just coming into the Gulf)

**Negative Pressure Test Procedure**

Kent asked David whether the change in the Negative Test procedure from a two step test to a one step test was a "significant" change. David said he didn't know. He wasn't aware of any change in protocol from the procedure that was written up in the 9-7/8" plan; he said he couldn't comment on why the rig crew changed the procedure.

7

CONFIDENTIAL

**Risk Assessment of Liner vs. Long-String Casing design**

Kent asked whether David's team had ever discussed risks of running the long-string as compared with a liner.

David said he recalled a discussion on the afternoon of April 13;  He said there was a "bias" for running the long-string, but only if the team felt it could properly circulate the cement job; if not, there was the option to run the liner.

He described the "bias" in favor of the long-string as follows:
- There were advantages in long-term well integrity running the long string,
- The completion team recommended running the long-string,
- The team was aware of a problematic track record (at the time) of running tie backs (e.g. problem on TH); team was not fully comfortable with the mechanical risks (e.g. aware of a tie back in casing that got stuck right above the PBR),
- Running two strings vs. one,
- The Versa-flex liner hanger that the team liked to run was not optimal for tie back completions, so the liner option would require running a conventional hanger which causes other problems,
- Cost was also a "secondary" factor to the decision; last factor considered after all other factors were addressed.

Kent asked if Temporary Abandonment (T/A) was discussed by the team.  David said that there was not a lot of conversation about TA – it wasn't preferred because if the well was TA'd, the next drilling team would need to deal with all the same risks, so that if the team could get comfortable with the plan, it felt it should go ahead with the plan to complete the well.  So, while TA was an option, it was not seriously discussed at the time.

Steve asked if the subsurface team was involved at any point in the discussions. David said no, they were not involved.  David said that there was no pressure from the subsurface exploration team or the completions team to complete the well with a long-string casing.

Kent then asked about running an expandable liner.  David said that the team had to run two hole sizes smaller at the bottom of the well than planned, with the 11-3/4" casing string set above the final string.  He said that they could have only run the expandable liner option if they could have gotten all the way to total depth in the 11-3/4" casing string, but the HC pay zone was below where the plan expected, so they had to run the other strings.

8

BP-HZN-BLY00124213

Kent asked if GoM had contingency inventory for 7" casing, floats, centralizers, etc. – David said he didn't know.

Kent then asked David when the planning began for running the 7" casing string. David replied that the planning probably started at the time the team began setting the 9-7/8" casing string (i.e. late March); at which point the team still didn't know if they would find any pay with the well.

### Risk Register

The Planning Team (Subsurface Engineering, Drilling Engineering and Ops Drilling engineers) were accountable for preparing the Risk Register for the Macondo well. David, as Engineering TL at that time, was part of the team involved in generating the risk register.

David described the following process –

- Pre-identified list of risks (based on experience with similar wells)
- During team meetings, there was incremental discussions of various risks, impacts and consequences as part of the Appraise/Select phase
- After risks for defined project are identified, then the team would work up the mitigations
- At each stage gate, the Register matrix should show risks, impacts and mitigations

BTB coordinators were also involved (Gabe Wilson; later Eric Mueller)

Kent asked David to describe what specific actions were taken from Pre-Response to Post-Response planning phase to mitigate the risks. David said that actions were assigned to individual team members to work on to mitigate risks. Where an action is open, the team is still working, in theory, to mitigate the risks; he doesn't know whether risk mitigation actions were formally written down as part of this effort; assignments were made to the team to address mitigations.

Kent asked whether the Risk Register document was used after its development (June 2009) (i.e. updated, reviewed, reconsidered). David said he couldn't recall. He said he didn't think the team used a RAT on this well. Kent commented that every risk identified was described as having a cost or schedule risk impact; David said he didn't know whether safety was an element or not.

9

BP-HZN-BLY00124214

**Introduction of OMS in Deepwater GOM**

David explained that Mark Webster made the most concerted effort to roll-out OMS; he utilized a three part awareness training in the context of staff meetings and also introduced Navigator and how to use it. David didn't know if there was a Local OMS that was developed for the DW GOM.

**HC Bearing Sands and Isolation Plan**

David stated he was only "peripherally" involved in discussions about the depth of the top of the primary HC zone. He recalls that for MMS regs, they used 17,800 as top of pay, which translates into TOC at 17,300 ft and 16,800 ft for BP's ETP. David said he recalls that the original Halliburton cement program called for 1400 annular feet of cement, which corresponds with approximately 16,800 ft as TOC.

Kent asked whether there was any discussion of HC sands at 17,467 ft. and David replied – "No". [Kent explained that a subsurface report developed after the April 20 incident has some indication of a potential HC zone at this level.]

**Evaluation of Performance of Team Members**

Kent asked what systems or measures are in place to gauge competency.

David replied that there are no specific tests; there are competencies on line and a 10 year (succession) plan is being developed, but there is no specific quantification regarding competency.

Kent asked whether there were any concerns that David had about the performance of Kaluza or Vidrine. David said none that he was aware of; but he noted that this was Kaluza's first tour on the DWH rig.

Kent asked about any performance issues with regard to Jesse Gagliano (Halliburton cement engineer). David responded that there were no formal performance (i.e. disciplinary) actions taken; but David noted that several BP engineering team members, including John Guide, had raised concerns about his work in various conversations. David believed that some of these concerns had also been raised with Halliburton, on occasion; although David wasn't directly involved, he believes that John Guide and/or George Coltrin may have had discussions about Gagliano with Halliburton's BP rep. Performance issues like mistakes running programs; having to re-do work; late delivery of cement test reports, etc. (David was not aware of any specific examples.)

10

BP-HZN-BLY00124215

Ultimately, David explained that the team was aware of Gagliano's short-comings but that they knew his weaknesses and tried to work around them.

Kent asked whether David was aware of any email correspondence concerning Gagliano performance problems. David said he was aware of performance conversations, but he doesn't recall how far these progressed.

Steve Robinson asked David if Transocean's management (Winlsow, Keaton, etc.) had ever raised any concerns about how the DWH/Macondo well operation was being run. Steve referenced a quote attributed to Jimmy Harrell, suggesting that he had expressed concerns previously to his management, to wit:  "Are you f***ing happy, the rigs on fire now.  I knew this would happen.")

David said he was unaware of any specific performance concerns with TO and he also confirmed that TO had never raised with him any concerns about how the Macondo well project was being run.  In his Engineering role,  David's primary interface at TO was John Keaton (former Rig manager), then Paul Johnstone.

Jon Sprague became primarily accountable for Engineering when David Sims took on his new Operations role from Ian (Little) in late March/early April 2010. Don Winslow was the Operations contact at TO.  Winslow never raised any concerns with David about the project, but David doesn't know whether Winslow had any discussions with Ian Little prior to David taking on his role.

**Lock Ring/Lock-Down Sleeve**

Kent asked who had accountability for deciding whether to run a lock-down ring before inserting the casing hanger.  David stated that he thought you could not run the lock down sleeve with the casing hanger seal assembly.  He believed the GOM protocol was to run a lock-down sleeve in a separate run, following completion of the well.

**Float Equipment/Float Collar**

David said he had no specific information regarding float shoe/float collar assembly and its conversion as part of the cement job.  He said he had asked John Guide to contact Steve Robinson with any information that he was aware of in response to an earlier inquiry on the subject.

[The interview was adjourned at approximately 10:20am CDT]

11

CONFIDENTIAL

BP-HZN-BLY00124216