UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | SECTION "J" |
| | * | |
| **THIS PLEADING APPLIES TO:** | * | JUDGE:  BARBIER |
| | * | |
| In Re The Complaint and Petition of | * | MAGISTRATE:  SHUSHAN |
| Triton Asset Leasing GmbH, Transocean | * | |
| Holdings LLC, Transocean Offshore | * | |
| Deepwater Drilling Inc., and Transocean | * | |
| Deepwater Inc., as Owner, Managing | * | |
| Owners, Owners *Pro-Hac Vice*, and/or | * | |
| Operators of the MODU Deepwater | * | |
| Horizon, in a Cause for Exoneration from or | * | |
| Limitation of Liability | * | |
| | * | |
| Civil Action Nos.: | * | |
| 2:10-cv-2771 and 2:10-md-2179 | * | |

## WEATHERFORD U.S., L.P. AND WEATHERFORD INTERNATIONAL, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND ALTERNATIVELY FOR PARTIAL SUMMARY JUDGMENT ON PUNITIVE DAMAGES

{N2412181.1}

## TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ................................................................................... iii

TABLE OF EXHIBITS ........................................................................................... vi

I.      SUMMARY OF ARGUMENT ..................................................................... 1

II.     INTRODUCTION ......................................................................................... 4

III.    STATEMENT OF FACTS ............................................................................ 5

        A.      M45AP FLOAT COLLAR ................................................................ 9

        B.      THE FLOAT COLLAR'S USE AND PERFORMANCE IN THE
                MACONDO WELL ......................................................................... 21

IV.     LAW AND ARGUMENT ........................................................................... 28

        A.      STANDARD FOR SUMMARY JUDGMENT .................................. 28

        B.      THE RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY .......... 29

        C.      THE CLAIMANTS HAVE PRODUCED NO MATERIAL EVIDENCE
                THAT THE WEATHERFORD FLOAT COLLAR WAS DEFECTIVE ............. 32

                1.      The Claimants Cannot Meet Their Burden of Proof of a
                        Manufacturing Defect ............................................................ 35

                2.      The Claimants Cannot Meet Their Burden of Proof of a Design
                        Defect ..................................................................................... 37

                3.      The Claimants Cannot Meet Their Burden of Proof of a Failure to
                        Warn ....................................................................................... 38

        D.      THE CLAIMANTS CANNOT MEET THEIR BURDEN OF PROOF OF
                CAUSATION .................................................................................... 41

        E.      ALTERNATIVELY, WEATHERFORD IS ENTITLED TO PARTIAL
                SUMMARY JUDGMENT DISMISSING ALL CLAIMS FOR
                PUNITIVE DAMAGES .................................................................... 41

{N2412181.1}

V.     CONCLUSION ................................................................................................................43

## <u>TABLE OF AUTHORITIES</u>

PAGE

**Cases**

*Badon v. R J R. Nabisco Inc*.,
    224 F.3d 382 (5th Cir. 2000).............................................................................. 29

*Benedict v. Zimmer, Inc.*,
    405 F. Supp. 2d 1026 (N.D. Iowa 2005)........................................................ 33

*Celotex Corp v. Catrett*,
    477 U.S. 317 (1986)......................................................................................... 28

*Edwards v. Your Credit, Inc.,*
    148 F.3d 427 (5th Cir. 1998)............................................................................ 29

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471, 128 S. Ct. 2605 (2008).............................................................. 42

*Hebert v. Outboard Marine Corp.*,
    638 F. Supp. 1166 (E.D. La. 1986)................................................................. 31

*Housley v. Orteck Intern., Inc.*,
    488 F. Supp. 2d 819 (S.D. Iowa 2007)........................................................... 33

*In Complaint of Merry Shipping Inc.*,
    650 F.2d 622 (5th Cir. 1981)............................................................................ 42

*In re M/V Danielle Bouchard*,
    164 F. Supp. 2d 794 (E.D. La. 2001)............................................................. 30

*Isham v. Padi Worldwide Corp.*,
    Nos. 06-382, 06-386, 2007 WL 2460776 (D. Haw. Aug. 23, 2007) ............... 30

*Johnson v. Black & Decker, U.S., Inc.,*
    29,996 (La. App. 2 Cir. 10/31/97); 701 So. 2d 1360, *writ denied* .................... 37

*Krummel v. Bombardier Corp.*,
    206 F.3d 548 (5th Cir. 2000)..................................................................... 30, 37

*La. Citizens Property Ins. Corp., v. Gen. Elec.,*
    2010 U.S. Dist. Lexis 38345 (M.D. La. 2010)................................................ 38

*Little v. Liquid Air Corp.*,
    37 F.3d 1069 (5th Cir. 1994) (en banc)............................................................29

*Lujan v. Nat'l Wildlife Fed.*,
    497 U.S. 871 (1990)............................................................................................29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................................29

*Miles v. Melrose*,
    882 F.2d 976 (5th Cir. 1989)............................................................................42

*Morgan v. Gaylord Container Corp.*,
    30 F.3d 586 (5th Cir. 1994)..............................................................................33

*Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd.*,
    40 F.3d 698 (5th Cir. 1994)..............................................................................29

*Oswalt v. Resolute Industries, Inc.*,
    642 F.3d 856 (9th Cir. 2011)......................................................................30, 41

*Palestina v. Fernandez*,
    701 F.2d 438 (5th Cir. 1983)............................................................................30

*Parish v. Werner*,
    2006 U.S. Dist. Lexis 2519 (S.D. Tex. 2006) ................................................38

*Pavlides v. Galveston Yacht Basin, Inc.*,
    727 F.2d 330 (5th Cir.1984)............................................................................30

*Regan v. Starcraft Marine LLC*,
    No. 06-1257, 2010 WL 996424 (W.D. La. Mar. 17, 2010) ............................30

*Rink v. Cheminova, Inc.*,
    400 F.3d 1286 (11th Cir. 2005) ......................................................................33

*St. Paul Fire & Marine Ins. Co. v. Lago Canyon, Inc.*,
    561 F.3d 1181 (11th Cir. 2009) ......................................................................30

*Sullivan v. Rowan Cos.*,
    736 F. Supp. 722 (E.D. La. 1990) ..................................................................30

*Townsend v. General Motors Corp.*,
    642 So. 2d 411 (Ala, 1994)..............................................................................38

*Villegas v. Waste Mgmt. of Louisiana LLC*,
    133 F. App'x 966 (5th Cir. 2005) ...................................................................................... 33

*Vines v. Beloit Corp.*,
    631 So. 2d 1003 (Ala. 1994) ........................................................................................... 38

*Weatherspoon v. Nissan North America, Inc.*,
    2010 U.S. Dist. Lexis 21329 (S.D. MS. 2010) ............................................................... 38

## Statutes

La. R.S. 9:2800.52 ................................................................................................................. 31, 32

La. R.S. 9:2800.54(A) ................................................................................................................. 31

La. R.S. 9:2800.55 ....................................................................................................................... 32

Restatement (Second) of Torts § 402A ....................................................................................... 30

Restatement (Third) of Torts ................................................................................................. passim

## Rules

Fed. R. Civ. Proc. 12 ..................................................................................................................... 4

Fed. R. Civ. Proc. 56(c) .............................................................................................................. 28

## Regulations

30 C.F.R. § 250.1721 ..................................................................................................................... 6

{N2412181.1}

## TABLE OF EXHIBITS

1.  Deposition Transcript of Calvin Barnhill

2.  API Standard 65-Part 2, Isolating Potential Flow Zones During Well Construction (Dec. 2010 (Depo. Ex. 8188)

3.  API Recommended Practice 65-Part 2 (May 2010) (Depo. Ex. 7734)

4.  API Recommended Practice 96 (1st Ed., Ballot 1 – April 1, 2011) (Proposed TREX 87,125)

5.  API Recommended Practice 10F (3d Ed., April 2002) (Depo. Ex. 8187)

6.  Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844)

7.  Expert Report of Glen Benge (United States) (Depo. Ex. 5990)

8.  Deposition Transcript of Glen Benge

9.  List of All Remaining Cases in which a Weatherford Entity is Named as a Defendant

10.  BP Daily Operations Report – Partners (Drilling) (Depo. Ex. 4046)

11.  Transocean Well Control Handbook (Depo. Ex. 596)

12.  BP's Group Engineering Technical Practices, GP 10-10 "Well Control" (Depo. Ex. 0215)

13.  Chief Counsel's Report, 2011, *National Commission on the BP Deepwater Horizon Oil Spill And Offshore Drilling, Report to the President* (Depo. Ex. 0986)

14.  Expert Report of Jerry Calvert (Weatherford) (Depo. Ex. 7836)

15.  BP Group Practice, GP 10-60*, Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension* (Depo. Ex. 0184)

16.   Deposition Transcript of Gene Beck

17.  BP Well Program, April 15, 2010 (Depo. Ex. 1810)

18.  Halliburton 9 7/8" x 7" Production Casing report, April 18, 2010 (Depo. Ex. 7837)

19.  Deposition Transcript of John Hughett

20.  Deposition Transcript of Lindell McGuire

21.  Deposition Transcript of Billy Ambrose

22.     Deposition Transcript of Thomas Roth

23.     Deposition Transcript of Erick Cunningham

24.     Assembly Drawing of Weatherford M45AP Float Collar (Depo. Ex. 3317)

25.     Weatherford Delivery Tickets re: Third Party Inspections of Float Collar (WFT-MDL-00003260-WFT-MDL-00003269 (Depo. Ex. 2585); WFT-MDL-00000433-WFT-MDL-00000437 (Depo. Ex. 2565 & 2566 & Proposed TREX 87,070, WFT-MDL-00022626-WFT-MDL-00022627; WFT-MDL-00022631-WFTMDL-00022632; WFT-MDL-00022709-WFT-MDL-00022710; WFT-MDL-00022638; WFT-MDL-00022629-WFTMDL-00022630 (Proposed TREX 87,081)

26.     Expert Report of Greg McCormack (Weatherford) (Depo. Ex. 7596)

27.     Expert Report of Marion Woolie (Weatherford) (Depo. Ex. 7841)

28.     Expert Report of Gene Beck (Halliburton) (Depo. Ex. 8152)

29.     Deposition Transcript of Ian Little

30.     F.R.C.P. 30(B)(6) Deposition Transcript of BP Through its Designated Representative, James Cowie

31.     Deposition Transcript of Gregory Walz

32.     Deposition Transcript of David Sims

33.     Deposition Transcript of John Guide

34.     Deposition Transcript of Steve Robinson

35.     Deposition Transcript of Jonathan Sprague

36.     Deposition Transcript of Kent Corser

37.     Deposition Transcript of Daniel Farr

38.     Deposition Transcript of Robert Beirute

39.     Technical Literature for Weatherford M45AO Auto-Fill Float Collar (Depo. Ex. 8155)

40.      Deposition Transcript of Dave Pritchard

41.      Deposition Transcript of Nathaniel Chaisson

{N2412181.1}

42.     Expert Report of Calvin Barnhill (Transocean) (Depo. Ex. 7676)

43.     Deposition Transcript of David Bolado

44.     F.R.C.P. 30(B)(6) Deposition of Stress Engineering Services, Inc. Through its Designated Representative, Kenneth Young

45.     Expert Report of John Hughett (Halliburton) (Depo. Ex. 7725)

46.     National Commission on the BP Deepwater Horizon Oil Spill And Offshore Drilling, *Report to the President* (Depo. Ex. 0025)

47.      Deposition Transcript of Greg McCormack

48.     Deposition Transcript of Adam Bourgoyne

49.     Engineering Report on Testing of Weatherford M45AP Float Collar, Stress Engineering Services, Inc., Nov. 22, 2010 (Depo. Ex. 0198)

50.     Deposition Transcript of Mark Bly

51.     Deposition Transcript of Brett Cocales

52.     Deposition Transcript of Warren Winters

53.     BP Daily Operations Report, 4/19/2010 (Depo. Ex. 1425)

54.     BP's Gulf of Mexico SPU Recommended Practice for Cement Design and Operations, (Depo. Ex. 790)

55.     Weatherford Technical Unit, Dual Wiper Plug Cementing Systems (Proposed TREX 87,068)

56.     Deposition Transcript of Lee Lambert

57.     Deposition Transcript of Vincent Tabler

58.     Halliburton 9.875" x 7" Foamed Production Casing Post Job Report, April 20, 2010, (Depo. Ex. 0742)

59.     Transocean Daily Drilling Report, April 19, 2010 (Depo. Ex. 1455)

60.     Expert Rebuttal Report of David Bolado (Halliburton) (Depo. Ex. 7785)

61.     Deposition Transcript of Ian Frigaard

62.    Deposition Transcript of J.J. Azar

63.    Deposition Transcript of George Medley

64.    BP's January 2010 Well Program for 9 7/8" casing (Depo. Ex. 1157)

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | SECTION "J" |
| | * | |
| **THIS PLEADING APPLIES TO:** | * | JUDGE:  BARBIER |
| | * | |
| In Re The Complaint and Petition of | * | MAGISTRATE:  SHUSHAN |
| Triton Asset Leasing GmbH, Transocean | * | |
| Holdings LLC, Transocean Offshore | * | |
| Deepwater Drilling Inc., and Transocean | * | |
| Deepwater Inc., as Owner, Managing | * | |
| Owners, Owners *Pro-Hac Vice*, and/or | * | |
| Operators of the MODU Deepwater | * | |
| Horizon, in a Cause for Exoneration from or | * | |
| Limitation of Liability | * | |
| | * | |
| Civil Action Nos.: | * | |
| 2:10-cv-2771 and 2:10-md-2179 | * | |

## WEATHERFORD U.S., L.P. AND WEATHERFORD INTERNATIONAL, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND ALTERNATIVELY FOR PARTIAL SUMMARY JUDGMENT ON PUNITIVE DAMAGES

**MAY IT PLEASE THE COURT:**

Defendants, Weatherford U.S., L.P. and Weatherford International, Inc. (collectively, "Weatherford"), respectfully submit this Memorandum in Support of their Motion for Summary Judgment and Alternatively for Partial Summary Judgment on Punitive Damages.

### I.   SUMMARY OF ARGUMENT

There is no evidence to support any claims that Weatherford is liable for the April 20, 2010 blowout and oil spill (the "Accident"). Plaintiffs, Cross-Claimants, and Third Party Plaintiffs (collectively, the "Claimants") brought product liability claims against Weatherford

related to a cementing tool known as a float collar manufactured by Weatherford and installed by BP in the production casing on the Macondo Well.  The Claimants allege that the float collar was *defective* in its design and manufacture because hydrocarbons that had entered the production casing from a failed cement job passed through the float collar, thus causing or contributing to the Accident.

There is no evidence that the float collar was defective.  Fact discovery regarding the cause of the blowout is complete; all expert witness reports and Rule 26 expert witness disclosures have been submitted; and all relevant expert witness depositions have been completed.  No lay witness has testified that the float collar was defective or that any act or omission by Weatherford caused or contributed to the Accident.  Further, none of the over fifty (50) *expert witnesses* in this case opined in any expert report or in any testimony that the float collar was defective or that any act or omission by Weatherford caused or contributed to the Accident.  Therefore, there are no material issues of fact; and Weatherford is entitled to summary judgment dismissing all claims against it**.**

A float collar is a tool used for running casing and cement placement.  It is designed, manufactured and marketed to serve three specific functions: surge control while running casing; providing a landing platform for wiper plugs; and preventing flow-back of cement.  Float collars have long been used by the oil and gas industry, and these three functions are well understood. The float collar in the production casing in the Macondo Well fulfilled all three functions. There is no evidence of any defect that prevented the float collar from performing its functions.

In circumstances where cement fails to act as a barrier to hydrocarbon flow and hydrocarbons reach the float collar, the oil and gas industry does not rely upon a float collar as a

{N2412181.1}

reliable seal against  the  flow of hydrocarbons; Weatherford does not represent otherwise. The primary barrier to hydrocarbon flow on the Macondo Well was the cement placed between the production casing string and the well bore annulus.[1]  A float collar is installed in the production casing to prevent the wet cement from flowing out of the well bore annulus back  into the casing (U-tubing) before the cement has set, or hardened.  The American Petroleum Institute ("API") sets standards to ensure that a float collar can fulfill its purpose of preventing the *cement* from flowing back, not to act as a seal to water, oil or gas.[2]  The evidence is uncontroverted that the Weatherford float collar was designed and manufactured according to the most stringent API standards.[3]

Quite simply, no lay or expert witness has testified or offered any opinion that the float collar was defective in any manner.  Those experts who did express opinions regarding the float collar in deposition testimony testified that the float collar was *not* defective and was reasonably fit for its intended purpose.  Independent testing, inspection and analysis performed on multiple float collars identical to the one used in the Macondo Well following the Accident confirmed Weatherford's design met industry and manufacturing standards and API requirements with no defects, and did not reveal any damage or anomalies that would affect the intended performance of the float collar.

---

[1] Exhibit 1, Deposition of Transocean expert Calvin Barnhill, 536:1-8, 537:4-24.

[2] Exhibit 2, API Standard 65-Part 2, Isolating Potential Flow Zones During Well Construction, § 4.6.4.1 and § 5.4.3 (Second Edition, Dec. 2010) (Depo. Ex. 8188); Exhibit 3, API, Recommended Practice 65-Part 2 (May 2010), (Depo. Ex. 7734) §§ 3.4, 4.4.3; Exhibit 4, API RP 96, (First Edition, Ballot 1 - April 1, 2011) (TREX 87, 125) §8.2.2.6, and Table B.4 – Shoetrack.

[3] Exhibit 5, API RP 10F (Third Edition, April 2002) (Depo. Ex. 8187);  Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 10-13; Exhibit 7, Expert Report of Glen Benge (United States) (Depo. Ex. 5990) at 26; Exhibit 8, Deposition of United States expert Glen Benge, 458:4-25.

The Claimants have not produced evidence to establish the essential elements of any cause of action against Weatherford and there are no material facts in dispute, thus entitling Weatherford to summary judgment as a matter of law dismissing all of Claimants' claims against Weatherford.

## II.    INTRODUCTION

BP contracted with Transocean to provide the *Deepwater Horizon* rig and personnel to complete the drilling of the Macondo Well.  On April 20, 2010, a well blowout occurred at the Macondo Well; and hydrocarbons from the well reached the *Deepwater Horizon* rig floor, resulting in an explosion and fire that caused eleven fatalities, many personal injuries, the total loss of the *Deepwater Horizon*, and an oil spill.

Hundreds of lawsuits have been filed throughout the country seeking to hold various parties liable for the damages.  The majority of the lawsuits filed in federal courts have been transferred and consolidated in these proceedings by orders of the Multi-District Litigation Panel.  This Court has established certain "pleading bundles" for purposes of filing master complaints, answers, and any F.R.C.P. 12 motions.  Weatherford was named as a defendant in the Bundle B1 Master Complaint, the Bundle C Master Complaint, and the individual Complaints of the state of Louisiana and Alabama, as well as certain individual Bundle A Complaints.  In addition, Weatherford was named as a third-party defendant in Transocean's Rule 14(c) Third Party Complaint and as a cross-claimant in several cross-claims filed by co-defendants in this MDL.  Attached as Exhibit "9" is a list of the remaining Complaints in which a Weatherford entity has been named as a defendant or party.  On August 26, 2011, this Court ruled upon several Motions to Dismiss the Bundle B1 Master Complaint, and held that

{N2412181.1}

4

admiralty jurisdiction applies to this case such that the General Maritime Law applies to all claims asserted herein.   *See* Order and Reasons, dated August 26, 2011 (the "B1 Order") (Rec. Doc. 3830).   The B1 Order also dismissed all state law claims for relief, limiting the remaining claims against Weatherford to General Maritime Law claims of negligence and products liability.[4]   *Id.*   The B1 Order also preserved the availability of punitive damages against Weatherford.   *Id*.

The claims asserted against Weatherford, whether styled as negligence or products liability, assert that the float collar was defective.[5]   As set forth in detail below, there is no evidence in the record to establish this allegation and, therefore, there is no factual dispute on this point.   In fact, the undisputed evidence is that the float collar was *not* defective and that Weatherford is not liable as a matter of law.   Weatherford is therefore entitled to summary judgment dismissing all claims.

### III.   STATEMENT OF FACTS

BP's Macondo Well in Mississippi Canyon Block 252, Gulf of Mexico, was located in 5,067 feet of water and drilled to a total depth of 18,360 feet on April 9, 2010.[6]   During well construction, the hydrostatic head of the weighted drilling fluid ("mud") was the primary barrier to control the well in the event of an unwanted influx of hydrocarbons into the well, *i.e.*,

---

[4] In the Court's subsequent Order and Reasons of November 14, 2011 (Rec. Doc. 4578), the Court dismissed claims for General Maritime Law trespass and nuisance.

[5] *See e.g.*, the "Negligence" Cause of Action in the B1 Amended Master Complaint, p. 160, ¶ 572 (Rec. Doc. 1128) ("In addition, Cameron and Weatherford as designers, manufacturers, and suppliers of the Deepwater Horizon's BOP and float collar, respectively, owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the design, manufacture and supply of the BOP and float collar.").

[6] Exhibit 10, BP Daily Operations Report-Partners (Drilling) (Depo. Ex. 4046), BP-HZN-MBI00013937.

a "kick."[7]   The secondary, or contingent barrier, was the blowout preventer ("BOP").[8]   Several

kicks were detected during drilling and successfully controlled by the *Deepwater Horizon* rig

and personnel prior to April 20, 2010.[9]

The final 9 7/8" x 7" casing string, referred to as the **production casing**, was installed in

the Well on April 18-19, 2010 and landed at 18,304 feet.[10]   At that point, BP began the process of

temporarily abandoning the Macondo Well, with the intent to re-enter at a later date to produce

the well.   In accord with industry standards, BP's Group Engineering Technical Practices

GP 10-60 for "Zonal Isolation Requirements during Drilling Operations and Well Abandonment

and Suspension" required two temporary barriers "designed to ensure zonal isolation for the

duration of the suspension and permit safe re-entry of the well."[11]   Federal regulations specify the

types of well control barriers that can be used in the temporary abandonment of wells.

Float collars are not included in the list.[12]   BP's Well Program of April 15, 2010 set forth the two

temporary barriers.   The first and primary barrier was cement placed between the 9 7/8" x 7"

---

[7] Exhibit 11, Transocean Well Control Handbook (Depo. Ex. 0596), section 3, subsection 1 at BP-HZN-2179MDL00330810.

[8] Exhibit 12, BP's Group Engineering Technical Practices, GP 10-10 "Well Control," § 3 (Depo. Ex. 0215), BP-HZN-2179MDL00408012 ("During balanced drilling, conventional and hydraulic workover activities, active barriers shall be defined as a stable column of fluid equal to or greater than bottom hole pressure.").

[9] Exhibit 13, Chief Counsel's Report | 2011, *National Commission on the BP Deepwater Horizon Oil Spill And Offshore Drilling | Report to the President*, (Depo. Ex. 0986), at Chapter  4.2: Well Design, pages 59-60.

[10] Exhibit 10, BP Daily Operations Report-Partners (Drilling) (Depo. Ex. 4046), BP-HZN-MBI00013937; Exhibit 14, Expert Report of Jerry Calvert (Weatherford) (Depo. Ex. 7836) at 4-5.

[11] Exhibit 15, BP Group Practice, GP 10-60, *Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension*, § 2, (Depo. Ex. 0184), BP-HZN-2179MDL 00269660.

[12] *See* 30 C.F.R. § 250.1721, *et seq.*; Exhibit 16, Deposition of Halliburton expert Gene Beck, 503:25-506:2.

production casing and the well bore from 18,304 feet to approximately 17,250.[13]  This was done to seal the annulus and achieve zonal isolation of the hydrocarbons in the formation, thus preventing any hydrocarbon flow from the formation into the casing.[14]  The second barrier was a 300 foot cement plug to be set inside the 9 7/8" x 7" production casing at approximately 8367 feet below the subsurface wellhead.[15]

The production casing included equipment manufactured by Weatherford for Nexen Petroleum, and purchased from Nexen by BP.  This equipment is designed to aid in the installation ("running") and cementing of the production casing, and included a reamer shoe, six centralizer subs and a float collar.[16]  The bottom 189 feet of the production casing string beginning with the float collar at 18,115 feet and ending with the reamer shoe at 18,304 feet is referred to as the shoe track assembly ("shoe track").[17]  (*See* Figure 1 below).

---

[13] Exhibit 17, BP Well Program (Depo. Ex. 1810), April 15, 2010 at § 9.2.3, p.6, BP-HZN-MBI 00128345.

[14] Exhibit 14, Expert Report of Jerry Calvert (Weatherford) (Depo. Ex. 7836) at 5 (citing Michael J. Economides, Larry T. Watters and Shari Dunn-Norman, eds., PETROLEUM WELL CONSTRUCTION 215 (1998); Fred Brooks & W.H. Grant Jr., WORLDWIDE CEMENTING PRACTICES: CHAPTER 4 PRIMARY CEMENTING 53 (1st ed. 1991); 4 Dwight K. Smith ed., Society of Petroleum Engineers, CEMENTING 1 (Rev. ed. 1990).

[15] Exhibit 17, BP Well Program (Depo. Ex. 1810), April 15, 2010 at § 9.2.4, p. 8, BP-HZN-MBI 00128345-347.

[16] The reamer shoe installed at the very bottom of the production casing has a cone-shaped eccentric aluminum nose with milled features to help guide the bottom of the casing through ledges and washed-out hole sections.  The centralizers provide sufficient standoff of the casing from the bore hole so that mud in the annulus can be circulated out and replaced by competent cement around the circumference and length of the casing to provide zonal isolation, *i.e.*, preventing any hydrocarbon flow from the formation into the well.  Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 14-16.

[17] Exhibit 14, Expert Report of Jerry Calvert (Weatherford) (Depo. Ex. 7836) at 4-5; Exhibit 6,  Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 4-5.

{N2412181.1}



**Figure 1**

BP's Well Plan called for cementing the shoe track as an additional means of achieving zonal isolation and preventing the flow of hydrocarbons.[18]   API RP 96 specifies that "conventional float equipment installed in the shoe track is not considered a barrier; the cement in the shoe track, however, may be considered a single, physical barrier."[19]   The oil and gas

---

[18] Exhibit 18, Halliburton 9 7/8" x 7" Production Casing report, April 18, 2010 (Depo. Ex. 7837), BP-HZN-CEC 021441, 449; Exhibit 17, BP Well Program (Depo. Ex. 1810), April 15, 2010 at § 9.2.3 p. 6, BP-HZN-MBI 00128345-347.

[19] Exhibit 4, API RP 96, (First Edition, Ballot 1 - April 1, 2011) (TREX 87, 125), page 74, §8.2.2.6, Table B.4 – Shoetrack; Exhibit 19, Deposition of Halliburton expert John Hughett, 510:8-25 ("Q. That cement is used to be a barrier to the flow of hydrocarbons from a formation, such as the production interval at the Macondo Well, correct? A. Yes, sir. Q. Have you ever written up a Well Program or supervised the writing of a Well Program or a Drilling Program on any well in which a float collar alone would be used as a barrier to hydrocarbon flow from the formation without cement? A. No sir.").

{N2412181.1}

industry recognizes that of all the operations performed during the drilling and completion of a well, none is more important to the safe and efficient operation of the well than a successful primary cement job.[20]   If zonal isolation is achieved, "the economic, liability, safety, governmental, and other requirements imposed during the life of the well will be met."[21]

### A.      M45AP Float Collar

The float collar installed at the top of the shoe track (18,115 feet) on the Macondo Well production casing was a 30" long Weatherford 7" Model M45AP Flow-Activated Mid-Bore Auto-Fill Float Collar (the "Float Collar").  Figure 2 is an assembly drawing of a Weatherford M45AP float collar.[22]  All Weatherford float collars are manufactured pursuant to Weatherford's Quality Management Systems certified to comply with ISO 9001:2008.[23]  The Float Collar used on the Macondo Well was re-inspected and approved by a third party on behalf of BP several weeks before the April 20, 2010 explosion.[24]

---

[20] Exhibit 14, Expert Report of Jerry Calvert (Weatherford) (Depo. Ex. 7836) at 5-6 .

[21] Exhibit 14, Expert Report of Jerry Calvert (Weatherford) (Depo. Ex. 7836) at 5-6 (citing WORLDWIDE CEMENTING PRACTICES: CHAPTER 4 PRIMARY CEMENTING, § 4.1 at p. 53, and PETROLEUM WELL CONSTRUCTION at 8-1.1, p. 215); Exhibit 20, Deposition of Cameron expert Lindell McGuire, 562:4-13 ("Q. And the ultimate barrier, though, is going to be the cement?  A. The ultimate barrier is going to be the cement."); Exhibit 21, Deposition of Billy Dean Ambrose, Transocean's Managing Director for North American Division, 714:1-715:1 (testifying that cement in annulus and shoe track meant to zonally isolate the formation and prevent the flow of hydrocarbons); Exhibit 22, Deposition of Thomas Roth, Halliburton's Product/Service Line VP, 712:23-714:11; Exhibit 1, Deposition of Transocean expert Calvin Barnhill, 562:9-563:15; Exhibit 23, Deposition of BP cement specialist Erick Cunningham, 694:11-698:18; Exhibit 19, Deposition of Halliburton expert John Hughett: 510:8-511:8.

[22] Exhibit 24, Depo. Ex. 3317.

[23] Exhibit 6, Expert Report of  Brent Lirette (Weatherford) (Depo. Ex. 7844) at 11.

[24] See Exhibit 25, in globo, WFT-MDL-00003260-WFT-MDL-00003269 (Depo. Ex. 2585); WFT-MDL-00000433-WFT-MDL-00000437 (Depo. Ex. 2565 & 2566 & TREX  87,070), WFT-MDL-00022626-WFT-MDL-00022627;  WFT-MDL-00022631-WFT-MDL-00022632;  WFT-MDL-00022709-WFT-MDL-00022710;  WFT-MDL-00022638; WFT-MDL-00022629-WFT-MDL-00022630 (TREX 87,081).

{N2412181.1}



**Figure 2**

Auto-fill float collars have been used in the oil and gas drilling industry for decades as a tool to aid in the cementing of casing in a well.[25]  Their specific purposes are well understood. It is undisputed that all auto-fill float collars, including the Float Collar, are designed, constructed and marketed to perform three functions:

---

[25] Exhibit 14, Expert Report of Jerry Calvert (Weatherford) (Depo. Ex. 7836) at 2, 6; Exhibit 20, Deposition of Cameron expert Lindell McGuire, 562:4-13; Exhibit 19, Deposition of Halliburton expert John Hughett, 511:1-8 ("Q. You would agree that a float collar is a tool designed to aid in the placement of cement, that is, to keep it in place, if pumped into place, correct?  A. Yes, sir. That particular function is to keep the cement still after being placed.").

{N2412181.1}

1.      Reduce surge pressures on the formation while running the casing string into the well bore (auto-fill function);

2.      Provide a landing seat for the cementing wiper plugs; and

3.      Prevent reverse flow of the wet cement slurry from the annulus into the casing (U-tubing) until the cement has time to set.[26]

---

[26] **Weatherford:** Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 10; Exhibit 26, Expert Report of Greg McCormack (Weatherford) (Depo. Ex. 7596) at 9; Exhibit 14, Expert Report of Jerry Calvert (Weatherford) (Depo. Ex. 7836) at 6; Exhibit 27, Expert Report of Marion Woolie (Weatherford) (Depo. Ex. 7841) at 12-13.

**Halliburton:** Exhibit 28, Expert Report of Gene Beck (Halliburton) (Depo. Ex. 8152) at 64 (opining that the purpose of the float valves is to prevent the backflow of cement up the casing during the cementing operation (i.e. u-tubing), and by holding back the cement, also preventing the flow of hydrocarbons below the cement up the casing.); Exhibit 22, Deposition of Thomas Roth, Halliburton's Product/Service Line VP, 707:12-711:18; Exhibit, 16, Deposition of Halliburton expert Gene Beck, 457:11-461:5 (opining that the primary reason for using a float collar is to hold cement in place and keep it static until it sets); Exhibit 19, Deposition of Halliburton expert John Hughett, 501:9-502:16, 511:1-8 (opining that it is generally accepted in the industry that functions of a float collar are for surge reduction, provide a cement plug landing surface, and as a tool designed to aid in cement placement to keep cement still after it is placed).

**BP**: Exhibit 29, Deposition of Ian Little, BP Wells Manager for E&A Drilling for the Gulf of Mexico, at 609:22-610:12; 610:21-611:7; 611:21-612:20 (testifying that BP engineers planned to use the Weatherford float equipment on the Macondo Well for three purposes: 1) stop the backflow of mud and cement after the end of the cement job, 2) prevent or reduce surge pressure; and 3) to provide a landing profile for the cement plugs); Exhibit 30, F.R.C.P. 30(B)(6) Deposition of BP through its designated representative, James Cowie, at 441:2-442:7 (testifying that the Float Collar served three purposes: provide surge reduction when running the production casing; prevent U-tubing of cement back into the casing; and to provide a landing place for the cement plug); Exhibit 31, Deposition of Gregory Walz, BP Drilling Engineering Team Leader, 794:6-:22 (testifying that the purpose of the Float Collar was to act as a surge reducer and to keep the cement in place.); Exhibit 32, Deposition of David Sims, BP Engineering Team Leader for the *Deepwater Horizon*, at 649:16-650:4, 651:10-18 (testifying that the traditional purpose of auto-fill collars is to act as a check valve that allows the casing to fill with fluids and after cementing prevent cement from U-tubing back inside the casing. Dual plug float collars, the type used in the Macondo Well, also act as the landing place for the top plug); Exhibit 33, Deposition of John Guide, BP Wells Team Leader for the Macondo Well, at 816:3-7 (testifying that the Float Collar's functions included: (1) surge reduction when running the casing into the well and (2) preventing cement from flowing up the shoe track at the conclusion of cement pumping); Exhibit 34, Deposition of Steve Robinson, BP Exploration Alaska and leader of sub-group on the BP internal investigation, at 447:13-22 (testifying that the purpose of running an auto-fill collar in a well like Macondo "is to allow running of the casing without surging the formation....[a]nd then, after conversion, to prevent the flow back, the U-tube [of cement]."); Exhibit 35, Deposition of Jonathan Sprague, BP Engineering Manager, at 719:24-720:12 (testifying that a float collar serves the following purposes: surge reduction, keep cement from flowing up the shoe track until it has hardened, and is a landing place for the wiper plugs to allow a pressure test); Exhibit 23, Deposition of Erick Cunningham, Western Hemisphere Cementing Sector Specialist for BP, at 696:18-20; 697:1-12 (testifying that the purpose of the float collar is: 1) surge reduction and 2) prevent cement from flowing up the shoe track.); Exhibit 36, Deposition of Kent Corser, BP employee assigned to lead the wells engineering portion of the BP post-incident investigation, Vol. II: 163:5-164:11 (testifying that the main reason BP wanted an auto-fill float collar was to prevent surge pressure while running the casing in the hole).

The Float Collar has two aluminum flapper valves held open by a 2.50" auto-fill tube.[27] As a casing string is lowered in the well, drilling fluids enter the casing then upward through the Float Collar's two flapper valves held open by the hollow auto-fill tube, thereby reducing surge pressure on the formation.[28] Once the casing reaches total depth, the Float Collar design allows the operator to circulate drilling fluid ("mud") through the Float Collar with the flapper valves held open by the auto fill tube by limiting the circulation rate through the float collar to below 4 barrels per minute ("bpm").[29] As specified in Weatherford product literature, increasing the circulation rate through the Float Collar above 5 bpm creates a differential pressure across the Float Collar sufficient to shear the 4 small brass screws retaining the auto fill tube.[30]

---

**Transocean**: Exhibit 21, Deposition of Billy Dean Ambrose, Transocean's Director of Maintenance and Tech Support and leader of Transocean's Investigation of the Deepwater Horizon Incident, at 697:10-19, 699:13-25; 700:1-4 (testifying that float collars are designed to perform the following functions when running casing in the hole and in cementing that casing after it is run: 1) reduce surge pressure when the casing string is run; 2) provide a landing profile for the cementing plug; and 3) prevent the backflow of cement from the annulus after cement pumping has stopped in the event that hydrostatic pressure in the annulus is greater than the hydrostatic pressure in the casing.); Exhibit 37, Deposition of Daniel Farr, Director of Special Projects for Transocean, 485:15-21 (testifying that it is Transocean's view that the function of the float collar is to retain the upward flow of cement from lift pressure until the cement hardens.); Exhibit 1, Deposition of Transocean expert Calvin Barnhill, 533:9-534:1, 535:4-25, 543:7-544:22 (opining that the Float Collar serves 2 main functions, surge reduction and prevent U-tubing of cement).

**Cameron:** Exhibit 20, Deposition of Cameron expert Lindell McGuire, 548:12-550:8, 561:15-562:13(confirming the three functions of the Float Collar and stating that the Float Collar is a tool to pump cement through).

**United States**: Exhibit 8, Deposition of United States expert Glen Benge, 459:1-460:10 (confirming the three functions of the Float Collar).

**Others:** Exhibit 38, Deposition of cement expert Robert Beirute, 497:2-502:20 (testifying that the main function of a float collar is surge reduction and prevent the back flow of cement while setting).

[27] Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 6-9.

[28] *Id*. at 19-20.

[29] *Id*. at 20.

[30] *Id.* at 20-26; Exhibit 39, Technical Literature for Weatherford M45AO Auto-Fill Float Collar (Depo. Ex. 8155), page 1 of 7.

{N2412181.1}

This procedure, referred to as **converting the float collar**, allows the auto-fill tube to eject from the float collar, freeing the two flapper valves to operate as one-way valves that open only with downward fluid flow through the float collar.[31]   When the flow of cement stops at the completion of the cement job, the spring loaded flappers close, blocking any reverse flow of cement slurry from the well bore annulus into the casing.[32]   The operational sequence of the Float Collar is demonstrated in Weatherford product literature as shown in Figure 3.[33]

---

[31] Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 22-25.

[32] *Id.* at 20-26; Exhibit 39, Technical Literature for Weatherford M45AO Auto-Fill Float Collar (Depo. Ex. 8155), page 7 of 7.

[33] Exhibit 39, Technical Literature for Weatherford M45AO Auto-Fill Float Collar (Depo. Ex. 8155), page 7 of 7.



**Figure 3**

HIGHLY CONFIDENTIAL                                                WFT-MDL-00020515

{N2412181.1}

The float collar's check valve function preventing the backflow of wet cement is widely recognized in the industry as the float collar's main purpose in the well.[34]   Equally well recognized is that the oil and gas industry does not rely on a float collar to provide a seal to the

---

[34] **Weatherford:** Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 1, 10-11; Exhibit 14, Expert Report of Jerry Calvert (Weatherford) (Depo. Ex. 7836) at 7, footnote 11 citing PETROLEUM WELL CONSTRUCTION at 8-5.3, p. 246 ("…the main purpose of the float collar is to prevent the cement from flowing back into the casing."); Exhibit 27, Expert Report of Marion Woolie (Weatherford) (Depo. Ex. 7841) at 12-13.

**Plaintiffs' Steering Committee ("PSC"):** Exhibit 40, Deposition of PSC expert David Pritchard, 531:22-532:3 ("Q.  -- and would you say ,Mr. Pritchard, from your experience that the -- from your experience the industry does not recognize a float collar to be a barrier to hydrocarbon flow?  A. In my experience I have never heard the float collar to be deemed a barrier.").

**Halliburton:** Exhibit 28, Expert Report of Gene Beck (Halliburton) (Depo. Exh 8152) at 62-64 ("In order to prevent u-tubing and keep the cement in place in the annulus long enough for it to set, it is necessary to have a device that serves as a check valve to prevent the cement from reentering the casing and to keep the cement in a static state. This is the purpose of the float equipment, including the float valve used in the Macondo well."); Exhibit 16, Deposition of Halliburton expert Gene Beck, 457:11-461:5 (opining that the primary reason for using a float collar is to hold cement in place and keep it static until it sets); Exhibit 19, Deposition of Halliburton expert John Hughett, 511:1-8 (opining that a float collar is a tool designed to aid in cement placement to keep cement still after it is placed); Exhibit 41, Deposition of Halliburton cement technical professional Nathaniel Chaisson, 617:13-618:9 (testifying that in connection with a cement job, a float collar acts as a check valve to hold back any fluids from u-tubing up the casing).

**Transocean**:  Exhibit 42, Expert Report of Calvin Barnhill (Transocean) (Depo. Ex. 7676) at 18 (opining that the primary function to be provided by the Float Collar was to stop cement from u-tubing back above the production casing's shoe track once the cement was in place); Exhibit 21, Deposition of Billy Dean Ambrose, Transocean's Director of Maintenance and Tech Support and leader of Transocean's Investigation of the Deepwater Horizon Incident, at 705:1-15; Exhibit 37, Deposition of Daniel Farr, Director of Special Projects for Transocean, 485:1-486:22 (testifying that it is Transocean's view that the function of a float collar is to retain the upward flow of cement from lift pressure until the cement hardens); Exhibit 1, Deposition of Transocean expert Calvin Barnhill, 533:9-534:1, 535:4-25.

**BP**: Exhibit 29, Deposition of Ian Little, BP Wells Manager for E&A Drilling for the Gulf of Mexico, at 610:3-612:6; Exhibit 30, F.R.C.P. 30(B)(6) Deposition of BP through its designated representative, James Cowie, at 441:12-17 (testifying that stopping the cement from U-tubing back inside the pipe was the primary purpose of the Float Collar in the Macondo Well); Exhibit 32, Deposition of David Sims, BP engineering team leader for the *Deepwater Horizon*, at 649:16-650:4.

**United States:** Exhibit 8, Deposition of United States expert Glen Benge, 459:1-460:10, 462:10-464:23, 464:24-465:17 ("Q. And that's the purpose of the float collar, to prevent that U-tubing of circulation fluids and cement from the outside back into the inside?  A. That's correct.").

uncontrolled flow of hydrocarbons, and Weatherford does not represent otherwise.[35]   As one

cement expert testified, no float collar to his knowledge has ever been made and represented to

provide a water, oil, or gas-type seal.[36]   The API in API Standard 65-Part 2, Isolating Potential

Flow Zones During Well Construction, § 5.4.3 states: "Float Equipment is used to prevent the

***cement*** from flowing back into the casing when pumping is stopped and/or pressure released"

and "Standard float equipment is not designed to provide a ***gas-tight seal***."[37]   API Standard 65-

Part 2, § 4.6.4.1 states: "Float valves should be rated for the anticipated flow rates and volumes

---

[35] Exhibit 8, Deposition of United States expert Glen Benge, 461:2-21,464:24-465:7; Exhibit 1, Deposition of Transocean expert Calvin Barnhill, 536:1-8; Exhibit 43, Deposition of Halliburton expert David Bolado, 380:24-381:5.

[36] Exhibit 8, Deposition of United States expert Glen Benge, 464:24-465:17 ("Q. The float -- no float collar to your knowledge ever made has been made and represented to provide a water, oil, or gas-type seal. Is that an accurate statement? A. That is an accurate statement.").

[37] Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 10-13; Exhibit 7, Expert Report of Glen Benge (United States) (Depo. Ex. 5990) at 26; Exhibit 2, API Standard 65-Part 2, § 4.6.4.1 and § 5.4.3 (Second Edition, Dec. 2010) (Depo. Ex. 8188).  Exhibit 26, Expert Report of Greg McCormack (Weatherford) (Depo. Ex. 7596) at 5 ("The American Petroleum Institute ("API') 'is recognized throughout the industry as the leading source of best available and safest technology as it relates to operations conducted and equipment used in the exploration and production of oil and gas.  API consists of member companies and individuals.  Subject matter experts from across the industry are appointed to address specific topics.  The topics include drilling and production operations, drilling and production equipment, cementing, well control, blow out prevention and well construction.  These subject matter experts meet in committees and through a lengthy process of exchanging ideas, technology, data and other information, develop recommended practices and standards, which are then peer-reviewed in ballots submitted to the entire membership for vetting, comment and approval.'"); Exhibit 44, 30(B)(6) Deposition of Stress Engineering Services, Inc. through its designated representative, Kenneth Young, 134:9-24 (testifying that the API provides a minimum standardization of equipment that receives broad industry consensus).  Although API Standard 65-Part 2  was published 8 months after the Accident, it memorialized proven standards and practices that have been followed in the industry long before it was published.  For this reason, post-Accident API recommended practices and standards have been cited by other Macondo Well incident investigative reports as well as experts in this litigation.  Exhibit 47, Deposition of Weatherford expert Greg McCormack, 93:19-94:5; Exhibit 45, Expert Report of John Hughett (Halliburton) (Depo. Ex. 7725) at 16, footnote 26; Exhibit 13, Chief Counsel's Report | 2011, *National Commission on the BP Deepwater Horizon Oil Spill And Offshore Drilling | Report to the President*, (Depo. Ex. 0986) at 80, 90 and 102, footnotes 73-74, 183, 316-317 respectively; Exhibit 46, National Commission on the BP Deepwater Horizon Oil Spill And Offshore Drilling | *Report to the President*, (Depo. Ex. 0025) at page 120, footnote 150 ("… The Commission does not agree that float valves, even when converted, constitute a distinct physical barrier to flow, but instead reinforce the cement in the shoe track… API, Recommended Practice 65-Part 2 (May 2010), §§ 3.4, 4.4.3 (float valves not included in the list of subsurface mechanical barriers; float equipment used to prevent cement from flowing back into the casing.").

{N2412181.1}

of the fluids pumped during circulation and **cementing** of the casing string," and "Float valves are typically designed for liquid service (e.g. **drilling fluid, cement, etc.**)."[38]

The API provides testing methods and performance categories for float collars in API RP 10F, Recommended Practice for Performance Testing of Cementing Float Equipment.[39] Consistent with the industry standard of using float collars only to control the reverse flow of wet cement, and not hydrocarbons, API RP 10F does not specify or recommend that float collars be tested with water, oil, or gas.  In fact, *no* industry tests require or recommend that float collars be tested with hydrocarbons.[40]  API Standard 65-Part 2 § 4.6.4.1, which specifically references API RP 10F, states: "Float valves shall be rated for the differential pressure between the minimum anticipated hydrostatic column above the shoe track and the hydrostatic column in the casing annulus **with cement in place.**[41]  For this reason API RP 10F specifies testing with 12 – 12.5 ppg water-based mud with 2-4% by volume 70-200 mesh silica sand, a test medium having similar physical properties to cement, and significantly thicker, or more dense, than water, oil or gas.[42]

---

[38] Exhibit 2, API Standard 65-Part 2, § 4.6.4.1 (Second Edition, Dec. 2010) (Depo. Ex. 8188).

[39] Exhibit 5, API RP 10F (Third Edition, April 2002) (Depo. Ex. 8187).

[40] Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 13; Exhibit 8, Deposition of United States expert Glen Benge, 464:24-465:7 ("Q.  … you made a point during your testimony to say that that float collar is designed and tested only to prevent backflow of mud. That's what it's tested for, correct?  A.  That's correct.  Q.  Right.  A.  It's tested with mud.  Q.  It's never tested either under ISO, API, or any other organization that has anything to do with the testing of float collars -- it is never  tested with hydrocarbons; is that correct?   A.  That is correct.  Q.  The float -- no float collar to your knowledge ever made has been made and represented to provide a water, oil, or gas-type seal. Is that an accurate statement?  A.  That is an accurate statement."); Exhibit 20, Deposition of Cameron expert Lindell McGuire, 552:23-553:11 ("Q. But -- cement--considering the state of cement, thickness, viscosity, it will hold the cement as it presses back up against the flapper, correct --  A.  That would --  Q. -- or it's designed to?  A.  That would be correct.  Q.  But it is not a seal to hydrocarbons, and, in fact, there is no agency that requires a float collar to be tested to seal hydrocarbons?  A.  That's correct.").

[41] Exhibit 2, API Standard 65-Part 2, § 4.6.4.1 (Second Edition, Dec. 2010) (Depo. Ex. 8188).

[42]  Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 10-13.  The 12-12.5 ppg water-based mud specified in API RP 10F has an API gravity of 6.67 to 6.94 degrees.  API gravity rating means

{N2412181.1}

By contrast, there are different industry standards for testing equipment designed to provide hydrocarbon seals.  For example, a down hole production packer that is intended to serve as a hydrocarbon seal for an indefinite period of time is required to be tested with a gas medium, as opposed to a float collar which has a temporary purpose during casing running and cementing.[43]  Significantly, as a cementing accessory tool, a float collar is never installed in a well without placing cement downstream as a barrier between the float collar and the formation.[44]  Upon completion of the cementing of a casing string, if the operator chooses to drill

---

[43] how heavy or light a liquid is compared to water, which has an API gravity of 10 degrees.  By comparison, gasoline, a much lighter and thinner fluid than water, has an API gravity of 35 degrees.  The estimated API gravity of the hydrocarbons in the Macondo Well in the area of the shoe track at 18,302 feet was 75 degrees, substantially lighter and thinner than the fluid required by API to rate the Float Collar.  *See* Exhibit 47, Deposition of Weatherford expert Greg McCormack, 98:10-24, 171:173:18; Exhibit 26, Expert Report of Greg McCormack (Weatherford) (Depo. Ex. 7596) at 24-25; Exhibit 48, Deposition of BP expert Adam Bourgoyne, Vol. II, 352:4-354:13, 356:6-17 (opining that the hydrocarbons in the Macondo Well were much  lower in density and viscosity than the test mud used in API 10F III C, and were "greatly different.").

[43] ISO 14310, Petroleum and natural gas industries – Downhole equipment - Completion accessories, specifies design validation grades including pressure testing with a gas medium.  *See* Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 13; Exhibit 20, Deposition of Cameron expert Lindell McGuire, 552:23-553:11 ("Q.  But -- cement--considering the state of cement, thickness, viscosity, it will hold the cement as it presses back up against the flapper, correct --  A.  That would --  Q.  -- or it's designed to?  A.  That would be correct.  Q.  But it is not a seal to hydrocarbons, and, in fact, there is no agency that requires a float collar to be tested to seal hydrocarbons?  A.  That's correct.").

[44] **BP Witnesses:**  Exhibit 23, Deposition of BP cement specialist Erick Cunningham, 694:11-698:18; Exhibit 36, Deposition of Kent Corser, BP engineer assigned to lead the wells engineering portion of the BP post-incident investigation, Vol. II: 178:1-179:25.

**Halliburton Witnesses:** Exhibit 19, Deposition of Halliburton expert John Hughett, 510:8-511:8 ("Q. That cement is used to be a barrier to the flow of hydrocarbons from a formation, such as the production interval at the Macondo Well, correct?  A.  Yes, sir.  Q.  Have you ever written up a Well Program or supervised the writing of a Well Program or a Drilling Program on any well in which a float collar alone would be used as a barrier to hydrocarbon flow from the formation without cement?  You've not reviewed any   A.  No, sir."); Exhibit 16, Deposition of Halliburton expert Gene Beck, 458:19-461:5 ("Q.  Now, did you ever design a well using an auto-fill float collar in which there was never an intent for cement to be behind or downstream of the float collar?  A.  Well, there was never –  Q.  Never?  A.  --an intent…. Q.  Have you ever designed a well in which you -- you included in a production string or an intermediate string -- well, let's just say a production string –  A.  Uh-huh.  Q.  -- that would be most -- most akin to Macondo --  A.  Right.  Q.  --in which you -- there was no intent for any cement to be in the casing immediately below the float collar.  A.  No, I -- I can't think of a situation where I would have planned that or -- or any -- any rationale for doing that.").

the well deeper, the internal components of the float collar, including the flapper valves, must be constructed of materials that are easily drillable.  This requirement of the drilling process limits the volume and hardness of the materials used in construction.[45]  The Float Collar flapper valves are made of cast aluminum, a metal strong enough to block the reverse flow of cement, yet soft enough to be drilled with PDC (polycrystalline diamond compact) bits.[46]  Because float collars are typically drilled out internally once the cement sets, float collars are considered only as a temporary, "short –lived" cementing accessory tool.[47]

There is no dispute that the float collar used in the Macondo Well was designed and manufactured by Weatherford to meet the performance criteria of API RP 10F Category III C, the highest rating for float equipment.[48]  Glen Benge, a chemical engineer retained as an expert witness by the United States, is considered to be one of the foremost cement experts in the world.[49]  Mr. Benge is a member of the API committee that prepared API RP 10F.[50]  In Mr. Benge's opinion, Category III C is the most rigorous test category allowed by API RP 10F.[51]  A

---

[45] Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 10, 38-40; Exhibit 1, Deposition of Transocean expert Calvin Barnhill, 538:19-540:6.

[46] Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 10.

[47] Exhibit 8, Deposition of United States expert Glen Benge, 459:1-460:10 ("Q. It's -- so the -- the  role and the purpose of a float collar is, relatively speaking with respect to cementing operations, of short duration?  A.  Yes, sir, it's a short-lived device."); Exhibit 1, Deposition of Transocean expert Calvin Barnhill, 538:19-540:6; Exhibit 6, Expert Report of Brent Lirette (Depo. Ex. 7844) at 10, 12.

[48] Exhibit 5, API RP 10F (Third Edition, April 2002) (Depo. Ex. 8187); Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 10-13; Exhibit 7, Expert Report of Glen Benge (United States) (Depo. Ex. 5990) at 26.

[49] Exhibit 8, Deposition of United States expert Glen Benge, 579:2-4.

[50] Exhibit 8, Deposition of United States expert Glen Benge, 457:1-10.

[51] *Id.* at 457:23-458:15.

float collar meeting this standard has a high degree of success in cementing operations and, Mr. Benge testified, is "reasonably fit for its intended purpose."[52]  Mr. Benge further testified that the Float Collar met this standard.[53]  No evidence has been produced to the contrary.

Post-Accident testing and analysis confirmed Weatherford's float collar design met API standards.  Following the Macondo incident, BP requested that Weatherford furnish ten float collars manufactured exactly like the one used on the Macondo Well.[54] BP arranged for Stress Engineering Services Inc. ("SES") to conduct an independent detailed inspection, analysis and evaluation of the design and construction of the Float Collar and its performance in the Macondo Well.[55]  Despite using a test medium (water-based mud) with sand particles approximately 10 times larger in diameter and more abrasive than the test medium recommended in API RP 10F, SES concluded the Weatherford float collars met the requirements of API RP 10F, were manufactured consistent with Weatherford's published specifications and representations, and were free of any defects.[56]  SES summarized their test results in its final report as follows:

> Performance tests on five Weatherford M45AP float collars were successfully completed at the SES test facility in Waller, Texas, from 23 July to 20 October 2010. The performance tests consisted of flow endurance tests, steady-state flow conversion tests, flow-surge conversion

---

[52] *Id.* at 458:21-24.

[53] *Id.* at 458:4-10.

[54] Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 41.

[55] *Id.* at 41.

[56]  *Id*. at 41-44; Exhibit 44, 30(B)(6) Deposition of Stress Engineering Services, Inc. through its designated representative, Kenneth Young, 42:1-22, 46:22-51:14,129:13-133:20 ("A. We saw no -- no real deviation from what they [Weatherford] stated in their literature.  We did some testing beyond what they stated.  Q.  And it was still -- acceptable?  A.  Correct.  **Q.  S**o as far -- at least this far you found no defect with the Weatherford flow collar and it worked as -- according to specifications and manufacturer specs?  A.  The specifications that we saw and API specifications, yes.").

{N2412181.1}

tests, flow-surge tests on converted float collars, and mechanical failure tests on auto-fill tubes. The flow-surge tests represented the sudden clearance of a blockage in the flow path, such as a blockage at the reamer shoe.

Based on test results, the float collars appear to meet the requirements of API RP 10F for endurance testing. Test results do not indicate any performance conflicts with published Weatherford data for the M45AP float collar. Post-test inspection did not reveal any damage or anomalies that would affect the intended performance of the float collar.[57]

**B.    The Float Collar's use and performance in the Macondo Well**

As the operator of the Macondo Well, BP selected the type of float collar to install on the production casing and decided the purpose of its use in the shoe track.[58]   Testimony by BP employees during discovery was consistent that BP selected the Weatherford float collar for the customary and industry-recognized purposes of reducing surge pressure while running the casing into the well, providing a landing seat for the cementing wiper plugs, and preventing reverse flow of the wet cement from the annulus into the casing (U-tubing).[59]   BP engineers and

---

[57] Exhibit 49, Engineering Report on Testing of Weatherford M45AP Float Collar, Stress Engineering Services, Inc., Nov. 22, 2010, WFT-MDL-00003370-609 (Depo. Ex. 0198), page vi.

[58] Exhibit 33, Deposition of John Guide, BP Wells Team Leader for the Macondo Well, at 813:18-816:14.

[59] Exhibit 29, Deposition of Ian Little, BP Wells Manager for E&A Drilling for the Gulf of Mexico, at 609:22-610:12; 610:21-611:7; 611:21-612:20 (testifying that BP engineers planned to use the Weatherford float equipment on the Macondo Well for three purposes: 1) prevent or reduce surge pressure; 2) to provide a landing profile for the cement plugs; and 3) stop the backflow of mud and cement after the end of the cement job); Exhibit 30, F.R.C.P. 30(B)(6) Deposition of BP through its designated representative, James Cowie, at 441:2-442:7 (testifying that the Float Collar used on the Macondo Well served three purposes: provide surge reduction when running the production casing; prevent U-tubing of cement back into the casing; and to provide a landing place for the cement plug);   Exhibit 31, Deposition of Gregory Walz, BP drilling engineer team leader, 794:6-22 (testifying that the purpose of the Float Collar in the Macondo Well was to act as a surge reducer and to keep the cement in place if the flapper valves held.); Exhibit 33, Deposition of John Guide, BP Wells Team Leader for the Macondo Well, at 816:3-7 (testifying that the Float Collar's functions included: (1) surge reduction when running the casing into the well and (2) preventing cement from flowing up the shoe track at the conclusion of cement pumping); Exhibit 36, Deposition of Kent Corser, BP employee assigned to lead the wells engineering portion of the BP post-incident investigation, Vol. II: 163:5-164:11 (testifying that the main reason BP wanted an auto-fill float collar was to prevent surge pressure while running the casing in the hole.); Exhibit 8, Deposition of United States expert Glen Benge, 459:1-461:21.

representatives testified the Float Collar successfully accomplished its intended functions of surge reduction, receiving the wiper plugs, and preventing any U-tubing of wet cement on the Macondo Well production casing cement job.[60]   BP, as the owner, operator and designer of the Macondo Well, selected the equipment to install on the production casing, and best knows what function and role BP intended for this equipment to serve in the cementing operations.   BP's designated representatives and employees testified that its selection and use of the  Float Collar was not for the purpose of serving as a physical or mechanical barrier to hydrocarbon flow, a role the cement job was intended to accomplish.[61]

---

[60] Exhibit 30, F.R.C.P. 30(B)(6) Deposition of BP through its designated representative, James Cowie, at 442:10-443:17; Exhibit 33, Deposition of John Guide, BP Wells Team Leader for the Macondo Well, at 799:22-804:19, 827:25-828:7; Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 41-56; Exhibit 26, Expert Report of Greg McCormack (Weatherford) (Depo. Ex. 7596) at 8-13.

[61] **BP Witnesses:** Exhibit 30, F.R.C.P. 30(B)(6) Deposition of BP through its designated representative, James Cowie, at 437:17-445:9 ("Q.  Okay. And -- just to make it clear, then, -- to go further with the Macondo well, the -- it is BP's position that the selection and use of the Weatherford float collar on the long string was not for the purpose of serving as a physical or mechanical barrier to hydrocarbon flow?  A.  I agree, sir, yes.  Q.  It's an accurate statement?  A.  It is."); Exhibit 33, Deposition of John Guide, BP Wells Team Leader for the Macondo Well, at 278:11-279:6 ( "A.  I think it's fairly known that the cement did not hold inside the shoe track.  Q.  Why didn't it hold?  A.  I don't know why it didn't hold, but - - But to clarify, the float collar has -- is not considered a barrier…-- it's not put there for that."); Exhibit 50, Deposition of Mark Bly, Head of Safety Operations for BP and leader of BP's post-accident investigation team, 60:15-62:16 (testifying that the BP internal investigation team found no evidence that the Float Collar was intended, either by design or manufacture, to act as a barrier to hydrocarbon flow.  The cement was intended to prevent hydrocarbon flow through the annulus and shoe track); Exhibit 36, Deposition of Kent Corser, BP engineer assigned to lead the well engineering portion of the BP post-incident investigation, Vol. II: 179:15-25 ("Q.  But -- if the  cement in the shoe track, for whatever reasons, did not constitute a barrier to flow, would it be an accurate statement that it would not be prudent to have considered the float valves alone to have prevented the ingress of hydrocarbons through the long string?  A.  I would agree with that."); Exhibit 51, Deposition of Brett Cocales, BP operations engineer for the *Deepwater Horizon*, 866:8-20, 867:10-15 (testifying that while the float collar could be a barrier to cement or possibly other fluids, it would not be a barrier to gas because the valves do not contain a gas type seal.  Further, he has never seen anything in writing with BP that states that a float collar is to be considered a barrier to hydrocarbon flow.); Exhibit 52, Deposition of Warren Winters, senior drilling engineer for BP, 171:2-172:6 (testifying that BP does not consider the float collar a barrier to hydrocarbon flow.); Exhibit 23, Erick Cunningham, Western Hemisphere Cementing Sector Specialist for BP, at 697:19-25; 698:10-18 (testifying that a float collar, even when properly converted, would not be a primary barrier or a reliable barrier to hydrocarbon flow.); Exhibit 48, Deposition of BP expert Adam Bourgoyne, Vol. II, 350:25-351:24 ("Q. In your -- in your report, in particular in the rebuttal report, you state that the float collar is generally not regarded as being reliable enough to consider it a barrier to hydrocarbons, correct?  A.  Right.  That -- that would be my opinion.  Q.  Okay.  And is that your opinion of how the oil and gas industry views float collars?  A.  That's my general understanding.  Q.  Okay.  And if you, Dr. Bourgoyne, were using a float collar on a well, you

{N2412181.1}

Installation of the production casing in the Macondo Well was completed on April 19, 2010.  When the *Deepwater Horizon* rig crew began pumping drilling mud down the casing to circulate the well in preparation for cementing, circulation could not be established through the shoe track due to blockage caused by debris that had collected while running the casing in the hole during auto-fill.[62]  Pump pressure was incrementally increased before the blockage was cleared and circulation established at 3,142 psi.[63]  BP engineer John Guide, the Macondo Well Team Leader, and BP engineer David Sims, Deepwater Operations Manager for the Gulf of Mexico, testified that BP had experienced similar blockage on previous wells, an acknowledged and foreseen risk when running casing in a surge reduction (auto-fill) mode.[64]  Incrementally increasing the pump pressure was BP's customary procedure to clear any such blockage in order to establish circulation to complete the cement job.[65]  No party to this litigation has attributed the problems associated with the shoe track debris blockage and difficulty establishing circulation  to

---

would not rely on it as a barrier to hydrocarbon flow would you?  A.  I would not.  Q.  Okay…Have you seen any evidence in this case that BP relied on the float collar to be a barrier to hydrocarbon flow?  A.  No.  Q.  Have you seen any evidence in this case that Transocean relied on the float collar to be a barrier to hydrocarbon flow?  A. No.").

**Halliburton Witnesses:** Exhibit 19, Deposition of Halliburton expert John Hughett: 510:8-511:8 ("Q. Halliburton holds its  cement out as a barrier to hydrocarbon flow, does it not?  A.  That's generally accepted in the industry, yes, sir.  Q.  That cement is used to be a barrier to the flow of hydrocarbons from a formation, such as the production interval at the Macondo Well, correct?  A.  Yes, sir.").

[62] Exhibit 33, Deposition of BP Wells Team Leader John Guide, 822:15-823:10.

[63] Exhibit 53, BP Daily Operations Report, 4/19/2010 (Depo. Ex. 1425) at BP-HZN-MB100191722-25; Exhibit 33, Deposition of BP Wells Team Leader John Guide, 821:22-822:15; Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 49-56; Exhibit 26, Expert Report of Greg McCormack (Weatherford) (Depo. Ex. 7596) at 13.

[64] Exhibit 33, Deposition of BP Wells Team Leader John Guide, 822:15-825:5; Exhibit 32, Deposition of David Sims, 649:1-651:9, 655:21-657:14, 658:1-665:3,681:20-682:12.

[65] Exhibit 33, Deposition of BP Wells Team Leader John Guide, 822:15-825:5; Exhibit 32, Deposition of David Sims, 649:1-651:9, 655:21-657:14, 658:1-665:3,681:20-682:12.

any malfunction or defect in the Float Collar.[66]   No evidence of any defect was presented in discovery, and no lay or expert witness has offered any opinions otherwise.   In fact, no one could determine with any degree of probability exactly where in the 189 foot shoe track the blockage had occurred.[67]

Cementing of the production casing to establish zonal isolation of the hydrocarbon-bearing zones was completed at 12:30 AM on April 20, 2010.[68]   After the cement pumping is complete, a standard industry-wide test known as a **"float test"** or **"float check"** is performed to determine whether the float valves are working properly, i.e., preventing cement from reverse flowing back up through the valves.[69]   This test is accomplished by pressuring up the system after the wiper plugs have landed on the float collar sealing off flow, then releasing the pressure and monitoring the system for flow back. [70] If fluid returns do not exceed the expected flow back,

---

[66] Exhibit 33, Deposition of BP Wells Team Leader John Guide, 822:15-825:5; Exhibit 32, Deposition of David Sims, 649:1-651:9, 655:21-657:14, 658:1-665:3,681:20-682:12; Exhibit 28, Expert Report of Gene Beck (Halliburton) (Depo. Ex. 8152) at 67-68; Exhibit 16, Deposition of Halliburton expert Gene Beck, 480:19-485: 21, 485:22-486:23 ("Q.  All right.  The-- blockage that-- resulted in the pressure increased to establish circulation--you with me?  A.  Uh-huh.  Q.  --did you attribute that blockage to any problem associated with the float collar?  A . No."); Exhibit 8, Deposition of United States expert Glen Benge, 452:4-453:4, 454:1-455:8, 457:1-458:25 ("Q.  But with respect to debris, though, it -- it's -- from what you've seen from this case, it was certainly foreseeable that there would be debris in this well?  A.  Yes.  Q.  And one of your opinions has to do with the failure to perform a complete bottoms-up circulation, correct?  A.  That is correct.  Q.  And so it certainly was foreseeable to a prudent operator or  anyone that was concerned with the running or the cementing of the production casing -- it's foreseeable that that debris may end up somewhere in the shoe track during auto-fill application?  A.  Any time you use auto-fill, that's always a consideration.  Q.  And that's certainly something that Weatherford didn't need to warn about?  A. Absolutely not, no.").

[67] Exhibit 44, 30(B)(6) Deposition of Stress Engineering Services, Inc. through its designated representative, Kenneth Young, 33:3-35:16.

[68] Exhibit 53, BP Daily Operations Report, 4/19/2010 (Depo. Ex. 1425).

[69] Exhibit 33, Deposition of BP Wells Team Leader John Guide, BP Well Team Leader for the Macondo Well, at 818:13-819:23; Exhibit 54, BP's Gulf of Mexico SPU Recommended Practice for Cement Design and Operations, Section 5.1.5 "Execution," (Depo. Ex. 790), BP-HZN-2179 MDL 00360844, § 5.1 at BP-HZN-2179 MDL 00360861-864.

[70] Exhibit 6, Expert Report of  Brent Lirette (Weatherford) (Depo. Ex. 7844) at 37-38.

{N2412181.1}

this is a reliable indication that there is no reverse flow through the float collar; this favorable situation is typically reported as "**floats holding**" or "**floats held**."[71]  Conversely, if fluid returns at the surface exceed the flow back expected due to the compressibility of fluids used to displace and bump the top plug, this is a reliable indication that the float collar is *not* "holding" and could allow cement to reverse flow.[72]  The float test performed upon completion of the Macondo Well cement job verified that there was no reverse flow of the wet cement slurry back up the casing (U-tubing). [73]  The float test was interpreted by BP and Halliburton as normal.[74]  Both the April 19, 2010 BP Daily Operations Report and Halliburton's Foamed Production Casing Post Job Report dated April 20, 2010 reported the float test as "Floats Holding" and "Floats Held."  The well was monitored and reported to be static.[75]

---

[71] Exhibit 33, Deposition of John Guide, BP Wells Team Leader for the Macondo Well, at 818:13-819:23; Exhibit 54, BP's Gulf of Mexico SPU Recommended Practice for Cement Design and Operations, Section 5.1.5 "Execution," (Depo. Ex. 790), BP-HZN-2179 MDL 00360844, § 5.1 at BP-HZN-2179 MDL 00360861-864; Exhibit 26, Expert Report of Greg McCormack (Weatherford) (Depo. Ex. 7596) at 17-19.

[72] Exhibit 6, Expert Report of  Brent Lirette (Weatherford) (Depo. Ex. 7844) at 37-38.  Weatherford's product literature recommends circulating the return displacement volume through the float collar as a means of assisting in removing debris that may affect valve function. Exhibit 39, (Depo. Ex. 8155) Technical Literature for Weatherford M45AO Auto-Fill Float Collar, at page 6 of 7 (Verification of check valve function); Exhibit 55, Weatherford Technical Unit, Dual Wiper Plug Cementing Systems, page 13 of 24 (TREX 87,068), WFT-MDL-00134874-WFT-MDL-00134897.

[73] Exhibit 33, Deposition of BP Wells Team Leader John Guide,  818:9-819:9.

[74] Exhibit 33, Deposition of BP Wells Team Leader John Guide,  818:9-819:23 ("Q: Are you aware of the results of that flow test on the Macondo well on April 19th or perhaps April 20th by this time, 2010?  A.  Yes, sir. Q.  And what was the result?  A.  The result, there was no flow on the annulus and no flow up the casing.  Q.  And for purposes of my client would it also be a correct statement that that flow test showed that the Weatherford float collar was functioning as intended?  A.  To the best of my knowledge, there's nothing to dispute that it wasn't.  Q. And you haven't come across any evidence to the contrary, even as you sit here today?  A.  That s correct."); Exhibit 56, Deposition of Lee Lambert, 550:14-24; 552:7-15; Exhibit 57, Deposition of Vincent Tabler, 213:2-215:10.

[75] Exhibit 53, BP Daily Operations Report, 4/19/2010 (Depo. Ex. 1425) at BP-HZN-MB100191725; Exhibit 58, Halliburton 9.875" x 7" Foamed Production Casing Post Job Report, April 20, 2010, (Depo. Ex. 0742).

Despite the evidence from the float test that the Float Collar was "Holding," some of the Claimants' expert witnesses have opined that the Float Collar never converted, i.e., that the auto-fill tube never ejected, thus holding open the flapper valves and preventing them from blocking any flow of cement up the casing. Although Weatherford's experts dispute this theory of non-conversion, whether or not the Float Collar converted is immaterial to Weatherford's alleged liability. First, even assuming the Float Collar did not convert, not a single witness, lay or expert, attributed this anomaly to any defect in the Float Collar. Instead, the alleged non-conversion has been attributed to: (1) BP not circulating fluids through the Float Collar at the specified pump rate required to convert it, i.e., eject the auto-fill tube or (2) BP possibly damaging the auto fill tube during the earlier 3142 psi surge event to clear the debris blockage preventing its ejection.[76] The Float Collar was never retrieved from the Well, rendering such conclusions as speculative. Second, the pressure differential required to cause cement from the annulus to back flow into the casing (U-tubing) was absent, and therefore there was no reverse flow of cement, whether or not the Float Collar converted. It is *undisputed* that there was no reverse flow of cement through the

---

[76] Weatherford's specification for the Float Collar conversion flow rate was 5 to 8 barrels per minute (bpm). Exhibit 39, Technical Literature for Weatherford M45AO Auto-Fill Float Collar (Depo. Ex. 8155), at page 1 of 7 ("**Features:** . . . 5 to 8 bbl/min de-activation flow rate at 500 to 700 psi.") (emphasis in original). Transocean's Daily Drilling Reports indicates that after the casing was landed and prior to the beginning of the cement job, the well was never circulated above 4 bpm. Exhibit 59, Transocean Daily Drilling Report, April 19, 2010 (Depo. Ex. 1455) BP-HZN-MBI 00136940-945; Exhibit 13, Chief Counsel's Report | 2011, *National Commission on the BP Deepwater Horizon Oil Spill And Offshore Drilling | Report to the President*, (Depo. Ex. 0986), at Chapter 4 – Technical Findings, pages 103-104 ("But the BP team later reduced the planned circulation rate to 4 bpm because of ECD [Equivalent Circulating Density] concerns—a rate that would not have converted the float valves according to the manufacturer's specifications.); Exhibit 28, Expert Report of Gene Beck (United States) (Depo. Ex. 8152) at 13,31-37, 62-72; Exhibit 60, Expert rebuttal report of David Bolado (Halliburton) (Depo. Ex. 7785) at 35-36; Exhibit 45, Expert Report of John Hughett (Halliburton) (Depo. Ex. 7725) at 28, 31-35.

float collar at the time of the float test in the early morning hours of April 20, 2010, approximately 20 hours before the blowout.[77]

It is also undisputed that no lay or expert witness has testified or offered any opinion that any problems associated with converting the Float Collar, including any suspected damage to the float collar from pressuring up to clear the debris blockage in shoe track, was caused or contributed to in any manner by any defect in the Float Collar's design or construction, or any failure to warn.  Quite simply, no lay or expert witness has testified or offered any opinion that the Float Collar was defective in any manner.  Those experts who did express their opinions in deposition testimony testified the Float Collar was not defective and was reasonably fit for its intended purpose.[78]

---

[77] Exhibit 6,  Expert Report of  Brent Lirette (Weatherford) (Depo. Ex. 7844) at 48-49,57-62; Exhibit 26, Expert Report of Greg McCormack (Weatherford) (Depo. Ex. 7596) at 13-19; Exhibit 8, Deposition of  United States expert Glen Benge, 463:1-16, 467:7-14.  (For wet cement to flow back (U-tube) into the casing and reach the float collar some 189 feet upstream would require a significant imbalance of hydrostatic pressure between the fluids inside and outside the casing.  Absent this imbalance, the fluids would remain in a static state  allowing the cement to set.  In the Macondo Well, the difference between the hydrostatic pressure in the annulus and the hydrostatic pressure inside the casing was almost in perfect balance such that once pumped the cement in the annulus and shoe track casing were static).

Both lay witnesses and expert witnesses have agreed that there was insufficient back pressure to cause reverse flow of wet cement slurry into the casing and through the float collar regardless of whether the float collar flapper valves were closed or open.  (*See* Exhibit 33, Deposition of BP Wells Team Leader John Guide, 816:15-818:1; Exhibit 13, Chief Counsel's Report | 2011, *National Commission on the BP Deepwater Horizon Oil Spill And Offshore Drilling | Report to the President*, (Depo. Ex. 0986), at Chapter 4 – Technical Findings, text of fn. 301 at p. 284; Exhibit 14,  Expert Report of Jerry Calvert (Weatherford) (Depo. Ex. 7836) at 10; Exhibit 21, Billy Dean Ambrose Deposition, at 704:5-25).

[78] **BP:** Exhibit 48, Deposition of BP expert Adam Bourgoyne, Vol. II, 347:15-349:6; Exhibit 30, F.R.C.P. 30(B)(6) Deposition of BP through its designated representative, James Cowie, at 442:10-443:17; Exhibit 52, Deposition of Warren Winters, BP Senior Drilling Engineer assigned to BP Macondo Well investigation with specific duties to investigate Weatherford float collar, 42:3-17, 507:6-19, 509:9-12,511:3-16,514:23-515:1, 519:18-520:13; Exhibit 44, 30(B)(6) Deposition of Stress Engineering Services, Inc. through its designated representative, Kenneth Young, who tested and analyzed 10 exemplar M45AP float collars on behalf of BP post-accident, 41:12-42:22, 46:22-51:14, 84:24-85:9, 86:4-10, 92:10-96:1, 129:13-133:20, 134:9-139:4, 143:12-145:19.

**United States:** Exhibit 8, Deposition of United States expert Glen Benge, 452:4-453:4, 454:1-455:8, 457:1-458:25.

{N2412181.1}

27

## IV.    LAW AND ARGUMENT

As set forth herein, the Claimants have not put forth any evidence to support their boilerplate allegations against Weatherford.  No lay or expert witness has testified or offered any opinion that the Float Collar was defective in any manner.  Those experts who did express their opinions in deposition testimony testified the Float Collar was not defective and was reasonably fit for its intended purpose.[79]  Accordingly, as discussed below, summary judgment on all claims is appropriate.

### A.    Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) mandates that summary judgment "shall be rendered forthwith if the pleadings, depositions, answered to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[80]  "The moving party is 'entitled to a judgment as a matter of law' if the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."[81] In such circumstances, "there can be 'no genuine issue as to any material fact,' since a complete

---

**Halliburton:** Exhibit 16, Deposition of Halliburton expert Gene Beck, 445:21-446:23,449:2-450:1, 451:1-455:8, 480:19-486:23; Exhibit 43, Deposition of Halliburton expert David Bolado, 393:19-394:6; Exhibit 19, Deposition of Halliburton expert John Hughett, 504:12-506:25;

**Transocean:** Exhibit 1, Deposition of Transocean expert Calvin Barnhill, 529:21-25, 530:22-531:9, 531:11-535:25; Exhibit 37, Deposition of Daniel Farr, Director of Special Projects for Transocean, 475:4-8, 485:1-486:22;

**Cameron:** Exhibit 20, Deposition of Cameron expert Lindell McGuire, 546:16-547:24;

[79] *See* Note 62, *supra*.

[80] Fed. R. Civ. P. 56(c).

[81] *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).

failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[82]

When the movant meets its burden, the non-movant must go beyond the pleadings and designate specific facts showing a genuine issue of material fact warranting a trial.[83] To withstand a motion for summary judgment, the nonmoving party who bears the burden of proof at trial must cite to particular evidence in the record to support the essential elements of its claim.[84] "Factual controversies are construed in the light most favorable to the non-movant, but only if both parties have introduced evidence showing that an actual controversy exists."[85] "[Courts] do not, however, in the absence of any proof, assume that the non-moving party could or would prove the necessary facts."[86] The nonmoving party's burden is not satisfied by creating some metaphysical doubt as to the material facts, submitting conclusory allegations or unsubstantiated assertions, or showing only a "scintilla" of evidence.[87]

### B.    The Restatement (Third) of Torts: Products Liability

The Claimants allege strict liability and negligence claims against Weatherford for a manufacturing and/or design defect of the float collar, as well as an alleged failure to warn. Under this Court's B1 Order, the General Maritime Law is the applicable law for all claims

---

[82] Id.

[83] *Id.* at 323-24.

[84] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd.*, 40 F.3d 698, 712 (5th Cir. 1994).

[85] *Edwards v. Your Credit, Inc.,* 148 F.3d 427, 432 (5th Cir. 1998).

[86] *Badon v. R J R. Nabisco Inc*., 224 F.3d 382, 394 (5th Cir. 2000) (citations omitted).

[87] See *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 889 (1990); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

{N2412181.1}

brought by Claimants.  (Rec. Doc. 3830).  "The applicable substantive law of products liability

in admiralty is found in the Restatement (Third) of Torts."[88]  Therefore, the claims asserted

herein are governed by the Restatement (Third).[89]  Additionally, state law may be applied where

not inconsistent with the Restatement (Third).[90]

---

[88] *See Regan v. Starcraft Marine LLC*, No. 06-1257, 2010 WL 996424, at *2 (W.D. La. Mar. 17, 2010).
Although Claimants cite to Section 402A of the Restatement (Second) of Torts (1965) as the applicable law to their
products liability claims, the Second Restatement was replaced by the Restatement (Third) of Torts: Products
Liability ("Restatement (Third)"), in 1998.  *See* Restatement (Third) of Torts: Products Liability § 1, *et seq.* (1998).
As noted by the comments to Restatement (Third) of Torts: Products Liability, the Second Restatement was created
to address solely manufacturing defects; however, "it soon became evident that § 402A, created to deal with liability
for manufacturing defects, could not appropriately be applied to cases of design defects or defects based on
inadequate instructions or warnings."   Cmt. (a), Restatement (Third) of Torts: Products Liability (1998).
Accordingly, the Restatement (Third) was developed to replace the Restatement (Second) and, *inter alia*, to provide
specific causes of action for design defect and failure to warn claims.  *Id.*  Indeed, in the most recent Fifth Circuit
decision regarding General Maritime Law products liability claims, the Fifth Circuit applied the Restatement (Third)
as the substantive law.  *See Krummel v. Bombardier Corp.*, 206 F.3d 548 (5th Cir. 2000).  As such, the Restatement
(Third) replaces the Restatement (Second) and should be the substantive law governing the products liability claims
asserted by Claimants herein.   *See Id.*; *Regan v. Starcraft Marine L.L.C.*, No. 06-1257, 2010 WL 996424, at *2
(W.D. La. Mar. 17, 2010); *see also St. Paul Fire & Marine Ins. Co. v. Lago Canyon, Inc.*, 561 F.3d 1181, 1190 n.18
(11th Cir. 2009); *Oswalt v. Resolute Industries, Inc.*, 642 F.3d 856 (9th Cir. 2011) (applying the Restatement (Third)
instead of the Restatement (Second) to General Maritime Law products liability claims and noting that the Fifth
Circuit in *Krummel* relied upon it as well); *Isham v. Padi Worldwide Corp.*, Nos. 06-382, 06-386, 2007 WL
2460776, at *6 (D. Haw. Aug. 23, 2007) ("Because Restatement (Second) of Torts § 402A since has been
superseded by Restatement (Third) of Torts, the Court shall rely on the Restatement (Third) of Torts where
applicable.").  Indeed, the claims as pleaded by the Claimants herein mimic the causes of action provided by the
Restatement (Third) despite the Claimants' citation to the  Restatement (Second).

[89] Weatherford notes that even if the Court draws upon the Restatement (Second) in its adjudication of this
Motion, summary judgment is similarly warranted under the Restatement (Second) of Torts, which employs similar,
yet not as refined, standards of liability for a product defect.  *See In re M/V Danielle Bouchard*, 164 F. Supp. 2d 794
(E.D. La. 2001) (Vance, J.) (setting forth the applicable standards for a products liability claim under the
Restatement (Second), which requires proof that a product is "unreasonably dangerous" and stating that "[a] product
can be considered unreasonably dangerous if it is defective in design or manufacture or if it is defective because of
inadequate instructions or warnings.") (citing *Pavlides v. Galveston Yacht Basin, Inc.*, 727 F.2d 330, 337–39 (5th
Cir.1984)).  Simply put and as discussed herein, there is no evidence that Weatherford's float collar was defective or
unreasonably dangerous; and therefore, Claimants cannot satisfy their burden under the standards espoused by the
Restatement (Second), the Restatement (Third) or the Louisiana Products Liability Act ("LPLA"), codified in
Section 9:2800.51, *et seq.*

[90] When products liability claims are asserted under the General Maritime Law, Louisiana courts have
applied the LPLA, codified in Section 9:2800.51, et seq., to the extent that it is consistent with the Restatement of
Torts.  *Palestina v. Fernandez*, 701 F.2d 438, 439 (5th Cir. 1983) (Even though admiralty suits are governed by
federal substantive and procedural law, courts applying maritime law may adopt state law by express or implied
reference where state law does not conflict with federal law, or by virtue of the interstitial nature of federal law); *see
Sullivan v. Rowan Cos.*, 736 F. Supp. 722, 725 (E.D. La. 1990) (admiralty case looking to Louisiana state law of
{N2412181.1}

Section 1 of the Restatement (Third) of Torts: Products Liability provides:

> One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect.[91]

Section 2 of the Restatement (Third) defines when a product is "defective" and provides as follows:

> A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product:
>
> (a) contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product;
>
> (b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe;
>
> (c) is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the

---

products liability); *Hebert v. Outboard Marine Corp.*, 638 F. Supp. 1166 (E.D. La. 1986) (admiralty case adopting Louisiana state law of products liability).

[91] The LPLA which establishes the "exclusive theories of liability for manufacturers for damage caused by their products," La. R.S. 9:2800.52, provides a similar cause of action:

The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of a product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.

La. R.S. 9:2800.54(A).

{N2412181.1}

omission of the instructions or warnings renders the product not reasonably safe.[92]

### C.    The Claimants Have Produced No Material Evidence That The Weatherford Float Collar Was Defective

To prove that the Float Collar was defective as alleged, the Claimants have the burden of proof to establish that the product "contain[ed] a manufacturing defect, [was] defective in design, or [was] defective because of inadequate instructions or warning" "at the time of sale or distribution."[93]   If the requisites are met, a claimant may use (a) negligence, (b) strict liability, or (c) implied warranty of merchantability to bring the claim.[94]   However, whatever the theory of liability, it is incumbent upon the claimant to establish a *defect* in the product in order to recover from a manufacturer.[95]   In the absence of proof of a product defect, the Claimants have no cause of action against Weatherford.

Fact discovery regarding the cause of the blowout is complete; all expert witness reports and Rule 26 expert witness disclosures have been submitted; and all relevant expert witness depositions have been completed.   No lay witness has testified that the Float Collar was defective.   No lay witness has testified that a defect in the Float Collar caused or contributed to

---

[92] Restatement (Third) of Torts: Products Liability § 2 (1998).

[93] Restatement (Third) § 2(a) (1998). Under the LPLA, a claimant can prove that a product was unreasonably dangerous in four different ways: (1) in construction or composition; (2) in design; (3) because of an inadequate warning; or (4) because of nonconformity to an express warranty.  La. R.S. 9:2800.54(B).  Like the Restatement (Third), under the LPLA, the Claimants must show that the product was unreasonably dangerous in construction or composition by establishing that, "at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer."  La. R.S. 9:2800.55.

[94] Restatement (Third) § 2 cmt. N.

[95] See, e.g., La. R.S. 9:2800.52 (the LPLA provides "exclusive theories of liability for manufacturers for damage caused by their products.")

{N2412181.1}

the cause of the Accident.  No lay witness has testified that any act or omission by Weatherford caused or contributed to the Accident.

Further, the product in question and the causes of the Macondo Well blowout are not within the ambit of common, lay knowledge. Expert testimony would be required to establish that the Float Collar was defective or that any defect was a cause of the blowout. Without such evidence, no genuine fact dispute exists; and the Claimants cannot meet their burden of proof. [96] None of the over fifty (50) *expert witnesses* in this case opined in any expert report or in any testimony that the Float Collar was defective.  No expert witness has opined that a defect in the Float Collar caused or contributed to the Accident.  No expert witness has opined that any act or omission by Weatherford caused or contributed to the Accident.  To the contrary, those experts who expressed an opinion in their reports or deposition testimony uniformly agreed the Float Collar was *not* defective.[97]  Since there is no evidence of a defect under any products liability

---

[96] *See Villegas v. Waste Mgmt. of Louisiana LLC*, 133 F. App'x 966, 968 (5th Cir. 2005) (upholding summary judgment because the non-movant failed to present expert testimony on causation); *See Morgan v. Gaylord Container Corp.*, 30 F.3d 586, 591 (5th Cir. 1994) (affirming grant of summary judgment dismissing design defect claim under the LPLA where expert evidence left "unanswered questions of engineering and design that are of sufficient complexity to be beyond the expertise of the average judge and juror."); *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1294-1296 (11th Cir. 2005) (affirming summary judgment on strict liability and negligence claims where plaintiffs offered no admissible evidence on the existence of a defect); *Housley v. Orteck Intern., Inc.*, 488 F. Supp. 2d 819, 828–830 (S.D. Iowa 2007) (granting summary judgment after plaintiff failed to provide expert evidence of causation regarding plaintiff's products liability claim); *Benedict v. Zimmer, Inc.*, 405 F. Supp. 2d 1026, 1031–1033 (N.D. Iowa 2005) (requiring plaintiff to produce expert evidence of causation to survive summary judgment on products liability claim); *see also* Restatement (Third) of Torts: Products Liability, § 2 cmt. d ("If the plaintiff introduces expert testimony to establish that a reasonable alternative design could practically have been adopted, a trier of fact may conclude that the product was defective notwithstanding that such a design was not adopted by any manufacturer, or even considered for commercial use, at the time of sale."); *Id.* at § 2 cmt. f (noting that expert evidence of alternative design not needed only where "the feasibility of a reasonable alternative design is obvious and understandable to laypersons.").

[97] The following witnesses are categorized by Parties and Claimants:

**United States**:  Exhibit 8, Deposition of United States expert Glen Benge, 452:4-453:4, 454:1-455:8, 457:1-458:25 ("… Are you familiar with that product, the M45AP auto-fill float collar?  A.  Yes, I've used it on wells before.  Q.  Successfully?  A.  Yes, sir.  Q.  Do you have high regards for the product?  A.  Definitely do.  Q. Do you have any opinions today as to whether or not that particular product on the well in question was defective in

{N2412181.1}

any way?  A.  I don't -- all of -- all of the information that I've seen says that it would not.  Q.  It was not defective?  A.  **It was not defective**.  Q.  In other words, you've given testimony today that perhaps it was damaged, perhaps it didn't convert.  But from all the information you reviewed, you don't attribute those problems to the defect in the design of the construction of the float collar; is that an accurate statement?  A.  That is an accurate statement, yes, sir.") (emphasis added).

**Halliburton:**  Exhibit 16, Deposition of Halliburton expert Gene Beck, 445:21-446:23,449:2-450:1, 451:1-455:8, 480:19-486:23("Q.  But a tech unit for the M45AO float collar, which is the applicable product literature, I'll represent to you, for the M45AP, which is specifically referenced right there in that bullet point.  My only purpose of showing you this here, is this what you reviewed?  A.  Yes, that is it…. Q.  I may ask you some questions.  Did you find that tech unit to be helpful and useful in educating you about the float collar?  A.  Yes, I did.  Q.  Did you find that it was adequate-- in explaining  to users what the performance specifications were for the float  collar?  A.  Yes.  Q.  Did you find it to be adequate in -- with respect to it -- to any warnings  that  it contained, such as how debris may cause the  float collar to malfunction?  A.  Correct.  Q.  You thought this was-- adequate?  A.  Yes, I did.  Q.  You would commend Weatherford  for that?  A.  I -- I -- yeah, I -- I really  -- I -- I think it's a fine piece of equipment…. Q.  Were you asked by Halliburton  to determine whether the float collar was defective in its design?  A.  No.  Q.  In its composition?  A.  No.  Q.  In the manufacturing of it?  A.  No.  Q.  In its construction?  A.  No.  Q.  Or in warnings?  A.  No.  Q.  And you – you  have not rendered an opinion on that?  A.  I have not.  Q.  But if I was to ask you for your personal opinion, you would -- you would tell me, I am I correct, that you do not find that float collar to be defective in any of those aspects?  A.  I'd agree with you."); Exhibit 43, Deposition of Halliburton expert David Bolado, 393:19-394:6 ("Q.  And you do not believe -- and you do not have an opinion that the Weatherford float collar was in any way defective, do you?  A.  I do not.  Q.  And do you feel that the Weatherford float collar, in this case, **was fit for its intended purpose?  A.  I believe it was**.") (emphasis added); Exhibit 19, Deposition of Halliburton expert John Hughett, 504:12-506:25.

**Transocean:**  Exhibit 1, Deposition of Transocean expert Calvin Barnhill, 529:21-25, 530:22-531:9, 531:11-535:25. ("Q.  All right.  And you have not rendered any opinions whether or not you feel the float collar in question was defective?  A.  I--I didn't see anything to tell me that it was defective.  Q.  All right. So you haven't-- A.  I don't know.  Q.  You haven't said--you haven't said anything in your Report whether it was defective, correct?  A.  Correct.  Q.  You've not been asked to render any appearance--any testimony regarding whether the float collar was defective?  A.  I have not.  Q.  But you do have a personal opinion as an Expert in reviewing this case that you see no evidence that it was defective?  Is that an accurate statement?  A.  I didn't see anything to tell me that specifically indicated that it was--that it was defective….");  Exhibit 37, Deposition of Daniel Farr, Director of Special Projects for Transocean, 475:4-8, 485:1-486:22.

**Cameron:**  Exhibit 61, Deposition of Cameron expert Ian Frigaard, Vol. II, 107:4-10 ("Q.  Okay. Doctor, would it be fair to say that you've seen no evidence and you've expressed no opinion that the float collar used in the long string of the Macondo well, the M45AP, was defective either in its design, competition, or construction, correct?  A.  I think that's correct".) Exhibit 20, Deposition of Cameron expert Lindell McGuire, 546:16-547:24 ("Certainly, the blowout was not a result of the failure of any equipment, including the float collar.").

**BP:** Exhibit 48, Deposition of BP expert Adam Bourgoyne, 347:15-349:6; Exhibit 30, F.R.C.P. 30(B)(6) Deposition of BP through its designated representative, James Cowie, at 442:10-443:17; Exhibit 52, Deposition of Warren Winters, BP Senior Drilling Engineer assigned to BP Macondo Well investigation with specific duties to investigate Weatherford float collar, 42:3-17, 507:6-19, 509:9-12,511:3-16,514:23-515:1, 519:18-520:13; Exhibit 44, 30(B)(6) Deposition of Stress Engineering Services, Inc. through its designated representative, Kenneth Young, who tested and analyzed 10 exemplar M45AP float collars on behalf of BP post-Accident, 41:12-42:22, 46:22-51:14, 84:24-85:9, 86:4-10, 92:10-96:1, 129:13-133:20, 134:9-139:4, 143:12-145:19 ("Q.  So in your opinion, within a reasonable degree of engineering probability, based on your experience, education and training, and based on the actual testing you did on this Weatherford collar, you do not believe that it was defective?  A.  I saw no indication of that.  Q.  And you also saw that it acted  as expected?  A.  In the testing and analysis that we did,

{N2412181.1}

34

theory of recovery, Weatherford is entitled to summary judgment as a matter of law on all claims.

### 1. The Claimants Cannot Meet Their Burden of Proof of a Manufacturing Defect

Since the Claimants have failed to put forth any evidence that the Weatherford Float Collar deviated from its specifications, they cannot meet their burden of proof to establish a manufacturing defect in the Float Collar.  A product "contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product."[98]   A manufacturing defect is "a departure from a product unit's design specifications."[99]   It "disappoints[s] consumer expectations" and typically involves "products that are physically flawed, damaged or incorrectly assembled."[100]   To prevail on a manufacturing defect claim, there must not only be proof of a defect, but the defect must

---

yes."); Exhibit 62, Deposition of BP expert JJ Azar, PhD, 453:24-454 ("Q.  And as you sit here today, you're not aware of any fact which would indicate that the Weatherford float collar was defective in any way, are you, sir?   A. No, sir.").

**M-I Swaco:**  Exhibit 63, Deposition of M-I Swaco expert George Medley, 364:2-12 ("Q.  And as you sit here today you're not aware of any fact or opinion that would indicate that the float collar on the Macondo well was defective in any way; is that correct?  A.  That's correct.").

**Weatherford:** Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844), at 2, 41-49; Exhibit 26, Expert Report of Greg McCormack (Depo. Ex. 7596), at 3-4, 9-25; Exhibit 14, Expert Report of  Jerry Calvert (Weatherford) (Depo. Ex. 7836), at 2, 6-14; Exhibit 27, Expert Report of Marion Woolie (Weatherford) (Depo. Ex. 7841), at 12-13.

[98] Restatement (Third) of Torts § 2(a) (1998).

[99] *Id.*  cmt. c.

[100] *Id.*  cmt. c.

have existed at the time the product left the manufacturer's hands and have caused the injury in question.[101]

In this case, there is no evidence that the Float Collar deviated from its specifications or that any such defect existed at the time the Float Collar left Weatherford's hands.  After the Accident, Stress Engineering Services, Inc. ("SES") was retained by BP to test, inspect and analyze Weatherford model M45AP float collars.[102]  Weatherford provided ten (10) M45AP float collars, all manufactured to the exact specifications as the one used on the Macondo Well. [103] After rigorous testing, SES concluded the float collars met the requirements of API RP 10F, were manufactured consistent with Weatherford's published specifications and representations, and were free of any defects.[104]  SES' final report stated:

> Based on test results, the float collars appear to meet the requirements of API RP 10F for endurance testing. Test results do not indicate any performance conflicts with published Weatherford data for the M45AP float collar. Post-test inspection did not reveal any damage or anomalies that would affect the intended performance of the float collar.[105]

No evidence was introduced during discovery to contradict SES' findings.  Accordingly, there is no evidence of a manufacturing defect, and no genuine material facts in dispute.  As

---

[101] Restatement (Third) § 1(1998).  *See also* Restatement (Third) of Torts § 2(a), cmt. c (1998).

[102] Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 41-42.

[103] *Id*. at 41.

[104] Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 41-44; Exhibit 44, 30(B)(6) Deposition of Stress Engineering Services, Inc. through its designated representative, Kenneth Young, 42:1-22, 46:22-51:14,129:13-133:20 ("A.  We saw no -- no real deviation from what they [Weatherford] stated in their literature. We did some testing beyond what they stated.  Q.  And it was still -- acceptable?  A.  correct.  Q.  so as far -- at least this far you found no defect with the Weatherford flow collar and it worked as -- according to specifications and manufacturer specs?  A. The specifications that we saw and API specifications, yes.").

[105] Exhibit 49, Engineering Report on Testing of Weatherford M45AP Float Collar, Stress Engineering Services, Inc., Nov. 22, 2010, WFT-MDL-00003370-609 (Depo. Ex. 198), page vi.

{N2412181.1}

such, Weatherford should be granted summary judgment dismissing all claims for manufacturing defect.

### 2. The Claimants Cannot Meet Their Burden of Proof of a Design Defect

In addition to not meeting their burden on their claims of a manufacturing defect, the Claimants cannot meet their burden of proof regarding a design defect in the Float Collar. "Whereas a manufacturing defect consists of a product unit's failure to meet the manufacturer's design specifications, a product asserted to have a defective design meets the manufacturer's design specifications but raises the question whether the specifications themselves create unreasonable risks."[106]   A product "is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe"[107]   Section 2(b) of the Restatement (Third) uses "reasonableness" or a "risk-utility balancing test" to judge whether a product design is defective.[108]

"To establish a *prima facie* case of [design] defect, the plaintiff must prove the availability of a technologically feasible and practical alternative design that would have reduced or prevented plaintiff's harm."[109]   "Assessment of a product design in most instances requires a

---

[106] Restatement (Third) §2, cmt. d.

[107] Restatement (Third) § 2(b) (1998).

[108] *Id.*; *see also Krummel*, 206 F.3d at 552 (employing a risk-utility analysis under the Restatement (Third)).

[109] *Id.*, and cmt. f.  *See also*, La. Rev. Stat. Ann. §§ 9:2800.56-.57; *Johnson v. Black & Decker, U.S., Inc.,* 29,996 (La. App. 2 Cir. 10/31/97); 701 So. 2d 1360, 1363, *writ denied,* (outlining the need for plaintiffs to present evidence of a reasonable alternative design in a design defect case).

comparison between an alternative design and the product design that caused the injury, undertaken from the viewpoint of a reasonable person."[110]  Although the Restatement (Third) makes clear that a design defect case involving a complex product like the Float Collar requires that the Claimants establish the availability of a reasonably alternative design of the Float Collar, not one witness has proffered an alternative design, much less explained how an alternative design could reasonably prevent their alleged injury.  Summary judgment should be granted on the Claimants' design defect claims because the Claimants have failed to put forth any evidence of the essential elements of a *prima facie* case, namely, that a feasible design alternative exists that would have a reasonable probability of preventing their injury, without impairing the utility, usefulness, practicality or desirability of the Float Collar to users in the oil drilling industry.[111]

### 3.     The Claimants Cannot Meet Their Burden of Proof of a Failure to Warn

Finally, the Claimants cannot meet their burden of proof to establish liability for failure to warn under the General Maritime Law.  Under the Restatement (Third), as adopted by the General Maritime Law, "[c]ommercial product sellers must provide reasonable instructions and

---

[110] Restatement Third §2, cmt. d.

[111] See, e.g. *Townsend v. General Motors Corp.*, 642 So. 2d 411 (Ala. 1994) (summary judgment granted for defendants as plaintiff's expert testimony did not establish the viability of an alternative design of a compaction unit on a garbage truck); *Vines v. Beloit Corp.*, 631 So. 2d 1003, 1006 (Ala. 1994) (summary judgment granted to defendants when plaintiff failed to show reasonable alternative design for machine that processed pulp wood into paper); *La. Citizens Property Ins. Corp., v. Gen. Elec.*, 2010 U.S. Dist. Lexis 38345 (M.D. La. 2010) (applying Louisiana law and granting summary judgment on defective design claim for failure to offer any evidence on essential element of the *prima facie* case, namely a reasonable alternative design); *Weatherspoon v. Nissan North America, Inc.*, 2010 U.S. Dist. Lexis 21329 (S.D. MS. 2010) (granting summary judgment in defective design claim for lack of evidence of a feasible design alternative that would have a reasonable probability of preventing plaintiff's injury without impairing the utility, usefulness, practicality or desirability of the product to users or consumers as required under Mississippi law); *Parish v. Werner*, 2006 U.S. Dist. Lexis 2519 (S.D. Tex. 2006) (granting summary judgment in design defect case for a lack of a safer alternative design and noting that as a matter of law, a product is not unreasonably dangerous if there is no safer alternative design).

warnings about the risks of injury posed by products."[112]   A product "is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe."[113]   To prevail on a failure to warn claim, a plaintiff must prove that "adequate instructions or warnings [of 'foreseeable risks of harm posed by the product'[114]] were not provided."[115]   "A product seller is not subject to liability for failing to warn or instruct regarding risks and risk-avoidance measures that should be obvious to, or generally known by foreseeable product users."[116]

In this case, not one witness, expert or otherwise, has suggested or testified that Weatherford failed to warn about a foreseeable risk.  While there is a foreseeable risk of debris clogging a float collar during the drilling process, this risk is known in the industry and was known by BP, the product user.[117]   Indeed, Weatherford's product literature recommends

---

[112] Restatement (Third) of Torts § 2, cmt. i.

[113] Restatement (Third) of Torts § 2 (1998); *see also* cmt. g.

[114] Restatement (Third) of Torts § 2(c).

[115] Restatement (Third) of Torts § 2, cmt. i.

[116] *Id.*

[117] Exhibit 33, Deposition of BP Wells Team Leader John Guide, 822:15-825:5 ; Exhibit 32, Deposition of David Sims, 649:1-651:9, 655:21-657:14, 658:1-665:3,681:20-682:12; Exhibit 28, Expert Report of Gene Beck (Halliburton) (Depo. Ex. 8152) at 67-68; Exhibit 16, Deposition of Halliburton expert Gene Beck, 480:19-485: 21, 485:22-486:23. ("Q.  The-- blockage that-- resulted in the pressure increased to establish circulation--you with me?  A.  Uh-huh.  Q.  --did you attribute that blockage to any problem associated with the float collar?  A.  No."); Exhibit 8, Deposition of United States expert Glen Benge, 452:4-453:4, 454:1-455:17, 457:1-458:25("Q.  But with respect to debris, though, it -- it's -- from what you've seen from this case, it was certainly foreseeable that there would be debris in this well?  A.  Yes.  Q.  And one of your opinions has to do with the failure to perform a complete bottoms-up circulation, correct?  A.  That is correct.     Q.  And so it certainly was foreseeable to a prudent operator or anyone that was concerned with the running or the cementing of the production casing -- it's foreseeable that that
{N2412181.1}

circulating as a means of assisting in removing debris from the casing that may affect valve

function.[118]   If conversion of a float collar is unsuccessful or questioned for any reason, or

damage is suspected to the flapper valves, the operator implements a simple remedial

contingency plan.  Instead of relying on the float collar flapper valves, pressure is shut in and

held at the surface (rig) which prevents any further reverse flow until enough time has elapsed

for the cement to set. Because this risk is known, operators, like BP, plan for that contingency [119]

---

debris may end up somewhere in the shoe track during auto-fill application?  A.  Any time you use auto-fill, that's always a consideration.  Q.  And that's certainly something that Weatherford didn't need to **warn about**?  A. Absolutely not, no.") (emphasis added).

[118] Exhibit 6, Expert Report of Brent Lirette (Weatherford) (Depo. Ex. 7844) at 37-38.  Weatherford's product literature recommends circulating the return displacement volume through the float collar as a means of assisting in removing debris that may affect valve function.  Exhibit 39, Technical Literature for Weatherford M45AO Auto-Fill Float Collar (Depo. Ex. 8155), at page 6 of 7 (Verification of check valve function); Exhibit 55, Weatherford Technical Unit, Dual Wiper Plug Cementing Systems, page 13 of 24 (TREX 87,068), WFT-MDL-00134874-WFT-MDL-00134897; Exhibit 8, Deposition of United States expert Glen Benge, 452:4-453:4, 454:1-455:17 ("Q.  Have you, in fact, looked at the Weatherford product literature for the M45AP float collar?  Have you looked at it?  A.  Yes, I have.  Q.  Did you note that there is a discussion in that technical unit brochure that warns that debris can cause malfunction of a float collar?  Did you note that?  A.  Yes, I've seen that there.  Q.  Did you think that was an adequate warning?  A.  I think it stated its purpose very well.").

[119] **BP:** Exhibit 35, Deposition of Jonathan Sprague, BP Engineering Manager, at 730:8-732:14. ("Q.  So if--if it is common to have in the well plan even before the float collar is even running, a contingency plan in case the float collar leaks, am I--am I to assume that it's not--it's not uncommon for a mechanical device such as a float collar 18,000 feet below surface to sometimes leak?  A.  It happens.  Q.  Okay.  And in fact, BP plans for that contingency?  A.  We recognize that it can happen.); Exhibit 32, Deposition of David Sims, BP Drilling and Completions Operations Manager and engineering team leader for the *Deepwater Horizon*, at 658:1-665:3; Exhibit 64, BP's January 2010 Well Program for the 9 7/8" casing (Depo. Ex. 1157), BP-HZN-MBI 00100386, at 13 ("6. Release the pressure to check if floats are holding. Allow max of 10-15 bbls to flow back if floats aren't holding, then pump back the same. *Hold pressure until cement has sufficient time to set*.") (emphasis added).

**Halliburton:** Exhibit 16, Deposition of Halliburton expert Gene Beck, 488:3-490:21 ("Q.  If I'm looking at the judge or the jury in this case, would you agree with me that I could tell them and say, The risks associated with my float collar -- or I should say, the ramifications of that risk are minimal because of the simple remedial practice of holding pressure until the cement sets?  A.  So -- so I -- I do agree with the premise of the statement in that if there is a problem with the conversion of the float collar,  there should be some remediation associated with -- that problem .  Q.  But the -- A.  And  your solution is a standard solution, to simply hold pressure and wait on cement a length of time.  Q.  A simple remedial measure? A.  I agree, yeah.  Q.  Very simple, right?  A.  Yes.").

**United States:** Exhibit 8, Deposition of United States expert Glen Benge,  455:9-456:10 ("Q.  And, in fact, would you agree with me, Mr. Benge, from your experience, float collars do fail, do they not?  A.  Yes, they do.  Q. That's something that most, if not all, operators foresee and plan for.  Is that an accurate statement?  A.  Yes, sir.  Q. In fact, have you ever seen a competent well plan that did not provide for a contingency in the event that a float

{N2412181.1}

40

Where the manufacturer warns of the risk, like Weatherford did here, summary judgment is warranted.[120]

### D.     The Claimants Cannot Meet Their Burden of Proof of Causation

In addition to being unable to meet their burden of proof in establishing a defect in the Float Collar , the Claimants cannot meet their burden of establishing that an alleged defect in the Float Collar caused or contributed to the harm allegedly suffered by the Claimants.  Under the Restatement (Third), as adopted by the General Maritime Law, causation is an essential element of a products liability cause of action.[121]   Since no evidence has been put forth regarding causation based on any defect of the Float Collar, Weatherford is entitled to summary judgment as to all claims asserted against it.

### E.     Alternatively, Weatherford is entitled to Partial Summary Judgment Dismissing All Claims for Punitive Damages

There is absolutely no evidence that Weatherford was negligent much less grossly negligent, reckless and/or willful.  Nonetheless, in addition to the product liability causes of action outlined above, certain Claimants seek punitive damages from Weatherford under the General Maritime Law.  These Claimants allege that Weatherford's actions in designing,

---

collar failed the float test?  A.  No, I've always seen that as – that incorporated.  Q.  And in this particular case, did you review any BP well plans to see if such a contingency plan was included in the running of the production casing?  A.  Yes, I did.  Q.  Okay. And, basically, that contingency plan is that there is -- if there is any suspicion that the float collar did not convert, then you simply hold pressure and wait until the cement has been given enough time to set, correct?  A.  That's correct.").

[120] *Oswalt v. Resolute Indus.*, 642 F.3d 856  (9th Cir. 2011) (summary judgment was properly awarded to heater manufacturer on failure-to-warn claim because heater's repair manual included an instruction for removing the burner unit that provided a means for disconnection of the power.).

[121]    Restatement (Third) of Torts, § 1 (1998) ("One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property ***caused by the defect***.") (emphasis added).

{N2412181.1}

manufacturing and supplying the Float Collar were grossly negligent, reckless, and/or willful. These Claimants allege that Weatherford had actual and/or constructive knowledge of the defects that caused and/or contributed to the blowout, and as such, Weatherford should owe punitive damages.

Before punitive damages may be recovered under the General Maritime Law, however, "gross negligence, or actual malice or criminal indifference which is the equivalent of reckless and wanton misconduct," is required on the part of the defendant.[122]   Gross negligence for purposes of General Maritime Law has been defined as "reckless and wanton misconduct."[123]

In *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 493-94, 128 S. Ct. 2605, 2621-22 (2008), the United States Supreme Court addressed several issues regarding punitive damages, including the scope of awards for punitive damages under the General Maritime Law.   The Court undertook a thorough review of punitive damages under the common law, which provides a source of law for the General Maritime Law, and in doing so, the Court stated that "[t]he prevailing rule in American courts . . . limits punitive damages to cases of . . . 'enormity,' where a defendant's conduct is 'outrageous,' 4 Restatement § 908(2), owing to 'gross negligence,' 'willful, wanton, and reckless indifference for the rights of others,' or behavior even more deplorable, 1 Schlueter § 9.3(A)."[124]   The Court further provided a description of the degrees of behavior giving rise to punitive damages:

---

[122] *Miles v. Melrose*, 882 F.2d 976, 989 (5th Cir. 1989) (quoting *In Complaint of Merry Shipping Inc.*, 650 F.2d 622, 626 (5th Cir. 1981) (internal quotations omitted).

[123] *See Miles*, 882 F.2d at 989.

[124] *Id.*

Under the umbrellas of punishment and its aim of deterrence, degrees of relative blameworthiness are apparent. Reckless conduct is not intentional or malicious, nor is it necessarily callous toward the risk of harming others, as opposed to unheedful of it. *See, e.g.*, 2 Restatement § 500, Comment a, pp. 587-588 (1964) ("Recklessness may consist of either of two different types of conduct. In one the actor knows, or has reason to know . . . of facts which create a high degree of risk of . . . harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk. In the other the actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so"). Action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability, as of course does willful or malicious action, taken with a purpose to injure. *See id.*, § 908, Comment e, p. 466 (1977) ("In determining the amount of punitive damages, . . . the trier of fact can properly consider not merely the act itself but all the circumstances including the motives of the wrongdoer ... ").[125] . . . .

As set forth above, the undisputed evidence is that the Float Collar was not defective in any way, and there is not a scintilla of evidence, documentary or otherwise, that would lead a reasonable trier of fact to conclude that Weatherford had knowledge of the defects alleged. Should this court not grant Weatherford's Motion for Summary Judgment on all claims, then it clearly should dismiss all claims for punitive damages.

## V.   CONCLUSION

There is no evidence, not even a scintilla of evidence, to support a cause of action against Weatherford. No evidence or expert opinions have been presented even suggesting that the Float Collar was defective and a cause of the Accident. Instead, the evidence and expert testimony has conclusively shown the Float Collar met industry standards in its design and construction, and was reasonably fit for its intended purpose as a cementing accessory tool. Weatherford is

---

[125] *Id.*

entitled to summary judgment as a matter of law and all claims against it should be dismissed with prejudice.  Alternatively, Weatherford is entitled to a partial summary judgment dismissing all claims for punitive damages with prejudice.

Respectfully submitted:

*/s/  Glenn G. Goodier*

GLENN G. GOODIER (#06130)
RICHARD D. BERTRAM (#17881)
LANCE M. SANNINO (#29409)
JONES, WALKER, WAECHTER, POITEVENT,
 CARRÈRE & DENÈGRE, L.L.P.
201 St. Charles Avenue. 48th Floor
New Orleans, Louisiana  70170-5100
Telephone:     (504) 582-8174
Facsimile:      (504) 589-8174
ggoodier@joneswalker.com
rbertram@joneswalker.com
lsannino@joneswalker.com

MICHAEL G. LEMOINE, T.A. (#8308)
GARY J. RUSSO (#10828)
DOUGLAS C. LONGMAN, JR. (#8719)
JONES, WALKER, WAECHTER, POITEVENT,
 CARRÈRE & DENÈGRE, L.L.P.
600 Jefferson Street, Suite 1600
Lafayette, Louisiana  70501-5100
Telephone:     (337) 593-7624
mlemoine@joneswalker.com
grusso@joneswalker.com
dlongman@joneswalker.com

*Counsel for Weatherford U.S., L.P. and
Weatherford International, Inc.*

{N2412181.1}

44

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of January, 2012, the above and foregoing has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with the Court's Pretrial Order No. 12, on November 1, 2010.

*/s/  Glenn G. Goodier*
_____