# EXHIBIT 1

# DEPOSITION TRANSCRIPT OF

# CALVIN BARNHILL

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2
 3   IN RE:  OIL SPILL       )   MDL NO. 2179
     BY THE OIL RIG          )
 4   "DEEPWATER HORIZON" IN )   SECTION "J"
     THE GULF OF MEXICO, ON )
 5   APRIL 20, 2010           )   JUDGE BARBIER
                              )   MAG. JUDGE SHUSHAN
 6
 7
 8
 9
10
11
12
13
14
15
16
17            * * * * * * * * * * * * * * * *
                    VOLUME 2
18            * * * * * * * * * * * * * * * *
19
20
         Deposition of Calvin Charles Barnhill,
21   P.E., taken at the Pan-American Building, 601
     Poydras Street, 11th Floor, New Orleans,
22   Louisiana, 70130, on the 30th day of November,
     2011.
23
24
25
```

1  construction of a float collar?

2     A.  Not that I remember.

3     Q.  Okay.  Have you ever seen the inside of a

4  float collar?

5     A.  Yes.

6     Q.  Okay.  In this particular case?

7     A.  No.

8     Q.  Okay.  Did you look at any inf -- any

9  materials in preparation for this deposition

10  regarding the Weatherford float collar in

11  question?

12     A.  I -- I think I've maybe seen like a -- a

13  brochure, schematic, or something like that of

14  the double valve float valve.

15     Q.  Was it -- was it basically to familiarize

16  yourself with the -- the mechanical design of the

17  float collar?

18     A.  Generally, yeah.  I mean, it was -- quite

19  honestly, I looked at it because I had a copy of

20  it.

21     Q.  All right.  And you have not rendered any

22  opinions whether or not you feel the float collar

23  in question was defective?

24     A.  I -- I didn't see anything to tell me

25  that it was defective.

1      Q.   All right.  So you haven't --

2      A.   I don't know.

3      Q.   You haven't said -- you haven't said

4  anything in your Report whether it was defective,

5  correct?

6      A.   Correct.

7      Q.   You've not been asked to render any

8  appearance -- any testimony regarding whether the

9  float collar was defective?

10      A.   I have not.

11      Q.   But you do have a personal opinion as an

12  Expert in reviewing this case that you see no

13  evidence that it was defective.  Is that an

14  accurate statement?

15      A.   I didn't see anything to tell me that

16  specifically indicated that it was -- that it was

17  defective.  There was the issue with

18  conversion --

19      Q.   Right.

20      A.   -- that could have been a series of -- a

21  multitude of things.

22      Q.   Isn't it -- isn't it a fact,

23  Mr. Barnhill, from your experience, that the

24  industry -- the drilling industry recognizes that

25  float collars can fail --

1     A.   Sure.

2     Q.   -- downhole?

3     A.   Yes.

4     Q.   And -- and not necessarily because

5   they're defective?

6     A.   Right.  You can have erosional issues.

7   There are other flow trash, other types of flow

8   issues that can create problems --

9     Q.   Right.

10    A.   -- for it.

11    Q.   And would you also agree that the -- that

12  the industry's recognition of this has resulted

13  in a uniform-type contingency test or plan that

14  all companies implement in the event they feel

15  the float collar has failed to convert?

16    A.   Typically -- well, the answer's "Yes."

17  There's a something that we do if we don't think

18  the floats are holding.

19    Q.   Right.  In other words, it's not

20  necessary to remove the entire casing string to

21  replace the float collar if the Operator feels as

22  though it hasn't converted?

23    A.   Correct, it is not --

24    Q.   And --

25    A.   -- and you would not.

1       Q.   And -- and you --

2       A.   You may not be able to.

3       Q.   True.

4       A.   Right.

5       Q.   Could -- could you tell us from your

6    experience what that typical contingency plan is?

7       A.   Basically you will have calculated ahead

8    of time what displacement you think the float

9    will bump -- or -- or I'm sorry, the plugs will

10   bump on the float.  Once you've reached that

11   point where you actually see a positive

12   indication of your -- of the plugs bumping, or

13   in -- if you're in the general range of the

14   displacement, you will stop.  You will bleed

15   back.  If the floats are holding, the flappers

16   will close, and there should be an appropriate

17   volume that will bleed off due to expansion.

18        If it continues to bleed -- again,

19   depending on how critical the volumes are -- you

20   may pump some -- you may pump a little bit to

21   push the cement back in place, and then you'll

22   just hold pressure to -- to keep everything in

23   place.

24       Q.   You'll hold pressure in order to allow

25   the cement not to rise?

1    A.   The idea -- you're trying to make sure

2    that the cement gets to a particular location --

3    Q.   Right.

4    A.   -- okay?  You're wanting it to be in your

5    shoe track and around in the annular space out

6    ti -- outside of the casing to whatever

7    predetermined height you've calculated that you

8    want it to be.

9         So, you know, the -- the purpose of

10   the -- the float valve is so that once you

11   start -- stop pumping, it acts like a check

12   valve.  The -- the flapper closes, and it holds

13   the cement in place.

14        So if the flapper's not holding, if it's

15   been damaged or something, then you're going to

16   apply what you believe to be appropriate amount

17   of pressure, if pressure's needed, to put the

18   cement where it is.  You don't want to

19   underpressure because you don't want the cement

20   coming back up.  You don't want to overpressure

21   to drive the cement down further.

22   Q.   So, in other words, holding pressure in

23   the event you feel the flappers have failed

24   basically substitutes the float collar's valve

25   function with the pressure?

1       A.  If you -- if you need that, yes.

2       Q.  Okay.

3       A.  If you have that -- if you have to

4  account for that differential.

5       Q.  Right.

6       A.  (Nodding.)

7       Q.  And even if a prudent Operator believes

8  that the float collar has not converted or the

9  valves were damaged, it's still prudent to

10  proceed with well operations upon holding

11  pressure for a sufficient time for the cement to

12  set?

13      A.  Yes.  And the only reason you wouldn't

14  proceed with well operations is if you had some

15  indication that something was going on to alter

16  those plans.

17      Q.  But let me just pursue that a little bit

18  more.  In other words, it -- it -- it -- it's

19  prudent for the Operator, if he assumes the float

20  collar is wide open, for him to continue with

21  well operations.  Is that an accurate statement?

22      A.  Sure.  I mean, I've had situations where,

23  you know, we've bumped the plugs.  We've bled

24  back.  It continued to bleed.  We didn't feel

25  like our floats were holding.  We held what we

Page 535

1  believed was the appropriate pressure, let

2  everything set up, and then went forward with the

3  operation.

4      Q.   Is -- is -- is -- is that one of the

5  reasons why you have the opinion that a float

6  collar is not a well control device; that is, in

7  some situations a prudent Operator continue well

8  operations with knowledge or the belief that a

9  float collar is wide open?

10     A.   I don't know that I ever put that in the

11 category, to be honest with you.

12     Q.   M-h'm.

13     A.   The -- you know, my thought on it was

14 more -- the intended purpose is to -- to

15 basically keep the cement in place.  Once the

16 cement sets up, it acts as the flow barrier.

17          You know, again, the -- the questions

18 that would come to my mind is -- is the bubble

19 tightness, if you will, of the -- of the

20 particular valve, to whether it could trap gas

21 and hold gas.  And I -- you know, just to me I

22 have never felt like a float collar was a well

23 control device.  We have well control devices,

24 and typically float collars are not in that

25 category.

PURSUANT TO CONFIDENTIALITY ORDER

1    Q.  Okay.  Have you, in all the ev --

2  evidence that you've reviewed and information

3  review, have you seen any representations by my

4  client, Weatherford, that the -- the M45

5  auto-fill float collar was designed and intended

6  to be a well control device?  You haven't --

7    A.  I don't believe I have.  I -- not that I

8  remember, certainly.

9    Q.  Have --

10    A.  I don't remember anything.

11    Q.  Have you reviewed testimony from BP

12  indicating that BP, as the owner of this well,

13  also did not consider the Weatherford float

14  collar to be a well control device?  Did you

15  review that testimony?

16    A.  I know I've seen some information that --

17  that -- and I don't know that it was put like

18  that.  I think it was expressed more in terms of

19  flow barrier --

20    Q.  Okay.

21    A.  -- but -- but that -- you know, that some

22  people felt that it's a flow barrier; some people

23  have felt it was not a flow barrier, within BP.

24  But my impression, that it was based on more --

25  again, you know, in the broad general sense, it's

Page 537

1   a flow barrier in the sense it's supposed to stop

2   the cement from flowing, but that's -- to me

3   that's different than a well control device.

4       Q.   And -- and what we're here about today in

5   this case is a well control event?

6       A.   We are.

7       Q.   So everything that we've been talking

8   about, the ultimate reason we're here regarding

9   the blowout and explosion can be summarized that

10  it was a well control event?

11      A.   It was a well control event, correct.

12      Q.   And your -- your testimony as an Expert

13  is that the Weatherford float collar was never

14  designed or intended to be a well control device?

15      A.   In my experience -- you know, I -- I

16  don't know what somebody designed or intended,

17  but in my experience, it is -- I do not consider

18  the float collar to be a well control device.

19      Q.   Okay.

20      A.   The cemented shoe track should serve as a

21  flow barrier, but the -- the -- to say I'm going

22  to run a float valve as my well -- downhole well

23  control device, that's not part of my experience,

24  right.

25      Q.   And -- and if -- if, for instance, a

Page 538

1    converted float collar with valves that were not

2    damaged was able to retard a flow, whatever that

3    flow may be --

4        A.   (Nodding.)

5        Q.   -- would I -- would it be correct to say

6    that that may be an incidental benefit?

7        A.   Well, again, if it -- if it buys you more

8    time, then, yes, that could be an incidental

9    benefit, but the issue would be for how long due

10   to erosional and corrosional effects is it.

11       Q.   Right.

12       A.   You know, I -- I don't know that you'd

13   want to sit there and rely on that.

14       Q.   Right.

15       A.   (Nodding.)

16       Q.   Let's talk about that, about erosion and

17   how long it might be able to hold back flow.

18       A.   (Nodding.)

19       Q.   Do you, from your experience, recognize

20   that a float collar has limitations with respect

21   to the materials that can be used to construct it

22   because of the fact that float collars are

23   drilled out upon completion of the cement job?

24       A.   I'm fully aware and have participated in

25   the drilling out of float collars, yes.

Page 539

1      Q.   Right.   What is drill pipe made out of?

2      A.   Drill pipe is made out of basically

3  steel.   There are different types of -- we do

4  have things other than steel drill pipe, but

5  the pi -- what we're talking about here is steel

6  pipe.

7      Q.   Basically steel?

8      A.   Correct.

9      Q.   And -- and if I told you that -- that

10  this particular Weatherford float collar's valves

11  were made of aluminum, would you have any reason

12  to disagree with me?   I'm not sure if you

13  analyzed the case that much.

14      A.   I have not analyzed the case that much,

15  but that would not --

16      Q.   Right.

17      A.   -- that would not surprise me.

18      Q.   And I realize you're not a metallurgist,

19  but just from your -- your expertise and common

20  sense, you would agree that aluminum is a lot

21  softer metal than -- than steel used for drill

22  pipe?

23      A.   I think I would agree with that.   I mean,

24  aluminum al -- alloys have certain applications.

25  But, again, Mike, I mean, the -- you know, float

1    collars are designed to be drilled out.

2    They're --

3         Q.   Okay.

4         A.   -- designed for us to put a bit in there

5    and put weight on that bit and drill those out

6    and drill through them.

7         Q.   Let's just continue on this line, though.

8    You -- you -- you mentioned in yesterday's

9    testimony, and also in your Report, that you

10   didn't know whether or not this float collar was

11   bubble tight --

12        A.   Yes.

13        Q.   -- am I saying that right?

14        A.   You are.

15        Q.   Now, let me put it in my words.  Are you

16   saying that -- that you did not -- you do not

17   know if Weatherford designed and manufactured

18   this float collar to where it would be a

19   gas-tight seal?

20        A.   Correct.

21        Q.   That's another way to say it, right?

22        A.   That's another way to say it.

23        Q.   Okay.  Are -- are you aware that -- that

24   Weatherford advertises this float collar as

25   meeting the performance criteria of API RP 10F?

1     Q.   Okay.

2     A.   Gas, of all the fluids, is -- is -- is a

3     tremendously mobile fluid and a very hard

4     fluid to --

5     Q.   All right.

6     A.   -- to trap or to hold.

7     Q.   Mr. Barnhill, you mentioned in your

8     testimony yesterday regarding whether a device is

9     bubble tight, that if it is not, then gas could

10    be trapped between the valves.  I -- I may -- may

11    not be quoting you directly, but is that

12    basically the substance of your testimony

13    yesterday?

14    A.   Run that by me, would you, please?

15    Q.   Well, I do have a quote, in fact.  Let me

16    see if I can read it for you real quick.  Here it

17    is.

18        "ANSWER:" -- and this was late yesterday

19    afternoon -- "Its -- you know" -- "its" --

20    talking about the float collar -- "its

21    purpose...particularly in this well, and the type

22    of float collar they were using, it was there to

23    provide two functions:  Number one, to be part of

24    the anti-surge system, that's why it was in the

25    pinned-open position" -- and I can't read this --

PURSUANT TO CONFIDENTIALITY ORDER

1   "and two, to act as a check valve to keep the

2   cement from U-tubing back."

3         Let me just stop you there.  That's --

4   that's your testimony?  That's your opinion?

5       A.  That's my opinion.

6       Q.  Any evidence to indicate that the

7   Weatherford float collar did not perform those

8   two functions adequately on the Macondo Well?

9       A.  We certainly know it performed the first

10  one.

11      Q.  (Nodding.)

12      A.  We have no indication that it did not

13  perform the second one.  We do know there was an

14  issue and to -- as to whether it converted or

15  not.

16      Q.  Right.

17      A.  The differential pressure associated with

18  the cement job would have been such that you

19  probably would have not have had cement movement

20  upward anyway.  So whether it secured that

21  function, or whether it provided that function or

22  not, is probably incidental.

23      Q.  Yes.  Let me continue.  You said:  "I've

24  never thought of it in terms...as being a well

25  control device, and, in fact, one of the

Page 562

1  T&A Procedure, or maybe we want to look at doing

2  a little bit more testing before we decide to

3  move forward.

4      Q.  Now, you listed in that -- those --

5  that -- those lists of things, that -- that --

6  that checklist, the fact, and I quote, "problems

7  with float collar confirmation"?

8      A.  Correct.

9      Q.  Why did you list that in Attachment A?

10     A.  Because, again, one of the things that

11 you're relying on, for your barrier, is going to

12 be, you know, the shoe -- the -- the cement in

13 the annulus and the cement in the shoe track.

14     Q.  M-h'm.

15     A.  Your shoe track is a barrier isolation.

16 And -- and we -- we don't know, you know, at --

17 at the time, we know there was an issue with --

18 with flo -- with the float collar.  So the

19 question becomes, are we really confident that we

20 have shoe track isolation as a primary barrier,

21 are we really confident that we have zonal

22 isolation on -- on the outside, but from the shoe

23 track standpoint, are we really confident that we

24 have isolation.  And that is a question.

25          You know, it's one thing to say,

PURSUANT TO CONFIDENTIALITY ORDER

1  "Everything went slick," you know.  And we -- you

2  know, we got a lot of margin for error.

3  Everything went slick throughout the job.  You

4  know, there are no close tolerance here.

5  There's -- there's no modifications here.

6  There's no questions ever arose.  You may reach

7  one conclusion.

8          So, again, it's just something where we

9  can say -- you know, at the end of the day, I

10 don't think you could sit back and say, "I have

11 proven, confirmed flow barriers, I have

12 established zonal isolation, so I feel

13 comfortable displacing this well, reducing the

14 hydrostatic pressure in this well," and moving

15 forward in that manner.

16    Q.  I'm understanding you.  I -- I -- I said

17 that was my last question, but I promise you this

18 will be my last one:  I -- I just would like for

19 you to take me on the rig in -- in words, put me,

20 you know, on the rig during the negative pressure

21 test so that I can explain, perhaps, to my

22 client.  There -- there was a reading of 1400 psi

23 on the drill pipe, right?

24    A.  Yeah.  We can see from this chart --

25    Q.  See from the chart, all right.

EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO.  2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO,  on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

## CONFIDENTIAL

### *WorldwideVIEW*™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Calvin Charles Barnhill, P.E.
**VOLUME 2**

NOVEMBER 30, 2011

## *ORIGINAL*



*Systems Technology for the Litigation World*

Litigation Group◆Court Reporting◆Video Production◆Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3   IN RE:  OIL SPILL        )   MDL NO. 2179
     BY THE OIL RIG           )
 4   "DEEPWATER HORIZON" IN   )   SECTION "J"
     THE GULF OF MEXICO, ON   )
 5   APRIL 20, 2010           )   JUDGE BARBIER
                              )   MAG. JUDGE SHUSHAN
 6

 7

 8               REPORTER'S CERTIFICATION
         TO THE ORAL AND VIDEOTAPED DEPOSITION OF
 9            CALVIN CHARLES BARNHILL, P.E.
                   NOVEMBER 30, 2011
10                      VOLUME 2

11
          I, Emanuel A. Fontana, Jr., Certified
12   Shorthand Reporter in and for the State of Texas,
     hereby certify to the following:
13
          That the witness, CALVIN CHARLES BARNHILL,
14   P.E., was duly sworn by the officer and that the
     transcript of the oral deposition is a true
15   record of the testimony given by the witness;

16        That the deposition transcript was submitted
     on December 5    , 2011, to the witness or to
17   Attorney David A. Baay         for the witness to
     examine, sign, and return to Worldwide Court
18   Reporters, Inc., by January 30     , 2012.

19        That the amount of time used by each party
     at the deposition is as follows:
20
          Mr. Ayers - 1 Hour, 14 Minutes
21        Mr. Nichols - 40 Minutes
          Mr. Lemoine - 38 Minutes
22        Ms. Scofield - 30 Minutes
          Ms. Lawrence - 1 Hour, 11 Minutes
23        Mr. Regan - 50 Minutes

24

25
```

PURSUANT TO CONFIDENTIALITY ORDER

1      I further certify that I am neither counsel
for, related to, nor employed by any of the
2  parties in the action in which this proceeding
was taken, and further that I am not financially
3  or otherwise interested in the outcome of the
action.
4
     SUBSCRIBED AND SWORN to by me on this 30th
5  day of November, 2011.

6

7

8                          Emanuel A. Fontana, Jr., RPR
9                          Texas CSR No. 1232
                           Expiration Date: 12/31/12
10                          Worldwide Court Reporters
                           Firm Registration No. 223
11                          3000 Weslayan, Suite 235
                           Houston, Texas   77027
12                          (713) 572-2000

13

14

15

16

17

18

19

20

21

22

23

24

25

PURSUANT TO CONFIDENTIALITY ORDER

1
2          I, CALVIN CHARLES BARNHILL, P.E., have
3   read the foregoing deposition and hereby affix my
4   signature that same is true and correct, except
5   as noted on the attached Amendment Sheet.
6
7                        CALVIN CHARLES BARNHILL, P.E.
8
9
10  THE STATE OF Louisiana )
    ~~COUNTY~~ OF Lafayette )
11  Parish
         Before me, Regena M. Stelly          , on
12  this day personally appeared CALVIN CHARLES
    BARNHILL, P.E., known to me (or proved to me
13  under oath or through _____ )
    to be the person whose name is subscribed to the
14  foregoing instrument and acknowledged to me that
    they executed the same for the purposes and
15  consideration therein expressed.
         Given under my hand and seal of office this
16  4th   day of  January          , 2012.
17
18
19                 NOTARY PUBLIC IN AND FOR
                   THE STATE OF Louisiana
20                 COMMISSION EXPIRES: death
21                 #30584
22
23
24
25

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1              CHANGES AND SIGNATURE

2  WITNESS NAME:  CALVIN CHARLES BARNHILL, P.E.

3  DATE OF DEPOSITION:  NOVEMBER 29, 2011

4  PAGE LINE      CHANGE           REASON

5  30  14  Change "they were" to "he was"

6  51  7   Change "Midocean" to "Metocean"

7  52  23  Add "floor" After "rig"

8  91  6   Add "14" to end of "917"

9  98  2   Change "Plug Point" to "ball and Seat"

10 99  3 & 11  Change "Plug point" to "ball and Seat"

11 114 24  Remove "S" from "oil"

12 129 19  Add "if it" After "And"

13 186 13  Change "Varies" to "barriers"

14 329 8   Change "Report" to "Plan"

15 363 3   Delete "in" from "within"

16 380 22  Replace 1st "redundant" with "Primary"

17 380 23  Add "s" to "barrier"

18 394 5   Add ";" After "been" & Replace "."

19         with ";" After "fluid"

20 394 6   Change "over" to "in"

21 400 11  Change "Netocean" to "Metocean"

22 402 13  Remove the "a" @ end of Sentence

23 413 6   Change "Postive" to "Negative"

24 415 25  Change 1st "and" to "in"

25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

*Calvin C. Barnhill*

712

```
1              CHANGES AND SIGNATURE

2   WITNESS NAME:  CALVIN CHARLES BARNHILL, P.E.

3   DATE OF DEPOSITION:  NOVEMBER 30, 2011

4   PAGE LINE        CHANGE              REASON

5   430  15    Replace "hydrostatic" with hydrostatically"

6   456  19    Change "Pipe" to "Pump"

7   459  20    Drop "s" from "Controls" and

8              add Schools after "Control"

9   460  11    Add ";" after Last "in" & Change

10             "on" to "a"

11  465  18    Change "Any" to "the end"

12  483  4     Change "Muds" to "Water"

13  486  14    Make "28:45" read "21:28:45"

14  553  10    Change "bouncing" to "balancing"

15  609  10    Add "." After System & Capitlize "There"

16  610  14    Remove "be"

17  623  24    Add Comma After 1st "is"

18  651  5     Change "DSA" to "ESA"

19  653  24    "Tousine" Should read "Tasine"

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____
```

**PURSUANT TO CONFIDENTIALITY ORDER**

*Calvin C. Barnhill*