# EXHIBIT 8

# DEPOSITION TRANSCRIPT OF

# GLEN BENGE

```
 1              UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
 2
 3    IN RE:  OIL SPILL      )   MDL NO. 2179
      by the OIL RIG,        )
 4    DEEPWATER HORIZON in   )   SECTION "J"
      the GULF OF MEXICO,    )
 5    April 20, 2010         )   JUDGE BARBIER
                             )
 6                           )   MAG. JUDGE
                             )   SHUSHAN
 7
 8
 9
10
11
12                  VOLUME 2 OF 2
13
14
15
16
17
              Deposition of OTTIS GLEN BENGE, taken
18    at Pan-American Building, 601 Poydras Street,
      11th Floor, New Orleans, Louisiana, 70130, on
19    November 18, 2011.
20
21
22
23
24
25
```

1    Q.  Mr. Benge, good morning.  My name is Mike

2    Lemoine.  Pleasure to meet you.

3    A.  Good morning.

4    Q.  And I represent Weatherford.

5         I want to ask you some questions starting

6    off with the float collar that was installed on

7    the production casing.  Are you familiar with

8    that product, the M45AP auto-fill float collar?

9    A.  Yes, I've used it on wells before.

10   Q.  Successfully?

11   A.  Yes, sir.

12   Q.  Do you have high regards for the product?

13   A.  Definitely do.

14   Q.  Do you have any opinions today as to

15   whether or not that particular product on the

16   well in question was defective in any way?

17   A.  I don't -- all of -- all of the

18   information that I've seen says that it would

19   not.

20   Q.  It was not defective?

21   A.  It was not defective.

22   Q.  In other words, you've given testimony

23   today that perhaps it was damaged, perhaps it

24   didn't convert.  But from all the information you

25   reviewed, you don't attribute those problems to

PURSUANT TO CONFIDENTIALITY ORDER

1    the defect in the design of the construction of

2    the float collar; is that an accurate statement?

3              MR. CERNICH:   Object to form.

4        A.   That is an accurate statement, yes, sir.

5        Q.   (BY MR. LEMOINE)   What do you attribute

6    to the reason why the float collar did not

7    convert -- if, in fact, that is accurate, it did

8    not convert, what do you attribute that to?

9        A.   Starting with the assumption that, in

10   fact, it didn't convert, because, understand, I

11   can't tell one way or the other --

12       Q.   We would hope that we could retrieve it,

13   but we can't.

14       A.   We can't.  I have to look for mechanisms

15   that -- that would have -- and if you look at

16   what -- what can cause a mechanical device to

17   fail, one is damage in transit or in handling on

18   the rig.  Let's assume that, you know, that's a

19   scenario.  Don't know whether that happened or

20   not.  We'll assume that didn't.

21              There was debris that -- apparent debris

22   that got in because it look a lot of pressure to

23   initiate circulation.  Those would be to either

24   mishandling or something downhole that I -- I

25   can't know what happened.

1      Q.  But with respect to debris, though, it --

2   it's -- from what you've seen from this case, it

3   was certainly foreseeable that there would be

4   debris in this well?

5      A.  Yes.

6      Q.  And one of your opinions has to do with

7   the failure to perform a complete bottoms-up

8   circulation, correct?

9      A.  That is correct.

10     Q.  And so it certainly was foreseeable to a

11  prudent operator or anyone that was concerned

12  with the running or the cementing of the

13  production casing -- it's foreseeable that that

14  debris may end up somewhere in the shoe track

15  during auto-fill application?

16     A.  Any time you use auto-fill, that's

17  always -- always a consideration.

18     Q.  And that's certainly something that

19  Weatherford didn't need to warn about?

20     A.  Absolutely not, no.

21     Q.  Right.  Have you, in fact, looked at the

22  Weatherford product literature for the M45AP

23  float collar?  Have you looked at it?

24     A.  Yes, I have.

25     Q.  Did you note that there is a discussion

1    in that technical unit brochure that warns that

2    debris can cause malfunction of a float collar?

3    Did you note that?

4       A.  Yes, I've seen that there.

5       Q.  Did you think that was an adequate

6    warning?

7             MR. CERNICH:  Object to form.

8       A.  I think it stated its purpose very well.

9       Q.  (BY MR. LEMOINE)  Okay.  And, in fact,

10   would you agree with me, Mr. Benge, from your

11   experience, float collars do fail, do they not?

12      A.  Yes, they do.

13      Q.  That's something that most, if not all,

14   operators foresee and plan for.  Is that an

15   accurate statement?

16             MR. CERNICH:  Objection.

17      A.  Yes, sir.

18      Q.  (BY MR. LEMOINE)  In fact, have you ever

19   seen a competent well plan that did not provide

20   for a contingency in the event that a float

21   collar failed the float test?

22      A.  No, I've always seen that as -- that

23   incorporated.

24      Q.  And in this particular case, did you

25   review any BP well plans to see if such a

1    contingency plan was included in the running of

2    the production casing?

3        A.   Yes, I did.

4        Q.   Okay.  And, basically, that contingency

5    plan is that there is -- if there is any

6    suspicion that the float collar did not convert,

7    then you simply hold pressure and wait until the

8    cement has been given enough time to set,

9    correct?

10       A.   That's correct.

11       Q.   Okay.  Just a few more questions about

12   the product, itself.

13            I noted in your report -- by the way, you

14   mentioned you know Brent Lirette, my client.  How

15   do you know Brent?

16       A.   I've known Brent for -- I've know Brent

17   for years.  Mainly we've met through API, through

18   when he was in the -- when I was working in New

19   Orleans and he was in Houma.

20       Q.   Okay.

21       A.   So I've known him for -- known him for

22   quite a while.

23       Q.   He's -- he's in Houston now.

24       A.   Yes, I know.

25       Q.   I think he'd like to go back to Houma,

1    but he's in Houston.  You mentioned API RP 10F?

2        A.  Yes.

3        Q.  You're familiar with that recommended

4    practice?

5        A.  Yes, I am.

6        Q.  Were you on the API committee that wrote

7    or revised API RP 10F?

8        A.  I was on the group that did some

9    revisions to it.  I don't think I was on the

10   original task group that did that one.

11       Q.  Does it equate to ISO 10427-3?  Are they

12   the same?

13       A.  Yes.

14       Q.  Can you tell me, Mr. Benge, what is the

15   difference -- I know what an RP is, it's a

16   recommended practice, but the ISO is more of a

17   standard, isn't it?

18       A.  Well, ISO doesn't make a distinction --

19       Q.  Yeah.

20       A.  -- between specifications --

21   recommendations or standards.  They only have the

22   designation standard.

23       Q.  Would you agree with me -- and let's just

24   use API RP 10F -- that regardless, whether it's a

25   recommended practice or not, the industry

1    recognizes that RP as being the standard for the

2    manufacturing of float collars regarding its

3    performance criteria?

4         A.   Yes, I would agree.   We use that -- even

5    though it's an RP, I personally use it as a

6    standard.

7         Q.   Right.   And from your review of this

8    case, do you agree that the Weatherford float

9    collar in question met that standard?

10        A.   Yes, it did.

11        Q.   And would you also agree that not only

12   did it meet that standard, but it met the most

13   rigorous test category allowed by API RP 10F, and

14   that is Category IIIC?

15        A.   Yes, sir, it did.

16        Q.   Would you agree with me, from your

17   experience, that a float collar that meets that

18   standard has a high degree of success in

19   cementing operations?

20        A.   Yes, sir, they do.

21        Q.   Would you agree with me that a float

22   collar that meets that standard is certainly, as

23   we say, reasonably fit for its intended purpose?

24        A.   Yes, sir.

25        Q.   You would agree with that.

1          Let's talk a little bit about the purpose

2     of a float collar.  I'll try to save time by

3     asking you some leading questions, if you don't

4     mind.

5          A.  Not at all.

6          Q.  Particularly right before lunch.

7          Would you agree with me that the purpose

8     of an auto-fill float collar, such as the

9     Weatherford float collar in the Macondo well, can

10     be summarized into three points:  Surge

11     protection, do you agree?

12          A.  Yes, sir.

13          Q.  A landing profile for the cementing

14     plugs?

15          A.  Yes, sir.

16          Q.  And to prevent the backflow of cement

17     slurry into the casing from the annulus until the

18     cement sets?

19          A.  Yes, sir.

20          Q.  Did I say that accurately?

21          A.  Yes, you did.

22          Q.  And would you agree with me that that

23     last purpose, that last function of preventing

24     backflow, is a temporary function?

25          A.  Yes, sir.

1      Q.  It's -- so the -- the role and the

2    purpose of a float collar is, relatively speaking

3    with respect to cementing operations, of short

4    duration?

5      A.  Yes, sir, it's a short-lived device.

6      Q.  And is that one of the reasons why,

7    Mr. Benge, that the industry does not consider a

8    float collar to be a well control device?

9      A.  Well, I think that's one of -- one of

10   many reasons --

11     Q.  Yeah.

12     A.  -- that I would, yes.

13     Q.  And I'm going to go through those with

14   you, but that was one of the first ones I wanted

15   to talk about.

16     A.  Yes, sir.

17     Q.  When you reviewed this case, I assume

18   that you read a number of depositions?

19     A.  Yes, sir, I have.

20     Q.  Did you read the testimony of the

21   corporate deposition of BP that was taken of --

22   in London of Jim Cowie?  Do you recall that

23   testimony?

24     A.  I'm sorry.  I don't recall that --

25     Q.  That's okay.

1      A.  -- that one.

2      Q.  Let me see if I can refresh your memory.

3          Do you recall reading testimony by BP

4  that they never intended, on the Weatherford

5  float collar, to serve any purpose on the Macondo

6  well other than the three that we just outlined?

7      A.  Yes, I do recall -- I recall reading

8  that.

9      Q.  And so that was -- that's certainly --

10 from your review of the case, there was certainly

11 no misunderstanding between Weatherford and BP as

12 to what the purpose of the float collar would be

13 in the Macondo well?

14              MR. CERNICH:  Objection.

15     A.  No, sir.

16     Q.  (BY MR. LEMOINE)  There was no

17 misrepresentation of Weatherford as to what the

18 float collar's intended purpose was?

19              MR. CERNICH:  Objection.

20     Q.  (BY MR. LEMOINE)  Do you agree with that?

21     A.  I agree with that.

22     Q.  Okay.  You've worked with Weatherford

23 before in the past?

24     A.  Yes, sir, I have.

25     Q.  Are they, in your opinion, a preferred

1    supplier of float equipment?

2        A.  Yes, sir, they -- excuse me -- yes, sir,

3    they are.

4        Q.  I want to talk to you a little bit

5    about -- well, maybe a lot -- regarding that last

6    purpose of the float collar, to prevent the

7    U-tubing of cement from the annulus to the shoe

8    track.  Did I say that correct?

9        A.  Yes, sir.

10       Q.  Let's talk a little bit about that.

11   The -- and I'm going to have to dummy this down.

12   Okay?

13           So in my way of understanding this, once

14   you have cement -- once you have fluids that are

15   pumped during circulation before cementing, that

16   fluid will end up in the annulus.  Yes or no?

17       A.  That's correct, yes.

18       Q.  And that -- and that fluid in the annulus

19   creates hydrostatic pressure, the weight of it?

20       A.  Yes, sir.

21       Q.  Okay.  Then comes the cement, and the

22   cement is pumped down the production casing in

23   this case, and ends up in the shoe track as well

24   as also in the annulus, correct?

25       A.  That's correct.

1      Q.   Now, the industry with respect to float

2   collars recognizes that in many cases the density

3   of the circulation fluid and the cement is

4   greater than the density of the cement and fluids

5   that remain in the casing after cement

6   displacement?

7      A.   Yes, sir.

8      Q.   And that -- that disequilibrium, that

9   greater pressure on the outside than the inside,

10   if left to Mother Nature, would want to equalize

11   through U-tubing?

12      A.   Yes, sir.

13      Q.   And that's the purpose of the float

14   collar, to prevent that U-tubing of circulation

15   fluids and cement from the outside back into the

16   inside?

17      A.   That's correct.

18      Q.   All right.  And so the force, the

19   pressure that we've been talking about that a

20   float collar is designed to hold back -- the

21   backpressure rating, I believe, is what it's

22   called, correct?

23      A.   Yes.

24      Q.   -- is the pressure that would be exerted

25   by fluids consisting of circulation fluids and

1    cement?

2         A.   That's correct.

3         Q.   That's it, correct?

4         A.   That's correct.

5         Q.   It is never intended to hold back

6    pressure that's being produced by the formation?

7         A.   No, it is not.

8         Q.   That's an accurate statement?

9         A.   That is an accurate statement.

10        Q.   All right.  So when you answered

11   questions to Halliburton's attorney yesterday

12   about, well, if the float collar was rated for

13   5,000 psi, if you take the delta difference

14   between what was above the collar and below the

15   collar, if that pressure -- that pressure

16   differential was resulting from the formation as

17   opposed to the natural densities of the fluids

18   that were circulated or cementing for -- or from

19   cementing, that float collar was not intended or

20   designed to hold that back.  That's an accurate

21   statement?

22        A.   That is correct.  That float collar is

23   not intended nor designed to do that.

24        Q.   In fact, I copied -- I had your testimony

25   copied to read last night, and you made a point

1    during your testimony to say that that float

2    collar is designed and tested only to prevent

3    backflow of mud.  That's what it's tested for,

4    correct?

5         A.  That's correct.

6         Q.  Right.

7         A.  It's tested with mud.

8         Q.  It's never tested either under ISO, API,

9    or any other organization that has anything to do

10   with the testing of float collars -- it is never

11   tested with hydrocarbons; is that correct?

12        A.  That is correct.

13        Q.  The float -- no float collar to your

14   knowledge ever made has been made and represented

15   to provide a water, oil, or gas-type seal.  Is

16   that an accurate statement?

17        A.  That is an accurate statement.

18        Q.  I'm a little confused about something,

19   and I know you're going to clear it up for me.

20   It -- when -- when the cement displacement is

21   complete and the top plug has bumped --

22        A.  Okay.

23        Q.  -- we can speak, you and I on these type

24   of terms, right?

25        A.  Yes.

1    blown out -- and I'm certainly not making fun of

2    you by speaking like that.  That's your opinion.

3         A.  I didn't mean --

4         Q.  I know that.  Well, it's a good sound

5    bite.

6         A.  I'm sorry.

7         Q.  Regardless if it was damaged, regardless

8    if it didn't convert, the fact that there was no

9    flowback when they did the float test terminates

10   the role of the float collar on the Macondo well.

11   Is that an accurate statement?

12        A.  That is --

13             MR. CHEN:  Objection; form.

14        A.  -- an accurate statement.

15        Q.  (BY MR. LEMOINE)  Let me ask you this:

16   Let's -- let's just assume that the float collar

17   valves were not functioning, either because it

18   did not convert or it was not damaged.  Let's

19   just go with that possible scenario.

20             Is it your testimony -- strike that.

21             I want you assume that the float collar

22   was converted and the valves were not damaged and

23   had properly closed.  I'm changing the scenario

24   on you.

25        A.  Okay.

1    the top five in the world, yes, sir.

2        Q.   Would you put yourself as one of the top

3    five cementing experts in the world?

4        A.   Yes, sir, I would.

5                MR. CERNICH:   Thank you.   That's

6    all, Mr. Benge.

7                THE VIDEOGRAPHER:   The time now is

8    3:16 p.m. Today's deposition of Mr. Glen Benge

9    consisting of 17 tapes is now concluded.

10       (THE DEPOSITION CONCLUDED AT 3:16 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

01-38790
TC/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG          )          MDL NO.  2179
"DEEPWATER HORIZON" in the               )
GULF OF MEXICO,  on                      )          SECTION: J
APRIL 20, 2010                           )
                                         )          JUDGE BARBIER
                                         )
                                         )          MAG. JUDGE SHUSHAN

## CONFIDENTIAL

### *WorldwideVIEW*™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Ottis Glen Benge
### VOLUME 2

NOVEMBER 18, 2011

# *ORIGINAL*



*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2
 3    IN RE:  OIL SPILL    )  MDL NO. 2179
      by the OIL RIG,      )
 4    DEEPWATER HORIZON in) SECTION "J"
      the GULF OF MEXICO, )
 5    April 20, 2010        )  JUDGE BARBIER
                            )
 6                          )  MAG. JUDGE
                            )  SHUSHAN
 7
                 REPORTER'S CERTIFICATION
 8           DEPOSITION OF OTTIS GLEN BENGE
                TAKEN NOVEMBER 18, 2011
 9
         I, Tamara Chapman, Certified Shorthand
10    Reporter in and for the State of Texas, hereby
      certify to the following:
11
         That the witness, OTTIS GLEN BENGE, was duly
12    sworn by the officer and that the transcript of
      the oral deposition is a true record of the
13    testimony given by the witness;
         That the deposition transcript was submitted
14    on December 1          , 2011, to the witness or to
      Attorney R. Michael Underhill for examination,
15    signature and return to Worldwide Court
      Reporters, Inc., by January 15      , 2012.
16           That the amount of time used by each
      party at the deposition is as follows:
17
                MR. STEVENSON - 1:03
18              MS. EASTERLING - 00:56
                MR. LEMOINE - 00:48
19              MR. MURRAY - 00:10
                MR. CHEN - 00:58
20              MR. CERNICH - 00:22
21           I further certify that I am neither
      counsel for, related to, nor employed by any of
22    the parties in the action in which this
      proceeding was taken, and further that I am not
23    financially or otherwise interested in the
      outcome of the action.
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

583

1    SUBSCRIBED AND SWORN to by me this 18th day of

*November*, 2011.

2

3

4

*Tamara Chapman*

5    TAMARA CHAPMAN, CSR

CSR NO. 7248; Expiration Date: 12-31-12

6    Worldwide Court Reporters

Firm Registration No. 223

7    3000 Weslayan, Suite 235

Houston, TX 77027

8    (713) 572-2000

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

581

SIGNATURE PAGE

     I, OTTIS GLEN BENGE, have read the
foregoing deposition and hereby affix my
signature that same is true and correct, except
as noted on the correction page.

_____
          OTTIS GLEN BENGE



     THE STATE OF *TEXAS*   )
COUNTY OF         ) *MONTGOMERY*

     Before me  *OTTIS GLEN BENGE*  on this day
personally appeared  *1/3/2012*            known
to me [or proved to me on the oath of
_____ or through
*DL 13481779 TEXAS*    (description of identity
card or other document)] to be the person whose
name is subscribed to the foregoing instrument
and acknowledged to me that he/she executed the
same for the purposes and consideration therein
expressed.
     Given under my hand and seal of office this
*3RD* day of *JANUARY*        , 201*2*.

_____
     NOTARY PUBLIC IN AND FOR
     THE STATE OF

My Commission Expires:
*8/17/2015*

337

1      CORRECTION PAGE

2      WITNESS NAME: OTTIS GLEN BENGE  DATE:  11/17/2011

3      PAGE   LINE   CHANGE                        REASON

4       10     23    Change "motherboard" to "motherbore"

5       16      8    Change "Engineer" to "Engineers"

6       19     24    Change  "Medtec" to "MEPTEC"

7       19     24    Insert a period after Dallas. Next sentence starts "Following...

8       29      3    Change "channeling" to "challenge"

9       30     25    Change "radio" to "radial"

10      35     24    Insert a comma after the word Bay

11      48     15    Change "that" to "what"

12      63      3    Change "cap" to "gap"

13      67      3    Add quotes to "Do you understand...

14      67      5    Add quotes to "Well, I don't really understand...

15      67      6    Add quotes to . . . that well."

16      67      7    Add quotes to "Okay, let's - -

17      67      9    Add quotes to . . . that training."

18      76     18    Change "oh" to "though"

19      96     25    Change "I grade" to "high grade"

20     101     24    Change "support" to "supporting"

21     120      2    Add quotes to "Hey, hold on.

22     122      1    Add quotes to "Stop the job . . . wait for those test results?"

23     123      1    Add quotes to "Hey, we need . . .

24     123      3    Add quotes to " . . . pump the cement yet?"

25     123     17    Change "Bill" to "Phil"

**PURSUANT TO CONFIDENTIALITY ORDER**

337

```
 1              CORRECTION PAGE

 2    WITNESS NAME: OTTIS GLEN BENGE  DATE:  11/17/2011

 3    PAGE   LINE   CHANGE                    REASON

 4    _163_  _10_    Change "well cap" to "WellCat"_____

 5    _166_  _4_     Change "well cap" to "WellCat"_____

 6    _166_  _25_    Change "well cap" to "WellCat"_____

 7    _172_  _25_    Change "ID" to "ISs"_____

 8    _180_  _10_    Change "Mr. Chiasson, Nathan Chiasson" to____

 9                   "Mr. Chaisson, Nathan Chaisson"_____

10    _180_  _18_    Change "Chiasson" to "Chaisson"_____

11    _180_  _20_    Change "Mr. Chiasson" to "Mr. Chaisson"_____

12    _180_  _25_    Change "Mr. Chiasson" to "Mr. Chaisson"_____

13    _181_  _8, 13, 20_    Change "Chiasson" to "Chaisson"_____

14    _194_  _12_    Change "pounds a gallon" to "pounds per gallon"

15    _204_  _24, 25_ Change "shallower" to "shallow water"_____

16    _212_  _2_     Insert a comma before the word "that"_____

17    _212_  _4_     Insert a period after the word "laboratories."

18    _212_  _7_     Insert a period after the first instance of the word "it,"

19    _214_  _8_     Change "an" to "no"_____

20    _244_  _10_    Add quotes to "aren't we . . . behind"_____

21    _244_  _14_    Add quotes to "we will give you an answer once he

22                   determines the effect"_____

23    _244_  _14_    Change "affected" to effect on"_____

24    _246_  _12_    Add quotes to Mr. Hafle communicated, "Not sure I like

25                   base oil use for this job.  Any thoughts?"___
```

**PURSUANT TO CONFIDENTIALITY ORDER**

337

```
CORRECTION PAGE

WITNESS NAME: OTTIS GLEN BENGE   DATE:   11/17/2011

PAGE    LINE    CHANGE                              REASON

 246     18      Add quotes to "There should be . . . lose a pump."

 247     22      Add quotes to "I would prefer . . . thoughts?"

 248     2       Add quotes to "There isn't a . . . it's done."

 249     19      Add quotes to "a very bright . . . design."

 254     4       Add quotes to "It seems . . . team"

 270     18      Change "an example" to "a sample"

 277     8       Change "Gregg" to "Greg"

 283     19      Change "continue" to "continued"

 309     7       Change "sent" to "signed"

 316     16      Change "Lignin sulfonate" to "lignosulfonate"

 316     16      Change "core" to "guar"

 318     25      Change "Lignin sulfonate" to "lignosulfonate"

 322     21      Change "should" to "there"

 322     22      Change "two" to "too"

 325     17      Change "deionizer to stabilize" to "deionized or distilled water"

 331     17      Change "weight" to "wait"

 331     23      Change "weight" to "wait"

 332     8       Change "weight" to "wait"

 349     17      Change "side" to "site"

 355     3       delete "what"

 369     6       Remove the comma

 382     5       Change "grading" to "gradation"
```

**PURSUANT TO CONFIDENTIALITY ORDER**

337

```
 1              CORRECTION PAGE

 2    WITNESS NAME: OTTIS GLEN BENGE DATE:  11/17/2011

 3    PAGE   LINE  CHANGE                    REASON

 4     398    21     Change "surge" to swab"

 5     453    22     Change "look" to "took"

 6     481    24     Change "Ian Little" to "Ian McPherson"

 7     504    22     Change "MODUS" to "MODUs"

 8     508    23     Change "TODCO" to "TOTCO"

 9     538    5      Change "17.3" to "17,300"

10     539    14, 15 Remove period between "Just because it's not there, the

11                   intercept point..."

12     541    2      Add quotes to "Anthony . . . Tommy."

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PURSUANT TO CONFIDENTIALITY ORDER