# EXHIBIT 20

# DEPOSITION TRANSCRIPT OF LINDELL McGUIRE

Page 359

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
 3    IN RE:  OIL SPILL        )  MDL NO. 2179
      BY THE OIL RIG           )
 4    "DEEPWATER HORIZON" IN   )  SECTION "J"
      THE GULF OF MEXICO, ON   )
 5    APRIL 20, 2010           )  JUDGE BARBIER
                               )  MAG. JUDGE SHUSHAN
 6
 7
 8
 9
10
11
12
13
14
15
16
17                   ***************
                       VOLUME 2 of 2
18                   ***************
19
20
                Deposition of LINDELL MCGUIRE, taken
21    at Pan-American Building, 601 Poydras Street,
      11th Floor, New Orleans, Louisiana, 70130, on
22    December 6, 2011.
23
24
25
```

PURSUANT TO CONFIDENTIALITY ORDER

Page 546

```
 1    that float collar.
 2         Q.    But -- but they may, so all of those
 3    float collars are designed to be drilled through,
 4    correct?
 5         A.    That's correct, they are.
 6         Q.    And the flappers -- in this case, we
 7    know there were two flappers on that float
 8    collar -- they're made out of a material that is
 9    intentionally placed there so that they can be
10    drilled through?
11         A.    That's correct.
12         Q.    It's aluminum.
13         A.    That's correct.
14         Q.    All right.
15         A.    Yeah.
16         Q.    You, in your report -- now I'd like
17    to -- a few questions --
18         A.    Okay.
19         Q.    -- to you specifically about this
20    float collar.
21               On page 4 of your original report in
22    the second paragraph -- and I'm -- for the sake
23    of moving this along here, I'm going to read
24    this.  Let me know if I read it correctly.
25               "The blowout" -- "The blowout did
```

Page 547

1     not occur because of failure of any well
2     equipment, including the BOPs."
3                    You would include the float collar
4     in that description of well equipment, would you
5     not?
6          A.    That's correct, I would.
7          Q.    Okay.  You're not suggesting that
8     any of the -- that equipment failed, and you're
9     not testifying to that, nor is that in your
10    report.  You're just saying, whether they failed
11    or not, they weren't the cause of the occurrence?
12         A.    Yeah, that's correct.
13         Q.    You're not testifying that the float
14    collar, the Weatherford float collar, failed in
15    any way, are you?
16         A.    No, I wouldn't cla -- I wouldn't
17    classify it as a failure.  I -- I wouldn't say
18    that.
19         Q.    Okay.
20         A.    I'm not testifying that anything
21    failed, so to speak, or -- let me rephrase that.
22                    Certainly, the blowout was not a
23    result of the failure of any equipment, including
24    the float collar.
25         Q.    Thank you.  All -- all of the

```
 1     equipment both on the rig and in the -- in the
 2     wellbore as we discussed a moment ago is designed
 3     for a particular purpose?
 4           A.    Correct.
 5           Q.    It's -- it's placed there to
 6     accomplish some objective, right?
 7           A.    That's correct.
 8           Q.    And all of the equipment's
 9     different.  They -- they have different
10     objectives?
11           A.    Correct.
12           Q.    All right.  I -- again, for sake of
13     moving us along, I know you read Mr. Cowie's
14     deposition.  He was the corporate representative
15     of BP.
16                 Did you -- did you -- do you recall
17     that?
18           A.    Which one.
19           Q.    Jim Cowie, the corporate
20     representative of BP.
21           A.    To tell you the truth, I can't
22     recall at the moment the names.
23           Q.    Well -- well, let me ask you, and
24     I'll -- if -- I can actually show you a copy of
25     the testimony.  I have it here if you need to --
```

PURSUANT TO CONFIDENTIALITY ORDER

Electronically signed by Rene Moarefi (401-392-745-8300)                                    0c9db092-dcca-45cc-83fc-29d4d6aa795c

```
 1     if you need it to refresh your memory.
 2               But Mr. Cowie testified that the
 3     float collar was selected by Weatherford and
 4     use -- by BP and used for BP for three specific
 5     purposes.  And I'll run through those for you.
 6               One, it was in auto fill mode in
 7     order to reduce surge pressure.
 8               You agree with that?
 9          A.   I would agree that that's what you
10     would run it in auto mode for.
11          Q.   Secondly, it served as a landing
12     profile for the plugs?
13          A.   That's correct.
14          Q.   And it was to assist in keeping the
15     cement from U-tubing back into the casing?
16          MR. POLLINGER:
17               Objection, form.
18          A.   Yes, that's correct.
19     EXAMINATION BY MR. RUSSO:
20          Q.   All right.  Can you -- it was -- it
21     was Mr. Cowie's testimony that those are the
22     three uses of a float collar.
23               Would you agree with that?
24          A.   That's correct.
25          Q.   Float collar's not a well control
```

PURSUANT TO CONFIDENTIALITY ORDER

Electronically signed by Rene Moarefi (401-392-745-8300)                    0c9db092-dcca-45cc-83fc-29d4d6aa795c

Page 550

1    device?
2         A.    Float collar is not a well control
3    device.
4         Q.    Not used by anybody as a well
5    control device or designed as one?
6         A.    It is not used as a well control
7    device.  It's not designed as a well control
8    device.
9         Q.    Now, I want to ask you some specific
10   questions about some of your earlier testimony.
11   And in particular your --
12        A.    Uh-huh.
13        Q.    -- you answered a couple of
14   questions about the float collar from
15   Halliburton's counsel.  I apologize I only have
16   two copies.  I'm going to give you one of them.
17              I had a copy of your testimony -- I
18   was actually surprised I could e-mail it to
19   myself, but I did that.
20              These are the pages, and I'll --
21   I'll try to reference it was your questions, but
22   I'll -- I'll try to get you to them.
23              You were talking to Halliburton's
24   counsel about Paragraph 5, bottom of page 4 of
25   your report.  I'm going to ask you if you'd take

PURSUANT TO CONFIDENTIALITY ORDER

Electronically signed by Rene Moarefi (401-392-745-8300)                                            0c9db092-dcca-45cc-83fc-29d4d6aa795c

Page 552

```
 1      would, and you can read it to yourself -- I'll
 2      attach a copy to the record so we have it --
 3      beginning that exchange at the top of page 439
 4      all the way through the bottom.
 5          A.     So you want me to read page 439
 6      through page 440?
 7          Q.     Correct.
 8          A.     (Witness complies.)
 9                 Okay.
10          Q.     Okay.  You talked to Halliburton's
11      counsel in his cross-examination of you about the
12      float collars holding?
13          A.     Uh-huh.
14          Q.     But the two of you exchanged
15      questions and answers, and you talked about
16      holding.  You used the term "cement" a couple of
17      times.
18                 Do you agree with Mr. Cowie that a
19      functioning float collar is not a seal to
20      hydrocarbons?
21          A.     It isn't necessarily a seal to
22      hydrocarbons.
23          Q.     But -- but -- but cement --
24      considering the state of cement, thickness,
25      viscosity, it will hold the cement as it presses
```

```
 1     back up against the flapper, correct --
 2          A.    That would --
 3          Q.    -- or it's designed to?
 4          A.    That would be correct.
 5          Q.    But it is not a seal to
 6     hydrocarbons, and, in fact, there is no agency
 7     that requires a float collar to be tested to seal
 8     hydrocarbons?
 9               MR. POLLINGER:
10                    Objection, form.
11          A.    That's correct.
12     EXAMINATION BY MR. RUSSO:
13          Q.    Okay.  When you were talking to
14     Halliburton's counsel earlier -- and I gave you a
15     copy of your -- your testimony.  And I -- I'm
16     really directing you to the second page of what
17     I've provided you a copy of.
18          A.    Okay.
19          Q.    And I'll attach that in a moment as
20     well.
21                    I want you to focus on your use of
22     the word "hold" for a minute as you read it.
23          A.    Sorry.  Say again.  You want me to
24     do what?
25          Q.    Your use of the term and
```

```
 1    behind?
 2         A.    Oh, I can't -- I can't make that
 3    judgment.  I don't -- you know, you -- you -- you
 4    don't have to circulate bottoms-up to get any
 5    what you would call debris off the bottom of the
 6    well.
 7         Q.    All right.  Let me mark -- I think
 8    you referred my two next exhibit numbers.
 9               (Exhibit Nos. 8113 and 8114 marked
10    for identification.)
11    EXAMINATION BY MR. RUSSO:
12         Q.    8113 will be the portions of
13    Mr. Cowie's testimony, and 8114 will be the
14    portions of your earlier testimony that you read.
15               I've -- I've heard the -- what a
16    shoe float collar described as a -- a -- a -- in
17    some respects as a vessel in which cement is
18    placed.
19         A.    Good.  I haven't heard that,
20    but . . .
21         Q.    Well, does that sound like an
22    accurate description that it's actually a
23    placeholder for the cement?
24         A.    I -- I -- I don't know.  I don't --
25    I don't see it as an accurate -- placeholder for
```

Page 562

```
 1      the cement, --
 2           Q.    Well --
 3           A.    -- no, I don't understand that.
 4           Q.    It's a spot where cement is going to
 5      be placed.  It's a vessel.
 6           A.    It's.
 7           Q.    It's a round pipe.
 8           A.    It's -- it is a tool that I'm going
 9      to pump cement through.
10           Q.    And -- and the ultimate barrier,
11      though, is going to be the cement?
12           A.    The ultimate barrier is going to be
13      the cement.
14           Q.    Okay.  I think I'm out of time.
15      Thank you.  I appreciate it.  Didn't go as fast
16      as I could.
17              THE VIDEOGRAPHER:
18                   We are off the record.  It is
19      1:54 p.m., and it's the end of Tape 12.
20                   (Short recess.)
21              THE VIDEOGRAPHER:
22                   We are back on the record, it is
23      2:01 p.m. and this is the beginning of Tape 13.
24                         EXAMINATION
25      BY MR. LANCASTER:
```

PURSUANT TO CONFIDENTIALITY ORDER

Electronically signed by Rene Moarefi (401-392-745-8300)                    0c9db092-dcca-45cc-83fc-29d4d6aa795c

# WORLDWIDE

### Systems Technology for the Litigation World

Court Reporting • Video Production • Videoconferencing • Litigation Group

December 8, 2011

Paul Savoy – *Via e-mail*
BECK REDDEN & SECREST
1221 McKinney, Suite 4500
Houston, TX 77010

Re:   Deposition of **Lindell V. McGuire, Vol. 2**
      12/06/2011
      In Re: Oil Spill by the Oil Rig "Deepwater Horizon"

Dear Mr. Savoy:

Enclosed please find the signature copy of the deposition of the witness named above. Please have the witness review the deposition and **sign the signature page and amendment sheets** prior to returning it to our office.

In accordance with the Federal Rules of Civil Procedure, your client has **45** days to review, sign and amend the deposition, then return the amendment sheets and signature page back to our office by **January 22, 2012** for further processing.

We sincerely appreciate your choosing Worldwide Court Reporters, Inc. and look forward to working with you in the future. If you have any questions regarding this matter, please feel free to contact our office.

Sincerely,

Rebeca Aguirre
Worldwide Court Reporters, Inc.

No. 1-38831

cc:   US Dept. of Justice
      Don K. Haycraft
      J. Robert Warren

---

**Corporate Headquarters**
3000 Weslayan St.   Suite 235   Houston TX 77027
713-572-2000   Fax 713-572-2009                                  For U.S. & International Services: 1-800-745-1101