# EXHIBIT 21

# DEPOSITION TRANSCRIPT OF

# BILLY AMBROSE

Page 384

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
 3     IN RE:  OIL SPILL         )  MDL NO. 2179
       BY THE OIL RIG            )
 4     "DEEPWATER HORIZON" IN    )  SECTION "J"
       THE GULF OF MEXICO, ON    )
 5     APRIL 20, 2010            )  JUDGE BARBIER
                                 )  MAG. JUDGE SHUSHAN
 6
 7
 8
 9
10
11
12
13
14
15
16
17                  *****************
                         VOLUME 2
18                  *****************
19
20
              Continuation of the deposition of Billy
21     Dean Ambrose, Individually and as a Corporate
       Representative, taken at Pan-American Building,
22     601 Poydras Street, 11th Floor, New Orleans,
       Louisiana, 70130, on the 19th day of July, 2011.
23
24
25
```

PURSUANT TO CONFIDENTIALITY ORDER

1      A.   No, we have not.

2      Q.   I'm going to be asking you questions

3  today in your role as a 30(b)(6) witness and the

4  Lead of the Investigation that Transocean

5  conducted into the Mo -- Macondo Well blowout.

6      A.   Okay.

7      Q.   Okay?  You've been asked some questions

8  previously about float collars, correct?

9      A.   I have.

10     Q.   All right.  Transocean's Investigative

11 Team is aware that float collars are designed to

12 perform certain functions in running casing in

13 the hole and in cementing that casing after it is

14 run, correct?

15     A.   Yes, the Investigation Team knew that.

16     Q.   And one purpose and function of the float

17 collar is to reduce surge pressure when the

18 casing string is run in the hole, correct?

19     A.   It is.

20     Q.   And that purpose and function was

21 fulfilled with respect to the running of the

22 casing in the Macondo Well with the Weatherford

23 float collar, inasmuch as there were no problems

24 with lost returns when running the casing in the

25 hole, correct?

```
 1      A.    -- I don't think, that we included in the
 2   Report.
 3      Q.    And sitting here right now, you don't
 4   recall any Findings of the Investigative Team
 5   that there was any problems with surge pressure
 6   or lost returns when the casing -- the long
 7   string production casing was run in the hole at
 8   Macondo, do you?
 9      A.    I cannot answer that question with the
10   material I have in front of me.
11      Q.    All right.  Let's move on.
12      A.    Okay.
13      Q.    A second purpose and function of the
14   float collar in the Macondo Well on the long
15   string production casing was to provide a landing
16   profile for the cementing plugs, correct?
17      A.    Yes, it is.
18      Q.    And the top and bottom plugs landed on
19   the profile, as far as the Transocean
20   Investigative Team knows, correct?
21      A.    There were indications that they did
22   land.
23      Q.    And a third purpose and reason that the
24   float collar was run in the Macondo Well was to
25   prevent the backflow of cement from the annulus
```

1    after cement pumping stopped, in the event that
2    hydrostatic pressure in the annulus was greater
3    than the hydrostatic pressure in the casing,
4    correct?
5       A.   That is a third reason, yes.
6       Q.   Okay.  The float check test that was
7    conducted after the cement job for the long
8    string production casing job at Macondo
9    demonstrated that there was no backflow of cement
10   from the annulus into the casing, correct?
11              MS. CLINGMAN:  Objection, form.
12      A.   There were -- there were issues with
13   regards to lift pressure at that time.  We don't
14   know whether or not there was or was not
15   backflow, or enough lift pressure, or if -- if
16   there was even lift pressure, to confirm the
17   floats would have held.
18      Q.   (By Mr. Zeringue) I'm not asking you if
19   the floats held, sir.  I'm asking you:  Was there
20   any backflow that was con -- found when the
21   Transocean Driller conducted the float check test
22   and pressured down on the top plug and bled back
23   only five barrels?
24              MS. CLINGMAN:  Objection, form.
25              MR. ZERINGUE:  What's wrong with the

1  finish his answer.
2       A.  We believe that the reason there was no
3  flowback was not related to the float collar, but
4  it was related to the lift pressure.
5       Q.  (By Mr. Zeringue) Okay.  How does
6  Transocean define "lift pressure"?
7       A.  We calculated the lift pressure within
8  the Report, and it's the balance of the U-tube of
9  the annulus side to the casing side.
10      Q.  And you -- and Transocean's Investigative
11 Team calculated the lift pressure as negative 54?
12      A.  Yes, sir.
13      Q.  That means that the annular side had a
14 greater hydrostatic head than did the casing
15 side, by 54 psi?
16      A.  No.  "Negative" would mean that the
17 interior casing side had more pressure than the
18 annulus side.
19      Q.  And if the interior casing side had more
20 pressure than the annulus side, that means if
21 there's going to be any flow of cement after the
22 pumping stops, it's going to be from the casing
23 to the annulus and not from the annulus to the
24 casing, correct?
25      A.  Yes.

1  Q. And the float collar is not designed to
2 prevent this forward flow of cement from casing
3 to annulus. The float collar is designed to
4 prevent the backflow of cement from annulus to
5 casing. Isn't that what the Transocean Team
6 found?
7  A. The float collar is designed to prevent
8 backflow, yes.
9  Q. Okay. And if there is a tendency of the
10 cement to flow from the casing to the annulus,
11 then there is no backflow, is there, in
12 accordance with the calculations that the
13 Transocean Team made at Page 70 of your Report,
14 correct?
15  A. Yes. That's what we state in the Report.
16  Q. Okay. So if the purpose of the float
17 collar, in part, was to prevent the backflow of
18 cement from the annular space to the casing, in
19 the event that the pressure on the casing side
20 was greater on the annulus, and it wasn't greater
21 on the annulus side, then the -- the float collar
22 served its purpose, correct?
23         MS. CLINGMAN: Objection, form.
24  A. I -- I don't agree with that statement.
25  Q. (By Mr. Zeringue) Okay. Now, let's look

```
 1       Q.  (By Mr. Zeringue) Now, you would agree in
 2   your role -- in your jobs at Transocean, as the
 3   Leader of the Transocean Investigative Team, that
 4   the cement in the shoe track and the annular
 5   cement work to zonally isolate the hydrocarbon
 6   formation in the Macondo Well and to preclude and
 7   prevent the flow of hydrocarbons up the wellbore;
 8   is that correct?
 9       A.  That was the cement that was meant to
10   isolate the formations.  The shoe track and the
11   annulus cement was one cement job, yes.
12       Q.  The bottomhole cement?
13       A.  Yes.
14       Q.  That would include the cement in the shoe
15   track and the cement in the annular space at the
16   bottom of the hole?
17       A.  Yes.
18       Q.  And that cement, that bottomhole
19   cement -- can we call it that?
20       A.  If you want, we can call it that, yes.
21       Q.  All right.  The bottomhole cement was
22   designed to zonally isolate the hydrocarbon
23   formation at the bottom of the Macondo Well and
24   to prevent the flow of hydrocarbons up the
25   wellbore at Macondo, correct?
```

```
 1        A.   That was the intent.
 2        Q.   Can you turn to Page 11 of your
 3   Transocean Report?  I believe you were asked
 4   about a portion of this sentence on page -- in
 5   the second paragraph on Page 11.  I'm going to
 6   read you the entire sentence.  "The well became
 7   underbalanced during the final displacement, and
 8   hydrocarbons began entering the wellbore through
 9   the faulty cement barrier and a float collar that
10   likely failed to convert."
11             Did I read that correctly?
12        A.   That's what it states.
13        Q.   And I believe you were questioned earlier
14   there, and I believe your testimony was that the
15   cement barrier you are referring to, the faulty
16   cement barrier that was in the well at Macondo,
17   was the bottomhole cement job consisting of the
18   annular cement and the cement in the shoe track,
19   correct?
20        A.   That is the cement that's referenced in
21   this sentence.
22        Q.   All right.  And I believe you said in
23   that line of questioning that the float collar is
24   not a well control barrier, and that it is meant
25   to be a barrier to cement flowback after the
```

04357458
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) ) ) ) ) ) ) | MDL NO. 2179  SECTION: J  JUDGE BARBIER  MAG. JUDGE SHUSHAN |

## CONFIDENTIAL

### WorldwideVIEW™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



## Billy Dean Ambrose

VOLUME 2

JULY 19, 2011

## ORIGINAL



*Systems Technology for the Litigation World*

Litigation Group ◆ Court Reporting ◆ Video Production ◆ Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3   IN RE: OIL SPILL          )  MDL NO. 2179
     BY THE OIL RIG            )
 4   "DEEPWATER HORIZON" IN    )  SECTION "J"
     THE GULF OF MEXICO, ON    )
 5   APRIL 20, 2010            )  JUDGE BARBIER
                               )  MAG. JUDGE SHUSHAN
 6

 7              REPORTER'S CERTIFICATION
        TO THE ORAL AND VIDEOTAPED DEPOSITION OF
 8                   BILLY DEAN AMBROSE,
                   INDIVIDUALLY AND AS A
 9              CORPORATE REPRESENTATIVE
                      JULY 19, 2011
10                       VOLUME 2

11
        I, Emanuel A. Fontana, Jr., Certified
12   Shorthand Reporter in and for the State of Texas,
     hereby certify to the following:
13
        That the witness, BILLY DEAN AMBROSE, was
14   duly sworn by the officer and that the transcript
     of the oral deposition is a true record of the
15   testimony given by the witness;

16      That the deposition transcript was submitted
     on July 19     , 2011, to the witness or to
17   Attorney  J. Robert Warren         for the
     witness to examine, sign, and return to Worldwide
18   Court Reporters, Inc., by September 2  , 2011.

19      That the amount of time used by each party
     at the deposition is as follows:
20
        Mr. Lancaster - 2 Hours, 11 Minutes
21      Mr. von Sternberg - 1 Hour, 9 Minutes
        Ms. Rocca - 26 Minutes
22      Mr. Gannaway - 1 Hour, 41 Minutes
        Mr. Barrow - 16 Minutes
23      Mr. Zeringue - 29 Minutes
        Ms. Clingman - 25 Minutes
24      Mr. Meunier - 41 Minutes
        Mr. Dills - 6 Minutes
25
```

PURSUANT TO CONFIDENTIALITY ORDER

```
 1        I further certify that I am neither counsel
     for, related to, nor employed by any of the
 2   parties in the action in which this proceeding
     was taken, and further that I am not financially
 3   or otherwise interested in the outcome of the
     action.
 4
          SUBSCRIBED AND SWORN to by me on this 19th
 5   day of July, 2011.

 6
                            [signature: Emanuel A. Fontana]
 7                          _____
                            Emanuel A. Fontana, Jr., RPR
 8                          Texas CSR No. 1232
                            Expiration Date: 12/31/12
 9                          Worldwide Court Reporters
                            Firm Registration No. 223
10                          3000 Weslayan, Suite 235
                            Houston, Texas   77027
11                          (713) 572-2000

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1  I, BILLY DEAN AMBROSE, have read the
2  foregoing deposition and hereby affix my
3  signature that same is true and correct, except
4  as noted on the attached Amendment Sheet.

*[signature]*  22/08/11

BILLY DEAN AMBROSE

**PURSUANT TO CONFIDENTIALITY ORDER**