# EXHIBIT 27

# EXPERT REPORT OF MARION WOOLIE (WEATHERFORD)

# (DEPO. EX. 7841)

# DEEPWATER HORIZON INCIDENT OF APRIL 20, 2010

Report of Marion M. Woolie

Oct. 14, 2011

Submitted on behalf of Weatherford U.S., L.P.

United States District Court For The Eastern District Of Louisiana

In Re: Oil Spill By The Oil Rig "Deepwater Horizon" in the Gulf Of Mexico, On April 20, 2010

Signature: *[signed] M. Woolie*

7841
Exhibit No. _____
Worldwide Court Reporters, Inc.

A.   **Introduction and Summary of Opinions**

This report analyzes drilling operations at the Macondo Well in the days leading up to the blowout on April 20, 2010, and addresses the tools and equipment which were utilized by the operator and the drilling contractor as they prepared for the temporary abandonment of the well. I have been asked to offer my opinions on well control during the temporary abandonment procedures at the Macondo Well. I have also been asked to offer my opinions on the intended purpose and use of the Weatherford float collar in the Macondo Well as it relates to the concept of well control during the temporary abandonment process. My opinions are offered based upon my experience and knowledge of the industry from a drilling contractor's perspective. I have reviewed a number of documents pertinent to the operations at the Macondo Well, including but not limited to IADC[1] reports, depositions of key BP, Transocean and Halliburton employees, Transocean's operating procedures and well control policies and BP's Group Practices concerning well control. I have also reviewed pertinent regulations issued by MMS (now BOEMRE), and similar industry regulations in the United Kingdom and Norway, and have reviewed industry best practices and handbooks concerning well control.

My opinions regarding drilling operations and the operations undertaken during the temporary abandonment phase and the use of the Weatherford float collar are summarized as follows:

(1)   During drilling operations and well construction, including the temporary abandonment process which was underway at the time of the blowout, there were two mechanisms for well control: (a) drilling mud and (b) the Blowout Preventer ("BOP") stack;

(2)   To accomplish zonal isolation of hydrocarbons in a well for purposes of temporary abandonment, acceptable barriers to hydrocarbon flow must be installed, tested and verified, which in this case were two cement barriers;

(3)   Float collars should not be relied upon as a well control device or as a barrier to hydrocarbon flow. No prudent person that was involved in the Macondo Well would rely on the Weatherford float collar for well control or as a barrier to hydrocarbon flow; and

---

[1] International Association of Drilling Contractors.

2

    (4)    The float collar is a temporary tool used to hold cement in place while the cement is setting during well construction, and it is designed so that it can be drilled out and destroyed.

I have set forth my opinions and conclusions regarding generally accepted well control practices during drilling operations and well construction based on my 30 plus years as a drilling contractor.

### B.  Background and Experience

I am an oil industry executive with 39 years experience in the oil and gas service sector. Approximately 30 of those years were spent in employment with offshore drilling contractors, including Global Marine, Global Santa Fe and Northern Offshore. I started my career in 1973 with The National Supply Company as a sweeper in their subsea wellhead facility while attending school at the University of Houston. I became a machinist manufacturing subsea components, then later moved into their drilling equipment division as a project coordinator building drilling rigs and then into sales. I graduated from the University of Houston with a Bachelor of Business Administration and an MBA in finance. In 1982, I went to work for Global Marine Drilling Company in sales. I was promoted to Sr. Vice President of Sales and Contracts and then later promoted to President of Global Marine Drilling Company. I spent approximately 4 years in the role of President.

In 2001, Global Marine merged with Santa Fe Drilling Company and became Global Santa Fe, Inc. At that time, I became Sr. VP of Operations for Global Santa Fe. At both Global Marine and Global Santa Fe, I was responsible for Worldwide Operations, including deep water Gulf of Mexico, engineering, construction, health, safety and environment, and supervision of all operations personnel in drilling. At its peak, Global Santa Fe had over 60 drilling rigs operating in offshore environments worldwide. In my work for Global Marine and Global Santa Fe, the safety of personnel, equipment and environment were an integral part of my job responsibilities. I attended to these safety matters on a daily basis, and was responsible for approving all safety and environmental policies and procedures for the entire company. I personally have attended hundreds of safety meetings and training classes, both onboard rigs

3

and on land. I was also responsible for teaching and supervising hundreds of meetings with drilling crews, both onshore and offshore. Educating and training drilling crews at Global Marine and Global Santa Fe was one of my primary job responsibilities. I am extremely familiar with the generally accepted industry standards and practices related to drilling of wells in the Gulf of Mexico.

I retired from Global Santa Fe in 2007 and later that year became CEO of Northern Offshore LTD, an international offshore drilling contractor. I retired from Northern Offshore at the end of 2009. Since that time, I have been consulting in the oil and gas industry. A more complete summary of my education and work background can be found in my CV, attached as Exhibit A to this report.

I served on the Executive Committee for the IADC for 6 years. I was elected Chairman of the IADC in 2004 and served a one-year term. I was a member of the American Petroleum Institute for approximately 10 years.

With respect to publications I have authored in the past, I have not authored any publications for public consumption. However, I have authored and/or participated in numerous industry presentations and publications in connection with my work on the IADC's Executive Committee. These included various safety and operational standards for the oil and gas industry, as detailed in my CV.

I have not offered testimony as an expert in any cases, either at trial or by deposition.

C.   **Analysis and Discussion**

1.   During drilling operations and well construction, including the temporary abandonment process which was underway at the time of the blowout, two mechanisms for well control exist: (a) drilling mud and (b) the Blowout Preventer ("BOP") stack. During this time, and until the well is successfully plugged and abandoned, the well is considered live. A drilling contractor on a live well must always ensure that it is capable of controlling the well to

4

prevent a blowout. The blowout of the Macondo Well occurred during the process of installing, testing and verifying the temporary abandonment barriers.

Transocean's well control policies and procedures are set forth in Transocean's Well Control Handbook.[2] BP also has its own policies and procedures in place for "Well Control" and "Zonal Isolation."

Time proven and well-accepted industry standards affirm the use of the hydrostatic head of the drilling mud as the primary means of controlling the well.[3] IADC Deepwater Well Control Guidelines[4] and the Well Control For the Rig Site Drilling Team training manual for well control school in Aberdeen, Scotland[5] set forth this fundamental principle. This concept is so fundamental to the drilling industry, that one would expect to find similar statements in the well control manuals of all drilling contractors.

The hydrostatic head provided by the weight of the drilling mud is the primary mechanism controlling the well during drilling operations and well construction. Transocean's Well Control Handbook, Section 3, subsection 1,[6] provides:

| Transocean | WELL CONTROL | SECTION | 3 |
|---|---|---|---|
| | HQS-OPS-HB-01 | SUBSECTION: | 1 |
| WELL CONTROL PRINCIPLES<br>PRIMARY WELL CONTROL | | | |

**1   DEFINITION**

Primary well control is the use of wellbore fluid density to provide sufficient hydrostatic pressure to prevent the influx of formation fluid (i.e. a kick) into the wellbore. It is of the utmost importance that primary control is maintained at all times by:
- Using drilling and completion fluids of an adequate density.
- Keeping the well full of an adequate density fluid at all times.
- Continuously monitoring active pit volumes, especially during tripping.
- Immediately detecting changes in the density, volumes and flow rate of drilling fluids from the wellbore and taking the appropriate action.

---

[2] Transocean Well Control Handbook, Depo. Ex. 596, BP-HZN-2179MDL00330768.
[3] "Practical Well Control," Ron Baker at 1-1 (4th ed. 1998).
[4] Third Edition, 2002.
[5] "Well Control for the Rig-Site Drilling Team Training Manual," vol. 4 rev. March 2002, Aberdeen Drilling Schools & Well Control Training Centre.
[6] Transocean Well Control Handbook, Depo. Ex. 596, section 3, subsection 1 at BP-HZN-2179MDL00330810.

The drilling mud is the drilling contractor's primary well control device and must be maintained at all times.[7] Mud as the primary well control device is reinforced in BP's Group Practices on Well Control: ***"During balanced drilling, conventional and hydraulic workover activities, active barriers shall be defined as a stable column of fluid equal to or greater than bottom hole pressure."***[8]

While the drilling mud is the primary well control device during drilling operations and well construction, the drilling contractor has a secondary well control device consisting of the BOP stack.[9] Section 3, subsection 2 of Transocean's Well Control Handbook[10] provides:

| **Transocean** | **WELL CONTROL** | SECTION: | 3 |
| --- | --- | --- | --- |
|  | HQS-OPS-HB-01 | SUBSECTION: | 2 |
| **WELL CONTROL PRINCIPLES** ||||
| **SECONDARY WELL CONTROL** ||||

**1   DEFINITION**

Secondary well control is the proper use of blowout prevention equipment to control the well in the event that primary control cannot be properly maintained.

Early recognition of the warning signals and rapid shut-in are the key to effective well control. By taking action quickly, the amount of formation fluid that enters the wellbore is minimized.

Transocean's designated use of the BOP stack as a secondary well control mechanism represents a good, accepted industry practice.[11] BP's GP 10-10 states that "[d]uring conventional drilling, completions and well work activities the active barrier shall normally be a

---

[7] Oil and Gas Well Drilling and Servicing Etool, http://www.osha.gov/SLTC/etools/oilandgas/index.html, US Dept. of Labor, OSHA. E.g., Transocean Well Control Handbook, Depo. Ex. 596, section 1, subsection 2 at § 1.7, BP-HZN-2179MDL00330776.

[8] BP's Group Engineering Technical Practices, GP 10-10 "Well Control," § 3, BP-HZN-2179MDL00408012.

[9] Oil and Gas Well Drilling and Servicing Etool, http://www.osha.gov/SLTC/etools/oilandgas/index.html, US Dept. of Labor, OSHA. OSHA designates the BOP as a passive component of well control.

[10] Transocean Well Control Handbook, Depo. Ex. 596, section 3, subsection 2 at BP-HZN-2179MDL00330814.

[11] E.g., "Practical Well Control," Ron Baker at 1-1 (4th ed. 1998); IADC Deepwater Well Control Guidelines (3d ed. 2002).

6

stable fluid column and the contingent barrier **shall be** the blowout preventer (BOP) equipment or tree."[12]

2.  To safely abandon a well, acceptable barriers to hydrocarbon flow must be installed, tested and verified prior to the removal of the drilling mud and the BOP stack. The designated temporary abandonment barriers for the Macondo Well were the bottom hole cement job and the surface cement plug.[13] These two barriers were designed to accomplish complete zonal isolation of the known hydrocarbons in the Macondo Well. During the process of installing, testing and verifying the two temporary abandonment barriers, the two mechanisms to control the well, as discussed above, are the hydrostatic head created by the drilling mud column and the BOP stack. Good oilfield practice and industry standards dictate that only upon the installation, testing and verification of the two temporary abandonment barriers in the well may the drilling contractor safely remove the drilling mud and BOP stack and move off of the well.[14] The float collar is not relied upon as a well control device at any time, either before, during or after the installation, testing and verification of the temporary abandonment barriers.

Until the two temporary barriers to hydrocarbon flow set forth in the temporary abandonment plan are installed, tested and verified, the well should be considered live, and well control must always be maintained. Transocean's Well Control Handbook requires a "minimum of two independent and tested barriers must be in place at all times."[15] In accord with industry standards, BP Group's Engineering Technical Practices GP 10-60 for "Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension" required two temporary barriers *"designed to ensure zonal isolation for the duration of the suspension and permit safe re-entry of the well."*[16] BP's Well Program of April 15th set forth the

---

[12] BP's Group Engineering Technical Practices, GP 10-10 "Well Control," § 6.1.20, BP-HZN-2179MDL00408015.
[13] BP Well Program dated April 15, 2010 at §§ 9.2.3, 9.2.4, pp. 6-8, BP-HZN-MBI 00128345-347.
[14] API RP 65 (Second Edition, December 2010), Part 2 at § 4.6.1.
[15] Transocean Well Control Handbook, Depo. Ex. 596, BP-HZN-2179MDL00330777.
[16] BP Group Practice, GP 10-60, Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension, § 2, BP-HZN-2179MDL 00269660.

7

two temporary barriers as the bottomhole cement and a surface cement plug.[17] BP's Group Practices regarding "Verification of Barriers," required an independent test of each of the temporary abandonment barriers.[18] The first barrier, the bottomhole cement, was to be tested with a negative pressure test to assess the integrity of the bottomhole cement. The negative pressure test establishes, in its simplest form, whether the bottomhole cement accomplished zonal isolation of the hydrocarbons in the Macondo Well by underbalancing the well and measuring inflow. The second barrier, the surface cement plug, was to be tested by "tagging" the top of the cement with "15k down."[19] Had both of these barriers to hydrocarbon flow been installed, tested and verified, the well would no longer be considered live. The drilling contractor could then have safely removed the well control devices, i.e. the drilling mud and BOP stack, and move off of the well.

   3.   Drilling contractors do not consider a float collar to be an acceptable well control device and it is not considered an acceptable component of the drilling contractor's well control equipment. Each float valve has one rubber o-ring lip type seal and a low working pressure rating of 5000 psi. If the float collar was to be considered for well control it would require, among other things, a far more robust seal assembly, redundancy in the number of seals, and a much higher working pressure rating in line with the 15,000 psi pressure rating of the BOP stack on the DEEPWATER HORIZON. Additionally, unlike BOPs, float collars are not designed to provide well control of hydrocarbons.[20] The bottom hole pressure of the Macondo Well was estimated to be approximately 12,000 psi, almost 2.5 times the 5000 psi working pressure of the float valve assembly. Accordingly, no one would ever rely upon the float collar to be a well control device, and no one would expose it to or expect it to contain the bottomhole pressures of the Macondo Well. In particular, API mandates that float valves "shall be rated for the differential pressure between the hydrostatic column above the shoe track and the hydrostatic

---

[17] BP Well Program dated April 15, 2010 at §§ 9.2.3, 9.2.4, pp. 6-8, BP-HZN-MBI 00128345-347.
[18] BP-HZN-2179 MDL 00269660.
[19] BP Well Program of April 15, 2010 at § 9.2.4, BP-HZN-MBI 00128347.
[20] E.g., API RP 96 (First Edition, Ballot 1-April1, 2011).

column in the casing annulus **with cement in place**."[21] In other words, the rating of the float valve is based upon the cement being in place and serving as the barrier.

A typical deep water BOP stack is approximately 60 feet tall and weighs 400 to 500 tons. (See Fig. 1, Deepwater Horizon BOP stack). The BOP stack is made of hardened steel. It has multiple redundant ram type preventers, multiple annular preventers, and blind shear ram preventers. Any one of these mechanisms can shut-in the well and provide a complete seal to hydrocarbons. It is equipped with a redundant multiplex control system, redundant control pods, and can be activated from multiple locations on board the rig and also by a remotely operated vehicle. By contrast, a float valve assembly is approximately 3 ¾ inches tall and weighs approximately 4.5 lbs. (See Fig. 2, Float Collar Assembly). The float valve is made of soft, drillable aluminum with a spring-loaded valve. The aluminum float valve does not provide a seal to hydrocarbon flow.[22]

The offshore drilling industry is highly regulated. I have reviewed the current MMS (BOEMRE) regulations, in particular Title 30, Part 250 -- Oil and Gas and Sulphur Operations in the Outer Continental Shelf, for regulations regarding float collar assemblies. There is no protocol or procedure in these regulations for the testing of a float collar as a well control device. On the other hand, Subpart D Blowout Preventer (BOP) Systems Requirement outlines extensively the design, use, and testing of well control equipment.[23] There is no mention of float collars in the entirety of Subpart D.

The only reference to float collars in the entire MMS (BOEMRE) regulations that I was able to find was under section 250.422 (a): "After cementing surface, intermediate, or production casing, you may resume drilling after the cement has been held under pressure for 12 hours. One acceptable method of holding cement under pressure is to use float valves to hold the cement in place."[24]

---

[21] API RP 65 (Second Edition, December 2010), Part 2 at § 4.6.4.1.
[22] E.g., API RP 96 (First Edition, Ballot 1-April1, 2011), p. 123.
[23] 30 CFR Part 250 at §§ 250.440 – 250.451.
[24] 30 CFR § 250.422(a).

9

My opinion is that the MMS (BOEMRE) regulations recognize that float valves in float collars are to be used and relied upon solely to hold the cement in place until it hardens, which is exactly what section 250.422 provides. As evidenced by the MMS (BOEMRE) regulations concerning well control equipment, there are detailed, specific and highly technical requirements for well control equipment.[25] Had MMS (BOEMRE) intended the float valves to be used as a well control device, there would have been extensive coverage of the valves in the well control section of the MMS (BOEMRE) regulations outlining operating parameters and periodic testing procedures for well control equipment. Section 250.515 mandates that "[t]he BOP system and system components and related well-control equipment shall be designed, used, maintained, and tested in a manner necessary to assure well control in foreseeable conditions and circumstances, including subfreezing conditions. The working pressure rating of the BOP system and BOP system components **shall exceed** the expected surface pressure to which they may be subjected."[26] There are no such requirements with respect to float collars.

Additionally, I reviewed existing industry regulations in other countries. I reviewed the Norwegian Regulations, NORSOK STANDARD D-010 Rev 3, Aug 2004 Well Integrity in Drilling and Well Operations. I also reviewed Oil and Gas UK Guidelines for the Suspension and Abandonment of Wells, Issue 3, January 2009. Neither, the Norwegian regulations nor the UK regulations make any mention of using float collars as a well control device. It is worth noting that the oil and gas industry considers the Norwegian regulation the most stringent in the world.

In my former capacity as President of Global Marine and Sr. Vice President Operations for Global Santa Fe, I was responsible for all safety and training in both companies. Part of my duties included the approval of all safety and operational policies and procedures relating to offshore drilling. In my 30 years of experience as a drilling contractor, I do not recall approving any policy, procedure or ever having heard of a conversation where a float valve was even suggested as an acceptable well control device. Simply put, float collars are not part of the drilling contractor's accepted well control equipment.

---

[25] 30 CFR §§ 250.440, 250.515, 250.516.
[26] 30 CFR § 250.515(a).

10

In reviewing Transocean's Well Control Handbook, I did not find any reference to the use of a float collar as well control equipment.[27] I have also reviewed BP's Group Practice 10-10 entitled "Well Control." Like Transocean, BP's Group Practice does not designate the float collar as well control equipment.[28] Transocean's Well Control Handbook and BP's Group Practice 10-10 mention that closed float valves may be run during casing running operations through a hydrocarbon zone.[29] This is irrelevant in this case because BP obtained a dispensation from its own Group Practices to run the casing for the entire Macondo Well on auto-fill (open float valves).[30] In any case, this should not be confused with well control equipment. The float collar, whether open or closed, never becomes a well control device. During casing running, as well as all other drilling operations and well construction activities, the drilling mud and the BOP stack are the primary and secondary well control mechanisms. In particular, Transocean's Well Control Handbook specifically identifies the hydrostatic head of the drilling mud as the primary well control device and the BOP stack as a secondary well control device, consistent with good oilfield practices.[31] BP's Group Practice 10-10[32] designates the drilling mud and the BOP stack as the well control devices during conventional drilling, not the float collar:

> 6.1.20   During conventional drilling, completions and well work activities the active barrier shall normally be a stable fluid column and the contingent barrier shall be the blowout preventer (BOP) equipment or tree. During under-balanced drilling, wireline, snubbing and coil tubing intervention activities, the active barrier shall normally be a dynamic mechanical sealing device and the contingent barrier shall be the BOP or tree.

In summary, the float collar is not intended to be, and is not accepted as, a well control device. Float collars are not designed, tested or used in the industry as a well control device. The well control devices utilized in the Macondo Well were the drilling mud and the BOP stack.

---

[27] Transocean Well Control Handbook, Depo. Ex. 596, at Section 9, BP-HZN-2179MDL00331036-77.
[28] BP's Group Practice 10-10, Section 7 "Conventional Well Control Equipment," BP-HZN-2179MDL00408015-21.
[29] Transocean Well Control Handbook, Depo. Ex. 596, BP-HZN-2179MDL00330850; BP's Group Practice 10-10, Section 6.1.13- 6.1.15.
[30] Brian Morel notes, BP-HZN-MBI 00021327. As recognized by Brian Morel, BP Lead Drilling Engineer, BP's choice to run in an auto fill position was likely based on its desire to reduce surge pressures on the formation.
[31] Transocean Well Control Handbook, Depo. Ex. 596, BP-HZN-2179MDL00330810-815. Testimony by Billy Dean Ambrose, Transocean's Investigation Team Leader, stated that "the float collar is not a well control device." When asked of knowledge of any literature or technical information that represented that Weatherford float collars may be used as a barrier to hydrocarbon flow from the formation, he answered, "I can only answer for myself. I am not aware of any literature." Deposition of Ambrose, July 19, 2011 at pp. 715-16.
[32] BP's Group Practice 10-10, Section 6, BP-HZN-2179MDL00408015.

11

These well control mechanisms are to be used until such time as both of the cement barriers are installed, tested and verified.

BP did not use the float collar as a barrier to hydrocarbon flow.[33] BP does not believe that the float collar is a physical or mechanical barrier to hydrocarbon flow. Weatherford made no representation to BP that the float collar on the Macondo Well would be a physical or mechanical barrier to hydrocarbon flow.[34] John Guide, BP's Wells Team Leader, stated that the Weatherford float collar was not used in the Macondo Well as a barrier to hydrocarbon flow, nor was it considered a barrier to hydrocarbon flow.[35]

**4.**  The float collar is a temporary tool used in the process of constructing the well, and it is designed so that it can be drilled out and destroyed. Once the cement job is completed, it has no further function. While waiting on cement to set, float valves temporarily function to prevent back flow of wet cement for 48 hours or less. After the cement hardens, the float valves have served their purpose and need to be drilled out in order to continue deepening a well. At the Macondo Well, the float collar would have remained in the hole during the period of abandonment; however, once the cement hardens the float collar had no function. The float collar at the Macondo Well would have been drilled out to complete the well. For that reason, float valves are made out of aluminum, so that they will grind up easily into small pieces and are of soft material to prevent damage to the drill bit or other down hole equipment.

The Weatherford float collar functioned as designed and used in the Macondo Well to hold the wet cement in place. BP specified the tools to be used in the running and cementing operations for the production casing. BP supplied Transocean with a Weatherford M45AP float collar. This float collar was an auto fill design, allowing the float collar to assist in reducing surge pressures during casing running operations. The float collar also provides a profile to land the cement plugs during the cementing operation. Its third function is to prevent wet cement from U tubing after cement pumping has stopped and the drilling crew is waiting on the cement to

---

[33] Corporate Deposition of BP, through James Cowie (Vol.2), p. 440.
[34] BP Deposition at pgs. 444 to 445.
[35] Deposition of John Guide, pgs. 278 thru 279.

harden. The float collar serves no permanent function in the well; rather, it is a temporary and expendable tool that is designed to be drilled out of the well using standard drilling bits.

On the Macondo Well, the three stated purposes of the float collar were served. "Full returns were observed throughout,"[36] thus indicating that surge had been reduced and no fluids were lost to the formation. The cementing plugs were landed on top of the float collar as per Brian Morel's email, "Pressure stayed low, but we had full returns the entire job, saw 80 psi lift pressure and landed out right on the calculated volume."[37] The float collar served its functions of surge reduction and as a landing profile.

Upon completion of the cement job, a float check test was performed to ensure the wet cement was not back flowing. Returns from the test did not exceed the pre-determined amount or returns predicted. BP well site leader Lee Lambert and Halliburton cementer Vincent Tabler observed the flow at the cement unit. Tabler testified they observed flow "until it was probably what we call a pencil stream. It stopped, started up again, and then stopped altogether," "and the two men concluded the float values were holding."[38] No lost returns were noted on the IADC report and the IADC report stated "bled back 5 bbls. and floats holding."[39] At this point the flapper valves of the float collar had served the purpose of preventing any back flow, and the drilling contractor enters the period of time known as "waiting on cement."

D.  **Conclusions**

In conclusion, it is my opinion the float collar is not a well control device, and was never intended by either Transocean or BP as a well control device in the Macondo Well. The MMS (BOEMRE) regulations do not recognize the float collar as a well control device, nor do the regulations of Norway or the UK. From an industry perspective, and based on 30 years experience as a drilling contractor, it is my opinion that no prudent driller, tool pusher or company man would rely on aluminum float collar flapper valves as a well control device. The

---

[36] N. Chaisson email to J. Gagliano April 20, 2010, 5:45 am with attached report; HAL_0011208-09.
[37] Brian Morel email, April 20, 2010; BP-HZN-MBI 00129052.
[38] Lambert and Tabler Testimony as set forth Chief Counsel's Report, Ch. 4.3 at p. 93; April 21, 2010 e-mail from Lee Lambert, BP-HZN-2179 MDL 00413137.
[39] Transocean DWH IADC Report 4/19/10, BP-HZN-MBI00136940—945.

Weatherford float collar assembly served the limited purposes for which it was designed and intended for use by Weatherford, and as used by BP in the Macondo Well, none of which included well control.

### E.     Compensation

I am being compensated for my services at a rate of $300.00/hour, together with expenses associated with my work.

Figure 1



DEEPWATER HORIZON BOP Stack

**Figure 2**



Float Collar Flapper Valve, with US quarter for scale