# EXHIBIT 46

# NATIONAL COMMISSION ON THE BP

# DEEPWATER HORIZON OIL SPILL

# AND OFFSHORE DRILLING:

# REPORT TO THE PRESIDENT

# (DEPO EX. 0025)



EXHIBIT #

WIT:



Chapter Four

# "But, who cares, it's done, end of story, [we] will probably be fine and we'll get a good cement job."

## The Macondo Well and the Blowout

In March 2008, BP paid a little over $34 million to the Minerals Management Service for an exclusive lease to drill in Mississippi Canyon Block 252, a nine-square-mile plot in the Gulf of Mexico. Although the Mississippi Canyon area has many productive oil fields, BP knew relatively little about the geology of Block 252: Macondo would be its first well on the new lease. BP planned to drill the well to 20,200 feet, both to learn more about the geology of the area and because it thought—based on available geological data—that it might find an oil and gas reservoir that would warrant installing production equipment at the well.[1] At the time, BP would have had good reason to expect that the well would be capable of generating a large profit.

Little more than two years later, however, BP found itself paying out tens of billions of dollars to

Fighting a losing battle, fireboats pour water onto the doomed rig in the hours after the Macondo well blowout. The tragic loss of the *Deepwater Horizon* at the close of the complex drilling project resulted from a series of missteps and oversights and an overall failure of management.

< *U.S. Coast Guard photo*

contain a blowout at the Macondo well, mitigate the damage resulting from the millions of gallons of oil flowing from that well into the Gulf of Mexico, and compensate the hundreds of thousands of individuals and businesses harmed by the spill. And that is likely just the beginning. BP, its partners (Anadarko and MOEX), and its key contractors (particularly Halliburton and Transocean) face potential liability for the billions more necessary to restore natural resources harmed by the spill.

The well blew out because a number of separate risk factors, oversights, and outright mistakes combined to overwhelm the safeguards meant to prevent just such an event from happening. But most of the mistakes and oversights at Macondo can be traced back to a single overarching failure—a failure of management. Better management by BP, Halliburton, and Transocean would almost certainly have prevented the blowout by improving the ability of individuals involved to identify the risks they faced, and to properly evaluate, communicate, and address them. A blowout in deepwater was not a statistical inevitability.

## The Challenges of Deepwater Drilling at the Macondo Well

### High Pressures and Risk of a Well Blowout

Oil forms deep beneath the Earth's surface when organic materials deposited in ancient sediments slowly transform in response to intense heat and pressure. Over the course of millions of years, these materials "cook" into liquid and gaseous hydrocarbons. The transformed materials can flow through porous mineral layers, and tend to migrate upward because they are lighter than other fluids in the pore spaces. If there is a path that leads to the surface, the hydrocarbons will emerge above ground in a seep or tar pit. If an impermeable layer instead blocks the way, the hydrocarbons can collect in porous rock beneath the impermeable layer. The business of drilling for oil consists of finding and tapping these "pay zones" of porous hydrocarbon-filled rock.

---

**Pore Pressure and Fracture Gradient**

Pore pressure is the pressure exerted by fluids in the pore space of rock. If drillers do not balance pore pressure with pressure from drilling fluids, hydrocarbons can flow into the wellbore (the hole drilled by the rig, including the casing) and unprotected sections of the well can collapse. The pore-pressure gradient, expressed as an equivalent mud weight, is a curve that shows the increase of pore pressure in a well by depth.

Fracture pressure is the pressure at which the geologic formation is not strong enough to withstand the pressure of the drilling fluids in a well and hence will fracture. When fracture occurs, drilling fluids flow out of the wellbore into the formation instead of circulating back to the surface. This causes what is known as "lost returns" or "lost circulation." The fracture gradient, expressed as an equivalent mud weight, is a curve that shows the fracture pressure of rocks in a well by depth.

seawater, BP placed more stress on the cement job at the bottom of the well than necessary. BP's stated reason for doing so was its preference for setting cement plugs in seawater rather than mud.[143] While industry experts have acknowledged that setting cement plugs in seawater can avoid mud contamination and that it is not unusual for operators to set cement plugs in seawater,[144] BP has provided no evidence that it or another operator has ever set a surface cement plug so deep in seawater (particularly without additional barriers). The risks BP created by its decision to displace 3,300 feet of mud with seawater outweighed its concerns about cement setting better in seawater than in mud. As BP has admitted, cement plugs *can* be set in mud.[145] BP also could have set one or more non-cement bridge plugs (which work equally well in mud or seawater).[146] No evidence has yet been produced that the BP team ever formally evaluated these options or the relative risks created by removing 3,300 feet of mud.

*It was not necessary to set the cement plug 3,300 feet below the mudline.* The BP Macondo team chose to do so in order to set the lockdown sleeve last in the temporary abandonment sequence to minimize the chances of damage to the sleeve. Setting the lockdown sleeve would require 100,000 pounds of force. The BP Macondo team sought to generate that force by hanging 3,000 feet of drill pipe below the sleeve—hence the desire to set the cement plug 3,000 feet below the mud line. BP's desire to set the lockdown sleeve last did not justify the risks its decision created. BP could have used other proven means to protect the lockdown sleeve if set earlier in the process. It also did not need 3,000 feet of space to generate 100,000 pounds of force.[147] Merrick Kelley, the individual at BP in charge of lockdown sleeves in the Gulf of Mexico, told Commission staff that he had recommended setting the plug roughly 1,300 feet below the mud line (using heavier drill pipe), rather than 3,300 feet down. That would have significantly increased the margin of safety for the well.[148]

*The most troubling aspect of BP's temporary abandonment procedure was BP's decision to displace mud from the riser before setting the surface cement plug or other barrier in the production casing.*[149] During displacement of the riser, the BOP would be open, leaving the cement at the bottom of the well (in the annulus and shoe track) as the *only* physical barrier to flow up the production casing between the pay zone and the rig.[150] Relying so heavily on primary cement integrity put a significant premium on the negative-pressure test and well monitoring during displacement, both of which are subject to human error.

*BP's decision under these circumstances to displace mud from the riser before setting another barrier unnecessarily and substantially increased the risk of a blowout.* BP could have set the surface cement plug, or a mechanical plug, before displacing the riser.[151] BP could have replaced the mud in the wellbore with heavier mud sufficient to overbalance the well.[152] It is not apparent why BP chose not to do any of these things.

**Kick Detection**

The drilling crew and other individuals on the rig also missed critical signs that a kick was occurring. The crew could have prevented the blowout—or at least significantly reduced its impact—if they had reacted in a timely and appropriate manner. What is not now clear is precisely why the crew missed these signals.

Chief Health, Safety and Environmental Officer)).

[145] Testimony of Mark Bly, 213; Testimony of Charlie Williams, Hearing before the National Commission, November 9, 2010, 45.

[146] Testimony of Steve Lewis, 54, 124. BP argues that "[t]he use of additional mechanical plugs would have brought its own additional risks." Powell, letter, att. 1, 6 (citing API, *Recommended Practice 65—Part 2* (May 2010), § 3.1); Guide, interview. However, BP does not present any evidence that the Macondo team in fact evaluated those risks or compared them with the risks of setting a single surface cement plug in seawater 3,300 feet below the mud line.

[147] Merrick Kelley (BP), interview with Commission staff, October 22, 2010; Industry expert, interview.

[148] BP asserts that "[u]sing drill collars would have required unracking the drill pipe on the rig and then locating and re-racking drill collars—a set of additional operations with attendant risks." Powell, letter, att. 1, 5. BP does not provide any evidence to substantiate the extent of such "attendant risks" or whether they outweighed the risks of the procedure BP chose. Most significantly, BP offers no evidence that its Macondo team ever considered such risks or performed a rigorous comparative risk analysis.

[149] Internal BP document (BP-HZN-CEC 8574).

[150] Testimony of Mark Bly, 308. BP has suggested that the float valves provided an additional barrier to flow. BP, Deepwater Horizon Accident Investigation Report, 68. The Commission does not agree that float valves, even when converted, constitute a distinct physical barrier to flow, but instead reinforce the cement in the shoe track. Clawson, interview (indicating that Weatherford does not consider the float collar to be a barrier to hydrocarbons); API, *Recommended Practice 65—Part 2* (May 2010), §§ 3.4, 4.4.3 (float valves not included in the list of subsurface mechanical barriers; float equipment used to prevent cement from flowing back into the casing).

[151] Testimony of Darryl Bourgoyne, Hearing before the National Commission, November 9, 2010, 133.

[152] Testimony of Charlie Williams, 46–53.

[153] Testimony of Bill Ambrose, 380–84.

[154] Between 8:00 and 9:49 p.m., the crew was performing a number of other activities that may have further confounded the data or at least distracted the driller. The crew was emptying various tanks on the rig into the active pit system, including "trip tanks" and "sand traps," which may have masked increased flow out of the well into the active pit system. At 9:18 p.m., a valve on one of the pumps blew, and a number of crew members from the rig floor went to fix it. Finally, the crew was operating one or both of the cranes on the main deck, which could have affected flow-out and volume readings.

[155] Internal BP document (BP-HZN-OSC 5420).

[156] Guide, interview.

[157] *Ibid.*; Internal BP document (BP-HZN-MBI 193529-39).

[158] It appears that the chain of command and responsibilities at BP during the execute phase were not well-understood by the Macondo Engineering Team Leader. When asked during an interview who was responsible for designing or amending the temporary abandonment procedures, the Macondo Engineering Team Leader said he would need to look at the company's chart of roles and responsibilities. Walz, interview.

[159] Internal BP document (BP-HZN-MBI 117603).

[160] Internal BP document (BP-HZN-MBI 128542).

[161] Internal BP document (BP-HZN-OSC 6224).

[162] There is a dispute as to whether BP personnel called back to shore that evening to discuss the data observed during the negative-pressure test. The Commission staff has to date seen no direct evidence of such a call. The staff's investigation is ongoing.

[163] Internal BP document (BP-HZN-BLY 38354).

[164] Internal BP document (BP-HZN-BLY 38355).

[165] Internal BP document (BP-HZN-BLY 38354).

[166] Internal BP document (BP-HZN-BLY 38361).