# EXHIBIT 60

# EXPERT REBUTTAL REPORT OF

# DAVID BOLADO (HALLIBURTON)

# (DEPO EX. 7785)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 )<br><br>Applies to:<br><br>ALL CASES and<br>2:10-cv-02771 | MDL No. 2179<br><br>Section: J<br><br>The Honorable Judge Barbier<br>Mag. Judge Shushan |

**REBUTTAL EXPERT REPORT OF DAVID BOLADO ON CEMENT JOB DESIGN, OPTICEM MODELING, AND CONTAMINATION**

Exhibit No. 7785
Worldwide Court Reporters, Inc.

**CONFIDENTIAL**

negative pressure test failed, and controlled the well until Halliburton could complete a remedial squeeze job, any issues of hydrocarbon isolation could have been addressed by one or more squeeze jobs.

This does not mean that centralization is not important, as Mr. Sabins would like the reader to believe. As Mr. Benge points out in his report, "lack of adequate centralization increased channeling, increased the risk of contamination of the slurries, and increased the risk of a barrier failure in the well."[74] Remedial cementing is available to fix primary cement jobs that do not provide complete hydrocarbon isolation in a well, but Halliburton's goal is to prevent remediation from being required in the first place. The importance of centralization is the reason why Mr. Gagliano ran multiple OptiCem simulations on April 14 and 15 in order to predict the number of centralizers required to centralize the well adequately and to minimize channeling. This is also why, when he received indications that BP was planning to use only 6 centralizers instead of the planned 21, Mr. Gagliano ran more OptiCem simulations without the 15 additional centralizers. When the results showed increased channeling and gas flow potential, Mr. Gagliano sent those results to BP. Unfortunately, BP decided not to follow Halliburton's recommendation of 21 centralizers knowing the risks of this choice, and increased the chances of contamination, channeling, and lack of zonal isolation.

## VIII. The Float Collar Likely did not Convert

Mr. Sabins asserts that evidence that the float collar converted is "compelling" and there is "no other evidence that indicates that the float collar did not convert."[75] Several other experts in this case do not agree with his conclusions. Dr. Frigaard concludes that the float collar did not convert, and the ball shot out of the autofill tube.[76] Cameron expert Kevin Trahan opined that "it is questionable that a sufficient flow rate was ever exerted to convert the float collar."[77] Transocean expert Calvin Barnhill states, contrary to Mr. Sabins, that the "float collar's condition was unknown

---

[74] Benge Expert Report p.19.

[75] Sabins Expert Report pp.83-84.

[76] Frigaard Expert Report p. 29.

[77] Trahan Expert Report p.17.

**35**

and there was no certainty that it properly converted."[78]  Glen Benge, expert for the United States, stated that the "float check test did not confirm the floats were holding . . . ."[79]  Even Weatherford's own expert, David Calvert, acknowledged that the float collar may not have converted.  Mr. Calvert stated that the cement stayed in place after pumping "either due to the converted flapper check valves or the hydrostatic balance existing in the well."[80]

Further, Mr. Sabins does not explain how hydrocarbons flowed past the float collar if the autofill tube converted.  As Mr. Beck, expert for Halliburton, articulated in his opening report, the float collar was tested to hold pressure differentials far in excess of the pressures experienced in the Macondo well.[81]  Regardless of whether the float collar is designed to be a permanent barrier to hydrocarbon flow, testing shows that had the float collar properly converted without damage, hydrocarbons would not have flowed past the barrier in the quantities necessary to explain the blowout.

### IX. Mr. Sabins' Theory of Porous Cement Does Not Allow Sufficient Flow for a Blowout.

Mr. Sabins theorizes that nitrogen bubbles traveled through the foamed cement and into the shoe track cement, creating a highly-foamed cement that became permeable when set.[82]  Mr. Sabins' porous shoe track cement theory does not withstand scientific scrutiny.  Even if Mr. Sabins' assumption that it is possible to create an unstable, permeable foam of 30 to 50 darcies accidentally[83] is correct, such a permeable cement would not

---

[78] Barnhill Expert Report p.4.

[79] Benge Expert Report p.26.

[80] Calvert Expert Report p.13.

[81] Beck Expert Report p.79.

[82] Sabins Expert Report pp.43-45, 53.

[83] Sabins Expert Report p.24 and fn.32.  Although Mr. Sabins says in his report that unstable foams can only reach 30 darcies of permeability, in footnote 32 he references a patent (a non-peer reviewed document) that states that permeable cement of up to 50 darcies is possible.  Mr. Strickland gave Mr. Sabins the benefit of the doubt and assumed up to 50 darcy permeability was possible.