## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG DEEPWATER HORIZON IN THE GULF OF MEXICO, ON APRIL 20, 2010 ) ) ) ) ) | MDL NO. 2179 SECTION: J JUDGE BARBIER |
| This Document Relates To: 210-CV-02771; MDL No. 2179 ) ) ) ) ) ) ) | MAGISTRATE NO. 1 MAGISTRATE SHUSHAN ~~JURY DEMAND MADE~~ |

### FIRST AMENDED CROSS-CLAIMS OF THIRD-PARTY DEFENDANTS ANADARKO PETROLEUM CORPORATION AND ANADARKO E&P COMPANY LP

Third-Party Defendants and Plaintiffs-in-Cross-Claims Anadarko Petroleum Corporation and Anadarko E&P Company LP (together "Anadarko") hereby state for their cross-claims the following:

### THE PARTIES

#### Third-Party Defendants and Plaintiffs-in-Cross-Claim

1.     Third-Party Defendant and Plaintiff-in-Cross-Claim Anadarko Petroleum Corporation ("APC") is a Delaware corporation with a principal place of business in The Woodlands, Texas.

2.     Third-Party Defendant and Plaintiff-in-Cross-Claim Anadarko E&P Company LP ("Anadarko E&P") is a Delaware limited partnership with its principal place of business in The Woodlands, Texas.  (APC and Anadarko E&P collectively are referred to herein as "Anadarko.").

~~3.      Third Party Defendant MOEX Offshore 2007 LLC ("MOEX") is a limited liability company with its principal place of business in Houston, Texas.  (Anadarko and MOEX collectively are referred to herein as the "Non-Operating Investors.")~~

3.      ~~4. Third Party Defendant MOEX USA Corporation ("MOEX USA") is incorporated in Delaware with a principal place of business in Houston, Texas.~~<u>Anadarko Petroleum Corporation and Anadarko E&P Company LP are parties to a Confidential Settlement Agreement ("the Settlement") with BP Exploration & Production Inc. ("BPXP").  Among other things, the Settlement provides that Anadarko releases all claims against BPXP and its affiliates, and that Anadarko assigns to BPXP all right, title and interest in its cross-claims for damages against other defendants.</u>

**The Transocean Third-Party Plaintiffs and Defendants-in-Cross-Claim**

<u>4.</u>      ~~5.~~ Third-Party Plaintiff and Defendant-in-Cross-Claim Triton Asset Leasing GmbH ("Triton") is a limited liability company organized and existing under the laws of the Swiss Confederation with a principal office in Zug, Switzerland.

<u>5.</u>      ~~6.~~ Third-Party Plaintiff and Defendant-in- Cross-Claim Transocean Holdings LLC is a limited liability company organized and existing under the laws of the State of Delaware, with a principal office in Houston, Texas.

<u>6.</u>      ~~7.~~ Third-Party Plaintiff and Defendant-in- Cross-Claim Transocean Offshore Deepwater Drilling Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal office in Houston, Texas.

<u>7.</u>      ~~8.~~ Third-Party Plaintiff and Defendant-in- Cross-Claim Transocean Deepwater Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal office in Houston, Texas.   (Third-Party Plaintiffs and Defendants-in-Cross-Claim Triton, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc., and Transocean Deepwater Inc. are collectively referred to herein as "Transocean" and the "Transocean Defendants-in- Cross-Claim.")<u>.</u>

- 2 -

### ~~The BP Third-Party Defendants and Defendants-in-Cross-Claims~~

~~9.      Third Party Defendant and Defendant in Cross Claim BP Exploration & Production, Inc. ("BP Exploration") is a Delaware Corporation with its principal place of business in Warrenville, Illinois.~~

~~10.      Third Party Defendant and Defendant in Cross Claim BP America Production Company ("BP America") is a Delaware Corporation with its principal place of business in Houston, Texas.~~

~~11.      Third Party Defendant and Defendant in Cross Claims BP p.l.c. is a British Public Limited Company with its corporate headquarters in London, England. (BP Exploration, BP America, and BP p.l.c. collectively are referred to herein as "BP.")~~

### Third-Party Defendant and Defendant-in-Cross-Claims Halliburton

8.      ~~12.~~ Third-Party Defendant and Defendant-in-Cross-Claim Halliburton Energy Services, Inc. ("Halliburton") is a Delaware Corporation with its principal place of business in Houston, Texas.

9.      ~~13.~~ Sperry Drilling Services (f/k/a Sperry Sun Drilling Services) ("Sperry") is a division of Halliburton Energy Services, Inc.

### Third-Party Defendant and Defendant-in-Cross-Claims M-I

10.      ~~14.~~ Third-Party Defendant and Defendant-in-Cross-Claim M-I, LLC, also known as M-I Swaco ("M-I"), is a Delaware limited liability company with its principal place of business in Wilmington, Delaware.

### ~~The Weatherford Third-Party Defendants and Defendants-in-Cross-Claims~~

~~15.      Third Party Defendant and Defendant in Cross Claim Weatherford U.S. L.P. is a Louisiana limited partnership with a principal place of business in Houston, Texas.~~

~~16.      Third Party Defendant and Defendant in Cross Claim Weatherford International, Inc. ("Weatherford International") is a Delaware corporation with its principal place of business in Houston, Texas.~~

~~17.     Weatherford U.S. L.P. and Weatherford International, Inc. collectively are referred to herein as "Weatherford."~~

~~**Third-Party Defendant and Defendant-in-Cross-Claims Cameron**~~

~~18.     Third Party Defendant and Defendant in Cross Claim Cameron International Corporation f/k/a Cooper Cameron Corporation ("Cameron") is a Delaware corporation with its principal place of business in Houston, Texas.~~

## SUBJECT MATTER JURISDICTION AND VENUE

<u>11.</u>     ~~19.~~ The Court has admiralty and maritime jurisdiction<u>, and</u> federal ~~jurisdiction, and supplemental~~<u>question</u> jurisdiction over these Cross-Claims pursuant to Article III, Section 2 of the United States Constitution, 28 U.S.C. § § 1333, 1367, 43 U.S.C. § 1349 and 33 U.S.C. § 2717. These are claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Venue is proper in this District pursuant to Rule F(9) of the Supplemental Rules for Admiralty and Maritime Claims.

## PERSONAL JURISDICTION

<u>12.</u>     ~~20.~~ Pursuant to Fed. R. Civ. P. 10(c), ~~the Non Operating Investors~~<u>Anadarko</u> respectfully ~~incorporate~~<u>incorporates</u> by reference the allegations of Petitioners' Rule 14(c) Third-Party Complaint and Plaintiffs' First Amended Master Complaint, Cross-Claim, and Third-Party Complaint for Private Economic Losses in Accordance with PTO No. 11 [CMO No.1] Section III(B1) ["B1 Bundle"] with respect to the Court's personal jurisdiction over the Defendants-in-Cross-Claims herein.

## STATEMENT OF FACTS

~~**BP's Role as the Designated Operator and Operating Party of the Macondo Well Site**~~

<u>13.</u>     ~~21.~~ On April 20, 2010, a well blowout caused an explosion and fire on the *Deepwater Horizon*, a semi-submersible mobile offshore drilling unit that was conducting deepwater offshore drilling and related oil exploration activities in the Gulf of Mexico (the "Blowout"). The Blowout sank the *Deepwater Horizon* and caused oil to spill into the Gulf of Mexico (the "Spill").

14.   ~~22.~~ The Blowout and Spill occurred in Mississippi Canyon Block 252 in the Gulf of Mexico, which contains the "Macondo Well." ~~At the time, BP Exploration was performing oil exploration, drilling, and production related operations in the area as the designated Operator under a lease granted to it by the former Minerals Management Service (the "Lease").~~

~~23.   The Blowout occurred because of the failure to seal off, or isolate, the well from hydrocarbons in the geologic formation beneath the ocean floor.  As a result, the pressure from the geologic formations was too much for the well to withstand and allowed hydrocarbons to enter the well, expanding at an ever-increasing rate until they reached the rig floor and then the *Deepwater Horizon*, causing it to explode.~~

~~24.   As the designated Operator under the Lease, BP Exploration was responsible for various aspects of the well and the drilling operations and for overseeing the contractors working with BP on the well.~~

~~25.   BP Exploration also was the designated "Operating Party" under the Macondo Prospect Offshore Deepwater Operating Agreement (the "OA") it entered into with the Non-Operating Investors and which relates to BP's deepwater offshore drilling activities at the Macondo Well site.[1]~~

~~26.   The OA explicitly provided that BP Exploration, as the Operating Party, was responsible for conducting all exploration, drilling, and associated activities at the Macondo Well.  BP Exploration and the Non-Operating Investors expressly agreed that BP Exploration had the "exclusive right and duty to conduct (or cause to be conducted) all [such] activities or operations."  The parties also agreed that BP Exploration was "not the agent" of the Non-Operating Investors but was "an independent contractor, not subject to [their] control or~~

---

~~[1] As of December 17, 2009 or thereabouts, BP Exploration and the Non-Operating Investors had obtained the following interest percentages in the Lease held by BP in the Macondo Well site:  BP Exploration:  65%; APC:  2.5%; Anadarko E&P:  22.5%; and MOEX:  10%.  Effective as of April 1, 2010, Anadarko E&P transferred its interest in the Lease to APC.~~

~~direction," except in limited circumstances that do not involve well design, drilling, and operations.~~

~~27.    As the designated Operator under the Lease and as the Operating Party under the OA, BP Exploration selected various contractors to conduct certain tasks and activities in connection with deepwater offshore drilling at the Macondo Well site.  The tasks and activities of these contractors were directed and closely supervised by BP Exploration, whose employees and authorized representatives on the rig were referred to by the contractors as "Company Men," and by BP as "Well Site Leaders."  For example:~~

15.    ~~a. At all relevant times, BP exercised operational control over the *Deepwater Horizon*.  BP America selected, supervised, and controlled the acts of Third Party Defendants-in-Cross-Claim Transocean as the owner and operator of the drilling rig to be used at the Macondo Well site.~~  The Transocean Defendants-in-Cross-Claim are the Owners, Managing Owners, Owners *Pro Hac Vice*, and/or Operators, of the *Deepwater Horizon*, and/or are considered Co-Owners of the *Deepwater Horizon*.  Transocean provided the *Deepwater Horizon* and the personnel to operate the rig and its equipment and systems ~~pursuant to a Drilling Contract between BP America and Transocean Ltd~~.  Transocean also provided the *Deepwater Horizon's* blowout preventer ("BOP") ~~manufactured by Cameron and~~which was installed at the Macondo Wellhead and through which hydrocarbons flowed up through the riser and to the rig causing the blowout.  ~~Subject always to BP Exploration's right of inspection, direction, approval and joint operational control,~~Transocean was responsible for operation of the drilling rig and for operations safety.

16.    ~~b. BP Exploration selected, supervised, and controlled the acts of Defendant-in-Cross-Claim Halliburton and its division, Sperry.~~  Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations. This included both onshore engineering support and offshore equipment and personnel based on *Deepwater Horizon*. Halliburton was responsible for and provided technical advice as to the design, modeling, placement, and testing of the cement that was pumped into place between the casing and the

geological formation and in the shoe track and annulus to isolate hydrocarbons from the wellbore at the Macondo well site.   Sperry was responsible for mudlogging equipment and personnel. Sperry mudlogging personnel were responsible for monitoring the well and advising the driller in the areas of mud pit volume changes, mud flow in and out of the well, mud gas levels and any pressure fluctuations.   ~~Halliburton and Sperry provided these components and services subject to BP Exploration's right of inspection, direction, and approval.~~

> ~~c.      BP Exploration selected, supervised, and controlled the acts of Defendant in Cross Claim M-I to provide the *Deepwater Horizon* with the mud products essential to maintaining well balance needed for safe deepwater offshore drilling, including drilling fluids and spacers, engineering services, and mud supervisory personnel, such as mud engineers and drilling fluid specialists, to manage the properties of those fluids in the Macondo Well.  M-I employed and/or supervised key fluid activities concerning the Macondo Well, such as using lost circulation material as a spacer, which never should have been done, and the mud displacement that was occurring at the time of the Blowout.  M-I provided these components and services subject to BP Exploration's right of inspection, direction, and approval.~~

> ~~d.      BP America selected, supervised and controlled the acts of Defendant in Cross Claim Weatherford International to design and provide casing components used by the *Deepwater Horizon*, such as the float collar, shoe, and centralizers, and to provide the personnel and equipment for running the casing and casing components into the wellbore.   Weatherford International provided these components and services subject to BP Exploration's right of inspection, direction, and approval.~~

**BP's Duties to the Non-Operating Investors**

28.    As the designated Operator under the Lease and Operating Party under the OA, BP Exploration accepted responsibility for all aspects of deepwater well design and offshore drilling at the Macondo Well, including risks to human safety and the environment.

29.    Under the OA, BP Exploration owed to the Non-Operating Investors the duties to "conduct all activities or operations" in connection with the Macondo Well "in a good and workmanlike manner, as would a prudent operator under the same or similar circumstances," and to take certain actions "in compliance with all applicable laws and regulations, including avoiding significant and unintended impact on (i) the health or safety of people, (ii) property, or (iii) the environment . . . ."

30.    BP Exploration knew that one of the most dangerous and foreseeable risks in drilling is the uncontrolled release of highly pressurized hydrocarbons trapped in the formations beneath the sea floor and that in order to prevent the occurrence of such "blowouts," it was necessary to continually balance and maintain the pressure inside the well against the ambient, pressurized environment in the surrounding formations.

31.    BP had a duty to the Non-Operating Investors to act with reasonable care with respect to executing the design, maintenance and/or performance of drilling operations, the *Deepwater Horizon*, and its appurtenances and equipment, as well as a duty to monitor with reasonable care the total depth drilling and testing, and to assess, report, and act promptly and prudently if and when indicators showed that hydrocarbons were escaping from the formations.

32.    The duties owed by BP to the Non-Operating Investors arose out of BP's status as the designated Operator under the Lease, the sole and controlling Operating Party under the OA, its undertaking of responsibility for the complex, technical process of deepwater offshore drilling, its knowledge of the risks to life and property inherent in deepwater offshore drilling, federal and state regulations, and industry custom and practice.

**The Blowout and Spill Resulted from BP's Gross Negligence and Reckless and Wanton Disregard for Safety**

33.     At the time of the Blowout, drilling at the Macondo Well site already was almost six weeks behind schedule and more than $58 million over budget, increasing daily by unbudgeted costs such as rig fees and lease and contractor fees.   This excess cost put the Macondo project in conflict with a recent BP mandate to achieve cost reductions in its Gulf of Mexico operations.

34.     In spite of the difficult and dangerous nature of the Macondo well, BP recklessly made multiple decisions about drilling and about the temporary abandonment plan for time savings and economic reasons,

35.     In the weeks leading up to the Blowout and Spill, BP knew that challenges presented by the Macondo Well increased the risk of a blowout and that those challenges correspondingly increased the need to vigilantly maintain well pressure in order to ensure the safe and workmanlike operation of the Macondo Well.

36.     As described below, the Blowout and the Spill were the direct and proximate result of BP's gross negligence and/or willful or wanton reckless disregard of the consequences of its acts and omissions.

**BP Was Grossly Negligent and Acted with Wanton and Willful Disregard for the Consequences of its Actions by Ignoring the Conclusive and Unambiguous Results of the Negative Pressure Test It Conducted on April 20, 2010**

37.     Under BP's direction and control, the Macondo Well was drilled to a depth of 18,360 feet.  At the bottom of the well was cement placed by the drilling team.  The cement at the bottom of the well was relied on to isolate hydrocarbons in the formations outside the well and to prevent them from coming up the well, as occurs in a blowout.

38.     BP knew that testing the integrity of the cement at the bottom of the well was critical to the safety of everyone on the rig.  BP also knew that it would perform just one test to evaluate the bottom well cement, a test known as a negative pressure test.  This was a change from BP's original plan to perform more than one negative pressure test, a change about which BP did not inform the Minerals Management Service.

- 9 -

39.     When conducting a negative pressure test of the type done at the Macondo, rig personnel seal the well and reduce the pressure inside the casing *below* the pressure in the formation that is outside the casing.   They then monitor the well to see whether any hydrocarbons leak into the casing from the formation.   In a successful negative pressure test there should be no pressure increase inside the well bore and no flow from the well bore for a sustained period of time.   Increased pressure during this period indicates that the primary cement job at the bottom of the well has failed and hydrocarbons are entering the well.

40.     On April 20, 2010, the day of the Blowout, BP conducted only one negative pressure test of the Macondo Well.   The test failed.

41.     The failed negative pressure test was a clear indication that the well lacked integrity and that the cement had failed to seal off the hydrocarbons in the highly pressurized formations surrounding the well.

42.     Despite the failure of the negative pressure test, BP proceeded to the next phase of temporary abandonment, during which the Blowout occurred.

43.     BP's failure to heed the results of the negative pressure test was, at a minimum, grossly negligent and wanton and reckless conduct.

44.     BP's conduct in ignoring the obvious and conclusive results of the failed negative pressure test was a direct and proximate cause of the Blowout and the Spill.

**BP's Decision to Not to Use 15 Additional Centralizers Was Grossly Negligent and Undertaken in Wanton and Willful Disregard of the Consequences**

45.     Deepwater offshore drilling can involve the placement and stabilization of the production casing in the well.   If run, the production casing is secured by cementing the exterior, or annular, space around the casing and the interior of the casing in the shoe track.

46.     The more centered the casing is in the well bore, the more secure it is and the more likely it is to achieve a proper cement job.   The failure to center the production casing in the surrounding well bore is dangerous and can lead to well failures, kicks, and blowouts.

47.     Centralizers are devices installed on production casing strings to ensure that the casing remains centered or close to centered in the well bore and stable.

48.     In September 2009, BP's well plan for Macondo called for the installation of 16 production casing centralizers.  In January 2010, BP revised its well plan to call for at least 11 centralizers on the production casing.

49.     On March 31, 2010, BP requested from Weatherford a total of "7-10" centralizers for use in the Macondo Well.   Weatherford advised BP that only six centralizers were immediately available.  BP determined that those six centralizers were sufficient even though it was less than the number BP had requested and about half the number called for in the well plan. Upon information and belief, BP did not ask whether additional centralizer subs could be manufactured in time for use in the Macondo Well, nor did BP attempt to secure acceptable equipment from suppliers other than Weatherford.

50.     On or about April 15, 2010, Halliburton recommended that the number of centralizers be increased to a total of 21 for well integrity purposes.  As a result, BP ordered an additional 15 centralizers from Weatherford and had them rushed to the rig by helicopter, along with an installation technician.   The rush order demonstrated that BP understood that it was critical to well safety to have the recommended number of centralizers.

51.     When the centralizers arrived on the rig, BP incorrectly thought that they were not the type it had expected and that additional work and time would be required to install them.  As a result, BP reverted to its prior decision to use just six centralizers, although it had seen a report showing that 10 centralizers created a moderate potential for gas flow.

52.     Upon information and belief, despite having made a rush order for the extra centralizers, BP's engineering team did not conduct any risk analysis to determine whether an inadequate number of centralizers would increase the chance of a blowout.

53.     When Halliburton learned of BP's decision, it generated a report that predicted poor centralization and severe gas flow problems resulting from inadequate centralization. Despite this warning, BP proceeded with its plan to run only six centralizers.

54.     BP's decision to use an inadequate number of centralizers was a direct and proximate cause of the Blowout and the Spill because had the production casing been properly centralized, it would have prevented the Blowout and the Spill.

**BP's Decision to Use an Untested Spacer Solution Was Grossly Negligent and Undertaken in Wanton and Willful Disregard of the Consequences**

55.     In order to prepare a well for a negative pressure test, a fluid called "spacer" material often is used to push heavy drilling fluid out of the well and ultimately reduce the pressure in the well to a low enough level to perform the test.

56.     The spacer material BP chose to use for the negative pressure test had never before been used or tested by BP or by anyone on the *Deepwater Horizon* and, upon information and belief, never had been used or tested by anyone in the industry for such purposes.

57.     The spacer material that BP chose had unusual characteristics. It was denser than the drilling mud being displaced from the well to prepare for the negative pressure test and was denser than the seawater that was to be placed in the well during the negative pressure test.

58.     By using a spacer that was so much more dense than the seawater, BP increased the risk that the spacer would migrate downward through the seawater and through the BOP annulars, confounding the negative pressure test with its added weight.

59.     Second, the spacer fluid used by BP created a risk of clogging flow paths that needed to be unobstructed in order to obtain an accurate negative pressure reading.  BP ignored warnings by M-I, the contractor chosen by BP to provide services related to spacers and other drilling products, that the spacer chosen by BP might dangerously "set up" or congeal in "small restrictions" in tools on the drill pipe.

60.     Although BP never had used this material as a spacer before, and never had tested it for such use, and although it used twice as much spacer for this negative pressure test as it had used at other similar jobs, BP did not undertake any risk analysis to consider the consequences of its actions.

61.     BP thus did not consider the risk that the dense spacer would clog crucial piping paths or otherwise interfere with the negative pressure test and did not take any precautions to ensure that displaced spacer did not confound the negative test results..

62.     BP's decision to use an untested spacer material based solely on non-operational considerations of avoiding the costs of disposing of environmental waste was a direct and proximate cause of the Blowout and the Spill in that it compromised the negative pressure test, the only test employed by BP to evaluate the integrity of the cement at the bottom of the well which was relied on to isolate hydrocarbons from the *Deepwater Horizon*.

### BP's Attempts to Convert the Float Collar Were Grossly Negligent and Undertaken in Wanton and Willful Disregard of the Consequences

63.     The Macondo Well was equipped with a device called a float collar.  The float collar is comprised of valves designed to permit a two-way flow of fluids in the casing and running string while the production casing is run.  The float collar is "converted" when the valves are closed and become one-way valves that permit drilling mud and cement to flow down through the inside of the casing but prevent "reverse flow" from coming back up the casing (as occurred in the Blowout).

64.     Converting the float collar is accomplished by circulating fluids at a required level of barrels per minute ("bpm").

65.     BP made nine attempts to convert the float collar.  On the first eight attempts, BP could not establish circulation, suggesting that the float collar, shoe track and/or casing was somehow plugged.  As a result, after each such attempt, BP increased the drill pipe pressure used in its next attempt to convert the float collar.

66.     BP consulted with Weatherford to ascertain how high it could increase the pressure in the drill pipe when attempting float collar conversion.  Weatherford advised BP that the drill pipe pressure could be increased as high as 6,800 pounds per square inch ("psi"), but that if the drill pipe pressure was increased to just 1,300 psi or more, the ball would be blown out of the autofill tube without converting the float collar equipment.

67.     BP ultimately increased the drill pipe pressure to 3140 psi.   After this ninth attempt, fluids began circulating down through the float collar assembly.   BP continued forward with operations as though the conversion had been successful, even though it never achieved sustained flow rates of 6 bpm, which were required for conversion of the float valves based on calculations using Weatherford specifications, and had been advised that 1,300 psi would damage the float collar conversion mechanism, rendering it impossible to convert.

68.     BP observed another anomaly when attempting to convert the float collar. The pump pressure required to circulate mud through the well was significantly lower than the 6 bpm that was expected.   The low circulating pressure raised concern among personnel on the rig floor. BP considered the possibility of a breach somewhere in the casing string.   Instead of resolving the issue, however, BP decided that the pressure gauge must be wrong and that the float collar must have converted.

69.     BP remained uncertain about whether it had achieved float collar conversion and thus also remained uncertain about whether the float collar valves would prevent the upward circulation of fluid (as ultimately occurred in the Blowout).   In the face of all of these uncertainties, BP proceeded onward with the cementing and temporary abandonment procedure, during the latter of which the Blowout occurred.

70.     BP's grossly negligent conduct in connection with its attempts to convert the float collar was a direct and proximate cause of the Blowout and the Spill by eliminating a barrier to materials rising up the well to the *Deepwater Horizon* and by masking a breach in well integrity.

**BP's Decision to Use an Unstable Cement Slurry Was Grossly Negligent and Undertaken in Wanton and Willful Disregard of the Consequences**

71.     BP chose to cement the final Macondo Well production casing into place using nitrogen foamed cement.   Using this technology posed a significant risk because an improperly designed or incorrectly pumped nitrogen foamed cement slurry can be unstable and lead to a failed primary cement job.

72.     It is common in the industry to use foamed cement on the first few casing strings in a deepwater well because shallow formations are often too weak to withstand the hydrostatic and dynamic pumping forces exerted by a heavier, normal-density cement slurry.

73.     It is less common to use foamed cement for deeper casing strings and in applications for which synthetic oil-based mud is being used as a drilling fluid.   Upon information and belief, BP had little or no experience with using the technology for this purpose.

74.     When designing a nitrogen foamed cement system, it is critical to test the stability of the foamed slurry.

75.     In February 2010, Halliburton laboratory personnel twice conducted foam stability tests of the nitrogen cement BP intended to use at the Macondo Well.  The test results indicated serious instability of the cement.  Halliburton reported results from one of the tests to BP in early March 2010.

76.     Halliburton tested the nitrogen cement again in April 2010.  These test results also indicated serious instability of the cement.

77.     BP proceeded to use the nitrogen cement on April 19, 2010, without ever having received a report from Halliburton confirming the cement's stability.  BP did so notwithstanding the concerns it had expressed to Halliburton about the inadequate job performance of a key Halliburton employee who was responsible for testing nitrogen cement.

78.     BP's conduct in using a nitrogen cement with which it had little or no prior relevant experience and without ever having received a test report confirming the cement's stability was grossly negligent and was a direct and proximate cause of the cement failure that resulted in the Blowout and the Spill.

**BP Was Grossly Negligent and Acted with Wanton and Willful Disregard for the Consequences of its Actions in its Implementation of a Temporary Abandonment Plan**

79.     BP planned to perform temporary abandonment after the *Deepwater Horizon* finished its drilling operations so that another rig later could complete the well construction process needed to collect hydrocarbons from the Macondo Well.

80.    BP made several changes to its initial temporary abandonment plan.  Upon information and belief, BP did not conduct any formal risk analysis before making these changes. For example:

a.      On April 18 and 19, a team of technicians from Schlumberger flew to the *Deepwater Horizon* to provide cement evaluation services and to be available on the rig if the cement job did not go as planned. The total cost for the Schlumberger services would be about $128,000 (exclusive of rig costs).  At 7:30 a.m. on April 20, the day of the Blowout, BP decided that the cement job had gone well enough that it sent home the Schlumberger technicians.  Had the technicians not been sent home, and had the cement evaluation services been performed, it would have alerted BP to problems with the cement job.

b.      BP also decided to use a cement plug to seal the well rather than a retrievable mechanical bridge plug.  The decision to use the cement plug was based on cost rather than risk assessment.  BP recognized that although the cement plug was "much cheaper," it would "leave [BP] with potential issues during completions."  Had BP used the retrievable mechanical bridge plug, it would have avoided displacing approximately 3000 feet of kill weight mud with seawater when installing the cement plug.  By requiring the rig crew to remove so much kill weight mud from the wellbore during temporary abandonment, BP's procedures greatly reduced the balancing pressure that the kill weight mud column in the wellbore exerted on the hydrocarbons below.

81.    BP made significant procedural changes in its temporary abandonment of the Macondo well in a relatively casual manner, without a structured approval or well plan amendment process.

82.    Rather than objectively considering the attendant risks, then developing a well design and procedures that were efficient and safe, and then arranging for the equipment and materials necessary to execute the design, BP did the opposite.  BP made decisions about what

type of pipe to use to set the lockdown sleeve (ordinary drill pipe, heavyweight, or drill collars), and hence where to set its surface cement plug, based on the type of pipe readily available on the rig.

### BP Was Grossly Negligent and Acted with Wanton and Willful Disregard for the Consequences of its Actions by Disregarding its Own Safety and Risk Management Procedures

83.     BP was aware of the need for both personal and process safety in all of its operations, including drilling operations in the Gulf of Mexico.  To such end, BP developed extensive process safety and risk management practices to be followed on all of its operations in order to instill a corporate culture of safety and to ensure the safety of its personnel and operations, including personnel and operations in the Gulf of Mexico.

84.     BP was grossly negligent by knowingly and recklessly failing to follow its own personal and process safety procedures when making decisions on the Deepwater Horizon. These failures include, but are not limited to, the failure to establish effective communication tools to identify, assess and mitigate risks; the failure to identify, document and assess risks; the failure to ensure compliance with risk management policies; the failure to establish performance standards and to implement risk mitigation plans to manage known risks; and the failure to ensure proper acceptance of and responsibility for process safety management at all levels. These failures caused or contributed to the events leading to the Blowout and Spill.

### Additional Acts of Gross Negligence by BP

85.     In addition to the acts and omissions described above, BP was grossly negligent, and acted with willful and/or wanton disregard for the consequences of its actions to the detriment of the Non-Operating Investors and others by:

a.     failing to supervise and participate in drilling operations to monitor well flow, to prevent an uncontrolled well, and to ensure that a blowout and subsequent oil spill did not occur;

b.     failing to follow its own procedures and protocols, failing to follow industry standards, and failing to follow plans filed with the government agencies

- 17 -

related to the Macondo Well including, among other things, its temporary abandonment procedure;

c. making last minute revisions to its temporary abandonment procedure on April 20, 2010, in order to speed up the abandonment process, thereby causing the negative test to be conducted while the Macondo Well was far more underbalanced than was permitted under its MMS Approved Modified Permit, due to the performance of an unapproved procedure directing removal of a great deal of kill weight mud before a negative test was performed;

d. executing a well design in a way that increased the risk of cementing failure and needlessly complicated post-blowout containment efforts;

e. failing to implement a full "bottoms up" circulation of mud between the running of the 9 7/8" x 7" casing and the beginning of the final cement job, despite the important safety-related information this procedure provides and despite industry practices and API recommendations, as alleged in more detail in ¶¶ 327-32 of the B1 Bundle Complaint;

f. choosing not to spot heavy mud in the rathole of the Macondo Well before the final cement job, despite industry practices and API recommendations and despite knowing of the high risk that the cement would "swap" with the lighter mud below it, would become contaminated, and would fail to achieve the zonal isolation required to prevent flow from hydrocarbon zones;

g. failing to perform adequate testing to determine if the float collar had converted, despite evidence that it had not converted;

h. cancelling the cement bond log test that would have determined the integrity of the cement job and whether there was a need for a remedial cement job, as alleged in more detail in ¶¶ 355-61 of the B1 Bundle Complaint, despite the fact that, among other things, BP did not request, obtain, or evaluate

comprehensive lab testing of the foamed cement it chose to use and decided that only a relatively small amount of cement was needed for the job;

i.      failing to deploy the casing hanger lockdown sleeve prior to removal of the kill weight mud referenced above in order to prevent the wellhead seal from being blown out by pressure from below, as alleged in more detail in ¶¶ 362-64 of the B1 Bundle Complaint, which was a change to the original plan;

j.      foregoing the setting of an additional, tested barrier further down the well prior to removal of 3,000 feet of kill weight mud during temporary abandonment;

k.      conducting premature mud displacement before well integrity was established, as alleged in more detail in ¶¶ 365-68 of the B1 Bundle Complaint, which was a change to the original plan and was an improper procedure to be undertaken in connection with conducting a negative pressure test;

l.      failing to ensure that the employees on the BP Macondo well team had sufficient competency in well control procedures and the management of complex systems;

m.      requiring simultaneous end-of-well operations that included bypassing mud pits in an effort to expedite the project and move the vessel to a different well, making it difficult or impossible to track fluid volumes into and out of the wellbore and detect whether the well was flowing, as alleged in more detail in ¶¶ 397-402 of the B1 Bundle Complaint, and failing to exercise the heightened degree of attention to gauges and other monitoring devices necessitated by this course of action;

n.      failing to ensure the proper design, manufacture, maintenance, and supply of the BOP and float collar;

o.      failing to adequately test the integrity of the float collar at the conclusion of the cement job;

p.      improperly using lost circulation and lift pressure as the sole parameters to evaluate the quality of the cement job;

q.      failing to properly inspect the *Deepwater Horizon* and failing to act on its knowledge that the schedule it imposed on Transocean did not permit proper maintenance of the *Deepwater Horizon* and its knowledge of Transocean's practice of disabling or bypassing vital safety systems and alarms, as evidenced by rig audits performed on the *Deepwater Horizon*;

r.      failing to correctly interpret flow rate and pressure when displacing the mud with seawater;

s.      failing to establish an effective procedure for personnel on the rig to communicate information to BP's Houston office and for BP's Houston office to communicate instructions to personnel on the rig;

t.      failing to establish an effective procedure for BP's Houston office to manage information, make decisions, and give instructions to personnel on the rig;

u.      failing to properly supervise its contractors whose conduct it supervised, directed, and controlled and for whom it was responsible;

v.      engaging in all of the foregoing acts and failures without performing risk assessments of each and every act or failure identified above, without performing risk assessments of the cumulative impacts of each successive act or failure, and without monitoring and enforcing compliance with its own policies requiring such risk assessments;

w.      failing to follow its own internal safety plans and programs; and

x.      scheduling a visit by BP executives during the critical temporary abandonment procedures, thereby needlessly distracting the crew from its duties.

86.      BP's acts and omissions breached the duties it owed to the Non-Operating Investors.

87. ~~BP's breaches of its duties to the Non-Operating Investors constituted negligence, gross negligence, and wanton and willful misconduct in reckless disregard of the rights and safety of others.~~

88. ~~All of the foregoing acts and/or omissions by BP proximately caused and/or contributed damages that the Non-Operating Investors have incurred and will continue to incur.~~

89. ~~BP's negligence, gross negligence and wanton and willful misconduct in reckless disregard of the rights and safety of others was committed in connection with operations that, if performed incorrectly, were known by BP as foreseeable causes of blowouts.~~

90. ~~All of the claims herein asserted by the Non-Operating Investors other than those under the Oil Pollution Act or arising under the OA (such as, for example, claims under maritime law and state law) are asserted in the event the Court rules that the Oil Pollution Act does not preempt all such claims.~~

~~**COUNT I**~~

~~**GROSS NEGLIGENCE AND WILLFUL MISCONDUCT<br>AGAINST BP - MARITIME LAW**~~

91. ~~Anadarko repeats and realleges ¶¶ 1-90 above.~~

92. ~~BP owed Anadarko a duty to act with reasonable care in connection with executing the design, planning, implementation, and conduct of the deepwater offshore drilling and related activities at the Macondo Well site.~~

93. ~~BP's duties included an obligation to refrain from acts of gross negligence or wanton and willful misconduct.~~

94. ~~BP breached its duties to Anadarko by committing acts of gross negligence and wanton and willful misconduct in reckless disregard of the rights and safety of others, as alleged more specifically above and in the B1 Bundle Complaint and Transocean's Third Party Complaint.~~

95. ~~BP's conduct was the proximate cause of foreseeable damage suffered by Anadarko, including claims made against it for liability for death, personal injury, clean-up costs,~~

economic loss, loss of investment, lost profits, and any damages or fines assessed in pending or future proceedings involving the Spill.  In addition, Anadarko has suffered economic losses as a result of BP's gross negligence, including, *inter alia*, the loss of the reservoir, the loss of its investments, lost profits, and defense costs, including attorneys' fees.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages, doubled, against BP.

## COUNT II

### NEGLIGENCE AGAINST BP - MARITIME LAW

96.     Anadarko repeats and realleges ¶¶ 1-95 above.

97.     BP owed Anadarko a duty to act with reasonable care in connection with executing the design, planning, implementation, and conduct of the deepwater offshore drilling and related activities at the Macondo Well site.

98.     BP breached its duties to Anadarko by committing acts of negligence, as alleged more specifically above and in the B1 Bundle Complaint and Transocean's Third Party Complaint.

99.     BP's conduct was the proximate cause of foreseeable damage suffered by Anadarko, including claims made against it for liability for death, personal injury, clean-up costs, economic loss, loss of investment, lost profits, and any damages or fines assessed in pending or future proceedings involving the Spill.  In addition, Anadarko has suffered economic losses as a result of BP's negligence, including, *inter alia*, the loss of the reservoir, the loss of their investments, lost profits, and defense costs, including attorneys' fees.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against BP.

## COUNT III

### INDEMNITY IN TORT AGAINST BP - MARITIME LAW

100.    Anadarko repeats and realleges ¶¶ 1-100 above.

101.    The Blowout, the Spill, and the resulting damages were caused by the gross negligence, willful misconduct and/or negligence of BP.

102.    Anadarko is without fault with respect to the Blowout and the Spill.  If Anadarko is found liable at all for damages in connection with the Blowout or the Spill, such liability will be purely vicarious, strict, and passive.

103.    Any and all damages assessed against Anadarko, whether vicariously or by operation of law, including without limitation any liability imposed in excess of the cap on liability provided for in the Oil Pollution Act (the "OPA"), 33 U.S.C. § 2704, should be repaid by BP as a wrongdoer who owes indemnity to parties who are without fault.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against BP.

## COUNT IV

### CONTRIBUTION AGAINST BP - MARITIME LAW

104.    Anadarko repeats and realleges ¶¶ 1-104 above.

105.    The claims asserted in these proceedings require the Court to assess and allocate proportional responsibility among all defendants (if any) for the damages claimed by the plaintiffs.

106.    Anadarko has the right to appear before and be heard by the Court with respect to whether it bears any proportional responsibility for the damages claimed by the plaintiffs (which Anadarko denies) and, if so, in what amount.

107.    Anadarko also has the right to appear before and be heard by the Court to establish the proportional responsibility of other defendants, including BP, in relation to the proportional responsibility (if any) of Anadarko.

108.    If Anadarko is found to have contributed to any damages suffered by Plaintiffs or the Third Party Plaintiffs, it is entitled to contribution from BP who bears a significantly greater proportional degree of fault for any such damages.

WHEREFORE, the Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against BP.

## COUNT V

### CONTRIBUTION AGAINST BP - OIL POLLUTION ACT

109.    Anadarko repeats and realleges ¶¶ 1-108 above.

110.    The claims asserted in these proceedings require the Court to assess and allocate proportional responsibility among all defendants (if any) for the damages claimed by the plaintiffs.

111.    Anadarko has the right to appear before and be heard by the Court with respect to whether it bears any proportional responsibility for the damages claimed by the plaintiffs (which Anadarko denies) and, if so, in what amount.

112.    Anadarko also has the right to appear before and be heard by the Court to establish the proportional responsibility of other defendants, including BP, in relation to the proportional responsibility (if any) of Anadarko.

113.    In the event Anadarko is found liable in any respect under the OPA, it is entitled under the OPA, 33 U.S.C. § 2709, to contribution from BP in the amount of BP's proportional degree of responsibility for any damages assessed against them.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against BP.

## COUNT VI

### BREACH OF CONTRACT AGAINST BP

114.    Anadarko repeats and realleges ¶¶ 1-113 above.

115.    BP has breached its obligations under the OA to Anadarko by failing to conduct all activities or operations in connection with the Macondo Well in a good and workmanlike manner, as would a prudent operator under the same or similar circumstances, failing to achieve safe and reliable activities and operations in compliance with all applicable laws and regulations, failing to avoid significant harm to (i) the health or safety of people, (ii) property, or (iii) the

environment; and failing to inform Anadarko of material decisions and shortcuts that negatively affected the safety of drilling operations and the prospects for safe and productive deepwater offshore drilling; failing to perform its obligations with respect to and accept responsibility for all Costs and Claims resulting from the Blowout and Spill.

116.   Anadarko has suffered damage as a result of BP's breach of contract, including without limitation incurring attorneys' fees as a result of BP's bad faith breach of contract.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against BP.

**COUNT VII**

**DECLARATORY JUDGMENT AGAINST BP - GROSS NEGLIGENCE UNDER ARTICLE 22.5 OF THE OA**

117.   Anadarko repeats and realleges ¶¶ 1-116 above.

118.   Article 22.5 of the OA provides in relevant part:

> Unless specifically provided otherwise in this Agreement, liability for losses, damages, Costs, expenses, or Claims involving activities or operations under this Agreement or affecting the Leases or the Contract Area which are not covered by or in excess of the insurance carried for the Joint Account shall be borne by each Party in proportion to its Participating Interest Share in the activity or operation out of which that liability arises, except that when liability results from the gross negligence or willful misconduct of a Party, that Party shall be solely responsible for liability resulting from its gross negligence or willful misconduct.

119.   There exists an actual controversy between BP and Anadarko as to whether BP's conduct, as alleged above, constitutes gross negligence or willful misconduct under Article 22.5 of the OA, thereby relieving Anadarko of any liability to BP for damages resulting from BP's conduct and from any obligations Anadarko might otherwise have under the OA.

120.   This Court has the power under 28 U.S.C. § 2201 to declare the rights and obligations of the parties with respect to this controversy.

WHEREFORE, Anadarko respectfully prays that the Court issue a declaratory judgment determining that BP's conduct as alleged above constituted gross negligence and/or willful misconduct under Article 22.5 of the OA, thereby relieving Anadarko of any liability to BP for

damages resulting from BP's conduct and from any obligations Anadarko might otherwise have under the OA..

## COUNT VIII

## DECLARATORY JUDGMENT AGAINST BP - NO LIABILITY UNDER THE OA FOR BP INDEMNITY OBLIGATIONS FOR CONSEQUENTIAL, PUNITIVE, OR INDIRECT DAMAGES

121.    Anadarko repeats and realleges ¶¶ 1-120 above.

122.    Article 22.5 of the OA provides in relevant part:

> UNDER NO CIRCUMSTANCES WILL A PARTY BE LIABLE TO ANOTHER PARTY FOR PUNITIVE DAMAGES, CONSEQUENTIAL, INDIRECT, UNFORSEEN, LOSS OF PROFIT, OR OTHER INDIRECT OR PENALTY DAMAGES EITHER IN LAW OR EQUITY.  (Capitalization in original.)

123.    There exists an actual controversy between Anadarko and BP concerning whether the quoted language of Article 22.5 prohibits BP from charging Anadarko any portion of indemnity obligations paid by or to be paid by BP to its contractual or implied indemnitees that represent consequential damages, indirect damages, unforeseen damages, loss of profit damages, punitive damages, or other indirect damages or penalty damages.

124.    This Court has the power under 28 U.S.C. § 2201 to declare the rights and obligations of the parties with respect to this controversy.

WHEREFORE, Anadarko respectfully prays that the Court issue a declaratory judgment determining that Article 22.5 of the OA prohibits BP from charging Anadarko any portion of indemnity obligations paid by or to be paid by BP to its contractual or implied indemnitees that represent consequential damages, indirect damages, unforeseen damages, loss of profit damages, punitive damages, or other indirect damages or penalty damages.

## COUNT IX

## DECLARATORY JUDGMENT AGAINST BP - NO LIABILITY UNDER THE OA FOR BP INDEMNIFYING GROSS NEGLIGENCE OF THIRD PARTIES

125.    Anadarko repeats and realleges ¶¶ 1-124 above.

126.    There exists an actual controversy between Anadarko and BP concerning whether Anadarko is required to contribute to any indemnity obligations paid or to be paid by BP to its contractual or implied indemnitees that represent damages resulting from an indemnitee who has acted with gross negligence or has committed willful misconduct.

127.    This Court has the power under 28 U.S.C. § 2201 to declare the rights and obligations of the parties with respect to this controversy.

WHEREFORE, Anadarko respectfully prays that the Court issue a declaratory judgment determining that Anadarko is not required to contribute to any indemnity obligations paid or to be paid by BP to its contractual or implied indemnitees that represent damages resulting from an indemnitee who has acted with gross negligence or has committed willful misconduct.

## COUNT X

### DECLARATORY JUDGMENT AGAINST BP - NO LIABILITY FOR JOINT INTEREST BILLS

128.    Anadarko repeats and realleges ¶¶ 1-127 above.

129.    There exists an actual controversy between Anadarko and BP concerning whether Anadarko is obligated to pay Joint Interest Bills rendered by BP subsequent to the Blowout for costs associated with the Blowout and Spill (the "JIBs").

130.    Under Article 22.5 of the OA, BP is solely responsible for liability resulting from its gross negligence or willful misconduct.

131.    Because the JIBs arose from BP's gross negligence, Anadarko has no obligation under the OA to pay the JIBS and BP has no right to charge Anadarko's account for the JIBS but is instead obligated to pay all Costs and Claims related to the Blowout and Spill.

WHEREFORE, Anadarko respectfully prays that the Court issue a declaratory judgment determining that Anadarko is not required to pay JIBs rendered by BP subsequent to the Blowout for costs associated with the Blowout and Spill.

## COUNT XI

### DECLARATORY JUDGMENT AGAINST BP - NO LIABILITY UNDER THE OA FOR INDEMNITY OBLIGATIONS OWED BY BP AMERICA OR BP P.L.C

132.   Anadarko repeats and realleges ¶¶ 1-131 above.

133.   There exists an actual controversy between Anadarko and BP under the OA as to whether Anadarko is obligated to pay any portion of contract indemnity obligations owed by BP America or BP p.l.c. under contracts entered into by those entities with contractors who provided services or goods in connection with the Macondo Well.

134.   Anadarko has no obligations under the OA to any entity other than BP Exploration (which latter obligations Anadarko denies).

135.   Accordingly, any contract indemnity obligations undertaken by BP America or BP p.l.c. are not in whole or in part chargeable under the OA to Anadarko.

WHEREFORE, Anadarko respectfully prays that the Court issue a declaratory judgment determining that Anadarko has no obligations under the OA to pay in whole or in part any contract indemnity obligations undertaken by BP America or BP p.l.c.

## COUNT XII

### GROSS NEGLIGENCE AND WILLFUL MISCONDUCT AGAINST BP - STATE LAW

136.   Anadarko repeats and realleges ¶¶ 1-135 above.

137.   In the event the Court rules that claims asserted in this action under state law are not preempted by federal law, Anadarko hereby alleges the following state law claim.

138.   BP owed Anadarko a duty to act with reasonable care in connection with executing the design, planning, implementation and conduct of the deepwater offshore drilling and related activities at the Macondo Well site.

139.   BP's duties included an obligation to refrain from acts of gross negligence or wanton and willful misconduct.

140.   BP breached its duties to Anadarko by committing a bad faith breach of contract and by acts of gross negligence and wanton and willful misconduct in reckless disregard of the

rights and safety of others, as alleged more specifically above and in the B1 Bundle Complaint and Transocean's Third Party Complaint.

141.    BP's conduct was the proximate cause of foreseeable damage suffered by the Anadarko, including claims made against it for liability for death, personal injury, clean-up costs, economic loss, loss of investment, lost profits, and any damages or fines assessed in pending or future proceedings involving the Spill.  In addition, Anadarko has suffered economic losses as a result of BP's gross negligence, including, *inter alia*, the loss of the reservoir, the loss of its investments, lost profits, and defense costs, including attorneys' fees.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages, doubled, against BP.

## COUNT XIII

### NEGLIGENCE AGAINST BP - STATE LAW

142.    Anadarko repeats and realleges ¶¶ 1-141 above.

143.    In the event the Court rules that claims asserted in this action under state law are not preempted by federal law, Anadarko hereby alleges the following state law claim.

144.    BP owed Anadarko a duty to act with reasonable care in connection executing the design, planning, implementation and conduct of the deepwater offshore drilling and related activities at the Macondo Well site.

145.    BP breached its duties to Anadarko by committing acts of negligence, as alleged more specifically above and in the B1 Bundle Complaint and Transocean's Third Party Complaint.

146.    BP's conduct was the proximate cause of foreseeable damage suffered by Anadarko, including claims made against it for liability for death, personal injury, clean-up costs, economic loss, loss of investment, lost profits, and any damages or fines assessed in pending or future proceedings involving the Spill.  In addition, Anadarko has suffered economic losses as a result of BP's negligence, including, *inter alia*, the loss of the reservoir, the loss of its investments, lost profits, and defense costs, including attorneys' fees.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against BP.

## COUNT XIV

### INDEMNITY IN TORT AND CONTRACT AGAINST BP - STATE LAW

147.   Anadarko repeats and realleges ¶¶ 1-146 above.

148.   In the event the Court rules that claims asserted in this action under state law are not preempted by federal law Anadarko hereby alleges the following state law claim.

149.   The Blowout, the Spill and the resulting damages were caused by the gross negligence, willful misconduct and/or negligence of BP.

150.   Anadarko is without fault with respect to the Blowout and the Spill.  If Anadarko is found liable at all for damages in connection with the Blowout or the Spill, such liability will be purely vicarious, strict, and passive.

151.   Any and all damages assessed against Anadarko, whether vicariously or by operation of law, including without limitation any liability imposed in excess of the cap on liability provided for in 33 U.S.C. § 2704, should be repaid by BP as a wrongdoer who owes indemnity to parties who are without fault and, in addition, pursuant to the terms of Article 22.5 of the OA.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against BP.

## COUNT XV

### CONTRIBUTION AGAINST BP - STATE LAW

152.   Anadarko repeats and realleges ¶¶ 1-151 above.

153.   In the event the Court rules that claims asserted in this action under state law are not preempted by federal law, Anadarko hereby alleges the following state law claim.

154.   The claims asserted in these proceedings require the Court to assess and allocate proportional responsibility among all defendants (if any) for the damages claimed by the plaintiffs.

155. Anadarko has the right to appear before and be heard by the Court with respect to whether it bears any proportional responsibility for the damages claimed by the plaintiffs (which Anadarko denies) and, if so, in what amount.

156. Anadarko also has the right to appear before and be heard by the Court to establish the proportional responsibility of other defendants, including BP, in relation to the proportional responsibility (if any) of Anadarko.

157. 33 U.S.C. § 2709 provides in relevant part that a person may bring a civil action for contribution against any other person who is liable or potentially liable under either the OPA "or another law."

158. If Anadarko is found to have contributed to any damages suffered by Plaintiffs or the Third Party Plaintiffs, it is entitled under state law pursuant to § 2709 of OPA to contribution from BP who bears a significantly greater proportional degree of fault for any such damages.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against BP.

## COUNT XVI

## DECLARATORY JUDGMENT AGAINST BP - RELIEF FROM OBLIGATIONS UNDER THE OA

159. Anadarko repeats and realleges ¶¶ 1-158 above.

160. BP has breached its obligations under the OA to Anadarko by failing to conduct all activities or operations in connection with the Macondo Well in a good and workmanlike manner, as would a prudent operator under the same or similar circumstances, failing to achieve safe and reliable activities and operations in compliance with all applicable laws and regulations, failing to avoid significant harm to (i) the health or safety of people, (ii) property, or (iii) the environment; and failing to inform Anadarko of material decisions and shortcuts that negatively affected the safety of drilling operations and the prospects for safe and productive deepwater offshore drilling.

~~161.   There exists an actual controversy between BP and Anadarko as to whether BP's conduct, as alleged above, relieves Anadarko of any obligations it might otherwise have to BP for under the OA.~~

~~WHEREFORE, Anadarko respectfully prays that the Court issue a declaratory judgment determining that BP's conduct as alleged above relieves Anadarko of any and all obligations to BP it might otherwise have under the OA~~

<u>17.</u>   <u>M-I provided the *Deepwater Horizon* with the mud products essential to maintaining well balance needed for safe deepwater offshore drilling, including drilling fluids and spacers, engineering services, and mud supervisory personnel, such as mud engineers and drilling fluid specialists, to manage the properties of those fluids in the Macondo Well. M-I employed and/or supervised key fluid activities concerning the Macondo Well, such as the mud displacement that was occurring at the time of the Blowout and the provision of "spacer" solution.</u>

### ALLEGATIONS AS TO TRANSOCEAN

<u>18.</u>   ~~162.~~ Anadarko repeats and realleges ~~¶¶ 1-161~~<u>the allegations</u> above.

<u>19.</u>   ~~163.~~ At all times material hereto<u>,</u> the *Deepwater Horizon* was owned, navigated, manned, possessed, managed, and controlled by Transocean ~~subject to BP's rights of inspection, approval and joint operational control~~.

<u>20.</u>   ~~164.~~ Transocean provided the *Deepwater Horizon* vessel and personnel to operate it at the Macondo site and<u>,</u> ~~subject to BP's rights of inspection, approval and joint operational control,~~ also was responsible for maintaining well control equipment, such as the BOP and its control systems.

<u>21.</u>   ~~165.~~ Transocean also provided operational support for drilling related activities on board the *Deepwater Horizon*, as well as onshore supervision and support for those drilling activities.

<u>22.</u>   ~~166.~~ As the owner and manager of the *Deepwater Horizon*, Transocean owed duties to Anadarko to, *inter alia*, man, possess, manage, control, navigate, maintain, and operate the *Deepwater Horizon* with reasonable and ordinary care.

23.    ~~167.~~ The duties owed by Transocean to Anadarko arose out of Transocean's status and duties as the Owner, Managing Owner, Owner *Pro Hac Vice*, and/or Operator or Co-Owner of the *Deepwater Horizon* used at the Macondo Well site, its undertaking of responsibility for the complex, technical process of deepwater offshore drilling, its contractual obligations ~~under its Drilling Contract with BP Exploration,~~ and its knowledge of the risks to life and property inherent in deepwater offshore drilling, federal and state regulations, and industry custom and practice.

24.    ~~168.~~ Transocean breached the duties it owed to Anadarko.

25.    ~~169.~~ Transocean's conduct in breaching its duties to Anadarko constituted negligence, or gross negligence, and/or willful misconduct <u>as may be established at trial based upon the evidence,</u> in disregard of the rights and safety of others, and all such blameworthy conduct was within the privity or knowledge of Transocean's managers.

26.    ~~170.~~ Transocean's negligence, or gross negligence and ~~wanton and~~/or willful misconduct <u>as may be established at trial based upon the evidence,</u> in reckless disregard of the rights and safety of others was committed in connection with operations that, if performed incorrectly, were known by Transocean as foreseeable causes of blowouts.

27.    ~~171.~~ As alleged in more detail in ~~¶ ¶ 520 521 of the B1 Bundle~~ <u>BPXP's Cross-Claim and Third-Party</u> Complaint <u>against Transocean</u>, Transocean's breaches of its duties included, but were not limited to, the following:

    a.    failing to properly manage, control, maintain and operate the *Deepwater Horizon* and its safety equipment, including the gas sensors, emergency shutdown systems, BOP diverter system and alarm and venting systems;

    b.    disabling vital alarm systems on the *Deepwater Horizon* before the Blowout; upon information and belief, had Transocean not disabled the alarm systems, the system would have sounded alarms just after the Blowout, shut down all potential ignition sources, alerting the crew to activate the drilling rig's emergency disconnect system ("EDS"), which likely would have prevented the explosion and saved the lives of the 11 rig workers who perished in the disaster;

    ~~c.    acquiescing to and/or not providing cautionary advice in the face of a series of reckless decisions concerning, *inter alia*, well design, the use of centralizers, cementing, integrity testing such as negative pressure testing, deployment of the casing hanger lockdown sleeve, spacer material, simultaneous~~

- 33 -

~~operations causing worker confusion and loss of focus, and the temporary abandonment procedure, including the setting of cement plugs and the timing and method of mud displacement;~~

c. ~~d.~~ violating the International Safety and Management Code ("ISM"), as adopted by the International Convention for the Safety of Life at Sea ("SOLAS"), which provides rules and standards to ensure that ships are constructed, equipped, and manned to safeguard life at sea, by failing to properly maintain the vessel, train personnel, and perform appropriate risk assessment analyses. *See* 46 USC §§ 3201-3205 and 33 CFR §§ 96.230 and 96.250;

d. ~~e.~~ failing to take reasonable steps in response to its knowledge that its safety performance during offshore drilling operations was poor and in response to its knowledge of significant problems related to the *Deepwater Horizon's* equipment and maintenance, including problems with the *Deepwater Horizon's* BOP, electronic alarm systems, ballast systems used to stabilize the vessel in the water, and other significant deficiencies that could lead to loss of life, serious injury, or environmental damage as a result of inadequate use and/or failure of equipment;

e. ~~f.~~ unreasonably postponing and ignoring needed maintenance on the *Deepwater Horizon*, and overriding or disabling vital safety mechanisms and alarms;

f. ~~g.~~ misinterpreting ~~and contributing to BP's misinterpretation of~~ the negative pressure test results, leading the rig crew to the erroneous view that the test was a success and well integrity had been established;

~~h.      failing to undertake any risk analysis or to establish mitigation plans regarding the performance of simultaneous operations during displacement after the negative pressure test;~~

i. ~~acquiescing in conducting premature mud displacement before sufficient evidence that the cement job had sealed the well properly, which was an improper procedure to be undertaken in connection with conducting a negative pressure test;~~

j. ~~acquiescing in the use of an abnormally large quantity of mixed and untested spacer fluid, despite the fact that this had never been done before and would make a correct interpretation of the negative pressure test more difficult than otherwise;~~

k. ~~failing to ensure that the BOP present on the *Deepwater Horizon* possessed reasonably safe, adequate, and functional technology to prevent blowouts;~~

l. ~~failing to ensure that the *Deepwater Horizon's* BOP had sufficient and functional built-in redundancy to eliminate single-point failure modes;~~

<u>g.</u>   ~~m.~~ failing to ensure that all foreseeable repairs, if any, and foreseeable modifications, if any, to the *Deepwater Horizon's* BOP were performed, completed, and tested with the drilling vessel's operations shut down and the well secured;

<u>h.</u>   ~~n.~~ failing to use replacement parts for the BOP that were manufactured by Cameron, the BOP's manufacturer;

o. ~~proceeding with the operations despite the fact that the bottom ram on the BOP was a test ram;~~

<u>i.</u>   ~~p.~~ failing to ensure that the testing~~, if any,~~ of the *Deepwater Horizon's* BOP was comprehensive, reviewed, and verified, and further failing to check and verify the BOP's entire operating and control system, including but not limited to, checking for leaks at ROV connection points, and verifying the functionality of the AMF and/or autoshear;

q.      failing to comply with requirements for periodic testing and certification, and failing to keep complete and accurate records of all BOP testing;

r.      failing to ensure that a BOP and/or back up BOP with sufficient strength and reliability for deepwater drilling was present and available on the *Deepwater Horizon*;

j.      s. failing properly to maintain functioning, independent control pods for the BOP;

k.      t. failing timely to activate the ("EDS") after indications of well control problems and mud/hydrocarbons coming up the riser;

l.      u. failing adequately to train its employees in well control;

m.      v. failing to adequately train its employees in responding to emergencies, including but not limited to, using the alarm and safety systems on the rig;

n.      w. failing to adequately assess the log and/or to report well stability or control issues to the Captain and others on the bridge prior to the Blowout; and

o.      x. opening or failing to close the mud gas separator line in response to the well control event.

### COUNT ~~XVII~~I

### ~~GROSS NEGLIGENCE AND WILLFUL MISCONDUCT AGAINST TRANSOCEAN - MARITIME LAW~~

172.    Anadarko repeats and realleges ¶¶ 1-171 above.

173.    Transocean owed duties to Anadarko to, *inter alia*, man, possess, manage, control, navigate, maintain, and operate the *Deepwater Horizon* with reasonable and ordinary care.

174.    Transocean's duties included an obligation to refrain from acts of gross negligence or wanton and willful misconduct.

175. ~~Transocean breached its duties to Anadarko by committing acts of gross negligence and wanton and willful misconduct in reckless disregard of the rights and safety of others and all such blameworthy conduct was within the privity or knowledge of Transocean's managers, as alleged more specifically above and in the B1 Bundle Complaint.~~

176. ~~Transocean's conduct was the proximate cause of foreseeable damage suffered by Anadarko, including claims made against it for liability for death, personal injury, clean-up costs, economic loss, loss of investment, lost profits, and any damages or fines assessed in pending or future proceedings involving the Spill.  In addition, Anadarko has suffered economic losses as a result of Transocean's gross negligence, including, *inter alia*, the loss of the reservoir, the loss of their investments, lost profits, and defense costs, including attorneys' fees.~~

~~WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages, doubled, against Transocean.~~

### ~~COUNT XVIII~~

### NEGLIGENCE AGAINST TRANSOCEAN - MARITIME LAW

28. ~~177.~~ Anadarko repeats and realleges ~~¶¶ 1-176~~ the allegations above.

29. ~~178.~~ Transocean owed duties to Anadarko to, *inter alia*, man, possess, manage, control, navigate, maintain, and operate the *Deepwater Horizon* with reasonable and ordinary care.

30. ~~179.~~ Transocean breached its duties to Anadarko by committing acts of negligence, or gross neglgigence, gross fault, and/or willful misconduct as may be established at trial based upon the evidence, and all such blameworthy conduct was within the privity or knowledge of Transocean's managers, as alleged more specifically above and in ~~the B1 Bundle~~ BPXP's Cross-Claims and Third-Party Complaint against Transocean.

31. ~~180.~~ Transocean's conduct was the proximate cause of foreseeable damage suffered by Anadarko, including claims made against it for liability for death, personal injury, clean-up costs, economic loss, loss of investment, lost profits, and any damages or fines assessed in pending or future proceedings involving the Spill.  In addition, Anadarko has suffered

economic losses as a result of Transocean's negligence, including, *inter alia*, the loss of the reservoir, the loss of its investments, lost profits, and defense costs, including attorneys' fees.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Transocean.

## COUNT ~~XIX~~II

### INDEMNITY IN TORT AGAINST TRANSOCEAN - MARITIME LAW

<u>32.</u>   ~~181.~~ Anadarko repeats and realleges ~~¶¶ 1-180~~<u>the allegations</u> above.

<u>33.</u>   ~~182.~~ The Blowout, the Spill, and the resulting damages were caused by the <u>negligence, or gross negligence</u>~~,~~ <u>and/or</u> willful misconduct ~~and/or negligence~~ of Transocean <u>as may be established at trial based upon the evidence,</u> and all such blameworthy conduct was within the privity or knowledge of Transocean's managers.

<u>34.</u>   ~~183.~~ Anadarko is without fault with respect to the Blowout and the Spill.  If Anadarko is found liable at all for damages in connection with the Blowout or the Spill, such liability will be purely vicarious, strict, and passive.

<u>35.</u>   ~~184.~~ Any and all damages assessed against Anadarko, whether vicariously or by operation of law, including without limitation any liability imposed in excess of the cap on liability provided for in the OPA, 33 U.S.C. § 2704, should be repaid by Transocean as a wrongdoer who owes indemnity to parties who are without fault.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Transocean.

## COUNT ~~XX~~III

### CONTRIBUTION AGAINST TRANSOCEAN - MARITIME LAW

<u>36.</u>   ~~185.~~ Anadarko repeats and realleges ~~¶¶ 1-184~~<u>the allegations</u> above.

<u>37.</u>   <u>Anadarko is without fault with respect to the Blowout and the Spill.  If Anadarko is found liable at all for damages in connection with the Blowout or the Spill, such liability will be purely vicarious, strict, and passive.</u>

38. ~~186.~~ ~~If Anadarko is found to have contributed to any damages suffered by Plaintiffs or the Third Party Plaintiffs, it~~Anadarko is entitled to contribution from Transocean, who bears a ~~significantly greater~~ proportional degree of fault for ~~any such damages~~Blowout and the Spill.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Transocean.

## COUNT ~~XXII~~IV

## CONTRIBUTION AGAINST TRANSOCEAN - OIL POLLUTION ACT

39. ~~187.~~ Anadarko repeats and realleges ~~¶¶ 1-190~~the allegations above.

40. ~~188.~~ The claims asserted in these proceedings require the Court to assess and allocate proportional responsibility among all defendants (if any) for the damages claimed by the plaintiffs.

~~189.   Anadarko has the right to appear before and be heard by the Court with respect to whether it bears any proportional responsibility for the damages claimed by the plaintiffs (which Anadarko denies) and, if so, in what amount.~~

~~190.   Anadarko also has the right and obligation to appear before and be heard by the Court to establish the proportional responsibility of Transocean in relation to the proportional responsibility (if any) of Anadarko.~~

~~191.   In the event Anadarko is found liable in any respect under the OPA, it is entitled under § 2709 of the OPA to contribution from Transocean in the amount of Transocean's proportional degree of responsibility for any damages assessed against them.~~

~~WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Transocean.~~

## ~~COUNT XXII~~

## ~~GROSS NEGLIGENCE AND WILLFUL MISCONDUCT AGAINST TRANSOCEAN - STATE LAW~~

~~192.   Anadarko repeats and realleges ¶¶ 1-191 above.~~

193.   In the event the Court rules that claims asserted in this action under state law are not preempted by federal law, Anadarko hereby alleges the following state law claim.

194.   Transocean owed duties to Anadarko to, *inter alia*, man, possess, manage, control, navigate, maintain, and operate the *Deepwater Horizon* with reasonable and ordinary care.

195.   Transocean's duties included an obligation to refrain from acts of gross negligence or wanton and willful misconduct.

196.   Transocean breached its duties to Anadarko by committing acts of gross negligence and willful misconduct in reckless disregard of the rights and safety of others, as alleged more specifically above and in the B1 Bundle Complaint and all such blameworthy conduct was within the privity or knowledge of Transocean's managers.

197.   Transocean's conduct was the proximate cause of foreseeable damage suffered by Anadarko, including claims made against it for liability for death, personal injury, clean-up costs, economic loss, loss of investment, lost profits, and any damages or fines assessed in pending or future proceedings involving the Spill.  In addition, Anadarko has suffered economic losses as a result of Transocean's gross negligence, including, *inter alia*, the loss of the reservoir, the loss of its investments, lost profits, and defense costs, including attorneys' fees.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages, doubled, against Transocean.

### COUNT XXIII

### NEGLIGENCE AGAINST TRANSOCEAN - STATE LAW

198.   Anadarko repeats and realleges ¶ ¶ 1-197 above.

199.   In the event the Court rules that claims asserted in this action under state law are not preempted by federal law, Anadarko hereby alleges the following state law claim.

200.   Transocean owed duties to Anadarko to, *inter alia*, man, possess, manage, control, navigate, maintain, and operate the *Deepwater Horizon* with reasonable and ordinary care.

- 40 -

201.    Transocean breached its duties to Anadarko by committing acts of negligence, as alleged more specifically above and in the B1 Bundle Complaint and all such blameworthy conduct was within the privity or knowledge of Transocean's managers.

202.    Transocean's conduct was the proximate cause of foreseeable damage suffered by Anadarko, including claims made against it for liability for death, personal injury, clean up costs, economic loss, loss of investment, lost profits, and any damages or fines assessed in pending or future proceedings involving the Spill.  In addition, Anadarko has suffered economic losses as a result of Transocean's negligence, including, *inter alia*, the loss of the reservoir, the loss of its investments, lost profits, and defense costs, including attorneys' fees.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Transocean.

### COUNT XXIV

### INDEMNITY IN TORT AGAINST TRANSOCEAN - STATE LAW

203.    Anadarko repeats and realleges ¶¶ 1-202 above.

204.    In the event the Court rules that claims asserted in this action under state law are not preempted by federal law, Anadarko hereby alleges the following state law claim.

205.    The Blowout, the Spill and the resulting damages were caused by the gross negligence, willful misconduct and/or negligence of Transocean.

41.    206. Anadarko is without fault with respect to the Blowout and the Spill.  If Anadarko is found liable at all for damages in connection with the Blowout or the Spill, including without limitation any liability imposed in excess of the cap on liability provided for in the OPA, 33 U.S.C. § 2704, such liability will be purely vicarious, strict, and passive.

207.    Any and all damages assessed against Anadarko, whether vicariously or by operation of law, should be repaid by Transocean as a wrongdoer who owes indemnity to parties who are without fault and whose blameworthy conduct was within the privity or knowledge of Transocean's managers.

~~WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Transocean.~~

~~**COUNT XXV**~~

~~**CONTRIBUTION AGAINST TRANSOCEAN - STATE LAW**~~

~~208.   Anadarko repeats and realleges ¶¶ 1-207 above.~~

~~209.   The claims asserted in these proceedings require the Court to assess and allocate proportional responsibility among all defendants (if any) for the damages claimed by the plaintiffs.~~

~~210.   Anadarko has the right to appear before and be heard by the Court with respect to whether it bears any proportional responsibility for the damages claimed by the plaintiffs (which Anadarko denies) and, if so, in what amount.~~

~~211.   Anadarko also has the right and obligation to appear before and be heard by the Court to establish the proportional responsibility of Transocean in relation to the proportional responsibility (if any) of Anadarko.~~

~~212.   33 U.S.C. § 2709 provides in relevant part that a person may bring a civil action for contribution against any other person who is liable or potentially liable under either the OPA "or another law."~~

<u>42.</u>   ~~213. In the event~~ Anadarko is found liable in any respect under the OPA, ~~it~~<u>Anadarko</u> is entitled ~~under state law pursuant to § 2709 of the OPA~~ to contribution from Transocean ~~in the amount of Transocean's~~, <u>who bears a</u> proportional degree of ~~responsibility for any damages assessed against them.~~<u>fault for Blowout and the Spill.</u>

<u>43.</u>   <u>In the event Anadarko is found liable for damages in any respect under the OPA, it is entitled under § 2709 of the OPA to contribution from Transocean in the amount of Transocean's proportional degree of responsibility for any damages assessed against them.</u>

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Transocean.

## ALLEGATIONS AS TO HALLIBURTON AND SPERRY

44.    ~~214.~~ Anadarko repeats and realleges ~~¶¶ 1-213~~the allegations above.

45.    ~~215.~~ Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations onboard the *Deepwater Horizon*, as well as onshore engineering support for those operations, which are critical to preventing well failures and blowouts.  Halliburton also provided technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo Well at and before the time of the Blowout, including but not limited to, the cement that was pumped into place behind the casing string and in the shoe track to isolate the hydrocarbons and seal the bottom of the well against the influx of hydrocarbons.

46.    ~~216.~~ Sperry was responsible for mud logging personnel and equipment on the *Deepwater Horizon*, including down-hole drilling tools.  Sperry's mud logging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud float in and out of the well, mud gas levels, and pressure fluctuations.

47.    ~~217.~~ Halliburton and Sperry owed ~~the Non-Operating Investors~~Anadarko a duty of reasonable and ordinary care in the performance of these responsibilities, including the duty to exercise reasonable care in conducting cementing, testing, analysis, and monitoring of the Macondo Well.

48.    ~~218.~~ Halliburton and Sperry's duty of care arose from their assuming responsibility for the complex, technical process of deepwater offshore drilling and related activities, their contractual obligations ~~to BP~~, their knowledge of the risks to life and property inherent in deepwater offshore drilling, federal and state regulations, and industry custom and practice.

49.    ~~219.~~ As alleged in more detail in ~~¶ 529 of the B1 Bundle Complaint and Transocean~~BPXP's Third-Party Complaint against Halliburton, Halliburton and its division Sperry committed acts of negligence, or gross negligence ~~and,~~ willful misconduct, and/or acted with reckless disregard of the rights and safety of others as may be established at trial based upon the evidence, all in breach of its duties to ~~the Non-Operating Investors~~Anadarko by, *inter alia*:

a.      failing to review properly the results of its own pre-job cement tests which, if properly reviewed, would have led Halliburton to redesign the cement used in the Macondo Well;

b.      performing the Macondo job without carefully reviewing laboratory foam stability data and without solid evidence that the foamed cement design would be stable;

c.      failing to require comprehensive lab testing to ensure the density and stability of the cement;

d.      recommending a cement design without conducting any formal internal review of that design;

e.      ~~acquiescing in BP's use of a cement product that had failed to pass any tests conducted by Halliburton prior to being used in the Macondo Well;~~

<u>e.</u>      ~~f.~~ selecting the pre-test conditioning time informally, choosing different conditioning times (ranging from no time to three hours) in each of the four foam stability tests without any stated explanation;

<u>f.</u>      ~~g.~~ assuming, without apparent scientific basis, that conditioning the base slurry before foaming was scientifically equivalent to foaming the cement then pumping it down the well;

<u>g.</u>      ~~h.~~ failing to exercise reasonable care in conducting its cementing, testing, analysis, and monitoring of the *Deepwater Horizon's* well and in guarding against or preventing the risk of an oil spill~~, including by failing to ensure adequate communication between personnel on the rig and its engineers in BP's Houston office~~;

<u>h.</u>      ~~i.~~ failing to recommend and carry out the proper design, modeling, placement, ~~and pumping of the cement and/or acquiescing in the improper use, placement,~~ and pumping of the cement in the Macondo Well at and before the time of the Blowout;

j.      ~~failing to recommend, require, or perform a full "bottoms up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards;~~

k.      ~~failing to heed the results of negative pressure testing which indicated that the cement job was defective;~~

- 44 -

l.     ~~acquiescing in the cancellation of the cement bond log test that would have determined the integrity of the cement job;~~

<u>i.</u>     ~~m.~~ missing signs of a kick during displacement of the riser with seawater which, if noticed, would have allowed the rig crew to shut in the well before hydrocarbons entered the riser and thereby prevented the Blowout; <u>and</u>

n.     ~~not being sufficiently alert to the possibility that a loss of well control might occur during the final displacement;~~

o.     ~~failing to recommend, deploy, and acquiescing in the decision not to deploy, the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below;~~

p.     ~~failing to recommend the use of and acquiescing in the decision not to use the proper number of centralizers;~~

<u>j.</u>     ~~q.~~ failing properly to monitor the Macondo Well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations~~; and~~

r.     ~~acquiescing to and participating in conducting premature mud displacement before sufficient evidence that the cement job properly had sealed the well~~.

<u>50.</u>     ~~220.~~ By making ~~or acquiescing to~~ these as well as other ~~reckless~~ decisions and/or <u>taking these as well as other</u> acts<u>,</u> Halliburton, and its division Sperry<u>,</u> acted with <u>negligence, or</u> gross negligence, willful misconduct, and<u>/or</u> reckless disregard of human life and the safety and health of the environment~~.~~

## ~~COUNT XXVI~~

### ~~GROSS NEGLIGENCE AND WILLFUL MISCONDUCT AGAINST HALLIBURTON AND SPERRY - MARITIME LAW~~

~~221.     Anadarko repeats and realleges ¶¶ 1-220 above.~~

222. ~~Halliburton and Sperry owed Anadarko a duty of reasonable and ordinary care in the performance of their responsibilities, including the duty to exercise reasonable care in conducting their cementing, testing, analysis, and monitoring of the *Deepwater Horizon's* well.~~

223. ~~Halliburton and Sperry's duties included an obligation to refrain from acts of gross negligence or willful misconduct.~~

224. ~~Halliburton and Sperry breached their duties to Anadarko by committing acts of gross negligence, willful misconduct, and by recklessly disregarding the rights and safety of others, as alleged more specifically above, in the B1 Bundle Complaint and in Transocean's Third Party Complaint.~~

225. ~~Halliburton and Sperry's conduct was the proximate cause of foreseeable damage suffered by Anadarko, including claims made against it for liability for death, personal injury, clean-up costs, loss of investment, lost profits, and any damages or fines assessed in pending or future proceedings involving the Spill.  In addition, Anadarko has suffered economic losses as a result of Halliburton and Sperry's gross negligence, including, *inter alia*, the loss of the reservoir, the loss of its investments, lost profits, and defense costs, including attorneys' fees.~~WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be ~~awarded its damages, doubled, against Halliburton and Sperry.~~ as may be established at trial based upon the evidence.

### COUNT ~~XXVII~~V

### NEGLIGENCE AGAINST HALLIBURTON AND SPERRY - MARITIME LAW

51. ~~226.~~ Anadarko repeats and realleges ~~¶¶ 1-225~~the allegations above.

52. ~~227.~~ Halliburton and Sperry owed Anadarko a duty of reasonable and ordinary care in the performance of their responsibilities, including the duty to exercise reasonable care in conducting its cementing, testing, analysis, and monitoring of the *Deepwater Horizon's* well.

53. ~~228.~~ Halliburton and Sperry breached their duties to Anadarko by committing acts of negligence, or gross negligence, willful misconduct, and/or reckless disregard as may be

established at trial based upon the evidence, as alleged more specifically above and in ~~the B1 Bundle~~BPXP's Third-Party Complaint against Halliburton.

54. ~~229.~~ Halliburton and Sperry's conduct was the proximate cause of foreseeable damage suffered by Anadarko, including claims made against it for liability for death, personal injury, clean-up costs, loss of investment, lost profits, and any damages or fines assessed in pending or future proceedings involving the Spill.  In addition, Anadarko has suffered economic losses as a result of Halliburton and Sperry's negligence, including, *inter alia*, the loss of the reservoir, the loss of its investments, lost profits, and defense costs, including attorneys' fees.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Halliburton and Sperry.

## COUNT ~~XXVIII~~VI

## INDEMNITY IN TORT AGAINST HALLIBURTON AND SPERRY - MARITIME LAW

55. ~~230.~~ Anadarko repeats and realleges ~~¶¶ 1-229~~ the allegations above.

56. ~~231.~~ The Blowout, the Spill, and the resulting damages were caused by the negligence, or gross negligence, and/or willful misconduct ~~and/or negligence~~ of Halliburton and Sperry as may be established at trial based upon the evidence.

57. ~~232.~~ Anadarko is without fault with respect to the Blowout and the Spill.  If Anadarko is found liable at all for damages in connection with the Blowout or the Spill, such liability will be purely vicarious, strict, and passive.

58. ~~233.~~ Any and all damages assessed against Anadarko, whether vicariously or by operation of law, should be repaid by Halliburton and Sperry as wrongdoers who owe indemnity to parties who are without fault.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Halliburton and Sperry.

## COUNT ~~XXIX~~VII

## CONTRIBUTION AGAINST HALLIBURTON AND SPERRY - MARITIME LAW

59. ~~234.~~ Anadarko repeats and realleges ~~¶¶ 1-233~~the allegations above.

235.     If Anadarko is found to have contributed to any damages suffered by Plaintiffs or the Third Party Plaintiffs, it is entitled to contribution from Halliburton and Sperry, who bear a significantly greater proportional degree of fault for any such damages.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Halliburton and Sperry.

### COUNT XXX

### GROSS NEGLIGENCE AND WILLFUL MISCONDUCT AGAINST HALLIBURTON AND SPERRY - STATE LAW

236.     Anadarko repeats and realleges ¶¶ 1-235 above.

237.     In the event the Court rules that claims asserted in this action under state law are not preempted by federal law, Anadarko hereby alleges the following state law claim.

238.     Halliburton and Sperry owed Anadarko a duty of reasonable and ordinary care in the performance of their responsibilities, including the duty to exercise reasonable care in conducting their cementing, testing, analysis and monitoring of the *Deepwater Horizon's* well.

239.     Halliburton and Sperry's duties included an obligation to refrain from acts of gross negligence and willful misconduct.

240.     Halliburton and Sperry breached their duties to Anadarko by committing acts of gross negligence and willful misconduct in reckless disregard of the rights and safety of others, as alleged more specifically above, in the B1 Bundle Complaint and in Transocean's Third Party Complaint.

241.     Halliburton and Sperry's conduct was the proximate cause of foreseeable damage suffered by Anadarko, including claims made against it for liability for death, personal injury, clean-up costs, loss of investment, lost profits, and any damages or fines assessed in pending or future proceedings involving the Spill.  In addition, Anadarko has suffered economic losses as a result of Halliburton and Sperry's gross negligence, including, *inter alia*, the loss of the reservoir, the loss of its investments, lost profits, and defense costs, including attorneys' fees.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages, doubled, against Halliburton and Sperry.

## COUNT XXXI

### NEGLIGENCE AGAINST HALLIBURTON AND SPERRY - STATE LAW

242. Anadarko repeats and realleges ¶¶ 1-242 above.

243. In the event the Court rules that claims asserted in this action under state law are not preempted by federal law, Anadarko hereby alleges the following state law claim.

244. Halliburton and Sperry owed Anadarko a duty of reasonable and ordinary care in the performance of their responsibilities, including the duty to exercise reasonable care in conducting its cementing, testing, analysis, and monitoring of the *Deepwater Horizon's* well.

245. Halliburton and Sperry breached their duties to Anadarko by committing acts of negligence, as alleged more specifically above, in the B1 Bundle Complaint and in Transocean's Third-Party Complaint.

246. Halliburton and Sperry's conduct was the proximate cause of foreseeable damage suffered by Anadarko, including claims made against it for liability for death, personal injury, clean-up costs, loss of investment, lost profits, and any damages or fines assessed in pending or future proceedings involving the Spill. In addition, Anadarko has suffered economic losses as a result of Halliburton and Sperry's negligence, including, *inter alia*, the loss of the reservoir, the loss of its investments, lost profits, and defense costs, including attorneys' fees.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Halliburton and Sperry.

## COUNT XXXII

### INDEMNITY IN TORT AGAINST HALLIBURTON AND SPERRY - STATE LAW

247. Anadarko repeats and realleges ¶¶ 1-246 above.

248. In the event the Court rules that claims asserted in this action under state law are not preempted by federal law Anadarko hereby allege the following state law claim.

249.   The Blowout, the Spill, and the resulting damages were caused by the gross negligence, recklessness, willful misconduct and/or negligence of Halliburton and Sperry.

60.   250. Anadarko is without fault with respect to the Blowout and the Spill.   If Anadarko is found liable at all for damages in connection with the Blowout or the Spill, such liability will be purely vicarious, strict, and passive.

251.   Any and all damages assessed against Anadarko, whether vicariously or by operation of law, should be repaid by Halliburton and Sperry as wrongdoers who owe indemnity to parties who are without fault.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Halliburton and Sperry.

### COUNT XXXIII

### CONTRIBUTION AGAINST HALLIBURTON AND SPERRY- STATE LAW

252.   Anadarko repeats and realleges ¶¶ 1-251 above.

253.   In the event the Court rules that claims asserted in this action under state law are not preempted by federal law, Anadarko hereby allege the following state law claim.

61.   254. If Anadarko is found to have contributed to any damages suffered by Plaintiffs or the Third Party Plaintiffs, it Anadarko is entitled to contribution from Halliburton and Sperry, who bear a significantly greater proportional degree of fault for any such damages the Blowout and Oil Spill.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Halliburton and Sperry.

### ALLEGATIONS AS TO M-I

62.   255. Anadarko repeats and realleges ¶¶ 1-254 the allegations above.

63.   256. M-I provided the *Deepwater Horizon* with the mud products essential to safe deepwater offshore drilling, including drilling fluids and spacers, engineering services, and mud supervisory personnel, such as mud engineers and drilling fluid specialists, to manage the properties of those fluids in the Macondo Well.  M-I employed, planned and/or supervised key

fluid activities concerning the Macondo Well, such as the mud displacement that was occurring at the time of the Blowout and the provision of "spacer" solution.

64.    257.  M-I owed ~~the Non Operating Investors~~Anadarko a duty of reasonable and ordinary care in the performance of the foregoing duties, including but not limited to, providing, controlling, and monitoring the mud and spacer solutions used on the *Deepwater Horizon*.

65.    258.  M-I's duty of care arose from its assuming responsibility for the complex, technical process of deepwater offshore drilling mud products, mud placement and related activities, its contractual obligations ~~to BP~~, its knowledge of the essential role that mud products and displacement play in protecting against the risks to life and property inherent in deepwater offshore drilling, federal and state regulations, and industry custom and practice.

66.    259.  As alleged in more detail in ~~¶ 532 of the B1 Bundle Complaint and Transocean's Third Party~~BPXP's Counter Complaint against M-I L.L.C., M-I breached its duties to ~~the Non Operating Investors by, *inter alia*:~~Anadarko.

> ~~a.    failing to provide, control, and monitor the mud and spacer solutions used on the *Deepwater Horizon* in a reasonably safe manner, including failing to object to the use of lost circulation material ("LCM") fluids as spacer, proximately causing and/or contributing to the damages incurred by the Non-Operating Investors;~~

> ~~b.    using an unconventional fluid mixture, and an unusually large volume of it, as "spacer" fluid.  This unusual composition and amount of fluid may have interfered with the negative pressure test results and/or caused damage or clogging in the BOP; and~~

> ~~c.    failing to assess or communicate that fluid and pressure levels indicated hydrocarbons were coming up the well.~~

~~COUNT XXXIV~~

~~GROSS NEGLIGENCE AND WILLFUL MISCONDUCT AGAINST M-I -
MARITIME LAW~~

~~260.    Anadarko repeats and realleges ¶¶ 1-259 above.~~

~~261.    M-I owed Anadarko a duty of reasonable and ordinary care in the performance of
its responsibilities, including but not limited to, providing, controlling, and monitoring the mud
and spacer solutions used on the *Deepwater Horizon*.~~

~~262.    M-I's duties included an obligation to refrain from acts of gross negligence or
willful misconduct.~~

~~263.    M-I breached its duties to Anadarko by committing acts of gross negligence and
willful misconduct, as alleged more specifically above, in the B1 Bundle Complaint and in
Transocean's Third-Party Complaint.~~

~~264.    M-I's conduct was the proximate cause of foreseeable damage suffered by
Anadarko, including claims made against them of liability for death, personal injury, clean-up
costs, loss of investment, lost profits, and any damages or fines assessed in pending or future
proceedings involving the Spill.  In addition, Anadarko has suffered economic losses as a result
of BP's gross negligence, including, *inter alia*, the loss of the reservoir, the loss of its
investments, lost profits, and defense costs, including attorneys' fees.~~

~~WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be
awarded its damages, doubled, against M-I.~~

~~COUNT XXXV~~

<u>COUNT VIII</u>

**NEGLIGENCE AGAINST M-I - MARITIME LAW**

<u>67.</u>    ~~265.~~ Anadarko repeats and realleges ~~¶¶ 1-264~~<u>the allegations</u> above.

<u>68.</u>    ~~266.~~ M-I owed Anadarko a duty of reasonable and ordinary care in the
performance of its responsibilities, including but not limited to, providing, controlling and
monitoring the mud and spacer solutions used on the *Deepwater Horizon*.

- 52 -

69. ~~267.~~ M-I breached its duties to Anadarko by committing acts of negligence, as alleged more specifically above, ~~in the B1 Bundle Complaint~~ and in ~~Transocean's Third Party~~BPXP's Counter Complaint against M-I L.L.C..

70. ~~268.~~ M-I's conduct was the proximate cause of foreseeable damage suffered by Anadarko, including claims made against it for liability for death, personal injury, clean-up costs, loss of investment, lost profits, and any damages or fines assessed in pending or future proceedings involving the Spill.  In addition, Anadarko has suffered economic losses as a result of ~~BP~~M-I's ~~gross~~ negligence, including, *inter alia*, the loss of the reservoir, the loss of its investments, lost profits, and defense costs, including attorneys' fees~~.~~

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against M-I.

## COUNT ~~XXXVII~~X

### INDEMNITY IN TORT AGAINST M-I - MARITIME LAW

71. ~~269.~~ Anadarko repeats and realleges ¶¶ ~~1-268~~the allegations above.

72. ~~270.~~ The Blowout, the Spill and the resulting damages were caused by the gross negligence, willful misconduct and/or negligence of M-I.

73. ~~271.~~ Anadarko is without fault with respect to the Blowout and the Spill.  If Anadarko is found liable at all for damages in connection with the Blowout or the Spill, such liability will be purely vicarious, strict, and passive.

74. ~~272.~~ Any and all damages assessed against Anadarko, whether vicariously or by operation of law, should be repaid by M-I as a wrongdoer who owes indemnity to parties who are without fault.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against M-I.

## COUNT ~~XXXVII~~X

### CONTRIBUTION AGAINST M-I - MARITIME LAW

75. ~~273.~~ Anadarko repeats and realleges ¶¶ ~~1-272 above.~~the allegations above.

274.    If Anadarko is found to have contributed to any damages suffered by Plaintiffs or the Third Party Plaintiffs, it is entitled to contribution from M-I who bears a significantly greater proportional degree of fault for any such damages.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against M-I.

### COUNT XXXVIII

### GROSS NEGLIGENCE AND WILLFUL MISCONDUCT AGAINST M-I - STATE LAW

275.    Anadarko repeats and realleges ¶¶ 1-274 above.

276.    In the event the Court rules that claims asserted in this action under state law are not preempted by federal law, Anadarko hereby alleges the following state law claim.

277.    M-I owed Anadarko a duty of reasonable and ordinary care in the performance of its responsibilities, including but not limited to, providing, controlling and monitoring the mud and spacer solutions used on the *Deepwater Horizon*.

278.    M-I's duties included an obligation to refrain from acts of gross negligence or willful misconduct.

279.    M-I breached its duties to Anadarko by committing acts of gross negligence and willful misconduct, as alleged more specifically above, in the B1 Bundle Complaint and in Transocean's Third Party Complaint.

280.    M-I's conduct was the proximate cause of foreseeable damage suffered by Anadarko, including claims made against it for liability for death, personal injury, clean-up costs, loss of investment, lost profits, and any damages or fines assessed in pending or future proceedings involving the Spill.  In addition, Anadarko has suffered economic losses as a result of BP's gross negligence, including, *inter alia*, the loss of the reservoir, the loss of its investments, lost profits, and defense costs, including attorneys' fees.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages, doubled, against M-I.

- 54 -

## COUNT XXXIX

### NEGLIGENCE AGAINST M-I - STATE LAW

281.   Anadarko repeats and realleges ¶¶ 1-280 above.

282.   In the event the Court rules that claims asserted in this action under state law are not preempted by federal law, Anadarko hereby alleges the following state law claim.

283.   M-I owed Anadarko a duty of reasonable and ordinary care in the performance of its responsibilities, including but not limited to, providing, controlling, and monitoring the mud and spacer solutions used on the *Deepwater Horizon*.

284.   M-I breached its duties to Anadarko by committing acts of negligence, as alleged more specifically above, in the B1 Bundle Complaint and in Transocean's Third Party Complaint.

285.   M-I's conduct was the proximate cause of foreseeable damage suffered by Anadarko, including claims made against it for liability for death, personal injury, clean-up costs, loss of investment, lost profits, and any damages or fines assessed in pending or future proceedings involving the Spill.  In addition, Anadarko has suffered economic losses as a result of M-I's negligence, including, *inter alia*, the loss of the reservoir, the loss of its investments, lost profits, and defense costs, including attorneys' fees.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against M-I.

## COUNT XL

### INDEMNITY IN TORT AGAINST M-I - STATE LAW

286.   Anadarko repeats and realleges ¶¶ 1-285 above.

287.   In the event the Court rules that claims asserted in this action under state law are not preempted by federal law, Anadarko hereby alleges the following state law claim.

288.   The Blowout, the Spill, and the resulting damages were caused by the gross negligence, willful misconduct and/or negligence of M-I.

289.—

76.     Anadarko is without fault with respect to the Blowout and the Spill.  If Anadarko is found liable at all for damages in connection with the Blowout or the Spill, such liability will be purely vicarious, strict, and passive.

~~290.     Any and all damages assessed against Anadarko, whether vicariously or by operation of law, should be repaid by M-I as a wrongdoer who owes indemnity to parties who are without fault.~~

~~WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against M-I.~~

~~COUNT XLI~~

~~CONTRIBUTION AGAINST M-I - STATE LAW~~

~~291.     Anadarko repeats and realleges ¶¶ 1-290 above.~~

~~292.     In the event the Court rules that claims asserted in this action under state law are not preempted by federal law, Anadarko hereby alleges the following state law claim.~~

~~293.     If Anadarko is found to have contributed to any damages suffered by Plaintiffs or the Third-Party Plaintiffs, it is entitled to contribution from M-I who bears a significantly greater proportional degree of fault for any such damages.~~

~~WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against M-I.~~

77.     Any and all damages assessed against Anadarko, whether vicariously or by operation of law, should be repaid by Halliburton and Sperry as wrongdoers who owe indemnity to parties who are without fault.

~~ALLEGATIONS AS TO WEATHERFORD~~

~~294.     Anadarko repeats and realleges ¶¶ 1-293 above and, upon information and belief, makes the following allegations against Weatherford.~~

295. Weatherford designed the casing components used by the *Deepwater Horizon*, such as the float collar, shoe, and centralizers, and provided the personnel and equipment for running the casing and casing components into the wellbore which contributed to the Blowout.

296. Weatherford owed duties of care to the Non-Operating Investors to, *inter alia*, exercise reasonable and ordinary care in the design and manufacture of the float collar.

297. Weatherford's duties to the Non-Operating Investors arose from undertaking to design and provide casing components and to provide personnel and equipment for the utilization of the casing components in deepwater offshore drilling operations known to be inherently dangerous to life and property, Weatherford's contractual relationship with BP, federal and state law, and industry custom and practice.

298. If, as alleged in ¶¶ 68-78 above, BP is not responsible for the failure to convert the float collar then, pursuant to Fed. R. Civ. P. 8(d)(3), Weatherford breached its duties to the Non-Operating Investors in designing, manufacturing, and supplying a float collar that failed to seal properly and which allowed hydrocarbon backflow into the casing, which proximately caused and/or contributed to the Blowout, explosions, fire, and Spill, resulting in damage to the Non-Operating Investors.

299. The float collar is a check valve device that is installed to prevent backflow or ingress of fluids into the casing. Well bore fluids, including cement, mud, formation fluids and hydrocarbons flowing into the casing from the bottom of the wellbore must pass through the float collar

300. On April 20, 2010, the Weatherford manufactured float collar did not seal properly, which allowed well bore fluids, including cement, mud, formation fluids to leak into the casing, contributing to the Blowout, explosions, fire, and Spill.

301. Weatherford's float collar failed to operate properly or at all, at the time of or following the Blowout, and this failure caused or contributed to the Blowout, explosions, fire, and Spill.

302. Weatherford's float collar was defective because it failed to operate as intended.

- 57 -

303.   The failure of Weatherford's float collar to operate as intended, if at all, proximately caused and contributed to the Blowout, explosions, fire, and Spill.

304.   Weatherford's float collar was defectively designed and/or manufactured such that it did not operate as intended to prevent well bore fluids, including cement, mud, formation fluids to leak into the well bore, which caused and/or contributed to the Blowout, explosions, fire, and Spill.

305.   Weatherford's float collar was in a defective condition and unreasonably dangerous to the Non-Operating Investors and others when it left Weatherford's control.

306.   At the time the float collar used at the *Deepwater Horizon* site left Weatherford's control, Weatherford knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

307.   At the time the float collar used at the *Deepwater Horizon* site left Weatherford's control, feasible design alternatives existed which would have, to a reasonable probability, prevented the harm suffered by the Non-Operating Investors without impairing the utility, usefulness, practicality, or desirability of the float collar.

308.   The Non-Operating Investors were foreseeable victims of the manifestation of the defects in the *Deepwater Horizon's* float collar.

309.   Weatherford had actual and/or constructive knowledge of the facts and circumstances relative to the float collar that caused or contributed to the Blowout, which in turn caused the Non-Operating Investors to incur damages, and Weatherford's actions and inactions were grossly negligent, negligent, reckless, and/or willful.   In the alternative, Weatherford is strictly liable for such damages

310.   As a result of manufacturing and/or defects in the Weatherford float collar, the Non-Operating Investors have suffered damage to and/or diminution of the value of their other property, loss of income, loss of business, inconvenience and/or loss of valuable resources, for which they are entitled to actual, compensatory, and punitive damages.

## COUNT XLII

### PRODUCTS LIABILITY AGAINST WEATHERFORD - MARITIME LAW

311.    Anadarko repeats and realleges ¶¶ 1-310 above.

312.    At all times relevant hereto, Weatherford was in the business of designing, manufacturing, marketing, selling, and/or distributing the float collar appurtenant to the vessel and used in connection with the drilling operations by the *Deepwater Horizon*.

313.    Anadarko was a foreseeable victim of the manifestation of the defects in the *Deepwater Horizon's* float collar.

314.    Weatherford had actual and/or constructive knowledge of the facts and circumstances relative to the float collar which caused or contributed to this incident, which in turn caused Anadarko to incur damages, and its actions and/or inactions were grossly negligent, reckless, and/or willful.

315.    If, as alleged in ¶¶ 68-78 above, BP is not responsible for the failure to convert the float collar then, pursuant to Fed. R. Civ. P. 8(d)(3), as a result of the defective design and/or manufacture of the float collar, Anadarko has suffered damage to or diminution of the value of its other property, loss of income, loss of business, inconvenience and/or loss of valuable resources, for which it is entitled to actual and compensatory damages.


WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Weatherford.

### COUNT XLIII

### INDEMNITY IN TORT AGAINST WEATHERFORD - MARITIME LAW

316.    Anadarko repeats and realleges ¶¶ 1-315 above.

317.    If, as alleged in ¶¶ 68-78 above, BP is not responsible for the failure to convert the float collar then, pursuant to Fed. R. Civ. P. 8(d)(3), the Blowout, the Spill, and the resulting damages were caused by the gross negligence, willful misconduct and/or negligence of Weatherford.

318. ~~Anadarko is without fault with respect to the Blowout and the Spill.  If Anadarko is found liable at all for damages in connection with the Blowout or the Spill, such liability will be purely vicarious, strict, and passive.~~

319. ~~Any and all damages assessed against Anadarko, whether vicariously or by operation of law, should be repaid by Weatherford as a wrongdoer who owes indemnity to parties who are without fault.~~

~~WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Weatherford.~~

### ~~COUNT XLIV~~

### ~~CONTRIBUTION AGAINST WEATHERFORD - MARITIME LAW~~

320. ~~Anadarko repeats and realleges ¶¶ 1-319 above.~~

321. ~~If Anadarko is found to have contributed to any damages suffered by Plaintiffs or the Third Party Plaintiffs, it is entitled to contribution from Weatherford who bears a significantly greater proportional degree of fault for any such damages.~~

~~WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Weatherford.~~

### ~~COUNT XLV~~

### ~~PRODUCTS LIABILITY AGAINST WEATHERFORD - STATE LAW~~

322. ~~Anadarko repeats and realleges ¶¶ 1-321 above.~~

323. ~~In the event the Court rules that claims asserted in this action under state law are not preempted by federal law Anadarko hereby alleges the following state law claim.~~

324. ~~At all times relevant hereto, Weatherford was in the business of designing, manufacturing, marketing, selling, and/or distributing the float collar appurtenant to the vessel and used in connection with the drilling operations by the *Deepwater Horizon*.~~

325. ~~Anadarko was a foreseeable victim of the manifestation of the defects in the *Deepwater Horizon's* float collar.~~

326.   Weatherford had actual and/or constructive knowledge of the facts and circumstances relative to the float collar which caused or contributed to this incident, which in turn caused Anadarko to incur damages, and its actions and/or inactions were grossly negligent, reckless, and/or willful.

327.   If, as alleged in ¶¶ 68-78 above, BP is not responsible for the failure to convert the float collar then, pursuant to Fed. R. Civ. P. 8(d)(3), as a result of the defective design and/or manufacture of the float collar, Anadarko has suffered damage to or diminution of the value of their other property, loss of income, loss of business, inconvenience and/or loss of valuable resources, for which it is entitled to actual and compensatory damages.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Weatherford.

### COUNT XLVI

### INDEMNITY IN TORT AGAINST WEATHERFORD - STATE LAW

328.   Anadarko repeats and realleges ¶¶ 1-327 above.

329.   In the event the Court rules that claims asserted in this action under state law are not preempted by federal law, Anadarko hereby alleges the following state law claim.

330.   If, as alleged in ¶¶ 68-78 above, BP is not responsible for the failure to convert the float collar then, pursuant to Fed. R. Civ. P. 8(d)(3), the Blowout, the Spill, and the resulting damages were caused by the gross negligence, willful misconduct and/or negligence of Weatherford.

331.   Anadarko is without fault with respect to the Blowout and the Spill.  If Anadarko is found liable at all for damages in connection with the Blowout or the Spill, such liability will be purely vicarious, strict, and passive.

332.   Any and all damages assessed against Anadarko, whether vicariously or by operation of law, should be repaid by Weatherford as a wrongdoer who owes indemnity to parties who are without fault.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Weatherford.

### COUNT XLVII

### CONTRIBUTION AGAINST WEATHERFORD - STATE LAW

333.   Anadarko repeats and realleges ¶¶ 1-332 above.

334.   In the event the Court rules that claims asserted in this action under state law are not preempted by federal law, Anadarko hereby alleges the following state law claim.

335.   If Anadarko is found to have contributed to any damages suffered by Plaintiffs or the Third Party Plaintiffs, it is to contribution from Weatherford who bears a significantly greater proportional degree of fault for any such damages.

WHEREFORE, Anadarko respectfully prays that judgment enter its favor and that it be awarded its damages against Weatherford.

### ALLEGATIONS AS TO CAMERON

336.   Anadarko repeats and realleges ¶¶ 1-335 above.

337.   At all times relevant hereto, Cameron was in the business of designing, manufacturing, marketing, selling, and/or distributing the BOP used in connection with the drilling operations onboard the *Deepwater Horizon*.

338.   Upon information and belief, if operating as intended on the night of the disaster, the BOP could have been manually or automatically activated before or immediately after the Blowout, cutting off the flow of oil at the wellhead, and limiting the Spill to a minute fraction of its ultimate severity and thereby sparing the Non-Operating Investors millions of dollars in losses and damage.

339.   Cameron manufactured the BOP in use at the Macondo Well on April 20, 2010.

340.   Upon information and belief, Cameron's BOP failed to operate properly or at all, at the time of or following the Blowout, and this failure caused and/or contributed to the Blowout, explosions, fire, and Spill.

341.   Upon information and belief, Cameron's BOP was in a defective condition and unreasonably dangerous to the Non-Operating Investors and others when it left Cameron's control.

342.   Upon information and belief, at all times, Cameron's BOP was used in the manner intended, or in a manner reasonably foreseeable and/or actually disclosed to Cameron prior to April 20, 2010.

343.   Upon information and belief, at the time the BOP left Cameron's control, it was in a defective condition unreasonably dangerous to the Non-Operating Investors and others in that it was designed and manufactured with over 260 known defects and failure modes, including but not limited to:

a.   inadequate, faulty, nonfunctioning and defective battery systems;

b.   inadequate, faulty, nonfunctioning, and defective dead man switches and related wiring;

c.   inadequate, faulty, nonfunctioning, and defective EDS;

d.   improperly sealed, leaky hydraulic systems;

e.   improperly designed, manufactured, and installed annular seals;

f.   insufficiently robust blind shear rams and insufficient emergency methods for closing the BOP;

g.   excessive reliance on an operational control pod as an emergency method of operating the BOP;

h.   excessive vulnerability of the blind shear rams to the failure of a single shuttle valve;

i.   insufficient warnings, instructions, and guidelines on permissible and foreseeable uses and modifications to the BOP and its component parts;

j.   insufficient testing and design verification of the BOP and its component parts to ensure the shearing capability of the ram and other functioning of the BOP during reasonably foreseeable uses; and

k.      in such other particulars as the evidence may show.

344.    Upon information and belief, at the time the BOP appurtenant to the *Deepwater Horizon* left Cameron's control, and at such times as Cameron modified the BOP, Cameron knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

## COUNT XLVIII

### PRODUCTS LIABILITY AGAINST CAMERON - MARITIME LAW

345.    Anadarko repeats and realleges ¶¶ 1-344 above.

346.    At all relevant times, the BOP appurtenant to the *Deepwater Horizon* was used in an intended and/or reasonably foreseeable manner.

347.    Anadarko was a foreseeable victim of the manifestation of the defects in the *Deepwater Horizon's* BOP.

348.    Cameron had actual and/or constructive knowledge of the facts and circumstances relative to the BOP which caused or contributed to this incident, which in turn caused Anadarko to incur damages, and its actions and/or inactions were grossly negligent, negligent, reckless, and/or willful.  In the alternative, Cameron is strictly liable for such damages.

349.    If, as alleged in above, BP and/or Transocean are not responsible for the failure of the BOP then, pursuant to Fed. R. Civ. P. 8(d)(3), as a result of the defective design and/or manufacture of the BOP, Anadarko has suffered damage to or diminution of the value of its other property, loss of income, loss of business, inconvenience and/or loss of valuable resources, for which it is entitled to actual and compensatory damages.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Cameron.

## COUNT XLIX

### INDEMNITY IN TORT AGAINST CAMERON - MARITIME LAW

350.    Anadarko repeats and realleges ¶¶ 1-349 above.

351.   If, as alleged in above, BP and/or Transocean are not responsible for the failure of the BOP then, pursuant to Fed. R. Civ. P. 8(d)(3), the Blowout, the Spill, and the resulting damages were caused by the gross negligence, willful misconduct and/or negligence of Cameron.

352.   Anadarko is without fault with respect to the Blowout and the Spill.  If Anadarko is found liable at all for damages in connection with the Blowout or the Spill, such liability will be purely vicarious, strict, and passive.

353.   Any and all damages assessed against Anadarko, whether vicariously or by operation of law, should be repaid by Cameron as a wrongdoer who owes indemnity to parties who are without fault.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Cameron.

## COUNT L

### CONTRIBUTION AGAINST CAMERON - MARITIME LAW

354.   Anadarko repeats and realleges ¶¶ 1-353 above.

355.   If Anadarko is found to have contributed to any damages suffered by Plaintiffs or the Third Party Plaintiffs, it is entitled to contribution from Cameron who bears a significantly greater proportional degree of fault for any such damages.

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Cameron.

## COUNT LI

### PRODUCTS LIABILITY AGAINST CAMERON - STATE LAW

356.   Anadarko repeats and realleges ¶¶ 1-355 above.

357.   In the event the Court rules that claims asserted in this action under state law are not preempted by federal law, Anadarko hereby alleges the following state law claim.

358.   At all relevant times, the BOP appurtenant to the *Deepwater Horizon* was used in an intended and/or reasonably foreseeable manner.

359.   Anadarko was a foreseeable victim of the manifestation of the defects in the ~~*Deepwater Horizon's* BOP.~~

360.   ~~Cameron had actual and/or constructive knowledge of the facts and circumstances relative to the BOP which caused or contributed to this incident, which in turn caused Anadarko to incur damages, and its actions and/or inactions were grossly negligent, reckless, and/or willful.~~

361.   ~~If, as alleged in above, BP and/or Transocean are not responsible for the failure of the BOP then, pursuant to Fed. R. Civ. P. 8(d)(3), as a result of the defective design and/or manufacture of the BOP, Anadarko has suffered damage to or diminution of the value of its other property, loss of income, loss of business, inconvenience and/or loss of valuable resources, for which it is entitled to actual and compensatory damages.~~

~~WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Cameron.~~

### ~~COUNT LII~~

### ~~INDEMNITY IN TORT AGAINST CAMERON - STATE LAW~~

362.   ~~Anadarko repeats and realleges ¶¶ 1-361 above.~~

363.   ~~In the event the Court rules that claims asserted in this action under state law are not preempted by federal law, Anadarko hereby alleges the following state law claim.~~

364.   ~~If, as alleged in above, BP and/or Transocean are not responsible for the failure of the BOP then, pursuant to Fed. R. Civ. P. 8(d)(3), the Blowout, the Spill, and the resulting damages were caused by the gross negligence, willful misconduct and/or negligence of Cameron.~~

365.   ~~Anadarko is without fault with respect to the Blowout and the Spill.  If Anadarko is found liable at all for damages in connection with the Blowout or the Spill, such liability will be purely vicarious, strict, and passive.~~

366.   ~~Any and all damages assessed against Anadarko, whether vicariously or by operation of law, should be repaid by Cameron as a wrongdoer who owes indemnity to parties who are without fault.~~

WHEREFORE, Anadarko respectfully prays that judgment enter in its favor and that it be awarded its damages against Cameron.

## COUNT LIII

### CONTRIBUTION AGAINST CAMERON - STATE LAW

367.   Anadarko repeats and realleges ¶¶ 1-366 above.

368.   In the event the Court rules that claims asserted in this action under state law are not preempted by federal law, Anadarko hereby alleges the following state law claim.

369.   If Anadarko is found to have contributed to any damages suffered by Plaintiffs or the Third Party Plaintiffs, it is entitled to contribution from Cameron who bears a significantly greater proportional degree of fault for any such damages.

WHEREFORE, Anadarko respectfully prays that judgment enter its favor and that it be awarded its damages against Cameron.

## JURY DEMAND

395.   Third Party Defendants and Plaintiffs in Cross Claims Anadarko Petroleum Corporation and Anadarko E&P Company LP hereby demand a jury on all issues so triable before the Court.M-I.

## PRAYER FOR RELIEF

WHEREFORE, Third-Party Defendants and Plaintiffs-in-Cross-Claim Anadarko Petroleum Corporation and Anadarko E&P Company LP respectfully pray that, after due proceedings, the Court enter judgment in their favor as set forth herein, grant their requests for general, equitable and legal relief, and enter such other relief as the Court deems just and proper.

Respectfully submitted,

DATED: ~~April 19, 2011~~ February 13, 2012            BINGHAM McCUTCHEN LLP

*/s/ James J. Dragna*
James J. Dragna
jim.dragna@bingham.com
Bingham McCutchen LLP
355 South Grand Avenue
Suite 4400
Los Angeles, California 90071-3106
Telephone (213) 680-6436
Facsimile (213) 680-8636

Ky E. Kirby
ky.kirby@bingham.com
David B. Salmons
david.salmons@bingham.com
Michael B. Wigmore
michael.wigmore@bingham.com
Warren Anthony Fitch
tony.fitch@bingham.com
Randall M. Levine
randall.levine@bingham.com
2020 K Street, NW
Washington, DC 20006-1806
Telephone (202) 373-6000
Facsimile (202) 373-6001

KUCHLER POLK SCHELL
WEINER & RICHESON, LLC

Deborah D. Kuchler, T.A. (La. Bar No. 17013)
dkuchler@kuchlerpolk.com
Janika Polk (La. Bar No. 27608)
jpolk@kuchlerpolk.com
Robert Guidry (La. Bar No. 28064)
rguidry@kuchlerpolk.com
1615 Poydras Street, Suite 1300
New Orleans, LA 70112
Tel: (504) 592-0691
Fax: (504) 592-0696