UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | : : : | MDL NO. 2179 |
| | : | SECTION J |
| THIS DOCUMENT RELATES TO: | : : | JUDGE BARBIER |
| 2:10-CV-02771 | : : | MAGISTRATE JUDGE SHUSHAN |
| | : | |

**UNITED STATES' OPPOSITION TO BP'S MOTION TO EXCLUDE
THE REPORTS AND TESTIMONY OF DR. ALAN R. HUFFMAN [DOCKET # 5426]**

BP has moved this Court to exclude the reports and testimony of Dr. Alan R. Huffman, the United States' expert on pore pressure issues. BP claims that Dr. Huffman "impermissibly reached conclusions of law and opined that BP violated numerous MMS regulations," and argues that Dr. Huffman's opinion with respect to the pressure integrity test "lacks evidentiary support and is unreliable." Doc. 5426 at 1.

BP's motion mis-characterizes Dr. Huffman's testimony. Rather than simply opining on ultimate legal issues, Dr. Huffman has offered expert testimony regarding his understanding of the MMS regulatory scheme, customs and practices in the industry, and BP's conduct at Macondo in the context of those customs, practices, and regulatory requirements. In forming his opinions, Dr. Huffman conducted an exhaustive review of the contemporaneous data, correspondence, and other information generated by the drilling parties – the very same information upon which Dr. Huffman would rely as a geologist advising his own clients about

1

the propriety of their own actions with respect to pore pressure/fracture gradient issues. The testimony of Dr. Huffman is thus within the bounds of permissible expert testimony; BP's motion should be denied.[1]

I.      **General Testimony From Expert and Industry Actors Regarding Regulatory Requirements Is Permissible To Assist the Trier Of Fact.**

In denying BP's previous Motion *in Limine* to Bar Fact or Opinion Testimony of Issues of Law, Doc. 5108, the Court held that "Dr. Huffman, as an expert on MMS regulations, may opine on whether a person's conduct is or is not in accord with the regulations." Doc. 5495 at 2.[2] This decision is consistent with Fifth Circuit precedent, and should guide the Court's determination in connection with the instant motion. *See, e.g., Huddleston v. Herman & MacLean*, 640 F.2d 534, 552 (5th Cir.1981), *aff'd in part, rev'd in part on other grounds*, 459 U.S. 375 (1983).

The cases cited by BP in support of its latest attempt to exclude the expert testimony of Dr. Huffman should not disturb the Court's previous determination. For example, BP now relies on *BNY Mellon, N.A. v. Affordable Holdings, Inc.*, Doc. 5426 at 3, where the court found that the expert report in question was "entirely devoid of a reference to or mention of industry standards related to the preparation of documents by corporations or corporate standards of care." No. 1:09CV226-SA-JAD, 2011 WL 2746301, at *1 (N.D. Miss. July 12, 2011). Here, Dr. Huffman's

---

[1] BP also claims that Dr. Huffman "impermissibly proffered an opinion regarding the M57B zone." *Id*. The United States asserts that Dr. Huffman was not retained to render an opinion on whether the M57B zone contained hydrocarbons. Indeed, when BP questioned Dr. Huffman about the M57B sand during his deposition, the attorney for the United States made it clear that such testimony was "beyond the scope" of Dr. Huffman's report. Deposition of Huffman at 606-607. The United States therefore does not object to limiting Dr. Huffman's testimony at trial to avoid opinions regarding whether the M57B zone contained hydrocarbons.

[2] The Court noted that "Dr. Huffman's opinion concerns whether or not a person's conduct violated the law (regulations)." *Id*.

report and testimony are replete with references to custom and practice in the oil drilling industry, distinguishing Dr. Huffman's testimony from an expert report that offers the trier of fact only legal conclusions. *See* Deposition of Huffman at 210 (explaining that his interpretation of the regulations is based on his industry "experience in working with operators").

BP's reliance on *In re Midland Enterprises, Inc.*, No. Civ. A. 00-3750, 2002 WL 31780156 (E.D. La. Dec 11, 2002), Doc. 5426 at 3, is similarly unavailing. In *Midland Enterprises*, the Court concluded that the expert "offer[ed] no objectively verifiable source or validation for his opinion" regarding the facts that gave rise to a regulatory violation. *Id*. In contrast, as set forth in his report, Dr. Huffman thoroughly analyzed the facts that gave rise to his opinions and only relied on the regulations to help "the Judge to understand the significance of the data and how it fits into that [regulatory] framework." Deposition of Huffman at 100.[3] Accordingly, Dr. Huffman should be permitted to testify about BP's compliance with the regulations, as this Court has already determined. Doc. 5495 at 2.

II.     **Dr. Huffman Reasonably Relied Upon the Type Of Data a Geophysicist Would Use To Form An Opinion About Whether BP Maintained a Safe Drilling Margin at Macondo.**

BP next argues that Dr. Huffman's opinion that BP performed invalid pressure integrity test "does not meet the admissibility standard." Doc. 5426 at 6. According to BP, Dr. Huffman's analysis of the pressure integrity tests is "unreliable because it is based primarily on a

---

[3]     Dr. Huffman explicitly centered the focus of his initial report on four factual issues: "(1) Did BP maintain a 'safe drilling margin' while drilling the Macondo well? (2) Did BP falsely report drilling margin information to MMS? (3) Did BP fail to disclose information to MMS that it was required to disclose before drilling ahead? (4) Were BP's drilling margin activities consistent with those of prudent operators?" Huffman Report at 5.

review of e-mail correspondence and lacks evidentiary support."[4]  *Id*.  On both points, BP's argument fails.

As an initial matter, Dr. Huffman's opinion is not based solely, or even primarily, on the e-mail that BP now challenges in its motion.  *See* Huffman Report at 32 ("BP internal documents *bolster* my conclusion that this test was most likely invalid and a re-test should have been performed.") (emphasis added).  Rather, Dr. Huffman relied upon geological and test data to reach his conclusions that the pressure integrity tests at the 13 5/8" and 9 7/8" shoes were not valid.  *See* Huffman Report at 31-32, 34-35; and *compare* Huffman Rebuttal Report at 10 ("As part of my analysis [of the pressure integrity tests], I undertook a detailed petrophysical analysis of the available well log data.") *with* Doc. 5426 at 7 (BP claims that "Dr. Huffman did not address the physical evidence showing that the tests did measure the strength of ten feet of new formation and were valid").  In fact, Dr. Huffman explained that he did not rely on internal e-mails if he "did not have the test data to go with it."  Huffman Deposition at 418.  Dr. Huffman explained further at his deposition that he was not making credibility determinations about the individuals who wrote e-mails about the pressure integrity tests, but "merely observing their statements and putting them into context of what [he saw] with the data."  Huffman Deposition at 107.  Thus, Dr. Huffman's conclusions about the validity of pressure integrity tests at the 13 5/8" and 9 7/8" shoes are based upon his independent analysis of the facts surrounding those tests and not, as BP contends, on BP's contemporaneous correspondence.

---

[4]  With respect to the pressure integrity test at the 13 5/8" shoe, BP cites two documents:  a March 23, 2010, e-mail from Martin Albertin to Mark Alberty and Randall Sant (TREX 3733) and a March 23, 2010, e-mail, from Brian Morel to Mark Hafle (TREX 1311).  With respect to the 9 7/8" shoe, BP refers to an Albertin e-mail from April 2, 2010 (TREX 1343) and an e-mail from Brian Morel on April 3, 2010 (TREX 3734).

Even if the Court were to find that Dr. Huffman's opinions about BP's interpretations of the pressure integrity tests are inadmissible, it need not disregard his ultimate conclusions about validity of the tests, conclusions that were based on objective data. In this case, Dr. Huffman relied on four main sources of objective information in assessing the validity of the pressure integrity tests: information from offset wells in the area; petrophysical data from the well logs; the shape of the pressure integrity test curve; and the predicted overburden pressure of the overlying rocks. *See* Huffman Report at 31-32, 34-35 and Huffman Rebuttal Report at 10, 13. Indeed, the email that BP references in the instant motion are exchanges between members of BP's own geophysical team discussing many of these same sources of information. *See* TREX 3733 (pore pressure/fracture gradient specialist Martin Albertin notes BP's pressure integrity test was "well above overburden"); TREX 2654 (pore pressure analyst Kate Paine notes the pressure integrity test was "above overburden"); TREX 1311 (wellsite geologist Gord Bennett suggests that the pressure integrity test curve "looked kinda odd"). Thus, insofar as BP's own drilling personnel were contemporaneously discussing these sources of information when making drilling decisions, it is entirely reasonable for Dr. Huffman to rely on these data sources to analyze and opine on drilling decisions after the fact.

To the extent that Dr. Huffman considered contemporaneous project correspondence at all, it was thus limited to the geophysical information set forth in such correspondence and to opinions expressed by BP's drilling engineers responsible for interpreting that data, in accordance with industry practice. Any argument that Dr. Huffman's opinion that was based on mere "speculation" is therefore baseless. *See* (Doc. 5426 at 5).

Moreover, to the extent that BP suggests the e-mails Dr. Huffman cited in his report are not sufficiently "technical" to require and/or support expert testimony, such an argument is belied by the documents themselves.[5] As one example, Martin Albertin's e-mail to Randall Sant and Mark Alberty on March 23, 2010, reads in part:

> We got a leakoff well above overburden at our last shoe. 13 5/8" shoe at 13145' TVDKB (at M72 approx), with only 5' of rat hole. Drilled to 13160' and performed LOT. Estimated OBG @ 13150 = 14.5 PPG. Shale PP = 12.3. Brumfield FG = 14.1. Poisson's Ratio FG = 13.9. Been scratching my head as to the origin: option 1: not a valid LOT, somehow performed another casing test? Option 2: OB-PP models wrong (tough to get OB and PP high enough to explain the test). Option 3: tectonic effects (we are between salt bodies, but they are far away (4-6 miles) and only normal faulting is observed). Option 4: tensile strength (seems far fetched given a likely high poisson's [sic] ratio shale).

TREX 3733 at 1-2. Although BP dismisses such evidence as mere correspondence not worthy of expert interpretation, the substance of the communications includes complex geophysical information that a layperson simply would not understand. *See* Deposition of Huffman at 446 (counsel for BP referred to this email as an "engineering science discussion"). For that reason, the Court should reject BP's broad arguments that the relevant e-mails are not sufficiently technical to require and/or advise expert testimony.

Finally, Dr. Huffman also relied on opinions expressed by BP's drilling engineers regarding the validity of the pressure integrity tests. Dr. Huffman explained that the "key here is for the operator doing the test to have confidence in its validity as an absolute fracture gradient."

---

[5] Doc. 5426 at 7 (citing *Tassin v. Sears, Roebuck & Co.*, 946 F.Supp. 1241, 1252-53 (M.D. La. 1996)). In *Tassin*, the court prohibited an expert from testifying about the conclusions he had reached, pointing out that the "correspondence and minutes from meetings" that the expert reviewed to reach his conclusions are not the kind of "technical" information that require expert testimony to make them understandable to a jury." *Id*. 946 F.Supp. at 1252-1253. By contrast, the documents that Dr. Huffman cites in his reports are highly technical.

Deposition of Huffman at 392. Dr. Huffman testified that, in his experience, if an operator expresses concern about the validity of a test, it is industry standard to retest. *Id*. at 447. Dr. Huffman testified that, when he worked at Exxon and Conoco, the drilling engineers ultimately made the decision about whether a pressure integrity test was valid. *Id*. at 494-5. As a result, Dr. Huffman relied on the drilling engineers' contemporaneous statements of the validity of the pressure integrity tests in rendering his opinion, just as he did in industry practice. *See id*. at 489-90. The Fifth Circuit has held that "deference ought to be accorded to the expert's view that experts in his field reasonably rely on such sources of information." *Greenwood Utils. Comm'n v. Miss. Power Co.*, 751 F.2d 1484, 1495 (5th Cir. 1985). Here the Court should show deference to Dr. Huffman's determination that these sources are important, and reject BP's contention that experts in Dr. Huffman's field do not typically rely on materials of this type.[6]

In the interest of brevity, the United States incorporates herein the legal standards under Fed. R. Evid. 702 applicable in bench trials, as set forth in the "United States' Opposition to BPs' Motion to Preclude Unreliable Opinions on the Failure of the Primary Cement Job," filed concurrently with this Opposition.

### III. CONCLUSION

For the foregoing reasons, the United States respectfully requests that BP's motion to exclude Dr. Huffman be denied.

---

[6] The e-mails between Mark Hafle and Brian Morel were the only information that provided Dr. Huffman with their insight as to the pressure integrity tests, as both drilling engineers invoked the Fifth Amendment.

Dated: February 14, 2012.

Respectfully submitted,

| | |
|---|---|
| IGNACIA S. MORENO | TONY WEST |
| Assistant Attorney General | Assistant Attorney General |
| Environment & Natural Resources Division | Civil Division |
| | |
| JAMES NICOLL | PETER F. FROST |
| Senior Counsel | Director, Torts Branch, Civil Division |
| NANCY FLICKINGER | Aviation & Admiralty Litigation |
| Senior Attorney | STEPHEN G. FLYNN |
| SARAH HIMMELHOCH | Assistant Director |
| Senior Attorney | MICHELLE T. DELEMARRE |
| DEANNA CHANG | SHARON K. SHUTLER |
| SCOTT CERNICH | JILL DAHLMANN ROSA |
| A. NATHANIEL CHAKERES | JESSICA SULLIVAN |
| JUDY HARVEY | JESSICA L. McCLELLAN |
| MATT LEOPOLD | MALINDA LAWRENCE |
| JEFFREY PRIETO | DAVID J. PFEFFER |
| GORDON YOUNG | ROBIN HANGER |
| ABIGAIL ANDRE | LAURA MAYBERRY |
| Trial Attorneys | BRIENA STRIPPOLI |
| | Trial Attorneys |
| /s/ Steven O'Rourke | U.S. Department of Justice |
| STEVEN O'ROURKE | Torts Branch, Civil Division |
| Senior Attorney | PO Box 14271 |
| U.S. Department of Justice | Washington, DC 20044 |
| Environmental Enforcement Section | (202) 616-4100 |
| PO Box 7611 | (202) 616-4002 fax |
| Washington, DC 20044 | |
| (202) 514-2779 | /s/ R. Michael Underhill |
| steve.o'rourke@usdoj.gov | R. MICHAEL UNDERHILL, T.A. |
| | Attorney in Charge, West Coast Office |
| | Torts Branch, Civil Division |
| | 7-5395 Federal Bldg., Box 36028 |
| | 450 Golden Gate Ave. |
| | San Francisco, CA 94102-3463 |
| | (415) 436-6648 |
| | (415) 436-6632 fax |
| | mike.underhill@usdoj.gov |

JAMES LETTEN
United States Attorney

SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
Hale Boggs Federal Building
500 Poydras St., Suite B-210
New Orleans, LA 70130

Attorneys for the UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 14th day of February, 2012.

/s/  Jill Dahlmann Rosa
U.S. Department of Justice