UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | : : : : | MDL NO. 2179 SECTION J |
| THIS DOCUMENT RELATES TO: | : : | JUDGE BARBIER |
| 10-4536 | : : | MAGISTRATE JUDGE SHUSHAN |

**RESPONSE OF THE UNITED STATES OPPOSING
BP'S MOTION TO LIMIT THE TESTIMONY OF GLEN BENGE [Doc. 5421]**

BP seeks to limit the opinions of the United States' cement expert, Glen Benge, to exclude his opinion that the BP engineers who designed the Macondo cement job were well-versed and knowledgeable in oil field cementing.

Perhaps at trial BP will argue that it assigned incompetent engineers to make cementing decisions such as: 1) using foam cement, 2) running a long-string casing, 3) drastically reducing the number of centralizers at the last minute without informing BP's cement contractor, 4) increasing the cement retarder concentration in the final cement slurry, and 5) limiting pre-cement job mud circulation in contravention of oil field best practices. And perhaps BP will argue that it empowered its engineers to make such decisions without being "well-versed" or "knowledgeable" in cementing. But these arguments are controverted by BP's own in-house cementing expert, Erick Cunningham, who testified that both Brian Morel, a "very bright young engineer," and Mark Hafle, "a senior deepwater drilling engineer," were "working on the [Macondo] cement design."[1] And, these arguments are controverted by Mr. Benge.

BP's motion should be denied because Mr. Benge applied his specialized knowledge and experience, obtained during his 34 years of work in oil field cementing, to an extensive record to

---
[1] Exhibit ("Exh.") A, Cunningham Dep. at 141:4-11.

1

arrive at his opinion that the BP engineers were well-versed and knowledgeable in cementing. In forming his expert opinions, Mr. Benge applied the same level of intellectual rigor that characterizes the practice of a cement expert in the oil field industry. As discussed herein, BP's contention that Mr. Benge should have used "scientific" methodology subject to "peer review" is simply irrelevant to Mr. Benge's testimony.

**I.   The challenged opinion: the BP well team was well-versed and knowledgeable in cementing and rejected the recommendations of BP's in-house cement expert and Halliburton (HESI).**

In his Expert Report, Mr. Benge states, "[t]he BP wells team was well versed in cementing," that they "were the final decision makers and were empowered to accept or reject the advice of both BP's internal cementing expert and Halliburton," and that the BP engineers "chose to accept risks when designing the cement job based on their awareness that remedial cementing work could be done at a later date." Exh. B, Benge Report at 1-2, 7-9.

Mr. Benge based his opinions on an extensive review of the record in this case – dozens of depositions and hundreds of BP and HESI documents, including emails and interview notes. *See* Exh. C, Benge Dep. at 575-578; Exh. D, Benge Reliance List. Among the testimony and multitude of documents Mr. Benge considered in developing his opinions were emails – emails that demonstrate the BP engineers understood oil field cementing and consciously accepted additional risks with their decisions. Understandably, BP would prefer that the Court not hear Mr. Benge's opinion that those risks were knowingly accepted by BP engineers experienced and knowledgeable in cementing.

For example, less than 24 hours before the production casing cement job was pumped, BP engineer Brian Morel instructed HESI to increase the retarder concentration in the cement slurry from eight gallons to nine gallons per hundred sacks of cement, having acknowledged the

added risk of doing so.[2]  This was after Mr. Morel had acknowledged the "added risks" of increasing the retarder concentration in an email to BP wells team leader John Guide:

> I would prefer the extra pump time with ***the added risk of having issues with the nitrogen***.  What are your thoughts?  There isn't a compressive strength development yet, so it's hard to ensure we will get what we need until it's done.[3]

In another instance, BP engineer Brett Cocales wrote to Brian Morel in reaction to BP's decision to use only six centralizers on the well:

> Even if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it.
>
> ***But, who cares, it's done, end of story, will probably be fine and we'll get a good cement job.***  I would rather have to squeeze than get stuck above the WH.  So Guide is right on the risk/reward equation.[4]

The foregoing emails are simply specific examples of the types of materials reviewed by Mr. Benge in formulating his opinions.  Other email correspondence shows BP overruling HESI on spacer volumes on a plug job,[5] discussing lost circulation additives for cement,[6] debating with HESI over pumping spacer behind the foam cement,[7] and debating internally whether to pump base oil ahead of the cement.[8]

BP's summary of the materials Mr. Benge considered in forming the opinions BP challenges is grossly inaccurate.  The United States submitted Mr. Benge's reliance list in this

---

[2] Exh. B, Benge Report at 21, TREX 1395 (Exhibit Bates No. is BP-HZN-MBI00128702.  Benge Report cites to identical document with Bates No. BP-HZN-2179MDL00250778).

[3] *Id*. at 21, BP-HZN-2179MDL00315248 (TREX 987) (emphasis added).

[4] *Id*. at 22, BP-HZN-MBI00128383 (TREX 1367) (emphasis added).

[5] *See id*. at 8-9, BP-HZN-2179MDL00244182 – 00244183, BP-HZN-2179MDL00244182 (TREX 7717).

[6] *See id.* at 9, BP-HZN-2179MDL00248960 (TREX 31001).

[7] *See id*. at 14-15, HAL_0010815 (TREX 733), BP-HZN-2179MDL00250637 (TREX 20010).

[8] *See id*. at 15, fn. 31, BP-HZN-2179MDL00282833 (TREX 1394).

matter on September 16, 2010. *See* Exh. D, Benge Reliance List.[9] Mr. Benge's reliance list includes not only the specific emails cited in his expert report,[10] but also it contains over 900 documents reviewed and considered by Mr. Benge in forming his opinions.

## II.  Applicable legal standard.

In the interest of brevity, the United States incorporates herein the legal standards under Fed. R. Evid. 702 applicable in bench trials, as set forth in the "United States' Opposition to BPs' Motion to Preclude Unreliable Opinions on the Failure of the Primary Cement Job," filed concurrently with this Opposition.

## III.  Mr. Benge's testimony concerning the cementing knowledge of the BP Macondo well team should be admitted as it is relevant and reliable.

BP challenges Mr. Benge's testimony on essentially two grounds: lack of competence and lack of scientific method. Both challenges are without merit as discussed below.

### A.  Mr. Benge is a highly qualified oil field cementing expert.

Mr. Benge is a world-recognized expert in oil field cementing. Indeed, BP's proffered cement expert, Ronald Crook, testified that Mr. Benge is one of the top oil field cementing experts in the world.[11] Mr. Benge has over 34 years of experience in oil field cementing. He has worked in every aspect of oil field cementing from shallow onshore wells to deepwater applications globally. Moreover, he has extensive experience with foam cement including

---

[9] Mr. Benge's reliance list was filed with the Court as part of the Reliance Exhibit List of the United States (Rec. Doc. 4039).

[10] This is in contrast to BP's cement expert, Ronald Crook, who had not reviewed all of the documents actually cited or footnoted in his expert report in this case, let alone many of the documents listed in his "considered" materials list (App. B to Crook's expert report). *See, e.g.*, Exh. E, Crook Dep. at 420:14-421:19, 504:16-505:20.

[11] *See* Exh. E, Crook Dep. at 407:14-19.

4

designing and managing the first offshore application of foam cement in 1995. He is recognized in the industry as a foam cementing expert.[12]

Mr. Benge began his career with Dowell, a division of Dow Chemical that provided oil field cementing services. In 1988, Mr. Benge went to work for Mobil Oil, and in 1992, he became a global cementing advisor. When Mobil merged with Exxon in 2000, he became ExxonMobil's Senior Technical Advisor for the company's global drilling operations, *i.e.*, ExxonMobil's global cement expert. In 2009, Mr. Benge became the Drilling Training Manager for ExxonMobil and served in that position until he retired in 2011.[13]

Of particular relevance to BP's erroneous description of Mr. Benge's expertise[14] is the fact that Mr. Benge worked with over 200 drilling engineers during his time at Mobil and ExxonMobil. While not directly supervising them, he regularly assessed the cementing competency of those engineers. *See* Exh. C, Benge Dep. at 569-570. He would assess their competency through conversations, email correspondence, and review of their cement programs (designs). *See id.* at 570-572. He developed opinions as to whether Mobil or ExxonMobil engineers were "well-versed" in cementing by reviewing their communications:

> Q. And in assessing the competency of those engineers, did you develop any opinions on whether the individual engineers were well versed in cementing?
>
> A. Yes, I would.
>
> Q. And how did you develop those – those opinions?

---

[12] *See id. See also* Exh. F, Calvert Dep. at 194:7-13.

[13] More details of Mr. Benge's extensive expertise, including association memberships and publications, are contained in his expert report. *See* Exh. B, Benge Report at 3-4 and Appendix A.

[14] In arguing that Mr. Benge lacks the expertise to assess the competency of the BP Macondo well team, BP focuses on a narrow sliver of Mr. Benge's expertise where he supervised cement lab personnel and ignores Mr. Benge's many years of experience as in-house cementing expert at Mobil and ExxonMobil where he worked with over 200 drilling engineers and assessed their competency in oil field cementing. *See* Exh. C, Benge Dep. at 568-575.

5

> A. Again, in -- and I was -- I'd be asked -- and I wasn't doing it as far as for a job analysis for that individual; I was -- I was asked to advise -- their supervisor, for example, would come to me and ask what's their competency in that particular -- in cementing because that was what it was. But we would assess -- and, again, I'm going to have to ask you to repeat your – your question. I'm sorry.
>
> Q. Sure. I was asking how you developed your opinions with regard to engineers as to –
>
> A. Right.
>
> Q. -- whether they were well versed in cementing.
>
> A. Oh, okay. Again, we would look at – one of the easiest ways is what types of questions they would ask, what the sophistication of their input into programs was, their understanding of -- of the programs, their performance in class. But a lot of it was through – through their communications. You can tell a lot of the sophistication of whether someone knows something or not just -- just based on some of their -- some of the quality of their communications.

Exh. C, Benge Dep. at 571-572.

Moreover, Mr. Benge was qualified to assess the cementing competency of engineers based on his own specialized experience. *See id*. at 570.[15] Mr. Benge applied his many years of experience in oil field cementing to evaluate the competency of the Mobil and ExxonMobil engineers. *See id*. at 572-573. Mr. Benge applied that same experience to the facts of this case to develop his opinion that the BP wells team was well-versed in cementing. *See id*. at 573-574.

### B.    Opinions can be based on experience and specialized knowledge, even if no "testing" or scientific method is involved.

BP's objection to Mr. Benge's testimony on the ground that his methodology was not subject to "testing" or "peer review" is inapposite. *See, e.g., Kirkland v. Marriott Int'l Inc.*, 416 F. Supp. 2d 480, 484 (E.D. La. 2006) (admitting testimony where expert gathered facts about the accident from the available physical evidence and testimony and evaluated facts based on his

---

[15] "Q. And do you think you are qualified to assess [the engineers'] competency with regard to cementing? A. Yes, I do. Q. And can you describe to me how you are qualified? A. Well, after 35 years of doing cement, of mentoring engineers, of teaching engineers and operations personnel, you get a -- you get a sense for -- for their ability to do that – to do that job."

extensive experience designing, inspecting, and maintaining elevators, where expert admitted to having done no tests, no mathematical calculations, and no experiments).  The nature and subject matter of Mr. Benge's testimony are not such that testing and peer review are relevant in determining whether his testimony is reliable.  *See U.S. v. Vicknair*, No. CRIM.A. 03-16, 2005 WL 1400443, at *5-6 (E.D. La. June 2, 2005) (finding that expert's extensive experience in and knowledge of international banking and trade practices and procedures applied to the alleged facts and supported his conclusion that the circumstances of transaction at issue were not consistent with a legitimate sale of promissory notes) (citing *Kumho Tire Co.*, 526 U.S. at 150; *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 244 (5th Cir. 2002); Fed. R. Evid. 702 Advisory Comm.'s Note (2000).  *See also Pipitone,* 288 F.3d at 245-50 (admitting expert testimony of infectious disease specialist that a contaminated syringe had infected the plaintiff with salmonella where expert reviewed relevant literature and applied his specialized knowledge, but did not conduct experiments or epidemiological studies); *Kumho Tire Co.*, 526 U.S. at 156 (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience").

    Notably, this Court explained as follows in *Schmidt v. MTD Products, Inc.*:

As Judge Vance reasoned in *Kirkland v. Marriott International Inc.*, 416 F. Supp. 2d 480, 484 (E.D. La. 2006), the Advisory Committee note to Rule 702 of the Federal Rules of Evidence explains that testimony from an expert whose reliability is based primarily on his or her personal observations, professional experience, education, and training may be admissible. That committee note provides:

> Nothing in this amendment is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training or education may not provide sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.

>Fed. R. Evid. 702, Advisory Committee's Note.  Also, in *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002), the Fifth Circuit concluded that when an expert's testimony is based on specialized knowledge, experience, training, and firsthand observation and is also supported by solid evidence in the scientific community, it is admissible – even without testing.

*Schmidt v. MTD Products, Inc.*, No. 04-3412, 2006 WL 5127539, *2 (E.D. La. July 5, 2006) (Barbier, J.) (finding expert's testimony was reliable and relevant, and "that his reasoning and methodology [were] drawn from the facts of the case *and* his expertise, making his testimony admissible") (emphasis in original).

Mr. Benge's opinions regarding the conduct of the BP Macondo team are analogous to expert testimony by law enforcement officers admitted pursuant to Fifth Circuit authority in drug trials.  The Fifth Circuit has noted a "well-established" rule that "'an experienced narcotics agent may testify about the significance of certain conduct or methods of operation unique to the drug distribution business,' as such testimony helps the trier of fact understand the evidence." *Vicknair*, 2005 WL 1400443, at *4 (allowing testimony with respect to certain standards, practices and procedures in transactions involving promissory notes because it would assist the jury in determining whether the transaction  lacked the hallmarks of a legitimate transaction and whether the transaction was designed to conceal or disguise the source of the purchase funds) (quoting *United States v. Buchanan*, 70 F.3d 818, 832 (5th Cir.1995)).

Similarly, Mr. Benge's opinions on BP's cementing competence are contemplated by Rule 702.

>[Rule 702] requires that the testimony must be the product of reliable principles and methods that are reliably applied to the facts of the case. While the terms "principles" and "methods" may convey a certain impression when applied to scientific knowledge, they remain relevant when applied to testimony based on technical or other specialized knowledge. ***For example, when a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the***

8

> ***agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.***

Fed. R. Evid. 702, Advisory Comm.'s Note (2000) (emphasis added).

Here, Mr. Benge applied his education, knowledge, and 34 years of experience in the specialized field of oil field cementing – including his oversight of engineers performing the same tasks as those employed by BP on the Macondo well – to analyze the record in this case and draw reliable conclusions. *See e.g., Pipitone*, 288 F.3d at 245-50; *Schmidt*, 2006 WL 5127539 at *2; *Kirkland*, 416 F. Supp. 2d at 484; *Vicknair*, 2005 WL 1400443, at *6.

Finally, while BP objects to certain bases of Mr. Benge's opinions, *e.g.*, emails among the BP Macondo engineers and HESI, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1077 (5th Cir. 1996). The Fifth Circuit has ruled that "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Id.* at 1078. BP is clearly entitled to put forth as much evidence as it would like at trial to show that the very engineers BP charged and trusted with designing the Macondo cement job were incompetent in cementing.

As demonstrated above, this is not one of those "exceptions" where exclusion of expert testimony is appropriate. See Fed. R. Evid. 702, Advisory Comm.'s Note (2000). Mr. Benge's opinions do not exceed the bounds of *Daubert* and will aid the trier of fact in his search for the truth. *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004). For the reasons set forth herein, the Court should deny BP's motion to limit the expert testimony of Mr. Benge.

Dated  February 14, 2012                                          Respectfully Submitted:

IGNACIA S. MORENO                                                 TONY WEST
Assistant Attorney General                                        Assistant Attorney General
Environment & Natural Resources Division                          Civil Division

JAMES NICOLL                                                      PETER F. FROST
Senior Counsel                                                    Director, Torts Branch, Civil Division
NANCY FLICKINGER                                                     Admiralty and Aviation
Senior Attorney                                                   STEPHEN G. FLYNN
SARAH HIMMELHOCH                                                  Assistant Director
Senior Litigation Counsel                                         MICHELLE DELEMARRE
DEANNA CHANG                                                      SHARON SHUTLER
SCOTT CERNICH                                                     JESSICA SULLIVAN
A. NATHANIEL CHAKERES                                             JESSICA MCCLELLAN
JUDY HARVEY                                                       DAVID PFEFFER
MATT LEOPOLD                                                      MALINDA LAWRENCE
ABIGAIL ANDRE                                                        Trial Attorneys
Trial Attorneys

<u>/s/ Steven O'Rourke</u>                                        <u>/s/ R. Michael Underhill</u>
STEVEN O'ROURKE                                                   R. MICHAEL UNDERHILL, T.A.
Senior Attorney                                                   Attorney in Charge, West Coast Office
Environmental Enforcement Section                                 Torts Branch, Civil Division
U.S. Department of Justice                                        U.S. Department of Justice
P.O. Box 7611                                                     7-5395 Federal Bldg, Box 36028
Washington, D.C. 20044                                            450 Golden Gate Avenue
Telephone: 202-514-2779                                           San Francisco, CA 94102-3463
Facsimile: 202-514-2583                                           Telephone: 415-436-6648
E-mail: steve.o'rourke@usdoj.gov                                  Facsimile: 415-436-6632
                                                                  E-mail: mike.underhill@usdoj.gov

JIM LETTEN
United States Attorney
SHARON SMITH
Assistant United States Attorney
Eastern District of Louisiana
Hale Boggs Federal Building
500 Poydras Street, Ste. B-210
New Orleans, LA 70130

Attorneys for the UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 14th day of February, 2012.

                              /s/  Steve O'Rourke
                              U.S. Department of Justice