UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | : : : : | MDL NO. 2179  SECTION J |
| THIS DOCUMENT RELATES TO: | : : | JUDGE BARBIER |
| 10-4536 | : | MAGISTRATE JUDGE SHUSHAN |

**UNITED STATES' OPPOSITION TO BP'S MOTION TO PRECLUDE UNRELIABLE OPINIONS ON THE FAILURE OF THE PRIMARY CEMENT JOB (DOC. 5435)**

The United States respectfully requests that this Court deny BP's Motion to Preclude Unreliable Opinions on the Failure of the Primary Cement Job ("BP's Motion"). [Doc. 5435]

**INTRODUCTION**

BP's Motion seeks to exclude expert opinions that the BP Macondo well team's decisions "*may have*" increased the risk of failure to the primary cement job. BP's motion should be denied as to the United States' cement expert, Glen Benge, for two reasons. First, Mr. Benge's opinions are relevant based on Federal Rule of Evidence 702's "helpfulness" standard because they are founded on "valid scientific connection[s] to the pertinent inquir[ies]," and will "assist the trier of fact to understand the evidence or determine a fact in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591-92 (1993).

Second, Mr. Benge's opinions are not speculative; in his opinion, BP's decisions virtually assured that the cement integrity would be compromised. In any event, even "speculative" expert opinions are not *per se* inadmissible. Under Rule 702, courts may admit expert opinions based on *Daubert*'s flexible reliability inquiry. *Daubert*, 509 U.S. at 588; *Runnels v. Tex.*

1

*Children's Hosp. Select Plan*, 167 Fed. Appx. 377, 381 (5th Cir. 2006) (citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999)).  Therefore, proponents of expert testimony "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, … [only] that their opinions are reliable." Fed. R. Evid. 702 Advisory Comm's Note (2000) (quoting *In re Paoli R.R. Yard PCB Litigation*, 35 F. 3d 717, 744 (3d Cir. 1994)); *see also Tug DANIELLE M. BOUCHARD v. Oryx Energy Co., Inc.*, No. A. 98-485, 2001 WL 709301, at *3 (E.D. La. June 25, 2001).

Mr. Benge offered none of the "barstool" opinions about which BP complains.  He did not opine that the BP well team's decisions "may have" caused the blowout; rather, he concluded that "[t]he job design was inadequate for the cement to be placed properly in the well.  Poor centralization, use of the base oil pre-flush, limited pre-job circulation and low pump rates ***virtually assured the cement integrity would be compromised***."[1]  And BP's own cement expert agrees with Mr. Benge.

Mr. Benge's opinions should be admitted under Federal Rules of Evidence 401 and 702.  He used his expertise and experience to draw conclusions about BP's cementing decisions based on the analysis of facts and data relevant to this case.  Surely BP's own expert would not have testified that he agreed with these opinions if—as BP contends—the opinions are neither relevant nor reliable.[2]

---

[1] Exhibit ("Exh.") A, Benge Expert Report at 3.

[2] Alternatively, Mr. Benge's opinions should be admitted because this is a bench trial, which allows the Court greater leeway to hear evidence.  For discussion of the *Daubert* standard as it relates to bench trials, *see* United States' Opposition to BP's Motion to Limit the Testimony of Glen Benge, filed contemporaneously herewith, at 10.

**ARGUMENT AND CITATION OF AUTHORITY**

I. **Applicable legal standard.**

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. Fed. R. Evid. 702; *see Daubert*, 509 U.S. at 588; *United States v. Hitt*, 473 F.3d 146, 158 (5th Cir. 2006). Notwithstanding *Daubert* and its progeny, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Comm.'s Note (2000). Every *Daubert* factor need not be satisfied for expert opinions to be admitted; the standard is a flexible one that allows a court to admit testimony it finds reliable and relevant. *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *see Runnels v. Tex. Children's Hosp. Select Plan*, 167 Fed. Appx. 377, 381 (5th Cir. 2006) (citing *Kumho Tire Co.*, 526 U.S. at 150; *Schmidt v. MTD Prod., Inc.*, No. 04-3412, 2006 WL 5127539, at *2 (E.D. La., July 5, 2006) (Barbier, J.). Therefore, "[b]oth the determination of reliability itself and the factors taken into account are left to the discretion of the district court consistent with its gatekeeping function under [Rule] 702." *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000).

Moreover, where, as here, the matter is to be tried to the bench, BP's motion should be denied unless the expert's testimony clearly exceeds the bounds of the *Daubert* standard. As this Court held in *Thompson v. Rowan Companies, Inc.*, No. 06-3218, 2007 WL 724646 (E.D. La. March 6, 2007) (Barbier, J.):

> ... the purpose of [a] *Daubert* motion is "to ensure that only reliable and relevant expert testimony is presented to the jury." *Rushing v. Kansas City Southern Ry. Co.*, 185 F.3d 496, 506 (5th Cir. 1999) (superseded by rule on other grounds), citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590–93, 1113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Thus, "[m]ost of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury." *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir.2000). "*Daubert* requires a binary choice – admit or exclude – and a judge in a bench trial should have discretion to admit questionable technical evidence, though of course he must not give it more weight than it deserves."

>   *SmithKline Beecham Corp. v. Apotex Corps.*, 247 F. Supp. 2d 1011, 1042 (N.D.Ill.2003).

*Thompson*, at * 1.  *See also Deville v. Comar Marine Corp.*, No. 08-4104, 2009 WL 1870896 (E.D. La. June 25, 2009) (Barbier, J.).  Thus, even were this motion a close call, BP's motion should be denied.

## II. Mr. Benge's opinions about the BP Macondo well team's decisions are relevant and should be admitted.

BP's Motion suggests that the opinions offered by Mr. Benge are irrelevant under Rule Rule 702 because they purportedly do not satisfy the Rule's "helpfulness" requirement.  This is inapposite.  Federal Rule of Evidence 401 "defines relevant evidence as that which has 'any tendency to make any fact… more probable or less probable than it would be without the evidence.'"  *Mathis v. Exxon Corp.*, 302 F.3d 448, 459 (5th Cir. 2002).  To meet the relevance standard, expert testimony must only "assist the trier of fact to understand or determine a fact in issue."  *Bocanegra v. Vicmar Serv., Inc.*, 320 F.3d, 581, 584 (quoting *Daubert*, 509 U.S. at 591-92).  In its motion, BP attacks Mr. Benge's opinions on the very decisions it made that contributed to the failure of the Macondo cement job to isolate hydrocarbons in the well.  Mr. Benge's opinions regarding the BP well team's decisions to (1) limit pre-cement job circulation, (2) use an exceptionally low volume of cement, and (3) limit the cement job pump rate, are supported by scientific analysis and will aid the Court in deciding issues of fact and drawing legal conclusions.  BP's Motion presents no arguments pertaining to the relevance of Mr. Benge's opinions that counsel for their preclusion.

### a. Expert's opinions need not be based on scientific certainty to be admissible.

BP proposes a test for reliability that would exclude as "speculative" virtually all expert opinions in this case.  Unknown or uncertain facts underlying an expert's opinion generally

"affect the weight to be assigned that opinion rather than its admissibility." *United States v. 14.38 Acres of Land, More or Less Situated in Leflore County, State of Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (rejecting as reversible error the district court's exclusion of expert testimony concerning the possible but uncertain extent of future flooding) (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)); *see also Bocanegra v. Vicmar Services, Inc.*, 320 F.3d at 589-90 (finding that the district court erred by excluding expert who reached his opinion that defendant's driving ability was impaired by drug use without knowing the specific quantity of drug ingested). Therefore, while BP's complains about the allegedly "speculative" nature of expert opinions in this case may counsel for closer consideration of such opinions' significance, it does not warrant their exclusion.

The admissibility of an expert's opinion is not based on his certainty, but his expertise, methods, and the reliability of the facts and data underlying such opinions: "[W]hen an expert's testimony is based on specialized knowledge, experience, training, and firsthand observation and is also supported by solid evidence in the scientific community, it is admissible – even without testing." *Schmidt*, 2006 WL 5127539 at * 2 (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245-50 (5th Cir. 2002)). Indeed, testing is not a prerequisite for expert opinions. For example, in *Kirkland v. Marriott Int'l Inc.*, the court admitted the expert's opinions even though the expert admitted to having done no tests, no mathematical calculations, and no experiments and defendants asserted that the expert performed no fieldwork, no measurements, and no outside research to reach his conclusions. 416 F. Supp. 2d 480, 484 (E.D. La. 2006). The court deemed the elevator expert's opinion reliable not because the expert was absolutely certain of his conclusions, but because his "reasoning and methodology [were] drawn from the facts of the

5

case and his expertise gained from thirty years of testing, designing, and inspecting elevators." *Id*. at 488.

In *Pipitone*, the court found that a specialist in infectious diseases who concluded that a contaminated syringe had infected the plaintiff with salmonella was sufficiently qualified to offer expert testimony. 288 F.3d at 245-49. The expert reached his conclusions by reviewing the available literature, applying his knowledge about the way in which the salmonella organism functions, and ruling out other explanations because they were highly improbable given the facts of that plaintiff's case. *Id*. The expert did not perform any experiments to test his beliefs, and the court accepted his explanation that an epidemiological study would not have been "necessary or appropriate in a case such as this." *Id*. at 246.[3]

Here, Mr. Benge applied his 34 years of experience and extensive technical expertise in oil field cementing to conclude that the BP well team's decisions to limit pre-job circulation, cement volume, and cement pump rates did, in fact, compromise the Macondo cement job. He did not speculate.

> b. *Mr. Benge's opinions concerning the BP Macondo well team's decisions are reliable and should be admitted.*

The fact that Mr. Benge testified that a factor "may have contributed to the incident" has no bearing on the relevance or reliability of his testimony. *See e.g. Tug DANIELLE M. BOUCHARD*, 2001 WL 709301 at *3 (admitting expert's testimony that a motor brake "possibly

---

[3] BP misrepresents the *Pipitone* court's exclusion of a different expert than the one discussed *supra*. 288 F.3d at 244-45. The court excluded this second expert's opinion that "it was as likely as not" that the syringe contained the salmonella bacteria as irrelevant because the opinion was "perfectly equivocal," and therefore did not make "any fact more or less probable." 288 F.3d at 245 (citing Fed. R. Civ. P. 401). In quoting the Fifth Circuit's opinion, BP omits the phrase "perfectly equivocal" and cites the decision for "affirming the exclusion of expert testimony that failed to show causation," (BP Motion at 2), but that misrepresents the holding. The expert was excluded because he had no opinion, not because his conclusions failed to prove causation. 288 F.3d at 245.

could" have failed). Mr. Benge's opinions are reliable and admissible because they are "based on specialized knowledge, experience, training, and firsthand observation and are also supported by solid evidence in the scientific community…." *Schmidt*, 2006 WL 5127539 at * 2 (citing *Pipitone*, 288 F.3d at 245-50). As explained in his report and supported by his reliance list, Mr. Benge's opinion that the BP well team's decision to forego a full bottoms-up circulation,[4] its use of "an exceptionally low volume of cement for the Macondo production string,"[5] and the slow rate at which the cement was pumped,[6] "virtually assured" that cement integrity would be compromised,[7] was based on his professional training, experience, and thorough analysis of relevant facts and data.

Mr. Benge has over 34 years of experience in oil field cementing. He has worked in every aspect of oil field cementing, from shallow onshore wells to deepwater applications globally, and for world renowned companies like Dow Chemical and ExxonMobil. He is recognized in the industry as one of the top oil field cementing experts in the world.[8] Mr. Benge *knows* what decisions compromise cement jobs. In fact, he wrote an article with BP cement expert Ronald Crook entitled, "Eight Steps Ensure Successful Cement Jobs," which states that "the basic factors engineers and operators must consider for successful cementing jobs have not changed in more than 50 years."[9] Upon listing the eight steps, Messrs. Benge and Crook write:

---

[4] Exh. A, Benge Report at 21-22.

[5] *Id.* at 19.

[6] *Id.* at 25.

[7] *Id.* at 3.

[8] *See* Exh. B, Crook Dep. at 407:14-19; Exh. A, Benge Report at 3-4, A-1 – A-5 (containing details of Mr. Benge's extensive expertise, including association memberships and publications).

[9] Exh. C, Ronald J. Crook, Glen Benge, Ronnie Faul, and Richard R. Jones, *Eight Steps Ensure Successful Cement Jobs*, OIL & GAS J., July 2, 2001, at 37 (TREX 7443).

>The industry *has conducted numerous projects over the years to validate* the importance of these factors. The projects have also *provided quantitative data* for more precisely defining the recipe for good zone isolation.[10]

Among the eight factors listed in the article are adequate pre-job circulation and maximum pump rates. Regarding circulation, the article states that "drilling fluid condition is the most important variable in achieving good displacement during a cement job" and instructs to "circulate the drilling fluid to help break the gel structure of the fluid" and that, "[a]fter the casing is on bottom and before the displacement begins, circulating the mud decreases its viscosity and increases its mobility."[11] Regarding pump rates, the article states that "[h]igh-energy flow in the annulus is most effective to ensure good mud displacement" and "best cementing results are obtained when the spacer and cement are pumped at maximum energy[.]"[12] Moreover, BP's cement expert, Ronald Crook, recently testified that he agrees with Mr. Benge:

>Q: In your review of all of the materials in this case, did you ever see any evidence, deposition testimony, or documentation that BP considered the risks of – well, first, you – you would – you would agree with me that – that running fewer than the number of recommended centralizers did increase risk on this cement job; is that right? …
>
>A: It had the potential for increased risk, yes, sir.
>
>Q: (By Mr. Cernich) Okay. And that not circulating bottoms up would increase the risks on this cement job? …
>
>A: It goes against good industry practices, yes, sir….
>
>Q: (By Mr. Cernich) And – and by doing so, it would increase the risk; is that right?...
>
>A: Potential for increasing the risk, yes, sir.[13]

Mr. Crook also testified that the BP well team's decision to pump a small amount of tail cement

---

[10] *Id.* (emphasis added).

[11] *Id.*

[12] *Id.* at 41.

[13] Exh. B, Crook Dep. at 460:22-461:20; *see also* Exh. B, Crook Dep. at 251:9-252:6.

8

was "unusual,"[14] while BP's Cementing Sector Specialist, Daryl Kellingray, stated in a June 26, 2010 email to Kent Corser that he was surprised by the BP Macondo well's cement design, in light of "the total… volume being so small."[15]

In sum, Mr. Benge's opinions about BP's cement design are neither equivocal nor speculative. BP's own expert shares Mr. Benge's views on the risks inherent in BP's decisions to limit pre-job circulation as well as the use of a low cement volume and slow pump rates. Indeed, Mr. Crook testified that he agreed with all of the opinions in Mr. Benge's Expert Report, except as to whether the cement was set at the time of the negative pressure test.[16] Mr. Benge's expert opinions are reliable based on the standards outlined in *Schmidt*, 2006 WL 5127539 at * 2, *Pipitone*, 288 F.3d at 245-50, and *Kirkland*, 416 F. Supp. 2d at 484, and are therefore admissible under Rule 702.

## CONCLUSION

BP's Motion is neither legally supported nor factually accurate. Federal Rule of Evidence 702 provides for expert testimony by "a witness qualified as an expert by knowledge, skill, experience, training, or education" if "the testimony is based on sufficient facts or data." It does not exclude opinions about what "may have" happened as long as those opinions are relevant and reliable. By expressing factually supported opinions that were formed using extensive experience and expertise, Mr. Benge's expert report and testimony satisfy the requirements of Rule 702.

---

[14] Exh. B, Crook Dep. at 525:18-526:19.

[15] *See* Exh. D, Kellingray Dep. at 124:17-125:8 and Exh. E, TREX 225.

[16] Exh. B, Crook Dep. at 405:5-406:4. When told that the compressive strength tests conducted on the Macondo well cement slurry were based on incorrect data and did not accurately reflect well hole conditions, Mr. Crook reversed his opinion and agreed that "the foam cement at the bottom of the Macondo Well may not have been set...." *See* Exh. B, Crook Dep. at 519:21-520:2.

For the foregoing reasons, the United States respectfully requests that BP's Motion be denied and that Glen Benge's opinions on the failure of the primary cement job be admitted.

Dated: February 14, 2012

Respectfully Submitted:

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

JAMES NICOLL
Senior Counsel
NANCY FLICKINGER
Senior Attorney
SARAH HIMMELHOCH
Senior Litigation Counsel
DEANNA CHANG
SCOTT CERNICH
A. NATHANIEL CHAKERES
JUDY HARVEY
MATT LEOPOLD
ABIGAIL ANDRE
Trial Attorneys

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-514-2779
Facsimile: 202-514-2583
E-mail: steve.o'rourke@usdoj.gov

JIM LETTEN
United States Attorney
SHARON SMITH
Assistant United States Attorney
Eastern District of Louisiana
Hale Boggs Federal Building
500 Poydras Street, Ste. B-210
New Orleans, LA 70130

Attorneys for the UNITED STATES OF AMERICA

TONY WEST
Assistant Attorney General
Civil Division

PETER F. FROST
Director, Torts Branch, Civil Division
   Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
MICHELLE DELEMARRE
SHARON SHUTLER
JESSICA SULLIVAN
JESSICA MCCLELLAN
DAVID PFEFFER
MALINDA LAWRENCE
   Trial Attorneys

/s/ R. Michael Underhill
R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg, Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone: 415-436-6648
Facsimile: 415-436-6632
E-mail: mike.underhill@usdoj.gov

10

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 14th day of February, 2012.

                                                           /s/ Steve O'Rourke
                                                          U.S. Department of Justice