UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | : | |
| OF MEXICO, ON APRIL 20, 2010 | : | SECTION J |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| 10-4536 | : | JUDGE BARBIER |
| | : | |
| | : | MAGISTRATE JUDGE SHUSHAN |

............................................................................................................................................

**UNITED STATES' OPPOSITION TO CAMERON'S MOTION TO EXCLUDE
BOP SHEAR RAM DESIGN OPINIONS OFFERED BY THE UNITED STATES'
EXPERTS, TALAS ENGINEERING, INC. (Doc. 5412)**

Cameron International Corporation moves to exclude the opinions of the United States' engineering experts – Rory Davis, J. Neil Robinson, Patrick Novak and Raymond Merala (collectively the "Talas group" or "Talas team") – on three narrow issues: 1) whether alternative designs for the blind shear ram were available; 2) whether offset pipe and the resulting shearing issues of the blind shear ram were foreseeable; and 3) whether the blind shear ram would have sealed had the AMF/deadman functioned at or near the time of the explosion. Cameron's motion should be denied as the Talas team's opinions are relevant, reliable, and based on a plethora of facts and data. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993) (trial court must ensure that expert opinions are relevant and reliable).[1]

**I.     Experience in Designing or Manufacturing Blowout Preventers is Not Necessary for the Opinions of the Talas Group to be Relevant and Reliable.**

Cameron argues that the Talas group is not qualified to offer expert opinions on BOP ram design, foreseeability of conditions inside the BOP, or sealing capability of the ram BOPs

---

[1] In the interest of brevity, the United States incorporates herein the legal standards under Fed. R. Evid. 702 (and *Daubert*) applicable in bench trials, as set forth in the United States' Opposition to BP's Motion to Preclude Unreliable Opinions on the Failure of the Primary Cement Job, filed concurrently with this Opposition.

because the members of the Talas group "lack the requisite knowledge, skill, experience, training or education" in BOPs.  Memorandum in Support of Cameron's Motion to Exclude BOP Shear Ram Design Opinions Offered by the United States' Experts, Talas Engineering, Inc. ("Mem.") at 5.  In support of its argument, Cameron points to the fact that the team members have not been involved in the design or operation of a BOP, have not been employed by a manufacturer of BOPs and do not have experience in deepwater drilling operations.  Mem. at 4-5.  However, experience with BOPs is not necessary in order for the opinions of the Talas group to be relevant, reliable, and helpful to the trier of fact.

The forensic analysis of the BOP and the conclusions reached by the members of the Talas group requires training, experience, knowledge and skill not with BOPs, but in *physics and engineering*, specifically mechanical and materials engineering as well as forensic analysis. The BOP is a hydro-mechanical device with electro-mechanical back-up control systems designed to shut in wells.  Members of the Talas group have designed and manufactured solenoid valves (some of which are in use in petroleum production today), developed and tested prototypes, analyzed hydraulic systems, and performed thermal, stress, and fatigue analysis on metallic and composite hardware.  Expert Report of Talas Engineering, Inc. ("Talas Report") at 43. Between the four members of the Talas group, there are over 130 years of mechanical engineering, materials engineering, and forensic engineering experience.  Dr. Davis and the other members of the Talas group are more than qualified to offer opinions on the design capabilities of the blind shear ram, whether the drill pipe moving off-center was foreseeable, and the likelihood of success in sealing the well had the blind shear rams functioned at or near the time the AMF/deadman was activated.

A.     Engineering Principles Remain the Same from Object to Object

Cameron's own expert agrees that BOP-specific training or experience is not a prerequisite to opining on matters related to the BOP. Clifton Knight, one of Cameron's experts who opines on, among other things, the cause of the off-center drill pipe, testified that his lack of experience with BOPs was not problematic because he has performed fluid dynamics and finite element analysis ("FEA") work on components more complex than BOP components. Exh. 1, Deposition of Clifton Knight at 136. Dr. Davis and the rest of the Talas group are highly qualified engineers with skills, training and experience running the gamut from the aerospace industry to the fluid power industry to accident reconstruction and forensic engineering. Their knowledge, experience, education and skills allow them to work on matters as diverse as designing medical equipment, to designing mining equipment, to assisting in the development of the Titan rocket. Talas Report at 39-40, 49.

The calculations and analyses performed by the Talas group are common aspects of a mechanical engineer's job. While the object the calculations and analyses are applied to may change, the calculations and analyses themselves remain the same. As explained by Mr. Merala:

> An engineer working in the area of accident reconstruction and failure analysis applies laws of physics and principles of engineering to a systematic analysis of the evidence associated with a particular accident and the circumstances associated with that accident. These engineering principals and laws of physics are not bounded by industry – motor vehicles, recreational equipment, an industrial equipment component or piece of equipment, and a BOP stack all abide by the same engineering principals and laws of physics.

Talas Report at 19.

For example, Dr. Davis calculated the amount of upward force on the drill pipe as part of his analysis of the cause of the drill pipe being off-center. Rebuttal Report of Talas Engineering, Inc. ("Talas Rebuttal Report") at 4-8, 25-33. As he explained during his deposition, these are the

3

same types of calculations used in analyzing forces exerted by fluids on other types of pipe, which he has done "many times." Exh. 2, Deposition of Rory R. Davis at 189-90. Based on those calculations, Dr. Davis concluded that the amount of upward force that would be exerted on the drill pipe from the fluids inside the drill pipe was not sufficient to cause the bending or buckling of the drill pipe, and therefore, that Transocean's theory that flow-induced forces caused the drill pipe to become off-center was flawed. Talas Report at 15. These are basic engineering principles and calculations that are applied regardless of whether one is studying the flow in the drill pipe in a BOP or propellants in a rocket engine. Exh. 2, Davis Dep. at 190. The same is true of the other analyses performed by the Talas team in formulating their opinions.

  B. <u>Dr. Davis and the Other Members of the Talas Group Have a Significant Amount Of Experience With the Deepwater Horizon's BOP.</u>

The Talas group was present at Michoud as part of the BOP Technical Working Group ("TWG") from day one. As members of the TWG, the Talas group members "provid[ed] technical input to how the work was being done" and evaluated the results of that work. *Id*. at 31-32. As Dr. Davis testified, there was nearly always at least one person from Talas present during the forensic examination of the BOP. *Id*. at 25-26. As members of the TWG, the Talas group was involved in developing testing protocols for the entire BOP stack, including components such as solenoids and batteries and evaluating the results of those tests. *Id.* at 31-35. The Talas group members personally and directly inspected and analyzed the pieces of the drill pipe, blind shear rams and ram blocks. The Talas team's first-hand interaction with, and observation of, the BOP over the course of nearly six months of Phase I and Phase II investigation, and subsequent examinations and analyses, give the Talas group more than sufficient experience and working knowledge of the BOP to formulate reliable opinions that will assist the trier of fact.

   C. <u>Applying Cameron's Analysis to Its Own Experts Would Result in Disqualification of At Least One of Them</u>.

It bears mentioning that, under Cameron's view, at least one of its own expert witnesses would be excluded from testifying under *Daubert*. Clifton Knight is an expert retained on behalf of Cameron to evaluate the expert reports of, among others, the Talas group relating to the BOP. Mr. Knight has not designed any blow out preventer components, has not designed blowout preventer systems, has not provided support to offshore drilling operations, does not have work experience relating to blowout preventers. Exh. 1, Knight Dep. at 22-23. Although Mr. Knight has no history working with BOPs, *id*. at 135, was not part of the TWG involved in the forensic examination of the *Deepwater Horizon's* BOP, and only saw pieces of the drill pipe or rams on a single occasion after they had been "taped up," *id.* at 140-41, Cameron relies on him to opine on BOP matters including the sealing ability of the BSRs with the pipe buckled or bent. *Id*. at 137. If the lack of prior work experience with BOPs is enough to disqualify an expert, Mr. Knight should be prevented from testifying on behalf of Cameron.

**II.** **Talas's Methodology in Forming The Opinion that Alternative Designs Existed was Reliable**.

Cameron attacks the methods employed by the Talas team in concluding that available alternative designs would have increased the likelihood of the blind shear ram functioning as designed. Mem. at 5. However, the Talas team's opinions are based on information, specifications and testimony that Cameron itself has provided regarding available alternative technologies. Cameron cites to a New Jersey District Court opinion for the proposition that an expert must have "some evidentiary basis for concluding that an alternative design actually exists and would work in the application." Mem. at 5, citing *Milanwicz v. The Raymond Corp*., 148 F.Supp.2d 525, 535 (D.N.J. 2001). The alternative designs propounded by the Talas team meet

5

that standard – not only do the alternative designs exist, they are manufactured and sold by Cameron for use in BOPs (including the BOP on the *Deepwater Horizon*), and have been for years.

The Talas group concluded that the blind shear ram on the *Deepwater Horizon's* BOP was unable to shear the pipe because the rig drifted, causing the drill pipe to move off-center in the BOP. The SBR-type blind shear ram used in the *Deepwater Horizon's* BOP had very limited ability to center the pipe and the shearing blade did not extend across the full width of the well bore. Once the drill pipe was off-center it was outside the reach of the shearing blade. Talas Report at 15. Thus, Talas concludes that "if the rams were either capable of centering the pipe or had blades the full width of the well bore, the pipe would probably have been cut. . . ." *Id.*

Cameron takes issue with the Talas team's opinion that the SBR-type blind shear ram in the *Deepwater Horizon's* BOP could not center pipe as effectively as other models of blind shear rams, claiming that those opinions were "based on no methodology or scientific principles." Mem. at 6. No methodology or scientific principles were needed for the Talas team to arrive at that conclusion because it is both obvious to any engineer and admitted by Cameron. Cameron's Engineering Bulletin entitled Shear Ram Product Line describes their "Double 'V' Ram" or DVS ram as featuring two "'V' shaped cutting edges. . . ."[2] Exh. 5, TREX 3183, Cooper Cameron Corp., *Engineering Bulletin EB 852D: Shear Ram Product Line*, October 30, 1998 at CAM_CIV_0003203, CAM_CIV_0003210. David McWhorter, Cameron's Vice President of Engineering and Quality for Cameron's Drilling Systems Division and Cameron's sole Rule

---

[2] That bulletin also states that the shearing force required with the DVS rams is less than on the SBR ram and that the width of the blades on the DVS ram are wider than those on the SBR ram. *Id*.

6

30(b)(6) designee on the design, testing, and performance of Cameron's BOP components testified regarding the effect of the double "V" blades on centering pipe as follows:

> **Q. Okay. Would the DVS system help [center the drill pipe in the BOP]?**
> A. The DVS has two Vs, as you pointed out earlier.
> **Q. Correct.**
> A. So –
> **Q. That's the reason I'm asking.**
> A. Right. So it would -- it would necessarily have a -- a greater tendency to center by virtue of its second V, and the blades are slightly wider.

Exh. 3, Deposition of David McWhorter at 140-41. Even though the improved centering ability of the DVS ram is recognized by Cameron, Dr. Davis calculated the centering forces of the SBR ram and the DVS ram. This engineering analysis confirmed that the DVS ram was better able to center pipe than the SBR. Talas Rebuttal Report at 17 and Att. 3 thereto. All of the assumptions and information related to those calculations are provided in Attachment 3 to the Talas group's rebuttal report.

Cameron's reliance on cases such as *Milanwicz* and *Watkins* for the proposition that the Talas team was required to establish that the alternative design would have controlled the Macondo well is misplaced. Both of those cases involved allegedly defective products, and expert witnesses who merely identified conceptual alternative designs that did not exist either in the market place or as a prototype. *See Milanowicz*, 148 F.Supp.2d at 539 ("if an expert seeks to base his conclusions on the existence of products incorporating his proposed alternative, he must corroborate his assertions by identifying these products, their manufacturers, and the extent of their use") and *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 992 (5th Cir. 1997) (expert excluded where he did not make any design drawings or conduct any tests of his proposed alternative technology). These cases are a far cry from the instant matter, where the Talas team relied on the design specifications and testimony provided *by Cameron*, relating to *Cameron* products that

are specifically designed and marketed for use in Cameron BOPs such as the one on the *Deepwater Horizon*. *See Willis v. Kia Motors Corp.*, 2009 WL 1974563 (N.D. Miss. July 8, 2009) (distinguishing *Watkins* and other cases where the alternative design was merely a concept rather than a design currently utilized).

Cases such as *Milanowicz* and *Watkins* are inapposite in situations where the alternative design is more than just a concept. The Talas team based their conclusions regarding available alternative blind shear rams on information obtained directly from Cameron and used their own calculations and engineering analyses to confirm the statements of Cameron. The only way the Talas team could have used unreliable methodologies to conclude that there were better alternatives is if Cameron used unreliable methodologies in designing, testing and marketing its products or if Cameron provided unreliable and inaccurate information in its design and marketing materials.

### IV. The Talas Team's Conclusion that Off-Center Drill Pipe Was Foreseeable is Also Properly Supported

Cameron argues that the Talas team's conclusion that the off-center drill pipe was foreseeable is "unsupported." Mem. at 7. Again, however, the deposition testimony of its own employees provides all the support that is needed, and confirms that drill pipe becoming off-center during a well control event is something that is well-known throughout the industry. As Cameron's Vice President for Engineering and Quality testified:

> **Q. Can the pipe be in the wellbore and be outside the cutting edges of the blades?**
> A. It -- it can.
> **Q. Okay. Why would that be a good design?**
> A. If the -- the BOP is -- was de -- or the ram was designed and -- and everyone who uses the ram understands that -- that the blade is a finite width, and that managing the pipe before you shear the pipe is an essential part of shearing the pipe in any kind of well control operation.
> **Q. Okay. Managing the pipe before you shear the pipe is an essential part of any well control operation. Did I hear you right?**

>    A. That's -- that's what I said.
>    **Q. M-h'm. And that's Cameron's position?**
>    A. I think that that's the industry's position.

Exh. 3, McWhorter Dep. at 141.  Similarly, Cameron's Director of Engineering

Technology , Melvyn Whitby confirmed that off-center pipe was foreseeable:

>    **Q.   Has Cameron had any discussions about modifying the blade configuration for the SBR blind shear ram design?**
>    A.   Not that I'm aware of.
>    **Q.   Has Cameron conducted any computer modeling to evaluate whether the drill pipe could fall outside the shearing blade surfaces for the SBR design blind shear rams?**
>    A.   The wellbore is -- is 18-3/4 inches.  The blades are less than that.  Okay?  The industry is aware of the limitations.  Because of the geometry of the nature of the ram, it's -- it's evident that -- that if a pipe was physically and solidly restrained, then a sealing and shearing problem could be anticipated.

Exh. 4, Deposition of Melvyn Whitby at 341.  Cameron's own testimony provides more than

enough support for the Talas team's conclusions that off-center drill pipe is something that is

foreseeable and well known in the industry.

## V.     The Talas Team's Opinion That the Blind Shear Rams Would Likely Have Sealed Is Reliable and Fully Supported.

Cameron's final criticism of the Talas group's report lies in their opinion that had the

AMF/Deadman functioned as designed, the blind shear ram would have operated as it was

intended and shut in the well.[3]  Mem. at 8-9.  According to Cameron, this opinion is unsupported

and the Talas team's "analysis was nonexistent."  Mem. at 9.

This is simply not true.  Cameron neglects to mention that Dr. Davis analyzed the

pressure differential across the drill pipe at the time AMF should have functioned and

determined that it was well within the differential that size and grade pipe could handle.  Talas

Rebuttal Report at 16.  Moreover, the Talas group performed an analysis of the flow conditions

---

[3] Cameron's position is odd, as it seems to imply that the blind shear rams that it sells to its customers are not capable of performing the tasks they are designed to do.

9

at the time of the explosions, and found that at that time of the explosion, there would be no flow in the drill pipe because it was closed on top, and near-zero annular flow because the variable bore ram was closed. Exh. 2, Davis Dep. at 43; Talas Rebuttal Report at 14. Other tests and analyses were considered but not performed because the team members were not satisfied that the results obtained would be accurate or reliable. It is clear that the Talas team's conclusions that the blind shear ram would likely have successfully sealed the well if operated at or near the time of the blow out are based on valid and reliable engineering tools and analyses.

## VI. CONCLUSION

Cameron's attempt to exclude the opinions of the Talas team regarding shear ram design and the foreseeability of off-center drill pipe must fail. The Talas team consists of four highly qualified mechanical and materials engineers who are more than qualified to offer opinions regarding the shear ram design and the effect of hydrocarbons in the drill pipe. Even if there were some question as to the reliability of the Talas group's opinion, those questions should go to the weight of the testimony, not the admissibility of their opinions. The United States respectfully requests that Cameron's motion to exclude the Talas group be denied.

Dated: February 14, 2012                                   Respectfully submitted,

| | |
|---|---|
| IGNACIA S. MORENO | TONY WEST |
| Assistant Attorney General | Assistant Attorney General |
| Environment & Natural Resources Division | Civil Division |
| | |
| JAMES NICOLL | PETER F. FROST |
| Senior Counsel | Director, Torts Branch, Civil Division |
| NANCY FLICKINGER | Aviation & Admiralty Litigation |
| Senior Attorney | STEPHEN G. FLYNN |
| SARAH HIMMELHOCH | Assistant Director |
| Senior Attorney | MICHELLE T. DELEMARRE |
| DEANNA CHANG | SHARON K. SHUTLER |
| SCOTT CERNICH | JILL DAHLMANN ROSA |
| A. NATHANIEL CHAKERES | JESSICA SULLIVAN |
| RACHEL HANKEY | JESSICA L. McCLELLAN |

| | |
|---|---|
| ABIGAIL ANDRE | MALINDA LAWRENCE |
| JUDY HARVEY | DAVID J. PFEFFER |
| MATT LEOPOLD | ROBIN HANGER |
| JEFFREY PRIETO | LAURA MAYBERRY |
| GORDON YOUNG | BRIENA STRIPPOLI |
| Trial Attorneys | Trial Attorneys |
| | U.S. Department of Justice |
| /s/ Steven O'Rourke | Torts Branch, Civil Division |
| STEVEN O'ROURKE | PO Box 14271 |
| Senior Attorney | Washington, DC 20044 |
| U.S. Department of Justice | (202) 616-4100 |
| Environmental Enforcement Section | (202) 616-4002 fax |
| PO Box 7611 | |
| Washington, DC 20044 | /s/ R. Michael Underhill |
| (202) 514-2779 | R. MICHAEL UNDERHILL, T.A. |
| steve.o'rourke@usdoj.gov | Attorney in Charge, West Coast Office |
| | Torts Branch, Civil Division |
| | 7-5395 Federal Bldg., Box 36028 |
| | 450 Golden Gate Ave. |
| | San Francisco, CA 94102-3463 |
| | (415) 436-6648 |
| | (415) 436-6632 fax |

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 14th day of February, 2012.

/s/ Steven O'Rourke
U.S. Department of Justice