**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISISNA**

| **IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010** | **MDL No. 2179** |
|---|---|
| | **SECTION "J"(1)** |
| | **JUDGE BARBIER** |
| **THIS DOCUMENT APPLIES TO: ALL CASES** | **MAGISTRATE SHUSHAN** |

**OPPOSITION TO M-I, LLC'S MOTION TO EXCLUDE CALVIN BARNHILL'S OPINIONS REGARDING THE RELATIONSHIP BETWEEN THE SPACER AND THE NEGATIVE PRESSURE TEST**

COME NOW Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, Transocean Deepwater Inc., and Triton Asset Leasing GmbH (collectively "Transocean") and file this, their Opposition to M-I, LLC's Motion to Exclude Calvin Barnhill's Opinions Regarding the Relationship Between the Spacer and the Negative Pressure Test. For the following reasons, M-I's motion should be denied.

## I. OVERVIEW

M-I attempts to exclude Barnhill's opinions that:

> The negative test actually confirmed the lack of well integrity and a lack of adequate primary flow barriers in the Macondo Well. However, **due primarily to the effects created by the unorthodox spacer,** and lack of understanding of the result being viewed, the negative test was approved by BP and BP then allowed the displacement to continue. However, this information should have resulted in the recognition that zonal isolation was not confirmed and that the SBM displacement should not proceed.[1]

M-I argues that his opinions are inadmissible for three reasons: (1) Barnhill has no relevant specialized knowledge or experience; (2) Barnhill did not test his theory; and (3) Barnhill's opinions are vague and

[1] Expert Report of Calvin Barnhill, p. 2 (emphasis added), attached hereto.

conclusory. However, its arguments are based on a complete misunderstanding of Barnhill's opinions, and are groundless for the purposes of its motion.

MI's arguments fail for three reasons. First, Barnhill's opinions are related to the application of the lost circulation materials (LCM) spacer at issue, not its chemical properties. As his opinions are operational in nature, he is sufficiently qualified to offer them under Federal Rule of Evidence 702. Second, because Barnhill's opinions do not depend on the chemical properties of the spacer, no testing is necessary to arrive at his conclusions. Third, Barnhill's opinions are not conclusory or vague. Rather, he has offered an explanation for the multiple ways the spacer could have affected the results of the April 20 negative pressure test (NPT), which is acceptable under FRE 702 and applicable jurisprudence. Based on the foregoing, discussed more fully below, MI's arguments are misplaced, and its motion must be denied.

## II. FACTS SURROUNDING THE NEGATIVE PRESSURE TEST

The factual background of this case is sufficiently well established in prior pleadings and is largely unnecessary for this motion. However, the facts of the NPT are important to explain the relevance of Barnhill's knowledge, skill, experience, training and education. Accordingly, a brief summary of the facts relating to the NPT may be helpful.

The purpose of the April 20 displacement procedure was to pump seawater down the drill pipe and up the riser to push the mud out of the riser so that the riser could be unlatched from the wellhead. BP chose to use a 16.0 PPG spacer comprised of water-based M-I LCM to complete the operation. The LCM spacer would act as an interface between the 14.0 PPG drilling mud and the 8.6 PPG seawater. The displacement procedure included the following steps:

1. Pump spacer though the well until it is above the upper annular of the BOP;
2. Stop the displacement;

    3. Close the upper annular of the BOP; and

4. Conduct NPT.

If the operation had gone as planned, the 16.0 PPG LCM spacer would have been placed above the BOP's upper annular, isolated from the seawater in the wellbore, and would not have affected the NPT. However, the evidence shows that some of the weighted spacer likely remained below the upper annular when the pumps were shut down, and that more leaked below the annular during the testing process. This left some of the 16.0 PPG LCM spacer across the BOP stack to mix with the 8.6 PPG seawater in the area where the kill line connected to the wellbore.

As the Court is aware, BP had the crew perform the NPT by monitoring flow on the kill line. BP declared the test successful after observing no flow on the kill line for 30 minutes, despite observing approximately 1400 PSI on the drill pipe at the same time. Barnhill opined in his report and deposition that the totally different pressure readings on the drill pipe and kill line had to be associated with either plugging of the kill line or a differential in hydrostatic pressure between the lines caused by the weight and location of the spacer.[2]

## III. LAW AND ARGUMENT

### *A. Barnhill is qualified by knowledge, skill, experience, training, and education to testify regarding the relationship between the spacer and the negative pressure test*

Barnhill is qualified by knowledge, skill, experience, training and education[3] to testify that the spacer confused and confounded the NPT either through plugging or a hydrostatic pressure effect. As explained below, Barnhill, as a Petroleum Engineer, has the knowledge, skill, experience, training and education to testify to the hydrostatic effect of fluids on downhole pressures and well conditions and that solids, such as Barite, can settle out of a water-based fluid. Understanding the pressure relationships and/or fluid suspension properties of various fluids, to include spacers, is an important part of the

[2] Deposition of Calvin Barnhill, p. 581, attached hereto.
[3] FED. R. EVID. 702.

training that petroleum engineers go through – both in the classroom and in the field. Petroleum engineers are trained in and are capable of determining and understanding the relationships between various fluids, to include spacers, in a downhole well setting.

Barnhill has over 40 years experience in the oil and gas industry, has both a bachelor's and master's degree in petroleum engineering, and has training and experience in well blowouts, drilling, drilling fluids, and drilling practices, to include the displacement of drilling fluids by both spacers and salt water.[4] He has personally designed, supervised, conducted and participated in multiple negative tests during his career.[5] He wrote his master's thesis on the effects created by the use of fluids of different properties during a displacement.[6] He has experience with and has tested cross-linked polymer fluids during his career, and has experience with various plugging type LCM pills.[7]

As a petroleum engineer, Barnhill has the knowledge, skill, experience, training, and education to testify concerning both: the hydrostatic effect of fluids on downhole pressures and well conditions, and issues associated with solids settling.[8] While Barnhill has not testified as an expert on the design, makeup, or chemical composition of spacers or LCM, he has testified in cases "dealing with the issues of lost circulation, and whether certain lost circulation materials were appropriate to be used in those applications,"[9] and in matters where spacer fluids have been utilized.[10] That solids, such as Barite, can settle out of a water-based fluid is something that Barnhill has been familiar with for a long time.[11] Based on the foregoing, Barnhill is more than qualified to testify regarding the relationship between the LCM spacer and the April 20 NPT.

---

4 Affidavit of Calvin Barnhill, attached hereto; Barnhill Rep., Curriculum Vitae.
5 Barnhill Depo., pp. 107-108.
6 Barnhill Rep., Curriculum Vitae.
7 Affidavit of Calvin Barnhill.
8 No attorney asked this basic question at Barnhill's deposition so Transocean attached Barnhill's Affidavit attesting to this basic expertise. If M-I objects to the Affidavit, Transocean would request that this issue be addressed as a preliminary matter during Barnhill's testimony.
9 Barnhill Depo., p. 567.
10 Barnhill Depo., p. 568.
11 Barnhill Depo., pp. 586-587.

***B. Barnhill's Opinions are Operational and Related to Application of the Spacer***

M-I argues that Barnhill's opinions should be excluded because Barnhill is not an expert on the chemical properties of spacers or LCM and has no experience with the LCM at issue. However, M-I ignores that Barnhill's opinions are operational in nature, are related only to the application of the spacer, and do not depend on its chemical properties. Accordingly, M-I's arguments are misguided and misplaced.

Barnhill's admission that he is not an expert on the chemical properties of the spacer or LCM does not negate that he possesses specialized knowledge of how spacers work mechanically during an NPT, and that spacers can confound the results of an NPT. Chemical analysis, familiarity, and testing of the spacer or its LCM ingredients is not needed to establish, based on accepted engineering principles, that this spacer confused and confounded the outcome of this NPT. Moreover, Barnhill's use of the term "unorthodox" in describing the spacer did not equate to an opinion regarding its chemical composition.[12] He used the term "unorthodox" because the spacer "was made up of two lost circulation material pills,"[13] and which he has never seen used as spacer in his 40-plus years of experience.[14] Barnhill also explained that he did not use the term "unorthodox" as a nefarious term:

> Q. So when you use the term "unorthodox" you're not ascribing any sort of nefarious term to that. It's simply it's a different type of spacer than normally would be used; is that correct?
>
> A. Correct, correct.[15]

Barnhill explained the nature of his spacer-related opinions during his deposition, stating:

> The problem I see with the negative test—with using a spacer—or conducting your negative test with the spacer involved is it creates or has the potential to create a level of confusion, and I think that's what we saw here in the Macondo Well…I'm not saying you can't do it, but you run the

---

[12] Barnhill Depo., p. 146-147
[13] *Id.*
[14] Barnhill Depo., p. 435.
[15] Barnhill Depo., pp. 579.

> risk of, when you do it, it can create complications for your test, and if it means that you misinterpret your test, then the results can be catastrophic.[16]

Barnhill made it clear in his report and his testimony that his opinions are based on the weighted LCM spacer's involvement with the NPT; not with the spacer's chemical composition. Because MI's motion is based on a misinterpretation of his opinions, it must be denied.

***C. Barnhill's opinions do not rely on testing***

M-I argues that since Barnhill did not test the spacer or its constituents, his opinions are speculative and unreliable. Its argument is in error, however, as Barnhill's opinions and methodology are reliable and admissible under applicable legal standards.[17]

The U.S. Supreme Court, in ***Daubert*** and its progeny, has enumerated several different factors courts may use to assess the reliability of an expert's opinion, including the testing of the expert's hypotheses.[18] Not every ***Daubert*** factor will be applicable in every situation.[19] When the expert's opinions are based on facts, a reasonable investigation, and traditional/mechanical expertise, and he provides a reasonable link between the information and the procedures he uses and the conclusions he reaches, then rigid compliance with ***Daubert*** is not necessary.[20] Moreover, "[s]trict evidentiary rules of admissibility are generally relaxed in bench trials,"[21] including Federal Rule of Evidence 702.[22]

Barnhill's theory of potential kill line plugging due to the presence of the weighted LCM spacer is based on principles with which he is familiar. Further, settling associated with the spacer was

---

[16] Barnhill Depo., pp. 272-73.
[17] FED. R. EVID. 702; ***Daubert v. Merrell Dow Pharms., Inc.,*** 509 U.S. 579(1993).
[18] ***Daubert***, 509 U.S. at 593.
[19] ***Guy v. Crown Equipment Corp.,*** 304 F.3d 320, 325 (5th Cir. 2004).
[20] ***Tassin v. Sears Roebuck and Co.***, 946 F. Supp. 1241, 1248(M.D.La. 1996).
[21] ***Morehead v. Mitshubisi Aircraft Int'l, Inc.,*** 828 F.2d 278, 287 (5th Cir. 1987) (quoting ***Null v. Wainwright***, 508 F.2d 340, 344 (5th Cir. 1975).
[22] ***Deal v. Hamilton Cnty. Bd. of Educ.***, 392 F.3d 840, 852 (6th Cir. 2004) ("The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial.").

confirmed by testing performed by BP.[23] Likewise, other experts reached the same conclusion concerning settling.[24] Furthermore, other anomalies occurred during the events that unfolded during the evening of April 20, 2010, after the NPT but prior to the explosions, that supports kill line plugging.[25] Through his experience in the industry, Barnhill is familiar with the concept that solids, such as Barite, can settle out of water-based fluids, such as the weighted LCM spacer utilized during the NPT.[26] While Barnhill did not base his opinions on the tests performed by BP, he noted those findings in his report as similar to his experience with these materials.[27] Moreover, because his opinions are focused on the mechanical effects of the spacer rather than its chemical composition, a chemical analysis of its make-up was not needed to arrive at his conclusion, i.e. that the spacer confused and confounded the negative test.[28]

That BP's tests, other experts' opinions and Barnhill's opinions differ from Chenevert's test results does not establish that Barnhill's opinions are unreliable. Barnhill used recognized engineering methodology and practical knowledge acquired through decades of experience as a petroleum engineer to establish theories as to what confused and confounded the NPT. M-I is free to disagree with Barnhill's opinions, but that disagreement does not demonstrate a flawed methodology. M-I's arguments go to the weight, not the admissibility, of his testimony.

***D. Barnhill's opinions regarding the relationship between the spacer and the negative pressure test are not vague and conclusory***

M-I finally argues that Barnhill's opinions are too vague and conclusory to be reliable because his deposition testimony includes statements about events he thinks are a "possibility" or "may" have

---

[23] Barnhill Depo., pp. 579-80; 582-83; 586-87.
[24] Expert Report of Adam T. Bourgoyne (BP), pp. 59, 60, attached hereto.
[25] Barnhill Rep., p. 36.
[26] Barnhill Depo., pp. 586-87.
[27] Barnhill Depo., pp. 579-80., 583-84.
[28] Barnhill Depo., pp. 584-85.

happened, and because he conceded as many as four possibilities for the zero pressure reading on the kill line. M-I's description of Barnhill's testimony is disingenuous as Barnhill's opinions are clear that:

> The location of the unorthodox spacer in the BOP's and the top of the wellbore created a situation that confused and confounded the negative test; either through plugging or hydrostatic pressure effect.[29]
>
> We know the choke and kill line got a totally different response than you would have gotten off the drill pipe side. So that had to be associated with either plugging of the line or a differential in hydrostatic pressure associated with the line.[30]

Barnhill's testimony regarding other explanations for the lack of kill line pressure was in response to questions during his deposition. However, as shown above, he did not retract his opinion that the zero reading on the kill line had to be associated with either plugging of the kill line or a differential in hydrostatic pressure.

The April 20 NPT was performed utilizing BOP equipment approximately 5,000 feet below the *DEEPWATER HORIZON.* No one knows exactly what caused the zero pressure on the kill line. That Barnhill is not able to conclude with absolute certainty everything that happened during the NPT does not render his opinions unreliable. Consequently, Barnhill used accepted engineering methodology to provide an opinion as to what could have confused and confounded the negative test; i.e. the weighted LCM spacer. It is the Court's role to determine the causes of events on the rig. Barnhill's role is to assist the Court with that endeavor, which he has done so with the benefit of decades of experience and training in the oilfield industry. Any questions about the factual underpinnings of his opinions go to the weight of the opinions, not their admissibility.

## IV. CONCLUSION

Barnhill is well qualified to testify to all of the opinions he has offered in this case. Under the two-prong analysis of *Daubert*, and F.R.E. 702, Barnhill possesses the requisite specialized knowledge,

---

[29] Barnhill Rep., p.28.
[30] Barnhill Depo, p.581.

skill, experience, training, and education to testify regarding the relationship between the weighted LCM spacer and the April 20 NPT. Barnhill's opinions are also reliable under FRE 702 as based on sound engineering principles and methodologies. Based on the foregoing, Triton Asset Leasing GmbH, Transocean Holdings, LLC, Transocean Offshore Deepwater Drilling, Inc., and Transocean Deepwater, Inc. respectfully request this Court deny M-I's Motion to Exclude Calvin Barnhill's opinion regarding the relationship between the spacer and the negative pressure test and admit into evidence the entirety of his opinions.

Respectfully submitted this 14th day of February, 2012,

By: /s/Steven L. Roberts
Steven L. Roberts (Texas, No. 17019300)
Rachel Giesber Clingman (Texas, No. 007842125)
Kent C. Sullivan (Texas, No. 19487300)
Sutherland Asbill & Brennan LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
Email: steven.roberts@sutherland.com
Rachel.clingman@sutherland.com
kent.sullivan@sutherland.com

By: /s/Kerry J. Miller
Kerry J. Miller (Louisiana, No. 24562)
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8169
Facsimile: (504) 599-8154
Email: kmiller@frilot.com

-and-

By: /s/Edwin G. Preis, Jr.
Edwin G. Preis, Jr. (Louisiana, No. 10703)
Richard J. Hymel (Louisiana, No. 20230)
Preis & Roy PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone: (337) 237-6062
Facsimile: (337) 237-9129

-and-

601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone: (504) 581-6062
Facsimile: (504) 522-9129

                        Email: egp@preisroy.com
rjh@preisroy.com

-and-

By: /s/Brad D. Brian
Brad D. Brian (California, No. 79001)
Allen M. Katz (California, No. 54933)
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 683-5180, (213) 683-4018
Email: brad.brian@mto.com
allen.katz@mto.com

Of Counsel:

John M. Elsley (Texas, No. 0591950)
Royston, Rayzor, Vickery & Williams LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 224-8380
Facsimile: (713) 225-9945
Email: john.elsley@roystonlaw.com

Daniel O. Goforth (Texas, No. 08064000)
Goforth Geren Esterling LLP
4900 Woodway, Suite 750
Houston, Texas 77056
Telephone: (713) 650-0022
Facsimile: (713) 650-1669
Email:dangoforth@goforthlaw.com

***Counsel for Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc. and Transocean Deepwater Inc.***

**CERTIFICATE OF SERVICE**

I hereby certify that on February 14th, 2012, I electronically filed the foregoing with the Court's CM/ECF system and service on all counsel by using the LexisNexis File & Serve, in accordance with Pretrial Order No. 12 which will send a notice of filing to all counsel accepting electronic notice.

/s/ Kerry J. Miller