## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" IN THE | § | |
| GULF OF MEXICO, ON APRIL 20, 2010 | § | SECTION: J |
| | § | |
| THIS PLEADING APPLIES TO: | § | JUDGE BARBIER |
| ALL CASES | § | |
| | § | MAGISTRATE JUDGE SHUSHAN |

### TRANSOCEAN'S OPPOSITION TO BP'S MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF MR. GREG CHILDS

NOW COMES Transocean Deepwater Drilling, Inc. ("Transocean") and files its response in opposition to BP's Motion to Exclude Certain Opinions and Testimony of Mr. Greg Childs ("Motion"). For the reasons set forth below, this Court should deny BP's Motion.

### INTRODUCTION

Mr. Childs's opinions and testimony on the functionality of the *Deepwater Horizon* control pods are relevant and based on reliable methodology, and therefore should be admitted. Mr. Childs formed his opinions on SEM batteries and solenoid 103Y after directing and analyzing Transocean's SEM battery testing on the *Deepwater Nautilus* and solenoid testing on the *Discoverer Enterprise*. These two rigs were chosen because they have the same Mark II control system that was on the *Deepwater Horizon*, and their BOP stacks are similarly configured. Under Federal Rule of Evidence 703, Mr. Childs may base opinions on facts and data supplied by others. Any attempt to strike Mr. Childs for relying in part on others' testing and analyses lacks merit. Therefore, this Court should deny BP's Motion.

### BACKGROUND

Mr. Childs is a reputable, experienced mechanical engineer, whose nearly forty-year career and expertise have focused exclusively on BOPs. (See Resume, Expert Report.) Currently, Mr. Childs is Vice President at WEST Engineering Services ("WEST Engineering"), where he is responsible for operations and technical issues concerning BOPs. Prior to joining WEST Engineering in 1996, Mr. Childs worked for Cameron in BOP design engineering for more than twenty years. Mr. Childs has spent a significant portion of his career assessing and analyzing BOP control systems, including AMF systems, control pod batteries and solenoids. (Deposition of Mr. Childs ("Childs Depo." 573:11-16.) Based on Mr. Childs's collective experience, he is a control systems expert, with particular understanding of AMF battery operation and solenoids. (Childs Depo. 572:1-21; 573:25-575:5.)

Transocean hired Mr. Childs in May 2010 to work on Transocean's Internal Investigation Team and to specifically focus on BOP issues. (Childs Depo. 21:22-22:13.) Mr. Childs asked his employee from WEST Engineering, Mr. Tolleson, to conduct control system testing for Transocean's Internal Investigation Team, BOP Team. Mr. Tolleson is an electrical engineer who is a control systems specialist. Mr. Tolleson has worked for Mr. Childs for two years and has performed numerous engineering tests and analyses for Mr. Childs's review.

As part of his work on Transocean's Internal Investigation Team, and under the direction of Mr. Childs, Mr. Tolleson conducted various tests on SEM batteries from Transocean's *Deepwater Nautilus*. It was recommended that Mr. Tolleson use the *Deepwater Nautilus* SEM because it had a Cameron-built Mark II control system similar to the *Deepwater Horizon*, as confirmed by Transocean's Engineering Department and Cameron. (Deposition of Robert Ewen Florence ("Florence Depo.) 115:7-18; 116:10-117:1.) In addition, Mr. Tolleson reviewed the software code to verify that the control systems were similar and would function similarly.

(Childs Depo. 144:14-145:25.)   Two other WEST engineers, Harshall Patil and Mika Reed, assisted Mr. Tolleson in the testing procedures (collectively "Childs's WEST Engineering Team").

The battery tests were conducted at WEST Engineering facilities on various days between October 20, 2010 and December 13, 2010.   The purpose of the tests was to investigate mechanisms that drained the 27-volt blue pod battery after the incident.   Mr. Childs was engaged with the WEST Engineering Team throughout the process.   On November 11, 2011, Transocean produced a Summary of SEM Battery Testing Results, a compilation of Mr. Tolleson's handwritten notes and testing results.   (See TREX-050378.)

In August 2011, Childs's WEST Engineering Team conducted solenoid testing on Transocean's *Discoverer Enterprise*, intentionally wiring a solenoid valve in reverse polarity to understand how it would behave.   Similar to the testing performed on the batteries, Childs's WEST Engineering Team performed these tests onboard the *Discoverer Enterprise* because the SEM was functionally identical to the *Deepwater Horizon* – both used a Mark II system.   (Childs Depo. 211:2-212:19.)   Childs's WEST Engineering Team discovered that a solenoid wired in reverse polarity successfully functions when power is run through the SEM, as it would be during an AMF sequence.   (See TREX-50165.)

On September 23, 2011, Mr. Childs submitted an expert report on behalf of Transocean, and on November 7, 2011, he submitted a rebuttal report.   Mr. Childs's opinions in those reports, and which he supported at deposition, are based on forty years of experience in the industry and reliable, scientific testing or structural analyses produced to all parties in this litigation.

## ARGUMENT

**A.      Applicable Standards**

A trial judge has broad discretion in admitting and excluding expert evidence.  Johnson v. Samsung Elec. Am., Inc., 277 F.R.D. 161, 163 (E.D. La. 2011).  The trial judge's discretion is "particularly broad in a bench trial" because there is no concern of prejudicing a jury.  United States v. Demjanjuk, 367 F.3d 623, 633-34 (6th Cir. 2004); see Fed. R. Evid. 703 Advisory Committee Notes on 2000 Amendment.

Pursuant to Federal Rule of Evidence 702, an expert may testify in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.  Fed. R. Evid. 702.  This rule reflects the United States Supreme Court's decisions in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed. 2d 469 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Daubert provides a two-prong test for determining admissibility of expert testimony.  The trial court acts as "gate-keeper" to ensure that the proffered expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. Daubert, 509 U.S. at 592, 113 S.Ct. at 2796.  As a general rule, ***questions relating to bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility*** and should be left for the fact-finder's consideration.  Johnson, 277 F.R.D. at 165. The judge assessing proffered expert testimony also should be mindful of other applicable rules. Id. at 595.  For example, Federal Rule of Evidence 703 permits an expert to base his opinion on otherwise inadmissible hearsay when the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."  See Daubert, 509 U.S. at 595, 113 S.Ct. at 2798.

**B.      Mr. Childs's Opinions Regarding the Functionality of the Control Pods Are Relevant.**

Mr. Childs's opinions regarding the functionality of the BOP control pods are relevant and should not be excluded.  In accordance with <u>Daubert</u>, Mr. Childs's opinions on this issue "assist the trier of fact to understand and determine a fact in issue." <u>Daubert</u>, 509 U.S. at 592. Scientific testimony is relevant when the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case. <u>Id.</u> at 593.

For the expert's testimony to fit the facts of the case, there does not need to be a perfect match as long as any analytical gaps do not "take [the opinion] out of the realm of substantive evidence. <u>Wackman v. Rubsamen</u>, 602 F.3d 391, 403 (5th Cir. 2010) (denying motion to exclude medical expert whose reliance studies did not perfectly match the case at hand because any such "gaps" did not "take [the opinion] out of the realm of substantive evidence"); <u>see also</u> Fed. R. Evid. 702 Advisory Committee Note on 2000 Amendment (whether "the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion" is but one non-dispositive factor relevant to the determination of the reliability of expert testimony).

BP's contention that an "analytical gap" exists in Mr. Childs's opinions regarding the applicability, and therefore relevance, of the SEM battery and solenoid tests conducted with the equipment of the *Deepwater Nautilus* and *Discoverer Enterprise* is wrong.  The principal cases cited by BP on this issue, <u>Moore v. Ashland Chem, Inc.</u>, 151 F.3d 269 (5th Cir. 1998) and <u>Knight v. Kirby Inland Marine Inc.</u>, 482 F.3d 347 (5th Cir. 2007), are inapposite, and demonstrate that the SEM battery and solenoid testing in this case should be admitted.  In <u>Moore</u>, a toxic tort action, a medical expert's testimony was excluded primarily because he: (1) offered no scientific support for his theory that exposure to the chemical at issue caused the plaintiff's illness; (2)

provided no explanation for his conclusion that the chemical had similar properties to another chemical scientifically linked to the illness; and (3) could not cite any scientific support for his conclusion that exposure to any chemical irritant at unknown levels could trigger the pulmonary condition at issue.  151 F.3d at 278-79.  Similarly, in Knight, also a toxic tort case, an expert's opinions were excluded because he relied on studies that had no applicability to the facts of the case.  482 F.3d at 352-53.  In both studies, different chemicals were used than the one at issue and the study group came from professions vastly different than plaintiffs.  Id. (case involved tankermen exposed to different chemicals than painters, photographers and carpenters in expert's study).

BP provides absolutely no case law to suggest that an "analytical gap" exists when an expert relies on studies or tests using similar equipment or properties analogous to the facts of the case.  The standard on "relevance" is an "appropriate fit," not a perfect fit, to the facts of the case.  See Daubert, U.S. at 593; In re Vioxx Products Liability Litigation, 401 F.Supp.2d 565, 573, 586 (E.D. La. 2005).  ***Nor does an expert's opinion possess an analytical gap merely because an opposing party disagrees with the conclusions reached in either the opinion or the reliance materials upon which it is based.***  See In re Vioxx, 401 F.Supp.2d at 587 ("a disagreement does not amount to improper methodology or scientifically unreliable data").

Here, Childs's WEST Engineering Team was fully engaged in the SEM battery testing on the *Deepwater Nautilus* and the solenoid testing on the *Discoverer Enterprise*.  The *Deepwater Nautilus* and *Discoverer Enterprise* were chosen because they used the same Mark II control system on the *Deepwater Horizon*.  (Florence Depo. 115:7-18.)

1.     **Childs's WEST Engineering Team's SEM Battery Testing on the Spare Pod from the *Deepwater Nautilus* Is Relevant.**

The SEM battery tests conducted on the *Deepwater Nautilus* spare pod used both batteries and an external power source.  Childs's WEST Engineering Team used the external power because it allowed them to analyze the SEM circuitry and software at a number of set power levels in a relatively short amount of time.  (See TREX-07692 at 5.)  Draining test batteries to pre-determined power levels is a non-exact and time-consuming process.  As the batteries are drained under load, they must be continuously monitored.  Attempting to speed up the process by draining the batteries under artificially high loads does not reflect actual SEM working conditions.  Using an external power source gave Childs's WEST Engineering Team the largest sample size within the time constraints imposed by the Macondo investigation.  (See TREX-050378.)

Contrary to BP's assertion, the external power source used in the SEM battery accurately mimics the power supplied by a battery.  The external power source contains a control setting that allowed Childs's WEST Engineering Team to limit both current and voltage.  Using the control settings, Childs's WEST Engineering Team set maximum allowable current and voltage levels.  During the SEM battery tests, the SEM circuitry and software drained the maximum current permitted by control setting, and voltage levels dropped.  (See TREX-07692 at 6, 8.) This reduction in voltage also occurs throughout a battery's lifecycle.  As such, the external power source mimicked the operation of a battery at a set power level.  The power source and other equipment used in the testing are described in the Summary of SEM Battery Testing Results document.  (See TREX-07692 at 7.)  The testing procedure, including the current limits, is outlined for each external-power source test performed.  (See, e.g., TREX-07692 at 30.)

2.    **Childs's WEST Engineering Team's Solenoid Tests on the *Discoverer Enterprise* Are Relevant.**

With respect to the solenoid testing, BP again misunderstands the purpose of the tests conducted aboard the *Discoverer Enterprise*. Childs's WEST Engineering Team designed the testing to determine whether a solenoid wired in reverse polarity can generate shifting force. Although hydraulic pressure was not applied, Childs's WEST Engineering Team relied upon the audible shift to determine whether the solenoid plunger successfully moved. (Childs Depo. 217:3-16.)

The relevance and reliability of Childs's WEST Engineering Team's testing is bolstered by DNV's AMF tests which were conducted under hydraulic pressure. In those tests, solenoid 103Y functioned in three of three tests when wired in reverse polarity. (TREX-01164 at 47-49.) BP was free to conduct its own testing under hydraulic pressure but did not. It may not now attack Childs's WEST Engineering Team's tests simply because it does not like the results.

In light of the above law and facts, Transocean's SEM battery and solenoid testing were designed to replicate possible scenarios that may have occurred on the *Deepwater Horizon*. The produced Summary of SEM Battery Testing Results and solenoid testing document sufficiently set forth Transocean's testing procedures and explain the purpose of the testing. There can be no dispute that Childs's WEST Engineering Team's SEM battery and solenoid testing are relevant to the facts of this case. Transocean has established that with SEM battery testing appropriate measures were taken to ensure similarity in design, configuration and power supply between the batteries used from the *Deepwater Nautilus* and those that were on the *Deepwater Horizon* at the time of the incident. The solenoid testing also has been adequately documented and produced. Accordingly, Mr. Childs's testimony is relevant to the facts of this case, and this Court should deny BP's Motion.

### C. Mr. Childs's Opinions Regarding the Functionality of the Control Pods Are Based on Reliable Methodology.

In addition to being relevant to the facts of the case, an expert's testimony must also be based on a reliable methodology. Daubert, 509 U.S. at 593, 595, 113 S.Ct. at 2797; Johnson, 277 F.R.D. at 164. In determining reliability, a court's focus "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. The court should consider a variety of nonexclusive and flexible factors in making this determination, such as whether the theory has been tested, subjected to peer review and generally accepted. Johnson, 277 F.R.D. at 164.

An expert may base his opinions on facts and data supplied by third parties without calling into question the reliability of the methodology employed. See Fed. R. Evid. 703; Gussack Realty Co. v. Xerox Co., 224 F.3d 85, 94 (2d. Cir. 2000). This includes relying on analyses and testing performed by other experts. Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments; Johnson, 277 F.R.D. at 166 (permitting expert to rely on conclusions from forensic testing conducted by other experts in products liability case). An expert also may rely on analyses performed by his assistant. See, e.g., McReynolds v. Sodexho, 349 F.Supp.2d 30, 36-37 (D.D.C 2004) (admitting expert's opinions based on statistical analyses run by assistants who wrote and understood the computer programming); Derrickson v. Circuit City Stores, Inc., No. 95–3296, 1999 WL 1456538, at *20 (D.Md. Mar. 19, 1999) (same). For example, in McReynolds, the court denied challenges to a statistician expert who was familiar with the technologies used in structuring the analysis forming his opinions, but relied on others to create and run the computer programs for the tests. 349 F. Supp.2d at 36. The court held that such protestations amounted to disputed factual issues and were insufficient as a matter of law. Id.

Here, like a doctor that relies on laboratory blood tests in making a diagnosis, Mr. Childs directed and relied on others, such as Childs's WEST Engineering Team, to test and generate data that Childs evaluated and used to support his opinions.

## CONCLUSION

For the foregoing reasons, Mr. Childs's opinions regarding the functionality of the yellow and blue control pods on April 20, 2010 are relevant and reliable. Therefore, Mr. Childs's testimony and opinions on these issues should be admitted, and BP's Motion should be denied.

Respectfully submitted,

By:___/s/ Steven L. Roberts_____
Steven L. Roberts (Texas, No. 17019300)
Rachel Giesber Clingman (Texas, No. 00784125)
Kent C. Sullivan (Texas, No. 19487300)
Sutherland Asbill & Brennan LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
Email: steven.roberts@sutherland.com
rachel.clingman@sutherland.com
kent.sullivan@sutherland.com

By:___/s/ Kerry J. Miller_____
Kerry J. Miller (Louisiana, No. 24562)
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8169
Facsimile: (504) 599-8154
Email: kmiller@frilot.com

-and-

By:___/s/ Edwin G. Preis, Jr._____
Edwin G. Preis, Jr. (Louisiana, No. 10703)
Richard J. Hymel (Louisiana, No. 20230)
Preis & Roy PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone: (337) 237-6062
Facsimile: (337) 237-9129

-and-

601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone: (504) 581-6062
Facsimile: (504) 522-9129

Email: egp@preisroy.com, rjh@preisroy.com

-and-

By: _____/s/ Brad D. Brian_____
Brad D. Brian (California, No. 79001)
Allen M. Katz (California, No. 54933)
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 683-5180, (213) 683-4018
Email: brad.brian@mto.com, allen.katz@mto.com

Of Counsel:

John M. Elsley (Texas, No. 0591950)
Royston, Rayzor, Vickery & Williams LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 224-8380
Facsimile: (713) 225-9945
Email: john.elsley@roystonlaw.com

Daniel O. Goforth (Texas, No. 08064000)
Goforth Geren Easterling LLP
4900 Woodway, Suite 750
Houston, Texas 77056
Telephone: (713) 650-0022
Facsimile: (713) 650-1669
Email: dangoforth@goforthlaw.com

*Counsel for Triton Asset Leasing GmbH,
Transocean Holdings LLC, Transocean
Offshore Deepwater Drilling Inc. and
Transocean Deepwater Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2012, I electronically filed the foregoing with the

Court's CM/ECF system and service on all counsel by using the LexisNexis File & Serve, in

accordance with Pretrial Order No. 12 which will send a notice of filing to all counsel accepting

electronic notice.

/s/  Kerry J. Miller_____