UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | : | |
| OF MEXICO, ON APRIL 20, 2010 | : | SECTION J |
| | : | |
| THIS DOCUMENT RELATES TO: | : | JUDGE BARBIER |
| | : | |
| 10-4536 | : | MAGISTRATE JUDGE SHUSHAN |

......................................................................................................................................

**THE UNITED STATES' OPPOSITION TO THE ANADARKO AND MOEX MOTIONS
TO EXCLUDE THE EXPERT TESTIMONY AND REPORT OF JAMES P. LANG [5404
& 5398] AND ANADARKO'S MOTION *IN LIMINE* TO STRIKE AND PRECLUDE
CERTAIN SECTIONS OF THE LANG EXPERT REPORT [5245]**

The United States respectfully submits its opposition to the motions to exclude the expert

testimony and report of James P. Lang, filed on January 24, 2012 by Anadarko Petroleum

Corporation and Anadarko E&P Company LP (collectively "Anadarko") and MOEX Offshore

2007 LLC and MOEX USA Corporation (collectively "MOEX").  This opposition also responds

to Anadarko's Motion *in Limine* to strike certain sections of the Lang expert report, which was

filed on January 17, 2012.[1]

As an initial matter, if the Court grants the pending motion for summary judgment related

to the liability of Anadarko under the Clean Water Act (Rec. Doc. 4836), the opinions of

Anadarko's expert, Mr. Vernon, would become irrelevant in Phase I, and the United States

would withdraw from Phase I all of Mr. Lang's opinions related to Anadarko.

I.     **INTRODUCTION**

Anadarko and MOEX (collectively "the Macondo partners") seek to exclude the opinions

of the United States' expert, James P. Lang, who submitted a rebuttal report in response to the

---

[1] On January 31, 2012, Magistrate Shushan approved the United States' agreement with counsel for Anadarko to
respond to its Motion *in Limine* on February 14 concurrently with its *Daubert* motion opposition.

opinions of Roger Vernon and Gordon R. Cain.  Messrs. Vernon and Cain each offered

affirmative expert reports stating their views regarding the relationship of the co-owners of the

Macondo well, who were non-operating parties (NOPs) under the Joint Operating Agreement

(JOA), with BP. [2]  The United States opposes Anadarko's and MOEX's motions on the

following grounds:

*Rebuttal nature of Lang:*  Lang's opinion exposes the exceedingly narrow nature of the

Vernon and Cain opinions, which completely ignore the ownership rights of the Macondo

partners under the JOA and other agreements.  Section V of his report is appropriable rebuttal to

the Vernon and Cain opinions and should not be excluded for the reasons stated below.[3]

*Relevance of Lang*.   If allowed to stand un-rebutted, the Vernon and Cain opinions

would mislead the finder of fact regarding the full range of Anadarko's and MOEX's ability to

monitor and influence drilling operations as co-owners of the Macondo well.  Lang explains the

full extent of Anadarko's and MOEX's ownership rights as understood and practiced in the

industry, including "professional courtesy" where co-owner suggestions regarding drilling are

taken seriously by the designated operator.

*If Lang is Excluded, Vernon and Cain should be too*:  Many of the criticisms that

Anadarko and MOEX direct toward Mr. Lang are equally valid criticisms of their own experts

(or each other's expert) and arise from Lang's task of rebutting both the Vernon and Cain

opinions, which take very different approaches and focus on different evidence.  Anadarko and

MOEX contend, primarily, that Lang should be excluded based on three flaws:

---

[2] The United States did not file motions to exclude the opinions offered by Vernon or Cain, despite the non-technical, quasi-legal nature of their opinions, because each of those reports arguably would pass muster in a bench trial under Fifth Circuit case law.

[3] With respect to sections III(4), XII, and XIII(3), which address potential impact of liabilities – such as costs, damages, or civil penalties associated with the Macondo blowout and oil spill – on deepwater drilling investment, the United States agrees that those matters are appropriate for a later penalty phase of the litigation and withdraws those opinions for purposes of the Phase I trial.

- Lack of specific qualifications

- Summarizing evidence

- Calling for legal conclusions

Lang's qualifications meet or exceed those of Vernon and Cain; he appropriately relies on the evidentiary record; and he does not offer legal opinions but provides an industry understanding of co-owner rights and responsibilities based on the offshore drilling agreements.  Mr. Lang's expert opinions meet the threshold for admissibility and should not be excluded.

## II.    LANG'S EXPERT OPINIONS ARE ADMISSIBLE UNDER THE *DAUBERT* STANDARD BECAUSE THEY ARE RELEVANT AND RELIABLE

In the interest of brevity, the United States incorporates herein the legal standards under Fed. R. Evid. 702 (and *Daubert*) applicable in bench trials, as set forth in the "United States' Opposition to BPs' Motion to Preclude Unreliable Opinions on the Failure of the Primary Cement Job," filed concurrently with this Opposition.

## A.    Lang's Rebuttal Opinion Is Reliable Because He Is Well-qualified Based on His Extensive Oil and Gas Industry Experience.

1.    Relevant Industry Experience is an Acceptable Basis to Offer Expert Opinion and Defendants' Arguments Merely go to Weight and Not Admissibility.

The three experts each render opinions based on years of work experience in different aspects of the oil and gas industry:  a drilling engineer (Anadarko), a landman (MOEX), and an oil and gas consultant (United States).  Concededly, none of the experts are using a scientific or engineering background to address the issue framed by the defendants' experts.  However, both Anadarko and MOEX attack Lang's expert opinions regarding the relationship of NOPs and operators on the grounds that he is unqualified to render them, making his opinions allegedly unreliable.  Anadarko Memorandum of Law in Support of its Motion ("Anadarko Mem.") at 3-7; MOEX Memorandum of Law in Support of its Motion ("MOEX Mem.") at 3-4.  First, the basis

for Lang's expert opinion is the same basis used by both Vernon and Cain, *relevant industry experience* with JOAs and roles of NOPs. The Macondo partners do not claim, nor could they, that this type of industry experience is not the proper foundation for expert testimony on the roles of co-owners of a deepwater well.  *See Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("District courts must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'") (citing Fed. R. Evid. 702); *see also Kona Tech. Corp. v. Southern Pac. Transp. Co*., 225 F.3d 595, 611(5th Cir. 2000) (finding the trial court could rely upon individuals experienced in a particular field for explanation of the technical meaning of terms used in the industry).  Nor do they argue that knowledge of industry practice not "specialized" or is unhelpful to the trier of fact.  The Macondo partners argue, simply, that Mr. Lang's experience with JOAs and NOP roles – which is from a business consulting perspective – is inadequate and presumably inferior to that of their own experts, a drilling engineer and a landman.

All three of the experts testify based on their industry experience.  To accept Anadarko's and MOEX's misguided invitation to strike Lang's opinions based on qualifications would also require the Court to call into question the qualifications of Vernon or Cain and disqualify them. The Anadarko and MOEX motions attempt to hold Lang to a standard not met by either of their own experts.  For example, MOEX describes experience that is supposedly necessary to give expert opinion on NOP roles in deepwater drilling as:  negotiating, drafting, administering and implementing a JOA, resolving disputes under a JOA, and having familiarity with the AAPL Model Form Deepwater Operating Agreement.  MOEX Mem. at 4.  Mr. Vernon, a drilling engineer, admitted that he has only worked with "three or four" JOAs in his career, has never seen model JOAs, has not individually negotiated JOAs, and did not read all of the JOAs he did

work with.  Exhibit ("Exh.") E, Vernon Dep. at 69:2-70:7.  For its part, Anadarko attacks Lang because he is not a drilling or petroleum engineer, has no experience analyzing drilling practices, has not drafted petroleum leases or JOAs, is not an expert on drilling regulations, and has not advised an NOP on whether it is obligated to monitor drilling operations.  Anadarko Mem. at 4.  Not surprisingly, Mr. Cain, as a landman, does not have any of this experience, except for the fact that he has drafted JOAs.  Exh. F, Cain Dep. at 34:3-36:23, 52:6-53:3, 66:12-70:21, 102:2-103:8, 136:12-137:6.  Mr. Vernon has not drafted JOAs or any other deepwater drilling agreements.  Exh. E, Vernon Dep. at 84:5-13.  Finally, Mr. Vernon does not claim to have had *personal* involvement in a decision to non-consent to a supplemental AFE, a point for which Anadarko and MOEX criticize Lang.  Anadarko Mem. at 5; MOEX Mem. at 4 (citing Lang Dep. at 30:2-38:6, *see* Exh. D).

These proposed conflicting qualification standards lead to the conclusion that drilling engineers, landmen, and oil and gas consultants may all have some relevant experience with JOAs and operator/NOP roles in deepwater drilling.

2.      Mr. Lang is Well-Qualified Because He Has Direct Relevant Experience with Matters on which He Opines.

Lang's broad experience with "hundreds of upstream assets" and working with all five "supermajor" oil and gas companies give him a greater understanding than defendants' experts of how the oil and gas industry understands the relationship between operators and NOPs, who partner to drill a particular exploratory well.  The Court should not disqualify Lang (or Vernon or Cain) on the basis of his primary profession but look to see if he has direct and relevant experience that gives rise to specialized knowledge of NOP roles and responsibilities.  Mr. Lang has these qualifications.

Mr. Lang has vast experience in decision-making related to deepwater exploration, with over 17 years working with a top oil and gas industry consulting firm.  This was the context where Lang gained substantial personal familiarity with industry norms for the operator/NOP relationship.  Exh. A, Lang Report at II, 4-5.  Mr. Lang obtained direct experience interpreting several dozen JOA's (Exh. D, Lang Dep. at 41:22-44:25), reviewing Authorizations for Expenditures (AFEs), consulting for operators and NOPs (*id.* at 129:6-187), and even training industry executives on how to understand the business implications of JOAs, including what rights the co-owners have under them.[4]  Lang also has substantial experience, in the deepwater context, with understanding what JOAs allow regarding the "tactical" decision to consent and non-consent to an AFE, designating an operator, and participating in the initial AFE decision and flexibilities a NOP might have after decision is made.  Exh. D, Lang Dep. at 31:11-32:5, 34:5-24, 36:20-37:12.  Other relevant areas that qualify Mr. Lang to give opinions regarding JOAs and NOPs include:  leading project teams of landmen, reservoir engineers, explorationists, and those responsible for commercial aspects of the oil and gas business and facilities; (*id.* at 41:22-42:10); visiting an offshore platform in the North Sea (*id.* at 39:7-40:4); and attending and hosting

---

[4] Q. Can you explain your experience in terms of how many joint operating agreements you've been involved with?

A. Certainly. I've probably seen several dozen joint operating agreements. I can't remember if I said this earlier or not, you know, 20 years in the industry, 17 with SDG, a few more years with CERA. We advise clients on many upstream activities.  My personal qualifications were that I led our energy practice. I also led the firm, but all my clients remained energy, and, of course, CERA was an energy firm.  We would look at assets like the Macondo exploration play.  Probably been involved with a few dozen of those assets in a deep-dive sense and hundreds of those assets when looking at them at the portfolio level, if that helps with your question.

* * *

Q. But never specifically did you provide any training with respect to operating agreements or petroleum leases; is that correct?

A. From a legal or drafting point of view, no.  From a business implication and what kinds of business terms would change risk and reward of assets, yes.

Exh. D, Lang Dep. at 226:15-227:8, 19:16-22.

industry meetings, including CERA week, the number one energy industry event that occurs annually in Houston (*id.* at 40:20-41:1).

Mr. Lang continues to do the same oil and gas consulting work today through his independently-owned business.  His firm was recently awarded a contract advising an oil and gas company in India regarding strategy for 75 deepwater assets.  Exh. D, Lang Dep. at 24:22-26:10.  The types of decisions he is advising this client on are: "should I bring in partners," "should I operate or nonoperate," and "which [assets] should I explore in what order."  *Id.*  Those decisions require a thorough understanding of JOAs, as well as industry practice regarding the operator/NOP relationship.

Anadarko and MOEX do not address this experience in their motions.  Their primary claim is that Lang's experience is irrelevant because it is limited to "strategy consulting" and "asset valuation."  This claim mischaracterizes Mr. Lang's deposition testimony.   They skew the record by omission, arguing that Mr. Lang never advised one of his oil and gas clients regarding a decision during deepwater drilling after an initial investment was made.  Anadarko Mem. at 4; MOEX Memo at 4.  While Mr. Lang could not provide a specific example in deposition of an instance where he advised a co-owner whether to consent to an AFE after drilling a deepwater well had commenced, he testified that he supervised project teams that addressed non-consent decisions and that his prior firm specifically advised on decisions during deepwater drilling with Shell Oil Company.  Exh. D, Lang Dep. at 33:2-34:4.

3.     Anadarko's Specific Criticisms of Lang's Qualifications are Unsupported.

Anadarko makes two specific claims that allegedly demonstrate that Lang is unqualified: 1) that Lang purportedly cannot explain how non-consent to an AFE by the Macondo partners demonstrates "control" over the drilling of the well, and 2) that Lang uses "circular" reasoning

regarding the Macondo partners' "obligation to monitor" drilling activities at Macondo. Anadarko Mem. at 5-6.  As discussed above, Mr. Lang's deposition revealed that the primary source of his expertise with regard to decisions with AFEs comes from his 17-year oil and gas consulting practice, where he and others under his supervision advised clients regarding AFE decisions.  He also reviewed the Macondo JOA's provisions regarding AFEs and the evidence in the record.  On that basis, Mr. Lang explains how non-consent to an AFE can amount to control by the Macondo partners.  The following examples are from his report:

- Though BP had more than 50% of the ownership interest, they sought to gain agreement with owners, and not force any decision on them.[5]

- In email exchanges among BP staff dated April 19, they refer to Anadarko and MOEX as "co-owners" who need to sign off on the decision to set the production casing and temporarily abandon the well.[6]

His deposition testimony is consistent:

- [T]hey had significant rights as -- if they nonconsented to any AFE operation, the operating party would have then a choice to proceed with or not them or seek and iterate on what the concerns are. Those are significant rights.  You have significant rights to offer alternative suggestions . . .  that right still existed to create counter AFEs, to create counter proposals.[7]

- I know they have rights to make proposals along the way, and they have significant rights at the AFE stages to consent or nonconsent. And the way the industry works is that no one is desiring to mow over another party during these discussions.[8]

- [T]hey can choose to nonconsent and force a dialogue about a different proposal at any supplemental AFE stage. They can suggest changes along the way.[9]

- Probably their biggest right is to execute the AFE and supplemental AFE process, which allows them to look at the upcoming proposed procedures for the well and evaluate

---

[5] Exh. A, Lang Report at 13 (citing TREX-02855 an April 14, 2010 email from BP employee Michael Beirne emphasizing with regard to setting the production casing: "We need to be sure we have co-owner approval prior to initiating this operation." Also with regard to temporarily abandoning the well, Beirne states: "This will require approval from co-owners.").
[6] *Id.* at 14 (citing TREX-01221 an April 19, 2010 email from Michael Beirne stating he is going to get co-owners approval not to pursue further operations.).
[7] Exh. D, Lang Dep. at 73:3-14.
[8] *Id.* at 74:25-75:6.
[9] *Id.* at 122:16-19.

whether they would like to continue or not, recognizing that there's well-defined implications for choosing to nonconsent.[10]

These examples demonstrate Lang's competence based on industry experience and knowledge of the rights afforded to NOPs under the JOA. Lang's opinion is not hypothetical to this case; it is supported by the BP emails cited illustrating BP viewed the Macondo partners as having a good measure of control by virtue of their rights to approve or disapprove the production casing AFE.

The second Anadarko claim regarding Lang's "confusing" opinions about the Macondo partners' well monitoring is manufactured and provides no grounds to question his qualifications or reliability. Nowhere in Lang's report does he state there is a NOP "obligation to monitor," contractual or otherwise. And he responded to repeated deposition questioning on the topic consistently and unambiguously. The following excerpts accurately and fairly reflect the full record regarding Lang's monitoring opinions and do not demonstrate "circular" reasoning or "confusion." His report states:

- Access logs, emails and deposition testimony reveal that both MOEX and Anadarko had employees watch the real time information streaming from Macondo and download well and operations information at various stages of operations.[11]

- [A]s owner[s] they very much have the responsibility and right to monitor that information to whatever degree they want.[12]

His deposition testimony is consistent:

- Q. And in any of those instances when you were advising nonoperating partners, did you ever advise them that it was their obligation to monitor all of the data from the rig on a real-time basis?

  A. Not personally. That would not be an area that I would advise one way or the other.

  Q. Okay. But are you aware of any industry practice in which nonoperators are advised that it is their obligation to monitor all of the rig data on a real-time basis?

---

[10] *Id.* at 211:9-15.
[11] Exh. A, Lang Report at 16; *see also* Lang Report at 16, n. 76; 17, n. 79.
[12] *Id*. at 19.

A. It's their opportunity to do so, but nowhere is it written that it's their obligation to do so.[13]

- Q. Okay. And with respect to Anadarko and MOEX, is it your opinion that they had an obligation to monitor the rig data on a real-time basis?

  A. It is my opinion they had an obligation to understand the operations of the rig in order to exercise their ownership rights effectively. How they interpreted that – that opportunity and what they chose to do on a moment-to-moment basis, that's, you know, their choices.

  Q. So going back to my question, is it your opinion that they had an obligation to monitor the rig data on a real-time basis?

  A. They apparently did. And it is my belief that that would be an effective industry practice in order to protect your ownership rights. There is not an obligation in the JOA that specifies they have to.[14]

Lang's view is that to exercise their ownership rights under the JOA, especially AFE decisions, the Macondo partners did *in fact* monitor drilling activities at the well, which was a prudent business practice. Anadarko has not articulated any grounds to exclude this opinion.

The sum of Mr. Lang's experience described in his report and deposition qualifies him as an expert with specialized knowledge on the roles of NOPs and the practical decisions made under JOAs. *See Schmidt v. MTD Products, Inc.*, No. 04-CV-3412, 2006 WL 5127539, at *2 (E.D. La. July 5, 2006) (Barbier, J.) (finding expert's testimony was "reliable and relevant . . . and that his reasoning and methodology [were] drawn from the facts of the case *and* his expertise, making his testimony admissible") (emphasis in original). The Macondo partners' claims to the contrary are inapposite. MOEX alleges there is "no evidence from Lang's report or his deposition" that provides a foundation for him to opine on NOP roles with respect to deepwater drilling. Anadarko claims "Mr. Lang repeatedly asserts unsupported and unsupportable inferences." This is pure rhetoric. The United States has established that Lang's

---

[13] Exh. A, Lang Dep. at 130:9-22.
[14] *Id*. at 132:15-133:8.

qualifications are directly relevant and reliable and not grounds for exclusion under the *Daubert* standard.  *See Daubert*, 509 U.S. at 592.  The Court can judge whether Lang's qualifications are more reliable than those possessed by Vernon or Cain in its assessment of each expert's credibility.

**B.      Lang's Opinions Are Relevant Because They Are Appropriate for Rebuttal Expert Testimony and Helpful to the Trier of Fact.**

Under *Daubert*, expert testimony must not only be reliable, it must also be relevant. *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010).  Mr. Lang's rebuttal opinion is highly relevant to the role of NOPs in deepwater drilling operations, particularly where the affirmative experts have ignored relevant evidence in forming their opinion.  As argued in the Lang expert report, Vernon and Cain give no weight to the ownership rights possessed by the Macondo partners, such as their ability to approve or disapprove of AFEs, monitor large volumes of well information made available to them, request meetings, raise questions and concerns, and offer independent proposals.  An expert's failure to consider all of the facts, or selective consideration of the facts, in and of itself renders the expert's testimony unreliable.  *See Lee Green v. La. Dep't. of Pub. Safety & Corr.*, No. 06-CV-1018, 2010 WL 1628769, at *5-6 (W.D. La. Apr. 20, 2010) (expert's opinion regarding cause of patient's lung problems unreliable where expert failed to consider other potential causes. "The inadequate treatment of other potential causes necessarily undermines the reliability of an expert's opinion." citing *Brown v. Parker-Hannifin Corp.*, 919 F.2d 308, 311-12 (5th Cir.1990)).  Thus, the Lang opinions should not be excluded as they will help the trier of fact appreciate the oil and gas industry understanding of the types of evidence that Vernon and Cain disregard.

One item of particular relevance brought to light by Lang is the notion that "[i]ndustry practice in these multi-partner projects is such that the parties are relying on each for more than

capital.  Skills, expertise, and technology ideas, are often shared among the parties.  Moreover, often the parties are in other projects together, and any single project is often part of a larger relationship."  Exh. A, Lang Report at 10.  Lang explains that this give-and-take in the industry at large is reflected at the rig level when a particular NOP seeks information or makes suggestions to its designated operator.  The fact that the same partners may be working together on multiple wells around the world, some wells where the other party may be the designated operator, makes it more likely that the NOPs' questions and suggestions are taken seriously by the designated operator.  Exh. D, Lang Dep. at 211:16-212:11.

In fact, Anadarko's expert agrees with this insight.  While not expressed in his report, Mr. Vernon agreed with Lang's opinion regarding this industry practice and used the term "professional courtesy" to describe it.  Exh. E, Vernon Dep. at 43:16-44:13, 145:20-146:18. Were it not for Mr. Lang's opinion, this notion of exchanging ideas between NOPs and operators may not have been established in this case.  It should not be excluded because it is relevant to the Macondo partners' relationship with BP and helpful to the trier of fact.

MOEX argues that the Court should exclude Lang's opinions as unsuitable for expert testimony because they are "his evaluation of documents and testimony to draw conclusions regarding the role and activities of MOEX Offshore."  MOEX Mem. at 5.  MOEX goes so far as to say that "the synthesis of the evidence performed by Lang does not require expert testimony, and Lang's apparent purpose is to be a mouthpiece through which the United States can present its factual and legal theories (with the veneer and perceived credibility of an independent expert)."  *Id.*  Here, however, Mr. Lang's report is structured to respond not only to MOEX's expert, Mr. Cain, but also to Anadarko's expert, Mr. Vernon.  Much of Vernon's report is a summary of fact depositions in this case and, if the court accepts MOEX's critique, equally

-12-

susceptible to those arguments.[15]  In the unlikely event that the Court agrees with MOEX that Mr. Lang's report cannot be admitted on this basis, then Anadarko's expert must also be stricken for the same reason.

It is completely appropriate to cite to the factual record in the case.  Notwithstanding the fact that Mr. Lang's discussion of the evidence is highly relevant, it is required to form an expert opinion on the role of the operator and NOPs at Macondo.  *See First Nat'l Bank of Louisville v. Lustig*, Civ. Nos. 87-CV-5488, 88-CV-1682, 1993 WL 411393 (E.D. La.1993) (denying a motion to exclude an expert on the grounds that he would discuss and explain for the jury evidence of financial transactions).  As discussed, the basis for Lang's opinions is his industry experience, which is what will assist the trier of fact in understanding the evidence.  Moreover, virtually every expert in this case has reviewed some of the evidence related to assist in forming opinions they are offering, including Vernon and Cain.  Mr. Cain had the unique disadvantage of only citing to eight documents in his reliance materials, including the JOA, a Lease Exchange Agreement, the Macondo Lease, and some model JOAs.  *See* Exh. C, Cain Report at Exhibit B. Therefore, in writing his report, he apparently had no idea how BP and the Macondo partners interacted in practice.  Only in preparing for his deposition did he actually read the evidence in the record, including the sole MOEX deposition, Mr. Ishii.  Exh. F, Cain Dep. at 80:3-19.  The fact that Mr. Lang, reviewed the evidence in the record and used it in forming his expert opinions is not only permissible, but adds to the relevance of his opinion.

Therefore, MOEX's request to exclude Lang's opinions incorporating the evidence against MOEX as "unsuitable expert testimony" should be denied.

---

[15] *See*, *e.g.* Exh. B, Vernon Report at ¶ 12 (Footnotes 7-15 to paragraph 12 have extensive citations to deposition testimony).

**C.      Lang Is Not Offering an Inappropriate Legal Opinion.**

Both Mr. Vernon and Mr. Cain opine, among other things, that neither defendant is an "operator" under the JOA.  Both point to specific provisions in the JOA and other evidence to arrive at that conclusion.  Nevertheless, MOEX claims Lang's opinion – that BP, Anadarko, and MOEX were owners of the Mississippi Canyon 252 lease and the Macondo well – is an "impermissible legal conclusion" and therefore should be excluded.  MOEX Mem. at 6-8. [16] This Court has made clear in its ruling regarding BP's Motion *in Limine* to Bar Fact or Opinion on Issues of Law, that the general rule barring legal conclusions does not exclude opinions where an expert uses a term with legal significance, such as "reckless," in its lay meaning.  Rec. Doc. 5495 at 2-3. [17]  Moreover, an expert may express an opinion that embraces the ultimate issue if the opinion is otherwise admissible.  Fed. R. Evid. 704; *United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977) (affirming admission of expert testimony even though it appeared to be a legal conclusion).  As explained in the advisory committee's note, the question "Did T have capacity to make a will?" should be excluded.  The question "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" is permissible.  Fed. R. Evid. 704 advisory committee's note; compare *Estate of Sowell v. United States*, 198 F.3d 169, 171 (5th Cir. 1999) (excluding testimony regarding whether a party "acted reasonably") with *Huddleston v. Herman & MacLean*, 640 F.2d 534, 552 (5th Cir.), *aff'd in part*, *rev'd in part on other grounds*, 469 U.S. 375 (1981) (permitting expert to testify concerning "the interpretation given some of the prospectus boilerplate language in the securities industry.").

---

[16]  Anadarko does not address the "legal opinion" issue directly but asks in a footnote that Lang's opinions be excluded apparently on similar grounds.  Anadarko Mem. at 3, n. 2.
[17]  The Court also permitted opining on whether a party violated drilling regulations.  Rec. Doc. 5495 at 2-3.

In his report, Lang provides insight into the industry understanding of NOPs rights and abilities as co-owners of the leasehold and the well.  Lang, a non-lawyer, said repeatedly throughout his deposition that he was not giving any legal opinions.  *See* Exh. D, Lang Dep. at 30:5-13; 34:5-10, 41:14-21, 62:9-23, 66:19-67:8, 70:4-72:20.  Lang's opinion regarding ownership is grounded is his "knowledge of how the industry works in these co-owned situations."  *Id*. at 61:10-64:13.  It is also clear that Lang uses the term "owner" in a lay business sense.  His usage of this term with respect to Anadarko and MOEX is extensively supported in the record.  BP and others often referred to Anadarko and MOEX as "partners," "co-owners," and "owners."  *See* Exh. A, Lang Report at 13, n. 51 (citing to the AFEs signed by Anadarko and MOEX).  With this understanding, there is no question that Lang's discussion of ownership is not offered in an impermissible legal sense.  The business understanding of NOPs ownership rights offered by Lang is important for the trier of fact and should not be excluded because it is the type of specialized knowledge that will assist in understanding the industry context of the JOA language and how it played out with respect to the Macondo partners.

It is also permissible for Lang to discuss the contracts between BP and the Macondo partners and his knowledge of how they are applied in the industry.  *See Brazos River Authority v. GE Ionics, Inc*., 469 F.3d 416 (5th Cir. 2006) (finding under FRE 704(a) a witness may testify as to a matter that embraces the ultimate issue to be decided by the trier of fact, and a witness could restate or read parts of a contract as a background or foundation for the question whether the corporation performed under the contract, provided he does not phrase his opinion in inadequately explored legal terms).

If the Court were to exclude Lang's discussion of ownership on the grounds he is offering legal opinion, it would also have to exclude Vernon's and Cain's opinions which address BP's

responsibilities as the designated operator under the Macondo JOA.  The Vernon report is very

explicit that:

> 9. BP, as Operator at Macondo, had exclusive authority for all decision-making on the well.  BP's responsibilities as the Operator and the extent of BP's exclusive control over drilling are typical of those found in the deepwater drilling industry.
>
> * * *
>
> 12. Thus, under the terms of the OA, BP was responsible for all activities and operations without any right of interference on the part of the NOPs.  BP was responsible for all decisions on the well and clearly sought to retain control for all decision-making . . . .

Exh. B, Vernon Report at 2-3.  Cain's report makes similar pronouncements about BP's control:

> 3. BP, as operator, had the exclusive right and duty to conduct (or cause to be conducted) all activities or operations under the Macondo OA.  This exclusive control by the operator is consistent with industry practice both in the Outer Continental Shelf ("OCS") and onshore.
>
> 4. BP, as operator, was not subject to the control or direction of Non-Operating Parties. This is consistent with industry practice . . . .

Exh. C, Cain Report at 1.  Vernon and Cain's statements reference the Macondo JOA and give

opinions about the level of authority BP had over drilling operations under the JOA.  The United

States did not move to exclude these opinions as legal opinions, but because Vernon and Cain

have engaged in interpreting the JOA and offering their opinion based on industry standards, it is

inappropriate for Anadarko or MOEX to attempt to exclude Lang's opinions on that basis.

Finally, Anadarko and MOEX both criticize Mr. Lang for being unfamiliar in his

deposition with the Court's Order and Reasons as to Motions to Dismiss the B1 Master

Complaint ("the B1 Order") that addresses Macondo partners' absence of a duty to intervene in

drilling operations with respect to the tort claims brought by the other plaintiffs in this case.  *See*

Rec. Doc. 3830.  The purpose of expert testimony is not to interpret Court orders, and Mr. Lang

did not when invited to do so during his deposition.  Exh. D, Lang Dep. at 77:2-79:12.[18]

Moreover, the B1 order did not address in any way the claims brought by the United States

against Anadarko and MOEX, which are based on strict liability under the Oil Pollution Act and

the Clean Water Act.  As the United States has argued in its Motion for Summary Judgment

against Anadarko, the responsibility that lessees have to the United States to comply with federal

drilling regulations is based on federal law.  Rec. Doc. 4836.  Therefore, the defendants' repeated

references to the B1 Order fail to address their potential liability to the United States.

**III.    SECTION V OF THE LANG EXPERT REPORT SHOULD NOT BE EXCLUDED PURSUANT TO ANADARKO'S MOTION *IN LIMINE* BECAUSE IT IS APPROPRIATE REBUTTAL MATERIAL.**

For purposes of the Phase I Trial, the United States withdraws sections III(4), XII, and

XIII(3) of the Lang expert report addressing the potential impact of liabilities on future

deepwater investment activities.  Exh. A, Lang Report at 4, 19, and 22.  The United States agrees

that those matters are appropriate for a later penalty Phase of the litigation and reserves its right

to reassert them at that time.  Accordingly, the Court should find that Anadarko's Motion *in*

*Limine* is moot with respect to everything except its discussion of Section V of the Lang report.

The Court should also find moot Section III. D. of the MOEX *Daubert* memorandum addressing

"Lang's Opinion on the Impact of Liability" and Anadarko's argument in Section III. C. of its

*Daubert* memorandum, as it addresses Lang's "opinions related to the impact of liability."

MOEX Mem. at 8; Anadarko Mem. at 9.

Section V titled, "Upstream Oil & Gas Industry – Business Strategies of Anadarko and

MOEX" is relevant to Mr. Lang's opinions regarding the ownership rights acquired by Anadarko

and MOEX and is appropriate material to rebut the Vernon and Cain reports.  Exh. A, Lang

---

[18] To the extent Mr. Cain's deposition testimony crosses into impermissible legal opinion when he interprets the B1 Order in his deposition, the Court should strike that portion of Cain's opinion.  Exh. F, Cain Dep. at 55:11-24.

Report at 6-10.  Fed. R. Civ. P. 26(a)(2)(D)(ii) allows for rebuttal expert testimony that is "intended solely to contradict or rebut evidence on the same subject matter" identified by another party's expert witness.  "The scope of rebuttal testimony is ordinarily a matter to be left to the sound discretion of the trial judge." *Tramonte v. Fibreboard Corp.*, 947 F.2d 762, 764 (5th Cir. 1991) (quoting *United States v. Winkle,* 587 F.2d 705, 712 (5th Cir. 1979) (citations omitted). However, a plaintiff's rebuttal expert opinion should not be excluded by the trial court where he addresses a new issue raised by defendants' experts that is critical to proving the plaintiff's *prima facie* case. *Rodriguez v. Olin Corp*., 780 F.2d 491, 496 (5th Cir. 1986); *see also McAfee v. Murray Ohio Mfg., Inc*, 66 F.App'x 523 at n. 25 (5th Cir. 2003) (quoting *Rodriguez*, 780 F.2d at 496).

        In the instant case, the United States offers a rebuttal opinion to address the overly-broad claims by Anadarko and MOEX that as non-operating partners on the Macondo well, they had *no control* over drilling operations whatsoever.  Mr. Lang's report lays out in detail the reasons this is untrue, based on his many years advising oil and gas clients.  Chief among those reasons is the Macondo partners' duty under the JOA to approve or disapprove of AFEs, the funding mechanism for drilling operations, including an AFE for the production casing where BP would not proceed without "co-owner approval."  Central to Mr. Lang's opinion is his explanation of the broader industry context in which BP, Anadarko, and MOEX were acting.  Section V discusses the commonality of "joint lease agreements and joint operating agreements," how these agreements allow the companies to share "a significant range of outcomes," how the players have "exposure to multiple opportunities," and how they are able to "leverage existing facilities" and "share knowledge."  Exh. A, Lang Report at 6, Sec. V. ¶ 1.  The industry practice described in Section V is a necessary predicate to understanding the "professional courtesy" that these

companies afford one another when they are all joint owners of one well, regardless of which company is the designated operator. The foundation that Section V provides for this opinion is appropriate and necessary rebuttal material to Vernon's and Cain's claims of no control or influence despite the Macondo partner's ownership position.

Other important aspects of Section V that are relevant to Lang's opinions regarding ownership rights and Macondo partner influence include the discussion of Anadarko's emphasis on the future "tie-back" of the Macondo well to its Pompano facility. This evidence, and its impact on the Macondo Well Participation Agreement between BP and Anadarko, goes directly to the question of whether Anadarko owns the facilities and physical equipment on its leases in the Gulf of Mexico. Exh. A, Lang Report at 6, Sec. V. ¶ 6. Another relevant discussion in Section V describes the type and level of due diligence that MOEX conducted in making the decision to become a co-owner and designating BP as the operator. *Id*. at ¶ 7. As Lang explains, the very act of designating an operator itself demonstrates control over the joint drilling venture.

In sum, the Court should not grant Anadarko's Motion *in Limine* to strike Section V of the Lang expert report because it contains important foundation for Lang's opinions regarding industry practice with respect to operator and NOP roles and "professional courtesy," and it contains discussion of direct evidence of the Macondo partners' ownership and control.

## IV.    CONCLUSION

For the reasons stated herein, the United States respectfully requests that the Court deny 1) Anadarko's Motion to Exclude the Expert Testimony and Report of James P. Lang; 2) MOEX's Motion to Exclude the Expert Report and Testimony of James P. Lang; and 3) Anadarko's Motion *in Limine* to Strike and Preclude from Trial Certain Sections of the Rebuttal Expert Report of James P. Lang and Certain Opinions of James P. Lang.

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

JAMES NICOLL
Senior Counsel
NANCY FLICKINGER
Senior Attorney
SARAH HIMMELHOCH
Senior Attorney
DEANNA CHANG
SCOTT CERNICH
A. NATHANIEL CHAKERES
RACHEL HANKEY
ABIGAIL ANDRE
JUDY HARVEY
MATT LEOPOLD
JEFFREY PRIETO
GORDON YOUNG
Trial Attorneys

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
U.S. Department of Justice
Environmental Enforcement Section
PO Box 7611
Washington, DC 20044
(202) 514-2779
steve.o'rourke@usdoj.gov

TONY WEST
Assistant Attorney General
Civil Division

PETER F. FROST
Director, Torts Branch, Civil Division
Aviation & Admiralty Litigation
STEPHEN G. FLYNN
Assistant Director
MICHELLE T. DELEMARRE
SHARON K. SHUTLER
JILL DAHLMANN ROSA
JESSICA SULLIVAN
JESSICA L. McCLELLAN
MALINDA LAWRENCE
DAVID J. PFEFFER
ROBIN HANGER
LAURA MAYBERRY
BRIENA STRIPPOLI
Trial Attorneys
U.S. Department of Justice
Torts Branch, Civil Division
PO Box 14271
Washington, DC 20044
(202) 616-4100
(202) 616-4002 fax

/s/ R. Michael Underhill
R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
7-5395 Federal Bldg., Box 36028
450 Golden Gate Ave.
San Francisco, CA 94102-3463
(415) 436-6648
(415) 436-6632 fax
mike.underhill@usdoj.gov

-20-

JAMES LETTEN
United States Attorney

SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras St., Suite 1600
New Orleans, LA 70130

Attorneys for the UNITED STATES OF AMERICA


## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 14th day of February, 2012.


/s/ Steven O'Rourke
U.S. Department of Justice