UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:   OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | MDL NUMBER 2179  SECTION: J<br><br>JUDGE BARBIER |
| Relates to: *All Cases* | MAGISTRATE JUDGE SHUSHAN |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## OPPOSITION TO BP'S *DAUBERT* MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF GREGG PERKIN

Perkin is a highly qualified mechanical engineer with extensive experience in oil field operations and equipment. He has been a consultant for Cameron, BP, Transocean, Shaffer, Hydril and others. He has 13 patents, multiple publications in the field, and has qualified as an expert witness on Blowout Preventers in several courts and on several occasions. His opinions are well within his qualifications and experience and are fully supported by evidence and analysis.

Typically, a qualified expert may offer testimony where it "will assist the *trier of fact* . . ." Fed. R. Evid. 702 (emphasis added).  However, where, as in this case, "a district judge sits as a trier of fact in place of the jury," it is well established that "[m]ost of the safeguards provided for in *Daubert* are not as essential." *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000).  In applying this principle, this Court has similarly noted that "the concerns of *Daubert* are largely moot in . . . a bench trial" because "*Daubert* was preoccupied with the courts' gatekeeping function vis-a-vis the jury." *Hebert v. Cannon*, CIV.A.A 04-1076, 2005 WL 3533695, at *2 (E.D. La. Oct 31, 2005) (Barbier, J.) (original emphasis). Citing this reason, this Court has frequently denied motions to exclude experts in a bench trial. *See, e.g., U.S. Marine, Inc. v. United States*, CIV.A. 08-2571, 2009 WL 3480979, at *1 (E.D. La. Oct. 26, 2009) (Barbier, J.); *Poiencot v. Global Sante Fe Drilling Co.*, CIV.A. 06-10793, 2008 WL 5429645, at *1 (E.D. la. Aug. 6, 2008) (Barbier, J.); *Wilson v. Am. Sec.*

*Ins. Co.*, CIV.A. 07-5984, 2008 WL 2704522, at *1 (E.D. La. July 3, 2008) (Barbier, J.); *Matheny v. Tetra Technologies, Inc.*, CIV.A. 07-1556, 2008 WL 2178091, at *1 (E.D. La. May 22, 2008 (Barbier, J.). Despite the fact that the "objectives of *Daubert* are no longer implicated" in bench trials, *Thompson v. Rowan, Inc.*, 2007 WL 724646, at *1, and "the rejection of expert testimony is the exception rather than the rule," Advisory Committee Notes, Fed. R. Civ. P. 702 (2000), BP has nonetheless deluged the Court with an indiscriminate barrage of generic *Daubert* motions.

BP attempts to exclude Perkin's testimony by arguing that the following opinions regarding defects and alternative designs are not proper: 1) the *Deepwater Horizon* BOP should have been equipped with alternative, better technologies; 2) the MUX cables on the *Deepwater Horizon* BOP controls should have been designed or configured to avoid a single point failure in the system; 3) that BP did not properly calculate, or plan for, the worst possible pressures that Macondo could deliver, *i.e.*, maximum anticipated surface pressure ("MASP") which is critical to BOP function; 4) that BP failed to assure that the BOP was adequately maintained; and 5) the *Deepwater Horizon* BOP did not have "best available and safest technology" ("BAST").

## I.   THE *DEEPWATER HORIZON* BOP SHOULD HAVE BEEN EQUIPPED WITH BETTER TECHNOLOGY

### A.   Alternative Shear Rams

BP argues that Perkin provides inadequate support for his opinion that BP should have availed itself of better and safer technologies which were available prior to April 20, 2010. In doing so, BP ignores Perkin's fully supported opinions that **a)** the BOP failed to seal the well because the cutting blades of the BOP's Shear Blind Rams ("SBR's" sometimes referred to as "BSR's") were incapable of shearing the off-center pipe; **b)** the tendency of pipe to be off-center was common and foreseeable and should have been well known to BP; and **c)** BP had available to it, through the BOP

manufacturer Cameron, alternate technologies which would have cured or ameliorated this dangerous defect but failed to utilize them.

BP incorrectly argues that Perkin's review and analysis of alternative designs must be supported by his testing or independent engineering analysis. Perkin "need not develop and test a prototype, nor must he publish his opinion in order to validate his conclusion as to safety devices suitable for this particular piece of machinery;" on the contrary, he can reach conclusions based on his review of existing, alternative ram designs and his knowledge in the area. *Surace v. Catepillar, Inc.*, 1995 WL 303895, at *2 (E.D.Pa. May 16, 1995), *aff'd in part, rev'd in part, on other grounds*, 111 F.3d 1039 (3rd Cir. 1997). See also, *Johnson v. Samsung Electronics America, Inc.,* 277 F.R.D. 161, 166 (E.D. La., Sept. 14, 2011); *Colon v. BIC USA, Inc.*, 199 F.Supp.2d 53, 76 (S.D.N.Y. Dec. 19, 2001); *Columbo v. CMI Corp.*, 26 F.Supp.2d 574, 577 (W.D.N.Y. Nov. 16, 1998). In addition, review of testing, experimental or statistical data generated by others in the field may suffice as a reasonable methodology upon which to base an expert opinion. *Monsanto Co. v. David*, 516 F.3d 1009, 1015 (Fed. Cir. 2008); *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 94, 95 (2d Cir. 2000); *Clark v. Takata Corp.*, 192 F.3d 750, 758 (3d Cir. 1999).

Perkin's testimony regarding the availability and effectiveness of these alternative ram designs is fully supported by, *inter alia*, his analysis of testimony and documents from the BOP's manufacturer, Cameron. The failure of the BOP to seal the well was because the BOP cutting blades (the "ram blocks") did not extend across the entire wellbore, a conclusion shared by other BOP experts including those retained by BP, Transocean, the USA and Halliburton. (Shanks, TREX-08122, pp. 29-30, 50; Childs, TREX-07687, pp. pg. 2, 22; Davis, TREX-07660, p. 15; and Stevick, TREX-07755, pp. 18-19, 27-28, respectively).

Off-center pipe is a common occurrence (Dep. Patrick Campbell, pp. 39-40). The risk that the BOP might fail because of the blade's inability to completely shear the off-center pipe is grave since the well could not be shut in. (Dep. Billy Dean Ambrose, p. 159)  BP configured the *Horizon* BOP such that the BSR was its *only* means on shearing the pipe and sealing the well.

Yet, BP refused to upgrade the BOP with technologies known to it which would have alleviated or ameliorated this grave and foreseeable danger including DVS rams, cDVS rams, and the use of two SBR's.

Cameron's DVS rams covered more of the wellbore than the SBR's thereby reducing the chance that drillpipe would be outside the cutting blades. (TREX-07001, p. 6 of 17; Dep. Melvin Whitby, p. 352) DVS rams also provided enhanced centering capabilities. (TREX-07660, p.15; TREX-07661, p.17) They were inexpensive, available, and would have been little or no trouble to install. (Dep. Jack Carter Erwin, p. 18) While DVS rams did not extend entirely across the well bore, their blades were wider than the SBR blades on the DWH BOP and would have increased its ability to center the pipe.  Both of these features would have improved the ability of the DWH BOP to seal the well and were touted by Cameron (TREX-07001, p.6 of 17) and confirmed by West Engineering. (TREX-01300, pp.3-5) These points are also confirmed by BP's own BOP expert Forest Shanks (TREX-08122, p.58) the U.S. BOP expert Rory Davis et al (TREX-07660, p.15 and TREX-07661, p.17).

Cameron offered yet another ram blade, the "cDVS," which was designed to overcome the shortcomings of the SBR by extending the blades *entirely* across the well bore. (Dep. Cameron Corporate Representative David McWhorter, pp. 145-148; Dep. Cameron Engineer Melvin Whitby, p. 649)  The cDVS rams were available since 2005 (Dep. Whitby, p. 354) and were available in the

18 3/4" (the size of the Macondo wellbore). (TREX-03185, p.CAM_CIV_0098267 - Cameron Engineering Bulletin 702D, and TREX-05985, p. BP HZN 2179MDL 00057634)[1] West Engineering also supports and validates Perkin's opinion that better cutting and shearing technology was available to BP well before April 20, 2010. (TREX-01300, p. 3-5, and TREX-07001, p. 6 of 17)

### B.    Two Blind Shear Rams, Tandem Boosters, larger accumulator pressure.

Perkin's opinion regarding the availability and superiority of two blind shear rams and/or tandem boosters, is supported by abundant evidence. By 2010, most BOPs were being built with two SBR's rather than one. (TREX-07535, p. 17; Dep. Jack Carter Erwin, p.62).

Tandem boosters have been commercially available through Cameron for a long time and have been used by BP and Transocean on other rigs (Dep. Andrew Frazelle, p.575). Tandem boosters virtually double the cutting force available. (Dep. David McWhorter, pp.118-119) Also, 5,000 psi accumulator systems were available, providing more cutting force than was available on the *Horizon* BOP. (Dep. David McWhorter, pp. 134-135). The *Horizon* only had 4,000 psi of cutting force available, a difference that becomes critical when the issue of shearability is addressed. Perkin's opinions as to the availability and feasibility of these technologies is amply supported by Cameron documents and the testimony of Cameron witnesses and others.

### II.   MUX CABLE LOCATION AND DESIGN

Both MMS regulations and API (American Petroleum Institute) **require** that there be *redundant* BOP control systems. (30 CFR 250.443). Cameron employee Richard Coronado admitted that this redundancy requirement mandated two complete control systems with no "single points of

---

[1] These depositions and documents are among many relied upon by Perkin to support his opinions. See Report, TREX-07535, generally and Appendices, TREX-07536, generally, including review of designs from other manufacturers (Dep. Gregg Perkin, pp. 89-91).

failure" ("SPOF"). (Dep. Coronado, pp. 608-609). Because both sets of BOP MUX cables on the DWH converged in the moonpool at the top of the riser, a known "hazardous area,"[2] the DWH control system violated this design mandate (see *e.g.* TREX-07581, p. 2, 24 and TREX-05094, p.5). Because the MUX cables traveled through a SPOF, there was no functional redundancy and the explosion on the DWH destroyed both MUX cable control systems of the BOP. No party to the case has disputed that a single explosion destroyed both MUX cables and disabled all operator control. (see, *e.g.* TREX-00001, Bly Report, p.151) Perkin's opinion that this SPOF should have been addressed and eliminated is supported by both MMS and API requirements for redundancy.

Perkin offered three alternative designs to eliminate or ameliorate this dangerous SPOF. The first of these was an acoustic trigger (which might be generically called a "remote control"). Thus, if the MUX cables were disabled, this backup system could still activate the BOP. Such a system has been available through Cameron since 1999 and Cameron witnesses have stated it is a good, reliable system with no known failures. (Dep. William LeNormand, p. 95; Dep. David McWhorter, pp. 124-125; Dep. Edward Gaude, pp. 78-80; Dep. Jack Carter Erwin, pp. 49-50) It is obvious that Perkin's opinion on the feasibility of this alternative design is adequately supported.

Perkin also opined that the cables themselves could be protected from explosion by protective coverings. (TREX-07535, p.19 and TREX-07536, p.39) Such technology is commonly used on drilling rigs and in industrial applications. Third, Perkin opined that one of the MUX cables could be rerouted so that it did not travel through the moonpool. He testified that this was feasible and that there was no engineering reason that such rerouting could not be done. (Dep. Gregg Perkin, pp. 576-578) As set forth in his report, these conclusions are based on engineering judgment and principles,

---

[2] *See, e.g.,* Testimony of BP WSL Martin Breazeale, pp.74-75 and Cameron's own schematic, TREX-08037.

and established technology, following decades of work in the oil industry.

### III. BP DID NOT PROPERLY CALCULATE THE WORST POSSIBLE CASE, *I.E.*, MAXIMUM ANTICIPATED SURFACE PRESSURE ("MASP")

Contrary to BP's argument, Perkin's opinions regarding the proper calculation of MASP is well within his area of expertise as a mechanical engineer with years of experience in oil field practice. Furthermore it is supported by an authoritative textbook as well as *BP's own standards*.

Perkin opined in detail about the pressures that Macondo could produce in the wellbore, in the event of a blowout. (TREX-07536, pp. 74-76)[3] In short, pressures in the wellbore at the BOP could exceed 10,000 psi. In order to calculate this 'worst possible case', *i.e.*, the 'maximum' anticipated pressure, Perkin assumed that the well would be a 100% column of gas from the bottom of the hole to the BOP and correctly states that this was maximum anticipated surface pressure ("MASP").

Perkin's opinion regarding the proper calculation of MASP is supported by an authoritative textbook (TREX-20275), BP's Drilling Well Operations Procedures (DWOP) (TREX-00093, p.B-9 [BP-HZN-2179MDL00057307]) and its Group Practice 10-10 (TREX-00215, p.10 of 22). These state unequivocally that exploratory wells should use a 100% column of gas to calculate the pressures that the well should produce. Other BP documents back support Perkin's interpretation (TREX-20149, p.8; TREX-20150, p.8; TREX-20151, p.8; TREX-20152, p.8) and state that the worst possible case is complete evacuation (*i.e.*100% gas). More than one witness testified that the "worst possible case" was 100% gas. (Dep. Trent Fleece, pp.79-80; Dep. Patrick Campbell, p.18; see also TREX-01861, p.9)

---

[3] He relied on several exhibits in support of this conclusion, including BP's filings with the MMS.

BP takes the position that the MMS regulations do not require the calculation of the worst possible case, just some amorphous "reasonable" standard, which the operator is free to define. This position fails to take into account that the regulation was changed in 2003 to include the word '**maximum**', or that non-exploratory wells (*e.g.* completion and workover wells) don't require MASP protection (30 CFR 250.601 and 250.515). Also, BP's interpretation of the rule conflicts with BP's internal documentation referenced above and would mean that MMS does not intend for the BOP to be able to handle all situations that could arise in the drilling of a given well.

But the MMS **requires** that the operator verify that the BOP Blind Shear Rams can shear and seal the well at MASP. (30 CFR 250.416(e))  In this case, BP did not even attempt to comply with 416(e), nor did it bother to calculate whether the drillpipe could be sheared at MASP. (Dep. Scherie Douglas, pp. 284-286) Perkin's interpretation of MASP is correct and well supported.

### IV.     BP FAILED TO ADEQUATELY MAINTAIN THE BOP

BP does not argue, nor could it, that it had no responsibility for proper maintenance of the DWH BOP. See, *e.g.*, 30 CFR 250.1501-1503 (requiring the operator to implement proper training in the use of the equipment) and 30 CFR 250.440 (requiring the operator to "design, install, **maintain**, test and use the BOP system and system components to ensure well control") (emphasis added).  BP has itself argued that Transocean's maintenance of the BOP is substandard and inadequate (Dias report, TREX-07772, pp.18-19; Dep. Paul Dias, pp.220-221).  Perkin's opinions regarding BP's inadequate maintenance is supported by citations to documents and materials from BP's and Transocean's own files, including the 2009 BP audit. (TREX-00275, p.2)[4]

---

[4] See also the deposition of BP's auditor, Norman Wong at p. 73 and associated exhibits. (TREX-06168, TREX-6142 and TREX-6143).

A glaring example of BP's inadequate maintenance is found in BP's failure to make sure that the BOP was re-certified in accordance with the manufacturer's 5 year re-certification recommendation. Although more than one auditor had complained about this item, nothing was done. (TREX-00257, p. TRN-MDL-00038634) BP had an obligation to ensure that proper maintenance was done, and yet did nothing to insure compliance. Perkin's opinion that BP failed in its maintenance obligation is more than adequately supported.

### V.     PERKIN'S OPINION ON THE NEED FOR THIS BOP TO HAVE BETTER EQUIPMENT IS WITHIN HIS EXPERTISE AND SUPPORTED

BP argues that Perkin's testimony that the *Horizon* BOP did not constitute the "best available and safest technology" ("BAST") under 30 C.F.R. § 250.107 (CCC) is an "impermissible legal conclusion." BP is wrong because Mr. Perkin's opinions on this topic simply represent those of a well qualified expert on BOPs opining whether the BOPs comported with federal regulations. "We do not exclude all testimony regarding legal issues. We recognize that a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." *Specht v. Jensen* 853 F.2d 805, 809 (10th Cir. 1988).

This Honorable Court has already, and correctly, allowed such testimony. BP recently filed a Motion *in Limine* which, in part, attempted to prevent Dr. Alan Huffman from testifying regarding BP's violation of MMS regulations as it pertained to Dr. Huffman's area of expertise. The Court denied this Motion finding that the expertise of Dr. Huffman was sufficient to allow him to opine as to whether BP's conduct contravened MMS regulations. [Rec. Doc. 5108]. Similarly, Perkin should also be allowed to address this question of MMS regulations as they touch on the areas of his

expertise, namely, what equipment is required for well control.

BP's complaint is that Perkin has concluded that BP should have a BOP that would control the maximum conditions at Macondo, which ironically, agrees with BP's own internal standards and guidelines (TREX-00093, p.B-9 [BP-HZN-2179MDL00057307] and TREX-00215, p.10 of 22). Under BP's interpretation, it had no obligation to use any BAST equipment unless specifically ordered to do so by the Director of MMS, even if such equipment is necessary to ensure well control. This is not the case. But, in any event, Perkin's opinion that safer technology was needed and available is supported by his analysis of the 'worst possible case' which Macondo could produce and with an extensive analysis of the forces needed to shear the drillpipe being used on the *Horizon.* (TREX-07536, p. 80-81) For that analysis, he used Cameron's own shearing formulas, developed, according to Cameron, through extensive testing (Dep. David McWhorter, pp.403-404). He then looked at available Cameron equipment (TREX-07001, generally), and other manufacturers' equipment (Dep. Perkin, pp.89-91) and concluded that more robust equipment was necessary to contain Macondo in the event of high pressures or a severe blowout. (Dep. Perkin, pp. 753-760) As discussed above, there were better and safer available technologies that could have done this.

**Conclusion**

For the above and foregoing reasons, BP's *Daubert* Motion to Exclude Perkin should be denied.

This 14th day of February, 2012.

Respectfully submitted,

| | |
|---|---|
| /s/ Stephen J. Herman | /s/ James Parkerson Roy |
| **Stephen J. Herman**, La. Bar No. 23129 | **James Parkerson Roy**, La. Bar No. 11511 |
| **HERMAN HERMAN KATZ & COTLAR LLP** | **DOMENGEAUX WRIGHT ROY & EDWARDS LLC** |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, Louisiana 70113 | Lafayette, Louisiana 70501 |
| Telephone: (504) 581-4892 | Telephone: (337) 233-3033 |
| Fax No. (504) 569-6024 | Fax No. (337) 233-2796 |
| E-Mail: sherman@hhkc.com | E-Mail: jimr@wrightroy.com |
| *Plaintiffs Liaison Counsel* | *Plaintiffs Liaison Counsel* |

**PLAINTIFFS' STEERING COMMITTEE**

| | |
|---|---|
| Brian H. Barr | Robin L. Greenwald |
| LEVIN, PAPANTONIO, THOMAS, | WEITZ & LUXENBERG, PC |
| MITCHELL, ECHSNER & PROCTOR, PA | 700 Broadway |
| 316 South Baylen St., Suite 600 | New York, NY  10003 |
| Pensacola, FL 32502-5996 | Office:  (212) 558-5802 |
| Office:  (850) 435-7045 | Telefax: (212) 344-5461 |
| Telefax: (850) 436-6187 | E-Mail:  rgreenwald@weitzlux.com |
| E-Mail: bbarr@levinlaw.com | |
| | Rhon E. Jones |
| Jeffrey A. Breit | BEASLEY, ALLEN, CROW, METHVIN, |
| BREIT DRESCHER & IMPREVENTO | PORTIS & MILES, P. C. |
| 999 Waterside Drive, Suite 1000 | 218 Commerce St., P.O. Box 4160 |
| Norfolk, VA 23510 | Montgomery, AL 36104 |
| Office:  (757) 670-3888 | Office:  (334) 269-2343 |
| Telefax: (757) 670-3895 | Telefax: (334) 954-7555 |
| E-Mail: jbreit@bdbmail.com | E-Mail:  rhon.jones@beasleyallen.com |

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA 70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595

Joseph F. Rice  
MOTLEY RICE LLC  
28 Bridgeside Blvd.  
Mount Pleasant, SC 29464  
Office: (843) 216-9159  
Fax No. (843) 216-9290  
E-Mail: jrice@motleyrice.com

Fax No. (985) 876-7594  
E-Mail: duke@williamslawgroup.org

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that the above and foregoing Opposition will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 14th day of February, 2012.

                                                                               s/ James Parkerson Roy and Stephen J. Herman