## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | * | MDL NUMBER 2179 |
| "DEEPWATER HORIZON" IN THE GULF | * | |
| OF MEXICO, ON APRIL 20, 2010 | * | SECTION: J |
| | * | |
| RELATES TO: *All Cases* | * | JUDGE BARBIER |
| | * | |
| (Including No. 10-2771) | * | MAGISTRATE JUDGE |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## OPPOSITION TO BP'S *DAUBERT* MOTION
## TO EXCLUDE THE REPORT AND TESTIMONY OF DR. ANDREW HURST

The report and testimony of Dr. Andrew Hurst, a renowned petroleum, geologist, geoscientist and professor of production geoscience at the University of Aberdeen in Scotland, sets forth an empirically verifiable, peer-reviewed method to evaluate the geological characteristics of deepwater well sites. A predrill geological evaluation, according to Dr. Hurst, is a crucial component of an adequate drilling exploration plan, for it enables one to mitigate technical risk during exploration drilling and thereby reduce the possibility of well-control complications. BP did not utilize the method of geologic evaluation described by Dr. Hurst; yet had BP engaged in such analysis, it is likely that the mud losses and repeated kicks that plagued Macondo could have been avoided. BP's attempt to suppress Dr. Hurst's testimony is simply an effort to conceal its pre-drill shortcomings.

BP moves to exclude Dr. Hurst's report and testimony on two grounds. First, it argues that Dr. Hurst's thermal modeling method is not reliable because it "does not rely on an accepted theory" [Doc. 5428-1 at 3]. Second, BP contends that Dr. Hurst's testimony is irrelevant. Both arguments are without merit and should be rejected.

I.      **Dr. Hurst's Opinions Are Reliable: They Have Been Generally Accepted in the Scientific Community, Have Been Widely Peer-Reviewed, and Have Been Tested.**

Pursuant to the decision of the Supreme Court in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589.   This inquiry requires a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."   *Id.* at 592-93.   The Supreme Court and the Fifth Circuit have outlined several factors that may guide the trial court's decision-making, to wit: (1) whether the theory is generally accepted; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory can and has been tested; (4) whether the known or potential rate of error is acceptable; and (5) whether there are standards controlling the technique's operation.   *See Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378-79 (5th Cir. 2010) (citing *Daubert*, 509 U.S. at 593 and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1998)).

An expert opinion is reliable where "the reasoning or methodology underlying the testimony is scientifically valid."   *Wells*, 601 F.3d at 378 (quoting *Daubert*, 509 U.S. at 592-593).   Rule 702 identifies criteria that comprise indicia of reliability: (1) testimony that is rooted in "sufficient facts or data"; (2) testimony that "is the product of reliable principles and methods"; and (3) indications that "the witness has applied the principles and methods reliably to the facts of the case."   Fed. R. Evid. 702.

### A.  Dr. Hurst's Opinions.

The report submitted by Dr. Hurst sets forth the concept referred to by petroleum geologists as the "Golden Zone."  The Golden Zone is a layer of the earth's crust that varies in depth but has a temperature range between 60º Centigrade (140º Fahrenheit) and 120º Centigrade (248º Fahrenheit). [Hurst Rep. at 10-11, 26.[1]]  Ninety percent of the earth's light oil and hydrocarbon reserves lie within this layer.[2]  [*Id.* at 26.]  Thus, deepwater exploration will naturally target the Golden Zone.  The key to a successful drill, however, is to understand the geologic challenges presented by areas within the Golden Zone, and to minimize the risks inherent in these challenges.  Dr. Hurst's report principally emphasizes the critical role that temperature plays in pore pressure prediction.  It explains that temperature-driven reactions modify the mineralogy, porosity, and permeability of sediment as it transforms into sedimentary rock deep below the earth's surface. [*Id.* at 6.]  Along the Gulf Coast, significant temperature-based change begins to occur rapidly at 60º Centigrade, where mineral transformations contribute to a decrease in permeability of subterranean rock formations. [*Id.* at 8.]  This decrease in permeability, in turn, causes mudstones to become more susceptible to elevated pore pressure, or overpressure. [*Id.* at 9.]  As temperatures rise, permeability decreases to such an extent that overpressure may lead to hydraulic fracturing. [*Id.*]  Similarly, in sandstones, the rate of permeability—and the concomitant increase in overpressure—decreases significantly above 120º Centigrade. [*Id.*]  This, again, leads to greater risk of hydraulic fracturing and, consequently, to greater risk of well-control events.  The challenge, thus, is clear: while the

---

[1] For ease of reference, Dr. Hurst's expert report is hereinafter referred to simply as "Hurst."

[2] As Dr. Hurst explains, the Golden Zone concept is "accepted and adopted in the oil industry," and based on a "huge" database of public-domain data culled from over 120,000 reservoirs, many in the Gulf of Mexico.  [Hurst at 10.]  In addition, Dr. Hurst cites to several academic studies that have studied and applied the Golden Zone concept. [*Id.*]  Thus, while BP attempts to cast aspersions on the tenability of the Golden Zone, it cannot point to any countervailing research—from either academia or industry—that questions the its validity or usefulness.

Golden Zone holds 90% of the earth's hydrocarbons, it also presents a layer of earth where overpressure risk becomes increasingly more significant the deeper drilling takes place into the Golden Zone.  To avoid a well-control event, geologists must derive accurate pore pressure predictions in advance of the drill.  For years, prevailing practice in the industry relied upon mechanical compaction models to derive pore pressure predictions. [*Id.* at 15-16.]  At least since 1998, however, geologists have recognized the limitations of mechanical compaction, and the significance of temperature-based modeling in pore pressure. [*Id.* at 15-16 (citing research which underpins the concept, Giles et al. 1992; Walderhaug 1994, 1996; Aase et al. 1196; Bjorkum and Nadeau 1998; Bjorkum et al. 1998); Oelkers et al. 1196, 1998.]  Dr. Hurst explains, "Following concepts used to define the Golden Zone (GZ), one can predict reservoir pressures from temperature and use probability distributions relevant to the study area." [*Id.* at 16.]  What is more, Statoil (the exploration and production company largely owned by the government of Norway, with operations all over the world, including the Gulf of Mexico) has utilized this thermal modeling method around the globe, [*id.* at 16, 26].

Perhaps most telling, the theory has not been opposed or criticized in scientific literature. Rather, there have been over 100 fundamental research papers that underpin the Golden Zone concept, and there have been nearly 30 citations of papers directly dealing with the Golden Zone concept. Zero papers have been found opposing or criticizing the concept. [*Id*. at 12.]

Dr. Hurst also details the manner in which thermal modeling could have been utilized in a troublesome geologic area such as Macondo.  The Mississippi Submarine Canyon Region, where Macondo is located, is characterized by "large submarine slumps that are associated with small-magnitude earthquakes, hydrocarbon seeps and the occurrence of gas hydrates." [*Id.* at 17.]  Dr. Hurst states that the seafloor conditions are unstable and are associated with large-scale

hydraulic fracturing. [*Id.*]  It is a region, in other words, rife with difficulty and one that "required appropriate and thorough pre-drill modeling of pore pressure evolution, and great caution." [*Id.* at 3.]  Indeed, the Macondo reservoir temperature was 117º Centigrade, which lies at the Golden Zone's outer boundary.  According to Dr. Hurst, this is "where one would expect the onset of HPHT [high pressure high temperature] conditions that may be accompanied by overpressure and possible development of hydraulic fracturing." [*Id.* at 11.]  This is precisely what Macondo experienced.  Had BP well engineers used thermal pressure modeling, they may have been better prepared.

### B. Dr. Hurst's Opinions Are Supported by Unassailable Methodology, Industry Standard Theory, and the Factual Record.

The report of Dr. Hurst is refreshingly scholarly and perhaps unusual for reports often found in litigation. Dr. Hurst cites to extensive scientific literature and quantitative analysis. But, in his inescapable scholarly fashion, he also acknowledges argument against the concept, which is rapidly disposed of in the weight of the extensive peer-reviewed scientific literature and data developed. His report cites to academic research "that uses extensive data and a robust quantitative approach to demonstrate the limitations of mechanical-compaction-based basin models and emphasizes the importance of thermally-driven mineralogical processes." [Hurst at 15 (citing at least six sources by six different authors over a span of six years, *supra*).]  Even recently a 2011 study by Nadeau directly applies thermal modeling. [Hurst at 16.]  Furthermore, Statoil has applied the modeling workflow set forth in Nadeau's study to evaluate basins. [*Id.*]

The Golden Zone concept is much more than a theory. It is derived from a huge database of over 120,000 producing reservoirs which includes the Gulf of Mexico offshore reservoir database. [*Id.* at 10, citing Buller et al.2005].  This data is the largest and most comprehensive of its kind in the world, and is in the public domain. [*Id.*, citing Ehrenberg et al. 2008a]. Hurst says:

"I am unaware of any similar concept in the public domain or the level to which the GZ concept is accepted and adopted in the oil industry." [*Id*.]

Dr. Hurst cites another recognized scholar, Buller, who confirms that the GZ concept is "an empirically verifiable theory showing that hydrocarbons in siliciclastic sentimentary basins of the world generally occur in a predictable manner controlled by the temperature." [*Id*. 10, Buller et al 2005]. He points out that while Buller refers only to siliciclastic reservoirs, Statoil has since expanded the database to include carbonate reservoirs. [*Id*. at 10 (Ehrenberg and Nadeau 2005; Ehrenberg, et al 2007; Ehrenberg, et al 2008b).]

As should be clear from the foregoing, the thermal modeling process set forth by Dr. Hurst is supported by academic research reported in peer reviewed literature and industry practice. Furthermore, it draws on Golden Zone data pulled from in excess of 120,000 reservoirs. This modeling method is thus rooted in sufficient facts and data, and the product of reliable principles and methods. Fed. R. Evid. 702.

BP attempts to disparage Dr. Hurst's opinion largely by wrenching quotations out of context. For example, it attacks his report because [BP misleadingly says] "papers dealing directly with the GZ concept have **. . . low[ ]** citations (<30 citations)." [Rec. Doc. 5428-1 at 3 (citing Hurst at 12).] Dr. Hurst's report actually reads: "Citations indices indicate that the fundamental research papers that underpin the GZ concept are high (often >100 citations), whereas the papers dealing directly with the GZ concept have **much lower** citations (<30 citations)" (emphasis added) [Hurst at 12]. (As if nearly 30 peer-reviewed citations is a small number.) Even if one were to assume that Rule 702 imposes a threshold citation requirement— and, though the Rule does not, the PSC submits that 30 citations in peer-reviewed work is not insignificant—thermal modeling is a concept widely discussed in the literature and actually

utilized in the industry.  It is, in short, a theory whose reliability clearly satisfies the *Daubert* requirements.

Finally, "[m]ost of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."  *Thompson v. Rowan Cos.*, 2007 WL 724646, at *1 (E.D. La. Mar. 6, 2007) (Barbier, J.) (quoting *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000)).  In fact, this Court has explained that in a bench trial, "the objectives of *Daubert* are no longer implicated."  *Id.*  BP will have ample opportunity to cross-examine Dr. Hurst; its arguments go to the weight of his testimony rather than its admissibility. The Court should therefore deny the instant motion.

## II.    Dr. Hurst's Opinions Are Relevant

Scientific testimony is relevant where "the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case."  *In re Vioxx Prods. Liability Litig.*, 2006 WL 6624015, at *4 (E.D. La. Feb. 3, 2006) (Fallon, J.).  In this case, there can be little doubt that Dr. Hurst's testimony is relevant.

Dr. Hurst's testimony draws into focus what could and should have been done before the well was drilled with respect to appropriate geological evaluation, regardless of what procedures oil companies operating in the Mississippi Canyon are currently following when creating a prognosis of the conditions to be encountered in a new well.  Dr. Hurst's testimony also highlights the geological consequences of drilling without the proper pre-drill evaluation and how it can result in substantial and uncontrolled damage to the rock formations.

Dr. Hurst will testify to the nature and characteristics of the water bottoms and subterranean reaches of the Mississippi Submarine Canyon in which Macondo is located. His

testimony will demonstrate that, due to the location of the well, the nature of the subterranean formations, and the depths and temperatures at which the well was drilled, there were exceedingly high risks to this exploration venture. The evidence will show that there were predictive methods which would have aided BP in drilling in a safer manner.

His report describes a method to analyze pore pressure and fracture gradients prior to commencement of drilling. As he explains, such an assessment allows geologists to properly predict and account for overpressure risks and to adapt accordingly. What is more, the Macondo well sat within a region fraught with risk. It was, in other words, precisely the type of well that required a thorough risk analysis based on the most up-to-date methods of predrill analysis. His testimony goes directly to best available science and industry practices.

The argument that Dr. Hurst did not look at Macondo-specific data to reach his conclusions is simply untrue. In forming his opinions, Dr. Hurst read Daily Geological Reports, BP Technical Memorandum, Shallow Hazards Assessment, a Knudson Email discussing Macondo Temperatures, and Macondo Temperature Curves. [Hurst Deposition at 25, Hurst at 34-35.] He read a report on the deposition of Morton Emilsen to obtain information about reservoir temperature [26:1-14]. He also read a portion of the deposition of Robert Bodek, and testified that he was disappointed that Mr. Bodek was unaware of what the Golden Zone was [27:2-25].

Dr. Hurst found the BP Technical Memoradum useful, as it provides "a reasonable summary of the approach that BP geologists use to predict pore pressure and demonstrates that … the model they used certainly didn't work very well." [Hurst Dep. at 102.] Within the BP Technical Memorandum, Dr. Hurst found the section on pore pressure and fracture gradient particularly useful, as it led him to conclude that "whatever method they used to predict pore

8

pressure underestimated the pore pressure, what we call the overburden" and "the actual measured [reservoir] pressures are much, and I emphasize much, lower than predicted." [*Id.* at 101-102. ]

Moreover, because this is a bench trial, typical *Daubert* safeguards are less essential.  *See Thompson*, 2007 WL 724646, at *1.  While that does not displace *Daubert* entirely, the Court should disregard what is essentially a run-of-the-mill relevance objection.  The testimony is clearly relevant; it makes it more probable that BP did not employ best drilling practices. Furthermore, pretrial motions to exclude evidence based on relevance are disfavored.  *See Auenson v. Lewis*, 1996 WL 457258, at *1 (E.D. La. Aug. 12, 1996).  The PSC should be permitted to present its evidence and, after viewing the evidence in context, the Court may assign the evidence the weight to which it is entitled.

### Conclusion

For the reasons set forth above, the PSC respectfully requests that the Court deny BP's motion to exclude the report and testimony of Dr. Andrew Hurst.

This 14th day of February, 2012.


Respectfully submitted,


/s/ Stephen J. Herman
**Stephen J. Herman**, La. Bar No. 23129
**HERMAN HERMAN KATZ
& COTLAR LLP**
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax No. (504) 569-6024
E-Mail: sherman@hhkc.com
*Plaintiffs Liaison Counsel*

/s/ James Parkerson Roy
**James Parkerson Roy**, La. Bar No.11511
**DOMENGEAUX WRIGHT ROY
&EDWARDS LLC**
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233-3033
Fax No. (337) 233-2796
E-Mail: jimr@wrightroy.com
*Plaintiffs Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Brian H. Barr
PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office: (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC 1601
Dauphin Street,
P. O. Box 66705
Mobile, AL 36660
Office: (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW Denham
Springs, LA 70726
Office: (225) 664-4193
Telefax: (225) 664-6925
E-Mail: calvinfayard@fayardlaw.

Robin L. Greenwald Levin,
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY 10003
Office: (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A. 188
East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399 E-Mail:
mike@mikespy.com

Ervin A. Gonzalez
COLSON HICKS EIDSON 255
Alhambra Circle, Penthouse Coral
Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail: ervin@colson.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW & ABRAMSON
601 Poydras Street, Suite 2615 New Orleans, LA 70130
Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Mikal C. Watts
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100 San
Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail: mcwatts@wgclawfirm.com
Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd. Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER, HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Office: (214) 521-3605
Telefax: (214) 599-1172
E-Mail: ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP 435 Corporate Drive, Suite 101 Maison Grand Caillou
Houma, Louisiana 70360 Office: (985) 876-7595 Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

## CERTIFICATE OF SERVICE

We hereby certify that this Memorandum will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 14th day of February, 2012.

s/ James Parkerson Roy and Stephen J. Herman