UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179  SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |
| ………………………………………………….. | : | |

**BP'S RESPONSE IN OPPOSITION TO HALLIBURTON'S
MOTION TO PRECLUDE THE TESTIMONY AND STRIKE
THE EXPERT REPORT OF DR. KATHLEEN SUTCLIFFE**

Throughout this litigation, the PSC and other parties have made repeated (and unsupported) attacks on BP's corporate safety culture. Dr. Kathleen Sutcliffe is a leading scholar in the field of organizational behavior with a particular focus on organizational reliability and resilience. Given her expertise and work in these areas, Dr. Sutcliffe was asked to assess BP's safety culture in the years leading up to the events on April 20, 2010. In addition, Dr. Sutcliffe addressed and rebutted opinions regarding BP's safety culture offered by Halliburton's own expert, Patrick Hudson, as well as the opinions of PSC experts Robert Bea and William Gale.

In a 92-page report with over 425 footnotes of citations to the record evidence, Dr. Sutcliffe opined that BP has "demonstrated the attributes of a strong safety culture" and that "attempting to establish that an organization's safety culture was the cause of an accident, as Dr. Bea and Dr. Gale purport to do, would be a complex and demanding task and may not be possible." Sutcliffe Report at 7, 92. Halliburton reluctantly concedes that Dr. Sutcliffe's core opinion is "potentially relevant," but contends that Dr. Sutcliffe's opinions as a whole fail to satisfy *Daubert* standards. HESI Mem. at 12. Halliburton's attacks, however, are based on a mischaracterization of Dr. Sutcliffe's field of study, the analysis she conducted, and the evidence

she considered. Dr. Sutcliffe applied a valid analytical framework to the extensive record in this case, and she reached opinions that are directly relevant to rebut the "safety culture" allegations asserted by Halliburton's and the PSC's experts.

## ARGUMENT

Under *Daubert*, district courts act as "gatekeepers" to prevent unreliable or irrelevant expert testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-91, 597 (1993). An expert's testimony is reliable when it is "'ground[ed] in the methods and procedures of science' and 'more than subjective belief or unsupported speculation.'" *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009). Methodologies or analytical frameworks grounded in a review of the relevant academic literature are reliable. *See Smith v. Pfizer Inc.*, 714 F. Supp. 2d 845, 856-57 (M.D. Tenn. 2010). Further, "[p]roposed testimony must be supported by appropriate validation – *i.e.,* 'good grounds,' based on what is known" to be reliable. *Daubert*, 509 U.S. at 590. To be relevant, the expert's testimony must "fit" the case at hand by providing relevant information that will assist the court to determine a fact in issue. *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352-355 (5th Cir. 2007). Dr. Sutcliffe's opinions are both reliable and fit the case at hand given the allegations made by the PSC, Halliburton and their experts.

**I.    DR. SUTCLIFFE'S OPINIONS ARE RELIABLE.**

    **A.    Dr. Sutcliffe Employed a Scientifically Valid Framework.**

Dr. Sutcliffe applied a framework grounded in the valid and scientific discipline of safety culture. As Dr. Sutcliffe explains, "[a]n organization's safety culture is the set of shared behavioral norms ('the way we do things'), underlying beliefs ('how things work'), and values ('what is important') that shape the way members of an organization act, think, and feel toward safety." Sutcliffe Report at 3. The study of safety culture is generally considered a sub-

2

component of organizational culture and is a recognized scientific discipline, the history of which Dr. Sutcliffe explains in Appendix C of her report.  Halliburton does not seriously contest the scientific validity of the field of safety culture, nor can it.  Halliburton's expert Dr. Hudson identifies himself as an expert within this same field and cites it as a primary focus of his studies.  Hudson Report at 7-10.  Additionally, Dr. Hudson relies upon several articles he has authored on the subject of organizational safety culture.  Hudson Rebuttal Report at nn.5-7.  Likewise, Dr. Bea teaches courses in organizational behavior at the University of California.  Bea Dep. at 37-38.

Dr. Sutcliffe is a leading expert within the field of safety culture.  She is a Professor of Management and Organizations at the Stephen M. Ross School of Business at the University of Michigan, where her research focuses on organizational adaptability, reliability and resilience.  She is widely published and teaches graduate and undergraduate courses on organizational behavior and theory, leading and managing change, and organizational learning.  Sutcliffe Report at 2.  Indeed, Dr. Sutcliffe's expertise is recognized by the other experts in this case.  According to Dr. Bea, "Dr. Sutcliffe is a well-respected academic in the area of organizational behavior."  Bea Dep. at 78.  Dr. Bea has cited her research in his own prior work.  *Id*.

As Dr. Sutcliffe explains in her report, the academic literature reflects that there are a basic set of components present in a strong corporate safety culture.  Sutcliffe Report at C-7.  Building on that peer-reviewed work, as well as her own published research, Dr. Sutcliffe analyzed the evidence relating to BP's safety culture against an analytical framework which considers whether a safety culture is:  (1) enabled, meaning that the organization and its leaders emphasize safety and create a positive safety climate; (2) enacted, meaning that members of the organization put safety policies and procedures into practice; and (3) elaborated, meaning that

3

the organization rigorously reflects on its safety performance and seeks to improve its policies and procedures as a result. *Id.* at 5.[1] Within each of these three elements, Dr. Sutcliffe identified specific observations to be expected in a strong safety culture. *Id.* It was against this scientifically valid framework – derived from the literature and her own research – that she assessed BP's safety culture.

### B.   Dr. Sutcliffe Properly Applied Her Framework to the Facts of This Case.

Dr. Sutcliffe conducted a meticulous and objective review of the evidence relevant to the "safety observations" contained within her framework. As she testified:

> I've looked at a variety of evidence and – a huge record of evidence, both positive and negative evidence. I used an analytical framework. I kept an open mind. I didn't take any direction from lawyers or counsel. I asked a team to go out and get the best, most robust evidence to assess what a company is doing and what I saw was a company that is very concerned with creating a safety infrastructure, very concerned with enacting safety and practice, and is concerned with learning and making its safety processes better. And I didn't know what I was going to find, and this is what I found.

Sutcliffe Dep. at 201-02; *see also id.* at 282-83, 306.

Dr. Sutcliffe's analysis included the review by her or her team of every single deposition exhibit and transcripts of all depositions that had been taken at the time she issued her report, as well as thousands of other produced documents. Sutcliffe Report at 4-6, Appx. D. Additionally, Dr. Sutcliffe supplemented this evidence with other publicly available articles, reports, speeches and materials. *Id.* at Appx. B (see Non-Bates Stamped Documents), Appx. D.[2] Given Dr.

---

[1]  S*ee also, e.g.*, T.J. Vogus et al., "Doing No Harm: Enabling, Enacting, and Elaborating a Culture of Safety in Health Care," *Academy of Management Perspectives*, Nov. 2010, 60-77; *see also* Sutcliffe Report at Appx. C.

[2] This extensive review of the record evidence stands in stark contrast to that done by Halliburton's expert, Dr. Hudson. Rather than conduct a thorough review of the record, Dr. Hudson relies extensively on popular press articles and books written by individuals with no expertise in the field of organizational

4

Sutcliffe's extensive review of the voluminous record, and the extensive citations to the record throughout her reports, any contention by Halliburton that her opinions are unreliable due to an insufficient "evidentiary mooring" is without merit.

## II. DR. SUTCLIFFE'S OPINIONS ARE RELEVANT TO REBUT THE OTHER PARTIES' ALLEGATIONS.

### A. The PSC and Other Parties Have Put BP's Safety Culture at Issue.

BP's safety culture has been called into question in this case by the PSC and other parties, including Halliburton. They have alleged BP's safety culture was deficient, examined witnesses on the issue, and offered their own experts to opine on the subject. The PSC alleges in their complaints that BP had an insufficient safety culture:

- "The culture of carelessness and impudence was not limited to Drilling Defendants' actions and decisions on the Deepwater Horizon at the Macondo well. In fact, Drilling Defendants have a history of foolhardy, irresponsible behavior across their operations on land and at sea - a record littered with accidents, spills, regulatory violations, fines and lawsuits." *See* Pls.' B1 Master Compl. at ¶429.

- "Despite this history of catastrophes and close calls, BP has been chronically unable or unwilling to learn from its many mistakes. The company's dismal safety record and disregard for prudent risk management are the results of a corporate safety culture that has been called into question repeatedly by government regulators and its own internal investigations. BP has consistently demonstrated that it will choose profit before safety at the expense of human lives and the environment." *Id.* at ¶431.

*See also* Ex. A (attached). The PSC and other parties repeatedly examined witnesses on the subject of safety culture:

- "[I]f whoever decides this case determines that the safety culture at BP was not what it should have been on April 20, 2010, my question to you is: Who would have been responsible for that?" Hayward Dep. at 796.

---

behavior or safety culture, and cited to a mere 23 produced documents in his initial report and only 15 additional produced documents in his rebuttal report. *See* BP's Mem. re Hudson at 4-5.

5

- "Was there any concern from the time that you -- during the time that you were in your job in the Gulf of Mexico that Drilling & Completions in Deepwater was suffering from a broken safety culture?"  Thierens Dep. at 91.

S*ee also* Ex. B (attached).

Both Halliburton and the PSC sponsored expert reports criticizing BP's safety culture. Drs. Bea and Gale's report contains two subsections devoted to BP's safety culture.  *See* Bea and Gale Report at 32, 43.  Commentary on BP's safety culture permeates their entire report.  *See* Ex. C (attached).  Dr. Hudson's reports too repeatedly criticized BP's safety culture as "loss-averse," "opportunistic and speed-driven" – devoting several sub-sections to these subjects.  Hudson Report at 6-7, 19, 22, 35; *see also* Ex. D (attached).  More importantly, Dr. Hudson explicitly conceded the significance of Dr. Sutcliffe's opinions, stating in his rebuttal report:  "The pertinent questions then are what did BP do to repair its safety culture after 2005, and what role did the deficiencies in BP's safety culture play in the Macondo disaster."  Hudson Rebuttal Report at 5.  Dr. Sutcliffe's opinions that BP successfully improved its safety culture after 2005 and that BP had a strong safety culture are directly responsive to Dr. Hudson's "pertinent questions."  *See, e.g.*, Sutcliffe Dep. at 47-48; Sutcliffe Report at 6-8.

    **B.**    **The Fact that Dr. Sutcliffe Does *Not* Offer Certain Opinions Should Not Preclude Her Testimony Under *Daubert*.**

Halliburton seeks to bar Dr. Sutcliffe's testimony because she does ***not*** offer opinions on certain questions.  Halliburton's primary criticism of Dr. Sutcliffe is that she did not analyze the Macondo incident itself and thus cannot opine on whether BP's safety culture played a causal role in the incident.  In doing so, Halliburton ignores Dr. Sutcliffe's explanation of why she did not render an opinion as to whether BP's safety culture caused the Macondo incident.  As Dr. Sutcliffe explained in her report:

6

> There is always a risk that an accident will happen. What a strong safety culture can accomplish is to reduce the likelihood of an accident and the severity of an accident should it occur. Given this, establishing that an organization's safety culture was a primary cause of an accident – or even a cause at all – would be a complex task and may not be possible. One would have to show deficiencies in the organization's safety culture and then demonstrate that those deficiencies led directly to the accident. The fact that an accident occurred is not enough.

Sutcliffe Report at 4-5; *see also id.* at 71, 92. *See also* Sutcliffe Dep. at 59 ("I didn't think that an analysis of BP's safety culture as a cause or one of the causes of Macondo was possible"); *see also id.* at 156, 183. Indeed, this issue explains the flaw in the analyses done by Drs. Bea, Gale, and Hudson. It is precisely because they purport to opine on causation that makes their work unreliable, and what therefore also makes Dr. Sutcliffe's opinions relevant.

Second, Halliburton criticizes Dr. Sutcliffe because she did not analyze the safety culture on the *Deepwater Horizon*. As Dr. Sutcliffe explained, Transocean, not BP, had a safety culture on the rig: "The rig was owned and – owned by Transocean. It was – the – the primary number of employees were Transocean employees, the safety management system was Transocean's." Sutcliffe Dep. at 82. As such, an analysis of the safety culture on the rig was not a part of studying BP's safety culture and was not necessary for Dr. Sutcliffe to reach her opinions.

Finally, Halliburton criticizes Dr. Sutcliffe for not analyzing the engineering details of BP's process-safety systems. Nowhere does Halliburton demonstrate, however, that such an analysis is necessary to render an opinion on BP's safety culture. As articulated in Dr. Sutcliffe's report, the study of safety culture is about organizational norms, beliefs and values that shape the way members of an organization act, think, and feel toward safety. Sutcliffe Report at 3. Within this context, the existence of embedded process-safety systems is what is important, not the technical details:

7

> Process safety is not a component of safety culture.  It is an element that contributes to a safety culture. . . . in the sense that organizations develop operating management systems.  The existence of an operating management system and the extent to which that management system incorporates  process safety, engineering technical practices, process safety routines and practices, that – that's one element that contributes to safety culture, but it isn't the same as safety culture.

Sutcliffe Dep. at 304.  Furthermore, Dr. Sutcliffe does not believe that the concepts of process and personal safety are entirely distinguishable, as individuals in the field do not actually distinguish them.  Rather, "safety is safety." [3]  *Id.* at 208-209; *see also id.* at 94-95, 260.

Halliburton has not shown (and cannot show) that the topics it claims Dr. Sutcliffe should have addressed, but did not address, were necessary to reach her conclusions.  Dr. Sutcliffe's opinions regarding BP's safety culture are well supported, reliable, and relevant to address the allegations of the PSC, Halliburton, and their respective experts.

## III. HALLIBURTON'S OTHER CRITICISMS OF DR. SUTCLIFFE'S OPINIONS ARE NOT GROUNDS FOR EXCLUSION.

Halliburton's remaining criticisms selectively ignore and mischaracterize the record.  For example, Halliburton argues that Dr. Sutcliffe could not identify a single lesson BP learned from prior incidents.[4]  HESI's Mem. at 24.  This is not true, and ignores Dr. Sutcliffe's explanation that organizational learning is not about citing to specific "lessons":

> Yeah.  I mean, I – I don't know that I can answer what lessons.  Because when we think of organizational learning, the organizational learning is the issue of embedding particular

---

[3] The type of technical analysis relating to process safety systems which Halliburton criticizes Dr. Sutcliffe for not doing is the subject of expert opinions provided by other BP experts in this case.  *See generally* Expert Report of Morris Burch.

[4] As Dr. Sutcliffe noted in her report, she refers to past incidents in her report because other experts (including Dr.Bea and Dr. Hudson) have referenced those incidents.  The Court recently issued a ruling on BP's motion in limine relating to past incidents.  Dr. Sutcliffe will, of course, testify in accordance with the court's ruling to the extent her testimony remains relevant in light of that ruling and the testimony of Drs. Bea and Hudson.

> practices or changes in an organization's infrastructure, in part because people don't go around with things in their minds all the time because you don't know that things are going to line up in the same way tomorrow. So you want to embed lessons into the infrastructure of the organization, which BP has done, and that's why – one of the reasons why I characterize them as having a strong learning orientation.

Sutcliffe Dep. at 215; *see also id.* at 284-85.

Halliburton similarly misconstrues Dr. Sutcliffe's testimony surrounding safety outcomes, arguing that Dr. Sutcliffe failed to account for safety outcomes in her analysis. Contrary to Halliburton's assertion, Dr. Sutcliffe ***did consider*** safety outcomes to determine how BP learned from these incidents: "Again, I would say that the elements that I have examined in my analysis, the mechanisms through which safety culture is created, I examined. And, you know, to the extent that I took out – took into account outcomes in terms of how BP learned and the kinds of things they enacted in response, I examined those things." *Id.* at 284; *see also id.* at 74, 284-87.

Halliburton also contends that Sutcliffe was "unaware" of certain details. For example, Halliburton states that Dr. Sutcliffe was unaware of an alleged 25% cut in costs at BP in 2005. HESI's Mem. at 24. Dr. Sutcliffe did, however, consider the underlying information, but simply could not recall those specifics at deposition. The topic of costs was discussed extensively in Dr. Sutcliffe's report, and at her deposition, Dr. Sutcliffe explained she could not remember the specifics. Sutcliffe Report at 78-82; Sutcliffe Dep. at 51-53. This is not surprising given the extensive record in this case and 425 footnotes in her reports.

Finally, Halliburton contends that Dr. Sutcliffe was unaware of OSHA violations, which is a gross mischaracterization of her testimony: "Again, I would say that I took into account in my analysis – the issues related to OSHA was one data point, it's one plant. I did a holistic assessment, a broad range of evidence as is evident in my report. And I see from the independent

expert reports that BP is making progress and, you know, progress takes time." Sutcliffe Dep. at 74.

## CONCLUSION

Dr. Sutcliffe's opinions satisfy the *Daubert* standard for admissibility as they are both reliable and relevant to rebut the opinions of other experts. Because Halliburton does not raise any valid grounds for exclusion, BP respectfully requests that the Court deny Halliburton's motion to strike the testimony and reports of Dr. Kathleen Sutcliffe.

Dated: February 14, 2012

Respectfully submitted,

/s / Don K. Haycraft

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Timothy A. Duffy, P.C.
(tim.duffy@kirkland.com)
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

>Robert C. "Mike" Brock
>(mbrock@cov.com)
>Covington & Burling LLP
>1201 Pennsylvania Avenue, NW
>Washington, DC 20004-2401
>Telephone: (202) 662-5985
>
>*Attorneys for the BP Exploration & Production Inc. & BP America Production Company*

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 14th day of February, 2012.

                                                                              /s/  Don K. Haycraft__