UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |
| ……………………………………………….. | : | |

## BP'S OPPOSITION TO HALLIBUTON'S MOTION TO EXCLUDE THE TESTIMONY AND EXPERT REPORT OF DR. WILLIAM WECKER

Halliburton fills its brief with mischaracterizations of the record and applicable law in seeking to preclude the Court from considering the expert opinions of Dr. William Wecker, a statistician and applied mathematician with four decades of experience. In asserting that Dr. Wecker's opinions are not relevant, Halliburton ignores the opinions of its own expert, as well as allegations that it and other parties have repeatedly made, criticizing BP's safety record as indicative of an allegedly defective safety culture that supposedly led to the Macondo blowout.

In response to these allegations, Dr. Wecker performed a statistical analysis of BP's safety record, comparing it to the safety records of other supermajor oil companies operating in the Gulf of Mexico. Dr. Wecker analyzed nine different industry-standard safety metrics tracked by the United States government and the oil and gas industry and concluded that, contrary to the assertions of the PSC and other parties, BP had a superior and improving safety record in the years leading up to the Macondo well blowout. Dr. Wecker's opinion squarely rebuts the opinions of opposing experts and would assist the trier of fact in understanding the evidence. Indeed, Halliburton's own expert, Dr. Hudson acknowledged that Dr. Wecker is the "*only* expert in this case who's actually looked at the safety data from BP and the other major oil companies." Hudson Dep. at 149-50 (emphasis added).

Halliburton's assertion that Dr. Wecker's opinions are unreliable is equally without merit. Tellingly, Halliburton does not challenge Dr. Wecker's analysis based on *any* of the factors that the United States Supreme Court or the Fifth Circuit has outlined for courts to consider in assessing the reliability of expert opinions: Halliburton does not contend that the methodology that Dr. Wecker employed (1) cannot be tested, (2) has not been subjected to peer review, (3) has no known potential error rate, or (4) is not generally accepted in the relevant scientific community. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-94 (1993); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002). Instead, Halliburton simply launches unfounded criticisms that Dr. Wecker failed to consider, or placed too much emphasis on, certain information. Halliburton's arguments distort, and in some instances ignore, Dr. Wecker's opinions and testimony. Halliburton's motion to exclude Dr. Wecker's opinions should be denied.

## ARGUMENT

Under *Daubert*, district courts act as "gatekeepers" to prevent irrelevant or unreliable expert testimony from being presented to the jury. *Daubert*, 509 U.S. at 589-91, 597. Expert opinions are relevant when they "fit" the case at hand by providing relevant information that will assist the court to determine a fact in issue. *Id.* at 591. An expert's testimony is reliable when it is "grounded in the methods and procedures of science" and "more than subjective belief or unsupported speculation." *Id.* at 590; *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388-89 (5th Cir. 2009). Dr. Wecker's opinions are both reliable and relevant given the allegations made by the PSC, Halliburton, and their experts.

I.  **DR. WECKER'S OPINIONS ARE RELEVANT TO REFUTE ASSERTIONS THAT BP HAD A POOR SAFETY CULTURE AND SAFETY RECORD.**

  A.  **The PSC and Others Have Put BP's Safety Culture and Record at Issue.**

BP's safety culture and record have been called into question by the PSC, Halliburton, and other parties. They have alleged that BP had a poor safety record, examined witnesses on the issue, and offered their own experts to opine that BP's safety performance has been inferior to other supermajor oil companies. For example, in support of its claims of gross negligence and punitive damages, the PSC alleges in its Complaint that BP's "dismal safety record" is indicative of a "deficient corporate culture" that ultimately caused the Macondo accident:

- "Drilling Defendants have a history of foolhardy, irresponsible behavior across their operations on land and at sea — a record littered with accidents, spills, regulatory violations, fines and lawsuits." *See* Pls.' B1 Master Compl. at ¶ 429.

- BP's "dismal safety record and disregard for prudent risk management are the results of a corporate safety culture that has been called into question repeatedly by government regulators and its own internal investigations. . . . This deficient corporate culture . . . is ultimately to blame for BP's grossly negligent decisions concerning the Macondo well." *Id.* at ¶ 431.

The PSC and the other parties repeatedly questioned individuals on the subject of BP's safety record at depositions:

- "And BP has an abysmal safety record; would you agree with me?" Inglis Dep. at 175-76; *see id.* at 180-82.

- "Are you aware of any other oil company that's had as many major fires, major releases, and well incidents as BP?" Saucier Dep. at 444.

*See also* Frazelle Dep. at 179 (asking whether BP's safety record was "deteriorating" in 2009); Shaw Dep. at 76-77 (asking witness about BP's safety record).[1]

---

[1] These types of allegations and questions should be precluded at trial as a result of the Court's recent ruling on BP's motion in limine to exclude evidence of prior alleged improper conduct and adverse proceedings. Dr. Wecker will, of course, testify in accordance with the Court's ruling to the extent his testimony remains relevant in light of that ruling and the testimony of Drs. Bea and Hudson.

3

Indeed, Halliburton's assertion that Dr. Wecker's opinions are not relevant is ironic given that Halliburton and the PSC have both sponsored experts who spend almost their entire reports criticizing BP's safety culture and conclude that it caused the Macondo blowout. For example, Halliburton's expert, Dr. Hudson, contends that BP's culture "made a major disaster all but inevitable." Hudson Report at 17. Hudson also asserts that other supermajors (such as Shell, ExxonMobil and Chevron) have superior systems for managing process safety and preventing accidents. For example, Hudson opines that "[b]ased upon my personal experience with other supermajors, from 2005 on, BP was well behind its competitors and had not caught up by April 2010 in its management of process safety." Hudson Rebuttal Report at 33-34; *see also* Hudson Report at 6 (comparing safety culture of BP to Exxon and Shell). Hudson criticizes BP experts Kathleen Sutcliffe and Morris Burch for ***not*** using benchmarks to compare BP's safety performance to other oil companies. *See* Hudson Rebuttal Report at 11, 33. As Hudson himself acknowledges, this is precisely the analysis that Wecker provides. Hudson Dep. at 149-50.

Similarly, Dr. Robert Bea, the PSC's expert, testified that he believes that BP's process safety has been inferior to that of Shell, Chevron, and Exxon. Bea Dep. at 72-73, 362. In fact, Bea gave BP a grade of "F-" but gave those other companies an "A+" in the area of process safety. *Id.* Bea went so far as to describe Shell as the "gold standard" of process safety in the industry. *E.g.*, *id.* at 259. Dr. Wecker's analysis refutes Bea's opinion, by demonstrating that, based on an objective review of safety data for these companies, BP's safety record in the years leading up to the accident was comparable to, and in several instances superior to, its peers (including Shell). *E.g.*, Wecker Report at ¶11, Figs. 13, 15-16, 20. Dr. Wecker also refutes the opinions of Dr. Bea and Dr. Hudson regarding BP's allegedly deficient safety culture, as a company with a defective safety culture would not be expected to have a superior safety record.

### B. The Fact That Dr. Wecker Does *Not* Offer Certain Opinions Does Not Preclude His Testimony Under *Daubert*.

Halliburton seeks to bar Dr. Wecker's testimony because he does **not** offer opinions on certain topics. In particular, Halliburton criticizes Dr. Wecker because he does not opine on the causes of the Macondo blowout or the causes of other prior incidents at Texas City, Prudhoe Bay or Grangemouth. HESI Br. at 4-5. In making this argument, Halliburton ignores Dr. Wecker's testimony explaining why those opinions are not necessary to his analysis. As Dr. Wecker explained, he did not need to analyze the causes of these incidents to analyze the actual data reflecting BP's safety record over time or as compared to other supermajors. *E.g.*, Wecker Dep. at 51 ("Q: Again, does this sound like a company with a good process safety record?" A: "I don't go by sound. I go by counting the actual facts. And the actual facts show a consistent improvement in safety."). By examining the actual data relating to BP's safety record, Wecker was able to opine on – and reject – the assertions made by the PSC, Halliburton, and others.

Halliburton's assertion that Dr. Wecker's opinions are "abstract" and "lack proper foundation" because he did not investigate the causes of the Macondo or prior incidents is not supported by the facts or the law. As explained, Dr. Wecker's analysis is based on a review of actual data based on metrics that the U.S. government and the industry have tracked and reported for years. Nothing about Dr. Wecker's analysis is "abstract" or without "foundation."

The cases Halliburton cites in support of its argument are likewise inapposite. HESI Br. at 6-7. Those cases involve experts who rendered unsupported medical causation opinions, *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 667 (5th Cir. 1999); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 272 (5th Cir. 1998), or improper legal conclusions. *Woodard v. Andrus*, CIV. A.

5

03-2098, 2009 WL 140527 (W.D. La. Jan. 20, 2009).[2]  Another, *Thomas v. FAG Bearings Corp.* 846 F. Supp. 1382, 1393 (W.D. Mo. 1994), involved an expert who, unlike Wecker, based his opinions on speculation and conjecture.  The final case Halliburton cites is a 2004 Texas state court decision that was later abrogated by the Texas Supreme Court where a petroleum engineering expert provided "no explanation" for how relevant factors affected his calculations.  *Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245 (Tex. 2004) *abrogated by Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1 (Tex. 2008).

In contrast, several courts have permitted expert testimony similar to the kind that Wecker provides here.  *See, e.g.*, *Kelly v. Paschall*, Civil No. W-03-CA-179, 2005 WL 5988648 at *3 (W.D. Tex. Apr. 19, 2005) (admitting expert's statistical analysis comparing number of arrests and investigations for task force to those for others based on baseline comparators); *Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1335, 1349-50 (S.D. Fla. 1999) *aff'd*, 333 F.3d 1248 (11th Cir. 2003) (admitting statistical expert testimony comparing Exxon's dealer margins with those of other dealers in same time period); *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 294 (5th Cir. 2010) (affirming admission of statistical expert opinions as reliable and relevant, noting that "courts routinely admit statistical evidence."). Indeed, Wecker himself has provided expert testimony in roughly 210 cases over the last 22 years alone, including numerous cases in which analyzed safety records of companies or their products similar to the analysis he performed here.  Wecker Dep. at 29-32, 168-70.

### C. Wecker Is Qualified To Perform a Statistical Analysis of BP's Safety Record.

Halliburton appears to assert that Dr. Wecker's opinions should be excluded because "he is not a process safety expert, except to the extent statistical or mathematical analysis is

---

[2] Indeed, in *Curtis*, the Fifth Circuit actually held that the trial court abused its discretion in ***excluding*** the expert's testimony.  174 F.3d at 672.

6

involved." HESI Br. at 4. But the statistical analysis of process safety metrics is *exactly* the kind of analysis that Dr. Wecker performs in this case. Wecker Dep. at 13.

Halliburton does not challenge Dr. Wecker's qualifications directly – understandably so. Dr. Wecker has 40 years of experience in the field of statistics and applied mathematics, including in the application of statistics to the oil and gas industry. Wecker Report at ¶2; Wecker Dep. at 13. A former tenured professor of applied mathematics and statistics, Wecker has analyzed the safety record of companies "many times" throughout his career. Wecker Dep. at 29-30. Wecker is a member of the American Statistical Association, the Institute of Mathematical Statistics, and the Society for Risk Analysis. He has also served as associate editor of the Journal of the American Statistical Association. Wecker Report at ¶4.

Halliburton's contention that Dr. Wecker "appears to lack an understanding of" process safety again ignores his deposition testimony, in which he explained process safety and the concepts involved:[3]

> There is this concept of personal safety as distinguished from process safety, and personal safety for me is easy to categorize. It relates to harm to people, the persons. And then since there's only one other category that's discussed, process safety, my definition would be, it's everything else. So if a helicopter runs out of fuel in the Gulf of Mexico and auto rotates into the water and nobody's hurt, they're picked up, and there's no fuel spilled because it was out of fuel, it wouldn't seem to fall in any of the categories, yet it is an accident, so you want to cover it somewhere, so I put all that into process safety in my mind. Wecker Dep. at 19.

Finally, Halliburton asserts that Wecker's analysis is simply "abstract 'bean-counting.'" HESI Br. at 5. Nothing could be further from the truth. Wecker sifted through voluminous databases and other materials containing a decade of government and industry safety data. He

---

[3] Halliburton suggests that Dr. Wecker improperly described process safety as involving "oil spills." HESI Br. at 4. But the API defines a "process safety event" as "[a]n unplanned or uncontrolled LOPC [loss of primary containment] of any material . . . from a process, or an undesired event or condition. . . ." Dep. Ex. 7454 at 6.

7

collected, reviewed, and analyzed the data (including normalizing the data by adjusting for rates based on a variety of factors) for nine safety metrics. Wecker Report at 5-6. This type of analysis could only reliably be performed by a qualified statistician such as Dr. Wecker.

## II. DR. WECKER'S ANALYSIS IS RELIABLE.

Dr. Wecker based his analysis on industry-standard safety metrics that both the government and supermajors have reported and tracked for up to the last 10 years. The API recommends the use of indicators such as those that Wecker analyzed. *See* Dep. Ex. 7454. Halliburton does not challenge any of the particular metrics that Wecker analyzes as being "unreliable." Instead, Halliburton argues that Wecker failed to consider, or placed too much emphasis on, certain information. Halliburton's assertions are unfounded, and in any event, provide no basis for exclusion.

### A. Dr. Wecker Properly Considered Both Personal and Process Safety Metrics.

Halliburton contends that Dr. Wecker's consideration of certain personal safety metrics "improperly skews" his analysis. HESI Br. at 7-8. Both personal and process safety metrics, however, are relevant to assessing a company's safety record. Indeed, the concepts of personal and process safety are "linked." Burch Dep. at 172; *see* Sutcliffe Dep. at 207-09. For example, the API has instructed that personal safety metrics, such as "days away from work" cases and fatalities, both of which Wecker measures, could be considered "Tier One" process safety events, or those of greatest consequence. Dep. Ex. 7454 at 21. "Recordable injuries," another metric Wecker analyzed, could constitute "Tier Two" process safety events. *Id.* at 23. BOEMRE and the Department of Labor have tracked these personal safety metrics for at least 17 years. More fundamentally, Halliburton cannot dispute the importance of personal safety in the workplace.

In any event, Halliburton fails to mention that Dr. Wecker devotes a substantial portion of his report to an analysis of process safety metrics. Seven of the nine metrics Dr. Wecker

8

considers have process safety components. For example, over the course of 17 pages in his report, Dr. Wecker analyzes the number and volume of oil spills, kick event data, and "accidents," which include fires, explosions, blowouts, and oil spills. Wecker Report at 23-39.

### B. Wecker Analyzed Reliable Comparative Safety Metrics.

Halliburton next argues that Dr. Wecker improperly "compares BP to industries such as sewage treatment, finish carpentry, and computer manufacturing." HESI Br. at 8. Halliburton once again mischaracterizes Wecker's opinions. Contrary to Halliburton's assertions, Dr. Wecker compared BP to other supermajors operating in the Gulf. Indeed, 23 of the 25 graphs in Wecker's report – including those Halliburton identifies in its brief – compare BP to its peers in the industry. Wecker Report, Figs. 1-16, 19-25. While Wecker included safety data for other U.S. industries along with data for the oil companies on certain graphs, this information puts BP's and other supermajors' safety records into context. *Id.*, Figs. 1-5, 8-12.

Out of the roughly 210 cases in which Dr. Wecker has provided expert deposition or trial testimony since 1990 alone (Wecker Dep. at 168-70), Halliburton cites to a single case from the Middle District of Florida in which a court excluded Dr. Wecker's opinions. *See Miller ex rel. Miller v. Ford Motor Co.*, No. 2:01-CV-545-FTM-29DNF, 2004 WL 4054843, at *1-2 (M.D. Fla. July 22, 2004). In *Miller*, the Court reasoned that Dr. Wecker's statistical analysis of data for various compact utility vehicles was not based on "substantially similar accidents" as the rollover of the Ford Explorer at issue in that case and was therefore likely to confuse the jury. *Id.* at *2. Critically, the plaintiffs in *Miller* apparently did not allege or present expert testimony asserting that the Ford Explorer had a safety record or rollover rate that was *inferior* to that of other SUVs. Here, in contrast, the PSC, Halliburton and other parties have asserted and proffered experts who opine that BP's safety culture and record are inferior to that of other supermajors. In addition, Dr. Wecker based his analysis in this case on the safety records

9

(including oil spills, blowouts, fires and explosions, kick events, and fatalities) of supermajor oil companies operating in the Gulf.  Several courts have admitted the type of testimony that Dr. Wecker provides here under similar circumstances.  *See, e.g.*, *Kelly*, 2005 WL 5988648 at *3.

### C. Dr. Wecker Considered Appropriate Time Frames.

Finally, Halliburton asserts that "[t]he time frames chosen by Wecker radically bias his conclusions."  HESI Br. at 9.  Halliburton again distorts the record.  As Dr. Wecker explained in his deposition, he analyzed time frames according to the data that was available.  Wecker Dep. at 28-29.  Nearly all of the data that Wecker considered covers the time periods ten or five years before the accident.  Data on the two metrics Halliburton identifies in its brief – "Major Incident Announcements" and "High Potential Incidents" – was not available before 2007.  *Id.*

Halliburton similarly asserts that Dr. Wecker should have considered safety data from the year 2010.  As explained, however, the PSC and others have criticized BP's safety record as indicative of a "deficient safety culture" that supposedly led to the Macondo incident.  *See, e.g.*, Pls.' B1 Master Compl. at ¶429-31, Exhibit A.  These assertions challenge BP's safety record and culture in the time periods leading up to the incident.  To refute those allegations, Wecker analyzed data up through 2009, the last full year with available data prior to the incident.[4]

### CONCLUSION

Dr. Wecker's opinions satisfy the *Daubert* standard for admissibility because they are both reliable and relevant to rebut the opinions of other experts.  Accordingly, BP respectfully requests that the Court deny Halliburton's motion to exclude Dr. Wecker's testimony and report.

---

[4] Likewise, in contending that Dr. Wecker was not aware of OSHA details, Halliburton again ignores his deposition testimony.  Not only was Wecker aware of the OSHA data, but he reviewed it and determined that, in fact, BP accounted for just roughly 3% of the total citations issued to U.S. refineries over the time period at issue.  Wecker Dep. at 53-57, 85-92.  Wecker's OSHA analysis was even marked as a deposition exhibit.  Dep. Ex. 7452.

Dated: February 14, 2012                    Respectfully submitted,


/s / Don K. Haycraft

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Timothy A. Duffy, P.C.
(tim.duffy@kirkland.com)
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
(mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Exploration & Production Inc. & BP America Production Company*

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 14th day of February, 2012.

                                                                                         /s/  Don K. Haycraft__