UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" in the | § | |
| GULF OF MEXICO, | § | SECTION:  J |
| on APRIL 20, 2010, | § | |
| | § | JUDGE BARBIER |
| Applies to: | § | |
| | § | MAG. JUDGE SHUSHAN |
| ALL CASES AND | § | |
| 2:10-CV-2771 | | |

_____

**HALLIBURTON ENERGY SERVICES, INC.'S COMBINED
RESPONSE IN OPPOSITION TO MOTIONS TO LIMIT
<u>TESTIMONY OF ITS EXPERT WITNESSES</u>**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

EVIDENCE IN SUPPORT OF HESI'S COMBINED RESPONSE IN OPPOSITION TO
    MOTIONS TO LIMIT TESTIMONY OF ITS EXPERT WITNESSES...........................2

ARGUMENT AND AUTHORITIES..............................................................................4

**I.**     IN DETERMINING THE ADMISSIBILITY OF EXPERT TESTIMONY,
     THIS COURT IS GUIDED BY *DAUBERT* AND ITS PROGENY. ......................4

       **A.**    The Court Serves As a Gate-Keeper Under *Daubert*..................................4

       **B.**    The *Daubert* Analysis Concerns Only the Threshold Issue of
           Admissibility....................................................................................4

       **C.**    An Examination of the Expert's Qualifications and Experience
           is the First Step in the *Daubert* Analysis. ....................................5

       **D.**    An Assessment of Reliability and Methodology is the Second
           Step in the Analysis. ......................................................................6

       **E.**    Experts Are Afforded a Wide Latitude in Offering Opinions. ...................7

       **F.**    The *Daubert* Analysis Is Tailored to the Facts and Circumstances
           of Each Case. .................................................................................8

       **G.**    The *Daubert* Admissibility Standards Are Attenuated in a
           Bench Trial....................................................................................9

**II.**    BP'S MOTION TO EXCLUDE TESTIMONY REGARDING THE "FAILURE
     OF THE PRIMARY CEMENT JOB" SHOULD BE DENIED. ...........................9

       **A.**    BP Selectively Attacks Any Cement Failure Theory That
           Implicates BP. ...............................................................................9

       **B.**    BP Acknowledges the Existence of the Phenomena Discussed in the
           Challenged Expert Opinions...........................................................10

       **C.**    The Opinions of HESI's Experts Are Based on an Analysis Appropriate
           for the Circumstances of this Case.................................................11

              **1.**    Expert Testimony Must Be Assessed With Reference to the
                  Practical Limitations of This Case...............................................11

              **2.**    Allegations of Insufficient Modeling or Investigation Do Not
                  Support the Granting of BP's Cement Motion. ..............................12

3. An Expert May Opine On Possibilities and Reasonable Probabilities. ..................................................................13

4. Analysis of Whether Cement Volume or Pump Rate Could Have Been Increased is Immaterial....................................14

D. There is No Merit to BP's Argument Concerning Rig Activities That Disturbed The Cement at the Bottom of the Macondo Well. ....................15

1. Rig Activities Could Have Disturbed the Cement in the Macondo Production Casing, Disrupting Its Ability to Set. .................................................................15

2. The Expert Conclusions Concerning the Potential Impact of Rig Activities on the Setting Cement Are Methodologically Sound..................................................16

III. JOHN HUGHETT'S TESTIMONY PLAINLY SATISFIES THE *DAUBERT* STANDARDS.......................................................................................19

A. Hughett Is Entitled To Offer Opinions About Rig Culture and Safety......................................................................20

B. Hughett's Opinions on Float Collar Conversion Are Appropriate and Will Assist the Court.......................................................21

C. Hughett Is Entitled to Rely on Other Experts Regarding Aspects of the M57B Hydrocarbon-bearing Zone...................................22

IV. RICHARD STRICKLAND'S OPINIONS EASILY SATISFY THE *DAUBERT* STANDARDS.....................................................................23

A. The Characterization and Identification of the M57B Zone as a "Hydrocarbon-bearing Zone" Is a Critical Issue in this Case. ..................23

B. BP's Arguments Over Definitions Are Improper for a *Daubert* Analysis................................................................25

1. Strickland's Definition of "Hydrocarbon-bearing Zone" is Both Appropriate and Useful.......................................................25

2. BP's "Industry Standards" Argument is Internally Inconsistent. ..................................................................28

3. Strickland Did Not Misapply His Own Definition. .......................29

4. It is Entirely Proper for Strickland to Opine that the M57B Zone May Have Affected Operations or Contributed to the Blowout............................................................30

**V.**    DAVID BOLADO'S EXPERT OPINIONS ARE ADMISSIBLE UNDER THE *DAUBERT* EVIDENTIARY STANDARDS.......................................................32

    **A.**    BP Approved or Failed to Correct the Inputs to OptiCem.........................32

        **1.**    Record Evidence Shows BP Approved or Failed to Correct the OptiCem Inputs.......................................................32

        **2.**    Bolado's Modeling Is Intended To Demonstrate What OptiCem Would Show With Corrected Inputs. ..................33

        **3.**    BP Disputes Only An Ill-Defined Portion of the OptiCem Inputs Bolado Modeled. ..................................................33

        **4.**    BP Incorrectly Denies That Bolado Has An Evidentiary Basis for Opining About BP's Involvement In the April 14 Meeting. ........................................................................34

    **B.**    "Roping" Could Have Occurred in the Shoe Track of the Macondo Well.....................................................................................35

        **1.**    Bolado's Conclusions Are Based on A Sound Methodology Appropriate For the Circumstances of this Case. ..........................35

        **2.**    BP Ignores Bolado's Other Theories Regarding Rat Hole Swapping.....................................................................35

    **C.**    Bolado is Entitled to Opine about the M57B Hydrocarbon-bearing Zone. ..................................................................36

        **1.**    Had the M57B Zone Been Modeled, OptiCem Would Have Shown A "Critical" Gas Flow Potential. ..............................36

        **2.**    BP Cannot Validly Challenge Bolado Based On His Consideration of The Conclusions Of Other Experts. ..................37

    **D.**    Bolado is Entitled to Model OptiCem Outputs Based on Increasing Gel Strength of the Drilling Mud................................................38

        **1.**    BP Is Responsible for Any Factual Uncertainty Concerning Gel Strength. ........................................................................39

        **2.**    Bolado's Consideration of Other Expert Opinions Is Ultimately A Red Herring..................................................................39

        **3.**    Bolado's Reference To Frigaard's Withdrawn Report Is No Basis For Excluding Bolado's Testimony. ..........................40

        **4.**    BP Cannot Establish It Was Prejudiced by the Inadvertent Non-Production of Bolado's OptiCem Files. .........................................41

VI.    DR. BECK MAY PROPERLY OPINE ABOUT BP'S CONDUCT TO ASSIST
       THE COURT IN DETERMINING WHETHER BP VIOLATED MMS
       REGULATIONS................................................................................................42

       A.    An Expert's Opinion is Not Inadmissible Merely Because It Makes
             Passing Reference to a Statute or Embraces an Ultimate Issue. ...............42

       B.    Expert Testimony on Industry Standards or Terminology Can
             Assist the Court in Statutory Interpretation. ...............................................45

VII.   THE OPINIONS OF DR. GLEN STEVICK SATISFY *DAUBERT*
       STANDARDS...................................................................................................47

       A.    Stevick's Expertise Will Likely Assist the Court Regarding
             Analysis of the Adequacy of the BOP Used on the
             *Deepwater Horizon.*....................................................................................47

       B.    BP's Motion Amounts to a Procedurally Improper Summary
             Judgment Motion. ........................................................................................49

       C.    Stevick is Qualified To Render An Opinion on BAST.............................50

VIII.  THERE IS NO BASIS TO EXCLUDE THE OPINIONS OF PATRICK
       HUDSON..........................................................................................................51

       A.    Hudson Employs a Sound Methodology. ....................................................51

       B.    Hudson Is Entitled to Draw Reasonable Inferences From the
             Record Evidence and Other Sources...........................................................53

       C.    Hudson is Entitled to Focus on BP's Actions and Limit the
             Scope of His Report. ....................................................................................54

IX.    THE OPINIONS OF SAM LEWIS SATISFY *DAUBERT'S* THRESHOLD
       REQUIREMENTS.............................................................................................55

       A.    Lewis Is Entitled to Opine on the Competence of BP's Wells Team
             Regarding Foamed Cement.........................................................................56

       B.    Lewis Is Entitled to Reference Relevant Facts Regarding
             His Employer's Cement Operations to Provide Background and
             Context to His Expert Report.......................................................................58

CONCLUSION..................................................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arreola v. Epic Divers, Inc.*,
No. 05-2788, 2006 U.S. Dist. LEXIS 97132 (E.D. La. Oct. 25, 2006) ................................46

*Bigelow v. New York Lighter Co., Inc.*,
No. A-03-CA-340 LY, 2005 U.S. Dist. LEXIS 47871
(W.D. Tex. June 27, 2005)...............................................................................................14, 55

*BNY Mellon, N.A. v. Affordable Holdings, Inc.*,
No. 1:09CV226-SA-JAD, 2011 U.S. Dist. LEXIS 75135
(N.D. Miss. July 12, 2011)......................................................................................................46

*Bonner v. ISP Techs.*,
259 F.3d 924 (8th Cir. 2001) ...................................................................................................7

*Borawick v. Shay*,
68 F.3d 597 (2d Cir. 1995).......................................................................................................7

*Bryan v. John Bean Div. of FMC Corp.*,
566 F.2d 541 (5th Cir. 1978) ...........................................................................................*Passim*

*Compton v. Subaru of Am., Inc.*,
83 F.2d 1513 (10th Cir. 1996) .................................................................................................5

*Cooper v. Pac. Life Ins. Co.*,
No. CV203-131, 2007 U.S. Dist. LEXIS 8350 (S.D. Ga. Feb. 6, 2007) ..........................44, 48

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)......................................................................................................*Passim*

*Feliciano-Hill v. Principi*,
439 F.3d 18 (1st Cir. 2006).................................................................................................5, 7

*Fernandez v. Spar Tek Indus.*,
No. 0:06-3253-CMC, 2008 U.S. Dist. LEXIS 41520 (D.S.C. May 23, 2008) .......................26

*Flax v. Quitman County Hosp., LLC*,
No. 2:09-CV-101-M-D, 2011 U.S. Dist. LEXIS 91424 (N.D. Miss. Aug. 16, 2011) .............12

*Garcia v. BRK Brands, Inc.*,
266 F. Supp. 2d 566 (S.D. Tex. 2003) .................................................................................8, 39

*Gussack Realty Co. v. Xerox Corp.*,
224 F.3d 85 (2d Cir. 2000).......................................................................................................8

*Guy v. Crown Equip. Corp.*,
    394 F.3d 320 (5th Cir. 2004) ..................................................................................5

*Henson v. Odyssea Vessels, Inc.*,
    No. 07-613, 2008 U.S. Dist. LEXIS 12026 (E.D. La. Feb. 15, 2008) ............................. 46-47

*Huddleston v. Herman & MacLean*,
    640 F.2d 534 (5th Cir. 1981) ..................................................................................46

*Jahn v. Equine Servs. PSC*,
    233 F.3d 382 (6th Cir. 2000) ...........................................................................31, 55

*Kannankeril v. Terminix Int'l*,
    128 F.3d 802 (3d Cir. 1997)....................................................................................7

*Knight v. Kirby Inland Marine, Inc.*,
    482 F.3d 347 (5th Cir. 2007) ..................................................................................6

*Kritser v. Beech Aircraft Corp.*,
    479 F.2d 1089 (5th Cir. 1973) ........................................................................*Passim*

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) .....................................................................................*Passim*

*Legier & Matherne, APAC v. Great Plains Software, Inc.*,
    No. 03-278 Sec. K (1), 2004 U.S. Dist. LEXIS 12361 (E.D. La. June 30, 2004)
    (Duval, J.)....................................................................................................37

*Libbey v. Wabash Nat'l Corp.*,
    No. 02-16-P-H, 2002 U.S. Dist. LEXIS 19039 (D. Me. Oct. 7, 2002)............................26, 29

*Lovejoy v. Sheriff Joseph Arpaio*,
    No. CV-09-01912-PHX-NVW, 2011 U.S. Dist. LEXIS 94503 (D. Az. August 22,
    2011) .........................................................................................................58

*Lust v. Merrell Dow Pharms.*,
    89 F.3d 594 (9th Cir. 1996) ................................................................................6, 8

*Maiz v. Virani*,
    253 F.3d 641 (11th Cir. 2001) ...........................................................................44, 48

*Mathis v. Exxon Corp.*,
    302 F.3d 448 (5th Cir. 2002) ..............................................................................4, 6

*McCullock v. H.B. Fuller Co.*,
    61 F.3d 1038 (2d Cir. 1995)...................................................................................5

*McLean v. 988011 Ontario, Ltd.*,
    224 F.3d 797 (6th Cir. 2000) ......................................................................... 33-34, 54

*Metrejean v. REC Marine Logistics,*
    L.L.C., No. 08-5049, 2009 U.S. Dist. LEXIS 92498 (E.D. La. Sept. 21, 2009) ..............45, 48

*Oddi v. Ford Motor Co.,*
    234 F.3d 136 (3d Cir. 2000) ............................................................................... 5-6

*Ostrowiecki v. Aggressor Fleet, Ltd.,*
    No. 07-6931, 2008 U.S. Dist. LEXIS 83052 (E.D. La. July 15, 2008)
    (Africk, J.)....................................................................................................*Passim*

*In re Paoli R.R. Yard PCB Litig.,*
    35 F.3d 717 (3d Cir. 1994) .........................................................................................5

*Pestel v. Vermeer Mfg.,*
    64 F.3d 382 (8th Cir. 1995) ........................................................................................6

*Pineda v. Ford Motor Co.,*
    520 F.3d 237 (3d Cir. 2008)........................................................................................5

*Pipitone v. Biomatrix, Inc. et. al.,*
    *288 F.3d 239, 250 (5th Cir. 2002)*............................................................................5

*Quiet Tech, DC-8 v. Hurel-Dubois UK Ltd.,*
    326 F.3d 1333 (11th Cir. 2003) ................................................................................33

*Redman v. John D. Brush & Co.,*
    111 F.3d 1174 (4th Cir. 1997) ..................................................................................27

*Rosado v. Deters,*
    5 F.3d 119 (5th Cir. 1993) .........................................................................................12

*Rudd v. General Motors Corp.,*
    127 F. Supp. 2d 1330 (M.D. Ala. 2001) ......................................................*Passim*

*Rushing v. Kansas City S. Ry.,*
    185 F.3d 496 (5th Cir. 1999) ......................................................................................6

*S.M. v. J.K.,*
    262 F.3d 914 (9th Cir. 2001) ......................................................................................5

*Seastrunk v. Darwell Integrated Tech.,*
    No. 3:05-CV-0531-BF(G), 2008 U.S. Dist. LEXIS 26498 (N.D. Tex. Mar. 28, 2008) .........26

*Smith v. BMW N. Am., Inc.,*
    308 F.3d 913 (8th Cir. 2002) ......................................................................................7

*Smith v. Ford Motor Co.,*
    215 F.3d 713 (7th Cir. 2000) ......................................................................................8

*Snyder v. Whittaker Corp.*,
    839 F.2d 1085 (5th Cir. 1988) ............................................................................................11

*Tanner v. Westbrook*,
    174 F.3d 542 (5th Cir. 1999) ..........................................................................................4, 8

*Thompson v. Rowan Cos.*,
    No. 06-3218, 2007 U.S. Dist. LEXIS 15822 (E.D. La. Mar. 6, 2007) (Barbier, J.) ...........9, 19

*Travelers Indem. Co. v. Royal Oak Enters., Inc.*,
    No. 5:02-CV-58-Oc-10GRJ, 2004 U.S. Dist. LEXIS 29575
    (M.D. Fla. Aug. 20, 2004) ..........................................................................................44, 48

*United States v. Leo*,
    941 F.2d 181 (3rd Cir. 1991) ............................................................................................46

*Wackman v. Rubsamen*,
    602 F.3d 391 (5th Cir. 2010) ............................................................................................11

## OTHER AUTHORITIES

30 C.F.R. § 250.421 ...........................................................................................................23

Federal Rule of Evidence 104(a) ......................................................................................1, 4

Federal Rule of Evidence 702 ...........................................................................................1, 4

Federal Rule of Evidence 703 ............................................................................................8

Federal Rule of Evidence 704(a) ........................................................................................45

Halliburton Energy Services, Inc. ("HESI") files this Combined Response in opposition to the motions filed by BP and Cameron seeking to exclude or limit portions of HESI's expert reports and testimony.[1]  In response, HESI respectfully shows the court as follows:

## **INTRODUCTION**

BP and Cameron seek to exclude or limit portions of the reports and testimony of seven of HESI's expert witnesses, including Sam Lewis, Richard Strickland, David Bolado, Gene Beck, John Hughett, Glen Stevick and Patrick Hudson.[2]  In addition, BP filed a *Daubert* challenge addressing certain topics, which attacks portions of opinions expressed by Lewis, Hughett, Bolado, and Beck.[3]  A review of the testimony and expert reports at issue reveals that the challenged testimony easily satisfies the standards for admissibility under *Daubert* and Federal Rules of Evidence 104(a) and 702.

The Court should deny the challenges to HESI experts, for the reasons summarized as follows:

> ➢ BP seeks the wholesale exclusion of any theory regarding the alleged "failure of the primary cement job," which necessarily implicates BP's own conduct.  BP's challenge fails because it sets an impossibly high methodological hurdle for admission of expert testimony, particularly given the evidentiary nature and scope of this case.  Furthermore, BP itself is responsible for the absence of certain data, an absence that BP improperly attempts to bootstrap into a *Daubert* challenge.

> ➢ For similar reasons, BP's attack on HESI's expert opinions on cement disturbance caused by rig activities are equally unfounded because the challenged analysis is more than adequate under *Daubert* standards.

---

[1] Weatherford is no longer a party to this case and its *Daubert* challenges to HESI's experts has been denied as moot. *See* Dkt. 5653; 5664.  Accordingly, HESI does not address Weatherford's motion.

[2] Specifically, HESI responds in opposition to BP's Motion to Limit the Testimony of Dr. Fredrick "Gene" Beck [Dkt. 5420]; BP's Motion to Limit the Testimony of Daniel [sic] Bolado [Dkt. 5422]; BP's Motion to Limit the Testimony of Dr. Patrick Hudson [Dkt. 5425]; BP's Motion to Limit the Testimony of John Hughett [Dkt. 5427]; BP's Motion to Limit the Testimony of Dr. Samuel Lewis [Dkt. 5429]; BP's Motion to Exclude Certain Opinions of Dr. Glen Stevick [Dkt. 5433]; BP's Motion to Limit the Testimony of Dr. Richard Strickland [Dkt. 5434]; and Cameron's Motion To Exclude Withdrawn Shear Ram Design Opinions Previously Offered By Halliburton's Expert, Glen Stevick [Dkt. 5415]; hereinafter, the "Motions."

[3] *See* BP's Motion to Preclude Unreliable Opinions on the Failure of the Primary Cement Job [Dkt. 5435].

> ➢ BP's challenge to Strickland fails because his extensive analysis of the M57B hydrocarbon-bearing zone, a critically important issue here, cannot be swept aside by inconsequential arguments about the definitions of words and phrases.

> ➢ BP's challenge to Bolado, Hughett, Lewis, and Hudson is fallacious.  BP incorrectly asserts that an expert cannot rely on the input or analysis of another expert without independent verification of the underlying data, which according to BP, also requires the professional qualifications necessary to engage in that independent analysis.  BP's argument is unsupported by the law.

> ➢ BP's arguments to the contrary notwithstanding, Hudson, one of the academic pioneers of the "Swiss Cheese model," and one of the most respected experts on the topic of process safety, is eminently qualified to testify regarding BP's process safety deficiencies and how those deficiencies led to the Macondo blowout.

> ➢ To the extent Beck and Stevick opine on issues of MMS regulations, their expertise, and their fact specific opinions, will assist the Court in addressing the highly technical subject matter addressed by these regulations.

> ➢ Finally, Dr. Lewis, an expert in cement chemistry and lab testing procedures, is more than qualified to opine that individuals such as Erick Cunningham or Robert Beirute are "sophisticated" with respect to foamed cement.  Cunningham has extensive experience with foamed cement and currently serves as the chairperson of the API working group dedicated to evaluating test methods for foamed cement jobs, and Beirute, the principal of Beirute Consulting, LLC, was selected and employed by BP as an outside consultant on cementing issues.

For the reasons set forth in greater detail *infra*, the Motions should be denied in their entirety.

## EVIDENCE IN SUPPORT OF HESI'S COMBINED RESPONSE IN OPPOSITION TO MOTIONS TO LIMIT TESTIMONY OF ITS EXPERT WITNESSES

In support of its Opposition to BP and Cameron's Motions, HESI relies upon the following, attached hereto as Exhibits (A) – (S) respectively:[4]

| Exhibit | Description of Exhibit |
|---------|------------------------|
| A | TREX-00001: Deepwater Horizon Accident Investigation Report (Bly Report) - dated September 8, 2010 |
| B | Leif Colson Deposition Excerpts |
| C | Brent Lirette Deposition Excerpts |

---

[4] Because they were already provided to the Court, the expert reports and CVs are not being attached to this response.

| Exhibit | Description of Exhibit |
|---------|----------------------|
| D | John Hughett Deposition Excerpts |
| E | TREX-06404<br>E-Mail – From: Huawen Gai Sent: Thu Jul 16 12:49:13 2009 – Subject:  Macondo likely abandonment pressure? |
| F | TREX-07279<br>E-Mail – From: Kent Corser Sent Fri Jun 25 19:15:28 2010 – Subject:  ACTION – Dynamic Simulation Report |
| G | TREX-03533<br>BP Gulf of Mexico SPU Technical Memorandum Dated: 26th July 2010 |
| H | Richard Strickland Deposition Excerpts |
| I | Jesse Gagliano Deposition Excerpts |
| J | David Bolado Deposition Excerpts |
| K | Doyle Maxie Deposition Excerpts |
| L | TREX-01388:<br>April 15, 2010 9 7/8" X 7" Production Casing Design Report<br>TREX-01391<br>E-Mail - From: Jesse Gagliano Sent: Thu Apr 15  20:35:05 2010 - Subject: OptiCem Report<br>TREX-60546:<br>April 18, 2010 9 7/8" X 7" Production Casing Design Report |
| M | Ronald Crook Deposition Excerpts |
| N | Affidavit of Justin Henderson |
| O | Letter from Raines to Bartoszek dated February 14, 2012 |
| P | BP and HESI Stipulation and Agreement |
| Q | Glen Stevick Deposition Excerpts |
| R | David Trocquet Deposition Excerpts |
| S | Clifton Knight Deposition Excerpts |

## <u>ARGUMENT AND AUTHORITIES</u>

**I.    IN DETERMINING THE ADMISSIBILITY OF EXPERT TESTIMONY, THIS COURT IS GUIDED BY *DAUBERT* AND ITS PROGENY.**

    **A.    The Court Serves As a Gate-Keeper Under *Daubert*.**

The Federal Rules of Evidence govern the admissibility of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587 (1993). Under Rule 702, the trial judge serves a gatekeeping function, making both relevance and reliability determinations and disallowing expert testimony that is not helpful to the trier of fact or that lacks a reliable foundation. *Id*. at 589; FED. R. EVID. 702, advisory committee's note, 2000 amendment ("The amendment makes no attempt to set forth procedural requirements for exercising the trial court's gatekeeping function over expert testimony"); *see also* FED. R. EVID. 104(a) (preliminary questions of admissibility shall be determined by the court which, in making its determination, is not itself bound by all the exclusionary rules of evidence). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. .

FED. R. EVID. 702. The proponent of expert testimony has the burden of establishing the admissibility of the expert's testimony under Federal Rule of Evidence 702 by a preponderance of the evidence. *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002).

    **B.    The *Daubert* Analysis Concerns Only the Threshold Issue of Admissibility.**

While the proponent of an expert is required to establish reliability for opinions to be admissible, it is not required to prove that the expert's opinions are correct. *Tanner v.*

*Westbrook*, 174 F.3d 542, 547 (5th Cir. 1999); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994), *overruled on unrelated grounds by General Elec. Co. v. Joiner*, 118 S. Ct. 512, 519 (1997); *see Oddi v. Ford Motor Co.*, 234 F.3d 136, 155-56 (3d Cir. 2000) (evidentiary requirement for reliability is lower than standard for proving case), *overruled on other grounds by Phillips v. Cricket Lighters*, 841 A.2d 1000 (Pa. 2003).  The focus of the gatekeeper analysis is on "principles and methodology, not the conclusions that they generate." *Daubert*, 509 U.S. at 595; *see Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).  If the challenging party's complaint goes to the weight to be accorded the evidence as opposed to its admissibility, that challenge is best mounted and addressed at trial.  *See Daubert*, 509 U.S. at 596; *Pipitone v. Biomatrix, Inc. et. al., 288 F.3d 239, 250 (5th Cir. 2002), see also S.M. v. J.K.*, 262 F.3d 914, 921 (9th Cir. 2001) ("A court may admit somewhat questionable testimony if it falls within the range where experts might reasonably differ, and where the jury must decide among conflicting views." (citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 153 (1999), *amended by* 315 F.3d 1058 (9th Cir. 2003)).

> **C.**     **An Examination of the Expert's Qualifications and Experience is the First Step in the *Daubert* Analysis.**

The proponent of expert testimony must show that the expert has the proper educational background or requisite experience to be qualified as a person with specialized knowledge. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042-43 (2d Cir. 1995).  However, a lack of specialization does not affect the admissibility of the expert opinion—only the weight to be given that opinion.  *Compton v. Subaru of Am., Inc.*, 83 F.2d 1513, 1520 (10th Cir. 1996); *see Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (finding abuse of discretion in exclusion of testimony simply because court did not believe the proposed expert was the best qualified or had the most appropriate specialization); *Feliciano-Hill v. Principi*, 439 F.3d 18, 25

(1st Cir. 2006) (testimony cannot be excluded simply because court may believe one expert is better qualified than another).  The Fifth Circuit has held that as long as the offering party provides some reasonable indication of qualification, the expert testimony can be admitted, allowing the trier of fact to consider the weight to be given the expert's qualifications.  *Rushing v. Kansas City S. Ry.*, 185 F.3d 496, 507 (5th Cir. 1999).

### D.     An Assessment of Reliability and Methodology is the Second Step in the Analysis.

The proponent of expert testimony must next establish the reliability of the expert's opinion.  *See Daubert*, 509 U.S. at 590-91.  Often, variability of type and purpose of the particular testimony requires flexibility in answering the reliability inquiry.  *Mathis*, 302 F.3d at 460 (citing *Kumho Tire Co.*, 526 U.S. at 150 (emphasizing that the *Daubert* analysis is "flexible" and must take account of "the nature of the issue, the expert's particular expertise, and the subject of his testimony")).  The expert's methodology must also be reasonably applied to the facts. *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 352-53 (5th Cir. 2007).  However, the proponent is not required to show that the expert performed the most elaborate tests or studies imaginable.  *Oddi*, 234 F.3d at 160.  Cases involving expert testimony derived mainly from firsthand observations and professional experience have deemed such elaborate testing analysis "not particularly relevant."  *See, e.g.*, *Pipitone*, 288 F.3d at 246 (rate of error and standards not particularly relevant when expert's testimony derived mainly from firsthand observations and professional experience in translating medical diagnoses); *see also Lust v. Merrell Dow Pharms.*, 89 F.3d 594, 597 (9th Cir. 1996) (if expert has not done original research, potential rate of error does not apply) (citing *Daubert,* 43 F.3d at 1317 n.4); *Pestel v. Vermeer Mfg.*, 64 F.3d 382, 384 (8th Cir. 1995).

Whether an expert's methodology has been subjected to peer review is another factor that courts consider in assessing the reliability of an expert; however, the fact that a theory has not been peer reviewed is not dispositive. *Pipitone*, 288 F.3d at 246; *see Kannankeril v. Terminix Int'l*, 128 F.3d 802, 809 (3d Cir. 1997) (lack of peer review not dispositive if expert's opinion supported by "widely accepted scientific knowledge"); *see also Bonner v. ISP Techs.*, 259 F.3d 924, 929 (8th Cir. 2001) (no requirement that the epidemiological studies supporting expert's opinion be published for opinion to be admissible); *Feliciano-Hill*, 439 F.3d at 25 (citations to published authority may be unnecessary when issue is not novel or complex). Courts have acknowledged that, in many cases, well-grounded or novel theories, or theories of limited interest, will not have been published or subjected to peer review. *Daubert*, 509 U.S. at 593.

### E. Experts Are Afforded a Wide Latitude in Offering Opinions.

Experts have wide latitude in offering opinions. *See Daubert*, 509 U.S. at 592 (". . .an expert is permitted wide latitude to offer opinions, including those that are not based on first hand knowledge or observation."). Applying *Daubert,* courts have held that experts are permitted to rely on a wide variety of sources and use a similarly wide choice of methodologies in developing their expert opinions. *See, e.g.*, *Smith v. BMW N. Am., Inc.*, 308 F.3d 913, 919 (8th Cir. 2002) (the fact that experts in other fields would base opinions on other factors does not require exclusion of expert whose testimony is helpful to the jury); *Borawick v. Shay,* 68 F.3d 597, 610 (2d Cir. 1995) (even if scientific evidence not generally accepted in the relevant scientific community, *Daubert* permits admission of evidence if its reliability has other independent support).

In a similar vein, courts will look to whether the theory, technique, or concept advanced by the expert is supported by sufficient facts or data. *See Pipitone*, 288 F.3d at 249-50. The sufficient facts or data relied upon by the expert may include inadmissible evidence, hypothetical

facts, and other experts' opinions.  *See, e.g., Bryan v. John Bean Div. of FMC Corp.,* 566 F.2d 541, 545 (5th Cir. 1978) ("The modern view in evidence law recognizes that experts often rely on facts and data supplied by third parties."); *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94-95 (2d Cir. 2000) (". . .an expert may rely on data that she did not personally collect . . . The expert need not have conducted her own tests") (citing *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 524 (2d Cir. 1996) ("Dr. Brown did not personally visit the landfills or dig up any shovelfuls of waste, but he was not required to do so.")); *Lust by & Through Lust v. Merrell Dow Pharms.*, 89 F.3d 594, 598 (9th Cir. 1996) (explaining that expert may base testimony on review of research conducted by others if his review and application complies with scientific principles in the field); *Garcia v. BRK Brands, Inc.*, 266 F. Supp. 2d 566, 576 (S.D. Tex. 2003) (". . .an expert may base his theories or conclusions on the research of other experts if he can demonstrate that he has done so reliably"); *Rudd v. General Motors Corp.,* 127 F. Supp. 2d 1330, 1343 (M.D. Ala. 2001).  Finally, the Federal Rules of Evidence expressly authorize the admission of an expert opinion that is based on "facts or data" that in itself is inadmissible, as long as the evidence relied upon is "of a type reasonably relied upon by experts in the particular field in forming opinions." FED. R. EVID. 703.

## F.  The *Daubert* Analysis Is Tailored to the Facts and Circumstances of Each Case.

In assessing *Daubert* challenges, courts evaluate whether the expert's reasoning and methodology "fit" the case that is, whether the expert's methodology can be properly applied to the facts and can assist the trier of fact in resolving an issue.  *Daubert*, 509 U.S. at 591-92; *Tanner*, 174 F.3d at 548.  An expert's testimony does not need to relate directly to the ultimate issue that is to be resolved by the trier of fact; it only needs to be relevant to evaluating a factual matter.  *See Smith v. Ford Motor Co.*, 215 F.3d 713, 720 (7th Cir. 2000).

### G.       The *Daubert* Admissibility Standards Are Attenuated in a Bench Trial.

Notably, this Court has held that "[m]ost of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury." *Thompson v. Rowan Cos.*, No. 06-3218, 2007 U.S. Dist. LEXIS 15822, at *3 (E.D. La. Mar. 6, 2007) (Barbier, J.) (citing *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000). "*Daubert* requires a binary choice—admit or exclude—and a judge in a bench trial should have discretion to admit questionable technical evidence, though of course he must not give it more weight than it deserves." *Thompson*, 2007 U.S. Dist. LEXIS 15822, at *3 (internal citations omitted).

## II.     BP'S MOTION TO EXCLUDE TESTIMONY REGARDING THE "FAILURE OF THE PRIMARY CEMENT JOB" SHOULD BE DENIED.

BP seeks to exclude expert testimony regarding "the failure of the primary cement job," which potentially affects the testimony of HESI's experts Hughett, Bolado and Lewis.  *See* BP's Motion, Dkt. 5435 ("BP Cement Motion").  This Court should deny BP's Cement Motion.

### A.       BP Selectively Attacks Any Cement Failure Theory That Implicates BP.

BP challenges experts examining the effect of no full "bottoms up" circulation immediately prior to the cement job;[5] the phenomenon of "rat hole" swapping;[6] the effect of BP's decision to use a small volume of cement pumped at a low rate; and the impact on the integrity of the cement of various rig activities during cement set up.[7]  *See* BP Cement Motion at 1.  Not

---

[5] Bolado concludes that "[m]ud cake in the annulus may also contact the cement as it is being pumped up the annulus, especially if BP's lack of bottoms-up circulation, poor centralization, and low pump rate left channels of mud in the annular space."  *See* Bolado Expert Report at 41.

[6] HESI's response to BP's arguments concerning "roping" and rat hole swapping is set forth in its response to BP's challenge to Bolado's testimony, section V(B), *infra*.

[7] Hughett opined that after completion of pumping the primary cement job, shortly after midnight on April 20, 2010, BP engaged in a series of rig activities over the next sixteen hours that varied the differential pressure on the top wiper plug, almost certainly causing this plug to move cyclically up and down the casing ("U-tubing") during the critical cement curing time.  The movement of the top wiper plug disturbed the cement, delaying its ability to set.  *See* Hughett Expert Report at 35-39; *see also* Bolado Expert Report at 40; Lewis Expert Report at 46. (concluding that BP's rig activities during what should have been an undisturbed wait-on-cement time would "certainly cause a

surprisingly, each of the theories challenged by BP implicates BP's own actions or omissions which may have contributed to the lack of zonal isolation.[8]   The transparent motivation underlying BP's challenges casts doubt on the veracity of its substantive claims, a doubt that is confirmed by examination of the actual challenges, because BP acknowledges the existence of the phenomena at issue, and the expert analysis performed is appropriate for this case.

**B.      BP Acknowledges the Existence of the Phenomena Discussed in the Challenged Expert Opinions.**

BP's Cement Motion is notably and carefully crafted.   BP does <u>not</u> deny the existence of the phenomena or mechanisms underlying the challenged theories.   BP Cement Motion at 1, 3. Nor could it.   BP acknowledges that these are "general phenomena" that are "observed from time to time," and that surge and swab forces are "known phenomena in the drilling industry."   *Id*. Further, BP's own Bly Report analyzed whether some of these phenomena may have been causally responsible for the blowout.   *See* Ex. A at 34, 57, 62, 67, 70, 78 (TREX 00001 [Bly Report]).   There is voluminous deposition testimony about these topics, and experts for HESI and other parties have all opined on these subjects, including Glen Benge for the United States and David Pritchard for the PSC.   Thus, the existence of the underlying issues BP challenges, and their potential impact on a cement job, are beyond question.

---

delay in cement set up time.").   HESI's response to BP's arguments concerning rig activities that affected the ability of the cement to set is more fully set forth, *infra*.

[8] In its Cement Motion, BP also mischaracterizes HESI's post-incident modeling as an alleged basis for its *Daubert* challenge.   Discussing the effect the lack of a full "bottoms up" circulation may have had on cementing operations, BP asserts that "Halliburton's post-incident modeling in this case, using a computer modeling program called Displace 3D, showed that there was in fact no channeling on the Macondo well cement job."   BP Cement Motion at 5 (emphasis in original).   BP provides no support for this assertion besides a citation to an exhibit.   BP's claim is simply false.   As explained in Bolado's rebuttal report, it is impossible to create a reliable Displace 3D simulation without the Fann 70 data or other Fann data from mud, base oil, and contaminations of mud with base oil, base oil with spacer, and spacer with cement.   *See* Bolado Rebuttal Report at 30.   As noted in Section V(D)(1), *infra*, as a result of BP's failure to obtain Fann 70 data, no such data exists from which to create an accurate model.

C.   **The Opinions of HESI's Experts Are Based on an Analysis Appropriate for the Circumstances of this Case.**

Instead of challenging the existence or potential effects of these phenomena directly, BP presents two closely related arguments for exclusion of testimony regarding the apparent failure of the primary cement job.  First, BP argues there was insufficient modeling or investigation to support the experts' conclusions.   BP Cement Motion at 4, 6.   Second, BP argues it is impermissible for an expert to opine that a certain phenomenon "may" have contributed to the blowout, as opposed to definitively testifying that the phenomenon actually occurred and was "the" cause of the event.  *Id*. at 1-2, 4.  Neither of BP's arguments survives scrutiny.

1.   **Expert Testimony Must Be Assessed With Reference to the Practical Limitations of This Case.**

Expert testimony may be stricken under *Daubert* when an expert fails to conduct a thorough analysis, the sufficiency of which is wholly dependent upon the *circumstances* of the case.  However, BP suggests that *Daubert* requires a level of analysis that is, as a practical matter, impossible, insisting that an analysis be performed on data that is lost or unavailable.  In this context, this Court should be guided by a line of cases admitting expert testimony in situations in which data is missing, lost, destroyed, or otherwise beyond the practicable purview of expert analysis.  *See generally Kritser v. Beech Aircraft Corp.*, 479 F.2d 1089, 1091-92, 1095 (5th Cir. 1973) (expert testimony that a defective fuel system caused engine failure and resulted in a plane crash was a "reasonable inference," not an "unwarranted assumption," because the opinion was derived from known facts about the angle of the plane as the pilot approached for landing); *Snyder v. Whittaker Corp.*, 839 F.2d 1085, 1089-90 (5th Cir. 1988) (where a shrimping boat sank and the wreckage was never recovered, expert testimony on causation was not speculation because the Federal Rules of Evidence "envision that such opinions can be given in response to hypothetical questions or facts presented to the expert at trial."); *see also Wackman v.*

*Rubsamen*, 602 F.3d 391, 398, 401-04 (5th Cir. 2010); *Flax v. Quitman County Hosp., LLC*, No. 2:09-CV-101-M-D, 2011 U.S. Dist. LEXIS 91424 at *15-16, 19 (N.D. Miss. Aug. 16, 2011).

BP's case law to the contrary is inapposite.  BP's authorities are traditional cases where the full range of data is available and where the challenged expert fails to conduct a robust analysis of that data.  BP's authorities do not address a scenario such as the one presented by this case, where data is missing, lost, destroyed, or was never available.  *See, e.g., Rosado v. Deters*, 5 F.3d 119, 124 (5th Cir. 1993) (expert stricken for failure to perform testing on vehicle that was available for testing).   To the extent the unique circumstances of this case created any unavoidable deficiencies in the experts' analytical methodology, BP may challenge the weight the Court should accord such opinions, but BP is not entitled to exclude such opinions as a matter of admissibility under *Daubert*.  There is no authority for such a position.

> **2.    Allegations of Insufficient Modeling or Investigation Do Not Support the Granting of BP's Cement Motion.**

Regarding its first specific argument, BP improperly attempts to establish an impossibly high bar for admissibility of expert testimony *given the circumstances of this case*.  For example, BP challenges Bolado's theory regarding rat hole swapping by asserting that his opinion would be more reliable if he had constructed "an apparatus that simulated the downhole conditions of the Macondo well after the cement job and conduct[ed] an experiment to see if swapping would have actually occurred."  *Id*. at 6.  The rat hole of the Macondo lies more than 18,000 feet beneath sea level, *i.e*., more than three miles deep.  Pressures at this depth exceed 10,000 psi, with static temperatures at the bottom of the well exceeding 200 degrees Fahrenheit.  *See* Hughett Expert Report at 36.  As a practical matter, it is virtually impossible to "construct an apparatus" that would directly simulate all these conditions.  That is presumably why no party— including the United States Government—went to such extraordinary lengths to satisfy BP's

artificially high standard.  Tellingly, BP did not do so to rebut the theories in question.  BP similarly challenges the experts opining on the effect of surge and swab pressure on the setting cement—essentially, that Hughett and other experts' opinions on this issue did not do enough to test it, or that it would be more persuasive if they had access to more facts.

While expert opinions must be reliable, reliability is a floor to admissibility; an expert's opinion does not have to be absolute.  Because most of the evidence in this case, including the expert opinions, is based on something other than direct observation and measurement, certainty and absolutes are impossible.  No party is in a position to irrefutably assess the condition of the Macondo production casing lying three miles beneath the Gulf of Mexico; nor is any party capable of evaluating, with absolute certainty, the condition of the float collar or the cement.  Direct observation and measurement is, as a practical matter, impossible.  Moreover, due to the nature of the incident, there is a significant amount of information that is simply lost or non-existent.[9]  Thus, the experts involved in this case were required to work within the limitations of the data available to them.[10]

### 3.    An Expert May Opine On Possibilities and Reasonable Probabilities.

BP's second complaint is that some of the experts' opinions are couched in terms of a phenomena that "may" have contributed to the incident, instead of the claim that it definitively and actually contributed to the incident.  BP, again, misstates the requirements of the law.  An

---

[9] For example, the parties' knowledge of various well conditions prior to the blowout is limited to the Sperry data, as the more comprehensive Transocean Hitec data set was lost when the *Deepwater Horizon* sank.

[10] Furthermore, BP is itself responsible for the absence of certain data. For example, as discussed in connection with the challenge to David Bolado, *infra*, there is some factual uncertainty about the gel strength of the drilling mud used at Macondo.  This uncertainty exists because BP failed to order Fann 70 testing which would have directly established viscosity.  Similarly, BP challenges Strickland's testimony regarding the character of the M57B zone. While it would have been possible to take fluid samples directly from the M57B zone while logging the well, which would serve as direct evidence of the nature of the M57B zone, *see* Ex. B at 110:13-111:3 [Colson Dep.]. BP failed to do so.  *Id*. at 109:18-110:12.  Yet BP challenges and seeks to the exclude Strickland's testimony and opinions for not having direct evidence regarding the M57B zone.  BP cannot exclude the testimony and opinions of experts whose opinions have been limited by BP's own actions.

expert is entitled to opine about a possible cause of an event, and his opinion is not rendered inadmissible under *Daubert* simply because the expert is unable, or unwilling, to opine that a phenomena was definitively a cause, or the sole cause, of an event.  *See Ostrowiecki v. Aggressor Fleet, Ltd*., No. 07-6931, 2008 U.S. Dist. LEXIS 83052 at *17-22 (E.D. La. July 15, 2008) (Africk, J.) (report by liability expert concluding that scuba divers "most likely never surfaced from the dive" and proffering three alternative causes for their underwater deaths was admissible because there was some evidence to support the conclusion, and cross-examination would give the fact finder an opportunity to determine how much weight to afford the expert's theories); *Bigelow v. New York Lighter Co., Inc*., No. A-03-CA-340 LY, 2005 U.S. Dist. LEXIS 47871 at *31-33 (W.D. Tex. June 27, 2005) (finding that alternative causes affect the weight given to the expert's testimony, not its admissibility; thus, expert need not be "able to categorically exclude each and every possible alternative cause . . . to require otherwise would mean that few experts would be able to testify.") (internal citations omitted).

Interestingly, although BP demands that HESI's experts meet this impossibly high standard, BP's own experts fail to do so.  *See, e.g*., Crook Expert Report at 55 (opining that good displacement was "likely achieved"); *id.* at 27-28 (opining that conditioning cement slurry for three hours "likely activated" the SA-541 additive); *see also* Expert Report of Bourgoyne at 11 (opining that use of loss circulation materials "likely" resulted in a fluid displacement the rig crew did not fully understand).  BP's selective and inconsistent attempt to raise the standard for admissibility must fail.

### 4. Analysis of Whether Cement Volume or Pump Rate Could Have Been Increased is Immaterial.

BP also claims that the opinions of HESI's experts concerning the volume of cement pumped and the pump rate should be stricken under *Daubert* because they failed to "set forth

analysis identifying how much more cement should have been pumped or how much faster it should have been pumped."  BP Cement Motion at 8.  According to BP, the opinions of HESI's experts are inadmissible because they failed to consider "whether the well formation could have withstood additional cement or a faster pump rate."  *Id*. at 8-9.  BP's argument falls victim to a logical fallacy.  HESI's experts opine that the small amount of cement utilized, and/or the low rate at which it was pumped, may have contributed to the cement not achieving zonal isolation.  Whether the well could have withstood additional cement or a faster pump rate is irrelevant to whether the cement volume or pump rate that was actually used caused or contributed to the incident.  By BP's logic, if the well could not have withstood a higher pump rate, then the pump rate actually used *could not have been a causal factor*.  In reality, if a well in a given configuration could not withstand a higher pump rate/cement volume, and if the pump rate/cement volume BP chose to use was likely to cause a problem, the proper conclusion is that *BP should have redesigned the well.*  As explained in detail by Dr. Beck, BP could have avoided the pump rate/cement volume problem by utilizing an intermediate casing string that would have isolated the 14.2 ppg sands and enabled BP to continue drilling into the 12.6 ppg sands with an adequate drilling margin.  *See* Beck Expert Report at 35-36.  BP's failure to properly design the well does not support exclusion of HESI's expert witnesses.

> **D.    There is No Merit to BP's Argument Concerning Rig Activities That Disturbed The Cement at the Bottom of the Macondo Well.**
>
>> **1.    Rig Activities Could Have Disturbed the Cement in the Macondo Production Casing, Disrupting Its Ability to Set.**

BP further seeks to exclude testimony relating to rig activities that commenced after the completion of the production casing cement job at 12:36 AM on April 20, 2010 and the potential effect of such activities on the setting cement.  (Dkt. Nos. 5427 and 5435.)  When the cement was initially pumped into the production casing, it was obviously in a liquid, pumpable state.

Absent contamination or deficiencies, the cement should have hardened if left undisturbed for a sufficient period of time. *See* Lewis Expert Report at 45. But in order to set, cement requires the formation of an interlocked crystal lattice. *See* Lewis Expert Report at 51; *see also* Bolado Expert Report at 40. This lattice is initially very fragile, and even the smallest movement will disrupt its formation and delay the setting process. *Id.*

After the cement was pumped into the production casing, HESI's experts opine that various forces were applied, causing the cement to move in a cyclical fashion up and down within the annulus ("U-tubing"), and that such movement could have prevented the cement from timely setting. *See* Hughett Expert Report at 35-39; Lewis Expert Report at 46; Bolado Expert Report at 40. More specifically, the forces that may have caused the movement of the cement include: (1) the initial negative pressure differential that existed after pumping the cement job; (2) the positive pressure test; (3) the negative pressure test; (4) the pumping of seawater into the casing; (5) the removal of mud from the casing; and (6) the repeated insertion and removal of drill pipe into the well in connection with setting the casing seal assembly and the displacement operations, which caused "surge" and "swab" forces within the wellbore. *See, e.g.*, Hughett Expert Report at 35-39.

> ## 2. The Expert Conclusions Concerning the Potential Impact of Rig Activities on the Setting Cement Are Methodologically Sound.

BP challenges these theories as speculative. BP Cement Motion at 3-4. In fact, a careful analysis of the opinions at issue, the underlying facts, and the methodology employed demonstrates that such testimony more than satisfies the admissibility standards of *Daubert*.

First, BP does not dispute that even the smallest physical movement of cement will retard its ability to harden, implicitly conceding that if the cement was disturbed by the rig activities in question, then its ability to set would have been delayed. Nor does BP dispute that the positive

pressure test, the negative pressure test, the pumping of seawater into the casing, or the removal of mud from the casing could have caused forces of sufficient magnitude to disturb the production casing cement.  Instead, BP quibbles about the "swab" and "surge" forces generated by the repeated insertion and removal of drill pipe from the well.  This selective attack on portions of opinions regarding the potential effect of a disturbance on the cement's integrity leaves the general theory intact, weakening BP's challenge.  Factual disagreements regarding the magnitude of swab and surge forces do not render these expert opinions unreliable.

Second, even the limited challenge to the "surge" and "swab" aspects of the general disturbance theory fails.  Not surprisingly, BP acknowledges that "surge" and "swab" pressures are "known phenomena in the drilling industry."  BP Cement Motion at 3.  Thus the challenge boils down to a complaint that not enough was done to establish the possibility that forces even BP acknowledges could cause the cement to move and therefore not set.  BP's own acknowledgements and admissions undermine the credibility of its argument.

Third, there are ample facts and methodological rigor to satisfy *Daubert's* initial admissibility requirements as to the "surge" and "swab" theories.  BP avoids addressing the methodology of HESI's experts in any detail; yet a review of the methodology employed casts further doubt on BP's challenge.  For example, Hughett's analysis is premised on failure of the float collar to convert, leaving the wiper plug as the only mechanism capable of resisting forces that could have moved the cement.  Hughett then cites tests Weatherford previously performed showing that at ambient temperature, it takes only 165 psi of differential pressure to move the wiper plug in the casing.  *See* Hughett Expert Report at 36 and n.60 (citing Ex. C at 88:15-89:21 [Lirette Dep.]).

Hughett then observes that during cementing operations, the wiper plug would have moved almost three miles down the casing before it "bumped" atop the float collar.  *Id.* at 36. Hughett opines that this nearly three mile journey likely abraded the polyurethane fins on the outside of the wiper plug and, by shrinking the effective diameter of the wiper plug and the tension of the fins against the casing wall, the wear suffered by the fins on the wiper plug would tend to reduce the amount of pressure required to move the plug.  *Id.*  Furthermore, the static temperature at the bottom of the well exceeded 200 degrees Fahrenheit, which would tend to make the polymer material of the wiper plug more pliable, again tending to reduce the amount of force required to move the plug.  *Id.*  Finally, Hughett explains that the wiper plug was pumped in synthetic oil based drilling mud, which would tend to lubricate the wiper plug and casing, again reducing the amount of pressure required to move the wiper plug.  Hughett ultimately concludes that, given the factual circumstances of the Macondo well, the amount of force required to move the wiper plug would be substantially less than 165 psi.  *Id.*

Next, Hughett notes that after the cement job was completed and the wiper plug bumped on the top of the float collar, there was about 100 psi of differential pressure across the wiper plug and, accordingly, there was likely enough pressure to move the wiper plug up and away from its initial resting place on top of the float collar.  *Id.* at 37.  Hughett then describes the sequence of positive and negative pressure tests, displacement operations, and movement of pipe that could have generated forces adequate to move the wiper plug cyclically up and down the casing.  *Id.* at 37-38.  Hughett also examined the size of the tools that were repeatedly inserted and withdrawn from the casing.  *See* Ex. D at 541:13-14 [Hughett Dep.].  Ultimately, based on the facts and methodology described above, and coupled with his 40 plus years of engineering and operational experience in the oil and gas industry, Hughett opined that "any movement of the

top wiper plug would have caused U-tubing of the cement in the area of the shoe track and annulus, which would have extended the setting time of the cement and thus extended the wait-on-cement time."  *See* Hughett Expert Report at 39; Ex. D at 544:21-23; 555:9-10 [Hughett Dep.].  This analysis more than satisfies the initial admissibility standards of *Daubert*.

BP claims, incorrectly, that Hughett failed to rely on any peer-reviewed industry publications in support of his conclusion.  BP Cement Motion at 4.  In fact, when asked precisely this question, Hughett explained "Actually, that's referenced in API Guidelines about rig activities and—and possibly moving cement.  That is actually in the API Guidelines on RP65."  *See* Ex. D at 542:13-20 [Hughett Dep.].

Finally, Lewis and Bolado also opine that rig activities could have moved the cement, hindering its ability to set.  *See* Lewis Expert Report at 51-52; Bolado Expert Report at 39-40.  The fact that other experienced experts opined that rig activities could have delayed the setting of the cement is an additional reason to deny BP's motion.  These three experts have opined on the same issues, giving credence to their reliability; moreover, this Court can assess the credibility of each of these experts in the full context of the upcoming bench trial.  *See Thompson*, 2007 U.S. Dist. LEXIS 15822, at *3 (noting that *Daubert* standards are relaxed in the context of a bench trial).  BP's challenge to the expert opinions concerning the impact of rig activities on the setting cement and its possible disturbance fail.

## III.   JOHN HUGHETT'S TESTIMONY PLAINLY SATISFIES THE *DAUBERT* STANDARDS.

John Hughett has been a licensed professional petroleum engineer in the State of Texas since 1981.  *See* Hughett Expert Report at 10-12; *see also* Report Appendix, 1-4.  Hughett has over 40 years of experience in the oil and gas industry and has drilled approximately 4,000 wells as a drilling contractor, operator, or consultant.  *Id*.  Hughett has worldwide drilling and

operations experience. *Id*. He served as the Engineering Manager for seven companies, during which time he was constantly on rig sites. *Id*. Hughett has managed drilling programs for some of the largest companies in the world, including Mexican PEMEX Exploracion Y Produccion D.R. *Id*.

BP lodges three challenges to Hughett's expert testimony: that Hughett is not qualified to render opinions on process safety, that Hughett did not conduct an adequate analysis to determine whether the float collar converted, and that Hughett cannot testify about the M57B hydrocarbon-bearing zone. *See* Dkt. No. 5427 ("BP Hughett Motion"). None of these challenges has merit.

### A.      Hughett Is Entitled To Offer Opinions About Rig Culture and Safety.

Regarding safety and rig culture, Hughett opines that BP, as the operator or "company man" on the Macondo well, directed or approved all activities on the rig, and that BP utilized an "autocratic culture on Macondo, a culture that did not invite or respect provider input" from contractors such as HESI. *See* Hughett Expert Report at 27.

BP argues that Hughett impermissibly opines about process safety in his opening report. *Id*. at 1, 3-4. But the words "process safety," "process," and "safety" appear nowhere in Hughett's report and unsurprisingly, Hughett testified that he does not consider himself an expert on process safety. Ex. D at 79:14-16 [Hughett Dep.]. Elsewhere in his deposition, Hughett testifies that he is offering opinions about "process safety," but it is clear from the context that he is not using the phrase "process safety" in the true technical meaning of that term, and that he is not an expert in the process safety discipline in the way that HESI's expert, Patrick Hudson, or the PSC's experts, Robert Bea and William Gale, are experts.[11]

---

[11] Dr. Hudson is one of the foremost authorities on the topic of process safety, and one of the original academic contributors to the "Swiss Cheese" model. *See* Hudson Expert Report at 7-10 and Report Appendix B. Dr. Bea is

Labels aside, however, Hughett is without question an expert on the topics of rig culture, the authority of an operator, the relationship between an operator and a contractor, and safe practices and procedures on a drilling rig.  As noted above, Hughett has 40 years of experience in the drilling industry, has managerial and engineering experience, and has personally served in the capacity of an operator on five to six hundred wells.  *See* Ex. D at 615:4-17 [Hughett Dep.]; *see also* Hughett Expert Report at 10-12 and Report Appendix, 1-4.  When he served in the capacity of operator, he observed standard industry practices and process safety standards, on hundreds of wells.  *See* Ex. D at 615:4-17 [Hughett Dep.].  When Hughett reaches a conclusion, for example, that BP utilized an "autocratic culture" on the Macondo well, one which did not invite or respect provider input, that opinion is based on his extensive experience, along with his review of documents and testimony in this case.  *See* Hughett Expert Report at 10-12; *see also* Report Appendix, 1-4.  Hughett is more than qualified to offer such testimony, based on his own expertise, his personal experience, and his analysis of the factual record in this case.

### B.    Hughett's Opinions on Float Collar Conversion Are Appropriate and Will Assist the Court.

BP makes a vague and unfounded argument that Hughett's opinions about the float collar conversion are inadmissible under *Daubert*.  Hughett makes the logical observation that if the flow path for the blowout was up the casing (*i.e.*, through the float collar), then it is unlikely the float collar converted (*i.e.*, that the flapper valves were not in a closed position that would block the flow of hydrocarbons).  *See* Hughett Expert Report at 34.  This conclusion rests in part on the

---

the co-founder of the Center for Catastrophic Risk Management and has authored, contributed to, or delivered more than 500 articles, books, and reports relating to issues of risk and risk management.  *See* Bea/Gale Expert Report at ii and Report Appendix A.  In addition, from 1982 to 2005, Dr. Bea was periodically retained by BP as a consultant to provide advice and recommendations on issues relating to safety systems, human error, and risk assessment for deepwater platforms, offshore drilling, pipelines, oil tankers, and refineries.  *See* Bea/Gale Expert Report at ii.  Dr. Gale is an engineering specialist in all aspects of risk management, safety, and risk assessment.  *See id.* and Report Appendix B.

fact that a Weatherford M45AP float collar could withstand up to 6,500 psi of reservoir induced back pressure if it was converted, thereby preventing the hypothesized flow of hydrocarbons up the casing. *Id.* Such a straightforward conclusion is entirely within Hughett's expertise based on his extensive experience, and based on his detailed analysis of the facts and circumstances in this case.

Furthermore, Hughett presents a detailed analysis of *why* the float collar likely did not convert: that the float shoe was likely clogged, that BP attempted to establish circulation nine separate times, that the circulation rate never exceeded 4.3 barrels per minute when a rate of 5-7 barrels per minute was necessary to convert the float collar, and that by pressuring the float collar up to 3,125 psi, BP likely blew the actuating ball through the retaining lip of the float collar, which can only withstand a pressure of 1,300 psi. *Id.* at 32-34. It is hard to imagine what other expertise, facts, or analysis BP would expect of an expert to satisfy *Daubert's* admissibly requirements and to opine that the float collar likely did not covert.

### C.   Hughett Is Entitled to Rely on Other Experts Regarding Aspects of the M57B Hydrocarbon-bearing Zone.

Hughett analyzes the significance of BP's failure to identify the M57B as the uppermost hydrocarbon-bearing zone, and notes that BP's failure to properly identify this zone is relevant to determining whether BP complied with MMS regulations (requiring placement of cement 500 feet above such a zone) and its own Recommended Practices requirements (requiring placement of cement 1,000 feet above such a zone). *See* Hughett Expert Report at 25-26. BP's sole objection to these conclusions is that Hughett deferred to Strickland for the determination of whether the M57B zone was capable of flowing and did not independently opine on that specialized technical issue. *See* BP Hughett Motion at 6-7. As discussed in detail in Section

I(E), *supra*, it is appropriate for one expert to utilize the conclusions or input of another expert. *See Bryan,* 566 F.2d at 545; *Rudd* 127 F. Supp. 2d at 1343.  For this reason, BP's challenge fails.

## IV.   RICHARD STRICKLAND'S OPINIONS EASILY SATISFY THE *DAUBERT* STANDARDS.

Dr. Strickland has a BS degree in petroleum engineering (1970), and an MSc and Ph.D in petroleum engineering from Texas A&M University.  *See* Strickland Expert Report at 6-7, ¶¶ 14-20; *see also* Report Appendix A.  He was an Associate Professor of Petroleum Engineering at Texas A&M for six years, and with more than thirty-five years of experience, is an expert in the area of reservoir engineering.  *Id.*

### A.   The Characterization and Identification of the M57B Zone as a "Hydrocarbon-bearing Zone" Is a Critical Issue in this Case.

A key issue in this case concerns the characteristics of the M57B sand located at 17,467 feet md[12] in the Macondo well.  While it would have been possible to take fluid samples directly from the M57B zone while logging the well, thus obtaining direct evidence of the nature of the M57B zone, BP failed to do so.  *See* Ex. B at 109:18-110:12; 110:13-111:3 [Colson Dep.].  Now, the characterization of the M57B zone is a disputed issue.  And despite being the party who caused the absence of direct evidence, BP now challenges Strickland for offering expert opinions about the nature of that zone.

MMS regulations required BP to cement at least 500 feet above the uppermost "hydrocarbon-bearing zone."   30 C.F.R. § 250.421 (2003).  Based on an analysis by BP petrophysicist Galina Skripnikova, who worked on the Macondo well, BP identified the M57A zone, located at 17,803 feet md, as the uppermost "hydrocarbon-bearing zone"—some 336 feet beneath the M57B zone.  *See* Strickland Expert Report at 4, ¶ 4.  Because it failed to properly

---

[12] "Md" refers to measured depth.

identify the M57B as the uppermost hydrocarbon-bearing zone, BP failed to place the requisite 500 feet of cement above the M57B zone.  By improperly focusing on the M56A zone, BP's cement design placed only 164 feet of cement above the M57B zone, creating the likelihood that zonal isolation would not be established.

Despite that it had been aware of the M57B zone since at least July of 2009, BP failed to inform MMS and Halliburton of the M57B zone and that it was in fact the uppermost "hydrocarbon-bearing zone."  *See* Ex. E [TREX 6404].  On April 11, 2010, BP specifically requested that the wireline logging tools "[s]low down to log thin sand @ 17,468' md," and otherwise had sufficient information to accurately assess the M57B zone as a "hydrocarbon-bearing zone."  *See* Strickland Expert Report at 14, ¶ 43 and n.11 (citing BP-HZN-2179MDL00889345-52).  Indeed, after the blowout, as revealed by record evidence and conceded by BP's expert, J. Leif Colson, BP's own analysis established that the M57B zone contained hydrocarbons (in the form of gas), with a saturation value of 44.7% hydrocarbons; that the M57B zone had the highest pore pressure of any of the sands in this interval; and that the M57B zone was capable of flow.  *See* Ex. F [TREX 7279]; Ex.G [TREX 3533]; *see also* Ex. B at 30:11-16; 79:21-80:11; 81:2-82:6; 85:20-87:4; 103:10-105:13; 228:1-231:3.

The significance of the M57B zone goes far beyond the question of whether BP violated a MMS regulation.  If the M57B zone is indeed a hydrocarbon-bearing zone capable of flowing, it could have affected the quality of the cement job, the alleged failure of which BP seeks to blame on HESI.  Had the M57B zone been properly identified as the uppermost hydrocarbon-bearing zone, HESI would not have proceeded with the cement job as originally planned.  *See* Bolado Expert Report at 23; Ravi Expert Report at 10.

The failure of BP to identify and disclose the M57B zone is all the more critical in light of the likely collapse of the 7" casing.  As explained in greater detail in Dr. Kris Ravi's report, it is likely that there was a breach in the shoe track and there was no cement present below this breach—a condition which created a direct, unimpeded path for hydrocarbon flow from the main pay sands into the casing.  *See* Ravi Expert Report at 30.  This flow subsequently caused the 7" casing to collapse, permitting the higher zones, such as the M57B, to flow past or through the collapsed casing, thereby contributing to the blowout.  *Id*.  In other words, the inadequately cemented M57B zone, located in an area of poor or non-existent centralization due to BP's decision to ignore HESI's recommendations, could have directly contributed hydrocarbons to the blowout.

## B.      BP's Arguments Over Definitions Are Improper for a *Daubert* Analysis.

BP advances two arguments in support of its request to limit the testimony of Dr. Strickland.  *See* BP's Motion, Dkt. No. 5434 ("BP Strickland Motion").  First, BP contends that because there is no regulatory definition, and no industry standard, practice or procedure regarding the meaning of "hydrocarbon-bearing zone," Strickland's working definition of "hydrocarbon-bearing zone" requires that his testimony be stricken under *Daubert*.  *Id*. at 2-6.  Second, BP claims that Strickland was logically inconsistent in the use of his own definition, a supposed fact which, according to BP, renders Strickland's conclusions wholly irrelevant.  *Id*. at 6-8.  Bickering over the meaning of a term so widely used and accepted in the industry does not give rise to a proper *Daubert* challenge.  Accordingly, BP's Motion should be rejected.

### 1.      Strickland's Definition of "Hydrocarbon-bearing Zone" is Both Appropriate and Useful.

Because the term "hydrocarbon-bearing zone" is not defined in the applicable MMS regulations, Strickland set forth a working definition of the phrase for the purpose of clarifying

his analysis of the various issues concerning the nature and characteristic of the M57B zone.  *See* Strickland Expert Report at 8, ¶ 21.  Strickland's working definition of a "hydrocarbon-bearing zone" is a "defined interval that contains oil and/or gas at a sufficient level such that oil and/or gas will flow out of the zone and into the well bore when the pressure in the well bore is reduced below the pressure in the zone."  *Id*.  It is hard to imagine what is objectionable about this definition, since it is practically tautological: a "hydrocarbon-bearing zone" is a zone that contains hydrocarbons and is capable of bearing or flowing hydrocarbons if the pressure in the well bore does not resist the tendency of the zone to flow.  It is noteworthy that BP does <u>not</u> directly attack the adequacy or the reasonableness of this definition, but instead engages in an indirect attack based on the absence of clear industry standards or practices.

BP fails to show why an expert confronted with an MMS regulation and BP internal documents governing a "hydrocarbon-bearing zone," cannot utilize a straightforward and logical definition based on experience in his industry.  This is precisely the context in which an expert opinion and analysis can assist the finder-of-fact.  *See generally Libbey v. Wabash Nat'l Corp.*, No. 02-16-P-H, 2002 U.S. Dist. LEXIS 19039, at *9 (D. Me. Oct. 7, 2002) ("To disallow expert testimony because there are no industry standards applicable . . . would prevent expert testimony in any case involving an injury that had not been anticipated or otherwise addressed by the industry involved.  Such an irrational outcome is not contemplated by *Daubert* or *Kumho*.").

Of course, an expert is not free to ignore a clearly established industry custom or practice and substitute his own definition.  *See, e.g., Seastrunk v. Darwell Integrated Tech.*, No. 3:05-CV-0531-BF(G), 2008 U.S. Dist. LEXIS 26498, at *10-13, 26 (N.D. Tex. Mar. 28, 2008) (expert opinion that disregarded industry standard was "not credible" and was insufficient evidence of copyright infringement claims); *Fernandez v. Spar Tek Indus.*, No. 0:06-3253-CMC, 2008 U.S.

Dist. LEXIS 41520, at *29-34 (D.S.C. May 23, 2008) (striking expert opinion where expert's methodology completely disregarded industry standards).  Nor is an expert free to opine that non-existent standards were met, where there are no such standards.  *See Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1179 (4th Cir. 1997) (holding it was speculative and misleading for metallurgical engineer to give opinion testimony that a particular safe met industry standards for burglar deterrence when no industry standard was ever established).  But neither of these circumstances apply here.  It is simply a fact that the oil and gas industry is governed by a MMS regulation that employs the phrase "hydrocarbon-bearing zone."  This is not a situation in which the expert manufactures a regulatory "standard" that does not exist.  Strickland cannot be faulted for analyzing and employing a reasonable, logical definition of the terms of the governing MMS standard, particularly when BP also employs a definition of the term similar to Strickland.

The fallacy of BP's argument is further demonstrated by its own actions and the analysis of its rebuttal experts.  As noted above, after the blowout, BP itself concluded that the M57B zone was a "hydrocarbon-bearing zone," because it was a discrete zone that contained hydrocarbons and was capable of flowing.  Indeed, in some documents, BP itself refers to the M57B zone as a "hydrocarbon-bearing interval."  *See* Ex. G; *see also* Ex. B at 103:16-105:13. BP argues that Dr. Strickland—a qualified and experienced reservoir engineer who analyzed the characteristics of the M57B zone in excruciating detail—cannot testify about the M57B zone based on BP's poorly articulated definitional argument.  BP's position is disingenuous because BP itself analyzed the M57B zone and reached conclusions *consistent* with Strickland.  *Id.*

Likewise, Strickland's definition that a hydrocarbon zone is a "defined interval that contains oil and/or gas at a sufficient level such that oil and/or gas will flow out of the zone and into the well bore when the pressure in the well bore is reduced below the pressure in the zone"

is similar to that employed by BP's own expert.  *Compare* Strickland Expert Report at 8, ¶ 21, *with* Ex. B at 41:8-15 [Colson Dep.].  BP's rebuttal expert, Mr. J. Leif Colson, testified that in order to determine the uppermost hydrocarbon-bearing zone:

> . . . one needs to consider, again, is whether there is evidence that the zone can, in fact, provide fluids to the wellbore, given a pressure difference; in other words, can the zone flow hydrocarbons.  That requires that you have a—an understanding of are there hydrocarbons in the zone.

*See* Ex. B at 41:8-15 [Colson Dep.].  The analytical definition employed by Colson is substantially the same, if not identical, to the one utilized by Strickland.  While BP is entitled to rebut Strickland's conclusions by presenting the testimony of rebuttal experts, it is misleading to suggest that Strickland's report is fatally deficient under *Daubert* because of alleged definitional infirmities, when BP's rebuttal experts employ substantially the same "definition" to present a different conclusion regarding the characterization of the M57B zone.

### 2.      BP's "Industry Standards" Argument is Internally Inconsistent.

BP's argument is logically incoherent.  In its *Daubert* challenge to Strickland, BP emphasizes that there is no applicable industry standard or regulatory definition of "hydrocarbon-bearing zone" and this void somehow precludes Strickland from offering testimony.  *See* BP Strickland Motion at 2-6.  But in its rebuttal expert report to Strickland, BP's experts state that while the MMS regulations do not define a "hydrocarbon-bearing zone," there is an industry practice, which is to "utilize available data and sound engineering judgment in making this determination."  *See* RJ Lee Rebuttal Report at 6.  BP's rebuttal experts opine that "[i]n industry practice, the determination of the uppermost hydrocarbon-bearing zone is made with the type of data that Ms. Skripnikova used, applying petrophysical expertise and judgment," *id*. at 15, the very data Strickland analyzed when applying his expertise and judgment.  While

Strickland reached a different conclusion from Skripnikova, the differing conclusion does not render Strickland's analysis, methodology, or opinion inadmissible.

As discussed, *supra*, the absence of an express regulatory definition does not affect the admissibility of Strickland's testimony.  *See e.g.*, *Libbey v. Wabash Nat'l Corp.*, 2002 U.S. Dist. LEXIS 19039, at *9.  Nor does the fact that Strickland's definition is derived from the use of "available data and sound engineering judgment."  Any criticism BP wishes to lodge against Strickland's conclusions regarding the characterization of the M57B zone go to the weight, not to admissibility, of his opinions under *Daubert.*

### 3.     Strickland Did Not Misapply His Own Definition.

BP's second challenge to Strickland's report is the argument that Strickland supposedly amended his definition of a "hydrocarbon-bearing zone" during his deposition, and supposedly failed to apply his amended definition to the facts of this case.  *See* BP Strickland Motion at 6-8. BP claims that Strickland added the condition that a hydrocarbon-bearing zone must be able to have significant flow that might affect operations.  *See* BP Strickland Motion at 2 (citing Strickland Dep. at 154).

As discussed *supra*, in his report, Strickland defines a hydrocarbon-bearing zone as a "defined interval that contains oil and/or gas *at a sufficient level* such that oil and/or gas will flow out of the zone and into the well bore when the pressure in the well bore is reduced below the pressure in the zone."  Strickland Expert Report at 8, ¶ 21 (emphasis added).  During his deposition, Strickland was asked what he meant by the qualifying phrase "at a sufficient level" and he testified that "if the pressure is right at pore pressure or just very slightly above and below, I think that's too—too low to measure and have any kind of significant flow—that might affect operations."  Ex. H at 154:20-25 [Strickland Dep.].   In its Motion, BP initially quotes a portion of Strickland's testimony accurately: "significant flow that might affect operations."  *See*

BP Strickland Motion at 2.  But BP later substitutes a purported quote of Strickland: "interferes with operations."  *Id*. at 7.  The phrase "interferes with operations" was not used by Strickland in his deposition, which is apparently why BP fails to provide any citation for the quotation in its Motion.  Having manufactured testimony from Strickland suggesting that his definition *requires* him to definitely establish that the M57B zone actually flowed, BP then quotes deposition testimony in which Strickland states the weaker conclusion that the M57B zone *could* have been a causal factor under the right circumstances, not that it definitely was a causal factor.  *See* BP Strickland Motion.  BP then concludes this rhetorical charade by claiming that Strickland's conclusion is inconsistent with his own definition and should thus be excluded.  *See* BP Strickland Motion at 8.

Of course, the requirement that the zone contain oil and/or gas *at sufficient levels* has always been a part of Strickland's analytical definition.  *See* Strickland Expert Report at 8, ¶ 21. Strickland did not add a new condition at his deposition, which is why Strickland testified that "it *might* affect operations."  Ex. H at 154:20-25 [Strickland Dep.].  BP cannot exclude Strickland's testimony under *Daubert* by deleting the word "might" from his testimony, or by attributing manufactured testimony to him.  Strickland's testimony has been consistent and there is no basis to exclude Strickland's report or testimony.

### 4.    It is Entirely Proper for Strickland to Opine that the M57B Zone May Have Affected Operations or Contributed to the Blowout.

Contrary to BP's implication, there is nothing wrong with Strickland testifying that the M57B zone is a hydrocarbon-bearing zone because it is *capable*, under the right circumstances, of flowing sufficient hydrocarbons to affect operations.[13]  An expert is entitled to limit the scope

---

[13] In effect, BP criticizes Strickland for opining that the M57B zone was capable of flowing, instead of opining that there is direct evidence that the M57B did, in fact, flow.  Yet BP simply ignores Strickland's conclusions where he refers to direct evidence of another zone flowing hydrocarbons.  Strickland opined that the M57C zone, located at

of his report to his particular areas of expertise, which is what Strickland did in this situation.  An expert is entitled to offer opinions about possible causes of an incident, and is not forced to opine only as to the sole cause of an incident.  *Jahn v. Equine Servs. PSC*, 233 F.3d 382, 390 (6th Cir. 2000); *Ostrowiecki,* 2008 U.S. Dist. LEXIS 83052 at *17-22.

Given that the M57B zone is a hydrocarbon-bearing zone, other experts may opine on the question of whether, in fact, there was a sufficient reduction of pore pressure in the well to cause the M57B zone to flow and whether, in fact, that flow affected operations.  Other HESI experts properly use Strickland's analysis of the M57B zone to further advance the evaluation of the zone's impact to the Macondo well and the resulting blowout.  For example, David Bolado analyzed what the OptiCem modeling would have shown had the characteristics of the M57B zone been disclosed to HESI.  *See* Bolado Expert Report at 21-23.  Including the M57B zone in the OptiCem modeling would have resulted in OptiCem predicting "critical gas flow," and HESI would not have pumped the job without design changes by BP.  *Id*. at 23.  Indeed, Bolado opined that in his view, BP's failure to disclose the M57B zone was "one of the most important causes of the apparent failure of the cement job to isolate the hydrocarbon zones in the Macondo well."  *Id*. As another example, Kris Ravi opined that the 7" inch casing likely collapsed around the previous shoe at 17,168 feet, which created a flow path for the M57B zone—situated in an uncentralized region—to flow hydrocarbons and thereby contribute to the blowout.  *See* Ravi Expert Report at 30.

---

17,704 feet md, had a less clear-cut signature on the well logs as a hydrocarbon-bearing zone compared to the M57B zone.  *See* Strickland Report at 38, ¶ 113.  Nevertheless, this region of the well was not static: 134 barrels of mud was lost to this zone; the well flowed back at rates from 6 to 24 barrels per hour and built up pressure at the surface; and the mud log recorded a significant rise in the gas content coming from this zone.  *Id*.  These are strong indicators that the M57C zone is a hydrocarbon-bearing zone, *i.e.* there is direct evidence of yet another hydrocarbon-bearing zone that is shallower than the M56A identified by BP as the "shallowest."  *Id*.

## V.    DAVID BOLADO'S EXPERT OPINIONS ARE ADMISSIBLE UNDER THE *DAUBERT* EVIDENTIARY STANDARDS.

Mr. Bolado has over 20 years of experience in the oil and gas industry, with approximately 17 years working exclusively with cementing in the Gulf of Mexico, including involvement with the design or implementation of over 600 cement jobs.  *See* Bolado Expert Report at 6-8; *see also* Report Appendix B.   BP seeks to exclude four discrete topics from Bolado's opening and rebuttal reports.  *See* BP's Motion Dkt. No. 5422 ("BP Bolado Motion). None of BP's arguments is valid.

### A.    BP Approved or Failed to Correct the Inputs to OptiCem.

BP's first challenge is that Bolado may not opine that BP approved or failed to correct the OptiCem inputs during a meeting Gagliano had with BP engineers on April 14, 2010.  *See* BP Bolado Motion at 1-2, 4-6.   Bolado notes that BP supplied HESI with inaccurate well and formation data and failed to correct the use of this data for purposes of OptiCem modeling. Bolado Expert Report at 8-11; 18-33.  BP seeks to strike this portion of Bolado's report based on the incredible claim that there are no facts in the record to support such a conclusion.

#### 1.    Record Evidence Shows BP Approved or Failed to Correct the OptiCem Inputs.

The record evidence establishes that BP supplied the necessary inputs to OptiCem and either verified those inputs, or failed to correct them.  *See, e.g.,* Ex. I at 229:9-230:23 [Gagliano Dep.].  And BP previously admitted that as the well operator, it provides HESI with well data for OptiCem modeling, including pore pressure data.  *See* Ex. A  at 66-67 (TREX 0001 [Bly Report]).[14]

---

[14] BP likens this situation to one in which the expert relies on "altered facts" or issues a report based on the "furtive inclusion" of supposed facts not in the record.  *See* BP Bolado Motion at 4 (citing *Guillory v. Domtar Indus., Inc*. 95 F.3d 1320, 1330-31 (5th Cir. 1996) ("altered facts"); *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) ("furtive inclusion")), but these cases are inapposite because the facts upon which Bolado relies are in the record.

### 2. Bolado's Modeling Is Intended To Demonstrate What OptiCem Would Show With Corrected Inputs.

BP does not dispute the reliability of Bolado's method of using OptiCem modeling.  BP only disputes the accuracy of the OptiCem inputs used by Bolado, or BP's knowledge or approval of the erroneous inputs that were previously inputted into OptiCem.  Such attacks go only to the weight of the evidence not its initial admissibility under *Daubert*.  *See, e.g., Quiet Tech, DC-8 v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1343-46 (11th Cir. 2003) (where expert used computational fluid dynamics model, challenge based on expert's use of incorrect or missing data inputs went to weight of the expert opinion, not its admissibility);  *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (an expert is entitled to form opinion based on assumed facts if there is some support for the assumptions in the record evidence, and challenges to the expert's opinion attacking the factual basis of the opinion go to the weight of the opinion, not its initial admissibility).

### 3. BP Disputes Only An Ill-Defined Portion of the OptiCem Inputs Bolado Modeled.

BP is notably vague about what OptiCem inputs it contends were used without BP's knowledge/approval.  Bolado notes that the incorrect OptiCem inputs included BP's decision to use six centralizers; BP's failure to inform HESI about the M57B hydrocarbon-bearing zone; and that the top of cement input should be modeled at 17,300 feet (based on BP's erroneous conclusion that the shallowest hydrocarbon-bearing zone was the M56A zone).  *See* Bolado Report at 21-26.  These facts are established in the record and BP has no legitimate claim that Bolado's analysis of such erroneous input data amounts to the "furtive inclusion" of non-facts.

Bolado notes that BP's petrophysicist calculated the pore pressure gradient of the M57B zone as 14.15 ppg.  *See* Bolado Report at 31.  Based on the analysis Strickland conducted, the actual pore pressure for this zone is approximately 14.2 ppg, well above the 14.15 ppg BP

calculated.  *Id; see also* Strickland Expert Report at 39-40, ¶¶ 114-20.  While BP is free to argue that its 14.15 ppg pore pressure calculation is correct, it has no basis for claiming that BP did not make the original calculation of 14.15 ppg for the M57B zone, or that Bolado is relying on "altered facts" in modeling the outcome of an input of 14.2 ppg.

> **4.      BP Incorrectly Denies That Bolado Has An Evidentiary Basis for Opining About BP's Involvement In the April 14 Meeting.**

BP disputes what occurred at an April 14, 2010 meeting where Jesse Gagliano connected his laptop to a projector screen and then ran OptiCem so that the BP personnel in attendance could participate in the modeling process.  To evidence this meeting, Bolado cites to the deposition transcripts of both Walz and Cunningham and also cites to Gagliano's testimony.  *See* Bolado Expert Report at 19 and nn.10-12.  Bolado then makes the entirely reasonable inference that BP either approved the OptiCem inputs discussed at the April 14 meeting, or failed to correct any errors.  *Id.* at 19-20.  That inference was supported by Bolado's own practice of confirming OptiCem inputs with the operator.  Case law is clear: an expert is entitled to make reasonable inferences in support of his ultimate conclusion.  *See Kritser,* 479 F.2d at 1095; *McLean,* 224 F.3d at 801.

In any event, the accuracy of Bolado's assumption was recently confirmed by Gagliano. Brian Morel, Mark Hafle, Erik Cunningham, Brett Cocales and Greg Walz all attended the April 14 meeting.  *See* Ex. I at 229:12-17 [Gagliano Dep.].  These BP personnel observed and verified the OptiCem inputs.  *Id.* at 230:8-9; 19-23 (Q: "And what was discussed at the April 14th meeting?"  A: "And, basically, I had my OptiCem up on a projector, on a screen, where everybody can see it, and we pretty much went through every input, and never—everybody verified the inputs I had in there.").

**B.     "Roping" Could Have Occurred in the Shoe Track of the Macondo Well.**

BP's second challenge to Bolado concerns his opinion that "rat hole" swapping could compromise the shoe track cement via the mechanism of "roping."  *See* BP Bolado Motion at 2-3, 6-7.  BP fails to demonstrate that Bolado's methodology is unreliable.

**1.     Bolado's Conclusions Are Based on A Sound Methodology Appropriate For the Circumstances of this Case.**

Bolado notes that the cement in the shoe track had a density of 16.74 ppg, whereas the mud beneath the shoe track cement had a density of 14.0 ppg.  *See* Bolado Expert Report at 35. He next observes that the higher, more dense fluid will naturally tend to swap places with the lighter fluid beneath it and notes that the industry has a term for this specific type of swapping, known as "roping."  *Id*.  Bolado cites to two industry publications that discuss how roping could create long channels in the shoe track cement.  *Id*. at 35 and n.58.  Bolado observes that the possibility of roping could have been eliminated by having a one way check valve at the bottom of the 7" casing, a design feature that BP chose not to use.  *Id*. at 36.  Bolado even provides a photograph, based on laboratory testing, of the roping effect.  *Id*.  This methodology is entirely satisfactory under the circumstances in this case, where it would be virtually impossible to replicate the precise down hole conditions at the bottom of a steel tube that is more than 3 miles long and bored deep beneath the seabed below the Gulf of Mexico.  *See generally Kritser*, 479 F.2d at 1091-92; *Ostrowiecki*, 2008 U.S. Dist. LEXIS 83052, at *17-22.

**2.     BP Ignores Bolado's Other Theories Regarding Rat Hole Swapping.**

It should be noted that Bolado opines that rat hole swapping could have contaminated the shoe track cement via <u>three</u> different mechanisms:  roping, contamination, or a combination or roping and contamination.  *See* Bolado Expert Report at 35.  He reiterated this point at his deposition, stating in response to BP's questioning that roping was *not* the only mechanism that

could have created a channel through the shoe track, because contamination could also cause that effect, or it could be caused by a combination of roping and contamination.  *See* Ex. J at 439-42 [Bolado Dep.].  In its *Daubert* challenge, BP attacks only Bolado's opinion that roping could have created a channel in the shoe track; BP does not challenge the contamination theory.  Thus Bolado's unchallenged theory of channeling by contamination will be presented to the Court, and his discussion of the contamination theory may necessarily involve discussion of the contamination/roping theory.  To the extent the Court has any concern about the methodology or reliability of Bolado's opinions regarding roping, it would be more efficient for the Court to reserve any ruling about Bolado's roping opinion until the issue arises in the context of the trial.

### C.    Bolado is Entitled to Opine about the M57B Hydrocarbon-bearing Zone.

BP's third challenge to Bolado concerns his OptiCem modeling of the M57B hydrocarbon-bearing zone.  *See* BP Bolado Motion at 1, 3, 7-9.  BP failed to disclose to HESI (or the MMS) the existence of the M57B zone as the uppermost hydrocarbon-bearing zone in the production interval of the Macondo well and thus it was not modeled properly in connection with the design of the cement job for the production casing.

#### 1.    Had the M57B Zone Been Modeled, OptiCem Would Have Shown A "Critical" Gas Flow Potential.

In his expert report, Bolado reports the outcome of an OptiCem run if the information about the M57B zone is used as an input, and demonstrates that OptiCem would show a "critical gas flow problem," with a numeric gas flow potential of 54.85.  *See* Bolado Expert Report at 23. Bolado notes that a gas flow potential of 55 is "unheard of" in his experience spanning 600 wells. *Id*.  He further notes that, with a flow potential of 55, he concludes it was "highly probable that the reservoir zone would flow."  *Id*.  Bolado also concludes that BP's failure to disclose the M57B zone at 17,467 feet is "one of the most important causes of the apparent failure of the

cement job to isolate the hydrocarbon zones," and had BP made HESI aware of the M57B zone, based on these OptiCem results, "Halliburton would not have pumped the cement job without design changes by BP." *Id*.

### 2. BP Cannot Validly Challenge Bolado Based On His Consideration of The Conclusions Of Other Experts.

BP does *not* challenge Bolado's expertise in conducting OptiCem modeling.  On the issue of the M57B zone, BP's sole challenge to Bolado is that he is neither a petrophysicist nor a geophysicist, and that he relied on Dr. Strickland's opinions regarding the M57B without attempting to independently verify Strickland's conclusions.[15]  *See* BP Bolado Motion at 3, 7-9. BP's challenge fails.  It is perfectly appropriate, and often necessary, for an expert in one field to rely on the conclusions or opinions of an expert in another field.  *See Legier & Matherne, APAC v. Great Plains Software, Inc.*, No. 03-278 Sec. K (1), 2004 U.S. Dist. LEXIS 12361, at *6-7 (E.D. La. June 30, 2004) (Duval, J.) (court found expert's reliance on projections of a third party without independent verification appropriate under *Daubert* reliability prong).

The propriety of an expert relying on the inputs of other experts is especially true in this context, where Bolado is an expert in operating a model (OptiCem), which requires highly complex inputs that are necessarily developed by other people with expertise in analyzing the various inputs (*e.g*., the geometry of the wellbore; the pore pressure, location, and characteristics of a reservoir zone; the fracture gradients of the well; the characteristics of the well fluids; the number and location of centralizers; and the cement type, volume, and pump rate.).  *See* Bolado Expert Report at 8-11; 18-30.  Reliance on the expertise of other individuals is necessary in both

---

[15]BP's states that Bolado "merely relied on Dr. Richard Strickland's opinions . . ." thereby falsely suggesting that Bolado relied exclusively on Strickland for analysis of the character of the M57B zone.  *See* Motion at 7.  As discussed above, there would be nothing improper about Bolado relying solely on Strickland, but that was not the case here.  In response to BP's questioning whether he relied only on Strickland's analysis, Bolado testified that he relied not only on Strickland, but also on Roland Chemali, and on documents from BP's own Bly Team investigation of the M57B zone.  *See* Ex. J at 168:17-170:24 [Bolado Dep.].

the operational setting within the industry (HESI's OptiCem operators relying on BP for necessary inputs), and also in the litigation context (Bolado relying on Strickland for input data concerning the M57B zone).  The error of BP's logic is demonstrated by the fact it proves too much.  By BP's twisted logic, it is unlikely that *any* individual could opine about OptiCem modeling, because such a witness would need to be virtually omniscient with regard to the oil and gas industry, having expertise not only in OptiCem, but also in geophysics, petrophysics, well design, well geometry, fluid rheology, downhole wellbore temperature assessment, analysis of pore pressures and fracture gradients, cement chemistry, and a multitude of other oilfield disciplines.

> **D.   Bolado is Entitled to Model OptiCem Outputs Based on Increasing Gel Strength of the Drilling Mud.**

BP's fourth and final challenge to Bolado's opinions concerns his OptiCem modeling using inputs representing increased gel strengths of the drilling mud, which showed that channeling was likely in the lower portion of the Macondo well annulus, including the lower regions of the annulus in proximity with or adjacent to the main pay sands.  *See* BP Bolado Motion at 1, 3, 9-10.  In his rebuttal expert report, Bolado noted that he agreed with the conclusions of Cameron's expert, Dr. Ian Frigaard, that the unusual length of time required to convert the float collar permitted the gel strength of the mud to increase over time.  *See* Bolado Rebuttal Report at 27-30.  Because he independently agreed with Frigaard's analysis and conclusions, Bolado performed some additional OptiCem modeling runs using inputs for increasing gel strengths of the mud, with the input ranging from 25 to 200 lbf/100ft$^2$.  *Id*. at 28. These OptiCem models support Bolado's conclusion that "it is likely that channeling occurred down the entire length of the annulus."  *Id*. at 28-29.

### 1.   BP Is Responsible for Any Factual Uncertainty Concerning Gel Strength.

It should be noted that the reason there is an issue about what gel strengths the drilling mud might attain is BP's apparent failure to order the appropriate Fann 70 test data that would be direct evidence of the gel strengths of the mud.  *See, e.g*., Ravi Expert Report at 23; Ex. K at 207:5-208:12 [Maxie Dep.].  It is disingenuous for BP to quibble about the gel strength data an expert relies upon to analyze the effect that increasing gel strength may have had on the channeling in the annulus of the Macondo well, when BP is responsible for creating any factual uncertainty through its failure to order the Fann 70 test data.  *Id*.

### 2.   Bolado's Consideration of Other Expert Opinions Is Ultimately A Red Herring.

BP attacks the reliability of Bolado's expert opinions on the basis that he improperly relied on the input of other experts.  *See* BP Bolado Motion at 9-10.  This challenge fails because Bolado's "reliance" on other experts is ultimately a red herring.[16]  The main thrust of Bolado's opinion is that the delay in attempting to convert the float collar gave time for the drilling mud to increase in gel strength.  The issue then becomes what OptiCem modeling would show regarding the likelihood of channeling in the annulus <u>if</u> the input parameters are adjusted to account for the increased gel strength.  *See* Bolado Rebuttal Expert Report at 27-30.

There is no genuine dispute that the gel strength of drilling mud will tend to increase as the mud sits in a static condition without being circulated.  *See, e.g*., Ravi Expert Report at 7, 11,

---

[16] Despite BP's repeated argument to the contrary, *see* BP Bolado Motion at 3-4, 9-10, it is entirely appropriate for Bolado to rely on the conclusions or input of other experts without independent verification of that input.  As discussed above, one expert is permitted to rely on the conclusions of another. *Rudd* 127 F. Supp. 2d at 1343; *Bryan,* 566 F.2d at 545; *Garcia*, 266 F. Supp. 2d at 576.

22-24, 26. Indeed, BP's cement expert, Ron Crook, conceded that drilling mud will tend to increase in gel strength as it sits static.[17]

Moreover, any implication that Bolado's adoption of Frigaard's gel strength numbers is improper is belied by the fact that Frigaard's expert report makes it clear that those numbers are supported by separately existing BP documents. *See* Frigaard Expert Report at 17-18 (citing Ex. L (HAL_0010699, (TREX 01388), BP-HZN-2179MDL00249820, (TREX 01391), and BP-HZN-MBI00128722, (TREX 60546) [BP's Production Casing Design Reports]). As noted by Frigaard, these documents independently support his gel strength calculations, because they assess gel strength values required to break circulation, and expressly reference the same gel strength range of 25 to 200 lbf/100ft$^2$. *Id.* Furthermore, Dr. Ravi, another HESI expert, has also opined on the gel strength values, and Bolado is entitled to rely on Ravi's analysis. *See* Ravi Expert Report at 7, 11, 22-24, 26.

### 3. Bolado's Reference To Frigaard's Withdrawn Report Is No Basis For Excluding Bolado's Testimony.

BP argues that Bolado's gel strength modeling must be stricken because Cameron withdrew Frigaard's opinion. *See* BP Bolado Motion at 10. As the Court is aware, there has been extensive briefing regarding the opinions of withdrawn experts. *See* January 31, 2012 Order [Dkt. No. 5327]; January 24, 2012 Order [Dkt. No. 5369]; February 2, 2012 Order [Dkt. No. 5560]. Contrary to BP's argument, nothing in this Court's order prevents an expert such as Bolado from utilizing a discrete portion of the data set developed by a withdrawn expert. Federal Rule of Evidence 703 permits an expert to rely on facts or data that are not independently admissible in evidence.

---

[17] *See* Ex. M at 556:11-16 [Crook Dep.] (Q: "Why would you expect the mud to gel up?" A: "If I keep it—it in dynamic mode, it won't—it won't be gelling up, but, you know, in dynamic conditions it won't gel up, but if I let it sit static, it—it will have a tendency to gel up.").

4. **BP Cannot Establish It Was Prejudiced by the Inadvertent Non-Production of Bolado's OptiCem Files.**

BP's final argument is that Bolado's testimony should be excluded because Bolado's OptiCem runs were not produced by the Court's November 11, 2011 deadline for production of rebuttal expert reliance materials. *See* BP Bolado Motion at 10. Due to an oversight by an outside document production vendor, C2Legal, these OptiCem runs were inadvertently not produced on November 10, 2011. *See* Ex. N [Henderson Aff.]; Ex. O [Letter from Raines to Bartoszek]). However, HESI listed all these documents in Bolado's list of reliance exhibits and on its trial exhibit list and produced them to all parties in its February 8, 2012 production.

BP did not raise this issue with HESI in connection with the service of Bolado's Rebuttal Expert Report, nor in connection with the two-day deposition of Bolado that took place on December 22-23, 2011.[18] HESI first learned of the inadvertent non-production of Bolado's files in BP's *Daubert* challenge to Bolado on January 24, 2012. Furthermore, pursuant to the September 22, 2011 agreement between BP and HESI, BP had continuing access to OptiCem through the expert discovery period for purposes of running its own modeling, and could easily conduct its own OptiCem modeling based on the four discrete values for gel strength (50, 100, 150 and 200 lbf/100ft$^2$). *See* Ex. P at 2, ¶ 5 [BP and HESI Stipulation Agreement].

There is no basis to exclude Bolado's testimony concerning OptiCem modeling based on increases in drilling mud gel strengths where BP cannot establish it was prejudiced, and where BP took no action to seek these files in advance of the filing of its *Daubert* challenge.

---

[18] BP admits that it is obvious from the face of Bolado's Rebuttal Expert Report that he had considered OptiCem modeling because the outputs of this modeling were pasted directly into the Report. *See* BP Bolado Motion at 10. It is also obvious because Bolado expressly states in his report "As a result, I ran additional OptiCem simulations . . . I ran simulations on all three of CSI's models using mud gel strengths of 50, 100, 150 and 200 lbf/100ft$^2$.") Bolado Rebuttal Expert Report at 28. Furthermore, these files were accurately referenced on the list of Bolado's Reliance Materials, which was timely served on all parties on November 11, 2011. *See* Bolado Rebuttal Expert Report Reliance Exhibit List Appendix at 6 (listing ".adi" files for "50 gel.adi," 100 gel.adi," 150 gel.adi," and 200.gel.adi.")].

VI.     **DR. BECK MAY PROPERLY OPINE ABOUT BP'S CONDUCT TO ASSIST THE COURT IN DETERMINING WHETHER BP VIOLATED MMS REGULATIONS.**

Dr. Frederick "Gene" Beck holds both M.S. and Ph.D degrees in petroleum engineering from Louisiana State University.  *See* Beck Expert Report at 17-19; *see also* Report Appendix A. He is currently an Associate Professor in the Department of Petroleum Engineering at Texas A&M University in College Station, Texas, and a drilling consultant for a publicly traded oil and gas company.  *Id.*  Beck has worked as a drilling engineer and rig supervisor for ARCO Alaska, and has successfully designed and drilled numerous high pressure/high temperature wells in excess of 20,000 feet.  *Id.*  Beck has been involved in drilling engineering, well site supervision and operations management in the oil and gas industry for over 20 years, and has been involved on an academic basis for 30 years.  *Id.*

A.     **An Expert's Opinion is Not Inadmissible Merely Because It Makes Passing Reference to a Statute or Embraces an Ultimate Issue.**

Dr. Beck's report discusses BP's poor well design, the narrow drilling margin BP created at the bottom of the Macondo well, BP's ill-advised choice to use a long string instead of a liner, BP's failure to identify the M57B zone as the "upper hydrocarbon-bearing zone," BP's excessive focus on annular pressure build-up, BP's reckless actions damaging the float collar and its requisite failure to convert, BP's decision not to employ a float shoe, BP's decision to use an inadequate number of poorly placed centralizers, BP's fateful decision to forego a cement bond log, BP's poorly conceived and risky temporary abandonment plans, the botched negative pressure testing, and HESI's satisfactory performance of its cementing, mudlogging and kick detection responsibilities.  *See* Revised Beck Expert Report.  BP's sole *Daubert* challenge to Beck is the claim that he impermissibly offered legal conclusions purportedly based upon his citation of MMS regulations.  *See* BP Beck Motion, Dkt. No. 5420.

To the extent Dr. Beck discusses MMS regulations, that testimony is inextricably intertwined with Beck's discussion of BP's violations of its own written policies and procedures, which Beck arranges in topical fashion, and analyzes in significant factual detail.  *See* Revised Beck Expert Report 23-24; 33-35.   In developing and stating his technical opinion, Beck properly recognized the relevance of regulations that set technical requirements for operators such as BP.  It would be anomalous indeed if an expert ignored legally-applicable technical standards that apply to the very decisions he is analyzing.   BP's own Drilling and Well Operations Practice (DWOP) recognized and required compliance with legal standards governing drilling and well operations.  *See* Revised Beck Report at 21 (citing DWOP at § 1.2). It is in the context of discussing BP's DWOP that Beck considered legally-applicable technical standards.

For example, Beck opened his opinion with a discussion of the DWOP as BP's written framework for designing and conducting drilling operations consistent with all relevant laws and regulations.  *See* Revised Beck Report at 20.  Expressly noting the DWOP's incorporation of legal requirements, Beck goes on to discuss 30 C.F.R. § 250.421(e), which requires a well operator to "use enough cement to cover or isolate all hydrocarbon-bearing zones above the shoe" and that "at a minimum, you must cement the annular space at least 500 feet above the casing shoe and 500 feet above the uppermost hydrocarbon-bearing zone."  *Id*. at 23-24.  Beck also discusses 30 C.F.R. § 250.427(b), which requires that "[w]hile drilling, you must maintain the safest drilling margin indentified in the approved APD [Application for Permit to Drill]. When you cannot maintain this safe drilling margin, you must suspend operations and remedy the situation."  *Id*.  By their own terms, such regulations concern highly technical matters and require a significant amount of factual analysis in order for compliance to be properly assessed.

An expert witness such as Dr. Beck, with extensive knowledge of the oil and gas industry, and informed by a detailed analysis of the underlying facts of this case, will likely assist the Court in assessing these issues.  Such testimony is not objectionable under *Daubert*.

Beck is entitled to put his conclusions within the proper contextual framework - which necessarily includes a review of relevant regulations.  *Maiz v. Virani*, 253 F.3d 641, 667 (11th Cir. 2001) (expert on forensic accounting issues was entitled "to state reasonable assumptions regarding the requirements of the applicable" law in order to put his opinions in context); *Travelers Indem. Co. v. Royal Oak Enters., Inc.,* No. 5:02-CV-58-Oc-10GRJ, 2004 U.S. Dist. LEXIS 29575 at *9-10 (M.D. Fla. Aug. 20, 2004) ("where, as here, the substance of the expert's testimony concerns ordinary practices and trade customs which are helpful to the fact-finder's evaluation of the parties' conduct against the standards of ordinary practice in the insurance industry, his passing reference to a legal principle or assumption in an effort to place his opinions in some sort of context will not justify the outright exclusion of the expert's report in its entirety."); *Cooper v. Pac. Life Ins. Co*., No. CV203-131, 2007 U.S. Dist. LEXIS 8350 at *4-6 (S.D. Ga. Feb. 6, 2007) (allowing expert to testify as to the practices normally followed by insurance companies regulated by the securities laws on the basis that "industry custom and practice is shaped by legal requirements . . . ").

One of Beck's ultimate conclusions is that BP's failure to act as a reasonably prudent operator led to the conditions that caused the blowout.  ("BP's damaging of and failure to convert the float collar and BP's disregard for the negative pressure test results stand as the direct causes of the blowout.").  *See* Revised Beck Report at p. 120.  This conclusion is based on facts in evidence about BP's conduct, Beck's extensive knowledge of standards for operator conduct and safety based on his experience in the deepwater drilling industry, and Beck's analysis of BP's

own written policies.  Beck's analysis necessarily required some contemplation of the Code of Federal Regulations, which sets forth the standards for conduct of an operator such as BP. Beck's resulting conclusion is that BP chose an "unreasonably risky" well design and temporary abandonment procedure, a conclusion that necessarily touches upon BP's duties as an operator. The mere fact that the Code of Federal Regulations discusses these duties does not render Beck's application of his professional knowledge to the facts inadmissible.  *See* Fed. R. Evid. 704(a) ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable just because it embraces an ultimate issue to be decided by the trier of fact."); *Metrejean v. REC Marine Logistics*, L.L.C., No. 08-5049, 2009 U.S. Dist. LEXIS 92498 at *6 (E.D. La. Sept. 21, 2009) (citing *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997) (an expert "may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied . . .").

BP also seeks to strike portions of Beck's Rebuttal Expert Report, as found on pages 16-20.  *See* BP Beck Motion at 1-3.  But this testimony was offered in rebuttal to the conclusions of BP expert Chuck Schoennagel, who maintained that BP fully complied with all MMS regulations while operating the Macondo well.  *See* Beck Rebuttal Report at 16-20.  BP obviously cannot have it both ways: if it proffers expert testimony to the effect that it complied with MMS regulations, HESI is entitled to rebut that testimony though an expert witness who demonstrates the contrary conclusion.

### B.      Expert Testimony on Industry Standards or Terminology Can Assist the Court in Statutory Interpretation.

Beck does not purport to interpret the statutory meaning of "hydrocarbon-bearing zone" as BP asserts.  *See* BP Beck Motion at p. 3.  In fact, he opines that the attempt by BP's expert to define that term is unnecessary because the industry standard is so clear that "[n]o definition is

needed."  *See* Rebuttal Expert Report of Gene Beck at 17.  Beck's assertion of what is "uniformly understood in the industry"— that operators do not treat hydrocarbon-bearing zones as limited to zones that are producible from a royalty standpoint—is an admissible opinion based on his knowledge of the industry.  *Id.*; *see, e.g., Huddleston v. Herman & MacLean*, 640 F.2d 534, 552 (5th Cir. 1981), *aff'd in part, rev'd in part on other grounds by* 459 U.S. 375 (1983) (even though his testimony "embraced the ultimate issue," lawyer could testify that language in a boilerplate contract was standard in the securities industry because the effect of the language went to scienter); *United States v. Leo*, 941 F.2d 181, 196 (3rd Cir. 1991) ("[w]hile it is not permissible for a witness to testify as to the governing law . . . our Court has allowed expert testimony concerning business customs and practices."); *Arreola v. Epic Divers, Inc*., No. 05-2788, 2006 U.S. Dist. LEXIS 97132 at *3-5 (E.D. La. Oct. 25, 2006) (Zainey, J.) (allowing expert testimony on how defendant's conduct fell below safety standards in the diving industry because the information was not "in the realm of knowledge held by the typical lay person."); *BNY Mellon, N.A. v. Affordable Holdings, Inc*., No. 1:09CV226-SA-JAD, 2011 U.S. Dist. LEXIS 75135 at *9-10 (N.D. Miss. July 12, 2011) (expert testimony on industry standards and corporate practice may assist the court in statutory interpretation).

This Court has previously acknowledged that expert testimony on maritime industry practice is "helpful to the trier of fact" under *Daubert*.  *Henson v. Odyssea Vessels, Inc*., No. 07-613, 2008 U.S. Dist. LEXIS 12026, at *9 (E.D. La. Feb. 15, 2008) (Barbier, J.) (finding that lay people do not have "specialized knowledge regarding cranes, personnel transfers, vessel operations, or marine safety . . .").  This same principle applies with even greater force in this case, particularly given the highly complex and technical matters concerning the largest offshore blowout in history.

## VII.   THE OPINIONS OF DR. GLEN STEVICK SATISFY *DAUBERT* STANDARDS.

Dr. Stevick holds a Ph.D in Mechanical Engineering from the University of California, Berkeley.  *See* Amended Stevick Expert Report, Report Appendix D.  Since 1986 he has worked as a mechanical engineering consultant, providing consultation in the areas of failure analysis and design.  *Id.*  Stevick has experience with shear calculations with blowout preventers ("BOP") and buckling calculations of pipes in the oil field and pipes generally.  Ex. Q at 541:22-542:14 [Stevick Dep.].  He is a member of the Piping Mechanical Design Committee of the Piping Code.  *Id.* at 542:4-6.  Stevick also has experience analyzing code provisions similar to the MMS's "Best Available and Safest Technology" ("BAST") in other industries, including "fit for service" provisions in codes regulating piping and cranes.  *Id.* at 60:6-12.

Stevick opines that while BP knew that the BOP was the single most important piece of equipment for preventing a blowout, BP nevertheless failed to equip the *Deepwater Horizon* with the most appropriate BOP for the Macondo well.  *See* Stevick Expert Report at 26-34.

BP raises two challenges to Stevick's testimony.  First, that Stevick impermissibly offers legal conclusions regarding MMS regulations that concern BAST and whether the *Deepwater Horizon*, or its BOP, complied with BAST.  *See* BP Stevick Motion at 1, 3-6 [Dkt. No. 5433].  Second, BP claims that Stevick is not qualified to render opinions regarding BAST.  *Id.*

### A.   Stevick's Expertise Will Likely Assist the Court Regarding Analysis of the Adequacy of the BOP Used on the *Deepwater Horizon*.

BP's central challenge to Stevick is that his conclusions regarding BAST are impermissible legal conclusions.  *Id.* at 1.  Stevick notes that MMS regulations required BP, as the operator of the Macondo well site, to "use the best available and safest technology (BAST) whenever practical on all exploration, development, and production operations."  *See* Amended Stevick Expert Report at 26.  Stevick then proceeds to engage in a highly fact specific analysis of

the BOP used in the Macondo well, and is critical of BP related to, *inter alia,* the following BOP deficiencies:

> ➢ BP's exclusive reliance upon a single blind shear ram ("BSR"), with a single "V"-shaped cutting blade as opposed to using two sealing rams;

> ➢ the availability of alternative blind shear ram designs with dual "V"-shaped cutting blades (Cameron DVS), providing improved shearing efficiency (up to 20% more efficient according to MMS's own research);

> ➢ the availability of tandem boosters with dual piston heads which roughly double the BSR shear force without causing additional wear and tear on piston seals (called "packers");

> ➢ the availability of underwater control pods with rechargeable BOP batteries subsea and that can be monitored from the surface;

> ➢ BP's exclusive reliance on unarmored MUX cables to activate the Emergency Disconnect System ("EDS") without having a back-up control system available (such as an acoustic control system—mandatory in Norway and Brazil); and

> ➢ BP's failure to utilize different programs for the Emergency Disconnect Sequence (EDS) and the Automatic Mode Function (AMF/Deadman) that would cause the Casing Shear Ram to fire first allowing the BSR to seal despite rapid flow.

*Id*. at 26-31.

As discussed *supra* in connection with BP's challenge to Beck, an expert is entitled to couch his opinions within the proper analytical context, and opinions embracing industry standards and terminology may assist the trier-of-fact, especially if the regulatory framework is highly technical and requires a detailed factual analysis. *See* section VI(A), *supra; see Maiz*, 253 F.3d at 667; *Travelers Indem. Co.,* 2004 U.S. Dist. LEXIS 29575 at *9-10; *Cooper*, 2007 U.S. Dist. LEXIS 8350 at *4-6; *Metrejean*, 2009 U.S. Dist. LEXIS 92498 at *6. That is precisely what Stevick offers in his expert report, and there is no basis for striking his opinions as "impermissible legal conclusions."

**B.     BP's Motion Amounts to a Procedurally Improper Summary Judgment Motion.**

BP makes the cryptic argument that portions of Stevick's testimony should be stricken pursuant to 30 C.F.R. § 250.107(c) because only the Director of the MMS is entitled to determine what constitutes BAST at the time of the *Deepwater Horizon* incident.  BP cites no authority for this proposition beyond its bare reference to § 250.107(c).  David Trocquet, who has been the District Manager of the New Orleans District of BOEMRE since December of 2008, was asked what he thought the regulatory phrase "best available and safest drilling technology" meant, and he testified:  "[i]n my opinion, it means what it—exactly what it says." Ex. R at 42:22-43:5 [Trocquet Dep].  Trocquet also confirmed that the phrase meant "what was available to the industry at the time."  *Id*. at 215:3-8.  Thus Trocquet adopts the <u>same</u> analysis Stevick employed:  the phrase means what it says in ordinary English, and hinges on what is available in the industry at the time.   Tellingly, Trocquet made no mention of any "determination" by the Director, which BP claims is such an essential part of the definition of that phrase that Stevick's entire analysis supposedly fails the initial admissibility test of *Daubert*.

BP's argument amounts to a motion for summary judgment that, as a matter of law, any reference to BAST requirements at trial must necessarily involve analysis of determinations made (or not made) by the Director.  If that is indeed BP's position, the Court should either deny BP's *Daubert* challenge on this issue, or at least require BP to appropriately brief this legal argument.   If the latter, BP should be required to explain its position in detail and provide supporting authorities, and should also bear the burden of persuasion on such a summary

judgment motion, instead of improperly attempting to cast the burden on HESI to rebut a cryptic and utterly undeveloped argument in the context of a *Daubert* challenge.[19]

### C.    Stevick is Qualified To Render An Opinion on BAST.

BP's final challenge to Stevick is the claim that he is not professionally qualified to render opinions on the issue of BAST.[20]  Although Stevick has not previously testified regarding BOPs in particular, he is very experienced in the area of pipes and tubulars, and the failure modes of pipes, including buckling, which is the fundamental engineering principle at issue concerning the BOP and its failure to shear the drill pipe.  *See* Ex. Q at 57:21-59:1 [Stevick Dep.].  Stevick has previously performed shear calculations with BOPs and buckling calculations of pipes in the oil field and pipes generally.  *See* Ex. Q at 541:22-542:14 [Stevick Dep.].  Stevick is a member of the Piping Mechanical Design Committee of the Piping Code.  *Id.* at 542:4-6.  In addition to his expertise in the fundamental engineering principles, Stevick also has experience analyzing and rendering professional opinions about regulations analogous to the BAST regulations, such as "fit for code" regulations and codes for piping and cranes.  *See id.* at 59:25-60:12.  Stevick is eminently qualified to opine about the underlying engineering principles and about BAST in particular.  Ironically, Clifton Knight, Cameron's expert on BOPs, reviewed Stevick's resume and history, and agreed that Stevick is qualified to opine on these topics based

---

[19]BP's argument is all the more cryptic because BP also lodges a *Daubert* challenge to Dr. Rory R. Davis, the BOP expert for the United States.  *See* BP Davis Motion, Dkt. No. 5424.  Davis engaged in essentially the same type of analysis as was performed by Stevick.  *See* Davis Expert Report.  Although BP makes an initial reference to § 250.107(c) on the second page of its motion, BP never again mentions the supposedly legally dispositive role of the MMS Director regarding BAST issues.  It thus appears that BP cannot develop an argument on this topic, and cannot apply it consistently in its briefing.  That is all the more reason for the Court to reject this argument.

[20]With respect to Cameron's Motion To Exclude Withdrawn Shear Ram Design Opinions Previously Offered By Halliburton's Expert, Glen Stevick [Dkt. No. 5415], HESI is not opposed to the exclusion of such design opinions because it agreed to withdraw those opinions.  HESI opposes Cameron's motion to the extent it suggests that Stevick is not qualified to offer opinions concerning the design of shear rams for a BOP.

on his experience level.  *See* Ex. S at 136:10-18 [Knight Dep.].  BP's challenge to Stevick falls flat.

## VIII.   THERE IS NO BASIS TO EXCLUDE THE OPINIONS OF PATRICK HUDSON.

Dr. Patrick Hudson is one of the world's leading authorities on the human factors in the management of safety in the oil and gas industry.  *See* Hudson Expert Report at 7; *see also* Report Appendix B.  He was the Project Leader of the *Tripod* Research program for Shell from 1987 to 1995.  Hudson Expert Report at 7.  Out of this research program, Hudson contributed to the original "Swiss Cheese Model" of accident causation cited by BP in its Bly Report.  *Id*. Hudson holds a Ph.D from the Faculty of Science of St. Andrews University in Scotland.  *Id*.  He worked to develop Shell's approach to safety management systems and led the Shell Group's *Hearts and Minds* research program on the development of safety culture in the oil and gas industry from 1998 to 2008.  *Id*. at 8.  Hudson was recently appointed as a Distinguished Lecturer for the Society of Petroleum Engineers for 2012 through 2013.  *Id*. at 10.

Hudson opines that the root cause of the Macondo blowout was BP's management practices, including its profound misunderstanding and disregard of safety systems.  *See* Hudson Expert Report at 6.  Seeking to exclude this evidence, BP adopts a faint-hearted, scattershot approach in its *Daubert* challenge, claiming that Hudson failed to employ "any" methodology and failed to consider other potential causes of the blowout.  *See* BP Hudson Motion at 1 [Dkt. No. 5425].  There is no merit to BP's contentions.

### A.    Hudson Employs a Sound Methodology.

In an attempt to persuade the Court that Hudson is somehow unreliable, BP completely mischaracterizes Hudson's actual methodology.  BP Hudson Motion at 2-9.  According to BP, Hudson's report is little more than a "cut and paste" job based almost exclusively on the random

opinions of ill-informed journalists, with an improperly biased analysis of BP's role in the Macondo blowout.  *Id.*

In fact, Hudson engages in a meticulous and exhaustive analysis of BP's process safety culture.  He begins his report with an analysis of BP's misunderstanding of the "Swiss Cheese Model," a model upon which BP relied in its Bly Report, and which has been a recurring theme throughout this case.  *See* Hudson Expert Report at 10-14. Hudson is one of the original contributors to the development of the "Swiss Cheese Model," and is eminently qualified to opine about BP's misapplication and misunderstanding of that model.  *Id.* at 7, 10-17.

Hudson next analyzes BP's corporate culture in detail, exploring its mergers and acquisitions, its leadership under CEO John Browne, its relentless cost cutting initiatives and its short-sighted focus on quarterly targets.  *Id.* at 17-23.  Hudson then turns to an analysis of BP's checkered history of industrial disasters caused by its process safety deficiencies.  *Id.* at 23-29. Hudson next presents a specific and factually detailed analysis of BP's conduct in connection with the Macondo well, including BP's role as ultimate decision-maker; its decisions to ignore advice regarding the number of centralizers to use; the desirability of running a full "bottoms up;" BP's decisions regarding the volume and pump rate of production casing cement; BP's nine attempts to convert the float collar; and BP's decision to use an unorthodox loss circulation material ("LCM") spacer in order to save costs.  *Id.* at  29-35.  Hudson then explores how BP's safety culture led to problems at Macondo and compares BP's approach to that of the other super major oil companies (*e.g.* Shell and Exxon-Mobil).  *Id.* at 37-45.

Hudson also analyzes, in detail, BP's various procedures concerning process safety, including its OIMS framework, and the predecessor gHSSEr system.  *Id.* at 43-48.  Having developed the foregoing analytical framework, Hudson next analyzes in detail why BP's

deficient process safety system led to the disaster in the Gulf, including BP's failure to use managerial tools at its disposal, its failure to pay attention to warning signs, its failure to conduct proper risk assessments for design and operation control, and BP's "target fixation" on wrapping up the temporary abandonment process on the Macondo well in order to hurry the *Deepwater Horizon* rig to the next projects, the Nile and Kaskida wells. *Id.* at 49-56.

Contrary to BP's implication that Hudson's report is nothing but a "cut and paste" job based on the unreliable work of journalists, Hudson lists over 30,000 documents in his "consideration materials" that support his analysis. *Id.* at Report Appendix A. In addition, Hudson considered 48 of the depositions taken in this case, citing to 44 of them in his expert report. *Id.* In terms of analysis and methodology, Hudson's expert report is strikingly similar to the report of the other acknowledged process safety experts in this case, Drs. Robert Bea and William Gale, retained by the PSC. *See* Bea/Gale Expert Report. Indeed, the Bea/Gale expert report was submitted two months prior to that of Dr. Hudson and Hudson carefully reviewed the Bea/Gale report, expressly noting that the Bea/Gale report "aligns closely" with his own, and that he agrees with the central conclusions reached by Bea and Gale. *See* Hudson Expert Report at 56. As noted throughout this response, an expert is entitled to rely on the input and analysis of other experts. Accordingly, there is simply no basis to conclude that Hudson failed to employ "any" methodology, or failed to consider and analyze a sufficient body of relevant facts.

### B.   Hudson Is Entitled to Draw Reasonable Inferences From the Record Evidence and Other Sources.

BP quibbles about various inferences Hudson makes in the course of his analysis. *See* BP Hudson Motion at 5-7. For example, Hudson gives careful consideration to the fate of Kevin Lacy, BP's former Vice-President of drilling and completions for the Gulf of Mexico. *See* Hudson Rebuttal Expert Report at 16. Lacy gave a speech in October 2009 critical of BP's

drilling activities, stating that BP was drilling wells that they could not even complete. *Id*. Shortly thereafter, in December 2009, Lacy was abruptly fired by Barbara Yilmaz. *Id*. Hudson, as a process safety expert, drew the reasonable inference that this event was some evidence that BP has a "kill the messenger" corporate culture which hinders BP's ability to learn important but inconvenient truths about its operations. *Id*. Such inferences are well within the purview of a process safety expert, who necessarily analyzes the deficiencies and effectiveness of a corporate culture, and will rarely encounter clear-cut and direct evidence of certain decisions (*e.g.* a memo written by Yilmaz expressly stating that Lacy should be terminated for speaking inconvenient truths about BP's deficient process safety culture). Case law recognizes that an expert is entitled to draw reasonable inferences from the record evidence in the course of reaching his expert opinion. *See Kritzers*, 479 F.2d at 1095 (finding that plaintiff's expert "drew a reasonable inference rather than . . . an unwarranted assumption of fact . . ." where the expert's conclusion was derived from application of his expert knowledge to the facts in evidence); *see McLean,* 224 F.3d 797, 801 (6th Cir. 2000) ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. However, mere 'weaknesses in the factual basis of an expert witnesses' opinion . . . bear on the weight of the evidence rather than its admissibility.'" (quoting *United States v. L.E. Cooke Co*., 991 F.2d 336, 342 (6th Cir. 1993) (internal citations omitted)). BP is free to challenge at trial the accuracy of this inference but is not entitled to strike Hudson's testimony pursuant to *Daubert*.

### C.    Hudson is Entitled to Focus on BP's Actions and Limit the Scope of His Report.

BP's also challenges the admissibility of Hudson's opinions, arguing that he focuses primarily on the actions of BP and its role in the Macondo disaster without analyzing the actions or omissions of other parties. *See* BP Hudson Motion at 7-8. There is nothing objectionable nor

LIMIT TESTIMONY OF ITS EXPERT WITNESSES                                                                 Page 54

improper about Hudson not categorically eliminating other causal contributors to the blowout. *See Ostrowiecki,* 2008 U.S. Dist. LEXIS 83052 at *17-22; *Bigelow,* 2005 U.S. Dist. LEXIS 47871 at *31033; *Jahn*, 233 F.3d at 390.  Furthermore, as explained in Hudson's report, BP is the owner and operator of the Macondo well, and acts as the "company man" on the rig, with final decision-making authority.  *See* Hudson Expert Report at 29-35; *see also* Hughett Expert Report at 13-24.  It is therefore entirely appropriate for Hudson to analyze whether BP's process safety deficiencies were a causal factor in the blowout, especially in light of BP's checkered past regarding its process safety systems and large scale industrial disasters.   In any event, as discussed in Section II (C), *supra*, an expert is entitled to opine about what may be a cause of any event, and is not required to analyze all conceivable causes or determine what was the definitive cause.  *See Ostrowiecki* 2008 U.S. Dist. LEXIS 83052 at *17-22; *Bigelow*, 2005 U.S. Dist. LEXIS 47871 at *31-33.

For the same reason, BP wrongly suggests that Hudson is not entitled to limit the scope of his report to the events leading up to hydrocarbons being in the riser.  Hudson is not obligated to analyze everything that could conceivably be relevant to the Macondo well.  BP implicitly recognizes this obvious limitation, because all of its experts limit the scope of their respective reports as well.

## IX.    THE OPINIONS OF SAM LEWIS SATISFY *DAUBERT'S* THRESHOLD REQUIREMENTS.

Lewis is a Technical Professional Team Leader for the HESI cementing organization.  He received his Ph.D in inorganic chemistry from Texas A&M University in 2003.  *See* Lewis Expert Report at 6-7; *see also* Report Appendix B.  He has worked within HESI for the past nine years doing research and development while providing technical support to HESI cement engineers around the world.  *Id*.  He currently leads the team of cementing chemistry

professionals who support and deliver solutions for cement engineers, and he oversees all the ongoing cementing technology projects.  *Id.*

BP seeks to limit the testimony of Lewis in two respects.  First, BP claims that Lewis is not entitled to opine that some of BP's employees or consultants were sophisticated or knowledgeable regarding foam cement.  *See* BP Lewis Motion, Dkt. No. 5429 at 1-3.  Second, BP asserts that Lewis's report cannot contain background facts or information, or rely on the opinions of other experts.  *Id.* at 7-10.  Neither argument is viable.

### A.    Lewis Is Entitled to Opine on the Competence of BP's Wells Team Regarding Foamed Cement.

Lewis opines that certain BP personnel had "substantial expertise" or "substantial awareness" regarding foam cement, or were "well versed" in these issues.  *See* Lewis Rebuttal Expert Report at 58-60.  BP makes the peculiar argument that Dr. Lewis is so utterly incapable of assessing the competence of BP's "Macondo wells team" that such opinions must be stricken under *Daubert*.  *See* BP Lewis Motion at 5 ("Dr. Lewis's opinions concerning the cementing competence of BP's wells team should be stricken as unreliable . . .").

BP carefully obscures the names of the individuals at issue, instead referring to them generically as "BP's Macondo wells team."   In fact, the individuals at issue include Erick Cunningham, Robert Beirute, Gregory Walz, Brian Morel, Brett Cocales and Mark Hafle.  *See* Lewis Rebuttal Expert Report at 58-60.

It is obvious why BP avoids naming names.  Lewis notes that one member of "BP's Macondo wells team" was Erick Cunningham, who has extensive expertise in the field of cement, specifically with foamed cement, and who serves as the chairperson of the API working group dedicated to evaluating test methods for foamed cement jobs.  *See id.* at 59 and n.142. Another member of the "Macondo wells team" is Robert Beirute, who Lewis notes is the

principal of Beirute Consulting, LLC and a cement expert employed by BP as an outside consultant on cement issues who gave presentations to BP on this topic.  *Id*. at 60 and n.146.

Given that Lewis is an expert in cement chemistry who routinely assists cement engineers (s*ee* Lewis Expert Report at 6-7; *see also* Report Appendix B) it is absurd for BP to suggest that Lewis cannot form the opinion that Beirute and Cunningham are competent and sophisticated on foam cement issues, particularly given the extensive experience of both men.

BP next argues that Lewis cannot opine that Walz, Morel, Cocales and Hafle are competent or knowledgeable regarding foam cement issues, because Lewis supposedly has a *Daubert* "methodology" for assessing such competence, and Lewis "strayed far from that methodology" in opining that these individuals were sophisticated regarding the issue of foamed cement.  *See* BP Lewis Motion at 5-7.  It turns out that Lewis's so-called "methodology" is the one he employs when he assesses the competence of his subordinates, *i.e.* employees in HESI's cement laboratory.  What BP characterizes as Lewis's expert "methodology" is simply his routine practice of evaluating employee competence by evaluating the employee's participation in training courses and their ability to understand test results.  *Id*. at 2.

From this fallacious premise, BP argues that because Lewis did not attempt to *evaluate employees of an adverse party* in the exact same manner as he does his own subordinates, his failure to "apply the same review methodology to the Macondo wells team" renders his opinion inadmissible under *Daubert*.  But *Daubert* does not require such an overly technical degree of formalism.  Lewis reviewed correspondence involving "BP's wells team," which involved a detailed and sophisticated discussion of such issues as cement contamination with synthetic oil based mud, rat hole swapping, and inadequate centralization.  *See* Lewis Rebuttal Expert Report at 60 and nn.147-49.  In combination with Lewis's expertise, such correspondence gives Lewis a

substantial basis to opine that BP's personnel were competent and sophisticated regarding foamed cement issues.  To the extent BP resists that conclusion, BP is free to establish the incompetence of its employees at trial, but it has not established a basis for striking Lewis under *Daubert*.

### B.   Lewis Is Entitled to Reference Relevant Facts Regarding His Employer's Cement Operations to Provide Background and Context to His Expert Report.

Incredibly, BP next challenges the admission of Lewis's testimony because he recites facts at the beginning of his expert report.  *See* BP Lewis Motion at 3-5, 7-10.  BP does not claim that these facts are irrelevant, false or misleading; nor does it claim that such facts were improperly incorporated into Lewis's opinions.  BP even acknowledges that Lewis is aware of some of these facts as a direct consequence of his employment with HESI.  *Id*. at 4.  Courts recognize that an expert is entitled to provide relevant background facts and information in his expert report in order to provide context to the analysis, especially where such background facts assist the fact-finder.  For example, in *Lovejoy v. Sheriff Joseph Arpaio*, No. CV-09-01912-PHX-NVW, 2011 U.S. Dist. LEXIS 94503, at *2 (D. Az. August 22, 2011), the defendant moved to strike portions of plaintiff's expert report because it provided background information about how K-9 units are viewed within police departments.  The court rejected the *Daubert* challenge on the grounds that plaintiff's expert was a police practices expert who had established a K-9 unit and had eleven years experience as a police chief.  *Id*.  The court found that this expert appropriately conveyed information in his report concerning how K-9 units are viewed within police departments, which is something of which the average juror may not be aware.  *Id*.

Likewise, Lewis, a cement expert, who has been employed by HESI for nine years, is entitled to include background facts about HESI's cement operations within his expert report, such as "How Halliburton Typically Designs a Cement Formation."  *See* Lewis Expert Report at

7-10; and Report Appendix B.  The inclusion of these facts does not render his testimony unreliable or inadmissible.

## <u>CONCLUSION</u>

**WHEREFORE,** Defendant Halliburton Energy Services, Inc. prays that upon final hearing, this Court deny the motions of Cameron and BP challenging the expert testimony of Sam Lewis, Richard Strickland, David Bolado, Gene Beck, John Hughett, Glen Stevick and Patrick Hudson, and that the Court award Halliburton Energy Services, Inc. such other and further relief, both general and special, whether at law or in equity, to which it may show itself justly entitled.

Respectfully submitted,

**GODWIN RONQUILLO PC**

/s/  *Donald E. Godwin*

Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
dgodwin@GodwinRonquillo.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
bbowman@GodwinRonquillo.com
Jenny L. Martinez
State Bar No. 24013109
jmartinez@GodwinRonquillo.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
fhartley@GodwinRonquillo.com
Gavin E. Hill
State Bar No.  00796756
ghill@GodwinRonquillo.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

and

R. Alan York
ayork@GodwinRonquillo.com
Jerry C. von Sternberg
jvonsternberg@GodwinRonquillo.com
Misty Hataway-Coné
mcone@GodwinRonquillo.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Halliburton Energy Services, Inc.'s Response In Opposition To Motions To Exclude Testimony Of Its Expert Witnesses has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this 14th day of February, 2012.


/s/   *Donald E. Godwin*
Donald E. Godwin