# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | **MDL No. 2179** |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | **SECTION: J** |
| | * | |
| **These Pleadings apply to:** | * | |
| *All Cases in Pleading Bundle B3* | * | |
| | * | |
| (Including No. 10-2771) | * | **JUDGE BARBIER** |
| | * | |
| | * | **MAGISTRATE** |
| | * | **SHUSHAN** |
| *   *   *   *   *   *   *   *   *   *   *   * | | |

**SECOND AMENDED MASTER COMPLAINT IN ACCORDANCE WITH
PTO NO. 11 [CASE MANAGEMENT ORDER NO. 1]
SECTION III.B(3) ["B3 BUNDLE"]**

<u>**Complaint in Admiralty**</u>

<u>**Rule 9(h)**</u>

## I.   <u>INTRODUCTION</u>

On April 20, 2010, an explosion on board the oil vessel *Deepwater Horizon* in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States.   The explosion resulted in an oil spill of unprecedented proportions and an oil slick that grew exponentially, depleting and destroying marine and coastal environments and estuarine areas in the Gulf of Mexico, Louisiana, Mississippi, Alabama, Texas and Florida (the "Gulf States").   In an ill-conceived effort to contain and to clean up the spill, massive amounts of chemical dispersants were sprayed from the air, at the surface of the Gulf and beneath the surface of the water.   Vast quantities of oil and debris were burned at the surface of the Gulf or skimmed from the water.   Beaches, marshes and wetlands fouled by oil and chemicals have been the focus of a variety of remedial efforts to remove the hazardous materials from these fragile areas.   Although the leaking well is now capped, the disastrous effects of the spill on the public health, the environment and the income, businesses and property of the residents, and property owners of the region are widespread and will likely remain so for decades.

Hundreds of individual and class actions were filed in state and federal courts on behalf of the thousands of victims of the spill.   By order entered on August 10, 2010, the Multi-District Litigation Panel (the "MDL Panel") transferred all actions then pending to this Court.   *See In re Oil Spill by the Oil Rig "Deepwater Horizon" In the Gulf of Mexico, on April 20, 2010,* MDL No. 2179, 731 F. Supp. 2d 1352 (JPML, August 10, 2010) (E.D. La. 2010) (the "Transfer Order").   On October 19, 2010, this Court entered its Case Management Order No. 1 (hereinafter "CMO No. 1"), wherein it directed the

2

filing of Master Complaints on behalf of the Plaintiffs.  The Court entered Pre-Trial Order No. 25 on January 12, 2011 to clarify CMO No. 1 and the scope and effect of the Master Complaints. In accordance with CMO No. 1, Paragraph III.B(3) and PTO No. 25, Paragraph 1, this Second Amended Master Complaint is filed on behalf of those plaintiffs seeking damages for all claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010, and all claims for Vessels of Opportunity ("VoO") breach of contract and personal property damages and who have filed their claims in this Court or whose claims have been transferred to this Court pursuant to the Transfer Order.

This Second Amended Master Complaint may also be joined with the Master Claim (or other Claim) in Limitation, as well as Master Answer (or other Answer) in Limitation, [No. 10-2771, Doc 249], pursuant to PTOs 24 and 25, or otherwise, and may form the basis of Claims tendered by Transocean to the Tendered Defendants pursuant to Federal Rule of Civil Procedure 14(c) [Doc 1320].

Accordingly, pursuant to CMO No. 1, Paragraph III.B(3), as clarified by PTO No. 25, Paragraph 1, Plaintiffs, by their undersigned counsel and other counsel identified herein, for themselves and all others similarly situated, submit this Second  Amended Master Complaint for actual, compensatory and punitive damages and other relief arising from the oil spill by the *Deepwater Horizon* oil vessel in the Gulf of Mexico on April 20, 2010, and state as follows:

1.     On April 20, 2010, at approximately 9:45 p.m. CST, a well blowout caused explosions on the *Deepwater Horizon*, an oil vessel in the Gulf of Mexico, igniting a

raging, gas-fueled fire on the vessel.  After burning for two days, the vessel sank to the ocean floor.

2.     As the *Deepwater Horizon* tipped into the sea, the long riser pipe connecting the vessel to the wellhead on the seafloor bent and broke, leaving the pipe leaking oil out of its now-open end, as well as through two breaks along its length.  An emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, causing the blown-out well to spew oil into the Gulf waters (the "Oil Spill").

3.     Each day during the course of the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out into a widening slick of oil, as well as spreading out in vast subsurface plumes.  On the surface, the shifting mass was large enough to be visible from outer space, at times covering tens of thousands of square miles, and spreading with the wind and currents towards the Gulf States' coastlines, where oil made landfall on white sand beaches, leased and privately owned subsurface areas, and in ecologically sensitive marshes and estuaries.  Under water, immense plumes of oil and dispersant chemicals swirled through the entire water column, damaging ecosystems throughout the Gulf of Mexico. Ultimately, almost five million barrels (210 million gallons) of crude oil spilled in the Gulf of Mexico.

4.     In the wake of the disaster, BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States.   This disaster response plan had three primary components: subsea response; offshore containment; and shoreline protection.

5.      BP's response to its self-created disaster included the use of chemical dispersants that were intended to break down the oil into finely dispersed droplets.  Dispersants generally contain a solvent, a surfactant and other additives that break up the surface tension of an oil slick or sheen to make the oil more soluble in water.

6.      Chemical dispersants have been sprayed onto the ocean surface from aircraft that fly over spills and dispense the chemicals from cargo holds, sprayed onto the ocean surface from fountain-type jets on the decks of boats, sprayed from smaller vessels onto the surface of the water, injected immediately below the surface of the water from vessels, injected deep below the surface of the ocean, and sprayed by hand.

7.      To date, BP and its contractors have used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico in connection with the Oil Spill.

8.      Many Plaintiffs have assisted and some continue to assist in the effort to prevent oil slicks from reaching the shore, or cleaning oil spill residue from the beaches, marshes and estuaries by participating in the relief effort orchestrated by BP.  As part of this effort, Plaintiffs came and continue to come into contact with crude oil, chemical dispersants and oil/chemical mixtures.  Even more disturbing, BP's aerial spray planes have negligently and/or intentionally sprayed chemical dispersants on the water despite the presence of boats and their crews in the vicinity of the spraying.

9.      Exposure to chemicals in crude oil and chemical dispersants can cause a wide range of health problems.  Crude oil has many highly toxic chemical ingredients that can damage every system in the body.  Dispersant chemicals can affect many of the same organs.  These include damage to the following parts of the body:  respiratory system, nervous system (including the brain), liver, reproductive/urogenital system, kidneys,

endocrine system, circulatory system, gastrointestinal system, immune system, sensory systems, musculoskeletal system, hematopoietic system (blood forming), skin, integumentary system, and metabolic system.

10.     Damage to these body parts and/or systems can cause a wide range of diseases and conditions.  Some of these diseases, conditions, and symptoms may be evident immediately or in a several day period, and others can appear months or years later.  The chemicals can impair normal growth and development through a variety of mechanisms, including endocrine disruption and direct fetal damage.  They can cause mutations that may lead to cancer and multi-generational birth defects.  Some of the chemicals are known carcinogens, such as benzene.

11.     Many of the chemicals in crude oil and the dispersants target the same organs in the human body, and this increases the risk and may also increase the severity of harm.  In addition, the dispersants currently used can increase the uptake (dose) of crude oil chemicals and movement of chemicals into critical organs.

12.     Many Plaintiffs have already experienced headaches, nausea, vomiting, dizziness, elevated blood pressure, eye and respiratory irritation, rashes,  chemical burns, and/or other symptoms caused by coming into contact with oil and/or chemical dispersants.  Moreover, the odors emanating from the oil and/or the dispersants are foul and the fumes are harmful.

13.     This Second Amended Master Complaint is submitted pursuant to this Court's CMO No. 1, as: 1) an administrative device to serve the functions of efficiency and economy; and 2) to present certain common claims and common questions of fact and law for appropriate action by this Court in the context of this multidistrict proceeding.

14.     This Second Amended Master Complaint does not include all claims asserted in all of the actions that have been transferred to this Court pursuant to the Transfer Order, nor is it intended to consolidate for any purposes the separate claims of the Plaintiffs. Those claims are set forth in the individual and class actions filed by each of the respective Plaintiffs.

15.     This Second Amended Master Complaint does not constitute a waiver or dismissal of any actions or claims asserted in the individual and class actions arising out of the Oil Spill, nor by it do the Plaintiffs relinquish the right to add or assert, or seek leave to add or assert, additional claims and parties defendant depending on further information learned through discovery or investigation.

16.     This Second Amended Master Complaint makes allegations of common issues of law and/or fact relating to the liability of Defendants, and places Defendants on notice that Plaintiffs may seek certification of one or more classes and/or subclasses, as appropriate, for the class-wide determination of the common issues of law and/or fact relating to the liability of Defendants. To such classes and/or subclasses actual, compensatory and punitive damages should be awarded to Plaintiffs for the injuries they have sustained as a result of Defendants' knowledge, conduct, acts and omissions as set forth herein.  Plaintiffs seek to maintain this action as a class action and/or the class certification of particular issues herein, under Rule 23 of the Federal Rules of Civil Procedure, including, as appropriate, Rule 23(a)(1)-(4); (b)(1)(B); (b)(3); (c)(4); and (c)(5).  Prior to any class certification motion, in sufficient time to place Defendants on fair notice and to enable appropriate discovery and briefing, with such scheduling subject to Court approval, Plaintiffs will identify those persons who will serve as proposed

representatives for the class sought to be certified and, if necessary, add or join them as parties hereto.

17.     Further, additional parties will likely join as plaintiffs in this action after the filing of this Second Amended Master Complaint, and those potential plaintiffs will have the opportunity to join this action by completing an online form dedicated to that purpose.

18.     In accordance with Paragraph 18 of PTO No. 25, the factual allegations pleaded in the Amended Master Complaint for the B1 Pleading Bundle [Doc 1128] are fully incorporated into and made a part of this Second Amended Master Complaint.

19.     Further, additional parties may join as plaintiffs in this action after the filing of this Second Amended Master Complaint, and those plaintiffs may have the opportunity to adopt these allegations and join this action by completing a Direct File Short Form, in accordance with PTOs Nos. 24 and 25.

## II.    **PARTIES**

### A.    **Plaintiffs**

20.     Plaintiffs are citizens of Florida, Alabama, Mississippi, Louisiana, Texas and other states, who have been exposed to oil, oil containing material, dispersants and/or other harmful chemicals, odors and emissions and/or who have suffered heat stroke, heat exhaustion or other heat-related conditions or illnesses during the clean-up following the *Deepwater Horizon* explosion, either because of their participation in the clean-up activity or as a result of their proximity to the oil, dispersants and/or other harmful chemicals from the *Deepwater Horizon* explosion and resulting oil spill.  They fall into six basic categories:

    a.     Boat captains, crew, vessel owners, workers, and/or volunteers involved in the Vessels of Opportunity program ("VoO program") who were exposed

to harmful chemicals, odors and emissions and/or who have suffered heat stroke, heat exhaustion, other heat related conditions or illnesses during post-explosion clean-up activities, and/or who were not adequately compensated for their work or time in the VoO program and/or whose property was damaged as a result of their work in the VoO program ("VoO Plaintiffs").

b.      Workers involved in decontaminating vessels that came into contact with oil and/or chemical dispersants or other clean-up activity who were exposed to harmful chemicals, odors and emissions during post-explosion clean-up activities ("Decontamination Plaintiffs").

c.      Vessel captains and crew who were not involved in the VoO program but who were exposed to oil, dispersants and/or other harmful chemicals, odors and emissions during post-explosion clean-up activities ("OffshoreVessel Plaintiffs").

d.      Clean-up workers and beach personnel who were involved in clean-up activities along shorelines and intercoastal and intertidal zones ("Onshore Plaintiffs").

e.      Residents who live and work in close proximity to coastal waters (e.g. while on vacation) ("Resident Plaintiffs").

f.      Non-residents who otherwise allege they were exposed to oil, oil containing material and/or dispersants due to their proximity to coastal waters ("Non-resident Plaintiffs").

21.    Plaintiffs who were part of the VoO program and not paid, either in part or in full, by certain defendants under the Master Vessel Charter Agreement ("Charter Agreement") and/or whose vessels were damaged in the course of working under the VoO program.

### B.    Defendants

### *The BP Defendants*

22.    Defendant BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois.  BP Exploration was a holder of a lease granted by the former Minerals Management Service  ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Oil Spill originated.

23.    The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010; however, it is referred to as the MMS throughout this Second Amended Master Complaint.

24.    BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. §2714.  This Court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

25.    Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas.  BP America Production was the party to the Drilling Contract with Transocean Ltd. for the drilling of

the Macondo well by the *Deepwater Horizon* vessel.  This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

26.     Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England.  BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo.  BP p.l.c. is one of the world's largest energy companies with over 80,000 employees and $239 billion in revenues in 2009.  BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division in which BP Exploration and BP America fall, through vertical business arrangements aligned by product or service groups.  BP p.l.c.'s operations are worldwide, including in the United States.  Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally.

27.     BP p.l.c. has submitted to this Court's jurisdiction by responding to Plaintiffs' discovery requests.

28.     BP p.l.c. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development.  A sampling of BP p.l.c.'s contacts with the U.S. are as follows:  (a) BP p.l.c.'s American Depository Shares are listed on the New York Stock Exchange and BP p.l.c. is the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP p.l.c. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP p.l.c.'s fixed assets are located in the U.S. or the European Union; and (e) BP p.l.c. reports having 2,100 U.S.-based employees in non-

Exploration & Production, non-Refining & Marketing BP entities.

29.    This Court may exercise personal jurisdiction over BP p.l.c. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure because claims in this action arise under federal law, the exercise of jurisdiction over BP p.l.c. is consistent with the United States Constitution and laws, and BP p.l.c. and has been served with a summons in individual complaints that are the subject of this Second Amended Master Complaint and/or has been served with and/or has waived and/or accepted service of the original B1 Bundle and B3 Bundle Master Complaints.

30.    This Court also has jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm specific jurisdiction provision (13 Louisiana Statute § 3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.  Plaintiffs' causes of action arise out of wrongful conduct committed by BP p.l.c., directly or indirectly by its agents, that caused injury or damage in Louisiana by an offense or quasi offense committed through an act or omission outside of Louisiana.  These acts or omissions took place both before the blowout resulting in the Oil Spill and in the negligent conduct of BP p.l.c. after the blowout in attempting to contain the Oil Spill.  BP p.l.c. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana.  BP p.l.c. has had continuous and systematic contacts with Louisiana (and with the United States more generally) and has been served with a summons in individual complaints that are the subject of this Second Amended Master Complaint and/or has been served with and/or accepted service and/or waived service of the original B1 Bundle and B3 Bundle Master Complaints.

31.    In addition, this Court also has personal jurisdiction over BP p.l.c. under agency

and alter ego principles, because BP p.l.c.'s agents, BP America and BP Exploration, do business in Louisiana.   BP America and BP Exploration are both wholly-owned subsidiaries of BP p.l.c.   In BP p.l.c.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BP America and BP Exploration, BP p.l.c. states that it "controls" both BP America and BP Exploration, among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities . . . ."

32.     Moreover, BP p.l.c. undertook the duty for pay and/or gratuitously to clean up the Oil Spill and as a result is liable for its acts and omissions in the attempt to clean-up the Oil Spill.

33.     BP Exploration, BP America and BP p.l.c. are generally referred to collectively as "BP."   As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

### The Transocean Defendants

34.     Defendant Transocean Ltd. ("Transocean Ltd.") is a Swiss corporation that, upon information and belief, maintains U.S. offices in Houston, Texas, and at all pertinent times was, upon information and belief, doing business in the United States and the State of Louisiana, including within this district.

35.     Defendant Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Louisiana and within

this district. Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

36.     Defendant Transocean Deepwater, Inc. ("Transocean Deepwater") is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

37.     Defendant Transocean Holdings, LLC ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Holdings is affiliated with Transocean Ltd. and is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon*'s offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. More specifically, Transocean Holdings is party to the contract with BP regarding the lease of the *Deepwater Horizon* for drilling operations in the Gulf of Mexico. On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the diesel fuel which escaped from the surface following the explosion aboard the *Deepwater Horizon*.

38.     Defendant Triton Asset Leasing GmbH ("Triton") is a Swiss limited liability company with its principal place of business in Zug, Switzerland. Triton is affiliated with Transocean Ltd. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

39.     Defendants Transocean Ltd., Transocean Deepwater, Transocean Offshore, Transocean Holdings, and Triton are hereinafter referred to collectively as "Transocean." At the Macondo site, Transocean provided the *Deepwater Horizon* vessel and personnel to operate it.  At all times relevant to the Oil Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems.  Transocean also provided operational support for drilling-related activities on board the *Deepwater Horizon*, as well as onshore supervision and support for those drilling activities at all times relevant to the Oil Spill.

### The Halliburton Defendants

40.     Defendant Halliburton Energy Services, Inc. ("Halliburton") is a Delaware corporation with its principal place of business in Houston, Texas.  Halliburton is registered to do and does business in the State of Louisiana.  Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the *Deepwater Horizon*, as well as onshore engineering support for those operations.  Halliburton was responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo well.  At and before the time of the blowout, Halliburton was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons such as gas and oil.

### BP's Responsibility for the Health and Safety of Clean-Up Workers or Others Exposed to Hydrocarbon Compounds, Dispersants and/or Oil

41.     The BP Defendants are ultimately responsible for the health and safety of all clean-up workers or others exposed to hydrocarbon compounds, dispersants and/or oil, by virtue of: **(i)** 40 C.F.R. ¶300.150; **(ii)** 33 U.S.C. §1321(c)(4)(B)(i), (iii) and (iv); and/or **(iii)**

various post-spill contracts, stipulations, agreements and/or other assumptions, undertakings and/or acknowledgements of responsibility, (including, for example, but not limited to, the Stipulation and Letter identified as Record Docs. 138 and 138-1 filed in Civil Action No. 2:10-cv-01156, as well as various contracts and/or agreements with or representations to the United States Government and/or the former "B3", "Responder", "Clean-Up" and/or "Dispersant" Defendants).

### The Drilling Defendants

42.    BP, Transocean, and Halliburton, (which has been tendered to Plaintiffs by Transocean pursuant to Rule 14(c)), are collectively referred to herein as the "Drilling Defendants," as they were all involved in the drilling, cementing, and other temporary well abandonment activities of the *Deepwater Horizon*, and thus their actions caused and/or contributed to the Spill. The Drilling Defendants are jointly, severally, and/or solidarily liable for post-spill exposure and injury claims under principles of general maritime law (or, alternatively, other applicable State and/or Federal tort law).

### The VoO Contract Defendants

43.    BP is responsible for the compensation of all clean-up workers or others engaged in the response to the oil spill as the Responsible Party pursuant to 33 U.S.C. §2702(b), as well as under the terms of Vessel of Opportunity ("VoO") or other vessel charter agreements, whether directly or through various agents or contractors.

44.    Defendant DRC Emergency Services, LLC ("DRC") is an Alabama limited liability company that at all pertinent times was doing business in the State of Louisiana. DRC participated in, *inter alia*, the post-explosion Oil Spill remediation and response activities, including the VoO program.

### III.   JURISDICTION AND VENUE

45.   Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime Jurisdiction."

46.   This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1333.

47.   This Court also has jurisdiction over this action pursuant to The Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

48.   This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

49.   The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and Claimants hereby designate this case as an admiralty or maritime case as provided in Rule 9(h).

50.   Venue is appropriate in this District under 28 U.S.C. § 1391, because the events or omissions giving rise to the claims asserted herein occurred in this District.  Venue is also appropriate in this District consistent with 28 U.S.C. § 1407 and the Transfer Order, subject to the provisions of the Direct Filing Order (PTO No. 20).

### IV.   FACTUAL ALLEGATIONS

#### A.   The *Deepwater Horizon* Catastrophe

51.   The *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil vessel built in 2001.  It was leased to BP through September 2013.  It was one of the largest vessels of its kind.

52.      BP leased the *Deepwater Horizon* to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf off the coast of Louisiana.

53.      On April 20, 2010, and as described in greater detail in the Amended Master Complaint for Pleading Bundle B1 [Doc 1128], (whose factual allegations are incorporated fully by reference herein), workers on the *Deepwater Horizon* oil vessel lost control of the Macondo well just after the final cementing work was completed.  During the course of the cementing work, an explosion occurred on the *Deepwater Horizon* and it caught fire.

54.      The explosion and fire caused the deaths of 11 people and injuries of many other workers on the vessel.  The fire burned for two days, and the vessel began to list progressively more until it finally sank on April 22, 2010.

55.      The *Deepwater Horizon* had been connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser.  As the *Deepwater Horizon* sank to the seafloor, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely.  The riser, bent into a crooked shape under water, extended from the well to 1,500 feet above the sea bed and then buckled back down.  Oil flowed out from the open end of the riser and from at least two places along its length.

56.      While crude oil was believed to be discharged before the *Deepwater Horizon* finally sank on April 22, 2010, the rate of discharge is believed to have increased once the *Deepwater Horizon* sank to the ocean floor.

57.      After the explosions, BP attempted to downplay and conceal the severity of the Spill.  Its initial leak estimate of 1,000 barrels per day was found by government

investigators to be a fraction of its measured leakage amount in excess of 50,000 barrels per day.  Moreover, following the Oil Spill, BP did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the Oil Spill.

58.     On or about June 20, 2010, Congressman Edward Markey released an internal BP document showing that the company's own analysis had actually revealed that the rate of oil spillage could reach 100,000 barrels, or 4,200,000 gallons, per day.

59.     The flow of oil continued unabated, and the ever-expanding oil slick made landfall on April 30, 2010, where it continued to affect greater areas of the Gulf coastline as it was driven landward by currents and winds.

60.     After the Oil Spill, an oil slick with a range of thousands of miles had formed and could be seen from outer space.  Additionally, thick, voluminous plumes of oil were identified in deep waters within the Gulf of Mexico.  The Oil Spill caused this slick and these plumes to form.  Oil washed and is washing ashore in the Gulf of Mexico, posing significant environmental and public health risks.

61.     As the oil made landfall along the Gulf Coast, it infiltrated and will continue to infiltrate the delicate wetlands, marshes, and intertidal zones that line the coast of Louisiana, Mississippi, Alabama, Texas and Florida, requiring clean up.

62.     For over 12 weeks, oil spewed into the Gulf of Mexico from the damaged well, dumping almost five million barrels (210 million gallons) of crude oil into sensitive ecosystems.

63.     On July 15, 2010, almost four months after the explosion and fire on the *Deepwater Horizon*, BP finally capped the well.

64.     The OPA imposes liability upon a "responsible party for a . . . facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs.  33 U.S.C. § 2702.

65.     The U.S. Coast Guard is responsible for implementing many aspects of the OPA, including designating responsible parties, as well as responding to oil spills and supervising and/or coordinating response actions.

66.     After the Oil Spill, the Coast Guard formally and/or informally designated Defendants BP Exploration and Transocean Holdings (as well as B1 Defendants MOEX and Anadarko) as "responsible parties" under the OPA.

**B.     The Response Effort and the Vessels of Opportunity Program**

67.     After the disaster, BP began implementing a disaster response plan to prevent oil from escaping the blown out well, to manually contain the oil, and to disperse oil in the water using chemical dispersants.

68.     As part of its offshore containment response program, BP directed the use of vessels to, *inter alia*, recover oil coming to the surface of the Gulf of Mexico; to skim oil from the surface of the water; and to conduct in-*situ* burning of oil that reached the surface of the water.  Many of the vessels BP used were part of its Vessels of Opportunity ("VoO") program for oil spill responses activities.  BP further directed and ordered its contractors who were using vessels as part of the offshore containment response program to engage vessels in the VoO program, including the charter agreement terms established by BP.

69.     The VoO program was touted by BP as a key component to BP's response to the disaster.  BP used several thousand commercial and charter fishing vessels and other

boats from communities along the shoreline to tow and deploy booms – floating barriers intended to contain, deflect, or hold back oil floating on the water's surface.  Other VoO vessels worked with absorbent booms used to soak up some of the millions of gallons of oil coming to the surface of the Gulf.  Still other VoO vessels supported in-*situ* burning efforts.  Some VoO vesels conducted skimming operations to skim oil off the surface. Other VoO vessels recovered light oil and tar balls.  Still others were tasked with the transportation of individuals to points out on the water.

70.     Plaintiff vessel owners who participated in the VoO program generally entered into Master Vessel Charter Agreements (the "Charter Agreements") under which Defendant BP  chartered their vessels pursuant to the VoO program (whether directly or through agents or sub-contractors, including DRC).

71.     Pursuant to the Charter Agreements, BP (and/or agents or sub-contractors such as DRC) agreed that the general maritime laws of the United States should govern "all matters of construction, validity and performance" of the Charter Agreements, and that only in the event that the general maritime laws of the United States do not apply, the laws of the State of Louisiana shall govern.

72.     The Charter Agreements were subsequently amended by letter agreement, stipulation and/or court order, and the amendments apply retroactively to the date of the initial signing of the Charter Agreements.

73.     In addition, Defendant BP made various statements and representations in the press, in court proceedings, on BP's website, and/or otherwise, in which BP recognized and/or voluntarily assumed responsibility for the safety and protection of workers

engaged in the VoO program. *See, e.g.,* Doc 127-7, filed in No. 10-1156 (June 16, 2010); *see also,* 40 C.F.R. ¶ 300.150.

74.     Defendant BP is subject to a letter agreement and/or court order that prevents it from attempting to enforce against VoO Plaintiffs any releases contained in Charter Agreements and/or other documents engaging VoO Plaintiffs.

75.     The Charter Agreements provided that the charter terms continued until the vessels were returned to moorings and decontaminated, and the boats received off hire dispatch notifications.  Termination did not occur until all three of these events occurred. Many vessels were laid off in August and September of 2010 and, although some were decontaminated, the owners were told that they were not released from the charters until they received off hire dispatch notifications.

76.     In most cases, off hire dispatch notifications were not received until after November 26, 2010.  The owners of these vessels did not return to fishing before receiving their off hire dispatch notification because they understood that they were still under hire until they received such notification.  Some VoO vessel owners did not receive off hire dispatch notifications until December, 2010 or January, 2011, and others still await vessel decontamination and/or receipt of off hire dispatch notification.

77.     Despite its detention of the VoO vessels through late November 2010 and beyond, BP (and/or agents or sub-contractors such as DRC) have refused to pay these vessel owners for the full charter term between the signing of the Charter Agreement and vessel decontamination, receipt of the off hire dispatch notification, and their vessels being returned to their moorings, during which time they were unable to return to their livelihoods.

78.     Many of the VoO vessels sustained substantial physical damage as the result of their participation in the VoO program.   The oil remediation efforts required of the vessels participating in the VoO program required the vessels to navigate through oil contaminated waters, staining propellers, rudders, and engines.

79.     Initially, BP (and/or agents or sub-contractors such as DRC) instructed the VoO vessel owners that their vessels would regularly undergo decontamination when they returned to shore on standby.   However, although large commercial vessels regularly underwent decontamination, VoO vessels did not.   As a result, large quantities of oil and other toxins accumulated on and in the VoO vessels.

80.     When decontamination was finally performed on some of the VoO vessels, the procedure was often performed inadequately, without full environmental protection, causing damage to the VoO vessels, their hulls, decks, equipment and/or other appurtenances.

81.     Because the vessels remained covered in oil and chemicals for weeks and, in some cases, months and even more than a year before decontamination, oil hardened like a varnish on hulls and decks of the vessels so that when decontamination was finally performed, the removal of the contaminants would cause paint to peel from the hulls, decks, equipment and appurtenances of the vessels.   Further, the Coast Guard did not permit vessels to return to the water until the vessel received a letter confirming that it had been decontaminated.

82.     In addition, BP (and/or agents or sub-contractors such as DRC) installed oil containment equipment for oil remediation on the back of VoO vessels and, when that equipment was removed, the decks were often damaged with holes and dents.   BP (and/or

agents or sub-contractors such as DRC) have failed to compensate the VoO vessel owners for this vessel damage.

83.     BP (and/or agents or sub-contractors such as DRC) have failed to pay VoO vessel owners for the period during which their vessels were inoperable due to vessel damage from oil containment operations, inadequate decontamination, and/or damage due to removal of BP equipment, and/or have otherwise failed to compensate the VoO Plaintiffs per the terms of the Charter Agreement, and/or have otherwise, upon information and belief, withheld compensation contingent upon the execution of a full and final release of all spill-related damages and claims.

84.     Some VoO program captains, crew and workers completed a four-hour worker safety training program.  Successful completion of the program resulted in the issuance of a "Petroleum Education Card."

85.     If BP (and/or agents or sub-contractors such as DRC) deemed that a vessel would come in contact with oil, it need only be staffed with one person who had completed a forty-hour Occupational Safety and Health Administration ("OSHA") Hazardous Waste Operations and Emergency Response awareness training class.

86.     BP (and/or agents or sub-contractors such as DRC) required vessels working near the source of the Oil Spill to provide crewmembers with respirators and appropriate training and fitting, but claimed that no VoO vessels would be deployed near the source.

      **C.     The Use of Chemical Dispersants**

87.     In addition to directing vessels at sea, BP coordinated and directed aircraft owned and/or operated by others to fly out over the Gulf to spot oil slicks and to spray chemical dispersants to oil on the surface of the Gulf.

88.     In addition to the VoO Program, Onshore Plaintiffs were hired by BP, DRC, and other BP clean up and response contractors, to clean up beaches, marshes, wetlands and other onshore areas by removing polluted sand, collecting tarballs, laying or collecting boom, hand-applying dispersant in inland areas, and other related clean-up efforts.

89.     Upon information and belief, immediately after the *Deepwater Horizon* disaster, on or about April 23, 2010, BP began subsea and aerial application of chemical dispersants, including a highly toxic form of chemical dispersant Corexit manufactured by Nalco Company, to the resulting oil slicks and sheens on the surface of the Gulf.

90.     Generally, the United States Oil Spill National Contingency Plan permits spraying of chemical dispersants at least 3 miles offshore or where the water is at least 10 meters deep.  The Coast Guard's Federal On Site Coordinator (the "On Site Coordinator") must approve BP's requests to use chemical dispersants.

91.     The Material Safety Data Sheet ("Data Sheet") – a form that sets forth the properties of a particular substance, including its toxicity and health effects - for Nalco's Corexit® 9500, one of the chemical dispersants used by BP, indicates that it contains the following hazardous substances: petroleum distillates, propylene glycol and organic sulfonic acid salt.  The Data Sheet for Nalco's Corexit® 9500 states that it is harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided.

92.     The Data Sheet for Nalco's Corexit® EC9527A, another chemical dispersant used by BP, indicates that it contains the following hazardous substances: 2-butoxyethanol (EGBE), organic sulfonic acid salt and propylene glycol.  The Data Sheet for Nalco's Corexit® EC9527A states that it is harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided.

93.     Both Nalco's Corexit® products used by BP contain non-specified organic sulfonic acid salt, which is "moderately toxic."

94.     On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA") Administrator directed BP within 24 hours of issuance to identify and to change to chemical dispersants that are less toxic than Nalco's Corexit® dispersants BP had been using.

95.     On May 20, 2010, BP objected to changing dispersants and notified the EPA that it would continue using Nalco's Corexit®.

96.     BP's use of chemical dispersants skyrocketed: on May 22, 2010, BP used 45,000 gallons and on May 23, 2010, it used 70,000 gallons.

97.     On May 26, 2010, the EPA directed BP to reduce overall use of Nalco's Corexit® by 75%.  The May 26, 2010 EPA directive also required BP to eliminate use of chemical dispersants on the surface except in rare cases where an exemption is sought in writing from and approved by the On Site Coordinator.

98.     Since the May 26, 2010 EPA directive, BP sought more than 40 exemption requests to use chemical dispersants on the surface of the Gulf of Mexico.

99.     According to the Aerial Dispersants Operations – Houma Status Report, as of June 26, 2010, BP had applied 933,023 gallons by aerial application.  BP ordered the application by 386 flights, or sorties, as of that same date.  BP has covered approximately 291 square miles of the Gulf with dispersant.  As of June 26, 2010, 718,454 gallons of Nalco's Corexit® 9500 had been sprayed on the Gulf and 214,569 gallons of Nalco's Corexit® 9527.  Upon information and belief, BP stopped using Nalco's Corexit® 9527 on May 23, 2010, when supplies allegedly ran out.

100.    According to the Aerial Dispersants Operations – Houma Status Report, as of June 26, 2010, BP made use of at least 10 spray aircraft and eight spotter aircraft.  At least six spray planes left from Stennis International Airport in Alabama.  At least four spray planes left from Houma, Louisiana.

101.    Upon information and belief, aerial dispersant sorties also would leave from airfields in Florida and were conducted and orchestrated by BP.  Upon information and belief, immediately after the *Deepwater Horizon* sinking, on or about April 23, 2010, BP also began authorizing the application of chemical dispersants manufactured by other companies, including JMN, PES and Acme, to contaminated vessels, containment equipment and near-shore and onshore areas to disperse the oil and clean vessels and equipment.

102.    The Data Sheet for PES's PES51™ indicates that it contains Cyclohexene,1-methyl-4-(1-methylethenyl)-, (4R) (CAS No. 5989-27-5).  The Data Sheet for PES's PES51™ states that it is should be handled with gloves and that it is moderately flammable and poses a slight risk to human health.  It is an irritant and dermal exposure and ingestion should be avoided.

103.    The Data Sheet for JMN and Acme's OMI-500® indicates that it contains Propylene Glycol T-Butyl Ether and nonionic surfactants.  The Data Sheet for JMN and Acme's OMI-500® states that it is harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided.

       **D.    Plaintiffs' Exposure to Harmful Chemicals**

104.    Upon information and belief,  VoO Plaintiffs were working on boats, which were part of the VoO Program, that were dispatched to lay boom to absorb the oil, or to haul in

27

oil saturated booms, or to skim oil from the surface of the Gulf, or to assist with in-*situ* burning, among other activities.  In this capacity, Plaintiffs were exposed to crude oil, chemical dispersants, crude oil mixed with chemical dispersants, and/or other harmful chemicals.  In many instances, workers got sea water mixed with crude oil, chemical dispersants, and/or other harmful chemicals on their skin.  They also inhaled fumes from the crude oil, chemical dispersants, and/or other harmful chemicals.

105.    Because Plaintiffs working on VoO vessels were not deemed by BP to be working near the source of the Oil Spill, they were not outfitted with respirators or equivalent safety devices.

106.    Upon information and belief, some VoO Plaintiffs attempted to use respirators and masks not supplied by BP (and/or agents or sub-contractors such as DRC) and were prevented by BP (and/or agents or sub-contractors such as DRC), as well as threatened with loss of VoO wages, if they wore respirators.

107.    Upon information and belief, when VoO Plaintiffs spotted oil slicks, they were instructed to contact BP directly and to provide BP with the coordinates of the slick.  Upon receiving this information, BP caused the dispatch of a spray plane from an airfield to the coordinates given and instructions to the pilot to spray the chemical dispersant from its cargo hold.

108.    Upon information and belief, the VoO Plaintiffs were not given warning, or were given insufficient warning, by BP of the plane's approach and were either directly or indirectly in the path of the spray zone, and/or the chemical dispersant spray drifted over the VoO Plaintiffs.

109.    Upon information and belief, VoO Plaintiffs in the vicinity of aerial spraying had also not received warning of aerial dispersant missions and BP had caused VoO Plaintiffs to come into contact by inhalation, ingestion, and dermal exposure with dispersants and oil/dispersant mixtures, oil and/or other harmful chemicals.

110.    Offshore Plaintiffs and Onshore Plaintiffs' primary tasks were to lay boom, haul boom, install other barriers, collect tar balls, remove polluted sand contaminated with oil and/or dispersants and other activities.  In this capacity, BP caused Offshore Plaintiffs and Onshore Plaintiffs to be exposed to crude oil by inhalation, ingestion, dermal (skin) absorption, and through contact with the eyes from spray mist.

111.    Upon information and belief, some Offshore Plaintiffs and Onshore Plaintiffs attempted to use respirators and masks while hauling boom, collecting tar balls, removing oil and/or dispersant-polluted sand and other activities, and were prevented by BP from doing so, as well as threatened with loss of their clean up jobs if they did not abide by the instruction.

112.    Decontamination Plaintiffs' tasks were to, *inter alia*, spray and clean vessels that came into contact with oil and dispersants and other harmful chemicals resulting from the Oil Spill and the application of dispersants, decontaminate oiled wildlife, and transport contaminated boom and other clean-up equipment and clean-up workers.   In this capacity, BP caused the Decontamination Plaintiffs to be exposed to crude oil and dispersants and other harmful chemicals by inhalation, ingestion, dermal exposure, and through contact with the eyes from spray mist.

113.    Resident Plaintiffs, due to the proximity of their homes and schools to the Gulf of Mexico, and the actions and omissions by BP, have been exposed to oil, dispersants, and other harmful chemicals and to fumes and odors from those chemicals.

114.    Non-resident Plaintiffs, due to their presence in the vicinity of the Gulf of Mexico, and the actions and omissions of BP, have been exposed to oil, dispersants, and other harmful chemicals and to fumes and odors from those chemicals.

115.    Upon information and belief, when the chemical dispersant came into contact with eyes, it caused irritation.  When the chemical dispersant came into contact with skin, VoO Plaintiffs, Onshore Plaintiffs, Decontamination Plaintiffs, Vessel Plaintiffs and some Resident Plaintiffs and Non-resident Plaintiffs complained of rashes, lesions and burns.

116.    Plaintiffs complained of the noxious odors and experience and of, *inter alia*, headaches, nausea, vomiting, respiratory problems, rashes and eye irritation, among other adverse health effects associated with exposure to chemicals in the environment resulting from the Oil Spill.

*The Crude Oil*

117.    The crude oil contains benzene and other volatile organic compounds ("VOCs") – chemical compounds that can affect the environment and human health -- such as ethylbenzene, toluene, xylene and naphthalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes and heavy metals such as aluminum, cadmium, nickel, lead and zinc.

118.    According to a presentation made in June 2010 to the Institute of Medicine of the National Academies entitled "Assessing the Human Health Effects of the Gulf of Mexico

Oil Spill: An Institute of Medicine Workshop," dermal exposure to certain VOCs in crude oil can cause, *inter alia*, redness, swelling, irritation, rashes and blisters on the skin and mucous membranes.  Inhalation exposure to certain VOCs in crude oil can cause, *inter alia*, ocular redness, soreness, watering and itching.  Inhalation exposure to certain other VOCs in crude oil can cause, *inter alia*, coughing, throat irritation, shortness of breath and wheezing.  Inhalation exposure to other VOCs in crude oil can also affect, *inter alia*, the nervous system causing nausea, vomiting, dizziness, irritability, confusion and weakness of extremities.  Ingestion of food or water containing VOCs from crude oil can cause, *inter alia*, nausea, vomiting and diarrhea.

119.    Chemicals such as benzene and PAHs are toxic components of crude oil and of grave concern.  These and many other chemicals in crude oil are volatile, moving from the oil into the air.  Once airborne, they can blow over the ocean for miles, reaching communities far from the spill.  They may be noticed as petroleum odors. Consequently, those individuals working on the spill response and people who live, work, visit or are otherwise in the vicinity of the Gulf of Mexico onshore could have been and can be exposed to crude oil chemicals in the air.

120.    According to the Agency for Toxic Substances and Disease Registry ("ASTDR"), which is part of the U.S. Department of Health and Human Services, benzene is a known mutagen and carcinogen.  Benzene in the crude oil can cause a variety of specific effects described in the recent Centers for Disease Control ("CDC") summary of benzene toxicity:  ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain and lethal central nervous system depression.

121.    A 2007 CDC review of benzene toxicity concluded that there is substantial human evidence that benzene causes leukemia.  It also reports aplastic anemia (a precursor of leukemia), chromosomal abnormalities in lymphocytes and bone marrow cells, damage to the immune system and abnormal development of blood cells.   When blood cells are deficient, this can cause other serious medical conditions, including infection due to a lack of leukocytes and increased cardiac stress due to a lack of erythrocytes.  Long term low level oral and inhalation exposures have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping and memory loss.

122.    As noted by Dr. Lisa Kaplowitz of the U.S. Department of Health and Human services, in her June 15, 2010 testimony before Congress:  "Oil can remain toxic in the environment for years."

*The Dispersants*

123.    The dispersants used by BP are known to cause, *inter alia*, headaches, nausea, vomiting, diarrhea, abdominal pains, dizziness, chest pains and tightness, irritation of the eyes, nose, throat and lung, decreased lung function, breathing difficulties, respiratory system damage, rapid breathing, asthma attacks, allergic reactions, skin irritation, damage, and sensitization, hypertension, damage to liver and kidneys, central nervous system depression, neurotoxic effects, damage to red blood cells, genetic damage and mutations, reproductive and developmental damage, immune system damage, cardiac arrhythmia, cardiovascular damage and increased severity of chronic obstructive pulmonary disease.

124.    BP used and, upon information and belief, continues to use the dispersants Corexit® 9500 and 9527 (more than 1.8 million gallons to date) to disperse the crude oil

on the surface of the Gulf of Mexico and to disperse the crude oil near the wellhead 5,000 feet below the surface of the Gulf of Mexico.

125.    Nalco's Data Sheet for Corexit® 9500 indicates that it contains petroleum distillates, propylene glycol and organic sulfonic acid salt.  The Data Sheet states that it is an eye and skin irritant.  It is harmful if inhaled, if ingested, or if it comes into contact with skin.   If it comes into contact with the eyes or skin it can cause irritation.  It is harmful if absorbed through the skin. If ingested, it may cause chemical pneumonia.  If inhaled, it may irritate the respiratory tract.

126.    Nalco's Data Sheet for Corexit® EC9527A indicates that it contains 2-butoxyethanol (EGBE), organic sulfonic acid salt and propylene glycol.  The Data Sheet states that it is an eye and skin irritant.  It is harmful if inhaled, if ingested, or if it comes into contact with skin.   If it comes into contact with the eyes or skin it can cause moderate irritation.   It is harmful if absorbed through the skin. If ingested, it may cause liver and kidney effects and/or damage, or irritate the gastrointestinal tract.  If inhaled, it may irritate the respiratory tract.  Acute exposure may cause adverse central nervous system effects, nausea, vomiting, anesthetic or narcotic effects.

127.    According to the New Jersey's EGBE Hazardous Substance Right to Know Fact Sheet, repeated or excessive exposure to EGBE may cause injury to red blood cells, the kidneys and the liver.  EGBE may be carcinogenic to humans.  It is an eye, nose and throat irritant.  It can cause nausea, vomiting, diarrhea and abdominal pain.  Exposure to EGBE can also cause headache, dizziness, lightheadedness and unconsciousness. Exposure to EGBE can damage a developing fetus, and chronic exposure may result in damage to the male and female reproductive systems in animals.

128.    Both Corexit® products used by BP contain non-specified organic sulfonic acid salt.

129.    Dioctyl sodium sulfosuccinate ("DSS") is an organic sulfonic acid salt.  DSS is irritating to the eyes and throat, and it may cause aspirin's gastrointestinal effects (mucosal damage) to be increased. It is absorbed from the gastrointestinal tract and excreted largely in bile.  Like many detergents, it has laxative effects.  DSS can increase the uptake of mineral oil and phenophthalein, suggesting that it may also increase the uptake of other oils and chemicals. The Hazardous Substances Data Bank reports that the American Medical Association's Council on Drugs identified docusate salts as potentially being toxic to the liver and describes DSS as "moderately toxic."

130.    Corexit® 9500 contains hydrotreated light petroleum distillates, which are believed to be very similar to kerosene.  According to the CDC's profile for kerosene, it is a toxic fuel with extensive information regarding acute and chronic health effects. Kerosene can enter the body when it is absorbed through the skin, or through inhalation or ingestion.  It is poorly absorbed in the gastrointestinal system.  Kerosene can cause serious immediate respiratory health problems if substantial amounts are inhaled. In addition, inhalation or dermal exposure to kerosene can cause bronchoconstriction, which is relevant to asthmatics and other people with respiratory disorders.  Kerosene can damage the skin directly, causing blisters, erythema, peeling skin, reddening, soreness, burning, swelling and other damage.  Kerosene vapors can cause eye irritation.  Dermal exposure has caused hyperactivity and hyper-responsiveness to tactile stimulation.  Oral exposure to kerosene can cause vomiting, abdominal pain, gastroenteritis, bleeding and diarrhea.

131.    Propylene glycol has solvent properties and is used as a solvent in many applications.  It is present in both Nalco's Corexit® products used by BP   According to the ASTDR, propylene glycol is a mild irritant, and its role as an allergic dermal sensitizer is not resolved.   Exposure to high levels of propylene glycol and mists containing this chemical can cause eye, nose, throat and lung irritation.  Some people are allergic to this chemical, and those with eczema may be at higher risk.  Erythema, edema, induration and other skin problems have been reported.

132.    Although not listed as a separate ingredient of the dispersants, when the dispersants are manufactured, a byproduct is formed at that time: 1,4 dioxane.  According to the Agency for Toxic Substances and Disease Registry, exposure to high levels of 1,4 dioxane can result in liver and kidney damage and death.  Inhalation of low levels of 1,4 dioxane can irritate the eyes and nose.  The U.S. Department of Health and Human Services reasonably anticipates that exposure to 1,4 dioxane causes cancer.   The California Environmental Protection Agency lists 1,4 dioxane as a known carcinogen.

133.    The Data Sheet for PES's PES51™ indicates that it contains Cyclohexene,1-methyl-4-(1-methylethenyl)-, (4R) (CAS No. 5989-27-5).   The Data Sheet for PES's PES51™ states that it is should be handled with gloves and that it is moderately flammable and poses a slight risk to human health.  It is an irritant and dermal exposure and ingestion should be avoided.

134.    The Data Sheet for JMN and Acme's OMI-500® indicates that it contains Propylene Glycol T-Butyl Ether and nonionic surfactants.  The Data Sheet for JMN and Acme's OMI-500® states that it is harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided.

135.    JMN and Acme's OMI-500® can be irritating to skin and eyes. High concentrations of vapor may cause irritation of the respiratory tract, experienced as nasal discomfort and discharge, possibly with chest pain and coughing. Headache, nausea, vomiting, dizziness, and drowsiness may occur. JMN and Acme's OMI-500® may cause mild to severe irritation experienced as discomfort or pain, excess blinking and tear production, possibly with marked redness and swelling of the conjunctiva. Brief contact with JMN and Acme's OMI-500® may cause slight irritation with itching and local redness. Prolonged contact, especially with concentrate, may cause more severe irritation, with discomfort or pain. Swallowing JMN and Acme's OMI-500® may cause headache, dizziness, in-coordination, nausea, vomiting, diarrhea, and general weakness.

### E.    Willful and Wanton Conduct of the Defendants

136.    Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* and during the subsequent attempt to clean the Oil Spill.   As demonstrated by the examples below, and by the foregoing factual allegations, Defendants' conduct evinced an ongoing willful, wanton, or reckless disregard for and indifference toward the safety of the people in the Gulf States and the environment of the Gulf of Mexico.

137.    Defendants BP and Transocean recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout.

138.    Defendants BP and Transocean recklessly, willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be

readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico and to prevent injuring Plaintiffs.

139.    Defendants recklessly, willfully and/or wantonly failed to use reasonably safe dispersant chemicals or other chemicals in their attempts to respond to the Oil Spill, and thereby exacerbated the pollution of the Gulf of Mexico and injury to Plaintiffs.

140.    Defendants, by their conscious and/or deliberate unreasonable acts and/or omissions complained of herein, and/or as the evidence may show, displayed gross negligence, reckless indifference, willfulness and/or wantonness.

### F.    Defendants' Knowledge Of The Risks

141.    OSHA, which promulgates regulations to protect worker safety in certain contexts, including hazardous waste activities and emergency responses, alerted the Coast Guard about its concerns over significant deficiencies in BP's Oil Spill response operations relating to worker safety.  OSHA repeatedly raised these concerns with BP as early as May 2010, but remained frustrated that BP did not address the most serious problems.

142.    Commercial fishing vessels and other vessels that made up the majority of the volunteer response vessels were not otherwise subject to inspection by the Coast Guard, and the captains and crew were not customarily trained to recognize or to avoid health hazards in the context of an oil spill.  Using these types of vessels is not unknown in response efforts, but proper OSHA training is required to adequately assess and avoid risks.

143.     Uninspected fishing vessels being used in response actions without training and inspection subjected the captains and crews to exposure to harmful chemicals found in crude oil and chemical dispersants.

144.     BP, aware of the risks that VoO and other response vessels would face, ignored worker safety concerns, even in the face of OSHA warnings and notification by the Department of Health and Human Services that VoO workers and other offshore and onshore clean-up workers were complaining of illnesses after being exposed to oil and dispersants.

145.     At all times relevant to this litigation, Defendants knew or should have known that:

      a.      crude oil contains chemicals hazardous to human health and to the environment and ecosystems;

      b.      chemical dispersants contain chemicals hazardous to human health and to the environment and ecosystems;

      c.      Plaintiffs should be adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances which they contain, which are being released into the environment; and

      d.      Plaintiffs should wear proper protective clothing and respirators when engaging in clean-up activities.

146.     The Oil Spill and the resulting contamination and use of chemical dispersants have caused and will continue to cause harm to people living and working in the Gulf States and the Gulf of Mexico.

## V.     DAMAGES AND OTHER RELIEF REQUESTED

147.     As a result of Defendants' acts or omissions, Plaintiffs have suffered and continue to suffer the following physical injury damages:

      a.      Exposure to chemicals in crude oil that have caused and/or continue to cause adverse health effects;

b.      Exposure to chemicals in weathered crude that have caused and/or continue to cause adverse health effects;

c.      Exposure to chemicals in dispersants that have caused and/or continue to cause adverse health effects;

d.      Exposure to chemicals in oil and dispersant mixtures that have caused and/or continue to cause adverse health effects;

e.      Exposure to other harmful chemicals from clean-up activities; and

f.      Costs incurred and inconvenience sustained in obtaining medical treatment and future medical treatment for exposure to chemicals.

148.   Plaintiffs have suffered a discernible physical injury from exposure to oil, dispersants, and/or oil and dispersant mixtures.

149.   Plaintiffs also demand injunctive and equitable relief and further, that Defendants be ordered to provide continued environmental, water supply, food supply, and air monitoring for Plaintiffs.

150.   Plaintiffs will suffer irreparable harm if the Court does not render the medical monitoring relief set forth in more detail in the Second Amended Master Complaint, and if Defendants are not ordered to create, fund and support a medical monitoring program.

151.   As a result of Defendants' acts or omissions, some Plaintiffs have suffered emotional distress caused by concern over exposure to chemicals.

## VI.    CLASS ALLEGATIONS

152.   Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated as members of a proposed Class pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, adequacy, typicality and commonality requirements of Rule 23(a), and the predominance and superiority requirements of Rule 23(b)(3).

153.    Plaintiffs seek certification of a Class.  The Class is defined as all persons who have been exposed to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill.  The Class definition is subject to refinement as events unfold and discovery proceeds.

154.     The Class is defined as follows: all persons who have been exposed to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill, which is comprised of:

  a.    All persons who have been exposed to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill and who presently have discernible physical injuries.

  b.    All persons who have been exposed to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill but who yet have no manifestation of physical injuries.

  c.    All persons who have been exposed to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill and whose real or personal property has been damaged as a result.

155.    Excluded from the Class are (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns and successors; and (2) the judge to whom this case is assigned and any member of the judge's immediate family.

    A.    Numerosity

156.    On information and belief, the Class consists of thousands of individuals who reside or work in the vicinity of the Gulf States and the Gulf of Mexico, participated in oil spill clean-up activities or visited an area in the vicinity of the Gulf of Mexico and came into contact with oil, dispersants and/or other harmful chemicals from the oil spill, and have been injured by Defendants, making joinder impracticable.

40

### B.  Typicality

157.   The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class members, have been placed at risk of adverse health effects and/or contractual damages and/or property damage proximately caused by exposure to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill.

158.   Furthermore, the factual bases of Defendants' misconduct are common to all Class members and represent a common thread of misconduct resulting in injury to all members of the Class.

### C.  Adequacy

159.   Plaintiffs will fairly and adequately represent and protect the interest of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting environmental, mass tort and complex class actions, including actions involving environmental contamination.

160.   Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

### D.  Commonality and Predominance of Common Issues

161.   There are numerous questions of law and fact common to all Class members, and those questions predominate over any questions that may affect only individual Class members that satisfy the requirements of Rule 23(a)(2) and 23(b)(3).   Defendants subjected the Class members to the same unlawful conduct.

162.   The predominant, common questions include the following:

a.  Whether BP was negligent in the use of dispersants and/or other hazardous chemicals;

b.  Whether Defendants' release of oil, dispersants and/or other hazardous chemicals is a public nuisance;

c.  Whether Defendants recklessly, willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico and to prevent injuring Plaintiffs;

d.  Whether BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its attempt to respond to the Oil Spill, and thereby exacerbated the pollution of the Gulf of Mexico and injury to Plaintiffs;

e.  Whether Defendants, by their conscious and/or deliberate unreasonable acts and/or omissions complained of herein, and/or as the evidence may show, displayed gross negligence, reckless indifference, willfulness and/or wantonness;

f.  Whether Defendants should be liable for the costs of future medical screening and monitoring;

g.  Whether BP's use of dispersants as part of their response activities constitutes a battery; and

h.  Whether BP was negligent in failing to warn against harm that could occur if its dispersants were used in the manner contemplated by BP.

i.  Whether BP is responsible for the compensation of all Vessel of Opportunity vessel owners, captains, workers and other clean-up workers involved in the response pursuant to 33 U.S.C. §2702(b).

j.  Whether BP (and/or agents or sub-contractors such as DRC) breached the terms of the Charter Agreements entered into with VoO Plaintiffs, and whether those Defendants are liable for the economic losses caused by such breach.

### E.    Superiority

163.    Absent class treatment, Plaintiffs and members of the Class will continue to suffer

harm as a result of Defendants' unlawful and wrongful conduct.

164.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Without a class action, individual Class members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights.  Because of the ratio of the economic value of the individual Class members' claims in comparison to the high litigation costs in complex environmental mass torts cases such as this litigation, few could likely seek their rightful legal recourse.  Absent a class action, Class members would continue to incur harm without remedy.

165.    The consideration of common questions of fact and law will conserve judicial resources and promote a fair and consistent resolution of these claims.

### F.    Federal Rules Relating to Class Actions

166.    The various claims asserted in this action are certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) because prosecuting separate actions by or against individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party opposing the Class; or adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other Class Members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

167.    The claims for injunctive relief in this case are certifiable under Fed. R. Civ. P. 23(b)(2).  Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief is appropriate respecting the Class as a whole.

168.    The common questions set forth above predominate over Class Members' individual issues.

169.    A class action is superior to other methods of dispute resolution in this case.  The Class Members have an interest in class adjudication rather than individual adjudication because of the overlapping rights.  It is highly desirable to concentrate the resolution of these claims in this single forum because it would be difficult and highly unlikely that the affected Class Members would protect their rights on their own without this class action case.  Management of the Class will be efficient and far superior to the management of individual lawsuits.

## VII.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Negligence Under General Maritime Law

(All Plaintiffs v. Drilling Defendants)

170.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.  Plaintiffs further reallege each and every factual allegation contained within the Amended B1 Master Complaint, in accordance with Paragraph 18 of PTO No. 25.

171.    At all times material hereto, Drilling Defendants were participating in drilling operations onboard the Deepwater Horizon in the Gulf of Mexico.

172.    At all times material hereto, Drilling Defendants owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the drilling operations of the *Deepwater Horizon* and the maintenance of the vessel, its appurtenances and equipment, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of an oil spill.

173.    The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.[1] The blowout and explosions on the *Deepwater Horizon,* its sinking and the resulting Spill were caused by the joint and concurrent negligence of Drilling Defendants.

## SECOND CLAIM FOR RELIEF

### General Maritime

### (Medical Monitoring As an Element Of Damages[2])

### (All Plaintiffs v. Drilling Defendants)

174.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

175.    VoO Plaintiffs were injured while acting under the Charter Agreement with BP (and/or agents or sub-contractors such as DRC) as set forth herein.  Decontamination Plaintiffs, Offshore Plaintiffs, Onshore Plaintiffs, Resident Plaintiffs, and Non-resident Plaintiffs were injured as a direct result of Defendants' negligence during the Oil Spill and Oil Spill Response.

176.    Plaintiffs have been exposed to greater than normal background levels of the oil, dispersants, and/or other hazardous chemicals used for combating or resulting from the Oil Spill.

---

[1] Although this Court has dismissed Plaintiffs' state law claims, Plaintiffs reallege them here out of an abundance of caution to preserve the claims for potential appeal.
[2] Although this Court has dismissed the medical monitoring claims alleged by those Plaintiffs without manifest injury, Plaintiffs reallege these claims here out of an abundance of caution to preserve the claims for potential appeal.

177.   The oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill are proven hazardous, dangerous, or toxic substances, to which Plaintiffs have been exposed.

178.   Plaintiffs' exposure may lead to serious health problems, diseases, and medical conditions that may be prevented or minimized by timely medical diagnosis and treatment.   Indeed, many Plaintiffs have experienced headaches, nausea, vomiting, respitory problems, rashes, lesions, and chemical burns.

179.   The method and means for diagnosing the Plaintiffs' potential medical problems are well-accepted in the medical and scientific community and will be of great benefit to Plaintiffs by preventing or minimizing health problems that Plaintiffs may encounter as a result of the Oil Spill and from dispersants used to attempt to clean the Oil Spill.

180.   As a proximate result of Plaintiffs' exposure to oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill, Plaintiffs have developed a significantly increased risk of contracting a serious latent disease.

181.    Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

182.   The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

183.   Plaintiffs have required medical treatment as a result of injuries caused by exposure to oil and/or chemical dispersants and other hazardous chemicals used to combat or resulting from the Oil Spill and have not reached maximum medical improvement.

184.    Defendants have denied such payment and/or have paid benefits in an insufficient amount.

185.    As a result of Defendants' failure to pay and/or delay in timely providing and/or paying the proper amount, Plaintiffs have suffered further injuries and damages.

186.    Defendants' failure to provide benefits has been callous, willful, wanton, or otherwise tortuous, for which punitive damages are recoverable.

187.    Defendant are also liable for all reasonable and necessary attorney's fees and costs incurred on Plaintiffs' behalf in seeking to secure proper benefits.

### THIRD CLAIM FOR RELIEF

### Negligence

### (All Plaintiffs v. Drilling Defendants)

188.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

189.    BP took control and directed all aspects of the recovery and relief effort to attempt to contain the Oil Spill, prevent oil from damaging the Gulf of Mexico and the shoreline, and to clean up the damage caused to date.  BP owed a duty to Plaintiffs, as well as to all persons who might foreseeably be harmed, to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.  BP failed to exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

190.    At all times relevant to this litigation, Defendants knew or should have known that:

      a.    crude oil contains chemicals hazardous to human health and to the environment and ecosystems, and can also damage personal property;

b.    chemical dispersants contain chemicals hazardous to human health and to the environment and ecosystems, and can also damage personal property;

c.    Plaintiffs should be adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances which they contain, which were and are being released into the environment; and

d.    Defendants' failure to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures would result in harm to Plaintiffs.

191.    Defendants' conduct fell below the duty of care owed to Plaintiffs amounting to a breach of that duty.  The existence and breach of these legal duties are established under the general maritime law and state laws,[3] as deemed applicable herein.  Defendants owed Plaintiffs the following duties:

a.    a duty to warn Plaintiffs, public officials, and government agencies of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous chemicals they contain;

b.    a duty to properly train and equip Plaintiffs to avoid exposure to hazardous substances encountered in connection with relief efforts;

c.    a duty to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

d.    a duty to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of vessels and crewmembers being exposed to aerial chemical dispersants; and

e.    a duty to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Plaintiffs.

---

[3] Although this Court has dismissed Plaintiffs' state law claims, Plaintiffs reallege them here out of an abundance of caution, and to preserve the claims for potential appeal.

192.    Plaintiffs suffered injury and loss as a result of Defendants' breach of their aforementioned duties.   Specifically, Defendants breached their duties owed to the Plaintiffs by:

a.    failing to warn the Plaintiffs, public officials, and government agencies of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous substances which they contain, which have come into contact with Plaintiffs' persons and the local environment and ecosystems;

b.    failing to properly train and equip Plaintiffs to avoid exposure to hazardous substances encountered in connection with relief efforts;

c.    failing to abide by the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and in shallow waters;

d.    failing to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of vessels and crewmembers being exposed to aerial chemical dispersants;

e.    failing to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Plaintiffs; and

f.    causing property damage to the vessels involved in the VoO program, and failing to properly administer and provide payment for work, hire, time, storage, incidentals, and/or property damage to those entities and workers participating in the VoO program.

193.    All of Plaintiffs' damages were caused in fact by Defendants' breach of their duties.

194.    Defendants' breach of their duties posed an unreasonable risk of harm to Plaintiffs.

195.    Defendants are liable in ordinary negligence to Plaintiffs.

196.    The danger and risk of harm to Plaintiffs was reasonably foreseeable.

197.    Defendants' breach of their duties was the direct and proximate cause of all of Plaintiffs' damages, and Defendants are liable therefor, including specifically, but not limited to, the damages the VoO Plaintiffs have suffered, *inter alia*, damages associated with loss and/or diminution of their personal property caused by their participation in the VoO program administered by BP in response to the Spill.

## FOURTH CLAIM FOR RELIEF

## <u>Gross Negligence</u>

## (All Plaintiffs v. Drilling Defendants)

198.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

199.    Defendants owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the manufacture, maintenance and operation of the *Deepwater Horizon*, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of the Oil Spill which occurred herein.  The existence and breach of these legal duties are established under the general maritime law and state law[4] as deemed applicable herein.

200.    Defendants have taken control and responsibility for all aspects of the recovery and relief effort to attempt to contain the Oil Spill, prevent oil from damaging the Gulf of Mexico and the shoreline, and to clean up the damage caused to date, including the use of chemical dispersants.  Defendants owed and breached a duty to Plaintiffs, as well as to all persons who might foreseeably be harmed, to exercise due care in the operation,

---

[4] Although this Court has dismissed Plaintiffs' state law claims, Plaintiffs reallege those claims here out of an abundance of caution, and to preserve the claims for potential appeal.

maintenance, handling, design, implementation and execution of the relief and recovery measures.   The existence and breach of these legal duties are established under the general maritime law and state law[5] as deemed applicable herein.

201.    Defendants had a heightened duty of care to Plaintiffs because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals.

202.    Defendants breached their legal duty to Plaintiffs and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent failure to contain the Oil Spill.

203.    Defendants knew or should have known that their wanton or reckless conduct would foreseeably cause Plaintiffs' injury and/or property damage.

204.    As a direct and proximate cause of Defendants' willful, wanton and reckless acts, Plaintiffs have suffered physical injuries and/or property damage and/or economic loss.

205.    Defendants' willful, wanton and reckless conduct, as described herein, entitles Plaintiffs to punitive damages.  The amount of punitive damages recoverable by Plaintiffs is not lawfully limited to the amount of their compensatory damages, but rather should be a multiplier of same sufficient to both punish Defendants and deter similar wrongdoing in the future.

---

[5] Although this Court has dismissed Plaintiffs' state law claims, Plaintiffs reallege those claims here out of an abundance of caution, and to preserve the claims for potential appeal.

## FIFTH CLAIM FOR RELIEF

### Negligence *Per Se*

### (All Plaintiffs v. Drilling Defendants)

206.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

207.   Defendants' conduct with regard to the manufacture, maintenance and/or operation of drilling operations and oil vessels such as the *Deepwater Horizon*, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by numerous state and federal laws and permits issued under the authority of these laws.  These laws and permits create statutory and regulatory standards that are intended to protect and benefit Plaintiffs, including, but not limited to, those set forth in Section 311 of the Clean Water Act, 40 C.F.R. § 300 App. E, 30 C.F.R. Part 254 and the Oil Pollution Act, 33 U.S.C. § 2717(b) (the "OPA"),[6] and regulations that govern the National Oil and Hazardous Substances Contingency Plan, *see, e.g.*, 40 C.F.R. § 300.150.

208.   Response actions under the National Contingency Plan must comply with provisions for response actions under 29 C.F.R. § 1910.120.  These regulations impose upon Defendants a standard of care to which Defendants did not adhere

209.   In addition to the allegations of statutory and regulatory violations made elsewhere in this Complaint, the federal Bureau of Safety and Environmental

---

[6] Although this Court has held that provisions of the Clean Water Act and Oil Pollution Act are not relevant to the claims set forth herein, Plaintiffs reallege claims under these provisions out of an abundance of caution, and to preserve potential issues for appeal.

Enforcement ("BSEE") found that Drilling Defendants violated the following federal regulations:

> a.      BP, Transocean, and Halliburton failed to protect health, safety, property, and the environment by failing to perform all operations in a safe and workmanlike manner, in violation of 30 C.F.R. § 250.107(a)(1);

> b.      BP, Transocean, and Halliburton did not take measures to prevent unauthorized discharge of pollutants into offshore waters, in violation of 30 C.F.R. § 250.300;

> c.      BP, Transocean, and Halliburton failed to take necessary precautions to keep the well under control at all times, in violation of 30 C.F.R. § 250.401(a);

> d.      BP did not cement the well in a manner that would properly control formation pressures and fluids and prevent the direct or indirect release of fluids from any stratum through the wellbore into offshore waters, in violation of 30 C.F.R. §§ 250.420(a)(1) and (2);

> e.      BP failed to conduct an accurate pressure integrity test, in violation of 30 C.F.R. § 250.427;

> f.      BP and Transocean failed to maintain the *Deepwater Horizon*'s BOP system in accordance with the American Petroleum Institute's Recommended Procedure 53 section 18.10.3, in violation of 30 C.F.R. § 250.446(a);

> g.      BP failed to obtain approval of the Temporary Abandonment procedures it actually used at the Macondo well, in violation of 30 C.F.R. § 250.1721(a);

> h.      BP failed to conduct an accurate pressure integrity test at the 13-5/8" liner shoe, in violation of 30 C.F.R. § 250.427; and

> i.      BP failed to suspend drilling operations at the Macondo well when the safe drilling margin identified in the approval application for permit to drill was not maintained, in four separate violations of 30 C.F.R. § 250.427(b).

210.    Defendants' violations of these statutory and/or regulatory standards constitute negligence *per se* under federal law, as well as general maritime law, Louisiana, Texas, Mississippi, Alabama and Florida law.

211.    Defendants had actual and/or constructive knowledge of the facts and circumstances leading to and causing the incidents described herein which in turn caused

Plaintiffs' injuries and their actions and inactions were grossly negligent, reckless, willful and/or wanton.

212.   As a direct and proximate cause of Defendants' violation of statutory and/or regulatory standards, the Plaintiffs have suffered physical injuries and/or property damage.

**SIXTH CLAIM FOR RELIEF**

**Breach of Contract**

**(VoO Plaintiffs v. VoO Contract Defendants)**

213.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

214.   As the Responsible Party, BP is responsible for all response and removal costs, pursuant to 33 U.S.C. §2702(b).

215.   VoO Plaintiffs who are vessel owners and who participated in the VoO program entered into a Charter Agreement that BP drafted and required to be used to participate in the VoO Program, whether the VoO Plaintiff contracted directly with BP or a contractor of BP, under which BP chartered or caused to be chartered their vessels pursuant to the VoO program.

216.   Pursuant to the Charter Agreement, BP agreed that the general maritime laws of the United States should govern "all matters of construction, validity and performance" of the Charter Agreement.

217.   The Charter Agreement was subsequently amended by letter agreement, stipulation and/or court order, said amendments applying retroactively to the date of the initial signing of the Charter Agreement.

218.    Under the Charter Agreement, BP, directly and/or thru agents or sub-contractors such as DRC, agreed to pay VoO Plaintiffs from the time they were activated on hire until the time they were taken off hire.  A vessel was not off hire until it received off-hire dispatch notification, was properly decontaminated, and was returned to moorings.

219.    BP, directly and/or thru agents or sub-contractors such as DRC, placed, or caused to be placed, VoO Plaintiffs on hire and received the benefit of VoO Plaintiffs' services. BP (and/or agents or sub-contractors such as DRC) did not properly off-hire VoO Plaintiffs; some did not receive sufficient decontamination, while many did not receive timely off-hire dispatch notification.

220.    BP (directly and/or thru agents or sub-contractors such as DRC) refused and continue to refuse payment for time owed under the Charter Agreements.

221.    The refusal of BP to pay amounts owed to the VoO Plaintiffs under Charter Agreements either directly with BP or with a BP agent or contractor is a breach of contract for which BP is liable.

222.    The refusal of DRC to pay amounts owed under the DRC Charter Agreements is a breach of contract for which DRC is liable.


## SEVENTH CLAIM FOR RELIEF

### Nuisance[7]

### (All Plaintiffs v. Drilling Defendants)

223.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here

---

[7] Although this Court has dismissed Plaintiffs' general maritime law nuisance claims, Plaintiffs reallege them here out of an abundance of caution, and to preserve the claims for potential appeal.

224.   The oil spill disaster has significantly interfered with the public's right to use and enjoy the Gulf of Mexico without oil slicks, chemical dispersants, tar balls, and other associated pollution.

225.   Prior to the *Deepwater Horizon* disaster, Plaintiffs enjoyed the use of the Gulf of Mexico for fishing, boating, and other economic and recreational pursuits, including residing on the Gulf of Mexico.

226.   Since the disaster, Plaintiffs have been unable to fish or boat, and many have lost their livelihoods.

227.   As a direct and proximate cause of the oil disaster, and VoO, Decontamination, Offshore Vessel, and Onshore Plaintiffs' work to assist in the relief effort, these Plaintiffs were exposed to harmful chemicals in the crude oil and in the chemical dispersants at levels, amounts, and under conditions different from the general public.

228.   As a result of the oil disaster, Resident Plaintiffs are constantly exposed to harmful chemicals in the air from oil, dispersants, and/or other harmful chemicals resulting from the Oil Spill at levels, amounts, and under conditions greater than from the general public.

229.   Moreover, all Plaintiffs are subjected to foul and harmful odors emanating from the crude oil soaked booms and/or the chemical dispersants.

230.   Plaintiffs have no adequate remedy at law.

231.   There exists an imminent likelihood of irreparable harm if an injunction is not issued.

232.   The threatened harm to the Plaintiffs and class members outweighs any potential harm to Defendants.

233.    Granting an injunction does not contravene a substantial public interest.

234.    Plaintiffs have a substantial likelihood of success based on the allegations, and Plaintiffs' allegations are likely to be proven and are not merely speculative.

235.    Plaintiffs are entitled to judgment finding Defendants liable to Plaintiffs for damages, including costs of future medical screening and monitoring, for the creation of a public nuisance and a judgment for injunctive relief to abate the nuisance.  Plaintiffs allege that these entitlements arise under the common law of their respective states, as well as general maritime law.

## EIGHTH CLAIM FOR RELIEF

### Battery[8]

### (VoO and Vessel Plaintiffs v. BP Defendants)

236.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here

237.    BP placed VoO Plaintiffs, Vessel Plaintiffs, and Decontamination Plaintiffs on and around vessels without adequate training, warning of risks, or safety equipment.

238.    BP intentionally sprayed, and/or directed spraying, chemical dispersants in the immediate vicinity of VoO Plaintiffs, Vessel Plaintiffs, and/or Decontamination Plaintiffs.

239.    BP's spraying of chemical dispersants in the immediate vicinity of Plaintiffs without warning or safety equipment has caused some Plaintiffs to be exposed to harmful chemicals and resulted in headaches, rashes, chemical burns, nausea, and vomiting.

---

[8] Although this Court has dismissed Plaintiffs' general maritime law battery claims, Plaintiffs reallege them here out of an abundance of caution, and to preserve the claims for potential appeal.

240.    VoO, Vessel, and Decontamination Plaintiffs are entitled to judgment finding BP liable to Plaintiffs for damages suffered as a result of subjecting Plaintiffs to unwanted, offensive conduct and enjoining BP's tortious conduct.

### NINTH CLAIM FOR RELIEF

### Florida Medical Monitoring Claim[9]

### (Florida Plaintiffs v. Drilling Defendants)

241.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

242.    Plaintiffs will suffer irreparable harm if the Court does not render the medical monitoring relief set forth herein, and if Defendants are not ordered to create, fund and support a medical monitoring program as set forth herein.  Further, the law governing medical monitoring in Florida is consistent with the general common law and should be applied accordingly.

243.    Plaintiffs demand injunctive and equitable relief and that Defendants be ordered to provide continued environmental, water supply, food supply, and air monitoring for Plaintiffs in Florida.

244.     Plaintiffs have been exposed to greater than normal background levels of oil, dispersants, and/or other hazardous chemicals as a result of the Oil Spill.

245.    The oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill are proven hazardous, dangerous, or toxic substances, to which Plaintiffs have been exposed.

---

[9] Although this Court has dismissed Florida Plaintiffs' claim for medical monitoring, Plaintiffs reallege this claim out of an abundance of caution, and to preserve potential issues for appeal.

246.    Plaintiffs' exposures were caused by Defendants' negligence or otherwise tortious conduct.

247.    Plaintiff's exposure may lead to serious health problems, diseases, and medical conditions that may be prevented or minimized by timely medical diagnosis and treatment.

248.    The method and means for diagnosing Plaintiffs' potential medical problems are well accepted in the medical and scientific community and will be of great benefit to Plaintiffs by preventing or minimizing health problems that Plaintiffs may encounter as a result of the Oil Spill and from dispersants used to attempt to clean the Oil Spill.

249.    As a proximate result of Plaintiffs' exposure to oil, dispersants, and/or other hazardous chemicals which have been released from the Oil Spill, Plaintiffs have developed a significantly increased risk of contracting a serious latent disease.  Moreover, many Plaintiffs have experienced symptoms of manifest injury, including headaches, nausea, vomiting, respitory problems, rashes, lesions, and chemical burns.

250.    Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.  The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

## TENTH CLAIM FOR RELIEF

### Punitive Damages[10]

### (All Plaintiffs v. Drilling Defendants)

251.    Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon*.

252.    Defendants BP, Transocean, and Halliburton engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire, and Spill, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence.  Plaintiffs, society and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by Defendants' misconduct herein.

253.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

254.    BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of life; instead, it continued to place others at risk in the interests of

---

[10]  Although this Court has dismissed punitive damages claims for Plaintiffs that are "seamen," Plaintiffs nonetheless reallege these punitive damages claims on behalf of non-seamen and, out of an abundance of caution, to preserve potential issues for appeal.

cost-cutting and financial gain.

255.   Transocean callously and with reckless disregard for human life disabled the flammable gas alarm system aboard the *Deepwater Horizon* and prevented said system from operating properly and preventing or containing the explosions, fire and loss of life.

256.   BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by using a well design with too few barriers to gas flow.

257.   BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

258.   BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by failing to run a bottoms-up circulation of the drilling mud prior to beginning the cement job.

259.   BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that cement mixture prior to using it in the well.

260.   BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by failing to run a cement bond log to evaluate the

integrity of the cement job.

261.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

262.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

263.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by ignoring and/or misinterpreting abnormal, "red flag" pressure test results.

264.    BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their grossly inadequate maintenance, and reckless and improper operation and use of the blowout preventers appurtenant to the *Deepwater Horizon*.

265.    BP and Transocean recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout.

266.    BP, Transocean, and Halliburton recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

267.   BP and Transocean willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

268.   BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico, and needlessly caused injury to Gulf residents.

269.   Further, BP recklessly, willfully, and/or wantonly failed to protect VoO Plaintiffs and their personal property from unnecessary exposure to oil and chemical dispersants during the response effort and/or failed to ensure that vessels were timely decontaminated to avoid damage, and thereby caused harm to persons working to contain or clean the Oil Spill and their personal property.

270.   In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality.  As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

271.   Defendants' conduct was oppressive, wanton, malicious, reckless, or grossly negligent each time they:

a.          failed to properly maintain and/or operate the *Deepwater Horizon*;

b.          operated the *Deepwater Horizon* in such a manner the safety and integrity of the vessel and the well were disregarded to save time and money;

c.          ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

d.          failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the *Deepwater Horizon*;

e.          violated MMS regulations and/or other applicable regulations/standards for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

f.          failed to take appropriate action to avoid or mitigate the accident;

g.          failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

h.          failed to ensure that the *Deepwater Horizon* and its equipment were free from defects, properly maintained and/or in proper working order;

i.          failed to provide appropriate disaster prevention equipment;

j.          failed to have an appropriate emergency spill response plan or readily available spill response equipment.

272.   BP recklessly, willfully and/or wantonly caused or contributed to Plaintiffs' injuries by their tortious design, and reckless and wanton operation and use of chemical dispersants.

273.   BP recklessly, willfully and/or wantonly failed to ensure that Plaintiffs would be adequately protected from exposure to harmful chemicals in oil, chemical dispersants, and other harmful chemicals resulting from the Oil Spill.

274.   Defendants willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of

64

Mexico and the corresponding clean up response measures involving the use of chemical dispersants.

275.    BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Oil Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico and/or caused harm to persons working to contain or clean-up the Oil Spill.

276.    Defendants' conduct, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because Defendants' conduct was motivated by financial gain; because it injured and endangered human and environmental health and safety; because it caused devastating damage and loss to the livelihoods, businesses, and properties of Plaintiffs; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to Defendants; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish Defendants and deter further repetition by Defendants or others.

277.    Accordingly, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

### Declaratory Relief:  Punitive Damages

278.    The Plaintiffs, the proposed Class, society, and the Gulf states have a legitimate and legally protected interest, additional to and independent of the interest or entitlement to compensation, in punishment and deterrence of reprehensible and harmful conduct, and in imposing full and effective punishment and deterrence of such conduct.  Punitive damages do not compensate for injury.  They are private fines, authorized by the general

maritime law (and/or state law), to punish reprehensible conduct and deter its future occurrence. Punitive damages are specifically designed to exact punishment, in excess of actual harm, to make clear that the defendants' misconduct is especially reprehensible, to embody social outrage and moral condemnation of such misconduct, and to assure that it is not repeated. Accordingly, Plaintiffs seek a judicial declaration against Defendants and in favor of the Class that any settlement provisions that purport, directly or indirectly, to release or to affect the calculation of punitive damages without a judicial determination of fairness, adequacy, and reasonableness are ineffective as contrary to law, equity and public policy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class demand judgment against Defendants jointly, severally and solidarily, as follows:

1. compensatory damages in amounts to be determined at trial;

2. punitive damages;

3. damages for medical screening and monitoring;

4. the implementation of a medical screening and monitoring program to be funded by the Defendants;

5. an order certifying the Class under the appropriate provisions of F.R.C.P. 23 as set forth herein, appointing Plaintiffs as Class Representatives, and appointing undersigned counsel as counsel for the Class;

6. pre-judgment and post-judgment interest at the maximum rate allowable by law;

7. attorneys' fees and costs of litigation;

8. injunction to abate the public nuisance created by Defendants;

9. injunction to abate the unwanted, offensive conduct by Defendants;

10. injunction to require monitoring of air and water;

11. any other and further relief available under all applicable state and federal laws; and

12. any other and further relief the Court deems just and proper.

This 16th day of February, 2012.

Respectfully submitted,

_____/s/   Stephen J. Herman_____        _____/s/ James Parkerson Roy_____
Stephen J. Herman, La. Bar No. 23129         James Parkerson Roy, La. Bar No. 11511
HERMAN HERMAN KATZ & COTLAR LLP              DOMENGEAUX WRIGHT ROY & EDWARDS LLC
820 O'Keefe Avenue                           556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113                 Lafayette, Louisiana 70501
Telephone: (504) 581-4892                    Telephone: (337) 233-3033
Fax No. (504) 569-6024                       Fax No. (337) 233-2796
E-Mail: sherman@hhkc.com                     E-Mail: jimr@wrightroy.com
*Plaintiffs' Liaison Counsel*                *Plaintiffs' Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

| | |
|---|---|
| Brian H. Barr<br>LEVIN, PAPANTONIO, THOMAS, MITCHELL,<br>ECHSNER & PROCTOR, PA<br>316 South Baylen St., Suite 600<br>Pensacola, FL 32502-5996<br>Office: (850) 435-7045<br>Telefax: (850) 436-6187<br>E-Mail: bbarr@levinlaw.com | Robin L. Greenwald<br>WEITZ & LUXENBERG, PC<br>700 Broadway<br>New York, NY 10003<br>Office: (212) 558-5802<br>Telefax: (212) 344-5461<br>E-Mail: rgreenwald@weitzlux.com |
| Jeffrey A. Breit<br>BREIT DRESCHER IMPREVENTO & WALKER<br>999 Waterside Drive, Suite 1000<br>Norfolk, VA 23510<br>Office: (757) 670-3888<br>Telefax: (757) 670-3895<br>E-Mail: jbreit@bdbmail.com | Rhon E. Jones<br>BEASLEY, ALLEN, CROW, METHVIN, PORTIS &<br>MILES, P. C.<br>218 Commerce St., P.O. Box 4160<br>Montgomery, AL 36104<br>Office: (334) 269-2343<br>Telefax: (334) 954-7555<br>E-Mail: rhon.jones@beasleyallen.com |
| Elizabeth J. Cabraser<br>LIEFF, CABRASER, HEIMANN &<br>BERNSTEIN, LLP<br>275 Battery Street, 29th Floor<br>San Francisco, CA 94111-3339<br>Office: (415) 956-1000<br>Telefax: (415) 956-1008<br>E-Mail: ecabraser@lchb.com | Matthew E. Lundy<br>LUNDY, LUNDY, SOILEAU & SOUTH, LLP<br>501 Broad Street<br>Lake Charles, LA 70601<br>Office: (337) 439-0707<br>Telefax: (337) 439-1029<br>E-Mail: mlundy@lundylawllp.com |
| Philip F. Cossich, Jr.<br>COSSICH, SUMICH, PARSIOLA & TAYLOR | Michael C. Palmintier<br>deGRAVELLES, PALMINTIER,<br>HOLTHAUS & FRUGE' |

8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL 36660
Office: (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA 70726
Office: (225) 664-4193
Telefax: (225) 664-6925
E-Mail: calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail: ervin@colson.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW & ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130
Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Office: (214) 521-3605
Telefax: (214) 599-1172
E-Mail: ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail: mcwatts@wgclawfirm.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that the above and foregoing will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 16th day of February, 2012.


    /s/   Stephen J. Herman and James Parkerson Roy