**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG DEEPWATER HORIZON IN THE GULF OF MEXICO, ON APRIL 20, 2010 | ) ) ) ) ) MDL No. 2179 ) Section: J |
| IN RE THE COMPLAINT AND PETITION OF TRITON ASSET LEASING GmbH, ET AL., IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | ) ) ) Judge: Barbier ) ) Magistrate: Shushan |
| This Document Relates To: 2:10-CV-02771 | ) ) ) ) |

**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
– SPECIFIC PERFORMANCE OF CONTRACTUAL ACCESS AGREEMENT**

**TABLE OF CONTENTS**

I.   FACTUAL BACKGROUND - THE EDWARD WISNER DONATION ......................... 2

II.  THE MC252 SPILL AND ITS IMPACT ON DONATION PROPERTY ......................... 5

III. THE WISNER DONATION/BP ACCESS AGREEMENT ................................................ 8

IV.  BP'S FAILURE  SUPPLY THE INFORMATION THE COMPANY COMMITTED TO SUPPLY IN THE ACCESS AGREEMENT ...................................................................... 10

   A. Response Planning Documents and Contracts ...................................................... 11

   B. Daily Reports Generated from Activities on the Property .................................... 11

   C. Information Gathered by SCAT Teams and Other Specialized Bodies ............... 12

   D. Aerial Photography, GIS Data and Other Information Developed in the Response ......... 12

   E. Analysis of Oil Found on the Donation's Property .............................................. 13

   F. Summary of Operations ......................................................................................... 13

V.   THE DONATION'S REPEATED EFFORTS TO HAVE BP HONOR ITS CONTRACTUAL COMMITMENT TO PROVIDE DOCUMENTATION .................... 13

VI.  SPECIFIC PERFORMANCE SHOULD BE GRANTED ................................................. 14

   A. The Terms of the Access Agreement are Unambiguous ...................................... 14

   B. Under Louisiana Law, Specific Performance is the Preferred Remedy for Breach of an Obligation to Deliver a Thing ............................................................................. 15

VII. CONCLUSION ................................................................................................................... 16

## TABLE OF AUTHORITIES

**Cases**

American Dredging Co. v. Miller, 510 U.S. 443, 452  (1994) ...................................................... 15

Carter-Green-Redd, Inc. v. USS Cabot/Dedalo Museum Foundation, 756 F. Supp. 276, (E.D. La. 1991) ................................................................................................................................ 15

Charter School of Pine Grove v. St. Helena Parish School Board,  9 So.3d 209, 222 (La. App. 1st Cir. 2009) ........................................................................................................................... 16

J.Weingarten, Inc. v. Northgate Mall, Inc., 404 So.2d 896, 901 (La.1981) ................................. 16

Lombardo v. Deshotel, 94–1172 (La.11/30/94)............................................................................ 16

Romero v. International Terminal Operating Co., 358 U.S. 354 373-74 (1959).......................... 15

Slocum-Stevens Ins. Agency v. International Risk Consultants, 666 So.2d 352, 357 (La. App. 2d Cir. 1995) ........................................................................................................................... 15

Weathersby v. Conoco Oil Co., 752 F.2d 953, 955-56 (5th Cir.1984)......................................... 15

**Civil Code Provisions**

L.S.A.-C.C. Art. 1983 ................................................................................................................... 15

L.S.A.-C.C. Art. 1986 ................................................................................................................... 16

L.S.A.-C.C. Art. 2046 ................................................................................................................... 15

MAY IT PLEASE THE COURT:

The Edward Wisner Donation ("the Wisner Donation" or "the Donation") owns approximately 35,000 acres of land in lower Lafourche Parish, generally bounded by Bayou Lafourche, Caminada Bay and the Gulf of Mexico, extending north to Leeville, Louisiana.  This includes approximately nine miles of the area known as Fourchon Beach, which directly fronts on the Gulf of Mexico.  The Donation manages this property on behalf of its beneficiaries, including the City of New Orleans, Tulane University, the Medical Center of Louisiana, the heirs of Edward Wisner, and the Salvation Army.  Over 60% of the Donation's income ultimately flows to charitable and philanthropic causes.  [Exhibit 1, Declaration of C. Cathy Norman ¶¶ II-IV].

Beginning in May, 2010 oil from the Deepwater Horizon spill began washing ashore on the Donation's Fourchon Beach property.  The Donation's property was the subject of massive oil spill response operations, at times involving over 1,000 workers, heavy equipment, board roads and massive earthen dams.  In August, 2010, the Donation entered into a contractual Access Agreement with BP Exploration & Production, Inc.  This agreement (referred to as the "BP Access Agreement" or just "the Access Agreement") governs BP's presence on the Donation's property, and contains a number of very specific commitments on the part of the Company. [Exhibit 1, Declaration of C. Cathy Norman ¶¶ VII-XI].

In the ensuing fifteen months, BP has breached many of these commitments.  This motion for partial summary judgment concerns one of the most important and time sensitive of these breaches.  In the Access Agreement BP committed to provide the Donation with a broad range of information in connection with oil removal operations on the Donation's property.  This information is necessary for the Donation to monitor and provide input on the response,

1

minimize damage to the Donation's property, and for the Donation's advisors and staff to carry out their obligations to act prudently on behalf of the beneficiaries. The Access Agreement specifically provides that this information will be provided to the Donation as received or on a weekly basis. Despite this clear commitment, BP has failed to supply much of the documentation it has developed, even after repeated requests and attempts by the Donation to secure good faith performance of the contract. [Exhibit 1, Declaration of C. Cathy Norman ¶¶ XII-XIV]. These breaches of the Access Agreement were specifically pled in the Donation's Answer in Limitation and Claim in Limitation, and Cross Claim for Damages, Declaratory and Injunctive Relief (Doc. 326).

In this motion the Donation requests that the Court order specific performance of the terms of the Wisner Donation/BP Access Agreement requiring BP to provide the Donation with information about the cleanup on the Donation's own property. As set out below, there is no issue of material fact as to the terms of the contract, and BP's breach of that contract. Because the Donation was required to take this action, the Donation also seeks, as provided in the Access Agreement, its attorneys fees and costs incurred in enforcing the Agreement.

## I.     FACTUAL BACKGROUND - THE EDWARD WISNER DONATION

The Edward Wisner Donation is a land-holding Complex Trust created in 1914 by philanthropist Edward Wisner. The Edward Wisner Donation Advisory Committee, which is composed of a representative of each of the beneficiaries, is responsible for administering the Donation's property. [Exhibit 1, Declaration of C. Cathy Norman ¶ III]. The Donation's management is required by Louisiana law to manage the property as prudent persons, to control, protect and preserve the corpus of the Donation. L.S.A.-R.S. 9:2090-91.

The Donation's Fourchon property is outlined in purple below:

2



The Fourchon property generates millions of dollars annually in income to the beneficiaries of the Donation. Primary sources of revenue, in descending order, include surface leases such as the one for the Port of Fourchon, the LOOP pipeline and a Chevron installation, royalties and rents from oil and gas development, and rents from a variety of other surface leases, including campsites and fishing clubs. Revenues are distributed to the beneficiaries, the majority of which in turn fund scores of charitable, artistic, philanthropic and educational projects. In past years these have included New Orleans' Mayoral Fellow program, the NO Police & Justice Foundation's Cops for Kids program, and the Gun Buy Back Committee. [Exhibit 1, Declaration of C. Cathy Norman ¶¶ II, IV].

The entirety of the Donation's Fourchon property is protected by Fourchon Beach, a coastal sand "levee" consisting of nine miles of native sandy beaches and dunes located between Belle Pass on the west and Elmer's Island on the east. This entire sand "headlands" is a fragile system that is continually reshaped by wind, waves and tide. In recent years the beach has retreated in a northern direction to its rear at a rate of about forty feet per year. In this sense, the beach is continually turning over, retreating and rebuilding atop the unique and rare mangrove forests, salt pans, tidal flats and salt water marsh to its north. All of these areas, together are

3

critical habitat for hundreds of species of plants and animals, and form a vital buffer against storms for areas inland. [Exhibit 1, Declaration of C. Cathy Norman ¶¶ V].

Fourchon Beach and the remainder of the Donation's Fourchon property protect the interior coastal wetlands dividing Barataria and Terrebonne Bays, along the banks of Bayou Lafourche (itself, until recently, a distributary of the Mississippi River). Without the Wisner Donation's Fourchon property, the spit of remaining land on either side of Bayou Lafourche would quickly erode, uniting the Barataria/Caminada and Terrebonne basins and exposing the underbelly of Louisiana to the forces of nature. If this were to pass, the historic coastal communities of Cocodrie, Dulac, Montegut, Isle Jean Charles, Pointe-Au-Chien, Lockport, Lafitte and Grand Bayou could become relics of the past, with Houma and New Orleans greatly threatened. If this were to pass, south Louisiana's unique heterogeneous cultures will be forever changed.

The Wisner Donation Advisory Committee understands its critical frontline role in this fight to save south Louisiana. The Committee and the management of the Donation have for decades worked to protect and restore the headlands and marsh. Indeed, numerous research and restoration projects make the Donation's Fourchon property one the most studied and active real-time coastal laboratories in the country. At the time of the Deepwater Horizon spill, a major project called the Caminada Headlands Restoration project was scheduled to begin. This project is designed to replenish the supply of sand in the system, to ensure the beach will successfully rebuild and remain as a protective barrier. The Caminada Headlands project is a public-private cooperative endeavor involving hundreds of millions of dollars, and is considered a top priority in preserving Louisiana's endangered coastline. [Exhibit 1, Declaration of C. Cathy Norman ¶¶ V].

4

The survival of this critical coastal habitat, and the nationally significant energy infrastructure on Donation property, is directly dependent on the survival of Fourchon beach. The contamination from the Deepwater Horizon oil spill has introduced additional risks for the planned restoration project, and has complicated efforts to save this area. Without adequate information about the spill and its impacts, the Donation will not be able to insure that these projects are carried out in a safe and timely manner, and protect the property against future impacts.

## II.  THE MC252 SPILL AND ITS IMPACT ON DONATION PROPERTY

On April 20, 2010, the Deepwater Horizon sank, snapping the riser extending from the MC252 well and releasing millions of barrels of oil into the Gulf of Mexico. The MC 252 oil first arrived in large quantities at the Donation's Fourchon property on or around May 20, 2010. Through the ensuing months, waves of additional fresh oil, emulsion, droplets and tarballs appeared along Fourchon beach and the surrounds, particularly during "tidal events," carried by waves associated with tropical storms. [Exhibit 1, Declaration of C. Cathy Norman ¶¶ VII-X].

The photo below demonstrates the extent of oil on the beach after just one of these events:



As the photo below demonstrates, these tidal events carried oil into the mangrove marsh behind the beach ridge.



It is difficult to overstate the degree of intrusion of oil and cleanup operations on the Donation's Fourchon property. In the period May- November 2011 response operations on the

Donation's property involved as many as 1,500 cleanup workers working a 24 hour day, essentially the population of a small town. In the early stages of the operations the Wisner Donation was often not consulted at all, but nonetheless supported the cleanup effort. [Exhibit 1, Declaration of C. Cathy Norman ¶¶ VII-XI].

During the summer of 2010, support infrastructure for the cleanup workers was set up over the entire length of the beach. Entire fleets of all terrain vehicles, earth moving equipment, portable restrooms, hydration stations, decontamination stations, and other support facilities were in heavy use throughout the beach area. [Exhibit 1, Declaration of C. Cathy Norman, ¶ VIII].

Equally important, the response effort actually changed the physical structure of the Donation's property. A major outlet to the Gulf, Bayou Fer Blanc, was dammed as part of the response effort. Other naturally occurring channels connecting the marsh and the beach were dammed with sheet pilings and had board roads laid across them to allow access of motorized equipment for the response effort. [Exhibit 1, Declaration of C. Cathy Norman ¶ IX].

The impacts of damming the naturally occurring outlets through the beach are substantial. After tropical storms or other high water events which push water over the beach ridge and into the marsh, the bayous and breaches allow the water to drain from the marsh. When the breaches are dammed the water either goes around the dams, causing additional erosion at the edges of the structures, or it finds a new route to the gulf, causing new breaches in the beach. Documenting and understanding the changes in the beach caused by the response effort is critical to understanding and preventing additional damage to the beach.    [Exhibit 1, Declaration of C. Cathy Norman ¶IX].

Despite the massive cleanup operation, oil can still be found throughout the Donation's property: on the sandy beach, in the washouts and natural bayous, in the salt flats, mangrove and

7

saltwater marshes found behind the beach crest and on the waterbottoms both in front of and behind the beach. On the beach these layers of oil, intermixed with sediment, in places eighteen inches to several feet deep, are referred to as "tar balls", "tar patties" and "tar mats". These deposits range widely in size, from inches to hundreds of feet in length. [Exhibit 1, Declaration of C. Cathy Norman ¶ X].

Although oil also washed deep into the salt marsh behind the beach at Fourchon, BP has never assessed the location of contamination in the marsh, despite requests from the Donation. The Donation has itself identified a number of marsh sites with oil contamination, and is monitoring several of these to determine the degradation rates and other characteristics of the oil remaining. It is critical to the Donation to have access to the information to determine the degree of contamination of its property. [Exhibit 1, Declaration of C. Cathy Norman ¶ XII].

Most recently BP has discontinued response operations on large parts of the Donation's property, despite the fact that oil remains in place. On other parts of the property, response operations continue to a limited extent. [Exhibit 1, Declaration of C. Cathy Norman ¶ X].

### III.    THE WISNER DONATION/BP ACCESS AGREEMENT

The Wisner Donation's Fourchon Property contains a substantial amount of oil and gas and other infrastructure. The Donation carefully monitors and manages all activities on the property, including maintenance of existing infrastructure and new projects. Because of its unique resources and location, the Donation also receives and routinely grants requests for the access to the property for research purposes. [Exhibit 1, Declaration of C. Cathy Norman ¶¶ IV, VI].

In order to carry out the obligation to protect the corpus of the Donation for its beneficiaries, the Donation for many years has routinely required anyone seeking to carry out activities on the property to execute a contractual access agreement. The Donation's standard

agreement contains provisions dealing with liability, indemnification, acceptable equipment usage, best management practices, coordination with Donation staff, and access to information developed on the property. [Exhibit 1, Declaration of C. Cathy Norman ¶ VI].

In keeping with its long-standing practice, the Donation requested that BP execute an Access Agreement governing oil spill response on the Donation's property.[1] After negotiation with BP's legal department, this agreement was executed by the parties in early August, 2010. The signed copy of the Access Agreement is included as Attachment A to Ms. Norman's declaration in support of this motion. The BP Access Agreement contains the terms found in the Donation's standard Access Agreement, as well as some terms geared to the massive oil spill response itself. The BP Access Agreement remains in effect today. [Exhibit 1, Declaration of C. Cathy Norman ¶ XI].

Three provisions of the Wisner Donation/BP Access Agreement are central to this motion. First, Paragraph 2 of the agreement provides as follows:

> (2) Prior to beginning operations, or as they become available, Grantee will provide Grantor with a copy of all work plans, protocols, or contracts ("cleanup documents") relating to Grantee's oil spill cleanup operations on Grantor's property. Copies of any revised, updated or supplemented cleanup documents will be provided to Grantor as soon as they become available.

[Exhibit 1, Declaration of C. Cathy Norman, Attachment A].

Paragraph 5 provides for BP to provide a written weekly summary of operations on the property:

---

[1] It is clear that landowners like the Donation retain control over their property during spill response. The MC252 Regional Incident Contingency Plan implemented in Louisiana states: "[l]andowners that provide access to or are affected by a spill have jurisdiction over their lands, and warrant special consideration by the responding agency or unified command. In the event that an incident poses, or has the potential to pose, an imminent threat to human health and/or the environment, it is in the best interest of the landowner to provide access to a FOSC." MC252 RICP, May 2010, page 40.

9

> (5) Grantee will provide Grantor a weekly summary of all removal/response operations undertaken on Wisner property, including a description of each operation performed, the dates of each operation, and the identity of all companies who worked on each operation.

[Exhibit 1, Declaration of C. Cathy Norman, Attachment A].

Paragraph 6 provides that BP will provide the Donation with all of the information developed on the property "as received or on a weekly basis:"

> (6) Grantee will provide Grantor with a copy of all waste manifests or other documents detailing all materials removed from Wisner Donation property, the results of all testing of any kind carried out on Grantor's property by Grantee or its contractors or at Grantee's request in connection with operations, and all documentary information such as photographs, video, GPS logs, reports, work logs or journals kept in connection with SCAT assessments and oil removal operations. This information will be provided as received on a weekly basis. If Grantee believes that any oil or oiled waste removed from the Wisner Property is not attributable to the Deepwater Horizon oil spill, Grantee shall segregate that waste and notify Grantor to allow the waste to be documented and samples taken.

[Exhibit 1, Declaration of C. Cathy Norman, Attachment A].

As set out in the next section of this memorandum, BP has supplied only limited information about the massive operations on the Donation's property, despite repeated requests and attempts by the Donation to secure compliance.

## IV.   BP'S FAILURE  SUPPLY THE INFORMATION THE COMPANY COMMITTED TO SUPPLY IN THE ACCESS AGREEMENT

As detailed above, BP's cleanup operations on the Donation property have been massive, and those operations have produced a corresponding amount of documentation.   However, BP has supplied the Donation with only a part, and likely only a very small part, of the information required under the BP Access Agreement.   The Donation does not know the full spectrum of information collected or generated by BP.  As a part of its request for relief in this motion, the Donation therefore requests that BP be required to provide a full list of all documents relating to its operations on Donation property, and a knowledgeable representative to testify regarding the

10

information that is responsive to the requirements of the Agreement. Even without full information, however, the Donation is aware that BP has failed to provide available information in at least the following areas.[2]

A.   Response Planning Documents and Contracts

Response operations on the Donation property were carried out under a number of different documents generated by the Deepwater Horizon Unified Command, of which BP is a part. These included documents called "Shoreline Treatment Recommendations" and "Shoreline Treatment Plans."

BP has supplied the Donation with some of these documents. However, operations during 2011 were carried out under a document called the "2011 Interim Louisiana Shoreline Plan," a copy of which has never been provided to the Donation. BP has not produced any of the contracts with subcontractors and others governing operations on the Donation's property. The Donation does not know whether other documents governing cleanup have also been withheld. [Exhibit 1, Declaration of C. Cathy Norman, ¶ XIII].

B.   Daily Reports Generated from Activities on the Property

Removal activities on the Donation's property are recorded in several types of daily reports. These include items such as sign in sheets from meetings, waste tracking reports, and other documents. BP has produced a limited number of these items dated prior to late March, 2011. The Donation does not know whether all of the daily reports generated prior to that date

---

[2] BP has also breached the Access Agreement in equally important ways that are not included in the present motion for partial summary judgment. For example, BP has refused to pay for required monitoring and analysis on the Donation's property. The practical effect of BP's refusal to abide by its payment obligations is that funds which would have gone to support philanthropic causes are instead being diverted to fund Deepwater Horizon spill response. Declaration of Caty Norman, ¶ XII.

11

have been produced, but it is clear that very few reports have been produced after that date. [Exhibit 1, Declaration of C. Cathy Norman, ¶ XIII].

C.     Information Gathered by SCAT Teams and Other Specialized Bodies

Assessment of the condition of the Donation's property was carried out at least in part by by specialized teams of contractors or BP employees. These included Shoreline Cleanup and Assessment Teams ("SCAT") and in some cases Forensic Research and Assessment Teams ("FRAT"). These groups assessed the amount and type of oil present, determined what response was necessary, performed beach profile measurements, and other tasks.

The SCAT and FRAT observations were recorded in a number of different types of reports. These include SCAT Liasion Reports, SCAT Daily Reports, SCAT Technical Visit Reports, Field Notes, Photographs, Shoreline Inspection Reports, Stage III Inspection Reports, beach profile reports, and FRAT Reports.

BP provided the Donation with at least some of these various types of reports, the last of which is dated in March 2011. Since that date BP has supplied very little information regarding SCAT schedules, no SCAT reports have been provided since that date. Again, the Donation has no way of knowing whether all of the documents prior to March 2011 have been produced, or exactly what documents have been produced after that date. [Exhibit 1, Declaration of C. Cathy Norman, ¶ XIII].

D.     Aerial Photography, GIS Data and Other Information Developed in the Response

BP has aerial photography, maps, and other information including Geographical Information System ("GIS") data sets related to the Donation's Fourchon property. BP has produced a limited amount of this type of information to the Donation, and some of this information may be available through other sources. Information produced included a few maps

12

indicating locations oil has been found at various points in the cleanup. However, despite repeated requests BP has never supplied the Donation with any GIS data sets, aerial photography, or other maps. [Exhibit 1, Declaration of C. Cathy Norman, ¶ XIII].

E.   Analysis of Oil Found on the Donation's Property

The Donation has received little or no analytical reports for oil found on the Donation's property. BP produced a limited number of documents called "Chain of Custody/Analytical Request Document," but did not produce the analytical results from any testing of any sort. [Exhibit 1, Declaration of C. Cathy Norman, ¶ XIII].

F.   Summary of Operations

BP has never provided any of the weekly summaries of removal/response operations undertaken on Donation property. [Exhibit 1, Declaration of C. Cathy Norman, ¶ XIII].

### V. THE DONATION'S REPEATED EFFORTS TO HAVE BP HONOR ITS CONTRACTUAL COMMITMENT TO PROVIDE DOCUMENTATION

As set out above, the BP Access Agreement provides for information about operations on the Donation's property to be provided as soon as available, or at a minimum on a weekly basis. BP has never complied with this commitment. As set out above BP has provided information to the Donation on an episodic basis, but the full suite of information provided by the agreement has never been provided.

BP's breach of the Access Agreeent literally began as soon as it was signed. On November 9, 2010, the Donation sent a letter to BP's counsel outlining BP's breaches of the agreement over the preceding three months. These breaches included failure to pay response costs, failure to provide contact information for people working on the property, and timely notice of meetings affecting the property. This letter, which is included as Attachment 2 to the Declaration of Cathy Norman, also listed the documentary information that BP had failed to

provide under the Access Agreement, and requested that BP come into full compliance with the agreement.  As a consequence of this and other communications, as detailed in the previous section of this memorandum BP provided the Donation with a limited amount of the information required under the Access Agreement.  This information was not provided until the spring of 2011, some months later, and only sporadic information has been provided to the Donation since that time. [Exhibit 1, Declaration of C. Cathy Norman, ¶ XIV].

Since the spring of 2011 the Donation informally requested this information from BP on a number of occasions.  The Donation was advised that Mike Taylor, a BP contractor, would be responsible for coordinating the provision of the information required by the Access Agreement.  On October 18, 2011, Mr. Taylor was provided with a list of information the Donation was missing.  Mr. Taylor responded that BP legal would have to approve the release of any information to the Donation.   [Exhibit 1, Declaration of C. Cathy Norman, ¶ XIV]. Despite follow up requests which were directly copied to BP's counsel BP has never produced any of this information and has never responded further to requests for the information.  [Exhibit 1, Declaration of C. Cathy Norman, ¶ XIV].  BP's breaches of the Access agreement were specifically pled in the Donation's Answer in Limitation and Claim in Limitation, and Cross Claim for Damages, Declaratory and Injunctive Relief (Doc. 326).

## VI.     SPECIFIC PERFORMANCE SHOULD BE GRANTED

A.      <u>The Terms of the Access Agreement are Unambiguous</u>

The terms of the Access Agreement, as set forth above, are straightforward and unambiguous.  They spell out the information regarding operations on the Donation's property that must be delivered to the Donation, and the time frame within which BP is to deliver that information.  Indeed, BP has never indicated any confusion or uncertainty about the information

14

that must be provided under the Access Agreement.   Rather, BP has simply declined to provide all of the information required.

The Louisiana Civil Code provides, in keeping with the near universal principles of contract law, that "[c]ontracts have the effect of law for the parties."  L.S.A.-C.C. Art. 1983. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."  L.S.A.-C.C. Art. 2046.  The question whether a contract is ambiguous is one of law, and the interpretation of an unambiguous contract is also one of law which may in appropriate cases be resolved on summary judgment. *E.g. Slocum-Stevens Ins. Agency v. International Risk Consultants,* 666 So.2d 352, 357 (La. App. 2d Cir. 1995).[3]

BP's obligation to provide information is plain and unambiguous, and that undertaking is law between the parties.  There is no excuse for BP's breach.

B.    Under Louisiana Law, Specific Performance is the Preferred Remedy for Breach of an Obligation to Deliver a Thing

Article 1986 of the Louisiana Civil Code establishes the right of an oblige to obtain specific performance of a contract:

---

[3] The Wisner Donation believes it is clear that the BP Access Agreement is governed by Louisiana state law, since it deals with the transfer of information that occurs on land, concerning activities on land.  *E.g.*, *Carter-Green-Redd, Inc. v. USS Cabot/Dedalo Museum Foundation*, 756 F. Supp. 276, (E.D. La. 1991) ("Clearly, the contract is one which was made on land to be performed on land, and there is no need or justification for resort to the law of the sea. Such matters can and should be dealt with under state law contract principles.").  However, if the Court determines that the Access Agreement is governed by the General Maritime law, the same principles apply.  *E.g.   Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 955-56 (5th Cir.1984) (interpretation of the terms of a contract is a matter of law, and words of maritime contract should be given their plain meaning unless the provision is ambiguous); *American Dredging Co. v. Miller*, 510 U.S. 443, 452  (1994) (state law remedies may be incorporated into admiralty when uniformity not required, citing *Romero v. International Terminal Operating Co.*, 358 U.S. 354 373-74 (1959)).

15

> Upon an obligor's failure to perform an obligation to deliver a thing, or not to do an act, or to execute an instrument, the court shall grant specific performance plus damages for delay if the obligee so demands. If specific performance is impracticable, the court may allow damages to the obligee.
>
> Upon a failure to perform an obligation that has another object, such as an obligation to do, the granting of specific performance is at the discretion of the court.

L.S.A.-C.C. Art. 1986. As the comment to this article notes, "if an obligor fails to perform an obligation to deliver a thing, the court shall grant specific performance to the obligee." A recent decision of a Louisiana appellate court summarizes the favored status of specific performance under Louisiana law:

> Under Louisiana's civil law system, specific performance is the preferred remedy for breach of contract. An obligee enjoys the right to demand, insofar as is practicable, the specific performance of the obligation. *Lombardo v. Deshotel,* 94–1172 (La.11/30/94), 647 So.2d 1086, 1090; *see* LSA–C.C. art.1986. An obligee has a right to specific performance for breach of contract except when it is impossible, greatly disproportionate in cost to the actual damage caused, no longer in the creditor's interest, or of substantial negative effect upon the interests of third parties. *J.Weingarten, Inc. v. Northgate Mall, Inc.,* 404 So.2d 896, 901 (La.1981).

*Charter School of Pine Grove v. St. Helena Parish School Board*, 9 So.3d 209, 222 (La. App. 1st Cir. 2009).

The BP Access Agreement creates a classic obligation to deliver a thing – in this case information which is in BP's hands. BP has simply declined to comply with these terms, and the appropriate remedy is to order BP to specifically comply with its obligations under the Access Agreement. This remedy is not just the preferred one, it is the only remedy which will permit the Donation to carry out its obligation to protect the property which forms the corpus of the trust.

### VII.    CONCLUSION

For all the reasons set out above, the Edward Wisner Donation requests that the Court grant summary judgment in favor of the Donation, finding that BP Exploration and Production, Inc. has breached its obligation to provide information under the BP Access Agreement. The

16

Donation requests that the Court require that BP take the following actions to remedy this breach:

(1)  Provide a detailed listing, and provide that listing to the Donation.

(2)  Provide a corporate representative with knowledge of all information relating to the Deepwater Horizon oil spill response on the Donation's property for examination under oath by the Wisner Donation.

(3)  Provide the Wisner Donation with all of the information required by the BP Access Agreement.

(4)  Set a schedule for the submission of the Wisner Donation's application for fees and costs incurred in enforcing the Access Agreement, as provided by Paragraph 11 of the Agreement.

Respectfully Submitted:

| | |
|---|---|
| /s/ Robert Wiygul | /s/ Joel Waltzer |
| Robert Wiygul (LA #17411) | Joel Waltzer (LA #19268) |
| 1011 Iberville Drive | 3715 Westbank Expressway, Ste. 13 |
| Ocean Springs, MS 39564 | Harvey, LA  70058 |
| Office: (228) 872-1125 | Office:  (504) 340-6300 |
| Fax:    (228) 872-1128 | Fax:     (504) 340-6330 |
| robert@waltzerlaw.com | joel@waltzerlaw.com |

*Counsel for Plaintiffs*:

### CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been electronically filed through the Court's CM/ECF system and/or LexisNexis File & Serve, in accordance with Pretrial Order No. 12, which will send a notice of electronic filing to all counsel of record on this 17th day of February, 2012.

/s/ Robert Wiygul

17