UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | § § § § § § § § | MDL No. 2179<br><br>SECTION:  J<br><br>JUDGE BARBIER<br><br>MAG. JUDGE SHUSHAN |
| Applies to:<br><br>ALL CASES AND<br>2:10-CV-2771 | | |

**HALLIBURTON ENERGY SERVICES, INC.'S COMBINED
REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE
<u>TESTIMONY OF EXPERT WITNESSES AND TO STRIKE EXPERT REPORTS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. i

INTRODUCTION ...............................................................................................................1

ARGUMENT AND AUTHORITIES..................................................................................1

      I.     KATHLEEN SUTCLIFFE'S OPINIONS FAIL TO SATISFY DAUBERT STANDARDS AND THE COURT'S DESIRE TO FOCUS ON THE MACONDO INCIDENT. ...........................................................................................1

      II.    WILLIAM WECKER'S OPINIONS SHOULD BE EXCLUDED UNDER DAUBERT AND ON THE GROUNDS OF RELEVANCY AS THE OPINIONS ARE BEYOND THE SCOPE OF THE PHASE ONE TRIAL. ..........3

      III.   SCHOENNAGEL'S UNSUBSTANTIATED LEGAL CONCLUSIONS ARE INADMISSIBLE UNDER DAUBERT..........................................................6

      IV.   J.J. AZAR'S OPINIONS SHOULD BE EXCLUDED TO THE EXTENT HE CONCEDED HIS LACK OF EXPERTISE.......................................................8

CONCLUSION....................................................................................................................11

## TABLE OF AUTHORITIES

**CASES**

*Miller ex rel. Miller v. Ford Motor Co.*,
  No. 01-545, 2004 U.S. Dist. LEXIS 29846 (M.D. Fla. July 22, 2004) ......................................5

**OTHER AUTHORITIES**

30 C.F.R. § 250.421 ...............................................................................................................7

Halliburton Energy Services, Inc. ("HESI") files this Combined Reply in further support of its Motion to Exclude Testimony of Expert Witnesses and to Strike Expert Reports [Dkt. 5406] (the "Motion"), and respectfully shows the Court as follows:

## INTRODUCTION

A review of BP's responses[1] reveals that BP essentially concedes the points raised in HESI's Motion. BP's implicit concessions, combined with the analysis set forth in the Court's Order and Reasons Regarding Motions in Limine to Exclude Instances of Prior Alleged Improper Conduct and Prior Adverse Criminal, Civil, or Regulatory Proceedings [Dkt. 5634] (the "Limine Order"), are additional reasons to grant HESI's Motion.

## ARGUMENT AND AUTHORITIES

**I.   KATHLEEN SUTCLIFFE'S OPINIONS FAIL TO SATISFY *DAUBERT* STANDARDS AND THE COURT'S DESIRE TO FOCUS ON THE MACONDO INCIDENT.**

The main thrust of HESI'S Motion to exclude Sutcliffe's opinions is that she did not analyze the Macondo well or the *Deepwater Horizon*. *See* Motion at 12-14. Instead of attempting to demonstrate whether BP's process safety system was a causal factor in the blowout, Sutcliffe merely analyzes BP's "safety culture" in the abstract, without reference to the Macondo well or the *Deepwater Horizon*. *Id*. BP concedes this point in its Response and oddly boasts that Sutcliffe did not attempt such an analysis because it would be a "complex task," and one that may be impossible for Sutcliffe to perform.[2] *See* BP Sutcliffe Response at 6-7.

---

[1] HESI's Combined Reply addresses BP's Memorandum In Opposition To Halliburton's Motion To Exclude Testimony Of Chuck Schoennagel [Dkt. 5699] ("BP Schoennagel Response"); BP's Memorandum In Opposition To Halliburton's Motion To Limit Testimony Of Dr. J.J. Azar [Dkt. 5700] ("BP Azar Response"); BP's Response In Opposition To Halliburton's Motion To Preclude The Testimony And Strike The Expert Report Of Dr. Kathleen Sutcliffe [Dkt. 5701] ("BP Sutcliffe Response"); and BP's Opposition To Halliburton's Motion To Exclude The Testimony And Report of Dr. William Wecker [Dkt. 5702] ("BP Wecker Response").

[2] In contrast to Sutcliffe, HESI's expert, Dr. Patrick Hudson, and the PSC's expert, Dr. Bea, both found it possible to conduct such an analysis, and have provided the Court with detailed expert reports analyzing how deficiencies in

In its Limine Order, the Court made clear that it was concerned with the potential for undue delay, waste of time, and presentation of cumulative evidence, and accordingly ordered the exclusion of evidence of prior incidents from the Phase One trial (*e.g.* the Texas City refinery explosion, the Grangemouth petrochemical incident, or the Prudhoe Bay, Alaska oil spill).  The Court made an exception for evidence relating to "whether or not BP had in place an adequate process safety system *on the Deepwater Horizon at the time of the Macondo blowout in April, 2010*" because such evidence is admissible and relevant to BP's alleged "lack of an adequate process safety system *for the Macondo operation*."  Limine Order at 5-6 (emphasis added).  The Court also noted that experts could rely on prior-incident process safety evidence to the extent this type of information was necessary to "forming opinions about *what happened at Macondo*."  *Id.* at 6 (emphasis added).  It is thus apparent from the Limine Order that Sutcliffe's opinions should be excluded because she does <u>not</u> attempt to assess the causal relationship between BP's process safety systems and the Macondo blowout, but instead merely opines about BP's "safety culture" in the abstract without reference to any events occurring on the *Deepwater Horizon* rig.  *See* Motion at 12-14.

HESI also noted Sutcliffe's "profoundly mistaken belief" that there was no need to analyze BP's process safety systems on the *Deepwater Horizon* because supposedly only Transocean's safety culture was relevant to the rig, a belief that reveals Sutcliffe's intentional and results-oriented failure to acknowledge that BP, as the operator, was the final decision maker on the rig and exercised that authority via the BP "company man."  *See* Motion at 14-16.  BP offers neither evidence nor explanation to show that Sutcliffe was correct in her belief that only Transocean's safety culture was relevant to the rig, but instead merely quotes Sutcliffe's

---

BP's process safety systems were a causal factor in the April 20, 2010 Macondo well blowout.  *See* Expert Report of Patrick Hudson; Expert Report of Dr. Robert Bea.

deposition testimony to that effect. *See* BP Sutcliffe Response at 7. Quoting Sutcliffe's mistaken belief does nothing to establish the truth of that belief or the reliability of an expert's opinion which is infected with such profound errors.

HESI made the related argument that Sutcliffe failed to properly analyze whether BP actually *implemented* various safety related improvements, or whether those improvements were *adequate* to address the challenges at issue. *See* Motion at 16-18. BP makes no clear response to these arguments, thereby implicitly conceding their validity.

HESI noted that Sutcliffe claims that BP has a "Learning Culture" but was unable in her deposition to name any lesson that BP had supposedly learned. *Id*. at 18. BP claims that this is "not true," but gives no example demonstrating the falsity of the claim. *See* BP Sutcliffe Response at 8. Tellingly, BP then hastens to explain that Sutcliffe believes that citing to actual examples of lessons learned is irrelevant to whether BP has a "Learning Culture." *Id*. at 8-9.

Finally, in a last ditch effort to defend Sutcliffe from HESI's *Daubert* challenge, BP goes out of its way to reference Dr. Hudson and to cite the expert report and deposition testimony of Dr. Bea. *Id*. at 3. What BP fails to mention is that neither Bea nor Hudson support Sutcliffe's analysis. Instead, Bea and Hudson provide withering critiques of Sutcliffe's shoddy analysis in this case. *See* Ex. A at 342:15-347:21 [Bea Dep.]; Hudson Rebuttal Expert Report at 4-24.

## II. WILLIAM WECKER'S OPINIONS SHOULD BE EXCLUDED UNDER *DAUBERT* AND ON THE GROUNDS OF RELEVANCY AS THE OPINIONS ARE BEYOND THE SCOPE OF THE PHASE ONE TRIAL.

As noted above, Sutcliffe's analysis should be excluded pursuant to the analysis in the Court's Limine Order, which excludes evidence relating to prior improper conduct, except to the extent such evidence, or expert testimony, relates specifically to how BP's deficient process safety systems were a causal factor in the Macondo well blowout on April 20, 2010. Sutcliffe at least purported to study BP's "safety culture" in the abstract. Wecker's analysis is even further

HALLIBURTON ENERGY SERVICES, INC.'S COMBINED REPLY IN SUPPORT
OF ITS MOTION TO EXCLUDE TESTIMONY OF EXPERT WITNESSES AND TO STRIKE EXPERT REPORTS

Page 3

removed from the Court's desire to focus the Phase One trial on what happened at the Macondo well on April 20, 2010, because Wecker simply engaged in an abstract "bean counting" exercise of toting up various events over various time frames, with no attempt to analyze whether these events have any particular connection with the Macondo blowout or the events on the *Deepwater Horizon*.[3]  *See* Motion at 4-7.

Like Sutcliffe, Wecker has no opinion about the causes of the Macondo blowout and made no study of it, nor does Wecker analyze process safety or its role in prior BP disasters.  *Id*.  Indeed, BP effectively concedes the preclusive effect of the Court's Limine Order, noting that Wecker will testify in accordance with the Court's Limine Order "to the extent his testimony remains relevant . . . ."  *See* BP Wecker Response at 3, n.1.

HESI also argued that Wecker has no understanding of the discipline of "process safety."  *See* Motion at 4-5.  In response, BP claims that HESI ignores Wecker's deposition testimony which supposedly demonstrates his understanding of process safety.  *See* BP Wecker Response at 7.  BP then quotes testimony in which Wecker explains that "personal safety" involves harm to people, whereas "process safety" involves "everything else."  *Id*. (citing Wecker Dep. at 19).  Wecker then gives an example of "process safety" involving a helicopter which crashes into the Gulf of Mexico, but without hurting anyone and without spilling fuel into the ocean.  *Id*.  According to Wecker, because nobody was hurt and no fuel was spilled, such an event could not be a personal safety incident and must therefore be a process safety incident.  *Id*.  According to Wecker's idiosyncratic definition of process safety, it is impossible for process safety to have played any role in the Macondo blowout, since 11 men were killed, many more were injured, and millions of barrels of hydrocarbons were "spilled" into the Gulf.  Contrary to BP's assertions,

---

[3] BP even acknowledges this point by noting that "over the course of 17 pages in his report, Dr. Wecker analyzes the number and volume of oil spills, kick event data, and 'accidents' which includes fires, explosions, blowouts, and oil spills."  *See* BP Wecker Response at 9.

HESI is not "ignoring" Wecker's testimony, but cites it as further proof that Wecker has no idea what process safety is.  *See* Ex. B at 18:16-19:18 [Wecker Dep.].

HESI noted that at least one district court has rejected Wecker's opinion as unreliable and irrelevant pursuant to *Daubert*.  *See* Motion at 10-11 (citing *Miller ex rel. Miller v. Ford Motor Co.*, No. 01-545, 2004 U.S. Dist. LEXIS 29846, at *2-8 (M.D. Fla. July 22, 2004)).  BP concedes that Wecker's testimony on behalf of Ford was excluded in the *Miller* case, but is careful to state that this is the only case that HESI was able to identify (from publicly available sources) of a court disqualifying Wecker.  *See* BP Wecker Response at 9.  Interestingly, BP does not affirmatively declare whether other courts have also rejected Wecker's methodology.  *Id.*

BP attempts to distinguish *Miller* on the ground that the plaintiffs did not allege or present expert testimony asserting that the Ford Explorer had a safety record inferior to that of other vehicles.  *Id.*  BP's argument appears to be that in contrast to the situation in *Miller*, in this case Wecker's testimony is supposedly admissible because BP's safety culture has been challenged as inferior to other supermajors.  *Id.*  This distinction is false.  Ford proffered Wecker's testimony to "disprove that the Explorer presented an unreasonable or disproportionate rate of risk relative to other vehicles."  *See Miller*, 2004 U.S. Dist. LEXIS 29846, at *5.  In fact, the *Miller* court excluded Wecker's testimony for the same reasons this Court should do so: Wecker improperly compared dissimilar accidents, dissimilar vehicles, and used a data set with an incorrect time period.  *See id.* at *6.  In this case, Wecker compares BP to sewage treatment plants and opines that BP's safety record is satisfactory based on time periods that exclude the Macondo blowout or the previous disasters at Texas City and elsewhere.  *See* Motion at 8-10.  The reasoning underlying the *Miller* court's prior exclusion of Wecker's testimony applies with equal or greater force in this case.

HALLIBURTON ENERGY SERVICES, INC.'S COMBINED REPLY IN SUPPORT  
OF ITS MOTION TO EXCLUDE TESTIMONY OF EXPERT WITNESSES AND TO STRIKE EXPERT REPORTS

Page 5

HESI argued that Wecker's analysis was unreliable because it excluded the year 2010, thus conveniently excluding the Macondo blowout. *Id*. at 9-10. BP is silent about the fact that the data point for the Macondo blowout would lie <u>four feet</u> above the zero line of Wecker's chart had Wecker included it in his analysis. *Id*. BP fails to provide a cogent explanation for Wecker's exclusion of the Macondo event, offering only the claim that because opposing parties have challenged BP's safety culture leading up to the event, Wecker can refute those challenges by focusing exclusively on events prior to the Macondo blowout. *See* BP Wecker Response at 10. This argument is a nonstarter because opposing parties are challenging BP's safety record as both leading up to *and including Macondo*, and these events are being linked because BP's process safety deficiencies are, at least in part, a *causal factor* in the Macondo blowout. *See* Limine Order at 6. It makes no more sense to exclude Macondo from an analysis of BP's safety record than it would to exclude the sinking of the *Titanic* from an analysis of the safety record of the White Star Line.

Finally, as with Sutcliffe, BP references Bea and Hudson in an apparent effort to rehabilitate Wecker. *See* BP Wecker Response at 1, 4. The Court should be aware that both Bea and Hudson provide devastating assessments of Wecker's methodology. *See* Ex. A at 349:24-352:25 [Bea Dep.]; Hudson Rebuttal Expert Report at 1-3, 42-43.

### III. SCHOENNAGEL'S UNSUBSTANTIATED LEGAL CONCLUSIONS ARE INADMISSIBLE UNDER *DAUBERT*.

Concerning Schoennagel, BP's Response is so vague it amounts to a concession of the points raised in HESI's Motion. BP either ignores HESI's arguments, responds to challenges HESI never made,[4] or falsely claims that Schoennagel's opinions "are not legal conclusions" and

---

[4] For example, HESI did not challenge Schoennagel's report to the extent he was merely providing background information about the MMS or discussing the historical evolution of MMS regulations. Nevertheless, BP devotes a substantial portion of its Response attacking this straw man. HESI would note, however, that there is no need for

are "based on his experience at the MMS." *See* BP Schoennagel Response at 3. For example, HESI pointed out that Schoennagel offers the purely legal conclusion that 30 C.F.R. § 250.421 "does not require 500 feet of cement above every stringer identified in a wellbore." *See* Motion at 23-24. Schoennagel admits that this conclusion is <u>not</u> based on his experience at MMS. *Id*. Moreover, as HESI demonstrated, Schoennagel reached this conclusion based solely on legal research and analysis, drawing inferences from other statutes to shed light on the meaning of § 250.421, while implicitly concluding that the absence of cross-referencing in § 250.421 was not legally significant. *Id*. BP's Response is silent with respect to this specific example of an egregious flaw in Schoennagel's analysis.

As another example, HESI argued that Schoennagel admitted that he has no experience with § 250.401, § 250.427, or § 250.428, either while he was employed at MMS, or subsequently as a private consultant. *Id*. at 22-23. BP simply ignores this challenge, instead offering the vague argument that an expert's opinion may be admissible even though "it has been some time since the expert engaged in the particular activity . . ." *See* BP Schoennagel Response at 5. But HESI's argument was that Schoennagel has <u>never</u> had experience with these regulations, not that his experience was somewhat dated.

HESI pointed out that Schoennagel was unable to answer whether BP was required to take further action if it modified its temporary abandonment plan, because that would depend on what the New Orleans District Office would require, and Schoennagel did not know what this office would require. *See* Motion at 22. BP again ignores the argument.

---

BP to offer an "expert" to provide such background information because there are a variety of fact witnesses who were deposed in this case and who, unlike Schoennagel, are current employees of the MMS who do not purport to offer inadmissible legal conclusions under the guise of "expert" testimony (*e.g.* Bryan Domangue is currently the District Manager of the Houma District, and David Trocquet is the current District Manager of the New Orleans District).

HALLIBURTON ENERGY SERVICES, INC.'S COMBINED REPLY IN SUPPORT  Page 7
OF ITS MOTION TO EXCLUDE TESTIMONY OF EXPERT WITNESSES AND TO STRIKE EXPERT REPORTS

HESI also noted that Schoennagel opines that BP made prompt and full disclosures to MMS of what was occurring on the well as it was being drilled, yet Schoennagel made no attempt to verify whether the reported information was accurate. *Id*. at 25. Instead, Schoennagel employs circular reasoning and simply assumes that since the forms were sent to MMS, MMS would have contacted BP if more information was necessary, and therefore there was no need to assess the accuracy of the information. *Id*. In its Motion, HESI makes the self-evident point that disclosing false or misleading information to the MMS does not constitute compliance with the regulations, and the mere fact that something is written on paper does not make it true.[5] To the extent Schoennagel opines otherwise, his conclusions are purely speculative, and thus inadmissible under *Daubert*. It does not assist the Court for an "expert" to simply assume that whatever is reported on a form is, in fact, accurate. BP fails to address this argument with any clarity. *See* BP Schoennagel Response at 6.

## IV. J.J. AZAR'S OPINIONS SHOULD BE EXCLUDED TO THE EXTENT HE CONCEDED HIS LACK OF EXPERTISE

HESI challenged Azar to the extent he expressly conceded his lack of expertise. Although BP half-heartedly argues that an expert who expressly admits his lack of expertise may nevertheless be permitted to offer expert testimony on such topics, in essence BP's Response either concedes the points raised in HESI's Motion[6] or offers nonsensical rejoinders.

HESI noted that Azar expressly admitted he was not an expert on mudlogging and HESI accordingly sought exclusion of any of Azar's opinions regarding mudlogging. *See* Motion at

---

[5] In contrast to Schoennagel's approach of assuming that what is written on a report must be accurate, Dr. Alan Huffman, an expert for the United States, actually analyzed whether BP reported accurate information to the MMS. *See* Huffman Expert Report. Contrary to Schoennagel's blithe speculation that BP fully complied with the regulations, Huffman provides a detailed analysis in support of his conclusions that BP failed to disclose information to MMS and/or reported false information to that agency.

[6] Because he expressly admitted a lack of expertise on these topics, HESI sought to exclude Azar's testimony to the extent he opined on the topics of wait-on-cement, float collars, the BOP, or wireline logging. *See* Motion at 27-29. BP concedes this point. *See* BP Azar Response at 2.

29. BP's response is puzzling. BP claims that: (1) Azar "did not offer any opinions regarding mudlogging that were unrelated to the monitoring of Macondo well data," (2) that Azar's opinions do not require him to be an expert in mudlogging, and (3) that Azar is not qualified to opine as to the *quality* of HESI's mudlogging services on the Macondo well. *See* BP Azar Response at 7-8. As to the first point, it is a distinction without a difference to claim that Azar is not opining about mudlogging except to the extent it may be related to "monitoring of Macondo well data." The monitoring of Macondo well data is precisely what is at issue in this case. As to the second point, it is absurd for BP to claim that Azar's express acknowledgment of his lack of mudlogging expertise is somehow acceptable under *Daubert*, particularly when Azar concludes that the Macondo well blowout was not the result of a failure of BP's drilling engineering, but rather "was directly caused by the failure of the rig drilling crew *and mudloggers* to properly monitor the well and the failure to recognize that an influx of hydrocarbons entered the well consistent with fundamental well control principles." *See* Azar Expert Report at 1 (emphasis added); *see also* p. 6 (same); p. 16 (opining that "[w]ith so many indicators, the rig crew *and mud loggers* should not miss these critical opportunities for kick detection") (emphasis added); p. 44 (opining that simultaneous operations did not hinder the ability of the Sperry mudloggers to monitor the well on the evening of April 20, 2010). As to the third point, Azar certainly appears to question the *quality* of Sperry's mudlogging services to the extent he opines that the direct cause of the blowout was the failure of Sperry's mudloggers to detect the kick. *Id*.

BP's other responses are equally nonsensical. For example, HESI noted that Azar expressly conceded his lack of expertise regarding centralizers. *See* Motion at 28-29. Nevertheless, Azar specifically opines that it was reasonable for BP to ignore HESI's recommendation to use 21 centralizers and instead use only 6 centralizers. *See* Azar Expert

Report at 37-38. BP's response is to proclaim that Azar "candidly" acknowledged at his deposition that he had no expertise about the number of centralizers that should be used at Macondo, but that Azar's opinions in this regard are nevertheless acceptable under *Daubert* because he is merely opining about BP's "decision-making process." *See* BP Azar Response at 7. By focusing on the reasonableness of BP's "decision-making process" regarding the number of centralizers to use, BP ignores Azar's admitted ignorance regarding the substantive, key issue: whether it was reasonable for BP to decide to use 6 centralizers, instead of 21, in light of the potential hazards. It makes no sense to claim that Azar can offer credible, valid opinions on this topic while simultaneously conceding that Azar has no expertise on the substantive issue.[7]

Equally absurd is BP's claim that there is nothing problematic under *Daubert* about Azar expressly conceding his lack of expertise concerning whether gelled mud had the capacity to contaminate the cement and prevent it from achieving zonal isolation. *See* BP Azar Response at 6. BP claims that Azar's ignorance of this topic is acceptable because it "did not relate to any of the opinions that Dr. Azar actually sought to express, either in his report or at his deposition." *Id*. <u>This claim is false</u>. Azar opines that it was reasonable for BP not to perform a full bottoms up circulation immediately prior to cementing the production casing. *See* Azar Expert Report at 35. One reason to perform a full bottoms up immediately before a cementing operation is to remove gelled mud, which can contaminate the cement and prevent it from achieving zonal isolation. *See* Beck Rebuttal Report at 35-37; Lewis Expert Report at 50-51. If Azar lacks expertise about the ability of gelled mud to contaminate cement, he is hardly in a position to

---

[7] A similar analysis applies to Azar's express concession that he is not an expert on cement bond logs. *See* Motion at 28. Azar opines that it was reasonable for BP to forego a cement bond log. *See* Azar Expert Report at 39-40. Azar's conclusion is based on his belief that there is no certainty that a cement bond log alone would have provided information sufficient to identify any problems with the cement job. *Id*. at 40. Yet Azar conceded that this belief was not based on any expertise. *See* Motion at 28 (citing Azar Dep. at 206:7-8). BP's only response to this point is to claim that Azar is merely opining about BP's "decision-making process." *See* BP Azar Response at 7. Again, Azar cannot opine as an expert that BP's decision-making process was correct if he has no expertise about the precise issue that would show that BP's decision-making process was incorrect.

offer a reliable expert opinion to the effect that it was acceptable for BP to abstain from a full bottoms up circulation.

Azar opines that "it is unquestionable" that "the cement failed." Azar Expert Report at 36. BP's sole defense of this conclusion is that because there was a blowout, therefore the cement failed. *See* BP Azar Response at 2, 5. But the mere fact a blowout occurred does not mean the cement necessarily "failed."[8] The issue in this case is *whether* the cement did not achieve zonal isolation, and if so, *why*. There is no *a priori* assumption that because there was a blowout, the cement itself necessarily failed. This is precisely why Azar's conclusions regarding cement and "cement failure" should be excluded. Because Azar expressly conceded he is not an expert on wait on cement, cement operations, the effect of gelled mud on cement, cement bond logging, centralizers, or float collars, he cannot validly opine about any mechanism that would have caused a lack of zonal isolation in the absence of cement failure (*e.g.* that BP failed to wait long enough for the cement to fully set (the WOC issues) or created channels in the cement (the gelled mud/centralizers/CBL issues)). Indeed, Azar was forced to concede this point at his deposition, admitting that if BP did not wait a sufficient time for the cement to set, that would not constitute a "failure of the cement." *See* Ex. C at 288:11-292:2 [Azar Dep.].

## CONCLUSION

**WHEREFORE,** Defendant Halliburton Energy Services, Inc. prays that upon final hearing, this Court grant its Motion to Exclude Testimony of Expert Witnesses and to Strike Expert Reports [Dkt. 5406].

---

[8] As one obvious example, Dr. Ravi opines that a breach in the casing below the float collar would have caused little or no cement to be placed beneath that breach, thereby providing the main pay sands direct access to the inside of the casing. *See* Ravi Rebuttal Expert Report at 29-30. If the cement was not even in the correct location, there is no basis to say the cement "failed."

Respectfully submitted,

**GODWIN RONQUILLO PC**

/s/  *Donald E. Godwin*
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
dgodwin@GodwinRonquillo.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
bbowman@GodwinRonquillo.com
Jenny L. Martinez
State Bar No. 24013109
jmartinez@GodwinRonquillo.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
fhartley@GodwinRonquillo.com
Gavin E. Hill
State Bar No.  00796756
ghill@GodwinRonquillo.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

and

R. Alan York
ayork@GodwinRonquillo.com
Jerry C. von Sternberg
jvonsternberg@GodwinRonquillo.com
Misty Hataway-Coné
mcone@GodwinRonquillo.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Halliburton Energy Services, Inc.'s Combined Reply In Support of Its Motion to Exclude Testimony of Expert Witnesses and to Strike Expert Reports has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this 20th day of February, 2012.

/s/ *Donald E. Godwin*
Donald E. Godwin

HALLIBURTON ENERGY SERVICES, INC.'S COMBINED REPLY IN SUPPORT
OF ITS MOTION TO EXCLUDE TESTIMONY OF EXPERT WITNESSES AND TO STRIKE EXPERT REPORTS
Page 13

1866356 v1-24010/0002 PLEADINGS