UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" IN THE GULF OF | § | |
| MEXICO, ON APRIL 20, 2010 | § | SECTION J |
| | § | |
| IN RE: THE COMPLAINT AND | § | |
| PETITION OF TRITON ASSET | § | JUDGE BARBIER |
| LEASING GMBH, ET AL. IN A | § | |
| CAUSE OF EXONERATION FROM | § | MAGISTRATE JUDGE SHUSHAN |
| OR LIMITATION OF LIABILITY | § | |
| | § | |
| This Document Relates To: | § | |
| *All cases and No.: 2-10-cv-2771* | § | |
| | § | |
| | § | |

**MOTION TO STRIKE EXPERT REPORT OF GEOFF MR. WEBSTER FOR
SUBSTANTIAL RELIANCE ON EXCLUDED JIT REPORT AND TESTIMONY
OR, IN THE ALTERNATIVE, TO STRIKE PORTIONS OF EXPERT REPORT
AND TESTIMONY OF GEOFF MR. WEBSTER REFERENCING EXCLUDED
JIT REPORT AND JIT TESTIMONY**

# EXHIBIT B

1

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2

 3   IN RE:  OIL SPILL      )   MDL NO. 2179
     BY THE OIL RIG         )
 4   "DEEPWATER HORIZON" IN )   SECTION "J"
     THE GULF OF MEXICO, ON )
 5   APRIL 20, 2010         )   JUDGE BARBIER
                            )   MAG. JUDGE SHUSHAN
 6

 7

 8

 9

10

11

12

13

14

15

16

17            * * * * * * * * * * * * * * * *
                      VOLUME 1
18            * * * * * * * * * * * * * * * *

19

20

         Deposition of Edward Geoffrey Webster,
21   taken at the Pan-American Building, 601 Poydras
     Street, 11th Floor, New Orleans, Louisiana,
22   70130, on the 18th day of November, 2011.

23                 ┌──────────────────┐
                   │    EXHIBIT       │
24                 │      B           │
                   │  Edward Webster  │
25                 └──────────────────┘
```

**PURSUANT TO CONFIDENTIALITY ORDER**

29

1    A. Close off.  Prevent gas from entering
2  certain spaces, such as the Engine Rooms, the --
3  the mud room.
4    Q. Okay.  And you started to answer my
5  second question, which was when you say "certain
6  vessel equipment," specifically what equipment
7  are you talking about?
8    A. Well, under the -- if I may do this real
9  quick. (Reviewing document.)  Under the
10 Operation Manual, I believe both the Ops Manual
11 2000, which was the first one, and then the Ops
12 Manual 2004, Section 8.5.3, talks about vent --
13 ventilation outside the living quarters.  And
14 then it lists a whole bunch of different
15 compartments that the dampers should be closed
16 automatically when the -- when the gas sensor
17 senses gas.
18     And I know it was the Engine Room, was
19 the mud pump room, I think it was the shale
20 shaker room.  Any area where there was the -- the
21 possibility or the presence of -- of causing an
22 explosion.
23    Q. Okay.  And the last question about the --
24 the language of that sentence, you indicated that
25 Transocean, in -- in overriding the system, had

30

1  converted it to one requiring human intervention.
2  And what do you mean by "converting it"?
3    A. Well, the IACS System is like what we
4  call a "PLC."  PLC means programmable logic
5  controller.  And what you can do, using the
6  interface or the computer interface, an
7  Electronic Technician can actually change the
8  functioning or the sequencing of a certain piece
9  of equipment.
10     For example, you can change the automatic
11 shut-down function of a louver to a manual
12 function, just by changing the path, if you want
13 to call it, in the IACS or the PLC.  So they had
14 modified it to be manually operated.  So in --
15    Q. Who's "they"?
16    A. -- other words --
17    Q. I -- I didn't mean to interrupt you, but
18 you --
19    A. Well --
20    Q. -- mentioned "they."  Who's "they"?
21    A. Well, Transocean or -- or -- or
22 Kongsberg.  I -- I don't know whether the
23 electron -- Electricians onboard the vessel could
24 do it, I'm -- I'm sure they could, because most
25 of these IT guys onboard are very, very smart.

31

1    Q. Okay.  And do you know when those
2  conversions occurred?
3    A. No, but Mr. Williams said that he was
4  onboard for, I believe, a year, and it -- it had
5  been done before that.  And I think there's some
6  other testimony that they had been overridden for
7  four or five years.
8    Q. Okay.  So approximately four or five
9  years ago?
10    A. Yes.
11    Q. Oh -- four or five years before the --
12    A. I believe --
13    Q. -- incident?
14    A. Yes, sir.  That's my understanding.
15    Q. And you -- you mentioned Mr. Williams.
16 You're talking about Michael Williams?
17    A. Yes, sir.
18    Q. Okay.  And you do cite -- in your Report
19 in Footnote 20, you cite the deposition of
20 Michael Williams in support for that statement
21 that I just went over.
22    A. That is correct.
23    Q. My question is -- that's the only
24 deposition that you cite, only piece of evidence
25 you cite:  Do you have any other support for that

32

1  statement that Transocean had overridden the
2  system for years and converted it to one
3  requiring human intervention, other than Michael
4  Williams' deposition?
5    A. Actually, the -- the Transocean Report of
6  the accident or -- or the -- the Rebuttal Report
7  of Transocean to the Coast Guard Report suggests
8  that Transocean didn't like the idea of automatic
9  shutdown, and that's why that -- that -- it
10 wasn't in auto.
11    Q. Okay.  That's your understanding of what
12 the Report said?
13    A. Yes.  And I think there's other testimony
14 about the -- well, there is other testimony.
15 Ms. Fleytas says that -- I'm pretty sure in her
16 deposition, that the general alarm was not in
17 "Auto," that it was in "Manual."
18    Q. In the same paragraph, you indicate that
19 Transocean failed "...to train...crew members
20 responsible for monitoring and responding to the
21 alarm system in a worst-case scenario."
22    A. Cor --
23    Q. Do you recall that statement?
24    A. Yes, sir.
25    Q. Okay.  What crew members are you

8 (Pages 29 to 32)

**PURSUANT TO CONFIDENTIALITY ORDER**

45

1    Q. Let's turn to your discussion of the ISM
2  Code. I believe it starts on Page 5 --
3    A. Yes, sir.
4    Q. -- of your Report. And you reference
5  the -- the ISM Code's discussion of Safety
6  Management Systems --
7    A. Correct.
8    Q. -- SMS?
9      So if I refer to "SMS" in this
10  deposition, would you agree to understand that
11  I'm referencing "Safety Management Systems"?
12    A. Yes, sir.
13    Q. Okay. You would agree that Transocean
14  authored an SMS?
15    A. Yes.
16    Q. Okay. You would agree that Transocean
17  implemented an SMS?
18    A. To a certain extent, yes.
19    Q. And I understand your Report is -- and
20  we'll get to the -- the issues you have with how
21  they implemented it. My -- my question was:
22  They did more than just authored it, they -- they
23  implemented a system that you may have some
24  issues as to how they did it?
25    A. Yes, they started implementation.

46

1    Q. You would agree that the DEEPWATER
2  HORIZON was certified under the ISM?
3    A. Yes.
4    Q. And you reference the Requirement for
5  designation of a -- this is too many designations
6  here, but the designation of a Designated Person?
7    A. Yes.
8    Q. Okay. Transocean designated a Designated
9  Person, did it not, for the DEEPWATER HORIZON?
10    A. For two conditions, yes.
11    Q. Okay. And what were those two
12  conditions?
13    A. One condition was when the vessel was
14  underway going from job to job, that would put
15  the Captain with the ultimate responsibility of
16  the vessel; and when on site drilling, that would
17  put the OIM as the on-site responsible person.
18    Q. And this is probably the way I phrased
19  the question, Mr. Webster, which was poorly.
20  Take a look at Page 6. In the middle of the
21  page, you discuss Section 4 of the ISM and its
22  discussion of Designated Person?
23    A. Yes.
24    Q. That -- the -- that type of Designated
25  Person, that's not the -- the OIM or the Master,

47

1  is it?
2    A. Okay. Well, that confused me, your word
3  of "Designated Person" --
4    Q. I -- I apologize.
5    A. -- because you have designated people
6  onboard, and then you have actually -- what --
7  what I term "DPA," which is Designated Person
8  Ashore.
9    Q. Why don't we just -- you -- I like your
10  approach better. We'll just refer to the
11  Designated Person mentioned on Page 6 as DPA?
12    A. That's perfect.
13    Q. Okay.
14    A. Mr. Canducci.
15    Q. Okay. And you -- with that comment, you
16  answered my question, but I'll go ahead and ask
17  it. Transocean did designate a DPA, correct?
18    A. That is correct.
19    Q. Okay. And who was that person?
20    A. Mr. Canducci.
21    Q. Okay. You indicate that Mr. Canducci
22  had, using your language, "...woefully inadequate
23  knowledge of the ISM Code."
24    A. Correct.
25    Q. Okay. You cite the U.S. Coast Guard

48

1  Report for support of that statement. Is there
2  anything else that you relied upon in concluding
3  that Mr. Canducci had "...woefully inadequate
4  knowledge of the ISM Code"?
5    A. Yes.
6      MR. COLOMB: Which footnote are we
7  looking at?
8      MR. KINCHEN: Sure. And it's
9  actually Footnote 34.
10      MR. COLOMB: 34, thank you.
11    A. Yes. His deposition.
12    Q. (By Mr. Kinchen) Okay. Anything else?
13    A. Well, I have to say this, as well: The
14  lack of documentation that I've seen in the file.
15  There's normally a lot of communication between
16  the DPA and the Captain. There's always -- there
17  should be Nonconformity Report. There should be
18  Corrective Action Reports. There should be
19  Reports from the DPA to the Senior Management
20  level on each vessel.
21      I mean, that's -- his function is to
22  understand what's happening on each vessel, to
23  understand they are operated safely, and Report
24  the same to the President and Senior Management.
25    Q. Okay. And do you know when Transocean

12 (Pages 45 to 48)



49

1 designated Mr. Canducci as its DPA?
2     A. From recollection, possibly a year before
3 the accident, something like that.
4     Q. So your -- your understanding is, is
5 approx -- approximately April 2009?
6     A. I believe that's right, yes --
7     Q. Okay.
8     A. -- from my memory.
9     Q. And do you have any knowledge at all of
10 any problems or issues in recovering E-mail
11 communications between the DEEPWATER HORIZON and
12 shore as a result of the April 20th, 2010
13 explosion?
14     A. No.
15     Q. All right. You indicate that
16 Mr. Canducci's "...training consisted of a
17 three-day course."
18         Is it your testimony here and
19 understanding that this was the only training
20 that Mr. Canducci ever received regarding the ISM
21 Code?
22     A. That's the -- yes, that's all I have seen
23 in the file and in his Report and his deposition.
24     Q. You indicate that: "He never worked with
25 the flag state of the Republic of the Marshall

50

1 Islands...or the United States Coast Guard...on
2 any ISM-related matters."
3     A. Correct.
4     Q. Is that still your position?
5     A. That's the information I got from the
6 Coast Guard Report.
7     Q. Okay. I know that's the information you
8 got from the Coast Guard Report. Is that your
9 position?
10     A. Yes. Well, and also in his deposition, I
11 don't believe it ever came up.
12     Q. Okay. Do you know who Jimmy Moore is?
13     A. I think -- was that his assistant? I
14 think he had a Second-in-Command.
15     Q. Do you know what Jimmy Moore's
16 responsibilities were?
17     A. If I remember correctly, ISM Auditor or
18 something like that.
19     Q. Okay.
20         THE COURT REPORTER: Three minutes.
21     Q. (By Mr. Kinchen) You indicate --
22     A. Excuse me.
23         THE WITNESS: After three minutes we
24 break?
25         THE COURT REPORTER: (Nodding.)

51

1         THE WITNESS: Okay. Sorry.
2     A. Excuse me.
3     Q. (By Mr. Kinchen) You indicate that
4 Mr. Canducci had never been onboard the DEEPWATER
5 HORIZON. You indicate: "Amazingly..." he "had
6 never been on board the" DEEPWATER HORIZON. Do
7 you recall that?
8     A. Yes.
9     Q. Okay. By the way, have you ever met
10 Mr. Canducci?
11     A. No, sir.
12     Q. And it's your position, again, that --
13 that Mr. Canducci assumed his DPA role in
14 approximately April of 2009?
15     A. That's to the best of my recollection,
16 yes.
17     Q. Okay. Do you know how many rigs were in
18 the North American fleet at the time he took his
19 job?
20     A. I understand there's like six or eight of
21 them. I --
22     Q. Okay. In determining whether or not
23 Mr. Canducci -- well, in concluding that it was
24 amazing that he had never been onboard the
25 DEEPWATER HORIZON, did -- do you think that it

52

1 would have been appropriate to determine when he
2 assumed his DPA role?
3     A. No, because I would have thought that
4 once he took the role, the first thing he would
5 have done would've visited the vessels and said,
6 "Hey, I'm the" -- "I'm the DPA. Captain, OIM, if
7 you have problems, you have to talk to me. Do
8 you have any issues with the ISM?" I mean, to
9 me, that's what I would have expected.
10     Q. And that's not a Requirement in anywhere
11 to do that, correct?
12     A. Good practice.
13     Q. And my question was: Is that a
14 Requirement anywhere?
15         MR. WILLIAMS: Object to the form.
16     A. No.
17     Q. (By Mr. Kinchen) So you're -- you're not
18 suggesting that Mr. Canducci violated any
19 Regulation by not visiting the DEEPWATER HORIZON?
20     A. No, I'm not.
21         MR. KINCHEN: How much time?
22         THE COURT REPORTER: One minute.
23         MR. KINCHEN: Why don't we stop
24 there.
25         THE WITNESS: Okay. Thank you.

PURSUANT TO CONFIDENTIALITY ORDER

73

1    A. Correct.
2    Q. And -- and certainly you make that point
3 in your Report. Have you ever seen the EDS
4 procedures for the drill crew on the DEEPWATER
5 HORIZON?
6    A. Yes.
7    Q. You have? When did you see those?
8    A. It -- it's in the -- it's in a particular
9 document.
10    Q. I would agree with you there. When did
11 you see that particular document?
12    A. When I read the file. It may be actually
13 in part of my -- may I look, if you don't mind?
14    Q. Sure.
15    A. (Reviewing document.)
16       (Discussion off the record.)
17    A. In fact, I read it yesterday again.
18    Q. (By Mr. Kinchen) You read the -- you read
19 the EDS procedures for the drill crew?
20    A. Yes. Well, I -- I read the -- the book
21 it's in.
22    Q. What's your understanding as to the EDS
23 procedures for the drill crew for the DEEPWATER
24 HORIZON? In other words, who can activate it and
25 when?

74

1    A. Could you just hold on a minute and let
2 me see -- let me make sure -- just refresh my
3 memory.
4       (Reviewing document.) I can't find it.
5 I'm sorry.
6       Okay. To answer your question, I -- I
7 believe that suggests that the Toolpusher can
8 also activate the EDS, as well as the people on
9 the bridge.
10    Q. Okay. You indicate on -- and I believe
11 we're on Page 7 -- that the Master, Captain
12 Kuchta, was woefully undertrained in the SMS?
13    A. Yes.
14    Q. You cite to the U.S. Coast Guard Report.
15 Did you rely on anything else in coming to that
16 conclusion?
17    A. Well, yes, by what happened during the
18 accident and lack of any other backup data to
19 show that he was following the ISM protocol.
20    Q. Okay. By "what happened in the
21 accident," are you talking about the act -- the
22 actions of the Captain?
23    A. Yes.
24    Q. Okay. And what -- what specific actions
25 of the Captain are you referencing?

75

1    A. Well, clearly, by not immediately taking
2 control, I mean, the OIM could have been killed,
3 and I -- I know he -- I believe he came in and
4 couldn't breathe --
5    Q. And --
6    A. -- but I mean, he should have taken
7 control. He was the guy in charge of the rig.
8 He's the overall responsibility. He should have
9 known that, as the Captain.
10    Q. It's your position that the Captain
11 didn't immediately take control?
12    A. Absolutely.
13    Q. Okay. And what do you base that on, that
14 statement?
15    A. Well, by the fact that they waited for
16 their OIM to come to give permission to EDS.
17    Q. And I -- I should have been more
18 specific. Are you talking again about Chris
19 Pleasant's testimony?
20    A. Yes. And -- and not just that, the fact
21 that it wasn't done immediately. There was a
22 delay.
23    Q. Right. But you weren't there, obviously,
24 so you understand my question is, your -- what
25 are you basing your -- your -- your knowledge of

76

1 what happened on -- and you mentioned Chris
2 Pleasant's testimony --
3    A. Yes.
4    Q. -- as far as what the Captain did?
5    A. Well, and then there's a -- there are
6 other -- there's other testimony there. I mean,
7 Bertone, the Chief Engineer, when he went there,
8 he asked permission to start the emergency
9 generator, I believe, so there was -- so there
10 was a lot of things going on there that the
11 Captain failed to take control of. I mean, the
12 first thing he should have done is got that rig
13 off that well. That's the -- the first thing you
14 do in an emergency like that, stop the rig from
15 burning, you know.
16    Q. Well, and -- and that's a -- let's talk
17 about that for a second. It's -- because we
18 haven't really focused on that.
19       It's your position, then, that -- well,
20 actually, let's wait, and let's -- let's talk
21 about that later.
22       With respect to your conclusion about
23 Captain Kuchta's training, did you review any
24 testimony that described the Time Out for Safety
25 Policy that was in place on the DEEPWATER

19 (Pages 73 to 76)

**PURSUANT TO CONFIDENTIALITY ORDER**

109

1 Transocean in their -- I think they bought them
2 out, if I understand, or they joined companies.
3     Q. M-h'm.
4     A. And I would imagine then that Transocean
5 had a different protocol, you know.
6     Q. Okay. So it's your understanding that --
7     A. That's it.
8     Q. -- when Transocean acquired R&B Falcon,
9 at that point that's when the modifications
10 occurred on the DEEPWATER HORIZON?
11     A. I believe so, to the IACS control.
12     Q. Okay. You state that -- right at the
13 very bottom of Page 11, you say it was standard
14 practice on the DEEPWATER HORIZON to set a number
15 of the combustible gas detectors in inhibited
16 mode. Do you see that?
17     A. Yes.
18     Q. And you cite the testimony of Michael
19 Williams in Footnote 86 as support?
20     A. Yes.
21     Q. Is that the only support that you have
22 for that statement?
23     A. No. It's also in the Coast Guard Report,
24 I believe.
25     Q. Okay. Do you rely on anything else

110

1 besides the testimony of Michael Williams and the
2 Coast Guard Report for that position?
3     A. I may have, but right now I don't recall.
4     Q. So as we sit here today, you don't know
5 of anything else that you relied on?
6     A. I don't remember, but as I say, I may
7 have.
8     Q. When you -- I know you've indicated that
9 you reviewed the MODU Spec Report, the 2009 and
10 2010 MODU Spec Reports. Did you review its
11 observation regarding the status and operability
12 of the combustible gas detectors when you're
13 formulating the opinion that we just read?
14     A. I must have done, yes.
15     Q. Okay. And do you know what the Report
16 said regard -- or -- and the observations that it
17 made regarding the status and operability of the
18 combustible gas detectors?
19     A. I don't remember. I'm sorry.
20     Q. You're not aware if they contradicted
21 your opinion at all?
22     A. No.
23     Q. They may have?
24     A. They may have, yes, because there's such
25 a heck of a big gui -- document, so --

111

1     Q. Okay. That doesn't change your opinion,
2 though, if the ModuSpec Report disagreed with
3 your opinion?
4     MR. WILLIAMS: Object to the form.
5     A. No, not really. I'd have to review the
6 ModuSpec Report and see what it said exactly.
7     Q. (By Mr. Kinchen) Sure. And certainly
8 you've relied upon the ModuSpec Report in
9 formulating other opinions in this Report of
10 yours?
11     A. Yes, I have.
12     Q. You indicate, moving to Page 12, that
13 Transocean bypassed an automatic shutdown system
14 designed to cut off electrical power when the
15 ventilation shutdown system safely failed as a
16 redundancy. Do you see that?
17     A. Where is that? I'm sorry. Where's --
18     Q. It's at the top of Page 12, first
19 sentence of Page 12.
20     A. (Reviewing document.)
21     Q. Do you see that sentence?
22     A. Yes.
23     Q. My question is, frankly: What are you --
24 what are you talking about here?
25     A. May I just look?

112

1     Q. Sure.
2     A. (Reviewing document.)
3     Oh, yes. I think in the Driller's Shack,
4 if that alarm goes off in the Driller's Shack,
5 then I think all the power is taken out of the
6 Driller's Shack for safety, and they have to
7 repower up once the alarm is reset.
8     That's -- that doesn't mean the
9 electrical power aboard the vessel, period, you
10 know.
11     Q. Okay. And maybe that's what I was
12 misunderstanding.
13     A. Right.
14     Q. You're just talking about the electrical
15 power to the Drill Shack?
16     A. Yes.
17     Q. Okay. And so that's what you're
18 referencing in that sentence?
19     A. Correct, sir.
20     Q. You cite the deposition of Michael
21 Williams and the Coast Guard Report. Did you
22 rely on anything else besides those two items in
23 support of your conclusion there?
24     A. It may have been in the ModuSpec Report,
25 too.

28 (Pages 109 to 112)

**PURSUANT TO CONFIDENTIALITY ORDER**

117

1  Q. (By Mr. Kinchen) Okay. Well, you cite
2  the Transocean Investigative Report. What did
3  you rely on in making that conclusion that the
4  overspeed trip -- overspeed trips mounted on the
5  engines failed to activate?
6  A. My experience of working with diesel
7  engines for 40 years.
8  Q. Okay. Anything else besides your
9  experience?
10  A. Well, the fact it was reported by several
11  people onboard that they heard the engines speed
12  up. They -- they -- shortly afterwards, there
13  was a blackout, and shortly after that there was
14  an explosion in -- in one of the Engine Rooms,
15  and then an explo -- I think it was Engine Room
16  No. 3 and then Engine Room No. 6, but I may be
17  wrong with those numbers.
18  Q. Okay. Is it your position, when you're
19  talking about the overspeeds, that the lack of
20  access to air prevented it from activating, the
21  overspeeds from activating?
22  A. No, nothing to do with the lack of air.
23  Q. Okay.
24  A. It's -- it has to do with the -- the gas
25  going into the engine, because what happens is

118

1  when the gas goes in the engine, it -- it's a
2  fuel, and that fuel speeds the engine up. You
3  have several trips on the engine. One is on the
4  governor. When it goes too fast, the governor's
5  supposed to pull back and turn the fuel back;
6  therefore, stopping or slowing the engine down.
7    The overspeed trip is designed, if it
8  goes I believe it's something like ten or fifteen
9  percent overspeed, it, too, is to shut the fuel
10  down.
11  Q. Okay. And I did -- I misstated when I
12  said lack of air. You clarified that.
13    Are you aware of any ent -- entities that
14  reviewed and approved the design of this engine
15  system when it was built?
16  A. I believe Wartsila, yes, but -- but there
17  were also air shutoff valves, and that's the --
18  if you like, the most important feature when
19  you're dill -- were drilling around gas. And
20  that's --
21    MR. KINCHEN: And I'm going to
22  object as --
23  A. -- an MMS Requirement.
24    MR. KINCHEN: -- nonresponsive.
25  A. The --

119

1  Q. (By Mr. Kinchen) My -- my question is --
2    MR. WILLIAMS: Go ahead.
3  Q. (By Mr. Kinchen) -- are you aware of
4  any -- and -- and you answered that question.
5  "Wartsila."
6    You state that: "The vessel's electrical
7  power stayed on, even after the ventilation
8  system safety features failed, which also allowed
9  combustible gas to enter enclosed areas
10  containing an" in -- "ignition source like the
11  driller's shack."
12    Do you see that? That's No. 3 on Page
13  12.
14  A. Yes.
15  Q. And my question is: What's your basis
16  for that statement?
17  A. The same thing. I mean, those dampers
18  should have closed cutting off the air, cutting
19  off the intake of combustible gas -- I mean,
20  yeah, gases into the engines.
21  Q. Okay.
22  A. The air shutoff valves didn't work,
23  either, so --
24  Q. Are you -- and I'm not even, at this --
25  at least at this point, asking you to -- whether

120

1  you agree with it, but are you aware of any
2  reasons why a -- the owner of a vessel such as
3  Transocean, would not want these dampers to be
4  automatically activated?
5  A. Oh, absolutely. I'm aware of their --
6  their protocol, which is against everything that
7  I can imagine. It's a --
8  Q. Okay. Let -- let's talk --
9  A. -- very stupid thing to do.
10  Q. Well -- and let's talk about the reason
11  that -- that you know, before we even talk about
12  your -- your opinion about it. What is your
13  understanding as to the reason why?
14  A. Well, in -- in -- I believe it's in their
15  Rebuttal Report to the Coast Guard, they state
16  that they don't like the air dampers to be closed
17  when the engines are running, because the air
18  dampers can be sucked in. And they don't want
19  the engines to stop, because they're on a DP,
20  they're in a -- in -- dynamically positioned over
21  the well. They don't want to have a -- a
22  drift-off --
23  Q. Okay.
24  A. -- which is, in my opinion, ridiculous.
25  Q. Okay. And -- and I want -- I -- I want

**PURSUANT TO CONFIDENTIALITY ORDER**

121

1 to hear -- tell me why you think it's ridiculous.
2 A. Well, why? You get an engine blowup and
3 a rig that sinks.
4 Q. Do you think it's unsafe for a rig to
5 drift?
6 A. Yes, but it's designed to drift, sir.
7 Q. Well, and -- and maybe we're
8 misunderstanding. I -- I -- I asked you: Do you
9 think that that's a -- a problem, a safety
10 problem, for a rig to drift?
11 A. No, it's not a safety problem. It's a
12 money problem. The CAJUN EXPRESS had three
13 drift-offs because they lost power. Nobody died.
14 No fire.
15 Q. The CAJUN EXPRESS was a vessel that you
16 were on, correct?
17 A. Yes.
18 Q. You were doing a survey?
19 A. Yes.
20 Q. And what is your recollection of how the
21 fire dampers were installed on the CAJUN EXPRESS?
22 A. I --
23 Q. Were they automatic?
24 A. -- I don't know. Frankly, I don't know.
25 I wasn't -- I wasn't there for that. I was there

122

1 to investigate why they lost complete power,
2 which is very unusual, of course, especially on
3 a -- a DPIII rig.
4 Q. Okay. And the issue of whether or not
5 they had fire dampers that could or --
6 A. They --
7 Q. -- that would or would not automatically
8 activate, did not factor into your investigation
9 as to why they lost power?
10 A. No, because it was nothing to do that --
11 this was -- it was to do with the Hirschman
12 dioptic converter.
13 Q. Okay. And you did not deem that vessel
14 unseaworthy?
15 A. I did not.
16 Q. Okay. Have you ever been on a DP MODU
17 that was configured differently than the
18 DEEPWATER HORIZON, with respect to the fire
19 dampers in the Engine Room?
20 A. I can't answer that. I don't know.
21 Q. Okay. So you don't know. In your entire
22 40 or 50 inspections, this ridiculous
23 configuration that you've deemed the fire
24 dampers, the automatic -- the -- the -- the
25 nonautomatic fire dampers -- that's a terrible

123

1 question.
2 In your 40 and 50 investigations and --
3 and surveys of DP MODUs, you're not aware of any
4 one of those having a configuration, with respect
5 to the fire dampers in the Engine Room, any
6 different than those on the DEEPWATER HORIZON?
7 A. I'm not, but I would assume there is.
8 Q. Okay. And with respect to those, those
9 Marine surveys that you were doing on those 40 or
10 50 DP MODUs, you were there to, among other
11 things, determine whether or not this was a
12 seaworthy vessel?
13 MR. WILLIAMS: Object to the form.
14 A. That's correct, yes.
15 Q. (By Mr. Kinchen) And did it cross your
16 mind, at any point, to determine whether or not
17 any of these vessels had a ridiculously
18 configured fire damper system that made the
19 vessel unsafe and unseaworthy?
20 MR. WILLIAMS: Object to form.
21 A. I did not, nor did ModuSpec.
22 Q. (By Mr. Kinchen) How many of those 40 or
23 50 DP MODUs that you surveyed had a general alarm
24 system that was configured like the DEEPWATER
25 HORIZON, where the -- where it did not

124

1 automatically activate?
2 A. I don't remember.
3 Q. You never checked on the configuration of
4 the general alarm on these 40 or 50 vessels when
5 you were determining whether or not they were
6 seaworthy?
7 A. I may have.
8 Q. But you --
9 A. And --
10 Q. -- just don't recall?
11 A. No, I don't recall.
12 Q. Not one?
13 A. No.
14 Q. Not one instance?
15 A. No.
16 Q. In any of those 40 or 50 surveys, did you
17 investigate the competency of any of the crew
18 members?
19 A. No, because I was doing a Safety Audit,
20 and some of the audits were accommodation
21 surveys.
22 Q. Okay. So you never -- you never
23 investigated the competency of a -- a Master?
24 A. No -- well, other than seeing his
25 Certificates.

PURSUANT TO CONFIDENTIALITY ORDER

**133**

1 reconfigured so that they weren't automatic?
2     A. They're the same thing.
3     Q. The same thing we were just talking
4 about?
5     A. Yes, sir.
6     Q. So given that we -- we have -- and -- and
7 I'm confident, actually, that -- that I'm not the
8 one that's describing it in -- using two
9 different terms, and I don't necessarily think
10 you are, too, but in the Regulations, again, I
11 see both terms. But bear with me, and I -- I --
12 this may be in certain situations asked and
13 answered, but let's -- let's use that term, air
14 intake valves, the "rig savers." It's your
15 position that the rig savers on the DEEPWATER
16 HORIZON had been reconfigured so that they were
17 not automatic?
18     A. Yes.
19     Q. Okay.
20     A. Rig savers/air intake valves.
21     Q. Okay. And those required human
22 intervention?
23     A. Yes.
24     Q. Okay. Let's move to Section VI, the
25 "INCOMPETENT VESSEL CREW."

**134**

1         MR. KINCHEN: How are we doing? How
2 much -- how much on this tape?
3         THE COURT REPORTER: Sixteen
4 minutes.
5         THE VIDEOGRAPHER: Sixteen minutes,
6 you've got 53 total.
7         MR. KINCHEN: Okay.
8     Q. (By Mr. Kinchen) This is on Page 13 of
9 your Report.
10     A. Yes.
11     Q. You indicate that the Dynamic Positioning
12 Officers had been trained by Kongsberg to operate
13 the DP system, but that neither had been trained
14 regarding the Fire and Gas System. Do you see
15 that?
16     A. Yes.
17     Q. And then you also say, "or in how to
18 respond to a worst-case scenario of cascading gas
19 alarms." You see that?
20     A. Yes.
21     Q. You referenced there in Footnote 95 the
22 testimony of Andrea Fleytas?
23     A. Yes.
24     Q. The Joint Investigation Team?
25     A. (Nodding.)

**135**

1     Q. Did -- did you review the deposition
2 testimony of Yancy Keplinger when you were
3 investigating this particular issue?
4     A. Yes, I read it.
5     Q. Okay. And did Yancy Keplinger, as far as
6 your understanding, discuss whether or not he had
7 been trained regarding the Fire and Gas System?
8     A. I believe he did.
9     Q. And what was your understanding as to
10 whether or not he had been trained regarding the
11 Fire and Gas System?
12     A. I don't recall. I'm sorry.
13     Q. Okay. You don't recall, and you didn't
14 cite his testimony, but yet you conclude that
15 neither had been trained regarding the Fire and
16 Gas System?
17     A. Well, certainly because --
18         MR. WILLIAMS: Object to the form.
19         THE WITNESS: Sorry.
20     A. Say it?
21     Q. (By Mr. Kinchen) You can answer.
22     A. Certainly, because based upon what you
23 read and what was happening there, he didn't know
24 what to do either.
25     Q. Okay. And so let's just get this clear:

**136**

1 It's your testimony here today that Yancy
2 Keplinger and Andrea Fleytas had no training on
3 the Fire and Gas System?
4     A. No. I mean, you just said it. I -- I
5 don't know that she did, but he may have had some
6 training, yes.
7     Q. Well, tell me how that that is consistent
8 with your statement in your Report, that neither
9 of the duty DPOs -- and we're talking about
10 Andrea Fleytas and Yancy Keplinger, correct?
11     A. Yes.
12     Q. -- neither had been trained regarding the
13 Fire and Gas System. I just asked you that
14 question, and you said that may not be correct.
15     A. Correct.
16     Q. So you may have a statement right there
17 that I just read in your Report that is not
18 accurate?
19     A. That could be so, sir, yes.
20     Q. Okay. Any reason why you would put a
21 statement in your Report in this case that is not
22 accurate?
23     A. No, but I think -- I think -- I think the
24 Coast Guard came to the same conclusion, so that
25 may be why I put it down.

34 (Pages 133 to 136)

**PURSUANT TO CONFIDENTIALITY ORDER**

133

1 reconfigured so that they weren't automatic?
2    A. They're the same thing.
3    Q. The same thing we were just talking
4 about?
5    A. Yes, sir.
6    Q. So given that we -- we have -- and -- and
7 I'm confident, actually, that -- that I'm not the
8 one that's describing it in -- using two
9 different terms, and I don't necessarily think
10 you are, too, but in the Regulations, again, I
11 see both terms. But bear with me, and I -- I --
12 this may be in certain situations asked and
13 answered, but let's -- let's use that term, air
14 intake valves, the "rig savers." It's your
15 position that the rig savers on the DEEPWATER
16 HORIZON had been reconfigured so that they were
17 not automatic?
18    A. Yes.
19    Q. Okay.
20    A. Rig savers/air intake valves.
21    Q. Okay. And those required human
22 intervention?
23    A. Yes.
24    Q. Okay. Let's move to Section VI, the
25 "INCOMPETENT VESSEL CREW."

134

1       MR. KINCHEN: How are we doing? How
2 much -- how much on this tape?
3       THE COURT REPORTER: Sixteen
4 minutes.
5       THE VIDEOGRAPHER: Sixteen minutes,
6 you've got 53 total.
7       MR. KINCHEN: Okay.
8    Q. (By Mr. Kinchen) This is on Page 13 of
9 your Report.
10    A. Yes.
11    Q. You indicate that the Dynamic Positioning
12 Officers had been trained by Kongsberg to operate
13 the DP system, but that neither had been trained
14 regarding the Fire and Gas System. Do you see
15 that?
16    A. Yes.
17    Q. And then you also say, "or in how to
18 respond to a worst-case scenario of cascading gas
19 alarms." You see that?
20    A. Yes.
21    Q. You referenced there in Footnote 95 the
22 testimony of Andrea Fleytas?
23    A. Yes.
24    Q. The Joint Investigation Team?
25    A. (Nodding.)

135

1    Q. Did -- did you review the deposition
2 testimony of Yancy Keplinger when you were
3 investigating this particular issue?
4    A. Yes, I read it.
5    Q. Okay. And did Yancy Keplinger, as far as
6 your understanding, discuss whether or not he had
7 been trained regarding the Fire and Gas System?
8    A. I believe he did.
9    Q. And what was your understanding as to
10 whether or not he had been trained regarding the
11 Fire and Gas System?
12    A. I don't recall. I'm sorry.
13    Q. Okay. You don't recall, and you didn't
14 cite his testimony, but yet you conclude that
15 neither had been trained regarding the Fire and
16 Gas System?
17    A. Well, certainly because --
18       MR. WILLIAMS: Object to the form.
19       THE WITNESS: Sorry.
20    A. Say it?
21    Q. (By Mr. Kinchen) You can answer.
22    A. Certainly, because based upon what you
23 read and what was happening there, he didn't know
24 what to do either.
25    Q. Okay. And so let's just get this clear:

136

1 It's your testimony here today that Yancy
2 Keplinger and Andrea Fleytas had no training on
3 the Fire and Gas System?
4    A. No. I mean, you just said it. I -- I
5 don't know that she did, but he may have had some
6 training, yes.
7    Q. Well, tell me how that that is consistent
8 with your statement in your Report, that neither
9 of the duty DPOs -- and we're talking about
10 Andrea Fleytas and Yancy Keplinger, correct?
11    A. Yes.
12    Q. -- neither had been trained regarding the
13 Fire and Gas System. I just asked you that
14 question, and you said that may not be correct.
15    A. Correct.
16    Q. So you may have a statement right there
17 that I just read in your Report that is not
18 accurate?
19    A. That could be so, sir, yes.
20    Q. Okay. Any reason why you would put a
21 statement in your Report in this case that is not
22 accurate?
23    A. No, but I think -- I think -- I think the
24 Coast Guard came to the same conclusion, so that
25 may be why I put it down.

34 (Pages 133 to 136)

**PURSUANT TO CONFIDENTIALITY ORDER**

133

1 reconfigured so that they weren't automatic?
2   A. They're the same thing.
3   Q. The same thing we were just talking
4 about?
5   A. Yes, sir.
6   Q. So given that we -- we have -- and -- and
7 I'm confident, actually, that -- that I'm not the
8 one that's describing it in -- using two
9 different terms, and I don't necessarily think
10 you are, too, but in the Regulations, again, I
11 see both terms. But bear with me, and I -- I --
12 this may be in certain situations asked and
13 answered, but let's -- let's use that term, air
14 intake valves, the "rig savers." It's your
15 position that the rig savers on the DEEPWATER
16 HORIZON had been reconfigured so that they were
17 not automatic?
18   A. Yes.
19   Q. Okay.
20   A. Rig savers/air intake valves.
21   Q. Okay. And those required human
22 intervention?
23   A. Yes.
24   Q. Okay. Let's move to Section VI, the
25 "INCOMPETENT VESSEL CREW."

134

1       MR. KINCHEN: How are we doing? How
2 much -- how much on this tape?
3       THE COURT REPORTER: Sixteen
4 minutes.
5       THE VIDEOGRAPHER: Sixteen minutes,
6 you've got 53 total.
7       MR. KINCHEN: Okay.
8   Q. (By Mr. Kinchen) This is on Page 13 of
9 your Report.
10   A. Yes.
11   Q. You indicate that the Dynamic Positioning
12 Officers had been trained by Kongsberg to operate
13 the DP system, but that neither had been trained
14 regarding the Fire and Gas System. Do you see
15 that?
16   A. Yes.
17   Q. And then you also say, "or in how to
18 respond to a worst-case scenario of cascading gas
19 alarms." You see that?
20   A. Yes.
21   Q. You referenced there in Footnote 95 the
22 testimony of Andrea Fleytas?
23   A. Yes.
24   Q. The Joint Investigation Team?
25   A. (Nodding.)

135

1   Q. Did -- did you review the deposition
2 testimony of Yancy Keplinger when you were
3 investigating this particular issue?
4   A. Yes, I read it.
5   Q. Okay. And did Yancy Keplinger, as far as
6 your understanding, discuss whether or not he had
7 been trained regarding the Fire and Gas System?
8   A. I believe he did.
9   Q. And what was your understanding as to
10 whether or not he had been trained regarding the
11 Fire and Gas System?
12   A. I don't recall. I'm sorry.
13   Q. Okay. You don't recall, and you didn't
14 cite his testimony, but yet you conclude that
15 neither had been trained regarding the Fire and
16 Gas System?
17   A. Well, certainly because --
18       MR. WILLIAMS: Object to the form.
19       THE WITNESS: Sorry.
20   A. Say it?
21   Q. (By Mr. Kinchen) You can answer.
22   A. Certainly, because based upon what you
23 read and what was happening there, he didn't know
24 what to do either.
25   Q. Okay. And so let's just get this clear:

136

1 It's your testimony here today that Yancy
2 Keplinger and Andrea Fleytas had no training on
3 the Fire and Gas System?
4   A. No. I mean, you just said it. I -- I
5 don't know that she did, but he may have had some
6 training, yes.
7   Q. Well, tell me how that that is consistent
8 with your statement in your Report, that neither
9 of the duty DPOs -- and we're talking about
10 Andrea Fleytas and Yancy Keplinger, correct?
11   A. Yes.
12   Q. -- neither had been trained regarding the
13 Fire and Gas System. I just asked you that
14 question, and you said that may not be correct.
15   A. Correct.
16   Q. So you may have a statement right there
17 that I just read in your Report that is not
18 accurate?
19   A. That could be so, sir, yes.
20   Q. Okay. Any reason why you would put a
21 statement in your Report in this case that is not
22 accurate?
23   A. No, but I think -- I think -- I think the
24 Coast Guard came to the same conclusion, so that
25 may be why I put it down.

34 (Pages 133 to 136)

PURSUANT TO CONFIDENTIALITY ORDER

137

1    Q. So you're saying that the Coast Guard may
2    also have an inaccurate statement in their
3    Report?
4    A. They may have, yes.
5    Q. Okay. As see sit here today, can you
6    tell me at all, based upon your investigation,
7    what training Yancy Keplinger and Andrea Fleytas
8    did have in the Fire and Gas System?
9    A. Very little.
10   Q. What training?
11   A. Very little. That's all I can answer
12   you.
13   Q. That's all you can tell me?
14   A. Yes.
15   Q. You cannot tell me any detail, any
16   specifics about the training of Andrea Fleytas
17   and Yancy Keplinger, even though you have stated
18   that they had no training?
19   A. We just discussed it.
20   Q. I -- I --
21   A. So --
22   Q. And I -- I don't think we discussed
23   exactly what their training was, and -- and I
24   guess you -- you're just saying you don't know?
25   A. I don't recall.

138

1        MR. WILLIAMS: Object to the form.
2    A. Sorry.
3    Q. (By Mr. Kinchen) I'm sorry. Say that
4    again?
5    A. I said I don't recall. It's just my
6    opinion they didn't, because of what happened.
7    Q. Okay.
8    A. They obviously didn't. If they had
9    training, they didn't have much training.
10   Q. That's your only basis, because of what
11   happened?
12       MR. WILLIAMS: Object to the form.
13   A. No. I -- I'm not sure that she was very
14   specific in her deposition -- I mean, in her
15   statement of what training she had.
16   Q. (By Mr. Kinchen) She wasn't very
17   specific. But again, I'm -- I'm asking you if
18   you have specifics, and you don't, do you?
19       MR. WILLIAMS: Object to the form.
20   A. I just replied to you, sir.
21   Q. (By Mr. Kinchen) And what was the answer?
22   A. I don't recall.
23   Q. You say "cascading gas alarms" in that
24   statement. Are you talking about two or more
25   alarms when you say cascading gas alarms?

139

1    A. Oh, I think, yes. A lot more than two or
2    four.
3    Q. Okay. Is it your understanding that --
4    you cite Andrea Fleytas again, the same sentence.
5    Is it your understanding that Andrea Fleytas
6    testified that she had no training as to whether
7    or not to hit the general alarm when two or more
8    gas sensors went off?
9    A. I don't recall.
10   Q. And let's skip training. What did Andrea
11   Fleytas, the testimony that you reviewed, what
12   did she testify about whether or not she hit the
13   general alarm when two or more sensors went off
14   on April the 20th, 2010?
15   A. No. She said she did, but that's
16   contradicted by the Shore Manager, Mr. Winslow.
17   Q. Okay. So in this situation, you cited
18   Ms. Fleytas's testimony, but you're suggesting
19   that actually her testimony on that issue is
20   contradicted by Daun Winslow, whose testimony you
21   don't cite in this footnote?
22       MR. WILLIAMS: Object to the form.
23   A. No, I'm making an observation. I don't
24   know that the -- for sure, that the general alarm
25   was sounded. It's -- there's a -- a suggestion

140

1    it wasn't.
2    Q. (By Mr. Kinchen) Okay.
3    A. I think that's up to the Judge to decide.
4    It's not up to me.
5    Q. Well, actually, you stated earlier today
6    that the general alarm never went off on April
7    the 20th, 2010.
8    A. That's what Mr. Winslow said.
9    Q. Okay. That's what you said. Do you want
10   to take back that testimony now?
11       MR. WILLIAMS: Object to the form.
12   A. No. Based upon what Mr. Winslow said, I
13   based that -- my assumption on that.
14   Q. (By Mr. Kinchen) Okay. We can agree
15   that, at least in -- from -- in your
16   understanding, that on this issue, the testimony
17   of -- at least your understanding, the testimony
18   of Andrea Fleytas contradicts the testimony of
19   Daun Winslow as to whether Andrea Fleytas
20   activated the general alarm?
21       MR. WILLIAMS: Object to the form.
22   A. It does, yes.
23   Q. (By Mr. Kinchen) Okay. And in this
24   particular instance, you are choosing to rely
25   upon the testimony of Daun Winslow, instead of

PURSUANT TO CONFIDENTIALITY ORDER

141

1 the testimony of Andrea Fleytas on this issue?
2     A. Absolutely. He's a Senior man. He's got
3 a lot of experience, a lot more than she has.
4 And she was in a panic mode. I mean, I don't
5 know that poor girl even understood what she did.
6     Q. What about Mr. Keplinger, did you review
7 his testimony as to whether or not he received
8 any training on whether to hit the general alarm
9 when he receives two or more alarms?
10     A. I don't recall. I'm sorry.
11     Q. What about David Young, did you review
12 his testimony?
13     A. H'm, I don't know. (Reviewing document.)
14 Oh, I have to go to the other one. Appendix B.
15 Oh, it's Appendix C.
16         What was his name again, please?
17     Q. David Young.
18     A. David Young.
19     Q. First Mate.
20         I guess, let me ask an obvious question:
21 If it's not in that Appendix that you're looking
22 in, can we conclude that you did not review it?
23     A. Yes.
24     Q. Okay. That's -- that's all I needed to
25 know.

142

1     A. Okay. It doesn't ring a bell to me,
2 that's why I wanted to check, but --
3     Q. Sure.
4     A. You know, you said I didn't review many
5 depositions, but, in fact, I did review quite a
6 few.
7     Q. I -- I -- I -- my -- my question to you
8 about depositions was really how many you had
9 reviewed.
10         Okay. "Instead of" -- the -- the next
11 sentence says: "Instead of sounding the general
12 alarm, advising the crew members in the engine
13 control room to shut down the engines, and
14 ensuring that the IACS automatic shutdown systems
15 described herein went online, DPO Andrea Fleytas
16 simply acknowledged the alarms from the bridge."
17         Do you see that?
18     A. Yes.
19     Q. Okay. And you cite the testimony of
20 Andrea Fleytas in support of that?
21     A. Yes. That's what she said.
22     Q. Okay. But again, it's your -- it's your
23 position that Andrea Fleytas did not activate the
24 general alarm?
25     A. Yes. I told you, I don't know that she

143

1 remembers what she was doing, poor girl, I mean,
2 she was totally panicked.
3     Q. Right. And -- and -- and, you know,
4 you're obviously referencing her testimony, I
5 understand what you're saying, but do you recall
6 reviewing Yancy Keplinger's deposition testimony
7 on this very issue?
8     A. No, I don't. I'm sorry.
9     Q. All right.
10         THE COURT REPORTER: Five minutes.
11     Q. (By Mr. Kinchen) You say that the -- you
12 do refer to Mr. Keplinger. You say: "The more
13 senior DPO, Yancy Keplinger, allowed this to
14 occur."
15         Do you see that?
16     A. Yes.
17     Q. Okay. And you cite the testimony of
18 Andrea Fleytas with respect to that statement?
19     A. Yes.
20     Q. Did you review the testimony of Yancy
21 Keplinger when you were making the statement that
22 Yancy Keplinger allowed this to occur?
23     A. I must have done, because I was -- you
24 know, you kept saying deposition of him. I think
25 there's only testimony, in the JIT, of Keplinger.

144

1     Q. Did you review any testimony from the JIT
2 with respect to Yancy Keplinger?
3     A. I did.
4     Q. Okay. And what was his position on
5 whether or not he allowed this to occur?
6     A. I don't -- I don't recall.
7     Q. Okay. You recall what Andrea said, but
8 you don't recall what Yancy said?
9     A. Sure. She was the person in -- over the
10 Unit.
11     Q. Okay. And if Yancy's testimony
12 contradicts yours -- well, scratch that question,
13 just so Duke doesn't have to object.
14         You say: "At a minimum, minimally
15 competent DPOs in this situation would have
16 allowed the cascading alarms to progress to a
17 general alarm."
18         Do you see that?
19     A. Yes.
20     Q. Okay. Let's -- let's step back for a
21 second. Based upon everything that you've
22 reviewed, what did you identify to be the first
23 indicator on the bridge that there was a well
24 control problem?
25     A. The gas alarms.

36 (Pages 141 to 144)

PURSUANT TO CONFIDENTIALITY ORDER

141

1 the testimony of Andrea Fleytas on this issue?
2     A. Absolutely. He's a Senior man. He's got
3 a lot of experience, a lot more than she has.
4 And she was in a panic mode. I mean, I don't
5 know that poor girl even understood what she did.
6     Q. What about Mr. Keplinger, did you review
7 his testimony as to whether or not he received
8 any training on whether to hit the general alarm
9 when he receives two or more alarms?
10     A. I don't recall. I'm sorry.
11     Q. What about David Young, did you review
12 his testimony?
13     A. H'm, I don't know. (Reviewing document.)
14 Oh, I have to go to the other one. Appendix B.
15 Oh, it's Appendix C.
16         What was his name again, please?
17     Q. David Young.
18     A. David Young.
19     Q. First Mate.
20         I guess, let me ask an obvious question:
21 If it's not in that Appendix that you're looking
22 in, can we conclude that you did not review it?
23     A. Yes.
24     Q. Okay. That's -- that's all I needed to
25 know.

142

1     A. Okay. It doesn't ring a bell to me,
2 that's why I wanted to check, but --
3     Q. Sure.
4     A. You know, you said I didn't review many
5 depositions, but, in fact, I did review quite a
6 few.
7     Q. I -- I -- I -- my -- my question to you
8 about depositions was really how many you had
9 reviewed.
10         Okay. "Instead of" -- the -- the next
11 sentence says: "Instead of sounding the general
12 alarm, advising the crew members in the engine
13 control room to shut down the engines, and
14 ensuring that the IACS automatic shutdown systems
15 described herein went online, DPO Andrea Fleytas
16 simply acknowledged the alarms from the bridge."
17         Do you see that?
18     A. Yes.
19     Q. Okay. And you cite the testimony of
20 Andrea Fleytas in support of that?
21     A. Yes. That's what she said.
22     Q. Okay. But again, it's your -- it's your
23 position that Andrea Fleytas did not activate the
24 general alarm?
25     A. Yes. I told you, I don't know that she

143

1 remembers what she was doing, poor girl, I mean,
2 she was totally panicked.
3     Q. Right. And -- and -- and, you know,
4 you're obviously referencing her testimony, I
5 understand what you're saying, but do you recall
6 reviewing Yancy Keplinger's deposition testimony
7 on this very issue?
8     A. No, I don't. I'm sorry.
9     Q. All right.
10         THE COURT REPORTER: Five minutes.
11     Q. (By Mr. Kinchen) You say that the -- you
12 do refer to Mr. Keplinger. You say: "The more
13 senior DPO, Yancy Keplinger, allowed this to
14 occur."
15         Do you see that?
16     A. Yes.
17     Q. Okay. And you cite the testimony of
18 Andrea Fleytas with respect to that statement?
19     A. Yes.
20     Q. Did you review the testimony of Yancy
21 Keplinger when you were making the statement that
22 Yancy Keplinger allowed this to occur?
23     A. I must have done, because I was -- you
24 know, you kept saying deposition of him. I think
25 there's only testimony, in the JIT, of Keplinger.

144

1     Q. Did you review any testimony from the JIT
2 with respect to Yancy Keplinger?
3     A. I did.
4     Q. Okay. And what was his position on
5 whether or not he allowed this to occur?
6     A. I don't -- I don't recall.
7     Q. Okay. You recall what Andrea said, but
8 you don't recall what Yancy said?
9     A. Sure. She was the person in -- over the
10 Unit.
11     Q. Okay. And if Yancy's testimony
12 contradicts yours -- well, scratch that question,
13 just so Duke doesn't have to object.
14         You say: "At a minimum, minimally
15 competent DPOs in this situation would have
16 allowed the cascading alarms to progress to a
17 general alarm."
18         Do you see that?
19     A. Yes.
20     Q. Okay. Let's -- let's step back for a
21 second. Based upon everything that you've
22 reviewed, what did you identify to be the first
23 indicator on the bridge that there was a well
24 control problem?
25     A. The gas alarms.

36 (Pages 141 to 144)

PURSUANT TO CONFIDENTIALITY ORDER



145

1    Q. Okay. And as you've described them, the
2  cascading gas alarms?
3    A. Well, I think a couple went off, then all
4  of a sudden they all started going off.
5    Q. Okay.
6    A. Well, not all, of course, but all that
7  got drenched with the -- the gas.
8    Q. Okay. So it's your understanding that
9  there was no indication of a Well Control Event
10 or anything like that until the alarms went off?
11   A. I believe that's correct from the -- at
12 the bridge.
13   Q. Okay. And what's your basis for that
14 conclusion?
15   A. I believe, based on Andrea Fleytas's
16 testimony.
17   Q. Okay. Anything else?
18   A. No, I don't think so.
19   Q. What's your understanding of the time it
20 would take, assuming that the general alarm
21 system wasn't configured in the way that --
22 that -- that we know it was, where it required
23 human intervention, what's your understanding of
24 the time it would take for multiple alarms to
25 activate the general alarm?

146

1    A. The way I understand it, only two, you
2  needed only two --
3    Q. Okay.
4    A. -- in the same space. So how long would
5  it take? Seconds.
6    Q. Seconds. Okay. Okay. You state that
7  the "...Transocean policy required the drillers
8  to respond to combustible and toxic gas alarms,"
9  that "were not trained on the IACS system."
10   Do you recall making that statement?
11   A. Yes.
12   Q. Okay. Did -- you -- you reference only,
13 in, Footnote 99, the U.S. Coast Guard Report.
14 Did you rely on anything else besides the U.S.
15 Coast Guard Report in concluding what
16 Transocean's Policy was on this issue?
17   A. Yes. I think it's in their Well Control
18 Handbook.
19   Q. Well Control Handbook?
20   A. Yeah.
21     THE COURT REPORTER: Thirty seconds.
22   Q. (By Mr. Kinchen) Anything else?
23   A. I don't recall at this point.
24   Q. Okay.
25     MR. KINCHEN: Okay. Why don't we

147

1  stop there, then.
2     THE VIDEOGRAPHER: The time is
3  12:09 p.m. We're off the record, ending Tape 3.
4     (Recess from 12:09 p.m. to 1:05 p.m.)
5     MR. KINCHEN: Ready.
6     THE VIDEOGRAPHER: All set?
7    The time is 1:05 p.m. We're back on the
8  record, beginning Tape 4.
9    Q. (By Mr. Kinchen) Mr. Webster --
10   A. M-h'm.
11   Q. -- let me go back and ask you a question
12 about the ISM Code. And if you could turn to
13 Page 7 of your Report, and I specifically want to
14 ask you about Section 5.2. And we were talking
15 about the -- the person in command in an
16 emergency situation.
17   Do you recall that discussion?
18   A. I do.
19   Q. Okay. And I had asked you about the
20 DEEPWATER HORIZON Operations Manual --
21   A. Yes.
22   Q. -- do you recall that?
23   And you -- you indicated that you had
24 reviewed it, correct?
25   A. Correct.

148

1    Q. And it was your understanding that the
2  Manual discussed who was in charge, OIM versus
3  the Master, but that with respect to emergency
4  situations, there was discussion or requirement
5  of some sort of changeover.
6    A. Yes.
7    Q. Okay. And you had indicated in your
8  Report as to the appropriate way to address this
9  authority issue, and you -- you had cited 5.2,
10 and I'll let you take a look at 5.2.
11   Is that your understanding as to how the
12 issue should be addressed by a company such as
13 Transocean?
14   A. (Reviewing document.) Yes.
15   Q. Okay. And specifically it says: "The
16 company should establish in the SMS that the
17 master has the overriding authority and the
18 responsibility to make decisions with respect to
19 safety and pollution prevention and to request
20 the company's assistance as necessary"?
21   A. Correct.
22   Q. And is it your position that that
23 provision is not in the DEEPWATER HORIZON's
24 Operation Manual?
25   A. (Reviewing document.) Well, let's see.

37 (Pages 145 to 148)

**PURSUANT TO CONFIDENTIALITY ORDER**

145

1    Q. Okay.  And as you've described them, the
2  cascading gas alarms?
3    A. Well, I think a couple went off, then all
4  of a sudden they all started going off.
5    Q. Okay.
6    A. Well, not all, of course, but all that
7  got drenched with the -- the gas.
8    Q. Okay.  So it's your understanding that
9  there was no indication of a Well Control Event
10 or anything like that until the alarms went off?
11   A. I believe that's correct from the -- at
12 the bridge.
13   Q. Okay.  And what's your basis for that
14 conclusion?
15   A. I believe, based on Andrea Fleytas's
16 testimony.
17   Q. Okay.  Anything else?
18   A. No, I don't think so.
19   Q. What's your understanding of the time it
20 would take, assuming that the general alarm
21 system wasn't configured in the way that --
22 that -- that we know it was, where it required
23 human intervention, what's your understanding of
24 the time it would take for multiple alarms to
25 activate the general alarm?

146

1    A. The way I understand it, only two, you
2  needed only two --
3    Q. Okay.
4    A. -- in the same space.  So how long would
5  it take?  Seconds.
6    Q. Seconds.  Okay.  Okay.  You state that
7  the "...Transocean policy required the drillers
8  to respond to combustible and toxic gas alarms,"
9  that "were not trained on the IACS system."
10      Do you recall making that statement?
11   A. Yes.
12   Q. Okay.  Did -- you -- you reference only,
13 in, Footnote 99, the U.S. Coast Guard Report.
14 Did you rely on anything else besides the U.S.
15 Coast Guard Report in concluding what
16 Transocean's Policy was on this issue?
17   A. Yes.  I think it's in their Well Control
18 Handbook.
19   Q. Well Control Handbook?
20   A. Yeah.
21      THE COURT REPORTER: Thirty seconds.
22   Q. (By Mr. Kinchen) Anything else?
23   A. I don't recall at this point.
24   Q. Okay.
25      MR. KINCHEN: Okay.  Why don't we

147

1  stop there, then.
2      THE VIDEOGRAPHER: The time is
3  12:09 p.m.  We're off the record, ending Tape 3.
4      (Recess from 12:09 p.m. to 1:05 p.m.)
5      MR. KINCHEN: Ready.
6      THE VIDEOGRAPHER: All set?
7    The time is 1:05 p.m.  We're back on the
8  record, beginning Tape 4.
9    Q. (By Mr. Kinchen) Mr. Webster --
10   A. M-h'm.
11   Q. -- let me go back and ask you a question
12 about the ISM Code.  And if you could turn to
13 Page 7 of your Report, and I specifically want to
14 ask you about Section 5.2.  And we were talking
15 about the -- the person in command in an
16 emergency situation.
17      Do you recall that discussion?
18   A. I do.
19   Q. Okay.  And I had asked you about the
20 DEEPWATER HORIZON Operations Manual --
21   A. Yes.
22   Q. -- do you recall that?
23      And you -- you indicated that you had
24 reviewed it, correct?
25   A. Correct.

148

1    Q. And it was your understanding that the
2  Manual discussed who was in charge, OIM versus
3  the Master, but that with respect to emergency
4  situations, there was discussion or requirement
5  of some sort of changeover.
6    A. Yes.
7    Q. Okay.  And you had indicated in your
8  Report as to the appropriate way to address this
9  authority issue, and you -- you had cited 5.2,
10 and I'll let you take a look at 5.2.
11      Is that your understanding as to how the
12 issue should be addressed by a company such as
13 Transocean?
14   A. (Reviewing document.)  Yes.
15   Q. Okay.  And specifically it says:  "The
16 company should establish in the SMS that the
17 master has the overriding authority and the
18 responsibility to make decisions with respect to
19 safety and pollution prevention and to request
20 the company's assistance as necessary"?
21   A. Correct.
22   Q. And is it your position that that
23 provision is not in the DEEPWATER HORIZON's
24 Operation Manual?
25   A. (Reviewing document.)  Well, let's see.

PURSUANT TO CONFIDENTIALITY ORDER