1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  OIL SPILL BY THE OIL RIG    *   10-MD-2179-CJB-SS
            *DEEPWATER HORIZON* IN THE    *
6           GULF OF MEXICO ON            *
            APRIL 20, 2010               *   February 10, 2012
7                                        *
                                         *
8   Applies to:  All Cases              *   9:30 a.m.
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

9

10

11                  DISCOVERY STATUS CONFERENCE
                 BEFORE THE HONORABLE SALLY SHUSHAN
12                UNITED STATES MAGISTRATE JUDGE

13

14  Appearances:

15

16  For the Plaintiffs:         Domengeaux Wright Roy
                                  & Edwards, LLC
                                BY:  JAMES P. ROY, ESQ.
17                              556 Jefferson Street, Suite 500
                                Post Office Box 3668
18                              Lafayette, Louisiana 70502

19

20  For the Plaintiffs:         Herman Herman Katz & Cotlar, LLP
                                BY:  STEPHEN J. HERMAN, ESQ.
21                              820 O'Keefe Avenue
                                New Orleans, Louisiana 70113

22

23  For the Plaintiffs:         Williamson & Rusnak
                                BY:  JIMMY WILLIAMSON, ESQ.
24                              4310 Yoakum Boulevard
                                Houston, Texas 77006

25

1   Appearances:

2   For the Plaintiffs:          Levin Papantonio Thomas Mitchell
                                   Rafferty & Proctor, PA
3                               BY:  BRIAN H. BARR, ESQ.
                                316 South Baylen Street, Suite 600
4                               Post Office Box 12308
                                Pensacola, Florida 32591
5

6   For the Plaintiffs:          Cunningham Bounds, LLC
                                BY:  ROBERT T. CUNNINGHAM, ESQ.
7                               1601 Dauphin Street
                                Mobile, Alabama 36604
8

9   For the Plaintiffs:          Lewis Kullman Sterbcow & Abramson
                                BY:  PAUL M. STERBCOW, ESQ.
10                              601 Poydras Street, Suite 2615
                                New Orleans, Louisiana 70130
11

12  For the Plaintiffs:          Breit Drescher Imprevento
                                   & Walker, PC
13                              BY:  JEFFREY A. BREIT, ESQ.
                                999 Waterside Drive, Suite 1000
14                              Norfolk, Virginia 23510

15
    For the Federal              U.S. Department of Justice
16  Government Interests:        Torts Branch, Civil Division
                                BY:  R. MICHAEL UNDERHILL, ESQ.
17                              7-5395 Federal Bldg., Box 36028
                                450 Golden Gate Avenue
18                              San Francisco, California 94102

19
    For the Federal              U.S. Department of Justice
20  Government Interests:        Environment & Natural Resources
                                BY:  SARAH D. HIMMELHOCH, ESQ.
21                              Post Office Box 663
                                Washington, DC 20044
22

23  For the Federal              U.S. Department of Justice
    Government Interests:        Environmental Enforcement Section
24                              BY:  STEVEN O'ROURKE, ESQ.
                                     A. NATHANIEL CHAKERES, ESQ.
25                              Post Office Box 7611
                                Washington, DC 20044

```
 1   Appearances:

 2
     For the State Interests:      Attorney General's Office
 3                                 BY:  COREY L. MAZE, ESQ.
                                   500 Dexter Avenue
 4                                 Montgomery, Alabama 36130

 5
     For the Defendant:            Liskow & Lewis, APLC
 6                                 BY:  DON K. HAYCRAFT, ESQ.
                                   701 Poydras Street, Suite 5000
 7                                 New Orleans, Louisiana 70139

 8
     For the Defendant:            Kirkland & Ellis, LLP
 9                                 BY:  J. ANDREW LANGAN, ESQ.
                                        MARK J. NOMELLINI, ESQ.
10                                      BRIAN A. KAVANAUGH, ESQ.
                                   300 N. Lasalle
11                                 Chicago, Illinois 60654

12
     For the Defendant:            Kirkland & Ellis, LLP
13                                 BY:  ROBERT R. GASAWAY, ESQ.
                                   655 Fifteenth Street NW
14                                 Washington, DC 20005

15
     For the Defendant:            Frilot, LLC
16                                 BY:  KERRY J. MILLER, ESQ.
                                   1100 Poydras Street, Suite 3700
17                                 New Orleans, Louisiana 70163

18
     For the Defendant:            Sutherland Asbill & Brennan, LLP
19                                 BY:  DAVID A. BAAY, ESQ.
                                        RACHEL GIESBER CLINGMAN, ESQ.
20                                 1001 Fannin Street, Suite 3700
                                   Houston, Texas 77002
21

22   For the Defendant:            Stone Pigman Walther Wittmann, LLC
                                   BY:  PHILLIP A. WITTMANN, ESQ.
23                                      CARMELITE M. BERTAUT, ESQ.
                                   546 Carondelet Street
24                                 New Orleans, Louisiana 70130

25
```

1    Appearances:

2

3    For the Defendant:              Beck Redden & Secrest, LLP
                                     BY:  DAVID J. BECK, ESQ.
                                     1221 McKinney, Suite 4500
4                                    Houston, Texas 77010

5

6    For the Defendant:              Godwin Ronquillo, PC
                                     BY:  DONALD E. GODWIN, ESQ.
                                     1201 Elm Street, Suite 1700
7                                    Dallas, Texas 75270

8

9    For the Defendant:              Godwin Ronquillo, PC
                                     BY:  R. ALAN YORK, ESQ.
                                     1331 Lamar, Suite 1665
10                                   Houston, Texas 77010

11

12   For the Defendant:              Kuchler Polk Schell
                                        Weiner & Richeson, LLC
                                     BY:  DEBORAH D. KUCHLER, ESQ.
13                                   1615 Poydras Street, Suite 1300
                                     New Orleans, Louisiana 70112

14

15   For the Defendant:              Bingham McCutchen, LLP
                                     BY:  WARREN A. FITCH, ESQ.
16                                   2020 K Street NW
                                     Washington, DC 20006

17

18   For National Response          Weil Gotshal & Manges, LLP
     Management, Inc.:               BY:  THEODORE E. TSEKERIDES, ESQ.
19                                   767 Fifth Avenue
                                     New York, New York 10153

20

21   Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                     500 Poydras Street, Room HB-406
22                                   New Orleans, Louisiana 70130
                                     (504) 589-7778

23

24

25   Proceedings recorded by mechanical stenography using
     computer-aided transcription software.

**PROCEEDINGS**

**(February 10, 2012)**

1

2

3         (The following proceedings were held in open court.)

4         **THE COURT:**  Okay.  Lets rock and roll.  The phone

5  participants, you can hear me?

6         **UNIDENTIFIED SPEAKER:**  Yes, ma'am.

7         **UNIDENTIFIED SPEAKER:**  Barely, Your Honor.

8         **THE COURT:**  Barely?

9         **UNIDENTIFIED SPEAKER:**  They're pretty faint.

10        **THE COURT:**  Could we turn up the volume on that?  Is

11  the microphone on?

12        **THE DEPUTY CLERK:**  Yes, ma'am.

13        **THE COURT:**  Telephone participants, is that better?

14        **UNIDENTIFIED SPEAKER:**  I don't notice a difference,

15  Your Honor.

16        **THE COURT:**  Let's talk about BOP and capping stack.

17  February 15 is the day for everybody to talk about the contents

18  in the five remaining gator boxes.  Yesterday or the day before

19  we got from Captain Englebert her report and invoice for

20  January.  I've asked Rob to undertake his bookkeeping task of

21  allocating how the invoice should be paid.

22              Anything to report on that Rob?

23        **MR. GASAWAY:**  Good morning.  Rob Gasaway for BP.

24  Yes, Your Honor.

25              David Baay, of Transocean, and I spoke about the

1   ownership of the capping stack issue.

2              So maybe, David, you could report on kind of

3   where we are.

4              **MR. BAAY:**  Good morning, Judge.

5              **THE COURT:**  How are you doing, David?

6              **MR. BAAY:**  David Baay for Transocean.  Rob and I

7   spoke last night, as he mentioned.  And my people have been

8   telling me that much of the equipment that's in the capping

9   stack we own, so I'm the source of whatever proof we have of

10  that.  I'll get with Rob and figure that out.

11             **MR. GASAWAY:**  Your Honor, I'd also report that we

12  circled back from Captain Englebert to David Grassmick, and we

13  confirmed that the capping stack, of course, is in the evidence

14  yard, where we hold the rights to keep it as opposed to some of

15  the buildings where we are giving up the leases.  So we don't

16  think there's a hard stop on February 15 on this.  And with

17  everything else going on, if we could just have a little bit of

18  leeway to dig through our paperwork, meet and confer, take this

19  issue off the Court's need to resolve --

20             **THE COURT:**  Not a problem, not a problem.  I might

21  suggest arm wrestling.  Look at the size of Gasaway.  I would

22  suggest to you that you don't want to do that.  You're

23  deceptively strong.

24             So anything else on the testing or protocol that

25  we need an update on?

1          **MR. GASAWAY:**  No, Your Honor.  I think we are in good
2     shape on all that.
3          **THE COURT:**  Good.  Thank you.
4               Fact witness list.  We have had some revision to
5     the fact witness list.  What is everybody's thought on whether
6     we should revise again?
7          **MR. LANGAN:**  Your Honor, I think BP did the master
8     list before.
9          **THE COURT:**  You did.
10          **MR. LANGAN:**  We would be willing to occasionally, if
11     the Court wants and the parties want, maybe reissue what we
12     understand the master list to look like based upon the
13     inevitable iterations that occur.
14          **THE COURT:**  I think that's fine.
15               Does anybody see a problem with that?
16          **MR. LANGAN:**  We will do the experts, too, if people
17     want.  We have it all in one place.
18          **THE COURT:**  If you don't mind, why don't we do that.
19     We'll keep it updated as we go.
20          **MR. LANGAN:**  Track changed or just clean?
21          **THE COURT:**  I think just clean.
22               Does anybody have a problem with that?  I don't
23     think we have time to talk about track changes anymore.
24               Don Godwin agrees.  It must be right.
25          **MR. GODWIN:**  I agreed with Andy on something,

1  Your Honor.

2          **THE COURT:**  That's fine.  I don't think track changes

3  are --

4          **MR. LANGAN:**  Okay.  We'll issue a clean one this week

5  sometime.

6          **THE COURT:**  As long as we have a pretty up-to-date

7  and final for the 27th, I think we are in good shape.

8          **MR. LANGAN:**  Very good.  We'll shoot for that.

9          **MR. UNDERHILL:**  Could I ask for a clarification?

10  Maybe if Andy does that he could, to make our lives easier,

11  indicate what is changed maybe on a separate list.

12          And also a clarification.  I looked at Cameron's

13  that was filed last night, and it looks like they added -- I

14  think I got that they added one, maybe.  Some they added are

15  actually called by other --

16          **MR. LANGAN:**  We are all over.

17          **MR. UNDERHILL:**  So my question is:  Is it a

18  free-for-all for parties to add witnesses?  We don't intend to

19  do so, but I want to know the ground rules.

20          **THE COURT:**  I think we had a final witness list date,

21  and there was a reason we had a final witness list date, but

22  that's one girl's thought.

23          **MR. UNDERHILL:**  Well, you wear the black robe, and we

24  just wear, actually, illegally, ties today.  I'm not supposed

25  to wear a tie.

1      THE COURT:  Correct.  You know why Andy is doing it,

2  civil disobedience, but why are you doing it?

3      MR. UNDERHILL:  I'm a contrarian too.

4      MR. LANGAN:  I'm not a contrarian.

5      MR. UNDERHILL:  So do I take this, at least one

6  black-robed woman's opinion, to be that our witness lists are

7  fixed insofar as adding witnesses that are not on somebody's

8  list already?

9      THE COURT:  Except for good cause shown.

10      MR. UNDERHILL:  Got it.  Thank you.

11      THE COURT:  I don't know about the additions, so I

12  won't comment.

13      MR. LANGAN:  I hear Mr. Underhill.  I guess what I

14  would propose is before the 27th we will produce a clean

15  witness list, fact and expert, plus a CompareRite that shows

16  how it compares to what was done on the 20th of January.

17      MR. MILLER:  I think the only changes are those set

18  forth in the --

19      MR. LANGAN:  We agree.  Mr. Coronado was added or

20  something.

21      THE COURT:  Those should be the only --

22      MR. MILLER:  It's not a free-for-all.  It's very

23  structured.

24      MR. LANGAN:  There's a few modest things.

25      MR. MILLER:  We can do it.

1           **THE COURT:**  Phone participant who is shuffling papers
2   and squeaking their chair, could you please not do that.  Thank
3   you very much.
4               Let's talk about trial subpoenas and try to keep
5   it quick and easy.  If a party issued any additional subpoenas
6   or in the future issues any, please let everybody know that you
7   have done it.
8               If a party intends to release a witness who has
9   been served with a subpoena, don't forget that you must notify
10  all parties before you report to the witness that the witness
11  is going to be released from the subpoena.
12              If a party contends that service of a subpoena
13  is defective for any reason, you must notify the Court and all
14  counsel within seven days of service of the subpoena.  Seven
15  days is probably too long, but anyway.
16              I guess at this point I want to talk about
17  records custodian.  That's the part I want to keep short.
18              Good morning, Steve.
19          **MR. HERMAN:**  Good morning, Your Honor.  Steve Herman
20  for the PSC.  Is there a question, or do you want me to briefly
21  say something?
22          **THE COURT:**  Let's briefly hear from you, because we
23  certainly got some pushback, shall we say, to the idea of
24  having records custodians available as we work our way through
25  the trial.

1          **MR. HERMAN:**  Well, I think we would certainly agree

2    that the consensus of all parties -- plaintiffs, defendants,

3    and particularly the Court -- is not to have records custodians

4    at trial.  Having said that, I think that it's almost standard

5    that you are able to include in your subpoena a basic request,

6    out of an abundance of caution, that somebody be available to

7    address at least the trial exhibits produced by that party.

8          You know, I understand the claim here is that

9    that's burdensome because there are so many exhibits, but

10   that's just a function of how big the trial is and how many

11   exhibits there are.  I don't think it makes it, in and of

12   itself, improper.  But the bottom line is -- and this kind of

13   dovetails with a lot of other issues, including the e-mail

14   ruling and everything else -- our basic position is that we are

15   two weeks from trial.  There's a lot of work to be done

16   particularly by the Court but also by the parties in the next,

17   I'll say, three months until culminating with proposed findings

18   of fact, reasons for judgment, and ultimately a proposed

19   judgment and reasons therefor.

20         So I think that the notion that there's this

21   urgency to sort everything out between now and February 27 is a

22   little bit of a false alarm.  The reality is most -- I wouldn't

23   say most.  A lot of the evidence has already been prepared.

24   This is something where the logistics has been a little bit --

25   you know, ideally you would have gotten the rulings first, then

1    you would have put the bundles together and the expert reports,

2    etc., but there just wasn't enough time to do that.

3              So now the notion -- and I'm not sure if this is

4    the defendants' argument, but it seems to be where they are

5    going -- that right now we should perhaps delay things and/or

6    pay inData millions of dollars to undo and redo bundles that

7    have already been done, when the judge has already explained

8    several times what he intends to do in terms of reviewing that

9    evidence, we would reject that.

10             Having said that, do we hope we can sit down

11   with the defendants and kind of go through some of these lists

12   and figure out what we can agree based on the judge's rulings

13   or otherwise we agree isn't admissible?  Yeah, we can do that.

14   But do we have to do that between now and February 27?  I would

15   say no.

16             Do we have to have a lot of meet-and-confers

17   over exhibits that may never be presented?  We know the

18   universe of the depo exhibits.  We know the universe of the

19   expert reliance exhibits, and I understand Your Honor has some

20   questions about that.  We can talk about that.

21             So we are really only talking about exhibits

22   that are going to be offered live at trial, and we are

23   certainly going to take the Court's orders into consideration

24   when we are deciding which exhibits we are going to offer up

25   and how we do that and how we do or don't lay a foundation.  We

1  don't want to waste the Court's time any more than anybody

2  else.

3        **THE COURT:**  Good.  I like that.

4          Let's talk about records custodians.  What are

5  you anticipating?  Let's just say we say, "Fine.  You serve the

6  subpoenas.  Records custodians must be available."  You don't,

7  as I understand it, anticipate that the records custodian will

8  sit there for two to three months.

9        **MR. HERMAN:**  No.

10        **THE COURT:**  How do you anticipate working that?

11        **MR. HERMAN:**  What we anticipate is -- I guess if we

12  have to do it before the close of our case, you're talking an

13  earlier point in time -- maybe not the end of the trial, maybe

14  you leave the record open for that purpose.  But I would

15  imagine that between now and some point in time, end of March

16  let's say, maybe end of April, whatever that time period is, we

17  are going to know these exhibits are clearly out, these

18  exhibits are clearly in, these exhibits are irrelevant because

19  they haven't even been offered.

20          So you are going to have a small set of exhibits

21  about which perhaps there is a question, and despite our best

22  efforts with the defendants, maybe we just can't agree.  So at

23  that point in time, we would say, "Look, here's the 10 exhibits

24  that we think we can lay a foundation for.  Can you have

25  somebody come in next week and have us examine them on these 10

1    exhibits?"  Or 20 exhibits.  I hear Mr. Roy saying, "Don't
2    limit us to 10 or 20.  We have to keep our options open."
3    Maybe it's a thousand.  I don't know what the number is.
4                 **THE COURT:**  It's not a thousand.
5                 **MR. HERMAN:**  I understand.  If Mr. Roy is on the
6    phone, he can speak up.
7                 **MR. ROY:**  I'm here.  I'm watching you.
8                 **MR. HERMAN:**  Feel free to overrule me at any time.
9                 **THE COURT:**  Thanks for that help.
10                So you don't anticipate on the first day of
11   trial having records custodians from the defendants sit with
12   bated breath for two to three months waiting to be called as
13   witnesses.
14                **MR. HERMAN:**  No.  And we understand from the Court's
15   order that some of the issues aren't directly related to the
16   way the documents were maintained.  Some may be.  Some are, you
17   know, whether the person was in the course and scope of their
18   employment, for lack of a better word.  We realize that a
19   records custodian probably in many cases won't be able to lay
20   the foundation for that, so that's a different issue.
21                But if the issue is, you know, were e-mails or
22   was this part of a normal reported business activity of the
23   company, then a few hours from a records custodian could
24   probably lay a foundation, or maybe not.  I don't know if we
25   are going to win or lose.

1          These were depositions that could have been done
2     in the beginning of the case that I think everybody kind of
3     wanted to push off.  A lot of these things could have been done
4     with thousands and thousands of requests for admissions.  We
5     thought it was clear that Your Honor didn't want us to do that.
6     We are just trying to figure out the most efficient way we can
7     do it, at the end of the day.
8          I think subpoenas are appropriate, and we are
9     entitled to have them.  It's a CYA, for lack of a better word.
10    But we don't want to waste the Court's time any more than
11    anybody else.
12    THE COURT:  Let's hear from the defendants first.
13    Andy and Transocean, I know, is in there.  All the defendants
14    objected.
15          Andy, does the explanation of not having to have
16    a records custodian there for two to three months give you any
17    comfort?
18    MR. LANGAN:  Yes, it gives us some comfort.
19          May I make a couple comments about this?
20    THE COURT:  Absolutely.
21    MR. LANGAN:  As Your Honor knows, our strong
22    preference has always been to have work-arounds, work this out
23    and negotiate.  That remains our strong preference.  At the
24    same time we have to preserve our rights to object to this on
25    jurisdictional and on other grounds, and we do.

1          Having said that, as our letter in the last day
2    or so pointed out, following the two rulings we've gotten now
3    from you -- and Mr. Nomellini can address this as well -- what
4    we would really like to see are some real good faith efforts
5    mutually to try to work through the evidence issues, given the
6    guidance we've now gotten from the Court that it turns out that
7    everything isn't a business record, after all.  We now know
8    that.
9          I think the PSC, it's incumbent upon them to
10   take those rulings to heart and start getting real, as opposed
11   to everything we produce is a business record.  It's just not
12   that way.  So there's got to be some good faith back-and-forth
13   on that.
14        **THE COURT:**  I agree.  The issue in my mind is, do we
15   take the time at this point, Andy, to meet and confer?  Or do
16   we take the PSC good faith representation that they are going
17   to take serious guidance from Judge Barbier's ruling and our
18   R&R and not use the documents that they believe --
19        **MR. LANGAN:**  Good first step.  However, let's take a
20   step back here.  I don't want to gloss over this point.
21   Mr. Herman has said and Mr. Roy has said on a number of
22   occasions that they intend to proffer, whatever that means, all
23   the expert reliance materials.  That is a truckload of stuff.
24        **THE COURT:**  That is a later agenda item.  We are
25   going to take care of that today.

1          **MR. LANGAN:**  That's really the elephant in the room

2   here, because if that's all coming in, especially in light of

3   the rulings yesterday, there is gobs of stuff that we now know,

4   according to Judge Barbier, is not relevant here.  And so what

5   are we doing?

6          **THE COURT:**  Gobs?  *Black's Law Dictionary.*

7          **MR. LANGAN:**  Lots of stuff.  A significant amount of

8   material.

9          **THE COURT:**  We are going to take care of that today

10  as well.  It's going to be a short meeting.

11          Here's the deal.  Mr. Herman, can you represent

12  to the parties that you are going to seriously take guidance

13  from Judge Barbier's ruling, from our R&R, and from the

14  subsequent ruling that we sent back to Judge Barbier and not

15  introduce into evidence those things that clearly are not --

16  not attempt to introduce into evidence those things that are

17  clearly not admissible under the ruling?

18          **MR. HERMAN:**  Yes, Your Honor, we can.

19          To address the elephant in the room, though --

20          **THE COURT:**  We are going to come to that, the

21  elephant.

22          **MR. HERMAN:**  Well, yes.  The answer is yes.

23          **THE COURT:**  Can we all take comfort from that rather

24  than two weeks prior to trial distracting everybody from the

25  effort at hand, which is to get ready for trial?

 1          **MR. LANGAN:**  Fair enough as long as our objection is
 2    preserved.
 3          **THE COURT:**  Preserved.
 4          **MR. LANGAN:**  I'm sure probably -- they can speak for
 5    themselves, but it cuts across all the --
 6          **THE COURT:**  Oh, it does, it cuts across all
 7    defendants.  You-all know the universe of exhibits that you
 8    think should not be introduced or attempted to be introduced at
 9    trial.  I'm going to trust the PSC to take guidance from it and
10    act accordingly.
11                Mr. Wittmann.
12          **MR. WITTMANN:**  Phil Wittmann from Cameron.  I thought
13    there was an order in place already.  We said that if there was
14    a serious authenticity dispute, it would be brought to the
15    Court in advance and ruled on.  I don't know of any serious
16    authenticity dispute regarding the Cameron documents.  I
17    certainly don't think we can produce a records custodian to
18    authenticate the hundreds of thousands of documents that have
19    been produced by Cameron in this case.  It's totally
20    unreasonable.
21          **THE COURT:**  I agree.  What Steve has told us is it's
22    not going to be hundreds of thousands.  I would guess that for
23    your client it will be one or two.
24          **MR. WITTMANN:**  We'll be happy to talk to him about
25    those.  Let's do that instead of having a records custodian

1    under subpoena.

2            **THE COURT:**  What I'm willing to do at this point,

3    based on Steve Herman's representations, is leave it alone with

4    the understanding that the records custodians do not have to

5    travel to New Orleans and be here the first day of trial

6    through the end of Phase One.  We will take that up if and when

7    the issue arises.

8                It also occurs to me that we might even do, if

9    we have to do it, a video hookup with these people from

10   wherever they are.  That's another way to skin that cat, if we

11   have to do it, Phil, and I'm not convinced we have to do it.

12           **MR. WITTMANN:**  I'm not either.  Thank you, Judge.

13           **THE COURT:**  They are not released from the subpoenas,

14   but they don't need to travel to New Orleans on the 27th day of

15   February.

16           **MR. WITTMANN:**  There's another issue.  They haven't

17   subpoenaed properly.  They subpoenaed me, and I don't think

18   they can do that because our records custodians are probably

19   over in Houston, outside the subpoena power.

20           **THE COURT:**  So you are not accepting service for

21   them.

22           **MR. WITTMANN:**  No, I'm not.

23           **MR. HERMAN:**  I guess we'll get a process server.

24           **THE COURT:**  Okay.  Anybody else who objects to the

25   subpoena services, please let PSC know, but we all agree that

1  the records custodians are not coming to trial and sitting for
2  two to three months.
3           **MR. LANGAN:**  I don't think it's a service issue for
4  us, but there is a jurisdictional issue that we are not
5  waiving.
6           **THE COURT:**  Okay.  Fair enough.
7           **MR. UNDERHILL:**  Could I have clarification on the
8  jurisdictional issue just to make sure we are clear on the
9  record?
10          **MR. LANGAN:**  Rule 45.  Custodian is not present
11  within the 100-mile "bulge."
12          **MR. UNDERHILL:**  I want to make sure we understand
13  what the rules of the game are.  So what I hear Andy saying is
14  that we are good with what you and Mr. Herman proposed; but on
15  the other hand, we are going to say, tear up the subpoena
16  because it's outside.
17              So if that's the case, then, I think we need to
18  have -- Andy has made a nice point about seeking cooperation.
19  The door swings both ways.  If we want to play that game, then
20  we can play the game.  I don't think that's where the Court
21  wants to go.  It's certainly not where we want to go.  I
22  strongly suspect neither the PSC.
23              So if there's a snake in the grass, I want to
24  know the snake is there and about to bite me.  I think I just
25  heard the snake hissing.  It doesn't make me happy, because the

1    cooperation, it sounds like it's not working.

2              **THE COURT:**  If there are any objections to the

3    subpoenas that have been served -- that is, improper service in

4    any way, shape, or form -- why don't y'all give us very short

5    letters on that issue.  We'll take it up.

6              **MR. YORK:**  Your Honor, Alan York for Halliburton.  We

7    think the process is fine.  We did raise a couple of technical

8    objections to the subpoena, but I feel sure we can work those

9    out.

10             **THE COURT:**  Thank you, Alan.  Appreciate it.

11             **MR. WITTMANN:**  Phil Wittmann for Cameron.  We have

12   already sent our letter to the Court on that subject.

13             **THE COURT:**  Steve is already working on a process

14   server.

15                  Hello, Mark.

16             **MR. NOMELLINI:**  Hello, Your Honor.  Mark Nomellini on

17   behalf of BP.  I understand that the PSC is going to take into

18   account whether, under the judge's orders, things are

19   admissible or not.  One thing that might be helpful is to have

20   some kind of advance warning that those things are coming down

21   the pike so that people can be ready with respect to that.

22   Maybe that's an agenda item, maybe that's something we can talk

23   through; but if it's part of a stack of a large group of

24   documents, it might be more difficult.  Again, that might be

25   something we have to all work out.

1      **THE COURT:**  Okay.  Well, why don't we work on that

2  this week.  And agenda item for next is where we stand on that.

3  Wow, we only have two more Phase One meetings.

4               As far as the *Daubert* motions, we are pretty

5  much coming in.  We have got one more February 20 -- the 14th

6  and then replies on the 20th.  The shorter you can keep them,

7  the better off you are, guys.  Judge Barbier's desk looks like

8  Mount Everest.

9      **MR. HERMAN:**  There's another from the government?  I

10  thought they were all filed.

11      **THE COURT:**  What are these, Mike?

12      **THE LAW CLERK:**  These are the oppositions that are

13  due on the 14th and the replies due on February 20.

14      **MR. HERMAN:**  Okay.

15      **THE LAW CLERK:**  The motions are all filed.

16      **THE COURT:**  Judge Barbier's desk is not looking good.

17  The shorter the better.

18               We have got Dr. Ravi coming up on February 15

19  and 16th.  Anything on that we need to talk about?

20      **MR. GODWIN:**  May I approach, Judge?

21      **THE COURT:**  You certainly may.

22      **MR. GODWIN:**  Thank you, Your Honor.  Good morning.

23  Don Godwin for Halliburton.  Dr. Ravi is scheduled for two days

24  this week here in New Orleans.  We will be here, obviously.

25               I would ask the Court to consider informing all

1   lawyers who are going to participate that Dr. Ravi gave a fact

2   deposition already.  He was examined extensively.  While we

3   know there will always be some overlap in a follow-up expert

4   deposition, we would like to limit as best we can not going

5   back over things that were already covered.

6                   His report, his opinions, what he reviewed, with

7   whom he spoke, and all things like that as an expert are

8   certainly open, and he will be expected to answer questions

9   about that.  But as far as things he has already covered, we

10  would suggest that time could be better spent than by covering

11  those things again.

12                   Thank you, Your Honor.

13       **THE COURT:**  Is there any problem with that?  I don't

14  see a problem with that.  We are too tired to replow ground,

15  aren't we?

16                   Bobbo, do you have a problem?

17       **MR. CUNNINGHAM:**  No, Your Honor.  It's always

18  debatable whether something has been covered before.

19       **THE COURT:**  It is, it is, but you are not going to go

20  back and start all over again.  Nobody really has a problem

21  with that.

22                   Mr. Sterbcow.

23       **MR. STERBCOW:**  No, Your Honor.  The only potential

24  problem we may have is Dr. Ravi's rebuttal report may be more

25  than just a rebuttal report.  We want to take his deposition

first to see exactly where we stand on that.  It appears the
report may go beyond the scope of, quote, rebutting what others
have said.  He may be introducing new opinions or attempts to
address depositions that were taken before he issued his
rebuttal report.  To the extent we come to that conclusion, we
may have to bring that to your attention.  That's all.

        THE COURT:  You're going to cover the rebuttal report
during the deposition.

        MR. STERBCOW:  Correct.  That's why we don't want to
say anything until the deposition is over.

        MR. GODWIN:  We certainly understand that, Judge.  We
stand by the fact that we believe strongly that the report is a
rebuttal report.  And Paul's point about there being new
opinions, well, obviously he is going to have opinions that are
rebutting what other opinions are, so they are going to be new
to that extent.  But in terms of it being a new expert report,
it is not, in our judgment.  But we do understand Paul's need
and perhaps others' -- BP has indicated as well -- that they
may want to bring to your attention at some point whether or
not everything is truly rebuttable.  If it is, we will address
it at that time.

        THE COURT:  Fine.  I appreciate it, Don.

        MR. GODWIN:  Thank you, Your Honor.

        THE COURT:  Who wants to update us on the status of
the forensic examination of the Halliburton computer?

1          **MR. GASAWAY:**  Your Honor, Rob Gasaway for BP.  There

2    was no objection by Halliburton, in theory, to the expert we

3    put out there.  Mr. Redgrave from our side and a lawyer working

4    with Mr. Bowman for their side are trying to contact the

5    proposed expert today, have him look at his files, make sure he

6    hasn't done any work for either BP or Halliburton that the

7    clients don't know about.

8              The process of reviewing and commenting on the

9    protocol is also underway.  That's in Halliburton's hands, and

10   they are looking at that.

11             BP proposed a number of just factual questions

12   about the computer, its custody, how it related to other

13   things.  Halliburton is looking at that.

14             Then we are also going to get underway with the

15   separate work screen which has to do with replicating the

16   displaced 3D modeling.  Progress is being made.  We continue to

17   want to pursue that.  I don't think there's any need for the

18   Court to hear me at this time.

19          **THE COURT:**  You know I like that report.

20          **MR. GODWIN:**  We agree, Judge.

21          **THE COURT:**  Good.  Thank you.

22             Is there anything we need to talk about relative

23   to inData gathering the depositions, the exhibits, and being

24   ready for the test run next week?  Anybody have any problem?

25          **MR. KAVANAUGH:**  Brian Kavanaugh for BP.  A couple of

1  points of clarification.  First, I assume that until

2  Judge Barbier rules on the pending motions in limine with

3  respect to the Fifth Amendment issues, those depositions would

4  not be included in the 168 that are being prepared on DVDs.

5          **THE COURT:**  Brian, I'm sorry, most of us -- the Fifth

6  Amendment, they are not yet being submitted to Judge Barbier.

7  I don't think they should be burned onto the CDs that are being

8  introduced at the close of evidence on the first Thursday.  We

9  hope to get a ruling out on that, but things might not be

10 crystal clear because of appeal and other things.  So I think

11 those should be excepted.  We will send a note to Jordan at

12 inData making sure that that's the case.

13         **MR. KAVANAUGH:**  Thank you, Your Honor.

14             The other point I have is just a point of

15 information for Your Honor and for other parties perhaps.

16 There's obviously an incredible volume of information included

17 in those first 168 depositions, tens of thousands of trial

18 transcript pages.  We have been trying to do what we can to

19 audit to some degree what inData has done, obviously with an

20 eye on whether our own submissions have been included.  We

21 really haven't had the opportunity to do that in great degree

22 with respect to the designations, but on the exhibits we have

23 had some back-and-forth with Jordan.  I'm going to continue

24 that conversation.

25             We, for our part, have noticed there are a

1   number of our highlighted exhibits missing, so we are hoping to
2   get that corrected early next week.  I don't know if others
3   have experienced that, but I wanted to bring this to the
4   Court's attention when we submit our list to him of exhibits we
5   previously submitted that didn't seem to make the final
6   bundles.
7           **THE COURT:**  You'll get that corrected at no cost; is
8   that correct?
9           **MR. KAVANAUGH:**  Pardon me, Your Honor?
10          **THE COURT:**  You'll get that corrected at no cost?
11          **MR. KAVANAUGH:**  I'm sure.
12          **THE COURT:**  I'm sure.
13              Everybody, if you have those kinds of problems,
14  please address them with Jordan as soon as possible because we
15  want to make sure that the bundles that ultimately go into
16  evidence contain everything that you-all want it to contain.
17          **MR. YORK:**  Alan York for Halliburton.  Brian was sort
18  of reading my mind.  I was standing to say the same thing.  We
19  have also found that there are exhibits that we highlighted and
20  uploaded to Worldwide that did not get linked to the deposition
21  and did not get included in the bundles.  It appears, from what
22  we have been able to work through, if they couldn't figure out
23  where to link it in the deposition, they just didn't include it
24  in the bundle.  It is more than just a one-party problem.  I
25  would just let everybody know it may be something you want to

1    check.  We are going through and checking all of ours.

2              THE COURT:  We will be in touch with Jordan and see

3    if we can't light a fire.

4              MR. YORK:  He has been very responsive.  Once we have

5    let him know of the problem, we have been able to get it

6    resolved within a day or two.  It does seem to be more

7    widespread than one party.

8              THE COURT:  Okay.  I appreciate that.

9              MR. LANGAN:  Your Honor, I apologize.

10             THE COURT:  That's okay, Andy.

11             MR. LANGAN:  On Dr. Ravi, I don't think there's a

12   time allotment.  I just talked to Mr. Sterbcow.  I think it's

13   over two days, thanks to Don and his team.  We could e-mail

14   this or we could just maybe try to resolve it now.

15   Mr. Sterbcow and I agreed that BP and the PSC would each take

16   six hours.  That's a total of 12.  That would leave two or

17   three for whoever else wants to examine the witness, including

18   maybe Halliburton.  It's just an idea.

19             MR. UNDERHILL:  And maybe the U.S.  Is that a

20   possibility too?

21             THE COURT:  No, it really isn't.  I'm sorry,

22   Underhill.

23             MR. UNDERHILL:  Your Honor, I'm not going to be

24   asking the questions, so it's not going to be a problem.

25             MR. LANGAN:  In fact, really, we contemplate two or

1    three hours for other parties, including the U.S.

2              **THE COURT:**  Okay.  So why don't we do this, guys.

3    Everybody send me an e-mail today with your request, and we'll

4    get something out either today or Monday.

5              **MR. LANGAN:**  Thank you.

6              **MR. MILLER:**  Kerry Miller for Transocean.  Why

7    wouldn't it be any different than Jesse Gagliano?

8              **THE COURT:**  I don't know.

9              **MR. MILLER:**  We went through this rigmarole with him,

10   and you issued an order on time allocation.

11             **THE COURT:**  You're just saying --

12             **MR. MILLER:**  Two-day deposition, Halliburton cement,

13   same parties.

14             **MR. LANGAN:**  Isn't he rebutting our expert's report?

15   That's why it's different.  That's the answer to Mr. Miller's

16   question.

17             **THE COURT:**  Everybody, send me your request, please.

18                   We have gotten everybody's statements with

19   regard to exhibits that they believe should be maintained as

20   confidential.  We'll take a look at that.  The exhibit list is

21   nearly final --

22             **MR. UNDERHILL:**  Could we go back just to the

23   confidentiality issue, Judge?

24             **THE COURT:**  Sure.

25             **MR. UNDERHILL:**  A question has arisen on my side.

1   The process is for submission, but there's no -- I'm thanking

2   you for this, there's no process for objection, because it

3   means we can turn our eyes to other tasks.

4            But a cursory look at some of the exhibits --

5   well, I wouldn't mention names other than, for example,

6   Transocean.  There's a designation of manuals.  There may be

7   some Coke formula things in the case.  I don't know.  For

8   example, sand maps of Anadarko, I doubt if anybody is going to

9   be interested in introducing sand maps, so it's probably not

10  going to be a problem.

11           But with respect to manuals, a well control

12  manual, for example, it's pretty intrinsic to the case.  I

13  don't think there's nary an expert from any party that's going

14  to testify about well control issues that's not going to refer

15  to that document.  So unless the Court is prepared to have it

16  hold up a sign and say "Press and public out, back in 15" about

17  every half hour, this isn't going to work.

18           All I'm saying, if there's not a process to

19  object, we would ask the Court to look fairly carefully, as I'm

20  sure it will anyway, so that we don't overdo the

21  confidentiality designations beyond the Coke formula.

22       **THE COURT:**  No.  We are going to look at it very

23  carefully.  You know, guys, I think we are beyond the process

24  for objection.  We are going to take a look at each of the

25  documents that a privilege is claimed over.  We will call our

1   best shot, give you a very limited time to object.  We'll take

2   the work file over to Judge Barbier, and he will do what he

3   does from there.  That's kind of the time schedule.

4           **MS. CLINGMAN:**  Your Honor, if I may, for Transocean,

5   briefly, just to give you an example used.

6           **THE COURT:**  Tell us for the record who is on the

7   phone.  Rachel?

8           **MS. CLINGMAN:**  Rachel Clingman for Transocean.  Thank

9   you.

10          We do consider the manuals to be trade secret

11  information.  They are not publicly available.  I think

12  Mr. Underhill's question goes to people can certainly be

13  questioned about contents and knowledge of manuals and

14  processes and procedures.  That doesn't mean the manuals in

15  their entirety have confidentiality removed and need to be in

16  the public domain.

17          As we're looking at it, I would ask the Court to

18  keep in mind the difference between asking questions about

19  something -- and that will come up when we object to deposition

20  testimony, a very different issue from admitting wholesale

21  documents that we believe are highly proprietary.

22          **THE COURT:**  I appreciate the clarification.

23          Also, guys, I don't think Judge Barbier is going

24  to say, "Okay, the entire manual comes in."  I believe he is

25  going to say, "The pages that you referred to in your

1   examination or cross-examination will come into evidence."  So
2   let's talk about that.  We are going to get to that when we get
3   to reliance exhibits.
4                    Phil.
5        **MR. WITTMANN:**  Yes, Your Honor.  Phil Wittmann for
6   Cameron.  Some of the engineering and technical documents that
7   have been designated do indeed come under our view of formula
8   for Coke, so we do have a serious objection to those.
9                    Some of the others that relate, for example, to
10  pricing schedules, if we redact the prices, we can probably
11  deal with it that way.
12       **THE COURT:**  I don't think anybody has any issue with
13  pricing.  We'll redact it.
14       **MR. WITTMANN:**  Thank you, Judge.
15       **THE COURT:**  You're welcome.
16                    The exhibit list is almost final.  We will have
17  a few additional exhibits that are added as a result of the
18  Gagliano, Crook, Ravi, and Houck depositions.  Then we should
19  have a final exhibit list.
20                    Anybody want to undertake to give us a final
21  exhibit list?
22       **MR. HERMAN:**  You seem to be volunteering us.
23       **THE COURT:**  I am volunteering you.
24       **MR. HERMAN:**  Yes, Your Honor, we will do that.
25       **THE COURT:**  Whenever you can.  Prior to, I guess, the

1   26th day of February, we'll get a final exhibit list.

2           **MR. HERMAN:**  Can we set at least a soft deadline for

3   the defendants to get to us any of the additional exhibits they

4   want to add from these recent depositions?

5           **THE COURT:**  Absolutely, guys.  Would you all please

6   look to see if there are any exhibits that you want to add to

7   the exhibit list for those witnesses:  Gagliano, Crook, Ravi,

8   and Houck.  Identify those for the PSC.

9           **MR. NOMELLINI:**  Mark Nomellini on behalf of BP,

10  Your Honor.  We also have some recent productions.  I'm told by

11  our legal assistant that on February 3 Transocean produced

12  approximately 200,000 pages of documents, which include some

13  Phase One documents that are interesting to us.  We hope to

14  keep the number as small as possible that we are adding to the

15  exhibit list.

16          **THE COURT:**  So that would include that as well.  I

17  guess Kerry, who isn't paying attention, doesn't realize I'm

18  staring at him for production of 200,000 new documents.

19          **MR. MILLER:**  That's my best defense.

20          **MR. YORK:**  Judge, as we had also mentioned once

21  before, there may be also a couple of cleanups from the last

22  couple of rounds of depositions where we were doing the exhibit

23  highlights.  Maybe --

24          **THE COURT:**  Okay.  Let's talk about a soft date.

25  What would you propose?  Thursday of next week?

1          **MR. BREIT:**  The deposition of Ravi and --

2          **THE COURT:**  Oh, Wednesday and Thursday, so that won't

3     work for Ravi.  Everybody else will have been deposed.

4               Thursday should work for all of the witnesses

5     except Ravi.  Why don't we do Monday for Ravi.

6          **MR. MILLER:**  Your Honor, Kerry Miller for Transocean.

7     What I was fumbling around for relates to Houck.  I understand

8     that he had a follow-up deposition this past week, but we still

9     haven't gotten all of his e-mails, and that was discussed at

10    the deposition.  So I'm not sure -- I think there was some

11    understanding at the deposition that it would be produced yet

12    again, if more e-mails were uncovered, and produced.  So I

13    think it's still an open issue.

14         **THE COURT:**  Okay.  Well, we will cross that bridge

15    when we get to it.  Thank you.  I appreciate you alerting us to

16    it.

17              Reliance exhibits.  This also is going to be

18    short.  Steve, you ready?

19              So this is how I see the world.  Reliance

20    exhibits do not come in en masse.  If during the course of

21    examining a witness, you-all pull out a reliance exhibit and

22    you use it on the direct or cross-examination of an expert,

23    those will be offered and introduced into evidence.  But

24    otherwise, if it's not used and it's not admitted into

25    evidence, I don't think we have a wholesale proffer.

1          **MR. HERMAN:**  Well, we are going to do whatever the

2     Court tells us to do, but I think that makes it very

3     problematic to try to have the truncated direct and whatever we

4     are gunning for, whether that's 45 minutes or an hour and

5     45 minutes, whatever.

6               It seems to me there's two big issues, and one

7     of them is admissibility.  We can work with the defendants on

8     that, maybe either pare down the list or whatever.

9               But what I recall of how this whole thing came

10    about and why we have reliance exhibits, which is kind of a new

11    thing as opposed to consideration materials, was at the very

12    first liaison conference -- well, it was a working -- I don't

13    remember what it was called, a trial working group conference,

14    or whatever -- we got some ideas from Judge Barbier about what

15    he was thinking and then worked those issues further with

16    Your Honor.

17               I think in your chambers Judge Barbier

18    mentioned, "Look, if it's not discussed" -- I think was the

19    word he used during the trial, and he brought this up at the

20    pretrial as well -- "then it doesn't come in."  We got

21    clarification pretty much immediately, I think, from him that

22    because you had a lot of depositions going into the record in

23    lieu of live testimony, the exhibits that went with those depo

24    designations would be discussed.

25          **THE COURT:**  Right.

1          **MR. HERMAN:**  So I think when Judge Barbier left and
2    we were talking with Your Honor about the work-through on the
3    rest of the issues, it came up, well, look, Your Honor,
4    normally in a trial you would spend a lot of time with experts
5    on direct largely for the purpose of using them to illustrate
6    to the Court what the important exhibits are.  And so if we are
7    going to bypass the direct by submitting a report, then we
8    should be able to submit exhibits that would have been
9    presented to the expert with the report.  They will be
10   considered to have been discussed.  They might not be
11   admissible, but they were considered to be discussed by the
12   expert during his direct or her direct.
13          **THE COURT:**  Okay.  Maybe we are cross-speaking.  Any
14   exhibit that is an exhibit that the expert prepared and is part
15   of his report comes in.
16               What I'm thinking of are the thousands of
17   things, like a treatise, where he reviewed a treatise in
18   preparation for his report and testimony but is not going to
19   refer to it during his examination.  He didn't refer to it in
20   his report other than he listed all of his reliance exhibits
21   that he reviewed in thinking about and preparing his report.
22          **MR. HERMAN:**  Well, some attorneys and/or experts
23   might have done a better job than others, is the bottom line.
24   But I thought the way it was at least intended by the Court,
25   and what we thought -- maybe we did a better job with some

1  experts than others, and maybe some of our experts did a better
2  job.
3            But what we thought was, you have the huge
4  universe of consideration materials, which is the hundred pages
5  of treatises and stuff that people considered and in a broad
6  sense quote/unquote relied on, that was the consideration list
7  and the consideration materials, which is obviously voluminous.
8  But then there were supposed to be a subset of exhibits that
9  are specifically referenced in the report itself because they
10 either were very illustrative or were central or the expert
11 really relied on those.  "I didn't just consider them, but I
12 really relied on those.  They were so important that I actually
13 put it in the report."
14           Those are the more limited set of reliance
15 exhibits.  Now, whether that's too voluminous to deal with, I
16 guess, is a different question; but at least that was the
17 intent, I thought.
18           THE COURT:  Okay.  Well, that's a good clarification.
19 I've been using "reliance" recently.  We have had some language
20 problems, but reliance exhibits to me were exhibits that they
21 did not prepare and that they did not cover in their report
22 other than to list in an addendum listing thousands of other
23 things that they may have relied on.
24           MR. HERMAN:  Okay.  We agree that those are just
25 consideration materials and unless, for whatever reason, they

1    are specifically used for impeachment or redirect or whatever
2    or for some other purpose in the trial, they wouldn't go in.
3              But we were always operating under the
4    assumption -- not necessarily they would be admissible -- some
5    of them are learned treatises, some of them may be inadmissible
6    for other reasons, based on the judge's rulings or otherwise --
7    but at least for the purpose of satisfying the quote/unquote
8    discussed rule, they would have been considered to have been
9    discussed by the expert during his or her direct because they
10   were specifically highlighted in the body of the report and not
11   just in a list that was attached to it.
12             When the expert bundles were delivered to the
13   Court, I think the expert bundles, like the deposition
14   designations, have hyperlinks to only those reliance exhibits,
15   not the huge universe of consideration exhibits.
16        **THE COURT:**  Not what you are referring to as the
17   consideration exhibit?
18             **MR. HERMAN:**  I think that's right.
19             **THE COURT:**  I understand the distinction.
20             Andy.
21             **MR. LANGAN:**  Yes, Your Honor.  I agree with
22   Mr. Herman to this extent.  Clearly, if you were drawing a Venn
23   diagram of consideration materials, there would be a circle,
24   and the reliance would be inside the circle.  But the inner
25   circle is still huge.  I mean, the plaintiffs have had experts

```
 1    whose reliance materials cited in the report -- thousands and
 2    thousands and thousands of documents, tens of thousands of
 3    pages, I have no doubt.  So we are still talking about a very
 4    large amount of material.
 5                 I guess what we are seeking to avoid -- and I
 6    hear him about, well, that's not all going into evidence,
 7    necessarily.  There will be document-by-document contentions
 8    about that.
 9                 Then I kind of question, then, what are we
10    doing?  What is the point of introducing all this reliance
11    material?  What are they trying to accomplish?  Is it so it can
12    all be public?  Is it so there can be a huge dump into the
13    record?  I'm not sure what we are trying to accomplish.  And
14    that's our concern, quite frankly.
15                 It shouldn't be a back door to admissibility,
16    and I don't hear him trying to suggest that.  But I'm really
17    not sure what we are trying to accomplish with this en masse
18    proffer even of the reliance materials, which are those
19    smaller --
20                 THE COURT:  Subset of the consideration documents.
21                 MR. LANGAN:  But still very, very large.
22                 MR. MILLER:  Your Honor, I don't know if you want
23    comments from the peanut gallery.
24                 THE COURT:  You qualify, so let's hear it.
25                 MR. MILLER:  Steve called it two big issues.  I think
```

1   there are two different issues.  Number one is the
2   confidentiality process and what happens when you remove the
3   confidential label from lots of documents, and then next week
4   we will deal with deposition designation testimony.

5        I think a problem occurs when everybody starts
6   conflating confidentiality with admission of exhibits.  If you
7   keep them separate, keep them separate and work through the
8   issue, it seems to me now on the issue of admissions -- you
9   know, what we have done in this case is we have said the expert
10  report will be the expert's direct testimony and we'll do some
11  kind of truncated direct.  Fine.

12       But if you back that assumption out and assume
13  this is a regular case in front of a jury and the expert would
14  testify and give his opinions, now, in that case that expert
15  had written a report, and that report had footnoted or listed
16  reliance materials.

17       But I don't think in that situation all of the
18  reliance materials would come into evidence when he testifies.
19  When I would put on his direct, if I felt as if I needed to
20  admit certain materials that were in connection with his report
21  and his testimony on direct, I would move for the admission of
22  those materials at that point in time.  By the same token,
23  during the cross, if adverse parties think that this expert
24  misquoted or misrelied or misunderstood materials that were
25  referenced in his report, then they would cross-examine that

1    expert on those materials, and they may want to introduce those

2    materials into the record.

3            I think that's probably what we ought to do in

4    this case.  Maybe it's not clean.  Maybe it's going to take

5    some time.  But I think it is the better alternative to some --

6    I understand why you want to take the confidentiality label off

7    en masse; that makes sense.  But admit evidence into the record

8    en masse or attach the expert reports?

9            In connection with Mr. Langan's Venn diagram, I

10   would think your two concentric circles are blurry.  I agree

11   that consideration is bigger than reliance, but they are not

12   clear, bright lines, as far as I can tell, either.

13           Those are my comments on the situation.

14           THE COURT:  Does anybody else want to chime in, or do

15   I have a good picture?  All right.

16           I'm going to talk to Judge Barbier about it now

17   that I have got clarification.  We'll figure it out and get

18   something out to you.

19           MR. LANGAN:  Did Mr. Miller say we are going to talk

20   about offering depositions later, next week?

21           MR. MILLER:  We got that extension, remember, to the

22   15th?

23           MR. LANGAN:  Oh, that's right, about confidentiality.

24           THE COURT:  We withdrew your heart attack, remember?

25           MR. LANGAN:  Yeah, that's great.

1      THE COURT:  That was your heart attack.

2      MR. LANGAN:  When we do talk about it next week, can

3  we have a discussion about how, for example, recent rulings may

4  affect whether some of these depositions need to be offered at

5  all?  We have witnesses that were deposed solely on issues that

6  have now been ruled to be irrelevant.

7      THE COURT:  Yes, we can discuss that.  If you would

8  like to circulate a list of those people, everybody can be

9  up-to-snuff, and we'll be ready to roll.

10      MR. MILLER:  I think the rulings of this week, again,

11  are helpful to now ruling on exhibits and exhibit objections on

12  a case-by-case, exhibit-by-exhibit or something close to that

13  basis.  You can relate a certain exhibit to the motion in

14  limine on the governmental reports we saw come out yesterday

15  and things of that nature.

16      I think that certain ground rules have been

17  laid, and they are helpful.  I know we are all inventing things

18  as we go, but maybe we have reached the point where we stop

19  inventing ways to make this a more efficient process.

20      THE COURT:  I don't think we have time to make it a

21  more efficient process.  That's the problem.

22      MR. MILLER:  We just need to start.

23      THE COURT:  We are out of time.

24      MR. MILLER:  Because I don't think the Court wants to

25  entertain now -- if we have made objections to testimony or to

1  exhibits -- just made objections, didn't necessarily insert all
2  the documents or all the testimony into a motion in limine, I
3  don't think the Court wants to be inundated with a bunch of
4  follow-up motions in limine at this point saying, hey, these
5  100 documents and these 1,000 lines of testimony relate to your
6  governmental report motion in limine, so deal with it now.
7          **THE COURT:**  Do you want me to be clear about that?
8          **MR. MILLER:**  You can, but I think we are all pretty
9  clear.
10         **THE COURT:**  I don't think anybody needs any
11 clarification on that.  No more motions in limine.  The
12 deadline has passed.  We have a couple more response dates.
13 That's it.
14         **MR. MILLER:**  Objections have been noted, and I don't
15 think anybody has waived anything, so --
16         **THE COURT:**  Right, exactly.  Thank you, Kerry.
17             We have already discussed how we are going to
18 handle things at trial with regard to objections to exhibits,
19 keeping track of what's admitted, all of that.  Does anybody
20 have any questions on that?
21             Andy.
22         **MR. LANGAN:**  Well, Your Honor, at some point, and
23 maybe soon, we may want to talk to you further about the
24 default rule.  In other words, in your working group orders,
25 you suggested that if an exhibit is used or is offered and the

1   judge doesn't specifically say it's out, then it's presumed

2   in --

3          THE COURT:  Uh-huh.

4          MR. LANGAN:  -- without necessarily an actual

5   explanation of that.  We wonder if that's really the proper way

6   to go.

7          THE COURT:  Well, you know, I didn't come up --

8          MR. LANGAN:  We made an objection to that.

9          THE COURT:  Well, I hear you.  I didn't come up with

10  any smart way to do it to the contrary.  So if you have a

11  suggested way to go otherwise, I will certainly consider it.

12         MR. LANGAN:  I much appreciate that.

13             We understand in the findings and conclusions

14  Judge Barbier may, in fact, make rulings and probably will make

15  rulings on that, about what he relied on and what he didn't and

16  deal with objections.  But I guess the question then becomes:

17  What does silence mean?  I think we may need to have a further

18  discussion about that.  Hopefully, there will be an opportunity

19  for that at some point.

20         THE COURT:  Why don't you circulate a proposal that's

21  brighter than my proposal.

22         MR. LANGAN:  All right.  We may end up back to your

23  proposal, but it's important enough that we definitely want a

24  further opportunity to be heard if that's possible.

25         THE COURT:  That's fine.  No problem on that all.

 1              **MR. UNDERHILL:**  Could I add one thing, Your Honor,

 2    back on the confidentiality issue.  I don't want to backtrack

 3    too much, but I think it's worth spending one moment because

 4    it's going to take up a lot of time and possibly millions of

 5    dollars.  When parties submit next week their confidentiality

 6    issues on depositions, I pose a hypothetical.  Let's assume

 7    that there's a critical witness that various parties, two or

 8    three parties -- PSC, U.S., Transocean -- think are important

 9    to their case in chief.  It's contrary to what BP wants.  We

10    have designated 50 pages of testimony.  PSC, 50.  Transocean,

11    50.

12              Let's assume that in that deposition there are

13    two pages of issues that BP considers confidential.  Let's

14    consider that there are two documents they consider

15    confidential.  Let's assume the Court agrees they are

16    confidential.  This hypothetical is going to run through most

17    of the depositions we have in this case.

18              Early on in the case, we collectively, with the

19    Court, made a decision that we were going to have an electronic

20    trial.  Judge Barbier decided that.  We made a collective

21    decision, parties and Court, that we would have deposition

22    bundles that were linked electronically to objections and

23    exhibits.

24              What I see happening is the train wreck, is that

25    it will not be a public trial because the trial will consist of

1    deposition testimony.  That's why we did 200 depositions

2    instead of calling 200 live sometimes because parties weren't

3    available for trial, outside subpoena or otherwise.

4                What I fear, the result of what I think some

5    parties are going to submit to the Court next week is we are

6    going to have to blow up that deposition process.  Now, if we

7    hadn't done it this way, perhaps we wouldn't have to blow it

8    up, because we could create a new one.  But I think you are

9    going to find a hand grenade or a neutron bomb in there.

10               What I'm hearing, one, on the practical level,

11   there's not time to do it.  We have a trial in two weeks, so we

12   don't have time to tear apart the bundles, separate it,

13   testimony, exhibits, reassemble.  A financial issue, I'm told

14   by the techy people this literally is an impossible job absent

15   probably months' worth of time.  Even if it was four weeks, it

16   still wouldn't work because what are we going to do the first

17   two weeks of trial, you know, declare a timeout?

18               An incredible amount of money.  I heard the

19   amount of bills just the PSC alone received last week -- I

20   don't know if it's from Worldwide or inData.  It's eye popping.

21   I'm in the wrong business.  We all are.  I think attorneys are

22   in the wrong business.  I'm going to work for Kim at inData.

23               **THE COURT:**  Me too.

24               **MR. UNDERHILL:**  It's a good gig if you can get it.

25               **THE COURT:**  You bet.

```
 1              MR. UNDERHILL:  So the financial cost to do this
 2    would be extraordinary on the parties.  Even if the Court said,
 3    "Tough luck, eat the cost, folks," it's not going to work
 4    timewise.  That's the hand grenade out there that I think we
 5    need to deal with when we face these issues on confidentiality
 6    next week.
 7                   It is a First Amendment issue.  It is a public
 8    trial.  This is not a slip-and-fall.  This is a case of
 9    national significance to the parties, to the Court, to the
10    country.  That's not a speech; it's just, I think, a statement
11    of reality we are all going to have to deal with.  I want to be
12    on one side of the First Amendment, not what I consider
13    personally the wrong side.
14                   So that's my hypothetical when we see these
15    issues come up next week.
16              THE COURT:  I think that was a speech.
17              MR. UNDERHILL:  Did you like it?
18              THE COURT:  Yes.
19                   So, Andy, do you want to say anything?  I'm
20    assuming -- and maybe it's a wrong assumption, but I'm assuming
21    that the pages of depositions and attached exhibits are very
22    few.
23              MR. LANGAN:  That's certainly our intention.  I never
24    know if Mr. Underhill's comments are directed at us or not.
25              THE COURT:  I'm assuming they are.
```

1          **MR. LANGAN:**  We have said many, many times this is a

2    public trial.  We acknowledge that.  We welcome that.  We

3    embrace that.  Our letter about the documents was surgical.

4          **THE COURT:**  That's right.

5          **MR. LANGAN:**  I expect our deposition, if there are

6    any Coca-Cola trade secret personal financial information, will

7    be surgical.  We have no problem with that.

8          **THE COURT:**  So let me just clearly state --

9          **MR. LANGAN:**  If we have any.

10         **THE COURT:**  Exactly.  First of all, I don't expect

11   that there will be many; and if there are, we'll have to deal

12   with it because I do not intend to unbundle the bundle.  Let me

13   be clear about that.

14              If there are as few as I anticipate there being,

15   I am hoping that we will be able to say to inData, "Can you go

16   into the bundle and take that page out of the public record?"

17   But we are not unbundling anything.  We are not locking the

18   doors.  None of that, in my view, is going to happen.

19              So let's see where we are next week.  It's a

20   valid point to raise, and if it's to the extent, Mike, that you

21   anticipate, we have a problem.  Okay.

22              I saw that we have a few more stipulations

23   pulled together for Phase One.  I think we are going to get a

24   revised list.

25              Tim, you are on the phone?

1            **MR. DUFFY:**  Yes, I am.

2            **THE COURT:**  We are going to get a revised pleading,

3    presumably, huh?

4            **MR. DUFFY:**  Well, I sent yesterday a Word document

5    that has all the stipulations to which no one objected.  I can

6    certainly put that in a pleading, if you want, but I just

7    wanted to see what you thought the next best step was.

8            **THE COURT:**  Let me ask everybody.  Does everybody

9    agree that we can go ahead and get the agreed-to stipulations

10   into a pleading filed of record and given to Judge Barbier?

11           **MR. FITCH:**  Judge, good morning again.  Tony Fitch

12   for Anadarko.  I'm not sure that's the case with respect to

13   Anadarko.  I know you may not have had a chance to look this

14   over carefully, but if you did, you would notice that on the

15   so-called agreed list, there's a very substantial gap between

16   27 and 59.  Now, you can take one wild guess what party is

17   affected by that by my being up there, and that's Anadarko.

18           A lot of the proposed stipulations were left off

19   by Mark properly because the PSC didn't disagree but just

20   pointed out that those 20 or so proposed stipulations, which no

21   one has disagreed with, because of the Court's prior rulings in

22   favor of Anadarko, really shouldn't be relevant.  We would love

23   that to be the case.  But, in fact, because of the way the U.S.

24   is pushing the evidentiary scope, those still are relevant.

25           So I suggest to you and to Mark and to the PSC,

1   who has not disagreed with them -- they previously did disagree

2   with them -- those should come back in.  Otherwise, Deb and Ky

3   will be standing up and taking 10 minutes with every witness to

4   do the examination.  That's right.  They don't want to do that.

5   They want to be sleeping in the back of the courtroom in this

6   trial.  So there's one problem.

7            Then, as you will see, there are seven or eight

8   disagreements quote/unquote by the United States.  They have

9   disagreed -- I could go through these in detail.  I have a

10  feeling you don't want that right now.

11          THE COURT:  You have a very, very sound reason to

12  believe that.

13          MR. FITCH:  They are refusing to agree to things they

14  have previously admitted in responses to RFAs.  I respectfully

15  suggest to the Court that just as your assistance has been

16  terrifically helpful on the Phase Two step process, that it

17  might be a good idea to get me and Mike or somebody together

18  from the government for 15 or 20 minutes on the phone -- or

19  today, whenever it works best for everybody -- and see if we

20  can work that out.

21          THE COURT:  All right.

22            Tim Duffy, would you please send me by e-mail

23  the proposed draft stipulations, send them out to Underhill and

24  Tony, and maybe one day next week we can have a conference call

25  to work through whatever is remaining.

1              Mike, you weren't here, but the issue is that
2     Anadarko and you seem to have some disagreements with regard to
3     stipulations.
4              **MR. UNDERHILL:**  I have not been deeply involved in
5     the Phase One stips.
6              **THE COURT:**  Who should I talk with?
7              **MR. UNDERHILL:**  Steve O'Rourke.  He is going to hate
8     me for this, but I think Steve has taken more of a lead on
9     this.  I would say that --
10             **MR. O'ROURKE:**  I hate you for other reasons too,
11    Mike.
12             **THE COURT:**  Go, O'Rourke.  I like that.  You should
13    have said it louder, however.
14             **MR. UNDERHILL:**  When you put two Irishmen in the same
15    case, you are going to have these problems.  I'm sorry.
16             I would say this.  I think we -- my
17    understanding, we had -- they sent out requests for admissions
18    to us a long time ago, and we answered what we considered to be
19    appropriate answers:  We agree to the following extent; we
20    disagree with this.
21             What I understand, we got recycled the requests
22    for admission.  And so to the extent that we don't stipulate,
23    we think our response to a request for admission is the correct
24    one.  If they want to agree with that as a stipulation, then I
25    think we have no problem.  But we are not going to admit to

something that we think is legally or factually wrong.  We are
just not.

To the extent that means it drops out as a stip
and Anadarko is unwilling to agree with us, then I think we
drop it out.  I think, frankly, a lot of these will be resolved
in the context of our pending summary judgment motion or cross
motions for summary judgment with Anadarko.  I think that will
resolve a lot of these issues.  But I don't think we can force
parties, any more than we can force Anadarko to agree with us
or -- you just can't.

THE COURT:  I'm not in the business of forcing
anyone.

MR. FITCH:  Nor can we.  And we are not asking them
to agree to something they haven't previously agreed to.  I
think for purposes of expediting the trial, it would be helpful
to try to work this out just as we did on Phase Two stips.  I
can also summarize our position and where the parties are.

THE COURT:  Steve O'Rourke, do you think this is an
exercise we should engage in?

MR. O'ROURKE:  This is Steve O'Rourke, Your Honor.
If Mr. Fitch is right, that we previously admitted these
things, then why don't they just move in the previous
admissions?  It will take them 30 seconds.

THE COURT:  It sounds like you admitted in part most
of the requests for admission, so perhaps the way to skin the

1   cat is to take the partial admissions and put them into the

2   stipulation.

3          **MR. FITCH:**  That's exactly what I think the end

4   result should be.

5          **THE COURT:**  Okay.  So, Tony, why don't you take a

6   crack at redrafting those stipulations that are applicable to

7   Anadarko and circulate them to O'Rourke and Tim Duffy.

8          **MR. FITCH:**  I will indeed, and I will also include

9   some supporting information for it.  Thank you, Judge.

10         **THE COURT:**  That's how we will handle that.  If you

11  still need me, let me know.  Okay, Steve O'Rourke?

12         **MR. O'ROURKE:**  Thank you.

13         **THE COURT:**  Here we go.  Demonstrative exhibits.

14  Boy, did we have some e-mail flying on that this week.  How far

15  along is everybody in putting their demonstratives together for

16  February 15?

17         **MR. MILLER:**  Your Honor, maybe a preliminary question

18  on that and then we can answer the real question, which is what

19  you just asked.  Some of the e-mail traffic this week focused

20  on what is a demonstrative.

21         **THE COURT:**  Let me go there.  For Jim Roy's purposes,

22  a demonstrative is not the things he enumerated.  So that if

23  Jim Roy wants to put an outline of his argument up on the

24  screen, go for it.

25         **MR. MILLER:**  I commented on it too.  I drew some very

1    broad lines.  If it's text, it's not a demonstrative.  If it's

2    a graphic, either still or animated, it is a demonstrative.

3            **THE COURT:**  I agree with that, but a visual part of

4    deposition testimony, a simple outline of opening statement,

5    which is what Jim Roy talked about, in my view is not a

6    demonstrative.

7            **MR. MILLER:**  Highlighted words from an exhibit?

8            **MR. LANGAN:**  A montage of greatest hits from video

9    clips we would say is a demonstrative.

10           **MR. ROY:**  This is Jim Roy.  Andy, I would agree with

11   you that a montage would be.  I don't consider a demonstrative

12   to be whatever exhibit -- pick a number.  20,011.  If I call up

13   20,011 and show three lines of it highlighted directly from

14   Exhibit 20,011, that's, to me, not --

15           **MR. LANGAN:**  Agreed.

16           **MR. ROY:**  Likewise, Judge, an outline not just for

17   opening statement, but really for a witness, because if you do

18   it any other way, it becomes impossible to use a PowerPoint in

19   the examination or cross-examination of any witness without

20   handing it over to the other side in advance.  I don't think

21   anybody wants to do that.  Do you?

22           **MR. BECK:**  Your Honor, this is David Beck.  I agree

23   with Jim.  I certainly don't want to do that.  I agree with him

24   on the montage.  However, if somebody wants to show a clip of

25   one deposition, it seems to me that falls in the same category

1    of simply putting up on the screen the text of the deposition.

2             **MR. ROY:**  I agree with that too.

3             **MR. BECK:**  My biggest concern is the deadline of the

4    15th for everything for a multimonth trial.

5             **THE COURT:**  I understand.  So here's my thought, and

6    then you-all can shoot at it.  I think you-all are pretty close

7    to having completed your demonstratives pursuant to the

8    deadline that's currently in effect, which is the 15th.  It is

9    my reaction that you go ahead and show them to each other.

10            Now, that doesn't mean that as things progress

11   during the course of the trial you can't modify them, you can't

12   add to them, you can't take them down and not use them, or that

13   you might not come up with a new demonstrative.

14            Let's stop there.  Does anybody disagree with

15   going ahead and giving each other the view of what you have

16   currently got?

17            **MR. WITTMANN:**  Phil Wittmann for Cameron.  David has

18   already spoken to Cameron's position.  It seems to me you are

19   creating a lot of exhibits that will be coming up on the 15th

20   that maybe don't need to be produced at all.

21            **THE COURT:**  My guess is they are creative.

22            **MR. WITTMANN:**  Well, I think your guess may not be

23   completely accurate.  What I would suggest is that perhaps a

24   deadline be set that the parties exchange or provide five days'

25   advance notice before putting an exhibit up, a demonstrative

1  exhibit up, which would give time to react to it.  It's almost
2  impossible --
3      **THE COURT:**  Five days is clearly not enough with this
4  scope of a trial, as far as I'm concerned.
5      **MR. WITTMANN:**  As to demonstrative exhibits?
6      **THE COURT:**  As to demonstratives.  Because you-all
7  may want to bring up objections to it, and you are going to
8  want rulings on it before it's used.  I don't know how to
9  explain this to you, but there are four people in this
10  courthouse working on this case, and we just can't drop
11  everything to look at a demonstrative, get oppositions, rule on
12  it in five days.  It just isn't going to happen.
13      **MR. WITTMANN:**  My problem is, if you can't anticipate
14  any demonstrative you might need by February 15 in a two-month
15  long trial --
16      **THE COURT:**  I have already said we will agree that
17  you don't have to anticipate everything.
18      **MR. BECK:**  Judge, this is David Beck again.  I think
19  everybody in concept agrees with the exchange of demonstratives
20  a reasonable period of time before they're going to be used.
21  Whether it's 5 days, 15 days, it really doesn't matter to me.
22  I just don't want to be in the position now of trying to
23  anticipate every conceivable demonstrative I might want to add,
24  because under the order of presentation, Cameron, for example,
25  is pretty far down the list, and I may decide not to use but a

few demonstratives simply because they have stated the evidence at the time we have to go forward.  So I'm agreeable to any reasonable time period.

**MR. WITTMANN:**  Well said, David.

**MR. ROY:**  Judge, Jim Roy.  If I might make one other observation.  I can't imagine that the Court or any lawyer at this trial would object to the use of a witness who steps down from the witness stand and takes a magic marker and uses an old-fashioned flip chart or a piece of chalk --

**THE COURT:**  Positively right.

**MR. ROY:**  -- to use a demonstrative to the Court. Nobody, certainly, is going to say that's got to somehow be disclosed beforehand.

So going to Mr. Beck's point, you know, look, I have some people on my team that will rise right now -- some of them may be in that courtroom -- and howl in protest at what I'm about to say.  But the truth of the matter is that fair or not, Mr. Beck's comment is a correct comment, that they cannot all be anticipated.

They may be reasonably anticipated, but they can't all be anticipated:  If I put a witness on and I show certain things or don't show certain things, and at 11:00 the night preceding Mr. Beck's cross-examination of my witness, his expert whispers in his ear, "Let's slightly modify one of these exhibits or one of the demonstratives to one of these exhibits

1  and use that to make your point tomorrow."

2          What we did in Judge Duval's MRGO trial, that

3  very situation -- and Mr. Underhill can confirm that with his

4  lead counsel in that trial for the government, Robin -- while

5  we had a rule that called for advance production within -- I

6  forget what it was, a couple days, if possible, or whatever --

7  both sides understood the realities of trial practice, the need

8  to be professional.  If somebody came in on the morning of a

9  cross-examination or something and said, "You know, I have

10  these seven additional demonstratives," the real purpose of it

11  was for people to be able to look and see if there was

12  something that was just patently objectionable of what was

13  getting ready to show, not to prevent the use of the

14  demonstrative.

15          As a trial lawyer, whether you are a defense

16  trial lawyer or a plaintiff trial lawyer, we want to try the

17  case and not get hung up on rigid presubmissions.  Otherwise

18  this is going to turn into nothing more than a Public Service

19  Commission hand, presubmitted trial.

20          **THE COURT:**  I'll make sure to quote you to

21  Judge Barbier.

22          **MR. ROY:**  I didn't use the word "secret" or

23  "Star Chamber," if you notice.  I was discrete in using those.

24          But I do believe that Mr. Beck raises a good

25  point, that there needs to be some flexibility.  And just like

1   we would be permitted to use a blackboard or a flip chart or

2   even take a blowup of an existing trial exhibit and let the

3   witness modify it on the fly, to some extent -- and it is a

4   bench trial -- there needs to be some kind of flexibility, I

5   would submit.  I disagree with Mr. Beck here.

6           **THE COURT:**  Mr. Cunningham.

7           **MR. CUNNINGHAM:**  Your Honor, Robert Cunningham for

8   the PSC.  I would go further than Jim Roy has gone and say it a

9   lot quicker.

10          **THE COURT:**  That, I agree with.

11          **MR. ROY:**  Because he uses one-syllable words.

12          **MR. CUNNINGHAM:**  We would propose that we have a

13  free-for-all rule and that everybody can use any demonstrative

14  they want without objection.  This is not a jury trial; this is

15  a judge trial.

16              If we try to create demonstratives that are

17  misleading or that include points that aren't in evidence,

18  Judge Barbier is not going to like that at all.  We think that

19  will serve as a filter to filter out unfair demonstratives.  So

20  we say let everybody do whatever kind of demonstrative they

21  want, put it in without objection.  We won't waste a bunch of

22  time debating it.

23          **MR. GODWIN:**  Your Honor, Don Godwin for Halliburton.

24  We would agree with Bobbo's comments in that regard.

25          **MR. LANGAN:**  Andy Langan for BP.  I think we ought to

1  have some process for objection.

2  　　　　　THE COURT:  So do I.

3  　　　　　MR. LANGAN:  I think we are fairly indifferent about

4  the schedule.

5  　　　　　THE COURT:  Guys, this all started -- let me give you

6  a little history, which, of course, drives me crazy.  I hate it

7  when you get up and say, "Let me give you a little history."

8  　　　　　　　This all started when we ran the question past

9  Judge Barbier and he said, "I want these all exchanged well in

10  advance of trial so if there are any objections, we can bring

11  them on in an orderly fashion and resolve them."  So that's how

12  this all started.

13  　　　　　　　I have spoken to him.  He understands the

14  concerns about having all demonstratives.  He understands the

15  concern about changing a demonstrative.  He understands the

16  problem with a two- to three-month trial, and you can't

17  anticipate everything.  All of that is fair.

18  　　　　　　　But he doesn't want to conduct the trial and

19  every time a demonstrative comes up have to stop the trial and

20  hear arguments on whether or not the demonstrative is

21  objectionable.  I agree with him.  None of us want that.

22  　　　　　　　So I thought the way to resolve it was that

23  you-all are far along on demonstratives that you think you

24  might use at trial and that we go ahead and exchange those on

25  the 15th.  That was my thought.  Beyond that, I agree with

Jim Roy that what he wants to use during opening is fair game.
I agree that a flip board being used with an expert during his
examination need not be exchanged, because you're going to work
with the expert during his examination.  I agree that you can't
anticipate everything you need during the course of the trial.
With advance notice that we can agree to, you show your
exhibit.  If there are no objections, you use it; if there are
objections, we resolve it.  So that's where I thought we could
go.

      So on the 15th, those demonstratives that
you-all think you're going to use, you show them to each other.
If there are no objections, we have a free-for-all.

      **MR. LANGAN:**  Your Honor, in light of that, we did
have what I hope were constructive process suggestions in our
e-mail, like a numbering system and a protocol for what would
be provided at the time of the exchange and that sort of thing.

      **MR. BREIT:**  We agree with all that protocol.

      **MR. LANGAN:**  Thank you, Mr. Breit.

      **THE COURT:**  I don't think there's any objection to
that, or at least I didn't see any objection to that.

      Can everybody live with this?  Jim Roy?

      **MR. ROY:**  Yes, ma'am.

      **THE COURT:**  Are you ready, Jim?

      **MR. ROY:**  Absolutely.  That's why I'm not there, in
order to be ready.

1        THE COURT:  David, you raised a very good point.  If

2   you only have two things that you anticipate or one thing you

3   anticipate you might use way down the line, a month and a half,

4   two months from there, that's all you show next week.  If

5   indeed, as the evidence develops, you believe you need to add

6   another one, I don't think five days is sufficient, but could

7   we go for seven to ten days?

8        MR. BECK:  Sure.  That would be fine with me,

9   Your Honor.

10        THE COURT:  You tell everybody, "Guys, we are

11   thinking about using another demonstrative.  Here it is," or,

12   "We gave you a demonstrative on the 15th, but we think it needs

13   to be modified."  I'm perfectly okay with that.  So you tell

14   everybody, "People, the demonstrative that we identified to you

15   on the 15th will be modified.  Here's the new demonstrative

16   with modification," or we are not going to use any

17   demonstratives.  That's perfectly okay.

18            Can you live with that, David?

19        MR. BECK:  We can, Your Honor.

20        THE COURT:  Anything else on demonstratives?

21        MR. FITCH:  Judge, what's your final day number?

22   Seven?  Ten?

23        THE COURT:  I guess, since we heard five, it means

24   seven probably --

25        MR. LANGAN:  Calendar days.

1          **THE COURT:**  Calendar days.  Calendar days.

2          **MR. LANGAN:**  Will our little protocol perhaps end up

3     in the order of the Court?

4          **THE COURT:**  Yes.

5          **MR. LANGAN:**  That might provide clarity instead of

6     referring back to an e-mail.

7          **THE COURT:**  Definitely.

8               Any things you need to report about issues with

9     the space or the court reporters?  Everything's going smoothly?

10    Good.

11              Everybody knows about the information technology

12    trial run.  We all know about marshaling exhibits at the close

13    of the day on Thursday.  Don't forget, at the close of

14    marshaling, the presenting party shall go ahead and notify

15    everybody of who will be called the next week and the order in

16    which they will be called.

17              So that's it for me on Phase One.  Anything

18    else?

19          **MR. MILLER:**  I have one thing, Your Honor.  Topic 19

20    of your working group report, which was the opening statement

21    order in which it came out -- I'm not sure this is necessarily

22    an action item.  It's a comment for potential further action.

23              The order of opening statement, you also said,

24    would generally control the order of proof in the case, which I

25    also take to mean the order of examination when witnesses are

called.  It seems to me -- and I know there was an exchange
with Don Godwin and the Court.  It seems to me, in general, the
order, if you want to summarize it, above BP it's the parties
who have not settled with BP, and then you have BP and the
parties who have settled with BP.

           I understand that the parties who have settled
with BP certainly, vis-à-vis the PSC claim -- well, the PSC is
still seeking punitive damages from us.  BP does not indemnify
us for punitive damages, so we have to have our shot with
certainly PSC witnesses who are trying to pin punitive damages
on us.

           However, with respect to Transocean -- and I
haven't talked to Don Godwin about it, Halliburton.  Our 14-C
claims and our cross-claims against the BP settling parties --
we don't seek punitive damages from anybody -- BP, Cameron,
Weatherford, Anadarko, on down the road.  So I question for
Transocean and Halliburton witnesses why the BP settling
parties would be able to cross-examine Transocean and
Halliburton witnesses given that those witnesses aren't seeking
to assert punitive damages against those particular parties.
It just seems it might be a way to shorten things up because
all those questions, I think, should be rolled up with BP.

           **THE COURT:**  So you would suggest that we put all of
those parties after BP?

           **MR. MILLER:**  They are after BP.  What I'm suggesting

1   is, vis-à-vis Transocean and Halliburton witnesses, our

2   witnesses shouldn't have to sustain cross-examinations after

3   BP, because we are not seeking to put punitive damages on

4   Anadarko or Cameron, so on and so forth.

5        **MS. KUCHLER:**  May I address that?  Deb Kuchler for

6   Anadarko.  As long as the U.S. in particular is targeting

7   Anadarko and is attempting to prove fault on Anadarko for

8   Clean Water Act fines and penalties, and as long as the OPA

9   strict liability claims remain where fault is going to be at

10  issue, and as long as the U.S. won't stipulate to things like

11  no one from Anadarko ever set foot on the DEEPWATER HORIZON, we

12  need to be able to question Transocean and Halliburton

13  witnesses about things that are Anadarko-specific defenses

14  irrespective of any claims that may or may not be pending

15  against those parties.  Those are fact witnesses that have

16  facts that may bear on other claims against us.

17       **MR. MILLER:**  That may be true if they are party

18  specific.  But generally, if they relate to compensatory

19  damage-type claims or cross-claims, I don't see why those

20  parties who are aligned with BP on compensatory damage issues

21  and compensatory cross-claim allocation of fault issues get to

22  have five or six different shots at my witnesses and -- maybe

23  Don wants it, I don't know.

24       **MR. GODWIN:**  I'm with you.

25       **MR. MILLER:**  -- Don's witnesses when I don't have a

1    punitive claim against them.

2                    I understand if that's an issue Deb has for

3    Anadarko and it's a Phase One issue and we are going to put

4    forward two crewmen of the DWH, and if she wants to say, "Have

5    you ever seen anyone from Anadarko aboard the DWH?" that's

6    fine.  I understand it.  But to get into compensatory damage

7    and cross-claim issues that are not Anadarko or Cameron or

8    Weatherford specific, I just don't think that's fair or

9    orderly.

10                   THE COURT:  Okay.

11                   MS. KUCHLER:  Well, depending on how the contribution

12   claims are ruled upon by Judge Barbier, we may have a dog in

13   those hunts.  Our argument is that we should be out of those

14   issues, but we are still in as of this 10 seconds.  So I hate

15   to be in a position where we get no time to cross-examine

16   witnesses on issues that do bear on legal claims that are still

17   pending against us.

18                   MR. MILLER:  I'm not asking for a ruling today, I

19   understand that, but just some ground rules thinking about how

20   we really shorten what could be a very long and painful

21   proceeding.

22                   THE COURT:  It's going to be anyway.

23                   MR. MILLER:  I know everything is relative,

24   Your Honor, two Advils or three today.

25                   THE COURT:  I did forget one agenda item, and that is

1   whether or not we have any opposers to the Weatherford motion

2   for summary judgment.  I saw one this week was withdrawn.  So

3   that just leaves Don Godwin to tell us.

4              MR. GODWIN:  Thank you, Your Honor.  Don Godwin for

5   Halliburton.  Judge, the remaining motion for summary judgment

6   that Halliburton has objected to is from Weatherford.  We have

7   reached an agreement with Michael Owen, on behalf of

8   Weatherford, that we hope to paper either today or Monday.

9   Certainly very, very soon a letter is going to be sent to Mike

10  today confirming that.  That is off the table.

11             THE COURT:  Let's all give Don a round of applause.

12                  Anything else on Phase One?

13             MR. UNDERHILL:  Just a clarification on the order of

14  witnesses, Your Honor -- I think we have no problem on this --

15  the way your order could read in terms of the examination of

16  witnesses at trial that reads PSC, U.S., States.  Collectively,

17  PSC, the U.S., and the States have agreed to try their cases

18  cooperatively; and so, for example, the way we plan to try it,

19  we might have one of our witnesses before other PSC witnesses.

20  Say it was one of my experts.  I would go before the PSC.  I

21  don't think there's any problem with that.  We just wanted to

22  have clarification.

23             THE COURT:  I don't think either.  I will talk with

24  Judge Barbier about that, but I don't think that's a problem.

25             MR. UNDERHILL:  Thank you, Your Honor.

1    **THE COURT:**  That's something, Kerry, maybe you-all

2  want to talk amongst the defendants about curing your problem.

3  Right now we know Anadarko is not going to agree, but we might

4  think creatively.

5    **MR. MILLER:**  You know, Deb gave a good example,

6  company-specific, specific to that company's issues in

7  Phase One.  We'll think about it.

8    **THE COURT:**  Anybody who is not here for Phase One may

9  vacate the premises -- no, Phase One people can leave.  Right.

10    Phase Two people.  There was substantial

11  progress on the stipulation discussion last week.  I was very,

12  very, very happy about that.  I assume everybody is still

13  working on that, huh?

14    **MR. BARR:**  Yes, Your Honor.  Brian Barr for the PSC.

15  As promised, I'm working on some language, some definitions.  I

16  am hoping I'll be able to get that by the end of today.

17    **THE COURT:**  You have been talking to your people?

18    **MR. BARR:**  I have been talking to my people.

19    **THE COURT:**  You just crack me up, Brian.  I loved it.

20  I wish I had some people where I could say, "Oh, let me talk to

21  my people and see how they feel about that."  That's really

22  good.

23    **MR. MAZE:**  We saw what his people just did to him

24  when you said they could leave.

25    **MR. WILLIAMSON:**  First of all, they got you in a

1  really good mood, and then they left.

2        THE COURT:  Brian really cracked me up on that last

3  conference we had.  I do think we made good progress, and I was

4  very encouraged by it.

5              Have we decided whether we have reached

6  agreement with the U.S. 30(b)(6)?

7        MR CHAKERES:  Your Honor, this is Nat Chakeres with

8  the United States.

9        THE COURT:  Hi, Nat.  How are you today?

10        MR CHAKERES:  There's one topic I think we still are

11  working on.  The topic with the interrogatory, I believe we

12  have settled on language there.  I think the other one, it's a

13  very minor wording issue.  I don't think it's preventing going

14  forward in terms of preparation for these depositions.  That's

15  where we are with that one.

16        THE COURT:  Good, good, good.

17              Rob.

18        MR. GASAWAY:  Rob Gasaway for BP.  One minor point.

19  We did serve the interrogatory last night.  I just wanted to

20  clarify for the Court, that was an agreed-upon interrogatory.

21  There's some language in there about oil flow from the well.

22  And as you know from our oral argument on the MSJ, BP's

23  position and Anadarko's is, obviously, the oil came from the

24  vessel.  But in the interest of getting an agreed interrogatory

25  out and being able to clarify on the record today that it was

1   an agreed interrogatory and protect our position, we thought
2   the Court might appreciate it if we didn't fight over those
3   nuances.  We agreed to that language.  That interrogatory is
4   out there.  I'm hopeful that we can reduce the scope of what
5   might otherwise be a burdensome 30(b)(6).
6           THE COURT:  That's very helpful, guys.  Thank you.
7   That's good work.
8               How about the BP 30(b)(6)?  The only thing we
9   have left remaining is the overlap issue?
10          MR. GASAWAY:  To my knowledge, Your Honor.  Remember,
11  the PSC has not sent a proposed 30(b)(6) records custodian
12  topic with wording, but they have put a placeholder in there.
13  It's our strong suggestion we put that in the "too hard" file
14  for now and come back to that later.  They would probably tell
15  you that's on the table as well.
16          MR. WILLIAMSON:  Exactly.  Jimmy Williamson for the
17  PSC.  Yes, Your Honor, the whole record -- given the Court's
18  orders on e-mails and the many issues you have heard on
19  Phase One regarding that issue, there's no question that we
20  want to address that early in Phase Two, which will
21  hopefully -- so the records custodian issue, whether it be
22  requests for admissions, 30(b)(6) witnesses, other discovery
23  methods, meet-and-confers, yes, that issue -- "placeholder" is
24  probably a pretty good word for that, for what we consider to
25  be that issue.

1          **MR. GASAWAY:**  Well, let me make a suggestion here.

2     We have not seen proposed language for a 30(b)(6) records

3     custodian topic.  I don't know if the best way to proceed is

4     for you to put language there or for us to have a general

5     meet-and-confer as to how we will handle it.

6          **MR. WILLIAMSON:**  Either Brian or I will be happy to

7     send a letter to BP addressing the topic.

8          **THE COURT:**  I notice you put Brian's name before

9     yours.

10          **MR. WILLIAMSON:**  As the Court knows, Brian does all

11    the hard work.  I try to do all the easy work.

12          **THE COURT:**  You just look pretty.

13          **MR. BARR:**  Brian Barr for the PSC, just thinking out

14    loud here.  Coming up with language on a single source --

15    records custodian other than an IS person that can talk to us

16    about how records are maintained, I think that would be easy to

17    put together.

18               One of our concerns, particularly with the way

19    we are trying to structure discovery in Phase Two, which is

20    doing largely 30(b)(6) discovery and trying not to do, at the

21    Court's request, a bunch of individual fact witnesses, our

22    concern with that approach given what -- I haven't been

23    involved in the e-mail issue and the business records.  I

24    haven't been involved in those discussions.  But from my

25    perspective, for whatever reason, there's an inability to come

 1  to an agreement as to what those things are.

 2              I am concerned in a 30(b)(6) context about us at

 3  least getting a witness for each of these topics, to which

 4  there's going to be documents relevant to those topics, that

 5  can meet the five-part test for every single document we want

 6  to show.  So the concern is we end up having to do a bunch of

 7  individual fact witnesses who can come in and say, yes, that

 8  person, that was within their scope of employment to talk about

 9  that issue they are talking about in this e-mail.

10              That's what I'm worried about.  I don't know the

11  best way to address that if the parties can't come to an

12  agreement.  I don't have faith that's going to happen at this

13  point.

14          THE COURT:  Okay.  Well, let's think about that.  I

15  would like to continue to talk through the issue and see what

16  we can do about it.  Maybe the way to go is to pick out some

17  examples, Brian.  Pick out some documents you have already

18  looked at.  I know you have.

19          MR. BARR:  My team has.

20          THE COURT:  "My people have."  Pull out some examples

21  that are of particular interest and concern to you, and use

22  that as the basis of further discussion.

23          MR. BARR:  We can do that.  The other suggestion -- I

24  went off on a tangent there, but kind of what I was planning on

25  saying was, for each topic, adding to the 30(b)(6) a records

1  custodian that can talk about business records exceptions,
2  authentication, all those types of issues on the documents
3  relevant to this topic.
4          **THE COURT:**  How many topics have we got?
5          **MR. BARR:**  I think there are, what, for the BP one,
6  like 30 with subparts.  I can't remember the exact number.
7          **MR. GASAWAY:**  Hundreds by our count, Your Honor --
8  Rob Gasaway for BP -- as we break them down.
9          **MR. BARR:**  I said with subparts.
10          **THE COURT:**  Let's pursue it first, if you don't mind,
11  Brian, by picking out 10 documents you are particularly
12  interested in and that cause you concern relative to needing a
13  custodian to identify, and let's see if that can help us with
14  our discussion.
15          **MR. BARR:**  We can do that, Your Honor.
16          **THE COURT:**  Your people.
17          **MR. BARR:**  My people.
18          **THE COURT:**  Does that make sense, Rob?
19          **MR. GASAWAY:**  It does.  What I would suggest is that
20  we just go ahead and finalize the BP notice.  Obviously, we
21  know this issue is looming out there, but we can finalize the
22  notice with respect to all these other topics, start moving
23  forward on that while we are track and parallel with Brian and
24  his people on this issue.
25          **THE COURT:**  I think Jimmy agrees with that.

1          **MR. WILLIAMSON:**  I do.  I just don't want it to be a

2     "gotcha" where we get to the end and they say, "You didn't do

3     requests for admissions, you didn't do this by 30(b)(6), and

4     you didn't take individual depos.  So you know what?  You can't

5     lay this predicate through the e-mail X."

6               Anyway, we will follow the Court's suggestions.

7          **THE COURT:**  What you do following this conference

8     when you read the transcript, pull this page out and keep it

9     with your records custodian file.

10         **MR. WILLIAMSON:**  With Brian's people?

11         **MR. BARR:**  You're one of my people.

12         **MR. WILLIAMSON:**  I am proud to be one of his people.

13    Thank you.

14         **THE COURT:**  So any report on Cudd Well?  The last we

15    heard about them is they didn't want to incur any expense, and

16    we didn't blame them.

17         **MR. BARR:**  I have not had another conversation with

18    their counsel.  He told me he was going to file objections.  He

19    was going to give them to me before he did that to see if we

20    could work them out.  I didn't get anything from him this week.

21         **THE COURT:**  Okay.  Why don't you stand up, because

22    next comes Wild Well and Oceaneering.

23         **MR. WILLIAMSON:**  Judge, I spoke to Wild Well's

24    counsel yesterday, Ms. Mince, and she and I agreed -- she said,

25    "Well, we have already produced a witness."

```
 1              I think she and I agreed Wild Well has already
 2    produced their documents.  I said, "Gee, if you don't produce a
 3    30(b)(6) witness, we are going to be taking individual
 4    depositions."
 5              So she was going to talk to their people.
 6    Ms. Mince and I agreed that she and I were going to try to
 7    reach a consensus and visit on Monday or Tuesday.
 8              THE COURT:  Good.
 9              MR. WILLIAMSON:  So Wild Well's going well.
10              Mr. Ralph Kraft, who is the attorney for
11    Oceaneering, and I have been in contact.  We are going to
12    hopefully make progress on those.
13              THE COURT:  Good.  If Ralph gives you trouble, call
14    me.
15              MR. WILLIAMSON:  Yes, your Honor.
16              THE COURT:  Woods Hole.
17              MR. GASAWAY:  Rob Gasaway for BP, Your Honor.  I
18    think the news there is that Mr. Chakeres did reach out to
19    Ms. Sanchez of our team, and I think they are making progress
20    on two fronts, from what I understand, both the front of
21    actually producing documents or at least getting them through
22    the pipelines we have heard about and other work streams, and
23    on the front of at least discussing some of the confidentiality
24    issues, some of the claims of confidentiality that might be
25    asserted on behalf of the United States.
```

1            So I had flagged that for both Mr. Chakeres and

2   the Court last week, but I understand progress was made offline

3   this week.  I'm not sure there is any need for Court action

4   this week.  We are still very interested in that and want to

5   press that forward.

6            Mr. Chakeres, are you on?  Is that accurate?

7            MR CHAKERES:  Yes, I'm on.  Thank you.

8            Your Honor, that is accurate.  We got a little

9   bit more clarification from Woods Hole regarding the types of

10  confidentiality we are concerned about.  It actually has to do

11  with they're in some capacity a military contractor, some of

12  the work they do on behalf of the United States government, so

13  there are some sort of the military national security

14  sensitivities.  We do have to do this review.  We are actively

15  doing it.  We don't have all the documents from Woods Hole.  I

16  don't think it's going to be a large universe of documents, but

17  we are working to get through this as quickly as possible.

18           THE COURT:  Good.  Thank you, Nat.  I was going to

19  suggest that you give us all national security clearance, but I

20  don't think this group will qualify for that.

21           MS. KUCHLER:  Nor would we want to.

22           THE COURT:  Anything else that we want to cover?

23           MR. TSEKERIDES:  Your Honor, it's Ted Tsekerides

24  again on that B3 post-explosion.  I know we're on schedule.  I

25  wanted to see if you had a chance to review the submissions and

1    if we should address that.

2              **THE COURT:**  Ted, I am diligent, but I am also

3    dilatory.  Apologies yet again.  I have not.  It's been one of

4    those weeks where I have literally not done anything except

5    major Phase One trial prep stuff.  I know I need to get to you.

6    I will try to turn my attention to you this weekend.

7              **MR. TSEKERIDES:**  It's obviously still an important

8    issue for us, but we definitely appreciate -- and we have been

9    seeing the e-mail traffic.  There's a lot going on.  So

10   whenever you think -- this week if you want to schedule it for

11   the 17th, that would be great, but we will keep an eye out for

12   the orders.

13             **THE COURT:**  Great.  Thank you so much.  I appreciate

14   it, Ted.

15             Rob.

16             **MR. GASAWAY:**  Your Honor, one miscellaneous item

17   here, if I could.  We have had issues in the past about U.S.

18   agencies asking for items that have been produced in discovery

19   here.  We talked about the CST.  We talked about the

20   Coast Guard.

21             BP got, through its business unit, requests for

22   Phase Two-type ROV data, subsea data of the oil flow.  We had

23   had a long and fruitful process with Mr. Lundy of the PSC where

24   we produced a number of videos of oil flow below the sea, and

25   we got a request of the business unit from NOAA for essentially

1    the same thing.  Ms. Esty Lobovits here is working on that.

2                    I just wanted to alert the Court and parties

3    that as far as BP is concerned, there's no problem with making

4    copies, giving them to NOAA, without restriction, at BP's

5    expense, in due course.

6                    There are other instances where agencies have

7    come to us and asked for MDL-type discovery data.  I wanted to

8    announce that on the record and just ask anybody to get back to

9    me or Ms. Lobovits if they think there's a problem with

10   producing those videos.

11                   Again, these are all videos we are proposing to

12   produce to them.  They were turned over initially to the PSC in

13   response to a request by Mr. Lundy.  So there's nothing the

14   parties don't know about here, just so everybody knows.

15           THE COURT:  Let's do this, guys.  If there is any

16   objection to that, would you all let us know Tuesday of next

17   week?  Otherwise, I think that's fine.

18           MR. GASAWAY:  Thank you very much, Your Honor.  And I

19   did talk to Mr. Underhill before he left about that, so he

20   knows.

21           THE COURT:  Good.  No problem.

22           MR CHAKERES:  Your Honor, this is Nat Chakeres.  If I

23   could just follow up on that very quickly.

24           THE COURT:  Sure.

25           MR CHAKERES:  I think it's the understanding of the

1    folks at NOAA who are sort of -- they are working side by side

2    with BP on certain things under a cooperative agreement, so I

3    think that was the reason for the circumstances of how that

4    request came in.

5                   It's our understanding -- I think we actually

6    are going to send a letter to BP about this today, but I'm glad

7    this came up.  We thought there was more video that exists than

8    has been produced in discovery to date.  That may be the case,

9    that may not be, but we -- there were gaps identified.  I think

10   NOAA did check with us about what's out there previously in

11   discovery.  That was sort of the genesis for that request.

12                  THE COURT:  Okay.

13                  MS. HIMMELHOCH:  For the record, that letter has gone

14   out.

15                  THE COURT:  Who just spoke up?

16                  MS. HIMMELHOCH:  I'm sorry, Your Honor.  This is

17   Sarah Himmelhoch.

18                  THE COURT:  What did you pipe in with?

19                  MS. HIMMELHOCH:  Mr. Chakeres made reference to a

20   letter to BP.  We had just some follow-up questions on their

21   responses to our Phase Two discovery, including the question

22   about the ROV video.

23                  THE COURT:  Whether you have it all, huh?

24                  MS. HIMMELHOCH:  Yes.

25                  THE COURT:  Okay.  Good.  Thank you.

1    **MR. GASAWAY:**  We'll send the video out, if there's no

2  objection, by Tuesday to NOAA; and then we'll look for this

3  letter, which I don't think we have reviewed yet.  We'll follow

4  up with that.

5    **THE COURT:**  Exactly.  Okay.  Anything else?

6    **MR. BARR:**  One thing real quickly, and it's more of a

7  request than a Court action.  I'm concerned that right now we

8  have depositions scheduled to start March 1 -- is when we are

9  supposed to start.  Is it too much to ask that people start

10  bringing schedules so we can start doing some scheduling next

11  week?

12    **THE COURT:**  It is not too much to ask.  It's just a

13  question of getting around to it.  So last week we asked

14  everybody to look at schedules for 30(b)(6) witnesses.  We

15  still need to hash through the order.  I know we have got some

16  issue about the order in which the witnesses will go.  Why

17  don't you and your people --

18    **MR. BARR:**  I'm never going to live that down.

19    **THE COURT:**  No, you're not.  It's for the remainder

20  of Phase Two, so clearly you're not going to live it down.

21    Anyway, give me a proposal of how you would like

22  it to go.  Why don't we ask BP and the U.S. to do likewise.  We

23  really have to cross that bridge as well and start scheduling.

24    **MR. BARR:**  We can do that.

25    **THE COURT:**  Fair enough?

1          **MR. BARR:**  Fair enough.

2          **THE COURT:**  All right.  I'm going, going, gone.

3     Thank you very much, guys.  Go home.

4          (Proceedings adjourned.)

5                              * * *

6                          **CERTIFICATE**

7          I, Toni Doyle Tusa, CCR, FCRR, Official Court

8     Reporter for the United States District Court, Eastern District

9     of Louisiana, do hereby certify that the foregoing is a true

10    and correct transcript, to the best of my ability and

11    understanding, from the record of the proceedings in the

12    above-entitled matter.

13

14

15                              s/ Toni Doyle Tusa
                                Toni Doyle Tusa, CCR, FCRR
16                              Official Court Reporter

17

18

19

20

21

22

23

24

25