**EXHIBIT 1**

**FIFTH AMENDMENT INVOCATIONS - ADVERSE INFERENCES**

**NAME:**  **MARK HAFLE**

**EMPLOYER:**  **BP**

**TITLE:**  **SR. DRILLING ENGINEER**

Hafle was BP's drilling engineer in charge of the Macondo well day-to-day operations.  He oversaw the multiple re-designs of the well, submitted permitting information, participated in the design and implementation of the cement job, and was consulted hours before the blowout regarding the negative pressure test.

**I.**  **Inferences to be drawn against BP:  Application of the *Libutti* Factors**

The Court may draw adverse inferences against BP from Hafle's invocation of the Fifth Amendment under the four non-exclusive factors suggested by the Second Circuit in *LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997), which this Court adopted in its February 14 Order.  Applied here, they are as follows:

**(1) the nature of the relevant relationships** – A special relationship between a party and an invoking non-party witness is not required before the Court will draw the inference. *FDIC v. Fidelity & Deposit Co.,* 45 F.3d 969, 978 (5th Cir. 1995).  In *FDIC*, an adverse inference was permissibly drawn where the "relationship" in question was that of a bank loan officer and a customer of the bank.  The relationship here is stronger, as BP and Hafle were in an employer/employee relationship.   As the Court stated in *FDIC*, "the fact of present employment serves primarily to reduce the chance that the employee will falsely claim to have engaged in criminal conduct for which the defendant employer is liable."   *Id.* at 978 (citing ROBERT HEIDT, *The Conjurer's Circle--The Fifth Amendment Privilege in Civil Cases*, 91 YALE L.J. 1062, 1119-20 n. 214 (1982). Adverse inferences may be drawn from the invocation by former employees, also.  "Any factors suggesting that a former employee retains some loyalty to his former employer-- such as the fact that the employer is paying for his attorney--would serve the same purpose." *Id.*

**(2) the degree of control of the party over the non-party witness** – The control factor weighs in favor of the inference.  As the Court noted in *New Hampshire Ins. Co. v. Blue Water Off Shore LLC,* 2009 WL 792530 (S.D. Ala. 2009), the "control" element deals not with the party's ability to control the witness at the time of his testimony, but "the degree of control the party has 'vested in the non-party witness in regard to the key facts and general subject matter of the litigation' and approximates the analysis for admissions of a party opponent under Federal Rule of Evidence 801(d)(2)."  *Id.* (quoting *Libutti*).  As

Hafle's employer, BP exercised control over him in regard to the temporary abandonment procedures at the Macondo well, which is central to this litigation.   Moreover, any statement by Hafle would qualify as an admission by BP under the Federal Rules of Evidence.

(3) **the compatibility of the interests of the party and non-party witness in the outcome of the litigation** - Hafle and BP have similar interests; it is in Hafle's interest that BP succeed in the litigation, particularly with respect to any decisions that he made.

(4) **the role of the non-party witness in the litigation** - As Senior Drilling Engineer, Hafle has unique knowledge concerning decisions made on the night of April 20 - in particular, the decision to go forward despite anomalous negative pressure test results.

BP contends that inferences should not be drawn against it from invocations by its employees because: (1) its employees chose to invoke the Fifth Amendment; (2) they did not do so at BP's urging; and (3) it provided corporate designees for all topics on which its employees took the Fifth Amendment. The Court stated in its Order that these arguments would be considered on a case-by-case basis.  Hafle's choice to invoke the Fifth Amendment, which BP states was not done at its urging, does not demonstrate a lack of loyalty to BP or indicate that Hafle wishes to harm BP.  If Hafle wished to incriminate BP, it could do so more effectively by his direct testimony.  Note that the "control" element of *Libutti* does not involve an examination of BP's control over Hafle's decision whether to testify; instead, this factor refers to BP's control over him during the period of time, and in regard to the key facts, that are the subject of the litigation. Finally, the corporate designees that BP designated do not have Hafle's unique knowledge.  As BP's Senior Drilling Engineer in charge of day-to-day operations at Macondo, he was involved in the multiple re-designs of the well and the negative pressure test, and discussions and decisions made concerning well design and negative pressure test results.  He has knowledge of facts that cannot be obtained from any other witness who is not also invoking the Fifth Amendment.

## II.    Inferences to be Drawn Against BP

### A.  Hafle, as Senior Drilling Engineer, was responsible for the design of the well, the design of the casing, the cementing job and well integrity testing.

048:11 - 048:14

048:11       Q.       And, sir, as the senior drilling

   12   engineer, your team had design of the well

   13   control on the Macondo well, did it not?

   14          A.       Same answer.

048:16 - 049:07

2

16      Q.      And you were responsible for

17  designing the Macondo well, were you not?

18      A.      Same answer.

19      Q.      And, sir, your team designed the

20  casing on the Macondo well, did it not?

21      A.      Same answer.

22      Q.      And your team approved of the

23  cementing job on the Macondo well, did it

24  not?

049:01      A.      Same answer.

02      Q.      And your team approved of the

03  manner and type of cement that were to be

04  used on the Macondo well, particularly in the

05  final cement job; is that correct, sir?

07      A.      Same answer.

049:20 - 050:08

20      Q.      And your team also oversaw and

21  approved such procedures as a cement bond

22  log?

23      A.      Same answer.

25      Q.      A negative test?

050:01      A.      Same answer.

02      Q.      Positive test?

04      A.      Same answer.

05      Q.      And other well integrity tests,

06  did you not?

08      A.      Same answer.

051:07 - 051:18

051:07      Q.      And it was your responsibility,

08  sir, to prepare reports and permits to the

09  MMS concerning the Macondo well; is that

10  correct, sir?

12      A.      Same answer.

3

13        Q.        And it was your responsibility

14   to keep the MMS apprised of well operations

15   where -- where regulations required that,

16   sir; is that correct?

18        A.        Same answer.

**B. BP was concerned that there were problems with the variables that Gagliano was using in the OptiCem modeling.**

020:11 - 020:18

020:11        Q.        And wasn't it a fact that you,

12   sir, and other members of your team, were

13   concerned that Jesse Gagliano was not keeping

14   an accurate record of all of the variables

15   that were being used in the Opti modeling --

16   OptiCem modeling that he was performing over

17   the course of -- of the life cycle of this

18   particular well?

020:20 - 020:25

020:20        A.        Same answer.

21        Q.        And, sir, you and your team

22   members knew that there -- there might be

23   problems with the variables that Jesse

24   Gagliano was using in this OptiCem modeling,

25   didn't you?

021:02 - 021:05

021:02        A.        Same answer.

03        Q.        And, sir, you and your team also

04   knew that you had a narrow window to get a

05   successful cement job; is that correct?

07        A.        Same answer.

022:08 - 022:11

022:08        Q.        And, in fact, you and Mr. Brian

09   Morel were the lead BP cement program

10   engineers on this job, were you not?

11         A.     Same answer.

**C.  Hafle never saw lab test results on the slurry that was used on the final cement job.**

022:20 - 023:02

022:20      Q.     And, sir, it is a fact that on

21   the final cement job, you do not recall

22   seeing any lab test results from Jesse

23   Gagliano that were run on the slurry that was

24   used on the final cement job, did you?

023:02      A.     Same answer.


055:04 - 055:09

055:04      Q.     And, sir, you essentially were

05   relying on a cement barrier where you'd never

06   seen the foam stability test on the cement

07   slurry; isn't that true, sir?

09         A.     Same answer.


097:11 - 097:17

097:11      Q.     Isn't it true that the only foam

12   stability lab test the -- the Macondo well

13   team had prior to commencement and completion

14   of the cement job on April 19 through 20,

15   2010, indicated an unstable foam cement?

17         A.     Same answer.

**D.  Despite his awareness of the risk of channeling, Hafle did not order a cement bond log.**

099:10 - 099:17

099:10      Q.     You were aware that there was an

11   increased risk of channeling with the

12   production casing interval cement job and

13   severe gas flow potential, but you did not

14   perform a cement bond log after the cement

15   job, did you?

17          A.      Same answer.

**E.  The cement job did not achieve the TOC required by EPT GP 10-60.**

025:14 - 026:04

025:14      Q.      And, sir, EPT GP 10-60 governs

15   zonal isolation, does it not, sir?

16          A.      Same answer.

17          Q.      And you're familiar with that,

18   as a drilling engineer, sir?

19          A.      Same answer.

20          Q.      And that calls for zonal

21   isolation -- that calls for the top of the

22   cement to be a thousand feet above the --

23   above a distinct permeable zone, does it not?

25          A.      Same answer.

026:01      Q.      And in the case of the Macondo

02   well final cement job, that didn't take

03   place, did it, sir?

04          A.      Same answer.

026:12 - 026:17

026:12      Q.      Okay.  And, sir, no proven

13   evaluative technique was performed of the

14   Macondo well to determine the top of cement,

15   was there?

17          A.      Same answer.

**F.  Hafle knew that the OptiCem models called for 21 centralizers and was
     aware of the risk of gas flow problems resulting from the use of
     fewer centralizers.**

036:09 – 036:17

036:09    Q.    You also knew, sir, didn't you,

10   that the Halliburton models, that the OptiCem

11   models that -- OptiCem models that you were

12   relying on to manage the well, in fact,

13   called for 21 centralizers to be used during

14   the final cement job; isn't that correct,

15   sir?

17        A.    Same answer.

036:23 – 037:06

036:23      Q.    And you knew, sir, that Jesse

24   Gagliano had prepared a report on April 18th,

25   2010, sir, which informed BP drill team,

037:01  including yourself, that failure to use 21

02   centralizers and using 6 or 7 instead would

03   cause a severe gas problem; is that correct,

04   sir?

06        A.    Same answer.


080:25 - 081:05

080:25        Q.    Okay.  And you were aware, sir,

081:01  that that was -- it was Halliburton's report

02   that if 21 centralizers were not used, you

03   would encounter severe gas flow conditions?

05        A.    Same answer.

081:25 - 082:09

081:25      Q.    And you were relying on

082:01  Halliburton's models throughout the drilling

02   process, were you not, sir?

04        A.    Same answer.

05        Q.    And, in fact, at the end, you

06   disregarded the Halliburton models, did you

07   not, sir?

09        A.    Same answer.

084:21 - 084:23

094:07 - 094:25
094:07          Q.          And after receiving

        08   Halliburton's April 18, 2010, OptiCem report

        09   which indicated a severe gas flow potential,

        10   BP proceeded to pump the cement job with only

        11   six centralizers, correct?

        13          A.          Same answer.

        14          Q.          Neither you nor any BP employee

        15   ever advised Halliburton before the

        16   production casing cement job began on

        17   April 19th, 2010, that BP had used only six

        18   of the 21 centralizers, did it -- did you?

        20          A.          Same answer.

        21          Q.          Isn't it true that neither you

        22   nor -- nor BP ever asked Halliburton to run a

        23   new OptiCem model with only six centralizers?

        25          A.          Same answer.

095:24 - 096:04
095:24          Q.          The decision to place only six

        25   centralizers on the production casing

096:01   interval was made to save BP time and money,

        02   correct?

        04          A.          Same answer.


        **G. Guide made the decision not to use the additional centralizers; BP**
        **could have waited for additional centralizers.**
160:08-160:18
160:08          Q.          Now, isn't it true that

        09 Mr. Guide was the one who decided not to use

        10 the additional centralizers?

8

12          A.      Same answer.

13          Q.      And that Mr. Guide did not want

14 to use the -- the additional centralizers

15 that was sent to the rig, you could have

16 waited for more centralizers, couldn't you?

18          A.      Same answer.

161:04 - 161:07

161:04      Q.      You agree that the number of

05   centralizers to use was totally up to BP?

07          A.      Same answer.

**H.  BP made numerous changes to the Temporary Abandonment Procedure during the last week of operations.**

051:24 - 053:07

051:24      Q.      In fact, your -- the drilling

25   engineers on the Macondo well made numerous

052:01   changes to the temporary abandonment

02   procedure during the last week of operations

03   on the DEEPWATER HORIZON, did they not?

04          A.      Same answer.

05          Q.      And, in fact, there was an

06   initial plan on April 12th, wasn't there,

07   sir?

08          A.      Same answer.

09          Q.      And there was a modification of

10   that plan on April 14th, wasn't there, sir?

11          A.      Same answer.

12          Q.      And there was another

13   modification on April 15th, was there not,

14   sir?

15          A.      Same answer.

16        Q.        And an MMS permit was filed with

17    a different variation on April 16th; isn't

18    that correct, sir?

19        A.        Same answer.

20        Q.        And yet a different procedure

21    was e-mailed to the rig for T&A on

22    April 20th, sir; is that correct?

24        A.        Same answer.

25        Q.        And the final procedure that was

053:01    e-mailed to the rig for temporary abandonment

02    was never approved by the MMS, was it, sir?

03        A.        Same answer.

05        Q.        It was never submitted to the

06    MMS, was it, sir?

07        A.        Same answer.


**I.   The well design decision was driven by time and money without risk
assessment.**

069:16 - 069:20

069:16        Q.        Okay.  By using a long string

17    versus a liner tieback, BP saved time and

18    money, did it not?

20        A.        Same answer.


074:24 - 075:05

074:24        Q.        And isn't it true, sir, that

25    many of the management-of-change processes

075:01    which occurred in April of 2010 regarding the

02    Macondo well did not have a risk assessment

03    process?

05        A.        Same answer.


075:17 – 075:21

075:17      Q.     Sir, isn't it a fact that the

18  design of the well was driven by rig

19  schedule?

21      A.     Same answer.


076:15 - 076:21

076:15      Q.     And, sir, isn't it true that you

16  and your well design team on the Macondo well

17  knew that the cement program designed for

18  this -- for the final cementing process was

19  manipulated to make the numbers work?

21      A.     Same answer.

201:14 - 201:20

201:14      Q.     In fact, isn't it true that in

15  the days preceding the blowout, many of your

16  decisions regarding the well were affected by

17  the fact that the well was over budget; isn't

18  that true?

20      A.     Same answer.


202:04 - 202:08

202:04      Q.     Because of that, in the days

05  preceding the blowout, BP made many decisions

06  that were cost-driven; isn't that right?

08      A.     Same answer.


189:10 - 189:15

189:10      Q.     When you were working on the

11  Macondo well before the blowout, isn't it

12  true that you were concerned with saving BP

13  all the money you could?

15      A.     Same answer.


**J. The Temporary Abandonment procedure that BP performed on the Macondo well was not the one sent to or approved by MMS, in violation of BP's permit.**

103:23 - 104:19

103:23      Q.      The temporary abandonment

24  procedure sent to MMS for approval was not

25  the temporary abandonment procedure that was

104:01  performed, was it?

03      A.      Same answer.

04      Q.      The temporary abandonment

05  procedure that was performed had not been

06  approved by MMS, had it?

08      A.      Same answer.

09      Q.      The temporary abandonment

10  procedure that was performed hadn't been

11  submitted to MMS, had it?

13      A.      Same answer.

14      Q.      It was a violation of BP's

15  permit to modify the temporary abandonment

16  procedure without approval from MMS, wasn't

17  it?

19      A.      Same answer.

**K.  Guide made the decision to deviate from the procedure approved by the MMS; Hafle did nothing to override Guide's decision.**

164:4-164:8

164:4      Q.      And John Guide made the decision

5 to deviate from the temporary abandonment

6 procedure approved by the MMS?

8      A.      Same answer.

166:19-167:11

166:19      Q.      Did you do anything to override

20 Mr. Guide's decision to deviate from the

21 temporary abandonment procedure approved by

22 the MMS?

24      A.      Same answer.

25      Q.      You agree that you could have

167:01 overridden Mr. Guide's decision to deviate

2 from the temporary abandonment procedure

3 approved by the MMS?

5          A.     Same answer.

6 Q. And you agree that you should

7 have overridden Mr. Guide's decision to

8 deviate from the temporary abandonment

9 procedure approved by the MMS?

11          A.     Same answer.


**L.  Neither Hafle nor Morel knew the specific procedure for a negative pressure test as late as April 17, 2010.**

230:01 - 230:16

230:01          Q.     Isn't it true that neither you

02   nor Brian Morel knew the specific procedure

03   for a negative test?

05          A.     Same answer.

06          Q.     In fact, as late as April 17th,

07   2010, you and Mr. Morel were still looking at

08   the specific MMS requirements for the test?

10          A.     Same answer.


**M.  Hafle was aware that the negative pressure test procedure followed was not the same as the procedure approved by the MMS.**

105:22 – 106:02

105:22          Q.     And the negative test

23   procedure – negative-pressure test procedure

24   was not the same as the negative-pressure

25   test procedure approved by MMS, correct?

106:02          A.     Same answer.


105:03 – 106:18

106:03          Q. And, in fact, you discussed with

13

04 John Guide whether the change in the

05 negative-pressure test procedure required

06 approval from MMS, didn't you?

09       Q.      MMS did not approve the

10 negative-pressure test that was in the Ops

11 note, correct?

13       A.      Same answer.

14       Q.      MMS did not approve the

15 negative-pressure test procedure that was

16 actually performed on the rig, did they?

18       A.      Same answer.

**N.   Hafle was aware, based on discussions with Don Vidrine on the night of April 20, that there was pressure on the drill line after the negative pressure test.**

31:09-33:21

31:09      Q. And, in fact, you spoke to

10 Mr. Vidrine, also, about the

11 negative-pressure test, did you not, sir?

13       A.      Same answer.

14       Q.      And you knew that Mr. Vidrine

15 had some problems with the negative-pressure

16 test, did you not, sir?

18       A.      Same answer.

19       Q.      And, in fact, you told the

20 investigators, noting page 6 of your

21 statement, sir -- of the interview notes,

22 sir, that later on April 20th, Don Vidrine

23 called Mark at 8:52 p.m., to talk about how

24 the test -- how to test the surface plug and

25 whether they should apply a pressure test or

32:01 a weight test.

2 Mark noted that Don also talked

3 to him about the negative test. Vidrine told

4 Mark that the crew had zero pressure on the

5 kill line, but they still had pressure on the

6 drill pipe.

7 So you knew -- you knew, sir,

8 did you not, that the rig was reporting

9 pressure on the drill pipe at the conclusion

10 of the negative test, didn't you?

12          A.       Same answer.

13          Q.       And you knew, sir, there

14 shouldn't have been any pressure on the drill

15 pipe on the negative test; isn't that

16 correct, sir?

18          A.        Same answer.

19          Q.       In fact, you told Mr. Vidrine

20 that you can't have pressure on the drill

21 pipe and a zero pressure on the kill line in

22 a test that's properly lined up, didn't you?

24          A.       Same answer.

25          Q.       And, in fact, the report – the

33:01 interview note states specifically that,

2 quote, Mark said he told Don that you can

3 have pressure on the drill pipe and a zero

4 pressure on the kill line in the test that's

5 properly lined up.

6 Is that what you told the

7 interviewer, sir?

8          A.       Same answer.

9          Q.       And is that what you told

10 Mr. Vidrine, sir?

11        A.      Same answer.

**O.  Although Hafle was aware of the anomalous negative pressure test results, he allowed the team to proceed to displacement.**

33:12-34:13

33:12        Q.      And so you knew, sir, sitting

13 at -- onshore at BP at the headquarters, that

14 the negative-pressure test was not

15 successful, didn't you, sir?

17        A.      Same answer.

18        Q.      And, sir, you let operations go

19 forward on the rig at that time, didn't you,

20 sir?

22        A.      Same answer.

23        Q.      And you let them complete a

24 displacement of the riser, didn't you, sir?

34:01        A.      Same answer.

2        Q.      And you let them complete – let

3 them displace seawater mud, didn't you, sir?

5        A.      Same answer.

6        Q.      And you let the well go

7 underbalanced, sir?

9        A.      Same answer.

10        Q.      And in doing so, you put the rig

11 at risk, sir?

13        A.      Same answer.

106:19 - 107:08

106:19        Q.      You knew that despite anomalous

20  pressure results observed during the

21  negative-pressure test, the rig crew deemed

22  the test to be successful, correct?

24        A.      Same answer.

25        Q.      You also knew there was

107:01  confusion about the negative-pressure test,

02  correct?

04      A.      Same answer.

05      Q.      You did not advise anyone of

06  those concerns, did you?

08      A.      Same answer.

107:13 - 107:18

13      Q.      Did you tell anyone at that time

14  that the well should be shut in until the

15  anomalous negative-pressure test results

16  could be explained?

18      A.      Same answer.

**P.   Hafle did not provide clear instructions as to how the negative pressure test results should be interpreted.**

071:03-071-15

071:03      Q.      Sir, when you drafted the

04  negative-pressure test procedure in this

05  matter, were there clear instructions as to

06  how to interpret that test?

07      A.      Same answer.

08      Q.      Did anyone call Mr. Kaluza or

09  Mr. Vidrine to tell them how to interpret the

10  test?

11      A.      Same answer.

12      Q.      Did anyone tell them exactly

13  what they should expect as a result of the

14  test?

15      A.      Same answer.

**Q.  BP's filing of the fracture gradient with the MMS was outdated and wrong.**

122:17 - 122:23

122:17      Q.      You knew that in October 2009,

18  when BP drilled further down the Macondo well

19   after it took a kick at 8,970 feet, it did so

20   without the required drilling margin,

21   correct?

23       A.      Same answer.

123:14 - 123:25

123:14       Q.      You knew that the margin between

15   the fracture gradient and mud weight was less

16   than the MMS approved waiver to drill with a

17   margin of 0.3 ppg, correct?

19       A.      Same answer.

20       Q.      You also knew that you risked a

21   well-control event by drilling ahead the

22   final 100 feet in the interval with less than

23   a .3 ppg margin?

25       A.      Same answer.

125:01 - 126:04

125:01       Q.      You also knew that according to

02   BP's Macondo team, the formation integrity

03   test result recorded was much higher than

04   expected, correct?

06       A.      Same answer.

07       Q.      In fact, the formation integrity

08   test result recorded was 16.0 pounds per

09   gallon, correct?

11       A.      Same answer.

12       Q.      And you knew that that 16.0 ppg

13   was higher than the overburden, correct?

15       A.      Same answer.

16       Q.      You knew that one possible

17   explanation for the high formation integrity

18   test result was that BP had been testing

19   casing or cement rather than the formation,

20  correct?

22          A.      Same answer.

23          Q.      And despite the questionable

24  formation integrity test result for its

25  9-7/8-inch casing shoe, you reported the 16.0

126:01      fracture gradient to MMS in your mid-April

02  drilling permit application, correct?

04          A.      Same answer.


126:11 - 126:23

126:11      Q.      And you knew at this point that

12  BP did not have a formation integrity test

13  that it could use to determine if it was

14  justified in drilling further into the well,

15  correct?

17          A.      Same answer.

18          Q.      And you also knew that despite

19  the lack of a reliable formation integrity

20  test, BP drilled further down the hole,

21  correct?

23          A.      Same answer.


127:16 - 127:20

127:16      Q.      BP didn't have a waiver to drill

17  the final interval with a mud weight within

18  0.5 ppg of the fracture gradient, did it?

20          A.      Same answer.


128:03 - 129:01

128:03      Q.      You knew that as of April 9,

04  2010, when the well was at 18,260 feet, BP

05  lacked a safe drilling margin, as that term

06  is used in the MMS regulations, correct?

08          A.      Same answer.

09        Q.      You also knew that even without

10  the safe drilling margin, BP drilled the

11  final 100 feet of the well, correct?

13        A.      Same answer.

14        Q.      You were aware that BP had not

15  informed MMS that it was going to continue to

16  drill 100 feet without a safe drilling

17  margin, correct?

19        A.      Same answer.

20        Q.      You were aware that certain

21  traditional best and safest cementing

22  practices were not being used at the Macondo

23  well because BP was concerned about

24  fracturing the formation, correct?

129:01       A.      Same answer.

**R.  Guide and Hafle made the decision to use 75 barrels of spacer.**

102:01-102:11

102:01        Q. And you are aware that John

02  Guide wanted to stay at 75 barrels of spacer,

03  weren't you?

05  A.      Same answer.

06  Q.      And you and Mr. Guide agreed

07  that you wanted to use less spacer despite

08  contrary opinions from Halliburton and

09  Mr. Cunningham, correct?

11        A.      Same answer.

**S.  Hafle was concerned about the well design; he was the "lone wolf" on wanting to do a "P&A."**

44:10-45:12

45:10        Q.      Did you tell the interviewer

11 that you were debating the pros and cons of a

12 liner?

13      A.      Same answer.

14       Q.      And did you tell the interviewer

15 that they could and should have run a cement

16 plug?

17      A.      Same answer.

18      Q.      And were you concerned, sir,

19 that the culture trained in 1989 didn't

20 support that?

21      A.       Same answer.

23      Q.      And, sir, what did you mean, was

24 the Lone-Wolf on wanting to do the P&A, David

25 Sims, John Guide, Morel, Doris Reiter --

45:01 that's R-e-i-t-e-r -- Brad Simpson?

2      A.      Same answer.

3      Q.      What does that mean, sir?

4      A.      Same answer.

5      Q.      And, ultimately, it was David

6 Sims who decided to do an MOC to run the

7 liner?

8      A.       Same answer.

9      Q.      Sir, was it a fact that in the

10 middle of deciding what the cement program

11 for this particular well was going to be,

12 that the system that was running the

13 simulations crashed?

15      A.      Same answer.

16      Q.      And, sir, you're not even sure

17 that the entire T&A process got a final MOC,

18 were you?

19      A.          Same answer.