**EXHIBIT 2**

**FIFTH AMENDMENT INVOCATIONS - ADVERSE INFERENCES**

**NAME:**　　　　　　**BRIAN MOREL**

**EMPLOYER:**　　　　**BP**

**TITLE:**　　　　　　**DRILLING ENGINEER**


Brian Morel, along with Mark Hafle, was one of two drilling engineers in charge of the Macondo well's day-to-day operations.  Morel noted a number of problems with the well, including lost returns, an "out of control" well team, and difficulty with Halliburton's procrastination.  Morel made and acquiesced to a number of reckless decisions concerning well design, centralization and the cement job.

**ADVERSE INFERENCES AGAINST BP**

**A.**　　　　**Application of the *Libutti* Factors to Inferences to be drawn against BP.**

The Court may draw adverse inferences against BP from Morel's invocation of the Fifth Amendment under the four non-exclusive factors suggested by the Second Circuit in *LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997), which this Court adopted in its February 14 Order (Doc. 5682).  "Whether these or other circumstances unique to a particular case are considered by the trial court, the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth."   *LiButti,* 107 F.3d at 124.  The *Libutti* factors, as applied here, are as follows:

**(1) the nature of the relevant relationships** – In *FDIC v. Fidelity & Deposit Co.,* 45 F.3d 969, 978 (5th Cir. 1995), the Court held that an adverse inference was proper where the "relationship" in question was that of a bank loan officer and a customer of the bank. As the Court noted in *FDIC*, "the fact of present employment serves primarily to reduce the chance that the employee will falsely claim to have engaged in criminal conduct for which the defendant employer is liable."  *Id.* at 978 (citing ROBERT HEIDT, *The Conjurer's Circle--The Fifth Amendment Privilege in Civil Cases*, 91 YALE L.J. 1062, 1119-20 n. 214 (1982)).  Adverse inferences may be drawn from the invocation by former employees, also.  "Any factors suggesting that a former employee retains some loyalty to his former employer--such as the fact that the employer is paying for his attorney--would serve the same purpose." *Id.*   Because BP and Morel are in an employer/employee relationship, the relationship is stronger here than in *FDIC*.  There is nothing to suggest a lack of loyalty on Morel's part.

**(2) the degree of control of the party over the non-party witness** – As the Court noted

in *New Hampshire Ins. Co. v. Blue Water Off Shore LLC,* 2009 WL 792530 (S.D. Ala. 2009), the "control" element deals not with the party's ability to control the witness at the time of his testimony, but "the degree of control the party has 'vested in the non-party witness in regard to the key facts and general subject matter of the litigation' and approximates the analysis for admissions of a party opponent under Federal Rule of Evidence 801(d)(2)." *Id.* Morel was BP's employee, and it exercised its control over him as his employer with respect to the key facts and general subject matter of this case. Moreover, any statement by Morel would qualify as an admission by BP under the Federal Rules of Evidence. BP's control over Morel is further demonstrated by the incentives BP offered, and Morel received, for speed and cost savings.

**(3) the compatibility of the interests of the party and non-party witness in the outcome of the litigation** - In considering this factor, the *LiButti* Court directed that "the trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation." *Libutti,* 107 F.3d at 123. It is in Morel's interest that BP succeed in the litigation, particularly with respect to any actions on his part. BP and Morel thus share an incentive that BP be absolved of liability. Morel's invocation advances BP's interests to the extent that it prevents Plaintiffs from obtaining direct testimony from him that would likely be more damaging to BP than the inferences. . Thus, Morel's interests in the outcome of this case are compatible with BP's.

**(4) the role of the non-party witness in the litigation** - As one of two drilling engineers in charge of the Macondo well's day-to-day operations, Morel has critical knowledge concerning the difficulties faced during the final days of the Deepwater Horizon and the reckless decisions made in response. His role is central to the litigation: he knew, *inter alia,* that the well team was "out of control" and inexperienced; the cement slurry – including a retarder that he requested and which he knew was likely to cause instability - had never been tested; and the number of centralizers used would likely result in severe gas channeling. Yet, he failed to stop the job to correct these problems although he had the power to do so.

BP contends that inferences should not be drawn against it from any of its employees' decisions to invoke the Fifth Amendment because: (1) its employees chose to invoke the Fifth Amendment; (2) they did not do so at BP's urging; and (3) it provided corporate designees for all topics on which its employees took the Fifth Amendment. The Court stated in its February 14 Order that these arguments would be considered on a case-by-case basis. Morel's choice to invoke the Fifth Amendment, which BP states was not done at its urging, does not demonstrate a lack of loyalty to BP or indicate that Morel wishes to harm BP. Indeed, if Morel wished to incriminate BP, he could do so much more effectively through his direct testimony.

BP's argument is, essentially, that it had no control over these employees' decisions. However, the "control" factor of *Libutti,* as discussed above, does not involve an examination of BP's control over Morel's decision whether to testify; instead, this

factor refers to BP's control over him with respect to the subject matter of the litigation. Clearly, BP had control over Morel as its employee, and the relationship here is much stronger than that involved in *FDIC*.  Finally, the corporate designees that BP provided do not have Morel's unique knowledge.   Morel was central to a number of critical (and reckless) decisions concerning well design and operations during temporary abandonment.   He is a significant witness on the issues of BP's negligence and recklessness.

In the end, the question is one of trustworthiness and whether the inferences advance the search for the truth.  The Court would advance the search for the truth by drawing the inferences requested. Numerous witnesses have asserted their Fifth Amendment rights in this case, leaving Plaintiffs without direct testimony on several key issues.  The unique circumstances of this case render Morel particularly worthy of belief as to the specific inferences identified below and, accordingly, the Court should draw these inferences against BP.

**B.      Specific Inferences to Be Drawn Against BP**

**1.      Morel was the principal person in charge of well design, and approved the cementing of the well.**

018:22 - 019:05   018:22      Q.  Okay.  And, sir, you, in fact, were the

23  principal person in designing the casing of that

24  well, were you not?

019:01      A.  Same answer.

02      Q.  (BY MR. BICKFORD)  And you and your team

03  approved of the design of the cementing of that

04  well, did you not?

05      A.  Same answer.

**2.      Macondo was considered a "nightmare well / a well from hell."**

022:04 - 022:24   022:04      Q.  (BY MR. BICKFORD)  And in this E-mail

05  chain, you tell your wife that -- "Sorry you-all

06  have" -- "having" -- "Sorry, you-all are

07  having" -- I'm sorry.

08          Your wife tells you, "Sorry you-all

09  are having well issues again.  This has been a

10  nightmare well.  You are smart to," quote, "'let

11  it go,'" close quote, "since you won't be involved

12  in all the conversation over the weekend.  They

13  can live with the consequences if they are poor."

14          Is that a discussion between you and

15  your wife, sir?

16      A.  Same answer.

17      Q.  In fact, you did believe this was a

18  nightmare well, didn't you, sir?

20      A.  Same answer.

21      Q.  (BY MR. BICKFORD)  And, in fact, you also

22  referred to this well as a "well from hell," did

23  you not, sir?

24      A.  Same answer.


**3.      Morel believed that the well team was "out of control."**

024:22 - 025:10   024:22      Q.  (BY MR. BICKFORD)  Sir, I direct your

23  attention to the Bates stamp number ending in 541,

24  which is Page 4 of this exhibit.  This is a --

25  purports to be another E-mail from you, sir, to

025:01  your wife dated Thursday March 11, 2010, quote:

02  "Our team is out of control.  Management is being

03  superconservative beyond belief.  Now, the lounge

04  lizard is going to help us out.  I can't take it;

05  so, I am staying away from the issues today."

06          Did I read that correctly, sir?

07     A.  Same answer.

08     Q.  Is that what you wrote your wife on

09  March 11th, 2010?

10     A.  Same answer.

**4.    The well posed multiple problems and occupied more and more of Morel's time as he struggled to get everything done.**

027:18 - 028:05   027:18     Q.  (BY MR. BICKFORD)  Sir, this is an E-mail

19  chain dated one day later on March 23rd, 2010; and

20  you, in writing to your wife, Jade Morel, state:

21  "Never stops with this well.  Just keeps throwing

22  us curve balls and making me work.  When I haven't

23  been in meetings, I've been struggling to get

24  everything done we need to get done."

25          Is that what you wrote your wife on

028:01  March 23rd, 2010?

02     A.  Same answer.

03     Q.  And the well was continuing to give you

04  problems, was it not, sir?

05     A.  Same answer.

**5.     On April 5, 2010, the well experienced a total loss of returns (TREX-04507, p.12).**

028:20 - 029:04      20      Q.  Sir, going to Page 12, on April 5th, you

21  had yet another well control problem, did you not?

22      A.  Same answer.

23      Q.  And, in fact, you wrote your wife on that

24  day that, quote:  "In another well control

25  situation with total loss returns.  So, today

029:01  should be a busy one."

02          Is that what you wrote your wife,

03  sir?

04      A.  Same answer.

**6.     Morel was aboard the DWH to oversee the final cementing operation due to the replacement of the previous Well Site Leader with an inexperienced Well Site Leader (Kaluza) (TREX-04507, p.17).**

032:19 – 032:24      032:19      Q.  Sir, then, right as this well was supposed

20  to be finished, there was a change-out of

21  personnel of BP on the rig, was there not?

22      A.  Same answer.

23      Q.  And Mr. Koluza was sent to the rig, was he

24  not?

25      A.  Same answer.

00032   1      Q.  And Mr. Koluza wasn't really trusted by

2  the people in your section, was he?

4    A.  Same answer.

5    Q.  (BY MR. BICKFORD)  You knew that

6  Mr. Koluza was a subpar well site leader, didn't

7  you?

9    A.  Same answer.

10    Q.  (BY MR. BICKFORD)  Did your drilling team

11  know that he was one of the least rated well site

12  leaders by BP in the Gulf of Mexico?

14    A.  Same answer.

15    Q.  (BY MR. BICKFORD)  Mr. Koluza didn't know

16  anything about this well, did he?

18    A.  Same answer.

19    Q.  (BY MR. BICKFORD)  And you were so

20  concerned about that that you went out to the rig

21  to oversee operations yourself, personally, did

22  you not?

24    A.  Same answer.


**7.    There Was Pressure to Save Costs for Advancement in BP; Morel's advancement within BP was predicated upon saving BP money (TREX-04058).**

035:06 – 037:10    035:06 Q.  (BY MR. BICKFORD)  One of the reasons that

7  you had been nominated for promotion with BP was

8  for saving BP money, was it not?

9    A.  Same answer.

10      Q.  In fact, it was listed as the "wise

11   decisions" on your nomination for promotion, sir;

12   isn't that correct?

13      A.  Same answer.

14      Q.  And if I -- in fact, they cite you as

15   saving $500,000 in one instance; is that correct?

16      A.  Same answer.

17      Q.  And, in fact, they cite you as saving

18   $2 million in another instance; is that correct?

19      A.  Same answer.

20      Q.  Okay.  So, when it got to the Macondo

21   Well, you were eager to save money on that well,

22   too, weren't you, sir?

24      A.  Same answer.

25      Q.  (BY MR. BICKFORD)  In fact, in all of your

00036   1   employment evaluations at BP, the fact that you

2   had been saving the company money were prominently

3   mentioned, weren't they?

5      A.  Same answer.

6      Q.  (BY MR. BICKFORD) And you've been praised

7   for that; isn't that correct, sir?

9      A.  Same answer.

10      Q.  (BY MR. BICKFORD)  Did you get this

11   promotion, sir?

12       A.  Same answer.

13       Q.  Sir, wasn't it a fact that, as of the

14   spring of 2010, the Macondo Well was far behind

15   schedule?

16       A.  Same answer.

17       Q.  Wasn't it a fact, sir, it was far for

18   cost?

20       A.  Same answer.

21       Q.  (BY MR. BICKFORD)  And you knew your drill

22   team, sir, was anxious to plug and abandon this

23   well and move to the next project; is that

24   correct, sir?

00037  1       A.  Same answer.

2       Q.  (BY MR. BICKFORD)  And that was the Nile

3   project; is that correct, sir?

4       A.  Same answer.

5       Q.  And so, sir, when it came to April of

6   2010, your team was concerned about saving as much

7   time and money as possible on this well; is that

8   correct?

10       A.  Same answer.

**8.      BP knew that Halliburton did not allow enough time to test the final cement slurry; Morel complained  on April 17th that Halliburton's  procrastination**

**in testing did not allow enough time to "tweak the slurry to meet our needs."
Morel believed that there was no excuse for this, as the cement and chemicals
had been on the rig for weeks  (TREX-01396).**

085:04 - 087:25   085:04     Q.  (BY MR. UNDERHILL)  At the bottom of that

           05  page, Bates stamp I read into the record

           06  previously, there is an E-mail from you to

           07  Mr. Mark Halfe at BP sent April 17, 2010, which is

           08  three days before the DEEPWATER HORIZON blowout,

           09  correct?

           10    A.  Same answer.

           11    Q.  The title or the subject matter of the

           12  E-mail, according to what's written here, is,

           13  quote, "Lab Tests," close quote, correct?

           14    A.  Same answer.

           15    Q.  I'd like you to tell me if I read this

           16  into the record correctly; and I'm quoting from

           17  the E-mail, yours to Mr. Hafle on April 17th of

           18  2010.  Quote:  "I'm about to send this to John and

           19  Greg, but wanted to send it past you first to make

           20  sure I'm not being out of line.  Jesse isn't

           21  cutting it anymore."

           22      Continuing on to the next page,

           23  quote:  "John and Greg, I need help next week

           24  dealing with Jesse.  I asked for these lab tests

25  to be completed multiple times early last week;

086:01  and Jesse still waited until the last minute, as

02  he has done throughout this well.  This doesn't

03  give us enough time to tweak the slurry to meet

04  our needs.

05          "As a team, we requested that he run

06  another test with 9 gallons on Wednesday.  I know

07  the first test had issues, but I do not understand

08  what took so long to get it underway and why a new

09  one wasn't put on right away.  There's no excuse

10  for this as the cement and chemicals we are

11  running has been on location for weeks.

12          "Thank you, Brian," close quote.

13          Did I read that E-mail correctly?

14      A.  Same answer.

15      Q.  Did you, in fact, send that E-mail to

16  Mr. Hafle on April 17th of 2010?

17      A.  Same answer.

18      Q.  On April 17th, 2010, were you acting

19  within the course and scope of your duties, your

20  professional duties as an employee of BP?

21      A.  Same answer.

22      Q.  And, in fact, let's say any time in which

23  you dealt with any subject matter concerning the

24  Macondo Well, you were, in fact, acting within the

25  course and scope of your duties as an employee of

087:01  BP, correct?

02      A.  Same answer.

03      Q.  And, in fact, on April 20th, 2010, you

04  were acting within the course and scope of your

05  duties at an employee of BP, correct?

06      A.  Same answer.

07      Q.  Back to the E-mail.  To the first page of

08  that exhibit, please, 1396, bottom of the page, an

09  E-mail string from Gregory S. Walz, W-A-L-Z, to

10  you, Mr. Morel; to Mr. Hafle; to Mr. Cocales; to

11  Mr. Guide, "Subject:  Lab tests," sent Sunday,

12  April 18th, 2010, correct?

13      A.  Same answer.

14      Q.  The response from Mr. Walz to you and the

15  other gentlemen I referred to in the

16  E-mail, quote:  "John and I already have a meeting

17  with Halliburton scheduled tomorrow afternoon,"

18  period, close quote.

19          Did I read that correctly?

20      A.  Same answer.

21      Q.  Did you, in fact, receive that -- strike

22  that.

23          You, in fact, did receive that E-mail

24  on or about April 18th of 2010, correct?

25      A.  Same answer.


**9.      BP never received final slurry cement test results.**

088:24 - 089:06   088:24      Q.  (BY MR. UNDERHILL)  And, in fact, prior to

25  the actual performance and completion of the

089:01  cement job for the production casing on the

02  Macondo Well, you, as a BP employee, were fully

03  aware that BP had not received all of the lab

04  tests concerning the final slurry mix that was

05  pumped for the production casing, correct?

06      A.  Same answer.


089:24 - 090:05      24      Q.  (BY MR. UNDERHILL)  And yet, nevertheless,

25  you, among others, allowed the cement for the

090:01  production casing to be pumped and performed and

02  allegedly completed without first receiving and

03  reviewing all of the lab tests for the production

04  casing, correct?

05      A.  Same answer.

10.   Morel believed that it was "too late" to get additional centralizers and hoped that gravity would keep the pipe centralized; however, he could have ordered the work to stop until additional centralizers could be delivered.

156:22 - 158:01   156:22          And this is an E-mail from you to

23  Jesse Gagliano, Mark Hafle, Brett Cocales, and

24  Greg Walz, subject:  Regarding OptiCem report.

25  And again, it's dated Thursday, April 15th.  I'm

157:01  going to read the text of the E-mail:  "We have

02  six centralizers.  We can run them in a row,

03  spread out, or any combinations of the two, but

04  the vertical hole, so hopefully the pipe stays

05  centralized due to gravity.  As far as changes,

06  it's too late to get any more product to the rig.

07  Our only options is to rearrange placement of

08  these centralizers.  Please see attached diagram

09  for my recommendation."

10          Did I read that right, Mr. Morel?

11     A.  Same answer.

12     Q.  And so, you said here:  "It's too late to

13  get any more product to the rig."  Isn't that

14  right?

15     A.  Same answer.

16     Q.  The truth is, it's never too late to get

17  any more product to the rig; isn't that right?

19      A.  Same answer.

20      Q.  (BY MR. SCHWARTZ)  If you had wanted to,

21  you could have stopped the rig completely to wait

22  on this product getting to the rig, couldn't you?

23      A.  Same answer.

24      Q.  Anyone on the rig on BP's behalf could

25  have done that; isn't that true?

158:01      A.  Same answer.


**11.      OptiCem modeling showed that the use of only seven centralizers would result in severe channeling; BP knew this, but proceeded with using only six centralizers.**

168:05 - 168:15   168:05      Q.  (BY MR. SCHWARTZ)  And the April 18th,

06  2010, computer modeling using OptiCem software

07  showed that using only seven centralizers would

08  result in severe channeling; isn't that right?

10      A.  Same answer.

11      Q.  (BY MR. SCHWARTZ)  Nevertheless, you, on

12  behalf of BP, proceeded with using only six

13  centralizers; isn't that right?

15      A.  Same answer.


**12.      The decision to pump 61 barrels of cement meant less cement above the hydrocarbon zone, hence displacement only 500 feet above the zone, violating BP Best Engineering Practices.**

162:03 - 162:14   162:03      Q.  (BY MR. SCHWARTZ)  Your decision and BP's

04  decision to pump only 61 barrels of cement meant

05  that there would be less cement above the

06  hydrocarbon zone, right?

08      A.  Same answer.

09      Q.  (BY MR. SCHWARTZ)  Displacement of the

10  cement only 500 feet above the hydrocarbon zone

11  violated BP's own engineering practice at BPT

12  1060; isn't that right?

14      A.  Same answer.


**13.    The lack of a cement bond log violated BP's internal procedures, and left BP
        with no way to verify whether there was any channeling in the cement.**

166:07 - 166:17  166:07      Q.  (BY MR. SCHWARTZ)  BP's decision not to

08          run a cement bond log violated BP's own internal

09          procedures, didn't it?

11      A.  Same answer.

12      Q.  (BY MR. SCHWARTZ)  And without this cement

13          bond log being run, BP had no way to verify

14          whether there was any channeling in the cement;

15          isn't that true?

17      A.  Same answer.


**14.    The low rate of pumping decreased the efficiency of the mud to be displaced
        by the cement and increased the risk of channeling.**

164:03 - 164:18  164:03      Q.  (BY MR. SCHWARTZ)  And BP decided to pump

04  the primary cement at a low rate; isn't that

05  right?

07      A.  Same answer.

08      Q.  (BY MR. SCHWARTZ)  And the low rate

09  decreased the efficiency with which the cement

10  displaced the mud from the annular space; isn't

11  that right?

13      A.  Same answer.

14      Q.  (BY MR. SCHWARTZ)  This low rate also

15  increased the risk of channeling; isn't that

16  right?

18      A.  Same answer.

**15.    BP's "best and safest" practices could not be used because of concerns the weight at the bottom of the hole would cause it to fracture.**

109:25 - 110:11   109:25      Q.  (BY MR. UNDERHILL)  During the cement job

110:01  for the production casing, you were aware that

02  certain traditional, quote, "best and safest,"

03  close quote, cementing practices were not being

04  used because BP was concerned that it could not

05  increase the weight at the bottom of its hole on

06  Macondo when it is circulating mud or cement to a

07  normal amount above its static downhole mud

08  weight, correct?

10          MR. SCHWARTZ:  Objection; form.

11      A.  Same answer.

**16.     BP had known for some time that the reported and permitted fracture gradient was misstated to the MMS.**

104:15 - 105:11  104:15      Q.  (BY MR. UNDERHILL)  You knew that when BP

16  filed its October 29th, 2009, application for

17  revised new well for the Macondo Well, it was

18  responsible for disclosing to the permit

19  regulators the actual LOT and pore pressure scores

20  it recorded when it set the casing shoe at the

21  depth of roughly 8,000 feet earlier in October of

22  that year, correct?

24      A.  Same answer.

25      Q.  (BY MR. UNDERHILL)  You knew that at that

105:01  depth, the surface mud weight equivalent of the

02  fracture gradient was no more than 10.3 pounds per

03  gallon, correct?

05      A.  Same answer.

06      Q.  (BY MR. UNDERHILL)  You also knew that, in

07  order to make the Macondo Well's drilling margin

08  look as large as possible, BP filed an old plot

09  that dated back to May 11th, 2009, correct?

11      A.  Same answer.

---------------------------------------------------------------------------------------

105:17 - 105:23     17     Q.  (BY MR. UNDERHILL)  You knew that, when,

18  in October 2009, BP drilled farther down the

19  Macondo after it took a kick at 80 -- strike

20  that -- at 8,970 feet, it did so without the

21  required kick margin, correct?

23     A.  Same answer.

---------------------------------------------------------------------------------------

107:16 - 108:12  107:16     Q.  (BY MR. UNDERHILL)  You knew that

17  according to BP's Macondo team, the formation

18  integrity test result recorded -- 16 pounds per

19  gallon -- was, in fact, much higher than expected,

20  correct?

22     A.  Same answer.

23     Q.  (BY MR. UNDERHILL)  You knew that BP's

24  Macondo team had no confidence in this result even

25  on the date the test was taken, correct?

108:02     A.  Same answer.

03     Q.  (BY MR. UNDERHILL)  You also knew that one

04  possible explanation that was discussed at the

05  time was that BP had been testing casing or cement

06  rather than the formation, correct?

08     A.  Same answer.

108:20 - 108:25     20     Q.  (BY MR. UNDERHILL)  You, nevertheless,

21  reported the 16-pound fracture gradient result to

22  MMS in your mid-April drilling permit application,

23  correct?

25     A.  Same answer.

-----------------------------------------------------------------------------------------

109:25 - 110:11   109:25     Q.  (BY MR. UNDERHILL)  During the cement job

110:01  for the production casing, you were aware that

02  certain traditional, quote, "best and safest,"

03  close quote, cementing practices were not being

04  used because BP was concerned that it could not

05  increase the weight at the bottom of its hole on

06  Macondo when it is circulating mud or cement to a

07  normal amount above its static downhole mud

08  weight, correct?

11     A.  Same answer.

**17.     BP recognized that adding retarder to the slurry would decrease its stability (TREX-00978).**

172:01 - 172:25   172:01     Q.  (BY MR. SCHWARTZ)  And your -- the subject

02  of the E-mail in Exhibit 987 is "Lab test."; isn't

03  that right?

04     A.  Same answer.

05     Q.  And you write to Jesse Gagliano:  "I would

06  prefer the extra pump time with the added risk of

07  having issues with the nitrogen.  What are your

08  thoughts?  There isn't a compressive strength

09  development yet, so it's hard to ensure we will

10  get what we need until it's done.  Brian."

11         Did I read that correctly, Mr. Morel?

12     A.  Same answer.

13     Q.  (BY MR. SCHWARTZ)  So, isn't it true in

14  this E-mail, you're telling Jesse Gagliano that

15  you would prefer to alter the cement slurry recipe

16  to include more retarder to increase the

17  thickening time or pump time of the cement?

19     A.  Same answer.

20     Q.  (BY MR. SCHWARTZ)  And isn't it true,

21  then, in that E-mail, that you are recognizing

22  that adding more retarder will potentially

23  increase the risk of a nitrogen foam instability?

25     A.  Same answer.

**18.   BP was drilling too fast to allow for full testing of pore pressure variations.**

176:20 - 177:01  176:20     Q.  (BY MR. SCHWARTZ)  Isn't it true that

21  during the drilling of this entire well, BP was

22  drilling too fast to allow for full testing of

23  pore pressure variations from predicted pore

24  pressure?

177:01     A.  Same answer.

**19.     BP used lost circulation materials as a spacer to save time and money.**

177:20 - 178:11     20     Q.  (BY MR. SCHWARTZ)  With regards to the

21  spacer that was used that we've discussed today,

22  BP chose to use lost circulation materials as a

23  spacer; isn't that right?

24     A.  Same answer.

25     Q.  (BY MR. SCHWARTZ)  And when you did so, BP

178:01  knew that there was a risk that this dense spacer

02  could clog flow paths that could be critical to

03  proper negative test procedure; isn't that right?

06     A.  Same answer.

07     Q.  (BY MR. SCHWARTZ)  And, nonetheless, you

08  used this spacer because it saved BP time and

09  money; isn't that right?

11     A.  Same answer.

**20.     BP tweaked the numbers to get the cement modeling to come out correctly.**

239:04 - 240:03  239:04     Q.  Sir, wasn't it a fact that Jesse Gagliano

05  had informed your drill team that -- that after

06  Halliburton ran the cement modeling for both the

07  liner and the long string designs that you had put

08  forth, that he told you that you couldn't submit

09  either one of those properly?

11      A.  Same answer.

12          MR. SCHWARTZ:  Objection; form.

13      Q.  (BY MR. BICKFORD)  And isn't it a fact,

14  sir, that your team knew that you fudged numbers

15  in order to get the model to come out in a proper

16  fashion, sir?

19      A.  Same answer.

20      Q.  (BY MR. BICKFORD)  And, sir, what

21  participation did you have in tricking or fudging

22  the model, sir?

24      A.  Same answer.

**21.     BP's MMS applications provided false information.**

20:20-21:01   Q. (BY MR. BICKFORD) And, sir, it was part

21 of you and your team's responsibility to prepare

22 reports and permits to the MMS, both for approval

23 and to keep the MMS apprised -- apprised of the

24 well operations; is that correct?

1 A. Same answer.


103:04-08    Q. You knew that the regulations prohibited

5 drilling without a safe drilling margin, as

6 identified in the approved APD for the Macondo

7 Well, correct?

8   A. Same answer.

**22.     BP made last minute changes to the Temporary Abandonment Plan, which included the procedure for the negative pressure test. The amended Temporary Abandonment Plan differed from the original procedure approved by MMS.**

093:01-097:08

21 You were aware, sir, that on or about

22 April 16th, 2010, BP submitted to the Minerals

23 Management Service an application for a permit to

24 modify the Macondo Well, correct?

25 A. Same answer.

94:01 Q. And you were aware that within that

2 document, Exhibit 570, BP provided to MMS a

3 Temporary Abandonment Procedure for the Macondo

4 Well, correct?

5 A. Same answer.

11 Q. And, in fact, that Temporary Abandonment

12 Procedure includes, among other things, a

13 procedure for a negative test to be performed on

14 the Macondo Well, correct?

15 A. Same answer.

96:22 Q. And, in fact, the ops note sent to the rig

23 and its well site leaders on April 20th, 2010,

24 contained a Temporary Abandonment Procedure that

25 the well site leaders were instructed to use,

97:01 correct?

2 A. Same answer.

3 Q. And, in fact, the Temporary Abandonment

4 Procedure contained in your ops note as part of

5 Exhibit 97 differed from the Temporary Abandonment

6 Procedure that had been approved by MMS in

7 Exhibit 570, correct?

8   A. Same answer.


**23.    BP chose to eliminate the use of liners instead of longstring on the basis of cost savings.**

150:14-150:23

14 Q. And you also agree that

15 it was substantially cheaper to cement the long

16 string than the liner; isn't that correct?

18 A. Same answer.

19 Q. And it would save --

20 doing so, it would have saved BP -- or did save BP

21 7- to $10 million, right?

23 A. Same answer.

**24.     The Temporary Abandonment Plan called for a large amount of heavy spacer, which created potential problems for running the negative pressure test.**

126:02-126:16

> 2 Q. (BY MR. HYMEL) By choosing the heavy
>
> 3 spacer, BP increased the risk that the spacer
>
> 4 would fall downward through the lighter seawater
>
> 5 during displacement and potentially end up beneath
>
> 6 the BOP when the lower annular was closed for the
>
> 7 negative pressure test, correct?
>
> 8 A. Same answer.
>
> 11 Q. (BY MR. HYMEL) Do you agree that the
>
> 12 spacer below the annular could cause problems with
>
> 13 the negative pressure test?
>
> 16 A. Same answer.

### ADVERSE INFERENCES AGAINST HALLIBURTON

**A.     Application of the *Libutti* Factors to Inferences to be Drawn Against Halliburton from Morel's invocation.**

In its February 14 Order, the Court agreed with the PSC that the lack of an employment relationship between the invoking witness and the party against whom the inference is to be drawn is not necessary.  The Court stated as follows:

> In *FDIC*, the Fifth Circuit found no need for a special relationship between the witness and the party against whom the adverse inference was sought. It quoted the following from *RAD Services Inc. v. Aetna Casualty & Surety Co*., 808 F. 2d 271, 275 (3rd Cir. 1986):
>
> > First, a witness truly bent on incriminating [a party] would likely offer damaging testimony directly, instead of hoping for an adverse inference from a Fifth Amendment invocation. Second, the trial judge could test the propriety of an

> invocation to ensure against irrelevant claims of privilege. Third, counsel may argue to the jury concerning the weight which it should afford the invocation and any inferences therefrom.
>
> 45 F.3d at 978. This responds to the thrust of the movers' arguments concerning non-employees.

(Doc. 5682, p. 4.)  Thus, here, the fact that Morel is not Halliburton's employee does not mean that adverse inferences cannot be drawn against it from Morel's invocation.

This Court held in its February 14 Order that the inferences should be decided on a case-by-case basis, and the *Libutti* factors will be helpful in that effort.  Note, however, that not *all* of the *Libutti* factors must be met.  First, the *Libutti* court itself stated that its factors were just suggestions.  Second, as the Court noted in its February 14 Order, the *FDIC* case is not inconsistent with *Libutti*.  The invocation in *FDIC* met only the fourth factor of *Libutti,* yet it was deemed proper in that case.

The *Libutti* factors, as applied to inferences to be drawn against Halliburton, are as follows:

**(1) the nature of the relevant relationships** – As noted, it is not necessary to show an employment relationship between Halliburton and Morel.  *FDIC v. Fidelity & Deposit Co.,* 45 F.3d 969, 978 (5th Cir. 1995).  Here, the relationship between Halliburton and Morel is at least as strong as that between the bank customer and loan officer in *FDIC.*  Halliburton and Morel's employer, BP, participated in operations on the Macondo well, and acted through their employees.   All employees and their corporate employers were working toward the goal of temporary abandonment.

(2) **the degree of control of the party over the non-party witness** – As the Court noted in *New Hampshire Ins. Co. v. Blue Water Off Shore LLC,* 2009 WL 792530 (S.D. Ala. 2009), this element addresses "the degree of control the party has 'vested in the non-party witness in regard to the key facts and general subject matter of the litigation' and approximates the analysis for admissions of a party opponent under Federal Rule of Evidence 801(d)(2)."  *Id.*  Since Halliburton and Morel's employer were involved in the operation of the Macondo well, which is the general subject matter of the litigation, the control element is met.  However, even if it is not, it is not necessary that this factor be met in order for the Court to draw the inference.   It was not met in *FDIC,* yet the Court deemed the inference proper in that case.

**(3) the compatibility of the interests of the party and non-party witness in the outcome of the litigation** - Morel and Halliburton have similar and compatible interests; it is in Morel's interest that all of the defendants succeed in the litigation.   If Halliburton's failure to test the slurry did not result in the blowout, then Morel's failure to require the testing before allowing the slurry to be pumped also did not cause it.

**(4) the role of the non-party witness in the litigation** - As one of two drilling engineers in charge of the Macondo well's day-to-day operations, Morel has critical knowledge concerning the difficulties faced during the final days of the Deepwater Horizon and the reckless decisions made in response.  His role is central to the litigation: he knew, *inter alia,* that the well team was "out of control" and inexperienced; the cement slurry – including a retarder that he requested and which he knew was likely to cause instability - had never been tested; and the number of centralizers used would likely result in severe gas channeling.  Yet, he failed to stop the job to correct these problems although he had the power to do so.

Under the circumstances of this case, in which numerous witnesses have invoked the Fifth Amendment, the inferences requested will advance the search for the truth. Morel is particularly worthy of belief as to the specific inferences identified below. Accordingly, the Court should draw these inferences against Halliburton.

**B.      Adverse Inferences to be drawn against Halliburton**

1.    **Halliburton did not allow enough time to test the final  cement slurry; Morel complained  on April 17th that Halliburton's  procrastination in testing did not allow enough time to "tweak the slurry to meet our needs."  Morel believed that there was no excuse for this, as the cement and chemicals had been on the rig for weeks  (TREX-01396).**

085:04 - 087:25   085:04      Q.  (BY MR. UNDERHILL)  At the bottom of that

05  page, Bates stamp I read into the record

06  previously, there is an E-mail from you to

07  Mr. Mark Halfe at BP sent April 17, 2010, which is

08  three days before the DEEPWATER HORIZON blowout,

09  correct?

10      A.  Same answer.

11      Q.  The title or the subject matter of the

12  E-mail, according to what's written here, is,

13  quote, "Lab Tests," close quote, correct?

14      A.  Same answer.

15      Q.  I'd like you to tell me if I read this

16  into the record correctly; and I'm quoting from

17  the E-mail, yours to Mr. Hafle on April 17th of

18  2010.  Quote:  "I'm about to send this to John and

19  Greg, but wanted to send it past you first to make

20  sure I'm not being out of line.  Jesse isn't

21  cutting it anymore."

22          Continuing on to the next page,

23  quote:  "John and Greg, I need help next week

24  dealing with Jesse.  I asked for these lab tests

25  to be completed multiple times early last week;

086:01  and Jesse still waited until the last minute, as

02  he has done throughout this well.  This doesn't

03  give us enough time to tweak the slurry to meet

04  our needs.

05          "As a team, we requested that he run

06  another test with 9 gallons on Wednesday.  I know

07  the first test had issues, but I do not understand

08  what took so long to get it underway and why a new

09  one wasn't put on right away.  There's no excuse

10  for this as the cement and chemicals we are

11  running has been on location for weeks.

12          "Thank you, Brian," close quote.

13          Did I read that E-mail correctly?

14     A.  Same answer.

15     Q.  Did you, in fact, send that E-mail to

16  Mr. Hafle on April 17th of 2010?

17     A.  Same answer.

18     Q.  On April 17th, 2010, were you acting

19  within the course and scope of your duties, your

20  professional duties as an employee of BP?

21     A.  Same answer.

22     Q.  And, in fact, let's say any time in which

23  you dealt with any subject matter concerning the

24  Macondo Well, you were, in fact, acting within the

25  course and scope of your duties as an employee of

087:01  BP, correct?

02     A.  Same answer.

03     Q.  And, in fact, on April 20th, 2010, you

04  were acting within the course and scope of your

05  duties at an employee of BP, correct?

06     A.  Same answer.

07     Q.  Back to the E-mail.  To the first page of

08  that exhibit, please, 1396, bottom of the page, an

09  E-mail string from Gregory S. Walz, W-A-L-Z, to

10  you, Mr. Morel; to Mr. Hafle; to Mr. Cocales; to

11  Mr. Guide, "Subject:  Lab tests," sent Sunday,

12  April 18th, 2010, correct?

13      A.  Same answer.

14      Q.  The response from Mr. Walz to you and the

15  other gentlemen I referred to in the

16  E-mail, quote:  "John and I already have a meeting

17  with Halliburton scheduled tomorrow afternoon,"

18  period, close quote.

19          Did I read that correctly?

20      A.  Same answer.

21      Q.  Did you, in fact, receive that -- strike

22  that.

23          You, in fact, did receive that E-mail

24  on or about April 18th of 2010, correct?

25      A.  Same answer.