EXHIBIT 4

FIFTH AMENDMENT INVOCATIONS - ADVERSE INFERENCES

NAME:             CURTIS KUTCHA

EMPLOYER:         TRANSOCEAN

TITLE:            MASTER OF MODU *DEEPWATER HORIZON*

Curtis Kutcha, a Transocean employee, was the Master of the Deepwater Horizon on the night of April 20, 2010.

## I. Adverse Inferences Against Transocean: Application of the *Libutti* Factors

The Court may draw adverse inferences against Transocean from Kutcha's invocation of the Fifth Amendment under the four non-exclusive factors suggested by the Second Circuit in *LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997), which this Court adopted in its February 14 Order (Doc. 5682). "Whether these or other circumstances unique to a particular case are considered by the trial court, the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *LiButti,* 107 F.3d at 124. The *Libutti* factors, as applied here, are as follows:

**(1) the nature of the relevant relationships** – As this Court noted in its Order, the Fifth Circuit has refused to require a special relationship between a party and an invoking non-party witness before drawing an adverse inference against the party from the non-party's invocation. *FDIC v. Fidelity & Deposit Co.,* 45 F.3d 969, 978 (5th Cir. 1995). In *FDIC*, an adverse inference was permissibly drawn where the "relationship" in question was that of a bank loan officer and a customer of the bank. Because Transocean and Kutcha are in an employer/employee relationship, the relationship is stronger here than in *FDIC*. As the Court stated in *FDIC*, "the fact of present employment serves primarily to reduce the chance that the employee will falsely claim to have engaged in criminal conduct for which the defendant employer is liable." *Id.* at 978 (citing ROBERT HEIDT, *The Conjurer's Circle--The Fifth Amendment Privilege in Civil Cases*, 91 YALE L.J. 1062, 1119-20 n. 214 (1982)). Adverse inferences may be drawn from the invocation by former employees, also. "Any factors suggesting that a former employee retains some loyalty to his former employer--such as the fact that the employer is paying for his attorney--would serve the same purpose." *Id.*

Transocean argues that "most of the current or former Transocean employees who have invoked the Fifth Amendment were in separate litigation directly adverse to Transocean,

1

concerning the same incident at issue in this case, at the time of their depositions. Their relationship to Transocean is expressly adversarial, and their refusals to testify will not support an adverse inference against Transocean. See, e.g., *United States v. Philip Morris USA Inc.,* 2004 WL 5916865, at *1 (D.D.C. July 23, 2004) ("The relationship between Osdene and Defendant Philip Morris USA is hostile and adverse and therefore would not support the inference that the non-party's invocation of his Fifth Amendment rights promotes the interests of the Defendant.")." (Doc. 5111-1, p. 3.)

The *Philip Morris* decision does not discuss the nature of the relationship in question, so it is not clear what the relationship was in that case or why it was "hostile and adverse." In any event, the existence of an adverse relationship, in itself, is not decisive. For instance, in *Brinks, Inc. v. City of New York,* 717 F.2d 700 (2d Cir. 1983), a case relied on heavily in *Libutti,* the Court held that a jury could draw adverse inferences against a corporate defendant from the invocation of the Fifth Amendment by a former employee of the corporation; this even though the corporation had filed counter claims against the employee.

Transocean did not identify the employees that have filed suit against it, and it is unclear whether Kutcha has initiated separate litigation directly adverse to Transocean. If he has not, Transocean's concerns of disloyalty on the basis of an adversarial relationship obviously do not apply to this witness. Even if he has, Transocean's argument is without merit. Transocean's argument suggests that employees who have filed suit against it arising out of the disaster are disloyal to Transocean and are, instead, motivated to incriminate Transocean in order to advance their claims against it. Notably, the Court in the instant case, in its discussion of the defendants' claims that invocations by non-employees cannot result in adverse inference against them, stated as follows:

> In *FDIC*, the Fifth Circuit found no need for a special relationship between the witness and the party against whom the adverse inference was sought. It quoted the following from *RAD Services Inc. v. Aetna Casualty & Surety Co.*, 808 F. 2d 271, 275 (3rd Cir. 1986):
>
>> First, a witness truly bent on incriminating [a party] would likely offer damaging testimony directly, instead of hoping for an adverse inference from a Fifth Amendment invocation. Second, the trial judge could test the propriety of an invocation to ensure against irrelevant claims of privilege. Third, counsel may argue to the jury concerning the weight which it should afford the invocation and any inferences therefrom.

> 45 F.3d at 978. This responds to the thrust of the movers' arguments concerning non-employees.

(Doc. 5682, p. 4.) The same argument could be made with respect to Kutcha's invocation, even if he has filed suit against Transocean. If he were "truly bent" on incriminating Transocean to advance a personal injury case against it, he would offer damaging testimony directly, instead of hoping that the Court would draw an adverse inference against Transocean based on his invocation.

(2) **the degree of control of the party over the non-party witness** – Transocean exercised control over Kutcha as its employee. As the Court noted in *New Hampshire Ins. Co. v. Blue Water Off Shore LLC,* 2009 WL 792530 (S.D. Ala. 2009), the "control" element deals not with the party's ability to control the witness at the time of his testimony, but "the degree of control the party has 'vested in the non-party witness in regard to the key facts and general subject matter of the litigation' and approximates the analysis for admissions of a party opponent under Federal Rule of Evidence 801(d)(2)." *Id.* (quoting *Libutti*). Transocean's argument that it lacked control over its invoking employees, evidenced by their filing claims against it, is inapplicable to Kutcha. Moreover, any statement by Kutcha would qualify as an admission by Transocean under the Federal Rules of Evidence.

(3) **the compatibility of the interests of the party and non-party witness in the outcome of the litigation** – In considering this factor, the *LiButti* Court directed that "the trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation." *Libutti,* 107 F.3d at 123. It is in Kutcha's interest that Transocean succeed in the litigation, particularly with respect to any actions on his part as Master of the Deepwater Horizon. Kutcha and Transocean thus share an incentive that Transocean be absolved of liability. Kutcha's invocation advances Transocean's interests to the extent that it prevents Plaintiffs from obtaining direct testimony from him that would likely be damaging to Transocean. Thus, Kutcha's interests in the outcome of this case are compatible with Transocean's.

(4) **the role of the non-party witness in the litigation** – As the Court found in its February 14 Order, this is the one *Libutti* factor that was present in *FDIC,* and this factor alone supported the inference in that case. This factor also favors consideration of the inferences against Transocean in the instant case. Kutcha was the Master of the Deepwater Horizon, and therefore has unique knowledge of events on the night of the blowout, alarms that were inhibited on the vessel, Transocean's lack of adherence to the International Safety Management Code, and the unseaworthiness of the vessel. All of these issues are critical to the litigation as a whole.

In the end, the question is whether the inference is whether the inference is trustworthy and advances the search for the truth. Inferences against Transocean from Kutchta's invocation advance the search for the truth in this case. Numerous witnesses have invoked their Fifth Amendment rights, leaving Plaintiffs without direct testimony on several key issues. The circumstances of this case render Kuchta particularly worthy of belief as to the specific inferences identified below. Accordingly, the Court should draw these inferences against Transocean.

**II.     Inferences to be Drawn Against Transocean.**

**A.     The alarms were inhibited on the Kongsberg system and emergency shutdown system aboard the *Deepwater Horzion*.**

  **pp. 25-26**
24 Q. And,
25 Captain Kuchta, you knew that the alarms
26:01 systems on the Deepwater Horizon had been set
2 to a mode called inhibit, didn't you?
4 A. Same answer.
5 Q. And you knew
6 that by setting the alarms to an inhibit mode
7 that the fire and gas safety systems alarms
8 had to be triggered by a human being
9 interface, is that correct?
11 A. Same answer.
12 Q. And that that
13 human being who was charged on the rig with
14 triggering a alarm for high combustible gas
15 would have been the dynamic positioning
16 officer that was manning the bridge at the
17 time; isn't that correct?
19 A. Same answer.
20 Q. And you knew,
21 sir, also, that the emergency shutdown
22 systems on the Deepwater Horizon had also
23 been set to an inhibit mode, didn't you?
25 A. Same answer.

**B.     The Dynamic Positioning Officer and Captain Kuchta were not properly trained to handle an emergency.**

4

**pp. 27-37**

27:24  Q. And on the night of April 20th
25 when those multiple gas detectors showing
29:01 highest levels of explosive gases went out
2 there was no combustible gas alarm sound, was
3 there?
4      A. Same answer.
7      Q. Sir, the
8 Deepwater Horizon, the dynamic positioning
9 officers on the Deepwater Horizon are
10 charge -- are principally charged with
11 sounding the alarms; are they not?
13     A. Same answer.
14     Q. And, sir, you
15 know that the dynamic positioning officers
16 who are on the bridge of the Deepwater
17 Horizon at the time of this incident on
18 April 20th, 2010 had never had specific
19 training to deal with a severe well blowout,
20 did you?
22     A. Same answer.
23     Q. And, in fact,
24 they had not been trained in any simulations
25 to mimic a severe well blowout, had they?
30:02  A. Same answer.
3      Q. In fact, they
4 hadn't been trained specifically what to do
5 when there was multiple gas alarms of a
6 magenta phase on the bridge; is that correct?
7      A. Same answer.
8      Q. There was no simulation that
9 Transocean itself ever ran with the dynamic
10 positioning officers that were on board the
11 bridge, sir, as to what steps to go through
12 and what systems to shut down in the event of
13 multiple gas alarms, say, five or ten showing
14 magenta on the bridge; is that true?
16     A. Same answer.
17     Q. And that --

5

18 you were aware that training hadn't taken
19 place; is that correct, sir?
21     A. Same answer.
22     Q. And you were
23 in charge of that training; were you not,
24 sir?
31:01  A. Same answer.
5     Sir, in fact, you had not been
6 trained specifically under a simulation of a
7 severe well blowout on the Deepwater Horizon,
8 had you, sir.
10    A. Same answer.
11    Q. And, you were
12 aware that Transocean officials onshore knew
13 that you hadn't been trained to react to a
14 severe well blowout, is that correct, sir?
16    A. Same answer.
17     Q. And the night
18 of April 20th, 2010, sir, none of the
19 emergency shutdown systems that were
20 accessible on the bridge were activated, were
21 they, sir?
23 A. Same answer.
36:06   Q. Now,
7 specifically, sir, you were never trained by
8 Kongsberg at the Kongsberg training school in
9 the use of the Simrad alarm fire and gas
10 safety systems and the emergency shutdown
11 systems that were on board the Deepwater
12 Horizon; is that correct?
13    A. Same answer.
14    Q. You never attended that course
15 at the Kongsberg school; is that correct?
16    A. Same answer.
17    Q. And the officials of Transocean
18 knew that that course existed, didn't they?
20    A. Same answer.
21    Q. And you as a
22 Master knew that that course existed, didn't
23 you?

6

24      A. Same answer.
25      Q. And it was your obligation to
37:01 know that the course involving the use of the
2 Conrad fire -- the Kongsberg fire and gas
3 safety systems on board the Deepwater Horizon
4 existed and was available to employees on the
5 Deepwater Horizon; is that correct?
7       A. Same answer.
8       Q. And the
9 dynamic positioning operators on board the
10 Deepwater Horizon at the time of the
11 April 20th, 2010 explosion had never taken a
12 course either, is that correct?


        **pp. 40-42**
19      Q. When you saw mud spewing from
20 the rig you panicked, didn't you, sir?
22      A. And same answer.
23      Q. And, sir, you
24 failed to activate the emergency shutdown
25 system at that time, didn't you?
40:02   A. Same answer.
3       Q. And you
4 failed to operate -- failed to initiate a
5 emergency disconnect, didn't you?
41:07   A. Same answer.
19      Q. In fact, Captain, there were no
20 training scenarios offered to you by
21 Deepwater Horizon as to when to operate the
22 emergency disconnect system, were there?
24      A. Same answer.
25      Q. And, in fact,
42:01 you were not sent to any schools where there
2 were training scenarios of a well blowout in
3 which you were trained to operate the
4 emergency disconnect system, was there?
5       A. Same answer.
6       Q. And, in fact, none of the
7 dynamic positioning operators on board the

8 Deepwater Horizon received training as to
9 when and how to operate the emergency
10 disconnect system; is that true?
12     A. Same answer.
13     Q. And, in fact,
14 the dynamic positioning operators on board
15 the Deepwater Horizon were not given the
16 authority to operate the emergency disconnect
17 system; is that correct?
19     A. Same answer.

**p. 59**

59:01  You are not trained in the
2 operation of the EDS; is that correct?
3     A. Same answer.
4     Q. You do not know whether all the
5 steps necessary to activate the EDS were
6 taken; isn't that correct?
7     A. Same answer.

**p. 62**

10     Q. Isn't it true, Captain, that
11 there was confusion on the Deepwater Horizon
12 about who was in charge when the events
13 started happening in the evening on that
14 night?
16     A. Same answer.

**pp. 93-94**

17     Q. Did you, in fact, advise
18 Mr. Harrell that he should not EDS the
19 vessel?
20     A. Same answer.
21     Q. Now, there are two different
22 systems that are emergency systems on the
23 vessel. There is the emergency disconnect
24 system which disconnects the vessel from the
25 riser -- or from the BOP; is that correct?
94:01  A. Same answer.

8

2      Q. And there is also an emergency
3 shutdown system which would shut down the
4 mechanical engines, generators, things on the
5 vessel, if gas is detected; is that correct?
6      A. Same answer.
7      Q. Neither of those systems worked
8 or were initiated on April 20th of 2010; is
9 that correct?
11     A. Same answer.


    **pp. 100-101**
12     Q. And the
13 order to activate the EDS system did not come
14 until after power was lost, there was an
15 explosion, and there was a fire; isn't that
16 correct?
17     A. Same answer.
18     Q. And you understand, do you not,
19 sir that your attempt -- the attempt to
20 activate the EDS system came 15 minutes after
21 the mud, gas, and hydrocarbons had reached
22 the rig floor, correct?
23     A. Same answer.
24     Q. And this was well over an hour
25 after the well had started flowing, you know
101:01 that, don't you, correct?
3      A. Same answer.

**C. Transocean did not abide by the International Safety Management Code, failing to identify potential emergency shipboard situations and provide procedures, training and drills to the crew.**

    **pp. 32-35**
23     Q. Sir, you're
24 aware of the International Safety Management
25 Code, are you not, sir?
33:01  A. Same answer.
2      Q. And, in fact, Transocean
3 provides in its own handbook and explanation

9

4 of the International Safety Management Codes;
5 is that correct?
6      A. Same answer.
7      Q. And that book is provided to you
8 as the Master of the vessel; is it not?
9      A. Same answer.
10     Q. And the international safety
11 codes specifically state that a company
12 should identify potential emergency shipboard
13 situations and establish procedures to
14 respond to them, isn't that correct?
15     A. Same answer.
16     Q. And, in fact, Transocean had not
17 identified a severe well blowout as a
18 emergency shipboard situation and had not
19 established procedures to respond to that; is
20 that correct?
23     Q. And
24 Transocean also under the -- Transocean also
25 under the safety -- International Safety
34:01 Management Code had an obligation to
2 establish programs for drills and exercises
3 to prepare for emergency situations; did they
4 not?
6      A. Same answer.
7      Q. And
8 Transocean did not establish any programs to
9 anticipate a severe well blowout with copious
10 amounts of gas produced, combustible gas
11 produced, did they?
13     A. Same answer.
14      Q. And
15 Transocean did not establish drills or
16 exercise to prepare for the situation of a
17 severe well blowout with copious gas --
18 amounts of gas produced, did they?
20     A. Same answer.
21     Q. The
22 International Safety Management Codes also
23 provide that the companies should provide a

10

24 safety management system so that it can
25 respond to hazards, accidents, and
35:01 emergencies involving its ships; is that
2 true, sir?
4      A. Same answer.


       **pp.35-36**
21     Q. There were no
22 programs and there were no drills, correct?
24     A. Same answer.
25     Q. And that was
36:01 not only true of the Deepwater Horizon; that
2 was true of all MODUs in the Transocean
3 fleet; is that correct?
5      A. Same answer.