EXHIBIT 5

FIFTH AMENDMENT INVOCATIONS - ADVERSE INFERENCES

NAME:             JIMMY HARRELL

EMPLOYER:         TRANSOCEAN

TITLE:            OFFSHORE INSTALLATION MANAGER (OIM)

As Transocean's OIM on the *Deepwater Horizon*, Harrell was the person in charge of the vessel and its operations during the events leading up to and including the blowout. In that position, his duties included double-checking the temporary abandonment procedure, the displacement procedure and the negative pressure test. Harrell testified at the MBI that he was responsible for the safety, conditions, and procedures on the vessel and that, at the time of the blowout, if the EDS did not activate, he remained in control of the vessel.

### ADVERSE INFERENCES AGAINST TRANSOCEAN

**I.      Application of the *Libutti* Factors to Inferences to be drawn against Transocean.**

The Court may draw adverse inferences against Transocean from Harrell's invocation of the Fifth Amendment under the four non-exclusive factors suggested by the Second Circuit in *LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997), which the Court adopted in its February 14 Order (Doc. 5682). "Whether these or other circumstances unique to a particular case are considered by the trial court, the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *LiButti,* 107 F.3d at 124. The circumstances of this case, in which a number of key witnesses have asserted their Fifth Amendment rights, warrant the inferences requested. The inferences identified will advance the search for the truth.

The *Libutti* factors, as applied here, are as follows:

**(1) the nature of the relevant relationships** – As this Court noted in its Order, the Fifth Circuit has refused to require a special relationship between a party and an invoking non-party witness before drawing an adverse inference against the party from the non-party's invocation. *FDIC v. Fidelity & Deposit Co.,* 45 F.3d 969, 978 (5th Cir. 1995). In *FDIC*, an adverse inference was permissibly drawn where the "relationship" in question was that of a bank loan officer and a customer of the bank. Because Transocean and Harrell are in an employer/employee relationship,

1

the relationship is stronger here than in *FDIC*. As the Court stated in *FDIC*, "the fact of present employment serves primarily to reduce the chance that the employee will falsely claim to have engaged in criminal conduct for which the defendant employer is liable." *Id.* at 978 (citing ROBERT HEIDT, *The Conjurer's Circle--The Fifth Amendment Privilege in Civil Cases*, 91 YALE L.J. 1062, 1119-20 n. 214 (1982)). Adverse inferences may be drawn from the invocation by former employees, also. "Any factors suggesting that a former employee retains some loyalty to his former employer--such as the fact that the employer is paying for his attorney--would serve the same purpose." *Id.*

Transocean argues that "most of the current or former Transocean employees who have invoked the Fifth Amendment were in separate litigation directly adverse to Transocean, concerning the same incident at issue in this case, at the time of their depositions. Their relationship to Transocean is expressly adversarial, and their refusals to testify will not support an adverse inference against Transocean. See, e.g., *United States v. Philip Morris USA Inc.,* 2004 WL 5916865, at *1 (D.D.C. July 23, 2004) ("The relationship between Osdene and Defendant Philip Morris USA is hostile and adverse and therefore would not support the inference that the non-party's invocation of his Fifth Amendment rights promotes the interests of the Defendant.")." (Doc. 5111-1, p. 3.)

The *Philip Morris* decision does not discuss the nature of the relationship in question, so it is not clear what the relationship was in that case or why it was "hostile and adverse." In any event, the existence of an adverse relationship, in itself, is not decisive. For instance, in *Brinks, Inc. v. City of New York,* 717 F.2d 700 (2d Cir. 1983), a case relied on heavily in *Libutti,* the Court held that a jury could draw adverse inferences against a corporate defendant from the invocation of the Fifth Amendment by a former employee of the corporation; this even though the corporation had filed counter claims against the employee.

Transocean did not identify the employees that have filed suit against it, and it is unclear whether Harrell has initiated separate litigation directly adverse to Transocean. If he has not, Transocean's concerns of disloyalty on the basis of an adversarial relationship obviously do not apply to this witness. Even if he has, Transocean's argument is without merit. Transocean's argument suggests that employees who have filed suit against it arising out of the disaster are disloyal to Transocean and are, instead, motivated to incriminate Transocean in order to advance their claims against it. Notably, the Court in the instant case, in its discussion of the defendants' claims that invocations by non-employees cannot result in adverse inference against them, stated as follows:

> In *FDIC*, the Fifth Circuit found no need for a special relationship between the witness and the party against whom the adverse inference was sought. It quoted the following from *RAD Services Inc. v. Aetna Casualty &*

> *Surety Co.*, 808 F. 2d 271, 275 (3rd Cir. 1986):
>
>> First, a witness truly bent on incriminating [a party] would likely offer damaging testimony directly, instead of hoping for an adverse inference from a Fifth Amendment invocation. Second, the trial judge could test the propriety of an invocation to ensure against irrelevant claims of privilege. Third, counsel may argue to the jury concerning the weight which it should afford the invocation and any inferences therefrom.
>
> 45 F.3d at 978. This responds to the thrust of the movers' arguments concerning non-employees.

(Doc. 5682, p. 4.)  The same argument could be made with respect to Harrell's invocation, even if he has filed suit against Transocean.  If he were "truly bent" on incriminating Transocean to advance a personal injury case against it, he would offer damaging testimony directly, instead of hoping that the Court would draw an adverse inference against Transocean based on his invocation.

**(2) the degree of control of the party over the non-party witness** – Transocean was Harrell's employer and exercised control over Harrell at the time of the incident.  As the Court noted in *New Hampshire Ins. Co. v. Blue Water Off Shore LLC,* 2009 WL 792530 (S.D. Ala. 2009), the "control" element deals not with the party's ability to control the witness at the time of his testimony, but "the degree of control the party has 'vested in the non-party witness in regard to the key facts and general subject matter of the litigation' and approximates the analysis for admissions of a party opponent under Federal Rule of Evidence 801(d)(2)." *Id.* (quoting *Libutti*). Thus, Transocean's lack of control over Harrell at the time of his deposition is not the question. Moreover, any non-privileged statement by Harrell would qualify as an admission by Transocean under the Federal Rules of Evidence.

**(3) the compatibility of the interests of the party and non-party witness in the outcome of the litigation** - Harrell and Transocean have similar interests in that it is in Harrell's penal interest that Transocean succeed in the litigation, particularly with respect to any actions on his part.  With respect to this factor, the *LiButti* Court directed that "the trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation." *Libutti,* 107 F.3d at 123.  Harrell's invocation advances Transocean's interests to the extent that it prevents Plaintiffs from obtaining direct testimony from him that would likely be more damaging to Transocean than the inference.

(4) **the role of the non-party witness in the litigation** – Harrell plays a significant and critical role in this litigation.  He was the OIM on the Deepwater Horizon and therefore in charge of the vessel during temporary abandonment.  It was his duty to double-check the temporary abandonment procedure, the displacement procedure and the negative pressure test.  Also, according to his MBI testimony, he remained in charge of the rig when the EDS did not activate to disconnect the rig from the well.

**II.      Inferences to be Drawn Against Transocean**

**A.      Transocean was aware of the anomalous negative pressure test results.**

    p. 13
11     Q. Were you not informed that there
12 was some discussion at or near the drill
13 floor between Transocean and BP personnel
14 about the results of the negative test?
15     A.   I take the Fifth.
16     Q. Weren't you informed by
17 Mr. Ezell that while there was some
18 discussion, it was felt that the results of
19 the negative test were good enough to proceed
20 with displacement to seawater in the HORIZON?
21     A.   I take the Fifth

    p. 14-15
17     Q. Are you not now aware -- or
18 aren't you now aware that in fact the
19 negative test indicated 1,400 psi in the
20 drill pipe, 0 psi in the kill line, which
21 should have alerted both Transocean and BP
22 personnel that there was an influx of
23 hydrocarbons occurring in the well at the
24 time the negative test was run?
15:01     A. I take the Fifth.

    p. 15-16
20     Q. Isn't it a
21 fact that there were specific indications on
22 the well monitoring equipment aboard the
23 DEEPWATER HORIZON both observed by Transocean

4

24 and Sperry-Sun that should have told the crew
25 members aboard the HORIZON that there was a
16:01 well control event occurring as of the time
02 the negative test was performed?
06     A.    I take the Fifth.

    pp. 85-86
18     Q. Isn't it true
19 that in the second negative test, that both
20 the BP company man and the toolpusher from
21 Transocean as well as the driller and
22 assistant driller conferred about whether or
23 not the second negative test had been a
24 success?
86:01     A. I take the Fifth.

    p. 116
06     Q. You became aware of some
07 anomalous readings during the first negative
08 test, did you not?
09     A. I take the Fifth.
11     Q. And you
12 instructed the crew who were conducting the
13 negative test to increase the annular
14 pressure to assist in being able to get a
15 negative test and hold the mud in the riser
16 between it and the drill pipe, correct?
18     A. I take the Fifth.

**B.     There was no protocol followed by Transocean on how to run and interpret the negative pressure test.**

    p. 19
19     Q. Have you not learned since the
20 incident that there was no protocol followed
21 by either Transocean or BP the night of
22 April 20th on how to both run and interpret
23 the negative test?
25     A. I take the Fifth.

      p. 62
03    Q. Okay.  Isn't it true that on
04 DEEPWATER HORIZON while drilling at
05 Macondo 252 that the DEEPWATER HORIZON drill
06 crew had itself a procedure for conducting a
07 negative test?
09    A. I take the Fifth.

**C.    It was Harrell's responsibility as Offshore Installation Manager to double check the temporary abandonment procedure, the displacement procedure and the negative pressure test.**

      p. 65
08 Isn't it true that you testified
09 under oath that you were over the entire rig
10 along with the captain in terms of your
11 responsibility?
17    A. I take the Fifth.

      p. 73-74
17    Q. Isn't it true
18 that it was your responsibility as the
19 overall person in charge aboard DEEPWATER
20 HORIZON to double-check the temporary
21 abandonment procedure placed by BP?
23    A. I take the Fifth.
24    Q. And isn't it
25 true that it was your responsibility as OIM
74:01 and an overall responsibility for the safety
02 of the DEEPWATER HORIZON to double-check the
03 displacement procedure?
05    A. I take the Fifth.
06    Q. Isn't it true
07 that as a OIM and a person overall in charge
08 aboard the DEEPWATER HORIZON that you and/or
09 your senior drill crew needed to be satisfied
10 with both the positive test and the negative
11 test?
13    A. I take the Fifth.

      p. 77
18 Isn't it true that you testified
19 under oath that when latched up to the well,
20 the OIM is in charge, not the master?
24    A. I take the Fifth.

      p. 105
03    Q. If you turn with me in your MBI
04 testimony to Page 115 -- 116, you were asked
05 whether you alone as the OIM were responsible
06 for safety, the conditions and the procedures
07 on board the DEEPWATER HORIZON.  And your
08 response was:  Yes, as OIM I was responsible
09 for the safety of everyone.
10 Correct?
11    A. I take the Fifth.

      pp. 105-107
25    Q. It is your
106:01 understanding as OIM that if the EDS, or
02 emergency disconnect system, did not
03 activate, you were still in charge of the
04 rig, correct?
06    A. I take the Fifth.
07    Q. And you
08 testified to this, in fact, in May before the
09 MBI panel.  On Pages 135 and 136 of your
10 testimony you were asked --
12    Q. -- you were
13 asked if it didn't activate -- referring to
14 the EDS system -- assuming that you were in
15 command before the incident, if the EDS
16 didn't activate, you would still be in
17 command throughout the -- the -- I believe
18 that should be evacuation here in instead of
19 the master -- your answer was:  Yes, if it
20 wasn't latched up, yes.
21 That was your testimony, sir?
107:09 A. I take the Fifth.

7

    p. 126
06 The results of the negative pressure tests
07 were misinterpreted by both Transocean and
08 BP, correct?
10   A. I take the Fifth.

    p. 128
04   Q. And sitting
05 here today, you would agree that having a
06 1400 psi pressure reading on the drill pipe
07 was an indication that the negative test had
08 failed, correct?
10   A. I take the Fifth

    pp. 128-129
23   Q. The rig crew,
24 specifically the Transocean rig crew, never
25 adequately accounted for the elevated
129:01 pressure in the drill pipe, did they?
03   A.  I take the Fifth.

## ADVERSE INFERENCES AGAINST BP

I.  **Inferences Drawn Based on Invocations of Non-Employees: Application of the *Libutti* Factors**

In its February 14 Order, the Court agreed with the PSC that an employment relationship between the invoking witness and the party against whom the inference is to be drawn is not necessary. The Court rejected BP's argument as follows:

> BP contends that under FDIC, the absence of an employment relationship between the invoking witness and the party against whom the adverse inference is sought remains relevant. It urges that the absence of an employment relationship is clearly an important circumstance courts consider when determining whether to apply adverse inferences. It argues that unlike the witnesses in FDIC, the Transocean and Halliburton employees will benefit from their invocation because the adverse inference will be used to attribute fault to BP rather than their employer. Further, it contends that the adverse inferences drawn from the invocations by the persons with relationships with the loan officer in FDIC were trustworthy. It urges that this quality is lacking for Transocean employees invoking the Fifth because of the adversarial relationship between Transocean and BP, such employees owe no loyalty to BP, and they are not controlled by it.

8

In *FDIC*, the Fifth Circuit found no need for a special relationship between the witness and the party against whom the adverse inference was sought. It quoted the following from *RAD Services Inc. v. Aetna Casualty & Surety Co.*, 808 F. 2d 271, 275 (3rd Cir. 1986):

> First, a witness truly bent on incriminating [a party] would likely offer damaging testimony directly, instead of hoping for an adverse inference from a Fifth Amendment invocation. Second, the trial judge could test the propriety of an invocation to ensure against irrelevant claims of privilege. Third, counsel may argue to the jury concerning the weight which it should afford the invocation and any inferences therefrom.

45 F.3d at 978. This responds to the thrust of the movers' arguments concerning non-employees.

(Doc. 5682, p. 4). Thus, here, the fact that Harrell is not BP's employee does not mean that adverse inferences cannot be drawn against it from Harrell's invocation.

In the end, the question is whether the invocations are trustworthy. Harrell's invocations are trustworthy under the circumstances of this case and will advance the search for the truth. The *Libutti* factors, applied here, are as follows:

**(1) the nature of the relevant relationships** – Harrell and BP participated together in operations on the Macondo well, and all employees and their corporate employers were working toward the goal of temporary abandonment.

**(2) the degree of control of the party over the non-party witness** – BP had "control" over Harrell as it was the operator of the Macondo well and Harrell was the OIM of the vessel drilling there under contract with BP. Since BP and Harrell's employer were involved in the operation of the Macondo well, which is the general subject matter of the litigation, the control element is met. Of course, it is not essential that the control factor be met in order for an adverse inference to be drawn. It was not met in *FDIC,* yet the Court found that the inference was proper in that case.

**(3) the compatibility of the interests of the party and non-party witness in the outcome of the litigation** - According to the *Libutti* Court, "the trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the

9

outcome of the litigation." *Id.* BP and Harrell arguably have similar and compatible interests; it is in Harrell's interest that all of the defendants succeed in the litigation. Harrell's invocation advances BP's interests in that it prevents Plaintiffs from obtaining direct testimony from him that would likely be damaging to BP.

(4) **the role of the non-party witness in the litigation** - As Transocean's OIM on the Deepwater Horizon, Harrell plays a critical role in this litigation. He was the person in charge of the vessel and its operations during the events leading up to and including the blowout. In that position, his duties included double-checking the temporary abandonment procedure, the displacement procedure and the negative pressure test. Harrell was responsible for the safety, conditions, and procedures on the vessel and that, at the time of the blowout, if the EDS did not activate, he remained in control of the vessel.

Inferences against BP from Harrell's invocations advance the search for the truth in this case. Numerous witnesses have asserted their Fifth Amendment rights, leaving Plaintiffs without direct testimony on several key issues. The circumstances of this case render Harrell particularly worthy of belief as to specific inferences identified below and, accordingly, the Court should draw these inferences against BP.

**II.    Inferences To Be Drawn Against BP**

**A.    BP was aware of the anomalous negative pressure test results.**

```
       pp. 14-15
17     Q. Are you not now aware -- or
18 aren't you now aware that in fact the
19 negative test indicated 1,400 psi in the
20 drill pipe, 0 psi in the kill line, which
21 should have alerted both Transocean and BP
22 personnel that there was an influx of
23 hydrocarbons occurring in the well at the
24 time the negative test was run?
15:01    A. I take the Fifth.

       pp. 85-86
18     Q. Isn't it true
19 that in the second negative test, that both
20 the BP company man and the toolpusher from
21 Transocean as well as the driller and
22 assistant driller conferred about whether or
```

10

23 not the second negative test had been a
24 success?
86:01      A. I take the Fifth.

**B.    There was no protocol followed by BP on how to run and interpret the negative pressure test.**

    p. 19
19     Q. Have you not learned since the
20 incident that there was no protocol followed
21 by either Transocean or BP the night of
22 April 20th on how to both run and interpret
23 the negative test?
25     A. I take the Fifth.