# EXHIBIT 7

## FIFTH AMENDMENT INVOCATIONS - ADVERSE INFERENCES

NAME:   CHRISTOPHER HAIRE

EMPLOYER:   HALLIBURTON

TITLE:   SERVICE SUPERVISOR

Christopher Haire is a Halliburton Service Supervisor. He witnessed the last two negative pressure tests on the Deepwater Horizon, as well as the faulty interpretations of its results, and knew that the cement job was likely to fail.

## INFERENCES AGAINST HALLIBURTON

**I.  Application of the *Libutti* Factors to Inferences to be drawn against Halliburton.**

In its Motion in *Limine* (Doc. 5144), Halliburton did not argue that Fifth Amendment invocations by its employees could not be the basis of adverse inferences against it. Instead, it limited its argument to invocations by witnesses not employed by Halliburton. Thus, Halliburton does not contest the drawing of adverse inferences against it from Haire's invocation, to the extent they fall within the Federal Rules of Evidence.

**II.  Inferences Drawn Against Halliburton**

**A.  Haire knew that the cement job might fail.**

    pp. 55-56
24    And I'll ask you, sir,
25 looking at that which purports to be a
56:01 model of the cement slurry that was pumped
02 around the Macondo 252 #1 production
03 casing, can you tell us, sir, if those
04 different densities of fluids indicate to
05 you a very strong likelihood of the
06 displacement leading to the inversion of
07 fluids, i.e., the lighter fluids exchanging

1

08 place with the heavier fluids and that
09 anyone knowing the densities of the fluids,
10 their intended placement in the job would
11 know that this cement job would fail?
14     A. Fifth.

    **pp. 100-101**
21     Q. Isn't it true, sir, that your
22 determination of there being a failure of
23 the negative-pressure tests while you were
24 on the Macondo 252 #1 rig on April 20,
25 2010, led you to report to Halliburton and
101:01 BP that those negative-pressure tests had
02 failed?
07     A. Fifth.

**B.     Haire knew that the first two negative pressure tests were unsuccessful.**

    **pp. 100-101**
21     Q. Isn't it true, sir, that your
22 determination of there being a failure of
23 the negative-pressure tests while you were
24 on the Macondo 252 #1 rig on April 20,
25 2010, led you to report to Halliburton and
101:01 BP that those negative-pressure tests had
02 failed?
07     A. Fifth

    **pp. 43-44**
24     Q. Tab 64 has under it, an e-mail
25 from a gentleman by the name of Christopher
44:01 Haire.
02 Is that you?
03     A. Fifth.
04     Q. It's dated June 10, 2010. It's
05 issued to Vince Tabler and it says, hey,
06 Vince, I read some report that stated that
07 the two negative tests we did were
08 considered successful. I stated that I
09 found them to be unsuccessful, and I was

10 checking to see if maybe you knew why
11 Transocean and BP were calling them
12 successful.
13 Did I read that correctly?
14    A. Fifth.

### pp. 122-123

15    You were the man on the rig
16 who monitored the last two negative tests
17 that were performed on the rig; is that
18 right?
23    A. Fifth.
24    Q. You were responsible for
25 monitoring the two negative tests performed
123:01 through the drill pipe; is that right?
06    A. I'll take the Fifth.
07    Q. And during the negative test,
08 you monitored and reported pressures; is
09 that right?
10    A. Fifth.
11    Q. You also bled off pressure and
12 reported the number of barrels that were
13 flowing back; is that right?
14    A. Fifth.

### p. 124

01    Q. Now, at the beginning of the
02 negative test, your gauges showed about
03 1200 psi of pressure on the drill pipe,
04 correct?
07    A. Fifth.
08    Q. And you bled off that pressure
09 and got back 23 barrels; is that right?
10    A. Fifth.
11    Q. You were told to shut in the
12 well after bleeding off 23 barrels, right?
13    A. Fifth.
14    Q. And in your experience, you
15 expected to see only three or five barrels
16 come back from the well, right?

19      A. Fifth.
20      Q. But you got 23 barrels here,
21 which is unusual, right?
22      A. Fifth.
23      Q. This raised a red flag to you,
24 correct?
25      A. Fifth.

      pp. 125-127
03      Q.   After shutting in the well, the
04  pressure rose back to 1400 psi, right?
07      A.   Fifth.
126:03      Q. And when you bled off pressure
04 through the kill line, you'd agree with me
05 that you got 15 barrels of seawater back,
06 correct?
07      A. Fifth.
08      Q. And when you shut in the well,
09 this time the well was still -- the line
10 was still flowing; is that correct?
11      A. I'll take the Fifth.
12      Q. And you were not able to bleed
13 the pressure down to zero before shutting
14 in the line; is that correct?
15      A. Fifth.
127:03      Q. Now, at this point, you were
04 told to stand by.  And during the time you
05 were standing by, the pressure increased
06 back to 1400 psi; is that right?


**C.    Haire knew the dangers of the well continuing to flow while conducting the negative pressure test, but did not inform others that the well was flowing or that the well had to be shut in.**

      pp. 45-46
14      Q. Isn't it true, Mr. Haire, that
15 you knew the dangers of the well continuing
16 to flow while conducting the
17 negative-pressure test and that either you

4

18 did not inform others that the well was
19 flowing and the well had to be shut in or
20 you did inform others that the well was
21 flowing and you did shut in the well?
24     A. Fifth.
25     Q. Which was it, Mr. Haire?  That
46:01 you shut in the well because it was
02 continuing to flow during the
03 negative-pressure test or you did not?
04     A. Fifth.

### ADVERSE INFERENCES AGAINST BP

I.     **Inferences Drawn Based on Invocations of Non-Employees of BP: Application of the *Libutti* Factors**

In its February 14 Order, the Court agreed with the PSC that an employment relationship between the invoking witness and the party against whom the inference is to be drawn is not necessary.  The Court rejected BP's argument, holding as follows:

> BP contends that under FDIC, the absence of an employment relationship between the invoking witness and the party against whom the adverse inference is sought remains relevant. It urges that the absence of an employment relationship is clearly an important circumstance courts consider when determining whether to apply adverse inferences. It argues that unlike the witnesses in FDIC, the Transocean and Halliburton employees will benefit from their invocation because the adverse inference will be used to attribute fault to BP rather than their employer. Further, it contends that the adverse inferences drawn from the invocations by the persons with relationships with the loan officer in FDIC were trustworthy. It urges that this quality is lacking for Transocean employees invoking the Fifth because of the adversarial relationship between Transocean and BP, such employees owe no loyalty to BP, and they are not controlled by it.
>
> In *FDIC*, the Fifth Circuit found no need for a special relationship between the witness and the party against whom the adverse inference was sought. It quoted the following from *RAD Services Inc. v. Aetna Casualty & Surety Co.*, 808 F. 2d 271, 275 (3rd Cir. 1986):
>
>> First, a witness truly bent on incriminating [a party] would likely offer damaging testimony directly, instead of hoping for an adverse inference from a Fifth Amendment invocation. Second, the trial judge could test the propriety of an invocation to ensure against irrelevant

5

> claims of privilege. Third, counsel may argue to the jury concerning the weight which it should afford the invocation and any inferences therefrom.
>
> 45 F.3d at 978. This responds to the thrust of the movers' arguments concerning non-employees.

(Doc. 5682, p. 4). Thus, here, the lack of an employment relationship between BP and Haire does not mean that adverse inferences cannot be drawn against it from Haire's invocation.

The Court has decided that the inferences should be decided on a case-by-case basis, and the *Libutti* factors will be helpful in that effort. However, not *all* of the *Libutti* factors must be met for the inference to be drawn. The *Libutti* Court itself stated that its factors were merely suggestions. Also, as this Court noted in its February 14 Order, the *FDIC* case is not inconsistent with *Libutti* – even though there was no evidence of control over the invoking witness in *FDIC*. The *FDIC* case met only the fourth factor of *Libutti,* yet this was sufficient for the Fifth Circuit to find that the inference was proper.

In the end, the question is whether the invocations are trustworthy. Application of the the *Libutti* factors demonstrates the trustworthiness of Haire's invocations as the basis for adverse inferences against BP:

**(1) the nature of the relevant relationships** – As noted, this Court has followed the Fifth Circuit's decision in *FDIC v. Fidelity & Deposit Co.,* 45 F.3d 969, 978 (5th Cir. 1995) and refused to require a special relationship between the party and the invoking non-party witness. In *FDIC*, an adverse inference was permissibly drawn where the "relationship" in question was that of a bank loan officer and a customer of the bank. As the *Libutti* Court noted, *FDIC* is "a case where the invoking non-party witnesses were neither employees, ex-employees nor members of any of the parties to the litigation. . . ." *Id*. at 123, and yet the *FDIC* Court permitted the inference to be drawn. The Court did not examine the alignment of the party and non-party's interests. Here, the relationship between Haire and BP is at least as strong as the relationship in *FDIC*. Haire was a service supervisor on the *Deepwater Horizon*, witnessed the negative pressure testing, and worked with BP in operations on the Macondo well. Haire was employed by a BP subcontractor, and all of the employees on board the *Deepwater Horizon* and their corporate employers were working toward the goal of temporary abandonment.

**(2) the degree of control of the party over the non-party witness** – This factor does not relate to the party's control over the witness's testimony. As the Court noted in *New Hampshire Ins. Co. v. Blue Water Off Shore LLC,* 2009 WL 792530 (S.D. Ala. 2009), this element addresses "the degree of control the party has 'vested in the non-party witness in regard to the key facts and

6

general subject matter of the litigation' and approximates the analysis for admissions of a party opponent under Federal Rule of Evidence 801(d)(2)." *Id.* BP had "control" over Haire in the sense that it was the operator of the Macondo well and Haire was a Service Supervisor employed by a BP subcontractor. Since BP and Haire's employer were involved in the operation of the Macondo well, which is the general subject matter of the litigation, the control factor is met. Even if it is not, it is not essential that this element be met in order for an adverse inference to be drawn. It was not present in *FDIC,* yet the Court in that case held that the inference was proper.

**(3) the compatibility of the interests of the party and non-party witness in the outcome of the litigation** - In considering this factor, the *Libutti* Court instructed that "the trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation." *Id.* at 123. Haire's assertion of the privilege advances BP's interests because it prevents Plaintiffs from obtaining direct testimony from him that would likely be damaging to BP. Further, it is in Haire's interests that all of the defendants be absolved of liability. Hence, Haire's interests in the outcome of the litigation, while not precisely the same, are compatible.

**(4) the role of the non-party witness in the litigation** - As Halliburton's Service Supervisor on the *Deepwater Horizon*, Haire played a significant role in this litigation. He witnessed the negative pressure testing and BP's faulty interpretation of the results, as well was BP's use of the Kodiak base cement slurry. These are critical issues to the litigation as a whole.

**II.     Inferences Drawn Against BP**

**A.     BP decided to use Kodiak base cement instead of a new slurry on the Macondo well to save money.**

     p. 157
04   Q. It was BP who decided to use the
05 Kodiak base cement on the Macondo well
06 instead of bringing in a new slurry,
07 correct?
10   A. Fifth.
11   Q. Bringing in a new blend would
12 have caused BP to incur additional costs,
13 correct?
16   A. Fifth.

**B.     BP was aware that the cement job might fail.**

**pp. 55-56**

24    And I'll ask you, sir,
25 looking at that which purports to be a
56:01 model of the cement slurry that was pumped
02 around the Macondo 252 #1 production
03 casing, can you tell us, sir, if those
04 different densities of fluids indicate to
05 you a very strong likelihood of the
06 displacement leading to the inversion of
07 fluids, i.e., the lighter fluids exchanging
08 place with the heavier fluids and that
09 anyone knowing the densities of the fluids,
10 their intended placement in the job would
11 know that this cement job would fail?
14    A. Fifth.

**pp. 99-102**

18    Q. And isn't it true, sir, that the
19 tests that were run by Halliburton through
20 Mr. Quirk actually showed that the cement
21 was not stable?
24    A. Fifth.
25    Q. Isn't it true, sir, that the
100:01 tests that were performed by Duncan labs of
02 Halliburton after the blowout showed that
03 the foam cement was not stable?
06    A. Fifth.
07    Q. Isn't it true, sir, that the
08 tests in Duncan showed that there was
09 settling of the cement and that, therefore,
10 it was not stable?
13    A. Fifth.
14    Q. Isn't it true that the CSI test
15 showed that the -- and the Chevron test
16 showed that the foam cement used by
17 Halliburton was not stable?
20    A. Fifth.
21    Q. Isn't it true, sir, that your
22 determination of there being a failure of

8

23 the negative-pressure tests while you were
24 on the Macondo 252 #1 rig on April 20,
25 2010, led you to report to Halliburton and
101:01 BP that those negative-pressure tests had
02 failed?
07     A. Fifth.
102: 11     Q. Isn't it true that the people at
12 BP expected the job to fail and expected to
13 have to perform a frac job?
16     A.   Fifth.

      **pp. 162-165**
25     Q. You're aware that about
163:01 50 barrels of cement were pumped for this
02 job, correct?
03     A. Fifth.
04     Q. And by this job, I mean the
05 production casing job.
06     A. Fifth.
07     Q. And you agree that this would be
08 considered a low volume of cement, correct?
09     A. Fifth.
164:01     Q. BP was trying to keep the TOC to
02 a minimum because of its focus on ECD,
03 correct?
04     A. Fifth.
05     Q. And keeping the TOC to a minimum
06 necessarily reduced the total volume of
07 cement that could be pumped down the well,
08 correct?
11     A. Fifth.
12     Q. Do you agree that with less
13 cement, there's a greater chance of mud
14 contamination?
15     A. Fifth.
18     Q. And lower of volume of cement
19 would mean less cement in the annular space
20 above the hydrocarbon zone, correct?
21     A. Fifth.
22     Q. You would agree that with less

9

23 cement there's a greater chance you might
24 not cover all areas?
25     A. Fifth.
165:03     Q. Which can result in the failure
04 to achieve zonal isolation, correct?
05     A. Fifth.

**C.     Although Haire considered the first two negative tests unsuccessful, BP and Transocean reported the tests as successful.**

    **pp. 43-44**
24     Q. Tab 64 has under it, an e-mail
25 from a gentleman by the name of Christopher
44:01 Haire.
02 Is that you?
03     A. Fifth.
04     Q. It's dated June 10, 2010. It's
05 issued to Vince Tabler and it says, hey,
06 Vince, I read some report that stated that
07 the two negative tests we did were
08 considered successful. I stated that I
09 found them to be unsuccessful, and I was
10 checking to see if maybe you knew why
11 Transocean and BP were calling them
12 successful.
13 Did I read that correctly?
14     A. Fifth.

## INFERENCES AGAINST TRANSOCEAN

**I.     Inferences Drawn Based on Invocations of Non-Employees of Transocean: Application of the *Libutti* Factors**

Transocean does not argue specifically that non-employees' invocations cannot be used against it. Application of the *Libutti* factors demonstrates the trustworthiness of Haire's invocation and weighs in favor of the inference against Transocean:

**(1) the nature of the relevant relationships** – The relationship between Haire and Transocean is at least as strong as that of the bank employee and customer in *FDIC*. Haire was employed as a service supervisor on the *Deepwater Horizon*, a vessel operated by Transocean, and worked with Transocean employees during the temporary abandonment procedures.

(2) **the degree of control of the party over the non-party witness** – Transocean had "control" over Haire under the second *Libutti* factor. Transocean was the operator of the *Deepwater Horizon* and Haire was a Service Supervisor employed by a BP subcontractor on the vessel. Again, this factor does not relate to the party's control over the witness's testimony. *New Hampshire Ins. Co. v. Blue Water Off Shore LLC,* 2009 WL 792530 (S.D. Ala. 2009). Since Transocean and Haire were involved in operations on the Macondo well, which is the general subject matter of the litigation, the control factor is met.

(3) **the compatibility of the interests of the party and non-party witness in the outcome of the litigation** - Transocean and Haire arguably have similar and compatible interests; it is in Haire's interest that all of the defendants succeed in the litigation so that he might also be absolved of criminal liability. The invocation advances Transocean's interests because it prevents Plaintiffs from obtaining direct testimony from Transocean that would likely be damaging to Transocean.

(4) **the role of the non-party witness in the litigation** - As Halliburton's Service Supervisor on the Deepwater Horizon, Haire played a significant role in this litigation. He witnessed the negative pressure testing and Transocean's faulty interpretation of the results. These are critical issues to the litigation as a whole.

**II.     Inferences to be Drawn Against Transocean**

**A.     Although Haire considered the first two negative tests unsuccessful, BP and Transocean reported the tests as successful.**

    **pp. 43-44**
24     Q. Tab 64 has under it, an e-mail
25 from a gentleman by the name of Christopher
44:01 Haire.
02 Is that you?
03     A. Fifth.
04     Q. It's dated June 10, 2010.  It's
05 issued to Vince Tabler and it says, hey,
06 Vince, I read some report that stated that
07 the two negative tests we did were
08 considered successful.  I stated that I
09 found them to be unsuccessful, and I was
10 checking to see if maybe you knew why
11 Transocean and BP were calling them

11

12 successful.
13 Did I read that correctly?
14     A. Fifth

**B.     Transocean knew that the negative pressure tests were unsuccessful.**

    **pp. 125-128**
03     Q.   After shutting in the well, the
04  pressure rose back to 1400 psi, right?
07     A.   Fifth.
126:03     Q. And when you bled off pressure
04 through the kill line, you'd agree with me
05 that you got 15 barrels of seawater back,
06 correct?
07     A. Fifth.
08     Q. And when you shut in the well,
09 this time the well was still -- the line
10 was still flowing; is that correct?
11     A. I'll take the Fifth.
12     Q. And you were not able to bleed
13 the pressure down to zero before shutting
14 in the line; is that correct?
15     A. Fifth.
127:03     Q. Now, at this point, you were
04 told to stand by.  And during the time you
05 were standing by, the pressure increased
06 back to 1400 psi; is that right?
07     A. Fifth.
18 after about an hour of not getting
19 word back, you went back to the rig floor
20 to find out what was going on, right?
21     A. Fifth.
22     Q. You met with four Transocean
23 employees at that time; is that right?
24     A. Fifth.
25     Q. Including the driller and
128:01 toolpusher; is that correct?
02     A. I'll take the Fifth.
03     Q. And these Transocean employees
04 told you that a third negative test had

05 been performed; is that correct?
08     A. Fifth again.