# EXHIBIT 8

# FIFTH AMENDMENT INVOCATIONS - ADVERSE INFERENCES

NAME:             CATHLEENIA WILLIS

EMPLOYER:    HALLIBURTON/SPERRY SUN

TITLE:              MUD LOGGER

Willis was one of two mud loggers on the DWH at the time of the April 20, 2010 blowout. She had the morning tower.

## INFERENCES AGAINST HALLIBURTON

**I.    Inferences Against Halliburton based on Willis' Invocation**

In its Motion in *Limine* letter brief (Doc. 5144), Halliburton did not argue that Fifth Amendment invocations by its employees could not be the basis of adverse inferences against it. Instead, it limited its argument to invocations by witnesses not employed by Halliburton. Thus, Halliburton has not contested the drawing of adverse inferences against it from Willis' invocations, to the extent they comply within the Federal Rules of Evidence.

**II.    Adverse Inferences to be Drawn Against Halliburton**

**A.    Willis had been a mud logger with Sperry less than 3 years and had no experience on wells such as Macondo, which had no thick salt portions.**

010:23 – 010:25
23     Q. Isn't it true that you worked
24     for Sperry-Sun for less than three years?
25   A. Same answer.

011:23 – 012:04
23     Q. Isn't it true that you had no
24      training or experience with drilling wells
25     such at the Macondo well, which did not have
1     thick salt sections, prior to the April 20
2     blowout?
4     A. Same answer.

**B.    Despite Sperry's advertisement of instructor-led "competency and development" training systems, Willis never participated in such a training program.**

012:11 – 013:08

| | |
|---|---|
| 11 | Q. And, if you |
| 12 | would, please turn to Page 8. And starting |
| 13 | with the -- the third paragraph that reads, |
| 14 | "And because you need well-trained personnel |
| 15 | to keep pace with rapidly advancing |
| 16 | technology, we make education an ongoing |
| 17 | process. Our competency development system |
| 18 | guides capable personnel in achieving skill |
| 19 | mastery along a clearly marked technical |
| 20 | career path. Specialized instructor-led |
| 21 | training is supplemented by online training |
| 22 | through the I Learn system and DVD-based |
| 23 | training courses available to all personnel." |
| 24 | Did I read that correctly? |
| 25 | A. Same answer. |
| 1 | Q. Okay. And this is a -- a |
| 2 | brochure from Sperry-Sun, correct? |
| 4 | A. Same answer. |
| 5 | Q. Okay. Isn't it |
| 6 | true that you've never heard of the |
| 7 | competency development program? |
| 8 | A. Same answer. |

**C. Sperry and Willis' role on the DWH was to provide the first line of defense by monitoring drilling conditions and identifying and communicating hazardous or unusual conditions and to ensure that surface equipment was operating properly.**

016:12 – 017:03

| | |
|---|---|
| 12 | Q. If you could, let me turn to |
| 13 | Page 4, Tab 44. And the first paragraph, |
| 14 | second full sentence reads, "Providing the |
| 15 | first line of defense, SDL specialists |
| 16 | monitor the drilling conditions to identify |
| 17 | and communicate any hazardous or unusual |
| 18 | conditions and ensure the surface equipment |
| 19 | is operating correctly." |
| 20 | Did I read that properly and |
| 21 | correctly? |
| 22 | A. Same answer. |
| 23 | Q. Isn't it true that BP hired |
| 24 | Sperry to be the first line of defense in |
| 25 | identifying and communicating any hazardous |
| 1 | or unusual conditions that occurred during |
| 2 | the drilling of the Macondo well? |
| 3 | A. Same answer. |

**D.   While on the BANKSTON, following the blowout, Keith related to Willis that he took a cigarette break shortly before the blowout because there was nothing for him to monitor.**

063:08 – 064:17
8      Q. Following the
9      blowout, isn't it true that you spoke with
10     Joseph Keith while you were on the DAMON
11     BANKSTON?
12     A. The same answer.
13     Q. Mr. Keith explained to you what
14     he was doing at the time of the blowout,
15     correct?
16     A. The same answer.
17     Q. And he told you he took a
18     cigarette break shortly before the blowout,
19     correct?
20     A. The same answer.
23      Q. He told you he
24     took a cigarette break because there was
25     nothing for him to monitor on the well,
1      correct?
4      Same answer.
5      Q. He told you he
6      had nothing to monitor because he could not
7       accurately measure the pit volumes or the
8      flow-in versus flow-out, correct?
11     Same answer.
12     Q. Isn't it true
13     that Mr. Keith told you he was not actively
14     monitoring the well at the time of the
15     blowout?
17     Same answer.

**E.   The proposed displacement was to begin about 1:30 p.m., and from approximately 1:28 p.m. until 5:12 p.m., Sperry was not able to accurately monitor the mud pit levels on the *Deepwater Horizon*.**

097:07 – 097:12
7      Q. Isn't it true that from about
8      1:28 p.m. to 5:12 p.m. on April 20, 2010,
9      that you were not accurately able to monitor
10     the mud pit levels on the DEEPWATER HORIZON?
12     Same answer.

**F.   Neither Willis nor Keith was actively monitoring the well at the time of the blowout.**

065:17 – 068:07

3

17     Q. This is an
18  e-mail from James Brement, Vice President of
19  Sperry PSL, to Jonathan Lewis, Senior VP D&D,
10:25:01 20 and Tim Probert, President of Global Business
21  Lines and Corporate Development, correct?
22     A. Same answer.
23     Q. And it's dated April 21, 2010,
24  at 7:58 a.m., correct?
25      A. Same answer.
   066:01            Q. This e-mail was sent less than
2   12 hours after the blowout, correct?
3      A. Same answer.
4      Q. You were still on the
5   DEEPWATER -- or you were still on the DAMON
6   BANKSTON when this e-mail was sent, correct?
7      A. Same answer.
8      Q. This e-mail reads, "I forgot to
9   mention, we had a crew change yesterday and
10  all of DD/MWD personnel came on shore. The
11  two SDL personnel just arrived on the rig
12  yesterday. There was no act of monitoring as
13  they were -- have already spoken with ROC."
14  Did I read that correctly?
15     A. Same answer.
16     Q. Now, you are one of the two SDL
17  personnel that are mentioned in this e-mail,
18  correct?
19     A. Same answer --
22     Q. And Joe Keith
23  was the other SDL personnel that's referenced
24  in this e-mail, correct?
   067:01            Same answer.
2      Q. Now, isn't it
3   true that you did, in fact, speak with the
4   ROC after the blowout?
5      A. Same answer.
6      Q. Isn't it true that Joe Keith
7   also spoke with the ROC after the blowout?
8      A. Same answer --
11     Q. And ROC stands
12  for Realtime Operation Center, correct?
13     A. Same answer.
14     Q. And you and Joe Keith both spoke
15  with the Realtime Operation Center while you
16  were on the DAMON BANKSTON, correct?
17     A. Same answer.
18     Q. And you told them that you
19  weren't actively monitoring the well because

4

```
20   you were on tower, correct?
21      A. Same answer.
22      Q. And isn't it true that Joe Keith
23   also told the Realtime Operation Center that
24   he was not actively monitoring the well at
25   the time of the blowout?
      068:02           Same answer.
3       Q.  In fact, that's
4    the same thing he told you when you were on
5    the BANKSTON with him, correct?
7       Same answer.
```

## ADVERSE INFERENCES AGAINST BP

**I.   Inferences Drawn Based on Invocations of Non-Employees:  Application of the *Libutti* Factors**

In its February 14 Order, the Court agreed with the PSC, making it clear that an employment relationship between the invoking witness and the party against whom the inference is to be drawn is not necessary.  The Court rejected BP's argument, holding as follows:

> BP contends that under FDIC, the absence of an employment relationship between the invoking witness and the party against whom the adverse inference is sought remains relevant. It urges that the absence of an employment relationship is clearly an important circumstance courts consider when determining whether to apply adverse inferences. It argues that unlike the witnesses in FDIC, the Transocean and Halliburton employees will benefit from their invocation because the adverse inference will be used to attribute fault to BP rather than their employer. Further, it contends that the adverse inferences drawn from the invocations by the persons with relationships with the loan officer in FDIC were trustworthy. It urges that this quality is lacking for Transocean employees invoking the Fifth because of the adversarial relationship between Transocean and BP, such employees owe no loyalty to BP, and they are not controlled by it.

> In *FDIC*, the Fifth Circuit found no need for a special relationship between the witness and the party against whom the adverse inference was sought. It quoted the following from *RAD Services Inc. v. Aetna Casualty & Surety Co*., 808 F. 2d 271, 275 (3rd Cir. 1986):

>> First, a witness truly bent on incriminating [a party] would likely offer damaging testimony directly, instead of hoping for an adverse inference from a Fifth Amendment invocation. Second, the trial judge could test the propriety of an invocation to ensure against irrelevant claims of privilege. Third, counsel may argue to the jury concerning the weight which it should afford the invocation and any inferences therefrom.

> 45 F.3d at 978. This responds to the thrust of the movers' arguments concerning non-employees.

(Doc. 5682, p. 4). Thus, here, the fact that Willis is not an employee of BP does not mean that adverse inferences cannot be drawn against it from Willis' invocation.

The Court in the instant case opined that the inferences should be decided on a case-by-case basis, and the *Libutti* factors will be helpful in that effort. However, not *all* of the *Libutti* factors must be met. First, the *Libutti* Court itself stated that its factors were just suggestions. Second, as the Court noted in its February 14 Order, the *FDIC* case is not inconsistent with *Libutti* – even though there was no evidence of control over the invoking witness in that case. The *FDIC* case met only the fourth factor of *Libutti,* and this was sufficient for the Court to hold in the instant case that the *FDIC* case was consistent with *Libutti.* In the end, the question is whether the invocations are trustworthy.

The issue is one of trustworthiness. The circumstances of this case, in which a number of key witnesses have asserted their Fifth Amendment rights, warrant the inferences requested. The inferences are trustworthy based on the *Libutti* factors, applied here as follows:

**(1) the nature of the relevant relationships** – As noted, this Court has followed the Fifth Circuit's refusal to require a special relationship between the party and the invoking non-party witness. *FDIC v. Fidelity & Deposit Co.,* 45 F.3d 969, 978 (5th Cir. 1995). In *FDIC*, an adverse inference was permissibly drawn where the "relationship" in question was that of a bank loan officer and a customer of the bank. As the *Libutti* Court noted, *FDIC* is "a case where the invoking non-party witnesses were neither employees, ex-employees nor members of any of the parties to the litigation. . . ." *Id*. at 123, and yet the *FDIC* Court permitted the inference to be drawn. Here, Willis was an employee of Halliburton/Sperry, BP's subcontractor. While it was not an employer/employee relationship, Willis and BP participated together in operations on the Macondo well, and all employees and their corporate employers were working toward the goal of temporary abandonment.

**(2) the degree of control of the party over the non-party witness** – This factor does not relate to the party's control over the witness's testimony; instead, as the Court noted in *New Hampshire Ins. Co. v. Blue Water Off Shore LLC,* 2009 WL 792530 (S.D. Ala. 2009), this element addresses "the degree of control the party has 'vested in the non-party witness in regard to the key facts and general subject matter of the litigation' and approximates the analysis for admissions of a party opponent under Federal Rule of Evidence 801(d)(2)." *Id.* (quoting *Libutti*). BP had "control" over Willis, as it was in control of operations at the Macondo well and Willis worked for one of its subcontractors. BP contracted with Willis' employer and both were engaged in operations on the *Deepwater Horizon*, which is the general subject matter of the litigation. As such, the control element is met. Even if it is not, it is not essential that the control factor be met in order for an adverse inference to be drawn. It was not met in *FDIC,* yet the Court found the inference to be proper in that case.

(3) **the compatibility of the interests of the party and non-party witness in the outcome of the litigation** - BP and Willis have similar interests; it is in Willis' penal interest that BP succeed in the litigation with respect to any action or inaction on her part for which BP may be held liable. According to the *Libutti* Court, "the trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation." *Id.* BP and Willis share the incentive that it not be held liable for her actions or inactions. Her invocation advances BP's interests, as it prevents Plaintiffs from obtaining her direct testimony, which would likely be more damaging to BP than the inference.

(4) **the role of the non-party witness in the litigation** - As one of two mud loggers on the Deepwater Horizon at the time of the blowout, Willis plays a significant role in this litigation. She observed and participated in the pumping of mud back to the BANKSTON during displacement, and voiced concerns about this. The displacement procedure is a critical part of this case.

Inferences against BP from Willis' invocation advance he search for the truth in this case, in which numerous witnesses have asserted their Fifth Amendment rights. The circumstance of this case render Willis particularly worthy of belief as to the specific inferences identified below and, accordingly, the Court should draw these inferences against BP.

**II.   Inferences to be Drawn Against BP**

**A.   BP determined the number of mud loggers on the *Deepwater Horizon* ("DWH").**

09:20 – 09:24

20   Q. Isn't it true
21   that BP decided how many mud loggers Sperry
22   would have on the DEEPWATER HORIZON at one
23   time?
24   A. Same answer.

**B.   During the pre-tower meeting on April 20, 2010, Willis expressed reservations about pumping mud back to the DAMON BANKSTON during the displacement procedure which was to take place on April 20, 2010 (TREX-03203 at 3), because of the inability to monitor pit gains (TREX-03204 at 187).**

053:11 – 054:20
11      Q. Isn't it true that, during that
12   pretower meeting, you expressed reservations
13   about whether it was a good idea to pump mud
14   back to the DAMON BANKSTON during the
15   displacement procedure?
16      A. Same --
18      A. Same answer.

24    Q. Now, isn't it
25    true that Exhibit 3603 (sic) is a true and
1    accurate copy of the notes that were taken by
2    BP during your interview with BP following
3    the blowout?
4    A. Same answer.
Q.    If you look about a third of the
6    way down the page, it reads, "They were
7    getting prepared to displace and discussed
8    the program. At the safety meeting they said
9    they would displace back to the boat. AD
10    said they would call her because she said she
11    could not monitor displacement back to the
12    boat."
13    Did I read that correctly?
14    A. Same answer.
15    Q. Okay. Isn't it true that that
16    statement reflects you being unhappy about
17    the fact that they were displacing mud back
18    to the boat?
20    A. Same answer.

096:17 – 097:12
17    Q. Isn't it true at the pretower
18    meeting on April 20th that you said that you
19    could not accurately monitor mud pit levels
20    during the proposed displacement procedure?
21    A. Same answer.
22    Q. Isn't it true that your concerns
23    about monitoring pit levels were not
24    addressed by the well site leader or
25    transitionary crew?
2    Same answer.
3    Q. Isn't it true
4    that the planned displacement procedure
5    proceeded at around 1:28 p.m. on April 20th?
6    A. Same answer.
7    Q. Isn't it true that from about
8    1:28 p.m. to 5:12 p.m. on April 20, 2010,
9    that you were not accurately able to monitor
10    the mud pit levels on the DEEPWATER HORIZON?
12    Same answer.

**C.    Joe Keith, the Sperry employee who was manning the opposite tower, also expressed concern about displacement to the BANKSTON.**

060:11 – 061:16
11    Q. Look back at
12    Exhibit 3603 (sic) for me, three-quarters of

| | | |
|---|---|---|
| 13 | | the way down. |
| 17 | | Q. About |
| 18 | | three-quarters of the way down the page, it |
| 19 | | reads, "She told Joe Keith in handover what |
| 20 | | was happening and he was not happy about |
| 21 | | displacement to the boat." |
| 22 | | Did I read that correctly? |
| 23 | | A. Same answer. |
| 24 | | Q. Isn't it true that, when you and |
| 25 | | Joe Keith changed towers, that he was upset |
| 1 | | about the fact they were displacing mud to |
| 2 | | the boat. |
| 4 | | A. Same answer. |
| 5 | | Q. Isn't it true |
| 6 | | that Joe Keith didn't believe that was a safe |
| 7 | | way to displace the well? |
| 10 | | A. The same answer. |
| 11 | | Q. Isn't it true |
| 12 | | that Joe Keith believed that the safest way |
| 13 | | to displace the well would be able -- would |
| 14 | | be to take the mud to the active pit system? |
| 16 | | Same answer. |

**D.     BP, nevertheless, approved the displacement.**

057:02 – 057:21

| | |
|---|---|
| 2 | Q. Isn't it true |
| 3 | that personnel from BP were present when you |
| 4 | told the assistant driller, Clark, that |
| 5 | displacing mud back to the boat would impair |
| 6 | your ability to monitor pit gains? |
| 8 | A. Same answer. |
| 9 | Q. Isn't it true |
| 10 | that personnel from BP approved of displacing |
| 11 | mud back to the boat rather than displacing |
| 12 | it to the active pits? |
| 14 | A. Same answer. |
| 15 |  Q. Isn't it true |
| 16 | that personnel from BP understood the |
| 17 | additional risk that would be caused by |
| 18 | displacing mud directly to the boat rather |
| 19 | than displacing it to the active pit system? |
| 21 | A. Same answer. |

**E.     Due to the displacement, Willis did not know when they were taking returns, and was essentially flying blind in terms of monitoring the well. This impeded the ability to detect a kick.**

058:10 – 058:04
10     Q. Isn't it true that, when you
11   were on the tower on April 20th, 2010, you
12   had no idea where they were taking the
13   returns to when they were displacing the
14   well?
16     A. Same answer.
17     Q. Isn't it true
18   that, on April 20, 2010, when you were on
19   tower, you were essentially flying blind in
20   terms of monitoring the well?
22     A. Same answer.
23     Q. Isn't it true
24   that, if the well had taken a kick while you
25   were on tower on April 20, 2010, you would
1    not have been able to see it?
4      A. Same answer.