EXHIBIT 9

FIFTH AMENDMENT INVOCATIONS - ADVERSE INFERENCES

NAME: ANDREA FLEYTAS

EMPLOYER: TRANSOCEAN

TITLE: DYNAMIC POSITIONING OFFICER (DPO)

Andrea Fleytas, a licensed third mate, was the Dynamic Positioning Officer on duty on the bridge of the *Deepwater Horizon* at the time of explosion. The *Deepwater Horizon* was her first vessel, and she had served for 1½ years.

I.   **Inferences to be drawn against Transocean: Application of the *Libutti* Factors**

The Court may draw adverse inferences against Transocean from Fleytas' invocation of the Fifth Amendment under the four non-exclusive factors suggested by the Second Circuit in *LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997), which Judge Barbier adopted in his February 14 Order (Doc. 5682). "Whether these or other circumstances unique to a particular case are considered by the trial court, the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *LiButti,* 107 F.3d at 124. The *Libutti* factors, as applied here, are as follows:

**(1) the nature of the relevant relationships** – As this Court noted in its February 14 Order, the Fifth Circuit has refused to require a special relationship between a party and an invoking non-party witness before drawing an adverse inference against the party from the non-party's invocation. *FDIC v. Fidelity & Deposit Co.,* 45 F.3d 969, 978 (5th Cir. 1995). In *FDIC*, an adverse inference was permissibly drawn where the "relationship" in question was that of a bank loan officer and a customer of the bank. Because Transocean and Fleytas are in an employer/employee relationship, the relationship is stronger here than in *FDIC*. As the Court stated in *FDIC*, "the fact of present employment serves primarily to reduce the chance that the employee will falsely claim to have engaged in criminal conduct for which the defendant employer is liable." *Id.* at 978 (citing ROBERT HEIDT, *The Conjurer's Circle--The Fifth Amendment Privilege in Civil Cases*, 91 YALE L.J. 1062, 1119-20 n. 214 (1982)). Adverse inferences may be drawn from the invocation by former employees, also. "Any factors suggesting that a former employee retains some loyalty to his former employer--such as the fact that the employer is paying for his attorney--would serve the same purpose." *Id.*

Transocean argues that this factor is not met with respect to its employees who, like

1

Fleytas, have filed suit against it. According to Transocean, "most of the current or former Transocean employees who have invoked the Fifth Amendment were in separate litigation directly adverse to Transocean, concerning the same incident at issue in this case, at the time of their depositions. Their relationship to Transocean is expressly adversarial, and their refusals to testify will not support an adverse inference against Transocean. *See, e.g., United States v. Philip Morris USA Inc.,* 2004 WL 5916865, at *1 (D.D.C. July 23, 2004) ("The relationship between Osdene and Defendant Philip Morris USA is hostile and adverse and therefore would not support the inference that the non-party's invocation of his Fifth Amendment rights promotes the interests of the Defendant.")." (Doc. 5111-1, p. 3.)

The *Philip Morris* decision does not discuss the nature of the relationship in question, so it is not clear what the relationship was in that case or why it was "hostile and adverse." In any event, the existence of an adverse relationship, in itself, is not decisive. For instance, in *Brinks, Inc. v. City of New York,* 717 F.2d 700 (2d Cir. 1983), a case relied on heavily in *Libutti,* the Court held that a jury could draw adverse inferences against a corporate defendant from the invocation of the Fifth Amendment by a former employee of the corporation; this even though the corporation had filed counter claims against the employee.

Transocean's argument suggests that employees like Fleytas are disloyal to Transocean and are, instead, motivated to incriminate Transocean in order to advance their claims against it. Notably, the Court in the instant case, in its discussion of the defendants' claims that invocations by non-employees cannot result in adverse inference against them, stated as follows:

> In *FDIC*, the Fifth Circuit found no need for a special relationship between the witness and the party against whom the adverse inference was sought. It quoted the following from *RAD Services Inc. v. Aetna Casualty & Surety Co.*, 808 F. 2d 271, 275 (3rd Cir. 1986):
>
>> First, a witness truly bent on incriminating [a party] would likely offer damaging testimony directly, instead of hoping for an adverse inference from a Fifth Amendment invocation. Second, the trial judge could test the propriety of an invocation to ensure against irrelevant claims of privilege. Third, counsel may argue to the jury concerning the weight which it should afford the invocation and any inferences therefrom.
>
> 45 F.3d at 978. This responds to the thrust of the movers' arguments concerning non-employees.

(Doc. 5682, p. 4.) The same argument could be made with respect to Fleytas' invocation. If she

2

were truly bent on incriminating Transocean to advance her personal injury case against it, she would offer damaging testimony directly, instead of hoping that the Court would draw an adverse inference against Transocean based on her invocation.

(2) **the degree of control of the party over the non-party witness** – as its employee, Transocean exercised control over Fleytas. Transocean argues that it did not have control over its employees who had filed suit against it at the time of their depositions. As the Court noted in *New Hampshire Ins. Co. v. Blue Water Off Shore LLC,* 2009 WL 792530 (S.D. Ala. 2009), the "control" element deals not with the party's ability to control the witness at the time of his testimony, but "the degree of control the party has 'vested in the non-party witness in regard to the key facts and general subject matter of the litigation' and approximates the analysis for admissions of a party opponent under Federal Rule of Evidence 801(d)(2)." *Id.* (quoting *Libutti*). Thus, Transocean's lack of control over Fleytas at the time of her deposition is not the question. Moreover, any non-privileged statement by Fleytas would qualify as an admission against Transocean under the Federal Rules of Evidence.

(3) **the compatibility of the interests of the party and non-party witness in the outcome of the litigation** - With respect to this factor, the *LiButti* Court directed that "the trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation." *Libutti,* 107 F.3d at 123. Fleytas and Transocean have similar interests in that it is in Fleytas' penal interest that Transocean succeed in the litigation, particularly with respect to any actions on her part. Fleytas' invocation advances Transocean's interests to the extent that it prevents Plaintiffs from obtaining direct testimony from her that would likely be damaging to Transocean.

(4) **the role of the non-party witness in the litigation** – Fleytas' role is significant, as Transocean's failure to adequately train its crew is one of the critical issues in this case. Her failure to sound alarms in a timely fashion - and Transocean's failure to properly train her to do so - resulted in a delay in notification of a well control event, and likely resulted in additional injury.

Under the unique circumstances of this case, in which nineteen witnesses have invoked the Fifth Amendment, the inferences requested against Transocean from Fleytas' invocations are trustworthy and advance the search for the truth. Accordingly, the Court should draw the specific inferences against Transocean identified below.

**II.     Inferences to be Drawn against Transocean**

**A.     Fleytas and the members of Transocean's bridge crew were not adequately trained to respond to a well control situation and were unfamiliar with safety shut-offs.**

      p. 23
11 Q. And isn't it true, Ms. Fleytas,
12 that you were never -- you never took the
13 K-Chief basic course by Kongsberg Simrad?
15 A. Same answer.

      pp. 23-24
24 Q. And did you know that the
25 K-Chief basic course was the basic operating
24:01 course for the fire and gas safety system
02 aboard the DEEPWATER HORIZON?
03 A. Same answer.
04 Q. And Transocean never offered to
05 have you take that course, did they?
07 A. Same answer.

      p. 29
08 Q. In other words, there was no
09 training given you as a dynamic positioning
10 officer by Transocean of a worst case
11 scenario on this rig, was there?
13 A. Same answer.

      pp. 30-31
14 Q. And there was no simulation or
15 training as to what immediate actions that
16 you should take when the gas levels were so
17 high that more than ten sensors show magenta,
18 indicating the intrusion of combustible gas
19 into multiple compartments; is that true?
21 A. Same answer.
22 Q. And Transocean never did send
23 you to that K-Chief basic course given by
24 Kongsberg, did they?
31:01 A. Same answer.

      p. 31
13 Q. And to your knowledge, ma'am, no
14 one that was on the bridge that -- that

4

15 night, either Captain Kuchta, or Yancy
16 Keplinger, had been trained as to what
17 immediate actions to take when gas levels
18 were so high than more than ten sensors
19 showed magenta, indicating intrusion of
20 combustible gas in multiple compartments; is
21 that true?
23 A. Same answer.

      p. 36
05 Q. And Transocean didn't train you
06 to use the emergency shut-down system, did
07 they?
09 A. Same answer.

      p. 53
15 Q. Ms. Fleytas, one of your
16 duties -- or your duty as a Transocean DPO
17 was to monitor the fire and gas alarms on the
18 DEEPWATER HORIZON rig, correct?
19 A. Same answer.

      p. 54
05 Q. And your duty as a DPO was -- on
06 watch on the bridge was to sound the general
07 alarm when there were, in fact, two or more
08 high gas sensors going off on the rig; is
09 that correct?
11 A. Same answer.
12 Q. Isn't it true that as the DPO,
13 Transocean did not train you as to what
14 exactly to do when you saw multiple gas
15 alarms going off on the bridge; is that
16 correct?
18 A. Same answer.
20 Transocean did not train you as to what
21 systems to shut down through the ESD panel
22 when you saw multiple gas alarms going off on
23 the bridge; is that correct?
25 A. Same answer.

    pp. 66-67
07 Q. Therefore, the emergency
08 shutdown panel required human intervention to
09 manually hit the controls to shut down the
10 ventilation to the engine room on April 20th,
11 correct?
13 A. Same answer.
14 Q. But you were actually never
15 trained by Transocean on when conditions on
16 the rig would warrant activation of that
17 emergency shutdown panel that was on your DPO
18 station, correct?
20 A. Same answer.
21 Q. And you were never given
22 procedures from Transocean for when
23 conditions warranted activation of that
24 emergency shutdown system?
67:01 A. Same answer.

**B.    Despite multiple combustible gas alarms sounding, Fleytas did not initiate any visual or audible alarms.**

    p. 34
01 Q. And if the fire and gas safety
02 system had not been inhibited, the -- and
03 sounded the alarms immediately, the men in
04 the confined spaces aboard the DEEPWATER
05 HORIZON who were close to the explosion would
06 have had some 45 seconds to 2 minutes to
07 evacuate those spaces; is that correct?
09 A. Same answer.
10 Q. And, in fact, the crew aboard
11 the DEEPWATER HORIZON had been trained to
12 evacuate spaces immediately upon the sounding
13 of combustible gas alarms, weren't they?
14 A. Same answer.
15 Q. And yet, no automatic
16 combustible gas alarm was ever sounded
17 because all of the alarms were set to be

18 inhibited; is that correct?
20 A. Same answer.

      p. 67
17 Q. On April 20th, 2010, after you
18 saw all the high gas alarms and magenta going
19 off on the DEEPWATER HORIZON rig, you, in
20 fact, did not activate the emergency shutdown
21 system to shut off the ventilation to the
22 engine rooms, correct?
23 A. Same answer.

      pp. 68-69
11 I'm going to start on page 60,
12 line 17, examination by Mr. Bickford.
13     Question, when is an emergency
14 shutdown of the ventilation system merited
15 with regard to high combustible gas alarms?
16     Your answer, I don't know.
17     Question, is there any procedure
18 that you would know of when you would do
19 an -- is there -- is there any procedure that
20 you would know of when you would do an
21 emergency shutdown of the ventilation due to
22 high gas alarms?
23     Your answer, no, I don't know of
24 any procedures.
25     Question, when you say
69:01 "procedures," I mean, are you aware of any
02 circumstances when you would trigger the
03 emergency shutdown in those areas?
04     In other words, when there is a
05 high gas alarm or an alarm sounding on your
06 panel, is there some procedure that you have
07 been given on the job or at your training at
08 Kongsberg which would indicate when you would
09 hit the emergency shutdown for ventilations
10 in certain areas?
11     Your answer, not that I can
12 remember, no.

      7

13     Did I read that correctly?
15     A.    Same answer.