# EXHIBIT 10

# FIFTH AMENDMENT INVOCATIONS - ADVERSE INFERENCES

NAME:             JAMES INGRAM

EMPLOYER:    TRANSOCEAN

TITLE:              SENIOR MATERIALS COORDINATOR

James Ingram was a Senior Materials Coordinator on the Deepwater Horizon at the time of the explosion on April 20, 2010, having held that position for three years.

## I.   Inferences to be drawn against BP:  Application of the *Libutti* Factors

In its February 14 Order, the Court made it clear that an employment relationship between the invoking witness and the party against whom the inference is to be drawn is not necessary.  The Court rejected BP's argument to the contrary, holding as follows:

> BP contends that under *FDIC*, the absence of an employment relationship between the invoking witness and the party against whom the adverse inference is sought remains relevant. It urges that the absence of an employment relationship is clearly an important circumstance courts consider when determining whether to apply adverse inferences. It argues that unlike the witnesses in *FDIC*, the Transocean and Halliburton employees will benefit from their invocation because the adverse inference will be used to attribute fault to BP rather than their employer. Further, it contends that the adverse inferences drawn from the invocations by the persons with relationships with the loan officer in *FDIC* were trustworthy. It urges that this quality is lacking for Transocean employees invoking the Fifth because of the adversarial relationship between Transocean and BP, such employees owe no loyalty to BP, and they are not controlled by it.
>
> In *FDIC*, the Fifth Circuit found no need for a special relationship between the witness and the party against whom the adverse inference was sought. It quoted the following from *RAD Services Inc. v. Aetna Casualty & Surety Co.*, 808 F. 2d 271, 275 (3rd Cir. 1986):
>
>> First, a witness truly bent on incriminating [a party] would likely offer damaging testimony directly, instead of hoping for an adverse

1

>inference from a Fifth Amendment invocation. Second, the trial judge could test the propriety of an invocation to ensure against irrelevant claims of privilege. Third, counsel may argue to the jury concerning the weight which it should afford the invocation and any inferences therefrom.
>
>45 F.3d at 978. This responds to the thrust of the movers' arguments concerning non-employees.

(Doc. 5682, p. 4). Thus, here, the fact that Ingram was not a BP employee does not mean that adverse inferences cannot be drawn against it from Ingram's invocation.

In its Order, this Court determined that the inferences to be drawn should be decided on a case-by-case basis, and the *Libutti* factors will be helpful in that effort. However, not *all* of the *Libutti* factors must be met. The *Libutti* Court stated that its proposed factors were suggestions. Also, as the Court noted in its February 14 Order, the *FDIC* case is not inconsistent with *Libutti* – even though there was no evidence of control over the invoking witness in that case. The *FDIC* case met only the fourth factor of *Libutti,* and this was sufficient for the Court to hold that the inferences were proper.

In the end, the question is whether the inferences are trustworthy and advance the search for the truth. Under the circumstances of this case, in which a number of witnesses have asserted their Fifth Amendment rights, the search for the truth will be advanced by the inferences requested.

The *Libutti* factors, applied here as follows:

**(1) the nature of the relevant relationships** – As noted, this Court has followed the Fifth Circuit's refusal to require a special relationship between the party and the invoking non-party witness. *FDIC v. Fidelity & Deposit Co.,* 45 F.3d 969, 978 (5th Cir. 1995). In *FDIC*, an adverse inference was permissibly drawn where the "relationship" in question was that of a bank loan officer and a customer of the bank. As the *Libutti* Court noted, *FDIC* is "a case where the invoking non-party witnesses were neither employees, ex-employees nor members of any of the parties to the litigation. . . ." *Id*. at 123, and yet the *FDIC* Court permitted the inference to be drawn. Here, the relationship between Ingram and BP is of similar strength. Ingram and BP, through its crew, participated together in operations on the *Deepwater Horizon*, and all employees and their corporate employers were working toward the goal of temporary abandonment.

**(2) the degree of control of the party over the non-party witness** – BP had "control" over

2

Ingram; it was the operator of the Macondo well and Ingram was employed by the vessel owner engaged by BP.  Importantly, this factor does not relate to the party's control over the witness's testimony; as the Court noted in *New Hampshire Ins. Co. v. Blue Water Off Shore LLC,* 2009 WL 792530 (S.D. Ala. 2009), this element addresses "the degree of control the party has 'vested in the non-party witness in regard to the key facts and general subject matter of the litigation' and approximates the analysis for admissions of a party opponent under Federal Rule of Evidence 801(d)(2)."  *Id.*  Since BP and Ingram's employer were involved in the operation of the Macondo well, which is the general subject matter of the litigation, the control element is met.  Even if it is not, it is not essential that this factor be met in order for an adverse inference to be drawn.  It was not met in *FDIC,* yet the Court held that the inference was proper in that case.

(3) **the compatibility of the interests of the party and non-party witness in the outcome of the litigation** - BP and Ingram have similar interests; it is in Ingram's penal interest that all of the defendants succeed in the litigation.  According to the *Libutti* Court, "the trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation."  *Id.*  Ingram's invocation advances BP's interests in that prevents Plaintiffs from obtaining direct testimony from him that would likely be more damaging to BP than the inference.  Even if Ingram filed suit against BP for injuries he sustained on the night of the blowout, an inference against it based on Ingram's invocation is proper; if Ingram wished to incriminate BP for purposes of advancing his suit, he would more likely testify directly as opposed to invoking the Fifth Amendment and hoping for an imposition of an adverse inference against BP.  *See FDIC,* 45 F.3d at 978 (citing *RAD Services Inc. v. Aetna Casualty & Surety Co*., 808 F. 2d 271, 275 (3rd Cir. 1986)).

(4) **the role of the non-party witness in the litigation** – Ingram plays a significant role in this litigation as a whole.  He has unique knowledge concerning BP's emphasis on cost saving over safety, a critical issue in this case.  Notably, this is the one *Libutti* consideration that this Court found to be met in *FDIC*, and it is undoubtedly met here.

Inferences against BP from Ingram's invocations advance the search for the truth in this case.  Nineteen witnesses have asserted their Fifth Amendment rights, leaving Plaintiffs without direct testimony on several key issues.  The circumstances of this case render Ingram particularly worthy of belief as to the specific inferences identified below and, accordingly, the Court should draw these inferences against BP.

**II.  Inferences to be drawn Against BP**

A.      **BP emphasized efficiency and cost saving over safety.**

**p. 27**
6      Q. Was it your understanding that
7 BP's preference not to change the annulars
8 was an example of BP emphasizing efficiency
9 and cost saving over safety in the
10 maintenance repairs and potential replacement
11 of critical well-control equipment?
13     A. Same answer.

**p. 67**
3      You know that Schlumberger was
4 on the rig ready to run a cement bond log
5 after the final production -- final cementing
6 of the production casing was done; isn't that
7 true?
8      A. Same answer.
9      Q. But BP sent them home.
10      Did you know that?
11     A. Same answer.
13     Q. And you'd agree -- and you'd
14 agree with me that BP sent Schlumberger home
15 rather than have them to do a cement bond log
16 because it saved BP a lot of time; isn't that
17 right?
19     A. Same --
20     Q. And by saving BP a lot of time,
21 you'd agree with me --
24     A. Same answer.

**p. 68**
12     Q. You'd agree with me, wouldn't
13 you, Mr. Ingram, that BP made numerous
14 cost-saving decisions that increased the
15 chance of a well blowout without running any
16 formal risk assessment; isn't that true?
17     A. Same answer.

**pp. 68-69**
19     Q. Isn't it true that in the days
20 preceding the blowout, many of the decisions

21 that were made regarding the well were
22 affected by the fact that the well was over
23 budget and it was over-allocated in the time
24 set for its completion?
1      A. Same answer.

**B.     It was BP's responsibility to assure consistency between drill pipe shearability and the blowout preventer's shearing capacity.**

    **p. 31**
18     Q. Was it the responsibility of BP
19 as operator to investigate and assure this
20 consistency between drill pipe shearability
21 and the blowout preventer's shearing
22 capacity?
24     A. Same answer.