EXHIBIT 11

FIFTH AMENDMENT INVOCATIONS - ADVERSE INFERENCES

NAME:           CALEB HOLLOWAY

EMPLOYER:       TRANSOCEAN

TITLE:          FLOOR HAND

Holloway was a Floor Hand employed by Transocean on the Deepwater Horizon at the time of the blowout.

**I.     Inferences to be drawn against Transocean: Application of the *Libutti* Factors**

The Court may draw adverse inferences against Transocean from Holloway's invocation of the Fifth Amendment under the four non-exclusive factors suggested by the Second Circuit in *LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997), which the Court adopted in its February 14 Order (Doc. 5682). "Whether these or other circumstances unique to a particular case are considered by the trial court, the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *LiButti,* 107 F.3d at 124. The circumstances of this case, in which nineteen witnesses have asserted their Fifth Amendment rights, warrant the inferences requested and will advance the search for the truth.

The *Libutti* factors, as applied here, are as follows:

**(1) the nature of the relevant relationships** – As this Court noted in its February 14 Order, the Fifth Circuit has refused to require a special relationship between a party and an invoking non-party witness before drawing an adverse inference against the party from the non-party's invocation. *FDIC v. Fidelity & Deposit Co.,* 45 F.3d 969, 978 (5th Cir. 1995). In *FDIC*, an adverse inference was permissibly drawn where the "relationship" in question was that of a bank loan officer and a customer of the bank. Because Transocean and Holloway are in an employer/employee relationship, the relationship is stronger here than in *FDIC*. As the Court stated in *FDIC*, "the fact of present employment serves primarily to reduce the chance that the employee will falsely claim to have engaged in criminal conduct for which the defendant employer is liable." *Id.* at 978 (citing ROBERT HEIDT, *The Conjurer's Circle--The Fifth Amendment Privilege in Civil Cases*, 91 YALE L.J. 1062, 1119-20 n. 214 (1982)). Adverse

1

inferences may be drawn from the invocation by former employees, also.  "Any factors suggesting that a former employee retains some loyalty to his former employer--such as the fact that the employer is paying for his attorney--would serve the same purpose." *Id.*
Transocean argues that "most of the current or former Transocean employees who have invoked the Fifth Amendment were in separate litigation directly adverse to Transocean, concerning the same incident at issue in this case, at the time of their depositions. Their relationship to Transocean is expressly adversarial, and their refusals to testify will not support an adverse inference against Transocean. See, e.g., *United States v. Philip Morris USA Inc.,* 2004 WL 5916865, at *1 (D.D.C. July 23, 2004) ("The relationship between Osdene and Defendant Philip Morris USA is hostile and adverse and therefore would not support the inference that the non-party's invocation of his Fifth Amendment rights promotes the interests of the Defendant.")." (Doc. 5111-1, p. 3.)

      The *Philip Morris* decision does not discuss the nature of the relationship in question, so it is not clear what the relationship was in that case or why it was "hostile and adverse."  In any event, the existence of an adverse relationship, in itself, is not decisive.  For instance, in *Brinks, Inc. v. City of New York,* 717 F.2d 700 (2d Cir. 1983), a case relied on heavily in *Libutti,* the Court held that a jury could draw adverse inferences against a corporate defendant from the invocation of the Fifth Amendment by a former employee of the corporation; this even though the corporation had filed counter claims against the employee.

      Transocean did not identify the employees that have filed suit against it, and it is unclear whether Holloway has initiated separate litigation directly adverse to Transocean.  If he has not, Transocean's concerns of disloyalty on the basis of an adversarial relationship obviously do not apply to this witness.  Even if he has, Transocean's argument is without merit.  Transocean's argument suggests that employees who have filed suit against it arising out of the disaster are disloyal to Transocean and are, instead, motivated to incriminate Transocean in order to advance their claims against it.  Notably, the Court in the instant case, in its discussion of the defendants' claims that invocations by non-employees cannot result in adverse inference against them, stated as follows:

> In *FDIC*, the Fifth Circuit found no need for a special relationship between the witness and the party against whom the adverse inference was sought. It quoted the following from *RAD Services Inc. v. Aetna Casualty & Surety Co.*, 808 F. 2d 271, 275 (3rd Cir. 1986):
>
>> First, a witness truly bent on incriminating [a party] would likely offer damaging testimony directly, instead of hoping for an adverse inference from a Fifth Amendment invocation. Second, the trial judge could test the propriety of an invocation to ensure against irrelevant

2

> claims of privilege. Third, counsel may argue to the jury concerning the weight which it should afford the invocation and any inferences therefrom.
>
> 45 F.3d at 978. This responds to the thrust of the movers' arguments concerning non-employees.

(Doc. 5682, p. 4.)  The same argument is applicable to Holloway's invocation, even if he has filed suit against Transocean.  If he were "truly bent" on incriminating Transocean to advance a personal injury case against it, he would offer damaging testimony directly, instead of hoping that the Court would draw an adverse inference against Transocean based on his invocation.

(2) **the degree of control of the party over the non-party witness** – Transocean exercised control over Holloway at the time of the incident.  As the Court noted in *New Hampshire Ins. Co. v. Blue Water Off Shore LLC,* 2009 WL 792530 (S.D. Ala. 2009), the "control" element deals not with the party's ability to control the witness at the time of his testimony, but "the degree of control the party has 'vested in the non-party witness in regard to the key facts and general subject matter of the litigation' and approximates the analysis for admissions of a party opponent under Federal Rule of Evidence 801(d)(2)."  *Id.* (quoting *Libutti*).  Thus, Transocean's lack of control over Holloway at the time of his deposition is not the question.  Moreover, any statement by Holloway would qualify as an admission by Transocean under the Federal Rules of Evidence.

(3) **the compatibility of the interests of the party and non-party witness in the outcome of the litigation** - Holloway and Transocean have similar interests in that it is in Holloway's penal interest that Transocean succeed in the litigation, particularly with respect to any actions on his part.  With respect to this factor, the *LiButti* Court directed that "the trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation."  *Libutti,* 107 F.3d at 123.  Holloway's invocation advances Transocean's interests to the extent that it prevents Plaintiffs from obtaining direct testimony from him that would likely be even more damaging to Transocean.  Transocean and Holloway share the incentive that it not be held liable for his actions or inactions.

(4) **the role of the non-party witness in the litigation** – Holloway plays a significant and critical role in this litigation.   He was a member of the Deepwater Horizon's crew that failed to follow proper practices or call a time out before the blowout occurred.

Inferences against Transocean from Holloway's invocations advance the search for the truth in this case.  Nineteen witnesses have asserted their Fifth Amendment rights, leaving

Plaintiffs without direct testimony on a several key issues.  The circumstances of this case render Holloway particularly worthy of belief as to the specific inferences identified below and, accordingly, the Court should draw these inferences against Transocean.

## II. Inferences to be Drawn Against Transocean

**A.    Transocean's drill crew did not follow proper practices leading up to the incident.**

    **pp. 118-119**
10 IN THE 45 MINUTES BEFORE THE
11 EXPLOSION, WERE THERE SUFFICIENT DRILL CREW
12 AVAILABLE TO ENGAGE IN ALL APPROPRIATE WELL
13 CONTROL ACTIVITIES?
15     A. PLEAD THE FIFTH.
16     Q. WERE THE
17 PROCEDURES IN THE TRANSOCEAN WELL CONTROL
18 MANUAL FOLLOWED BY THE DRILL CREW DURING THE
19 EVENING OF APRIL 20TH, 2010, IN THE 45
20 MINUTES PRIOR TO THE EXPLOSION?
22     A. I WOULD LIKE TO PLEAD THE FIFTH.
23     Q. WERE THE
24 PROCEDURES SET FORTH IN TRANSOCEAN'S
25 EMERGENCY RESPONSE MANUAL, SECTION 7, WELL
119:01 CONTROL, SHALLOW GAS BLOWOUT, FOLLOWED BY ANY
02 OF THE PEOPLE ON THE DRILL CREW AT THAT TIME?
04     A. I WOULD LIKE TO PLEAD THE FIFTH.
05     Q. (BY MR. HAYCRAFT)  DID DEWEY --
06 WERE YOU IN RADIO CONTACT WITH DEWEY REVETTE
07 DURING THE TIME PERIOD 45 MINUTES BEFORE THE
08 EXPLOSION?
09     A. I WOULD LIKE TO PLEAD THE FIFTH.
10     Q. DID DEWEY REVETTE ALERT YOU TO
11 COME TO THE DRILL FLOOR BECAUSE A WELL
12 CONTROL EVENT WAS OCCURRING AT ANY POINT IN
13  THE HOUR BEFORE THE EXPLOSION?
    **p. 123**
14     A. I WOULD LIKE TO PLEAD THE FIFTH.
19     Q. NOW, I'M BACK TO THE NIGHT OF
20 APRIL THE 20TH.  DID YOU KNOW THAT EVENING
21 THAT SOMEONE IN THE DRILL CREW DIVERTED THE

4

5

22 FLOW TO THE POOR BOY DEGASSER RATHER THAN
23 DIVERTED IT TO THE OVERBOARD LINES?
25     A. I WOULD LIKE TO PLEAD THE FIFTH.