UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | § § § § | MDL No. 2179 SECTION J |
| IN RE: THE COMPLAINT AND PETITION OF TRITON ASSET LEASING GMBH, ET AL. IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | § § § § § § § | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |
| This Document Relates To: *All cases and No.: 2-10-cv-2771* | § § § § | |

## MOTION TO STRIKE PORTIONS OF EXPERT REPORTS AND DEPOSITIONS REFERENCING EXCLUDED JIT REPORT AND JIT TESTIMONY

# EXHIBIT B
## J. R. Batte

## EurIng J. R. Batte
BEng, CEng, CMarEng, FRINA, FIMarEST

## Report Concerning the Matter of DEEPWATER HORIZON

Dated 17 October 2011





officer.[36] He had never received training for a scenario in which there was contemporaneous activation of numerous detection zone alarms being triggered.[37] This is covered further in Section 7.3.

**DPO (Andrea Fleytas)**

The DPO, Andrea Fleytas, who was on watch on the vessel's bridge as the emergency evolved, had not been trained in the use of the vessel's safety monitoring equipment.[38] She had never received training for a scenario in which there was contemporaneous activation of numerous detection zone alarms being triggered.[39] This is covered further in Section 7.3.

### 7.3  TRANSOCEAN MAINTAINED THE RIG'S EMERGENCY SYSTEMS IN MANUAL MODE, HEIGHTENING THE IMPORTANCE OF CREW TRAINING

Transocean's obligation to properly train key members of the DEEPWATER HORIZON crew to react to and deal with emergencies was particularly critical given that the vessel's Emergency Shutdown System, the General Alarms, and the Emergency Disconnect System all required manual intervention from a member of the crew in order to function. As mentioned below, there is conflicting evidence on whether, and to what extent, the Emergency Shutdown System required human intervention from Bridge personnel, particularly the DPOs.

The DEEPWATER HORIZON was fitted with a complex Kongsberg-Simrad Integrated Alarm and Control System (IACS), sometimes referred to as the Simrad Vessel Control (SVS), and commonly called the Fire & Gas System (F&G System), which was operated and monitored from the vessel bridge.[40] The F&G System was integrated with other rig systems that supported additional emergency responses, including the audio and visual alarm systems, the PA system, and the Emergency (engine) Shut Down (ESD) system.[41]

---

[36] Y. Keplinger Deposition, p. 19 (Sept. 12, 2011) (He held an "AB Limited" licence, meaning "Able-Bodied Seaman." He was not qualified to be a deck officer of this vessel).

[37] Y. Keplinger Deposition, p. 146 (Sept. 12, 2011).

[38] Kongsberg Maritime, Inc. Deposition, pp. 46 - 48, 50 (April 5, 2011); Kongsberg Training Spreadsheet (Exhibit 1122).

[39] Y. Keplinger Deposition, pp. 89-90 (Sept. 12, 2011).

[40] Y. Keplinger Deposition, pp. 54-55 (Sept. 12, 2011).

[41] Y. Keplinger Deposition, pp. 54-58 (Sept. 12, 2011).

with which these drills are taken, and can result in crew failing to follow the set procedure when a genuine emergency occurs.

Transocean had written procedures for specific emergency drills that were simply ignored. An example of this is the EDS drill, which was required by Transocean to be carried out weekly according to Transocean's Emergency Response Manual (Emergency Disconnect Procedure section):[58]

> *The DEEPWATER HORIZON crews will strictly adhere to these Alert Actions and <u>EDS drill will be executed weekly</u>.*

From the evidence available it appears likely these specific and important emergency drills were either never or very rarely carried out.

- John Keeton, the DEEPWATER HORIZON rig manager from 2001 to 2009, does not know whether or not weekly EDS drills were conducted on the vessel.[59]

- The DPO on duty on April 20, 2010 (Andrea Fleytas) had not been trained to push the Emergency Disconnect button.[60]

- The Senior DPO (Yancy Keplinger) on duty on April 20, 2010, when asked if EDS drills ever took place answered "*I think so*" but shortly afterwards stated that he knew of no EDS drills.[61]

- Keplinger also stated EDS activation was not a subject covered in the training matrix.[62]

- Captain Kuchta was not trained to activate the EDS.[63]

---

[58] DEEPWATER HORIZON Emergency Response Manual, at TRN-MDL-02070856 (Exhibit 4644).

[59] J. Keeton Deposition, pp. 469-70 (Aug. 18, 2011) (the DEEPWATER HORIZON Rig Manager from 2001 through 2009 admitted he does not know whether the crew performed weekly EDS drills).

[60] Y. Keplinger Deposition, pp. 145-46 (Sept. 12, 2011).

[61] Y. Keplinger Deposition, pp. 150-52 (Sept. 12, 2011).

[62] Y. Keplinger Deposition, pp. 145-46 (Sept. 12, 2011).

[63] Captain Kuchta training history (Exhibit 3749); Testimony of C. Kuchta, Marine Board Inquiry, May 27, 2010 AM, p. 230.

of the following: (i) the engine control systems and their interface with the ESD system; (ii) capabilities of the EDS system; and (iii) major emergency management [MEM].

No evidence that any training or advice was provided on the circumstances that might lead to the manual activation of the ESD has been found. For example, the Senior DPO could not recall if his training included under what circumstances the ESD should be activated.[81] The DPO had not been trained on when to activate the the ESD, and specifically, did not know if the detection of combustible gas in the engine room merited activating the ESD.[82] Captain Kuchta had not attended the Major Emergency Management Course required by Transocean nor had he received any training in well control in the time he had been with the company.[83]

There is no evidence that any of the previously described safety devices failed to function as designed on April 20, 2010. The fact that one and possibly two engines over-sped is consistent with my conclusion. I explain my reasoning in Appendix 8. Because the over-speed safety devices for the engines were set to manual mode, the only way the engines could have been saved was to shut one or both of them down manually once the high gas alarms had been activated and/or move the vessel away from the area with the gas contamination.

As no such actions were taken by those on the bridge of the vessel (the Master and the two DPOs), the engines failed and the vessel was lost. The only explanation for these failures to react is that the crew members had not been given the necessary authority, were inexperienced and inadequately trained.

---

[81] Y.Keplinger Deposition, pp. 89 - 91 (Sept. 12, 2011).

[82] Testimony of A. Fleytas, Marine Board Inquiry, Oct. 5, 2010 PM, at pp. 40, 60-61 (the DPO also testified she did not know if it would appropriate to activate the ESD if the F&G System detected combustible gas).

[83] Rig Manager Performance Training Marine Module for MEM, TRN-MDL-01159660-01159803 at TRN-MDL-01159705; Operations Integrity Case, Section 5.3.1.2 (Exhibit 5476) (stating that the Master is required to complete Major Emergency Management training); Operations Integrity Case, Section 2.3.10.2 (Exhibit 5474) (stating that the Master must complete the Major Emergency Management course); Kuchta Training Record (Exhibit 3747) (disclosing that Kuchta had not completed the Major Emergency Management Course); Kuchta Training Certificates (Exhibit 3750).

149

1  A. I do.
2  Q. Did you review any testimony of
3  crew members on board the Deepwater Horizon,
4  crew members who indicated that they were
5  unaware where they fit within the
6  organization and command structure on the
7  Deepwater Horizon?
8  A. Other than the master and OIM,
9  no.
10  Q. Okay. And it's your position
11  that the master and OIM testified that they
12  were -- were not aware of where they fit
13  within the organization and command structure
14  of the Deepwater Horizon?
15  A. Their answers to questions
16  indicated to me that they -- well, their
17  answers indicated to me that because there
18  was a conflict in their answers that they
19  weren't sure where they fit in.
20  Q. All right. And let's talk about
21  the -- the conflict in their answers that
22  you're referencing. What conflict in -- in
23  their answers, the answers of the OIM and the
24  master, are you referencing?
25  A. The OIM, as I recall in his

150

1  evidence to the, what I'd refer to as the
2  joint inquiry, that --
3  Q. Can we refer to that as -- are
4  you talking about the Coast Guard hearings
5  here in New Orleans?
6  A. Yes.
7  Q. So we'll refer to that as the
8  JIT hearings?
9  A. The JIT.
10  Q. Does that work for you?
11  A. That's fine. Jimmy Harrell gave
12  evidence to the JIT and -- and -- like, my
13  understanding, if you were looking at all
14  that he said, basically, he was in command of
15  the Deepwater Horizon.
16  Q. And what about that -- that in
17  your opinion conflicted with -- with what
18  Captain Kuchta was testifying?
19  A. Captain Kuchta, as I recall --
20  again, taking all of his answers into
21  consideration, I believe the that there were
22  certain instances where maybe the OIM was
23  in -- in command and certain instances where
24  he was in command.
25  Q. Let's move to Page 12 at the

151

1  very top. Where you start talking about
2  reaction speed, decisiveness, and clarity.
3  That next sentence you indicate, Any delay
4  (whether in closing watertight doors or
5  activating the BOP or executing the Emergency
6  Disconnect System (EDS) procedures) can have
7  disastrous results.
8  My only question about that is
9  we covered this a little bit when we were
10  talking about the fact that you were not
11  rendering opinions on well control issues.
12  You're not suggesting in this statement that
13  the BOP was not activated in time, are you?
14  A. I would say in answer to that,
15  the emergency disconnect system was not
16  operated in time. As far as the BOP, I have
17  no direct knowledge as to what happened with
18  the BOP, per se.
19  Q. Fair enough, and we'll talk
20  about the EDS. That's what I thought. I
21  just wanted to clarify.
22  Section 6.2 of your report talks
23  about Transocean should not have placed the
24  OIM in charge of the Deepwater Horizon during
25  drilling. Do you see that?

152

1  A. I do.
2  Q. Okay. And you indicate, "An OIM
3  who does not have a Master's License should
4  not be in charge of a MODU. However, most of
5  Transocean's Management System documentation
6  placed the OIM Jimmy Harrell, who did not
7  have a Master's License, in charge of the
8  DEEPWATER HORIZON."
9  Did I read that correctly?
10  A. Yes, you did, and I would add
11  that perhaps the report would have been
12  clearer if I had indicated a DP MODU.
13  Q. Okay. This reference -- and it
14  may not be the first time you've referenced
15  the term "in charge," but I want to talk
16  about that. Are you familiar with the term
17  "person in charge" as it's used on DP MODUs?
18  A. In general terms, yes.
19  Q. Okay. And what's your
20  understanding of that term generally, "person
21  in charge"?
22  A. My understanding of person in
23  charge is the person who has the full
24  responsibility for what's going on.
25  Q. Okay.

38 (Pages 149 to 152)

```
                                                          229
 1      A.   He saw it.
 2      Q.   Saw it, okay.  It's your
 3 understanding that there were multiple
 4 explosions?
 5      A.   There was definitely certainly
 6 one explosion.  There is very good evidence
 7 that there was two explosions, and you have
 8 to then sort of say, well, were there other
 9 ones?  It's hard -- once -- once the fire got
10 out of control, there may have been more
11 explosions, but there is strong evidence that
12 there were two explosions.
13           Can I add, and those explosions
14 followed the increased speeding up -- or
15 speeding up of the two engines that were
16 running that night.
17      Q.   Okay.  And what's your
18 understanding of how long it -- it took
19 between the first explosion and the second
20 explosion?
21      A.   Seconds.
22      Q.   Okay.  Less than ten?
23      A.   I'd have to look at the
24 testimony.  I can find it if you want me to,
25 but I believe -- I think the -- there is good
```

```
                                                          230
 1 testimony that it was something -- I think
 2 one specific person said it was 11 seconds.
 3 But it was a matter of seconds, not minutes.
 4      Q.   Okay.  What's your understanding
 5 of how long it takes for the EDS to occur,
 6 for the disconnect to occur once it's
 7 activated?
 8      A.   Less than a minute.  Around a
 9 minute, let's say.
10      Q.   What's that?
11      A.   Around a minute.
12      Q.   Around a minute.  You talk about
13 in -- in Section 7, also, that Transocean
14 employed a crew with inadequate experience
15 and certification and -- and you indicate
16 that for a vessel to be seaworthy, it has to
17 be manned by a correctly certified, properly
18 trained, and suitably experienced crew, and
19 that's your position, correct?
20      A.   That's correct.
21      Q.   In your previous -- well, in
22 your experience in this industry, obviously
23 you're being asked to make a determination as
24 to whether or not the Deepwater Horizon was
25 seaworthy.  Have you ever been -- have you
```

```
                                                          231
 1 ever rendered an opinion before today as to
 2 whether or not a vessel was seaworthy?
 3      A.   I've written reports and given
 4 opinions as to whether a ship met certain
 5 requirements at specific times, but I'm
 6 not -- don't believe I've used the word
 7 "seaworthy" in respect to making a comment as
 8 to whether a ship was seaworthy at a
 9 particular time.  I don't think I've used the
10 word "seaworthy."
11      Q.   Like you're doing here in this
12 case?
13      A.   That's correct.
14      Q.   And how many years have you been
15 in this industry?
16      A.   I can only describe that
17 forever.  Even as a child, I was in this
18 industry.
19      Q.   So this is -- this is the first
20 time that you have made a determination that
21 a vessel was seaworthy or unseaworthy?
22      A.   I think I have made a number of
23 determinations as to whether a vessel
24 complied with requirements or not --
25      Q.   Okay.
```

```
                                                          232
 1      A.   -- and a number of instances it
 2 didn't, and that would render it unseaworthy,
 3 but I've never been asked to address the
 4 specific question at so-and-so and so-and-so,
 5 was this vessel seaworthy.  I haven't been
 6 asked that.
 7           THE VIDEOGRAPHER:  We have less than a
 8 minute, sir.
 9           MR. KINCHEN:  Okay.  Why don't we stop
10 here for a second.
11           THE VIDEOGRAPHER:  We're off the record
12 at 3:08, end tape 5.
13           (Recess from 3:08 p.m. to 3:18 p.m.)
14           THE VIDEOGRAPHER:  We're on the record
15 at 3:18, start tape 6.
16      Q.   (BY MR. KINCHEN)  Let's move
17 ahead to Page 19, and there is a discussion,
18 actually, at the bottom of Page 9 -- bottom
19 of Page 18, top of Page 19 relative to the
20 training for Yancy Keplinger.  Do you see
21 that section in your report?  Bottom of
22 Page 18, top of Page 19.
23      A.   Yes, I do.
24      Q.   Okay.  And you indicate -- and
25 this is specifically at the top of Page 19 --
```

**PURSUANT TO CONFIDENTIALITY ORDER**

233
1  that Mr. Keplinger "had never received
2  training for a scenario in which there was
3  contemporaneous activation of numerous
4  detection zone alarms being triggered."
5       Do you see that?
6    A.   I do.
7    Q.   And so essentially when you say
8  "numerous detection zone alarms," we've
9  talked about how the response required for
10 one alarm is different from the response
11 required for two or more alarms, correct?
12   A.   Well, he talked about it, you
13 mentioned it, and I agreed that there is --
14 that that subject is covered in it.
15   Q.   And is that the point that you
16 are making here, that Yancy Keplinger never
17 received training for that situation when
18 there were two alarms, you call detection
19 zone alarms being triggered?
20   A.   Yes, I -- I -- I make that
21 statement, and I -- that's what I've
22 understood from his testimony and the
23 testimony of Andrea Fleytas.
24   Q.   Okay.  I'm going to ask you to
25 take a look at -- you reviewed

234
1  Mr. Keplinger's deposition, correct?
2    A.   Yes, I have.  I have reviewed
3  his deposition in this case and other
4  interview forms and that -- that sort of
5  thing of Mr. Keplinger.
6    Q.   Okay.  I'm going to ask you to
7  take a look at page -- look -- using the
8  numbers in the bottom right-hand corner,
9  Page 23 of Mr. Keplinger's deposition.
10   A.   Sorry.  In the bottom right-hand
11 corner?
12   Q.   Exactly.
13   A.   20 -- well, it goes 21 to 24.
14 Yeah?
15       MR. HAYCRAFT:  No.
16       THE WITNESS:  Oh, so there.  On the
17 right, okay.
18       MR. HAYCRAFT:  His deposition page is
19 89 to 92.
20       THE WITNESS:  89 to 92, yeah.
21   Q.   (BY MR. KINCHEN)  You got it.
22 Okay.  And I'm going to ask you to follow
23 with me on a question and answer that occurs
24 at the bottom of Page 89 of Mr. Keplinger's
25 deposition and the top of Page 90.

235
1       The question is, You weren't
2  trained in the DPS, quote, lessons learned,
3  unquote, for multiple zones going off at the
4  same time, correct?
5       Did I read that question
6  correctly?
7    A.   Sorry, I'm still trying to find
8  where you are.
9    Q.   Sure.
10   A.   I thought you said Page 19 --
11 page -- which page are you on?
12   Q.   Bottom of Page 89 there.
13   A.   Bottom of Page 89.  Right.  Can
14 you start again?
15   Q.   Sure.  The question was, You
16 weren't trained in the DPS lessons learned
17 for multiple zones going off at the same
18 time, correct?
19       Did I read that question
20 correct?
21   A.   Yes, you did.
22   Q.   Okay.  And the answer was, We
23 were trained if you have two detectors in one
24 space that is confirmed, two or more.
25       Did I read that correctly?

236
1    A.   You did.
2    Q.   Okay.  And so did you review
3  that part of Mr. Keplinger's testimony before
4  you made a statement that he had never
5  received training for a scenario in which
6  there was contemporary -- contemporaneous
7  activation of numerous detection zone alarms
8  being triggered?
9       MR. HAYCRAFT:  Form.
10   A.   His question and answer here --
11 I'm sorry, you'll have to -- I want to answer
12 your question.  Can you ask your question
13 again?
14   Q.   (BY MR. KINCHEN)  My question
15 is -- is simply, did you review that part of
16 his deposition that we just read before you
17 made the statement that he had never received
18 training for a scenario in which there was
19 contemporaneous activation of numerous
20 detection zone alarms being triggered?
21   A.   Yes, I did read this.
22   Q.   Okay.
23   A.   But I would add --
24   Q.   That's the question.
25   A.   I --

**PURSUANT TO CONFIDENTIALITY ORDER**

237
1  Q.   I move --
2  A.   I'm sorry, I want to add, he did
3  answer the question -- he did give an answer
4  to the question, but he hasn't actually
5  answered the question that was asked.
6     MR. KINCHEN: Move to strike that last
7  part of your question that was not -- answer
8  that was nonresponsive.
9  Q.   (BY MR. KINCHEN) You then talk
10 about in your report Andrea Fleytas, and you
11 indicate that Ms. Fleytas -- and, again, we
12 are still on Page 19. You indicate that
13 "Ms. Fleytas, who was on watch on the
14 vessel's bridge as the emergency evolved, had
15 not been trained in the use of the vessel's
16 safety monitoring equipment."
17 A.   That's correct.
18 Q.   Did I read that correctly? So
19 it's your testimony under oath here today
20 Ms. Fleytas had not been trained at all in
21 the use of the vessel's monitoring
22 equipment -- safety monitoring equipment?
23 A.   That's correct.
24 Q.   What's your basis for making
25 that statement that she had never been

238
1  trained in the use of the vessel's safety
2  monitoring equipment?
3  A.   Pages 55 and 56 of her testimony
4  to the Marine Board Of Inquiry.
5  Q.   Okay. Anything else?
6  A.   There may be other -- as I sit
7  here today, I can't answer that.
8  Q.   So you don't know --
9  A.   I don't -- I don't remember
10 any -- I do have as one of the corrections to
11 my report, because I -- you can see I
12 reference No. 39 as Yancy Keplinger's
13 deposition, Page 88 -- 89 to 90. I've
14 revised that to the testimony of Andrea
15 Fleytas, the Marine Board of Inquiry, October
16 the 5th, 2010, and the afternoon -- sorry,
17 October the 5th, yes, p.m., at Pages 55 and
18 56.
19 Q.   Right. And, again, anything
20 else -- as you sit here today, do you know of
21 anything else that supports that statement
22 that you've just made?
23 A.   As I sit here, I don't recall
24 anything else. I -- I -- there may well be
25 others. In fact, there are, but I -- I --

239
1  the references I've given I do recall.
2  Q.   You understand that this is my
3  one opportunity to ask you questions before
4  trial, correct?
5  A.   That's correct.
6  Q.   Okay. So when I ask you if you
7  know -- yes or no, do you know whether there
8  is any additional items that support your
9  statement, can you, as you sit here today
10 giving me my one opportunity to ask you
11 questions, can you tell me whether or not you
12 know or not if there were additional
13 information to support that statement?
14 A.   As I sit here today, I do not
15 remember any more whether there were any
16 more.
17 Q.   Okay. And you're here today to
18 testify about your report, and I'm sure
19 your -- your counsel has -- has instructed
20 you that the purpose for your deposition, but
21 you understand that the purpose of my
22 questions today is my opportunity to
23 understand the basis for the conclusions
24 and -- and -- and opinions that you make in
25 your report?

240
1  A.   I understand, yeah.
2  Q.   You understand that I'm not
3  going to get another opportunity -- if you
4  later recall a basis for this, I'm not going
5  to get another opportunity to ask you up
6  until trial?
7  A.   I understand that.
8  Q.   And you're prepared today,
9  you're -- the preparation -- how --
10 approximately how long did you take in
11 preparing for this deposition?
12 A.   I would say I've taken 15
13 months.
14 Q.   And it's your understanding that
15 in the preparation for this, you were
16 preparing to -- you were preparing so that I
17 could ask you questions in this one
18 opportunity to obtain the basis for your
19 opinions and observations?
20 A.   I understand that.
21 Q.   Okay. And so you are prepared
22 today to provide me the basis for your
23 opinions and ob- -- observations, correct?
24 A.   As best I can, bearing in mind
25 the vast number of documents that I've

**PURSUANT TO CONFIDENTIALITY ORDER**

```
                                                              269
 1      Q.    The station sheet?
 2      A.    The --
 3      Q.    The call sheet?
 4      A.    Yeah.  That document clearly
 5  was -- it was posted.  Bearing in mind that
 6  the people we're talking about were there
 7  effectively to drill a well and working on --
 8  on that aspect of it, in a day-to-day basis I
 9  think it would be normal that they would be
10  dealing with the OIM or the senior
11  drilling -- Transocean drilling person on
12  board.
13            So I -- I don't see why it
14  necessarily follows that BP themselves, the
15  BP personnel on board would have been aware
16  of, as I term it, this confusing command
17  structure.
18      Q.    Okay.  Turn with me, if you
19  will, to tab 29 in your binder.  I want to
20  shift gears a little bit.  Tab 29 has been
21  previously introduced as Exhibit 3806, and
22  this is -- these are excerpts from the --
23      A.    I think you have -- sorry for
24  interrupting.  There is a loose page.
25      Q.    Yes, that's correct.  It's all
```

```
                                                              270
 1  together.
 2      A.    Right, okay.
 3      Q.    They're just different pages of
 4  the same testimony.  This is the MBI
 5  testimony of Jim Harrell.  I believe you
 6  testified that you reviewed this?
 7      A.    Yes.
 8      Q.    Okay.  I'd like to draw your
 9  attention to just a couple of items in
10  Mr. Harrell's MBI testimony.  If you turn to
11  pages, first of all, 115 to 116, it's in the
12  loose part.  Are you there?  At the bottom of
13  the page of 115 Mr. Harrell is asked, Is it
14  true that at all times prior to an emergency
15  that you and you alone as the OIM are
16  responsible for the safety, the conditions,
17  and the procedures on board the Deepwater
18  Horizon?
19            He answers, "Yes, as the OIM I
20  am responsible for the safety of everyone."
21            Let me stop right there.  Did
22  you review that in preparation for your
23  report that you prepared, that statement in
24  particular?
25            MR. KINCHEN:  Object to form.
```

```
                                                              271
 1      A.    I had read this.  I remember it.
 2  As I reviewed a lot of documents, yes.  The
 3  answer is yes, I had reviewed this, and this
 4  is one of the documents that I -- I have
 5  looked at --
 6      Q.    (BY MR. FLEMING)  Okay.
 7      A.    -- helped to form my opinion.
 8      Q.    What I'd like to do is I'd like
 9  to walk you through a couple of other
10  sections of Mr. Harrell's MBI testimony and
11  then we going to switch over to Mr. Hackney's
12  testimony, and I'll ask you questions about
13  those.
14      A.    Okay.
15      Q.    Let's turn to Page 35 of the
16  loose leaf.
17      A.    Top of Page 35?
18      Q.    It's in the loose leaf portion.
19      A.    This goes to 34.
20      Q.    It's all on one page.  35 is up
21  on that.  Do you see that?
22            MR. HAYCRAFT:  It's missing from the
23  last...
24            MR. LOVE:  Another one.
25            MR. HAYCRAFT:  Let's switch.
```

```
                                                              272
 1      Q.    (BY MR. FLEMING)  Are you there?
 2      A.    Top of Page 35?
 3      Q.    Yes.
 4            MR. HAYCRAFT:  His depo -- his
 5  testimony?
 6            MR. FLEMING:  This -- this is all Jimmy
 7  Harrell's testimony.
 8      Q.    (BY MR. FLEMING)  The question
 9  was asked of Mr. Harrell, When you're on a
10  rig such as the one you're dealing with we
11  had some discussions or questions concerning
12  chain of command, once you are in the hole
13  who is in charge?  Master and you.
14      A.    Sorry, 30 -- I'm --
15      Q.    35.  The numbers are down at the
16  bottom of the page.
17      A.    Yeah, okay, right.
18      Q.    Do you see that?
19      A.    Okay.  Start again.
20      Q.    When you were on a rig such as
21  the one you were dealing with we had some
22  discussions or questions concerning the chain
23  of command.  Once you are on the hole, who is
24  the charge, the master or you?
25            ANSWER:  You say on hole, you
```

273
1  mean latched up?
2      QUESTION: Yes.
3      ANSWER: Latched up that would
4  be the OIM, which you be me.
5      Do you see that, sir?
6    A.  Yes, sir.
7    Q.  You were aware of that when you
8  were drafting your report?
9      MR. KINCHEN: Object to form.
10    A.  Yes. Sorry, I think we talked
11  over each other.
12    Q.  (BY MR. FLEMING) Yes.
13    A.  Yes, I had, I had read this.
14    Q.  Okay. And then turn to
15  Page 116, 115 and 116.
16    A.  Yep, I got it.
17    Q.  Bottom of Page 115 Mr. Harrell
18  is asked -- sorry, did I -- I just read that
19  one.
20    A.  You've done that, yes.
21      MR. HAYCRAFT: But you can read it
22  again.
23      MR. FLEMING: No, that's all right.
24    Q.  (BY MR. FLEMING) I'm sorry,
25  turn to Page 135.

274
1    A.  Yep.
2    Q.  And then in the second full
3  paragraph on Page 135 Mr. Harrell is asked,
4  Let's say you were in charge when you were
5  latched up. Now, according to your
6  testimony, according to the transfer of
7  command, what you are saying is once the
8  abandon ship is ordered by the master there
9  is some kind of transfer of command that
10  takes place between you and the master,
11  correct.
12      ANSWER: Yes.
13      QUESTION: When does that take
14  place? When the EDS is activated when does
15  that transfer of command take place under
16  what conditions?
17      ANSWER: Yeah, it would be after
18  the disconnect, because once you disconnect
19  from the well, he would be in command at that
20  time.
21      Do you see that, sir?
22    A.  Yes, I do.
23    Q.  Okay. Before we move on to
24  Mr. Hackney's deposition, let me ask you some
25  questions about those three sections that we

275
1  just read out. Is it your understanding that
2  Mr. Harrell's understanding about the roles
3  and duties of the OIM are in compliance with
4  international law or are they not?
5      MR. KINCHEN: Object to form.
6    A.  They are not. Sorry, they are
7  not in compliance with it.
8    Q.  (BY MR. FLEMING) Okay. Why are
9  they not in compliance with international
10  law?
11    A.  Because he is not a qualified
12  ship master.
13    Q.  Okay. Why would he need to be a
14  qualified ship master in this context?
15    A.  Because UNCLOS -- the law of the
16  sea states that a master should be in command
17  of a -- master of a vessel should be in
18  command.
19    Q.  Okay. And since Mr. Harrell was
20  not a master of a vessel, he was not in
21  command of the vessel; is that your
22  testimony?
23    A.  He should not be -- sorry, I --
24    Q.  That's all right. Go ahead,
25  sir.

276
1    A.  He should not have been the
2  master of the vessel.
3    Q.  When this --
4    A.  He wasn't qualified to be.
5    Q.  Sorry. When we just -- the last
6  section that we just read on Pages 135, do
7  you recall that we were talking about the
8  disconnect and the EDS and the chain of
9  command?
10    A.  Sorry, repeat that.
11    Q.  When we were talking about how
12  the transfer of command would take place once
13  the -- the vessel was disconnected from the
14  well on Page 135 --
15    A.  Yes.
16    Q.  Do you see that?
17    A.  But can I -- at the end of the
18  day there is -- there is jumping around here
19  a bit because, first of all, we're talking
20  about the abandon ship is ordered by the
21  master, then we're talking about the EDS is
22  activated. There is clearly a confusion
23  here.
24    Q.  Sir, I understand. I
25  understand. I'm trying to clear up a little

**PURSUANT TO CONFIDENTIALITY ORDER**

273

1  mean latched up?
2      QUESTION: Yes.
3      ANSWER: Latched up that would
4  be the OIM, which you be me.
5      Do you see that, sir?
6      A.  Yes, sir.
7      Q.  You were aware of that when you
8  were drafting your report?
9      MR. KINCHEN: Object to form.
10     A.  Yes. Sorry, I think we talked
11 over each other.
12     Q.  (BY MR. FLEMING) Yes.
13     A.  Yes, I had, I had read this.
14     Q.  Okay. And then turn to
15 Page 116, 115 and 116.
16     A.  Yep, I got it.
17     Q.  Bottom of Page 115 Mr. Harrell
18 is asked -- sorry, did I -- I just read that
19 one.
20     A.  You've done that, yes.
21     MR. HAYCRAFT: But you can read it
22 again.
23     MR. FLEMING: No, that's all right.
24     Q.  (BY MR. FLEMING) I'm sorry,
25 turn to Page 135.

274

1      A.  Yep.
2      Q.  And then in the second full
3  paragraph on Page 135 Mr. Harrell is asked,
4  Let's say you were in charge when you were
5  latched up. Now, according to your
6  testimony, according to the transfer of
7  command, what you are saying is once the
8  abandon ship is ordered by the master there
9  is some kind of transfer of command that
10 takes place between you and the master,
11 correct.
12     ANSWER: Yes.
13     QUESTION: When does that take
14 place? When the EDS is activated when does
15 that transfer of command take place under
16 what conditions?
17     ANSWER: Yeah, it would be after
18 the disconnect, because once you disconnect
19 from the well, he would be in command at that
20 time.
21     Do you see that, sir?
22     A.  Yes, I do.
23     Q.  Okay. Before we move on to
24 Mr. Hackney's deposition, let me ask you some
25 questions about those three sections that we

275

1  just read out. Is it your understanding that
2  Mr. Harrell's understanding about the roles
3  and duties of the OIM are in compliance with
4  international law or are they not?
5      MR. KINCHEN: Object to form.
6      A.  They are not. Sorry, they are
7  not in compliance with it.
8      Q.  (BY MR. FLEMING) Okay. Why are
9  they not in compliance with international
10 law?
11     A.  Because he is not a qualified
12 ship master.
13     Q.  Okay. Why would he need to be a
14 qualified ship master in this context?
15     A.  Because UNCLOS -- the law of the
16 sea states that a master should be in command
17 of a -- master of a vessel should be in
18 command.
19     Q.  Okay. And since Mr. Harrell was
20 not a master of a vessel, he was not in
21 command of the vessel; is that your
22 testimony?
23     A.  He should not be -- sorry, I --
24     Q.  That's all right. Go ahead,
25 sir.

276

1      A.  He should not have been the
2  master of the vessel.
3      Q.  When this --
4      A.  He wasn't qualified to be.
5      Q.  Sorry. When we just -- the last
6  section that we just read on Pages 135, do
7  you recall that we were talking about the
8  disconnect and the EDS and the chain of
9  command?
10     A.  Sorry, repeat that.
11     Q.  When we were talking about how
12 the transfer of command would take place once
13 the -- the vessel was disconnected from the
14 well on Page 135 --
15     A.  Yes.
16     Q.  Do you see that?
17     A.  But can I -- at the end of the
18 day there is -- there is jumping around here
19 a bit because, first of all, we're talking
20 about the abandon ship is ordered by the
21 master, then we're talking about the EDS is
22 activated. There is clearly a confusion
23 here.
24     Q.  Sir, I understand. I
25 understand. I'm trying to clear up a little

**PURSUANT TO CONFIDENTIALITY ORDER**

277

1  bit for you.  All my question is in this
2  section that we just read in the record on
3  Page 135 where he's asked when does the
4  transfer of command take place and
5  Mr. Harrell responds, it would be after the
6  disconnect, because once you disconnect from
7  the well, he, being the master, would be the
8  command at that time.
9           And I believe you -- you --
10 first of all, is it your opinion that that is
11 a correct statement of being in compliance
12 with the -- sorry, bad question.  Let me
13 rephrase that.
14          Is Mr. Harrell correct in
15 stating that the -- under international law
16 the OIM is in control of the vessel until it
17 is de-latched from the well?
18          MR. KINCHEN: Object to form.
19     A.   Absolutely not.  On a -- a DP
20 vessel which is underway at all times a
21 master has to be in command.  Harrell was not
22 a qualified master and therefore should not
23 have been in command of that vessel.
24     Q.   (BY MR. FLEMING)  I believe
25 Mr. Kinchen was asking you some questions

278

1  earlier today about the -- a logbook and
2  where a log had to be -- a notation in the
3  log had to be made once a transfer in command
4  had been issued.  Do you recall that
5  testimony, sir?
6     A.   Yes, I do.
7     Q.   Is this something akin to that
8  issue that we're talking about here on
9  Page 135 of the MBI testimony with the
10 transfer of the command?
11          MR. KINCHEN: Object to form.
12     A.   This -- this specific order, as
13 you call it, that you have to log when this
14 change of command takes place is -- is just
15 simply confusing, because it can be
16 misinterpreted, it can be read, as we've
17 discussed today in -- in different ways.
18 There should never have been on this vessel a
19 change of command at any stage.
20     Q.   (BY MR. FLEMING)  And going
21 further down on Page 136 down at the bottom
22 of the page where Mr. Harrell is asked about
23 the handoff, he said -- the question, Did you
24 have a handoff?  How did the handoff take
25 place between you and the master in terms of

279

1  the evolution?
2          ANSWER: We worked together, but
3  that is something -- I mean, I do it -- I do
4  turn it over to him.  Like if we are going to
5  a new location after we unlatch, he becomes
6  in charge, but I am still responsible for the
7  safety of everyone out there, no matter what.
8          And then if you skip down a
9  little bit further --
10         MR. HAYCRAFT: Wait.
11    A.   Sorry.
12         MR. HAYCRAFT: We've run out of
13 transcript.
14    Q.   (BY MR. FLEMING)  We've run
15 transcript?
16    A.   We've run out of transcript
17 again.  But I'm happy to listen to your
18 words.
19    Q.   I'll just read it to you.
20         MR. HAYCRAFT: Just read slower.
21         MR. FLEMING: The rest of it -- Don,
22 take my word for it.  You can read it, if
23 you'd like.
24    Q.   (BY MR. FLEMING)  I'm trying to
25 understand here and there's -- jumping down

280

1  it says, "did it ever -- did it ever hand off
2  between you and the master of the vessel?"
3          Mr. Harrell responds, No, I
4  never made a hand off because it did not
5  unlatched.  You could see the slip joint come
6  up and the -- it trails off.
7          So again, my question to you,
8  sir, is is it -- is Mr. Harrell correct in
9  compliance with international law in stating
10 that his belief was that he was still in
11 control of the Horizon because there was not
12 a successful EDS procedure?
13         MR. KINCHEN: Object to form.
14    A.   I think it's almost impossible
15 to answer that question because it's asking
16 me to presuppose that he at any stage could
17 have been in command of the vessel.  And by
18 international law on a DP vessel he could
19 never have been in command of the vessel, and
20 therefore this question of a handover or when
21 the handover should take place, I can't
22 answer because it should never have taken
23 place.  The master should have been in
24 control at -- in command, in control, in
25 charge at all stages.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
                                                              277
 1   bit for you.  All my question is in this
 2   section that we just read in the record on
 3   Page 135 where he's asked when does the
 4   transfer of command take place and
 5   Mr. Harrell responds, it would be after the
 6   disconnect, because once you disconnect from
 7   the well, he, being the master, would be the
 8   command at that time.
 9          And I believe you -- you --
10   first of all, is it your opinion that that is
11   a correct statement of being in compliance
12   with the -- sorry, bad question.  Let me
13   rephrase that.
14          Is Mr. Harrell correct in
15   stating that the -- under international law
16   the OIM is in control of the vessel until it
17   is de-latched from the well?
18          MR. KINCHEN:  Object to form.
19       A.    Absolutely not.  On a -- a DP
20   vessel which is underway at all times a
21   master has to be in command.  Harrell was not
22   a qualified master and therefore should not
23   have been in command of that vessel.
24       Q.    (BY MR. FLEMING)  I believe
25   Mr. Kinchen was asking you some questions
```

```
                                                              278
 1   earlier today about the -- a logbook and
 2   where a log had to be -- a notation in the
 3   log had to be made once a transfer in command
 4   had been issued.  Do you recall that
 5   testimony, sir?
 6       A.    Yes, I do.
 7       Q.    Is this something akin to that
 8   issue that we're talking about here on
 9   Page 135 of the MBI testimony with the
10   transfer of the command?
11          MR. KINCHEN:  Object to form.
12       A.    This -- this specific order, as
13   you call it, that you have to log when this
14   change of command takes place is -- is just
15   simply confusing, because it can be
16   misinterpreted, it can be read, as we've
17   discussed today in -- in different ways.
18   There should never have been on this vessel a
19   change of command at any stage.
20       Q.    (BY MR. FLEMING)  And going
21   further down on Page 136 down at the bottom
22   of the page where Mr. Harrell is asked about
23   the handoff, he said -- the question, Did you
24   have a handoff?  How did the handoff take
25   place between you and the master in terms of
```

```
                                                              279
 1   the evolution?
 2          ANSWER:  We worked together, but
 3   that is something -- I mean, I do it -- I do
 4   turn it over to him.  Like if we are going to
 5   a new location after we unlatch, he becomes
 6   in charge, but I am still responsible for the
 7   safety of everyone out there, no matter what.
 8          And then if you skip down a
 9   little bit further --
10          MR. HAYCRAFT:  Wait.
11       A.    Sorry.
12          MR. HAYCRAFT:  We've run out of
13   transcript.
14       Q.    (BY MR. FLEMING)  We've run
15   transcript?
16       A.    We've run out of transcript
17   again.  But I'm happy to listen to your
18   words.
19       Q.    I'll just read it to you.
20          MR. HAYCRAFT:  Just read slower.
21          MR. FLEMING:  The rest of it -- Don,
22   take my word for it.  You can read it, if
23   you'd like.
24       Q.    (BY MR. FLEMING)  I'm trying to
25   understand here and there's -- jumping down
```

```
                                                              280
 1   it says, "did it ever -- did it ever hand off
 2   between you and the master of the vessel?
 3          Mr. Harrell responds, No, I
 4   never made a hand off because it did not
 5   unlatched.  You could see the slip joint come
 6   up and the -- it trails off.
 7          So again, my question to you,
 8   sir, is is it -- is Mr. Harrell correct in
 9   compliance with international law in stating
10   that his belief was that he was still in
11   control of the Horizon because there was not
12   a successful EDS procedure?
13          MR. KINCHEN:  Object to form.
14       A.    I think it's almost impossible
15   to answer that question because it's asking
16   me to presuppose that he at any stage could
17   have been in command of the vessel.  And by
18   international law on a DP vessel he could
19   never have been in command of the vessel, and
20   therefore this question of a handover or when
21   the handover should take place, I can't
22   answer because it should never have taken
23   place.  The master should have been in
24   control at -- in command, in control, in
25   charge at all stages.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

**281**

:28  1    Q.   (BY MR. FLEMING) Understood.
     2  This testimony that we just went over
     3  specifically with respect to the handoff,
     4  sir, what impact, if any, does that have upon
:28  5  any of the conclusions that you reached in
     6  your report?
     7        MR. KINCHEN: Objection; form.
     8    A.   None at all.
     9    Q.   (BY MR. FLEMING) So it doesn't
:28 10  change anything?
    11    A.   No.
    12    Q.   Does it bolster the -- any of
    13  the opinions that you have in your report?
    14    A.   No. The opinions I formed after
:28 15  reviewing all of these documents, and this
    16  doesn't in any way alter those opinions.
    17    Q.   Okay. And following
    18  Mr. Harrell's MBI testimony, you -- I'm not
    19  sure you have this one, do you have Page 140?
:29 20    A.   Is this in the --
    21    Q.   I believe this is in the loose
    22  leaf.
    23    A.   No, then -- I stop at 136.
    24    Q.   Okay. On Page 140 he's asked a
:29 25  question, Do you think that it would be a

**282**

     1  good idea for the government to require that?
     2  Because here you have two individuals, OIM,
     3  like you don't have the marine side of it and
     4  the master has the marine side of it and then
:29  5  there are two different people here.
     6        ANSWER: Yes, anytime you can
     7  eliminate confusion, it would be better?
     8        My question to you, were you
     9  aware that Jimmy Harrell testified with the
:29 10  MBI panel that under his opinion it would be
    11  better to eliminate the two positions of OIM
    12  and master?
    13        MR. KINCHEN: Objection; form.
    14    A.   I remember in -- in general
:29 15  terms I certainly read that statement. I
    16  remember it being one of the items that
    17  indicated that there was confusion, and I do
    18  remember that.
    19    Q.   (BY MR. FLEMING) In your
:30 20  opinion is that an example of some of the
    21  confusion that you were talking about earlier
    22  between -- with respect to the command
    23  structure?
    24        MR. KINCHEN: Object to form.
:30 25    A.   It's -- it's part of it.

**283**

 1    Q.   (BY MR. FLEMING) Let's turn to
 2  tab 40 in your binder.
 3    A.   Your binder?
 4    Q.   Yeah.
 5    A.   Yeah, 40, got it.
 6    Q.   Tab 40. This is the deposition
 7  testimony of David Hackney. Are you familiar
 8  with this dep- -- the -- his deposition
 9  testimony?
10    A.   Yes, I am.
11    Q.   David Hackney was the captain or
12  the master of the Horizon who was not
13  actually on board at the time of the blowout,
14  correct?
15    A.   Yes, that's correct.
16    Q.   If you could turn with me to
17  Page 50 to 51 in your binder there.
18    A.   Sorry again. I go to --
19    Q.   50.
20    A.   Yes, I've got 50. I haven't got
21  51.
22    Q.   It's all on the same page.
23        MR. HAYCRAFT: He's talking about that
24  number. So give him the actual page number.
25        MR. FLEMING: I'm sorry, Page 13.

**284**

 1        MR. HAYCRAFT: I mean, the deposition
 2  page number.
 3        MR. FLEMING: Yeah, I was.
 4        THE WITNESS: Yeah, I'm -- that will be
 5  13.
 6        MR. HAYCRAFT: See the little numbers
 7  here?
 8        THE WITNESS: 49, 50, 51.
 9    Q.   (BY MR. FLEMING) Got it. Okay.
10  Down at the bottom of the page on Page 50
11  Captain Hackney is asked, And there was only
12  one person holding the authority as captain
13  on board the Horizon -- the Deepwater Horizon
14  at any one time, correct?
15        ANSWER: Yes.
16        At the top of Page 51, And the
17  reason for there being one captain is that if
18  there is a time sensitive decision that needs
19  to be made, there's one person who has the
20  final authority to make that decision,
21  correct?
22        ANSWER: Yes, the master is
23  overall responsible and in charge.
24        QUESTION: The master is overall
25  responsible and in charge for the safety of

PURSUANT TO CONFIDENTIALITY ORDER

285
1  the vessel, correct?
2       ANSWER: That's correct.
3       Question, is -- is it your
4  opinion that Captain Hackney's statement here
5  is, in fact, correct and in compliance with
6  international law.
7       A.   What he's describing there is a
8  correct command structure that -- that UNCLOS
9  for modified command, yes.
10      Q.   Okay.  And this is inconsistent
11 with what we just read from Jimmy Harrell's
12 MBI testimony, correct?
13      MR. KINCHEN: Objection; form.
14      A.   It's certainly opposite.
15      Q.   (BY MR. FLEMING)  Okay.
16      MR. HAYCRAFT: I just want to make sure
17 you got chalk and cheese.
18      MR. FLEMING: I got chalk and cheese.
19      MR. HAYCRAFT: I know.  I meant
20 Phyllis.
21      THE REPORTER: Thank you.
22      Q.   (BY MR. FLEMING)  If you'll turn
23 to Page 54 of Captain Hackney's transcript.
24      A.   54.
25      Q.   Uh-huh.  Line 17.  It says, You

286
1  had the authority and discretion to take
2  whatever actions were required for the safety
3  of the crew and the vessel; is that correct?
4       ANSWER: That's correct.
5       Question, that, again, is
6  inconsistent with what we just read from
7  Jimmy Harrell's MBI testimony, correct?
8       A.   Jimmy Harrell clearly believed
9  that he was in command, and Hackney here is
10 saying the opposite, that he as the master
11 would be the person in command.
12      Q.   And, again, let's be clear.
13 Captain Hackney was the master at the same
14 time when Jimmy Harrell was the OIM -- I'm
15 sorry.  Captain Hackney was assigned as the
16 master of the Horizon at the same time that
17 Jimmy Harrell was assigned as the OIM on the
18 Horizon, correct?
19      A.   I -- they were both assigned at
20 the same time, and because of the shift
21 pattern and the difference in times where
22 they changed I cannot guarantee you that they
23 were on the vessel at the same time, but I
24 would expect them to have actually served on
25 the vessel at the same time.

287
1       Q.   Understood, fair point.  But
2  this is inconsistent with Mr. Harrell's
3  testimony that we just read, correct?
4       MR. KINCHEN: Objection; form.
5       A.   Yes, it's totally inconsistent.
6       Q.   (BY MR. FLEMING)  Is this
7  another example of the confusion that you've
8  alluded to with respect to the Transocean
9  command structure?
10      MR. KINCHEN: Object to form.
11      A.   Yes, it is.
12      Q.   (BY MR. FLEMING)  Turn to
13 Page 71 and 72.  And I believe this is
14 something that you've made reference to
15 before concerning the -- the vessel being
16 underway.  Captain Hackney is asked on
17 line 18 of Page 71, so is it -- it is your
18 testimony today that the ship is always in an
19 underway mode and never in a drilling mode?
20      ANSWER: It can be both, but
21 it's always in the underway mode.
22      QUESTION: Okay.  I understand
23 that.  The ship -- that Deepwater -- a ship
24 such as the Deepwater Horizon could be both
25 in an underway mode and a drilling mode?

288
1  That's correct.
2       Question, is it your
3  understanding that this is, in fact, in
4  compliance with international law, what
5  Captain Hackney is saying here?
6       A.   I don't know that international
7  law -- that you would say -- this question
8  and answer has anything to do with compliance
9  with international law.  What Hackney is
10 saying is that this DP vessel is always
11 underway for a significant perhaps portion of
12 time.  Whilst it is underway it is also in
13 drilling mode.  The technical terms that are
14 used in -- in regulations use the word
15 "underway" and "on location."  Now, "on
16 location" means that a vessel is wherever it
17 is, but it is either aground or bottom
18 bearing or fully anchored or tethered and
19 therefore effectively not underway.
20      "Underway" is a vessel that is
21 not aground, not anchored or tethered, and
22 the regulations state that when a vessel is
23 underway, it should have a master in command.
24      Q.   Okay.  And so your opinion is
25 that -- and I believe you stated this in your

72 (Pages 285 to 288)

**PURSUANT TO CONFIDENTIALITY ORDER**

285

1  the vessel, correct?
2      ANSWER: That's correct.
3      Question, is -- is it your
4  opinion that Captain Hackney's statement here
5  is, in fact, correct and in compliance with
6  international law.
7      A.  What he's describing there is a
8  correct command structure that -- that UNCLOS
9  for modified command, yes.
10     Q.  Okay.  And this is inconsistent
11 with what we just read from Jimmy Harrell's
12 MBI testimony, correct?
13     MR. KINCHEN: Objection; form.
14     A.  It's certainly opposite.
15     Q.  (BY MR. FLEMING)  Okay.
16     MR. HAYCRAFT: I just want to make sure
17 you got chalk and cheese.
18     MR. FLEMING: I got chalk and cheese.
19     MR. HAYCRAFT: I know.  I meant
20 Phyllis.
21     THE REPORTER: Thank you.
22     Q.  (BY MR. FLEMING)  If you'll turn
23 to Page 54 of Captain Hackney's transcript.
24     A.  54.
25     Q.  Uh-huh.  Line 17.  It says, You

286

1  had the authority and discretion to take
2  whatever actions were required for the safety
3  of the crew and the vessel; is that correct?
4      ANSWER: That's correct.
5      Question, that, again, is
6  inconsistent with what we just read from
7  Jimmy Harrell's MBI testimony, correct?
8      A.  Jimmy Harrell clearly believed
9  that he was in command, and Hackney here is
10 saying the opposite, that he as the master
11 would be the person in command.
12     Q.  And, again, let's be clear.
13 Captain Hackney was the master at the same
14 time when Jimmy Harrell was the OIM -- I'm
15 sorry.  Captain Hackney was assigned as the
16 master of the Horizon at the same time that
17 Jimmy Harrell was assigned as the OIM on the
18 Horizon, correct?
19     A.  I -- they were both assigned at
20 the same time, and because of the shift
21 pattern and the difference in times where
22 they changed I cannot guarantee you that they
23 were on the vessel at the same time, but I
24 would expect them to have actually served on
25 the vessel at the same time.

287

1      Q.  Understood, fair point.  But
2  this is inconsistent with Mr. Harrell's
3  testimony that we just read, correct?
4      MR. KINCHEN: Objection; form.
5      A.  Yes, it's totally inconsistent.
6      Q.  (BY MR. FLEMING)  Is this
7  another example of the confusion that you've
8  alluded to with respect to the Transocean
9  command structure?
10     MR. KINCHEN: Object to form.
11     A.  Yes, it is.
12     Q.  (BY MR. FLEMING)  Turn to
13 Page 71 and 72.  And I believe this is
14 something that you've made reference to
15 before concerning the -- the vessel being
16 underway.  Captain Hackney is asked on
17 line 18 of Page 71, so is it -- it is your
18 testimony today that the ship is always in an
19 underway mode and never in a drilling mode?
20     ANSWER: It can be both, but
21 it's always in the underway mode.
22     QUESTION: Okay.  I understand
23 that.  The ship -- that Deepwater -- a ship
24 such as the Deepwater Horizon could be both
25 in an underway mode and a drilling mode?

288

1  That's correct.
2      Question, is it your
3  understanding that this is, in fact, in
4  compliance with international law, what
5  Captain Hackney is saying here?
6      A.  I don't know that international
7  law -- that you would say -- this question
8  and answer has anything to do with compliance
9  with international law.  What Hackney is
10 saying is that this DP vessel is always
11 underway for a significant perhaps portion of
12 time.  Whilst it is underway it is also in
13 drilling mode.  The technical terms that are
14 used in -- in regulations use the word
15 "underway" and "on location."  Now, "on
16 location" means that a vessel is wherever it
17 is, but it is either aground or bottom
18 bearing or fully anchored or tethered and
19 therefore effectively not underway.
20     "Underway" is a vessel that is
21 not aground, not anchored or tethered, and
22 the regulations state that when a vessel is
23 underway, it should have a master in command.
24     Q.  Okay.  And so your opinion is
25 that -- and I believe you stated this in your

72 (Pages 285 to 288)

**PURSUANT TO CONFIDENTIALITY ORDER**

285

1  the vessel, correct?
2       ANSWER: That's correct.
3       Question, is -- is it your
4  opinion that Captain Hackney's statement here
5  is, in fact, correct and in compliance with
6  international law.
7       A.    What he's describing there is a
8  correct command structure that -- that UNCLOS
9  for modified command, yes.
10      Q.    Okay. And this is inconsistent
11 with what we just read from Jimmy Harrell's
12 MBI testimony, correct?
13      MR. KINCHEN: Objection; form.
14      A.    It's certainly opposite.
15      Q.    (BY MR. FLEMING) Okay.
16      MR. HAYCRAFT: I just want to make sure
17 you got chalk and cheese.
18      MR. FLEMING: I got chalk and cheese.
19      MR. HAYCRAFT: I know. I meant
20 Phyllis.
21      THE REPORTER: Thank you.
22      Q.    (BY MR. FLEMING) If you'll turn
23 to Page 54 of Captain Hackney's transcript.
24      A.    54.
25      Q.    Uh-huh. Line 17. It says, You

286

1  had the authority and discretion to take
2  whatever actions were required for the safety
3  of the crew and the vessel; is that correct?
4       ANSWER: That's correct.
5       Question, that, again, is
6  inconsistent with what we just read from
7  Jimmy Harrell's MBI testimony, correct?
8       A.    Jimmy Harrell clearly believed
9  that he was in command, and Hackney here is
10 saying the opposite, that he as the master
11 would be the person in command.
12      Q.    And, again, let's be clear.
13 Captain Hackney was the master at the same
14 time when Jimmy Harrell was the OIM -- I'm
15 sorry. Captain Hackney was assigned as the
16 master of the Horizon at the same time that
17 Jimmy Harrell was assigned as the OIM on the
18 Horizon, correct?
19      A.    I -- they were both assigned at
20 the same time, and because of the shift
21 pattern and the difference in times where
22 they changed I cannot guarantee you that they
23 were on the vessel at the same time, but I
24 would expect them to have actually served on
25 the vessel at the same time.

287

1       Q.    Understood, fair point. But
2  this is inconsistent with Mr. Harrell's
3  testimony that we just read, correct?
4       MR. KINCHEN: Objection; form.
5       A.    Yes, it's totally inconsistent.
6       Q.    (BY MR. FLEMING) Is this
7  another example of the confusion that you've
8  alluded to with respect to the Transocean
9  command structure?
10      MR. KINCHEN: Object to form.
11      A.    Yes, it is.
12      Q.    (BY MR. FLEMING) Turn to
13 Page 71 and 72. And I believe this is
14 something that you've made reference to
15 before concerning the -- the vessel being
16 underway. Captain Hackney is asked on
17 line 18 of Page 71, so is it -- it is your
18 testimony today that the ship is always in an
19 underway mode and never in a drilling mode?
20      ANSWER: It can be both, but
21 it's always in the underway mode.
22      QUESTION: Okay. I understand
23 that. The ship -- that Deepwater -- a ship
24 such as the Deepwater Horizon could be both
25 in an underway mode and a drilling mode?

288

1  That's correct.
2       Question, is it your
3  understanding that this is, in fact, in
4  compliance with international law, what
5  Captain Hackney is saying here?
6       A.    I don't know that international
7  law -- that you would say -- this question
8  and answer has anything to do with compliance
9  with international law. What Hackney is
10 saying is that this DP vessel is always
11 underway for a significant perhaps portion of
12 time. Whilst it is underway it is also in
13 drilling mode. The technical terms that are
14 used in -- in regulations use the word
15 "underway" and "on location." Now, "on
16 location" means that a vessel is wherever it
17 is, but it is either aground or bottom
18 bearing or fully anchored or tethered and
19 therefore effectively not underway.
20      "Underway" is a vessel that is
21 not aground, not anchored or tethered, and
22 the regulations state that when a vessel is
23 underway, it should have a master in command.
24      Q.    Okay. And so your opinion is
25 that -- and I believe you stated this in your

72 (Pages 285 to 288)

**PURSUANT TO CONFIDENTIALITY ORDER**

# LISKOW&LEWIS
A Professional Law Corporation

| | | |
|---|---|---|
| One Shell Square | 822 Harding Street | First City Tower |
| 701 Poydras Street, Suite 5000 | Post Office Box 52008 | 1001 Fannin Street, Suite 1800 |
| New Orleans, LA 70139 | Lafayette, LA 70505 | Houston, TX 77002 |
| (504) 581-7979 Main | (337) 232-7424 Main | (713) 651-2900 Main |
| (504) 556-4108 Fax | (337) 267-2399 Fax | (713) 651-2908 Fax |

www.Liskow.com

November 28, 2011                    **Don K. Haycraft**             Direct: (504) 556-4128
                                                                      dkhaycraft@liskow.com

Plaintiffs' Liaison Counsel
Defense Liaison Counsel
Coordinating Counsel

      In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20,
             2010, MDL No. 2179
             Our File No.: 10451.084

Dear Counselors:

Eight footnotes in Mr. Batte's expert report need corrections. None of the corrections reflect alterations of Mr. Batte's reliance data, methodology, or conclusions. We set forth in the original and revised footnotes, as follows:

**Footnote 37**
- **Original:** Y. Keplinger Deposition, p. 146 (Sept. 12, 2011).
- **Revised:** Y. Keplinger Deposition, p. 89 (Sept. 12, 2011).

**Footnote 39**
- **Original:** Y. Keplinger Deposition, pp. 89-90 (Sept. 12, 2011).
- **Revised:** Y. Keplinger Deposition, pp. 89-90 (Sept. 12, 2011); Testimony of A. Fleytas, Marine Board Inquiry, Oct. 5, 2010 PM, at p. 55-56.

**Footnote 60**
- **Original:** Y. Keplinger Deposition, pp. 145-46 (Sept. 12, 2011).
- **Revised:** Y. Keplinger Deposition, pp. 145-46 (Sept. 12, 2011); Testimony of A. Fleytas, Marine Board Inquiry, Oct. 5, 2010 PM, at pp. 10-12.

7572
Exhibit No. _____
Worldwide Court
Reporters, Inc.



November 28, 2011

Page 2

**Footnote 80**
- **Original:** *See, e.g.,* Y. Keplinger Deposition, pp. 88, 139 (Sept. 12, 2011).
- **Revised:** D. Brown Deposition, pp. 67-75 (May 3, 2011) (Transocean's Acting Second Engineer on the rig testified that "we started hearing the two engines, 3 and 6, ramping up in their RPMs. It was a gradual climb, but it just kept going and going and it never stopped."); M. Williams Deposition, pp. 69-72 (July 20, 2011) (testifying that he heard the engine run "maybe three times faster than I had ever heard it run" before the explosion).

**Footnote 99**
- **Original:** U.S. Coast Guard Witness Statement of S. Bertone (Exhibit 4361).
- **Revised:** U.S. Coast Guard Witness Statement of S. Bertone (TRN-MDL-00265563-265568).

**Footnote 113**
- **Original:** J. Kent Deposition, pp. 16-29 (June 22, 2011).
- **Revised:** J. Kent Deposition, pp. 16-29 (June 21, 2011).

**Footnote 114**
- **Original:** J. Kent Deposition, p. 154 (June 22, 2011).
- **Revised:** J. Kent Deposition, p. 154 (June 21, 2011).

**Footnote 154**
- **Original:** P. Johnson Deposition, pp. 375-76 (March 28, 2011). *See also* J. Kent Deposition, pp. 277-278 (June 21, 2011) (the Rig Manager - Asset confirmed that there were a number of audit findings associated with fire and gas detection systems, but represented that most of these items had been corrected by the time of the incident).
- **Revised:** P. Johnson Deposition, pp. 373-74 (March 28, 2011). *See also* J. Kent Deposition, pp. 277-278 (June 21, 2011) (the Rig Manager - Asset confirmed that there were a number of audit findings associated with fire and gas detection systems, but represented that most of these items had been corrected by the time of the incident).

Please contact me if you have any questions.

Sincerely,

Don K. Haycraft

DKH/apf