UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | § § § § | MDL NO. 2179<br><br>SECTION J |
| IN RE: THE COMPLAINT AND PETITION OF TRITON ASSET LEASING GMBH, ET AL. IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | § § § § § § | JUDGE BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| This Document Relates To:<br>*All cases and No.: 2-10-cv-2771* | § § § § § | |

## MOTION TO STRIKE PORTIONS OF EXPERT REPORTS AND DEPOSITIONS REFERENCING EXCLUDED JIT REPORT AND JIT TESTIMONY

# EXHIBIT K
## Jeff Wolfe

1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
 3    IN RE:  OIL SPILL        )   MDL NO. 2179
      BY THE OIL RIG           )
 4    "DEEPWATER HORIZON" IN   )   SECTION "J"
      THE GULF OF MEXICO, ON   )
 5    APRIL 20, 2010           )   JUDGE BARBIER
                               )   MAG. JUDGE SHUSHAN
 6
```

20            Deposition of JEFF L. WOLFE,
   taken at Pan-American Building, 601 Poydras
21 Street, 11th Floor, New Orleans, Louisiana,
   70130, on the 1st day of December, 2011.

EXHIBIT K
J. Wolfe

**PURSUANT TO CONFIDENTIALITY ORDER**

```
                                                  193
 1   every person on every rig should be trained
 2   in all of these things.
 3       Q.  All righty.  Did you review the
 4   training record of Captain Kuchta?
 5       A.  Yes, I did.
 6       Q.  Was he trained in EDS?
 7       A.  I don't believe he was.
 8       Q.  Did he have authority in the
 9   Transocean command structure to initiate EDS?
10       A.  I'm trying to recall that
11   chapter out of the...
12       Q.  Are you thinking about --
13       A.  Well, I'm thinking about your
14   question.  I mean, he was the master.  He
15   certainly had the overriding authority to
16   initiate whatever action he felt was
17   necessary for the safety of the vessel or the
18   environment.  I'm trying to recall if -- if
19   he had specific EDS training.
20       Q.  Well, I thought you already
21   answered that you did not believe he did have
22   EDS training.
23       A.  I don't recall that -- that
24   entry.  I mean, obviously, that's a
25   multiple-page document.  I --
```

```
                                                  194
 1       Q.  Well, I don't -- pardon me if I
 2   interrupted, so I'll stop for a second.
 3           Okay.  Well, let's see, you
 4   were -- you were engaged in this matter to
 5   review the seaworthiness of the Deepwater
 6   Horizon, correct?
 7       A.  That's correct.
 8       Q.  Okay.  Although this isn't a
 9   memory contest, nothing is, would you agree
10   with me, sir, that the training record, the
11   qualifications, the licensing of the captain
12   of the ship is an important matter for that
13   expert to be aware of?
14       A.  Yes.  And I -- and what I'm
15   telling you is I am aware of it.  I just
16   don't recall the specifics.
17       Q.  Okay.  So the specific question
18   was, and I'll state it again, was
19   Captain Kuchta trained in EDS, question mark?
20       A.  I'm telling you, I -- right off
21   the top of my head, sitting here today, I
22   can't answer that.  It's probably been weeks
23   since I've looked at that document, and I
24   looked at many training records.
25       Q.  Uh-huh.  Well, I have the
```

```
                                                  195
 1   training record in front of me and it's in
 2   your binder, but I'm asking you sitting
 3   here -- and I'll give you the opportunity to
 4   look at it.
 5           Here's the second question
 6   related to Captain Kuchta.  Put training over
 7   here.  We've just gone over that, and you
 8   don't remember.  Now the word is "authority."
 9   Was Captain Kuchta authorized to initiate EDS
10   aboard the Deepwater Horizon that night?
11       A.  I think that, yes, he would have
12   been.  As the captain, he certainly had the
13   authority.  I think it would be very
14   unconventional for him to initiate that
15   action without -- without some concurrence of
16   the -- of the well control experts.  But,
17   yes, I'm quite certain he had the authority.
18       Q.  Okay.  Did he know he had the
19   authority?
20       A.  I can't --
21       MR. JOHNSON:  Object to the form.
22       A.  I can't -- I really -- I don't
23   know what was in his mind, so I really
24   can't -- I can't answer that.
25       Q.  (BY MR. HAYCRAFT)  Well, you
```

```
                                                  196
 1   know he did testify under oath in this
 2   case -- or, excuse me, in the joint
 3   investigation team,    I, you know he did
 4   testify?
 5       A.  Yeah.
 6       Q.  And you read that testimony;
 7   it's cited in your -- in your report,
 8   correct?
 9       A.  I reviewed it.
10       Q.  Okay.  Well, I've got it in my
11   binder, and we'll look at it in a minute to
12   refresh your recollection on those two
13   questions.
14       A.  Okay.
15       Q.  But in the meantime, I'm going
16   to continue with Captain Kuchta and your
17   memory, did Captain Kuchta have major
18   emergency management training?
19       A.  If -- well, depending on -- if
20   you're asking about the -- whether he had
21   been trained to -- in emergency response,
22   obviously his STCW training, Bridge Resource
23   Management training would cover that.
24       Q.  Uh-huh.
25       A.  But I am aware that there was
```

**PURSUANT TO CONFIDENTIALITY ORDER**

197

1  a -- there was a specific Transocean
2  sponsored course, and I -- I -- I don't
3  believe he had attended that.
4     Q.  Okay. Same question. Did
5  Captain Kuchta have any well control
6  training?
7     A.  He obviously had some minor
8  level, because he had an OIM endorsement on
9  his license, which meant that he would have
10 had to attend the prerequisite five-day
11 course, but that -- that certainly wouldn't
12 make him an expert in well control.
13    Q.  That's not my question. My
14 question was, as you apparently answered, did
15 he have any well control certification?
16    A.  He had an OIM endorsement, and
17 part of that endorsement requires a five-day
18 well control school.
19    Q.  Okay. Did you review
20 Transocean's computer printout of all of
21 Captain Kuchta's training?
22    A.  Yes, that's the document I was
23 referring to.
24    Q.  Why don't you turn to tab 18 in
25 our binder. It's been previously marked in

198

1  the deposition record as Exhibit 3747.
2  And -- and it's a computer printout, and
3  you'll probably recognize it when you see it.
4  Tab 18.
5     Okay. You've -- the first page
6  has another individual because the second
7  page is where Captain Kuchta starts up. And
8  you'll see it's chronological from most
9  recent to if you go to the -- the last entry
10 for Captain Kuchta, it's dated 1998.
11    So this training record shows
12 Captain Kuchta's training from January 7,
13 1998, through and including March 22, 2010,
14 correct, sir?
15    MR. JOHNSON: Objection; form.
16    A.  Yes, that's correct.
17    Q.  (BY MR. HAYCRAFT) And you say
18 you haven't reviewed that for several weeks?
19    A.  It's -- it's been several weeks.
20    Q.  Okay. You remember the four --
21 or let's count. EDS, Major Emergency
22 Management, well control, any of those three?
23 Call it out if you see it.
24    A.  Where he attended?
25    Q.  Yeah, where he attended well

199

1  control school and got a certificate, where
2  he attended Major Emergency Management class
3  and/or school and got a certificate, or where
4  he attended a course in EDS, Emergency
5  Disconnect Procedures.
6     MR. JOHNSON: Objection; form.
7     A.  I don't see any of those listed
8  by name, as you've described them, and I
9  don't know the -- the individual elements of
10 each one of these courses, but there could
11 have been, could have been something included
12 in the DPO OJT syllabus  erhaps.
13    Q.  (BY MR. AYCRAFT) Okay. Now,
14 if you'll turn -- thank you very much. If
15 you'll turn to tab 14 of your binder. And
16 we're still on the subject of
17 Captain  uchta's trainin , 'ust to keep your
18 mind engaged.
19    Do you see Captain  uchta's
20 testimony there? And you -- you've cited
21 Captain Kuchta's testimony in your materials.
22    A.  Yes.
23    Q.  So I haven't -- you have --
24 you've reviewed his testimony as well as
25 others in connection with your assessment of

200

1  events that night?
2     A.  Yeah, if you could give me a
3  minute, I'd like to see what I -- what I did
4  cit to.
5     Q.  Well, actually, I withdraw the
6  question because I don't want to have you
7  thumb through your whole report to find where
8  you cited Captain Kuchta. I'll represent to
9  you and you can send me a letter if I'm wrong
10 later. But for right now I want to ask my
11 question.
12    Turn to Page 204 of
13 Captain Kuchta's testimony, please. Do you
14 remember the question that I had asked
15 earlier was you reviewed his training record,
16 the computer printout, that Transocean
17 provided in this matter, and you -- you
18 didn't see anything there, and when I asked
19 you that before, you looked at the training
20 record, and you said you didn't remember.
21    Look at Page 204 about the EDS.
22    And the question on line 20 is,
23 "Are you trained to activate the EDS
24 yourself?"
25    The answer was "No.

PURSUANT TO CONFIDENTIALITY ORDER

```
                                                    201
 1              "Is that the OIM?"
 2              And his answer was, "Yes."
 3              Do you see that, sir?
 4       A.     Yes.
 5       MR. JOHNSON: Object to form, by the
 6   way.
 7       Q.   (BY MR. HAYCRAFT) Okay. Does
 8   that refresh your recollection especially
 9   after reviewing the computer printout from
10   Transocean about his training record together
11   with his question and answer at the   IMB
12   hearings that I just refreshed your
13   recollection with?
14       MR. JOHNSON: Objection; form.
15       Q.   (BY MR. HAYCRAFT) Was
16   Captain Kuchta trained to EDS?
17       MR. JOHNSON: Objection; form.
18       A.   No. According to his JIT
19   testimony, no.
20       Q.   (BY MR. HAYCRAFT) Based on your
21   experience with the Coast Guard and your life
22   experience, how long does it take an
23   electrical signal to travel 5,000 feet?
24       A.   I -- I couldn't speculate on
25   that.
```

```
                                                    202
 1       Q.   Less than a second, for sure?
 2       MR. JOHNSON: Objection; form.
 3       A.   I don't know if there are any
 4   solenoid switches. I mean, if you're just
 5   asking about a straight wire, I'm sure it's
 6   very quick, but I can't -- I'm not an
 7   electrical engineer, so...
 8       Q.   (BY MR. HAYCRAFT) Okay. Well,
 9   you know that electricity travels at the
10   speed of light, correct?
11       A.   Right.
12       MR. JOHNSON: Objection; form.
13       Q.   (BY MR. HAYCRAFT) Which is
14   186,000 miles per second, correct?
15       A.   That's correct.
16       MR. JOHNSON: Objection; form.
17       Q.   (BY MR. HAYCRAFT) 5,000 feet is
18   a very, very small percentage of
19   186,000 miles, isn't it?
20       A.   Yes.
21       Q.   Let's turn to tab 1 of your
22   binder. We'll mark this as -- oh, it's
23   already been marked as Exhibit 7673. And
24   you'll see Article 94, "Duties of the flag
25   State." Do you see that, sir?
```

```
                                                    203
 1       A.    Yes
 2       Q.    And you quote from this document
 3   in your expert report; do you not?
 4       A.    This is an excerpt from UNCLOS,
 5   I believe, right?
 6       Q.    Yes, it is. But you recognize
 7   it as an excerpt from UNCLOS?
 8       A.    Yes.
 9       Q.    And that's all caps,
10   U-N-C-L-O-S, that's the United Nations
11   Convention For the Law of the Sea?
12       A.    That's correct.
13       Q.    Okay. You expressed your view
14   earlier before lunch that, in your view, the
15   captain of the ship and specifically here the
16   Deepwater Horizon is always in command of the
17   ship, correct?
18       A.    That's correct.
19       Q.    And "in command" means in charge
20   of, doesn't it?
21       A.    Yes.
22       Q.    Let's look at Article 94,
23   specifically lines or subsection or however
24   it would be termed 3 and then 4, reading in
25   conjunction, and we'll read along together
```

```
                                                    204
 1   quickly.
 2          "Every state shall take such
 3   measures for ships flying its flag as are
 4   necessary to ensure safety at sea with
 5   regard, comma, inter alia, comma, to, colon."
 6          And then let's read down to (b),
 7   the manning of ships, taking into account the
 8   applicable international instruments.
 9          And then looking at 4,
10   "Such measures shall include those necessary
11   to ensure, colon," and then we're going to
12   look at the following measures, but what I
13   want to make sure we -- we have straight in
14   our mind before we turn the page and possibly
15   leave these initiating words behind is what
16   does "such measures" refer to? Do you
17   understand my question?
18       MR. JOHNSON: Object to form.
19       Q.   (BY MR. HAYCRAFT) Do you see in
20   3 where it says, "Every state shall take such
21   measures," and then in line -- or paragraph
22   or Section 4, it says, "Such measures shall
23   include those necessary to ensure"?
24          You'll agree with me, sir, that
25   the such measures in subsection 4 refers to
```

**PURSUANT TO CONFIDENTIALITY ORDER**

233

```
 1      A.   He's the chief mate.
 2      Q.   So he would be in the mar- -- on
 3  the maritime side of the ship there is
 4  captain and then chief -- chief mate as the
 5  next officer, correct?
 6      A.   Correct.
 7      Q.   And the chief mate has to have a
 8  maritime license, correct?
 9      A.   That's correct.
10      Q.   Look at Page 196 of David
11  Young's deposition, and the question at
12  Line 11 is, "I'm going to read from Page 62
13  and 63 of the transcript" -- and the
14  questioner is referring to the -- to the MBI
15  or JIT transcript. "And, first, I'm going to
16  ask you if I'm reading it accurately and then
17  I'll ask you a followup question. From the
18  time you came on watch to the time you
19  departed the vessel, you evacuated from the
20  vessel, who was in charge of the HORIZON?
21  Your answer was the O -- the OIM is in charge
22  while connected and the captain would be in
23  charge of the emergency situation."
24          "QUESTION: So the captain is in
25  charge of the emergency situation whether
```

234

```
 1  it's connected or not connected?"
 2          Your answer, no. He would be
 3  dealing with the fire of it and the
 4  evacuation end of it.
 5          Question over on Page 197, "So
 6  who is in charge of the vessel?
 7          "ANSWER: The OIM.
 8          "QUESTION: From the time you
 9  came on watch to the time you evacuated the
10  vessel?"
11          Your answer then was, "Yes."
12          And then the questioner says,
13  "And my first question is simply for you to
14  make sure that I read those two pages
15  correctly."
16          "ANSWER: It looks like you read
17  them correctly."
18          Okay. So you understand that
19  while we just read is -- is -- actually, it
20  was me -- well, I'm not sure who it was, but
21  somebody was asking David Young questions
22  about his prior testimony at the MBI. Do you
23  understand that so far?
24          MR. JOHNSON: Objection; form.
25      A.   Okay.
```

235

```
 1      Q.   (BY MR. HAYCRAFT) Now the
 2  questioner says, "You just testified in this
 3  proceeding that the Captain was in charge,
 4  didn't you?"
 5          And his answer is, "Yes."
 6          And the question is, "Which is
 7  correct, what you said a few months after
 8  this tragedy or what your saying today?"
 9          And Mr. Keplinger's answer was,
10  "The captain is in charge of the emergency
11  situation, which was the -- the navigational
12  and safety end of the vessel and the OIM for
13  the drilling end."
14          Did I read that correctly of
15  Mr. Keplinger's deposition testimony?
16      A.   Yes.
17          MR. JOHNSON: Objection; form.
18      Q.   (BY MR. HAYCRAFT) Now, I could
19  do this for a while longer, but you've seen
20  that we -- we read over David Hackney's
21  deposition testimony, Yancy Keplinger's
22  deposition testimony, and then we closed
23  with -- with Chief Mate David Young's
24  testimony. Do you follow me so far?
25      A.   Yes.
```

236

```
 1      Q.   It -- it sounds to me -- and I'm
 2  asking you what your view is, not mine --
 3  that at least among those three individuals
 4  they had three different conceptions of who
 5  was in charge at different times, fair to
 6  say?
 7          MR. JOHNSON: Objection; form.
 8      A.   Well, here again, I go back to
 9  the -- to the distinction I made that the
10  person in charge is not synonymous with the
11  master.
12      Q.   (BY MR. HAYCRAFT) Okay. Is the
13  master sometimes not the person in charge on
14  the Deepwater Horizon?
15      A.   The master is sometimes not the
16  person in charge.
17      Q.   Okay. And, for example, during
18  day to day drilling operations the master of
19  the Deepwater Horizon is not the person in
20  charge, correct?
21      A.   He's not the person in charge,
22  but he's still the master.
23      Q.   He becomes the person in charge
24  either when they get underway or during a,
25  quote, emergency, end quote, correct?
```

59 (Pages 233 to 236)

**PURSUANT TO CONFIDENTIALITY ORDER**