UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | § § § § | MDL No. 2179<br><br>SECTION J |
| IN RE: THE COMPLAINT AND PETITION OF TRITON ASSET LEASING GMBH, ET AL. IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | § § § § § § | JUDGE BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| This Document Relates To:<br>*All cases and No.: 2-10-cv-2771* | § § § § § | |

## MOTION TO STRIKE PORTIONS OF EXPERT REPORTS AND DEPOSITIONS REFERENCING EXCLUDED JIT REPORT AND JIT TESTIMONY

# EXHIBIT L
Fredrick Beck

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG )
"DEEPWATER HORIZON in the )
GULF OF MEXICO, )      MDL No. 2179
on APRIL 20, 2010 )
)                                                Section J :
Applies to    : )
)     The Honorable Judge Barbier
ALL CASES and )             Mag. Judge Shushan
2:10-cv-02771 )

# EXPERT REPORT OF
# DR FREDERICK GENE" BECK
# ON WELL DESIGN CONTROL DRILLING, AND MONITORING



EXHIBIT
L
F. Beck

**REBUTTAL EXPERT REPORT OF DR. FREDERICK "GENE" BECK**

responsibility for those decisions falls squarely on BP's, Transocean's, and M-I SWACO's shoulders.

### A. The Sperry mudlogger was not in the same position as BP and the Transocean drilling crew.

A common mischaracterization throughout the other parties' expert reports is the comparative position of the Sperry mudlogger relative to the Transocean drilling crew. BP's experts in particular improperly attempt to lump these individuals into a single category.[140] However, as outlined in my Opening Report, the Sperry mudlogger and the Transocean drilling crew were not on equal footing on the evening of April 20. Transocean had better information about both the well and the rig operations. In particular, not only was the Transocean drilling crew fully aware of rig operations at all times—they were, after all, directing and conducting those operations—but they could also monitor the flow-out data when they began diverting returns overboard right as it appears the well started kicking, while Joe Keith could not.[141] The drill crew's control of operations also puts them in a direct, hands-on position to be aware of ongoing operations, whereas the mudlogger sits in a small room away from the drill floor. To stay abreast of rig operations, the mudlogger must receive updates from the drilling crew.

I understand the drilling crew never once called Joe Keith on April 20, 2010.[142] Nor did the BP well site leader, the M-I SWACO compliance specialist, or drilling fluids engineer attempt to keep the mudlogger informed of any ongoing operations. In addition, the mudlogger had no ability or authority to make decisions regarding rig configuration, well control actions, displacement procedure, or whether to activate the BOP; this authority is reserved for the BP company man and the Transocean drilling crew who are all required by regulation to be certified in well control.

---

[140] *See, e.g.*, Bourgoyne Report (BP) at 10 and 64-66; Grace Report (BP) at 2 and 18-20; and Azar Report (BP) at 11, 44-45, and 50.

[141] Any implication by BP's experts that Joe Keith had access to Transocean's flow-out data is belied by the findings of BP's own investigative team. Bly Report at 42; S. Robinson Depo., 1/27/2011 at 348:25-349:23; *see also* TRN-INV-01824082 (E-mail relating to Transocean's investigation concluding the Sperry sensor was bypassed when diverting overboard, but the Transocean paddle sensor was not)."

[142] Tr. of USCG/MMS Investigation (J. Keith testimony), 12/7/2010 at 193:11-15.

**CONFIDENTIAL**

**EXPERT REPORT OF DR. FREDERICK "GENE" BECK**

divine rig operations by analyzing data measured by a host of sensors throughout the rig, or by querying the Transocean crew members. I understand that during the final displacement, the Transocean drilling crew did not communicate rig activities to the Sperry mudlogger, leaving him in the dark.[158] Common sense dictates that an individual in such a position would not be the primary line of defense against a catastrophic blowout and its potential financial and environmental consequences.

Additionally, the mudlogger has numerous duties unrelated to monitoring the well for kicks, including keeping track of all fluids used in the drilling process, calibrating the Sperry sensors, collecting and characterizing cutting samples from the well, monitoring for problems with rig equipment/sensors, preparing daily and end of well reports, and preparing the surface data logging unit for transfer.[159] Indeed, the mudlogger does not have primary responsibility for kick detection.[160] The Transocean driller, assistant driller, toolpusher, and offshore installation manager, and the BP company man are required by regulation to be certified every two years in kick detection,[161] while the mudlogger is not. This reflects the prevailing understanding that a mudlogger is, at best, a "second set of eyes" for the drilling crew.[162]

The displacement procedure designed by M-I SWACO, executed by Transocean, and authorized by BP, put the Sperry mudlogger at a distinct disadvantage to members of the drilling crew who not only could monitor

---

[158] Tr. of USCG/MMS Investigation (J. Keith testimony), 12/7/2010 at 193:11-15; *see also* J. Bellow Depo., 5/3/2011 at 610:4-9 (BP's 30(b)(6) witness agreeing that "there is an expectation that the wellsite leadership will inform mudloggers of information that will affect their ability to do their job.").

[159] *See, e.g.*, Depo. Ex. 609.

[160] P. Lee Depo., 6/2/2011, 459:20-460:22 ("Q. The driller, the AD, the drilling crew are the -- have the primary responsibility for monitoring downhole conditions; would you agree with that? A. I think so, yes, sir." (objection omitted)). Mr. Lee was a BP well site leader on the Deepwater Horizon.

[161] 30 CFR 250.401(d), 30 CFR 250 Subpart O; s*ee also, e.g.*, TRN-MDL-00536818.

[162] *See, e.g.*, P. Lee Depo., 6/2/2011, 460:20-23; W. Wheeler Depo., 8/25/2011 at 95:22-96:1 ("Q. Okay. Did you rely on the Sperry-Sun mudloggers, or did you rely more on the -- your own data that the drill crew would get? A. I relied on mine."); M. Burgess Depo., 4/20/2011 at 327:12-328:5 ("My primary ones I watched was the HiTech. That's the primary ones I watched. Sperry was a backup, in my book.").

105

**EXPERT REPORT OF DR. FREDERICK "GENE" BECK**

primary kick-indicators unavailable to the mudlogger (such as flow-out while diverting), but also had full knowledge of the rig operations (such as staggering the pumps), as well as the ability to shut in the well (by activating the blowout preventer) in the event of a kick. These individuals, not the Sperry mudlogger, are responsible for missing and failing to respond to the kick that led to the Macondo blowout.[163]

The primary responsibility for well monitoring remained with Transocean throughout the displacement procedure according to Minerals Management Service regulation and Transocean's own procedures. Minerals Management Service regulations require a member of the drilling crew on the rig floor to maintain "continuous surveillance."[164] Similarly, Transocean's Well Control Handbook clearly states "[t]he Driller is responsible for monitoring the well at all times."[165] Despite this clear line of responsibility, Transocean's expert, Mr. Barnhill, improperly attempts to shift this burden to the mudlogger by suggesting that the driller and two assistant drillers would have been distracted by other issues during the displacement.[166] If a driller is distracted or busy, however, his responsibilities fall to one of the assistant drillers. If the Transocean driller and two assistant drillers were all too busy to keep an eye on the well, as Mr. Barnhill suggests, leaving the mudlogger as the sole and primary individual monitoring for a well control situation, someone from the crew should have at least called the mudlogger to let him know he had that

---

[163] Further analysis regarding the displacement and the impact of additional simultaneous and non-standard operations can be found in Appendix C, describing mudlogging on the *Deepwater Horizon* generally and on April 20, 2010.

[164] "You must take necessary precautions to keep wells under control at all times. You must: . . . (c) Ensure that the <u>toolpusher</u>, <u>operator's representative</u>, or a <u>member of the drilling crew</u> maintains continuous surveillance on the rig floor from the beginning of drilling operations until the well is completed or abandoned, unless you have secured the well with blowout preventers (BOPs), bridge plugs, cement plugs, or packers." 30 CFR 250.401(c) (emphasis added).

[165] Depo. Ex. 590 at TRN-MDL-00286784 (Transocean Well Control Handbook, Section 1.3.6).

[166] *See, e.g.*, Expert Report of Calvin Barnhill, Macondo Engineering, Operations and Well Control Response, 9/24/2011 (hereinafter "Barnhill Expert Report") at 39-40.

106

**EXPERT REPORT OF DR. FREDERICK "GENE" BECK**

responsibility.[1] I have seen no evidence that anyone made such a call. Thus, the responsibility remained squarely with Transocean to monitor the well, aided by the mudlogger's second set of eyes.

### 2. BP and Transocean conducted simultaneous and non-standard operations that obscured primary kick indicators during the final displacement.

Mudloggers perform a variety of tasks, but the primary task of a mudlogger is to set up, configure and maintain sensors, and to monitor data that pertains to a host of drilling-related parameters. These parameters are measured by sensors (such as a flow sensors and pit volume sensors) positioned at various locations around the rig. As part of maintaining this system, the mudlogger monitors the sensors' output for anomalies.

Anomalies in pit volumes, or other parameters available to the mudlogger, can be caused by a number of different activities such as fluid transfers between pits, rig movement, crane activity, and, of course, an influx into the well. Significant anomalies that the mudlogger cannot reconcile are communicated to the driller, assistant driller, company man, toolpusher, and/or mud engineer so those individuals may determine whether the anomaly is an expected response, or a sign of a potential problem such as a pipe washout, faulty sensor, or a kick.

On April 20, 2010, the *Deepwater Horizon* was preparing to abandon the Macondo well. To do so, BP's plan called for underbalancing the well by replacing heavy drilling fluid with lighter seawater prior to setting a cement plug. All parties knew a kick could occur during this process, yet in their haste to move to a new drill site, BP, Transocean, and M-I SWACO elected to perform multiple simultaneous and non-standard actions without regard for safety or even their own standard operating procedures.[168] These actions included:

---

[167] Tr. of USCG/MMS Investigation (J. Keith testimony), 12/7/2010 at 193:11-15; *see also* J. Bellow Depo., 5/3/2011 at 610:4-9 (BP's 30(b)(6) witness agreeing that "there is an expectation that the wellsite leadership will inform mudloggers of information that will affect their ability to do their job.").

[168] Section 4.1.1 of Transocean's Well Control Handbook states that individuals involved in rig activity should "[k]eep all mud treatment and pit transfers to the absolute minimum during critical sections of the well. The Mud Engineer and the Derrickman must keep the Driller and Mud Loggers informed of any transfers or treatments or mud." Depo. Ex.

107