**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | § | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE GULF OF | § | |
| MEXICO, ON APRIL 20, 2010 | § | SECTION J |
| | § | |
| IN RE: THE COMPLAINT AND | § | |
| PETITION OF TRITON ASSET | § | JUDGE BARBIER |
| LEASING GMBH, ET AL. IN A | § | |
| CAUSE OF EXONERATION FROM | § | MAGISTRATE JUDGE SHUSHAN |
| OR LIMITATION OF LIABILITY | § | |
| | § | |
| This Document Relates To: | § | |
| *All cases and No.: 2-10-cv-2771* | § | |
| | § | |
| | § | |

## MOTION TO STRIKE PORTIONS OF EXPERT REPORTS AND DEPOSITIONS REFERENCING EXCLUDED JIT REPORT AND JIT TESTIMONY

# EXHIBIT N
## Kris Ravi

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG
"DEEPWATER HORIZON" in the
GULF OF MEXICO,
on APRIL 20, 2010

Applies to:

ALL CASES and
2:10-cv-02771

MDL No. 2179

Section: J

The Honorable Judge Barbier
Mag. Judge Shushan

# REBUTTAL EXPERT REPORT OF DR. KRIS RAVI
## TO THE REPORT OF RONALD J. CROOK REGARDING CEMENTING ISSUES

January 30, 2012


EXHIBIT N
Kris Ravi

CONFIDENTIAL

whether certain effects of additives are properly counterbalanced by other additiv s. For example, whether ZoneSealant 2000 effectively counteracts the defoaming effect of D-Air 3000 is tested by foaming the entire slurry with the defoamer blended and testing the slurry's stab lity. The Macondo slurry (with all additives included) was subjected to a foam stability test, and the test demonstrates that this slurry, with all additives, was capable of being foamed and was stable.[3] The mere presence of D-Air 3000 does not make the slurry incapable of being foamed. Nor does the mere presence of D-Air 3000 renders the slurry unstable.

**Mr. Crook's Opinion #4:** Although foam tests should have been conducted on the slurry formulation that was pumped at the Macondo Well, Halliburton did not run those tests. Available pre-incident testing by Halliburton shows that the slurry design exhibited signs of settling and foam instability. Post-incident testing by various laboratories confirmed the pre-incident testing results showing slurry instability.

> **General Response:** The decision to change the retarder concentration was done by BP at the last minute, 48 hours before the cement job was supposed to be pumped.[4] It was the decision of BP to accept the risks of proceeding with the cement job without having the foam stability test results on the slurry with an additional .01 gps of retarder. Nevertheless, the final April foam stability test (on a slurry containing .08 gps of retarder) shows that the set foamed cement density is the same at the top and bottom of the set foam cement sample, demonstrating that the slurry was stable.[5] I do not believe that this foam stability test result would change with the addition of only .01 gps of additional retarder. Further, the only completed post-incident foam stability test using the actual rig cement blend was the unset foam stability test conducted by OTC on the "MAC4" sample, with 0.09 gps of retarder.[6] Even though the MAC4 sample was more than a year old, that test showed that the slurry was stable according to the API criteria.[7] All of the post-incident testing relied upon by Mr. Crook to assert that the Macondo slurry was unstable was conducted on non-representative, non-rig samples.

**Mr. Crook's Opinion #5:** The design of the cementing program appears to be adequate. Sufficient cement was used to cement above the designated hydrocarbon zones and sufficient spacer was pumped before the cement. The pump rates were adequate based on the well conditions.

> **General Response:** BP did not accept HESI's recommendations regarding the number of centralizers and proper wellbore cleaning prior to the cement job, both of which contributed to mud channeling and fluid influx from the formation. BP did not disclose all the hydrocarbon bearing formations with significant pore pressure. BP did not meet the MMS requirement of placing cement at least 500 feet above the highest hydrocarbon

---

[3] *See* MDL Litigation Ex 4566 at HAL_DOJ_0000042.

[4] *See* MDL Litigation Ex. 5567.

[5] *See* MDL Litigation Ex 4566 at HAI_DOJ_0000042.

[6] *See* MDL Litigation Exs. 5937, 5939 (Oilfield Testing & Consulting tests for Joint Investigation eam); *se al b* G Garrison Dep. at 176:7-23.

[7] *See* G. Garrison Dep. at 207:9-13.

Page 4

I disagree with Mr. Crook's primary opinion on page 32 that "testing performed on laboratory stock is largely representative of the performance of actual field blends."

It is common in the industry, particularly in deepwater wells, to perform operational cement testing on cement and additive samples taken from the field (or in this case, from the rig). Time and expense is incurred to bring these samples from the rig by boat or by helicopter.[65] The very purpose for this practice is the recognition that cement, in particular, is variable. That means that test results can vary between laboratory stock cement and actual rig cement. It is all the more important to obtain actual rig samples for testing when the cement blend is coming from a marine environment. In the marine environment of deepwater cementing, the cement on the rig is loaded into a tank on a boat, transported by boat to the rig and then blown into other tanks aboard the rig. All these events have the potential to contaminate the cement blend with humidity/moisture and even the contents of other cement blend residue in the tanks and transport systems. Thus, once a slurry leaves shore for the rig, it begins to develop its own unique history that has the potential to change the slurry's chemical composition and thus performance under testing.[66]

Even the passage of time can change the chemical composition of the cement blend. That is why samples for testing are routinely re-taken after the passage of time. Mr. Benge, for example, expressed the opinion that he would re-sample dry blend for operational testing every two weeks.[67] This practice also is in recognition of the fact that samples taken just two or three weeks apart may themselves render variable testing results.

The principle of cement variability is also recognized in BP's own internal cementing documents. For example, in its Drilling and Completions Cementing Manual, BP states: "Laboratory testing is a critical element in successful well cementing. Cement, chemical additives and well conditions are never entirely consistent or predictable, therefore, the testing of field representative samples is critical to ensure the slurry has the properties to meet the cementing objectives."[68] Further, in recognition of cement's variability the HESI-BP contract requires HESI to use rig cement, not laboratory stock, for testing.[6] Finally, virtually every

---

[65] *See* G. Garrison Dep. at 178:13-179:12.

[66] *See* D. Kellingray Dep., at 556:17-24 (testifying that ther is "a level of uncertainty' if ig amples were not used for testing); at 560-8 12 (testifying that "There was . . . it' quite common tha we would se differences" when testing rig samples and substitute samples.)

[6] *See* G. Benge Dep. at 271 5-20.

[68] *See* MDL Litigation Ex. 6233 (Drilling and Completions Cementing Manual: Cement Laboratory Testing ection SRP 4.1-0003) at p 3

[6] *See* MDL Litigation Ex 447 (Contract Section 3, Appendix 6, ¶ 2 1 (All testing is required on rig amples . . ."

Page 18

knowledgeable cement expert in this case agrees that cement exhibits variability and that variability of test results should be expected between testing on laboratory stock and rig cement.[70]

For these reasons, I don't agree with Mr Crook's statement that testing on laboratory stock is largely representative of testing on actual rig cement. The industry disagrees with him. BP's internal documents disagree with him. And the most experienced cement experts in this case disagree with him. Therefore, to the extend Mr Crook relied on post-incident testing on lab stock or non-rig cement to support his opinions, I would disagree.

Yes, HESI may run preliminary tests on lab stock material, but it confirms the results using the cement and additives from the rig or field location. There is a very good reason why the industry has adopted this procedure and is willing to incur the time and cost of getting the materials from the location to the lab.

Cement is manufactured using naturally occurring materials such as limestone. Cement clinker is then ground with other materials, tested and then sent to end users. Cement powder reacts with water and hence is susceptible to changes in chemistry on exposure to air, especially in a marine environment. The cement produced may change from batch to batch due to the differences in raw materials used, and how it is produced. In addition even two samples from the same batch will differ in their performance if they are stored handled transported and moved differently.[71]

This variability depending on the source of the cement is actually demonstrated by the Chevron testing. Chevron's post-incident tests were conducted using lab stock cement and additives sent by HESI[72] But they were not conducted on actual rig samples as those were being preserved by order of the court. Foam stability tests were conducted by Chevron on the cement provided by HESI. Those were Chevron tests 6, 7 and 9.[73] Chevron also conducted a foam stability test using cement directly obtained from Lafarge, not HESI. That was Chevron test 8. Despite being branded as the very same cement, the foam stability test result on the cement obtained directly from Lafarge (test 8) was significantly different than the foam stability test results obtained on the Lafarge cement obtained from HESI's lab stock (tests 6, 7 and 9)[74]. This clearly demonstrates the importance of knowing which cement is used in the testing before drawing conclusions from the test results.

With that preface about the variability of cement, I will respond to Mr. Crook's reliance on the various post-incident testing conducted after the Macondo incident

---

[70] *See* Beirute Dep at 323:10-19; 326:15-327:14 (A cementing consulting expert for BP, opined that there is a difference between "rig sampling and shelf sampling" because "cements do change from batch to batch . field waters may change and even additives from batch to batch may change so there might be differences" and therefore it is 'possible' that "shelf samples could test differently than the rig samples." *See also* G. Garrison Dep at 73:7-12, 177:15-179:12 (The JIT's cementing expert, agreed that lab stock gives "some indication" but that rig sampling testing is preferred out of "concerns for representativeness of testing." ; C. Gardner Dep., 289:18 291:24 same and D. Brown Dep., 239:2-12 same).

[71] *See* G. Benge Dep at 271.5-20.

[72] *Se* MDL Litigation x 457 at p

[73] *Se* G. Gardner Dep. at 295:_- 99'52

[74] *Id*

Page 19

> **(Crook Report, Pages 34–36) – relying on Chevron testing as representative of the slurry pumped on the Macondo well.**

**Chevron testing.** Chevron did not test actual rig samples.[75] Based on the above discussion, I do not agree that the results of Chevron's testing are representative of the slurry pumped at the Macondo well.[76] I disagree wi h Mr. Crook's reliance on the Chevron tests to opine about the propert cs and/or performance of the slurry pumped at the Macondo well.

> **(Crook R port, Pages 37–39) – relying on O C testing as representative of the slurry pumped on the Macondo well.**

**OTC testing.** OTC conducted cement testing at the request of the U.S. government.[77] The majority of the cement tests conducted by OTC were conducted on lab stock cement and additives. However, OTC did conduct two—and only wo—tests on actual rig blend from th e Macondo production casing job. Tha rig blend was turned over to the U.S. government by HESI, and the U S. government in turn provided some portion of what was turned over to OTC for testing. The specific slurry sample comprised of actual rig blend was designed "MAC4" in the OTC report.[78] Other than the Ha liburton testing in April 2010, this is the only test with the rig cement blend, although it was more than a year old when OTC tested it.[79]

OTC conducted an "unset" foam stability test and "set" foamed stability test on the MAC4 slurry, which contained the same amount of retarder - .09 gps   that the Macondo slurry contained. The results of the unset foam stability test by even Greg Garrison's admission, showed a stable slurry in the unset form. The report from OTC shows a Table titled Stability of Unset Foamed Cement Slurry" on Page 38.[80] The last row shows results for the Macondo rig blend under "MAC4." This clearly shows that the foamed cement slurry had no settling and no free fluid. While the Table says the MAC4 slurry experienced "bubble breakout," Greg Garrison testified that it was "minor" and not to the degree that it would be considered unstable under API criteria.[81] In fact Mr. Garrison testified that the unset foam stability test on the MAC4 slurry indicated that the rig cement slurry was stable,[82] even more than a year after the incident.

---

[75] *See* G. Gardner Dep. at 300:22-301 20.

[76] Even Craig Gardner of Chevron conceded in front of the National  ommission that he would need to test the rig samples to determine if the Macondo slurry was stable ("More specificall  do you b lieve that your testing is a reliable indication o  what would have happened if you tested the rig blend? A: I would have to test the rig blend to answer that.") (National Commission Testimony at 225 8-14)

[77] *See* MDL Litigation Ex 5937

[8] *Id* at p 35

[79] *Id.* at p 3 ("Well samples were received Wedne day J n  2 201  from the U S. Coas Gu d t) ar .

[80] *Id* at p. 38

[81] *See* G. Garrison Dep. at 195:16-204.6.

[82] *I* at 205 10-207 1  3.

With respect to the "set" foam stability test conducted by OTC on the MAC4 slurry, that test was prematurely terminated in contravention of API recommended testing protocols.[83] Thus, no foam stability test result was obtained from this test.[84] OTC terminated the test after 48 hours and noted that the cured sample would not set up completely. API clearly states that the sample should be allowed to cure for 24 hours **or until set**.[85] However, there is a good reason why the cured sample did not set within 48 hours, and it has to do with OTC's testing protocol.

The temperature ramp OTC used to heat the water bath into which the foam slurry is poured was different from what was used in the Halliburton testing in April 2010. Halliburton used 4 hours to ramp the temperature from 135 degrees F to 180 degrees F.[86] OTC used 8 hours to ramp from 135 degrees F to 180 degrees F (4 hours from 135 degrees F to 165 degrees F, and another 4 hours from 165 degrees F to 180 degrees F).[87] When a Wellcat temperature simulator was used to simulate the temperature during cement slurry hydration, the simulation results showed that it would take 1½ hours from 135 degrees F to 165 degrees F and 2 hours from 165 degree F to 180 degrees F. (See Table 1 in Sec. VIII). This means that Halliburton's temperature ramp is correct. It also means that OTC's temperature ramp was too long, which likely explains why the MAC4 foam slurry did not set up within 48 hours. Had OTC used the proper temperature ramp, the cured foam slurry sample likely would have set up within 48 hours, as it did when Halliburton conducted the test back in April 2010.

In conclusion, the test on lab cement at Chevron was not representative of the Macondo rig cement blend, and the test on the Macondo rig cement blend conducted by OTC showed that the base cement slurry could be foamed successfully and that the foamed slurry was stable, as per API specifications.

The most relevant foam stability test for the Macondo foam cement was the one conducted by Halliburton in April 1010.[88] Only one other foam stability test was performed to conclusion on the actual rig cement since the Macondo incident (although more than a year later), and that test (OTC's unset foam stability test) showed the foam cement slurry could be successfully foamed and that it was stable. Given the acknowledged variability of cement, post-incident testing conducted on lab stock cement or any other non-rig cement is unrepresentative of the slurry pumped at the Macondo well.

V. **BP'S OPERATIONAL DECISIONS PLACED CONSTRAINTS ON THE FOAM CEMENT JOB PUMPED AT MACONDO THAT UNDERMINED ITS ABILITY TO ISOLATE THE HYDROCARBON ZONES IN THE WELL.**

(Crook Report, Pages 39-41)   opining that BP properly designed TOC to be 17,300 feet.

---

[83] *See* G. Garrison Dep. at 211:12-212:8.

[84] *See* G. Garrison Dep. at 29:8-21

[85] *See* API RP 10b-4.

[86] *See* MDL Litigation Ex. 802 at HAL 0010642

[87] *Id.*

[88] *See* MDL Litigation Ex. 4566

Page 21