UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG § <br> "DEEPWATER HORIZON" in the § <br> GULF OF MEXICO, § <br> on APRIL 20, 2010 § <br> § <br> Applies to:  All Cases and § <br>                         2:10-CV-2771 § <br> § | | MDL No. 2179 <br><br> SECTION:  J <br><br> JUDGE BARBIER <br><br> MAG. JUDGE SHUSHAN |

_____

**HESI'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR ADVERSE INFERENCES BASED ON ASSERTIONS OF THE FIFTH AMENDMENT**

Defendant, Halliburton Energy Services, Inc. ("HESI") files this Memorandum in Support of Its Motion for Adverse Inferences Based on Assertions of the Fifth Amendment, and in support thereof, would show as follows:

**I.    The Invocation of the Privilege Against Self-Incrimination in Civil Proceedings May Lead to the Imposition of an Adverse Inference.**

**A.    The Fifth Amendment Protects Against Self-Incrimination.**

The Fifth Amendment protects against self-incrimination by providing that: "No person . . . shall be compelled in any criminal case to be a witness against himself. . . ." U.S. CONST. amd. V. The Supreme Court broadly construes its protection to ensure that an individual is not compelled to produce evidence that may later be used against him or her in a criminal proceeding. *Maness v. Meyers*, 419 U.S. 449, 461 (1975); *Kastigar v. United States*, 406 U.S. 441, 445 (1972). For Fifth Amendment protection a statement must (1) be compelled, (2) be testimonial, and (3) potentially incriminate a person in a criminal proceeding. *See Fisher v. United States*, 425 U.S. 391, 399 (1976); *United States v. Gecas*, 120 F.3d 1419, 1428 n.11 (11th Cir. 1997) (en banc).

      **B.**    **An Adverse Inference May Be Applied to Witnesses Taking the Fifth Amendment, Provided There Is Corroborating Evidence to Support the Inference.**

In *Baxter v. Palmigiano*, 425 U.S. 308, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976), the U.S. Supreme Court commented on the issue of silence by a witness in a civil proceeding: "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a party to a civil cause.' " (internal citation omitted). Thus, in a civil case, a negative or adverse inference may be drawn against a party to the action who asserts his or her Fifth Amendment privileges. Federal and Louisiana state law are in accord in this regard. *See Miles v. Louisiana Landscape Specialty*, 697 So. 2d 348, 351 (La.App. 5 Cir. 1997); *Farace v. Indep. Fire Ins. Co.*, 699 F.2d 204, 210 (5th Cir. 1983).

The evidentiary weight of an adverse interest will depend upon the circumstances, but in all cases, the inference cannot stand unsupported. *See Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 675 (5th Cir. 1999); *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 119 (5th Cir. 1990). ***The most important factor in a court's analysis of whether to apply an adverse inference is the inference sought must be supported by corroborating or independent evidence.*** *See id.* at 119. In other words, parties may not simply manufacture unsubstantiated facts and impute them to a witness taking the Fifth Amendment. There must be independent evidence to support the negative inferences beyond the invocation of the privilege against self-incrimination; otherwise, no inferences may be drawn. *See United States v. Stelmokas*, 100 F.3d 302, 311 (3rd Cir. 1996) (citing *United States v. Local 560 of the Int'l Bhd. of Teamsters, etc.*, 780 F.2d 267, 292, n.32 (3rd Cir. 1985)).

II. **HESI Is Entitled to Seek Adverse Inferences for Certain Witnesses Who Pled the Fifth Amendment.**

   A. **HESI Seeks Adverse Inferences for 7 Witnesses.**

HESI seeks the imposition of specific adverse inferences[1] for the following witnesses who have invoked the Fifth Amendment:

| Name | Employer | Job Title | Depo Date |
|---|---|---|---|
| Bertone, Steve | Transocean | Chief Engineer/Maintenance Supervisor | 07/27/11 |
| Hafle, Mark | BP | Senior Drilling Engineer | 07/22/11 |
| Harrell, Jimmy | Transocean | Offshore Installation Manager | 07/12/11 |
| Kaluza, Robert | BP | Well Site Leader (On Rig) | 07/11/11 |
| Morel, Brian | BP | Drilling Engineer | 07/21/11 |
| Seraile, Allen | Transocean | Assistant Driller | 07/25/11 |
| Wheeler, Wyman | Transocean | Toolpusher | 08/25/11 |

   B. **Steve Bertone of TO**

Steve Bertone was the Transocean ("TO") Maintenance Supervisor/Chief Engineer on the Deepwater Horizon ("DWH") from November 2008 until the time of the Macondo blowout. Based on his refusal to answer a number of questions in his deposition (cited below), HESI seeks the following adverse inferences against TO:

- Bertone was aware of the DWH September 2009 audit which documented 390 jobs of overdue planned maintenance, amounting to 3,545 overdue man-hours of maintenance (Exhibit 4362, 17:12-18:16; 86:1-20; 90:13-22).

- Bertone was personally responsible to properly maintain the safety critical equipment on the Horizon (48:3-9).

- Based on the foregoing, it was Bertone's responsibility to ensure that all maintenance items on the DWH were addressed in a proper and timely fashion. He did not do this. Bertone's actions increased the risk profile of the Macondo well.

---

[1] The independent corroborating evidence for these assertions is either contained in an exhibit cited below or will be established through the course of trial.

### C. Mark Hafle of BP

Mark Hafle was one of BP's program engineers for the Macondo well. Based on his refusal to answer a number of questions in his deposition (cited below), HESI seeks the following adverse inferences against BP:

- Hafle and Morel were the lead BP cement program engineers and both prepared a decision tree that included a Cement Bond Log (Exhibit 4447; 22:8-15; 23:23-24:9).

- Hafle talked to Well Site Leader Don Vidrine about the test results from the negative pressure test and told him that there would not be pressure on the drill pipe in a test that is properly lined up (Exhibit 4447; 30:19-31:24).

- Hafle talked to Vidrine, who advised that during the negative pressure test, there was zero pressure on the kill line but pressure remained on the drill pipe (Exhibit 4448; 174:1-176:8).

- It was Hafle's position that a cement plug should have been set, but the BP culture did not support it (Exhibit 4453; 43:9-46:2).

- Hafle was focused on achieving cost savings for BP, including the use of the Fast Drill method on the Macondo well for an estimated savings of $250,000 (57:24-59:22; 182:11-189:15).

- Many of BP's decisions on the Macondo well focused on saving time and money, including: the decision not to use 21 centralizers, as recommended by HESI; the decision to use an LCM spacer; the decision to displace before setting the cement plug; the decision to forego further well integrity tests after anomalous negative test results; the decision to bypass the reserve pits and offload mud to the *Damon Bankston*; and the

decision to forgo bottoms-up circulation before cementing among others (66:3-8-70:14; 107:19-111:5; 167:12-168:10; 194:19-203:4; 205:1-11; 206:17-209:16).

- Based on the foregoing, Hafle's cost-cutting decisions on the Macondo Well significantly increased the risk of a blowout occurring.

### D. Jimmy Harrell of TO

Jimmy Harrell was the TO OIM on duty on the DWH at the time of the blowout. Based on his refusal to answer a number of questions in his deposition (cited below), HESI seeks the following adverse inferences against TO and/or BP:

- Harrell, as OIM, was responsible for the safety, conditions, and procedures on board the DWH (65:7-11; 105:3-11).

- The first version of the written displacement procedure that the BP Company Man provided to Harrell did not include a negative test. Harrell told the BP Company Man that he would not perform a displacement without first conducting a negative test (111:23-113:19).

- Harrell was aware of some anomalous readings during the first negative test and instructed the drill crew to increase the annular pressure (116:6-22).

- The BP Company Man and the TO Toolpusher were responsible for interpreting the negative pressure test (86:15-24).

- During the entire day of April 20, 2010, Harrell was busy escorting four VIPs (Pat O'Bryan and David Sims from BP and Daun Winslow and Buddy Trahan from TO) around the rig (108:18-110:10).

- With respect to the cement job, Harrell knew it was better to run a full bottoms-up circulation (135:12-22).

- On the morning of the explosion, Harrell told another TO worker that "I guess that's what we have those pinchers for" in reference to the BOP blind shear rams potentially being activated.. (136:13-138:4).

- Based on the foregoing, it was Harrell's responsibility to ensure the negative pressure test was properly run and interpreted. Harrell did not do this. Additionally, BP failed to include a negative pressure test in its original well plan, and amended its plan to include this only at Harrell's insistence.

### E.     Robert Kaluza of BP

Robert Kaluza, Jr. was one of the Well Site Leaders on duty on the DWH at the time of the blowout. Based upon Kaluza's refusal to answer a number of questions in his deposition (cited below), HESI seeks the following adverse inferences against BP:

- At the pre-tour meeting on the morning of April 20, 2010, Kaluza and Jimmy Harrell, OIM of the DWH, had a heated discussion, wherein Harrell disagreed with the final plan of plugging and abandoning the well as a dangerous method, but Kaluza told him, "This is how it's going to be" (64:12-65:10). In response to the prior exchange with Kaluza at the pre-tour meeting, Harrell replied to Kaluza, "I guess that's what we have pincers for." (65:11-17).

- Kaluza was aware on April 20th that between 1200 and 1400 psi remained on the drill pipe during the performance of all the negative test procedures (239:13-19).

- Kaluza and Vidrine did not consult BP experts in Houston about the 1400 psi pressure on the drill pipe and lack of flow on the kill line but, instead, they explained it away with the "bladder effect" theory (48:1-10).

- The differential pressures on the drill pipe and the kill line during the second negative test indicated that there was a problem that should have been investigated (290:15-21).

- BP never provided Kaluza any formal training on how to conduct a negative pressure test or any training on what was required for a pressure test to be successful (144:24-145:10).

- There were no procedures or documents from BP on the rig, to which Kaluza could refer for guidance on how to conduct or interpret a negative pressure test (145:11-25).

- It was BP's responsibility to interpret the negative test, and the BP Well Site Leader makes the final decision regarding whether the negative test has passed or failed (219:8-18)

- Kaluza did not call BP onshore to confirm the theory that the psi found in the drill pipe during the negative pressure test was caused by a "bladder effect," despite the fact that BP had a number of experts onshore with whom he could have consulted on this bladder effect theory (53:25-54:12).

- Prior to April 20, 2010, Kaluza had never heard of a bladder effect with respect to negative tests (241:6-9).

- As BP Well Site Leader, Kaluza knew that cementing at four barrels per minute is less than an optimal rate of cement flow, and he described it as "odd" and "very low" (28:24-29:21, Exhibit 3188).

- Kaluza directed the pump rate for the cement job on Macondo (235:2-5).

- Kaluza determined the volume of cement that was going to be pumped in the cement job (235:6-10).

- Kaluza was aware that failing to perform a bottoms-up circulation increases the risk of channeling in the subsequent cement job and compromises the ability of a cement job to

obtain zonal isolation due to the risk of contamination and/or channeling (236:22-237:4; 237:5-11).

- Kaluza was aware that crane operations affect the ability to monitor flow and pit volumes and, thus, crane operations during displacement affect the mudloggers' ability to monitor the well (159:15-160:5).

- Kaluza was aware that the mudloggers were not notified that the mud offloading from the pits to the Damon Bankston had ceased. (158:15-159:1, Ex. 3567). Without being so notified, the mudloggers would not know to monitor the volume in the pits (159:2-7).

- When the overboard dump line was opened during the sheen test, the Sperry-Sun flow meter was bypassed (160:22-161:3).

- Once discharges were directed overboard, the flow could not be monitored by the Sperry-Sun flow meters (161:4-9).

- Based on the foregoing, Kaluza's actions and decisions on the Macondo Well significantly increased the risk of a blowout occurring.

### G.     Brian Morel of BP

Brian Morel was a BP drilling engineer on the Macondo well. Based on his refusal to answer a number of questions in his deposition (cited below), HESI seeks the following adverse inferences against BP:

- Morel was the lead engineer who was responsible for the entire drilling program on the Macondo well (Exhibit 4504).

- Morel was responsible for the design, monitoring, reporting, and overall safety at the Macondo well. (18:15-24; 19:1-7; 19:14-19; 19:21-20:6; 20:8-11; 20:13-17; 20:19-24; 21:1).

- Morel was aware that the Macondo was regarded as a "nightmare well" and "the well from hell" (21:10-11; 21:17-23:9; Ex. 4507).

- Morel was aware that the DWH took a "bad kick" on March 8, 2010 (23:15-17; 23:18-24:7; 24:9; Ex. 4507).

- Morel was aware of a well control event occurring on April 5th, 2010 that resulted in a total loss of returns (28:20-29:9; 29:11; Ex. 4507).

- Morel had a concern with Bob Kaluza taking over as well site leader. (33:5-22; 33:24-34:3; 34:5; Ex. 4507).

- Morel was aware that HESI had recommended the use of 21 centralizers on the production casing (47:18-48:21; 48:23-49:1; Exhibit 4510).

- Morel was aware that HESI's computer modeling [Exhibit 4511] predicted a severe gas flow problem if only seven centralizers were used (51:19-52:21; 52:23-53:11).

- Morel was aware of BP's decision to use six centralizers (138:24-139:5; 139:7-10; 139:24-140:2; 140:4-12; 140:14).

- Morel was focused primarily on cost cutting on the Macondo well (35:25-36:3; 36:5-7; 36:9-18; 36:20-24; 37:1-8).  Specifically, the following decisions made on the Macondo well were cost-driven:  the decision to discard the liner/tie-back design (40:3-6; 40:8-10; 40:12; 150:6-11; 150:13-16; 150:18-21; 150:23-151:1; 151:3-7; 150:9); the decision to run less than 21 centralizers (37:11-14; 37:16; 156:4-11; 156:13-15; 156:17; 157:20-158:4; 158:6); the decision to forego the cement bond log (37:24-38:1; 38:3; 158:7-13; 158:15-16; 158:18-20); the decision to use loss circulation materials as a spacer (38:3-8; 38:9; 177:20-178:3; 178:6-9; 178:11); and the decision not to perform a full bottoms-up circulation (118:15-18; 118:20).

- Based on the foregoing, Hafle's decisions on the Macondo Well significantly increased the risk of a blowout occurring.

### H.    Allen Seraile of TO

Allen Seraile was a Transocean assistant driller on the DWH.  Based on his refusal to answer a number of questions in his deposition (cited below), HESI seeks the following adverse inferences against TO and/or BP:

- The OIM, Driller, and Assistant Driller did not properly monitor the Macondo well during the hour before mud and hydrocarbons hit the rig floor  (52:2-8).

- It is easier for the drilling crew to detect a kick than for the mud logger since the crew has knowledge that the mud loggers do not have  (58:1-7; 59:23-60:1).

- Seraile never had any problem with the mud loggers (56:17-20).

- The drilling crew is responsible for shutting in the well if a kick is indicated or even suspected  (61:5-8; 116:10-15).

- TO's Well Control Handbook required the crew to shut in the well immediately upon any indication of flow, rather than taking time to conduct a flow check  (109:14-25).

- BP dictated the well program; (11:12-19; 15:8-11); the type of cement program (12:5-8); the number of centralizers (13:21-25); and the timing and decision to conduct a negative pressure test  (15:16-20).

- Based on the foregoing, the Transocean drilling crew did not properly monitor the well. Because the drilling crew has more knowledge than the mudloggers, it is easier for them to detect a kick; upon detection of a kick, the crew had a responsibility to shut in the well immediately.  With regard to BP, BP dictated operations on the DWH, including the instructions for displacement that left only one barrier in place at the time of the incident.

I.   **Wyman Wheeler of TO**

Wyman Wheeler was a Transocean toolpusher on the DWH. Based on his refusal to answer a number of questions in his deposition (cited below), HESI seeks the following adverse inferences against TO and/or BP:

- Wheeler reported the results of the first negative pressure test as abnormal to BP Company Man Don Vidrine and called a timeout on the rig floor to review the test results (33:6-20; 110:9-111:2).

- Based on the foregoing, both TO and BP had actual knowledge of an abnormal test result from the first negative pressure test. Notwithstanding this, both TO and BP ignored this and concluded that the negative pressure test was successful.

Dated:  February 24, 2012          Respectfully Submitted,

**GODWIN RONQUILLO PC**

**By:** /s/ *Donald E. Godwin*
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
DGodwin@GodwinRonquillo.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
BBowman@GodwinRonquillo.com
Jenny L. Martinez
State Bar No. 24013109
JMartinez@GodwinRonquillo.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
FHartley@GodwinRonquillo.com
Gavin E. Hill
State Bar No.  00796756
GHill@GodwinRonquillo.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

and

R. Alan York
AYork@GodwinRonquillo.com
Jerry C. von Sternberg
JVonSternberg@GodwinRonquillo.com
Misty Hataway-Coné
MCone@GodwinRonquillo.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone:  713.595.8300
Facsimile:  713.425.7594

**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES, INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Halliburton Energy Services Inc.'s Memorandum in Support of Its Motion for Adverse Inferences Based on Assertions of the Fifth Amendment has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this 24th day of February, 2012.

/s/  *Donald E. Godwin*
Donald E. Godwin