**1**

Montgomery v USA        Case 2:11-cv-02298-CJB-SS        U S Dist Ct EAST DIST OF LA

1    **Exhibit 1 NPFC Claim Determination N10036-0344**
2

U.S. Department of
Homeland Security

**United States
Coast Guard**



Director
United States Coast Guard
National Pollution Funds Center

NPFC CA  MS 7100
US COAST GUARD
4200 Wilson Blvd. Suite 1000
Arlington, VA 20598-7100
Staff Symbol: (CA)
Phone:
E-mail:

Fax:  202-493-6937

5890
3/17/2011

CERTIFIED MAIL – RETURN RECEIPT REQUESTED
Number:



Mobile, AL 36607

RE:     Claim Number: N10036-0344

Dear                    :

The National Pollution Funds Center (NPFC), in accordance with the Oil Pollution Act of 1990, 33
U.S.C. § 2701 et seq. (OPA) and the associated regulations at 33 C.F.R. Part 136, denies payment on
claim number N10036-0344 involving the Deepwater Horizon oil spill.  Please see the enclosed Claim
Summary/Determination Form for further explanation.

Disposition of this reconsideration constitutes final agency action.

If you have any questions or would like to discuss the matter, you may contact me at the above
address and phone number.

Sincerely,

Claims Adjudication Division
U.S. Coast Guard

Encl:  Claim Summary / Determination Form

## CLAIM SUMMARY / DETERMINATION FORM

| | | |
|---|---|---|
| Date | : | 3/12/2011 |
| Claim Number | : | N10036-0344 |
| Claimant | : | ███████████ |
| Type of Claimant | : | Private (US) |
| Type of Claim | : | Loss of Profits and Earning Capacity |
| Claim Manager | : | ████████████ |
| Amount Requested | : | $10,400.00 |

*FACTS*:

On or about April 20, 2010, the Mobile Offshore Drilling Unit Deepwater Horizon (Deepwater Horizon) exploded and sank in the Gulf of Mexico. As a result of the explosion and sinking, oil was discharged. The Coast Guard designated the source of the discharge and identified BP as a responsible party (RP). BP accepted the designation and advertised its OPA claims process. On August 23, 2010, the Gulf Coast Claims Facility (GCCF) began accepting and adjudicating claims for certain individual and business claims on behalf of BP.

*CLAIM AND CLAIMANT*

On December 16, 2010, ███████████(Claimant) presented a lost profits & earnings claim in the amount of $10,400.00 to the National Pollution Funds Center (NPFC) for reimbursement. The Claimant asserted that he lost profits & earnings due to his hours being cut as a result of the Deepwater Horizon incident but never provided an explanation or information on his place of employment. In a letter dated January 10, 2011, the NPFC requested that the Claimant provide additional information to support his claim. Based on the W-2's provided by the Claimant, it appears as though he was employed by ███████████, LLC in Coden, Alabama in 2010 but no further information was provided.

The Claimant stated that he filed an Emergency Advance Payment claim with the GCCF and was subsequently denied. The NPFC verified this information with the GCCF. Claimant was provided Claimant ID # ██████ and Claim ██████ which was in fact denied by the GCCF.

The NPFC denied the claim on February 24, 2011, on the basis that the Claimant failed to provide the additional requested information to support his claim and establish that he had suffered a loss of profits.

*REQUEST FOR RECONSIDERATION:*

On March 7, 2011, the Claimant sent a request for reconsideration via facsimile dated March 7, 2010 to ███████████ stating he would like the NPFC to reconsider his claim. The Claimant provided hand written answers to the questions the NPFC posed in its official request for additional information dated January 10, 2011. The Claimant provided copies of his 2007 W2 earnings statement from ███████████ LLC, an illegible copy of his 2008 Wage and Income Transcript from the IRS, and a copy of his 2009 and 2010 W2s from ███████████ LLC. It is important to note that the Claimant did not provide any of his income tax returns for 2007, 2008, and 2009 including all attachments, Schedule C's as requested by the NPFC.

***RECONSIDERATION CLAIM ANALYSIS:***

The claimant requested reconsideration via facsimile on March 7, 2011. To support his request for reconsideration, the claimant provided hand written answers to the questions the NPFC posed in its official request for additional information dated January 10, 2011, copies of his 2007 W2 earnings statement from ████████████ LLC, an illegible copy of his 2008 Wage and Income Transcript from the IRS, and a copy of his 2009 and 2010 W2s from ████████████ LLC. It is important to note that the Claimant did not provide any of his income tax returns for 2007, 2008, and 2009 including all attachments, Schedule C's as requested by the NPFC. The Claimant was concrete truck driver for ████████████ LLC and requests $10,400.00 in loss of profits and earnings. When the NPFC requested that he describe how he calculated his lost earnings, the Claimant's reply on reconsideration was "...the lost of 40 hours + no overtime because no major jobs were going to build anything in this area until thing get better on the coast area." Based on that explanation, the NPFC still is unable to determine how the Claimant derived at his sum certain.

**NPFC Determination on Reconsideration**

Under 33 CFR 136.105(a) and 136.105(e)(6), the claimant bears the burden of providing to the NPFC all evidence, information, and documentation deemed necessary by the Director, NPFC, to support the claim. Under 33 CFR § 136.233, a claimant must establish loss of profits or impairment of earning capacity. A request for reconsideration must be in writing and include the factual or legal grounds for the relief requested, providing any additional support for the claim. The NPFC considered all the documentation submitted by the Claimant.

The NPFC performed another analysis of the financial information the Claimant did provide in his claim submission. Below is a table which identifies the Claimant's pre-spill earnings and the Claimant's post-spill earnings.

**TABLE 1: Earnings by Year and Employer**

| YEAR | EMPLOYER | GROSS EARNINGS BASED ON W2 INFORMATION |
|------|----------|----------------------------------------|
| 2010 | ████     | $35,666.14                             |
| 2009 | ████     | $6,606.40                              |
| 2009 | ████     | $21,885.60                             |
| 2008 | ████     | $36,524.00                             |
| 2007 | ████     | $33,087.12                             |

Based on the preceding table, the NPFC has determined that the Claimant's earnings were overall better after the Deepwater Horizon incident than prior to the incident. While the information originally provided was minimal, the NPFC does not see how the Claimant has calculated a loss of profits and earning capacity as a result of the spill.

The NPFC again denies the claim because (1) the alleged loss is not due to injury, destruction or loss of property or natural resources as a result of a discharge or substantial threat of discharge of oil and (2) the Claimant has failed to demonstrate a loss of profits and earnings. Therefore this claim is denied upon reconsideration.

Claim Supervisor:

Date of Supervisor's review: *3/17/11*

Supervisor Action: ***Denial on reconsideration approved***

1    **Exhibit 2 NPFC Claim Determination N10036-0009**
2

U.S. Department of
Homeland Security

**United States
Coast Guard**



Director
United States Coast Guard
National Pollution Funds Center

NPFC CA  MS 7100
US COAST GUARD
4200 Wilson Blvd. Suite 1000
Arlington, VA 20598-7100
Staff Symbol: (CA)
Phone: ███████████
E-mail:
██████████████████
Fax:   202-493-6937

5890
3/15/2011

CERTIFIED MAIL – RETURN RECEIPT REQUESTED
Number: █████████████████████

████████████████████

Miami, FL 33157

RE:      Claim Number: N10036-0009

Dear █████████████████:

The National Pollution Funds Center (NPFC), in accordance with 33 CFR Part 136, denies payment on the claim number N10036-0009 involving Deepwater Horizon.  Please see the attached Claim Summary / Determination Form for an explanation regarding this denial.

Disposition of this reconsideration constitutes final agency action.

If you have any questions or would like to discuss the matter, you may contact me at the above address and phone number.

Sincerely,

████████████████████████
████████████████████████
████████████████████████
██████ Claims Adjudication Division
U.S. Coast Guard

ENCL:  Claim Summary / Determination Form

CLAIM SUMMARY / DETERMINATION FORM

| | | |
|---|---|---|
| Date | : | 3/15/2011 |
| Claim Number | : | N10036-0009 |
| Claimant | : | ███████████ |
| Type of Claimant | : | Private (US) |
| Type of Claim | : | Loss of Profits and Earning Capacity |
| Claim Manager | : | ███████████ |
| Amount Requested | : | $314,000.00 |

*FACTS*:

On or about 20 April 2010, the Mobile Offshore Drilling Unit Deepwater Horizon (Deepwater Horizon) exploded and sank in the Gulf of Mexico. As a result of the explosion and sinking, oil was discharged. The Coast Guard designated the source of the discharge and identified BP as a responsible party (RP). BP accepted the designation and advertised its OPA claims process. On 23 August 2010, the Gulf Coast Claims Facility (GCCF) began accepting and adjudicating claims for certain individual and business claims on behalf of BP.

*CLAIM AND CLAIMANT*:

Claimant, ███████████, presented a claim in the amount of $314,000.00 to the National Pollution Funds Center (NPFC) on 10 September 2010, claiming a loss of profits and impairment of earning capacity resulting from the Deepwater Horizon incident.

The NPFC's original denial determination was completed and issued to the Claimant on December 6, 2010. The NPFC denied the claim because the Claimant failed to meet his burden to demonstrate he had a loss of profits and earnings due to the injury to, destruction of or loss of property or natural resources as a result of a discharge or substantial threat of a discharge of oil. On January 19, 2011, ███████████ requested reconsideration of the NPFC's December 06, 2010 denial based on the following information:

1. With respect to 33 CFR §136.233(a), Claimant provided (3) individual Certified Property Appraisals as evidence for the properties that are subject of this claim. Claimant contends that the appraisals accurately appraise the taxable value of the (3) subject properties before the incident, the value after the incident, and the loss of value as a result without any other economic factors contributing to that assessment;

2. With respect to 33 CFR §136.233(b), Claimant states he has proven factually that his real property was injured and damaged as a result of the oil-spill through certified appraisal, depreciating property value disclosures that are now required by law whereas they were not before the spill, and loss of interested buyers that would no longer pursue the subject properties owned by the Claimant. Claimant further states that the damage caused directly by the oil-spill and substantial threat of oil was overwhelming proof to cause market stigma, reduce the value of the properties, and eliminate an essential factor that is required to making profit on the sale of any property, interested buyers;

3. With respect to 33 CFR §136.233(c), Claimant states he submitted the original purchase contract between ███████████ and himself for the amount of $100.00, the executed IRS Form 1099 for the amount of $90,000.00 of taxable profit from real estate investing and sale of the most recent and relevant investment by the Claimant, along with four (4) pay stubs from his employer that indicated the year to date income from ███████████

Construction to establish the rate of pay by proration of $6,033.39 biweekly for Claimant's income from January 1, 2010 to August 13, 2010. Claimant earned $48,267.00, a reduction of $90,000.00 during the oil-spill. Also, the direct loss of value as a result of the injury to the subject properties (i.e., Claimant's assets as proven by certified appraisal in the same period is $41,813.00) and Claimant has paid $1,350.00 for the certified appraisals to prove his case which contends furthers his loss;

4. With respect to 33 CFR §136.233(d), Claimant maintains that he continues to have regular employment with the same construction company for the past 20 years. Claimant states that his income has not been supplemented by any other speculative real estate investment sales or any other sources of income in order to offset the loss of profit he alleges to have experienced as a result of the Deepwater Horizon incident. Claimant further alleges that there are other sources of income available although he continues to lose money due to the lost opportunities for him to invest without the working capital therefore there is no opportunity for him to offset his losses until he receives compensation.

5. In summary, the Claimant requests compensation for the alleged loss of marketability, diminished property value, and loss of interested buyers that occurred during the defined period, specifically from April 20,2010 through July 15, 2010 or caused the loss thereafter in the total amount of $442,292.00 for those fair and accurate incurred loss of profits and additional costs that resulted from his certified appraisals in the amount of $1,350.00, property taxes, mortgage interest and maintenance costs in the amount of $12,942.00 for 12 months, property diminution in the amount of $41,813.00, loss of income and profit from the previously evidenced historical 100% rate of return on investments based on the loss of $214,000.00 lost profit realized and projected rate of return to the total amount of $428,000.00 just prior to the Deepwater Horizon incident based on the evidence and proofs submitted and where no other contrary evidence has been submitted or exists.

It is important to note that the information provided above (items 1-5) are the Claimant's assertions on reconsideration but are not proven by the documentation submitted by the Claimant. Additionally, the Claimant has misconstrued the claims regulation associated with lost profits and earnings located at 33 CFR §136.233(a-d). See NPFC Analysis and Determination on Reconsideration discussion below.

**NPFC Analysis and Determination on Reconsideration**

To receive compensation from the OSLTF for lost profits and earnings, the Claimant MUST establish that his loss of profits and earnings was due to the injury, destruction or loss of real property, personal property or natural resource in order to have an OPA compensable damage. In this particular claim, [redacted] states two bases for his request for reconsideration and they are: (1) loss of marketability and sale of his three investment properties and (2) diminution of property values.

With respect to the Claimant's first basis on reconsideration, the Claimant states he has a loss of marketability of his three investment properties based on what he refers to as "the full selling price" of the subject properties.

Based on the documentation presented by the Claimant in his original claim submission, the Claimant stated that he listed the selling price for each of the subject investment properties as (1) parcel one located in [redacted] Key, FL at $149,000.00; (2) parcel two located in [redacted] Key, FL at $95,000.00, and (3) parcel three located in [redacted] Key, FL at $75,000.00 bringing his

original selling price for all three properties to $319,000.00 based on a copy of his individual Craigslist property advertisements. The Claimant has not provided documentation for the sale price of each property via a signed purchase and sale agreement for which he alleges he had prospective buyers. Therefore it is impossible for the NPFC to verify definitively that the Claimant would have received his asserted $214,000.00 for the sale of the subject properties.[1] Moreover, the Claimant has not actually sold the properties; therefore, his alleged loss remains prospective.

With respect to the second basis on reconsideration, the Claimant states he has property value diminution. In support of the Claimant's request for reconsideration, the Claimant hired an Appraiser to perform certified appraisals on the three investment properties which are the subject of this claim. The December 2010 certified appraisals provided by the Claimant include a pre-spill value, a post-spill value, and a property diminution value as determined by the appraiser. The Claimant stated that the resulting property diminution value does not include any other economic factors. However, upon review of the appraiser's considerations, under the 'Introduction" section of each property appraisal, it is clear that the value concluded in the appraisal reports considered information that was used for the analysis from most recent sales occurring pre and post oil-spill which do contain other economic factors, since the sale(s) were based on market demand with environmental considerations built in.

Although Claimant asserts that the appraisals accurately measure the taxable value of the (3) subject properties due to the oil spill, this is not the "injury, destruction or loss of real property, personal property or natural resource" contemplated by the statute and regulations. In this case his property was not injured, destroyed or lost due to the oil spill nor was his property injured, destroyed or lost due to damage to the natural resource.

When considering property value diminution, the concept could constitute an economic loss only if the Claimant had realized an actual financial loss by selling the subject properties and that loss was due to the injury, destruction or loss of the real property or the natural resource. Additionally, when considering property value diminution, the value should equal only the reduction in market value as a direct result of the damage to the natural resource. Consideration should also be given to any increase in property prices since the end of the oil-spill. These would reduce the Claimant's asserted loss once the loss is actually realized.

It is important to note that the appraised value of the subject properties post incident is only an indication of their potential value. Furthermore, as noted above, the Claimant cannot claim a loss for the full price of the properties that he currently still owns. If in fact he sells the properties the Claimant still has the burden to demonstrate that any loss he were to realize is due to the damage to the natural resource.

With respect to the Claimant's arguments associated with property taxes, mortgage interest and maintenance fees requested over a twelve month period, the NPFC finds that the Claimant would have been responsible for servicing the mortgage and paying property-related expenses regardless of the oil-spill until the properties were sold; therefore, these costs are not OPA compensable. Moreover, some of the costs that the Claimant alleges are for a future time period

---

[1] While the Claimant submitted letters from two prospective buyers withdrawing their interest or commitment to the properties, these letters were generated in October 2010 and November 2010, respectively. Both of these dates are long after the time period where there was a threat of the discharge of oil reaching the Florida Keys. The offshore well was capped on July 15, 2010; therefore, Claimant has not established that the injury to the natural resource caused his alleged loss of profits.

which makes them speculative in nature and not an actual damage at the time the claim was presented.

With respect to the Claimant's argument that he incurred appraisal costs in order to document a decline in property values, the NPFC does not disagree that the Claimant incurred such costs. However, (1) the NPFC does not compensate for 'claim preparation costs' [2] which is what the appraisal fee is considered since the Claimant has yet to demonstrate a loss of profits and earnings and because (2) the Claimant has not realized any financial losses by way of the sale of the subject properties.

The NPFC again denies the claim because the Claimant has not established that his alleged losses are due to the injury, destruction or loss of property or natural resources.

Claim Supervisor:

Date of Supervisor's review: *3/15/11*

Supervisor Action: ***Denial on reconsideration approved***

Supervisor's Comments:

---

[2] *See,* 33 CFR §136.105(e)(8)

**3**

1   **Exhibit 3 NPFC Claim Determination N10036-0166**
2

| U.S. Department of Homeland Security<br><br>**United States Coast Guard** |  | Director<br>United States Coast Guard<br>National Pollution Funds Center<br>Natural Resource Damage (NRD)<br>Claims Division | U.S. Coast Guard Stop 7100<br>4200 Wilson Blvd, Suite 1000<br>Arlington, VA 22203-1804<br>Staff Symbol: (CN)<br>Phone: ███████<br>E-mail: ███████ |

16480

January 10, 2011

*CERTIFIED MAIL Number:* ████████████

████████████

Gretna, LA 70053

RE: Claim Number: N10036-0166

Dear ████████████

The National Pollution Funds Center (NPFC) has reviewed your claim for lost subsistence use of natural resources resulting from the Deepwater Horizon oil spill. We have determined that you have not met your burden of proving a subsistence use loss as defined by the Oil Pollution Act (OPA, 33 U.S.C. 2701 *et seq.*) and OPA claims regulations (33 CFR Part 136). Accordingly, the NPFC denies payment of your claim. The basis of this determination follows.

*Background*

On or about April 20, 2010, the Mobile Offshore Drilling Unit Deepwater Horizon (Deepwater Horizon) exploded and sank in the Gulf of Mexico. As a result, oil was discharged and the federal government and Gulf coast states closed certain waters to commercial and recreational fishing for varying periods of time. The Coast Guard designated the source of the discharge and identified BP as a responsible party (RP). BP accepted the designation and advertised its OPA claims process. On August 23, 2010, the Gulf Coast Claims Facility (GCCF), a representative for the RP, began accepting and adjudicating claims for certain individual and business claims on behalf of BP.

*Facts of Your Claim*

On September 17, 2010, you presented a claim for Emergency Advance Payment to the GCCF, which was denied. On November 29, 2010, you presented your claim to the NPFC for lost subsistence use of natural resources following the Deepwater Horizon incident. The claim form that you submitted states that you seek $3,500 as damages for lost subsistence use for the period from winter 2010 through early 2011. You submitted no additional information with your claim form.

*Applicable Law*

OPA provides that the Oil Spill Liability Trust Fund (OSLTF) is available pay claims for uncompensated damages resulting from oil pollution incidents. 33 U.S.C. § 2712 (a)(4). Damages include the loss of subsistence use of natural resources. 33 U.S.C. § 2702(b)(2)(C).

General Claim Requirements

The regulations at 33 CFR Part 136 include general claim requirements and requirements specific to lost subsistence use claims.
Claims, including those for lost subsistence use of natural resources, must be: (a) in writing for a sum certain (33 C.F.R. §136.105(b)), (b) submitted to the NPFC within three years after the date on which the injury and its connection with the incident were reasonably discoverable (33 C.F.R. §136.101(a)), and (c) presented first to the (RP or guarantor and that claim is denied or not settled after 90 days before submission to the NPFC for payment (except as noted in 33 C.F.R. §136.103(a)). The NPFC finds that your claim meets the general claim requirements.

Subsistence Use Loss Claim Requirements

The claims regulations (33 C.F.R. §§136.219-223) provide additional requirements for lost subsistence use claims. Specifically, each claim for loss of subsistence use of natural resources must:

1) be for lost subsistence use and submitted by an eligible claimant;
2) identify and describe the actual subsistence use of each specific natural resource for which compensation is being claimed;
3) describe how and to what extent the claimant's subsistence use was affected by injury to or loss of each specific natural resource;
4) describe efforts to mitigate the subsistence use loss; and
5) be based on the reasonable cost to replace the lost subsistence use of natural resources.

*Claim Submission and Documentation*

On November 29, 2010, the NPFC received your claim for lost subsistence use of natural resources from the Deepwater Horizon spill. While you included a claim form stating that you seek $3,500 as damages for lost subsistence use, there was no additional documentation to support the claim.

*NPFC Determination*

Your claim for lost subsistence use is denied because you have not met your burden of proving a subsistence use loss as defined by the Oil Pollution Act (OPA, 33 U.S.C. 2701 *et seq.*) and OPA claims regulations (33 U.S.C. §136). You have not identified the

specific natural resource that was injured or lost, or described your subsistence use of that resource and how and to what extent such use was affected by the spill. Further, you have not provided information on how you mitigated your alleged loss or determined the reasonable replacement cost of the natural resource for which you seek compensation. It is also unclear the time period for which you are seeking compensation. If the time period is the winter 2010 through early 2011, this is a future time period for which you have not yet suffered a loss of subsistence use.

## *Request for Reconsideration*

You may request the NPFC to reconsider this determination. Reconsideration requests must be received by the NPFC in writing within 60 days of the date of this letter, and will be based upon the additional factual or legal information that you provide with your request. A claim may be reconsidered only once, and written disposition of a reconsideration request constitutes final agency action. If the NPFC fails to issue a written decision within 90 days after receipt of a request for reconsideration, this determination, at the option of the claimant, shall be deemed final agency action.

Should you choose to request NPFC reconsideration of this determination, please mail the request with claim number (N10036-0166) to:

Chief (Cn)
National Pollution Funds Center
U.S. Coast Guard
4200 Wilson Boulevard, Suite 1000
Arlington, VA 20598-7100

If you have any questions, please feel free to contact me at the above address or by phone at ▮▮▮▮▮▮▮▮

Sincerely,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

U.S. Coast Guard

3

4

1   **Exhibit 4 NPFC Claim Determination N10036-0117**

2

3



| | |
|---|---|
| U.S. Department<br>of Homeland Security | Director<br>United States Coast Guard<br>National Pollution Funds Center<br>Natural Resource Damage (NRD)<br>Claims Division | U.S. Coast Guard Stop 7100<br>4200 Wilson Blvd, Suite 1000<br>Arlington, VA 22203-1804<br>Staff Symbol: (CN)<br>Phone: ██████<br>E-mail: ██████ |
| **United States**<br>**Coast Guard** | | |

16480

January 10, 2011

*CERTIFIED MAIL Number:* ███████████

████████████

Gulfport, MS 39503-3254

RE:  Claim Number: N10036-0117

Dear ████████

The National Pollution Funds Center (NPFC) has reviewed your claim for lost
subsistence use of natural resources resulting from the Deepwater Horizon oil spill.  We
have determined that you have not met your burden of proving a subsistence use loss as
defined by the Oil Pollution Act (OPA, 33 U.S.C. § 2701 *et seq.*) and OPA claims
regulations (33 CFR Part U.S.C. §136).  Accordingly, the NPFC denies payment of your
claim.  The basis of this determination follows.

### *Background*

On or about April 20, 2010, the Mobile Offshore Drilling Unit Deepwater Horizon
(Deepwater Horizon) exploded and sank in the Gulf of Mexico.  As a result, oil was
discharged and the federal government and Gulf coast states closed certain waters to
commercial and recreational fishing for varying periods of time.  The Coast Guard
designated the source of the discharge and identified BP as a responsible party (RP).  BP
accepted the designation and advertised its OPA claims process.  On August 23, 2010,
the Gulf Coast Claims Facility (GCCF), a representative for the RP, began accepting and
adjudicating individual and business claims on behalf of BP.

### *Facts of Your Claim*

On August 23, 2010, you presented a claim for Emergency Advance Payment to the
GCCF, which was denied on October 28, 2010.  On November 19, 2010, you presented
your claim to the NPFC for lost subsistence use of natural resources following the
Deepwater Horizon incident.  You seek $13,144.20 as damages for lost subsistence use,
determined as the cost to replace fish that you claim you would have caught and used for
subsistence food during a six month period if the spill had not occurred.  You used quotes

from three seafood companies that do business over the internet to determine the replacement cost.

## *Applicable Law*

OPA provides that the Oil Spill Liability Trust Fund (OSLTF) is available to pay claims for damages resulting from oil pollution incidents. 33 U.S.C. § 2712(a)(4). Damages include loss of subsistence use of natural resources. 33 U.S.C. § 2702(b)(2)(C). The regulations at 33 CFR Part 136 include general claim requirements and requirements specific to lost subsistence use claims.

## General Claim Requirements

Claims, including those for lost subsistence use of natural resources, must be: (a) in writing for a sum certain (33 C.F.R. §136.105(b)), (b) submitted to the NPFC within three years after the date on which the injury and its connection with the incident were reasonably discoverable (33 C.F.R. §136.101(a)), and (c) presented first to the (RP or guarantor and that claim is denied or not settled after 90 days before submission to the NPFC for payment (except as noted in 33 C.F.R. §136.103(a)). The NPFC finds that your claim meets the general claim requirements.

## Subsistence Use Loss Claim Requirements

The claims regulations (33 C.F.R. §§136.219-223) provide additional requirements for lost subsistence use claims. Specifically, each claim for loss of subsistence use of natural resources must:

1) be for lost subsistence use and submitted by an eligible claimant;
2) identify and describe the actual subsistence use of each specific natural resource for which compensation is being claimed;
3) describe how and to what extent the claimant's subsistence use was affected by injury to or loss of each specific natural resource;
4) describe efforts to mitigate the subsistence use loss; and
5) be based on the reasonable cost to replace the lost subsistence use of natural resources.

## *Claim Submission and Documentation*

The claim you submitted to the NPFC by fax on November 19, 2010 included a letter with the following supporting documents: a letter from the GCCF dated October 28, 2010 denying your claim for Emergency Advance Payment (Claimant Identification Number: ▮▮▮▮), citing lack of proof of subsistence use and/or damages incurred due to loss of subsistence use of natural resources injured or destroyed as a result of the spill; three estimates for seafood from companies that sell and ship seafood from outside the Gulf region, which you assert represent similar types and quantities to those you regularly harvested for subsistence purposes; an affidavit from a witness testifying to your

subsistence use of natural resources from the Gulf of Mexico; unemployment verification for the benefit period May 30, 2010 to May 29, 2011, from the Mississippi Department of Employment Security; a fishing closure advisory for Mississippi state waters; various blog and news articles about the spill; and a copy of a recreational fishing license from the state of Mississippi that appears to have been issued in August of 2010[1].

### NPFC Determination

Your claim for lost subsistence use is denied because you have not met your burden of proving a subsistence use loss as defined by the Oil Pollution Act (OPA, 33 U.S.C. § 2701 *et seq.*) and OPA claims regulations (33 CFR Part 136). While you provided a copy of your recreational fishing license from August 2010, you have not provided sufficient evidence for the NPFC to determine whether you had a valid fishing license for the time period prior to the incident, and documentation necessary to demonstrate lawful fishing activities for this period. Moreover, the period of your claimed loss exceeds the closure period in your area. Therefore, your loss of subsistence use for a part of the period for which you claim a loss did not result from the Deepwater Horizon oil spill but from your choice not to fish in your area. Additionally, while you included a fishing closure advisory for Mississippi state waters in your documentation, you have not shown that you attempted to mitigate subsistence use losses, to the extent that they occurred, by fishing in locations that were not closed to fishing. Lastly, the internet-based cost estimates you provided do not reflect the reasonable replacement cost of the natural resource for which you seek compensation nor did you provide evidence that you incurred any replacement costs.

### Request for Reconsideration

Under OPA, you may ask the NPFC to reconsider this determination. Reconsideration requests must be received by the NPFC in writing within 60 days of the date of this letter, and will be based upon the additional factual or legal information that you provide with your request. A claim may be reconsidered only once, and written disposition of a reconsideration request constitutes final agency action. If the NPFC fails to issue a written decision within 90 days after receipt of a request for reconsideration, this determination, at the option of the claimant, shall be deemed final agency action.

Should you choose to request NPFC reconsideration of this determination, please mail the request and additional claim information with the appropriate claim number (N10036-0117) to:

---

[1] The copy of the fishing license provided to the NPFC is illegible. The NPFC cannot definitively determine to whom and when the license was issued.

Chief (Cn)
National Pollution Funds Center
U.S. Coast Guard, Stop 7100
4200 Wilson Boulevard, Suite 1000
Arlington, VA  20598-7100

If you have any questions about reconsideration, please feel free to contact me at the above address or by phone at ████████.

Sincerely,

U.S. Coast Guard

4

**5**

1   **Exhibit 5 Affidavit of D. Montgomery**

2   # UNITED STATE DISTRICT COURT

3   ## EASTERN DISTRICT OF LOUISIANA

4   ### 500 Poydras Street

5   ### New Orleans, LA 70130

6   ### (504) 589-7600

7

| | |
|---|---|
| **D. MONTGOMERY** | MDL NO. |
| -And- | |
| **All Other Similarly Situated Parties** | **SECTION: J-1** |
| *Plaintiffs*, | |
| Vs | **JUDGE** |
| | **MAG. JUDGE** |
| **UNITED STATES OF AMERICA** | **Case 2:10-md-02179-CJB-SS (lead)** |
| **DEPARTMENT OF** | **Case 2:11-cv-02298-CJB-SS (member)** |
| **HOMELAND SECURITY** | |
| **UNITED STATES COAST** | ## __AFFIDAVIT OF D.__ |
| **GUARD** | ## __MONTGOMERY__ |
| -And- | |
| Director of National Pollution Funds Center - Craig A. Bennett **(In his Official Capacity** as Director, National Pollution Funds Center United States Coast Guard) *Defendants* | |

8

9   **NOW COMES** Plaintiff, Duane Montgomery, states under oath that the statements and claims

10  presented in the attached Motion for CLASS ACTION Certification Order are true to the best of

11  my knowledge.

12

13  D. Montgomery

14  c/o ETR

15  33523 Eight Mile Rd

16  Bldg A-3, STE 108

17  Livonia, Michigan 48152

18  (313) 670-0371

State of Delaware County of Kent
Subscribed and sworn before me on _____ (Date)

_____ (Notary Signature)

CANDICE ALANNA JACKSON
Notary Public
State of Delaware
My Commission Expires on Nov 19, 2012

19  Plaintiff, In Pro per

**6**

1    **Exhibit 6 Testimony of Kenneth R. Feinberg before the Committee on Natural Resources**

**GCCF**     Gulf Coast Claims Facility

Testimony of Kenneth R. Feinberg
Administrator, Gulf Coast Claims Facility

Committee on Natural Resources
U.S. House of Representatives
October 27, 2011

Mr. Chairman:

I thank this Committee for the opportunity to testify concerning the design, implementation and administration of the Gulf Coast Claims Facility ("GCCF"), with a mandate to compensate all eligible claims arising out of the oil discharges from the Deepwater Horizon spill on April 20, 2010. I have been asked by both the Administration and BP to administer the GCCF, which evaluates, processes and decides any and all claims from private individuals and businesses impacted by the spill. Since its inception on August 23, 2010, the GCCF has received approximately one million claims from individuals and businesses located not only in the five state Gulf Region, but from all 50 states and 38 foreign countries.

I note, for example, receipt of 303 claims from the State of Washington; 166 of these were determined to be eligible and were paid a total of $2,704,388. And, the GCCF has received 328 claims from the ranking minority member's State of Massachusetts; 51 of these claims were determined to be eligible and were paid a total of $723,103.

The GCCF has processed 95 percent of all claims received, an extraordinary accomplishment considering the volume and complexity of the claims. As of October 21, 2011, we have paid approximately $5.5 billion (with an additional $400 million in outstanding offers) to some 213,068 claimants, honoring approximately 379,611 claims.

Even though the oil spill occurred some 18 months ago, the GCCF continues to receive on average about 2,270 new claims each week, convincing statistical evidence that the GCCF is

1

accomplishing its mission in providing efficient, fair and generous compensation to the victims of the environmental disaster in the Gulf. Whatever constructive criticism may be directed at the GCCF, the current filing rate is proof positive that we are doing something right. Individuals and businesses victimized by the spill clearly are not hesitating in filing claims in unprecedented numbers with the GCCF.

The GCCF remains in place to process any remaining claims that may be submitted until August 22, 2013. This was a wise decision; there is still plenty of time for claimants to submit a claim to the GCCF.

As you know, a $20 billion escrow fund was established by BP to pay all eligible claims that are submitted to the GCCF. And BP has agreed to supplement this escrow fund as needed to assure full and fair compensation to all individuals and businesses that are found to be eligible for payment. The entire cost of the GCCF is being borne by BP, without any cost to the taxpayers or the citizens of the Gulf Region.

During the initial three-month Emergency Advance Payment phase of the GCCF – from August 23, 2010 until November 23, 2010 – approximately $2.58 billion was paid to some 170,000 eligible individuals and businesses to cover up to six months of documented damage. These interim payments were made without any requirement that the claimant waive any right to litigate or return to the GCCF for additional compensation. Since the end of the emergency phase of the Program, the GCCF has paid additional claims totaling almost $3 billion to eligible claimants.

All claimants are provided a voluntary choice concerning the nature of the payments: a Final Payment for all remaining past, present and future documented damage; an Interim Payment for past quarterly documented damage; or a Quick Payment requiring no further documentation concerning damage for those claimants who received a prior payment from the GCCF. Those individual claimants opting for a Final or Quick Payment cannot return to the GCCF for additional compensation and must sign a release waiving their right to litigate against BP and any other defendant companies allegedly involved in the oil spill. Those selecting the Interim Payment option are not required to sign any release, and may return to the GCCF for subsequent payments for ongoing additional documented damage attributable to the spill.

2

As of October 21, 2011, 127,313 claimants have opted for the Quick Payment option, 63,133 have preferred the Final Payment option and 29,742 have opted for an Interim Payment. The choice is entirely up to the individual claimant; the GCCF does not prefer one option over another. The volume of claimants choosing each of these three payment options is sound evidence that all three options are readily available depending upon the unique circumstances confronting each individual claimant.

All claim determinations are made by the GCCF without any interference from either the Administration, BP or any other interested parties. My work is monitored by the Department of Justice and BP, but, again, there has been absolutely no interference with the discretion of the GCCF in the processing of individual claims and making individual determinations of eligibility and damage.

Any praise or criticism concerning the administration of the GCCF should be directed to me and me alone.

To meet the onslaught of claims, the GCCF initially established 35 regional claims offices throughout the Gulf Region to handle claims and assist claimants. (The GCCF has employed as many as 3,200 individuals in performing the various functions of the GCCF.) Fifteen full-time site offices (and an additional four offices with once-weekly or by appointment hours) currently remain in place as in person claim volume gradually diminishes, particularly from certain regional offices. Claimants may file claims in a number of ways including in person by visiting a site office, by U.S. mail, by fax and electronically through the GCCF website. During the past eight weeks, only 13.5% of all claims filed with the GCCF were submitted through local claims offices; the remainder were filed either electronically or by mail.

I am confident that the GCCF's local presence throughout the Gulf Region is more than sufficient to handle all claims inquiries by local citizens visiting GCCF offices.

The GCCF has received an incredibly diverse and complex number of claims from both individuals and businesses: death and physical injury claims; lost income and lost profit claims; subsistence claims; real and personal property damage claims; and removal and cleanup cost claims. We have received claims not only from fishermen, shrimpers, oyster harvesters, hotels, restaurants, real estate agents and developers and retail businesses, but also from builders,

3

contractors, developers, dentists, veterinarians, chiropractors, and restaurants and businesses located thousands of miles from the site of the spill. All are being processed. As already indicated, the GCCF is generally current when it comes to notifying claimants about the status of their claim: the calculated amount to be paid and why; reasons why the claim is denied; or reasons why the claim may yet be eligible for payment but lacks the minimum documentation necessary for the GCCF to pay the claim. If a claim is deemed deficient, the claimant is invited to work with the GCCF in supplementing the individual file in order to make the claim payable.

Claims may be denied for a variety of reasons: no documentation of damage or no evidence that the alleged damage is linked to the oil spill. (The GCCF recently completed a mass mailing to all denied claimants notifying these claimants of the opportunity to re-file a claim with the GCCF if they now have the necessary documentation to support the damages asserted.) In addition, since its inception in August of 2010, the GCCF has lacked jurisdiction to process damage claims alleged by local governmental entities; such claims must be submitted to BP itself for evaluation and payment. Unfortunately, the GCCF also lacks the necessary authority to process and pay any and all individual and business claims arising out of the federal government's moratorium pertaining to certain oil rig drilling in the Gulf of Mexico. BP has established a separate $100 million fund in New Orleans to process eligible moratorium claims. I direct all moratorium claimants (currently approximately 1,600 claimants) to that Fund for consideration of their claims. The GCCF is in no way involved with that Fund.

Pursuant to the Federal Oil Pollution Control Act, the decisions of the GCCF are accountable to the United States Coast Guard and a Liability Trust Fund. Any claimant dissatisfied with GCCF decisions pertaining to eligibility or the calculation of damages has the statutory right to ask the Coast Guard to conduct an independent review of the GCCF's decision. To date, the Coast Guard has received 1,486 requests for such an independent review and has completed the review of 1,359 of these requests; *in every single instance the Coast Guard has agreed with the ultimate decision rendered by the GCCF.* Based upon claims volume, the number of claims that continue to be filed with the GCCF from thousands of individuals and businesses, the amount of funds being distributed by the GCCF, and the independent opinions rendered by the United States Coast Guard ratifying GCCF decisions, it is clear to me that the GCCF is succeeding in its mission.

4

The Program is not perfect and I welcome constructive criticism from the distinguished Members of this Committee.  With claims volume at approximately one million submitted claims, there may be a certain inconsistency in the treatment of similarly situated claimants who offer similar proof of damage; when we review and discover such inconsistencies, we fix the problem by supplementing the payments.

Much of the criticism directed at the GCCF concerns allegations that the procedures used by the GCCF to determine both eligibility and compensation are enveloped in mystery, leading to inconsistency and a perception that the process is too often arbitrary and capricious.  The GCCF has taken the following steps designed to deal with this criticism:

a.  We have retained the services of seven local professional organizations, including lawyers and claims processing experts in each impacted Gulf state, to assist claimants in responding to individual inquiries about their respective claims and the reasons underlying GCCF eligibility and calculation determinations.  Individuals from six of these local firms remain in place throughout the Gulf Region.  Claimants may at any time, or by appointment, visit a site office and meet with one of our local liaisons.  Claimants now have various options for contacting a GCCF representative for assistance with filing a new claim or providing information on the status of an existing claim.  One of the most important improvements in the process is that each claimant is provided the name and telephone number of specific claims' representatives included in each and every determination, deficiency and denial letter sent to all claimants.  Claimants may call the toll-free GCCF helpline or email questions to our information email box and receive a written response; claimants may log onto the secure website and receive the status of their claims as well as copies of any letters and payment information that were sent by the GCCF concerning that claim.  In addition, we have enhanced the information regarding notices and other important information on the GCCF website in order to alert claimants about issues regarding the claims process.  I believe these steps go a long way in alleviating much of the frustration and anger of claimants who previously could not get answers to their claims questions.

b.  The GCCF has also become much more open and transparent in providing a wealth of information (available in English, Spanish, Vietnamese and Khmer) on its website.  Among other things, the GCCF website currently provides Important Notices and Information, a lengthy set of Frequently Asked Questions, posted copies of the GCCF Protocol for Interim and Final Claims, a copy of the Final Rules Governing Payment Options, Eligibility and Substantiation Criteria; a Summary of Options for Filing Claims, the Final Payment Methodology, specific information regarding supporting documentation requirements, a list of Claims Site Offices, information regarding Free Legal Assistance and information on how to report fraud. All claimants have the opportunity to file claims electronically and can access information relating to their claims, including copies of all letters sent to them by the GCCF, the status of their claims, determination letters and payment offer explanations.  We are also providing more detailed information in all correspondence with claimants.  This has also improved the process, providing claimants with a sense that they are not simply part of an "assembly line" that does not take into account the individual characteristics of their claim.

We have also agreed with the Department of Justice that an independent audit should be made of the GCCF, focusing on procedures, practices and data, in order to determine just how efficient, consistent and successful the GCCF has been in analyzing claims and compensating eligible claimants. I am confident that the audit will be both truly "independent" and focused. I look forward to this audit. I am confident it will validate the work of the GCCF and its dedicated personnel.

I also think it important to emphasize the unprecedented nature of the GCCF, and the role it has assumed.  As an Adjunct Professor of Law, having taught Mass Torts at New York University School of Law, Columbia University Law School, the University of Pennsylvania Law School and Georgetown University Law Center, I know of no other mass disaster in which any Administration has worked with a private company in establishing a multi-billion dollar private fund to pay all eligible victims. The GCCF is unique. It will not easily be replicated in other contexts.

When I was asked by the Bush Administration and Attorney General John Ashcroft to design and administer the September 11th Victim Compensation Fund enacted by Congress, I knew that all compensation paid to the victims of the 9/11 attacks would consist entirely of public funds.  The GCCF, however, is funded entirely by BP without any contribution from the government or other private entities.  During the 33-month history of the 9/11 Fund, I processed a total of just over 7,500 submitted claims, paying about $7 billion in public taxpayer funds to approximately 5,300 families and physically injured victims.  In administering the GCCF, I have often received over 7,500 submitted claims in just one week (!) and, as already indicated, have already authorized payment of $5.5 billion in just the first year of the GCCF's existence.

Again, Mr. Chairman, I very much appreciate the opportunity to testify before this distinguished Committee and look forward to answering any questions that Members may have pertaining to the design, implementation and administration of the GCCF.  I wish to assure you and the Members of this Committee personally of my ongoing efforts to make the GCCF process work so as to benefit those individuals and businesses most in need.  I believe that the GCCF is achieving its objective.  I will continue to work with you and others to make sure that the GCCF is as efficient, effective and fair as possible.

I am also attaching for the Committee's consideration two documents that summarize important statistics pertaining to GCCF submissions, processing and payment of claims.  I would be pleased and honored to answer any questions from you and any other Members of this distinguished Committee.