**6**

1    **Exhibit 6, Bean Dredging, LLC, et al v. United States of America)**

2

3

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| BEAN DREDGING, LLC, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | Civil Action No. 08-1508 (CKK) |

**MEMORANDUM OPINION**
(March 30, 2010)

Plaintiff Bean Dredging, LLC ("Bean Dredging"),[1] successor in interest to Bean Dredging

Corporation, filed this lawsuit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701

*et seq.*, seeking judicial review of the final agency action of the National Pollution Funds Center

("NPFC") denying Bean Dredging's claim under the Oil Protection Act of 1990, 33 U.S.C. §

2701, *et seq.*, for reimbursement of costs and damages incurred in connection with an oil

pollution incident in Humboldt Bay, California on September 6, 1999.  This matter comes before

the Court on the parties' cross-motions for summary judgment.  The Court has conducted a

searching review of the parties' motions and responsive briefing, the attachments thereto, the

relevant statutes, regulations and case law, and the record of this case as a whole.  For the reasons

---

[1] Also named as Plaintiffs in this action are Bean Dredging's underwriters in interest, Navigators Insurance Services of Texas, Inc., National Union Fire Insurance Company and Water Quality Insurance Syndicate.  As indicated in the Complaint, these entities are U.S. domestic insurers of oil pollution risks, each of which provided pollution liability insurance to Bean Dredging and paid some or all of the removal costs and damages at issue in this litigation.  *See* Complaint, Docket No. [1], ¶ 5.  For the purposes of this Memorandum Opinion, the Court need not differentiate between Bean Dredging and its insurers and shall therefore refer to all Plaintiffs in this case collectively as "Bean Dredging."

set forth below, the Court shall GRANT-IN-PART and DENY-IN-PART the United States' [19]

Motion for Summary Judgment, shall DENY Bean Dredging's [20] Motion for Summary

Judgment, and shall remand this matter to the NPFC for further proceedings consistent with this

Memorandum Opinion.  Specifically, the Court DENIES WITHOUT PREJUDICE both the

United States' [19] Motion for Summary Judgment and Bean Dredging's [20] Motion for

Summary Judgment with respect to Bean Dredging's claims that the NPFC erred when it

misinterpreted and misapplied the term "seas" as used in 46 C.F.R. § 44.340(a)(1), and shall

remand this matter to the NPFC for further explanation of its interpretation of the relevant

regulations and its reasons for rejecting the interpretation advanced by Bean Dredging.  In

addition, the Court shall GRANT the United States' [19] Motion for Summary Judgment and

shall DENY Bean Dredging's [20] Motion for Summary Judgment insofar as Bean Dredging

asserts that the NPFC's final determination is inconsistent with the MCIR and is therefore

arbitrary and capricious.

## I. BACKGROUND

*A.      Statutory Background*

Congress passed the Oil Pollution Act ("OPA") of 1990 in response to the disastrous

March 1989 oil spill involving the Exxon Valdez in Prince William Sound, Alaska.  *Water*

*Quality Ins. Syndicate v. United States*, 522 F. Supp. 2d 220, 226 (D.D.C. 2007).  Pursuant to the

terms of the OPA, "each responsible party[2] for a vessel . . . from which oil is discharged . . . into

or upon the navigable waters . . . is liable for the removal costs and damages . . . that result from

---

[2] In the case of a watercraft vessel, the "responsible party" is "any person owning, operating, or demise chartering the vessel." 33 U.S.C. § 2701(32)(A).

such incident." 33 U.S.C. § 2702(a).  This includes all removal costs incurred by the United States government and certain removal costs incurred by other individuals as well as damages to natural resources, property, etc.  *Id.* § 2702(b).

In certain circumstances, however, the OPA permits responsible parties to limit their financial liability for removal costs and damages and to seek reimbursement for costs incurred. *See* 33 U.S.C. §§ 2704, 2708.  A responsible party who believes it is eligible for reimbursement may submit its claim for removal costs or damages directly to the Oil Spill Liability Fund.  *Id.* § 2713.  The NPFC, which is a part of and administered by the U.S. Coast Guard, a component of the Department of Homeland Security, is responsible for processing claims for reimbursement under the OPA.  Pl.'s Stmt. ¶ 3.  The NPFC may deny a claim for reimbursement if certain conditions are not met.  In particular, as is relevant to the case at hand, a responsible party is **not** eligible for reimbursement of any costs or damages incurred as a result of an oil spill if, *inter alia*, "the incident was proximately caused by . . . the violation of an applicable Federal safety, construction, or operating regulation by the responsible party, an agent or employee of the responsible party, or a person acting pursuant to a contractual relationship with the contractual party."  *Id.* § 2704(C)(1)(B).

     B.     *Factual Background*

        1.     The September 6, 1999 Oil Spill

As indicated above, this lawsuit arises from an oil spill that occurred on September 6, 1999, in Humboldt Bay, California.  Bean Dredging Corporation was the operator of the Dredge

Stuyvesant (the "Stuyvesant"), the vessel involved in that incident.  Pl.'s Stmt. ¶ 1.[3]  The

Stuyvesant is a diesel propelled, hydraulic hopper dredge that was, at the time of the incident,

operating under a contract with the United States Army Corps of Engineers to perform

maintenance dredging at the Outer Bar channel of the entrance to Humboldt Bay.  *Id.* ¶¶ 4-5, 13.

The immediate cause of the oil spill is not in dispute.  The parties agree that the incident

was caused when fuel oil spilled out from a 15 inch fracture in the hull plate of the Stuyvesant's

aft starboard fuel oil tank.  *Id.* ¶¶ 48, 56.  The parties further agree that the fracture in the hull

plate was almost certainly caused when the starboard dredge head[4] hit the Stuyvesant's fuel oil

tank as the vessel executed a 180 degree turn to port during its dredging operations[5] at

---

[3] As a preliminary matter, the Court notes that it strictly adheres to the text of Local Civil Rule 7(h)(2), which applies "to cases in which judicial review is based solely on the administrative record" and requires that in such cases, "motions for summary judgment and oppositions thereto shall include a statement of facts with references to the administrative record."  In setting forth the relevant background, the Court therefore cites to Plaintiff's Statement of Facts in support of its Motion for Summary Judgment ("Pl.'s Stmt.") or Defendant's Statement of Material Facts in support of its Motion for Summary Judgment ("Def.'s Stmt."), unless controverted by the opposing party's respective response statement, in which case the Court shall also cite to Plaintiff's Response Statement ("Pl.'s Resp.) or the Defendant's Response Statement ("Def.'s Resp."), as appropriate.  In addition, where necessary, the Court shall cite directly to the evidence in the record.

[4] The Stuyvesant is outfitted with port and starboard drag arms, which are both lowered by wire from cranes over the side during dredging operations.  Pl.'s Stmt. ¶ 7.  Dredge heads, fitted with 12-inch long spikes, are attached to the ends of each of the drag arms.  *Id.* ¶ 8.  During dredging operations, the dredge sails forward to allow the lowered drag arms and corresponding dredge heads to scrape the sea bottom and loosen the bottom material, which is then drawn into the vessel through water jets and piping in the drag arms and deposited into the dredge's hopper (an open hatch with runs fore to aft for approximately 15 feet).  *Id.* ¶¶ 9-10.

[5] Bean Dredging explains that when operating the Stuyvesant, the vessel dredges a path along a pre-arranged line, called a "cut."  Pl.'s Stmt. ¶ 11.  Upon reaching the end of a cut, the drag arms are lifted off the ocean bottom and suspended in the water as the dredge turns about face 180 degrees to start another cut in the opposite direction.  *Id.*

4

approximately 6:00 P.M. on September 6th. *Id.* ¶¶ 54-56.  This is reflected in the Court Guard's

Marine Casualty Investigative Report ("MCIR") issued after the incident in question, in which

the Coast Guard indicated that "the vessel apparently rolled several times during the turn and the

draghead collided with the side plate," causing the fracture through which the oil leak occurred.

*Id.* ¶ 57.  The Coast Guard further concluded in the MCIR that the accident was likely caused by

bad weather and an error in judgment by the vessel's crew.  *See id.*  While the parties dispute, to

some extent, the severity of the weather conditions existing in Humboldt Bay at the time of the

incident, this dispute is not material for purposes of the instant Memorandum Opinion.  Rather, it

is sufficient to note that Bean Dredging itself concedes that at the time of incident the Stuyvesant

was encountering at least "occasional" swells of 10 feet or greater.  *See id.* ¶ 25 ("Captain

Howcraft estimated that the seas and swells were anywhere from approx. six feet to twelve feet

(at times)."); *see also* ¶¶ 91-92.

The oil spill was first noticed at approximately 7:10 P.M. on September 6th, at which

time the Stuyvesant immediately notified the Coast Guard Station at Humboldt Bay, Bean

Dredging's site office, and the National Response Center, that the spill had occurred.  *Id.* ¶¶ 32-

38.  Precautions were undertaken to minimize the spill and to patch the fracture in the hull plate.

*Id.* ¶¶ 40-45.  By approximately 2:00 A.M. the following morning (*i.e.,* September 7, 1999), the

fuel oil had been contained and the Coast Guard permitted the Stuyvesant to sail to shore for

repairs.  *Id.* ¶ 46.  The Coast Guard estimated that approximately 2,100 gallons of Intermediate

Fuel Oil 180 was lost before the oil spill was ultimately contained.  *Id.* ¶ 53.  Bean Dredging

alleges that it incurred uncompensated removal costs in the amount of $8.5 million and that it

5

had also agreed to pay an additional $7.8 million in damages as part of a settlement with the

National Resource Trustees and the State of California as compensation for injuries sustained to

various natural resources as a result of the oil spill.  *Id.* ¶¶ 64-68.

2.    Proceedings Before the NPFC

On September 2, 2005, Bean Dredging filed a claim with the NPFC for reimbursement of

removal costs and damages (the "Claim").  *Id.* ¶ 71.  Bean Dredging asserted in its Claim that it

was entitled under the OPA to a limitation on its financial liability for the oil spill and requested

reimbursement of approximately $11.7 million in incurred removal costs and damages.  *Id.*

The NPFC initially denied the Claim on December 14, 2006, based, in relevant part, on

its determination that Bean Dredging was ineligible for reimbursement under the OPA because

the spill had been caused by the vessel's violation of two federal operating and safety regulations

— specifically, 46 C.F.R. § 44.340 and 46 C.F.R. § 42.09-1(c).  *Id.* ¶ 73; *see also* Administrative

Record ("A.R.") at 8.[6]  The former regulation provides, in relevant part, that "[e]ach hopper

dredge assigned a working freeboard may be operated at drafts from the normal freeboard to the

working freeboard if," *inter alia*, the "[s]eas are not more than 10 feet."  46 C.F.R. §

44.340(a)(1).  The latter regulation provides that "[t]he master of the vessel for which a load line

certificate has been issued shall be responsible for the maintenance of such certificate on board

such vessel and for compliance with its terms and conditions."  46 C.F.R. § 42.09(1)(c).  The

load line certificate in turn provides that the Stuyvesant may be operated at its working freeboard

---

[6] The NPFC also determined that Bean Dredging was barred from bringing its Claim
under the terms of its dredging contract and as well as under the terms of a release executed at
the completion of the Humboldt Bay project.  Pl.'s Stmt. ¶ 73.  This determination, however, is
not at issue in the present litigation.

6

in seas, *inter alia*, that are "[n]ot more than 3 meter waves." A.R. at 115.[7]

On June 6, 2007, Bean Dredging submitted a Request for Reconsideration to the NPFC. Pl.'s Stmt. ¶ 74. As is of relevance to this Memorandum Opinion, Bean Dredging argued that the NFPC's decision denying its Claim was in error because: (1) its vessel had not been operating in violation of either 46 C.F.R. § 44.340 or 46 C.F.R. § 42.09-1(c) at the time of the incident; and (2) the NPFC's decision contradicted the Coast Guard's MCIR. *See* A.R. at 1751-53. With respect to the first of these arguments, Bean Dredging directed the NPFC to the Notice of Proposed Rulemaking for 46 C.F.R. § 44.340, and argued that the history of the regulation demonstrated that the term "seas" as used in that regulatory provision was intended to refer specifically to the "significant wave height" *Id.* at 1752. As Bean Dredging explains and as the United States does not dispute, the phrase "significant wave height" is a term of art in the field of oceanography that is defined as the average height of the highest one-third of waves encountered over a specified period of time. *See* Pl.'s MSJ at 16; Def.'s Opp'n at 2 (conceding that "there is an oceanographic term 'significant wave height' which means just what Bean Dredging asserts," but disputing that the term should be applied to the regulations at issue). Bean Dredging therefore argued in its request for reconsideration that the language in 46 C.F.R. § 44.340(a)(1)

---

[7] The Court notes that while Bean Dredging initially disputed before the NPFC that the cited regulations applied to the Stuyvesant at the time of the incident, *see* A.R. at 40-41, Bean Dredging has not raised a similar argument before this Court. Accordingly, there is no dispute that these regulations applied to the Stuyvesant at the time in question, such that the dredge was required to operate within the boundaries set forth in the regulatory provisions — including the requirement that the dredge not operate in seas more than 10 feet. Given the parties' agreement that the Stuyvesant was required to operate in compliance with these regulatory provisions, the Court need not delve into a discussion of the terms "working freeboard" and "normal freeboard," which both involve technical concepts unfamiliar to the average layperson.

prohibiting a vessel from operating in "seas" of more than 10 feet is properly construed as

prohibiting a vessel from operating only in seas in which there is a significant wave height of 10

feet — *i.e.*, seas in which waves of more than 10 feet occur with a degree of regularity and not

just occasionally or at times.  A.R. at 1752.  Accordingly, while Bean Dredging conceded that its

vessel was operating in seas that *at times* encountered waves of over 10 feet, it argued that the

evidence in the record did not necessarily demonstrate that the vessel was operating in seas with

a *significant wave height* of more than 10 feet.  *See id.* at 1752-53.  Bean Dredging therefore

urged that the NPFC's finding that the Stuyvesant was in violation of the cited regulations was in

error.[8]

    With respect to Bean Dredging's second argument, it directed the NPFC to the MCIR

issued with respect to the September 6, 1999 oil spill and noted, in relevant part, that the MCIR

did not reflect any determination by the Coast Guard that the incident had been caused by

_____

[8] Although neither party has directly addressed this issue, it appears that the relevant
requirements for operating at the working freeboard that are listed on the load line certificate —
and which must be complied with pursuant to 46 C.F.R. § 42.09-1(c) — are drawn directly from
46 C.F.R. § 44.340(a).  *See* 46 C.F.R. § 44.340(b) (requiring the dredge's load line certificate
indicate on its fact each restriction included in paragraph (a)); *see also* A.R. at 115 (certifying
that the ship had been surveyed and the freeboards assigned in accordance with 46 C.F.R. Part
44).  In other words, the load line certificate simply reiterates the requirements set forth in 46
C.F.R. § 44.340 that obligate a vessel working at drafts from the normal freeboard to the working
freeboard to operate only in certain circumstances — including, as is relevant here, that the seas
are not greater than 10 feet.  This in turn implies that the interpretation of term "seas," as used in
46 C.F.R.  44.340, should also apply to the interpretation of the requirements set forth in a
vessel's load line certificate.  Although in this case the load line certificate prohibited operation
in seas with waves of more than 3 meter (or 9.842 feet) — rather than 10 feet, as is used in the
regulatory provision — the parties indicate that this minimal difference is immaterial to their
pending cross-motions for summary judgment.  *See* Def.'s MSJ at 3, n 4; Pl.'s MSJ at 15, n. 5.

violations of any federal operating or safety regulations. *Id.* at 1751.[9]  Bean Dredging therefore

urged that "[t]he NPFC's determination in this case is in direct contradiction to the conclusion of

the U.S. Coast Guard investigators who were on the scene at the time in question, with best

access to all of the relevant evidence." *Id.*

On November 13, 2007, the NPFC issued a decision affirming the initial denial of Bean

Dredging's Claim for reimbursement under the OPA.  Pl.'s Stmt. ¶ 76.  In particular, the NPFC

affirmed its initial finding that the Stuyvesant had been operating at the time of the incident in

violation of 46 C.F.R. § 44.340 and 46 C.F.R. § 42.09-1(c) and that the Stuyvesant's violations

of these federal operating and safety regulations had caused the incident at issue. *Id.* ¶ 77.  In so

finding, the NPFC rejected the two arguments raised by Bean Dredging in its request for

reconsideration.

With respect to Bean Dredging's first argument regarding the correct interpretation of the

term "seas," the NPFC noted that this argument had been advanced by Bean Dredging in its

request for reconsideration.  A.R. at 18.  The NPFC, however, did not provide any explicit

discussion of this argument in its final decision affirming denial of the Claim.  *See generally id.*

---

[9] At the time Bean Dredging submitted its initial Claim to the NPFC in September of 2005, the NPFC was not permitted to consider MCIRs in administrative proceedings regarding claims under the OPA.  This prohibition was based on the Coast Guard's broad interpretation of 46 U.S.C. § 6308, which provides that MCIRs are not "admissible as evidence or subject to discovery in any civil or administrative proceeding, other than an administrative proceeding initiated by the United States." *See* 71 Fed. Reg. 60553, 60553 (explaining previous prohibition on the use of MCIRs in OPA claim proceedings).  In October of 2006, however, the Coast Guard issued a Notice of Interpretation, in which it indicated that it was reversing its prior interpretation of 46 U.S.C. § 6308, as it concerned the use of MCIRs in claim proceedings under the OPA; specifically, the Coast Guard announced that the NPFC would now be permitted to "consider and rely on any part of a MCIR in determining whether to pay or deny a claim." *Id.* at 60554.

at 12-26. Nonetheless, it is abundantly clear that the NPFC ultimately rejected Bean Dredging's assertion that the relevant regulations were violated only if the vessel had been operating in seas with a significant wave height of 10 feet or more; the NPFC made no attempt to determine whether the "significant wave height" at the time of the incident was in excess of 10 feet, but rather affirmed that the record evidence sufficiently demonstrated that the vessel had operated in waves in excess of 10 feet (without reference to any specific frequency requirement) and was therefore in violation of its load line certificate and 46 C.F.R. § 44.340. *See id.* at 20-23. Given that the NPFC did not provide any discussion in its written decision regarding Bean Dredging's argument on this point, however, there is no explanation on the record as to why the NPFC rejected application of the term "significant wave height" to the relevant regulations. *See generally id.* at 12-26.

In addition, the NPFC rejected Bean Dredging's second argument that the NPFC's initial determination was in error because it contradicted the MCIR. *See id.* at 20-21. Unlike its rejection of Bean Dredging's regulatory argument, the NPFC provided a clear explanation for its decision not to rely on the MCIR. Specifically, the NPFC explained that the Coast Guard, in its Notice of Interpretation announcing its decision to permit the use of MCIRs in OPA claim proceedings, explicitly stated that the "NPFC is not bound by any part of the investigation" and indeed "can reach not only different facts but also different opinions or conclusions than the opinions or conclusions in the MCIR." *Id.* at 20 (citing 71 Fed. Reg. 60553, 60554 and 72 Fed. Reg. 17574, 17545). The NPFC therefore rejected any claim by Bean Dredging that the NPFC was bound by statements and/or findings in the MCIR. *Id.* In addition, the NPFC explained that,

while the Coast Guard did not cite the Stuyvesant for violations of 46 C.F.R. § 44.340 or 46

C.F.R. § 42.09-1(c), it did initiate an administrative penalty proceeding [against the Stuyvesant] .

. . for violati[ons] of 33 U.S.C. § 1321," which provides for administrative penalties against

owners or operators of vessels responsible for oil discharges.  *Id.*  As such, the NPFC concluded

that "[t]he mere fact that the Coast Guard prosecuted a penalty action under 33 U.S.C. § 1321

instead of alleging all possible regulatory violations does not establish that the vessel complied

with 46 C.F.R. § 44.340 or the load line certificate at the time of the incident."  *Id.*  For these

reasons, the NPFC affirmed its initial denial of Bean Dredging's Claim.  *Id.* at 23.

  C.  *Procedural Background*

  Bean Dredging filed the instant lawsuit on August 28, 2008, seeking judicial review of

the NPFC's decision denying its Claim for reimbursement under the OPA.  *See* Complaint,

Docket No. [1].  The parties subsequently filed cross-motions for summary judgment, which are

now pending before the Court.  *See* Def.'s MSJ, Docket No. [19]; Pl.'s MSJ, Docket No. [20].

Briefing on the parties' motions is now complete.  *See* Def.'s Opp'n, Docket No. [23]; Pl.'s

Opp'n, Docket No. [22]; Pl.'s Reply, Docket No. [24].[10]  Accordingly, the cross-motions are now

ripe for the Court's review and resolution.

## II. LEGAL STANDARD

  Both parties agree that the NPFC's decision to deny Bean Dredging's claim for

reimbursement under the OPA is properly analyzed under the standard of review set forth in the

APA, pursuant to which a court must set aside an agency action that is "arbitrary and capricious,

---

[10] The Court notes that the United States declined to file a reply in support of its motion
for summary judgment.

an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706. This

standard of review is highly deferential to the agency, so that a court need not find that the

agency's decision is "the only reasonable one, or even that it is the result [the court] would have

reached had the question arisen in the first instance in judicial proceedings." *Am. Paper Inst.,*

*Inc. v. Am. Elec. Paper Serv. Corp.*, 461 U.S. 402, 422 (1983). Rather, to survive the "arbitrary

and capricious" standard, an agency need show only that it "'examine[d] the relevant data and

articulate[d] a satisfactory explanation for its action, including a rational connection between the

facts found and the choice made." *PPL Wallingford Energy LLC v. Fed. Energy Regulatory*

*Comm'n*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n, v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal punctuation omitted). The Court is

not entitled to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park,*

*Inc. v. Volpe*, 401 U.S. 402, 416 (1971). This is particularly so where an agency "is evaluating

scientific data within its technical expertise;" in such a case, the Court must give the agency "an

extreme degree of deference." *Am. Farm Bureau Fed'n v. Envtl. Prot. Agency*, 559 F.3d 512,

519 (D.C.Cir. 2009) (internal quotation marks omitted).

"'The party challenging an agency's action as arbitrary and capricious bears the burden of

proof.'" *City of Olmsted Falls v. Fed. Aviation Admin.*, 292 F.3d 261, 271 (D.C. Cir. 2002)

(quoting *Lomak Petroleum, Inc. v. Fed. Energy Regulatory Comm'n*, 206 F.3d 1193, 1198 (D.C.

Cir. 2000)). An agency decision must generally be affirmed on the grounds stated therein, and a

reviewing court may not attempt to supply "a reasoned basis for the agency's action that the

agency itself has not given." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Consistent with this

12

review standard, judicial review is confined to the full administrative record before the agency at the time the decision was made. *Envtl. Def. Fund, Inc. v. Castle*, 657 F.2d 275, 284 (D.C. Cir. 1981).

### III. DISCUSSION

Bean Dredging advances two principal arguments in favor of its motion for summary judgment challenging the NPFC's denial of its Claim and in opposition to the United States' cross-motion for summary judgment. First, Bead Dredging argues that the "NPFC erred when it misinterpreted and misapplied the meaning of the term 'seas' as set forth in 46 C.F.R. § 44.340(a)(1)." Pl.'s MSJ at 14. Second, Bean Dredging contends that the NPFC's decision its Claim is arbitrary and capricious because it contradicts the Coast Guard's Marine Casualty Investigation Report. *Id.* at 20. The Court shall address each argument in turn below.

A.    *The NFPC's Interpretation of "Seas" as Used in 46 C.F.R. § 44.340(a)(1)*

Bean Dredging first argues that the NPFC erred when it failed to interpret the term "seas," as used in 46 C.F.R. § 44.340(a)(1), as specifically referring to "significant wave height." As described above, it is clear that the NPFC rejected Bean Dredging's argument that the relevant regulations were violated only if the vessel had been operating in seas with a significant wave height of 10 feet or more. *See supra* at pp. 9-10. However, as Bean Dredging correctly points out, the NPFC's written decision does not contain any explicit discussion of this decision. Accordingly, while it is apparent from review of the NPFC's decision that it rejected Bean Dredging's position, the record is devoid of any explanation as to the reasons for this rejection. Nor did the NPFC clearly explain the contours of its own interpretation of the regulation in

13

question.  Although it appears that the NPFC interpreted the regulations at issue to prohibit the operation of a vessel in seas with waves of more than 10 feet without reference to any specific frequency requirement, there is no actual discussion in the record indicating how the NPFC itself defines "seas" of more than 10 feet, as that phrase is used in 46 C.F.R. § 44.340(a)(1).  This is particularly significant because the regulation itself is ambiguous; it does not include any definition for the term "seas" and, as Bean Dredging points out and the United States does not dispute, the term "seas" may "have a different connotation to different people, *i.e.*, wave height, swell height, combined wave height, wind wave height, etc.," Pl.'s MSJ at 18.

The United States has also failed in its present pleadings to provide the Court with any evidence as to the reasons for or the exact contours of the NPFC's decision regarding the proper interpretation of 46 C.F.R. § 44.340(a)(1).  Although the United States does advance certain arguments in its briefing in an effort to explain the NPFC's decision — for example, stating that the NPFC "discounted" the approach suggested by Bean Dredging "because it was inapplicable to real-world operations and thus irrelevant," *see* Def.'s MSJ at 14, and asserting that the NPFC's own interpretation of the regulation is appropriate because "the regulation is meant to be applied by individual mariners and vessel owners, not oceanographers, in limiting a vessel's operations," Def.'s Opp'n at 4 — these statements are made without any record support.  The unsupported representations of counsel, presented solely in the parties' pleadings on summary judgment, are insufficient and cannot be relied upon by the Court.

Accordingly, while the United States argues that the NPFC's interpretation of its own regulations is entitled to substantial deference, *see* Def.'s MSJ at 10, the Court cannot — without

14

a forthright agency interpretation — determine whether deference is, in fact, appropriate in this case. Similarly, the Court cannot evaluate whether the NPFC's rejection of the regulatory interpretation urged by Bean Dredging was arbitrary and capricious without an explanation as to its reasons for the rejection. It is well established that "'the focal point for judicial review should be the administrative record already in existence, not some new record made initially by the reviewing court.'" *Florida Power & Light Co.*, 470 U.S. at 743 (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Id.* Rather, "[t]he task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." *Id.*

For these reasons, the Court must remand this case back to the agency for further explanation as to the interpretation of the relevant regulations it adopted and its reasons for rejecting the interpretation advanced by Bean Dredging. Both the United States' [19] Motion for Summary Judgment and Bean Dredging's [20] Motion for Summary Judgment are therefore DENIED WITHOUT PREJUDICE with respect to Bean Dredging's claims that the NPFC erred when it misinterpreted and misapplied the term "seas" as used in 46 C.F.R. § 44.340(a)(1).[11]

-----------------------

[11] Given the Court's conclusion, above, that this case must be remanded back to the agency for further explanation, it shall not at this time address Bean Dredging's related

B.      *The Coast Guard's Marine Casualty Investigation Report*

Second, Bean Dredging argues that the NPFC's decision denying Bean Dredging's Claim

is arbitrary and capricious because it is inconsistent with and contradicts the Coast Guard's

MCIR that was issued with respect to the September 6, 1999 oil spill.  While the Court has

already determined that this case must be remanded back to the agency for further explanation

with respect to Bean Dredging's first argument, as discussed above, the Court nonetheless briefly

addresses this second argument in order to provide guidance to the agency on remand.

In support of its argument, Bean Dredging directs the Court to the Coast Guard's MCIR,

which — as Bean Dredging emphasizes — does not contain any citations from the Coast Guard

for violation of either 46 C.F.R. § 44.340 or 46 C.F.R. § 42.09-1(c).  Pl.'s Stmt. ¶ 58.  According

to Bean Dredging, the NPFC acted arbitrarily and capriciously when it disregarded this fact and

found to the contrary that the Stuyvesant had violated these regulatory provisions.  Pl.'s MSJ at

20-22.  The Court, however, does not agree.

As an initial matter, the MCIR does not appear on its face to contradict the NPFC's final

decision denying Bean Dredging's Claim.  The MCIR itself indicates that "[t]he sea state was

reported to be anywhere from 8 to 12 feet" in Humboldt Bay at the time of incident.  Pl.'s Stmt. ¶

57.  The MCIR further observes that the "sea state at the opening of the channel (referred to as

the 'rock and roll alley')," which is where the incident was reported to have occurred, "is much

more pronounced and severe."  *Id.*  The MCIR concluded that the incident "appears to be caused

_____

arguments challenging the NPFC's evidentiary decisions regarding the weather conditions in
Humboldt Bay at the time of the incident. The reasonableness of the NPFC's evidentiary
decisions depends, in part, upon the proper interpretation of the relevant regulations.

by bad weather and an error in judgment in the part of the pipeman." *Id.* The MCIR's findings are therefore entirely consistent with the NPFC's determination that the Stuyvesant had been operating in seas with waves in excess of 10 feet at the time of the incident and that this was the proximate cause of the accident.

Bean Dredging nonetheless argues that the MCIR and the NPFC determination are inconsistent with each other because the MCIR, unlike the NPFC decision, did not cite the Stuyvesant for violations of either 46 C.F.R. § 44.340 or 46 C.F.R. § 42.09-1(c). In essence, Bean Dredging urges that the MCIR's silence should be read as indicating that the Coast Guard investigators affirmatively found that the Stuyvesant had not violated either regulatory provision. Even assuming that the Court were to accept this predicate assertion — which is a questionable assumption on the record now before the Court — it is nonetheless clear that the NPFC was under no obligation to reach the same conclusions as reflected in the MCIR. As the NPFC correctly explained in its final decision, "the NPFC is not bound by such reports of investigation," 71 Fed. Reg. 60553, 60554, and "can reach not only different facts but also different opinions or conclusions than the opinions and conclusions in the MCIR," 72 Fed. Reg. 17574, 17575. In announcing that the NPFC would now be permitted to consider MCIRs, the Coast Guard explained that its intent was to avoid the agency "having to duplicate the investigative process in order to gather evidence that was included in a Marine Casualty Investigation Report (MCIR)," which "in turn, resulted in delays while those duplicative investigative efforts were carried out." *Id.* at 60553. To that end, the Coast Guard indicated that, "[w]hile any part of such a MCIR may be considered, it is the enclosures to such a report, such as

17

witness statements, navigation records and vessel logs that will most likely bear on any determination to pay or deny a claim." *Id.* at 60554. It is therefore clear that in permitting the NPFC to consider the MCIRs in administrative claim proceedings, the Coast Guard intended only to provide the NPFC with a resource to assist in the gathering of relevant facts and evidence, and not to bind the NPFC to any specific legal conclusions or factual findings set forth in the MCIR.

Accordingly, the fact that the NPFC — but not the Coast Guard investigators responsible for the MCIR — found that Stuyvesant had violated 46 C.F.R. § 44.340 and 46 C.F.R. § 42.09-1(c) does not, by itself, demonstrate that the NPFC's decision was arbitrary or capricious. The NPFC was free to conduct a *de novo* review of the evidence and to reach its own conclusions. As such, absent a specific, identified error in the NPFC's final determination, the simple fact that the NPFC reached a different conclusion than is reflected in the MCIR as to the statutory violations but not as to the factual predicate is insufficient to establish that the denial of Bean Dredging's Claim was arbitrary or capricious. The United States' [19] Motion for Summary Judgment is therefore GRANTED and Bean Dredging's [20] Motion for Summary Judgment is DENIED insofar as Bean Dredging asserts that the NPFC's final determination is inconsistent with the MCIR and is therefore arbitrary and capricious.

## IV. CONCLUSION

For the reasons set forth above, the Court shall GRANT-IN-PART and DENY-IN-PART the United States' [19] Motion for Summary Judgment, shall DENY Bean Dredging's [20] Motion for Summary Judgment, and shall remand this matter to the NPFC for further

proceedings consistent with this Memorandum Opinion.  Specifically, the Court DENIES

WITHOUT PREJUDICE both the United States' [19] Motion for Summary Judgment and Bean

Dredging's [20] Motion for Summary Judgment with respect to Bean Dredging's claims that the

NPFC erred when it misinterpreted and misapplied the term "seas" as used in 46 C.F.R. §

44.340(a)(1), and shall remand this matter to the NPFC for further explanation of its

interpretation of the relevant regulations and its reasons for rejecting the interpretation advanced

by Bean Dredging.  In addition, the Court shall GRANT the United States' [19] Motion for

Summary Judgment and shall DENY Bean Dredging's [20] Motion for Summary Judgment

insofar as Bean Dredging asserts that the NPFC's final determination is inconsistent with the

MCIR and is therefore arbitrary and capricious.  And appropriate Order accompanies this

Memorandum Opinion.

Date: March 30, 2010

　　　　　　　　　　　　　　　　 _/s/_____

**COLLEEN KOLLAR-KOTELLY**
United States District Judge

7

Montgomery v USA          Case 2:11-cv-02298-CJB-SS          U S Dist Ct EAST DIST OF LA

1    **Exhibit 7, NPFC Claims Processing System**

2

3

　
Agency    Bureau    Investment Type    Line of Business    Sub Funct

## Department of Homeland Security USCG - NPFC Claims Processing System (NPFC-CPS) (2010)

NPFC-CPS supports NPFC's mission to adjudicate third party claims for compensation for damages caused by oil pollution. It also supports claims from trustees for Natural Resource Damage assessments and restoration.

## IT Investment Details:

| | |
|---|---|
| Unique Project Identifiers (UPI) | 024-60-01-05-02-6108-00 |
| Agency Name | Department of Homeland Security |
| Bureau Name | United States Coast Guard |
| Mission Area | 05 |
| Investment Title | USCG - NPFC Claims Processing System (NPFC-CPS) (2010) |
| Category of the Investment | 00 |
| IT Investment Number | 6108 |
| IT Investment Type Description | |
| Sub-Function | Environmental Remediation |
| Four parts of Exhibit 53 | IT investments for Mission Area Support |
| 2008 Budget | $0.24M |
| 2009 Budget | $0.27M |
| 2010 Budget | $0.25M |
| Line of Business | Environmental Management |
| 2008 DME | $0.00M |
| 2009 DME | $0.00M |
| 2010 DME | $0.00M |
| 2010 Agency Budget | $6316.02M |

### Request Pricing

Complete this form to receive pricing on a subscription to EMA Research Services or on the reviewed business solutions.

**\* First Name:**

**\* Last Name:**

**\* Email:**

◉ I need Resources for IT Professionals

◎ I need Resources for IT Vendors

[ Send Request ]

**ABOUT:**

This information is derived from a companion document to Chapter 9 of the Analytical Perspectives volume of the budget, and provides the Information Technology (IT), by agency or department, for FY2008 - Actuals (PY), FY2009 - Enacted (CY), and FY2010 - Budget (BY). For additional guidance about the formulation of the Information Technology and E-Gov Exhibit 53s for the FY2010 budget, please go to: http://www.whitehouse.gov/omb/circulars/a11/current_year/s53.pdf

For additional guidance about the Planning, Budgeting, Acquisition of Capital Assets, Exhibit 300s for the FY2010 budget, please go to: http://www.whitehouse.gov/omb/circulars/a11/current_year/s300.pdf

About   Legal   Sitemap   | Copyright 2009 - SolutionPipe

1  **USCG - NPFC Claims Processing System (NPFC-CPS)**
2  **(2010)**

Agency    Bureau    Investment Type    Line of Business    Sub Funct

**Department of Homeland Security USCG - NPFC Claims
Processing System (NPFC-CPS) (2010)**

NPFC-CPS supports NPFC's mission to adjudicate third party claims for compensation for damages
caused by oil pollution. It also supports claims from trustees for Natural Resource Damage assessments
and restoration.

**IT Investment Details:**

| | |
|---|---|
| Unique Project Identifiers (UPI) | 024-60-01-05-02-6108-00 |
| Agency Name | Department of Homeland Security |
| Bureau Name | United States Coast Guard |
| Mission Area | 05 |
| Investment Title | USCG - NPFC Claims Processing System (NPFC-CPS) (2010) |
| Category of the Investment | 00 |
| IT Investment Number | 6108 |
| IT Investment Type Description | |
| Sub-Function | Environmental Remediation |
| Four parts of Exhibit 53 | IT investments for Mission Area Support |
| 2008 Budget | $0.24M |
| 2009 Budget | $0.27M |
| 2010 Budget | $0.25M |
| Line of Business | Environmental Management |
| 2008 DME | $0.00M |
| 2009 DME | $0.00M |
| 2010 DME | $0.00M |
| 2010 Agency Budget | $6316.02M |

**ABOUT:**

This information is derived from a companion document to Chapter 9 of the Analytical Perspectives
volume of the budget, and provides the Information Technology (IT), by agency or department, for FY2008
- Actuals (PY), FY2009 - Enacted (CY), and FY2010 - Budget (BY). For additional guidance about the
formulation of the Information Technology and E-Gov Exhibit 53s for the FY2010 budget, please go to:
http://www.whitehouse.gov/omb/circulars/a11/current_year/s53.pdf

For additional guidance about the Planning, Budgeting, Acquisition of Capital Assets, Exhibit 300s for the
FY2010 budget, please go to: http://www.whitehouse.gov/omb/circulars/a11/current_year/s300.pdf

About  Legal  Sitemap  | Copyright 2009 - SolutionPipe

**Request Pricing**

Complete this form to receive
pricing on a subscription to EMA
Research Services or on the
reviewed business solutions.

* First Name:

* Last Name:

* Email:

◉ I need Resources for IT
Professionals

○ I need Resources for IT
Vendors

[ Send Request ]

3
4  http://gov-spending.solutionpipe.com/investment/5250-0-uscg-npfc-claims-processing-
5  sys
6

**8**

1 **Exhibit 8 Affidavit of D. Montgomery**

2 # UNITED STATE DISTRICT COURT

3 # EASTERN DISTRICT OF LOUISIANA

4 500 Poydras Street

5 New Orleans, LA 70130

6 (504) 589-7600

7

| | |
|---|---|
| **D. MONTGOMERY** | **MDL NO.** |
| -And- | |
| **All Other Similarly Situated Parties** *Plaintiffs*, | **SECTION: J-1** |
| Vs | **JUDGE** **MAG. JUDGE** **Case 2:10-md-02179-CJB-SS (lead)** **Case 2:11-cv-02298-CJB-SS (member)** |
| **UNITED STATES OF AMERICA DEPARTMENT OF HOMELAND SECURITY UNITED STATES COAST GUARD** | |
| -And- | <u>**AFFIDAVIT OF D. MONTGOMERY**</u> |
| Director of National Pollution Funds Center - Craig A. Bennett **(In his Official Capacity** as Director, National Pollution Funds Center United States Coast Guard) *Defendants* | |

8

9 **NOW COMES** Plaintiff, Duane Montgomery, states under oath that the statements and claims

10 presented in the attached Motion for Summary Judgment are true to the best of my knowledge.

11

12 D. Montgomery

13 c/o ETR

14 33523 Eight Mile Rd

15 Bldg A-3, STE 108

16 Livonia, Michigan 48152

17 (313) 670-0371

18 Plaintiff, In Pro per

19

**9**

Montgomery v USA        Case 2:11-cv-02298-CJB-SS        U S Dist Ct EAST DIST OF LA

1    **Exhibit 9, October 2010 Advance Payment from GCCF**
2

Gulf Coast Claims Facility
Kenneth R. Feinberg, Administrator
P.O. Box 9658
Dublin, OH 43017-4958
1-800-916-4893

| | |
|---|---|
| Claim Number: | 01070213 |
| Check Number: | 00087099 |
| Check Date: | 10/19/10 |
| Check Amount: | $43,900.00 |

DUANE MONTGOMERY
C/O ETR
33523 EIGHT MILE ROAD
BLDG. A-3; STE 108
LIVONIA, MI 48152

### Notice of Emergency Advance Payment Determination

The check attached to this letter represents an Emergency Advance Payment from the Gulf Coast Claims Facility ("GCCF") for damages suffered as a result of the Deepwater Horizon Oil Spill on April 20, 2010.  (If you requested multiple checks, those checks should be included here.)

The GCCF has calculated the amount of your Emergency Advance Payment according to the rules that apply uniformly to all claimants. The amount is a reasonable estimate only of your projected losses and cannot be changed or adjusted at this time. At the time of the submission of your Final Claim for Final Payment, you will at that point have the opportunity to present additional documentation and materials that you feel support your position.  All such issues will be considered when determining the amount of any Final Payment for all losses.

This check may be presented at any Banking Institution in the country for payment.  However, if you do not have your own bank account at which you can cash this check, the GCCF has made arrangements with Whitney National Bank, which has branches located throughout the affected region in the Gulf, to assist you.  For more information on this check cashing service, please see the enclosed, Notice of Check Cashing Options For Individuals Who Do Not Have Bank Accounts, along with a list of Whitney bank branches.

The GCCF will report annually to federal and state taxing authorities, using IRS Form 1099 or a state form equivalent, for certain payments made.  In early 2011, you will receive your copy of that form.  The GCCF cannot provide you with tax advice.  You should consult with your own tax advisor to determine the impact of any payments you receive from the GCCF on your individual tax situation.

For assistance or additional information, please visit our website at www.GulfCoastClaimsFacility.com, or call us toll-free at 1-800-916-4893, TTY at 1-866-682-1758 or email us at info@gccf-claims.com.

---

Gulf Coast Claims Facility
Kenneth R. Feinberg, Administrator
P.O. Box 9658
Dublin, OH 43017-4958
1-800-916-4893

WHITNEY
Whitney National Bank

| | |
|---|---|
| CHECK NUMBER: | 00087099 |
| CHECK DATE: | 10/19/10 |

*Forty three thousand nine hundred and 00/100 Dollars*

*****$43,900.00

PAY
TO
THE
ORDER
OF

DUANE MONTGOMERY
C/O ETR
33523 EIGHT MILE ROAD
BLDG. A-3; STE 108
LIVONIA, MI 48152

VOID AFTER 90 DAYS

BY _Edward Morell_
AUTHORIZED SIGNATURE
Deepwater Horizon Oil Spill Trust

Payable at Citibank N.A., One Penn's Way, New Castle, DE 19720

⑈00087099⑈ ⑈031100209⑈ 388287271⑈