# Exhibit E

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois  60654

Andrew Langan, P.C.
To Call Writer Directly:
(312) 862-2064
andrew.langan@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

February 23, 2012

**Via E-Mail**

James Parkerson Roy
Domengaeux Wright Roy & Edwards LLC
556 Jefferson St., Suite 500
Lafayette, Louisiana 70501

Stephen J. Herman
Herman, Herman Katz & Cotlar, LLP
820 O'Keefe Ave.
New Orleans, Louisiana 70113

Re:     *Effect of Judge Barbier's February 9, 2012 Orders*

Dear Jim and Steve:

I write to follow up on the discussion at last Friday's Working Group conference as to the implications of Judge Barbier's February 9, 2012 Order (Rec. No. 5634) on BP's motions *in limine* regarding prior incidents and proceedings – particularly with regard to whether and to what extent designated deposition testimony needs to be edited in order to comply with the Court's Order.  It is clear that the parties have different, and inconsistent, views on this issue.

The Order "exclude[s] evidence of prior accidents or alleged misconduct in Phase I of the trial," and similarly excludes "evidence of prior adverse criminal, civil, and regulatory proceedings."  Order at 6-7.  The Court noted that its ruling does not exclude certain evidence regarding the OMS, as the Court ruled that is relevant "to BP's alleged lack of an adequate process safety system for the Macondo operation."  *Id.* at 6.  The Court also noted that "expert reports are not necessarily excluded merely because they rely upon prior-incident process safety evidence." *Id.*

There can be no doubt that the Order precludes the introduction into evidence of questions to, and answers from, fact witnesses regarding prior incidents and violations. Significant portions of the designated deposition testimony have thus been ruled inadmissible by the Court, and it is the responsibility of the parties – particularly those who designated this testimony (knowing it was the subject of pending objections) – to conform the evidence proffered to the Court's Order.

Hong Kong     London     Los Angeles     Munich     New York     Palo Alto     San Francisco     Shanghai     Washington, D.C.

# KIRKLAND & ELLIS LLP

Jim Roy and Steve Herman
February 23, 2012
Page 2

Several times, BP has requested that the PSC take appropriate steps to exclude these now-improper designations.  In a letter to the Court dated February 16, 2012, I identified eight designated deposition transcripts significantly affected by this issue and asked how the PSC intended to address the issue of excluded testimony.  In response, the PSC said it did not intend to take any steps to modify the designated testimony, claiming it was "impractical" to do so.  At last Friday's conference, the PSC indicated that it not only believed it would be difficult to cull out this testimony, but that the testimony itself was not necessarily excluded by the Court's February 9, 2012 Order.

BP believes all parties have an obligation to resolve this issue in advance of any proffer of this inadmissible evidence to the Court during the trial, or, worse yet, the use of such testimony in opening statements – both of which would be tantamount to ignoring the Court's Order.  BP has therefore identified, using Mr. Hayward's deposition as an illustrative example, testimony it believes is excluded from evidence under the Court's February 9th Order.  The attached list and highlighted transcript reflects portions of Mr. Hayward's deposition that contain designated testimony that should not be used by the parties or proffered into evidence.[1]

We seek your agreement that this testimony will not be used or admitted into evidence, and your commitment to take steps to prevent the use or admission of similar testimony by other witnesses.  Please let us know your position as soon as possible so that we may submit this issue to the Court if we cannot reach agreement prior to the start of the trial.

Very truly yours,

/s/ J. Andrew Langan, P.C.

---

[1] We also noticed several designations that run afoul of the Court's February 9, 2012 Order on BP's motion *in limine* regarding, among other things, the National Commission and Chief Counsel's report (Rec. No. 5635), so we included them on the attached list and highlighted transcript as well.  We made no effort, however, to identify or address *all* of BP's objections to the Hayward designations, and this submission should not be taken as an agreement or admission that other designated portions of Mr. Hayward's testimony to which BP has lodged objections are admissible or are not excluded by other rulings on various motions *in limine*.

# KIRKLAND & ELLIS LLP

Jim Roy and Steve Herman
February 23, 2012
Page 3


cc:    Robert C. "Mike" Brock
       Don K. Haycraft
       Matthew T. Regan
       Hariklia ("Carrie") Karis
       Mike Underhill
       Luther Strange
       Corey Maze
       James Trey Phillips
       Megan Terrell
       MDL 2179 Defense Liaison Counsel

**DESIGNATED HAYWARD DEPOSITION TESTIMONY**
**THAT VIOLATES THE COURT'S FEBRUARY 9, 2012 ORDERS**

| Start | End | Order |
|-------|-----|-------|
| 46:14 | 47:22 | Prior Conduct/Proceedings |
| 50:21 | 52:21 | Governmental Records/Reports |
| 56:15 | 85:20 | Prior Conduct/Proceedings |
| 88:4 | 101:7 | Prior Conduct/Proceedings |
| 108:17 | 108:24 | Prior Conduct/Proceedings |
| 123:19 | 124:5 | Prior Conduct/Proceedings |
| 146:13 | 149:9 | Prior Conduct/Proceedings |
| 204:13 | 221:4 | Prior Conduct/Proceedings |
| 223:1 | 230:21 | Prior Conduct/Proceedings |
| 298:11 | 298:13 | Governmental Records |
| 301:11 | 301:23 | Prior Conduct/Proceedings |
| 322:1 | 323:11 | Governmental Records/Reports |
| 638:13 | 639:1 | Governmental Records/Reports |
| 695:14 | 695:25 | Prior Conduct/Proceedings |
| 696:14 | 697:6 | Prior Conduct/Proceedings |
| 766:10 | 767:2 | Governmental Records/Reports |

1

1          UNITED STATES DISTRICT COURT

          EASTERN DISTRICT OF LOUISIANA

2

3   IN RE:  OIL SPILL        )     MDL NO. 2179

    BY THE OIL RIG           )

4   "DEEPWATER HORIZON" IN    )     SECTION "J"

    THE GULF OF MEXICO, ON    )

5   APRIL 20, 2010            )     JUDGE BARBIER

                              )     MAG. JUDGE SHUSHAN

6

7

8

9

10

11

12

13

14

15

16

17              * * * * * * * * * * * * * * * * *

                        VOLUME 1

18              * * * * * * * * * * * * * * * * *

19

20

21          Deposition of Anthony Hayward, taken at

    Kirkland & Ellis International, 30 St. Mary Axe, 22nd

22  Floor, London EC3A 8AF, England, United Kingdom, on the

    6th of June, 2011.

23

24

25

PURSUANT TO CONFIDENTIALITY ORDER

```
 1                 A P P E A R A N C E S
 2
 3       Magistrate Judge Sally Shushan
         UNITED STATES DISTRICT COURT
 4       EASTERN DISTRICT OF LOUISIANA
         500 Poydras Street, B345
 5       New Orleans, Louisiana  70130
 6
    APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
 7       Mr. Robert T. Cunningham
         Mr. William E. Bonner
 8       CUNNINGHAM BOUNDS, LLC
         1601 Dauphin Street
 9       Mobile, Alabama  36604
10       Mr. Paul M. Sterbcow
         LEWIS, KULLMAN, STERBCOW & ABRAMSON
11       601 Poydras Street, Suite 2615
         New Orleans, Louisiana  70130
12
         Mr. Calvin C. Fayard, Jr.
13       FAYARD & HONEYCUTT
         519 Florida Avenue, SW
14       Denham Springs, Louisiana  70726
15       Mr. Stephen J. Herman
         HERMAN, HERMAN, KATZ & COTLAR
16       820 O'Keefe Avenue
         New Orleans, Louisiana  70113
17
         Mr. Ronnie G. Penton
18       LAW OFFICES OF RONNIE G. PENTON
         209 Hoppen Place
19       Bogalusa, Louisiana  70427-3827
20       Mr. John Parkerson Roy
         DOMENGEAUX, WRIGHT, ROY & EDWARDS
21       556 Jefferson Street, Suite 500
         Lafayette, Louisiana  70501
22
23
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1   APPEARING FOR THE DERIVATIVE PLAINTIFFS, MDL 2185
     SECURITIES PLAINTIFFS SUBCLASS:
 2        Mr. Richard Warren Mithoff
          MITHOFF LAW FIRM
 3        500 Dallas St. - Penthouse
          Houston, Texas  77002
 4
     APPEARING FOR BP, INC.:
 5        Mr. Richard C. Godfrey
          Mr. Mark R. Filip
 6        KIRKLAND & ELLIS
          300 North LaSalle
 7        Chicago, Illinois  60654
 8        Mr. Daryl A. Libow
          SULLIVAN & CROMWELL
 9        1701 Pennsylvania Avenue, N.W.
          Washington, D.C.  20006-5805
10
          Mr. James J. Neath
11        ASSOCIATE GENERAL COUNSEL
          BP LEGAL
12        BP AMERICA INC.
          501 Westlake Park Boulevard
13        Houston, Texas  77079
14   APPEARING FOR ANTHONY HAYWARD:
          Mr. Dan K. Webb
15        Mr. Thomas L. Kirsch II
          WINSTON & STRAWN
16        35 West Wacker Drive
          Chicago, Illinois  60601-9703
17
     APPEARING FOR ANDY INGLIS:
18        Ms. Kathleen H. Goodhart
          COOLEY LLP
19        101 California Street, 5th Floor
          San Francisco, California  94111-5800
20
     APPEARING FOR TRANSOCEAN:
21        Mr. Steven L. Roberts
          Mr. Daniel Johnson
22        Mr. Jack Massey
          SUTHERLAND ASBILL & BRENNAN
23        1001 Fannin, Suite 3700
          Houston, Texas  77002-6760
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1   APPEARING FOR ANADARKO PETROLEUM COMPANY
    AND MOEX OFFSHORE 2007:
2        Ms. Diane C. Hertz
         BINGHAM MCCUTCHEN
3        399 Park Avenue
         New York, New York 10022-4689
4
    APPEARING FOR CAMERON INTERNATIONAL CORPORATION:
5        Mr. David J. Beck
         BECK, REDDEN & SECREST
6        One Houston Center
         1221 McKinney Street, Suite 4500
7        Houston, Texas  77010-2010
8   APPEARING FOR DRIL-QUIP, INC.:
         Mr. C. Dennis Barrow, Jr.
9        WARE, JACKSON, LEE & CHAMBERS
         America Tower, 42nd Floor
10       2929 Allen Parkway
         Houston, Texas  77019-7101
11
    APPEARING FOR M-I SWACO:
12       Mr. Hugh E. Tanner
         MORGAN, LEWIS & BOCKIUS
13       1000 Louisiana Street, Suite 4000
         Houston, Texas  77002
14
         Mr. Steven A. Luxton (Partial Appearance)
15       MORGAN, LEWIS & BOCKIUS, LLP
         1111 Pennsylvania Avenue, NW
16       Washington, D.C.  20004
17  APPEARING FOR HALLIBURTON:
         Mr. Donald E. Godwin
18       Ms. Jenny L. Martinez
         Ms. Stefanie K. Major
19       GODWIN RONQUILLO
         1201 Elm Street, Suite 1700
20       Dallas, Texas 75270-2041
21  APPEARING FOR THE UNITED STATES:
         Mr. R. Michael Underhill
22       Attorney in Charge
         West Coast office
23       U.S. DEPARTMENT OF JUSTICE
         TORTS BRANCH, CIVIL DIVISION
24       450 Golden Gate Avenue
         7th Floor, Room 5395
25       San Francisco, California  94102-3463
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1   APPEARING FOR THE STATE OF ALABAMA:
          Mr. Luther Strange
 2        Attorney General
          Mr. Corey L. Maze
 3        Special Deputy Attorney General
          Mr. Winfield J. Sinclair
 4        Assistant Attorney General
          OFFICE OF THE ATTORNEY GENERAL
 5        STATE OF ALABAMA
          501 Washington Avenue
 6        Montgomery, Alabama  36104
 7   APPEARING FOR THE STATE OF LOUISIANA:
          Mr. Allan Kanner
 8        Ms. Elizabeth "Lili" Petersen
          Attorneys for Louisiana Attorney General
 9        KANNER & WHITELEY
          701 Camp Street
10        New Orleans, Louisiana  70130-3504
11   APPEARING FOR OHIO PENSION FUNDS:
          Mr. Jeffrey C. Block
12        BERMAN DEVALERIO
          One Liberty Square
13        Boston, Massachusetts  02109
14   ALSO PRESENT:
          Mr. Peter Jennings, Logistics Supervisor
15        Mr. Ray Aguirre, Case Manager
          Mr. Max Kennedy, Videographer
16        Ms. Lilia Garcia
          Mr. Chad Paris
17        Ms. Cecelia Aguilar
18
19
20
21
22
23
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1 aspirations," do you see that?

2   A. I do.

3   Q. And does it show that a Level A through E

4 business impact also requires a root cause analysis

5 investigation?

6   A. Yeah.

7   Q. And in addition to the fact that you were

8 familiar with this GDP, you knew exactly what a root

9 cause analysis was, didn't you?

10   A. I knew the -- the concept behind a root cause

11 analysis, yes.

12      MR. CUNNINGHAM:  Tab 6.

13     (Exhibit No. 6003 marked.)

14      THE COURT REPORTER:  6003.

15   Q. (By Mr. Cunningham) I'll show you Exhibit

16 6003.  This is a speech you gave on April the 1st of

17 2005, correct?  You can look at the top.

18   A. Yeah.

19   Q. And this is about one week, ten days, in that

20 vicinity --

21   A. M-h'm.

22   Q. -- after the Texas City disaster, isn't it?

23   A. It is.

24   Q. And did you say in this speech in the first

25 paragraph:  "...last week BP experienced the most

1    serious and tragic safety accident in our recent

2    history.  15 of our people died in a major explosion at

3    a refinery in Texas - we do not yet know the cause of

4    the accident but we will and we will learn from it and

5    take action to ensure that it is never repeated"?

6         Did I read that correctly?

7    A.    Correct.

8    Q.    Did you say that?

9    A.    I did.

10   Q.    And then in the middle of the next paragraph,

11   did you say this:  "We are applying our established

12   process of root cause analysis to determine the

13   underlying cause of the incident"?

14   A.    I did say that.

15   Q.    All right.  You knew exactly what a root cause

16   analysis was because you described in this speech what

17   you were going to do after Texas City, and that was a

18   root cause analysis, didn't you?

19   A.    I described --

20         MR. GODFREY:  Objection as to form.

21   A.    I described in this speech what we're going to

22   do after Texas City, that is correct.

23   Q.    (By Mr. Cunningham) So knowing everything that

24   you knew and holding the positions that you held on

25   June 17th of 2010, you told the United States Congress

**PURSUANT TO CONFIDENTIALITY ORDER**

1       MR. GODFREY:  Objection to form.

2       MR. WEBB:  -- "they knew."

3    A.   They'd been briefed on the extent of the

4    report of the investigation and what we had found at

5    that time.

6    Q.   (By Mr. Cunningham) Yes, sir.  And your

7    in-house legal counsel and your PR people knew what the

8    investigation covered, didn't they?

9       MR. GODFREY:  Objection as to form.

10   A.   Well, you can clearly see in the terms of

11   reference.

12   Q.   (By Mr. Cunningham) All right.  And they

13   watched your testimony before the Congress you would

14   expect, wouldn't you?

15   A.   I would expect.

16   Q.   All right.  Did your PR people congratulate

17   you on how you did after your testimony was concluded?

18      MR. GODFREY:  Objection as to form.

19   A.   No one congratulated me after that day.  Thank

20   you very much.

21   Q.   (By Mr. Cunningham) You're fully aware,

22   though, that the Presidential Commission did

23   investigate management-related causes, aren't you?

24   A.   I haven't read the Presidential Commission

25   Report because it was published a long time after I

**PURSUANT TO CONFIDENTIALITY ORDER**

1   left the company.  I'm aware of it through the press,

2   and I -- I've skimmed it.  So it's -- there is

3   certainly a section on management causes.

4       Q.    All right.

5       A.    I have no idea as to the depth or extent of

6   that investigation.

7       Q.    Are you aware of the conclusion stated in the

8   Presidential Commission Report, quote:  "Most of the

9   mistakes and oversights at Macondo can be traced back

10  to a single over-arching failure, a failure of

11  Management," end quote?

12              MR. GODFREY:  Objection as to form.

13      Q.    (By Mr. Cunningham) My question is:  Are you

14  aware of that statement?

15      A.    I'm aware of that statement.  And as I read

16  it, it referred to the immediate oversight of the

17  Macondo Well; that's to say, either on the rig or in

18  the immediate management over the rig.

19      Q.    Okay.

20              MR. ROBERTS:  Objection, form.

21      Q.    (By Mr. Cunningham) All right.  So as you read

22  it, it's the people on the rig or the immediate

23  managers on the rig that they were talking about and

24  not you and the other high level executives at BP.  Is

25  that your testimony?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.    That's what I interpreted from the description

2  in the Report.

3    Q.    All right.  So -- so you -- you read it -- or

4  when you heard what it said, your conclusion was

5  "They're not talking about me"?

6    A.    I didn't -- I didn't say that.  I said my

7  interpretation was that the investigation and the

8  conclusions drawn in the Presidential Commission were

9  referring to management actions primarily on the rig.

10    Q.    Well, do you or do you not think that that

11  statement that, "Most of the mistakes and oversights at

12  Macondo can be traced back to a single over-arching

13  failure, a failure of Management"?  Do you or do you

14  not think that that statement included references to

15  you?

16            MR. GODFREY:  Objection as to form.

17            MR. WEBB:  Object to form.

18    A.    I have no idea what that referred to.  It was

19  certainly not made clear in the report what it referred

20  to.  So all I can do is draw an interpretation based on

21  the -- the extent of the -- of the report.

22    Q.    (By Mr. Cunningham) You know that Rex

23  Tillerson, the CEO of Exxon, said virtually the same

24  thing, didn't he?

25            MR. GODFREY:  Objection as to form.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    your Congressional testimony later, because there's --

2    there's more there, isn't it?  There's more there what

3    you testified falsely under oath, isn't there?

4              MR. GODFREY:  Objection.

5    A.    I do not believe so --

6              MR. GODFREY:  Move to strike.

7    A.    -- at all.

8    Q.    (By Mr. Cunningham) Now, as far as

9    investigations go, you know what a full and

10   comprehensive investigation is, because you and BP have

11   seen a lot of them since you've been in the top

12   leadership; isn't that true?

13             MR. GODFREY:  Objection as to form.

14   A.    I've seen most of the investigations.

15   Q.    (By Mr. Cunningham) All right.  BP has been

16   the subject of, and you have been in the top leadership

17   for multiple investigations resulting in criminal

18   charges and guilty pleas; isn't that true?

19             MR. GODFREY:  Objection as to form.

20   A.    To my knowledge, there is one accident where

21   the company subsequently pled guilty, to a guilty

22   charge.

23   Q.    (By Mr. Cunningham) Okay.  Well --

24   A.    Criminal charge.

25   Q.    -- one is all you know about?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.    To a criminal charge, yeah.

2    Q.    All right.  Well, let's start --

3    A.    Well, perhaps --

4    Q.    -- with 1999, then, all right?  In Alaska.

5    You were Lord Browne's Executive Assistant.  At that

6    point, you had been his Executive Assistant for almost

7    10 years, hadn't you?

8    A.    Well, I'm sorry, but in 1999, I wasn't his

9    Exec -- I was his Executive Assistant for a year.  I

10   then went to Colombia for four years.  I went to

11   Venezuela for almost three years.  And I came back to

12   take up an executive role in 1997.  In 1999, I believe

13   I was the Group Treasurer.

14   Q.    You were the Group Treasurer, the position

15   that Lord Browne had previously held?

16   A.    No.  The person who previously had that role

17   was a gentleman called John Buchanan.

18   Q.    Is it a position that Lord Browne had held at

19   some point --

20   A.    He had held --

21   Q.    -- previously?

22   A.    -- at an earlier point in his career in the

23   middle of the '80s in --

24   Q.    Okay.

25   A.    -- '86 to '88, I believe --

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   You were --

2    A.   -- when --

3    Q.   -- you were the Treasurer then at that

4  point --

5    A.   I was the Treasurer.

6    Q.   -- in 1999?

7    A.   Yes.

8    Q.   And BP pleaded guilty to a felony for dumping

9  toxic waste in Alaska; isn't that true?

10   A.   That's correct.

11   Q.   All right.  The crime occurred in 1999, and

12  sentence was handed down on February the 3rd of 2000,

13  while you were the Treasurer, right?

14   A.   That's correct.

15   Q.   There was a $500,000 fine, which was the

16  maximum allowable fine, and BP agreed to spend $20

17  million on an Environmental Management system, true?

18            MR. GODFREY:  Objection as to form.

19   A.   I -- I -- I'm sure it is true, I can't recall

20  the details.  I can't recall the fine or the

21  commitments we made -- -

22   Q.   (By Mr. Cunningham) Well --

23   A.   But if your assertion is that's what we did,

24  I'm certain that's correct.

25   Q.   Well, you were the Treasurer.  Did you write

PURSUANT TO CONFIDENTIALITY ORDER

1    the check?  Did you sign --

2         A.    It's --

3         Q.    -- the check?

4         A.    -- 12 years ago, a -- a lot of water has

5    passed under a bridge.  I cannot remember, but I'm sure

6    if that's what the record says, then it's correct.

7         Q.    So you think you signed a $20 million check

8    and a $500,000 check for a --

9         A.    Well, I --

10        Q.    -- criminal fine, but you don't remember?

11        A.    The answer -- with respect, sir, Treasurers

12   don't sign checks.  And --

13        Q.    But --

14        A.    -- I do not remember.  I'm sorry --

15        Q.    Okay.

16        A.    -- but I do not remember.

17        Q.    All right.  So you don't know how that money

18   got paid, in your position as Treasurer, then?

19        A.    I -- it would have been -- it would have been

20   a bank transfer.  But, you know, I -- I -- I -- I

21   honest -- I do not remember --

22        Q.    All right.

23        A.    -- those details --

24        Q.    Well, you --

25        A.    -- I'm sorry.

1    Q.    -- remember that BP was put on five years'
2    probation, don't you?
3    A.    I remember BP was --
4    Q.    In --
5    A.    -- put on probation.
6    Q.    -- February of 2000, put on five years'
7    probation for a felony, right?
8              MR. GODFREY:  Objection as to form.
9    Q.    (By Mr. Cunningham) Right?
10   A.    I --
11             MR. GODFREY:  Same objection.
12   A.    -- I -- I remember we were put on probation.
13   Q.    (By Mr. Cunningham) All right.  And in --
14   A.    Thank you for reminding me why.
15   Q.    -- and -- and in 2003, in 2003, while that
16   probation was in progress, you became a Member of the
17   Board, right?
18   A.    Correct.
19   Q.    And you were the CEO of E&P at that point --
20   A.    That's correct.
21   Q.    -- is that correct?
22   A.    (Nodding.)
23   Q.    And this is -- in 2000 -- the -- the Year
24   2000, when this felony conviction occurred, this is
25   during the period of acquisitions and mergers that

PURSUANT TO CONFIDENTIALITY ORDER

1  began in 1999 and ran through 2003, correct?

2     A.    That's correct.

3     Q.    All right.  And BP got off probation for this

4  felony in February of 2005, and the Texas City disaster

5  that killed 15 people and injured 170 occurred the next

6  month, didn't it?

7              MR. GODFREY:  Objection as to form.

8     Q.    (By Mr. Cunningham) March --

9     A.    That's -- actually --

10    Q.    -- of 2005?

11    A.    -- the accident occurred in March of 2005.

12    Q.    And it's after that felony conviction that we

13  see a quote that's going to be familiar in every

14  disaster BP's involved in, don't we.  And that is,

15  "We're going to do everything to be sure it never

16  happens again."  Isn't that what was said by BP?

17              MR. GODFREY:  Objection to form.

18    A.    I don't recall.

19              MR. CUNNINGHAM:  (Indicating.)

20              MR. BONNER:  (Tendering.)

21              MR. CUNNINGHAM:  Tab 11.

22           (Exhibit No. 6005 marked.)

23              THE COURT REPORTER:  6005.

24    Q.    (By Mr. Cunningham) (Tendering.) This is a

25  news article that discover -- discusses the guilty

PURSUANT TO CONFIDENTIALITY ORDER

62

1    plea.  And if you'll look down about four or five

2    paragraphs where it starts with "BP vice president," do

3    you see that?

4         A.    I do.

5         Q.    Do you know who Chris Phillips was at that

6    point?

7         A.    I do.

8         Q.    Do you see where he is quoted as saying, "We

9    are committed to ensuring this never happens again,"

10   end quote?

11        A.    I do.

12        Q.    Then comes the Year 2000.  BP's Grangemouth

13   petrochemical complex, there are a series of major

14   incidents involving equipment failure and fire, true?

15        A.    Correct.

16        Q.    And at this point, you're the Treasurer of BP,

17   right?

18        A.    That's right.

19        Q.    Is your office in London?

20        A.    It is.

21        Q.    All right.  And where is Grangemouth?

22        A.    In Edinburgh, Scotland.

23        Q.    Scotland.  And various investigations were

24   conducted of the Grangemouth events, and BP was fined a

25   million pounds, true?

1    A.    I believe that's correct.

2    Q.    And did -- did you write that check, or did

3  you have anything to do with seeing that that was paid,

4  since you were the Treasurer?

5    A.    As -- as I said, Treasurers do not write

6  checks.

7    Q.    All right.  And BP made statements after the

8  Grangemouth event such as "We changed our process

9  Management system to be sure this never happens again,"

10 correct?

11   A.    I -- I don't recall that, but I'm sure that's

12 probably right.

13   Q.    And Lord Browne said, "We are renewing our

14 commitment to safety," didn't he?

15   A.    I -- I -- the -- I don't remember what Lord

16 Browne said.  If you'd like to show me where he

17 said it --

18   Q.    You would have --

19   A.    -- I think --

20   Q.    -- expected him to say something like that,

21 right?

22   A.    Something like that --

23   Q.    Yeah.

24   A.    -- I would imagine.

25   Q.    And -- and you -- when these events occurred,

1  you were right there in the top Management at BP,

2  weren't you?

3      A.   I was at the top Management.

4      Q.   And then comes 2005, Texas City.  You're on

5  the Board of Directors.  Are you still the Treasurer,

6  or have you now taken a higher position?

7      A.   I'm, at that point, the CEO of E&P.

8      Q.   CEO of E&P and on the Board of Directors.  And

9  it's March 23rd, 2005, when that disaster occurs in

10 Texas, correct?

11     A.   Correct.

12     Q.   And BP had just gotten off probation the month

13 before for the Alaska felony --

14              MR. WEBB:  Objection.

15     Q.   (By Mr. Cunningham) -- right?

16              MR. GODFREY:  Objection as to form.

17     Q.   (By Mr. Cunningham) Right?

18              MR. GODFREY:  The same objection.

19     A.   That's what the record shows.

20     Q.   (By Mr. Cunningham) As a result of Texas City,

21 BP pled guilty to a felony, didn't it?

22     A.   They -- we did.  Or BP did.

23              THE COURT REPORTER:  Two minutes.

24              MR. CUNNINGHAM:  Let's stop here.

25              MR. GODFREY:  Off the tape.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. CUNNINGHAM:  He says we've got two

2  minutes, so I won't --

3          MR. GODFREY:  It's a convenient time to

4  stop him.

5          MR. CUNNINGHAM:  All right.

6          THE VIDEOGRAPHER:  Off the record at

7  9:37 a.m., ending Tape 1.

8        (Recess from 9:37 a.m. to 9:57 a.m.)

9          MR. CUNNINGHAM:  Ready.

10          THE VIDEOGRAPHER:  All set?

11        On the record at 9:57 a.m., beginning Tape 2.

12     Q.   (By Mr. Cunningham) Dr. Hayward, my closing

13  question was this:  As a result of the Texas City

14  disaster on March 23rd of 2005, BP pled guilty to a

15  felony, didn't it?

16     A.   That's correct.

17        (Exhibit No. 6006 marked.)

18          THE COURT REPORTER:  6006.

19     Q.   (By Mr. Cunningham) I hand you Exhibit 6006.

20  Judgment --

21          MR. GODWIN:  Tab number?  Tab number?

22          MR. CUNNINGHAM:  Excuse me.  12.

23          MR. GODWIN:  Thank you.

24     Q.   (By Mr. Cunningham) Judgment was imposed on

25  March the 12th of 2009, true?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.    Correct.

2    Q.    Excuse me?

3    A.    Correct.

4    Q.    And you were the CEO?

5    A.    I was.

6    Q.    BP was sentenced to probation for three years,

7    weren't they?

8    A.    That's correct.

9    Q.    So as of April 20th, 2010, the date of the

10   DEEPWATER HORIZON disaster and the deaths of 11 men, BP

11   was on probation for a felony related to the deaths of

12   15 people and still had two years to go on its

13   probationary term, true?

14            MR. GODFREY:   Objection --

15            MR. WEBB:   Object to the form of the

16   question.

17            MR. GODFREY:   -- as to form.

18   Q.    (By Mr. Cunningham) True?

19   A.    We were still on probation on the 20th of

20   April for Texas City.

21   Q.    And still had two years to go?

22   A.    And still had two years to go.

23   Q.    As a matter of fact, BP is still on probation

24   today, isn't it?

25            MR. GODFREY:   Objection as to form.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.    Yes.

2    Q.    (By Mr. Cunningham) And there were conditions

3    of supervision for that probation, weren't there?

4    A.    There were.

5    Q.    If you look on Page 2, it required that BP

6    designate an official of the organization to act as

7    their representative and be the primary contact with

8    the Probation Officer, right?

9    A.    Correct.

10   Q.    Did you have to report to the Probation

11   Officer, or was that somebody else?

12   A.    That was somebody else.

13   Q.    And BP has violated this Settlement Agreement,

14   hadn't it?

15         MR. GODFREY:   Objection as to form.

16   A.    I'm sorry?  We had --

17   Q.    (By Mr. Cunningham) BP violated the Settlement

18   Agreement that it entered as part of this guilty plea,

19   didn't it?

20   A.    Can -- can you --

21   Q.    You don't know anything about that?

22   A.    It's not that I don't know anything about it.

23   I'd just like to be clear about --

24   Q.    Paragraph 8 on Page 3 of 5 requires BP to

25   fully comply with the Settlement Agreement it exeted --

**PURSUANT TO CONFIDENTIALITY ORDER**

1    executed between it and the United States Occupational

2    Health and Safety Administration.

3         A.    M-h'm.

4         Q.    Right?

5         A.    M-h'm.

6              MR. GODFREY:  Objection as to form.

7         Q.    (By Mr. Cunningham) And the reason you're

8    hesitating when I asked you whether they violated that

9    Settlement Agreement is what?

10        A.    Is because of the protracted discussion and

11   negotiation we had with OSHA over the exact terms of

12   the Settlement Agreement.

13        Q.    So it is in dispute whether or not you

14   violated the Settlement Agreement?

15        A.    I honestly can't recall the details of where

16   we got to with OSHA in the course of late 2009, early

17   2010.

18        Q.    All right.  Page 4, BP paid criminal monetary

19   penalties in the form of a fine of $50 million,

20   correct?

21        A.    That's correct.

22        Q.    And if you look at Page 7 of the Criminal

23   Information that's attached to these first few

24   documents, if you turn to Page 7 of that Criminal

25   Information, which is Page 7 of 8, top right corner --

**PURSUANT TO CONFIDENTIALITY ORDER**

1  do you have that page?

2      A.    Does it start with E, "Excess Pressure"?

3      Q.    Yes.

4      A.    All right.

5      Q.    And if you'll look down below H, BP pled

6  guilty to a knowing violation of risk management

7  practices, didn't it?

8              MR. GODFREY:  Objection as to form.

9      A.    Well, what it says under H is that BP Products

10 failed since at least 1999 to perform a relief valve

11 study.

12     Q.    (By Mr. Cunningham) Excuse me.  I -- I --

13              MR. GODWIN:  Objection, form.

14     Q.    (By Mr. Cunningham) I misstated what I was

15 asking you to refer to.

16              Below H, the next paragraph --

17     A.    I'm sorry.

18     Q.    -- starts with "knowing violations of risk

19 management practices," correct?

20     A.    That's correct.

21     Q.    And it discusses the period between January of

22 '99 and March of 2005, correct?

23     A.    Correct.

24     Q.    All right.  And included in the time frame

25 when the violations occurred, you were Treasurer of BP

1    PLC, correct?

2        A.    Correct.

3        Q.    Part of that time.

4        A.    Correct.

5        Q.    On the Board of Directors of BP PLC, correct?

6        A.    Correct.

7        Q.    Or the No. 2 man, or CEO of E&P?

8        A.    CEO of E&P would be a more accurate

9    description.

10       Q.    In the top Management.  You were there,

11   weren't you?

12       A.    I was in the top Management.

13       Q.    Did you -- did you have to sign the check

14   paying these penalties?

15             MR. GODFREY:  Objection as to form.

16       A.    I think I made it clear Treasurers don't sign

17   checks.

18       Q.    (By Mr. Cunningham) Did you issue the check?

19   Did you order the check?  Did you ever even see the

20   check?

21       A.    No, I didn't ever see the check.

22       Q.    You didn't?

23       A.    I was -- most money is sent by bank transfer

24   these days, as I'm sure you're aware.

25       Q.    Did you -- did you ever go to Court as a

**PURSUANT TO CONFIDENTIALITY ORDER**

1  result of this?  Did you ever appear in Court for the

2  guilty plea?

3      A.   No.

4      Q.   Did you ever undergo questioning in a

5  deposition like this today, relative to the Texas City

6  disaster?

7      A.   No, because it was -- in -- in reality, I had

8  no authority or accountability over Texas City at any

9  point in -- in this time.

10     Q.   So even though you were in the top Management

11 of BP, you had no accountability.  Is that your

12 testimony?

13     A.   I said I was not accountable for the Texas

14 City refinery or any -- any part of my -- the

15 organization I was running was not accountable for the

16 Texas City refinery.  That is why I was not deposed, I

17 am assuming.

18     Q.   Did you ever give testimony such as you're

19 giving today either in the Alaska felony case, the

20 Grangemouth event, or the Texas City disaster?

21     A.   I did not.

22     Q.   And then after Texas City, Lord Browne said

23 the same thing that we've heard before, that BP says

24 after a felony convictions or disasters, and that is,

25 "We're going to do whatever it takes to see it never

PURSUANT TO CONFIDENTIALITY ORDER

1    happens again," didn't he?

2              MR. WEBB:  Object to the form.

3              MR. GODFREY:  Objection to the form.

4      A.    If you can show me, I -- I can confirm or deny

5    whether that's the case.

6      Q.    (By Mr. Cunningham) Tab 15.

7            (Exhibit No. 6007 marked.)

8              THE COURT REPORTER:  Exhibit 6007.

9      A.    Thank you.

10     Q.    (By Mr. Cunningham) This is a BP press

11   release, correct?

12     A.    It is, yes.

13     Q.    Dated 17 August 2005?

14     A.    Correct.

15     Q.    Which is a few months after the explosion,

16   right?

17     A.    Correct.

18     Q.    And it quotes "BP Group Chief Executive John

19   Browne," doesn't it?

20     A.    It did -- it does.

21     Q.    And does it quote him, in the third paragraph,

22   as saying, quote:  "The Texas City explosion was the

23   worst tragedy in the recent history of BP, and we will

24   do everything possible to ensure nothing like it

25   happens again," end quote?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.    It does.

2    Q.    Did I read that correctly?

3    A.    Correct.

4    Q.    And that's almost exactly the same thing you

5  had said in BP TV ads after the DEEPWATER HORIZON

6  blowout, isn't it?

7              MR. GODFREY:  Object to the form of the

8  question.

9    A.    I think I'd like to see the TV ad so I can

10  make the comparison, if you have them available.  But

11  if not, then I -- I honestly don't remember what I said

12  in the TV ads, frankly.

13    Q.    (By Mr. Cunningham) So you do not remember

14  having said, essentially, that the DEEPWATER HORIZON

15  was a tragedy and that you would do everything possible

16  to ensure nothing like it happened again?  You don't

17  recall --

18    A.    I'm sure --

19    Q.    -- saying that?

20    A.    I'm sure I said something very similar.

21    Q.    And -- and you said it more than once and --

22    A.    I'm sure I did.

23    Q.    -- in more than one location, didn't you?

24    A.    I did.

25    Q.    Then we come to 2006, and that is the Prudhoe

PURSUANT TO CONFIDENTIALITY ORDER

1   Bay pipeline leak of some 200,000 gallons.  You --

2   you -- you're familiar with that, aren't you?

3       A.   I am, yes.

4       Q.   You were CEO of E&P and on the Board of

5   Directors and you were in the top Management of the

6   company when that occurred, correct?

7       A.   I was.

8       Q.   And BP pled guilty to violations of the Clean

9   Water Act, didn't it?

10      A.   Correct.

11               MR. CUNNINGHAM:  Tab 13.

12           (Exhibit No. 6008 marked.)

13               THE COURT REPORTER:  6008.

14      Q.   (By Mr. Cunningham) (Tendering.)

15      A.   Thank you.

16      Q.   If you'll look at Page 1, sentence was imposed

17  on November the 29th of 2007, wasn't it?

18               MR. GODFREY:  What page, please?

19               MR. CUNNINGHAM:  Three, excuse me, three.

20  It actually is the third page down.  It says "Page 1 of

21  5" at the top.

22      A.   Yeah.

23      Q.   (By Mr. Cunningham) Do you see that?

24      A.   M-h'm.

25      Q.   BP pled guilty -- or the sentence was imposed

1    on November 29th 2007, wasn't it?

2        A.    Correct.

3        Q.    And at that time, you were the head man at BP

4    PLC.  You were the CEO, weren't you?

5        A.    I was, yes.

6        Q.    And, again, BP was put on probation for a term

7    of three years, true?

8        A.    Correct.

9        Q.    So as of the date of the DEEPWATER HORIZON

10   blowout, BP was on probation for two crimes, wasn't it?

11       A.    That's correct.

12       Q.    One related to multiple deaths, and the other

13   related to an oil spill --

14               MR. GODFREY:  Ob --

15       Q.    (By Mr. Cunningham) -- true?

16               MR. GODFREY:  Objection as to form.

17       A.    We were on probation for two -- two accidents.

18       Q.    (By Mr. Cunningham) Well, one of them --

19               MR. GODWIN:  Objection, form.

20       Q.    (By Mr. Cunningham) One of them related to

21   multiple deaths, and the other related to an oil spill?

22       A.    That's correct.

23       Q.    Didn't it?

24               MR. GODFREY:  Objection as to form.

25       Q.    (By Mr. Cunningham) And there were conditions

1  of probation attached that are on Page 2 of 5 here,

2  right?

3      A.    Sorry.   (Reviewing document.)

4      Q.    Do you have that, the standard conditions of

5  probation, the bottom of the page?

6      A.    Yes, I do, yeah.

7      Q.    Required the defendant organization to provide

8  a resi -- a representative to be the primary contact

9  with the probation officer, right?

10     A.    Correct.

11     Q.    I don't guess that was you, was it?

12     A.    It wasn't me.

13     Q.    And it required, in Paragraph 5, that "the

14  defendant organization...notify the probation officer

15  within seventy-two hours of any criminal prosecution,

16  major civil litigation, or administrative proceeding

17  against the organization."

18          True?

19     A.    Correct.

20     Q.    Did BP comply with its terms of probation by

21  notifying its probation officer about this litigation?

22          MR. GODFREY:  Objection as to form.

23     A.    I -- I honestly don't know.

24     Q.    (By Mr. Cunningham) Well --

25     A.    I have no knowledge whatsoever.  I would

1   imagine that we complied with the terms of the

2   probation.

3        Q.    All right.   Turn to the next page.   BP paid

4   criminal monetary penalties in the form of a $12

5   million fine and $8 million restitution, correct?

6        A.    H'm.

7              MR. GODFREY:   Which page are we at?

8        A.    Sorry, I can't -- sorry.  We're on Page 4 of

9   5, are we now?

10       Q.    (By Mr. Cunningham) It say -- it says at the

11  top --

12             MR. GODFREY:   Which -- which page are you

13  on?

14       Q.    -- "Criminal Monetary Penalties."

15             MR. GODFREY:   Oh, Page 4 of 5, thank you.

16       A.    Yeah.

17       Q.    (By Mr. Cunningham) Correct?

18       A.    Correct.

19       Q.    $12 million fine and $8 million restitution?

20       A.    M-h'm, correct.

21       Q.    And do we need to guess what BP said in the

22  wake of this event, or will you just go ahead and agree

23  that they said the same thing they had been saying in

24  every other disaster and every other criminal plea --

25             MR. WEBB:   Object to the form of the

1    question.

2              MR. GODFREY:  Objection, form.

3       Q.    (By Mr. Cunningham) -- that it would never

4    happen again, would you agree?

5              MR. GODFREY:  Same objection.

6       A.    I don't know what they -- I --

7       Q.    (By Mr. Cunningham) You don't know what they

8    said?

9       A.    If you'll demonstrate to me what we said, then

10   I can agree with you or disagree with you.

11             MR. CUNNINGHAM:  (Indicating.)

12          (Exhibit No. 6009 marked.)

13             THE COURT REPORTER:  6009.

14             MR. GODWIN:  What tab was that?

15             MR. CUNNINGHAM: 10.

16             MR. GODWIN:  Thank you.

17      Q.    (By Mr. Cunningham) (Tendering.)

18      A.    Thank you.

19      Q.    If you'll turn to the next-to-the-last page of

20   this transcription of an interview, Steve Marshall,

21   President of BP Alaska.  Do you see him?

22      A.    I do, next-to-the-last page.

23      Q.    And do you see in the quote on the left under

24   his picture where he says that:  "...we need to bring

25   to bear" certain actions "to make sure an incident like

1   this does not happen again"?

2        A.    Yeah, I think what he's referring to is "need

3   to put in place systems, including pigging, and

4   ultrasonic testing, and whatever technology we need to

5   bring to bear" --

6        Q.    "...to make sure" --

7        A.    -- "to make sure an incident like this" --

8        Q.    -- "an incident like this does not happen

9   again"?

10       A.    -- "does not happen again."

11       Q.    Correct?

12       A.    That's right.

13       Q.    Now, we're through 2006, let's go to 2007.

14             In 2007, BP entered into a Deferred

15   Prosecution Agreement in Illinois for mail fraud and

16   wire fraud, true?

17                  MR. GODFREY:   Objection as to form.

18       A.    Could you just elaborate a little bit about

19   what was -- sorry.

20       Q.    (By Mr. Cunningham) Mail fraud and wire fraud.

21   You don't know anything about it?

22       A.    I -- I'm sure I do know something about it,

23   but I don't recall hearing it described in those terms.

24                  MR. CUNNINGHAM:   Tab 16.

25                  (Exhibit No. 6010 marked.)

**PURSUANT TO CONFIDENTIALITY ORDER**

1          THE COURT REPORTER:   6010.

2     Q.    (By Mr. Cunningham) (Tendering.) If you will

3  look at Page 21 of "ATTACHMENT A" to this exhibit --

4               MR. CUNNINGHAM:   Is that separate -

5          (Discussion off the record.)

6     A.    (Reviewing document.)

7     Q.    (By Mr. Cunningham) -- which is a "STATEMENT

8  OF FACTS."  It's Page 1, starts at Page 1.

9               MR. GODFREY:   Which -- which -- I'm

10  sorry, which page?

11               MR. CUNNINGHAM:   It's Attachment -- it's

12  Attachment A is how it's described, Rick, on -- it's

13  Page 21 --

14               THE WITNESS:   I'm half through them.

15               MR. CUNNINGHAM:   -- of 36.

16               MR. GODFREY:   It's about halfway through

17  the document.

18               MR. CUNNINGHAM:   Yeah, yeah.

19               MR. WEBB:   Well, there's multiple

20  documents here, so I don't think the witness has any

21  idea where you are in the document.

22               MR. CUNNINGHAM:   Well, I'm trying to help

23  him find it if I can.

24     A.    I'm trying to find it --

25     Q.    Let's just -- I'll show it to you.  It's this

1    far down and it starts with Attachment A, "Statement of
2    Facts"?
3        A.    (Reviewing document.)
4        Q.    There are a series of Officer Certificates and
5    it follows those.
6        A.    It follows those, okay.   (Reviewing document.)
7    Okay.
8        Q.    Have you found it?
9        A.    Yeah, yeah.
10       Q.    Okay.
11       A.    Yes.
12       Q.    If you'll look at Page 21 of Attachment A, and
13   I'm looking at the numbers at the bottom.
14       A.    M-h'm, yep.
15       Q.    Let me read to you the Paragraph 73 and see if
16   this refreshes your recollection about what BP pleaded
17   guilty to.
18       A.    Okay.
19       Q.    And in 2007, you were the CEO, right?
20       A.    That's correct.
21       Q.    And so when I say "mail fraud" and "wire
22   fraud," you don't remember that?
23       A.    I -- I don't remember it because I always
24   referred to it as propane trading, not mail fraud.
25       Q.    Oh, you called it trading.  Okay.  All right.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.    I -- I'm --

2    Q.    See if I --

3    A.    -- sorry.  I apologize.

4    Q.    See if I read correctly at the bottom.  "Based

5  on the facts set forth above, BP admits that through

6  the actions of its employees, BP conspired to corner

7  the market and manipulate the price of February 2004

8  TET propane contrary to Commodity Exchange Act...and

9  engage in transactions that violated 18 U.S.C. 1341

10 (mail fraud)" --

11    A.    M-h'm.

12    Q.    -- "and 18 U.S.C. 1343 (wire fraud)."

13          Now does that refresh your recollection?

14    A.    Yeah, yeah.  Yeah.

15    Q.    And if you look at Page 1 of the entire

16 exhibit, it sets out the various entities that entered

17 the agreement, in the first paragraph.

18          Do you see that?

19    A.    I do.

20    Q.    It included BP America, and the BP America

21 subsidiaries, BP Corporation North America, BP Products

22 North America, Inc., BP America Production Company, BP

23 Energy Company, and BP International Services Company,

24 correct?

25    A.    Yes.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.    And the Deferred Prosecution Agreement is for
2  a period of three years from October of 2007, isn't it?
3      A.    That's correct.
4      Q.    And BP agreed to pay monetary penalties in
5  this Deferred Prosecution Agreement of a hundred
6  million dollars to the U.S. Treasury, right?
7              MR. GODFREY:  Objection as to form.
8      A.    I believe that's right.
9      Q.    (By Mr. Cunningham) All right.  And $53
10 million to a victim restitution fund, right?
11     A.    I believe that's right.
12     Q.    And $25 million to The U.S. Postal Services
13 Consumer Fraud Fund, right?
14     A.    That's correct.
15     Q.    It was signed in October of 2007, and you were
16 the CEO, weren't you?
17     A.    That's correct.
18     Q.    So on April 20th, 2010, the date of the
19 DEEPWATER HORIZON explosion, this Deferred Prosecution
20 Agreement was still in effect, wasn't it?
21     A.    It was.
22     Q.    Just to summarize, then, Dr. Hayward, as of
23 April 20, 2010, BP was on probation for two crimes and
24 was the subject of a three-year Deferred Prosecution
25 Agreement for mail fraud and wire fraud?

PURSUANT TO CONFIDENTIALITY ORDER

1          MR. GODFREY:  Objection as to form.

2     Q.   (By Mr. Cunningham) Correct?

3          MR. GODFREY:  Same objection.

4     A.   That is correct.

5     Q.   (By Mr. Cunningham) And one of those crimes

6  involved multiple deaths and injuries, and one involved

7  an oil spill, didn't it?

8          MR. GODFREY:  Objection as to form.

9     A.   That's correct.

10    Q.   (By Mr. Cunningham) And all of that conduct

11 occurred while you were:  A, Executive Assistant or in

12 some other position; B, No. 2 at BP, or as you say, on

13 the third level, CEO of E&P; or C, you were on the

14 Board of Directors; or D, you were CEO?

15         MR. WEBB:  Objection to form.  Compound.

16    Q.   (By Mr. Cunningham) True?

17    A.   We can debate exactly how you want to describe

18 it.

19    Q.   Well, let me --

20    A.   Let --

21    Q.   Let me try it this way:  When all of those

22 events and guilty pleas occurred, you were in the top

23 leadership at BP, weren't you?

24    A.   I was in the leadership of BP, yes, correct.

25    Q.   And despite everything that had occurred

1    before 2007, during which you were part of the top

2    leadership at BP, the Board of Directors promoted you

3    to CEO in 2007, didn't they?

4        A.    They did.

5        Q.    In fact, the entire time that you were the CEO

6    of BP, BP was on probation for criminal conduct, true?

7        A.    For incidents that had occurred prior to my

8    becoming the CEO, that is true.

9        Q.    Is it true that the entire time you were CEO

10   of BP, BP was on probation for criminal conduct?

11               MR. GODFREY:   Objection as to form.

12       A.    As I said, BP was on probation for criminal

13   conduct during my time as CEO for incidents that had

14   occurred prior to me becoming the CEO.

15       Q.    (By Mr. Cunningham) They occurred while you

16   were in the top leadership of BP, though, didn't they?

17       A.    I was -- I was in the senior leadership.

18       Q.    You were in the senior leadership, weren't

19   you?

20       A.    I was.

21       Q.    And it's true, isn't it, that the culture of

22   an organization is shaped by the leaders in it?

23               MR. WEBB:   Object to form.

24       Q.    (By Mr. Cunningham) That people do what

25   leaders do?

PURSUANT TO CONFIDENTIALITY ORDER

1    do...that's been proven time and time again"?  Did you

2    or did you not say that?

3        A.    I did say that.  I did say that.

4        Q.    You would agree, wouldn't you, Dr. Hayward,

5    that there were a couple of common threads running

6    through the various investigations by various parties

7    both inside and outside BP of Grangemouth, Texas City,

8    and Prudhoe Bay?  There were a couple of common threads

9    running through those, weren't they?

10                   MR. GODFREY:  Objection as to form.

11        A.    I would like you to elaborate as to which

12    common threads you might be referring to --

13        Q.    All right.

14        A.    -- then I can --

15        Q.    Well, let me refer you to two.  Those

16    investigations focused, one after the other, on issues

17    including one, cost-cutting, and two, process safety,

18    correct?

19        A.    I certainly believe that process safety was a

20    common theme.  I think there is certainly no evidence

21    in the case of Alaska that it was anything to do with

22    cost-cutting.

23        Q.    Well, then --

24        A.    It was to do with the assessment of risk, but

25    it wasn't about cost-cutting.

**PURSUANT TO CONFIDENTIALITY ORDER**

1     Q.    All right.  Well, do you concede, then, that
2     the other two investigations a common thread was
3     cost-cutting by Senior Management?
4     A.    I don't agree with that.
5     Q.    You don't agree with that?
6     A.    No.
7     Q.    All right.  Did you read press reports that
8     described cost-cutting by Lord Browne, aggressive
9     cost-cutting directed by him as one of the causes of
10    those events?
11              MR. GODFREY:  Objection to form.
12    A.    Did I read press reports?
13    Q.    (By Mr. Cunningham) M-h'm.
14    A.    I may have read press reports.  I don't
15    recall.
16    Q.    And in the lessons that were learned from
17    Grangemouth, was the subject of cost-cutting discussed?
18    A.    I -- I don't recall.
19              MR. CUNNINGHAM:  (Indicating.)
20              MR. BONNER:  (Tendering.)
21              MR. CUNNINGHAM:  Tab 8.
22    Q.    (By Mr. Cunningham) From a safety perspective
23    it was important that lessons be learned from prior
24    events such as Grangemouth, correct?
25    A.    Correct.

PURSUANT TO CONFIDENTIALITY ORDER

1        (Exhibit No. 6011 marked.)

2                THE COURT REPORTER:  11.

3                MR. GODFREY:  What's the Exhibit number

4   of this?

5                THE COURT REPORTER:  6011.

6                MR. GODFREY:  Thank you.  Now I get the

7   "11" part.  Thank you.

8       Q.    (By Mr. Cunningham) And, certainly, in your

9   capacity in the leadership at BP, you were interested

10  in what lessons there were to learn from events such as

11  Granemouth -- Grangemouth, correct?

12      A.    Yes, indeed.

13      Q.    And if you look at the first page of this

14  exhibit, we see that the three authors were, in fact,

15  employees of BP, weren't they?

16      A.    M-h'm.

17      Q.    So they would know that the Senior Management

18  level that BP would be reading this Report they wrote

19  about the lessons from Grangemouth, correct?

20      A.    I'm sure that's correct.

21      Q.    All right.  If you look at Page 252 at the

22  bottom, tell me whether or not I read this correctly

23  under "Cost Targets":  "There was too short a focus on

24  short term cost reduction reinforced by KPI's..."

25                That's key performance indicators, isn't it?

PURSUANT TO CONFIDENTIALITY ORDER

1       "...in performance contracts, and not enough

2   focus on longer-term investment for the future.  HSE

3   was unofficially sacrificed to cost reductions, and

4   cost pressures inhibited staff from asking the right

5   questions; eventually staff stopped asking."

6           Did you read that when this Report was issued?

7       A.   I can't recall.  I almost certainly did, but I

8   can't recall it.

9       Q.   You're almost certain you did, but you can't

10   recall it?

11      A.   I can't recall it, no.

12      Q.   Okay.  And you're familiar with the U.S.

13   Chemical Safety Investigation Report out of Texas City,

14   correct?

15      A.   I am.

16           MR. CUNNINGHAM:  Tab 21.

17           MR. BONNER:   (Tendering.)

18           MR. CUNNINGHAM:  I'm going to mark the

19   full copy, Rick, and give y'all pages from it.

20           MR. GODFREY:  That's fine.

21       (Exhibit No. 6012 marked.)

22           THE COURT REPORTER:  6012, Mr. Godfrey.

23           MR. GODFREY:  Thank you.

24      Q.   (By Mr. Cunningham) (Tendering.)

25      A.   Thank you.

**PURSUANT TO CONFIDENTIALITY ORDER**

1       Q.     This report came out in March of 2007, seven

2    years after Grangemouth, correct?

3       A.     Correct.

4       Q.     And among the Key Findings, turn to Page 25,

5    if you will.

6       A.     (Reviewing document.)

7       Q.     Do you have that page?

8       A.     I do.

9       Q.     The first paragraph under Key Organizational

10   Findings, tell me whether I read this correctly, quote,

11   "Cost-Cutting, failure to invest, and production

12   pressures from BP group executive managers impaired

13   process safety performance at Texas City."

14            Did I read that correctly?

15      A.     You did.

16      Q.     And if you'll turn to Page 157, do you see

17   that there's a followup portion here or correction on

18   Page 158, Section 9.4, related to budget cuts?

19      A.     M-h'm.

20      Q.     It refers to a 2002 study.  That's three years

21   before the Texas City explosion, correct?

22      A.     Correct.

23      Q.     Are you familiar with the study that was done

24   three years before Texas City?

25      A.     I'm not familiar with it, no.  I'm certain I

**PURSUANT TO CONFIDENTIALITY ORDER**

1  was at the time, but I'm not familiar with it.

2      Q.    Tell me if I read this correctly:  "The 2002

3  study identified a 25 percent cut in fixed cash cost

4  targeted in 1999" to "2000.  In 1999, the BP Group

5  Chief Executive" --

6          That would have been Lord Browne?

7      A.    Correct.

8      Q.    -- "outlined his strategies and goals for" the

9  "newly merged company, with the target of" reducing

10  business -- "business unit cash costs for the year 2001

11  by at least 25 percent from year 1998 levels.  He also

12  set out three year targets to cut" 1 point -- "1.4

13  billion from R&M worldwide."

14          Did I read that correctly?

15      A.    You did.

16      Q.    Turn to the next page, second paragraph:

17  "While some BP refinery leaders resisted the call for a

18  25 percent reduction in fixed costs, Texas City made

19  serious cuts and came close to the 25 percent reduction

20  target.  Its cost reduction strategy was to

21  'aggressively drive costs out of the system at an

22  accelerated pace relative to other refiners.'"

23          Did I read that correctly?

24      A.    Correct.

25      Q.    And that same Report also noted what BP had

**PURSUANT TO CONFIDENTIALITY ORDER**

1    learned in the lessons -- in the way of lessons from

2    Grangemouth, didn't it, on Page 145?

3              Look down at the bottom and tell me whether I

4    read this correctly in the middle of the paragraph:

5    "...even though the group Chief Executive told staff in

6    October 2000 edition of BP's in-house magazine that BP

7    would learn lessons from Grangemouth and other

8    incidents.  The CSB found that a number of managers,

9    including executive leadership had little awareness or

10   understanding of the lessons from Grangemouth."

11             Did you read that when it was published?

12   A.   Did I read this -- this Report?

13   Q.   Yes.

14   A.   I did.

15   Q.   All right, sir.  And the Baker Independent

16   Panel Report, which BP commissioned, reached similar

17   conclusions, didn't it?

18   A.   It did.

19   Q.   And then if we move to Prudhoe Bay.

20             MR. CUNNINGHAM:  Tab 38.

21             MR. BONNER:  (Tendering.)

22         (Exhibit No. 6013 marked.)

23             THE COURT REPORTER:  6013.

24   Q.   (By Mr. Cunningham) I'm going to mark the full

25   report and give you excerpts.

1              MR. GODFREY:  Right.  Thank you.

2       Q.   (By Mr. Cunningham) Are you familiar with the

3    Booz Allen Report that BP commissioned out of Prudhoe

4    Bay?

5       A.   Yes, I am.

6       Q.   And this is a Report or a study that BP paid

7    for, correct?

8       A.   Correct.

9       Q.   And if you look at Page 7, the bottom, where

10   it says:  "BP XA had a deeply ingrained cost Management

11   ethic as a result of long periods of low oil prices,

12   constrained budgets, and multiple cost/head count

13   reduction initiatives."

14           Did I read that correctly?

15              MR. GODFREY:  Objection as to form.

16      A.   It also says, just so we're complete:

17   "However, larger budgets alone would not have prevented

18   these incidents without fundamental changes in

19   corrosion and integrity Management."

20      Q.   (By Mr. Cunningham) The question was:  Did I

21   read the sentence before that correctly or not?

22      A.   You did.

23      Q.   All right.

24      A.   I just wanted to make certain the context was

25   complete.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   And are you familiar with a Fortune article

2  that was published relating to this very issue?

3                MR. GODFREY:  Objection to form.

4    A.   No, I don't -- I don't -- I don't recall it.

5    Q.   (By Mr. Cunningham) Of cost-cutting?  You

6  don't recall --

7    A.   I don't recall the Fortune article.

8         When was the Fortune article published?

9    Q.   It was published in January of 2011.

10   A.   I -- yes, I'm -- I'm aware.

11   Q.   Are you familiar with that?

12   A.   I'm aware of that article, yes.

13   Q.   And are you familiar with the statement in

14  that article that "John Browne" -- quote, "John

15  Browne's legacy as CEO would be enormous - for better

16  and worse.  After taking over in 1995 he imposed a

17  tough bottom-line mentality, ever focused on cutting"

18  cost?

19        Did you read that?

20   A.   No.

21   Q.   Is that true?

22   A.   No.

23   Q.   It's not true?

24   A.   No.

25   Q.   So he was not focused on cutting cost?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.    He was focused on running a very effective

2  business.

3      Q.    Okay.

4      A.    It wasn't just about cutting costs, or

5  anything --

6      Q.    Well, it wasn't just about cutting cost?

7      A.    It wasn't about cutting costs.  It was about

8  building a -- a large oil and gas company.

9      Q.    Is it -- is it your testimony, Mr. Hayward,

10  that John Browne did not aggressively cut cost when he

11  was CEO of BP?

12            MR. GODFREY:  Objection as to form.

13      A.    I -- there was certainly cost management in BP

14  at the time.

15      Q.    (By Mr. Cunningham) So --

16      A.    But I'm not saying -- I -- I -- I don't think

17  that's in any way a complete description.  So I'm

18  sorry, the answer is "No."

19      Q.    The answer is "No," he did not aggressively

20  cut cost while he was CEO?

21            MR. GODFREY:  Objection as to form.

22      Q.    (By Mr. Cunningham) Is that your testimony?

23      A.    He certainly cuss -- cut costs, but as part of

24  running the business.  It wasn't like it was the only

25  thing that was happening.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.    Okay.  It wasn't the only thing that happened,
2  but he certainly cut cost, correct?
3    A.    He certainly reduced costs --
4    Q.    All right.
5    A.    -- yes.
6    Q.    You were famil --
7    A.    There's a difference, I think.  Sorry -- I'm
8  sorry.
9    Q.    Go ahead.
10    A.    I interrupted you.
11    Q.    All right.  You were familiar with all of
12  these investigations and studies when you became CEO in
13  2007, weren't you?
14    A.    I was.
15    Q.    Because you had been there, and you had been
16  directly involved in the top leadership and as a Board
17  Member and as a Treasurer, correct?
18    A.    Correct.
19    Q.    All right.  And when you testified in
20  Congress, on June the 17th of 2010, you knew by that
21  point that Congress knew and the public knew about BP's
22  history of cost-cutting and the relationship between
23  that and what occurred at Texas City, you knew that,
24  didn't you?
25              MR. WEBB:  Objection, form.

1       MR. GODFREY:  Objection, form.

2    A.   I knew that some people had made that link.

3    Q.   (By Mr. Cunningham) You knew that the --

4    A.   That's certainly true.

5    Q.   Okay.  You knew that the Chemical Safety Board

6  had made a link between cust cotting -- cust --

7  cost-cutting and impaired process safety that they

8  believed had led to the Texas City disaster?

9    A.   I knew what the Chemical Safety Board had

10  concluded.

11    Q.   And your testimony before Congress came three

12  years after those Reports, three years after you were

13  CEO, and five years after Texas City, right?

14    A.   And three years after I had launched a major

15  change program at BP to --

16    Q.   I didn't ask you about that.

17    A.   -- take account of the --

18    Q.   Did you hear me --

19       MR. WEBB:  Before you --

20    Q.   (By Mr. Cunningham) -- ask you about a

21  change --

22       MR. WEBB:  -- he can answer --

23       MR. CUNNINGHAM:  No.  I didn't ask

24  him about any change --

25       MR. WEBB:  You interrupted -- you can

1  move to strike it, but he has a right to finish his

2  answer.

3           MR. CUNNINGHAM:  He does not have to

4  right -- have a right to make a speech on my time

5  about something I didn't ask him.

6           MR. WEBB:  He's in the middle of an

7  answer.  I think he has a right to finish it.

8      A.   You have your time back.

9      Q.   (By Mr. Cunningham) When you took the oath

10  before Congress on June the 17th of 2010, the last

11  thing you wanted to admit was that since 2007, when you

12  became CEO, and despite what had happened at

13  Grangemouth, Texas City, and Prudhoe Bay, you had done

14  exactly the same thing as Lord Browne, you had

15  aggressively cut cost, didn't you?

16      A.   Oh, that is fundamentally --

17           MR. GODFREY:  Objection as to form.

18      A.   -- and completely inaccurate.

19      Q.   (By Mr. Cunningham) Okay.

20      A.   And I will -- if you would allow me to --

21      Q.   No.  I'm asking you --

22      A.   -- please, sir, I would like to explain to you

23  what I did do.

24      Q.   Here's the way it works:  If I want an

25  explanation, I'll ask for one.  If I don't ask your

1   lawyers, great lawyers, they can ask you to explain any

2   answer that they feel you need to explain.  Okay?

3           My question was real simple:  Did you or did

4   you not?  And as I understand your answer, it's "No, I

5   didn't."

6       A.   I categorically did not.

7       Q.   You categorically did not.  All right.

8                   MR. CUNNINGHAM:  Oh, I got it.

9           (Discussion off the record.)

10      Q.   (By Mr. Cunningham) Exhibit 6000.  Tab 1, Page

11  37.

12                  THE COURT REPORTER:  6000.

13      Q.   (By Mr. Cunningham) It's a -- it's the -- it's

14  to your right.  To your right.  There.

15                  MR. WEBB:  I got it.

16                  MR. CUNNINGHAM:  Oh, it's -- that's not

17  it.

18                  MR. WEBB:  This is 6000?  Tony's speech?

19                  MR. CUNNINGHAM:  Okay.  Excuse me.  6001.

20  I'm sorry.

21                  MR. WEBB:  6001.

22                  MR. GODFREY:  6001.

23                  MR. WEBB:  Do you have 6001 in front of

24  you?  That's --

25                  THE WITNESS:  I do.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              MR. CUNNINGHAM:  Tab 25.

 2              (Exhibit No. 6014 marked.)

 3              THE COURT REPORTER:  6014.

 4     Q.   (By Mr. Cunningham) (Tendering.)

 5          This is your copy.  The other one is --

 6     A.   Oh, I'm sorry.

 7     Q.   -- your counsel's.

 8     A.   Thank you.

 9     Q.   You gave a speech that was reported in the

10  Guardian on September the 26th of 2007, correct?

11     A.   Correct.

12     Q.   It states in the first sentence:  "Tony

13  Hayward, the new Chief Executive of BP, is to instigate

14  a thorough Management shakeup in an attempt to refocus

15  the group following a dreadful third quarter."  Is that

16  true?

17     A.   Correct.

18     Q.   And it says in Paragraph 3:  "Mr. Hayward

19  outlined new plans to slash management layers from 11

20  to 7, redeploying some staff and removing others to

21  kick start an oil group that he believes has become

22  overcautious, despite the fatal Texas City refinery

23  fire and other major accidents in the U.S."

24          Did I read that correctly?

25     A.   You did.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   No, I haven't.

2            MR. CUNNINGHAM:   Tab 33.

3            (Exhibit No. 6018 marked.)

4            THE COURT REPORTER:   6018.

5      Q.   (Tendering) I'll hand you 6018.  Is that a

6   2010 Drilling Excellence Plan?

7      A.   That's what it said it is.  I haven't seen

8   this document prior to today.

9      Q.   And do you see where it says on the next page

10  under "Performance Focus," "Every rig minute counts"?

11     A.   I do.

12     Q.   Turn to the next page.  Do you see the bullet

13  point at the top that says "Time is Money"?

14     A.   I do.

15     Q.   And do you see the one at the bottom that says

16  "Every minute matters"?

17     A.   And the one in between, "Efficient Wells are

18  Safer Wells."  I do.

19     Q.   Dr. Hayward, your cost-cutting -- your

20  cost-cutting in the wake of the Grangemouth

21  investigation and the Texas City investigation flowed

22  right down to the drill rigs, didn't it?

23     A.   There was no cost-cutting conducted by me in

24  the wake of Grangemouth or Texas City.  The

25  cost-cutting conducted by me upon bec -- upon becoming

**PURSUANT TO CONFIDENTIALITY ORDER**

1    the CEO of BP in 2007 was to reduce the corporate

2    complexity of the company and reduce the overhead.

3         Q.    It --

4         A.    That is a very different focus than

5    operations.

6         Q.    Is it your testimony that your cost-cutting

7    initiatives did not flow right down to the rigs?

8         A.    I -- I --

9              MR. WEBB:  Objection, asked and

10   answered --

11        A.    I do not know --

12             MR. WEBB:  Objection, form.

13        A.    -- whether they flowed down to the rig, no --

14        Q.    (By Mr. Cunningham) You don't know?

15        A.    No, I don't, because my focus was on reducing

16   the corporate overhead of the company.

17        Q.    Your --

18        A.    That's the thing that I could most easily and

19   obviously focus on.

20        Q.    Your -- your cost-cutting flowed right down to

21   the Gulf of Mexico in general and the DEEPWATER HORIZON

22   specifically, didn't it?

23        A.    I do not believe that --

24             MR. WEBB:  Objection, form.  Objection,

25   form.

1      Q.    Major accidents are ones that have the

2  potential to cause multiple fatalities, just like what

3  occurred on the DEEPWATER HORIZON, correct?

4      A.    Correct.

5      Q.    Major accidents include accidents with the

6  potential to cause catastrophic environmental damage,

7  just like what occurred on the DEEPWATER HORIZON,

8  correct?

9      A.    Correct.

10     Q.    Major accidents include a blowout just like

11  what occurred on the DEEPWATER HORIZON, correct?

12     A.    Correct.

13     Q.    And failures by BP in process safety were

14  cited as early as Grangemouth, weren't they?

15          MR. GODFREY:   Objection as to form.

16     A.    There were certainly elements of process

17  safety failures in the Grangemouth incident.

18     Q.    Tab 8 --

19          MR. CUNNINGHAM:   What exhibit is that?

20          MR. BONNER:   6011.

21     Q.    (By Mr. Cunningham) -- 6011 is the exhibit

22  number.

23          MR. GODFREY:   6011.

24          MR. CUNNINGHAM:   6011.

25          MR. GODFREY:   Hold on one second, please,

**PURSUANT TO CONFIDENTIALITY ORDER**

1    while we find it.

2        Q.    (By Mr. Cunningham) You have that?

3        A.    I do.

4        Q.    Turn to Page 252, please.

5        A.    (Complying.)

6        Q.    Do you see par -- Paragraph "4.9 Process

7    Safety"?  Do you have --

8        A.    I do.

9        Q.    -- that?

10       A.    I do.

11       Q.    Does it say:  "With no formal structure or

12   specific focus on process safety, many of the

13   components of process safety management (PMS) were not

14   formalized at Grangemouth.  There was no site

15   governance structure to provide overview and assurance

16   that process safety issues were being handled

17   appropriately.  Process safety needed to be evaluated

18   to the same level as personal safety"?

19           Did I read that correctly?

20       A.    That's correct.

21       Q.    And Grangemouth, again, is in the year 2000,

22   correct?

23       A.    Correct.

24       Q.    And, in fact, the Chemical Board Report cited

25   failures and process safety as one of the root causes

**PURSUANT TO CONFIDENTIALITY ORDER**

1    of the disaster at Texas City, didn't it?

2         A.    It did.

3         Q.    And even your own internal report on Texas

4    City, done by your Head Safety Man, at the time John

5    Mogford, recognized failures in process city -- at

6    Texas City, didn't it?

7         A.    It did.

8         Q.    The Chairman of the Chemical Safety Board

9    commented on this very subject after the Texas City

10   report was issued, didn't she?

11        A.    I believe so, yes.

12        Q.    All right.  And so I can be sure we're both

13   referring to the same quote, let me read it to you and

14   see if this is the quote you had in mind.  The Chairman

15   of the CSB was Carol Merritt, quote:  "It is my" --

16        A.    Sorry.  Can you just remind me --

17        Q.    Carolyn Merritt?

18        A.    Quote from when was this?  Sorry.

19        Q.    After the CSB Report came out.

20              "It is my sincere hope and belief that our

21   report and the recent Baker Report will establish a new

22   standard of care for corporate Boards of Directors and

23   CEOs throughout the world.  Process safety programs to

24   protect the lives of workers and the public deserve the

25   same level of attention, investment, and scrutiny as

PURSUANT TO CONFIDENTIALITY ORDER

1    companies now dedicate to maintaining their financial

2    controls.  The Boards of Directors of oil and chemical

3    companies should examine every detail of their process

4    safety programs to ensure that no other terrible

5    tragedy like the one at BP occurs," end quote.

6            Is that what you remember her saying?

7        A.   It's obviously there --

8        Q.   Or words to that effect?

9        A.   Words to that effect, yes.

10       Q.   Okay.  And you are very familiar with process

11   safety because of your position as Chair of the Group

12   Operating Risk Committee, aren't you?

13       A.   I am.

14       Q.   That's one of the responsibilities of the

15   Group Operating Risk Committee, isn't it?

16       A.   What is the responsibility?

17       Q.   Process safety?

18       A.   Process safety.

19       Q.   Part of OMS?

20       A.   Process safety is part of OMS.

21       Q.   All right.

22       A.   And the group operating risk committee was

23   implementing -- charged with implementing OMS.

24       Q.   All right.  And it's OMS and its integral

25   component of process safety that you have repeatedly

1   form.

2      A.   That's entire speculation based on something

3   that didn't occur, that may or may not have been an

4   outcome.

5            MR. CUNNINGHAM:  Let me see the book, my

6   copy.

7            MR. BONNER:  (Tendering.)

8      Q.   (By Mr. Cunningham) I'll hand you a book we'll

9   mark as the next exhibit.

10           MR. CUNNINGHAM:  I don't have copies for

11  everybody, but here it is, and we'll pass it around

12  later if you don't already have it.

13           (Exhibit No. 6026 marked.)

14           THE COURT REPORTER:  6026.

15     Q.   (By Mr. Cunningham) Have you read this book,

16  Dr. Hayward?

17     A.   I skimmed it when it was -- when it was

18  produced.

19     Q.   So --

20     A.   I didn't read it from cover to cover, but I

21  did look at it --

22     Q.   Okay.

23     A.   -- in the past.

24     Q.   So when it came out in 2008 -- it's titled

25  "Failure to Learn."  It's a safety analysis of the BP

**PURSUANT TO CONFIDENTIALITY ORDER**

1   disaster, the Texas City disaster, correct?

2        A.    That's correct.

3        Q.    So you knew it came out in 2008, you had the

4   book in hand, and you didn't read it?

5        A.    As I said to you, I didn't read it from cover

6   to cover.  I look -- I -- I skimmed it.

7        Q.    You skimmed it.  What do you mean you "skimmed

8   it"?

9        A.    I looked -- I read it over in a -- in a --

10  perhaps over a course of four or five days, perhaps

11  half an hour a day, something of that sort.

12       Q.    Okay.

13       A.    But I didn't read it from cover to cover.

14       Q.    You read it over the course of four or five

15  days, but you didn't read it from cover to cover.  You

16  read parts of it, is that what you're saying?

17       A.    Yes, that's right.

18       Q.    Okay.  And it was published about three years

19  after Texas City, correct?

20       A.    That's correct.

21       Q.    You were the CEO of BP when it came out,

22  that's correct?

23       A.    Correct.

24       Q.    Right?

25       A.    (Nodding.)

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.    Did -- did some of the other safety leadership

2  at BP read the book?

3    A.    I'm certain they did.  It was widely

4  circulated.

5    Q.    And the title, "Failure to Learn," refers to

6  BP -- BP's conduct before Texas City, correct?

7    A.    That's correct.

8    Q.    That's what it's about?

9    A.    That's correct.

10    Q.    And on Page 51, for example, when you skimmed

11  it, you saw that the chapter was titled "Blindness to

12  major risk," right?

13    A.    I don't recall that.  Which chapter are you

14  on, sir?

15    Q.    51, page --

16    A.    Page --

17    Q.    Chapter 6, Page 51, "Blindness to major risk,"

18  do you see that?

19    A.    Correct.

20    Q.    And in the middle of the page, it quotes from

21  the Baker Report, doesn't it, and specifically refers

22  to process safety hazards, right?

23        Do you see that?

24    A.    Yep.

25    Q.    It says:  "Process safety hazards give rise to

1  major accidents involving the release of potentially

2  dangerous materials, the release of energy (such as

3  fires and explosions), or both.  Process safety

4  incidents can have catastrophic effects and can result

5  in multiple injuries and fatalities, as well as

6  substantial economic, property, and environmental

7  damage."

8          Did I read that correctly?

9      A.   You did.

10     Q.   That -- that's exactly what had happened at

11  Texas City.  That was a process safety accident, wasn't

12  it?

13              MR. GODFREY:  Objection as to form.

14     A.   It was deemed to be a process safety accident.

15     Q.   (By Mr. Cunningham) Yeah.

16     A.   Correct.

17     Q.   And this entire chapter discusses the subject

18  of process safety, doesn't it?

19     A.   Let me just refresh my memory.  It was four or

20  five years ago -- three or four years ago.  (Reviewing

21  Exhibit 6026.)

22          Yes.

23     Q.   And on Page 63, toward the end of this, it

24  states, in bold:  "The major lesson:  the need to focus

25  on process safety."

1          Did I read that --

2     A.   That's correct.

3     Q.   -- correctly?

4     A.   Yes.

5     Q.   And the second sentence in the first

6   paragraph:  "All noted, in particular, that BP had

7   emphasized personal safety indicators and had paid

8   little attention to process safety indicators."

9          Did I read that correctly?

10    A.   That's correct.

11    Q.   "Correspondingly, their recommendations

12   focused on the need to give greater prominence to

13   process safety."

14         Right?

15    A.   Correct.

16    Q.   The same lesson we discussed earlier as having

17   been found in other events other than Texas City,

18   correct?

19    A.   And that is why we --

20              MR. GODFREY:  Objection as to form.

21    A.   -- implemented in 2007 and 2008 a safety

22   system focused on process safety called the Operating

23   Management System.

24    Q.   (By Mr. Cunningham) That's why you implemented

25   OMS, because OMS focuses on process safety?

PURSUANT TO CONFIDENTIALITY ORDER

1    A.    That's correct.

2    Q.    Correct?

3    A.    Correct.

4    Q.    All right.  And process safety is the kind

5    of -- is the safety program designed to prevent just

6    what happened on the DEEPWATER HORIZON, correct?

7              MR. WEBB:  Objection, form.

8              MR. GODFREY:  Objection to form.

9    A.    You would certainly hope that it would prevent

10   something of the -- of the tragic accident we saw with

11   the DEEPWATER HORIZON.

12   Q.    (By Mr. Cunningham) All right.  Now turn to

13   Page 65.  Did you read or skim or scan Chapter 7 on

14   "Inability to Learn"?

15   A.    Well, I don't recall, but I'm sure I did at

16   the time.

17   Q.    All right.  If you look down toward the middle

18   of the page, again, it refers to the Baker Panel, and

19   states:  "Its final recommendation was that:  Quote,

20   'BP should use the lessons learnt from the Texas City"

21   tragedy -- "tragedy and from the Panel's report to

22   transform the company into a recognized industry leader

23   in process safety management.'"

24         Do you see where it says that?

25   A.    That's indeed what we were doing --

1       Q.    And do you see the next --

2       A.    -- to the point where by in 2009, BP was

3   recognized as an industry leader, ironically, in the

4   Gulf of Mexico.

5       Q.    And you're talking about the same place where

6   we just went through those process safety gaps that

7   were high risk according to BP's own evaluation.  We're

8   talking about the same Gulf of Mexico --

9       A.    We're not talking --

10              MR. WEBB:  Objection --

11      A.    I'm not --

12              MR. WEBB:  Objection.  Argumentative.

13      A.    I just --

14              MR. WEBB:  Objection.

15      A.    I just want to, if I can.

16              As I tried to explain on a number of

17   occasions, the basis to improve safety is to take

18   action, measure gaps, take action, measure.  You

19   don't --

20      Q.    And you --

21      A.    -- improve safety by just sitting in a room

22   talking about it.  You go out and measure, identify

23   the -- where the gaps are, and take action to close

24   them.

25      Q.    And five years --

1    A.    And that is the process that we were going

2    through.

3    Q.    And five years after Texas City, you were

4    still measuring in the Gulf --

5    A.    We were still --

6    Q.    -- right?

7    A.    -- closing.

8    Q.    And the next sentence here says:  "The fact

9    is, however, that these lessons were widely available

10    previously."  Do you see that?

11    A.    (Reviewing document.)

12    Q.    The lessons learned from Texas City, the

13    author states:  "...these lessons were widely available

14    previously," doesn't it?

15    A.    With respect to Texas City.

16    Q.    Yeah.

17    A.    (Nodding.)

18    Q.    And then --

19    A.    Correct.

20    Q.    -- he discusses Grangemouth, correct --

21    A.    Correct.

22    Q.    -- in the next few pages?

23    A.    Correct.

24    Q.    And then he discusses something we haven't

25    discussed, Longford, which was not a BP operation but

1    which BP was fully aware of, an explosion at the ESSO

2    plant, correct?

3        A.    Correct.

4                MR. GODFREY:  Objection as to form.

5        Q.    (By Mr. Cunningham) BP knew all about that

6    because --

7        A.    Well, I'm not sure we knew all about it, but

8    we certainly were aware of the explosion.  And there

9    was a book published, I believe.

10       Q.    There was a book published called "Excerpts

11   From Lessons From Longford" that was circulated within

12   BP, and John Mogford himself, the Head Safety Man at

13   BP, circulated an E-mail with highlights from that

14   book, didn't he?

15               MR. WEBB:  Objection --

16       A.    Well --

17               MR. WEBB -- multiple parts to the

18   question, objection.

19       A.    I don't recall that, but I'm -- as I read this

20   book, I'll just finish reading it, if I can, that seems

21   to have been the case.

22       Q.    (By Mr. Cunningham) That seems to be the case.

23   Is that what you said?

24       A.    That's what I said --

25               MR. WEBB:  Objection.  Leading.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.    -- but I haven't -- you know, I don't recall

2    that.  I'm just reading the book now, and I'm -- okay?

3    Q.    (By Mr. Cunningham) All right.  And if you

4    turn to the next page, what he's referring to is laid

5    out in detail, Page 70, where the bold is "Messages

6    from major reviews."  And it states that:  "A major

7    external review of Texas City in 2002 described the

8    failings that it identified as 'urgent and

9    far-reaching.'"  And does it then state, quote:

10   "Assets safety [process safety]...is one of the biggest

11   issues identified by the assessment team"?

12         Do you see that?

13   A.    Correct.

14   Q.    That's referring to a study that was done at

15   Texas City three years before the explosion in 2005,

16   where that study identified process safety as a

17   problem, correct?

18   A.    I --

19              MR. GODFREY:  Objection to the form.

20   A.    I know nothing about this.  All I'm doing is

21   reading the book, as you are here.

22   Q.    (By Mr. Cunningham) Okay.

23   A.    So I can assume that the book is accurate.  I

24   was not involved with Texas City at that time.

25   Q.    Well, then, do you know about the major audit

**PURSUANT TO CONFIDENTIALITY ORDER**

1    done in 2003 by a team of BP people at Texas City

2    focusing on process safety that's referred to in the

3    next paragraph?

4         A.   I don't --

5         Q.   Do you know --

6         A.   I --

7         Q.   -- about that one?

8         A.   I don't remember that.

9         Q.   Okay.

10        A.   I'm sure if it's in here it's correct, but I

11   don't remember that.

12        Q.   And then we come to Page 73.  Did you skim

13   this part of the book when you read it in 2008?

14        A.   I -- I honestly don't know.

15        Q.   On cost-cutting?

16        A.   I don't know.  I probably did.

17        Q.   You --

18        A.   I can't --

19        Q.   -- probably did?

20        A.   I can't remember.

21        Q.   And it discusses the impact of cost-cutting on

22   process safety and how that led to the disaster of

23   Texas City, doesn't it?

24        A.   Well, I don't know because --

25             MR. GODFREY:  Objection, form.

PURSUANT TO CONFIDENTIALITY ORDER

1      A.    -- I haven't actually read it.

2      Q.    (By Mr. Cunningham) Well --

3      A.    So -- the best part of four or five years.  So

4   if you want me to say "Yes" or "No," I need to read it.

5      Q.    Well, I don't want you to stop and read the

6   whole chapter.  So we'll -- we'll move on --

7      A.    Okay.

8      Q.    -- but whatever the case, at the time you read

9   this book and did or didn't read the chapter on

10  cost-cutting is when you were engaged in cutting

11  $4 billion in cost out of BP; isn't that --

12     A.    Well, I was --

13              MR. WEBB:  Objection to the form of the

14  question.

15     A.    As I've tried to explain to you on a number of

16  occasions, the costs that -- that were being removed at

17  BP were in Head Office, in the Corporate Offices of the

18  company.  They were nothing to do with the operations.

19     Q.    You cut $4 billion out of the Head Office?

20     A.    Yes.  We had -- yes.  That's why we did it,

21  30 --

22     Q.    Where -- where's Head Office?

23     A.    -- $30 billion of overhead.  Cost sitting

24  above --

25     Q.    Where is the Head Office?

**PURSUANT TO CONFIDENTIALITY ORDER**

1     A.    It's in London.  It's in Houston.  It's in

2   many different locations all over the world.  We had a

3   very significant cost base, sitting above the

4   operation, had no impacts on the operation, added

5   nothing to the operation other than burden and

6   complexity.  That is what we removed in the course of

7   2008 through 2010, and we supplemented the operations

8   by investing into them.

9     Q.    Did your read the chapter, Chapter 9, Page 83

10  on the "Reward structures"?

11    A.    As I said, I'm sure I did at the time, but I

12  don't recall what it says.

13    Q.    Well, we haven't discussed this today, but do

14  you remember that it discusses --

15    A.    No.

16    Q.    -- Lord Browne tying compensation of employees

17  to cost-cutting?

18    A.    I don't remember any of the details of this

19  book.

20    Q.    Well, that's the exact same thing you did when

21  you became CEO, you tied compensation to cost-cutting,

22  didn't you?

23          MR. GODFREY:  Objection as to form.

24    A.    I tied compensation, firstly, to safety and

25  then to financial performance.  Safety --

PURSUANT TO CONFIDENTIALITY ORDER

217

1    Q.    (By Mr. Cunningham) The financial performance?

2    A.    Safety was a cost mark.  You either -- you

3    either performed against the safety matrix or you got

4    nothing.

5    Q.    Did you or did you not tie compensation to

6    cost-cutting?

7    A.    There was an element of compensation that

8    related to management of costs.

9    Q.    All right.  Turn to page one --

10   A.    It was subsidiary to safety performance.

11   Q.    Turn to Page 107, "Leadership."  Did you read

12   this chapter?

13   A.    As I've said, I'm sure at the time I did, but

14   I don't recall.  So --

15   Q.    Well, if --

16   A.    -- if you want me to answer questions, I -- I

17   will need to read it.

18   Q.    Well, if you -- if you were the CEO of BP at

19   the time you saw this and saw a chapter on leadership,

20   it seems like you probably --

21   A.    I probably would have done.

22   Q.    -- would have read that.

23   A.    But as I say, I can't remember whether I did,

24   and I can't remember what it says.  So if we want to

25   have a question and answer, I'll need to read it.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.    I'm going to ask you whether or not you agree

2  with the second paragraph that's quoted here out of the

3  Baker Panel Report, which says this, quote:  "The Panel

4  believes that a primary reason that process safety is

5  not more widely shared as a core value in the US

6  refinery workforce is that BP executive and corporate

7  refining management have not provided effective process

8  safety leadership."

9         Did I read that correctly?

10   A.    You did.

11   Q.    And then on Page 120, in the "Conclusion" --

12           MR. GODFREY:  Which page, please?

13           MR. WEBB:  120.

14           MR. CUNNINGHAM:  120.

15   Q.    (By Mr. Cunningham) Third sentence down,

16  quote:  "BP's most senior executives failed to provide

17  appropriate leadership on process safety issues,"

18  period, end quote.

19         Did you read that when you scanned this

20  chapter?

21   A.    I almost certainly did.

22   Q.    You certainly did?

23   A.    I almost certainly did.

24   Q.    Okay.

25   A.    And throughout my term as the Leader, I

1    focused exclusively on process safety.

2        Q.    And in conclusion, did you -- or do you think

3    you read the concluding chapter --

4        A.    I'm sure I read --

5        Q.    -- page --

6        A.    -- the concluding chapter.

7        Q.    -- 157?

8              Second paragraph, quote:  The major -- "The

9    major lesson coming out of the various reports written

10   about the accident is the need for a specific focus on

11   process safety" --

12       A.    That's correct.

13       Q.    -- "but this was not a new insight.  Time and

14   again" --

15       A.    Well --

16       Q.    -- "reports about major accidents in the

17   petrochemical industry have drawn this conclusion.

18   What is most striking about the Texas City accident was

19   BP's failure to have learnt this lesson already.  It

20   seems that the organisation suffered from a learning

21   disability in this respect."

22             Do you agree with that?

23             MR. GODFREY:  Objection to the form.

24       A.    I -- I think that's -- I think that certainly

25   in 2005 we needed to shift our focus to process safety,

1   rather than personal safety.  And in the time that I

2   was the CEO of the company, that's exactly what we did.

3   We had a relentless focus on process safety.

4        Q.   (By Mr. Cunningham) And did you --

5        A.   And notwithstanding the tragic accident in the

6   Gulf, all of the indications, measurements, showed that

7   we were improving significantly.

8        Q.   And did you read the final conclusion on

9   cost-cutting on Page 162, where it says, quote:  "Cost

10  cutting was perhaps the most obvious cause of the

11  failure to learn at Texas City," end quote?

12            Do you agree with that?

13            MR. GODFREY:  Objection as to form.

14       A.   It was certainly one of the things that

15  contributed to Texas City, that -- there's no doubt.

16       Q.   (By Mr. Cunningham) And so you read this book

17  or you skimmed this book or you reviewed this book in

18  2008, when it came out, and in 2010 on the DEEPWATER

19  HORIZON, despite the institution of your OMS in 2007,

20  you still had not found the time to do an MAR on the

21  DEEPWATER HORIZON, correct?

22            MR. WEBB:  Objection to the form of the

23  question.

24       A.   I don't do MARs.

25       Q.   (By Mr. Cunningham) You don't do MARs?

1    A.    But what is clear is that we had made major

2    changes to operations with explicit focus on process

3    safety.  Consequently on Texas City, actually, in line

4    with a lot of what is written in here.

5    Q.    Is that the reason that there was no process

6    Engineer responsible for the Gulf of Mexico drilling

7    operation?

8                MR. WEBB:  Objection, form.

9    A.    I'm not sure --

10   Q.    (By Mr. Cunningham) That's not consistent, is

11   it?

12   A.    I'm not -- I'm not aware of why that was not

13   the case.

14   Q.    Yeah.

15   A.    But all I can tell you is there's been a lot

16   of focus on process safety in the intervening three

17   years.  I when I have the opportunity to explain to

18   people, I will tell you.

19   Q.    All right.  So given BP's safety history at

20   the time you testified before Congress, you made the

21   point you've made here today multiple times, didn't

22   you, that you did everything possible to change

23   everything between 2007 and 2010 before the DEEPWATER

24   HORIZON occurred --

25                MR. WEBB:  Objection to the form of the

1      Q.    (By Mr. Cunningham) And the specific event

2   that precipitated these changes that you've discussed

3   today and that you talk about in Congress was Texas

4   City, right?

5      A.    I think the specific event was the publication

6   of the Baker Report and the recognition of what the

7   Baker Report said.

8      Q.    All right.  And we've read what portions of

9   the Baker Report said.  But it's true that in the wake

10  of Texas City, you and Lord Browne repeatedly stated

11  that it would never happen again, didn't you?

12                MR. WEBB:  Objection, form.

13     A.    I -- I believe we repeated we would do

14  everything possible to -- to --

15                MR. CUNNINGHAM:  35.

16     A.    -- stop it from happening again.

17                MR. CUNNINGHAM:  Tab 35.

18                THE COURT REPORTER:  Previously marked.

19     Q.    (By Mr. Cunningham) Exhibit 870, previously

20  marked.  This is a news release from the U.S.

21  Department of Labor in October, in fact, the end of

22  October of 2009, correct?

23     A.    (Reviewing document.) Correct.

24     Q.    Read the first two paragraphs into the record,

25  please.

**PURSUANT TO CONFIDENTIALITY ORDER**

1   MR. GODFREY:  Object as to form.

2   Q.   (By Mr. Cunningham) Loud enough for people to

3   hear it.

4   MR. GODFREY:  Objection as to form.

5   A.   First two paragraphs?

6   Q.   (By Mr. Cunningham) Yes, sir.

7   A.   "U.S." -- beginning with "The U.S. Department

8   of Labor's" --

9   Q.   Yes.

10  A.   "The U.S. Department of Labor's Occupational

11  Safety and Health Administration (OSHA) today announced

12  it is issuing" an "$87,430,000 in proposed penalties to

13  BP Products North America...for the company's failure

14  to correct potential hazards faced by employees.  The

15  fine is the largest in OSHA's history.  The prior"

16  target "total penalty, $21 million, was issued in 2005,

17  also against BP."

18       "Safety violations at BP's Texas

19  City...refinery resulted in...massive explosion -- with

20  15 deaths and 170 people injured -- in March of 2005.

21  BP entered into a settlement agreement with OSHA in

22  September of that year, under which the company agreed

23  to corrective actions to eliminate potential hazards

24  similar to those that caused the 2005 tragedy."

25  Today -- "today's announcement comes at the conclusion

1    of a six-month inspection by OSHA, designed to evaluate

2    the extent to which BP has complied with its

3    obligations under the 2005 Agreement and OSHA

4    Standards."

5        Q.   Now, this -- this news release is four and a

6    half years after Texas City, isn't it?

7        A.   It is.

8        Q.   And it's two years after you became the CEO,

9    isn't it?

10       A.   Correct.

11       Q.   And tell me whether or not -- whether or not I

12   read the statement below this made by the Secretary of

13   Labor correctly.  Quote, "When BP signed the OSHA

14   settlement from the March 2005 explosion, it agreed to

15   take comprehensive action to protect employees.

16   Instead of living up to that commitment, BP has allowed

17   hundreds of potential hazards to continue unabated..."

18   end quote.

19           Did I read that correctly?

20       A.   You did.

21              MR. CUNNINGHAM:  Tab 34.

22              MR. BONNER:   (Tendering.)

23           (Exhibit No. 6027 marked.)

24              THE COURT REPORTER:  6027.

25              MR. WEBB:  You said 27?

PURSUANT TO CONFIDENTIALITY ORDER

1          THE COURT REPORTER:   (Nodding.)

2      Q.    (By Mr. Cunningham) The news article I want to

3   ask you about, Mr. Hayward, it is titled:  "Renegade

4   Refiner:   OSHA says BP has 'systemic safety problem.'"

5   First paragraph:  "Two refineries owned by oil giant

6   BP..." --

7          And this is dated May the 17th of 2010,

8   correct?

9      A.    Correct.

10     Q.    "Two refineries owned by" BP oil giant -- or

11  "oil giant BP account for 97 percent of all flagrant

12  violations found in the refining industry by government

13  safety inspectors over the past three years..."

14         Is that correct?

15             MR. GODFREY:   Objection as to form.

16     A.    That's what it says.

17     Q.    (By Mr. Cunningham) Is that a fact?

18     A.    That's what it says.

19     Q.    "Most of BP's citations were classified as

20  'egregious willful' by the Occupational Safety and

21  Health Administration and reflect alleged violations of

22  a rule designed to prevent catastrophic events at

23  refineries."

24         Is that what it says?

25     A.    It is.

**PURSUANT TO CONFIDENTIALITY ORDER**

1   Q.   Going down to the next paragraph, last

2   sentence:  "While continuing its probe in Texas City,

3   OSHA launched a nationwide refinery inspection program

4   in June 2007 in response to a series of fires,

5   explosions and chemical" lease -- "releases throughout

6   the industry.  Refinery inspection data obtained by the

7   Center under the Freedom of Information Act for OSHA's

8   nationwide program and for the parallel Texas City

9   inspection show that BP received a total of 862

10  citations between" July -- June" 7 "and February 2010

11  for alleged violations at its refineries in Texas City

12  and Toledo, Ohio."

13          Is that, in fact, true?

14              MR. GODFREY:  Objection as to form.

15  A.   That's what it says here.

16  Q.   (By Mr. Cunningham) And June 2007 to February

17  of 2010, that's about the three-year period when you

18  were the CEO, isn't it?

19  A.   That's correct.

20  Q.   And then it goes on to say:  "Of those, 760

21  were classified as 'egregious willful' and 69 were

22  classified as 'willful'...virtually all...the citations

23  were for alleged violations of OSHA's process safety

24  management standard..."

25          Did I read that correctly?

PURSUANT TO CONFIDENTIALITY ORDER

1     A.    You did.

2     Q.    "BP accounted for 829 of the 851 willful

3  violations among all refiners cited by OSHA during the

4  period analyzed..."

5           Do you disagree with those numbers?

6     A.    I have no basis to disagree with them.

7     Q.    "Top OSHA Officials told the Center in an

8  interview that BP was cited for more egregious willful

9  violations than other refiners because it failed to

10 correct the types of problems that led to the 2005

11 Texas City accident even after OSHA pointed them out."

12          Did I read that correctly?

13    A.    You did.

14    Q.    And then turn to the next page, fifth

15 paragraph down:  "No other oil company inspected by

16 OSHA since June" of "2007 was even close to BP in the

17 number of citations issued."

18          Did I read that correctly?

19    A.    Correct.

20    Q.    And then we find that willful and egregious is

21 defined as follows:  "OSHA defines a willful violation

22 as one 'committed with plain indifference to or

23 intentional disregard for employee safety and health.'"

24          Did I read that right?

25    A.    You did.

PURSUANT TO CONFIDENTIALITY ORDER

1    Q.    "An egregious willful violation is considered

2   so severe that it can result in a penalty each time a

3   violation occurs, rather than a single penalty for all"

4   the "violations..."

5        Did I read that correctly?

6    A.    You did.

7        THE COURT REPORTER:  Four --

8        MR. CUNNINGHAM:  Tab 34.

9        THE COURT REPORTER:  Four minutes.

10       MR. CUNNINGHAM:  That's what I want.  Tab

11   34.

12       (Discussion off the record.)

13       MR. CUNNINGHAM:  Tab 36.

14       MR. BONNER:  (Tendering.)

15       (Exhibit No. 6028 marked.)

16       THE COURT REPORTER:  6028.

17   Q.    (By Mr. Cunningham) (Tendering.)

18   A.    Thank you.

19   Q.    This is an "OSHA FactSheet," a "BP History

20   Fact Sheet."  It relates to the BP Texas City refinery.

21   I'd ask you to look at the time line of events at the

22   bottom.  You'll see on July 22nd, 2006, a fatality,

23   correct?

24   A.    Yes.

25   Q.    You'll see on June 5th, 2007, a fatality,

1    correct?

2        A.    Yep.

3        Q.    Correct?

4        A.    Correct.

5        Q.    And on January 14th, 2008, a fatality,

6    correct?

7        A.    Correct.

8        Q.    And on October the 9th, 2008, a fatality,

9    correct?

10       A.    Correct.

11       Q.    And who was absolutely responsible for safety

12   at BP during these three years cited in these articles?

13             MR. WEBB:  Objection as to form.

14             MR. GODFREY:  Objection, form.

15       Q.    (By Mr. Cunningham) Who was it?

16             MR. GODFREY:  Same objection.

17       A.    I was the Chief Executive of the company

18   during these three years.

19       Q.    (By Mr. Cunningham) And despite these numbers

20   which you knew about, in the April 15th, 2010, BP

21   Sustainability Report, Tab 37 --

22             MR. GODFREY:  What exhibit number,

23   please?

24             MR. CUNNINGHAM:  I don't have one yet, I

25   don't think.

PURSUANT TO CONFIDENTIALITY ORDER

1    the well?

2                    MR. WEBB:  Objection to the form of the

3    question.

4                    MR. GODFREY:  Objection to the form of

5    the question.

6        A.    What I don't know is whether that was the case

7    or not.  I --

8        Q.    (By Mr. Sterbcow) Here.

9        A.    I'm not -- I'm not aware as to whether or not

10    it was the tool joint across the blind shear ram that

11    prevented the blind shear ram closing.  My

12    understanding from a cursory look at the Presidential

13    Commission is that -- is that is not what was found.  I

14    don't know.

15        Q.    Did you know before April 20th, 2010, that the

16    foreseeable possibility existed that a tool joint could

17    be forced back up to the level of the blind shear ram

18    and, therefore, prevent it from operating and sealing a

19    well that was undergoing --

20        A.    No.

21                    MR. WEBB:  Object --

22        Q.    (By Mr. Sterbcow) -- a well control event in

23    the Gulf of Mexico?

24                    MR. WEBB:  Objection to form.

25                    MR. GODFREY:  Objection, form.

**PURSUANT TO CONFIDENTIALITY ORDER**

1   does that call into question BP's reliance on this

2   piece of equipment as the final fail-safe prevention of

3   an accident like the one you had on April 20, 2010?

4           MR. GODFREY:  Objection to form.

5       A.   I can't judge on the basis of this whether

6   that's a -- an appropriate conclusion to draw or not.

7   What is clear is that everyone else in the industry

8   relied on the blowout preventers as the ultimate form

9   of containment in the event of a blowout, and the

10  industry has done that for 50 or 60 years.

11      Q.   (By Mr. Sterbcow) Did anyone else in the

12  industry, to your knowledge, have the history of

13  criminal convictions and OSHA violations that BP had in

14  2010?

15          MR. WEBB:  Objection, form of the

16  question.

17      A.   I'm not aware of all of the history of the

18  industry, but what I am aware of is that the history of

19  BP's drilling in -- in the deepwater Gulf of Mexico was

20  it was deemed by the Regulators to be amongst the very

21  best, in terms of its --

22          MR. GODWIN:  Object to form.

23      A.   -- safety performance.

24          MR. GODWIN:  Object to form.

25      Q.   (By Mr. Sterbcow) And that deeming of being

1    Q.    (By Mr. Sterbcow) Would you agree with me that

2    the Presidential Commission was far more critical of BP

3    than the Bly Report was?

4    A.    I think it's fair to say that the Presidential

5    Commission was critical of I think what was referred to

6    as systemic failure in management of the industry and

7    also critical of BP.

8    Q.    Do you think that that criticism extended to a

9    systemic failure within BP Management, or was it just

10   industrywide management?

11              MR. WEBB:   Objection to the form.

12   A.    I haven't read the Presidential Commission in

13   detail.  I've read the -- large part the reports in the

14   press, and the reports in the press that I read

15   referred to the industry.  I think the Head of the

16   Presidential Commission was very clear when he said

17   that it's not the instance of a one rogue operator or

18   one outlier.  It's an industry systemic issue.  That's

19   what his principal conclusion was, and --

20   Q.    (By Mr. Sterbcow) Okay.

21   A.    -- that's what I read in the press.

22   Q.    And you -- you obtained that information from

23   the press but not sitting down and reading the entire

24   report?

25   A.    Well, I -- I skimmed the report.  I didn't go

**PURSUANT TO CONFIDENTIALITY ORDER**

1   through it page to page.  But it seemed -- in terms of

2   what -- how that accident happened, it seemed to be

3   very consistent with the findings of the Bly Report,

4   and there was, as I said, some broader findings about

5   the industry.

6              MR. GODWIN:  Object to form.

7        Q.    (By Mr. Sterbcow) Do you know whether --

8   did -- are you aware of the fact that Fred Bartlit

9   issued a Chief Counsel's independent, separate report

10  following the Presidential Commission Report?

11       A.    I didn't see that, no.

12       Q.    So you haven't seen that at all?

13       A.    No.

14       Q.    Okay.

15       A.    I've seen the Presidential Commission.

16       Q.    All right.  Are you content, then,

17  understanding you've left the company, that you have a

18  good working -- accurate working knowledge of the facts

19  and circumstances surrounding this accident, including

20  all causes, from the Bly Report?

21       A.    I would say that that would be an unreasonable

22  statement to make on my behalf at this time, given that

23  I have been away from this now for nine or ten

24  months -- almost a year, in fact -- and have only taken

25  a sort of -- I don't want to say cursory, because it's

**PURSUANT TO CONFIDENTIALITY ORDER**

1                        CHANGES AND SIGNATURE

2   WITNESS NAME:  ANTHONY HAYWARD

3   DATE OF DEPOSITION:  JUNE 6, 2011

4   PAGE  LINE          CHANGE       REASON

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

**PURSUANT TO CONFIDENTIALITY ORDER**

1

2          I, ANTHONY HAYWARD, have read the foregoing

3    deposition and hereby affix my signature that same is

4    true and correct, except as noted on the attached

5    Amendment Sheet.

6

7

                            ANTHONY HAYWARD

8

9

     THE STATE OF                    )

10

     COUNTY OF                       )

11

12          Before me,                         , on

     this day personally appeared ANTHONY HAYWARD, known to

13   me (or proved to me on the oath of

                              or through                )

14   to be the person whose name is subscribed to the

     foregoing instrument and executed the same for the

15   purposes and consideration therein expressed.

             GIVEN UNDER my hand and seal of office this

16        day of                    , 2011.

17

18

                    Notary Public in and for

19                  The State of

20

21

22

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
 2
 3   IN RE:  OIL SPILL        )      MDL NO. 2179
     BY THE OIL RIG           )
 4   "DEEPWATER HORIZON" IN    )      SECTION "J"
     THE GULF OF MEXICO, ON    )
 5   APRIL 20, 2010            )      JUDGE BARBIER
                               )      MAG. JUDGE SHUSHAN
 6
 7
 8               REPORTER'S CERTIFICATION
            TO THE ORAL AND VIDEOTAPED DEPOSITION OF
 9                     ANTHONY HAYWARD
                       JUNE 6, 2011
10                       VOLUME 1
11
12
         I, Emanuel A. Fontana, Jr., Certified Shorthand
13   Reporter in and for the State of Texas, hereby certify
     to the following:
14
         That the witness, ANTHONY HAYWARD, was duly sworn
15   by the officer and that the transcript of the oral
     deposition is a true record of the testimony given by
16   the witness;
17       That the deposition transcript was submitted on
               , 2011, to the witness or to
18   Attorney                         , for the witness to
     examine, sign, and return to Worldwide Court Reporters,
19   Inc., by                  , 2011.
20       That the amount of time used by each party at the
     deposition is as follows:
21
         Mr. Cunningham - 3 Hours, 51 Minutes
22       Mr. Sterbcow - 2 Hours, 7 Minutes
         Mr. Underhill - 1 Hour, 57 Minutes
23
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

447

1      I further certify that I am neither counsel for,
related to, nor employed by any of the parties in the
2  action in which this proceeding was taken, and
further that I am not financially or otherwise
3  interested in the outcome of the action.
4      SUBSCRIBED AND SWORN to by me on this 6th day of
June, 2011.

5

6

7            _____
            Emanuel A. Fontana, Jr., RPR
8            Texas CSR No. 1232
            Expiration Date: 12/31/12
9            Worldwide Court Reporters
            Firm Registration No. 223
10           3000 Weslayan, Suite 235
            Houston, Texas  77027
11           (713) 572-2000

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

1              UNITED STATES DISTRICT COURT

               EASTERN DISTRICT OF LOUISIANA

2

3   IN RE:  OIL SPILL          )      MDL NO. 2179

    BY THE OIL RIG             )

4   "DEEPWATER HORIZON" IN     )      SECTION "J"

    THE GULF OF MEXICO, ON     )

5   APRIL 20, 2010             )      JUDGE BARBIER

                               )      MAG. JUDGE SHUSHAN

6

7

8

9

10

11

12

13

14

15

16

17                  * * * * * * * * * * * * * * * * *

                          VOLUME 2

18                  * * * * * * * * * * * * * * * * *

19

20

21          Deposition of Anthony Hayward, taken at

    Kirkland & Ellis International, 30 St. Mary Axe, 22nd

22  Floor, London EC3A 8AF, England, United Kingdom, on the

    8th of June, 2011.

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

449

```
 1                A P P E A R A N C E S
 2
 3       Magistrate Judge Sally Shushan
         UNITED STATES DISTRICT COURT
 4       EASTERN DISTRICT OF LOUISIANA
         500 Poydras Street, B345
 5       New Orleans, Louisiana  70130
 6  APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
         Mr. Stephen J. Herman
 7       HERMAN, HERMAN, KATZ & COTLAR
         820 O'Keefe Avenue
 8       New Orleans, Louisiana  70113
 9       Mr. Robert T. Cunningham
         Mr. William E. Bonner
10       CUNNINGHAM BOUNDS, LLC
         1601 Dauphin Street
11       Mobile, Alabama  36604
12       Mr. Ronnie G. Penton
         LAW OFFICES OF RONNIE G. PENTON
13       209 Hoppen Place
         Bogalusa, Louisiana  70427-3827
14
         Mr. John Parkerson Roy
15       DOMENGEAUX, WRIGHT, ROY & EDWARDS
         556 Jefferson Street, Suite 500
16       Lafayette, Louisiana  70501
17       Mr. Calvin C. Fayard, Jr.
         FAYARD & HONEYCUTT
18       519 Florida Avenue, SW
         Denham Springs, Louisiana  70726
19
    APPEARING FOR THE DERIVATIVE PLAINTIFFS, MDL 2185
20  SECURITIES PLAINTIFFS SUBCLASS:
         Mr. Richard Warren Mithoff
21       MITHOFF LAW FIRM
         500 Dallas St. - Penthouse
22       Houston, Texas  77002
23  APPEARING FOR BP, INC.:
         Mr. Richard C. Godfrey
24       KIRKLAND & ELLIS
         300 North LaSalle
25       Chicago, Illinois  60654
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        Mr. Michael Brock
          COVINGTON & BURLING
 2        1201 Pennsylvania Avenue, Northwest
          Washington, D.C.  20004-2401
 3
          Mr. Daryl A. Libow
 4        SULLIVAN & CROMWELL
          1701 Pennsylvania Avenue, N.W.
 5        Washington, D.C.  20006-5805
 6        Mr. James J. Neath
          ASSOCIATE GENERAL COUNSEL
 7        BP LEGAL
          BP AMERICA INC.
 8        501 Westlake Park Boulevard
          Houston, Texas  77079
 9
     APPEARING FOR ANTHONY HAYWARD:
10        Mr. Dan K. Webb
          Mr. Thomas L. Kirsch II
11        WINSTON & STRAWN
          35 West Wacker Drive
12        Chicago, Illinois  60601-9703
13   APPEARING FOR ANDY INGLIS:
          Ms. Kathleen H. Goodhart
14        COOLEY LLP
          101 California Street, 5th Floor
15        San Francisco, California  94111-5800
16   APPEARING FOR TRANSOCEAN:
          Mr. Steven L. Roberts
17        Mr. Carter L. Williams
          SUTHERLAND ASBILL & BRENNAN
18        1001 Fannin, Suite 3700
          Houston, Texas  77002-6760
19
          Ms. Heather G. Callender
20        TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC.
          4 Greenway Plaza
21        Houston, Texas  77046
22   APPEARING FOR ANADARKO PETROLEUM COMPANY:
          Ms. Diane C. Hertz
23        Mr. Robert C. Stillwell
          Mr. Peter C. Neger
24        BINGHAM MCCUTCHEN
          399 Park Avenue
25        New York, New York 10022-4689
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1    APPEARING FOR CAMERON INTERNATIONAL CORPORATION:
           Mr. David J. Beck
 2         Mr. David W. Jones
           BECK, REDDEN & SECREST
 3         One Houston Center
           1221 McKinney Street, Suite 4500
 4         Houston, Texas  77010-2010
 5    APPEARING FOR DRIL-QUIP, INC.:
           Mr. C. Dennis Barrow, Jr.
 6         WARE, JACKSON, LEE & CHAMBERS
           America Tower, 42nd Floor
 7         2929 Allen Parkway
           Houston, Texas  77019-7101
 8
      APPEARING FOR M-I SWACO:
 9         Mr. Steven A. Luxton
           MORGAN, LEWIS & BOCKIUS, LLP
10         1111 Pennsylvania Avenue, NW
           Washington, D.C.  20004
11
           Mr. Hugh E. Tanner
12         MORGAN, LEWIS & BOCKIUS
           1000 Louisiana Street, Suite 4000
13         Houston, Texas  77002
14    APPEARING FOR HALLIBURTON:
           Mr. Donald E. Godwin
15         Ms. Jenny L. Martinez
           Ms. Stefanie K. Major
16         GODWIN RONQUILLO
           1201 Elm Street, Suite 1700
17         Dallas, Texas 75270-2041
18         Ms. Stephanie T. Bragg
           HALLIBURTON
19         2107 CityWest Boulevard, Building 2
           Houston, Texas  77042-3051
20
      APPEARING FOR WEATHERFORD:
21         Mr. Wayne G. Zeringue, Jr.
           JONES, WALKER, WAECHTER, POITEVENT, CARRERE &
22         DENEGRE, LLP
           201 St. Charles Avenue
23         New Orleans, Louisiana  70170
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

452

```
1    APPEARING FOR THE UNITED STATES:
          Mr. R. Michael Underhill
2         Attorney in Charge
          West Coast Office
3         U.S. DEPARTMENT OF JUSTICE
          TORT BRANCH, CIVIL DIVISION
4         450 Golden Gate Avenue
          7th Floor, Room 5395
5         San Francisco, California  94102-3463
6    APPEARING FOR THE STATE OF ALABAMA:
          Mr. Luther Strange
7         Attorney General
          Mr. Corey L. Maze
8         Special Deputy Attorney General
          Mr. Winfield J. Sinclair
9         Assistant Attorney General
          OFFICE OF THE ATTORNEY GENERAL
10        STATE OF ALABAMA
          501 Washington Avenue
11        Montgomery, Alabama  36104
12   APPEARING FOR THE STATE OF LOUISIANA:
          Mr. Allan Kanner
13        Ms. Elizabeth "Lili" Petersen
          Attorneys for Louisiana Attorney General
14        KANNER & WHITELEY
          701 Camp Street
15        New Orleans, Louisiana  70130-3504
16   APPEARING FOR OHIO PENSION FUNDS:
          Mr. Jeffrey C. Block
17        BERMAN DEVALERIO
          One Liberty Square
18        Boston, Massachusetts  02109
19   ALSO PRESENT:
          Mr. Peter Jennings, Logistics Supervisor
20        Mr. Ray Aguirre, Case Manager
          Mr. Max Kennedy, Videographer
21        Ms. Lilia Garcia
          Mr. Chad Paris
22        Ms. Cecelia Aguilar
23
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

638

1      Q.    (By Mr. Godwin) Okay.

2      A.    -- which wells are critical or not.  I'm not a

3  Drilling Engineer, so --

4      Q.    I understand, sir.  Okay.

5      A.    I presume that's based on some

6  technical assessment or --

7      Q.    It could --

8      A.    -- challenges of the well.  And I --

9      Q.    It could well be.

10     A.    And I --

11     Q.    But that's what he said.

12     A.    -- have no opinion with regard to that.

13     Q.    Now, my question to you, is:  Is -- with re --

14  are you aware that, on the Macondo Well, that over the

15  life of the well, that the Presidential Commission

16  Chief Counsel Report you spoke of quite extensively

17  today, reported that this well had lost 16,000 barrels

18  of mud during the drilling of the well?

19     A.    I wasn't aware of that.

20     Q.    Are you aware that the Chief Counsel Report,

21  Fred Bartlit's Report for the Presidential Commission,

22  which you said you had some familiarity with, that the

23  losses -- that the cost to BP for the losses of the mud

24  was in excess of $13 million in time and materials?

25  Are you aware of that?

**PURSUANT TO CONFIDENTIALITY ORDER**

639

1        A.    I was not --

2                MR. GODFREY:  Objection as to the form of

3     claiming the Presidential Commission when it was the

4     Chief Counsel's Report.

5                MR. GODWIN:  Okay.

6        Q.    (By Mr. Godwin) Now, with regard to -- going

7     back again to the HAZOP, are you aware that, in the

8     Exhibit 862, that requires that the HAZOP be in

9     writing, that if there's going to be any deviation from

10    that Policy, that that deviation would also have to be

11    in writing and approved?  Are you aware of that?

12       A.    I've -- if I was, I've forgotten it.

13       Q.    Okay.

14       A.    I probably was at the time, but I'm not --

15    I --

16       Q.    Okay.

17       A.    -- I can't recall that.

18       Q.    All right.  We deposed here yesterday, a lady

19    by the name of Gill -- Gillian Cowlam, C-o-w-l-a- --

20    l-a-m.  Do you know Ms. Cowlam?

21       A.    I don't.

22       Q.    She's a for -- or she is a BP employee based

23    in the U.K., and she's worked in -- in -- she --

24       A.    M-h'm.

25       Q.    -- worked on the investigation for about three

**PURSUANT TO CONFIDENTIALITY ORDER**

695

1   and certainly some of the others were not mandatory, so

2   obviously, what's written here suggests that this

3   document is mandatory.

4       Q.   Okay.  You don't have any reason to believe

5   it's not?

6       A.   No.

7       Q.   Okay.  In the last paragraph on that page, it

8   says:  "Since the conception of" Beyond the Best Common

9   Process "in 2000 we have learned new lessons and

10  identified better practices.  This updated publication

11  captures those lessons and best practices."  Do you see

12  that?

13      A.   I do.

14      Q.   Do you know if any of the lessons learned from

15  Texas City were in any way incorporated into this

16  document?

17      A.   I don't know.

18      Q.   Would you expect that they would have been?

19      A.   I think there were other processes that were

20  focused on Process Safety that the lessons from Texas

21  City were incorporated into.

22      Q.   And what would those have been?

23      A.   As I said, the Control of Work and Integrity

24  Management Standards.

25      Q.   Okay.

PURSUANT TO CONFIDENTIALITY ORDER

1    A.   Which were the two key Process Safety tools to

2  improve Process Safety performance across the company.

3    Q.   And you consider Risk Management part of

4  Process Safety?

5    A.   I do.

6    Q.   So if this document contains a section -- and

7  we'll look at it -- called "Risk Management," then this

8  document will also inherently pertains to Process

9  Safety, right?

10    A.   In --

11         MR. GODFREY:   Objection as to form.

12    A.   Inasmuch as Risk Management is part of Process

13  Safety, that's correct.

14    Q.   (By Ms. Hertz) Okay.   And Risk Management is

15  not something that is necessarily different in concept

16  from a facility such as Texas City to deepwater

17  drilling, is it?

18         MR. GODFREY:   Objection as to form.

19    A.   Certainly, there are some risks that are

20  common, such as the containment of hydrocarbons.

21    Q.   (By Ms. Hertz) And there certainly were

22  lessons learned from Texas City that BP applied or

23  attempted to apply --

24    A.   Correct.

25    Q.   -- to deepwater drilling; is that right?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.    Correct.

2    Q.    Okay.

3    A.    Such as layers of protection analysis.

4    Q.    Okay.

5    A.    Which --

6    Q.    And others, right?

7    A.    And -- and, yeah, Integrity Management

8    Standards and that sort of thing.

9    Q.    Okay.  I'm going to ask you to jump, please,

10   to 361, Bates 361.

11                MR. GODFREY:  361?

12                MS. HERTZ:  Yes.

13                MR. GODFREY:  Thank you.

14   Q.    (By Ms. Hertz) And this is a page entitled

15   "Element 5 - Risk Management," and I'd like to draw

16   your attention to the bottom of that page under "Risk

17   Management Process."  It says, "The Risk Management

18   Process has four main, cyclical steps (identify,

19   assess, respond, control) the outputs of which are

20   recorded in a database known as a Risk Register.  The

21   cycle is not a once-per-well or even a once-per-stage-

22   gate process.  It is a continuous loop by which risks

23   are captured and worked throughout the well

24   life-cycle..."

25                And do you see that?

1    in the Bly Report?

2         A.    The basis of my knowledge is the Bly Report.

3         Q.    All right.  Now, there were a few documents

4    that I want to show you -- and by the way, you told

5    us -- by -- did you ever read the Presidential

6    Commission Report?

7         A.    I didn't -- I didn't read it in detail.  I

8    read the press reports at the time.  I asked my PA to

9    print it, and I skimmed it, but I did not read it.

10        Q.    And you were asked earlier about the Chief

11   Counsel's Report, Chief Counsel to the National

12   Committee on the BP Deepwater Horizon Oil Spill and

13   Offshore Drilling?

14        A.    I haven't read the Chief Counsel's Report.

15        Q.    Did you -- has anybody ever advised you or did

16   you read a statement by the Chief Counsel, and I quote,

17   "Hydrocarbons had entered the riser well before the

18   crew attempted to activate the BP, and even a perfectly

19   functioning BOP could not have prevented the explosions

20   that killed 11 men on April 20th."

21            Had you ever seen that statement before?

22        A.    I -- I think I saw it referred to in the

23   press.

24        Q.    And do you agree with that?

25        A.    I don't have the basis for agreeing with it,

**PURSUANT TO CONFIDENTIALITY ORDER**

1    because I wasn't part of the investigation.  I don't

2    know.

3        Q.   All right.  You were asked about a number of

4    documents on Monday, and time does not allow me to go

5    into a lot of them.  But I want to hit a couple of

6    them, and then I want to ask you about another

7    document.

8        A.   M-h'm.

9        Q.   With respect to your testimony about blowout

10   preventers, I'm sure you haven't had the opportunity to

11   read BP's Well Control Manual.  Is that --

12       A.   I'm afraid I haven't.

13       Q.   Okay.  It is a multivolume set of documents --

14       A.   M-h'm.

15       Q.   -- okay?  Volume 2 is entitled "Fundamentals

16   of Well Control."  And I'm not going to ask you,

17   mercifully, about a -- a lot of these pages in the

18   document, but I do want to just refer you to something

19   in the document.  And specifically, I want to refer you

20   to --

21            MR. BECK:  And by the way, this is

22   Exhibit 2390 for the record.

23       Q.   (By Mr. Beck) And if you would look -- it's

24   toward the end, Doctor, it's the pages ending 0797.

25            MR. GODFREY:  7 -- what was the last one?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1                    CHANGES AND SIGNATURE

2   WITNESS NAME:  ANTHONY HAYWARD

3   DATE OF DEPOSITION:  JUNE 8, 2011

4   PAGE  LINE       CHANGE      REASON

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____
```

**PURSUANT TO CONFIDENTIALITY ORDER**

904

1

2      I, ANTHONY HAYWARD, have read the foregoing

3  deposition and hereby affix my signature that same is

4  true and correct, except as noted on the attached

5  Amendment Sheet.

6

7

                        ANTHONY HAYWARD

8

9

THE STATE OF                    )

10

COUNTY OF                       )

11

12      Before me,                              , on

this day personally appeared ANTHONY HAYWARD, known to

13  me (or proved to me on the oath of

                        or through                )

14  to be the person whose name is subscribed to the

foregoing instrument and executed the same for the

15  purposes and consideration therein expressed.

        GIVEN UNDER my hand and seal of office this

16      day of                    , 2011.

17

18

            Notary Public in and for

19          The State of

20

21

22

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2
 3   IN RE:  OIL SPILL          )       MDL NO. 2179
     BY THE OIL RIG             )
 4   "DEEPWATER HORIZON" IN     )       SECTION "J"
     THE GULF OF MEXICO, ON     )
 5   APRIL 20, 2010             )       JUDGE BARBIER
                                )       MAG. JUDGE SHUSHAN
 6
 7
 8                     REPORTER'S CERTIFICATION
             TO THE ORAL AND VIDEOTAPED DEPOSITION OF
 9                          ANTHONY HAYWARD
                             JUNE 8, 2011
10                             VOLUME 2
11
12
         I, Emanuel A. Fontana, Jr., Certified Shorthand
13   Reporter in and for the State of Texas, hereby certify
     to the following:
14
         That the witness, ANTHONY HAYWARD, was duly sworn
15   by the officer and that the transcript of the oral
     deposition is a true record of the testimony given by
16   the witness;
17       That the deposition transcript was submitted on
                  , 2011, to the witness or to
18   Attorney                         , for the witness to
     examine, sign, and return to Worldwide Court Reporters,
19   Inc., by                         , 2011.
20       That the amount of time used by each party at the
     deposition is as follows:
21
         Mr. Strange - 18 Minutes
22       Mr. Kanner - 1 Hour, 6 Minutes
         Mr. Roberts - 59 Minutes
23       Mr. Godwin - 59 Minutes
         Ms. Hertz - 1 Hour, 15 Minutes
24       Mr. Beck - 1 Hour, 13 Minutes
         Mr. Godfrey - 1 Hour, 11 Minutes
25       Mr. Cunningham - 37 Minutes
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1        I further certify that I am neither counsel for,

related to, nor employed by any of the parties in the

2    action in which this proceeding was taken, and

further that I am not financially or otherwise

3    interested in the outcome of the action.

4        SUBSCRIBED AND SWORN to by me on this 8th day of

June, 2011.

5

6

7        _____

         Emanuel A. Fontana, Jr., RPR

8        Texas CSR No. 1232

         Expiration Date: 12/31/12

9        Worldwide Court Reporters

         Firm Registration No. 223

10       3000 Weslayan, Suite 235

         Houston, Texas  77027

11       (713) 572-2000

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**