```
 1                     UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF LOUISIANA
 2
       ***********************************************************
 3

 4     IN RE:  OIL SPILL BY THE          DOCKET NO. MDL-2179
       OIL RIG DEEPWATER HORIZON         NEW ORLEANS, LOUISIANA
 5     IN THE GULF OF MEXICO ON          FRIDAY, FEBRUARY 17, 2012
       APRIL 20, 2010
 6     CIVIL

 7
       ***********************************************************
 8

 9                     TRANSCRIPT OF PROCEEDINGS
               HEARD BEFORE THE HONORABLE SALLY SHUSHAN
10                  UNITED STATES MAGISTRATE JUDGE

11

12     APPEARANCES:

13     FOR THE PLAINTIFF:          DOMENGEAUX, WRIGHT, ROY & EDWARDS
                                   BY:  JAMES P. ROY, ESQ.
14                                 P. O. BOX 3668
                                   556 JEFFERSON ST.
15                                 LAFAYETTE, LA 70502-3668

16                                 HERMAN, HERMAN, KATZ & COTLAR, LLP
                                   BY:  STEPHEN J. HERMAN, ESQ.
17                                 820 O'KEEFE AVENUE
                                   NEW ORLEANS, LA 70113
18
                                   WILLIAMSON & RUSNAK
19                                 BY:  JIMMY WILLIAMSON, ESQ.
                                   4310 YOAKUM BOULEVARD
20                                 HOUSTON, TX 77006

21                                 LEVIN PAPANTONIO THOMAS MITCHELL
                                   RAFFERTY & PROCTOR, PA
22                                 BY:  BRIAN H. BARR, ESQ.
                                   316 SOUTH BAYLEN STREET, SUITE 600
23                                 POST OFFICE BOX 12308
                                   PENSACOLA, FL 32591

24

25
```

```
 1                                  LEWIS KULLMAN STERBCOW & ABRAMSON
                                    BY:  PAUL M. STERBCOW, ESQ.
 2                                  601 POYDRAS STREET, SUITE 2615
                                    NEW ORLEANS, LA 70130
 3
                                    BREIT DRESCHER IMPREVENTO & WALKER
 4                                  BY:  JEFFREY A. BREIT, ESQ.
                                    1000 DOMINION TOWER
 5                                  999 WATERSIDE DRIVE
                                    NORFOLK, VA 23510
 6
                                    IRPINO LAW FIRM
 7                                  BY:  ANTHONY IRPINO, ESQ.
                                    2216 MAGAZINE ST.
 8                                  NEW ORLEANS, LA 70130

 9   FOR THE STATE OF LOUISIANA:    KANNER & WHITELEY
                                    BY:  ALLAN KANNER, ESQ.
10                                  701 CAMP STREET
                                    NEW ORLEANS, LA 70130
11
     FOR THE UNITED STATES
12   DEPARTMENT OF JUSTICE:         U.S. DEPARTMENT OF JUSTICE
                                    TORTS BRANCH, CIVIL DIVISION
13                                  BY:  R. MICHAEL UNDERHILL, ESQ.
                                    450 GOLDEN GATE AVENUE
14                                  7TH FLOOR, ROOM 5395
                                    SAN FRANCISCO, CA 94102
15
                                    U.S. DEPARTMENT OF JUSTICE
16                                  GOVERNMENT INTERESTS:
                                    ENVIRONMENTAL ENFORCEMENT SECTION
17                                  BY:  STEVEN O'ROURKE, ESQ.
                                         A. NATHANIEL CHAKERES, ESQ.
18                                  POST OFFICE BOX 7611
                                    WASHINGTON, DC 20044
19
     FOR THE STATE INTERESTS:       ATTORNEY GENERAL'S OFFICE
20                                  BY:  COREY L. MAZE, ESQ.
                                    500 DEXTER AVENUE
21                                  MONTGOMERY, AB 36130

22

23

24

25
```

```
 1   FOR BP AMERICA INC., BP
     AMERICA PRODUCTION COMPANY,
 2   BP COMPANY NORTH AMERICA,
     INC., BP CORPORATION NORTH
 3   AMERICA, INC., BP EXPLORATION &
     PRODUCTION INC., BP HOLDINGS
 4   NORTH AMERICA LIMITED, BP
     PRODUCTS NORTH AMERICA INC.:     KIRKLAND & ELLIS, LLP
 5                                    BY:  J. ANDREW LANGAN, ESQ.
                                          BRIAN P. KAVANAUGH, ESQ.
 6                                    300 N. LASALLE
                                      CHICAGO, IL 60654
 7
                                      LISKOW & LEWIS
 8                                    BY:  DON K. HAYCRAFT, ESQ.
                                      ONE SHELL SQUARE, SUITE 5000
 9                                    701 POYDRAS STREET
                                      NEW ORLEANS, LA 70139
10
     FOR HALLIBURTON
11   ENERGY SERVICES, INC.:           GODWIN RONQUILLO
                                      BY:  DONALD E. GODWIN, ESQ.
12                                    RENAISSANCE TOWER
                                      1201 ELM STREET, SUITE 1700
13                                    DALLAS, TX 75270

14
     FOR CAMERON INTERNATIONAL
15   CORPORATION:                     BECK REDDEN & SECREST, LLP
                                      BY:  DAVID J. BECK, ESQ.
16                                         DAVID JONES, ESQ.
                                      1221 MCKINNEY, SUITE 4500
17                                    HOUSTON, TX 77010

18
     FOR ANADARKO PETROLEUM
19   CORPORATION, ANADARKO E&P
     COMPANY, LP, MOEX USA
20   CORPORATION, AND
     MOEX OFFSHORE:                   BINGHAM McCUTCHEN, LLP
21                                    BY:  WARREN A. FITCH, ESQ.
                                      2020 K STREET NW
22                                    WASHINGTON, DC 20006

23                                    KUCHLER POLK SCHELL WEINER &
                                      RICHESON
24                                    BY:  DEBORAH D. KUCHLER, ESQ.
                                      1615 POYDRAS STREET, SUITE 1300
25                                    NEW ORLEANS, LA 70112
```

```
1
     FOR TRANSOCEAN HOLDINGS, LLC,
2    TRANSOCEAN OFFSHORE DEEPWATER
     DRILLING INC., AND TRANSOCEAN
3    DEEPWATER
     INC.:                         FRILOT
4                                  BY:  KERRY J. MILLER, ESQ.
                                   ENERGY CENTRE, 36TH FLOOR
5                                  1100 POYDRAS STREET
                                   NEW ORLEANS, LA 70163
6
                                   SUTHERLAND
7                                  BY:  STEVEN L. ROBERTS, ESQ.
                                        CARTER L. WILLIAMS, ESQ.
8                                  1001 FANNIN STREET, SUITE 3700
                                   HOUSTON, TX 77002-6760
9

10   SPECIAL MASTER:               RET. CAPTAIN SUZANNE E. ENGLEBERT

11

12   OFFICIAL COURT REPORTER:      KAREN A. IBOS, CCR, RPR, CRR
                                   500 POYDRAS STREET, ROOM HB-406
13                                 NEW ORLEANS, LOUISIANA 70130
                                   (504) 589-7776
14

15

16       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
     PRODUCED BY COMPUTER.
17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                   (FRIDAY, FEBRUARY 17, 2011)

 3                      (STATUS CONFERENCE)

 4

 5        (OPEN COURT.)

 6             THE COURT:  We're waiting for the ELMO to warm up, we'll

 7   get to that in a minute.  We are going to try to make it fast.  I

 8   wanted to tell, and I am sorry I didn't get word out to you before

 9   this, but Phase Two participants, the chances are we are not going

10   to get to you today, we have a lot of Phase One stuff to cover; and

11   so if anybody is here or on the phone solely for Phase Two, you are

12   released from bondage.  Jimmy, thank you for coming.

13             MR. WILLIAMSON:  Thank you, Judge.

14             THE COURT:  I do apologize, I should have gotten word to

15   you.

16             MR. WILLIAMSON:  It's all good.  I'm sure Mr. Barr and I

17   want to reiterate that we want Phase Two to get going as soon as

18   possible.

19             Jimmy Williamson for the PSC, by the way.

20             THE COURT:  I read Mr. Barr's letter that was transmitted

21   to me yesterday evening, it has been read, not fully digested but

22   read.  And I am fully aware of that.

23             MR. WILLIAMSON:  And on the other hand, we understand the

24   court's schedule.  So thank you.

25             THE COURT:  Thank you.  I appreciate it, Guys.
```

```
 1              MR. BARR:  But I am going to stay and hang out with my
 2   people.
 3              THE COURT:  Your peeps.  We'll shorten it to that, Brian.
 4              Okay.  Everybody can see what's on the screen, so please
 5   take note.  We do expect to see you next Friday.
 6              MR. MILLER:  Thursday.
 7              THE COURT:  I'm sorry, next Thursday.  We do expect to
 8   see you, even for a brief time.  I think we're going to need to see
 9   each other by then.  In that context.
10              MR. MILLER:  One glaring omission from the invitation.
11   Casual only.  So you need to make that order clear.
12              THE COURT:  And no civil disobedience.  I think that
13   perhaps khakis are even too dressy.
14              MR. LANGAN:  I have a question about that, your Honor.
15   How did Mr. Miller spell khaki in that e-mail?
16              THE COURT:  Not correctly.
17              MR. LANGAN:  I thought, you know, is that a Louisiana
18   thing.  I always thought it was K-H-A-K-I.
19              THE COURT:  Yes, K-H.
20              MR. LANGAN:  Yeah, okay.
21              MR. MILLER:  You know, Don pointed it out to me and I
22   chalked it up to my general lack of fashion sense.
23              THE COURT:  Well, it also has to do with that grammar
24   school education in Napoleonville.
25              MR. MILLER:  I can spell other things, though.
```

1           THE COURT:  But our thanks to Kerry and Transocean, we

2    appreciate it.

3           Okay.  Captain Englebert, are you on the line?

4           CAPTAIN ENGLEBERT:  Yes, your honor.

5           THE COURT:  How do you do?

6           CAPTAIN ENGLEBERT:  I am doing great.

7           THE COURT:  Captain Englebert is preparing for the Mardi

8    Gras season, we had a detailed discussion yesterday about what her

9    plans are.  They are detailed and exhausting, and if anybody wants

10   to talk after today's conference about recommendations on where you

11   should be or that kind of thing, please come see me, we will be

12   glad to do it.

13          But, Captain, you're ready to roll; is that correct?

14          CAPTAIN ENGELBERT:  I am, I am.  And very quickly, and

15   Muses was excellent last night.

16          THE COURT:  Wasn't Muses excellent.

17          CAPTAIN ENGLEBERT:  Yes.

18          THE COURT:  We can get a report from Mr. Steve Roberts

19   with regard to that because he attended last night.

20          CAPTAIN ENGLEBERT:  I hate to wonder if he wasn't one of

21   the Elvises.

22          THE COURT:  He got a high heel.

23          MR. ROBERTS:  No, Amy did.

24          THE COURT:  I'm sorry, someone he was with, Amy got a

25   high heel, so it was a worthwhile trip for him.

1              Okay.  Go ahead, Captain Englebert.

2              CAPTAIN ENGLEBERT:  Just quickly, to update the status of

3     the BP gator box item.  I don't know if you hear me through the

4     static.

5              THE COURT:  Is that you creating the static or somebody

6     else on the phone with static?

7              CAPTAIN ENGLEBERT:  It might be me, I still have water

8     issues.

9              THE COURT:  You're calling from home, huh?

10             CAPTAIN ENGLEBERT:  Yes.  The gator boxes, my

11    understanding is that the Department of Justice has given a

12    position on retention for the five gator boxes that I had

13    recommended, and I understand that's in discussion.  I just wanted

14    to update you quickly.  We have a tentative schedule to release

15    those items the week of the 27th of February, so I am looking for a

16    confirmation before that time from all of the parties of whether or

17    not that retention recommendation from the Department of Justice is

18    what you want to go with.

19             THE COURT:  Okay.  Let's stop there.  Everybody, have you

20    all had the opportunity to look at what the DOJ has recommended

21    retaining; and if so, do you all have anything else to add to the

22    retention list is the question, and can you do it in the coming

23    week?  You see what kind of response I get, Captain.

24             CAPTAIN ENGLEBERT:  And I even sent them pictures, I'm

25    just disappointed.

```
 1            THE COURT:  Exactly.  Exactly.  If there is a problem,
 2    guys, if there's something you want to add, try to do it this week.
 3    If you can't do it this week, please let Captain Englebert and me
 4    know that you can't do it this week.
 5            Also, and Captain I assume you were going to get to this,
 6    any time you refer to any item, Captain Englebert has provided us
 7    with a detailed inventory and each item inventoried has a specific
 8    item number, could you please make sure that when you respond you
 9    use her inventory item number so there will be no dispute about
10    what we're talking about, that would make it much easier for her.
11            CAPTAIN ENGLEBERT:  And in the Power Point I am referring
12    to, I did include the item numbers in each of the boxes.  So we're
13    just talking about the gator boxes, I am trying to attempt to
14    return those gator boxes to BP because they're on rental.
15            THE COURT:  Right.  And so take a look at the DOJ
16    communication.  If you have anything you want to add to the DOJ's
17    list as far as retention, please try to get to it this week with
18    specific item numbers.
19            Okay.  Captain --
20            MR. CHAKERS:  Your Honor, excuse me, this is Nat Chakers
21    from the Department of Justice.
22            I just had one clarification to make as to our
23    recommendation.  I don't think it was clear from the e-mail we sent
24    as to one set of items in the post incident evidence locker.  We
25    requested retention of ring gaskets and we had a photograph of two
```

1    of those ring gaskets, and our recommendation would be to retain

2    all similar ring gaskets, not just the ones in the photograph; and

3    all other items that aren't ring gaskets, we're fine with being

4    cleared up, so that's our recommendation as to those.  And I can

5    send a communication in writing if that would be helpful for the

6    record.

7                CAPTAIN ENGLEBERT:  This is Captain Englebert.  The

8    clarification on the container, I have an entire container full of

9    those kinds of items and it wasn't rigorously -- the inventory of

10   that container wasn't rigorously vetted through the parties.  So

11   I'll do that as the next vetting, I'll present that as a

12   recommendation for release, you know, in a week or so after we get

13   this release done.

14               MR. CHAKERS:  Okay.  Thank you.

15               THE COURT:  Okay, Captain, what's next on your agenda?

16               CAPTAIN ENGLEBERT:  Okay.  Just quickly a status update

17   on the BP/Halliburton computer protocol.  It's almost done, I think

18   it's going to be to you today, that's their intention; neutral

19   party has been agreed to, and I've been in conference with that

20   neutral party to make sure that they have all of the things that

21   your intention is for the protocol and for the court order.  So

22   that's moving forward.

23               THE COURT:  Good, good, good, good.

24               CAPTAIN ENGLEBERT:  And I believe I'll end up starting

25   that next week.

1          THE COURT:  Good.

2          CAPTAIN ENGLEBERT:  After Mardi Gras, of course.

3          THE COURT:  Terrific.  For everybody's info, Captain

4   Englebert has reviewed the protocol and approved it, so you know if

5   she approves it, I'll approve it.

6          CAPTAIN ENGLEBERT:  Right.

7          And last but not least, is I would appreciate a

8   discussion on evidence going to trial.  The Department of Justice

9   and other parties have told me in their -- couple of weeks ago they

10  came and viewed some of the evidence and informed me that they

11  wanted to potentially bring evidence to the courtroom, and I wanted

12  to have a frank and open discussion about that so that I can get an

13  idea of logistics.

14         THE COURT:  Okay.  So who is ready for a frank and open

15  discussion, because I am.  So let me -- and anything, Captain, you

16  want to pipe in on, I will be happy to let you do so.

17         But let me ask the first question.  As I understand it,

18  we've had some larger parts requested.  We are talking about the

19  rams, which are 800 to 1,000 pounds; and the annulars which are

20  also big and heavy.

21         Now, as I understand it, these parts have been lasered

22  scanned.  So my first question is, why would we want to bring these

23  to court rather than just develop computer images from the laser

24  scan data and display that to Judge Barbier for a full

25  understanding with expert testimony of what we're looking at?

1    Anybody want to respond to that?

2         MR. LANGAN:  Your Honor, Andy Langan for BP.  We've

3    talked a little bit about this issue as a team, and I think where

4    we are right now is we would like to keep our options open.  We are

5    not committed about the rams or the annulars and having them

6    brought to court.  We understand the challenges involved.  We

7    understand that photography may be sufficient, hopefully it will

8    be.

9         On the other hand, depending on how the expert testimony

10   comes in and what the issues are, we can't rule out the possibility

11   that we'll make this extraordinary request.  But we are certainly

12   not saying we need it for opening or anything like that.  We ought

13   to kick that can down the road frankly, as far as we're concerned.

14        THE COURT:  You know me, I'm always in favor of that.  I

15   guess question No. 2 is, if -- and I want to hear from other people

16   as well if you all want to comment -- but if we decide that we do

17   need some of this larger equipment for demonstrative purposes, the

18   preference from my point of view, and I believe from Captain

19   Englebert's point of view, would be to travel to the equipment

20   rather than the equipment traveling to us.  Captain, is that a fair

21   statement?

22        CAPTAIN ENGLEBERT:  Depending on what it is, absolutely,

23   your honor.

24        THE COURT:  Well, if we're talking with these larger

25   items, the annulars and the rams.  So we need to think about that.

```
 1   And we don't want to make multiple trips to Michoud with court
 2   reporters and the assembled masses, so I would put that out there
 3   for consideration as well.
 4          But with these larger pieces, it seems to me that
 5   computer modelling, photographs and videos should -- and notice I
 6   am saying should -- cover most eventualities.  So we'll kick the
 7   can down the road.  Jimmy, do you want to pipe in?
 8          MR. WILLIAMSON:  I think I agree with the court.
 9          THE COURT:  Jimmy Williamson for?
10          MR. WILLIAMSON:  Jimmy Williamson for the PSC, your
11   Honor.
12          I agree with the court, the computer modeling and the
13   photography, of course it will be up to Judge Barbier and his
14   discretion, of course; No. 1, it's probably easier to go to Michoud
15   than to bring it.  But No. 2, I only rose to say we don't think
16   we're going to need it in our case in chief.  But having said that,
17   if anybody wants a piece of equipment we would be like to be given
18   enough notice to figure out if there's any other piece of equipment
19   we would like inspected at the same time.
20          THE COURT:  During the course of the trial?
21          MR. WILLIAMSON:  Right.  So BP wants to bring the blind
22   shear rams, we want notice so that we can figure out if there's
23   anything else we want Judge Barbier to look at at the same time.
24          THE COURT:  Positively.
25          MR. LANGAN:  No surprises about that.
```

1          THE COURT:  No surprises.  We are going to plan our trip,

2     if there is a trip; and we hope to have one trip, if there is a

3     trip.

4          MR. WILLIAMSON:  Yes, your honor.

5          THE COURT:  So Jimmy I appreciate that clarification, and

6     I agree with it.

7          CAPTAIN ENGLEBERT:  The smaller items I don't really have

8     a problem with bringing to the court, I would just like some notice

9     because it will take a little bit to get them packaged up and to

10    you.

11         THE COURT:  Right.

12         CAPTAIN ENGLEBERT:  But the larger items, I think as much

13    warning as I can have, and I realize it won't be right away when

14    the trial starts, but it will take me a bit of set-up, I would say

15    approximately five days, if you could give me five working days to

16    set it all up.

17         THE COURT:  Well, nobody gets five working days in this

18    case.

19         CAPTAIN ENGLEBERT:  I have to convince NASA that they can

20    open their gates to just about anybody.

21         THE COURT:  Okay.  Well, no, we will give you as much

22    advanced time as we can, Captain.

23         CAPTAIN ENGLEBERT:  Appreciate it.

24         THE COURT:  Let's talk about the smaller parts, guys.  As

25    I understand it, the United States has requested various pipes.

1  Can that not be photographed and used demonstrably that way rather

2  than bringing them in?  And then the other question is, the

3  solenoids, which are not big, but again, do those need to come in

4  person or can that also be covered by photographs, video, et

5  cetera?  I realize those have not been laser scanned, so laser scan

6  is not an option there.

7         MR. UNDERHILL:  I am familiar with the solenoids, your

8  Honor, they are pretty small, and I think the idea might be that

9  rather than looking at the photographs as I have and seeing how

10  this wire should have gone here instead of here, it's a lot easier

11  to do up front, and I don't think that's an imposition on anybody

12  to bring the small parts.

13         THE COURT:  Well, we've got chain of custody issues, and

14  if we could avoid it, I would rather avoid it; but if we can't

15  avoid it, what I would like to do is have you all think about the

16  issue and then let each other and Captain Englebert know what

17  smaller items, if any, you would like and when you think, best

18  forecast you would need them.  Because she is going to have to

19  think it through, box them up, and go through her chain of custody

20  issues, including keeping things under lock and key.  Is that a

21  fair summation, Captain?

22         CAPTAIN ENGLEBERT:  Yes, your honor.

23         THE COURT:  Okay.  Is there anything else, Captain -- oh,

24  I know something else.  Everybody saw the division of invoices for

25  the captain, and we do ask you to promptly process those.

1           Captain, did I forget anything that you wanted to cover?

2           CAPTAIN ENGLEBERT:  No, your honor, you got everything.

3           THE COURT:  I appreciate it.  You can pop off and do your

4     Mardi Gras planning now.

5           CAPTAIN ENGLEBERT:  Thank you.  I think I'll work on the

6     water in my phone line as well.

7           THE COURT:  That would be helpful, I'd appreciate that

8     for the next call.

9           CAPTAIN ENGLEBERT:  All right.  Thank you.

10          THE COURT:  Thank you.

11          CAPTAIN ENGLEBERT:  Bye.

12        (WHEREUPON, CAPTAIN ENGLEBERT EXITED THE CONFERENCE.)

13          THE COURT:  Okay.  With regard to the revised fact and

14    expert witness lists, how are we coming on that, Andy?

15          MR. LANGAN:  Very good, your honor.  I expect to be able

16    to produce that if not today then Monday.

17          THE COURT:  Plenty of time.

18          MR. LANGAN:  And, your Honor, I did want to mention,

19    we'll produce it along the lines that we talked about, showing the

20    tract changes.  And the only other thing that's sort of

21    substantive, I guess, is that Weatherford having been dismissed

22    from the case, they had a witness Mr. Lynette (SIC) --

23          THE COURT:  Lirette.

24          MR. LANGAN:  -- who was a will-call witness for

25    Weatherford, BP would like to add that person as a will call for us

```
 1    as a fact witness, and that will be reflected on the master list
 2    that we did.  I can't see it prejudicing anybody.
 3              THE COURT:  I don't see any prejudice.  Does anybody have
 4    a problem?  Paul Sterbcow does not, so that must be it.
 5              MR. LANGAN:  Thank you.
 6              THE COURT:  You're welcome.  While we're on witnesses,
 7    and I have it down later in my agenda, but while it's on my mind
 8    and it's important, Judge Barbier would like to have advanced
 9    notice of who is being called in the next week, best estimate, and
10    the order in which they're being called so he can make sure to have
11    reviewed the expert reports and be prepared every Monday for what
12    you believe you will be presenting that week.  And I know that the
13    PSC has changed the order of witnesses because I've heard
14    discussion recently, so next week, please, latest by Monday give us
15    your forecast of what's happening starting the 27th day of February
16    so Judge Barbier can work all week on that.  Mr. Roy.
17              MR. ROY:  Yes, ma'am.  Bea first, McKay second, and
18    possible short clips in-between.
19              THE COURT:  Could you put that in writing to us, please.
20    Thank you so much.  And do you think that will take all week?
21              MR. ROY:  Our direct sure won't.
22              THE COURT:  Well, then err on the side of caution.  And
23    don't pile it on, but make your best estimate of who would come
24    next.
25              MR. ROY:  The next witness would be Mr. Bly.  Bea, McKay,
```

```
 1    Bly.
 2              MR. MILLER:  So, Jim, it's Bea, McKay, Bly?  We couldn't
 3    hear.
 4              MR. ROY:  Bea, McKay, Bly.
 5              THE COURT:  Bea, McKay, Bly.
 6              MR. ROY:  And we may play a short excerpt in-between some
 7    of those.
 8              THE COURT:  Okay.  But if you will put that projection,
 9    please, in writing to all counsel and to us so that I can give it
10    to Judge Barbier and he can start working, maybe this weekend.
11              MR. ROY:  Yes, ma'am.
12              MR. LANGAN:  So, your Honor, I was just going to comment
13    on the notice point.  I thought that following the pretrial
14    conference we actually had a Thursday convention, and I think this
15    is perfectly consistent with that, but I'm assuming we will keep up
16    with a Thursday convention of the parties in the case is going to
17    broadcast what their expectations are, right?
18              THE COURT:  Right.  And if we can do it any sooner for
19    Judge Barbier that would be helpful, but he will be in trial so I
20    guess it's a moot point.  He will be paying attention to other
21    things once the trial commences.  That would be you.
22              MR. MILLER:  Your honor, and Andy, just to make clear.
23    The order for the first week is special in that it's coming out a
24    week in advance, correct?
25              THE COURT:  It is.
```

```
 1              MR. MILLER:  Once we get in trial, it's going to be the
 2    Thursday before the following Monday?
 3              THE COURT:  Well, if we could do it any sooner, so, for
 4    instance, if the PSC could project sooner, that would be helpful.
 5    But if you can't, do the best you can because Judge Barbier is
 6    going to be working every night and all weekend to get ready for
 7    the next week as we're going.  And there's a lot of material for
 8    him to cover.  So if we can do it sooner --
 9              MR. MILLER:  That's great in terms of travel with experts
10    and experts wanting to see their counterparts, the sooner the
11    better.
12              THE COURT:  Right.  He has a lot of material to cover to
13    make sure he is ready for you every Monday.  Is that an
14    understatement?  Are you ready, Mr. Roy?
15              MR. ROY:  I didn't say anything.  I am just standing up
16    for whenever you're ready.
17              THE COURT:  Are you ready?
18              MR. ROY:  I'm ready, of course.  Your Honor, we don't
19    mind, we would be willing to submit our good faith projection and
20    calendar to the court in camera, we don't want to submit it because
21    it really is just a projection at this point for the entire trial.
22    But to the extent it would help the court in prioritize what it's
23    going to look at, you know, unless someone objects we don't mind
24    doing that.  But we only want to submit that in camera at this
25    time.
```

1          THE COURT:  That would be fine, I would appreciate that,

2     Jim, and that way we can kind of have a projection for what he

3     needs to pull out and when you all are projecting he'll need to

4     have read it.

5          MR. LANGAN:  Your honor, it's Andy, I want to make sure I

6     understood this.  Mr. Roy is suggesting that the court would know

7     something that we wouldn't know?

8          THE COURT:  Yes.

9          MR. LANGAN:  Okay.  I guess I have a problem with that.

10         THE COURT:  You do?

11         MR. LANGAN:  Sure.  I mean, that strikes me as a little

12    bit unusual for the court to know what's coming and the adversaries

13    don't.

14         MR. MILLER:  That's in addition to, not in lieu of the

15    regular Thursday convention.

16         MR. ROY:  Right, absolutely.

17         THE COURT:  Andy, I am just trying to make sure that

18    Judge Barbier is ready for each week.

19         MR. LANGAN:  Right.

20         THE COURT:  How about if we got an in camera two-week

21    projection?

22         MR. LANGAN:  You know, I guess I feel like just in

23    general, we all know it's important to all of us to get ready for

24    trial and know which witnesses are coming, the court and the

25    parties, we have a lot at stake here.  And the court knows what's

```
 1    coming, why can't the parties know.  If they're not ready to tell
 2    their adversaries what they're going to do, why should the court
 3    know that.  It just doesn't make sense to me.
 4              THE COURT:  Okay.  I'll think about it.
 5              MR. LANGAN:  Okay.  Thank you.
 6              THE COURT:  What I am thinking is, Jim, maybe you can go
 7    ahead and give the projection of Week 1 to everyone and an in
 8    camera projection of Week 2 to me and I will think about it before
 9    I distribute it to Judge Barbier, Andy, okay?
10              MR. LANGAN:  Thank you.  Yes, your Honor.
11              THE COURT:  But I won't go beyond Week 2 at this point.
12              MR. LANGAN:  I just have a standing request of when that
13    comes to order of proof, order of witnesses, what's happening next,
14    we ought to have transparency.
15              MR. MILLER:  Your honor, if I can come in briefly on
16    that.  I don't care so much about long-term projections because
17    we've all done long-term projections and they change every day, so
18    they're not really that reliable.  What I would prefer is if we
19    could move up the Thursday convention a little bit earlier in the
20    week just to be able to make concrete travel plans and those kind
21    of logistical plans, that I think is actually more helpful as
22    opposed to knowing what BP or PSC or Halliburton's long-term
23    projections are.
24              THE COURT:  Okay.  How do you guys feel about that?
25              MR. ROY:  We just aim to please, your Honor.
```

1          THE COURT:  Well, what are you thinking, a Wednesday

2    reveal date?

3          MR. MILLER:  You know, Wednesday by noon would be great,

4    that's a whole lot better than Thursday at five, just in terms of

5    planing and logistics and things of that nature.

6          MR. ROY:  We have absolutely no problem with that, your

7    Honor.

8          THE COURT:  We are going to change that.  We will have

9    our regular marshalling conference on Thursday, but we will go

10   ahead and move up the projections for the next week to noon on

11   Wednesday.  And that should help everybody.  Okay.  Thanks, Kerry.

12         LAW CLERK:  Excuse me, your Honor, will that projection

13   be made available to the lawyers and the public?

14         THE COURT:  I think so, yeah.

15         LAW CLERK:  So everybody will know?

16         MR. MILLER:  That's just a projection for the following

17   week, that's it.

18         THE COURT:  That's a projection for the following week.

19   And what we can do is Wednesday at noon we can do it, if you like,

20   on the record when we break for lunch.

21         MR. FITCH:  Judge, Tony Fitch for Anadarko.  Just in

22   terms of logistics, since there's no access for people who are in a

23   support role outside of the courtroom, it will be helpful if those

24   could be served as normal, e-mailed or something, at noon Wednesday

25   by one of their colleagues.

```
 1              THE COURT:  Sounds good.  Brian will have his people do
 2     that.
 3              We're clear about the procedure for trial subpoenas as
 4     far as notifying all persons before releasing any witness from the
 5     subpoena, everybody has that clear?
 6              MR. LANGAN:  On that maybe perhaps the PSC very kindly
 7     put together a tentative list around the 3rd of February about
 8     that, it might be time for an update, perhaps, if Steve doesn't
 9     mind.
10              MR. HERMAN:  I can do that.
11              THE COURT:  Let's do that.  Let's circulate an update on
12     that so everybody knows where we stand, that would be helpful.
13              MR. UNDERHILL:  Your Honor, quick question?
14              THE COURT:  Sure.
15              MR. UNDERHILL:  On the issue of subpoenas --
16              THE COURT:  That's Mike Underhill.
17              MR. UNDERHILL:  I'm sorry.  Thank you, Judge.  Has the
18     IME for Mr. Vidrine been set?
19              THE COURT:  It has not been set and we have gotten a
20     motion to reconsider an IME, so we have that pending, we just have
21     not had an opportunity to sit down and look at it.
22              MR. MILLER:  Your honor, on that issue, we are going to
23     file an opposition to the motion to reconsider today --
24              THE COURT:  I figured that.
25              MR. MILLER:  -- because we have been in contact with
```

1    Dr. Culver, he is willing to go to Lafayette to conduct the IME and

2    he is willing to do it soon, so.

3              THE COURT:  But we have not had an opportunity to look at

4    the law that Mr. Habans is citing, nor have we read your

5    opposition.

6              MR. MILLER:  Neither have I, but it's coming.

7              THE COURT:  But Dr. Culver does have an office in

8    Lafayette.

9              MR. MILLER:  Yes, and he is willing to travel and does

10   have availability over the next week or so.

11             THE COURT:  So we will get to it ASAP.

12             Okay.  Records custodians.  Do we all agree that any

13   records custodians that will come to trial will be coming to trial

14   at the end of the Phase One presentation and that they need not

15   appear February 27th, is there any issue here?

16             So we will work on that as the trial proceeds.

17             Okay.  Next up is advanced notice of exhibits.  BP has

18   suggested that before a party offers into evidence a large group of

19   documents, which some parties may contend are inadmissible under

20   some of Judge Barbier's in limine rulings, the party that wants to

21   introduce it provide notice to all.  Is there an issue with that?

22   And obviously, Steve, there is, come on up.

23             MR. HERMAN:  Steve Herman for the PSC.  I don't know if

24   there's an issue, I think we've advised everyone for several weeks

25   that we intend the first Thursday to offer, I don't know if it's

1    going to be 168 because we have to deal the Fifth Amendment and

2    there are some that are live witnesses on people's will call list

3    that I guess will be pulled.  But whatever that number is, I don't

4    know, 150 depositions, with whatever exhibits have been referenced

5    by any of the parties within those depositions.  So the defendants

6    have notice of that and I think, your Honor, I thought had ruled

7    last week, and I think it's in about three different orders, that

8    we're not going unbundle the bundles at this point.  And, you know,

9    it's a bench trial and I think Judge Barbier is perfectly capable

10   of considering admissible evidence and not considering inadmissible

11   evidence.

12           THE COURT:  Yeah.  And, you know, I think that's right.

13   I'm particularly, though, Steve, concerned about what we all are

14   now calling the trade secret information and how we're going to

15   deal with that because there is some truly trade secret information

16   in very few pages.  But that needs to be dealt with and we need to

17   consider how we're going to take care of that issue.

18           MR. HERMAN:  Understood.  But again, and I think people

19   have raised this in previous conferences, there's a difference

20   between what is offered into evidence then also what's admitted

21   into evidence ultimately by Judge Barbier and then also ultimately

22   what is released to the public.  I think we're all kind of seeing a

23   somewhat contemporaneous thing.  But if some of the bundles have to

24   be held up or redacted before they can be released to the public,

25   then that's a different issue than holding up -- being able to make

1   our offer of proof essentially.

2           THE COURT:  Okay.  Andy, do you want to comment on that?

3           MR. LANGAN:  Your Honor, yes.  So I think the last time

4   we talked about this we noted that there are some examples, we

5   think fairly clear examples of rulings on motions in limine that

6   really casting the doubt, or really have been resolved and the

7   whole depositions or nearly whole depositions are no longer

8   admissible.  Like, for instance, there was a 30(b)(6) of

9   Mr. Armstrong that related to other incidents.  We now have a

10  ruling that other incidents aren't admissible.  And so what's the

11  point of massive offerings of these things when the judge has

12  already said that they shouldn't come in.  So I still don't

13  understand what the point is.

14          We would like to cut through that, I think we sent a

15  letter in that had six or seven examples of these, and Mr. Herman's

16  reaction was too bad we're doing it anyway.  I mean, that's at

17  least how I read his response, unless we're told we can't.  So we

18  continue to object to that and we don't understand the point.

19          THE COURT:  Mr. Roy wants to come up on that one.  Come

20  on up, Mr. Roy.

21          MR. ROY:  Your Honor, without dwelling on the specific

22  deposition that Andy mentioned, we can work out the details of

23  whether actual testimony is or is not admissible as we go.  The

24  court specifically ruled that evidence of prior incidents and

25  alleged lessons learned or not learned might be referred to

1   legitimately by experts.

2             THE COURT:  Right.

3             MR. ROY:  That's Dr. Bea, Dr. Bea is the first witness.

4             THE COURT:  That's fine.  But does that mean that the

5   deposition that Andy referenced comes in?

6             MR. ROY:  That's why I say it's a separate evidentiary

7   issue, and we can pull that aside and talk about those two or three

8   or whatever it is that deal specifically with it.  But I rise for

9   the limited purpose of making it very clear that however you

10  resolve the specific admissibility or non-admissibility of the

11  testimony of Mr. Armstrong on the lessons that BP did or did not

12  learn from Texas City, Grangemouth, Alaska pipeline, et cetera,

13  that this does not impact Dr. Bea's ability to rely --

14            THE COURT:  Judge Barbier was very clear about that.

15            MR. ROY:  And Dr. Bea's ability to rely upon that

16  testimony.

17            THE COURT:  Fine.  But Judge Barbier was very clear about

18  that.  He is not going to re-try any of those prior incidents.  And

19  so what I would like you to do, Jim, is I would like you to talk to

20  Andy or his designee and your designee about what BP believes is

21  now inadmissible due to the judge's ruling about other incidents,

22  for instance.

23            MR. ROY:  Sure.

24            THE COURT:  And see if you can't reach agreement with

25  regard to those depositions, those exhibits that should come out

1   because of the in limine ruling.

2         MR. ROY:  Right.  If I could just emphasize what we think

3   is a discrete difference and nuance we believe in the order, the

4   ruling of the court.

5         It dealt with specific reports, investigations as to

6   whether they were by themselves admissible.  When we're dealing

7   with BP key people who either admit they knew of a lesson to be

8   learned or they didn't and they were aware of it, our position is

9   that is inseparable from the concept of process safety because

10  process safety by even their own expert's definition requires

11  looking back and learning from mistakes in processes in the past.

12        So all I am saying is is that I believe that BP's

13  position, I would love to hear to the contrary, but I believe BP's

14  wish list is nobody ever gets to talk or ask questions of any

15  witness except Dr. Bea about Grangemouth, Texas City, or Prudhoe

16  Bay, or any other disaster that BP suffered.  And all I am saying

17  to you is that once Dr. Bea explains the connection and what he has

18  relied upon as he has in his report, as well as in his discovery

19  deposition, that this may very well at least to the extent it's

20  relevant allow the actual direct testimony of BP key players to

21  say, you know, I didn't learn anything.  That's relevant.  Once

22  Dr. Bea testifies --

23        THE COURT:  It may be, it may be, Jim, but I am not sure

24  it comes in in your initial offer.

25        MR. ROY:  No, I agree.

```
 1              THE COURT:  So what I would like you to do is, Andy, can
 2   you provide the PSC with not just a list of examples but a more
 3   comprehensive list of what you believe should not come in because
 4   of Judge Barbier's in limine rulings and let them take a look at it
 5   and let's see.  I'll be glad to work with you all on it this week.
 6              MR. LANGAN:  Can we start with the deposition list we
 7   sent to Steve in which he said sorry, too bad, we're doing it
 8   anyway?
 9              THE COURT:  Sure.
10              MR. LANGAN:  That was the meet and confer so far, we said
11   how about these and he said no.
12              THE COURT:  I think that Steve has now decided, yes, he
13   will talk to you.
14              MR. LANGAN:  And that's a step in the right direction.
15              I also need to comment here.  I mean, it's very
16   interesting that we learned today that Bea is going first.  And
17   it's clear from Mr. Roy's comment that this is what this is going
18   to be about, this is their grand strategy to undue a motion in
19   limine ruling they don't like.  So it's going to be up to Judge
20   Barbier, but it's very -- I'm all for transparency and I greatly
21   appreciate hearing a preview of their strategy, but we're going to
22   have a contest about that I'm sure before Judge Barbier.
23              THE COURT:  And I won't be there, so.
24              MR. LANGAN:  The other thing I was going to say is on the
25   March 1st proffer of 168 depositions, I just want to say once
```

```
 1    again, I think that's far from a forgone conclusion in Judge
 2    Barbier's mind from what I heard on the 3rd of February that he is
 3    going to entertain a massive dump of depositions.  I heard him say
 4    on several occasions on the 3rd of February that he had in mind
 5    more like 50 or 60.  So I know Steve needs to say what he needs to
 6    say and we need to say what we've said, which is we think he has
 7    something very different in mind and we don't waive our rights on
 8    that.
 9              THE COURT:  Okay.  Steve.
10              MR. HERMAN:  Happy to talk to Mr. Langan.  Before I talk
11    to Mr. Langan, I would like to know what the logistics are that the
12    court anticipates, because let's assume I sit down with Mr. Langan
13    and I agree that these five questions under the court's in limine
14    ruling are not admissible and these seven exhibits are not
15    admissible.  Where do we go from there?  Do we go back to the
16    inData and tell them they have to take apart the bundles and put
17    them back together?
18              THE COURT:  We've spoken to Jordan about that because I
19    was very concerned about the confidential information and how we
20    were going to deal with that.  And so Jordan reports that he can go
21    in and redact pages or lines or part of an exhibit that is linked
22    to the depositions.  And so that's doable and he didn't seem to
23    think it was a big deal.
24              Now, we can do a conference call with Jordan, he is in
25    town for the duration so we might even be able to get together with
```

```
 1   him, but he indicated that if we gave him specific instructions on

 2   what to do, he can do it.

 3             MR. HERMAN:  Okay.  That sounds optimistic.

 4             THE COURT:  I am an optimist.

 5             MR. HERMAN:  Me too.  I am trying to get a sense, maybe

 6   this question is better posed to Andy, of what the universe is, is

 7   it limited to prior incidents or now are we going to go back and

 8   have BP tell us everything that it contends that the court has

 9   ruled inadmissible and we're going to waste three weeks going back

10   and fighting about it.

11             THE COURT:  I think that why don't you and Andy and I get

12   together after the conference and kind of put some parameters on

13   it, okay?  Fair enough?

14             MR. HERMAN:  That's fine.  While I am up here can I say

15   something else?

16             THE COURT:  Off topic?

17             MR. HERMAN:  It's somewhat related.  It's a CYA for our

18   trial team on the Baxter order.  I think we fundamentally agree

19   with the principles and we've always agreed with it, that we won't

20   ask about the Baxter investigation.  The slight dilemma that we

21   have is that because the order includes the analyses that were done

22   within the document that we don't have anymore, that nobody's read

23   in, I don't know, six or nine months, we're certainly not going to

24   intentionally ask about it because we don't even know what it is,

25   but it's possible that we could ask a question and then they jump
```

```
 1   up and say you're violating the order because that analysis was
 2   done in the Baxter investigation.  I don't really know how to avoid
 3   that, but I just want to kind of protect the record and protect our
 4   trial team on that.
 5           THE COURT:  Duke asked you to ask that question?
 6           MR. UNDERHILL:  Can we just take a step back to what Andy
 7   brought up, the idea of advanced notice of exhibits.  Could we just
 8   do a trial like the way the trial attorneys do it?  It's a really
 9   sincere request, your Honor.  I mean, I like to look at things in a
10   practical light and figure out how it works out in real life.
11           With a witness the next day it might be 2 a.m. before I
12   figure out my final exhibits that I intend to use, and it's going
13   to continually change based upon the testimony that comes into
14   trial.  A document that I don't think is relevant now may be
15   relevant next week because of what a witness says, possibly my own,
16   possibly an adverse witness.  And to have this advanced notice
17   thing is really impossible, it's impractical, and it's just not the
18   way to do a trial.  In a bench trial like this, Judge Barbier knows
19   how he ruled, he issued the order.  And if it's a document or
20   whatever that we think is let's say there may be some documents we
21   figure, okay that's out, got it, that document is in --
22           THE COURT:  Mike, the request itself was a large batch of
23   documents, it's not on a document-by-document basis.
24           MR. UNDERHILL:  Okay.  If we're talking about like
25   concepts like prior incidents, I can understand it's a finite
```

```
 1    universe possibly, but I really don't want to have this
 2    bureaucratic Iraqi army structure, we like to think we're Navy
 3    Commandos.
 4              THE COURT:  Your speech are fine, go sit down.  Thank
 5    you.
 6              MR. UNDERHILL:  Can I mention the Seals once?
 7              THE COURT:  No.
 8              MR. LANGAN:  Your Honor, was that a Department of Justice
 9    lawyer looking at me and talking about bureaucracy?
10              THE COURT:  Yes, it was.
11              MR. MILLER:  A golden moment in the case, Andy.
12              THE COURT:  Good one, Andy, good one.
13              Okay.  We're working on that final round of Daubert
14    motions, Monday is the deadline for three page replies.
15              Do we have a report on whether anybody is going to object
16    to the scope of Dr. Ravi's report?
17              MR. LANGAN:  Your Honor, we'll confirm by the end of the
18    day, we have no present plans for an additional motion.
19              THE COURT:  Good.  Thank you, Andy.
20              If anybody does have a problem, would you let everybody
21    know ASAP.
22              Okay.  Guys, now, inData is going to include the Fifth
23    Amendment deposition bundles going to Judge Barbier and introduced
24    into evidence on the DVD.  Does anybody have a problem with that?
25              MR. KAVANAUGH:  Your Honor, Brian Kavanaugh for BP.
```

```
1              THE COURT:  How are you doing, Brian?

2              MR. KAVANAUGH:  I'm doing well.  Thank you.  Our issue is

3    just the ability to complete the bundles, I think various parties

4    didn't tender objections or otherwise, and if we had a reasonable

5    amount of time to do that.

6              THE COURT:  We are not in a hurry on it.  Do you all want

7    to agree to something?  Steve.  Steve and Brian, come on up, let's

8    talk.

9              MR. HERMAN:  Steve Herman for the PSC.  I think all of

10   our stuff is in, we read the judge's order obviously.  Actually in

11   our two-page summaries we kind of bullet pointed the inferences

12   that we wanted the court to draw, and that's kind of where we

13   spelled it out.  However, in light of the judge's ruling, we're

14   going back very surgically and are going to come up with a list of

15   very few total presumptions or inferences that we want the court to

16   draw from the Fifth Amendment depos.  We need to submit that like

17   in a motion or something?

18             MR. BREIT:  We were hoping to be able to submit that the

19   Friday before trial.  Jeffrey Breit for the PSC.

20             MR. HERMAN:  Friday before trial we will submit some type

21   of pleading that outlines the specific inferences or presumptions.

22             THE COURT:  But your cuts, your depo cuts are done and

23   everybody has them?

24             MR. HERMAN:  Yes.  Well, inData has them.

25             THE COURT:  Well, the parties know what the cuts are,
```

```
 1   yes.  So, Brian, what would you propose?
 2              MR. KAVANAUGH:  I don't know if other parties are in the
 3   same circumstances --
 4              THE COURT:  They are.
 5              MR. KAVANAUGH:  -- I think we could have our objections
 6   in five days.  There's not that many depositions that are
 7   implicated by this.
 8              THE COURT:  Defendants, do you all have any take on you
 9   want five days to do your cuts on the Fifth Amendment witnesses?
10              MS. KUCHLER:  Yes.
11              MR. MILLER:  Yes.
12              THE COURT:  Next Friday?
13              MS. KUCHLER:  Fine.
14              THE COURT:  Is that okay?
15              MR. KAVANAUGH:  And I'm assuming we're just responding to
16   what's already there, this has nothing to do with the more limited
17   universe that Steve just mentioned?
18              THE COURT:  No.  So you will go ahead and get your cuts
19   in to inData and everybody else by next Friday, and then Jordan
20   should be able to turn it around pretty quickly from there.  You
21   all are not going to have counter designations on Fifth Amendment?
22              MR. BREIT:  No.
23              THE COURT:  So that will complete the bundles, Brian.
24              MR. KAVANAUGH:  Thank you, your Honor.
25              THE COURT:  You're welcome.  Anything else, Kerry?
```

```
1              MR. MILLER:  No.
2              THE COURT:  Trade secret information, we've gone from
3    confidential to trade secret information.  So we sent out an e-mail
4    this week asking you all to answer four discrete questions with
5    regard to the listing that we've exchanged.  The problem is is that
6    you all seem to be answering the questions only with regard to your
7    exhibits, which doesn't help us at all.
8              So can we talk about that, please.  Brian.
9              MR. KAVANAUGH:  Happy to go first, your Honor.
10             THE COURT:  Come on.
11             MR. KAVANAUGH:  I think, and I don't speak for anyone
12   else, I think we are going to need a list from inData of the
13   universe of exhibits that were tendered by all parties.  We don't
14   have -- we don't have a list of that.  We know what we submitted.
15   And absent looking at every individual bundle, we wouldn't know all
16   of the other highlighted excerpts submitted by all of the other
17   parties.
18             THE COURT:  Hold on, hold on, backup, backup.  First I am
19   only talking about the exhibits in only the small universe of
20   exhibits that the parties have identified as what they believe is
21   trade secret information contained in the exhibits.
22             MR. HAYCRAFT:  Like Transocean's manuals.
23             THE COURT:  Like Transocean's manuals.  So my default
24   position, I'll give you one that I thought was really easy.
25   Anadarko has four or five exhibits where there's pricing
```

```
 1    information, redact the prices; sand reservoir information, nobody
 2    cares about that, redact it, the documents come in.  So that's real
 3    easy by my view of the world.
 4            But then we've got a universe out there so, for instance,
 5    a lot of manuals in their entirety, which is problematical, no
 6    question about it.  What I was hoping we could accomplish is that
 7    everybody look at this limited universe of documents and answer the
 8    questions for all of those.  Do you intend to use them.  So
 9    Transocean is worried about its manuals, you all -- meaning the
10    PSC -- probably will answer yes to the question, but not the entire
11    manual, probably two or three pages of the manual.  Is that right?
12            MR. BREIT:  Slices.
13            THE COURT:  So the entire manuals are not going to come
14    in, so I don't have to worry about the entire manuals coming in and
15    somebody saying those are proprietary trade secret documents.  All
16    I have to worry about are those pages that you all, PSC, intend to
17    use.  So what I was asking is, PSC, could you tell me out of this
18    universe of documents, which ones and which pages you all intend to
19    use so that we can talk about how those were going to come into
20    evidence.  And, Mike, I'm sorry that you don't like what I am
21    saying, but that's how it's going to work.
22            MR. UNDERHILL:  I understand.
23            MR. HERMAN:  I'm not sure that we understood that.
24    Before right now.
25            MR. UNDERHILL:  Yeah.
```

 1          THE COURT:  That's why I said we weren't going to Phase

 2   Two today.

 3          Good morning, Mr. Irpino.

 4          MR. IRPINO:  Good morning, your Honor, Anthony Irpino for

 5   the PSC.

 6          I think one of the things that is helpful is to get, and

 7   I don't know if we can do this from a time-wise perspective, but to

 8   get the decisions from the court; because we're dealing with -- we

 9   talked about circles inside of circles last week.  We have the

10   requests from the defendants of different exhibits, some like BP's

11   I think was 18.

12          THE COURT:  Yes, very small universe.

13          MR. IRPINO:  I think Transocean is a different universe,

14   a couple few hundred.  It would, I think, be helpful to start with

15   to see what the court is going to rule on with respect to those

16   requests regarding exhibits and deposition designations.

17          THE COURT:  Wait, hold on.  What rulings are we talking

18   about?

19          MR. IRPINO:  Parties have requested trade secret

20   protection, it's a request.  Our understanding is the court is

21   going to determine if it's valid based on First Amendment rights,

22   public access, and all of that to see if -- I mean, I would imagine

23   there is going to be a smaller universe of exhibits --

24          THE COURT:  Just as for instance, that -- well, you know,

25   I guess my point is this, Guys.  A manual.  I don't need to rule on

1    whether the entire manual is trade secret because the entire manual

2    is not going to be introduced into evidence.  Only those portions

3    of the manual that, for instance, the PSC wants to use, do I need

4    to review for trade secrets.  You see, I don't need to review 21

5    manuals in their entirety because you all are not going to offer 21

6    manuals in their entirety because Judge Barbier is not going to

7    admit them in their entirety.

8            So that's the distinction I am trying to draw, and I

9    thought that I had made that clear in my e-mail this week, but

10   obviously I did not.  So my apology.  Michael's apology.

11           LAW CLERK:  Yeah, because I drafted the e-mails.

12           THE COURT:  No, I revised it, I revised it.

13           So that's what I am trying to work my way through.  I

14   don't want to have to sit down this weekend and read 21 Transocean

15   manuals.  I would rather sit down this weekend and look at those

16   pages that the PSC already knows is in their script for

17   cross-examination of the Transocean witnesses.

18           MR. BREIT:  Your Honor, if I could, Jeffrey Breit for the

19   PSC.

20           The problem with that is we have designated in the 168

21   bundles, now significantly less for purposes of offering Thursday

22   of trial, but for cross-examination purposes we can't sit here and

23   represent to the court that we have determined each and every page

24   of a group practice manual in advance and show our strategy in

25   advance that only page 6 of the group practice manual we're going

 1    to ask questions about, because it may be that 6, 12, 30 and 57

 2    come up and that's the problem.

 3            THE COURT:  I hear you, but we are not admitting all of

 4    these manuals into evidence.

 5            MR. MILLER:  Right.

 6            THE COURT:  So I can't rule in advance that all of this

 7    or is not trade secret.  Some of it is.  I've looked at portions of

 8    it and some of it is.

 9            MR. MILLER:  And I think that's right, your Honor.  And

10    the understanding, I think you made it clear in your working group

11    order of yesterday, that neither reliance materials nor the

12    exhibits associated with whatever the number of deposition

13    designation is, 168, is going to be admitted en mass.  The court

14    has made very clear there will be no en mass introduction.

15            When Transocean did its testimony confidentiality

16    designations, those were very small and very skinny because the

17    questions were limited to usually a page or two or a section or a

18    paragraph.  We're happy to work with Jeff and the PSC if the issue

19    is we're focused on the one page of driller responsibilities in a

20    400 page manual.  The objection is to the 400 page manual, not the

21    one page on driller responsibilities, for example.

22            MR. BREIT:  And I am happy to answer, Mr. Roy's at the

23    mike, but it is the advanced questioning of live witnesses which is

24    next to impossible for us to show our hand, and we are unwilling to

25    show our hand.

1          With regard to the deposition designations, we understand

2     that there have been cuts that include the very pages that were

3     used as part of those depositions, behind it is the manual itself.

4     In my discussions yesterday with Mike and inData, it's clear that

5     only those pages, which are part of those cuts, are going to be

6     offered as part of the bundle.  If there is something that they

7     tell us is a trade secret that we agree, I think Anthony has been

8     working with the team in our group to try to narrow that, we will

9     go through that and say, yeah, that's a blacked out portion.  But

10    for strategy purposes, I don't want to do so much.

11         THE COURT:  Okay.  Let's start with depositions.  And

12    what I would like you to do is work with mostly Transocean, as I

13    recall the listings, but there are other parties who have very

14    limited designations, and let's talk about those pages of the

15    exhibits to the depositions that Transocean contends are

16    confidential trade secret information and which you all want to

17    introduce into evidence.  And either through redaction or

18    otherwise, we might be able to take care of the issue.

19         MR. BREIT:  Mr. Irpino has been meeting for a year with

20    the other parties on confidentiality, trade secrets, and things

21    like that, and Anthony and our team that have been reviewing the

22    rulings as well as the confidential orders can do that during the

23    Mardi Gras period.

24         THE COURT:  Now, with regard to live witnesses, I would

25    like everyone to review all of the exhibits.  And before they are

1   publicly used at trial, you will talk to your opponent and say I

2   intend to use this in the examination today and see if you all

3   can't resolve the claim of trade secret information.

4          MR. BREIT:  Only on those issues where they've claimed

5   trade secret?

6          THE COURT:  That's right.  Oh, yeah, I mean, everything

7   else is public.  We've now narrowed the universe considerably.  The

8   biggest universe was Transocean.  So I would still like you all to

9   review each -- not each other's because you all have not designated

10  any trade secrets -- I would like everyone to review everyone

11  else's listing of trade secret exhibits with a view toward

12  answering the questions, do you intend to use it at trial, in other

13  words, introduce into evidence.  And if you don't, we don't have to

14  worry about it, okay.  Why do we worry about something if it's not

15  going to be used.

16         So if the answer is clearly no, say no.  If the answer

17  with live witnesses is we don't know yet, say we don't know yet.

18  If the answer is with depositions, yes, then you can deal with it.

19         But I would like to get those questions answered so we

20  can further narrow the universe and figure out where to go on it.

21         MR. BREIT:  Can I ask for a clarification?

22         THE COURT:  Yes you may.

23         MR. BREIT:  In the deposition designations we have done

24  all of our designations, including exhibits for 168 depositions.

25         THE COURT:  Yes.

1        MR. BREIT:  Transocean has listed as, I understand it,

2    close to 300 Coca-Cola trade secrets.  We shouldn't, I believe,

3    have to go back to our 168 cuts and say, guys, do y'all want to

4    talk about this?  They should go through these 168 depositions and

5    say, look, we think this page, this document needs to be addressed.

6    Otherwise we are going to be spending -- chasing our tail, and

7    that's what they should be doing.

8        MR. MILLER:  The depositions aren't the issue with us.

9    If you look at our submission on the 15th of our depositions, it

10   was very small, it did not involve a lot of trade secret

11   information at all.

12       THE COURT:  I think he is talking about exhibits attached

13   to the depositions.

14       MR. MILLER:  Isn't that part of the process if they're

15   not being admitted en mass anyway?  Isn't that something we can

16   just deal with down the road, because they're not being admitted en

17   mass?  That was my understanding.

18       MR. BREIT:  They're being offered as a group of

19   depositions, whatever the number of depositions under 168 after

20   live witnesses, they're all going to be offered in separate CD's of

21   exhibits.  What I don't want to be doing is going through trial and

22   saying we want to talk to a live witness about something that's

23   been offered and then have Kerry say, look, this is trade secret.

24   I think it's incumbent upon them to tell us in advance.  Because

25   we've already done all of the objections and those are issues

1    dealing with motions in limine, now we have to go through a whole

2    series of trade secrets where the court has been very narrow about

3    the Coca-Cola recipe, and now we have 300 exhibits and 168

4    depositions, we're going to have to start wondering, do we have to

5    go back through and start editing and start moving things for

6    inData, it killed the whole process of the last seven months, and I

7    don't want to do it, nor do I think we should.

8              THE COURT:  We are not going to kill the process, but we

9    have to get a handle on this.  And the biggest issue, Kerry, is

10   Transocean.

11             So why don't you do this, you go to the testimony,

12   presumably that testimony links to most of your claims of privilege

13   as to exhibits, is that a fair assumption?

14             MR. MILLER:  I'm going to turn it over to Carter, he

15   knows more than I do.

16             THE COURT:  Come on, Carter.

17             MR. WILLIAMS:  Your Honor, Carter Williams on behalf of

18   Transocean.

19             We don't have a problem with testimony where it's, here

20   is page 7, here are the driller's key responsibilities, that's not

21   the issue.  The issue is that list and there is a lot of

22   duplication, there may be 300 total, but it's probably 20 something

23   manuals, that's the playbook for how we operate.  And, you know, we

24   don't want that --

25             THE COURT:  But listen, people, the playbook is not

1    coming into evidence.  How do I get you all to agree what pages

2    from the playbook were covered in the deposition and how do we

3    cover those pages and keep them confidential?

4              MR. BREIT:  I understood him to say he doesn't have a

5    problem with the individual pages.

6              MR. WILLIAMS:  We don't have a problem with individual

7    pages.

8              MR. BREIT:  So we don't have to go through the bundles

9    then and worry about those pages.

10             MR. WILLIAMS:  That's right, as long as the exhibits as a

11   whole are not undesignated, we're fine.

12             MR. KAVANAUGH:  They are.  I'm sorry to jump in.  They

13   are in the bundles.  I think we're missing the fundamental point,

14   the bundle includes the entire exhibit.

15             THE COURT:  The bundle includes the entire manual,

16   people.  Am I not clear or did I start the conversation by saying

17   entire manuals will not be introduced into evidence.  Only the

18   pages that were referred to in the depositions will be offered.

19   And if indeed Transocean doesn't have a problem with the pages that

20   were offered into evidence during the testimony of the witness,

21   then we don't have a trade secret problem with the depositions.

22             MR. MILLER:  Correct.

23             MR. WILLIAMS:  That's right.

24             THE COURT:  So how do we accomplish it?

25             MR. ROY:  Your Honor, may I ask --

1          THE COURT:  No, not yet, Jim, let me get the answer.

2          MR. ROY:  This is the answer.

3          THE COURT:  Okay.  Let's hear it.

4          MR. ROY:  This is the answer.  We never intended to offer

5     the entire manual whatever it was.  That came up in a liaison

6     conference, if you recall, where somebody, I don't know said, well,

7     maybe the judge might want to refer to the document in globo

8     himself to get context.  From the PSC standpoint, if it ends this

9     problem with Transocean's manuals, all right, we've gotten the

10    admission from them, they're not claiming Coca-Cola secrets,

11    trademark, anything else on the individual pages that were offered

12    as exhibits in the depositions and now as TREX exhibits for trial.

13         That's all we're offering.  The manuals were there as a

14    secondary link for the convenience of the court.  And you've made

15    it very clear and the court's made it very clear, we can't put the

16    whole manual in, I guess absent some extraordinary circumstance.

17         THE COURT:  Correct.  It's just junk as far as I'm

18    concerned.

19         MR. ROY:  Right.  So as far as I'm concerned, the whole

20    manual if three pages are offered as a TREX and they have been and

21    it's in the deposition bundle, then all you have to do is say the

22    secondary link doesn't go public, which is the whole document.

23         THE COURT:  Correct.  Now, with regard to Transocean,

24    would you please take a look at all of the manuals and speak to

25    Jordan Ray and make sure that the only thing that the court version

1    of the depositions contains are those specific pages referenced

2    during the course of any witness's examination, and that he not

3    have a link to the entire manual.

4              Now, as I understand it, Carter, that goes a long way

5    toward meeting your objections; is that right?

6              MR. WILLIAMS:  Absolutely.

7              THE COURT:  Now, let's go the next step.  Just with

8    Transocean.  You made a very few designations that you thought the

9    testimony was trade secret.  Right?

10             MR. WILLIAMS:  That's correct.

11             THE COURT:  Have you all conferred on those very few

12   designations?

13             MR. IRPINO:  No, your Honor.  Again, we were thinking the

14   court was going to come out with an order on the designations

15   saying what they thought, and then if there was a disagreement that

16   we would let the court know.  We can go meet and confer on

17   designations, we thought the court was just going to give us the

18   court's opinion as to whether or not it agreed.

19             THE COURT:  Well --

20             MR. BREIT:  We can do that, Judge, without any problem.

21   I think Mike and I probably need to discuss with inData again

22   whether the separation of the mass of the manual can be cut as

23   easily as what we talked about.

24             THE COURT:  We will get on the phone with Jordan, And,

25   Carter, if you would like to participate, we will be happy to bring

```
 1    you into the conversation.

 2             Okay.  So let's talk about the other, and the rest of the

 3    universe is quite small, designated exhibits that have been claimed

 4    as trade secret.  Anthony, have you looked at those?

 5             MR. IRPINO:  Yes.

 6             THE COURT:  And do you have disagreement or agreement on

 7    some?

 8             MR. IRPINO:  We have some disagreement, but I think it's

 9    fair to say that we have a significant amount of agreement.  So I

10    think it sounds like our best plan is to do meet and confers --

11             THE COURT:  Well, I think the best plan, first, is to

12    tell them that you agree on these and then have a quick meet and

13    confer on the ones that you disagree on.  And I will be glad to, if

14    you can't resolve those that you disagree on, look at those.

15             Same with deposition testimony.  My recollection is very

16    little of the deposition testimony was designated; is that correct?

17             MR. LANGAN:  Your Honor, Andy Langan.  I think it is

18    correct.  It would be helpful to hear from your Honor that in

19    general, I think a number of parties said trade secret but also

20    personal information like social security numbers, e-mail

21    addresses --

22             THE COURT:  We don't care about that, do we?

23             MR. LANGAN:  Can we have an agreement on that?

24             THE COURT:  Yes, positively.  I mean, personal

25    information, medical information, home addresses.  Y'all don't care
```

```
 1   about that.
 2            MR. ROY:  Your Honor, Mr. Irpino has a lengthy list that
 3   he's prepared already to give to them, we couldn't do it before
 4   this hearing, to address all of that stuff, clearly none of that
 5   should go public, we agree.
 6            THE COURT:  I think that's right.  And thank you,
 7   Anthony, for working so hard on it.  That's great.  I think
 8   progress is being made.
 9            Do you all want to have perhaps a backup telephone call
10   scheduled for maybe Tuesday of next week to talk about those things
11   that may not be resolved?
12            MR. IRPINO:  Just the court and us or just --
13            THE COURT:  Yes.
14            MR. IRPINO:  Tuesday?
15            LAW CLERK:  That's Mardi Gras.
16            THE COURT:  Oh, that's Mardi Gras, not that it makes any
17   difference.
18            We'll be here, we'll do it Tuesday with you.
19            MR. IRPINO:  No, that's okay.
20            THE COURT:  Which tells you why it is I haven't reviewed
21   the deposition testimony.  I understand.
22            MR. IRPINO:  So Wednesday?
23            THE COURT:  Wednesday.  What would be good for you guys?
24   The designees, that would include Carter and Anthony and whoever
25   else wants to participate, we'll circulate dial-in information, 10
```

```
 1   a.m.?  11 a.m.?

 2             MR. IRPINO:  Wednesday after Mardi Gras?

 3             THE COURT:  Oh.

 4             MR. IRPINO:  If I am in that day --

 5             THE COURT:  1:30 p.m.?

 6             MR. IRPINO:  Yes.

 7             THE COURT:  1:30 p.m., sold to the lowest bidder.  And

 8   we'll circulate the dial in, we don't need the masses, just those

 9   people who are working on the issue and only those things that

10   you've not been able to resolve.

11             MR. FITCH:  Judge, an additional logistics question.  I

12   don't mean to interrupt.  Tony Fitch, Anadarko.

13             Once the personal information document, for example, has

14   been resolved and agreed it can be redacted or the seismic

15   information can be redacted and all of that, is the -- and parties

16   agree on that by exchange of e-mail or whatever or meet and confer,

17   is it then the party's responsibility and authorization to make

18   that substitution or tell Jordan, to send it to Jordan to make the

19   substitution.

20             THE COURT:  And be specific.  I mean, circulate it to

21   all, but, yes, it will be that party's obligation to make sure that

22   the information is properly either redacted or otherwise.  Let me

23   say for the record though that sand reservoir information, pricing

24   and technical information, that kind of information can be redacted

25   in my view and nobody's the worse for wear.
```

```
 1            MR. FITCH:  And those who don't have very much, I think

 2   there are two or three --

 3            THE COURT:  I think Anadarko probably you all are going

 4   to agree.

 5            MR. FITCH:  We'll take the initiative, we'll send it

 6   around one more time, and then we'll move on with inData.

 7            THE COURT:  Right.  Mike, I know you're there.  I am just

 8   not ready for you yet.  Jimmy?

 9            MR. WILLIAMSON:  Jimmy Williamson from the PSC.  Cameron

10   has raised a -- you just said something about pricing.  Cameron has

11   raised a claim of confidentiality on pricing, I'm sure we will work

12   most of it out; but the fact that some of the modifications on the

13   BOP were so cheap or so inexpensive is going to be a relevant fact

14   on BOP stuff.  We will be happy to meet and confer with Cameron and

15   try to work that out in an agreeable fashion.

16            THE COURT:  Look at my old friend, who I haven't seen in

17   a long time.  How are you doing?

18            MR. JONES:  Fine, Judge, thanks.  David Jones for

19   Cameron.

20            I know what Jimmy is referring to, I think he is talking

21   mostly about deposition testimony, and I don't think we objected to

22   that.  But we will be able to work that out.

23            THE COURT:  Good.  Thank you.

24            Okay.  Let me keep going.  Halliburton raised an issue

25   with a settlement agreement and just redacting the price, was that
```

1    right, Don, or do you think the entire agreement?

2              MR. GODWIN:  Just the price is fine, your Honor.  Don

3    Godwin for Halliburton.

4              THE COURT:  You had your best practices and your other

5    manuals, I assume that with the PSC -- Don, quit talking.

6              MR. GODWIN:  I understand, Judge.

7              THE COURT:  I assume that much like Transocean that the

8    PSC used very few pages of those documents during the deposition.

9              MR. GODWIN:  That's correct, Judge.  And we would have

10   the same position as Transocean, the whole manual or manuals would

11   stay out, pages would go in without objection.

12             THE COURT:  Good.  So let's work it the same way as we've

13   agreed that we're going to work it with Transocean, okay.  And you

14   will have responsibility, go back to Jordan, tell him about not

15   linking to the entire document but just linking to the pages that

16   were used.

17             MR. GODWIN:  We will, your Honor.

18             THE COURT:  Okay.  Perfect.

19             MR. GODWIN:  Thank you.

20             THE COURT:  BP, I assume PSC doesn't object to the

21   tubular design manual, but who knows, talk to Anthony about that.

22   Seismic and downhole, I assume you all don't object to that.

23             MR. HERMAN:  Steve Herman for the PSC.  We would just

24   like to get a clarification.  We're talking about redacting things,

25   even what they consider to be personal information.  We're only

```
 1    talking about what's publicly available, not necessarily redacting
 2    it -- it still goes into the record as evidence, correct?
 3              THE COURT:  Redacted.
 4              MR. HERMAN:  Well, I think what we were contemplating is
 5    that if it's relevant, pricing information, compensation, even some
 6    things that they consider to be personal information we believe may
 7    be relevant to the facts of the case.  We're perfectly happy to
 8    have it protected in some way in terms of whether it's released to
 9    the press or to the public.  But just because something is personal
10    doesn't make it irrelevant or inadmissible.
11              MR. LANGAN:  Someone's social security number?
12              THE COURT:  No, no, he's talking about, I assume, things
13    like compensation.
14              MR. LANGAN:  Well, the amount --
15              MR. HERMAN:  Compensation, pricing information.
16              MR. LANGAN:  The amount Judge Barbier has ruled is
17    inadmissible.  All we're seeking to do is redact that.  So I
18    thought we already won that.  Are we arguing that now?
19              THE COURT:  I think we are.  Steve, there was a prior
20    ruling by Judge Barbier, I believe, and I'll have to go back
21    because that paper flying fast and furious, but indicated that he
22    didn't think compensation was relevant.  I think you can talk
23    about, for instance, and the issue that was raised was whether or
24    not compensation was based on safety practices.  Right?
25              MR. HERMAN:  Right.  That would seem to be relevant.
```

1          MR. LANGAN:  All we did in our confidentiality was do

2     amount of compensation.  We tried to follow his honor's ruling and

3     the other stuff, that was the whole point.  So I don't understand

4     what we're talking about.

5          THE COURT:  Anthony has something to say.

6          MR. IRPINO:  I think that's helpful to make sure that

7     that's clear.  I am not say anything different from Steve, but just

8     to make sure that it's clear.  You had the designate page and line

9     just to know what area, but even though the page and lines are

10    designated they just weren't the actual dollar number is my

11    understanding.

12         THE COURT:  They want the actual dollar number redacted

13    is what they're asking for.  But you all certainly can talk about

14    was your bonus tied to blank.

15         MR. HERMAN:  I'm thinking of things that are already in

16    depositions and/or in documents, and if they've won a motion in

17    limine, then -- and it's inadmissible, then it can be redacted for

18    all purposes.  But I assume that there is some information that

19    they consider to be confidential and/or personal that the judge has

20    not made an in limine ruling on that we believe is admissible, and

21    I think there should be a clear distinction between redacting

22    something from the public or the press because it's "confidential

23    or personal" and redacting it from what is actually admitted into

24    evidence.

25              THE COURT:  But do you see that's why I asked the four

```
1    questions and I asked you to look at what they said they believe
2    needs to be redacted and tell us whether you agree, whether you
3    don't intend to use it, whether you disagree, et cetera.
4             MR. HERMAN:  Okay.  Maybe we need to have two responses,
5    one on admissibility and one on what we agree is private.
6             MR. LANGAN:  And trade secret.
7             MR. HERMAN:  There's two separate issues is guess is the
8    potential point of confusion.
9             THE COURT:  Okay.  So tell us what you think the issues
10   are so we can all be clear.  One is trade secret.
11            MR. HERMAN:  One is whether information is either trade
12   secret or personal in such a way that it should not be released to
13   the public.
14            THE COURT:  Correct.
15            MR. HERMAN:  That's one issue.  The other issue is
16   whether something is relevant and admissible into evidence.
17            THE COURT:  Okay.
18            MR. BARR:  Your Honor, Brian Barr.  One thing that was
19   said that I wanted to provide some clarification on because you
20   mentioned sand reservoirs a couple of times.  Whether or not that's
21   relevant for Phase One, not my issue.  But something like that
22   would be very relevant for Phase Two, which goes directly to what
23   Steve is talking about with if it's a trade secret, that's fine, it
24   doesn't go to the public.  But it's still admissible to the court
25   because it's going to be something that's very relevant to the
```

 1   quantification issue.

 2            THE COURT:  We are not talking about reservoir

 3   information in most cases for the Macondo well, we're talking about

 4   reservoirs for other areas of the Gulf; and I can't say see that

 5   this is either relevant and I certainly believe it's trade secret,

 6   so.

 7            All right.  Mr. Underhill, are you going to speechify?

 8            MR. UNDERHILL:  No.  I am actually going to try to solve

 9   some problems.

10            THE COURT:  Thank you.  I appreciate that.

11            MR. UNDERHILL:  First of all, this is not a speech, we

12   are trying to avoid work for the court, we hope you understand

13   that.

14            THE COURT:  I do understand that.

15            MR. UNDERHILL:  And so in that vein some of the documents

16   that we're assuming are confidential -- and I think we're talking

17   about Transocean -- Andy will be pleased to note that I'll

18   compliment BP, we think that their list of confidential documents

19   was very circumspect, very reasonable.

20            THE COURT:  It was.

21            MR. UNDERHILL:  Halliburton has done a pretty good job,

22   and Anadarko we thought did a pretty good job.  Our primary dispute

23   is with Transocean.

24            THE COURT:  I agree.

25            MR. UNDERHILL:  Rather than debate the issue, we've done

1    it enough, what I would ask the court ask Transocean to provide is

2    a list of all of the documents that they designated confidential

3    that have made and been available to the MBI and to Congress,

4    because I think we're assuming that these are not already publicly

5    available.  I haven't checked their web site to know if I can click

6    on them there.  But I suspect that their database is accessible,

7    they can say whether these documents, yes or no, have been

8    submitted to other investigative bodies.  I think it might simplify

9    our process.

10           The second point is a clarification with Andy on the

11   issue of seismic and downhole.  I don't know the scope of what Andy

12   is talking about.  If he is talking about seismic and downhole

13   information on the Macondo well, that's this case.  It probably

14   doesn't affect -- actually it does affect one of the government's

15   experts Dr. Huffman, who it's pore pressure fracture gradient and

16   that's what that is all about.  So if we were to redact all of that

17   information, if we started now, we might be done in a couple of

18   months.  Sincerely.

19           And Dr. Pritchard, not our expert, but the PSC's, he has

20   a lot of information, or David Pritchard in his report that has

21   downhole information about pore pressure fracture gradient, all

22   kinds of these issues.  So I am not clear what Andy is talking

23   about on that.  If it's non-Macondo well then we think, for our

24   part we don't think it's relevant anyway.  If it's Macondo well,

25   it's highly relevant and we're talking about a wealth, literally a

1    wealth of documents that I think all parties, including BP, intends

2    to seek admission.  So I would just like clarification on what he

3    is talking about.

4              MR. LANGAN:  So I have to consult.  Can I take this up

5    with Mike off line?  He raises some valid points and I just need

6    some clarity from our team, but I hear what he is saying.  Is that

7    okay?

8              THE COURT:  Yes, sure.

9              MR. LANGAN:   Thank you.

10             Relative to looking to the MBI, what's your take on that,

11   Carter?

12             MR. WILLIAMS:  Your Honor, our take is that some of these

13   documents probably were submitted to congressional committees or

14   the MBI, but we made a claim of confidentiality there, too, and to

15   our knowledge they are not publicly available.

16             THE COURT:  All right.  You will check that as part of

17   your review?

18             MR. WILLIAMS:  I will.

19             THE COURT:  Thank you.  All right, Guys, so that will be

20   covered, Mike.

21             Okay.  Mike O'Keefe and I will try to get on the phone

22   with Jordan today and update him on our conversation today and make

23   sure that he is prepared to hear from each of you once the process

24   is completed.

25             Are there any other questions with regard to this?

1          MR. FITCH:  That was easy enough.

2          THE COURT:  Yes.

3          Okay.  On exhibit lists, we're still going to have some

4   straggling additional exhibits coming in because of the depositions

5   that have recently been taken.  Whose got the master list, is that

6   you, Andy?

7          MR. LANGAN:  I believe so.  I know we submitted an

8   updated list per the schedule yesterday for BP.

9          THE COURT:  Right.  I am just thinking that what we do is

10  we do the master list maybe Thursday of next week with any

11  straggling exhibits on it.  So will everybody focus on that, the

12  depositions that we took were Gagliano, Ravi and Houck, those

13  should be the only stragglers, and otherwise we should have a final

14  exhibit list.

15         MR. LANGAN:  And I don't recall, is it BP's

16  responsibility for the master list?

17         THE COURT:  I don't know.  Who was it?

18         LAW CLERK:  PSC's responsibility.

19         THE COURT:  PSC's responsibility.

20         MR. BREIT:  Steve Herman.

21         MR. HERMAN:  I was sitting silently hoping that Andy

22  would volunteer.

23         MR. LANGAN:  I knew that it wasn't us.

24         THE COURT:  You should have said it wasn't you.  Yeah,

25  you should have said it's not me, it's Steve.

1          MR. HERMAN:  Very gracious.  I think your Honor already

2    ordered us to put together something by the 26th.

3          MR. LANGAN:  We took the witness list, we thought that

4    was a fair trade.

5          THE COURT:  You did, thank you, it was fair.

6          MR. HERMAN:  If I could just request everyone.  I think

7    at least one party already has, but if you can send us whatever

8    your additional exists are in an Excel spreadsheet instead of just

9    in a PDF, it would be helpful.  Thanks.

10         THE COURT:  Okay.  Thank you.

11         Here you go, another long discussion, hopefully not.  We

12   raised the issue and Steve Herman talked about the difference

13   between consideration exhibits and reliance exhibits.  So we've

14   narrowed the universe.  Reliance exhibits are not going to come

15   into evidence en mass.  If during the course of an expert's direct

16   or cross-examination, any exhibit issues, then the exhibit can be

17   offered into evidence and Judge Barbier will rule on it.  If an

18   exhibit, including a reliance exhibit is not used during the course

19   of the trial, it will not come into evidence.

20         Now, anybody want to talk to me about that?  Oh, that was

21   a shorter conversation than I expected.  Thank you.

22         MR. UNDERHILL:  Can I ask for clarification on that?

23         THE COURT:  Sure.

24         MR. UNDERHILL:  On the consideration exhibits, there may

25   be documents that, let's say, that we would want to cite to in post

1    Phase One trial findings and conclusions that the parties propose,

2    but they may not be worthy, frankly, of trial time to take up the

3    court's time to just get it in the record to cover our tails.  What

4    we were thinking one way to do it is that -- to be honest and I'll

5    confess to it, we did it, too -- I think all of the parties padded

6    their lists, we didn't want to be foreclosed.  And, well, two

7    months before trial you don't know what you're going to do.

8              THE COURT:  Absolutely.

9              MR. UNDERHILL:  So now we're getting down to the

10   nitty-gritty and making our cuts.  What we were thinking might be

11   practical, and rather than burning court time, take what we felt

12   were the exhibits, the consideration exhibits truly worthwhile we

13   would want the court to potentially look at or cite to, and simply

14   put them in a list; and if we need to have the witness say on the

15   stand, yes, I relied upon these documents, end of story, and then

16   those are moved in on the Thursday afternoon sessions, we think

17   that might be a practical way to handle it.

18             THE COURT:  Well, but let's stop for a minute, because it

19   that document is a treatise --

20             MR. UNDERHILL:  I am not talking treatises.

21             THE COURT:  What are we talking?

22             MR. UNDERHILL:  Well, it could be an e-mail, I don't

23   know, it could be any document, but not treatises.

24             THE COURT:  Okay.  And if it is treatises, then just the

25   pages that are being relied upon.  I don't want treatises dumped

```
 1    into the record, it does no one any good.

 2             MR. UNDERHILL:  I understand.  That's not what I am

 3    talking about.  Let's say there are ten e-mails, two daily activity

 4    reports from the rig, and 15 other X, Y, Z's --

 5             THE COURT:  That otherwise have not been offered into

 6    evidence with the fact witnesses --

 7             MR. UNDERHILL:  And frankly, probably aren't worth the

 8    trial time of having the witness go in, yes, I relied upon it and

 9    this is what it is, just to make the paper record, we don't think

10    that's an efficient use of the court's time or ours.  But yet there

11    might be a few documents, and I think that the court hopefully will

12    trust the parties, all of us, our discretion not to do what we did

13    in the exhibit list to truly make your final cuts which you think

14    you will likely rely upon your documents in the proposed findings,

15    that would be my suggestion to handle these consideration exhibits.

16             THE COURT:  Okay.  PSC, any comment?

17             MR. HERMAN:  That's fine with us.

18             THE COURT:  Andy?

19             MR. LANGAN:  Your Honor, I think that as long as it's

20    handled discretely and surgically and not en mass, I think all of

21    the parties would benefit from some opportunity to make sure their

22    bases are covered for things they truly intend to rely on, so I

23    think there's something that can be worked out.  We were just

24    always trying to avoid the massive --

25             THE COURT:  The dump.
```

```
 1              MR. LANGAN:  The dump.

 2              THE COURT:  So we're using reliance a little differently

 3     at this point.  What we're talking about now are exhibits that the

 4     experts may have relied on and which the parties want to rely on in

 5     their findings of fact and conclusions of law.  So it's not just

 6     any reliance exhibits, it's the smaller category of you all want to

 7     perhaps rely on these documents when you submit your findings of

 8     fact and conclusions of law?

 9              MR. LANGAN:  And, of course, as has been stated in this

10     courtroom many times before, the fact that an expert relies on

11     something doesn't make it admissible.  Obviously.  So, all of this

12     is subject to the rules of evidence.

13              THE COURT:  Yes.  I mean, there are a lot of things that

14     the experts may have relied on that they are entitled to rely on,

15     but are not admissible at the trial, and we all know that.

16              But thank you for the clarification, that's right, Andy.

17              All right.  Okay.  Let's talk about the problem that we

18     are encountering with the Anadarko stipulations, and that's going

19     to involve Steve O'Rourke, who is not paying attention --

20              MR. O'ROURKE:  I was paying attention to him.

21              THE COURT:  -- and Anadarko.  Yes, come on up.

22              MS. KUCHLER:  Who is paying attention.

23              THE COURT:  Who is paying attention.  Okay.  Tony.  I

24     haven't gone all the way through your letter I must admit.

25              MR. FITCH:  Understandably.
```

```
 1              THE COURT:  I went pretty far into it.

 2              MR. FITCH:  And you get the idea, and I much appreciate

 3  it.

 4              THE COURT:  I do get the idea.  So your position is these

 5  are the facts, why isn't the U.S. stipulating to them; is that

 6  fair?

 7              MR. FITCH:  In large part, yes, ma'am.

 8              THE COURT:  Okay.  Steve, let's hear from you.

 9              MR. O'ROURKE:  Steve O'Rourke for the United States.

10  Judge, the short version here is that the person who spearheads our

11  Anadarko part of our case was out of town for two days, so later

12  this afternoon we are going to send them counter proposal language.

13              THE COURT:  Good.

14              MR. O'ROURKE:  We will probably also send some vitriolic

15  letter to go along with it.

16              THE COURT:  CC me on that, you hear.  Make sure to cc me

17  on that one, that would be fun reading this evening.

18              MR. FITCH:  Where is the sympathy here?

19              MR. O'ROURKE:  But the short version is, they sent us

20  requests for admissions, they were substantially similar to these,

21  we didn't agree.  We proposed counter language.  On the summary

22  judgment motion they had proposed -- sorry, they had a statement of

23  undisputed facts, we didn't agree, we had counter language.  The

24  stipulations, same version, we didn't agree.  Now we're on the

25  fourth time, now it's a letter saying agree again, and we're going
```

```
 1   to send them back the same language saying we can't agree the way
 2   you wrote it, we'll agree on this other thing.
 3            THE COURT:  When you do that, would you put their
 4   proposal and your counter proposal so I can look at it side by
 5   side?
 6            MR. O'ROURKE:  Sure.
 7            THE COURT:  With your vitriolic letter.
 8            MR. O'ROURKE:  Yes, ma'am.  We're really talking about
 9   tweaks here, they say they have no involvement in the topic.  You
10   had no involvement in the topic, they approved authorizations, they
11   monitored it, they had access to data, they were in a contract,
12   that's involvement.  We have counter language that will get their
13   point, it's the same one we've done every time.  Thanks.
14            THE COURT:  Okay.  Thank you.  I appreciate the
15   clarification, and we'll try to work through that next week.
16            MR. FITCH:  I very appreciate it with all of the other
17   stuff you have to do.
18            THE COURT:  Okay.  Let's move on to demonstrative
19   exhibits.  Does anybody have anything that is particularly
20   bothering them about our earlier pronouncements?  Is there any
21   uncertainty, any clarity that needs to be brought to bear?
22            Good morning, David.
23            MR. BECK:  Good morning, your Honor.  This has to do with
24   demonstratives.  As the court will recall, last week I raised this
25   question about when the parties actually had to exchange
```

1    demonstratives, particularly when you weren't sure what you were

2    going to do.  I want to ask for a clarification by the court,

3    because after looking at the demonstrative aids which the parties

4    have already exchanged, it's -- we're reasonably sure that we're

5    now going to want certain particular type demonstrative aids.

6           The question I have is, do we exchange those as quickly

7    as they're finished or do we wait until a week before our case in

8    chief when we're definitely going to use them?  Whatever way the

9    court rules is fine with us, but I just didn't want to be in the

10   situation of somebody saying, wait a minute, you had those prepared

11   six weeks ago or you finished preparing them six weeks ago, you

12   should have produced them then.  So I just need a clarification.

13          THE COURT:  Okay.  So let's talk about that.

14          MR. HERMAN:  We're okay.  We don't care, we're fine.

15          THE COURT:  Everybody wants to wait until a week before?

16          MR. BREIT:  Except, just for David though.

17          THE COURT:  So just for Cameron it will be a week before,

18   but for everyone else you want it now; is that right?

19          MR. BREIT:  Yesterday, Wednesday.

20          THE COURT:  Is everybody comfortable now that any further

21   changes, modifications, or additions can be exchanged a week before

22   your projected use?

23          MR. LANGAN:  I think the seven day notice rule is going

24   to work fine.

25          THE COURT:  Fine.

1          MR. LANGAN:  I think the court maybe added a good cause

2     thing here, did you really mean that?

3          MR. BECK:  That's what really triggered my question when

4     I saw that good cause reference in there.

5          MR. LANGAN:  It sounded to me like a week ago.

6          THE COURT:  I think responding to somebody else's

7     demonstrative is good cause.

8          MR. LANGAN:  Okay.  There we go.

9          THE COURT:  There you go.  I can't remember what my

10    thinking was when I added good cause, but I specifically added it

11    to make sure that I guess we didn't have any foolishness.  I don't

12    know what my thought process was, Andy.  But I do think responding

13    to someone else's demonstrative is good cause.

14         MR. LANGAN:  All right.  All right.

15         THE COURT:  So the seven day rule applies, even if you

16    know what you're going to do now, David --

17         MR. BECK:  We can wait.

18         THE COURT:  -- you can wait.  Thank you.

19         MR. LANGAN:  So in terms of clarification, and I think

20    Mr. Kavanaugh's e-mail yesterday touched upon, maybe this is a

21    demonstrative issue, maybe it's a deposition issue, but people

22    intend to use video clips, not for impeachment, put aside the

23    question of impeachment, but just as part of their case in chief

24    given the fairness and completeness rules it seems like there ought

25    to be a process for disclosure of those, and we just wanted to have

```
1     that on the radar screen.  In fact, Mr. Roy mentioned that it might

2     be a first week of trial issue, so it might be timely.

3              THE COURT:  Yes.  And I do think we need to cover that.

4     Now remember what Judge Barbier said about that, he doesn't want to

5     watch hours of video depositions.  Not what we're talking about.

6     Paul, I believe your position is very short clips --

7              MR. STERBCOW:  Correct.

8              THE COURT:  -- of questioning that you believe is

9     important for Judge Barbier to view in judging the credibility of

10    the witness.

11             MR. STERBCOW:  And if necessary for context between one

12    witness to the next.  That's what we contemplate.  We don't see

13    this as being a big deal, we're not going to do a lot of this, we

14    don't think, we don't anticipate, but what we wanted to make clear

15    based on the e-mail yesterday is that if we wanted to play -- first

16    of all, we will disclose for the following week's witness, we are

17    going to play ten minutes of whoever.

18             THE COURT:  And what ten minutes.

19             MR. STERBCOW:  As part of the disclosure.  I didn't like

20    that, but we'll consent to that.  Okay.  I am past that now.

21             But what we don't want to do is have to put together some

22    movie of our clip, all of the defendants clips, and then pop it in

23    at one time, it's untenable.  And it destroys the presentation of

24    our case.  The judge needs to know what evidence the PSC is putting

25    in through a video, and then to the extent any other defendant
```

1    follows us and wants to put their evidence in, they can do that.

2          But the wording of the e-mail mentions the term

3    contemporaneous and that's what caused us pause.  Okay.  If we want

4    to play 20 minutes of Tony Hayward, we'll put it on, we'll let them

5    know it's coming and play it.  Then if Transocean comes behind us

6    and says, well, we want 15 minutes, that's their business and they

7    play it as part of whatever they're going to do in response or BP

8    or whoever it is.

9          MR. MILLER:  We agree with Paul's proposal, we think that

10   makes sense.

11         THE COURT:  That was Kerry Miller saying that Transocean

12   agrees.  Come on up, Andy.

13         MR. LANGAN:  Your Honor, I am not sure I disagree.  All I

14   would say whether it's video or a deposition, we just want to have

15   the rules of fairness and completeness apply.  So if we get notice

16   about what they intend to play by page and line or whatever it is,

17   then it's up to us, I think, to come forward and say for fairness

18   and completeness, your Honor, you need to hear the following

19   additional 30 seconds.  Just like you would if someone was reading

20   a dep.  We're not talking about new matter, we're talking about

21   fairness and completeness.  And all we're asking for is notice.

22         THE COURT:  But, Andy, the distinction is that you're

23   saying that for fairness and completion you would play it following

24   the PSC's video clip?

25         MR. LANGAN:  I think that's what the federal rules

1    provide for.

2             MR. GODWIN:  Fairness and completeness.

3             MR. LANGAN:  Fairness and completeness, not new matter.

4    You cut off the witness, let him compete his answer kind of stuff.

5    Maybe it's a non-issue, but again, all we're asking for is that the

6    fairness and completeness rules apply, and for that we need notice

7    and we can raise any issue, that's all.

8             THE COURT:  Okay.  David.

9             MR. BECK:  David Beck for Cameron.  I agree with the PSC

10   on this, we are going to have enough trouble and difficulty from

11   day to day getting ready for witnesses to cross-examine and so on.

12   I frankly don't want to be in the position of getting ready to play

13   a video clip and have somebody come up to me and say, now, David,

14   page 183 the witness also said this, you need to plug this in or

15   we're going to interrupt your cross and plug this in.  It seems to

16   me Judge Barbier is going to have the entire deposition anyway.  Or

17   the relevant portions of the deposition.  So I don't know why a

18   party on who wants to play something else can do it in their part

19   of the case.  I think it allows the examination, cross and

20   otherwise to move much more smoothly and it lets everybody get what

21   they want.

22            THE COURT:  Well, I think what Andy said, and, Andy,

23   correct me if I'm wrong, the only thing he is worried about is that

24   you, I won't point at the PSC, but you designate question, answer,

25   question, partial answer and he wants to play the rest of the

```
 1    answer.  I think that's all we're talking about.

 2              MR. LANGAN:  That is correct.  Every trial lawyer knows

 3    the difference between new matter and fairness and completeness,

 4    we're just talking about the latter.

 5              THE COURT:  So I think that's all we're talking about.

 6    So I don't think it's going to be a problem if Paul doesn't stop

 7    the testimony in the middle of an answer, then we shouldn't

 8    encounter Andy's problem.

 9              MR. STERBCOW:  Well, I agree except it's hard for me to

10    stand here now and stay if the answer is three pages and the answer

11    to the question is one page, I don't have to play three pages.  It

12    seems to me if I am not misleading the court, then I play what I

13    want to play.  If I am taking things out of context and making an

14    answer sound like the guy is saying "a" where he really said "b" --

15              THE COURT:  Which I know you're not going to do.

16              MR. STERBCOW:  Which we're not going to do, that's

17    exactly right.

18              THE COURT:  So, Andy, I am going to reserve your issue,

19    shall let's see the designations are and see if you have a problem.

20              MR. LANGAN:  We just want notice and if there is an issue

21    we raise it.

22              THE COURT:  Seven days notice of the video clip

23    designation.

24              MR. LANGAN:  Right.

25              THE COURT:  And if you have a problem, you raise it.
```

1          MR. LANGAN:  Then the trial judge will presumably follow

2    the rules, and we may win some and lose some.  We know that.

3          THE COURT:  Okay.  All right.  And remember, don't push

4    the envelope on how long these clips are.

5          MR. STERBCOW:  We won't.

6          MR. GODWIN:  We would support Andy's view on that in that

7    it seems to me it will be difficult if the PSC notifies us on

8    Wednesday that they're going to have a video clip and then they

9    then the following Monday or Tuesday they play it.  And if my

10   client doesn't come up for two days to be able to cross-examine the

11   witness, when we come up then with the video clip to respond to

12   what Paul may have put in for two minutes, it's going to be out of

13   context.

14         So I think for fairness and completeness, I agree with

15   what Andy says, we need notice of it and we need be able to have

16   our option of completeness and favorable completeness evidence put

17   on immediately following the running of their clip.

18         THE COURT:  There's a difference between fairness and

19   completeness and presenting the favorable testimony.  I think you

20   go too far when you talk about presenting the favorable testimony.

21   Andy is just talking about completeness.

22         MR. GODWIN:  Well, and that's what I am talking about,

23   but whether it's favorable or unfavorable, nobody is going to read

24   the unfavorable testimony so we have to assume that they're going

25   to play only favorable testimony.  So I am just suggesting that I

1    think, and I am agreeing with Andy, we get notice of it, they put

2    on a video clip, we have a right to respond.  And obviously if we

3    come up there and we start putting things in that Judge Barbier

4    disagrees with, he is going to tell us no pretty quickly.

5          But I do think that we need to help keep it in context.

6    When they play a video for a minute and a half of what Dr. Ravi

7    said, I want to be able to respond briefly with what I think his

8    well-established and complete record at that moment.

9          THE COURT:  Well, I am not going that far with you, Don.

10   I think that's a completely different issue than what Andy raised.

11   So I am not going to go that far with you.  Now, if Judge Barbier

12   allows it, fine.  But I don't think that other than completing the

13   witness's answer that you get to present your case.

14         MR. GODWIN:  Don Godwin again for Halliburton.  I really

15   wasn't talking about presenting our case, Judge, as much as if a

16   question is asked and there's an answer given and we believe the

17   answer is not complete and then the next question comes up, we want

18   to be able to follow with the next question or two and answer just

19   to complete it so that it's not out of context is all I am

20   suggesting; not to go into 25 pages later and pull out some stuff

21   to put it in, that could be viewed as material that is not

22   responsive.  That's what I'm talking about.

23         THE COURT:  That narrows it somewhat.

24         MR. GODWIN:  Thank you, Judge.

25         MR. STERBCOW:  All of this is already in the record, I am

1    not pulling this out of a vacuum.

2            THE COURT:  It's already in the record.  And the purpose

3    for playing the video clips -- and you will have the same right,

4    Don -- is to select very limited testimony that you think the judge

5    should view to judge the witness.

6            MR. GODWIN:  Right.  Thank you, your Honor.

7            THE COURT:  Okay.  Now, relative to live feeds.

8    Everybody understands no live feeds of realtime transcripts outside

9    of the courthouse.  I am sorry for any confusion on that, but we

10   are prohibited by the Administrative Office of the U.S. Courts from

11   doing so.  So we can't get it to your satellite offices, we're

12   prohibited from doing it.

13           MR. MILLER:  Your Honor, one question on that.  Kerry

14   Miller for Transocean.  And to quote my friend Andy Langan, we get

15   it.  My understanding of live feeds in the courthouse and exactly

16   what that entails is there are two overflow courtrooms, 216 in the

17   building across the way and this courtroom, correct?

18           THE COURT:  Right, right.

19           MR. MILLER:  And in room 316 and in this courtroom,

20   you're going to have audio, plus the exhibit on the screen, across

21   the way, for example, and here, plus the realtime feed available,

22   right?

23           THE COURT:  Not the realtime feed on a screen.  If you

24   have --

25           MR. MILLER:  If you have audio --

1          THE COURT:  If you have subscribed for realtime, you can

2    sit in there with your laptop and view the realtime.

3          MR. MILLER:  But in this particular room, for example,

4    you're going to have audio piped in, you can hear the witness,

5    we'll hear the lawyers, we'll hear Judge Barbier --

6          THE COURT:  Yep.

7          MR. MILLER:  -- and we'll see whatever exhibit or video

8    is being displayed at the time.

9          THE COURT:  Is being displayed at that time, right.

10          MR. MILLER:  Now, with respect to all of the war rooms

11    that we all have in the Hale Boggs complex.  In those war rooms

12    we're just going to have access to the realtime feed?

13          THE COURT:  Realtime feed.

14          MR. MILLER:  No audio or evidence feeds.

15          THE COURT:  Correct.  Okay.

16          LAW CLERK:  Your Honor, yesterday in the conclusion of

17    the dry run, I told some of the people that the overflow courtroom

18    was the courtroom across the hall from Judge Barbier and that's not

19    correct.

20          THE COURT:  And that's not correct.  The overflow

21    courtrooms:  Third floor of the courthouse, room C-316, and this

22    fabulous courtroom, room B-309.  You all are very used to being in

23    here, come view it here.  Okay.  So those are the two overflow

24    courtrooms.

25          And we think the dry run with the technical people

1   yesterday went very well.  At the end of today's meeting I would

2   like to meet with the defense side of the case to talk about how

3   we're going to work things out as far as seating from your point of

4   view, I don't want to spend time in the group with that.

5            MR. LANGAN:  Along those lines?

6            THE COURT:  Yes, sir.

7            MR. LANGAN:  This is not anything official or not

8   anything approved, but we did come up with a tentative map that I

9   have shared with this group.

10           THE COURT:  Good.

11           MR. LANGAN:  We are making progress.  Would your Honor

12   want a copy?  Again it's not approved.

13           THE COURT:  I thought what we might do is go over to the

14   courtroom together and figure it out today.

15           MR. LANGAN:  In the meantime I will hand up two versions

16   of it, and I think we're fairly close but there is no agreement

17   yet.

18           THE COURT:  Okay.  Well, when we finish up, we can take a

19   break and meet over there and see if we can't get it completed so

20   everybody knows where they are and we've got it done, one less

21   thing to do.

22           MR. LANGAN:  And I do think we need to talk about the

23   media rows, we saw Judge Barbier's order from this morning, which

24   is slightly different than that -- but whatever.

25           THE COURT:  A few tweaks, a few tweaks.

1          MR. LANGAN:  We would like to talk about that, too, at

2     the appropriate time.

3          THE COURT:  Do you want to cover that now?

4          MR. LANGAN:  Just this, your Honor, and Mr. Miller

5     pointed this out to me.  I do think there is going to be a need for

6     some dedicated defense rows, maybe more than one row in the

7     courtroom.  So anyway.  And we have to accommodate the media, too,

8     of course, but there may be better ways and we just need to talk

9     about that.  And Kerry may have more specific suggestions.

10         THE COURT:  Okay.  We'll cover that when we get over

11    there.

12         MR. MILLER:  I think that's right, I'll cover that.  I

13    have some specific ideas.  It's kind of like at a wedding, your

14    Honor, we need some tables reserved for the family since the family

15    has to take pictures and do things.

16         THE COURT:  Speaking of which, Corey, could you put on

17    the ELMO for us, take that off, and I think you'll see -- no, there

18    should be -- is there another piece, a picture of a table?  This

19    has been approved, thank you, Alan York, by Judge Barbier for use

20    in the courtrooms.  You can go to Amazon.com, Table Mate II.  It

21    comes in several finishes.  It is 29.99, which means you don't

22    qualify for the super saver shipping if you only buy one.

23         MR. MAZE:  I thought you got it for $25?

24         THE COURT:  Is it $25, I thought it was 30.

25         MR. HAYCRAFT:  If you're a prime Amazon customer.

1          THE COURT:  I am not an Amazon prime customer.  So 29.95

2     and it folds up, and so get it in any -- wood grain or any other

3     finish that it's available.  And you, too, can have a work table in

4     the courtroom.

5          Mike O'Keefe wants to know if you can use it as a ladder

6     on Mardi Gras, it does not look sturdy enough.

7          All right.  Guys, Judge Barbier would like for the first

8     day of trial a list of those trial attorneys who will be making

9     appearances for the record on the first day.  His courtroom deputy,

10    who is with us today, needs to keep the minutes, and so we're not

11    looking for all attorneys who may come at some point during the

12    course of the trial, we are looking for a short list of trial

13    attorneys who he will ask to make an appearance for the record and

14    then have a record of who they were.  So could you funnel that very

15    brief list to Mike O'Keefe and me and we will compile it for Judge

16    Barbier.  Thank you very much.

17         Transocean raised the issue of order of examination of

18    witnesses.  It gets very complicated, Kerry, and I am inclined to

19    say --

20         MR. MILLER:  Take it as it comes.

21         THE COURT:  -- take it as it comes, let's stick with the

22    order, unless you raise it with Judge Barbier and he says, yeah,

23    that's fair, go ahead and ask a few limited questions.  Okay?

24         Yes, David.

25         MR. BECK:  David Beck for Cameron.  I just need a

1    clarification.  When you said this is fair, I am not sure what

2    you're talking about.  Are you talking about the proposal that was

3    made or just let Judge Barbier deal with the issue?

4         THE COURT:  Judge Barbier is going to have to deal with

5    the issue.  I just don't think we can anticipate changing the order

6    for every witness and the alignment of the parties.

7         MR. BECK:  Because we really want to be heard on this

8    issue.

9         THE COURT:  I think we have to just go in the order that

10   we've got it done, and if you stand up and say, Judge, we have some

11   limited questioning of this particular witness that we would like

12   to do out of order, let him take it up.

13        MR. BECK:  Okay.  Thank you.

14        MR. MILLER:  I think that's right.

15        THE COURT:  I just can't anticipate.

16        MR. MILLER:  No hard and fast rules.  The point, David,

17   last week was with respect to the way that the allocation has come

18   out and, you know, PCS, DOJ, States first and then Transocean and

19   Halliburton and then BP and then the parties that have settled with

20   BP is kind of the order that they came out.  The point I made and

21   the objection I would likely make in trial is if BP cross-examines

22   a Transocean witness, for example, or a Halliburton witness,

23   because Transocean is not asserting punitive damage claims against

24   Cameron or Clean Water Act claims against Anadarko and MOEX, we

25   don't think it's proper for you to conduct an examination of our

1    witnesses as if you were BP.

2         MR. BECK:  I can assure you I am not going to be BP

3    during the course of this trial.  So, I mean, I guess we just deal

4    with it at the time because we do have serious problems.

5         THE COURT:  I cannot, David, anticipate every eventuality

6    that's going to arise during the course of the trial, but the

7    general rule is going to be the default allocation of order of

8    witnesses, and that's the best I think we can do.

9         MR. MILLER:  Somebody had a question about this, I think

10   I know the answer.  When you did the order of allocation, you did

11   it for opening statement and you assigned time.  The time was just

12   for opening statement, right?

13        THE COURT:  Yes, yeah.

14        MR. LANGAN:  That's a very interesting idea though.

15        MR. BECK:  It better be, I got ten minutes.

16        MR. MILLER:  That's an interesting question and I said I

17   would ask.

18        MR. LANGAN:  Is there some momentum for this?

19        THE COURT:  Yeah, Judge Barbier.

20        MR. MILLER:  I am just checking off a box.  There are no

21   time limits in place right now --

22        THE COURT:  There are not, but there could be if you all

23   abuse his patience.

24        MR. MILLER:  Got it.  I was right.

25        THE COURT:  And so word to the wise.  But there are no

1    current time limits on any of the parties during the course of the

2    trial.

3            Okay.  I am going to get out a memo to you guys about

4    access to the federal courthouse, coming and going during the week,

5    what you can and cannot do.  I am going to try to make it as

6    crystal clear as we possibly can, because the more tired we get the

7    more ambiguities there are, at least in your eyes.

8            But here is the general thing.  We're going to ask you to

9    give us some telephone numbers so court security can contact

10   someone up in your offices or down in your offices, as the case may

11   be, if they need to get in touch with you.  Liquids are not allowed

12   in through court security, so we're going to allow you all to bring

13   in supplies on Fridays, which is our day off.  You can bring in

14   cases of water, cases of soft drinks, all of your food supplies for

15   the week so that we don't slow down security during the time that

16   you're in trial, so Friday is your supply day.  We will try to get

17   that out to you today.

18           Let me see if there's anything else on there that I

19   wanted to highlight for you.  Ordering lunch, I would like you all

20   to try to have the same person regularly be the person to go

21   downstairs and meet the person who is making the lunch delivery

22   outside of the courthouse so the court security will get to know

23   that person and they can just come in to the courthouse with it.

24   They should be down to meet deliveries, but if they're not, we

25   would like contact information to call them and get them down there

```
 1    and get it in to you.  Because I think you're only going to have an
 2    hour, so we want it ready for you.  And so we will get that out to
 3    you today.
 4              Is there anything else that you all are concerned about
 5    that you want me to cover in this memo?  Because it will be my last
 6    communication with regard to access to the courthouse.
 7              So anything else that you all are concerned about?
 8              MR. BECK:  Judge, just a quick question.  I've seen
 9    conflicting times for when we begin trial, I've seen eight and I've
10    seen 8:30.
11              THE COURT:  I believe it's eight o'clock.  I mean, Judge
12    Barbier --
13              THE DEPUTY CLERK:  Definitely eight.
14              THE COURT:  Eight o'clock.  He gives you full trial days.
15              MR. MILLER:  Get your money's worth, right.
16              THE COURT:  You get your money's worth with Judge
17    Barbier.
18              MR. MILLER:  A couple of open questions about your
19    logistical memo from yesterday, as I recall.  No. 1 is, printers in
20    the courtroom, Mike, we had some discussion about it, you said no
21    dot matrix; and there was some question about, well, where we were
22    going to put them, jury room or along the wall, or something like
23    that.  I am not quite sure where that issue ended up.
24              THE COURT:  We will have to check that.
25              LAW CLERK:  We didn't get that resolved.
```

1          MR. MILLER:  I think the other one was is the court going

2    to have flip charts or white boards in the room, or do we need to

3    bring those in if we intend on using those?

4          THE COURT:  You can borrow my white board here, and I saw

5    that Judge Barbier has a flip board in his courtroom, right?

6          THE DEPUTY CLERK:  Yes, he does.

7          THE COURT:  Does he have a white board?

8          THE DEPUTY CLERK:  I don't think so.

9          THE COURT:  We will take my white board and you've got

10   it.

11         MR. MILLER:  So those will be provided and we don't need

12   to bring them in.

13         THE COURT:  Yes.  We'll bring it over if he doesn't.

14   Okay.  What else?

15         Okay.  Why don't we take a ten minute break, and defense

16   counsel, I will meet you over in Judge Barbier's courtroom to see

17   if we can't get your seating straight.

18         Thank you, phone participants.

19         THE DEPUTY CLERK:  All rise.

20       (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

21

22                         *  *  *  *  *  *

23

24

25

```
 1

 2

 3                     REPORTER'S CERTIFICATE

 4

 5        I, Karen A. Ibos, CCR, Official Court Reporter, United

 6   States District Court, Eastern District of Louisiana, do hereby

 7   certify that the foregoing is a true and correct transcript, to the

 8   best of my ability and understanding, from the record of the

 9   proceedings in the above-entitled and numbered matter.

10

11

12   _____

13                     Karen A. Ibos, CCR, RPR, CRR

14                     Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```