# Attachment D

# Preliminary Report from the WHOI Flow Rate Measurement Group
## Prepared by Team Leader Richard Camilli, Woods Hole Oceanographic Institution
### June 10, 2010

At the direction of the NIC's Flow Rate Technical Group and the U.S. Coast Guard Headquarters, the USCG Research and Development Center contracted the Woods Hole Oceanographic Institution (WHOI) to initiate on-site data collection and analysis of the DEEPWATER HORIZON oil spill.  As a part of this effort a team of experts led by WHOI and assisted by experts from the Johns Hopkins University, the University of Georgia and the Massachusetts Institute of Technology used acoustic technologies to conduct a direct analysis of flow rates.

This analysis is based on measurements collected after the top-kill attempt had ended and before the riser was cut, during Maxx3 ROV Dive #35 on May 31, 2010. The ROV was operated by Oceaneering International and supplied to the team by BP.  These measurements were recorded at two distinct sites, above the riser pipe and at the kink above the BOP. Flow estimates are derived from three different view angles above the riser pipe and three view angles above the BOP. These estimates are preliminary. This estimate is likely to undergo revision based upon further analysis of the remaining data.

Estimates are based on the following:

1.  Velocity profiles from the acoustic Doppler current profiler (ADCP). This device provides a measurement of the fluid velocity for a series of bins along each of four beams. The preliminary velocity estimates represent an average for each bin. The averaged beam velocity is transformed into a vertical velocity assuming zero horizontal flow. The average flow velocity was calculated assuming an axisymmetric Gaussian distribution.
2.  Plume cross sectional estimates from the 1.8MHz  multibeam sonar. 300 cross-sectional estimates were averaged for each site to obtain composite horizontal cross sectional areas.
3.  The flow velocity and area estimates were then multiplied to produce an ensemble estimate of the volumetric flow rate. This is a preliminary bulk flow estimate. The flow may contain gases, fluids, and solids including but not limited to natural gas, condensate, oil, sediments, and brine.

Data quality
1.  The signal quality of the ADCP measurements indicates that the Doppler velocity estimates are accurate. Likewise averaging the bins with respect to time and spatial transformations provides a representative figure for ensemble plume flow velocity.
2.  The maximum jet velocity is measured by the 60 deg upward pointing ADCP beam and is therefore not co-planar with the imaging multibeam sonar cross-sectional data. Therefore, unless a turbulent jet model is invoked, the volumetric flow rate calculation will represent a lower bound. By approximating the flow as an axisymmetric turbulent jet, a rate at the height corresponding to the cross-sectional area estimated from the multibeam sonar can be determined; this represents the higher bound estimate.
3.  A comprehensive understanding of the source composition (e.g., percentage gas, oil, sediment, brine) is needed to accurately estimate the petroleum leak rate and mass balance.
4.  Source composition can be determined through the collection and analysis of end-member samples at the leak origin using gas-tight samplers.
5.  Only a small subset of the data collected from field operations has been analyzed to produce this preliminary estimate.

Estimated flow rates:
**Riser:**            $0.076 \text{m}^3/\text{s}$ to $0.15 \text{m}^3/\text{s}$
**BOP kink:**         $0.040 \text{m}^3/\text{s}$ to $0.079 \text{m}^3/\text{s}$
**Total flow rate:**  $0.12 \text{m}^3/\text{s}$ to $0.23 \text{m}^3/\text{s}$

**WHOI Flow Rate Measurement Group Members:**
Richard Camilli (WHOI)
Andy Bowen (WHOI)
Dana Yoerger (WHOI)
Alexandra Techet (MIT)
Daniela Di Iorio (UGA)
Louis Whitcomb (JHU)

SPECIAL FEATURE

# Acoustic measurement of the *Deepwater Horizon* Macondo well flow rate

Richard Camilli[a,1], Daniela Di Iorio[b], Andrew Bowen[a], Christopher M. Reddy[c], Alexandra H. Techet[d], Dana R. Yoerger[a], Louis L. Whitcomb[a,e], Jeffrey S. Seewald[c], Sean P. Sylva[c], and Judith Fenwick[a]

[a]Department of Applied Ocean Physics and Engineering, Woods Hole Oceanographic Institution, Woods Hole, MA 02543; [b]Department of Marine Sciences, University of Georgia, Athens, GA 30602; [c]Department of Marine Chemistry and Geochemistry, Woods Hole Oceanographic Institution, Woods Hole, MA 02543; [d]Department of Mechanical Engineering, Massachusetts Institute of Technology, Cambridge, MA 02139; and [e]Department of Mechanical Engineering, Johns Hopkins University, Baltimore, MD 21218

Edited* by Marcia K. McNutt, US Geological Survey, Reston, VA, and approved August 11, 2011 (received for review January 25, 2011)

On May 31, 2010, a direct acoustic measurement method was used to quantify fluid leakage rate from the *Deepwater Horizon* Macondo well prior to removal of its broken riser. This method utilized an acoustic imaging sonar and acoustic Doppler sonar operating onboard a remotely operated vehicle for noncontact measurement of flow cross-section and velocity from the two leak sites. Over 2,500 sonar cross-sections and over 85,000 Doppler velocity measurements were recorded during the acquisition process. These data were then applied to turbulent jet and plume flow models to account for entrained water and calculate a combined hydrocarbon flow rate from the two leak sites at seafloor conditions. Based on the chemical composition of end-member samples collected from within the well, this bulk volumetric rate was then normalized to account for contributions from gases and condensates at initial leak source conditions. Results from this investigation indicate that on May 31, 2010, the well's oil flow rate was approximately $0.10 \pm 0.017$ m$^3$ s$^{-1}$ at seafloor conditions, or approximately $85 \pm 15$ kg s$^{-1}$ ($7.4 \pm 1.3$ Gg d$^{-1}$), equivalent to approximately $57,000 \pm 9,800$ barrels of oil per day at surface conditions. End-member chemical composition indicates that this oil release rate was accompanied by approximately an additional $24 \pm 4.2$ kg s$^{-1}$ ($2.1 \pm 0.37$ Gg d$^{-1}$) of natural gas (methane through pentanes), yielding a total hydrocarbon release rate of $110 \pm 19$ kg s$^{-1}$ ($9.5 \pm 1.6$ Gg d$^{-1}$).

Gulf of Mexico | oil spill | buoyant plume | buoyant jet | subsurface

A ccurate assessment of the hydrocarbon fluid release rate from well blowouts such as that of the *Deepwater Horizon* Macondo well provides fundamental information for evaluating intervention options to regain well control, properly scaling oil collection and containment operations, estimating the total spill volume, assessing environmental damage, and investigating well casing or blowout preventer (BOP) failure modes. On May 31, 2010, a direct acoustic technique was used to measure the volumetric flow rate of fluids (liquid and gas) emitted from the *Deepwater Horizon* Macondo well. This method, which adapts acoustic techniques previously developed for deep-sea hydrothermal vent research (1), enabled observation from a remotely operated vehicle (ROV) (Fig. S1) at horizontal standoff distances of between 2 and 7 m, providing a noncontact method of measurement wherein the sensors did not disturb the flow or become fouled with oil or gas hydrate accretions. Despite the optical opacity of the fluid, this acoustic technique enabled quantitatively detailed measurement of the leaks' cross-sectional areas and velocity profiles. This acoustic flow rate assessment was conducted on a "not to interfere basis" due to the well containment operations being carried out from late April through mid-July. Data were thus collected on an opportunistic basis during short time intervals between containment procedures.

Acoustic measurement commenced immediately following the unsuccessful "top kill" attempt, before the riser was removed and the lower marine riser package Top Hat #4 containment system was placed on top of the BOP. At this time the well's leaks were located in two distinct areas: a kinked section of the riser pipe immediately above the BOP's flex joint (28.7381° N 88.3660° W), and at the broken end of the riser approximately 225 m north-northwest of the well's BOP. Independent acoustic measurements were required at each site.

## Results

Horizontal cross-section images of fluids flowing from the well were recorded above each of the leak locations using the imaging sonar (1,089 cross-section images at $3.0 \pm 0.1$ m above the broken riser source, and 1,500 cross-section images $1.3 \pm 0.1$ m above the BOP-kink source), requiring between 3 and 4 min of acquisition per leak site (Fig. 1). To aid these operations, the ROV was equipped with a pair of parallel-sighting lasers that assisted in aiming the imaging sonar and Doppler sonar at the centers of the hydrocarbon leaks (Fig. S1). Cross-section area calculation was based on interframe motion tracking of acoustic returns using a standard threshold of 3.5 dB (signal-to-noise ratio of 1.5 : 1) or more above background noise (2), and flow areas were counted only if the contiguous area was equal to or greater than 0.01 m$^2$. The threshold for contiguous region was defined as an area larger than the Nyquist theorem limit of the imaging sonar's pixel resolution at a range of approximately 7 m. Using this method, the mean cross-section areas of the leak jets of the broken riser and BOP kink are 1.10 and 0.996 m$^2$, respectively, with the standard error of the mean for each leak site of ±0.005 and ±0.004 m$^2$ (equivalent to ±0.45 and ±0.42% relative standard error), respectively. Optical observation of flow width using the parallel-sighting lasers (0.1-m beam spacing) indicates that the acoustic cross-section values are valid (Fig. S2). The ROV's high-definition video camera was, however, uncalibrated and did not account for optical distortions, making it inappropriate for quantitatively precise size estimation.

At each of the two leak sites, the ROV was positioned facing the rising source fluids with vehicle headings of 120°, 240°, and 360°. Doppler sonar data were obtained with the ROV holding station in a fixed position within 0.5 m of a desired positional set point at each station for durations of approximately 5 min. The flow velocity data from a 60° upward pointing Doppler beam (Fig. S3) were postprocessed and combined with ROV navigation position estimates to compute the instantaneous vertical velocity for each ping ensemble within a 3D coordinate frame. The velo-

Author contributions: R.C., D.D., A.B., D.R.Y., and L.L.W. designed research; R.C., A.B., C.M.R., and S.P.S. performed research; R.C., D.D., A.B., C.M.R., A.H.T., D.R.Y., L.L.W., and J.S.S. contributed new reagents/analytic tools; R.C., D.D., A.B., C.M.R., A.H.T., D.R.Y., L.L.W., J.S.S., S.P.S., and J.F. analyzed data; and R.C., D.D., A.B., C.M.R., A.H.T., D.R.Y., L.L.W., and J.F. wrote the paper.

The authors declare no conflict of interest.

*This Direct Submission article had a prearranged editor.

[1]To whom correspondence should be addressed. E-mail: rcamilli@whoi.edu.

This article contains supporting information online at www.pnas.org/lookup/suppl/doi:10.1073/pnas.1100385108/-/DCSupplemental.

ENVIRONMENTAL SCIENCES



**Fig. 1.** Measured jet cross-section areas based on imaging sonar using motion tracking with a 3.5 dB (signal-to-noise ratio = 1.5:1) threshold at a horizontal plane 3 m above the broken riser leak source (*Upper*), and 1.3 m above the BOP-kink leak source (*Lower*). X-axis values denote the sample number, with a total of 1098 cross-section measurements taken for the broken riser leak and 1,500 cross-section measurements for the BOP kink. Measurements were recorded at a rate of approximately 6 Hz, for durations of 3 min at the broken riser site, and 4 min at the BOP-kink site. The periodic variability in cross-section areas for each of the leak sites is consistent with turbulent flow.

city calculations are based on an initial set of 42,270 broken riser and 42,894 BOP-kink Doppler sonar measurements.

The momentum length scale, $L_M$, of the jet sources, was approximately 0.6 m for the broken riser and 0.1 m for the BOP kink (*SI Text*). The differing source sizes and geometries may have influenced the length scale, with the BOP-kink leak site being made up of numerous small diameter sources acting as diffusers, whereas the broken riser was comprised of a single large diameter source. In comparison, the $L_M$ of deep-sea hydrothermal vent flows are at most 1 m (3). Based on the estimated momentum length scales, Doppler measurements at both sites were determined to be within the region of buoyancy-driven plume flow, as characterized by Papanicolaou and List (4). The BOP-kink imaging sonar cross-section plane was determined to be within the plume region, whereas the broken riser cross-section plane was within the upper limits of its jet flow region.

With these flow correspondences, the perimeter of fluid flow at each leak site is defined using the cross-section area of the imaging sonar measurement and augmented by empirically derived expansion rates of 0.108 and 0.105 (4) for jet and plume flow, respectively, where the horizontal radius of fluid flow, $b_w$, expands upward or contracts downward in the plume flow region as $b_w \sim 0.105z$, where $z$ is the vertical distance from the sonar imaging plane and $b_w$, similarly expands upward or contracts downward in the jet flow region as $b_w \sim 0.108z$. Downward continuing the expansion models from the measured cross-section planes to their respective sources predict a source diameter of $0.53 \pm .02$ m for broken riser, and a $0.84 \pm .02$ m effective source diameter for the multiple closely spaced leak orifices at BOP-kink site.

ROV video imagery showed that the broken riser orifice was modestly deformed but maintained a generally circular shape and that the multiple BOP-kink leaks were arranged in a pattern that approximated an oval (5). Consequently, flow rates were determined using accepted models of free round jets emanating into a quiescent fluid and transitioning to buoyancy-driven plumes (4, 6, 7). Under these models, at sufficient distance from the orifice the flow becomes fully developed. Within this region, the velocity profiles become self-similar and the initial jet velocity profile at the orifice becomes inconsequential (8, 9). A distance, $z_c$, corresponding to 5 times the orifice diameter, is typically considered sufficient for fully developed flow.

Raw Doppler measurements within the plume volumes reveal negative (downward) velocities with maximum magnitude approaching that of positive (upward) velocities (Figs. 2 and 3), symptomatic of intense turbulence. Optical imagery shows turbulent mixing well fluids rapidly transitioning to fine emulsions of hydrocarbons and water (Fig. S2) that are visually indistinguishable from the emulsion layer described at approximately 1,100- to 1,300-m depth (10).

Using the previously described buoyancy-driven plume expansion model, velocity measurements recorded at varying heights within this control volume are downward-continued to a plane common with the cross-section plane (*SI Text*).

Downward-continued vertical velocity measurements within the broken riser and BOP-kink plume measurement volumes indicate normal distributions about their means, with respective median values of 0.11 and $1.4 \times 10^{-4}$ m s$^{-1}$. When binned at equally spaced intervals along their respective axial radii, the downward-continued vertical velocities are highest at the axial center, transitioning to lower velocities as a function of radial distance from the center, generally following a 2D Gaussian distribution about the centerline (Fig. 3). The spatially and temporally averaged vertical velocity, $w_{avg}$, at the cross-section plane height for the broken riser and BOP kink are, respectively, 0.14 and 0.05 m s$^{-1}$. Standard error values for these vertical velocity estimates are, respectively, $\pm 0.003$ and $\pm 0.008$ m s$^{-1}$ (equivalent to $\pm 2$ and $\pm 16\%$ relative standard error).

Volumetric fluid flow rate (well fluids and entrained seawater), $\mu$, is computed at the cross-section plane height as the product of the cross-sectional area multiplied by its respective $w_{avg}$, yielding $0.154 \pm 0.004$ m$^3$ s$^{-1}$ for the broken riser and $0.050 \pm 0.008$ m$^3$ s$^{-1}$ for the BOP kink. Entrained seawater, $Q_{water}$, is estimated for the cross-section plane as a function of the flow's lateral surface area, $A_{lat}$, extending between the source and cross-section plane (6), $w_{avg}$, and an entrainment coefficient (4), $\alpha$, where $\alpha_{jet} = 0.0535 \pm 0.0025$ is used for the broken riser site, and $\alpha_{plume} = 0.0833 \pm 0.0042$ is used for the BOP-kink site (*SI Text*). Based on calculated $A_{lat}$ surface areas of $8.1 \pm 0.17$ and $4.0 \pm 0.27$ m$^2$ for the broken riser jet and BOP-kink plume, respectively, and their associated $w_{avg}$ velocities, the water entrainment rate at the cross-section planes are $0.057 \pm 0.006$ and $0.016 \pm 0.004$ m$^3$ s$^{-1}$, respectively. These water volume entrainment values compare favorably to dilution estimated as a dimensionless function of distance from the jet orifice (7).

Camilli et al.

SPECIAL FEATURE

ENVIRONMENTAL SCIENCES

PNAS
PNAS
PNAS



**Fig. 2.** Three-dimensional reconstruction of velocity fields based on Doppler sonar velocity field measurements recorded at the BOP-kink leak site (*Upper*) and the broken riser leak site (*Lower*). Each colored dot represents the location of a Doppler ping ensemble, with the dot color describing the estimated velocity in meters per second (as specified in the colorbar). The black ellipse in each graph indicates the calculated size and location of the leak source; blue dashed ellipses indicate the calculated flow perimeters. Black dots indicate the position of the ROV-mounted Doppler sonar during measurement.



**Fig. 3.** Vertical velocity profiles of flow at the BOP kink and broken riser. *A* shows the raw vertical velocities for all recorded heights within the BOP plume measurement volume, *B* shows the calculated velocity profile at BOP-kink cross-section measurement plane using the downward-continued plume model. Velocities are binned at equally spaced intervals of 0.1 $r/b_w$, where $-r/b_w$ is the region recorded between the ROV and the jet's vertical axis, and $+r/b_w$ is the distal region opposite $-r/b_w$. The number of measurements recorded within each bin is described as n, and error bars represent the standard error of the mean for each bin. *C* shows the raw vertical velocities for all recorded heights within the broken riser flow measurement volume, and *D* shows the calculated velocity profile at the broken riser cross-section measurement plane using the downward-continued plume model.

The net volumetric fluid flux rates from the Macondo well leak sites, $Q$, are obtained by subtracting $Q_{water}$ from $\mu$. Calculated $Q$ values are thus $0.097 \pm 0.011$ m$^3$ s$^{-1}$ for the broken riser leak and $0.034 \pm 0.009$ m$^3$ s$^{-1}$ for the BOP-kink leak, yielding a combined well flux rate of approximately $0.131 \pm 0.02$ m$^3$ s$^{-1}$.

The volumetric well fluid-to-seawater mixing ratios at the broken riser and BOP-kink cross-section planes indicate that the ambient seawater entrained with the well fluids caused rapid cooling of these jets. Based on the ambient seawater temperature of 4.4 °C (10), a maximum measured temperature of 37 °C at a well fluid exit vent (11), and the specific heat of crude oil being approximately half that of seawater, the bulk fluid temperature of the BOP-kink jet was less than 14 °C and the bulk fluid temperature of the jet at the broken riser cross-section plane is calculated

to have been less than 13 °C, although the actual temperature at the broken riser source was presumably lower due to conductive cooling during well fluid transport within the several hundred meters of coiled riser pipe linking the BOP to the broken riser end location.

End-member chemical composition analysis by Reddy et al. (11) reveals that the well fluids contained no detectable formation water and were by mass approximately 15% methane, 7% ethane through pentanes, 77% hexanes and higher petroleum hydrocarbons, and less than 1% carbon dioxide and nitrogen (overall error ±2%). Thermodynamic calculations indicate that under initial source conditions ethane and higher hydrocarbons would remain in liquid form, suggesting that gas phase components would be limited to methane, carbon dioxide, and nitrogen.

Based on nonideal gas compressibility and a methane hydrate stability point of approximately 15.5 °C at ambient hydrostatic

pressure (approximately 150 atm), the water that became turbulently entrained with the jet subjected these free gases to aqueous dissolution while simultaneously causing carbon dioxide to condense into liquid phase and transitioning methane into a hydrate phase. Under these conditions the well fluids at the cross-section plane heights were by volume 76% oil (i.e., hexanes and higher hydrocarbons), with the remaining fluid balance composed of methane hydrate, liquefied ethane through pentanes, and nonhydrocarbon gases.

Multiplying the estimated $Q$ of each leak source with the calculated oil fraction, $0.76 \pm 0.02$, yields a net oil flow rate, $Q_{oil}$, of $0.074 \pm 0.0096$ and $0.026 \pm 0.0077$ m$^3$ s$^{-1}$ of oil from the broken riser and BOP kink, respectively, for a combined total of $0.10 \pm 0.017$ m$^3$ s$^{-1}$. Socolofsky et al. (12) estimated an oil density at ambient seafloor conditions of 858 kg m$^{-3}$, indicating a combined oil transport of approximately $85 \pm 15$ kg s$^{-1}$ (or $7.4 \pm 1.3$ Gg d$^{-1}$) from the two leak sites. Measured oil density was 821 kg m$^{-3}$ at surface conditions (11), indicating that the volumetric oil flux rate calculated at ambient seafloor conditions would expand by 4.5% at surface conditions to approximately $0.104 \pm 0.018$ m$^3$ s$^{-1}$, equivalent to $57{,}000 \pm 9{,}800$ barrels of oil per day. As indicated by the end-member chemical composition (11), this oil release rate was accompanied by an additional $24 \pm 4.2$ kg s$^{-1}$ ($2.1 \pm 0.37$ Gg d$^{-1}$) of natural gas (methane through pentanes) from the two leak sites, yielding a total hydrocarbon release rate of $110 \pm 19$ kg s$^{-1}$ ($9.5 \pm 1.6$ Gg d$^{-1}$).

## Discussion

Although the overall statistical measurement error is inclusive of recorded natural variability in the turbulent flow, the methods described here may be subject to additional nonstatistical uncertainty caused by systematic observational or model biases. The extremely limited opportunity for data collection at the leak sites did not permit additional investigation. Nonetheless, comparison of measurement data with theoretical bounds and other independent measurements provide some indication of model performance and potential biases.

The sonar-derived source diameter calculations derived from average measured flow cross-section and distance-dependent jet flow expansion are in close agreement with other independent measurements. The broken riser source diameter, calculated at $0.53 \pm 0.02$ m, is nearly identical to the nominal 0.492 m (19.375 in.) internal diameter of the *Deepwater Horizon* riser pipe (13, 14). Similarly, the sonar estimated BOP-kink source diameter, at $0.84 \pm 0.02$ m, matches the maximum measured distance between individual leak orifices at the flattened riser section of the BOP kink (5).

Fluid velocity measurement errors due to ROV vehicle motions were calculated for each station. The ROV's mean X, Y, and Z component velocities during acoustic flow measurements were, respectively, $-0.00009$, $0.00016$, and $0.00023$ m s$^{-1}$ for the broken riser site, and $-0.00122$, $-0.0015$, and $-0.00056$ m s$^{-1}$ for the BOP-kink site. These measured mean vehicle velocities are negligible in comparison to the measured fluid flow velocities.

Unlike shallow water releases of oil and natural gas, which tend to generate two phase flow with a large initial density defect and bubble slip velocities (15), the ambient seafloor pressure and temperature regime at the Macondo well site impose a minimum initial gas phase density of at least approximately 120 kg m$^{-3}$ and an initial bulk (oil and gas) fluid density within a factor of two of the ambient seawater. Moreover, entrainment of the low temperature seawater indicates rapid density increases through cooling and phase transformations of methane and carbon dioxide, evolving the fluids into a single phase before the turbulent jet flow is fully developed. These near-source effects increase the bulk fluid density to approximately 950 kg m$^{-3}$, sharply eroding the initial density deficit and associated buoyancy forces (16). Optical imagery at each of the leak sites confirmed methane hydrate

formation within the near-field measurement volumes, indicating that the well fluids had rapidly cooled to a temperature of 15.5 °C or less. Atmospheric observations in the vicinity of the well site also show that methane did not reach the sea surface (17, 18), and subsurface chemical measurements reveal that the methane instead formed a neutrally buoyant plume at approximately 1,100-m depth (10, 19), indicating that buoyancy-driven methane flux ceased within the initial 400 m of vertical water column transport.

Horizontal water currents measured in the vicinity of the well were less than 0.08 m s$^{-1}$ (10), indicating that the horizontal water currents did not significantly influence the leaks' flow regimes and plume spreading rates within the length scales of the measurement regions. The minimum height, $z_B$, at which horizontal water column currents would cause the flow to bend horizontally and increase the lateral expansion rate as a result of horizontal momentum entrainment were at least an order of magnitude greater than the measurement volumes' vertical length scales (*SI Text*). Optical imagery recorded during ROV inspection of the leak sites confirmed that source fluids flowed along vertical axes to heights of substantially more than 10 m without any discernible lateral deviation above their respective source locations.

The calculations described here make use of the well's end-member chemical composition, which has an appreciably lower natural gas mass fraction than those reported from surface containment vessels (20) or from samples collected from within a leak source jet (11). If the source jet sample composition (11) is instead applied, the volume fraction of oil would decrease from 0.76 to 0.68. This would decrease the net oil flux rate by approximately 11%, while simultaneously increasing the natural gas fraction (methane through pentanes) by an equivalent percentage.

The single day acoustic flow rate estimate reported here corresponds with other independently determined oil release estimates (21–23). The acoustic flow rate estimate may be used in conjunction with these independent well flow rate estimates from other dates to characterize potential release rate variability due to factors such as reservoir depletion and modification of the well structure during containment operations (24). As an ensemble, these estimates suggest a modestly decreasing trend in the well's flow rate as a function of time. If, however, this May 31, 2010, acoustic flow rate estimate of $57{,}000 \pm 9{,}800$ barrels of oil per day is extrapolated as a static rate for the interval following the Macondo well blowout and continuing until well shut-in, it indicates a total release of $4{,}800{,}000 \pm 800{,}000$ barrels of oil ($0.81 \pm 0.1$ Tg total hydrocarbons) from the Macondo well from April 20, 2010, to July 14, 2010. Net oil leak to the ocean, calculated as this cumulative release, minus the oil collected using the riser insertion tube tool (25), Top Hat #4, and BOP choke and kill lines (20), totals approximately $4{,}000{,}000 \pm 800{,}000$ barrels.

Considering that there existed no industry-accepted technologies for measuring hydrocarbon flow rate from this leaking deepwater well (26, 27), the acoustic methods described here provide a useful means for quantitative assessment of leakage rate. Prior to removal of the riser, the Macondo well's optically opaque, initially multiphase fluids and multiple irregularly shaped source jets (5) introduced a level of complexity that made flow estimation with optical methods difficult. Although this acoustic method requires integration of specialized hardware, it permitted a three-dimensional view through these fluids enabling highly resolved measurements of cross-sections and characterization of velocity fields within these complex flow regimes. Future deepwater well failure assessment efforts should include a portfolio of techniques that account for the physical and chemical complexity of the leak as well as mobilization requirements.

SPECIAL FEATURE

## Methods

These acoustic measurement methods were undertaken using a work-class ROV (Maxximum, Oceaneering International) that was specifically equipped by the authors for these operations with a dual-frequency identification sonar (DIDSON 3000 imaging sonar, Sound Metrics) and a 1.2-MHz acoustic Doppler sonar (acoustic Doppler current profiler, 1,200-kHz Workhorse, Teledyne RD) for direct measurement of the well fluid expulsion cross-sections and velocity distributions, respectively (Figs. S1 and S3).

The position and orientation of acoustic measurements were obtained by combining data from the ROV's standard suite of navigation sensors. The ship's survey (*MSV Ocean Intervention III*) provided 1-Hz position estimates of an ROV acoustic beacon, as reported by the ultrashort baseline (USBL) navigation system on the vessel (Sonardyne USBL, with integrated survey by Fugro Chance Inc.). These navigation estimates were augmented with 10-Hz heading, pitch, and roll of the ROV recorded by its inertial navigation system (Meridian Gyrocompass, Teledyne TSS). ROV depth was measured using a quartz depth sensor (Digiquartz®, Paroscientific). The vehicle's relative motion was also obtained from a Doppler velocity log (DVL) (300-kHz Navigator, Teledyne RD Instruments) operated in bottom-lock mode and recorded at 4 Hz. The USBL, orientation, and DVL data were processed using a complementary filter that combines the low-frequency content of the USBL position with the high-frequency content of the relative position from the DVL (28), (break frequency 0.002 Hz). In instances where the USBL position was unreliable (possibly due to interference from the leak sources or other vehicles operating in the area), an estimate of the distance to the jet flow was used to transform the DVL's relative displacements into a relative coordinate frame.

The sonar imaging plane was located $3.0 \pm 0.1$ m above the broken riser source and $1.3 \pm 0.1$ m above the BOP-kink source, with the imaging sonar transducer located at a horizontal distance of between 4 and 7 m from the leak sources (Fig. S3). These imaging sonar cross-section measurements were recorded using a 1.8-MHz acoustic frequency and with an acquisition rate of approximately 6 Hz. The imaging sonar resolution is calculated based on its 96 beam array with individual beam widths of 0.3° and range bin size of 0.022 m. Interframe motion tracking of acoustic returns was calculated using DIDSON Version 5.25.11 software (Sound Metrics Corporation). Cross-section estimates used the DIDSON beam correction software feature and each cross-section was compensated by cosine 10° (due to the sonar being mounted to the ROV with an upward viewing angle of 10°) (Fig. S3).

The 1.2-MHz Doppler sonar was configured to record velocities with an acquisition rate of approximately 5 Hz from each of its four acoustic beams at locations up to 15 m from the instrument at fixed intervals along each beam. The Doppler sonar beams were arranged with beam number four aimed horizontally and beam number three pointing upward at 60° (Figs. S1 and S3). The lateral Doppler sonar standoff distance from the flow was between 2 and 5 m, depending on field of view obstructions.

**ACKNOWLEDGMENTS.** The authors thank the US Coast Guard Research and Development Center (RDC), particularly RDC Executive Director Donald Cundy, LT. Joseph Kusek, LT. Jarrett Parker, and SK1 Omar Arredondo for their assistance with field operations, with additional support from CDR Michael Rorstad at the US Coast Guard Lockport Louisiana facility; Matt Burdyny and Teledyne RD Instruments for assistance with field operations and Doppler data analysis; Bill Hanot and Sound Metrics for assistance with imaging sonar data analysis; the *MSV Ocean Intervention III* ROV crews for assistance with field operations; the National Deep Submergence Facility [Woods Hole Oceanographic Institution (WHOI)] and Dr. Hanumant Singh for generous loan of equipment; and Flow Rate Technical Group leader Dr. Marcia McNutt, as well as the many other individuals within National Incident Command for their valuable assistance. Finally, the authors wish to acknowledge Dr. John Trowbridge for his key insights and suggestions, as well as the anonymous peer reviewers and editors for their input. This work was supported through US Coast Guard Contract HSCG32-10-C-R00020 with additional support from NSF RAPID Grant OCE-1045025 and the WHOI Coastal Ocean Institute.

1. Rona PA, et al. (2006) Entrainment and bending in a major hydrothermal plume, Main Endeavour Field, Juan de Fuca Ridge. *Geophys Res Lett* 33:L19313, 10.1029/2006GL027211.
2. Sound Metrics Corp. (2010) *Didson V5.25 Software Manual* (Sound Metrics Corp., Lake Forest Park, WA) p 81.
3. Speer KG (1999) Thermocline penetration of buoyant plumes. *Mid-Ocean Ridges, Dynamics of Processes Associated with Creation of New Ocean Crust*, eds JR Cann, H Elderfield, and A Laughton (Cambridge Univ Press), pp 249–263.
4. Papanicolaou PN, List E (1988) Investigations of round vertical turbulent buoyant jets. *J Fluid Mech* 195:341–391.
5. Kusek J (2010) *DH Riser Kink Holes—Measurement with Field Drawings and Image* (US Coast Guard Research and Development Center, New London, CT) p 14.
6. Morton B, et al. (1956) Turbulent Gravitational Convection from Maintained and Instantaneous Sources. *Proc R Soc Lond A Math Phys Sci* 234(1196):1–23.
7. Fischer HB, et al. (1979) *Mixing in Inland and Coastal Waters* (Academic, San Diego) p 483.
8. Pope SB (2000) *Turbulent Flows* (Cambridge Univ Press, New York) p 771.
9. Hinze JO (1975) *Turbulence* (McGraw-Hill, New York) p 790.
10. Camilli R, et al. (2010) Tracking hydrocarbon plume transport and biodegradation at Deepwater Horizon. *Science* 330:201–204.
11. Reddy CM, et al. (2011) Composition and fate of gas and oil released to the water column during the *Deepwater Horizon* oil spill. *Proc Natl Acad Sci USA*, 10.1073/pnas.1101242108.
12. Socolofsky S, et al. (2011) Formation dynamics of subsurface hydrocarbon intrusions following the Deepwater Horizon blowout. *Geophys Res Lett* 38:L09602, 10.1029/2011GL047174.
13. Transocean (2010) *Deepwater Horizon fact sheet*, available from http://www.deepwater.com/fw/filemanager/fm_file_manager_download.asp?FileName=Deepwater_Horizon_spec_sheet.pdf&FilePath=/_filelib/FileCabinet/Horizon/ (accessed December 30, 2010).
14. Vetcogray (2008) *HMF Marine Drilling Riser Coupling product information sheet*, available from http://hydrilpressurecontrol.com/_pdf/pressureControlBrochures/VG_hmf_marine_drc.pdf (accessed February 27, 2011).
15. Milgram JH (1983) Mean flow in round bubble plumes. *J Fluid Mech* 133:345–376.
16. Cardoso SSS, McHugh ST (2009) Turbulent plumes with heterogeneous chemical reaction on the surface of small buoyant droplets. *J Fluid Mech* 642:49–77.
17. Yvon-Lewis SA, et al. (2011) Methane flux to the atmosphere from the Deepwater Horizon oil disaster. *Geophys Res Lett* 38:L01602, 10.1029/2010GL045928.
18. Ryerson TB, et al. (2011) Atmospheric emissions from the Deepwater Horizon spill constrain air-water partitioning, hydrocarbon fate, and leak rate. *Geophys Res Lett* 38:L07803, 10.1029/2011GL046726.
19. Valentine DL, et al. (2010) Propane respiration jump-starts microbial response to a deep oil spill. *Science* 330:208–211.
20. US Department of Energy (2010) *Combined Total Amount of Oil and Gas Recovered Daily from the Top Hat and Choke Line Oil Recovery Systems* (US Department of Energy, Washington, DC).
21. National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (2010) *The Amount and Fate of the Oil—Draft—Staff Working Paper No. 3* (National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, Washington, DC) p 29.
22. Crone TJ, Tolstoy M (2010) Magnitude of the 2010 Gulf of Mexico oil leak. *Science* 330 (6004):634–634.
23. McNutt MK, et al. (2011) *Assessment of Flow Rate Estimates for the Deepwater Horizon/Macondo Well Oil Spill. Flow Rate Technical Group Report to the National Incident Command, Interagency Solutions Group* (US Department of Interior, Reston, VA) p 22.
24. Bristol S (2010) Government estimates—Through August 01 (Day 104). *Deepwater Horizon MC252 Gulf Incident Oil Budget* (National Oceanic and Atmospheric Administration, Silver Spring, MD).
25. US Department of Energy (2010) *Oil and Gas Recovery Data from the Riser Insertion Tube from May 17 until the Riser Insertion Tube Was Disconnected on May 24 in Preparation for Cutting Off the Riser*.
26. McKay L (2010) Congressional Hearing Testimony, Deepwater Horizon: Oil Spill Prevention and Response Measures and Natural Resource Impacts, House Transportation and Infrastructure Committee, May 19, 2010, Washington. DC.
27. Harris R (2010) "Gulf Spill May Far Exceed Official Estimates" (interview with BP Spokesman Bill Salvin), *Morning Edition: May 14, 2010* (National Public Radio).
28. Whitcomb LL, et al. (2000) Advances in underwater robot vehicles for deep ocean exploration: Navigation, control, and survey operations. *Robotics Research-The Ninth International Symposium* (Springer, London).

ENVIRONMENTAL SCIENCES

# Supporting Information

## Camilli et al. 10.1073/pnas.1100385108

### SI Text

**Approximating Momentum Length Scale.** The momentum length scale, $L_M$, of the jet sources, was approximated by estimating the specific buoyancy transport, $B$, and the specific momentum transport, $M$, for the broken riser and blowout preventer (BOP) kink sites using Doppler velocity measurements from within the flow region, where

$$w = 3.85 \sqrt[3]{\frac{B}{z}} \exp\left[-90\left(\frac{r}{z}\right)^2\right]$$

plume model for Doppler velocities, **[S1]**

$$w = 7.58 \frac{\sqrt{M}}{z} \exp\left[-86\left(\frac{r}{z}\right)^2\right]$$

jet model at the cross-section plane, **[S2]**

$$L_M = \frac{M^{3/4}}{B^{1/2}},$$ **[S3]**

and $M$ and $B$ are conserved quantities. These curves can be fitted to the cross-section measurement plane using velocity values calculated for the measurement plane using a downward-continued plume expansion model (described in the main text) increasing as $b_w = 0.105z$. Raw Doppler measurements within the defined plume volume can be applied to Eq. **S1** to solve for $B$. Each of the downward-continued Doppler measurements ($w_1$, $r_1$, $z_1$) at the cross-section plane can be applied to Eq. **S2** to solve for $M$. Single point values of $M$ and $B$ can then be averaged together to estimate mean values of $M$ and $B$. Values of $M$ are approximately 0.11 and approximately 0.06 m$^4$ s$^{-2}$ for the broken riser and BOP kink, respectively; values for $B$ are approximately 0.1 and approximately 0.9 m$^4$ s$^{-3}$, respectively. These values can then be applied to Eq. **S3** in order to approximate $L_M$. Broken riser and BOP kink $L_M$ values are approximated as 0.6 and 0.1 m, respectively.

### Downward Continuing Vertical Velocity Measurements.
Vertical velocity within a plume is well characterized and follows the relation,

$$w = \frac{A}{\sqrt[3]{z}} \exp\left(-90\left(\frac{r}{z}\right)^2\right),$$ **[S4]**

where $A$ is a constant that is dependent on $B$, $z$ is the distance from the source, and $r$ is the radial distance from centerline (1).

Through algebraic substitution of $A$, each of the nonzero Doppler velocity bins (bins lacking valid returns are recorded as zeros) positioned within the expanding radius of the calculated plume volumes and at a distance greater than $z_c$ above the source (5,532 and 504 data points for the broken riser and BOP kink, respectively) is then downward-continued to the cross-section plane using

$$w_1(r_1) = w_2 \sqrt[3]{\frac{z_2}{z_1}} \exp\left[90\left(\left(\frac{r_2}{z_2}\right)^2 - \left(\frac{r_1}{z_1}\right)^2\right)\right],$$ **[S5]**

where $w_1$ is the calculated velocity at the cross-section plane, $w_2$ is the measured velocity at a height of $z_2$ above the source at a radial distance $r_2$ from the center axis, and $z_1$ is the cross-section plane height above the source (Fig. S3) at a radial distance of $r_1$. The value of $r_1$ is determined from the relationship

$$\frac{r_1}{b_w(z_1)} = \frac{r_2}{b_w(z_2)},$$ **[S6]**

where $b_w(z)$ is the width of the flow that scales as a function of $z$ and the expansion coefficient. Individual velocity measurements, $w_1$, are then averaged together to produce a radially and time-averaged vertical velocity, $w_{avg}$, of the flow at the cross-section plane height for each leak site.

### Estimating Water Entrainment.
Water entrainment between the source and the cross-section measurement plane is calculated according to the following relationship:

$$Q_{water} = \alpha w_{avg} A_{lat},$$ **[S7]**

where $A_{lat}$ is the flow's lateral surface area extending between the source and cross-section plane, and $\alpha$ is the entrainment coefficient. Based on estimated flow regimes the broken riser uses $\alpha_{jet} = 0.0535 \pm 0.0025$, whereas the BOP-kink flow uses $\alpha_{plume} = 0.0833 \pm 0.0042$.

The minimum height, $z_B$, at which horizontal water column currents would cause the flow to bend horizontally and increase the lateral expansion rate as a result of horizontal momentum entrainment is $z_B = B/U^3$ (2). Using a horizontal water current, $U$, of approximately 0.08 m s$^{-1}$ (3), and the previously computed specific buoyancy transport values, the horizontal current would only distort the plume flows at distances in excess of approximately 1,700 and 200 m above the broken riser and BOP-kink sources, respectively. The vertical length scales of the respective measurement volumes were, by comparison, at least an order of magnitude smaller.

1. Papanicolaou PN, List E (1988) Investigation of round vertical turbulent buoyant jet. *J Fluid Mech* 195:341–391.
2. Fischer HB, et al. (1979) *Mixing in Inland and Coastal Waters* ( Academic, San Diego), p 483.
3. Camilli R, et al. (2010) Tracking hydrocarbon plume transport and biodegradation at Deepwater Horizon. *Science* 330:201–204.



**Fig. S1.**   Photo of Oceaneering *MAXXIMUM 3* work-class remotely operated vehicle (ROV) prior to acoustic flow rate survey operations. The ROV is equipped with a forward-looking 1.2-MHz Doppler sonar (visible as green object with four red piezo-acoustic disks), and a 1.8 MHz acoustic imaging sonar (visible as yellow rectangular and black cylindrical objects directly above the Doppler sonar). Parallel sighting lasers are attached in a vertical configuration to the starboard side of the imaging sonar.

**Fig. S2.**   Photographs of near-field jet flow leaks at (*a*) the BOP kink and (*b*) the broken riser. Both sources exhibit turbulent mixing of well fluids into a fine emulsion. Multiple individual jet sources at the BOP kink and obstructions caused by the riser's conductor pipes are clearly visible. Parallel sighting lasers are visible as two vertically aligned red dots with beam spacing of 0.1 m.



**Fig. S3.** Diagram of computational model to calculate flow rate using imaging sonar measured cross-sectional area estimates and Doppler sonar velocity measurements.

SPECIAL FEATURE

# Composition and fate of gas and oil released to the water column during the *Deepwater Horizon* oil spill

Christopher M. Reddy[a,1], J. Samuel Arey[b], Jeffrey S. Seewald[a], Sean P. Sylva[a], Karin L. Lemkau[a], Robert K. Nelson[a], Catherine A. Carmichael[a], Cameron P. McIntyre[a], Judith Fenwick[c], G. Todd Ventura[d], Benjamin A. S. Van Mooy[a], and Richard Camilli[c]

[a]Department of Marine Chemistry and Geochemistry, Woods Hole Oceanographic Institution, Woods Hole, MA 02543; [b]Environmental Chemistry Modeling Laboratory, Swiss Federal Institute of Technology at Lausanne (EPFL), 1015 Lausanne, Switzerland; [c]Applied Ocean Physics and Engineering Department, Woods Hole Oceanographic Institution, Woods Hole, MA 02543; and [d]Department of Earth Sciences, University of Oxford, Parks Road, Oxford OX1 3PR, United Kingdom

Edited by John M. Hayes, Woods Hole Oceanographic Institution, Berkeley, CA, and approved June 10, 2011 (received for review January 25, 2011)

ENVIRONMENTAL SCIENCES

Quantitative information regarding the endmember composition of the gas and oil that flowed from the Macondo well during the *Deepwater Horizon* oil spill is essential for determining the oil flow rate, total oil volume released, and trajectories and fates of hydrocarbon components in the marine environment. Using isobaric gas-tight samplers, we collected discrete samples directly above the Macondo well on June 21, 2010, and analyzed the gas and oil. We found that the fluids flowing from the Macondo well had a gas-to-oil ratio of 1,600 standard cubic feet per petroleum barrel. Based on the measured endmember gas-to-oil ratio and the Federally estimated net liquid oil release of 4.1 million barrels, the total amount of $C_1$–$C_5$ hydrocarbons released to the water column was $1.7 \times 10^{11}$ g. The endmember gas and oil compositions then enabled us to study the fractionation of petroleum hydrocarbons in discrete water samples collected in June 2010 within a southwest trending hydrocarbon-enriched plume of neutrally buoyant water at a water depth of 1,100 m. The most abundant petroleum hydrocarbons larger than $C_1$–$C_5$ were benzene, toluene, ethylbenzene, and total xylenes at concentrations up to 78 µg L$^{-1}$. Comparison of the endmember gas and oil composition with the composition of water column samples showed that the plume was preferentially enriched with water-soluble components, indicating that aqueous dissolution played a major role in plume formation, whereas the fates of relatively insoluble petroleum components were initially controlled by other processes.

Gulf of Mexico | subsurface plumes

During the 3 mo following April 20, 2010, the Macondo well emitted several million barrels of gas and oil at the seafloor of the Gulf of Mexico following the sinking of the *Deepwater Horizon* drilling platform. Relative to oil spills occurring at the sea surface, petroleum hydrocarbons experienced a unique set of processes following their release at 1.5-km depth (1–4). This spill demonstrates the importance of interwoven chemical, physical, and biological processes in regulating the transport and fate of hydrocarbons in the deep marine environment. Compositional information for petroleum (gas and oil) released by the well at the seafloor is essential for evaluating the fates of hydrocarbons in the sea. Moreover, such information provides direct constraints on estimates of the total mass of individual hydrocarbons released to the environment and the flow rates at the site of the spill (5). Gases are of particular interest because the gas fraction represents a large component of the carbon released, and it was biodegraded rapidly in the water column (3, 4). Compositional data for released oil is also necessary for forensic analyses when distinguishing Macondo well oil from hydrocarbons released from other sources in the Gulf of Mexico.

Numerous studies have examined factors that influence the compositional evolution of oil spilled at the sea surface (6–10), where evaporation and dissolution may simultaneously remove hydrocarbons from the floating oil. Because these competing processes complicate efforts to differentiate aqueous dissolution from other loss processes, few studies have attempted to quantify aqueous dissolution of hydrocarbons to the water column (11). Petroleum released from the Macondo well at 1.5-km depth, however, allows the partitioning of hydrocarbons into the aqueous phase to be studied in the absence of atmospheric evaporation.

To acquire a representative endmember of gas and oil, two samples of fluids exiting the Macondo well were collected on June 21, 2010, using isobaric gas-tight (IGT) samplers deployed from a remotely operated vehicle (ROV) (Fig. 1 and Fig. S1) (12). The gas-tight samplers maintained the collected fluids at hydrostatic seafloor pressures, thereby precluding the loss of volatile species prior to analysis at our shore-based laboratories. One sample (MW-1) was acquired between the stub of the lower marine riser package (LMRP) and the lower annulus of the Top Hat #4 collection device. A second sample (MW-2) was collected above one of the Top Hat #4 vents. These fluids, collected in situ during the spill using an approach that preserves the integrity of gas and oil composition, provide a unique opportunity for chemical analysis of petroleum hydrocarbons in the endmember fluid emitted from the well.

During the period from June 19 to June 28, 2010, we also collected water column samples within the region of a southwest trending deep water plume defined by Camilli et al. (1). This plume was initially identified by elevated levels of methane and light aromatic hydrocarbons (benzene, toluene, ethylbenzene, and total xylenes, referred to collectively as BTEX). In this study, we present a comprehensive dataset for a wider range of compounds including *n*-alkanes, branched alkanes, monoaromatic hydrocarbons, and polycyclic aromatic hydrocarbons (PAHs) (Fig. S2) (13). The compositional evolution of hydrocarbons during their trajectory through the water column can be used to diagnose the physical, chemical, and biological processes acting on petroleum released to the deep sea.

## Results and Discussion

Owing to its collection from within the LMRP, sample MW-1 contained predominantly petroleum hydrocarbons (gas and oil) and a minor amount (approximately 5% vol/vol) of an aqueous fluid of seawater composition. In contrast, MW-2 contained approximately 23% seawater, presumably due to turbulent mixing of

Author contributions: C.M.R., J.S.S., S.P.S., and R.C. designed research; C.M.R., J.S.A., J.S.S., S.P.S., K.L.L., R.K.N., C.A.C., C.P.M., G.T.V., and B.A.S.V.M. performed research; J.S.S., J.F., and R.C. contributed sampling and logistics; C.M.R., J.S.A., J.S.S., S.P.S., K.L.L., R.K.N., J.F., G.T.V., B.A.S.V.M., and R.C. analyzed data; and C.M.R., J.S.A., J.S.S., and R.C. wrote the paper.

The authors declare no conflict of interest.

This article is a PNAS Direct Submission.

Freely available online through the PNAS open access option.

[1]To whom correspondence should be addressed. E-mail: creddy@whoi.edu.

This article contains supporting information online at www.pnas.org/lookup/suppl/doi:10.1073/pnas.1101242108/-/DCSupplemental.



**Fig. 1.** Photograph of fluids exiting the Macondo well being collected on June 21, 2010, with an IGT sampler deployed by the *Millennium 42* ROV from the vessel *Ocean Intervention III*. The IGT sampler, located in the center of the picture, is held by a robotic arm seen on the right side of the image. At the time of collection, the kinked riser section directly above the blowout preventer had been sheared off and the LMRP Top Hat #4 containment system had been placed over the riser stub. The maximum temperatures measured when collecting MW-1 and MW-2 were 105 and 37 °C, respectively.

ascending oil, gas, and water at the collection site a few meters above the LMRP. The observation that both samples contained only seawater indicates that significant amounts of saline formation waters were not being released from the well along with gas and oil (14). Chemical analysis of both samples yielded comparable results and revealed that the total $C_1$–$C_5$ hydrocarbon

components (Table 1) are composed predominately of methane, comprising approximately 80 mol%. The stable carbon and hydrogen isotope ratios of the gases exhibit increasing $^{13}$C and $^{2}$H content with increasing carbon number, indicating a thermogenic origin (16), consistent with production from the deep petroleum reservoir tapped by the Macondo well.

The contents of sample MW-1 enabled determination of the gas-to-oil ratio (GOR, defined as the standard cubic feet per petroleum barrel at 15.6 °C and 1 bar) for fluids flowing from the Macondo well LMRP. Although chemical and isotopic analyses of MW-1 and MW-2 yield nearly identical compositions for the gas and oil fractions, measured GORs differed between the samples. MW-1 yielded a GOR of 1,600, whereas MW-2 yielded a value of 2,470 (Table 1). We suspect that the GOR determined for MW-2 was modified by phase segregation during the few meters of ascent to the point of collection and may have been further biased by a modified ROV thruster that directed a high velocity jet of water at the Top Hat #4 vent in order to clear well fluids from the field of view during sample collection. Accordingly, MW-1 likely represents a more accurate representation of the fluid exiting the well. The MW-1 value of 1,600 is similar to the GOR predicted from thermal maturity indicators in the oil that indicate a value of 1,730 (Table 1) (15). Ambient hydrostatic pressure and temperature (150 bar, 5 °C) at the Macondo well leak site suggest that ethane and higher hydrocarbons would be found predominantly in liquid oil phase, whereas methane is chiefly in the gas phase (17).

Previously reported GOR values for fluids released from the well are limited to estimates from oil-recovery vessels after hydrocarbons captured at the seafloor were pumped to the sea surface. Fluids collected from the choke line of the blowout preventer between June 17 and 23, 2010, on the *Q4000* recovery vessel were characterized by GOR values that ranged from 1,760 to 1,965 (mean = 1,810 ± 70) (18), close to the value determined in this study on June 21. On June 24, 2010, however, the GOR

**Table 1. Composition of hydrocarbon gases ($C_1$ to $C_5$) and oil of MW-1 from the Macondo well on June 21, 2010, and a comparison of gas end-members estimated from field data from June 2010 by Valentine et al. (3)**

| Analyte | MW-1 content | Valentine et al. (3)* |
|---|---|---|
| Gas[†] | | |
| Methane | 82.5% ($\delta^{13}$C = −57.5‰; $\delta$D = −187‰) | 87.5% ($\delta^{13}$C = −61.3‰) |
| Ethane | 8.3% ($\delta^{13}$C = −31.5‰; $\delta$D = −147‰) | 8.1%($\delta^{13}$C = −30.5‰) |
| Propane | 5.3% ($\delta^{13}$C = −29.2‰; $\delta$D = −123‰) | 4.4% ($\delta^{13}$C = −29.0‰) |
| Isobutane | 0.97% ($\delta^{13}$C = −29.9‰) | NA [‡] |
| *n*-butane | 1.9% ($\delta^{13}$C = −27.9‰; $\delta$D = −119‰) | NA |
| Isopentane | 0.52% | NA |
| *n*-pentane | 0.52% | NA |
| Methane/ethane | 9.9 | 10.85 |
| Methane/propane | 15.5 | 19.8 |
| GOR (measured) | 1,600 standard cubic feet per barrel | NA |
| GOR (estimated) | 1,730 standard cubic feet per barrel [§] | NA |
| GOR | | 3,000 standard cubic feet per barrel [¶] |
| Oil (select properties) [‖] | | |
| Density | 820 g L$^{-1}$ | NA |
| Gravity | 40° API | NA |
| Carbon | 86.6% | NA |
| Hydrogen | 12.6% | NA |
| Nitrogen | 0.38% | NA |
| Sulfur | 0.39% | NA |
| Saturated hydrocarbons | 74% ($\delta^{13}$C = −27.9‰) | NA |
| Aromatic hydrocarbons | 16% ($\delta^{13}$C = −26.5‰) | NA |
| Polar hydrocarbons | 10% | NA |

*Valentine et al. (3) defined only the relative abundances for the endmember methane, ethane, and propane from field samples. The relative percentages of hydrocarbon gases measured in MW-1 were calculated using methane through pentanes.
[†]We measured butanes and pentanes in both the gas and oil in MW-1 (*SI Text*). Here, we present only the butanes and pentanes isolated in our gas fraction. For a complete accounting of all compounds collected, refer to Table S2.
[‡]NA, not applicable.
[§]Estimated from Mango ratios (15) using the composition of 2- and 3-methyl pentanes and 2- and 3-methyl hexanes in MW-1 oil (Table S2).
[¶]Valentine et al. (3) chose this value based on "information released by BP."
[‖]See *SI Text* for discussion of properties listed below.

Reddy et al.

SPECIAL FEATURE

ENVIRONMENTAL SCIENCES

PNAS



**Fig. 2.** Plots of GOR as a function of (*A*) date and (*B*) daily oil collected by the recovery vessels *Discoverer Enterprise* and *Q4000* (19).

for fluids recovered on the *Q4000* underwent an abrupt increase to values near 2,400 and remained at this level until July 16, 2010 (Fig. 2) (18).

Analysis of *Q4000*'s daily GOR values from the two periods indicates that their means and distributions are statistically different with a greater than 99% confidence level. In contrast, hydrocarbons simultaneously captured on *Discoverer Enterprise* recovery vessel using the Top Hat #4 across both periods do not exhibit this abrupt GOR change, indicating that the apparent GOR variability recorded by these surface vessels is attributable to the collection process itself, not variability in the endmember

GOR. Indeed, daily GOR values for fluids recovered from the Top Hat #4 reveal an inverse correlation with increasing oil collection rate (Fig. 2). Extrapolation of these trends to higher oil collection rates would yield decreased GOR values that are consistent with the MW-1 endmember GOR that was also collected from within Top Hat #4. Similar trends exist for fluids collected before and after the step change on the *Q4000*.

Using the federally estimated net liquid oil release of 4.1 million barrels to the Gulf of Mexico (19), the net total $C_1$–$C_5$ hydrocarbons released to the water column was $1.7 \times 10^{11}$ g. Comparison of our calculations to other studies (Table S1) reveals differences that are primarily due to GOR values employed. For example, Valentine et al. (3) used a GOR of 3,000 that yields total methane, ethane, and propane releases that are higher than our values by a factor of two. By comparison, Joye et al. (20) found fluxes nearly four times greater than ours for their high-end estimate.

The composition of the MW-1 oil fraction contained 74% saturated hydrocarbons, 16% aromatic hydrocarbons, and 10% polar hydrocarbons (Table 1). Along with other results, these data are consistent with a moderately mature, light sweet crude oil, with no evidence of subseafloor biodegradation (Figs. S2 and S3, Table 1, and Table S2). The polar fraction (10%) is comprised of molecules containing oxygen, nitrogen, and sulfur spanning a wide molecular weight range. Many of these compounds are resistant to evaporation, biodegradation, and photolysis. Hence, they have the potential to remain in the environment long after other oil components have been removed or degraded (21, 22). Because many of these polar compounds are not typically analyzed in field samples, the resulting 0.41 million barrels of polar hydrocarbons released into the Gulf of Mexico may be overlooked in studies examining the fate of oil released during this spill.

In addition to bulk analyses, the gas and oil fractions were analyzed for select compounds (Table S2). We have used our results from the analysis and relative amounts of gas and oil fractions to calculate the total amount released and the composition of the "reconstituted" reservoir fluid on a mass/mass basis. This exercise indicates that the most abundant compound released from the Macondo well on a mass basis was methane at 0.15 g g$^{-1}$ of reconstituted fluid. The total $C_1$ to $C_5$ hydrocarbons were 0.24 g g$^{-1}$, and the other 140 hydrocarbon compounds were 0.24 g g$^{-1}$ of the total mass of reconstituted fluid. This indicates that traditional molecular-level methods to characterize oil can account for only half of the material that flowed from the Macondo well.

To constrain the fate of hydrocarbon components released to the deep sea, several convoluted processes need to be considered. Petroleum emitted from the LMRP rapidly partitions into four phases in the deep water column: a gas phase, a liquid oil phase, an aqueous phase, and a hydrate phase. Once in the water col-



**Fig. 3.** Water column profiles of BTEX collected at (*A*) 2.3, (*B*) 6.1, (*C*) 16.5, and (*D*) 27 km from the Macondo well. These stations were within the region of the deep water plume identified by Camilli et al. (1) in June 2010 (See Table S4 for actual BTEX values in these water samples). BTEX composed 2.2% of the total oil in MW-1 (Table S2).

umn, these phases may physically segregate during buoyancy-driven ascent of light liquid oil droplets and gas bubbles toward the sea surface and descent of heavier liquid oil droplets, enriched in dense components such as long-chain $n$-alkanes (23), toward the seafloor. Moreover, in near-field environments where separate oil, gas, and aqueous phases may coexist, partitioning of components between phases will evolve continuously due to depth-dependent changes in pressure and temperature. These processes were likely influenced by the seafloor injection of dispersants that may enhance aqueous dissolution and the stabilization of oil droplets. Current-driven advective transport of hydrocarbon-rich plumes provided an opportunity for continued aqueous dissolution and microbial degradation of bioavailable components.

Quantitative compositional data for gas and oil exiting the Macondo well provides an opportunity to examine chemical, physical, and biological processes affecting their abundance during transport through the water column. Here, we assess the role of aqueous dissolution as a possible driver for the previously reported formation of deep water hydrocarbon-enriched plumes of neutrally buoyant water at 1,100-m depth. The abundance of low molecular weight $n$-alkanes and aromatic compounds observed in the hydrocarbon-rich plume at 1,100 m are far below their aqueous saturation values at ambient conditions, suggesting that gas and oil droplets did not reach complete equilibrium with the aqueous phase, and partitioning into the deep water column is a kinetically controlled process. However, the rates at which hydrocarbon compounds dissolve from gas bubbles and oil droplets are likely influenced by their aqueous solubilities (11). To investigate the relationship between aqueous solubility and abundance in the 1,100-m plume, we evaluated the fractionation of hydrocarbon components into the deep water column relative to two highly water-soluble oil components: methane and benzene.

Abundant evidence suggests that methane released at the seafloor was quantitatively trapped at 1,100-m depth. Aqueous methane was the most abundant hydrocarbon component in deep water plumes, reaching values as high as 183 $\mu$mol kg$^{-1}$ in a mid-June 2010 survey within an approximately 10-km radius of the well (3). Methane was nearly absent at more shallow depths, suggesting that methane bubbles have dissolved completely upon reaching 1,100-m depth (1, 3). This is further confirmed by observed methane concentrations at natural background levels in the atmosphere overlying the sea-surface oil slick (24) and measured sea-to-air fluxes indicating that approximately 0.01% of the methane released from the reservoir was released into the atmosphere (25). The observed near-complete dissolution of methane in deep waters is consistent with previous field and modeling studies in systems of similar water column depth (26, 27).

Assuming that all of the released methane resides in deep water plumes, quantities of ethane and propane retained can be estimated by examining their abundance relative to that of methane. For this purpose, we define the fractionation index for a given compound as

$$F_{i,\text{ methane}} = \frac{\left(\frac{C_{i,\text{ water column}}}{C_{\text{methane, water column}}}\right)}{\left(\frac{C_{i,\text{ MW-1}}}{C_{\text{methane,MW-1}}}\right)} \qquad [1]$$

where $F_{i,\text{methane}}$ is the fractionation index for species $i$, $C_{i,\text{water column}}$ is the observed molal concentration of component $i$ in the water column, $C_{\text{methane,water column}}$ is the molal concentration of methane in the water column, $C_{i,\text{ MW-1}}$ is the molal concentration of component $i$ in the original oil (MW-1 sample), and $C_{\text{methane, MW-1}}$ is the molal concentration of methane in the MW-1 sample. The resulting index is an indicator of the chemical fractionation of component $i$ in the deep water column relative

to methane. A value of $F_{i,\text{methane}}$ equal to unity corresponds to material that is channeled completely into deep water plumes to the same extent as methane. An $F_{i,\text{methane}}$ value of zero corresponds to material that is completely retained within the ascending oil and likely reaches the sea surface.

The compositional evolution of methane, ethane, and propane at 1,100 m suggests that phase partitioning processes influenced these low molecular weight hydrocarbons differently. Valentine et al. (3) used the spatial variations in the isotopic and chemical compositions of $C_1$-$C_3$ hydrocarbons in plume water samples to demonstrate the preferential microbial degradation of propane in the plume. The isotopic compositions for $C_1$-$C_3$ hydrocarbons in our sample MW-1 collected at the LMRP is nearly identical to the near-field plume values of Valentine et al. (3) (Table 1), consistent with an absence of biodegradation in the region of the plume nearest the Macondo well. However, the relative distributions of methane, ethane, and propane for these nonbiodegraded plume samples show small but noteworthy differences relative to the MW-1 sample. For example, the molal methane/ethane ratio of 10.85 consistently observed in nonbiodegraded plume samples (3) is slightly higher than the value of 9.9 observed in the pristine petroleum. These concentration ratios produce and $F_{\text{ethane,methane}}$ value of 0.91, indicating that most of the ethane emitted from the Macondo well was retained in the deep sea, but to a slightly lesser extent than methane. Similarly, the $F_{\text{propane,methane}}$ value of 0.78 for nonbiodegraded samples indicates that most of the propane released from the Macondo well resided in the subsurface, but to a lesser extent than ethane and methane. These results imply that a sizeable portion of ethane (9%) and propane (22%) was retained in the buoyant liquid oil phase that continued ascent to the sea surface. The rapid dissolution of methane, ethane, and propane is consistent with their high aqueous solubilities (Table S3) at ambient conditions in the deep water column (100–150 bar and 4–6 °C). Because the aqueous solubility of short-chain $n$-alkanes decreases with increasing chain length, the observed trend suggests that aqueous dissolution governed the fractionation of these gases into the deep water column.

Joye et al. (20) measured $C_1$ to $C_5$ gases at 1,100 m depth from 2 to 11 km southwest and west of the Macondo well from May 25 to June 6, 2010, and did not observe the inverse correlation of methane/ethane and methane/propane ratios with total hydrocarbon abundance documented by Valentine et al. (3). They observed methane/ethane and methane/propane ratios of 9.9 and 14.7, respectively, values that are remarkably similar to the MW-1 sample (Table 1). An explanation for the differences in the data of Valentine et al. (3) and Joye et al. (20) remains elusive but may be related to numerous activities at the well in late May and early June that likely affected the flow and partitioning of released gases. For example, the riser insertion tube was removed on May 25, the "top kill" began on May 26 and ended on May 29, the initial shearing of the riser pipe occurred on June 1 and was followed by a second shearing on June 2, and installation of the Top Hat #4 collection device occurred on June 3 (28). It should be noted that all of the Valentine et al. (3) samples were collected after these events.

Looking beyond hydrocarbon gases, we investigated the fractionation of higher molecular weight petroleum components into the deep water column by comparing their abundances to benzene. Benzene is highly water-soluble, suggesting that it too may have dissolved rapidly in the deep sea. Indeed, benzene concentrations were systematically elevated (0.4–21.7 $\mu$g L$^{-1}$) in the 1,100-m-depth plume and nearly absent at depths shallower than 1,000 m (1) (Fig. 3, and Table S4). A comprehensive survey of hydrocarbons in air above the Macondo well site revealed that very little benzene reached the sea surface (24). Taken together, water column and surface measurements suggest that benzene was predominantly retained in the deep water column. Replacing $C_{\text{methane,water column}}$ and $C_{\text{methane, MW-1}}$ in Eq. 1 with the

concentrations of benzene in the water ($C_{benzene, water\ column}$) and original oil ($C_{benzene,\ MW-1}$), respectively, we calculated benzene-normalized fractionation indices ($F_{i, benzene}$) for less water-soluble hydrocarbons.

Using the benzene-normalized fractionation index, $F_{i, benzene}$, we tested the hypothesis that aqueous partitioning controlled the preferential retention of non-gas petroleum components. We examined the relationship between observed $F_{i, benzene}$ values and compound aqueous solubilities ($S_i^{sat}$) for a set of 33 detected oil components, including monoaromatic alkylated hydrocarbons, naphthalenes, dibenzothiophenes, and several other alkylated and unsubstituted PAHs (Table S3). (Assuming ideal Raoultian behavior, the aqueous solubility of a given compound in the MW-1 oil is equal to the aqueous solubility of the pure liquid multiplied by the mole fraction in the oil. For compounds that are solids at ambient conditions, aqueous solubility refers to the subcooled liquid aqueous solubility; see SI Text.) Across this compound set, we found that the fractionation index decreased systematically with decreasing aqueous solubility (Table S3). This trend is readily apparent in the representative stations shown in Fig. 4. Similar trends were observed at 20 sampling locations (positions of unique latitude, longitude, and depth) where hydrocarbons were detectable, at distances ranging from 1.7 to 34.6 km from the Macondo well and at water depths ranging from 1,065 to 1,221 m (Fig. S4). With a single exception, $n$-alkanes were not found at detectable concentrations at sampling locations where benzene was present. Uniquely, the 1,201-m depth sample at station 19 contained significant levels of $n$-alkanes and other sparingly soluble compounds but was depleted in water-soluble compounds such as BTEX (Fig. S5). This exceptional sample is consistent with the capture of liquid oil droplets that had been partially dissolved into the ambient water, thereby exhibiting enrichment in sparingly soluble components relative to water-soluble components.

Collectively, the observed relative abundances of $C_1$–$C_3$ hydrocarbons and longer-chain petroleum constituents provide



**Fig. 4.** Fractionation index ($F_{i, benzene}$) as a function of aqueous solubility for 33 different hydrocarbon compounds observed in the southwesterly hydrocarbon plume observed by Camilli et al. (1) at four different stations ranging from 2.3 to 27 km distance from the Macondo well (same stations as shown in Fig. 3). A fractionation index value of 1 corresponds to material that has completely departed the ascending oil, relative to benzene, and contributes to the plume. A low fractionation index corresponds to material that is predominantly retained within the ascending oil. For compounds that are solids at ambient conditions, aqueous solubility refers to the subcooled liquid aqueous solubility; see SI Text for a more complete discussion of this term.

compelling evidence that the 1,100-m plume identified by Camilli et al. (1) is comprised of dissolved hydrocarbons. In turn, the results provide strong evidence that advective transport in solution is the principal means by which hydrocarbons are transferred from the well to the deep sea. Evidence for the presence of oil droplets was only observed in one sample. Selective partitioning of water-soluble petroleum components into the deep sea is also consistent with the results of Ryerson et al. (24), who documented a positive correlation between the aqueous solubilities of several hydrocarbon components and their extents of depletion in atmospheric samples collected above the oil spill. These authors suggested that the depleted compounds were likely retained within the water column. The rapid dissolution of highly soluble oil components in the deep water is also consistent with the reported near-quantitative sequestration of the highly water-soluble dispersant component dioctyl sodium sulfosuccinate at 1,100-m depth (29).

The ultimate fate of these water-soluble petroleum hydrocarbons in the deep water plume is unknown, although biodegradation may have been an important process. However, the absolute and relative abundances of BTEX compounds show no systematic spatial trends (Figs. 3 and 4), suggesting that negligible dilution or biodegradation occurred during the 4 d required for their transport in the plume over a distance of 27 km (1). This is consistent with previously published estimates of respiration rates that indicate hydrocarbon degradation in the plume was unlikely to be in excess of 7 $\mu$g L$^{-1}$ d$^{-1}$, including degradation of hydrocarbon gases and petroleum (1). Because Valentine et al. (3) suggested that the microbial respiration of hydrocarbon gases outpaced petroleum respiration by at least a factor of two, the degradation rate for petroleum hydrocarbons may have been on the order of 2 $\mu$g L$^{-1}$ d$^{-1}$. This degradation rate, in conjunction with the hydrocarbon concentrations reported here, yields a half-life on the order of 1 mo for petroleum hydrocarbons. By contrast, Hazen et al. (2) reported half-lives for $n$-alkanes on the order of a few days. The absence of observable gradients in the concentrations of BTEX compounds within this plume along with the preceding half-life calculation indicates that water-soluble petroleum hydrocarbons persisted longer than the gas and $n$-alkane fractions.

## Conclusion

The endmember sample of gas and oil that flowed from the Macondo well was collected with an IGT sampler and analyzed. The material had a GOR of 1,600 standard cubic feet per petroleum barrel. Using the federally estimated net liquid oil release of 4.1 million barrels (19), the total $C_1$–$C_5$ hydrocarbons released to the water column was $1.7 \times 10^{11}$ g.

The deep sea entrainment of water-soluble hydrocarbons has far-reaching implications for deep water oil spills. Our results demonstrate that most of the $C_1$–$C_3$ hydrocarbons and a significant fraction of water-soluble aromatic compounds were retained in the deep water column, whereas relatively insoluble petroleum components were predominantly transported to the sea surface or deposited on the seafloor, although the relative proportions are not known.

The resulting apportionments of hydrocarbon transfers to the water column and atmosphere are therefore very different for a deep water oil spill versus a sea-surface oil spill. During sea-surface oil spills, highly water-soluble components such as BTEX, $C_3$-benzenes, and naphthalene quickly volatilize and are rapidly lost to the atmosphere within hours to days, thereby limiting the extent of aqueous dissolution into the water column. In the case of the *Deepwater Horizon* oil spill, however, gas and oil experienced a significant residence time in the water column with no opportunity for the release of volatile species to the atmosphere. Hence, water-soluble petroleum compounds dissolved into the

water column to a much greater extent than is typically observed for surface spills.

## Materials and Methods

**Collection of Samples with IGTs.** Samples MW-1 and MW-2 were collected from the Macondo well on June 21, 2010, using IGT samplers (12) deployed from the *Millennium 42* ROV operating from the vessel *Ocean Intervention III*. Following retrieval of the samplers on board the ship, the IGTs were delivered to Woods Hole Oceanographic Institution (WHOI) for sample processing. Each sampler was vented into a closed system that allowed for separation and quantitative measurement of the total amount of gas, oil, and seawater (Fig. S1). The gas and oil contents were used to calculate a GOR.

**Gas and Aqueous Phase Analysis.** The composition of gases and stable carbon isotope values ($\delta^{13}C$) in MW-1 and MW-2 were performed by Isotech Laboratories. Composition analysis was performed chromatographically and also used to isolate gases for isotope analysis employing combustion to $CO_2$ and dual-inlet analysis using isotope ratio mass spectrometry. The stable hydrogen isotope values ($\delta D$) of gases were measured at WHOI by cryofocusing (30) prior to analysis by pyrolysis gas chromatography isotope ratio mass spectrometry. Uncertainties for the compositional analyses are $\pm2\%$ and $\pm0.1\%$ and $\pm2\%$, for the carbon and hydrogen isotopic analyses, respectively. The anion content of the aqueous phases of MW-1 and MW-2 were measured by ion chromatography.

**Oil Analysis.** The oil samples were analyzed by numerous techniques both at WHOI and outside laboratories. Characterization was considered for three categories: bulk, compound class, and molecular-level. Bulk analyses included density; American Petroleum Institute (API) gravity; and percentage of saturated hydrocarbons, aromatic hydrocarbons and polar hydrocarbons. Compound class analysis was performed by gas chromatography (GC) and comprehensive two-dimensional gas chromatography (GC×GC) with flame ionization detection (FID) and mass spectrometry (MS). Molecular-level quantitation of individual compounds as well as carbon and hydrogen isotope

measurements and biomarker analysis (by GC×GC-FID) were also performed. See *SI Text* for a complete discussion of these analyses.

**Gulf of Mexico Water Sampling and Analysis.** Approximately 100 water samples were collected in collaboration with the ongoing Natural Resource Damage Assessment program aboard the research vessel (R/V) *Endeavor* (cruise 478) (13). Water samples from 15- to 1,500-m water depths were analyzed for approximately 100 volatile organic compounds (VOCs) and semivolatile organic compounds (SVOCs). Samples were collected using a rosette of 12 10-L Go-Flo bottles (1) and transferred to 40- and 900-mL amber glass bottles with Teflon-lined caps, for VOC and SVOC analysis, respectively.

Selection of sampling locations and water depths was guided by in situ sensors, including the *TETHYS* mass spectrometer and AquaTracka fluorometers mounted on the rosette, and surveys from the autonomous operated underwater vehicle *Sentry* (1).

VOCs were analyzed using US Environmental Protection Agency (EPA) SW-846 Method 8260B, modified. SVOCs were measured following the guidance procedures in EPA SW-846 Method 8270C, modified, and 8015. The complete analysis for water samples, in duplicate, for VOC and SVOC provided approximately 17,000 results. We only used data that was above the laboratory blank and detection limit as well as chromatographically resolved and identified for each specific compound or compound class. The end result was approximately 1,000 usable datapoints.

**ACKNOWLEDGMENTS.** We thank the crews of the R/V *Endeavor, Ocean Intervention III*, and Oceaneering. Many thanks to Lieutenants J. Parker, J. Kusek, and SK1 O. Arredondo of the US Coast Guard for their assistance during marine operations at the *Deepwater Horizon* site. We thank K. Keteles, C. Briner, O. Reeves, J. Quinn, J. Farrington, D. Yoerger, M. Jakuba, and J. Kinsey for their assistance. This research was supported by National Science Foundation Grants OCE-1043976 to C.M.R., OCE-1045025 to R.C., and OCE-1045670 to B.A.S.V.M; US Coast Guard Grant HSCG3210CR0020 to R.C.; and Department of Energy Grant DE-FG02-06ER15775 to C.M.R.

1. Camilli R, et al. (2010) Tracking hydrocarbon plume transport and biodegradation at Deepwater Horizon. *Science* 330:201–204.
2. Hazen TC, et al. (2010) Deep-sea oil plume enriches indigenous oil-degrading bacteria. *Science* 330:204–208.
3. Valentine DL, et al. (2010) Propane respiration jump-starts microbial response to a deep oil spill. *Science* 330:208–211.
4. Kessler JD, et al. (2011) A persistent oxygen anomaly reveals the fate of the spilled methane in the deep Gulf of Mexico. *Science* 331:312–315.
5. Camilli R, et al. (2011) Acoustic measurement of the Deepwater Horizon Macondo well flow rate and oil spill size. *Proc Natl Acad Sci USA*, in press.
6. Harrison W, Winnik MA, Kwong PTY, Mackay D (1975) Crude oil spills. Disappearance of aromatics and aliphatic components from small sea-surface slicks. *Environ Sci Technol* 9:231–234.
7. Boehm PD, Fiest DL, Mackay D, Paterson S (1982) Physical-chemical weathering of petroleum hydrocarbons from the Ixtoc I blowout: Chemical measurements and a weathering model. *Environ Sci Technol* 16:498–505.
8. Southworth GR, Herbes SE, Allen CP (1983) Evaluating a mass transfer model for the dissolution of organics from oil films into water. *Water Res* 17:1647–1651.
9. Wolfe D, et al. (1994) The fate of the oil spilled from the *Exxon Valdez. Environ Sci Technol* 28:560A–568A.
10. National Research Council (2003) *Oil in the Sea III: Inputs, Fates and Effects* (National Academy Press, Washington, DC).
11. Arey JS, Nelson RK, Plata DL, Reddy CM (2007) Disentangling oil weathering using GC×GC. 2. Mass transfer calculations. *Environ Sci Technol* 41:5747–55.
12. Seewald JS, Doherty KW, Hammar TR, Liberatore SP (2002) A new gas-tight isobaric sampler for hydrothermal fluids. *Deep-Sea Res Part I* 49:189–196.
13. National Oceanic and Atmospheric Administration's Office of Response and Restoration and the University of New Hampshire *Environmental Response Management Application® (ERMA), R/V Endeavor* cruise 478. Available at http://gomex.erma.noaa.gov.
14. Hunt JM (1996) *Petroleum Geochemistry and Geology* (Freeman, San Francisco), 2nd Ed.
15. Mango FD, Jarvie DM (2001) GOR from oil compositions. *20th International Meeting on Organic Geochemistry*, Vol 1 (Elsevier, Nancy, France), pp 406–407.
16. Sherwood Lollar B, Westgate TD, Ward JA, Slater GF, Lacrampe-Couloume G (2002) Abiogenic formation of alkanes in the Earth's crust as a minor source for global hydrocarbon reservoirs. *Nature* 416:522–524.
17. Zuo JY, et al. (2008) EOS-based downhole fluid characterization. *SPE Asia Pacific Oil and Gas Conference and Exhibition* (Society of Petroleum Engineers) SPE114702.
18. United States Department of Energy (2010) Combined total amount of oil and gas recovered daily from the Top Hat and Choke Line oil recovery systems., Available at http://www.energy.gov/open/documents/5_2_Item_84_Recovery_Volumes_16_July_0000.ods. Accessed January 18, 2011.
19. McNutt M, et al. (2011) Assessment of flow rate estimates for the Deepwater Horizon/Macondo well oil spill. Flow Rate Technical Group report to the National Incident Command, Interagency Solutions Group, March 10, 2011.
20. Joye SB, MacDonald IR, Leifer I, Asper V (2011) Magnitude and oxidation potential of hydrocarbon gases released from the BP oil well blowout. *Nat Geosci* 4:160–164.
21. Wang ZD, Fingas M, Sergy G (1994) Study of 22-year-old arrow oil samples using biomarker compounds by GC/MS. *Environ Sci Technol* 28:1733–1746.
22. Maki H, Sasaki T, Harayama S (2001) Photo-oxidation of biodegraded crude oil and toxicity of the photo-oxidized products. *Chemosphere* 44:1145–1151.
23. Strom-kristiansen T, Lewis A, Daling PS, Hokstad JN, Singsaas I (1997) Weathering and dispersion of naphthenic, asphaltenic and waxy crude oils. *International Oil Spill Conference-Improving Environmental Protection* (American Petroleum Institute, Washington, DC), pp 631–636.
24. Ryerson TB, et al. (2011) Atmospheric emissions from the Deepwater Horizon spill constrain air-water partitioning, hydrocarbon fate, and leak rate. *Geophys Res Lett* 38:L07803, 10.1029/2011GL046726.
25. Yvon-Lewis SA, Hu L, Kessler J (2011) Methane flux to the atmosphere from the Deepwater Horizon oil disaster. *Geophys Res Lett* 38:L01602.
26. McGinnis DF, Greinert J, Artemov Y, Beaubien SE, Wüest A (2006) Fate of rising methane bubbles in stratified waters: How much methane reaches the atmosphere? *J Geophys Res* 111:C09007, 10.1029/2005JC003183.
27. Yapa PD, Dasanayaka LK, Bandara UC, Nakata K (2008) Modeling the impact of an accidental release of methane gas in deepwater. *Oceans 2008* (Institute of Electrical and Electronics Engineers, New York), 10.1109/OCEANS.2008.5151817.
28. United States Department of Energy (2010) Key events timeline., Available at http://www.energy.gov/open/oilspilldata.htm. Accessed April 11, 2011.
29. Kujawinski EB, et al. (2011) Fate of dispersants associated with the Deepwater Horizon oil spill. *Environ Sci Technol* 45:1298–1306.
30. Sansone FJ, Popp BN, Rust TM (1997) Stable carbon isotopic analysis of low-level methane in water and gas. *Anal Chem* 69:40–44.

# Supporting Information

## Reddy et al. 10.1073/pnas.1101242108

### SI Text

**Background on Isobaric Gas-Tight (IGT) Samplers.** Fig. S1*A* shows a photograph of an IGT sampler, which is constructed of chemically inert titanium and designed for gas-tight collection of fluids at pressures to 450 bar and temperatures in excess of 400 °C (1). A thermocouple attached to the snorkel inlet allows real-time monitoring of fluid temperature. The sampler is 45-cm long without the snorkel and weighs 15 kg in air and 8.4 kg in seawater. Filling the 150-mL sample volume requires approximately 90 s. Real-time communication is accomplished through an inductively coupled link (2).

**Recovery of Gas and Oil from the IGTs.** Fig. S1*B* shows a schematic of the system used to collect and separate the gas and oil from the IGTs. The sampler content was expelled into the separation reservoir where degassing of liquid oil and water occurred. Oil and water remained in the separation reservoir while the gas was diverted into submerged 10-L Tedlar bags. As the Tedlar bag inflated, water was displaced from the tank and collected in a graduated cylinder. The gas-to-oil ratio (GOR) was calculated from the volume of gas (corrected for the hydrostatic head of the displacement tank) and oil collected. The uncertainty of the measurement is 2%.

Because each sampler required more than one Tedlar bag to collect all of the gas released during the separation step, the Tedlar bags for a given sampler were attached to a custom-made stainless steel manifold to chemically and isotopically equilibrate the bags, eliminating any fractionation effects that may have occurred during depressurization and withdrawal.

**Results from MW-1 and MW-2 Gas and Oil Analysis.** We characterized the gas and oil in MW-1 and MW-2 with numerous techniques (Table S1). Here, we discuss what was analyzed and how it was analyzed. If not presented elsewhere, we comment on the results. We considered three categories: bulk, compound class, and molecular-level. For some of these categories, stable carbon and hydrogen isotope measurements were performed.

#### I. Bulk.

i. Density was measured directly on the oil fraction at 22 °C, and the American Petroleum Institute (API) gravity was estimated from the density.

ii. Analysis of the oil fraction for carbon, hydrogen, nitrogen, and sulfur content was performed by Midwest Microlabs, Inc.

iii. Percent saturated and aromatic hydrocarbons from $n$-$C_{5+}$ was calculated by combining results of GC–flame ionization detection (FID) ($n$-$C_5$ to $n$-$C_{10}$) and GC×GC-FID for $n$-$C_{10+}$ (Figs. S2 and S3)(3). Polar hydrocarbon content was determined from the analysis of the oil by GeoMark Research, Inc., for the $C_{15+}$ fraction and normalized to the whole oil based on GC analysis, GC×GC analysis, and high-temperature simulated distillation. The isotopic composition of the saturated and aromatic hydrocarbons for $n$-$C_{15+}$ was performed by GeoMark Research, Inc. High-temperature simulated distillation by GC was performed on the GC-amenable fraction of the MW-1 oil. This analysis revealed that, on a nonpolar capillary column, 15, 25, 50, and 75% of the mass elutes before the $n$-$C_9$, $n$-$C_{11}$, $n$-$C_{18}$, and $n$-$C_{30}$ saturated alkanes, respectively (Triton Analytics).

#### II. Compound class.

i. Compound class abundance was calculated from GC-FID and GC×GC-FID analyses. GC-FID data was used for the carbon range up to $n$-$C_{10}$. Using appropriate first- and second-dimension constraints for each compound class, GC×GC-FID was used to calculate compound class abundance for the $n$-$C_{10}$ to $n$-$C_{38}$ elution window (3).

#### III. Molecular-level.

i. The analyses of gas released from the IGTs and their carbon isotope values were performed by Isotech Laboratories. Hydrogen isotope analysis was done at the Woods Hole Oceanographic Institution (WHOI). Butanes and pentanes were observed in both the gas and oil fractions of MW-1 and MW-2. Isotope values for butanes and pentanes were measured in the gas fraction only.

ii. Individual compounds in the oil were measured by GC-FID, GC-MS, GC×GC-FID, and comprehensive two-dimensional gas chromatography with time-of-flight mass spectrometry (GC×GC-MS) (Table S2) (4–6).

The analyses described above indicate the oil was light (40° API), sweet (<0.5% sulfur), with a high saturated hydrocarbon content (Table 1 and Table S1). There is no evidence of biodegradation based on the high abundance of $n$-alkanes (Figs. S2 and S3; Tables S1 and S2).

**Contamination Avoidance Program for Water Sampling on the Research Vessel (R/V) Endeavor Cruise 478 (June 2010).** Because oil was frequently on the sea surface during this cruise, we developed a comprehensive contamination avoidance program. Our goals were to (i) minimize any oil contact with sampling equipment, the vessel, or personnel; (ii) isolate areas of high probability of oiling; and (iii) decontaminate immediately. These steps included segregating the deck of the research vessel into "hot," "warm," and "cold" zones, which demanded redirecting the foot traffic of the vessel. The hot zone was limited to only several members of the science crew where contact with oil was highest, mainly when deploying and recovering sampling gear. The warm zone was a transition zone where boots and other gear used in the hot zone stayed behind and were exchanged for "clean" footwear. The cold zone was the rest of the vessel. High traffic areas of the deck were covered with sorbent padding, which was replaced one to two times a day. Gloves, sorbent pads, and other potentially contaminated materials were placed in special disposal barrels.

Routine water sampling followed a standard protocol. First, we used Go-Flo bottles, which employ a unique design intended to reduce contamination from surface oil by opening hydrostatically beneath the sea surface. They are deployed in a "closed" position and are set to "open" by hydrostatic release at 10-m depth. Before this cruise, we reconditioned 12 Go-Flos by reducing any materials that would either contribute petroleum hydrocarbons or other organic compounds as well as sorb hydrocarbons. For example, we coated the inside of each bottle with a Teflon spray. Before deployment and recovery of the rosette, the sea surface was "cleaned" with Dawn dish detergent with a garden hose via an aspirator. Once the water samples were collected, they were passed hand-to-hand from the hot zone through a passageway to a warm zone. The Go-Flo bottles and the rest of the rosette were vigorously scrubbed with a solution of Dawn and then rinsed with fresh water.

Several times on the cruise after cleaning the Go-Flo bottles, 10 L of deionized water were poured into a randomly selected bottle. After ten minutes, water blanks were collected for volatile and semivolatile organic compound analysis. The bottle was then cleaned again before deployment.

**Aqueous Solubility.** "Aqueous solubility" refers to the subcooled liquid aqueous solubility, $S_i^{aq}$ (mol L$^{-1}$). This is the aqueous solubility of a hypothetical pure liquid of solute $i$, which is distinct from the real solubility if the system is a solid at the temperature of interest. Hydrocarbons are expected to partition from the liquid oil phase into the aqueous phase according to their subcooled liquid aqueous solubilities multiplied by their mole fraction in the oil phase, assuming Raoult's law (7).

Approximate solubility values for methane, ethane, and propane at 5 °C and 100 bar were interpolated from measured methane, ethane, and butane solubilities reported by Dhima et al. (8) and Kim et al. (9) at varying temperatures and pressures. Solubility values for benzene, toluene, xylenes, $n$-propylbenzene,

trimethylbenzenes, naphthalene, C$_1$-naphthalenes, fluorene, phenanthrene, pyrene, fluoranthene, benz[$a$]anthracene were taken from previously published compilations of (subcooled) liquid aqueous solubility at 25 °C and 1 bar (7, 10). Solubility values for the remaining compounds were estimated based on the known values of analogous compounds modified by fragment contributions reported by Myrdal et al. (11). Aqueous solubility values for benzene and larger hydrocarbons were assumed to be negligibly affected by the high pressures (100–150 bar) of the deep water column, based on the findings of Sawamura et al. (12); hence, solubility data measured at 1 bar were used for these compounds. Additionally, aqueous solubility values for benzene and larger hydrocarbons were not adjusted to ambient temperature (5 °C), because the relevant physical property data are not available for most compounds and because this is considered likely to be a small correction. Aqueous solubility values were not corrected for salinity, which was considered a small adjustment that would affect all hydrocarbon compounds similarly (7).

1. Seewald JS, Doherty KW, Hammar TR, Liberatore SP (2002) A new gas-tight isobaric sampler for hydrothermal fluids. *Deep-Sea Res Part I* 49:189–196.
2. Bradley AM, Tivey MK, Liberatore SP, Duester AR (1995) Development and testing of thermocouple/thermistor array packages for monitoring temperature at hydrothermal vent sites. *EOS* 76: F4211.
3. Ventura GT, Raghuraman B, Mullins OC, Nelson RK, Reddy CM (2010) Chemical compound class oil fingerprinting techniques using comprehensive two-dimensional gas chromatography (GC×GC). *Org Geochem* 41:1026–1035.
4. Nelson RK, et al. (2006) Tracking the weathering of an oil spill with comprehensive two-dimensional gas chromatography. *Environ Forensics* 7:33–44.
5. Farwell C, et al. (2009) Weathering and the fallout plume of heavy oil from strong petroleum seeps near Coal Oil Point, CA. *Environ Sci Technol* 43:3542–3548.
6. Lemkau KL, et al. (2010) The M/V *Cosco Busan* Spill: Source identification and short-term fate. *Mar Pollut Bull* 60:2123–2129.
7. Schwarzenbach RP, Gschwend PM, Imboden DM (2003) *Environmental Organic Chemistry.* (John Wiley & Sons, Inc, Hoboken, NJ).
8. Dhima A, de Hemptinne JC, Moracchini G (1998) Solubility of light hydrocarbons and their mixtures in pure water under high pressure. *Fluid Phase Equilib* 145:129–150.
9. Kim YS, Ryu SK, Yang SO, Lee CS (2003) Liquid water-hydrate equilibrium measurements and unified predictions of hydrate-containing phase equilibria for methane, ethane, propane, and their mixtures. *Ind Eng Chem Res* 42:2409–2414.
10. Arey JS, Nelson RK, Xu L, Reddy CM (2005) Using comprehensive two-dimensional gas chromatography retention indices to estimate environmental partitioning properties for a complete set of diesel fuel hydrocarbons. *Anal Chem* 77: 7172–7182.
11. Myrdal PB, Manka AM, Yalkowsky SH (1995) AQUAFAC 3: Aqueous functional group activity coefficients; application to the estimation of aqueous solubility. *Chemosphere* 30:1619–1637.
12. Sawamura S, Kitamura K, and Taniguchi Y (1989) Effect of pressure on the solubilities of benzene and alkylbenzenes in water. *J Phys Chem* 93:4931–4935.





**Fig. S1.** Images of (*A*) IGT sampler and (*B*) schematic of system used to collect and separate the contents of the IGTs.



**Fig. S2.** GC-FID chromatogram of the oil fraction from MW-1. On the x axis, time has been converted to n-alkane carbon number. Compounds identified include benzene, toluene, ethylbenzene, as well as m-, p-, and o-xylenes.



**Fig. S3.** GC×GC-FID chromatogram of MW-1 oil depicted as a volatility-by-polarity color-contour plot. The first dimension is a separation using a nonpolar 100% polydimethylsiloxane stationary phase, and the second dimension is a separation using a polar 50% phenyl polysilphenylene stationary phase. The location of chemical classes on a volatility-by-polarity GC×GC chromatogram are annotated (3). Nonpolar alkanes are located at the bottom, with one-ring and multi-ring aromatic hydrocarbons further up the y axis. Internal standards are in green.



**Fig. S4.** Fractionation index values versus aqueous solubilities for compounds in deep water column samples collected on the R/V *Endeavor* (cruise 478; June 2010). (*A*) Fractionation index values as a function of aqueous solubility for 33 compounds measured at 20 sampling locations (totaling 467 data points). Sampling locations had distances ranging from 1.7 to 34.6 km from the Macondo well and depths ranging from 1,065 to 1,221 m. (*B*) Mean fractionation index values and 68% confidence intervals versus aqueous solubility for 26 compounds measured at 14 sites. Compounds with fewer than three individual fractionation index data were excluded, because meaningful error statistics could not be calculated for these cases. The confidence interval for each compound was estimated from a gamma distribution fitted to the fractionation index data. For compounds that are solids at ambient conditions, "aqueous solubility" refers to the subcooled liquid aqueous solubility; this is explained further in the *SI Text*. One sample (Station 19, depth 1201 m) deviated significantly from the trends shown above. This sample was collected relatively near to the Macondo well (see main text and Fig. S5 for further discussion).



**Fig. S5.** This sample was collected relatively near the Macondo well (Station 19; 2.3 km SW of the Macondo well; 1201-m depth) and exhibited aberrantly high fractionation index values for several sparingly soluble compounds (e.g., $F_{pyrene,benzene} = 2.2$ and $F_{C14+n-alkanes,benzene} = 11.7$). We interpret that this sample contained liquid oil from which water-soluble components had been predominantly removed.

**Table S1. Quantities of individual gases released from the Macondo well as calculated in this study and by Valentine et al. (1), Kessler et al. (2), and Joye et al. (3)**

| Analyte | MW-1 content, % | Total hydrocarbons released from the Macondo well | | | |
|---|---|---|---|---|---|
| | | Current study*, g | Valentine et al. (1)[†], g | Kessler et al. (2)[‡], g | Joye et al. (3)[§], g |
| Gas[¶] | | | | | |
| Methane | 82.5 | $1.0 \times 10^{11}$ | $2.1 \times 10^{11}$ | $1.5 \times 10^{11}$ to $2.0 \times 10^{11}$ | $3.5 \times 10^{11}$ to $4.9 \times 10^{11}$ |
| Ethane | 8.3 | $1.9 \times 10^{10}$ | $3.6 \times 10^{10}$ | $2.6 \times 10^{10}$ to $3.5 \times 10^{10}$ | $2.5 \times 10^{10}$ to $3.5 \times 10^{10}$ |
| Propane | 5.3 | $1.8 \times 10^{10}$ | $2.8 \times 10^{10}$ | $2.0 \times 10^{10}$ to $2.8 \times 10^{10}$ | $1.4 \times 10^{10}$ to $1.9 \times 10^{10}$ |
| Isobutane | 0.97 | $4.7 \times 10^{9}$ | — | — | — |
| n-butane | 1.9 | $1.0 \times 10^{10}$ | — | — | $1.3 \times 10^{10}$ to $1.8 \times 10^{10}$ |
| Isopentane | 0.52 | $5.6 \times 10^{9}$ | — | — | — |
| n-pentane | 0.52 | $7.3 \times 10^{9}$ | — | — | $7.5 \times 10^{9}$ to $1.0 \times 10^{10}$ |
| Total (C₁ to C₅ hydrocarbons) | | $1.7 \times 10^{11}$ | — | — | — |
| Oil[∥] | | | | | |
| GC-amenable** | | | | | |
| n-alkanes | 0.15 | $8.1 \times 10^{10}$ | — | — | — |
| Branched alkanes | 0.26 | $1.4 \times 10^{11}$ | — | — | — |
| Cycloalkanes | 0.16 | $8.4 \times 10^{10}$ | — | — | — |
| Alkylbenzenes and indenes | 0.09 | $4.8 \times 10^{10}$ | — | — | — |
| Polycyclic aromatic hydrocarbons | 0.039 | $2.1 \times 10^{10}$ | — | — | — |
| Biomarkers | 0.016 | $8.8 \times 10^{9}$ | — | — | — |
| Others | 0.18 | $1.5 \times 10^{11}$ | — | — | — |
| Polars[††] | 0.10 | $5.4 \times 10^{10}$ | — | — | — |
| Total oil (GC-amenable and polars) | | $5.3 \times 10^{11}$ | — | — | $6.0 \times 10^{11}$ to $8.4 \times 10^{11}$ |
| Total gas and oil | | $6.9 \times 10^{11}$ | — | — | — |

*Calculated with a net oil emission of $4.1 \times 10^{6}$ barrels (4).

[†]As reported in SI text of Valentine et al. (1).

[‡]As reported in table 1 of Kessler et al. (2).

[§]Oil and gas fluxes as reported by Joye et al. (3) in table 1 of their manuscript, but their table S1 values appear to be correct. Note that it appears Joye et al. (3) switched *i*-butane and *n*-butane values in table 2 of their manuscript, but their table S1 values appear to be correct.

[¶]We measured butanes and pentanes in both the gas and oil in MW-1 (*SI Text*). In the second column, we present only the butanes and pentanes isolated in our gas fraction. For a complete accounting of all compounds collected, refer to Table S2.

[∥]Based on the oil composition from n-C₅ and n-C₃₈.

**GC-amenable is defined as the saturated plus aromatic hydrocarbons fractions of the oil.

[††]Polar hydrocarbon content (10%) was calculated from the analysis of the oil by Geomark for the C₁₅₊ fraction and normalized to the whole oil based on GC analysis, GC×GC analysis, and high-temperature simulated distillation.

1 Valentine DL, et al. (2010) Propane respiration jump-starts microbial response to a deep oil spill. *Science* 330:208–211.
2 Kessler JD, et al. (2011) A persistent oxygen anomaly reveals the fate of the spilled methane in the deep Gulf of Mexico. *Science* 331:312-315.
3 Joye SB, MacDonald IR, Leifer I, Asper V (2011) Magnitude and oxidation potential of hydrocarbon gases released from the BP oil well blowout. *Nat Geosci* 4:160–164.
4 McNutt M, et al. (2011) Assessment of flow rate estimates for the Deepwater Horizon/Macondo well oil spill. Flow Rate Technical Group report to the National Incident Command, Interagency Solutions Group, March 10, 2011.

**Table S2. Concentration of petroleum hydrocarbons measured in the MW-1 gas and oil fractions, calculated composition of the "reconstituted" reservoir fluid, and total amount of each compound released**

| Compound | Isolated gas fraction from MW-1, g g⁻¹ of gas | Isolated oil fraction from MW-1, g g⁻¹ of oil | Reconstituted reservoir fluid, g g⁻¹ of fluid | Total released*, g |
|---|---|---|---|---|
| Methane ($\delta^{13}C = -57.5$‰; $\delta D = -187$‰) | $6.2 \times 10^{-1}$ | 0 | $1.5 \times 10^{-1}$ | $1.0 \times 10^{11}$ |
| Ethane ($\delta^{13}C = -31.5$‰; $\delta D = -147$‰) | $1.2 \times 10^{-1}$ | 0 | $2.8 \times 10^{-2}$ | $1.9 \times 10^{10}$ |
| Propane ($\delta^{13}C = -29.2$‰; $\delta D = -123$‰) | $1.1 \times 10^{-1}$ | 0 | $2.6 \times 10^{-2}$ | $1.8 \times 10^{10}$ |
| i-C₄ ($\delta^{13}C = -29.9$‰) | $2.6 \times 10^{-2}$ | $6.1 \times 10^{-4}$ | $6.7 \times 10^{-3}$ | $4.7 \times 10^{9}$ |
| n-C₄ ($\delta^{13}C = -27.9$‰; $\delta D = -119$‰) | $5.2 \times 10^{-2}$ | $2.9 \times 10^{-3}$ | $1.5 \times 10^{-2}$ | $1.0 \times 10^{10}$ |
| i-C₅ | $1.8 \times 10^{-2}$ | $5.0 \times 10^{-3}$ | $7.9 \times 10^{-3}$ | $5.6 \times 10^{9}$ |
| n-C₅ | $1.7 \times 10^{-2}$ | $8.1 \times 10^{-3}$ | $1.0 \times 10^{-2}$ | $7.3 \times 10^{9}$ |
| Carbon dioxide | $2.5 \times 10^{-2}$ | 0 | $5.9 \times 10^{-3}$ | $4.2 \times 10^{9}$ |
| 2,2-dimethylbutane | 0 | $2.5 \times 10^{-4}$ | $1.9 \times 10^{-4}$ | $1.3 \times 10^{8}$ |
| Cyclopentane | 0 | $1.3 \times 10^{-3}$ | $1.0 \times 10^{-3}$ | $7.1 \times 10^{8}$ |
| 2,3-dimethylbutane | 0 | $8.2 \times 10^{-4}$ | $6.3 \times 10^{-4}$ | $4.4 \times 10^{8}$ |
| 2-methylpentane | 0 | $6.2 \times 10^{-3}$ | $4.7 \times 10^{-3}$ | $3.3 \times 10^{9}$ |
| 3-methylpentane | 0 | $3.9 \times 10^{-3}$ | $3.0 \times 10^{-3}$ | $2.1 \times 10^{9}$ |
| n-C₆ [†] | $2.0 \times 10^{-2}$ | $1.2 \times 10^{-2}$ | $1.4 \times 10^{-2}$ | $9.6 \times 10^{9}$ |
| 2,2-dimethylpentane | 0 | $3.0 \times 10^{-4}$ | $2.3 \times 10^{-4}$ | $1.6 \times 10^{8}$ |
| Methylcyclopentane | 0 | $6.9 \times 10^{-3}$ | $5.3 \times 10^{-3}$ | $3.7 \times 10^{9}$ |
| 2,4-dimethylpentane | 0 | $7.8 \times 10^{-4}$ | $6.0 \times 10^{-4}$ | $4.2 \times 10^{8}$ |
| 2,2,3-trimethylbutane | 0 | $6.0 \times 10^{-5}$ | $4.6 \times 10^{-5}$ | $3.2 \times 10^{7}$ |
| Benzene | 0 | $3.0 \times 10^{-3}$ | $2.3 \times 10^{-3}$ | $1.6 \times 10^{9}$ |
| 3,3-dimethylpentane | 0 | $1.7 \times 10^{-4}$ | $1.3 \times 10^{-4}$ | $9.2 \times 10^{7}$ |
| Cyclohexane | 0 | $7.4 \times 10^{-3}$ | $5.7 \times 10^{-3}$ | $4.0 \times 10^{9}$ |
| 2-methylhexane | 0 | $4.9 \times 10^{-3}$ | $3.7 \times 10^{-3}$ | $2.6 \times 10^{9}$ |

| Compound | Isolated gas fraction from MW-1, g g$^{-1}$ of gas | Isolated oil fraction from MW-1, g g$^{-1}$ of oil | Reconstituted reservoir fluid, g g$^{-1}$ of fluid | Total released*, g |
|---|---|---|---|---|
| 2,3-dimethylpentane | 0 | $1.6 \times 10^{-3}$ | $1.2 \times 10^{-3}$ | $8.6 \times 10^{8}$ |
| 1,1-dimethylcyclopentane | 0 | $8.8 \times 10^{-4}$ | $6.7 \times 10^{-4}$ | $4.7 \times 10^{8}$ |
| 3-methylhexane | 0 | $5.3 \times 10^{-3}$ | $4.0 \times 10^{-3}$ | $2.8 \times 10^{9}$ |
| 1,3-dimethylcyclopentane (cis) | 0 | $1.8 \times 10^{-3}$ | $1.4 \times 10^{-3}$ | $9.8 \times 10^{8}$ |
| 1,3-dimethylcyclopentane (trans) | 0 | $1.8 \times 10^{-3}$ | $1.4 \times 10^{-3}$ | $9.5 \times 10^{8}$ |
| 3-ethylpentane | 0 | $3.8 \times 10^{-4}$ | $2.9 \times 10^{-4}$ | $2.0 \times 10^{8}$ |
| 1,2- dimethylcyclopentane (trans) | 0 | $3.0 \times 10^{-3}$ | $2.3 \times 10^{-3}$ | $1.6 \times 10^{9}$ |
| $n$-C$_7$ | 0 | $1.4 \times 10^{-2}$ | $1.0 \times 10^{-2}$ | $7.4 \times 10^{9}$ |
| Methylcyclohexane | 0 | $1.7 \times 10^{-2}$ | $1.3 \times 10^{-2}$ | $9.1 \times 10^{9}$ |
| 2,5-dimethylhexane | 0 | $6.6 \times 10^{-4}$ | $5.0 \times 10^{-4}$ | $3.6 \times 10^{8}$ |
| 2,4-dimethylhexane | 0 | $8.7 \times 10^{-4}$ | $6.6 \times 10^{-4}$ | $4.7 \times 10^{8}$ |
| Ethylcyclopentane | 0 | $1.0 \times 10^{-3}$ | $7.7 \times 10^{-4}$ | $5.4 \times 10^{8}$ |
| 1,2,3-trimethylcyclopentane (ctc) | 0 | $9.3 \times 10^{-4}$ | $7.1 \times 10^{-4}$ | $5.0 \times 10^{8}$ |
| 2,3,4-trimethylpentane | 0 | $1.4 \times 10^{-4}$ | $1.1 \times 10^{-4}$ | $7.5 \times 10^{7}$ |
| 2,3-dimethylhexane | 0 | $5.7 \times 10^{-4}$ | $4.4 \times 10^{-4}$ | $3.1 \times 10^{8}$ |
| 2-methylheptane | 0 | $5.3 \times 10^{-3}$ | $4.0 \times 10^{-3}$ | $2.8 \times 10^{9}$ |
| 4-methylheptane | 0 | $1.4 \times 10^{-3}$ | $1.1 \times 10^{-3}$ | $7.6 \times 10^{8}$ |
| 3-ethylheptane | 0 | $3.1 \times 10^{-3}$ | $2.4 \times 10^{-3}$ | $1.7 \times 10^{9}$ |
| 3-ethylhexane | 0 | $3.4 \times 10^{-4}$ | $2.6 \times 10^{-4}$ | $1.8 \times 10^{8}$ |
| Toluene | 0 | $8.5 \times 10^{-3}$ | $6.5 \times 10^{-3}$ | $4.6 \times 10^{9}$ |
| 1,4-dimethylcyclohexane (trans) | 0 | $1.5 \times 10^{-3}$ | $1.1 \times 10^{-4}$ | $8.1 \times 10^{8}$ |
| $n$-C$_8$ | 0 | $1.3 \times 10^{-2}$ | $1.0 \times 10^{-2}$ | $7.1 \times 10^{9}$ |
| 1,2-dimethylcyclohexane | 0 | $2.0 \times 10^{-3}$ | $1.5 \times 10^{-3}$ | $1.1 \times 10^{9}$ |
| 4-methyloctane | 0 | $1.6 \times 10^{-3}$ | $1.2 \times 10^{-3}$ | $8.5 \times 10^{8}$ |
| 2-methyloctane | 0 | $2.1 \times 10^{-3}$ | $1.6 \times 10^{-3}$ | $1.1 \times 10^{9}$ |
| Ethylbenzene | 0 | $1.2 \times 10^{-3}$ | $9.5 \times 10^{-4}$ | $6.7 \times 10^{8}$ |
| 3-methyloctane | 0 | $2.1 \times 10^{-3}$ | $1.6 \times 10^{-3}$ | $1.2 \times 10^{9}$ |
| $p/m$-xylene | 0 | $6.6 \times 10^{-3}$ | $5.1 \times 10^{-3}$ | $3.6 \times 10^{9}$ |
| $o$-xylene | 0 | $2.4 \times 10^{-3}$ | $1.9 \times 10^{-3}$ | $1.3 \times 10^{9}$ |
| $n$-C$_9$ | 0 | $1.2 \times 10^{-2}$ | $9.4 \times 10^{-3}$ | $6.6 \times 10^{9}$ |
| Isopropylcyclohexane | 0 | $5.7 \times 10^{-4}$ | $4.4 \times 10^{-4}$ | $3.1 \times 10^{8}$ |
| Isopropylbenzene | 0 | $3.4 \times 10^{-4}$ | $2.6 \times 10^{-4}$ | $1.8 \times 10^{8}$ |
| 3,3-dimethyloctane | 0 | $2.0 \times 10^{-3}$ | $1.5 \times 10^{-3}$ | $1.1 \times 10^{8}$ |
| $n$-propylbenzene | 0 | $5.7 \times 10^{-4}$ | $4.4 \times 10^{-4}$ | $3.1 \times 10^{8}$ |
| 2-methylnonane | 0 | $1.3 \times 10^{-3}$ | $9.5 \times 10^{-4}$ | $6.7 \times 10^{8}$ |
| 3-methylnonane | 0 | $1.0 \times 10^{-3}$ | $7.9 \times 10^{-4}$ | $5.6 \times 10^{8}$ |
| 1-methyl-3-ethylbenzene | 0 | $1.5 \times 10^{-3}$ | $1.2 \times 10^{-3}$ | $8.2 \times 10^{8}$ |
| 1-methyl-4-ethylbenzene | 0 | $6.4 \times 10^{-4}$ | $4.9 \times 10^{-4}$ | $3.4 \times 10^{8}$ |
| 1,3,5-trimethylbenzene | 0 | $1.2 \times 10^{-3}$ | $9.2 \times 10^{-4}$ | $6.5 \times 10^{8}$ |
| 1-methyl-2-ethylbenzene | 0 | $6.9 \times 10^{-4}$ | $5.3 \times 10^{-4}$ | $3.7 \times 10^{8}$ |
| $n$-C$_{10}$ | 0 | $1.1 \times 10^{-2}$ | $8.7 \times 10^{-3}$ | $6.1 \times 10^{9}$ |
| 1,2,4-trimethylbenzene | 0 | $3.0 \times 10^{-3}$ | $2.3 \times 10^{-3}$ | $1.6 \times 10^{9}$ |
| Isobutylbenzene | 0 | $1.1 \times 10^{-4}$ | $8.4 \times 10^{-5}$ | $5.9 \times 10^{7}$ |
| $sec$-butylbenzene | 0 | $1.9 \times 10^{-4}$ | $1.5 \times 10^{-4}$ | $1.0 \times 10^{8}$ |
| 1-methyl-3-isopropylbenzene | 0 | $3.6 \times 10^{-4}$ | $2.8 \times 10^{-4}$ | $1.9 \times 10^{8}$ |
| 1-methyl-4-isopropylbenzene | 0 | $2.0 \times 10^{-4}$ | $1.5 \times 10^{-4}$ | $1.1 \times 10^{8}$ |
| 1,2,3-trimethylbenzene | 0 | $1.0 \times 10^{-3}$ | $7.6 \times 10^{-4}$ | $5.4 \times 10^{8}$ |
| 1,3-diethylbenzene | 0 | $1.6 \times 10^{-4}$ | $1.2 \times 10^{-4}$ | $8.6 \times 10^{7}$ |
| 1-methyl-3-propylbenzene | 0 | $7.3 \times 10^{-4}$ | $5.6 \times 10^{-4}$ | $3.9 \times 10^{8}$ |
| 1-methyl-4-propylbenzene | 0 | $3.0 \times 10^{-4}$ | $2.3 \times 10^{-4}$ | $1.6 \times 10^{8}$ |
| $n$-butylbenzene | 0 | $2.8 \times 10^{-4}$ | $2.1 \times 10^{-4}$ | $1.5 \times 10^{8}$ |
| 1,2-dimethyl-4-ethylbenzene | 0 | $5.3 \times 10^{-4}$ | $4.0 \times 10^{-4}$ | $2.9 \times 10^{8}$ |
| 1-methyl-2-propylbenzene | 0 | $3.9 \times 10^{-4}$ | $3.0 \times 10^{-4}$ | $2.1 \times 10^{8}$ |
| 1,4-dimethyl-2-ethylbenzene | 0 | $3.6 \times 10^{-4}$ | $2.8 \times 10^{-4}$ | $1.9 \times 10^{8}$ |
| $n$-C$_{11}$ | 0 | $1.1 \times 10^{-2}$ | $8.1 \times 10^{-3}$ | $5.7 \times 10^{9}$ |
| 1,3-dimethyl-4-ethylbenzene | 0 | $3.8 \times 10^{-4}$ | $2.9 \times 10^{-4}$ | $2.0 \times 10^{8}$ |
| 1,3-dimethyl-5-ethylbenzene | 0 | $5.0 \times 10^{-4}$ | $3.8 \times 10^{-4}$ | $2.7 \times 10^{8}$ |
| Naphthalene | 0 | $1.1 \times 10^{-3}$ | $8.2 \times 10^{-4}$ | $5.8 \times 10^{8}$ |
| C$_1$-naphthalenes | 0 | $2.3 \times 10^{-3}$ | $1.8 \times 10^{-3}$ | $1.3 \times 10^{9}$ |
| C$_2$-naphthalenes | 0 | $2.8 \times 10^{-3}$ | $2.2 \times 10^{-3}$ | $1.5 \times 10^{9}$ |
| C$_3$-naphthalenes | 0 | $2.1 \times 10^{-3}$ | $1.6 \times 10^{-3}$ | $1.1 \times 10^{9}$ |
| C$_4$-naphthalenes | 0 | $9.1 \times 10^{-4}$ | $6.9 \times 10^{-4}$ | $4.9 \times 10^{8}$ |
| 1,2,3,4-tetramethylbenzene | 0 | $4.3 \times 10^{-4}$ | $3.3 \times 10^{-4}$ | $2.3 \times 10^{8}$ |
| $n$-C$_{12}$ | 0 | $9.4 \times 10^{-3}$ | $7.2 \times 10^{-3}$ | $5.1 \times 10^{9}$ |
| $i$-C$_{13}$ | 0 | $2.3 \times 10^{-3}$ | $1.8 \times 10^{-3}$ | $1.2 \times 10^{9}$ |
| $i$-C$_{14}$ | 0 | $1.7 \times 10^{-3}$ | $1.3 \times 10^{-3}$ | $9.1 \times 10^{8}$ |
| $n$-C$_{13}$ | 0 | $8.3 \times 10^{-3}$ | $6.3 \times 10^{-3}$ | $4.5 \times 10^{9}$ |
| $i$-C$_{15}$ | 0 | $1.7 \times 10^{-3}$ | $1.3 \times 10^{-3}$ | $9.1 \times 10^{8}$ |
| $n$-C$_{14}$ | 0 | $7.6 \times 10^{-3}$ | $5.8 \times 10^{-3}$ | $4.1 \times 10^{9}$ |
| $i$-C$_{16}$ | 0 | $2.9 \times 10^{-3}$ | $2.2 \times 10^{-3}$ | $1.5 \times 10^{9}$ |
| $n$-C$_{15}$ ($\delta^{13}$C = $-29.4$‰) | 0 | $7.3 \times 10^{-3}$ | $5.5 \times 10^{-3}$ | $3.9 \times 10^{9}$ |

| Compound | Isolated gas fraction from MW-1, g g$^{-1}$ of gas | Isolated oil fraction from MW-1, g g$^{-1}$ of oil | Reconstituted reservoir fluid, g g$^{-1}$ of fluid | Total released*, g |
|---|---|---|---|---|
| Fluorene | 0 | $1.7 \times 10^{-4}$ | $1.3 \times 10^{-4}$ | $9.2 \times 10^{7}$ |
| $C_1$-fluorenes | 0 | $4.4 \times 10^{-4}$ | $3.4 \times 10^{-4}$ | $2.4 \times 10^{8}$ |
| $C_2$-fluorenes | 0 | $6.5 \times 10^{-4}$ | $5.0 \times 10^{-4}$ | $3.5 \times 10^{8}$ |
| $C_3$-fluorenes | 0 | $5.8 \times 10^{-4}$ | $4.4 \times 10^{-4}$ | $3.1 \times 10^{8}$ |
| $n$-$C_{16}$ ($\delta^{13}C = -29.2‰$) | 0 | $6.1 \times 10^{-3}$ | $4.6 \times 10^{-3}$ | $3.3 \times 10^{9}$ |
| $i$-$C_{18}$ | 0 | $1.9 \times 10^{-3}$ | $1.5 \times 10^{-3}$ | $1.0 \times 10^{9}$ |
| $n$-$C_{17}$ ($\delta^{13}C = -29.2‰$; $\delta D = -104.2‰$) | 0 | $5.4 \times 10^{-3}$ | $4.1 \times 10^{-3}$ | $2.9 \times 10^{9}$ |
| Pristane | 0 | $3.1 \times 10^{-3}$ | $2.4 \times 10^{-3}$ | $1.7 \times 10^{9}$ |
| Dibenzothiophene | 0 | $1.0 \times 10^{-4}$ | $7.6 \times 10^{-5}$ | $5.4 \times 10^{7}$ |
| $C_1$-dibenzothiophenes | 0 | $3.4 \times 10^{-4}$ | $2.6 \times 10^{-4}$ | $1.8 \times 10^{8}$ |
| $C_2$-dibenzothiophenes | 0 | $4.8 \times 10^{-4}$ | $3.7 \times 10^{-4}$ | $2.6 \times 10^{8}$ |
| $C_3$-dibenzothiophenes | 0 | $3.9 \times 10^{-4}$ | $3.0 \times 10^{-4}$ | $2.1 \times 10^{8}$ |
| $C_4$-dibenzothiophenes | 0 | $2.4 \times 10^{-4}$ | $1.8 \times 10^{-4}$ | $1.3 \times 10^{8}$ |
| Phenanthrene | 0 | $4.0 \times 10^{-4}$ | $3.1 \times 10^{-4}$ | $2.2 \times 10^{8}$ |
| $C_1$-phenanthrenes | 0 | $9.9 \times 10^{-4}$ | $7.6 \times 10^{-4}$ | $5.3 \times 10^{8}$ |
| $C_2$-phenanthrenes | 0 | $1.1 \times 10^{-3}$ | $8.2 \times 10^{-4}$ | $5.8 \times 10^{8}$ |
| $C_3$-phenanthrenes | 0 | $7.6 \times 10^{-4}$ | $5.8 \times 10^{-4}$ | $4.1 \times 10^{8}$ |
| $C_4$-phenanthrenes | 0 | $3.6 \times 10^{-4}$ | $2.8 \times 10^{-4}$ | $1.9 \times 10^{8}$ |
| $n$-$C_{18}$ ($\delta^{13}C = -29.3‰$) | 0 | $4.4 \times 10^{-3}$ | $3.3 \times 10^{-3}$ | $2.4 \times 10^{9}$ |
| Phytane | 0 | $1.9 \times 10^{-3}$ | $1.4 \times 10^{-3}$ | $1.0 \times 10^{9}$ |
| $n$-$C_{19}$ ($\delta^{13}C = -29.6‰$; $\delta D = -98.7‰$) | 0 | $3.9 \times 10^{-3}$ | $2.9 \times 10^{-3}$ | $2.1 \times 10^{9}$ |
| $n$-$C_{20}$ ($\delta^{13}C = -29.2‰$; $\delta D = -102.9‰$) | 0 | $3.4 \times 10^{-3}$ | $2.6 \times 10^{-3}$ | $1.8 \times 10^{9}$ |
| Fluoranthene | 0 | $6.0 \times 10^{-6}$ | $4.6 \times 10^{-3}$ | $3.2 \times 10^{6}$ |
| Pyrene | 0 | $2.0 \times 10^{-5}$ | $1.5 \times 10^{-5}$ | $1.1 \times 10^{7}$ |
| $C_1$-fluoranthenes/pyrenes | 0 | $1.6 \times 10^{-4}$ | $1.2 \times 10^{-4}$ | $8.6 \times 10^{7}$ |
| $C_2$-fluoranthenes/pyrenes | 0 | $2.5 \times 10^{-4}$ | $1.9 \times 10^{-4}$ | $1.3 \times 10^{8}$ |
| $C_3$-fluoranthenes/pyrenes | 0 | $2.7 \times 10^{-4}$ | $2.1 \times 10^{-4}$ | $1.5 \times 10^{8}$ |
| $C_4$-fluoranthenes/pyrenes | 0 | $2.0 \times 10^{-4}$ | $1.5 \times 10^{-4}$ | $1.1 \times 10^{8}$ |
| $n$-$C_{21}$ ($\delta^{13}C = -29.4‰$; $\delta D = -85.4‰$) | 0 | $2.7 \times 10^{-3}$ | $2.1 \times 10^{-3}$ | $1.5 \times 10^{9}$ |
| $n$-$C_{22}$ ($\delta^{13}C = -29.2‰$; $\delta D = -104.4‰$) | 0 | $2.4 \times 10^{-3}$ | $1.8 \times 10^{-3}$ | $1.3 \times 10^{9}$ |
| $n$-$C_{23}$ ($\delta^{13}C = -29.4‰$; $\delta D = -95.1‰$) | 0 | $2.1 \times 10^{-3}$ | $1.6 \times 10^{-3}$ | $1.1 \times 10^{9}$ |
| $n$-$C_{24}$ ($\delta^{13}C = -29.5‰$; $\delta D = -97.8‰$) | 0 | $1.8 \times 10^{-3}$ | $1.4 \times 10^{-3}$ | $9.8 \times 10^{8}$ |
| Benz[a]anthracene | 0 | $2.0 \times 10^{-5}$ | $1.5 \times 10^{-5}$ | $1.1 \times 10^{7}$ |
| Chrysene | 0 | $1.1 \times 10^{-4}$ | $8.4 \times 10^{-5}$ | $5.9 \times 10^{7}$ |
| $C_1$-benz[a]anthracenes/chrysenes | 0 | $2.4 \times 10^{-4}$ | $1.8 \times 10^{-4}$ | $1.3 \times 10^{8}$ |
| $C_2$-benz[a]anthracenes/chrysenes | 0 | $2.9 \times 10^{-4}$ | $2.2 \times 10^{-4}$ | $1.6 \times 10^{8}$ |
| $C_3$-benz[a]anthracenes/chrysenes | 0 | $1.9 \times 10^{-4}$ | $1.5 \times 10^{-4}$ | $1.0 \times 10^{8}$ |
| $n$-$C_{25}$ ($\delta^{13}C = -29.3‰$; $\delta D = -85.4‰$) | 0 | $1.5 \times 10^{-3}$ | $1.1 \times 10^{-3}$ | $8.1 \times 10^{8}$ |
| $n$-$C_{26}$ ($\delta^{13}C = -29.6‰$; $\delta D = -91.0‰$) | 0 | $1.3 \times 10^{-3}$ | $1.0 \times 10^{-3}$ | $7.2 \times 10^{8}$ |
| $n$-$C_{27}$ ($\delta^{13}C = -29.4‰$; $\delta D = -103.3‰$) | 0 | $1.1 \times 10^{-3}$ | $8.5 \times 10^{-4}$ | $6.0 \times 10^{8}$ |
| $n$-$C_{28}$ ($\delta^{13}C = -29.4‰$; $\delta D = -102.7‰$) | 0 | $8.3 \times 10^{-4}$ | $6.3 \times 10^{-4}$ | $4.5 \times 10^{8}$ |
| $n$-$C_{29}$ ($\delta^{13}C = -29.4‰$; $\delta D = -75.8‰$) | 0 | $7.7 \times 10^{-4}$ | $5.9 \times 10^{-4}$ | $4.1 \times 10^{8}$ |
| $n$-$C_{30}$ ($\delta^{13}C = -30.2‰$; $\delta D = -89.9‰$) | 0 | $6.6 \times 10^{-4}$ | $5.0 \times 10^{-4}$ | $3.6 \times 10^{8}$ |
| $n$-$C_{31}$ ($\delta^{13}C = -30.0‰$; $\delta D = -77.7‰$) | 0 | $6.9 \times 10^{-4}$ | $5.3 \times 10^{-4}$ | $3.7 \times 10^{8}$ |
| $n$-$C_{32}$ ($\delta^{13}C = -29.9‰$) | 0 | $5.6 \times 10^{-4}$ | $4.3 \times 10^{-4}$ | $3.0 \times 10^{8}$ |
| $n$-$C_{33}$ ($\delta^{13}C = -30.2‰$) | 0 | $4.7 \times 10^{-4}$ | $3.6 \times 10^{-4}$ | $2.5 \times 10^{8}$ |
| $n$-$C_{34}$ ($\delta^{13}C = -29.8‰$) | 0 | $3.5 \times 10^{-4}$ | $2.7 \times 10^{-4}$ | $1.9 \times 10^{8}$ |
| $n$-$C_{35}$ ($\delta^{13}C = -31.0‰$) | 0 | $2.7 \times 10^{-4}$ | $2.1 \times 10^{-4}$ | $1.5 \times 10^{8}$ |
| $n$-$C_{36}$ ($\delta^{13}C = -30.7‰$) | 0 | $2.3 \times 10^{-4}$ | $1.8 \times 10^{-4}$ | $1.2 \times 10^{8}$ |
| $n$-$C_{37}$ ($\delta^{13}C = -29.4‰$) | 0 | $1.9 \times 10^{-4}$ | $1.5 \times 10^{-4}$ | $1.0 \times 10^{8}$ |
| $n$-$C_{38}$ ($\delta^{13}C = -30.3‰$) | 0 | $1.7 \times 10^{-4}$ | $1.3 \times 10^{-4}$ | $9.2 \times 10^{7}$ |
| $n$-$C_{39}$ | 0 | $1.4 \times 10^{-4}$ | $1.1 \times 10^{-4}$ | $7.5 \times 10^{7}$ |
| $n$-$C_{40}$ | 0 | $1.3 \times 10^{-4}$ | $9.9 \times 10^{-5}$ | $7.0 \times 10^{7}$ |
| $n$-$C_{41}$ | 0 | $1.0 \times 10^{-4}$ | $7.6 \times 10^{-5}$ | $5.4 \times 10^{7}$ |
| $n$-$C_{42}$ | 0 | $1.3 \times 10^{-4}$ | $9.9 \times 10^{-5}$ | $7.0 \times 10^{7}$ |

Data from analyses performed by GeoMark Research, Inc., Alpha Analytical, and at WHOI. Stable carbon isotope values ($\delta^{13}C$; in ‰) were measured on select $n$-alkanes with an error of $\pm 0.3‰$. Stable hydrogen isotope values ($\delta D$; in ‰) were measured on select $n$-alkanes with an error of $\pm 4‰$.

*Calculated using 4.1 million barrels released.

†For the analysis of the gas fraction, a value of $C_{6+}$ was also reported. We assumed that most of this material was $n$-$C_6$ and placed this result in the gas fraction column for $n$-$C_6$. Butanes and pentanes were found in both the gas and oil fractions. In this table, they are separated into each measured fraction and used to calculate the total released.

**Table S3. Aqueous solubilities and fractionation indices with respect to methane and benzene for soluble and moderately soluble compounds measured in the deep water column**

| Chemical name | $\log_{10}$ aqueous solubility [*] | $F_{i,\text{methane}}$ [†] | $F_{i,\text{benzene}}$ [‡] | $N_{\text{obs}}$ [§] |
|---|---|---|---|---|
| Methane | −1 | 1 | — | — |
| Ethane | −1.2 | 0.91 | — | — |
| Propane | −1.6 | 0.78 | — | — |
| Benzene | −1.65 | — | $1.00 \times 10^0$ | 52 |
| Toluene | −2.22 | — | $5.05 \times 10^{-1}$ | 52 |
| o-xylene | −2.75 | — | $3.78 \times 10^{-1}$ | 45 |
| Ethylbenzene | −2.8 | — | $3.69 \times 10^{-1}$ | 35 |
| p/m-xylene | −2.8 | — | $3.59 \times 10^{-1}$ | 40 |
| Naphthalene | −3.17 | — | $2.21 \times 10^{-1}$ | 19 |
| 1,2,4-trimethylbenzene | −3.33 | — | $2.11 \times 10^{-1}$ | 35 |
| n-propylbenzene | −3.34 | — | $2.18 \times 10^{-1}$ | 14 |
| 1,3,5-trimethylbenzene | −3.38 | — | $2.32 \times 10^{-1}$ | 28 |
| $C_1$-naphthalenes | −3.68 | — | $2.04 \times 10^{-2}$ | 6 |
| Dibenzothiophene | −3.98 | — | $1.38 \times 10^{-2}$ | 3 |
| Fluorene | −4.13 | — | $3.83 \times 10^{-2}$ | 3 |
| $C_2$-naphthalenes | −4.19 | — | $1.04 \times 10^{-2}$ | 8 |
| $C_1$-dibenzothiophenes | −4.39 | — | $1.05 \times 10^{-2}$ | 4 |
| Phenanthrene | −4.52 | — | $1.12 \times 10^{-2}$ | 3 |
| $C_1$-fluorenes | −4.6 | — | $3.35 \times 10^{-2}$ | 2 |
| $C_3$-naphthalenes | −4.69 | — | $1.42 \times 10^{-2}$ | 4 |
| $C_2$-dibenzothiophenes | −4.89 | — | $8.46 \times 10^{-3}$ | 12 |
| $C_2$-fluorenes | −5.04 | — | $1.29 \times 10^{-2}$ | 1 |
| $C_4$-naphthalenes | −5.19 | — | $1.74 \times 10^{-2}$ | 3 |
| Fluoranthene | −5.2 | — | $1.02 \times 10^{-1}$ | 1 |
| Pyrene | −5.26 | — | $3.19 \times 10^{-1}$ | 6 |
| $C_3$-dibenzothiophenes | −5.39 | — | $4.30 \times 10^{-3}$ | 2 |
| $C_2$-phenanthrenes/anthracenes | −5.4 | — | $5.15 \times 10^{-2}$ | 8 |
| $C_3$-fluorenes | −5.54 | — | $1.38 \times 10^{-2}$ | 1 |
| $C_1$-fluoranthenes/pyrenes | −5.7 | — | $1.32 \times 10^{-2}$ | 18 |
| $C_4$-dibenzothiophenes | −5.89 | — | $4.40 \times 10^{-3}$ | 2 |
| $C_3$-phenanthrenes/anthracenes | −5.9 | — | $5.94 \times 10^{-3}$ | 21 |
| Benz[a]anthracene | −5.98 | — | $2.95 \times 10^{-2}$ | 1 |
| $C_2$-fluoranthenes/pyrenes | −6.2 | — | $1.26 \times 10^{-2}$ | 15 |
| $C_4$-phenanthrenes/anthracenes | −6.43 | — | $5.87 \times 10^{-3}$ | 8 |
| $C_3$-fluoranthenes/pyrenes | −6.6 | — | $1.07 \times 10^{-2}$ | 10 |
| $C_4$-fluoranthenes/pyrenes | −7.1 | — | $1.01 \times 10^{-2}$ | 5 |

[*]Aqueous solubility" (mol L$^{-1}$) refers to the subcooled liquid aqueous solubility; this is explained further in the *SI Text*.

[†]$F_{i,\text{methane}}$ values were estimated based on the MW-1 gas content and methane/ethane and methane/propane molal ratios in nonbiodegraded samples as reported by Valentine et al. (1)

[‡]Reported $F_{i,\text{benzene}}$ figures are mean values of the benzene-normalized fractionation index for each of the 33 compounds measured at 20 sampling locations collected during the R/V *Endeavor* cruise 478 (June 2010). Sampling locations had distances ranging from 1.7 to 34.6 km from the Macondo well and depths ranging from 1,065 to 1,221 m.

[§]The number of times each compound was detected across 20 sampling locations, including replicate samples at a single location.

1 Valentine DL, et al. (2010) Propane respiration jump-starts microbial response to a deep oil spill. *Science* 330:208–211.

**Table S4. Concentrations and depths of benzene, toluene, ethylbenzene, and xylenes (referred to collectively as BTEX compounds) detected at stations 19, 13, 14, and 18 (refer to Fig. 3)**

| | Depth (m) | Benzene (µg L⁻¹) | Toluene (µg L⁻¹) | Ethylbenzene (µg L⁻¹) | Xylenes * (µg L⁻¹) | Total BTEX (µg L⁻¹) |
|---|---|---|---|---|---|---|
| | | Benzene ($\mu$g L$^{-1}$) | Toluene ($\mu$g L$^{-1}$) | Ethylbenzene ($\mu$g L$^{-1}$) | Xylenes * ($\mu$g L$^{-1}$) | Total BTEX ($\mu$g L$^{-1}$) |
| **Station 19** | | | | | | |
| 2.3 km SW of Macondo well | 15 | — | — | — | — | — |
| Lat: 28° 44′ 5.28″ N | 501 | — | — | — | — | — |
| Long: 88° 23′ 21.84″ W | 800 | — | — | — | — | — |
| | 1,085 | 9.0 | 17.0 | 2.0 | 15.5 | 43.5 |
| | 1,201 | 0.4 | 0.5 | — | — | 0.9 |
| | 1,500 | — | — | — | — | — |
| **Station 13** | | | | | | |
| 6.1 km SW of Macondo well | 910 | — | — | — | — | — |
| Lat: 28° 43′ 48.00″ N | 1,080 | — | 0.3 | — | — | 0.3 |
| Long: 88° 25′ 38.64″ W | 1,095 | — | 0.5 | — | — | 0.5 |
| | 1,110 | — | — | — | — | — |
| | 1,125 | 4.7 | 6.6 | 0.6 | 4.2 | 16.1 |
| | 1,140 | 1.7 | 2.5 | 0.3 | 1.6 | 6.1 |
| | 1,155 | 21.7 | 31.0 | 3.0 | 21.5 | 77.2 |
| | 1,170 | 0.6 | 0.7 | — | — | 1.3 |
| | 1,185 | — | — | — | — | — |
| | 1,200 | 3.5 | 3.9 | 0.3 | 2.1 | 9.8 |
| | 1,400 | — | — | — | — | — |
| **Station 14** | | | | | | |
| 16.5 km SW of MW | 900 | — | — | — | — | — |
| Lat: 28° 41′ 57.84″ N | 1,065 | 2.2 | 4.1 | 0.4 | 3.3 | 10.0 |
| Long: 88° 31′ 45.48″ W | 1,080 | 5.7 | 13.6 | 2.0 | 15.0 | 36.3 |
| | 1,095 | 11.2 | 20.0 | 2.2 | 15.8 | 49.2 |
| | 1,125 | 13.0 | 22.3 | 2.1 | 15.5 | 52.9 |
| | 1,140 | 2.8 | 4.2 | 0.3 | 2.4 | 9.7 |
| | 1,155 | 2.0 | 2.8 | — | 1.5 | 6.3 |
| | 1,170 | — | — | — | — | — |
| | 1,200 | — | — | — | — | — |
| | 1,350 | — | — | — | — | — |
| **Station 18** | | | | | | |
| 27 km SW of MW | 1,124 | 7.7 | 13.2 | 1.2 | 11.3 | 33.4 |
| Lat: 28° 39′ 47.16″ N | 1,129 | 2.0 | 2.0 | – | 0.9 | 4.9 |
| Long: 88° 38′ 2.76″ W | 1,144 | 5.0 | 7.0 | 0.5 | 4.5 | 17.0 |
| | 1,148 | 6.0 | 8.2 | 0.6 | 4.9 | 19.7 |

*Sum of o-, m-, and p-xylenes.

# Attachment E

**Gault, Lorrie**

| | |
|---|---|
| **From:** | Fetouh, Dahlia S [DFetouh@goodwinprocter.com] |
| **Sent:** | Friday, December 23, 2011 1:52 PM |
| **To:** | Eisert, Joseph A.; Gasaway, Robert R. |
| **Cc:** | DeSantis, Karen McCartan; Johnson, Ebony; mbrowne@cov.com; Remis, Shepard M |
| **Subject:** | RE: WHOI Subpoena |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Joe:

Thank you for your email and your offer of a ten-day extension.  Unfortunately, that will not be sufficient given the circumstances.  Attached please find WHOI's Objection to the Subpoena pursuant to Rule 45.

After you have had an opportunity to review the objections, I would be happy to discuss the issues raised.

Thank you and happy holidays,
Dahlia

Dahlia S. Fetouh
**Goodwin Procter** LLP
Exchange Place
53 State Street
Boston, MA 02109
T: 617-570-1263
F: 617-523-1231
dfetouh@goodwinprocter.com
www.goodwinprocter.com

---

**From:** Eisert, Joseph A. [mailto:jeisert@kirkland.com]
**Sent:** Tuesday, December 20, 2011 5:43 PM
**To:** Fetouh, Dahlia S
**Cc:** Gasaway, Robert R.; DeSantis, Karen McCartan; Johnson, Ebony; mbrowne@cov.com
**Subject:** WHOI Subpoena

Dahlia--

Following up on our telephone conversation this afternoon and your request for an extension, BP is willing to provide a ten-day extension, i.e., until January 19, 2012, for the subpoena served on WHOI. Please let us know if that is acceptable from you side.

Regards,


Joseph A. Eisert | Kirkland & Ellis LLP
655 Fifteenth Street, N.W. Suite 1200 | WASHINGTON, DC 20005 | (202) 879-5136 DIRECT | (202) 879-5200 FAX | joseph.eisert@kirkland.com



**************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
**************************************************************



**************************************************************

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**************************************************************
**************************************************************

This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

**************************************************************


Attachments:
    Rule 45 Objections to BP Subpoena Ltr - 12-23-11.PDF.PDF (855282 Bytes)

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Karen McCartan DeSantis
To Call Writer Directly:
(202) 879-5217
karen.desantis@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

January 13, 2012

**VIA U.S. MAIL AND
ELECTRONIC MAIL**

Dahlia Fetouh
Goodwin Procter LLP
Exchange Place
Boston, Massachusetts 02109

Re:   *In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of
Mexico on April 20, 2010* (Docket No. MDL 2179): Subpoena served on
Woods Hole Oceanographic Institute

Dear Dahlia:

Thank you for our telephone conversations earlier this week and last week.  I am writing to summarize those conversations, and please correct me if I am mistaken about your client's position on any issue or about any of the following information:

- The acoustics work performed by Woods Hole Oceanographic Institute ("WHOI") in connection with the Deepwater Horizon incident was performed under contract with the U.S. government, and you believe that contract was specifically with the U.S. Coast Guard;

- WHOI objects to producing certain documents pursuant to the above-referenced subpoena as it considers them to be confidential under the terms of its contract with the U.S. government or U.S. Coast Guard;

- WHOI is currently searching for documents within its possession and control responsive to the subpoena and will advise you as to (1) which responsive documents it can produce that are not subject to any objection -- confidentiality or otherwise; and (2) which responsive documents it deems confidential.

- WHOI has not given you a date by which it can provide information to you regarding responsive documents -- whether those documents are deemed to be confidential or not -- but you will be asking WHOI to provide you with a date;

Chicago    Hong Kong    London    Los Angeles    Munich    New York    Palo Alto    San Francisco    Shanghai

K&E 20963019.1

## KIRKLAND & ELLIS LLP

Dahlia Fetouh
January 13, 2012
Page 2

- WHOI has sent some documents responsive to the subpoena to the U.S. Coast Guard, and it is WHOI's position that those documents are no longer in the possession and control of WHOI.

I look forward to talking again and receiving updated information. I specifically would like to discuss a Pre-Trial Order in the case which establishes a process for producing documents deemed to be confidential by both parties and non-parties.

Best regards,

Karen McCartan DeSantis

**Gault, Lorrie**

| | |
|---|---|
| **From:** | Fetouh, Dahlia S [DFetouh@goodwinprocter.com] |
| **Sent:** | Wednesday, January 25, 2012 5:18 PM |
| **To:** | Johnson, Ebony |
| **Cc:** | DeSantis, Karen McCartan |
| **Subject:** | RE: |

Thank you.

Dahlia S. Fetouh
**Goodwin Procter** LLP
Exchange Place
53 State Street
Boston, MA 02109
T: 617-570-1263
F: 617-523-1231
dfetouh@goodwinprocter.com
www.goodwinprocter.com


**From:** Johnson, Ebony [mailto:ebony.johnson@kirkland.com]
**Sent:** Wednesday, January 25, 2012 4:03 PM
**To:** Fetouh, Dahlia S
**Cc:** DeSantis, Karen McCartan
**Subject:**

Ms. Fetouh,

My colleague, Karen DeSantis, asked that I send you the pretrial order from the Deepwater Horizon Multidistrict Litigation that protects confidential information.  Attached please find Pretrial Order #13.

Feel free to contact me if you have questions.

Regards,

Ebony Sunala Johnson
Kirkland & Ellis LLP
655 Fifteenth Street, NW
Washington, DC 20005
202-879-5269 (direct)
202-879-5200 (fax)
email: ebony.johnson@kirkland.com

*****************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this

communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
**********************************************************

**********************************************************

**IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the IRS, we
inform you that any U.S. tax advice contained in this communication (including any attachments) is not
intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the
Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction
or matter addressed herein.**
**********************************************************
**********************************************************

**This message is intended only for the designated recipient(s). It may contain confidential or proprietary
information and may be subject to the attorney-client privilege or other confidentiality protections. If you
are not a designated recipient, you may not review, copy or distribute this message. If you receive this in
error, please notify the sender by reply e-mail and delete this message. Thank you.**
**********************************************************

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| Applies to: *All Cases.* | * | JUDGE BARBIER |
| | * | MAGISTRATE SHUSHAN |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### PRE-TRIAL ORDER NO. 13

### ORDER PROTECTING CONFIDENTIALITY

1.   *Purpose.* To expedite the flow of discovery material, facilitate the prompt resolution of disputes over confidentiality, protect material to be kept confidential, and ensure that protection is afforded only to material entitled to such treatment, pursuant to the Court's inherent authority, its authority under Rule 26(c) of the Federal Rules of Civil Procedure and the judicial opinions interpreting such Rule.

2.   *Information.* Information includes the contents of documents, data associated with documents (whether physical or in electronic format), oral and written testimony, answers to interrogatories, admissions, and data derived from objects other than documents, produced or disclosed in these proceedings by any party to these proceedings or by any third party (the "Producing Party") to any other party or parties (the "Receiving Party").

3.   *Condition.* This order covers information that the Producing Party designates "Confidential" or "Highly Confidential". Information may be designated as Confidential when the Producing Party reasonably believes the information disclosed constitutes, reflects, discloses or contains information subject to protection under Federal Rule of

Civil Procedure 26(c). Information may be designated as Highly Confidential when the Producing Party reasonably believes that the disclosure of Confidential Information to third party competitors will result in commercial harm.   The parties shall make Confidential and Highly Confidential designations in good faith to insure that only those documents that merit Confidential or Highly Confidential treatments are so designated.

4.      *Procedure.*

      A.      *Designation.* To designate information as Confidential or Highly Confidential, a Producing Party must mark it or identify it on the record as such. Either designation may be withdrawn.

      B.      *Marking.* All or any part of a document, tangible object, discovery response, or pleading disclosed, produced, or filed by a Producing Party may be designated Confidential or Highly Confidential by marking the appropriate legend ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL") on the face of the document and each page so designated.   With respect to tangible items or electronically stored information produced in native format, the appropriate legend shall be marked on the face of the tangible item or media containing electronically stored information, if practicable, or by written notice to the Receiving Party at the time of disclosure, production or filing that such tangible item or media is Confidential or Highly Confidential or contains such information.

      C.      *Timing.* Documents and other objects must be designated before disclosure.   In the event that a Producing Party designates some or all of a witness' deposition testimony Confidential or Highly Confidential, the specific page and line designations over which confidentiality is claimed must be provided to all Liaison Counsel within fourteen (14) days of receipt of the transcript, provided, however, that Liaison Counsel will consider reasonable requests for an extension of the deadline.   Deposition testimony shall be treated as Highly Confidential pending the deadline or, if applicable, extended deadline for designation.

      D.      *Errors.* Accidental or inadvertent disclosure of information does not waive the confidential status of such information or any privilege attached thereto.   In the event that Confidential or Highly Confidential Information is inadvertently disclosed, the Producing Party may thereafter reasonably assert a claim or designation of confidentiality, and promptly provide replacement media consistent with PTO XX.   Thereafter, the Receiving Party must immediately

return the original information and all copies of the same to the Producing Party and make no use of such information.

5.     *Who.* Confidential Information may be used only by:

    A.    Parties;
    B.    The Court;
    C.    Court reporters (including audio and video);
    D.    Special masters;
    E.    Mediators;
    F.    Parties' counsel, including any counsel representing a Party in any government investigation relating to the April 20, 2010, Deepwater Horizon explosion, fire and/or resulting spill;
    G.    The direct staff of these people;
    H.    Witnesses, except for lay witnesses who previously have not seen or had access to the Confidential Information and who have no reasonable need to see the Confidential Information in order to provide testimony;
    I.    Any expert or consultant, and his, her or its staff, hired by a party for litigation purposes who agrees to be bound by this Order and signs the certificate attached as Appendix A;
    J.    Any other person to whom the Producing Party, in writing, authorizes disclosure; and
    K.    Counsel (and their staff) for parties in other litigation asserting claims against Defendants that arise out of the April 20, 2010 Deepwater Horizon explosion, fire and/or resulting spill ("Related Litigation"), provided that (i) the proposed recipient agrees to be bound by this Order and signs the certificate attached as Appendix A;  (ii) Liaison Counsel for the party that supplies the Confidential Information to such recipient maintains copies of the certificates and a log identifying each such recipient and (iii) Liaison Counsel for the party that supplies the Confidential Information to such recipient shall make that log available to Liaison Counsel for the other parties at their request.  Upon a showing by Defendants that Confidential Information has been used in violation of this Order, Liaison Counsel shall provide copies of the log and certificates to the Magistrate Judge for in camera review.

6.    *Highly Confidential.*

The Highly Confidential designation is intended to prevent competitive injury between and among persons or entities who might be commercially adverse to one another in the marketplace. Hence, the use of information designated Highly Confidential is restricted to the following persons:

A.    The Court and its staff;

B.    Special masters or discovery referees appointed by the Court and their staff;

C.    Court reporters (including audio and video), interpreters, translators, copy services, graphic support services, document imaging services, and database/coding services retained by counsel, provided these individuals or an appropriate company official with authority to do so on behalf of the company executes a certification attached hereto as Appendix A.

D.    Mediators and their staff, provided such persons execute a certification attached hereto as Appendix A;

E.    Parties' external counsel and internal counsel whose primary responsibilities include overseeing this litigation, and their direct staff;

F.    Persons who prepared, received, or reviewed the Highly Confidential information prior to its production in the matters comprising MDL No. 2179 and who execute a certification in the form attached hereto as Appendix A;

G.    A witness during a hearing, a deposition or preparation for a deposition who is a current employee of the Party that produced the applicable document(s) or who appears, based upon the document itself or testimony in a deposition, to have specific knowledge of the contents of the document designated "HIGHLY CONFIDENTIAL," provided such witness executes a certification in the form attached hereto as Appendix A;

H.    Outside experts or consultants retained by a party for litigation purposes, provided such expert executes a certification in the form attached as Appendix A.

I.    Any other person to whom the Producing Party, in writing, authorizes disclosure; and

J.    Counsel for parties in Related Litigation as defined in paragraph 5(K), provided that: (i) the proposed recipient agrees to be bound by this Order and signs the certificate attached as Appendix A; (ii) Liaison Counsel for the party that supplies the Confidential Information to such recipient maintains a log identifying each such recipient and makes that log available for inspection and copying to Liaison Counsel for the other parties at their request; and (iii) Liaison Counsel for the party that supplies the Confidential Information to such recipient shall make that log available to Liaison Counsel for the other parties at their request. Upon a

showing by Defendants that Highly Confidential Information has been used in violation of this Order, Liaison Counsel shall provide copies of the log and certificates to the Magistrate Judge for in camera review.

7.    *Where.* Confidential Information and Highly Confidential Information must be used only in this MDL Proceeding, in Related Litigation as defined in paragraph 5(K) or in any government investigation into the Deepwater Horizon incident or resulting oil spill so long as such use is permitted herein.

8.    *How.*

    A.    *Acknowledgment.* Subject to the restrictions contained in paragraph 6, the persons identified in paragraphs 5 and 6 may receive or review Confidential or Highly Confidential Information upon execution of the certificate attached as Appendix A or by affirming on the record that he or she will not disclose Confidential or Highly Confidential Information revealed during the deposition and will keep the transcript confidential.

    B.    *Filings.* No pleading will be sealed. If Confidential Information must be filed, it will be filed under seal as an appendix to the instrument that refers to it. As little of the source document as possible should be sealed. References in the instrument must be sufficiently abstract not to disclose the information.

    C.    *Hearings.* In the event that a Receiving Party intends to utilize Confidential or Highly Confidential Information during a pre-trial hearing, such Receiving Party shall provide written notice no less than five (5) days prior to the hearing, to the Producing Party and to the Court, except that shorter notice may be provided if the Receiving Party could not reasonably anticipate the need to use the document at the hearing five (5) days in advance, in which event notice shall be given immediately upon identification of that need. The use of such Confidential or Highly Confidential Information during the pre-trial hearing shall be determined by agreement of the parties or by Order of the Court.

    D.    *Subpoenas.* If Confidential Information is subpoenaed from the Receiving Party, the Receiving Party must notify the Producing Party in writing within five (5) days of its receipt that the subpoena covers Confidential or Highly Confidential Information.

9.    *Challenges.* Any party may object to the propriety of the designation of specific material as Confidential or Highly Confidential by serving a written objection upon the Producing

Party's counsel.  The Producing Party or its counsel shall thereafter, within ten (10) calendar days, respond to such objection in writing by either: (i) agreeing to remove the designation; or (ii) stating the reasons for such designation.  If the Objecting Party and the Producing Party are subsequently unable to agree upon the terms and conditions of disclosure for the material(s) in issue, the **Objecting Party** may move the Court for an order **withdrawing the designation** as to the specific designations on which the Parties could not agree.  Counsel may agree to reasonable extensions of the twenty (20) day period, if necessary.  On such a motion, the Producing Party shall have the burden of proving that "good cause" exists for the designation at issue and that the material is entitled to protection as Confidential or Highly Confidential Information under applicable law.  In the event a motion is filed by the Objecting Party, the information at issue shall continue to be treated in the manner as designated by the Producing Party until the Court orders otherwise.  A Receiving Party does not waive its right to challenge a Confidential or Highly Confidential Information designation by electing not to raise a challenge promptly after the original designation is disclosed and may challenge a designation at such time as the Receiving Party deems appropriate.

10.    *Return.*  Within ninety days of the termination of any party from all proceedings in this MDL proceeding or in Related Litigation, that party, its employees, attorneys, consultants and experts must destroy or return all originals and/or copies of documents with Confidential Information or Highly Confidential Information, provided however, that the obligation to destroy or return such documents that is imposed on counsel, consultants and experts representing multiple parties shall not occur until the last of their represented parties has been terminated from the foregoing referenced proceedings.  At the written request of the Producing Party, any person or entity having custody or control of recordings, notes, memoranda, summaries or other written materials, and all copies thereof, relating to or containing discovery materials produced by the Producing Party (the "Discovery Materials") shall deliver to the Producing Party an affidavit certifying that reasonable efforts have been made to assure that all Discovery Materials (except for privileged communications, work product and court-filed documents as stated above) have been destroyed or delivered to the Producing Party in accordance with the terms of this Protective Order.  This order survives the termination of this MDL proceeding.

New Orleans, Louisiana, this 2nd day of November, 2010.

THE HONORABLE CARL J. BARBIER
UNITED STATES DISTRICT COURT JUDGE

**APPENDIX A**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL No. 2179 SECTION: J |
| Applies to: *All Cases.* | * * | JUDGE BARBIER MAGISTRATE SHUSHAN |

\* \* \* \* \* \* \* \* \* \* \* \*

### CERTIFICATION

I hereby certify that I have read the Protective Order entered in the above-captioned action and that I understand the terms thereof.

I agree to be bound by the Protective Order.

I further agree to submit to the jurisdiction of this Court for purposes of enforcing the Protective Order.

I understand that these certifications are strictly confidential, that counsel for each party are maintaining the certifications without giving copies to the other side, and that the parties expressly agreed and the Court ordered that except in the event of a violation of this Order, the parties will make no attempt to seek copies of the certifications or to determine the identities of persons signing them. I further understand that if the Court finds that any disclosure is necessary to investigate a violation of this Order, the disclosure will be limited to outside counsel only and outside counsel shall not disclose any information to their clients that could tend to identify any certification signatory unless and until there is specific evidence that a particular signatory may have violated the Order, in which case limited disclosure may be made with respect to that signatory.

Date:

(Signature)

Name:

(Typed or Printed)

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Karen McCartan DeSantis
To Call Writer Directly:
(202) 879-5217
karen.desantis@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

January 26, 2012

**VIA U.S. MAIL AND
ELECTRONIC MAIL**

Dahlia Fetouh
Goodwin Procter LLP
Exchange Place
Boston, Massachusetts 02109

Re:    *In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of
Mexico on April 20, 2010* (Docket No. MDL 2179); Subpoena served on
Woods Hole Oceanographic Institute

Dear Dahlia:

I look forward to talking to you tomorrow regarding status of collection of documents
responsive to the subpoena to Woods Hole.  A brief synopsis of our call from last week should
aid our discussion:

- You advised that Woods Hole will be able to produce raw data "and the like" that we
have requested, and Woods Hole is in the process of collecting that data.  It is your belief
that the algorithms requested will be included in that collection.

- You advised that Woods Hole objects to the production of documents reflecting a
deliberative or scholastic process associated with its work.  You also advised that Woods
Hole objects to the production of proprietary information (described as the intellectual
property of individual researchers).

- You advised that you anticipate that some documents would be ready to submit to
counsel for the Coast Guard this week.  You anticipate that the Coast Guard will then
review those documents to determine if it will assert any privilege or "protection"
regarding the collected documents under its contract with Woods Hole.  While you had
not heard when the Coast Guard would be able to begin and finish its document review,
you had placed calls to counsel for the Coast Guard.

Chicago      Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai

Fetouh letter.doc

# KIRKLAND & ELLIS LLP

Dahlia Fetouh
January 26, 2012
Page 2

- I asked for a written communication advising which documents were being withheld pursuant to which objections and what would be produced and when.  I agreed to send you a copy of the PTO affording protection for confidential documents of both parties and non-parties, and you agreed to discuss that PTO with counsel for the Coast Guard.

- I advised that our client may want to take steps to attempt to speed the production process.

    I look forward to talking to you soon.

    Best regards,

    Karen McCartan DeSantis/llp

    Karen McCartan DeSantis

**Gault, Lorrie**

| | |
|---|---|
| **From:** | Fetouh, Dahlia S [DFetouh@goodwinprocter.com] |
| **Sent:** | Thursday, February 02, 2012 10:51 PM |
| **To:** | DeSantis, Karen McCartan |
| **Cc:** | Land, Christopher |
| **Subject:** | RE: Woods Hole Subpoena |

Karen:

An initial group of documents has been collected and transmitted to
Coast Guard counsel for their review.

Thanks,
Dahlia


Dahlia S. Fetouh
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
T: 617-570-1263
F: 617-523-1231
dfetouh@goodwinprocter.com
www.goodwinprocter.com



-----Original Message-----
From: DeSantis, Karen McCartan [mailto:kdesantis@kirkland.com]
Sent: Thursday, February 02, 2012 8:18 PM
To: Fetouh, Dahlia S
Subject: Woods Hole Subpoena

Dahlia,

I hope that your travels are going well.  I will be in the air for much
of tomorrow, but am hoping you may be able to send me a quick email
regarding status.

Are you able to confirm that the Woods Hole documents\data discussed
last week and that you anticipated receiving this week have been
provided to you and sent on to counsel for the Coast Guard for review?

Any updated information would be appreciated.

Best regards,
Karen
Karen McCartan DeSantis
     Kirkland and Ellis, LLP
     655 Fifteenth Street, NW
     Washington, DC 20005

     (202) 879 5217
*********************************************************

1

The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*****************************************************
******************************************************
IRS CIRCULAR 230 DISCLOSURE:
To ensure compliance with requirements imposed by the IRS, we
inform
you that any U.S. tax advice contained in this communication
(including any attachments) is not intended or written to be used,
and
cannot be used, for the purpose of (i) avoiding penalties under
the
Internal Revenue Code or (ii) promoting, marketing or recommending
to
another party any transaction or matter addressed herein.
******************************************************

******************************************************
This message is intended only for the designated recipient(s).  It
may
contain confidential or proprietary information and may be subject
to
the attorney-client privilege or other confidentiality
protections.
If you are not a designated recipient, you may not review, copy or
distribute this message.  If you receive this in error, please
notify
the sender by reply e-mail and delete this message.  Thank you.
******************************************************

**Gault, Lorrie**

| | |
|---|---|
| **From:** | Fetouh, Dahlia S [DFetouh@goodwinprocter.com] |
| **Sent:** | Thursday, February 02, 2012 11:03 PM |
| **To:** | DeSantis, Karen McCartan |
| **Cc:** | Land, Christopher |
| **Subject:** | RE: Woods Hole Subpoena |

One week was what the Coast Guard initially estimated before they had
seen the documents.  We can follow up with them early next week to see
where they stand and whether we can give you a more concrete estimate as
to the date.

Best,
Dahlia


Dahlia S. Fetouh
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
T: 617-570-1263
F: 617-523-1231
dfetouh@goodwinprocter.com
www.goodwinprocter.com



-----Original Message-----
From: DeSantis, Karen McCartan [mailto:kdesantis@kirkland.com]
Sent: Thursday, February 02, 2012 10:58 PM
To: Fetouh, Dahlia S
Cc: Land, Christopher
Subject: Re: Woods Hole Subpoena

Thank you.  You had said one week was expected to be needed for Coast
Guard review.  Do you expect those documents to have been reviewed by
the Coast Guard and ready for production to us on a certain day next
week?

Best regards,
Karen


Karen McCartan DeSantis
    Kirkland and Ellis, LLP
    655 Fifteenth Street, NW
    Washington, DC 20005

    (202) 879 5217

----- Original Message -----
From: Fetouh, Dahlia S [mailto:DFetouh@goodwinprocter.com]
Sent: Thursday, February 02, 2012 09:50 PM
To: DeSantis, Karen McCartan

Cc: Land, Christopher <CLand@goodwinprocter.com>
Subject: RE: Woods Hole Subpoena

Karen:

An initial group of documents has been collected and transmitted to
Coast Guard counsel for their review.

Thanks,
Dahlia


Dahlia S. Fetouh
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
T: 617-570-1263
F: 617-523-1231
dfetouh@goodwinprocter.com
www.goodwinprocter.com



-----Original Message-----
From: DeSantis, Karen McCartan [mailto:kdesantis@kirkland.com]
Sent: Thursday, February 02, 2012 8:18 PM
To: Fetouh, Dahlia S
Subject: Woods Hole Subpoena

Dahlia,

I hope that your travels are going well.  I will be in the air for much
of tomorrow, but am hoping you may be able to send me a quick email
regarding status.

Are you able to confirm that the Woods Hole documents\data discussed
last week and that you anticipated receiving this week have been
provided to you and sent on to counsel for the Coast Guard for review?

Any updated information would be appreciated.

Best regards,
Karen
Karen McCartan DeSantis
    Kirkland and Ellis, LLP
    655 Fifteenth Street, NW
    Washington, DC 20005

    (202) 879 5217
**********************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this

2

communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*********************************************************
*********************************************************
IRS CIRCULAR 230 DISCLOSURE:
To ensure compliance with requirements imposed by the IRS, we
inform
you that any U.S. tax advice contained in this communication
(including any attachments) is not intended or written to be used,
and
cannot be used, for the purpose of (i) avoiding penalties under
the
Internal Revenue Code or (ii) promoting, marketing or recommending
to
another party any transaction or matter addressed herein.
*********************************************************

*********************************************************
This message is intended only for the designated recipient(s).  It
may
contain confidential or proprietary information and may be subject
to
the attorney-client privilege or other confidentiality
protections.
If you are not a designated recipient, you may not review, copy or
distribute this message.  If you receive this in error, please
notify
the sender by reply e-mail and delete this message.  Thank you.
*********************************************************

*********************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*********************************************************

**Gault, Lorrie**

| | |
|---|---|
| **From:** | Fetouh, Dahlia S [DFetouh@goodwinprocter.com] |
| **Sent:** | Tuesday, February 14, 2012 4:05 PM |
| **To:** | DeSantis, Karen McCartan |
| **Cc:** | Land, Christopher |
| **Subject:** | RE: Woods Hole Subpoena |

Karen,

The Coast Guard informs us that they just received the documents late last week.  We sent them via Fed-Ex on February 2nd, but we understand that the documents were held up by the Coast Guard's internal security procedures.  They have not given us an exact date for completion of their review, although we understand from the DOJ that they were very busy at the moment, which may result in some delay.  But we have asked them for an update on their timing and we will let you know once they do.  As a reminder, this first production responds generally to Section 1 of your subpoena.  We continue to gather documents responsive to Section 2.

And, as we have said before, we will not producing documents that are subject to scholastic privileges, confidentiality, or other legal privileges as explained in the Rule 45 objection we served in response to your subpoena.  We do not have an estimate of the exact number of documents so withheld, and we call for your assistance in avoiding any undue burden in gathering this data, as is your obligation under Rule 45(c)(1).  We believe our identification of these privileges should be sufficient for you to understand the nature of the withheld documents.  Further, also per Rule 45(c)(1), has your client agreed to include payment for costs related to the response to this subpoena?   As you will recall, we raised this question in our objection and again in our last conversation, but we have not gotten any response yet.

Many thanks,
Dahlia


Dahlia S. Fetouh
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
T: 617-570-1263
F: 617-523-1231
dfetouh@goodwinprocter.com
www.goodwinprocter.com


-----Original Message-----
From: DeSantis, Karen McCartan [mailto:kdesantis@kirkland.com]
Sent: Tuesday, February 14, 2012 1:33 PM
To: Fetouh, Dahlia S
Cc: Land, Christopher
Subject: Re: Woods Hole Subpoena

Dahlia,

Can you please update me?  I spoke to a DOJ lawyer last week who has
been in touch with you, and I understood from him that some documents
had been sent to the Coast Guard for review.  Do you know when the
review may be completed and when we might expect documents?  Also, how
many documents will be withheld from this production and under which
claims of privilege?

Thank you,
Karen


Karen McCartan DeSantis
    Kirkland and Ellis, LLP
    655 Fifteenth Street, NW
    Washington, DC 20005

    (202) 879 5217

----- Original Message -----
From: Fetouh, Dahlia S [mailto:DFetouh@goodwinprocter.com]
Sent: Thursday, February 02, 2012 10:02 PM
To: DeSantis, Karen McCartan
Cc: Land, Christopher <CLand@goodwinprocter.com>
Subject: RE: Woods Hole Subpoena

One week was what the Coast Guard initially estimated before they had
seen the documents.  We can follow up with them early next week to see
where they stand and whether we can give you a more concrete estimate as
to the date.

Best,
Dahlia


Dahlia S. Fetouh
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
T: 617-570-1263
F: 617-523-1231
dfetouh@goodwinprocter.com
www.goodwinprocter.com


-----Original Message-----
From: DeSantis, Karen McCartan [mailto:kdesantis@kirkland.com]
Sent: Thursday, February 02, 2012 10:58 PM
To: Fetouh, Dahlia S
Cc: Land, Christopher
Subject: Re: Woods Hole Subpoena

Thank you.  You had said one week was expected to be needed for Coast

Guard review.  Do you expect those documents to have been reviewed by
the Coast Guard and ready for production to us on a certain day next
week?

Best regards,
Karen


Karen McCartan DeSantis
    Kirkland and Ellis, LLP
    655 Fifteenth Street, NW
    Washington, DC 20005

    (202) 879 5217

----- Original Message -----
From: Fetouh, Dahlia S [mailto:DFetouh@goodwinprocter.com]
Sent: Thursday, February 02, 2012 09:50 PM
To: DeSantis, Karen McCartan
Cc: Land, Christopher <CLand@goodwinprocter.com>
Subject: RE: Woods Hole Subpoena

Karen:

An initial group of documents has been collected and transmitted to
Coast Guard counsel for their review.

Thanks,
Dahlia


Dahlia S. Fetouh
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
T: 617-570-1263
F: 617-523-1231
dfetouh@goodwinprocter.com
www.goodwinprocter.com


-----Original Message-----
From: DeSantis, Karen McCartan [mailto:kdesantis@kirkland.com]
Sent: Thursday, February 02, 2012 8:18 PM
To: Fetouh, Dahlia S
Subject: Woods Hole Subpoena

Dahlia,

I hope that your travels are going well.  I will be in the air for much
of tomorrow, but am hoping you may be able to send me a quick email
regarding status.

Are you able to confirm that the Woods Hole documents\data discussed
last week and that you anticipated receiving this week have been

provided to you and sent on to counsel for the Coast Guard for review?

Any updated information would be appreciated.

Best regards,
Karen
Karen McCartan DeSantis
    Kirkland and Ellis, LLP
    655 Fifteenth Street, NW
    Washington, DC 20005

    (202) 879 5217
*************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*************************************************
***************************************************
IRS CIRCULAR 230 DISCLOSURE:
To ensure compliance with requirements imposed by the IRS, we
inform
you that any U.S. tax advice contained in this communication
(including any attachments) is not intended or written to be used,
and
cannot be used, for the purpose of (i) avoiding penalties under
the
Internal Revenue Code or (ii) promoting, marketing or recommending
to
another party any transaction or matter addressed herein.
*************************************************

***************************************************
This message is intended only for the designated recipient(s).  It
may
contain confidential or proprietary information and may be subject
to
the attorney-client privilege or other confidentiality
protections.
If you are not a designated recipient, you may not review, copy or
distribute this message.  If you receive this in error, please
notify
the sender by reply e-mail and delete this message.  Thank you.
*************************************************

*************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for

the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*********************************************************

*********************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*********************************************************

# KIRKLAND & ELLIS LLP
#### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Karen McCartan DeSantis
To Call Writer Directly:
(202) 879-5217
karen.desantis@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

February 23, 2012

**VIA U.S. MAIL AND
ELECTRONIC MAIL**

Dahlia Fetouh
Goodwin Procter LLP
Exchange Place
Boston, Massachusetts 02109

Re:   *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico
on April 20, 2010* (Docket No. MDL 2179); Subpoena Served on Woods
Hole Oceanographic Institution

Dear Dahlia:

Thank you for your e-mail of February 14, 2012 advising as to the status of Coast Guard
review of documents responsive to the Woods Hole subpoena. As you are aware, my client has
been anticipating your initial production for several weeks, and it has been over ten weeks since
the subpoena was served on Woods Hole. As you may also know, the ongoing multi-district
litigation is being conducted under tight time frames, and it is critically important that we receive
Woods Hole's production as soon as possible. Although we appreciate your and Woods Hole's
efforts and assurances of forthcoming production, I must at this point request that you provide us
by the end of this week with dates certain for production of an initial document set and for the
remainder of responsive documents, including the requested electronically stored documents
such as e-mails. Further, I ask for a date estimate for a privilege log.

You have informed us that your client intends to withhold from production certain
responsive documents or communications on the basis that they are protected by a "scholastic or
academic process" privilege. We are not aware of any basis for such a privilege and ask that you
reconsider your position in this regard. If you nonetheless plan to assert such privileges, please
provide us as soon as possible with the authority which you contend support this claim of
privilege and identification of at least several examples of documents over which you intend to
assert the privilege. In that manner, we can, as appropriate, begin the process of seeking judicial
resolution of the issue, even as we wait for you to complete your production and privilege log.

Chicago    Hong Kong    London    Los Angeles    Munich    New York    Palo Alto    San Francisco    Shanghai

# KIRKLAND & ELLIS LLP

Dahlia Fetouh
February 23, 2012
Page 2

I also write to advise that my client is not prepared to compensate Woods Hole for time and effort spent collecting and producing documents in response to the subpoena. As you have noted, under Rule 45(c)(1), "[a] party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena." Fed. R. Civ. P. 45(c)(1). We believe we have taken reasonable steps to ensure that our requests are appropriately targeted and not unduly burdensome. We also note that your client undertook its work on the matter at issue with full knowledge that its work would likely be relevant in ongoing and potential litigation, and so it can hardly come as a surprise that certain of its documents have been subpoenaed in that litigation. While there may be situations where it is appropriate to shift costs from the responding party to the serving party, this situation is not one of them. *Behrend v. Comcast Corp.*, 248 F.R.D. 84, 86 (D. Mass. 2008). My client is, however, willing to bear reasonable costs associated with copying, mailing, or other document delivery services.

I look forward to speaking with you.

Best regards,

*Karen McCartan De Santis / lkp*

Karen McCartan DeSantis

## Gault, Lorrie

| | |
|---|---|
| **From:** | Fetouh, Dahlia S [DFetouh@goodwinprocter.com] |
| **Sent:** | Thursday, February 23, 2012 4:15 PM |
| **To:** | DeSantis, Karen McCartan |
| **Cc:** | Remis, Shepard M; Land, Christopher |
| **Subject:** | RE: WHOI Subpoena |

Karen:

We are in receipt of your letter.  We will respond in due course, but we will not be able to respond by the end of the day tomorrow as demanded in your letter.  In the meantime, I can say that we have just been updated on the Coast Guard's review of the initial set of materials, and it appears that we will be able to produce an initial set of documents in approximately a week to ten days.

Thank you,
Dahlia

Dahlia S. Fetouh
**Goodwin Procter** LLP
Exchange Place
53 State Street
Boston, MA 02109
T: 617-570-1263
F: 617-523-1231
dfetouh@goodwinprocter.com
www.goodwinprocter.com

**From:** Gault, Lorrie [mailto:lgault@kirkland.com] **On Behalf Of** DeSantis, Karen McCartan
**Sent:** Thursday, February 23, 2012 12:59 PM
**To:** Fetouh, Dahlia S
**Subject:** WHOI Subpoena

```
*******************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*******************************************************
```

```
*******************************************************
```

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**************************************************************

**************************************************************

This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

**************************************************************

**Gault, Lorrie**

| | |
|---|---|
| **From:** | Fetouh, Dahlia S [DFetouh@goodwinprocter.com] |
| **Sent:** | Thursday, February 23, 2012 5:09 PM |
| **To:** | DeSantis, Karen McCartan |
| **Cc:** | Remis, Shepard M; Land, Christopher |
| **Subject:** | RE: WHOI Subpoena |

Karen:

As we explained in our last telephone conversation, this initial production will contain documents not subject to our objections that are responsive to Part I of the subpoena.

Thank you,
Dahlia

Dahlia S. Fetouh
**Goodwin Procter** LLP
Exchange Place
53 State Street
Boston, MA 02109
T: 617-570-1263
F: 617-523-1231
dfetouh@goodwinprocter.com
www.goodwinprocter.com

**From:** DeSantis, Karen McCartan [mailto:kdesantis@kirkland.com]
**Sent:** Thursday, February 23, 2012 4:31 PM
**To:** Fetouh, Dahlia S
**Subject:** Re: WHOI Subpoena

Dahlia,

Thank you for this response. Can you please provide some detail as to the nature of the forthcoming initial production? Will it be a comprehensive and complete set of requested data; a partial set of requested data; a complete set of requested communications; a partial set of requested communications? Based on prior conversations with you, my understanding is that this first set is to be data (and algorithms) and should be a complete set. Please advise.

Thank you,
Karen

Karen McCartan DeSantis
Kirkland and Ellis, LLP
655 Fifteenth Street, NW
Washington, DC 20005

(202) 879 5217

**From:** Fetouh, Dahlia S [mailto:DFetouh@goodwinprocter.com]
**Sent:** Thursday, February 23, 2012 03:15 PM

**To:** DeSantis, Karen McCartan
**Cc:** Remis, Shepard M <SRemis@goodwinprocter.com>; Land, Christopher <CLand@goodwinprocter.com>
**Subject:** RE: WHOI Subpoena

Karen:

We are in receipt of your letter.  We will respond in due course, but we will not be able to respond by the end of the day tomorrow as demanded in your letter.  In the meantime, I can say that we have just been updated on the Coast Guard's review of the initial set of materials, and it appears that we will be able to produce an initial set of documents in approximately a week to ten days.

Thank you,
Dahlia

Dahlia S. Fetouh
**Goodwin Procter** LLP
Exchange Place
53 State Street
Boston, MA 02109
T: 617-570-1263
F: 617-523-1231
dfetouh@goodwinprocter.com
www.goodwinprocter.com

---

**From:** Gault, Lorrie [mailto:lgault@kirkland.com] **On Behalf Of** DeSantis, Karen McCartan
**Sent:** Thursday, February 23, 2012 12:59 PM
**To:** Fetouh, Dahlia S
**Subject:** WHOI Subpoena

```
*************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*************************************************
```

---

```
*************************************************************
```

**IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the**

Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Gault, Lorrie**

| | |
|---|---|
| **From:** | Fetouh, Dahlia S [DFetouh@goodwinprocter.com] |
| **Sent:** | Thursday, February 23, 2012 6:13 PM |
| **To:** | DeSantis, Karen McCartan |
| **Cc:** | Land, Christopher; Remis, Shepard M |
| **Subject:** | Re: WHOI Subpoena |

Karen:

I apologize -- I should have said Part II of the subpoena not Part I. And my understanding is that the initial production will contain the majority of what we plan to produce with respect to Part II. With that said, I cannot preclude the possibility that we will discover additional materials going forward that will be produced in response to Part II.

Thanks,
Dahlia

---

**From:** DeSantis, Karen McCartan [mailto:kdesantis@kirkland.com]
**Sent:** Thursday, February 23, 2012 05:12 PM
**To:** Fetouh, Dahlia S
**Subject:** Re: WHOI Subpoena

Dahlia,

Will that initial production set be your complete production with respect to Part I, or are we to expect more documents responsive to Part I at a later date?

Thank you,
Karen

Karen McCartan DeSantis
Kirkland and Ellis, LLP
655 Fifteenth Street, NW
Washington, DC 20005

(202) 879 5217

---

**From:** Fetouh, Dahlia S [mailto:DFetouh@goodwinprocter.com]
**Sent:** Thursday, February 23, 2012 04:09 PM
**To:** DeSantis, Karen McCartan
**Cc:** Remis, Shepard M <SRemis@goodwinprocter.com>; Land, Christopher <CLand@goodwinprocter.com>
**Subject:** RE: WHOI Subpoena

Karen:

As we explained in our last telephone conversation, this initial production will contain documents not subject to our objections that are responsive to Part I of the subpoena.

Thank you,
Dahlia

Dahlia S. Fetouh
**Goodwin Procter** LLP
Exchange Place
53 State Street
Boston, MA 02109
T: 617-570-1263
F: 617-523-1231
dfetouh@goodwinprocter.com
www.goodwinprocter.com

---

**From:** DeSantis, Karen McCartan [mailto:kdesantis@kirkland.com]
**Sent:** Thursday, February 23, 2012 4:31 PM
**To:** Fetouh, Dahlia S
**Subject:** Re: WHOI Subpoena

Dahlia,

Thank you for this response. Can you please provide some detail as to the nature of the forthcoming initial production? Will it be a comprehensive and complete set of requested data; a partial set of requested data; a complete set of requested communications; a partial set of requested communications? Based on prior conversations with you, my understanding is that this first set is to be data (and algorithms) and should be a complete set. Please advise.

Thank you,
Karen

Karen McCartan DeSantis
Kirkland and Ellis, LLP
655 Fifteenth Street, NW
Washington, DC 20005

(202) 879 5217

**From:** Fetouh, Dahlia S [mailto:DFetouh@goodwinprocter.com]
**Sent:** Thursday, February 23, 2012 03:15 PM
**To:** DeSantis, Karen McCartan
**Cc:** Remis, Shepard M <SRemis@goodwinprocter.com>; Land, Christopher <CLand@goodwinprocter.com>
**Subject:** RE: WHOI Subpoena

Karen:

We are in receipt of your letter.  We will respond in due course, but we will not be able to respond by the end of the day tomorrow as demanded in your letter.  In the meantime, I can say that we have just been updated on the Coast Guard's review of the initial set of materials, and it appears that we will be able to produce an initial set of documents in approximately a week to ten days.

Thank you,
Dahlia

Dahlia S. Fetouh
**Goodwin Procter** LLP
Exchange Place
53 State Street

Boston, MA 02109
T: 617-570-1263
F: 617-523-1231
dfetouh@goodwinprocter.com
www.goodwinprocter.com

**From:** Gault, Lorrie [mailto:lgault@kirkland.com] **On Behalf Of** DeSantis, Karen McCartan
**Sent:** Thursday, February 23, 2012 12:59 PM
**To:** Fetouh, Dahlia S
**Subject:** WHOI Subpoena

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```
**IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.**
```
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```
**This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.**
```
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
```

and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
************************************************************

************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
************************************************************

**Gault, Lorrie**

| | |
|---|---|
| **From:** | Fetouh, Dahlia S [DFetouh@goodwinprocter.com] |
| **Sent:** | Tuesday, February 28, 2012 5:43 PM |
| **To:** | DeSantis, Karen McCartan |
| **Cc:** | Land, Christopher; Remis, Shepard M |
| **Subject:** | BP/WHOI Subpoena |
| **Attachments:** | scan_scan_20120228_161910.pdf |

Karen:

Please see the attached correspondence.

Thank you,
Dahlia


Dahlia S. Fetouh
**Goodwin Procter** LLP
Exchange Place
53 State Street
Boston, MA 02109
T: 617-570-1263
F: 617-523-1231
dfetouh@goodwinprocter.com
www.goodwinprocter.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
**This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

GOODWIN | PROCTER

Dahlia S. Fetouh
617.570.1263
dfetouh@goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

February 28, 2012

**Via Electronic Mail and First-Class Mail**

Karen McCartan DeSantis
Kirkland & Ellis LLP
655 Fifteen Street, N.W.
Washington, DC  20005

Re:   *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20,*
      *2010* (Docket No. MDL 2179); Subpoena Served on Woods Hole Oceanographic
      Institution

Dear Karen:

I write in response to your letter dated February 23, 2012 (the "Letter"), requesting that Woods
Hole Oceanographic Institution ("WHOI") provide a production schedule including "dates
certain" for WHOI's initial production as well as an estimate on the time necessary to produce a
privilege log, all by the following day, February 24, 2012.

We first note that British Petroleum's ("BP") demand for WHOI to respond within 24 hours
hardly comports with BP's obligations under Rule 45. *See* Fed. R. Civ. P. 45(c)(1) ("A party or
an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to
avoid imposing undue burden or expense on a person subject to a subpoena."). This demand,
coupled with BP's refusal to cover WHOI's expenses incurred in connection with responding to
BP's broad subpoena and BP's demand for a detailed privilege log, serves to illustrate BP's
unreasonable approach to this non-party subpoena.

You state at the outset of the Letter that time is critical to BP, noting that the subpoena was
issued 10 weeks ago. But you fail to acknowledge that the subpoena was served shortly before
the Christmas and New Year holidays. You also fail to acknowledge that WHOI timely served
its objections to the subpoena pursuant to Rule 45 on December 23rd (the "Rule 45 Objection").
Despite the fact that WHOI is under no obligation to provide any documents following service of
its Rule 45 Objection, WHOI has attempted to negotiate with BP in good faith in order to
provide you with relevant materials. While we understand you may be under a difficult time
constraint in light of the current trial schedule, we do note that BP was fully aware of WHOI's

GOODWIN | PROCTER

Karen McCartan DeSantis, Esq.
February 28, 2012
Page 2

work and the primary article at issue in the subpoena which was published by WHOI over two years ago in June 2010. Any time pressure is not of WHOI's making.

As we have explained several times the process of collecting and producing documents has been slowed by forces outside of WHOI's control. As we have previously informed you, many of the materials sought by the subpoena are within the control of individuals who have been inaccessible at sea for periods of time since the subpoena was served. Moreover, as we made clear in our Rule 45 Objection and our subsequent conversations, before WHOI can produce any material it must be reviewed by the federal government pursuant to WHOI's contractual obligations. Thus, while WHOI has endeavored to collect and produce materials to BP in response to the subpoena, WHOI cannot provide BP with "dates certain" for future events that are contingent on the actions of others.

## Scholastic Privilege

In the Letter, you claim that "you are not aware of any basis" for the scholastic and academic process protection asserted in our Rule 45 Objection and ask us to provide authority for this well-established protection. Although we believe the assertions in our Rule 45 Objection are sufficient and that BP's counsel must certainly be capable of identifying this authority, we provide the following summary of the academic and scholastic process protection to aid your consideration of our objections. Namely, federal courts have recognized that in order to protect the important goal of academic research, academics "engaged in pre-publication research should be accorded protection commensurate to that which the law provides for journalists." *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 714 (1st Cir. 1998) (affirming the district court's order quashing a third-party subpoena seeking academic researchers notes, tapes, and recorded transcripts used for a published study). This protection applies because "scholars too are information gatherers and disseminators." *Id.*

Indeed, courts have held that internal discussions on academic research must be protected from disclosure to avoid a chilling effect on frank, fulsome, and important scientific debate. Protecting the non-disclosure of internal academic discussions on draft scientific publications "help[s] to ensure that the articles disseminated to the medical and scientific communities are of the highest quality." *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 249 F.R.D. 8, 14 (D. Mass. 2008) (*In re Bextra* I) (quashing subpoena of peer review comments of the *New England Journal of Medicine*); *see also In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, No. 08 C 402, 2008 U.S. Dist. LEXIS 21098 (N.D. Ill. Mar. 14, 2008) (*In re Bextra* II) (same). This protection exists to allow scientists to have an open debate without fear of being later questioned on a postulated statement taken out of context. As the First Circuit noted, it is harmful to academic debate "'if disclosure of outtakes, notes, and other unused information, even if nonconfidential, becomes routine and casually, if not cavalierly, compelled."

GOODWIN | PROCTER

Karen McCartan DeSantis, Esq.
February 28, 2012
Page 3

*Cusumano*, 162 F.3d at 715 (quoting *United States v. LaRouche Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1988)).  Compelling such disclosure would be "harmful to the [academic institution's] ability to fulfill both its journalistic and scholarly missions, and by extension harmful to the medical and scientific communities, and to the public interest."  *In re Bextra* I, 249 F.R.D. at 14.  These principles apply here.  Accordingly, WHOI should not—and indeed cannot—be compelled to disclose the internal documents and discussions that are the foundation of its academic research.

**Compensation for WHOI's Expenses**

Remarkably, BP continues to impose requirements on WHOI that exceed the requirements of Rule 45 while simultaneously refusing to compensate WHOI, a non-profit organization, for its expenses incurred in responding to this third party subpoena.  WHOI's efforts in responding to the subpoena come at considerable expense to WHOI, in terms of lost productivity, legal expense, and actual production costs.

Rule 45 provides that the subpoenaing party should help offset the costs to a non-party in responding to subpoena it issues.  *See* Fed. R. Civ. P. 45(c)(1) ("A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to a subpoena."); *see also Am. Fed. of State, Cnty. and Mun. Emps. (AFSCME) Council 79 v. Scott*, No. 11-21976-Civ-Ungaro/Torres, 2011 WL 6057553, at *4 n.1 (S.D. Fla. 2011) ("The costs of producing the documents required by this Order must be borne by the Defendant, as the ACLU is not a party in the case and Rule 45 clearly allows for the recovery of reasonable costs by the non-party served with a subpoena."); *cf.* Advisory Comm. Notes to 1991 Amendments to Rule 45 ("A non-party required to produce documents or materials is protected against significant expense resulting from involuntary assistance to the court.").  This is particularly true where, as here, a large corporation's request to a non-profit entity like WHOI places an onerous burden of time and money on that non-profit.  *In re Grand Jury Subpoena Duces Tecum Issued to S. Motor Carriers Rate Conference, Inc., Dated August 13, 1975*, 405 F.Supp. 1192, 1198 (N.D. Ga. 1975) (protecting a nonprofit company from significant expenses and disruption of work by ordering subpoenaing party to bear the costs of production).  Now not only is BP demanding the production of voluminous materials without compensation, it is also demanding that WHOI go to the added expense of creating a detailed privilege log without offering to cover that expense, limit the categories that must be logged, or consider whether a log is truly necessary.  This position runs directly counter to Rule 45 and the policies behind it.

Finally, the suggestion that it is appropriate to refuse to compensate WHOI for its costs because WHOI "undertook its work on the matter at issue with full knowledge that its work would likely be relevant in ongoing and potential litigation" is entirely without merit.  WHOI and its scientists

GOODWIN PROCTER

Karen McCartan DeSantis, Esq.
February 28, 2012
Page 4

went to great personal sacrifice to provide aid after the explosion and oil spill.  To suggest that WHOI should not be entitled to compensation under Rule 45 because it should have known that BP would drag it into this litigation, is not only unfounded but serves as a paramount illustration of why nonprofits and academics such as WHOI and its researchers should be protected from the kind of intrusive and unreasonable demands made in the subpoena. BP's approach has the danger of creating precisely the kind of chilling effect that federal courts have sought to avoid.

*       *       *

Reserving all rights and protections asserted above and in WHOI's Rule 45 Objection, WHOI will continue its efforts to gather and produce relevant non-privileged documents that have been reviewed and approved for such disclosure by the Coast Guard.  As previously disclosed, we recently received comments from the Coast Guard on our first collection and we anticipate that our first production will be shipped to you shortly.  Scientists needed to gather our second production have recently returned from sea, and we are scheduled to meet with them this week. We anticipate that we will be in a position to send a second set of documents to the Coast Guard by the end of next week.

Sincerely,

Dahlia S. Fetouh

Dahlia S. Fetouh

DSF/cmc

LIBA/2265504.2

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Karen McCartan DeSantis
To Call Writer Directly:
(202) 879-5217
karen.desantis@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

March 2, 2012

**VIA U.S. MAIL AND
ELECTRONIC MAIL**

Dahlia Fetouh
Goodwin Procter LLP
Exchange Place
Boston, Massachusetts 02109

Re:    *In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of
Mexico on April 20, 2010* (Docket No. MDL 2179); Subpoena served on
Woods Hole Oceanographic Institution ("Woods Hole" or "WHOI")

Dear Dahlia:

I write in response to your letter dated February 28, 2012.  Please know that my colleagues, our client, and I continue to await production of an initial set of subpoenaed documents.  We recognize that you have indicated that the documents will arrive "shortly," but, once again, without specifying a specific date by which we can expect to receive them.  Nonetheless, as noted in my letter of last week, we continue to appreciate your and Woods Hole's efforts over the past 11 weeks to gather documents responsive to the subpoena.

We must respond to your statement regarding BP's request for a production calendar.  Our request that WHOI provide a schedule for production of documents is hardly a "demand" that fails to comport with BP's Rule 45 obligations.

Specifically, our request is not -- as your letter implies -- a demand that WHOI respond to the subpoena within 24 hours.  Your client has had almost three months to respond to the subpoena, and at no time in the course of those months have we asked that WHOI produce documents within 24 hours.  Our request is simply for a production calendar and asks that you, as counsel for WHOI, provide dates by which we may expect initial and any additional document productions, as well as a privilege log.  Such calendar information could easily be provided in three sentences or fewer and should hardly impose a burden, particularly in light of the significant amount of time that you have been working with WHOI to respond to our subpoena.

Chicago      Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai

# KIRKLAND & ELLIS LLP

Dahlia Fetouh
March 2, 2012
Page 2

In this regard, I had understood from our prior communications that some WHOI scientists needed to advance the production of some of the responsive documents were due back from sea on February 10.  While we expect that at least since February 10, you have been working with some of the WHOI scientists involved in work on Deepwater Horizon, we offer the following:  WHOI has posted on its website a synthesis of some of its research on the incident, entitled "Science in a Time of Crisis: WHOI's Response to the Deepwater Horizon Oil Spill."  The following scientists and personnel are highlighted, and each is featured in one or more video interviews: Rich Camilli, Chris Reddy, Tim Shank, Stephanie Murphy, Bob Nelson, Susan Avery, Andy Bowen, Larry Madin, Rob Munier, Jeff Seewald, Dana Yoerger, Sean Sylva, Karin Lemkau, and Ben Van Mooy.  It seems that it would be fairly straightforward and worthwhile to collect immediately all Deepwater Horizon files and communications from these individuals and send them on to the Coast Guard for any review that may be necessary.

## "Scholastic Privilege"

In your letter of February 28, you describe the "scholastic privilege" as a "well-established protection" in federal court, but the only case cited for this broad proposition is *Cusumano v. Microsoft Corp.*, 162 F.3d 708 (1st Cir. 1998).  In fact, neither the First Circuit nor any other federal circuit court has acknowledged the existence of a "scholastic privilege," or has held that academic research is entitled to the protections of such a "privilege."

Moreover, a fair reading of *Cusumano* indicates only that the highly journalistic nature of the researchers' work in that case would "suggest" affording a "modicum of protection" to certain "confidential" research materials which, in that case, were comprised of interviews with human sources. *Id.* at 714-15.  *Cusumano* further indicates that the protection to be provided would be "commensurate to that which the law provides for journalists" so that sources would not hesitate to confide in researchers conducting interviews. *Id.* at 714.  *Cusumano* then protected some research material -- not through invocation of a "privilege" -- but rather through application of Rule 26's balancing test.  That test "contemplates consideration of myriad factors, often uniquely drawn out of the factual circumstances of a particular case." *Id.* at 716.

The Rule 26 balancing test -- not a "privilege" -- was also at issue in the other case you cited, *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 249 F.R.D. 8 (D. Mass. 2008) (*In re Bextra I*).  Application of the Rule 26 test used in both *Cusumano* and *In re Bextra I* weighs strongly in BP's favor here.  BP cannot obtain requested documents elsewhere, even were it to "expend substantially more effort," because Woods Hole has sole possession of the responsive documents. *See* 249 F.R.D. at 12; 162 F.3d at 712. Further, the data and communications requested by BP cannot be characterized as being of "limited probative value." 249 F.R.D. at 12.  On the contrary, the requested data and communications are central to the

# KIRKLAND & ELLIS LLP

Dahlia Fetouh
March 2, 2012
Page 3

three published scientific articles referenced in the subpoena and allegedly support and inform the U.S. Government's flow rate estimates released to the public and now at issue in litigation. Unlike in *Cusumano*, BP's need for the subpoenaed material cannot be described as "not great," and BP's use of the material is not solely "for purposes akin to impeachment." 162 F.3d at 712. Rather, BP seeks the subpoenaed documents in order to fully understand both the analysis and conclusions of WHOI scientists and others in order to inform its work on subjects in litigation.

## Compensation

Regarding your request for compensation for time and effort spent responding to BP's subpoena, we acknowledge that Rule 45 imposes a requirement on the subpoenaing party to avoid imposing undue burden. We have avoided imposition of burden, working with you over almost three months in an effort to obtain requested documents. And, it is well established that "[u]sually, absent an order compelling document production, a non-party bears its own production cost." *See Behrend v. Comcast Corp.*, 248 F.R.D. 84 (D. Mass. 2008) (citing *Boston Children's Heart Found., Inc. v. Nadal-Ginard*, No. Civ.A. 93-12539-REK, 1995 WL 17015062, at *2 (D. Mass. Aug. 23, 1995)).

Moreover, even with an order compelling production, courts look at several factors before shifting costs. *See id.* Relevant factors identified in *Behrend* and weighing against shifting of costs in this instance include that WHOI is an "interested" party because it was "substantially involved" in the underlying work effort and therefore "could have anticipated" that such an effort could "potentially spawn litigation or discovery." *Id.* at 86-87. Moreover, the requested data and communications are clearly "relevant" and "necessary," and the pending litigation is unquestionably "of public importance." *Id.*

You also rely on authority that has no relevance given the facts at issue here. In citing *In re Grand Jury Subpoena Duces Tecum Issued to S. Motor Carriers Rate Conf., Inc., Dated August 13, 1975*, 405 F. Supp. 1192 (N.D. Ga. 1975), you invoke a case where compliance costs were asserted to be in excess of $1 million, and it was approximated that it would require "125,700 to 243,294 man-hours" to respond to the subpoena. *See id.* at 1198. It is hardly reasonable for WHOI to suggest that it is in a similar position, such that to bear its own costs for production would be "virtually impossible." *Id.* at 1199.

Finally, even if, as you suggest, BP "can more readily bear the costs," this fails to justify shifting an ordinary and logically anticipated expenditure to BP. It may be prudent, however, for WHOI to consider asking the U.S. Government to assist with its costs in responding to the subpoena, given that it is our understanding that WHOI performed the work underlying these requests under contract with the U.S. Coast Guard.

# KIRKLAND & ELLIS LLP

Dahlia Fetouh
March 2, 2012
Page 4

\*    \*    \*    \*    \*

     As you likely know, MDL 2179 is pending before Judge Carl Barbier in the U.S. District Court for the Eastern District of Louisiana.  We intend to raise with the Court our concern about lack of a production calendar for documents subpoenaed from WHOI.  We also will ask for the Court's assistance in enforcement of the subpoena and resolution of any claims of privilege.  Again, thank you for your efforts over the past months in responding to this subpoena.

Best regards,

Karen McCartan DeSantis