## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * | MDL NO. 2179<br><br>SECTION J |
| This document relates to all actions. | * * * | |
| | * * | Honorable CARL J. BARBIER |
| | * * | Magistrate Judge SHUSHAN |
| | * | |

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc., et al., individually and on behalf of themselves and all others similarly situated, | * * * * | Civil Action No. 12-970<br><br>SECTION J |
| Plaintiffs, | * * * | |
| v. | * * * | Honorable CARL J. BARBIER<br><br>Magistrate Judge SHUSHAN |
| BP Exploration & Production Inc; BP America Production Company; BP p.l.c., | * * | |
| Defendants. | | |

### THE PLAINTIFFS' STEERING COMMITTEE'S AND BP DEFENDANTS' MEMORANDUM IN SUPPORT OF JOINT MOTION FOR (1) PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, (2) SCHEDULING A FAIRNESS HEARING, (3) APPROVING AND ISSUING PROPOSED CLASS ACTION SETTLEMENT NOTICE, AND (4) BP'S MOTION FOR ADJOURNING THE LIMITATION OF LIABILITY TRIAL

*COUNSEL FOR ALL MOVING PARTIES ARE LISTED AT END OF MOTION*

# TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................................1

BACKGROUND ................................................................................................2

I.     PROCEDURAL HISTORY .......................................................................2

II.    SETTLEMENT NEGOTIATIONS.............................................................4

III.   SETTLEMENT CLASS DEFINITIONS AND EXCLUSIONS ....................7

IV.   SUMMARY OF THE PROPOSED ECONOMIC AND PROPERTY
DAMAGES SETTLEMENT.......................................................................7

     A.    The Proposed Settlement's Procedural Elements ....................................8

         1.    The Transition Process.............................................................8

         2.    Creation Of The Court Supervised Settlement Program.............9

         3.    Settlement Program Appellate Procedure................................10

         4.    Assignment, Release, And Other Protections ...........................11

         5.    Final Judgment......................................................................11

         6.    Class Notice ..........................................................................12

     B.    Four Unique Features Of The Proposed Settlement Guarantee
Exceptionally Full And Fair Compensation. ........................................13

     C.    The Proposed Settlement's Payment Categories ...................................15

         1.    Economic Loss.......................................................................16

         2.    Property Damage ...................................................................21

         3.    Vessels Of Opportunity ("VoO") Charter Payment..................22

         4.    Vessel Physical Damage Claims..............................................23

         5.    Subsistence Damage Payments................................................23

         6.    The Seafood Compensation Program .......................................23

         7.    The Gulf Coast Promotional Fund...........................................25

**ARGUMENT** ...........................................................................................................**25**

**I.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE.** ........................................................................................**25**

    **A.**    The Settlement Agreement Meets The Standard For Preliminary Approval........26

    **B.**    The Settlement Agreement Meets The More Demanding Requirements For Final Approval............................................................................................29

        **1.**    Absence Of Fraud And Collusion..............................................................31

        **2.**    Complexity, Expense, And Likely Duration Of The Litigation ................34

        **3.**    The Stage Of The Proceedings And Amount Of Discovery Completed ..................................................................................................37

        **4.**    The Probability Of Plaintiffs' Success On The Merits ..............................38

        **5.**    Range Of Possible Recovery ....................................................................40

        **6.**    Opinions Of Class Counsel, Class Representatives, And Absent Class Members ......................................................................................41

**II.   THE PROPOSED NOTICE TO THE CLASS COMPLIES WITH RULE 23(C)(2) AND RULE 23(E).** ..................................................................**43**

    **A.**    The Proposed Notice Distribution Method And Notice Contents Comply With Rule 23(c)(2)..............................................................................44

        **1.**    The Proposed Notice Distribution Method Satisfies Rule 23(c)(2)..........44

        **2.**    The Proposed Notice Contents Satisfy Rule 23(c)(2)...............................46

    **B.**    The Proposed Notice Complies With Rule 23(e). ..................................................47

**III.  THE COURT SHOULD ADJOURN THE LIMITATION AND LIABILITY TRIAL UNTIL AFTER THE FAIRNESS HEARING.** ..............................**49**

**IV.   REQUESTED PROCEDURES AND TIMETABLE** ........................................**51**

**CONCLUSION** .......................................................................................................**51**

**APPENDIX A — PROPOSED CLASS DEFINITION** ........................................**A-1**

**APPENDIX B — SETTLEMENT EXHIBIT 22** ...................................................**B-1**

**APPENDIX C — SETTLEMENT EXHIBIT 23** ...................................................**C-1**

# TABLE OF AUTHORITIES

## CASES

*Altier v. Worley Catastrophe Response, LLC*,
   No. 11-241, 2012 WL 161824 (E.D. La. Jan. 18, 2012) ........................................................... 7

*Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*,
   616 F.2d 305 (7th Cir. 1980) ...................................................................................................... 30

*Ass'n For Disabled Ams., Inc. v. Amoco Oil Co.*,
   211 F.R.D. 457 (S.D. Fla. 2002) ......................................................................................... 28, 36

*Ayers v. Thompson*,
   358 F.3d 356 (5th Cir. 2004) .............................................................................................. 30, 37, 41

*Billitteri v. Secs. Am., Inc.*,
   2011 WL 3586217 (N.D. Tex. Aug. 4, 2011) ........................................................................... 34

*Bowling v. Pfizer, Inc.*,
   143 F.R.D. 141 (S.D. Ohio 1992) .............................................................................................. 31

*Brunson v. La.-Pac. Corp.*,
   818 F. Supp. 2d 922 (D.S.C. 2011) ........................................................................................... 33

*Carlough v. Amchem Prods., Inc.*,
   10 F.3d 189 (3d Cir. 1993) ........................................................................................................ 50

*Collins v. Sanderson Farms, Inc.*
   568 F. Supp. 2d 714 (E.D. La. 2008) ............................................................................ 29, 31, 35

*Cotton v. Hinton*,
   559 F.2d 1326 (5th Cir. 1977) ..................................................................................... 29, 30, 40, 41

*DeHoyos v. Allstate Corp.*,
   240 F.R.D. 269 (W.D. Tex. 2007) ....................................................................................... 38, 41

*Domingue v. Sun Elec. & Instrumentation*,
   No. 09-682, 2010 WL 1688793 (M.D. La. Apr. 26, 2010) ....................................................... 32

*Eatmon v. Palisades Collection LLC*,
   No. 08-306, 2011 WL 147680 (E.D. Tex. Jan. 18, 2011) ......................................................... 45

*Exxon Shipping Co. v. Baker*,
   554 U.S. 471 (2008) ................................................................................................................... 36

*Faircloth v. Certified Fin., Inc.*,
   No. 99-3097, 2001 WL 527489 (E.D. La. May 16, 2001) ............................................. 35, 36, 37

*Fowler v. Birmingham News Co.*,
608 F.2d 1055 (5th Cir. 1979)........................................................... 47

*Gautreaux v. Pierce*,
690 F.2d 616 (7th Cir. 1982)............................................................. 27

*Granada Invs., Inc. v. DWG Corp.*,
962 F.2d 1203 (6th Cir. 1992)........................................................... 32

*Harris v. Vector Mktg. Corp.*,
No. 08-5198, 2011 WL 1627973 (N.D. Cal. Apr. 29, 2011) .................... 33

*In re Catfish Antitrust Litig.*,
939 F. Supp. 493 (N.D. Miss. 1996) .................................................. 34

*In re CertainTeed Roofing Shingle Prods. Liab. Litig.*,
269 F.R.D. 468 (E.D. Pa. 2010) ....................................................... 43

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
MDL No. 2047, 2011 WL 2313866 (E.D. La, June 9, 2011) ............ 44, 50

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
MDL No. 2047, 2012 WL 92498 (E.D. La. Jan. 10, 2012) ........ 26, 27, 44, 45

*In re Combustion, Inc.*,
968 F. Supp. 1116 (W.D. La. 1997)............................................... *passim*

*In re Corrugated Container Antitrust Litig.*,
643 F.2d 195 (5th Cir. 1981)..................................... 29, 31, 38, 41

*In re Corrugated Container Antitrust Litig.*,
659 F.2d 1322 (5th Cir. 1981)......................................................... 40

*In re Currency Conversion Fee Antitrust Litig.*,
263 F.R.D. 110 (S.D.N.Y. 2009)....................................................... 34

*In re Diet Drugs Prods. Liab. Litig.*,
282 F.3d 220 (3d Cir. 2002) ........................................................... 50

*In re Educ. Testing Serv. Praxis Principles of
Learning & Testing: Grades 7-12 Litig.*,
447 F. Supp. 2d 612 (E.D. La. 2006) .......................................... 29, 37

*In re Enron Corp. Secs., Derivs., & "ERISA" Litig.*,
No. MDL-1446, 2008 WL 4178151 (S.D. Tex. Sept. 8, 2008) ................ 48

*In re Exxon Valdez*,
229 F.3d 790 (9th Cir. 2000)........................................................... 29

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.,*
   --- F. Supp. 2d ----, No. 09-2046, 2012 WL 948365 (S.D. Tex. Mar. 20, 2012) ............... 32, 39

*In re Initial Pub. Offering Sec. Litig.,*
   243 F.R.D. 79 (S.D.N.Y. 2007) ................................................................................. 39

*In re Katrina Canal Breaches Litig.,*
   628 F.3d 185 (5th Cir. 2010) ..................................................................................... 30

*In re Lease Oil Antitrust Litig.,*
   186 F.R.D. 403 (S.D. Tex. 1999) .............................................................................. 30

*In re Mills Corp. Sec. Litig.,*
   265 F.R.D. 246 (E.D. Va. 2009) ............................................................................... 32

*In re Napster, Inc. Copyright Litig.,*
   MDL No. 1369, 2007 WL 2907892 (N.D. Cal. Oct. 2, 2007) .................................... 50

*In re Nasdaq Market-Makers Antitrust Litig.,*
   176 F.R.D. 99 (S.D.N.Y. 1997) ................................................................................ 27

*In re OCA, Inc. Sec. & Deriv. Litig.,*
   No. 05-2165, 2008 WL 4681369 (E.D. La. Oct. 17, 2008) .................................. 27, 42, 45, 46

*In re Oil Spill by Amoco Cadiz,*
   4 F.3d 997 (7th Cir. 1993) ........................................................................................ 35

*In re Oil Spill by the Oil Rig "Deepwater Horizon"*
*in the Gulf of Mexico, on April 20, 2010,*
   731 F. Supp. 2d 1352 (J.P.M.L. 2010) ...................................................................... 2

*In re Serzone Prods. Liab. Litig.,*
   231 F.R.D. 221 (S.D. W. Va. 2005) .......................................................................... 43

*In re Shell Oil Refinery,*
   155 F.R.D. 552 (E.D. La. 1993) ..................................................................... 27, 34, 35, 37

*In re Sony Corp. SXRD Rear Projection Television Mktg.,*
*Sales Practices & Prods. Liab. Litig.,*
   MDL No. 09-2102, 2010 WL 1993817 (S.D.N.Y. May 19, 2010) ........................... 50

*In re Traffic Exec. Ass'n.-E. R.R.,*
   627 F.2d 631 (2d Cir. 1980) ...................................................................................... 28

*In re Train Derailment Near Amite La.,*
   No. 1531, 2006 WL 1561470 (E.D. La. May 24, 2006) ............................................ 32

*In re Trans Union Corp. Privacy Litig.*,
  629 F.3d 741 (7th Cir. 2011) ................................................................. 48

*In re U.S. Oil & Gas Litig.*,
  967 F.2d 489 (11th Cir. 1992) ............................................................... 34

*In re Vitamins Antitrust Litig.*,
  305 F. Supp. 2d 100 (D.D.C. 2004) ....................................................... 39

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004) ................................................................... 29

*Int'l Union, United Auto., Aerospace & Ag. Implement*
  *Workers of Am. v. Gen. Motors Corp.*,
  497 F.3d 615 (6th Cir. 2007) ........................................................... 43, 48

*Int'l Union, United Auto., Aerospace, & Agric.*
  *Implement Workers of Am. v. Gen. Motors Corp.*,
  No. 07-14074, 2008 WL 2968408 (E.D. Mich. July 31, 2008) ............... 28

*Karvaly v. eBay, Inc.*,
  245 F.R.D. 71 (E.D.N.Y. 2007) ............................................................. 27

*Kincade v. Gen. Tire & Rubber Co.*,
  635 F.2d 501 (5th Cir. 1981) ................................................................. 29

*Klein v. O'Neal*,
  705 F. Supp. 2d 632 (N.D. Tex. 2010) ................................................... 35

*Landis v. N. Am. Co.*,
  299 U.S. 248 (1936) ............................................................................... 50

*Lazar v. Pierce*,
  757 F.2d 435 (1st Cir. 1985) ................................................................. 29

*Louie v. Kaiser Found. Health Plan, Inc.*,
  No. 08-0795, 2008 WL 4473183 (S.D. Cal. Oct. 6, 2008) ..................... 33

*Lucas v. Kmart Corp.*,
  234 F.R.D. 688 (D. Colo. 2006) ............................................................. 32

*M.D. ex rel. Stukenberg v. Perry*,
  --- F.3d ----, No. 11-40789, 2012 WL 974478 (5th Cir. Mar. 23, 2012) ... 30

*Marcus v. Dept. of Revenue*,
  206 F.R.D. 509 (D. Kan. 2002) ............................................................. 50

*Maywalt v. Parker & Parsley Pet. Co.*,
  67 F.3d 1072 (2d Cir. 1995) .......................................................... 33

*McAlarnen v. Swift Transp. Co.*, *Inc.*,
  No. 09-1737, 2010 WL 365823 (E.D. Pa. Jan. 29, 2010) ........... 33

*McNamara v. Bre-X Minerals Ltd.*,
  214 F.R.D. 424 (E.D. Tex. 2002) ................................................. 27

*Meijer, Inc. v. Warner Chilcott Holdings Co. III*,
  565 F. Supp. 2d 49 (D.D.C. 2008) ............................................... 38

*Menkes v. Stolt-Nielsen S.A.*,
  270 F.R.D. 80 (D. Conn. 2010) .................................................... 28

*Mullane v. Cent. Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950) ...................................................................... 48

*Navarro-Ayala v. Hernandez-Colon*,
  951 F.2d 1325 (1st Cir. 1991) ...................................................... 48

*Neff v. VIA Metro. Transit. Auth.*,
  179 F.R.D. 185 (W.D. Tex. 1998) ................................................ 29

*Newby v. Enron Corp.*,
  394 F.3d 296 (5th Cir. 2004) ................................................. 30, 38

*Parker v. Anderson*,
  667 F.2d 1204 (5th Cir. 1982) ..................................................... 38

*Pettway v. Am. Cast Iron Pipe Co.*,
  576 F.2d 1157 (5th Cir. 1978) ..................................................... 42

*Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*,
  636 F.3d 235 (6th Cir. 2011) ....................................................... 38

*Priceline.com, Inc. v. Silberman*,
  405 F. App'x 532 (2d Cir. 2010) ................................................. 34

*Priddy v. Edelman*,
  883 F.2d 438 (6th Cir. 1989) ....................................................... 40

*Quigley v. Braniff Airways, Inc.*,
  85 F.R.D. 74 (N.D. Tex. 1979) .................................................... 48

*Radosti v. Envision EMI*,
  717 F. Supp. 2d 37 (D.D.C. 2010) ............................................... 38

*Reed v. Gen. Motors Corp.*,
    703 F.2d 170 (5th Cir. 1983).................................................................. 30, 38, 39, 42

*Rodriguez v. West Publ'g Grp.*,
    563 F.3d 948 (9th Cir. 2009)......................................................................... 34, 36

*Ruiz v. McKaskle*,
    724 F.2d 1149 (5th Cir. 1984).............................................................................. 32

*Salinas v. Roadway Express, Inc.*,
    802 F.2d 787 (5th Cir. 1986)................................................................................ 37

*San Antonio Hispanic Police Officers Org., Inc. v. City of San Antonio*,
    188 F.R.D. 433 (W.D. Tex. 1999)......................................................................... 42

*Smith v. Ajax Magnethermic Corp.*,
    No. 02-0980, 2007 WL 3355080 (N.D. Ohio Nov. 7. 2007) ................................ 36

*Smith v. Crystian*,
    91 F. App'x 952 (5th Cir. 2004)........................................................................... 29

*Smith v. Tower Loan of Miss., Inc.*,
    216 F.R.D. 338 (S.D. Miss. 2003)........................................................................ 34

*Stott v. Capital Fin. Servs., Inc.*,
    277 F.R.D. 316 (N.D. Tex. 2011) ......................................................................... 40

*Trombley v. Nat'l City Bank*,
    759 F. Supp. 2d 20 (D.D.C. 2011) ....................................................................... 38

*Turner v. Murphy Oil USA, Inc.*,
    472 F. Supp. 2d 830 (E.D. La. 2007) ........................................................... *passim*

*UAW v. Gen. Motors Corp.*,
    235 F.R.D. 383 (E.D. Mich. 2006)........................................................................ 28

*UAW v. Gen. Motors Corp.*,
    No. 05-73991, 2006 WL 891151 (E.D. Mich. Mar. 31,2006) ............................... 43

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
    669 F.3d 632 (5th Cir. 2012)................................................................................ 30

*Williams v. New Orleans Pub. Serv. Inc.*,
    No. 75-1635, 1988 WL 98283, (E.D. La. Sept. 15, 1988) .................................... 27

## **STATUTES**

28 U.S.C. § 1407.......................................................................................................... 2

28 U.S.C. § 1651(a) .......................................................................................... 57

Fed. R. Civ. P. 23 ............................................................................... 26, 51, 57

Fed. R. Civ. P. 23(a) ......................................................................................... 27

Fed. R. Civ. P. 23(b) ......................................................................................... 27

Fed. R. Civ. P. 23(b)(3) .............................................................................. 49, 53

Fed. R. Civ. P. 23(c)(2) ....................................................... 49, 50, 52, 54

Fed. R. Civ. P. 23(c)(2)(B) ........................................................... 50, 52, 53

Fed. R. Civ. P. 23(c)(3) ............................................................... 50, 52

Fed. R. Civ. P. 23(e) ................................................................ 49, 53, 54

Fed. R. Civ. P. 23(e)(1) ..................................................................................... 54

Fed. R. Civ. P. 23(e)(2) ..................................................................................... 26

Fed. R. Civ. P. 23(e)(3) ....................................................................................... 7

## OTHER AUTHORITIES

Arnsdorf, Isaac,
    Exxon Valdez to Be Junked Years After Worst U.S. Ship Spill, available at
    http://www.bloomberg.com/news/2012-03-20/
    exxon-valdez-sold-for-scrap-years-after-worst-u-s-tanker-spill.html (Mar. 20, 2012)............ 34

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.311 ............................................. 45

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.632 ................................. 25, 26, 50

MANUAL FOR COMPLEX LITIGATION (SECOND) § 30.44 ............................................. 26

MCLAUGHLIN, JOSEPH M.,
    2 MCLAUGHLIN ON CLASS ACTIONS: LAW & PRACTICE § 6:7 (8th ed. 2011) ........................... 29

NEWBERG ON CLASS ACTIONS § 11:51 (4th ed. 2010) ................................................. 30

Office of Court Appointed Claims Administrator,
    Court Supervised Claim Program,
    Press Release, available at
    http://www.gulfcoastclaimsfacility.com/PressRelease-03-23-12.pdf (March 23, 2012)............ 8

Press Release Regarding Transition Process, available at
    http://www.gulfcoastclaimsfacility.com/PressRelease-04-10-12.pdf (Apr. 10, 2012) ............... 9

## INTRODUCTION

The Plaintiffs' Steering Committee ("PSC") (by and through Interim Class Counsel) and the BP Defendants (by and through their undersigned counsel) respectfully submit this Memorandum in support of their joint motion for (1) preliminary approval of the class action settlement; (2) scheduling a fairness hearing; (3) approval and issuance of class action settlement notice; and (4) BP's unopposed request for adjournment of the Limitation and Liability trial.[1]

After nearly two years of exceptionally complex, resource-intensive, and hard-fought litigation, the PSC and BP have reached a proposed settlement.  Under the Agreement, which is being filed separately, a new *Deepwater Horizon* Court Supervised Settlement Program will resolve claims under rules that (1) have been agreed upon by the parties after lengthy negotiation; (2) are subject to Court approval; and (3) are transparent, easily understood, and fair to both sides.  At all times, decisions reached by the Claims Administration Vendors as overseen by the Claims Administrator will be subject to appellate review by neutral, independent decisionmakers.

As in any settlement, neither side will receive everything it wants—not BP, which believes that plaintiffs' claims are subject to considerable litigation risk, and not the PSC, who maintain that they would one day obtain larger awards if their claims were to proceed to trial. On balance, however, the Agreement creates a comprehensive compensation system, and thus represents a resolution that is more than fair, reasonable, and adequate when judged against the standards of Federal Rule of Civil Procedure 23.

The PSC and BP thus jointly request that the Court enter an order (1) preliminarily

---

[1] Unless otherwise defined herein, capitalized terms in this memorandum refer to defined terms and have the meaning set forth in the proposed *Deepwater Horizon* Economic and Property Damage Settlement Agreement filed concurrently herewith.

approving the proposed settlement; (2) scheduling a fairness hearing; (3) approving the proposed notice protocol; and (4) granting BP's unopposed request to adjourn the Limitation and Liability trial until after the fairness hearing has occurred and the Court has adjudicated the fairness of the settlement, either approving or rejecting it.

## **BACKGROUND**

### I.   **PROCEDURAL HISTORY**

On April 20, 2010, an explosion and fire aboard the *Deepwater Horizon* triggered a tragic chain of events that led to eleven deaths, dozens of injuries, and an oil spill in the Gulf of Mexico.  This Court took charge of the cases filed in this District arising from the incident, and on August 10, 2010, the Judicial Panel on Multidistrict Litigation ("JPML") centralized all federal actions (excluding securities suits) in this District and assigned them to this Court pursuant to 28 U.S.C. § 1407.  *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d 1352 (J.P.M.L. 2010).

On October 19, 2010, the Court issued Pretrial Order 11 (Rec. Doc. 569) ("PTO 11"), creating pleading bundles for various types of claims.  Among the pleading bundles is the B1 bundle, which encompasses all private claims for economic loss and property damage.  *Id.* at 3.[2] In accordance with PTO 11, plaintiffs filed the B1 Master Complaint on December 15, 2010 (Rec. Doc. 879), and filed a First Amended B1 Master Complaint on February 9, 2011 (Rec. Doc. 1128).  After numerous defendants filed motions seeking to dismiss the First Amended B1 Complaint, the Court issued an order granting in part and denying in part these motions on August 26, 2011 (Rec. Doc. 3830).  BP subsequently answered the First Amended Complaint on September 27, 2011 (Rec. Doc. 4130).  To date, approximately 109,000 claimants have filed

---

[2] A motion for preliminary approval of a proposed medical class settlement is being filed separately.  That proposed settlement encompasses personal injury claims falling within the B3 bundle.  *See* Pretrial Order 11.

short-form joinders adopting the First Amended B1 Master Complaint.  On April 16, 2012, plaintiffs filed a new class action complaint captioned *Bon Secour Fisheries, Inc. v. BP Exploration & Production Inc.*, No. 12-970 (Rec. Doc. 6252).

The First Amended B1 Master Complaint (Rec. Doc. 1128) sought relief in six counts: general maritime law claims (Count I); OPA claims (Count II); state law claims (Count III); a punitive damages claim (Count IV); and claims seeking declaratory relief relating to the GCCF (Counts V and VI).  After extensive briefing, the Court dismissed counts III, V, and VI.  *See* B1 Order (Rec. Doc. 3830) at 37-39.  The Court's rulings as to the other counts also provided important guidance to the parties in evaluating the strengths and weaknesses of their respective claims and defenses.  The newly filed *Bon Secour Fisheries* class action complaint asserts six causes of action or accompanying forms of relief:  (1) negligence, gross negligence and willful misconduct, and breach of contract, under general maritime law; (2) OPA claims; (3) nuisance, trespass, fraudulent concealment, and strict liability claims, under federal or other applicable law; and (4) punitive damages on the foregoing claims.  (Rec. Doc. 6252 ¶¶ 319-432.)  BP will file an answer to the *Bon Secour Fisheries* complaint in accord with the Federal Rules of Civil Procedure and any future Court orders.

In the 20 months that have passed since the JPML's centralization order, the parties have engaged in extensive discovery and motion practice.  The Court kept this litigation moving at a brisk pace, through monthly status conferences and detailed case management orders.  The parties completed all discovery necessary to prepare for trial, including taking 311 depositions, producing approximately 90 million pages of documents, and exchanging more than 80 expert reports on an intense and demanding schedule.  Depositions were conducted on multiple tracks and on two continents.  Discovery was kept on course by weekly discovery conferences before

Magistrate Judge Shushan and by prompt rulings by the Court. As a result, the parties arrived at the eve of trial completely apprised of the operative facts and thoroughly prepared to engage in adversarial trial litigation.

## II.   SETTLEMENT NEGOTIATIONS

Consistent with the Court's instruction to the PSC to "[e]xplore, develop, and pursue all settlement options pertaining to any claim or portion thereof of any case filed in this litigation," Pretrial Order 8 (Rec. Doc. 506) at 4, the PSC and BP have engaged in good-faith, lengthy, and intricately detailed settlement discussions. They did so without disrupting or distracting from discovery and trial preparation, on an equally intensive parallel track. The parties were ultimately able to reach a settlement precisely because of the information and knowledge that they obtained through the discovery process and pretrial rulings.

The parties initiated contact through their respective counsel and had preliminary meetings in early 2011 to discuss the possibility of engaging in settlement discussions. The parties began negotiating in earnest in February 2011, and negotiations were held on a virtually daily basis commencing in May 2011. The parties negotiated separately, though concurrently, two distinct class action settlements, the Medical Settlement and the Economic and Property Damages Settlement. The former is discussed in the parties' Medical Settlement Preliminary Review Motion. The latter is discussed here.

The parties initially negotiated with each other directly. In early 2012, Magistrate Judge Shushan became increasingly involved as a neutral mediator between the parties, overseeing many of the negotiations and ensuring that the process was fair and ethical. Her involvement was integral to the ultimate resolution of the litigation.

In negotiating the Settlement Agreement, the parties followed the same protocol for each type of claim: rather than negotiating a total settlement, either a figure for an aggregate class

settlement or for each type of claim, the parties instead assessed the strength and value of each type of claim.  Without regard to total payout figures, the parties negotiated claims frameworks, programs, and processes, including details such as what types of proof would be required for claimants to receive a settlement benefit, what categories of claims would be paid, whether certain claimants would benefit from causation presumptions, and how settlement benefits would be calculated.  The negotiations were exclusively focused, from the outset, on producing claims frameworks that could be administered simply, fairly, objectively, and consistently, and, in every instance, according to the merits of the underlying claims.  The principle was two-fold:  to design claims frameworks that fit a wide array of damage categories, and, within each category, to treat like claims alike, so as to proceed with both fairness and predictability.

During this process, PSC and other Plaintiffs' counsel most familiar with each type of claim advised the negotiators to ensure that the frameworks reflected the actual situations faced by the hundreds of thousands of people potentially affected by the oil spill.  For example, attorneys representing seafood restaurants contributed to the development of the business economic loss framework, which details the steps by which businesses recover for losses due to the spill.  So, too, did attorneys representing employees inform the development of the individual lost wages framework; attorneys representing wetlands owners, the property damage framework; attorneys representing homeowners, the property sales loss framework—and so on.

With the exception of the Seafood Compensation Program, there is no limit or "cap" on the amount to be paid by BP under these programs.  Rather, all claims that meet the criteria for each program will be paid in full.  Such claims will be paid without delay—claimants need not await final settlement approval for payment.  Claimants may submit claims in multiple categories to recover for all demonstrable losses arising from the *Deepwater Horizon* Incident.

The parties also negotiated the claims process for the Seafood Compensation Program over an extensive period. While the parties had discussed an open-ended framework, it became clear by early March 2012 that a fixed sum of $2.3 billion would best compensate eligible participants fully and fairly. At the parties' suggestion, the Court appointed John W. Perry, Jr., to preside over the proposed settlement of the seafood program. (Rec. Doc. 5998.)

On the eve of the Limitation and Liability trial, upon being informed that the parties were near an agreement in principle, the Court adjourned the trial for one week "to allow the parties to make further progress in their settlement discussions." (Rec. Doc. 5887.) The parties continued negotiating, and on March 2, 2012, the Court adjourned the trial once more after the parties reached an agreement in principle. As the Court explained, the "settlement would likely result in a realignment of the parties in this litigation and require substantial changes to the current Phase I trial plan." (Rec. Doc. 5955.) By separate order, the Court also designated the PSC Co-Liaison Counsel as Interim Class Counsel, in order to facilitate the consummation of the Agreement and the implementation of the settlement approval process. (Rec. Doc. 5960).

At the parties' request and consistent with the agreement in principle, the Court entered its First Amended Order Creating Transition Process to facilitate the transition from the Gulf Coast Claims Facility ("GCCF") to the Court Supervised Settlement Program envisioned by the settlement. (Rec. Doc. 5995).

The parties worked out an agreement on the essential terms of the settlement, designed all of the compensation frameworks, and finalized the procedures that will govern the Settlement Program. Only then, upon receiving permission from the Court, BP and the PSC proceeded to negotiate an appropriate Class Counsel fee. As a result, and subject to Court approval, the BP parties have agreed not to contest a request by Class Counsel for an award, in an amount to be set

by the Court, not to exceed $600 million, for class counsel's fees, costs, and expenses, as detailed fully in Exhibit 27 to the Settlement Agreement.[3]  Consistent with Federal Rule of Civil Procedure 23(e)(3), there is no "agreement made in connection with th[is] proposal" other than the Economic and Property Damage Class Settlement Agreement being submitted herewith to this Court.

## III.   SETTLEMENT CLASS DEFINITIONS AND EXCLUSIONS

To effectuate the settlement, the PSC is seeking by separate motion to certify a class of individuals and businesses that suffered economic loss or property damage as a result of the *Deepwater Horizon* Incident.  BP does not oppose the motion, and the proposed class definition is annexed to this memorandum as Appendix A, along with the relevant maps contained in Appendices B and C.  The frameworks and programs to be established to benefit the class are explained in Section IV immediately below.

## IV.   SUMMARY OF THE PROPOSED ECONOMIC AND PROPERTY DAMAGES SETTLEMENT

Like any settlement, this settlement is "a compromise, a yielding of the highest hopes in exchange for certainty and resolution."  *Altier v. Worley Catastrophe Response, LLC*, No. 11-241, 2012 WL 161824, at *14 (E.D. La. Jan. 18, 2012) (quotations omitted).  It is, however, a settlement that stands on its own as a comprehensive, fair, and reasonable compensation system that does not discount demonstrable losses or compromise procedural fairness. The settlement's most salient feature is that it makes whole the myriad of plaintiffs asserting that they have suffered economic loss or property damage as a result of the *Deepwater Horizon* Incident.

---

[3] Under this provision, Class Counsel would seek an interim award of $75 million.  Additional interim payments equivalent to 6% of class claims would be paid quarterly, and the fee would not exceed a total of $600 million under any circumstances.  All terms of the fee provision are subject to Court approval.

### A.     The Proposed Settlement's Procedural Elements

Under the Agreement, the GCCF will be replaced by a new Court Supervised Settlement Program, headquartered and with claims offices located in the same Gulf area as the class members whose claims they will resolve.  The new program will use a highly transparent and objective process to provide full and fair compensation to individuals and businesses harmed by the spill.  BP has agreed to pay all administrative costs, even though the new Settlement Program is and will remain independent of BP.  The Agreement provides for a claims deadline of April 22, 2014, or six months after the Effective Date of the settlement, whichever is later.

### 1.     The Transition Process

The Transition Orders issued by the Court on March 8, 2012 govern the transition process pending the Court's preliminary approval of the settlement and initiation of the settlement claims process.  For all claims submitted to the GCCF for which an unpaid, unexpired offer is pending, the Transition Coordinator will pay 60% of the offer without requiring a release.  *See* Am. Transition Order (Rec. Doc. 5995) at 3.  Moreover, "[i]f the claimant receiving the 60% payment is a member of the proposed settlement class, the claimant has a right to additionally recover from the Court Supervised Settlement Program *the greater of*: the remaining 40% of the GCCF offer, or the class settlement payment minus any amount previously paid by the Transition Process."  *Id.* (emphasis added).  The Order also allows eligible claimants to obtain GCCF "Quick Pay" disbursements until May 7, 2012, *id.*; provides for notice of the termination to all eligible participants, *id.*; and provides that the transition process will terminate upon entry of preliminary approval and the establishment of the settlement claims process, *id.* at 4.  Any disagreements about the claims administration process that cannot be resolved by the new Claims Administrator and the parties will be referred to the Court for resolution.

To aid in the transition from the GCCF to the new Settlement Program, the Court has already appointed Patrick Juneau as the Claims Administrator and directed him to establish a Transition Process.  *See id.* at 1-2; *see also* Office of Court Appointed Claims Administrator, Court Supervised Settlement Program, BP Oil Spill, Press Release, *available at* http://www.gulfcoastclaimsfacility.com/PressRelease-03-23-12.pdf (March 23, 2012).  Likewise, the Court has already appointed (a) Lynn Greer as Transition Coordinator, *see* Am. Transition Order, at 1; (b) James Parkerson Roy and Stephen J. Herman as Interim Class Counsel, *see* Order (Rec. Doc. 5960); and (c) John W. Perry, Jr. as a neutral to preside over the proposed settlement of the seafood program, *see* Order (Rec. Doc. 5998).[4]

### 2.    Creation Of The Court Supervised Settlement Program

Under the Agreement, the GCCF will be replaced by a new Settlement Program that is "subject to the ongoing supervision of the court."  Agreement, Section 4.4.7.  The new program (once it fully implements the proposed settlement under the Court's oversight shortly after preliminary approval) will use a highly transparent and objective process to provide full and fair compensation to individuals and businesses harmed by the spill.

Under the proposed settlement, the Settlement Program will compensate class members pursuant to frameworks described in greater detail in background section IV.C, below.  The Settlement Program is designed to be responsive to claimants.  It will function neither as a depersonalized bureaucracy nor as an adversarial system.  Instead, the parties have agreed that the Settlement Program will assist class members in submitting their claims:

---

[4] According to this Court's Amended Transition Order, "[t]he Transition Coordinator will: (a) evaluate claims currently pending with the Gulf Coast Claims Facility; and (b) evaluate any new claims submitted before the proposed Court supervised claims program."  Rec. Doc. 5995, at 2.  Between March 8, 2010, and April 10, 2010, the Transition Coordinator paid 5,238 claimants a total sum in excess of $134 million.  *See* Press Release Regarding Transition Process, *available at* http://www.gulfcoastclaimsfacility.com/PressRelease-04-10-12.pdf (Apr. 10, 2012).

The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall work with Economic Class Members (including individual Economic Class Members' counsel and Class Counsel) to facilitate Economic Class Members' assembly and submission of Claims Forms, including all supporting documentation necessary to process Claim Forms under the applicable Claims Processes. The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement.

Agreement, Section 4.3.7.

Submitted claims will be evaluated and processed by the by the claims administration vendors. *See* Agreement, Section 4.38. In the claims administration vendors' evaluation of claims, there shall be no relevance or effect to the fact that any claimant previously had a claim denied or rejected by the GCCF. *See* Agreement, Section 4.4.9.

### 3. Settlement Program Appellate Procedure

Beyond providing transparent, objective, and fair rules for calculating awards, the proposed settlement process provides for ample internal appellate review. Claimants have the right to appeal denials of claims for insufficient documentation and to challenge any final determination made in their cases by the new Settlement Program. BP, in contrast, will be able to appeal only where an individual claimant is awarded more than $25,000 in base compensation. Appeals as to the amount of compensation will be decided using so-called "baseball arbitration," where the appellate panel must select either the amount advanced by the claimant or the amount advanced by BP. All appellate panelists will be selected by the Court from a list agreed upon by the parties. If the amount at issue is more than $1,000,000 in base compensation, an appeal will be considered by a three-member panel; in such an instance, at least one panel member must be

from the claimant's home State.[5]

### 4.  Assignment, Release, And Other Protections

Pursuant to the Agreement, all class members who accept payment under the new Settlement Program agree to release, forever discharge, and covenant not to sue, *inter alia*, (i) BP, (ii) all federal and state oil spill liability funds, and (iii) every one of the other listed "Released Parties" (including all defendants in the *Deepwater Horizon* litigation except Halliburton and Transocean[6]) for any and all defined released claims arising from or relating in any way to the DWH Spill.

Participating class members will reserve all punitive damage claims against Transocean and Halliburton.  In addition, the Agreement expressly reserves to class members specific carved-out claims.[7]  Finally, subject to final approval, the proposed class will obtain an assignment of certain of BP's claims against Transocean and Halliburton.

### 5.  Final Judgment

Under the Agreement, the parties will seek a final judgment approving the settlement, certifying the class for settlement purposes, and dismissing all of the released economic loss and property damage claims of the Economic Loss Class against BP.[8]  BP, moreover, agrees not to

---

[5] Both the $25,000 and $1,000,000 appeal thresholds referred to in this paragraph refer to base compensation, prior to application of a risk transfer premium ("RTP").  RTPs are explained in background section IV.B, below.

[6] The intent of the Agreement is for BP to pay *all compensatory damages* but to allow the plaintiffs to continue to seek punitive damage recoveries from Halliburton and Transocean, which is the sole basis for the exclusion of those defendants from the release.  The plaintiffs, moreover, have agreed with BP to a set of special rules to effectuate the parties' intent to allow the plaintiffs to seek exclusively punitive damages against Halliburton and Transocean, including the plaintiffs' (1) agreeing not to seek compensatory damages against Halliburton or Transocean; and (2) agreeing, among other protections to BP, not to execute on any compensatory damages that might be awarded to plaintiffs against Halliburton and Transocean.  *See* Agreement, Section 11.

[7] For example, class members can participate in the settlement while reserving any claims for moratorium-related loss.

[8] The Agreement reserves certain claims of the Economic Class Members and, of course, does not affect the claims of non-Class Members.

contest a request by Class Counsel for fees, costs, and expenses up to a maximum of $600 million, should such an award be approved by the Court.  (The maximum award will include fees, costs, and expenses paid under the separate Medical Benefits Class Action Settlement; jointly the total award may not exceed $600 million.)  Importantly, this sum will be paid separately from any amounts paid to the Settlement Class, and it does not reduce their payments or benefits.  (*See* Settlement Agreement Ex. 27.)

### 6.    Class Notice

The Settlement Notice Program was designed with the requirements of Rule 23 and due process in mind.  The heart of the notice program is a multimedia notice program that will cover the entire United States, with a particular focus on the Gulf Coast regions.  *See* Ex. 1 (Azari Decl.); Ex. 2 (Kinsella Decl.); Ex. 3 (Wheatman Decl.) (setting out the methodology, media to be targeted, and scope of the extensive notice plan prepared to inform potential class members of their options).  The media notice effort will include publication in over 2,100 local and national newspapers and nationwide publication in leading national consumer magazines, trade, business and specialty publications, local television, radio and newspapers in the Gulf Coast Areas, appropriate foreign language and African-American publications, and online banner advertising. The campaign will also include individually mailed notice to class members (who can be identified from court filings, court records, and GCCF records), including to all those class members who filed short-form joinders as part of pretrial preparation for the Limitation and Liability trial.  To the extent that records indicate that individual class members are represented by counsel, individual notice will also be mailed to their attorneys.

The parties will also make available multiple channels through which class members can learn more about the settlement.  The settlement administrator will establish a toll-free number staffed by representatives who can field class members' questions and help them through the

claims process.  And most importantly, the administrator will establish a comprehensive notice and claims website through which class members can learn about the settlement, submit their claims online, and check their claim status.  The website will feature a list of frequently asked questions, which will be regularly updated to ensure that the class receives information of common concern.  The settlement web address will be included in all notice materials.  Every potential class member will have access to a complete copy of the Settlement Agreement, including its exhibits.  Finally, BP has agreed to provide up to $5 million in funds for a supplemental publicity campaign managed by the PSC.  As described in argument section II.B below, notice experts forecast that this notice campaign may come to be regarded as one of the most comprehensive and elaborate notice programs in litigation history, with 95% of the adults in the Gulf Coast exposed to class notice materials on average 8.8 times, and 83% of U.S. adults exposed on average 3.8 times.

### B.   Four Unique Features Of The Proposed Settlement Guarantee Exceptionally Full And Fair Compensation.

The Agreement includes four overarching features that are uniquely designed to guarantee the fairness and adequacy of the proposed settlement:

*First*, Section 4.4.10.3 of the Agreement provides for the satisfaction of all economic and property loss claims by class members arising out of the oil spill, even for losses caused by the actions or omissions of Transocean or Halliburton.   In other words, BP has taken the extraordinary step of agreeing to pay all of those compensatory damages itself even though the spill was a multi-party, multi-causal event.

*Second*, claimants in many of the claims categories will receive, in addition to calculated

baseline damages, Risk Transfer Premium ("RTP") payments.[9] RTP payments are meant to compensate class members for pre-judgment interest, the risk of oil returning, consequential damages, inconvenience, aggravation, the risk of future loss, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors. These RTPs—which are multiples of baseline damages added to many class members' compensatory damages awards, and which were negotiated separately for each damage category—will fully compensate claimants for all potential future and unknown losses relating to the DWH Spill, along with all other elements of damage, thereby extinguishing claims for damages under all conceivable legal theories.[10] As the name suggests, from the perspective of a class member, RTP payments provide additional monetary recoveries to plaintiffs who contend they bear the risk of future and unknown losses, whereas from the defense perspective BP pays such additional compensation in exchange for broad releases.

*Third*, Section 11 of the Agreement, "Assignment and Protections," assigns to Plaintiffs BP's spill-related claims against Transocean and Halliburton. As the Agreement indicates, the assigned claims include claims for repair of the Macondo Well, related economic losses to BP, costs that BP incurred to respond to the spill, and any punitive damage claims that BP may have against Transocean or Halliburton. The Settlement Class may pursue these claims for additional compensation on top of full compensatory payments that already have been augmented by RTPs.

---

[9] For example, if the compensation amount is $10,000 for a tourism-related injury, and the RTP applicable to a recovery of that type is 2.5, then $10,000 is multiplied by 2.5, which product is then added to the $10,000 to reach the total amount of compensation (*i.e.*, $10,000 + $25,000 = $35,000 in total compensation).

[10] The parties concur that the Agreement fully and finally resolves any and all claims for damages (including punitive damages)—under any legal theory—by granting comprehensive releases to the defined released parties, including BP, while BP expressly continues to deny liability for punitive damages. Additionally, for damage categories involving RTPs, plaintiffs should not be deemed to concede that baseline damages would provide full compensation in the absence of RTPs. They agree only that the total of baseline damages and RTP payments together constitutes compensation acceptable as a compromise in settlement.

***Fourth***, unlike most class settlements that do not pay benefits until the court's approval order is final and no longer appealable, this Agreement enables class members to receive settlement payments on an accelerated schedule.  Class members can file claims immediately following the Court's determination of fairness.  The Court Supervised Settlement Program will process those claims and make settlement payments to class members if they execute an individual release.  Thus, the Agreement allows class members to be compensated promptly, and much sooner than is normally the case in class action settlements.

## C.     The Proposed Settlement's Payment Categories

The settlement permits Class Members to submit multiple claims and receive compensation for multiple categories of damage.  For each of the categories, BP and the PSC negotiated claims processes that provide the fullest and fairest compensation possible to each type of individual and entity harmed by the *Deepwater Horizon* Incident.[11]   In order to accomplish this goal, the claims process must take into account the individual circumstances of each claimant, thereby adding some necessary complexity to the calculation methods.  But in every instance the payment formulas remain transparent, objective, and fair to the individuals and businesses that will be compensated under them.[12]

In total, the settlement provides for recovery in the following categories of economic and property damage or loss:

---

[11] Certain business types are excluded from the class, such as oil and gas.  Others, such as gaming, banking and financial services, insurance, defense contracting industries, and entities that market BP-branded fuel are excluded for most claims.  Also excluded are Federal and State governmental agencies, employees of MDL 2179 defendants, persons and entities that have been paid by the GCCF and executed a GCCF Release, and persons and entities engaged in menhaden ("pogy") fishing and harvesting.  Such businesses are excluded either because (1) any claimed losses are unlikely to have been caused by the DWH Spill and/or (2) the Parties have concluded that such claims could more appropriately be handled on an individual basis through other pending lawsuits or other settlements.

[12] It is important to note that nothing in this Agreement is an admission of law or fact by any party, and nothing contained in the various claims frameworks or evidence called for under such frameworks or otherwise is intended to create a presumption or inference for any purpose beyond making claims payments pursuant to the settlement.

1.  Economic Loss

Individual Loss of Wages
Business Economic Loss
Multi-Facility Business Economic Loss
Start-Up Business Economic Loss
Failed Business Economic Loss
Failed Start-Up Business Economic Loss

3.  Vessels of Opportunity Charter Payment

4.  Vessel Physical Damage

2.  Property Damage

Loss of Use/Enjoyment of Real Property
Coastal Real Property Damage
Wetlands Real Property Damage
Realized Real Property Sales Loss

5.  Subsistence Damage

6.  Seafood Compensation Program

The formulas were developed with the assistance of various experts (including economists, accountants, and real estate experts) who analyzed and responded to questions posed by both BP and the PSC throughout the negotiation process.

BP has also agreed to fund settlement and claims administration and the notice program; to provide a separate fund of $57 million to promote the Gulf Coast and its waters; to fund a supplemental publicity campaign up to $5 million to be designed and administered by the PSC; and to offer reimbursement to all categories of claimants for accounting services required for filing their claims. This reduces the paperwork burdens associated with presenting a claim and enhances the fairness of the settlement.

## 1.    Economic Loss

### a.    Individuals

Individual workers in the affected regions will be eligible for benefits to offset spill-related losses, in addition to any applicable RTP determined pursuant to a claims process that takes into account geographic location, nexus of the worker's injury to the oil spill, and other relevant factors.

The standards for establishing causation for individuals are flexible and provide claimants with multiple options. Causation is presumed for those individuals most likely to have been affected by the spill, including those on the coast and those employed in certain seafood-related businesses. Other individual claimants are required to demonstrate a loss of earnings attributable to the spill during May through December 2010 (or other applicable period in the case of certain Seafood Industry claimants) based on financial information and/or sworn statements from their employer(s). In addition, as described below, certain individual claimants lacking tax documents or other earnings documentation will be eligible for compensation under the settlement provided that they meet additional causation requirements.

The documentation requirements for individual economic loss claims balance the need for demonstrating causation and lost earnings with recognition of individuals' varying employment circumstances and ordinary record-keeping practices. All claimants must submit a sworn claim form and varying types of support. Four documentation categories are established:

**Category I:** Claimants with Tax Information Documents for 2010 and prior periods, including both full-year and seasonal workers, must submit them, along with Pay Period Earnings Documentation, if they possess it.

**Category II:** Claimants without such Tax Information Documents, but who have Pay Period Earnings Documentation or other earnings documentation for 2010 and prior periods, must submit such documentation.

**Category III:** Claimants with Tax Information Documents or Pay Period Earnings Documentation who lack comparable pre-2010 employment data because they were New Entrants To Employment, Career Changers, or had less than 12 months of earning history in the Claiming Job as of April 20, 2010, must provide information for 2010 and prior and subsequent years so that an appropriate basis for comparison of projected and actual 2010 earnings can be established.

**Category IV:** Claimants without any earnings documentation who were employed in Zones A, B, or C must submit sworn written statements, as well as supporting sworn

17

written statements by their employer(s) and are subject to additional requirements for establishing causation.[13]

Individual compensation includes several components and depends in part on the amount of documentation provided. Lost earnings are calculated as the estimated difference between a claimant's expected earnings from a job within the class geography during May to December 2010 (or April 2011 in the case of certain Seafood Industry claimants), and the claimant's actual earnings during that claim period. Expected earnings are estimated based on consideration of (1) the claimant's historical earnings or documented anticipated earnings or, for claimants without sufficiently documented pre-spill earnings, the claimant's 2011 earnings; and (2) for certain claimants with contemporaneous documentation of pre-spill and post-spill earnings, application of defined growth factors so as to take more precise account of year-to-year wage increases. Depending on the location and/or industry in which the claimant was employed, and the amount of documentation provided, the claimant may be eligible for an RTP multiple of lost earnings. Eligible claimants may also receive additional compensation for lost health insurance, pension benefits, and qualified training costs and qualified job search costs, which will not be multiplied by an RTP. The claims framework also provides cash benefits for workers who incurred training or job search costs as a consequence of the oil spill. Compensation calculated using the above-listed factors will be reduced to take account of previous spill-related payments.

---

[13] Self-employed individual vendors are compensated subject to a special compensation framework tailored to their business. Individual Periodic Vendors, who periodically made retail sales of goods or services to Non-Local Consumers in certain zones during 2009 and 2010, did not maintain a fixed business location in a building from which they made the sales, and do not have Tax Information Documents sufficient to make a claim for Business Economic Loss must provide other information regarding those sales and a supporting Sworn Statement from an adjacent business. Similarly situated Festival Vendors, who engage in comparable activities at defined Festivals or major sporting events, need to provide similar documentation, including a sworn statement from the Festival Coordinator or other individual with knowledge of the Festival Vendor's activities.

###### b.        Business

Business economic damage claimants will also be compensated under the settlement for post-spill losses of earnings and profits, and all compensation calculations will factor in any pre-spill growth.  The compensation amounts for many business economic damage claimants will also be enhanced by an RTP.  The following discussion describes the claims process for pre-existing businesses that lost earnings or profits.  The Agreement and accompanying exhibits detail a similar process for failed businesses, start-up businesses, and failed start-up businesses.

The Claims Administrator will calculate business economic damage claimants' expected post-spill earnings by following a two-step process.  Step one calculates the value of the business's reduction in profit during a claimant-selected loss period (any three or more consecutive months of the eight months following the spill), by comparing the post-spill earnings during the loss period to pre-spill earnings from the same months in a claimant-selected benchmark year.[14]  Step two accounts for expected profits by calculating a claimant-specific factor that captures the business's growth trend during the four months immediately preceding the spill, and applying it, along with a general, economy-wide growth factor, to determine what the business' expected profits would have been during the loss period, but for the spill.  The sum of step one (loss calculation) and step two (expected profit but for spill) results in the business claimant's base compensation amount, which may then be enhanced by applying an RTP and/or offset by prior payments received, depending on the type of business.

Businesses must submit documentation to support their claims that reflect their business structure, as well as provide their federal tax returns and profit and loss statements (or other documents) evidencing monthly revenues and expenses.  Depending on claimant-specific factors,

---

[14] Business economic damage claimants can choose 2009, an average across 2008 and 2009, or an average across 2007, 2008, and 2009, as their benchmark year.

businesses may be required to submit additional documentation, such as documents evidencing client cancellations that may have depressed earnings during the benchmark period.

Businesses in certain geographic zones and industries, such as seafood processing, will not be required to provide documentation demonstrating causation, while businesses in other zones will be required to submit varying degrees of evidence of causation.  For example, businesses in Fairhope, Alabama fall into Zone B.  In order to recover, they must submit evidence of causation.  One such form of evidence is documentation of a V-shaped revenue pattern—an aggregate decline of 8.5% or more in total revenues over a period of three consecutive months in the eight months following the spill followed by an aggregate increase of 5% or more in total revenues over the same period in 2011.

In addition to the lost profits calculated by the two-step process described above, claimants may receive an RTP multiple of that amount based on a schedule negotiated by the parties.  Total claimant compensation equals lost profits plus the applicable RTP, minus any OPA payments already received by the claimant from BP or the GCCF.  RTP payments vary according to the Claimant's proximity to the Gulf and the precise type of business involved. Seafood processors who process shrimp, crab, and oyster, for instance, will receive four times their documented damages (*i.e.*, an RTP of 3.00).  Likewise, tourist businesses closest to Gulf waters will receive over three times their documented damages (*i.e.*, an RTP of 2.5), while tourism businesses even 220 miles from the Louisiana coast will receive over double their documented damages (*i.e.*, an RTP of 1.25).  The proposed settlement provides for similar compensation methodologies for Start-Up Businesses, Failed Businesses, and Failed Start-Up Businesses, with modifications tailored to their specific circumstances.  In short, the proposed

settlement will carefully provide full and fair recompense for economic loss claims submitted by Gulf businesses.

### 2. Property Damage

#### a. Loss Of Use And Enjoyment

The Agreement calculates compensation for coastal property damage claims by using a specified percentage of a standardized property tax applicable to the property parcel; the percentage used is based on the presence of oil and the environmental sensitivity of the coastal property. An RTP is then applied to the base compensation amount.

#### b. Real Property Damage

The Agreement also provides compensation for damages to real property in two sub-categories: (1) Coastal Real Property Claims, and (2) Wetlands Real Property Claims.

Under the Coastal Real Property Claims Process, claimants will submit their requests to the Claims Administration Vendor, and if they can satisfy the documentation requirements to establish ownership, they will recover a percentage of their 2010 Applicable Property Tax for the parcel, varying from 30% to 45%, depending on the applicable compensation category. An RTP of 2.5 will be applied to the Coastal Real Property Compensation Amount. Additionally, if Coastal Real Property Claimants can establish that they incurred physical damage from response operations, they can recover additional compensation (without augmentation by an RTP).

Under the Wetlands Real Property Claims Process, two categories are established: (1) Category A, consisting of parcels documented to contain oil on all or part of the relevant acreage based on several sources, including the published Shoreline Cleanup Assessment Team ("SCAT") reports; and (2) Category B, consisting of parcels documented by SCAT as "no oil observed." Within Category A, claimants would be compensated a minimum of $35,000 per oiled parcel. Claimants in Category B would be compensated a minimum of $4,500 per acre on

a per parcel basis.  Finally, an RTP of 2.5 will apply to all Wetlands Real Property Claims. Overall, these provisions will ensure that real property claims will be fully and fairly compensated on a generous basis.

**c.**     **Realized Sales Losses**

Relatedly, the Agreement also provides compensation for those who realized sales losses as a result of the spill.  Under the Agreement, individuals and entities who sold residential parcels in the Real Property Sales Compensation Zone between April 21, 2010 and December 31, 2010 will receive compensation for sales contracts executed on or after April 21, 2010 or for other sales contracts that have been subject to a price reduction due to the DWH Spill (foreclosures or like processes are excluded).  The amount of recovery is 12.5% of the sale price and is not eligible for an RTP.

**3.**     **Vessels Of Opportunity ("VoO") Charter Payment**

The proposed settlement will also provide funds for those who participated in the VoO program.  *First*, all working VoO participants will be entitled to receive at least $41,600 in compensation, with the amount increasing for those with larger boats.  To guard against double recovery, those working VoO participants who also will receive economic loss compensation that directly involves the use of their VoO vessel (except in the case of compensation payments under the Seafood Program) will have their VoO compensation partially reduced.  *Second*, those VoO participants who were never placed on hire to perform actual services on the water will be entitled to receive up to $10,200, with no offset, even if such a "non-working VoO participant" will also be receiving an award under the Seafood Program.  VoO claims, being contractual in nature and not involving a transfer of tort injury risk, are not eligible for an RTP.

22

#### 4.     Vessel Physical Damage Claims

The Agreement also compensates vessel owners for damage to their vessels.  Under the Agreement, claimants may recover for physical damage to an eligible vessel (as well as its equipment or rigging) due to or resulting from either the DWH spill itself or cleanup operations. The amount of recovery is the lesser of the costs necessary to either conduct a reasonable repair of the vessel or to replace the vessel in its entirety.  No RTP is applied to this category of claims. Vessels are eligible whether or not they were enrolled in the VoO program; the only vessels that may not recover are those that were working for an Oil Spill Response Organization at the time of the physical injury.

#### 5.     Subsistence Damage Payments

The Agreement compensates claimants who relied on seafood and wildlife for subsistence purposes for the total value of the subsistence natural resources that they lost due to the oil spill, plus an RTP enhancement to compensate for factors including the value of subsistence community customs and culture.  Subsistence claimants are defined as individuals who fish, hunt, or harvest Gulf of Mexico natural resources, including seafood and game, in a traditional or customary manner and to sustain the basic dietary, economic, shelter, tool, or clothing needs of themselves and their families.  Given the economic challenges facing subsistence claimants, the Claims Administrator will form a dedicated administrative team to assist subsistence claimants with filing claims and will establish field teams to verify large claims.  Subsistence claims will be augmented by an RTP of 2.25.

#### 6.     The Seafood Compensation Program

The Seafood Compensation Program, which is described in Exhibit 10 to the Settlement Agreement, ensures that individuals and businesses in the seafood industry harmed by the *Deepwater Horizon* Incident are made entirely whole.  Notably, the amount that BP has agreed

to pay to fund the Seafood Compensation Program exceeds the annual revenue of these industries many times over.

Under the Seafood Compensation Program, Commercial Fishermen, Seafood Boat Captains, all other Seafood Crew, Oyster Leaseholders, and Seafood Vessel Owners will be compensated for economic loss claims relating to Seafood, including shrimp, oysters, finfish, blue crab, and other species. A $2.3 billion Seafood Compensation Program Amount provides the funding for eligible claims under the program including shrimp, oysters, finfish, blue crab, and other species. As developed and approved by the Court-appointed neutral, John W. Perry, Jr., the Seafood Compensation Program allocates the funds on multiple criteria—both between various industries and amongst different industry participants, such as vessel owners, boat captains, oyster leaseholders, and seafood crew.

The Seafood Compensation Program contains five separate plans to provide compensation to claimants. Each plan contains its own eligibility and documentation requirements and each describes the specific compensation methods available to claimants. The independent methods of calculation for claims in each plan ensures that claimants will be compensated fairly and adequately for economic losses related to Seafood. Vessel owners and boat captains in the shrimp, oyster, finfish, blue crab, and other seafood plans will be compensated in relation to their seafood harvesting revenues from previous years in Specified Gulf Waters. Additional payments, such as per-acre compensation to oyster leaseholders and per-share compensation for Individual Fishing Quotas shareholders in the finfish industry are available to eligible claimants. Seafood crew—the mates, boatswains, and deckhands other than the boat captain—are all eligible for compensation tied to either their former or expected wages and hours. Those seafood crew members who cannot provide tax forms, financial information or

a sworn statement from an employer to establish employment and compensation may be eligible for a lump sum payment if they provide sufficient sworn statements from sponsors or attorneys.[15]

The Seafood Compensation Program allows claimants to file claims for multiple types of economic losses. For example, a shrimping boat captain who also captains a blue crab vessel may be eligible for compensation under both compensation plans. Additionally, a vessel owner who is also the boat captain may be eligible for vessel owner and boat captain compensation. The RTPs provided are generous, ranging from 2.25 to 8.75.

### 7. The Gulf Coast Promotional Fund

BP has also agreed to finance a $57 million fund to promote the Gulf Coast. This fund will be administered for the benefit of the Gulf region. In particular, the promotional fund is intended to encourage Gulf Coast tourism, as well as to help grow the Gulf's seafood industry. Economic analysis suggests that for every dollar of advertising directed towards promoting the Gulf Coast, one can expect much more in return in increased tourism and seafood revenues. Individual Gulf tourist industry participants are often unable to establish funds like this purely by private agreement because the benefits of fund expenditures unavoidably flow to participating and non-participating businesses alike. Hence, the actual value to the class of the Promotional Fund that BP is agreeing to establish for the benefit of the Gulf far exceeds its already significant $57 million face amount.

### <u>ARGUMENT</u>

## I. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE.

The parties and their counsel (who have many decades of class action and class

---

[15] The Seafood Compensation Program Sworn Claim Form may be submitted any time after a Preliminary Approval Order is issued, but no later than 30 days from the date of entry of a Final Order and Judgment of the District Court after it rules upon final approval of the Settlement Agreement.

settlement experience) collectively agree that the proposed settlement represents a fair, reasonable, and adequate resolution of this dispute and should be preliminarily approved.

### A.     The Settlement Agreement Meets The Standard For Preliminary Approval.

Federal Rule of Civil Procedure 23 governs class actions.  Under Rule 23, a class action may be settled only with the Court's approval upon a finding that the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  Although the Rule does not explicitly require it, courts generally undertake their Rule 23(e) obligations pursuant to a two-step process: *first*, the Court undertakes a preliminary review in order to gain information regarding the settlement prior to issuing class and settlement notice and scheduling a hearing; *second*, following preliminary approval, the Court holds a final fairness hearing and decides whether to approve or disapprove the settlement.  *See* MANUAL FOR COMPLEX LITIGATION (FOURTH) ["MCL 4TH"] § 21.632, *et seq*.  "The two-step process for evaluation of proposed settlements has been widely embraced by the trial and appellate courts."  *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, 2012 WL 92498, at *7 (E.D. La. Jan. 10, 2012) (citing MCL 4TH § 21.6).

Should the Court grant this motion to preliminarily approve the settlement, the Court will later have the opportunity to conduct a thorough fairness hearing to ensure that the settlement merits final approval in the ultimate analysis.  Today, however, the parties start the approval process by requesting preliminary approval.  The preliminary approval process provides the opportunity for the Court to study the details of the settlement and elicit the information that it needs in order to determine, at the final review stage, whether to approve the settlement.  *See* MCL 4th § 21.632, *et seq*.  This initial review embodies the Court's discretion in managing complex litigation in order to ensure that the settlement is appropriately postured for final fairness review and to determine whether to issue notice of the final fairness hearing.  During

this process of preliminary review, the Court can also consult with the parties and communicate any concerns it may have about the settlement terms.

At this preliminary stage, the court makes a "preliminary determination that the proposed [settlement] class satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b)."  MCL 4TH § 21.632.[16]  Additionally, the court makes a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms, provides for notice to the class, and sets the date for the formal fairness hearing.  *Id.*; *see also Chinese-Manufactured Drywall*, 2012 WL 92498, at *7.

To obtain preliminary approval, the parties need only demonstrate that that the proposed settlement (i) appears to be the product of serious, informed, non-collusive negotiations, (ii) has no obvious deficiencies, (iii) does not improperly grant preferential treatment to class representatives or segments of the class, and (iv) falls within the range of possible approval.  *See, e.g., In re OCA, Inc. Sec. & Deriv. Litig.*, No. 05-2165, 2008 WL 4681369, at *11 (E.D. La. Oct. 17, 2008); *accord*, *e.g.*, *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982); *McNamara v. Bre-X Minerals Ltd.*, 214 F.R.D. 424, 430 (E.D. Tex. 2002); *In re Nasdaq Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997); *In re Shell Oil Refinery*, 155 F.R.D. 552, 555 (E.D. La. 1993) (citing MANUAL FOR COMPLEX LITIGATION (SECOND) § 30.44 (1985)); *Williams v. New Orleans Pub. Serv. Inc.*, No. 75-1635, 1988 WL 98283, at *1 (E.D. La. Sept. 15, 1988).

Notably, the standards that apply at this preliminary stage are "not as stringent as those applied to a motion for final approval."  *OCA*, 2008 WL 4681369, at *11 (citing *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 86 (E.D.N.Y. 2007)); *accord*, *e.g.*, *Chinese-Manufactured Drywall*, 2012

---

[16] As noted above, Interim Class Counsel are separately moving for preliminary settlement class certification, and for settlement purposes BP will not oppose the motion.

WL 92498, at *7.  Rather, preliminary approval constitutes "a determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness."  *In re Traffic Exec. Ass'n.-E. R.R.*, 627 F.2d 631, 634 (2d Cir. 1980); *see also Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 101 (D. Conn. 2010) (citing *In re Traffic Exec*, 627 F.2d at 634).[17]

In this settlement, the total recovery that BP has agreed to provide is uncapped; BP's initial estimates place its cost at approximately $7.8 billion.  The settlement was negotiated and crafted by the parties with the guiding principle of providing individualized, fair, and full compensation for victims of the oil spill.  As discussed above, the settlement was negotiated at arm's length; does not grant any preferential treatment to class representatives; and provides full and fair compensation for those in each of the damage categories within the class.

For these reasons, there can be no serious dispute that the proposed settlement satisfies the comparatively modest standards for preliminary approval.  Both because it is already apparent that the Agreement meets the standard for final approval and because the Court's resolution of whether the Agreement has "any obvious deficiencies" or instead "falls within the range of possible approval" is necessarily informed by the standards that will apply at final approval, we address these issues in detail in the following section.

---

[17] At the formal fairness hearing stage, the Court will conduct a more thorough review than is required now at the preliminary approval stage.  At no point does the process of reviewing the fairness and adequacy of the settlement rise to the level of scrutiny demanded by a trial, however.  *See, e.g., Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.*, No. 07-14074, 2008 WL 2968408, at *22 (E.D. Mich. July 31, 2008)  ("The question . . . is whether the parties are using settlement to resolve a legitimate legal and factual disagreement.") (quotation omitted); *UAW v. Gen. Motors Corp.*, 235 F.R.D. 383, 387 (E.D. Mich. 2006) ("[A] fairness hearing is not a trial, but instead has a very singular and narrow purpose—to determine whether the settlement at issue is fair, reasonable, and adequate."); *Ass'n For Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002)  ("In evaluating these considerations, the Court must not try the case on the merits.").

**B.     The Settlement Agreement Meets The More Demanding Requirements For Final Approval.**

The public interest strongly favors the settlement of class actions.  *See, e.g.*, *Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501, 507 (5th Cir. 1981) ("'Particularly in class action suits, there is an overriding public interest in favor of settlement.'") (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)); *Smith v. Crystian,* 91 F. App'x 952, 955 (5th Cir. 2004) (similar); *Turner v. Murphy Oil USA, Inc.,* 472 F. Supp. 2d 830, 843 (E.D. La. 2007) ("The public interest favoring settlement is especially apparent in the class action context where claims are complex and . . . could lead to years of protracted litigation and sky-rocketing expenses."); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("Additionally, there is an overriding public interest in settling class action litigation, and it should therefore be encouraged."); *In re Exxon Valdez*, 229 F.3d 790, 795 (9th Cir. 2000) ("As a result, the general policy of federal courts to promote settlement before trial is even stronger in the context of large-scale class actions."); *Lazar v. Pierce*, 757 F.2d 435, 440 (1st Cir. 1985) ("Last, we should point to the overriding public interest in favor of the voluntary settlement of disputes, particularly where class actions are involved.").

Because "settlement is the preferred means of resolving litigation," there is a "strong presumption in favor of finding a settlement fair."  *Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 720 (E.D. La. 2008) (quotation omitted); *accord*, *e.g., In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 619 (E.D. La. 2006); *Neff v. VIA Metro. Transit. Auth.*, 179 F.R.D. 185, 208 (W.D. Tex. 1998).   In evaluating a class action settlement, courts compare the terms of the settlement with "the likely rewards the class would have received following a successful trial of the case."  *Cotton*, 559 F.2d at 1330.  Nevertheless, courts should avoid engaging in "a trial on the merits" in evaluating the

fairness of a settlement.  *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981).  Instead, the Court's independent judgment and the judgment of experienced counsel for the parties can guide the assessment of the parties' relative strength in the case, since plaintiffs' and defense counsel seek the most favorable outcome for their clients in the shadow of a fully litigated trial.  *Cotton*, 559 F.2d at 1330.

With those background principles in mind, the Fifth Circuit has set forth six factors to guide a court's review of whether to approve a class action settlement at the **final approval** stage:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.

*Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004) (quoting *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983)); *accord*, *e.g.*, *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 n.1 (5th Cir. 2012);  *Newby v. Enron Corp.*, 394 F.3d 296, 308 (5th Cir. 2004); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 431 (S.D. Tex. 1999).  Each of these "*Reed*" factors counsels in favor of preliminary approval.

Although these factors are not required to be met for **preliminary approval**, applying them here nevertheless counsels in favor of preliminary approval, especially when viewed in their totality.  *See* JOSEPH M. MCLAUGHLIN, 2 MCLAUGHLIN ON CLASS ACTIONS: LAW & PRACTICE § 6:7 (8th ed. 2011) (citing *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 322-26 (7th Cir. 1980)) (review and application of the six factors is an exercise in balancing and the balancing decisions made are reviewed for abuse of discretion); *see also In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 194 (5th Cir. 2010) ("We review the district court's approval of the settlement for an abuse of discretion."); *Newby*, 394 F.3d at 300 ("A district court's approval of a class action settlement may be set aside only for abuse of

discretion."); *see also M.D. ex rel. Stukenberg v. Perry*, --- F.3d ----, No. 11-40789, 2012 WL 974478 at *2 (5th Cir. 2012) (noting a district court's "inherent power to manage and control pending litigation").  Indeed, because all six factors are squarely met now, the standard for final approval is already convincingly satisfied, though the Court need only grant preliminary approval at this time.

### 1.    Absence Of Fraud And Collusion

To begin with, there is no suggestion of fraud or collusion in the negotiation of this settlement.  BP and the PSC have been engaged in fiercely contested litigation involving hundreds of depositions, tens of millions of pages in discovery, hundreds of motions, and other adversarial preparations for an imminent trial.  The parties reached a settlement only after months of hard-fought, contentious negotiation sessions, many of which were mediated and supervised by Judge Shushan.  Dozens of PSC lawyers and hundreds of plaintiffs' counsel in the MDL have evaluated the fairness of the settlement.  The complete absence of contrary evidence, combined with the fact that Judge Shushan personally mediated the settlement over the past several months, should readily lead the Court to conclude there was no fraud or collusion.  *See, e.g., Collins*, 568 F. Supp. 2d at 725 (citing NEWBERG ON CLASS ACTIONS § 11:51 (4th ed. 2010) (explaining that the presumption against finding fraud or collusion in a settlement in the absence of contrary evidence is strengthened when a Magistrate Judge participates in the settlement process)).

The absence of collusion can also be presumed based on the overall fairness and generosity of the proposed settlement terms under the commonsense "proof is in the eating test." *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 152 (S.D. Ohio 1992).  Under this test, if the terms of the proposed settlement are fair, then the reviewing court can deem the formative negotiations to have been proper.  *See Corrugated Container*, 643 F.2d at 211 ("In general, we think a

31

settlement should stand or fall on the adequacy of its terms . . .  If the terms are fair, the court may reasonably conclude that counsel did perform adequately."); *Turner*, 472 F. Supp. 2d at 846 ("Finally, a presumption exists that settlement negotiations were conducted properly in the absence of collusion if the terms of the proposed settlement are demonstrably fair.").

Likewise, because the settlement has been reached at arm's length without fraud or collusion, "the trial court 'should be hesitant to substitute its own judgment for that of counsel.'" *Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984) (per curiam) (citation omitted); *see also Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) ("Absent evidence of fraud or collusion, such settlements are not to be trifled with.").  Rather, the fact "that this settlement is the negotiated result of an adversarial proceeding is an indication of its fairness." *Domingue v. Sun Elec. & Instrumentation, Inc.*, No. 09-682, 2010 WL 1688793, at *1 (M.D. La. Apr. 26, 2010); *see also In re Train Derailment Near Amite La.*, MDL No. 1531, 2006 WL 1561470, *19 (E.D. La. May 24, 2006) ("The fact that a class action settlement is reached after arms' length negotiations by experienced counsel generally gives rise to a presumption that the settlement is fair, reasonable, and adequate . . . ."); *In re Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 255 (E.D. Va. 2009) ("Negotiations were sufficiently thorough, contentious, and at arm's length to ensure the propriety of Class Counsel's decision to enter into the settlement and the proceedings leading thereto.").

Notably, the parties negotiated over attorneys' fees for class counsel only after reaching an agreement on the relief to be afforded class members.  "'Because the parties have not agreed to an amount or even a range of attorneys' fees, there is no threat of the issue explicitly tainting the fairness of settlement bargaining.'"  *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, --- F. Supp. 2d ----, MDL No. 09-2046, 2012 WL 948365, at *16 (S.D. Tex. Mar.

32

20, 2012) (quoting *Turner*, 472 F. Supp. 2d at 845); *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 693 (D. Colo. 2006) ("The fact that the parties did not discuss damages until they had made substantial progress on the injunctive issues, and did not discuss attorneys' fees until all other issues were virtually finalized, is also indicative of a fair and arm's-length process."); *McAlarnen v. Swift Transp. Co., Inc.*, No. 09-1737, 2010 WL 365823, at *12 (E.D. Pa. Jan. 29, 2010) ("Furthermore, Class counsel did not discuss attorneys' fees and costs until after they had come to terms with Defendant over substantive relief to the Class.").

Moreover, the Agreement has no obvious deficiencies, and does not grant preferential treatment to class representatives or to segments of the class. *See Harris v. Vector Mktg. Corp.*, No. 08-5198, 2011 WL 1627973, at *9 (N.D. Cal. Apr. 29, 2011) ("[T]he absence of any preferential treatment supports preliminary approval of the Settlement Agreement."); *Brunson v. La.-Pac. Corp.*, 818 F. Supp. 2d 922, 927 (D.S.C. 2011) ("There are no grounds to doubt the fairness nor are there other obvious deficiencies in the Settlement, such as unduly preferential treatment of Plaintiffs or of segments of the class . . . ."); *Louie v. Kaiser Found. Health Plan, Inc.*, No. 08-0795, 2008 WL 4473183, at *7 (S.D. Cal. Oct. 6, 2008) (preliminarily certifying a class for settlement purposes where the division, even as between formal sub-classes, was the product of "reasonable balancing"). Overall, then, the first factor counsels strongly in favor of approval.

Finally, Magistrate Judge Shushan played an important supervisory role in facilitating and mediating the settlement. Her evenhanded and daily, and often minute-by-minute, efforts throughout the last three months of negotiations strongly counsel in favor of the approving the settlement. *See, e.g.*, *Maywalt v. Parker & Parsley Pet. Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995) ("[T]he supervision of settlement negotiations by a magistrate judge, as occurred here, makes it

less likely that . . . [class counsel have promoted] their own interests over those of the class."); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 122 (S.D.N.Y. 2009) (settlement reached after mediation is entitled to a presumption of arms-length dealings and fairness), *aff'd sub nom. Priceline.com, Inc. v. Silberman,* 405 F. App'x 532 (2d Cir. 2010); *Smith v. Tower Loan of Miss., Inc.*, 216 F.R.D. 338, 353 (S.D. Miss. 2003) (upholding settlement where the Magistrate Judge's "mediation efforts" helped facilitate the settlement); *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 497 (N.D. Miss. 1996) (upholding settlement where the Magistrate Judge "was intimately involved with the settlement negotiations among the parties in this action").

### 2.    Complexity, Expense, And Likely Duration Of The Litigation

There can be "no dispute that this case is one of the most procedurally complex, expensive, and potentially lengthy cases" in the history of the United States. *Shell Oil*, 155 F.R.D. at 559.   Indeed, this case easily surpasses *Shell Oil* in complexity.   Given the unprecedented complexity of this litigation, it is appropriate to "consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Id.* at 560 (quotation omitted); *see also Rodriguez v. West Publ'g Grp.*, 563 F.3d 948, 966 (9th Cir. 2009) (affirming approval of settlement where "a number of serious hurdles remained" for the plaintiffs"); *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Complex litigation . . . can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive.   Accordingly, the Federal Rules of Civil Procedure authorize district courts to facilitate settlements in all types of litigation, not just class actions."); *Billitteri v. Secs. Am., Inc.*, No. 09-1568, 2011 WL 3586217, at *10 (N.D. Tex. Aug. 4, 2011) (noting there was little doubt that the amount of time it would take to

recover on behalf of class members "would measure in years rather than the months contemplated by the parties at this stage"); *Klein v. O'Neal*, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010) ("When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened.").

Notwithstanding the extraordinary amount of litigation progress that has been made in the two years since the DWH Spill, the remaining trial and appellate proceedings, if litigated through final judgment, could last for a decade or more.[18]  Each of the three previously defined phases of the Limitation and Liability trial raises complex issues of law, science, and operative fact. Following these three phases, individual plaintiffs would then need to establish their entitlement to damages, along with the quantum of damages, during trial phases that have not even been scheduled.  As a result, to obtain final judgments in this Court could take many years.  *See Collins*, 568 F. Supp. 2d at 726 (finding a potential trial lasting "several weeks" weighs in favor of approving a settlement); *Faircloth v. Certified Fin. Inc.*, No. 99-3097, 2001 WL 527489, at *4 (E.D. La. May 16, 2001) (approving settlement where trial "was estimated to last at least two weeks"); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1127 (W.D. La. 1997) (finding "the prospect of a trial lasting months" weighs heavily in favor of approving a settlement); *Shell Oil*, 155 F.R.D. at 560 ("[E]ven a six month trial is considered extremely lengthy and the expense for

---

[18] Complex cases such as this can take decades to resolve.  For instance, the *Exxon Valdez* spill occurred in March 1989, but litigation remains ongoing today, over twenty-three years after the spill, and eighteen years after the 1994 trial.    *See, e.g.*, Isaac Arnsdorf, *Exxon Valdez to Be Junked Years After Worst U.S. Ship Spill*, http://www.bloomberg.com/news/2012-03-20/exxon-valdez-sold-for-scrap-years-after-worst-u-s-tanker-spill.html (Mar. 20, 2012) ("Last month, a judge ruled that U.S. and Alaskan governments could pursue further damage claims.").  Likewise, while the *Amoco Cadiz* spill occurred in March 1978, the Seventh Circuit was still resolving litigation arising out of the spill as of September 1993.  *See In re Oil Spill by Amoco Cadiz*, 4 F.3d 997 (7th Cir. 1993).  Absent a settlement, litigation of this case promises to take as much time as those cases, if not more.  Prior to the testimony of a single witness at the now-stayed Limitation and Liability trial, this case has heard approximately 1,200 motions, and the docket includes more than 6,200 entries.

the parties, the claimants, and the judicial system would be enormous.").  Moreover, should this case proceed to trial, it almost certainly would become more complicated, since there is no reason to suppose that the case would become less complex or contentious as trial began.  *See Faircloth*, 2001 WL 527489, at *4 (concluding from the "contentious motion practice on behalf of virtually all parties involved" that the case "would undoubtedly continue on a protracted litigation path absent approval of the proposed settlement agreement").

Nor would the road end with the entry of judgments in this Court.  This litigation has raised numerous difficult legal questions under federal statutory and general maritime law, many of first impression.  *See id.* (approving a settlement where the statutes were "extremely intricate and technical").  Given the complexities inherent in litigation of this nature, it is not surprising that nearly twenty years elapsed between the *Exxon Valdez* oil spill and the Supreme Court's decision in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008).  Such litigation represents "an enormous financial and psychological burden on all parties involved" and counsels in favor of settlement.  *Combustion*, 968 F. Supp. at 1127; *see also Rodriguez*, 563 F.3d at 966 (noting that the "[i]nevitable appeals would likely prolong the litigation, and any recovery by class members, for years"); *Ass'n For Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 469 (S.D. Fla. 2002) ("[A]bsent settlement, this matter clearly will require a protracted and expensive trial and appeal, under circumstances where the ultimate results are highly uncertain."); *Smith v. Ajax Magnethermic Corp.*, No. 02-0980, 2007 WL 3355080, at *6 (N.D. Ohio Nov. 7. 2007) ("Absent a settlement, there is the potential for further protracted litigation and the additional expenditure of significant money, time, and resources.  Moreover, Plaintiffs are not assured of recovery upon the completion of the litigation.  A fair settlement, therefore, has significant merit as a resolution to this matter.").

Because "the most controversial and hard-fought of all the issues in this case" remain to be litigated, *Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 790 (5th Cir. 1986) (per curiam), this settlement "eliminates the transaction costs that further proceedings would impose" and "provides relief for the class sooner than continued litigation would," *Ayers*, 358 F.3d at 369. For the parties, it is therefore entirely "proper to take the bird in the hand instead of a prospective flock in the bush." *Shell Oil*, 155 F.R.D. at 560. This is particularly true given that the "bird in the hand" includes RTPs, which means that the total compensation being paid is several multiples greater than what plaintiffs claim as their presently demonstrable injury. The second factor counsels strongly in favor of approval.

### 3.    The Stage Of The Proceedings And Amount Of Discovery Completed

The third factor "asks whether the parties have obtained sufficient information to evaluate the merits of the competing positions." *In re Educ. Testing Servs.*, 447 F. Supp. 2d 612, 620 (E.D. La. 2006) (quotations omitted). "Thus, the question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed . . . ." *Id.* at 620-21.

While the question may not be "whether the parties have completed a particular amount of discovery," *id.* at 620, in this case there can be no doubt that the parties have completed an extraordinary amount of discovery. The numbers are breathtaking. Over the course of 19 months, the parties have deposed 311 fact and expert witnesses with 7,416 documents marked as deposition exhibits. The parties have produced approximately 90 million pages of documents and approximately 20 terabytes of data. By any measure, the amount of discovery that has already occurred is more than sufficient to ensure a fair settlement. *Cf. Faircloth*, 2001 WL 527489, at *4 (approving a settlement where "thousands" of pages were produced).

Significantly, the Fifth Circuit has said that formal discovery is not a prerequisite to the approval of a settlement. *See Newby*, 394 F.3d at 306. Indeed, "[g]enerally speaking, a settlement should stand or fall on the adequacy of its terms." *Id.* (alterations and quotation omitted); *see also Corrugated Container*, 643 F.2d at 211 (rejecting the argument that "representation in the settlement process is necessarily inadequate unless informed by the process of discovery"). Here, in light of the staggering amount of discovery that has been completed in a compressed timeframe, the Court may presume that the settlement represents an informed, educated, and fair resolution of this dispute. *See, e.g.*, *Turner*, 472 F. Supp. 2d at 847; *Feinberg v. Hibernia Corp.*, 966 F. Supp. 442, 445 (E.D. La. 1997); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 292 (W.D. Tex. 2007). Clearly, the massive information developed to date leaves all parties in a position to assess their respective positions in fine-grained detail and make a reasonable decision on settlement; nothing more, and in fact much less, is required. *See, e.g.*, *Combustion*, 968 F. Supp. at 1127.

### 4.      The Probability Of Plaintiffs' Success On The Merits

Consideration of the factor relating to the "probability of the plaintiffs' success on the merits" also supports settlement. *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982); *see also Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 245 (6th Cir. 2011). "Counsel should have 'sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-à-vis the probability of success . . . ." *Trombley v. Nat'l City Bank*, 759 F. Supp. 2d 20, 26 (D.D.C. 2011) (quoting *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 62 (D.D.C. 2010)); *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 565 F. Supp. 2d 49, 57 (D.D.C. 2008)).

Evaluating this factor requires the Court to compare the settlement terms "with the likely rewards the class would have received following a successful trial of the case." *Reed*, 703 F.2d

at 172.  Thus, "the court must compare the terms of the compromise with the likely rewards of litigation."  *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 83 (S.D.N.Y. 2007) (quotation omitted).  The Court, however, "must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial."  *Reed*, 703 F.2d at 172 (quotation omitted).  The focus is on policing settlements in light of the principle that they must not "come too early to be suspicious."  *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100, 105 (D.D.C. 2004).

With the extensive motion practice on the B1 amended complaint, the reams of discovery in this case, and the imminence of the Phase I trial, it is clear that the settlement here is not coming too early, in a fashion suggesting that parties' counsel lacked sufficient data to evaluate the strengths and weaknesses of their claims, or in a way that would interfere with or obfuscate this Court's ability to assess the probability of success on the parties' various claims and defenses.  The negotiations here were protracted and reached conclusion only as the start of the trial loomed and only after many complicated issues were resolved with Magistrate Judge Shushan's assistance.  The parties, and the Court, are highly informed on the facts and legal theories pertinent to the merits of the claims and defenses on which this litigation, absent settlement, would ultimately be decided.

While the PSC and BP have markedly different opinions regarding the strength of the claims at issue and ultimate recovery in this litigation, there can be no doubt that both sides have advanced important arguments, and neither side can confidently expect a complete victory or one that would not be subject to the potential risk and/or delay of appeal.  This Court is well aware of these issues and it can invoke its experience in the litigation that has occurred to date in weighing this fourth factor.  *See Heartland Payment Sys.*, 2012 WL 948365, at *17 ("The court is well

aware of the parties' positions in this case, the legal issues, and the risks to the Consumer Plaintiffs should litigation continue." (citing *Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 344 (N.D. Tex. 2011)).  This factor favors approval of the proposed settlement.

### 5.  Range Of Possible Recovery

Consistent with the fact that there is litigation risk to both sides, the Agreement provides for compensation somewhere between the best-case scenarios envisioned by either side.  "[T]he essence of a settlement is compromise.  A just result is often no more than an arbitrary point between competing notions of reasonableness." *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1325 (5th Cir. 1981).  Thus, the "trial court should not make a proponent of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes."  *Cotton*, 559 F.2d at 1330 (quotation omitted).  In other words, the "fact that the plaintiff might have received more if the case had been fully litigated is no reason not to approve the settlement." *Priddy v. Edelman*, 883 F.2d 438, 447 (6th Cir. 1989); *see also Combustion,* 968 F. Supp. at 1129 ("The proposed settlement need only reflect a fair, reasonable, and adequate estimation of the value of the case in view of what might happen at trial.").

In this case, the proposed settlement provides more than sufficient and adequate compensation to satisfy this standard.  This is true for several reasons, including the following: (1) in the Agreement, BP has voluntarily assumed the responsibility to pay not only its fair share of the recovery necessary to make the proposed class members whole, but to pay *all* compensatory damages to class members; and (2) BP has agreed to pay RTPs applicable to many categories of class members.  Under the baseline process of "comparing the settlement to the estimated recovery times a multiplier [*i.e.*, a percentage multiplier < 1] derived from the

likelihood of prevailing on the merits," which the Fifth Circuit has counseled is a touchstone of the analysis here, *see Corrugated Container*, 643 F.2d at 217, this proposed settlement, with its "risk transfer premium" feature (which adds multipliers of 1 *or greater than 1* to the base compensation applicable to many types of claims), easily passes muster.  Were the settlement to be rejected, further litigation would be unlikely to provide the plaintiffs with the negotiated RTPs, so any consideration of the range of possible outcomes favors approval of the settlement. *See, e.g.*, *Ayers*, 358 F.3d at 373.

Notably, the baseline goal is to compensate the Settlement Class Members for all demonstrable economic loss claims that are defined in the Agreement's damage categories.  The recoveries by Class Members under the Agreement are not discounted while certain other claims they possess are reserved.[19]  Collectively, that set of outcomes falls well within the reasonable bounds of a fair settlement.  The fifth factor thus likewise robustly supports approval.

### 6.     Opinions Of Class Counsel, Class Representatives, And Absent Class Members

Here, the PSC and BP both strongly believe that the proposed settlement represents a fair and reasonable resolution of this sharply contested litigation.  Where "counsel for both parties have significant experience in litigating and negotiating settlement of class actions," this fact is strong evidence that the settlement is fair and reasonable.  *DeHoyos*, 240 F.R.D. at 287 (quotations omitted); *Cotton*, 559 F.2d at 1330 ("In performing this balancing task, the trial court is entitled to rely upon the judgment of experienced counsel for the parties."); *Turner*, 472 F.

---

[19] Six categories of claims are expressly reserved and explicitly defined in the Agreement.  They may be summarized briefly as follows:  (1) bodily injury claims; (2) claims of BP shareholders in any derivative or direct actions; (3) claims of natural persons for moratoria losses; (4) claims relating to menhaden (or "pogy") fishing, processing, selling, catching, or harvesting; (5) economic damage claims suffered by entities or employees in the banking, gaming, financial, insurance, oil and gas, real estate development, defense contractor industries, and entities selling or marketing BP-branded fuel (including jobbers and branded dealers); and (6) claims for punitive damages against Halliburton and Transocean.

Supp. 2d at 852 (same principle); *Combustion*, 968 F. Supp. at 1128 (noting it was "not lost on the Court that counsel for the compromising parties, some of the most able attorneys in the country, when armed with extensive knowledge of the facts, decided that settlement rather than a . . . trial was in the best interest of their clients"); *In re OCA*, 2008 WL 4681369, at *11 ("The settlement was reached after over three years of litigation and extensive discovery, and thus counsel for all parties were experienced and familiar with the factual and legal issues in the case"); *San Antonio Hispanic Police Officers Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 461 (W.D. Tex. 1999) ("In reviewing the opinions of counsel, the Court is to bear in mind that counsel for each side possess the unique ability to assess the potential risks and rewards of litigation . . . ." (quotation omitted)).

The Fifth Circuit has recognized that courts must rely to a large degree on the judgment of competent counsel, terming such counsel the "linchpin" of an adequate settlement. *Reed*, 703 F.2d at 175 (further noting "the value of the assessment of able counsel negotiating at arm's length cannot be gainsaid" because "[l]awyers know their strengths and they know where the bones are buried"); *see also Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1216 (5th Cir. 1978) (holding that if experienced counsel determine a settlement is in the class's best interests, "the attorney's views must be accorded great weight").

Here, counsel for both the PSC and BP have many decades of experience in prosecuting and defending class action lawsuits. Collectively, they have been involved in some of the largest and most complex class and mass tort settlements in the nation's history—*e.g.*, asbestos, tobacco, retiree healthcare benefits, insurance, discrimination, pharmaceutical products, etc. In fact, counsel for the PSC and BP have previously been lead counsel in reaching two of the largest settlements ever negotiated in this country—*i.e.,* the tobacco settlement with the States (the

PSC's Mr. Rice), and union retiree health care benefits for General Motors (BP's counsel Mr. Godfrey, acting as GM's counsel in the retiree health care class settlements).[20]   These and other extraordinarily experienced negotiating counsel were also armed with the facts developed through the extensive and fully completed Phase I discovery and Phase I trial preparations.   All of that groundwork deeply informed the reasonable assessments each side reached concerning the range of outcomes in this case, which is much farther along than cases of concern addressed in certain judicial decisions, where other litigation was being settled in its nascent stages.   Not so here.   The sixth factor therefore also supports preliminary approval.

*       *       *

In all, the Court's present task is made relatively uncomplicated thanks to the factors set out above.   The settlement's structure guarantees fair treatment of each individual claimant, regardless of type or extent of damage.   Accordingly, the parties respectfully request that the Court preliminarily approve the settlement and schedule a formal fairness hearing where it will consider whether to grant final approval to the settlement.

## II.   THE PROPOSED NOTICE TO THE CLASS COMPLIES WITH RULE 23(C)(2) AND RULE 23(E).

Where parties seek certification of a settlement class pursuant to Rule 23(b)(3) and approval of a settlement pursuant to Rule 23(e)—as the PSC does here by separate motion, unopposed by BP—"notice of the class action must meet the requirements of both Rule 23(c)(2) and Rule 23(e)."   *In re CertainTeed Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 480 (E.D. Pa. 2010); *accord In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 231 (S.D. W. Va. 2005).   In this case, the parties jointly submit that the agreed-upon comprehensive notice

---

[20]   *See UAW v. Gen. Motors Corp.*, No. 05-73991, 2006 WL 891151 (E.D. Mich. Mar. 31,2006), *aff'd Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007).

program easily satisfies these requirements.

**A.      The Proposed Notice Distribution Method And Notice Contents Comply With Rule 23(c)(2).**

Rule 23(c)(2) provides that where a class is certified pursuant to Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).  The notice is required to state (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues or defenses; (4) that a class member may enter an appearance though an attorney if the member so desires; (5) that the court will exclude from the class any member who requests exclusion; (6) the time and manner for requesting exclusion; and (7) the binding effect of a class judgment under Rule 23(c)(3).  *Id.*

The notice protocol agreed upon by the parties is fully described in the Declaration of Cameron R. Azari, Esq., (Ex. 1); the Declaration of Katherine Kinsella (Ex. 2); and the Declaration of Shannon R. Wheatman, Ph.D. (Ex. 3).  As the exhibits make plain, the notice plan complies with all requirements pertaining to both the manner of distribution and the contents of the notice.

**1.      The Proposed Notice Distribution Method Satisfies Rule 23(c)(2).**

Courts routinely approve class notice distribution plans far less robust than that contemplated here.  For example, in *In re Chinese-Manufactured Drywall*, the court approved a notice program consisting of nothing more than individual notice to all class members and their counsel, and the posting of the settlement agreement on the Court's MDL website.  *See* 2012 WL 92498, at *13.  The Court found that the notice was "written in plain and straightforward language; it also objectively and neutrally apprises all Class Members on the nature of the action, the definition of Class and Subclasses, and relevant deadlines and restrictions, as well as the date

and location for the final Fairness Hearing."  *Id.*

And in *In re Combustion,* in addition to mailing individual notice to class members, the class notice was "published in two local newspapers, the Baton Rouge Morning Advocate and the Denham Springs News on March 13, 1997."  968 F. Supp. at 1129.  The court found the "direct mailings as well as publication in two local newspapers [to be] reasonable and sufficient to satisfy the Due Process requirement of notice, as well as all notice requirements of [Rule 23]."  *Id.*; *see also In re OCA*, 2008 WL 4681369, at *16 (notice plan calling for direct mailing to class members, as well as publication in the national edition of the *Wall Street Journal* and distribution by a news wire and the Depository Trust Company's Legal Electronic Notice System was sufficient).

As discussed above, the Agreement provides for both individual and media notice.  Thus, individual notice will be mailed to every plaintiff in any lawsuit that has been consolidated into the MDL and every plaintiff who has filed a short-form joinder into the B1 Master Complaint (as amended), as well as other available lists of potential class members.  To ensure that no individuals are unintentionally omitted, all addresses will be checked against the National Change of Address Database.

Moreover, because "Rule 23 itself contemplates that current address information might not be available for all potential class members," *Eatmon v. Palisades Collection LLC*, No. 08-306, 2011 WL 147680, at *4 (E.D. Tex. Jan. 18, 2011), the parties have also agreed upon a massive, nationwide media effort that will include publication in (1) leading national consumer magazines; (2) trade, business, and specialty publications; (3) local newspapers; (4) African American, Vietnamese, Spanish, and Cajun language publications; (5) local television advertising; (6) local radio advertising; (7) online banner advertising; (8) an informational

release; (9) a nationally televised public service announcement; and (10) a case website.  This

state of the art notice plan is more than sufficient to comply with the dictates of Rule 23(c)(2)(B).

*See, e.g.*, MCL 4TH § 21.311 ("Publication in magazines, newspapers, or trade journals may be

necessary if individual class members are not identifiable after reasonable effort or as a

supplement to other notice efforts.").   Further, the Court may take judicial notice of the

significant media attention engendered by every aspect of this litigation, and thus the resulting

press coverage the settlement will generate.   Independent media coverage will increase the

dissemination of information about the settlement and thereby magnify the effect of formal

notice.

### 2.      The Proposed Notice Contents Satisfy Rule 23(c)(2).

In addition to satisfying the distribution requirements, the proposed notice also satisfies

the requirements pertaining to its contents.   In compliance with Rule 23(c)(2)(B), the proposed

notice states (1) the nature of the action; (2) the definition of the class certified; (3) the class

claims, issues, or defenses; (4) that a class member may enter an appearance though an attorney

if the member so desires; (5) that the court will exclude from the class any member who requests

exclusion; (6) the time and manner for requesting exclusion; and (7) the binding effect of a class

judgment under Rule 23(c)(3).   *See In re OCA,* 2008 WL 4681369, at *15 (approving class

notice where  the "plain language of the Notice apprises all class members of the nature of the

action, the definition of the class, the class claims and the defenses, the class members' right to

be heard, the class members' right to exclusion, the time and manner for requesting exclusion,

and the binding effect of a class judgment") (citations omitted).   The notice does so in simple

terms written in plain English.   As the experts at Hilsoft Media and Kinsella Media have

concluded, "The Notices have been designed to provide a clear, concise, plain language

statement of Class Members' legal rights and options."   Azari Decl. ¶ 23; *see also* Kinsella Decl.

¶ 7 (concluding that the notice plan "is a multi-faceted notification effort that fully meets the requirements of Rule 23(c)(2) of the Federal Rules of Civil Procedure").

The settlement notice will direct class members to a website where class members can view relevant materials, including the Settlement Agreement with all Exhibits, the *Bon Secour* class action complaint, the Court's orders relating to the settlement, instructions regarding how to submit a claim, as well as other pertinent pleadings and informational materials. The website will include a list of frequently asked questions, and the list will be updated regularly to reflect any areas of common concern.   In addition, notice will include a toll-free telephone number for class members to contact the claims administrator to obtain additional information about the settlement and the claims process.  The proposed notice will apprise class members of the material terms of the settlement and outline the procedures and related deadlines.  These include how a class member may exclude himself, herself, or itself from the class or object to the settlement's terms.  The notice also informs class members of the date and place of the hearing at which the Court will consider final approval of the settlement.

### B.    The Proposed Notice Complies With Rule 23(e).

In contrast to the form of notice of certification for a Rule 23(b)(3) class as required by Rule 23(c)(2)(B), the form of notice for a settlement under Rule 23(e) is left in the Court's discretion to a greater degree.  Thus, under the Rules, the sole requirement is that the Court "direct notice in a *reasonable manner* to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1) (emphasis added).  Under this Rule, subject to the minimum requirements of due process, the Court has complete discretion over the form and manner of notice.  *See, e.g.*, *Fowler v. Birmingham News Co.*, 608 F.2d 1055, 1059 (5th Cir. 1979) (noting the "mechanics of the notice process are left to the discretion of the district court subject only to the broad 'reasonableness' standards imposed by due process"); *Navarro-Ayala v. Hernandez-*

47

*Colon*, 951 F.2d 1325, 1337 (1st Cir. 1991) (same principle); *Quigley v. Braniff Airways, Inc.*, 85 F.R.D. 74, 77 (N.D. Tex. 1979) (noting a district court's "virtually complete discretion as to the manner and method of notice").

The requirements of due process are straightforward in the settlement context. Notice must only be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the [settlement] and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *accord, e.g., Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 629 (6th Cir. 2007). Significantly, compliance with Rule 23(c)(2) itself can satisfy the Due Process Clause. *See In re Enron Corp. Secs., Derivs., & "ERISA" Litig.*, No. MDL-1446, 2008 WL 4178151, at *2 (S.D. Tex. Sept. 8, 2008).

The extensive notice program here is eminently reasonable and, in fact, is exceptionally far-reaching. Both BP and the PSC have retained experts to ensure that the notice program more than complies with all requirements imposed by the Federal Rules. For instance, BP has retained Hilsoft Notifications. Hilsoft Notifications has been responsible for dozens of class action notice programs, including for the *In Re Trans Union* privacy litigation—which included 190 million class members and required use of the Internet, magazines, newspapers, and both television and radio. *See generally In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741 (7th Cir. 2011). The PSC, in turn, has retained Kinsella Media. Kinsella Media also specializes in providing class action notices in complex litigation and has spent hundreds of millions of dollars on media outreach efforts to provide notice in over 700 cases.

The experts at Hilsoft Notifications and Kinsella Media have developed the comprehensive notice program proposed in this case. As noted above, Hilsoft Notifications has

48

estimated, using the traditional sources in the field and computer modeling, that 95% of the adults in the Gulf Coast will be exposed to class notice materials 8.8 times on average, and 83% of U.S. adults will be exposed 3.8 times on average.  *See* Azari Decl. ¶ 19.  Experts in the field refer to a notice program with benchmarks reaching that level as having both significant "reach" and "frequency."  *Id*. ¶¶ 12-14 & n.2; *see also id.* ¶ 20 ("In my experience, the projected reach and frequency of the Notice Plan media effort in the Gulf Coast Areas will surpass that of the vast majority of other court-approved notice programs, and has been designed to meet and exceed due process requirements.  The reach and frequency to all U.S. adults is also consistent with the most thorough and expansive class action media notice efforts."); Kinsella Decl. ¶ 10 (stating that the reach and frequency may be even greater than reported, as certain local and community newspapers, trade publications, and other publications are not measured).

In short, the proposed notice program is extraordinarily robust, and far and away exceeds the minimum requirements imposed by the Federal Rules and thus of the Due Process Clause. The Court should have no reluctance in approving the proposed notice program.[21]

## III.   THE COURT SHOULD ADJOURN THE LIMITATION AND LIABILITY TRIAL UNTIL AFTER THE FAIRNESS HEARING.

To facilitate settlement, BP respectfully requests (and the PSC does not object) that the Court should adjourn the Limitation and Liability trial pending this Court's final review of the settlement through the fairness hearing process.  The law is plain that the Court has the power to stay all matters in a MDL pending final approval of a proposed settlement.  *See, e.g.*, *In re Sony Corp. SXRD Rear Projection Television Mktg., Sales Practices & Prods. Liab. Litig*., MDL No.

---

[21]   In the coming days, BP and the PSC will request, by separate motion, that the Court a guardian ad litem, consistent with Section 31 of the Settlement Agreement.  The purpose of appointing a guardian ad litem is to provide a neutral party whose sole responsibility is to assess the fairness of the proposed Settlement for those class members who lack the capacity to determine for themselves whether the proposed Settlement adequately and fairly represents their interests.

09-2102, 2010 WL 1993817, at *6 (S.D.N.Y. May 19, 2010); *In re Napster, Inc. Copyright Litig.*, MDL No. 1369, 2007 WL 2907892, at *2 (N.D. Cal. Oct. 2, 2007); *cf. Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (explaining that "the power to stay proceedings is incidental to the power inherent in every court").

The fact that BP has not requested a complete stay of all litigation counsels in favor of granting this request.  Indeed, it is routine for courts to grant a complete stay of ***all*** proceedings until after the fairness hearing—relief that goes far beyond what BP is seeking here.  *See, e.g.*, *Marino v. Pioneer Edsel Sales, Inc.*, 349 F.3d 746, 749 (4th Cir. 2003) (in light of a class action settlement "all proceedings were stayed pending a fairness hearing."); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, 2011 WL 2313866, at *1 (E.D. La. June 9, 2011) ("[T]he Court issued a written Preliminary Approval Order which included a number of rulings and terms, including dates and terms for notice to be issued, a final fairness hearing on October 27, 2011, and a stay order on related proceedings during the Rule 23 approval process."); *Marcus v. Dept. of Revenue*, 206 F.R.D. 509, 514 (D. Kan. 2002) ("All further litigation of this proceeding is hereby stayed pending final determination of the acceptance of the settlement agreement at the fairness hearing.").[22]

The fact that BP is seeking a far more modest stay means that the Court can continue to move other aspects of this massive litigation along without compromising the ability of the PSC

---

[22] Pursuant to the All-Writs Act, 28 U.S.C. § 1651(a), a court considering whether to preliminarily approve a settlement has the far-reaching power to enjoin ***any overlapping or parallel actions*** to allow the court to effectively and expeditiously administer the proposed settlement agreement.  *See In re Diet Drugs Prods. Liab. Litig.*, 282 F.3d 220, 236 (3d Cir. 2002) ("The threat to the federal court's jurisdiction [over a preliminary settlement] posed by parallel state actions is particularly significant . . . ."); *In re Napster,* 2007 WL 2907892, at *2 ("Upon the Court's entry of this Order, all further proceedings in this lawsuit (including, but not limited to, any existing discovery obligations) shall be stayed pending Final Settlement Approval or termination of the Settlement Agreement, whichever occurs earlier, except for those matters necessary to obtain and/or effectuate the Final Settlement Approval."); *see also Carlough v. Amchem Prods., Inc.,* 10 F.3d 189, 203-04 (3d Cir. 1993) (district court's preliminary injunction enjoining absent members of purported federal class in an asbestos related tort action from prosecuting state claims was necessary in aid of its jurisdiction because prospect of settlement was imminent after years of pretrial negotiations in a complex matter).

and BP to settle the Economic Class claims.

## IV.    REQUESTED PROCEDURES AND TIMETABLE

As demonstrated above, preliminarily approving a class action settlement necessitates compliance with various procedural requirements.  MCL 4TH § 21.632.  Accordingly, BP and the PSC jointly request that the Court now (1) make a preliminary determination that the Agreement is fair, reasonable, and adequate; (2) approve the notice program so that notice may issue; and (3) at BP's request (without objection from the PSC) adjourn and stay the Limitation and Liability trial pending a fairness hearing.  To effectuate final approval of the settlement, the parties further ask that the Court (4) set a date by which objections to the settlement are due; (5) set a date by which members of the class must opt out of the settlement class; (6) set a date for reply submissions responding to any objections; and (7) set a date for a fairness hearing, at which time the parties will request that the Court issue final approval of the settlement and enter a final judgment.

The parties respectfully propose the following timetable, which is reflected in the attached proposed form of order:

- Notice to be sent out by May 3, 2012

- Motion papers in support of settlement to be filed by August 13, 2012

- Objections to be filed by August 31, 2012

- Opt-Out period to be closed by October 1, 2012

- Reply submissions to be filed by October 22, 2012

- Fairness hearing to be set and commenced on or about November 8, 2012

## CONCLUSION

The Agreement that has been reached by the parties is fair, adequate, and reasonable.  It

makes the plaintiff class entirely whole (and more), while sparing class members years of litigation with no guarantee of a recovery rising to the generous levels provided for in the agreement.  The PSC and BP respectfully request that their joint motion be granted, to enable the settlement approval process, including class notice, to commence and advance towards a formal fairness hearing under Rule 23(e).

April 18, 2012                          Respectfully submitted,


__/s/ Stephen J. Herman_____          ___/s/ James Parkerson Roy_____

Stephen J. Herman, La. Bar No. 23129     James Parkerson Roy, La. Bar No. 11511
HERMAN HERMAN KATZ & COTLAR              DOMENGEAUX WRIGHT ROY & EDWARDS
LLP                                      LLC
820 O'Keefe Avenue                       556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113             Lafayette, Louisiana 70501
Telephone: (504) 581-4892                Telephone: (337) 233-3033
Fax No. (504) 569-6024                   Fax No. (337) 233-2796

Interim Class Counsel/Plaintiffs Liaison   Interim Class Counsel/Plaintiffs Liaison Counsel
Counsel                                  MDL 2179
MDL 2179


### PLAINTIFFS' STEERING COMMITTEE
_____

Joseph F. Rice                           Conrad S.P. "Duke" Williams
MOTLEY RICE LLC                          WILLIAMS LAW GROUP
28 Bridgeside Blvd.                      435 Corporate Drive, Suite 101
Mount Pleasant, SC 29464                 Maison Grand Caillou
Office:  (843) 216-9159                  Houma, LA 70360
Telefax: (843) 216-9290                  Office:  (985) 876-7595
                                         Telefax: (985) 876-7594


Brian H. Barr                            Robin L. Greenwald
LEVIN, PAPANTONIO, THOMAS,               WEITZ & LUXENBERG, PC
MITCHELL, ECHSNER & PROCTOR, PA          700 Broadway
316 South Baylen St., Suite 600          New York, NY  10003
Pensacola, FL 32502-5996                 Office:  (212) 558-5802
Office:  (850) 435-7045                  Telefax: (212) 344-5461
Telefax: (850) 436-6187


Jeffrey A. Breit                         Rhon E. Jones
BREIT DRESCHER IMPREVENTO &              BEASLEY, ALLEN, CROW, METHVIN,
WALKER, P.C.                             PORTIS & MILES, P. C.
999 Waterside Drive, Suite 1000          218 Commerce St., P.O. Box 4160
Norfolk, VA 23510                        Montgomery, AL 36104
Office:  (757) 670-3888                  Office:  (334) 269-2343
Telefax: (757) 670-3895                  Telefax: (334) 954-7555

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGÉ
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501

_____/s/ Richard C. Godfrey, P.C._____

James J. Neath                    Richard C. Godfrey, P.C.
Mark Holstein
BP AMERICA INC.                   J. Andrew Langan, P.C.
501 Westlake Park Boulevard       Andrew B. Bloomer, P.C.
Houston, TX  77079                Wendy L. Bloom
Telephone:  (281) 366-2000        R. Chris Heck
Telefax:  (312) 862-2200          Christopher J. Esbrook
                                  KIRKLAND & ELLIS LLP
Daniel A. Cantor                  300 North LaSalle Street
Andrew T. Karron                  Chicago, IL 60654
Ellen K. Reisman                  Telephone:  (312) 862-2000
ARNOLD & PORTER LLP               Telefax:  (312) 862-2200
555 Twelfth Street, NW
Washington, DC 20004              Jeffrey Bossert Clark
Telephone:  (202) 942-5000        KIRKLAND & ELLIS LLP
Telefax:  (202) 942-5999          655 Fifteenth Street, N.W.
                                  Washington, D.C. 20005
Jeffrey Lennard                   Telephone:  (202) 879-5000
Keith Moskowitz                   Telefax:  (202) 879-5200
SNR DENTON
233 South Wacker Drive            _____/s/ Don K. Haycraft_____
Suite 7800
Chicago, IL  60606                Don K. Haycraft (Bar #14361)
Telephone:  (312) 876-8000        R. Keith Jarrett (Bar #16984)
Telefax:  (312) 876-7934          LISKOW & LEWIS
                                  701 Poydras Street, Suite 5000
                                  New Orleans, Louisiana 70139
*OF COUNSEL*                      Telephone:  (504) 581-7979
                                  Telefax:  (504) 556-4108

                                  Robert C. "Mike" Brock
                                  COVINGTON & BURLING LLP
                                  1201 Pennsylvania Avenue, NW
                                  Washington, DC 20004
                                  Telephone:  (202) 662-5985
                                  Telefax:  (202) 662-6291


**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

## APPENDIX A:  PROPOSED CLASS DEFINITION[*]

Economic and Property Damages Settlement Class shall mean the NATURAL PERSONS and ENTITIES defined in this Section 1, subject to the EXCLUSIONS in Section 2 below.  If a person or entity is included within the geographical descriptions in Section 1.1 or Section 1.2, and their claims meet the descriptions of one or more of the Damage Categories described in Section 1.3, that person or entity is a member of the Economic and Property Damages Settlement Class, unless the person or entity is excluded under Section 2:

1.1.    Individuals.   Unless otherwise specified, all Natural Persons residing in the United States who, at any time between April 20, 2010 and April 16, 2012, lived in, worked in, were offered and accepted work in, owned or leased real or personal property located within, or owned or leased or worked on a vessel harbored or HOME PORTED in the States of Louisiana, Mississippi, or Alabama, the counties of Chambers, Galveston, Jefferson and Orange in the State of Texas, or the counties of Bay, Calhoun, Charlotte, Citrus, Collier, Dixie, Escambia, Franklin, Gadsden, Gulf, Hernando, Hillsborough, Holmes, Jackson, Jefferson, Lee, Leon, Levy, Liberty, Manatee, Monroe, Okaloosa, Pasco, Pinellas, Santa Rosa, Sarasota, Taylor, Wakulla, Walton and Washington in the State of Florida, including all adjacent Gulf waters, bays, estuaries, straits, and other tidal or brackish waters within the States of Louisiana, Mississippi, Alabama, or those described counties of Texas or Florida (the "GULF COAST AREAS") (Exhibit 22), or the U.S. waters of the Gulf of Mexico and all adjacent bays, estuaries, straits, and other tidal or brackish waters within the Gulf Coast Areas, as specifically shown and described in Exhibit 23 ("SPECIFIED GULF WATERS"), or worked on a vessel in Specified Gulf Waters after April 20, 2009.  With respect to SEAFOOD CREW Claims, persons must have worked on a vessel that landed SEAFOOD in the Gulf Coast Areas after April 20, 2009.

and

1.2.    Entities.   All Entities doing business or operating in the Gulf Coast Areas or Specified Gulf Waters that:

1.2.1.  at any time from April 20, 2010 to April 16, 2012, owned, operated, or leased a physical facility in the Gulf Coast Areas or Specified Gulf Waters and (A) sold products in the Gulf Coast Areas or Specified Gulf Waters (1) directly to CONSUMERS or END USERS of those products or (2) to another Entity that sold those products directly to Consumers or End Users of those products, or (B) regularly purchased Seafood harvested from Specified Gulf Waters in order to produce goods for resale;

---

[*] The Class Definition includes certain capitalized defined terms, the meaning of which is given in the *Deepwater Horizon* Economic and Property Damages Settlement Agreement.  Exhibits referenced in the above definition are included as exhibits to the Settlement Agreement.  Exhibits 22 and 23 are also reproduced as Appendixes B and C, respectively, to this memorandum.

1.2.2.  are service businesses with one or more full-time employees (including owner-operators) who performed their full-time services while physically present in the Gulf Coast Areas or Specified Gulf Waters at any time from April 20, 2010 to April 16, 2012; or

1.2.3.  owned, operated, or leased a vessel that (1) was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or (2)  landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012; or

1.2.4.  owned or leased REAL PROPERTY in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012;

1.3.  Individuals and Entities who meet the geographical descriptions of Sections 1.1 or 1.2 above are included in the Economic Class only if their Claims meet the descriptions of one or more of the Damage Categories described below.

1.3.1.  The following are summaries of the Damage Categories, which are fully described in the attached Exhibits 1A-15:

1.3.1.1.  Seafood Compensation Program.  Damages suffered by a COMMERCIAL FISHERMAN, Seafood Crew, or SEAFOOD VESSEL OWNER that owned, operated, leased or worked on a vessel that (1) was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or (2) Landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012; and damages suffered by, inter alia, OYSTER LEASEHOLDERS and IFQ Owners.  (Exhibit 10).  Claims for Economic Damage arising from the fishing, processing, selling, catching, or harvesting of menhaden (or "pogy") fish are excluded from the Seafood Compensation Program and other Economic Damage Claims under this Agreement.

1.3.1.2.  Economic Damage Category.  Loss of income, earnings or profits suffered by Natural Persons or Entities as a result of the DEEPWATER HORIZON INCIDENT, subject to certain Exclusions. (Exhibits 16-19)

1.3.1.3.  Subsistence Damage Category.  Damages suffered by Natural Persons who fish or hunt to harvest, catch, barter, consume or trade Gulf of Mexico natural resources, including Seafood and GAME, in a traditional or customary manner, to sustain their basic or family dietary, economic security, shelter, tool or clothing needs, and who relied upon subsistence resources that were diminished or restricted in the geographic region used by the CLAIMANT due to or resulting from the Deepwater Horizon Incident.  (Exhibit 9)

1.3.1.4.  VoO Charter Payment Category.  Damages suffered by Natural Persons or Entities who registered to participate in BP's Vessels of Opportunity ("VoO") program and executed a VoO MASTER VESSEL

CHARTER AGREEMENT with BP, Lawson, USMS, USES, DRC, or any other BP subcontractor as CHARTERER, and completed the initial VoO training program.

1.3.1.5.  Vessel Physical Damage Category.  Physical damage that was sustained by an eligible Claimant's eligible vessel due to or resulting from the Deepwater Horizon Incident or the Deepwater Horizon Incident response cleanup operations, including the Vessels of Opportunity Program.  (Exhibit 14)

1.3.1.6.  Coastal Real Property Damage Category.  Damages alleged by a Coastal Real Property Claimant that meet the requirements set forth in the Coastal Real Property Claim Framework.

1.3.1.7.  Wetlands Real Property Damage Category.  Damages alleged by a Wetlands Real Property Damage Claimant that meet the requirements set forth in the Wetlands Real Property Claim Framework.

1.3.1.8.  Real Property Sales Damage Category.  Damages alleged by a Real Property Sales Claimant that meet the requirements set forth in the Real Property Sales Framework.

1.3.1.9.  Individuals/Employees in Otherwise Excluded Oil and Gas, Gaming, Banking, Insurance, Funds, Defense Contractors, Developers Industries, and any Entity selling or marketing BP-branded fuel (including jobbers and branded dealers):  As more fully described in Exhibit 16 and Section 5.10 below, individuals and employees of businesses and employers in these otherwise excluded industries described in Section 2 may submit Claims for Economic Damage outside of these excluded industries, and may pursue all other recovery permitted under other aspects of the Settlement.

1.3.1.10.  Individuals/Employees in Support Services to Oil and Gas Industry:  As more fully described in Exhibit 16 and Section 5.10 below, individuals and employees of businesses/employers in the SUPPORT SERVICES TO OIL AND GAS INDUSTRY, described in Exhibit 16 may submit Claims for Economic Damage incurred as a result of their employment in the Support Services to Oil and Gas Industry for (i) non-moratoria business interruption from Support Services to Oil and Gas Industry activities and (ii) non oil and gas industry Economic Damages due to or resulting from the Deepwater Horizon Incident, except for moratoria claims.  As is also more fully described in Exhibit 16, these individuals and employees may also pursue Claims for other Economic Damage outside the Support Service to Oil and Gas Industry, and may pursue all other recovery permitted under other aspects of the Settlement.

A-3

1.3.1.11.     Businesses/Employers in Otherwise Excluded Gaming, Banking, Insurance, Funds, Defense Contractors and Developers Industries:  As more fully described in Exhibit 16 and Section 5.10 below, businesses and employers in these otherwise excluded industries described in Section 2 may submit Claims only for Coastal Real Property Damage and Wetlands Real Property Damage, but are not entitled to recover under any other aspect of the Settlement.

1.3.1.12.     Businesses/Employers in Support Services to Oil and Gas Industry:  As more fully described in Exhibit 16 and Section 5.10 below, businesses and employers in the "Support Services to Oil and Gas Industry," described in Exhibit 16, may submit Claims for (i) non-moratoria business interruption from Support Services to Oil and Gas Industry activities and (ii) non-oil and gas industry Economic Damages arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident, except for moratoria claims, and may pursue all other recovery permitted under other aspects of the Settlement.

Exclusions from the Economic and Property Damages Settlement Class Definition

2.1.     Notwithstanding the above, the following individuals and Entities, including any and all of their past and present predecessors, successors, personal representatives, agents, trustees, insurers, reinsurers, indemnitors, subrogees, assigns, and any other Natural Person, legal or juridical person or Entity entitled to assert any Claim on behalf of or in respect of any such individual or Entity in their respective capacities as such are excluded from the Economic Class.

2.2.     Excluded Individuals or Entities:

2.2.1.  Any Economic Class Member who or which timely elects to be excluded from the Economic Class under the deadlines and procedures to be set forth in the ECONOMIC AND PROPERTY DAMAGES SETTLEMENT CLASS ACTION SETTLEMENT NOTICE.

2.2.2.  Defendants in MDL 2179, and individuals who are current employees, or who were employees during the CLASS PERIOD, of BP or other defendants in MDL 2179.

2.2.3.  The Court, including any sitting judges on the United States District Court for the Eastern District of Louisiana, their law clerks serving during the pendency of the MDL, and members of any such judge's or current law clerk's immediate family.

2.2.4.  The following exclusions are based on the substantive nature of the business, not the legal or juridical form of that business.  Any of the following types of Entity, or any Natural Person to the extent he or she

A-4

alleges Economic Damage based on their employment by such an Entity, during the Class Period are excluded:

2.2.4.1.  Financial Institutions as identified in the NAICS codes listed on Exhibit 18, which include, by way of example, commercial banks; savings institutions; credit card issuers; credit insurers; factors or other sales finance entities; financial or investment advisers or portfolio managers; fund managers; investment banking entities; lending institutions; real estate mortgage or lending entities; brokers or dealers of securities, commodities, commodity contracts or loans; securities or commodities exchanges; entities serving as custodians, fiduciaries or trustees of securities or other financial assets; or entities engaged in other financial transaction intermediation, processing, reserve or clearinghouse activities, provided, that the following shall not be excluded solely pursuant to this Section 2.2.4.1 unless they are subject to a different exclusion:  stand-alone ATMs, credit unions, pawn shops, businesses engaged predominantly in making payday loans or paycheck advances and businesses that sell goods and services and offer financing on these purchases to their customers.

2.2.4.2.  Funds, Financial Trusts, and Other Financial Vehicles, as identified in the NAICS codes listed on Exhibit 18, after giving effect to the bracketed exceptions contained in NAICS Codes 525920 and 523991, which include by way of example, public-open end investment funds; investment funds; real estate investment trusts; REMICS; mutual funds; money market funds; derivatives; health and welfare funds; insurance funds; pension funds; financial trusts; and special purpose financial vehicles provided, that successions, estates, testamentary trusts, trusts of Natural Persons, bankruptcy estates, limited liability companies, corporations, Sub-Chapter "S" corporations, partnerships, limited partnerships, joint ventures, and any other businesses or juridical Entities, shall not be excluded pursuant to this Section 2.2.4.2 solely by reason of their form of legal or juridical structure or organization, except to the extent they are excluded pursuant to another exclusion in Section 2.2 of this Agreement.

2.2.4.3.  Gaming, as identified in the NAICS codes listed on Exhibit 18, which includes, by way of example,  casinos; casino hotels; off-track betting parlors; racetracks and other gambling establishments provided, that the following shall not be excluded solely pursuant to this Section 2.2.4.3 unless they are subject to a different exclusion: (a) bingo parlors, and (b) video gaming at bars, bingo parlors, hotels, off-track betting parlors, racetracks, restaurants and truck stops.

A-5

2.2.4.4.  Insurance Entities, as identified in the NAICS codes listed on Exhibit 18, which include, by way of example, insurance carriers issuing disability, health, life, medical, property and casualty, title or other insurance; reinsurers; insurance agencies and brokerages; underwriting agencies or organizations; claims adjusters and processors; third-party insurance or fund administrators; or other insurance-related businesses.

2.2.4.5.  Oil and Gas Industry, as identified in the NAICS codes listed on Exhibit 17, which includes by way of example, firms engaged in:  extracting crude petroleum, natural gas or other hydrocarbons; drilling wells; preparing, maintaining or constructing petroleum or natural gas well-sites or other mineral extraction sites; mining; maintaining or constructing petroleum or natural gas pipeline or distribution facilities; pipeline distribution of crude petroleum, refined petroleum, oil or natural gas; petroleum or natural gas refining or other mineral refining and/or manufacturing; manufacturing petroleum lubricating oil and grease, petrochemical products, or other petroleum and coal products or chemical products derived from extracted minerals; merchant wholesaling of construction and mining (except oil well) machinery and equipment; wholesale distribution of oil well machinery, equipment and supplies; wholesale distribution of petroleum, petroleum products, other extracted minerals, chemical products produced from extracted or refined minerals, petroleum bulk stations and terminals, petroleum and petroleum products merchant wholesalers.

2.2.4.6.   Defense Contractors/Subcontractors, including firms which derive in excess of at least 50% of their annual revenue from contracts with the United States Department of Defense and Individuals whose employer qualifies as a Defense Contractor.

2.2.4.7.  Real Estate Developers, including any Natural Person or Entity that develops commercial, residential or industrial properties.  This includes, but is not limited to, any Entity developing an entire subdivision (as defined by the law of the state in which the parcel is located) of Real Property, including condominiums with multiple residential units and/or a residential subdivision with contiguous home sites and homes, provided, however, that Real Estate Developers shall be eligible to assert Coastal Real Property Claims under Section 5.7 and Real Property Sales Damage Claims under Section 5.9

2.2.4.8.   Any Entity selling or marketing BP-branded fuel, including jobbers and branded dealers.

A-6

2.2.5.  GOVERNMENTAL  ORGANIZATIONS,  as  defined  in  this Agreement, provided that Native American tribal Entities may consent to participate in the Settlement as to otherwise eligible Claims.

2.2.6.  Any Natural Person or Entity who or that made a claim to the GCCF, was paid and executed a GCCF RELEASE AND COVENANT NOT TO SUE, provided, however, that the execution of a GCCF Release and Covenant Not to Sue shall not prevent a Natural Person or Entity from making a VoO Charter Payment Claim or a Vessel Damage Claim, nor shall a release covering only bodily injury prevent a Natural Person from making Claims under this Agreement.

**Appendix B (Settlement Agreement Ex. 22)**

## Map of Gulf Coast Area



028834

**Appendix C (Settlement Agreement Ex. 23)**

## Map of Specified Gulf Waters



| BOUNDARY POINTS IN GULF OF MEXICO | | | | | |
|---|---|---|---|---|---|
| Point | Latitude | Longitude | Point | Latitude | Longitude |
| A | 28.206°N | -96.318°W | G | 25.703°N | -91.092°W |
| B | 25.956°N | -97.145°W | H | 25.669°N | -88.385°W |
| C | 25.971°N | -96.980°W | I | 24.933°N | -87.210°W |
| D | 25.997°N | -93.445°W | J | 24.941°N | -86.938°W |
| E | 24.734°N | -93.664°W | K | 25.207°N | -86.553°W |
| F | 25.445°N | -91.645°W | L | 23.925°N | -81.216°W |

028891

C-1

## Map of Specified Gulf Waters



| Point | Latitude | Longitude |
|-------|----------|-----------|
| A | 29.197°N | -95.057°W |
| B | 29.086°N | -95.130°W |
| C | 29.063°N | -95.092°W |
| D | 28.986°N | -94.978°W |

C-2

## Map of Specified Gulf Waters



**LEGEND**

| | |
|---|---|
| 🟦 | Specified Gulf Waters |
| 🟨 | Waters Not Included in Class Definition: State Waters Within 3 Marine Leagues (9 Nautical Miles) of Coasts of Texas Counties Not Included in Gulf Coast Area |
| ⬜ | Boundaries of National Territorial Waters |
| 🟩 | County Boundaries |

**BOUNDARY POINTS**

| Point | Latitude | Longitude |
|-------|----------|-----------|
| A | 25.306°N | -80.372°W |
| B | 25.354°N | -80.265°W |
| C | 25.342°N | -80.251°W |
| D | 25.314°N | -80.150°W |
| E | 25.184°N | -79.692°W |

028893

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of April 2012.

/s/ Don K. Haycraft
Don K. Haycraft